# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| LASHAWN JONES, KENT ANDERSON, STEVEN DOMINICK, ANTHONY GIOUSTAVIA, JIMMIE JENKINS, GREG JOURNEE, RICHARD LANFORD, LEONARD LEWIS, EUELL SYLVESTER and MARK WALKER, on behalf of themselves and all others similarly situated, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| **Plaintiffs,** | ) |
| v. | )<br>) |
| MARLIN GUSMAN, Sheriff, Orleans Parish, CARLOS LOUQUE, Warden, House of Detention, KEVIN WINFIELD, Warden, Old Parish Prison, BONITA PITTMAN, Warden, Templeman Phase V, CHARLES EZEB, Warden, Temporary Jails, JERROD SPINNEY, Warden, Conchetta, JOHN DOE, Warden, Temporary Detention Center, SAMUEL GORE, Medical Director, and CHARLES HIGGINS, Psychiatric Director, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| **Defendants.** | ) |

Civil Action No.

Class Action for Declaratory
and Injunctive Relief

## COMPLAINT

### INTRODUCTION

1.      This is a class action filed on behalf of the men, women and youth imprisoned at

the Orleans Parish Prison ("OPP"), to protect them from abusive and unconstitutional conditions

of confinement.  The majority of people incarcerated in Orleans Parish Prison are pre-trial

detainees; they are held at the jail while they await their court dates.

2.      Individuals housed at the jail are at imminent risk of serious harm. Rapes, sexual assaults, and beatings are common place throughout the facility.  Violence regularly occurs at the hands of sheriffs' deputies, as well as other prisoners. The facility is full of homemade knives, or "shanks."  People living with serious mental illnesses languish without treatment, left vulnerable to physical and sexual abuse.  These conditions have created a public safety crisis that affects the entire City of New Orleans. The jail is oversized, understaffed, and Sheriff Gusman's classification and security policies and practices are dangerously deficient. The men and women housed there are at constant risk of physical harm due to the presence of contraband and weapons in the facility, which, coupled with the absence of meaningful mental health services, places the lives of people incarcerated there in immediate jeopardy.

3.      Sheriff Gusman demonstrates deliberate indifference to the basic rights of the people housed at OPP by implementing constitutionally deficient security, staffing, classification and mental health policies and practices. Defendants' inability or refusal to manage a facility of this size has become increasingly apparent in recent years, with violence and health crises steadily escalating within the facility.

4.      Sheriff Gusman and the Defendant wardens knowingly allow their deputies to abandon their obligations to protect the people in their custody from harm.  Deputies fail to supervise the housing tiers—they do not perform cell checks or regular inspections of the living areas. As a result, a culture of brutal violence has flourished throughout the facility. Men, women and youth in Sheriff Gusman's custody have endured brutal rapes and prolonged beatings—all a direct result of the policies and practices of the Orleans Parish Sherriff's Office. .

5.      Sheriff Gusman purports to run one protective custody floor for the entire complex.  This floor is supposed to protect individuals who are particularly vulnerable to

violence and abuse on the regular housing units. Yet many of the cell doors do not lock and the Sheriff's dangerously deficient staffing policies and practices extend onto this unit. As a result, violence is rampant even on this floor.  The Sheriff punishes some individuals who seek protection by placing them in the "hole."  On this disciplinary tier individuals often are subject to solitary confinement—locked alone in their cells for 24 hours a day—deprived of human contact and sensory stimulation.

6.       According to data released by the federal government, up to 64% of people held in local jails live with a mental illness.  Sheriff Gusman implements a number of policies and procedures that deprive people living with mental illness of constitutionally adequate care. Upon admission to OPP, Defendants have a policy of suspending medication for 30 days, and sometimes longer. This makes people living with mental illness particularly susceptible to abuse, because symptoms of their mental illness begin to manifest acutely when they are denied medication. Unsurprisingly, this practice causes some individuals to experience suicidal ideation.

7.       Suicidal prisoners with mental health needs are transferred to a direct observation cell, in which they are held almost naked for days. Once they no longer express a desire to injure themselves, they then are transferred to the psychiatric tiers—where they are locked down in their cells for 23 hours a day and deprived of mental health interventions. People living there are not allowed to go outside or visit with their families. Overhead lights are on 24 hours per day, and the tier contains actively psychotic people living on the ground in overcrowded cells. Deputies do not walk the tiers. Rape is rampant. The conditions have been well documented, by the U.S. Department of Justice, the federal Prison Rape Elimination Act Commission, the U.S. Marshals, the media, by individual civil lawsuits and by motions in criminal cases.  In spite of widespread public knowledge about the conditions within the facility, the Defendants have failed

to correct known deficiencies, and, indeed, recently opened an additional 400 bed temporary detention facility.

8.      An expert hired by the City of New Orleans has recommended a jail with 1,438 beds, based upon New Orleans' population and crime rates. OPP currently has 3,400 beds. The Defendants are not adequately staffing or supervising a facility of this size. As additional beds are opened up, more lives are placed in danger. The City of New Orleans has made some efforts to reduce the number of people incarcerated in OPP for low-level offenses, but over 35,000 people are processed through intake annually. This means that people are detained in the facility for non-violent and low-level crimes, as well as more serious crimes of rape and murder.

9.      Additionally, Sheriff Gusman continues to house approximately 1,000 individuals who have been convicted of state offenses and have been sentenced to the State Department of Public Safety and Corrections ("DPSC"). Sheriff Gusman's decision to house 1,000 convicted state prisoners makes the facility more dangerous for everyone, by unnecessarily significantly expanding the size of the jail. The larger population makes it harder for deputies to staff and maintain order.

10.     Individual lawsuits are unable to accomplish the sort of systemic overhaul necessary to creating a constitutionally acceptable facility. Therefore, on behalf of themselves and all similarly situated persons imprisoned at the Orleans Parish Prison, the Plaintiffs seek declaratory and injunctive relief ordering the Defendants to cease all unconstitutional and unlawful policies and practices at the prison and to provide class members with required care and living conditions.

## JURISDICTION

11.     This cause of action arises under the United States Constitution, enforceable pursuant to 42 U.S.C. § 1983. Jurisdiction in this Court is proper pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).

12.     This Court is authorized to grant declaratory relief under 28 U.S.C. §§ 2201 and 2202, and injunctive relief pursuant to Rule 65 of the Federal Rules of Civil Procedure.

## VENUE

13.     Venue is proper under 28 U.S.C. § 1391(b)(2) because a "substantial part of the events or omissions giving rise to the claim[s] occurred" in this district.

## PARTIES

14.     The Plaintiffs are all people who are currently or will be incarcerated at the Orleans Parish Prison ("OPP") and who are subject to conditions of confinement that violate their rights under the U.S. Constitution.

15.     Plaintiff LaShawn Jones is a pretrial detainee currently incarcerated in OPP, Templeman Phase V. The Defendants have exhibited deliberate indifference to LaShawn's serious mental health needs.  LaShawn also has been brutally assaulted by an OPCSO deputy, as a result of Defendants' deficient staffing and security policies. LaShawn fears for her safety and is in desperate need of mental health services.

16.     Plaintiff Kent Anderson is a pretrial detainee currently incarcerated in the psychiatric tier of OPP, House of Detention. Anderson filed multiple sick calls and grievances prior to being given his required medication. He became suicidal and still was denied access to psychiatric care. Anderson is in immediate need of mental health care, and is suffering as a result of Defendants' deliberate indifference to his serious mental health needs.

17.     Plaintiff Steven Dominick is a DOC prisoner housed in Orleans Parish Prison, House of Detention. Dominick is on protective custody because he has been jumped, stabbed and threatened, as a result of Defendants' dangerously deficient security, staffing and classification policies and practices. Dominick fears for his safety.

18.     Plaintiff Anthony Gioustavia is a pretrial detainee currently incarcerated in OPP, Old Parish Prison. Gioustavia was attacked by another prisoner quickly after being booked into OPP, and has witnessed multiple fights and stabbings, as a result of Defendants' dangerously deficient policies and practices. Gioustavia fears for his safety.

19.     Plaintiff Jimmie Jenkins is a pretrial detainee currently incarcerated in the psychiatric tier of OPP, House of Detention. Jenkins suffers from schizophrenia and has been denied access to constitutionally adequate mental health care. Jenkins is in immediate need of mental health care, and is suffering as a result of Defendants' dangerously deficient mental health policies and practices.

20.     Plaintiff Greg Journee is a pretrial detainee currently incarcerated in OPP, House of Detention. Journee was moved from Old Parish Prison to House of Detention because he was unsafe, but then was stabbed repeatedly in the House of Detention. Journee fears for his safety, as a result of Defendants' dangerously deficient staffing, security and classification policies and practices.

21.     Plaintiff Richard Lanford has been attacked severely multiple times in OPP. He was beaten so severely that he sustained broken facial bones and had to be transported to the hospital for injuries. He is currently injured and in extreme pain. He has experienced threats of sexual assault. Lanford has been attacked in various facilities throughout OPP, as a result of

Defendants' dangerously deficient classification, staffing and security policies and practices. Lanford fears for his safety.

22.     Plaintiff Leonard Lewis is pretrial detainee currently incarcerated in OPP, House of Detention. Lewis has repeatedly been stabbed and beaten in OPP, in various buildings and locations, including while in protective custody, as a result of Defendants' dangerously deficient classification, staffing and security policies and practices. Lewis fears for his safety.

23.     Plaintiff Euell Sylvester is a pretrial detainee currently incarcerated in OPP, House of Detention. Since arriving at OPP, Sylvester has been beaten and sexually assaulted, as a result of Defendants' dangerously deficient classification, staffing and security policies and practices. Sylvester fears for his safety.

24.     Plaintiff Mark Walker is a sentenced DOC prisoner currently incarcerated in OPP, Old Parish Prison. Walker is diagnosed with bipolar disorder and is legally blind. He has been raped, beaten up by guards, jumped by prisoners and denied mental healthcare while in OPP, as a result of Defendants' dangerously deficient policies and practices. Walker fears for his safety.

25.     Defendant Marlin Gusman is the elected Sheriff for Orleans Parish.  He has overall responsibility for the policies, procedures, operations and supervision of the Orleans Parish Sheriff's Office, its employees, agents, and assigns, including all correctional facilities under the control of his office, including the Orleans Parish Prison ("OPP"). Orleans Parish Prison is composed of several correctional facilities including the House of Detention ("HOD"), Old Parish Prison, Temporary Jails ("the Tents"), Templeman V, Conchetta, and the new Temporary Detention Center ("TDC"). There is additionally the Work Release center located on South Broad Street. Defendant Gusman is the final policymaker for the Orleans Parish Sheriff's Office and the Orleans Parish Prison. He is ultimately responsible for determining staffing,

classification, security and mental health policies at OPP. He is sued in his official capacity only. He is a resident of full age of majority of the Eastern District of Louisiana.

26.     Defendant Carlos Louque is an employee of the Orleans Parish Sheriff's Office, acting under the direction and supervision of Defendant Gusman. He is the warden of the House of Detention (HOD), one of the facilities comprising the Orleans Parish Prison. HOD is also sometimes referred to as "CLU." He has responsibility for the policies, procedures, and operations of the HOD, its employees, agents and assigns, including determining staffing, security, classification and mental health policies. On information and belief he is a final policymaker for HOD regarding these policies and practices, and is also responsible for implementing policies promulgated by Sheriff Gusman. He is sued in his official capacity only. He is a resident of full age of majority of the Eastern District of Louisiana.

27.     Defendant Kevin Winfield is an employee of the Orleans Parish Sheriff's Office, acting under the direction and supervision of Defendant Gusman. He is the warden of the Old Parish Prison, one of the facilities comprising the Orleans Parish Prison. He has responsibility for the policies, procedures, and operations of the Old Parish Prison, its employees, agents and assigns, including determining staffing, security, classification and mental health policies. On information and belief he is a final policymaker for Old Parish Prison regarding these policies and practices, and is also responsible for implementing policies promulgated by Sheriff Gusman. He is sued in his official capacity only. He is a resident of full age of majority of the Eastern District of Louisiana.

28.     Defendant Bonita Pittman is an employee of the Orleans Parish Sheriff's Office, acting under the direction and supervision of Defendant Gusman. She is the warden of Templeman V, one of the facilities comprising the Orleans Parish Prison. She has responsibility

for the policies, procedures, and operations of Templeman V, its employees, agents and assigns, including determining staffing, security, classification and mental health policies. On information and belief she is a final policymaker for Templeman V regarding these policies and practices, and is also responsible for implementing policies promulgated by Sheriff Gusman. She is sued in her official capacity only. She is a resident of full age of majority of the Eastern District of Louisiana.

29.    Defendant Charles Ezeb is an employee of the Orleans Parish Sheriff's Office, acting under the direction and supervision of Defendant Gusman. He is the warden of the Temporary Jails ("Tents"), one of the facilities comprising the Orleans Parish Prison. He has responsibility for the policies, procedures, and operations of the Tents, its employees, agents and assigns, including determining staffing, security, classification and mental health policies. On information and belief he is a final policymaker for the Tents regarding these policies and practices, and is also responsible for implementing policies promulgated by Sheriff Gusman. He is sued in his official capacity only. He is a resident of full age of majority of the Eastern District of Louisiana.

30.    Defendant Jerrod Spinney is an employee of the Orleans Parish Sheriff's Office, acting under the direction and supervision of Defendant Gusman. He is the warden of Conchetta, one of the facilities comprising the Orleans Parish Prison. He has responsibility for the policies, procedures, and operations of Conchetta, its employees, agents and assigns, including determining staffing, security, classification and mental health policies. On information and belief he is a final policymaker for Conchetta regarding these policies and practices, and is also responsible for implementing policies promulgated by Sheriff Gusman. He

is sued in his official capacity only. He is a resident of full age of majority of the Eastern District of Louisiana.

31.    Defendant Doe is an employee of the Orleans Parish Sheriff's Office, acting under the direction and supervision of Defendant Gusman. He or she is the warden of The Temporary Detention Center ("TDC"), one of the facilities comprising the Orleans Parish Prison. He or she has responsibility for the policies, procedures, and operations of TDC, its employees, agents and assigns, including determining staffing, security, classification and mental health policies. On information and belief he or she is a final policymaker for TDC regarding these policies and practices, and is also responsible for implementing policies promulgated by Sheriff Gusman. He or she is sued in his official capacity only. He or she is a resident of full age of majority of the Eastern District of Louisiana.

32.    Defendant Gore is an employee of the Orleans Parish Sheriff's Office, acting under the direction and supervision of Defendant Gusman. Dr. Gore has responsibility for the policies, procedures, and operations of OPP's medical department, its employees, agents and assigns, including mental health policies and procedures. On information and belief he is a final policymaker for OPP regarding these policies and practices. He is sued in his official capacity only. He is a resident of full age of majority of the Eastern District of Louisiana.

33.    Defendant Higgins is an employee of the Orleans Parish Sheriff's Office, acting under the direction and supervision of Defendants Gore and Gusman. He has responsibility for the policies, procedures, and operations of psychiatric services at OPP, its employees, agents and assigns. On information and belief he is a final policymaker for OPP regarding mental health policies and practices. He is sued in his official capacity only. He is a resident of full age of majority of the Eastern District of Louisiana.

10

## CLASS ACTION ALLEGATIONS

34.     The named Plaintiffs bring this suit on their own behalf and on behalf of all people who are, or will in the future be, incarcerated at the OPP. Included in this class is a proposed sub-class comprised of all individuals who now are, or who will in the future be incarcerated at the OPP and who live with a serious mental illness ("mental health sub-class").

35.     The class is so numerous that joinder of all members is impractical.  OPP currently houses approximately 3,400 people and is undergoing expansion.[1] The class also includes many future members whose names are not known, as the facility regularly admits new arrestees. It is believed that approximately 35,000 people cycle through OPP annually, and therefore the prospective class is 35,000 people per year.[2] It is estimated that the mental health subclass is currently comprised of approximately 2, 176 individuals and that during the course of one year, approximately 21,760 individual sub-class members will pass through the OPP.

There are contentions that are common to all class members, including but not limited to the following:

1) The Defendants have a policy and practice of failing to take reasonable measures to protect individuals from harm. The Defendants' dangerous deficient staffing policies and practices related to security (including policies and practices related to contraband, classification and staffing) result in the Plaintiffs enduring brutal beatings, rapes, assaults and/or being exposed to an unacceptably high risk these injuries.

---

[1] Sheriff Gusman recently opened an additional 400 bed facility called TDC. This brings the total number of beds at OPP to 3800. It is Plaintiffs' understanding that some of the Tents are undergoing renovations as is the House of Detention, but until the closure of beds is announced, the Sheriff has expanded the jail size significantly, from 3,400 beds to 3,800 beds.

[2] This number is down significantly from years past due to City arrest policy reforms, but a recent Metropolitan Crime Commission study found that still one third of arrests are for out of parish warrants, which generally are traffic violations, meaning that there are very low level offenders housed in OPP, as well as people accused of violent crimes. Metropolitan Crime Commission, *Orleans Parish Criminal Justice Accountability Report*, November 2011. Available at: http://www.metropolitancrimecommission.org/html/research.html, last checked March 31, 2012.

2) The Defendants have a policy and practice of exhibiting deliberate indifference to the Plaintiffs' serious mental health needs. The Defendants' deliberate indifference manifests in depriving individuals of necessary medication, evaluations, psychiatrist visits and other mental health inventions, of subjecting Plaintiffs seeking mental health treatment and suicide protections to degrading, humiliating and de-humanizing treatment—including forcing them to strip naked, holding them in large congruent cells, and locking them down for 23 hours a day, and

3) The Defendants have been and are currently aware of the unconstitutional policies and practices that are in place throughout OPP, which function to expose prisoners to brutal violence and to deprive them of mental health services.

36.    Because the policies, practices and customs challenged in this Complaint apply with equal force to the named Plaintiffs and the other members of the class, and because every class members seeks identical declaratory and injunctive relief that would require the Defendants to cure their unconstitutional policies and practices, the claims of the named Plaintiffs are typical of the class in general.

37.    The named Plaintiffs will fairly and adequately represent the interests of the class. They possess a strong personal interest in the subject matter of the lawsuit and are represented by experienced counsel with expertise in class action prison conditions litigation in federal court. Counsel have the legal knowledge and resources to fairly and adequately represent the interests of all class members in this action.

38.    The Defendants have acted or refused to act on grounds generally applicable to the class. Their policies, practices, acts, and omissions have affected all class members. Accordingly, final injunctive and declaratory relief is appropriate to the class as a whole.

## STATEMENT OF FACTS

39.    The people imprisoned at OPP live in unconstitutional and inhumane conditions and endure great risks to their safety and security.  Because OPP is dangerously understaffed and because existing staff lack the training and supervision necessary to care for the people in their

custody, corruption and violence are rampant. The classification system is inadequate, and fails to screen for prisoners with enemies, as well as fails to sort prisoners into dorms according to propensity for violence or risk of harm. Prisoners face threats to their lives and safety on an almost daily basis, and struggle to secure even the most basic services at OPP. Mental health care is dangerously deficient, exacerbating—and in some instances causing—the violent crises within the facility.

40.     New Orleans taxpayers pay Defendants over $22 per day per prisoner to house and care for City prisoners, plus additional millions of dollars for medical care and operating expenses. Louisiana taxpayers pay Defendants $27 per day per prisoner to house and care for State prisoners housed at OPP, plus additional funds for prisoners needing mental health services. Defendants also previously received a per diem from the Federal government, but last week the U.S. Marshals announced that they have pulled all of their prisoners from OPP due to concerns about conditions and safety.

41.     A 2009 findings letter by the United States Department of Justice concluded that conditions in Orleans Parish Prison are unconstitutional. Violations found included inadequate protection from harm, including specifically inadequate classification and staffing. The DOJ also found inadequate mental health and medical care, including staffing and an express finding of a failure to follow-up on mental health issues at intake screening.

42.     This Complaint describes conditions that currently exist and gives examples involving specific individuals who are or were incarcerated at OPP.  Some of the individuals are named plaintiffs and some are not.

**<u>Eighth and Fourteenth Amendment Violations: Inadequate Mental Health Treatment</u>**

84.     New Orleans continues to experience a mental health crisis. Recent Department of Health and Hospital (DHH) budget cuts have made OPP the largest psychiatric unit in the City of New Orleans. National statistics indicate that 64% of incarcerated people suffer from mental illness, and Orleans Parish's numbers are higher. Defendant Gore recently estimated that 45% of the OPP population had some form of mental health need. In spite of this, OPP identifies only 6% of its population as receiving psychotropic medications, indicating a gross failure to identify and treat mental illness.  OPP mental health policies, conditions and staffing are exacerbating the crisis.

85.     Defendants maintain a policy of not prescribing psychiatric medications for the first thirty to sixty days of a person's incarceration. Upon incarceration, it is Defendants' policy to automatically deprive detainees of mental health medications, unless the individual can provide records verifying treatment.  Defendants do not conduct a meaningful independent evaluation of the detainee. The policy fails to ensure the provision of adequate mental health care in no small part because  it requires imprisoned individuals living with serious mental health issues to have the capacity and means to verify their medical records from behind the prison's walls. These individuals need immediate treatment, but are denied under Defendants' current policy.

86.     Additionally, even where detainees identify as needing medication and identify outside providers, Defendant Higgins and his staff do not receive or verify those records for weeks or months. Moreover, if the acquired records show that the individual was non-compliant with the treatment regiment prior to incarceration, or if records reflect that the person was also on drugs or alcohol, all medication is suspended. In this way, people who enter OPP experience a suspension or denial of needed medication.

87.    This policy has disastrous consequences.  Individuals who take psychiatric medications cannot be abruptly deprived of these medications without suffering serious harm.  A significant number of the people incarcerated in OPP have untreated serious mental health needs. Under Defendant Higgin's policy of only providing treatment to people whose outside records he can verify, OPP fails to ensure adequate psychological assessments of people incarcerated there. This results in under-identification of, and inadequate treatment for, people with serious mental illnesses. As was noted in the DOJ findings letter, prisoners do not receive adequate mental health evaluations. The mental health evaluations they do receive are perfunctory.

88.    People who are suddenly removed from their medication, or who do not receive needed medication, understandably experience serious mental health crises and deteriorate. As a result, they are significantly more vulnerable to guard and prisoner abuse and violence. It also puts them at increased risk of suicide. There is no reliable way to get mental health services in case of emergencies, even for those at high risk of suicide. There are no panic call buttons in the cells or on the tiers and often no deputies are present in areas where prisoners are housed, putting these individuals at great risk of harm.

89.    Once an individual is designated by a staff member as suicidal, he or she is moved to "direct observation" on the psychiatric floor, which is the 10th floor of the House of Detention. He must remain there until he is evaluated by a mental health professional who can determine whether the person remains a suicide risk. All suicidal prisoners are forced to strip naked and change into a suicide smock,[3] and are housed in a large holding tank, together. They are forced to stay in this holding tank for 24 hours a day.

---

[3] The smock looks like a dress or wrap. It is a black vest that wraps around the body, and falls to about mid-thigh. Other than the smock, suicidal prisoners are naked, except that they are often allowed to keep their shoes.

90.     In the direct observation tank, there is nowhere to lie down or go to the bathroom. They are denied access to telephones, families and lawyers. People are housed in this tank until they sign a contract stating that they will not harm themselves or others.  Once that contract is signed, they are moved elsewhere on the 10th floor. The floor contains three male psychiatric tiers and one tier for women, who are not exclusively psychiatric patients.

91.     The psychiatric floor reeks of urine, and is extremely hot and loud. Most cells are two man cells, but many have three men in them, with people sleeping on the floor. Each of the three psychiatric tiers also has a six man cell, which routinely house between 10 and 15 prisoners, with men sleeping on the floor, sometimes without mats.

92.     OPP has a policy and practice of hiring insufficient numbers of qualified medical and mental health professionals. In accordance with this policy and practice, OPP has not hired enough staff to properly care for the mental health needs of 3,400 men, women and youth.  OPP currently employs one full-time psychiatrist, Defendant Higgins. Higgins does not conduct minimally adequate assessments or review necessary information before diagnosing (or dismissing) patients and making determinations about whether to prescribe medication.

93.     Defendants have a policy and practice of failing to supervise its medical staff and of failing to implement effective systems to ensure that medications are timely ordered and delivered and that prescribed care is provided. Medical staff commonly fail to provide prescribed treatment. Inconsistent prescription drug delivery and other lapses in treatment are customary. Staff repeatedly run out of medication prescribed, causing lengthy gaps in treatment. Additionally, individuals are commonly given multiple doses of their medication at one time, which creates fights over additional medication, again creating a gap in treatment. Defendants

Gore and Higgins have a duty to ensure these lapses do not occur, but they do not correct these recurrent problems.

94.     People who need mental health services are discouraged from seeking necessary care because they are charged a three-dollar copayment for submitting a sick call form. The prisoners' accounts are charged as soon as the form is filled out, whether or not the individual is seen by medical personnel. If a condition worsens or becomes more severe, prisoners are hesitant to submit additional forms, which will debit money from their account, without assurance that they will actually be treated.

95.     Defendants also fail to ensure that OPP staff receive necessary training on managing mentally ill individuals and on suicide prevention training. The woefully deficient training, monitoring, and supervision of OPP staff has led to several tragic deaths in recent years.

96.     In January 2009, Cayne Miceli died after spending four hours in five point restraints on OPP's psychiatric tier.

97.     In April 2010, Michael Hitzman told deputies he felt suicidal, and deputies told him to sit down. When he became "belligerent" Sherriff's deputies threw him into a holding cell. He was later found, having hung himself with his t-shirt.

98.     In August 2011, Bill Goetzee was arrested after attempting to grab a federal security officer's gun from its holster, saying he wanted to kill himself. Goetzee was placed on the psychiatric tier at OPP but, upon information and belief was not placed on suicide watch. Prisoners have reported that he attempted to hang himself, but was stopped. Days later he killed himself by ingesting toilet paper.

99.     Defendants have a policy and practice of denying access to constitutionally adequate mental health services that demonstrates deliberate indifference to the serious mental health

needs of individuals in their custody. This deliberate indifference has disastrous and often fatal consequences for the men, women and youth housed in the facility.

100.    The injuries suffered by the individuals described below illustrate how the Defendants' policies and practices of deliberate indifference to prisoners' serious mental health needs harm the Plaintiffs and the class members.

<u>LASHAWN JONES</u>

101.    LaShawn Jones is diagnosed Bipolar and Manic Schizophrenic. She is prescribed to receive Divalproex and Haloperidol. She was arrested and placed in OPP on March 21, 2012. Her charges are unknown to both her and her family.

102.    LaShawn has struggled with her mental health issues for years. She knows when she hears voices that she needs to go to the mental health center. She went there on March 21, 2012. It is unclear what happened, but somehow LaShawn was arrested. Her family has been informed by the health service provider that LaShawn was arrested because the facility could not take care of her due to budget cuts.

103.    LaShawn was brought to the psychiatric floor of OPP, in the House of Detention. Other prisoners on the tier saw her brought in. They heard the female deputy who brought her in, say "You wanna fu**in' fight me one on one? You wanna fu**in' play with me?" At this point the deputy proceeded to beat and attack LaShawn. LaShawn sustained lacerations and bruising to her face and body. Other women attest that the beating was severe and lasted awhile. LaShawn was seen immediately afterwards, bleeding all over herself from lacerations to her face and wearing nothing but her underwear. LaShawn was left on the tier for days without medical care. Eventually she was transported to the hospital.

104.    As of this filing, LaShawn has a bloody, blackened eye, from the attack that occurred over a week ago.

105.    Defendants' policies of inadequately training staff to interact with persons living with mental illness, and failing to supervise and train staff generally, have resulted in serious injuries to LaShawn. She is need of immediate mental health services and is currently extremely fearful for her safety.

KENT ANDERSON

106.    Kent Anderson has a history of stress and anxiety disorders. He also is suffering from severe depression. Prior to incarceration, Kent was prescribed Abilify and Buspirone, amongst other medications. Kent was not provided with medication in OPP, and his disorders worsened. His fiancé brought his medication to the jail in an attempt to verify his need for medication, but the deputies told her that they do not "deal with that." Kent therefore languished without his medication.

107.    Kent became suicidal while housed in the Old Parish Prison and is now on the psychiatric floor of the House of Detention. He is in desperate need of mental health interventions and is currently experiencing a mental health crisis. He is receiving inadequate care. He says, "it's hard to keep waking up."

JIMMIE JENKINS

108.    Plaintiff Jimmie Jenkins has a history of schizophrenia and depression. When he arrived at OPP on June 28th, 2010 he was non-cooperative in his initial screening. On July 3, however, he reported a history of mental illness, and identified the clinic at which he was treated.

109.    Jimmie was seen by the psychiatric department on July 14, which noted a past history of schizophrenia, and also noted that he had prior inpatient treatment at two different mental health facilities. Still he was not prescribed medications.

110.    Jimmie was seen again for a psychiatric appointment on July 28. At that point he again is not prescribed medications, but OPP requested his medical records from his outside providers.

111.    Jimmie is seen again by psychiatric services on August 19. Doctors determine not to prescribe him medications.

112.    On January 18, 2012, Jimmie wrote a sick call saying that he needed mental health care. ("I need to be seen by a mind doctor. Psychology.") He is seen by a nurse on January 23, 2012, who notes, "says he hasn't had psych meds in 19 months, says saw Dr. Higgins, nothing was ordered."

113.    On January 30, 2012 Jimmie reported suicidal ideations and was transferred to the psychiatric tier, where he now remains.

114.    Jimmie's records illustrate Dr. Higgins' policy of suspending medication for a period of time upon arrest. Jimmie was in OPP for almost two months before his outside medical records were even requested, in spite of the fact that the facility was on notice that he had a diagnosis of schizophrenia, and had two inpatient hospitalizations in mental health facilities.

115.    Through implementing this policy, the Defendants manifest deliberate indifference to Jimmie's mental health needs, and the mental health needs of all individuals with serious mental health needs incarcerated in OPP.

T.P.

116.    T.P. is an individual living with mental illness who has been denied care in OPP.

117.    One week after arrest, T.P. informed Sheriff's deputies that he is bipolar and schizophrenic. This fact is also noted on his medical intake form. T.P. was receiving medications for these illnesses prior to being incarcerated. He explained to the jail that he needed the medication to treat his serious mental health needs, and that it was urgent. Sheriff's deputies advised him that he would get a psych visit.

118.    A week later, the Defendants still failed to provide T.P. with mental health services. During this time T.P. was attacked, which is directly related to his initial plea for care. He told the nurse he needs his medication, and that he was afraid for his safety. He also signed a release for his medication records to be sent to the facility.

119.    Several days later, T.P. was placed on suicide watch, yet the Defendants still failed to provide him with adequate mental health services. For the next several days, medical records indicate that T.P. was involved in altercations with other prisoners, which were directly related to his initial plea for mental health treatment. He was taken to the hospital for a head laceration that requires stitches. He also was started on a daily regiment of Thorzine.

120.    T.P. bounced between suicide watch and protective custody over the course of three months, but somehow there is a note in his file three months after his arrest: "no psych meds at this time." In this time, T.P. consistently reported to medical staff that other inmates were threatening him.

121.    Months later, T.P. is found hitting his head against a wall. At this point, Halidol is ordered. T.P. reports being "jumped by homosexuals" and nurses note facial swelling, bruising and "passion marks." No rape kit is conducted.

122.    T.P. is transferred to suicide watch after being found with a shirt tied around his neck, and to a pole.

123.    T.P. remains on suicide watch.

124.    In the first week he was in OPP, T.P. requested medical care. He advised the Defendants of exactly what his diagnosis is, and what medication he was on. He warned them that he would have serious problems if they did not give him his medication. He signed release forms for his records to be sent to Defendants. He did not receive any appointment or medication until after he sustained a lacerated skull. He has subsequently sustained multiple attacks. This is a direct failure of the Defendants failure to implement adequate mental health services. T.P., as a mentally ill prisoner, was particularly vulnerable to abuse and harm in OPP. Defendants' policies exhibit deliberate indifference to his serious medical need.

<u>C.S.</u>

125.    C.S. has a history of schizophrenia, but was diagnosed in jail as having major depression. Prior to his incarceration, he was taking Remeron, Tremodal, and Promethezine. He also has a history of being prescribed Celexa, Haldol and Ativan. C.S. has previously been hospitalized to receive mental health services.

126.    Upon his arrest on May 4, 2011 C.S. signed for a release of his medical records to OPP. His exam noted schizophrenia. He was not provided any medication.

127.    On May 21, 2011 C.S. filed a sick call, explaining that he was hearing voices. He also reported hallucinations. On May 24, 2011 OPP determined "no psych meds necessary."

128.    In July C.S. reports as suicidal.

129.    In early November, C.S. was prescribed Celexa. He advised the nurse that because his medication was not working he would take multiple doses at one time.

130.    In mid-November he attempted suicide by taking 11 pills at once, and was brought by ambulance to the hospital. The hospital ordered anti-depressants and counseling.

131.   Two weeks later, the jail provided him with Wellbutrin, an anti-depressant.

132.   C.S. has continued to struggle with hallucinations and suicidal ideations at the jail.

133.   Defendants' policies exhibit deliberate indifference to C.S.'s serious medical needs. He came in with a known mental health history, including two instances of inpatient care. Defendants still denied him care for the first several months of his incarceration, until he reported as suicidal. Then the Defendants' policy of distributing multiple pills at one time exhibited deliberate indifference to C.S.'s mental health, and constituted a security risk. He did attempt suicide with those pills. As a result of the Defendants' deliberate indifference, C.S.'s life was in jeopardy.

### Eighth and Fourteenth Amendment Violations: Protection from Harm and Dangerous and Violent Conditions of Confinement

134.   OPP is an extremely dangerous prison. For years, violent fights have occurred at OPP seemingly every day.

135.   Defendants Gusman has a longstanding policy of understaffing the prison. In much of the prison, it appears that often only one officer is assigned to supervise each floor. This is consistent with the DOJ findings letter, which noted that there often is one deputy per 88 man Tent, or one guard per floor in the HOD, which would be one individual deputy supervising 60 prisoners. These conditions have continued unabated. Prisoners are left unsupervised when the assigned officer leaves the area for other reasons, such as using the bathroom, eating lunch, etc. Moreover, it is believed that there is a policy at OPP that prohibits a lone guard from entering the tier in response to a crisis. Prisoners have to scream for guards and beat on the door or window to get attention in the event of a medical emergency or a fight. In the event of an emergency, prisoners generally have to administer first aid to one another, and often have to resort to calling 911 for

assistance. This understaffing and inability to respond to emergency situations creates violent conditions that subject prisoners to serious and sometimes permanent injury, including death.

136.    Defendants have long been aware that the routine understaffing of OPP creates a risk of serious harm to the people incarcerated there.  In addition to the DOJ letter referenced above, Sheriff Gusman has been the Defendant in over 200 lawsuits in the three years since that letter came out. Many of those suits involved excessive violence in the facility. Likewise, many criminal defense attorneys have filed motions in their clients' criminal cases that detailed the brutality their clients suffered while in Sheriff Gusman's custody.  In many of these cases, the State court judges ordered transfer of vulnerable or victimized detainees.  The media has widely reported criminal defendants showing up for court with wounds from the prison. In January of this year, undersigned counsel placed Defendants on notice of violent conditions in certain areas of the jail. Still, the conditions persist. A review of the routes from OPP to University Hospital for the month of February 2012 show 23 transports to the hospital from OPP for fractures, puncture wounds, lacerations, trauma and the like. This does not include medical emergencies handled in-house at OPP.

137.    The understaffing of the facility and the minimal supervision that Defendants provide to deputies in the facility contributes to staff abuse and exploitation of the people incarcerated there. Because staffing is so thin and supervision so minimal, correctional officers who want to exploit prisoners have ample opportunity to do so.

138.    Officers who enter the prison at night are not searched. This allows correctional officers to smuggle in drugs and contraband. Defendants are aware that the contraband-smuggling takes place, but they have not taken reasonably adequate measures to halt the practice, including

adequate measures to ensure that correctional officers are properly searched before entering the facility.  The presence of contraband in the facility increases violence.

139.    Cell doors on almost all units can easily be rigged to remain unlocked when shut, allowing prisoners to leave their cells and enter the cells of others at any time, resulting in many assaults. Defendants have received multiple reports of assaults stating that prisoners escaped or entered other cells through rigged doors, including on the protective custody tiers. Despite these reports, Defendants have failed to adequately supervise correctional officers to ensure that they routinely and effectively protect the individuals in their custody from harm.

140.    Sheriff's deputies do not routinely conduct security checks to confirm that prisoners are safe inside their cells. In the House of Detention in particular, deputies cannot see what is happening on the tiers without walking onto the tier, which they do not do. There are no emergency call buttons on the tier, so victimized or sick prisoners often cannot get help. As a result of these failures, several Plaintiffs were raped or beaten for prolonged periods of time. Yet despite their knowledge of this and other assaults that frequently occur inside cells, Defendants have failed to enact adequate policies and procedures, adopt adequate staffing complements, or train and supervise officers to ensure that individuals are protected from harm.

141.    Many officers knowingly instigate fights and attacks by purposefully opening cell doors to allow prisoners who are in conflict to leave their cells at the same time. Some officers order or persuade prisoners to attack other prisoners. Many officers also facilitate attacks by intentionally leaving cell blocks unsupervised and cell doors unsecured. Defendants have received many complaints about these problems from prisoners, but rarely conduct thorough investigations or take corrective action.  Defendants have a policy and practice of not training and supervising

staff to ensure that the deputies employed there take their obligation to protect prisoners seriously.

142.    Weapons are readily available throughout the prison. The facilities are full of homemade knives, or "shanks." Every prisoner reports knives on his tier. Defendants are aware of this grave problem. It is documented in their own incident reports and medical records, as well as prisoner grievances they review. Despite their knowledge, they have failed to take reasonable measures to protect prisoners from suffering weapon-induced injuries.

143.    Prisoners in protective custody are not safe. While in protective custody, prisoners have been attacked and stabbed. OPP staff fail to take reasonable measures to ensure the safety of these prisoners, who are particularly vulnerable to prison violence due to a variety of factors including size, disposition, nature of their offense, and mental illnesses. Even on the protective custody tiers, cells do not lock. A number of prisoners have complained to prison authorities about these practices, but Defendants have failed to conduct an appropriate investigation into the allegations or to take any other precautions to protect the vulnerable people in their custody.

144.    Inadequate classification is a significant contributor to the violence in OPP. As noted by the DOJ, the primary purpose of a classification system is "to determine the degree of supervision required to control each inmate and to maintain safety and security...." A good classification system would use objective, behavior-based factors to determine appropriate custody level, such as: severity of offense, prior convictions, prior incarcerations, and personal characteristics such as age, residence and employment. It also would screen for known enemies, checking to ensure that prisoners are not housed with persons against whom they are testifying, or family members of the victim of their crime.

145.     Defendants fail to complete proper investigations before making housing determinations. Officials have repeatedly placed prisoners on tiers with other people from whom they had requested separation and protection—resulting in numerous attacks.  Defendants are aware of these dangers, having received numerous complaints from prisoners about these issues, but have not taken adequate measures to protect people. Even on a tier supposedly reserved for vulnerable prisoners, Defendants expose those in their custody to the risk of serious harm. There is no area of protection for youth who endure threats of violence; they are simply held in a cell on the same tier as their attackers, where they are subjected to horrific abuse and prolonged cell confinement. Likewise, Defendants fail to screen for enemies in transporting people to court and holding them prior to court, which is when many attacks occur.

146.     The injuries suffered by the individuals described below illustrate how the Defendants' dangerously deficient security practices put the Plaintiffs and other prisoners in danger.

<u>Jray Tapp</u>

147.     In late February 2012, Jray Tapp was arrested on municipal charges of disturbing the peace and public drunkenness. Jray was in OPP for 28 days, until March 15, 2012.

148.     Upon arriving on the psychiatric tier, Jray was initially placed in the suicide tank. Once it was determined that he was no longer suicidal, Jray was moved to an overcrowded cell on the psychiatric tier, where people were sleeping on the floor. Rather than giving Jray a mat to sleep on, the guard sent another prisoner in with the mat. When Jray tried to get his mat, the other prisoner stabbed him in the back of the neck.

149.     Jray went in and out of consciousness as he was hit and stabbed by multiple prisoners. "Altogether, they stabbed me once in the neck, multiple times in the head and back. My hand

was sliced up when I tried to grab the knife. I also had two black eyes and my face was all swollen up."

150.    It took the guards a long time to respond, and even longer for an ambulance to arrive, as Jray lay in his blood. The guards yelled at him—demanding that he stand up and asserting that he was not injured. He told them that he could not move his neck, at which time deputies grabbed his neck and twisted it. He was transported to the hospital, where he was treated. The OPP medical unit transport order says that he was sent for "multiple puncture wounds."

151.    Upon return from the hospital Jray was placed on another psychiatric tier. His cellmate, who is seriously mentally ill, needed a colostomy bag but did not have one and was defecating on himself and in the cell. Jray slept on the floor without a mat for multiple nights.

152.    Jray then was transferred to the Tents, where he again was jumped by another prisoner. That attack resulted in facial bruising, and reopened some of the wounds from his earlier stabbing.

153.    As a low level offender without much of a criminal history, Defendants should have taken cautionary measures to protect Jray. Instead, in the short time he was at OPP, Jray was housed in two locations where he was seriously injured. Defendants' deficient classification, security and staffing policies directly caused him harm.

EUELL SYLVESTER

154.    Euell is particularly vulnerable to violence because he is a witness in a crime and is currently pressing charges against another prisoner. This is a matter of public record, yet Defendants failed to take reasonable measures to assure Euell's safety.

155.    Defendants placed Euell in the same building as the person he is pressing charges against, Old Parish Prison. That person "put a hit" on Euell. Because of this, multiple men cornered

Euell. Some of them had knives. They restrained him and beat him. They hit him with their slippers and mop buckets. The beating tore skin off of his back. The men also sexually assaulted Euell.

156.    It is unclear where the deputies were while this attack was occurring, but Old Parish Prison has open dorm-style housing, and had a guard looked into the dorm, they would have seen what was occurring.

157.    Euell reported what happened to deputies. He did not get a rape kit. He had to file a request to get an HIV and STD test.

158.    Since the attack, Euell has been placed in proximity to his attackers multiple times, and, as his assault made clear, prisoners can "order hits" throughout the facility. He is in protective custody now, but continues to get threats. Cells pop open and knives are readily available to prisoners. Euell does not feel safe in Orleans Parish Prison.

LEONARD LEWIS

159.    Plaintiff Leonard Lewis is in need of protection because he is testifying against a man in a criminal case. Despite this known affiliation, Leonard has been threatened, beat up and stabbed in multiple buildings at OPP. Defendants have failed to take reasonable measure to provide him with adequate protection.

160.    Leonard was first attacked in August of 2010, when a deputy put him in a cell with a person who knew the man Leonard is testifying against. The deputy knew Leonard was at risk, but placed him in the cell anyway. Leonard was stabbed multiple times.

161.    Leonard filed a grievance on that incident immediately after it happened, on August 20, 2010. He was informed that he was placed in that cell "by mistake."

162.    Leonard filed a second step grievance, saying he was dissatisfied with that response, and asking that he be protected. He received a response saying that the matter had been taken care of, but he still felt unsafe. Leonard filed a third step grievance in September 2010. Just this month, after undersigned counsel began investigating this matter, (and two years after the attack) Leonard received a response from Defendant Gusman himself that the deputy who placed him in jeopardy has been "counseled."

163.    During the two year time period the Defendants waited to respond to Leonard's grievance, he was beaten, attacked and stabbed additional times, while on protective custody. He was jumped one day when he was brought to court with general population prisoners.

164.    In November, while on protective custody, Leonard was jumped again on his way back from court. Someone yelled at him that he was a "rat," because they knew that he was a witness in protective custody. Because the cells were open, men came into his cell and beat him. He yelled for help, but it took him hours to get the deputy's attention. His face was swollen and his nose injured. He filed another grievance about the issue, and was informed that SOD ("Special Operations Division") is investigating it.

165.    On March 27, 2012 he was brought to court with the man he is testifying against. He is not supposed to be around the man.

166.    Leonard does not feel safe because he has been seriously attacked multiple times. Defendants' policies and practices of inadequate staffing, security and classification have resulted in his being injured multiple times, and he remains vulnerable in the Defendants' custody.

MARK WALKER

167.   Mark Walker is currently incarcerated in OPP on a medical tier in Old Parish Prison. He is diagnosed with bipolar disorder and is legally blind. After his arrest, Mark was forced to perform oral sex on another prisoner. He yelled for the guards but they did not come. After the assault, Mark was placed on suicide watch.

168.   Mark reported the assault, but was not seen by SOD until 41 days after the attack. They interviewed him in front of other prisoners heightening his fear of retaliation. It also took a long time for Mark to get an HIV test. He still has not received the results of that test.

169.   Mark is particularly vulnerable to attack and abuse because he is legally blind. As a result, he was jumped multiple times in the Tents. Sheriff's deputies failed to protect him.

170.   One night, Mark was packing up his items to move to another facility. When he grabbed his mat, the deputy said that Mark had hit him with it. The deputy took Mark to the back of Tent One and beat him, while he was handcuffed. A female deputy witnessed this incident and initially laughed while Mark endured the beating, but eventually, after the Deputy continued to beat Mark for an extended period of time, she told him to stop.

171.   Mark has asked multiple times to see a social worker. When he asks why he has not been seen, he is told that his complaints are not in the computer.

172.   Mark says, "the guards do not patrol the tiers, they do not respond to verbal complaints or grievances. Like everyone else in here, I am constantly in fear for my well-being." Due to his heightened vulnerabilities, Mark has been consistently subjected to attacks in various facilities in OPP. The Defendants' deficient staffing, security and classification systems have failed to protect him from abuse.

ANTHONY GIOUSTAVIA

173.    Anthony is 19 years old, and was attacked by a bigger, older man when he first arrived in the House of Detention. The attack was prolonged because no deputies were present on his tier. Since then, Anthony has seen many other fights, including an attack on a very small prisoner, who was grabbed by other men while he was sleeping. He also witnessed a fight where one man was stabbed in the mouth and twice in the back.

174.    Anthony is currently in OPP, and feels like his safety is immediately at risk.  He is located on a violent tier and is aware of other prisoners tying people up and choking them until they pass out.  Anthony says, "Guards are never around when fights break out, which is often. They usually come by for count time, and then leave again for hours." Defendants' policies and practices of failing to protect people in their custody are creating an imminent risk to Anthony's safety.

GREG JOURNEE

175.    Greg was originally housed in Old Parish Prison, but asked to be moved because he was receiving threats. When he asked to be moved, the Warden said, "you know this is a jail facility. I can't make sure nothing happens to you."

176.    Right after being moved into the House of Detention, Journee was jumped by several men. Some of them held him, while one stabbed him over and over. He was bleeding and yelled for a deputy. No one came until the next day. Greg did not receive medical attention for the stabbing.

177.    Greg says, "all of the cells pop in all of the tiers and the guards leave us alone. People on my tier have shanks so big they look like kitchen knives. Guys can get out and come get you at any time. The guards aren't going to do anything to stop it. I don't think anyone is safe here."

<u>STEVEN DOMINICK</u>

178.    Steven Dominick is in protective custody in the House of Detention because he is a witness against someone accused of another crime. Steven has been threatened with knives, jumped and stabbed. He also has witnessed many stabbings in OPP.

179.    Steven says, "guards do nothing to prevent violence. In fact, they often instigate it. When severe injury results from a fight, guards fail to respond with urgency. It can take hours for a deputy to come to a tier. Consequently, I have had to apply pressure to knife wounds and called family members to call 911 since the guards refuse to help. These facilities are not undermanned, they are unmanned. Deputies frequently leave their posts. Guards typically work two floors during one shift, which is about 94 people. It doesn't matter what facility you are in, you're going to be lucky to escape without some scars."

<u>RICHARD LANFORD</u>

180.    Plaintiff Richard Lanford is currently housed in the Conchetta facility at OPP. Richard is especially vulnerable to attack because he this is his first time in OPP.

181.    Richard has sustained serious injuries in two facilities at OPP: Old Parish Prison and House of Detention. Since his arrest in the fall, Richard has been beaten multiple times, and had to be taken to the hospital for injuries sustained.

182.    Richard was jumped soon after arriving in the House of Detention, probably because he is particularly vulnerable to attack. He suffered serious injury in that attack; his arm was injured, and he now cannot move it without extreme pain. He reported it to deputies, who refused to help

or move him away from the people who attacked him. Richard remains in significant pain from that attack, and deputies continue to deny him medical attention.

183.    Richard was subsequently moved to the Old Parish Prison. He was jumped again and this time, his face was severely injured. He had to wait over an hour for medical attention, and ultimately required surgery as a result of the attack. Inexplicably, Richard was returned from the hospital to OPP. Other prisoners knew that he had reported the attack and received medical care for his injuries, so they labeled him a "rat." Immediately after returning to OPP, Richard was jumped again, this time in the medical tier of Old Parish Prison. He was reinjured in that attack.

184.    Because of the severe abuse he was sustaining, and due to his appearing in criminal court with bruises and lacerations, the two judges in Richard's criminal case ordered that he be moved from Old Parish to Conchetta for his safety. However, he was moved back to OPP, where he was threatened again.

185.    Subsequent to undersigned counsel meeting with Richard, Defendants finally moved him to Conchetta. He is now on a tier with one of the men who attacked him in Old Parish Prison. He does not feel safe.

186.    Richard explains that guards patrol too many areas at once and are absent for long periods of time. Medication is distributed in bulk, with multiple doses at once, called a "keep on person" medication distribution system. Richard is on pain medication because of his surgery. He has been threatened for his medication and is forced to give it away, in lieu of being attacked.

187.    Defendants' classification and staffing deficiencies directly led to Richard's severe facial injuries, and the injury to his arm. Even after he was attacked in HOD, the Defendants failed to classify him as needing protection, allowing further victimization in OPP. After he was brutalized in OPP, he was returned there, only to be immediately attacked again. He was not

moved until undersigned counsel began visiting him. Richard says, "I am extremely depressed as a result of the violence and conditions of this place. I feel like I have aged ten years in the six months I have spent here. We're treated like animals here."

J.J.

188.    J.J. was incarcerated at OPP at the age of 15, because he is being tried as an adult. He was booked onto the juvenile tier in Templeman V. J.J. was jumped on the juvenile tier as soon as he entered; he was confronted by older, tougher youth with knives.

189.    J.J. witnessed rape and violence on the juvenile tier. He witnessed a youth being raped anally with toothbrush. J.J. reported the unconstitutional conditions. He requested protective custody, and was placed on 23 hour cell confinement, still on the same tier with the other youth.

190.    J.J. continued to be tormented by some of the other youth on the tier, who called him a "rat" for being on protective custody. The one hour per day that J.J. was allowed out of his cell to use the telephone and shower meant that other youth had to be locked down during that time. This created intense animosity between others on the tier and J.J.

191.    Other youth threw ice water and urine on J.J. They obtained his educational records, which were left out by the guards and contained his home address, and threatened to kill his mother, because he was a "rat."

192.    The conditions made J.J. suicidal. He reported to the guards that he wanted to kill himself.

193.    J.J. was transported to the psychiatric tier in the House of Detention. Because he was a juvenile, they placed him in the shower—which was the only cell in which he could be kept separate from adults. The shower floor was covered in semen and urine. J.J. was naked, except for a suicide smock. He was afraid to sit down, so he stood up all night long.

194.    While on the tier, he heard a prisoner being raped. The next morning, J.J. overheard the prisoner tell the guard that he had been raped. The guard said that the prisoner was lying.

195.    J.J. signed a contract to get off of the psychiatric tier.

196.    J.J. was transferred back to protective custody on the juvenile unit. However, guards threatened to allow other youth to attack him, because he continued to report to outside sources the unconstitutional conditions on the tier.

197.    J.J. was jumped twice, once on his way to court, and once in the visitation room, while visiting with his mother.

198.    As a result of outside advocacy, J.J. was moved to another building. He is now housed in a special unit. That unit initially consisted of 23 hour lockdown and solitary cell confinement. For weeks, there was no television or books. The solitary cell confinement caused the people housed there to deteriorate mentally. J.J. and the other people on that tier have struggled significantly emotionally over the last several months. The cell confinement has been extremely damaging to them.

## EXHAUSTION

199.    The named Plaintiffs have exhausted all available administrative remedies, to the extent that the ARP procedure is available.

## CLAIMS FOR RELIEF

### First Claim

### Eighth Amendment Violations: Deliberate Indifference to Plaintiffs' Serious Mental Health Needs

By failing to provide constitutionally adequate mental health care to address the Plaintiffs' serious medical and mental health needs and by allowing the policies and practices of providing

grossly substandard healthcare to continue, Defendants violate the Plaintiffs' rights under the Eighth and Fourteenth Amendments to the United States Constitution.

## Second Claim

### Eighth Amendment Violations: Failure to Protect From Dangerously Violent Conditions of Confinement

By subjecting Plaintiffs to dangerously violent conditions of confinement and by exhibiting deliberate indifference to Plaintiffs' substantial risk of serious physical injury as a result of these conditions, Defendants violate the Plaintiffs' rights to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs pray that this Honorable Court grant the following relief:

a.        Declare that the acts and omissions of the Defendants violate Plaintiffs' constitutional rights and federal law;

b.        Enter a preliminary and permanent injunction requiring the Defendants, their agents, subordinates, employees and all others acting in concert with them to cease their unconstitutional and unlawful practices and to remedy their violations of the Constitution and the laws;

c.        Award to the Plaintiffs reasonable costs and attorney's fees; and

d.        Grant the Plaintiff such other relief as the Court may deem just and proper.

RESPECTFULLY SUBMITTED, this the 2nd day of April, 2012.


Katie M. Schwartzmann
Katie M. Schwartzmann, T.A., La. Bar No. 30295
Sheila A. Bedi, Miss. Bar No. 101652 (*pro hac vice* application forthcoming)
The Southern Poverty Law Center
4431 Canal Street
New Orleans, Louisiana 70119
504-486-8982 (phone)
504-486-8947 (fax)