**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA**

_____

**LASHAWN JONES,** *et al.*,                )

)          **Case No. 2:12-cv-00859**

)

**Plaintiffs,**          )          **Section I**

**v.**                              )          **Judge Lance M. Africk**

)          **Magistrate Shushan**

**MARLIN GUSMAN, Sheriff, Orleans**     )

**Parish,** *et al.*,                      )

)

**Defendants.**          )

_____

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

Since the filing of this lawsuit one month ago, reports of violence and sexual assault at the Orleans Parish Prison have continued at alarming rates, and the situation has worsened in recent days.  Orleans Parish Sheriff's deputies remain free to abuse individuals housed at the Orleans Parish Prison ("OPP") with no fear of accountability. Persons living with mental illness continue to be denied mental health treatment.  As a result, people's conditions deteriorate and some are driven to attempt suicide.  Last week, the United States Department of Justice reiterated that recent conditions at Orleans Parish Prison remain dangerously unconstitutional.[1]  The federal government has removed all individuals in its custody from OPP—citing concerns over unlawful conditions.[2]  Despite

---

[1] United States Department of Justice, "Civil Rights Investigation of Orleans Parish Prison System," April 23, 2012, attached hereto as Exhibit 1.

[2] New Orleans Times Picayune, March 26, 2012, *Federal inmates pulled out of the Orleans Parish jail*, http://www.nola.com/crime/index.ssf/2012/03/federal_inmates_pulled_out_of.html, last visited May 1, 2012; New Orleans Times Picayune, April 25, 2012, *Immigration and Customs Enforcement pulls its detainees out of New Orleans jail* http://www.nola.com/crime/index.ssf/2012/04/immigration_and_customs_enforc_1.html, last visited May 1, 2012.

the well-documented and pervasively unlawful conditions in OPP, Sheriff Gusman has refused to take sufficient remedial action.[3]  In the meantime, individuals live daily under life threatening conditions, and it is only a matter of time before yet another prisoner dies in Orleans Parish Prison.[4]  Accordingly, the Plaintiffs seek immediate injunctive relief from this Court, to Order Defendant Gusman to modify his policies and procedures to ensure that individuals in his custody are protected from harm and provided with constitutionally adequate mental health services. Plaintiffs so move on their own behalves, and on behalf of all current and future residents of OPP.

**<u>Statement of Facts</u>**

> Since my lawyers filed the lawsuit, things have been hell for me. Deputies tell me, 'You want to complain about things? You want to go tell your lawyers? We'll send you back to Old Parish Prison.' They know I don't want to go over there because I am afraid of getting stabbed up. All they have to do is put me on a tier with people from a neighborhood I'm not from and they can really mess me up. I don't regret being part of the lawsuit. Somebody had to step up and change things, but it's making my life really hard in here. I'm really afraid that I'm going to get hurt and deputies are going to let it happen.[5]

Since the filing of this case, the situation at OPP has become even more dire. In the last couple of weeks, several prisoners have been raped, and many more beaten.  The situation at OPP is simply out of control.  Two prisoners escaped from the Sheriff's "state of the art" Temporary Detention Center on Saturday, April 28, 2012, and, upon information and belief, no one at OPCSO realized that the pair was missing until a citizen saw two prisoners in jumpsuits along Interstate 10.  As detailed extensively below, in recent days

---

[3] Defendant Gusman called the Department of Justice findings "sensationalized." New Orleans CityBusiness, *Gusman Responds to Justice Department Letter on Orleans Parish Prison Conditions,* April 24, 2012. http://neworleanscitybusiness.com/thenewsroom/2012/04/24/gusman-responds-to-justice-department-letter-on-orleans-parish-prison-conditions/, last visited April 30, 2012.

[4] There have been a number of deaths in OPP in recent years, including those determined by the DOJ to have been preventable. A timeline of those deaths is provided at http://opprc.org/OPPRC/OPP_Deaths_Timeline.html, last visited May 1, 2012.

there has been a disturbing uptick in violence against prisoners, and a troubling continuation of the denial of medication to people living with mental illness. Plaintiffs and witnesses are concerned for their safety, and ask this Court to set a hearing on a Motion for Preliminary Injunction within the next 90 days.[6] Plaintiffs recognize the extraordinary nature of this expedited request, and that it will require significant attention and effort by the parties, but such urgent relief is needed, due to the ever worsening crisis at OPP, as outlined below.

## Discussion

In order to prevail on a motion for preliminary injunctive relief, an applicant must demonstrate:

> (1) a substantial likelihood of success on the merits; (2) a substantial threat that the movant will suffer irreparable injury if the injunction is denied; (3) that the threatened injury outweighs any damage that the injunction might cause the defendant; and (4) that the injunction will not disserve the public interest.

Reliant Energy Serv., Inc. v. Enron Canada Corp., 349 F.3d 816, 826 n.7 (5th Cir. 2003) (internal quotations and citation omitted).  All four requirements must be met.  Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara, 335 F.3d 357, 363 (5th Cir. 2003).  There is no question that the Plaintiffs in this case have carried their burden of persuasion on all counts.

## I.      There Is a Substantial Likelihood of Success on the Merits

To determine the likelihood of success on the merits, courts look to the standards provided in the relevant substantive law.  Valley v. Rapides Parish School Bd., 118 F.3d

---

[5] Ex 3, Anderson Decl. ¶¶ 2-5.

[6] Immediate relief is necessary. However, because of the system-wide nature of the remedies required, this Court and the parties will need discovery and expert testimony to conduct a meaningful hearing. Accordingly, Plaintiffs are filing herewith a request for an expedited discovery schedule.

1047, 1051 (5th Cir. 1997). Here, those standards are found in the leading Supreme Court cases governing the rights of incarcerated persons to be protected from harm and to receive adequate mental health services. See Farmer v. Brennan, 511 U.S. 825 (1994) and Estelle v. Gamble, 429 U.S. 97 (1976). On these exact two issues, the Department of Justice just found, "it is largely uncontestable that the deficiencies in the operation of OPP violate the Constitution."[7] Ex. 1 at 2.

A. **Plaintiffs will prevail on their claim that Defendants fail to protect them from harm.**

The Eighth and Fourteenth Amendments' prohibitions on cruel and unusual punishment include an obligation on the part of prison officials to protect prisoners from harm. "Having incarcerated persons, … having stripped them of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course." Farmer v. Brennan, 511 U.S. 825, 833 (1994), *quoting* Hudson v. Palmer, 468 U.S. 517, 526 (1984). "Gratuitously allowing the beating or rape of one prisoner by another serves no legitimate penological objective, any more than it squares with evolving standards of decency. Being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society." Id.

To determine whether the Defendants have violated the law by failing to protect the Plaintiffs, this Court must examine (1) whether the plaintiffs are incarcerated in conditions posing a substantial risk of serious harm, and (2) whether the Defendants' state

---

[7] It bears reiterating that the finding of unconstitutionality by the DOJ came after Plaintiffs filed this suit, and was the result of inspections conducted by the DOJ the week of April 2, 2012. The findings letter is based upon an investigation by a team of attorneys and experts, and the conditions reflected therein are the ongoing current conditions. Ex. 1 at 2. These findings were simply a continuation of previous findings of unconstitutional conditions, released in 2009, attached hereto as Exhibit 3.

of mind is one of "deliberate indifference" to the prisoners' health or safety, i.e., whether

the official knew of and disregarded the risk to the Plaintiffs.  Horton v. Cockrell, 70 F.3d

397, 401 (5th Cir. 1995); Hinojosa v. Johnson, 277 F. App'x 370, 374 (5th Cir. 2008).

Both prongs of the test are easily met on the facts of this case.

>    1.  *Plaintiffs are incarcerated under conditions posing a substantial risk
>        of serious harm*

The Fifth Circuit has explained,

> There is no concise definition of what types of prison conditions pose a
> "substantial risk of serious harm" under the Eighth Amendment. Instead,
> we examine this component of the test "contextually," making sure to be
> responsive to "contemporary standards of decency."  We must consider
> "whether society considers the risk ... to be so grave that it violates
> contemporary standards of decency to expose anyone unwillingly to such a
> risk.

Horton v. Cockrell, 70 F.3d 397, 401 (5th Cir. 1995).

Conditions in OPP clearly constitute a substantial risk of serious harm. The

Supreme Court has made clear that rape and physical abuse are serious harms that the

courts must act to prevent.  To secure injunctive relief, an individual plaintiff does not

have to prove the risk of harm is particular to him, as it does not matter whether prison

officials could identify in advance precisely who would attack whom.  Rather, the culture

of violence and lawlessness may be so pervasive that all prisoners are at risk, and this

constitutes a substantial risk of serious harm.  Furthermore, deliberate indifference exists

in prison situations "'where terror reigns.'" Brooks v. Stringer, No. 2:04-cv-120, 2007

WL 1087487 at *16-17 (S.D. Miss. Apr. 10, 2007).

The "terror" in OPP is a direct result of the Defendants' deficient policies and

practices. In its inspection (conducted after this lawsuit was filed) the DOJ found:

> OPP is a violent and dangerous institution. Our inspection uncovered
> shockingly high rates of serious prisoner-on-prisoner violence and officer

> misconduct. We received reports of widespread sexual assaults, including gang rapes. The violence, sexual assaults, and pervasive atmosphere of fear are the direct result of inadequate staffing, deficient classification, use of prisoners to provide security supervision through "Tier Reps," poor staff training, and failed systems of accountability.

Ex. 1 at 2.  As the DOJ noted, these conditions are unconstitutional.  Courts have found a substantial risk of harm linked with a rise in violent conditions when, as is the case at OPP, prisons lack effective classification policies, are understaffed, fail to train and supervise deputies, have inadequate contraband policies, and permit general violations of security protocols.  *See, e.g.,* Morgan v. Hubert, 335 F. App'x 466, 471 (5th Cir. 2009) (placing an inmate on protective custody in proximity to general population inmates creates an "objective and substantial risk to his safety"); Alberti v. Klevenhagen, 790 F.2d 1220, 1226 (5th Cir. 1986) ("failure to control or segregate prisoners who pose a danger to the physical safety of other prisoners can constitute cruel and unusual punishment"); Hazel v. Bell, No. 9:08-cv-216, 2010 WL 1038743 at *23 (E.D. Tex. Jan. 8, 2010) *citing* Greason v. Kemp, 891 F.2d 829, 838 (11th Cir. 1990) ("In order to prevail on a claim of understaffing, a plaintiff must plead and prove that there was a policy at the prison, promulgated or implemented by the policy-making official, of deliberate indifference to the risk of understaffing, and that this policy caused his injury").

In the instant case there is no question that the Plaintiffs are incarcerated under conditions that pose a substantial risk of serious harm. Consider the following violent incidents that occurred **since the filing of this lawsuit one month ago**:[8]

- On April 29, 2012, and April 30, 2012, deputies stormed Tents 2 and 5, apparently in response to prisoners reporting problems to the Fire Marshal,

---

[8] These are only persons for whom signed declarations are attached to this filing, arranged alphabetically as Exhibit 2. These declarations are the tip of the iceberg.  Undersigned counsel has been contacted by 400 people incarcerated in OPP, and the list is growing daily. Because of barriers in access to collecting that information, this list represents only some of what Plaintiffs have documented to date.

and not moving to the shower area quickly enough when instructed to do so.  One deputy fired what prisoners describe as a "shotgun," which may be a "less than lethal" weapon such as a bean bag rifle. The deputy intentionally discharged the weapon next to the face of Dan McCorvey. Dan has ringing and hearing loss in his ear. The gates in the Tent are held together with shackles, which poses a risk of death to prisoners should a fire break out. Prisoners reported this to the Fire Marshal. Terrell Pierce says, "Some ranking officers told us that our tent was on ban because we were complaining to the Fire Marshal about everything that is wrong back here. Being on ban means we can't buy things from the commissary or use the phones to call our family or attorneys."

- On April 23, 2012, deputies sexually assaulted prisoner Nathanial Johnson by forcibly penetrating him anally with what is believed to be an object of some sort. Nathanial could not see the attack because he had a blanket over his head.  "They pulled down my pants and forced anal penetration. The attack did not last very long, I think because I was screaming the whole time." Via undersigned counsel, Nathanial has requested a rape kit and protection.

- On April 24, 2012 deputies handcuffed and shackled Bryan Hampton, put him in the elevator (where there are no cameras) and proceeded to beat him. The deputies picked him up by the shackles and slammed his face into the wall, causing a gash on his right eye.  Multiple deputies punched, kicked and stomped him in the face. His eye required stitches. The deputies then informed Hampton that if he complained about the incident he would be charged with a crime.

- Cornell Lowery witnessed a stabbing in the HOD facility on April 17, 2012, and "when the lights came on I saw this guy lying in a pool of blood and then the other guys he was fighting with tied him up for awhile." Cornell was moved to the Tents.  In the Tents he was tied to a bed by other prisoners so that they could steal his items. "I have written lots of grievances about my fear as well as other concerns, but I have never received a response to these complaints. Considering how this jail is run, I think there's a good chance I'll be dead before I get out of here."  On April 28, 2012, deputies beat Cornell because he refused to cut his hair.

- On April 16, 2012, deputies failed to provide appropriate protections to Jaime Hernandez who was jumped by multiple prisoners and beaten until he required hospitalization.  During the attack, Jaime attempted to alert the deputies to his plight—but he was unable to get their attention.  Jaime saw a similar thing happen to another young man, who also was beaten severely and who the deputies failed to assist.  "He screamed and screamed and screamed but the guards weren't there."

- Deputies also failed to protect Maurice Tabb who suffered serious injuries during an April 9, 2012 attack. "They (other prisoners) came into my cell at night and started beating me." Maurice was tied up during the attack. He sustained serious injury to his face and his peripheral vision is damaged; he was ultimately transported to the hospital. "I was yelling for a deputy the whole time, but nobody came." Maurice also witnessed another man anally raped with objects in Old Parish Prison, and "saw a man nearly get killed over there because other guys were stabbing him over and over."

In addition to these incidents since the filing of this case, the following are recent instances of violence continuing from OPP:

- Michael Simonson, who lives with mental illness, was attacked by other prisoners on March 31, 2012, four days after he returned to OPP from the state hospital for competency restoration. Deputies allowed other prisoners to beat Michael with shackles causing his face to swell so severely that he could barely open his eyes. He was forced to give up his medication to other prisoners who hit him in the rear end with a broomstick and threatened to penetrate him anally with the broomstick if he did not give up his medication.

- James Pierce witnessed Michael Simonson get beaten in the face with shackles that the deputies had placed in the possession of prisoners. "My life is being threatened daily by other inmates on the tenth floor House of Detention. I recently moved myself … because I felt like my life was in danger. When the Department of Justice was here for an investigation, I spoke with them and since then things have gotten worse. Guards told my cellmates… that I told on them for having weapons in the cell and this has made me a target. Inmates throw things at me and hit me with objects every chance they get. During the evenings inmates are out of their cells and constantly hit me with things and threaten to kill me. I have not been able to get any sleep because I fear when I go to sleep inmates will pop open my cell and kill me."

- Jason Gibson is a gay male who endures constant harassment and threats. He has been moved multiple times around OPP because everywhere he goes he is threatened with knives, and told things like "bitch suck my d**k." In March a tier rep beat him with a broomstick and tried to force anal penetration. Jason was unable to get deputies to respond to verbal requests or grievances. "They don't walk the tiers and almost all of them don't respond when you're screaming for help." Jason is now currently receiving threats that he "is going to get f***ed on the yard."

- Daniel Cook had been in OPP for only thirteen days when he was jumped by multiple prisoners in OPP's Temporary Detention Center on March 28, 2012.  His right arm was broken and his left arm bruised badly.

- Terrance Turner was forced at knifepoint to perform oral sex on another prisoner on March 26, 2012, in the bathroom of the holding tank waiting to go to court. Terrance said he was suicidal and wanted to see a psychiatrist to discuss what happened. "I did not feel comfortable discussing it with any deputy in the facility; it has been made very clear to me that they didn't care about what happened to inmates here."

- Terrell Pierce is a pretrial detainee who has witnessed five fights in the Tents, including one involving knives, since March 14, 2012.  "If anyone gets hurt, they hurry up and get them out. Or they take away your visits and put you in the Hole so your family can't see what happened."

- Daryl Walker was previously incarcerated in the Tents, and witnessed young mentally ill men get attacked between February and March 2012. "Most of the fights were young guys jumping people who I think needed mental health help because they couldn't comprehend anything. They were walking around without their shoes because guys would steal their shoes. Sometimes the deputies would give them slippers, but then the guys would steal their slippers. If deputies saw them barefoot at roll call, they usually didn't do anything about it."

- Durrell Richard is a gay man who has been attacked and harassed by other prisoners and deputies because of his sexual orientation. Durrell has been brought at knifepoint to the shower by another prisoner, who was the tier rep on the floor. "He told me to face the wall and lather up my butt, and then he stood behind me, rubbed his penis on my butt, and ejaculated on me. After this incident I notified the warden and filed a grievance… when I told them the name of the inmate who had done this to me they immediately knew who I was talking about. They were acting like this prisoner had done this before to other men, and that they were fully aware of his behavior." As a result of being gay, Durrell has been punched by other prisoners, and a deputy laughed at him and told others to "sterilize the mat" that he had slept on, because he was gay. "My experience in Orleans Parish Prison has changed my life permanently. I have nightmares, night sweats, severe anxiety, and depression. I feel humiliated and degraded."

- In Old Parish Prison, in late September 2011, Blaine Pennison witnessed another prisoner stabbed in the face in the Templeman V building. "Guys were getting jumped left and right and guards didn't do anything to stop it."

- Anthony Montecino witnessed the rape of a transgender woman at knifepoint in the shower on the protective custody tier of House of Detention in the fall of 2011.

- In August 2011, C.W. was tied to a bed, beaten by two of his cellmates, and raped anally with a broomstick. He was left bleeding and tied up all night. When a deputy saw him, she said, "it looks like you need to find yourself a boyfriend," and did not move him. Over the course of several months C.W.'s attackers forced him to perform oral sex, and ejaculated on him in the showers. He has sustained lifelong injuries from these attacks. "I feel like what happened to me has driven me into a shell inside myself, and I can't come out of it. I can't stop thinking about it—these incidents replay over and over and over in my head. I am ashamed and deeply upset."

- Donald Washington was in the cell when C.W. was attacked and brutalized and has seen two different men anally raped in Old Parish Prison. "I was housed at the House of Detention for just under one year. While I was on the fifth floor, south side in late August 2011 in Cell 2, I was housed in a ten-man cell.  I witnessed a cellmate, C.W., get raped by two other cellmates, M.G. and F.L.  It was night time and M.G. and F.L. wrestled C.W. to the floor, and raped him with a broom.  After they were done, they tied C.W. up with ripped-up pieces of a sheet to a bunk bed. C.W. was naked and bleeding.  At about 1 am, a female deputy, Lt. N., came by and saw C.W. tied up and bleeding.  C.W. asked to be untied but she laughed at him and said he was lying.  She said it looked like C.W. needed to "find himself a man," like a boyfriend, to take care of him and protect him.  C.W. stayed tied up until morning. C.W. stayed on my tier until October 2011.  For the remainder of that time, M.G. and F.L. forced C.W. to perform oral sex, or would force him into the shower where they would ejaculate on him. While C.W. and I were being taken down for attorney visits, I heard C.W. tell a deputy, Lt. T., about being raped.  Lt. T. replied that if C.W. didn't like being raped, he "probably shouldn't be in jail then." C.W.'s rape isn't the only sexual violence I have witnessed in this prison.  After I was moved to the B3 tier of the Old Parish facility this past winter, I have seen other prisoners have anal sex with two different men.  One of these men is named Bob, the other is a smaller guy who is gay.  Neither of them are consenting – rather, they are being forced to do it by the other prisoners and they don't fight back because they are terrified."

Prisoners are uniformly reporting that deputies are either absent from the tier or do not respond to emergencies.[9] As the very recent incidents above make clear, the situation is worsening and lives are in jeopardy, such that Plaintiffs clearly face a substantial risk of serious harm.

2. *Defendants are deliberately indifferent to the risk of harm to Plaintiffs*

In addition to showing that they are subjected to a substantial risk of harm, Plaintiffs also easily meet the "deliberate indifference" prong of the test.  "Deliberate indifference" is best understood as subjective reckless disregard for the safety of inmates. Farmer v. Brennan, 511 U.S. 825, 836 (1994).  The standard is analogous to the standard for criminal recklessness, meaning that a prison official was aware of and disregarded a risk to the safety of the prisoner.  Id. at 839.   The subjective recklessness requirement does not require that a plaintiff prove that a prison official actually knew that harm would befall the plaintiff; rather, the plaintiff must prove that the prison official was aware of the substantial risk of harm.  Id. at 842.   "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence… and a fact finder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."  Id.

> For example, if an Eighth Amendment plaintiff presents evidence showing that a substantial risk of inmate attacks was "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk.

---

[9] See declarations of Thomas Everett, Shaundrick Gould, Blaine Pennison, Willie Rhodes, Daryl Walker, Emory Walters, and Donald Washington, attached hereto as Exhibit 2.

Id. at 842-43. *See also* Perez v. Anderson, 350 F. App'x 959 (5th Cir. 2009).

Unlike many official capacity prison cases seeking injunctive relief, in this case Defendants cannot dispute that they have knowledge of the substantial risk of serious harm to the putative Plaintiff class. Sources ranging from the United States Department of Justice, the Prison Rape Elimination Act Commission and multiple media reports have detailed the brutally violent conditions that persist in OPP.  Clearly, Defendants have— and have long had—knowledge of the risk facing those in their custody. They have simply chosen to disregard that risk.

In 2009, the U.S. Department of Justice issued a findings letter concluding that conditions at OPP were so dangerous that they violated the Constitution. The DOJ also identified serious deficits in the mental health care system. Ex. 3.

In April 2012 the DOJ issued a second findings letter, which distressingly noted that the very same deficiencies outlined in 2009 persisted and had worsened. Throughout the report, the DOJ notes that it placed Defendant Gusman on notice of failed policies three years ago, which he failed to correct:

- Violence: "Consistent with our 2009 letter we found a high incidence of prisoner-on-prisoner violence at OPP, particularly in the HOD and Tents units, creating a climate of fear that is tolerated by staff at all levels of the institution." Ex. 1 at 4.

- Staffing: "Consistent with our on-site inspections in 2008, we found instances in which a single officer was required to supervise an entire pod of more than 80 prisoners for a 12-hour shift…. Exacerbating staffing shortages, we found that OPP continues to operate without a staffing plan. Id. at 6.

- Classification: "Up until one month ago OPP continued to use the same deficient classification system we found in 2009." (Although revised in 2012 in advance of the DOJ visit) "we remain concerned about prisoner safety because there is no existing mechanism to re-assess and re-classify individuals already in OPP." Id. at 8.

- Officer Use of Force: "In 2009 we found a pattern or practice of unnecessary and inappropriate uses of force by OPP correctional officers, in violation of the Constitution's requirement that any use of force be proportionate to the threat posed by the prisoner…. [s]o flagrant it constituted calculated abuse. OPP does not appear to have implemented any new systems to prevent, detect, or correct patterns of excessive use of force." Id. at 9.

- Absence of Grievance System: "As we found in 2009 and as highlighted in the OJP PREA Report, OPP continues to lack a functional grievance system." Id. at 10.

- Deficient Suicide Prevention: "As we found in 2009, OPP is deliberately indifferent to the risk of prisoner suicides." Id. at 11. (Noting conditions on the mental health tier were "horrific" and "deplorable.")

- Mental Health Care: "OPP continues to lack the appropriate staff and structure to provide constitutionally adequate mental health care." Id. at 13.

It simply cannot be said that the Defendants were not on notice of precisely the claims raised in Plaintiffs' Complaint, and in this Motion. In addition to the DOJ findings, Defendants were on notice of the conditions for multiple other reasons. Hundreds of lawsuits have been filed against OPP, and thousands of prisoner grievances have been filed. Criminal defense attorneys have petitioned the state court criminal judges to move their clients for their safety, and the criminal court judges have tried to accomplish this, by ordering Defendant Gusman to move certain brutalized prisoners. There has been extensive testimony by some of the Defendants in front of government panels and various courts.

Finally, as in Farmer, Defendants were aware of the risk because it is obvious. It has been covered in the media, and one cannot walk around in OPP and not see the deplorable conditions, and people with injuries. Plaintiffs will prevail on their claim that Defendants were deliberately indifferent to the risk of harm; these Defendants knew of and disregarded a significant risk.  For three years Defendants failed to correct deficient

policies or procedures, and failed to adequately train and supervise the deputies, which led to the harm to the putative Plaintiff class.

Plaintiffs' theory of liability against the Defendants is two-fold.  First, injunctive relief is appropriate because Defendants personally implemented and executed deficient policies that are leading to harm to the Plaintiffs and the putative class.   Second, injunctive relief is appropriate against these Defendants due to their failure to train and supervise their deputies and employees.  "For a supervisory official to be held liable, they must 'affirmatively participate in acts that cause constitutional deprivation' or 'implement unconstitutional policies that causally result in plaintiff's injury.'"  Hinojosa v. Johnson, 277 F. App'x 370, 379 (5th Cir. 2008), quoting Mouille v. City of Live Oak, 977 F.2d 924, 929 (5th Cir. 1992).   Here Plaintiffs can prove both Defendants' personal involvement in the harm that has befallen them, and Defendants' personal failure to train and supervise subordinates, which are the policies that have caused them harm.

<em>a.  Defendants personally created policies and practices that are deliberately indifferent to Plaintiffs' rights</em>

In the instant case, Defendants not only were deliberately indifferent to the needs of the Plaintiffs by failing to act, but they, as policymakers, actively implemented policies or practices that caused harm. The Defendants may not have been personally present for each injury sustained by the Plaintiffs, but that is no bar to liability.  Defendants are "deliberately indifferent" if they implemented policies that led to the harm to the Plaintiffs, as Plaintiffs will show these Defendants have.  As the DOJ chronicled above, and as Plaintiffs will show, Defendants have adopted policies of inadequate staffing, medical care, classification and security that have resulted in injury.  Regardless of what Defendants' written policies provide, "[i]n some cases, a condition may reflect an

unstated or *de facto* policy, as evidenced by a pattern of acts or omissions 'sufficiently extended or pervasive, or otherwise typical of extended or pervasive misconduct by [jail] officials, to prove an intended condition or practice." Shepherd v. Dallas County, 591 F.3d 445, 452 (5th Cir. 2009), *quoting* Hare v. City of Corinth, 74 F.3d 633, 645 (5th Cir. 1996). *See also* Duvall v. Dallas County, TX, 631 F.3d 203, 208 (5th Cir. 2011).

>   b.  *Defendants are deliberately indifferent to Plaintiffs' rights by failing to train and supervise their subordinates*

Additionally, Defendants are deliberately indifferent for "failure to train and supervise" the deputies at OPP. To succeed on a failure to supervise claim, a plaintiff must show: "(1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference." Smith v. Brenoettsy, 158 F.3d 908, 911-12 (5th Cir. 1998) *citing* Hinshaw v. Doffer, 785 F.2d 1260, 1263 (5th Cir. 1986).  In the instant case, Plaintiffs will show that Defendants have failed to adequately train and supervise their deputies. As attested to in the attached declarations, deputies are simply unavailable to prisoners. They are smoking, surfing the internet, or simply absent.  Regardless of what Defendants' written policies provide, Defendants have failed to ensure that deputies are adequately trained to do their jobs, and have failed to supervise them to ensure that they are actually doing their jobs. These failures have led to the harm to the Plaintiffs and the putative class.

In both failing to adopt adequate policies, and in failing to supervise staff, Defendants have been indifferent to Plaintiffs' constitutional rights.  This indifference is deliberate, as it is beyond question that Defendants are aware of the risks to Plaintiffs, and requires remedy from this Court.

15

**B. Plaintiffs will prevail on their claim that Defendants fail to provide constitutionally adequate mental health care.**

The Eighth Amendment imposes a duty on prison officials to ensure that inmates receive adequate medical care.  Easter v. Powell, 467 F.3d 459, 463 (5th Cir. 2006). In Estelle v. Gamble, the Supreme Court established that "deliberate indifference to serious medical needs of prisoners" constitutes a violation of the Eighth Amendment's proscription against cruel and unusual punishment.  429 U.S. 97, 104 (1976). "The crucial question in determining an Eighth Amendment claim 'is whether the prison official, acting with deliberate indifference, exposed a prisoner to a sufficiently substantial risk of serious damage to his future health.'"  Burleson v. Tex. Dep't of Criminal Justice, 393 F.3d 577, 589 (5th Cir. 2004),  quoting Farmer v. Brennan, 511 U.S. 825, 843 (1994).

According to the Fifth Circuit, a "serious medical need" is "one for which treatment has been recommended or for which the need is so apparent that even laymen would recognize that care is required." Gobert v. Caldwell, 463 F.3d 339, 345 n.12 (5th Cir. 2006). Serious medical needs are not limited to physical ailments; needs for psychological or psychiatric treatment qualify as well, Domino v. Tex. Dep't of Criminal Justice, 239 F.3d 752, 754 (5th Cir. 2001), because "mental health needs are no less serious than physical needs." Gates v. Cook, 376 F.3d 323, 332 (5th Cir. 2004). To assert a cognizable claim, a plaintiff must allege that prison officials "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." Brewster, 587 F.3d at 770.  All of those elements are met here. As the DOJ just found, "OPP continues to lack the appropriate staff and structure to provide constitutionally adequate mental health care. OPP's mental health services continue to be deficient in the

following areas: (1) evaluation and screening; (2) staffing; (3) assessment and treatment; (4) treatment planning; and (5) quality assurance review." Exhibit 1 at 13.

In <u>Newman v. Alabama</u>, 503 F.2d 1320 (5th Cir. 1974), the Fifth Circuit affirmed the district court's finding that the Alabama Penal System's "nominal assistance to mentally ill inmates" was part of the entire medical care system's violation of the Eighth Amendment. <u>Id.</u> at 1324. No psychiatrists, social workers or counselors were employed in any of APS' facilities, and one clinical psychologist spent one afternoon per week at three separate prisons.  <u>Id.</u>  OPP suffers many of the same deficiencies, as the DOJ just noted that OPP employs "one full-time psychiatrist, one social worker, and four LPNs, who were supervised by one registered nurse.  OPP's mental health staff is grossly inadequate to handle OPP's daily population of about 2,900 prisoners." Exhibit 1 at 15.  This is not a new problem, as the same issues were identified in the DOJ's 2009 report on OPP. Ex.3 at 17.

In <u>Gates v. Cook</u>, 376 F.3d 323 (5th Cir. 2004), the Fifth Circuit affirmed the injunction issued to remedy the "grossly inadequate" mental health care afforded to Death Row inmates.  Some of the constitutionally-deficient characteristics included the following: lack of other mental health services besides medication; inadequate comprehensive mental health evaluations by specialists; visits by specialists at inmates' cells within hearing of other inmates and guards; sporadic monitoring of inmates receiving psychotropic medications; minimal inmate contact with medical staff; and inmates being prescribed the wrong medication or no medication for long periods of time, potentially leading to dangerous physical side effects or psychotic breakdowns.  Almost identical violations exist at OPP. The DOJ found that whereas the national average is that 18-30% of prisoners need mental health care, at OPP only 6% of prisoners are identified

as needing mental health care. "The shockingly low number of prisoners receiving mental health care at OPP reflects a system-wide breakdown in identifying prisoners in need of treatment." Exhibit 1 at 14.

The stories of Plaintiffs and witnesses attest to the very real human cost of Defendants' continued refusal to adopt an adequate mental health care system. The failures of the Defendants are not theoretical—these failures inflict very real harm on the individuals in the Defendants' custody. These serious deficits contribute to the chaos and culture of violence in the facility, and cause people with serious mental illness to rapidly decline.

- Roy Metrejean is diagnosed with schizophrenia and bipolar disorder, and was receiving medication prior to arriving at OPP, "for these illnesses and for my visual and auditory hallucinations." However, when Roy arrived at OPP Defendant Higgins discontinued all medications except one, from which he weaned Roy off. Roy is experiencing a mental health crisis.[10] "I haven't received any mental health medication for the past two months even though I have filed several sick calls and grievances asking for it. Some nights I cry myself to sleep because of my hallucinations and because I'm so scared for my life."

- Jaime Hernandez is diagnosed with bipolar disorder. He has been in OPP since February 2012 and has yet to receive his medication, despite meeting with Defendant Higgins. "My mind is going crazy and I need help."

- Durrell Richard is not a mental health patient at OPP, but was transferred to the mental health floor after enduring a sexual assault in February 2012. "I spent a week and a half on the tenth floor of HOD,[11] which was horrible. I don't know why I was there, as they kept asking me if I wanted to hurt myself or others and I kept telling them I didn't. That place was straight out of a bad movie, as what was going on was so ridiculous I could not even believe it was happening. There was a mentally ill man with a colostomy bag that would never get changed, and he sat in his own filth for days. There was another man, named R.R., who I think was

---

[10] Plaintiffs apologize to the Court for filing Roy's declaration as a handwritten document. His call to our office came in as an emergency on April 30, 2012, and we were only able to see him on the date of this filing, which prohibited the multiple visits necessary to obtain a typed declaration.

[11] The tenth floor of the House of Detention was the mental health/ "psychiatric tier" for Orleans Parish Prison, until the Sheriff announced the closure of HOD.

mentally ill, and lots of other male prisoners would put their penises in his mouth. This happened repeatedly. Finally, there was a third mentally ill gay man who I saw get dragged by his legs down the hallway by other prisoners, while everyone hit him with their shoes and he cried out for help. I was desperate to get out of there."

- Michael Simonson is a mentally ill man who was determined incompetent to stand trial, transferred to the state hospital, restored, and sent back to OPP. Michael arrived at OPP on March 26, 2012, and was placed on the mental health tier. Five days later he was beaten badly in the face with shackles by other prisoners. He also witnessed a stabbing in his cell on that tier. "I was threatened that … if I didn't give up my mental health medication that I would not wake up the next morning and that I would be beat with a pair of shackles. While in the shower I was approached by the same group of men who physically assaulted me. They grabbed a broomstick and began to slap me on my rear end with the broomstick. They then told me if I don't give them my mental health medication the broomstick was going up my butt." Michael was one of ten men sleeping on the floor in his cell on the mental health tier.

- In late March 2012 Plaintiff LaShawn Jones, who is mentally ill, was beaten by a female deputy. OPP officials continue to allow this deputy to have access to her. Witness Khadijad Smith says "Then I heard the sounds of someone getting hit- like pop pop pop pop. I saw the guard leave the cell. My cell hadn't been closed all the way so once the guards cleared out I left my cell to go take a look at LaShawn. Her right eye looked busted open like she had been kicked or hit in the face with an object- the way she looked there is no way someone did that with their fists. She was bleeding all over herself from her injuries and was saying her jaw was broke. She wasn't wearing any clothes except her underwear. LaShawn stayed in her cell for two days before anyone took her to get medical attention. For those two days, she slept the entire time, except for when we woke her up to make sure she ate."

- Plaintiff Kent Anderson, who lives with a mental illness, is not receiving his medication. Kent requires medication for stress, anxiety and claustrophobia.  Upon arrival at OPP, it took months for Kent to receive his medication, despite his fiancé bringing the medication to the jail to encourage them to treat Kent. This caused Kent to become suicidal.  "It's hard to keep waking up." Although he now receives his medication, he still does not receive it consistently.  "I'm in Templeman Phase V now and the nurses say that the jail has run out of my medicine. They haven't given me my medicine for anxiety or claustrophobia in five or six days."

- Nathanial Johnson is schizophrenic and is not receiving adequate treatment. "I've been locked up since June 2011 and I have been struggling a lot. Part of the reason I am having a hard time is because I'm

schizophrenic and I'm not getting any help. I hear voices that tell me to hurt myself and others. In February I was struggling so much that I tried hanging myself. Guards weren't around and I would have done it, but other guys on the tier calmed me down. They yelled for guards who came several minutes later. The guys told them I was trying to commit suicide, so they sent me to suicide watch. I didn't get any help though. I tried telling Dr. Higgins about my diagnosis and the voices I hear when I was on HOD 10. I had also talked to him about it before that when I was still over at Old Parish Prison and he didn't do anything. I saw Dr. Higgins again on April 30, 2012 and I told him about the voices. He just told me, 'don't listen to them.' I hear the voices every day. It's not getting better and they're hard to ignore. I have seen inmates beat each other up in different buildings and now the deputies have hurt me. I am afraid for my safety."

Plaintiffs have a substantial likelihood of success on their mental health care claims.

## II.  Preliminary Relief is Essential to Prevent Irreparable Harm

The second factor a court is to consider in assessing whether to issue temporary injunctive relief is whether the movant will sustain irreparable harm should the injunction not issue.  "Irreparable harm" means harm that cannot be compensated for by money damages.  "In general, harm is irreparable, in the context of a preliminary injunction, where there is no adequate remedy at law, such as money damages…." Janvey v. Alguire, 647 F.3d 585, 600 (5th Cir. 2011).  "However, the mere fact that economic damages may be available does not always mean that remedy at law is 'adequate.'" Id.  In this instance, Plaintiffs are at risk of sustaining irreparable harm should an injunction not issue, for two separate reasons.

First, the Fifth Circuit, and other courts, have consistently held that denial of constitutional rights constitutes irreparable injury. Deerfield Medical Center v. City of Deerfield, 661 F.2d 328, 383 (5th Cir. 1981); Murillo v. Musegades, 809 F.Supp. 487 (W.D. Tex. 1992).  Plaintiffs' Eighth and Fourteenth Amendment rights are currently being violated, and are going to continue to be violated without this Court's intervention.

Second, in the instant case, Plaintiffs and putative class members are being violently attacked.  It is difficult to conceive of a greater irreparable harm than the sexual abuse, stabbings and, in some instances, outright torture that is occurring at OPP. Likewise, people living with mental illness deteriorate and are suffering greatly. This is not a case involving a breach of contract or question of specific performance, in which money damages can later compensate for an injury.  Class members' lives and futures are in serious and legitimate risk.

The nineteen Plaintiff and witness declarations attached to the Motion for Class Certification attest to these conditions.  R. Doc. 2-2; 2-3. The additional twenty-five declarations attached to this Motion document additional injury that has befallen individuals, and these stories are only the beginning of the 400 people that have requested help from SPLC.  Beyond these that have already sustained injury, there are thousands of others who are at risk, right now.   It is well-established that "injunctive relief is appropriate 'to prevent a substantial risk of serious injury from ripening into actual harm.'"  Thomas v. Bryant, 614 F.3d 1288, 1318-19 (11th Cir. 2010) (quoting Farmer, 511 U.S. at 845) (affirming injunction against prison's chemical agent policy).  "In such circumstances, the irreparable-injury requirement may be satisfied by demonstrating a history of past misconduct, which gives rise to an inference that future injury is imminent."  Id. at 1318.  The instances of harm that have befallen the almost fifty declarants to this Court, as well as those incidents documented in the press and to the DOJ, demonstrate that the risk of harm to others in OPP is indeed "imminent."

## III.    Preliminary Relief Would Not Disserve the Public Interest.

Because the Defendants in this case are "public servants charged with the enforcement of the law" – including the Constitution – it is appropriate to "consider

21

together the balancing of the equities required by test three and the question of whether the injunction would disserve the public interest, which is test four." Spiegel v. City of Houston, 636 F.2d 997, 1002 (5th Cir. 1981); *accord* Thomas v. Johnston, 557 F. Supp. 879, 918 (W.D. Tex. 1983). There is no question that both tests are met in this case. It is well-settled that the public interest is always served by ensuring compliance with the Constitution and civil rights law. *See*, *e.g.*, Valley v. Rapides Parish School Board, 118 F.3d 1047, 1056 (5th Cir. 1997); G&V Lounge, Inc. v. Mich. Liquor Control Comm'n, 23 F.3d 1071, 1079 (6th Cir. 1994). The relief requested by the Plaintiffs—jail conditions that comply with the U.S. Constitution—is already the Defendants' obligation. It is clearly in the public interest that the jail conditions be remedied, as the facility that we have now is churning out more violent, angry individuals than go in, and also is so poorly staffed that people are escaping. Injunctive relief will forward the public interest.

## IV.    The Requirement That a Bond Be Posted Should Be Waived

The Plaintiffs respectfully request that the Court exercise its discretion to waive the bond requirement customarily associated with the issuance of preliminary injunctive relief. *See* Fed. R. Civ. P. 65(c). Several courts have declined to require plaintiffs to post bond in connection with temporary restraining orders and preliminary injunctions. *See* Moltan Co. v. Eagle-Picher Indus., Inc., 55 F.3d 1171, 1176 (6th Cir. 1995) (approving waiver of bond given strength of case and "the strong public interest involved"); Bookfriends, Inc. v. Talt, 223 F. Supp. 2d 932, 953 (S.D. Ohio 2002) (declining to require bond based on finding that defendants would suffer no monetary damage in the event they were wrongfully enjoined); Sluiter v. Blue Cross & Blue Shield, 979 F. Supp. 1131, 1145 (E.D. Mich. 1997) ("Due to the strong likelihood of Plaintiffs' success on the merits and their demonstrated financial inability, the Court finds it would be improper to require any

security in this matter.").   In this case, several factors counsel in favor of waiver, including the strength of the claims, the Plaintiffs' indigency, and the strong public interest involved.

### Conclusion

Plaintiffs request that their motion for an immediate preliminary injunction be granted and that the bond requirement be waived.  Immediate intervention by this Court is necessary to remedy the constitutional deficiencies at OPP. Since the filing of this case, and even after the DOJ's findings letter on April 24, 2012, prisoners have been seriously harmed in OPP.  Prisoners have no way to fend for themselves. The jail's internal grievance system does not work, as attested to by Plaintiffs, and as found by the DOJ.[12]

> When I complained about being put in a cell with someone who was threatening me, a guard said, 'let them kill each other' to another guard. Later on, the same guy jumped me. Prior to his attack, I filed a grievance alerting the jail to his threats and my fear for my safety. The fact the guards didn't prevent him from attacking me when they could have really traumatized me. Things are out of control in this jail, regardless of the facility. Guards don't protect you. It's like the inmates run the jail.

Ex. 2, Walters Decl. ¶¶ 4-6.

The Sheriff is not going to fix the problems voluntarily. Last week, when the federal government declared conditions unconstitutional, Defendant Gusman called the Department of Justice's findings "sensationalized."[13]   When similar findings were released in 2009 he called the letter "terribly dated, fundamentally flawed work done by

---

[12] "As we found in 2009 and as highlighted in the OJP PREA Report, OPP continues to lack a functional prisoner grievance system." Exh. 1 at 10.

[13] New Orleans CityBusiness, *Gusman Responds to Justice Department Letter on Orleans Parish Prison Conditions,* April 24, 2012. http://neworleanscitybusiness.com/thenewsroom/2012/04/24/gusman-responds-to-justice-department-letter-on-orleans-parish-prison-conditions/, last visited April 30, 2012.

people who obviously have little appreciation for the tasks facing a city in recovery…."[14] The conditions have existed for years, and Defendant Gusman has personally been on notice *at least* since 2009. The Department of Justice was "distressed that the problems we described in our initial findings letter persist or have worsened." Ex. 1 at 2. "It is largely uncontestable that the deficiencies in the operation of OPP violate the Constitution." Id.

Plaintiffs' likelihood of success on the merits is great. Plaintiffs and everyone in OPP face a substantial risk of irreparable injury should this Court not intervene. It is in the public interest that this Court issue an injunction.

Respectfully submitted,

/s/ Katie M. Schwartzmann
Katie Schwartzmann, La. Bar No. 30295
Sheila A. Bedi, Miss. Bar No. 101652
(application for admission *pro hac vice* forthcoming)
The Southern Poverty Law Center
4431 Canal Street
New Orleans, Louisiana 70119
504-486-8982 (telephone)
504-486-8947 (facsimile)
Counsel for Plaintiffs

CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document will be filed electronically via the Court's CM/ECF system, which will automatically provide notice to all parties, this 1st day of May 2012.

/s/ Katie M. Schwartzmann
Katie M. Schwartzmann

---

[14] Times Picayune, *Orleans Parish Prison Conditions Unconstitutional, Justice Department Finds*, September 22, 2009, http://www.nola.com/crime/index.ssf/2009/09/justice_department_finds_some.html, last visited April 30, 2012.