UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

_____

LASHAWN JONES, *et al.*, and            )
THE UNITED STATES OF AMERICA,           )
                                        )   Civil Action No. 2:12-cv-00859
PLAINTIFFS,                             )   Section I
                                        )   Judge Lance M. Africk
v.                                      )   Magistrate Judge Chasez
                                        )
MARLIN GUSMAN, Sheriff,                 )
                                        )
                                        )
DEFENDANT.                              )
_____ )


**CONSENT JUDGMENT**

## TABLE OF CONTENTS

I.   PARTIES ................................................................................................- 1 -

II.   INTRODUCTION ....................................................................................- 1 -

III.   DEFINITIONS ........................................................................................- 2 -

IV.   SUBSTANTIVE PROVISIONS ..............................................................- 5 -

   A.   PROTECTION FROM HARM .............................................................- 5 -

      1.   Use of Force Policies and Procedures ...........................................- 5 -

      2.   Use of Force Training ....................................................................- 6 -

      3.   Use of Force Reporting ..................................................................- 7 -

      4.   Early Intervention System ("EIS") ............................................. - 10 -

      5.   Safety and Supervision ................................................................ - 11 -

      6.   Security Staffing .......................................................................... - 13 -

      7.   Incidents and Referrals ................................................................ - 14 -

      8.   Investigations .............................................................................. - 16 -

      9.   Pretrial Placement in Alternative Settings: ................................. - 17 -

      10.   Custodial Placement within OPP ................................................. - 17 -

      11.   Prisoner Grievance Process ......................................................... - 18 -

      12.   Sexual Abuse ............................................................................... - 19 -

      13.   Access to Information .................................................................. - 19 -

   B.   MENTAL HEALTH CARE ................................................................ - 19 -

      1.   Screening and Assessment ........................................................... - 20 -

      2.   Treatment ..................................................................................... - 21 -

      3.   Counseling................................................................................... - 22 -

      4.   Suicide Prevention Training Program .......................................... - 22 -

5. Suicide Precautions ....................................................................................... - 24 -

6. Use of Restraints .......................................................................................... - 25 -

7. Detoxification and Training ........................................................................... - 26 -

8. Medical and Mental Health Staffing .............................................................. - 27 -

9. Risk Management .......................................................................................... - 27 -

C. MEDICAL CARE ............................................................................................... - 29 -

1. Quality Management of Medication Administration .................................... - 29 -

2. Health Care Delivered .................................................................................. - 30 -

3. Release and Transfer .................................................................................... - 31 -

D. SANITATION AND ENVIRONMENTAL CONDITIONS .................................... - 31 -

1. Sanitation and Environmental Conditions.................................................... - 31 -

2. Environmental Control ................................................................................. - 32 -

3. Food Service ................................................................................................. - 32 -

4. Sanitation and Environmental Conditions Reporting................................... - 33 -

E. FIRE AND LIFE SAFETY ................................................................................... - 33 -

1. Fire and Life Safety....................................................................................... - 33 -

2. Fire and Life Safety Reporting...................................................................... - 34 -

F. LANGUAGE ASSISTANCE ................................................................................ - 34 -

1. Timely and Meaningful Access to Services .................................................. - 34 -

2. Language Assistance Policies and Procedures.............................................. - 35 -

3. Language Assistance Training ....................................................................... - 36 -

4. Bilingual Staff ............................................................................................... - 37 -

G. YOUTHFUL PRISONERS .................................................................................. - 37 -

V. FUNDING........................................................................................................... - 37 -

VI. THE NEW JAIL FACILITY ................................................................................. - 38 -

VII.   COMPLIANCE AND QUALITY IMPROVEMENT ..................................................... - 38 -

VIII.   REPORTING REQUIREMENTS AND RIGHT OF ACCESS ................................. - 39 -

IX.   MONITORING ............................................................................................................ - 40 -

X.   ENFORCEMENT ......................................................................................................... - 42 -

XI.   CONSTRUCTION, IMPLEMENTATION, AND TERMINATION ........................... - 43 -

XII.   STIPULATION PURSUANT TO THE PRISON LITIGATION REFORM ACT,
        18 U.S.C. § 3626 ......................................................................................................... - 44 -

## I.    <u>PARTIES</u>

This Consent Judgment ("Agreement") is entered among and between the Plaintiff class; United States of America, acting through the United States Department of Justice; and the Orleans Parish Sheriff (in his official capacity).

## II.    <u>INTRODUCTION</u>

1.    The purpose of this Agreement is to address the constitutional violations alleged in this matter, as well as the violations alleged in the findings letter issued by the United States on September 11, 2009.   The Orleans Parish Prison ("OPP") is an integral part of the public safety system in New Orleans.  Through the provisions of this Agreement, the Parties seek to ensure that the conditions in OPP protect the constitutional rights of prisoners confined there.  By ensuring that the conditions in OPP are constitutional, the Sheriff will also provide for the safety of staff and promote public safety in the community.

2.    Plaintiffs are the settlement class (*Jones* and *JJ* Plaintiffs) and the United States.  The Parties agree to a settlement class comprised of all individuals who are now or will be imprisoned in OPP.

3.    Defendant is the Orleans Parish Sheriff (in his official capacity) and each of his successors in office  ( the "Defendant").  Defendant shall ensure that the Orleans Parish Sheriff's Office ("OPSO") will take all actions necessary to comply with the provisions of this Agreement.

4.    As indicated in Section XII of this Agreement, the Parties consent to a finding that this Agreement complies in all respects with the provisions of the Prison Litigation Reform Act, 18 U.S.C. § 3626(a).

5.    OPP is a parish-wide correctional facility in New Orleans, Louisiana.  OPSO is responsible for providing care, custody, and control of prisoners.  The Parties recognize that the conditions in OPP and the treatment of prisoners confined there have an impact on whether prisoners will be successfully re-integrated on release, whether released prisoners will re-offend, and on the public confidence in the criminal justice system.

6.    OPSO has taken steps to address concerns at OPP.  OPSO has in place certain policies, practices, and procedures, and has plans to adopt certain other policies, practices, and procedures.  This Consent Judgment is based on these policies, practices, and procedures, and contemplates that the dispute between the Parties will be resolved by the continued development and implementation of these measures.

### III.    <u>DEFINITIONS</u>

1.  "OPSO" refers to the Orleans Parish Sheriff's Office, which is responsible for all corrections and security functions at the Facility.

2.  "OPP" or "Facility" or "Jail" refers to the Orleans Parish Prison, and shall include the Temporary Detention Center ("TDC"), Templeman V, Conchetta, the FEMA-supplied windowless canvas-tents ("The Tents"), the original Orleans Parish Prison Jail, and the Broad Street work-release facility, as well as any facility that is built, leased, or otherwise used, to replace or supplement the current OPP or any part of OPP.

3.  "DOJ" refers to the United States Department of Justice, which represents the United States in this matter.

4.  "SPLC" refers to the Southern Poverty Law Center, which represents the Plaintiff class in this matter.  Should SPLC cease to represent the Plaintiff class, "Plaintiffs' counsel" will be substituted for "SPLC."

5.  "Assessment factors" refers to the evaluation or estimate of the levels of risk for suicide and self-injurious behavior requiring intervention.

6.  "Bilingual staff" means a staff person who has demonstrated and verified proficiency, pursuant to generally accepted objective criteria, in both spoken English and at least one other language as authorized by OPP.  Bilingual staff must be routinely assessed and serve as bilingual employees on behalf of OPP.

7.  Consistent with, or in accordance with, the term "generally accepted correctional standards" shall mean those industry standards accepted by correctional professionals or organizations in the relevant subject area as agreed to by the Parties (e.g., the NCCHC or ACA).

8.  "Days" are measured in calendar days; weekend days are included.

9.  "Describe" means provide a clear and detailed description of anything done, seen, or heard.

10. "District Attorney" or "DA's Office" refers to the Orleans Parish District Attorney's Office.

11. "Document" when used in this Agreement as a verb means completing a report either in hard copy or in electronic format.

12. "Effective Date" means the date the Court enters a definitive judgment regarding the amount of funding needed to ensure compliance with the signed Agreement that has been entered as a court order by the Court.

13.    "EIS" means the Early Intervention System, which is a system to collect and analyze data regarding uses of force and is used to identify the need for corrective action, including changes to training protocols and policy or retraining or disciplining individual officers or groups of officers.

14.    "Emergency maintenance needs" means items that affect building security, or which may cause imminent danger to the life, safety, or health of prisoners.

15.    "Good cause" means fair and honest reasons, regulated by good faith on the part of either party, that are not arbitrary, capricious, trivial, or pretextual.

16.    "IAD" refers to the Internal Affairs Division.

17.    "Include," "includes", or "including" means "include, but not be limited to" or "including, but not limited to."

18.    "Interdisciplinary Team" refers to a team consisting of treatment staff from various disciplines, including medical, nursing, and mental health and one or more members from security.

19.    "Limited English Proficient" or "LEP" refers to a person who does not speak English as his/her primary language and has a limited ability to read, write, speak, or understand English.  LEP individuals may be competent in certain types of communication (e.g. speaking or understanding), but still be LEP for other purposes (e.g. reading or writing).

20.    "Monitor" means an individual and his or her team of professionals, all of whom are selected by the Parties to oversee implementation of the Agreement.

21.    "NOPRS" means City of New Orleans PreTrial Release Services.

22.    "Prisoners" or "Prisoner" is construed broadly to refer to one or more individuals detained at, or otherwise housed, held, in the custody of, or confined at OPP based on arrests, detainers, criminal charges, civil contempt charges, or convictions.

23.    "Psychotropic medication" means any medication used to affect mental activity, perception, behavior, or mood.

24.    "Qualified Health Care Professional" means an individual who has received instruction and supervision in identifying and interacting with individuals in need of health care services.

25.    "Qualified Medical Professional" means a licensed physician, licensed physician assistant, or a licensed nurse practitioner, who is currently licensed by the State of Louisiana to deliver those health care services he or she has undertaken to provide.

26.    "Qualified Medical Staff" refers to Qualified Medical Professionals and Qualified Nursing Staff.

27.    "Qualified Mental Health Professional" refers to an individual with a minimum of masters-level education and training in psychiatry, psychology, counseling, social work or psychiatric nursing, who is currently licensed by the State of Louisiana to deliver those mental health services he or she has undertaken to provide.

28.    "Qualified Nursing Staff" means registered nurses and licensed practical nurses currently licensed by the State of Louisiana to deliver those health care services he or she has undertaken to provide.

29.    "Reportable incidents" refers to any incident that involves a Level 1 or 2 rule violation, a prisoner death or serious injury, serious suicide attempt, sexual threats, a cell extraction, a use of force or restraint, a medical emergency, escapes and escape attempts, and fires.

30.    "Serious injury" means any injury requiring hospitalization and/or follow-up medical care.

31.    "Serious suicide attempt" means a suicide attempt that is considered to be either potentially life-threatening or that requires hospitalization.  Even if caught in the early stages of the attempt, if the injury resulting from the attempted act could be life threatening, the suicide attempt is "serious" and is reportable under this Agreement.

32.    "Special Management Units" mean those housing units of the Facility designated for prisoners in administrative or disciplinary segregation, in protective custody, on suicide precautions, with mental illness, or who are youth age 17 and below.

33.    "Staff Members" includes all employees, including correctional officers, who have contact with prisoners.

34.    "Suicide Attempt" means any serious effort to commit an act of self-harm that can result in death and involving definite risk.

35.    "Suicide Precautions" means any level of watch, observation, or measures to prevent suicide or self-harm.

36.    "Train" means to instruct in skills to a level that the trainee has the demonstrated proficiency by testing to implement those skills as and when called for.  "Trained" means proficient in the skills.

37.    "Threshold" or "threshold event" means requiring a certain level of intervention due to a serious event or a number of serious events.  This term is further explained in Appendix A.

38.   "Triggers" or "triggering event" means an event or events, like a suicide or serious suicide attempt that causes the Facility to self-assess.  This term is further explained in Appendix A.

39.   "Use of force" means the application of physical or mechanical measures to compel compliance.  "Use of force" shall include all force to compel compliance except complaints of minor discomfort from un-resisted handcuffing or un-resisted shackling of prisoners for movement purposes.

40.   "Vital Documents" means paper or electronic written material that contains information that is critical for accessing OPP's programs, services, or activities, or is required by law. Vital documents may include grievance forms, notification to prisoners (such as rule violations, transfers, and grievance responses), prisoner handbooks, sick call forms, and request for service forms.

41.   "Youth" and "youthful prisoner" shall mean any person in OPSO custody who is age 17 or younger, or who is housed in OPP as a "transfer" youth being tried as an adult.

42.   Throughout this Agreement, the following terms are used when discussing compliance: substantial compliance, partial compliance, and non-compliance.  "Substantial Compliance" indicates that Defendant has achieved compliance with most or all components of the relevant provision of the Agreement.  "Partial Compliance" indicates that Defendant achieved compliance on some of the components of the relevant provision of the Agreement, but significant work remains.  "Non-compliance" indicates that Defendant has not met most or all of the components of the Agreement.

## IV.   SUBSTANTIVE PROVISIONS

### A.   PROTECTION FROM HARM

Consistent with constitutional standards, Defendant shall provide prisoners with a safe and secure environment and ensure their reasonable safety from harm.  OPSO shall take all reasonable measures to ensure that during the course of incarceration prisoners are not subjected to unnecessary or excessive force by OPSO staff and are protected from violence by other prisoners.

1.   Use of Force Policies and Procedures

   a.   OPSO shall develop, implement, and maintain comprehensive policies and procedures (in accordance with generally accepted correctional standards) relating to the use of force with particular emphasis regarding permissible and impermissible uses of force.

   b.   OPSO shall develop and implement a single, uniform, reporting system under a Use of Force Reporting policy.  OPSO reportable force shall be divided into two levels, as further specified in policy:  Level 1 uses of force will include all serious

uses of force (i.e., the use of force leads to injuries that are extensive, serious or visible in nature, including black eyes, lacerations, injuries to the mouth or head, multiple bruises, injuries to the genitals, etc.), injuries requiring hospitalization, staff misconduct, and occasions when use of force reports are inconsistent, conflicting, or otherwise suspicious.  Level 2 uses of force will include all escort or control holds used to overcome resistance that are not covered by the definition of Level 1 force.

c.      OPSO shall assess, annually, all data collected regarding uses of force and make any necessary changes to use of force policies or procedures to ensure that unnecessary or excessive use of force is not used in OPP.  The review and recommendations will be documented and provided to the Monitor, DOJ, and SPLC.

2.      Use of Force Training

a.      OPSO shall ensure that all correctional officers are knowledgeable of and have the knowledge, skills, and abilities to comply with use of force policies and procedures.  At a minimum OPSO shall provide correctional officers with pre-service and annual in-service training in use of force, defensive tactics, and use of force policies and procedures.  The training will include the following:

(1)     instruction on what constitutes excessive force;

(2)     de-escalation tactics; and

(3)     management of prisoners with mental illness to limit the need for using force.

b.      OPSO shall ensure that officers are aware of any change to policies and practices throughout their employment with OPP.  At a minimum, OPSO shall provide pre-service and annual in-service use of force training that prohibits:

(1)     use of force as a response to verbal insults or prisoner threats where there is no immediate threat to the safety or security of the institution, prisoners, staff or visitors;

(2)     use of force as a response to prisoners' failure to follow instructions where there is no immediate threat to the safety or security of the institution, prisoners, staff or visitors;

(3)     use of force against a prisoner after the prisoner has ceased to offer resistance and is under control;

(4)     use of force as punishment or retaliation; and

(5)    use of force involving kicking, striking, hitting, or punching a non-combative prisoner.

c.    OPSO shall randomly test five percent of the correctional officer staff on an annual basis to determine their knowledge of the use of force policies and procedures.  The testing instrument and policies shall be approved by the Monitor.  The results of these assessments shall be evaluated to determine the need for changes in training practices.  The review and conclusions will be documented and provided to the Monitor.

3.    Use of Force Reporting

a.    Failure to report a use of force incident by any staff member engaging in the use of force or witnessing the use of force shall be grounds for discipline, up to and including termination.

b.    OPSO shall ensure that sufficient information is collected on uses of force to assess whether staff members complied with policy; whether corrective action is necessary including training or discipline; the effectiveness of training and policies; and whether the conditions in OPP comply with this Agreement.  At a minimum, OPSO will ensure that officers using or observing a Level 1 use of force shall complete a use of force report that will:

(1)    include the names of all staff, prisoner(s), or other visual or oral witness(es);

(2)    contain an accurate and specific account of the events leading to the use of force;

(3)    describe the level of resistance and the type and level of force used, consistent with OPP use of force policy and procedure, as well as the precise actions taken by OPSO staff in response to the incident;

(4)    describe the weapon or instrument(s) of restraint, if any, and the manner of such use;

(5)    be accompanied by a prisoner disciplinary report, if it exists, pertaining to the events or prisoner activity that prompted the use of force incident;

(6)    describe the nature and extent of injuries sustained by anyone involved in the incident;

(7)    contain the date and time when medical attention, if any, was requested and actually provided;

(8)    describe any attempts the staff took to de-escalate prior to use of force;

(9)     include an individual written account of the use of force from every staff member who witnessed the use of force;

(10)    include photographs taken promptly, but no later than two hours after an use of force incident, of all injuries sustained, or as evidence that no injuries were sustained, by prisoners and staff involved in the use of force incident;

(11)    document whether the use of force was digitally or otherwise recorded. If the use of force is not digitally or otherwise recorded, the reporting officer and/or watch commander will provide an explanation as to why it was not recorded; and

(12)    include a statement about the incident from the prisoner(s) against whom force was used.

c.    All officers using a Level 2 use of force shall complete a use of force report that will:

(1)     include the names of staff, prisoner(s), or other visual or oral witness(es);

(2)     contain an accurate and specific account of the events leading to the use of force;

(3)     describe the level of resistance and the type and level of force used, consistent with OPP Use Of Force policy and procedure, as well as the precise actions taken by OPSO staff in response to the incident;

(4)     describe the weapon or instrument(s) of restraint, if any, and the manner of such use;

(5)     be accompanied by a prisoner disciplinary report, if it exists, pertaining to the events or prisoner activity that prompted the use of force incident;

(6)     describe the nature and extent of injuries sustained by anyone involved in the incident;

(7)     contain the date and time when medical attention, if any, was requested and actually provided; and

(8)     describe any attempts the staff took to de-escalate prior to use of force;

d.    OPSO shall require correctional officers to notify the watch commander as soon as practical of any use of force incident or allegation of use of force. When

notified, the watch commander will respond to the scene of all Level 1 uses of force. When arriving on the scene, the watch commanders shall:

(1)     ensure the safety of everyone involved in or proximate to the incident;

(2)     determine if any prisoner or correctional officer is injured and ensure that necessary medical care is provided;

(3)     ensure that personnel and witnesses are identified, separated, and advised that communications with other witnesses or correctional officers regarding the incident are prohibited;

(4)     ensure that witness and subject statements are taken of both staff and prisoner(s) outside of the presence of other prisoners and staff;

(5)     ensure that the supervisor's use of force report is forwarded to IAD for investigation if, upon the supervisor's review, a violation of law or policy is suspected. The determination of what type of investigation is needed will be based on the degree of the force used consistent with the terms of this Agreement;

(6)     If the watch commander is not involved in the use of force incident, the watch commander  shall review all submitted use of force reports within 36 hours of the end of the incident, and shall specify his findings as to completeness and procedural errors. If the watch commander believes that the use of force may have been unnecessary or excessive, he shall immediately contact IAD for investigation consideration and shall notify the warden or assistant warden; and

(7)     All Level 1 use of force reports, whether or not the force is believed by any party to be unnecessary or excessive, shall be sent to IAD for review. IAD shall develop and submit to the Monitor within 90 days of the Effective Date clear criteria to identify use of force incidents that warrant a full investigation, including injuries that are extensive or serious, visible in nature (including black eyes, injuries to the mouth, injuries to the genitals, etc.), injuries requiring hospitalization, staff misconduct (including inappropriate relationships with prisoners), and occasions when use of force reports are inconsistent, conflicting, or otherwise suspicious.

e.     Ensure that a first-line supervisor is present during all pre-planned uses of force, such as cell extractions.

f.     Within 36 hours, exclusive of weekends and holidays, of receiving the report and review from the shift commander, in order to determine the appropriateness of the force used and whether policy was followed, the Warden or Assistant Warden shall review all use of force reports and supervisory reviews including:

        (1)     the incident report associated with the use of force;

        (2)     any medical documentation of injuries and any further medical care;

        (3)     the prisoner disciplinary report associated with the use of force; and

        (4)     the Warden or Assistant Warden shall complete a written report or written statement of specific findings and determinations of the appropriateness of force.

g.     Provide the Monitor a periodic report detailing use of force by staff. These periodic reports shall be provided to the monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. Each report will include the following information:

        (1)     a brief summary of all uses of force, by type;

        (2)     date that force was used;

        (3)     identity of staff members involved in using force;

        (4)     identity of prisoners against whom force was used;

        (5)     a brief summary of all uses of force resulting in injuries;

        (6)     number of planned and unplanned uses of force;

        (7)     a summary of all in-custody deaths related to use of force, including the identity of the decedent and the circumstances of the death; and

        (8)     a listing of serious injuries requiring hospitalization.

h.     OPSO shall conduct, annually, a review of the use of force reporting system to ensure that it has been effective in reducing unnecessary or excessive uses of force. OPSO will document its review and conclusions and provide them to the Monitor, SPLC, and DOJ.

4.     Early Intervention System ("EIS")

a.     OPSO shall develop, within 120 days of the Effective Date, a computerized relational database ("EIS") that will document and track staff members who are involved in use of force incidents and any complaints related to the inappropriate or excessive use of force, in order to alert OPSO management to any potential problematic policies or supervision lapses or need for retraining or discipline. The Chief of Operations Deputy, supervisors, and investigative staff shall have

access to this information and shall review on a regular basis, but not less than quarterly, system reports to evaluate individual staff, supervisor, and housing area activity. OPSO will use the EIS as a tool for correcting inappropriate staff behavior before it escalates to more serious misconduct.

b.      Within 120 days of the Effective Date, OPSO senior management shall use EIS information to improve quality management practices, identify patterns and trends, and take necessary corrective action both on an individual and systemic level. IAD will manage and administer EIS systems. SOD will have access to the EIS. IAD will conduct quarterly audits of the EIS to ensure that analysis and intervention is taken according to the process described below. Command staff shall review the data collected by the EIS on at least a quarterly basis to identify potential patterns or trends resulting in harm to prisoners. The Use of Force Review Board will periodically review information collected regarding uses of force in order to identify the need for corrective action, including changes to training protocols and policy or retraining or disciplining individual staff or staff members. Through comparison of the operation of this system to changes in the conditions in OPP, OPSO will assess whether the mechanism is effective at addressing the requirements of this Agreement.

c.      OPSO shall provide, within 180 days of the implementation date of its EIS, to SPLC, DOJ and the Monitor, a list of all staff members identified through the EIS and corrective action taken.

d.      The EIS protocol shall include the following components: data storage, data retrieval, reporting, data analysis, pattern identification, supervisory assessment, supervisory intervention, documentation, and audit.

e.      On an annual basis, OPSO shall review the EIS to ensure that it has been effective in identifying concerns regarding policy, training, or the need for discipline. This assessment will be based in part on the number and severity of harm and injury identified through data collected pursuant to this Agreement. OPSO will document its review and conclusions and provide them to the Monitor, who shall forward this document to DOJ and SPLC.

5.      Safety and Supervision

Recognizing that some danger is inherent in a jail setting, OPSO shall take all reasonable measures to ensure that prisoners are not subjected to harm or the risk of harm. At a minimum, OPSO shall do the following:

a.      Maintain security policies, procedures, and practices to provide a reasonably safe and secure environment for prisoners and staff in accordance with this Agreement.

b.     Maintain policies, procedures, and practices to ensure the adequate supervision of prisoner work areas and trustees.

c.     Maintain policies and procedures regarding care for and housing of protective custody prisoners and prisoners requesting protection from harm.

d.     Continue to ensure that correctional officers conduct appropriate rounds at least once during every 30 minute period, at irregular times, inside each general population housing unit and at least once every 15 minute period of special management prisoners, or more often if necessary.  All security rounds shall be documented on forms or logs that do not contain pre-printed rounding times.  In the alternative, OPSO may provide direct supervision of prisoners by posting a correctional officer inside the day room area of a housing unit to conduct surveillance.

e.     Staff shall provide direct supervision in housing units that are designed for this type of supervision.  Video surveillance may be used to supplement, but must not be used to replace, rounds by correctional officers.

f.     Increase the use of overhead video surveillance and recording cameras to provide adequate coverage throughout the common areas of the Jail, including the Intake Processing Center, all divisions' intake areas, mental health units, special management units, prisoner housing units, and in common areas of the divisions.

g.     Continue to ensure that correctional officers who are transferred from one division to another are required to attend training on division-specific post orders before working on the unit.

h.     Continue to ensure that correctional officers assigned to special management units, which include youth tiers, mental health tiers, disciplinary segregation, and protective custody, receive eight hours of specialized training regarding such units on prisoner safety and security on at least an annual basis.

i.     Continue to ensure that supervisors conduct daily rounds on each shift in the prisoner housing units, and document the results of their rounds.

j.     Continue to ensure that staff conduct daily inspections of cells and common areas of the housing units to protect prisoners from unreasonable harm or unreasonable risk of harm.

k.     Continue to ensure that staff conduct random monthly shakedowns of cells and common areas so that prisoners do not possess or have access to dangerous contraband.

l.     Provide the Monitor a periodic report of safety and supervision at the Facility. These periodic reports shall be provided to the monitor within four months of the

Effective Date; and every six months thereafter until termination of this
Agreement.  Each report will provide the following information::

(1)     a listing of special management prisoners, their housing assignments, the
        basis for them being placed in the specialized housing unit, and the date
        placed in the unit; and

(2)     a listing of all contraband, including weapons, seized, including the type
        of contraband, date of seizure, location and shift of seizure.

6.      Security Staffing

a.      OPSO shall ensure that correctional staffing and supervision is sufficient to
        adequately supervise prisoners, fulfill the terms of this Agreement, and allow for
        the safe operation of the Facility, consistent with constitutional standards.  OPSO
        shall achieve adequate correctional officer staffing in the following manner:

(1)     Within 90 days of the Effective Date, develop a staffing plan that will
        identify all posts and positions, the adequate number and qualification of
        staff to cover each post and position, adequate shift relief and coverage for
        vacations.  The staffing plan will ensure that there is adequate coverage
        inside each housing and specialized housing area and to accompany
        prisoners for court, visits and legal visits and other operations of OPP and
        to comply with all provisions of this Agreement.  OPSO will provide its
        plan to the Monitor, SPLC, and DOJ for approval.  The Monitor, SPLC, or
        DOJ will have 60 days to raise any objections and recommend revisions to
        the staffing plan.

(2)     Within 120 days before the opening of any new facility, submit a staffing
        plan consistent with subsection (1) above.

(3)     Within 90 days after completion of the staffing study, OPSO shall recruit
        and hire a full-time professional corrections administrator to analyze and
        review OPP operations.   The professional corrections administrator shall
        report directly to the Sheriff and shall have responsibilities to be
        determined by the Sheriff.  The professional corrections administrator
        shall have at least the following qualifications:  (a) a bachelor's degree in
        criminal justice or other closely related field; (b) five years of experience
        in supervising a large correctional facility; and (c) knowledge of and
        experience in applying modern correctional standards, maintained through
        regular participation in corrections-related conferences or other continuing
        education.

(4)     Provide the Monitor a periodic report on staffing levels at the Facility.
        These periodic reports shall be provided to the monitor within four months

of the Effective Date; and every six months thereafter until termination of this Agreement  Each report will include the following information:

    i.     a listing of each post and position needed;

    ii.    the number of hours needed for each post and position;

    iii.   a listing of staff hired and positions filled;

    iv.   a listing of staff working overtime and the amount of overtime worked by each staff member;

    v.    a listing of supervisors working overtime; and

    vi.   a listing of and types of critical incidents reported.

b.    Review the periodic report to determine whether staffing is adequate to meet the requirements of this Agreement.  OPSO shall make recommendations regarding staffing based on this review.  The review and recommendations will be documented and provided to the Monitor.

7.    Incidents and Referrals

a.    OPSO shall develop and implement policies that ensure that Facility watch commanders have knowledge of reportable incidents in OPP to take action in a timely manner to prevent harm to prisoners or take other corrective action.   At a minimum, OPSO shall do the following:

b.    Continue to ensure that Facility watch commanders document all reportable incidents by the end of their shift, but no later than 24 hours after the incident, including prisoner fights, rule violations, prisoner injuries, suicide attempts, cell extractions, medical emergencies, found contraband, vandalism, escapes and escape attempts, and fires.

c.    Continue to ensure that Facility watch commanders report all suicides and deaths no later than one hour after the incident, to a supervisor, IAD, the Special Operations Division, and medical and mental health staff.

d.    Provide formal pre-service and annual in-service training on proper incident reporting policies and procedures.

e.    Implement a policy providing that it is a disciplinary infraction for staff to fail to report any reportable incident that occurred on his or her shift.  Failure to formally report any observed prisoner injury may result in staff discipline, up to and including termination.

    f.      Maintain a system to track all reportable incidents that, at a minimum, includes the following information:

        (1)     tracking number;

        (2)     the prisoner(s) name;

        (3)     housing classification and location;

        (4)     date and time;

        (5)     type of incident;

        (6)     injuries to staff or prisoner;

        (7)     medical care;

        (8)     primary and secondary staff involved;

        (9)     reviewing supervisor;

        (10)    external reviews and results;

        (11)    corrective action taken; and

        (12)    administrative sign-off.

e.      Ensure that incident reports and prisoner grievances are screened for allegations of staff misconduct, and, if the incident or allegation meets established criteria in accordance with this Agreement that it is referred for investigation.

f.      Provide the Monitor a periodic data report of incidents at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement.

g.      The report will include the following information:

        (1)     a brief summary of all reportable incidents, by type and date;

        (2)     a description of all suicides and in-custody deaths, including the date, name of prisoner, and housing unit;

        (3)     number of prisoner grievances screened for allegations of misconduct; and

        (4)     number of grievances referred to IAD or SOD for investigation.

h.      Conduct internal reviews of the periodic reports to determine whether the incident reporting system is ensuring that the constitutional rights of prisoners are respected. Review the quarterly report to determine whether the incident reporting system is meeting the requirements of this Agreement. OPSO shall make recommendations regarding the reporting system or other necessary changes in policy or staffing based on this review. The review and recommendations will be documented and provided to the Monitor.

8.      Investigations

OPSO shall ensure that it has sufficient staff to identify, investigate, and recommend correcting misconduct that has or may lead to a violation of the Constitution. At a minimum, OPSO shall:

a.      Maintain implementation of comprehensive policies, procedures, and practices for the timely and thorough investigation of alleged staff misconduct, sexual assaults, and physical assaults of prisoners resulting in serious injury, in accordance with this Agreement. Investigations shall:

(1)     be conducted by persons who do not have conflicts of interest that bear on the partiality of the investigation;

(2)     include timely, thorough, and documented interviews of all relevant staff and prisoners who were involved in or who witnessed the incident in question, to the extent practicable; and

(3)     include all supporting evidence, including logs, witness and participant statements, references to policies and procedures relevant to the incident, physical evidence, and video or audio recordings.

b.      Continue to provide SOD and IAD staff with pre-service and annual in-service training on appropriate investigation policies and procedures, the investigation tracking process, investigatory interviewing techniques, and confidentiality requirements.

c.      Ensure that any investigative report indicating possible criminal behavior will be referred to IAD/SOD and then referred to the Orleans Parish District Attorney's Office if appropriate.

d.      Provide the Monitor a periodic report of investigations conducted at the Facility. These periodic reports shall be provided to the monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement.

e.      The report will include the following information:

(1)     a brief summary of all completed investigations, by type and date;

(2)     a listing of investigations referred for administrative investigation;

(3)     a listing of all investigations referred to an appropriate law enforcement agency and the name of the agency; and

(4)     a listing of all staff suspended, terminated, arrested or reassigned because of misconduct or violations of policy and procedures.  This list must also contain the specific misconduct and/or violation.

f.      OPSO shall review the periodic report to determine whether the investigation system is meeting the requirements of this Agreement and make recommendations regarding the investigation system or other necessary changes in policy based on this review.  The review and recommendations will be documented and provided to the Monitor.

9.      Pretrial Placement in Alternative Settings:

a.      OPSO shall maintain its role of providing space and security to facilitate interviews conducted pursuant to the City's pretrial release program, which is intended to ensure placement in the least restrictive appropriate placement consistent with public safety.

b.      OPSO shall create a system to ensure that it does not unlawfully confine prisoners whose sole detainer is by Immigration and Customs Enforcement ("ICE"), where the detainer has expired.

10.     Custodial Placement within OPP

a.      OPP shall implement an objective and validated classification system that assigns prisoners to housing units by security levels, among other valid factors, in order to protect prisoners from unreasonable risk of harm.  The system shall include consideration of a prisoner's security needs, severity of the current charge, types of prior commitments, suicide risk, history of escape attempts, history of violence, gang affiliations, and special needs, including mental illness, gender identity, age and education requirements.  OPSO shall anticipate periods of unusual intake volume and schedule sufficient classification staff to classify prisoners within 24 hours of booking and perform prisoner reclassifications, assist eligible DOC prisoners with re-entry assistance (release preparation), among other duties related to case management.

b.      Prohibit classifications based solely on race, color, national origin, or ethnicity.

c.    Ensure that the classification staff has sufficient access to current information regarding cell availability in each division.

d.    Continue to update the classification system to include information on each prisoner's history at OPSO.

e.    Continue competency-based training and access to all supervisors on the full capabilities of the OPSO classification and prisoner tracking system.

f.    Conduct internal and external review and validation of the prisoner classification system on at least an annual basis.

g.    Provide the Monitor a periodic report on classification at the Facility. These periodic reports shall be provided to the monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. Each report will include the following information:

(1)    number of prisoner-on-prisoner assaults;

(2)    number of assaults against prisoners with mental illness;

(3)    number of prisoners who report having gang affiliations;

(4)    most serious offense leading to incarceration;

(5)    number of prisoners classified in each security level;

(6)    number of prisoners placed in protective custody; and number of misconduct complaints.

h.    OPSO shall review the periodic data report and make recommendations regarding proper placement consistent with this Agreement or other necessary changes in policy based on this review. The review and recommendations will be documented and provided to the Monitor.

11.    Prisoner Grievance Process

a.    OPSO shall ensure that prisoners have a mechanism to express their grievances, resolve disputes, and ensure that concerns regarding their constitutional rights are addressed. OPSO shall, at a minimum, do the following:

(1)    Continue to maintain policies and procedures to ensure that prisoners have access to an adequate grievance process and to ensure that grievances may be reported and filed confidentially, without requiring the intervention of a correctional officer. The policies and procedures should be applicable and standardized across all the Facility divisions.

(2)    Ensure that each grievance receives appropriate follow-up, including providing a timely written response and tracking implementation of resolutions.

(3)    Ensure that grievance forms are available on all units and are available in Spanish and Vietnamese and that there is adequate opportunity for illiterate prisoners and prisoners who have physical or cognitive disabilities or language barriers to access the grievance system.

(4)    Separate the process of "requests to staff" from the grievance process and prioritize grievances that raise issues regarding prisoner safety or health.

(5)    Ensure that prisoner grievances are screened for allegations of staff misconduct and, if an incident or allegation warrants per this Agreement, that it is referred for investigation.

(6)    A member of the management staff shall review the grievance tracking system quarterly to identify areas of concerns. These reviews and any recommendations will be documented and provided to the Monitor.

12.    Sexual Abuse

OPSO will develop and implement policies, protocols, trainings, and audits consistent with the requirements of the Prison Rape Elimination Act of 2003, 42 U.S.C. § 15601, et seq., and its implementation of regulations, including but not limited to, preventing, detecting, reporting, investigating, and collecting sexual abuse data, including prisoner-on-prisoner and staff-on-prisoner sexual abuse, sexual harassment, and sexual touching.

13.    Access to Information

OPSO will ensure that all newly admitted prisoners receive information, through an inmate handbook and, at the discretion of the Jail, an orientation video, regarding the following topics: understanding Facility disciplinary process and rules and regulations; reporting misconduct; reporting sexual abuse or assault; accessing medical and mental health care, emergency procedures, and sending and receiving mail, understanding the visitation process, and accessing the grievance process.

## B.    MENTAL HEALTH CARE

OPSO shall ensure constitutionally adequate intake, assessment, treatment, and monitoring of prisoners' mental health needs, including but not limited to, protecting the safety of and giving priority access to prisoners at risk for self-injurious behavior or suicide. OPSO shall assess on an annual or more frequent basis whether the mental health services at OPP comply with the Constitution. In order to provide mental health services to prisoners, OPSO, at a minimum, shall:

1.      Screening and Assessment

    a.      Develop and maintain comprehensive policies and procedures for appropriate screening and assessment of prisoners with mental illness.  These policies should include definitions of emergent, urgent, and routine mental health needs, as well as timeframes for the provision of services for each category of mental health needs.

    b.      Develop and implement an appropriate screening instrument that identifies mental health needs, and ensures timely access to a mental health professional when presenting symptoms requiring such care.  The screening instrument should include the factors described in Appendix B.  The screening instrument will be validated by a qualified professional approved by the Monitor within 180 days of the Effective Date and every 12 months thereafter, if necessary

    c.      Ensure that all prisoners are screened by Qualified Medical Staff upon arrival to OPP, but no later than within eight hours, to identify a prisoner's risk for suicide or self-injurious behavior.  No prisoner shall be held in isolation prior to an evaluation by medical staff.

    d.      Implement a triage policy that utilizes the screening and assessment procedures to ensure that prisoners with emergent and urgent mental health needs are prioritized for services.

    e.      Develop and implement protocols, commensurate with the level of risk of suicide or self-harm, to ensure that prisoners are protected from identified risks for suicide or self-injurious behavior.  The protocols shall also require that a Qualified Mental Health Professional perform a mental health assessment, based on the prisoner's risk.

    f.      For prisoners with emergent or urgent mental health needs, search the prisoner and monitor with constant supervision until the prisoner is transferred to a Qualified Mental Health Professional for assessment.

    g.      Ensure that a Qualified Mental Health Professional conducts appropriate mental health assessments within the following periods from the initial screen or other identification of need:

        (1)      14 days, or sooner, if medically necessary, for prisoners with routine mental health needs;

        (2)      48 hours, or sooner, if medically necessary, for prisoners with urgent mental health needs; and

(3)     immediately, but no later than two hours, for prisoners with emergent mental health needs.

h.     Ensure that a Qualified Mental Health Professional performs a mental health assessment no later than the next working day following any adverse triggering event (i.e., any suicide attempt, any suicide ideation, and any aggression to self resulting in serious injury).

i.     Ensure that a Qualified Mental Health Professional, as part of the prisoner's interdisciplinary treatment team, maintains a risk profile for each prisoner on the mental health case load based on the Assessment Factors identified in Appendix B, and develops and implements a treatment plan to minimize the risk of harm to each of these prisoners.

j.     Ensure adequate and timely treatment for prisoners, whose assessments reveal mental illness and/or suicidal ideation, including timely and appropriate referrals for specialty care and visits with Qualified Mental Health Professionals, as clinically appropriate.

k.     Ensure crisis services are available to manage psychiatric emergencies.  Such services include licensed in-patient psychiatric care, when clinically appropriate.

l.     On an annual basis, assess the process for screening prisoners for mental health needs to determine whether prisoners are being appropriately identified for care. Based on this assessment, OPSO shall recommend changes to the screening system.  The assessment and recommendations will be documented and provided to the Monitor.

2.     Treatment

a.     Review, revise, and supplement its existing policies in order to implement a policy for the delivery of mental health services that includes a continuum of services, provides for necessary and appropriate mental health staff, includes a treatment plan for prisoners with serious mental illness and collects data and contains mechanisms sufficient to measure whether care is being provided in a manner consistent with the Constitution.

b.     Ensure that treatment plans adequately address prisoners' serious mental health needs and that the treatment plans contain interventions specifically tailored to the prisoners' diagnoses and problems.

c.     Provide group or individual therapy services by an appropriately licensed provider where necessary for prisoners with mental health needs.

d.     Ensure that mental health evaluations that are done as part of the disciplinary process include recommendations based on the prisoner's mental health status.

e. Ensure that prisoners receive psychotropic medications in a timely manner and that prisoners have proper diagnoses and/or indications for each psychotropic medication they receive.

f. Ensure that psychotropic medications are administered in a clinically appropriate manner as to prevent misuse, overdose, theft or violence related to the medication.

g. Ensure that prescriptions for psychotropic medications are reviewed by a Qualified Mental Health Professional on a regular, timely basis and prisoners are properly monitored.

h. Ensure that standards are established for the frequency of review and associated charting of psychotropic medication monitoring, including monitoring for metabolic effects of second generation psychotropic medications.

3. Counseling

a. OPSO shall develop and implement policies and procedures for prisoner counseling in the areas of general mental health/therapy, sexual-abuse counseling, and alcohol and drug counseling. This should, at a minimum, include some provision for individual services.

b. Within 180 days of the Effective Date, report all prisoner counseling services quarterly to the Monitor, which should include:

(1) the number of prisoners who report having participated in general mental health/therapy counseling at OPP;

(2) the number of prisoners who report having participated in alcohol and drug counseling services at OPP;

(3) the number of prisoners who report having participated in sexual-abuse counseling at OPP; and

(4) the number of cases with an appropriately licensed practitioner and related one-to-one counseling at OPP.

4. Suicide Prevention Training Program

a. OPSO shall ensure that all staff who supervise prisoners have the adequate knowledge, skill, and ability to address the needs of prisoners at risk for suicide. Within 180 days of the Effective Date, OPSO shall review and revise its current suicide prevention training curriculum, to include, the following topics:

(1)    suicide prevention policies and procedures (as revised consistent with this Agreement);

(2)    analysis of facility environments and why they may contribute to suicidal behavior;

(3)    potential predisposing factors to suicide;

(4)    high-risk suicide periods;

(5)    warning signs and symptoms of suicidal behavior;

(6)    case studies of recent suicides and serious suicide attempts;

(7)    mock demonstrations regarding the proper response to a suicide attempt;

(8)    differentiating between suicidal and self-injurious behavior; and

(9)    the proper use of emergency equipment.

b.    Ensure that all correctional, medical, and mental health staff are trained on the suicide screening instrument and the medical intake tool.

c.    Ensure that multi-disciplinary in-service training is completed annually by all correctional, medical, and mental health staff, to include training on updated policies, procedures, and techniques.  The training will be reviewed and approved by the Monitor.

d.    Ensure that staff are trained in observing prisoners on suicide watch and step-down unit status.

e.    Ensure that all staff that have contact with prisoners are certified in cardiopulmonary resuscitation ("CPR").

f.    Ensure that an emergency response bag that includes a first aid kit and emergency rescue tool shall be in close proximity to all housing units.  All staff that has contact with prisoners shall know the location of this emergency response bag and be trained to use its contents.

g.    Randomly test five percent of relevant staff on an annual basis to determine their knowledge of suicide prevention policies.  The testing instrument and policies shall be approved by the Monitor.  The results of these assessments shall be evaluated to determine the need for changes in training practices.  The review and conclusions will be documented and provided to the Monitor.

5.      Suicide Precautions

      a.      OPSO shall implement a policy to ensure that prisoners at risk of self harm are identified, protected, and treated in a manner consistent with the Constitution.

      b.      Ensure that suicide prevention procedures include provisions for constant direct supervision of actively suicidal prisoners and close supervision of special needs prisoners with lower levels of risk (at a minimum, 15 minute checks). Correctional officers shall document their checks in a format that does not have pre-printed times.

      c.      Ensure that prisoners on suicide watch are immediately searched and monitored with constant direct supervision until a Qualified Mental Health Professional conducts a suicide risk assessment, determines the degree of risk, and specifies the appropriate degree of supervision.

      d.      Ensure that all prisoners discharged from suicide precautions receive a follow-up assessment within three to eight working days after discharge, as clinically appropriate, in accordance with a treatment plan developed by a Qualified Mental Health Care Professional.  Upon discharge, the Qualified Mental Health Care Professional shall conduct a documented in-person assessment regarding the clinically appropriate follow-up intervals.

      e.      Implement a step-down program providing clinically appropriate transition from suicide precautions for prisoners discharged from suicide precautions.

      f.      Develop and implement policies and procedures for suicide precautions that set forth the conditions of the watch, incorporating a requirement of an individualized clinical determination of allowable clothing, property, and utensils.  These conditions shall be altered only on the written instruction of a Qualified Mental Health Professional, except under emergency circumstances or when security considerations require.

      g.      Ensure that cells designated by OPSO for housing suicidal prisoners are retrofitted to render them suicide-resistant (e.g., eliminating bed frames/holes, sprinkler heads, water faucet lips, and unshielded lighting or electrical sockets).

      h.      Ensure that every suicide or serious suicide attempt is investigated by appropriate mental health and correctional staff, and that the results of the investigation are provided to the Sheriff and the Monitor.

      i.      Direct observation orders for inmates placed on suicide watch shall be individualized by the ordering clinician based upon the clinical needs of each inmate, and shall not be more restrictive than is deemed necessary by the ordering clinician to ensure the safety and well being of the inmate.

j.      Provide the Monitor a periodic report on suicide and self-harm at the Facility. These periodic reports shall be provided to the monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. The report will include the following:

(1)      all suicides;

(2)      all serious suicide or self-harm attempts; and

(3)      all uses of restraints to respond to or prevent a suicide attempt .

k.      Assess the periodic report to determine whether prisoners are being appropriately identified for risk of self harm, protected, and treated. Based on this assessment, OPSO shall document recommended changes to policies and procedures and provide these to the Monitor.

6.    Use of Restraints

a.      OPSO shall prevent the unnecessary or excessive use of physical or chemical restraints on prisoners with mental illness.

b.      Maintain comprehensive policies and procedures for the use of restraints for prisoners with mental illness consistent with the Constitution.

c.      Ensure that approval by a Qualified Medical or Mental Health Professional is received and documented prior to the use of restraints on prisoners living with mental illness or requiring suicide precautions.

d.      Ensure that restrained prisoners with mental illnesses are monitored at least every 15 minutes by Custody Staff to assess their physical condition.

e.      Ensure that Qualified Medical or Mental Health Staff document the use of restraints, including the basis for and duration of the use of restraints and the performance and results of welfare checks on restrained prisoners.

f.      Provide the Monitor a periodic report of restraint use at the Facility. These periodic reports shall be provided to the monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. Each report shall include:

(1)      A list of prisoners whom were restrained;

(2)      A list of any self-injurious behavior observed or discovered while restrained; and

- 25 -

(3)     A list of any prisoners whom were placed in restraints on three or more occasions in a thirty (30) day period or whom were kept in restraints for a period exceeding twenty-four (24) hours.

g.      Assess the periodic report to determine whether restraints are being used appropriately on prisoners with mental illness.  Based on this assessment, OPSO shall document recommended changes to policies and procedures and  provide these to the Monitor.

7.     Detoxification and Training

a.      OPSO shall ensure that all staff who supervise prisoners have the knowledge, skills, and abilities to identify and respond to detoxifying prisoners.  Within 180 days of the Effective Date, OPSO shall institute an annual in-service detoxification training program for Qualified Medical and Mental Health Staff and for correctional staff.  The detoxification training program shall include:

(1)     annual staff training on alcohol and drug abuse withdrawal;

(2)     training of Qualified Medical and Mental Health Staff on treatment of alcohol and drug abuse conducted by the Chief Medical Officer or his or her delegate;

(3)     oversight of the training of correctional staff, including booking and housing unit officers, on the policies and procedures of the detoxification unit, by the Chief Medical Officer or his or her delegate;

(4)     training on drug and alcohol withdrawal by Qualified Medical and Mental Health Staff;

(5)     training of Qualified Medical and Mental Health Staff in providing prisoners with timely access to a Qualified Mental Health Professional, including psychiatrists, as clinically appropriate; and

(6)     training of Qualified Medical and Mental Health Staff on the use and treatment of withdrawals, where medically appropriate.

b.      Provide medical screenings to determine the degree of risk for potentially life-threatening withdrawal from alcohol, benzodiazepines, and other substances, in accordance with Appendix B.

c.      Ensure that the nursing staff complete assessments of prisoners in detoxification on an individualized schedule, ordered by a Qualified Medical or Mental Health Professional, as clinically appropriate, to include observations and vital signs, including blood pressure.

d.      Annually, conduct a review of whether the detoxification training program has been effective in identifying concerns regarding policy, training, or the proper

identification of and response to detoxifying prisoners. OPSO will document this review and provide its conclusions to the Monitor.

8.      Medical and Mental Health Staffing

   a.      OPSO shall ensure that medical and mental health staffing is sufficient to provide adequate care for prisoners' serious medical and mental health needs, fulfill constitutional mandates and the terms of this Agreement, and allow for the adequate operation of the Facility, consistent with constitutional standards.

   b.      Within 90 days of the Effective Date, OPSO shall conduct a comprehensive staffing plan and/or analysis to determine the medical and mental health staffing levels necessary to provide adequate care for prisoners' mental health needs and to carry out the requirements of this Agreement.  Upon completion of the staffing plan and or analysis, OPSO shall provide its findings to the Monitor, SPLC, and DOJ for review.  The Monitor, SPLC, and DOJ will have 60 days to raise any objections and recommend revisions to the staffing plan.

9.      Risk Management

   a.      OPSO shall develop, implement, and maintain a system to ensure that trends and incidents involving avoidable suicides and self-injurious behavior are identified and corrected in a timely manner.  Within 90 days of the Effective Date, OPSO shall develop and implement a risk management system that identifies levels of risk for suicide and self-injurious behavior and requires intervention at the individual and system levels to prevent or minimize harm to prisoners, based on the triggers and thresholds set forth in Appendix B.

   b.      The risk management system shall include the following processes to supplement the mental health screening and assessment processes:  incident reporting, data collection, and data aggregation to capture sufficient information to formulate a reliable risk assessment at the individual and system levels; identification of at-risk prisoners in need of clinical treatment or assessment by the Interdisciplinary Team or the Mental Health Committee; and development and implementation of interventions that minimize and prevent harm in response to identified patterns and trends.

   c.      OPSO shall develop and implement an Interdisciplinary Team, which utilizes intake screening, health assessment, and triggering event information for formulating treatment plans.  The Interdisciplinary Team shall:

      (1)      include the Medical and Nursing directors, one or more members of the psychiatry staff, counseling staff, social services staff, and security staff, and other members as clinical circumstances dictate;

(2)     conduct interdisciplinary treatment rounds, on a weekly basis, during which targeted patients are reviewed based upon screening and assessment factors, as well as triggering events; and

(3)     provide individualized treatment plans based, in part, on screening and assessment factors, to all mental health patients seen by various providers.

d.     OPSO shall develop and implement a Mental Health Review Committee that will, on a monthly basis, review mental health statistics including, but not limited to, risk management triggers and trends at both the individual and system levels.  The Mental Health Review Committee shall:

(1)     include the Medical and Nursing Director, one or more members of the psychiatry staff and social services staff, the Health Services Administrator, the Warden of the facility housing the Acute Psychiatric Unit, and the Risk Manager.

(2)     identify at-risk patients in need of mental health case management who may require intervention from and referral to the Interdisciplinary Team, the OPSO administration, or other providers.

(3)     conduct department-wide analyses and validation of both the mental health and self-harm screening and assessment processes and tools, review the quality of screenings and assessments and the timeliness and appropriateness of care provided, and make recommendations on changes and corrective actions;

(4)     analyze individual and aggregate mental health data and identify trends and triggers that indicate risk of harm;

(5)     review data on mental health appointments, including the number of appointments and wait times before care is received; and

(6)     review policies, training, and staffing and recommend changes, supplemental training, or corrective actions.

e.     OPSO shall develop and implement a Quality Improvement and Morbidity and Mortality Review Committee that will review, on at least a quarterly basis, risk management triggers and trends and quality improvement reports in order to improve care on a Jail-wide basis.

(1)     The Quality Improvement Committee shall include the Medical Director, the Director of Psychiatry, the Chief Deputy, the Risk Manager, and the Director of Training.  The Quality Improvement Committee shall review and analyze activities and conclusions of the Mental Health Review Committee and pursue Jail-wide corrective actions.

(2)    The Quality Improvement Committee shall:

    i.    monitor all risk management activities of the facilities through the review of risk data, identification of individual and systemic trends,  and recommendation and monitored implementation of investigation or corrective action; and

    ii.    generate reports of risk data analyzed and corrective actions taken.

(3)    The Morbidity and Mortality Review Committee shall include one or more members of Jail operations, the medical department, the mental health department, related clinical disciplines, corrections, and the Risk Manager. The Morbidity and Mortality Review Committee shall:

    i.    Review suicides and serious suicide attempts in a morbidity and mortality capacity;

    ii.   outline the factors involved in each case, including the individual circumstances, identification of predisposing factors, documentation, medical and security procedures and training, and perform a psychological autopsy and morbidity report;

    iii.  recommend changes to medical and security policies and procedures;

    iv.   develop a written plan, with a timetable, for corrective actions; and

    v.    Ensure a final mortality review report is completed within 30 days of a suicide or suicide attempt.

f.    OPSO shall review mortality and morbidity reports quarterly to determine whether the risk management system is ensuring compliance with the terms of this Agreement.  OPSO shall make recommendations regarding the risk management system or other necessary changes in policy based on this review. The review and recommendations will be documented and provided to the Monitor.

## C.    MEDICAL CARE

OPSO shall ensure constitutionally adequate treatment of prisoners' medical needs. OPSO shall prevent unnecessary risks to prisoners and ensure proper medication administration practices.  OPSO shall assess on an annual or more frequent basis whether the medical services at OPP comply with the Constitution.  At a minimum, OPSO shall:

1.    Quality Management of Medication Administration

a. Within 120 days of the Effective Date, ensure that medical and mental health staff are trained on proper medication administration practices, including appropriately labeling containers and contemporaneously recording medication administration;

b. Ensure that physicians provide a systematic review of the use of medication to ensure that each prisoner's prescribed regimen continues to be appropriate and effective for his or her condition;

c. Maintain medication administration protocols that provide adequate direction on how to take medications, describe the names of the medications, how frequently to take medications, and identify how prisoners taking such medications are monitored; and

d. Maintain medication administration protocols that prevent misuse, overdose, theft or violence related to medication.

2. Health Care Delivered

a. Provide the Monitor a periodic report on health care at the Facility. These periodic reports shall be provided to the monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. Each report will include:

    (1) number of prisoners transferred to the emergency room for medical treatment related to medication errors;

    (2) number of prisoners taken to the infirmary for non-emergency treatment related to medication errors;

    (3) number of prisoners prescribed psychotropic medications;

    (4) number of prisoners prescribed "keep on person" medications; and

    (5) occurrences of medication variances.

b. Review the periodic health care delivery reports to determine whether the medication administration protocols and requirements of this Agreement are followed. OPSO shall make recommendations regarding the medication administration process, or other necessary changes in policy, based on this review. The review and recommendations will be documented and provided to the Monitor.

3.   Release and Transfer

    a.   OPSO shall notify Qualified Medical or Mental Health staff regarding the release of prisoners with serious medical and/or mental health needs from OPSO custody, as soon as such information is available.

    b.   When Qualified Medical or Mental Health staff are notified of the release of prisoners with serious medical and/or mental health needs from OPSO custody, OPSO shall provide these prisoners with at least a seven-day supply of appropriate prescription medication, unless a different amount is necessary and medically appropriate to serve as a bridge until prisoners can reasonably arrange for continuity of care in the community.

    c.   For all other prisoners with serious medical and/or mental health needs who are released from OPSO custody without advance notice, OPSO shall provide the prisoner a prescription for his or her medications, printed instructions regarding prescription medications, and resources indicating where prescriptions may be filled in the community.

    d.   For prisoners who are being transferred to another facility, OPSO shall prepare and send with a transferring prisoner a transition summary detailing major health problems and listing current medications and dosages, as well as medication history while at the Facility. OPSO shall also supply sufficient medication for the period of transit for prisoners who are being transferred to another correctional facility or other institution, in the amount required by the receiving agency.

**D.   SANITATION AND ENVIRONMENTAL CONDITIONS**

    Defendant shall ensure that prisoners are provided with constitutionally adequate sanitation and environmental conditions. To provide prisoners safe living conditions, OPSO, at a minimum, shall:

1.   Sanitation and Environmental Conditions

    a.   OPSO shall provide oversight and supervision of routine cleaning of housing units, showers, and medical areas. Such oversight and supervision will include meaningful inspection processes and documentation, as well as establish routine cleaning requirements for toilets, showers, and housing units to be documented at least once a week but to occur more frequently.

    b.   Continue the preventive maintenance plan to respond to routine and emergency maintenance needs, including ensuring that showers, toilets, and sink units are adequately installed and maintained. Work orders will be submitted within 48 hours of identified deficiencies, or within 24 hours in the case of emergency maintenance needs.

c.  Maintain adequate ventilation throughout OPSO facilities to ensure that prisoners receive adequate air flow and reasonable levels of heating and cooling. Maintenance staff shall review and assess compliance with this requirement, as necessary, but no less than twice annually.

d.  Ensure adequate lighting in all prisoner housing units and prompt replacement and repair of malfunctioning lighting fixtures in living areas within five days, unless the item must be specially ordered.

e.  Ensure adequate pest control throughout the housing units, including routine pest control spraying on at least a quarterly basis and additional spraying as needed.

f.  Ensure that any prisoner or staff assigned to clean a biohazardous area is properly trained in universal precautions, outfitted with protective materials, and properly supervised.

g.  Ensure the use of cleaning chemicals that sufficiently destroy the pathogens and organisms in biohazard spills.

h.  Maintain an infection control plan that addresses contact, blood borne, and airborne hazards and infections.  The plan shall include provisions for the identification, treatment, and control of Methicillin-Resistant Staphylococcus Aureus ("MRSA") at the Facility.

2.  Environmental Control

a.  OPSO shall ensure that broken or missing electrical panels are repaired within 30 days of identified deficiencies, unless the item needs to be specially ordered.

b.  Develop and implement a system for maintenance and timely repair of electrical panels, devices, and exposed electrical wires.

3.  Food Service

a.  OPSO shall ensure that food service staff, including prisoner staff, continues to receive in-service annual training in the areas of food safety, safe food handling procedures, and proper hygiene, to reduce the risk of food contamination and food-borne illnesses.

b.  Ensure that dishes and utensils, food preparation and storage areas, and vehicles and containers used to transport food are appropriately cleaned and sanitized on a daily basis.

c.  Check and record on a daily basis the temperatures in the refrigerators, coolers, walk-in refrigerators, the dishwasher water, and all other kitchen equipment with a temperature monitor, to ensure proper maintenance of food service equipment.

4.      Sanitation and Environmental Conditions Reporting

a.      Provide the Monitor a periodic report on sanitation and environmental conditions in the Facility.  These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement.  The report will include:

(1)     number and type of violations reported by health and sanitation inspectors;

(2)     number and type of violations of state standards;

(3)     number of prisoner grievances filed regarding the environmental conditions at the Facility;

(4)     number of inoperative plumbing fixtures, light fixtures, HVAC systems, fire protection systems, and security systems that have not been repaired within 30 days of discovery;

(5)     number of prisoner-occupied areas with significant vandalism, broken furnishings, or excessive clutter;

(6)     occurrences of insects and rodents in the housing units and dining halls; and

(7)     occurrences of poor air circulation in housing units.

b.      Review the periodic sanitation and environmental conditions reports to determine whether the prisoner grievances and violations reported by health, sanitation, or state inspectors are addressed, ensuring that the requirements of this Agreement are met.  OPSO shall make recommendations regarding the sanitation and environmental conditions, or other necessary changes in policy, based on this review.  The review and recommendations will be documented and provided to the Monitor.

## E.     FIRE AND LIFE SAFETY

OPSO shall ensure that the Facility's emergency preparedness and fire and life safety equipment are consistent with constitutional standards.  To protect prisoners from fires and related hazards, OPSO, at a minimum, shall:

1.      Fire and Life Safety

a.      Ensure that necessary fire and life safety equipment is properly maintained and inspected at least quarterly.  These inspections must be documented.

b.    Ensure that a qualified fire safety officer conducts a monthly inspection of the facilities for compliance with fire and life safety standards (e.g., fire escapes, sprinkler heads, smoke detectors, etc.).

c.    Ensure that comprehensive fire drills are conducted every six months.  OPSO shall document these drills, including start and stop times and the number and location of prisoners who were moved as part of the drills.

d.    Provide competency-based training to staff on proper fire and emergency practices and procedures at least annually.

e.    Within 120 days of the Effective Date, ensure that emergency keys are appropriately marked and identifiable by touch and consistently stored in a quickly accessible location, and that staff are adequately trained in use of the emergency keys.

2.    Fire and Life Safety Reporting

a.    Provide the Monitor a periodic report on fire and life safety conditions at the Facility.  These periodic reports shall be provided to the Monitor within four months of the Effective Date and every six months thereafter until termination of this Agreement.   Each report shall include:

(1)    number and type of violations reported by fire and life safety inspectors;

(2)    fire code violations during annual fire inspections; and

(3)    occurrences of hazardous clutter in housing units that could lead to a fire.

b.    Review the periodic fire and life safety reports to determine whether the prisoner grievances and violations reported by fire and life safety inspectors are addressed, ensuring the requirements of this Agreement are being met.  OPSO shall make recommendations regarding the fire and life safety conditions, or other necessary changes in policy, based on this review.  The review and recommendations will be documented and provided to the Monitor.

**F.    LANGUAGE ASSISTANCE**

1.    Timely and Meaningful Access to Services

a.    OPP shall ensure effective communication with, and provide timely and meaningful access to services at OPP to all prisoners at OPP, regardless of their national origin or limited ability to speak, read, write, or understand English.  To achieve this outcome, OPP shall:

(1)      Develop and implement a comprehensive language assistance plan and policy that complies, at a minimum, with Title VI of the Civil Rights Act of 1964, as amended, (42 U.S.C. § 2000d et seq.) and other applicable law;

(2)      Ensure that all OPP personnel take reasonable steps to provide timely, meaningful language assistance services to limited English Proficient ("LEP") prisoners;

(3)      At intake and classification, identify and assess demographic data, specifically including the number of LEP individuals at OPP on a monthly basis, and the language(s) they speak;

(4)      Use collected demographic information to develop and implement hiring goals for bilingual staff that meet the needs of the current monthly average population of LEP prisoners;

(5)      Regularly assess the proficiency and qualifications of bilingual staff to become an OPP authorized interpreter ("OPPAI");

(6)      Create and maintain an OPPAI list and provide that list to the classification and intake staff; and

(7)      Ensure that while at OPP, LEP prisoners are not asked to sign or initial documents in English without the benefit of a written translation from an OPPAI.

2.     Language Assistance Policies and Procedures

a.     OPP shall develop and implement written policies, procedures and protocols for documenting, processing, and tracking of individuals held for up to 48 hours for the U.S. Department of Homeland Security ("DHS");

b.     Policies, procedures, and protocols for processing 48-hour holds for DHS will:

(1)      Clearly delineate when a 48-hour hold is deemed to begin and end;

(2)      Ensure that, if necessary, an OPPAI communicates verbally with the OPP prisoner about when the 48-hold period begins and is expected to end;

(3)      Provide a mechanism for the prisoner's family member and attorney to be informed of the 48-hour hold time period, using, as needed, an OPPAI or telephonic interpretation service;

    (4)     Create an automated tracking method, not reliant on human memory or paper documentation, to trigger notification to DHS and to ensure that the 48-hour time period is not exceeded.

    (5)     Ensure that telephone services have recorded instructions in English and Spanish;

    (6)     Ensure that signs providing instructions to OPP prisoners or their families are translated into Spanish and posted;

    (7)     Provide Spanish translations of vital documents that are subject to dissemination to OPP prisoners or their family members.  Such vital documents include, but are not limited to:

        i.   grievance forms;

        ii.   sick call forms;

        iii.   OPP inmate handbooks; Prisoner Notifications (e.g., rule violations, transfers, and grievance responses) and

        iv.   "Request for Services" forms.

    (8)     Ensure that Spanish-speaking LEP prisoners obtain the Spanish language translations of forms provided by DHS; and

    (9)     Provide its language assistance plan and related policies to all staff within 180 days of the Effective Date of this Agreement.

3.    Language Assistance Training

    a.    Within 180 days of the effective date, OPP shall provide at least eight hours of LEP training to all corrections and medical and mental health staff who may regularly interact with LEP prisoners.

    (1)     LEP training to OPP staff shall include:

        i.   OPP's LEP plan and policies, and the requirements of Title VI and this Agreement;
        ii.   how to access OPP-authorized, telephonic and in-person OPPAIs; and
        iii.   basic commands and statements in Spanish for OPP staff.

    (2)     OPP shall translate the language assistance plan and policy into Spanish, and other languages as appropriate, and post the English and translated versions in a public area of the OPP facilities, as well as online.

        (3)        OPP shall make its language assistance plan available to the public.

4.        Bilingual Staff

        (1)        OPP shall ensure that adequate bilingual staff are posted in housing units where DHS detainees and other LEP prisoners may be housed.

        (2)        OPP shall ensure that an appropriate number of bilingual staff are available to translate or interpret for prisoners and other OPP staff. The appropriate number of bilingual staff will be determined based on a staffing assessment by OPP.

## G.    YOUTHFUL PRISONERS

Consistent with the Prison Rape Elimination Act of 2003, 42 U.S.C. § 15601, et seq., and its implementation of regulations, a youthful prisoner shall not be placed in a housing unit in which the youthful prisoner will have sight, sound, or physical contact with any adult prisoner through use of a shared dayroom or other common space, shower area, or sleeping quarters. In areas outside of housing units, OPSO shall either: maintain sight and sound separation between youthful prisoners and adult prisoners, or provide direct staff supervision when youthful prisoners and adult prisoners have sight, sound, or physical contact. OPP shall ensure that youthful prisoners in protective custody status shall have no contact with, or access to or from, non-protective custody prisoners. OPP will develop policies for the provision of developmentally appropriate mental health and programming services.

## V.   <u>FUNDING</u>

A.        The Court shall determine the funding needed to ensure constitutional conditions of confinement at OPP, in accordance with the terms of this Agreement, and the source(s) responsible for providing that funding. Defendant shall be responsible for implementation of this Agreement upon a definitive judgment with regard to such funding.

B.        Once the funding is determined pursuant to Paragraph A, the funding amount thereafter may be adjusted on an annual basis to account for changes in the size of the prisoner population, inflation, or other operating costs. If the Parties are unable to agree upon such adjustments to the annual budget, the Monitor will intervene and resolve the dispute. If the Monitor cannot resolve the dispute within 45 days, the dispute will be submitted to the district judge for resolution. The Parties agree to work in good faith to determine available cost savings measures that may result from the ongoing implementation of this Agreement or otherwise.

C.        Defendant will provide an annual budget for the expenditure of the funds for operation of OPP and an annual audited financial statement to the Monitor and the Parties. The

Monitor will assist in conducting oversight to ensure that funds for implementing this Agreement are allocated to achieve compliance with this Agreement.

## VI.    THE NEW JAIL FACILITY

A.    The Parties anticipate that Defendant will build a new jail facility or facilities that will replace or supplement the current facility located at 2800 Gravier Street, New Orleans, Louisiana.  This Agreement shall apply to any new jail facility.

B.    Defendant shall obtain the services of a qualified professional to evaluate, design, plan, oversee, and implement the construction of any new facility.  At each major stage of the facility construction, Defendant shall provide the Monitor with copies of design documents.

C.    Defendant shall consult with a qualified corrections expert as to the required services and staffing levels needed for any replacement facility.  OPSO shall complete a staffing study to ensure that any new facility is adequately staffed to provide prisoners with reasonable safety.

D.    Defendant will ensure that the new jail facility will be built in accordance with:  (1) the American Correctional Association's standards in effect at the time of construction; (2) the American with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101-12213, including changes made by the ADA Amendments of 2008 (P.L. 110-325) and 47 U.S.C. §§ 225-661, and the regulations thereunder; and (3) all applicable fire codes and regulations.

## VII.    COMPLIANCE AND QUALITY IMPROVEMENT

A.    Within 120 days of the Effective Date, OPSO shall revise and/or develop its policies, procedures, protocols, training curricula, and practices to ensure that they are consistent with, incorporate, address, and implement all provisions of this Agreement.  OPSO shall revise and/or develop as necessary other written documents such as screening tools, logs, handbooks, manuals, and forms, to effectuate the provisions of this Agreement.  OPSO shall send pertinent newly-drafted and revised policies and procedures to the Monitor as they are promulgated.  The Monitor will provide comments on the policies to OPSO, SPLC and DOJ within 30 days.  OPSO, SPLC and DOJ may provide comments on the Monitor's comments within 15 days.  At that point, the Monitor will consider the Parties' comments, mediate any disputes, and approve the policies with any changes within 30 days.  If either party disagrees with the Monitor, they may bring the dispute to the Court.  OPSO shall provide initial and in-service training to all Facility staff with respect to newly implemented or revised policies and procedures.  OPSO shall document employee review of and training in new or revised policies and procedures.

H.    Within 180 days of the Effective Date, Defendant shall develop and implement written quality improvement policies and procedures adequate to identify serious deficiencies in protection from harm, prisoner suicide prevention, detoxification, mental health care, environmental health, and fire and life safety in order to assess and ensure compliance

with the terms of this Agreement on an ongoing basis. Within 90 days after identifying serious deficiencies, OPSO shall develop and implement policies and procedures to address problems that are uncovered during the course of quality improvement activities. These policies and procedures shall include the development and implementation of corrective action plans, as necessary, within 30 days of each biannual review.

I.  The Parties agree that OPSO will hire and retain, or reassign a current OPSO employee for the duration of this Agreement, to serve as a full-time OPSO Compliance Coordinator. The Compliance Coordinator will serve as a liaison between the Parties and the Monitor and will assist with OPSO's compliance with this Agreement. At a minimum, the Compliance Coordinator will: coordinate OPSO's compliance and implementation activities; facilitate the provision of data, documents, materials, and access to OPSO's personnel to the Monitor, SPLC, DOJ, and the public, as needed; ensure that all documents and records are maintained as provided in this Agreement; and assist in assigning compliance tasks to OPSO personnel, as directed by the Sheriff or his or her designee. The Compliance Coordinator will take primary responsibility for collecting information the Monitor requires to carry out the duties assigned to the Monitor.

J.  On a bi-annual basis, OPSO will provide the public with a self-assessment in which areas of significant improvement or areas still undergoing improvement are presented either through use of the OPSO website or through issuance of a public statement or report.

## VIII.  REPORTING REQUIREMENTS AND RIGHT OF ACCESS

A.  OPSO shall submit periodic compliance reports to the Monitor. These periodic reports shall be provided to the Monitor within four months from the date of a definitive judgment on funding; and every six months thereafter until termination of this Agreement. Each compliance report shall describe the actions Defendant has taken during the reporting period to implement this Agreement and shall make specific reference to the Agreement provisions being implemented. The report shall also summarize audits and continuous improvement and quality assurance activities, and contain findings and recommendations that would be used to track and trend data compiled at the Facility. The report shall also capture data that is tracked and monitored under the reporting provisions of the following provisions: Use of Force; Suicide Prevention; Health Care Delivered; Sanitation and Environmental Conditions; and Fire and Life Safety.

B.  OPSO shall, within 24 hours, notify the Monitor upon the death of any prisoner. The Monitor shall forward any such notifications to SPLC and DOJ upon receipt. OPSO shall forward to the Monitor incident reports and medical and/or mental health reports related to deaths, autopsies, and/or death summaries of prisoners, as well as all final SOD and IAD reports that involve prisoners. The Monitor shall forward any such reports to SPLC and DOJ upon receipt.

C.  Defendant shall maintain sufficient records to document that the requirements of this Agreement are being properly implemented and shall make such records available to the Monitor within seven days of request for inspection and copying.  In addition, Defendant shall maintain and provide, upon request, all records or other documents to verify that they have taken the actions described in their compliance reports (e.g., census summaries, policies, procedures, protocols, training materials, investigations, incident reports, tier logs, use of force reports).

D.  SPLC, DOJ and their attorneys, consultants, and agents shall have unrestricted access to the Facility, prisoners, staff and documents, as reasonably necessary to address issues affected by this Agreement.  SPLC and DOJ shall provide at least seven days' notice and disclose the names of each individual to participate in the visit, each individual's role, and the purpose of the visit. SPLC shall not have to provide seven days notice for regular attorneys' visits.

E.  Within 30 days of receipt of written questions from SPLC or DOJ concerning Defendant's compliance with the requirements of this Agreement, Defendant shall provide the requester with written answers and any requested documents.

## IX.   MONITORING

A.  Monitor Selection:  The Parties will jointly select a Monitor to oversee implementation of the Agreement.  Should the monitor position become vacant and the Parties are unable to agree on a replacement, the Parties shall recommend candidates to the Court, and the Court will appoint the Monitor from the names submitted by the Parties.  Neither party, nor any employee or agent of either party, shall have any supervisory authority over the Monitor's activities, reports, findings, or recommendations.  Allocation of the cost for the Monitor's fees and expenses shall be determined by the Court.   Should all the Parties agree that the Monitor is not fulfilling his or her duties in accordance with this Agreement, the Parties may petition the Court for the Monitor's immediate removal and replacement.  One party may unilaterally petition the Court for the Monitor's removal for good cause, and the other Parties will have the opportunity to respond to the petition.

B.  Good cause for the purposes of this Agreement shall mean, but not be limited to:  gross neglect of duties; willful misconduct; inappropriate personal relationship with Defendant or any OPSO employee; conflicts of interest; or any criminal conduct during the pendency of this Agreement.

C.  Monitor Qualifications:  The Monitor and his or her staff shall have appropriate experience and education or training related to the subject areas covered in this Agreement.  The Parties reserve the right to object for good cause to any member of the Monitor's staff.

D.  Monitor Access:  The Monitor shall have full and complete access to the Facility, all Facility records, prisoner medical and mental health records, staff, and prisoners.  OPSO

shall direct all employees to cooperate fully with the Monitor.  All information obtained by the Monitor shall be maintained in a confidential manner.

E.     Monitor Ex Parte Communications:  The Monitor shall be permitted to initiate and receive ex parte communications with all Parties.

F.     Monitor Distribution of OPSO Documents, Reports, and Assessments:  Within seven days of receipt, the Monitor shall distribute all OPSO assessments and reports to SPLC and DOJ.  The Monitor also shall provide any OPSO compliance-related documents within seven days to DOJ and SPLC, upon request.

G.     Limitations on Public Disclosures by the Monitor:  Except as required or authorized by the terms of this Agreement or the Parties acting together, the Monitor shall not make any public or press statements (at a conference or otherwise) or issue findings with regard to any act or omission of Defendant or Defendant's agents, representatives or employees, or disclose information provided to the Monitor pursuant to this Agreement.  The Monitor shall not testify in any other litigation or proceeding with regard to any act or omission of Defendant or any of Defendant's agents, representatives, or employees related to this Agreement, nor testify regarding any matter or subject that he or she may have learned as a result of his or her performance under this Agreement, nor serve as a non-testifying expert regarding any matter or subject that he or she may have learned as a result of his or her performance under this Agreement.  Unless such conflict is waived by all Parties, the Monitor shall not accept employment or provide consulting services that would present a conflict of interest with the Monitor's responsibilities under this Agreement, including being retained (on a paid or unpaid basis) by any current or future litigant or claimant, or such litigant's or claimant's attorney, in connection with a claim or suit against Defendant, Defendant's departments, officers, agents or employees.  The Monitor is not a State/County or local agency or an agent thereof, and accordingly the records maintained by the Monitor shall not be deemed public records subject to public inspection.  Neither the Monitor nor any person or entity hired or otherwise retained by the Monitor to assist in furthering any provision of this Agreement shall be liable for any claim, lawsuit or demand arising out of the Monitor's performance pursuant to this Agreement.  This provision does not apply to any proceeding before a court related to performance of contracts or subcontracts for monitoring this Agreement.

H.     Monitor's Reports:  The Monitor shall file with the Court and provide the Parties with reports describing the steps taken by Defendant to implement this Agreement and evaluate the extent to which Defendant has complied with each substantive provision of the Agreement.  The Monitor shall issue an initial report 120 days after the Effective Date, and then every 180 days thereafter.  The reports shall be provided to the Parties in draft form for comment at least 14 days prior to their issuance.  The Monitor shall consider the Parties' responses and make appropriate changes, if any, before issuing the report.  These reports shall be written with due regard for the privacy interests of individual prisoners and staff and the interest of Defendant in protecting against disclosure of information not permitted by this Agreement.

I.      Reports issued by the Monitor shall not be admissible against Defendant in any proceeding other than a proceeding related to the enforcement of this Agreement initiated and handled exclusively by Defendant, SPLC, or DOJ.

J.      Compliance Assessments:  In the Monitor's report, the Monitor shall evaluate the status of compliance for each relevant provision of the Agreement using the following standards:  (1) Substantial Compliance; (2) Partial Compliance, and (3) Non-compliance. In order to assess compliance, the Monitor shall review a sufficient number of pertinent documents to accurately assess current conditions, interview all necessary staff, and interview a sufficient number of prisoners to accurately assess current conditions.  The Monitor shall be responsible for independently verifying representations from Defendant regarding progress toward compliance, and examining supporting documentation.  Each Monitor report shall describe the steps taken by each member of the monitoring team to analyze conditions and assess compliance, including documents reviewed and individuals interviewed, and the factual basis for each of the Monitor's findings.

K.      Technical Assistance by the Monitor:  The Monitor shall provide Defendant with technical assistance as requested by Defendant.  Technical assistance should be reasonable and should not interfere with the Monitor's ability to assess compliance.

## X.      ENFORCEMENT

A.      The Court shall retain jurisdiction over the implementation of this Agreement at the existing OPP or any other facility used to replace or supplement OPP for all purposes.

B.      During the period that the Agreement is in force, if the Monitor, SPLC, or DOJ determines that Defendant has not made material progress toward substantial compliance with a significant obligation under the Agreement, and such failure constitutes a violation of prisoners' constitutional rights, SPLC or DOJ may initiate contempt or enforcement proceedings against Defendant for an alleged failure to fulfill an obligation under Sections IV through X of this Agreement in Court.

C.      Before taking judicial action to initiate contempt or other enforcement proceedings, SPLC or DOJ shall give Defendant written notice of its intent to initiate such proceedings, and the Parties shall engage in good-faith discussions to resolve the dispute and may petition the Court for a status conference to assist in resolution.

D.      Defendant shall have 30 days from the date of such notice to cure the failure (or such additional time as is reasonable due to the nature of the issue and agreed upon by the Parties) and provide the complaining party with sufficient proof of its cure.  At the end of the 30-day period (or such additional time as is reasonable due to the nature of the issue and agreed upon by the Parties), in the event that the complaining party determines that the failure has not been cured, that party may initiate contempt proceedings without further notice.  The Parties commit to work in good faith with Defendant to avoid enforcement actions.

E.    In case of an emergency posing an immediate threat to the health or safety of any prisoner or staff member at OPP, however, DOJ or SPLC may omit the notice and cure requirements herein and seek enforcement of the Agreement.

## XI.    CONSTRUCTION, IMPLEMENTATION, AND TERMINATION

A.    Defendant shall implement all reforms, as designated within the provisions of this Agreement, that are necessary to effectuate this Agreement.  The implementation of this Agreement will begin immediately upon the Effective Date.

B.    Except where otherwise agreed to under a specific provision of this Agreement, Defendant shall implement all provisions of this Agreement within 180 days of the Effective Date.

C.    This Agreement shall terminate when Defendant has achieved substantial compliance with each provision of the Agreement and have maintained Substantial Compliance with the Agreement for a period of two years.

D.    If any unforeseen circumstance occurs that causes a failure to timely carry out any requirements of this Agreement, Defendant shall notify DOJ and SPLC in writing within seven days after Defendant becomes aware of the unforeseen circumstance and its impact on the Defendant's ability to perform under the Agreement.  The notice shall describe the cause of the failure to perform and the measures taken to prevent or minimize the failure. Defendant shall implement all reasonable measures to avoid or minimize any such failure.

E.    This Agreement shall constitute the entire integrated Agreement of the Parties.  No prior or contemporaneous communications, oral or written, will be relevant or admissible for purposes of determining the meaning of any provisions herein, in this litigation or in any other proceeding.

F.    The Agreement shall be applicable to, and binding upon, all Parties, their officers, agents, employees, assigns, and their successors in office.

G.    Failure by any party to enforce this entire Agreement or any provision thereof with respect to any deadline or any other provision herein shall not be construed as a waiver of the party's right to enforce other deadlines or provisions of this Agreement.

H.    If any provision of this Agreement is declared invalid for any reason by a court of competent jurisdiction, said finding shall not affect the remaining provisions of this Agreement.

## XII.    STIPULATION PURSUANT TO THE PRISON LITIGATION REFORM ACT, 18 U.S.C. § 3626

The Parties stipulate that this Agreement complies in all respects with the provisions of 18 U.S.C. § 3626(a).  The Parties further stipulate and agree and the Court finds that the prospective relief in this Agreement is narrowly drawn, extends no further than necessary to correct the violations of federal rights as alleged by Plaintiffs in the Complaints, is the least intrusive means necessary to correct these violations, and will not have an adverse impact on public safety or the operation of a criminal justice system.  Accordingly, the Parties agree and represent that the Agreement complies in all respects with the provisions of 18 U.S.C. § 3626(a).  Any admission made for purposes of this Agreement is not admissible if presented by third Parties in another proceeding.


So ORDERED this _____ day of _____, 2012



The Honorable _____, United States District Court Judge

**FOR THE PLAINTIFF CLASS:**


KATIE SCHWARTZMANN
ELIZABETH CUMMING
Southern Poverty Law Center
4431 Canal Street
New Orleans, LA 70119
(504) 486-8982
katie.schwartzmann@splcenter.org

**FOR THE PLAINTIFF, THE UNITED STATES:**


JAMES LETTEN                          THOMAS E. PEREZ
United States Attorney                Assistant Attorney General
Eastern District of Louisiana         Civil Rights Division


ROY L. AUSTIN, JR.
Deputy Assistant Attorney General
Civil Rights Division


JONATHAN M. SMITH
Chief
Special Litigation Section


LAURA L. COON, Special Counsel
COREY M. SANDERS
KERRY K. DEAN
SILVIA J. DOMINGUEZ
Trial Attorneys
U.S. Department of Justice
Civil Rights Division, Special Litigation Section
950 Pennsylvania Ave., NW
Washington, D.C. 20530
(202) 305-3229
corey.sanders@usdoj.gov

FOR THE DEFENDANT SHERIFF:

MARLIN N. GUSMAN
Orleans Parish Sheriff


T. ALLEN USRY
JOHN F. WEEKS II
FREEMAN R. MATTHEWS
BLAKE J. ARCURI
Usry, Weeks & Matthews, APLC
1615 Poydras Street, Suite 1250
New Orleans, LA  70112
(504) 592-4600

APPENDIX A
Criteria that Trigger Referral for Investigation

| **Trigger Events Occurring in OPP** | **Thresholds Reached at OPP** |
|---|---|
| 1.  Existence of resulting injuries that are extensive or serious | 1.  Two or more use of force incidents or complaints in a 30-day period. |
| 2.  Existence of resulting injuries involving fractures or head trauma | 2.  Inmate death resulting from a use of force |
| 3.  Existence of resulting injuries that require treatment at outside hospitals | 3.  Officer arrested for suspected misconduct related to a use of force |
| 4.  Reports of events by staff and inmates that are materially inconsistent | |
| .5.  Failure to report or report accurately the use of force | |
| 6.  Retaliation against an inmate or other staff member for reporting the use of excessive or inappropriate force | |
| 7.  Interfered or failed to cooperate with an investigation regarding a use of force | |
| 8.  Sexual conduct with an inmate | |

APPENDIX B
Screening and Assessment Factors, Triggers, and Thresholds

| Screening Factors | Assessment Factors | Trigger Events Occurring in Orleans Parish Prison | Thresholds Reached in Orleans Parish Prison |
|---|---|---|---|
| **History, Ideation, and Observation** | | | |
| Intake screening shall inquire as to the following:<br><br>1. Past suicidal ideation and/or attempts<br>2. Current suicidal ideation, threat, or plan<br>3. Prior mental health treatment or hospitalization<br>4. Recent significant loss - such as the death of a family member or close friend<br>5. History of suicidal behavior by family members and close friends<br>6. Suicide risk during any prior confinement<br>7. Any observations of the transporting officer, court, transferring agency, or similar individuals regarding the prisoner's potential suicidal risk | Any of the following:<br><br>1. Suicide risk screening indicates moderate or high risk<br>2. Any suicide attempt in the past<br>3. Any suicidal ideations, with intent/plan within the past 30 days<br>4. Any command hallucinations to harm self within the past 30 days<br>5. Any combination of the following:<br>  a) Suicidal ideations within the past year with or without intent/plan<br>  b) Suicidal gestures (current and/or within past year)<br>  c) One or more of the following diagnoses:<br>    i) Bipolar Disorder, Depressed<br>    ii) Major Depression With or Without Psychotic Features<br>    iii) Schizophrenia<br>    iv) Schizoaffective Disorder<br>    v) Any diagnosis within the Pervasive Developmental Disorder Spectrum<br>    vi) Any other factor(s) determined by the interdisciplinary team (IDT) as contributing to suicide risk (e.g. recent loss, family history of suicide, etc.)<br>6. Any history of self-injurious behavior (SIB) resulting in injury requiring medical attention within the past year | 1. Any suicide attempt<br>2. Any suicide ideation, with or without a plan<br>3. Any aggression to self resulting in major injury | 1. Any suicide<br>2. Any suicide attempt resulting in outside medical treatment<br>3. Two or more episodes of suicidal ideation/attempts within 14 consecutive days<br>4. Four or more episodes of suicidal ideations/ attempts within 30 consecutive days |

-48-

| **Detoxification and Use of Illicit Substances** | | |
|---|---|---|
| Intake screening shall inquire as to the following:<br>1. Substance(s) or medications used<br>2. Amount<br>3. Time of last use<br>4. History of use<br>5. Any physical observations, such as shaking, seizing, hallucinating, history of drug withdrawal symptoms, such as agitation, tremors, seizures, hallucinations, and D.T.'s (delirium tremens) | Any of the following:<br>1. Immediate history of substance use disorder<br>2. History of substance use disorder within the past year.<br>3. Any degree of risk for potentially life-threatening withdrawal from alcohol, benzodiazepines, opiates, opioid derivatives and other substances.<br>4. Vital signs appearing abnormal, when measuring body temperature, pulse rate, blood pressure, and respirations.<br>5. CIWA-AR score of 10 or over. | 1. Any incident of an individual testing positive for illicit substance (street drug) use<br>2. Use of benzodiazepines (continuous for more than 60 days) in an individual with past history of substance use disorder<br>4. Any suicide attempt<br>5. Any suicidal ideation, with or without a plan<br>6. Any aggression to self resulting in major injury |
| | | 1. Two or more incidents of illicit use in 7 consecutive days<br>2. Four or more incidents of illicit use in 30 consecutive days |