UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **LASHAWN JONES, et al.** | **CIVIL ACTION NO. 12-859** |
| **VERSUS** | **JUDGE LANCE M. AFRICK** |
| **MARLIN N. GUSMAN, Orleans Parish Sheriff, et al.** | **MAGISTRATE JUDGE ALMA CHASEZ** |

### MEMORANDUM IN SUPPORT OF THIRD-PARTY DEFENDANT CITY OF NEW ORLEANS' MOTION FOR APPOINTMENT OF A RECEIVER

**MAY IT PLEASE THE COURT:**

Third-Party Defendant, the City of New Orleans (the "City"), hereby submits its Memorandum in Support of its Motion for Appointment of a Receiver. Specifically, the City moves the Court to appoint a receiver to control all of the administrative, correctional and financial aspects of the operations of Orleans Parish Prison ("OPP") and related facilities—starting immediately.[1]

### INTRODUCTION

Sadly, the City comes before the Court in another chapter of a long history regarding asserted conditions at OPP and the Orleans Parish Sheriff's failure to resolve them despite being

---

[1] To note, the City is not asking the Court to remove Sheriff Gusman from office; the decision whether to retain Sheriff Gusman is one that only the voters of Orleans Parish can make.

1

aware of these conditions after a span of forty-four (44) years of litigation. With this history in mind, it has become increasingly clear that if problems still exist at OPP, it is because the conditions at OPP have not been addressed by Sheriff Gusman for the last nine (9) years. Equally important, the conditions at OPP are attributed to lack of management; although the Court has scheduled separate evidentiary hearings to determine if the City must contribute more tax dollars to the Sheriff, it is apparent that poor management, and not money, have caused and permitted such conditions to exist.

Despite operating under a series of consent decrees from the *Hamilton v. Morial* litigation, the Orleans Parish Sheriff's Office ("OPSO") faces a new lawsuit involving similar contentions by inmates within OPP, as well as the Department of Justice, alleging that nothing has changed at OPP under Sheriff Gusman and, based upon his latest testimony and press conferences, it is highly unlikely, if not a certitude, that anything will improve while he manages OPP. Sheriff Gusman's longstanding failure to comply with the consent decrees in *Hamilton,* as well as address arguably constitutional minimums that Plaintiffs contend are lacking, now requires extraordinary action by this Court. The City respectfully asserts that the form of this remedial action should consist of placing OPP in receivership and appointing a qualified and seasoned correctional expert as receiver to operate OPP and sections of the OPSO.

      A.      **Appointment of a Receiver is Called for When, Like Here, There is a History of Non-Compliance with Constitutional Mandates.**

"A district court's power to fashion and effectuate its decrees of constitutional import is broad and flexible."[2] A receivership is "an intrusive remedy which should only be resorted to in

---

[2] *Shaw v. Allen*, 771 F. Supp. 760, 762 (S.D. W. Va. 1990)(quoting *Morgan v. McDonough*, 540 F.2d 527, 533 (1st Cir. 1976)) (alteration omitted).

extreme cases."[3] In those cases, such as here, where "traditional remedies … are inadequate under the circumstances a court acting within its equitable powers is justified [ ] in implementing less common remedies, such as a receivership, so as to achieve compliance with a constitutional mandate."[4] While extraordinary, "[r]eceiverships [are] far from unknown in prison litigation" both before and after the Prison Litigation Reform Act.[5] Federal courts have appointed receivers to manage all or a part of severely troubled prison systems.[6] Indeed, this has occurred as recently as 2006.[7] Not only do federal courts appoint receivers to oversee failing jail systems, but receivership is also a tool utilized when addressing other government agencies that cannot or would not comply with the law.[8] Unfortunately, the situation and alleged constitutional violations occurring at OPP as well as the Sheriff's abject failure to resolve them despite being acutely aware of consent decrees authorized by other courts warrants the immediate appointment of a receiver to operate OPP – unless this Court accepts Sheriff Gusman's testimony that neither the inmates, the deputies, nor the members of the public are at risk.

---

[3] *Id.*
[4] *Id.*
[5] *Plata v. Schwarzenegger*, 603 F.3d 1088, 1093 (9th Cir. 2010).
[6] *See, Plata*, 603 F.3d at 1093; *Inmates of D.C. Jail v. Jackson*, 158 F.3d 1357, 1359 (D.C. Cir. 1998) (receiver appointed over jail's medical and mental health services); *Newman v. Alabama*, 466 F. Supp. 628, 635 (M.D. Ala. 1979) (receiver appointed to oversee entire prison system); *Shaw v. Allen*, 771 F. Supp. 760, 763-64 (S.D. W. Va. 1990) (receiver appointed over county jail). *Cf.*, *Wayne County Jail Inmates v. Wayne County Chief Executive Officer*, 444 N.W.2d 549, 560-61 (Mich. Ct. App. 1989).
[7] *Plata*, 603 F.3d at 1093.
[8] *See, Morgan v. McDonough*, 540 F.2d 527, 532-34 (1st Cir. 1976) (school system); *Gary W. v. Louisiana*, Civ. A. No. 74-2412, 1990 WL 17537, at *30-33 (E.D. La. Feb. 26, 1990) (state children's services agencies); *Turner v. Goolsby*, 255 F. Supp. 724, 730 (N.D. Ga. 1966) (county school system). *Cf. Judge Rotenberg Educ. Ctr., Inc. v. Comm'r of Dep't of Mental Retardation*, 677 N.E. 2d 127, 150 (Mass. 1997), *abrogated on other grounds In re Birchell*, 913 N.E.2d 799, 813 (Mass. 2009).

B.  **According to the Inmates and the Department of Justice, the Sheriff Has Continued a Long Standing History of Denying Prisoners Their Constitutional Rights.**

Despite being subject to the various consent decrees in *Hamilton* – none of which have been terminated (at Sheriff Gusman's request as recently as last month) – the Sheriff, according to the Plaintiffs and DOJ, continued his office's woeful tradition for nearly a decade of providing unacceptable conditions at OPP and for the general public. From 2008 through the present, Sheriff Gusman, either at his request or involuntarily, has been the subject of two (2) different reports issued by divisions of the Department of Justice and the Sheriff has received two (2) distinct letters from the Department of Justice alleging that the conditions at OPP – including medical, mental health, security, sexual abuse, excessive force, and environmental conditions – are not acceptable and appear to violate federal rights. Notably, the issues raised in both Reports and again in both of DOJ's Findings Letters in 2009 and 2012 were the subject of the consent decrees in *Hamilton*. Both the inmates and the Civil Rights Division of DOJ have stated repeatedly that OPP conditions fall below constitutional minimums. Despite these Reports and the Findings Letters, the Sheriff did nothing to ameliorate the conditions at OPP, and, in April 2012, a group of inmates represented by the Southern Poverty Law Center filed a class action lawsuit against the Sheriff. Six months later, the Department of Justice's Civil Rights Division (the "Civil Rights Division") intervened in the Plaintiff Inmates' lawsuit.

In December 2012, the Sheriff, the Plaintiff Inmates, and the Civil Rights Division moved this Court to approve a consent decree they entered into without the City. Following this request, the Court held a fairness hearing on April 1st through 4th, 2013, to take evidence as to whether or not the proposed consent decree complies with the narrow restraints and the statutory

4

need to assess the impact upon third parties (the members of the public) required by the Prison Litigation Reform Act as well as whether the proposed consent decree, as a purported class action settlement, is fair and reasonable. Based on the testimony and evidence elicited during that hearing, it is clear that, if the Court accepts the testimony offered by the fact and expert witnesses presented by the Plaintiffs, then the traditional remedies are inadequate and additional action by the Court is needed to resolve the problems at OPP. Relying upon the recent disclosures during the hearing, coupled with the history of *Hamilton,* the City respectfully submits that the appointment of a receiver to operate OPP is essential and needed.

Even based on a cursory review of the testimony of the various expert and fact witnesses presented by the Civil Rights Division and the putative class of Plaintiff Inmates, represented by the Southern Poverty Law Center, at the April 1, 2013, hearing in *Jones*, the need for a receiver to manage OPP's daily operations is apparent, unless the Court rejects the credibility of their witnesses and accepts the diametrically opposed testimony of Sheriff Gusman.

### 1.     The Department of Justice's Findings Letters

In 2009 and again in 2012, the United States' Department of Justice sent a "findings letter" (collectively, the "Findings Letters") to Sheriff Gusman and his attorneys detailing the DOJ's concerns regarding the conditions at OPP. In its first Findings Letter, the DOJ concluded, based on three (3) visits to OPP throughout 2008, that the Sheriff failed to adequately protect inmates from harm from other inmates and staff, to provide adequate mental health needs, to

provide adequate suicide prevention, to provide adequate medical management, to provide safe and sanitary conditions, and to provide adequate fire safety.[9]

Considering the fact that the Sheriff failed to substantively respond to the DOJ's allegations, the DOJ sent a second Findings Letter to the Sheriff on April 23, 2012.[10] In addition to detailing the Sheriff's lack of communications with the DOJ in response to its first Findings Letter as well as the conditions in OPP, the DOJ noted that not only had there been no improvements as to the conditions at OPP but conditions worsened.[11] Despite this series of grave criticisms by the DOJ, Sheriff Gusman took no action and allowed the situation at OPP to continue and apparently worsen as Plaintiffs' experts testified.[12]

### 2. Prison Rape Elimination Act Report

Although these facts, expert testimony, expert reports and documentary evidence provide compelling reasons to appoint a receiver, there are even more facts to support such a decision. Among the many reports and findings regarding the conditions deteriorating at OPP was a report published by a DOJ sponsored agency to assess compliance with the Prison Rape Elimination Act.[13] Though the report was intended to focus on sexual assaults in jails, the authors of the report decided to expand their assessment when they considered the operations at OPP. In short, these individuals concluded that, for a jail its size, OPP was the worst in the country.

---

[9] A copy of the DOJ's September 11, 2009, Findings Letter is attached hereto as Exhibit "A;" it was marked as trial exhibit 1.

[10] A copy of the DOJ's April 23, 2013, Findings Letter is attached hereto as Exhibit "B;" it was marked as trial exhibit 2.

[11] *Id.*

[12] It is also noteworthy that, besides writing letters, the Civil Rights Division took no affirmative action during the intervening four years.

[13] A copy of the PREA Report is attached hereto as Exhibit "C," and was marked as trial exhibit 4.

### 3. Testimony of the Plaintiff Inmates

During the fairness hearing for the consent decree proposed in the *Jones* litigation, three former inmates from OPP testified regarding the conditions that exist at the jail.[14] This testimony revealed the depth of the problems regarding the conditions at OPP including the prevalence of inmate-on-inmate violence, sexual assaults, Sheriff's deputies' failure to perform their assigned tasks, and deficiencies in both general medical and mental health treatment. Many, if not all, of these alleged deficiencies were items that should have been resolved pursuant to the currently binding consent decrees in *Hamilton*. Unlike many other critical documents he chose not to read describing conditions at OPP today, Sheriff Gusman has first-hand knowledge of the consent decrees in the *Hamilton* case. The fact these conditions continue to exist shows that control of OPP must be removed from the hands of the current Orleans Parish Sheriff and placed in the hands of an independent Court-appointed receiver.

### 4. The Reports and Testimony of Dr. Jeffrey Schwartz.

The Plaintiff Inmates retained and presented the expert report and testimony of Dr. Jeffrey Schwartz regarding the conditions and alarming lack of safety within OPP. Prior to his retention in *Jones*, Dr. Schwartz had previous involvement with OPP. In 2008, Dr. Schwartz and another correctional consultant, Mr. Rod Miller, toured OPP and prepared a detailed report about the operations and conditions at OPP.[15] This study and report by Dr. Schwartz and his colleague were undertaken through the National Institute of Corrections – an agency that operates under the aegis of the Department of Justice – that the Sheriff himself requested provide assistance regarding the conditions at OPP.

---

[14] At the fairness hearing testimony was provided by Euell Sylvester, Donald Washington, and Aaron Steel.
[15] A copy of the 2008 Report entitled "An Operational Review of the Orleans Parish Jails," dated October 10, 2008, is attached hereto as Exhibit "D," and was marked as trial exhibit 3.

In their 2008 report, Dr. Schwartz and Mr. Miller identified numerous concerns and expressed a broad range of criticism, specifically including the Sheriff's lack of leadership; they also chronicled virtually every issue that ultimately became a basis for the *Jones* lawsuit filed four years later against the Sheriff and his senior management. At the outset of their preliminary observations, these two consultants concluded that there were many areas and problems that could be fixed quickly, easily, or cheaply. They also expressed their view that if Sheriff Gusman wanted to address the issues identified in their 2008 report, he needed to prioritize his efforts. Nothing happened. Not in 2008, 2009, 2010, 2011, or 2012. Indeed as of April 2013, the Sheriff counters and contradicts every opinion expressed by Dr. Schwartz in 2008 as well as takes issue with Dr. Schwartz's opinions that were reaffirmed following Dr. Schwartz's recent inspections of the OPP facility last year.

Five years after his initial Report, Dr. Schwartz' views did not change – and the Sheriff did not change either. Concluding his 62 page expert report in *Jones*, Dr. Schwartz's first conclusion is that "OPP lacks effective, principled leadership."[16] Once again, Dr. Schwartz notes in his report that his investigative efforts were "compromised to an unusual degree by Defendant's [Sheriff Gusman's] lack of cooperation and lack of production of relevant documents."[17] Sheriff Gusman's refusal to cooperate with jail correctional consultants retained to support the proposed consent decree Sheriff Gusman signed provides additional support for the City's position that the Sheriff should not be "at the wheel" for OPP.

Besides disagreeing with the contents of DOJ Findings Letters delivered to the Sheriff in 2009 and 2012, the Sheriff contravened the contents of every pleading offered in support of the

---

[16] A copy of Dr. Schwartz' Expert Report, dated March 4, 2013, is attached hereto as Exhibit "E."
[17] *Id.*

8

proposed consent decree in *Jones* he supposedly endorsed by his signature. His signature to the proposed consent decree proved to be a hollow gesture. Despite the fact that Sheriff Gusman testified under oath that he did not bother to read the expert reports, including the lengthy narratives prepared by Dr. Schwartz and Manuel Romero (discussed in more detail below), he repeatedly "took issue" with their conclusions. It is peculiar, to the say the least, that the Sheriff has the audacity to sign a proposed consent decree but disagree with the need for it and its contents.

In his March 2, 2013, report, Dr. Schwartz states that OPP is one of the worst jail systems he has seen in his 35 years of working with and inspecting jails. If that were not enough, Dr. Schwartz commented that OPP may be the worst run jail he has ever seen. These statements were made *before* Dr. Schwartz viewed the extraordinary tapes of incarcerated inmates prancing down Bourbon Street, using illegal drugs, brandishing a Glock .45 firearm, partying with beer, and flagrant gambling while incarcerated in OPP. Prior to viewing these remarkable events, in and out of the jail, Dr. Schwartz recognized the basic problems at OPP stemmed from lack of leadership and management.

Given the long and tortured history involving OPP, no consent decree, even as appropriately modified and tailored, will be effective unless the leadership changes. Without doubt, that is the consensus of the experts. The Sheriff did not just "take issue" with Dr. Schwartz's expert opinions and observations; Sheriff Gusman unflinchingly stated that he disagrees with each and every allegation asserted in pleadings offered to support the proposed Consent Decree and correspondingly disagrees with all of the expert opinions. Simply put, the Sheriff does not believe there is a problem at OPP despite being under numerous consent decrees

in *Hamilton* and having yet another consent decree proposed in *Jones* which, quizzically, he signed. Given this history, it is clear that the "traditional remedies" are woefully insufficient considering that the Sheriff has subscribed to another consent decree when he rejects the facts offered to justify the proposed consent decree and when he has not heeded for years the consent decrees already affecting OPP.

### 5. The Report and Testimony of Manuel Romero.

In addition to Dr. Schwartz, the Civil Rights Division presented its own expert regarding the conditions at OPP, Mr. Manuel Romero, the former deputy of operations for the State of New Mexico's prison system. Among other conclusions, Mr. Romero's expert report found "alarming conditions" at OPP.[18] Mr. Romero based his opinions, in part, on two (2) separate visits to OPP in April and December of 2012. Tellingly, Mr. Romero expressed his opinion that conditions at OPP worsened from his visit in April 2012 to his visit in December 2012; once more Sheriff Gusman begged to differ when Sheriff Gusman testified. Further, Mr. Romero testified that "prisoner-on-prisoner" violence flourishes in the dysfunctional OPP, as he chronicled from his inspections at OPP and review of prison documents.

Significantly, Mr. Romero testified that a fundamental security component in a jail setting is contraband control. This basic jail practice is required not only to protect inmates and deputies in OPP but to ensure that the safety of the members of the public is likewise a top priority. Under Sheriff Gusman's watch, this was not done. On April 2, 2013, the Court permitted disclosure of three video tapes that had been requested by the City a month ago but not revealed by the Sheriff until April 1, 2013—less than 24 hours earlier. The April 1st production

---

[18] A copy of Mr. Romero's Expert Report, dated March 4, 2013, is attached hereto as Exhibit "F."

by Sheriff Gusman was untimely – under any standard.  To be clear, it is apparent from the Court's comments and the City's numerous statements, both in court pleadings and to the public, that the Court and Mayor Landrieu were deeply disturbed upon hearing the evidence presented last week.  These tapes, to put it mildly, shock the conscious.  The resulting public outcry has proven that the images these tapes show go beyond mere sensationalism; they graphically reveal deep flaws within the daily operations of OPP and the Sheriff's Office.  It is safe to assume that neither the Court in *Jones* nor the public were apathetic about this series of blatant prisoner misconduct, escapes and the proliferation of contraband in the jail.  These tapes were offered into evidence as City Exhibit 13 without any objection by the Sheriff.

Immediately after these tapes were shown in court, Mr. Romero testified.  To say he was mildly stunned after viewing the footage would be an understatement.  Not surprisingly, Mr. Romero testified that he has never seen anything like what he watched on those tapes.  He told the Court he has never seen such an inordinately high level of dysfunction at a jail facility.  Compounding these issues, Mr. Romero believed that the inmates pictured were using an array of illegal drugs and a gun in one video and walking the streets of the City when they were supposed to be incarcerated.

Correspondingly, Mr. Romero corroborated Dr. Schwartz' views that allocation of resources by Sheriff Gusman was "upside down;" in other words, Sheriff Gusman chose not to properly prioritize his resources to manage OPP.  He also testified that these events established a lack of leadership and a lack of accountability by the Sheriff.  Even if the Court in *Jones* approves some version of a tailored, non-intrusive consent decree, the mere fact that the Court finds that such a document is necessary, despite the fact that the various consent decrees in

*Hamilton* are still in effect, only underscores the void of leadership and accountability that these corrections experts believe are the touchstones required by a keeper of the jail. Both experts agreed with the well-known maxim that the "buck stops" with the head of an organization. As their testimony indicates, no one was at the "top" when it came to OPP. Indeed, they observed, among other things, that Sheriff Gusman used a "hands-off" management style, which either allowed or exacerbated falsified records, unacceptable jail practices, and rampant misconduct by the Sheriff's deputies.

The conclusions of Mr. Romero coupled with Dr. Schwartz's opinions lead to the inescapable conclusion that drastic remedies are needed to correct the problems within the Orleans Parish Sheriff's Office and the resulting deplorable conditions at OPP – unless the Court finds the testimony of Sheriff Gusman to be more credible than the Plaintiffs' witnesses.

### 6. Recent Federal Indictments of the Sheriff's Key Senior Staff.

Two senior deputies at the Sheriff's office recently plead guilty to bid-rigging, conspiracy, and bribery. Not only did these deputies admit they committed federal felonies but their illegal conduct drained an untold amount of revenue from the operations at OPP. Moreover, even Sheriff Gusman acknowledged that this federal criminal investigation involving his office was not concluded and that the vendors and businessmen who had contracts with his office are likely under criminal investigation.

### 7. The Recently Disclosed Videos from Within OPP and the Sheriff's Response Further Support the Need for a Receiver.

Perhaps the most irregular and illegal activities presented during the hearing involved the disclosure of the videos reluctantly produced by Sheriff Gusman. Equally disquieting was Sheriff Gusman's attempt to explain away graphic recordings of inmate misconduct and

endangerment of the public. Initially the Sheriff testified that he did not recall the videos. Specifically, when asked if he was aware of any such videos, he responded "[n]ot really, no."[19] Further, Sheriff Gusman referred to the existence of these videos as "one of those rumors you hear," and explicitly stated he did not view the videos.[20] On March 14th, the City requested production of any tapes evidencing inmates' use of contraband or inmate escapes. It was not until March 28th when the Court enforced the City's request for videos that the Sheriff advised the City that the tapes were turned over to agents from the Federal Bureau of Investigation, presumably in response to a federal grand jury subpoena; the Sheriff represented that he did not retain a copy of the tapes though the City's request for these tapes preceded delivery of the tapes to the FBI. According to his attorneys, agents from the FBI delivered to him a copy of the tapes the next day (March 29, 2013, which was Good Friday). The tapes were then produced on April 1st pursuant to a protective order preventing disclosure to anyone except attorneys and experts, at the request of the Sheriff. On April 2nd, in response to the City's efforts, the Court lifted the protective order and permitted disclosure of these tapes to the public.

The City will not recount in detail the aberrant and unacceptable behavior flaunted in the tapes by certain inmates. Needless to say, these tapes show disturbing images of inmates while in OPP engaging in explicit drug use, gambling, consuming alcohol, and, most shockingly, brandishing a firearm within a cell. These tapes also show inmates cavorting on Bourbon Street at a time when they admit they are supposed to be incarcerated in OPP. In addition to the contents of the tapes, the City requests that the Court take notice of the Sheriff's response, both

---

[19] Transcript of Deposition of M. Gusman, at p. 156:13 – 18. A copy of the relevant portions of the transcript of Sheriff Gusman's deposition is attached hereto as Exhibit "G."
[20] *Id.* at pp. 156:19 – 157:26.

on and off the witness stand, and his effort to spin the facts instead of accepting responsibility for the gross breaches of jail security.

After testifying that he did not recall ever seeing the tapes, Sheriff Gusman then testified that he saw them in 2009.  He offered even more implausible testimony that the tapes were in a safe for more than three years and neither he nor his senior staff knew how to open the safe.  As part of an effort to blunt the import of these tapes, the Sheriff suggested that tapes had been doctored, though he was unable to offer any support for this implausible notion.  Building upon his incredulous suggestions, the Sheriff publicly said he could not detect contraband in the videos because he was using a small screen to watch them.  Yet, there was no audio or visual difficulty in ascertaining every event on these tapes (including the disturbingly broad array of contraband) when Sheriff Gusman's attorneys produced the tapes to the Court and the City.  After these revelations that startled the public and correctional professionals alike, it was reported that contraband and escapes were almost a daily activity for OPP inmates.[21]  The Sheriff ventured to say that he found disclosures provided by these additional inmates regarding jail security transgressions skeptical and sought to denigrate these first-hand admissions by calling the inmates "unnamed persons who claim they recall incidents from four years ago."  In contrast, it seems that Sheriff Gusman is the one person that recalls very little.  The ever changing explanations offered by Sheriff Gusman only reinforce the experts' conclusions that the Sheriff lacks "principled leadership" and has not been accountable for the operations of OPP.

---

[21] Claire Galofaro, *2 Inmates Came and Went As They Pleased from OPP, Bringing Drugs and Gun With Them, Fellow Prisoners Say*, available at
http://www.nola.com/crime/index.ssf/2013/04/2_inmates_came_and_went_as_the.html#incart_m-rpt-1 (last visited April 8, 2013).

### 8. The Public's Response to the Recent Disclosures Corroborates the Appointment of a Receiver.

The City is now not alone in suggesting that a receiver is necessary and warranted. A cross-section of reports and publications have created a chorus of voices agreeing with the City and imploring the appointment of a receiver to operate OPP. A lengthy editorial published on April 6, 2013, in the Times-Picayune and on nola.com, concluded that "the Sheriff himself clinches the argument that he is unfit to oversee reforms at the prison."[22] Observing that the Sheriff did not even read the expert reports produced in the *Jones* litigation relating to conditions at OPP, the newspaper's editors observed that the Sheriff nonetheless steadfastly refused to agree with any of the conclusions reached by these experts who were retained to support the very consent decree Sheriff Gusman signed several months ago. The strongly-worded editorial states that the Sheriff should be made to account for the funds he receives from the City and others. The City is no longer the only party calling for an accounting, notably, the editors of the Times-Picayune now concur with the City that the safety of the inmates, deputies and the public are paramount. Achieving these goals, as the editors correctly express, is essential for the viability of New Orleans and its national reputation. The editors of the Times-Picayune conclude by asking the Court to "find someone other than Sheriff Gusman to do the job."

In addition to the Times-Picayune, the well-known columnist Jarvis DeBerry recognized the Sheriff's incongruous positions of subscribing to the consent decree in *Jones* yet disputing

---

[22] *The Case for Change at Orleans Parish Prison: Editorial*, available at http://www.nola.com/opinions/index.ssf/2013/04/the_case_for_change_at_orleans.html (last visited April 8, 2013), a copy of which is attached hereto as Exhibit "H."

that the conditions at OPP fall below accepted minimum standards.[23]  Concluding his column, Mr. DeBerry pointedly poses the question:  "How can he be trusted to fix the jail if he isn't convinced it's broke?"[24]  Mr. DeBerry now joins the City in finding that Sheriff Gusman cannot be trusted to reform OPP.

In addition to these publications, the Gambit Weekly has also called for the appointment of a receiver as well as the resignation of Sheriff Gusman.[25]  Based on the Sheriff's recent "disingenuous testimony" as well as other factors, "at a minimum he [Sheriff Gusman] should be out of the picture."[26]  Indeed, according to this publication, "Gusman has failed the citizens of New Orleans and owes them his resignation.  If he chooses to stay, [the Court] should appoint a receiver to clean up OPP."[27]

## CONCLUSION

The Court alluded to the multiple references by the City that a receiver may be demanded.  Recognizing that a receiver is appointed under extraordinary circumstances, the City deferred filing a motion for the appointment of a receiver to manage the Orleans Parish Sheriff's Office.  The City now respectfully submits its motion for a receiver based upon these facts, days of testimony, and public safety concerns.  While the Court deferred ruling on the Sheriff's funding claim until July 1st, the additional money he seeks from the City's limited funds is not the panacea; instead, it is a change in management.  Stated simply, the person at the top is neither

---

[23] Jarvis DeBerry, *You Won't Believe Sheriff Marlin Gusman's Testimony*, available at http://www.nola.com/opinions/index.ssf/2013/04/you_wont_believe_sheriff_marli.html (last visited April 8, 2013), a copy of which is attached hereto as Exhibit "I."
[24] *Id.*
[25] *Guns, Drugs, and Videotape*, available at http://www.bestofneworleans.com/blogofneworleans/archives/2013/04/05/editorial-guns-drugs-and-videotape (last visited April 8, 2013), a copy of which is attached hereto as Exhibit "J."
[26] *Id.*
[27] *Id.*

accountable nor capable of exercising leadership skills, as the testimony last week regrettably revealed. If the current situation does not justify the appointment of a receiver, nothing does.

Respectfully submitted,

**PHELPS DUNBAR LLP**

BY:   */s/Harry Rosenberg*
Harry Rosenberg (Bar #11465)
Bryan Edward Bowdler (Bar #32097)
Canal Place | 365 Canal Street, Suite 2000
New Orleans, Louisiana 70130-6534
Telephone: 504-566-1311
Telecopier: 504-568-9130
Email:  harry.rosenberg@phelps.com
     bryan.bowdler@phelps.com

Richard F. Cortizas (Bar #28890)
Sharonda R. Williams (Bar #28809)
Chief of Litigation
City Attorney's Office
1300 Perdido Street
New Orleans, Louisiana 70112
Telephone: 504-658-9800

Ralph Capitelli (Bar #3858)
Brian Capitelli (Bar #27398)
CAPITELLI & WICKER LLP
1100 Poydras Street, Suite 2950
New Orleans, Louisiana 70163
Telephone: 504-582-2425

**ATTORNEYS FOR THIRD-PARTY DEFENDANT, CITY OF NEW ORLEANS**

**CERTIFICATE OF SERVICE**

      This is to certify that a copy of the foregoing was filed on this 9th day of April 2013, with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to all participating counsel of record.

                              */s/ Harry Rosenberg*
                              Harry Rosenberg