1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF LOUISIANA
2

3       ****************************************************************

4

LAWSHAWN JONES, ET AL
5

                                    CIVIL DOCKET NO. 12-859 "I"
6            V.                     NEW ORLEANS, LOUISIANA
                                    MONDAY, APRIL 1, 2013
7

MARLIN GUSMAN, ET AL
8

9       ****************************************************************

10

                          **DAY 1  MORNING SESSION**
11             TRANSCRIPT OF FAIRNESS HEARING PROCEEDINGS
              HEARD BEFORE THE HONORABLE LANCE M. AFRICK
12                   UNITED STATES DISTRICT JUDGE

13

14      APPEARANCES:

15

16      FOR THE PLAINTIFFS:        SOUTHERN POVERTY LAW CENTER
                                   BY:  KATHARINE SCHWARTZMANN, ESQUIRE
17                                 4431 CANAL STREET
                                   NEW ORLEANS, LA 70119
18

19
                                   SOUTHERN POVERTY LAW CENTER
20                                 BY:  JENNIFER M. COCO, ESQUIRE
                                   1055 ST. CHARLES AVENUE, SUITE 505
21                                 NEW ORLEANS, LA 70130

22

23                                 SOUTHERN POVERTY LAW CENTER
                                   BY:  SARA ZAMPIERIN, ESQUIRE
24                                      CHRISTINE P. SUN, ESQUIRE
                                   400 WASHINGTON AVENUE
25                                 MONTGOMERY, AL 36104

```
 1    APPEARANCES CONTINUED:

 2

 3                                ELIZABETH CUMMING
                                 ATTORNEY AT LAW
 4                               316 SOUTH DORGENOIS STREET
                                 NEW ORLEANS, LA 70119
 5

 6
      FOR THE UNITED STATES
 7    OF AMERICA:               U. S. DEPARTMENT OF JUSTICE
                                 CIVIL RIGHTS DIVISION
 8                               BY:  LAURA COON, ESQUIRE
                                      MATTHEW J. DONNELLY, ESQUIRE
 9                                    COREY M. SANDERS, ESQUIRE
                                 950 PENNSYLVANIA AVENUE, NW
10                               WASHINGTON, DC 20530

11

12    FOR THE DEFENDANTS:       USRY, WEEKS & MATTHEWS
                                 BY:  FREEMAN R. MATTHEWS, ESQUIRE
13                                    BLAKE J. ARCURI, ESQUIRE
                                 1615 POYDRAS STREET, SUITE 1250
14                               NEW ORLEANS, LA 70112

15

16    FOR THE CITY OF
      NEW ORLEANS:               PHELPS DUNBAR
17                               BY:  HARRY ROSENBERG, ESQUIRE
                                      BRYAN E. BOWDLER, ESQUIRE
18                               CANAL PLACE
                                 365 CANAL STREET, SUITE 2000
19                               NEW ORLEANS, LA 70130

20

21                               CAPITELLI & WICKER
                                 BY:  RALPH CAPITELLI, ESQUIRE
22                                    BRIAN J. CAPITELLI, ESQUIRE
                                 ENERGY CENTRE
23                               1100 POYDRAS STREET, SUITE 2950
                                 NEW ORLEANS, LA 70163
24

25
```

1    APPEARANCES CONTINUED:

2

3                                    CITY ATTORNEY'S OFFICE
                                     BY:  SHARONDA R. WILLIAMS, ESQUIRE
4                                    1300 PERDIDO STREET, 5TH FLOOR
                                     NEW ORLEANS, LA 70112
5

6

7    OFFICIAL COURT REPORTER:   CATHY PEPPER, CRR, RMR, CCR
                                CERTIFIED REALTIME REPORTER
8                                REGISTERED MERIT REPORTER
                                500 POYDRAS STREET, ROOM HB406
9                                NEW ORLEANS, LA  70130
                                (504) 589-7779
10                               Cathy_Pepper@laed.uscourts.gov

11

12   PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.  TRANSCRIPT
     PRODUCED BY COMPUTER.

13

14

15

16

17

18

19

20

21

22

23

24

25

1                            **I N D E X**

2

3    EXAMINATIONS                                          PAGE

4

5    **EUELL DEVALL SYLVESTER**.............................  24

6    DIRECT EXAMINATION BY MS. ZAMPIERIN..................  25

7    CROSS-EXAMINATION BY MR. RALPH CAPITELLI.............  55

8    **JEFFREY SCHWARTZ**....................................  61

9    VOIR DIRE EXAMINATION BY MS. SCHWARTZMANN............  61

10   DIRECT EXAMINATION BY MS. SCHWARTZMANN...............  66

11   LUNCHEON RECESS.....................................  137

12

13

14                       **E X H I B I T S**

15

16   DESCRIPTION                                           PAGE

17

18   EXHIBITS 1 THROUGH 101, 140 THROUGH 351, 363, 368      73

19   THROUGH 371, 380, 353, 354 AND 356 WERE ADMITTED.....

20   EXHIBITS 372 THROUGH 379 WERE ADMITTED..............  74

21

22

23

24

25

1                           P-R-O-C-E-E-D-I-N-G-S

2                       M O R N I N G   S E S S I O N

3                           MONDAY, APRIL 1, 2013

4                         (COURT CALLED TO ORDER)

5

6

08:29:34  7              THE DEPUTY CLERK:  All rise.

08:29:49  8              THE COURT:  Thank you.  Good morning.

08:29:49  9              VOICES:  Good morning, Your Honor.

08:29:49 10              THE COURT:  All right.  Let's call the case, please.

08:29:52 11              THE DEPUTY CLERK:  Civil Matter 2012-859,

08:29:58 12    *Lashawn Jones, et al., versus Marlin Gusman, et al.*  This

08:30:00 13    matter is set for Fairness Hearing.

08:30:00 14              THE COURT:  Thank you.

08:30:02 15                   Counsel, make your appearance.  Let's start with

08:30:04 16    plaintiffs and the Department of Justice.

08:30:06 17              MS. COON:  Laura Coon on behalf of the United States,

08:30:09 18    Your Honor.

08:30:09 19              MR. DONNELLY:  Matt Donnelly, Your Honor.  Good

08:30:11 20    morning.

08:30:11 21              THE COURT:  Good morning.

08:30:14 22              MR. SANDERS:  Corey Sanders for the United States,

08:30:15 23    Your Honor.

08:30:15 24              MS. SCHWARTZMANN:  Katie Schwartzmann, the plaintiff

08:30:17 25    class.

08:30:18 1          MS. SUN:  Christine Sun for the plaintiffs.

08:30:21 2          MS. ZAMPIERIN:  Sara Zampierin for the plaintiffs.

08:30:24 3          MR. MATTHEWS:  Freeman Matthews for the Sheriff.

08:30:27 4          MR. ARCURI:  Blake Arcuri for the Sheriff.

08:30:30 5          MR. ROSENBERG:  Good morning, Your Honor.

08:30:31 6   Harry Rosenberg on behalf of the City of New Orleans.

08:30:33 7          MR. RALPH CAPITELLI:  Good morning, Your Honor.

08:30:34 8   Ralph Capitelli, also for the City.

08:30:37 9          MS. WILLIAMS:  Good morning, Your Honor.

08:30:39 10  Sharonda Williams for the City of New Orleans.

08:30:40 11         MR. BOWDLER:  Good morning, Your Honor.  Bryan Bowdler

08:30:42 12  on behalf of the City of New Orleans.

08:30:44 13         MR. BRIAN CAPITELLI:  Brian Capitelli on behalf of the

08:30:46 14  City of New Orleans, Your Honor.

08:30:47 15         THE COURT:  Good morning to everyone.

08:30:48 16             The proposed Consent Judgment in this case would

08:30:51 17  settle the claims of plaintiffs, Lashawn Jones, et al., and

08:30:54 18  intervenor plaintiff, the United States of America, against the

08:30:57 19  defendant, the Sheriff of Orleans Parish.

08:30:58 20             These claims allege the conditions in

08:31:01 21  Orleans Parish Prison facilities violate the United States

08:31:05 22  Constitution and federal statutory law.

08:31:06 23             Should the Court enter the proposed

08:31:08 24  Consent Judgment, it would not be a judgment on the merits of

08:31:11 25  the plaintiffs' and intervenor plaintiff's claims; rather, the

08:31:15 1    Court would be finding that a settlement of those claims in the

08:31:16 2    form of a Consent Judgment is appropriate pursuant to several

08:31:19 3    legal standards.

08:31:20 4            Generally, before entering the Consent Judgment,

08:31:22 5    the Court must ascertain that the settlement is fair and that

08:31:25 6    it does not violate the Constitution, statutes or

08:31:29 7    jurisprudence.

08:31:29 8            The Court must also be satisfied that the

08:31:32 9    Consent Judgement does not have an unreasonable or proscribed

08:31:34 10   effect on third parties.

08:31:35 11           Because the proposed Consent Judgment involves

08:31:39 12   prospective relief with respect to a prison, an additional

08:31:42 13   standard of review applies.  Pursuant to the Prison Litigation

08:31:46 14   Reform Act, the PLRA, 18 U.S.C. Section 3626, the Court must

08:31:51 15   find that the proposed Consent Judgment is narrowly drawn,

08:31:53 16   extends no further than necessary to correct the violation of

08:31:55 17   the federal right, and is the least intrusive means necessary

08:31:59 18   to correct the violation of the federal right.

08:32:01 19           The parties seek the Court's certification of the

08:32:03 20   settlement class consisting of all current and future

08:32:06 21   Orleans Parish Prison inmates.  In order to approve the

08:32:09 22   settlement of a class action, the Court must additionally

08:32:10 23   determine that the settlement is fair, adequate and reasonable,

08:32:13 24   especially insofar as it affects inmates who are not named

08:32:17 25   plaintiffs in the lawsuit.

08:32:18  1          Although the City of New Orleans is not a party

08:32:19  2     to the proposed Consent Judgment, it is participating to voice

08:32:23  3     its objections to the proposed Consent Judgment and to litigate

08:32:26  4     certain issues relevant to the May 28th and July 1st funding

08:32:30  5     hearings that overlap with the Court's inquiry into whether to

08:32:34  6     enter the proposed Consent Judgment.

08:32:35  7          In preparing for today's hearing, the Court has

08:32:37  8     received more than 150 comments from the general public and

08:32:39  9     from current OPP inmates.  In addition to the evidence

08:32:44  10    presented at the hearing, the Court will consider these

08:32:46  11    comments in determining whether to enter the proposed

08:31:22  12    Consent Judgment.

08:32:49  13          All right.  Each side has been allowed 10 minutes

08:32:51  14    for opening statements.  Let's begin with the plaintiffs.

08:33:01  15          MS. COON:  Thank you, Your Honor.

08:33:01  16          THE COURT:  You're the intervenor.  Do you wish to

08:33:04  17    start?

08:33:05  18          MS. COON:  Your Honor, the plaintiff intervenor and the

08:33:07  19    class plaintiffs will be doing a single opening statement.

08:33:10  20          THE COURT:  All right.  Thank you.

08:33:10  21          MR. ROSENBERG:  Your Honor, before we begin, the City

08:33:13  22    wishes to invoke its right for sequestration of any witnesses

08:33:17  23    in the courtroom.

08:33:18  24          THE COURT:  Other than experts and party

08:33:20  25    representatives, are there any witnesses who may be called to

08:33:23 1    testify in this case present in the courtroom or right outside

08:33:29 2    the courtroom?

08:33:29 3            All right.  The lawyers can advise their

08:33:32 4    witnesses other than the persons that I mentioned of the

08:33:36 5    court's order of sequestration, that is, no witnesses are to

08:33:40 6    discuss the case with anyone other than the lawyers to any

08:33:42 7    side, if they wish to do so, until the hearing has been

08:33:47 8    finalized.

08:33:48 9            All right.  Thank you.  Go ahead.

08:33:49 10           MS. COON:  There is one thing.  I noticed that

08:33:55 11   Mr. Kopplin is here.  Will he be testifying?

08:33:58 12           MR. ROSENBERG:  He's the City representative,

08:34:00 13   Your Honor.

08:34:00 14           THE COURT:  All right.  That's fine.

08:34:01 15           MS. COON:  Thank you, Your Honor.

08:34:01 16           Good morning.  I'm Laura Coon on behalf of

08:34:04 17   plaintiff intervenor, United States.  Together with the

08:34:07 18   plaintiff class and defendant Sheriff, we urge the Court to

08:34:11 19   enter the amended proposed Consent Judgment.

08:34:12 20           The Consent Judgment is designed to correct

08:34:14 21   long-standing, dangerous and inhumane conditions at the jail.

08:34:21 22           Despite the filings in this case and the press

08:34:23 23   reports, I am pleased to stand before you and report that there

08:34:26 24   is little dispute among the United States, class plaintiffs,

08:34:28 25   the Sheriff and the City on many of the critical issues before

08:34:32  1   the Court.

08:34:33  2          Most importantly, all parties to this litigation

08:34:37  3   agree that conditions at the jail are unacceptable, and that

08:34:41  4   change is necessary.

08:34:43  5          All parties agree that these problems are

08:34:45  6   long-standing, persistent and severe.

08:34:48  7          All parties agree that reform will take a

08:34:52  8   concerted effort over time, and that it will be a big and

08:34:56  9   important project.

08:34:57 10          All parties agree that it is the Sheriff's

08:35:01 11   responsibility to run the jail, but that the City has a

08:35:04 12   critical interest in the jail's operations since most of the

08:35:07 13   jail population are City detainees.

08:35:12 14          Finally, all parties agree that a safe and well

08:35:15 15   run jail is critical to the public safety of the City of

08:35:18 16   New Orleans.

08:35:19 17          A functioning criminal justice system requires

08:35:22 18   humane jail conditions.  New Orleanians live and work in the

08:35:25 19   jail, and they return to the community permanently scarred by

08:35:30 20   the unacceptable conditions there.

08:35:31 21          The disputes between the parties are limited.

08:35:35 22   They are limited to, one, who should pay for jail reform and

08:35:40 23   how much is needed to start it, and, two, whether, from the

08:35:43 24   City's perspective, the remedy agreed to by the United States,

08:35:47 25   class plaintiffs and the Sheriff goes far enough.

08:35:51  1          The City seeks the extraordinary remedy of

08:35:56  2     receivership rather than a Consent Decree.  At the hearing this

08:35:58  3     week, the plaintiffs will present evidence --

08:36:00  4          THE COURT:  I didn't think the City asked for

08:36:03  5     receivership.  I thought that the City stated that it was an

08:36:06  6     option that they reserved the right to request receivership.

08:36:09  7     Is that correct or incorrect?

08:36:09  8          MR. ROSENBERG:  That's correct, Your Honor.  We have

08:36:11  9     not yet formally moved for the appointment of a receiver.

08:36:14 10          THE COURT:  All right.  Proceed.

08:36:14 11          MS. COON:  At the hearing this week, the plaintiff will

08:31:22 12     present evidence that the proposed Consent Judgment is the

08:36:22 13     legally appropriate remedy to address long-standing and current

08:36:25 14     Constitutional violations at the jail.

08:36:28 15          The court will hear testimony from experts in

08:36:31 16     jail management, jail operations and mental healthcare who will

08:36:35 17     explain why the proposed Consent Judgment provisions are

08:36:38 18     minimally necessary based on their expertise and their

08:36:41 19     comprehensive review of conditions at OPP.

08:36:45 20          The Court will also hear from current and former

08:36:47 21     OPP detainees who will testify about their experiences there;

08:36:52 22     the Court will hear from the family of one of the many

08:36:56 23     prisoners who has died at OPP; and, the Court should consider

08:36:59 24     the dozens of comments from community members urging the Court

08:37:02 25     to order systemic reform at OPP.

08:37:05 1          The community is profoundly affected by

08:37:07 2   conditions in the jail.  Dangerous and deadly conditions have

08:37:10 3   plagued the jail for decades.  In the last seven years,

08:37:13 4   40 people have died, including at least five suicides just

08:37:16 5   since 2010.

08:37:17 6          There are countless reports of stabbings and

08:37:21 7   other physical and sexual assaults, including at least

08:37:25 8   700 assaults and 32 stabbings in the last year, based on OPP's

08:37:29 9   own records.

08:37:31 10         There are certainly many more incidents of harm

08:37:35 11  based on the simple fact that OPP has about half the staff it

08:37:39 12  needs, so prisoners are left unsupervised, unable to get help

08:37:43 13  in time, and unable to avoid future incidents by the same

08:37:47 14  people.

08:37:47 15         The testimony will show that the jail is an

08:37:50 16  institution stuck in time.  Its policies are antiquated and

08:37:54 17  have failed to keep up with modern correctional practices.

08:37:57 18  Staff training has not been updated.

08:38:00 19         Practices long discarded by other jails are

08:38:02 20  commonplace.  The buildings are decrepit and in disrepair, and

08:38:07 21  funding has stagnated as well.

08:38:08 22         Today, this Court has the opportunity to change

08:38:10 23  course and effect change.  OPP has been starved for many years.

08:38:15 24  It has been starved of contemporary policies, staff training

08:38:19 25  and accountability measures; it has been starved of guidance

and professional corrective standards; and, it has been starved of resources.

The proposed Consent Judgment addresses all of these long-standing deficiencies in a manner that is fair, adequate, reasonable, and compliant with federal and state law.

It strikes the appropriate balance that is required by the Prison Litigation Reform Act because the required remedies are minimally necessary, narrowly tailored to address the Constitutional violations, and go no further than necessary to ensure that the rights of prisoners under the Constitution and laws of the United States are respected.

The City is here today as a third-party defendant because state law requires the City to pay for Constitutional conditions of confinement for its detainees. The City has declined to sign on to the proposed Consent Judgment.

For these reasons, the proposed Consent Judgment's effect on the City may not be unreasonable or proscribed.

The proposed Consent Judgment has no such effect on the City. Rather, the proposed Consent Judgment sets up a process that gives the City ample opportunity on an ongoing basis to work with the parties and, if necessary, the Court to ensure annual jail funding is targeted to achieve Constitutional conditions, taking into account future changes in the jail population, progress in substantive jail reform,

and changes in operations, such as the opening of the new jail next year.

In addition to a fair process for annual budget determinations, the proposed Consent Judgment gives the City access to periodic data reports and financial statements from the Sheriff to enable the City to begin conducting oversight over the money it contributes to the jail and the conditions in which its detainees are housed.

But the proposed Consent Judgment does not rely solely on the plaintiffs or the City or the Sheriff to ensure the reforms are implemented.  Rather, it calls for an independent monitor with subject matter experts to supervise and facilitate implementation of required reforms through periodic inspections and public reports.

The monitor also will review and approve jail policies, provide technical assistance and facilitate access to resources to guide compliance.

The monitor will work closely with the professional corrections administrator and the full-time compliance coordinator that are both required by the proposed Consent Judgment.

The proposed Consent Judgment addresses all of the systemic deficiencies that contributed to the ongoing problems at the jail, as well.  It requires development and implementation of policies, procedures, and training regarding

08:41:10  1    all aspects of correctional management and operations,

08:41:13  2    including use of force, investigations, prevention of prison

08:41:18  3    rape, and contraband prevention and detection.

08:41:23  4            It requires adequate correctional staffing to

08:41:24  5    supervise prisoners.  This must be determined periodically

08:41:27  6    based on the number of prisoners and the housing unit

08:41:32  7    structures.  It requires tracking of facility data to determine

08:41:34  8    where dangerous incidents are happening, why they are

08:41:37  9    happening, when they are happening, and who is involved, in

08:41:41  10   order to curb the unacceptable levels of violence in the jail.

08:41:45  11           It requires the provision of adequate medical and

08:41:47  12   mental health care, including access to necessary medications

08:41:50  13   and treatment by adequate numbers of qualified staff.

08:41:53  14           It requires appropriate supervision and clinical

08:41:56  15   intervention for individuals who are or become suicidal in the

08:41:59  16   jail.

08:42:00  17           It requires improvements in sanitation and fire

08:42:03  18   safety up, until and after the new jail facility is built.

08:42:07  19           Finally, the agreement requires that limited

08:42:10  20   English proficiency prisoners have access to translation

08:42:15  21   services and translated forms to enable access to medical and

08:42:19  22   other basic services in the jail.

08:42:20  23           The proposed Consent Judgment is a

08:42:23  24   comprehensible, court-enforceable blueprint for Constitutional

08:42:26  25   jail conditions.  We ask the Court to act expeditiously to

08:42:29 1    approve it.

08:42:30 2                    Thank you, Your Honor.

08:42:31 3            THE COURT:  Thank you.

08:42:31 4               Mr. Matthews.

08:42:37 5            MR. MATTHEWS:  Your Honor, I will keep this brief.

08:42:39 6            THE COURT:  Yes, sir.

08:42:40 7            MR. MATTHEWS:  There was months of negotiation with the

08:42:44 8    Justice Department for this Consent Decree.  The Sheriff

08:42:49 9    believes that, for the most part, it is a good Consent Decree.

08:42:53 10   It may need some tweaking going forward.

08:42:56 11                   We have older facilities now.  We're hoping that

08:42:58 12   the new jail will come online right after the first of the

08:43:02 13   year.  That should alleviate some of the problems.

08:43:04 14                   In the meantime, where the Sheriff could, without

08:43:11 15   additional funding, he has attempted to make changes.  You'll

08:43:16 16   hear some of those today or during this week when different

08:43:20 17   witnesses testify.

08:43:21 18                   But I would like to report to the Court that,

08:43:25 19   just last week, the National Commission on Correctional

08:43:30 20   Healthcare has certified the medical departments at the

08:43:33 21   Sheriff's Office.  That is huge.  That was a huge upgrade that

08:43:37 22   we've done.

08:43:38 23                   So we think the Consent Decree is necessary.

08:43:43 24   It's up to the Court, obviously, to make any changes or tweak

08:43:47 25   it like it needs -- like the Court feels it should, but we

08:43:51  1    would ask that it be approved.

08:43:54  2            THE COURT:  Thank you, Mr. Matthews.

08:43:59  3                Mr. Rosenberg.

08:44:01  4            MR. ROSENBERG:  Good morning, Your Honor.

08:44:01  5            THE COURT:  Good morning.

08:44:02  6            MR. ROSENBERG:  Your Honor, the City and Mayor Landrieu

08:44:12  7    both believe that the Constitutional rights of the inmates, as

08:44:14  8    well as the Constitutional rights of the nonincarcerated

08:44:18  9    individuals should be protected.

08:44:20 10            Needless to say, the Mayor is acutely concerned

08:44:23 11    about the nature of the serious allegations made by the

08:44:29 12    plaintiff inmates and the Department of Justice; but, the Mayor

08:44:32 13    is obligated to consider the welfare and safety of more than

08:44:37 14    370,000 residents who are not incarcerated, as well as the

08:44:41 15    welfare of the 1600 to 1900 inmates who are incarcerated in

08:44:48 16    Orleans Parish Prison.

08:44:49 17            The City has now been constrained to voice an

08:44:52 18    objection to the proposed Consent Decree because it is too

08:44:57 19    broad, Your Honor, and because it does not conform either to

08:45:01 20    federal law, state law, local law, or Constitutional

08:45:06 21    principles.

08:45:06 22            It is neither fair nor reasonable to third

08:45:11 23    persons.  By that, I mean, Judge, the people who are not in

08:45:15 24    prison.  Those are the other third parties that Your Honor

08:45:18 25    mentioned in your opening remarks that need -- whose interests

08:45:22  1   likewise need to be considered.

08:45:24  2           The Sheriff said he is the keeper of the jail,

08:45:31  3   Your Honor.  He said that in pleadings.  He makes all the

08:45:36  4   decisions, according to what the DOJ has said and according to

08:45:44  5   what he said in his own pleadings; but, yet, when the

08:45:48  6   Department of Justice came down and inspected the Sheriff's

08:45:50  7   Office in 2008, as Your Honor knows, and made an inspection and

08:45:54  8   met with the Sheriff repeatedly, he made no changes.

08:45:58  9           He got a detailed findings letter, that the

08:46:01 10   evidence will show later in this proceeding, Your Honor, in

08:46:05 11   September of 2009, about action that he needed to take, and the

08:46:10 12   Sheriff disagrees with each of those findings still.

08:46:14 13           He got a similar letter in April of 2012, from

08:46:17 14   the Department of Justice, talking about the deficiencies that

08:46:22 15   not only remained the same but had gotten worse, and he still

08:46:25 16   took no action in 2012.

08:46:28 17           He filed this motion for a Consent Decree,

08:46:31 18   Your Honor, with the Department of Justice and with the

08:46:34 19   inmates; but, he's testified as recently as a couple of weeks

08:46:37 20   ago that he disagrees with all of the allegations they make.

08:46:43 21           He disagrees with their proposed findings of fact

08:46:46 22   that are presented in support of the Consent Decree.  He

08:46:50 23   disagrees with the other pleadings that have been presented in

08:46:54 24   support of the Consent Decree.  Yet, oddly, he is a mover for

08:47:00 25   the Consent Decree.

08:47:02  1          The Sheriff has testified that the jail is safe.

08:47:06  2  The Sheriff has testified that the inmates and the deputies

08:47:11  3  there are in fine condition.  That's his testimony that's been

08:47:17  4  adduced so far in pretrial proceedings.  But he's never said

08:47:23  5  that the conditions of the jail that he runs as the keeper of

08:47:28  6  the jail are unconstitutional.

08:47:31  7          Now, the Department of Justice has stood up this

08:47:34  8  morning and said it's protecting the entire public and its tax

08:47:40  9  dollars.  That's just not true, Your Honor.  I think we'll see

08:47:43 10  that.

08:47:43 11          The Department of Justice says it's tasked with

08:47:46 12  ensuring Constitutional conditions of confinement; but, the

08:47:53 13  Department of Justice has sent mixed messages.

08:47:55 14          The City, Your Honor, we'll show has acted

08:47:58 15  reasonably.  We've tried to engage in a dialogue to determine

08:48:06 16  whether this proposed Consent Decree is too broad at the

08:48:09 17  moment.

08:48:10 18          In 2008, the Department of Justice came down

08:48:13 19  here, met repeatedly, interviewed the Sheriff, inspected OPP.

08:48:18 20  They did nothing.

08:48:19 21          In 2009, they wrote a letter.  They still did

08:48:23 22  nothing.

08:48:24 23          In 2012, they wrote another letter and a report.

08:48:30 24  Still did nothing.

08:48:30 25          It wasn't until the inmates filed a lawsuit in

08:48:33  1    April of 2012, that, six months later, the Department of

08:48:38  2    Justice filed this lawsuit with some "me too" allegations.

08:48:42  3         Now, I understand the Department of Justice

08:48:45  4    wishes to avoid responsibility for sitting on their hands.  I

08:48:50  5    understand that they've compounded the problem with sort of an

08:48:54  6    unorthodox approach to this proceeding, Your Honor, and refused

08:48:58  7    to provide any financial assistance to the City, knowing that

08:49:03  8    the City is already burdened by not one, but potentially five

08:49:08  9    different Consent Decrees foisted by the Department of Justice.

08:49:12 10         What the Department of Justice wants to do is

08:49:14 11    come down here and tell the City what to do, how to do it, and

08:49:17 12    then get back on a plane to DC.

08:49:19 13         Your Honor has addressed this point precisely in

08:49:23 14    his opening remarks, which is that, under the Prison Litigation

08:49:27 15    Reform Act, the Court must approve only the most narrowly

08:49:32 16    tailored and least intrusive reforms to meet Constitutional

08:49:37 17    standards.

08:49:38 18         Even the Sheriff believes the Consent Decree

08:49:41 19    could be narrower.  That's going to come out during this

08:49:45 20    hearing, Your Honor.

08:49:46 21         The inmates are entitled to Constitutional

08:49:49 22    conditions, without a doubt, just like the rest of the

08:49:53 23    citizenry are entitled to those conditions.  But, with all due

08:49:56 24    respect, Your Honor, the inmates are not entitled to Cadillac

08:50:00 25    treatment just because they've been convicted or they've been

08:50:03  1  charged with a crime.

08:50:04  2        The law is clear in this state that those

08:50:08  3  individuals who are incarcerated do not get better treatment

08:50:11  4  than the poor working class.

08:50:13  5        Now, the Mayor and the City are committed under

08:50:18  6  the Home Rule Charter to operate a balanced budget while

08:50:23  7  protecting the welfare of the residents.  The decree that is

08:50:27  8  being proposed, Your Honor, is not narrowly tailored just

08:50:31  9  because DOJ and the plaintiff inmates make that their mantra.

08:50:36 10        The Sheriff said he's already doing virtually

08:50:41 11  what the decree is providing.  We've heard that just again this

08:50:47 12  morning.  Unless he admits to operating an unconstitutional

08:50:51 13  facility, Judge, then the decree is overly broad.

08:50:55 14        Now, as Your Honor knows from the pleadings,

08:50:58 15  neither DOJ nor the inmates have sued the City.  Only the

08:51:05 16  Sheriff has sued the City to bring in or to seek additional

08:51:10 17  money, which, as Your Honor noted, was for another hearing that

08:51:13 18  we have later in the year.  The Court bifurcated those claims

08:51:18 19  from this proceeding.

08:51:20 20        The City, Your Honor, has advised the Court that

08:51:28 21  determination as to whether the conditions at the jail are

08:51:31 22  Constitutional are the only legal issue between the plaintiffs

08:51:36 23  and the Sheriff; but, the Court has asked us to respond, asked

08:51:41 24  the City to respond as to whether this proposed Consent Decree

08:51:45 25  meets state, federal and local laws.

08:51:47  1          THE COURT:  I thought the City would be happy to be

08:51:50  2     part of the process.  Is that not the case?

08:51:52  3          MR. ROSENBERG:  Your Honor, the City --

08:51:53  4          THE COURT:  If you don't want to participate, you all

08:51:56  5     can leave today, and we'll go on without you all.

08:51:58  6          MR. ROSENBERG:  Your Honor, I think we have an

08:52:00  7     obligation because, as Your Honor noted at the outset, we have

08:52:02  8     an obligation to ensure that the proposed Consent Decree is

08:52:07  9     fair not just to the inmates, but is fair to the other

08:52:10 10     individuals, those third parties that Your Honor recognized --

08:52:15 11          THE COURT:  That's precisely why the City is here.

08:52:18 12          MR. ROSENBERG:  That's all I'm saying, Your Honor, is

08:52:20 13     that's the reason the City is here.

08:52:21 14          We're not -- we're not challenging the conditions

08:52:25 15     of the jail because that's between these folks, the DOJ and the

08:52:31 16     inmates, and these folks, the Sheriff, because he's the keeper

08:52:34 17     of the jail.

08:52:35 18          What we're saying is the Consent Decree, though,

08:52:39 19     adversely impacts the other 370,000 residents, as Your Honor

08:52:44 20     knows, and that's the reason we're here.

08:52:45 21          That's what I was trying to articulate,

08:52:48 22     Your Honor, and I apologize if I hadn't been clear on that.

08:52:50 23          Your Honor, the City believes that the

08:52:57 24     Consent Decree is not conforming -- does not conform to the

08:53:02 25     Prison Litigation Reform Act.

08:53:06 1          In addition, the proposed Consent Decree and the

08:53:16 2     so-called Amended Consent Decree, Your Honor, which we haven't

08:53:19 3     alluded to yet, would not only violate Constitutional law,

08:53:23 4     would not only violate the Federal Rules of Civil Procedure,

08:53:27 5     would not only violate state law, but violates the Home Rule

08:53:32 6     Charter for the City of New Orleans that's been in existence

08:53:35 7     for more than 60 years.

08:53:37 8          Your Honor, in essence, the plaintiffs, the DOJ,

08:53:43 9     and the Sheriff are asking this Court to virtually emasculate

08:53:51 10    the democratic form of government that's the cornerstone of

08:53:55 11    this City, in violation of Constitutional principles and

08:54:01 12    separation of power principles.

08:54:02 13         Neither, Your Honor -- and I say this with all

08:54:07 14    due respect -- but neither the DOJ, nor the inmates, nor the

08:54:11 15    Sheriff are entitled to seize control of City governance.

08:54:17 16    Your Honor, we're going to present evidence to that effect

08:54:20 17    during this hearing.

08:54:20 18         Thank you, Your Honor.

08:54:21 19    THE COURT:  Thank you.

08:54:22 20         All right.  Plaintiff, let's call your first

08:54:24 21    witness.

08:54:24 22    MS. ZAMPIERIN:  Good morning, Your Honor.

08:54:29 23         The plaintiffs call their first witness,

08:54:32 24    Euell Sylvester, who is a named plaintiff in this case.  He's

08:54:35 25    with the marshals, I believe.

08:55:00  1          THE COURT:  Does the marshal know to bring him down

08:55:01  2   here?  Did you let the marshal know that we needed him down

08:55:01  3   here?

08:55:04  4              Did you let the marshal know that he was going to

08:55:05  5   be your first witness?

08:55:06  6          MS. ZAMPIERIN:  We did, Your Honor.

08:55:17  7          THE COURT:  Let's find out what's going on.  Let's call

08:55:17  8   the marshal service.

08:55:18  9              What's his name?

08:55:20 10          MS. ZAMPIERIN:  Euell Sylvester.

08:55:39 11          MR. ROSENBERG:  Your Honor, we were just going to find

08:55:41 12   out the order of witnesses, so that we would know who the

08:55:44 13   plaintiffs and DOJ are calling first and second.

08:56:02 14          MS. ZAMPIERIN:  We're going to call Euell Sylvester,

08:56:03 15   then Dr. Schwartz, then Donald Washington, and then

08:56:07 16   Durrell Richard; and, if there is time, Manny Romero.

08:56:16 17          THE DEPUTY CLERK:  Please raise your right hand.  Do

08:56:16 18   you solemnly swear the testimony you are about to give will be

08:56:16 19   the truth, the whole truth and nothing but the truth, so help

08:56:16 20   you God?

08:56:20 21          THE WITNESS:  Yes, ma'am.

08:56:20 22                    **EUELL DEVALL SYLVESTER**

08:56:20 23    was called as a witness and, after being first duly sworn by

08:56:20 24    the Clerk, was examined and testified on his oath as follows:

08:56:22 25          THE DEPUTY CLERK:  Please state your name and spell it

08:56:24  1    for us.

08:56:35  2            THE WITNESS:  Euell Devall Sylvester.  First name,

08:56:37  3    E-U-E-L-L, middle name, D-E-V-A-L-L, last name,

08:56:46  4    S-Y-L-V-E-S-T-E-R.

08:56:48  5                          DIRECT EXAMINATION

08:56:48  6    BY MS. ZAMPIERIN:

08:56:51  7    Q.    Good morning, Mr. Sylvester.

08:56:52  8    A.    Good morning.

08:56:53  9    Q.    Can I ask you where you're from?

08:56:56  10   A.    New Orleans.

08:56:56  11   Q.    Do you have family from New Orleans as well?

08:56:59  12   A.    Yes, ma'am.

08:56:59  13   Q.    Who is living here currently?

08:57:02  14   A.    None of my immediate family is living actually in the

08:57:07  15   City.  My mother is in the outskirts, in Kenner.  I have a

08:57:12  16   girlfriend and two kids that's in eastern New Orleans.

08:57:15  17   Q.    Can you tell me what your profession is?

08:57:19  18   A.    I'm a local entertainer.

08:57:20  19   Q.    What does that mean?

08:57:23  20   A.    Basically, I'm under contract with a record company as far

08:57:28  21   as hip hop and different other things.

08:57:29  22   Q.    Have you ever been incarcerated at Orleans Parish Prison?

08:57:34  23   A.    Yes, ma'am.

08:57:35  24   Q.    When were you last incarcerated there?

08:57:38  25   A.    Well, on this charge here, I rolled into Orleans Parish

08:57:46 1    October 4, 2010, all the way till September 28th, where I

08:57:54 2    received my sentence.  A few weeks later, they moved me to DOC.

08:58:00 3         THE COURT:  What year, September 28th?

08:58:03 4         THE WITNESS:  2012.

08:58:03 5                              EXAMINATION

08:58:04 6    BY MS. ZAMPIERIN:

08:58:04 7    Q.    So about two years?

08:58:06 8    A.    Yes, ma'am.

08:58:11 9    Q.    In which buildings in OPP did you live?

08:58:13 10   A.    Every last one of them except for the temporary tents.

08:58:17 11   Q.    Can you name them?

08:58:18 12   A.    HOD, Templeman V, the Old Parish Prison and Conchetta.

08:58:23 13   Q.    Thank you.

08:58:25 14         How often did you witness violence when you were at

08:58:28 15   OPP?

08:58:29 16   A.    Depending on what building I was in.

08:58:31 17   Q.    What was the worst building?

08:58:34 18   A.    The Orleans Parish Prison.

08:58:35 19   Q.    What do you mean by Orleans Parish Prison?

08:58:40 20   A.    The Old Parish Prison, OPP.  Yes, ma'am.

08:58:43 21   Q.    How often did you witness violence in that building?

08:58:45 22   A.    Every day.

08:58:46 23   Q.    What types of violence did you witness?

08:58:50 24   A.    Fights, stabbings, people being sexually assaulted.  Just,

08:58:59 25   you know, your average violence on the streets that gets taken

08:59:04 1    to the jailhouse.

08:59:05 2    Q.    Did you ever see fights involving weapons?

08:59:08 3    A.    Yes, ma'am.

08:59:09 4    Q.    Did you often see weapons when you were in OPP?

08:59:13 5    A.    Yes, ma'am.

08:59:13 6    Q.    What types of weapons?

08:59:17 7    A.    Shanks.  You know, inmate-made shanks with -- as far as

08:59:23 8    boots.  Like, they took the metal out of boots, sharpened them

08:59:28 9    and made shanks.

08:59:29 10            Society knives, meaning, you know, knives that we

08:59:31 11    have in our kitchens.  Bricks, little bitty bricks they hit

08:59:37 12    people over the head with.  Metal from different parts of the

08:59:41 13    jail.  Different things like that.

08:59:42 14    Q.    Did you see any of these weapons in your living quarters?

08:59:46 15    A.    Yes, ma'am.

08:59:47 16    Q.    Did you ever see the guards conduct searches for these

08:59:51 17    weapons in your living quarters?

08:59:53 18    A.    Sometimes.

08:59:53 19    Q.    About how often?

08:59:58 20    A.    Once or twice every five, six months, something like that.

09:00:01 21    Q.    How did they conduct a search?

09:00:07 22    A.    Well, they'll send -- they'll send what used to be SID.

09:00:10 23    They changed the name to SOD.  They'll send those guys to the

09:00:14 24    dormitory, whatever dormitory they're going to shake down,

09:00:18 25    meaning search.

09:00:19 1               They pretty much tell everybody to line up somewhere,

09:00:22 2    put their hands on their head, face the wall and don't look

09:00:26 3    back, while they go through all the cells and things like that.

09:00:28 4    Q.   In your experience, did they find many weapons in those

09:00:33 5    searches?

09:00:33 6    A.   Sometimes they do, sometimes they don't.

09:00:35 7    Q.   Would you still see weapons in the residential areas after

09:00:38 8    the search?

09:00:38 9    A.   Yes.  Yes, ma'am.

09:00:38 10   Q.   So do you think that the shakedowns were effective?

09:00:42 11   A.   No.  They was -- wasn't effective at all.

09:00:46 12   Q.   Have you ever been physically attacked while at OPP?

09:00:49 13   A.   Yes, ma'am.

09:00:49 14   Q.   Have you ever been sexually assaulted at OPP?

09:00:53 15   A.   Yes, ma'am.

09:00:54 16   Q.   I want to ask you some questions about that assault.

09:00:59 17               Where were you when you were assaulted?

09:01:02 18   A.   In the Orleans Parish Prison on the tier called B-4.

09:01:06 19   Q.   Is that in the Old Parish Prison?

09:01:08 20   A.   Yes, ma'am.

09:01:08 21   Q.   That's where you were living at the time?

09:01:10 22   A.   Yes, ma'am.

09:01:11 23   Q.   How many people were on your tier?

09:01:15 24   A.   Probably between 30 or 50 on the left side.  That's the

09:01:22 25   dorm I was on.

Q.    When you say the left side, was there another side as
well?

A.    Yeah, you have the left, and you have the right side.  The
number of people varies depending on if they are going to pack
it or people go home or whatever.

Q.    Okay.  Where were the guards stationed on that tier?

A.    Outside the dormitory.  He has a station outside the
doors.

Q.    Do you know, are the guards usually sitting there?

A.    When?

Q.    Were they?

A.    Not really.  They -- I mean, they'd come around every
three hours.

Q.    Could they see you from -- could they see the inmates from
the station where they were sitting?

A.    They have to get up and come look through the window.

Q.    What time of day was it when you were attacked?

A.    10:30 at night.

Q.    How do you know that?

A.    It was a lockdown.

Q.    What is lockdown?

A.    That's when the lights go off.  The procedure is the
inmates are not supposed to be in the day room.  They're
supposed to be around their bed area and, pretty much, lights
out.

09:02:28  1    Q.    How did the attack begin?

09:02:31  2    A.    I was laying on my mattress looking over some law work.  A

09:02:41  3    few -- about a few dudes walked up asking me to rap a song for

09:02:46  4    them.

09:02:47  5           I looked at them, and I'm, like, you know, I'm facing

09:02:50  6    some serious charges.  I don't really -- I'm not really in the

09:02:53  7    mood to be rapping no rap song.  You know, I'm trying to get

09:02:57  8    myself out of jail.

09:02:59  9           One dude walked out of the crowd, sat behind me.  I

09:03:04 10    started putting my papers back in the bag.  I didn't really

09:03:10 11    think nothing of it.

09:03:10 12           When I glanced up, I noticed all the dudes that was

09:03:13 13    in the front at the bottom of the mat.  They had their shoes

09:03:16 14    on.  It was a lot of them.

09:03:17 15           So, before I can get up or anything, the dude that

09:03:21 16    was sitting behind me grabbed me, choked me from behind.

09:03:25 17    That's when the attack began.

09:03:26 18    Q.    How many men approached you?

09:03:28 19    A.    I don't want to say an exact number, but it's definitely

09:03:31 20    between 10 or 14.

09:03:32 21    Q.    Did they all live in your dorm?

09:03:34 22    A.    Yes, ma'am.

09:03:35 23    Q.    So you were sitting on your mat -- on your mattress when

09:03:40 24    10 to 14 guys approached you.  What did they do next?

09:03:43 25    A.    Well, while the dude was choking me, me and him was --

09:03:47  1    we're tussling on the mat.  I'm trying to, you know, pretty
09:03:50  2    much get him off.
09:03:51  3            Immediately, that's when the other ones started
09:03:55  4    grabbing me and started ripping my clothes off.
09:03:56  5            They immediately -- they didn't hesitate at all.
09:03:59  6    They started tying me up with some strings that they had broke
09:04:04  7    pieces of.
09:04:04  8            What they did next was -- I started breaking the
09:04:08  9    strings.  The strings that they tied around my legs, I broke
09:04:10 10    them.  The strings that they tied around my hands, I broke
09:04:13 11    them.
09:04:14 12            They used this material (indicating).  They made
09:04:17 13    strips of this material (indicating) with a razor, and they
09:04:19 14    used that.  I couldn't break this.  And --
09:04:22 15    Q.    When you say this, can you tell the court reporter what
09:04:26 16    you're pointing to?
09:04:27 17    A.    Jail uniform.  This material is real thick.  That's what
09:04:31 18    they tied me up with, and I couldn't break that.
09:04:33 19            So what they did, they turned me over on my stomach.
09:04:36 20    They hogtied me with the strings, and they begin to beat me
09:04:41 21    repeatedly in the back of my head; mop stick, mop bucket, they
09:04:46 22    threw the mop bucket at the back of my head.
09:04:49 23            Right there, at that present moment, that's the
09:04:51 24    beginning where the sexual assault actually happened.
09:04:53 25    Q.    What happened when they sexually assaulted you?

09:04:56  1    A.    What they did was a dude stuck his finger into my anal

09:05:01  2    area.  Another dude took a toothbrush and stuck a toothbrush

09:05:03  3    into my anal area.  Another dude actually stuck his tongue in

09:05:08  4    my anal area.

09:05:10  5           Then they took toothpaste and put it between my

09:05:15  6    buttocks area.  They took a blanket, tied the blanket over my

09:05:19  7    face, tight, and begin to beat me some more and repeatedly.

09:05:27  8    I'm trying to pretty much gasp for air because I couldn't

09:05:27  9    breathe.

09:05:30 10           When they noticed I was getting ready to pass out,

09:05:32 11    one of the dudes lifted the blanket from over my head.  He told

09:05:35 12    the dude to go get the asthma puffer from out the back of the

09:05:38 13    dorm.  I don't even have asthma.

09:05:40 14           He ran, and he put the pump to my mouth, telling me

09:05:43 15    to hit the pump.  I just hit it, but -- you know, thinking that

09:05:46 16    that was going to pretty much cease the matter, so -- but it

09:05:50 17    really didn't work.

09:05:52 18    Q.    Were you in pain at the time?

09:05:53 19    A.    Yes, ma'am.

09:05:53 20    Q.    Can you describe the pain you were feeling?

09:05:56 21    A.    I mean, I couldn't breathe.  The back of my head was

09:06:01 22    pounding because -- I mean, a mop stick, just you imagine a mop

09:06:04 23    stick going to the back of your head, regardless of a blanket

09:06:07 24    or whatever is on it.

09:06:09 25           He hit me with -- they hit me with the mop bucket

09:06:12  1    repeatedly.  They was punching me, kicking me in my stomach,
09:06:16  2    kicking me in my ribs.  This whole time that this is going on,
09:06:17  3    I'm hogtied.  I can't do nothing.
09:06:20  4         This is no guard on the dorm where I can holler for
09:06:23  5    the guard.  I mean --
09:06:25  6    Q.    I'm sorry, can we go back to the sexual assault?
09:06:28  7         What items did you say that they used to assault you?
09:06:31  8    A.    A finger, one dude used his tongue, and somebody else used
09:06:37  9    a toothbrush, and another dude put toothpaste.
09:06:41  10   Q.    Did that hurt?
09:06:43  11   A.    Yes, ma'am.
09:06:43  12   Q.    After they took the blanket off your head, what did they
09:06:49  13   do?
09:06:50  14   A.    Well, after I hit the asthma pump, they didn't put the
09:06:54  15   blanket back over my head.
09:06:55  16        What they did, about three guys picked me up from the
09:06:59  17   strings, carried me to the back of the dormitory, threw me on
09:07:01  18   the floor.
09:07:02  19        As soon as I got back there, when they threw me on
09:07:04  20   the floor, they took a shank, cut the strings loose, and they
09:07:07  21   told me to stand up.
09:07:10  22        It's going to be kind of hard for me to describe
09:07:13  23   this, what I'm getting ready to describe, but when I stood up,
09:07:16  24   they made me put my arms behind me, like to squeeze a pole
09:07:21  25   backwards.  They took my hands and tied them up one at a time

09:07:25 1    and tied me toward the post.  So I'm, like, with my hands

09:07:29 2    backwards, like this (indicating).

09:07:30 3          That's when about four or five guys begin to, you

09:07:34 4    know, pretty much punch on me, punch me in my face, punch me in

09:07:37 5    my neck, my chest.

09:07:38 6          One of the dudes screamed, you know, don't hit him in

09:07:41 7    his face, don't hit him in his face, which I found that kind of

09:07:45 8    odd.

09:07:46 9    Q.   So you were tied up to the pole.

09:07:48 10   A.   Yes, ma'am.

09:07:48 11   Q.   How many guys did you say were beating you?

09:07:51 12   A.   At that particular moment, it was about four or six of

09:07:55 13   them.  They were just taking turns punching me, punching me,

09:07:58 14   constantly punching me.  I'm steady trying to, you know, find a

09:08:01 15   way to talk myself out this situation.

09:08:03 16   Q.   Did they untie you after that?

09:08:05 17   A.   Briefly.  They cut those strings, and they made me turn

09:08:10 18   around and hug the pole this time.  I was hugging the pole,

09:08:14 19   like forwardly.

09:08:15 20         This time, they made me turn around, face the pole,

09:08:17 21   hug the pole.  The pole was an extremely wide pole.

09:08:19 22         They tied me up the exact same way, but this time

09:08:22 23   they took my legs and tied my legs up toward the pole too.

09:08:25 24         That's when they went and got the mop stick.  They

09:08:28 25   got the mop bucket again.  They got some hot water.  I think

09:08:33  1    they actually put urine in a cup and was throwing it on me.

09:08:40  2            They begin -- that's how I got the marks on my back.

09:08:42  3    They ripped all the skin off my back with their slippers and

09:08:46  4    everything.   They constantly -- they beat me repeatedly,

09:08:48  5    nonstop.

09:08:48  6    Q.    Were you still naked at this time?

09:08:50  7    A.    Yes, ma'am.

09:08:51  8    Q.    They kept you tied up while they were beating you?

09:08:55  9    A.    Yes, ma'am.

09:08:55 10    Q.    What were your injuries at that time?

09:09:01 11    A.    My left arm was extremely swollen.   The skin was

09:09:06 12    completely ripped off my -- in a lot of parts of my back and on

09:09:11 13    my buttocks area.

09:09:13 14            The front of my head, I had a gash right here -- you

09:09:16 15    see it?   It's still visible today -- from the mop bucket.

09:09:22 16            I was just -- after everything happened, I was just

09:09:25 17    completely depressed.   You know, I was really -- I was really

09:09:28 18    depressed, and I was trying to find an alternative to see how

09:09:30 19    can I, you know, pretty much get past that, from what I was

09:09:36 20    thinking.   You know, I never went through nothing like that in

09:09:37 21    my lifetime.

09:09:40 22    Q.    Did they eventually untie you?

09:09:42 23    A.    Yes, ma'am.

09:09:42 24    Q.    Did anything else happen after they untied you?

09:09:46 25    A.    They untied me from hugging the pole after a while.

09:09:49 1          What they did was, they got some more strings made of

09:09:54 2    this (indicating), and they made a -- like a -- I guess it was

09:09:59 3    supposed to be some type of thong, like a woman's thong or

09:10:02 4    something, and they forced me to put it on.

09:10:05 5          It was so small, I couldn't put it on, so I just put

09:10:09 6    it up to -- like, to my thigh area, and I just stood there.

09:10:11 7          They -- I guess they wanted it to be a comical thing.

09:10:17 8    I guess they were trying to embarrass me or something in front

09:10:20 9    of the dormitory.  So they made me dance.  I don't even know

09:10:24 10   how to dance, so I just basically was just moving my hands,

09:10:27 11   pretty much, not to anger them any further so I'd die.

09:10:29 12         Because, you know, like 90 percent of the crowd had

09:10:34 13   knives in their hands visible.  I mean, if I was to do anything

09:10:38 14   crazy or anything, I knew they was going to kill me for sure.

09:10:40 15   There was no doubt in my mind.

09:10:42 16   Q.   When you say 90 percent of the crowd, how many men were

09:10:45 17   there?

09:10:46 18   A.   Between 10 and 14 of them.

09:10:46 19   Q.   Oh, okay.

09:10:47 20   A.   They were still -- all of them -- the same people that

09:10:48 21   dragged me from my rack was the same people back there the

09:10:52 22   whole process.

09:10:53 23   Q.   Could other people on your dorm see while this was going

09:10:57 24   on?

09:10:57 25   A.   Yes, ma'am.  We have -- they have what they call chicken

09:10:59 1    wires that separates the left side from the right side.  In

09:11:04 2    between, it's what we like to call the corridor.

09:11:08 3          End of the hall, you know, it's a door into the

09:11:10 4    corridor.  We can see each other and talk to each other and

09:11:13 5    send stuff back and forth to each other.  Not supposed to, but,

09:11:15 6    you know, you got little bitty holes in the chicken wire, so

09:11:19 7    they found ways to fish things.

09:11:20 8          But, yeah, they can see everything.  We can hear

09:11:22 9    everything the other dorm is doing, everything.

09:11:24 10   Q.   What happened after that?

09:11:27 11   A.   They pretty much -- after they took all -- they made me

09:11:31 12   stand in the shower.  They cut the water on.  About three, four

09:11:35 13   guys stood in front of the shower with their knives in their

09:11:37 14   hand, and just told me to stand under the hot water, don't

09:11:40 15   move, which I don't know what the point of that was.

09:11:43 16         But they went and got the mop bucket, sat the mop

09:11:46 17   bucket inside the shower and told me to sit in it.  I sat in

09:11:49 18   it, and they pushed me to the front of the shower.  Everybody

09:11:52 19   laughing, ha, ha, ha, hee, hee, hee, ha, ha, ha, this and that.

09:11:57 20         They told me to get up.  They cut the bands off me.

09:12:01 21   That was pretty much it.

09:12:02 22   Q.   How long did this whole assault take?

09:12:05 23   A.   Well, that's the thing that we have been trying to figure

09:12:11 24   out.  As lockdown was at 10:30, when they finished everything,

09:12:16 25   I had asked them did they want me to leave off the dorm.  They

09:12:20  1    told me no.

09:12:21  2           So I grabbed my clothes, I hopped in the shower.  I

09:12:23  3    was in the shower five minutes.  I just washed the toothpaste

09:12:27  4    from out of my buttocks area and, you know, cleaned myself up,

09:12:29  5    and I went to my rack.

09:12:30  6           I laid down five minutes.  The lights came on.  The

09:12:33  7    deputy opened the door and said, feed up.  Feed up is at

09:12:37  8    4 o'clock in the morning.

09:12:38  9    Q.    What is feed up?

09:12:40  10   A.    It's when breakfast come, in other words.  Breakfast,

09:12:44  11   lunch and dinner.

09:12:44  12   Q.    Did you see any guards or hear any guards come in that

09:12:49  13   night?

09:12:49  14   A.    When I was tied up to the pole, a guard came in.  I guess

09:12:52  15   he was supposed to do his normal routine check.  I heard the

09:12:56  16   door open, I heard the keys, and I heard the guys on the right

09:13:01  17   side yelling, 12, 12, 12.

09:13:02  18          That basically mean, like, you know, 12 o'clock, sort

09:13:04  19   of like a slang for 12 o'clock, somebody coming.

09:13:08  20          Everybody stopped.  I stopped.  I stopped talking.

09:13:11  21   They stopped.  Whatever happened, apparently someone must have

09:13:16  22   interrupted the guards.  I don't know if an inmate intervened

09:13:21  23   in the whole situation and was talking to the guard in the

09:13:23  24   front, but he never made it to the back of the dorm.

09:13:26  25          If he had made it to the back of the dorm, at that --

09:13:28 1    I was still tied up to the pole.  At that point, whether he

09:13:33 2    wanted to or not, he would have had to follow procedure because

09:13:35 3    that's a serious -- you see an inmate, no clothes on, tied to a

09:13:38 4    pole, that's serious at that point.

09:13:40 5    Q.    Did you yell for the guard?

09:13:41 6    A.    I couldn't.  If I'd have did that, then they would have

09:13:43 7    came with the body bags that night -- or that morning.  They

09:13:45 8    would have killed me.

09:13:47 9          If I would have screamed, guard, guard, guard, help

09:13:49 10   me, I would have got stabbed up.  Then there would have been a

09:13:52 11   whole investigation on who killed this dude in the back of this

09:13:55 12   dorm.

09:13:56 13   Q.    How often did the guards normally come by when you were in

09:14:00 14   Old Parish?

09:14:01 15   A.    Every two, three hours, something like that.

09:14:03 16   Q.    At nighttime as well?

09:14:05 17   A.    Nighttime.  It don't matter what time it is.

09:14:07 18   Q.    Did you report the incident?

09:14:10 19         THE COURT:  What did you say?  I missed that part.

09:14:13 20   What did you say about how often they came back there?

09:14:16 21         THE WITNESS:  She said nighttime.  It doesn't matter

09:14:17 22   whether it's day or night.  It's still the same -- the time is

09:14:21 23   still exactly the same thing.  Even in the daytime, it'll take

09:14:23 24   them three, four, five hours to come back to our dormitory.

09:14:26 25         THE COURT:  To go inside the dormitory?

09:14:28  1          THE WITNESS:  Even to come back to the little -- their

09:14:29  2   station or whatever, either way it goes.

09:14:31  3          THE COURT:  So we're talking about average every three,

09:14:33  4   four, five hours, they would come to this station, or they

09:14:35  5   would actually come into the tier?

09:14:37  6          THE WITNESS:  No.

09:14:37  7          THE COURT:  Which?

09:14:38  8          THE WITNESS:  Outside the dormitory.

09:14:40  9          THE COURT:  Do they ever come inside the dormitory?

09:14:42 10          THE WITNESS:  No, sir.

09:14:43 11          THE COURT:  They never come inside the dormitory?

09:14:46 12          THE WITNESS:  If they do, it would be once a week.

09:14:46 13                              EXAMINATION

09:14:46 14   BY MS. ZAMPIERIN:

09:14:48 15   Q.   Maybe you can explain what you mean by coming inside the

09:14:51 16   dormitory.  Did they walk at all where you could see them, in

09:14:55 17   the tier at all?

09:14:57 18   A.   Like I told the Judge, probably once a week they'll come

09:15:01 19   and sign their book or sit at their desk.

09:15:03 20          They only come to a dorm that has the Internet.  If

09:15:06 21   their station has a computer without the Internet, they are not

09:15:09 22   going to be at that dorm a long time.

09:15:11 23          Whatever floor -- there is four floors that they

09:15:13 24   cover, no matter what building they are in.  Whatever dorm has

09:15:16 25   the Internet access, far as Facebook and -- that's the dorm

09:15:20 1  that they are going to spend the most of their time in.

09:15:22 2  Q.    How often do the guards do a walkthrough on the corridor?

09:15:27 3  A.    I was there almost two years.  I mean, I probably saw a

09:15:34 4  guard actually do this three times out of the two years I was

09:15:37 5  there.

09:15:37 6  Q.    So when the guard came in that night, was that normal for

09:15:41 7  him to walk onto the tier?

09:15:46 8  A.    Well, it was normal for him to open the door, walk in,

09:15:48 9  stop, talk to somebody right there, and then leave and go about

09:15:51 10  his business.  That was normal.

09:15:51 11  Q.    Okay.

09:15:52 12  A.    If he would have walked down, that would have shocked me.

09:15:56 13  It really would have shocked me.  It would have probably saved

09:15:58 14  me.

09:15:58 15  Q.    So did you report the incident?

09:15:59 16  A.    Yes, ma'am.

09:15:59 17  Q.    To whom?

09:16:04 18  A.    Four days later, I saw the first sergeant.  Sergeant Sims

09:16:09 19  is her name.

09:16:12 20          I couldn't really tell her exactly what I wanted to

09:16:15 21  tell her right by the gate because the dudes -- a lot of the

09:16:17 22  dudes that was involved in the incident, as far as sexually

09:16:20 23  assaulting me and beating me, was standing like right there.

09:16:23 24          So what I did was I knocked on the window.  She was

09:16:25 25  signing the book.  I knocked on the window.  She looked at the

09:16:29  1    window, and I did like -- I waved my hand, like to come here.

09:16:32  2         She walked into the corridor right there by the

09:16:35  3    mailbox.  I walked up to the gate.  I said -- my exact words, I

09:16:39  4    said, Sergeant Sims, I got to get off this dorm.  She say, why

09:16:44  5    you got to get off this dorm?  I said, if I don't get off the

09:16:47  6    dorm, I'm going to die.

09:16:49  7         She was like, what do you mean, you're going to die?

09:16:52  8    I cut my eyes like this to the left.  She looked.  I kept

09:16:55  9    cutting my eyes, and she knew I was trying to tell her

09:16:55 10    something.

09:16:56 11         So she told the deputy, open that front door.  They

09:16:59 12    opened the door, and that's -- from there, I went out there.  I

09:17:02 13    pulled my shirt down, showed her my back.

09:17:04 14         She sent the deputy on the dorm to get my stuff and

09:17:08 15    brought me downstairs.  She made some phone calls.  At that

09:17:11 16    point, that's where everything started off.

09:17:12 17    Q.   You said she was the first sergeant that you saw?

09:17:16 18    A.   Yes, ma'am.

09:17:17 19    Q.   You said she was signing a logbook.  Why is that

09:17:21 20    significant?

09:17:25 21    A.   The procedure for the Orleans Parish -- or whatever -- any

09:17:28 22    jail, probably, when a ranking officer or even a deputy make a

09:17:31 23    routine check, they're supposed to sign the logbook and date

09:17:34 24    it, put a time, and saying that, I, such and such, walked the

09:17:39 25    dorm on such and such time, everything was such and such, or

09:17:42  1   whatever they write in there; but, they are supposed to give a
09:17:44  2   check in the logbook to keep track and make sure that they are
09:17:48  3   doing their job.
09:17:49  4   Q.    Had she walked on the tier before signing?
09:17:50  5   A.    No.  No.
09:17:51  6   Q.    How did you get her attention?
09:17:53  7   A.    I knocked on the window, the front -- the big door
09:17:57  8   window -- the little small glass, I knocked on it.
09:17:59  9   Q.    After you told her -- after you reported the incident,
09:18:05 10   were you able to tell her everything that happened to you?
09:18:07 11   A.    No, ma'am.
09:18:08 12   Q.    What didn't you tell her?
09:18:10 13   A.    The only thing I left out was the sexual assault because
09:18:14 14   at that time I was a little bit uncomfortable for, you know,
09:18:17 15   pretty much saying that with a woman, you know, because I
09:18:20 16   really was trying to figure out a way to handle it.
09:18:22 17   Q.    Why did you wait four days to report the incident?
09:18:27 18   A.    Due to what I like to call inmate trickery.
09:18:32 19         Basically, what it is, it's this certain mind
09:18:37 20   situation that inmates will have on deputies that they get --
09:18:42 21   like, they be friends -- they become friends with.
09:18:44 22         If it's a case where it's serious, an inmate -- not
09:18:49 23   every inmate, but, you know, majority of the inmates, they have
09:18:52 24   this thing where they can lead a deputy or some type of ranking
09:18:56 25   officer in a way to think that a situation is not as serious as

09:19:01 1    it may seem.  They, 90 percent of the time, take it that way.

09:19:06 2          I have saw incidents where a dude was getting beat up

09:19:09 3    from a dude, and report it, and the dude that beat him up will

09:19:12 4    walk to the gate and put his arm around him, just like, man,

09:19:15 5    this is my boy.  Man, why you be playing with these people like

09:19:19 6    that?  They will really take that serious.

09:19:20 7          This dude will really be saying, man, that dude just

09:19:23 8    beat me up.  It has happened, and it continues to happen.

09:19:25 9    Q.   So what you're saying is some of the deputies don't

09:19:30 10   believe people that report incidents?

09:19:32 11   A.   They don't -- unless you're bleeding and dying and

09:19:35 12   dragging your stuff to that door, grabbing on that door, that's

09:19:38 13   the only way they're going to act.

09:19:40 14         If you're not bleeding and blood coming from your

09:19:42 15   face, they're not going to take it seriously.

09:19:45 16   Q.   So you waited until you saw --

09:19:46 17   A.   I waited until I saw a ranking officer because I know for

09:19:49 18   a fact, regardless of a ranking officer want to do it or not,

09:19:53 19   they have to act on something like that.

09:19:55 20         I mean, she have our deputy standing right there.

09:19:59 21   That's the only reason why.

09:20:00 22   Q.   So you said you reported the incident except for the

09:20:04 23   sexual assault.  Did you tell another guard or anyone that

09:20:09 24   worked at OPP about the sexual assault?

09:20:11 25   A.   Yes, ma'am.  When I was brought downstairs, I would say

that night, Lieutenant Johnson -- they call him KJ; he knew me from my time being in there and everything -- I called him over to the gate. It was on his off day. I called him over to the gate, and I told him I needed to talk to him about something really important.

I never talked to him like that, so he knew it was serious. So he came back out the office, came to the gate. He asked me what was wrong.

I told him that I was jumped and attacked on B-4, and I told him I was sexually assaulted. When I told him that, he was like, what? He said, who sexually assaulted you? I said, man, about -- it was about 10 or 14 dudes, man. I'm like -- you know, I had a -- they beat my -- and I pulled my shirt down.

When I pulled my shirt down and showed him my back, he picked his phone up, and he called Mark. That was one of the dudes at SID -- SOD. From there, that night they came there and investigated. They did a whole thorough investigation, brought the whole dorm down and different things like that.

Q.    You said you showed him your back. Did you still have injuries at the time?

A.    Yes, ma'am.

Q.    After you reported the incident, did you get medical treatment?

09:21:23  1    A.    No, ma'am.

09:21:23  2          THE COURT:  How long was that following the incident

09:21:26  3    that you spoke to the lieutenant?

09:21:28  4          THE WITNESS:  From the time I was attacked?  Four days.

09:21:31  5    The same day.  The same day I --

09:21:32  6          THE COURT:  I thought you said you had spoken to a

09:21:35  7    sergeant initially, right?

09:21:36  8          THE WITNESS:  The same day.

09:21:37  9          THE COURT:  Then you spoke to a lieutenant after the

09:21:39 10    sergeant?

09:21:40 11          THE WITNESS:  Yes, sir.

09:21:40 12          THE COURT:  All right.

09:21:40 13                          EXAMINATION

09:21:41 14    BY MS. ZAMPIERIN:

09:21:41 15    Q.    So you didn't receive any medical treatment?

09:21:44 16    A.    No, ma'am.

09:21:44 17    Q.    Did you receive a rape kit or an HIV test or an STD test?

09:21:51 18    A.    No, ma'am.

09:21:52 19    Q.    Did you ever file a sick call to get that testing?

09:21:54 20    A.    Yes, ma'am.

09:21:55 21    Q.    How long after you filed that did you get the testing, if

09:21:58 22    at all?

09:21:58 23    A.    Almost a year.

09:21:59 24    Q.    How long after the incident did you get the testing?

09:22:09 25    A.    I didn't get a HIV test or an AIDS test until Prieur

09:22:13 1    (spelled phonetically), this company called Prieur came and

09:22:16 2    interviewed me.  That's when they did it.  That was, like --

09:22:21 3    I'm talking about we're talking months.  I was on protective

09:22:25 4    custody at the time.

09:22:25 5    Q.    Do you know why these men attacked you?

09:22:31 6    A.    They say it was a hit sent by a defendant where I was a

09:22:38 7    victim in his own robbery case.

09:22:40 8    Q.    How do you know that?

09:22:43 9    A.    They told me.  They told me why they was beating me up and

09:22:49 10   why they was doing what they was doing.

09:22:50 11          They told me that their partner, "Butter," said that

09:22:55 12   I was getting ready to testify in his trial, and they -- pretty

09:22:58 13   much, he said, "Butter" told us to kill you.  He said -- and it

09:23:00 14   was like, you're lucky we don't flush you right now, and that's

09:23:05 15   slang for kill.

09:23:06 16   Q.    Did they force you to do anything else relating to your

09:23:08 17   testimony against who you are calling "Butter"?

09:23:12 18   A.    Yes, ma'am.  After the incident, after -- they made me

09:23:16 19   sign a paper, which I believe is still seized by Orleans Parish

09:23:25 20   Criminal Sheriff's office.  It stated that I, Euell Sylvester,

09:23:29 21   solemnly swear that Robert Scott, which is "Butter," did not

09:23:34 22   rob me on such and such date at such and such time.  I put

09:23:38 23   "affidavit" at the top.

09:23:38 24   Q.    This was during the incident, they forced you to sign

09:23:44 25   this?

09:23:45  1    A.    Yes, after everything.  It was on the same day, same dorm.
09:23:49  2    It was just after everything was over.  That's the last thing
09:23:51  3    they made me do.
09:23:52  4    Q.    Did you know that Robert Scott was in the same building as
09:23:55  5    you?
09:23:56  6    A.    Yes, ma'am.
09:23:56  7    Q.    How did you know that?
09:23:59  8    A.    When I first arrived at Orleans Parish Prison, he sent me
09:24:04  9    a little bitty note saying that he didn't rob me.  He had been
09:24:10 10    down two years, and he just want to go home, and different
09:24:13 11    things like that.
09:24:14 12          I mean, he don't even know me.  I don't even know how
09:24:17 13    he got my real name.  That's still a mystery to me today.
09:24:22 14    Q.    When you arrived or any time before you were put on that
09:24:25 15    tier did anyone at the jail ever ask you if there was anyone
09:24:29 16    who you needed to be protected from?
09:24:30 17    A.    No, ma'am.
09:24:31 18    Q.    Did they ask you if you were testifying against anyone
09:24:34 19    else?
09:24:34 20    A.    No, ma'am.
09:24:34 21    Q.    Do you know if any of the guards knew about the charges
09:24:38 22    that you filed against Robert Scott?
09:24:41 23    A.    It's a good possibility.
09:24:42 24    Q.    Did you tell any of them?
09:24:46 25    A.    A few of them, after I got that note.  I told them that

09:24:49  1    there was a dude upstairs.  You know, I'm pretty much a victim
09:24:52  2    in his case.  They was like, all right, so?
09:24:56  3    Q.    They didn't move you after you told them that?
09:24:58  4    A.    Nope.
09:24:58  5    Q.    Why not?
09:25:00  6    A.    It's not serious.  You got to be bleeding and dying for
09:25:03  7    them to do something, either put you on PC or something.
09:25:07  8    Q.    Did you ever see any of your attackers again after you
09:25:11  9    were moved off of the tier?
09:25:12 10    A.    Yes, ma'am.
09:25:13 11    Q.    When was this?  Or where was this?
09:25:19 12    A.    The first incident was when I was on protective custody in
09:25:23 13    HOD on the ninth floor.  I went -- this is when they finally
09:25:28 14    answered the sick call that I filled out for an HIV test.
09:25:34 15          I already had took the HIV test already.  But they
09:25:37 16    took me upstairs on the tenth floor to the medical unit, and I
09:25:41 17    saw one of the dudes that -- the dude that actually stuck his
09:25:46 18    tongue in my anal area.  He was standing by the gate on one of
09:25:50 19    the tiers when I was came through the stairwell door with the
09:25:52 20    deputy and a few other guys off my dormitory.
09:25:55 21          He pretty much was screaming and shouting and yelling
09:25:59 22    things through the gate, saying I was ratting on him, and I got
09:26:01 23    him charged with all of these charges.  He was trying to
09:26:04 24    convince the dudes around me that I was some type of rat.
09:26:08 25          But what he didn't know, that everybody that was

09:26:10 1  around me, they knew about what happened, and they got into a

09:26:13 2  big argument with the guy. He pretty much was just cursing and

09:26:16 3  screaming and different things like that.

09:26:17 4  Q.    Where was he?

09:26:20 5  A.    He was behind the gate on a dorm -- behind a cell, on

09:26:25 6  another dorm.

09:26:26 7  Q.    What happened after that?

09:26:28 8  A.    I went in. The deputy brought me in to see the doctor. I

09:26:36 9  told the doctor -- I took a test and everything, and they

09:26:39 10 brought me back out in the hallway.

09:26:40 11        He saw me. Some type of way -- this, again, is

09:26:47 12 inmate trickery, and it kind of sound crazy -- but some type of

09:26:52 13 way, they convinced the guard to open the gate, and he let some

09:26:55 14 black dude out, some -- I guess it was his homeboy.

09:26:57 15        The guard walked him over to where all of us was

09:27:02 16 standing on the ward. The dude went down the line, your name

09:27:03 17 is "Seventh Ward Shorty," your name is "Seventh Ward Shorty,"

09:27:03 18 your name is "Seventh Ward Shorty"?

09:27:07 19        The guard that was with me knew what was going on,

09:27:10 20 and he yanked me back into the doctor's office.

09:27:13 21 Q.    They were asking if any of you were "Seventh Ward Shorty"?

09:27:13 22 A.    Yes, ma'am.

09:27:17 23 Q.    Who is "Seventh Ward Shorty"?

09:27:18 24 A.    That's my stage name.

09:27:19 25 Q.    Was there any reason why the guard should have let him out

09:27:23 1    of his cell that you know of?

09:27:26 2    A.    There's no -- he didn't have sick call.  It wasn't no type

09:27:28 3    of yank to clean up the area.  He wasn't going to court.  There

09:27:34 4    was no reason why that he should have let that guy out the

09:27:37 5    gate.

09:27:37 6    Q.    Thanks.

09:27:42 7         Mr. Sylvester, do you understand that you're a named

09:27:45 8    plaintiff in this lawsuit?

09:27:47 9    A.    Yes, ma'am.

09:27:47 10   Q.    That you represent not only yourself, but a whole class of

09:27:52 11   people that are currently at OPP or will be in the future?

09:27:55 12   A.    Yes, ma'am.

09:27:55 13   Q.    Why did you participate in this lawsuit?

09:27:59 14   A.    Because I guess it got to a point where I really thought

09:28:04 15   about everything -- all everything.  You know, what happened to

09:28:06 16   me, I just don't want it to happen to nobody else.

09:28:09 17        I know that we can't save the world, and I know that

09:28:12 18   we cannot be in a thousand places at one time, but I believe

09:28:15 19   that this -- by this coming to light, the way it is, through

09:28:21 20   the media and everything, I think this is going to put a stop

09:28:23 21   to a lot of things, because at this point it's real serious.

09:28:27 22   It's not a joke no more.

09:28:29 23        I mean, I'm tired of seeing dudes die at OPP.  I'm

09:28:33 24   tired of seeing dudes get jumped for things that they don't

09:28:36 25   have no part of.  I'm tired of hearing about rapes and beatings

09:28:40 1    and all of this type of stuff at OPP.  Some way it's got to

09:28:43 2    stop.  That's why I participated in this case.

09:28:45 3    Q.    Based on your experience there, what do you think needs to

09:28:48 4    change at OPP?

09:28:50 5    A.    They need -- the Sheriff needs to provide every inmate

09:28:57 6    that's being housed there for the time period that they're

09:29:00 7    being housed there something to free their mind.

09:29:03 8          They need to go to school.  A lot of these dudes are

09:29:05 9    uneducated.  They don't have no GED, no high school diploma.

09:29:10 10   All they know is the streets.

09:29:11 11         He needs to provide things for them to look forward

09:29:15 12   to, teach them how to be fathers to their kids, teach them how

09:29:18 13   to be role models to their wives, their mommas and to their

09:29:22 14   immediate family.

09:29:22 15   Q.    Thinking about the experience that you related to us

09:29:25 16   today, do you think that there are things that could change to

09:29:27 17   prevent things like that from happening again?

09:29:28 18   A.    There is a lot of things that could change to prevent that

09:29:33 19   from happening again.

09:29:34 20   Q.    Can you name some of them?

09:29:35 21   A.    For starters -- and I'm just going to use one building --

09:29:38 22   OPP itself, if you place a camera on the back of the dorm and a

09:29:42 23   camera in front of the dorm, nobody is going to commit a crime

09:29:46 24   like that on camera unless they're just crazy.  There is no

09:29:49 25   type of cameras on the dorms whatsoever.

09:29:52  1    Q.    What about if there were additional guards there?

09:29:55  2    A.    Yes, ma'am.  One guard cannot guard 300 dudes.  You'd be

09:30:00  3    having one guard to four floors.

09:30:02  4          I believe that he should have a guard on each floor,

09:30:05  5    one, two, three, four.  If not -- and there's two sides, so

09:30:09  6    technically it should be two guards.

09:30:11  7          I think the problem will really cease -- if not cease

09:30:15  8    completely, it will really decrease a lot of situations that

09:30:18  9    we're having with that jail.

09:30:19 10    Q.    Is there anything that you would change about

09:30:22 11    classification or telling -- asking inmates who they need to be

09:30:26 12    protected from?

09:30:26 13    A.    Yeah, I think he should structure the enrollment process

09:30:31 14    based on the way -- and it's crazy -- the DOC does it.  I mean,

09:30:35 15    when an inmate or an offender roll into Central Lockup, they

09:30:40 16    need to be asked, do you have enemies; or, if you're not sure,

09:30:45 17    do you think you have enemies?

09:30:46 18          At that point, if the inmate says yeah to any one of

09:30:49 19    those questions, they take the initiative and make the proper

09:30:55 20    reservations, and they place these people according to what

09:30:58 21    they said.

09:31:00 22    Q.    Have you read the Consent Decree?

09:31:01 23    A.    Yes, ma'am.

09:31:02 24    Q.    Do you think it will address some of the problems that you

09:31:06 25    saw at OPP?

09:31:08 1    A.    I think it would address every single problem and every

09:31:12 2    single aspect of problem in OPP.

09:31:14 3    Q.    Do you believe that you can represent the interests of

09:31:19 4    others at OPP fairly?

09:31:20 5    A.    Yes, ma'am.

09:31:20 6    Q.    Why do you think that?

09:31:23 7    A.    Because, I mean, I know that I'm incarcerated, but I'm a

09:31:31 8    decent guy.  I believe that me stepping up and stepping forward

09:31:34 9    saying my story and letting the City know what happened to me,

09:31:39 10   that's going to give a lot of people courage to step forward

09:31:42 11   and come clean and say, hey, this happened to me too.  Such and

09:31:46 12   such did this to me too.

09:31:48 13        I believe that me doing this is just -- you know, a

09:31:50 14   lot of people are going to look at this like, man, that's a

09:31:53 15   brave young man to say the things that he said.

09:31:55 16        You know, it's got to stop.  I believe that that's

09:32:00 17   representation -- that's all.  I mean, it's self-explanatory.

09:32:05 18        MS. ZAMPIERIN:  Thank you, Mr. Sylvester.

09:32:09 19         No further questions, Your Honor.

09:32:10 20        THE COURT:  Sheriff?

09:32:13 21        MR. MATTHEWS:  No questions.

09:32:14 22        THE COURT:  Any by the City?

09:32:16 23        MR. RALPH CAPITELLI:  Just a few.

09:32:18 24        THE COURT:  Of what crime have you been convicted, are

09:32:20 25   you serving time for?

09:32:20 1                 THE WITNESS:  It's armed robbery.

09:32:22 2                 THE COURT:  What's your sentence?

09:32:23 3                 THE WITNESS:  10 years without bail.  I've got, like,

09:32:25 4      four, five more years left.

09:32:30 5                         CROSS-EXAMINATION

09:32:30 6      BY MR. RALPH CAPITELLI:

09:32:32 7      Q.    Good morning, Mr. Sylvester.  My name is

09:32:34 8      Ralph Capitelli --

09:32:34 9      A.    How are you doing, sir?

09:32:35 10     Q.    -- and I represent the City of New Orleans, not the

09:32:37 11     Sheriff, okay?

09:32:38 12     A.    How are you doing?

09:32:38 13     Q.    You understand that?

09:32:39 14     A.    Yes, sir.

09:32:40 15     Q.    You and I have never met or spoken before; is that

09:32:40 16     correct?

09:32:43 17     A.    No, sir.

09:32:43 18     Q.    Okay.  In connection --

09:32:44 19                 THE COURT:  It is correct; you haven't?

09:32:46 20                 THE WITNESS:  Oh, yeah, yeah.  It is correct.  I'm

09:32:47 21     sorry.

09:32:49 22                         EXAMINATION

09:32:49 23     BY MR. RALPH CAPITELLI:

09:32:52 24     Q.    In connection with this matter, when you were assaulted,

09:32:56 25     okay, you indicated that you eventually did report that to the

09:33:01 1    SOD, correct?

09:33:02 2    A.    Well, to the sergeant.

09:33:04 3    Q.    The sergeant.  But then eventually SOD took a statement?

09:33:07 4    A.    Yes, sir.

09:33:07 5    Q.    Is it correct to say or are you aware that approximately

09:33:11 6    11 people were arrested over this incident from parish prison?

09:33:15 7    A.    Yes, a lot of them.

09:33:16 8    Q.    Did you ever testify against any of those individuals that

09:33:22 9    assaulted you, in court?

09:33:22 10   A.    They dropped all charges.

09:33:24 11   Q.    So nobody was ever convicted or charged?

09:33:26 12   A.    Nobody was ever -- they was charged, and I saw the

09:33:29 13   charges.  All the charges was dropped with each and every last

09:33:32 14   with one of them, with phone recorded conversations of them

09:33:36 15   admitting what they done.

09:33:37 16   Q.    In terms of the -- you mentioned, and it's in the

09:33:42 17   statement that you gave to SOD, that this was an attack or

09:33:47 18   retaliation because you were going to testify against somebody

09:33:52 19   else, correct?

09:33:52 20   A.    Yes, sir.

09:33:52 21   Q.    Who is that?

09:33:53 22   A.    Robert Scott.

09:33:54 23   Q.    Did you know for a fact whether Robert Scott knew any of

09:33:59 24   these individuals; did they say that, or what did they say?

09:34:01 25   A.    Yeah, they say that a few of them went to school with him.

09:34:04  1    That's where he sent the hit from.  He was sitting in class
09:34:08  2    with a few of them, and that's pretty much -- he was set for
09:34:10  3    trial that next week.
09:34:11  4    Q.    You knew Robert Scott?
09:34:13  5    A.    No, I didn't know him prior to him robbing me.
09:34:16  6    Q.    Was it an armed robbery?
09:34:19  7    A.    Yes, sir.
09:34:19  8    Q.    Did you ever testify in that case?
09:34:21  9    A.    No, sir.  No, sir.
09:34:22 10    Q.    Now, in fact, you're doing 10 years for armed robbery with
09:34:29 11    a firearm, correct?
09:34:30 12    A.    No, not -- they dropped the charges to regular armed
09:34:34 13    robbery, not with a firearm.
09:34:34 14    Q.    If I show you the document, you would dispute that it's --
09:34:37 15    you're doing 10 years for armed robbery?
09:34:40 16    A.    Yes, sir, for armed robbery.
09:34:40 17    Q.    In connection with this matter, do you remember signing a
09:34:44 18    declaration originally when you signed on with the lawsuit
09:34:49 19    about what happened to you?  Do you remember signing that?
09:34:52 20    A.    Yes, sir.
09:34:53 21          MR. RALPH CAPITELLI:  I would like to show the witness
09:34:59 22    the declaration.  Your Honor, it's Document Number 2-2, but
09:35:02 23    I'll mark it City 1 for this purpose, Your Honor.
09:35:05 24          THE COURT:  It hasn't been introduced into evidence
09:35:08 25    yet, correct?

09:35:10  1        MR. RALPH CAPITELLI:  What's that?

09:35:10  2        THE COURT:  It has not been introduced?

09:35:13  3        MR. RALPH CAPITELLI:  It has not been introduced.  It's

09:35:13  4   in the court record, but it has not been introduced.

09:35:17  5        THE COURT:  It's Document 2-2?

09:35:17  6        MR. RALPH CAPITELLI:  2-2 in the record, but it has not

09:35:19  7   been introduced.

09:35:21  8        THE COURT:  You're marking it as City 1; is that right?

09:35:23  9        MR. RALPH CAPITELLI:  Yes, City 1.

09:35:23 10        THE COURT:  All right.

09:35:25 11        MR. RALPH CAPITELLI:  I would like to approach the

09:35:27 12   witness.

09:35:27 13        THE COURT:  Sure.

09:35:27 14                         EXAMINATION

09:35:27 15     BY MR. RALPH CAPITELLI:

09:35:27 16   Q.   I would like you to look at this.  First, take a minute

09:35:29 17   and examine it, and ask if that's your -- let me help you with

09:35:32 18   that.  Okay.

09:35:36 19            On the second page, is that your signature?

09:35:38 20   A.   Yes, sir.

09:35:39 21   Q.   Are you familiar with this?

09:35:41 22   A.   Yes, sir.

09:35:41 23   Q.   Okay.

09:35:43 24   A.   I have a copy of it.

09:35:43 25   Q.   You've had a chance to review it prior to this?

09:35:47  1   A.   Yeah, I read it a few times.

09:35:49  2   Q.   You read it a few times.

09:35:50  3        I would like you to look, in particular, at Paragraph

09:35:53  4   Number 5.  Just take a minute and read that.

09:35:53  5   A.   (Complies.)

09:36:05  6        All right.

09:36:05  7   Q.   In that paragraph, you say that during the attack a deputy

09:36:11  8   came on the floor but never looked at it, okay?

09:36:13  9   A.   And never -- yeah.

09:36:14 10   Q.   Because the deputies don't really care, correct?

09:36:16 11   A.   Yes.

09:36:16 12   Q.   So what your testimony is, that it wasn't that there

09:36:19 13   wasn't a deputy there to stop this, it's that the deputy who

09:36:28 14   was on duty didn't care or wouldn't do anything; is that

09:36:28 15   correct?

09:36:30 16   A.   No, that's not my testimony.

09:36:31 17   Q.   What is it?

09:36:31 18   A.   It's basically he wasn't on the dorm when everything was

09:36:34 19   happening.  I heard when he came on the dorm.

09:36:36 20        He was gone.  When he locked down, he left off the

09:36:38 21   tier.  When he came back, I heard when he came back, I heard

09:36:41 22   the keys, I heard the front door open.  That's it.

09:36:43 23        I didn't see nobody.  Nobody walked down.  He would

09:36:47 24   have saw me tied to a pole.

09:36:48 25   Q.   But your statement is correct that a deputy was on the

09:36:51  1   floor?  On Paragraph Number 5, you indicate --

09:36:52  2   A.    At a certain point.

09:36:55  3   Q.    During the attack?

09:36:56  4   A.    Not during the attack.

09:36:57  5   Q.    Well, would you read Number 5?  It says, "during the

09:37:01  6   attack."

09:37:01  7   A.    I mean while I was tied up.  You want to say -- while I

09:37:04  8   was tied up, yes.

09:37:04  9   Q.    So during the attack, there was a deputy there, and the

09:37:09 10   deputy did nothing.  But you didn't scream during any part of

09:37:13 11   the attack; is that correct?

09:37:14 12   A.    Right.

09:37:15 13         THE COURT:  It's your testimony the deputy did not go

09:37:19 14   down to the back part of the tier where you were, the rear part

09:37:22 15   of the tier; is that right?

09:37:23 16         THE WITNESS:  Yes, sir.  Yes, sir.

09:37:25 17         MR. RALPH CAPITELLI:  No further questions, Your Honor.

09:37:29 18         THE COURT:  All right.  Thank you.

09:37:30 19              Any redirect?

09:37:31 20         MS. ZAMPIERIN:  No, Your Honor.

09:37:32 21         THE COURT:  Thank you, sir.

09:37:34 22              Let's call your next witness.

09:38:16 23         MS. SCHWARTZMANN:  We call Jeff Schwartz.

08:56:16 24         THE DEPUTY CLERK:  Please raise your right hand.  Do

         25   you solemnly swear the testimony you are about to give will be

1    the truth, the whole truth and nothing but the truth, so help

2    you God?

3                THE WITNESS:  I do.

4                          **JEFFREY SCHWARTZ**

5     was called as a witness and, after being first duly sworn by

09:38:23 6     the Clerk, was examined and testified on his oath as follows:

09:38:23 7          THE DEPUTY CLERK:  You may have a seat.  State your

09:38:24 8    name and spell it for us, please.

09:38:27 9          THE WITNESS:  Jeffrey Arthur Schwartz, S-C-H-W-A-R-T-Z.

09:38:27 10                     VOIR DIRE EXAMINATION

09:38:27 11    BY MS. SCHWARTZMANN:

09:38:40 12    Q.    Good morning, Mr. Schwartz.

09:38:41 13    A.    Good morning.

09:38:42 14    Q.    What is your area of professional focus?

09:38:44 15    A.    I have worked with criminal justice agencies for my entire

09:38:51 16    career.

09:38:51 17    Q.    You said criminal justice agencies?  I'm sorry.

09:38:56 18    A.    Yes, I did.

09:38:56 19    Q.    Specifically, what types of criminal justice agencies have

09:39:01 20    you worked for?

09:39:02 21    A.    Law enforcement agencies and correctional agencies.

09:39:04 22    Q.    How long have you worked with correctional agencies?

09:39:11 23    A.    For something over -- perhaps, 35 years, a little bit

09:39:16 24    more.

09:39:16 25    Q.    In that time, how many jails and prisons have you worked

09:39:19 1    with?

09:39:22 2    A.    Hundreds.  I don't have any count, but more than 200.

09:39:28 3    Perhaps, 300 or so.

09:39:32 4    Q.    Can you tell the Court generally what types of tasks

09:39:36 5    you've done in these jails and prisons?

09:39:38 6    A.    Yes.  Most -- a large percentage, but not half of my work,

09:39:46 7    has been training of correctional staff or supervisors,

09:39:52 8    managers.

09:39:52 9         I've done a lot of work after major emergencies or

09:39:56 10   large scale crises, particularly if they went wrong.  For

09:40:00 11   instance, a hostage situation where people were killed, I've

09:40:04 12   been asked to do critical incident reviews, also called after

09:40:08 13   action reports.

09:40:10 14        I've done a number of security analyses of prisons or

09:40:14 15   jails, and I've done operational reviews of prisons or jails.

09:40:20 16   I've been involved in what I would refer to as turnaround

09:40:26 17   management with a particularly troubled jail or prison on a

09:40:32 18   number of occasions.

09:40:34 19        There is also a wide variety of other things, some

09:40:38 20   personnel work, but that would account for a large proportion

09:40:41 21   of my work.

09:40:42 22   Q.    Mr. Schwartz, what is your highest level of educational

09:40:47 23   attainment?

09:40:48 24   A.    I have a Ph.D. in research psychology, with an emphasis on

09:40:52 25   experimental design and statistics.

09:40:55  1    Q.   Can you tell us, what is the NIC?

09:40:57  2    A.   That's the term that people in corrections use for the

09:41:01  3    National Institute of Corrections, which is a quite small

09:41:06  4    branch of the U.S. Department of Justice, which is -- it's

09:41:11  5    administratively attached to the federal prison bureau --

09:41:15  6    Federal Bureau of Prisons, and its mission is to work with and

09:41:19  7    help state and local correctional agencies throughout the

09:41:25  8    country.

09:41:25  9            THE COURT:  What is your connection with the NIC?

09:41:28 10            THE WITNESS:  I've done a great deal of work with them

09:41:31 11    for more than 30 years.

09:41:33 12                          EXAMINATION

09:41:33 13    BY MS. SCHWARTZMANN:

09:41:35 14    Q.   Dr. Schwartz, can you describe what types of work you've

09:41:38 15    done with the NIC?

09:41:40 16    A.   Yes.  Perhaps once to three times a year, I've been asked

09:41:47 17    to do technical assistance for NIC, which may be for their

09:41:52 18    jails division, their prisons division, their training academy

09:41:56 19    or for their community corrections division.  Most often with

09:41:59 20    jails and prisons.

09:42:02 21            I have been the project manager for research projects

09:42:05 22    and some national training projects that were very large,

09:42:09 23    multi-year projects for NIC.

09:42:13 24            I have developed an online training program for NIC

09:42:18 25    for correctional staff on emergency preparedness, and I've

09:42:24  1   co-authored two book-length publications that NIC distributes,

09:42:29  2   which are on emergency preparedness for jails and prisons.

09:42:36  3        That's among the work.  There are probably a few

09:42:40  4   other things.

09:42:40  5   Q.   Dr. Schwartz, you said that you've done operational

09:42:44  6   reviews.  Can you describe what those are?

09:42:46  7   A.   Yes, an operational review is like a security audit except

09:42:51  8   rather than focusing on security it looks broadly at all areas

09:42:56  9   and functions of a jail or a prison.

09:43:01  10        It's a very broad look at its -- it comes down to

09:43:07  11  look at everything you can as much as you can within the time

09:43:09  12  allotted, whether it's pretrial alternatives or basic security

09:43:16  13  issues or inmate programs, just the whole gamut of functions

09:43:23  14  and activities within a prison or jail.

09:43:25  15  Q.   Have you done operational reviews for the NIC?

09:43:28  16  A.   Yes, with some regularity.

09:43:31  17  Q.   We'd like to show you Exhibit 373.  Mr. Donnelly is going

09:43:38  18  to bring it up to you.  It's also going to come up on your

09:43:41  19  screen.

09:43:43  20        MR. DONNELLY:  Permission to approach, Your Honor?

09:43:45  21        THE COURT:  Yes.

09:43:45  22                        EXAMINATION

09:43:45  23  BY MS. SCHWARTZMANN:

09:43:48  24  Q.   Dr. Schwartz, is that your CV?

09:43:49  25  A.   Yes, this is my résumé.

09:43:50  1    Q.    Does that accurately reflect your experience and

09:43:54  2    background?

09:43:54  3    A.    It does.

09:43:57  4    Q.    Did you form opinions in this case --

09:44:02  5    A.    Yes.

09:44:02  6    Q.    -- about Orleans Parish Prison?  Sorry.

09:44:04  7    A.    Yes, I did.

09:44:05  8    Q.    Thanks.

09:44:07  9              What did you do to arrive at your opinions?

09:44:09 10          THE COURT:  Hold on.  Let's first see if there is any

09:44:11 11    issue with respect to whether he's an expert or not.  Are you

09:44:14 12    tendering him as an expert in any particular area?

09:44:16 13          MS. SCHWARTZMANN:  Security and operations.

09:44:20 14          THE COURT:  Of a prison?

09:44:22 15          MS. SCHWARTZMANN:  Of a prison.

09:44:22 16          THE COURT:  Security and operations of a prison?

09:44:25 17          MS. SCHWARTZMANN:  Yes, Your Honor.

09:44:26 18          THE COURT:  Is there anybody who would like to ask

09:44:28 19    Dr. Schwartz anything on the predicate, that is, whether or not

09:44:31 20    he should be accepted as an expert?

09:44:34 21          MR. MATTHEWS:  Your Honor, are we talking about prisons

09:44:36 22    or jails or both?

09:44:37 23          THE COURT:  Let Dr. Schwartz state his expertise.  Is

09:44:44 24    it prison, jail or both?

09:44:46 25          THE WITNESS:  It's both.

09:44:49  1        MR. MATTHEWS:  No objection, Your Honor.

09:44:49  2        THE COURT:  Any objection to him being recognized as an

09:44:54  3   expert in that area?

09:44:54  4        MR. ROSENBERG:  No, Your Honor.  The City has no

09:44:56  5   objection.

09:44:57  6        THE COURT:  Thank you.

09:44:57  7           I find him to be an expert as tendered in the

09:45:01  8   security and operations of a prison, jail or both.

09:45:02  9        MS. SCHWARTZMANN:  Thank you, Your Honor.

09:45:02 10                    DIRECT EXAMINATION

09:45:02 11   BY MS. SCHWARTZMANN:

09:45:06 12   Q.   Dr. Schwartz, is there agreement in the field of

09:45:10 13   corrections about the goals and objectives of a jail?

09:45:14 14   A.   Yes, there is.

09:45:14 15   Q.   What is that agreement?

09:45:18 16   A.   There is agreement at the broadest level.  Every

09:45:22 17   correctional agency I have seen or worked with has as its first

09:45:27 18   priority community safety, or it may be expressed as community

09:45:32 19   protection.

09:45:33 20           After community safety, there is broad agreement that

09:45:36 21   the other major goals are staff safety and then inmate safety

09:45:42 22   and welfare, usually, but not always, in those terms and in

09:45:46 23   that order.

09:45:47 24           Beyond that, there is discussion and some

09:45:50 25   disagreement.

09:45:52 1    Q.    Is there agreement in the field about how experts evaluate

09:45:56 2    a jail as to whether it's operating well or badly?

09:46:02 3    A.    Yes, there is, with the same qualification.

09:46:06 4          At the broadest level, there is excellent agreement;

09:46:09 5    and, then, below that, on the details, not so much.

09:46:14 6          In terms of evaluating whether a jail is good or bad,

09:46:17 7    how it's performing, people first -- people in the field will

09:46:22 8    first look to indicators, including inmate-on-inmate violence,

09:46:30 9    number of suicides, number of escapes, staff use of force,

09:46:37 10   sexual assaults, rapes and other kinds of sexual assaults.

09:46:41 11         Those are the -- if you will, the outcome variables

09:46:44 12   that people look to.  There is broad agreement that if those

09:46:49 13   are bad, the facility is bad.  If those are very good, the

09:46:53 14   facility is, at least at that level, working very well.

09:46:56 15   Q.    So applying those factors and the reviews you did in this

09:47:02 16   case, do you have a general opinion for the Court about whether

09:47:07 17   OPP is operating badly or well?

09:47:10 18   A.    I do.

09:47:10 19   Q.    What is that opinion?

09:47:14 20   A.    OPP is terrible.  It is --

09:47:19 21         THE COURT:  Just so the Court understands, when you say

09:47:22 22   OPP, are you talking about only that building which is referred

09:47:25 23   to as the Old Parish Prison or the facilities in general that

09:47:30 24   comprise OPP and related facilities?

09:47:33 25         THE WITNESS:  Thank you, Your Honor.  I have been going

09:47:35  1    back and forth with that.

09:47:37  2              I will try to use OPP to refer to the whole jail

09:47:41  3    system.  I'll try to remember to call Old Parish that; but,

09:47:47  4    frequently, both are called OPP.  So -- but I'll try to --

09:47:52  5         THE COURT:  So your conclusions aren't just limited to

09:47:55  6    that building known as the OPP?

09:47:57  7         THE WITNESS:  No, my conclusions are for the jail

09:47:59  8    system, all of the buildings.

09:48:00  9         THE COURT:  All right.  Thank you.

09:48:01 10              With respect to what Mr. Matthews said before,

09:48:04 11    why don't you explain the difference between a jail and a

09:48:07 12    prison.

09:48:07 13         THE WITNESS:  Jails are county run.  In Louisiana,

09:48:12 14    parish run.  They are more local.

09:48:17 15              Prisons are state and usually part of a state

09:48:19 16    department of corrections.  That's the general distinction.

09:48:23 17              There are seven states where there is one

09:48:26 18    department of corrections that runs jail and prison facilities,

09:48:31 19    and the facilities aren't differentiated necessarily.

09:48:38 20                              EXAMINATION

09:48:38 21    BY MS. SCHWARTZMANN:

09:48:40 22    Q.   I think you were giving your general opinion to the Court

09:48:42 23    of whether OPP is operating badly or well.

09:48:48 24    A.   It's operating worse than badly.  In my many years looking

09:48:53 25    at jails and prisons, OPP is the worst jail I've ever seen.  I

09:49:01 1 can't be sure because I have not seen every large jail in the

09:49:04 2 country, but I've seen and worked with many of the large jails,

09:49:07 3 and I believe it is likely the worst large city jail in the

09:49:11 4 United States.

09:49:12 5 Q.    Can you be more specific for the Court about what leads

09:49:16 6 you to the conclusion that OPP -- conditions there are

09:49:20 7 terrible?

09:49:20 8 A.    Yes.  The reason that stands above all others is the

09:49:26 9 runaway inmate-on-inmate violence that's at a level that is, in

09:49:33 10 my experience, unprecedented.

09:49:35 11      Beyond that, I would cite escapes.  Last year, in

09:49:40 12 2012, I believe there were -- in an eight-month period, there

09:49:44 13 were nine escapes, from April through November, nine inmate

09:49:49 14 escapes in six separate incidents.

09:49:52 15      There have been, I believe, six suicides in the last

09:49:58 16 recent few years, and perhaps a seventh that is an incident

09:50:02 17 that's not fully investigated yet but may be a suicide.

09:50:07 18      The sexual assaults, rapes and sexual assaults are at

09:50:13 19 an extraordinarily high level, the highest I have ever seen.

09:50:18 20      The staff use of force is frequently -- sometimes

09:50:25 21 unreported.  Incidents involving excessive or unnecessary force

09:50:31 22 appear to be commonplace.

09:50:32 23      The picture -- I can't be anywhere near as eloquent

09:50:36 24 as the witness right before me, but it is a most extraordinary

09:50:43 25 and horrific situation.

09:50:46  1    Q.   Dr. Schwartz, you said that inmate-on-inmate violence

09:50:53  2    stands out above all else.  So I would like to direct your

09:50:56  3    attention to a document that we previously marked and admitted

09:50:58  4    as Exhibit 354.  Mr. Donnelly is going to bring you a paper

09:51:04  5    copy.

09:51:05  6         THE COURT:  You say it's previously been admitted.  Has

09:51:08  7    anything been formally admitted into evidence?

09:51:10  8         MS. SCHWARTZMANN:  We haven't moved it in, Your Honor.

09:51:13  9    This is in the condensed bench book.

09:51:13 10         THE COURT:  Why don't we move in all of the documents

09:51:14 11    that have previously been agreed to.  I know there are several

09:51:17 12    that are waiting for some unredacted copies from the Sheriff's

09:51:21 13    Office, but why can't we just let everything else come in now,

09:51:25 14    you know, without objection.

09:51:29 15         MR. ROSENBERG:  Your Honor, the City doesn't have any

09:51:31 16    objection to that approach.  However, this particular document,

09:51:34 17    Your Honor, we have objected to because we've stated it's a

09:51:38 18    summary demonstrative which was not initially listed as an

09:51:42 19    exhibit by either the DOJ or the plaintiff inmates.

09:51:45 20         THE COURT:  Haven't I ruled on that already?

09:51:46 21         MR. ROSENBERG:  I don't believe, Your Honor.

09:51:52 22              I'll have to pull it back up again, Your Honor,

09:51:53 23    but I don't believe Your Honor ruled on that.

09:51:57 24         MR. DONNELLY:  I believe this is one of the ones you

09:51:58 25    did rule on.

09:51:59  1          THE COURT:  I've ruled on every objection that's been

09:52:01  2   brought to my attention so far in my last minute entry.  I

09:52:07  3   believe I did rule with respect to the summary documents.

09:52:10  4          MR. ROSENBERG:  Your Honor, just to avoid interrupting

09:52:13  5   counsel, just so our objections are preserved, I mean, we've

09:52:16  6   made the objection.  I understand some documents Your Honor has

09:52:20  7   overruled our objections, some you have sustained those

09:52:22  8   objections.

09:52:23  9          I didn't want to have to bounce up every time

09:52:25 10   just to preserve the record, Your Honor.  Is that acceptable?

09:52:33 11          THE COURT:  I've ruled already on Exhibit 354.  I've

09:52:37 12   ruled on that already.

09:52:38 13          All right.  Well, I understand that the City

09:52:41 14   maintains its objection to any documents that I've ruled

09:52:44 15   adversely to it; but, all the documents that everybody has

09:52:49 16   agreed to, in addition to the ones that I've admitted into

09:52:51 17   evidence, should be offered into evidence, so we don't have to

09:52:55 18   keep just referring to them and I don't know whether they have

09:52:57 19   been admitted or not.  Because, obviously, we can't have in

09:53:00 20   evidence something which hasn't been admitted into evidence.

09:53:04 21          MR. ROSENBERG:  We have no objection.

09:53:05 22          Your Honor, if the Court will just indulge me,

09:53:07 23   just as a housekeeping issue, Mr. Capitelli identified

09:53:11 24   City Exhibit 1 with Mr. Sylvester.  I believe it should be City

09:53:16 25   Exhibit 11, because our exhibits were premarked 1 through 10

09:53:19  1    already.

09:53:20  2         THE COURT:  So noted.  That will be renumbered to City

09:53:23  3    Exhibit 11.  Let's offer them into evidence.

09:53:25  4         MR. DONNELLY:  Your Honor, I have the numbers, if that

09:53:27  5    will help.

09:53:28  6         THE COURT:  Let's do that, please.

09:53:28  7         MR. DONNELLY:  Exhibits 1 through 101 -- these are the

09:53:38  8    plaintiffs' exhibits -- 140 through 351, 363, 368 through 371,

09:53:52  9    380.  353, 354, 356, and 381.  Those last four were the summary

09:54:06 10    exhibits.

09:54:11 11         Your Honor, those don't include the expert

09:54:13 12    reports, which I believe you agreed to admit.  I can also give

09:54:17 13    you those numbers if you would like.

09:54:19 14         THE COURT:  I don't believe I ruled on 381, did I?

09:54:21 15         MR. DONNELLY:  It was a late addition based on the

09:54:27 16    timing of some information we got.  We handed it over to all of

09:54:30 17    the defendants, and I believe they have the same types of

09:54:32 18    objections as they did before as far as --

09:54:34 19         THE COURT:  What is 381?

09:54:35 20         MR. DONNELLY:  381 is a summary exhibit about the

09:54:40 21    number of prisoners that are currently on prescription

09:54:44 22    medications, and it cross-references the data between the

09:54:50 23    census of the prisoners and this list.

09:54:52 24         THE COURT:  The underlying documentation is in evidence

09:54:55 25    with respect to 381?

09:54:55  1          MR. DONNELLY:  Yes.

09:54:56  2          THE COURT:  There is no contest as to the accuracy of

09:55:00  3    the underlying documents?

09:55:01  4          MR. ROSENBERG:  Well, Your Honor, we haven't had a

09:55:02  5    chance to object to that Exhibit 381.  It was submitted after

09:55:06  6    all of the exhibits were submitted by counsel consistent with

09:55:08  7    Your Honor's order.

09:55:09  8          THE COURT:  Do you want to object now?

09:55:10  9          MR. ROSENBERG:  Well, we do, Your Honor, at least until

09:55:13 10    we have an opportunity to determine whether there is any

09:55:14 11    accurate foundation.

09:55:15 12          THE COURT:  So we'll hold up.  We're not going to admit

09:55:17 13    381 right now.  Just hold off on that.

09:55:19 14              I'll let you refer to it, but I'm not going to

09:55:23 15    admit it until the City has a chance to take a look at it.

09:55:26 16          MR. DONNELLY:  Thank you, Your Honor.

09:55:28 17          THE COURT:  Everything else is admitted without

09:55:29 18    objection or subject to the objections that I previously ruled

09:55:32 19    upon.

09:53:29 20              (WHEREUPON, Exhibits 1 through 101, 140 through 351,

09:53:46 21    363, 368 through 371, 380, 353, 354 and 356 were admitted.)

09:55:33 22          MR. DONNELLY:  Your Honor, I didn't list in there the

09:55:36 23    expert reports and their CV's.

09:55:38 24          THE COURT:  What are the numbers?

09:55:38 25          MR. DONNELLY:  Those are 372 through 379.

09:55:46  1          THE COURT:  Those are all admitted.

09:55:46  2          (WHEREUPON, Exhibits 372 through 379 were admitted.)

09:55:50  3          MR. DONNELLY:  Thank you, Your Honor.

09:55:50  4          MS. SCHWARTZMANN:  Your Honor, I'm sorry, before we

09:55:52  5  proceed, one other housekeeping measure that the marshals just

09:55:55  6  brought up.

09:55:56  7          Once the individual prisoners are finished

09:55:59  8  testifying, will the Court release them from their writ, so

09:56:01  9  they can return --

09:56:01 10          THE COURT:  Unless any party tells me there is a need

09:56:03 11  to maintain that person here for further testimony.

09:56:07 12          MS. SCHWARTZMANN:  We don't have that need.

09:56:07 13          MR. MATTHEWS:  No, Your Honor.

09:56:07 14          MR. ROSENBERG:  None, Your Honor.

09:56:08 15          THE COURT:  All right, released.

09:56:10 16          MS. SCHWARTZMANN:  Thank you, Your Honor.

09:56:12 17          THE COURT:  Anything else?

09:56:12 18          MR. DONNELLY:  Permission to approach to hand him --

09:56:15 19          THE COURT:  That's 381?

09:56:17 20          MR. DONNELLY:  This is 354.

09:56:21 21          THE COURT:  354.  Excuse me.  It's already been

09:56:23 22  admitted.

09:56:23 23                          EXAMINATION

09:56:23 24  BY MS. SCHWARTZMANN:

09:56:23 25  Q.   Dr. Schwartz, have you seen this document before?

09:56:29  1    A.    Yes, I have.

09:56:29  2    Q.    What is it?

09:56:31  3    A.    It's a summary of the year 2012, showing by month the

09:56:35  4    number of inmates from OPP who were sent to the hospital, to

09:56:44  5    emergency rooms for injury, and those sent to emergency rooms

09:56:49  6    or psychiatric emergency facilities for psychiatric emergency

09:56:55  7    or crisis situations.

09:56:56  8          It excludes inmates who were sent before being booked

09:57:01  9    or as a precondition of being booked.  These are all in-custody

09:57:06 10    inmates who were sent to -- basically, to hospital emergency

09:57:08 11    rooms outside the jail.

09:57:10 12    Q.    I don't want to go through each of these months, but, if

09:57:13 13    we could just focus -- if you could just maybe explain to the

09:57:16 14    Court one or two months, what is indicated on this sheet.

09:57:20 15    A.    Yes.  What's been highlighted is April and May.  If you

09:57:24 16    look just at April, I think the rest of this follows the exact

09:57:29 17    pattern.

09:57:32 18          It breaks -- the total number of inmates sent to

09:57:36 19    emergency rooms from OPP was 72, based on the medical records

09:57:42 20    and the hospital and ambulance transport records.

09:57:46 21          Then it's further broken down into lacerations and

09:57:49 22    punctures, fractures and dislocations, trauma, sexual assaults,

09:57:55 23    and what I've considered a somewhat separate category, which

09:57:59 24    are the mental health crisis situations.

09:58:01 25    Q.    Did you look at statistics from other jails to compare to

this level of emergency transport from OPP?

A.    I did.  I looked at three jails that I've worked with rather extensively, and I have good access to those jails.

I looked at Shelby County, Tennessee, which is Memphis, because it's about the same size jail system, and there are a number of parallels.

I looked at Milwaukee, Wisconsin, because the Milwaukee County jails are about the same size.

I looked at Boise, Idaho, which is Ada County, A-D-A. That jail is about one-third the size of OPP.

Q.    What can you tell us about how the emergency routes from the Memphis jail compare to these routes from Orleans Parish Prison?

A.    It's difficult to talk about a comparison because the numbers are so out of scale.

Shelby County -- in 2012, if you look, I don't remember the exact numbers, but there are over 90 -- during the year there were more than 90 psychiatric emergency trips, hospital or ambulance runs, and there were more than 600 hospital or emergency runs for serious injury.

Q.    From OPP, you mean?

A.    From OPP, over 600, and psychiatric over 90.

The comparable figures for Shelby County, from that jail, a jail I'm very familiar with, were seven hospital runs during 2012 for injury or trauma resulting from violence and

09:59:51 1    eight psychiatric emergencies.

09:59:56 2         Now, I should note that OPP does not distinguish

09:59:58 3    between hospital runs for injury due to violence as opposed to

10:00:05 4    injury due to an accident, someone fell, someone was injured in

10:00:08 5    a basketball game.

10:00:10 6         But I did look at the underlying records, and far

10:00:14 7    less than half of the injury hospital runs from OPP are due to

10:00:21 8    those kinds of things; far more than half are due to violence.

10:00:26 9    Q.    Do you have an opinion as to why there is so much inmate

10:00:30 10   violence in OPP?

10:00:32 11   A.    I do.

10:00:32 12   Q.    What is that?

10:00:34 13   A.    The two reasons that are much larger than anything else,

10:00:40 14   in my opinion, the first is the failure of staff to supervise

10:00:49 15   inmates, and the second reason is the failure to have a

10:00:53 16   functioning or effective classification system.

10:01:00 17   Q.    To start with staff supervision, can you broadly describe

10:01:06 18   staff supervision at OPP?

10:01:08 19   A.    Staff supervision of inmates is distinguished primarily by

10:01:12 20   its absence.  OPP is the most understaffed jail I have seen.

10:01:20 21        There are posts -- OPP is composed of buildings which

10:01:25 22   are old, linear, staff-intensive designs.  It has to be heavily

10:01:30 23   staffed for supervision.

10:01:33 24        You should have one staff member for each tier.  They

10:01:37 25   do not.  It is very common for there to be one staff member

10:01:43 1    assigned to two tiers, and it's not infrequent that they are

10:01:46 2    particularly short staffed for days or weeks, and some staff

10:01:52 3    are assigned four tiers to supervise.

10:01:55 4         That means that a tier -- the most a tier would have

10:01:59 5    would be supervision one quarter of the time.  Now, that

10:02:03 6    doesn't take into account things like meal breaks, bathroom

10:02:08 7    breaks, or times, which are fairly frequent, when staff simply

10:02:12 8    leave their post and are chatting with other staff or doing

10:02:16 9    something else.

10:02:16 10        So that combination means that inmates most of the

10:02:20 11   time are on their own and can do whatever with each other, and

10:02:24 12   they do.

10:02:25 13   Q.   Do you have an estimation about the number of additional

10:02:31 14   staff needed at OPP?

10:02:34 15   A.   It's very large.  It may be 75 percent increase in the

10:02:38 16   current staffing, but it could be a hundred percent or

10:02:42 17   125 percent because they need hundreds of deputies.

10:02:46 18        I have not done a staffing analysis, and I can't give

10:02:49 19   you a precise figure.

10:02:51 20   Q.   To turn to the second factor you mentioned,

10:02:55 21   classification, can you first explain what is a classification

10:02:59 22   system?

10:02:59 23        THE COURT:  One question for you.  If you haven't done

10:03:01 24   a staffing analysis, how do you know that the additional

10:03:05 25   staffing needed is somewhere between 75 percent and

10:03:07 1    125 percent?

10:03:09 2         THE WITNESS:  I looked at master rosters and actual

10:03:15 3    schedules to try to determine how many staff were there -- just

10:03:20 4    roughly how many staff would it take just -- not to fill all

10:03:24 5    positions, but just to put a deputy every shift in every tier,

10:03:28 6    and that was my very rough estimate.

10:03:31 7         THE COURT:  Just one other question which touches on

10:03:33 8    all of this.  I read that portion of your report having to do

10:03:37 9    with limitations.  You've documented the fact that some

10:03:40 10   documents that were requested were not produced and it being

10:03:45 11   difficult to evaluate the department's practices with regard to

10:03:48 12   the PREA.

10:03:50 13           State for the record what PREA is.

10:03:53 14        THE WITNESS:  That's the federal prison -- I'm sorry,

10:03:57 15   Prison Rape Elimination Act, PREA.

10:04:00 16        THE COURT:  I think you indicated there are other clear

10:04:03 17   examples of similar limitations with respect to disciplinary

10:04:07 18   records; is that right?

10:04:08 19        THE WITNESS:  Yes, Your Honor.

10:04:08 20        THE COURT:  So my question is, with respect to these

10:04:12 21   limitations that have been imposed on you, does that make it

10:04:19 22   difficult for you to testify with respect to what needs to be

10:04:22 23   done overall?

10:04:25 24        THE WITNESS:  No, Your Honor.  I think that there are

10:04:28 25   opinions that I might have reached that I couldn't, where I

10:04:31 1    could not draw conclusions about some areas.

10:04:35 2           The inmate discipline that you mentioned is an

10:04:39 3    excellent example; but, even without the records, for example,

10:04:43 4    I know that the inmate disciplinary histories are not kept by

10:04:49 5    inmate and can't be recalled by inmate.  I'm very aware of the

10:04:52 6    limitations and implications of that.

10:04:55 7           So I might have more extensive information and

10:05:00 8    more detailed opinions, but I just worked with what I had.

10:05:05 9           THE COURT:  Thank you.

10:05:08 10          THE WITNESS:  Yes, sir.

10:05:09 11                        EXAMINATION

10:05:09 12   BY MS. SCHWARTZMANN:

10:05:11 13   Q.   Dr. Schwartz, to ask a clarifying question about that,

10:05:15 14   what did you do to arrive at your opinions in this case?

10:05:18 15   A.   I reviewed a very large number of documents.  The case

10:05:22 16   record is huge.

10:05:24 17          I looked at a small number of videotapes.  I traveled

10:05:31 18   to New Orleans the third week of December of last year, 2012,

10:05:35 19   and spent that week onsite touring the jail facilities in some

10:05:41 20   detail.

10:05:42 21          While I was touring, I also, during the week,

10:05:46 22   arranged interviews, one-on-one interviews that were scheduled.

10:05:50 23   I ended up interviewing 13 inmates individually.  I also talked

10:05:57 24   with inmates informally, one on one or in small groups.

10:06:01 25          As I toured facilities, I similarly talked informally

10:06:04  1    with deputies and supervisors.  As I went through the

10:06:09  2    facilities, I met with key managers and administrators.

10:06:14  3         When I finished my week, I had one person I hadn't

10:06:18  4    been able to connect with, who I interviewed by phone.  Another

10:06:22  5    manager I talked to by phone because I had additional

10:06:26  6    questions.

10:06:26  7         So I based my opinions on all of that review.

10:06:32  8    Q.   Okay.  Thank you.

10:06:34  9         To turn back to the classification system, can you --

10:06:40 10    what is the purpose of a classification system?

10:06:43 11    A.   It's to distinguish types of inmates and groups of inmates

10:06:49 12    primarily so that they can be housed in a way where they will

10:06:54 13    fair best and be safest.

10:06:56 14         So it is intended to sort out high security inmates

10:07:01 15    from low security, for example, so that low security inmates

10:07:07 16    may be in a large dorm and need less supervision.

10:07:11 17         An inmate who turns out to have a frequent escape

10:07:15 18    history, you would not want in a large dorm that is low

10:07:19 19    security or low custody.  That person should be in a maximum

10:07:22 20    security kind of place.

10:07:28 21         You're also looking for special populations that need

10:07:32 22    separate or special housing.  Those would be from special needs

10:07:35 23    inmates, elderly and infirm inmates, inmates that are actively

10:07:40 24    suicidal or have a suicide history, inmates with other mental

10:07:44 25    health histories, inmates who need protective custody.

10:07:48  1          Now, because of PREA, Prison Rape Elimination Act,

10:07:53  2   every jail and prison is mandated to screen inmates for

10:07:57  3   likelihood of being a victim and likelihood of being a

10:08:00  4   predator, so that those inmates can be kept apart as well as

10:08:04  5   possible.

10:08:04  6   Q.   What is the basis for your opinion that you stated earlier

10:08:08  7   that the classification system is contributing to the violence

10:08:13  8   at OPP?

10:08:13  9   A.   The most surprising finding that I base that on, and I was

10:08:17 10   very surprised, was a snapshot of, in December -- I believe

10:08:23 11   December 17, I'm not sure of the date -- I reviewed a snapshot

10:08:28 12   of all the inmates who were in the jail on that date and what

10:08:33 13   their classifications were.

10:08:36 14          What I found was that if you exclude the inmates who

10:08:40 15   are in booking, who haven't yet been classified, there were a

10:08:43 16   remaining 2400 and some inmates in the jail, and over a third,

10:08:51 17   35 percent of those inmates, had not been classified.

10:08:55 18          Those inmates were scattered across all of the

10:08:59 19   facilities and in just about all or all of the tiers.  So that

10:09:05 20   when you looked at a particular tier, it might be five or it

10:09:11 21   might be 15 inmates who were there had not been classified.

10:09:14 22          Well, you don't know if that -- those inmates are

10:09:17 23   extremely aggressive, with long violent histories and high

10:09:22 24   likelihood to be predators, or whether they are inmates who are

10:09:27 25   weak or previous victims, somebody who might as well -- may be

10:09:32 1    developmentally disabled mates who are often victimized,

10:09:37 2    mental health inmates who are more frequently victimized.

10:09:41 3          You might have those two groups mixed together; and,

10:09:46 4    in fact, looking at other data, you did.

10:09:47 5          The other major factor that was very surprising is

10:09:54 6    that an essential big part of the classification system is

10:09:58 7    reclassifying.  I may not know you when you're admitted to the

10:10:01 8    jail; but, once you've been a victim once or twice, you're a

10:10:05 9    known victim.  You should be reclassified and housed somewhere

10:10:09 10   where you won't be with aggressive or predatory inmates.

10:10:13 11         There is no reclassification at OPP, so inmates who

10:10:16 12   have -- who are now known predators because of past incidents

10:10:19 13   aren't labeled as predators, as known predators.

10:10:23 14         Known victims, on the day of the snapshot I reviewed,

10:10:29 15   of the 2400 and some inmates at OPP, exactly one inmate was

10:10:36 16   classed as a known victim.

10:10:38 17         There are days when they have lots more than that

10:10:40 18   known victims on one day.  There were four inmates classified

10:10:46 19   as predators, known predators.  That's -- if it wasn't so

10:10:50 20   serious, it would be sort of humorous, I guess.  It's not.

10:10:55 21         THE COURT:  When you state that over a third of the

10:10:57 22   inmates are not classified on that particular date, what is

10:11:01 23   that based on?  Is that based on absence of records or

10:11:04 24   something else?

10:11:04 25         THE WITNESS:  It was based on a classification summary

10:11:12  1    that listed the number of inmates on each tier.  Then, within

10:11:17  2    each tier, it also gave the classification information for that

10:11:21  3    inmate.

10:11:21  4            It would say whether that inmate was low, medium

10:11:24  5    or high security, which are the three labels that are used

10:11:28  6    here.

10:11:28  7            It would also say whether it was a known victim,

10:11:32  8    a potential victim, or not a potential victim; known predator,

10:11:36  9    not a known predator, or a potential predator.  So there was

10:11:41 10    information for each inmate.

10:11:43 11            When you looked at the number of inmates who had

10:11:46 12    no classification --

10:11:49 13            THE COURT:  Go ahead, take your time.

10:11:52 14            THE WITNESS:  Thank you.

10:11:57 15            When you looked at the number of inmates where

10:11:59 16    there were no classification information entries, that totaled

10:12:04 17    35 percent of the total.

10:12:07 18            Then you could see where those inmates with no

10:12:11 19    classification information were distributed.  They were

10:12:16 20    throughout OPP, throughout the facilities, throughout the

10:12:19 21    tiers.

10:12:19 22            THE COURT:  So with respect to those 35 percent of the

10:12:24 23    inmates, either the questions weren't asked, or it was not

10:12:26 24    recorded?

10:12:27 25            THE WITNESS:  That would be my -- my conclusion,

10:12:30  1   Your Honor, yes.

10:12:31  2          THE COURT:  All right.

10:12:31  3                              EXAMINATION

10:12:31  4   BY MS. SCHWARTZMANN:

10:12:33  5   Q.   Dr. Schwartz, we're going to pull up Exhibit 380 on the

10:12:36  6   screen in front of you.  Is this the document that you're

10:12:39  7   referring to?  It's probably hard to see.

10:12:46  8   A.   Yes, it does appear to be.  I'm looking at part of it, but

10:12:51  9   that does appear to be the document.

10:13:05 10          I was just handed the document, and this is it.  It

10:13:08 11   has inmate numbers and inmate names and then the classification

10:13:14 12   information.

10:13:15 13          THE COURT:  That's document what number?

10:13:17 14          MS. SCHWARTZMANN:  380, Your Honor.

10:13:26 15          THE COURT:  Can you make the type any wider on that

10:13:30 16   screen?  If you can't, you can't.

10:13:37 17          All right.  Those of us over 40 will just suffer

10:13:41 18   through it.  So let's go ahead and continue.

10:13:59 19          MS. SCHWARTZMANN:  I just wanted to confirm,

10:14:00 20   Your Honor, that that was the document on which he relied.

10:14:00 21                              EXAMINATION

10:14:00 22    BY MS. SCHWARTZMANN:

10:14:04 23   Q.   Dr. Schwartz, did you also form an opinion about the

10:14:11 24   availability of weapons in OPP?

10:14:13 25   A.   I did.

10:14:13 1    Q.    What was that opinion?

10:14:16 2    A.    They are widely available, and the efforts to interdict

10:14:23 3    weapons coming in that are being made in OPP are largely

10:14:29 4    unsuccessful.

10:14:29 5            I looked at --

10:14:30 6            THE COURT:  Largely what?  Excuse me.

10:14:33 7            THE WITNESS:  I'm sorry.  Largely unsuccessful.

10:14:35 8            I looked at records of searches that listed what

10:14:38 9    was found.  I remember one that was -- the tier was B-4.  The

10:14:48 10   search, they searched both sides, and on one side they found

10:14:52 11   five shanks, three pieces of a fan blade that were in

10:14:58 12   the process of being sharpened into weapons.

10:15:01 13           The other side was -- I've lost this now -- it

10:15:05 14   was either three or seven shanks.  A cigarette lighter was on

10:15:10 15   each side.

10:15:10 16           The contraband weapons -- well, all weapons are

10:15:16 17   contraband if they are in inmate hands, obviously -- appear to

10:15:22 18   be widespread and easily available to inmates.

10:15:24 19           There were also references to the easy

10:15:26 20   availability of weapons within many of the investigations that

10:15:31 21   I reviewed, some of the inmate declarations.  That was also a

10:15:36 22   topic that came up frequently when I sat down and interviewed

10:15:40 23   individual inmates.

10:15:40 24                          EXAMINATION

10:15:40 25      BY MS. SCHWARTZMANN:

Q.   We've talked broadly about the contributors to the levels
of violence in there, and I would like to focus on some of the
systems in OPP that are responsible for responding to violence
in the jail.

          The first system is staff use of force.  Can you tell
the Court what are the primary elements of a use of force
system in a correctional agency?

A.   There are four.  They would be use of force policies, use
of force training, use of force reporting, and then reviews
and/or investigations of use of force.

Q.   So turning first to OPP's use of force policy, do you have
an opinion about that policy?

A.   I do.

Q.   What is your opinion?

A.   The policy is rather recently revamped.  It was issued in
January of 2012.  There are some important improvements from
prior use of force policy; but, overall, the policy is
ineffective.

          The major reason it's ineffective does not have to do
with the quality of the policy.  The staff are not familiar
with the policy.  They have not been trained to the new policy.
They don't follow the new policy, of course, because they don't
know it, and supervisors and managers don't hold them
accountable for the new policy.

          So the policy is better than it used to be.  It's

10:17:11 1    still deficient, but that's, frankly, somewhat irrelevant.

10:17:16 2    Q.    What is the purpose of a use of force policy as it relates

10:17:22 3    to inmate safety?

10:17:23 4    A.    It's critical for inmate safety because, without a policy

10:17:28 5    that is used and enforced and adhered to, staff in a situation

10:17:35 6    may think they need to use force when clearly they should not.

10:17:39 7    They may use too much force and seriously injure.    In some

10:17:45 8    cases, inmates have been killed in use of force situations; not

10:17:49 9    in this jail, but in the country.

10:17:50 10            So inmates can fair very badly and be badly injured

10:17:56 11    in situations where staff should have used less force or staff

10:18:00 12    should have used no force at all.

10:18:02 13            It's crucial that a use of force policy tell staff --

10:18:07 14    at its heart, it should say, this is what's permissible, and

10:18:13 15    this is what is not permissible in these situations, and then

10:18:16 16    something about how you do it.

10:18:17 17    Q.    Okay.  But even with the revisions to OPP's use of force

10:18:22 18    policy, are there still problems with the policy as written?

10:18:25 19    A.    Yes.  The new policy does ask every staff member using

10:18:31 20    force to write an independent report, which is proper; but, it

10:18:35 21    doesn't ask every staff member witnessing the use of force to

10:18:40 22    write an independent report, which it should.

10:18:43 23            It does distinguish between preplanned and reactive

10:18:48 24    use of force situations.  That's a strong improvement.  But it

10:18:51 25    doesn't require, for instance, videotaping of preplanned

10:18:57  1    situations, or a supervisor on scene in preplanned situations,

10:19:01  2    or a supervisor or manager authorizing the use of force

10:19:06  3    preplanned, or medical either on scene or on standby for a

10:19:10  4    preplanned use of force.  Those are the major points of making

10:19:14  5    the distinction.

10:19:16  6            There are a number of areas that are important that

10:19:19  7    aren't touched on by the use of force policy.  I remember

10:19:25  8    positional asphyxia is not talked about.

10:19:28  9            So there are a number of aspects that the key issues

10:19:34 10    also go to the reporting of use of force, which I've mentioned,

10:19:39 11    but to the review and -- reviews and investigations.

10:19:43 12            So use of force situations at OPP, in spite of the

10:19:49 13    policy, continue to appear to be underreported, that is, use of

10:19:54 14    force happenings are not reported or are reported wrongly with

10:19:59 15    no consequence.

10:20:00 16    Q.    Okay.  I'd like to look at two examples of reviews of

10:20:05 17    staff use of force which you just mentioned.

10:20:08 18            First, we're going to look at Exhibit 275, page 50 of

10:20:12 19    that.  Mr. Donnelly will bring you a paper copy.

10:20:29 20    A.    Thank you.

10:20:29 21    Q.    Dr. Schwartz, are you familiar with that document?

10:20:46 22    A.    Yes, I have reviewed this.

10:20:47 23    Q.    What is it?

10:20:53 24    A.    I'm trying to find the pages I'm familiar with, but --

10:20:58 25    Q.    Oh, I'm sorry.

10:20:58  1    A.    That's all right.

10:20:59  2          This is a -- it's the medical records for an inmate,

10:21:05  3    and it also has the SOD, or Special Operations Division,

10:21:12  4    investigation of the use of force.  That's what it is.

10:21:17  5    Q.    The SOD investigation should have a yellow tab on it for

10:21:21  6    you.

10:21:21  7    A.    Yes, it does.

10:21:23  8    Q.    You've got that.

10:21:24  9          Can you briefly summarize for the Court what happened

10:21:28 10    in this incident that's documented in the SOD report?

10:21:30 11    A.    Yes.  There was a report of an inmate injury from another

10:21:38 12    inmate, a violence incident, a fight.

10:21:42 13          A lieutenant from SOD and four deputies, I think,

10:21:49 14    called detectives, but SOD members, went over to that unit.

10:21:53 15    One of the deputies got into a verbal altercation or a

10:21:59 16    disagreement with one inmate in that unit.  It was a dorm.

10:22:04 17          The deputy reports that the inmate then tried to

10:22:13 18    punch him.  The deputy says that he avoided the punch and then

10:22:19 19    took the inmate to the floor, and that the inmate fell on the

10:22:23 20    floor and got an injury to his face falling on the floor.

10:22:28 21    Q.    Okay.  So this is the SOD investigation of that incident.

10:22:34 22          Who was the officer involved in taking down the

10:22:38 23    inmate?

10:22:40 24    A.    Detective Jonathan Griffin, Sr.

10:22:43 25    Q.    Can you tell us who authored the SOD investigation into

10:22:47 1  that use of force?

10:22:51 2  A.    Detective Jonathan Griffin, Sr.

10:22:55 3  Q.    Now, turn two pages to the Use of Force form associated

10:22:59 4  with this file.

10:23:00 5       Did the file find that the use of force was

10:23:08 6  justified?

10:23:09 7  A.    I'm still looking for that --

10:23:10 8  Q.    Oh, I'm sorry.  It should have just been two pages.

10:23:14 9  A.    -- page here.  Sorry.  Thank you.

10:23:28 10       I have it now.

10:23:29 11  Q.    Did the form find that the use of force was justified?

10:23:36 12  A.    Yes, it did.

10:23:38 13  Q.    Who signed that finding?

10:23:43 14  A.    That's also by the -- by Detective Griffin.

10:23:53 15  Q.    Did you review the victim in the case, Mr. Neely -- or the

10:23:59 16  inmate in this case, his medical records from LSU?

10:24:02 17  A.    Yes, I did.

10:24:03 18  Q.    What did those records indicate that he presented at the

10:24:07 19  hospital for?

10:24:10 20  A.    The doctor's -- the doctor's narrative says that he was

10:24:15 21  punched in the face and ended up with a laceration near his

10:24:22 22  mouth or at his mouth.

10:24:23 23  Q.    Now we're going to turn to page 29 of that same exhibit.

10:24:40 24       Was there also an IAD investigation into this matter?

10:24:42 25  A.    Yes.

10:24:43 1  Q.   Can you explain for the Court the difference between IAD

10:24:49 2  and SOD.  We just looked at the SOD investigation.

10:24:51 3  A.   IAD is Internal Affairs Division.  According to policy,

10:24:57 4  IAD should conduct -- is charged with conducting use of force

10:25:01 5  investigations, as of the policy last January.  They don't,

10:25:04 6  however.  All use of force investigations continue to be

10:25:09 7  handled by SOD.  The policy is just ignored.

10:25:13 8  Q.   Is this, what's on the screen now or in front of you, the

10:25:20 9  IAD investigation in this case?

10:25:22 10 A.   It is.  There is a paragraph, and that's the extent of it.

10:25:30 11 It closes the -- it says, no witnesses, and the investigation

10:25:36 12 is closed, and the charges are not sustained.

10:25:40 13       It's the result -- the reason IAD even got involved

10:25:46 14 was, evidently, a relative of the inmate from outside the jail

10:25:50 15 made a complaint.  That was received by IAD, and they looked

10:25:54 16 into it and within a few days closed it saying, there is

10:26:00 17 nothing there, there are no witnesses.

10:26:04 18       The reality is that that detective went into that

10:26:07 19 dorm with two other detectives and a lieutenant.  There was no

10:26:10 20 attempt to even interview them or interview Detective Griffin

10:26:18 21 himself.  They just said there is nothing there and closed it.

10:26:21 22 There is no actual indication that any real investigation was

10:26:25 23 ever considered.

10:26:26 24 Q.   If we can go back to the Use of Force form which was at

10:26:38 25 page 52 of the exhibit.

10:26:38 1    A.    Yes.

10:26:40 2    Q.    Do you have that up?

10:26:40 3    A.    I do not.

10:26:42 4          Yes, I have it.  Thank you.

10:26:44 5    Q.    What is your opinion of this form?

10:26:55 6    A.    It is not an appropriate use of force report form.  It

10:27:01 7    doesn't provide enough detail about what was done in reaction

10:27:06 8    to what situation, what specific kinds of force were used.

10:27:10 9          Again, it's very biased.  There is one portion of the

10:27:19 10   form that basically says choose among the following and check

10:27:22 11   off the reason you're finding the staff were justified.

10:27:28 12   Q.    Is that section up on the screen, the section you're

10:27:35 13   talking about?  No.

10:27:37 14   A.    No.  There is a section on the back that says, reason

10:27:42 15   force was used.  It's on the second page of the form, or the

10:27:45 16   back of the form.

10:27:50 17         THE COURT:  What's the problem with SOD making a report

10:27:52 18   about what happened, as long as there is an independent

10:27:56 19   evaluation of what happened by IAD?

10:27:58 20         THE WITNESS:  Well, if IAD were conducting -- if there

10:28:01 21   was a further review by IAD, that would not be as problematic;

10:28:06 22   but, SOD frequently responds to issues that don't come under

10:28:13 23   control immediately.

10:28:14 24         If you need help, if you need physical force help

10:28:17 25   and you need more staff, partly because of the short staffing

10:28:20  1    and partly because of tradition, it is SOD that comes more

10:28:26  2    heavily equipped and will put down a large fight that doesn't

10:28:30  3    stop or something like that.

10:28:31  4              So some of the complaints about use of force are

10:28:35  5    against SOD.  SOD is a -- within OPP, that's a fairly tight

10:28:41  6    knit and seen as something of an elite unit.  They get lots of

10:28:45  7    training.  They get lots of things other staff don't get.

10:28:49  8              It doesn't make sense for them to investigate

10:28:51  9    their own folks.  It's a built-in conflict of interest of

10:28:55 10    sorts.

10:28:55 11         THE COURT:  But you have no problem with the SOD making

10:28:58 12    a report about what happened, you just think there should be a

10:29:01 13    further tier of inquiry; is that right?

10:29:03 14         THE WITNESS:  Exactly, sir.

10:29:04 15         THE COURT:  I mean, it's no different than a police

10:29:05 16    officer on the streets of New Orleans making a report as to

10:29:07 17    what happened, and Internal Affairs following up later on to

10:29:10 18    see if something is justified.

10:29:11 19         THE WITNESS:  Absolutely.  If they are involved, they

10:29:13 20    should make a report, as you're saying.  It's who investigates

10:29:16 21    that, that is wrong.

10:29:18 22              Policy says IAD should.  That makes sense.  The

10:29:22 23    policy is ignored, and SOD does.

10:29:25 24         THE COURT:  But if the SOD officer checks off

10:29:28 25    self-defense because that's how he or she perceives it, what is

10:29:33  1    the problem with that, as long as there is an independent

10:29:37  2    inquiry?

10:29:38  3          THE WITNESS:  There wouldn't be except you'd like the

10:29:40  4    Use of Force form to not have preprinted categories and a

10:29:44  5    check-off system.  You really want the officer to write a

10:29:47  6    report.

10:29:48  7                I've never seen a police agency use this kind --

10:29:50  8    I've never seen a correctional agency use something like this

10:29:52  9    before.  This is new to me.

10:29:55 10                What would be much more helpful for review

10:29:59 11    purposes is write what happened, write why -- provide some

10:30:05 12    detail about why you needed to use force, provide some detail

10:30:10 13    about how you attempted to do something other than use force,

10:30:14 14    and then provide some detail about what force you actually

10:30:18 15    used.

10:30:18 16          THE COURT:  So in your opinion it's just too

10:30:20 17    conclusory, the way the form is written?

10:30:23 18          THE WITNESS:  Yes, Your Honor.  You said it much better

10:30:25 19    than I did.

10:30:26 20          THE COURT:  All right.  Let's go.

10:30:29 21                          EXAMINATION

10:30:29 22    BY MS. SCHWARTZMANN:

10:30:29 23    Q.    Dr. Schwartz, did you review the proposed Consent Decree

10:30:32 24    and the provisions regarding use of force?

10:30:35 25    A.    I did.

10:30:35 1    Q.    Does the proposed Consent Decree provide that a failure to

10:30:43 2    report staff use of force is grounds for discipline or possible

10:30:49 3    termination?

10:30:49 4    A.    It does require that.

10:30:50 5    Q.    Does it require that anybody who observes a use of force

10:30:55 6    must report it?

10:30:55 7    A.    Yes.

10:30:55 8    Q.    Are those and other provisions in the Consent Decree

10:30:59 9    regarding use of force, in your opinion, targeted to OPP's

10:31:04 10   particular deficiencies?

10:31:05 11   A.    Yes, they are.

10:31:06 12   Q.    Do you have an opinion as to whether those provisions are

10:31:10 13   minimally necessary to bring OPP into compliance with basic

10:31:13 14   correctional standards?

10:31:14 15        MR. ROSENBERG:  Your Honor, the City objects to that

10:31:16 16   question.  That's an issue for the Court to decide.  That's not

10:31:18 17   for Dr. Schwartz to decide.

10:31:20 18             He's now opining on the legal issues as to the

10:31:25 19   application of the Consent Decree in the context of the prison

10:31:28 20   litigation format.

10:31:29 21        THE COURT:  Overruled.  Go ahead.

10:31:30 22        MS. SCHWARTZMANN:  Thank you, Your Honor.

10:31:30 23                          EXAMINATION

10:31:32 24   BY MS. SCHWARTZMANN:

10:31:32 25   Q.    Dr. Schwartz, you can answer if you remember the question.

10:31:35  1    A.    I do remember the question.

10:31:37  2          Yes, I think the provisions in the proposed

10:31:40  3    Consent Decree regarding use of force are minimally necessary

10:31:44  4    to correct the problems with use of force at OPP.

10:31:49  5    Q.    Okay.  Separately from use of force, I would like us to

10:31:51  6    now turn to investigations into staff misconduct more broadly

10:31:56  7    at OPP.

10:31:57  8          Did you examine staff discipline issues at the jail?

10:32:01  9    A.    I did examine them in detail.  I also -- they came up as I

10:32:06 10    talked with inmates, but I specifically took a group of

10:32:13 11    71 investigations into staff misconduct and reviewed every one

10:32:18 12    of those.

10:32:18 13    Q.    Of the 71 investigations into staff misconduct, how many

10:32:22 14    dealt with staff use of force?

10:32:24 15    A.    Two.

10:32:25 16    Q.    Can you provide the Court with examples of what sorts of

10:32:29 17    investigations comprised the remaining 69 files that you

10:32:32 18    reviewed?

10:32:33 19    A.    Two other investigations concerned staff dealing with

10:32:40 20    inmates and charges that there was misconduct.  There was one

10:32:44 21    that was questionable as to whether it was mainly a staff

10:32:49 22    dealing with inmate issue.

10:32:50 23          The rest, the biggest group was investigations

10:32:56 24    centering on personnel issues such as tardiness or failure to

10:33:00 25    report to work when ordered.  The second biggest group of the

10:33:05 1    71 were staff/staff conflicts.

10:33:11 2    Q.    In your review of those files, were all staff investigated

10:33:16 3    equally?

10:33:16 4    A.    No.    There were no investigations of any regular staff

10:33:23 5    above the level of sergeant.    They were all investigations of

10:33:29 6    deputies or sergeants.    One reserve lieutenant, but that's not

10:33:33 7    a regular employee.

10:33:36 8    Q.    Why -- I'm sorry.

10:33:37 9    A.    There were two investigations of line level staff

10:33:44 10   deputies, each of whom -- they were completely different

10:33:47 11   issues.    They weren't related; but, in each case, the deputy in

10:33:52 12   the course of the investigation made very serious allegations

10:33:55 13   about improper performance and behavior on the part of a major,

10:34:00 14   the same major that both of them singled out.

10:34:04 15           There was never any follow-up or investigation that

10:34:07 16   were in the records.

10:34:11 17   Q.    Why is the failure to investigate supervisory officials

10:34:16 18   significant?

10:34:16 19   A.    The concept -- I am familiar with it most often being

10:34:21 20   referred to as a concept of supervisory accountability.    If a

10:34:28 21   deputy has done something wrong and it's extraordinary, it's an

10:34:30 22   anomaly, that's one thing; but, where there has been obviously

10:34:34 23   a practice of failing to do what policy requires, you may look

10:34:37 24   to discipline the deputy who is doing that, but you should hold

10:34:45 25   the sergeant, the first line supervisor of that person, to

10:34:48 1 higher standards, and perhaps the lieutenant and on up the
10:34:50 2 line.
10:34:50 3          If you don't hold higher level people accountable,
10:34:54 4 one, it produces serious morale problems; and, two, the people
10:35:01 5 who are making the decisions have no accountability, and when
10:35:06 6 something really bad happens, there is just a rush to judgment
10:35:09 7 to find some deputy that it lands on.
10:35:12 8 Q.    Okay.  Are there examples of inappropriately low
10:35:17 9 disciplinary measures being assigned to staff for misconduct?
10:35:21 10 A.    Yes, I did find those.
10:35:23 11 Q.    I would like to pull up Exhibit 281, page 9 of that.
10:35:47 12 A.    Yes, I'm familiar with this investigation.
10:35:49 13 Q.    Okay.  Can you briefly describe for the Court -- I'm going
10:35:56 14 to direct your attention to the third paragraph, that last
10:35:59 15 sentence.  Can you describe for the Court what happened in this
10:36:02 16 incident?
10:36:02 17 A.    Yes.  A deputy was in a verbal confrontation with an
10:36:10 18 inmate.  The deputy then took the inmate out of the area.  They
10:36:13 19 were in an office.
10:36:14 20          The deputy took the inmate to a stairwell and said,
10:36:19 21 okay, let's fight.  The inmate refused to fight, and the deputy
10:36:25 22 put his hands behind his back and said, go ahead, take the
10:36:29 23 first swing, and continued to try to provoke the inmate into
10:36:32 24 fighting with him.
10:36:34 25          That deputy was then -- that much was confirmed.  The

10:36:40  1    deputy acknowledged that, and the deputy was given a 10-day

10:36:45  2    suspension.  In my opinion, that should have been a terminating

10:36:48  3    offense.

10:36:48  4    Q.    Okay.  What is the purpose of staff misconduct

10:36:57  5    investigation as it relates to inmate safety?

10:37:01  6    A.    It's crucial because if staff are not disciplined when

10:37:08  7    there is serious misconduct, it's a message to other staff that

10:37:11  8    those kinds of things will be overlooked, so you get more of it

10:37:15  9    and, for example, more inappropriate use of force or excessive

10:37:20 10    force situations.

10:37:21 11          It also is a message to inmates that there is no

10:37:24 12    sense in reporting things because it will be whitewashed.

10:37:27 13    Q.    On the point of inadequate investigations, I want to walk

10:37:32 14    through one more example.  That's Exhibit 274.

10:37:35 15    A.    Yes, I am familiar with this investigation.

10:38:08 16    Q.    The facts here are lengthy, but can you briefly summarize

10:38:13 17    for the Court what happened?

10:38:14 18    A.    It's a complex situation; but, basically, an inmate got

10:38:19 19    into a verbal confrontation with a deputy in one of the tents.

10:38:22 20    The deputy, along with some other staff, decided to -- as a

10:38:28 21    retaliatory move, to put that inmate into Tent 6.

10:38:34 22          The inmate objected and said they had enemies in

10:38:37 23    Tent 6 and would be assaulted.  There were no beds in Tent 6

10:38:42 24    that were open.  They took -- there were beds open in other

10:38:46 25    tents.

10:38:46 1          They took the inmate to Tent 6, anyway.  As soon as

10:38:50 2     the inmate was put into Tent 6, within a matter of seconds, the

10:38:57 3     inmate was jumped and assaulted by a number of inmates.

10:39:00 4     Fortunately, there was no permanent injury.

10:39:03 5          The inmate came then out of Tent 6 very agitated and

10:39:08 6     absolutely furious, wildly angry, holding a broomstick and

10:39:14 7     yelling, "I'm going to kill everyone."

10:39:16 8          Deputies subdued the inmate and put him in handcuffs.

10:39:22 9     One of the deputies then punched the inmate several times, and

10:39:28 10    acknowledged that, after he was handcuffed.  That same deputy

10:39:35 11    asked another deputy to write a report for him.

10:39:39 12         Another deputy wrote the report, put this deputy's

10:39:42 13    name on it and submitted it.

10:39:45 14         There were also allegations that this same deputy --

10:39:50 15    third allegation -- had worked with the tier rep from Tent 6 to

10:39:56 16    set up the hit, had given something of value or promised

10:40:01 17    something to the tier rep if he would set up the hit on this

10:40:06 18    inmate when he went into Tent 6.

10:40:10 19    Q.   What was the name of that deputy that's alleged to have

10:40:11 20    punch the restrained inmate and set up the hit?

10:40:11 21    A.   Deputy Mallory.  His first name is Ajay, A-J-A-Y.

10:40:15 22    Q.   In your review of documents in this case, did you come

10:40:19 23    across Deputy Mallory's name elsewhere?

10:40:22 24    A.   Yes.  He was involved in a previous incident involving use

10:40:31 25    of force.  I also saw that subsequent to this incident, he was

10:40:39  1  actually arrested in a situation quite parallel to this

10:40:43  2  situation.

10:40:44  3          The situation he was arrested for was allegedly

10:40:49  4  punching an inmate after the inmate was restrained.  He, in

10:40:54  5  that situation, is alleged to have threatened that he would put

10:40:57  6  the inmate in a tent and have him assaulted in one of the

10:41:02  7  tents.

10:41:02  8  Q.    Similar facts as the previous incident?

10:41:05  9  A.    Yes.

10:41:06 10  Q.    In the first incident where he punched a restrained inmate

10:41:10 11  in the face, was he terminated for that?

10:41:12 12  A.    No.  The investigation was absolutely terrible, and none

10:41:18 13  of the allegations were sustained.  The investigator did not --

10:41:24 14  carefully did not ask any questions of any of the witnesses,

10:41:28 15  including Deputy Mallory, about whether or not he punched the

10:41:34 16  inmate after restrained, whether he asked somebody to write a

10:41:37 17  report for him, or whether he was involved in organizing the

10:41:41 18  assault.  So he received no discipline whatsoever for the

10:41:46 19  incident.

10:41:46 20  Q.    Does the Consent Decree have specific provisions with

10:41:52 21  regard to staff investigations?

10:41:54 22          THE COURT:  Let me ask, about how much longer do you

10:41:56 23  have with this witness?

10:41:58 24          MS. SCHWARTZMANN:  We're probably 60 percent through.

10:42:01 25          THE COURT:  All right.  We're going to break at 11:45,

10:42:05 1   okay.  But right now, I think we have been going at this for a

10:42:10 2   while.  We're going to take a 10-minute recess, and we'll start

10:42:13 3   back in 10 minutes.

10:42:24 4            THE DEPUTY CLERK:  All rise.

10:42:24 5            (WHEREUPON, at 10:42 a.m., the Court took a recess.)

10:57:46 6            THE DEPUTY CLERK:  All rise.

10:57:49 7            THE COURT:  Thank you.  Have a seat.

10:57:52 8                We're back in session.  We're going to work until

10:57:57 9   11:45, and then we'll come back at 12:45.

10:57:57 10                           EXAMINATION

10:58:02 11       BY MS. SCHWARTZMANN:

10:58:02 12   Q.    Dr. Schwartz, does the proposed Consent Decree have

10:58:11 13   specific provisions with regard to staff investigations?

10:58:16 14   A.    Yes, it does.

10:58:16 15   Q.    Can you describe those provisions for the Court?

10:58:21 16   A.    It requires professional training for investigators.  It

10:58:28 17   requires comprehensive investigations.  Importantly, it

10:58:31 18   requires keeping records of investigations in a manner that

10:58:37 19   allows analysis of the data by pattern.

10:58:42 20                It also requires that the data be -- that it be

10:58:51 21   possible to analyze the data by employee, because without

10:58:56 22   that -- the proposed Consent Decree requires an early warning

10:59:04 23   system, a system where you can intervene when an employee has

10:59:09 24   been in too many use of force situations or questionable

10:59:12 25   situations, but nothing horrible.

10:59:14  1        The idea is do more training, do some corrective

10:59:19  2   action so that doesn't escalate, both making it safer for

10:59:24  3   inmates and also saving that employee's career, perhaps.  So it

10:59:29  4   requires that the data be available in a form that could be

10:59:32  5   used by an early warning system.

10:59:34  6   Q.    Based upon your review of the documents and your

10:59:38  7   methodology in investigating this case, do you have an opinion

10:59:43  8   as to whether the staff investigation provisions of the

10:59:45  9   proposed Consent Decree are targeted to OPP's particular

10:59:51 10   deficiencies?

10:59:51 11   A.    Yes.  My opinion is that they are targeted to OPP and

10:59:57 12   what's going on there.

10:59:58 13   Q.    Now I would like to talk about the incident reporting

11:00:03 14   system.  What is an incident reporting system?

11:00:05 15   A.    It's the way in which employees in a jail document

11:00:12 16   anything that happens that's out of the ordinary and

11:00:17 17   significant to some degree.

11:00:19 18        So it covers anything from something delayed the

11:00:25 19   lunch meal by 45 minutes, to there was a large fight, to there

11:00:31 20   is no hot water in this unit, to absolutely everything going on

11:00:36 21   in the jail.

11:00:37 22        When something happens that is out of the ordinary

11:00:41 23   and is significant, employees are required to write a report.

11:00:47 24   That then becomes the major communication method to let other

11:00:51 25   staff, and particularly decision makers, review those, respond

11:00:56 1    to them, make decisions about what should be done, and also

11:01:00 2    provides a record for later review, if necessary.

11:01:04 3    Q.    Did you form an opinion about OPP's incident reporting

11:01:11 4    system?

11:01:11 5    A.    Yes.  The system is deficient.

11:01:13 6    Q.    How is it deficient?

11:01:14 7            THE COURT:  What is that, I'm sorry?

11:01:16 8            THE WITNESS:  My opinion is that the system is

11:01:18 9    deficient.

11:01:19 10            THE COURT:  Which system?

11:01:20 11            THE WITNESS:  I'm sorry, the incident reporting system.

11:01:22 12            THE COURT:  Thank you.

11:01:23 13                              EXAMINATION

11:01:23 14    BY MS. SCHWARTZMANN:

11:01:26 15    Q.    How is it deficient?

11:01:30 16    A.    The incidents are frequently not reported.  When they are

11:01:34 17    reported, they are sometimes not sent to the appropriate

11:01:40 18    channels.

11:01:41 19            The reports themselves are substandard and very poor

11:01:46 20    quality reports in many cases.  The reports are seldom

11:01:51 21    screened -- almost never, as far as I can see, screened for

11:01:56 22    staff bad performance or actionable issues by staff.

11:02:04 23            There are a number of problems with the reporting

11:02:05 24    system.

11:02:06 25    Q.    Does the proposed Consent Decree have a provision that

11:02:10 1    requires staff to document all incidents?

11:02:12 2    A.    Yes, it does.

11:02:13 3    Q.    Does it have a provision that requires OPP to screen the

11:02:17 4    incident reports for allegations of staff misconduct?

11:02:20 5    A.    Yes.  It does.

11:02:22 6    Q.    Does it require OPP to maintain a tracking system of

11:02:26 7    incidents?

11:02:26 8    A.    Yes.  That's also included in the proposed decree.

11:02:31 9    Q.    Do you have an opinion as to whether those provisions in

11:02:34 10    the decree and the other incident reporting provisions are

11:02:38 11    necessary to remedy the deficiencies at OPP?

11:02:40 12          MR. ROSENBERG:  Your Honor, again, we object.  That's a

11:02:42 13    decision for the Court, not for Dr. Schwartz.  Nor has he been

11:02:46 14    qualified to express an opinion, Your Honor, when you qualified

11:02:49 15    him as an expert witness.

11:02:51 16          THE COURT:  Do you want to respond to that?

11:02:53 17          MS. SCHWARTZMANN:  Yes, Your Honor.  I'm asking for his

11:02:55 18    opinion as to whether it would bring the jail up to compliance

11:02:57 19    with basic correctional standards, not the Constitutional

11:03:00 20    standards, so I'm not asking for a legal answer.

11:03:02 21          THE COURT:  All right.  The case law is clear that with

11:03:05 22    respect to the appropriate remedy, expert testimony is

11:03:08 23    sufficient.

11:03:08 24          The objection is overruled.  Go ahead.

11:03:10 25          THE WITNESS:  I do believe that those are all

11:03:16 1    necessary -- that those provisions in the proposed

11:03:22 2    Consent Decree are necessary to remedy what is currently

11:03:25 3    occurring in the jail.

11:03:25 4                         EXAMINATION

11:03:26 5    BY MS. SCHWARTZMANN:

11:03:26 6    Q.    Now, to turn to investigations into prisoner-on-prisoner

11:03:34 7    violence in the jail.

11:03:34 8              Can you describe for the Court OPP's system for

11:03:38 9    investigating incidents of violence?

11:03:40 10   A.    Yes, they are all investigated by SOD.  They are

11:03:47 11   investigated sometimes late.  Many incidents are not

11:03:52 12   investigated.  Incidents are -- individual situations are

11:03:58 13   dropped for inappropriate reasons, so that there is no follow

11:04:01 14   through.

11:04:01 15             The end result -- well, another important thing that

11:04:09 16   occurs at OPP is that the investigations, like investigations

11:04:14 17   of use of force, are entirely within SOD.  There is no other

11:04:19 18   management review.  There is no check and balance.

11:04:22 19   Q.    That description that you just provided, in your

11:04:41 20   experience or opinion, does that comport with basic minimal

11:04:46 21   correctional standards?

11:04:47 22   A.    No, it doesn't.  Those incident reports should be -- I'm

11:04:53 23   sorry, reports of inmate violence or knowledge of inmate

11:04:58 24   violence should be consistently and quickly investigated,

11:05:01 25   because if that's not done you leave perpetrators unnecessarily

11:05:06  1    in the general population, and they simply do it again.  Some

11:05:12  2    other inmate is then assaulted or stabbed or what have you.

11:05:14  3    But it's a basic safety issue.

11:05:18  4         It's also important for staff.  The same inmates who

11:05:21  5    are a danger to other inmates are typically the most dangerous

11:05:25  6    inmates for staff.  It's in everyone's interest that those

11:05:30  7    investigations be thorough and that they end up with an

11:05:34  8    appropriate resolution.

11:05:36  9         In many cases that would mean that the inmate

11:05:39  10   responsible for the inmate violence would be sent to punitive

11:05:45  11   segregation as a sanction for what they've done.  They might

11:05:50  12   then be reclassified and end up in administrative segregation

11:05:54  13   or in a very high security unit, where they wouldn't have

11:05:57  14   access to inmates except for some, perhaps, aggressive inmates,

11:06:04  15   and staff would know when they dealt with them that they are

11:06:07  16   dealing with the most dangerous inmates in the jail.

11:06:09  17   Q.    Okay.  To focus on that specifically, I would like to turn

11:06:13  18   to Exhibit 222.

11:06:14  19   A.    Yes.  I have this, and I've seen it before.

11:07:10  20   Q.    Can you describe to the Court, what is that document?

11:07:14  21   A.    This is a report on the arrest of an inmate, and it is

11:07:20  22   also a summary of the investigation of a violent incident --

11:07:25  23   inmate-on-inmate violent incident.

11:07:28  24   Q.    Briefly, what happened in that inmate-on-inmate violent

11:07:33  25   incident?

11:07:34  1    A.    Inmate Terry Smith was in the cell -- or around the cell

11:07:40  2    of inmate Edwin Lee.  Edwin Lee punched Smith a few times or

11:07:48  3    several times, knocking him to the ground.

11:07:54  4            Inmate Smith, Terrence Smith, fell backwards when he

11:07:58  5    was punched and hit his head, the back of his head, on the

11:08:01  6    floor, cement floor, very hard and was bleeding.

11:08:06  7            When the staff got there, he was on the floor and

11:08:10  8    bleeding from the head.

11:08:11  9    Q.    I'd like to direct your attention to Exhibit 151.  It's on

11:08:31 10    the screen in front of you, if you could look.

11:08:32 11            Is that a photograph of Mr. Smith's injuries?

11:08:35 12    A.    Yes, when he was first found; before he had been moved and

11:08:39 13    when he was first found by staff.

11:08:40 14    Q.    Also, Exhibit 152.

11:08:45 15            Is that also a photograph of Mr. Smith's injuries

11:08:48 16    from the file?

11:08:48 17    A.    Yes, it is.

11:08:49 18    Q.    After reviewing what happened to Mr. Smith, did you review

11:08:55 19    other OPP documents pertaining to Edwin Lee, the man who

11:09:01 20    assaulted Mr. Smith?

11:09:01 21    A.    I did.  I found that there were at least six prior

11:09:04 22    occasions where Mr. Lee had assaulted other inmates or been

11:09:10 23    accused of it.

11:09:11 24            From the description, it sounded like he had been a

11:09:14 25    predatory inmate who was very aggressive and had been in a

11:09:19  1    number of prior assaults, most of which had either not been

11:09:23  2    fully investigated -- there was only an incident report, but no

11:09:28  3    investigation -- or they hadn't done anything with him, it had

11:09:32  4    been dropped part way through -- culminating in this episode

11:09:36  5    where Mr. Smith was permanently -- had permanent brain damage,

11:09:43  6    and my understanding is he's close to brain dead and will never

11:09:51  7    recover.

11:09:52  8    Q.    I would like to next look at Exhibit 348, page 17.

11:10:05  9    A.    Thank you.

11:10:21 10          Yes, I'm familiar with this also.  It is an SOD

11:10:25 11    investigation of a physical altercation that took place in

11:10:35 12    which an inmate was, again, seriously injured.

11:10:40 13    Q.    Can you briefly describe what happened in that incident?

11:10:43 14    A.    Yes.  An inmate was assaulted, I think in the morning, but

11:10:47 15    that same day.

11:10:48 16          An inmate was assaulted.  The staff decided to move

11:10:51 17    him to another living unit.  Two deputies escorted the inmate,

11:10:56 18    who was, by the way, a mental health inmate.  He was escorted

11:10:59 19    back to the unit he had been on in order to get his property

11:11:02 20    and move it.

11:11:04 21          When they escorted him into the unit, he went up to

11:11:08 22    another inmate and said, essentially, I want -- I'm going to

11:11:11 23    take my slippers back.  The inmate, who had been sitting on his

11:11:16 24    bunk, objected to that.

11:11:18 25          Then the inmate who was being moved went to an area

11:11:22  1    where there was -- there were shelves or something like that,
11:11:26  2    and said, I'm going to get my slippers.  The other inmate got
11:11:31  3    up, went and got a crutch, which he had, and used the metal
11:11:38  4    portion of the crutch to beat this inmate over the -- the
11:11:42  5    mental health inmate over the head a number of times, injuring
11:11:46  6    him rather seriously.  That was what took place.
11:11:49  7    Q.   We're going to look at Exhibit 147, which is going to come
11:11:55  8    up on your screen there.
11:11:57  9         Is that a photograph of the injuries in the file that
11:11:59 10    you reviewed?
11:12:00 11    A.   Yes, it is.
11:12:00 12    Q.   Exhibit 148.
11:12:03 13         Is that also a photo of the injuries in this
11:12:08 14    incident?
11:12:08 15    A.   Yes, it is.
11:12:09 16    Q.   Dr. Schwartz, what does this incident in particular
11:12:13 17    indicate to you about security issues at OPP?
11:12:22 18    A.   There are several very obvious issues.  One is was the
11:12:26 19    inmate supposed to have a crutch, and was it necessary that he
11:12:30 20    have a crutch with a metal portion of the crutch that was such
11:12:34 21    an obvious weapon.
11:12:35 22         A perhaps more fundamental question is, knowing it
11:12:41 23    was a mental health inmate, and knowing he had been assaulted
11:12:44 24    on that living unit earlier that day, why were the two deputies
11:12:50 25    who were sent specifically to escort him to get his property

11:12:54 1    not paying attention, either of them, as a verbal confrontation

11:13:03 2    developed, and then one inmate moved, and then the other inmate

11:13:06 3    went and got a crutch and began hitting him over the head and

11:13:09 4    was able to do that repeatedly for a while?

11:13:12 5         What was it those deputies were doing, and why

11:13:15 6    weren't they doing their job?  That's -- like a number of

11:13:18 7    incidents we've talked about, it appears -- we don't have

11:13:23 8    further facts because they never investigated those questions

11:13:26 9    at all; but, on the face of it, it appears that it may be just

11:13:31 10   inexcusable performance by staff.

11:13:34 11        But, obviously, it should be investigated.  It

11:13:40 12   wasn't.

11:13:40 13   Q.    Thank you.

11:13:41 14        Turning to sexual assault, what are the practices at

11:13:53 15   OPP when a prisoner reports a sexual assault?

11:13:59 16   A.    The practices are -- they vary a great deal.  In too many

11:14:04 17   cases, the person reporting the sexual assault, which is almost

11:14:08 18   always the victim -- or the alleged victim, that person is,

11:14:13 19   instead of being taken immediately for medical assessment

11:14:16 20   and/or treatment, that person is put in a holding tank or

11:14:22 21   otherwise segregated.

11:14:23 22        They are sometimes subjected to staff in the area

11:14:28 23   making fun of them, making derisive comments, suggesting it

11:14:33 24   didn't happen, or, in some cases, not one or two, but telling

11:14:37 25   other inmates, oh, he's just being a homosexual, or something

11:14:42  1   like that, but announcing something that would cause further

11:14:46  2   problems.

11:14:47  3          Further, the victims are, with some regularity,

11:14:53  4   subjected to great pressure to admit that it didn't happen or

11:14:57  5   to recant.

11:14:58  6          In some cases, inmates are taken quickly for medical

11:15:03  7   assessment and treatment as is appropriate; but, far too many

11:15:09  8   cases, none of the right things happen.

11:15:14  9   Q.   Did you review sexual assault investigation videotapes in

11:15:21 10   your review of this case file?

11:15:22 11   A.   Yes, I did.

11:15:23 12          I reviewed one quite lengthy videotape of two

11:15:30 13   different staff members.  It should have been an interview, but

11:15:35 14   it wasn't.  It was an interrogation of a victim reporting a

11:15:41 15   sexual assault -- or an alleged sexual assault.

11:15:43 16   Q.   Can we just bring up the still shot of that video for you

11:15:49 17   to confirm that Exhibit 5 is the video that you reviewed and

11:15:52 18   you're referring to.  I don't want to play the video.

11:15:55 19          Is that a possibility?

11:15:56 20          While he's working on that, Dr. Schwartz, can you

11:16:05 21   tell us, what was wrong -- or what in your mind did not meet

11:16:08 22   basic correctional standards about the interview that you're

11:16:11 23   referencing right now?

11:16:12 24   A.   It's -- it is wrong at every level.  It was, I think,

11:16:20 25   more -- yes, that's the -- that's the -- neither of the two

11:16:25  1    staff members are in the picture yet, but -- and they are one

11:16:28  2    at a time.  It's two different sessions.  That is the inmate,

11:16:31  3    and that's the tape I reviewed.

11:16:32  4    Q.    Thank you.  That's Exhibit 5.

11:16:36  5    A.    The whole tenor of the interview or interrogation is this

11:16:44  6    didn't happen, why don't you admit it?  You're going to get in

11:16:48  7    trouble.  You're causing trouble for other people.  Just

11:16:52  8    repeatedly.

11:16:53  9          The inmate is pressured long enough that after -- by

11:16:59 10    the way, there are also threats against the inmate.  The two

11:17:04 11    staff members lie to the inmate.  The inmate said that he

11:17:10 12    was -- that he had been assaulted and that -- by three staff

11:17:15 13    members, and that something was inserted into his rectum.

11:17:22 14          One of the interviewers continues to tell the inmate

11:17:29 15    that the medical tests prove that it didn't happen, nothing

11:17:32 16    like this happened.  Even if somebody had put a finger in your

11:17:35 17    rectum, the medical tests would show that.

11:17:38 18          That's obviously not true.  This inmate listening to

11:17:41 19    that doesn't know that.  It's not a particularly sophisticated

11:17:45 20    inmate, I think.

11:17:48 21          After a few hours, the inmate says, okay, it didn't

11:17:53 22    happen.  At that point, the interviewer has accomplished his

11:17:58 23    goal and is wrapping it up.

11:18:00 24          The inmate then continues to talk on tape and says, I

11:18:05 25    knew I should have -- I should have come forward earlier and

11:18:08  1   gone to the hospital earlier.  It would have showed that.  He

11:18:11  2   continues to say, it happened, I've handled this badly.

11:18:14  3        So although -- and the staff take the position, he

11:18:18  4   recanted, it's over, it never happened.  The inmate is still

11:18:22  5   saying, yes, it happened.  It's offensive listening to it.

11:18:28  6        They invoke the inmate's mother.  They talk to the

11:18:33  7   inmate about, why would you do this to these staff members'

11:18:37  8   families?  It's rather outrageous in my opinion.

11:18:40  9   Q.   Did you review any other SOD sexual assault investigation

11:18:43 10   tapes?

11:18:43 11   A.   Yes.  I reviewed another investigation tape that began

11:18:49 12   with the investigator sitting down to interview the witness --

11:18:56 13   I'm sorry, the person -- the victim, the person reporting the

11:19:01 14   alleged incident.

11:19:02 15        Before hello or anything else, the first thing that

11:19:04 16   the investigator does is to Mirandize the victim.

11:19:11 17   Q.   In your review of OPP investigation files, was that common

11:19:15 18   that the victim would be Mirandized?

11:19:17 19   A.   Yes, that was common.

11:19:19 20        What was also common happened in the first video that

11:19:22 21   we talked about, which is, in a surprisingly large number of

11:19:28 22   cases, someone reports a sexual misconduct incident and ends up

11:19:35 23   being charged with a new crime.

11:19:38 24        So the staff -- the most common was for filing a

11:19:43 25   false report, but the staff arrest and rebooked and charged

11:19:46 1   with a new crime on a number of cases where somebody came

11:19:49 2   forward.

11:19:52 3          THE COURT:  What's the number on that other video that

11:19:56 4   he referred to?

11:19:57 5          MS. SCHWARTZMANN:  That is not in evidence, Your Honor,

11:19:59 6   because we got it very close to this hearing.  We got it just a

11:20:02 7   couple weeks ago, I think.  We can supplement afterwards.

11:20:06 8          MR. MATTHEWS:  Your Honor, that was the tape months ago

11:20:10 9   we produced, and I think we provided the Court a copy of that.

11:20:14 10         MS. SCHWARTZMANN:  No, you're talking about Exhibit 5.

11:20:17 11         THE COURT:  I'm talking about the second video, not

11:20:20 12  Exhibit 5.

11:20:20 13         Let's proceed.

11:20:21 14                        EXAMINATION

11:20:21 15  BY MS. SCHWARTZMANN:

11:20:25 16  Q.   Dr. Schwartz, we're going to direct your attention to

11:20:29 17  Exhibit 324, which we'll pull up on the screen in front of you.

11:20:51 18  A.   Yes, I'm familiar with this investigation as well.  I'm

11:20:55 19  looking at the SOD investigation of an allegation of sexual

11:21:01 20  battery.

11:21:01 21  Q.   Can you briefly describe for the Court what happened in

11:21:04 22  this investigation?

11:21:05 23  A.   An inmate said that several inmates approached his bunk

11:21:12 24  while he was sleeping and tied him to the bunk using makeshift

11:21:21 25  ropes made out of inmate clothing.

11:21:23 1          That they then took turns -- one inmate in particular

11:21:27 2   held him down, and then continued to hold him down, and the

11:21:31 3   inmates took turns climbing on top of him and rubbing their

11:21:37 4   penises against him, or what he referred to as dry humping him.

11:21:43 5          He was not -- they did not take his clothes off.  He

11:21:46 6   was not naked at the time.  There was no allegation of

11:21:48 7   penetration.  But that was -- that was the allegation that was

11:21:53 8   made.

11:21:53 9   Q.   Can you describe SOD's investigation into these

11:21:58 10  allegations?

11:21:58 11  A.   They took pictures -- I can.  They took pictures of --

11:22:09 12  excuse me, please -- they took photos of wrist injuries and

11:22:17 13  then confirmed with a nurse that those were consistent with his

11:22:20 14  having been tied up.

11:22:22 15         They talked to the deputy who had been working in

11:22:25 16  that area at the time.  The deputy said, yes, that -- I'm

11:22:31 17  paraphrasing.  The deputy said, yes, he knew that something was

11:22:34 18  going on because people were going in and out of that area, and

11:22:40 19  different inmates were approaching where this inmate was.

11:22:44 20  Essentially, information that was consistent with and tending

11:22:51 21  to verify what the inmate had said.

11:22:52 22  Q.   Was that deputy interviewed by SOD -- or investigated, I'm

11:22:55 23  sorry, for not responding to what he saw?

11:22:58 24  A.   No.

11:22:58 25  Q.   Did SOD question anybody else that was on the tier about

11:23:04  1    what happened?

11:23:04  2    A.    No.

11:23:04  3          THE COURT:  Did the deputy indicate why he didn't

11:23:08  4    investigate further when he knew something was going on?

11:23:11  5          THE WITNESS:  No, there is nothing in the record that

11:23:13  6    he said or -- and he wasn't interviewed.

11:23:16  7                         EXAMINATION

11:23:16  8    BY MS. SCHWARTZMANN:

11:23:17  9    Q.    Dr. Schwartz, looking at the report, what was the date

11:23:19 10    that that incident was reported to SOD?

11:23:25 11    A.    One moment, please.  I'm sorry.

11:23:26 12    Q.    Or if you look at the screen.

11:23:28 13    A.    January 4, 2012.

11:23:33 14    Q.    On page 3 of that document, what date was the

11:23:37 15    investigation closed by SOD?

11:23:39 16    A.    My memory is January 11th, but I'm not -- let's see, now

11:23:48 17    it's up.  Yes, January 11th, about one week later.

11:23:53 18          THE COURT:  You said when was it closed by the City;

11:23:56 19    was that your question?

11:23:58 20          MS. SCHWARTZMANN:  By SOD, I'm sorry.

11:23:58 21                         EXAMINATION

11:23:58 22    BY MS. SCHWARTZMANN:

11:24:00 23    Q.    Why was the investigation closed?

11:24:03 24    A.    Because the inmate had been transferred.  He was a

11:24:06 25    mental health inmate, and he had been transferred to a

11:24:10 1   mental health hospital in Baton Rouge.

11:24:12 2   Q.    After he's transferred, does SOD do any further

11:24:17 3   investigation into what happened to him?

11:24:19 4   A.    No.  They stopped anything and dropped the case -- closed

11:24:22 5   the case at that point.

11:24:24 6   Q.    Why is that a problem?

11:24:26 7   A.    Well, most obviously because the inmates who did it are

11:24:31 8   still out there in the population, and there is some other

11:24:34 9   inmate who is going to be victimized, likely, by the same

11:24:38 10  inmates.

11:24:38 11  Q.    Dr. Schwartz, how can a prisoner report sexual assault in

11:24:43 12  jail?  What are the ways?

11:24:45 13  A.    The most -- an inmate -- well, there are many ways.  An

11:24:50 14  inmate may report sexual assault by a grievance.  An inmate --

11:24:55 15  perhaps the most common is that an inmate simply tells a staff

11:24:59 16  member, either the person who is closest or on duty when the

11:25:03 17  incident occurs, or a staff member the inmate has some rapport

11:25:08 18  with, or the inmate may ask to talk to rank.

11:25:14 19       Some inmates write letters.  Those are most often

11:25:17 20  sent to the warden.

11:25:19 21       In jails that follow PREA recommendations and

11:25:22 22  requirements, there is often a hotline because it requires

11:25:26 23  multiple channels.  PREA also requires that at least one of

11:25:31 24  those channels accept anonymous complaints.

11:25:35 25       So there are a variety of ways in which inmates can

11:25:38  1   and do report sexual assault incidents.

11:25:41  2   Q.    Does OPP have an anonymous hotline for reporting sexual

11:25:46  3   assaults?

11:25:46  4   A.    No.

11:25:46  5   Q.    So what are the ways that an inmate at OPP could report a

11:25:51  6   sexual assault?

11:25:52  7   A.    Grievance.  Report it to an officer on the unit.  Ask to

11:25:55  8   talk to rank.  Write a letter to a high-ranking official,

11:26:01  9   usually the warden.

11:26:03  10        The other way is tell a family member, and then the

11:26:06  11  family member -- with or without the inmate's permission, it

11:26:10  12  happens both ways -- calls in and reports it.  Those are

11:26:14  13  primary.

11:26:14  14  Q.    I would like to direct your attention to Exhibit 353.

11:26:38  15        Dr. Schwartz, have you reviewed that document?

11:26:40  16  A.    Yes, I have.

11:26:41  17  Q.    What is that?

11:26:43  18  A.    It's a graph -- it's a bar graph that contrasts the number

11:26:51  19  of sexual assault investigations that have been started July

11:26:54  20  through August -- each month, July through August, for alleged

11:27:01  21  sexual misconduct against -- and those are shown in the blue,

11:27:07  22  and the bars in the red are the number of grievance reports

11:27:13  23  involving sexual misconduct.

11:27:15  24  Q.    So the red is the number of sexual misconduct grievances,

11:27:19  25  and the blue is the number of open investigations?

11:27:22  1    A.    Of investigations initiated in that month, yes.

11:27:24  2    Q.    Without going through the chart, again, can you just

11:27:28  3    highlight for the Court a couple of months of what this

11:27:33  4    reflects?

11:27:35  5    A.    Well, I can tell you, because I remember this from

11:27:37  6    reviewing it, that there are five -- during that six-month

11:27:44  7    period, SOD began five -- initiated five investigations into

11:27:52  8    sexual misconduct incidents, and there were 80 grievances in

11:27:57  9    that same six months alleging sexual misconduct.

11:28:02  10          Now, that does not -- that 80 would not include those

11:28:08  11   that were reported through those other channels.

11:28:09  12   Q.    What do the numbers on this graph indicate to you?

11:28:15  13   A.    That most allegations of sexual misconduct, sexual

11:28:21  14   assault, rape, etcetera, that most are not investigated.

11:28:23  15   Q.    Overall, do OPP's practices conform to PREA requirements

11:28:32  16   or basic correctional standards with regard to sexual assault?

11:28:37  17   A.    No, they conform to neither.

11:28:38  18   Q.    Why do sexual assault policies and practices matter for

11:28:44  19   protection from harm?

11:28:44  20   A.    Because they create a climate in which aggressive inmates

11:28:54  21   believe that they can get away with these kinds of offenses.

11:28:58  22          They fail to result in segregating those inmates who

11:29:03  23   are sexual perpetrators of crimes, segregating them from the

11:29:10  24   general population and from vulnerable inmates.

11:29:13  25          They send a message to staff that these incidents are

11:29:17 1    not to be taken very seriously.

11:29:20 2             There are a lot of reasons, and they're rather

11:29:23 3    straightforward.

11:29:23 4    Q.   Does the proposed Consent Decree have provisions regarding

11:29:27 5    sexual assault investigation policies and procedures?

11:29:29 6    A.   Yes, it does.

11:29:30 7    Q.   Do you have an opinion as to whether those provisions in

11:29:34 8    the Consent Decree are necessary to bringing OPP into

11:29:37 9    compliance with basic correctional standards?

11:29:40 10            MR. ROSENBERG:  Same objection, Your Honor.

11:29:42 11            THE COURT:  Overruled.

11:29:45 12            THE WITNESS:  In my opinion, they are absolutely

11:29:47 13   necessary to correct what is going on.

11:29:47 14                           EXAMINATION

11:29:50 15   BY MS. SCHWARTZMANN:

11:29:50 16   Q.   Finally, I'd like to look at the grievance system.

11:29:55 17            Can you first explain to the Court what a grievance

11:29:57 18   system is?

11:29:58 19   A.   Yes.  A grievance system in a prison or in a jail is a

11:30:05 20   system in which inmates can, when they wish to, make a written

11:30:13 21   report or a written -- it's called a grievance, which they file

11:30:16 22   in response to anything that they think is wrong and that they

11:30:20 23   believe needs to be corrected or that they want corrected.

11:30:23 24            It may range, once again, from very serious issues to

11:30:29 25   minute things.  It can be in any aspect.  Almost everything in

11:30:34 1    a jail or prison is grievable.  There are a few exceptions.

11:30:38 2             So the grievance may be about the quality of food.

11:30:40 3    It may be about a bad program, like the school program isn't

11:30:46 4    good.  Lack of recreation, staff use of force, inmate-on-inmate

11:30:51 5    sex pressure, anything.

11:30:53 6             Those written -- those written grievances then, one,

11:31:01 7    give the staff and the institution a chance to respond and

11:31:05 8    resolve the issue for that inmate, so that inmate isn't

11:31:09 9    churning on it and grinding his or her teeth.

11:31:13 10            They also let the institution know about patterns of

11:31:17 11   problems.  There are a number of positive aspects of grievance

11:31:23 12   systems with regard to what they do.

11:31:26 13   Q.    I'd like to direct your attention first to Exhibit 302.

11:31:44 14            Dr. Schwartz, what is this document?

11:31:46 15   A.    It's a grievance that was submitted by an inmate saying

11:31:50 16   that the inmate -- it's marked as an emergency grievance,

11:31:55 17   rather.  That's the inmate's choice.

11:31:57 18            The inmate has marked this as an emergency, rather

11:32:01 19   than a regular grievance, and is saying that the inmate -- the

11:32:05 20   inmate is saying that he needs to be transferred, that he's in

11:32:08 21   fear of his life, and that on prior occasions he has -- he has

11:32:12 22   been beaten, he's had his fingers broken, and he's been stabbed

11:32:16 23   four times in another incident.

11:32:17 24   Q.    On what date did the inmate file that grievance?

11:32:22 25   A.    February 17, 2011.

11:32:25  1   Q.    Then turning to the next page, the facility's response.

11:32:32  2   A.    There is no response to the inmate.  This grievance was

11:32:36  3   closed out or dropped on March 1st, about two weeks later,

11:32:42  4   because the inmate -- well, what it says is the inmate rolled

11:32:45  5   out on March 1st at 10:03, meaning he was discharged from the

11:32:50  6   jail.

11:32:50  7   Q.    Now, we're going to look at Exhibit 305.

11:33:09  8         Can you describe that document, please?

11:33:10  9   A.    Yes.  It's an inmate grievance that says two deputies

11:33:17 10   assaulted him, punched him and kicked him.  He has a knot on

11:33:23 11   the front of his head and back of his head.  He's requested

11:33:26 12   medical attention but not gotten any.  He's put in a sick call

11:33:30 13   slip that wasn't responded to.  The grievance is asking for

11:33:34 14   medical attention.

11:33:34 15   Q.    Again, what was the date that the inmate filed that

11:33:38 16   grievance?

11:33:40 17   A.    On October 25, 2011.

11:33:41 18   Q.    What was the date of the facility response?

11:33:44 19   A.    About three months later, on January 27, 2012.

11:33:52 20         But, again, it's not a response to the inmate.  It's

11:33:55 21   a closing of the grievance saying that the inmate rolled out on

11:33:59 22   that date.

11:33:59 23   Q.    This is the last one, Exhibit 312.

11:34:17 24         Can you describe that document, please?

11:34:19 25   A.    This is also an inmate grievance.  The inmate says that

11:34:23  1    he's mentally disabled; that he hasn't gotten his psych meds;

11:34:29  2    that less than a month prior to filing this grievance, that he

11:34:32  3    hung himself; he still hasn't got psych meds; and that he's

11:34:43  4    been assaulted by other inmates taking his mattress.

11:34:46  5         This is asking for medical or mental health

11:34:48  6    attention, that he hasn't seen the doctor or gotten his

11:34:51  7    medications.

11:34:51  8    Q.   When is that filed and responded to?

11:34:55  9    A.   It was filed on June 8, 2011.  The response is on

11:35:10 10    September 19 -- yeah, it's a little over three months.

11:35:16 11    September 19, 2011.

11:35:18 12         Here, the response is to the inmate.  The jail is

11:35:22 13    telling the inmate, three months after the grievance, "You will

11:35:25 14    be seen by medical personnel."  That's verbatim.

11:35:28 15    Q.   Dr. Schwartz, in your opinion, at OPP, is the general

11:35:34 16    purpose of the grievance system as it relates to inmate safety

11:35:39 17    that you testified earlier, is that purpose being fulfilled?

11:35:41 18    A.   No.

11:35:42 19    Q.   Why not?

11:35:45 20    A.   When grievances are not responded to in a timely manner --

11:35:50 21    it is centrally and particularly important that emergency

11:35:57 22    grievances be triaged quickly and responded to quickly.  That's

11:36:01 23    the whole point of an -- of the emergency grievance provision

11:36:05 24    within the grievance system.  When they aren't, first, the

11:36:11 25    inmate gets no relief.

11:36:13  1          In some of these cases -- I'm sure if we looked at a

11:36:17  2  lot of cases, that some inmates who said, get me out of here,

11:36:20  3  I'm in danger, were then assaulted before they were released

11:36:25  4  because the response was so slow, which means nobody looks into

11:36:31  5  the situation.

11:36:33  6          Second, the grievances should in general be screened

11:36:37  7  for allegations of staff misconduct.  That doesn't happen at

11:36:41  8  OPP.  That's an important check and balance that doesn't occur.

11:36:46  9          Third, by handling inmates in the way in which these

11:36:51 10  examples have shown, it's a clear message to the inmate

11:36:55 11  population, as they talk with each other, don't bother, you

11:36:59 12  either won't get an answer, it won't be meaningful, or they

11:37:02 13  will blow you off, or however it's expressed; but, it has a

11:37:06 14  real chilling effect on other inmates using the grievance

11:37:10 15  system to get relief.

11:37:10 16          That also -- what you do is you've taken a safety

11:37:15 17  valve and welded it shut.  That now the pressure on -- even an

11:37:20 18  inmate who is bothered by something minor, it's not minor in

11:37:25 19  that inmate's eyes.  That inmate may assault a staff member

11:37:29 20  after he's angry enough or frustrated enough.

11:37:33 21          So it goes to inmate safety first, but it also goes

11:37:36 22  to staff safety.  It's just -- it's an inexcusable way to deal

11:37:39 23  with a grievance system.

11:37:40 24          Why bother to have grievances if you're not going to

11:37:43 25  look at them or respond to them until it's irrelevant.

11:37:46  1    Q.    Can you please describe in summary for the Court your

11:37:57  2    overall opinion of operations at Orleans Parish Prison?

11:37:59  3    A.    Operations are poor.  I would like to tell you there are a

11:38:08  4    couple of areas I found that look quite good or are really

11:38:13  5    encouraging or are being run in top notch fashion; that's not

11:38:17  6    so.  I found area after area.

11:38:20  7          Basic security is very poor.  Staff either haven't

11:38:25  8    had the training or it hasn't been good training.  Supervisors

11:38:28  9    aren't doing what they -- supervisors aren't supervising.

11:38:32 10    Managers, even at the level of warden, act more like

11:38:35 11    supervisors than managers.

11:38:36 12          The operation is -- it really is dreadful, and the

11:38:46 13    results of it are the things that we have been talking about

11:38:48 14    today.

11:38:48 15    Q.    You mentioned at the outset of your testimony that you've

11:38:53 16    been involved, one of your areas of focus in your practice has

11:38:58 17    been working with turning around troubled facilities.

11:39:00 18    A.    That's correct.

11:39:01 19    Q.    Is there a facility that comes to mind as comparable to

11:39:05 20    OPP?

11:39:05 21    A.    Yes.  I mentioned earlier that the jail that I've worked

11:39:10 22    with extensively that seems to me to have a lot of parallels is

11:39:14 23    the Shelby County jail in Memphis, Tennessee.

11:39:19 24    Q.    Can you talk to the Court about your experience in that

11:39:22 25    case with the turnaround efforts in Memphis?

11:39:24 1   A.    Yes.

11:39:27 2        MR. ROSENBERG:  Your Honor, I'm just going to object on

11:39:30 3   the basis of relevancy at this point.  I mean, the

11:39:31 4   Shelby County jail is not part of this litigation.

11:39:34 5        THE COURT:  Well, I think, correct me if I'm wrong, the

11:39:38 6   doctor used it as a comparison because, if I remember

11:39:40 7   correctly, it's a jail of the same or similar size to the

11:39:44 8   Orleans Parish Prison; is that right?

11:39:45 9        THE WITNESS:  Yes, it is.

11:39:46 10       THE COURT:  Any other reason to use the Shelby County

11:39:49 11  jail as a comparison?

11:39:50 12       THE WITNESS:  It was one of the worst big city jails in

11:39:54 13  the country.  The overwhelming problem was violence and staff

11:39:59 14  use of force.  Sexual assaults were much too frequent.

11:40:04 15       Many of the problems we have been talking about

11:40:06 16  today that are in my report and that are in my opinions in this

11:40:10 17  case were true and documented in great detail in Shelby County

11:40:16 18  in 2000, when I got involved.

11:40:19 19       The other thing is that demographically the jail

11:40:23 20  is similar.  If you look at staff, if you look at inmate

11:40:27 21  populations, the staff are more heavily female.  That is true

11:40:31 22  in most jails.  That's true to a slightly lesser extent here,

11:40:36 23  but there are a lot of parallels.

11:40:37 24       THE COURT:  So your opinions with respect to the

11:40:39 25  Orleans Parish Prison are based, in part at least, on your

experience with respect to other jails which you view have had

similar problems; is that a fair statement?

THE WITNESS:  No, sir.  My opinions here were based on

the record here, my tours and my interviews.

I was saying that -- the question was, was I

involved in the turnaround in Shelby County since it began with

problems that were similar, and yes -- I was saying yes, I was.

THE COURT:  But part of your expertise in this case is

based, in fact, on some of these experiences you've had working

at other jails?

THE WITNESS:  Yes.

THE COURT:  Analyzing other jail problems such as

Shelby County?

THE WITNESS:  Absolutely.

THE COURT:  The objection is overruled.

MR. ROSENBERG:  Your Honor, I understand the Court's

ruling.  I'm not arguing with you, other than to say there is

nothing in Mr. Schwartz's report that deals with the

Shelby County facility.  That was the only reason we objected,

Your Honor.

THE COURT:  Overruled.

MR. ROSENBERG:  Thank you, Judge.

EXAMINATION

BY MS. SCHWARTZMANN:

Q.   I'll try to narrow my question maybe to address what

11:41:43 1   Mr. Rosenberg raised.

11:41:46 2         Specifically, because we're here on a

11:41:51 3   Fairness Hearing for a Consent Decree, can you talk about the

11:41:54 4   role of the Consent Decree and the provisions therein and the

11:41:56 5   implementation thereof in the turnaround of the Shelby County

11:42:00 6   jail?

11:42:03 7   A.    Yes.  The Consent Decree --

11:42:04 8         MR. ROSENBERG:  Your Honor -- I'm sorry, Mr. Schwartz.

11:42:06 9         Your Honor, just same objection.  I mean, we're

11:42:08 10  now getting into the Fairness Hearing, the appropriateness of a

11:42:12 11  Consent Decree in Shelby County, which is not part of his

11:42:16 12  report, nor should it be relevant to this hearing.

11:42:20 13        THE COURT:  You had an opportunity to depose the expert

11:42:22 14  if you wanted to?

11:42:23 15        MR. ROSENBERG:  Well, Your Honor, the City had limited

11:42:25 16  budgets.  We couldn't depose -- we did theoretically have an

11:42:29 17  opportunity to depose him, but we couldn't; but, we did rely

11:42:32 18  upon his report and the parameters of his report, which do not

11:42:36 19  mention Shelby County.

11:42:36 20        THE COURT:  My question was, did you have the

11:42:38 21  opportunity to depose him if you wanted to?  For whatever

11:42:42 22  reason, your answer is yes, but you did not.

11:42:45 23        MR. ROSENBERG:  That's correct, Judge.  We had the

11:42:46 24  opportunity to depose all the experts across the country, but

11:42:49 25  we didn't have the financial resources to do so; but, we did

11:42:52  1    rely upon the parameters of his report.

11:42:53  2            THE COURT:  All right.  Anything else?

11:42:56  3            MS. SCHWARTZMANN:  No, Your Honor.

11:42:57  4            THE COURT:  It's overruled.  Go ahead.

11:43:00  5            MR. ROSENBERG:  Thank you, Judge.

11:43:02  6            THE WITNESS:  Could you repeat the question, please?

11:43:03  7                         EXAMINATION

11:43:03  8    BY MS. SCHWARTZMANN:

11:43:05  9    Q.   The question, Dr. Schwartz, is whether you can just

11:43:06 10    describe for the Court, in the context of considering the

11:43:10 11    Consent Decree that's under consideration by it, the role that

11:43:13 12    the Consent Decree and the provisions of that Consent Decree

11:43:14 13    had in the turnaround of the Shelby County jail.

11:43:19 14    A.   It was the monitoring of the Consent Decree there and the

11:43:25 15    judge's -- well, federal judge there, his enforcement of that

11:43:30 16    decree which finally got the county, Shelby County, to take

11:43:36 17    seriously the need to reform that jail.

11:43:40 18            The provisions of the Consent Decree and the

11:43:44 19    monitoring resulted in a huge turnaround project that went

11:43:51 20    three and a half or four years.  At the end of it, the jail had

11:43:58 21    become one of the -- clearly, one of the best big city jails in

11:44:02 22    the country, and in some specific ways perhaps the best.

11:44:06 23            I've maintained contact, and I find it very

11:44:10 24    rewarding.  That jail has maintained that status and is very

11:44:16 25    low violence, very well operated.  Staff morale and

11:44:23  1    professionalism are very high.  But that three and a half to

11:44:25  2    four years, I spent approximately a week in four in Memphis.

11:44:32  3              THE COURT:  Let's move on to something else.

11:44:34  4              MR. ROSENBERG:  Thank you, Judge.

11:44:34  5                          EXAMINATION

11:44:34  6    BY MS. SCHWARTZMANN:

11:44:34  7    Q.    Dr. Schwartz, you've reviewed the Consent Decree in this

11:44:37  8    case?

11:44:37  9    A.    I have.

11:44:38 10    Q.    Is it your opinion that the Consent Decree is a necessary

11:44:41 11    step in reforming the conditions at OPP?

11:44:44 12              MR. ROSENBERG:  Your Honor, the same objection.  That's

11:44:45 13    up to the Court to decide.

11:44:47 14              THE COURT:  Overruled.

11:44:48 15              MR. ROSENBERG:  Thank you.

11:44:49 16              THE WITNESS:  Yes, I believe it is necessary.

11:44:49 17                          EXAMINATION

11:44:51 18    BY MS. SCHWARTZMANN:

11:44:51 19    Q.    Why do you believe that?

11:44:55 20    A.    The Sheriff has had report after report over the course of

11:45:04 21    years with detailed descriptions of the problems and detailed

11:45:09 22    descriptions of recommendations to fix the problems, and the

11:45:15 23    situation has gotten worse rather than gotten better.

11:45:18 24              Most of those recommendations have gone ignored.

11:45:24 25    Most of the problems have -- not all of them, certainly, but

11:45:29  1   many of the serious -- most of the serious problems remain and

11:45:34  2   are worse.

11:45:35  3        So I have no confidence that without a Consent Decree

11:45:41  4   there would be a change of heart and things would happen that

11:45:44  5   need to happen to keep inmates safe and to keep the staff in

11:45:48  6   better positions and safer.

11:45:50  7        MS. SCHWARTZMANN:  I have nothing further, Your Honor.

11:45:52  8        THE COURT:  All right.  Just a couple questions before

11:45:53  9   we move on with the other parties.

11:45:56 10        Have you spoke with the U. S. Marshal in this

11:45:58 11   district as to the reason why federal prisoners are no longer

11:46:03 12   housed at the Orleans Parish Prison facilities?

11:46:05 13        THE WITNESS:  No.  I saw a letter indicating that that

11:46:07 14   decision had been made, but that's all I know, Your Honor.

11:46:10 15        THE COURT:  Are there any inaccuracies in your report

11:46:13 16   that you would like to comment upon?  Or to the best of your

11:46:18 17   knowledge, is your report accurate, I guess is what I'm asking

11:46:21 18   you?

11:46:22 19        MS. SCHWARTZMANN:  If I can, Your Honor, we did bring

11:46:23 20   to the other parties' attention that there is an inaccuracy in

11:46:26 21   the reference to Exhibit 5, I think, the videotape.

11:46:28 22        Dr. Schwartz did clarify for me that there is a

11:46:31 23   factual -- one sentence that's inaccurate.  It refers to one

11:46:35 24   inmate by the wrong number, and the wrong facts get injected.

11:46:41 25        THE WITNESS:  An inmate is wrongly identified as a

11:46:44  1    different inmate.

11:46:44  2             Outside of that, Your Honor, I do not know of

11:46:47  3    any -- I believe my report is accurate as written.

11:46:50  4             THE COURT:  If I understand your testimony, correct me

11:46:52  5    if I'm wrong, there are numerous problems that need to be

11:46:58  6    addressed.  Some of the problems are operational on the part of

11:47:01  7    the Sheriff, is that right?  Things that have to be done

11:47:04  8    differently; is that correct?

11:47:05  9             THE WITNESS:  Yes, it is.

11:47:05 10             THE COURT:  There are other things, such as one of the

11:47:09 11    most obvious resource problems is staffing; is that right?

11:47:11 12             THE WITNESS:  Yes, sir.

11:47:13 13             THE COURT:  You view that as one of the largest reasons

11:47:14 14    for the runaway violence, how you term it, at OPP is a lack of

11:47:18 15    inmate supervision, and that results, to a large part, because

11:47:22 16    of inadequate staffing; is that correct?

11:47:25 17             THE WITNESS:  Yes, sir.

11:47:27 18             THE COURT:  I think you state in your report that

11:47:30 19    the -- is that if the jail is to operate safely tomorrow or a

11:47:34 20    month from tomorrow, a huge increase in staffing levels is

11:47:37 21    needed; is that correct?

11:47:38 22             THE WITNESS:  It is, Your Honor.

11:47:39 23             THE COURT:  You also take to task the per diem/per

11:47:46 24    night way in which the Sheriff gets financing.

11:47:49 25             Of course, that's pursuant to an agreement

11:47:52  1    between the City and the Sheriff's Office for many years; you

11:47:55  2    understand that?

11:47:57  3                THE WITNESS:  I do.

11:47:58  4                THE COURT:  But you also indicate that's a basic and

11:48:00  5    serious structural problem because the Sheriff has incentive to

11:48:04  6    hold more inmates and keep inmates as long as possible; is that

11:48:04  7    right?

11:48:08  8                THE WITNESS:  Yes, that is an opinion, Your Honor.

11:48:10  9                THE COURT:  Notwithstanding that, it's your opinion

11:48:10  10   that OPP remains, as you state it, shockingly underfunded; is

11:48:14  11   that correct?

11:48:14  12               THE WITNESS:  Yes, sir.

11:48:15  13               THE COURT:  You also refer to the risk at the OPP

11:48:23  14   facilities as of life and death proportions.  Is that, in fact,

11:48:27  15   correct?

11:48:27  16               THE WITNESS:  It is, Your Honor.

11:48:28  17               THE COURT:  You note that the risk of preventable

11:48:31  18   suicide is unacceptably high, the risk of death to an inmate at

11:48:35  19   the hands of other inmates is also unacceptably high, and the

11:48:38  20   risk of multiple facilities from a fire is unacceptably high.

11:48:42  21               You refer to those as clear and present dangers;

11:48:44  22   is that, in fact, correct?

11:48:45  23               THE WITNESS:  Yes, it is, sir.

11:48:46  24               THE COURT:  There is a serious problem with respect to

11:49:05  25   review of the staffing records according to your report; that

11:49:09  1   is a fact, as well, correct?

11:49:10  2           THE WITNESS:  It is, sir, yes.

11:49:12  3           THE COURT:  Many staff posts in living units are left

11:49:17  4   unfulfilled shift after shift and facility after facility; is

11:49:17  5   that right?

11:49:22  6           THE WITNESS:  It is.

11:49:27  7           THE COURT:  In addition to security practice issues,

11:49:34  8   there is also an issue with respect to security equipment being

11:49:39  9   broken and things like that, nonoperational; is that right?

11:49:42 10           THE WITNESS:  Yes, sir.

11:49:52 11           THE COURT:  I think you indicated that some inmates

11:49:55 12   were kept there overnight without mattresses because of a lack

11:49:58 13   of mattresses when the jail is overcrowded; is that right?

11:50:03 14           THE WITNESS:  I'm not sure if it was because the jail

11:50:06 15   didn't have the mattresses or because they simply didn't get

11:50:10 16   them to those inmates on those living units.

11:50:14 17                But the result was that inmates are not given

11:50:18 18   mattresses on some occasions and are left either on a bunk

11:50:22 19   without a mattress or sleeping on the floor.

11:50:24 20           THE COURT:  Is it correct that there has been a finding

11:50:27 21   by the United States Department of Justice within the last few

11:50:30 22   years that the Orleans Parish Prison facilities was one of the

11:50:35 23   worst jails in the country with regard to the incidence of rape

11:50:37 24   and other sexual assaults; is that, in fact, correct?

11:50:40 25           THE WITNESS:  Yes, that's part of a national

11:50:42  1   publication that U.S. Justice put out.

11:50:44  2        THE COURT:  One of the concerns raised in your report,

11:50:50  3   which appears to be a significant concern, is that of fire

11:50:55  4   safety; is that right?

11:50:56  5        THE WITNESS:  Yes, sir.

11:50:59  6        THE COURT:  According to your testimony, your report,

11:51:02  7   there is a real possibility of a catastrophic fire event with

11:51:05  8   multiple to many fatalities; is that right?

11:51:07  9        THE WITNESS:  Yes, it is.

11:51:08 10        THE COURT:  There are also issues with respect to

11:51:21 11   emergency preparedness within the jail and the level of

11:51:23 12   preparation for a major emergency; is that right?

11:51:25 13        THE WITNESS:  Yes, sir.

11:51:26 14        THE COURT:  Mr. Matthews, do you have any questions?

11:51:38 15        MR. MATTHEWS:  Yes, Your Honor.  It's ten to 12:00.  I

11:51:40 16   didn't know if you wanted to stop now.

11:51:41 17        THE COURT:  We'll take a break, and then we'll come

11:51:42 18   back and start promptly at 1 o'clock.  We'll be in recess.

        19        (WHEREUPON, at 11:51 a.m., the Court was in luncheon

        20   recess.)

        21                        *    *    *

        22

        23

        24

        25

1
2                        REPORTER'S CERTIFICATE

3

4              I, Cathy Pepper, Certified Realtime Reporter,

5    Registered Merit Reporter, Certified Court Reporter of the

6    State of Louisiana, Official Court Reporter for the United

7    States District Court, Eastern District of Louisiana, do hereby

8    certify that the foregoing is a true and correct transcript to

9    the best of my ability and understanding from the record of the

10   proceedings in the above-entitled and numbered matter.

11

12

13                            *s/Cathy Pepper*_____

14                            Cathy Pepper, CRR, RMR, CCR
                             Certified Realtime Reporter
15                            Registered Merit Reporter
                             Official Court Reporter
16                            United States District Court
                             Cathy_Pepper@laed.uscourts.gov
17

18

19

20

21

22

23

24

25

## 1

**1** [12] - 1:6, 1:10, 4:18, 5:3, 57:23, 58:8, 58:9, 71:24, 71:25, 72:7, 73:20, 137:18
**10** [10] - 8:13, 30:20, 30:24, 36:18, 45:12, 55:3, 57:10, 57:15, 71:25, 103:3
**10-day** [1] - 100:1
**10-minute** [1] - 103:2
**101** [3] - 4:18, 72:7, 73:20
**1055** [1] - 1:20
**10:03** [1] - 124:5
**10:30** [2] - 29:18, 37:24
**10:42** [1] - 103:5
**11** [3] - 56:6, 71:25, 72:3
**1100** [1] - 2:23
**11:45** [2] - 102:25, 103:9
**11:51** [1] - 137:19
**11th** [2] - 118:16, 118:17
**12** [5] - 38:17, 38:18, 38:19
**12-859** [1] - 1:5
**125** [2] - 78:17, 79:1
**1250** [1] - 2:13
**12:00** [1] - 137:15
**12:45** [1] - 103:9
**13** [1] - 80:23
**1300** [1] - 3:4
**137** [1] - 4:11
**14** [4] - 30:20, 30:24, 36:18, 45:12
**140** [3] - 4:18, 72:8, 73:20
**147** [1] - 111:7
**148** [1] - 111:12
**15** [1] - 82:21
**150** [1] - 8:8
**151** [1] - 109:9
**152** [1] - 109:14
**1600** [1] - 17:15
**1615** [1] - 2:13
**17** [3] - 82:11, 110:8, 123:25
**18** [1] - 7:14
**19** [2] - 125:10, 125:11
**1900** [1] - 17:15
**1st** [3] - 8:4, 124:3, 124:5

## 2

**2-2** [3] - 57:22, 58:5, 58:6
**200** [1] - 62:2
**2000** [2] - 2:18, 128:18
**2008** [2] - 18:7, 19:18
**2009** [2] - 18:11, 19:21
**2010** [2] - 12:5, 26:1
**2011** [4] - 123:25, 124:17, 125:9, 125:11
**2012** [13] - 18:13, 18:16, 19:23, 20:1, 26:4, 69:12, 75:3, 76:16, 76:25, 80:18, 87:16, 118:13, 124:19
**2012-859** [1] - 5:11
**2013** [2] - 1:6, 5:3
**20530** [1] - 2:10
**222** [1] - 108:18
**24** [1] - 4:5
**2400** [2] - 82:16, 83:15
**25** [2] - 4:6, 124:17
**27** [1] - 124:19
**274** [1] - 100:14
**275** [1] - 89:18
**281** [1] - 99:11
**28th** [3] - 8:4, 26:1, 26:3
**29** [1] - 91:23
**2950** [1] - 2:23

## 3

**3** [1] - 118:14
**30** [2] - 28:24, 63:11
**300** [2] - 53:2, 62:3
**302** [1] - 123:13
**305** [1] - 124:7
**312** [1] - 124:23
**316** [1] - 2:4
**32** [1] - 12:8
**324** [1] - 116:17
**348** [1] - 110:8
**35** [4] - 61:23, 82:17, 84:17, 84:22
**351** [3] - 4:18, 72:8, 73:20
**353** [4] - 4:19, 72:9, 73:21, 120:14
**354** [7] - 4:19, 70:4, 71:11, 72:9, 73:21, 74:20, 74:21
**356** [3] - 4:19, 72:9, 73:21
**36104** [1] - 1:25

## 3626
**3626** [1] - 7:14
**363** [3] - 4:18, 72:8, 73:21
**365** [1] - 2:18
**368** [3] - 4:18, 72:8, 73:21
**370,000** [2] - 17:14, 22:19
**371** [3] - 4:19, 72:8, 73:21
**372** [3] - 4:20, 73:25, 74:2
**373** [1] - 64:17
**379** [3] - 4:20, 73:25, 74:2
**380** [5] - 4:19, 72:9, 73:21, 85:5, 85:14
**381** [8] - 72:9, 72:14, 72:19, 72:20, 72:25, 73:5, 73:13, 74:19

## 4

**4** [3] - 26:1, 38:8, 118:13
**40** [2] - 12:4, 85:17
**400** [1] - 1:24
**4431** [1] - 1:17
**45** [1] - 104:19

## 5

**5** [8] - 59:4, 60:1, 60:5, 113:17, 114:4, 116:10, 116:12, 133:21
**50** [2] - 28:24, 89:18
**500** [1] - 3:8
**504** [1] - 3:9
**505** [1] - 1:20
**52** [1] - 92:25
**55** [1] - 4:7
**589-7779** [1] - 3:9
**5TH** [1] - 3:4

## 6

**6** [8] - 100:21, 100:23, 101:1, 101:2, 101:5, 101:15, 101:18
**60** [2] - 23:7, 102:24
**600** [2] - 76:20, 76:22
**61** [2] - 4:8, 4:9
**66** [1] - 4:10
**69** [1] - 97:17

## 7

**700** [1] - 12:8
**70112** [2] - 2:14, 3:4
**70119** [2] - 1:17, 2:4
**70130** [3] - 1:21, 2:19, 3:9
**70163** [1] - 2:23
**71** [3] - 97:11, 97:13, 98:1
**72** [1] - 75:19
**73** [1] - 4:18
**74** [1] - 4:20
**75** [2] - 78:15, 78:25

## 8

**8** [1] - 125:9
**80** [2] - 121:8, 121:10

## 9

**9** [1] - 99:11
**90** [6] - 36:12, 36:16, 44:1, 76:17, 76:18, 76:22
**950** [1] - 2:9

## A

**A-D-A** [1] - 76:9
**A-J-A-Y** [1] - 101:21
**a.m** [2] - 103:5, 137:19
**ability** [1] - 138:9
**able** [3] - 43:10, 81:4, 112:4
**above-entitled** [1] - 138:10
**absence** [2] - 77:20, 83:23
**absolutely** [6] - 94:19, 101:6, 102:12, 104:20, 122:12, 129:14
**academy** [1] - 63:18
**accept** [1] - 119:24
**acceptable** [1] - 71:10
**accepted** [1] - 65:20
**access** [8] - 14:5, 14:16, 15:12, 15:20, 15:21, 40:25, 76:3, 108:14
**accident** [1] - 77:4
**accomplished** [1] - 114:22
**according** [6] - 18:4, 53:20, 92:3, 135:25,

137:6
**account** [3] - 13:24, 62:20, 78:6
**accountability** [3] - 12:25, 98:20, 99:5
**accountable** [2] - 87:24, 99:3
**accuracy** [1] - 73:2
**accurate** [3] - 73:11, 133:17, 134:3
**accurately** [1] - 65:1
**accused** [1] - 109:23
**achieve** [1] - 13:23
**acknowledged** [2] - 100:1, 101:10
**act** [4] - 15:25, 44:13, 44:19, 127:10
**Act** [6] - 7:14, 13:7, 20:15, 22:25, 79:15, 82:1
**acted** [1] - 19:14
**action** [5] - 7:22, 18:11, 18:16, 62:13, 104:2
**actionable** [1] - 105:22
**actively** [1] - 81:23
**activities** [1] - 64:14
**actual** [2] - 79:2, 92:22
**acutely** [1] - 17:10
**Ada** [3] - 76:9
**addition** [6] - 8:9, 14:3, 23:1, 71:16, 72:15, 136:7
**additional** [7] - 7:12, 16:15, 21:16, 53:1, 78:13, 78:24, 81:5
**additionally** [1] - 7:22
**address** [5] - 11:13, 13:9, 53:24, 54:1, 129:25
**addressed** [2] - 20:13, 134:6
**addresses** [2] - 13:3, 14:22
**adduced** [1] - 19:4
**adequate** [5] - 7:23, 13:5, 15:4, 15:11, 15:13
**adhered** [1] - 88:5
**administrative** [1] - 108:12
**administratively** [1] - 63:5
**administrator** [1] - 14:19
**administrators** [1] - 81:2
**admit** [5] - 72:12, 73:12, 73:15, 113:4,

114:6
**admits** [1] - 21:12
**admitted** [12] - 70:3, 70:6, 70:7, 71:16, 71:19, 71:20, 73:17, 73:21, 74:1, 74:2, 74:22, 83:7
**ADMITTED....** [1] - 4:19
**ADMITTED..............** [1] - 4:20
**admitting** [1] - 56:15
**adversely** [2] - 22:19, 71:15
**advise** [1] - 9:3
**advised** [1] - 21:20
**Affairs** [2] - 92:3, 94:17
**affected** [1] - 12:1
**affects** [1] - 7:24
**affidavit** [1] - 47:23
**AFRICK** [1] - 1:11
**afterwards** [1] - 116:7
**agencies** [7] - 61:15, 61:17, 61:19, 61:21, 61:22, 63:7
**agency** [4] - 66:17, 87:7, 95:7, 95:8
**aggressive** [5] - 82:23, 83:10, 108:14, 109:25, 121:20
**agitated** [1] - 101:5
**ago** [3] - 18:20, 116:7, 116:8
**agree** [5] - 10:3, 10:5, 10:7, 10:10, 10:14
**agreed** [4] - 10:24, 70:11, 71:16, 72:12
**agreement** [9] - 15:19, 66:12, 66:15, 66:16, 66:20, 67:1, 67:4, 67:12, 134:25
**ahead** [7] - 9:9, 84:13, 85:18, 96:21, 99:22, 106:24, 131:4
**AIDS** [1] - 46:25
**air** [1] - 32:8
**Ajay** [1] - 101:21
**AL** [3] - 1:4, 1:7, 1:25
**al** [3] - 5:12, 6:17
**allegation** [4] - 101:15, 116:19, 117:6, 117:7
**allegations** [10] - 17:11, 18:20, 20:2, 98:12, 101:14, 102:13, 106:4, 117:10, 121:13, 126:7

**allege** [1] - 6:20
**alleged** [6] - 101:19, 102:5, 112:18, 113:15, 115:14, 120:20
**allegedly** [1] - 102:3
**alleging** [1] - 121:9
**alleviate** [1] - 16:13
**allotted** [1] - 64:12
**allowed** [1] - 8:13
**allows** [1] - 103:19
**alluded** [1] - 23:3
**almost** [5] - 41:3, 46:23, 105:21, 112:17, 122:25
**altercation** [2] - 90:15, 110:11
**alternative** [1] - 35:18
**alternatives** [1] - 64:12
**ambulance** [2] - 75:20, 76:19
**Amended** [1] - 23:2
**amended** [1] - 9:19
**AMERICA** [1] - 2:7
**America** [1] - 6:18
**ample** [1] - 13:21
**anal** [4] - 32:1, 32:3, 32:4, 49:18
**analyses** [1] - 62:14
**analysis** [3] - 78:18, 78:24, 103:19
**analyze** [1] - 103:21
**analyzing** [1] - 129:12
**AND** [1] - 4:19
**anger** [1] - 36:11
**angry** [2] - 101:6, 126:20
**announcing** [1] - 113:1
**annual** [2] - 13:23, 14:3
**anomaly** [1] - 98:22
**anonymous** [2] - 119:24, 120:2
**answer** [4] - 96:25, 106:20, 126:12, 130:22
**answered** [1] - 49:14
**antiquated** [1] - 12:16
**anyway** [1] - 101:1
**apart** [1] - 82:4
**apologize** [1] - 22:22
**appear** [5] - 69:22, 85:8, 85:9, 86:17, 89:13
**appearance** [1] - 5:15
**APPEARANCES** [3] - 1:14, 2:1, 3:1

**application** [1] - 96:19
**applies** [1] - 7:13
**applying** [1] - 67:15
**appointment** [1] - 11:9
**approach** [5] - 20:6, 58:11, 64:20, 70:16, 74:18
**approached** [3] - 30:18, 30:24, 116:23
**approaching** [1] - 117:19
**appropriate** [9] - 7:2, 11:13, 13:6, 15:14, 93:6, 105:17, 106:22, 108:8, 113:7
**appropriateness** [1] - 130:10
**approve** [4] - 7:21, 14:15, 16:1, 20:15
**approved** [1] - 17:1
**April** [5] - 18:13, 20:1, 69:13, 75:15, 75:16
**APRIL** [2] - 1:6, 5:3
**ARCURI** [2] - 2:13, 6:4
**Arcuri** [1] - 6:4
**area** [20] - 29:24, 32:2, 32:3, 32:4, 32:6, 35:13, 36:6, 38:4, 49:18, 51:3, 61:14, 65:12, 66:3, 99:18, 110:25, 112:22, 117:16, 117:18, 127:6
**areas** [6] - 28:7, 64:8, 80:1, 89:6, 127:4, 127:16
**arguing** [1] - 129:17
**argument** [1] - 50:2
**arm** [2] - 35:11, 44:4
**armed** [6] - 55:1, 57:6, 57:10, 57:12, 57:15, 57:16
**arms** [1] - 33:24
**arranged** [1] - 80:22
**arrest** [2] - 108:21, 115:25
**arrested** [3] - 56:6, 102:1, 102:3
**arrive** [2] - 65:9, 80:14
**arrived** [2] - 48:8, 48:14
**Arthur** [1] - 61:9
**articulate** [1] - 22:21
**ascertain** [1] - 7:5
**aspect** [2] - 54:2, 122:25
**aspects** [3] - 15:1, 89:9, 123:11
**asphyxia** [1] - 89:8

**assault** [26] - 28:16, 31:24, 33:6, 33:7, 37:22, 43:13, 44:23, 44:24, 102:18, 112:14, 112:15, 112:17, 113:9, 113:15, 115:9, 119:11, 119:14, 120:1, 120:6, 120:19, 121:14, 121:16, 121:18, 122:5, 126:19
**assaulted** [2] - 26:24, 28:14, 28:17, 31:25, 45:10, 45:11, 55:24, 56:9, 100:23, 101:3, 102:6, 108:2, 109:20, 109:22, 110:14, 110:16, 111:23, 114:12, 124:10, 125:4, 126:3
**assaulting** [1] - 41:23
**assaults** [7] - 12:7, 12:8, 67:10, 69:18, 75:22, 110:1, 120:3, 128:14, 136:24
**assessment** [2] - 112:19, 113:7
**assigned** [3] - 78:1, 78:3, 99:9
**assistance** [3] - 14:16, 20:7, 63:17
**associated** [1] - 91:3
**asthma** [3] - 32:12, 32:13, 33:14
**AT** [1] - 2:3
**attached** [1] - 63:5
**attack** [9] - 30:1, 30:17, 56:17, 59:7, 60:3, 60:4, 60:6, 60:9, 60:11
**attacked** [5] - 28:12, 29:17, 45:9, 46:4, 47:5
**attackers** [1] - 49:8
**attainment** [1] - 62:23
**attempt** [1] - 92:20
**attempted** [2] - 16:15, 95:13
**attention** [13] - 43:6, 70:3, 71:2, 99:14, 109:9, 112:1, 116:16, 120:14, 123:13, 124:12, 124:14, 125:6, 133:20
**ATTORNEY** [1] - 2:3
**ATTORNEY'S** [1] - 3:3
**audit** [1] - 64:7
**August** [2] - 120:20

**authored** [2] - 64:1, 90:25
**authorizing** [1] - 89:2
**availability** [2] - 85:24, 86:20
**available** [3] - 86:2, 86:18, 104:4
**AVENUE** [3] - 1:20, 1:24, 2:9
**average** [2] - 26:25, 40:3
**avoid** [3] - 12:13, 20:4, 71:4
**avoided** [1] - 90:18
**aware** [2] - 56:5, 80:5

## B

**B-4** [3] - 28:18, 45:9, 86:9
**background** [1] - 65:2
**backwards** [1] - 33:25, 34:2, 109:4
**bad** [6] - 67:6, 67:13, 99:6, 105:22, 123:3
**badly** [7] - 67:2, 67:17, 68:23, 68:24, 88:10, 115:2
**bag** [1] - 30:10
**bags** [1] - 39:7
**bail** [1] - 55:3
**balance** [3] - 13:6, 107:18, 126:8
**balanced** [1] - 21:6
**bands** [1] - 37:20
**bar** [1] - 120:18
**bars** [1] - 120:22
**base** [1] - 82:9
**based** [16] - 11:18, 12:8, 12:11, 15:6, 52:3, 53:14, 72:15, 75:19, 81:7, 83:23, 83:25, 104:6, 128:25, 129:3, 129:9
**basic** [11] - 15:22, 64:12, 96:13, 106:19, 107:20, 108:3, 113:22, 121:16, 122:9, 127:7, 135:4
**basis** [3] - 13:22, 82:6, 128:3
**basketball** [1] - 77:5
**bathroom** [1] - 78:6
**Baton** [1] - 119:1
**battery** [1] - 116:20
**beat** [8] - 31:20, 32:7, 35:4, 44:2, 44:3, 44:8, 45:13, 111:4

**beaten** [1] - 123:22
**beating** [4] - 34:11, 35:8, 41:23, 47:9
**beatings** [1] - 51:25
**become** [3] - 15:15, 43:21, 131:21
**becomes** [1] - 104:24
**bed** [1] - 29:24
**beds** [2] - 100:23, 100:24
**BEFORE** [1] - 1:11
**began** [5] - 30:17, 112:3, 115:11, 121:7, 129:6
**begin** [8] - 8:14, 8:21, 14:6, 30:1, 31:20, 32:7, 34:3, 35:2
**beginning** [1] - 31:24
**behalf** [5] - 5:17, 6:6, 6:12, 6:13, 9:16
**behavior** [1] - 98:13
**behind** [7] - 30:9, 30:16, 33:24, 50:5, 99:22
**believes** [3] - 16:9, 20:18, 22:23
**below** [1] - 67:5
**bench** [1] - 70:9
**best** [5] - 81:13, 131:21, 131:22, 133:16, 138:9
**better** [5] - 21:3, 87:25, 95:18, 132:23, 133:6
**between** [15] - 10:21, 21:22, 22:15, 28:24, 30:20, 32:5, 36:18, 37:2, 68:11, 72:22, 77:3, 78:25, 88:23, 92:1, 135:1
**beyond** [2] - 66:24, 69:11
**biased** [1] - 93:9
**bifurcated** [1] - 21:18
**big** [6] - 10:8, 43:7, 50:2, 83:6, 128:12, 131:21
**biggest** [2] - 97:23, 97:25
**bit** [2] - 43:14, 61:23
**bitty** [3] - 27:11, 37:6, 48:9
**black** [1] - 50:14
**blade** [1] - 86:11
**Blake** [1] - 6:4
**BLAKE** [1] - 2:13
**blanket** [6] - 32:6, 32:11, 32:23, 33:12, 33:15
**bleeding** [5] - 44:11,

44:14, 49:6, 109:6, 109:8
**blood** [1] - 44:14
**blow** [1] - 126:13
**blue** [2] - 120:21, 120:25
**blueprint** [1] - 15:24
**body** [1] - 39:7
**Boise** [1] - 76:9
**book** [4] - 40:19, 41:25, 64:1, 70:9
**book-length** [1] - 64:1
**booked** [2] - 75:8, 75:9
**booking** [1] - 82:15
**boots** [2] - 27:8
**bother** [2] - 126:11, 126:24
**bothered** [1] - 126:18
**bottom** [1] - 30:13
**bounce** [1] - 71:9
**Bowdler** [1] - 6:11
**BOWDLER** [2] - 2:17, 6:11
**boy** [1] - 44:5
**brain** [2] - 110:5, 110:6
**branch** [1] - 63:4
**brave** [1] - 54:15
**break** [4] - 31:14, 31:18, 102:25, 137:17
**breakfast** [2] - 38:10
**breaking** [1] - 31:8
**breaks** [3] - 75:18, 78:6, 78:7
**breathe** [2] - 32:9, 32:21
**Brian** [1] - 6:13
**BRIAN** [2] - 2:22, 6:13
**bricks** [2] - 27:11
**brief** [1] - 16:5
**briefly** [7] - 34:17, 90:9, 99:13, 100:16, 108:24, 110:13, 116:21
**bring** [9] - 21:16, 24:1, 64:18, 70:4, 89:19, 96:13, 106:18, 113:16, 133:19
**bringing** [1] - 122:8
**broad** [6] - 17:19, 19:16, 21:13, 64:10, 66:20, 67:12
**broadest** [2] - 66:16, 67:4
**broadly** [4] - 64:8, 77:17, 87:1, 97:6
**broke** [3] - 31:6, 31:9, 31:10

53:2
broken [3] - 75:21, 123:22, 136:9
broomstick [1] - 101:6
brought [7] - 42:15, 44:25, 45:19, 50:8, 50:10, 71:2, 74:6
BRYAN [1] - 2:17
Bryan [1] - 6:11
bucket [7] - 31:21, 31:22, 32:25, 34:25, 35:15, 37:16, 37:17
budget [2] - 14:3, 21:6
budgets [1] - 130:16
building [8] - 26:16, 26:17, 26:21, 40:24, 48:4, 52:21, 67:22, 68:6
buildings [4] - 12:20, 26:9, 68:8, 77:21
built [2] - 15:18, 94:9
built-in [1] - 94:9
bunk [4] - 110:24, 116:23, 116:24, 136:18
burdened [1] - 20:8
bureau [1] - 63:5
Bureau [1] - 63:6
business [1] - 41:10
Butter [4] - 47:11, 47:13, 47:17, 47:21
buttocks [2] - 32:6, 35:13, 38:4
BY [44] - 1:16, 1:20, 1:23, 2:8, 2:12, 2:17, 2:21, 3:3, 3:11, 3:12, 4:6, 4:7, 4:9, 4:10, 25:6, 26:6, 40:14, 46:14, 55:6, 55:23, 58:15, 61:11, 63:13, 64:23, 66:11, 68:21, 74:24, 80:12, 85:4, 85:22, 86:25, 95:22, 96:24, 103:11, 105:14, 107:5, 116:15, 118:8, 118:22, 122:15, 129:24, 131:8, 132:6, 132:18

**C**

Cadillac [1] - 20:24
CALLED [1] - 5:4
camera [3] - 52:22, 52:23, 52:24
cameras [1] - 52:25
CANAL [3] - 1:17, 2:18, 2:18
cannot [2] - 51:18,

53:2
CAPITELLI [16] - 2:21, 2:21, 2:22, 6:7, 6:13, 54:23, 55:6, 55:23, 57:21, 58:1, 58:3, 58:6, 58:9, 58:11, 58:15, 60:17
Capitelli [4] - 6:8, 6:13, 55:8, 71:23
CAPITELLI............. [1] - 4:7
care [3] - 15:12, 59:10, 59:14
career [2] - 61:16, 104:3
carefully [1] - 102:14
carried [1] - 33:17
case [30] - 5:10, 6:16, 9:1, 9:6, 9:22, 22:2, 23:24, 43:22, 47:7, 49:2, 52:2, 57:8, 65:4, 67:16, 80:14, 80:15, 91:15, 91:16, 92:9, 98:11, 101:22, 104:7, 106:21, 113:10, 119:4, 119:5, 127:25, 128:17, 129:8, 132:8
cases [11] - 88:8, 105:20, 108:9, 112:17, 112:24, 113:6, 113:8, 115:22, 116:1, 126:1, 126:2
catastrophic [1] - 137:7
categories [1] - 95:4
category [1] - 75:23
CATHY [1] - 3:7
Cathy [2] - 138:4, 138:14
cathy_Pepper@laed.uscourts.gov [1] - 3:10
Cathy_Pepper@laed.uscourts.gov [1] - 138:16
causing [1] - 114:7
CCR [2] - 3:7, 138:14
cease [3] - 32:16, 53:7
cell [4] - 50:5, 51:1, 109:1
cells [1] - 28:3
cement [1] - 109:6
census [1] - 72:23
CENTER [3] - 1:16, 1:19, 1:23
centering [1] - 97:24
Central [1] - 53:15
centrally [1] - 125:21

CENTRE [1] - 2:22
certain [3] - 8:4, 43:19, 60:2
certainly [2] - 12:10, 132:25
CERTIFICATE [1] - 138:2
certification [1] - 7:19
Certified [3] - 138:4, 138:5, 138:14
certified [1] - 16:20
CERTIFIED [1] - 3:7
certify [1] - 138:8
challenging [1] - 22:14
chance [4] - 58:25, 73:5, 73:15, 123:7
change [4] - 10:4, 12:22, 12:23, 52:4, 52:16, 52:18, 53:10, 133:4
changed [1] - 27:23
changes [5] - 13:24, 14:1, 16:15, 16:24, 18:8
channels [4] - 105:18, 119:23, 119:24, 121:11
charge [1] - 25:25
charged [7] - 21:1, 49:23, 56:11, 56:12, 92:4, 115:23, 115:25
charges [9] - 30:6, 48:21, 49:23, 56:10, 56:13, 57:12, 92:12, 97:20
CHARLES [1] - 1:20
chart [1] - 121:2
Charter [2] - 21:6, 23:6
chatting [1] - 78:8
check [7] - 38:15, 42:23, 43:2, 93:10, 95:5, 107:18, 126:8
check-off [1] - 95:5
checks [1] - 94:24
chest [1] - 34:5
chicken [2] - 36:25, 37:6
chilling [1] - 126:14
choice [1] - 123:17
choked [1] - 30:16
choking [1] - 30:25
choose [1] - 93:10
Christine [1] - 6:1
CHRISTINE [1] - 1:24
churning [1] - 123:9
cigarette [1] - 86:14
cite [1] - 69:11
citizenry [1] - 20:23

**City** [61] - 6:6, 6:8, 6:10, 6:12, 6:14, 8:1, 8:21, 9:12, 9:25, 10:11, 10:13, 10:15, 11:1, 11:4, 11:5, 13:12, 13:13, 13:14, 13:17, 13:20, 13:21, 14:4, 14:6, 14:10, 17:6, 17:17, 19:14, 20:7, 20:8, 20:11, 21:5, 21:15, 21:16, 21:20, 21:24, 22:1, 22:3, 22:11, 22:13, 22:23, 23:6, 23:11, 23:15, 25:15, 54:9, 54:22, 55:10, 57:23, 58:8, 58:9, 66:4, 70:15, 71:13, 71:24, 72:2, 73:15, 96:15, 118:18, 130:15, 135:1
**CITY** [2] - 2:16, 3:3
**city** [3] - 69:3, 128:12, 131:21
**City's** [1] - 10:24
**CIVIL** [2] - 1:5, 2:7
**Civil** [1] - 23:4
**civil** [1] - 5:11
**claims** [5] - 6:17, 6:20, 6:25, 7:1, 21:18
**clarify** [1] - 133:22
**clarifying** [1] - 80:13
**class** [10] - 5:25, 7:20, 7:22, 8:19, 9:18, 9:24, 10:25, 21:4, 51:10, 57:1
**classed** [1] - 83:16
**classification** [14] - 53:11, 77:16, 78:21, 81:9, 81:10, 82:7, 83:6, 83:25, 84:2, 84:12, 84:16, 84:19, 85:11
**classifications** [1] - 82:13
**classified** [5] - 82:15, 82:17, 82:21, 83:18, 83:22
**clean** [2] - 51:3, 54:11
**cleaned** [1] - 38:4
**clear** [6] - 21:2, 22:22, 79:16, 106:21, 126:10, 135:21
**clearly** [2] - 88:6, 131:21
**Clerk** [2] - 24:24, 61:6
**CLERK** [8] - 5:7, 5:11, 24:17, 24:25, 60:24, 61:7, 103:4, 103:6
**climate** [1] - 121:20

**climbing** [1] - 117:3
**clinical** [1] - 15:14
**close** [2] - 110:6, 116:6
**closed** [8] - 92:12, 92:16, 92:21, 118:15, 118:18, 118:23, 119:4, 124:3
**closely** [1] - 14:18
**closes** [1] - 92:11
**closest** [1] - 119:16
**closing** [1] - 124:21
**clothes** [4] - 31:4, 38:2, 39:3, 117:5
**clothing** [1] - 116:25
**co** [1] - 64:1
**co-authored** [1] - 64:1
**COCO** [1] - 1:20
**combination** [1] - 78:10
**comical** [1] - 36:7
**coming** [5] - 38:19, 40:15, 44:14, 51:19, 86:3
**comment** [1] - 133:16
**comments** [4] - 8:8, 8:11, 11:24, 112:23
**Commission** [1] - 16:19
**commit** [1] - 52:23
**committed** [1] - 21:5
**common** [6] - 77:25, 115:17, 115:19, 115:20, 115:24, 119:15
**commonplace** [2] - 12:20, 69:22
**communication** [1] - 104:24
**community** [7] - 10:19, 11:24, 12:1, 63:19, 66:18, 66:20
**company** [2] - 25:20, 47:1
**comparable** [2] - 76:23, 127:19
**compare** [2] - 75:25, 76:12
**comparison** [3] - 76:14, 128:6, 128:11
**complaint** [1] - 92:15
**complaints** [2] - 94:4, 119:24
**completely** [4] - 35:12, 35:17, 53:8, 98:10
**complex** [1] - 100:18
**compliance** [5] - 14:17, 14:20, 96:13, 106:18, 122:9

**compliant** [1] - 13:5
**Complies** [1] - 59:5
**comport** [1] - 107:20
**composed** [1] - 77:21
**compounded** [1] - 20:5
**comprehensible** [1] - 15:24
**comprehensive** [2] - 11:19, 103:17
**comprise** [1] - 67:24
**comprised** [1] - 97:17
**computer** [1] - 40:21
**COMPUTER** [1] - 3:12
**concept** [2] - 98:19, 98:20
**concern** [1] - 137:3
**concerned** [2] - 17:10, 97:19
**concerns** [1] - 137:2
**concerted** [1] - 10:8
**Conchetta** [1] - 26:12
**conclusion** [2] - 69:6, 84:25
**conclusions** [3] - 68:5, 68:7, 80:1
**conclusory** [1] - 95:17
**condensed** [1] - 70:9
**condition** [1] - 19:3
**conditions** [20] - 6:20, 9:21, 10:3, 10:18, 10:20, 11:19, 12:2, 13:14, 13:24, 14:7, 15:25, 19:5, 19:12, 20:22, 20:23, 21:21, 22:14, 69:6, 132:11
**conduct** [3] - 27:16, 27:21, 92:4
**conducting** [3] - 14:6, 92:4, 93:20
**confidence** [1] - 133:3
**confinement** [2] - 13:14, 19:12
**confirm** [2] - 85:19, 113:17
**confirmed** [2] - 99:25, 117:13
**conflict** [1] - 94:9
**conflicts** [1] - 98:1
**conform** [4] - 17:19, 22:24, 121:15, 121:17
**conforming** [1] - 22:24
**confrontation** [3] - 99:17, 100:19, 112:1
**connect** [1] - 81:4
**connection** [4] - 55:18, 55:24, 57:17, 63:9

**Consent** [69] - 6:16, 6:24, 7:2, 7:4, 7:9, 7:11, 7:15, 8:2, 8:3, 8:6, 8:12, 9:19, 9:20, 11:2, 11:12, 11:17, 13:3, 13:15, 13:16, 13:19, 13:20, 14:4, 14:9, 14:21, 14:22, 15:23, 16:8, 16:9, 16:23, 17:18, 18:17, 18:22, 18:24, 18:25, 19:16, 20:9, 20:18, 21:24, 22:8, 22:18, 22:24, 23:1, 23:2, 53:22, 95:23, 96:1, 96:8, 96:19, 97:3, 102:20, 103:12, 103:22, 104:9, 105:25, 107:2, 122:4, 122:8, 130:3, 130:4, 130:7, 130:11, 131:11, 131:12, 131:14, 131:18, 132:7, 132:10, 133:3
**consequence** [1] - 89:15
**consider** [3] - 8:10, 11:23, 17:13
**consideration** [1] - 131:11
**considered** [3] - 18:1, 75:23, 92:23
**considering** [1] - 131:10
**consistent** [3] - 73:6, 117:13, 117:20
**consistently** [1] - 107:24
**consisting** [1] - 7:20
**constantly** [2] - 34:14, 35:4
**Constitution** [3] - 6:22, 7:6, 13:11
**Constitutional** [15] - 11:14, 13:9, 13:13, 13:24, 15:24, 17:7, 17:8, 17:20, 19:12, 20:16, 20:21, 21:22, 23:3, 23:11, 106:19
**constrained** [1] - 17:17
**contact** [1] - 131:23
**contemporary** [1] - 12:24
**contest** [1] - 73:2
**context** [2] - 96:19, 131:10
**continue** [3] - 85:18, 89:13, 92:6

**continued** [2] - 99:23, 117:2
**CONTINUED** [2] - 2:1, 3:1
**continues** [4] - 44:8, 114:14, 114:24, 115:2
**contraband** [3] - 15:3, 86:16, 86:17
**contract** [1] - 25:20
**contrasts** [1] - 120:18
**contributed** [1] - 14:23
**contributes** [1] - 14:7
**contributing** [1] - 82:7
**contributors** [1] - 87:1
**control** [2] - 23:15, 93:23
**conversations** [1] - 56:14
**convicted** [3] - 20:25, 54:24, 56:11
**convince** [1] - 49:24
**convinced** [1] - 50:13
**Coon** [2] - 5:17, 9:16
**COON** [7] - 2:8, 5:17, 8:15, 8:18, 9:10, 9:15, 11:11
**coordinator** [1] - 14:20
**copies** [1] - 70:12
**copy** [4] - 58:24, 70:5, 89:19, 116:9
**Corey** [1] - 5:22
**COREY** [1] - 2:9
**cornerstone** [1] - 23:10
**correct** [33] - 7:16, 7:18, 9:20, 11:7, 11:8, 55:16, 55:19, 55:20, 56:1, 56:5, 56:19, 57:11, 57:25, 59:10, 59:15, 59:25, 60:11, 97:4, 122:13, 127:18, 128:5, 130:23, 134:4, 134:8, 134:16, 134:21, 135:11, 135:15, 135:22, 136:1, 136:20, 136:24, 138:8
**corrected** [2] - 122:23
**correctional** [17] - 12:17, 15:1, 15:4, 61:21, 61:22, 62:7, 63:7, 63:25, 66:17, 87:7, 95:8, 96:14, 106:19, 107:21, 113:22, 121:16, 122:9

**Correctional** [1] - 16:19
**Corrections** [1] - 63:3
**corrections** [6] - 14:19, 63:2, 63:19, 66:13, 68:16, 68:18
**corrective** [2] - 13:1, 104:1
**correctly** [1] - 128:7
**corridor** [4] - 37:2, 37:4, 41:2, 42:2
**counsel** [3] - 5:15, 71:5, 73:6
**count** [1] - 62:2
**countless** [1] - 12:6
**country** [7] - 63:8, 69:2, 88:9, 128:13, 130:24, 131:22, 136:23
**county** [2] - 68:13, 131:16
**County** [17] - 76:4, 76:8, 76:9, 76:16, 76:23, 127:23, 128:4, 128:10, 128:17, 129:6, 129:13, 129:19, 130:5, 130:11, 130:19, 131:13, 131:16
**couple** [5] - 18:19, 116:7, 121:3, 127:4, 133:8
**courage** [1] - 54:10
**course** [5] - 12:23, 87:22, 98:12, 132:20, 134:25
**Court** [60] - 6:23, 7:1, 7:5, 7:8, 7:14, 7:22, 8:7, 8:10, 9:18, 10:1, 11:20, 11:22, 11:23, 11:24, 12:22, 13:22, 15:25, 16:18, 16:24, 16:25, 20:15, 21:18, 21:20, 21:23, 23:9, 62:4, 67:16, 67:21, 68:22, 69:5, 71:22, 74:8, 75:14, 87:6, 90:9, 92:1, 96:16, 97:16, 99:13, 99:15, 100:17, 103:5, 103:15, 106:13, 107:8, 108:20, 116:9, 116:21, 121:3, 122:17, 127:1, 127:24, 131:10, 132:13, 137:19, 138:5, 138:6, 138:7, 138:15, 138:16
**court** [6] - 11:15, 15:24, 31:15, 51:3, 56:9, 58:4
**Court's** [3] - 7:19, 8:5,

**COURT** [148] - 1:1, 3:7, 5:4, 5:8, 5:10, 5:14, 5:21, 6:15, 8:16, 8:20, 8:24, 9:14, 11:4, 11:10, 16:3, 16:6, 17:2, 17:5, 22:1, 22:4, 22:11, 23:19, 24:1, 24:7, 26:3, 39:19, 39:25, 40:3, 40:7, 40:9, 40:11, 46:2, 46:6, 46:9, 46:12, 54:20, 54:22, 54:24, 55:2, 55:19, 57:24, 58:2, 58:5, 58:8, 58:10, 58:13, 60:13, 60:18, 60:21, 63:9, 64:21, 65:10, 65:14, 65:16, 65:18, 65:23, 66:2, 66:6, 67:21, 68:5, 68:9, 70:6, 70:10, 70:20, 71:1, 71:11, 72:2, 72:6, 72:14, 72:19, 72:24, 73:2, 73:8, 73:12, 73:17, 73:24, 74:1, 74:10, 74:15, 74:17, 74:19, 74:21, 78:23, 79:7, 79:16, 79:20, 80:9, 83:21, 84:13, 84:22, 85:2, 85:13, 85:15, 86:6, 93:17, 94:11, 94:15, 94:24, 95:16, 95:20, 96:21, 102:22, 102:25, 103:7, 105:7, 105:10, 105:12, 106:16, 106:21, 116:3, 116:11, 118:3, 118:18, 122:11, 128:5, 128:10, 128:24, 129:8, 129:12, 129:15, 129:21, 130:13, 130:20, 131:2, 131:4, 132:3, 132:14, 133:8, 133:15, 134:4, 134:10, 134:13, 134:18, 134:23, 135:4, 135:9, 135:13, 135:17, 135:24, 136:3, 136:7, 136:11, 136:20, 137:2, 137:6, 137:10, 137:14, 137:17
**court** [6] - 11:15, 15:24, 31:15, 51:3, 56:9, 58:4
**Court's** [3] - 7:19, 8:5,

129:16
**court's** [1] - 9:5
**court-enforceable** [1] - 15:24
**courtroom** [3] - 8:23, 9:1, 9:2
**cover** [1] - 40:24
**covers** [1] - 104:18
**crazy** [4] - 36:14, 50:12, 52:24, 53:14
**create** [1] - 121:20
**crime** [5] - 21:1, 52:23, 54:24, 115:23, 116:1
**crimes** [1] - 121:23
**Criminal** [1] - 47:20
**criminal** [4] - 10:17, 61:15, 61:17, 61:19
**crises** [1] - 62:10
**crisis** [2] - 75:7, 75:24
**critical** [5] - 9:25, 10:12, 10:15, 62:12, 88:4
**CROSS** [2] - 4:7, 55:5
**cross** [1] - 72:22
**CROSS-EXAMINATION** [2] - 4:7, 55:5
**cross-references** [1] - 72:22
**crowd** [3] - 30:9, 36:12, 36:16
**CRR** [2] - 3:7, 138:14
**crucial** [2] - 88:13, 100:6
**crutch** [6] - 111:3, 111:4, 111:19, 111:20, 112:3
**culminating** [1] - 110:4
**CUMMING** [1] - 2:3
**cup** [1] - 35:1
**curb** [1] - 15:10
**current** [5] - 7:20, 8:9, 11:13, 11:20, 78:16
**cursing** [1] - 50:2
**custody** [5] - 47:4, 49:12, 75:9, 81:19, 81:25
**cut** [5] - 33:20, 34:17, 37:12, 37:20, 42:8
**cutting** [1] - 42:9
**CV** [1] - 64:24
**CV's** [1] - 73:23

**D**

**damage** [1] - 110:5
**dance** [2] - 36:9, 36:10

**danger** [2] - 108:5, 126:3
**dangerous** [5] - 9:21, 12:2, 15:8, 108:5, 108:16
**dangers** [1] - 135:21
**data** [8] - 14:5, 15:7, 72:22, 83:4, 103:19, 103:20, 103:21, 104:4
**date** [11] - 42:23, 47:22, 82:11, 82:12, 83:22, 118:9, 118:14, 123:24, 124:15, 124:18, 124:22
**DAY** [1] - 1:10
**days** [6] - 41:18, 43:17, 46:4, 78:2, 83:17, 92:16
**daytime** [1] - 39:23
**DC** [2] - 2:10, 20:12
**dead** [1] - 110:6
**deadly** [1] - 12:2
**deal** [3] - 63:10, 112:16, 126:22
**dealing** [3] - 97:19, 97:22, 108:16
**deals** [1] - 129:18
**dealt** [2] - 97:14, 108:15
**death** [2] - 135:14, 135:18
**decades** [1] - 12:3
**December** [3] - 80:18, 82:10, 82:11
**decent** [1] - 54:8
**decide** [3] - 96:16, 96:17, 132:13
**decided** [2] - 100:20, 110:16
**decision** [3] - 104:25, 106:13, 133:14
**decisions** [3] - 18:4, 99:5, 105:1
**declaration** [2] - 57:18, 57:22
**declarations** [1] - 86:21
**declined** [1] - 13:15
**decrease** [1] - 53:8
**decree** [6] - 21:7, 21:11, 21:13, 106:8, 106:10, 131:16
**Decree** [43] - 11:2, 16:8, 16:9, 16:23, 17:18, 18:17, 18:22, 18:24, 18:25, 19:16, 20:18, 21:24, 22:8, 22:18, 22:24, 23:1,

23:2, 53:22, 95:23, 96:1, 96:8, 96:19, 97:3, 102:20, 103:12, 103:22, 104:9, 105:25, 107:2, 122:4, 122:8, 130:3, 130:4, 130:7, 130:11, 131:11, 131:12, 131:14, 131:18, 132:7, 132:10, 133:3
**Decrees** [1] - 20:9
**decrepit** [1] - 12:20
**defendant** [4] - 6:19, 9:18, 13:12, 47:6
**DEFENDANTS** [1] - 2:12
**defendants** [1] - 72:17
**defense** [1] - 94:25
**deficiencies** [6] - 13:4, 14:23, 18:14, 96:10, 104:10, 106:11
**deficient** [5] - 88:1, 105:5, 105:6, 105:9, 105:15
**definitely** [1] - 30:19
**degree** [1] - 104:17
**delayed** [1] - 104:18
**democratic** [1] - 23:10
**demographically** [1] - 128:19
**demonstrative** [1] - 70:18
**Department** [16] - 5:16, 16:8, 17:12, 18:6, 18:14, 18:18, 19:7, 19:11, 19:13, 19:18, 20:1, 20:3, 20:9, 20:10, 63:4, 136:21
**department** [2] - 68:16, 68:18
**DEPARTMENT** [1] - 2:7
**department's** [1] - 79:11
**departments** [1] - 16:20
**depose** [5] - 130:13, 130:16, 130:17, 130:21, 130:24
**depressed** [2] - 35:17, 35:18
**deputies** [16] - 19:2, 43:20, 44:9, 59:10, 78:17, 81:1, 90:13, 90:15, 98:6, 98:10, 101:8, 101:9, 110:17, 111:24,

112:5, 124:9
**deputy** [41] - 38:7,
42:11, 42:14, 42:22,
43:24, 44:20, 49:20,
50:8, 59:7, 59:13,
59:25, 60:9, 60:10,
60:13, 79:5, 90:17,
90:18, 98:11, 98:21,
98:24, 99:7, 99:17,
99:18, 99:20, 99:21,
99:25, 100:1,
100:19, 100:20,
101:10, 101:11,
101:12, 101:14,
101:19, 117:15,
117:16, 117:17,
117:22, 118:3
**DEPUTY** [8] - 5:7,
5:11, 24:17, 24:25,
60:24, 61:7, 103:4,
103:6
**Deputy** [3] - 101:21,
101:23, 102:15
**deputy's** [1] - 101:12
**derisive** [1] - 112:23
**describe** [18] - 32:20,
33:22, 33:23, 63:14,
64:6, 77:17, 99:13,
99:15, 103:15,
107:8, 108:20,
110:13, 116:21,
117:9, 124:8,
124:24, 127:1,
131:10
**DESCRIPTION** [1] -
4:16
**description** [2] -
107:19, 109:24
**descriptions** [2] -
132:21, 132:22
**design** [1] - 62:25
**designed** [1] - 9:20
**designs** [1] - 77:22
**desk** [1] - 40:19
**despite** [1] - 9:22
**detail** [7] - 80:20, 93:7,
95:12, 95:14, 97:9,
128:17
**detailed** [4] - 18:9,
80:8, 132:21
**details** [1] - 67:5
**detainees** [4] - 10:13,
11:21, 13:14, 14:8
**detection** [1] - 15:3
**detective** [3] - 90:24,
91:2, 92:18
**Detective** [2] - 91:14,
92:20
**detectives** [2] - 90:14,
92:19

**determination** [1] -
21:21
**determinations** [1] -
14:4
**determine** [5] - 7:23,
15:7, 19:15, 73:10,
79:3
**determined** [1] - 15:5
**determining** [1] - 8:11
**DEVALL** [3] - 4:5,
24:22, 25:3
**Devall** [1] - 25:2
**developed** [2] - 63:24,
112:2
**development** [1] -
14:24
**developmentally** [1] -
83:1
**dialogue** [1] - 19:15
**die** [4] - 36:11, 42:6,
42:7, 51:23
**died** [2] - 11:23, 12:4
**diem/per** [1] - 134:23
**difference** [2] - 68:11,
92:1
**different** [14] - 16:16,
20:9, 25:21, 27:12,
27:13, 45:19, 48:10,
50:3, 94:15, 98:10,
113:13, 114:2,
117:19, 134:1
**differentiated** [1] -
68:19
**differently** [1] - 134:8
**difficult** [3] - 76:14,
79:11, 79:22
**dinner** [1] - 38:11
**diploma** [1] - 52:9
**DIRE** [2] - 4:9, 61:10
**direct** [6] - 70:2,
99:14, 109:9,
116:16, 120:14,
123:13
**DIRECT** [4] - 4:6, 4:10,
25:5, 66:10
**disabled** [2] - 83:1,
125:1
**disagreement** [2] -
66:25, 90:16
**disagrees** [4] - 18:12,
18:20, 18:21, 18:23
**discarded** [1] - 12:19
**discharged** [1] - 124:5
**disciplinary** [3] -
79:17, 80:4, 99:9
**discipline** [5] - 80:2,
96:2, 97:8, 98:24,
102:18
**disciplined** [1] - 100:6
**discuss** [1] - 9:6

**discussion** [1] - 66:24
**dislocations** [1] -
75:22
**dispute** [2] - 9:24,
57:14
**disputes** [1] - 10:21
**disrepair** [1] - 12:20
**distinction** [2] - 68:16,
89:5
**distinguish** [3] - 77:2,
81:11, 88:23
**distinguished** [1] -
77:19
**distributed** [1] - 84:19
**distributes** [1] - 64:1
**district** [1] - 133:11
**DISTRICT** [3] - 1:1,
1:1, 1:12
**District** [2] - 138:7,
138:16
**division** [2] - 63:18,
63:19
**DIVISION** [1] - 2:7
**Division** [2] - 90:3,
92:3
**DOC** [2] - 26:2, 53:14
**DOCKET** [1] - 1:5
**doctor** [4] - 50:8, 50:9,
125:6, 128:6
**doctor's** [3] - 50:20,
91:20
**document** [18] -
57:14, 70:3, 70:16,
74:25, 85:6, 85:9,
85:10, 85:13, 85:20,
89:21, 104:15,
106:1, 108:20,
118:14, 120:15,
123:14, 124:8,
124:24
**Document** [2] - 57:22,
58:5
**documentation** [1] -
72:24
**documented** [3] -
79:9, 90:10, 128:17
**documents** [11] -
70:10, 71:3, 71:6,
71:14, 71:15, 73:3,
79:10, 80:15,
101:22, 104:6,
109:19
**DOJ** [8] - 18:4, 21:9,
21:15, 22:15, 23:8,
23:14, 24:13, 70:19
**dollars** [1] - 19:9
**Donald** [1] - 24:15
**done** [20] - 16:22,
56:15, 62:5, 62:9,
62:14, 62:15, 63:10,

63:15, 64:5, 64:15,
78:18, 78:23, 79:23,
93:7, 98:21, 105:1,
107:25, 108:11,
110:3, 134:7
**DONNELLY** [15] - 2:8,
5:19, 64:20, 70:24,
72:4, 72:7, 72:15,
72:20, 73:1, 73:16,
73:22, 73:25, 74:3,
74:18, 74:20
**Donnelly** [4] - 5:19,
64:17, 70:4, 89:19
**door** [11] - 37:3, 38:7,
38:16, 41:8, 42:11,
42:12, 43:7, 44:12,
49:19, 59:22
**doors** [1] - 29:8
**DORGENOIS** [1] - 2:4
**dorm** [31] - 28:25,
30:21, 32:13, 33:4,
36:23, 37:9, 37:25,
38:24, 38:25, 39:12,
40:20, 40:22, 40:24,
40:25, 42:4, 42:5,
42:6, 42:14, 42:25,
45:19, 48:1, 50:5,
50:6, 52:22, 52:23,
59:18, 59:19, 81:16,
81:18, 90:16, 92:19
**dormitory** [12] - 27:24,
29:7, 33:17, 36:9,
39:24, 39:25, 40:8,
40:9, 40:11, 40:16,
49:20
**dorms** [1] - 52:25
**doubt** [2] - 20:22,
36:15
**down** [25] - 18:6,
19:18, 20:11, 24:1,
24:2, 27:24, 38:6,
41:12, 42:13, 45:14,
45:15, 45:19, 48:10,
50:16, 59:20, 59:23,
60:14, 64:10, 75:21,
86:22, 90:22, 94:2,
115:12, 117:2
**downstairs** [2] -
42:15, 44:25
**dozens** [1] - 11:24
**dr** [1] - 85:5
**Dr** [28] - 24:15, 63:14,
64:5, 64:24, 65:19,
65:23, 66:12, 70:1,
74:25, 80:13, 85:23,
89:21, 95:23, 96:17,
96:25, 103:12,
106:13, 111:16,
113:20, 116:16,
118:9, 119:11,

120:15, 123:14,
125:15, 131:9,
132:7, 133:22
**dragged** [1] - 36:21
**dragging** [1] - 44:12
**draw** [1] - 80:1
**drawn** [1] - 7:15
**dreadful** [1] - 127:12
**dropped** [7] - 56:10,
56:13, 57:12,
107:13, 110:4,
119:4, 124:3
**dry** [1] - 117:4
**dude** [19] - 30:9,
30:15, 30:25, 32:1,
32:2, 32:3, 32:12,
33:8, 33:9, 39:11,
44:2, 44:3, 44:7,
49:1, 49:17, 50:14,
50:16
**dudes** [14] - 30:3,
30:12, 32:11, 34:6,
41:21, 41:22, 45:12,
45:17, 49:17, 49:24,
51:23, 51:24, 52:8,
53:2
**due** [7] - 20:23, 23:14,
43:18, 77:3, 77:4,
77:7, 77:8
**duly** [2] - 24:23, 61:5
**DUNBAR** [1] - 2:16
**during** [14] - 16:16,
20:19, 23:17, 47:24,
59:7, 60:3, 60:4,
60:5, 60:9, 60:10,
76:17, 76:25, 80:21,
121:6
**Durrell** [1] - 24:16
**duty** [2] - 59:14,
119:16
**dying** [2] - 44:11, 49:6

**E**

**early** [2] - 103:22,
104:5
**easily** [1] - 86:18
**Eastern** [1] - 138:7
**EASTERN** [1] - 1:1
**eastern** [1] - 25:16
**easy** [1] - 86:19
**educational** [1] -
62:22
**Edwin** [3] - 109:2,
109:19
**effect** [6] - 7:10,
12:23, 13:17, 13:19,
23:16, 126:14
**effective** [3] - 28:10,

28:11, 77:16
**effort** [1] - 10:8
**efforts** [2] - 86:2, 127:25
**eight** [2] - 69:12, 77:1
**eight-month** [1] - 69:12
**either** [13] - 17:19, 40:2, 49:7, 70:19, 84:23, 86:14, 89:3, 110:1, 112:1, 119:16, 126:12, 127:7, 136:18
**elderly** [1] - 81:23
**elements** [1] - 87:6
**Elimination** [2] - 79:15, 82:1
**elite** [1] - 94:6
**ELIZABETH** [1] - 2:3
**eloquent** [1] - 69:23
**elsewhere** [1] - 101:23
**emasculate** [1] - 23:9
**embarrass** [1] - 36:8
**emergencies** [2] - 62:9, 77:1
**emergency** [18] - 63:25, 64:2, 75:5, 75:6, 75:10, 75:19, 76:1, 76:11, 76:18, 76:20, 123:16, 123:18, 125:21, 125:23, 137:11, 137:12
**emphasis** [1] - 62:24
**employee** [3] - 98:7, 103:21, 103:23
**employee's** [1] - 104:3
**employees** [2] - 104:15, 104:23
**enable** [2] - 14:6, 15:21
**encouraging** [1] - 127:5
**end** [5] - 37:3, 107:15, 108:7, 108:12, 131:20
**ended** [2] - 80:23, 91:21
**ends** [1] - 115:22
**enemies** [3] - 53:16, 53:17, 100:22
**ENERGY** [1] - 2:22
**enforceable** [1] - 15:24
**enforced** [1] - 88:5
**enforcement** [2] - 61:21, 131:15
**engage** [1] - 19:15
**English** [1] - 15:20
**enrollment** [1] - 53:13

**ensure** [4] - 13:10, 13:23, 14:10, 22:8
**ensuring** [1] - 19:12
**enter** [4] - 6:23, 8:6, 8:11, 9:19
**entering** [1] - 7:4
**entertainer** [1] - 25:18
**entire** [2] - 19:8, 61:15
**entirely** [1] - 107:17
**entitled** [5] - 20:21, 20:23, 20:24, 23:15, 138:10
**entries** [1] - 84:16
**entry** [1] - 71:2
**episode** [1] - 110:4
**equally** [1] - 98:3
**equipment** [1] - 136:8
**equipped** [1] - 94:2
**escalate** [1] - 104:2
**escape** [1] - 81:17
**escapes** [4] - 67:9, 69:11, 69:13, 69:14
**escort** [1] - 111:25
**escorted** [3] - 110:17, 110:18, 110:21
**especially** [1] - 7:24
**ESQUIRE** [14] - 1:16, 1:20, 1:23, 1:24, 2:8, 2:8, 2:9, 2:12, 2:13, 2:17, 2:17, 2:21, 2:22, 3:3
**essence** [1] - 23:8
**essential** [1] - 83:6
**essentially** [2] - 110:22, 117:20
**estimate** [1] - 79:6
**estimation** [1] - 78:13
**ET** [2] - 1:4, 1:7
**et** [3] - 5:12, 6:17
**etcetera** [1] - 121:14
**Euell** [4] - 23:24, 24:10, 24:14, 47:20
**euell** [1] - 25:2
**EUELL** [3] - 4:5, 24:22, 25:3
**evaluate** [2] - 67:1, 79:11
**evaluating** [1] - 67:6
**evaluation** [1] - 93:19
**event** [1] - 137:7
**eventually** [3] - 35:22, 55:25, 56:3
**evidence** [14] - 8:9, 11:3, 11:12, 18:10, 23:16, 57:24, 70:7, 71:17, 71:20, 72:3, 72:24, 116:5
**evidently** [1] - 92:14
**exact** [5] - 30:19, 34:22, 42:3, 75:16,

76:17
**exactly** [4] - 39:23, 41:20, 83:15, 94:14
**EXAMINATION** [34] - 4:6, 4:7, 4:9, 4:10, 25:5, 26:5, 40:13, 46:13, 55:5, 55:22, 58:14, 61:10, 63:12, 64:22, 66:10, 68:20, 74:23, 80:11, 85:3, 85:21, 86:24, 95:21, 96:23, 103:10, 105:13, 107:4, 116:14, 118:7, 118:21, 122:14, 129:23, 131:7, 132:5, 132:17
**EXAMINATIONS** [1] - 4:3
**examine** [3] - 58:17, 97:8, 97:9
**examined** [2] - 24:24, 61:6
**example** [5] - 80:3, 81:15, 100:9, 100:14
**examples** [5] - 79:17, 89:16, 97:16, 99:8, 126:10
**excellent** [2] - 67:4, 80:3
**except** [5] - 26:10, 44:22, 64:7, 95:3, 108:14
**exceptions** [1] - 123:1
**excessive** [2] - 69:21, 70:9
**exclude** [1] - 82:14
**excludes** [1] - 75:8
**excuse** [3] - 74:21, 86:6, 117:12
**Exhibit** [27] - 64:17, 70:4, 71:11, 71:24, 71:25, 72:3, 73:5, 85:5, 89:18, 99:11, 100:14, 108:18, 109:9, 109:14, 110:8, 111:7, 111:12, 113:17, 114:4, 116:10, 116:12, 116:17, 120:14, 123:13, 124:7, 124:23, 133:21
**exhibit** [4] - 70:19, 72:20, 91:23, 92:25
**EXHIBITS** [2] - 4:18, 4:20
**exhibits** [4] - 71:25, 72:8, 72:10, 73:6
**Exhibits** [3] - 72:7,

73:20, 74:2
**existence** [1] - 23:6
**expeditiously** [1] - 15:25
**experience** [8] - 28:4, 52:3, 52:15, 65:1, 69:10, 107:20, 127:24, 129:1
**experiences** [2] - 11:21, 129:9
**experimental** [1] - 62:25
**expert** [10] - 65:11, 65:12, 65:20, 66:3, 66:7, 72:11, 73:23, 106:15, 106:22, 130:13
**expertise** [3] - 11:18, 65:23, 129:8
**experts** [5] - 8:24, 11:15, 14:12, 67:1, 130:24
**explain** [7] - 11:17, 40:15, 68:11, 75:13, 78:21, 92:1, 122:17
**explanatory** [1] - 54:17
**express** [1] - 106:14
**expressed** [2] - 66:18, 126:13
**extends** [1] - 7:16
**extensive** [1] - 80:7
**extensively** [2] - 76:3, 127:22
**extent** [2] - 92:10, 128:22
**extraordinarily** [1] - 69:19
**extraordinary** [3] - 11:1, 69:24, 98:21
**extremely** [3] - 34:21, 35:11, 82:23
**eyes** [2] - 42:8, 42:9, 126:19

## F

**face** [11] - 28:2, 32:7, 34:4, 34:7, 34:20, 44:15, 90:20, 91:21, 102:11, 112:9
**Facebook** [1] - 40:25
**facilitate** [2] - 14:13, 14:16
**facilities** [17] - 6:21, 16:11, 67:23, 67:24, 68:18, 68:19, 75:6, 80:19, 80:25, 81:2, 82:19, 84:20,

127:17, 133:12, 135:14, 135:20, 136:22
**facility** [10] - 15:7, 15:18, 21:13, 67:13, 67:14, 124:18, 127:19, 129:19, 136:4
**facility's** [1] - 124:1
**facing** [1] - 30:5
**fact** [12] - 12:11, 18:21, 44:18, 56:23, 57:10, 79:9, 83:4, 129:9, 135:14, 135:22, 136:1, 136:24
**factor** [2] - 78:20, 83:5
**factors** [1] - 67:15
**facts** [4] - 100:16, 102:8, 112:8, 133:24
**factual** [1] - 133:23
**fail** [1] - 121:22
**failed** [1] - 12:17
**failing** [1] - 98:23
**failure** [5] - 77:14, 77:15, 96:1, 97:24, 98:17
**fair** [10] - 7:5, 7:23, 13:4, 14:3, 17:22, 22:9, 81:13, 88:10, 129:2
**fairly** [3] - 54:4, 78:7, 94:5
**Fairness** [3] - 5:13, 130:3, 130:10
**FAIRNESS** [1] - 1:11
**falling** [1] - 90:20
**false** [1] - 115:25
**familiar** [10] - 58:21, 76:24, 87:20, 89:21, 89:24, 98:19, 99:12, 100:15, 110:10, 116:18
**families** [1] - 115:8
**family** [6] - 11:22, 25:11, 25:14, 52:14, 120:10, 120:11
**fan** [1] - 86:11
**far** [12] - 10:25, 19:4, 25:20, 27:7, 40:25, 41:22, 71:2, 72:18, 77:6, 77:8, 105:21, 113:7
**fashion** [1] - 127:5
**fatalities** [1] - 137:8
**fathers** [1] - 52:12
**fear** [1] - 123:21
**February** [1] - 123:25
**Federal** [2] - 23:4, 63:6

**federal** [10] - 6:22, 7:17, 7:18, 13:5, 17:20, 21:25, 63:5, 79:14, 131:15, 133:11
**feed** [3] - 38:7, 38:9
**fell** [3] - 77:4, 90:19, 109:4
**female** [1] - 128:21
**few** [17] - 26:2, 30:3, 48:25, 49:20, 54:23, 56:25, 57:2, 59:1, 59:2, 64:3, 69:16, 92:16, 109:2, 114:21, 123:1, 136:21
**field** [3] - 66:12, 67:1, 67:7
**fight** [5] - 90:12, 94:2, 99:21, 104:19
**fighting** [1] - 99:24
**fights** [2] - 26:24, 27:2
**figure** [3] - 37:23, 43:16, 78:19
**figures** [1] - 76:23
**file** [8] - 46:19, 91:4, 91:5, 109:16, 111:9, 113:10, 122:21, 123:24
**filed** [8] - 18:17, 19:25, 20:2, 46:21, 48:22, 124:15, 125:8, 125:9
**files** [3] - 97:17, 98:2, 115:17
**filing** [2] - 115:24, 125:2
**filings** [1] - 9:22
**fill** [1] - 79:4
**filled** [1] - 49:14
**finalized** [1] - 9:8
**finally** [5] - 10:14, 15:19, 49:13, 122:16, 131:16
**financial** [3] - 14:5, 20:7, 130:25
**financing** [1] - 134:24
**findings** [3] - 18:9, 18:12, 18:21
**fine** [2] - 9:14, 19:3
**finger** [3] - 32:1, 33:8, 114:16
**fingers** [1] - 123:22
**finished** [3] - 37:24, 74:7, 81:3
**fire** [4] - 15:17, 135:20, 137:3, 137:7
**firearm** [2] - 57:11, 57:13
**first** [34] - 16:12, 23:20, 23:23, 24:5,

24:13, 24:23, 25:2, 41:18, 42:17, 48:8, 49:12, 58:16, 61:5, 65:10, 66:17, 67:7, 67:8, 77:14, 78:21, 87:5, 87:11, 89:18, 98:25, 99:23, 101:21, 102:10, 109:12, 109:13, 115:15, 115:20, 122:17, 123:13, 125:24, 126:21
**fish** [1] - 37:7
**five** [14] - 12:4, 20:8, 27:20, 34:3, 38:3, 38:6, 39:24, 40:4, 55:4, 82:20, 86:11, 121:6, 121:7
**fix** [1] - 132:22
**floor** [15] - 33:18, 33:20, 40:23, 49:13, 49:16, 53:4, 59:8, 60:1, 90:19, 90:20, 109:6, 109:7, 136:19
**FLOOR** [1] - 3:4
**floors** [2] - 40:23, 53:3
**flush** [1] - 47:14
**focus** [5] - 61:14, 75:13, 87:2, 108:17, 127:16
**focusing** [1] - 64:8
**foisted** [1] - 20:9
**folks** [2] - 22:15, 22:16, 94:9
**follow** [5] - 39:2, 87:22, 98:15, 107:13, 119:21
**follow-up** [1] - 98:15
**following** [3] - 46:2, 93:10, 94:17
**follows** [3] - 24:24, 61:6, 75:16
**food** [1] - 123:2
**FOR** [4] - 1:16, 2:6, 2:12, 2:16
**Force** [3] - 91:3, 92:24, 95:4
**force** [60] - 15:2, 47:16, 67:9, 69:20, 69:21, 87:5, 87:6, 87:8, 87:9, 87:10, 87:11, 87:17, 88:2, 88:6, 88:7, 88:8, 88:11, 88:12, 88:13, 88:17, 88:20, 88:21, 88:24, 89:2, 89:4, 89:7, 89:10, 89:12, 89:14, 89:17, 90:4, 91:1, 91:5, 91:11, 92:4, 92:6, 93:6,

93:8, 93:15, 93:24, 94:4, 95:12, 95:13, 95:14, 95:24, 96:2, 96:5, 96:9, 97:3, 97:4, 97:5, 97:14, 100:9, 100:10, 101:25, 103:24, 107:17, 123:4, 128:14
**forced** [2] - 36:4, 47:24
**foregoing** [1] - 138:8
**form** [16] - 7:2, 23:10, 65:4, 85:23, 91:3, 91:11, 92:24, 93:5, 93:6, 93:10, 93:15, 93:16, 95:4, 95:17, 104:4, 105:3
**formally** [2] - 11:9, 70:7
**format** [1] - 96:20
**former** [1] - 11:20
**forms** [1] - 15:21
**forth** [2] - 37:5, 68:1
**fortunately** [1] - 104:4
**forward** [6] - 16:10, 52:11, 54:8, 54:10, 114:25, 116:2
**forwardly** [1] - 34:19
**foundation** [1] - 73:11
**four** [21] - 34:3, 34:12, 37:12, 39:24, 40:4, 40:23, 41:18, 43:17, 46:4, 53:3, 53:5, 55:4, 72:9, 78:3, 83:18, 87:8, 90:13, 123:23, 131:20, 132:2
**fractures** [1] - 75:22
**frankly** [1] - 88:1
**free** [1] - 52:7
**FREEMAN** [1] - 2:12
**Freeman** [1] - 6:3
**frequent** [3] - 78:7, 81:17, 128:14
**frequently** [6] - 68:4, 69:20, 83:2, 86:22, 93:22, 105:16
**friends** [2] - 43:21
**front** [15] - 30:13, 35:14, 36:8, 37:13, 37:18, 38:24, 42:11, 43:7, 52:23, 59:22, 85:6, 92:8, 109:10, 116:17, 124:11
**frustrated** [1] - 126:20
**fulfilled** [1] - 125:17
**full** [1] - 14:19
**full-time** [1] - 14:19
**fully** [2] - 69:17, 110:2

**fun** [1] - 112:23
**functioning** [2] - 10:17, 77:16
**functions** [2] - 64:9, 64:13
**fundamental** [1] - 111:22
**funding** [4] - 8:4, 12:21, 13:23, 16:15
**furious** [1] - 101:6
**future** [4] - 7:20, 12:13, 13:24, 51:11

**G**

**game** [1] - 77:5
**gamut** [1] - 64:13
**gash** [1] - 35:14
**gasp** [1] - 32:8
**gate** [11] - 41:21, 42:3, 44:4, 45:3, 45:4, 45:7, 49:18, 49:22, 50:5, 50:13, 51:5
**GED** [1] - 52:9
**general** [9] - 8:8, 67:16, 67:23, 68:16, 68:22, 108:1, 121:24, 125:15, 126:6
**generally** [2] - 7:4, 62:4
**girlfriend** [1] - 25:16
**given** [3] - 100:1, 101:16, 136:17
**glanced** [1] - 30:12
**glass** [1] - 43:8
**goal** [1] - 114:23
**goals** [2] - 66:13, 66:21
**God** [2] - 24:20, 61:2
**governance** [1] - 23:15
**government** [1] - 23:10
**grabbed** [2] - 30:16, 38:2
**grabbing** [2] - 31:4, 44:12
**graph** [2] - 120:18, 121:12
**great** [4] - 63:10, 112:16, 113:4, 128:17
**grievable** [1] - 123:1
**grievance** [26] - 119:14, 120:7, 120:22, 122:16, 122:17, 122:19, 122:21, 123:2,

123:11, 123:15, 123:16, 123:19, 123:24, 124:2, 124:9, 124:13, 124:16, 124:21, 124:25, 125:2, 125:13, 125:16, 125:23, 125:24, 126:14, 126:23
**grievances** [7] - 120:24, 121:8, 123:6, 125:20, 125:22, 126:6, 126:24
**Griffin** [4] - 90:24, 91:2, 91:14, 92:20
**grinding** [1] - 123:9
**ground** [1] - 109:3
**grounds** [1] - 96:2
**group** [3] - 97:10, 97:23, 97:25
**groups** [3] - 80:24, 81:11, 83:3
**guard** [19] - 33:4, 33:5, 38:14, 38:23, 39:5, 39:9, 41:4, 41:6, 44:23, 50:13, 50:15, 50:19, 50:25, 53:2, 53:3, 53:4
**guards** [11] - 27:16, 29:6, 29:9, 38:12, 38:22, 39:13, 41:2, 48:21, 53:1, 53:6
**guess** [8] - 36:2, 36:7, 36:8, 38:14, 50:14, 51:14, 83:20, 133:17
**guidance** [1] - 12:25
**guide** [1] - 14:17
**GUSMAN** [1] - 1:7
**Gusman** [1] - 5:12
**guy** [3] - 50:2, 51:4, 54:8
**guys** [8] - 27:23, 30:24, 33:16, 34:3, 34:11, 37:13, 38:16, 49:20

**H**

**half** [6] - 12:11, 62:6, 77:7, 77:8, 131:20, 132:1
**hall** [1] - 37:3
**hallway** [1] - 50:10
**hand** [5] - 24:17, 37:14, 42:1, 60:24, 74:18
**handcuffed** [1] - 101:10

handcuffs [1] - 101:8
handed [2] - 72:16, 85:10
handle [1] - 43:16
handled [2] - 92:7, 115:2
handling [1] - 126:9
hands [10] - 20:4, 28:2, 31:10, 33:25, 34:1, 36:10, 36:13, 86:17, 99:22, 135:19
happenings [1] - 89:14
happy [1] - 22:1
hard [3] - 33:22, 85:7, 109:6
harm [2] - 12:10, 121:19
HARRY [1] - 2:17
Harry [1] - 6:6
HB406 [1] - 3:8
head [17] - 27:12, 28:2, 31:21, 31:22, 32:11, 32:21, 32:23, 33:12, 33:15, 35:14, 109:5, 109:8, 111:5, 112:3, 124:11
health [10] - 15:12, 75:24, 81:25, 83:2, 110:18, 111:5, 111:23, 118:25, 119:1, 125:5
Healthcare [1] - 16:20
healthcare [1] - 11:16
hear [6] - 11:15, 11:20, 11:22, 16:16, 37:8, 38:12
HEARD [1] - 1:11
heard [8] - 21:11, 38:15, 38:16, 59:19, 59:21, 59:22
hearing [11] - 8:7, 8:10, 9:7, 11:2, 11:11, 20:20, 21:17, 23:17, 51:25, 116:6, 130:12
Hearing [3] - 5:13, 130:3, 130:10
HEARING [1] - 1:11
hearings [1] - 8:5
heart [2] - 88:14, 133:4
heavily [3] - 77:22, 94:2, 128:21
hee [3] - 37:19
held [1] - 117:2
hello [1] - 115:15
help [9] - 12:12, 24:19, 39:9, 58:17, 61:1, 63:7, 72:5, 93:24

helpful [1] - 95:10
hereby [1] - 138:7
hesitate [1] - 31:5
high [11] - 52:9, 69:19, 81:14, 82:23, 84:5, 108:13, 120:8, 132:1, 135:18, 135:19, 135:20
high-ranking [1] - 120:8
higher [2] - 99:1, 99:3
highest [2] - 62:22, 69:19
highlight [1] - 121:3
highlighted [1] - 75:15
himself [2] - 92:21, 125:3
hip [1] - 25:21
histories [3] - 80:4, 81:25, 82:23
history [2] - 81:18, 81:24
hit [14] - 27:11, 32:15, 32:25, 33:14, 34:6, 34:7, 47:6, 57:1, 101:16, 101:17, 101:20, 109:5
hitting [1] - 112:3
HIV [4] - 46:17, 46:25, 49:14, 49:15
HOD [2] - 26:12, 49:13
hogtied [2] - 31:20, 33:3
hold [8] - 65:10, 73:12, 73:13, 87:23, 98:24, 99:3, 117:2, 135:6
holding [2] - 101:6, 112:20
holes [1] - 37:6
holler [1] - 33:4
home [2] - 29:5, 48:10
Home [2] - 21:6, 23:5
homeboy [1] - 50:14
homosexual [1] - 112:25
Honor [114] - 5:9, 5:18, 5:19, 5:23, 6:5, 6:7, 6:9, 6:11, 6:14, 8:15, 8:18, 8:21, 9:13, 9:15, 11:8, 16:2, 16:5, 17:4, 17:6, 17:19, 17:24, 18:3, 18:7, 18:10, 18:18, 19:9, 19:14, 20:6, 20:13, 20:20, 20:24, 21:8, 21:14, 21:17, 21:20, 22:3, 22:6, 22:7, 22:10, 22:12, 22:19, 22:22,

22:23, 23:2, 23:8, 23:13, 23:16, 23:18, 23:22, 24:6, 24:11, 54:19, 57:22, 57:23, 60:17, 60:20, 64:20, 65:17, 65:21, 66:1, 66:4, 66:9, 67:25, 70:8, 70:15, 70:17, 70:21, 70:22, 70:23, 71:4, 71:6, 71:10, 71:22, 72:4, 72:11, 73:4, 73:9, 73:16, 73:22, 74:3, 74:4, 74:13, 74:14, 74:16, 79:19, 79:24, 85:1, 85:14, 85:20, 95:18, 96:15, 96:22, 106:12, 106:14, 106:17, 116:5, 116:8, 122:10, 128:2, 129:16, 129:20, 130:8, 130:9, 130:15, 131:3, 132:12, 133:7, 133:14, 133:19, 134:2, 134:22, 135:8, 135:16, 137:15
Honor's [1] - 73:7
HONORABLE [1] - 1:11
hop [1] - 25:21
hoping [1] - 16:11
hopped [1] - 38:2
horrible [1] - 103:25
horrific [1] - 69:25
hospital [11] - 75:4, 75:10, 75:20, 76:19, 76:20, 76:24, 77:3, 77:7, 91:19, 115:1, 119:1
hostage [1] - 62:11
hot [3] - 34:25, 37:14, 104:20
hotline [1] - 119:22, 120:2
hours [5] - 29:13, 39:15, 39:24, 40:4, 114:21
housed [6] - 14:8, 52:6, 52:7, 81:12, 83:9, 133:12
housekeeping [2] - 71:23, 74:5
housing [2] - 15:6, 81:22
hug [2] - 34:18, 34:21
huge [5] - 16:21, 80:16, 131:19, 134:20

hugging [2] - 34:18, 35:25
humane [1] - 10:18
humorous [1] - 83:20
humping [1] - 117:4
hundred [1] - 78:16
hundreds [2] - 62:2, 78:17
hung [1] - 125:3
hurt [1] - 33:10

I

IAD [11] - 91:24, 92:1, 92:3, 92:4, 92:9, 92:13, 92:15, 93:19, 93:20, 93:21, 94:22
Idaho [1] - 76:9
idea [1] - 104:1
identified [2] - 71:23, 133:25
ignored [2] - 92:7, 94:23, 132:24
imagine [1] - 32:22
immediate [2] - 25:14, 52:14
immediately [4] - 31:3, 31:5, 93:23, 112:19
impacts [1] - 22:19
implementation [3] - 14:13, 14:25, 130:5
implemented [1] - 14:11
implications [1] - 80:6
important [8] - 10:9, 45:5, 87:16, 89:6, 107:15, 108:4, 125:21, 126:8
importantly [2] - 10:2, 103:17
imposed [1] - 79:21
improper [1] - 98:13
improvement [1] - 88:24
improvements [2] - 15:17, 87:16
in-custody [1] - 75:9
inaccuracies [1] - 133:15
inaccuracy [1] - 133:20
inaccurate [1] - 133:23
inadequate [2] - 100:13, 134:16
inappropriate [2] - 100:9, 107:13
inappropriately [1] -

99:8
incarcerated [6] - 17:14, 17:15, 21:3, 25:22, 25:24, 54:7
incentive [1] - 135:5
incidence [1] - 136:23
incident [43] - 39:18, 41:15, 41:22, 43:9, 43:17, 44:22, 45:24, 46:2, 46:24, 47:18, 47:24, 49:12, 56:6, 62:12, 69:16, 90:10, 90:12, 90:21, 99:16, 101:24, 101:25, 102:8, 102:10, 102:19, 104:13, 104:14, 105:3, 105:11, 106:4, 106:10, 107:22, 108:22, 108:23, 108:25, 110:2, 110:13, 111:14, 111:16, 115:14, 115:22, 118:10, 117:17, 123:23
incidents [18] - 12:10, 12:13, 15:8, 44:2, 44:10, 69:14, 69:21, 83:12, 105:16, 106:1, 106:7, 107:9, 107:11, 107:12, 112:7, 120:1, 121:8, 121:25
include [2] - 72:11, 121:10
included [1] - 106:8
including [6] - 12:4, 12:7, 15:2, 15:12, 67:8, 102:15
incorrect [1] - 11:7
increase [2] - 78:15, 134:20
independent [5] - 14:12, 88:20, 88:22, 93:18, 95:1
indicate [6] - 60:1, 91:18, 111:17, 118:3, 121:12, 135:4
indicated [4] - 55:25, 75:14, 79:16, 136:11
indicating [3] - 31:13, 36:2, 133:13
indicating) [2] - 31:12, 34:2
indication [1] - 92:22
indicators [1] - 67:8
individual [3] - 74:7, 86:23, 107:12
individually [1] - 80:23

**individuals** [6] -
  15:15, 17:9, 21:3,
  22:10, 56:8, 56:24
**indulge** [1] - 71:22
**ineffective** [2] - 87:18,
  87:19
**inexcusable** [2] -
  112:10, 126:22
**infirm** [1] - 81:23
**informally** [2] - 80:24,
  80:25
**information** [8] -
  72:16, 80:7, 84:2,
  84:10, 84:16, 84:19,
  85:12, 117:20
**infrequent** [1] - 78:1
**inhumane** [1] - 9:21
**initiated** [2] - 121:1,
  121:7
**initiative** [1] - 53:19
**injected** [1] - 133:24
**injure** [1] - 88:7
**injured** [2] - 77:4,
  88:10, 110:12
**injuries** [7] - 35:10,
  45:22, 109:11,
  109:15, 111:9,
  111:13, 117:12
**injuring** [1] - 111:5
**injury** [9] - 75:5,
  76:20, 76:25, 77:3,
  77:4, 77:7, 90:11,
  90:20, 101:4
**inmate** [157] - 27:7,
  38:22, 39:3, 43:18,
  43:22, 43:23, 50:12,
  52:5, 53:15, 53:18,
  64:13, 66:21, 67:8,
  69:9, 69:13, 70:1,
  77:9, 80:2, 80:4,
  80:5, 81:17, 83:15,
  84:3, 84:4, 84:10,
  85:11, 86:17, 86:21,
  88:3, 88:4, 90:2,
  90:11, 90:12, 90:16,
  90:17, 90:19, 90:23,
  91:16, 92:14, 97:22,
  99:18, 99:20, 99:21,
  99:23, 100:5,
  100:18, 100:21,
  100:22, 101:1,
  101:2, 101:3, 101:5,
  101:8, 101:9,
  101:18, 101:20,
  102:4, 102:6,
  102:10, 102:16,
  107:23, 108:2,
  108:9, 108:10,
  108:21, 108:23,
  108:24, 109:1,

109:2, 109:4,
  109:25, 110:12,
  110:14, 110:16,
  110:17, 110:18,
  110:22, 110:23,
  110:25, 111:2,
  111:4, 111:5,
  111:19, 111:23,
  112:2, 114:2, 114:9,
  114:10, 114:11,
  114:14, 114:18,
  114:20, 114:21,
  114:24, 115:4,
  115:7, 116:23,
  116:25, 117:1,
  117:19, 117:21,
  118:24, 118:25,
  119:9, 119:13,
  119:14, 119:15,
  119:17, 119:18,
  120:5, 123:4, 123:8,
  123:15, 123:16,
  123:18, 123:19,
  123:20, 123:24,
  124:2, 124:4, 124:9,
  124:15, 124:20,
  124:21, 124:25,
  125:12, 125:13,
  125:16, 125:25,
  126:10, 126:18,
  126:19, 126:21,
  128:20, 133:24,
  133:25, 134:1,
  134:15, 135:18
**inmate's** [4] - 115:6,
  120:11, 123:17,
  126:19
**inmate-made** [1] -
  27:7
**inmate-on-inmate** [6]
  - 67:8, 69:9, 70:1,
  108:23, 108:24,
  123:4
**inmates** [101] - 7:21,
  7:24, 8:9, 17:7,
  17:12, 17:15, 18:19,
  19:2, 19:25, 20:21,
  20:24, 21:9, 21:15,
  22:9, 22:16, 23:14,
  29:14, 29:23, 43:20,
  43:23, 53:11, 70:19,
  75:4, 75:8, 75:10,
  75:18, 77:15, 77:19,
  78:10, 80:23, 80:24,
  81:11, 81:14, 81:15,
  81:23, 81:24, 81:25,
  82:2, 82:4, 82:12,
  82:14, 82:16, 82:17,
  82:18, 82:21, 82:22,
  82:24, 83:2, 83:10,
  83:11, 83:15, 83:18,

83:22, 84:1, 84:11,
  84:15, 84:18, 84:23,
  86:18, 86:23, 88:8,
  88:10, 97:10, 97:20,
  100:11, 101:3,
  104:3, 108:4, 108:5,
  108:6, 108:14,
  108:16, 109:22,
  112:25, 113:6,
  116:23, 117:3,
  117:19, 119:7,
  119:10, 119:19,
  119:25, 121:20,
  121:22, 121:24,
  122:20, 125:4,
  126:2, 126:9,
  126:14, 133:5,
  135:6, 135:19,
  136:11, 136:16,
  136:17
**inquiry** [3] - 8:5,
  94:13, 95:2
**inserted** [1] - 114:13
**inside** [5] - 37:17,
  39:25, 40:9, 40:11,
  40:15
**insofar** [1] - 7:24
**inspected** [2] - 18:6,
  19:19
**inspection** [1] - 18:7
**inspections** [1] -
  14:14
**instance** [2] - 62:11,
  88:25
**instead** [1] - 112:19
**Institute** [1] - 63:3
**institution** [3] - 12:16,
  123:7, 123:10
**intended** [1] - 81:14
**intensive** [1] - 77:22
**interdict** [1] - 86:2
**interest** [3] - 10:12,
  94:9, 108:6
**interests** [2] - 17:25,
  54:3
**Internal** [2] - 92:3,
  94:17
**Internet** [3] - 40:20,
  40:21, 40:25
**interrogation** [2] -
  113:14, 114:5
**interrupted** [1] - 38:22
**interrupting** [1] - 71:4
**intervene** [1] - 103:23
**intervened** [1] - 38:22
**intervenor** [5] - 6:18,
  6:25, 8:16, 8:18,
  9:17
**intervention** [1] -
  15:15

**interview** [6] - 92:20,
  113:13, 113:22,
  114:5, 115:12
**interviewed** [6] -
  19:19, 47:2, 81:4,
  86:22, 117:22, 118:6
**interviewer** [1] -
  114:22
**interviewers** [1] -
  114:14
**interviewing** [1] -
  80:23
**interviews** [3] - 80:22,
  129:4
**introduced** [5] -
  57:24, 58:2, 58:3,
  58:4, 58:7
**intrusive** [2] - 7:17,
  20:16
**investigate** [3] - 94:8,
  98:17, 118:4
**investigated** [12] -
  45:18, 69:17, 98:2,
  107:10, 107:11,
  107:12, 107:24,
  110:2, 112:8,
  112:11, 117:22,
  121:14
**investigates** [1] -
  94:20
**investigating** [2] -
  104:7, 107:9
**investigation** [33] -
  39:11, 45:19, 90:4,
  90:5, 90:21, 90:25,
  91:24, 92:2, 92:9,
  92:11, 92:22, 98:12,
  98:15, 99:12, 100:5,
  100:15, 102:12,
  104:8, 108:22,
  110:3, 110:11,
  113:9, 115:9,
  115:11, 115:17,
  116:18, 116:19,
  116:22, 117:9,
  118:15, 118:23,
  119:3, 122:5
**investigations** [28] -
  15:2, 86:20, 87:10,
  89:11, 92:5, 92:6,
  97:6, 97:11, 97:13,
  97:17, 97:19, 97:23,
  98:4, 98:5, 98:9,
  100:13, 102:21,
  103:13, 103:17,
  103:18, 107:6,
  107:16, 108:7,
  120:19, 120:25,
  121:1, 121:7
**investigator** [3] -

102:13, 115:12,
  115:16
**investigators** [1] -
  103:16
**invoke** [2] - 8:22,
  115:6
**involved** [11] - 15:9,
  41:22, 62:16, 90:22,
  92:13, 94:19,
  101:24, 102:17,
  127:16, 128:18,
  129:6
**involves** [1] - 7:11
**involving** [4] - 27:2,
  69:21, 101:24,
  120:23
**irrelevant** [2] - 88:1,
  126:25
**issue** [8] - 21:22,
  65:11, 71:23, 96:16,
  97:22, 108:3, 123:8,
  136:8
**issued** [1] - 87:15
**issues** [15] - 8:4, 9:25,
  64:13, 89:9, 93:22,
  96:18, 97:8, 97:24,
  98:11, 105:22,
  111:17, 111:18,
  122:24, 136:7,
  137:10
**it'll** [1] - 39:23
**items** [1] - 33:7
**itself** [1] - 52:22

## J

**jail** [98] - 9:21, 10:3,
  10:11, 10:13, 10:15,
  10:18, 10:19, 10:22,
  11:14, 11:16, 12:2,
  12:3, 12:15, 13:23,
  13:25, 14:1, 14:7,
  14:15, 14:24, 15:10,
  15:16, 15:18, 15:22,
  15:25, 16:12, 18:2,
  19:1, 19:5, 19:6,
  21:21, 22:15, 22:17,
  27:13, 30:8, 31:17,
  42:22, 48:15, 53:9,
  62:17, 64:9, 64:14,
  65:24, 66:8, 66:13,
  67:2, 67:6, 68:2,
  68:7, 68:11, 68:18,
  68:25, 69:1, 69:3,
  75:11, 76:5, 76:10,
  76:12, 76:24, 77:20,
  80:19, 82:2, 82:12,
  82:16, 83:8, 87:4,
  88:9, 92:14, 97:8,
  104:15, 104:21,

106:18, 107:3, 107:7, 108:16, 119:12, 122:19, 123:1, 124:6, 125:12, 127:21, 127:23, 128:4, 128:7, 128:11, 128:19, 129:12, 130:6, 131:13, 131:17, 131:20, 131:24, 134:19, 136:13, 136:14, 137:11
**jail's** [1] - 10:12
**jailhouse** [1] - 27:1
**jails** [23] - 12:19, 61:25, 62:5, 62:15, 63:18, 63:20, 64:2, 65:22, 68:13, 68:25, 69:2, 75:25, 76:2, 76:3, 76:8, 119:21, 128:12, 128:22, 129:1, 129:10, 131:21, 136:23
**January** [6] - 87:16, 92:5, 118:13, 118:16, 118:17, 124:19
**Jeff** [1] - 60:23
**JEFFREY** [2] - 4:8, 61:4
**Jeffrey** [1] - 61:9
**JENNIFER** [1] - 1:20
**job** [2] - 43:3, 112:6
**Johnson** [1] - 45:1
**joke** [1] - 51:22
**Jonathan** [2] - 90:24, 91:2
**JONES** [1] - 1:4
**Jones** [2] - 5:12, 6:17
**Judge** [7] - 17:23, 21:13, 40:18, 129:22, 130:23, 131:5, 132:4
**judge** [1] - 131:15
**JUDGE** [1] - 1:12
**judge's** [1] - 131:15
**Judgement** [1] - 7:9
**Judgment** [23] - 6:16, 6:24, 7:2, 7:4, 7:11, 7:15, 8:2, 8:3, 8:6, 8:12, 9:19, 9:20, 11:12, 11:17, 13:3, 13:15, 13:19, 13:20, 14:4, 14:9, 14:21, 14:22, 15:23
**judgment** [2] - 6:24, 99:6
**Judgment's** [1] - 13:17

**July** [3] - 8:4, 120:19, 120:20
**jumped** [2] - 45:9, 51:24, 101:3
**June** [1] - 125:9
**jurisprudence** [1] - 7:7
**Justice** [17] - 5:16, 16:8, 17:12, 18:6, 18:14, 18:18, 19:7, 19:11, 19:13, 19:18, 20:2, 20:3, 20:9, 20:10, 63:4, 136:21, 137:1
**justice** [4] - 10:17, 61:15, 61:17, 61:19
**JUSTICE** [1] - 2:7
**justified** [4] - 91:6, 91:11, 93:11, 94:18

**K**

**KATHARINE** [1] - 1:16
**Katie** [1] - 5:24
**keep** [7] - 12:17, 16:5, 43:2, 71:18, 133:5, 135:6
**keeper** [3] - 18:2, 19:5, 22:16
**keeping** [1] - 103:18
**Kenner** [1] - 25:15
**kept** [5] - 35:8, 42:8, 80:4, 82:4, 136:12
**key** [2] - 81:2, 89:9
**keys** [2] - 38:16, 59:22
**kicked** [1] - 124:10
**kicking** [2] - 33:1, 33:2
**kids** [2] - 25:16, 52:12
**kill** [4] - 36:14, 47:13, 47:15, 101:7
**killed** [4] - 39:8, 39:11, 62:11, 88:8
**kind** [5] - 33:22, 34:7, 50:12, 81:20, 95:7
**kinds** [5] - 67:10, 77:8, 93:8, 100:8, 121:21
**kit** [1] - 46:17
**kitchens** [1] - 27:11
**KJ** [1] - 45:1
**knit** [1] - 94:6
**knives** [4] - 27:10, 36:13, 37:13
**knocked** [4] - 41:24, 41:25, 43:7, 43:8
**knocking** [1] - 109:3
**knot** [1] - 124:10
**knowing** [3] - 20:7, 111:12, 111:23
**knowledge** [2] -

107:23, 133:17
**known** [11] - 68:6, 83:9, 83:12, 83:13, 83:14, 83:16, 83:18, 83:19, 84:7, 84:8, 84:9
**knows** [3] - 18:7, 21:14, 22:20
**Kopplin** [1] - 9:11

**L**

**LA** [8] - 1:17, 1:21, 2:4, 2:14, 2:19, 2:23, 3:4, 3:9
**labeled** [1] - 83:13
**labels** [1] - 84:5
**laceration** [1] - 91:21
**lacerations** [1] - 75:21
**lack** [3] - 123:4, 134:14, 136:12
**laid** [1] - 38:6
**LANCE** [1] - 1:11
**Landrieu** [1] - 17:6
**lands** [1] - 99:7
**large** [15] - 62:6, 62:10, 62:20, 63:22, 69:1, 69:2, 69:3, 78:15, 80:15, 81:16, 81:18, 94:2, 104:19, 115:21, 134:15
**largely** [3] - 86:3, 86:6, 86:7
**larger** [1] - 77:13
**largest** [1] - 134:13
**Lashawn** [2] - 5:12, 6:17
**last** [17] - 12:3, 12:8, 16:19, 25:3, 25:24, 26:10, 48:2, 56:13, 69:11, 69:15, 71:2, 72:9, 80:18, 92:5, 99:14, 124:23, 136:21
**late** [2] - 72:15, 107:11
**laughing** [1] - 37:19
**LAURA** [1] - 2:8
**Laura** [2] - 5:17, 9:16
**law** [12] - 6:22, 13:5, 13:13, 17:20, 21:2, 23:3, 23:5, 30:2, 46:21, 106:21
**LAW** [4] - 1:16, 1:19, 1:23, 2:3
**laws** [2] - 13:11, 21:25
**LAWSHAWN** [1] - 1:4
**lawsuit** [6] - 7:25, 19:25, 20:2, 51:8, 51:13, 57:18

**lawyers** [2] - 9:3, 9:6
**laying** [1] - 30:2
**lead** [1] - 43:24
**leads** [1] - 69:5
**least** [9] - 7:17, 12:4, 12:7, 20:16, 67:14, 73:9, 109:21, 119:23, 128:25
**leave** [5] - 22:5, 37:25, 41:9, 78:8, 107:25
**Lee** [4] - 109:2, 109:19, 109:22
**left** [12] - 12:12, 28:24, 29:1, 29:3, 35:11, 37:1, 42:8, 43:13, 55:4, 59:20, 136:3, 136:18
**legal** [4] - 7:3, 21:22, 96:18, 106:20
**legally** [1] - 11:13
**legs** [3] - 31:9, 34:23
**length** [1] - 64:1
**lengthy** [2] - 100:16, 113:12
**less** [4] - 77:7, 81:16, 88:11, 125:2
**lesser** [1] - 128:22
**letter** [6] - 18:9, 18:13, 19:21, 19:23, 120:8, 133:13
**letters** [1] - 119:19
**letting** [1] - 54:9
**level** [13] - 62:22, 66:16, 67:4, 67:14, 69:9, 69:19, 76:1, 98:5, 98:9, 99:3, 113:24, 127:10, 137:11
**levels** [3] - 15:10, 87:1, 134:20
**lie** [1] - 114:11
**Lieutenant** [1] - 45:1
**lieutenant** [6] - 46:3, 46:9, 90:13, 92:19, 98:6, 99:1
**life** [2] - 123:21, 135:14
**lifetime** [1] - 35:21
**lifted** [1] - 32:11
**light** [1] - 51:19
**lighter** [1] - 86:14
**lights** [3] - 29:22, 29:24, 38:6
**likelihood** [2] - 82:3, 82:24
**likely** [2] - 69:3, 119:9
**likewise** [1] - 18:1
**limitations** [4] - 79:9, 79:17, 79:21, 80:6
**limited** [5] - 10:21,

10:22, 15:19, 68:5, 130:15
**line** [5] - 28:1, 50:16, 98:9, 98:25, 99:2
**linear** [1] - 77:22
**list** [2] - 72:23, 73:22
**listed** [3] - 70:18, 84:1, 86:8
**listening** [2] - 114:18, 115:5
**litigate** [1] - 8:3
**litigation** [3] - 10:2, 96:20, 128:4
**Litigation** [4] - 7:13, 13:7, 20:14, 22:25
**live** [3] - 10:18, 26:9, 30:21
**living** [9] - 25:13, 25:14, 27:14, 27:17, 28:21, 110:17, 111:24, 136:3, 136:16
**local** [5] - 17:20, 21:25, 25:18, 63:7, 68:14
**lockdown** [3] - 29:20, 29:21, 37:24
**locked** [1] - 59:20
**Lockup** [1] - 53:15
**logbook** [3] - 42:19, 42:23, 43:2
**long-standing** [4] - 9:21, 10:6, 11:13, 13:4
**look** [28] - 28:2, 29:16, 52:11, 54:14, 58:16, 59:3, 64:10, 64:11, 67:8, 67:12, 73:15, 75:16, 75:25, 76:16, 77:6, 89:16, 89:18, 98:23, 109:10, 110:8, 111:7, 118:12, 122:16, 124:7, 126:25, 127:4, 128:20
**looked** [18] - 30:5, 41:25, 42:8, 59:8, 76:2, 76:4, 76:7, 76:9, 79:2, 80:17, 82:20, 84:11, 84:15, 86:5, 86:8, 92:2, 92:15, 126:1
**looking** [6] - 30:2, 68:24, 81:21, 83:4, 85:8, 91:7, 116:19, 118:9
**looks** [2] - 64:8, 126:4
**loose** [1] - 33:20
**lost** [1] - 86:13
**LOUISIANA** [2] - 1:1,

1:6
**Louisiana** [3] - 68:13, 138:6, 138:7
**low** [7] - 81:15, 81:18, 81:19, 84:4, 99:8, 131:25
**LSU** [1] - 91:16
**lucky** [1] - 47:14
**lunch** [2] - 38:11, 104:19
**luncheon** [1] - 137:19
**LUNCHEON** [1] - 4:11

## M

**ma'am** [41] - 24:21, 25:12, 25:23, 26:8, 26:20, 27:3, 27:5, 27:15, 28:9, 28:13, 28:15, 28:20, 28:22, 30:22, 32:19, 33:11, 34:10, 35:7, 35:9, 35:23, 36:25, 41:16, 42:18, 43:11, 44:25, 45:23, 46:1, 46:16, 46:18, 46:20, 47:18, 48:6, 48:17, 48:20, 49:10, 50:22, 51:9, 51:12, 53:2, 53:23, 54:5
**mailbox** [1] - 42:3
**maintain** [2] - 74:11, 106:6
**maintained** [2] - 131:23, 131:24
**maintains** [1] - 71:14
**major** [9] - 62:9, 66:21, 83:5, 87:19, 89:4, 98:13, 98:14, 104:24, 137:12
**majority** [1] - 43:23
**makers** [1] - 104:25
**makeshift** [1] - 116:24
**Mallory** [2] - 101:21, 102:15
**Mallory's** [1] - 101:23
**man** [8] - 44:4, 44:5, 44:7, 45:12, 54:14, 54:15, 109:19
**management** [4] - 11:16, 15:1, 62:17, 107:18
**manager** [3] - 63:21, 81:5, 89:2
**managers** [5] - 62:8, 81:2, 87:23, 127:10, 127:11
**mandated** [1] - 82:2
**manner** [3] - 13:4,

103:18, 125:20
**Manny** [1] - 24:16
**mantra** [1] - 21:9
**March** [2] - 124:3, 124:5
**mark** [1] - 57:23
**Mark** [1] - 45:16
**marked** [3] - 70:3, 123:16, 123:18
**marking** [1] - 58:8
**marks** [1] - 35:2
**MARLIN** [1] - 1:7
**Marlin** [1] - 5:12
**marshal** [4] - 24:1, 24:2, 24:4, 24:8
**Marshal** [1] - 133:10
**marshals** [2] - 23:25, 74:5
**master** [1] - 79:2
**mat** [3] - 30:13, 30:23, 31:1
**material** [3] - 31:12, 31:13, 31:17
**mates** [1] - 83:1
**Matt** [1] - 5:19
**Matter** [1] - 5:11
**matter** [12] - 5:13, 14:12, 32:16, 39:17, 39:21, 40:24, 55:24, 57:17, 91:24, 101:2, 121:18, 138:10
**MATTHEW** [1] - 2:8
**Matthews** [5] - 6:3, 16:4, 17:2, 68:10, 137:14
**MATTHEWS** [11] - 2:12, 2:12, 6:3, 16:5, 16:7, 54:21, 65:21, 66:1, 74:13, 116:8, 137:15
**mattress** [4] - 30:2, 30:23, 125:4, 136:19
**mattresses** [4] - 136:12, 136:13, 136:15, 136:18
**maximum** [1] - 81:19
**Mayor** [4] - 17:6, 17:10, 17:12, 21:5
**meal** [2] - 78:6, 104:19
**mean** [25] - 17:23, 25:19, 26:19, 29:12, 32:21, 32:22, 33:5, 36:13, 38:18, 40:15, 41:3, 42:7, 44:20, 48:12, 51:23, 53:14, 54:7, 54:17, 60:7, 71:5, 76:21, 94:15, 108:9, 128:3, 130:9
**meaning** [3] - 27:10, 27:25, 124:5

**meaningful** [1] - 126:12
**means** [4] - 7:17, 78:4, 78:10, 126:4
**meantime** [1] - 16:14
**measure** [1] - 74:5
**measures** [2] - 12:25, 99:9
**MECHANICAL** [1] - 3:11
**media** [1] - 51:20
**medical** [18] - 15:11, 15:21, 16:20, 45:24, 46:15, 49:16, 75:19, 89:3, 90:2, 91:16, 112:19, 113:6, 114:15, 114:17, 124:12, 124:14, 125:5, 125:14
**medications** [3] - 15:12, 72:22, 125:7
**medium** [1] - 84:4
**meds** [2] - 125:1, 125:3
**meet** [2] - 20:16, 113:21
**meets** [1] - 21:25
**member** [9] - 77:24, 77:25, 88:19, 88:21, 119:16, 119:17, 120:10, 120:11, 126:19
**members** [6] - 11:24, 90:14, 113:13, 114:1, 114:11, 114:13
**members'** [1] - 115:7
**memory** [1] - 118:16
**Memphis** [5] - 76:5, 76:12, 127:23, 127:25, 132:2
**men** [3] - 30:18, 36:16, 47:5
**mental** [11] - 11:16, 15:12, 75:24, 81:24, 83:2, 110:18, 111:5, 111:23, 118:25, 119:1, 125:5
**mentally** [1] - 125:1
**mention** [1] - 130:19
**mentioned** [9] - 9:4, 17:25, 56:16, 78:20, 80:2, 89:10, 89:17, 127:15, 127:21
**Merit** [2] - 138:5, 138:15
**MERIT** [1] - 3:8
**merits** [1] - 6:24
**message** [4] - 100:7, 100:11, 121:25,

126:10
**messages** [1] - 19:13
**met** [4] - 18:8, 19:19, 55:15, 81:2
**metal** [4] - 27:8, 27:12, 111:3, 111:20
**method** [1] - 104:24
**methodology** [1] - 104:7
**middle** [1] - 25:3
**might** [7] - 79:25, 80:7, 82:20, 82:21, 82:25, 83:3, 108:11
**Milwaukee** [2] - 76:7, 76:8
**mind** [5] - 36:15, 43:19, 52:7, 113:21, 127:19
**minimal** [1] - 107:20
**minimally** [4] - 11:18, 13:8, 96:13, 97:3
**minor** [2] - 126:18
**minute** [4] - 58:16, 59:4, 71:2, 122:25
**minutes** [5] - 8:13, 38:3, 38:6, 103:3, 104:19
**Mirandize** [1] - 115:16
**Mirandized** [1] - 115:18
**misconduct** [16] - 97:6, 97:11, 97:13, 97:20, 99:9, 100:4, 100:7, 106:4, 115:22, 120:21, 120:23, 120:24, 121:8, 121:9, 121:13, 126:7
**missed** [1] - 39:19
**mission** [1] - 63:6
**mixed** [2] - 19:13, 83:3
**models** [1] - 52:13
**modern** [1] - 12:17
**moment** [4] - 19:17, 31:23, 34:12, 118:11
**mommas** [1] - 52:13
**MONDAY** [2] - 1:6, 5:3
**money** [2] - 14:7, 21:17
**monitor** [3] - 14:12, 14:15, 14:18
**monitoring** [2] - 131:14, 131:19
**MONTGOMERY** [1] - 1:25
**month** [7] - 69:12, 75:3, 120:20, 121:1, 121:6, 125:2, 134:20
**months** [12] - 16:7, 20:1, 27:20, 47:3,

75:12, 75:14, 116:8, 121:3, 121:9, 124:19, 125:10, 125:13
**mood** [1] - 30:7
**mop** [11] - 31:21, 31:22, 32:22, 32:25, 34:24, 34:25, 35:15, 37:16
**morale** [2] - 99:4, 131:25
**morning** [23] - 5:8, 5:9, 5:20, 5:21, 6:5, 6:7, 6:9, 6:11, 6:15, 9:16, 17:4, 17:5, 19:8, 21:12, 23:22, 25:7, 25:8, 38:8, 39:7, 55:7, 61:12, 61:13, 110:14
**MORNING** [1] - 1:10
**most** [28] - 10:2, 10:12, 16:9, 20:15, 41:1, 62:6, 63:19, 69:24, 77:20, 78:4, 78:10, 82:9, 98:19, 108:5, 108:16, 110:1, 115:24, 119:7, 119:13, 119:15, 119:19, 121:13, 121:14, 128:22, 132:24, 132:25, 133:1, 134:11
**mother** [2] - 25:15, 115:6
**motion** [1] - 18:17
**mouth** [3] - 32:14, 91:22
**move** [8] - 37:15, 49:3, 70:10, 100:21, 110:16, 110:20, 132:3, 133:9
**moved** [7] - 11:9, 26:2, 49:9, 70:8, 109:12, 110:25, 112:2
**mover** [1] - 18:24
**moving** [1] - 36:10
**MR** [71] - 4:7, 5:19, 5:22, 6:3, 6:4, 6:5, 6:7, 6:11, 6:13, 8:21, 9:12, 11:8, 16:5, 16:7, 17:4, 17:6, 22:3, 22:6, 22:12, 24:11, 54:21, 54:23, 55:6, 55:23, 57:21, 58:1, 58:3, 58:6, 58:9, 58:11, 58:15, 60:17, 64:20, 65:21, 66:1, 66:4, 70:15,

70:21, 70:24, 71:4, 71:21, 72:4, 72:7, 72:15, 72:20, 73:1, 73:4, 73:9, 73:16, 73:22, 73:25, 74:3, 74:13, 74:14, 74:18, 74:20, 96:15, 106:12, 116:8, 122:10, 128:2, 129:16, 129:22, 130:8, 130:15, 130:23, 131:5, 132:4, 132:12, 132:15, 137:15
**MS** [66] - 4:6, 4:9, 4:10, 5:17, 5:24, 6:1, 6:2, 6:9, 8:15, 8:18, 9:10, 9:15, 11:11, 23:22, 24:6, 24:10, 24:14, 25:6, 26:6, 40:14, 46:14, 54:18, 60:20, 60:23, 61:11, 63:13, 64:23, 65:13, 65:15, 65:17, 66:9, 66:11, 68:21, 70:8, 74:4, 74:12, 74:16, 74:24, 80:12, 85:4, 85:14, 85:19, 85:22, 86:25, 95:22, 96:22, 96:24, 102:24, 103:11, 105:14, 106:17, 107:5, 116:5, 116:10, 116:15, 118:8, 118:20, 118:22, 122:15, 129:24, 131:3, 131:8, 132:6, 132:18, 133:7, 133:19
**multi** [1] - 63:23
**multi-year** [1] - 63:23
**multiple** [3] - 119:23, 135:20, 137:8
**must** [8] - 7:5, 7:8, 7:14, 7:22, 15:5, 20:15, 38:21, 96:6
**mystery** [1] - 48:13

## N

**naked** [2] - 35:6, 117:6
**name** [20] - 24:9, 24:25, 25:2, 25:3, 26:11, 27:23, 41:19, 48:13, 50:16, 50:17, 50:18, 50:24, 52:20, 55:7, 61:8, 101:13, 101:19, 101:21, 101:23
**named** [3] - 7:24,

23:24, 51:7
**names** [1] - 85:11
**narrative** [1] - 91:20
**narrow** [1] - 129:25
**narrower** [1] - 20:19
**narrowly** [4] - 7:15, 13:8, 20:15, 21:8
**National** [2] - 16:19, 63:3
**national** [2] - 63:22, 136:25
**nature** [1] - 17:11
**near** [2] - 69:23, 91:21
**necessarily** [1] - 68:19
**necessary** [20] - 7:16, 7:17, 10:4, 11:18, 13:8, 13:10, 13:22, 15:12, 16:23, 96:13, 97:3, 105:2, 106:11, 107:1, 107:2, 111:19, 122:8, 122:13, 132:10, 132:16
**neck** [1] - 34:5
**need** [20] - 16:10, 17:25, 18:1, 52:5, 52:8, 53:11, 53:16, 74:10, 74:12, 78:17, 81:16, 81:21, 81:25, 88:6, 93:24, 93:25, 131:17, 133:5, 134:5
**needed** [9] - 10:23, 18:11, 24:2, 45:4, 48:16, 78:14, 78:25, 95:12, 134:21
**needless** [1] - 17:10
**needs** [9] - 12:12, 16:25, 52:3, 52:5, 52:11, 79:22, 81:22, 122:23, 123:20
**Neely** [1] - 91:15
**negotiation** [1] - 16:7
**never** [15] - 19:4, 35:20, 38:24, 40:11, 45:6, 55:15, 59:8, 59:9, 95:7, 95:8, 98:15, 105:21, 110:6, 112:8, 115:4
**New** [14] - 6:6, 6:10, 6:12, 6:14, 8:1, 10:16, 10:18, 23:6, 25:10, 25:11, 25:16, 55:10, 80:18, 94:16
**new** [10] - 14:1, 15:18, 16:12, 87:21, 87:22, 87:24, 88:19, 95:9, 115:23, 116:1
**NEW** [10] - 1:6, 1:17, 1:21, 2:4, 2:14, 2:16, 2:19, 2:23, 3:4, 3:9

**next** [7] - 14:2, 30:24, 31:8, 57:3, 60:22, 110:8, 124:1
**NIC** [8] - 63:1, 63:9, 63:15, 63:17, 63:23, 63:24, 64:1, 64:15
**night** [8] - 29:18, 38:13, 39:7, 39:22, 41:6, 45:1, 45:17, 134:24
**nighttime** [3] - 39:16, 39:17, 39:21
**nine** [2] - 69:13
**ninth** [1] - 49:13
**NO** [1] - 1:5
**nobody** [7] - 51:16, 52:23, 56:11, 56:12, 59:23, 126:4
**none** [4] - 25:14, 74:14, 102:12, 113:8
**nonincarcerated** [1] - 17:8
**nonoperational** [1] - 136:9
**nonstop** [1] - 35:5
**normal** [4] - 38:15, 41:6, 41:8, 41:10
**normally** [1] - 39:13
**notch** [1] - 127:5
**note** [4] - 48:9, 48:25, 77:2, 135:17
**noted** [3] - 21:17, 22:7, 72:2
**nothing** [16] - 19:20, 19:22, 19:24, 24:19, 30:11, 33:3, 35:20, 60:10, 61:1, 92:17, 92:21, 103:25, 114:15, 118:5, 129:18, 133:7
**noticed** [3] - 9:10, 30:12, 32:10
**notwithstanding** [1] - 135:9
**November** [1] - 69:13
**Number** [4] - 57:22, 59:4, 60:1, 60:5
**number** [34] - 15:6, 29:4, 30:19, 62:14, 62:18, 67:9, 72:21, 75:4, 75:18, 76:6, 78:13, 80:15, 80:17, 84:1, 84:11, 84:15, 85:13, 89:6, 89:9, 101:3, 105:23, 110:1, 111:5, 112:6, 115:21, 116:1, 116:3, 120:18, 120:22, 120:24, 120:25, 123:11,

133:24
**numbered** [1] - 138:10
**numbers** [8] - 15:13, 72:4, 72:13, 73:24, 76:15, 76:17, 85:11, 121:12
**numerous** [1] - 134:5
**nurse** [1] - 117:13
**NW** [1] - 2:9

## O

**o'clock** [4] - 38:8, 38:18, 38:19, 137:18
**oath** [2] - 24:24, 61:6
**object** [4] - 73:5, 73:8, 106:12, 128:2
**objected** [4] - 70:17, 100:22, 110:24, 129:19
**objection** [16] - 17:18, 66:1, 66:2, 66:5, 70:14, 70:16, 71:1, 71:6, 71:14, 71:21, 73:18, 106:24, 122:10, 129:15, 130:9, 132:12
**objections** [6] - 8:3, 71:5, 71:7, 71:8, 72:18, 73:18
**objectives** [1] - 66:13
**objects** [1] - 96:15
**obligated** [1] - 17:13
**obligation** [2] - 22:7, 22:8
**observes** [1] - 96:5
**obvious** [3] - 111:18, 111:21, 134:11
**obviously** [7] - 16:24, 71:19, 86:17, 98:22, 112:11, 114:18, 119:7
**occasions** [4] - 62:18, 109:22, 123:21, 136:18
**occur** [1] - 126:8
**occurring** [1] - 107:3
**occurs** [2] - 107:16, 119:17
**October** [2] - 26:1, 124:17
**odd** [1] - 34:8
**oddly** [1] - 18:24
**OF** [5] - 1:1, 1:11, 2:7, 2:16
**offender** [1] - 53:15
**offense** [1] - 100:3
**offenses** [1] - 121:21
**offensive** [1] - 115:5

**offer** [1] - 72:3
**offered** [1] - 71:17
**office** [4] - 45:7, 47:20, 50:20, 99:19
**OFFICE** [1] - 3:3
**Office** [4] - 16:21, 18:7, 70:13, 135:1
**officer** [9] - 42:22, 43:25, 44:17, 44:18, 90:22, 94:16, 94:24, 95:5, 120:7
**official** [1] - 120:8
**OFFICIAL** [1] - 3:7
**Official** [2] - 138:6, 138:15
**officials** [1] - 98:17
**often** [12] - 26:14, 26:21, 27:4, 27:19, 39:13, 39:20, 41:2, 63:19, 83:1, 98:19, 119:19, 119:22
**old** [1] - 77:22
**Old** [6] - 26:12, 26:20, 28:19, 39:14, 67:23, 68:3
**older** [1] - 16:11
**once** [8] - 27:20, 40:12, 40:18, 63:16, 74:7, 83:8, 122:24
**one** [73] - 9:10, 10:22, 11:22, 20:8, 26:10, 30:9, 32:11, 33:8, 33:25, 34:6, 45:16, 49:17, 49:18, 51:18, 52:21, 53:2, 53:3, 53:5, 53:18, 56:14, 68:17, 70:24, 74:5, 75:14, 76:10, 77:24, 77:25, 78:5, 78:23, 79:7, 80:22, 80:24, 81:3, 83:15, 83:18, 86:9, 86:10, 90:15, 90:16, 93:9, 97:11, 97:20, 98:6, 98:22, 99:4, 100:14, 100:19, 101:9, 102:6, 111:18, 112:2, 112:24, 113:12, 114:1, 114:14, 117:1, 118:11, 118:17, 119:23, 123:6, 124:23, 127:16, 128:12, 131:21, 133:23, 134:10, 134:13, 136:22, 137:2
**one-on-one** [1] - 80:22
**one-third** [1] - 76:10

**ones** [3] - 31:3, 70:24, 71:16
**ongoing** [2] - 13:21, 14:23
**online** [2] - 16:12, 63:24
**onsite** [1] - 80:19
**open** [8] - 38:16, 41:8, 42:11, 50:13, 59:22, 100:24, 120:25
**opened** [2] - 38:7, 42:12
**opening** [5] - 8:14, 8:19, 14:1, 17:25, 20:14
**operate** [2] - 21:6, 134:19
**operated** [1] - 131:25
**operating** [5] - 21:12, 67:2, 67:17, 68:23, 68:24
**operation** [1] - 127:12
**operational** [5] - 62:15, 64:5, 64:7, 64:15, 134:6
**operations** [9] - 10:12, 11:16, 14:1, 15:1, 65:13, 65:16, 66:8, 127:2, 127:3
**Operations** [1] - 90:3
**opining** [1] - 96:18
**opinion** [31] - 67:16, 67:19, 68:22, 77:9, 77:14, 82:6, 85:23, 86:1, 87:12, 87:14, 93:5, 95:16, 96:9, 96:12, 100:2, 104:7, 104:11, 105:3, 105:8, 106:9, 106:14, 106:18, 107:20, 115:8, 122:7, 122:12, 125:15, 127:2, 132:10, 135:8, 135:9
**opinions** [9] - 65:4, 65:9, 79:25, 80:8, 80:14, 81:7, 128:16, 128:24, 129:3
**OPP** [77] - 8:9, 11:19, 11:21, 11:23, 11:25, 12:11, 12:23, 19:19, 26:9, 26:15, 26:20, 27:4, 28:12, 28:14, 44:24, 51:11, 51:23, 52:1, 52:4, 52:22, 53:25, 54:2, 54:4, 67:17, 67:20, 67:22, 67:24, 68:2, 68:4, 68:6, 68:23, 68:25, 69:6, 75:4, 75:19,

76:1, 76:10, 76:21, 76:22, 77:2, 77:7, 77:10, 77:18, 77:20, 77:21, 78:14, 82:8, 83:11, 83:15, 84:20, 85:24, 86:3, 87:3, 89:12, 94:5, 96:13, 97:4, 97:7, 104:11, 106:3, 106:6, 106:11, 107:16, 109:19, 111:17, 112:15, 115:17, 120:2, 120:5, 122:8, 125:15, 126:8, 127:20, 132:11, 134:14, 135:10, 135:13
**OPP's** [8] - 12:8, 87:11, 88:17, 96:9, 104:9, 105:3, 107:8, 121:15
**opportunity** [7] - 12:22, 13:21, 73:10, 130:13, 130:17, 130:21, 130:24
**opposed** [1] - 77:3
**option** [1] - 11:6
**order** [8] - 7:21, 9:5, 11:25, 15:10, 24:12, 66:23, 73:7, 110:19
**ORDER** [1] - 5:4
**ordered** [1] - 97:25
**ordinary** [2] - 104:16, 104:22
**organizing** [1] - 102:17
**originally** [1] - 57:18
**Orleanians** [1] - 10:18
**Orleans** [32] - 6:6, 6:10, 6:12, 6:14, 6:19, 6:21, 7:21, 8:1, 10:16, 17:16, 23:6, 25:10, 25:11, 25:16, 25:22, 25:25, 26:18, 26:19, 28:18, 42:21, 47:19, 48:8, 55:10, 65:6, 76:12, 80:18, 94:16, 127:2, 128:8, 128:25, 133:12, 136:22
**ORLEANS** [10] - 1:6, 1:17, 1:21, 2:4, 2:14, 2:16, 2:19, 2:23, 3:4, 3:9
**otherwise** [1] - 112:21
**outcome** [1] - 67:11
**outrageous** [1] - 115:8
**outset** [2] - 22:7, 127:15

**outside** [7] - 9:1, 29:7, 40:8, 75:11, 92:14, 134:2
**outskirts** [1] - 25:15
**overall** [4] - 79:23, 87:17, 121:15, 127:2
**overcrowded** [1] - 136:13
**overlap** [1] - 8:5
**overlooked** [1] - 100:8
**overly** [1] - 21:13
**overnight** [1] - 136:12
**overruled** [8] - 71:7, 96:21, 106:24, 122:11, 129:15, 129:21, 131:4, 132:14
**oversight** [1] - 14:6
**overwhelming** [1] - 128:13
**own** [5] - 12:9, 18:5, 47:7, 78:11, 94:9

# P

**pack** [1] - 29:4
**page** [10] - 58:19, 89:18, 91:9, 91:23, 92:25, 93:15, 99:11, 110:8, 118:14, 124:1
**PAGE** [2] - 4:3, 4:16
**pages** [3] - 89:24, 91:3, 91:8
**pain** [2] - 32:18, 32:20
**paper** [3] - 47:19, 70:4, 89:19
**papers** [1] - 30:10
**Paragraph** [2] - 59:3, 60:1
**paragraph** [3] - 59:7, 92:10, 99:14
**parallel** [1] - 102:1
**parallels** [3] - 76:6, 127:22, 128:23
**parameters** [2] - 130:18, 131:1
**paraphrasing** [1] - 117:17
**parish** [2] - 56:6, 68:14
**Parish** [25] - 6:19, 6:21, 7:21, 17:16, 25:22, 25:25, 26:12, 26:18, 26:19, 26:20, 28:18, 28:19, 39:14, 42:21, 47:19, 48:8, 65:6, 67:23, 68:3, 76:12, 127:2, 128:8, 128:25, 133:12,

136:22
**part** [19] - 16:9, 22:2, 39:19, 51:25, 60:10, 60:14, 68:15, 83:6, 85:8, 98:13, 110:4, 128:4, 128:25, 129:8, 130:11, 134:6, 134:15, 136:25
**participate** [2] - 22:4, 51:13
**participated** [1] - 52:2
**participating** [1] - 8:2
**particular** [10] - 34:12, 59:3, 65:12, 70:16, 82:20, 83:22, 96:10, 104:9, 111:16, 117:1
**particularly** [6] - 62:10, 62:17, 78:2, 104:25, 114:19, 125:21
**parties** [12] - 7:10, 7:19, 10:2, 10:5, 10:7, 10:10, 10:14, 10:21, 13:22, 17:24, 22:10, 133:9
**parties'** [1] - 133:20
**partly** [2] - 93:25, 94:1
**partner** [1] - 47:11
**parts** [2] - 27:12, 35:12
**party** [4] - 8:1, 8:24, 13:12, 74:10
**pass** [1] - 32:10
**past** [2] - 35:19, 83:12
**pattern** [2] - 75:17, 103:19
**patterns** [1] - 123:10
**pay** [2] - 10:22, 13:13
**paying** [1] - 112:1
**PC** [1] - 49:7
**penetration** [1] - 117:7
**penises** [1] - 117:4
**PENNSYLVANIA** [1] - 2:9
**people** [27] - 12:4, 12:14, 17:23, 26:24, 27:12, 28:23, 29:4, 29:5, 36:20, 36:21, 36:23, 44:5, 44:10, 51:11, 53:20, 54:10, 54:14, 56:6, 62:11, 63:2, 67:7, 67:12, 99:3, 99:4, 114:7, 117:18
**PEPPER** [1] - 3:7
**Pepper** [3] - 138:4, 138:13, 138:14
**per** [1] - 134:23

**perceives** [1] - 94:25
**percent** [12] - 36:12, 36:16, 44:1, 78:15, 78:16, 78:17, 78:25, 79:1, 82:17, 84:17, 84:22, 102:24
**percentage** [1] - 62:6
**PERDIDO** [1] - 3:4
**performance** [3] - 98:13, 105:22, 112:10
**performing** [1] - 67:7
**perhaps** [6] - 61:23, 62:3, 63:16, 69:16, 99:1, 104:3, 108:14, 111:22, 119:15, 131:22
**period** [3] - 52:6, 69:12, 121:7
**periodic** [2] - 14:5, 14:14
**periodically** [1] - 15:5
**permanent** [2] - 101:4, 110:5
**permanently** [2] - 10:19, 110:5
**permissible** [2] - 88:14, 88:15
**permission** [3] - 64:20, 74:18, 120:11
**perpetrators** [2] - 107:25, 121:23
**persistent** [1] - 10:6
**person** [10] - 74:11, 81:3, 81:19, 98:25, 112:17, 112:18, 112:20, 115:13, 119:16
**personnel** [3] - 62:20, 97:24, 125:14
**persons** [2] - 9:4, 17:23
**perspective** [1] - 10:24
**pertaining** [1] - 109:19
**Ph.D** [1] - 62:24
**PHELPS** [1] - 2:16
**phone** [5] - 42:15, 45:16, 56:14, 81:4, 81:5
**phonetically** [1] - 47:1
**photo** [1] - 111:13
**photograph** [3] - 109:11, 109:15, 111:9
**photos** [1] - 117:12
**physical** [3] - 12:7, 93:24, 110:11
**physically** [1] - 28:12
**picked** [2] - 33:16,

45:16
**picture** [2] - 69:23, 114:1
**pictures** [2] - 117:11
**pieces** [2] - 31:7, 86:11
**PLACE** [1] - 2:18
**place** [5] - 52:22, 53:20, 81:20, 110:11, 111:6
**places** [1] - 51:18
**plagued** [1] - 12:3
**plaintiff** [12] - 5:24, 6:18, 8:18, 9:17, 9:18, 11:11, 17:12, 21:9, 23:20, 23:24, 51:8, 70:19
**plaintiff's** [1] - 6:25
**PLAINTIFFS** [1] - 1:16
**plaintiffs** [15] - 5:16, 6:1, 6:2, 6:17, 7:25, 8:14, 8:19, 9:24, 10:25, 11:3, 14:10, 21:22, 23:8, 23:23, 24:13
**plaintiffs'** [2] - 6:25, 72:8
**plane** [1] - 20:12
**play** [1] - 113:18
**playing** [1] - 44:5
**pleadings** [4] - 18:3, 18:5, 18:23, 21:14
**pleased** [1] - 9:23
**PLRA** [1] - 7:14
**point** [14] - 20:13, 37:15, 39:1, 39:4, 42:16, 51:14, 51:21, 53:18, 60:2, 100:13, 114:22, 119:5, 125:23, 128:3
**pointing** [1] - 31:16
**points** [1] - 89:4
**pole** [14] - 33:24, 34:9, 34:18, 34:20, 34:21, 34:23, 35:25, 38:14, 39:1, 39:4, 59:24
**police** [2] - 94:15, 95:7
**policies** [7] - 12:16, 12:24, 14:16, 14:25, 87:8, 121:18, 122:5
**policy** [25] - 87:11, 87:12, 87:15, 87:17, 87:20, 87:21, 87:22, 87:24, 87:25, 88:2, 88:4, 88:13, 88:18, 88:19, 89:7, 89:13, 92:3, 92:5, 92:7, 94:22, 94:23, 98:23
**poor** [4] - 21:4, 105:19, 127:3, 127:7

population [6] - 10:13, 13:25, 108:1, 119:8, 121:24, 126:11
**populations** [2] - 81:21, 128:21
**portion** [4] - 79:8, 93:9, 111:4, 111:20
**position** [1] - 115:3
**positional** [1] - 89:8
**positions** [2] - 79:5, 133:6
**positive** [1] - 123:11
**possibility** [3] - 48:23, 113:19, 137:7
**possible** [4] - 82:5, 96:2, 103:21, 135:6
**post** [2] - 34:1, 78:8
**posts** [2] - 77:21, 136:3
**potential** [3] - 84:8, 84:9
**potentially** [1] - 20:8
**pounding** [1] - 32:22
**POVERTY** [3] - 1:16, 1:19, 1:23
**power** [1] - 23:12
**POYDRAS** [3] - 2:13, 2:23, 3:8
**practice** [3] - 98:23, 127:16, 136:7
**practices** [7] - 12:17, 12:19, 79:11, 112:14, 112:16, 121:15, 121:18
**PREA** [7] - 79:12, 79:13, 79:15, 82:1, 119:21, 119:23, 121:15
**precise** [1] - 78:19
**precisely** [2] - 20:13, 22:11
**precondition** [1] - 75:9
**predator** [4] - 82:4, 84:8, 84:9
**predators** [6] - 82:24, 83:12, 83:13, 83:19
**predatory** [2] - 83:10, 109:25
**predicate** [1] - 65:19
**premarked** [1] - 71:25
**preparation** [1] - 137:12
**preparedness** [3] - 63:25, 64:2, 137:11
**preparing** [1] - 8:7
**preplanned** [5] - 88:23, 88:25, 89:1, 89:3, 89:4
**preprinted** [1] - 95:4

**prescription** [1] - 72:21
**present** [6] - 9:1, 11:3, 11:12, 23:16, 31:23, 135:21
**presented** [4] - 8:10, 18:22, 18:23, 91:18
**preserve** [1] - 71:10
**preserved** [1] - 71:5
**press** [1] - 9:22
**pressure** [3] - 113:4, 123:5, 126:17
**pressured** [1] - 114:9
**pretrial** [2] - 19:4, 64:12
**pretty** [16] - 28:1, 29:24, 31:1, 32:8, 32:16, 34:4, 35:19, 36:11, 37:11, 37:21, 43:15, 47:12, 49:1, 49:21, 50:2, 57:2
**prevent** [2] - 52:17, 52:18
**preventable** [1] - 135:17
**prevention** [2] - 15:2, 15:3
**previous** [3] - 82:25, 101:24, 102:8
**previously** [4] - 70:3, 70:6, 70:11, 73:18
**Prieur** [2] - 46:25, 47:1
**primarily** [2] - 77:19, 81:12
**primary** [2] - 87:6, 120:13
**principles** [3] - 17:21, 23:11, 23:12
**priority** [1] - 66:18
**Prison** [25] - 6:21, 7:13, 7:21, 13:7, 17:16, 20:14, 22:25, 25:22, 26:12, 26:18, 26:19, 26:20, 28:18, 28:19, 48:8, 65:6, 67:23, 76:13, 79:15, 82:1, 127:2, 128:8, 128:25, 133:12, 136:22
**prison** [20] - 7:12, 15:2, 17:24, 56:6, 62:17, 63:5, 64:9, 64:14, 65:14, 65:15, 65:16, 65:24, 66:8, 68:12, 68:18, 79:14, 82:2, 96:19, 122:19, 123:1
**prisoner** [4] - 107:6, 112:15, 119:11
**prisoner-on-**

**prisoner** [1] - 107:6
**prisoners** [10] - 11:23, 12:12, 13:10, 15:5, 15:6, 15:20, 72:21, 72:23, 74:7, 133:11
**prisons** [10] - 61:25, 62:5, 62:14, 62:15, 63:18, 63:20, 64:2, 65:21, 68:15, 68:25
**Prisons** [1] - 63:6
**problem** [1] - 20:5, 53:7, 54:1, 54:2, 93:17, 94:11, 95:1, 119:6, 128:13, 135:5, 135:24
**problematic** [1] - 93:21
**problems** [21] - 10:5, 14:24, 16:13, 53:24, 88:18, 97:4, 99:4, 105:23, 113:2, 123:11, 128:15, 129:2, 129:7, 129:12, 132:21, 132:22, 132:25, 133:1, 134:5, 134:6, 134:11
**procedure** [3] - 29:22, 39:2, 42:21
**Procedure** [1] - 23:4
**procedures** [2] - 14:25, 122:5
**proceed** [3] - 11:10, 74:5, 116:13
**proceeding** [3] - 18:10, 20:6, 21:19
**PROCEEDINGS** [3] - 1:11, 3:11, 5:1
**proceedings** [2] - 19:4, 138:10
**process** [6] - 13:21, 14:3, 22:2, 36:22, 53:13, 86:12
**PRODUCED** [1] - 3:12
**produced** [2] - 79:10, 116:9
**produces** [1] - 99:4
**profession** [1] - 25:17
**professional** [4] - 13:1, 14:19, 61:14, 103:16
**professionalism** [1] - 132:1
**proficiency** [1] - 15:20
**profoundly** [1] - 12:1
**program** [3] - 63:24, 123:3
**programs** [1] - 64:13
**progress** [1] - 13:25
**project** [3] - 10:9,

63:21, 131:19
**projects** [3] - 63:21, 63:22, 63:23
**promised** [1] - 101:16
**promptly** [1] - 137:18
**proper** [2] - 53:19, 88:20
**property** [2] - 110:19, 111:25
**proportion** [1] - 62:20
**proportions** [1] - 135:14
**proposed** [38] - 6:16, 6:23, 7:11, 7:15, 8:2, 8:3, 8:6, 8:11, 9:19, 11:12, 11:17, 13:3, 13:15, 13:16, 13:19, 13:20, 14:4, 14:9, 14:20, 14:22, 15:23, 17:18, 18:21, 19:16, 21:8, 21:24, 22:8, 23:1, 95:23, 96:1, 97:2, 103:12, 103:22, 104:9, 105:25, 106:8, 107:1, 122:4
**proscribed** [2] - 7:9, 13:18
**prospective** [1] - 7:12
**protected** [3] - 17:9, 48:16, 53:12
**protecting** [1] - 19:8, 21:7
**protection** [2] - 66:19, 121:19
**protective** [3] - 47:3, 49:12, 81:25
**prove** [1] - 114:15
**provide** [10] - 14:16, 20:7, 52:5, 52:11, 93:7, 95:11, 95:12, 95:14, 96:1, 97:16
**provided** [2] - 107:19, 116:9
**provides** [1] - 105:2
**providing** [1] - 21:11
**provision** [4] - 15:11, 105:25, 106:3, 125:23
**provisions** [17] - 11:17, 95:24, 96:8, 96:12, 97:2, 102:20, 103:13, 103:15, 104:8, 106:9, 106:10, 107:1, 122:4, 122:7, 130:4, 131:12, 131:18
**provoke** [1] - 99:23
**psych** [2] - 125:1, 125:3

**psychiatric** [5] - 75:6, 76:18, 76:22, 77:1
**psychology** [1] - 62:24
**public** [4] - 8:8, 10:15, 14:14, 19:8
**publication** [1] - 137:1
**publications** [1] - 64:1
**puffer** [1] - 32:12
**pull** [4] - 70:22, 85:5, 99:11, 116:17
**pulled** [3] - 42:13, 45:13, 45:15
**pump** [3] - 32:14, 32:15, 33:14
**punch** [6] - 34:4, 90:18, 101:20
**punched** [7] - 91:21, 101:9, 102:10, 102:15, 109:2, 109:5, 124:10
**punching** [5] - 33:1, 34:13, 34:14, 102:4
**punctures** [1] - 75:22
**punitive** [1] - 108:10
**purpose** [6] - 57:23, 81:10, 88:2, 100:4, 125:16, 125:17
**purposes** [1] - 95:11
**pursuant** [3] - 7:2, 7:13, 134:25
**pushed** [1] - 37:18
**put** [28] - 28:2, 32:5, 32:14, 33:9, 33:14, 33:24, 35:1, 36:4, 36:5, 42:24, 44:4, 47:22, 48:14, 49:7, 51:20, 79:5, 94:2, 99:22, 100:21, 101:2, 101:8, 101:12, 102:5, 112:20, 114:16, 124:12, 137:1
**putting** [1] - 30:10

**Q**

**qualification** [1] - 67:3
**qualified** [3] - 15:13, 106:14
**quality** [3] - 87:20, 105:20, 123:2
**quarter** [1] - 78:5
**quarters** [2] - 27:14, 27:17
**questionable** [2] - 97:21, 103:24
**questions** [11] - 28:16, 53:19, 54:19, 54:21,

60:17, 81:6, 84:23, 102:14, 112:8, 133:8, 137:14
**quickly** [4] - 107:24, 113:6, 125:22
**quite** [4] - 63:3, 102:1, 113:12, 127:4

**R**

**rack** [2] - 36:21, 38:5
**raise** [2] - 24:17, 60:24
**raised** [2] - 130:1, 137:2
**Ralph** [2] - 6:8, 55:8
**RALPH** [14] - 2:21, 4:7, 6:7, 54:23, 55:6, 55:23, 57:21, 58:1, 58:3, 58:6, 58:9, 58:11, 58:15, 60:17
**ran** [1] - 32:14
**range** [1] - 122:24
**rank** [2] - 119:18, 120:8
**ranking** [5] - 42:22, 43:24, 44:17, 44:18, 120:8
**rap** [2] - 30:3, 30:7
**Rape** [2] - 79:15, 82:1
**rape** [4] - 15:3, 46:17, 121:14, 136:23
**rapes** [3] - 51:25, 67:10, 69:18
**rapping** [1] - 30:7
**rapport** [1] - 119:17
**rat** [1] - 49:24
**rather** [13] - 6:25, 11:2, 13:20, 14:11, 64:8, 76:3, 87:15, 111:6, 115:8, 122:2, 123:17, 123:18, 132:23
**ratting** [1] - 49:22
**razor** [1] - 31:13
**reached** [1] - 79:25
**reaction** [1] - 93:7
**reactive** [1] - 88:23
**read** [6] - 53:22, 59:1, 59:2, 59:4, 60:5, 79:8
**ready** [3] - 32:10, 33:23, 47:12
**real** [6] - 31:17, 48:13, 51:21, 92:22, 126:14, 137:7
**reality** [1] - 92:18
**really** [21] - 29:12, 30:6, 30:10, 32:17, 35:17, 41:13, 41:20,

43:16, 44:6, 44:7, 45:5, 51:14, 53:7, 53:8, 59:10, 95:5, 99:6, 127:4, 127:12
**Realtime** [2] - 138:4, 138:14
**REALTIME** [1] - 3:7
**rear** [1] - 60:14
**reason** [15] - 22:13, 22:20, 44:21, 50:25, 51:4, 69:8, 77:15, 87:19, 92:13, 93:11, 93:14, 128:10, 129:19, 130:22, 133:11
**reasonable** [3] - 7:23, 13:5, 17:22
**reasonably** [1] - 19:15
**reasons** [5] - 13:16, 77:13, 107:13, 122:2, 134:13
**rebooked** [1] - 115:25
**recalled** [1] - 80:5
**recant** [1] - 113:5
**recanted** [1] - 115:4
**receive** [2] - 46:15, 46:17
**received** [4] - 8:8, 26:2, 92:15, 102:18
**receiver** [1] - 11:9
**receivership** [3] - 11:2, 11:5, 11:6
**recent** [1] - 69:16
**recently** [2] - 18:19, 87:15
**recess** [4] - 103:2, 103:5, 137:18, 137:20
**RECESS....................**
**..................** [1] - 4:11
**reclassification** [1] - 83:11
**reclassified** [2] - 83:9, 108:12
**reclassifying** [1] - 83:7
**recognized** [2] - 22:10, 66:2
**recommendations** [3] - 119:21, 132:22, 132:24
**record** [10] - 25:20, 58:4, 58:6, 71:10, 79:13, 80:16, 105:2, 118:5, 129:4, 138:9
**RECORDED** [1] - 3:11
**recorded** [2] - 56:14, 84:24
**records** [14] - 12:9, 75:19, 75:20, 77:6,

79:18, 80:3, 83:23, 86:8, 90:2, 91:16, 91:18, 98:16, 103:18, 135:25
**recover** [1] - 110:7
**recreation** [1] - 138:5
**rectum** [2] - 114:13, 114:17
**red** [2] - 120:22, 120:24
**redirect** [1] - 60:19
**refer** [5] - 62:16, 68:2, 73:14, 135:13, 135:21
**reference** [1] - 133:21
**references** [2] - 72:22, 86:19
**referencing** [1] - 113:23
**referred** [4] - 67:22, 98:20, 116:4, 117:4
**referring** [3] - 71:18, 85:7, 113:18
**refers** [1] - 133:23
**reflect** [1] - 65:1
**reflects** [1] - 121:4
**reform** [5] - 10:7, 10:22, 11:25, 13:25, 131:17
**Reform** [4] - 7:14, 13:7, 20:15, 22:25
**reforming** [1] - 132:11
**reforms** [3] - 14:11, 14:13, 20:16
**refused** [2] - 20:6, 99:21
**regard** [6] - 79:11, 102:21, 103:13, 121:16, 123:12, 136:23
**regarding** [5] - 14:25, 95:24, 96:9, 97:3, 122:4
**regardless** [2] - 32:23, 44:18
**Registered** [1] - 138:5
**REGISTERED** [1] - 3:8
**registered** [1] - 138:15
**regular** [4] - 57:12, 98:4, 98:7, 123:19
**regularity** [2] - 64:16, 113:3
**related** [3] - 52:15, 67:24, 98:11
**relates** [3] - 88:2, 100:5, 125:16
**relating** [1] - 47:16
**relative** [1] - 92:14
**release** [1] - 74:8
**released** [2] - 74:15,

126:3
**relevancy** [1] - 128:3
**relevant** [2] - 8:4, 130:12
**relied** [1] - 85:20
**relief** [3] - 7:12, 125:25, 126:15
**rely** [3] - 14:9, 130:17, 131:1
**remain** [1] - 133:1
**remained** [1] - 18:15
**remaining** [2] - 82:16, 97:17
**remains** [1] - 135:10
**remarks** [2] - 17:25, 20:14
**remedies** [1] - 13:8
**remedy** [6] - 10:24, 11:1, 11:13, 106:11, 106:22, 107:2
**remember** [10] - 57:17, 57:19, 68:3, 76:17, 86:9, 89:7, 96:25, 97:1, 121:5, 128:6
**renumbered** [1] - 72:2
**rep** [2] - 101:15, 101:17
**repeat** [1] - 131:6
**repeatedly** [8] - 18:8, 19:19, 31:21, 32:7, 33:1, 35:4, 112:4, 114:8
**report** [52] - 9:23, 16:18, 19:23, 39:18, 41:15, 43:17, 44:3, 44:10, 55:25, 79:8, 88:20, 88:22, 90:10, 90:11, 93:6, 93:17, 94:12, 94:16, 94:20, 95:6, 96:2, 96:6, 97:25, 101:11, 101:12, 102:17, 104:23, 108:21, 110:2, 115:25, 118:9, 119:11, 119:14, 120:1, 120:5, 120:7, 122:21, 128:16, 129:18, 130:12, 130:18, 131:1, 132:20, 133:15, 133:17, 134:3, 134:18, 135:25, 137:2, 137:6
**reported** [9] - 43:9, 44:22, 45:24, 89:14, 105:16, 105:17, 118:10, 121:11
**reporter** [1] - 31:15

**REPORTER** [3] - 3:7, 3:7, 3:8
**Reporter** [7] - 138:4, 138:5, 138:6, 138:14, 138:15, 138:15
**REPORTER'S** [1] - 138:2
**reporting** [13] - 87:9, 89:10, 100:12, 104:13, 104:14, 105:3, 105:11, 105:23, 106:10, 112:17, 113:14, 115:13, 120:2
**reports** [18] - 9:23, 12:6, 14:5, 14:14, 62:13, 72:12, 73:23, 90:17, 105:19, 105:20, 106:4, 107:22, 107:23, 112:15, 115:22, 120:12, 120:22
**represent** [3] - 51:10, 54:3, 55:10
**representation** [1] - 54:17
**representative** [1] - 9:12
**representatives** [1] - 8:25
**request** [1] - 11:6
**requested** [2] - 79:10, 124:11
**require** [4] - 88:25, 96:4, 96:5, 106:6
**required** [5] - 13:7, 13:8, 14:13, 14:20, 104:23
**requirements** [2] - 119:22, 121:15
**requires** [20] - 10:17, 13:13, 14:24, 15:4, 15:7, 15:11, 15:14, 15:17, 15:19, 98:23, 103:16, 103:17, 103:18, 103:20, 103:22, 104:4, 106:1, 106:3, 119:22, 119:23
**research** [2] - 62:24, 63:21
**reservations** [1] - 53:20
**reserve** [1] - 98:6
**reserved** [1] - 11:6
**residential** [1] - 28:7
**residents** [3] - 17:14, 21:7, 22:19
**resolution** [1] - 108:8

**resolve** [1] - 123:8
**resource** [1] - 134:11
**resources** [3] - 13:2, 14:17, 130:25
**respect** [17] - 7:12, 20:24, 23:14, 65:11, 68:10, 71:3, 72:25, 79:17, 79:20, 79:22, 84:22, 106:22, 128:24, 129:1, 135:24, 136:8, 137:10
**respected** [1] - 13:11
**respond** [6] - 21:23, 21:24, 104:25, 106:16, 123:7, 126:25
**responded** [4] - 124:13, 125:8, 125:20, 125:22
**responding** [2] - 87:3, 117:23
**responds** [1] - 93:22
**response** [8] - 122:22, 124:1, 124:2, 124:18, 124:20, 125:9, 125:12, 126:4
**responsibility** [2] - 10:11, 20:4
**responsible** [2] - 87:3, 108:10
**rest** [3] - 20:22, 75:16, 97:23
**restrained** [4] - 101:20, 102:4, 102:10, 102:16
**result** [4] - 92:13, 107:15, 121:22, 136:17
**resulted** [1] - 131:19
**resulting** [1] - 76:25
**results** [2] - 127:13, 134:15
**retaliation** [1] - 56:18
**retaliatory** [1] - 100:21
**return** [2] - 10:19, 74:9
**revamped** [1] - 87:15
**review** [2] - 7:13, 11:19, 14:15, 58:25, 64:7, 81:7, 89:11, 91:15, 93:21, 95:10, 95:23, 98:2, 101:22, 104:6, 104:25, 105:2, 107:18, 109:18, 113:9, 113:10, 115:9, 115:17, 135:25
**reviewed** [14] - 80:15, 82:11, 83:14, 86:21, 89:22, 97:11, 97:18,

111:10, 113:12, 113:17, 114:3, 115:11, 120:15, 132:7
**reviewing** [2] - 109:18, 121:6
**reviews** [8] - 62:12, 62:15, 64:6, 64:15, 67:15, 87:9, 89:11, 89:16
**revisions** [1] - 88:17
**rewarding** [1] - 131:24
**ribs** [1] - 33:2
**Richard** [1] - 24:16
**RIGHTS** [1] - 2:7
**rights** [3] - 13:10, 17:7, 17:8
**ripped** [2] - 35:3, 35:12
**ripping** [1] - 31:4
**rise** [3] - 5:7, 103:4, 103:6
**risk** [4] - 135:13, 135:17, 135:18, 135:20
**RMR** [2] - 3:7, 138:14
**rob** [2] - 47:22, 48:9
**robbery** [7] - 47:7, 55:1, 57:6, 57:10, 57:13, 57:15, 57:16
**robbing** [1] - 57:5
**Robert** [6] - 47:21, 48:4, 48:22, 56:22, 56:23, 57:4
**role** [3] - 52:13, 130:4, 131:11
**roll** [1] - 53:15
**rolled** [3] - 25:25, 124:4, 124:21
**Romero** [1] - 24:16
**room** [1] - 29:23
**ROOM** [1] - 3:8
**rooms** [4] - 75:5, 75:11, 75:19
**ropes** [1] - 116:25
**Rosenberg** [6] - 6:6, 17:3, 130:1
**ROSENBERG** [32] - 2:17, 6:5, 8:21, 9:12, 11:8, 17:4, 17:6, 22:3, 22:6, 22:12, 24:11, 66:4, 70:15, 70:21, 71:4, 71:21, 73:4, 73:9, 74:14, 96:15, 106:12, 122:10, 128:2, 129:16, 129:22, 130:8, 130:15, 130:23, 131:5, 132:4, 132:12,

132:15
**rosters** [1] - 79:2
**Rouge** [1] - 119:1
**rough** [1] - 79:6
**roughly** [1] - 79:4
**routes** [2] - 76:11, 76:12
**routine** [2] - 38:15, 42:23
**rubbing** [1] - 117:3
**rule** [2] - 70:25, 71:3
**Rule** [2] - 21:6, 23:5
**ruled** [8] - 70:20, 70:23, 71:1, 71:11, 71:12, 71:14, 72:14, 73:18
**Rules** [1] - 23:4
**ruling** [1] - 129:17
**run** [5] - 10:11, 10:15, 68:13, 68:14, 127:5
**runaway** [2] - 69:9, 134:14
**runs** [7] - 19:5, 68:18, 76:19, 76:20, 76:24, 77:3, 77:7
**rush** [1] - 99:6
**résumé** [1] - 64:25

---

**S**

---

**S-C-H-W-A-R-T-Z** [1] - 61:9
**S-Y-L-V-E-S-T-E-R** [1] - 25:4
**s/Cathy** [1] - 138:13
**safe** [3] - 10:14, 19:1, 133:5
**safely** [1] - 134:19
**safer** [2] - 104:2, 133:6
**safest** [1] - 81:13
**safety** [16] - 10:15, 15:18, 17:13, 66:18, 66:20, 66:21, 88:3, 88:4, 100:5, 108:3, 125:16, 126:16, 126:21, 126:22, 137:4
**sanction** [1] - 108:11
**Sanders** [1] - 5:22
**SANDERS** [2] - 2:9, 5:22
**sanitation** [1] - 15:17
**Sara** [1] - 6:2
**SARA** [1] - 1:23
**sat** [4] - 30:9, 37:16, 37:17, 86:22
**satisfied** [1] - 7:8
**save** [1] - 51:17
**saved** [1] - 41:13

**saving** [1] - 104:3
**saw** [14] - 41:3, 41:18, 42:17, 44:2, 44:16, 44:17, 49:17, 50:11, 53:25, 56:12, 59:24, 101:25, 117:23, 133:13
**scale** [2] - 62:10, 76:15
**scarred** [1] - 10:19
**scattered** [1] - 82:18
**scene** [2] - 89:1, 89:3
**scheduled** [1] - 80:22
**schedules** [1] - 79:3
**school** [4] - 52:8, 52:9, 56:25, 123:3
**SCHWARTZ** [1] - 61:4
**Schwartz** [34] - 24:15, 60:23, 61:9, 61:12, 62:22, 63:14, 64:5, 64:24, 65:19, 65:23, 66:12, 70:1, 74:25, 80:13, 85:5, 85:23, 89:21, 95:23, 96:17, 96:25, 103:12, 106:13, 111:16, 113:20, 116:16, 118:9, 119:11, 120:15, 123:14, 125:15, 130:8, 131:9, 132:7, 133:22
**Schwartz's** [1] - 129:18
**SCHWARTZ..............
.......................** [1] - 4:8
**SCHWARTZMANN** [45] - 1:16, 5:24, 60:23, 61:11, 63:13, 64:23, 65:13, 65:15, 65:17, 66:9, 66:11, 68:21, 70:8, 74:4, 74:12, 74:16, 74:24, 80:12, 85:4, 85:14, 85:19, 85:22, 86:25, 95:22, 96:22, 96:24, 102:24, 103:11, 105:14, 106:17, 107:5, 116:5, 116:10, 116:15, 118:8, 118:20, 118:22, 122:15, 129:24, 131:3, 131:8, 132:6, 132:18, 133:7, 133:19
**Schwartzmann** [1] - 5:24
**SCHWARTZMANN....
........** [1] - 4:9

**SCHWARTZMANN....**
**..........** [1] - 4:10
**Scott** [6] - 47:21, 48:4, 48:22, 56:22, 56:23, 57:4
**scream** [1] - 60:10
**screamed** [2] - 34:6, 39:9
**screaming** [2] - 49:21, 50:3
**screen** [11] - 64:19, 82:2, 85:6, 85:16, 92:8, 93:12, 106:3, 109:10, 111:8, 116:17, 118:12
**screened** [1] - 105:21, 126:6
**search** [4] - 27:21, 27:25, 28:8, 86:10
**searched** [1] - 86:10
**searches** [2] - 27:16, 28:5, 86:8
**seat** [2] - 61:7, 103:7
**second** [8] - 24:13, 58:19, 77:15, 78:20, 93:15, 97:25, 116:11, 126:6
**seconds** [1] - 101:2
**Section** [1] - 7:14
**section** [3] - 93:12, 93:14
**security** [18] - 62:14, 64:7, 64:8, 64:12, 65:13, 65:16, 66:8, 81:14, 81:15, 81:19, 81:20, 84:5, 108:13, 111:17, 127:7, 136:7, 136:8
**see** [25] - 19:9, 27:2, 27:4, 27:14, 27:16, 28:7, 29:14, 35:15, 35:18, 36:23, 37:4, 37:8, 38:12, 39:3, 40:16, 49:8, 50:8, 59:23, 65:10, 84:18, 85:7, 94:18, 105:21, 118:16
**seeing** [2] - 51:23, 51:24
**seek** [2] - 7:19, 21:16
**seeks** [1] - 11:1
**seem** [1] - 44:1
**segregated** [1] - 112:21
**segregating** [2] - 121:22, 121:23
**segregation** [2] - 108:11, 108:12
**seize** [1] - 23:15
**seized** [1] - 47:19

**seldom** [1] - 105:20
**self** [2] - 54:17, 94:25
**self-defense** [1] - 94:25
**self-explanatory** [1] - 54:17
**send** [5] - 27:22, 27:23, 37:5, 121:25
**sense** [3] - 94:8, 94:22, 100:12
**sent** [14] - 19:13, 42:14, 47:6, 48:8, 57:1, 75:4, 75:5, 75:8, 75:10, 75:18, 105:17, 108:10, 111:25, 119:20
**sentence** [4] - 26:2, 55:2, 99:15, 133:23
**separate** [3] - 69:14, 75:23, 81:22
**separately** [1] - 97:5
**separates** [1] - 37:1
**separation** [1] - 23:12
**September** [5] - 18:11, 26:1, 26:3, 125:10, 125:11
**sequestration** [2] - 8:22, 9:5
**sergeant** [8] - 41:18, 42:17, 46:7, 46:10, 56:2, 56:3, 98:5, 98:25
**Sergeant** [2] - 41:18, 42:4
**sergeants** [1] - 98:6
**serious** [20] - 17:11, 36:9, 39:3, 39:4, 43:22, 43:25, 44:6, 45:7, 49:6, 51:21, 76:20, 83:20, 98:12, 99:4, 100:7, 122:24, 133:1, 135:5, 135:24
**seriously** [6] - 44:15, 88:7, 110:12, 111:6, 122:1, 131:17
**service** [1] - 24:8
**services** [2] - 15:21, 15:22
**serving** [1] - 54:25
**session** [1] - 103:8
**SESSION** [1] - 1:10
**sessions** [1] - 114:2
**set** [5] - 5:13, 57:2, 101:16, 101:17, 101:20
**sets** [1] - 13:20
**settle** [1] - 6:17
**settlement** [5] - 7:1, 7:5, 7:20, 7:22, 7:23
**seven** [4] - 12:3,

68:17, 76:24, 86:14
**Seventh** [5] - 50:17, 50:18, 50:21, 50:23
**seventh** [1] - 69:16
**several** [6] - 7:2, 70:11, 101:9, 109:3, 111:18, 116:23
**severe** [1] - 10:6
**sex** [1] - 123:5
**sexual** [39] - 12:7, 31:24, 33:6, 43:13, 44:23, 44:24, 67:10, 69:18, 75:22, 112:14, 112:15, 112:17, 113:9, 113:15, 115:9, 115:22, 116:19, 119:11, 119:14, 120:1, 120:2, 120:6, 120:19, 120:21, 120:23, 120:24, 121:8, 121:9, 121:13, 121:16, 121:18, 121:23, 122:5, 128:14, 136:24
**sexually** [6] - 26:24, 28:14, 31:25, 41:22, 45:10, 45:11
**shake** [1] - 27:24
**shakedowns** [1] - 28:10
**shank** [1] - 33:20
**shanks** [5] - 27:7, 27:9, 86:11, 86:14
**Sharonda** [1] - 6:10
**SHARONDA** [1] - 3:3
**sharpened** [2] - 27:8, 86:12
**sheet** [1] - 75:14
**Shelby** [15] - 76:4, 76:16, 76:23, 127:23, 128:4, 128:10, 128:17, 129:6, 129:13, 129:19, 130:5, 130:11, 130:19, 131:13, 131:16
**shelves** [1] - 111:1
**Sheriff** [30] - 6:3, 6:4, 6:19, 9:18, 9:25, 10:25, 14:6, 14:10, 16:8, 16:14, 18:2, 18:8, 18:12, 19:1, 19:2, 19:19, 20:18, 21:10, 21:16, 21:23, 22:16, 23:9, 23:15, 52:5, 54:20, 55:11, 132:20, 134:7, 134:24, 135:5

**Sheriff's** [6] - 10:10, 16:21, 18:6, 47:20, 70:12, 135:1
**shift** [3] - 79:5, 136:4
**shirt** [3] - 42:13, 45:13, 45:15
**shocked** [2] - 41:12, 41:13
**shockingly** [1] - 135:10
**shoes** [1] - 30:13
**short** [2] - 78:2, 93:25
**Shorty** [5] - 50:17, 50:18, 50:21, 50:23
**shot** [1] - 113:16
**shouting** [1] - 49:21
**show** [7] - 12:15, 18:10, 19:14, 57:14, 57:21, 64:17, 114:17
**showed** [4] - 42:13, 45:15, 45:21, 115:1
**shower** [6] - 37:12, 37:13, 37:17, 37:18, 38:2, 38:3
**showing** [1] - 75:3
**shown** [2] - 120:21, 126:10
**shut** [1] - 126:17
**sick** [4] - 46:19, 49:14, 51:2, 124:12
**SID** [2] - 27:22, 45:17
**side** [12] - 8:13, 9:7, 28:24, 29:1, 29:3, 37:1, 38:17, 86:10, 86:13, 86:15
**sides** [2] - 53:5, 86:10
**sign** [5] - 13:15, 40:19, 42:23, 47:19, 47:24
**signature** [1] - 58:19
**signed** [2] - 57:18, 91:13
**significant** [5] - 42:20, 98:18, 104:17, 104:23, 137:3
**signing** [5] - 41:25, 42:19, 43:4, 57:17, 57:19
**similar** [7] - 18:13, 79:17, 102:8, 128:7, 128:20, 129:2, 129:7
**similarly** [1] - 80:25
**simple** [1] - 12:11
**simply** [4] - 78:7, 108:1, 119:15, 136:15
**Sims** [2] - 41:18, 42:4
**single** [3] - 8:19, 54:1, 54:2
**singled** [1] - 98:14
**sit** [2] - 37:17, 40:19

**sitting** [8] - 20:4, 29:9, 29:15, 30:16, 30:23, 57:1, 110:23, 115:12
**situation** [15] - 34:15, 38:23, 43:20, 43:25, 62:11, 69:25, 88:5, 93:8, 100:18, 102:1, 102:2, 102:3, 102:5, 126:5, 132:23
**situations** [14] - 53:8, 75:7, 75:24, 88:8, 88:11, 88:15, 88:24, 89:1, 89:12, 100:10, 103:24, 103:25, 107:12
**six** [8] - 20:1, 27:20, 34:12, 69:14, 69:15, 109:21, 121:6, 121:9
**six-month** [1] - 121:6
**size** [4] - 76:5, 76:8, 76:10, 128:7
**skin** [2] - 35:3, 35:11
**slang** [2] - 38:19, 47:15
**sleeping** [2] - 116:24, 136:19
**slightly** [1] - 128:22
**slip** [1] - 124:13
**slippers** [3] - 35:3, 110:23, 111:2
**slow** [1] - 126:4
**small** [5] - 36:5, 43:8, 63:3, 80:17, 80:24
**Smith** [7] - 109:1, 109:2, 109:4, 109:18, 109:20, 110:5
**Smith's** [2] - 109:11, 109:15
**snapshot** [3] - 82:10, 82:11, 83:14
**so-called** [1] - 23:2
**society** [1] - 27:10
**SOD** [35] - 27:23, 45:17, 56:1, 56:3, 56:17, 90:3, 90:5, 90:10, 90:13, 90:14, 90:21, 90:25, 92:2, 92:7, 93:17, 93:22, 94:1, 94:5, 94:11, 94:23, 94:24, 107:10, 107:17, 110:10, 115:9, 116:19, 117:22, 117:25, 118:10, 118:15, 118:20, 119:2, 121:7
**SOD's** [1] - 117:9
**solely** [1] - 14:10
**solemnly** [3] - 24:18,

47:21, 60:25
**someone** [4] - 38:21, 77:4, 115:22
**sometimes** [7] - 27:18, 28:6, 69:20, 105:17, 107:11, 112:22
**somewhat** [2] - 75:23, 88:1
**somewhere** [3] - 28:1, 78:25, 83:9
**song** [2] - 30:3, 30:7
**soon** [2] - 33:19, 101:1
**sophisticated** [1] - 114:19
**sorry** [19] - 33:6, 55:21, 61:17, 65:6, 74:4, 79:14, 86:7, 89:25, 91:8, 91:9, 98:8, 105:7, 105:11, 107:23, 115:13, 117:23, 118:11, 118:20, 130:8
**sort** [4] - 20:5, 38:18, 81:14, 83:20
**sorts** [2] - 94:10, 97:16
**sound** [1] - 50:12
**sounded** [1] - 109:24
**SOUTH** [1] - 2:4
**SOUTHERN** [3] - 1:16, 1:19, 1:23
**Special** [1] - 90:3
**special** [3] - 81:21, 81:22
**specific** [5] - 69:5, 93:8, 102:20, 103:13, 131:22
**specifically** [5] - 61:19, 97:10, 108:17, 111:25, 130:2
**spell** [2] - 24:25, 61:8
**spelled** [1] - 47:1
**spend** [1] - 41:1
**spent** [2] - 80:19, 132:2
**spite** [1] - 89:12
**spoken** [2] - 46:6, 55:15
**squeeze** [1] - 33:24
**Sr** [2] - 90:24, 91:2
**ST** [1] - 1:20
**stabbed** [3] - 39:10, 108:2, 123:22
**stabbings** [3] - 12:6, 12:8, 26:24
**staff** [89] - 12:11, 12:18, 12:24, 15:13,

62:7, 63:25, 66:21, 67:9, 69:20, 77:14, 77:17, 77:18, 77:19, 77:22, 77:24, 77:25, 78:2, 78:7, 78:8, 78:14, 79:3, 79:4, 87:5, 87:20, 88:5, 88:11, 88:13, 88:19, 88:21, 89:17, 93:11, 93:25, 94:7, 96:2, 97:6, 97:8, 97:11, 97:13, 97:14, 97:19, 97:21, 98:2, 98:4, 98:9, 99:9, 100:4, 100:6, 100:7, 100:20, 102:21, 103:13, 104:8, 104:25, 105:22, 106:1, 106:4, 108:4, 108:6, 108:15, 109:7, 109:13, 110:16, 112:10, 112:22, 113:13, 114:1, 114:11, 114:12, 115:3, 115:7, 115:24, 115:25, 119:15, 119:17, 121:25, 123:4, 123:7, 126:7, 126:19, 126:22, 127:7, 128:13, 128:20, 128:21, 131:25, 133:5, 136:3
**staff-intensive** [1] - 77:22
**staff/staff** [1] - 98:1
**staffed** [2] - 77:23, 78:2
**staffing** [10] - 15:4, 78:16, 78:18, 78:24, 78:25, 93:25, 134:11, 134:16, 134:20, 135:25
**stage** [1] - 50:24
**stagnated** [1] - 12:21
**stairwell** [2] - 49:19, 99:20
**stand** [4] - 9:23, 33:21, 37:12, 37:14
**standard** [1] - 7:13
**standards** [11] - 7:3, 13:1, 20:17, 96:14, 99:1, 106:19, 106:20, 107:21, 113:22, 121:16, 122:9
**standby** [1] - 89:3
**standing** [8] - 9:21, 10:6, 11:13, 13:4, 41:23, 44:20, 49:18,

50:16
**stands** [2] - 69:8, 70:2
**start** [6] - 5:15, 8:17, 10:23, 77:17, 103:2, 137:18
**started** [7] - 30:10, 31:3, 31:4, 31:6, 31:8, 42:16, 120:19
**starters** [1] - 52:21
**starved** [4] - 12:23, 12:24, 12:25, 13:1
**State** [1] - 138:6
**state** [16] - 13:5, 13:13, 17:20, 21:2, 21:25, 23:5, 24:25, 61:7, 63:7, 65:23, 68:15, 79:13, 83:21, 134:18, 135:10
**statement** [5] - 8:19, 56:3, 56:17, 59:25, 129:2
**statements** [2] - 8:14, 14:5
**STATES** [3] - 1:1, 1:12, 2:6
**States** [12] - 5:17, 5:22, 6:18, 6:21, 9:17, 9:24, 10:24, 13:11, 69:4, 136:21, 138:7, 138:16
**states** [1] - 68:17
**station** [5] - 29:7, 29:15, 40:2, 40:4, 40:21
**stationed** [1] - 29:6
**statistics** [2] - 62:25, 75:25
**status** [1] - 131:24
**statutes** [1] - 7:6
**statutory** [1] - 6:22
**STD** [1] - 46:17
**steady** [1] - 34:14
**STENOGRAPHY** [1] - 3:11
**step** [2] - 54:10, 132:11
**stepping** [2] - 54:8
**stick** [4] - 31:21, 32:22, 32:23, 34:24
**still** [21] - 18:12, 18:15, 19:21, 19:24, 28:7, 35:6, 35:15, 36:20, 39:1, 39:22, 39:23, 45:21, 47:19, 48:13, 88:1, 88:18, 91:7, 113:16, 115:4, 119:8, 125:3
**stomach** [2] - 31:19, 33:1
**stood** [4] - 19:7,

33:23, 36:6, 37:13
**stop** [7] - 41:9, 51:20, 52:2, 54:16, 59:13, 94:3, 137:16
**stopped** [5] - 38:20, 38:21, 119:4
**story** [1] - 54:9
**straightforward** [1] - 122:3
**STREET** [7] - 1:17, 2:4, 2:13, 2:18, 2:23, 3:4, 3:8
**streets** [3] - 26:25, 52:10, 94:16
**strikes** [1] - 13:6
**strings** [9] - 31:6, 31:9, 31:10, 31:20, 33:17, 33:20, 34:17, 36:1
**strips** [1] - 31:13
**strong** [1] - 88:24
**structural** [1] - 135:5
**structure** [1] - 53:13
**structures** [1] - 15:7
**stuck** [5] - 12:16, 32:1, 32:2, 32:3, 49:17
**stuff** [4] - 37:5, 42:14, 44:12, 52:1
**subdued** [1] - 101:8
**subject** [2] - 14:12, 73:18
**subjected** [2] - 112:22, 113:4
**submitted** [4] - 73:5, 73:6, 101:13, 123:15
**subsequent** [1] - 101:25
**substandard** [1] - 105:19
**substantive** [1] - 13:25
**sued** [2] - 21:15, 21:16
**suffer** [1] - 85:17
**sufficient** [1] - 106:23
**suggesting** [1] - 112:23
**suicidal** [2] - 15:15, 81:24
**suicide** [3] - 69:17, 81:24, 135:18
**suicides** [3] - 12:4, 67:9, 69:15
**SUITE** [4] - 1:20, 2:13, 2:18, 2:23
**summarize** [2] - 90:9, 100:16
**summary** [8] - 70:18, 71:3, 72:9, 72:20, 75:3, 83:25, 108:22, 127:1

**SUN** [2] - 1:24, 6:1
**Sun** [1] - 6:1
**supervise** [4] - 14:12, 15:5, 77:14, 78:3
**supervising** [1] - 127:9
**supervision** [8] - 15:14, 77:17, 77:18, 77:19, 77:23, 78:5, 81:16, 134:15
**supervisor** [3] - 89:1, 89:2, 98:25
**supervisors** [6] - 62:7, 81:1, 87:23, 127:8, 127:9, 127:11
**supervisory** [2] - 98:17, 98:20
**supplement** [1] - 116:7
**support** [2] - 18:22, 18:24
**supposed** [8] - 29:23, 29:24, 36:3, 37:5, 38:15, 42:23, 43:1, 111:19
**surprised** [1] - 82:10
**surprising** [2] - 82:9, 83:5
**surprisingly** [1] - 115:21
**suspension** [1] - 100:2
**sustained** [3] - 71:7, 92:12, 102:13
**swear** [3] - 24:18, 47:21, 60:25
**swing** [1] - 99:23
**swollen** [1] - 35:11
**sworn** [2] - 24:23, 61:5
**Sylvester** [10] - 23:24, 24:10, 24:14, 25:2, 25:7, 47:20, 51:7, 54:18, 55:7, 71:24
**SYLVESTER** [1] - 24:22
**SYLVESTER.............
.................** [1] - 4:5
**system** [34] - 10:17, 68:3, 68:8, 76:5, 77:16, 78:22, 81:9, 81:10, 82:7, 83:6, 87:5, 87:7, 95:5, 103:23, 104:5, 104:14, 105:4, 105:5, 105:8, 105:10, 105:11, 105:24, 106:6, 107:8, 122:16, 122:18, 122:19,

122:20, 125:16,
125:24, 126:15,
126:23
**systemic** [2] - 11:25,
14:23
**systems** [2] - 87:3,
123:12

**T**

**tab** [1] - 90:5
**tailored** [3] - 13:8,
20:16, 21:8
**tank** [1] - 112:20
**tape** [4] - 114:3,
114:24, 115:11,
116:8
**tapes** [1] - 115:10
**tardiness** [1] - 97:24
**targeted** [4] - 13:23,
96:9, 104:9, 104:11
**task** [1] - 134:23
**tasked** [1] - 19:11
**tasks** [1] - 62:4
**tax** [1] - 19:8
**teach** [2] - 52:12
**technical** [2] - 14:16,
63:17
**technically** [1] - 53:6
**teeth** [1] - 123:9
**Templeman** [1] -
26:12
**temporary** [1] - 26:10
**ten** [1] - 137:15
**tendered** [1] - 66:7
**tendering** [1] - 65:12
**tending** [1] - 117:20
**Tennessee** [2] - 76:4,
127:23
**tenor** [1] - 114:5
**tent** [1] - 102:6
**Tent** [8] - 100:21,
100:23, 101:1,
101:2, 101:5,
101:15, 101:18
**tenth** [1] - 49:16
**tents** [4] - 26:10,
100:19, 100:25,
102:7
**term** [2] - 63:2, 134:14
**terminated** [1] -
102:11
**terminating** [1] -
100:2
**termination** [1] - 96:3
**terms** [3] - 56:16,
66:22, 67:6
**Terrence** [1] - 109:4
**terrible** [3] - 67:20,

69:7, 102:12
**Terry** [1] - 109:1
**test** [7] - 46:17, 46:25,
49:14, 49:15, 50:9
**testified** [6] - 18:19,
19:1, 19:2, 24:24,
61:6, 125:17
**testify** [8] - 9:1, 11:21,
16:17, 47:12, 56:8,
56:18, 57:8, 79:22
**testifying** [3] - 9:11,
48:18, 74:8
**testimony** [14] - 11:15,
12:15, 19:3, 24:18,
47:17, 59:12, 59:16,
60:13, 60:25, 74:11,
106:22, 127:15,
134:4, 137:6
**testing** [3] - 46:19,
46:21, 46:24
**tests** [2] - 114:15,
114:17
**THE** [226] - 1:11, 1:16,
2:6, 2:12, 2:16, 5:7,
5:8, 5:10, 5:11, 5:14,
5:21, 6:15, 8:16,
8:20, 8:24, 9:14,
11:4, 11:10, 16:3,
16:6, 17:2, 17:5,
22:1, 22:4, 22:11,
23:19, 24:1, 24:7,
24:17, 24:21, 24:25,
25:2, 26:3, 26:4,
39:19, 39:21, 39:25,
40:1, 40:3, 40:6,
40:7, 40:8, 40:9,
40:10, 40:11, 40:12,
46:2, 46:4, 46:6,
46:8, 46:9, 46:11,
46:12, 54:20, 54:22,
54:24, 55:1, 55:2,
55:3, 55:19, 55:20,
57:24, 58:2, 58:5,
58:8, 58:10, 58:13,
60:13, 60:16, 60:18,
60:21, 60:24, 61:3,
61:7, 61:9, 63:9,
63:10, 64:21, 65:10,
65:14, 65:16, 65:18,
65:23, 65:25, 66:2,
66:6, 67:21, 67:25,
68:5, 68:7, 68:9,
68:13, 70:6, 70:10,
70:20, 71:1, 71:11,
72:2, 72:6, 72:14,
72:19, 72:24, 73:2,
73:8, 73:12, 73:17,
73:24, 74:1, 74:10,
74:15, 74:17, 74:19,
74:21, 78:23, 79:2,

79:7, 79:14, 79:16,
79:19, 79:20, 79:24,
80:9, 80:10, 83:21,
83:25, 84:13, 84:14,
84:22, 84:25, 85:2,
85:13, 85:15, 86:6,
86:7, 93:17, 93:20,
94:11, 94:14, 94:15,
94:19, 94:24, 95:3,
95:16, 95:18, 95:20,
96:21, 102:22,
102:25, 103:4,
103:6, 103:7, 105:7,
105:8, 105:10,
105:11, 105:12,
106:16, 106:21,
106:25, 116:3,
116:11, 118:3,
118:5, 118:18,
122:11, 122:12,
128:5, 128:9,
128:10, 128:12,
128:24, 129:3,
129:8, 129:11,
129:12, 129:14,
129:15, 129:21,
130:13, 130:20,
131:2, 131:4, 131:6,
132:3, 132:14,
132:16, 133:8,
133:13, 133:15,
133:25, 134:4,
134:9, 134:10,
134:12, 134:13,
134:17, 134:18,
134:22, 134:23,
135:3, 135:4, 135:8,
135:9, 135:12,
135:13, 135:16,
135:17, 135:23,
135:24, 136:2,
136:3, 136:6, 136:7,
136:10, 136:11,
136:14, 136:20,
136:25, 137:2,
137:5, 137:6, 137:9,
137:10, 137:13,
137:14, 137:17
**themselves** [1] -
105:19
**theoretically** [1] -
130:16
**therein** [1] - 130:4
**thereof** [1] - 130:5
**they've** [4] - 20:5,
20:25, 108:11
**thick** [1] - 31:17
**thigh** [1] - 36:6
**thinking** [3] - 32:15,
35:20, 52:15

**third** [12] - 7:10, 13:12,
17:22, 17:24, 22:10,
76:10, 80:18, 82:16,
83:21, 99:14,
101:15, 126:9
**third-party** [1] - 13:12
**thong** [1] - 36:3
**thorough** [2] - 45:18,
108:7
**thousand** [1] - 51:18
**threatened** [1] - 102:5
**threats** [1] - 114:10
**three** [9] - 29:13,
33:16, 37:12, 39:15,
39:24, 40:3, 41:4,
53:5, 63:16, 76:2,
84:5, 86:11, 86:14,
114:12, 124:19,
125:10, 125:13,
131:20, 132:1
**threw** [3] - 31:22,
33:17, 33:19
**THROUGH** [4] - 4:18,
4:19, 4:20
**throughout** [4] - 63:7,
84:20
**throwing** [1] - 35:1
**tied** [18] - 31:9, 31:10,
31:18, 32:6, 33:25,
34:1, 34:9, 34:22,
34:23, 35:8, 38:14,
39:1, 39:3, 59:24,
60:7, 60:8, 116:24,
117:14
**tier** [24] - 28:18, 28:23,
29:6, 40:5, 40:17,
41:7, 43:4, 48:15,
49:9, 59:21, 60:14,
60:15, 77:24, 78:4,
79:5, 82:20, 84:1,
84:2, 86:9, 94:13,
101:15, 101:17,
117:25
**tiers** [5] - 49:19, 78:1,
78:3, 82:19, 84:21
**tight** [2] - 32:7, 94:5
**timely** [1] - 125:20
**timing** [1] - 72:16
**tired** [3] - 51:23,
51:24, 51:25
**TO** [1] - 5:4
**today** [9] - 12:22,
13:12, 16:16, 22:5,
35:15, 48:13, 52:16,
127:14, 128:16
**today's** [1] - 8:7
**together** [2] - 9:17,
83:3
**tomorrow** [2] -
134:19, 134:20

**tongue** [3] - 32:3,
33:8, 49:18
**took** [28] - 18:16, 27:8,
32:2, 32:5, 32:6,
33:12, 33:20, 33:25,
34:23, 37:11, 49:15,
49:16, 50:9, 56:3,
90:19, 97:10, 99:18,
99:20, 100:24,
101:1, 103:5,
110:11, 111:6,
117:1, 117:3,
117:11, 117:12
**toothbrush** [3] - 32:2,
33:9
**toothpaste** [3] - 32:5,
33:9, 38:3
**top** [3] - 47:23, 117:3,
127:5
**topic** [1] - 86:22
**total** [2] - 75:18, 84:17
**totaled** [1] - 84:16
**touched** [1] - 89:7
**touches** [1] - 79:7
**toured** [1] - 80:25
**touring** [2] - 80:19,
80:21
**tours** [1] - 129:4
**toward** [2] - 34:1,
34:23
**track** [1] - 43:2
**tracking** [2] - 15:7,
106:6
**tradition** [1] - 94:1
**trained** [1] - 87:21
**training** [13] - 12:18,
12:24, 14:25, 62:7,
63:18, 63:22, 63:24,
87:9, 94:7, 103:16,
104:1, 127:8
**transcript** [1] - 138:8
**TRANSCRIPT** [2] -
1:11, 3:11
**transferred** [4] -
118:24, 118:25,
119:2, 123:20
**translated** [1] - 15:21
**translation** [1] - 15:20
**transport** [2] - 75:20,
76:1
**trauma** [2] - 75:22,
76:25
**traveled** [1] - 80:17
**treatment** [7] - 15:13,
20:25, 21:3, 45:25,
46:15, 112:20, 113:7
**triaged** [1] - 125:22
**trial** [2] - 47:12, 57:3
**trickery** [1] - 43:18,
50:12

**tried** [2] - 19:15, 90:17
**trips** [1] - 76:18
**trouble** [2] - 114:7
**troubled** [2] - 62:17, 127:17
**true** [6] - 19:9, 114:18, 128:17, 128:21, 128:22, 138:8
**truth** [6] - 24:19, 61:1
**try** [6] - 68:2, 68:3, 68:4, 79:3, 99:23, 129:25
**trying** [12] - 22:21, 30:7, 31:1, 32:8, 34:14, 35:18, 36:8, 37:23, 42:9, 43:16, 49:23, 89:24
**turn** [9] - 34:17, 34:20, 78:20, 81:9, 91:3, 91:23, 97:6, 107:6, 108:17
**turnaround** [6] - 62:16, 127:25, 129:6, 130:5, 131:13, 131:19
**turned** [1] - 31:19
**turning** [4] - 87:11, 112:14, 124:1, 127:17
**turns** [4] - 34:13, 81:17, 117:1, 117:3
**tussling** [1] - 31:1
**tweak** [1] - 16:24
**tweaking** [1] - 16:10
**twice** [2] - 27:20, 83:8
**two** [32] - 10:23, 25:16, 26:7, 39:15, 41:3, 41:4, 48:10, 53:5, 53:6, 64:1, 75:14, 77:13, 78:1, 83:3, 89:16, 91:3, 91:8, 92:19, 97:15, 97:19, 98:9, 99:4, 110:17, 111:24, 112:24, 113:12, 113:25, 114:2, 114:10, 124:3, 124:9
**tying** [1] - 31:6
**type** [9] - 36:3, 43:24, 49:24, 50:11, 50:12, 51:2, 52:1, 52:25, 85:15
**types** [7] - 26:23, 27:6, 61:19, 62:4, 63:14, 72:17, 81:11
**typically** [1] - 108:5

# U

**U.S** [2] - 63:4, 137:1
**U.S.C** [1] - 7:14
**unable** [2] - 12:12, 12:13
**unacceptable** [3] - 10:3, 10:20, 15:10
**unacceptably** [3] - 135:18, 135:19, 135:20
**uncomfortable** [1] - 43:14
**unconstitutional** [2] - 19:6, 21:12
**under** [7] - 13:10, 20:14, 21:5, 25:20, 37:14, 93:22, 131:11
**underfunded** [1] - 135:10
**underlying** [3] - 72:24, 73:3, 77:6
**underreported** [1] - 89:13
**understaffed** [1] - 77:20
**uneducated** [1] - 52:9
**unfulfilled** [1] - 136:4
**uniform** [1] - 31:17
**unit** [12] - 15:6, 49:16, 90:14, 90:16, 94:6, 104:20, 108:13, 110:17, 110:19, 110:21, 111:24, 120:7
**United** [12] - 5:17, 5:22, 6:18, 6:21, 9:17, 9:24, 10:24, 13:11, 69:4, 136:21, 138:6, 138:16
**UNITED** [3] - 1:1, 1:12, 2:6
**units** [2] - 136:3, 136:16
**unless** [4] - 21:12, 44:11, 52:24, 74:10
**unnecessarily** [1] - 107:25
**unnecessary** [1] - 69:21
**unorthodox** [1] - 20:6
**unprecedented** [1] - 69:10
**unreasonable** [2] - 7:9, 13:17
**unredacted** [1] - 70:12
**unreported** [1] - 69:21
**unsuccessful** [2] - 86:4, 86:7

**unsupervised** [1] - 12:12
**untie** [2] - 34:16, 35:22
**untied** [2] - 35:24, 35:25
**up** [72] - 12:17, 13:20, 15:18, 16:24, 19:7, 28:1, 29:16, 30:3, 30:12, 30:15, 31:6, 31:18, 33:16, 33:21, 33:23, 33:25, 34:9, 34:22, 34:23, 35:8, 36:6, 37:20, 38:4, 38:7, 38:9, 38:14, 39:1, 39:10, 42:3, 44:2, 44:3, 44:8, 45:16, 47:9, 51:3, 54:8, 60:7, 60:8, 64:18, 70:22, 71:9, 73:12, 74:6, 80:23, 85:5, 86:22, 91:21, 93:2, 93:12, 94:17, 97:9, 98:15, 99:1, 99:11, 101:16, 101:17, 101:20, 106:18, 108:7, 108:12, 110:21, 111:3, 111:8, 113:16, 114:23, 115:22, 116:17, 117:14, 118:17, 132:13
**updated** [1] - 12:18
**upgrade** [1] - 16:21
**upstairs** [2] - 49:1, 49:16
**urge** [1] - 9:18
**urging** [1] - 11:24
**urine** [1] - 35:1
**USRY** [1] - 2:12

# V

**value** [1] - 101:16
**valve** [1] - 126:17
**variables** [1] - 67:11
**varies** [1] - 29:4
**variety** [2] - 62:19, 119:25
**vary** [1] - 112:16
**verbal** [4] - 90:15, 99:17, 100:19, 112:1
**verbatim** [1] - 125:14
**verify** [1] - 117:21
**versus** [1] - 5:12
**victim** [16] - 47:7, 49:1, 82:3, 83:8, 83:9, 83:16, 84:7,

84:8, 91:15, 112:18, 113:14, 115:13, 115:16, 115:18
**victimized** [3] - 83:1, 83:2, 119:9
**victims** [4] - 82:25, 83:14, 83:18, 113:3
**video** [6] - 113:16, 113:17, 113:18, 115:20, 116:3, 116:11
**videotape** [2] - 113:12, 133:21
**videotapes** [2] - 80:17, 113:9
**videotaping** [1] - 88:25
**view** [2] - 129:1, 134:13
**violate** [5] - 6:21, 7:6, 23:3, 23:4, 23:5
**violates** [1] - 23:5
**violation** [3] - 7:16, 7:18, 23:11
**violations** [2] - 11:14, 13:9
**violence** [24] - 15:10, 26:14, 26:21, 26:23, 26:25, 67:8, 69:9, 70:1, 76:25, 77:3, 77:8, 77:10, 82:7, 87:2, 87:3, 90:12, 107:7, 107:9, 107:23, 107:24, 108:10, 128:13, 131:25, 134:14
**violent** [4] - 82:23, 108:22, 108:23, 108:24
**virtually** [2] - 21:10, 23:19
**visible** [2] - 35:15, 36:13
**voice** [2] - 8:2, 17:17
**VOICES** [1] - 5:9
**VOIR** [2] - 4:9, 61:10
**vulnerable** [1] - 121:24

# W

**wait** [1] - 43:17
**waited** [2] - 44:16, 44:17
**waiting** [1] - 70:12
**walk** [5] - 40:16, 41:7, 41:8, 44:4, 100:13
**walked** [9] - 30:3, 30:9, 41:12, 42:2,

42:3, 42:24, 43:4, 50:15, 59:23
**walkthrough** [1] - 41:2
**wall** [1] - 28:2
**wants** [1] - 20:10
**ward** [1] - 50:16
**Ward** [5] - 50:17, 50:18, 50:21, 50:23
**warden** [3] - 119:20, 120:9, 127:10
**warning** [2] - 103:22, 104:5
**washed** [1] - 38:3
**Washington** [1] - 24:15
**WASHINGTON** [2] - 1:24, 2:10
**water** [4] - 34:25, 37:12, 37:14, 104:20
**waved** [1] - 42:1
**ways** [7] - 37:7, 119:12, 119:13, 119:25, 120:5, 120:12, 131:22
**weak** [1] - 82:25
**weapon** [1] - 111:21
**weapons** [13] - 27:2, 27:4, 27:6, 27:14, 27:17, 28:4, 28:7, 85:24, 86:3, 86:12, 86:16, 86:20
**week** [13] - 11:3, 11:11, 16:16, 16:19, 40:12, 40:18, 57:3, 80:18, 80:19, 80:21, 81:3, 118:17, 132:2
**WEEKS** [1] - 2:12
**weeks** [5] - 18:19, 26:2, 78:2, 116:7, 124:3
**welded** [1] - 126:17
**welfare** [4] - 17:13, 17:15, 21:7, 66:22
**WERE** [2] - 4:19, 4:20
**whatsoever** [2] - 52:25, 102:18
**WHEREUPON** [4] - 73:20, 74:2, 103:5, 137:19
**whitewashed** [1] - 100:12
**whole** [14] - 24:19, 33:2, 36:22, 37:22, 38:23, 39:11, 45:18, 45:19, 51:10, 61:1, 64:13, 68:2, 114:5, 125:23
**WICKER** [1] - 2:21
**wide** [2] - 34:21, 62:19
**widely** [1] - 86:2

**wider** [1] - 85:15
**widespread** [1] - 86:18
**wildly** [1] - 101:6
**WILLIAMS** [2] - 3:3, 6:9
**Williams** [1] - 6:10
**window** [6] - 29:16, 41:24, 41:25, 42:1, 43:7, 43:8
**wire** [1] - 37:6
**wires** [1] - 37:1
**Wisconsin** [1] - 76:7
**wish** [3] - 8:16, 9:7, 122:20
**wishes** [2] - 8:22, 20:4
**witness** [15] - 23:21, 23:23, 24:5, 24:23, 26:14, 26:21, 26:23, 57:21, 58:12, 60:22, 61:5, 69:24, 102:23, 106:15, 115:12
**WITNESS** [68] - 24:21, 25:2, 26:4, 39:21, 40:1, 40:6, 40:8, 40:10, 40:12, 46:4, 46:8, 46:11, 55:1, 55:3, 55:20, 60:16, 61:3, 61:9, 63:10, 65:25, 67:25, 68:7, 68:13, 79:2, 79:14, 79:19, 79:24, 80:10, 83:25, 84:14, 84:25, 86:7, 93:20, 94:14, 94:19, 95:3, 95:18, 105:8, 105:11, 106:25, 118:5, 122:12, 128:9, 128:12, 129:3, 129:11, 129:14, 131:6, 132:16, 133:13, 133:25, 134:9, 134:12, 134:17, 134:22, 135:3, 135:8, 135:12, 135:16, 135:23, 136:2, 136:6, 136:10, 136:14, 136:25, 137:5, 137:9, 137:13
**witnesses** [9] - 8:22, 8:25, 9:4, 9:5, 16:17, 24:12, 92:11, 92:17, 102:14
**witnessing** [1] - 88:21
**wives** [1] - 52:13
**woman** [1] - 43:15
**woman's** [1] - 36:3
**words** [2] - 38:10, 42:3

**world** [1] - 51:17
**worse** [4] - 18:15, 68:24, 132:23, 133:2
**worst** [5] - 26:17, 68:25, 69:3, 128:12, 136:23
**wrapping** [1] - 114:23
**wrist** [1] - 117:12
**writ** [1] - 74:8
**write** [11] - 43:1, 88:20, 88:22, 95:5, 95:11, 101:11, 102:16, 104:23, 119:19, 120:8
**written** [7] - 88:18, 95:17, 122:20, 122:21, 123:6, 134:3
**wrongly** [2] - 89:14, 133:25
**wrote** [3] - 19:21, 19:23, 101:12

## Y

**yank** [1] - 51:3
**yanked** [1] - 50:20
**year** [12] - 12:8, 14:2, 16:13, 21:18, 26:3, 46:23, 63:16, 63:23, 69:11, 75:3, 76:18, 80:18
**years** [20] - 12:3, 12:23, 23:7, 26:7, 41:3, 41:4, 48:10, 55:3, 55:4, 57:10, 57:15, 61:23, 63:11, 68:24, 69:16, 131:20, 132:2, 132:21, 135:1, 136:22
**yell** [1] - 39:5
**yelling** [3] - 38:17, 49:21, 101:7
**yellow** [1] - 90:5
**young** [1] - 54:15
**yourself** [1] - 51:10

## Z

**ZAMPIERIN** [12] - 1:23, 6:2, 23:22, 24:6, 24:10, 24:14, 25:6, 26:6, 40:14, 46:14, 54:18, 60:20
**Zampierin** [1] - 6:2
**ZAMPIERIN**.............. .. [1] - 4:6