UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **LASHAWN JONES, et al.** | **CIVIL ACTION NO.  12-859** |
| **VERSUS** | **JUDGE LANCE M. AFRICK** |
| **MARLIN N. GUSMAN, Orleans Parish Sheriff, et al.** | **MAGISTRATE JUDGE ALMA CHASEZ** |

### REPLY MEMORANDUM IN SUPPORT OF THIRD-PARTY DEFENDANT CITY OF NEW ORLEANS' MOTION FOR APPOINTMENT OF A RECEIVER

**MAY IT PLEASE THE COURT:**

Third-Party Defendant, the City of New Orleans (the "City"), hereby submits its Reply Memorandum in Support of its Motion for Appointment of a Receiver to respond to the memoranda filed by Marlin N. Gusman, Orleans Parish Sheriff (the "Sheriff"), and the Plaintiff Inmates and the Civil Rights Division.  Neither the Sheriff's memorandum nor the joint memorandum from the Plaintiff Inmates and the Civil Rights Division present convincing arguments to allow the Sheriff to continue operating Orleans Parish Prison ("OPP") – a troubling situation that they collectively concede the Sheriff has not improved during his nine (9) years of control.

To use the Plaintiffs' words, Orleans Parish Sheriff's Office (the "OPSO") is "deeply dysfunctional," even after being the subject of multiple federal court consent decrees regarding the conditions at OPP and related facilities.[1]  Considering this, the appointment of a receiver is indeed appropriate.  A receiver is needed to ensure that OPP operates in a constitutional manner and to provide assurance to the public that their tax dollars are being spent properly and wisely.

I.      **THE SHERIFF'S RELIANCE AND (MIS)TELLING OF HISTORY DOES NOT MINIMIZE THE FACT THAT HIS MISMANAGEMENT OF OPP IS THE REASON THE CURRENT STATE OF AFFAIRS EXIST.**

The Sheriff begins his opposition memorandum by posing the same question the *Times-Picayune* asked on April 7, 2013:  "Sheriff Marlin Gusman: [w]orst jailer, or just burdened with worst jail?"[2]  Bucking what has fast become the public's perception after watching criminal conduct *within* OPP, the Sheriff, despite the mound of evidence to the contrary, suggests that he has no culpability for the conditions in OPP unfavorably critiqued by every expert witness during the hearing earlier this month, while in the same breath testifying that everything is copasetic there.  If this Court rejects the testimony offered by Sheriff Gusman as incredulous, then Sheriff Gusman, in what seems to have become a lamentable habit, places the blame on anyone and everyone other than himself.  It apparently is easier to blame others than to fix the situation.  That is precisely the lack of "principled leadership" attributed to Sheriff Gusman according to the expert testimony presented to this Court earlier in the month.

---

[1] Of all residents in this community, Sheriff Gusman has to be one of the most, if not the most, knowledgeable individual about the alleged conditions and corresponding consent decrees.  He served for six (6) years as Chief Administrative Officer for the City while the *Hamilton* case was being litigated and resolved.  He then spent four (4) years as a member of the City Council overseeing the budget for the Sheriff's Office.  And for nearly a decade as Sheriff, he and the same law firm that represented the Sheriff in the *Hamilton* case and now represent him presumably were aware of these federal court proceedings.

[2] John Simerman, *Sheriff Marlin Gusman: Worst jailer, or just burdened with worst jail?*, available at http://www.nola.com/crime/index.ssf/2013/04/sheriff_gusman_worst_jailer_or.html (last visited April 24, 2013).

**A.      The Sheriff's History Lesson Is An Attempt To Not Accept Responsibility.**

Instead of addressing the problems facing OPP which are compounded by the Sheriff's lack of leadership and competent management that have exacerbated the problems as correctional experts have observed first-hand, the Sheriff seeks to divert the Court's attention from his long-standing failings.  This rabbit-trail offered by the Sheriff goes nowhere.  Vague and isolated comments about the *Hamilton* litigation is not a meaningful response.  Similarly, Sheriff Gusman's self-praise for handling challenges in the aftermath of Katrina misses the mark; virtually all of the residents of this City faced equal if not more horrific challenges as the result of Katrina.  More notably, overseeing the evacuation of inmates eight (8) years ago simply does not excuse the managerial vacuum allowed to exist by Sheriff Gusman during the ensuing eight (8) years.  The Sheriff's testimony during the fairness hearing tells a different story.  Throughout his entire time on the witness stand (and notably this was his only time in court during one of the most significant events affecting his tenure), the Sheriff repeatedly disagreed with every component of the Proposed Consent Decree that he was formally sponsoring.[3]

In trying to respond to the City's pending motion for appointment of a receiver who would be trained to operate a correctional facility, the Sheriff resorts to the "more money" argument.  In other words, while the Sheriff testified that conditions at OPP are fine for inmates and deputies alike, the Sheriff nevertheless posits that he would be a better leader if the City would loosen its purse strings in his favor.  The Sheriff's unusual argument is logically flawed.

_____

[3] This position also creates an interesting dilemma considering that the Sheriff testified that conditions at OPP comport with constitutional minimums.  If that is what the Sheriff believes, then why does he propose a far-reaching consent decree and why does he need additional funds to improve conditions at OPP that, according to him, are dandy?

PD.9209740.1

It is akin to suggesting that turning over more money to a spendthrift will somehow cure his wasteful spending.  That type of thinking certainly is repugnant to the taxpayers of this City, and, more to the point, it dodges the question of why a receiver is essential.

The Sheriff's effort to foist blame upon the City for the conditions in OPP, which ironically he believes are fine, is not a reasoned solution.  Tellingly, Sheriff Gusman fails to address the sharp criticism of him and his office by the Plaintiffs' multiple experts.  He has been unable to articulate how any additional funding would be the panacea for lack of leadership and his hands-off form of managing OPP for nine years.

To be more specific:

1)      Additional funding is not needed to stop inmates from coming and going from OPP as they please;

2)      Additional funding is not needed to prevent contraband in OPP – such as illegal drugs, beer, cellphones, and guns, all of which were graphically displayed in videos recorded by incarcerated prisoners during their sprees of tomfoolery;

3)      Additional funding is not needed to have the Sheriff report criminal activity he saw to the District Attorney;[4]

4)      Additional funding is not needed to stop guards from assaulting inmates; and

5)      Additional funding is not needed to have the Sheriff's deputies actually do their jobs.

Simply stated, the catchword is management – not money.

---

[4] John Simerman, *D.A. Cannizzaro says he's probing sheriff's deputies, inmates over jail videos*, available at   http://www.nola.com/crime/index.ssf/2013/04/da_cannizzaro_says_hes_probing.htm#incart_river   (last   visited April 26, 2013).

4

In his opposition, Sheriff Gusman inexplicably does not attempt to address the evidence accepted by this Court. His position presumably is bottomed upon looking away from the evidence adduced at the fairness hearing that disclosed:

- Despite receiving a findings letter from the Department of Justice in 2009, the Sheriff allowed conditions to *worsen,* which led to a second findings letter from the Civil Rights Division in 2012;

- Despite receiving a technical assistance report prepared by Dr. Schwartz, who testified during the fairness hearing at the behest of the Plaintiffs, and despite learning from Dr. Schwartz through this National Institute of Corrections study in 2008 that changes could be made "quickly, cheaply, and easily," the Sheriff chose not to implement any of those changes and did not bother to heed this Report from corrections professionals;

- When asked about the 2009 and 2012 findings letters, the Sheriff dismissed the conclusions reached by the correctional experts because he felt that the Department of Justice's inspections were cursory (facts these experts refuted);

- As Dr. Schwartz complained, his investigations were made more difficult because of the Sheriff's lack of cooperation;

- An expert witness retained by the Department of Justice in this litigation testified that in a span of just seven (7) months, conditions at OPP worsened under the Sheriff's watch;

PD.9209740.1

- Both of the expert witnesses specializing in operating correctional facilities stated that the Sheriff's staffing priorities are "upside down" and, as a result, he minimized the importance of inmate and deputy safety;

- The Sheriff oversees a department where several of his senior staff have been charged and plead guilty to federal crimes including bribery and kickbacks, and other businessmen reportedly close to Sheriff Gusman have been charged with federal felonies and/or under criminal investigation based on their dealings with the OPSO;

- The OPSO is now being investigated by the Orleans Parish District Attorney's Office in connection with the videos played by the Court during the fairness hearing and the Sheriff's decision not to report to the District Attorney what is uncontroverted criminal activity to the naked eye; and

- The Sheriff testified that, despite the direct testimony from those in his care and custody and experts in a field in which the Sheriff had no training before he took office, OPP meets constitutional minimums and the Proposed Consent Decree is not necessary.

With all this in mind, the rhetorical question presented by the *Times-Picayune* and quoted by the Sheriff bears repetition:  Is the Sheriff the worst jailer or did he inherit, as he appears to argue, the worst jail?  Either alternative answer demands appointment of a receiver.  If he is the worst jailer, a receiver must be put into place.  If he took office with the worst jail in 2004 and did nothing to rectify the conditions, he does not get a pass.  Even if the Sheriff needs more money from the City to operate, a contention the City disputes, how could the City be asked to

give more money to the "worst jailer" or more money to a leader lacking leadership skills?  That would be wasteful at best.  These disquieting facts cannot be overlooked by allowing the status quo under a Sheriff who has embraced the status quo under oath.

**B.      Despite the Sheriff's Protests, the Facts Support the Appointment of A Receiver.**

Should the Court allow Sheriff Gusman's re-writing of history, that would still be inadequate to prevent the needed appointment of a receiver. The Sheriff argues that the Department of Justice findings and various consent decrees from *Hamilton* – except of the course the "funding" settlement – do not provide a complete picture.  Because no one ever filed a pleading against Sheriff Gusman in *Hamilton* and his belief that the *Hamilton* consent decrees were no longer in effect as of June 20, 2008, Sheriff Gusman maintains that he is absolved of responsibility for those issues.  However, when the facts of this case are viewed in conjunction with the history from *Hamilton*, as well as Sheriff Gusman's recent invocation of the *Hamilton* case (which he abandoned quickly), a different story appears.

According to the 2009 Findings Letter from the Department of Justice, the Civil Rights Division first notified Sheriff Gusman of its intent to "conduct an investigation of conditions at OPP" presumably because the Civil Rights Division believed that there was "a pattern or practice of conduct that violates the constitutional rights of inmates in adult detention and correctional facilities."[5]   This, as Sheriff Gusman admits in his opposition, occurred *before* the consent decrees in *Hamilton* were terminated.  The Civil Rights Division then conducted one of three inspections of OPP a mere three (3) days after the *Hamilton* consent decrees were terminated by

---

[5] *See,* Trial Exhibit 1.

7

the Court.[6]  It was this visit, along with two (2) others, that led the Civil Rights Division to find that "certain conditions at OPP violate the constitutional rights of inmates."  These inspections were followed by de-briefings with the Sheriff and his attorneys on each of the three occasions. Yet, none of these conditions were a problem, according to the Sheriff.

Under the Sheriff's strained theory, even though all the consent decrees from *Hamilton* were in effect at the time the Civil Rights Division began investigating the Sheriff and OPP for violations of the inmates' constitutional rights, that cannot be taken into account because there was never a formal court order issued.  Like his testimony when he stated that conditions at OPP currently meet constitutional minimums, the Sheriff again minimizes the realities at OPP in favor of his own version of history.  If the Court accepts the Sheriff's views as reliable and credible, there is no need for a consent decree; otherwise, both the Sheriff's testimony as well as his unique chronological perspective only underscore, not rebut, the need for appointment of a receiver.

C.    **The Sheriff Has Ignored the Various Tools At His Disposal To Increase Funding.**

As mentioned above, the Sheriff argues that conditions at OPP are caused solely because of funding issues.  Considering all of the options available to the Sheriff from the time he took office until the present, his complaints about underfunding ring hollow.  First, and as the Sheriff should well know considering his lengthy recitation of self-serving history from *Hamilton*, he could have sought additional funding from the City as early as January 1, 2006, as part of the settlement with the City – a settlement with which the Sheriff was personally and directly

---

[6] *Id.*

PD.9209740.1

familiar.  This settlement was not just a document he received when he assumed the office of

Sheriff.

Paragraph 6 of the Settlement Agreement between the City and the Sheriff, states:

> Prior to December 31, 2005, the Sheriff and the City will not file
> any motions seeking to increase or decrease the *per diem* rate paid
> by the City of New Orleans, the amounts paid by the City of New
> Orleans to the Sheriff for medical services, the amount of
> payments by the City for court services or any other payment made
> by the City as established in this Settlement Agreement or the
> Stipulation and Consent Judgment entered in July 18, 1990.[7]

Recognizing his ability to seek Court intervention to force the City to increase funding to

his office, if needed, the Sheriff did nothing – much like his response to the various DOJ findings

letters.  This seems to support the fact that the Sheriff does not need more money from the City.

Only after this lawsuit was commenced and after the City itself broached the *Hamilton* case, did

the Sheriff take any action in *Hamilton*.  In December 2012, the Sheriff filed a motion to increase

the City's share of funding to the OPSO.  But the Sheriff then dismissed his request to increase

funding pursuant to the *Hamilton* settlement within weeks of the request and before the Court

took any action.  Sheriff Gusman's references to the *Hamilton* case and his conduct add fodder to

the City's request for a receiver.[8]

Second, the Sheriff has the ability to use the Law Enforcement District, for which the

Sheriff is the *ex officio* chief executive officer, to levy a tax "to fund the operations of his office,"

subject to voter approval.[9]  The City knows the Court scheduled two hearings as to funding, but

the City is constrained to briefly respond to the so-called funding issue because the Sheriff seeks

---

[7] Rec. Doc. 402-2.
[8] In another inconsistent move, Sheriff Gusman asked this Court to keep the *Hamilton* case alive while he
pursues more funds from the City in this proceeding.
[9] *See*, La. R.S. 13:5901(A) and 13:5903(D).

9

to use it to blunt the compelling facts for a receiver. That attempt also falters. Pointedly, Sheriff Gusman has never used this statutory authority to obtain additional funding over and above the approximately $30 million dollars the City provides pursuant to its obligations in *Hamilton*.

Instead of using either of these options, the Sheriff resorted to requesting the City Council to provide him additional funding during the City's annual budget process. Every time he would ask for additional funds though, he would simply say that he wanted more; the Sheriff would not (and presumably could not) provide the detailed supporting documentation necessary to justify his requests. Deputy Mayor Kopplin testified to those facts during the fairness hearing. The Sheriff's arguments regarding lack of funding are just another example of the Sheriff's failure to accept responsibility for his actions or lack of action. Instead of taking the steps available to him to increase funding, the Sheriff merely sought to reach into the City's limited budget for more dollars. Even then, the Sheriff never took the time to provide the City with the required details as to why he needed additional funds or provide any supporting documentation. Brushing aside these facts, the Sheriff clings to the notion that he is blameless for the problems at OPP if any exist – which he categorically denies.

These reasons, combined with the testimony of members of the putative class and experts, support the finding a receiver is needed to implement the reforms, including improving the conditions of confinement as well as the financial disarray, and would be indispensable if the Court approves the Proposed Consent Decree, even a narrower version as the City advocates.

## II. THE PLAINTIFFS' RESPONSE LIKEWISE DOES NOT PRESENT SUFFICIENT REASONS TO DENY THE CITY'S MOTION.

The Plaintiff Inmates and the Civil Rights Division, in another joint memorandum, have set forth what appears to be a hybrid position that a receiver ultimately will be needed but they

PD.9209740.1

nonetheless support the Sheriff, even though he has moved about as far away from the Proposed Consent Decree as humanly possible. Despite referring to the OPSO as a "deeply dysfunctional organization" and launching an investigation regarding alleged unconstitutional conditions at OPP at a time when the Sheriff was under a consent decree in *Hamilton*, the Civil Rights Division, along with the Plaintiff Inmates, want to give yet another chance to a Sheriff that they believe has shown for nearly a decade that he cannot run a jail that meets constitutional minimum standards. Oddly, the Southern Poverty Law Center and the Civil Rights Division suggest that a receiver is unnecessary because they will take the requisite steps to ensure compliance with the Proposed Consent Decree. In other words, they do not want a receiver now but they anticipate serving as a *de facto* -receiver in light of the Sheriff's shortcomings and his refusal to join with them except through a single court filing with which the Sheriff now takes issue.

### A.   It Is Curious That the Plaintiff Inmates and the Civil Rights Division Will Allow the Sheriff, Who Disputes the Need For the Consent Decree, To Implement the Consent Decree.

The crux of the Plaintiff Inmates' and the Civil Rights Division's argument is that, despite the "deep[ ] dysfunction," they want to give the Sheriff one more opportunity because they expect the Court to micromanage and supervise his activities. Surprisingly, the Plaintiff Inmates and the Civil Rights Division are willing to do so, even though the Sheriff testified against the need for the Proposed Consent Decree while he was a co-signatory with them. Has there ever been another jailer who signed a consent decree with Plaintiffs and the Civil Rights Division, and then sharply and without explanation turned around, and, under oath, denied the need for it? The City looked hard and could not find one other instance.

PD.9209740.1

With that in mind, the Plaintiff Inmates and the Civil Rights Division still cling to the belief that advisors, with no actual power, will be able to convince this Sheriff and his senior staff to make the necessary reforms to OPP.  Perhaps this is the power of positive thinking, but such an approach certainly would be troubling to the Court and to the public if the Proposed Consent Decree is approved.

B.      **The Plaintiff Inmates and the Civil Rights Division Continue to Ignore State Law By Saying the City Could (or Can) Remedy Conditions at OPP.**

Unsurprisingly, both the Plaintiff Inmates and the Civil Rights Division continue to ignore State law in their ill-conceived remarks about the City.  As the Court well knows and the Plaintiffs ignore, the City has no role or authority to affect conditions at OPP.  Indeed, this Court has recognized this situation on numerous occasions.  In a recent case, this Court dismissed an inmate's claims against the City in a §1983 Civil Rights Act action because the City had no responsibility for the conditions at OPP.[10]  Quoting a different section of this Court, the Court in *Picard* wrote that "the legislative scheme dictates that the City of New Orleans bears the obligation of satisfying the expenses of housing prisoners, while the sheriff has the duty of operating the facility."[11]  Stated succinctly, "the City's financial obligations do not constitute authority to control how the sheriff fulfills his duties."[12]  The Court concluded that "the City has no legal duty to oversee the jail's … daily operations."[13]  State court decisional law likewise shows that the City (or other funding municipalities) have no authority regarding the conditions

---

[10] *Picard v. Gusman*, 2012 WL 6504772 (E.D. La. Nov. 26, 2012) (Knowles, M.J.).
[11] *Id.* at *3.
[12] *Id.*
[13] *Id.*

at OPP (or other parish prisons).[14]  Taking a page from the Southern Poverty Law Center's and the Civil Rights Division's non-committal position, legislative change may occur in the future, but right now the City's focus is on ensuring OPP has qualified and capable leadership to be vigilant about every person's constitutional safeguards.

The Plaintiff Inmates and the Civil Rights Division contend that, despite their lack of ability to influence the Sheriff in his role as the sole party responsible for conditions at OPP, it is the City's "inaction" and its alleged "inability … to redress known deficiencies at OPP" that have led the parties to this point.  Plaintiffs and the Civil Rights Division know better. Exacerbating their unjustified attack upon the City, they argue, conveniently without legal authority or logic, that the City should have either cut-off funding to the Sheriff to show its displeasure with the Sheriff (which would have violated an order from this Court) or throw more money down the proverbial money pit known as the OPSO.  The Civil Rights Division's myopic view is perhaps understandable; it does not have to address the myriad of issues that go along with governing a municipality with approximately 370,000 citizens with limited resources and the requisite balanced budget under the Home Rule Charter.

### C.    Like the Sheriff, the Civil Rights Division Is Now Trying To Turn the Spotlight Away From Its Own Inaction.

Instead of addressing its own passivity, the Civil Rights Division, just like the Sheriff, hopes to divert attention.  It is ironic for the Civil Rights Division to do so.  The Civil Rights Division began investigating OPP and the Sheriff in 2008; the result of multiple investigations was that they wrote a letter.  After letting conditions deteriorate, as their expert testified, the

---

[14] *See, e.g.*, *Langley v. City of Monroe*, 582 So.2d 367 (La. App. 2 Cir. 1991) (dismissing claim against police jury because it had no power or discretion over parish sheriff's office); *Griffin v. Foti*, 523 So.2d 935 (La. App. 4 Cir. 1988) (holding that City was not liable either in negligence or strict liability to inmate injured in slip and fall because City had no duty with respect to daily maintenance).

13

Civil Rights Division looked into OPP again in 2012; the result: they wrote another letter. Unless the Civil Rights Division considers penning two (2) letters over a four (4) year period to be the height of activism and protecting the public it professes to protect, then its statements lack substance, and, more importantly, lack corresponding action.  The Civil Rights Division also acknowledges that it knows that the City was a defendant in *Hamilton*, yet it never explains why it only sued Sheriff Gusman in this litigation.  The answer is simple.  The Civil Rights Division knew who was to blame in 2008, 2009, 2010, 2011, 2012, and today – it is the person who has testified he is the keeper of the jail.

<u>CONCLUSION</u>

The City recognizes and fully understands the extraordinary remedy it has requested.  Of course, the City understands why the Sheriff opposes the City's motion that would require a professional correctional officer to operate OPP and related facilities.  However, the City steadfastly believes that if the Court imposes the Proposed Consent Decree it would be mystifying to have Sheriff Gusman ensure compliance after hearing directly from him, without exception, that he sees no need for changes at OPP.  As the Plaintiff Inmates and the Civil Rights Division allude to in their brief, reforming OPP may take time and energy under the Proposed Consent Decree.  Such change inherently requires leadership from someone dedicated to being the jailer of Orleans Parish and not just hosting Easter egg hunts in the park.  For these reasons,

14

as well as those set forth in the City's motion, it is respectfully submitted a receiver must be appointed if a consent decree, under these circumstances, is to be effective.

Respectfully submitted,

**PHELPS DUNBAR LLP**

BY:    */s/Harry Rosenberg*
Harry Rosenberg (Bar #11465)
Bryan Edward Bowdler (Bar #32097)
Canal Place | 365 Canal Street, Suite 2000
New Orleans, Louisiana 70130-6534
Telephone: 504-566-1311
Telecopier: 504-568-9130
Email: harry.rosenberg@phelps.com
         bryan.bowdler@phelps.com

Richard F. Cortizas (Bar #28890)
Sharonda R. Williams (Bar #28809)
City Attorney's Office
1300 Perdido Street
New Orleans, Louisiana 70112
Telephone: 504-658-9800

Ralph Capitelli (Bar #3858)
Brian Capitelli (Bar #27398)
CAPITELLI & WICKER LLP
1100 Poydras Street, Suite 2950
New Orleans, Louisiana 70163
Telephone: 504-582-2425

**ATTORNEYS FOR THIRD-PARTY
DEFENDANT, CITY OF NEW ORLEANS**

PD.9209740.1

**CERTIFICATE OF SERVICE**

This is to certify that a copy of the foregoing was filed on this 29th day of April 2013, with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to all participating counsel of record.

*/s/ Harry Rosenberg*
Harry Rosenberg

16