## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**LASHAWN JONES ET AL.**                                   CIVIL ACTION

                                                                **No. 12-859**
**VERSUS**                                                      **c/w 12-138**
                                                        **REF: BOTH CASES**

**MARLIN GUSMAN ET AL.**                                       SECTION I


## ORDER APPROVING CONSENT JUDGMENT AND
## CERTIFYING SETTLEMENT CLASS

Before the Court is the joint motion[1] for approval of the proposed consent judgment[2] filed

by plaintiffs, LaShawn Jones et al. ("Class Plaintiffs"), intervenor plaintiff, the United States of

America ("United States") (collectively, "Plaintiffs"), and defendant, the Orleans Parish Sheriff

("Sheriff"). Also before the Court is the motion[3] for certification of a settlement class filed by Class

Plaintiffs, which the United States and the Sheriff do not oppose. Third-party defendant, the City

of New Orleans ("City"), opposes approval of the proposed consent judgment and certification of

a settlement class.[4] For the following reasons, the motions are **GRANTED**.

---

[1]R. Doc. No. 101. Record citations are to Civil Action No. 12-859 unless otherwise noted.

[2]Consent Judgment. Record citations to "Consent Judgment" are to the document filed on this date, which incorporates the March 18, 2013 amendments discussed herein and grammatical and typographical corrections listed in a separate filing.

[3]R. Doc. No. 145.

[4]*E.g.*, R. Doc. No. 159.

-1-

## FACTUAL BACKGROUND

This lawsuit arises from the alleged unlawful conditions of confinement at Orleans Parish Prison ("OPP"). Among other things, the lawsuit seeks to address deficiencies in safety and security, medical and mental health care, environmental conditions, fire safety, and Spanish language services at OPP. Inmates are currently housed in seven physical facilities that collectively comprise OPP, namely, (1) the original OPP,[5] (2) Conchetta, (3) Templeman Phase V, (4) the Temporary Detention Center, (5) the Tents, (6) the Warren McDaniels Transitional Work Center, and (7) the Intake Processing Center.[6] The 600-800 inmates housed in the original OPP include youth inmates, maximum security inmates, and inmates with medical issues.[7] Conchetta houses 300-400 inmates, including both youth and adult inmates, in six housing units.[8] Templeman Phase V ("Templeman V") houses approximately 240 female inmates and inmates with mental health issues in nine different units.[9] The Temporary Detention Center houses approximately 400-500 inmates in four units, each of which contains two dormitories.[10] The Tents consist of eight windowless canvas tents, supplied by the Federal Emergency Management Agency ("FEMA") after Hurricane Katrina,[11]

---

[5]This facility is also referred to as "Old Parish Prison." *E.g.*, Pl. Ex. 374, at 10; R. Doc. No. 405, at 26. The Court refers to this facility as the "original OPP" and to the seven facilities generally as "OPP."

[6]Pl. Ex. 3; Pl. Ex. 374, at 7; Pl. Ex. 380.

[7]Pl. Ex. 85; Pl. Ex. 370; Pl. Ex. 374, at 32; Pl. Ex. 380.

[8]Pl. Ex. 88; Pl. Ex. 368; Pl. Ex. 374, at 13; Pl. Ex. 380.

[9]Pl. Ex. 374, at 15; Pl. Ex. 380.

[10]Pl. Ex. 374, at 16; Pl. Ex. 380.

[11]R. Doc. No. 374, at 7.

which collectively house approximately 500-600 inmates in a dormitory setting.[12] Approximately 150 inmates may be present at the Intake Processing Center on a given day.[13] Approximately 115 inmates may be present at the Warren McDaniels Transitional Work Center, also referred to as the Broad Street work-release facility, on a given day.[14]

## PROCEDURAL HISTORY

Although the conditions at OPP have long been the subject of litigation, this particular lawsuit is the product of investigations and complaints arising in the past five years.[15] In early 2008, the Sheriff requested technical assistance from the National Institute of Corrections, a federal agency, expressing particular concern as to OPP facilities' staffing and emergency preparedness.[16] After two outside consultants conducted a six-day site visit, they drafted a report examining operations at OPP facilities, and focusing on staffing and emergency preparedness.[17] They noted

---

[12]Pl. Ex. 374, at 13-14; Pl. Ex. 380.

[13]Pl. Ex. 380.

[14]Pl. Ex. 380.

[15]The litigation before the Court is separate from that in *Hamilton v. Morial*, which was ongoing for approximately 40 years before that case was closed in 2008. *See Hamilton Plaintiffs v. Williams Plaintiffs*, 147 F.3d 367, 368 (5th Cir. 1998) ("In 1969 a class action, *Hamilton v. Schiro*, was filed in the Eastern District of Louisiana challenging conditions in the New Orleans Parish Prison. In April 1970, the trial court found that the prison conditions were unconstitutional and issued a remedial decree, including a prisoner population cap."); *see also* Civil Action No. 69-2443, R. Doc. No. 2007 (August 23, 2007) (dismissing plaintiffs' claims without prejudice), adopted by Civil Action No. 69-2443, R. Doc. No. 2041 (June 20, 2008) ("Magistrate Judge Chasez has done an outstanding job through the years and all parties to this litigation were fortunate to have her preside over this case. But this litigation has now run its natural course and the time has come to end it.").

[16]Pl. Ex. 3, at 3.

[17]Pl. Ex. 3, at 6.

OPP's "pervasive and long standing problems," which date back many years.[18] The October 2008

report discussed some of the deficiencies alleged in this case and proposed general solutions.[19]

In September 2009, the United States, through the Department of Justice ("DOJ"), conducted

a site visit at OPP and issued a letter to the Sheriff, describing findings of unlawful conditions

related to inmate violence, staff use of force, mental health care, and environmental conditions.[20] In

April 2012, DOJ issued a findings update letter to the Sheriff, reporting that unlawful conditions

persisted, notifying the Sheriff of discriminatory conditions not addressed in the previous letter, and

requesting that the Sheriff take immediate action.[21]

On January 18, 2012, three youth inmates, through their next friends, filed a sealed complaint

for injunctive and declaratory relief, alleging that unconstitutional conditions at OPP facilities

subjected them to substantial risks of bodily harm or death.[22]

On April 2, 2013, ten named OPP inmates ("Class Representatives"), seeking solely

injunctive relief, filed a complaint alleging that the Sheriff, the wardens of several OPP facilities,

OPP's medical director, and its psychiatric director were violating OPP inmates' Eighth and

---

[18]Pl. Ex. 3, at 6.

[19]*E.g.*, Pl. Ex. 3, at 60-61 ("Current classification practices are inadequate and require substantial improvements. . . . The Sheriff should request assistance from the National Institute of Corrections to develop a comprehensive new approach to inmate behavior management, including the development of a valid and effective system of inmate classification.").

[20]Pl. Ex. 1. DOJ issued a copy of the letter to Mayor Ray Nagin; T. Allen Usry, counsel for the Sheriff; Penya Moses-Fields, City Attorney; and Jim Letten, United States Attorney for the Eastern District of Louisiana.

[21]Pl. Ex. 2. DOJ issued a copy of the letter to Mayor Mitch Landrieu; T. Allen Usry, counsel for the Sheriff; Richard Cortizas, Acting City Attorney; and Jim Letten, United States Attorney for the Eastern District of Louisiana.

[22]Civil Action No. 12-138, R. Doc. No. 2.

Fourteenth Amendment rights. Class Representatives specifically alleged that defendants fail to provide constitutionally adequate medical care and mental health care.[23] Class Representatives further alleged that violent conditions of confinement subjected them to a substantial risk of serious physical injury, to which defendants were deliberately indifferent.[24] On the same day they filed their complaint, Class Representatives filed a motion for certification of a class of plaintiffs consisting of all current and future OPP inmates.[25] The April 2 complaint was consolidated with the January 18 complaint.[26] The Court refers to the class, including Class Representatives, as "Class Plaintiffs." Class Plaintiffs are represented by the Southern Poverty Law Center ("SPLC").

Class Plaintiffs moved for a preliminary injunction, but discovery disputes delayed the consideration of this motion.[27] By September 21, 2012, however, the Court was advised that the Sheriff intended to file a third-party complaint against the City, after which Class Plaintiffs would file a motion for entry of a proposed consent judgment.[28]

On September 24, 2012, the United States moved to intervene in the April 2 lawsuit, stating that such intervention would provide the most efficient resolution of Class Plaintiffs' and the United

---

[23]R. Doc. No. 1, at 36-37.

[24]R. Doc. No. 1, at 37.

[25]R. Doc. No. 2.

[26]R. Doc. No. 13. Subsequent litigation has focused on the April 2 complaint. The named plaintiffs in Civil Action No. 12-138, however, are parties to this settlement pursuant to its express terms and implicitly as class members. *See* Consent Judgment, at 1.

[27]*E.g.*, R. Doc. No. 56.

[28]R. Doc. No. 71.

States' overlapping concerns.[29] The Court granted the United States' unopposed motion.[30] In its complaint in intervention, the United States alleged that the Sheriff violates inmates' Eighth and Fourteenth Amendment rights by failing to protect inmates from harm, providing insufficient mental health and medical care, and subjecting inmates to unconstitutional environmental conditions.[31] The United States also alleged that the Sheriff violates Title VI by unlawfully discriminating against Latino inmates with limited English proficiency.[32]

On October 1, 2012, with leave of Court, the Sheriff filed two, substantively similar, third-party complaints against the City, one based on Class Plaintiffs' claims and one based on the United States' claims.[33] In each complaint, the Sheriff asserted that, "should judgment be rendered granting any prospective relief against third-party plaintiff," the Court should order the City of New Orleans to pay the Sheriff "the full cost, as determined by the Court, of providing any prospective relief ordered by this Court pursuant to 18 U.S.C. § 3626."[34]

## THE PROPOSED CONSENT JUDGMENT

On December 11, 2012, Class Plaintiffs, the United States, and the Sheriff moved for the Court to approve a proposed consent judgment, notwithstanding the City's decision to remain a

---

[29]R. Doc. No. 68, at 3.

[30]R. Doc. No. 69.

[31]R. Doc. No. 70.

[32]R. Doc. No. 70.

[33]R. Doc. Nos. 75, 76.

[34]R. Doc. Nos. 75, 76.

nonparty to the agreement.[35]

The consent judgment is a 49-page agreement[36] entered into by Class Plaintiffs, including the named plaintiffs from each of the two consolidated cases, the United States, acting through DOJ, and the Sheriff, in his official capacity.[37] The consent judgment also functions as a settlement of class members' claims. According to the consent judgment:

> The purpose of this Agreement is to address the constitutional violations alleged in this matter, as well as the violations alleged in the findings letter issued by the United States on September 11, 2009. [OPP] is an integral part of the public safety system in New Orleans, Louisiana. Through the provisions of this Agreement, the Parties seek to ensure that the conditions in OPP protect the constitutional rights of prisoners confined there. By ensuring that the conditions in OPP are constitutional, the Sheriff will also provide for the safety of staff and promote public safety in the community.[38]

The substantive provisions of the consent judgment are organized by subject matter: protection from harm, mental health care, medical care, sanitation and environmental conditions, fire safety, language assistance, and youthful prisoners. Each subject is divided into several components, which address certain policies and practices. For example, mental health care is divided into the following components: screening and assessment, treatment, counseling, suicide prevention training program, suicide precautions, use of restraints, detoxification and training, medical and mental health staffing, and risk management.[39]

_____

[35]R. Doc. No. 101.

[36]This number does not include the cover page and table of contents, which constitute an additional 4 pages and are numbered separately.

[37]Consent Judgment, at 1.

[38]Consent Judgment, at 1.

[39]Consent Judgment, at ii-iii.

Within each subject and component, the substantive provisions are a mix of broad guidelines and specific benchmarks. For example, under "screening and assessment" for mental health issues, the consent judgment requires that the Orleans Parish Sheriff's Office ("OPSO") "[d]evelop and implement an appropriate screening instrument that identifies mental health needs, and ensures timely access to a mental health professional when presenting symptoms requiring such care."[40] In particular, the consent judgment requires that inmates "with urgent mental health needs" receive an assessment by a qualified mental health professional within 48 hours.[41]

With respect to oversight, the consent judgment provides that the parties to the agreement "will jointly select a Monitor to oversee implementation of the Agreement," with the Court resolving selection disputes.[42] Among other duties, the Monitor is responsible for providing the parties to the agreement, the City, and the Court with periodic reports on the Sheriff's compliance with the consent judgment.[43] The consent judgment provides that the Monitor will receive "full and complete" access to OPP facilities, records, staff, and inmates.[44]

Separate from the appointment of a Monitor, the consent judgment obligates OPSO to "hire and retain, or reassign a current OPSO employee for the duration of this Agreement, to serve as a

---

[40]Consent Judgment, at 20.

[41]Consent Judgment, at 20-21.

[42]Consent Judgment, at 40-41. Monitor is defined to include "an individual and his or her team of professionals." Consent Judgment, at 3.

[43]Consent Judgment, at 42. The consent judgment also requires the Sheriff to provide periodic compliance reports to the Monitor, although the Monitor is "responsible for independently verifying representations from [the Sheriff] regarding progress toward compliance, and examining supporting documentation." Consent Judgment, at 42.

[44]Consent Judgment, at 41.

full-time OPSO Compliance Coordinator."[45] According to the consent judgment:

> At a minimum, the Compliance Coordinator will: coordinate OPSO's compliance and implementation activities; facilitate the provision of data, documents, materials, and access to OPSO's personnel to the Monitor, SPLC, DOJ, and the public, as needed; ensure that all documents and records are maintained as provided in this Agreement; and assist in assigning compliance tasks to OPSO personnel, as directed by the Sheriff or his or her designee.[46]

In addition, the Compliance Coordinator is responsible for collecting the information the Monitor requires from OPSO.[47]

As to funding, the consent judgment sets forth a process by which the Court will "determine the initial funding needed to ensure constitutional conditions of confinement at OPP, in accordance with the terms of this Agreement, and the source(s) responsible for providing that funding at an evidentiary hearing ('funding trial')" at which the parties to the agreement, as well as the City, shall have the right to participate.[48] After this time, the funding amount "may be adjusted" through a process by which the Monitor attempts to resolve disagreements between the Sheriff and the City.[49] If the Monitor is unable to do so within 45 days, the dispute is submitted to the Court.[50]

The Consent Judgment provides specific procedures with respect to enforcement. For example, "if the Monitor, SPLC, or DOJ determines that Defendant has not made material progress

---

[45]Consent Judgment, at 39.

[46]Consent Judgment, at 39.

[47]Consent Judgment, at 39.

[48]Consent Judgment, at 38.

[49]Consent Judgment, at 38.

[50]Consent Judgment, at 38.

toward Substantial Compliance with a significant obligation under the Agreement, and such failure constitutes a violation of prisoners' constitutional rights, SPLC or DOJ may initiate contempt or enforcement proceedings against Defendant . . . ."[51] Before taking such action, however, "SPLC or DOJ shall give Defendant written notice of its intent to initiate such proceedings," the parties shall work in good faith to resolve the dispute, and "Defendant shall have 30 days from the date of such notice to cure the failure . . . ."[52] In the event of an emergency that poses "an immediate threat to the health or safety of any prisoner or staff member at OPP, however, DOJ or SPLC may omit the notice and cure requirements" and immediately pursue an enforcement proceeding.[53]

With respect to termination, the consent judgment provides that it "shall terminate when Defendant has achieved Substantial Compliance with each provision of the Agreement and has maintained Substantial Compliance with the Agreement for a period of two years."[54] As for severability, if any consent judgment provision "is declared invalid for any reason by a court of competent jurisdiction, said finding shall not affect the remaining provisions of the Agreement."[55]

After Class Plaintiffs, the United States, and the Sheriff filed their motion for approval of the consent judgment, briefing and conferences addressed the need for a fairness hearing.[56] Ultimately, it became clear that the City of New Orleans must also be given the opportunity to litigate the issue

---

[51]Consent Judgment, at 43.

[52]Consent Judgment, at 43.

[53]Consent Judgment, at 43.

[54]Consent Judgment, at 43.

[55]Consent Judgment, at 44.

[56]*E.g.*, R. Doc. Nos. 113, 126.

of whether the proposed consent judgment exceeds minimum constitutional standards, arguably absolving the City of its funding obligation pursuant to state law and violating the Prison Litigation Reform Act's narrow tailoring requirement.[57] Accordingly, the City was given the opportunity to participate in the fairness hearing not just as an affected third party, but also as a party pursuant to its status as a third-party defendant.[58] In the interim, Class Plaintiffs filed an unopposed motion to certify a settlement class, which superseded the original, presumably opposed, motion for class certification.[59]

## THE FAIRNESS HEARING

At a fairness hearing commencing on April 1, 2013, the Court considered whether the proposed consent judgment was consistent with constitutional and statutory law and jurisprudence such that it should be approved as between Class Plaintiffs, the United States, and the Sheriff.[60] The fairness hearing lasted four full days, and the parties introduced nearly 400 exhibits into evidence.[61] Plaintiffs called four current and former OPP inmates, E.S., D.W., D.R., and A.S.[62] Plaintiffs called

---

[57]*E.g.*, R. Doc. Nos. 107, 113.

[58]*E.g.*, R. Doc. No. 126.

[59]R. Doc. No. 145; *see also* R. Doc. No. 2.

[60]R. Doc. Nos. 384, 386, 389, 390.

[61]The Court has provided record citations for its findings, but these citations are not exhaustive lists of the evidence considered for a particular point. For example, the staggering level of violence at OPP is evidenced by the testimony of the experts and inmates, the number of investigated assaults, the high threshold required for such investigations, the records of hospital transports, and inmate grievances.

[62]These witnesses testified under their full names. As Katharine Schwartzmann, lead counsel for Class Plaintiffs, summarized: "It has taken enormous bravery for the plaintiffs to come forward and to tell the Court about their experiences. They have opened themselves up, their lives, their criminal histories up to review, to scrutiny, to cross-examination, and . . . none of them stand to make a dollar

four experts: Jeffrey Schwartz, an expert in "security and operations" of jails and prisons;[63] Manuel Romero, an expert in "jail administration, with a particular emphasis on security, staffing, environmental conditions, food service and sanitation, fire conditions, and Limited English Proficiency ("LEP") services";[64] Dr. Bruce Gage, an expert in "correctional mental health care";[65] and Dr. Daphne Glindmeyer, an expert in "mental health and psychiatry, as well as juvenile mental health in corrections."[66] Plaintiffs also called the twin sister of an inmate who committed suicide at OPP while at the Intake Processing Center.[67] The City called Andrew Kopplin, the City's First Deputy Mayor and Chief Administrative Officer.[68] The Sheriff's only witness was Sheriff Marlin Gusman.[69]

The parties provided extensive briefing on the legal issues implicated by the pending motions prior to the hearing.[70] They also provided supplemental briefing after the hearing.[71] In addition to the evidence presented at the hearing, the Court considered approximately 150 public comments

---

out of this case." R. Doc. No. 412, at 34.

[63]R. Doc. No. 405, at 66.

[64]R. Doc. No. 407, at 25.

[65]R. Doc. No. 408, at 82.

[66]R. Doc. No. 409, at 174-75.

[67]R. Doc. No. 410, at 57-58.

[68]R. Doc. No. 409, at 7.

[69]R. Doc. No. 411, at 6.

[70]*E.g.*, R. Doc. Nos. 399, 416, 427.

[71]*E.g.*, R. Doc. Nos. 149, 197, 226-374, 387.

submitted by both class members and non-class members.[72] The Court addresses the motion for

approval of the consent judgment and the motion for certification of a settlement class in turn.

## CONSENT JUDGMENT ANALYSIS

### I. Standard of Law

Generally, before entering a consent judgment, also called a consent decree, courts must

decide whether it "represents a reasonable factual and legal determination based on the facts of

record, whether established by evidence, affidavit, or stipulation." *Williams v. City of New Orleans*,

729 F.2d 1554, 1559 (5th Cir. 1984) (quoting *United States v. City of Miami*, 664 F.2d 435, 441 (5th

Cir. 1981)). Courts must also ascertain that the settlement is fair and that it does not violate the

Constitution, statutes, or jurisprudence. *Id.* (citing *City of Miami*, 664 F.2d at 441). "In assessing the

propriety of giving judicial imprimatur to the consent decree, the court must also consider the nature

of the litigation and the purposes to be served by the decree." *City of Miami*, 664 F.2d at 441.

If a consent judgment potentially affects third parties, courts must carefully scrutinize it to

ensure that the effect "is neither unreasonable nor proscribed." *Williams*, 729 F.2d at 1560 (quoting

*City of Miami*, 664 F.2d at 441). Courts must "safeguard the interests of those individuals who [are]

affected by the decree but were not represented in the negotiations." *Id.*

Because the proposed consent judgment involves prospective relief with respect to prison

conditions, an additional level of review applies. The Prison Litigation Reform Act ("PLRA")

provides:

> Prospective relief in any civil action with respect to prison conditions
> shall extend no further than necessary to correct the violation of the
> Federal right of a particular plaintiff or plaintiffs. The court shall not

---

[72]*E.g.*, R. Doc. Nos. 138-40, 153-55, 159, 173, 177, 179, 219-23, 367.

grant or approve any prospective relief unless the court finds that
such relief is narrowly drawn, extends no further than necessary to
correct the violation of the Federal right, and is the least intrusive
means necessary to correct the violation of the Federal right. The
court shall give substantial weight to any adverse impact on public
safety or the operation of a criminal justice system caused by the
relief.[73]

Through the PLRA, "Congress sought to curtail federal courts' long-term involvement in prison
reform and halt federal courts from providing more than the constitutional minimum necessary to
remedy federal rights violations." *Frazar v. Ladd*, 457 F.3d 432, 438 n. 19 (5th Cir. 2006) (citing
18 U.S.C. §§ 3626(a)(1)(A), (b)(3), (c)(1)). Compliance with the PLRA generally presents a higher
bar to approval of a consent judgment than that imposed by caselaw.[74] The parties to the consent
judgment have stipulated that it complies with the PLRA,[75] but the Court conducts an independent
inquiry.[76]

The U.S. Supreme Court addressed the PLRA's narrow tailoring requirement in *Brown v.
Plata*, 131 S. Ct. 1910 (2011), a prisoner release order case. In that case, the Court explained:
"Narrow tailoring requires a fit between the remedy's ends and the means chosen to accomplish
those ends. The scope of the remedy must be proportional to the scope of the violation, and the order
must extend no further than necessary to remedy the violation." *Plata*, 131 S. Ct. at 1939-40

---

[73]18 U.S.C. § 3626(a)(1)(A).

[74]The Court remains mindful of the different standards, but concurrently addresses the constitutional
and statutory claims pursuant to both the jurisprudential standard and that set forth in the PLRA.

[75]Consent Judgment, at 44.

[76]The parties have not suggested the Court do otherwise. *See* R. Doc. No. 151, at 16 (arguing that
such a stipulation is insufficient); R. Doc. No. 156-2, at 2 (noting that "Plaintiffs will provide a
robust evidentiary record from which the Court can make the requisite findings under the [PLRA].
The Court need not rely on the PLRA stipulation . . . .").

(internal quotations and modification omitted) (quoting *Bd. of Trustees v. Fox*, 492 U.S. 469, 480 (1989)). Narrow tailoring does not require perfection. *See Fox*, 492 U.S. at 480 (Narrow tailoring requires "a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served.") (internal quotations omitted). The Court must ensure that the relief provided in the proposed consent judgment is narrowly drawn, extends no further than necessary to correct the violation of a federal right, and is the least intrusive means of doing so.

The Court must also "give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief," although the PLRA "does not require the court to certify that its order has no possible adverse impact on the public." § 3626(a)(1)(A); *Plata*, 131 S. Ct. at 1941. "Whenever a court issues an order requiring the State to adjust its incarceration and criminal justice policy, there is a risk that the order will have some adverse impact on public safety in some sectors." *Plata*, 131 S. Ct. at 1941. Accordingly, "[a] court is required to consider the public safety consequences of its order and to structure, and monitor, its ruling in a way that mitigates those consequences while still achieving an effective remedy of the constitutional violation." *Id.* at 1942.

## II. Analysis

In asserting that conditions at OPP are unconstitutional, Plaintiffs face a high bar. To demonstrate a violation of inmates' constitutional rights, Plaintiffs must show a substantial risk of serious harm to which prison officials were deliberately indifferent. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Demonstrating deliberate indifference requires that prison officials must "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists,

and must also draw the inference." *Id.* at 837. "[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Gates v. Cook*, 376 F.3d 323, 333 (5th Cir. 2004); *see also Marsh v. Butler Cnty.*, 268 F.3d 1014, 1028 (11th Cir. 2001) (en banc) ("Plaintiffs' allegations that the County received many reports of the conditions but took no remedial measures is sufficient to allege deliberate indifference to the substantial risk of serious harm faced by inmates in the Jail.").

Pretrial detainees and convicted prisoners "look to different constitutional provisions for their respective rights to basic needs such as medical care and safety." *Hare v. City of Corinth*, 74 F.3d 633, 639 (5th Cir. 1996) (en banc), *rev'd on other grounds*, 135 F.3d 320, 324 (5th Cir. 1998). However, "no constitutionally relevant difference exists between the rights of pretrial detainees and convicted prisoners to be secure in their basic human needs." *Id.* at 647. Plaintiffs rely on the Eighth Amendment standard for conditions of confinement.[77] Because "a pretrial detainee's due process rights are said to be 'at least as great as the Eighth Amendment protections available to a convicted prisoner,'" this standard sets the minimal constitutional protections afforded to all OPP inmates. *Id.* at 639 (quoting *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983)); *see also Alberti v. Klevenhagen*, 790 F.2d 1220, 1224 (5th Cir. 1986) ("Where dealing with the constitutionally rooted duty of jailers to provide their prisoners reasonable protection from injury at the hands of fellow inmates, we need not dwell on the differences in rights enjoyed by pre-trial detainees and convicted persons or the maturation of prisoners' rights in general.") (quotation omitted).

The underlying constitutional violations alleged in this matter are systemic. As in *Plata*, "[P]laintiffs do not base their case on deficiencies" that occurred "on any one occasion," and the

---

[77]*E.g.*, R. Doc. No. 140, at 105.

Court "has no occasion to consider" whether any individual deficiency would "violate the Constitution . . . if considered in isolation." 131 S. Ct. at 1925 n. 3. Rather, "Plaintiffs rely on systemwide deficiencies" that allegedly subject inmates to a "substantial risk of serious harm" and cause conditions in OPP "to fall below the evolving standard of decency that would mark the progress of a maturing society." *Id.*; *see also Gates v. Cook*, 376 F.3d at 333 (It is "important to note that the inmate need not show that death or serious illness has occurred.").

Specific examples of dysfunction at OPP are representative of systemic deficiencies. The Court's inquiry is not focused on whether any one of these examples demonstrates the violation of a constitutional right. *See Plata*, 131 S. Ct. at 1925 n. 3; *see also Alberti*, 790 F.2d at 1225 ("We need not determine whether any of these incidents individually constituted an Eighth Amendment violation, for the evidence established that the totality of the circumstances in the jails were condemnable."). The Court must determine, however, whether the proposed consent judgment is consistent with the PLRA.

"The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones." *Gates v. Cook*, 376 F.3d at 332. The Constitution requires that inmates receive adequate food, clothing, shelter, medical care, and mental health care, and that detention facilities "take reasonable measures to ensure the safety of the inmates." *Id.* (citing *Farmer*, 511 U.S. at 832). The Fifth Circuit has held that, with respect to conditions of confinement, even where "[e]ach factor separately, i.e., overcrowding dormitory barracks, lack of classification according to severity of offense, [] inmates with weapons, lack of supervision by [] guards, absence of a procedure for confiscation of weapons, may not rise to constitutional dimensions [], the effect of the totality of these circumstances [may be] the infliction of punishment on inmates violative of the Eighth Amendment . . . ." *Gates v.*

*Collier*, 501 F.2d 1291, 1309 (5th Cir. 1974). "Conditions of confinement may establish an Eighth Amendment violation 'in combination . . . only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise—for example, a low cell temperature at night combined with a failure to issue blankets." *Gates v. Cook*, 376 F.3d at 333 (quotation omitted). Remedying unconstitutional conditions of confinement is a "necessarily aggregate endeavor, composed of multiple elements that work together to redress violations of the law." *Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1070 (9th Cir. 2010).

These principles indicate that it is appropriate to consider the proposed consent judgment's provisions grouped according to subject matter. This approach recognizes the multiple circumstances that have a "mutually enforcing effect" with respect to deficient conditions at OPP. Additionally, it permits the Court to consider in the aggregate the proposed remedies relevant to each underlying federal right. Accordingly, the Court will analyze the proposed consent judgment's provisions with respect to the following alleged deficiencies at OPP: (1) safety and security, (2) medical care and mental health care, (3) environmental conditions, and (4) fire safety.[78]

### A. Safety and Security

Manuel Romero, an expert in jail administration, with a particular emphasis on security, staffing, and use of force,[79] concluded that OPP is "totally dysfunctional in terms of overall security," and that it is an "unsafe facility for both staff and inmates."[80]

---

[78]In many cases, there is considerable overlap in the evidence relevant to different categories. For example, OPP's deficiencies in medication administration are relevant to inmate medical care, inmate suicide, contraband practices, and inmate-on-inmate violence.

[79]R. Doc. No. 407, at 25. Romero has evaluated and assessed "well over a hundred prisons and jails in the United States." R. Doc. No. 407, at 22.

[80]R. Doc. No. 407, at 44.

Jeffrey Schwartz, an expert in security and operations of jails and prisons, has worked with more than 40 of the 50 state departments of corrections and toured hundreds of prisons and jails.[81] He concluded that, in over 35 years of working with and reviewing jails and prisons, "OPP is the worst jail I've ever seen," and "it is likely the worst large city jail in the United States."[82] Schwartz described an "extraordinary and horrific situation,"[83] in which OPP is "plagued" by "suicides and other in-custody deaths, rapes and other sexual assaults, stabbings, and severe beatings."[84]

In 2012, OPP had over 600 transports to local emergency rooms for physical injuries, of which far more than half were related to violence.[85] A similarly sized jail in the Memphis, Tennessee area had 7 emergency room transports related to violence in a comparable period of time.[86] OPP's alarming levels of violence are directly attributable to numerous policies and practices that are gravely deficient,[87] including policies and practices associated with staffing and supervision, contraband, classification, sexual assault, and training and accountability.

### 1. Staffing and Supervision

---

[81]Schwartz founded a non-profit criminal justice training and consulting organization in 1972. Since that time, he has worked with law enforcement and correctional agencies in the United States and Canada. Pl. Ex. 372, at 1. Schwartz has evaluated and assessed approximately 300 prisons and jails. R. Doc. No. 405, at 61-62.

[82]R. Doc. No. 405, at 67-69; *see also* Pl. Ex. 372, at 5.

[83]Pl. Ex. 372, at 69.

[84]Pl. Ex. 372, at 11.

[85]R. Doc. No. 405, at 77.

[86]R. Doc. No. 405, at 78-77.

[87]Pl. Ex. 374, at 16-17.

Inadequate staffing is one of the most significant causes of the runaway violence at OPP.[88] Schwartz concluded that OPP facilities "are the most poorly staffed correctional facilities I have ever encountered."[89] Schwartz testified that while most correctional agencies might use the term "understaffed" to indicate that perhaps 10% more staff are needed, OPP's "realistic need" may be at least 75% or 100% more staff.[90] The Court questioned Schwartz as to how he reached these estimates, and he replied that, after looking at a master roster and schedules, he tried to determine "just roughly how many staff would it take just, not to fill all positions, but just to put a deputy every shift in every tier. And that was my very rough estimate."[91] The original OPP, for example, often operates with between 25-50% of its direct security posts unfilled.[92] A single officer is sometimes left responsible for supervising multiple floors of inmates.[93] Shift after shift, across facilities, security posts are left unstaffed.[94]

Even with an exceptionally low level of staffing, administrators prioritize staffing nonsecurity posts before security posts, a practice opposite that used in most prisons and jails.[95] Certain nonsecurity assignments may be staffed and operating in a relatively normal fashion, while

---

[88]R. Doc. No. 412, at 38.

[89]Pl. Ex. 372, at 8.

[90]Pl. Ex. 372, at 8.

[91]R. Doc. No. 405, at 78-79.

[92]Pl. Ex. 85; Pl. Ex. 370.

[93]Pl. Ex. 85; Pl. Ex. 370; Pl. Ex. 372, at 15; Pl. Ex. 374, at 11.

[94]Pl. Ex. 372, at 16.

[95]Pl. Ex. 372, at 9.

staff are not present to patrol living units and common areas or to perform escort or transport services.[96]

OPP does not maintain any policy or procedure with respect to minimum staffing levels where, for example, staff may be required to work overtime to ensure that inmates are at least minimally supervised.[97] Watch commanders may be forced to schedule a shift with insufficient officers, and merely "hope that nothing terrible happens."[98]

The absence of staff at security posts means that staff members may not physically enter housing units when doing routine security checks because OPP policy prohibits them from entering housing units alone.[99] It is a "rare occasion" for staff members conducting a security round to "actually go in . . . and view all the inmates and view the cells and into the showers and the activity areas."[100] The evidence indicates that security rounds are neither frequent enough nor thorough enough to even minimally deter or detect inmate violence.[101] Inmates "kick on the cell" or "take something and ram it across the bars" with the hope that staff members will respond when assistance is needed.[102] As one inmate testified, this can take "30 minutes, maybe an hour, 40 minutes,

---

[96]Pl. Ex. 372, at 9.

[97]Pl. Ex. 372, at 15-16.

[98]Pl. Ex. 372, at 15.

[99]R. Doc. No. 407, at 71-73, 83; Pl. Ex. 374, at 11.

[100]R. Doc. No. 407, at 71; Pl. Ex. 374, at 11-13.

[101]Pl. Ex. 372, at 16-19; Pl. Ex. 374, at 10.

[102]R. Doc. No. 406, at 113.

whenever they get ready to come upstairs and see what's going on."[103] The record is replete with examples of inmate-on-inmate violence that demonstrate the manner in which a lack of supervision permits such violence to flourish.

For instance, OPP records show that, on one particular evening, a deputy heard what he believed to be inmates fighting on a tier, as well as statements like "stick your finger in his butt and piss on him."[104] The deputy could not see what was going on, but he reported that he did not investigate because OPP policy prohibits staff members from venturing onto the tiers alone.[105] A sergeant arrived "later in the night," but there is no indication in the record that any OPP staff member attempted to intervene at the time of the "altercation."[106]

### 2. Contraband

Although the Court recognizes that possession of contraband in a correctional facility is not necessarily unusual, OPP is plagued to a marked degree with contraband, including phones, weapons, and drugs.[107] Weapons, in particular, are "widespread and readily available to inmates."[108] Shanks are "rampant," and the number of stabbings is "extremely high" and "very disturbing" for

---

[103]R. Doc. No. 406, at 113.

[104]Pl. Ex. 11; Pl. Ex. 374, at 11-12.

[105]Pl. Ex. 11; Pl. Ex. 374, at 11-12; *see also* R. Doc. No. 407, at 71-72.

[106]Pl. Ex. 11.

[107]*See* Pl. Ex. 374, at 20, 23-24; City Ex. 13; R. Doc. No. 406, at 63; *see also* R. Doc. No. 411, at 82.

[108]R. Doc. No. 405, at 86; *see also* R. Doc. No. 406, at 63, 161. The evidence shows that items like mops, brooms, buckets, and coolers are frequently used in assaults. There is no effective system for preventing inmates from using such items as weapons. *See* Pl. Ex. 372, at 21, 60.

a facility the size of OPP.[109] Inmates report having access to street drugs and contraband prescription drugs.[110] Despite repetitive problems with assaults and weapons, OPSO does not conduct regular shakedowns in a manner that would minimize the presence of contraband.[111] *Compare Gates v. Collier*, 501 F.2d at 1308 ("Although many inmates possess weapons, there is no established procedure for discovering and confiscating weapons, nor is possession of weapons reported or punished.").

Three videos, apparently filmed by inmates around the calendar year 2009[112] and unearthed the weekend before the fairness hearing, show inmates brandishing a loaded gun, using intravenous drugs, gambling with handfuls of cash, displaying cell phones, drinking cans of beer, and cavorting on Bourbon Street, having escaped OPP for an evening of leisure.[113] These videos appear to have been filmed at the now-closed House of Detention ("HOD"), in part to highlight the absence of supervision and the poor environmental conditions.[114] Whatever the history behind the videos, inmates were able to blatantly engage in criminal conduct, which they literally announced was occurring,[115] without showing any concern for staff intervention. There was no suggestion that the staff members responsible for supervising these inmates were ever identified, much less

---

[109]Pl. Ex. 374, at 23-24, 24 n.6.

[110]R. Doc. No. 406, at 63, 132-33.

[111]Pl. Ex. 374, at 37.

[112]R. Doc. No. 407, at 5.

[113]City Ex. 13.

[114]City Ex. 13 ("CNN, y'all gonna get first bid on this tape . . . Orleans Parish Prison exposed.").

[115]City Ex. 13 ("Pop me one of them beers open . . . Snort all that dope . . . .").

disciplined.[116] The conduct in the video may have occurred several years ago, but the policies, practices, and culture that enabled the outrageous conduct remain relevant.[117]

### 3. Classification

The failure to classify a substantial number of inmates risks "intermingling of inmates convicted of aggravated violent crimes with those who are first offenders or convicted of nonviolent crimes." *Gates v. Collier*, 501 F.2d at 1308; *see Stokes v. Delcambre*, 710 F.2d 1120, 1124 (5th Cir. 1983) ("[F]ailure to control or separate prisoners who endanger the physical safety of other prisoners can constitute cruel and unusual punishment."). A functioning classification system ensures that inmates are housed in a manner that increases the safety of inmates and staff by, for example, identifying and separating inmates likely to be predators from inmates likely to be victims.[118] In conjunction with a lack of direct supervision, OPP's utterly ineffective classification system is a significant cause of the unprecedented levels of violence at OPP.[119]

On a sample date in December 2012, of the inmates who had proceeded past intake, approximately 35% had not been classified in any manner.[120] The unclassified inmates were

---

[116]Romero testified that he would expect some staff involvement given the level of dysfunction. R. Doc. No. 407, at 39-40. Such involvement would not be without precedent. In one documented instance, a female staff member, who was engaged in a "romantic relationship" with an inmate, warned the inmate to conceal a cell phone because of an upcoming shakedown. The staff member also sent text messages to the same inmate on his cell phone both while she was on and off duty. The staff member subsequently resigned. Pl. Ex. 58.

[117]R. Doc. No. 407, at 35-36.

[118]Pl. Ex. 372, at 12-14; Pl. Ex. 374, at 30-33; R. Doc. No. 407, at 46-47.

[119]Pl. Ex. 372, at 14; R. Doc. No. 407, at 46-50, 53, 57-62.

[120]Pl. Ex. 380; R. Doc. No. 406, at 82-85.

"scattered across all of the facilities and in just about all of the tiers."[121] Of the approximately 2,400 inmates at OPP on that date, only one inmate was classified as a known victim and only four inmates were classified as known predators, notwithstanding the staggering frequency of violence at OPP.[122] Of the inmates who were classified, potential predators were mixed with potential victims, and high, medium, and low security inmates were housed together, undermining the purpose of the classification system.[123] A sample four-person cell on the same date held a high security potential predator, a high security nonpredator, a medium security nonpredator, and a low security nonpredator.[124] Schwartz testified that such housing should "not ever happen" because "it could be explosive" given the "obvious potential" that "the two high security inmates, especially the one that's a potential predator, could be preying on the one that's the lower security, or perhaps even on the medium security."[125] *See also Marsh,* 268 F.3d at 1025 ("[P]retrial detainees were housed with convicted inmates, nonviolent offenders with violent offenders, juveniles with adults, and mentally ill persons with those in good mental health."). OPP also does not effectively separate youth and adult inmates.[126]

---

[121]Pl. Ex. 380; R. Doc. No. 406, at 82-85.

[122]Pl. Ex. 380; R. Doc. No. 405, at 83.

[123]*E.g.*, Pl. Ex. 380; R. Doc. No. 407, at 46-50, 53, 57-62. Staff members acknowledged to Romero that correct placement of inmates was complicated by limitations associated with the number of beds available for certain types of inmates. Accordingly, inmates may be placed where there is space available, even if this placement is inconsistent with their classification. *E.g.*, R. Doc. No. 407, at 53-54; *see also* Pl. Ex. 372, at 33 (noting that a juvenile requested a transfer because his roommate "gets aggressive," but deputies responded that "there is nowhere for him to go").

[124]R. Doc. No. 407, at 56-57.

[125]R. Doc. No. 407, at 56-58.

[126]Pl. Ex. 372, at 10; Pl. Ex. 378, at 41; *see* R. Doc. No. 1, at 35.

Because OPP does not have an effective system for reclassification, inmates who have violently assaulted other inmates may remain classified as "nonpredators."[127] The risk related to such inaccurate information is compounded by the fact that an inmate's disciplinary record does not become part of his permanent record.[128] Rather, an inmate receives a new disciplinary folder for each OPP facility he stays in, and these folders do not follow the inmates during transfers.[129] Facilities do not always maintain an inmate's disciplinary record once he leaves, and determining whether the record was maintained requires a "time consuming search."[130] These practices indicate that staff cannot rely on either an inmate's classification or his disciplinary record when evaluating the inmate's risk of violence.[131] The absence of such information plainly increases the risk of harm to staff and to other inmates. Moreover, as discussed below, the classification process does not identify or consider an inmate's English proficiency.[132]

The importance of classification was illustrated by the following arc of one inmate's violent actions, which ultimately caused another inmate to suffer severe and permanent brain damage:

•       In August 2011, E.L., a 20-year-old male inmate, was observed repeatedly striking a 50-year-old inmate in the face and back of the head in one of the Tents. The victim stated that

---

[127]R. Doc. No. 405, at 83.

[128]Pl. Ex. 372, at 49.

[129]Pl. Ex. 372, at 49.

[130]Pl. Ex. 372, at 49.

[131]*See* R. Doc. No. 405, at 108 ("The same inmates who are a danger to other inmates are typically the most dangerous inmates for staff."); R. Doc. Nos. 228-29 (describing E.L.'s attacks on staff members). The Court is not familiar with E.L.'s classification status, as he was apparently not present at OPP on the date for which the classification census was sampled. *See* Pl. Ex. 380.

[132]*See* R. Doc. No. 407, at 109, 112.

E.L. "needed his medication." E.L. was too "hostile and combative" to be interviewed about the event, and he threw a large trash can at one deputy and spit on another deputy's face. In a separate incident, he threw a wet towel at a third deputy's back, angry that she was moving his belongings to another Tent in response to the assault.[133]

• In September 2011, at HOD, E.L. began punching a 24-year-old inmate in the face because the other inmate was using a toilet that E.L. wanted to use. He threw the inmate into the bars of the cell hard enough to cause a head injury that required hospital treatment.[134]

• In October 2011, another inmate requested to be moved to a different HOD tier because E.L. was antagonizing him by throwing ice and water on him and attempting to fight him. The grievance was denied because the inmate "had enemies" on the other side of the same tier, and the record does not suggest the inmate was offered any relief.[135]

• In December 2011, E.L. had been antagonizing a certain deputy at HOD. At some point, E.L. was able to defeat the locking mechanism on his cell door, arm himself with a broken broomstick, and attack the deputy, hitting him in the face with the broomstick and fracturing his jaw. He also struck another deputy with the broomstick, possibly fracturing the deputy's hand.[136]

• On June 18, 2012, K.M., a Templeman V inmate, reported via a sick call request that he had

---

[133]Pl. Ex. 223; Pl. Ex. 225; Pl. Ex. 227.

[134]Pl. Ex. 226.

[135]Pl. Ex. 224.

[136]Pl. Ex. 229.

his "two teeth knocked out in a physical altercation on my tier."[137] On June 26, K.M. reported the attack to the Special Operations Division ("SOD") and identified E.L. as his attacker.[138] He stated that he had not come forward sooner because E.L. "bullies all the older inmates," and K.M. was scared for his life.[139]

- On June 23, 2012, at Templeman V's A-3 tier, a "step down psychiatric tier,"[140] E.L. punched T.S., a 65-year-old man, several times in the face hard enough to knock him backwards. T.S. struck his head on a metal bench as he fell. A detective conducting a routine security check discovered T.S. lying on the ground with a pool of blood around his head. The punches and the strike to the back of the head caused T.S.'s brain to hemorrhage, resulting in a permanent, nearly "brain dead" state.[141]

E.L., an aggressive and predatory inmate with a penchant for administering blows to the head and face and for preying upon older inmates, ultimately caused T.S.'s severe and permanent brain damage.

E.L.'s attacks, which occurred across a variety of prison facilities, illustrate that, in the

---

[137]Pl. Ex. 246.

[138]Pl. Ex. 230.

[139]Pl. Ex. 230. The Court notes that there is no suggestion in the record that anyone investigated the identity of K.M.'s assailant despite the fact that his sick call request expressly cited an altercation as the source of his injuries. OPP does not utilize the data recorded by medical services to identify acts of violence, and medical staff are not subject to any policy that would encourage them to report injuries resulting from violence. Pl. Ex. 259, at 57-62; Pl. Ex. 372, at 56.

[140]Pl. Ex. 371.

[141]Pl. Ex. 222. E.L. subsequently trapped a deputy at Templeman V by grabbing his hand through a cell door food slot, and punching him in the face. The deputy was routed to the hospital. Pl. Ex. 228.

absence of adequate staffing and supervision, "even a low security housing unit with an unsophisticated inmate population will sink toward the lowest common denominator."[142]A lack of staff supervision and a lack of effective inmate classification result in OPP's most vulnerable inmates, including the mentally ill and elderly, falling prey to OPP's most dangerous inmates.[143]

### 4. Sexual Assault

OPP has an extraordinarily high level of rapes and sexual assaults, unprecedented in the many facilities toured by Romero.[144] However, the number of investigations into such conduct is "minuscule."[145] A DOJ Review Panel ("Panel") on prison rape selected OPP as a representative high-incidence facility for discussion at a public hearing.[146] The Panel was "deeply disturbed by the apparent culture of violence at OPP."[147]

---

[142]Pl. Ex. 372, at 15. Staffing records for Templeman V were provided with respect to a period ranging from May 2012 to December 2012. These records reflect that, more often than not, there was no deputy even assigned to A-3, the tier on which T.S. was attacked. Pl. Ex. 371.

[143]*See also* R. Doc. No. 405, at 82-83 (describing mentally ill and developmentally disabled inmates as vulnerable); R. Doc. No. 406, at 153 (describing mentally ill or developmentally disabled inmate forced to do "sexual dances")."A substantial number of inmates on suicide watch" claim suicidality to avoid disciplinary segregation. Pl. Ex. 372, at 50. "That produces a toxic stew of acute psychiatric inmates, acute suicidal inmates and disciplinary segregation inmates. It is an accident waiting to occur." Pl. Ex. 372, at 50; *see also* Pl. Ex. 260, at 106-07 (OPP's medical director estimates that at least 90 percent of inmates who report being suicidal are not, in fact, suicidal).

[144]Pl. Ex. 374, at 38.

[145]R. Doc. No. 405, at 121.

[146]Pl. Ex. 4, at 4. Although the Panel began with a focus on the now-closed South White Street Jail, it shifted its focus to OPP operations as a whole. Pl. Ex. 4, at 73. The Panel acknowledged that the shift in focus was, in part, related to the United States' allegations underlying this lawsuit. Pl. Ex. 4, at 73. The Court is mindful of the relationship between the Panel's report, follow-up measures, and the United States' complaint in intervention, and it has weighed the evidence accordingly.

[147]Pl. Ex. 4, at 82.

Calculating the incidence rate of sexual assault at OPP is difficult.[148] The grievance logs for July 20, 2012, through December 19, 2012, were missing entries.[149] In October, the only full month for which data is available, there were 30 grievances reporting sexual assault and no investigations.[150] The most investigations occurred in November, when there were two investigations and 26 grievances reporting sexual assault, not including missing entries.[151] OPP staff members have a pattern of tolerating sexual misconduct, as demonstrated by the lack of repercussions for inmates who engage in such misconduct in plain view of deputies.[152]

There is no consistent practice by which staff respond to inmate reports of sexual assault.[153] While in some cases inmates are quickly assessed and treated, Schwartz testified that, in "far too many cases, none of the right things happen."[154] Most often, nothing happens.[155] "The standard used by OPP investigators seems to be that, short of having forensic evidence in the form of DNA or documented injury to a body orifice, there was no sexual misconduct."[156] Staff sometimes publicly

---

[148]The Court does not rely on the sexual assault rate suggested by Plaintiffs, as its applicability to current OPP facilities has not been established. *See* R. Doc. No. 416, at 42. In any case, however, sexual assault at OPP is all too common, and in part directly attributable to the absence of inmate supervision.

[149]Pl. Ex. 353.

[150]Pl. Ex. 353.

[151]Pl. Ex. 353.

[152]Pl. Ex. 374, at 38-41.

[153]R. Doc. No. 405, at 112-13.

[154]R. Doc. No. 405, at 113; *see also* Pl. Ex. 60.

[155]Pl. Ex. 372, at 38.

[156]Pl. Ex. 374, at 38.

make derisive comments when an inmate reports a sexual assault, resulting in an announcement of the victim's status and a strong display of tolerance for sexual assault.[157]

A video admitted into evidence portrays an interview with an inmate who reported a sexual assault.[158] The inmate is "Mirandized,"[159] repeatedly told that nothing happened,[160] and further informed that the absence of detectable physical injury one week after the alleged assault proved it did not occur.[161] Identifying false reports is a valid objective, but the testimony and other evidence presented at the hearing suggest that the practices used to investigate sexual assaults have the effect of discouraging bona fide reports, embarrassing inmates who come forward, and instilling in staff and inmates the impression that such reports can be quickly discounted.[162]

E.S., a former OPP inmate, testified that, on a daily basis at the original OPP, he saw violence, including "[f]ights, stabbings, people being sexually assaulted, just, you know, your

---

[157]R. Doc. No. 405, at 112-13.

[158]Pl. Ex. 5 (video and transcript).

[159]*See* Pl. Ex. 5, at 54. According to Schwartz, it is common for OPP inmates who report sexual assaults to be Mirandized. R. Doc. No. 405, at 115 ("Before hello or anything else, the first thing that
the investigator does is to Mirandize the victim.").

[160]Pl. Ex. 5, at 41-42, 51.

[161]Pl. Ex. 5, at 41-42, 51.

[162]*See* R. Doc. No. 406, at 89. Schwartz asked staff members about inmates who report sexual assaults. According to Schwartz, "nobody said every inmate is lying," but staff suggested "most of these inmates are fabricating," to some extent. Schwartz also noted that "SOD staff continually violate the most crucial principle of medical care and mental health care in jails[:] custody and security staff may not act as gatekeepers for health or mental health services." When SOD members determine a sexual assault report is unfounded, they refuse to provide the inmate with even a "cursory medical assessment." Pl. Ex. 372, at 39.

average violence on the streets taken to the jailhouse."[163]

One night, after the lights were turned out at 10:30 p.m., E.S. was attacked by a group of 10-14 inmates.[164] They ripped off his clothes and attempted to tie him up with pieces of string, but he was able to break free.[165] They then used a razor to cut strips of fabric from an inmate uniform.[166] After they hog-tied E.S. with the fabric, they sexually assaulted him.[167] E.S. testified that one inmate "stuck his finger into my anal area," another inmate "stuck a toothbrush into my anal area," and another inmate "actually stuck his tongue in my anal area."[168] The attackers "took toothpaste and put it between my buttocks area."[169] Next, they tied a blanket around E.S.'s face and continued beating him.[170] E.S.'s gasps for air were worrisome enough that one inmate retrieved an "asthma puffer" for him, although E.S. did not have asthma, but the beating continued.[171] The inmates kicked E.S. in the stomach and ribs and struck the back of his head with a mop and bucket.[172]

At some point, the assailants picked up E.S. and carried him to a new location at the back of the dormitory, where they released him from the hog-tied position and tied him to a post, with his

---

[163]R. Doc. No. 405, at 26-27.

[164]R. Doc. No. 405, at 30.

[165]R. Doc. No. 405, at 31.

[166]R. Doc. No. 405, at 31.

[167]R. Doc. No. 405, at 31-32.

[168]R. Doc. No. 405, at 32.

[169]R. Doc. No. 405, at 32.

[170]R. Doc. No. 405, at 32.

[171]R. Doc. No. 405, at 32-33.

[172]R. Doc. No. 405, at 31, 33.

back to the post.[173] At this point, four to six inmates began punching him repeatedly.[174] He was

subsequently untied and repositioned to face the post.[175] The attackers threw hot water and possibly

urine on E.S., and beat him so severely with a mop stick that the skin was ripped from his back and

buttocks.[176] E.S. was still naked.[177] At some point during this phase of the attack, a guard performed

a routine check, but he did not walk far enough down the hall to notice E.S., naked, bound, and

beaten.[178] E.S. reported that he did not cry out because he was certain that he would be killed if he

did so.[179]

      In the final phase of the attack, the inmates fashioned "some type of thong, like a woman's

thong" from strips of uniform fabric.[180] They forced E.S. to put it on and, E.S. testified, in an attempt

to be "comical" or to "embarrass me or something in front of the dormitory . . . they made me dance.

I don't even know how to dance. So I just basically was just moving my hands . . . If I would do

anything crazy I knew they were going to kill me for sure. There's no doubt in my mind."[181] E.S.

---

[173]R. Doc. No. 405, at 33-34.

[174]R. Doc. No. 405, at 34.

[175]R. Doc. No. 405, at 34.

[176]R. Doc. No. 405, at 34-35.

[177]R. Doc. No. 405, at 35.

[178]R. Doc. No. 405, at 38-39. E.S. testified that he would have been "shocked" if the guard actually walked down the tier but, had the guard done so, "[i]t would have probably saved me." R. Doc. No. 405, at 41.

[179]R. Doc. No. 405, at 39.

[180]R. Doc. No. 405, at 36.

[181]R. Doc. No. 405, at 36.

reported that "90% of the crowd had knives in their hands visible."[182]

After the episode in which the attackers made E.S. dance, they made him shower.[183] They forced him to sit in a mop bucket and "pushed it to the front of the shower, everybody laughing, ha, ha, ha . . . ."[184] E.S. indicated the assault lasted hours.[185] While E.S.'s assault resulted in an investigation, where OPP staff "brought the whole dorm down," E.S. did not receive medical treatment for nearly a year.[186]

E.S.'s testimony parallels a report by another inmate, A.A.,[187] in which a group of inmates tied A.A. to a bunk using strips of inmate clothing and then sexually assaulted him.[188] After A.A. reported the assault on January 4, 2012, SOD's investigation included photographing A.A.'s wrist abrasions, which a nurse confirmed were "consistent with [] having been tied up."[189] Another inmate, whom A.A. identified as a witness, confirmed that he knew something was happening because

---

[182]R. Doc. No. 405, at 36.

[183]R. Doc. No. 405, at 36-37.

[184]R. Doc. No. 405, at 37.

[185]R. Doc. No. 405, at 37-38.

[186]Additional details from E.S.'s testimony reveal other troubling circumstances surrounding his assault, including that it may have been foreseeable and preventable as an act of retaliation against E.S., organized by someone against whom E.S. was a witness in a criminal trial. R. Doc. No. 405, at 47-48.

[187]These initials are used for convenience. The inmate's name has been obscured in the record, although other identifying information is available.

[188]The record suggests that this was one of two sexual assaults A.A. experienced at OPP. Pl. Ex. 324.

[189]The abrasions were still visible on January 11, 2013. Pl. Ex. 324.

inmates were going in and out of the area where A.A. was restrained.[190] A.A. identified five attackers using photographs of other inmates in the tier.[191] A.A. was transferred to a mental health hospital in Baton Rouge one week later, and the SOD investigation was closed.[192]

While the incident was referred to the office of the Orleans Parish District Attorney, that office determined that "based on the circumstances and statements given, we would not likely prosecute this case if an arrest was made."[193] Aside from this referral, there is no evidence that action was taken to protect other inmates on the tier from the individuals who had forcibly bound and sexually assaulted A.A.[194] OPP's practice of terminating a sexual assault investigation when a victim leaves a facility permits sexual predators to continue to prey on other inmates.[195]

The Court reiterates that the details of the described assaults are not discussed because they are brutal, although they are that, but because they are emblematic of systemic deficiencies in inmate safety and security. *See Alberti*, 790 F.2d at 1225 ("We recite the incidents of violence and sexual assault which follow not to exhaustively catalog conditions in the jails but to provide examples of the nature of evidence presented at the hearings."). As far as the Court is aware, no staff members were identified, confronted, or otherwise held accountable for their absence during the nights in

---

[190]Pl. Ex. 324. Schwartz's testimony suggested this witness was a deputy. R. Doc. No. 405, at 117-18. The Court discounts this suggestion as a likely misstatement because it is inconsistent with the underlying evidence.

[191]Pl. Ex. 324.

[192]Pl. Ex. 324.

[193]Pl. Ex. 324.

[194]R. Doc. No. 405, at 118-19.

[195]*E.g.*, Pl. Ex. 67; R. Doc. No. 405, at 119. According to A.A., he was "not the only one being tied up" and subjected to such attacks. Pl. Ex. 324.

which E.S. and A.A. were assaulted.

### 5. Training and Accountability

Accountability systems are fundamental to prisoner and staff safety.[196] Such systems include use of force policies, investigations, incident reporting, and grievance procedures.[197] Many, and perhaps even most, of OPP's accountability systems are ignored or directly contravened on a "wholesale basis."[198]The Court addresses in turn OPP's grievance system, use of force policy and investigations, and reliance on tier reps.

### a. Grievance System

A grievance system permits inmates to make a written report to address anything from minor complaints to sexual assaults.[199] Grievances alert administrators to individual problems as well as to potential patterns of problems.[200]

Grievances at OPP are sometimes effectively ignored because they are not addressed until an inmate leaves, at which time they are closed.[201] For example, in a February 17, 2011 grievance, an inmate reported that he had been beaten and stabbed and that his fingers had been broken.[202] The

---

[196]Pl. Ex. 374, at 33.

[197]Pl. Ex. 374, at 33.

[198]Pl. Ex. 372, at 11.

[199]R. Doc. No. 405, at 122-23.

[200]R. Doc. No. 405, at 123.

[201]R. Doc. No. 405, at 125-26.

[202]Pl. Ex. 302; R. Doc. No. 405, at 123.

inmate requested a transfer, stating that he feared for his life.[203] The grievance was closed on March 1, when the inmate was discharged, but his transfer request and reports of assaults were never addressed.[204] In another instance, an inmate reported being beaten by deputies on October 25, 2011.[205] He described knots on his head related to the beating and a sick call request that was ignored.[206] The grievance sought medical attention, and the inmate specifically requested x-rays of his head.[207] Approximately three months later, the grievance was closed because the inmate left OPP.[208] His sick call request—and allegations of staff misconduct—were apparently never addressed.[209] OPP staff suggested that, with respect to inmate-on-inmate violence, there is only an investigation when an inmate requires stitches.[210]

The failure of OPP to address even emergency grievances in a timely manner is inexplicable.[211] Grievance procedures have improved in the last year but they still fall far short, and the Court requires assurance that these improvements will continue.[212]

---

[203]Pl. Ex. 302; R. Doc. No. 405, at 123.

[204]Pl. Ex. 302; R. Doc. No. 405, at 123-24.

[205]Pl. Ex. 305.

[206]Pl. Ex. 305.

[207]Pl. Ex. 305.

[208]Pl. Ex. 305.

[209]Pl. Ex. 305; R. Doc. No. 405, at 124.

[210]Pl. Ex. 374, at 37.

[211]R. Doc. No. 405, at 125-26.

[212]Pl. Ex. 372, at 47.

### b. Use of Force & Investigations

OPP has deeply ingrained problems with respect to staff members' uncontrolled use of force on inmates.[213] OPP's investigative process for staff and prisoner misconduct fails to address, and is itself part of, the many operational breakdowns in OPP's accountability systems.[214] As with any jail or prison, use of force is a legitimate and "necessary component" of maintaining order at OPP.[215] A use of force policy ensures that staff are aware of the level of force that is appropriate in a given situation and provides guidance with respect to the use of force needed to avoid unnecessary injuries.[216]

While OPP staff members report efforts to implement change, these efforts are in their infancy.[217] OPP's use of force policy was rewritten somewhat recently, but it remains ineffective because staff members are not familiar with it and supervisors do not hold staff members accountable to the policy.[218] In short, the policy is routinely ignored altogether.[219] For example, while the Internal Affairs Division ("IAD") is charged with use of force investigations pursuant to the new policy, SOD continues to handle such investigations.[220] Similarly, while the new policy calls

---

[213]Pl. Ex. 372, at 11, 40; Pl. Ex. 374, at 34.

[214]Pl. Ex. 374, at 37.

[215]Pl. Ex. 374, at 33.

[216]R. Doc. No. 405, at 88.

[217]Pl. Ex. 372, at 40; Pl. Ex. 374, at 34.

[218]R. Doc. No. 405, at 87.

[219]Pl. Ex. 372, at 28.

[220]R. Doc. No. 405, at 92.

for a use of force "review board," there is no such board, despite the fact that the policy is more than a year old.[221]

One of the most egregious allegations of use of force suggested that an officer ordered "hits" on particular inmates, either by instructing a tier rep to arrange a hit or by placing the inmate in an area where known enemies made violence likely.[222] The same officer was later arrested after punching an inmate, who additionally reported that the officer had threatened to have the inmate assaulted.[223] *See Cantu v. Jones*, 293 F.3d 839, 845 (5th Cir. 2002) ("The jury found that the appellants essentially orchestrated the attack. This is in no way reasonable behavior for a prison official."). The same officer had previously been accused of punching a restrained inmate, but the investigator did not question any of the witnesses, including the officer, about whether it occurred.[224] Not surprisingly, given the absence of elicited evidence, the prior allegation had not been sustained.[225]

As noted above, SOD investigates use of force reports, *including* reports of force by SOD members.[226] In at least one documented instance, the same officer who used force on an inmate authored the report that determined such level of force was appropriate.[227] Training records suggest

---

[221]R. Doc. No. 406, at 87.

[222]R. Doc. No. 405, at 101-02; Pl. Ex. 56.

[223]R. Doc. No. 405, at 101-02; Pl. Ex. 56.

[224]R. Doc. No. 405, at 102.

[225]R. Doc. No. 405, at 102.

[226]Pl. Ex. 372, at 40. Schwartz describes SOD as a tightly knit unit, which staff members perceive as elite. Pl. Ex. 372, at 40.

[227]R. Doc. No. 405, at 90-91; Pl. Ex. 275.

that SOD members do not receive any in depth or specialized training relative to investigations.[228] The training that OPSO staff members generally receive includes materials focused on police investigations and car stops, but there is no indication of regular or in-service training relative to the conduct of investigations in a jail or prison environment.[229] OPP does not effectively track use of force or reports of staff misconduct.[230]

### c. Tier Reps

Tier representatives ("tier reps") are inmates in charge of maintaining order on their tiers.[231] OPP staff members report that tier reps help with communication and represent their living units when inmates are given a say in decisionmaking.[232] OPP inmates report that tier reps control phone time, make decisions about inmate housing, and occasionally administer beatings to other inmates at the behest of staff.[233] Tier reps have the power to distribute food, including determining how much food to distribute per serving and whether to dole out "seconds."[234] As Schwartz stated, "food is one of the small number of 'hot button' items for almost all inmates," so this kind of power can be "used

---

[228]Pl. Ex. 372, at 40.

[229]Pl. Ex. 372, at 40.

[230]Pl. Ex. 372, at 40.

[231]Pl. Ex 372, at 43; Pl. Ex. 374, at 17; R. Doc. No. 406, at 136-37. Although discussed in this subsection, the use of tier reps is relevant to several aspects of inmate safety and security.

[232]Pl. Ex. 372, at 43.

[233]Pl. Ex. 372, at 43-44; Pl. Ex. 374, at 17. Public comments from inmates endorsing the proposed consent judgment also discuss such "hits." *See, e.g.*, R. Doc. No. 240.

[234]Pl. Ex. 372, at 43.

to extort other inmates and also be a source of confrontation or violence."[235]

Given the fundamental flaws in OPP's classification system, predatory or aggressive inmates may become tier reps.[236] Testimony from D.R., an inmate sexually harassed and assaulted by a tier rep, illustrates that tier reps have the opportunity to assault other inmates and to discourage reporting of such assaults.[237] D.R. testified that his tier rep, C.C., would "sometimes, early in the morning, take the television from Cell 1 and turn it towards the shower and put the aerobics channel on so he could go into the shower and masturbate."[238] One morning, C.C. ordered D.R. to get in the shower.[239] C.C. followed him, carrying a shank,[240] and proceeded to sexually assault D.R.[241] D.R. waited for approximately one week to report the assault, because "I had to think of a way to get around the immediate sergeants or officers that were in the building" so that the report would not reach C.C. before D.R. could be transferred.[242] Ultimately, after reporting the assault, D.R. was successful in

---

[235]Pl. Ex. 372, at 43-44; Pl. Ex. 374, at 17; *see also* Pl. Exs. 43, 47, 55 (describing stabbings related to food distribution); R. Doc. No. 406, at 138 (noting fights resulted from tier rep's manipulation of food distribution); R. Doc. No. 407, at 43.

[236]*See*, *e.g.*, Pl. Ex. 32; *see also* Pl. Ex. 372, at 44. This statement assumes that OPP would not knowingly choose such inmates to be tier reps. *But see* Pl. Ex. 372, at 44 ("A male inmate casually referred to the fact that the staff usually picked the person they perceived to be the toughest inmate on the unit as the tier rep.").

[237]R. Doc. No. 406, at 136-42.

[238]R. Doc. No. 406, at 138.

[239]R. Doc. No. 406, at 138.

[240]R. Doc. No. 406, at  138-39.

[241]R. Doc. No. 406, at 139.

[242]R. Doc. No. 406, at 141-42. In another instance, female inmates reported tier reps openly engaging in sexual activities with other inmates, which an investigation confirmed. Pl. Ex. 374, at 18.

his request to be transferred to another tier, although while on the "at risk" tier at Conchetta he suffered an additional physical assault.[243]

At Conchetta, D.R. attempted to break up a fight because of a concern that another inmate "was about to get really beat up."[244] Before he could reach the fight, "I felt someone strike me in the back of the head . . . . I balled up on the ground and I felt blows to my forehead, to my back, and to my legs."[245] After he reported the assault, D.R. cooperated by describing his attacker's physical appearance.[246] SOD staff initially brought an individual to D.R. in order to determine if D.R. could identify that individual as his attacker.[247] D.R. testified that he believed that individual had been physically assaulted by SOD in retaliation for the attack on D.R.[248] The individual had blood around his teeth and blood was also trickling from his mouth.[249] D.R. informed SOD that the individual was not his attacker, and D.R. was returned to the tier, notwithstanding the fact that his true attacker remained on the tier.[250] D.R. learned his assailant's name at roll call the next morning, and reported that discovery in a grievance.[251] Although D.R. and the attacker were both moved, they were "moved

---

[243]R. Doc. No. 406, at 142-43.

[244]R. Doc. No. 406, at 143.

[245]R. Doc. No. 406, at 143.

[246]R. Doc. No. 406, at 144.

[247]R. Doc. No. 406, at 145-46.

[248]R. Doc. No. 406, at 145.

[249]R. Doc. No. 406, at 145.

[250]R. Doc. No. 406, at 146.

[251]R. Doc. No. 406, at 146-47.

together at the same time" and left alone together in a holding cell.[252] D.R. reported "I was just sitting there kind of on pins and needles, hoping that he didn't realize exactly what was going on."[253]

According to Romero, OPP has established an informal culture in which tier reps "make up for deficient staffing realities to help supplement facility order, which is a dangerous and reckless practice."[254] As Schwartz stated, the "use of tier reps is a corrupt practice," in which it is "inevitable that some of the tier reps will abuse their positions."[255] The risk of "arbitrary infliction" of "physical and economic injury" is present whenever an inmate has "unchecked authority" over other inmates. *Gates v. Collier*, 501 F.2d at 1307.

One especially troubling situation illustrates deficiencies associated with the use of tier reps, but also broader deficiencies related to staff accountability. OPP records show that a high-ranking male security officer regularly observed a female tier rep showering and escorted her to a private office after hours for "prolonged periods of time."[256] His actions were reported and confirmed by two staff members.[257] Inmates also witnessed the shower viewings, as well as the private office visits.[258] Inmate witnesses reported that the tier rep would frequently engage in physical altercations

---

[252]R. Doc. No. 406, at 147.

[253]R. Doc. No. 406, at 147.

[254]Pl. Ex. 374, at 19.

[255]Pl. Ex. 372, at 44.

[256]Pl. Ex. 26.

[257]Pl. Ex. 26.

[258]Pl. Ex. 26.

with other inmates, but the tier rep was never included in the corresponding incident reports.[259] The inmate at issue reportedly said that the officer promised to transfer money into her account once she left OPP for a new facility.[260]

Despite the witnessed sexual misconduct, the officer was permitted to resign, and there was never an investigation because of "insufficient evidence, the lack of witnesses and the statements taken."[261] The extent to which other staff members, including those tasked with supervising the female inmates, knew of the conduct is unclear because of the lack of an investigation.[262] This is not the only documented instance of a staff member engaging in sexual conduct with an inmate.[263] The Court notes that, while not addressed in the sexual assault section of this opinion, sexual or romantic "relationships" between staff members and inmates are *never* acceptable and are, at best, implicitly coercive.

### 6. Conclusion

"It is well established that prison officials have a constitutional duty to protect prisoners from violence at the hands of their fellow inmates." *Longoria v. Texas*, 473 F.3d 586, 592 (5th Cir. 2006) (citing *Farmer*, 511 U.S. at 832-33). The proposed consent judgment addresses the proven deficiencies relative to inmates' safety and security. For example, it requires OPSO to ensure adequate staffing, regular security rounds, and direct supervision in units designed for this type of

---

[259]Pl. Ex. 26.

[260]Pl. Ex. 26.

[261]Pl. Ex. 26. The same staff member was involved in an altercation with an inmate in which the staff member admitted to using shackles to choke the inmate. Pl. Ex. 7.

[262]Pl. Ex. 26.

[263]*See* Pl. Ex. 41; Pl. Ex. 61.

supervision.[264] It also requires the development of a classification system that takes into account factors including security needs, suicide risk, and risk of violence or self-harm.[265] The proposed consent judgment also requires that the classification system be updated to reflect an inmate's history at OPP.[266] These provisions directly address OPP's deficiencies with respect to inmate-on-inmate violence, including sexual assault.

With respect to training and accountability, the consent judgment provides that OPSO "shall develop, implement, and maintain comprehensive policies and procedures (in accordance with generally accepted correctional standards) relating to the use of force" and shall "develop and implement a single, uniform reporting system."[267] An "Early Intervention System" will document and track staff members involved in use of force incidents.[268] The consent judgment requires "timely and thorough investigation of alleged staff misconduct, sexual assaults, and physical assaults of prisoners resulting in serious injury."[269]

OPP inmates are subject to an epidemic of violence.[270] The operational and administrative dysfunction of OPP's accountability systems put staff members and inmates at risk on a daily basis. *Compare Marsh v. Butler Cnty., Ala.*, 268 F.3d 1014, 1028 (11th Cir. 2001) (en banc) ("[C]onditions

---

[264]Consent Judgment, at 12-13.

[265]Consent Judgment, at 17-18.

[266]Consent Judgment, at 18.

[267]Consent Judgment, at 5.

[268]Consent Judgment, at 10-11.

[269]Consent Judgment, at 16.

[270]Pl. Ex. 352, at 11.

in a jail facility that allow prisoners ready access to weapons, fail to provide an ability to lock down inmates, and fail to allow for surveillance of inmates pose a substantial risk of serious harm to inmates."). The Court concludes that with respect to safety and security, the proposed consent judgment "represents a reasonable factual and legal determination based on the facts of record." *Williams*, 729 F.2d at 1559. Considering the evidence presented, the Court further concludes that the consent judgment is narrowly drawn to remedy the violation of Plaintiffs' federal rights, is the least intrusive means of doing so, and extends no further than necessary. *See Plata*, 131 S. Ct. at 1939-40 (discussing § 3626(a)(1)).

### B. Medical and Mental Health Care

During the course of the fairness hearing, the evidence, including credible witness testimony, exposed stark, sometimes shocking, deficiencies in OPP's medical and mental health care system. Inmates with mental health issues are housed in deplorable conditions.[271] Mental health units smell strongly of feces, urine, and rotting organic matter.[272] Several inmates had floors and walls smeared with feces when Dr. Gage visited, and many cells had "evidence of the detritus of several days' food and utensils."[273] *Compare Gates v. Cook*, 376 F.3d at 338 (Living in "extremely filthy" cells with "crusted fecal matter, urine, dried ejaculate, peeling and chipping paint, and old food particles on the walls . . . would present a substantial risk of serious harm to inmates."). Such unsanitary

---

[271]R. Doc. No. 408, at 156-57.

[272]Pl. Ex. 376, at 27.

[273]R. Doc. No. 408, at 156; *see* Pl. Ex. 378, at 38 (describing individual with "psychotic symptoms" "with approximately ten plates of molded rotten food lying on the unoccupied upper bunk," in a "dirty, malodorous" environment).

conditions can cause or exacerbate illness.[274] Moreover, "mental health units, including those

designed for suicide monitoring, were patently not suicide proof."[275]

The consent judgment aims to remedy broad areas of medical and mental health care,

including intake services, access to care, medication, staffing, suicide prevention, and records. The

Court addresses each in turn.

### 1. Intake

At intake, prisoners with clear histories of self-harm, mental illness, or potential withdrawal

from prescribed or illicitly acquired substances are cleared for placement in the general population

without any medical or mental health consultation.[276] Agitated inmates are shackled or chained to

an ordinary chair, which may permit them to manipulate their shackles or chains to cause self-

harm.[277]

Dr. Bruce Gage, a correctional mental health care expert,[278] has been the Chief of Psychiatry

for the Washington State Department of Corrections since 2008.[279] He concluded that OPP's mental

health services are largely inadequate "in all regards," "from screening through assessment,

treatment, suicide policies and practices, restraint, medication, medical records, continuity of care,

---

[274]Pl. Ex. 376, at 28.

[275]Pl. Ex. 376, at 27.

[276]Pl. Ex. 376, at 35.

[277]Pl. Ex. 376, at 38; Pl. Ex. 378, at 31; R. Doc. No. 408, at 98-99.

[278]R. Doc. No. 408, at 82.

[279]Pl. Ex. 376. From 1993 to 2000, he was involved in a University of Washington/Department of Corrections collaboration project that established an inpatient residential mental health program at one of the prisons. R. Doc. No. 408, at 80. Between 1990 and 2008, Dr. Gage worked at Western State Hospital in Lakewood, Washington, setting up continuity of care between jails and the state hospital and consulting with jails on issues such as involuntary medication. R. Doc. No. 408, at 79; *see also* Pl. Ex. 376.

and access to care."[280]

      In his report, Dr. Gage stated that in several cases, including instances of inmate suicide, an initial referral to psychiatry could have changed the outcome of the cases.[281] For example, M.H. committed suicide while still in the Intake Processing Center, notwithstanding that he had previously reported ingesting crack cocaine and he had recently been hospitalized for suicidality.[282] At intake, he was wandering around, and "gravitated toward the exit doors," but he was "herded back to the seats" by staff members.[283] Because he attempted to leave through an exit door, he was placed in an isolation cell.[284] In the isolation cell, he hung himself with his t-shirt.[285] Dr. Gage testified that M.H.'s death could have been prevented with proper mental health assessment and treatment.[286] When asked by the Court whether his testimony reflected a "medical certainty," Dr. Gage responded affirmatively, testifying that an assessment would have, at a minimum, prevented the isolation that facilitated M.H.'s suicide.[287]

      T.W. provides a representative example with respect to the lack of intake screening and follow-up psychiatric services.[288] T.W. set her house on fire.[289] After she was treated for burns at

---

[280]R. Doc. No. 408, at 83.

[281]Pl. Ex. 376, at 35.

[282]R. Doc. No. 410, at 58-60; *see also* Pl. Ex. 80-2.

[283]Pl. Ex. 80-2.

[284]Pl. Ex. 80-2.

[285]Pl. Ex. 80-2.

[286]R. Doc. No. 408, at 110.

[287]R. Doc. No. 408, at 110.

[288]Pl. Ex. 376, at 20; *see also* Pl. Ex. 74.

[289]Pl. Ex. 376, at 20; *see also* Pl. Ex. 74.

Baton Rouge General Hospital, she was sent to OPP on September 7, 2012.[290] At intake, she described depression that had occurred within the last year and three prior suicide attempts.[291] In addition, her hospital records indicated that she carried a diagnosis of bipolar disorder and that she was currently prescribed lithium and mirtazapine, an antidepressant.[292] At intake, T.W. was ordered pain medication and referred to psychiatry for "eval. for meds."[293] Despite this referral, T.W. was apparently not given any access to psychiatric care until November 15, 2012.[294] The events of that date are unclear.[295]

On November 16, 2012, T.W. received a psychiatric chronic care treatment plan from an OPP psychiatrist.[296] While the plan notes T.W. felt suicidal because she missed her children, the plan shows little awareness of her three previous suicide attempts, her prior diagnosis, or her prior psychotropic medications.[297] With respect to OPP's psychiatry services, T.W. received no diagnosis and no medications.[298] When Dr. Gage visited in December 2012, T.W. reported auditory hallucinations of "people out to get me," to whom she sometimes talked back.[299] She also spoke about "people being sent to hurt her."[300] Other inmates said that T.W. paces a lot, cries a lot, and

---

[290]Pl. Ex. 376, at 20.

[291]Pl. Ex. 376, at 20.

[292]Pl. Ex. 376, at 20.

[293]Pl. Ex. 376, at 20.

[294]Pl. Ex. 376, at 20.

[295]Pl. Ex. 376, at 20; *see also* Pl. Ex. 74.

[296]Pl. Ex. 376, at 20.

[297]Pl. Ex. 376, at 20-21.

[298]Pl. Ex. 376, at 21.

[299]Pl. Ex. 376, at 21.

[300]Pl. Ex. 376, at 21.

"sleeps all day."[301] The record is devoid of evidence that T.W. received the mental health treatment that was obviously needed while she was at OPP.

### 2. Access to Care & Treatment

After Dr. Gage reviewed the records provided, "[t]here was not one example of a thorough psychiatric assessment by the OPP psychiatrist in any of the records and most were not even minimally adequate."[302] None of the records included an assessment of suicide risk, rather, "this portion of the assessment consisted in simply noting whether the person expressed suicidal ideation or not. The same was true of homicidal ideation and consideration of danger to others in general."[303] This is consistent with the testimony of an inmate that the extent of psychiatric exams is often limited to: "Are you suicidal or homicidal?"[304]

OPP has one full-time psychiatrist who works 40 hours per week.[305] Inmates may wait weeks or months for psychiatric appointments.[306] With respect to emergency care during the day, the psychiatrist is contacted and inmates are transferred to the mental health unit for suicide monitoring.[307] Accordingly, suicide tiers are the primary site of emergency services during the day.[308] After hours, the psychiatrist may sometimes be reached by telephone, but there is no mental

---

[301]Pl. Ex. 376, at 21.

[302]Pl. Ex. 376, at 37.

[303]Pl. Ex. 376, at 37.

[304]Pl. Ex. 376, at 32; R. Doc. No. 408, at 169. T.W. also told Dr. Gage, without being asked, that the OPP psychiatrist sometimes asks her, "'Are you suicidal or homicidal?' and that's it." Pl. Ex. 376, at 21.

[305]R. Doc. No. 408, at 122-23; *see also* Pl. Ex. 259, at 102-03.

[306]Pl. Ex. 312; Pl. Ex. 376, at 39-40; R. Doc. No. 405, at 124-25; R. Doc. No. 408, at 126-27.

[307]Pl. Ex. 376, at 38.

[308]Pl. Ex. 376, at 38.

health provider actually on call or present at OPP facilities.[309] An inmate who needs mental health care after hours or on weekends will either be sent to the mental health unit for suicide watch or to the emergency room.[310] Inmates who harm themselves or who are suicidal are typically not seen until the next working day, while those with less serious, but still urgent, complaints—including suicidal ideation without a plan—are not seen for several days.[311]

The experiences of D.R. and R.S. illustrate compounding inadequacies in mental and medical health care. D.R. testified as to the abhorrent conditions experienced by H.T., an inmate whom D.R. testified "seemed partially handicapped and mentally handicapped also," based on the "things he would say," "the way he got around," and his inability to care for himself.[312] H.T. utilized a colostomy bag, and "[e]very morning his colostomy bag would come off and there would be feces all in his cell and all over his jumper."[313] H.T. would leave the soiled jumper on the ground, "[a]nd someone would have to go in [his cell] and get his jumper and bring it to the gate and set it down and help him clean himself and somehow reattach the bag."[314] Other inmates, not staff members, would assist H.T. by cleaning and reattaching his colostomy bag and carrying his soiled jumper to the gate, where staff members would retrieve it.[315] While this daily routine seems inconsistent with basic care, perhaps more disturbing is that H.T. had to rely on other inmates' compassion and willingness to provide untrained nursing care to ensure he had an unsoiled jumper and an attached

---

[309] Pl. Ex. 376, at 38.

[310] Pl. Ex. 376, at 38; R. Doc. No. 408, at 114.

[311] Pl. Ex. 376, at 39.

[312] R. Doc. No. 405-06.

[313] R. Doc. No. 406, at 408.

[314] R. Doc. No. 406, at 148.

[315] R. Doc. No. 406, at 148-150.

colostomy bag.[316]According to D.R., who witnessed H.T.'s treatment for more than two months, staff members who took roll call would, on a daily basis, see fecal matter that had spilled from the colostomy bag into H.T.'s cell and sometimes see H.T., sitting in his bed nude or wrapped in a towel.[317] Yet this offensive routine continued, and some staff members even joked about it.[318]

Another inmate's slow suicidal decline similarly illustrates the deficiencies with respect to both medical and mental health care. R.S. came to OPP after a standoff with the police.[319] R.S. expressed "wanting the cops to kill him," and an emergency room note describes suicidal ideation.[320] OPP staff notes reflect that R.S. stated: "I don't want to kill myself. I just wish I would die."[321]While on suicide watch, R.S. refused treatment, food, and water.[322] He became profoundly dehydrated, for which he was taken to the emergency room several times.[323]

R.S.'s extreme depression caused a "failure to thrive," which Dr. Gage described as occurring when people with severe depression or terminal illnesses stop eating and drinking, resulting in dehydration complications, including urinary tract infections, and complications related

---

[316]D.R. testified that he was not sure how other inmates reattached the bag. "I didn't have the stomach for it." R. Doc. No. 406, at 148. The Court notes that the inmates who took it upon themselves to care for H.T. were subject to the health risks potentially associated with direct exposure to fecal matter. "Frequent exposure to the waste of other persons can certainly present health hazards that constitute a serious risk of substantial harm." *Gates v. Cook*, 376 F.3d at 341.

[317]R. Doc. No. 406, at 150; *see also* Pl. Ex. 376, at 20 (describing instance in which a different inmate was "not given his antipsychotic medication on at least one occasion because he was in a towel rather than jail clothing").

[318]R. Doc. No. 406, at 150.

[319]R. Doc. No. 408, at 150; Pl. Ex. 76-1.

[320]Pl. Ex. 76-2.

[321]Pl. Ex. 76-1.

[322]Pl. Ex. 76-1.

[323]R. Doc. No. 408, at 150.

to inactivity, including pneumonia.[324] Records document that medical staff observed R.S. refusing food, while "saturated in urine and feces stating he can't get up."[325] On another instance, staff described him as "unwilling or unable to get up off of floor."[326] Records also show that R.S. "experienced an episode of incontinence, requiring his cell mate to clean him up."[327] Despite his refusal of basic sustenance, documented suicidality, and repeated hospitalizations, the Court has been provided with no evidence that OPP authorities undertook efforts that would facilitate and permit them to involuntarily treat R.S.[328]

OPP staff observed and documented R.S.'s decline. He was seen daily by nurses and eight times by physicians.[329] Nonetheless, R.S. died of urosepsis and pneumonia while still on suicide watch.[330] It is egregious that R.S. died after *announcing* his passive suicidality[331] and after spending days refusing food and lying on the floor, with no effort to provide involuntary treatment or otherwise actively intervene in R.S.'s slow suicide.[332] However, the internal OPP mortality report concluded that the standard of care was met, emphasizing that R.S. refused treatment.[333]

Dr. Daphne Glindmeyer, an expert in mental health and psychiatry and juvenile mental

---

[324]R. Doc. No. 408, at 151.

[325]Pl. Ex. 76-1.

[326]Pl. Ex. 76-1.

[327]Pl. Ex. 76-2.

[328]R. Doc. No. 408, at 150-51.

[329]Pl. Ex. 76-2.

[330]R. Doc. No. 408, at 150-51.

[331]*See* Pl. Ex. 167 (defining, in OPP's suicide lecture materials, "passive suicidality" as "wanting to be dead").

[332]R. Doc. No. 408, at 151.

[333]Pl. Ex. 76-2.

health in corrections,[334] is the medical director for Assertive Community Treatment, a program that provides in-home care to individuals with "chronic persistent severe mental illness."[335]

Dr. Glindmeyer conducted a site visit at the unit housing youth inmates.[336] The population of youth inmates at the time was approximately 24, and these inmates ranged from approximately 14 years old to 18 years old.[337] Just over half of the youth inmates were housed in protective custody because of issues including prior sexual assault.[338] Those in protective custody were confined for 23 hours per day.[339] Youth inmates and staff advised Dr. Glindmeyer to see a youth inmate who had symptoms including "bizarre behavior" and a history of suicidal ideation.[340] Although the inmate had been seen by a psychiatrist ten months earlier, he received no diagnosis for his apparent mood disorder and he was not receiving any medication or treatment.[341] Dr. Glindmeyer persuasively opined that his treatment or lack thereof was worsening his condition,[342] and his isolation was increasing his risk of suicide.[343]

---

[334]R. Doc. No. 409, at 174-75.

[335]R. Doc. No. 409, at 174. For approximately the last nine years, she has also served as a consent judgment compliance monitor with respect to mental health care in Mississippi's juvenile correctional facilities. Pl. Ex. 379, at 4-5. She has previously served as the Director of Psychiatry for Louisiana State University Health Science Center's Juvenile Corrections Program. Pl. Ex. 379, at 5.

[336]R. Doc. No. 409, at 213.

[337]R. Doc. No. 409, at 213.

[338]R. Doc. No. 410, at 7; *see also* Pl. Ex. 378, at 41-42.

[339]Pl. Ex. 378, at 42, 45; R. Doc. No. 410, at 11-12.

[340]R. Doc. No. 410, at 13-14.

[341]R. Doc. No. 410, at 14.

[342]R. Doc. No. 410, at 15.

[343]R. Doc. No. 410, at 15.

### 3. Medication

Even where records demonstrated that medications are provided by agencies such as hospitals, and even when that fact is documented through reputable sources of information in the record, psychotropic medications are frequently discontinued at OPP.[344]

At intake, psychotropic medications are stopped approximately 75-80% of the time, with some OPP treatment providers refusing to order them in any circumstance.[345] While there are legitimate concerns associated with the potential abuse of such medications, the wholesale discontinuation of all medications creates a risk that inmates will deteriorate psychiatrically, develop a discontinuation syndrome, or experience withdrawal, all of which can cause unnecessary pain and suffering.[346] Moreover, the abrupt discontinuation of psychotropic medication can increase the likelihood of suicide and assault and worsen inmates' long-term prognosis.[347]

### a. Detoxification and Withdrawal

OPP inmates who require a detoxification protocol are not consistently identified or effectively treated. For example, C.F.'s intake questionnaire indicates that she was taking 2 milligrams of a benzodiazepine, Xanax, four times daily, an amount and frequency which Dr. Glindmeyer characterized as "a lot," pursuant to a prescription to treat her mental illness.[348] At intake, C.F. specifically identified the pharmacy that filled her prescriptions and the hospital where

---

[344]R. Doc. No. 408, at 102.

[345]R. Doc. No. 408, at 101, 114-16.

[346]R. Doc. No. 408, at 101-02.

[347]R. Doc. No. 408, at 101-02; R. Doc. No. 408, at 102-03. As Schwartz noted, cessation of medication may be "logical if there was a reliable system for reassessing those inmates at a predetermined time, and if inmates could reliably get to sick call." Pl. Ex. 372, at 25-26. The evidence demonstrates that there are no such reliable systems in place.

[348]R. Doc. No. 409, at 185; *see also* Pl. Ex. 180.

she received mental health treatment.[349] OPP discontinued the benzodiazepine.[350] C.F. was monitored for only five days, despite the fact that benzodiazepine withdrawal can occur up to ten days after cessation of use.[351] During those five days, her vital signs would occasionally meet the criteria for providing detoxification medication; sometimes such medication was provided, sometimes it was not.[352]

During Dr. Glindmeyer's visit on December 20, 2012, she observed C.F. "screaming very loudly" that she "needed to go to a wedding and that she had a baby in her tubes and they needed to come cut it out right away."[353] Staff and other inmates indicated C.F. had been in that state or a similar state for several days prior to Dr. Glindmeyer's site visit.[354] Dr. Glindmeyer spoke with C.F., who was "extremely paranoid," "screaming, cursing," and "very agitated."[355] Dr. Glindmeyer took C.F.'s pulse, and found it to be "over a hundred. And her skin was just wet. Clammy."[356] C.F. was experiencing delirium tremens, which Dr. Glindmeyer testified, is "very, very dangerous with a relatively high risk of mortality."[357] Given the severity of the situation, Dr. Glindmeyer reported her concerns directly to nursing staff, who then reportedly routed C.F. to the emergency room.[358] A subsequent review of C.F.'s records showed that her delirium or psychosis was never noted before

---

[349]R. Doc. No. 409, at 185-86; *see also* Pl. Ex. 180.

[350]Pl. Ex. 378, at 36-37.

[351]R. Doc. No. 409, at 189-90.

[352]R. Doc. No. 409, at 190; *see also* Pl. Ex. 378, at 37; Pl. Ex. 180.

[353]Pl. Ex. 378, at 37; R. Doc. No. 409, at 191.

[354]Pl. Ex. 378, at 37; R. Doc. No. 409, at 191.

[355]R. Doc. No. 409, at 191.

[356]R. Doc. No. 409, at 191.

[357]R. Doc. No. 409, at 192.

[358]R. Doc. No. 409, at 192.

Dr. Glindmeyer's visit.[359] She had received no medication, despite the fact that staff and inmates indicated she had been in this disturbing, "obviously acutely ill," state for days.[360] Dr. Glindmeyer persuasively attributed C.F.'s state to OPP's detoxification protocol.[361] *Gates v. Cook*, 376 F.3d at 343 (noting "testimony that prisoners seldom see medical staff and that monitoring of medication was sporadic, with prisoners potentially being prescribed the wrong medication or no medication for long periods of time, potentially leading to extremely dangerous physical side effects or psychotic breakdowns").[362]

### b. Untreated Mental Illness

OPP does not provide appropriate treatment to mentally ill inmates, even when they pose a danger to themselves or others. For example, S.T.[363] entered OPP in November 2012, but he was subsequently routed to the emergency room several times in a seven-day period.[364] The behavior that led to these visits generally included "climbing on ceiling and pulling light fixtures, throwing tile, spreading feces on windows," and "swinging from light fixtures."[365] S.T. reported auditory hallucinations.[366] At one point, S.T. was found "naked in his cell, with abrasions and signs of

---

[359]Pl. Ex. 378, at 22.

[360]Pl. Ex. 378, at 22. R. Doc. No. 409, at 191.

[361]R. Doc. No. 409, at 192.

[362]Dr. Gage's report suggests that he witnessed C.F. being removed for evaluation, but his subsequent review of her records showed no evidence of any such evaluation or hospitalization. Pl. Ex. 376, at 48.

[363]The initials of this inmate are actually T.S., but they are not used here so as to avoid conflation with the other T.S., who was attacked by E.L.

[364]Pl. Ex. 73.

[365]Pl. Ex. 73.

[366]Pl. Ex. 73.

trauma."[367] An emergency room physician noted that S.T. would be discharged and "can follow up with psychiatry in jail, as it certainly appears that he will require medication to decrease his disruptive behavior."[368] When Dr. Gage observed S.T. in December 2012, "[h]e was mute and hid himself under a blanket, refusing to speak to me."[369] Dr. Glindmeyer also observed S.T. on two occasions in December 2012.[370] "On the first observation, he declined to speak," and he was lying on a mattress on the floor, with a "flat affect, slow movements, and poor eye contact."[371] Staff members reported that he had a history of refusing to eat.[372] On the second observation, S.T. demonstrated psychomotor retardation, moving in slow motion.[373] He spoke softly and slowly, and his affect remained flat.[374] Despite S.T.'s persistently bizarre behavior, OPP records reflect that the only psychotropic medication OPP ever provided to S.T. was a single emergency dose of an antipsychotic medication.[375] In short, S.T. remained symptomatic and untreated.[376]

Another inmate, R.C., was transferred to the mental health unit on November 27, 2012, less than a week after arriving at OPP.[377] The record indicates this transfer may have been related to a prior history of schizophrenia and ongoing suicidal and homicidal ideation, which included

---

[367]Pl. Ex. 73.

[368]Pl. Ex. 73.

[369]Pl. Ex. 376, at 19.

[370]Pl. Ex. 378, at 15.

[371]Pl. Ex. 378, at 15.

[372]Pl. Ex. 378, at 15.

[373]Pl. Ex. 378, at 15.

[374]Pl. Ex. 378, at 15.

[375]Pl. Ex. 376, at 19; Pl. Ex. 378, at 16.

[376]Pl. Ex. 376, at 19; Pl. Ex. 378, at 15-16.

[377]Pl. Ex. 91.

statements such as "I feel people are trying to kill me . . . I'll hurt somebody [by] cutting their throat off."[378] An OPP medical doctor, who was not part of the mental health care team, documented R.C. as "being extremely belligerent and bizarre, thinking that [the doctor] will harm him" and "soiled in stool."[379] The doctor noted that R.C. had a history of psychiatric issues and "defer[red] to psych. for further management of psychosis, before dealing w/ medical issues."[380] When Dr. Gage toured the facility in mid-December, R.C. was "overtly responding to internal stimuli (indicative of hallucinations)," talking to people who were not there, and otherwise acting "grossly psychotic."[381] Dr. Gage later saw R.C. "lying under the bed, lying in his own excrement," with "shards of tile . . . arrayed on the sill of the window in plain sight."[382] R.C. later ingested the shards of tile.[383] According to Dr. Gage, R.C. was "simply allowed to languish in psychosis, untreated," despite the fact that evidence of psychosis was documented in R.C.'s record by other physicians.[384]

### 4. Staffing

As with security and safety, OPP's severe deficiencies in mental health and medical care are

---

[378]R. Doc. No. 376, at 16; R. Doc. No. 408, at 160-61; *see also* Pl. Ex. 91. R.C. submitted a sick call request on November 26, 2012, stating, "I would like to receive my medicine that helps to keep my mind calm. I was being housed at Allen Correctional Facility. I was taking Haldol and Benadryl. Thank you & God Bless." Pl. Ex. 91. The timing of this request suggests it may have been associated with his transfer.

[379]R. Doc. No. 408, at 160-61; *see also* Pl. Ex. 376, at 15; Pl. Ex. 91.

[380]Pl. Ex. 91.

[381]Pl. Ex. 376, at 15; R. Doc. No. 408, at 161.

[382]R. Doc. No. 408, at 161.

[383]R. Doc. No. 408, at 161.

[384]Pl. Ex. 376, at 43. Dr. Gage described R.C. as someone who "would have readily qualified for involuntary treatment with antipsychotics." R. Doc. No. 408, at 161. In his report, Dr. Gage detailed numerous additional examples of inmates at OPP who were left untreated. *See* Pl. Ex. 376, at 9-27.

largely attributable to dramatically insufficient staffing.[385] Dr. Glindmeyer concluded that OPP's

mental health staffing is "woefully inadequate."[386] There is one psychiatrist and one social worker

for approximately 2,500 inmates.[387] According to Dr. Gage, OPP needs at least one additional

psychiatrist or psychiatric prescriber to meet minimum standards.[388] Nurses report that there is no

time to provide any formal mental health treatment, and that they engage in minimal contact usually

only in the context of mandatory evaluations.[389] Given the number of inmates and the number of

nurses, it is impossible for the nurses to adequately evaluate and chart patients, administer

medications, respond to emergencies, provide suicide monitoring, gather sick call information, and

provide basic nursing services.[390]

The Court questioned Dr. Gage as to certain statements in his report characterizing the

relationship between staff and inmates at OPP.

> THE COURT: You have a statement in your report which states, "There's a general pattern of reckless and callous disregard for the suffering and treatment needs of the mentally ill and chemically dependent in OPP." That's a very strong statement. Do you want to explain that at all?
>
> THE WITNESS: Well, I would stand by that. I guess that would be the first thing that I would say. I mean, I've seen a number of jails and I have not seen conditions as deplorable as I have seen in this jail, and I have not seen such absence of mental health services in the

---

[385]Pl. Ex. 376, at 29.

[386]R. Doc. No. 409, at 196. Dr. Glindmeyer also testified that youth inmates seem to be controlled by another youth inmate, as opposed to by the deputies. This youth inmate was physically the largest inmate, and the other youth inmates appeared to wait for his acquiescence before responding to Dr. Glindmeyer's questions. R. Doc. No. 410, at 8-9.

[387]Pl. Ex. 376, at 29.

[388]R. Doc. No. 408, at 132.

[389]Pl. Ex. 376, at 42.

[390]Pl. Ex. 376, at 29.

> context of just abysmal physical environments and the kind of failure
> to monitor people and so on that I was speaking about. It was just
> more dramatic than I have ever seen in any other institution.[391]

While the Sheriff and City have suggested that an inmate population reduction may occur in just a

few months, the evidence suggests that OPP has inadequate staffing to treat even a reduced

population.[392]

### 5. Suicide Prevention

According to Dr. Gage, "[OPP] records and interviews with staff and inmates demonstrate

a level of disregard and disrespect on the part of most staff towards the mentally and chemically

dependent" that is made plain by the conditions on the residential mental health unit and "especially

the approach to suicide monitoring."[393] The evidence supports this characterization.

Suicide assessments at OPP are cursory and repetitive. Psychiatric contact with inmates is

extremely brief, generally lasting less than five minutes.[394] OPP policy requires that staff members

monitor inmates on suicide watch at all times.[395] But the staffing deficiencies and physical structures

of OPP facilities make it nearly impossible to conduct adequate assessments and to directly observe

inmates on suicide watch.[396] Those written assessments that are actually completed are perfunctory,

and some appear to have been filled out in advance.[397] OPP does not have any suicide proof cells,

and records demonstrate that inmates on suicide watch have access to medications that can be used

---

[391]R. Doc. No. 408, at 186-187.

[392]R. Doc. No. 408, at 187.

[393]Pl. Ex. 376, at 50.

[394]Pl. Ex. 376, at 45.

[395]R. Doc. No. 408, at 171.

[396]Pl. Ex. 376, at 45.

[397]Pl. Ex. 376, at 46.

to overdose.[398] Staff and inmates on the suicide watch unit could not recall the last time cells were searched for contraband, and there was no log of any such searches.[399]

On the suicide watch tier, records demonstrate that significant self-harm events were not listed as "sentinel events" that would trigger staff review.[400] These events included "head banging severe enough to require sutures," swallowing pills, chemicals, and pieces of tile, and "countless episodes of tying cloth around necks, sometimes anchored to objects."[401] Inmates who commit suicide are sometimes not discovered for quite some time.[402] *Compare Plata*, 131 S. Ct. at 1934 (noting that "prison staff did not even learn of [an inmate's death] for several hours").

OPP staff members' ignorance of cut-down tools is particularly alarming. A cut-down tool is a type of knife "made to cut through layers of something that has been fashioned as a rope," such as the "thick material that uniforms are made of."[403] Suicide is a leading cause of death in correctional settings,[404] and approximately 95% of suicides in jails and prisons are committed by hanging.[405] Cutting someone down without a cut-down tool may take more time, decreasing the chance of survival.[406] Virtually none of OPP's staff, including the staff members responsible for suicide watch, could locate cut-down tools when the experts visited.[407]

---

[398]*See also* Pl. Ex. 378, at 23.

[399]Pl. Ex. 376, at 45-46.

[400]Pl. Ex. 376, at 47.

[401]Pl. Ex. 376, at 47.

[402]Pl. Ex. 376, at 30; *see e.g.*, Pl. Ex. 78; Pl. Ex. 81.

[403]R. Doc. No. 406, at 85.

[404]*E.g.*, R. Doc. No. 410, at 46.

[405]R. Doc. No. 406, at 85-86.

[406]R. Doc. No. 406, at 85-86.

[407]R. Doc. No. 406, at 86; R. Doc. No. 408, at 159.

### 6. Records

Dr. Gage testified, and the Court has observed firsthand in connection with its own review, that record keeping at OPP is very poor.[408] For example, while medical forms may be reasonably constructed, they are often left blank or incomplete or are simply not present in inmates' medical records.[409] These are not mere clerical oversights. In numerous instances, inmates are sent to the emergency room, but there is no indication in the inmates' medical records regarding the outcome of their visits.[410]

Notes are undated, misdated, unsigned, and otherwise deficient.[411] There is a consistent pattern of incompletion.[412] The serious deficiencies in record keeping make it difficult to comprehensively assess the quality of care at OPP and to render emergency care to inmates.[413] Moreover, the absence of consistent medication administration records contributes to the risk of overprescription, overdose, contraband trade, and inmate-on-inmate violence.[414]

### 7. Conclusion

The Court has reviewed the voluminous evidence regarding medical and mental health care at OPP and the measures in the amended proposed consent judgment that the signatories agree are

---

[408]R. Doc. No. 408, at 89, 94.

[409]Pl. Ex. 376, at 30.

[410]Pl. Ex. 376, at 31.

[411]R. Doc. No. 409, at 100.

[412]R. Doc. No. 409, at 100.

[413]R. Doc. No. 408, at 179-80.

[414]R. Doc. No. 408, at 177-78; *see* Pl. Ex. 376, at 34-35; Pl. Ex. 378, at 23. An inmate on suicide watch showed Schwartz a large bag of pills and a cup full of pills, totaling approximately 75 pills, which he had been stockpiling. Pl. Ex. 372, at 24-25. Schwartz reported the situation to OPP's medical director. Pl. Ex. 372, at 25.

necessary to address deficiencies. The evidence presented was largely targeted towards deficiencies in mental health care, although the evidence also shows deficiencies in non-mental health care treatment, in particular sick call requests, medication administration, and emergency room visits, that relate to the risk of suicide, violence, and contraband trade.[415] The evidence presented shows that a lack of treatment altogether, rather than inadequate treatment, contributes to severe deficiencies in medical and mental health care at OPP.[416]

The consent judgment directly addresses OPP's deficiencies with respect to medical and mental health care. For example, it requires that an inmate's risk of suicide or other self-harm be evaluated within eight hours of arriving at OPP and it prohibits placing inmates in isolation who have not been screened.[417] It requires that an inmate receive a mental health assessment no later than the next working day following an "adverse triggering event," such as a suicide attempt or self-injury.[418] It also requires that "psychotropic medications are administered in a clinically appropriate manner as to prevent misuse, overdose, theft, or violence related to the medication."[419]

"Just as a prisoner may starve if not fed, he or she may suffer or die if not provided adequate medical care. A prison that deprives inmates of basic sustenance, including adequate medical care, is incompatible with the concept of human dignity and has no place in civilized society." *Plata*, 131 S. Ct. at 1928. OPP's deficiencies with respect to medical and mental health care are widespread, and the deficiencies with respect to mental health care are particularly obvious and pervasive. Dr.

---

[415]R. Doc. No. 410, at 52-53.

[416]Pl. Ex. 376, at 50.

[417]Consent Judgment, at 20.

[418]Consent Judgment, at 21.

[419]Consent Judgment, at 22, 30.

Gage testified that OPP's absence of mental health services is "dramatic" when compared to any other institution he has seen.[420] Considering the allegations of system-wide constitutional violations and the evidence presented of "complex and intractable" deficiencies, the Court concludes that the "scope of the remedy" presented in the proposed consent judgment is "proportional to the scope of the violation." *Id.* at 1937, 1940. The consent judgment provisions on mental and medical health care are necessary to remedy the violation of federal rights, and they are the least intrusive means of doing so. *See id.*

### C. Environmental Conditions

OPP facilities are in a state of disrepair.[421] Ventilation throughout OPP facilities is very poor, in part because inmates plug the vents.[422] Rusted and poorly secured fixtures can be used to create and conceal weapons.[423] Inmates, including inmates on suicide watch, have easy access to shards of broken tile, which may be ingested, thrown, or used as a weapon.[424] *Compare Marsh*, 268 F.3d at 1027 ("The structure of the Jail was so dilapidated that inmates could fashion weapons from pieces of the building."). Old locks in disrepair allow inmates to lock and unlock their cells at will.[425] *Compare id.* ("[L]ocks on the doors to cells did not work, preventing inmates from being locked down."). Many toilets, sinks, and showers are not functional.[426] Sewage seeps into cells, including

---

[420]R. Doc. No. 408, at 187.

[421]R. Doc. No. 407, at 98.

[422]R. Doc. No. 407, at 100.

[423]R. Doc. No. 407, at 98, 101; *see* Pl. Ex. 374, at 45.

[424]*E.g.*, Pl. Ex. 90; Pl. Ex. 374, at 46.

[425]Pl. Ex. 372, at 55.

[426]R. Doc. No. 407, at 98.

cells where inmates eat.[427] *Compare Gates v. Cook*, 376 F.3d at 341 ("[E]xposure to human waste 'evokes both the health concerns emphasized in *Farmer* and the more general standards of dignity embodied in the Eighth Amendment.'") (quoting *DeSpain v. Uphoff*, 264 F.3d 965, 974 (10th Cir. 2001)). The acute psychiatric unit's showers have large amounts of black mold on the ceilings and walls.[428] Clouds of gnats have resulted in an increased incidence of skin problems.[429] Cells housing mentally ill inmates have feces spread on the walls.[430] Inmates, including inmates on the acute psychiatric unit, sometimes sleep on the floor or on bare steel bunks because they are not given mattresses.[431]

OPP's environmental conditions pose a security risk, and this risk endangers the lives of staff members and inmates, while also endangering the community through potential escapes.[432] OPP's environmental conditions also create a health hazard for staff members and inmates. *See Alberti v. Sheriff of Harris Cnty.*, 937 F.2d 984, 1000-01 (5th Cir. 1991) (observing that "problems with the jails' plumbing, ventilation, fire safety, supplies, food service, and medical care" could "weigh in favor" of a finding of deliberate indifference). The consent judgment addresses these risks by requiring, for example, that OPP adequately install and maintain fixtures and that OPP's food service staff, including inmates, receive training on food safety.[433] The Court has closely reviewed

---

[427]Pl. Ex. 372, at 54; R. Doc. No. 412, at 26-27; City Ex. 13; *see also* R. Doc. No. 407, at 45 (unsanitary conditions portrayed in City Ex. 13 persist).

[428]Pl. Ex. 372, at 54.

[429]Pl. Ex. 372, at 56; Several inmate letters described showers with "leech like" or "slug like" creatures, which one inmate described as "gnats before they transform." *E.g.*, R. Doc. Nos. 274, 294.

[430]R. Doc. No. 409, at 103-04.

[431]Pl. Ex. 372, at 26-27.

[432]Pl. Ex. 372, at 56; Pl. Ex. 374, at 47.

[433]Consent Judgment at 31-32.

the measures in the proposed consent judgment, and finds them narrowly drawn and no more intrusive than necessary to remedy the violation of inmates' constitutional rights.

### D. Fire Safety

With respect to fire safety, Romero observed fire hazards, including electrical sockets that had been "burnt out, perhaps by inmates tampering with them . . . to ignite something."[434] Romero reported that staff members were unable to locate emergency exit keys in a timely manner, if at all.[435] A key control program is "foundational to jail security,"[436] but there is no reliable key control program at OPP.[437] According to Romero, "[s]taff and prisoners reported that emergency doors are frequently locked with shackles because during power outages, these doors pop open."[438] At the time of Romero's visit, the fire alarm system for the last three months at several facilities had consisted of a "fire watch," in which a person walked through units looking for fire hazards or signs of fire.[439] In September 2012, the Louisiana State Fire Marshal's office and the New Orleans Fire Department conducted a joint surprise inspection.[440] The OPP staff member assigned to the fire watch had, by 10:30 a.m., filled out the fire watch check log for the entire day.[441]

---

[434]R. Doc. No. 407, at 102-03.

[435]Romero requested that staff members locate an emergency key for one of the housing units. Staff members located a key within about ten minutes, but it was the wrong key. A key located after an hour worked for one door but not for another. Ultimately, Romero concluded that the keys were kept in the warden's office, but the warden is only there during the day and the keys are not otherwise available to staff. Romero suspected the locks had been sabotaged by inmates. R. Doc. No. 407, at 104-07.

[436]Pl. Ex. 374, at 21.

[437]Pl. Ex. 372, at 21, 45.

[438]Pl. Ex. 374, at 46.

[439]R. Doc. No. 407, at 103-04.

[440]Pl. Ex. 62.

[441]Pl. Ex. 62. The staff member was suspended for 5 days.

The inability of staff to operate emergency exits is deeply worrisome and poses the type of problem that could result in a large-scale catastrophic fire event with many fatalities.[442] While the Sheriff's testimony suggested that improvements have been made in recent months, the proposed consent judgment will ensure that such improvements remain consistent.[443] For example, the consent judgment requires that fire equipment be maintained and inspected quarterly and that staff be trained in the use of emergency keys.[444] In conjunction with the presence of contraband, including lighters[445] and "stingers,"[446] the dysfunctional emergency exit system, and the inadequate supervision at OPP, fire related issues pose a risk to the security and safety of inmates and staff. The remedies in the proposed consent judgment with respect to fire safety are narrowly drawn to remedy the violation of the federal rights addressed herein, and they are no more intrusive than necessary to do so.

## III. Statutory Rights

The United States alleges that OPP discriminates against Limited English Proficiency ("LEP")[447] inmates by failing to provide LEP inmates with meaningful access to OPP's intake, processing, housing, medical, and other services.[448]

---

[442] *E.g.*, R. Doc. No. 405, at 137; *see also* Pl. Ex. 372, at 44-46.

[443] R. Doc. No. 441, at 87-88.

[444] Consent Judgment, at 34.

[445] R. Doc. No. 405, at 86.

[446] Stingers are constructed by cutting a live electrical wire with a shank and attaching a washer to the end of the wire. Inmates use stingers to heat up food. R. Doc. No. 406, at 101-02.

[447] Limited English Proficiency ("LEP") characterizes individuals who cannot speak, write, or understand the English language such that their ability to communicate is limited. R. Doc. No. 407, at 108.

[448] R. Doc. No. 70, at 12. While conditions at OPP appear obviously inconsistent with the Prison Rape Elimination Act ("PREA"), PREA is not one of Plaintiffs' underlying causes of action. *See, e.g.*, *Ball v. Beckworth*, No. 11-37, 2011 WL 4375806, at *4 (D. Mont. Aug. 31, 2011). Nonetheless, the parties appear to agree that the consent judgment should be tailored to remedy PREA violations.

Section 601 of Title VI of the Civil Rights Act of 1964 provides that "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." *See also N.Y. Urban League, Inc. v. New York*, 71 F.3d 1031, 1036 (2d Cir. 1995); *United States v. Maricopa Cnty., Ariz.*, No. 12-00981, 2012 WL 6742314 (D. Ariz. Dec. 12, 2012). "[L]ongstanding case law, federal regulations and agency interpretation of those regulations hold language-based discrimination constitutes a form of national origin discrimination under Title VI." *Maricopa Cnty.*, 2012 WL 6742314, at *4.

A policy guidance document issued by DOJ states that an entity's obligation with respect to a particular service can be evaluated through an "individualized assessment that balances the following four factors: (1) [t]he number or proportion of LEP persons eligible to be served or likely to be encountered by the program or grantee; (2) the frequency with which LEP individuals come in contact with the program; (3) the nature and importance of the program, activity, or service provided by the program to people's lives; and (4) the resources available to the grantee/recipient and costs." Dep't of Justice, Guidance to Federal Financial Assistance Recipients Regarding Title VI Prohibition Against National Origin Discrimination Affecting Limited English Proficient Persons, 67 Fed. Reg. 4145501, 41459 (June 18, 2002); *see also Maricopa Cnty.*, 2012 WL 6742314, at *4 ("DOJ coordinates government-wide compliance with Title VI and its interpretation

---

*Compare* R. Doc. No. 416, at 48 (filing by Plaintiffs, asserting: "The proposed Consent Judgment's remedies regarding sexual abuse and sexual assault are the minimum necessary to correct OPP's PREA-related deficiencies."); R. Doc. No. 154, at 8 (suggesting that the consent judgment is not narrowly tailored to remedy PREA violations). The Court concludes that the consent judgment is narrowly drawn with respect to constitutional standards. To the extent PREA standards are relevant, the consent judgment is PLRA compliant with respect to those standards as well. In any case, the only statutory right before the Court arises under Title VI.

of Title VI is entitled to special deference.") (citations omitted).

While OPP has LEP inmates,[449] OPP has virtually no services for LEP inmates.[450] This creates problems with respect to classification, medical treatment, and emergency situations.[451] *See* 67 Fed. Reg. at 41469-70. At intake, LEP inmates sign forms and other documents without knowing their contents.[452] Staff members informed Romero that they have a "catch phrase type book," but they were unable to locate it after searching for 20 minutes.[453] The number of LEP inmates is unknown because OPP does not keep a record, whether through intake classification or through some other process, of inmates that do not speak English.[454]

OPP also does not keep a record or otherwise identify staff members who are bilingual.[455] Romero was informed that only one staff member at intake speaks Spanish.[456] Accordingly, when that officer is not on duty, there is no one to communicate with Spanish-speaking inmates.[457] While other inmates may provide translation services in some circumstances, in "many circumstances" such an arrangement fails to comply with Title VI and its implementing regulations because of issues relative to confidentiality and physical safety. *See* 67 Fed. Reg. 4145501 at 41462 ("[O]ther inmates . . . are not competent to provide quality and accurate interpretations.").

---

[449]R. Doc. No. 407, at 109.

[450]R. Doc. No. 407, at 112-13.

[451]R. Doc. No. 407, at 108-11.

[452]R. Doc. No. 407, at 110; *see also* R. Doc. No. 81-1, at 11 (English translation of declaration describing inability to obtain medical care because of language barrier).

[453]R. Doc. No. 407, at 111.

[454]R. Doc. No. 407, at 109, 112.

[455]R. Doc. No. 407, at 113.

[456]R. Doc. No. 407, at 113.

[457]R. Doc. No. 407, at 113.

The proposed consent judgment provides for language assistance policies and procedures that will ensure compliance with Title VI. It requires, for example, that OPP provide Spanish translations of vital documents, including sick call forms and inmate handbooks, and that an appropriate number of bilingual staff members be available for translation or interpretation.[458] There is little doubt that the proposed consent judgment's provisions addressing LEP inmates are narrowly drawn to remedy the violation of inmates' rights pursuant to Title VI, and the provisions are no more intrusive than necessary.[459]

## IV. Objections to Approval

The City has raised several objections to the proposed consent judgment. "A party potentially prejudiced by a decree has a right to a judicial determination of the merits of its objection." *City of Miami*, 664 F.2d at 447. However, "[c]omplete accord on all issues []is not indispensable to the entry of [a consent judgment]." *Id.* at 440. In "multiparty litigation, two parties may resolve all of the issues that do not affect a third party, ask the court to include only this settlement in a consent decree, and submit to the court for adjudication the remaining issues, disputed between them and the third party." *Id.*

Although its legal arguments have been elusive at times, the City's overarching objection is that the consent judgment has an unreasonable and proscribed effect on third parties as a result of the consent judgment's funding provision, its unknown costs, its indirect effect on public safety, and its allegedly collusive history. The City also contends that the consent judgment extends further than necessary, in violation of the PLRA and state law. Finally, the City challenges particular

---

[458]Consent Judgment, at 36-37.

[459]*E.g.*, Pl. Ex. 374, at 49-50.

provisions that require the Sheriff to "continue to" take certain actions and, relatedly, contends that the consent judgment cannot be approved absent a plainly worded concession of liability on the part of the Sheriff.

### A. Provision-by-Provision Approach

The City asserts that the Court must examine the proposed consent judgment "provision by provision," making particularized findings that a federal right has been violated and injunctive relief is narrowly drawn and necessary with respect to each and every provision. In support of this argument, the City cites cases addressing the termination of consent judgments.[460] But the Fifth Circuit has rejected such reliance on "provision-by-provision" cases as "misplaced" because the statutory subsection addressing termination of a consent decree, § 3626(b)(3), "on its face requires such written findings. Conversely, [§ 3626(a)(1)], which applies to the approval of prospective relief, does not." *Gates v. Cook*, 376 F.3d at 336 n.8 (distinguishing *Castillo v. Cameron Cnty.*, 238 F.3d 339, 351 (5th Cir. 2001)). Because this case involves § 3626(a)(1), no such approach is required here.

Nonetheless, the Court has taken great care to compare the evidence in support of the alleged violations of federal rights to the remedial provisions proposed in the consent judgment. Moreover, the City received the opportunity to challenge specific provisions of the consent judgment, ensuring they received even greater scrutiny.[461] Although not required to do so, the Court has carefully combed through the consent judgment and concludes that its provisions are narrowly drawn to remedy the violation of inmates' federal rights in light of the evidence presented at the fairness

---

[460]R. Doc. No. 427, at 11 (citing *Cason v. Seckinger*, 231 F.3d 777, 785 (11th Cir. 2000)).

[461]*E.g.*, R. Doc. No. 126, at 3.

hearing.

## B. Effect on Third Parties

### 1. Funding Provision

The City argues that the proposed consent judgment's funding provision, Section V, has an impermissible effect on third parties. The City initially contended that Section V "impermissibly infringes on the City's rights as a non-party," by permitting "the Sheriff, the Plaintiff Inmates, and the Civil Rights Division [to] decide what is the appropriate level for funding for the Sheriff's office without affording the City an opportunity to be heard or a means to even have an evidentiary hearing."[462] In response, the parties to the consent judgment amended it "to ensure (a) that the City can fully participate in all proceedings relating to the funding and cost of implementing the Proposed Consent Judgment, and (b) that the City will receive complete information regarding compliance and conditions at OPP."[463] The City now contends that the Sheriff and Plaintiffs "took it upon themselves to 'resolve the concerns of . . . the City'" through the amendments.[464] In doing so, the City argues, they inserted amendments which impermissibly "obligate the City to certain actions to which the City does not consent."[465] The City additionally argues that the amendments interfere with the City's preparation of a balanced budget.[466]

For the sake of clarity, all of the amendments to the proposed consent judgment are set forth below. Deletions are indicated through stricken text and insertions are underlined.

---

[462]R. Doc. No. 153, at 7; *see also* R. Doc. No. 427, at 9-10.

[463]*See* R. Doc. No. 183, at 1-2.

[464]R. Doc. No. 219, at 1 (quoting R. Doc. No. 183).

[465]R. Doc. No. 219, at 2.

[466]R. Doc. No. 219, at 3-4.

## V. FUNDING

A. The Court shall determine the initial funding needed to ensure constitutional conditions of confinement at OPP, in accordance with the terms of this Agreement, and the source(s) responsible for providing that funding at an evidentiary hearing ("funding trial"). Defendant, third-party Defendant City of New Orleans ("City"), and Plaintiffs shall have the right to participate fully in the funding trial, including producing expert testimony and analysis regarding the cost of implementing this Agreement.

A.B. Defendant shall be responsible for implementation of this Agreement upon a definitive judgment with regard to such initial funding for this Agreement.

B.C. Once the funding is determined pursuant to Paragraph A, the funding amount thereafter may be adjusted on an annual basis to account for changes in the size of the prisoner population, inflation, or other operating costs. If the Parties Defendant and the City are unable to agree upon such adjustments to the annual budget, the Monitor will intervene and resolve the dispute. If the Monitor cannot resolve the dispute within 45 days, the dispute will be submitted to the district judge for resolution. Defendant, the City, and Plaintiffs The Parties agree to work in good faith to determine available cost savings measures that may result from the ongoing implementation of this Agreement or otherwise.

C.D. Defendant will provide an annual budget for the expenditure of the funds for operation of OPP and an annual audited financial statement to the Monitor, the City, and the Parties Plaintiffs. The Monitor will assist in conducting oversight to ensure that funds for implementing this Agreement are allocated to achieve compliance with this Agreement.

## IX. MONITORING

F. Monitor Distribution of OPSO Documents, Reports, and Assessments: Within seven days of receipt, the Monitor shall distribute all OPSO assessments and reports to SPLC, and DOJ, and the City. The Monitor also shall provide any OPSO compliance-related documents within seven days to DOJ, and SPLC,

and the City upon request.[467]

The City specifically objects to the amendments because they "*require* the City to subject itself to the 'assistance' of the Monitor to set funding levels for the Sheriff's office."[468] But if the City does not want to participate in a process in which the Monitor resolves disputes, it need not do so. While the funding provision now expressly includes the City, the Sheriff, and the Plaintiffs in the funding decisionmaking process, this modification merely provides the City with "the right," rather than the obligation, "to participate" in the Monitor's dispute resolution. Ultimately, "[i]f the Monitor cannot resolve the dispute within 45 days, the dispute will be submitted to the district judge for resolution."[469] Nothing in the cited provision permits the Sheriff and Plaintiffs to impose any obligation upon the City without a hearing.

The City also objects on the basis that it cannot be required to appear in Court to settle funding disputes. There is a pending third-party complaint against the City. This claim and the law defining the relationship between the City and the Sheriff, including any funding obligations, are the source of any such requirement.

## 2. Effect on Public Safety Funding

The City next contends that the proposed consent judgment requires a "diversion of funds"

---

[467]R. Doc. No. 183-2. Although the City did not object to the amendment of the monitoring provision, the Court includes it because it is relevant to the Court's determination that additional notice to the class members was not required. The City has also not objected to the provision requiring that it "work in good faith to determine available cost saving measures." *See City of Miami*, 664 F.2d at 442-44 (noting which provisions had been objected to by a third party); *id.* at 444 (The district court's "approval of the decree, insofar as it affected [the parties] and, patently, insofar as it is not objected to by the [third party] must be affirmed.").

[468]R. Doc. No. 219, at 3.

[469]R. Doc. No. 183-2, at 1.

that will adversely affect public safety and the welfare of the citizens of New Orleans who are not inmates at OPP.[470]

First Deputy Mayor Andrew Kopplin testified relative to the effects that the proposed consent judgment could have on the City's budget. Because the cost of implementing the proposed consent judgment and the party responsible for paying any additional costs have not yet been determined, the Court permitted the City to offer testimony regarding the effect that a price tag of $22.5 million would have on the City's budget, should the City be required to pay such costs in full. Kopplin stated that the $22.5 million figure was based on a request from the Sheriff.[471]

It is important to emphasize that, at this stage of the proceedings, the Court does not know whether any additional revenue is needed to ensure that OPP inmates are afforded the full protections of the Constitution and Title VI. The Court has not yet heard argument on the City's state law funding obligation or heard evidence relative to the funds available to the Sheriff and the Sheriff's spending of any such funds. Determining whether the City has an additional funding obligation and the amount of any such obligation is impossible at this stage. Accordingly, the Court will assume, for the sake of argument, that the City could be obligated to spend an additional $22.5 million on implementation of the consent judgment.

Kopplin testified that either significant layoffs and furloughs or a drastic reduction in the number of police officers and fire department employees available to respond to public emergencies would be necessary if the City was forced to spend an additional $22.5 million to remedy the

---

[470]R. Doc. No. 153, at 4.

[471]R. Doc. No. 409, at 15.

conditions at OPP.[472] Such measures, Kopplin concluded "would put all of the citizens of the City at risk."[473]

The PLRA requires courts to "give substantial weight to any adverse impact on public safety" caused by the entry of a consent judgment. 18 U.S.C. § 3626(a)(1). Plaintiffs assert that legislative history and caselaw demonstrate that this requirement is oriented towards the more direct effects on public safety associated with prisoner release orders and population caps.[474] *See, e.g.*, *Plata*, 131 S. Ct. at 1941-42. The Court has considered the "difficult and sensitive" question of the proposed consent judgment's effect on public safety, especially insofar as it may indirectly lead to decreased services in other areas. *Id.* at 1942.

The Court is well aware of New Orleans' high homicide rate[475] and budgetary constraints,[476] but the evidence shows that violent crime is endemic within OPP as well. *See id.* at 1942. OPP inmates, and particularly inmates with mental health issues, leave the facility more damaged, and perhaps more dangerous, than when they arrived.[477] *Compare id.* Experts opined that OPP poses "clear and present dangers" of "life and death proportions" with respect to suicide and inmate

---

[472]R. Doc. No. 409, at 17-19.

[473]R. Doc. No. 409, at 19.

[474]R. Doc. No. 179, at 6.

[475]R. Doc. No. 412, at 62.

[476]*E.g.*, R. Doc. No. 409, at 17-18.

[477]As counsel for the Sheriff articulated, "it's meant to be a jail. It's not a hospital, it's not a mental health ward, but that's what's coming into the jail more and more because all the health services are being cut everywhere else. So they are dumping them at the Sheriff's doorstep." R. Doc. No. 412, at 45; *see also* 42 U.S.C.A. § 15601(3) ("America's jails and prisons house more mentally ill individuals than all of the Nation's psychiatric hospitals combined. As many as 16 percent of inmates in State prisons and jails, and 7 percent of Federal inmates, suffer from mental illness.").

violence, and the risk of a tragic fire is unacceptable.[478] Inmate escapes are not uncommon, and the prospect of armed inmates, whether outside or inside prison walls, is alarming.[479] The evidence shows that OPP itself presents a public safety crisis, which endangers inmates, staff, and the community at large.[480]

The Court concludes that, even were it to give substantial weight to the public safety issues outside OPP, ignore the public safety issues inside OPP, and assume that the consent judgment will cost the City an additional $22.5 million, the proposed consent judgment complies with the PLRA.

Notwithstanding this conclusion, the Sheriff's funding claim will be subject to a rigorous examination through two hearings, and any future funding claims will be addressed through a process that includes the participation of the City and, potentially, the Court. The consent judgment, and the Court's approach to its approval, are structured in a manner designed to minimize any indirect adverse effects on public safety. *See* § 3626(a)(1).

### 3. Cost & Taxes

Related to its argument that the proposed consent judgment's implementation costs will draw resources from other areas of public safety, the City argues that it cannot afford the consent judgment. In particular, the City argues, "any increase in funding to the Sheriff['s] Office inevitably

---

[478]R. Doc. No. 405, at 135-37.

[479]Schwartz testified that, while the videos portraying inmates armed with a loaded gun, gambling, using intravenous drugs, and freely exiting and entering OPP to wander Bourbon Street are several years old, "my concern is that some of that could reoccur or is reoccurring" such that inmates could be endangering the non-incarcerated residents of New Orleans. R. Doc. No. 412, at 32.

[480]R. Doc. No. 412, at 42; R. Doc. No. 407, at 44 ("The security failures of the jail extend to the community."); Pl. Ex. 372, at 5 (OPP facilities are "significantly more dangerous for staff than most jails, and for no good reason.").

will require the City to increase taxes imposed against the citizens of the City of New Orleans."[481] Even assuming that the City will have to provide additional revenue in the future to implement the consent judgment, a finding that the Court does not make at this juncture, "[i]t is well established that inadequate funding will not excuse the perpetuation of unconstitutional conditions of confinement, nor will an allegedly contrary duty at state law." *Smith v. Sullivan*, 611 F.2d 1039, 1043-44 (5th Cir. 1980) (internal citations omitted). "That it may be inconvenient or more expensive for the [local government] to run its prison in a constitutional fashion is neither a defense to this action or a ground for modification of the judgment rendered in this case." *Gates v. Collier*, 501 F.2d at 1322.

The City has had the opportunity to put forth evidence that the conditions at OPP meet constitutional muster or that the proposed consent judgment extends farther than constitutionally necessary. The City has not presented any evidence, including expert testimony, showing that conditions at OPP do not violate the Constitution or Title VI. The City has also not offered evidence with respect to an alternative, less costly or less intrusive, approach to remedying conditions at OPP. *See Armstrong*, 622 F.3d at 1071.

The Court anticipates that staffing will be one of the greatest costs associated with the proposed consent judgment. When it comes to staffing levels, the consent judgment provides the City with continuing opportunities to put forth evidence regarding the staffing and salaries needed to run a facility that meets constitutional and statutory requirements, including the PLRA. The uncontroverted evidence, however, is that some increase in staffing is necessary to ensure that

---

[481]R. Doc. No. 153, at 5.

conditions at OPP meet constitutional minimum requirements.[482]

The City's proposed finding of law that "[t]he Court may not approve a proposed consent decree that results in the raising of taxes" is disingenuous.[483] The City cites 18 U.S.C. § 3626(a)(1)(C), but that statute provides: "Nothing in this section shall be construed to authorize the courts, in exercising their remedial powers, to order the construction of prisons or the raising of taxes." The Court has no intention of ordering the City, the Sheriff, or any other political entity, for that matter, to raise taxes or to construct yet another facility. To the extent our elected political leaders intend to house inmates at OPP facilities, however, these facilities must meet constitutional and statutory minimum requirements.

### 4. Negotiating History

The City argues that the parties have colluded in drafting a consent judgment that fails to recognize the Sheriff's revenue streams and that treats the City as "an unlimited bank account for the benefit of the inmates and the Sheriff."[484] The City appears to suggest that the Sheriff and Plaintiffs colluded by leaving the City out of the process while drafting a consent judgment that is broader and more expensive than necessary to remedy the conditions at OPP.[485]

The City describes as "unorthodox" the legislative landscape in which the City must finance

---

[482]*See, e.g.*, R. Doc. No. 412, at 38.

[483]R. Doc. No. 153, at 6; R. Doc. No. 427, at 11.

[484]R. Doc. No. 151, at 14-15.

[485]In *Williams*, the Fifth Circuit observed that "the district court had to bear the full responsibility in this case to safeguard the interests of those individuals who were affected by the decree but were not represented in the negotiations." 729 F.2d at 1560. The Court has not interpreted *Williams* to indicate that the City's participation in negotiations excuses the Court from its "full responsibility" to safeguard the City's interests as a third party.

a jail which is run by the Sheriff.[486] The literature suggests that such arrangements are not uncommon. *E.g.*, Margo Schlanger, *Civil Rights Injunctions Over Time: A Case Study of Jail and Prison Court Orders*, 81 N.Y.U. L. Rev. 550, 562-63 (2006). Whether or not common, however, this financial relationship could incentivize sheriffs to seek out broad, expensive consent judgments.[487] The Court has been vigilant about ensuring compliance with the PLRA, however, and the City has assisted through its vigorous adversarial participation in this process. Nonetheless, at this stage, the City has not identified ways in which the proposed consent judgment's objectives—namely, compliance with the Constitution—could be obtained for a lesser cost, and the expert testimony was persuasive that the remedies included in the consent judgment are the minimum necessary to remedy conditions at OPP.

The City also objects to the Plaintiffs' characterization of its role in negotiating the proposed consent judgment. Plaintiffs have asserted: "Since November 2011, the Sheriff and the City participated in negotiations to formulate a comprehensive remedy to [] unlawful conditions."[488] The City responds that it "did not participate in negotiations to formulate what is termed a comprehensive remedy for alleged unlawful conditions."[489] However, the record shows that attorneys for the City actively participated in the negotiations.

After the Sheriff filed his two third-party complaints, the Court was advised that all parties, including the City, were prepared to enter into an interim consent judgment, subject to a dispute over

---

[486]R. Doc. No. 159, at 2.

[487]*See* Schlanger, 81 N.Y.U. L. Rev. at 562-63, 623 (noting "not so very hard fought" litigation involving sheriffs).

[488]R. Doc. No. 140, at 2.

[489]R. Doc. No. 154, at 6.

the cost and funding of the interim consent judgment's reforms.[490] An October 12 filing by Plaintiffs shows that the parties, including the City, had been successful in reaching "agreement on all of the substantive provisions in the proposed Settlement Agreement," with the exception of an interim funding amount to "be in effect until completion of a staffing analysis."[491] The accuracy of this filing was confirmed at an October 15 status conference, in which the City Attorney at the time, Richard Cortizas, and the current City Attorney, Sharonda Williams, participated.[492] The Court was advised by counsel for all parties that:

> [T]here is no dispute with respect to those portions of the proposed consent judgment detailing unconstitutional conditions at Orleans Parish prison facilities as well as efforts that need to be undertaken to ensure that prison facilities satisfy constitutional standards. There is also no dispute that the City of New Orleans is responsible for funding those efforts that must be undertaken, pursuant to the proposed consent judgment, to remedy existing conditions. The only remaining issue before the Court is the level of interim and permanent funding required to remedy the unconstitutional conditions.[493]

The Court specifically confirmed the substance of this paragraph with counsel at the status conference. The confirmation was obtained through querying counsel for each party and receiving individual verbal affirmation that the parties were ready to sign the agreement.

Counsel were ordered to appear in person at the next status conference, ostensibly to provide

---

[490]*See* R. Doc. Nos. 77, 81.

[491]R. Doc. No. 81; *see also* R. Doc. No. 156-6 (May 31, 2012 email from the City's then-Chief of Litigation, Sharonda Williams, to counsel for the United States and the Sheriff) ("I made some proposed edits to the last version that was circulated. Please see attached."); R. Doc. No. 156-7 (July 11, 2012 email from the City's then-Chief of Litigation, Sharonda Williams, to counsel for the United States and Sheriff) ("See [] my redline of the most recent draft.").

[492]R. Doc. No. 82 (listing participants).

[493]R. Doc. No. 82.

the Court with the signed consent judgment, which would permit future development of the interim funding amount, and to discuss the appointment of a special master.[494] At the conference, notwithstanding numerous express assertions to the contrary by the City's counsel, the Mayor of the City of New Orleans announced that he was unwilling to sign any such agreement.[495] The Mayor advised the Court that when he signed the New Orleans Police Department ("NOPD") consent decree, the City was unaware that it was facing additional, significant revenue requests in connection with the OPP litigation.[496] Despite the persistent and skilled efforts of retired Judge Terry Q. Alarcon, who put in countless hours free of charge to facilitate negotiations, the parties could not reach an agreement.[497]

To be clear, the City's negotiations with respect to the consent judgment carry no weight whatsoever in the Court's analysis of the proposed consent judgment outside of its collusion analysis. The City had the right to refuse to sign the proposed consent judgment at any point, notwithstanding its prior apparent willingness to agree to the proposed reforms subject to a future resolution of the cost and funding dispute. The point of recounting this litigation history is to identify the persuasive evidence, including the procedural history of the case, that contradicts the City's argument that it was left out of the negotiations process.

---

[494]R. Doc. No. 82.

[495]R. Doc. No. 86; *see also* R. Doc. No. 92.

[496]Another section of the Court has rejected this assertion. *See United States v. City of New Orleans*, No. 12-1924, 2013 WL 2351266, at *10 (E.D. La. May 23, 2013) (Morgan, J.) ("The City's argument that it had no knowledge of the potential cost ramifications for the OPP Consent Decree at the time it signed the NOPD Consent Decree is patently false. At least as early as July 19, 2012, several days before the City signed the NOPD Consent Decree on July 24, 2012, the City was on notice that the Sheriff intended to request '$22.5 million of "new" estimated costs' that would 'bring the total budget for OPP to $45 million' for 2013.") (modifications omitted).

[497]*See* R. Doc. No. 86.

**C. Louisiana Rev. Stat. Ann. § 15:738**

The City argues that the proposed consent judgment is inconsistent with La. Rev. Stat. Ann.

§ 15:738, which provides:

> No incarcerated state prisoner, whether before trial, during trial or on appeal, or after final conviction, who is housed in any jail, prison, correctional facility, juvenile institution, temporary holding center, or detention facility within the state shall have a standard of living above that required by the constitutions of the United States and the state of Louisiana, as ordered or interpreted by the appropriate courts of last resort, or by the standards set by the American Correctional Association. It is the intention of this legislature that, to the extent permitted by law, no inmate shall have a standard of living better than the state poverty level. Citizens should not be worse off economically and living in conditions that are below those granted to inmates whose living standards are being paid for and subsidized by the hard-working and law-abiding people of the state of Louisiana.

At the fairness hearing and in its briefing, the City makes much of the fact that the proposed

consent judgment would provide inmates with medical and mental health care to an extent that

exceeds that provided to certain non-incarcerated citizens.[498]

No one disputes that La. Rev. Stat. § 15:738 does not negate constitutional minimum

standards. Moreover, the parties are well aware that governments carry a special responsibility for

those in their custody. "To incarcerate, society takes from prisoners the means to provide for their

own needs. Prisoners are dependent on the State for food, clothing, and necessary medical care. A

prison's failure to provide sustenance for inmates may actually produce physical torture or a

lingering death." *Plata*, 131 S. Ct. at 1928 (quotation omitted). The Court notes that the statute's

reliance on American Correctional Association standards implicates a higher level of care in some

---

[498]*E.g.*, R. Doc. No. 412, at 53-54; R. Doc. No. 427, at 16.

situations than that required by the Constitution.[499]

The City argues, however, that in evaluating what the Constitution requires, the Court should take into account the unfortunate living conditions experienced by some impoverished non-incarcerated citizens of Louisiana.[500] While constitutional standards reflect "the evolving standards of decency that mark the progress of a maturing society," *Plata*, 131 S. Ct. at 1925 n. 3 (quoting *Farmer*, 511 U.S. at 834), the Court has never before heard it argued that constitutional standards vary depending on the poverty level existing in the state or community in which one lives. As counsel for Class Plaintiffs highlighted during closing statements, such an interpretation has the effect of affording lessened constitutional protections to citizens of Louisiana.[501] The law does not support this argument. A state's inability or unwillingness to provide certain services to its non-incarcerated citizens does not excuse it from the constitutional obligation to provide basic care to those in its custody.

**D. Specific Provisions**

Because the nature of the City's objections to the proposed consent judgment remained amorphous even as the fairness hearing was imminent, the Court ordered the City to clarify its position: "The City shall identify with particularity the provisions of the proposed consent decree that it is challenging."[502]

---

[499]R. Doc. No. 407, at 32 ("In terms of the American Correctional Association, it does take it up to a little bit higher level because they have other things in those standards that go beyond the minimal required to operate a safe jail.").

[500]R. Doc. No. 412, at 54.

[501]R. Doc. No. 412, at 39-40.

[502]R. Doc. No. 126, at 3 (emphasis in original). In the same order, the Court ensured the City was on notice of its obligation to argue at the fairness hearing any state-law funding defenses related to the overbreadth of the proposed consent judgment or the constitutionality of the conditions at OPP.

In response, the City identified the funding provisions and fourteen substantive provisions beginning with the phrase "continue to."[503] The City did not argue that these fourteen provisions extended further than constitutionally required, but rather argued that they were unnecessary because they "obligate the Sheriff merely to 'continue' to follow policies and procedures that he has already implemented according to the language of the proposed Consent Decree."[504] "It cannot be reasonably argued," the City contends, that these provisions are "'narrowly drawn,' if they simply order the Sheriff to *continue* to do what he already does."[505] Plaintiffs respond that the "continue to" language is "the product of extensive negotiations, during which the Sheriff represented, without verification, that improvements had been made in certain areas."[506]

The Court has carefully examined the "continue to" provisions to which the City objects. These provisions address direct supervision and rounds; detection of contraband; inmate classification; grievances; training for special populations, including inmates with mental health issues; and building maintenance. The evidence was compelling that OPP suffers from serious deficiencies in these areas such that the consent judgment's provisions are narrowly drawn, are necessary to remedy the violation of a federal right, and are the least intrusive means of doing so.

Moreover, even if the Sheriff's good faith efforts have resulted in recent changes, the proposed consent judgment remains necessary. The Fifth Circuit observed in *Gates v. Cook*, with respect to a state correctional department: "It is well settled that a defendant's voluntary cessation

---

The purpose of this approach was to avoid having to call the same expert witnesses and hear the same testimony at the funding hearing.

[503]R. Doc. No. 153, at 8-11.

[504]R. Doc. No. 153, at 8.

[505]R. Doc. No. 159, at 19.

[506]R. Doc. No. 156-2, at 6.

of a challenged practice does not deprive a federal court of its power to determine the legality of the practice. . . . The fact that many of these conditions have persisted for years despite MDOC's purported efforts leads us to likewise conclude that MDOC has not met the heavy burden of showing that its voluntary conduct has mooted any of the issues presented here." 376 F.3d at 337; *see also Gates v. Collier*, 501 F.2d at 1321 ("Changes made by defendants after suit is filed do not remove the necessity for injunctive relief, for practices may be reinstated as swiftly as they were suspended."). A defendant's assurance that it is "already on the path towards compliance is insufficient to moot the issue." *Gates v. Cook*, 376 F.3d at 343-42. According to Schwartz, "almost all of [the] problems given to OPSO in writing" in the 2008 National Institute of Corrections report "remain unmitigated today."[507]

The Court permitted the parties to add record citations to their proposed findings of fact and conclusions of law after the hearing.[508] The City did so, but it also attempted to "revise" its proposed findings of fact and conclusions of law to introduce arguments that were not raised when the City responded to the Court's order to "<u>identify with particularity the provisions of the proposed consent decree that it is challenging</u>."[509] In the same paragraph, the Court expressly stated that "[d]efenses related to the constitutionality of existing conditions or the overbreadth of the proposed consent decree that are not raised shall be deemed waived."[510] While not expressly invited, the Court welcomes the City's additional citations to legal authority.[511] The Court mentions only briefly those

---

[507]Pl. Ex. 372, at 20.

[508]R. Doc. No. 391.

[509]R. Doc. No. 126, at 3; R. Doc. No. 395.

[510]R. Doc. No. 126, at 3.

[511]*See, e.g.*, R. Doc. No. 427, at 14.

arguments that were not raised until weeks after the hearing and that are, accordingly, waived.

For example, in its proposed conclusions of law, the City challenges as overbroad the provision stating that the consent judgment shall "terminate when the [Sheriff] has achieved substantial compliance with each provision of the Agreement and [has] maintained Substantial Compliance with the Agreement for a period of two years."[512] Because the City did not raise this argument until several weeks after the hearing, opposing counsel did not have an opportunity to address it. Nonetheless, in light of the evidence of longstanding deficiencies at OPP facilities arising from deep-rooted and systemic weaknesses, the Court finds the two-year provision narrowly drawn and otherwise compliant with the PLRA.

The City additionally raises a new challenge to the failure to define "substantial compliance" with objective, quantifiable targets.[513] The consent judgment defines substantial compliance as "compliance with most or all components of the relevant provision of the Agreement."[514] In light of the components of the proposed consent judgment, which include both general guidelines and specific baseline requirements, and the evidence admitted at the hearing, the Court concludes that this objection is without merit. *See also M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 848 (5th Cir. 2012) ("Named Plaintiffs must make an effort to give content to what it would mean to provide adequate or appropriate levels of services, so that final injunctive relief may be crafted to describe in reasonable detail the acts required.") (quotation and modification omitted).

---

[512]R. Doc. No. 427, at 14 (citing R. Doc. No. 101-3, at 43).

[513]R. Doc. No. 427, at 14-15.

[514]Consent Judgment, at 9.

### E. Admission of Liability

The City contends that "[u]nless [the Sheriff] admits to operating an unconstitutional facility, [] the decree is overly broad."[515] In particular, the City demands that the Sheriff provide a "plainly-worded and straightforward admission of 'deliberate indifference.'"[516] Some inmates, including one of the Class Representatives, similarly contend that the proposed consent judgment is inadequate because it does not require an admission of liability from the Sheriff or a finding to that effect.[517]

While the Court is aware of the fact that the City and certain inmates may be dissatisfied with a ruling that does not require a plain admission of liability, this is an inherent part of a settlement, as opposed to a matter litigated through a full trial. By choosing to enter into a consent judgment, the parties may "avoid the collateral effects of adjudicated guilt. *United States v. City of Jackson*, 519 F.2d 1147, 1152 n. 9 (5th Cir. 1979) (quoted in *City of Miami*, 664 F.2d at 441-42).

In the consent judgment, Class Plaintiffs, the United States, and the Sheriff stipulate that the consent judgment "complies in all respects with the provisions of 18 U.S.C. § 3626(a)" and, specifically, "that the prospective relief in this Agreement is narrowly drawn, extends no further than necessary to correct the violations of the federal rights as alleged by Plaintiffs in the Complaints, is the least intrusive means necessary to correct these violations, and will not have an adverse impact on public safety or the operation of a criminal justice system. . . . Any admission made for purposes of this Agreement is not admissible if presented by Third Parties in another proceeding."[518]

"The requirements for the entry of relief in 18 U.S.C. § 3626(a)(1) may appear in some

---

[515]R. Doc. No. 405, at 21.

[516]R. Doc. No. 159, at 23.

[517]*E.g.*, R. Doc. No. 229, at 4-7; R. Doc. No. 237, at 2.

[518]Consent Judgment, at 44.

tension with any attempt by defendants to continue to deny legal liability while agreeing to the entry of the relief sought by plaintiffs." Elizabeth Alexander, *Getting to Yes in a PLRA World*, 30 Pace L. Rev. 1672, 1684 (2010). Neither the PLRA nor caselaw requires a plainly worded concession of liability, and the Sheriff's stipulation with respect to the consent judgment parallels the language in the PLRA.  The Court must focus on whether the proposed relief complies with the Constitution, statutory law, including the PLRA, and jurisprudence. Whether the Sheriff's stipulation amounts to a "cryptic" concession is not the Court's concern. *See* Margo Schlanger, *Plata v. Brown and Realignment: Jails, Prisons, Courts, and Politics*, 48 Harv. C.R.-C.L. L. Rev. 165, 173-74 (2013); *see also* H.R. Rep. No. 104-21, at 24 n.2 (1995).

## IV. Public Comments

The Court invited the general public, as well as OPP inmate class members, to comment on the proposed consent judgment. The Court received numerous public comments from individuals who are not incarcerated. Virtually every comment endorsed the proposed consent judgment.

The Court heard from a broad cross section of the community.[519] Community groups, law professors, and religious leaders similarly described the necessity and urgency of injunctive relief.[520] The public comments consistently expressed that conditions at OPP have been deficient, to say the least, for a very long time. The Chief District Defender for Orleans Parish and the Louisiana Public Defender Board wrote to express support for the proposed consent judgment and express their concern for the safety of OPP staff members and inmates.[521] Family members of incarcerated

---

[519]R. Doc. Nos. 327, 329.

[520]R. Doc. Nos. 264, 320, 325.

[521]R. Doc. Nos. 256, 319, 322.

individuals, including individuals who died in OPP, implored the Court to enter an order approving the consent judgment,[522] describing as "shocking and offensive" the City's characterization of Plaintiffs' suit as seeking "steaks and cognac" for inmates.[523] The public comments also expressed the opinion that politicians, including the Sheriff of Orleans Parish and the Mayor of New Orleans, have failed and will continue to fail to take action absent court approval of the consent judgment.[524]

The consent judgment represents a reasonable factual and legal determination based on the extensive factual record. It is fair and consistent with the Constitution, statutes, including the PLRA, and jurisprudence. Its effect on third parties is not unreasonable or proscribed. Having concluded that the consent judgment is overwhelmingly supported by the evidence, including OPP records and persuasive trial testimony, the Court turns to the determination of whether the consent judgment is additionally a fair, adequate, and reasonable class settlement.

## CLASS SETTLEMENT ANALYSIS

Class Plaintiffs have filed an unopposed motion[525] for certification of a settlement class consisting of all people who are currently or will be incarcerated at the Orleans Parish Prison."[526]

---

[522]*E.g.*, R. Doc. Nos. 238, 251-54, 373.

[523]*See* R. Doc. No. 159, at 14 ("While the City does not question that constitutional standards must be satisfied, the federal Courts, like the Legislature, have recognized that serving steaks and cognac to inmates is not a constitutional entitlement."); R. Doc. No. 250, at 2 ("We are not asking for 'steaks and cognac.' We are asking that the over 2,000 people who continue to be held in the Orleans Parish jail be held in a safe, secure, and humane environment, with appropriate medical and mental health services and conditions fit for human habitation.").

[524]*E.g.*, R. Doc. No. 241; R. Doc. No. 250, at 2-3; R. Doc. No. 260; R. Doc. No. 331.

[525]R. Doc. No. 145.

[526]R. Doc. No. 145-1, at 6-7; *see also* R. Doc. No. 1, at 11; Consent Judgment, at 1. The City contends that the other parties have "marginalized" the City, such that "the City is not in a position to address" the certification issue. The City contends, however, that "it is inordinate, and tantamount to overkill, to certify a class in this case." R. Doc. No. 159, at 8-9.

The terms of the proposed settlement, which is the same document as the consent judgment, have already been discussed.

**I. Standard of Law**

When determining whether to certify a settlement class, courts must determine whether the requirements for certification are met and whether the settlement is fair, adequate, and reasonable, especially insofar as it affects inmates who are not named plaintiffs in the lawsuit.

Rule 23(a) of the Federal Rules of Civil Procedure permits certification of a plaintiff class only if four requirements are met: (1) the class is so numerous that joinder of all members is impracticable ("numerosity"); (2) there are questions of law or fact common to the class ("commonality"); (3) the claims or defenses of the representative plaintiffs are typical of the claims or defenses of the class ("typicality"); and (4) the representative plaintiffs will fairly and adequately protect the interests of the class ("representation"). Although courts need not consider the likely difficulties in managing a class action when considering a settlement class, courts must be cognizant when considering the other factors that there will not be a "later opportunity for class adjustments." *In re OCA*, No. 05-265, 2008 WL 4681369, at *6 (E.D. La. Oct. 17, 2008) (Vance, J.) (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997)). "The existence of a settlement class may even 'warrant more, not less, caution on the question of certification.'" *Id.* (quoting *Amchem*, 521 U.S. at 620).

Class certification is appropriate when a "rigorous analysis" confirms that the requirements of Rule 23(a) are met. *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011). Courts must "look beyond the pleadings to 'understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of certification issues.'" *M.D. ex rel.*

*Stukenberg v. Perry*, 675 F.3d 832, 837 (5th Cir. 2012) (quoting *McManus v. Fleetwood Enters., Inc.*, 320 F.3d 545, 548 (5th Cir. 2003)). Certification also requires that a class meets the requirements of one of the subsections in Rule 23(b).

Plaintiffs seek certification pursuant to Rule 23(b)(2), which applies where a defendant has "acted or refused to act on grounds that apply generally to the class" such that injunctive or declaratory relief is appropriate. "Rule 23(b)(2) was created to facilitate civil rights class actions." *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 330 (4th Cir. 2006) (citation omitted). "The key to the (b)(2) class is 'the  indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.'" *Dukes*, 131 S. Ct. at 2557 (quoting Richard Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009)). The claims at issue present a paradigmatic case for Rule 23(b)(2) relief. If an individual plaintiff successfully brought a lawsuit raising the systemic claims at issue here, the injunctive relief sought, "as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests." Fed. R. Civ. P. 23(b)(2).

If certification requirements are met, the Court must still determine whether to approve the settlement. As a threshold matter, the Court looks to whether notice was provided "in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e). With respect to the substance of the settlement, the Court inquires whether the settlement is fair, adequate, and reasonable pursuant to Rule 23(e). The Fifth Circuit has advised courts to consider six factors in making this assessment: "(1) the existence of fraud or collusion behind the settlement; (2) the

complexity, expense, and likely duration of the litigation; (3) the stage of the proceedings and the amount of discovery completed; (4) the probability of plaintiffs' success on the merits; (5) the range of possible recovery; and (6) the opinions of class counsel, class representatives, and absent class members." *Ayers v. Thompson*, 358 F.3d 356, 369 (5th Cir. 2004) (citing *Parker v. Anderson*, 667 F.2d 1204, 1209 (5th Cir. 1982)).

## II. Certification Analysis

### A. Numerosity

"To satisfy the numerosity prong, 'a plaintiff must ordinarily demonstrate some evidence or reasonable estimate of the number of purported class members.'" *Pederson v. La. State Univ.*, 213 F.3d 858, 868 (5th Cir. 2000) (quoting *Zeidman v. J. Ray McDermott & Co.*, 651 F.2d 1030, 1038 (5th Cir. 1981)). OPP has approximately 2,500 inmates,[527] and joinder of these inmates would be impracticable, weighing in favor of certification. Moreover, the population is constantly in flux. "[T]he fact that the class includes unknown, unnamed future members also weighs in favor of certification." *Id.* at 868 n. 11.

### B. Commonality

The common questions of law or fact required by Rule 23(a)(2) must be able to "generate common *answers* apt to drive the resolution of the litigation." *Dukes*, 131 S. Ct. at 2551 (quoting Nagareda, 84 N.Y.U. L. Rev. at 132. "Before and after *Wal-Mart*, courts have certified classes of incarcerated persons challenging specific, written, acknowledged, official policies." *Mathis v. GEO Grp.*, No. 08-CT-21, 2012 WL 600865, at *6 (E.D.N.C. Feb. 23, 2012) (citing cases). In *M.D. ex rel. Stukenberg*, the Fifth Circuit expressly disagreed with the proposition that a policy must injure

---

[527]Pl. Ex. 380.

each class member to provide the foundation for class wide relief.  675 F.3d at 847-48. "Rather, the class claims could conceivably be based on an allegation that the [defendant] engages in a pattern or practice of agency action or inaction—including a failure to correct a structural deficiency within the agency, such as insufficient staffing—'with respect to the class,' so long as the declaratory or injunctive relief 'settling the legality of the [defendant's] behavior with respect to the class as a whole is appropriate.'" *Id.* (quoting R. 23(b)(2)(1966 Amendments advisory committee note)). The Court considers each of the Plaintiff Class's claims to determine whether the commonality requirement is met.[528]

The mere incantation of the words "systemic violation" does not justify class certification. *See id.* at 844. For example, in *M.D. ex rel. Stukenberg*, plaintiffs alleged systemic violations of substantive due process, which defendants contended were not capable of resolution because they required an individualized "shocks the conscience" inquiry. *Id.* at 843. Here, however, Class Plaintiffs present claims that are susceptible to common answers. *See Logory v. Cnty. of Susquehanna*, 277 F.R.D. 135, 143 (M.D. Pa. 2011) ("Unlike *Dukes*, where commonality was destroyed where there was no 'common mode of exercising discretion that pervade[d] the entire company,' here there is a solid [prison] policy that applied directly to all potential class members.") (quoting *Dukes*, 131 S. Ct. at 2554).

The claims, defenses, relevant facts, and applicable substantive law demonstrate that certification is warranted with respect to Class Plaintiffs' Eighth and Fourteenth Amendment protection from harm claims. Whether certain conditions at OPP either by themselves, or through

---

[528]The Court need not address the Title VI claim brought by the United States because Class Plaintiffs alleged only constitutional claims.

a "mutually enforcing effect," put inmates at a substantial risk of harm is amenable to a common

answer. *See Gates v. Cook*, 376 F.3d at 333. Plaintiffs have identified practices with respect to

staffing, contraband, supervision, and classification, for example, that uniformly create a substantial

risk of harm for all class members.[529] *See M.D. ex rel. Stukenberg*, 675 F.3d at 848 & n. 7

(suggesting that staffing levels are the type of condition that is generally applicable to a class of

plaintiffs); *see also Gates*, 376 F.3d at 333. Similarly, whether OPP officials have been deliberately

indifferent to any such risk can be demonstrated in a manner that is applicable to all class members.

The facts and law also demonstrate that Class Plaintiffs' Eighth and Fourteenth Amendment

medical and mental health care claims warrant certification.[530] These claims do not allege

"amorphous" systemic deficiencies. *Compare M.D. ex rel. Stukenberg*, 675 F.3d at 844. Class

Plaintiffs have identified "discrete and particularized practices" including, for example, medication

and suicide prevention practices, as well as staffing inadequacies, that are mutually enforcing causes

of OPP's deficient conditions.[531] *Compare id.* at 844. Accordingly, a class action is an appropriate

vehicle for these claims.

### C. Typicality

The typicality inquiry "focuses on the similarity between the named plaintiffs' legal and

remedial theories and the theories of those whom they purport to represent." *Stirman v. Exxon Corp.*,

280 F.3d 554, 562 (5th Cir. 2002). Typicality is established where "the class representative's claims

---

[529]The Court notes that this case involves a single administrative entity responsible for multiple facilities. The evidence shows that the proposed consent judgment's relief is appropriately applied to all seven facilities.

[530]As discussed above, the details relevant to Plaintiffs' medical and mental health care claims, and the associated remedies, largely overlap. Accordingly, the Court considers the two claims together.

[531]R. Doc. No. 1, at 2-3.

have the same essential characteristics of those of the putative class." *Id.* Here, Class Representatives consist of both pre- and post-trial detainees, and they present legal and remedial theories common to the class members. *Compare Hawkins v. Comparet-Cassani*, 251 F.3d 1230, 1238 (9th Cir. 2001). While class members' experiences at OPP may differ, "the claims arise from a similar course of conduct and share the same legal theory" and, therefore, "factual differences will not defeat typicality" in this case. *Stirman*, 280 F.3d at 562 (quotation omitted).

### D. Adequacy of Representation

"Rule 23(a)'s adequacy requirement encompasses class representatives, their counsel, and the relationship between the two." *Id.* at 563 (quotation omitted). Class Representatives and class counsel have demonstrated that they will fairly and adequately protect the interests of the class. The Court is satisfied with the "zeal and competence" of class counsel and "the willingness and ability of the representatives to take an active role in and control the litigation."[532] *Id.* (quotation omitted).

## III. Settlement Analysis

### A. Notice

Rule 23(e) requires that class members be notified of a settlement, but notice "need only satisfy the broad reasonableness standards imposed by due process." *In re Katrina Canal Breaches Litig.*, 628 F.3d 185, 197 (5th Cir. 2010) (internal quotations and citation omitted). Due process is satisfied if the notice provides class members with the "information reasonably necessary for them to make a decision whether to object to the settlement." *Id.*

The Court approved a procedure in which a notice document and copy of the consent

---

[532]*E.g.*, R. Doc. Nos. 229, 235-37.

judgment were distributed to all inmates at OPP on a given date.[533] In addition, 50 copies of the notice were posted in common areas in the seven OPP facilities, indicating how inmates could obtain a full copy of the consent judgment.[534] An abbreviated notice also ran in *The Times-Picayune* on two different days and it was also posted on the newspaper's website, NOLA.com.[535] The abbreviated notice was posted by the Court on its website, as well as on class counsel's website, DOJ's website, and the Sheriff's website.[536] The City was also invited to post a copy on its website. The Court finds these procedures easily satisfy Rule 23(e)'s requirements by providing class members with more than enough information to determine whether the settlement is objectionable.

The Court previously determined that the amendments to the proposed consent judgment did not require new notice. The Court ruled, "the amendments do not alter the original Proposed Consent Judgment's substance or effect in a manner that would require new briefing before the April 1, 2013 fairness hearing or a revised class notice."[537] After reviewing the parties' supplemental briefing,[538] the Court remains convinced that no additional notice was necessary. The minor modifications with respect to the City, described *supra*, did not impair class members' rights even indirectly, and the modifications certainly did not constitute a material change with respect to the class members. *See, e.g.*, *In re Baby Products Antitrust Litig.*, 708 F.3d 163, 175 n. 10, 182 (3d Cir. 2013) (supplemental notice required only if settlement is "materially altered"); *In re Integra Realty Res., Inc.*, 262 F.3d

---

[533]*See* R. Doc. No. 129; 131.

[534]*See* R. Doc. No. 129.

[535]*See* R. Doc. No. 129.

[536]*See* R. Doc. No. 129.

[537]R. Doc. No. 213.

[538]*E.g.*, R. Doc. Nos. 395, 399.

1089, 1111 (10th Cir. 2001) (no additional notice needed where amendment "merely expanded the rights of class members").

### B. Fraud or Collusion

The consent judgment is the product of a protracted period of litigation between Class Plaintiffs, DOJ, the Sheriff, and the City.[539] The relief offered in the consent judgment demonstrates that SPLC has been unwavering in fulfilling its obligations to Class Plaintiffs. For these reasons, as well as those discussed above with respect to the City's participation in the process, the Court is satisfied that the consent judgment is not tainted by fraud or collusion.

### C. Complexity, Expense, and Duration of Litigation

Class Plaintiffs observe that the expenses associated with this case are high because demonstrating deliberate indifference would require "significant statistical, anecdotal, and expert evidence."[540] While Class Plaintiffs further believe that they have obtained such evidence, they accurately acknowledge that a failure to settle the case would require a protracted motions practice and potential appeals that would delay the relief requested.[541] Such delays would prolong Class Plaintiffs' exposure to the safety risks at OPP, weighing in favor of settlement.

### D. Stage of the Proceedings

With respect to the stage of the proceedings, including the depositions and expert reports completed, this case has progressed to a marked degree. Class counsel notes that four staff paralegal investigators, as well as multiple law clerks and interns, have spent "thousands of hours

---

[539] *See* R. Doc. No. 138, at 8; R. Doc. No. 411, at 22-23.

[540] R. Doc. No. 138, at 9.

[541] R. Doc. No. 138, at 9.

documenting conditions in the jail by interviewing people housed there."[542] "There has not been a single point, in the last year and a half of this litigation, that Plaintiffs stopped doing client intake, responding to calls from the jail, and gathering evidence."[543]

The City asserts that an absence of evidence at the fairness hearing supporting class certification and settlement prohibits the Court from certifying the settlement class and approving the settlement.[544] This argument is flawed because the Court never indicated that it required an evidentiary hearing for class certification and because the evidence presented at the fairness hearing was directly relevant to the certification and class settlement inquiry. Moreover, the evidence presented at the hearing was consistent with the evidence presented prior to the hearing, including the declarations submitted by class counsel.[545]

### E. Plaintiffs' Probability of Success & Possible Recovery

The Court concludes that Class Plaintiffs' probability of success and the possible recovery associated with success supports approval of the consent judgment. As discussed with respect to the PLRA's narrow tailoring inquiry, the Court concludes that the remedies set forth in the consent judgment address the allegations in Class Plaintiffs' complaint. Moreover, class counsel notes that the injunctive relief addressed in areas relevant to the United States' complaint in intervention will provide an additional benefit to many class members.[546]

The City contends that the Court should consider "a defendant's financial condition when

---

[542]R. Doc. No. 138, at 11 (citing R. Doc. No. 138-1).

[543]R. Doc. No. 138, at 11 (citing R. Doc. No. 138-1).

[544]R. Doc. No. 427, at 8.

[545]*E.g.*, R. Doc. No. 137-4.

[546]R. Doc. No. 138, at 11.

deciding whether to approve a class action settlement."[547] In light of the evidence presented at trial, neither the City's nor the Sheriff's financial condition defeats the class settlement. Moreover, the cases cited by the City are not persuasive in the context of a class action solely for injunctive relief.[548]

### F. Opinions of Class Counsel, Class Representatives, and Absent Class Members

The opinions of class counsel strongly support entry of the proposed consent judgment.[549] The Court has received many comments from class members in support of the proposed consent judgment. Inmates' comments describe numerous deficiencies, including poor environmental conditions, inadequate staffing and absent staff members, classification and housing problems, illicit drug use, sexual assault and other violence, staff use of excessive force, and inadequate medical and mental health care, including inadequate suicide prevention.[550] Although many inmates wrote solely about the current conditions at OPP,[551] those inmates that commented on the proposed settlement were generally positive.[552] Some inmates objected to the lack of financial compensation,[553] but the proposed consent judgment does not limit the ability of inmates to bring claims for damages and the complaint never sought such damages.[554]

---

[547]R. Doc. No. 427, at 8.

[548]*See Cody v. Hillard*, 88 F. Supp. 2d 1049, 1059 (D.S.D. 2000) ("This factor is not particularly important in the present case because the action is not for monetary damages.").

[549]*E.g.*, R. Doc. No. 138.

[550]*E.g.*, R. Doc. Nos. 227, 229, 269,270, 274, 275-76, 334, 353.

[551]*E.g.*, R. Doc. No. 235.

[552]*E.g.*, R. Doc. No. 227 (generally approving of proposed consent judgment, but noting concerns about noncompliance).

[553]*E.g.*, R. Doc. No. 228.

[554]R. Doc. No. 1, at 37.

One recurrent objection is that the proposed consent judgment does not go far enough because the Sheriff's compliance will be in appearance only, while the deficient conditions at OPP will persist or worsen.[555] Some class members assert that the Sheriff will present a facade of compliance during visits by experts or the Court, but not engage in substantive change.[556] These objectors ask for the Monitor to be "in house" or "on hand at all times within the jail" to ensure compliance.[557] One of the Class Representatives objects on the basis that the proposed consent judgment "reads like a Standard Policy []Book issued by the Fed. Bureau of Prisons, La. Dept. of Corrections, and American Correctional Association (ACA)," and fails to set forth "specific details" on correcting the underlying problems.[558]

The Fifth Circuit's "jurisprudence [] makes clear that a settlement can be approved despite opposition from class members, including named plaintiffs." *Ayers*, 358 F.3d at 373. The proposed consent judgment "gives OPP officials discretion in establishing the details of facility-specific policies designed to address constitutional infirmities," but it also creates "concrete, baseline requirements."[559] *Freeman v. Berge*, 68 F. App'x 738, 742-43 (7th Cir. 2003) ("[I]f defendants have not lived up to their end of the bargain, [] inmates' remedy is to enforce the agreement, not attack it."). The Court is aware that in other cases, whether because of inability or unwillingness to comply, prison administrators have failed to implement consent judgments. Should this happen, appropriate

---

[555] *E.g.*, R. Doc. Nos. 227, 229. While some inmates appear to no longer reside at OPP, the Court will address their contentions as objections without ruling on class standing.

[556] R. Doc. No. 229.

[557] *E.g.*, R. Doc. No. 227.

[558] R. Doc. No. 229, at 10.

[559] R. Doc. No. 140, at 123.

measures will be considered.[560] At this point, however, these objections do not preclude approval of the class settlement.

The Court finds that the proposed class satisfies the numerosity, typicality, commonality, and adequacy of representation requirements set forth in Rule 23(a) and additionally meets the requirements for certification pursuant to Rule 23(b)(2). Moreover, the proposed settlement fulfills the requirements associated with Rule 23(e). Accordingly, the Court certifies the class, defined as "all people who are currently or will be incarcerated at the Orleans Parish Prison," and approves the class settlement.

## CONCLUSION

Whether "budget shortfalls, a lack of political will in favor of reform," and/or other factors are responsible for OPP's deficiencies, these deficiencies must be remedied. *Plata*, 131 S. Ct. at 1936. Such conditions "are rarely susceptible of simple or straightforward solutions," but the consent judgment presents a narrowly drawn yet comprehensive means of ensuring the protection of inmates' federal rights. *Id.*

The federal rights at issue here, particularly with respect to the Constitution, establish minimum standards rather than ideals to which a correctional institution may aspire. These minimum standards are nonnegotiable. The Constitution guarantees that inmates, including convicted inmates and pretrial detainees who are presumed innocent, receive certain minimum levels of medical care and mental health care. It also guarantees that inmates will not be subject to a substantial risk of physical injury, sexual assault, or death to which officials are deliberately indifferent. The Court finds that the proposed consent judgment is the only way to overcome the years of stagnation that

---

[560]*See, e.g.*, R. Doc. No. 392.

have permitted OPP to remain an indelible stain on the community, and it will ensure that OPP inmates are treated in a manner that does not offend contemporary notions of human decency. After carefully considering the tremendous amount of evidence, the parties' arguments, including the City's objections, and the law, the Court concludes that the consent judgment should be approved.

      **IT IS ORDERED** that the motions are **GRANTED**.

New Orleans, Louisiana, June 6, 2013.

LANCE M. AFRICK
UNITED STATES DISTRICT JUDGE