Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 1 of 350

Jones vs. Gusman 08.05.13 Funding Hearing                                    1

```
 1                 IN THE UNITED STATES DISTRICT COURT FOR

 2                   THE EASTERN DISTRICT OF LOUISIANA

 3                            AT NEW ORLEANS

 4

 5   LASHAWN JONES, KENT ANDERSON, STEVEN      )
     DOMINICK, ANTHONY GHOUSTAVIA, JIMMIE      )
 6   JENKINS, GREG JOURNEE, RICHARD LANFORD,   )
     LEONARD LEWIS, EUELL SYLVESTER and MARK   )
 7   WALKER, on behalf of themselves and all   )
     other similarly situated, et al.,         )
 8                                             )
                         Plaintiffs,           )
 9                                             )
                  v.                           ) Case No. 12-859 "I"
10                                             ) August 5, 2013
     MARLIN GUSMAN, Sheriff, Orleans Parish,   ) Funding Hearing
11                                             )
                         Defendants.           )
12   _____)

13

14

15                       TRANSCRIPT OF PROCEEDINGS

16                 BEFORE THE HONORABLE LANCE M. AFRICK

17                    UNITED STATES DISTRICT JUDGE

18

19

20   SUSAN A. ZIELIE, RMR, FCRR
     Official Court Reporter
21   HB 406
     500 Poydras Street
22   New Orleans, Louisiana 70130
     susan_zielie@laed.uscourts.gov
23   504.589.7781

24

25   Proceedings Recorded by Computer-aided Stenography.
```

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 2 of 350

Jones vs. Gusman 08.05.13 Funding Hearing                    2

```
1   APPEARANCES:

2

3   For the Plaintiffs:        KATHARINE MURPHY SCHWARTZMANN, ESQ.
                               Southern Poverty Law Center
4
                               ELIZABETH CUMMING, ESQ.
5                              Elizabeth Cumming, Attorney at Law

6

7   For Intervenor            LAURA COON, ESQ.
        Plaintiff:            KERRY DEAN, ESQ.
8                             COREY SANDERS, ESQ.
                              US Dept of Justice
9

10
    For Defendant Gusman:      FREEMAN RUDOLPH MATTHEWS, ESQ.
11                             BLAKE J. ARCURI, ESQ.
                               THOMAS USRY, ESQ.
12                             Usry Weeks & Matthews

13

14  Third Party Defendant     HARRY ROSENBERG, ESQ.
    City of New Orleans:       Phelps Dunbar, LLP
15
                               RALPH J. CAPITELLI, ESQ.
16                             Capitelli & Wicker

17                             SHARONDA R. WILLIAMS, ESQ.
                               City Attorney's Office
18
                               BRYAN BOWDLER, ESQ.
19

20

21

22

23

24

25
```

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 3 of 350

Jones vs. Gusman 08.05.13 Funding Hearing                3

1                              INDEX

2   *Opening Statements*

           By Defendant Gusman                        8
3          By Third-Party Defendant City             16
           By Intervenor Plaintiffs USA              21

4
    *Testimony of*:
5       **GERALD URSIN**
           Direct by Mr. Acuri                    27, 80
6          Cross by Mr. Rosenberg                     56

7       **MICHAEL LAUGHLIN**
           Direct by Mr. Acuri                        80
8          Cross by Mr. Rosenberg                     95

9       **RICHARD DEMAREE INGLESE**
           Direct by Mr. Matthews               103, 130
10         Cross by Mr. Rosenberg                    145
           Cross by Mr. Sanders                      156
11
        **JAMES AUSTIN**
12         Direct by Mr. Rosenberg          161, 223, 270
           Traverse Examination
13              Ms. Dean                             171
           Cross By Mr. Acuri                        233
14         Cross by Ms. Dean                         249

15      **ANDY KOPPLIN**
           Direct by Mr. Rosenberg              276, 298
16         Cross by Ms. Coon                         286

17

18

19

20

21

22

23

24

25

10:09:5
10:09:5
10:09:5
10:09:5
10:52:4

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 4 of 350

Jones vs. Gusman 08.05.13 Funding Hearing                    4

1    NEW ORLEANS, LOUISIANA; MONDAY, AUGUST 5, 2013          08:20:1

2                    8:30 A.M.                                08:20:2

3    THE COURT:  Good morning, everybody.                    08:30:0

4         Let's call the case, please.                       08:30:0

5    CASE MANAGER:  Civil matter 12-859, Lashawn Jones, et   08:30:0

6    al., vs. Marvin Gusman, et al.  This matter is set for a funding   08:30:1

7    hearing.                                                08:30:1

8    THE COURT:  Counsel make your appearance for the        08:30:1

9    record.                                                 08:30:2

10   MS. COON:  Good morning, Your Honor.  Laura Coon on      08:30:2

11   behalf of the United States.                            08:30:2

12   MS. DEAN:  Good morning, Your Honor.  Kerry Dean on      08:30:2

13   behalf of the United States.                            08:30:2

14   MR. SANDERS:  Good morning, Your Honor.  Cory Sanders    08:30:2

15   on behalf of the United States.                         08:30:3

16   MS. SCHWARTZMANN:  Katie Schwartzmann from the Southern  08:30:3

17   Poverty Law Center representing the plaintiff class.     08:30:3

18   MR. MATTHEWS:  Freeman Matthews representing Sheriff     08:30:3

19   Gusman.                                                 08:30:3

20   MR. ACURI:  Blake Arcuri representing Sheriff Gusman.    08:30:4

21   MR. ROSENBERG:  Good morning, Your Honor.  Harry        08:30:4

22   Rosenberg and Bryan Bowdler on behalf of the City of New  08:30:5

23   Orleans.                                                08:30:5

24        Your Honor, Ms. Williams and Mr. Capitelli are     08:30:5

25   arguing a Fifth Circuit Court of Appeals' argument on behalf of  08:30:5

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 5 of 350

Jones vs. Gusman 08.05.13 Funding Hearing                              5

1    the City, but will be joining us shortly.                          08:30:5

2              THE COURT:  Thank you.                                   08:30:5

3              On June 26, 2013, the Court entered an order            08:30:5

4    approving a Consent Judgment, an agreement between the plaintiff   08:31:0

5    class, consisting of all current and future inmates, intervenor   08:31:0

6    plaintiff, the United States of America and the sheriff of        08:31:0

7    Orleans Parish.  The Court found that the Consent Judgment was    08:31:0

8    the only way to ensure that Orleans Parish Prison conditions do   08:31:1

9    not violate the federal law, including the Constitution.          08:31:1

10             The Court's reasoning and the Consent Judgment          08:31:1

11   itself are available on the Eastern District of Louisiana's       08:31:1

12   website.                                                          08:31:2

13             The sheriff previously filed two third-party            08:31:2

14   complaints against the City of New Orleans, asserted that the     08:31:2

15   Court should order the City to pay the sheriff, quote:  The full  08:31:2

16   costs as determined by the Court of providing any perspective     08:31:2

17   relief, unquote, required by the Consent Judgment.                08:31:3

18             The Court has scheduled several funding hearings        08:31:3

19   to address the sheriff's third-party complaints.  The plaintiff   08:31:4

20   class, the United States of America, will remain a part of the    08:31:4

21   funding hearing process because of their strong interest in       08:31:4

22   ensuring that the Consent Judgment is faithfully implemented.     08:31:4

23             Prior funding hearing dates have focused on the         08:31:5

24   additional funding, if any, that the sheriff needs to maintain    08:31:5

25   conditions at OPP through the end of the fiscal year, which       08:31:5

Case 2:12-cv-00859-LMA-MBN   Document 544   Filed 08/20/13   Page 6 of 350

Jones vs. Gusman 08.05.13 Funding Hearing                6

1   coincides with the calender year.  Today's hearing is focused on      08:32:0

2   the additional funding, if any, that the sheriff needs to             08:32:0

3   implement the changes set forth in the Consent Judgment for the       08:32:0

4   remainder of the year.  As no one contends that the new jail          08:32:0

5   facility will be opened by the end of this year, the evidence         08:32:1

6   presented will reflect the costs associated with bringing             08:32:1

7   current OPP facilities into compliance with the Consent               08:32:2

8   Judgment.                                                             08:32:2

9            Only after considering all the evidence presented            08:32:2

10  in the past hearings and this week's hearings will the Court          08:32:2

11  enter a judgment as to the amount of money, if any, that the          08:32:2

12  City of New Orleans is obligated to pay to implement the Consent      08:32:3

13  Judgment for the remainder of the year.                               08:32:3

14           All the parties have agreed to this approach, and            08:32:3

15  it is the Court's hope that the normal budgetary process will         08:32:4

16  resolve any disputes regarding funding for 2014.  If it does          08:32:4

17  not, the Court and a monitor, once appointed, will assist in the      08:32:4

18  resolution of such disputes.                                          08:32:5

19           To that end, a follow-up hearing has been                    08:32:5

20  scheduled for Monday, September 30, 2013 at 8:30 a.m. to address      08:32:5

21  the future costs of implementing the Consent Judgment.                08:33:0

22           Although today's hearing is focused on this year,            08:33:0

23  the Court will not automatically exclude evidence relevant to         08:33:0

24  more long-term determinations.  Such evidence will likely prove       08:33:0

25  helpful to the parties, and the Court will consider future            08:33:1

1    funding issues.                                                    08:33:1

2              Each party will have ten in which to present an          08:33:1

3    opening statement.  We'll begin with the sheriff.                  08:33:2

4         MR. ROSENBERG:  Before we begin, would the Court hear         08:33:2

5    me a moment, please?                                               08:33:2

6              Your Honor, the City of New Orleans filed a Notice       08:33:2

7    of Appeal on July 31st of this year with respect to the June 6th   08:33:3

8    order by the Court.  And, with all due respect, Your Honor, we     08:33:3

9    would object to the Court exercising any subject matter            08:33:4

10   jurisdiction after that Notice of Appeal was filed because the     08:33:4

11   appeal deprives the Court of subject matter jurisdiction.          08:33:5

12        THE COURT:  Did you brief that?                               08:33:5

13        MR. ROSENBERG:  No, Your Honor.  We've not briefed it.        08:33:5

14        THE COURT:  Why wouldn't you do that?  Why would you          08:33:5

15   wait until the morning of the hearing to bring up that legal       08:33:5

16   question?                                                          08:34:0

17        MR. ROSENBERG:  Well, Your Honor, there have been lot         08:34:0

18   of others issues that have occurred on the spur of the moment.     08:34:0

19   We thought the Court would understand that the Notice of Appeal    08:34:0

20   deprived the Court of jurisdiction.                                08:34:0

21              We're constrained to raise it now.  If I failed to      08:34:1

22   brief it, Your Honor, I'm remiss.  But we certainly can provide    08:34:1

23   the Court with some citations that support the absence of          08:34:1

24   jurisdiction, Your Honor.                                          08:34:2

25        THE COURT:  Well, you are remiss.  As far as I'm              08:34:2

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 8 of 350

Jones vs. Gusman 08.05.13 Funding Hearing                    8

1    concerned, bringing it up at this late date shows bad faith on            08:34:2

2    the part of the City of the New Orleans.  We're going to go               08:34:3

3    forwarded today.                                                          08:34:3

4              You knew, just like every other lawyer here, that              08:34:3

5    we're going forward with this hearing.  We're been talking about          08:34:3

6    exhibits, we've been talking about opening statements, we've              08:34:3

7    been talking about who's going to testify.  And, for you to               08:34:4

8    bring this up now, is very questionable.                                  08:34:4

9              So the objection is overruled.  Let's go forward               08:34:4

10   with the opening statements.                                              08:34:4

11             MR. ROSENBERG:  Okay, Your Honor.  As long as my               08:34:4

12   objection remains on the record.                                          08:34:5

13             THE COURT:  Why wouldn't it remain on the record?              08:34:5

14             MR. ROSENBERG:  Because, Your Honor, I understand you          08:34:5

15   said it's overruled, but I don't --                                      08:34:5

16             THE COURT:  Your objection is on the record because the        08:34:5

17   court reporter has it.                                                    08:35:0

18             Now sit down.  Sit down.                                       08:35:0

19             MR. ROSENBERG:  I respect the Court's order, Your             08:35:0

20   Honor.                                                                    08:35:0

21             THE COURT:  Sit down.                                          08:35:0

22             Let's begin with the sheriff.                                  08:35:0

23             MR. ACURI:  Thank you, Your Honor.                             08:35:0

24             We're here this morning to discuss what the                    08:35:1

25   implementation of the Consent Judgment that this Court entered           08:35:1

Case 2:12-cv-00859-LMA-MBN   Document 544   Filed 08/20/13   Page 9 of 350

Jones vs. Gusman 08.05.13 Funding Hearing          9

1    is going to cost.                                                    08:35:1

2              You're going to hear expert testimony, experts            08:35:2

3    from all the parties.  They're going to tell you unanimously        08:35:2

4    that staffing is what comprises the vast majority of those          08:35:2

5    costs.                                                              08:35:3

6              The staffing levels at OPP are critical and               08:35:3

7    they must be increased immediately.                                 08:35:3

8              Now, you're going to hear that, last year, at the         08:35:3

9    time when the sheriff, the Department of Justice and the City       08:35:4

10   were meeting at our office to discuss possible resolution of the    08:35:4

11   Consent Decree, the City asked the sheriff to prepare a list of     08:35:4

12   all the posts that needed to be filled at OPP.  Chief Ursin         08:35:5

13   ordered Colonel Laughlin, who is the assistant chief of security    08:35:5

14   and has been in the department for 22 years, has worked in every    08:36:0

15   one of the facilities, to go through and compile post-by-post of    08:36:0

16   every sport that exists within the jail that needs to have a        08:36:0

17   deputy staffed at it.                                               08:36:0

18             He did that.  Counted the jail security staff and         08:36:1

19   all the jail deputies in the rank, the transportation deputies      08:36:1

20   in the rank and the kitchen deputies in the rank.                   08:36:1

21             At that time, the sheriff had approximately 440           08:36:2

22   jail security staff.                                                08:36:2

23             It was included that there were an additional 330         08:36:2

24   posts which remained unfilled in the jail that needed to be         08:36:3

25   filled to comply with the Consent Judgment.                         08:36:3

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 10 of 350

Jones vs. Gusman 08.05.13 Funding Hearing                10

1          Since that time, in July of 2012, the sheriff has          08:36:3

2   lost 65 jail security staff.  He's operating the same number of   08:36:3

3   facilities and he has the name number of inmates.                 08:36:4

4          Now, the expert numbers vary on how many staff are         08:36:4

5   needed for the sheriff to comply with the Consent Judgment, but   08:36:5

6   they're all a very substantial increase in staff.  And the        08:36:5

7   numbers are conclusive that we shouldn't wait; we should begin    08:36:5

8   to hire immediately.  Because even Dr. Austin, who compiled a     08:37:0

9   staff report which doesn't address these current facilities, or   08:37:0

10  doesn't appear to, agreed that at least 130 additional staff      08:37:0

11  would be needed to operate the new facility.                      08:37:0

12         Now, Chief Ursin is going to take the stand and            08:37:1

13  testify as to the challenges of hiring and retaining the staff    08:37:1

14  at OPP's current situation, as well as other costs associated     08:37:1

15  with the Decree.                                                  08:37:2

16         He's going to tell you that deputies are paid             08:37:2

17  $9.69 an hour to work at the jail.  That's a starting salary of   08:37:2

18  $21 thousand; and, after they become post-certified, receive an   08:37:2

19  additional $5,000 per year that's paid by the state of           08:37:3

20  Louisiana.  That's the same pay that's given to NOPD and all the  08:37:3

21  other law enforcement officers in that state.                     08:37:4

22         Chief Ursin is going to tell you that, at that            08:37:4

23  salary, he cannot attract deputies, he cannot retain deputies,    08:37:4

24  and that this department has become a farming ground for other    08:37:4

25  departments in the region.  He's going to tell you that he        08:37:4

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 11 of 350

Jones vs. Gusman 08.05.13 Funding Hearing

11

1    routinely loses deputies to the fast-food industry in New                08:37:5

2    Orleans because they're able to offer better pay.                        08:37:5

3                   Chief Ursin is going to tell you that the sheriff          08:37:5

4    has developed an aggressive hiring plan.  He's already prepared           08:38:0

5    advertisements to advertise in all the regional papers,                   08:38:0

6    including in the North Shore and the surrounding parishes.                08:38:0

7    They're going to go to colleges and job fairs to begin to                08:38:1

8    attract deputies.  But that a base salary of $36 thousand is             08:38:1

9    what's required to be able to comply with the Consent Judgment,          08:38:2

10   retain the staff and attract new staff.                                   08:38:2

11                  He thinks that, by the end of the year, he could           08:38:2

12   have 60 additional staff hired and trained if that's the new             08:38:2

13   salary.                                                                   08:38:2

14                  He's going to tell you, he's taken additional              08:38:2

15   steps to implement the Consent Decree, such as the internet              08:38:3

16   reporting system; the early warning system, which the jail              08:38:3

17   didn't even have before; an electronic grievance system, which          08:38:3

18   is in all the facilities except for OPP.  It can't be put in             08:38:4

19   there because of logistics, but it will be present in the new            08:38:4

20   jail.  And that's a bid process for a deputy watch core system,          08:38:4

21   which is going to monitor that deputies go up and down the tiers         08:38:5

22   and track their movement electronically, that bid process is             08:38:5

23   almost complete and we believe the high bidder has a system              08:39:0

24   which can be removed from this jail eventually and be placed in          08:39:0

25   the new jail, so it's cost-efficient.                                     08:39:0

1    He's going to tell you about additional costs that    08:39:0

2    are required associated with training; such that, when we pull    08:39:0

3    our current deputies off of the tiers to be able to train them,    08:39:0

4    overtime is going to be needed to fill those spots.    08:39:1

5    He's also going to tell you that the jail is    08:39:1

6    desperately in need of a jail management system, and I think the    08:39:1

7    Department of Justice is going to agree, as our current one    08:39:2

8    dates back to the mid-1980s and is woefully inadequate to be    08:39:2

9    able to adequately report and track the inmates' locations    08:39:3

10   within the jail.    08:39:3

11   He's going to tell you that he has a new jail    08:39:3

12   transition plan in place, that he's got several plans to be able    08:39:3

13   to train both at direct observation facilities across the    08:39:3

14   country that are considered the gold standard and that the ACA    08:39:4

15   is going to come in and provide additional training.  They're    08:39:4

16   working with the sheriff right now to get a program in place.    08:39:4

17   You're going to hear also from medical experts    08:39:5

18   that are going to testify that the $3.2 million lump sum    08:39:5

19   payment, which was last set over a decade ago, is woefully    08:39:5

20   inadequate to provide costs of medical care to all the inmates    08:40:0

21   at the jail.  Dr. Inglese, the former medical director at OPP    08:40:0

22   and the current medical director at St. Tammany -- the NCCHC has    08:40:0

23   written an article about him indicating that while at OPP he had    08:40:1

24   obtained the Holy Grail of health care, which is improved    08:40:1

25   patient care at reduced costs -- he's going to tell you that    08:40:1

1    OPP's medical budget rivals that of facilities' medical budgets          08:40:1

2    back in 1998.          08:40:2

3              He's going to testify as to what positions are          08:40:2

4    needed and what changes and practice will require additional          08:40:2

5    funding.          08:40:2

6              And you're going to hear that Dr. Gage, the          08:40:3

7    plaintiff's and DOJ's expert, largely agrees with his analysis.          08:40:3

8              Now, from Dr. Austin's report that he prepared for          08:40:3

9    the City, you'll note that he does not appear to talk about the          08:40:3

10   staffing in the current facilities.  And I'll submit to you that          08:40:4

11   this is more of what we've seen from the City throughout this          08:40:4

12   process, which is an intent to kick the can down the road and          08:40:4

13   only look at that new jail.  This should not be allowed.          08:40:5

14             I'll reiterate something that I raised in the          08:40:5

15   past.  The City's position throughout this has been to talk          08:40:5

16   about what money the sheriff is spending, that they're not          08:40:5

17   paying him.  They have not ever contested that the $23 a day is          08:41:0

18   enough to provide food, housing, clothing, mattresses and          08:41:0

19   security deputies for all their inmates.  That would not be          08:41:1

20   testified to by any expert, nor would any expert in the country          08:41:1

21   testify to that.          08:41:1

22             They have not provided any evidence that $3.2          08:41:1

23   million is sufficient to provide health care to all of their          08:41:2

24   inmates in 2013.          08:41:2

25             What the City's asking you to do is to ignore          08:41:3

Case 2:12-cv-00859-LMA-MBN   Document 544   Filed 08/20/13   Page 14 of 350

Jones vs. Gusman 08.05.13 Funding Hearing                    14

1   state law.  Their argument is that there's nothing that prevents                08:41:3

2   the sheriff from spending his funds on their inmates.  And,                      08:41:3

3   that's a great -- it's a very convenient argument.  Like there's                 08:41:4

4   nothing that prevents me from taking my pay check and giving it                  08:41:4

5   to the sheriff or for me from filling the pot holes that they                    08:41:4

6   won't fill in the street.  And that may work when broadening the                 08:41:5

7   sideline issue.  But, here, state law is clear that the City is                  08:41:5

8   obligated to pay 100 percent of the costs of housing its inmates                 08:41:5

9   and providing their medical care.  That's every cost associated                 08:42:0

10  with it.                                                                         08:42:0

11          So I'm going to ask you to take into consideration                       08:42:0

12  that these payments are not enough.  That you should consider                    08:42:1

13  what these payments are there to provide, and they are                           08:42:1

14  insufficient to provide those critical cost centers to care for                 08:42:1

15  these inmates.  And to take -- to give the respect it deserves                   08:42:2

16  to the City's argument that the sheriff has too many cars, as if                 08:42:2

17  the cars are only used for the jail.  As if the sheriff doesn't                  08:42:3

18  have the obligation under state law to serve every subpoena for                  08:42:3

19  civil district and criminal district court.  That he doesn't                     08:42:4

20  have a capeous division that is responsible for chasing down                     08:42:4

21  every inmate that Vira suggests to be released and doesn't                       08:42:4

22  return to court.  I want you to give that only what it deserves,                 08:42:5

23  Judge.                                                                           08:42:5

24          THE COURT:  Two minutes.                                                 08:42:5

25          MR. ACURI:  Again, the City's asking the Court to                        08:43:0

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 15 of 350

Jones vs. Gusman 08.05.13 Funding Hearing                15

1    ignore state law.  I'm simply asking the Court to listen to all    08:43:0

2    the evidence and to apply the law that the state of Louisiana    08:43:0

3    has set through statutes passed by the legislature, and that the    08:43:1

4    City be ordered to pay the entire cost of housing all of its    08:43:1

5    inmates under the terms of this Consent Judgment.    08:43:1

6              Thank you.    08:43:2

7         THE COURT:  Thank you.    08:43:2

8              Let me hear from the City.    08:43:2

9         MR. ROSENBERG:  Your Honor knows that we're proceeding    08:43:2

10   subject to our objection.    08:43:3

11        THE COURT:  I don't now how many times you have to    08:43:3

12   repeat that.  All right.    08:43:3

13        MR. ROSENBERG:  I have to make that record, Your Honor,    08:43:4

14   because the Department of Justice as we speak is arguing lack of    08:43:4

15   subject matter jurisdiction this morning in another City-related    08:43:4

16   case that they're pursuing.  So, if we don't -- I don't want to    08:43:4

17   have the Department of Justice suggest, when we're at the    08:43:5

18   appellate level, that subject matter jurisdiction has not been    08:43:5

19   raised.    08:44:0

20        THE COURT:  Did you not hear what I said before?    08:44:0

21        MR. ROSENBERG:  I did hear.    08:44:0

22        THE COURT:  Then all we need to talk about it is once.    08:44:0

23   Let's not belabor it; I understand.    08:44:0

24              Quite frankly, I'm not sure -- and I haven't    08:44:0

25   looked at it because it hasn't been briefed or brought up up to    08:44:0

1    this point -- I'm not sure that the City of New Orleans even has          08:44:1

2    a right to appeal because it wasn't a party to the Consent               08:44:1

3    Judgment.  But I don't know the answer to that.                          08:44:1

4           So let's move on to your opening statement, if you               08:44:2

5    can go ahead and do that.                                                08:44:2

6           MR. ROSENBERG:  I'm going to do that, Your Honor.                 08:44:2

7           Without a doubt, the Orleans Parish Prison is a                   08:44:2

8    component of the City's criminal justice system.                         08:44:2

9           As the Court heard from the sheriff's lips, he                    08:44:2

10   believes that OPP houses about 1,650 municipal inmates.  Though          08:44:3

11   even that number, Your Honor, is too high, as the evidence is            08:44:3

12   going to prove in this hearing.  And even his witnesses and              08:44:4

13   DOJ's witnesses use a 50 percent higher number than that 1,650.          08:44:4

14          The City has repeatedly stated its commitment to                  08:44:5

15   ensure that the prisoners are incarcerated in a minimal                  08:44:5

16   constitutional environment, and the City will respect this              08:45:0

17   Court's directive.                                                       08:45:0

18          But the City asks the Court not to turn its back                  08:45:0

19   on upon the 380,000 un-incarcerated residents who live and work         08:45:1

20   in the City.  Nor should the Court fail to consider protecting          08:45:1

21   the safety and welfare of tourists and businesses that are the          08:45:1

22   lifeblood of this City.  The City, like the Court, is mindful of        08:45:2

23   the need to strike an appropriate balance in the allocation of          08:45:2

24   the City's limited resources.                                           08:45:2

25          During this hearing, the Court will receive                      08:45:3

1    additional evidence about the financial strains the City is            08:45:3

2    operating under.  Furloughs have already been necessitated.            08:45:3

3    Essential services to businesses and families' have already been       08:45:4

4    cut to the bone.  Presumably recognizing the City's lack of            08:45:4

5    needed funds, the public would expect Sheriff Gusman, who              08:45:4

6    opposed additional funds to the sheriff's office when he was the       08:45:5

7    chief administrative officer, to at least be willing to work in        08:45:5

8    tandem with the City.  Regrettably, that has not occurred.             08:45:5

9    Instead, Sheriff Gusman has embraced a parochial and fairly            08:46:0

10   myopic view of taxpayer dollars.  He and his team focus                08:46:0

11   regularly on maximizing the amount of money he hopes to receive        08:46:0

12   from the City.  That is not in the best interest of the public         08:46:1

13   he agreed to serve.                                                    08:46:1

14          Despite professing he operated a safe and                       08:46:1

15   constitutional jail over the last eight years, he endorsed a           08:46:2

16   decree that inevitably requires a paradigm shift in the way OPP        08:46:2

17   has operated and is premised upon his prior oversight of an            08:46:3

18   unconstitutional facility.                                             08:46:3

19          This Court issued Factual Findings that OPP was                 08:46:3

20   operating in an unsafe, unconstitutional, unacceptable manner.         08:46:3

21   Instead of accepting responsibility or even partial                    08:46:4

22   responsibility for these institutional shortcomings, he chooses        08:46:4

23   to ask the City to give him tens of millions of dollars in            08:46:5

24   addition to the $30 million already provided by the City each         08:46:5

25   year.                                                                  08:46:5

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 18 of 350

Jones vs. Gusman 08.05.13 Funding Hearing          18

1    This apparent request to double the City's payment

2  comes from the same person the plaintiff's expert witness

3  criticized as a hands-off manager.  Among other criticisms,

4  Dr. Schwartz, as Your Honor remembers, in April, a correctional

5  expert, concluded that the jail lacked effective principal

6  leadership.  Those were the very same facts that forced the City

7  to file a motion for the appointment of a receiver.

8    The sheriff's rejoinder has been the same:  Do not

9  be concerned about his management, do not be concerned about

10  waste, do not be concerned about lack of transparency.  Rather,

11  as almost a character in Jerry McGuire clamored, he says:  Just

12  show me the money and give me the money.  That's not a proper

13  course.

14    The people in the City of New Orleans, Your Honor,

15  live within their means.  The City lives within its means.  It

16  appears that only the sheriff believes that there is a money

17  tree in the backyard of the City.  And that imaginary tree just

18  does not exist.  The City's resources are limited, Your Honor.

19  And you know that.

20    The Court will hear testimony from a number of

21  witnesses; but, most of them, like the DOJ, do not even pause to

22  consider the consequences of bloated proposals.  Simply, they do

23  not even address the damaging affect to New Orleanians.

24    In contrast, the City's expert, Jim Austin, has

25  recognized the need to satisfy the terms of the Consent Decree

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 19 of 350

Jones vs. Gusman 08.05.13 Funding Hearing                19

1    while not pushing the City over the financial cliff.  Dr. Austin    08:48:3

2    will explain to this Court that reduction of inmate population    08:48:3

3    is the central proposition which can be quickly achieved to    08:48:4

4    accelerate implementation of this Court's directive.    08:48:4

5            Equally as important, the Court will receive    08:48:4

6    testimony from City representatives recounting the City's    08:48:5

7    efforts to reduce jail population, which has been successful,    08:48:5

8    and the blow to the City that it will sustain if it must    08:48:5

9    singularly finance the hefty sums the plaintiffs and the sheriff    08:49:0

10   now propose.  Such an approach, as the Court knows, would cause    08:49:0

11   the NOPD to cancel recruiting classes, among other things; would    08:49:1

12   result in fewer police officers on the street; would result in    08:49:1

13   fewer fire departments; would result in time of emergency    08:49:2

14   services increased; would eliminate valuable NORD programs to    08:49:2

15   the children of this City; would undercut the work of building    08:49:3

16   inspectors and reduce sanitation efforts throughout the City,    08:49:3

17   just to name a few.    08:49:3

18           In contrast, the sheriff contends he should not be    08:49:3

19   required to spend nearly $3 million of net revenue from the    08:49:4

20   Civil Division operations because that division is supposedly    08:49:4

21   distinct from the Criminal Division.    08:49:5

22           Judge, there is not a person in this courtroom who    08:49:5

23   will not be affected if the Court decides to impose a hefty    08:49:5

24   financial burned only upon the City, unless that person lives in    08:50:0

25   another parish, another state or happens to live in the District    08:50:0

1    of Columbia.                                                          08:50:0

2              The sheriff, nonetheless, presses his theory that,          08:50:0

3    though there's no legal segregation between the Civil Division        08:50:1

4    and the Criminal Division, it's all one department since May of       08:50:1

5    2010, as the sheriff's outside auditor and the sheriff's inside       08:50:1

6    auditor have recognized, that he somehow can treat that money         08:50:2

7    separately.  He didn't treat it separately in 2010 when he got        08:50:2

8    $3.6 million.  He didn't treat it separately when he had the          08:50:3

9    forgiveness of a $22 million loan.  He hasn't treated it              08:50:3

10   separately when he's gotten over $16 million in commissions and       08:50:3

11   fees from the Civil Division.  That money is part and parcel of       08:50:4

12   one single department, Your Honor.                                    08:50:4

13             The sheriff's suggestion is reminiscent of                  08:50:5

14   Alexandre Dumas, who I know the Court is familiar with, because       08:50:5

15   he wrote *The Three Musketeers*.  And Mr. Dumas is known for his      08:51:0

16   quote over 200 years ago as saying:  Business, quite simple,          08:51:0

17   it's other people's money.                                           08:51:1

18             Well, that expression has no place in municipal             08:51:1

19   governance, as the City respectfully submits, Your Honor.  The        08:51:1

20   money, whether it's in the sheriff's coffers or the City's           08:51:1

21   account, belongs to the public, and the taxpayers are entitled        08:51:2

22   to have an accounting and have that money spent wisely.               08:51:2

23             If additional funds are needed to implement the            08:51:2

24   Consent Decree that the sheriff signed, he signed it.  He must        08:51:3

25   contribute to this process.  That means the OPSO must allocate,       08:51:3

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 21 of 350

Jones vs. Gusman 08.05.13 Funding Hearing                    21

1    not hoard, its net revenue.  The OPSO must seek means to raise                08:51:4

2    needed funds.  And, most importantly, the OPSO, the sheriff,                  08:51:4

3    must scrutinize, prioritize and reduce spending across the                    08:51:5

4    spectrum, from record-setting legal fees, high-priced computer                08:51:5

5    technology, the reduction of take-home vehicles and                           08:52:0

6    extracurricular activities that are simply not part of the                    08:52:0

7    sheriff's mission.                                                            08:52:1

8              If the Court concludes that the OPSO needs                          08:52:1

9    additional funds to implement the Consent Decree, we                          08:52:1

10   respectfully submit Sheriff Gusman is obligated and legally must              08:52:1

11   share a portion of that financial burden.  Otherwise, the Court               08:52:2

12   will approve blind spending to the taxpayers' detriment and will              08:52:2

13   condone a decade of mismanagement that actually led to this                   08:52:3

14   Consent Decree.                                                               08:52:3

15             Thank you, Your Honor.                                              08:52:3

16        THE COURT:  All right.  Who is next?                                     08:52:3

17        MS. COON:  I am, Your Honor.                                             08:52:4

18             On June 6th, this Court ordered comprehensive                       08:52:4

19   reform of the dangerous and unconstitutional conditions at the                08:52:5

20   Orleans Parish Prison.                                                        08:52:5

21             In its order, the Court found that the Consent                      08:52:5

22   Judgment is the only way to overcome the years of stagnation                  08:52:5

23   that have permitted OPP to remain an indelible stain on the                   08:53:0

24   community and it will ensure that OPP inmates are treated in a                08:53:0

25   manner that does not offend contemporary notions of human                    08:53:1

1    decency.                                                              08:53:1

2                This community is suffering from a public safety          08:53:1

3    crisis at OPP because basic investments in staffing, facilities       08:53:2

4    and operations have been lacking for decades.  These                  08:53:2

5    deficiencies have harmed and continue to harm prisoners, their        08:53:2

6    families, corrections staff and the community.                        08:53:2

7                There is no dispute that an extreme shortage of           08:53:3

8    corrections, medical and mental health staff is placing              08:53:3

9    detainees in an unreasonable risk of assault, disease, suicide        08:53:3

10   and mental decompensation.                                            08:53:4

11               The lack of officer supervision codified by               08:53:4

12   understaffing is exacerbated by the mixing of aggressors and          08:53:5

13   vulnerable inmates through inadequate classing and housing            08:53:5

14   separation.                                                           08:53:5

15               There is no dispute that the current OPP jail             08:53:5

16   facilities need over 300 more deputies beyond the 385 or so           08:54:0

17   deputies OPP currently has.  The sheriff, the City and the            08:54:0

18   plaintiffs all conducted expert staffing analyses.  Although the      08:54:1

19   precise building recommendations varied somewhat, all of the          08:54:2

20   experts recommend between 700 and 800 deputies for the current        08:54:2

21   jail facilities, which currently have 385.                            08:54:2

22               There is also no dispute that staffing is the             08:54:3

23   largest cost-driver of the Consent Judgment.  And, in order to        08:54:3

24   achieve adequate staffing, the jail will need to recruit and          08:54:3

25   retain a significant number of qualified staff.  This will take       08:54:4

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 23 of 350

Jones vs. Gusman 08.05.13 Funding Hearing                    23

1    some time.  OPP can't fill the many empty posts overnight.    08:54:4

2    Rather, it will take some time to recruit, hire and train     08:54:5

3    deputies.  That's why the process needs to start immediately.  08:54:5

4    Otherwise, it will be impossible to staff even just the        08:54:5

5    remaining facilities when the new jail opens.                  08:55:0

6              The monitor also needs to get onboard to assist     08:55:0

7    with hiring and training plans.                                08:55:0

8              And, practically speaking, recruiting qualified     08:55:0

9    officers for OPP is likely to require a more competitive salary 08:55:1

10   than the current $9.69 an hour.                                08:55:1

11             The horrific conditions at the jail also need to    08:55:2

12   change in order to recruit qualified candidates.  The facilities 08:55:2

13   are dangerously unsanitary.  Officers lack clear policies and  08:55:2

14   training to enable them to perform their jobs.                 08:55:3

15             There are insufficient accountability mechanisms    08:55:3

16   to identify and address officers who violate laws or policies. 08:55:3

17   As a result, staffing needs include not only significant numbers 08:55:4

18   of line officers but also staff to conduct classification,     08:55:4

19   training, investigations, supervision of line officers and     08:55:5

20   implementation of the early warning system called for by the   08:55:5

21   Consent Judgment.  These are addressed in the expert reports the 08:56:0

22   parties submitted.                                             08:56:0

23             The parties also addressed the funding needed to    08:56:0

24   bring medical and mental health care up to constitutional      08:56:0

25   requirements.  The sheriff and the plaintiffs concur with the  08:56:1

1    approximate amount of the costs for medical and mental health

2    staffing, medications and equipment.  The City does not dispute

3    these costs, but instead argues that the costs should be

4    calculated based not on the over 2,000 inmates currently at the

5    facility but on the 1,600 inmates that should be at the facility

6    if population reductions could be accomplished through Pretrial

7    Services, the actions of state court judges and removal of DOC

8    inmates.

9            THE COURT:  And that argument is a nonstarter, because

10   obviously we're trying at this point to get this prison through

11   the end of the year and maintaining hopefully constitutional

12   standards.

13           MS. COON:  Yes, Your Honor.  The plaintiffs vigorously

14   support that.

15               And, although the plaintiffs also agree that the

16   City should vigorously produce population reduction efforts to

17   address over-incarceration and minimize jail expenses, it would

18   be poor planning to assume that reduction will happen.

19   Especially, that the reduction would happen by September 1,

20   2013, as the City contends.  Particularly since the City's own

21   expert notes that the population has remained fairly stable for

22   the last 12 months.

23               The plaintiffs encourage the City and the sheriff

24   to formulate and implement a concrete plan for population

25   reduction that involves all the necessary players, including the

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 25 of 350

Jones vs. Gusman 08.05.13 Funding Hearing                        25

1  judges.                                                           08:57:3

2            But because OPP is currently in crisis with regard      08:57:3

3  to staffing, supervision, training and physical plant            08:57:3

4  deficiencies, resources need to be allocated now.  For example,  08:57:4

5  the residential mental health unit cannot continue to house      08:57:4

6  inmates in the current atrocious conditions.  Even if the new    08:57:5

7  jail under construction is able to be modified to add medical    08:57:5

8  and mental health facilities and suicide observation cells,      08:57:5

9  we're months away from that.  When peoples' lives are at stake,  08:58:0

10  that's too long.                                                08:58:0

11            Swift action is within the City's and the             08:58:0

12  sheriff's powers.  As the Court will learn this week, the City  08:58:1

13  is sitting on $61 million of undelivered FEMA obligations from  08:58:1

14  Katrina's destruction of or damage to the jail facilities, and  08:58:1

15  the sheriff is sitting on $57 million of that FEMA money.  So    08:58:2

16  there's absolutely no reason to continue to subject inmates and  08:58:2

17  staff to the dangerous and unhealthy conditions they have been  08:58:3

18  living and working in for at least the last eight years.  Any    08:58:3

19  more delay in addressing the unconscionable conditions of the    08:58:3

20  jail is unexcusable.  Even under the best-case scenario, if a    08:58:4

21  new jail were to open tomorrow and some facilities could be      08:58:4

22  closed, there's no dispute that at least 130 more deputies are   08:58:4

23  needed.  That's undisputed.  As is the fact that federal money   08:58:5

24  is available as we speak for jail capital projects or jail       08:58:5

25  capital improvements.  There's no real dispute about the total   08:59:0

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 26 of 350

Jones vs. Gusman 08.05.13 Funding Hearing                    26

 1    level of resources needed immediately to address the horrendous          08:59:0

 2    conditions at the jail.                                                  08:59:0

 3              To the extent that the City argues that better                 08:59:0

 4    accounting of the jail's finances is needed, we agree.  The             08:59:1

 5    Consent Judgment already requires a detailed budget, data                08:59:1

 6    reports and financial documents from the sheriff each year.             08:59:1

 7              In addition, the Office of the Inspector General               08:59:2

 8    also recommended clear identification and tracking of funding            08:59:2

 9    for jail expenses.  We agree with that as well.                         08:59:2

10              The path forward is clear:  The parties generally             08:59:3

11    agree on the resources needed to proceed, at least with respect         08:59:3

12    to the initial funding required for the current fiscal year             08:59:4

13    while the new jail remains under construction.  And that's all          08:59:4

14    the Court needs to decide at this point in order to trigger             08:59:4

15    Consent Judgment implementation and start the long overdue              08:59:5

16    process of reforming the unconstitutional jail conditions that          08:59:5

17    have plagued the parish for far too long.                               08:59:5

18              Thank you, Your Honor.                                        09:00:0

19         MS. SCHWARTZMANN:  We join with the United States, Your            09:00:0

20    Honor.                                                                  09:00:0

21         THE COURT:  All right.  Thank you.                                 09:00:0

22              Let's begin with the testimony.  Sheriff, you're             09:00:0

23    first up; is that right?                                                09:00:1

24         MR. ACURI:  Yes, Your Honor.                                       09:00:1

25         MR. ROSENBERG:  In case it wasn't clear in the April              09:00:1

```
 1   hearing, we've asked for a sequestration of all fact witness.       09:00:1

 2            THE COURT:  Other than expert witness?                     09:00:2

 3            MR. ROSENBERG:  Of course, Your Honor.                     09:00:2

 4            THE COURT:  Are there any fact witnesses present in the    09:00:2

 5   courtroom that are not expert witnesses?                            09:00:2

 6                 If there are any fact witnesses, please, counsel,     09:00:2

 7   advise those witnesses that the Court has ordered those             09:00:3

 8   witnesses sequestered.  They cannot discuss their testimony         09:00:3

 9   among each other or with anyone else.  Of course, they can          09:00:4

10   discuss it with counsel for any of the parties.                     09:00:4

11                 All right, let's go.                                  09:00:4

12            MR. ACURI:  Sheriff would call Chief Deputy Gerry          09:00:4

13   Ursin.                                                              09:00:4

14                 GERALD URSIN, Being first duly sworn, testified as    09:00:5

15   follows:                                                            09:01:2

16            CASE MANAGER:  State your name and spell it for the        09:01:2

17   record.                                                             09:01:2

18            THE WITNESS:  Gerald G-E-R-A-L-D Ursin U-R-S-I-N.          09:01:2

19                      DIRECT EXAMINATION                               09:01:3

20   BY MR. ACURI:                                                       09:01:3

21   Q   Chief Ursin, can you state where you're employed for the       09:01:3

22   record, please.                                                     09:01:3

23   A   Orleans Parish Sheriff's Office.                                09:01:3

24   Q   What's your position there?                                     09:01:4

25   A   I'm chief deputy.                                               09:01:4
```

Jones vs. Gusman 08.05.13 Funding Hearing                    28

```
 1   Q   What are your duties as chief deputy?                      09:01:4

 2   A   I would reference it as like a chief executive officer.   09:01:4

 3   Q   How long have you held that position?                     09:01:5

 4   A   Since November of '11.                                    09:01:5

 5   Q   And who was your predecessor in that position?            09:01:5

 6   A   Chief William Sharp.                                      09:02:0

 7   Q   How long have you been with the sheriff's office, Chief?  09:02:0

 8   A   About six years.                                          09:02:0

 9   Q   And how long have you been employed in law enforcement?   09:02:0

10   A   About 35 years.                                           09:02:1

11   Q   What agencies have you worked for?                        09:02:1

12   A   I worked for the NOPD for about 28 years.  I retired from 09:02:1

13   there.                                                        09:02:1

14              And then I also worked for the Jefferson Parish    09:02:2

15   District Attorney's Office.                                   09:02:2

16   Q   Chief, have you read the Consent Judgment that was entered 09:02:2

17   by the Court in June?                                         09:02:3

18   A   Yes, sir.  Several times.                                 09:02:3

19   Q   And could you tell the Court, when did the OPSO begin     09:02:3

20   implementing provisions from the Consent Judgment?           09:02:4

21   A   We actually started prior to it being signed.  Because of 09:02:4

22   the different drafts that were made, the sheriff knew that we 09:02:4

23   would have to do some changes, and one of those changes was the 09:02:5

24   classification system.                                       09:02:5

25   Q   And could you tell the Court how the classification system 09:02:5
```

1  worked before?                                                    09:03:0

2  A   It was pretty much bond-driven.  Based on the value of your   09:03:0

3  bone or the bond that was set drove -- it looked at your charges  09:03:0

4  as well, but it was pretty much bond-driven.                      09:03:1

5  Q   How does it work now?                                         09:03:1

6  A   Now, we take an account obviously of the bonding charges,     09:03:1

7  but we look at your past history within if you've been in OPP,    09:03:1

8  we look at your criminal history nationwide.  We have             09:03:2

9  questionnaires that we ask which would identify you maybe as a    09:03:3

10  potential victim, potential predator, those things.              09:03:3

11  Q   And has at that system been validated yet?                   09:03:3

12  A   No, sir.  It has not.                                        09:03:4

13  Q   Why not?                                                     09:03:4

14  A   Well, to get a true validation, I think best practice would  09:03:4

15  say that you would need to run that system for ten months to a   09:03:5

16  year.                                                            09:03:5

17          Since we created it in-house, we have been               09:03:5

18  constantly been tweaking it.  But I think now we're on a path to 09:03:5

19  move towards some kind of validation.                            09:04:0

20          THE COURT:  Validation by whom?                          09:04:0

21          THE WITNESS:  We'll probably bring in the American       09:04:0

22  Correctional Association.                                        09:04:0

23          THE COURT:  Have you hired any interpreters to assist    09:04:0

24  with interpreting?                                               09:04:1

25          THE WITNESS:  No, sir.  Not yet.  We've reached out to   09:04:1

```
1   our purchasing agent to look at different contractors that we      09:04:1

2   could bring in.                                                    09:04:2

3           One that I liked was that we could call 24/7, they         09:04:2

4   did 12 languages.                                                  09:04:2

5           THE COURT:  But there's nobody yet, is what you're         09:04:3

6   saying?                                                            09:04:3

7           THE WITNESS:  Nor, sir.  We are still researching it.      09:04:3

8   BY MR. ACURI:                                                      09:04:3

9   Q   Chief, what's going to be the most costly part of             09:04:3

10  implementing the Consent Judgment?                                 09:04:4

11  A   Manpower.                                                      09:04:4

12  Q   Is the manpower right now adequate in the facilities?         09:04:4

13  A   No, sir.                                                       09:04:4

14          MR. ROSENBERG:  Your Honor, I'm sorry, it's a little       09:04:5

15  late.  But the chief is now providing expert testimony.  There's  09:04:5

16  been no foundation, Your Honor; he's just providing opinion        09:05:0

17  testimony.  They have experts to provide that type of testimony    09:05:0

18  but it's not Chief Ursin.                                          09:05:0

19          THE COURT:  Do you want to respond?                        09:05:0

20          MR. ACURI:  Judge, I'll lay a foundation for him to be     09:05:1

21  able to respond in this format.                                    09:05:1

22          THE COURT:  He's the chief deputy as well.  He's very      09:05:1

23  familiar with the budget, I assume, and the staffing at the        09:05:1

24  Orleans Parish Sheriff's Office.                                   09:05:2

25          Chief, is that correct?                                    09:05:2
```

1              THE WITNESS:  Yes.                                09:05:2

2              THE COURT:  Objection is overruled.               09:05:2

3                   Go ahead.                                    09:05:2

4    BY MR. ACURI:                                               09:05:2

5    Q   Chief, are you familiar with the layout of all of our  09:05:2

6    current facilities?                                         09:05:3

7    A    Yes.                                                   09:05:3

8    Q   Are you familiar with all of our posts on there?       09:05:3

9    A    I would think that I have a good handle on all the necessary  09:05:3

10   posts that we would need.                                  09:05:3

11   Q   How many security deputies to we currently have in the 09:05:3

12   jails?                                                      09:05:4

13   A   About 440.                                             09:05:4

14   Q   Is that right now, or is that at the time of Colonel    09:05:4

15   Laughlin's report?                                         09:05:4

16             MR. ROSENBERG:  Again, Your Honor, there's been no 09:05:5

17   foundation.  Colonel Laughlin's report is not in evidence.  I'd 09:05:5

18   object to lack of foundation.                              09:05:5

19             THE COURT:  Overruled.                           09:05:5

20                  Go ahead.                                   09:05:5

21   BY MR. ACURI:                                               09:05:5

22   A   When that report was done in, I believe, '12, we were at 09:06:0

23   440.  We're now at 385, 390.                              09:06:0

24   Q   When we say security deputies, what employees do you include 09:06:0

25   in that?                                                   09:06:1

1   A   In our organization, that would be obviously the jail    09:06:1

2   employees assigned to the different buildings.  It also would be    09:06:1

3   the kitchen.  It also would be transportation.  And we also have    09:06:1

4   some security assigned to medical.    09:06:2

5   Q   And does that include the ranking officers as well as    09:06:2

6   deputies?    09:06:2

7   A   Yes.    09:06:3

8   Q   For your department to comply with the Consent Decree, are    09:06:3

9   you going to need to fill those remaining posts?    09:06:4

10  A   Yes, sir.    09:06:4

11  Q   Chief, do you have a surplus of deputies in some area that    09:06:4

12  we don't know about that we could just move to the jail today?    09:06:5

13  A   I wish we did.    09:06:5

14          Because of the shortage, I would say about 20    09:06:5

15  months ago or so, the sheriff made a decision and we were taking    09:06:5

16  -- we've stripped from our administrative positions any that we    09:07:0

17  could.  Those that remain that are certified to go into the    09:07:0

18  jail, we're pulling them one day week.  So they are doing 32    09:07:1

19  hours basically of their administrative duties, one day in the    09:07:1

20  jail.    09:07:1

21          In March of -- I think it was March of 2012, we    09:07:1

22  went on a furlough for non-secured personnel in the jail.  So we    09:07:2

23  couldn't pull people two days a week then, because they get one    09:07:3

24  day every two weeks off without pay.  But, the other week, they    09:07:3

25  still go to the jail.    09:07:3

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 33 of 350

Jones vs. Gusman 08.05.13 Funding Hearing                 33

1   Q   Chief, are you able to retain the staff that you currently    09:07:3

2   have?                                                             09:07:4

3   A   Our attrition rate, I think, I is extreme.                    09:07:4

4           MR. ROSENBERG:  Your Honor, again, I'd object.  There's   09:07:4

5   been no foundation for these types of questions.                  09:07:5

6           THE COURT:  He's the chief deputy of the jail.  Why       09:07:5

7   wouldn't he know that?                                            09:07:5

8           MR. ROSENBERG:  Your Honor, I understand what his         09:07:5

9   position is.  But there's been no foundation as to why they're    09:07:5

10  leaving, when they're leaving, what was the reason for leaving.   09:08:0

11  There's nothing presented to the Court at all.                    09:08:0

12          THE COURT:  Overruled.                                    09:08:0

13              Go ahead.                                             09:08:0

14  BY MR. ACURI:                                                     09:08:0

15  Q   Chief, I'll ask it again:  Are you able to retain the         09:08:1

16  current staff that you have at the jail?                          09:08:1

17  A   We probably have a 30 percent rate of leaving.                09:08:1

18  Q   How much are deputies paid per hour?                          09:08:1

19  A   $9.69 when they come in the door.                             09:08:2

20          THE COURT:  You stated there was a 30 percent what        09:08:2

21  rate?                                                             09:08:2

22          THE WITNESS:  Leaving.  Attrition rate.                   09:08:2

23          THE COURT:  Are there any exit interviews?                09:08:3

24          THE WITNESS:  Yes.                                        09:08:3

25          THE COURT:  Any way to find out why they're leaving,      09:08:3

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 34 of 350

Jones vs. Gusman 08.05.13 Funding Hearing                    34

1    other than those dismissed for cause?                         09:08:3

2         THE WITNESS:  Yes, sir.  They're leaving -- believe it   09:08:3

3    or not, you know, a young person today doesn't worry about what 09:08:3

4    his benefits are going to be or what her benefits 30 years down 09:08:4

5    the road.  They're worried about what they can put on their   09:08:4

6    table for their family when this check comes in.  Many leave  09:08:4

7    because the dollar an hour, 9.69.  We lose people to McDonald's, 09:08:5

8    Burger King.  Fast food in general.                           09:09:0

9         And then, when we get them post-certified now and        09:09:0

10   go through the post-certifying academy, in a sense we're a     09:09:1

11   training ground, and then other parishes, Jefferson Parish, St. 09:09:1

12   Charles, St. John, will then take our employee that we've      09:09:1

13   invested the training in and bring them into their facility.   09:09:1

14   And, they can give them a two-week course and they're ready to 09:09:2

15   go, at a substantial increase in pay.                         09:09:2

16   BY MR. ACURI:                                                 09:09:3

17   Q   Do you know what that $9.69 works out to roughly per year? 09:09:3

18   A   About $21 thousand.                                       09:09:3

19   Q   And do they get bump in their pay after they're           09:09:3

20   post-certified?                                               09:09:4

21   A   Yes.  They get state pay, which is $500 a month.  And that's 09:09:4

22   paid by the state.                                            09:09:4

23   Q   Chief, as chief deputy, is the OPSO going to be able to    09:09:4

24   comply with the Consent Decree at this pay level?             09:09:5

25   A   No.                                                       09:09:5

1  Q   Are you going to be able to attract enough new deputies to    09:09:5

2  be able to staff the jail at this pay level?                      09:10:0

3         MR. ROSENBERG:  Your Honor, same objection.  He's          09:10:0

4  asking for him for expert testimony and there's no foundation as  09:10:0

5  to whether he can attract them or not.                            09:10:1

6         THE COURT:  I disagree with that.  He didn't ask for       09:10:1

7  expert testimony.  He's asking, based on his experience, one of   09:10:1

8  the issues relative to the hiring.  The objection overruled.      09:10:1

9  BY MR. ACURI:                                                     09:10:2

10 A   No.  I mean, I have trouble hiring people now.  We're         09:10:2

11 starting a new, what we refer to as a 90-hour course, which is    09:10:2

12 the Level 1 of a post course to bring in somebody new to the      09:10:2

13 jail.  It's actually now more, we do about 110 hours.  But it's   09:10:3

14 still referred to as a 90-hour course.  And, I'm trying to start  09:10:3

15 one Monday, and I will be lucky if I have 12 new recruits in it.   09:10:4

16 A week from today.                                                09:10:4

17 Q   When was the last time we've done a 90-hour course at the     09:10:4

18 sheriff's office?                                                 09:10:4

19 A   We graduated one, I would say, 3 weeks ago, 4 weeks ago.      09:10:5

20 Q   Do you know how many members were in that course?            09:10:5

21 A   We started, if my memory serves me correct, with 14.  We      09:10:5

22 lost two during the 90-hours training.  And I think we've lost    09:11:0

23 two more since they've graduated.                                 09:11:0

24 Q   Chief, have you developed a hiring plan to be able to comply  09:11:0

25 with the Consent Judgment?                                        09:11:1

1   A   Yes.  We do have a hiring plan in place.  We've designed ads      09:11:1

2   to run, not only in the Times-Picayune, the Advocate, we've          09:11:1

3   reached out so we have contacts in some of the weekly journals,      09:11:2

4   like the river parishes.  Folsom has a weekly newspaper for that     09:11:2

5   area.  We also looked at some Mississippi journals that we could     09:11:3

6   advertise.                                                           09:11:3

7            We also will go on to some of the websites, the            09:11:3

8   American Correctional Association, American Jail Association.        09:11:3

9   We designed some ads, they're ready to go.                          09:11:4

10           And we also did something similar to what the              09:11:4

11  police department did years ago under Superintendent Pennington.    09:11:4

12  We would hit some of the military bases where they have job         09:11:5

13  fairs and try and sell our product there.                          09:11:5

14           We also would go to some colleges.  We go to               09:12:0

15  Delgato now, but that's the only outreach that we do.              09:12:0

16  Q   And what salary is part of that of the hiring plan?            09:12:0

17  A   $36 thousand.                                                   09:12:1

18  Q   Do you think you're going to be able to comply, your           09:12:1

19  knowledge as chief deputy in hiring deputies, with anything less   09:12:1

20  than $36 thousand?                                                  09:12:2

21       MR. ROSENBERG:  Your Honor, again, it calls for              09:12:2

22  speculation; no foundation.  He's just asking him whether people   09:12:2

23  come to the sheriff's office for 36 thousand.  They may come for   09:12:2

24  $28 thousand.  There's been no foundation for the chief --         09:12:3

25       THE COURT:  What's the basis for the $36 thousand            09:12:3

Case 2:12-cv-00859-LMA-MBN   Document 544   Filed 08/20/13   Page 37 of 350

Jones vs. Gusman 08.05.13 Funding Hearing                    37

```
 1    figure?                                                      09:12:3

 2          THE WITNESS:  Your Honor, we're the lowest paid in the 09:12:3

 3    metro area, by far.  If you look at competitive salaries in St. 09:12:4

 4    Charles and Jefferson Parish for correctional officers, that's 09:12:4

 5    where the $36 thousand came from.                             09:12:4

 6          THE COURT:  But how did you come up with $36 thousand? 09:12:5

 7    Do those other agencies pay more than $36 thousand or $36     09:12:5

 8    thousand?                                                     09:12:5

 9          THE WITNESS:  St. Charles, I believe, is at $36         09:12:5

10    thousand.  Jefferson Parish, if I'm not mistaken, is a hair over 09:12:5

11    that.  St. Bernard is $35,000, a hair less.                   09:13:0

12          THE COURT:  So you're trying to pay at or near the      09:13:0

13    level of these other law enforcement agencies in the neighboring 09:13:0

14    or adjoining parishes?                                        09:13:1

15          THE WITNESS:  Yes, sir.                                 09:13:1

16    BY MR. ACURI:                                                 09:13:1

17    Q   Chief, if you were able to implement that plan, do you have 09:13:1

18    any idea how many deputies you could hire and train before the 09:13:2

19    year is over?                                                 09:13:2

20    A   Well, I think that, if September 1st we could go out with 09:13:2

21    our hiring plan at a new salary, we could bring onboard probably 09:13:3

22    near 60 and have them trained by the opening of the building, 09:13:3

23    which we think will be in mid-march.                          09:13:4

24          THE COURT:  How many people do you think you would be   09:13:4

25    able to bring on?                                             09:13:4
```

1          THE WITNESS:  Sixty.                                      09:13:4

2          THE COURT:  Why do you think you could bring on 60?       09:13:4

3          MR. ROSENBERG:  I think there's a market out there with   09:13:5

4    people.                                                         09:13:5

5                Again, in my experience, when I was with NOPD,      09:13:5

6    when we went aggressively went out hiring with a new salary plan 09:13:5

7    and hit these military bases and all, we were able to do very   09:14:0

8    well with that.  And I believe we still could do well with that. 09:14:0

9          THE COURT:  You're talking about correctional officers;  09:14:1

10   you're not talking about personnel with the mental health       09:14:1

11   issues?                                                         09:14:1

12         THE WITNESS:  No, sir.  These are strictly people that    09:14:1

13   would come into the jail.                                       09:14:1

14         THE COURT:  But you don't believe you could do more       09:14:1

15   than 60 prior to the opening of the new jail; is that what your 09:14:1

16   testimony is?                                                   09:14:2

17         THE WITNESS:  Yes, sir.                                   09:14:2

18         THE COURT:  When you do you anticipate the new jail       09:14:2

19   opening?                                                        09:14:2

20         THE WITNESS:  Mid-March of 2014.                          09:14:2

21         THE COURT:  With the changes that are necessary to        09:14:2

22   comply with the Consent Decree?                                 09:14:3

23         THE WITNESS:  Yes, sir.                                   09:14:3

24   BY MR. ACURI:                                                   09:14:3

25   Q   Chief, have you implemented other changes at the jail to    09:14:4

```
 1   attempt to comply with the Consent Decree?                09:14:4

 2   A   Yes, sir.                                              09:14:4

 3        THE COURT:  Let me ask one other question.  Obviously  09:14:4

 4   you've given some thought, according to your testimony, and  09:14:5

 5   you've interviewed correctional officers who are leaving, and  09:14:5

 6   you're involved in knowing what the hiring issues are relative  09:15:0

 7   to the sheriff's office.                                   09:15:0

 8        My question is this:  In your opinion, is there      09:15:0

 9   any way that you can maintain some modicum of staffing necessary  09:15:0

10   to comply with the Consent Decree without raising the wages of  09:15:1

11   the deputies?                                              09:15:1

12        THE WITNESS:  No, sir.                                09:15:1

13   BY MR. ACURI:                                              09:15:2

14   Q   Chief, can you tell the Court what other steps you've taken  09:15:2

15   to comply with the Consent Decree other than the staffing plan?  09:15:2

16   A   Yes, sir.                                              09:15:3

17        We went forward with a new incident reporting        09:15:3

18   system.  Our old incident reporting system was really archaic,  09:15:4

19   in my opinion.  It didn't have drop-down boxes it.  It really  09:15:4

20   didn't have searches features on it so you had to do text  09:15:5

21   searches.  And, if you're familiar with that, Your Honor, like I  09:15:5

22   might put into a report ICE and do I-C-E.  Someone else might do  09:15:5

23   I-period-C-period-E-period.  Another might say Immigration and  09:16:0

24   Customs.  If you don't search every way possible that they could  09:16:0

25   have wrote out ICE out, you won't find all your documents.  09:16:0
```

1    There was no approval process for a supervisor to    09:16:1

2    review the report and kick it back, for whatever the reason:    09:16:1

3    Didn't have enough meat in it, the investigation wasn't    09:16:2

4    complete.    09:16:2

5    So we went out to bid, and VANTOS was the lowest    09:16:2

6    bidder.  It was awarded the contract.    09:16:3

7    We now have I think really a state-of-the-art    09:16:3

8    incident system.  Many drop-down boxes.  Every field is    09:16:3

9    searchable.    09:16:4

10    We won't have -- even the misspelling of an    09:16:4

11    inmate's name, as you start to type the inmate, the name will    09:16:4

12    appear, or several names if you just do the first two or three    09:16:5

13    initials, and then you can identify the right inmate.  Once you    09:16:5

14    identify the right inmate, then -- we file inmates by folder    09:16:5

15    numbers -- that number will automatically come up.  His race,    09:17:0

16    sex, date of birth.  So the errors that we saw before just won't    09:17:0

17    be there.    09:17:1

18    The second part of this incident reporting system    09:17:1

19    is an early warning system, which we need for the Consent    09:17:1

20    Decree.  That is not on online yet.  We anticipate that going    09:17:2

21    online before September 1st.  And that deals with our use of    09:17:2

22    force.  And I think the good thing about that incident system is    09:17:3

23    that, once -- if it's a use of force report, once it's approved,    09:17:3

24    it will go right to internal affairs.  So we don't have to worry    09:17:3

25    about making a copy and getting it over there or faxing it or    09:17:4

1   getting lost in the process.  It's sent to their database and

2   they can start tracking.

3            If we see a deputy that has more than would be an

4   acceptable number of use of force incidents, where we can bring

5   them in for counseling or progressive discipline or even

6   termination.  And we've never had that before.

7   BY MR. ACURI:

8   Q   Chief, do you know how much it costs the sheriff's office to

9   get the incident reporting system?

10  A   I would say that, for the incident reporting system and some

11  modifications with it, we've probably spent right at $60,000.

12            THE COURT:  That's already been spent?

13            THE WITNESS:  Yes, sir.

14            THE COURT:  How much more is needed to be spent.

15            THE WITNESS:  Probably I would think anywhere from 5 to

16  7, 8 thousand for the early warning system when it's complete.

17            THE COURT:  $5,000 to 7,000 or 8,000?

18            THE WITNESS:  Yes, sir.

19            THE COURT:  What do you base that on?

20            THE WITNESS:  In the contract, we had so many

21  programming hours by the vendor.  And I know, to get it right,

22  we exceeded those hours.  So that we have to pay additional

23  fees.

24            THE COURT:  Let me ask you just a more general

25  question, just to digress for a second.

Jones vs. Gusman 08.05.13 Funding Hearing

1    Listening to all this testimony up to this point, 09:19:0

2    the sheriff's office has been operating in a certain way for 09:19:0

3    years at a certain level, doing things in a certain way, which 09:19:1

4    even according to the sheriff now need to be addressed, now need 09:19:1

5    to be changed.  The City of New Orleans has been approving the 09:19:2

6    sheriff's budget for years now without the type of inspection 09:19:2

7    that we have undergone in this courtroom.  So, I guess my 09:19:3

8    question is:  Do you have any idea why these issues have not 09:19:3

9    been addressed prior to them being addressed in this courtroom? 09:19:3

10   THE WITNESS:  Well, I can only tell you, Your Honor, in 09:19:4

11   my position that I hold now, that we've gone to the council and 09:19:4

12   we've requested salary increases, we've requested other things, 09:19:5

13   and that's the budget process for us.  And, of course, none of 09:19:5

14   it has been approved. 09:19:5

15   BY MR. ACURI: 09:19:5

16   Q   Chief, have we moved forward with anything on the Watch Tour 09:20:1

17   system yet? 09:20:1

18   A   The Watch Tour is another thing that we've been moving 09:20:1

19   forward with the Consent Decree. 09:20:1

20   THE COURT:  What is that system? 09:20:1

21   THE WITNESS:  It's called the Watch Tour system, Your 09:20:2

22   Honor. 09:20:2

23   And we looked at several programs out there, 09:20:2

24   vendors, before we went out with an RFP. 09:20:2

25   It's come back.  The committee has awarded the -- 09:20:3

Jones vs. Gusman 08.05.13 Funding Hearing

```
 1   or picked the vendor, the winning vendor.  And I understand our       09:20:3
 2   purchasing agent is reaching out this week to award the contract      09:20:4
 3   to that person.                                                       09:20:4
 4            And, if I can talk about it, I think it's kind of            09:20:4
 5   unique, Your Honor.  We're fortunate that this company won it, I      09:20:4
 6   think.  Basically, at every workstation on a tier, we will put        09:20:5
 7   -- it's a wand and a cradle.  Most of the tour systems, the           09:21:0
 8   electronic tour systems, need a desktop computer to marry with        09:21:0
 9   it.  This one doesn't.  We can plug right into an IP jack and it      09:21:1
10   will work right off the mainframe.                                    09:21:1
11            Also, we don't have to wire the jail.  It uses an            09:21:1
12   RFI system.  So we have these little chips that run about a           09:21:2
13   dollar.  So we'll mount them, say, above each cell.  The deputy,      09:21:2
14   depending on where he's assigned and what kind of inmate is on        09:21:3
15   that tier, may make rounds every 15 minutes, every 10 minutes,       09:21:3
16   every 30 minutes.  He or she will take the wand out of the            09:21:4
17   cradle.  As he walks the tier, he or she will stop and point it      09:21:4
18   at the chip, and the wand will beep.  And he'll continue down        09:21:5
19   the tier and then return and come back.  And, when he places it     09:21:5
20   in the cradle, it will download that walk, the time.  And we         09:21:5
21   have management reports that we can pull from it to see if            09:22:0
22   they're doing what they're doing.                                     09:22:0
23            We also have the wands for the watch commander,              09:22:0
24   the assistant warden and the warden, to make sure everybody's        09:22:1
25   doing what they're supposed to be doing in making these rounds.      09:22:1
```

1              I think the other great part of the system is          09:22:2

2    that, we can move it to the new jail.  We won't have to buy a     09:22:2

3    second system.                                                    09:22:2

4              THE COURT:  Are additional funds needed to implement    09:22:2

5    the watch tours, Watch Tour system?                               09:22:3

6              THE WITNESS:  The sheriff was able to locate funds      09:22:3

7    with, you know, from our current budget.  It's going to be about  09:22:4

8    $70,000, Your Honor.                                              09:22:4

9              THE COURT:  But that's in the current budget?           09:22:4

10             THE WITNESS:  Yes, sir.                                 09:22:4

11             THE COURT:  So that's been paid for?                    09:22:4

12             THE WITNESS:  It will be, yes, sir.                     09:22:4

13             THE COURT:  Are additional funds needed to maintain it? 09:22:5

14             THE WITNESS:  Yes, sir.  I would think it would.  I     09:22:5

15   mean, when we move into the new building, I'm sure there will be  09:22:5

16   some programming costs.                                           09:23:0

17   BY MR. ACURI:                                                     09:23:0

18   Q   Chief, are there going to be any costs incurred with         09:23:1

19   training to implement the Consent Decree?                         09:23:1

20   A   We've already incurred some costs.  Currently, we have an     09:23:2

21   American Correctional Association program going on to for what    09:23:2

22   we call our first line supervisors.  It's the sergeants and many  09:23:2

23   of the lieutenants.  ACA, American Correctional Association,      09:23:3

24   worked with us to develop a course.  For the most part, it is     09:23:3

25   online, has some classroom instruction on it.                     09:23:3

1          We have to piecemeal it; because, in a perfect         09:23:4

2   world, you would take these supervisors and do a 40-hour course   09:23:4

3   in a classroom.  But we don't have the luxury to be able to take  09:23:5

4   them out the jail.  So we do it over a period of time.            09:23:5

5          We also -- there was costs involved in that.  I          09:23:5

6   believe it was around $5,000 that we had to write to the          09:24:0

7   American Correctional Association.                                09:24:0

8          We also have -- with the new PREA standards,             09:24:1

9   Prison Rate Elimination Act, we've done training on that.  We've  09:24:1

10  identified a PREA coordinator, an assistant coordinator.  Any     09:24:2

11  personnel that would have the remotest chance of having           09:24:2

12  interaction with the inmate has taken the PREA course test.       09:24:3

13  It's an online course.  You have to get a 75 or above to have a   09:24:3

14  passing grade.                                                    09:24:3

15         And, last I checked, I think 96 percent of our            09:24:4

16  personnel has been trained and passed the course.                09:24:4

17         As we do new hires and they go through like the 90        09:24:4

18  -hour course, they will be trained in that and also take the      09:24:5

19  test.                                                             09:24:5

20  Q   Chief, did we have a field training officer program prior to  09:24:5

21  attempting to comply with the Consent Decree?                     09:25:0

22  A   Not during my tenure here at the sheriff's office.  I can't   09:25:0

23  speak about before that.                                          09:25:0

24         We do have one now.  In fact, we just graduated          09:25:0

25  our first group of FTOs two weeks ago.                            09:25:1

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 46 of 350

Jones vs. Gusman 08.05.13 Funding Hearing

46

1    Q    Now, were there any costs associated with training those

2    FTOs?

3    A    Sure, there's costs.  When I bring them to the academy,

4    because we are short-staffed, I have to fill those holes.  I

5    can't leave that hole vacant in the jail.  So we have to hire

6    somebody on overtime.

7              It's like the post class that we talked about

8    we're starting next Monday.  Instead of doing -- in a perfect

9    world, you would do an academy eight hours a day.  I can't do

10   that because I can't afford to take them out the jail.  So I do

11   it part time.  We do 12 hour shifts.  So, six hours, they're in

12   training; six hours, they're in the jail.

13             So, instead of getting the class out in maybe 90

14   days, 110 days, this class that starts August 15th -- I'm sorry,

15   August 12th -- won't get out until mid-December.

16             And sometimes we have to stop the academy.  I

17   can't have class that day because I need them in the jail.  So

18   that extends the time period further out.

19   Q    Chief, do we have education programs at the Orleans Parish

20   Sheriff's Office?

21   A    Yes.  We have several.

22             We have a GED program.  We're in partners with the

23   Orleans Parish School Board on that.

24             We also have one for our transitional work, and

25   we're in partners with Delgato with that.

1          Unfortunately -- and we an alternative work skills          09:26:3

2    program, which I think has been really successful for us.          09:26:4

3          But, recently, we got a letter from the City's          09:26:4

4    criminal justice council that we won't be funded for these          09:26:4

5    programs.  As they die this year -- one ends September 30th, I          09:26:5

6    believe the other two end December 31st of 2013 -- they're no          09:26:5

7    longer fund.          09:27:0

8    Q    So there will no GED programs at the sheriff's office funded          09:27:0

9    by the City anymore?          09:27:0

10          MR. ROSENBERG:  Your Honor, I'm going object.  He's          09:27:0

11    leading the witness.  The witness has already testified to that.          09:27:0

12          THE COURT:  Overruled.          09:27:1

13          Go ahead.          09:27:1

14          MR. ROSENBERG:  Thank you.          09:27:1

15    BY MR. ACURI:          09:27:1

16    Q    So the GED program will no longer be funded by the City?          09:27:1

17    A    The sheriff's looking to see what we can do to fund it.  I          09:27:1

18    mean, it's going to be requirement for the Consent Decree.  I          09:27:2

19    think it's a needed program, to get these guys educated on a new          09:27:2

20    foot.          09:27:2

21          Just like the re-entry program.  I mean, I think          09:27:2

22    we've had great success with that.  If you get released -- if          09:27:3

23    you're a convicted felon, you get released, 28 percent of the          09:27:3

24    time, you're coming back.  The re-entry program, only 12 percent          09:27:3

25    of the time.  It's a new program.  I mean, it's got a ways to          09:27:4

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 48 of 350

Jones vs. Gusman 08.05.13 Funding Hearing                     48

1  go.  But, so far, the numbers are really good.  DOC is really

2  pleased.

3            Our transitional work has a very low recidivism

4  rate as well, compared to somebody who just got released.

5  Q   Chief, can you describe the jail management system for the

6  Court?  How it's currently set up.

7  A   The jail management system was, from what I understand, was

8  created in the early 80s.  And I call it a green screen system.

9  It's very archaic.  Anything we try to add to it, is a big deal.

10  In other words, if you had a modern jail system, a lot of the

11  new programs out there -- say, if we ever had funding to get a

12  true classification program, as opposed to trying to develop it

13  in-house, it's plug-n-play, if you pardon the expression.  You

14  buy the software it comes in and very little software

15  programming is needed.  It basically, you load it on a server

16  and it goes.  We can't do that.  I mean, everything is a major

17  deal.  Because you have to write what they call a bridge program

18  from the jail management system to whatever new system you're

19  trying to go online with.

20            We went to an electronic grievance system.  It's

21  one of the things in the Consent Decree.  We had no money to do

22  an electronic grievance system.  Our jail management system

23  certainly couldn't handle a true electronic grievance system.

24            But we did some research and we found out that our

25  commissary vendor on the kiosks that they put in the jails could

1    do an electronic grievance system.  So that's what we're doing

2    now in all buildings but OPP or Old Parish Prison.

3              It's in three languages; it's in Vietnamese,

4    Spanish and English.  So, if you're Vietnamese, you would type

5    your grievance in Vietnamese; and then, when you hit send, it

6    would convert it to English.  When the warden or the medical

7    department or whoever it's addressed to answers it, when they

8    send it back to the inmate, it will convert it to Vietnamese.

9    The same thing with Spanish.

10             The problem we're having with that is, when our

11   contract expires with the current commissary vendor, we could

12   lose the electronic grievance.  I mean, we don't know if this

13   vendor is going to win it next time we go out to bid.

14             If you had a modern jail management system, that

15   would be an arm of it, the electronic grievance system.

16        THE COURT:  When does the contract expire?

17        THE WITNESS:  I believe in about a year, Your Honor.

18        THE COURT:  So it's good until the end of the year?

19        THE WITNESS:  I think it's some time in '14.

20        THE COURT:  So it's good to the end of the year?

21        THE WITNESS:  Yes, sir.

22   BY MR. ACURI:

23   Q   Chief, is the Orleans Parish Sheriff's Office, in your

24   experience as chief, going to be able to comply with the Consent

25   Decree with this current jail management system in place?

1    A    No, sir.                                                09:30:5

2    Q    Chief, have you taken any steps to begin planning for   09:31:0

3    transitioning to the new jail facility?                      09:31:1

4    A    Yes, sir.                                               09:31:1

5              Well, we started the supervisor course that I just 09:31:1

6    talk about a couple minutes ago, the American Correctional   09:31:2

7    Association.                                                 09:31:2

8              The sheriff has had conversations with Art         09:31:2

9    Weinstein.  He's the Director of Corrections in Montgomery   09:31:3

10   County, Maryland.                                            09:31:3

11             MR. ROSENBERG:  Your Honor -- Chief, I apologize -- the 09:31:3

12   chief is now getting into testimony that is rank hearsay, Your 09:31:3

13   Honor.  He's talking about what someone else inevitably told him 09:31:4

14   about a conversation that they had with a third party.       09:31:4

15             THE COURT:  Well, the question is, what is the purpose 09:31:4

16   of testimony.  Is it to show why they're doing what they're  09:31:5

17   doing, or is it for some other purpose.  Tell me.            09:31:5

18             MR. ACURI:  It's to show what steps we are taking to be 09:31:5

19   able to comply with the terms of the Consent Judgment as we move 09:31:5

20   to the new jail.  These things are going to start this year. 09:32:0

21             THE COURT:  Objection overruled.                   09:32:0

22             Go ahead.                                          09:32:0

23             MR. ROSENBERG:  Thank you.                         09:32:0

24             THE WITNESS:  Yes, sir.                            09:32:0

25   BY MR. ACURI:                                                09:32:0

1  A   The sheriff and I have talked to Warden Green of Montgomery    09:32:0

2  County.  And what we think -- and I think you have to pick the    09:32:1

3  right moment.  You can't do it too far in advance, because    09:32:1

4  they'll forget the training before the opening of the building.    09:32:2

5  Because direct supervision will be very new to this    09:32:2

6  organization.    09:32:2

7           So we intend, in November, if it looks like we're    09:32:2

8  still going mid-March to open, to send up 20 supervisors --    09:32:3

9  which is going to be a challenge for us because of the shortage    09:32:3

10 that we have -- to go to Maryland.  We've determined best cost    09:32:4

11 alternative plan would be to drive them in a van.  There's a    09:32:4

12 Motel 6 and a couple of other motels near the jail that are    09:32:5

13 reasonable.  And they would do two tours of duty with their    09:32:5

14 counterparts in Montgomery County.    09:32:5

15          Montgomery County was picked, Your Honor, because    09:33:0

16 it's, in my opinion, one of the most progressive highly-rated    09:33:0

17 jail facilities in this country.  I think you could ask any of    09:33:1

18 the experts that will take the stand here who will talk about    09:33:1

19 that.    09:33:1

20          And then, in December, we would send another 20    09:33:2

21 deputies up there.    09:33:2

22          And then another batch later on in December.    09:33:2

23          Then the temporary detention center is a --    09:33:2

24          THE COURT:  So, you've had these conversations, the    09:33:3

25 sheriff's had these conversations with the sheriff.  And the    09:33:3

1   purpose of the conversation, as I understand it, is to go ahead          09:33:3

2   and talk about further training for these deputies so you can            09:33:4

3   make a decision whether or not you're going to send them up              09:33:4

4   there?                                                                   09:33:4

5            THE WITNESS:  I think we've made that decision, Your            09:33:4

6   Honor.                                                                   09:33:5

7            THE COURT:  But that's why you had the conversation             09:33:5

8   with the other sheriff?                                                  09:33:5

9            THE WITNESS:  Yes, sir.  It's the Director of                   09:33:5

10  Corrections in Maryland.                                                 09:33:5

11           THE COURT:  All right.                                          09:33:5

12           THE WITNESS:  So, here, in our facility, the closest            09:34:0

13  thing I think we have to direct supervision is the temporary             09:34:0

14  detention center.                                                        09:34:0

15           And we'll start, as these guys get back, we will                09:34:0

16  start farming them to the temporary detention center with other          09:34:1

17  deputies who haven't been able to go to the training, so that            09:34:1

18  they'll work hand-in-hand in the closest thing we have to a              09:34:1

19  direct supervision model.                                               09:34:2

20           So that, when that building opens up, we should                 09:34:2

21  have 60 to 90 deputies that have experienced direct supervision.         09:34:2

22           We also hope to have American Correctional                      09:34:3

23  Association come down and do a course or two on direct                   09:34:3

24  supervision at our campus.  So that, when that building opens,           09:34:4

25  we have a good foundation to go in there.                                09:34:4

1   BY MR. ACURI:                                            09:34:4

2   Q   Chief, I want to ask you about the population currently at   09:34:5

3   the jail.                                                09:34:5

4               Can you tell the Court how many un-sentenced   09:34:5

5   inmates are in the jail?                                 09:34:5

6   A   Yes, sir.  I didn't see the count today.  But, on the 31st,   09:35:0

7   we had about 1,790.                                      09:35:0

8   Q   And, to be clear, those are un-sentenced inmates who are   09:35:1

9   awaiting trial in criminal district court or municipal court?   09:35:1

10  A   That's correct.                                      09:35:1

11              THE COURT:  Does that number include DOC inmates who   09:35:2

12  have open charges?                                       09:35:2

13              THE WITNESS:  No, sir.                        09:35:2

14              THE COURT:  Does not.                         09:35:2

15              THE WITNESS:  No, sir.                        09:35:2

16              THE COURT:  And does it include Plaquemines Parish   09:35:2

17  inmates?                                                 09:35:3

18              THE WITNESS:  No, sir.                        09:35:3

19  BY MR. ACURI:                                            09:35:3

20  Q   Can you tell the Court how many sentenced municipal or   09:35:3

21  misdemeanor inmates we have serving parish prison time?   09:35:3

22  A   On any given day, we have 100.  On the 31st, we had 98.   09:35:3

23              THE COURT:  What kind of inmates?            09:35:4

24              THE WITNESS:  Municipal inmates who have been   09:35:4

25  sentenced.                                               09:35:5

Case 2:12-cv-00859-LMA-MBN   Document 544   Filed 08/20/13   Page 54 of 350

Jones vs. Gusman 08.05.13 Funding Hearing                54

```
 1              THE COURT:  That's within that 1,790?              09:35:5

 2              THE WITNESS:  No, sir.                             09:35:5

 3   BY MR. ACURI:                                                09:35:5

 4   Q   So, to be clear, those are inmates who have been sentenced   09:35:5

 5   to parish time and can't go to DOC; correct?                09:35:5

 6   A   Municipal is really City time.                          09:36:0

 7              We probably have 60 state inmates that have been  09:36:0

 8   sentenced to parish prison time.                            09:36:0

 9              THE COURT:  That's in addition to the 1,790?      09:36:1

10              THE WITNESS:  Yes, sir.                           09:36:1

11              THE COURT:  And in addition to the approximately 100?   09:36:1

12              THE WITNESS:  Yes, sir.                           09:36:1

13   BY MR. ACURI:                                                09:36:1

14   Q   How many Department of Correction inmates did you have on   09:36:2

15   the 31st?                                                    09:36:2

16   A   503.                                                     09:36:2

17   Q   How many of those are probation and parole violators?   09:36:2

18   A   On any given day, I probably have around 75 probation and   09:36:3

19   maybe closer to 100 parole.                                 09:36:3

20              I have about 190 to 200 DOC inmates here that have   09:36:4

21   open state charges for Orleans Parish to be prosecuted.  You   09:36:5

22   know, even though they've been convicted as DOC and we bill them   09:36:5

23   to DOC, they're actually here on DA business.               09:37:0

24              THE COURT:  So DOC will pay a per diem for those  09:37:0

25   inmates; is that right?                                     09:37:0
```

1        THE WITNESS:  Yes, sir.                                    09:37:1

2              But, if I had to ship all the DOC inmates back, if   09:37:1

3    that's what the Court would rule, then these 198 would convert 09:37:1

4    to City inmates.  Because they're here on -- I mean, I charge  09:37:1

5    DOC because they're convicted.                                 09:37:2

6        THE COURT:  Am I correct that, the sheriff can't           09:37:2

7    ship DOC inmates unless DOC is willing to take those inmates?  09:37:2

8        THE WITNESS:  Yes, sir.                                    09:37:3

9              On any given day, I probably have 75 in the cue,     09:37:3

10   waiting to go to DOC.                                          09:37:3

11             When you're convicted -- I'm not sure how the        09:37:3

12   federal system works -- but we have to do a preconviction packet 09:37:4

13   for DOC.  It involves fingerprints, we have to do an interview 09:37:4

14   with the inmate and we also have to get the sentence, the true 09:37:4

15   copy, from the clerk's office.  And we put that packet together 09:37:5

16   and we send that to DOC.  And then we wait to actually put them 09:37:5

17   on list so that we can ship them.                              09:38:0

18             Every Tuesday, I usually average about 30 inmates    09:38:0

19   going to Hunt.                                                 09:38:0

20       THE COURT:  I guess my point is, you can't call DOC and    09:38:0

21   say:  We have 100 sentenced DOC inmates, we're going to drop   09:38:1

22   them off tomorrow?                                             09:38:1

23       THE WITNESS:  No, sir, we cannot.                          09:38:2

24       THE COURT:  Or you can pick them up tomorrow.              09:38:2

25             You have to work with DOC on that?                   09:38:2

```
 1              THE WITNESS:  No, I cannot.                    09:38:2

 2              THE COURT:  All right, go ahead.               09:38:2

 3              MR. ACURI:  One moment, Judge.                 09:38:3

 4                   (Pause in proceedings.)                   09:38:3

 5              MR. ACURI:  I have nothing further.  Mr. Rosenberg may   09:38:3

 6    have some questions.                                     09:38:3

 7              THE COURT:  Thank you.                         09:38:4

 8                   City.                                     09:38:4

 9                        CROSS EXAMINATION                    09:38:4

10    BY MR. ROSENBERG:                                        09:38:4

11    Q   Chief Ursin, if DOC or Secretary LeBlanc told the sheriff   09:38:5

12    that he was picking up all of those DOC inmates, other than the   09:39:0

13    ones that were writted, he could pick all those up tomorrow;   09:39:0

14    could he not?                                            09:39:1

15    A   I guess he could, yes, sir.                          09:39:1

16    Q   Yes, sir.                                            09:39:1

17              So he could -- and, by the way, do you know how   09:39:1

18    much DOC is paying the sheriff for those inmates that are housed   09:39:1

19    in Orleans Parish Prison on a per diem basis?            09:39:2

20    A   It's about $26.                                      09:39:2

21    Q   $26?                                                 09:39:2

22         THE COURT:  What was your question about he could pick   09:39:3

23    them up tomorrow?                                        09:39:3

24         MR. ROSENBERG:  If the secretary -- my question, Your   09:39:3

25    Honor, to the chief, deputy chief, was that if -- if Secretary   09:39:3
```

```
 1    LeBlanc at DOC asked to pick up all the inmates, other than the    09:39:4
 2    ones that were specifically writted, he could do that tomorrow.    09:39:4
 3              And his answer was in the affirmative.                   09:39:4
 4    BY MR. ROSENBERG:                                                  09:39:4
 5    Q   Do you know how much the sheriff or others are seeking on a    09:39:5
 6    per diem or cost basis to house inmates at OPP, sir?              09:40:0
 7    A   No, sir.                                                       09:40:0
 8         THE COURT:  By the way, has the DOC secretary ever said       09:40:0
 9    to the sheriff's office:  We want all your DOC sentenced inmates   09:40:1
10    and we're going to pick them up tomorrow or in a week?            09:40:1
11         THE WITNESS:  Not to my knowledge.                           09:40:1
12         MR. ROSENBERG:  And, Your Honor, if I could follow-up        09:40:2
13    on Court's question.                                               09:40:2
14    BY MR. ROSENBERG:                                                  09:40:2
15    Q   But there's nothing -- just so I am clear, Chief -- there's    09:40:2
16    nothing that prevents the secretary of DOC from doing exactly     09:40:2
17    that; isn't that true?                                            09:40:2
18    A   Not that I'm aware of.                                         09:40:3
19    Q   Yes, sir.                                                      09:40:3
20              And my earlier question -- I'm not sure if I            09:40:3
21    finished spitting it out -- but my earlier question was:  Do you  09:40:3
22    know how much either the sheriff or DOJ or the inmates are        09:40:4
23    asking for the funding of Orleans Parish Prison under the         09:40:4
24    Consent Decree?                                                    09:40:5
25    A   No, sir.                                                       09:40:5
```

1  Q   Do you know that it exceeds more than the $26 that you're    09:40:5

2  getting per inmate from DOC on a daily basis?    09:40:5

3  A   I would hope so.    09:41:0

4  Q   Yes, sir.    09:41:0

5         So you would agree with me, would you not, that    09:41:0

6  it's a losing financial proposition to house DOC inmates, at    09:41:0

7  least losing for the people of Orleans Parish; would you not?    09:41:3

8  A   Well, I think that --    09:41:1

9         THE COURT:  What's the relevance of this testimony?    09:41:1

10        That per diem is set by state law; is it not?    09:41:2

11        MR. ROSENBERG:  Yes, sir, it is.    09:41:2

12        And my only point, Your Honor, is that that is a    09:41:2

13  cost factor that we asked the Court to consider.  Which is, the    09:41:2

14  housing of those DOC inmates continues to cause the OPP to incur    09:41:3

15  an inordinate financial loss.    09:41:4

16        THE COURT:  Well, there's some things the City needs to    09:41:4

17  do with DOC and with the legislature, if it can.  I understand    09:41:4

18  that.    09:41:4

19        Of course, there are also certain fixed costs    09:41:4

20  that, whether they're DOC inmates or Orleans prison inmates,    09:41:5

21  you're going to have to incur; is that right?    09:41:5

22        THE WITNESS:  Yes, sir.    09:41:5

23        And DOC also allows us to bill for medical on top    09:41:5

24  of that per diem.    09:42:0

25  BY MR. ROSENBERG:    09:42:0

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 59 of 350

Jones vs. Gusman 08.05.13 Funding Hearing                    59

1    Q    Yes, sir.                                                    09:42:0

2             That's $8 a day?                                         09:42:0

3    A    I believe so, yes, sir.                                      09:42:0

4             THE COURT:  Is that also for mental health, or is there  09:42:0

5    additional?                                                       09:42:0

6             THE WITNESS:  There's additional for mental health.      09:42:0

7    BY MR. ROSENBERG:                                                 09:42:0

8    Q    Just is to follow-up, is that for acute mental health, or    09:42:1

9    just mental health?                                               09:42:1

10   A    Acute.                                                       09:42:1

11   Q    Yes, sir.                                                    09:42:1

12             And do you have any idea what the percentage of         09:42:1

13   acute mental health in the current population is, sir?            09:42:2

14   A    No, sir.                                                     09:42:2

15   Q    You were asked some questions about the population today at  09:42:3

16   OPP, and I think you indicated there were 1,790 municipal         09:42:3

17   inmates; is that right, sir?                                      09:42:4

18   A    That was on the 31st, sir.                                   09:42:4

19   Q    On the 31st of July?                                         09:42:5

20   A    Yes, sir.                                                    09:42:5

21   Q    And are you aware, Chief Ursin, that just a month or two     09:42:5

22   before, in May, for example -- May 11th, to be precise, of this   09:43:0

23   year -- there were only 1,521 municipal inmates at OPP?           09:43:0

24   A    We've never had 1,500 municipal inmates.                     09:43:1

25             I would agree that, May, it's possible we could         09:43:2

1    have had pretrial or un-sentenced inmates.                    09:43:2

2    Q   If we get the sheriff's daily inmate count, would that    09:43:2

3    represent accurately the population of municipal inmates?      09:43:3

4    A   Well, I guess I'm confused.  We do have municipal inmates. 09:43:3

5    We do have municipal inmates.  I would think we have, at any   09:43:4

6    given day, maybe 90 sentenced and 100 waiting for trial in     09:43:4

7    municipal court.  And then we have the pretrial inmates or     09:43:5

8    un-sentenced state inmates.                                    09:43:5

9    Q   Would the daily inmate count show the number of municipal  09:43:5

10   inmates?                                                       09:44:0

11   A   Yes, sir.                                                  09:44:0

12        MR. ROSENBERG:  Your Honor, could I just show counsel a   09:44:1

13   document?                                                      09:44:1

14              (Pause in proceedings.)                             09:44:2

15        MR. ROSENBERG:  Your Honor, may I approach the witness?   09:44:3

16        THE COURT:  Sure.                                         09:44:3

17   BY MR. ROSENBERG:                                              09:44:3

18   Q   Mr. Ursin, show you a document which we've marked Exhibit  09:44:3

19   178.                                                           09:44:4

20        MR. ROSENBERG:  178, Your Honor.                          09:44:5

21   BY MR. ROSENBERG:                                              09:44:5

22   Q   Is that what you were referring to as the daily inmate     09:44:5

23   count?                                                         09:44:5

24   A   This is a count that I think we prepare for billing.  It's 09:44:5

25   not the inmate count that I get, no, sir.  I get it in a       09:45:0

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 61 of 350

Jones vs. Gusman 08.05.13 Funding Hearing                61

1    different format.                                                    09:45:0

2    Q    I didn't mean to step over you, Chief.                         09:45:0

3    A    I'm sorry.                                                      09:45:0

4    Q    That's all right.                                              09:45:0

5              Those are the inmates that you bill the City for;         09:45:0

6    is that right?                                                      09:45:1

7    A    Um-hum.                                                        09:45:1

8    Q    Is that a yes, so the court reporter can take it down?         09:45:1

9    A    Yes.                                                           09:45:1

10   Q    So, if I could, without showing you whole document --          09:45:1

11   A    I don't have anything on the screen.                           09:45:4

12   Q    I'm trying to put it on for you.                               09:45:4

13              (Pause in proceedings.)                                  09:45:4

14   BY MR. ROSENBERG:                                                   09:45:4

15   Q    If I show you just May of this document -- let me try to       09:45:5

16   zoom in a little bit so you can see the whole document -- is        09:46:0

17   that, for example, going to show that, in May, the sheriff         09:46:0

18   indicated that there were a municipal daily inmate pop of 1,521?    09:46:1

19   A    What line?                                                     09:46:2

20              THE COURT:  Where are you?                               09:46:2

21              MR. ROSENBERG:  May 11th, Your Honor.                    09:46:2

22              THE COURT:  Where are the headings of these categories?  09:46:2

23              MR. ROSENBERG:  Your Honor, they're at the first page.   09:46:3

24              I gave it to the chief.                                  09:46:3

25              THE COURT:  As long as you're familiar with the          09:46:3

Case 2:12-cv-00859-LMA-MBN   Document 544   Filed 08/20/13   Page 62 of 350

Jones vs. Gusman 08.05.13 Funding Hearing                    62

```
 1   headings.                                                      09:46:3

 2           THE WITNESS:  I'm not familiar with this report.       09:46:3

 3           MR. ROSENBERG:  Your Honor, here's the headings.       09:46:3

 4           THE COURT:  He's not going to be able to memorize it.  09:46:4

 5               You can refer back to it if you need to.           09:46:4

 6           MR. ROSENBERG:  I'm happy to show it to him, Judge.  I 09:46:4

 7   gave it to him, but I'm willing to let him keep it.            09:46:5

 8           THE WITNESS:  That would be great.                     09:46:5

 9           MR. ROSENBERG:  Sure.                                  09:46:5

10   BY MR. ROSENBERG:                                              09:46:5

11   Q   My only question, sir, is:  On May 11th, is the sheriff's  09:47:0

12   document that was produced to the City showing that the inmate 09:47:0

13   count was 1,521?                                               09:47:1

14   A   What date?  I'm sorry.                                     09:47:1

15   Q   May 11, Mr. Ursin.                                         09:47:1

16   A   Yes.                                                       09:47:2

17           But it's a moving target.  A couple weeks ago, we      09:47:2

18   had 122 pretrial inmates that became DOC inmates in one week.  A 09:47:2

19   lot of them are pleas.  We did have some trials.               09:47:3

20           So, I mean, if you look at that week, we went from     09:47:3

21   X and added 122.                                               09:47:4

22   Q   Yes?                                                       09:47:4

23           And that of course -- maybe the judge asked you        09:47:4

24   about this -- and then there's still the Plaquemines Parish    09:47:5

25   inmates that are being housed at OPP until the end of the year; 09:47:5
```

1    is that right, sir?                                      09:47:5

2    A    Yep.  We have Plaquemines Parish.                  09:47:5

3              Last I heard from Plaquemines was, they were  09:48:0

4    hoping to have their jail opened up Thanksgiving.       09:48:0

5              THE COURT:  Those Plaquemines Parish inmates, am I  09:48:0

6    correct that they are supervised by Plaquemines Parish deputies?  09:48:1

7              THE WITNESS:  That's correct.                 09:48:1

8    BY MR. ROSENBERG:                                        09:48:1

9    Q    Just as a follow-up to the Court's question, how much does  09:48:1

10   the Court receive for each of those inmates on a daily basis?  09:48:1

11   A    I don't know, sir.  That CEA was done before I was chief  09:48:2

12   deputy.                                                  09:48:2

13   Q    That CEA being cooperative endeavor agreement; is that what  09:48:2

14   you mean?                                                09:48:3

15   A    Yes.                                                 09:48:3

16   Q    It's not, to your knowledge, Chief -- I know it came before  09:48:3

17   you came on as chief deputy -- but that amount is certainly not  09:48:4

18   in the range of 50 or $60 per day from Plaquemines Parish; is  09:48:4

19   it?                                                       09:48:4

20   A    I would think not.  But, again, I don't know.      09:48:4

21   Q    And those inmates are going to be gone by, at the outside,  09:48:5

22   Thanksgiving?                                            09:49:0

23   A    The last update I got from Plaquemines, yes, sir, was that  09:49:0

24   they were hoping to have them -- their jail open and their  09:49:0

25   inmates moved by Thanksgiving.                           09:49:0

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 64 of 350

Jones vs. Gusman 08.05.13 Funding Hearing                    64

1    Q    You were asked about some turnover or overturn, as you used                09:49:1

2    the term, among deputies.  Do you remember the series of                        09:49:1

3    questions by your lawyer?                                                       09:49:2

4    A    Yes, sir.                                                                  09:49:2

5    Q    In the past, the deputies at OPP had been working a                        09:49:2

6    considerable amount of overtime; had they not?                                 09:49:3

7    A    Yes.  At one time, they worked what they call a four and two              09:49:3

8    schedule, which had built in overtime in it.                                   09:49:3

9    Q    Yes, sir.                                                                  09:49:4

10                    And, in fact, some of those deputies were working             09:49:4

11   60 plus hours a week on a regular basis; were they not?                        09:49:4

12   A    I don't know if that's the correct figure.  But it was built             09:49:5

13   in overtime on four and two.                                                   09:49:5

14   Q    And you don't know if that type of work schedule, working 60             09:49:5

15   hours a week, week-in and week-out, was the kind of thing that                 09:50:0

16   would also drive away deputies; do you?                                        09:50:0

17   A    I think not, because of the paycheck that they were getting              09:50:0

18   at the end of two weeks with putting in those kinds of hours.                  09:50:1

19   Q    So they were making considerably more than the 26, 28                     09:50:1

20   thousand that you were talking about earlier?                                  09:50:2

21   A    They make $21 thousand now.  Because we've changed it to                  09:50:2

22   four and two, and now they're on what many in this state refer                 09:50:2

23   to as the state police schedule.                                              09:50:3

24   Q    Yes, sir.                                                                  09:50:3

25                    But, before then, they were making considerably              09:50:3

1   more than the $28 thousand that you had talked about earlier;                09:50:3

2   right?                                                                        09:50:4

3   A    Yes, sir.                                                                09:50:4

4   Q    Yes, sir.                                                                09:50:4

5          And now, even with the $21 thousand, they're                          09:50:4

6   getting the state supplemental -- I'm sorry -- they're getting               09:50:4

7   additional $6 thousand or so once they're post-certified; is                 09:50:5

8   that right?                                                                   09:50:5

9   A    Once they're post-certified, yes.                                        09:50:5

10  Q    And that's frequently shortly after they've been hired;                  09:51:0

11  right, sir?                                                                   09:51:0

12  A    I would think it's more like ten months to a year.                       09:51:0

13  Q    And, Chief, is it also right, besides that pay, that the                 09:51:0

14  sheriff's office pays an increase based upon tenure?                          09:51:1

15  A    Yes, sir.                                                                09:51:2

16  Q    And how much is that, sir?                                               09:51:2

17  A    I believe it's two and a half percent.  I could be wrong on             09:51:2

18  that.  It's at three years, I believe five years and ten years.              09:51:2

19  Q    Closer to three percent, and then another three percent                 09:51:3

20  after five years; would that be more like it?                                09:51:3

21  A    It could be, yes, sir.                                                   09:51:4

22  Q    Yes, sir.                                                                09:51:4

23         And, in fact, have you ever compared the pay scale                     09:51:4

24  of -- the current pay scale of an Orleans Parish correctional                 09:51:5

25  officer to a correctional -- the salary of a correctional                     09:51:5

1    officer within the state?                                          09:52:0

2    A    Yes, we did.                                                  09:52:0

3    Q    And what's the comparison show?                              09:52:0

4    A    We were the lowest.                                          09:52:0

5    Q    Now, when you say you're the lowest, you talked about St.    09:52:0

6    Charles; right, sir?                                              09:52:1

7    A    I believe we looked at St. Charles, Jefferson Parish, St.    09:52:1

8    Bernard.  I believe St. Tammany as well.                         09:52:2

9    Q    First of all, let me ask you, when you say we looked at it,  09:52:2

10   is that Mr. Ambruster's document?                                 09:52:3

11   A    No.  I was Major Jay Mariano, our HR person, do some         09:52:3

12   research.  Along with Colonel Laughlin, Mike Laughlin.            09:52:3

13            THE COURT:  You said the deputies make $21 thousand      09:52:3

14   plus post-certified ten months to a year down the line another   09:52:4

15   $6 thousand; is that right?                                       09:52:4

16            THE WITNESS:  Yes.  From the state.                      09:52:4

17            THE COURT:  So that's a total of about what?  $27        09:52:4

18   thousand.                                                         09:52:4

19            THE WITNESS:  Once they're post certified.               09:52:5

20            THE COURT:  Then they have to wait another three years   09:52:5

21   or so to get another two percent?                                 09:52:5

22            THE WITNESS:  Yes.  At three years, five years and ten   09:52:5

23   years.                                                            09:53:0

24            THE COURT:  When you compared the hiring of the          09:53:0

25   deputies in Orleans Parish compared to all of these other        09:53:0

Case 2:12-cv-00859-LMA-MBN   Document 544   Filed 08/20/13   Page 67 of 350

Jones vs. Gusman 08.05.13 Funding Hearing                    67

1   parishes, I think you said that the starting salaries for the

2   deputy was the lowest.  My question is, how much -- when that

3   comparison was made by the sheriff's office, how much were the

4   deputies making then, and when did the comparison take place?

5              THE WITNESS:  I believe the comparison took place about

6   a year from where we're at now.  In summer -- late summer of

7   '12.

8              THE COURT:  How much were the deputies making then?

9              THE WITNESS:  $21 thousand.  They were on a state

10  police schedule.

11             THE COURT:  Thank you.

12  BY MR. ROSENBERG:

13  Q   When you compared the deputies' pay to St. Charles,

14  Jefferson Parish or St. Bernard, those sheriff's departments

15  patrol; do they not?

16  A   Well, Jefferson Parish as well as St. Bernard and I believe

17  St. Charles, they have correctional deputies in the jail as well

18  as road deputies.  We looked at the correctional pay.

19  Q   Is there a difference between the correctional deputies and

20  the road pay deputies in those parishes?

21  A   Yes.

22  Q   So how much was the correctional deputy getting in St.

23  Charles?

24  A   There was a year ago, but I believe we were doing 9.69, and

25  they were doing about 11 and some change.

1    Q    Do you have any idea of how Jefferson or St. Bernard was       09:54:1

2    comparing?                                                          09:54:2

3    A    Jefferson was 12 and some change.                             09:54:2

4              And, I could be wrong, but I think St. Bernard was       09:54:2

5    in that $11.                                                        09:54:2

6    Q    Do you know, sir, what is a -- these deputies only have to    09:54:3

7    have to have a high school degree; isn't that right, sir?          09:54:3

8    A    Yes, sir.                                                      09:54:4

9    Q    Do you know what the median earning for someone with a high   09:54:4

10   school degree is in Orleans Parish, sir?                           09:54:4

11   A    No, sir.  I don't.                                            09:54:4

12   Q    It's far below the numbers that you're suggesting today; is   09:54:5

13   it not, Mr. Ursin?                                                 09:54:5

14   A    I have no idea what the mean figure is.                       09:54:5

15   Q    You also talked about the, I think, the Watch Tour program.   09:55:0

16   And, just so that I'm clear, that is a part of a software          09:55:1

17   program, as you explained in your deposition, which can be just    09:55:1

18   plugged out and then plugged in to the new facility; right?        09:55:2

19   A    Yes.                                                          09:55:2

20   Q    Except for the sensors?                                       09:55:2

21   A    Well, the sensors, and then you have to identify the IP       09:55:2

22   address to the mainframe.  You know, that this is tier I, pod 1,   09:55:3

23   side A, whatever the case may be.                                  09:55:3

24   Q    Pretty modest expense to just to make that transfer of        09:55:4

25   taking out the equipment from the current facilities and putting   09:55:4

1    it into the new facility; isn't that right, sir?                     09:55:4

2    A    Unless the management programs, if we would need a different    09:55:5

3    type of management program in the new facility because it's a        09:55:5

4    mentality health tier, it's a whatever type tier it is, that         09:55:5

5    could add programming costs.  But, with excluding management         09:56:0

6    reports, it would be a minimal cost, yes, sir.                       09:56:0

7    Q    Yes, sir.                                                       09:56:0

8              Because I think you said in your deposition, if            09:56:0

9    you remember last month, you just switched it over.  I think         09:56:1

10   your words were:  It goes right to the mainframe, you just walk      09:56:1

11   across the street and plug in the new one; isn't that right,         09:56:1

12   sir?                                                                 09:56:2

13   A    I think I just said it.                                         09:56:2

14   Q    So we're talking about a relative nominal cost there; right,    09:56:2

15   sir?                                                                 09:56:2

16   A    Yes, sir.                                                       09:56:2

17   Q    And, just so I'm clear, sir --                                  09:56:3

18              MR. ROSENBERG:  Your Honor, I don't know if we are        09:56:3

19   going to handle this today or in September.                          09:56:3

20   BY MR. ROSENBERG:                                                    09:56:4

21   Q    But you didn't have any involvement in the planning of the      09:56:4

22   new correctional facility; did you, sir?                             09:56:4

23   A    No, sir.                                                        09:56:4

24   Q    And you don't know whether Sheriff Gusman even shared the       09:56:4

25   City ordinance in 2011 with the architect that's handling the        09:56:5

1    new facility; do you?                                        09:57:0

2    A    I believe Jerry Herbert was at the hearing, City council  09:57:0

3    chambers.                                                     09:57:0

4    Q    So Mr. Hebert knew about that ordinance?                 09:57:0

5    A    Yes, sir.  If memory serves me correctly.                09:57:0

6    Q    Did he know -- and did he also know about the Consent Decree  09:57:1

7    that you said you were stating to implement last September?   09:57:1

8    A    What's that, sir?                                        09:57:2

9    Q    Did Mr. Hebert know about the Consent Decree that you    09:57:2

10   testified that the sheriff was starting to implement last    09:57:2

11   September?                                                    09:57:2

12            THE COURT:  How can he testify whether he knew?      09:57:2

13            MR. ROSENBERG:  I'm asking when he knows it.         09:57:3

14            THE COURT:  He can testify as to whether somebody was  09:57:3

15   present.  How can he testify as to whether somebody knew?    09:57:4

16            MR. ROSENBERG:  Your Honor, I'm not going to argue.  09:57:4

17   I'm going to ask him a different question.                   09:57:4

18   BY MR. ROSENBERG:                                            09:57:4

19   Q    Do you know if Sheriff Gusman provided Mr. Hebert with the  09:57:4

20   with a copy of the Consent Decree?                           09:57:5

21   A    No, sir.  I don't know.                                  09:57:5

22   Q    Did you provide him with a copy of the Consent Decree?  09:57:5

23   A    No, sir.  I did not.                                     09:57:5

24   Q    Are you part of the policy committee that oversees the   09:57:5

25   design of the new facility?                                  09:58:0

1   A    I am on the construction team.  Yes, sir.  That we meet once   09:58:1

2   a week.  I don't know if that's a policy committee.   09:58:1

3   Q    You meet once a week?   09:58:1

4            And you were aware of the Consent Decree last   09:58:1

5   December; were you not, sir?   09:58:2

6   A    Um-hum.  Yes, sir.   09:58:2

7   Q    Did you take any steps to ensure that Mr. Hebert or the   09:58:2

8   entire policy team was aware of the implications of the Consent   09:58:2

9   Decree?   09:58:3

10  A    Did I?  No, sir.   09:58:3

11  Q    To your knowledge, did the sheriff?   09:58:3

12  A    Well, the sheriff had a lot of meetings with Mr. Hebert and   09:58:3

13  the various architects and our construction managers that I   09:58:4

14  didn't attend.  So I can't answer what the sheriff knew.   09:58:4

15  Q    There were adjustments being made, just as we speak,   09:58:5

16  regarding the new facility as a result of either Mr. Hebert or   09:58:5

17  the sheriff not complying with the ordinance and the Consent   09:59:0

18  Decree; isn't that right, sir?   09:59:0

19            THE COURT:  What's the relevance of asking that?   09:59:0

20            MR. ROSENBERG:  Well, Your Honor, I'm trying to find   09:59:1

21  out, if that's going to be an issue for September, then I'll   09:59:1

22  defer it to September.   09:59:1

23            THE COURT:  What's the relevance now?   09:59:1

24            I don't know if it's going to be relevant in   09:59:1

25  September.  Let's move on to something else.   09:59:2

1    BY MR. ROSENBERG:                                           09:59:2

2    Q    Is there a staffing study done for the new facility, sir?   09:59:2

3    A    Yes, sir.  We did one in-house in the summer of '12, I   09:59:2

4    believe.                                                     09:59:3

5    Q    Summer of 12.                                           09:59:3

6              And are you working on another staffing facility   09:59:3

7    now for the new facility?                                    09:59:4

8    A    Yes, sir.  Colonel Laughlin is putting one together.    09:59:4

9    Q    Has that been prepared, sir?                            09:59:4

10   A    I believe it's been submitted to the sheriff for his review.   09:59:4

11             MR. ROSENBERG:  Your Honor, we haven't seen that.  If   09:59:5

12   that's going to be an issue for today, then we'd ask that the   09:59:5

13   sheriff produce that document.  Because, when we deposed Mr.   10:00:0

14   Ursin last month, it was represented that the study is       10:00:1

15   preliminary and it's just -- it's not yet been completed.  So,   10:00:1

16   if it's been completed and produced to the sheriff, that's   10:00:2

17   another document that's not been produced to us that we ought to   10:00:2

18   see.                                                         10:00:2

19             MR. ACURI:  Judge, I believe he just testified that   10:00:2

20   it's not complete, and he submitted it to the sheriff, who is   10:00:3

21   making modifications to it.  It's not complete.             10:00:3

22             THE COURT:  Do you know what it's going to be      10:00:3

23   completed?                                                   10:00:4

24             This is strictly staffing for the new facility; is   10:00:4

25   that right?                                                  10:00:4

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 73 of 350

Jones vs. Gusman 08.05.13 Funding Hearing          73

1          MR. ROSENBERG:  That's correct, Your Honor.          10:00:4

2          THE COURT:  Do you when that's going to be completed?          10:00:4

3          MR. ACURI:  I don't know.          10:00:4

4               The chief may know, Judge.          10:00:4

5          THE WITNESS:  We did a draft document, Colonel Laughlin          10:00:5

6   did a draft document.  It was submitted to the sheriff that, as          10:00:5

7   Mr. Acuri said, he's going to make some notes, changes, maybe          10:00:5

8   even comment on it.  Return it to us, which I will give my          10:01:0

9   input.  And then the final document would come out of it.  I          10:01:0

10  would suspect it would be a month away.          10:01:1

11         THE COURT:  The sheriff does have some expert testimony          10:01:1

12  about staffing; is that right?          10:01:1

13         MR. ACURI:  Yes, Judge.  Staffing as to the current          10:01:1

14  facilities.          10:01:1

15         THE COURT:  We need to have that document produced          10:01:2

16  before the next hearing.          10:01:2

17         MR. ROSENBERG:  Judge --          10:01:2

18         THE COURT:  Hold on, let me hear from the Department of          10:01:2

19  Justice.          10:01:2

20               Go ahead.          10:01:3

21         MS. COON:  Just to round out the picture, the United          10:01:3

22  States also has some expert testimony to present regarding the          10:01:3

23  staffing of the jail, and we're prepared to do during the          10:01:4

24  hearing this week.          10:01:4

25         THE COURT:  The question is, if it's on the sheriff's          10:01:4

1    lap now, hopefully the sheriff can give it some expedited          10:01:4

2    review.  I want it to be a review that's meaningful; but,          10:01:5

3    obviously, we need to get this produced so we can all discuss it   10:01:5

4    on September 30.                                                   10:01:5

5             THE WITNESS:  Your Honor, can I say something?           10:01:5

6             THE COURT:  Yes.                                          10:02:0

7             MR. ROSENBERG:  I think another thing the sheriff is     10:02:0

8    waiting on is, as a part of the Consent Decree, we have to have    10:02:0

9    a correctional expert on staff.  The sheriff formed a committee    10:02:0

10   with stakeholders from the community.  They've narrowed it down,   10:02:1

11   from what I understand, to two finalists.  And I think the input   10:02:1

12   of that person will be critical to the staffing of the new        10:02:1

13   facility.                                                          10:02:2

14   BY MR. ROSENBERG:                                                  10:02:2

15   Q    My only point is, Mr. Ursin, you projected that that study    10:02:2

16   would be presented to the sheriff on June 30th, over a month       10:02:2

17   ago; did you not?                                                  10:02:3

18   A    Yes.  I thought it would get there.                           10:02:3

19   Q    When did it get there, sir?                                   10:02:3

20   A    If I'm not mistake, it was after the 4th of July.             10:02:3

21   Q    So that's still a month ago.                                  10:02:3

22             And have you seen a revised version of that             10:02:4

23   staffing study, sir?                                               10:02:4

24   A    No, I have not.                                               10:02:4

25   Q    Who's seen it?  Besides the sheriff?                          10:02:4

```
 1   A    Colonel Laughlin gave me the draft.  I looked at it.      10:02:5

 2              And then Colonel Laughlin presented it to the        10:02:5

 3   sheriff.                                                        10:02:5

 4         THE COURT:  Is Colonel Laughlin testifying?               10:02:5

 5         MR. ACURI:  Yes, Judge.                                   10:03:0

 6         THE COURT:  He can certainly be asked about it.           10:03:0

 7              But that report needs to be -- just one second.      10:03:0

 8              (Pause in proceedings.)                              10:03:1

 9         THE COURT:  Will the correctional administrator be        10:03:3

10   there in time for the next hearing, which I think is September  10:03:3

11   30th?                                                           10:03:4

12         THE WITNESS:  I believe the sheriff is anxious to get     10:03:4

13   this, whoever it is, onboard.  So, like I said, they've narrowed 10:03:4

14   it down to two.  I don't know -- I'm not on that committee.  I  10:03:4

15   don't know the timetable.  But I know the sheriff is anxious to 10:03:5

16   have that person onboard quickly.                               10:03:5

17         THE COURT:  Why don't we do this.  Why don't you let me   10:03:5

18   know what the sheriff proposes with respect to this document.   10:04:0

19              Of course, I'd like the new administrator to be      10:04:0

20   able to weigh in on it also.                                    10:04:0

21              But why don't you let me know by the end of the      10:04:1

22   week what the sheriff's proposal is, and I'll take it from      10:04:1

23   there.                                                          10:04:2

24         MR. ACURI:  We'll do that, Your Honor.                    10:04:2

25   BY MR. ROSENBERG:                                               10:04:2
```

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 76 of 350

Jones vs. Gusman 08.05.13 Funding Hearing                76

1    Q    Just a couple of other questions.                        10:04:2

2              One of the facilities at the OPP is the work        10:04:2

3    release center; is that right?                                10:04:2

4    A    Transitional work center, yes, sir.                      10:04:2

5    Q    Does that house only DOC inmates, sir?                   10:04:3

6    A    Yes.  It houses the transitional work inmates that go out to  10:04:3

7    jobs daily.                                                   10:04:3

8              It houses some community service DOC.               10:04:4

9              And it also will house what we call weekend         10:04:5

10   warriors.  These are people that have been convicted and     10:04:5

11   sentenced that do their time over weekends.  And they check in  10:04:5

12   on a Friday and check out Monday morning, in some cases Sunday  10:04:5

13   evening.  I think, right now, we have one individual that checks  10:05:0

14   in during the week because his days off from work are         10:05:0

15   Tuesday/Wednesday.                                            10:05:1

16   Q    Those are a couple.                                      10:05:1

17              I'm just trying to find out the majority or the    10:05:1

18   largest portion of the individuals housed at the work release  10:05:1

19   facility are DOC inmates; isn't that true?                    10:05:1

20   A    Yeah.  They're in the transitional work program or the  10:05:2

21   community service program.  A lot of them wait to go into the  10:05:2

22   community service and then come down to the first floor in    10:05:3

23   transitional work.                                            10:05:3

24              The transitional work center is an old firehouse.  10:05:3

25   It's like housing them in your house.  There's no cell, no bars.  10:05:4

1    These are low-risk inmates.                                    10:05:4

2    Q   And I'm just trying to find out, sir, that the sheriff uses   10:05:4

3    then City funds for the Work Release Center; does he not?    10:05:5

4    A   I mean, we use funds from DOC.  They pay their own stay,   10:05:5

5    those in transitional work.  So they work a salary.  They're   10:06:0

6    working at whatever location.  By state law, a piece of their   10:06:1

7    salary is their upkeep, their bed & board, their food, that kind   10:06:1

8    of thing.  The rest of it goes into a savings account that they   10:06:1

9    could give to the family to help support their family.    10:06:1

10   Sometimes we get court orders for family support, child support.   10:06:2

11   That comes out of their account to pay that.               10:06:2

12   Q   I understand the statutory framework.                  10:06:3

13              I'm just asking, the overhead that the sheriff   10:06:3

14   sustains, part of that is from the City payments; is it not?   10:06:3

15   A   I would think, minimum.                                10:06:4

16   Q   Minimum?                                               10:06:4

17   A   If any.                                                10:06:4

18   Q   Minimum?                                               10:06:4

19              You don't know that for sure, though.           10:06:4

20   A   No, sir.  I don't.                                     10:06:4

21   Q   Let me ask you this, sir.  Let me just go back to the deputy   10:06:4

22   pay raise -- pay scale.                                    10:06:4

23              Do you know, for example, how much insurance is   10:06:5

24   paid by say an Orleans Parish sheriff's deputy compared to a DOC   10:07:0

25   correctional officer?                                      10:07:0

1    A    You're talking about like health insurance?                    10:07:1

2    Q    Yes, sir.                                                      10:07:1

3    A    No.                                                            10:07:1

4              I mean, I know if you take advantage of the health        10:07:1

5    plan, you are deducted, and it's a pass-thru to the City.           10:07:1

6    Q    Yes, sir.                                                      10:07:2

7              And so you don't know if, for example, the                10:07:2

8    individual working as an Orleans Parish sheriff's deputy is         10:07:2

9    paying one half of what his counterpart at DOC is paying; do        10:07:3

10   you?                                                                10:07:3

11   A    I have no idea.  No, sir.                                      10:07:3

12   Q    And, by the way, when you mention benefits, besides the base   10:07:3

13   salary, there's approximately a 30 percent adjustment for           10:07:4

14   various indirect benefits to those deputies; is there not?          10:07:4

15   A    I mean, there is indirect benefit.  I don't know if it's 30    10:07:4

16   percent, no, sir.                                                   10:07:5

17   Q    And I would just ask you one last question.  You were asked    10:07:5

18   about the request made to the council for pay raises.  Were you     10:07:5

19   aware that, under the *Hamilton* settlement agreement, that the     10:08:0

20   sheriff could have come in at any time after 2006 and asked for     10:08:1

21   increases to pay for the deputies?                                  10:08:1

22   A    No, sir.  I'm not aware of that.                               10:08:2

23              I know that we've asked the council, in the              10:08:2

24   budgets that we've submitted to the City since I've been chief      10:08:2

25   deputy, has requested pay raises.                                   10:08:2

1    Q    Yes, sir.                                                   10:08:2

2                And are you aware that actually a motion was filed   10:08:3

3    by Sheriff Gusman in the *Hamilton* case asking to increase pay  10:08:3

4    raises?                                                          10:08:3

5    A    No, sir.                                                    10:08:3

6    Q    And so you're not aware that that motion was then withdrawn 10:08:3

7    shortly thereafter by the sheriff; is that right?               10:08:4

8    A    No.  No, sir.  I'm not aware of that.                       10:08:4

9                MR. ROSENBERG:  Those are all the questions I have.  10:08:4

10   Thank you.                                                       10:08:5

11               MS. COON:  No questions, Your Honor.                 10:08:5

12               MS. SCHWARTZMANN:  No questions, Your Honor.         10:08:5

13               THE COURT:  All right.  Let's call your next witness. 10:08:5

14                   Thank you, sir.                                  10:08:5

15                   Is there any redirect?                          10:08:5

16               MR. ACURI:  Just one question.                       10:09:0

17               MR. ROSENBERG:  Your Honor, in connection with Mr.   10:09:0

18   Urslin's testimony, we would offer, file and introduce Exhibit   10:09:0

19   117.                                                             10:09:1

20               THE COURT:  Is 117 not in evidence yet?             10:09:1

21               MR. ROSENBERG:  I don't believe it is, Your Honor.   10:09:1

22               MR. ACURI:  No objection.                            10:09:1

23               THE COURT:  It's admitted.                          10:09:2

24                   (Exhibit admitted.)                             10:09:2

25                       REDIRECT EXAMINATION                        10:09:2

Case 2:12-cv-00859-LMA-MBN   Document 544   Filed 08/20/13   Page 80 of 350

Jones vs. Gusman 08.05.13 Funding Hearing                    80

1    BY MR. ACURI:                                               10:09:2

2    Q   Chief, you testified that the sheriff's office has gone to    10:09:2

3    the council and asked for money for pay raises?            10:09:2

4    A   Since I've been chief deputy, yes.                     10:09:2

5    Q   Is it your understanding that he should have to sue the City    10:09:3

6    of New Orleans or litigate to get increases for deputies' pay?    10:09:3

7            MR. ROSENBERG:  Your Honor, he's leading his own    10:09:3

8    witness now.                                               10:09:4

9            THE COURT:  Sustained.                             10:09:4

10           MR. ACURI:  No further questions.                  10:09:4

11           THE COURT:  Thank you.                             10:09:4

12               You may step down.  Thank you.                 10:09:4

13               Let's call your next witness.                  10:09:4

14           MR. ACURI:  Call Colonel Michael Laughlin.         10:09:4

15               MICHAEL LAUGHLIN, being duly sworn, testified as    10:10:4

16   follows:                                                   10:10:4

17           CASE MANAGER:  State and spell your name for the    10:10:4

18   record.                                                    10:10:5

19           THE WITNESS:  Colonel Michael Laughlin.            10:10:5

20           THE COURT:  Do you want to spell it, please.       10:10:5

21           THE WITNESS:  Sure.  L-A-U-G-H-L-I-N.              10:10:5

22                   DIRECT EXAMINATION                         10:10:5

23   BY MR. ACURI:                                              10:10:5

24   Q   Colonel Laughlin, state for the record, where are you    10:10:5

25   employed?                                                  10:11:1

1    A    Orleans Parish Sheriff's Office.                          10:11:1

2    Q    What's your position there?                               10:11:1

3    A    I'm the assistant chief of security for the sheriff's     10:11:1

4    office, as well as the commander of the Special Operations     10:11:1

5    division.                                                      10:11:2

6    Q    How long have you employed at the sheriff's office?       10:11:2

7    A    Just over 22 years.                                       10:11:2

8    Q    And, during your time at the sheriff's office, have you   10:11:2

9    worked within all the facilities that are currently operated as 10:11:3

10   jails?                                                         10:11:3

11   A    Yes, I have.                                              10:11:3

12   Q    And, as assistant chief of security, you familiar with all 10:11:3

13   the post positions within those facilities?                    10:11:4

14   A    Yes, I am.                                                10:11:4

15   Q    I'm going to show you, it's on your screen, what's been   10:11:4

16   marked as sheriff's Exhibit 28.  Can you identify that?        10:11:5

17   A    Yeah.  That's a report that I had written.                10:12:0

18   Q    And when did you write that report?                       10:12:0

19   A    August of last year.                                      10:12:1

20   Q    And why did you report that report, Colonel?              10:12:1

21   A    I was instructed by our chief deputy, Chief Ursin, to go to 10:12:2

22   all the different jails and to identify the post positions of  10:12:2

23   each jail and the required number of deputies to be assigned to 10:12:3

24   each tier within each jail.                                    10:12:3

25            He instructed me to include the civil district       10:12:3

Jones vs. Gusman 08.05.13 Funding Hearing

1    court.                                                                      10:12:4

2              However, to not include Broad Street, because of                 10:12:4

3    it being like a halfway house for a police center.                         10:12:4

4    Q   And, when you refer to Broad Street, are you referring to              10:12:5

5    the Transitional Work Center?                                              10:12:5

6    A   I am.                                                                   10:12:5

7    Q   And, when you say it's like a halfway house, can you                    10:12:5

8    describe for the court what you mean?                                       10:13:0

9    A   It's a two-story building.  It's not secured at all.  The              10:13:0

10   second floor windows do not have locks on it.  The inmates can             10:13:0

11   come and go in the back to wash clothes.  They do not wear                  10:13:1

12   inmate uniforms.  Only jeans and such.  They go out to work in             10:13:1

13   the mornings or in the evenings and return back to that                     10:13:2

14   location.  Their visits on the weekend are contact visits,                  10:13:2

15   unlike the normal jail.                                                     10:13:3

16   Q   And, as the assistant chief of security, would you ever                 10:13:3

17   house pretrial detainees in that building?                                  10:13:3

18   A   No.  The only inmates that can be housed there are the                  10:13:3

19   Department of Correction inmates.  They have to go through a                 10:13:4

20   process, a screening process, and be approved.                             10:13:4

21   Q   Are those the inmates that leave to go to work every day?               10:13:4

22   A   Yes.  That's correct.                                                   10:13:5

23   Q   Colonel, after the chief instructed you to prepare the                  10:13:5

24   report, did you go through and do that?                                     10:14:0

25   A   Yes.                                                                    10:14:0

Case 2:12-cv-00859-LMA-MBN     Document 544     Filed 08/20/13     Page 83 of 350

Jones vs. Gusman 08.05.13 Funding Hearing                    83

1   Q    Tell the Court what process you went about when you prepared          10:14:0

2   this.                                                                       10:14:1

3   A    Basically, I went and met with each warden and associate              10:14:1

4   warden of every facility.  We had a sit-down first and discussed           10:14:1

5   the jails as a whole.  Got some basic information, you know, bed           10:14:2

6   capacity and such, current population, type of inmates they                10:14:2

7   house.                                                                      10:14:3

8                  And then, from there, with the wardens and                   10:14:3

9   associate wardens, we walked every tier.                                   10:14:3

10  Q    Were you able to identify all the posts within the current           10:14:3

11  jail facilities?                                                           10:14:4

12  A    Yes.                                                                   10:14:4

13  Q    Were all those posts filled by deputies?                             10:14:4

14  A    No.                                                                    10:14:4

15  Q    Do you know how many of them were unfilled?                          10:14:4

16  A    It's in my report.                                                    10:14:5

17                 Some facilities, it was half.  Some facilities, it          10:14:5

18  was a little bit better.  It just varied.                                  10:15:0

19                 THE COURT:  When you say posts, what do you mean by          10:15:0

20  post filled?                                                               10:15:0

21                 THE WITNESS:  Positions that the staff have to or the       10:15:0

22  facility has to have a deputy at.                                          10:15:0

23                 For example, at OPP, it's four stories.  So's               10:15:1

24  there's a tier on each floor.  Well, it's required to have a               10:15:1

25  deputy at all times on every one of those tiers.                          10:15:2

1         And, on some occasions, it's not like that.                10:15:2

2   Sometimes the deputy's required to have two tiers.               10:15:2

3         THE COURT:  So there are occasions where the tiers         10:15:3

4   don't have any deputy supervision at all because the deputy is   10:15:3

5   going to another tier?                                           10:15:4

6         THE WITNESS:  That's correct.  So they have to lock it     10:15:4

7   down and go down whatever they have to do on the other tier, and 10:15:4

8   then basically juggle between the two.                           10:15:4

9         THE COURT:  Is that the way you want to run your jail      10:15:5

10  or is there some reason for that?                                10:15:5

11        THE WITNESS:  Well, the reason was the manpower.  They     10:15:5

12  just did not have the employees to cover all the positions.      10:15:5

13        THE COURT:  I see.                                         10:16:0

14        THE WITNESS:  In my report that I put together, on some    10:16:0

15  particular tiers, there should be more than one deputy.  In      10:16:0

16  others, just one.  It just depended on the different type of     10:16:1

17  inmates that were housed.                                        10:16:1

18            Again, for example, with OPP, at the time this         10:16:1

19  report was done, they had the youth offender tier, which is like 10:16:2

20  your juveniles.  In my experience, we should have two deputies   10:16:2

21  assigned to that tier, not just one.                            10:16:2

22            Our administrative segregation tier, the inmates       10:16:3

23  that violate departmental rules and regulations, to me, that's   10:16:3

24  where you should have two deputies assigned to tier because      10:16:4

25  those inmates are locked down all the time.  So it's a lot       10:16:4

1    harder to work within that tier.                          10:16:5

2            THE COURT:  Did that tier have at least one?      10:16:5

3            THE WITNESS:  Yes.                                10:16:5

4            THE COURT:  How about the tiers where maximum security   10:16:5

5    inmates were housed, did that tier have at least one at all   10:17:0

6    times?                                                    10:17:0

7            THE WITNESS:  Yes.                                10:17:0

8    BY MR. ACURI:                                             10:17:0

9    Q   Colonel, I'm going to direct you to the Bate stamp 996,   10:17:0

10   which I have on the screen here.                          10:17:0

11           Is that part of your report?                     10:17:1

12   A   Yes.                                                  10:17:1

13   Q   Can you explain to the judge basically what that page shows.   10:17:1

14   A   Well, just what we just talked about.  This is the OPP   10:17:1

15   facility.  It's a four-story building with a tier.  It's kind of   10:17:1

16   shaped like an H.  So each corner has a tier that goes up.   10:17:2

17           And, for example, just going down, A3 was our    10:17:2

18   youth offender tier.  So, at the time, they only had -- as you   10:17:3

19   can see, the current for that particular day, they had a deputy   10:17:3

20   assigned to that tier.  However, they should have two.    10:17:4

21           As you go down, like E4, for example, on that    10:17:4

22   particular day, they did not have a deputy assigned.  So the   10:17:4

23   deputy assigned to B3 would have been required to cover both of   10:17:5

24   those tiers.  He would have to juggle back and forth.     10:17:5

25           THE COURT:  Who is housed in B4?                  10:17:5

1        THE WITNESS:  At the time, it would be -- it would be          10:18:0

2   un-sentenced state inmates, violent offenders.  Any one of the      10:18:0

3   four, like murder, rape, armed robbery, high bonds, things of       10:18:0

4   that nature.                                                        10:18:1

5        THE COURT:  So you had violent offenders without any           10:18:1

6   supervision some of the time?                                       10:18:1

7        THE WITNESS:  Some of the time, yes, sir.                      10:18:1

8        THE COURT:  How were they housed?  Are they housed on          10:18:2

9   individual cells, or on a tier?                                     10:18:2

10       THE WITNESS:  There's three types of tiers.                    10:18:2

11            You have, just what you're describing, a split            10:18:2

12  dorm with individual cells that can hold up to four inmates in      10:18:2

13  each cell, going back seven cells.  Then --                         10:18:3

14       THE COURT:  Let's talk about B4, to make it                    10:18:3

15  understandable.                                                     10:18:3

16       THE WITNESS:  Sure.  B4 is what we call a split dorm.          10:18:3

17  Basically, it's two sides.  There's a walkway in the middle         10:18:4

18  where the deputies can walk up and down.  And there's basically     10:18:4

19  48 beds on each side.  And, it's open, like almost like a           10:18:5

20  day-room type setting.                                              10:18:5

21       THE COURT:  So there are no cells with four persons in         10:18:5

22  the cell?                                                           10:18:5

23       THE WITNESS:  No.  Not on that tier.                           10:19:0

24       THE COURT:  So you have 48 inmates charged with serious        10:19:0

25  crimes on each side?                                                10:19:0

1          MR. ROSENBERG:  It could be up to.  I mean, some don't.      10:19:0

2          THE COURT:  So, if somebody is place at risk      10:19:0

3    physically, physically at risk, and there's not a sheriff's      10:19:1

4    deputy there, what options does that inmate have, other than to      10:19:1

5    scream and hope somebody shows up?      10:19:2

6          THE WITNESS:  Well, that.  Make phone calls.  Things of      10:19:2

7    that nature.      10:19:2

8          THE COURT:  How is he going to make a phone call if      10:19:2

9    he's being attacked?      10:19:3

10          THE WITNESS:  I see what you're saying.  If he's being      10:19:3

11    attacked, no.      10:19:3

12              Just to clarify for you, the whole tier holds 48.      10:19:3

13    It's on a split dorm.  It's like 24 inmates on one side, 24      10:19:3

14    inmates on the other.      10:19:4

15              So what I also created, because of the security, I      10:19:4

16    created what we call rover position.  Which would be, if on that      10:19:4

17    particular side, some inmate had to go to medical or dental or      10:19:5

18    go to court or what have you, that rover would be responsible      10:19:5

19    for picking those inmates up, bringing them to their locations      10:20:0

20    and bringing them back.      10:20:0

21          THE COURT:  One other question to you.  If you're      10:20:0

22    dealing with -- let's say you're dealing with the maximum      10:20:0

23    number, 48 inmates on each side, and there happens to be --      10:20:0

24          THE WITNESS:  24 on each side.      10:20:1

25          THE COURT:  24 on each side.      10:20:1

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 88 of 350

Jones vs. Gusman 08.05.13 Funding Hearing                    88

1            And there happens to be a problem while there's                    10:20:1

2   one deputy on that tier.  Now, can the deputy visualize the                 10:20:1

3   entire tier, or not?                                                        10:20:2

4            THE WITNESS:  Yes, he can.                                         10:20:2

5            THE COURT:  Now, if there's a problem inside, that                 10:20:2

6   deputy -- inside one of the sides of the cell, that deputy is               10:20:2

7   not going into the middle of 24 cells; is that right?                       10:20:2

8            THE WITNESS:  That's correct.                                      10:20:2

9            THE COURT:  So what does the deputy do?                            10:20:3

10           THE WITNESS:  He calls on the phone to control for                 10:20:3

11  backup.  And then the rank, other deputies from other tiers,                10:20:3

12  whatever the case may be, would respond.                                    10:20:3

13           THE COURT:  So, even with one deputy there, there's                10:20:4

14  additional time necessary to get other persons necessary to                 10:20:4

15  respond?                                                                    10:20:4

16           THE WITNESS:  Correct.  He cannot go in alone.                     10:20:4

17  BY MR. ACURI:                                                               10:20:5

18  Q   Colonel, this rover position that you were referring to,                10:20:5

19  which is identified on page 996, do we currently have those                 10:20:5

20  rovers within the jail?                                                     10:21:0

21  A   No.  We do not.                                                         10:21:0

22           THE COURT:  What are tiers C3 and C4?  Who do those                10:21:0

23  tiers house?                                                                10:21:1

24           THE WITNESS:  C2 would house un-sentenced state                    10:21:1

25  inmates, as well as -- you said C4?                                         10:21:1

1        THE COURT:  Correct.                                    10:21:1

2        THE WITNESS:  Same thing.                               10:21:2

3        THE COURT:  All types of crimes?                        10:21:2

4        THE WITNESS:  Correct.                                  10:21:2

5   BY MR. ACURI:                                                10:21:2

6   Q   Colonel, right now, in the situation you described, if an   10:21:2

7   inmate has to go to medical or dental, who takes that inmate to   10:21:3

8   medical or dental?                                          10:21:3

9   A   The deputy that's assigned to that tier.                10:21:3

10  Q   So that deputy has to leave that tier with that inmate?  10:21:3

11  A   He has to lock down the tier and bring the inmate to    10:21:4

12  medical, dental or what have you, yes.                      10:21:4

13  Q   Now, Colonel, you said that you compiled this report back in   10:21:4

14  July or August of 2012?                                     10:21:5

15  A   Correct.                                                10:21:5

16  Q   Do you know how many jail security deputies you had total   10:21:5

17  when you compiled this report?                              10:22:0

18  A   Somewhere around, total at the time, was somewhere around   10:22:0

19  420 some odd in security.                                   10:22:1

20  Q   You know how many you have now?                         10:22:1

21  A   Somewhere in the neighborhood of 361, 381.  Somewhere in   10:22:1

22  that range.                                                 10:22:2

23        THE COURT:  Now, when you say in security, are those   10:22:2

24  deputies who are actually involved in the day-to-day supervision   10:22:2

25  of corrections?  In other words, of supervising the inmates?   10:22:3

1          THE WITNESS:  Correct.  The add-on is your          10:22:3

2    transportation, because they deal with the inmates, as well as   10:22:4

3    the kitchen.                                                10:22:4

4          THE COURT:  And administrative; right?               10:22:4

5          THE WITNESS:  Administration does not fall under jail   10:22:4

6    security, no, sir.  That number is just what you describe, those   10:22:4

7    that are working in the jails that have contact with the   10:22:5

8    inmates.                                                    10:22:5

9          THE COURT:  How about intake deputies?              10:22:5

10          THE WITNESS:  Yes.                                   10:22:5

11          THE COURT:  Is that included in the number you just   10:22:5

12    gave us?                                                    10:23:0

13          THE WITNESS:  Yes.                                   10:23:0

14          Courts would be left out, both of the courts.       10:23:0

15    Administration.  Those type of things.                     10:23:0

16    BY MR. ACURI:                                              10:23:0

17    Q   Now, Colonel, you mentioned that, for instance, tier A3, you   10:23:1

18    said it formerly housed the youth offender population.  Where   10:23:1

19    are those now?                                             10:23:1

20    A   We've moved them to the Conchetta facility.          10:23:1

21    Q   Do you have other populations that would be present on tiers   10:23:2

22    that have shifted?                                         10:23:3

23    A   We moved the females out of the Templeman V to three of the   10:23:3

24    tents at the temp facility, temporary jail facility.       10:23:3

25          And the reason we moved the youth offenders is, at   10:23:4

1    the time, that's a 48 bed dorm.  And so we moved them out of          10:23:4

2    that facility because we needed the space.  And we moved them to      10:23:4

3    Conchetta, where the other youth offenders are housed.  So we         10:23:5

4    have two tiers, we have a protective custody youth offender tier      10:23:5

5    and a general population youth offender tier.                         10:23:5

6    Q    As a result of those changes, have the total staffing needs      10:24:0

7    changed?  Not within just these tiers, but do you need fewer          10:24:0

8    deputies because of those moves?                                      10:24:1

9    A    No.  We just shifted to the other facilities.                    10:24:1

10   Q    So, at Conchetta, where they are now, do you still feel like     10:24:1

11   you need two deputies there?                                          10:24:2

12   A    Yes.                                                             10:24:2

13   Q    Colonel Laughlin, have you read the Consent Judgment that        10:24:2

14   was entered by the Court in this case?                                10:24:3

15   A    Yes, I've read it.                                               10:24:3

16   Q    As assistant chief of Security, can your department comply       10:24:3

17   with that Consent Judgment without filling these additional          10:24:4

18   posts?                                                               10:24:4

19   A    No.                                                             10:24:4

20         THE WITNESS:  Your Honor, again, he's asking this              10:24:4

21   witness for opinion testimony, and we object.  I understand his       10:24:5

22   position, Judge, but he's still providing opinion testimony.         10:24:5

23         THE COURT:  He's well suited to provide this type of           10:24:5

24   testimony by the activities in which he engages on a daily            10:24:5

25   basis.  Overruled.                                                    10:25:0

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 92 of 350

Jones vs. Gusman 08.05.13 Funding Hearing                        92

```
1            Go ahead.                                        10:25:0

2   BY MR. ACURI:                                             10:25:0

3   A    So yes.                                              10:25:0

4   Q    Since you have completed this report in July or August of  10:25:0

5   2012, have any of these identified facilities gone offline or   10:25:1

6   any new facilities come online?                          10:25:1

7   A    No.                                                  10:25:1

8   Q    Is the inmate population from when you completed this report  10:25:1

9   drastically different than what it is today?             10:25:2

10  A    I know would say no.  I would say it's pretty much the same.  10:25:3

11  We're hovering right around 2,400 total inmate population.  10:25:3

12           THE COURT:  Chief Deputy Ursin previously testified  10:25:4

13  about his knowledge about why some of the staff leaves and why  10:25:4

14  it's difficult to retain persons at the jail.            10:25:4

15           THE WITNESS:  Yes, sir.                          10:25:4

16           THE COURT:  In connection with your duties, do you have  10:25:4

17  anything to do with discovering or being involved and    10:25:5

18  interviewing deputies in connection to why they're leaving?  10:25:5

19           THE WITNESS:  I've talked to deputies.          10:26:0

20           THE COURT:  That are leaving?                    10:26:0

21           MR. ROSENBERG:  That have left and, yes, that are  10:26:0

22  leaving, just to get their take on why.  I've had some in my own  10:26:0

23  division.  And my division's considered one of the more -- one  10:26:0

24  of the better divisions to get into, and I've reduced by five  10:26:1

25  since a year ago.  And they've left -- my people have left to go  10:26:1
```

1  to other law enforcement agencies, such as St. Tammany.  I've        10:26:2

2  had one that actually went into his own business, lawn care.  So     10:26:2

3  -- and it's all basically because of money.                          10:26:3

4  By MR. ACURI:                                                        10:26:4

5  Q   Colonel, we know you compiled this report.                       10:26:4

6             Have you also have been assigned to compile a             10:26:4

7  report regarding the new facility that's scheduled to come           10:26:4

8  online some time next year?                                          10:26:4

9  A   Yes.  In that report -- that report was a little different       10:26:5

10 than this one.  This report that I compiled here has nothing to      10:26:5

11 do with a relief factor.  It was just identifying posts.             10:26:5

12            The new jail report that I've conducted for the           10:27:0

13 new facility coming online actually has relief factor in it.         10:27:0

14            THE COURT:  What's the relief factor?                     10:27:0

15            THE WITNESS:  For those that are like on annual, sick     10:27:1

16 leave, continual education, things of that nature.  So --            10:27:1

17 because they've still got to have those folks fill in.  And,         10:27:1

18 with the Consent Decree, it's requiring a lot more continuous        10:27:2

19 education.  So a lot more people will be going to the training       10:27:2

20 academy for advanced learning and education.                        10:27:2

21 BY MR. ACURI:                                                        10:27:3

22 Q   You talked about your report.  Have you turned that report       10:27:3

23 to anyone?                                                           10:27:4

24 A   Yes.                                                             10:27:4

25 Q   Who did you turn it over to?                                     10:27:4

1    A    The sheriff.                                                10:27:4

2    Q    And has he returned it with comments or suggestions yet to  10:27:4

3    you?                                                              10:27:5

4    A    No.                                                         10:27:5

5              I've talked to him about it, mostly because it's       10:27:5

6    kind of on hold.  Because of the possibility of having to now    10:27:5

7    include the mental health, which in the report I did, It was     10:27:5

8    just for strictly for the jail, not the mental health part.      10:28:0

9              THE COURT:  Why can't that part be released?           10:28:0

10             THE WITNESS:  Because you're going to lose bedding.     10:28:1

11   And then, with mental health, you have a whole different animal,  10:28:1

12   so to speak, because you have direct observation, you have       10:28:1

13   suicide watch.  So you have to have a lot more -- it's a lot      10:28:2

14   more labor intensive as a facility.  You need a lot more         10:28:2

15   employees there.                                                 10:28:2

16   BY MR. ACURI:                                                    10:28:2

17   Q    Colonel Laughlin, this staffing report that you turned over 10:28:3

18   to the sheriff, does it include anything for any other buildings 10:28:3

19   other than what's known as Templeman III or IV replacement?      10:28:4

20   A    No.                                                         10:28:4

21   Q    So it doesn't include anything for Templeman IV?            10:28:4

22   A    No.  Just the jail, the new jail.                           10:28:4

23             MR. ACURI:  I have nothing further.  Mr. Rosenberg may  10:28:5

24   have some questions for you.                                     10:28:5

25                         CROSS EXAMINATION                          10:28:5

1   BY MR. ROSENBERG:                                                10:28:5

2   Q   This document which your lawyer sometimes calls a report,    10:29:0

3   Exhibit 28, was prepared over year; is that right, sir?          10:29:1

4   A   Yes, sir.                                                    10:29:1

5   Q   And have you done anything to update this document other     10:29:1

6   than this draft report that's on the sheriff's desk?            10:29:2

7           THE COURT:  Why was it over a year ago?  I thought you   10:29:2

8   said you wrote it August 2012.                                  10:29:2

9           THE WITNESS:  Yes.                                       10:29:3

10          THE COURT:  So it's about a year.                        10:29:3

11          THE WITNESS:  Yes.                                       10:29:3

12          MR. ROSENBERG:  I understand, Your Honor, July or        10:29:3

13  August 2012.                                                    10:29:3

14          THE COURT:  August 2012 is what he testified.           10:29:3

15          THE WITNESS:  End of July/early August.  So a year ago. 10:29:4

16  And I haven't changed it.                                       10:29:4

17          MR. ROSENBERG:  I wasn't mincing the report.            10:29:4

18          THE COURT:  I was trying to get the timeframe.          10:29:5

19  BY MR. ROSENBERG:                                               10:29:5

20  Q   Have you done anything since this document or report you     10:29:5

21  prepared a year ago, sir?                                       10:29:5

22  A   No.  I have not changed it.                                  10:29:5

23  Q   We've heard testimony that certain measures were taken by    10:30:0

24  the sheriff once he signed the Consent Decree.  Did you take any 10:30:0

25  measures to ensure that tiers were not vacant or vacated by      10:30:0

1    deputies as this report or documents shows?                    10:30:1

2    A   Currently?                                                 10:30:1

3    Q   Yes, sir.                                                  10:30:1

4    A   They still have tiers that are open.                       10:30:1

5    Q   Okay.  And are those tiers include -- for example, the tiers   10:30:2

6    you mentioned, the B4, the C2 and the C4, do those tiers also  10:30:2

7    house -- at that time, did they house DOC inmates, sir?        10:30:3

8    A   Some, yes.                                                 10:30:3

9    Q   And is it your testimony, Mr. Laughlin, that the population   10:30:3

10   at OPP is approximately the same today as it was a year ago,   10:30:4

11   2,825 inmates?                                                 10:30:5

12   A   No.  I just said, it was approximately 2,400 right now.    10:30:5

13   Q   2,400 right now?                                           10:31:0

14   A   Total population.                                          10:31:0

15   Q   And how many of those inmates are DOC inmates, sir?        10:31:0

16   A   I would say around in the 500 range.                       10:31:1

17   Q   And then there's another 65 or 75 Plaquemines Parish       10:31:2

18   inmates; is that right, sir?                                   10:31:2

19   A   That's correct.                                            10:31:2

20   Q   And --                                                     10:31:2

21            THE COURT:  The Plaquemines Parish inmates, are they  10:31:3

22   housed separately?                                             10:31:4

23            THE WITNESS:  Yes, sir.  They have their own tier.    10:31:4

24            THE COURT:  Because they are supervised by their own  10:31:4

25   deputies?                                                      10:31:4

```
1              THE WITNESS:  Yes, that's correct.              10:31:5

2    BY MR. ROSENBERG:                                         10:31:5

3    Q   Are some of these administrative functions, including 10:31:5

4    providing food for the inmates, come from the Orleans Parish 10:31:5

5    Prison?                                                   10:31:5

6    A   Yes, sir.                                             10:31:5

7    Q   That doesn't come from Plaquemines Parish; does it, sir? 10:31:5

8    A   No, sir.                                              10:32:0

9              THE COURT:  So Plaquemines Parish pays a per diem; 10:32:0

10   correct?                                                  10:32:0

11             THE WITNESS:  To be sure.                       10:32:0

12             THE COURT:  But it also supervises its own inmates? 10:32:0

13             THE WITNESS:  Yes, sir.                         10:32:0

14             THE COURT:  And you don't absorb any of those   10:32:1

15   supervision cost; correct?                                10:32:1

16             THE WITNESS:  No, sir.                          10:32:1

17   BY MR. ROSENBERG:                                         10:32:1

18   Q   You absorb administrative costs; right?              10:32:2

19             THE COURT:  He testified to that.               10:32:2

20             MR. ROSENBERG:  I just wanted to be sure that was 10:32:2

21   clear.                                                    10:32:3

22                 Your Honor, I don't know if the sheriff is  10:32:3

23   intending to offer this as a document, because we have some 10:32:3

24   issues with this which were not covered in the questions.  But, 10:32:3

25   if it's limited to the staffing at OPP, then I'll limit my 10:32:4
```

1   questions.  If it's not, then I have some other questions to          10:32:4

2   ask.          10:32:4

3          THE COURT:  Well, is the sheriff intending to offer?          10:32:4

4          MR. ACURI:  Yes, Judge.          10:32:5

5          THE COURT:  Go ahead and continue.          10:32:5

6          MR. ROSENBERG:  Sure.          10:32:5

7   BY MR. ROSENBERG:          10:32:5

8   Q   You've actually projected deputies for the civil court          10:32:5

9   division; have you not, sir?          10:32:5

10  A   Yes, sir.          10:32:5

11  Q   And did you just make guesses as to those numbers, or did          10:33:0

12  you talk to the civil district court judges?          10:33:0

13  A   No.  I met with Chief McGee on our staff.          10:33:0

14  Q   And you're projecting 41 deputies just at civil district          10:33:1

15  court?          10:33:1

16  A   Yeah.  An additional 30.          10:33:1

17  Q   Yes, sir.          10:33:2

18          And that would provide a deputy in each courtroom          10:33:2

19  of civil district court?          10:33:2

20  A   That's correct.          10:33:2

21  Q   But there's been no request by the civil district court for          10:33:2

22  that number of deputies; has there?          10:33:3

23  A   Well, my understanding in talking to Chief McGee, yes, there          10:33:3

24  have been -- I don't want to use the word complaints -- but many          10:33:4

25  conversations in which that has been discussed.          10:33:4

Case 2:12-cv-00859-LMA-MBN   Document 544   Filed 08/20/13   Page 99 of 350

Jones vs. Gusman 08.05.13 Funding Hearing                99

1    THE COURT:  Do the plaintiffs or the DOJ contend that    10:33:4

2   the costs of deputies at the civil district court are part of    10:33:5

3   this funding issue?    10:33:5

4    MS. COON:  No, Your Honor.  We have not been including    10:33:5

5   deputies in civil court in our staffing recommendations.    10:34:0

6    MR. ROSENBERG:  Your Honor, just so we're clear, the    10:34:0

7   City wasn't going to get into that other, than the fact that    10:34:0

8   it's part and parcel of this Exhibit 28.    10:34:0

9    THE COURT:  I understand; but I just wanted to confirm    10:34:1

10   that because I'm listening to this and I just don't think it's    10:34:1

11   part of the funding issue to which I have to be concerned with.    10:34:1

12    MR. ROSENBERG:  Your Honor, as long as the sheriff or    10:34:2

13   any other party is not asking the City or asking, period, for    10:34:2

14   more money for deputies relating to civil district court or the    10:34:2

15   other courts other than the deputies for the jail, that's fine.    10:34:3

16   We'll accept that and move on.    10:34:3

17    MR. MATHEWS:  That's correct, Your Honor.  This is just    10:34:4

18   for security.  That is part of the report.    10:34:4

19    THE COURT:  What about criminal district court?    10:34:4

20    MR. ACURI:  Judge, those deputies, the City pays a lump    10:34:4

21   sum for those deputies pursuant an a Consent Decree.  Those are    10:34:5

22   not included in here because this report was specifically    10:34:5

23   provided at the City's question.  We prepared it at the City's    10:35:0

24   request.    10:35:0

25    THE COURT:  So, as far as the Court is concerned, it    10:35:0

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 100 of 350

Jones vs. Gusman 08.05.13 Funding Hearing                    100

```
1   doesn't have to direct itself for providing funding from the        10:35:0

2   City or otherwise at the civil district court or criminal           10:35:1

3   district court?                                                     10:35:1

4            MR. ACURI:  Right, Judge.                                  10:35:1

5            MR. ROSENBERG:  Can I be heard?                            10:35:1

6              The document that he's referring to that provides        10:35:2

7   deputies for the criminal district is part of the Hamilton         10:35:2

8   settlement.  As Your Honor indicated, we can't have both, the      10:35:2

9   Hamilton settlement and the Consent Decree.                         10:35:3

10           THE COURT:  Well, the Hamilton case is still alive; is     10:35:3

11  it not?  It teams to me that -- I'm just speaking out loud --       10:35:3

12  the City needs to go back to the Hamilton case to the extent it     10:35:4

13  has some issue with the criminal court deputies.  I'm not going     10:35:4

14  to resolve that here.                                               10:35:5

15           THE WITNESS:  Yes, sir.                                    10:35:5

16             And all of the terms of the Hamilton decision will       10:35:5

17  be addressed by the City.                                           10:35:5

18           MR. ACURI:  Just to be clear, part of that is an           10:36:0

19  outside settlement agreement, because the sheriff is to provide     10:36:0

20  one deputy per courtroom at the criminal district court.            10:36:0

21           THE COURT:  Let's go on to something else.  I get it.      10:36:1

22  BY MR. ROSENBERG:                                                   10:36:1

23  Q   Again, you've talked in this document about the sheriff's       10:36:1

24  fleet; is that right, sir?                                          10:36:1

25  A   Yes, sir.                                                       10:36:2
```

1    Q    Do you know how many new vehicles the sheriff bought in        10:36:2
2    2011?                                                               10:36:2
3    A    I don't have an exact total, no, sir.                          10:36:2
4    Q    Do you know how many he bought in 2012?                        10:36:2
5    A    No, sir.                                                       10:36:3
6    Q    It certainly wouldn't surprise you to hear that he bought      10:36:3
7    more than 30 different vehicles?                                    10:36:3
8          THE COURT:  What's the relevance of that?  I don't            10:36:3
9    really care.                                                        10:36:4
10          MR. ROSENBERG:  Well, Your Honor --                          10:36:4
11          THE COURT:  It's money spent.                                10:36:4
12          MR. ROSENBERG:  Your Honor, I understand.                    10:36:4
13          But he's also talking about vehicles for 2013 and            10:36:4
14    2014.  So I'm just trying to understand and lay a predicate,       10:36:5
15    Your Honor, because he's saying that their fleet is depleted in    10:36:5
16    this document.                                                     10:37:0
17          THE COURT:  Do you have enough vehicles to get you           10:37:0
18    through the end of the year?  Can you all take the bus, a street   10:37:0
19    car?  Do you all have enough vehicles to get you through the end   10:37:1
20    of the year?                                                       10:37:1
21          THE WITNESS:  I have no idea.                                10:37:1
22          THE COURT:  Let's go on to somebody who knows.               10:37:1
23          MR. ROSENBERG:  That's fine, Judge.  That will make it       10:37:1
24    easy.  I should have asked that question myself, and I apologize   10:37:1
25    for not being sharp.                                               10:37:2

1          THE COURT:  No problem.                                    10:37:2

2          MR. ROSENBERG:  And so, Your Honor, if that's the         10:37:2

3   temporal boundaries of this proceeding, because the sheriff in   10:37:3

4   this document has talked about vehicles for 2013, 2014, that     10:37:3

5   would not be germane to what I understand the Court's inquiry    10:37:4

6   is.  It's just whether he's got enough vehicles to get him      10:37:4

7   through December 31st, 2013.                                     10:37:4

8          THE COURT:  Exactly.                                      10:37:4

9          MR. ROSENBERG:  Thank you, Your Honor.  No other          10:37:5

10  questions.                                                       10:37:5

11         THE COURT:  Are there any other questions about the       10:37:5

12  report since they're going to attempt to introduce it?          10:37:5

13         MR. ROSENBERG:  I have no other questions regarding the   10:37:5

14  report at this point.                                            10:38:0

15         THE COURT:  Okay.  All right.                             10:38:0

16             How about any questions by the United States?        10:38:0

17         MS. COON:  No, Your Honor.                                10:38:1

18         MS. SCHWARTZMAN:  Nothing from us, Your Honor.            10:38:1

19         THE COURT:  All right.                                    10:38:1

20             Any redirect?                                        10:38:1

21         MR. ACURI:  No, Your Honor.                               10:38:1

22         THE COURT:  Thank you, sir.  I appreciate it.            10:38:1

23         MR. MATTHEWS:  Judge, could we have a short recess?       10:38:2

24         THE COURT:  It's almost 10:40.  Let's take a ten minute   10:38:2

25  recess, and then we're going to work until 11:30.               10:38:2

1        (Proceedings in recess.)                              10:38:3

2        THE COURT:  Have a seat.                              10:52:0

3            Let's call your witness, please.                 10:52:0

4            By the way, how many more witnesses does the    10:52:1

5    sheriff have to put on?                                  10:52:1

6        MR. MATTHEWS:  Judge, we have Dr. Inglese, and George  10:52:1

7    Armbruster by deposition.                                10:52:2

8            RICHARD DEMAREE INGLESE, being first duly sworn,  10:52:4

9    testified as follows:                                    10:52:3

10       CASE MANAGER:  Take a seat.  And if you'll state and  10:52:3

11   spell your name for the record.                          10:52:3

12       THE WITNESS:  My name is Richard Demaree Inglese,    10:52:4

13   Richard R-I-C-H-A-R-D Demaree D-E-M-A-R-E-E Inglese      10:52:4

14   I-N-G-L-E-S-E.                                           10:53:0

15                    DIRECT EXAMINATION                      10:53:0

16   BY MR. MATTHEWS:                                         10:53:0

17   Q   Doctor, did I ask you to appear here in court today to  10:53:0

18   present testimony?                                       10:53:0

19   A   Yes.                                                 10:53:0

20   Q   Could you explain briefly the areas I asked you to testify  10:53:0

21   to?                                                      10:53:1

22       THE COURT:  Why don't you lay the foundation for his  10:53:1

23   expertise.                                               10:53:1

24       MR. MATTHEWS:  I will.                               10:53:1

25   BY MR. MATTHEWS:                                         10:53:1

1    A    The cost to implement a medical program that meets                    10:53:1

2    specifications put forth in the US Department of Justice Consent          10:53:2

3    Decree.                                                                    10:53:2

4    Q    And you have formed an opinion; correct?                             10:53:2

5    A    Yes, I have.                                                          10:53:2

6    Q    Would you tell the Court a little bit about your education,          10:53:2

7    please.                                                                   10:53:3

8    A    Yes.                                                                  10:53:3

9              I went to undergraduate at Case Western Reserve                 10:53:3

10   University in Cleveland, Ohio.                                            10:53:3

11             And then I did my medical school at the University             10:53:4

12   Pennsylvania, School of Medicine at Philadelphia.                         10:53:4

13             And then, after that, I did my internship and                  10:53:4

14   residency in internal medicine for the United States Air Force           10:53:4

15   at Keisler, Biloxi, Mississippi.                                          10:53:5

16             So that was the completion of my education.                    10:53:5

17   Q    And what is your present occupation?                                 10:53:5

18   A    I'm the medical director at St. Tammany Parish Sheriff's            10:54:0

19   Office.                                                                   10:54:0

20   Q    How long have you held that position?                               10:54:0

21   A    Since May of 2004.                                                   10:54:0

22   Q    And, prior to coming to the St. Tammany Parish Sheriff's           10:54:1

23   office, what position did you hold?                                       10:54:1

24   A    I was -- previously, I was the medical director of Orleans         10:54:1

25   Parish -- back then, it was Criminal Sheriff's Office, from             10:54:2

1    November of 2000 until July of 2006.                          10:54:2

2    Q    Could you identify any professional experience that you've    10:54:2

3    had that would assist you in forming your opinion here today.    10:54:3

4    A    Yes.  In addition to my training as an internist and working    10:54:3

5    in a jail, I have a consulting business on the side, where I    10:54:4

6    consult in a brother of medical-legal related issues, but one of    10:54:4

7    my specialties is correctional health care.  And I have    10:54:5

8    consulted, designed and/or implemented 15 or 16 different jail    10:54:5

9    medical programs in the state of Louisiana.  So part of    10:55:0

10   consulting on a lot of them have been reviewing the budgets.    10:55:0

11   I've actually personally designed five jail medical systems for    10:55:1

12   parish jails in Louisiana, and taken two of them through    10:55:1

13   implementation, Orleans in 2000.  It was completely    10:55:1

14   reconstructed, the medical department.  And St. Tammany was    10:55:2

15   constructed from scratch in May of 2004.    10:55:2

16             So that, I'm quite familiar with the standard of    10:55:3

17   care at correctional facilities throughout Louisiana, and also    10:55:3

18   the budgets and staffing that it takes to set up departments    10:55:4

19   here.    10:55:4

20             I also have been a member of the society of    10:55:4

21   correctional physicians and have done a lot of the work looking    10:55:4

22   at jails nationally, large jails, medium-sized jails, and how    10:55:5

23   they implemented their health care programs and how they    10:55:5

24   budgeted those programs.  I've taken a facility through both    10:56:0

25   NCCAC and ACA accreditation, so I'm sort of familiar with the    10:56:0

1    standards of care nationally as well as regionally.    10:56:1

2                    I also teach correctional health care at Tulane    10:56:1

3    University School of Medicine as part of their medical student    10:56:1

4    curriculum and also part of their medicine training for    10:56:2

5    internists in training at the residency program there.    10:56:2

6                    Also, I was medical director of an emergency room    10:56:3

7    and of a primary care clinic for the United States Air Force, so    10:56:3

8    I designed and implemented my budget for those departments as    10:56:3

9    well.    10:56:4

10   Q   Have you ever been qualified as an expert as to correctional    10:56:4

11   health care?    10:56:4

12   A   Yes, I have.    10:56:4

13   Q   Have you ever been denied?    10:56:4

14   A   No, I have not.    10:56:4

15   Q   What courts have you been accepted as an expert?    10:56:5

16   A   I've been accepted in federal courts.    10:56:5

17                   I would need to refer to my CV to find out what    10:56:5

18   specific judge or magistrate.    10:57:0

19   Q   Here in the Eastern District?    10:57:0

20   A   Yes.    10:57:0

21       MR. MATTHEWS:  Judge, I would tender Dr. Inglese as an    10:57:0

22   expert in the field of correctional health care and staffing and    10:57:0

23   budgeting.    10:57:1

24       MR. ROSENBERG:  The City has no objection, Your Honor.    10:57:1

25       THE COURT:  When you say staffing and budgeting, you're    10:57:1

1    talking about with respect to health care issues?                    10:57:1

2           MR. MATTHEWS:  Yes, Your Honor.                               10:57:2

3           THE COURT:  Anybody want to ask anything on the               10:57:2

4    predicate?                                                           10:57:2

5           MR. SANDERS:  Nothing on that.                                10:57:2

6           THE COURT:  Thank you.                                        10:57:2

7               Let me ask you something.  Are you board certified        10:57:2

8    and have you had any fellowships?                                    10:57:3

9           THE WITNESS:  Yes.  I was board certified in medicine.        10:57:3

10   I am now practicing almost totally in correctional health care,      10:57:3

11   and there is no boards for correctional health care as it            10:57:3

12   exists.                                                              10:57:4

13              I took my internal medicine boards in 1996, passed        10:57:4

14   them on the first time.  It's a ten-year board certification         10:57:4

15   process.  But I no longer need that to function as a                 10:57:4

16   correctional health care expert, so I've never recertified.         10:57:5

17              I've never failed them or anything, just have not         10:57:5

18   retaken them.                                                        10:57:5

19              And there's no additional training besides any            10:58:0

20   continuing medical education you get above and beyond your           10:58:0

21   internal medicine training.  Every year, we have to get 20 hours     10:58:0

22   of continuing medical education.                                     10:58:1

23              But I've spent a lot of time in personal training         10:58:1

24   preparing myself in areas of medicine that traditionally are not     10:58:1

25   the purview of the general internist, such as psychiatric            10:58:2

Jones vs. Gusman 08.05.13 Funding Hearing

1    issues, because I have to do deal with that on a daily basis.                    10:58:2

2              I've been qualified as an expert in the court on                       10:58:3

3    drug and alcohol withdrawals, intoxication.  Something we see                    10:58:3

4    every day in the jail that isn't in the preview of a regular                     10:58:4

5    internist.  Run an HIV clinic.  I was a volunteer gratis faculty                 10:58:4

6    for years running a TB clinic for the City of New Orleans.  So                   10:58:4

7    I've spent might time sort of training myself in those areas as                  10:58:5

8    a correctional health care specialist as opposed to being an                     10:58:5

9    internist buffering your oncology or ventilator skills, et                       10:59:0

10   cetera.  But there isn't any formal training program that                        10:59:0

11   certificates you with a fellowship in correctional medicine.                     10:59:0

12             THE COURT:  I find him to be an expert and qualified as                10:59:1

13   such in the field of correctional health industry, including                    10:59:1

14   staffing and budgeting for that discipline.                                      10:59:1

15             MR. MATTHEWS:  Thank you, Your Honor.                                  10:59:2

16   BY MR. MATTHEWS:                                                                 10:59:2

17   Q   Doctor, would you tell us what you reviewed to prepare your                  10:59:2

18   opinion.                                                                         10:59:2

19   A   On page 2 of my expert report --                                            10:59:2

20             THE COURT:  What number is the report, by the way?                     10:59:3

21             MR. MATTHEWS:  It is Exhibit No. 27.  And it's Bate's                  10:59:3

22   No. 929.                                                                         10:59:4

23   BY MR. MATTHEWS:                                                                 10:59:5

24   A   I've read the US Department of Justice Consent Decree.  I                    10:59:5

25   have had several telephone conversations and email exchanges                     10:59:5

OFFICIAL TRANSCRIPT
SUSAN A. ZIELIE, CRR, RMR, FCRR

1    with Dr. Samuel Gore, the current medical direct of OPP.  There    10:59:5

2    were some facility changes and editions, modifications since the    11:00:0

3    last time I had actually participated in that facility, so I had    11:00:0

4    some questions about the size, the staffing, how they were    11:00:1

5    providing coverage.  Also some budgetary issues.  So he emailed    11:00:1

6    me back some responses, so I reviewed that.    11:00:1

7              He also forwarded me some documents about his    11:00:2

8    proposed staffing plan and his proposed budgets.  So I reviewed    11:00:2

9    those.    11:00:2

10             I reviewed the report of Dr. Shansky, Ron Shansky,    11:00:2

11    from 2003 that was submitted when OPP was previously under a    11:00:3

12    Consent Decree with judge magistrate, and that report had some    11:00:4

13    useful -- I remembered it having some useful information about    11:00:4

14    budgetary and cost comparisons nationally.    11:00:5

15             I also reviewed the expert reports from Dr. Gage    11:00:5

16    and Dr. Austin, the DOJ's and City's health care experts.    11:00:5

17    Q    Doctor, I'm going to refer you to a page, Bate's No. 943,    11:01:0

18    and ask you to identify that, please.  I believe it's part of    11:01:2

19    your report.    11:01:3

20    A    Yes.    11:01:3

21    Q    What was the purpose of that?    11:01:3

22    A    I spent the bulk of my report -- I had broken my report into    11:01:3

23    sessions, administrative sections.  Administrative personnel to    11:01:4

24    run the jail medical department.  And then I broke it down    11:01:4

25    clinic by clinic, discussing how many RNs, how many LPNs and how    11:01:4

1    many medical assistants would be needed in that clinic based on

2    duties that a particular clinic would run and the hours of

3    operation of that clinic and how proximal they were to one of

4    the 24-hours clinic that can provide backup.

5              And then, after that --

6    Q    And what does this document reflect?

7    A    Once I came up with the total numbers of medical staff and

8    the types of medical staffs, RNs vs. LPNs versus medical

9    assistants, then I took their current salaries and I made a

10   spreadsheet that puts their hourly rate, accounts for the amount

11   of overtime hours at time and a half they would get, and then I

12   figured in ancillary costs such as the sheriff pays into the

13   pending fund, Medicare, health insurance.  So, if you pay an

14   employee a $100 thousand, there's probably an additional roughly

15   $18 thousand, roughly 18 percent that the employer has to pay in

16   addition to the salary in terms of benefits.  And so I came up

17   with the total cost to pay for health care positions on this.

18   So this is trying to take not just their salaries but their

19   salaries and ancillary costs as well, and I came up with a total

20   for all staffing position costs.  And that what this shows.

21   Q    And this was all the staffing positions that you referenced

22   in your report?

23   A    Yes.

24   Q    And this has nothing to do with the total number; there is

25   per position per individual; correct?

1  A   Well, you can see, it lists the position and it lists the        11:03:2

2  current hourly salary of that position.  But then, when you do       11:03:3

3  the math on it, this one is for each one, but there's going to       11:03:3

4  be X number of LPNs, X number of RNs.                                11:03:4

5            I think in the -- at the end -- I'm trying to look         11:03:5

6  -- yeah.  This is the number by position.                            11:04:0

7            I believe that there's another column on here that        11:04:0

8  has a multiplier that takes the employee total per LPN and it        11:04:1

9  factored in if I was asking for eight of them so that we came up     11:04:2

10 with a final column total.                                           11:04:2

11 Q   But what we have here in front of us is per position;            11:04:2

12 correct?                                                             11:04:3

13 A   Yes.  It's per position.  But I think, the original             11:04:3

14 document, I think it didn't bring out that final column.             11:04:3

15 Q   I would refer you to your report, which is Exhibit 27?           11:04:3

16          MR. MATTHEWS:  Which I would ask that it be moved into      11:04:4

17 evidence, Your Honor.                                                11:04:4

18          THE COURT:  Any objection?                                  11:04:4

19          MR. ROSENBERG:  No objection, Your Honor.                   11:04:5

20            In fact, I thought all the expert reports were            11:04:5

21 going to be admitted into evidence.  That was my understanding       11:04:5

22 from the Department of Justice and the plaintiffs as well, Your      11:04:5

23 Honor.                                                               11:05:0

24          THE COURT:  All right.  It's admitted.                      11:05:0

25            (Exhibit admitted.)                                       11:05:0

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 112 of 350

Jones vs. Gusman 08.05.13 Funding Hearing                    112

1          MR. ROSENBERG:  Is that true, Your Honor, can we move

2    them all in?

3          THE COURT:  If you all agreed.

4          MR. ROSENBERG:  I'm sorry we didn't put it on the

5    record.

6          MS. COON:  We had requested that stipulation but had

7    not heard back from all counsel.  So, if that's the case, and

8    the parties do stipulate to admission with all the expert

9    reports, we'd agree.

10          THE COURT:  Do you agree with that?

11          MR. ROSENBERG:  Yes, Your Honor.

12          MR. ACURI:  Yes, Your Honor.

13          THE COURT:  How about the Souther Poverty Law Center?

14          MS. SCHWARTZMANN:  Yes, Your Honor.

15          THE COURT:  Be admitted.

16               (Exhibit admitted.)

17          What column do you say you're missing on this

18    document?

19

20          THE WITNESS:  When it printed out, this template

21    exceeds the space on a given page.

22          If you look at LPN nights, it gives you the total

23    salary and the total amount that that position would cost,

24    55,045.

25          There's column after this that says I asked for

1    ten LPNs -- and I'm just making that number up -- so then it was    11:06:0
2    total.    11:06:0
3            THE COURT:  This has that.  It says number of    11:06:0
4    positions, 16.    11:06:1
5            THE WITNESS:  My copy does not.    11:06:1
6            THE COURT:  And, actually, what's on the screen now has    11:06:1
7    that as well.    11:06:2
8            THE WITNESS:  Okay.  That wasn't big enough that I was    11:06:2
9    catching that.  I'm sorry.  I'm missing that on the one that's    11:06:2
10   printed out for me.    11:06:2
11            So this is how I came up for the total cost for    11:06:2
12   the salaried staffing positions, which would be entered into the    11:06:3
13   next table.    11:06:3
14   Q   Doctor, is it your opinion that, at the present staffing and    11:06:4
15   budgeting levels at Orleans Parish Prison, that the Consent    11:06:5
16   Decree standards can be met?    11:06:5
17   A   With the positions as they exist now?    11:07:0
18   Q   Yes.    11:07:0
19   A   No.  There's no way that, with all the different    11:07:0
20   expectations and they don't even have some of the specialties    11:07:1
21   that are asked for in the Consent Decree.  So current personnel    11:07:1
22   are not qualified to perform some of those functions.    11:07:2
23            THE COURT:  Let me ask you something.  I'm looking at    11:07:2
24   the same form.    11:07:2
25            When it talks about salaries, like for LPN night    11:07:2

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 114 of 350

Jones vs. Gusman 08.05.13 Funding Hearing

114

1  and LPN day, RN day and RN night, et cetera, are those salaries    11:07:3

2  based on what they are paying now or what the current    11:07:4

3  marketplace requires for hiring of qualified persons?    11:07:4

4         THE WITNESS:  That's based on what I think the    11:07:4

5  prevailing rage is for an LPN or RN with approximately three to    11:07:4

6  five years experience.    11:07:5

7         THE COURT:  That the prevailing wage in the community?    11:07:5

8         THE WITNESS:  For a nurse in a jail.    11:07:5

9            It is even more specific for an LPN in this    11:07:5

10  community.  It's an LPN in a jail.    11:08:0

11         THE COURT:  I want to tie it down.    11:08:0

12            My question is, if you look at just the salaries    11:08:0

13  of what's required nationwide generally for a nurse in a jail,    11:08:1

14  or are you looking for what the salary is for a nurse in a jail    11:08:1

15  who comes from the Orleans Parish area or the adjoining area?    11:08:1

16         THE WITNESS:  Yes.    11:08:2

17         THE COURT:  Is that what you looked at?    11:08:2

18         THE WITNESS:  I looked at the salaries for Orleans    11:08:2

19  Parish, St. Tammany Parish, the local parishes here.    11:08:2

20  BY MR. MATTHEWS:    11:08:2

21  Q   Doctor, let's go through your report.  Page 3, you have    11:08:3

22  staffing requirements to meet the DOJ requirements, and you    11:08:3

23  start with administration.  Would you have tell the Court what's    11:08:3

24  needed?    11:08:4

25  A   At a facility 1,500 to 2,500 bed jails, they're of course    11:08:4

1    going to need a medical director.  So I salaried for a medical

2    director.

3    Q    And how about the psychiatric services?

4    A    The same thing.  With a mental health unit and a 1,500 to

5    2,500, you're going to need a director of psychiatric services.

6              Now, here, I did look at the requested salaries

7    from Dr. Gore for these positions.  And I looked to see if what

8    he was asking for was an appropriate salary for those positions.

9    Some people were already in these positions and already earning

10   a salary.

11             And so you can see, for the medical director, the

12   average internist in the United States makes $225 thousand.

13   Medical directors usually make quite significantly more than

14   that, especially at larger jails.  Given that Dr. Gore, you

15   know, has a 2,400 bed jail, his current salary of $231,000, I

16   find that's entirely reasonable.  As a medical director myself,

17   I'm on call seven days week for emergencies.  And considering

18   our adding responsibility, I think that $6 thousand more than

19   the average internist in the United States is certainly

20   appropriate and probably far beneath what most medical directors

21   with similar responsibilities would make.

22             The director of Psychiatric Services, Dr. Higgins'

23   proposed salary of $195 thousand, I actually find it very low.

24   Your typical psychiatrist in the local area with five years'

25   experience makes roughly $225 thousand a year.  I spent a lot of

1    time researching that because there are numerous resources and    11:10:3

2    salaries are all over the board.  But the consensus figure I    11:10:3

3    could come up with for a psychiatrist with five years'    11:10:4

4    experience in the local region is about $225 thousand.    11:10:4

5    Q    Doctor, going to the health service administrator, what    11:10:5

6    service does that person perform?    11:10:5

7    A    That's the administrative head.  Medical director's    11:11:0

8    compatriot, if you will.  The medical director standardized    11:11:0

9    medical care and the delivery of the health care and the medical    11:11:1

10   positions.  Whereas the health service administrator oversees a    11:11:1

11   lot of the budgetary issues, interfacing pharmacy, interfacing    11:11:1

12   with lab services, making sure the contracts are up-to-date.    11:11:1

13   Sort of the equivalent of a hospital medical administrator as    11:11:2

14   opposed to a hospital medical director.    11:11:2

15   Q    And you have the director of nursing services and medical    11:11:2

16   operations.  Would you briefly explain what their duties are.    11:11:3

17   A    The director of nursing services oversees all the nursing    11:11:3

18   staff.  And at a facility OPP's size, there's a lot nursing    11:11:4

19   standards that need to be up-kept, the monitoring that needs to    11:11:4

20   be done.  Making sure that the nurses comply with standards set    11:11:4

21   forth by the Louisiana State Board of Nursing.  And those are    11:11:5

22   requirements and standards that physicians, by nature of their    11:11:5

23   training, are not familiar with.  So the director of nursing    11:11:5

24   services oversees nursing care in the facility and the nursing    11:12:0

25   specific in terms of their nurse training.    11:12:0

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 117 of 350

Jones vs. Gusman 08.05.13 Funding Hearing                    117

1    Q    How about medical operations?                          11:12:0

2    A    The medical operations at OPP is sort of a catch-all for all   11:12:1

3    other ancillary administrative functions that are not parts of   11:12:1

4    the jobs above:  Scheduling out-patient appointments at the   11:12:2

5    hospitals, overseeing the clerking staff, medical records   11:12:2

6    storage, those types of things.  So it's sort of a catch-all   11:12:3

7    there.                                                       11:12:3

8                    I was the one that initially named that position,   11:12:3

9    and they've just continued with the name.                    11:12:3

10   Q    And, Doctor, your opinion is based upon a jail population, a   11:12:4

11   daily jail population of what?                                11:12:4

12   A    Well, my budget estimate here in this report was based on a   11:12:4

13   daily inmate census of 2,435.                                11:12:5

14   Q    And then I believe that you move into, with your report,   11:12:5

15   into nurse staffing by buildings.  And would you explain to the   11:13:0

16   Court why the nursing staffing is separated and distinct   11:13:0

17   depending on what building you're in?                        11:13:1

18   A    Yes.                                                    11:13:1

19                    What I did -- and I won't belabor this, and if you   11:13:1

20   want more detail just please ask me -- but I broke down all the   11:13:1

21   different buildings at OPP.  And, if you'll see on the page 4 of   11:13:2

22   my report at No. 3, several of the buildings were quite easy to   11:13:2

23   do.  I, at the end of page 3, I talked about the things that I'm   11:13:3

24   looking for.  And so I took the buildings, Conchetta, CTA, MCD,   11:13:3

25   TDC, TNT and TB-5, the females, those are all buildings and   11:13:4

1    clinics that operate from 8 to 4.  So it was it was very easy    11:13:5

2    for me to figure how many inmates they're going to pass meds to,    11:13:5

3    how many sick calls are they going to have to collect on a daily    11:13:5

4    basis, how long is it going to take to take them to triage those    11:14:0

5    sick calls.  They are going to have to perform wound care for    11:14:0

6    those patients in those facilities.  All the different things.    11:14:0

7    Vital sign checking, directly observe therapy med pass.  I made    11:14:0

8    a list of all the duties that each nurse in every building would    11:14:1

9    need to do.    11:14:1

10            And so, for these buildings that just run from 8    11:14:1

11    to 4, it was very easy to come up with their staffing.  So I    11:14:2

12    didn't need a lot of discussion.    11:14:2

13            For instance, Conchetta, 350 inmates, runs 8 to 4.    11:14:2

14    Two nurses and one medical assistant can certainly take care of    11:14:3

15    all of those responsibilities from 8 to 4.  So I came up with a    11:14:3

16    total number of nurses at that those buildings.    11:14:3

17            The next three buildings though, OPP, the psych    11:14:4

18    clinic and IPC, this were a little more difficult.  Because    11:14:4

19    they're 24-hour clinics.  So you need a day shift and a night    11:14:4

20    shift.    11:14:5

21            In addition, at night, they cover various other    11:14:5

22    buildings that only have daytime clinics.  So I had to make sure    11:14:5

23    they had sufficient nighttime personnel there to cover.    11:14:5

24            The OPP clinic is the jail's main intensive    11:15:0

25    medical unit, so there needs to be RNs there.  Whereas the other    11:15:0

1  IPC doesn't need to have RNs there.                          11:15:1

2  Q   Let's stay at OPP so you can explain that one before we move  11:15:1

3  on to the next one.                                          11:15:1

4           So what's the special needs at OPP?                11:15:2

5  A   OPP is -- each building has its own general medical clinic  11:15:2

6  where nurses and medical assistants reside to perform just   11:15:2

7  regular routine clinic functions, such as passing out        11:15:3

8  medications, collecting sick call requests, et cetera.       11:15:3

9           If somebody's really sick, they move them to the   11:15:4

10 OPP medical clinic.  It's a much more intensive medical clinic  11:15:4

11 where you can perform much more in-depth detailed sort of urgent  11:15:5

12 care.  It's like an urgent care clinic.  So it seeds to be    11:15:5

13 staffed like an urgent care clinic.  It's also 24 hours because  11:16:0

14 it provides nighttime coverage to the bulk of the jail so there  11:16:0

15 will needs to be RNs and LPNs on call at night.              11:16:0

16 Q   If we go to page 5 at the top, you have No. 5, you have  11:16:1

17 Psych.  Would you explain to the Court what that is and what the  11:16:1

18 special needs are for that.                                  11:16:1

19 A   Well, the psychiatric clinic runs 24-hours a day as well.  11:16:2

20 And they deal with the most serious of the mentally ill       11:16:2

21 participants incarcerated.  There are patients with metal     11:16:3

22 illness in the general population, but the most serious ones,  11:16:3

23 the ones that might be in restraints, the ones that might be on  11:16:3

24 suicide watch, the one that are at most danger of self-harm, the  11:16:4

25 ones that can't be trusted to take medication, any incompetent  11:16:4

1   inmates, they're at Psych.  So there needs to be 24-hour nursing          11:16:4
2   staff there.                                                             11:16:4
3           The Psych clinic also provides nighttime coverage               11:16:5
4   to the females that are housed in that building because their            11:16:5
5   clinic is closed at that time.                                          11:16:5
6           So I needed to come up with the number of nurses                11:17:0
7   and the qualifications of nurses to staff that Psych clinic              11:17:0
8   24-hours a day.  And, these 24-hours a day, you need to figure           11:17:0
9   out how many day nurses you need, how many night nurses you              11:17:1
10  need.  But basically those shifts work every other day.  They            11:17:1
11  tend to work on a police schedule:  Work three/off four, work            11:17:1
12  four/off three.  But it's the equivalent of every other day.            11:17:2
13  So, if I need two nurses in the day and two nurses in the night,         11:17:2
14  I actually need eight nurses.  Because you need two for this             11:17:3
15  day, two for the next day, two for this night.  So they work             11:17:3
16  on-and-off tag teams.                                                   11:17:3
17          So I went through every clinic and explained                    11:17:3
18  exactly why they needed the number of nurses I said they did.           11:17:4
19  So I wouldn't just give you:  OPP needs this many LPNs, this             11:17:4
20  many RNs.  I broke it down to the number by building and the            11:17:5
21  specific shifts they were going to work and the specific duties         11:17:5
22  they were going on do on those shifts so it could be very clear.        11:17:5
23  I didn't just grab those numbers at random.  If there's any             11:18:0
24  questions on that spreadsheet we saw initially, it's explained          11:18:0
25  in the bulk of my report where I came up with those staffing            11:18:0

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 121 of 350

Jones vs. Gusman 08.05.13 Funding Hearing                                  121

1    numbers.                                                          11:18:1

2    Q   Okay.  Now, if we drop down to No. 6 and it's IPC, now what   11:18:1

3    is IPC?                                                           11:18:1

4    A   That's the intake processing center where new arrestees are   11:18:1

5    going to be brought for booking.  And, as part of that booking,   11:18:1

6    you have an intake medical screening.  So there needs to be       11:18:2

7    nurses there to deal with screening the new arrestees and         11:18:2

8    dealing with whatever medical issues they have.  If they come in  11:18:3

9    with infections, if they're injured at the time of the arrest,    11:18:3

10   if they're mentally unstable, if they are heavily intoxicated,    11:18:3

11   if they're withdrawing.  So you have to have a very active        11:18:4

12   presence, health presence, in an intake area of a jail this       11:18:4

13   large.                                                            11:18:5

14   Q   Then, below that, you have clinic nurse/MA staffing           11:18:5

15   requirements.  Can you explain what that is?                      11:18:5

16   A   I totalled everything that I'd talked about so far.  When I   11:19:0

17   totalled all the LPNs, all the RNs, all the medical assistants,   11:19:0

18   this is the total.  But it's not my final total.                  11:19:0

19        THE COURT:  It appears to me, it appears to the Court,       11:19:0

20   that intake is a critical part of the process.  And, if that's    11:19:1

21   done right, that can help alleviate problems later on; is that a  11:19:1

22   fair statement?                                                   11:19:2

23        THE WITNESS:  Absolutely.                                    11:19:2

24        THE COURT:  So some of the health care professionals         11:19:2

25   that you're suggesting for intake, that doesn't take into         11:19:3

1   consideration the fact that you might need interpreters at the    11:19:3

2   intake process?    11:19:3

3            THE WITNESS:  Usually, in this area, the only problem    11:19:4

4   you have is with Spanish speakers.  And so that's sort of one of    11:19:4

5   the duties of the medical directors, is to make sure there are    11:19:5

6   either deputy interpreters or health staff that are fluent in    11:19:5

7   Spanish to be there.  If they speak another language, obviously    11:20:0

8   you can't have someone on staff that speaks every language.    11:20:0

9   There's a telephone translator/interpreter line that you can    11:20:0

10  call into and put the inmate on the phone, and you can ask the    11:20:0

11  health services questions with an interpreter there.    11:20:1

12           THE COURT:  So you would just make that there is    11:20:1

13  somebody there who speaks Spanish?    11:20:1

14           THE WITNESS:  That, or the nurses on call needs to know    11:20:1

15  how to use the telephone line.  It works in Spanish as well, but    11:20:2

16  we've never really had a problem with not having some nurse who    11:20:2

17  speaks Spanish.  We had, when I was medical director there, we    11:20:3

18  had a few of the nurses who speak Spanish.  In St. Tammany,    11:20:3

19  where I work, we have two of our physicians are fluent in    11:20:3

20  Spanish, several of our health staff, some of our deputies are    11:20:3

21  Latinos.  So that's really never been an issue.    11:20:3

22               But that's one of the functions of a medical    11:20:4

23  director, is to anticipate those exact type of needs and make    11:20:4

24  sure that your staffing is taking care of that.    11:20:4

25           THE COURT:  Are there a significant amount of    11:20:5

1   Vietnamese inmates, or not?                                          11:20:5

2          THE WITNESS:  Not that I've seen, no.  But I haven't          11:20:5

3   run OPP since 2006.  So, if that has changed since then, that is     11:20:5

4   not a question that I specifically --                               11:21:0

5          THE COURT:  But agree that you don't want inmates            11:21:0

6   interpreting other inmates' questions or health care issues?        11:21:0

7          THE WITNESS:  No.  No.  It's appropriate for health          11:21:0

8   training security staff to be used in that venue.  You try to       11:21:1

9   maintain patient confidentiality as much as possible, separating    11:21:1

10  medical from security.  But there are times, for health and         11:21:2

11  safety reasons or for practicality sake, where you have to          11:21:2

12  share, there needs to be a sharing of information between           11:21:2

13  medical and security staffs.  But I would never use an inmate to    11:21:3

14  interpret for another inmate.                                       11:21:3

15  BY MR. MATTHEWS:                                                    11:21:3

16  Q   Doctor, I would ask you to move to paragraph C where you        11:21:4

17  have additional nurse/MA requirements.  Explain to the Court        11:21:4

18  what that is, please.                                               11:21:5

19  A   I had spent the first four pages telling -- you know,           11:21:5

20  generating in my expert report the number of LPNs we needed, the   11:21:5

21  number of night LPNs, the number of RNs, the number of medical     11:21:5

22  assistants.  However, each employee of the sheriff's office gets    11:22:0

23  three weeks vacation a vacation a year.  So, if you have ten        11:22:0

24  nurses, that's 30 weeks you're going to be missing someone.  If     11:22:1

25  you have 20 nurses, that's entire nursing position that is          11:22:1

1   always going to be vacant because somebody take their annual

2   leave or sick leave.  So you need an appropriate number of staff

3   so that, when people take vacations, you're not -- someone's

4   always on vacation.  You would always be working short.  You

5   have would always have too few staff to do the amount of work.

6   So you have to account for vacations.  And, with 37 nursing

7   positions, each nurse having three weeks of vacation a year,

8   that's 111 weeks.  So, basically, you needed two more nurses to

9   fill those staffing positions.

10  Q   And, Doctor, I would ask you to turn to page 6.  And, where

11  you have total clinic nurses, is that the calculation you made

12  based upon those relief factors or the annual leave factors?

13  A   Yes.  That is the -- based on the annual leave factor but

14  there's also something else.  With -- our nurses are primarily

15  females, and almost at any given time I have one nurse, some

16  times two -- and I've had at St. Tammany, which is considerably

17  smaller than OPP, as many as three nurses who were pregnant or

18  on maternal leave at the same time.  So, with a young female

19  population, you certainly have to, sick leave aside, annual

20  leave aside, you have to account for people that are going to be

21  out for surgery, for maternity leave, and staff for those

22  positions, again, so you're not always understaffed.  If you

23  staffed just the bear minimum that every clinic would need to

24  operate and don't factor in vacations and sick leaves, then you

25  are always going to be woefully understaffed.

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 125 of 350

Jones vs. Gusman 08.05.13 Funding Hearing

125

1  Q   And I would ask you to now move to paragraph D, which is          11:23:5

2  psychiatric services.  And ask you to briefly explain to the        11:24:0

3  Court what your report reflects there.                              11:24:0

4  A   These are some take-home points that I got from reading         11:24:0

5  through the Consent Judgment.  This is sort of a poor man's         11:24:1

6  summary of the things that the Consent Judgment would like the      11:24:1

7  jail to do in terms of psychiatric services, mental health          11:24:2

8  services at the jail.  So I was sort of listing those, you know,    11:24:2

9  a synopsis of the things that we're going to be required so that    11:24:3

10 I could talk about what positions I was going to ask for to         11:24:3

11 satisfy these requirements.  So that's -- I was just sort of        11:24:4

12 summarizing some of the salient points from the Consent            11:24:4

13 Judgment.                                                           11:24:5

14 Q   And does anything in that paragraph or that section cause       11:24:5

15 you to add any additional staff?                                    11:24:5

16 A   Well, I think that, with the emphasis that they're placing      11:24:5

17 on suicide risk assessment early on, counseling of inmates that     11:25:0

18 are particularly at risk for mental health problems, follow-up      11:25:1

19 of patients who had been seen on suicide watch, certainly I         11:25:1

20 think we need some social workers' positions.  We need some         11:25:1

21 mental health counselor positions.  Some drug and alcohol abuse     11:25:2

22 counseling positions.  Somebody who is licensed to provide          11:25:2

23 therapy.  So those are positions that OPP has traditionally not     11:25:3

24 had on staff, for as long as my memory goes back.  Those would      11:25:3

25 be new things that the jail does not currently do.  So we needed    11:25:4

1   a host of psychiatric positions to be able to do those things.

2          THE COURT:  When you talk about someone, for instance,

3   having to provide therapy, do you take into consideration the

4   fact, when you're looking at the numbers, that some of these

5   inmates will be in and out in a fairly short of period of time,

6   they will not be there for a long period of time?  For instance,

7   pretrial detainees, municipal prisoners?

8          THE WITNESS:  It's a very good question, which is why

9   many places don't have these positions.  Because, if your

10  average length of stay is four weeks, by the time you've

11  identified them, scheduled them, get maybe one counseling

12  session in.  And so many people think that there's a limited

13  gain from these types of positions.

14             That being said, my job was not to decide what OPP

15  should be doing or what activities are appropriate in a jail

16  mental health unit.  I was asked, if they had to implement the

17  Consent Decree as written, what positions would you need to make

18  this happen.  I was not asked to go through the Consent Decree

19  and say:  Should a jail mentality health unit be doing every

20  single thing that's in this Consent Decree.  I was asked to say:

21  The Consent Decree is a given, if the jail was going to have to

22  implement this, how much would it cost in Louisiana in 2013 to

23  staff it and to operate it.  And so that was the question I

24  answered.

25          THE COURT:  So I guess my question is:  In looking at

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 127 of 350

Jones vs. Gusman 08.05.13 Funding Hearing                    127

1    the practical side of things, and knowing that some of these                11:27:2

2    inmates are not going to be there for extended periods of time,             11:27:2

3    can the staffing be less than what you suggest in your report?              11:27:3

4            THE WITNESS:  I don't think the staffing could be less             11:27:3

5    unless the Consent Decree would be modified to remove some of               11:27:3

6    the things that they're asking the jail to do.                              11:27:4

7            Part of the proper implementation so there isn't                   11:27:4

8    going to be waste is the director of Psychiatric Services and               11:27:4

9    the medical director deciding who gets those counseling                     11:27:5

10   services.  Can they identify prospectively the inmates who are              11:27:5

11   likely to be here for a long period of time, the inmates most               11:28:0

12   likely to be at risk for self-harm, and sort of channel the                 11:28:0

13   counseling services to them with judicious issues use with those            11:28:1

14   services.  As opposed to saying:  Everyone that answers yes to              11:28:1

15   Question 3 sees the mental health coordinator.  So that's going             11:28:1

16   to be an implementation and oversight.  And that's going to be              11:28:2

17   very important for oversight.                                               11:28:2

18           THE COURT:  So the monitor may be able to adjust these             11:28:2

19   figures, depending on what the population is.                               11:28:3

20           MR. ROSENBERG:  Absolutely.  What the monitor feels                11:28:3

21   what the population is and what is practically working.                     11:28:3

22           THE COURT:  Okay.  Fair enough.                                    11:28:3

23   BY MR. MATTHEWS:                                                            11:28:3

24   Q   Doctor, I'm going to move you down to on page 7 and                     11:28:4

25   paragraph E, nonpsychiatric clinical care providers.  And would            11:28:4

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 128 of 350
Jones vs. Gusman 08.05.13 Funding Hearing

128

1    you explain to the Court what that section is.                    11:28:5

2    A    These are people that provide health care functions --       11:28:5

3    provide health care functions to the inmates that we haven't      11:29:0

4    previously addressed.  They're providing clinical health          11:29:0

5    services, but they're not nurses or they're not clinic nurses.    11:29:0

6    They're not administrative staff and they're not part of these    11:29:1

7    additional psychiatric staff that I've asked for.  But they're    11:29:1

8    essential functions that a jail medical department needs.         11:29:1

9              And there are three of those -- three main sort of      11:29:2

10   ancillary divisions of a health care department that are          11:29:2

11   essential for a jail that's this big, and one would be a quality  11:29:3

12   improvement department.  You need somebody who is monitoring      11:29:3

13   compliance to policies and procedures, adequacy of policies and   11:29:4

14   procedures, peer-reviewing the physicians, answering the          11:29:4

15   inmate's health care grievances, responding to inmates,           11:29:4

16   monitoring to see if there are any trends and we need to bring    11:29:5

17   them the to the medical director's attention so we can modify     11:29:5

18   policies and procedures.  Keeping statistic information           11:30:0

19   regarding the number of inmates with drug problem else, the       11:30:0

20   number of the waiting time to see the physician, the waiting      11:30:0

21   time see the psychiatrist.  All of those quality measures that    11:30:1

22   everybody in the hospital dreads, they do have a very important   11:30:1

23   function in a jail:  You need somebody overseeing compliance      11:30:1

24   with policies and procedures.                                     11:30:2

25              THE COURT:  Mr. Matthews, is this a good time to take a 11:30:2

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 129 of 350

Jones vs. Gusman 08.05.13 Funding Hearing                                                    129

1    break?                                                    11:30:2

2            MR. MATTHEWS:  Yes, Your Honor.                   11:30:2

3            THE COURT:  Hate to interrupt your testimony, but we've   11:30:2

4    been going for awhile.                                    11:30:3

5            So, unless anyone has an objection, I'd like to  11:30:3

6    recess until 12:30.  Okay?                                11:30:3

7            The Court will recess until then.  Thank you.    11:30:3

8            By the way, as a housekeeping matter, have the   11:30:5

9    other reports that have been referred to and testified to, have   11:30:5

10   they been produced into evidence?                         11:30:5

11           MR. MATTHEW:  Judge, the only other report that is not   11:30:5

12   an expert report is Colonel Laughlin's.                   11:30:5

13           THE COURT:  Any objection to that?               11:31:0

14           MR. ROSENBERG:  No.                               11:31:0

15           THE COURT:  It's admitted.                        11:31:0

16           Anything else.                                    11:31:0

17           MR. ROSENBERG:  Just to be sure, City Exhibits 81 and   11:31:0

18   82 are the two expert reports, and we would offer, file and   11:31:1

19   introduce.                                                11:31:1

20           THE COURT:  Admitted without objection.          11:31:1

21           Anything else?  Thank you.                        11:31:1

22           (11:30 a.m., proceedings recessed for lunch.)    11:30:4

23

24

25

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 130 of 350
Jones vs. Gusman 08.05.13 Funding Hearing

130

1           AFTERNOON PROCEEDINGS                    11:30:4

2                12:30 P.M.                          12:36:1

3        THE COURT:  You're still under oath, of course.   12:36:1

4           You may commence.                        12:36:1

5        MR. MATTHEWS:  Thank you.                    12:36:1

6           DIRECT EXAMINATION (CONTINUED)           12:36:1

7  BY MR. MATTHEWS:                                   12:36:1

8  Q   Doctor, I'm going to ask you to turn to page 96 of your   12:36:2

9  report, under G, Education and Training.  Would you explain to   12:36:2

10 the Court what's contained in that opinion?       12:36:2

11 A   You're going need a physician to oversee the health staffs'   12:36:3

12 medical educational training, continuing education for academic   12:36:3

13 pursuits, training such as training for codes, training for mock   12:36:3

14 suicides.  But then there's, all of the health care   12:36:4

15 professionals have credentials:  Nursing licenses, CPR   12:36:4

16 certifications, physician CMEs.  Someone has to keep databases   12:36:4

17 and files on all of that.  And, for this many employees, that's   12:36:5

18 going to take a dedicated staff member to that position.  So I   12:36:5

19 spelled out in this section what is needed, some of the things   12:36:5

20 that they will train on and monitor that are important to a jail   12:37:0

21 and why that position is essential and what the training will be   12:37:0

22 of the incumbent.                                  12:37:1

23 Q   For infection control, the Section H.        12:37:1

24 A   Besides mental health, one of the single most important   12:37:2

25 challenges for a jail is communicable disease:  Infectious   12:37:2

1    tuberculosis, resistant staff infections, et cetera.  In cold    12:37:3

2    and flu season, influenza outbreaks can be devastating in a    12:37:3

3    jail.  So, these type of things, you need a dedicated infection    12:37:4

4    control division.  Every single inmate needs tuberculosis tested    12:37:4

5    every year.  All health staff, all jail staff.  So somebody has    12:37:5

6    got to do these activities, and then somebody's got to monitor    12:37:5

7    the databases recording these.  So these need to be budgeted    12:37:5

8    positions.    12:38:0

9    Q    And, if we go to page 10, under I, you discuss medical    12:38:0

10   supply.  What is that?    12:38:0

11   A    In addition to the pharmaceuticals that are provided to the    12:38:0

12   inmates, there's many, many medical supplies for wound care,    12:38:1

13   packing, 4x4s, you know, over-the-counter medications, eye    12:38:1

14   drops, contact lens solutions, et cetera.  I mean, the list is    12:38:2

15   exhaustive.  But you're going to need somebody to procure those    12:38:2

16   supplies, to monitor inventory of those supplies.  And,    12:38:3

17   especially in a jail system with multiple buildings, you're    12:38:3

18   going to have to make sure all of the supplies are moved out to    12:38:3

19   the different clinics, coordinate inventories in these specific    12:38:4

20   clinics, replenish stock so the nurses have them at their    12:38:4

21   fingertips that.  Just doesn't happen by themselves.  And    12:38:5

22   there's not enough nurses in the clinic that they can also do    12:38:5

23   the supply work.    12:38:5

24                I will budgeted specialty nursing positions just    12:38:5

25   for specialty nurses.  Supply clerks get paid a lot less.    12:38:5

1            So, anyway, this just describes the functions of    12:39:0

2    medical supplies and how it would have to be staffed.    12:39:0

3    Q   And who about dental services for the jail?    12:39:0

4    A   Well, part of health care at a jail, there's medical care,    12:39:1

5    mental health care and dental services.  You know, you certainly    12:39:1

6    need dental services.  And OPP has an onsite dental clinic, so    12:39:1

7    you're going to need dentists to staff that clinic.  And I    12:39:2

8    projected what that staffing would be to adequately provide    12:39:2

9    dental care to the inmates.    12:39:3

10   Q   And how about the clerical support that you discuss.    12:39:3

11   A   OPP doesn't have a formal electronic medical record.  Most    12:39:3

12   jails don't.  They've got some electronic, some things gotten    12:39:4

13   entered into sort of an electronic database, but it's not a    12:39:4

14   formal hospital type of electronic medical records.  So someone    12:39:4

15   needs to keep the files, organize the files.  When the inmates    12:39:5

16   leave, files go into storage.  When inmates come back, they're    12:39:5

17   retrieved.  Information on scheduling of each particular    12:39:5

18   clinic's patients, there needs to be clerical positions    12:40:0

19   scheduled for it, and this is the number of clerical positions    12:40:0

20   that would needed to be there to run 2,450 bed jail.    12:40:0

21   Q   Did you review -- read and review the report of Dr. Gage as    12:40:1

22   to the medical staffing on cost for the Orleans Parish Jail?    12:40:1

23   A   Dr. Gage, yes.    12:40:2

24   Q   Do you agree or disagree with his findings?    12:40:2

25   A   We matched very closely.  He actually called for a little    12:40:2

1   more staffing than I did for the mental health division.  But he    12:40:3

2   remarks in his report how closely our staffing projections meet    12:40:3

3   each other.    12:40:3

4              And I would reiterate that I didn't receive his    12:40:4

5   report until well after I had submitted mine.  So -- and we    12:40:4

6   matched exceedingly close in terms of our projected staffing    12:40:4

7   needs.    12:40:5

8   Q   Do you feel that the staffing numbers that you recommended    12:40:5

9   would provided adequate staffing to comply wit the Consent    12:40:5

10  Decree?    12:40:5

11  A   I projected a bare bones absolute minimum that would just    12:40:5

12  comply with the DOJ Consent Decree.  And I really want to make    12:41:0

13  that clear.  I knew the Court would be looking at this very    12:41:1

14  critically, and I didn't want any inflated numbers.  There is no    12:41:1

15  fat in my budget.  This is the absolute bare minimum that it    12:41:1

16  would take to comply with the Consent Decree.  Of the three    12:41:2

17  expert reports that were produced, mine is by far and away the    12:41:2

18  lowest.    12:41:3

19              And, just for a frame of reference, there was a    12:41:3

20  study done in 2001 in a correctional health care book comparing    12:41:3

21  health care costs of medium to large jails across the country.    12:41:4

22  And, in 1998, the cost per inmate per day was $8.  Now, if you    12:41:4

23  looked at only jails from 1,500 beds to 4,000 beds, the average    12:41:5

24  cost was $10.36 a day.  I've projected a $8.54 a day.  So the    12:42:0

25  costs that I've asked for is less than what similarly sized    12:42:0

1    jails were paying 1998.                                          12:42:1

2              And, in the last 15 years, health care costs have      12:42:1

3    risen dramatically.  There was a study done by Dr. Gore in June  12:42:2

4    of 2011 where he looked at 1,500-ish bed jails across the        12:42:2

5    nation.  The average health care costs in 2011 were $10.36 per   12:42:3

6    day in that study.  I'm asking for far less than that.           12:42:3

7              It's interesting, the expert Dr. Austin, he            12:42:4

8    projected that the medical budget, even with decreased           12:42:4

9    populations, with the changes to go into place, would go from    12:42:5

10   $47 million to $79 million, which is a 68 percent increase.  If  12:42:5

11   you apply that to the current OPP budget, which has an average   12:43:0

12   daily inmate cost of $6.16 per day, that would increase the      12:43:0

13   health care costs to $10.18 per day.  Again, I think it can be   12:43:0

14   done for $8.54.                                                  12:43:1

15             But I would reiterate to the Court, this was a         12:43:1

16   bear bones -- there is no fat.  I didn't throw in an extra       12:43:2

17   position here, raise a salary a little bit.  I wanted it as      12:43:2

18   honest as possible, to just meet the DOJ requirements and        12:43:2

19   nothing else.  And, everything goes perfectly and is run         12:43:3

20   perfectly well, this is the cheapest you could implement the     12:43:3

21   Consent Decree for.  And, again, my budget is far less than the  12:43:4

22   other two experts put out there.                                 12:43:4

23             So I think that -- and I think that mine is by far     12:43:4

24   and away the most accurate.  And I think this is very important  12:43:5

25   for two reasons.                                                 12:43:5

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 135 of 350

Jones vs. Gusman 08.05.13 Funding Hearing                    135

1          Number one, I ran OPP for six years.  And, at          12:43:5

2   first, you may step back and you may think, hmm, well, so you  12:44:0

3   know all these people, is this really a fair opinion.  It is the  12:44:0

4   most fair opinion; because, having run it, I understand it on a  12:44:0

5   level that no expert that reads about it, takes a couple days'  12:44:1

6   tour of it can understand.                                   12:44:1

7          The elevators at OPP have never been able to take     12:44:1

8   the medication cart.  So med packs in that building takes twice  12:44:2

9   as long at any other building because you have to carry up the  12:44:2

10  meds upstairs.  To get into the tents to get into the medical  12:44:3

11  clinic, you have to go up metal steps.  You can't take the     12:44:3

12  medication cart up there.  How do you respond to emergencies in  12:44:3

13  the middle of the night when you've got to take the responder  12:44:4

14  full of medications up there?  How do you get the responder back  12:44:4

15  to Broad Street Work Release when there's an emergency at night?  12:44:4

16  I've had nurses wheel a suitcase full of medication down Broad  12:44:4

17  Street at 3 a.m.  I have an understanding of the layout of the  12:44:5

18  system, of how the buildings interact with each other, of things  12:44:5

19  that have been tried and didn't work, that no other expert can  12:45:0

20  bring to the table.                                          12:45:0

21          In addition, I implemented the pharmacy contract     12:45:0

22  with Diamond in 2000.  I implemented the contract with the    12:45:0

23  Arcadian Ambulance.  I implemented McKesson Supply.  All of   12:45:1

24  those contracts, I understand.  I understand the vendors, I    12:45:1

25  understand the limitations.  And I still use Diamond at St.    12:45:1

1    Tammany, McKesson at St. Tammany, Express X-Ray at St. Tammany,          12:45:2

2    Stericycle Biohazard Waste Removal.  So I understand the                 12:45:2

3    vendors, how they interact, their limitation, their costs per            12:45:2

4    inmate at St. Tammany.  Being geographically so close, my costs          12:45:3

5    of goods and services are the same.  You bring somebody from Los         12:45:3

6    Angeles, from Washington, from Washington, DC, from King County          12:45:4

7    or Cook County, they don't understand our prevailing nurses             12:45:4

8    wages, our costs of goods and services, our -- what does our             12:45:4

9    local community offer in terms of backup.                                12:45:5

10           There is no hospital in the state of Louisiana                   12:45:5

11   that will take into the inpatient psych unit, the lockdown psych         12:45:5

12   unit, an incarcerated person.  Not one, unless they be committed         12:46:0

13   to Feliciana.  That is not inherently obvious.                           12:46:0

14           So you can't understand the costs of operating at                12:46:1

15   OPP unless you understand the special needs of this region and           12:46:1

16   of OPP itself, and I can bring that to the table.  And that's            12:46:1

17   why I think my budget's very accurate.                                   12:46:2

18       THE COURT:  Now, you said -- I think you said in your                12:46:2

19   report, the difference between your estimates and Dr. Gore's             12:46:2

20   estimates of staffing costs are only like -- there's only like a        12:46:3

21   3 percent difference, is that right?                                     12:46:3

22       THE WITNESS:  Dr. Gore did -- I'm not sure what you're               12:46:3

23   asking me.                                                               12:46:3

24       THE COURT:  Statistic costs.                                         12:46:4

25           As a matter of fact, I'm looking at page 11 of                   12:46:4

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 137 of 350

Jones vs. Gusman 08.05.13 Funding Hearing                        137

```
 1   your report, last paragraph.                              12:46:4

 2           THE WITNESS:  Page 11.  I'm sorry.                 12:46:4

 3               Yes.  Dr. Gore did an independent staffing     12:46:5

 4   estimate calling for the positions that he wanted.        12:47:0

 5               And our staffing, our projected costs, were very, 12:47:0

 6   very similar.  And I think, you know, we have both understand 12:47:1

 7   what it takes to run and how many nurses it would run a   12:47:1

 8   building.  So I think that that is, you know, I developed -- I 12:47:1

 9   didn't take Dr. Gore's staffing analysis and implement it and 12:47:2

10   see how much it would does take that.  I started from scratch 12:47:2

11   and developed my own.  But it matches very similarly to   12:47:3

12   Dr. Gore's, because we both know what it would take to implement 12:47:3

13   the Consent Decree.                                       12:47:3

14           THE COURT:  Why does your report and Dr. Gore's report 12:47:4

15   differ generally with respect to the staffing?  What is   12:47:4

16   Dr. Austin's report?                                      12:47:5

17           THE WITNESS:  In Dr. Austin's report, he is very vague. 12:47:5

18   He says that you'll need 13 additional health staff, but he 12:47:5

19   doesn't actually tell you these additional staffing positions 12:47:5

20   are how many LPNs, how may RNs.  His report doesn't list  12:48:0

21   anything about which staff per building, what kind of staff, 12:48:0

22   what qualifications of the staff.  I think that he based that 12:48:0

23   report on a summary report from some other expert's report.  I 12:48:1

24   think Dr. Shansky was back out at the jail.  And I think there 12:48:1

25   were a number of reports that went into Dr. Austin generating 12:48:2
```

1    each summary report.  But Dr. Austin doesn't actually list in    12:48:2

2    his report the staffing numbers.  He just says they'll need 13    12:48:3

3    additional staff.    12:48:3

4    BY MR. MATTHEWS:    12:48:3

5    Q    Doctor, based on your experience, do Pretrial or DOC inmates    12:48:3

6    use more of the jail's medical resources?    12:48:4

7    A    A pretrial inmate is a tremendously more expensive than a    12:48:5

8    DOC inmate, for a vast number of reasons.  But, by the time --    12:48:5

9    when you get a DOC inmate, you get him one of two ways.  You    12:48:5

10   have them when they were arrested and they get sentenced and    12:49:0

11   they become a DOC inmate, in which case you've had them in your    12:49:0

12   care for six months to three years, so they're a very stable    12:49:0

13   inmate.  Or you get them from some other facility or from DOC,    12:49:1

14   in which case they've been jail or in prison for an extended    12:49:1

15   period of time.  So you have a very stable inmate, who is stable    12:49:2

16   on their medication.  Their mental health problems have been    12:49:2

17   dealt with.  They're on mental health therapy.  So this is a    12:49:2

18   very controlled population.    12:49:2

19           A parish inmate, you're arresting them from the    12:49:3

20   street, they may not be on medication, they may be on the wrong    12:49:3

21   medications.  You've got all your problems with people coming in    12:49:3

22   intoxicated, so they need closer monitoring.  Then you've got    12:49:3

23   all of the withdrawal issues with drug and alcohol withdrawal,    12:49:4

24   fatal delirium tremens.  Your psychiatric patients from not been    12:49:4

25   on their meds, they're unstable.  Your HIV patients have not    12:49:5

1    been on their meds.  So the amount of health care time to care                    12:49:5

2    for an inmate and the expense of getting them stable, of                          12:50:0

3    ordering labs to work up their medical problems, is tremendously                  12:50:0

4    greater.  So parish inmates are very, very much more expensive.                   12:50:0

5              In St. Tammany, I did a study for the last three                        12:50:1

6    years.  Forty percent of our inmates are parish inmates.  We are                  12:50:1

7    sort of the reverse of OPP.  But those 40 percent cost us 65                      12:50:1

8    percent of our medical budget.                                                    12:50:2

9              So that makes parish inmates are about three times                      12:50:2

10   as expensive as a DOC inmate.                                                     12:50:2

11         MR. ROSENBERG:  Your Honor -- I'm sorry, I didn't mean                      12:50:3

12   to interrupt you.                                                                 12:50:3

13             But we have not seen that document that he's                            12:50:3

14   referring to now.  And, if he's going to refer to it, I thought                   12:50:3

15   it would be listed.  I don't see it in his report.  And I would                   12:50:4

16   have expected it would have been produced or referenced.                          12:50:4

17         THE COURT:  What about that?                                                12:50:4

18         THE WITNESS:  I'm not sure what document he's talking                       12:50:4

19   about.                                                                            12:50:5

20         MR. ROSENBERG:  The report you're just referencing.                         12:50:5

21         THE WITNESS:  It's not a report.                                            12:50:5

22             Every year, Dr. French, who is a doctor that works                      12:50:5

23   with me at St. Tammany, we have sat down and done a calculation                   12:51:0

24   to figure out -- I've written letters to the sheriff's office                     12:51:0

25   and the government about that -- it's a simple letter, three                      12:51:1

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 140 of 350
Jones vs. Gusman 08.05.13 Funding Hearing

140

1    years in a row.  I could certainly forward those to the Court.    12:51:1

2         THE COURT:  That's all right.  It's not based on any    12:51:1

3    report, obviously.  Just based on his conversations.  So let's    12:51:1

4    proceed.    12:51:2

5         THE WITNESS:  But my point is that, parish inmates are    12:51:2

6    very much more expensive than DOC inmates.  And that has great    12:51:2

7    bearing on reducing the size of the jail.    12:51:2

8    BY MR. MATTHEWS:    12:51:2

9    Q   Now, Doctor, the additional staff that you're suggesting    12:51:3

10   that the sheriff's office hire, the medical staff, would you let    12:51:4

11   the Court know, how long do you believe it would take to get    12:51:4

12   those people in place?    12:51:5

13   A   If you started the hiring process today, it would take quite    12:51:5

14   a few months.  Probably between three and six months before you    12:51:5

15   could get -- if there were 13 additional slots, personnel    12:52:0

16   billets to fill, until you could actually fill those.    12:52:0

17            It's not so easy to get a nurse that wants to work    12:52:1

18   in a jail environment and possibly get paid less than she would    12:52:1

19   at a nicer place, like Ochsner.  So it takes a very special kind    12:52:1

20   of nurse to be a correctional health care nurse.  So those    12:52:2

21   billets are not easily filled.    12:52:2

22   Q   On page 14 of your report, you talk about -- you reference    12:52:3

23   special considerations.  Would you identify that for the Court,    12:52:4

24   please.    12:52:5

25   A   Yeah.  There is an unrealized expense that it's impossible    12:52:5

1  to project at this time that the sheriff's office and the City    12:52:5

2  are certainly going to have to deal with.  And that is the    12:53:0

3  privatization of the Charity Hospital system.  Starting in July    12:53:0

4  1st of this year, the Charity Hospital had sold off all of its    12:53:1

5  independent hospital and they actual all became privately owned    12:53:1

6  facility.  So now care is no longer free.    12:53:2

7          So things like arrestees who are sent to the    12:53:2

8  hospital at the time of booking, those were free care for the    12:53:2

9  jail in the past.  Now the jail will have to pay all of those ER    12:53:3

10  bills at the full price for an ER visit.  We used to get    12:53:3

11  specialty, at OPP and St. Tammany, if you referred someone to    12:53:4

12  cardiology for a GI, for an MRI, those things were all free in    12:53:4

13  the past.    12:53:5

14          In the new system, the majority of the things will    12:53:5

15  not be free.  That is going to be many hundreds of thousands of    12:53:5

16  dollars a year cost to the jail that are not in my budget, and    12:54:0

17  they're not mentioned in Dr. Gage's budget or Dr. Austin's    12:54:0

18  budget either.    12:54:1

19          And it's actually impossible to project because,    12:54:1

20  as I said, the Charity Hospital system was privatized of as July    12:54:1

21  1st of this year.  So we haven't begun to see what is going to    12:54:1

22  be covered by DOC, what isn't going to be covered by DOC, are    12:54:2

23  they going to charge us Medicaid rates, are they going to charge    12:54:2

24  us regular rates.  We have no idea what these costs are going to    12:54:2

25  be.    12:54:3

1        But all of that care was free to OPP until July                    12:54:3

2   1st.  Now, all those hospital bills for all those inmates are          12:54:3

3   going to have to be paid by the sheriff's office, and those are        12:54:3

4   going to be hundreds of thousands dollars a year.                      12:54:4

5        I have not seen that discussed in any of the                       12:54:4

6   expert reports, which goes back to the importance of having an         12:54:5

7   expert that's familiar with the system and with this region.          12:54:5

8   That's not something intuitively obvious that you would have          12:54:5

9   realized, that we've lost our Charity Hospital system.  But the       12:54:5

10  jail's going to have to pay for hospitalized patients now.            12:55:0

11       THE COURT:  Does your report take that into                        12:55:0

12  consideration?                                                         12:55:1

13       THE WITNESS:  I mentioned it under Special                         12:55:1

14  Considerations.  But, as I said, it didn't happen until July          12:55:1

15  1st.  And so, we have no idea of what those bills are going to         12:55:1

16  be, so it's impossible to project that at this time.                  12:55:1

17       It probably won't be possible to project for about                 12:55:2

18  a year, because we won't even start getting the bills for three       12:55:2

19  to six months, and then they'll be a way that you can ask for         12:55:2

20  reconsideration.  And so, by the time it's all ferrated out,          12:55:3

21  it's going to be six to nine months before we start seeing how        12:55:3

22  many bills we're going to have to pay in a given month.               12:55:4

23       THE COURT:  So there's no provision in this new law                12:55:4

24  that began July 1st for these correctional facilities?               12:55:4

25       THE WITNESS:  DOC was given some change that was given            12:55:5

1    to initially Charity Hospital to care for offenders.  That was    12:55:5

2    $55 million.  DOC was given the mandate that they will use that    12:55:5

3    to pay for DOC offenders but they should also make provision for    12:56:0

4    parish jails across state.    12:56:0

5            DOC has implemented a plan that will pay for some    12:56:1

6    but not all health care costs.  For instance, HIV medications    12:56:1

7    that you would get at the hot pharmacy typically run $2,500 to    12:56:2

8    $3,000 a month that will not be covered up the new plan.  So,    12:56:2

9    every patient on HIV medications, OPP will now have to pay    12:56:2

10   $3,000 a month to give them their medications.  So there's    12:56:3

11   provisions for some.    12:56:3

12           DOC has said they will not cover OB costs.  They    12:56:3

13   just won't.  So, any pregnant care that OPP has to give to    12:56:4

14   pregnant inmates, including the costs of delivery, will have to    12:56:4

15   be foot by the parish.  Previously, that was pad in full by    12:56:5

16   Charity Hospital.    12:56:5

17           So there is a huge -- a parish inmate who suffers    12:56:5

18   a fight and has a fractured jaw and has to have surgery, a lot    12:56:5

19   these things, emergency cares, every inmate that comes into    12:57:0

20   booking and is sent from the jail to the hospital for clearance,    12:57:0

21   DOC has been very clear, they will not pay clearance.    12:57:0

22           OPP, they send minimum of ten a day.  So if you're    12:57:1

23   talking $1 thousand hospital bill, I mean, we could be looking    12:57:1

24   at some astronomical numbers.    12:57:2

25           I have taken this to the sheriff's administration    12:57:2

1   for about the last year, because I saw this coming, and everyone    12:57:2

2   said:  Oh, they'll be provisions made, they'll be provisions        12:57:2

3   made.  About in May, we got a panic call from DOC asking us all     12:57:3

4   to meet in a meeting at Lake Charles, and they sat down with all    12:57:3

5   the medical directors of all the facilities --                      12:57:3

6          MR. ROSENBERG:  I apologize, but he's now getting in to      12:57:4

7   what other people are saying who are never going to testify in      12:57:4

8   this proceeding.                                                    12:57:4

9          THE COURT:  All right.  Don't testify what somebody          12:57:4

10  else told you.                                                      12:57:4

11             Although it appears that this is a significant           12:57:5

12  problem that's going to be faced not only by New Orleans but        12:57:5

13  other parishes as well.                                             12:57:5

14         THE WITNESS:  Yes.  The medical director at DOC has          12:57:5

15  provided charts of their program if anyone has any questions.       12:58:0

16  The only thing I brought in my report is there are costs that       12:58:0

17  nobody is dealing with yet.  And I think, when the Court's          12:58:0

18  deciding how we're going to implement health care, we have to       12:58:1

19  keep those things in mind.                                          12:58:1

20         THE COURT:  What may be of a concern is the fact that        12:58:1

21  the sheriff'S office, if that's the case, may not want to send      12:58:1

22  some of these inmates in for medical care because of costs          12:58:2

23  involved.  And, rather, to the extent they feel they can do so,     12:58:2

24  just keep them there, as opposed to sending them to the             12:58:2

25  hospital.                                                           12:58:3

1    All right, let's go.                                         12:58:3

2    BY MR. MATTHEWS:                                             12:58:3

3    Q   Doctor, finally, I'm going to go ask you to turn to what is    12:58:3

4    marked at Bate's No. 944, which is your proposed annual      12:58:3

5    operating budget to meet the DOJ requirements.  And that's for    12:58:4

6    2013.  And I would ask you just to identify this for the Court    12:58:4

7    and explain it, please.                                      12:58:4

8    A   Okay, yes.  This is my budget.  The earlier spreadsheet  12:58:5

9    allowed me to come up with a number for staffing.  I told you    12:58:5

10   why I needed the staff that I needed.  I came up with the costs    12:59:0

11   of salaries of that staff in Louisiana.  I added in benefits,    12:59:0

12   and that was my number for staffing.                         12:59:1

13           The remainder of things on this record are your      12:59:1

14   major budgetary expenses for a medical department:  Pharmacy,    12:59:1

15   lab, ambulance, biohazardous waste disposal, records, medical    12:59:1

16   supply, oxygen and dialysis -- is not a small task for a     12:59:2

17   facility like OPP.                                           12:59:3

18           And then, when you add all the components of the     12:59:3

19   budget together, this is what I got, $7,588,746 to take care of    12:59:3

20   2,540 inmates.                                               12:59:4

21   Q   To comply with the Consent Decree?                       12:59:4

22   A   To comply with the Consent Decree, yes, sir.            12:59:5

23           MR. MATTHEWS:  Thank you, Doctor.  That's all I have.    12:59:5

24                   CROSS EXAMINATION                            13:00:0

25   BY MR. ROSENBERG:                                            13:00:0

1  Q   Dr. Inglese, there's no Medicare available for inmates;    13:00:0

2  isn't that right?    13:00:1

3  A   Medicare's not available to inmates with the exception of,    13:00:1

4  if you are an inpatient stay, so you're at the hospital for    13:00:1

5  greater than 23 hours, and you meet the Medicare/Medicaid rules:    13:00:2

6  Permanently disabled, et cetera.  There's some provisions so    13:00:3

7  that a homeless person would meet.  But, all outpatient services    13:00:3

8  paid for by Medicare and Medicaid, there's none available to    13:00:3

9  incarcerated persons.    13:00:4

10  Q   And, I take it from your report, you looked at staffing,    13:00:4

11  among other things; is that right?    13:00:5

12  A   Yes, sir.    13:00:5

13  Q   And did you look at the number of employees in total at OPP    13:00:5

14  or within the -- I should say, within the Orleans Parish    13:01:0

15  Sheriff's Office?    13:01:0

16  A   Nonmedical staff?    13:01:0

17  Q   Everyone.    13:01:0

18  A   No, I did not.    13:01:1

19  Q   Do you know how many clerks there are in the Orleans Parish    13:01:1

20  Sheriff's Office?    13:01:1

21  A   I do not.    13:01:1

22  Q   Do you know whether they are being fully utilized?    13:01:1

23  A   I don't.    13:01:2

24  Q   And you also talked about staffing positions within the    13:01:2

25  medical area.  Are there any vacant staff positions now within    13:01:3

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 147 of 350

Jones vs. Gusman 08.05.13 Funding Hearing                    147

1  the OPP?                                                          13:01:4

2  A   I don't know what their current census is.  I wasn't looking  13:01:4

3  at operations when I did my report.  I was looking at the         13:01:4

4  Consent Decree and designing a department that would meet the     13:01:5

5  mandates of the Consent Decree.  I didn't look at how OPP was     13:01:5

6  functioning now.                                                  13:02:0

7  Q   Yes, sir.                                                     13:02:0

8            Let me just take, for example, when you looked --       13:02:0

9  and this is -- I have a Bates number, but I think it's the        13:02:0

10 second to last page of your substantive report.  It's the table. 13:02:1

11           Do you need a copy of that, sir?                        13:02:1

12           Yeah, that's exactly right.                             13:02:1

13 A   I have it all except there may be a few -- I'm missing the     13:02:1

14 column that shows me number of staff members.                     13:02:2

15 Q   I'll put it here on the screen here.                          13:02:3

16           I just want to ask you a couple of questions.           13:02:4

17           For example, the clerk's salary, do you see that?       13:02:4

18 A   Yes, sir.                                                     13:02:5

19 Q   It's the to third last line.                                 13:02:5

20 A   Okay.                                                         13:02:5

21 Q   You have -- and this is just one of the 13 to 14 clerks that  13:02:5

22 you're proposing for the medical department; right?              13:03:0

23 A   That's what I need to see that form for.                      13:03:0

24 Q   There it is.                                                  13:03:1

25           Sorry, Your Honor.                                      13:03:3

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 148 of 350

Jones vs. Gusman 08.05.13 Funding Hearing                  148

1    So just look -- do you see the clerk line?          13:03:3

2    A    Yes.                                            13:03:3

3    Q    Let's just take that as an illustration.  You've got a clerk   13:03:3

4    that you're proposing get paid $12 an hour; is that right?   13:03:4

5    A    Yes.                                            13:03:4

6    Q    That's 50 percent higher than the -- more than 50 percent   13:03:4

7    higher than the minimum wage today; isn't that right?   13:03:5

8    A    That's right true.                              13:03:5

9         Medical clerk is not the same as a regular clerk   13:03:5

10   who just does data entry.  These clerks have to type into the   13:04:0

11   medical system, and they have to be well versed in medical   13:04:0

12   terminology.  So there's definitely specialty training involved   13:04:0

13   in a medical clerk.  You can't just hire somebody from the   13:04:1

14   street to enter stuff into the computer.  And that clerk's also,   13:04:1

15   some of them are working with medical supply, so they've got to   13:04:1

16   be able to understand and do inventories and understand the   13:04:2

17   names of medications.  So these are really specialty positions   13:04:2

18   that are health care/health services department specific.  So   13:04:3

19   these are -- I'm paying my clerk at St. Tammany, I believe,   13:04:3

20   $14.50.  So I found this salary very reasonable for that   13:04:4

21   position.                                            13:04:4

22        A lot of facilities will use medical assistants in   13:04:4

23   these clerical positions.                            13:04:4

24   Q    Well, some of these clerks are just doing administrative   13:04:5

25   work; aren't they?                                   13:04:5

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 149 of 350

Jones vs. Gusman 08.05.13 Funding Hearing                    149

1    A    Most of their work is dealing with medical stuff.  They're    13:04:5

2    typing medical notes into the rudimentary data system we have.    13:05:0

3    So you start using some of those drugs names and some of those    13:05:0

4    diagnoses names, you need someone who's got some specialty    13:05:1

5    training there.    13:05:1

6    Q    Do they a degree when you hire a clerk with specialty    13:05:1

7    training?    13:05:2

8    A    No.    13:05:2

9    Q    And typing in a medical name?    13:05:2

10   A    No.    13:05:2

11                We've got to the give them that training.    13:05:2

12   Q    Yes.  You give it to them; right?  You, whether you're the    13:05:2

13   medical director in St. Tammany or Dr. Gore, the medical    13:05:2

14   director at OPP, provides -- you or someone under you or him --    13:05:3

15   provides that type of training; is that correct?    13:05:3

16   A    Correct.    13:05:3

17   Q    So it's fair to say that a clerk could perform that function    13:05:4

18   as long as they're given that training; isn't that right?    13:05:4

19   A    No.  I'm trying to be very politic about this; but, the    13:05:4

20   normal clerical positions, you can hire someone from off the    13:05:5

21   street.  Someone who is going to be able to absorb and learn    13:05:5

22   that information is going to have to have a little higher    13:05:5

23   cognitive function and you're going to have to pay for somebody    13:06:0

24   who could go out in the outside world and get a much better    13:06:0

25   paying job than working, you know, for $7 an hour Louisiana    13:06:0

1    minimum wage.  You need somebody that's capable of learning that    13:06:1

2    can be taught this, and you're going to pay a little bit for    13:06:2

3    that type of person.    13:06:2

4    Q    That's true in the workplace with regard to almost everyone;    13:06:2

5    isn't it?  You have to determine the capability of that employee    13:06:2

6    either by interviewing them or by overseeing them; isn't that    13:06:3

7    true, sir?    13:06:3

8    A    That is true.    13:06:3

9    Q    So, just to make sure, Dr. Inglese, that's not a degree or    13:06:3

10    something beyond formal education of high school that that clerk    13:06:4

11    comes to you with in applying for a job handling inventory for    13:06:4

12    medical supplies; is it?    13:06:5

13    A    No.    13:06:5

14    Q    And, in conjunction with this document, is it fair to say    13:06:5

15    that you basically use somewhere around 28 to 30 percent of    13:07:0

16    fringe benefits across the board for everyone from the medical    13:07:1

17    director down to the clerk?    13:07:1

18    A    I didn't calculate a percentage.  I think it's based on your    13:07:1

19    salary.  Because some of the costs like health care costs were a    13:07:2

20    fixed amount.  And that's a higher percentage of an $18 thousand    13:07:2

21    salary than it would be of a $230 thousand salary.  So the    13:07:2

22    percentage is going to vary with the salary.    13:07:3

23            But these are the percentages that are paid now by    13:07:3

24    the sheriff's office with the exception of health insurance.    13:07:3

25    Because I didn't know how much -- I didn't receive any of that    13:07:4

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 151 of 350

Jones vs. Gusman 08.05.13 Funding Hearing

151

1    documentation, despite my request.  So I actually just used what    13:07:4

2    St. Tammany pays for its health insurance, figuring they are    13:07:4

3    both sheriff's offices, they both have similar plans with    13:07:5

4    similar benefits.  So they probably cost similar amounts, being    13:07:5

5    the same geographic region.    13:08:0

6              So, I can assure you, whatever the percentages are    13:08:0

7    that are here, these are the real percentages that are in effect    13:08:0

8    in the medical department.  And, in fact, the calculators that I    13:08:0

9    used are the exact same ones that I used when developing my    13:08:1

10   budget this year for St. Tammany.  So, whatever these    13:08:1

11   percentages are, they are factual, accurate and represent true    13:08:1

12   costs to the sheriff's office.    13:08:1

13   Q   And let me ask you this, sir.  Just to make sure I    13:08:2

14   understood your earlier testimony, you've told the Court that in    13:08:2

15   all likelihood it would be three to six months to hire the type    13:08:2

16   of staff you're proposing?    13:08:3

17   A   To hire the full complement.  Of course, you're going to get    13:08:3

18   some people within a week, some people within two weeks, within    13:08:3

19   a month.  By the time you could get 13 new people, if you    13:08:4

20   started hiring tomorrow and advertising tomorrow, I really think    13:08:4

21   that it would probably be three to six months before you'd have    13:08:5

22   all 13 hired.    13:08:5

23   Q   All 13 clerks?    13:08:5

24   A   Including -- I don't know how many clerks they have now.  I    13:08:5

25   don't know how many more are needed.  Are there two needed or    13:09:0

1    five needed?                                                    13:09:0

2    Q    That's what I'm asking you, sir.                           13:09:0

3    A    I didn't study how long the length of time to transition   13:09:0

4    from the staff at OPP to meet the staffing that I asked for.  I  13:09:1

5    designed a medical department that could deliver the standard of  13:09:1

6    care that was set forth in the Consent Decree.                  13:09:1

7    Q    And so do you have any idea how long it would take to hire  13:09:2

8    another psychiatrist that you've proposed at OPP?               13:09:3

9    A    I have no idea.  Depends how much they were willing to pay  13:09:3

10   for one.                                                        13:09:3

11   Q    Sure?                                                      13:09:3

12            And do you have any of idea, similarly, how long       13:09:3

13   it would take to hire the complement of additional nurses you're  13:09:3

14   proposing?                                                      13:09:4

15   A    No.  That's what I said, three to six months.  That was    13:09:4

16   primarily speaking about the nurses.                            13:09:4

17   Q    So we're talking about 2014 primarily?                     13:09:4

18   A    No.                                                        13:09:5

19            If you started advertising now, you could -- by        13:09:5

20   the time you do a background check, it's going to take several  13:10:0

21   weeks.  But you'd start getting some people by the end of       13:10:0

22   August.                                                         13:10:0

23            I think it will take three to six months to get        13:10:0

24   everyone.  But certainly you could begin building that staff in  13:10:0

25   a far shorter period of time.  You know, you'd have a           13:10:1

1  significant number by mid-September, I would think, early                 13:10:1

2  October.                                                                  13:10:1

3  Q   Let me ask you this, sir.  And I think you were asked this            13:10:1

4  by the judge as well.                                                     13:10:3

5             Your special consideration of the medical care                13:10:3

6  center of Louisiana --                                                    13:10:3

7  A   Yes.                                                                  13:10:3

8  Q   -- as I understood what you've written in your report, as            13:10:3

9  opposed to what you testified to, you said that state law                 13:10:4

10  mandates the Medical Center of Louisiana provide free care to            13:10:4

11  inmates; is that right?                                                  13:10:5

12  A   I'm not a lawyer.                                                     13:10:5

13  Q   Yes, sir.  That's all I'm trying to find out.                        13:10:5

14  A   -- but how it was read to me by the attorneys was --                 13:10:5

15  Q   No, I'm not asking you about what the attorneys told you,            13:11:0

16  sir.                                                                     13:11:0

17  A   I'm telling you the state law said, or at least what I'm             13:11:0

18  told -- I haven't read it -- was that state law says that the            13:11:0

19  Medical Center of Louisiana will take care of inmates in parish          13:11:0

20  jails.  But the Medical Center of Louisiana has ceased to exist          13:11:1

21  so that provision that took care of parish inmates is no longer.         13:11:1

22  So there is no provision in state law anymore to take care of            13:11:2

23  the inmates.                                                             13:11:2

24  Q   I understand your testimony, sir.                                    13:11:2

25             But, in your report, which is Exhibit 27, as I                13:11:3

1    read it, you write:  Once the facilities are privatized -- on          13:11:3

2    page 14 -- they may no longer offer free care to inmates.  Isn't       13:11:4

3    that what you've written; sir?                                         13:11:4

4    A    Yes.  And that's what I wrote --                                  13:11:4

5    Q    Let me just finish the question.                                  13:11:5

6    A    Yes, sir.                                                         13:11:5

7    Q    This is just a possibility based upon your speculation;           13:11:5

8    isn't that true, sir?                                                  13:11:5

9    A    No, that's not true.  It was just a speculation on March          13:11:5

10   14th when I generated my report.                                      13:12:0

11            Since then, DOC called us all together in Lake               13:12:0

12   Erie Charles and told us they are no longer paying.  My worse         13:12:0

13   case scenario that I put in my report because I envisioned it         13:12:1

14   being a possibility has gone from possibility to probability to       13:12:1

15   actuality.  It now exists, and OPP will have to deal with that        13:12:1

16   cost.                                                                 13:12:2

17   Q    And all the parishes will have to deal with that cost; is        13:12:2

18   that right?                                                           13:12:2

19   A    Yes, they will.                                                  13:12:2

20   Q    And that's something that the state system will have to          13:12:2

21   address for all 64 parishes, not just Orleans; is that right?         13:12:3

22   A    No.  Not the state system.  The parishes or the municipal        13:12:3

23   body who supplies funding for health care to the jails has to         13:12:4

24   address that.  At St. Tammany Parish, it's the parish council         13:12:4

25   that we're now going to ask them for the money to pay for the         13:12:5

Case 2:12-cv-00859-LMA-MBN   Document 544   Filed 08/20/13   Page 155 of 350

Jones vs. Gusman 08.05.13 Funding Hearing                         155

1  hospital costs.  In Orleans, as I understand, it's the City of                 13:12:5

2  New Orleans.                                                                   13:12:5

3  Q   I'm not asking you, Dr. Inglese, to provide the legal                      13:12:5

4  argument your lawyer's given you.                                             13:13:0

5  A   We haven't discussed that.                                                13:13:0

6  Q   Let me ask you then one other related question.  If I                      13:13:0

7  understood your testimony, you said that, if there's a                        13:13:1

8  population shift, that would affect of course the staffing                    13:13:1

9  levels required; isn't that true, sir?                                        13:13:2

10 A   Yes, it would.                                                            13:13:2

11 Q   And that would be -- so, if the population at OPP decreased               13:13:2

12 by say a thousand inmates, for example, that would reduce the                 13:13:2

13 medical staff needed at OPP; would it not?                                    13:13:3

14 A   It would.                                                                 13:13:3

15      THE COURT:  Just for the record, what I envision is                      13:13:4

16 this.  Nobody can put an accurate number on exactly what the                  13:13:4

17 inmate population is going to be or exactly how many is needed.               13:13:4

18 And there's no way we're going to be able hire all these people               13:13:5

19 before the end of the year and have everything up and running.                13:13:5

20 That's would be unrealistic.  That's why we're going to have the              13:13:5

21 monitor, that's why we're going to have the jail administrator,               13:14:0

22 that's why we have oversight.  Some of these numbers are going                13:14:0

23 to going to be in flux, and we'll just deal with it as we go                  13:14:0

24 along.  That's the only way to do it.  There's no way to put an               13:14:1

25 exact figure on any of that.                                                  13:14:1

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 156 of 350

Jones vs. Gusman 08.05.13 Funding Hearing    156

1    MR. ROSENBERG:  Your Honor -- I don't know if you're    13:14:1

2  asking me for a response -- but I understand that.  And,    13:14:1

3  frankly, Dr. Inglese testified, as I heard him a minute ago, say    13:14:2

4  that the moderator can and should adjust the medical staff based    13:14:2

5  upon the population of inmates.  And that will come in due    13:14:2

6  course, as Your Honor just commented.    13:14:3

7    All I'm trying to say is, if the population    13:14:3

8  decreases, then, correspondingly, the medical staff could    13:14:3

9  decrease.  That's all I was trying to establish.    13:14:4

10    It may be common sense, Your Honor, but I just    13:14:4

11  wanted to establish that because we're looking at different pops    13:14:4

12  -- at least, the sheriff is looking at a different populations    13:14:5

13  than the City is for purposes of this proceeding.    13:14:5

14    THE COURT:  The parties are going to have to work more    13:14:5

15  closely with the monitor; and, to the extent there's a dispute,    13:14:5

16  of course I'm more than happy -- I wouldn't say happy is the    13:15:0

17  word -- but I will get involved and try to come to some    13:15:0

18  understanding of where we need to be.    13:15:1

19    MR. ROSENBERG:  Your Honor, I thought you were always    13:15:1

20  happy to see us.    13:15:1

21    Those are all the questions I have of Dr. Inglese.    13:15:1

22    MR. SANDERS:  Your Honor, I have about five questions.    13:15:2

23    CROSS EXAMINATION    13:15:2

24  BY MR. SANDERS:    13:15:2

25  Q   Dr. Inglese, you reviewed the Consent Decree; right?    13:15:2

Case 2:12-cv-00859-LMA-MBN     Document 544     Filed 08/20/13     Page 157 of 350

Jones vs. Gusman 08.05.13 Funding Hearing                    157

1    A    I did.                                                                    13:15:2

2    Q    When we are talking about staffing needs, are you saying                 13:15:2

3    that they should wait three to six months before you start                    13:15:3

4    hiring individuals?                                                           13:15:3

5    A    No.  I think the question was how long would it take to get              13:15:3

6    them hired, all hired.  And I said, if they started now, they                 13:15:3

7    probably couldn't fill all of those slots for three to six                    13:15:4

8    months.  But I'm not suggesting they should wait to do that.                  13:15:4

9            I think, if they start tomorrow, it will still                        13:15:5

10   take three to six month to get them all filled.                              13:15:5

11   Q    To address the staffing shortages that you found during your            13:15:5

12   evaluation, would you recommend that OPP start now in hiring                  13:15:5

13   additional medical staff?                                                    13:16:0

14           MR. ROSENBERG:  Your Honor, I'm sorry, maybe I misheard              13:16:0

15   the question.  I didn't hear that the witness said that there                13:16:0

16   were staffing shortages yet.  And the question is based upon                 13:16:0

17   that premise.  So I'd just object to a lack of foundation.                   13:16:1

18           THE COURT:  Let's ask that question.  I think I know                 13:16:1

19   what the answer's going to be.  Let's ask that question.                     13:16:1

20   Sustained.                                                                   13:16:1

21   BY MR. SANDERS:                                                              13:16:2

22   Q    You've conducted an evaluation of the OPP staffing needs;              13:16:2

23   right?                                                                       13:16:2

24   A    Yes.                                                                    13:16:2

25   Q    In looking at those staffing needs, were you able to compare           13:16:2

Jones vs. Gusman 08.05.13 Funding Hearing                158

1    what their current complement staffing levels were?                    13:16:2

2    A    I did not compare their current.  I projected the costs to        13:16:3

3    run a jail medical that met the Consent Decree.  But I did not         13:16:3

4    look at what -- which of the positions I've asked for that            13:16:4

5    they've currently filled.                                             13:16:4

6           THE COURT:  Do you know how the jail is staffed now to          13:16:4

7    meet with what you propose?                                           13:16:4

8           THE WITNESS:  No.  The specialized psychiatric pieces,          13:16:4

9    social workers, mental health counselors, therapists, that are        13:16:5

10   asked for in the Consent Decree, those positions are either           13:16:5

11   nonexistent or marginally staffed.  So they would need to be          13:17:0

12   hired de novo at this time.                                           13:17:0

13   BY MR. SANDERS:                                                       13:17:0

14   Q    When you say the nonexistent staff, are you saying they          13:17:0

15   should begin right identifying those individuals?                     13:17:1

16   A    I'm not clear as to where the Consent Decree stands.  It         13:17:1

17   hasn't be said we're going to do it.  If so, you need to hire         13:17:2

18   these people now if they have to start meeting it immediately.        13:17:2

19   I'm not sure where you all are in the process.                        13:17:2

20          This is my, you know, besides generating the                   13:17:3

21   report, this is my first understanding.                              13:17:3

22          If it's already been decided they have to meet it              13:17:3

23   and they have to be begin meeting it ASAP, then they need to          13:17:3

24   start hiring them now.                                                13:17:4

25          If the Court is still considering whether or not               13:17:4

1    the Consent Decree is going to be implemented in toto or in        13:17:4

2    part, then it's going to affect those hiring decisions.            13:17:4

3                So I don't think I'm qualified to know the answer      13:17:5

4    to that question at this point.                                    13:17:5

5            MR. SANDERS:  Thank you so much, Dr. Inglese.              13:18:0

6            THE COURT:  Any other questions?                          13:18:0

7                Any redirect?                                          13:18:0

8            MR. MATTHEWS:  No, Your Honor.                            13:18:0

9            THE COURT:  Thank you, Doctor.                            13:18:0

10               Let's call your next witness.                          13:18:0

11           MR. MATTHEWS:  Your Honor, the only other witness the     13:18:0

12   sheriff's office has is expert George Armbruster on staffing.      13:18:1

13   And he's unable to be here today.  We've perpetuated his          13:18:1

14   testimony last week, and the deposition will be -- should be       13:18:2

15   ready this afternoon the transcript or tomorrow.                   13:18:2

16           THE COURT:  Everybody agrees his deposition be            13:18:2

17   introduced into evidence?                                          13:18:3

18           MR. ROSENBERG:  Yes, Your Honor.  And the only           13:18:3

19   observation I make is whether you want us to designated the        13:18:3

20   lines as we did before, which may save the Court some time.  But  13:18:3

21   that's up to Your Honor.                                           13:18:4

22           THE COURT:  That will save everybody some time.  I        13:18:4

23   absolutely agree with that the.                                    13:18:4

24               So I want to get the designations of each of his       13:18:4

25   testimony preferably -- instead of just listing it, get a copy     13:18:5

1   of the transcripts and highlight those portions each of the      13:19:0

2   parties want the Court to consider.  Everybody can use a differ   13:19:0

3   colored marker if you want, that's fine.  But I need that.        13:19:0

4              When am I going to get that by?                        13:19:1

5         MR. MATTHEWS:  The deposition is supposed to be ready       13:19:1

6   this afternoon or tomorrow morning.  I can have it for           13:19:1

7   Wednesday, and I'll got you a copy of it.                         13:19:1

8         THE COURT:  Well, it has to be designated.  So let me       13:19:2

9   have a copy of that by -- I think we're going to finish up here   13:19:2

10  maybe Thursday?                                                   13:19:2

11        MR. ROSENBERG:  I'm sort of hopeful it might be earlier     13:19:3

12  than Thursday.                                                    13:19:3

13        THE COURT:  I want the designated portions -- I want        13:19:3

14  the whole deposition, but the designated portions reflected by    13:19:3

15  Monday at noon.                                                   13:19:4

16        MR. ROSENBERG:  And, Your Honor, while we'll we are on      13:19:4

17  that topic, I was intending to -- and I will make it easier for   13:19:4

18  the Court -- do the same with Ms. Boyer's testimony -- I'm sorry  13:19:5

19  -- Colonel Langham's testimony.  I apologize.  Where we provided  13:19:5

20  the Court with the lines and the pages, but I had meant to        13:20:0

21  provide the colored coordination so the Court can just ease       13:20:0

22  through it and see, if it's yellow, it's the sheriff, if it's --  13:20:0

23        THE COURT:  Who is introducing that?                        13:20:1

24        MR. ROSENBERG:  We introduced it at the last hearing,       13:20:1

25  Your Honor.  And I'll take care of that.                          13:20:1

1        THE COURT:  I appreciate that.  Let's get that by                13:20:1

2   Monday also.                                                          13:20:2

3             So you don't have any additional witnesses?                13:20:2

4        MR. MATTHEWS:  No.  The sheriff rests.                          13:20:2

5        THE COURT:  Fine.                                               13:20:2

6             City.                                                      13:20:2

7        MR. ROSENBERG:  Yes, sir.                                       13:20:2

8             City would call Dr. James Austin, Your Honor.             13:20:2

9             JAMES AUSTIN, being duly sworn, testified as              13:21:0

10  follows:                                                             13:21:0

11        CASE MANAGER:  Please have a seat.  And state your name       13:21:0

12  and spell it for us, please.                                        13:21:0

13        THE WITNESS:  My name is James Austin, A-U-S-T-I-N.           13:21:0

14                      DIRECT EXAMINATION                              13:21:1

15  BY MR. ROSENBERG:                                                   13:21:1

16  Q   Good afternoon, Dr. Austin.                                     13:21:1

17  A   Good afternoon.                                                 13:21:1

18  Q   Dr. Austin, are you currently employed, sir?                    13:21:1

19  A   Yes.  I am the president of JFA Institute.                      13:21:2

20  Q   And could you just tell Judge Africk, what is the JFA           13:21:2

21  Institute?                                                          13:21:2

22  A   Basically, I'm a criminologist.  And we do consulting work      13:21:2

23  for correctional agencies across throughout the country.  Jails,    13:21:3

24  state prisons, juvenile systems, et cetera.                         13:21:3

25  Q   Now --                                                          13:21:4

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 162 of 350

Jones vs. Gusman 08.05.13 Funding Hearing                162

1    THE COURT:  What type of consulting work do you do?    13:21:4

2    THE WITNESS:  Specifically and more germane to this    13:21:4

3  situation, we do population projections.  So I do the population    13:21:4

4  projections for state of Louisiana, Department of Corrections.    13:21:5

5  I do the projections for the -- now for the mayor in terms of    13:21:5

6  the jail population, vacation system, risk assessment systems,    13:22:0

7  strategic planning kinds of studies.  And we get involved often    13:22:0

8  in states that have crowding problems and develop plans to deal    13:22:1

9  with their crowding problems.    13:22:1

10 BY MR. ROSENBERG:    13:22:1

11 Q   Just by way of background, Dr. Austin, can you tell the    13:22:1

12 Court what is the extent of your formal education.    13:22:2

13 A   I have a bachelor's degree, master's degree and a Ph.D. in    13:22:2

14 Sociology.  Ph.D. was awarded from the University of California    13:22:2

15 at Davis.    13:22:3

16    THE COURT:  So it's generally sociology; it's not any    13:22:3

17 particular area of sociology?    13:22:3

18    THE WITNESS:  Criminology.    13:22:3

19    THE COURT:  Your Ph.D. is --    13:22:4

20    THE WITNESS:  Is in sociology.    13:22:4

21    THE COURT:  You said something about criminology.    13:22:4

22    THE WITNESS:  Criminology is a subspecialty of    13:22:4

23 sociology.  People would call me a criminologist.    13:22:4

24 BY MR. ROSENBERG:    13:22:4

25 Q   Dr. Austin, besides your consulting work, have you also    13:22:5

1    taught sociology and criminology?                    13:23:0

2    A    I have a little bit.  I taught at George Washington    13:23:0

3    University for about three years.  But I was also running a    13:23:0

4    research institute for GW.                    13:23:1

5              Basically, I started out in corrections in 1997.    13:23:1

6    I worked in the Louisiana Department of Corrections at Joliet    13:23:1

7    State Penitentiary.  And, since then, I've been doing research    13:23:2

8    working for the National Council on Crime Delinquency for about    13:23:2

9    25 years, George Washington for about five years.    13:23:2

10              And then, started my own organization, which is    13:23:3

11    where I'm at now.                    13:23:3

12    Q    Have you, sir, ever served -- let me strike that and start    13:23:3

13    again.                    13:23:4

14              Have you ever been hired as a consultant by the    13:23:4

15    Department of Justice?                    13:23:5

16    A    Yes.                    13:23:5

17    Q    On more than one occasion?                    13:23:5

18    A    Yes.                    13:23:5

19    Q    Have you served as a monitor with respect to correctional    13:23:5

20    facilities in the United States?                    13:24:0

21    A    Yes.                    13:24:0

22    Q    Have you been suggested as a monitor by the Department of    13:24:0

23    Justice?                    13:24:1

24    A    I believe I have been.  I'll let them --    13:24:1

25    Q    Have you been -- have you worked with Southern Poverty Law    13:24:1

1    Center?                                                    13:24:2

2    A    Yes.   Currently, in Mississippi, there's a Consent Decree at   13:24:2

3    the Walnut Grove facility.   And I was jointly approved,    13:24:2

4    appointed, by the state and the plaintiffs.   Southern Poverty   13:24:3

5    was one of those representing the class of inmates there.   13:24:3

6    Q    And, when you say the Walnut Grove facility, just so the   13:24:4

7    record is clear, is that another correctional institution?   13:24:4

8    A    Yes.   It's an adult correctional facility run by a private   13:24:4

9    correctional agency.                                        13:24:5

10   Q    And have you been qualified as an expert witness before   13:24:5

11   today, sir?                                                 13:24:5

12   A    Yes, I have.                                           13:24:5

13   Q    On more than one occasion?                             13:24:5

14   A    Yes, I have.                                           13:25:0

15           THE COURT:   In what fields?                        13:25:0

16           THE WITNESS:   I'm sorry?                           13:25:0

17           THE COURT:   What fields?                           13:25:0

18           THE WITNESS:   Most recently, in the Coleman Plateau   13:25:0

19   case in California.                                         13:25:1

20   BY MR. ROSENBERG:                                          13:25:1

21   Q    I'm not sure we all have a working knowledge of the   13:25:1

22   California case.   Maybe you could help us by telling Judge   13:25:1

23   Africk.                                                     13:25:2

24   A    That's the case where the state was sued in terms of   13:25:2

25   unconstitutional conditions with regard to medical, mental   13:25:2

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 165 of 350

Jones vs. Gusman 08.05.13 Funding Hearing        165

1   health care.  And, a three-judge panel was convened, and they        13:25:2

2   ordered the state to start lowering the prison population.        13:25:3

3   Appealed to the supreme court.  They just affirmed it again.        13:25:3

4           THE COURT:  I'm familiar with that case.        13:25:4

5               So in what field did you qualify?        13:25:4

6           THE WITNESS:  I was an expert in terms of crafting a        13:25:4

7   population reduction plan, which the state has implemented.        13:25:4

8           THE COURT:  Have you ever testified as an expert before  13:25:5

9   that?        13:25:5

10          THE WITNESS:  Yes.  I'm blanking on the one time I        13:26:0

11  testified.  I have had my deposition taken several times.  But,  13:26:0

12  in terms of actual testimony, I think there was one other time  13:26:0

13  in a correctional matter that I was a witness at a trial.        13:26:1

14          THE COURT:  What field did you qualify?        13:26:1

15          THE WITNESS:  Same thing.        13:26:1

16          THE COURT:  In population reduction plans?        13:26:1

17          THE WITNESS:  Yeah.        13:26:2

18              It had to do with the constitutional standards of  13:26:2

19  the correctional system; was it a safe facility or not.        13:26:2

20          THE COURT:  So you didn't really qualify in population  13:26:3

21  reduction plans.  You're telling me you qualified in some other  13:26:3

22  area with respect to the safety of the jail?        13:26:3

23          THE WITNESS:  Yeah.  At a correctional facility.  It        13:26:4

24  had to do with I believe with the level of safety that was going  13:26:4

25  on in the prison system.        13:26:4

1      THE COURT:  Where was that?                          13:26:4

2      THE WITNESS:  That was in Mississippi.               13:26:4

3      THE COURT:  And how long ago was that?               13:26:5

4      THE WITNESS:  About four our five years ago.  That was  13:26:5

5  an administrative segregation, solitary confinement.     13:26:5

6      THE COURT:  Is that what the focus of your testimony  13:27:0

7  was?                                                      13:27:0

8      THE WITNESS:  That was, yes.                          13:27:0

9      THE COURT:  All right.  Thank you.                    13:27:0

10 BY MR. ROSENBERG:                                         13:27:0

11 Q   Dr. Austin, have you been appointed by federal courts to  13:27:1

12 provide expert testimony or opinions?                     13:27:1

13 A   No.                                                   13:27:2

14         The only thing I've done by the federal court is  13:27:2

15 on these memorandums of agreements.  And that was in Georgia and  13:27:2

16 Louisiana where I was appointed as the monitor in those two  13:27:3

17 states.                                                   13:27:3

18 Q   Were you retained as an expert witness by the Department of  13:27:4

19 Justice in connection with the Orleans Parish Criminal Sheriff's  13:27:4

20 Office back in the early 1990s?                           13:27:5

21 A   Yes.                                                  13:27:5

22 Q   And have you likewise been appointed by the court, I think  13:27:5

23 it was in the Ruiz case, to produce evaluation reports regarding  13:28:1

24 the classification system?                                13:28:1

25 A   That was in Texas, yes.                               13:28:1

1    Q   Yes, sir.                                                    13:28:1

2            THE COURT:  That was what?  I'm sorry.                   13:28:1

3            THE WITNESS:  In Texas.                                  13:28:2

4            MR. ROSENBERG:  I'm sorry, I'll let the witness          13:28:2

5    respond.                                                        13:28:2

6    BY MR. ROSENBERG:                                               13:28:2

7    Q   Go ahead.                                                   13:28:2

8    A   In Texas.                                                   13:28:2

9    Q   And were you also retained by the Department of Justice in  13:28:2

10   the Florida case regarding correctional issues?                13:28:3

11   A   Yes.                                                        13:28:3

12           THE COURT:  Which is the Florida case?                  13:28:3

13           THE WITNESS:  If you're referring to what I understand, 13:28:4

14   it had to do with discrimination in the workplace, Florida and 13:28:4

15   then Orleans also.  They were not allowing women to hold custody 13:28:5

16   positions.  So they were sued by Justice, Civil Rights Division. 13:28:5

17           THE COURT:  So, the early 1990s, the Orleans Parish     13:29:0

18   sheriff was an office that you say you were retained, that had  13:29:0

19   to do with discrimination issues?                              13:29:1

20           THE WITNESS:  I don't think I was retained by the       13:29:1

21   sheriff.  I think I was retained by the Department of Justice.  13:29:1

22           MR. ROSENBERG:  And these, of course, are all appended  13:29:1

23   to his report, which is one of the City's exhibits, if it would 13:29:1

24   make it easier for the Court.                                  13:29:2

25   BY MR. ROSENBERG:                                              13:29:2

1  Q   And, Dr. Austin, do you know the way the system -- I mean,   13:29:2

2  the Orleans Parish Prison system and other correctional systems   13:29:3

3  in Louisiana operate?   13:29:4

4  A   Well, yes.   13:29:4

5          I think it was in 2010, the Department of Justice   13:29:4

6  -- it wasn't the Civil Rights Division, it was within the   13:29:4

7  National Institute of Justice which is the part of the   13:29:5

8  Department of Justice.  There was a request from the City to   13:29:5

9  come in and look at the jail population and come up with a   13:29:5

10  forecast of where we think that jail population was going to go.   13:30:0

11  And they wanted us to develop some alternatives that would   13:30:0

12  affect the impact of that projected size.  So that was, the   13:30:1

13  Department of Justice retained my company to do that.  And, we   13:30:1

14  did that, and issued a report in 2010.   13:30:2

15  Q   And did you issue a report at the request of the Department   13:30:2

16  of Justice?   13:30:2

17  A   Well, that was part of the task.  Yeah.  That was part of   13:30:2

18  the contract, was to do that.   13:30:3

19          MR. ROSENBERG:  Your Honor, I know the Court has the   13:30:3

20  benefit of Dr. Austin's accomplishments attached to the expert   13:30:3

21  report.  So, in conjunction with that information and his   13:30:4

22  testimony, we would offer Dr. Austin as an expert witness in   13:30:4

23  correctional facilities regarding population, staffing and   13:30:4

24  health care, as well as attendant costs.   13:30:5

25          THE COURT:  Regarding staffing -- I'm sorry, what else?   13:30:5

1        MR. ROSENBERG:  Staffing -- regarding population,          13:31:0

2   staffing, health care and attendance costs.          13:31:0

3        THE COURT:  Does his report also cover health care          13:31:0

4   staffing?          13:31:1

5        MR. ROSENBERG:  Yes, Your Honor.          13:31:1

6        THE COURT:  Do you have any medical background?          13:31:1

7        THE WITNESS:  I do not.          13:31:1

8        THE COURT:  Well, let me hear what the rest of you all          13:31:1

9   have to say.          13:31:1

10        MS. DEAN:  Your Honor, we would like to hear a bit more          13:31:1

11   about the witness's qualifications with regard to staffing and          13:31:2

12   medical before agreeing to his testimony.          13:31:2

13        THE COURT:  That's why you all have the opportunity to          13:31:2

14   ask some questions.          13:31:3

15           Where is the part of his report, the pages where          13:31:3

16   he talks about health care, just so I can direct myself to that?          13:31:3

17        MR. ROSENBERG:  I'm sorry, Your Honor?          13:31:4

18        THE COURT:  Health care staffing issues, where is that          13:31:4

19   in your report?          13:31:4

20        MS. DEAN:  Your Honor, I believe it is on page 13.          13:31:4

21        THE COURT:  Thank you.          13:31:5

22        MR. ROSENBERG:  And, Your Honor, just to make clear,          13:31:5

23   the last witness, Dr. Inglese, has actually talked about          13:31:5

24   Dr. Austin's report in the context of health care for inmates.          13:32:0

25        THE COURT:  But that doesn't mean he's qualified to          13:32:0

1    testify to that.                                                    13:32:0

2              THE WITNESS:  I understand, but you were asking about     13:32:1

3    it.                                                                 13:32:1

4              THE COURT:  I understand that.                            13:32:1

5              Have you ever been qualified as an expert or              13:32:1

6    provided expert advice to correctional facilities involving        13:32:1

7    health care staffing levels?                                       13:32:2

8              THE WITNESS:  No.  But, if I might just add, in this      13:32:2

9    report, what I relied upon was a review by Dr. Gore and then       13:32:2

10   Dr. Ron Shansky, who I have worked with in a number of             13:32:2

11   situations.  I had Dr. Shansky come down and review the staffing   13:32:3

12   levels needed to get into compliance with the Consent Decree.      13:32:3

13   So I'm relying upon Dr. Ron Shansky, which the previous witness    13:32:3

14   referenced.  That report's been submitted.                        13:32:4

15             So, I recognize I'm not an expert in the medical         13:32:4

16   care.  That's why I retained the services of Dr. Shansky to look   13:32:4

17   at that, so I could come up with a summary report of what we       13:32:5

18   thought.  So these are not my numbers as a medical expert.  I     13:32:5

19   relied upon the expertise of Dr. Gore and Dr. Shansky, who are     13:33:0

20   doctors.                                                           13:33:0

21             THE COURT:  So, basically, what you're telling me,       13:33:0

22   Doctor, is that, with respect to the health care staffing,         13:33:0

23   you're testimony would just repeat or rely upon those two other    13:33:0

24   I guess proposed experts; is that right?                           13:33:1

25             THE WITNESS:  Yes, sir.                                  13:33:1

1    THE COURT:  You haven't done any independent research    13:33:1

2    other than reading their reports and reiterating what they have    13:33:1

3    to say?    13:33:2

4    THE WITNESS:  I didn't read -- I didn't read the    13:33:2

5    reports.  I met with them.  I talked with them.  I spent two    13:33:2

6    days down here with them.  And we went over the staffing needs    13:33:2

7    under two scenarios.  And that had to do with the population    13:33:3

8    size, and that's where my expertise comes in.    13:33:3

9    THE COURT:  All right, thank you.    13:33:3

10    THE WITNESS:  You're welcome.    13:33:4

11    TRAVERSE EXAMINATION    13:33:4

12    BY MS. DEAN:    13:33:4

13    Q   Hello, Dr. Austin.  Kerry Dean.    13:33:4

14    Just to clarify, the report that you were talking    13:33:4

15    about that Dr. Shansky did, was that the 2002 report?    13:33:4

16    A   No.  He did not write any report.  I asked that he come down    13:33:5

17    and visit with me at the time I was doing site visits and in    13:33:5

18    preparation of this report.  So we spent two days, together with    13:33:5

19    Dr. Gore.  And they went over current staffing levels, medical    13:34:0

20    care and what would be the projected size of medical care under    13:34:0

21    two scenarios.  One was a 2000 inmate population and the other    13:34:1

22    was a 1,500 inmate population.    13:34:1

23    THE COURT:  Dr. Gore is going to testify; is that    13:34:1

24    right?    13:34:2

25    MR. ROSENBERG:  Dr. Gore is an employee --    13:34:2

1      THE COURT:  I am just asking anybody --            13:34:2

2      MR. ROSENBERG:  He's an employee of the sheriff.  I    13:34:2

3  don't believe the sheriff has listed him as a witness.   13:34:2

4  BY MS. DEAN:                                              13:34:3

5  Q   Dr. Austin, did Dr. Shansky provide you with any written   13:34:3

6  findings?                                                 13:34:3

7  A   No.                                                   13:34:3

8  Q   Reviewing your CV that's attached to your report, it appears   13:34:3

9  that most of the work you've done in the last many years have   13:34:4

10  been in the area of classification or population reduction; is   13:34:4

11  that right?                                              13:34:5

12  A   No.                                                  13:34:5

13  Q   What other areas have you focused on?               13:34:5

14  A   Program evaluations.  Strategic master plans for state and   13:34:5

15  local correctional systems.                              13:35:0

16  Q   What have the program evaluations you've conduced consisted   13:35:0

17  of?                                                      13:35:1

18  A   Just finished, as an example, a study of a program design   13:35:1

19  that the LA County sheriff's office is operating for inmates.   13:35:1

20  Boot camp evaluations, substance abuse programs.  Anything that   13:35:2

21  had as to do with trying to change recidivism rates,     13:35:2

22  rehabilitative treatment programs.                       13:35:3

23      THE COURT:  Apart from the medical staffing issue, have   13:35:3

24  you ever provided expert services as to the staffing needed for   13:35:3

25  given by correctional facility, that is security staffing needed   13:35:4

Case 2:12-cv-00859-LMA-MBN     Document 544     Filed 08/20/13     Page 173 of 350

Jones vs. Gusman 08.05.13 Funding Hearing

173

1    by an institution without -- let me see if I can rephrase that    13:35:4

2    more artfully.    13:35:5

3              Have you ever testified as an expert and provided    13:35:5

4    expert advice involving the staffing needed for a given prison    13:36:0

5    population?    13:36:0

6              THE WITNESS:  As an expert?    13:36:0

7              THE COURT:  Yes.    13:36:0

8              THE WITNESS:  In court?    13:36:0

9                   No.    13:36:1

10             THE COURT:  How been outside of court.    13:36:1

11             THE WITNESS:  Yes.    13:36:1

12             THE COURT:  To whom was that?    13:36:1

13             THE WITNESS:  Generally, I'm involved in those kind of    13:36:1

14    studies several times a year.  I work with another person who is    13:36:1

15    referenced in my report, Ken McGinnis with the group CNA, and we    13:36:2

16    commonly go into joint studies of staffing levels, bed    13:36:2

17    population.  We just finished a big one for the state of    13:36:3

18    Colorado.  We're doing one now for Kentucky.  We're going to    13:36:3

19    start one for the Bureau of Prisons.  So, commonly, we work    13:36:3

20    together as a team in terms of doing these estimates on both    13:36:4

21    population -- just to back up.    13:36:4

22              In order to do the staffing levels, you have to    13:36:4

23    know what the population characteristics are by these    13:36:5

24    classification levels.  As a previous witness said, you know,    13:36:5

25    the sheriff's department doesn't have a good classification    13:37:0

1    system right now.  So, to determine what kinds of staff you          13:37:0

2    need, you need to know what kind of inmates you have.  Like a        13:37:1

3    minimum security housing unit requires a different staffing          13:37:1

4    pattern than a solitary confinement kind of housing unit.  So we     13:37:1

5    work together in terms of figuring out what the population,          13:37:2

6    security needs, are.  And then we staff it accordingly.             13:37:2

7              But I haven't been an expert, but I do a lot of           13:37:3

8    reports for state and local government in tandem with Mr.            13:37:3

9    McGinnis's organization.                                             13:37:4

10           THE COURT:  So you have been involved in staffing           13:37:4

11   studies for a given inmate population?                               13:37:4

12           THE WITNESS:  Yes.                                           13:37:4

13           THE COURT:  Although you've never been accepted in any      13:37:4

14   court --                                                             13:37:5

15           THE WITNESS:  I've never been asked.                        13:37:5

16           THE COURT:  So the answer is, you've never been             13:37:5

17   accepted; correct?                                                   13:37:5

18           THE WITNESS:  Right.                                         13:37:5

19           THE COURT:  What else?                                      13:37:5

20   BY MS. DEAN:                                                         13:37:5

21   Q   Did you contribute to Mr. McGinnis's report on staffing in      13:37:5

22   this matter?                                                         13:38:0

23   A   Absolutely, yes.                                                13:38:0

24   Q   And you relied on his report in forming your report?           13:38:0

25   A   Yes.                                                            13:38:0

1         MS. DEAN:  That's all we have at this point, Your       13:38:0

2   Honor.                                                        13:38:0

3         THE COURT:  Anything by the sheriff?                    13:38:0

4         MR. MATTHEWS:  No, Your Honor.                          13:38:1

5         THE COURT:  All right.  I find, I will accept him as an 13:38:1

6   expert in the field of staffing, prison population and        13:38:1

7   population reduction.                                         13:38:2

8             However, I deny him an expert in health care       13:38:2

9   staffing.  He'll not be permitted to provide an expert report 13:38:2

10  with respect to that area, as I find he's not an expert in that 13:38:2

11  area.                                                         13:38:2

12        MR. ROSENBERG:  Your Honor, so it's clear, we weren't   13:38:3

13  offering Dr. Austin as an expert, per se, in health care.  We 13:38:3

14  were just asking him to observe what was needed for staffing in 13:38:3

15  health care, which is part of the correctional operations.    13:38:4

16        THE COURT:  After what I have heard from him and the    13:38:4

17  way he arrived at any figures following the need for any health 13:38:5

18  care staffing, I don't find him to be an expert in that area. 13:38:5

19  So I won't allow him to testify in that.                      13:38:5

20        MR. ROSENBERG:  Well, Your Honor, let me ask Dr. Austin 13:39:0

21  some questions then.                                          13:39:0

22             I'll come back to that, Your Honor.                13:39:0

23        THE COURT:  And I'm just saying, I'm not going to allow 13:39:0

24  him to answer any questions involving health care staffing.   13:39:1

25        MR. ROSENBERG:  Your Honor, my point is, Dr. Austin, if 13:39:1

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 176 of 350

Jones vs. Gusman 08.05.13 Funding Hearing          176

1    you look at his report, which we're about to go over, Dr. Austin    13:39:2

2    not only met with Dr. Gore, the medical director of the Orleans    13:39:2

3    Parish Prison, but has opined that his views or expressed his    13:39:3

4    views that are frankly consistent with Dr. Gore.  And that's all    13:39:3

5    we were trying to develop in this proceeding, Judge.    13:39:4

6            THE COURT:  Dr. Gore can testify.    13:39:4

7            Who is the other doctor that you spoke with over a    13:39:4

8    two-day period?    13:39:4

9            THE WITNESS:  Dr. Ron Shansky.    13:39:5

10           THE COURT:  Dr. Ron Shansky, he can testify if that is    13:39:5

11   appropriate.    13:39:5

12           But he himself admitted that he has no independent    13:39:5

13   expertise with respect to health care staffing.    13:39:5

14           MR. ROSENBERG:  I didn't mean to interrupt, Your Honor.    13:40:0

15           THE COURT:  That's it.    13:40:0

16           MR. ROSENBERG:  But, Your Honor, other experts have    13:40:0

17   testified based upon what they have been told.  For example, the    13:40:0

18   last witness who -- Dr. Inglese, who I understand has got a    13:40:1

19   medical degree, but was referring to Dr. Shansky's report, a    13:40:1

20   draft report in 2003 in the *Hamilton* litigation.    13:40:1

21           THE COURT:  This witness has got his figures    13:40:2

22   exclusively by two day's worth of oral conversations and notes    13:40:2

23   from two other doctors.  And that's it.    13:40:2

24           MR. ROSENBERG:  Your Honor, could I develop that?    13:40:3

25           THE COURT:  If there's something else to hear, I'll    13:40:3

```
 1   hear it.  But he hasn't convinced me that he's an expert in that    13:40:3

 2   area and he's never been accepted as an expert in that area.        13:40:3

 3          MR. ROSENBERG:  I understand he hasn't been accepted.        13:40:4

 4   He's never been offered as an expert.                               13:40:4

 5   BY MR. ROSENBERG:                                                   13:40:4

 6   Q   Did you spend more than two days looking at staffing issues,    13:40:4

 7   sir?                                                                13:40:4

 8          THE COURT:  We're talking about health care staffing         13:40:5

 9   issues.                                                             13:40:5

10   BY MR. ROSENBERG:                                                   13:40:5

11   Q   I'm sorry, I'll be more precise.                                13:40:5

12   A   I don't know if this is useful or not, but basically the        13:40:5

13   numbers that I'm relying upon are very consistent with              13:40:5

14   Dr. Gage's and Dr. Inglese's numbers.                               13:41:0

15          THE COURT:  Let's move on.  Note your objection for the      13:41:0

16   record.  Let's move on.                                             13:41:0

17   BY MR. ROSENBERG:                                                   13:41:0

18   Q   I will ask it another way, and I'll come back to that.          13:41:0

19          Let me ask you this, sir.  You prepared a report            13:41:0

20   in anticipation of your testimony today?                            13:41:1

21   A   Yes, I did.                                                     13:41:1

22   Q   That's Exhibit 81; is that right?                               13:41:1

23   A   Yes.                                                            13:41:1

24   Q   First of all, you've read the Consent Decree; have you not,     13:41:1

25   sir?                                                                13:41:2
```

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 178 of 350

Jones vs. Gusman 08.05.13 Funding Hearing                    178

1    A    Yes.

2    Q    And you've read -- you've read the reports of the other

3    experts; have you not?

4    A    Yes.

5    Q    Have you walked through Orleans Parish Prison?

6    A    Yes.

7    Q    Would you tell the Court what you did in order to prepare

8    this report.

9    A    Well, we reviewed -- it's not only in my document but also

10   the document of Mr. McGinnis.  We went through on the staffing

11   side for the correctional detention system.  We did site tours

12   of all the facilities, we reviewed the post positions.  We

13   looked at whether or not they had a relief factor.  We looked at

14   overtime.  We did interviews with all the leadership in the

15   sheriff's department.  And then we started -- we built our

16   models to crunch the numbers in terms of what we thought the

17   staffing levels would need based on certain sizes of the system,

18   current system, and then an alternative approach.

19           On the cost size, I worked with a gentleman, David

20   Eckenthall with PFM, who does this kind of work in terms of

21   estimating the costs of municipal spending.  And he took the

22   numbers of staff that we were coming up by position and

23   generated estimates of how much additions in staff that we were

24   recommending would cost.

25           We did also look at revenues that would be lost as

1    the population changed in a jail.  You make money on telephone          13:43:1

2    calls, commissary, things like that.                                    13:43:1

3              You also save money by not having inmates needing             13:43:1

4    prescriptions, injuries and things like that.                           13:43:2

5              And then the two entities, basically Mr.                      13:43:2

6    McGinnis's entity and Mr. Eckenthall's group, gave me                    13:43:2

7    information.  And I pulled all that information into this                13:43:3

8    summary report, which I hope would be kind of like a big picture        13:43:3

9    of what I thought would get this jail system into compliance as         13:43:3

10   quickly as possible with the Consent Decree and with the very           13:43:4

11   narrow focus on doing things this year, this calender year, that        13:43:5

12   would have a dramatic and significant impact on the safety of           13:43:5

13   the inmates and staff in that system.                                   13:44:0

14   Q   Is it fair to say that your primary concern and the                 13:44:0

15   preparation of this report was to determine what it would take         13:44:0

16   to comply with the Consent Decree in 2013?                              13:44:1

17   A   2013 and then going forward.  You know, it actually would          13:44:2

18   follow from that.                                                       13:44:2

19             But in terms of, I wasn't nearly concerned about              13:44:2

20   doing some things this year.  Because, in reading the                   13:44:2

21   information about what's been going on in the jail the last few         13:44:3

22   years, I am, as we all are, concerned about the safety of the          13:44:3

23   inmates and staff there.  And I think there are things that we         13:44:3

24   can do that are -- have been done elsewhere, pretty basic kind         13:44:4

25   of things that could be done that would dramatically impact the        13:44:4

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 180 of 350
Jones vs. Gusman 08.05.13 Funding Hearing

180

1    safety of the jail system.                                           13:44:5

2    Q    And are those things that could be done in 2013 --             13:44:5

3    A    Yes.                                                           13:44:5

4    Q    -- based upon your assessment, sir?                           13:45:0

5    A    Can and I think should be done.                               13:45:0

6    Q    And who are the members of the senior staff at Orleans        13:45:0

7    Parish Prison or of the sheriff's office that you interviewed?     13:45:1

8    A    Well, we talked to Chief Ursin, Mike Laughlin, Dr. Gore.      13:45:1

9    And then there are a number of people -- I can't remember their    13:45:2

10   names -- but these are people that were in various positions of    13:45:2

11   leadership.  But those are the three senior kinds of people that   13:45:2

12   we talked to in and that were interviewed.                        13:45:3

13   Q    Dr. Austin, just to cut to the very question that the        13:45:3

14   Court's continued to raise, what is it that in your opinion       13:45:3

15   needs to be done to strive to achieve compliance with the        13:45:4

16   Consent Decree in the year 2013?                                  13:45:5

17        THE COURT:  I'm going to allow him to testify to            13:45:5

18   everything except the health staffing levels.                    13:45:5

19        THE WITNESS:  Fair.                                         13:46:0

20   BY MR. ROSENBERG:                                                 13:46:0

21   A    The number one thing is to get a jail administrator.  It's   13:46:0

22   clear by looking at some of the operational problems that others  13:46:0

23   have noted, there is a lack of strong leadership to run this     13:46:1

24   jail properly in terms of basic kinds of fundamental things.     13:46:1

25   And, without that jail administrator, we're just not going to    13:46:2

1    get anywhere very quickly.  So that would be the number one                13:46:2

2    thing to do.                                                              13:46:2

3                   Second would be to drive this population down as           13:46:2

4    far as we could, as quickly as we could, without jeopardizing            13:46:3

5    public safety.                                                            13:46:3

6                   So those are the two kind of cornerstones of this          13:46:4

7    plan, those two things.                                                   13:46:4

8    Q   And we've heard testimony become advertising for a jail             13:46:4

9    administrator, so I'm just going to pass over that for a moment         13:46:5

10   since that's part of the Consent Decree.                                 13:46:5

11                  The reduction of population is the topic I'd like         13:46:5

12   to address first, though, with you.                                      13:47:0

13                  First of all, are you aware of the Pretrial              13:47:0

14   Services or Vira Institute program?                                      13:47:1

15   A    Yes.                                                                 13:47:1

16   Q    On Pretrial Services?                                               13:47:1

17   A    Yes.                                                                 13:47:1

18   Q    And has -- could you explain to the Court what that program        13:47:1

19   consists of?                                                             13:47:1

20   A    Well, by way of background, going back to 2010, when I            13:47:1

21   started here, the parish prison population was about 3,200.  And       13:47:2

22   we've been able to drive it down by about 800 or so in the past        13:47:3

23   two years through -- there's three factors going on.                    13:47:3

24                  One is that crime has been going down in Orleans,        13:47:4

25   absent some of the tragic things that have happened in 2013.           13:47:4

1    But, basically, if you go back the last five, ten years, the                13:47:5

2    crime rate has dropped dramatically.  The crime rate here is now            13:47:5

3    lower here than it is in Baton Rouge and other places.  That                13:48:0

4    also means that the number of people being arrested has been                13:48:0

5    going down.  Arrests drive the jail population.                             13:48:1

6            THE COURT:  What's that?                                            13:48:1

7            THE WITNESS:  Arrests.  The arrests have been going                 13:48:1

8    down dramatically.                                                          13:48:1

9            And we've gotten the police department to start                    13:48:1

10   refining how and who they arrest for what charges, which has a              13:48:2

11   big impact on the jail.                                                     13:48:2

12           There's about 30 some thousand people come into                    13:48:2

13   the jail every year.  They spend an average of about 21 days.              13:48:3

14   About 40 percent of those 30 some thousand are gone within two             13:48:3

15   or three days.  So what's left are these people that stay for a            13:48:4

16   long period of time.  Pretrial, almost all pretrial.                       13:48:4

17           So this jail population is now being driven by                     13:48:4

18   those people that do not get out within a day or two.  Pretrial,           13:48:5

19   release -- which you were you mentioning, just to give you                 13:48:5

20   perspective, pretrial release was one of the recommendations I            13:48:5

21   made in 2010.  You did not have a pretrial service program.               13:49:0

22           Vira Institute received funding to initiate that                   13:49:0

23   program, and that program has had a significant impact on the             13:49:0

24   size of the pretrial felon population.  Which is a big chunk of           13:49:1

25   this jail population.                                                      13:49:1

1          THE COURT:  What do you know about the Vira Institute?          13:49:1

2     I'm not familiar.          13:49:2

3          THE WITNESS:  Vira goes way back before I was born.          13:49:2

4     They've been around forever.  They were the first -- I don't          13:49:2

5     know how far you want to go back, but basically they started the          13:49:2

6     first bail reform program in New York City.  And I think they go          13:49:3

7     back to about 1940, 1950.  And they're a big national          13:49:3

8     organization, very well respected.  They do a lot of research.          13:49:4

9     And in the same kind of business that I do, but are much bigger          13:49:4

10    than I.          13:49:5

11         THE COURT:  So you suggest that the Vira Institute          13:49:5

12    could reduce the jail population?          13:49:5

13         THE WITNESS:  They did it.          13:49:5

14         THE COURT:  Obviously, you need a judge to sign off on          13:50:0

15    it.          13:50:0

16         THE WITNESS:  Right.  But the judge needs to know that          13:50:0

17    what he's got in front of him is someone suitable for pretrial          13:50:0

18    release.          13:50:0

19              Before Vira came in, he did not have any risk          13:50:0

20    instrument -- which is what I do also, the risk assessment.          13:50:0

21    They had no risk instrument to determine is this person was a          13:50:0

22    low, moderate, high person for supervision.          13:50:1

23              The idea is to get the low risk people out who          13:50:1

24    have very low rates of failure to appear and pretrial arrests,          13:50:2

25    and that will reduce your jail population.          13:50:2

1        Again, if you don't get out of this jail system in     13:50:2

2   the first four or five days, you will stay three to four months.   13:50:2

3        THE COURT:  Have there been studies on how reliable the   13:50:2

4   Vira Institute's recommendations are regarding pretrial release?   13:50:3

5        THE WITNESS:  Well, not on this particular one that's   13:50:3

6   in place here in Orleans.                                  13:50:4

7              But, nationally, yeah.  I've done validation   13:50:4

8   studies.  The Pretrial Justice Institute has done studies.  Ohio   13:50:4

9   University -- I mean, there's a lot of studies out there, and   13:50:5

10  there are all pretty good predictors.                      13:50:5

11             I will add this one thing, if you're interested.   13:50:5

12  Is that, most people -- I say most -- like 80, 90 percent of the   13:50:5

13  people that are released pretrial do not get re-arrested, do not   13:51:0

14  fail to appear.  So it's kind of a low risk group.         13:51:0

15             So, the more that you can get into that group and   13:51:1

16  get them out on pretrial supervision, you're going to have a   13:51:1

17  pretty big impact on the jail population.                  13:51:1

18        THE COURT:  What percentage of Vira recommended        13:51:1

19  releases result in revocations or those persons who Vira   13:51:2

20  recommended for release committing other crimes?          13:51:2

21        THE WITNESS:  Here in Orleans?                        13:51:2

22        THE COURT:  Correct.                                  13:51:3

23        THE WITNESS:  I don't know.                           13:51:3

24             One other thing, which is the other big driver of   13:51:3

25  a jail population and here in Orleans, is how long it takes to   13:51:3

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 185 of 350

Jones vs. Gusman 08.05.13 Funding Hearing

185

1    dispose of a case.                                    13:51:4

2           So, to the extent to which we can get early    13:51:4

3    disposition cases here, we can move these cases, filing the   13:51:4

4    charges, et cetera, et cetera.  Time is money.  Time a huge   13:51:5

5    factor in these jail population systems.              13:51:5

6           And, just to give you how dramatic this can be, a   13:51:5

7    study I did just complete with Michael Jacobson.  The jail   13:52:0

8    population in New York City at Rikers Island used to be 22   13:52:0

9    thousand inmates.  It's now 11 thousand.  They reduced it by 50   13:52:1

10   percent.  And they did it primarily by the police changing how   13:52:1

11   they charged people.  At the same time they dropped it by 50   13:52:1

12   percent, the crime rate has plummeted.                13:52:2

13          So this is the power of -- and that's what we do,   13:52:2

14   we model these things.  We look at who is come in for what kinds   13:52:3

15   of arrests, can we do filed citations, what are you charging   13:52:3

16   these people at, how long is it taking the prosecutor to file a   13:52:3

17   case, these are all things that don't cost a dime but can save   13:52:4

18   you a ton of money.                                   13:52:4

19          Now, the importance here again for me is, you   13:52:4

20   know, it's -- in my work I've done before as a monitor in   13:52:5

21   Louisiana and Georgia, the first thing we do is try and get this   13:52:5

22   population down and get this place stabilized and safe as soon   13:52:5

23   as we can.  Because, if you get it safe, now we can hire people.   13:53:0

24   Now we have people come in and see this as a safe place to work,   13:53:0

25   a good place to work.  It's not a good place to work now.   13:53:0

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 186 of 350

Jones vs. Gusman 08.05.13 Funding Hearing                    186

1           So this is why I'm kind of pushing some things            13:53:1

2    that we could do that would make this place safer, more          13:53:1

3    attractive to work in.                                           13:53:1

4           I believe we need to make some adjustments on             13:53:1

5    salary.  I agree with that.  That's to be determined.            13:53:2

6           But the real problem is that 30 percent turnover          13:53:2

7    rate.  I think people are leaving because it's not a pleasant    13:53:2

8    place to work.  It's not a safe place to work.                   13:53:3

9           And so population reductions that are done safely         13:53:3

10   --                                                               13:53:3

11          THE COURT:  Have you spoken to sheriffs' employees who    13:53:3

12   have left within the past several years?                         13:53:4

13          THE WITNESS:  I have not.                                 13:53:4

14          THE COURT:  Have you spoken to Chief Ursin about that?    13:53:4

15          THE WITNESS:  Not Chief Ursin but the sheriff.  I've      13:53:4

16   talked to the sheriff several times.                             13:53:5

17          THE COURT:  Have you been made aware of the fact that     13:53:5

18   one of the big issues is that they're trained and earning a      13:53:5

19   lower than average wage when compared with somebody joining law  13:53:5

20   enforcement agencies, and then they go work for those agencies   13:54:0

21   instead to increase their salaries?                              13:54:0

22          THE WITNESS:  Let me put it this way, with all due        13:54:1

23   respect.                                                         13:54:1

24          As a scientist, I would say the proper study has          13:54:1

25   not been done.  The way that should be done is that you would    13:54:1

1    sample people that are leaving early, termination.  And you have    13:54:1

2    someone come in and find out what is the reason why.    13:54:2

3              I've heard the testimony, and I'm not saying    13:54:2

4    they're incorrect.  But, the way I work, you would actually do a    13:54:3

5    scientific study.  Wouldn't take much, 30, 60 days.  Because a    13:54:3

6    loft people are leaving every month.  And find out why they're    13:54:3

7    leaving and then report that.    13:54:4

8              Then you would make the appropriate adjustment.    13:54:4

9              I do think the salary issue is important here and    13:54:4

10   needs to be fixed.  There's no question about that.  Depends at    13:54:4

11   what level.    13:54:5

12             It looks to me, just looking at it from what I've    13:54:5

13   seen, people that have been here a long time are adequately    13:54:5

14   compensated.  It's those people that are the new recruits.  And    13:54:5

15   that's the dangerous part.    13:55:0

16        THE COURT:  And that's really what Chief Ursin    13:55:0

17   testified to.    13:55:0

18        THE WITNESS:  That's right.    13:55:0

19             That's the dangerous part in the jail, because    13:55:0

20   they are the ones that are usually put into the cell blocks.    13:55:0

21        THE COURT:  So you would not dispute the fact that    13:55:1

22   there are some percentage of staff that would leave to get    13:55:1

23   higher wages at another agency?    13:55:2

24        THE WITNESS:  Not at all.    13:55:2

25        THE COURT:  But you think there should be more    13:55:2

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 188 of 350

Jones vs. Gusman 08.05.13 Funding Hearing

188

1    scientific study of that?                                          13:55:2

2          THE WITNESS:  Of why they're leaving.                        13:55:3

3                I think what we're going to find the problem is        13:55:3

4    those people that leave within a year, they start out at less      13:55:3

5    than $10, and it takes them -- I think the chief said it takes     13:55:3

6    up to year to get the additional 6.  Can we make that faster?      13:55:4

7    We start higher and make it happen faster.  And then I think       13:55:4

8    we'd see better retention.  And better retention means a safer     13:55:5

9    jail.                                                              13:55:5

10          THE COURT:  Before deciding if the Vira Institute is        13:55:5

11    the right approach for New Orleans, would you like to see some     13:55:5

12    of the figures, some scientific analysis, to determine whether    13:56:0

13    or not that system that the Vira Institute uses --                13:56:0

14          THE WITNESS:  Yes.                                          13:56:0

15          THE COURT:  -- is working here in New Orleans?              13:56:0

16          THE WITNESS:  Yes.                                          13:56:1

17          THE COURT:  But that hasn't been done yet.                  13:56:1

18          THE WITNESS:  No.  And every system -- I think that's a     13:56:1

19    good point, Judge, because every system needs to be what we call  13:56:1

20    validated on your population.  Because -- and if the Court        13:56:1

21    doesn't see that, that it's been validated, then they lose        13:56:2

22    confidence.  So people have to have confidence that we're         13:56:2

23    picking the right people.                                         13:56:3

24          THE COURT:  Thank you.                                      13:56:3

25    BY MR. ROSENBERG:                                                 13:56:3

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 189 of 350

Jones vs. Gusman 08.05.13 Funding Hearing

189

1  Q    Just to go back to the salary number that Mr. Ursin came up    13:56:3

2  with, let me just show you another document prepared by Mr.    13:56:4

3  Laughlin.    13:56:4

4        MR. ROSENBERG:  This is sheriff Exhibit 28, Your Honor.    13:56:4

5  And it's on Bate stamp 982.  And this was a document he prepared    13:56:5

6  just a year before.    13:57:0

7  BY MR. ROSENBERG:    13:57:0

8  Q    Can you see that, sir?    13:57:0

9  A    Yes.    13:57:0

10        You're asking me?  Yes.    13:57:0

11  Q    And Mr. Laughlin was proposing a salary of $26 thousand as a    13:57:0

12  start-up salary.  Do you see that?    13:57:1

13  A    Yep.  That's what he says, yes.  $26 thousand.    13:57:1

14  Q    Did you hear any -- we'll come back to the salary in a    13:57:2

15  second, sir.    13:57:3

16        But let me ask you this as a follow-up to the    13:57:3

17  judge's question.  The Vira Institute operates across the United    13:57:3

18  States; does it not?    13:57:4

19  A    It does.  It's a national organization.    13:57:4

20  Q    And, while I understand the Orleans Parish program has not    13:57:4

21  been validated, per se, the pretrial service concept used by    13:57:5

22  Vira has been approved throughout the United States; has it not?    13:57:5

23  A    There's hundreds of counties, parishes, that are using    13:58:0

24  pretrial service programs.    13:58:0

25  Q    And is that just one means of reducing the population at    13:58:0

1   OPP, in your opinion?                                      13:58:0

2   A   Yes.  That's one means.                               13:58:1

3   Q   Let me turn, if I could, Dr. Austin, to back to your report   13:58:1

4   and ask you to look at a table you prepared.  It's table 2 in   13:58:2

5   your report.                                               13:58:2

6   A   Yes.                                                   13:58:2

7           THE WITNESS:  I think this is a good table, Judge, to   13:58:2

8   look at.                                                   13:58:3

9           MR. ROSENBERG:  I'm sorry, Your Honor.             13:58:3

10          THE COURT:  Table 2?                               13:58:3

11          MR. ROSENBERG:  I'm sorry, Judge.  I know you have it   13:58:3

12  in front of you, but I flipped it to the bottom back.      13:58:3

13          THE WITNESS:  Want me to go through it real quickly?   13:58:4

14  BY MR. ROSENBERG:                                          13:58:4

15  Q   Would you, please.                                     13:58:4

16  A   So the source of this is, by way of background, we worked   13:58:4

17  out a relationship with --                                 13:58:5

18          MR. ROSENBERG:  One second.  We have lost the image,   13:58:5

19  Dr. Austin.                                                13:58:5

20              There it is.  Sorry.                           13:58:5

21  BY MR. ROSENBERG:                                          13:58:5

22  A   Every month, my organization gets from the sheriff what we   13:58:5

23  call extract data file, which is everyone that's in custody at   13:59:0

24  the end of month.  We also get everyone that's been released   13:59:0

25  from custody.  And we're using this data to monitor the    13:59:1

1    population.  So this is what we call a snapshot of the          13:59:1

2    population as of April 2013.  It really hasn't changed much over 13:59:1

3    the last year or so.  It's pretty much constant.                13:59:2

4              So, on that date, we had 2,273 people in the          13:59:2

5    facilities at that time.                                        13:59:3

6              548 are DOC inmates, sentenced DOC inmates.  And      13:59:3

7    78 are DOC work release inmates.  It's a total of about 626.    13:59:3

8              There's 171 that are also state people but they       13:59:4

9    are in for parole violation, and they're sitting in the jail    13:59:4

10   waiting to have their revocation reviewed by the court and a    13:59:5

11   disposition reached.                                            13:59:5

12             There's another 237 people that are also state        13:59:5

13   offenders.  That are probation violators.  They have violated   14:00:0

14   the terms of their probation.                                   14:00:0

15             That's a total of those two of 408.                   14:00:0

16        THE COURT:  Some of those state parole or state            14:00:1

17   probation offenders, they could be facing open state charges.   14:00:1

18        THE WITNESS:  They often are.  They often are.  Very       14:00:2

19   good point.                                                     14:00:2

20             We did audits of this.  I worked very closely with    14:00:2

21   Secretary LeBlanc's staff in putting this report together, and  14:00:2

22   they audits for me of this population.  So many of those parole 14:00:2

23   violators or probation violators are receiving charges.         14:00:3

24             However, I would also argue -- not argue -- but we    14:00:3

25   found that many of them get placed back on parole supervision,  14:00:3

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 192 of 350

Jones vs. Gusman 08.05.13 Funding Hearing

192

1    back on probation.  They cut a deal and they get reinstated.    14:00:4

2              But I think the important point is that, about    14:00:4

3    half of the jail population, parish prison, are state offenders    14:00:5

4    that are there for one way or another.    14:00:5

5              So those are target groups that I would be looking    14:00:5

6    at in terms of trying to minimize, if I could.    14:01:0

7              The other huge group is the felony pretrial    14:01:0

8    population.  There's a thousand of them that are pending, and    14:01:0

9    they all have felony charges.  And they are the ones that will    14:01:1

10    stay in that jail for a considerable period of time.  The vast    14:01:1

11    majority of them will be placed on probation or credit for time    14:01:1

12    served.  Some portion, but not the majority of them, will go to    14:01:2

13    state prison.    14:01:2

14              And then there's other subgroups in there that are    14:01:2

15    not that significant, but there may be some things that could be    14:01:3

16    done that would minimize those populations.    14:01:3

17              I've lost the screen.    14:01:3

18         MR. ROSENBERG:  Yeah.  We have, too.  We're having some    14:01:4

19    technical difficulties.    14:01:4

20         THE COURT:  Here you go.    14:01:4

21         MR. ROSENBERG:  I can give the witness a copy.  We can    14:01:4

22    put it on.    14:01:5

23              We'll put it back up, Judge.    14:01:5

24         THE WITNESS:  Go to the next --    14:01:5

25         MR. ROSENBERG:  In fact, I'll let him have my copy,    14:02:0

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 193 of 350

Jones vs. Gusman 08.05.13 Funding Hearing

193

1    which is more important for the witness.                  14:02:0

2              THE WITNESS:  That's okay, because I want to go through  14:02:0

3    the next few tables, if I can.                            14:02:0

4              MR. ROSENBERG:  Sure.                           14:02:0

5              THE WITNESS:  The next table that's significant for me  14:02:1

6    is table 3, Your Honor.                                   14:02:2

7    BY MR. ROSENBERG:                                         14:02:2

8    Q    Let me just, before you do that --                   14:02:2

9    A    Let me -- there's one group called the youthful offender  14:02:2

10   group, About 30 inmates that are juveniles charged as adults.  14:02:2

11   Now, I did some research on this.  I mean, I want to get those  14:02:3

12   juveniles out of the jail, if I could.  They should be held in a  14:02:4

13   juvenile facility because federal standards require them to  14:02:4

14   receive education.  They are juveniles, they should be managed  14:02:5

15   as juveniles until their cases are disposed of.          14:02:5

16              Once they are sentenced as adults, I mean, even  14:03:0

17   though they're juveniles and transferred to the DOC, they go to  14:03:0

18   a specialized unit within the Louisiana Department of     14:03:0

19   Corrections where they can continue to get their proper   14:03:1

20   education and other program that are specific to juveniles.  So  14:03:1

21   that is a group, I don't want to lose sight it.           14:03:1

22              It's another pocket that, getting to the Consent  14:03:2

23   Decree, your Consent Decree or the Consent Decree notes that  14:03:2

24   these juveniles have to be in a separate housing unit, they have  14:03:3

25   to be away from adults from sight and sound, they have to  14:03:3

Case 2:12-cv-00859-LMA-MBN   Document 544   Filed 08/20/13   Page 194 of 350

Jones vs. Gusman 08.05.13 Funding Hearing

194

1    receive education comparable to what they would get if they were      14:03:3

2    on the streets.  So it's a group that really is going to be best      14:03:4

3    served in a juvenile facility.  So one of the things that we          14:03:4

4    should try to look at the extent that we could remove them and        14:03:5

5    put in into a juvenile facility.                                      14:03:5

6            THE COURT:  Excuse me one second.                            14:04:0

7               (Pause in proceedings.)                                   14:04:0

8            THE COURT:  Just a quick question.  With respect to DOC      14:04:0

9    inmates that have open charges --                                    14:04:4

10           THE WITNESS:  Yes, sir.                                      14:04:4

11           THE COURT:  -- you can't ship those to DOC because they      14:04:4

12   have open charges; is that correct?                                  14:04:4

13           THE WITNESS:  No.  You can.  I've talked with Secretary      14:04:5

14   LeBlanc on this specific issue.  There are some.  He just did a      14:04:5

15   special run for me --                                                14:05:0

16           MR. MATTHEWS:  Your Honor, I'm going to object to this,      14:05:0

17   to what Secretary LeBlanc said.  We don't have any chance to         14:05:0

18   cross examine him, and that's contrary to what anybody else has      14:05:0

19   testified to.                                                        14:05:1

20           MR. ROSENBERG:  Judge, I'm not sure it's contrary to        14:05:1

21   it.  And, frankly, we've heard other expert testimony based upon     14:05:1

22   what --                                                              14:05:1

23           THE COURT:  I'm going to let him testify to it.             14:05:1

24           MR. ROSENBERG:  Thank you, Judge.                           14:05:1

25           THE COURT:  Go ahead.                                        14:05:2

1      Because we've heard testimony that you cannot ship          14:05:2

2  those persons if they have open charges.                        14:05:2

3          THE WITNESS:  I have, too.  That's why I looked at it    14:05:2

4  very carefully.                                                  14:05:3

5          Some of them do.  A lot of them do not.  They're        14:05:3

6  done.  They're ready to go.                                      14:05:3

7          THE COURT:  What do you mean, some of them do --         14:05:3

8          THE WITNESS:  Some have pending felonies on other        14:05:3

9  matters.  They've been sentenced already to the Department of    14:05:3

10 Corrections but they still have outstanding charges.             14:05:4

11         THE COURT:  Those are the ones I'm talking about.        14:05:4

12         THE WITNESS:  I asked this question directly of          14:05:4

13 Secretary LeBlanc because they are under the jurisdiction now of 14:05:4

14 the Department of Corrections.  And this is not uncommon as you   14:05:5

15 go around the country, that you have state inmates who still      14:05:5

16 have pending charges.  And what happens, the DOC transports them  14:05:5

17 back to the courts when they need to be appearing in court.       14:06:0

18         THE COURT:  Where are those inmates reflected on your     14:06:0

19 chart?  DOC inmates with open charges?                           14:06:1

20         THE WITNESS:  They're in that 548 and 78 group.  They    14:06:1

21 are part of the 628.                                             14:06:1

22         MR. ROSENBERG:  Subject to legal status, Your Honor.     14:06:2

23         THE COURT:  What about the parole and probation          14:06:2

24 violators, some of them have open charges, too; right?           14:06:2

25         THE WITNESS:  Yeah.  But I'm not looking at all of        14:06:2

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 196 of 350

Jones vs. Gusman 08.05.13 Funding Hearing                    196

1    them.  I don't think you can move them.  I'm not proposing to          14:06:3

2    move them.                                                             14:06:3

3              What I propose for them is expedite their cases as           14:06:3

4    quickly as you could and that would reduce their presence.  But        14:06:3

5    I don't think -- they cannot be moved, no.                             14:06:4

6         THE COURT:  I don't understand.  If you can move the              14:06:4

7    state DOC inmates with open charges, why couldn't you move the         14:06:4

8    state patrol and probation violators with open charges and             14:06:4

9    transport them back and forth, according to your testimony, just       14:06:5

10   like the others?  That doesn't make sense to me.                       14:06:5

11        THE WITNESS:  Well, the parole violator, they have been           14:06:5

12   brought into custody because they either they got arrested or          14:07:0

13   they have violated the terms of their parole supervision.  They        14:07:0

14   were granted parole so they're on parole.  They violate and they       14:07:0

15   go into the jail to hear the revocation hearing which is going         14:07:1

16   to be held in some due process time.                                   14:07:1

17             This is not -- this is the way most jails look               14:07:1

18   like, except for the DOC picture.                                      14:07:2

19        THE COURT:  You are aware that sometimes DOC inmates or           14:07:2

20   other inmates have additional charges brought against them while       14:07:2

21   they're in the parish prison?                                          14:07:3

22        THE WITNESS:  Um-hum.  Yeah.  Basically, scientific               14:07:3

23   information.                                                           14:07:3

24             But, again, there is a considerable number of                14:07:3

25   inmates in the parish prison that are DOC inmates that are good        14:07:3

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 197 of 350

Jones vs. Gusman 08.05.13 Funding Hearing          197

1    to go.  They're ready to be moved.                          14:07:4

2                    And, just to give you the full background, okay,    14:07:4

3    Louisiana is very different than the rest of the country.  Half    14:07:4

4    of its state prison population is in the parishes.  Half of it,    14:07:5

5    50 percent.  In most states, it's maybe 2, 3, 4 percent.  And    14:07:5

6    the only people that are there are people that have been    14:08:0

7    sentenced and they're waiting for the paperwork to get shipped    14:08:0

8    out.                                                       14:08:0

9                    So the only state that even comes close to    14:08:1

10   Louisiana is Kentucky, which has about 35 percent of it's    14:08:1

11   inmates in local facilities.                               14:08:1

12          THE COURT:  It's good to be first in something.    14:08:2

13          THE WITNESS:  If we go to table 3, if you can.    14:08:2

14   BY MR. ROSENBERG:                                          14:08:2

15   Q    That's what I was about to ask you.                   14:08:3

16   A    So, on table 3, what I am suggesting is we remove as many of    14:08:3

17   those DOC inmates immediately.                             14:08:4

18   Q    And, I'll just stop you there, Dr. Austin.            14:08:4

19                    Based upon your fact finding and conversations    14:08:5

20   with Secretary LeBlanc, who heads up the Department of    14:08:5

21   Corrections, is it your understanding that those state inmates    14:08:5

22   could be moved tomorrow?                                   14:09:0

23   A    Yes.  We have -- the good news about the state of Louisiana,    14:09:0

24   the prison population, thanks to some reforms, it's dropping.    14:09:0

25   So there are thousands of empty beds in the state system.  So    14:09:1

1    there's not a problem in finding beds for them.                    14:09:1

2              So I recommended the 474.  Not all of them because    14:09:2

3    some of them the paperwork is late.  There may be reasons to    14:09:2

4    keep some of them here.                    14:09:2

5              Some people said all of them be removed.  I don't    14:09:3

6    think that's practical.  But I we can get I think three-fourths    14:09:3

7    of them moved to the state department of corrections.    14:09:3

8              Plaquemines Parish Prison are also going to be --    14:09:4

9    that contract will end this year.  I was told it would end in    14:09:4

10   September, but maybe it's the end of the year.    14:09:4

11             And then the Vira Institute was awarded additional    14:09:5

12   funding to ramp up its pretrial release program.  And I feel    14:09:5

13   that, by the end -- some time this year, and it depends upon how    14:09:5

14   fast they start ramping it up, we could reduce -- remember that    14:10:0

15   thousand pretrial felon population I showed you?  Drop that,    14:10:0

16   175.                    14:10:1

17        MR. ROSENBERG:  Hold on for one second, Dr. Austin.    14:10:1

18             (Pause in proceedings.)                    14:10:2

19   BY MR. ROSENBERG:                    14:10:2

20   A   And, if we do that, if we were to move quickly on it, we    14:10:2

21   could get the sheriff's jail population reduced to 1,583.    14:10:3

22             Now, here's my -- I guess, before people talk    14:10:4

23   about is it feasible, if we can do this, now we can close the    14:10:5

24   tents and Conchetta.  The tents is one of the worst places I've    14:10:5

25   seen.  Close that down.                    14:11:0

1    There are about 80 officers that are already

2    trained, hired.  They can be reallocated to the remaining

3    facilities, which would significantly increase the safety of the

4    system by having more officers in these housing units.  You

5    heard of, from Mr. Laughlin, the lack of positions that are not

6    being filled and they can't hire additional staff until 2014.

7    This would be massive infusion of staff to the other facilities

8    until the new facility opens up.

9         We also located, by the way, in our staffing

10   analysis, we located about 10 to 15 positions that are in the

11   civil side that we think aren't really doing functions that are

12   necessary.  They could be brought over to the detention system.

13        So, my whole strategy, Judge, is to lower this

14   population, get more officers immediately into the remaining

15   facilities and make this -- that would have a big impact I think

16   on the safety and we could do it immediately.

17        THE COURT:  Let me say this for the record.  A couple

18   of things.

19        First of all, there's some inconsistencies in the

20   testimony, as I've heard it.  Although I've allowed testimony

21   related to what has been said, what has been discussed with the

22   Secretary for the Department of Correction, there's been some

23   inconsistencies with testimony.  Based on what I've heard at

24   this point, I'm not going to accept the fact that -- it hasn't

25   been proven to me adequately that the Department of Corrections

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 200 of 350

Jones vs. Gusman 08.05.13 Funding Hearing

200

1   would just go ahead and pick up all these inmates if requested          14:12:3

2   to and that's the secretary's position.  I would have to hear          14:12:4

3   from the secretary to take that position.  Because it is an           14:12:4

4   important because of the inconsistencies with the testimony.          14:12:4

5   That's the first thing.          14:12:4

6              Second thing is, all these things you've focused          14:12:4

7   on, which are good food for thought involving how to reduce the          14:12:5

8   prison population -- of course we never want to do that at the          14:12:5

9   expense of security.  I would assume, you would agree with that?          14:12:5

10          THE WITNESS:  I agree.          14:13:0

11          THE COURT:  But all these ideas are great ideas.  But,          14:13:0

12   until they're done and until those numbers have been reduced and          14:13:0

13   the administrators and the elected officials have agreed on          14:13:0

14   those things to further reduce the population, I'm left with a          14:13:1

15   population which -- left with a population the way it is right          14:13:1

16   now.          14:13:2

17              So, attempting to get this jail through December          14:13:2

18   31st, before the budgetary process takes over for the 2014          14:13:2

19   fiscal year, okay, these are great ideas but they're not helping          14:13:3

20   me arrive at what I need to get through the end of the year.          14:13:3

21          THE WITNESS:  Right.          14:13:3

22              My only observation would be, of what I've heard          14:13:3

23   this morning, right now, we're losing -- if you go up to 30          14:13:4

24   percent, right, termination rate, turnover rate, 30 percent, the          14:13:4

25   staffing level has been dropping.  According to the testimony,          14:13:5

1    we're losing 30 percent.  Which means, between now and the end    14:14:0

2    of the year, we're going to lose about another 100 officers that    14:14:0

3    we've got to find, train, replace.    14:14:0

4              I would just be concerned, Your Honor, that the    14:14:1

5    situation is going to be what it is today unnecessarily in terms    14:14:1

6    of safety.  Safety of staff and inmates, until we start doing    14:14:2

7    some things that -- and this is one way to do it.    14:14:2

8              And I would welcome you to call Secretary    14:14:3

9    LeBlanc --    14:14:3

10         THE COURT:  I'm not calling anybody.  It's going to be    14:14:3

11    up to the parties to call the secretary.    14:14:3

12              But I will tell you this.  In my ideal world, what    14:14:3

13    needs to be done now, instead of the sheriff and the City    14:14:4

14    continuing to fight over this staffing issue -- which eventually    14:14:4

15    is going to be resolved by the Court at least until the end of    14:14:4

16    the year -- so we can make sure that we don't have more violent    14:14:5

17    outbursts at the jail, people unnecessarily hurt, more suicides,    14:14:5

18    staff being put at risk, all that, what they need to do is they    14:15:0

19    need to get together --    14:15:0

20         THE WITNESS:  I agree.    14:15:0

21         THE COURT:  -- and start the staffing process now.  Not    14:15:0

22    kick the can down the road or wait for some federal court to do    14:15:0

23    it.  Otherwise the consequences are too great.  That's in my    14:15:1

24    mind.    14:15:1

25         THE WITNESS:  I agree with you.  I agree with you.    14:15:1

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 202 of 350

Jones vs. Gusman 08.05.13 Funding Hearing

202

1          And an example of Dr. Inglese's --                    14:15:1

2          THE COURT:  They can ask -- the City can ask for      14:15:2

3   reimbursement later on.  They can have these debates at the  14:15:2

4   budget hearings.                                             14:15:2

5              Right now, there needs to be increased staff, and 14:15:2

6   we need to need to start today.  Because, after what I've heard  14:15:3

7   not only today but previously, there are people at risk within  14:15:3

8   the prison and outside the prison because of the way it's --  14:15:3

9   because it's being run in a somewhat insecure way as to       14:15:4

10  staffing.                                                    14:15:4

11         THE WITNESS:  I agree with you.                       14:15:4

12             And I -- this is just my plan, and I've seen it   14:15:4

13  done elsewhere.  In terms of public safety, they're still    14:15:5

14  incarcerated.  They're just not going to be incarcerated here in  14:16:0

15  a, I think we would agree, it's an unconstitutional jail.     14:16:0

16  They're going to go to the Department of Corrections, which is  14:16:0

17  much safer.  Better care.  Better medical care.              14:16:0

18         THE COURT:  I don't have all the answers.  But I know  14:16:1

19  that it takes some time to get through this process.  And, in  14:16:1

20  the meantime, there's an emergency.  That's what I know.     14:16:1

21             Let's go.                                         14:16:1

22         MR. ROSENBERG:  Your Honor, I understand the conflict  14:16:2

23  between the parties regarding Secretary LeBlanc's position.  But  14:16:2

24  I think that was, as I understood what Dr. Austin is saying and  14:16:2

25  I'll let him speak directly on this point, that was the      14:16:2

1    immediate fix that we thought the Court was concerned about.    14:16:3

2    Which is, if those inmates can be moved back to DOC or some    14:16:3

3    other facility, and they're under the control of the Department    14:16:4

4    of Corrections, that can be done posthaste.    14:16:4

5         THE COURT:  The Department of Corrections isn't a party    14:16:5

6    here.  I can't order the Department of Corrections to take these    14:16:5

7    inmates.  There has to be some agreement there between the    14:16:5

8    sheriff and the Department of Corrections.  Right now, there    14:16:5

9    isn't.    14:17:0

10         The testimony previously was the fact that you    14:17:0

11   cannot force the Department of Corrections to take inmates.    14:17:0

12   They can't tell you how many they're going to take.  You can    14:17:0

13   make requests, but they tell you what they're going to take.  So    14:17:0

14   that's part of the problem.    14:17:1

15         Now, I do agree with you, to the extent that they    14:17:1

16   can get some of these DOC inmates that aren't needed to help    14:17:1

17   maintain the jail, that's a good thing.  But I have no control    14:17:1

18   over that.    14:17:2

19         MR. ROSENBERG:  Your Honor, if I might, given the fact    14:17:2

20   that the sheriff has not closed the *Hamilton* litigation and the    14:17:2

21   Court is sort of overseeing that, although it may technically be    14:17:2

22   slotted to another section, but they've been viewed in tandem,    14:17:3

23   the Department of Corrections is a defendant in that case.  So I    14:17:3

24   would just welcome the Court to let them come forward as part of    14:17:3

25   that case or let the City bring them forward as part of the    14:17:4

1   *Hamilton* case in order that the Court can get to the bottom of    14:17:4

2   it:  Whether these DOC inmates can be transferred immediately to    14:17:4

3   another state facility and be removed from Orleans Parish so we    14:17:5

4   can reduce the population at Orleans Parish.  Which, one,    14:17:5

5   reduces costs; and, two, more importantly, increases safety.    14:18:0

6         THE COURT:  All right.  Let's not lose focus on this.    14:18:0

7   The Department of Corrections is not a defendant in this case.    14:18:1

8   For me to bring them in now or for Judge Zainey to bring them in    14:18:1

9   on the *Hamilton* matter is going to take some time.  We don't    14:18:1

10  have that time.    14:18:1

11        Now, there may be things that can be done with the    14:18:1

12  Department of Corrections for the next fiscal year.  Might be    14:18:2

13  things that I have to deal with or the parties have to deal with    14:18:2

14  it.  But, right now, I have what I have, and we're going to get    14:18:2

15  through the end of the year, posthaste.    14:18:3

16        THE WITNESS:  I understand you, Your Honor.    14:18:3

17        THE COURT:  I don't want the blood on my hands; okay?    14:18:3

18  The blood will not be on my hands.    14:18:3

19        MR. ROSENBERG:  Nor does the City want it, Your Honor.    14:18:3

20  That's the reason we were looking for an immediate fix to the    14:18:3

21  problem.    14:18:4

22  BY MR. ROSENBERG:    14:18:4

23  Q   Let me ask you this, sir.  The new facility --    14:18:4

24  A   Yes.    14:18:5

25  Q   -- have you looked at what the new facility would house in    14:18:5

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 205 of 350
Jones vs. Gusman 08.05.13 Funding Hearing

205

1    terms of the number of inmates?                            14:19:0

2    A    Yes.                                                   14:19:0

3    Q    And what's your opinion as to what the new facility would  14:19:0

4    house?                                                     14:19:1

5    A    Well, you mean, numbers?                              14:19:1

6    Q    In numbers, yes.                                      14:19:1

7    A    Let's go to table 5.  That, I think, would help you.  14:19:1

8              This is what we would hope the system would look  14:19:2

9    like in the early part of 2014 when the new facility is opened  14:19:2

10   up.                                                        14:19:3

11             Prior to some -- there's some last minute changes,  14:19:3

12   I'm aware of, in the mission of it.  Which is make it able to  14:19:3

13   take the medical mental health inmates.  So this is before those  14:19:4

14   changes have been developed.                               14:19:4

15             So they had a capacity of 1,420.  I set the      14:19:4

16   population at 1,314.  In other words, you should never have --  14:19:5

17   you should have some wiggle room at any given time in that new  14:19:5

18   facility, due to seasonal fluctuations and things like that.  14:20:0

19             The only other facility you would need at that   14:20:0

20   point would be Templeman 5, and Templeman 5 would be your  14:20:0

21   primary place for medical/mental health.  Which I believe all  14:20:1

22   the experts are agreeing is the proper location.           14:20:2

23             And, Judge, I take your point about the Department  14:20:2

24   of Corrections not being a party.  But, if you were able to do  14:20:2

25   it, you would have an extremely manageable system.  Starting in  14:20:2

1    January/February, we'd just have two facilities.  We've closed    14:20:3

2    out all the junk.  And we've got people coming into a place    14:20:3

3    that's safe, secure and a place they want to work.    14:20:4

4               So we would be there.  That would be our model    14:20:4

5    scenario for what would happen in 2014.    14:20:5

6               I think, if you got to this as a goal, all the    14:20:5

7    other parts of the Consent Decree start to come into place.  We    14:20:5

8    should see reductions in everything.    14:21:0

9               And like, for example, an example that the doctor    14:21:0

10   gave about an inmate getting his jaw fractured, you wouldn't    14:21:0

11   have those incidents because it's a safe environment.  We are    14:21:1

12   not going to have inmates with their jaws getting fractured.  So    14:21:1

13   the medical costs are going to go down.    14:21:1

14               So that's basically, you know, the scenario that    14:21:2

15   we developed.    14:21:2

16               This drives all the other costs then for the    14:21:2

17   Consent Decree.  It becomes something that's much less expensive    14:21:2

18   to the taxpayers of Orleans.    14:21:3

19               Let me just add one thing, if I could, Your Honor,    14:21:3

20   about the costs of the DOC inmates.  The sheriff gets    14:21:3

21   compensated $26 a day per person.  If they've got severe medical    14:21:4

22   mental health, it's another $8.  So that's a small percent of    14:21:5

23   that population.    14:21:5

24               Our current estimate has been verified by the    14:21:5

25   Office of the Inspector General.  The current daily cost of    14:21:5

1    housing an inmate in the sheriff's system is in the neighborhood    14:22:0

2    of $45.  So it is costing someone in Orleans to house these DOC    14:22:0

3    inmates.  You are not saving any money; you're losing money.  I    14:22:1

4    think Mr. Parrish's report indicates that the cost is like $65    14:22:1

5    per day.    14:22:2

6              Housing these state DOC inmates is a losing    14:22:2

7    proposition.  You're losing big money on this, and you are    14:22:2

8    spreading thin your existing staff so that you have situations    14:22:3

9    where housing units are not being properly staffed and    14:22:3

10   supervised.  And that's why I keep coming back to these DOC    14:22:4

11   inmates as a target.    14:22:4

12   BY MR. ROSENBERG:    14:22:4

13   Q   And you mentioned, if we project into 2014, that there would    14:22:4

14   be a need for additional deputies even at the new facility; is    14:22:5

15   that right, Dr. Austin?    14:22:5

16   A   Yes.  Yes.    14:23:0

17             I don't have -- the exact number is about 135 new    14:23:0

18   deputies, Your Honor, need to be hired.  That process needs to    14:23:1

19   start now.  Needs to start now.  We need to start hiring people    14:23:1

20   now.    14:23:2

21             THE COURT:  Agreed.    14:23:2

22             THE WITNESS:  I am very concerned about, we're not    14:23:2

23   going to be ready for this new jail.  And that's why I'm    14:23:2

24   concerned about the jail administrator not being in place.    14:23:2

25             But, yes, we need to start hiring officers now and    14:23:3

Case 2:12-cv-00859-LMA-MBN   Document 544   Filed 08/20/13   Page 208 of 350

Jones vs. Gusman 08.05.13 Funding Hearing

208

1    probably at a different compensation level when they get hired.    14:23:3

2           THE COURT:  And, for the record, I have urged the City    14:23:3

3    and sheriff to sit down and attempt to resolve that issue, even    14:23:4

4    on a temporary basis, until I'm blue in the face.  But it hasn't    14:23:4

5    happened yet.    14:23:4

6           THE WITNESS:  And I know you didn't want to hear about    14:23:4

7    my medicals and stuff.  All I'm going say is that, in Dr. Gage's    14:23:5

8    report, which you are going to hear about, he notes that there    14:23:5

9    is a linear reduction in the number of medical staff that you    14:23:5

10   need as that population goes down.  So there are -- it means --    14:24:0

11   you'd still have to hire more medical/mental health staff.  I    14:24:0

12   don't disagree.  And I'm pretty much in line with Dr. Gage, his    14:24:1

13   numbers.  So I don't think there's controversy there.  The    14:24:1

14   question is, what kind of population are going to have, and that    14:24:1

15   does drive the costs.  If you're going to be basically    14:24:2

16   increasing your medical costs because you're housing state DOC    14:24:2

17   inmates that you're losing money on, I just don't see the value    14:24:3

18   or logic of that.    14:24:3

19   BY MR. ROSENBERG:    14:24:3

20   Q   By the way, before we move on, Dr. Austin, I know on table    14:24:3

21   45, if we can back up just a second, under your structure for    14:24:4

22   2014, there would be the new jail and Templeman 5; is that    14:24:5

23   right, sir?    14:24:5

24   A   Right.  Templeman 5 I think can hold it for several years.    14:24:5

25          I think at that point we need to start looking at    14:25:0

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 209 of 350

Jones vs. Gusman 08.05.13 Funding Hearing

209

1    building a brand-new state-of-the-art facility that would hold    14:25:0

2    medical/mental health people.  It doesn't need to be that large    14:25:0

3    but that would be -- although, Your Honor, one more statistic    14:25:1

4    that you might find interesting.  The incarceration rate    14:25:1

5    nationally for jails across the country is about 220 per 100,000    14:25:1

6    population.  If you take that rate and apply it to Orleans, you    14:25:2

7    would need a jail of about 6 to 800.  You're not going to be    14:25:3

8    there because you do have a higher crime rate and your arrests    14:25:3

9    are higher.  But it is conceivable, in my mind, that you could    14:25:3

10   -- if the new facility is reconfigured and everything, you could    14:25:4

11   get everybody into that new facility.  But that's just something    14:25:4

12   I'd like for everyone to kind of entertain at some point.    14:25:5

13           But, if not, Templeman 5 would hold it just well.    14:25:5

14   And then we'd probably talk about replacing that facility, what    14:26:0

15   we'd call a bridge facility, which would be a start-of-the-art    14:26:0

16   medical/mental health facility.    14:26:0

17           THE COURT:  By the way, the City can have the    14:26:0

18   attendance of the Department of Corrections secretary present at    14:26:1

19   this hearing.  That would be probably be very helpful in    14:26:1

20   resolving some of these issues where we have testimony on both    14:26:1

21   sites of the coin.    14:26:1

22           MR. ROSENBERG:  Do our best, Your Honor.    14:26:2

23   BY MR. ROSENBERG:    14:26:2

24   Q   Let me just follow up on a point you made.    14:26:2

25           You have the pairing of the new jail facility with    14:26:3

Jones vs. Gusman 08.05.13 Funding Hearing

210

1    Templeman 5; is that right, sir?                          14:26:3

2    A    That's correct.                                      14:26:3

3    Q    You're aware of the city ordinance that paired the new jail    14:26:3

4    facility with the temporary detention center for 18 months and    14:26:4

5    then it would be closed; are you not?                      14:26:4

6    A    Yes.                                                  14:26:4

7    Q    And has the ability to use the temporary detention center    14:26:4

8    for 18 months after the new jail facility is operative somewhat    14:26:5

9    collapsed in view of the ongoing modifications now to the new    14:26:5

10    jail facility?                                            14:27:0

11    A    It could be.  I haven't been able to examine the    14:27:0

12    modification.                                             14:27:0

13              I will say this, is that in terms of the costs and    14:27:0

14    the Consent Decree, if we don't do something about this    14:27:1

15    population and they modify the new jail, you might lose 200 beds    14:27:1

16    off the new jail.  With a population of 2,400, the City is going    14:27:2

17    to have to build another 1,200 bed facility to meet the Consent    14:27:2

18    Decree.  And you need to start building that pretty quickly    14:27:3

19    unless you want to stay in this Consent Decree for a long time.    14:27:3

20    So you're going to have to build another large jail if you want    14:27:3

21    to say at the 2,400 level.                                14:27:4

22    Q    And one the footnotes to your table 5 is the peaking factor?    14:27:4

23    A    Yes.                                                 14:27:5

24    Q    Could you just address what that means?              14:27:5

25    A    Peaking factor has to do with seasonality.  So, right now,    14:27:5

1    we're in our peak -- population generally rises in the summer.      14:27:5

2    Declines in the winter and spring.  Then starts coming back up      14:28:0

3    again.  So it takes that into account.                             14:28:0

4              And then also the fact that you have a special           14:28:1

5    populations.  We have inmates that are high security.  You will    14:28:1

6    need to have some cells available to put people into high          14:28:1

7    security.  We need to separate the juveniles from the adults.      14:28:2

8              On the women's side, you know, you have different        14:28:2

9    kinds of programmatic needs for them.  They all can't be           14:28:2

10   maximized to the full capacity.                                    14:28:3

11             So you have to have a peaking factor so that at no       14:28:3

12   time in the year does the jail become overcrowded.  And this was   14:28:3

13   a calculated rate that I know the architect, Mr. Gerry Hebert,     14:28:4

14   has accepted.  And it's pretty common.  It's usually in the 7.5   14:28:4

15   to 10 percent range.                                              14:28:5

16   Q   And we've been talking --                                     14:28:5

17   A   So that column on right would show you, here's the number of  14:28:5

18   surplus beds you would have.  At the highest peak, you would       14:29:0

19   still have those kinds of beds available even at your highest      14:29:0

20   peak.                                                              14:29:0

21   Q   That's what I was going to ask you.  So even with the          14:29:0

22   peeking factor applied --                                         14:29:1

23   A   You'd have surplus beds.                                       14:29:1

24   Q   You would still have surplus beds?                             14:29:1

25   A   You will always have surplus beds.                             14:29:1

1  Q    Let me talk with you a moment about the projected costs that    14:29:1

2  have been discussed in part earlier today.    14:29:2

3  A    Yes.    14:29:2

4  Q    Have you assessed what appropriate costs would be for the    14:29:2

5  implementation of the Consent Decree?    14:29:3

6  A    Under my scenario?    14:29:3

7  Q    Yes, sir.  Only under your scenario.    14:29:3

8  A    Yes.    14:29:4

9           And that was done principally by David Eckenthall    14:29:4

10  and his group at PFM.    14:29:4

11  Q    I know you said there was going to be some lost revenue?    14:29:4

12  A    But we're going to add staff.  We're going to add deputies,    14:29:5

13  administrative staff, substantial numbers of medical staff.    14:29:5

14  It's going to, we think, cost someone $7.1 million per year    14:29:5

15  going forward.    14:30:0

16           There may be some savings we could achieve if you    14:30:0

17  outsource, for example, health care.  It's common now for jails    14:30:1

18  to contract with -- like, in the juvenile system here in    14:30:1

19  Louisiana, LSU provides health care services.  They're    14:30:1

20  contracted to do that.  So that could be -- and jails have found    14:30:2

21  that to be efficient.    14:30:2

22           Food service can be contracted out.    14:30:2

23           All sorts of kinds of services, you can contract    14:30:3

24  out, that will give some savings.    14:30:3

25           But we've got it, under this scenario, of about    14:30:3

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 213 of 350

Jones vs. Gusman 08.05.13 Funding Hearing                    213

1    $7.1 million per year.                                    14:30:3

2              If you go up to the 2,400 level, and I think Mr.    14:30:4

3    Parrish's report I believe was at the $20 some plus million per    14:30:4

4    year.  So that's a big difference.                       14:30:5

5    Q    He's at $20 million of additional expense?           14:30:5

6    A    Per year.                                            14:30:5

7    Q    And you're at 7?                                     14:30:5

8    A    Per year.  Yeah.                                     14:31:0

9              So someone's going to be paying more money.  And,    14:31:0

10   if you get to that level, your cost per day -- under my    14:31:0

11   scenario, you will go up to 65, $70 per day per inmate under    14:31:0

12   this scenario.  That's what you cost per inmate.  You will be    14:31:1

13   probably the Cadillac parish prison in Louisiana.  I don't know    14:31:1

14   of any other parish that's spending that kind of money per day.    14:31:1

15             And that's another side here.  Because some of the    14:31:2

16   work that I do, you know, how much money you spend doesn't have    14:31:2

17   much to do often with how safe the jail is.  One of the places I    14:31:2

18   work at is Los Angeles County, which has been racked by violence    14:31:3

19   and corruption.  They are probably the most expensive jail in    14:31:3

20   the country.  Their per diem is $110 per day.  And yet -- they    14:31:4

21   pay their officers extremely well.  Their average salary is in    14:31:4

22   the 65 to $75,000 per year.  Yet, they had a terrible violence    14:31:4

23   situation, a corrupt situation.                          14:31:5

24             So, money is one thing.  Leadership is something    14:31:5

25   else.  A jail administrator, you're going to need to get this    14:32:0

1   jail administrator.  And that jail administrator has to have the    14:32:0

2   authority to bring on whoever he or she wants to back them up.    14:32:0

3        THE COURT:  Has your staffing analysis demonstrated how    14:32:1

4   many federal judges it's going to take to thoroughly go through    14:32:1

5   all this information?    14:32:1

6        THE WITNESS:  No, Your Honor, it has not.    14:32:2

7        THE COURT:  The answer is just one.    14:32:2

8        Let's move on.    14:32:2

9   BY MR. ROSENBERG:    14:32:2

10  Q   And, in terms of those costs, $7 million of costs --    14:32:3

11  A   Per year.    14:32:3

12  Q   -- per year, is it correct that those costs can also be    14:32:3

13  reduced by cost savings by the sheriff operating the facility?    14:32:4

14  A   Well, yeah.  All these estimates you've heard, Judge, are    14:32:4

15  estimates.  And, until they open up that facility, you know, we    14:32:4

16  really don't know what the bottom line is going to be.  I think    14:32:5

17  it was well taken by several people, the monitor is going to    14:32:5

18  work with you in terms of figuring out what needs to be done as    14:33:0

19  you go forward.  I think everyone agrees, we need to go forward,    14:33:0

20  we need to start hiring people.  It's just going to be how many    14:33:0

21  and over what time and what the population is going to look    14:33:1

22  like.    14:33:1

23        So, yeah, there's a lot of uncertainty in that, in    14:33:1

24  those estimates, I think you should be aware of.  No one can    14:33:2

25  tell you exactly what's going to happen.    14:33:2

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 215 of 350

Jones vs. Gusman 08.05.13 Funding Hearing                    215

1  Q    And is it correct that, as you've expressed in your report,    14:33:2

2  Dr. Austin, that what you really need is a 90-day look back once    14:33:3

3  the new facility opens up or maybe longer?    14:33:3

4  A    Well, it will be, once you start monitoring it, it will be    14:33:4

5  self evident pretty quickly what's going on.    14:33:4

6            And part of the problem I think that we have to    14:33:5

7  deal with in this jail system is the lack of data.  It was very    14:33:5

8  difficult to get basic information about overtime, rosters,    14:33:5

9  master rosters.  These are things that are kind of common.  So    14:34:0

10  trying to get a benchmark of where we are in terms of staff.    14:34:0

11  Incidents, I have yet to find -- I've requested several times,    14:34:1

12  what's the assault rate per month.  How many assaults are    14:34:1

13  occurring in the system.  Where are they occurring.  This is    14:34:1

14  stuff that's routinely printed out in any jail management system    14:34:2

15  so we can see where the trouble spots are.    14:34:2

16            So those kind of infrastructure things need to get    14:34:3

17  put in place under the direction of the jail administrator as    14:34:3

18  quickly as possible, so, when you start investing these millions    14:34:3

19  of dollars -- if I was you, Judge, you'd want reports that say    14:34:4

20  we are investing this money wisely, we are seeing incidents go    14:34:4

21  down, We are seeing that the turnover rate go down, et cetera.    14:34:5

22  That's what you will want to see.    14:34:5

23  Q    And, by the way, if you'd just go to terms of the projected    14:35:0

24  costs, Dr. Austin, if I could just turn a moment to your table 8    14:35:0

25  in the report.  I think you touched upon this briefly.  See it?    14:35:1

1    A    Yeah.                                                              14:35:2

2              THE COURT:  Table 8.                                          14:35:2

3              MR. ROSENBERG:  Table 8, Your Honor.                          14:35:2

4              THE WITNESS:  I have it.                                      14:35:2

5    BY MR. ROSENBERG:                                                       14:35:2

6    Q    Is that the projected daily cost for an inmate, as you've          14:35:2

7    calculated it, at the $7 million cost?                                  14:35:3

8    A    Yeah.  I'm sorry if I said 65.                                     14:35:3

9    Q    You did.                                                           14:35:4

10             It's a little higher?                                         14:35:4

11   A    I apologize.  It will go up to $79 per inmate per day.             14:35:4

12   Right now, you're spending about 45, $47 per day.  So it's going        14:35:4

13   to be a huge jump in costs for whoever is paying for this.              14:35:5

14             The biggest -- it's kind of interesting, Your                 14:35:5

15   Honor.  If you look at the actual budget that my associates at          14:36:0

16   PFM came up with and the OIG came up with, we're not really             14:36:0

17   changing the overall spending level.  It's in that 44, $45             14:36:1

18   million a year.  What you're losing is those revenues from the          14:36:2

19   state, the $26.  You are losing that.                                   14:36:2

20             But that revenue -- I'm trying to phrase this                 14:36:3

21   properly -- it was a sucker's game.  It allowed this place to           14:36:3

22   get vastly larger than it should be without paying for it.  And         14:36:3

23   that's what got this place in trouble.  So, if that's what got          14:36:4

24   it place in trouble, it's the thing you need to do with to get          14:36:5

25   this thing back on track.                                               14:36:5

1    Q    If I can understand what you said just by a way of an

2    analogy.  Is what is happening as a result of housing DOC

3    inmates like the little girl who was buying apples for a dime

4    and selling them for a nickel and hoping to make it up on

5    quantity?

6    A    That's about right.  It's about right.

7    Q    And so, if you look at your table 8, that is basically three

8    times what the DOC is paying for its inmates per day to Orleans

9    Parish Sheriff's Office?

10   A    Right.  You'd be losing about 50 bucks per day per inmate,

11   even if being subsidized.

12               The interesting thing, if you look at the costs of

13   incarceration for the state DOC, it's one of the lowest in the

14   country.  And it's the lowest -- it's about 17 or $18 thousand

15   per year per inmate.  It's one of the lowest.  And it's low

16   because the parishes are subsidizing the incarceration of these

17   state inmates by keeping the local level at the $26 rate.

18   Q    So, by my rough math, is it correct to say that, for each of

19   those DOC inmates, if they're continued to be housed at Orleans

20   Parish Prison, each one of those would cost over $18 thousand a

21   year?

22   A    Yes.  That's correct.  At the DOC, yes.  As opposed to your

23   cost would be much higher than that.

24   Q    That would be the cost for each DOC inmate that the sheriff

25   or that the City would have to absorb each -- for each inmate

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 218 of 350

Jones vs. Gusman 08.05.13 Funding Hearing

218

1    each year; is that right?                                          14:38:3

2    A    Say that again.  Restate the question.                        14:38:3

3    Q    Yes.  If there's a delta between the $26 and the $79, then    14:38:3

4    we're talking about more than $50 per day per inmate?              14:38:4

5    A    Well, I'll put it differently.  If you keep the state people  14:38:4

6    here, that $7 million is going to at least double and maybe        14:38:4

7    triple.  And those are state inmates that you are paying for.      14:38:5

8    Q    Not me.  The taxpayers of Orleans Parish.                     14:39:0

9    A    The state is paying a portion of it, but you're paying for    14:39:0

10   most of it.                                                        14:39:1

11            THE COURT:  Did you read Mr. Parrish's report prior to    14:39:1

12   testifying today?                                                  14:39:1

13            THE WITNESS:  I did.                                      14:39:1

14            THE COURT:  Are you aware of the fact that he says that   14:39:1

15   -- the figure he puts at $64 per day based on an average daily     14:39:2

16   census of 2,400 inmates.                                           14:39:2

17            THE WITNESS:  Right.                                      14:39:2

18            THE COURT:  He says that's well below the national        14:39:2

19   average for jails in the United States, which is a $100 per day    14:39:3

20   or more is common.  And that the Orleans Parish Sheriff's Office   14:39:3

21   cost per day is unusual low because primarily because of           14:39:3

22   salaries paid.  Are you aware of that?                             14:39:4

23            THE WITNESS:  Yes, I'm aware of that.                     14:39:4

24                May I respond to that?                                14:39:4

25            THE COURT:  Yes, please.                                  14:39:5

1       THE WITNESS:  So there is no national average cost                    14:39:5

2    that's published anywhere in the country.  He's correct that            14:39:5

3    there are plenty of major jail systems that are costing $100 or         14:39:5

4    more per day.  There's a ton of them that are not and they are          14:39:5

5    also constitutional.                                                    14:39:5

6            So let me give you another example.  In                         14:40:0

7    Connecticut, if you go to state prison in Connecticut, the cost         14:40:0

8    is $50 thousand per year per inmate.  In Kentucky, it's $16             14:40:0

9    thousand per year.  So that's a differential you'll see in the          14:40:1

10   state prison system, which we do have the national data.  You'll        14:40:1

11   see the same thing in state jails.                                      14:40:1

12           Generally, in the south, with all due respect, the              14:40:2

13   south generally has lower salaries than in the northeast and in         14:40:2

14   California, Oregon, Washington.  They have things called unions         14:40:2

15   there, negotiated things.  They have --                                 14:40:3

16       THE COURT:  I've never heard of that.                               14:40:3

17       THE WITNESS:  I know.  That's my point.                             14:40:3

18       MR. ROSENBERG:  He was trying to be diplomatic, Your                14:40:4

19   Honor.                                                                  14:40:4

20       THE WITNESS:  So, I'm not going to quarrel with David's             14:40:4

21   statement, there are plenty that pay more.  And I'm saying,             14:40:4

22   yeah, you've got to start paying more.                                  14:40:4

23       THE COURT:  Everyone says the costs alone are because               14:40:5

24   the low salaries.                                                       14:40:5

25           I mean, obviously, if your salaries increase,                   14:40:5

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 220 of 350

Jones vs. Gusman 08.05.13 Funding Hearing                    220

1    that's going to affect the amount per day.                    14:40:5

2            THE WITNESS:  It is.                                   14:41:0

3            THE COURT:  Per inmate.                                14:41:0

4            THE WITNESS:  But I don't think you need to go to $100 14:41:0

5    per day.                                                       14:41:0

6            If you went to $100 per day for 2,400 inmates,         14:41:0

7    your budget would be astronomical.  And, with all due respect, 14:41:1

8    that's not necessary.  I think we can -- the title of my report 14:41:1

9    was a constitutional jail.  I think we can get to a            14:41:2

10   constitutional jail at these rates.                            14:41:2

11           THE COURT:  Does he say we have to go to go $100 a day? 14:41:2

12           THE WITNESS:  He didn't say that, no.                  14:41:3

13           THE COURT:  What else?                                 14:41:3

14           MR. ROSENBERG:  Your Honor, just a few other questions 14:41:3

15   for Dr. Austin.                                                14:41:3

16   BY MR. ROSENBERG:                                              14:41:3

17   Q   Did you consider -- let me back up and ask you this.       14:41:3

18           Have you ever been involved in the outsourcing or      14:41:4

19   privatization of activities related to correctional facilities, 14:41:5

20   Dr. Austin?                                                    14:41:5

21   A   I haven't been involved in it but I know it exists and     14:41:5

22   occurs in a lot of correctional facilities.                   14:41:5

23   Q   That's what I mean by involved, and a poor choice of words. 14:42:0

24           Has that been done with respect to various            14:42:0

25   components of municipal jails throughout the United States?    14:42:0

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 221 of 350

Jones vs. Gusman 08.05.13 Funding Hearing                    221

1    A    It has.                                                    14:42:1

2    Q    That there is outsourcing or privatization?               14:42:1

3    A    It has.                                                    14:42:1

4    Q    And could you tell Judge Africk what are the types of areas    14:42:1

5    that could be subject to outsourcing that have proved to be    14:42:2

6    successful in terms of reducing costs?                         14:42:2

7    A    Well, the big one is health care.                         14:42:3

8              And then food service would be the second largest    14:42:3

9    one.                                                           14:42:3

10             There's also maintenance kinds of -- they'd have     14:42:3

11   professional or private maintenance firms come in and provide  14:42:4

12   the maintenance to the facility.                               14:42:4

13             But I would say the two biggest savings that         14:42:4

14   you're going to achieve by outsourcing would be the medical care    14:42:5

15   area -- and that includes also your drugs, pharmaceutical -- and    14:42:5

16   then the food service.                                         14:42:5

17   Q    And so, besides outsourcing or privatization -- and, by the    14:43:0

18   way, for example, I don't know if you know -- I know the Court  14:43:0

19   can take judicial notice of it, Judge, and maybe save me a     14:43:0

20   question.  But, when you walk through security, those were not  14:43:1

21   US Marshals there; were they?                                  14:43:1

22   A    No.  They were not.                                       14:43:1

23   Q    That's an outsourcing form for guarding?                  14:43:1

24   A    I guess what you're get to, the sheriff has certain       14:43:2

25   functions that are deputy functions that could be outsourced and    14:43:2

1    to a private vendor.  And you'd get some savings there.                    14:43:3

2    Q    And so, to the extent that there is consideration of                  14:43:3

3    expenses for guarding a courthouse or providing security, those            14:43:3

4    could be outsourced, just like they're done in this courthouse;            14:43:4

5    isn't that right?                                                          14:43:4

6    A    That's correct.                                                       14:43:4

7    Q    And, in your experience, that has resulted in savings?                14:43:4

8    A    Some savings, yes.                                                    14:43:5

9         THE COURT:  I hope these are all things that are                      14:43:5

10   discussed thoroughly and vetted during the 2014 budget                     14:43:5

11   proceedings.                                                               14:44:0

12        MR. ROSENBERG:  Yes, sir.  I do, too.  I've tried to                  14:44:0

13   make a list so we can have that dialog in full and have the                14:44:0

14   transparency the Court alluded to last week.  And, we can have             14:44:0

15   the kind detail, so we can have that full discourse.                       14:44:1

16        THE COURT:  And, obviously, it's not going to be just                 14:44:1

17   the mayor and the sheriff's office, there are other parties that           14:44:1

18   are going to have to brought into the equation as well.  It's a            14:44:2

19   tough job and there's a lot to be done.  It's a Herculean task.            14:44:2

20        What else?  I'm sorry.                                                14:44:2

21        MR. ROSENBERG:  That's all right, Your Honor.                         14:44:3

22        I think, Judge, could I ask the Court for five                        14:44:4

23   minutes?  Because of pairing down certain areas, and I would               14:44:4

24   like to look at those areas and see if I've covered all the                14:44:4

25   areas I want to cover.                                                     14:44:5

1    THE COURT:  All right.  Let's take a ten minute recess.    14:44:5

2    And we'll be back and finish at 5:00 o'clock.    14:44:5

3    (Proceedings in recess.)    14:45:2

4    THE COURT:  Thank you.  Have a seat.    15:01:1

5    What's up?    15:01:1

6    MR. ROSENBERG:  Your Honor, I just have a few other    15:01:1

7    questions for Dr. Austin.    15:01:1

8    THE COURT:  Sure.    15:01:1

9    CROSS EXAMINATION (CONTINUED)    15:01:1

10   BY MR. ROSENBERG:    15:01:2

11   Q   Dr. Austin, if you could just turn back to the salary issue    15:01:2

12   for a moment.  If, as you suggest say a ten percent raise is    15:01:2

13   afforded for the starting salaries to Orleans Parish deputies,    15:01:3

14   when you consider the other benefits that they are given    15:01:3

15   compared to their counterparts say in the Louisiana DOC, would    15:01:4

16   that make the salaries and the benefits comparable, sir?    15:01:4

17   A   It would come pretty close if not comparable.  Because the    15:01:5

18   deputies here get -- on health care, for example, they have to    15:01:5

19   make less of a contribution than the state employees.  It's    15:02:0

20   rather considerate, I think like $200 per month.    15:02:1

21   Q   Isn't it true that, after the deputy served 15 years,    15:02:1

22   assuming that they get promoted to colonel or major or some    15:02:2

23   other high paying job, that that individual would actually make    15:02:2

24   more than his or her counterpart at the Louisiana DOC?    15:02:2

25   A   It probably would.  Somewhat more.    15:02:3

1    Q    And that same individual would make over 90 percent of what    15:02:3

2    with a New Orleans Police Department officer would make each    15:02:4

3    year; isn't that true, sir?    15:02:4

4            THE COURT:  After 15 years, you're talking about?    15:02:4

5            MR. ROSENBERG:  Yes, sir.    15:02:4

6    BY MR. ROSENBERG:    15:02:4

7    A    I believe that's correct.    15:02:4

8    Q    Now, I just have a few other follow-up questions, sir.    15:02:5

9            I know we talked about privatization briefly.  Are    15:02:5

10    you aware that some municipalities and sheriff's offices also    15:03:0

11    engage in either pooling or shared resources to save costs by    15:03:0

12    combining similar functions, such as payroll, maintenance,    15:03:1

13    technology?    15:03:1

14    A    Within a city department?  Yes.  They would build what they    15:03:1

15    call a common platform on their IT applications and policies and    15:03:2

16    procedures so there would be redundancy in the information    15:03:2

17    that's being shared.    15:03:3

18    Q    And then let me ask you just one isolated question.  We've    15:03:3

19    heard a lot about this new kitchen coming aboard, but I'm just    15:03:3

20    going to ask you about the food costs.  According to the    15:03:4

21    information we've seen, the food costs per inmate per day is    15:03:4

22    about $4.18.  Is that your understanding?    15:03:5

23    A    That's my understanding.    15:03:5

24    Q    And are you aware that other municipalities in this area of    15:03:5

25    the country with similar sized jails have lower food costs per    15:04:0

1    day for their inmates?                                         15:04:0

2    A    They do.                                                  15:04:1

3    Q    Can you think of any?                                     15:04:1

4    A    Well, just about -- the Department of Corrections has a   15:04:1

5    lower cost per day on their food service.  I don't have the    15:04:1

6    exact number but you could find them -- for me, I'm not a      15:04:2

7    nutritional expert.  So, obviously, the food has to be prepared, 15:04:2

8    has to be decent and suitable.  But there could be some savings 15:04:3

9    there.                                                         15:04:3

10              I would say, though, in the big picture, food is    15:04:3

11   not what's going to drive this budget.  It's going to be the   15:04:4

12   staffing levels.                                               15:04:4

13   Q    I understand that.  I'm just trying to look at every penny 15:04:4

14   for the City.                                                  15:04:5

15              THE COURT:  There are a number of other correctional 15:04:5

16   facilities grow their own food and they do their own farming.  15:04:5

17              THE WITNESS:  That's correct.                       15:04:5

18              THE COURT:  You're not aware of any farming going on 15:04:5

19   around South White Street; are you?                            15:05:0

20              THE WITNESS:  I haven't seen any.                   15:05:0

21              MR. ROSENBERG:  There was some fishing going on.    15:05:0

22   BY MR. ROSENBERG:                                              15:05:0

23   Q    Are you aware that the city of Mobile, Alabama spends about 15:05:0

24   $2.70 to feed its inmates?                                     15:05:1

25   A    That's correct.                                           15:05:1

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 226 of 350

Jones vs. Gusman 08.05.13 Funding Hearing

226

1    Q    And, if you just took the delta between what the city of

2    Mobile has, with a 1,600 inmate jail, and compare that to what

3    Orleans Parish is spending, that would save about $800 thousand

4    a year; would it not?

5    A    If you do the math, that's what it would save you, about

6    $800 thousand.

7         THE COURT:    They're skinnier inmates; aren't they?

8    Security issues when you get a skinnier inmate, understand that.

9         MR. ROSENBERG:    I'm not going to touch that, Judge.

10   BY MR. ROSENBERG:

11   Q    Let me just move on to a few other questions, sir.

12        The plans of the plaintiffs and the sheriff focus on

13   numbers of staff; you aware of that, sir?

14   A    Yes, sir.

15   Q    Was it your purpose in preparing your report and presenting

16   your testimony today that your work would focus instead upon how

17   to address these unconstitutional conditions as quickly as

18   possible?

19   A    That is my focus.    That's my narrow focus.

20        It would be a different situation if we had a

21   constitutional jail that was safe and secure.    But we don't.

22   And I'm looking at the things you'd have to do to build up the

23   infrastructure, recruit leadership.    And that's going to take

24   some time.    And I would be very concerned -- we should all be

25   very concerned what could happen over that period of time while

1    we're trying to build this infrastructure.                          15:06:5

2              So my -- I'm different than most people.  My -- in        15:06:5

3    this regard.  People hire me basically to see if we can lower       15:06:5

4    populations.  That's one of my main missions, really, in the        15:07:0

5    work that I do.                                                     15:07:0

6    Q    In your experience over the last several decades,              15:07:1

7    Dr. Austin, have you found any benefit to raising inmate            15:07:1

8    population?                                                         15:07:1

9    A    No.  The research that I've done and others, you don't get     15:07:1

10   any public safety benefit.  I would argue -- and I've written      15:07:2

11   about this -- that you're actually jeopardizing public safety by    15:07:2

12   pouring too much resources, money, into the back-end of the         15:07:3

13   system which is your correctional system.                           15:07:3

14              I think you've got a very significant Consent            15:07:3

15   Decree now with the police department.  The police can obviously    15:07:4

16   have a big impact on safety.  And then there's prevention,          15:07:4

17   long-term prevention kinds of things that, you know, governments    15:07:5

18   invest in:  School systems, vocational training, housing.  I        15:07:5

19   would argue that those investments, as a citizen, will have a       15:08:0

20   big impact on the future crime rate.  You have a -- you have a      15:08:0

21   high crime rate here.  Fortunately, it's been going down.  And      15:08:1

22   we want to keep on getting it down.  And, the more we can get       15:08:2

23   that down, the less you're going to need a jail population of       15:08:2

24   2,400.  So, in terms of investments, you want to make sure          15:08:2

25   you're making those investments and they're not being             15:08:3

1   jeopardized by the back-end, which is the jail and prison                15:08:3

2   system.                                                                  15:08:3

3   Q   And, to segue into the population issue for a moment, you've         15:08:3

4   read Mr. Ambruster's and Mr. Parrish's reports; have you not?            15:08:4

5   A   I have.                                                              15:08:5

6   Q   And their opinions are based upon the jail population of             15:08:5

7   2,400; is that right?                                                    15:08:5

8   A   That's correct.  As well as Dr. Gage's.                             15:08:5

9   Q   Yes, sir.  I am staying away from that for a moment because          15:09:0

10  the Court cautioned us to stay a little bit away from it a               15:09:0

11  little bit.  So I want to focus on Ambruster and Parrish.                15:09:0

12              But other reports that you've seen have focused on           15:09:1

13  2,400 inmates as the total pop; is that true?                           15:09:1

14  A   Yes.  And that population figure remain constant going               15:09:2

15  forward.                                                                 15:09:2

16  Q   And, in your opinion, that not should should not be the case; is     15:09:2

17  that correct, Dr. Austin?                                                15:09:2

18  A   There's no reason for it to be that high, from a                     15:09:3

19  criminological safety perspective.                                       15:09:3

20  Q   Any of those reports that you've reviewed by the experts             15:09:3

21  either for DOJ or the plaintiffs or the sheriff, have you even           15:09:3

22  any allocation of expenses for the DOC inmates?                          15:09:4

23  A   I don't believe so, no.                                              15:09:4

24  Q   And is it true that, in your opinion, that if the population         15:09:4

25  of Orleans Parish Prison would be reduced, then their                    15:09:5

1    assumptions should fall as well?                                    15:10:0

2    A    Right.  I think they say so -- I know Mr. Parrish's report     15:10:0

3    says that there would be -- you have to recalculate everything      15:10:1

4    and basically see where that population settles down to.            15:10:1

5              So, being pragmatic, you know, between now and            15:10:1

6    December, I would make every effort I could, you know, to lower     15:10:2

7    the population, see how low we can take it.  And then we start      15:10:2

8    developing a budget for what's left and go forward from there.      15:10:3

9    Q    And because we've heard about the challenge in hiring new      15:10:3

10   deputies, for whatever reason, whether it's time or money or        15:10:4

11   other factors, that reduced population would allow those trained    15:10:4

12   deputies to be reallocated to other facilities; is that right?      15:10:4

13   A    Right.  Right.                                                 15:10:5

14             And I guess the other thing I would kind of note,         15:10:5

15   under my scenario, you need to hire about 135 new deputies.         15:10:5

16   Between now and December, you're going to lose, I don't know,       15:11:0

17   40, 50, 60.  So that's, on top of that, we're talking about 200     15:11:0

18   new people we got to get.  I don't know if the system's capable     15:11:1

19   of doing that.                                                      15:11:1

20             So that's why I think to try and staff up, you            15:11:1

21   know, to a higher level is going to be very difficult to do, you    15:11:2

22   know, now and into the future and will reduce the stress on that    15:11:2

23   if we can lower need for that.  So that's --                        15:11:3

24             The add other big benchmark will be when the new          15:11:3

25   facility opens and how we need to staff that.  We have kind of      15:11:3

1    an idea; but, until we put inmates in there and start watching          15:11:4

2    the incidents and stuff like that, delivery of services, we will          15:11:4

3    need to make adjustments, people need to make adjustments on          15:11:4

4    what the actual staffing level should be.          15:11:5

5              But we can start moving now, again, on hiring          15:11:5

6    people.  But I go back again to the jail administrator.  If          15:11:5

7    there's one thing that this puzzle is lacking, and it's          15:12:0

8    disturbing to me that at this point we don't have a jail          15:12:0

9    administrator.          15:12:1

10          THE COURT:  Of course, if you start hiring new people,          15:12:1

11   which you advocate -- and I certainly understand the reason for          15:12:1

12   that -- you have to go ahead and hire these people at an          15:12:1

13   increased, it appears to me to attract people who will stay --          15:12:2

14   I'm not saying a number but an increased salary -- which means          15:12:2

15   you also have to increase the base of other persons who are          15:12:2

16   working at the jail so persons who are hired are not making more          15:12:3

17   than persons who are starting out?          15:12:3

18          THE WITNESS:  Right.  And I think what you're going to          15:12:3

19   see, Your Honor, is that that group doesn't last more than a          15:12:4

20   year.  That's probably -- I bet a lot of money that the 30          15:12:4

21   percent turnover is in that category.  They come in at $10, they          15:12:5

22   don't like what they see, and they leave.          15:12:5

23          MR. ROSENBERG:  Your Honor, if I could just follow-up          15:13:0

24   on that.          15:13:0

25   BY MR. ROSENBERG:          15:13:0

1    Q    Dr. Austin, are you aware that the average pay among all the    15:13:0

2    Orleans Parish sheriff's employees is about $65,000 a year, sir?    15:13:0

3    A    It wouldn't surprise me.  Because, from what I've seen, if    15:13:1

4    you look at the curve, you know, it's a lot of people short    15:13:1

5    term, and then this other big group that's been there a long    15:13:1

6    time.  And they are, you know, they're making a good salary now.    15:13:2

7    They probably also have retirement that they're getting from    15:13:2

8    other agencies that they've retired from.  So they're pretty    15:13:3

9    well compensated.    15:13:3

10              But that's not the workforce that are in the cell    15:13:3

11    blocks.  They're not in the cell blocks; but they're in their    15:13:3

12    offices and they're texting messages and stuff like that.    15:13:4

13              It's that front line group that needs -- that's    15:13:4

14    your source of safety in that jail.  And so that's the group we    15:13:4

15    need to find and retain and keep compensated at a proper level.    15:13:5

16    Q    And so one of things you would expect, as a consultant in    15:13:5

17    correctional matters, would be for the jail administrator to    15:14:0

18    access whether it's lopsided; whether you have too many    15:14:0

19    colonels, majors and senior people and not enough deputies; is    15:14:1

20    that right?    15:14:1

21    A    There could be some savings there.  Again, the jail    15:14:1

22    administrator -- as I understand it, the staff serve at the    15:14:1

23    pleasure, am I correct in that, of the sheriff?  Extraordinary    15:14:1

24    power.  And that's why a jail administrator, who is strong, can    15:14:2

25    come in and first order of business let me see what I've got at    15:14:2

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 232 of 350

Jones vs. Gusman 08.05.13 Funding Hearing                    232

1    the top that I don't need and reallocate that money into higher                    15:14:3

2    starting salaries.                    15:14:3

3            THE COURT:  That's why we also have a monitor.                    15:14:3

4            THE WITNESS:  You raise a good point.  Because the                    15:14:4

5    monitor -- because I don't have a good sense on the monitor's                    15:14:4

6    authority.  Some Consent Decrees give the monitors great                    15:14:4

7    authority, others just kind of advisory.                    15:14:5

8                But, you're right, the monitor should be weighing                    15:14:5

9    in on those issues well.                    15:14:5

10           THE COURT:  By the way, do we know when we're going to                    15:15:0

11   have a monitor?                    15:15:0

12           MR. ROSENBERG:  Your Honor, I'll address it first.                    15:15:0

13               But, actually, we had planned to discuss that                    15:15:0

14   among all counsel right after this hearing so we could look at                    15:15:0

15   some of the names that have been circulated.                    15:15:1

16           THE COURT:  Okay, great.                    15:15:1

17           MS. COON:  Your Honor, we'd hope to advise you by the                    15:15:1

18   end of this week as to whether we can reach agreement.                    15:15:2

19           THE COURT:  Obviously, it's just critical.  Because                    15:15:2

20   some of the timeframe in which things have to be done is gauged                    15:15:2

21   on the monitor.  So I need to have a monitor who is acceptable,                    15:15:2

22   moving forward.  In addition to the jail administrator.                    15:15:3

23           MS. COON:  Absolutely, Your Honor.                    15:15:3

24           THE WITNESS:  These are two key positions.                    15:15:3

25           MS. COON:  We will respond to this week and ask the                    15:15:4

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 233 of 350

Jones vs. Gusman 08.05.13 Funding Hearing

233

1    Court.                                                          15:15:4

2          THE COURT:  That sounds good.                             15:15:4

3    BY MR. ROSENBERG:                                               15:15:5

4    Q   One last question, Dr. Austin.  If you remembered looking at  15:15:5

5    the Consent Decree, even though the jail administrator would    15:15:5

6    have correctional knowledge, he or she still reports to the     15:15:5

7    sheriff; doesn't he?                                            15:15:5

8    A   Right.  And, when that person is hired, I would hope that he  15:15:5

9    or he is told that they have the authority -- and they will     15:16:0

10   probably need, in my opinion, to bring in some people, you know,  15:16:1

11   that they know that they can trust, that they can work with.    15:16:1

12   Because there are going to be some hard decisions made about,   15:16:1

13   you know, who stays and who goes.                               15:16:2

14          MR. ROSENBERG:  Thank you.                               15:16:2

15              Your Honor, we pass the witness.                     15:16:2

16          THE COURT:  Thank you.                                   15:16:2

17              All right, questions.                                15:16:2

18                      CROSS EXAMINATION                            15:16:3

19   BY MR. ACURI:                                                   15:16:3

20   Q   Dr. Austin, I'm Blake Arcuri.  I represent the sheriff.  I  15:16:3

21   have a few follow-ups for you.                                  15:16:3

22   A   Good afternoon.                                             15:16:4

23   Q   You provided as part of your report some inmate projections  15:16:4

24   on the population; correct?                                     15:16:4

25   A   Correct.                                                    15:16:4

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 234 of 350
Jones vs. Gusman 08.05.13 Funding Hearing

234

1    Q    How long ago did you prepare this report?                15:16:4

2    A    This report that was submitted --                        15:16:5

3    Q    Yes.                                                      15:16:5

4    A    Don't hold me to the date, but it was in July.           15:16:5

5    Q    So I want to reference table 3 of your report, which Mr.  15:16:5

6    Rosenberg had pointed to earlier.  And you have the average   15:17:0

7    populations, up on the top row, and then you have by September 15:17:0

8    2013 on the bottom row.                                       15:17:1

9              So, in July, is that what you projected, if         15:17:1

10   everything continue as it had been, for the population in     15:17:1

11   Orleans Parish Prison if some of these additional steps were  15:17:2

12   taken?                                                        15:17:2

13   A    If those steps were taken, yeah, that's what the population 15:17:2

14   would get to.                                                 15:17:2

15   Q    And the thing that couldn't be affected, by like the DOC  15:17:3

16   inmates -- obviously, those haven't been moved out?           15:17:3

17   A    Right.                                                    15:17:3

18   Q    But the pretrial inmates, were you basing that upon Vira and 15:17:3

19   the police department's work.                                 15:17:4

20   A    Right.  I've been in constant contact with Vira, John Will 15:17:4

21   who is the director.  And we've talked at great length as to  15:17:4

22   whether or not he thinks that he could get that pretrial       15:17:5

23   population lowered.                                           15:17:5

24             Of the three, that's the one that probably would    15:17:5

25   be, in my mind, maybe the most difficult do.  But it's certainly 15:18:0

1    doable, given the risk level, I think.                         15:18:0

2            THE COURT:  What are the three?  DOC and Vira and --    15:18:1

3            THE WITNESS:  Plaquemines.                              15:18:1

4            THE COURT:  It appears to the Court that that's not     15:18:1

5    going to be an issue because they are going to be out of there 15:18:2

6    by Thanksgiving.  I mean, they have their own staff.  That is  15:18:2

7    such a small part of this whole thing.  That's not going to    15:18:2

8    resolve these issues.                                          15:18:2

9            THE WITNESS:  No, it's not.  I'm just mentioning it to  15:18:2

10   take into account that they'll be removed.  That's all.        15:18:3

11   BY MR. ACURI:                                                  15:18:3

12   Q   Dr. Austin, I want to point you to the federal pretrial and 15:18:3

13   municipal inmates.  You had projected that we'd be talking about 15:18:4

14   152 municipal pretrial and 1,136 municipal pretrial; correct?  15:18:4

15   A   Yes.                                                       15:18:5

16   Q   Are you aware, as of July 31st, there was 1,790 pretrial   15:18:5

17   inmates in the Orleans Parish Prison?                          15:18:5

18   A   Well, you have to give me the document you're referring to. 15:18:5

19   Q   I'm referring to Chief Ursin's testimony.                  15:19:0

20   A   I know, but I need to see the document you're talking about. 15:19:0

21   I need to see it.                                              15:19:0

22   Q   Do you dispute what Chief Austin stated was the un-sentenced 15:19:1

23   population on July 31, 2013?                                   15:19:1

24           MR. ROSENBERG:  Your, Honor I'll object to that.       15:19:1

25   That's an inappropriate question to ask, when he's disputing or 15:19:2

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 236 of 350

Jones vs. Gusman 08.05.13 Funding Hearing                    236

1   not.  He asked for an underlying document, and he's not been                    15:19:2

2   given one.                                                                      15:19:2

3           THE COURT:  Well, Deputy Ursin didn't talk about an                     15:19:2

4   underlying document; it was just his testimony.  So I'll allow                  15:19:3

5   him to answer the question.                                                     15:19:3

6               Did you hear Deputy Ursin testify to that?                          15:19:3

7           THE WITNESS:  I did.  And I don't know where he's                       15:19:3

8   getting that number from.  The number I get is from the                         15:19:3

9   sheriff's department.                                                           15:19:4

10  BY MR. ACURI:                                                                   15:19:4

11  Q   But this is a projected number; right?  September 2013?                     15:19:4

12  A   Yeah.  That would be based, you're lowing the pretrial                      15:19:4

13  felony population.                                                              15:19:4

14          THE COURT:  Are there any documents in evidence                         15:19:5

15  reflecting how many pretrial inmates there are as of July 31st?                 15:19:5

16          MR. ACURI:  No, Judge.  That changes every day.  We                     15:19:5

17  don't have anything in evidence.  We can provide it to the                      15:20:0

18  Court.                                                                          15:20:0

19          THE COURT:  But there's no document now in evidence, is                 15:20:0

20  what I'm saying.                                                                15:20:0

21          MR. ACURI:  No.                                                         15:20:0

22          THE WITNESS:  I'd just add that, every month, I'm                       15:20:1

23  supposed to be getting from sheriff's department the extract                    15:20:1

24  file which has the number of pretrial felons in custody the end                 15:20:1

25  of that month.                                                                  15:20:2

1          THE COURT:  Where did you get the 1,136 from?                    15:20:2

2          THE WITNESS:  That's a reduction, that's a reduced              15:20:2

3     number.                                                              15:20:2

4              The 1,377, I think City's counsel showed you a              15:20:2

5     sheriff's population count by month.  Recall that one, Your         15:20:3

6     Honor?                                                              15:20:4

7          THE COURT:  No, I don't.                                       15:20:4

8          THE WITNESS:  Anyway, it's called the billing document,        15:20:4

9     and it lists the number of inmates in those categories each day,    15:20:4

10    each month.  And what that top row is the 2013 average for          15:20:5

11    January through June 30th.  So those are the average numbers        15:21:0

12    that have been in existence.  They are peeking right now because    15:21:0

13    it's July, and they should start receding.                          15:21:1

14         THE COURT:  So this is my question.  Did you look the          15:21:1

15    documents which resulted in 1,377 average, or were you just told    15:21:1

16    that?                                                               15:21:2

17         THE WITNESS:  No, no, no.  Those are coming from the           15:21:2

18    sheriff's department.                                               15:21:2

19         THE COURT:  From documents from the sheriff's                  15:21:2

20    department?                                                         15:21:2

21         THE WITNESS:  From the sheriff, yes.                           15:21:2

22    BY MR. ACURI:                                                       15:21:2

23    Q   Dr. Austin, even --                                             15:21:2

24         THE WITNESS:  That's that the column they list, is            15:21:3

25    felony pretrial.  So that's where that comes from.  That's why,    15:21:3

1    when he says 17, 18 hundred, I don't know where he gets that              15:21:3

2    number.                                                                    15:21:4

3            THE COURT:  Understood.                                            15:21:4

4    BY MR. ACURI:                                                              15:21:4

5    Q   You talked about why the inmate population has decreased              15:21:4

6    over the past year or so, and you credited Vira for some of that          15:21:4

7    and the police department with some of that; correct?                     15:21:5

8    A   Reduced crime and reduced arrests.  And the transfer of              15:21:5

9    state inmates to the DOC.                                                  15:22:0

10   Q   As part of reducing the population to reach your goals,              15:22:0

11   should one of the goals of the City and the sheriff together be           15:22:1

12   to prevent inmates who have been through this system from coming          15:22:1

13   back?                                                                      15:22:2

14   A   Recidivism?                                                            15:22:2

15   Q   Yes.                                                                   15:22:2

16   A   Yes.                                                                   15:22:2

17   Q   Are you aware of that DOC re-entry program that's run                15:22:2

18   through the Orleans Parish Prison?                                         15:22:2

19   A   Am I'm aware of it, yes?  I visited it.                              15:22:3

20   Q   What's your position on the DOC re-entry program, which has          15:22:3

21   about 115 inmates in it?                                                   15:22:4

22   A   I think it's an excellent program that should be located in          15:22:4

23   a safe facility.                                                          15:22:4

24   Q   So is it your position --                                            15:22:4

25   A   It's not a safe facility now.                                        15:22:5

1   Q    Is it your position that the DOC re-entry program should be          15:22:5

2   removed from the Orleans Parish Prison?                                   15:22:5

3   A    Yeah.  I talked to Secretary LeBlanc about this, and the new         15:23:0

4   facility that's going to open up with about 800, 900 beds in it,          15:23:0

5   he's talking about locating it there or creating some other               15:23:0

6   facility where they could locate it.  But it could be placed              15:23:1

7   just about anywhere in the area.                                          15:23:1

8        THE COURT:  Is the DOC re-entry program, is that part                15:23:1

9   of the Consent Decree?                                                    15:23:2

10       MS. SCHWARTZMAN:  They are, Your Honor.  They are                     15:23:3

11  included in our class members.  That facility in particular is            15:23:3

12  one we targeted on the sanitation and the other conditions, but           15:23:3

13  the population there are part of our clients.                             15:23:4

14       MS. COON:  So it is part of the Consent Decree to the                 15:23:4

15  extent that all of the requirements of the Consent Judgment               15:23:4

16  would apply to the facility and the conditions in which all the           15:23:5

17  inmates are housed in.                                                    15:23:5

18       THE COURT:  I mean, by having a program, is that part                 15:23:5

19  of the Consent Decree?                                                    15:23:5

20       MS. SCHWARTZMANN:  No.                                                15:23:5

21       THE COURT:  That isn't constitutionally required, to                 15:23:5

22  have a re-entry program; am I correct about that?                         15:24:0

23       MS. COON:  Correct.  The program itself is not required              15:24:0

24  by the Consent Judgment.                                                  15:24:0

25       THE COURT:  And the DOC pays part of that?  Pays                      15:24:1

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 240 of 350

Jones vs. Gusman 08.05.13 Funding Hearing                    240

```
1   something to that; is that the testimony?                          15:24:1

2            MR. ACURI:  That's correct.  They pay roughly half a      15:24:1

3   million dollars for the program on top of the per diem.            15:24:1

4            THE COURT:  That's not anything the City would be         15:24:2

5   required to pay for, that is the re-entry program?                 15:24:2

6            MR. ACURI:  No, Your Honor.                                15:24:2

7            THE COURT:  You agree with that?                           15:24:2

8            MS. COON:  I have no reason to dispute that.               15:24:2

9            THE COURT:  Okay.  All right.                              15:24:2

10           Let's go.                                                  15:24:3

11  BY MR. ACURI:                                                       15:24:3

12  Q   Dr. Austin, would you agree that an additional step that       15:24:3

13  could be taken to reduce recidivism is to have a GED program       15:24:3

14  within the facility?                                               15:24:4

15  A   It would be very marginal if any impact.  The average length   15:24:4

16  of stay, like I said, you know, is about -- well, for all          15:24:4

17  inmates, it's about 19 days.  If you don't get out in the          15:24:5

18  initial few days, you'll spend three to four months in there.      15:24:5

19  Because of operational issues, security issues, generally only     15:25:0

20  very small percents of the jail population can get into a GED      15:25:0

21  program and even complete it.  It's more like a starting kind of   15:25:1

22  thing.                                                             15:25:1

23           Now, these programs are very useful for jail              15:25:1

24  safety.  So running these programs -- I'm not saying don't run     15:25:2

25  them.  But their impact on recidivism rates are quite marginal.    15:25:2
```

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 241 of 350

Jones vs. Gusman 08.05.13 Funding Hearing                241

1    BY MR. ACURI:

2    Q   So do you agree with the City's decision to completely cut    15:25:2

3    funding to get the program in prison?    15:25:3

4           MR. ROSENBERG:  I'd object to that.  First of all, the    15:25:3

5    GED is not part of the Consent Decree.    15:25:3

6           THE COURT:  What's the relevance of that?    15:25:3

7              Chief Ursin testified that, the educational    15:25:4

8    program, the funding was completely cut by the City.  There is a    15:25:4

9    requirement in the Consent Decree for education be provided.    15:25:4

10          MR. ROSENBERG:  I didn't object to the fact that he    15:25:5

11   testified about irrelevant stuff, and I should have objected    15:25:5

12   about a lot of things that the Court didn't agree with me on.    15:25:5

13             But, with all due respect, Your Honor, that is not    15:25:5

14   part of this Consent Decree.  If the sheriff wants to raise that    15:26:0

15   as part of his budget request for 2014, have at it.  But that's    15:26:0

16   not part of this document.    15:26:1

17          MS. SCHWARTZMANN:  The only educational requirements in    15:26:1

18   the Consent Decree, Your Honor, are as with regard to the youth.    15:26:1

19   And those services are provided by OPSB, the Orleans Parish    15:26:1

20   School Board.  I'm not aware of whether the City funds the GED    15:26:2

21   program separate from that.  I don't know.    15:26:2

22          THE COURT:  The so only requirement in the Consent    15:26:3

23   Decree is for education of the juveniles?    15:26:3

24          MS. SCHWARTZMANN:  That's correct.    15:26:3

25          THE COURT:  Then the objection is sustained.    15:26:3

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 242 of 350

Jones vs. Gusman 08.05.13 Funding Hearing

242

1         THE WITNESS:  Thank you, Your Honor.                    15:26:3

2    BY MR. ACURI:                                               15:26:3

3    Q    Now, Dr. Austin, does your report contain any information    15:26:3

4    about staffing the current facilities, the needs to staff all    15:26:4

5    the facilities that are operated right now by the sheriff?   15:26:4

6    A    It's not in my report, but I have that number.         15:26:5

7    Q    Why didn't you include it in the report?              15:26:5

8    A    The way I was looking at it, is that those facilities --   15:26:5

9    first of all, if you have a Consent Decree that's in place, you   15:27:0

10   have a new facilities that's going to open up, my understanding   15:27:0

11   in talking to the sheriff's people, it's ahead of schedule,   15:27:1

12   January or February.  So that staffing analysis, although   15:27:1

13   we went through the procedures of it, is irrelevant.  We're now   15:27:2

14   into August.  So we should be in the process now of getting   15:27:2

15   ready for the new facility.  But almost all those inmates which   15:27:3

16   are going to be relocated in the new facility.  So, trying to do   15:27:3

17   a staffing analysis, I didn't see the purpose of it, the   15:27:3

18   relevance of it, because they're going to be gone and they won't   15:27:4

19   be operating.  Except for whatever ones are left over, which   15:27:4

20   could be the temporary detention center perhaps.           15:27:4

21         If you have stay at the 2,400 based on I think Mr.   15:27:5

22   Parrish's plan, you'd keep the temporary detention facility and   15:27:5

23   McDaniel open, in addition Templeman 5.  So why would you do a   15:27:5

24   staffing analysis of OPP.                                  15:28:0

25         And, given what the chief said today, he can't      15:28:0

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 243 of 350

Jones vs. Gusman 08.05.13 Funding Hearing

243

1    hire any new people until next spring.  That's what I heard his    15:28:0

2    testimony, is that the earliest he would hire 60 people would be    15:28:1

3    next spring.    15:28:1

4           THE COURT:  I don't think he said the earliest he could    15:28:1

5    hire would be next spring.  I think he said it would take him    15:28:2

6    until next spring to have 60 hired.    15:28:2

7           THE WITNESS:  Okay.  And, by then, we've lost maybe    15:28:2

8    that many.    15:28:3

9    BY MR. ACURI:    15:28:3

10   Q   Did the City ask you to include the current facilities    15:28:3

11   within your staffing projections?    15:28:3

12   A   Did they do what?    15:28:3

13   Q   Did they ask you to include the number of staff needed in    15:28:3

14   the current facilities --    15:28:3

15   A   No.    15:28:3

16   Q   -- in their projections?    15:28:4

17           So they only asked for the new facilities?    15:28:4

18   A   This is my position.  This is what I thought -- this is my    15:28:4

19   report.  So I crafted my report to a plan that I thought was    15:28:4

20   most relevant.  I had that option, to put it in.  But I chose    15:28:5

21   not to.    15:29:0

22           But I can provide the Court with those numbers if    15:29:0

23   you wanted to see them.    15:29:0

24   Q   Would those numbers be based upon Mr. McGinnis's report?    15:29:0

25   A   Yes.    15:29:1

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 244 of 350
Jones vs. Gusman 08.05.13 Funding Hearing

244

1   Q   So you would agree that even more than 130 staff are needed    15:29:1

2   to staff the current facilities that are operated by the    15:29:1

3   sheriff?    15:29:2

4   A   Yeah.  But it's like building -- staffing something that    15:29:2

5   won't exist in four months.    15:29:2

6   Q   Let's talk about what won't exist.  I notice that, with part    15:29:2

7   of your staffing projections, you included Templeman 5.    15:29:3

8   A   Correct.    15:29:3

9   Q   Did the City tell you to include Templeman 5 as part of your    15:29:3

10  projections?    15:29:3

11  A   No.  They saw that I was including them, but they didn't    15:29:4

12  tell me to include it.    15:29:4

13  Q   Did the City tell you that the conditional use per any that    15:29:4

14  it issued requires the sheriff to shut down Templeman 5    15:29:4

15  immediately upon occupancy of the new building?    15:29:5

16  A   I talked to the sheriff's people about this, Mike Laughlin    15:29:5

17  and some of his associates.  And they, you know -- when I went    15:30:0

18  through the facility, I said:  Well, this looks like a good    15:30:0

19  place to keep open, can we do it?  And they said:  Yeah, we can    15:30:0

20  do this.  So, they said yes, you know, they would be able to    15:30:1

21  keep Templeman 5 open for several years.    15:30:1

22  Q   Did the City tell you that only one jail could be occupied    15:30:1

23  because of its conditional use permit?    15:30:2

24  A   Well , you know, I've heard a lot about these conditional    15:30:2

25  use permits, and I'm not an expert in it.  And everyone tells a    15:30:2

1    little different story on it.  Some people say they're relevant,    15:30:3

2    they are not relevant, they can be chained, da, da, da.  So I'll    15:30:3

3    let you all fight that out.    15:30:3

4              But, from an operational point of view, Templeman    15:30:3

5    5 and I think all the other experts are saying keep Templeman 5    15:30:4

6    open so we can house the medical/mental health.  Unless you're    15:30:4

7    proposing to close it.    15:30:4

8    Q   So it's your opinion today that the conditional use permit    15:30:4

9    needs to be changed?    15:30:5

10             MR. ROSENBERG:  Your Honor --    15:30:5

11             THE WITNESS:  I'm not making that opinion at all.    15:30:5

12             THE COURT:  Sustained.  Sustained.    15:30:5

13   BY MR. ACURI:    15:30:5

14   Q   Dr. Austin, you referenced that the sheriff is losing money    15:31:0

15   on DOC inmates because of the $26 per diem; correct?    15:31:0

16   A   The City's losing money.  The City and the sheriff are    15:31:1

17   losing money.    15:31:1

18   Q   Is the sheriff losing money because of City's $23 per day    15:31:1

19   inmate per diem?    15:31:2

20   A   Well, it's not adequate, you know, to fund what needs to be    15:31:2

21   done to run a constitutional jail.  Yeah, $23 -- I've stated    15:31:3

22   publically that that per diem budgeting process is just one of    15:31:3

23   the worst things that's ever happened out here.    15:31:3

24   Q   So, to steal Mr. Rosenberg's quote, buying apples for a dime    15:31:4

25   and selling them for a nickel?    15:31:4

1    MR. ROSENBERG:  Your Honor, he can steal my quote; but    15:31:4

2    we've already agreed at the last hearing that the City's    15:31:5

3    position was the same as I believe the sheriff's and plaintiff's    15:31:5

4    and DOJ, which is that we would eliminate the per diem moving    15:31:5

5    forward.    15:32:0

6    THE COURT:  We still have this *Hamilton* case out there.    15:32:0

7    So, really, at some point, we're going to have some discussions    15:32:0

8    about what to do about that.    15:32:0

9    THE WITNESS:  Agreed, Your Honor.    15:32:1

10    THE COURT:  So I understand that.    15:32:1

11    Doesn't appear that any of the parties seem to    15:32:1

12    think -- or the experts seem to think that the per diem is the    15:32:1

13    best approach.    15:32:2

14   BY MR. ACURI:    15:32:2

15   Q    I want to touch briefly on what Mr. Rosenberg touched on    15:32:2

16   about with the salaries compared with the Department of    15:32:2

17   Corrections' prison guards.  Is there any reason why we're    15:32:3

18   comparing to the Department of Corrections, as opposed to the    15:32:3

19   parish jails that surround this region?    15:32:3

20   A    Well, on the comparisons that I saw that the sheriff -- that    15:32:4

21   Mr. Laughlin presented, it's not clear in his data how that    15:32:4

22   comparison is being done.    15:32:5

23    So I do know what the -- because I'm familiar with    15:32:5

24   the Department of Corrections, because I work for them.  So I    15:32:5

25   know what their numbers.    15:33:0

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 247 of 350
Jones vs. Gusman 08.05.13 Funding Hearing

247

1    And you just have to be careful when you look at    15:33:0

2  the other parishes that you're not mixing law enforcement with    15:33:0

3  custody people.  Across the board, across the country, people    15:33:0

4  that are custody officers are not paid at the same level as    15:33:1

5  police, law enforcement people that work the streets.  There are    15:33:1

6  some exceptions to that; but, in general, those costs are    15:33:2

7  usually lower.    15:33:2

8    I just think that, if we get to the same standard    15:33:2

9  as the Department of Corrections, we'll be in a much better    15:33:2

10  shape than we are today.  I think that's an affordable thing we    15:33:3

11  can do without breaking the bank and get better officers    15:33:3

12  entering the workforce.    15:33:4

13    I will let you all debate what's the proper    15:33:4

14  compensation level.  But I know it shouldn't be -- 36 thousand,    15:33:4

15  I would definitely take issue.  In fact, in the report itself,    15:33:5

16  it doesn't say $36 thousand, it says $26 thousand.  So that    15:33:5

17  might a better starting point to look at.    15:33:5

18  Q   Do you know what NOPD officers are paid?    15:34:0

19  A   I've seen the report on them, yes.  I can't tell you    15:34:0

20  exactly.  But they get paid more.    15:34:0

21  Q   Would $45 thousand sound accurate to you?    15:34:0

22  A   Is that the average, or is that the starting?    15:34:1

23  Q   The starting?    15:34:1

24  A   I don't know.  I've seen it but I can't tell you what it is.    15:34:1

25  Q   So if you testified that -- and you heard Chief Ursin agree    15:34:1

1    that law enforcement officers are traditionally paid higher                15:34:2

2    salaries than correction officers.  Is that $20 thousand                   15:34:2

3    difference in salary that you're referencing, is that                      15:34:3

4    appropriate?                                                               15:34:3

5    A   Well, basically, I guess I would, you know -- I would say              15:34:3

6    let's see what we can do with raising the entry level salary.              15:34:3

7    Because I think everyone -- I would say, if you entered -- if              15:34:4

8    you had a starting salary for a correctional officer at $46                15:34:4

9    thousand, compared to what the regular salaries are, if that's             15:34:5

10   what you're saying, in the other parishes and the department of            15:34:5

11   corrections, you're approaching almost twice the entry level.              15:35:0

12   And it looks like those other places are able to retain people,            15:35:0

13   you know, at much lower entry level.  So I wouldn't do it unless           15:35:0

14   you felt it was absolutely necessary.                                      15:35:1

15           THE COURT:  But, again, if you raise those entry level             15:35:1

16   salaries, you're also going to have to examine the salaries that           15:35:2

17   are already there.                                                         15:35:2

18           THE WITNESS:  You would.                                           15:35:2

19            Let's say we're going to raise the entry level in                 15:35:2

20   up to $26 thousand, here may be 50 or 75 employees there right             15:35:3

21   now that may get a bump immediately.                                       15:35:4

22           THE COURT:  Or even higher?                                        15:35:4

23           THE WITNESS:  Or even higher.                                      15:35:4

24           THE COURT:  To allow for their tenure.                             15:35:4

25           THE WITNESS:  Yeah.                                                15:35:4

BY MR. ACURI:

Q   One final topic.  Mr. Rosenberg brought up food costs and I believe compared this facility to Mobile, Alabama?

A   Yes.

Q   Are you familiar with that facility at Mobile, Alabama?

A   No.  I just saw the statistics.  I haven't visited the Mobile, Alabama jail.

Q   So you don't know if Mobile, Alabama is cooking food in two temporary kitchens and then quickly delivering the food over a ten block radius; do you?

A   I don't know.

Q   And you don't know if Mobile, Alabama has a food train of inmates going up four floors because the City won't repair its elevators?

A   I don't know.

        MR. ROSENBERG:  Objection, Your Honor.  There's no foundation for that.

        THE COURT:  Sustained.

        MR. ROSENBERG:  Thank you.

        MR. ACURI:  I have no further questions.

        THE COURT:  All right.  Thank you.

                      CROSS EXAMINATION

BY MS. DEAN:

Q   Okay, Dr. Austin, just to clarify, you have recommended 543 security staff for just the new jail facility at Templeman 5; is

1    that correct?

2    A    Yes.

3    Q    And that results in approximately 135 new hires?

4    A    Yes.

5    Q    And, if the average daily population doesn't get all the way

6    down to the allowable capacity for those two buildings, there

7    and additional building would have to remain open?

8    A    Yes.

9    Q    And that building would have to be staffed?

10   A    Yes.  Although not the entire building.  If you don't hit

11   those numbers, then my recommendation would go to the temporary

12   detention facility which has, you, know 500 bed capacity but

13   they are in separate units.  So you can just open each unit that

14   you need to.  So you wouldn't have to operate the whole

15   building.  You could operate part of it.  Or the whole one,

16   whatever it was necessary.

17   Q    You would have to operate whatever was necessary to fit all

18   the population?

19   A    Yes.  Yes.

20   Q    And you would have to staff for those facilities?

21   A    Yes, you would.

22   Q    And you mentioned that the population has been stable in the

23   last 12 months?

24   A    Yes.

25   Q    In the work you've done with other jurisdictions to develop

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 251 of 350

Jones vs. Gusman 08.05.13 Funding Hearing

251

1    plans to decrease the population, what have you done to put                    15:38:0

2    those plans in place to make it happen?                                        15:38:1

3    A    Well, I guess I'll give you two examples.  One is extreme                 15:38:1

4    and one is not.                                                                15:38:2

5                  The extreme one is Coleman Plateau case.  That's a              15:38:2

6    federal court-ordered.  And they have a been ordered to do it.                15:38:2

7                  The other one would be Broward County, jail in                  15:38:3

8    Florida where I'm working now.  And, there, we've identified                  15:38:3

9    four or five reforms, which have to do mostly with expediting                 15:38:3

10   court processing, expanding pretrial release, expanding work                  15:38:4

11   release, et cetera.  And they are implementing that plan now.                 15:38:4

12   They need to get -- they're on a Consent Decree that's been in                15:38:5

13   existence for almost 40 years.  But those reforms should knock                15:38:5

14   it down -- just telling you -- those plans will lower it about                15:39:0

15   40, 445.  That's a base of about 4,300 inmates.  So, when they                15:39:1

16   hit that mark, they'll be at 85 percent capacity.  And that's                 15:39:2

17   the levels that have been set by the Consent Decree, and                       15:39:2

18   hopefully they'll get out of the Consent Decree.                              15:39:3

19   Q    Who needs to be involved?                                                15:39:3

20   A    I should say something else.  I also have a very -- my                    15:39:3

21   mission, I guess, or my interest, is getting into compliance as               15:39:4

22   quickly as possible and getting out of the Consent Decrees as                 15:39:4

23   quickly as possible so we can go back to business as normal.  So              15:39:4

24   that's why I'm pushing this plan.  Sorry.                                     15:39:5

25   Q    What entities do we need to involve in order to make this                15:39:5

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 252 of 350

Jones vs. Gusman 08.05.13 Funding Hearing                    252

1    plan happen?                                              15:39:5

2    A    We have to bring everybody in.  We have to -- obviously, the    15:40:0

3    Department of Correction is a big person.  But I think we have    15:40:0

4    to bring in the courts.  And that would be the public defender,    15:40:0

5    the district attorney and the judges.  Because what's left here    15:40:1

6    is that pretrial felon population.                        15:40:1

7              Now, the police, it's going to be interesting.    15:40:1

8    I'm not that familiar with the Consent Decree on the police.    15:40:2

9    But I am aware that the mayor's staff and the police chief    15:40:2

10    understand this situation.  And they are already thinking about    15:40:3

11    some plans that would reduce the number of people being arrested    15:40:3

12    for felony crimes.  And that would be the mark.  If we could    15:40:3

13    reduce those arrests without jeopardizing public safety, we    15:40:4

14    would have a pretty substantial impact upon that pretrial felony    15:40:4

15    population.                                              15:40:4

16              But those are the core criminal justice agencies    15:40:5

17    that need to be involved.                                15:40:5

18              There's going to be a pig issue about pretrial    15:40:5

19    release, because Vira started it up, and at some point maybe    15:40:5

20    that needs to be transitioned to the Courts so that they own it    15:41:0

21    and run it.  And that might be something they want to talk to    15:41:0

22    the courts about.                                        15:41:0

23    Q    Thank you.                                          15:41:0

24              Turning back to your report, does your report    15:41:1

25    mention any costs other than staffing?                    15:41:1

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 253 of 350
Jones vs. Gusman 08.05.13 Funding Hearing

253

1  A   Well, there are the I guess the indirect costs --    15:41:1

2  Q   Would it help if I gave you the City Exhibit 83, the PMF    15:41:3

3  analysis?    15:41:4

4  A   Sure.    15:41:4

5        MS. DEAN:  Permission to approach, Your Honor?    15:41:4

6        THE COURT:  Sure.    15:41:4

7        THE WITNESS:  Thank you.    15:41:4

8  BY MS. DEAN:    15:41:4

9  Q   Does your report cover any costs for renovation?    15:42:0

10 A   I believe they do not.    15:42:0

11 Q   So you had toured Templeman 5.    15:42:1

12 A   Yes.    15:42:1

13 Q   Did you believe that Templeman 5 can comply with the Consent    15:42:1

14 Judgment in its current physical state?    15:42:2

15 A   Well, no.  It needs to be cleaned up.  And that would need    15:42:2

16 to be done.    15:42:2

17        You know, I don't know if we need additional    15:42:2

18 revenues to do that because I'm not -- it's very hard to find    15:42:3

19 out how the money is being spent now by the sheriff.  So it may    15:42:3

20 well be there's money somewhere in those budgets.  I heard some    15:42:3

21 references about people sitting on millions of dollars of FEMA    15:42:4

22 money; is that correct?  So I think someone needs to look at    15:42:4

23 that.  But my costs do not account for that.  That needs to    15:42:5

24 happen.    15:42:5

25        When Dr. Shansky and I toured it with Dr. Gore, we    15:42:5

1    could obviously see some pointing is necessary, some ventilation    15:43:0

2    issues, some housing, clean up, stuff like that.  Structurally,    15:43:0

3    it looked good.  But there's some cosmetic stuff like -- I don't    15:43:0

4    remember on which floor it was, I think it was of the third    15:43:1

5    floor -- there was a couple of conference rooms that have been    15:43:1

6    converted into storage, to just storing junk in there.  We need    15:43:1

7    those rooms to conduct therapy groups.  So we need to move stuff    15:43:2

8    out, we need to re-carpet.  You know, I don't think they are    15:43:2

9    huge, but there are some costs there.    15:43:2

10   Q    And did your report account for any maintenance costs?    15:43:3

11   A    No.    15:43:3

12   Q    Did your report --    15:43:3

13   A    They're assumed to be standard, I guess, as they are now.    15:43:3

14           THE COURT:  I don't know what you mean by that.    15:43:4

15           THE WITNESS:  Well, again, my plan says -- they're    15:43:4

16   paying maintenance costs now to maintain their current    15:43:4

17   facilities.  I guess our assumption is that, by going from seven    15:43:5

18   facilities down to two, the maintenance -- and going to a    15:43:5

19   brand-new facilities, those maintenance costs should be reduced.    15:43:5

20   Or at least they shouldn't be increasing.  Because maintaining    15:44:0

21   old facilities that are kind of falling apart shouldn't be at    15:44:0

22   the level of a brand-new facility, if that's what you mean by    15:44:1

23   maintenance.    15:44:1

24   BY MS. DEAN:    15:44:1

25   Q    But you didn't take those codes into account?    15:44:1

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 255 of 350

Jones vs. Gusman 08.05.13 Funding Hearing          255

1    A    No.

2                But, now that you mention it, I would hope that

3    those maintenance costs are reduced.

4    Q    Did you put any costs in for training?

5    A    The only thing that we did on the relief factor -- and this

6    is a good point -- we increased -- there was no relief factor.

7    There's -- which was almost unheard of, that you don't have a

8    factor.  So what you have is people not being relieved.  We

9    observed officers leaving their posts and basically padlocking

10   the housing there and disappearing for an hour.  Which is

11   totally unacceptable.  So that's part of the relief factor.

12               But the other part was training.  They only

13   allocated 20 hours of training, so we're doubling the training

14   in our relief factor.

15               Now, I can't control the quality of the training.

16   I know that, in the other expert reports in the Consent Decree,

17   training was not considered to be a great thing.  So the quality

18   of the training needs to improve.  But we didn't look at what

19   that would cost.

20               I don't know, like the costs of going up to

21   Maryland, which sounds like a nice trip, to observe direct

22   supervision -- which is a good point.  The concept of direct

23   supervision, Your Honor, is a concept that's use in many jails,

24   and others it's not used.  But it requires a special workforce.

25   This is people that are good at talking to people, you know.

1    And so I don't think they're going to get it just by going up to    15:45:5

2    Montgomery County and watching what Montgomery -- you actually    15:45:5

3    have to have people here on your workforce that are direct    15:46:0

4    supervision experts and can direct the staff.  Because it's a    15:46:0

5    constant tutoring kind of thing where you're observing    15:46:1

6    videotape; every shift, you did this right, you did this wrong.    15:46:1

7    So that is a big issue, the quality of the training needs to be    15:46:1

8    improved.  And we did not factor in what those costs might be.    15:46:2

9    Q    But you did assume that training requirements for inservice    15:46:2

10   training would be up from 20 hours to 40?    15:46:3

11   A    Yeah.  We doubled it, yes.    15:46:3

12   Q    But you didn't add any additional training staff into your    15:46:3

13   estimate?    15:46:3

14   A    No.    15:46:3

15   Q    You said your number one recommendation is to get a jail    15:46:3

16   administrator into the facility; correct?    15:46:4

17   A    Yes.    15:46:4

18   Q    Did you cover that in your report?    15:46:4

19   A    Only that it's in the cost of that jail administrator.  We    15:46:4

20   put in costs of hiring a jail administrator in there based on    15:46:5

21   what we thought that would cost.    15:47:0

22   Q    And that $168,750 per year?    15:47:0

23   A    Right.    15:47:0

24   Q    And you also put in cost for a compliance coordinator?    15:47:1

25   A    Yes.    15:47:1

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 257 of 350

Jones vs. Gusman 08.05.13 Funding Hearing                    257

1   Q    At $135 thousand a year?                                    15:47:1

2   A    Yes.                                                        15:47:1

3   Q    Did you estimate monitoring costs?                         15:47:1

4   A    Yes.                                                        15:47:2

5   Q    And that came to $300 thousand a year?                     15:47:2

6   A    Yeah.  That's the whole package, though.                   15:47:2

7   Q    What does that include?                                    15:47:2

8   A    That's the monitor and the monitor's experts.             15:47:2

9   Q    And I see you also have IT costs here?                      15:47:2

10  A    Yes.                                                        15:47:3

11            Again, there are certain -- I notice, in the          15:47:3

12  Consent Decree, there's an incident reporting mechanism that's  15:47:3

13  required.  So that should cover establishing that IT.           15:47:4

14            Again, in most jail budgets, there's an IT budget.    15:47:4

15  That's a regularly funded kind of thing.  Again, it was hard for 15:47:5

16  us to identify the set-aside, but we're assuming that whatever  15:47:5

17  IT needs are being met -- now this is something else that I     15:48:0

18  guess the defendant's counsel, Mr. Rosenthal, mentioned about   15:48:0

19  City agencies sharing.  What you usually see at the municipal   15:48:1

20  level is a city IT department.  And they're kind of taking care 15:48:1

21  of all the IT.  And they get efficiencies, they get better      15:48:2

22  reductions in the costs.  So I am assuming that -- I'm familiar 15:48:2

23  with the current information system.  I'm using it.  It's       15:48:3

24  working pretty -- I think it's working okay.  It gives me the   15:48:3

25  information I need.  I think it is lacking in terms of the      15:48:4

1    critical incidents.                                                    15:48:4

2              There's probably a master roster management system           15:48:4

3    that needs to be built.  But we believe that $70,000 would cover       15:48:5

4    that, the costs of the software to develop that.                       15:48:5

5    Q    Thank you.                                                        15:48:5

6              The cost analysis part of your report, you said             15:49:0

7    you relied on PFM?                                                     15:49:0

8    A    Yes.                                                              15:49:1

9    Q    Who is PFM?                                                       15:49:1

10   A    They're a nationally recognized consulting group.  They do a     15:49:1

11   lot of work at the municipal level.  They do work here for            15:49:1

12   Orleans.  They've done work for correctional agencies.  First         15:49:1

13   time I'd worked with them, I was very impressed with their work.      15:49:2

14   Q    And what did they provide to you for your report?                15:49:2

15   A    The way it would work, I would do the population estimates       15:49:2

16   by custody level, et cetera, et cetera.  CNA at the same time         15:49:3

17   was doing the current staffing.  And then -- so they looked at        15:49:3

18   what the staffing levels were at each of the seven facilities.        15:49:4

19   And then they asked me to identify what would be left.  We've         15:49:4

20   got the population down, so we did Templeman 5 and used those         15:49:5

21   staffing recommendations.  And then CNA went in and did a            15:49:5

22   staffing analysis with, on the new facility, with the               15:49:5

23   architects.  We had two architects consulting with them.            15:50:0

24              That producing staffing levels for the new              15:50:0

25   facilities.  And then PFM takes those staffing numbers by           15:50:1

1    officer level and runs them through their spreadsheets, which          15:50:1

2    takes into account the salary levels and benefits, et cetera.          15:50:2

3              The other thing that they started doing, they                15:50:2

4    started knocking out some savings which would be indirect              15:50:2

5    savings on certain items.                                              15:50:3

6              But that's how the process would work.  So the               15:50:3

7    last piece of the puzzle was PFM's cost.  They were able to do         15:50:3

8    that once we established the population, the staffing levels.          15:50:4

9    And then they crunch the numbers on what the costs would be.           15:50:4

10   Q   And PFM based their cost analysis on the average daily             15:50:4

11   population of 1,600?                                                   15:50:5

12   A   Yeah.  Approximately.  Of those two facilities.  What would        15:50:5

13   it take to staff those two facilities.                                 15:50:5

14   Q   Thank you.                                                         15:51:0

15             And you mentioned savings.                                   15:51:0

16        THE COURT:  Excuse me one second.  Going back to where            15:51:1

17   you were, that other -- that summary chart, though, that              15:51:1

18   includes health staffing; is that right?                              15:51:1

19        THE WITNESS:  It does.                                            15:51:2

20             I think, for the record -- I don't know if I'm               15:51:2

21   interfering with what you're requesting of me -- but that pretty      15:51:2

22   much is in current compensation levels for those medical staff.       15:51:2

23   PFM used those.  I don't believe we increased the compensation        15:51:3

24   levels.                                                               15:51:3

25        THE COURT:  Does this include maintaining salaries as            15:51:3

1    they are now with respect to regular staff, correctional staff?    15:51:4

2            THE WITNESS:  Yes.    15:51:4

3            THE COURT:  It does?    15:51:4

4            THE WITNESS:  Yes.    15:51:4

5            They'd have to rerun these numbers.  If we do what    15:51:4

6    we were talking about, Your Honor, of increasing the starting    15:51:5

7    salary, They would have to rerun them.  Which they could do    15:51:5

8    pretty quickly.  I would just say, once we identify the number    15:52:0

9    of staff that would be impacted by a higher entry level, then    15:52:0

10   they could, I'd say within a couple of days, rerun the numbers    15:52:0

11   and give you a new estimate of what that would look like in    15:52:1

12   terms of additional costs.    15:52:1

13           They've developed a pretty good model that you can    15:52:1

14   use almost -- something you may want to use in the future.    15:52:2

15   They've got the thing pretty well modeled, so you can simulate    15:52:2

16   different costs by staff position and benefits and whatever    15:52:2

17   relief factor you put in.  And I think that Mr. Rosenthal    15:52:3

18   suggested, and I would agree, some time in the spring, you'd    15:52:4

19   have to look at all of this stuff all over again and come up    15:52:4

20   with new numbers of what's required.    15:52:4

21           THE COURT:  Of course, one of the concerns, you said    15:52:4

22   this includes what the staffing projections are with respect to    15:52:5

23   the medical.  And, of course, I haven't qualified you in that    15:52:5

24   field, so I will have to look for that number somewhere else.    15:52:5

25           THE WITNESS:  All I'll say is I relied on Dr. Gore and    15:53:0

1    Dr. Shansky --                                                    15:53:0

2              THE COURT:  I've heard all that.                        15:53:0

3              THE WITNESS:  Sorry.                                    15:53:0

4              THE COURT:  No problem.                                 15:53:0

5                    What else?                                        15:53:0

6    BY MS. DEAN:                                                      15:53:1

7    Q    Just to clarify, on the medical numbers you do have on here, 15:53:1

8    they're based on the average daily population of 1,600?          15:53:1

9    A    Approximately.                                              15:53:1

10   Q    You a moment ago mentioned savings, so I just want to direct 15:53:1

11   up to the second page of this document.  And I'm hoping you can  15:53:2

12   explain for me, according to what I'm seeing here, there's a     15:53:2

13   projected annual revenue loss of approximately 5.8 million from  15:53:2

14   removing the 474 state DOC inmates, their per diem, Plaquemines' 15:53:3

15   per diem, the inmates' telephone costs from those inmates and    15:53:4

16   the commissary revenue for those inmates; that's correct?        15:53:5

17   A    That's correct.                                             15:53:5

18   Q    And the projected savings you have here from the population 15:53:5

19   drop are approximately $4.4 million?                            15:53:5

20   A    That's correct.                                             15:54:0

21   Q    So, between those two numbers, there would be a net loss of 15:54:0

22   approximately $1.4 million from removing those inmates?          15:54:0

23   A    From reducing the population.                               15:54:1

24   Q    Yes.                                                        15:54:1

25   A    Yes.                                                        15:54:1

1    Q    I just wanted to clarify, based on the discussion we had      15:54:1

2    earlier about the cost to the City of New Orleans from those       15:54:1

3    prisoners, I understood that they were costing the City quite a    15:54:2

4    bit?                                                               15:54:3

5              MR. ROSENBERG:  Your Honor, is that a closing argument?  15:54:3

6              I'd just object to the question.                        15:54:3

7              THE COURT:  I don't think she's finished the question   15:54:3

8    yet.                                                               15:54:3

9              Go ahead.                                                15:54:3

10             MR. ROSENBERG:  I'm sorry, Your Honor.  That was a       15:54:3

11   premature objection.                                              15:54:4

12   BY MS. DEAN:                                                      15:54:4

13   Q    And I'm just asking to explain for clarity sake, earlier you 15:54:4

14   had testified that the DOC inmates were a high-cost driver.        15:54:4

15   And, based on this document, it appears as if more money would    15:54:5

16   be saved -- would be lost by removing them than saved.            15:54:5

17   A    Well, the overtime?  Are you including the overtime?          15:55:0

18             The overtime is a completely different issue.  The      15:55:0

19   1.8 million in overtime.                                          15:55:1

20   Q    Okay.                                                         15:55:1

21   A    Because, what we're doing by staffing, increasing -- by      15:55:1

22   adding the 135 staff, you reduce the overtime.                    15:55:2

23   Q    So, even if the population wouldn't drop, that $1.8 million  15:55:2

24   in overtime savings would still be realized?                      15:55:3

25   A    If you add the staff.                                        15:55:3

1   Q    Yes.                                                          15:55:3

2   A    Yeah.  You're robbing Peter to pay Paul basically.  They are  15:55:3

3   doing their best, I guess, to cover these positions through        15:55:4

4   overtime.  So, as you add staff, you don't need to use the         15:55:4

5   overtime like they have been.  So that would reduce the overtime   15:55:4

6   they've been paying out.  That's the $1.8 million you would save   15:55:5

7   in overtime.  But, basically, using your overtime pool to pay      15:55:5

8   for the new staff to reduce the overtime situation.                15:56:0

9   Q    So, if we exclude the overtime, we have $5.8 million in lost  15:56:0

10  revenue, and only approximately $2.6 million in savings?           15:56:1

11  A    In savings, projected savings.                                15:56:1

12  Q    So that would be a difference of $4.2 million?                15:56:2

13  A    Where are you getting at, I guess?                            15:56:2

14  Q    I'm simply trying to clarify.  To me, it looks like you are   15:56:3

15  losing more money by reducing the population than you are saving   15:56:3

16  money.                                                             15:56:4

17  A    Oh, well, yeah.  It's kind of counterintuitive, I guess.      15:56:4

18  But the amount of money that you are going to have to spend to     15:56:5

19  run this system is going to go up not that much.  So, if you       15:56:5

20  just look at the spending side, the speeding side, that's not      15:56:5

21  going to change too much.  It's going to go up to the additional   15:57:0

22  staff that we talked about.                                        15:57:0

23           What you really lose is that revenue from the            15:57:0

24  state of those inmates, those 450 inmates that are no longer       15:57:0

25  you're going to go get revenue on.                                 15:57:1

1    So you lose the revenue, but you were lopsided to          15:57:1

2   begin with, is I guess the way I would phrase it.  You were  15:57:2

3   running an unconstitutional jail system by putting the state 15:57:2

4   inmates in there and you're only getting paid for a partial  15:57:3

5   portion of what they actually cost.  So, if you take that, the 15:57:3

6   $45 million and divided it by 2,400, that's what -- that's what 15:57:4

7   it's really costing you.  And it's more than the $26 per day.  15:57:4

8   That's what I mean, it's a losing population.  These          15:57:4

9   calculations are estimates of how much they lose -- they are  15:57:5

10   what they are, which is you're going lose that amount in revenue 15:57:5

11   up there.  And, on the savings, because you have fewer inmates, 15:58:0

12   the health care costs -- which, you have like several hundreds 15:58:0

13   of inmates that are in the general population, you know, that  15:58:0

14   are on medication, expensive medication.  And these are DOC   15:58:1

15   inmates, so they are gone.  Food service, we are not feeding   15:58:1

16   them anymore.                                                 15:58:2

17          The overtime is kind of like a separate thing.        15:58:2

18   The overtime expenditure goes down, but that's being, you know, 15:58:2

19   picked up by the additional hiring of 135 staff.             15:58:3

20          So I don't know if that explains it for you, but      15:58:3

21   that's about the best way I can explain now that all comes    15:58:3

22   together.                                                     15:58:4

23          You're saying we're losing money, we're not losing    15:58:4

24   money by sending these state inmates to the DOC?  Is that what 15:58:4

25   you're -- is that what you're looking at?                    15:58:5

1   Q   That's just what it looks like from this document.  I didn't          15:58:5

2   think that was what you testified to earlier.                            15:58:5

3   A   It's going to cost you revenue to ship them there.  But the          15:59:0

4   system that you had in place is unconstitutional.  So, you have          15:59:0

5   to ramp up your system, you have to pay for your system, and             15:59:1

6   make it constitutional.  That's going to increase your overall          15:59:1

7   costs.  But you lose that revenue, which makes it even higher of        15:59:2

8   a loss, if you know what I'm saying.  That's the $7 million that        15:59:2

9   you get to.  The net additional payment is coming largely from          15:59:3

10  that loss in the revenues from the state per diem, the $4.4             15:59:3

11  million.                                                                 15:59:4

12  Q   And the costs to make the jail constitutional will be there         15:59:4

13  whether it's average daily population or 1,600 or a larger              15:59:4

14  population?                                                              15:59:5

15  A   No.  The costs to make is much less if you go down to 1,600.        15:59:5

16  If it's at 2,400, it's going to be much more expensive.                 15:59:5

17          These are my numbers for the 1,600.  If you were               16:00:0

18  to go up to 2,400, you'd have a completely different chart.             16:00:0

19  Q   But it would be at least $7 million?                                 16:00:0

20  A   It's at least $7 million, yeah.  That's the best scenario I         16:00:1

21  can give you, $7 million.                                               16:00:1

22          If you stay at the 2,400, I think your estimates              16:00:1

23  are going to be at $22 million.  Plus some other assumptions            16:00:1

24  about what the starting salary is going to be.                          16:00:2

25  Q   You said you have reviewed Mr. Parrish's report; correct?           16:00:2

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 266 of 350

Jones vs. Gusman 08.05.13 Funding Hearing                    266

1    A    Yes.                                                        16:00:2

2    Q    Are you aware that Mr. Parrish's staffing numbers for the  16:00:2

3    new jail and Templeman 5 are actually lower than your staffing  16:00:3

4    numbers?                                                        16:00:3

5    A    Yeah.  I noticed that.  I may not be here to hear his      16:00:3

6    testimony, but I wasn't clear in his numbers -- and this should 16:00:4

7    be clarified -- where intake processing staff are.  It looks    16:00:4

8    like he has kept them out of the -- the new jail is going to be 16:00:5

9    the new intake center.  And, I have to say, you cannot run that 16:00:5

10   new jail at 1,400 with 350 some staff.  You could do it without 16:00:5

11   the intake center staff, but the intake center staff is a big   16:01:0

12   part of your staffing.  That's where that's staffing enriched.  16:01:0

13   And it looks to me like he may have not have included that in   16:01:1

14   the new jail.  I may be wrong, but that was my first -- now, I   16:01:1

15   haven't seen his actual spreadsheet.  He didn't say that        16:01:2

16   includes the temporary intake center staff.  We're moving them  16:01:2

17   into the new jail.  That's where they're going to be.  I'm      16:01:2

18   pretty confident numbers are pretty good, this is what it will  16:01:3

19   take that run that new jail with the intake center.             16:01:3

20          THE COURT:  Of course, your numbers are premised, a lot  16:01:3

21   of your testimony is premised on the fact, it appears to the    16:01:4

22   Court, that these populations are going to be reduced.          16:01:4

23          THE WITNESS:  Absolutely, yes.                           16:01:4

24          THE COURT:  As a result of the Department of             16:01:4

25   Correction, Vira, that sort of thing.                          16:01:5

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 267 of 350

Jones vs. Gusman 08.05.13 Funding Hearing                    267

1    If that doesn't happen, these numbers don't happen    16:01:5

2  either?    16:01:5

3    THE WITNESS:  Right.  You're absolutely right, Judge.    16:01:5

4    MS. DEAN:  May I approach?    16:02:0

5  BY MS. DEAN:    16:02:0

6  Q   I'm going to just ask a couple of questions about Mr.    16:02:0

7  McGinnis' report that you contributed to.    16:02:0

8    Mr. McGinnis' report is City Exhibit No. 82.    16:02:0

9    If you could turn to page 3, Mr. McGinnis states    16:02:1

10  that the first phase of this review involved an assessment of    16:02:2

11  the staffing needs of all seven facilities of the Orleans Parish    16:02:2

12  Jail; is that correct?    16:02:3

13  A    Yes.    16:02:3

14  Q   And, if you'd turn to page 9, he recommended 711 officers    16:02:3

15  for the existing facilities?    16:02:4

16  A    Yes.    16:02:4

17  Q   Do you agree with that assessment?    16:02:4

18  A    Yes.    16:02:4

19  Q   And Mr. McGinnis also says that he applied a generic relief    16:02:4

20  factor to staffing for the existing facilities.    16:02:5

21    Do you know what the generic relief factor is?    16:02:5

22  A   1.25.    16:02:5

23  Q   Thank you.    16:03:0

24    If you'd turn to page 7.  Mr. McGinnis says:  On    16:03:0

25  the night shift, one deputy would be responsible to providing    16:03:0

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 268 of 350

Jones vs. Gusman 08.05.13 Funding Hearing                    268

1    security supervision for two housing units while supported by

2    the control center deputy.

3                And, I should clarify, this was talking about the

4    new jail; is that right?

5    A    Correct.

6    Q    And would that be direct supervision?

7    A    No.  I know where you're going with this.  Mr. Parrish's

8    estimates assume a direct supervision.  He's not putting people

9    in the towers; and he's putting people in the housing unit.

10               Our concern, quite frankly -- if I may just add

11   -- is, right now, this staff, this workforce we're talking

12   about, is not trained in direct supervision, doesn't know direct

13   supervision, has no expertise in direct supervision.  Should not

14   be asked to do direct supervision unless they are so trained,

15   and that will take awhile to do.  So I'm going to go with what

16   we've got.  And, what they can do, is this design with an

17   officer in the tower; and, at night, someone's going back and

18   forth to inspect those housing units.

19   Q    Thank you.

20               Also, on page 7, Mr. McGinnis makes the statement:

21   In the special population housing unit, two deputies would be

22   assigned on both shifts supported by a control center deputy.

23               Is that more intensive staffing for the special

24   population housing units?

25   A    It's more than what it is now.  It's adequate.  It's

1    adequate, we think, to control that population.

2    Q    What is special population?

3    A    Protective custody, administrative segregation, disciplinary

4    segregation.

5    Q    And you think it's appropriate to have more intensive

6    staffing on those units?

7    A    You need to, yes.  For example, they're in cells.  Cells

8    have to be checked on a regular basis.  They're problematic

9    inmates.

10   Q    And would that apply to special population housing units on

11   Templeman 5 as well?

12   A    We wouldn't have any there.

13             Templeman 5, the way we looked at it again with

14   Dr. Gore and Dr. Shansky, we would need about 120, 130 -- we

15   would expect 120, 130 inmates that would be there that were

16   acute medical and acute mental health.

17             That still leaves approximately another 100, 150,

18   175 that we could use for general population inmates.  Could be

19   workforce inmates.

20             I want the special population inmates in the new

21   jail.  I don't want them at Templeman 5.  That would be my

22   preference.

23   Q    If you'd turn to page 12, Mr. McGinnis is discussing the

24   relief factors that you used for the new jail, and mentions that

25   you chose different jurisdictions because they are similar to

1    OPSO in several areas and because they have very low relief        16:06:0

2    factors which will result in a conservative projection of the      16:06:0

3    actual relief staffing.                                            16:06:1

4              Did you evaluate whether those jurisdictions have        16:06:1

5    sufficient staffing?                                               16:06:1

6    A    Yeah.  I've been involved in the studies at Harris County,    16:06:1

7    Maricopa.                                                          16:06:2

8    Q    And they have sufficient staffing there?                      16:06:2

9    A    Yes.                                                           16:06:2

10   Q    And what is their relief factor?                              16:06:2

11   A    I don't -- I'd have to go back to the doc -- these are        16:06:2

12   studies that I did with Mr. McGinnis.  I don't have them           16:06:3

13   available.                                                         16:06:3

14              MS. DEAN:  That's all we have.  Thank you, Dr. Austin.  16:06:4

15              THE WITNESS:  Thank you.                                16:06:4

16              MS. DEAN:  Thank you.                                   16:06:4

17              THE COURT:  Thank you.                                  16:06:4

18              Anybody else?                                           16:06:4

19              MR. ROSENBERG:  Your Honor, I just have a few follow-up 16:06:5

20   on redirect.                                                       16:06:5

21              THE COURT:  Sure.                                       16:06:5

22                    REDIRECT EXAMINATION                              16:06:5

23   BY MR. ROSENBERG:                                                  16:07:0

24   Q    Dr. Austin, just a few things.                               16:07:0

25              MR. ROSENBERG:  Your Honor, I know you asked about July 16:07:0

1  2013 for the pretrial issue, pretrial detainees.  I just wanted          16:07:1

2  to make sure that we've addressed this.                                  16:07:1

3           That on -- if you would pull up table 1.                        16:07:1

4  BY MR. ROSENBERG:                                                        16:07:1

5  Q   Does that show at least through June of 2013; sir?                   16:07:3

6  A   Yeah.  That's through June 2013.                                     16:07:3

7  Q   And, again, those were documents or records and data that           16:07:3

8  were provided to you by the sheriff's office; is that correct?          16:07:4

9  A   Orleans Parish Sheriff's Office gives those to me each              16:07:4

10 month.                                                                   16:07:4

11 Q   Now, I also wanted to ask you about a couple of other               16:07:4

12 questions that were posed to you by the other attorneys.                16:07:5

13          The New Orleans Police Department officers, those              16:07:5

14 applicants are required to have different credentials, both             16:08:0

15 professionally and educationally, than an applicant serving as a        16:08:1

16 correctional deputy at OPP; isn't that true?                           16:08:1

17 A   Well, I haven't look at the New Orleans Police Department           16:08:2

18 requirements, but I can tell you generally -- because I can't           16:08:2

19 speak to New Orleans, I haven't studied it.  But, generally, law        16:08:2

20 enforcement are paid -- have different hiring requirements and          16:08:3

21 are paid at a different level, higher level.                           16:08:3

22 Q   I understand, you haven't looked at that specific issue.           16:08:4

23 A   Right.                                                              16:08:4

24 Q   Has it been your experience that at least applicants for           16:08:4

25 jobs -- applicants for jobs involved in patrolling activities          16:08:5

Jones vs. Gusman 08.05.13 Funding Hearing                    272

1    and serving on a police department have at least 60 hours or a       16:08:5

2    college degree, rather than just a high school degree, as the        16:09:0

3    OPP deputy applicants have?                                          16:09:0

4    A   It would not surprise me if that was the case.                   16:09:0

5           THE COURT:  Do you know the answer?                           16:09:1

6    BY MR. ROSENBERG:                                                    16:09:1

7    Q   I'm asking you, Dr. Austin.                                      16:09:1

8    A   I don't know the answer.                                         16:09:1

9           THE COURT:  All right.  He doesn't know.                      16:09:1

10   BY MR. ROSENBERG:                                                    16:09:2

11   Q   Okay.                                                            16:09:2

12           And are you aware, sir, that the period from the            16:09:2

13   first five years of employment to the 25th year of employment --    16:09:2

14   we're just going to look at those two timeframes -- that, with       16:09:3

15   respect to NOPD officers here, there's only a nine percent          16:09:3

16   salary increase during those 20 years?                              16:09:3

17   A   Yes, I saw that.                                                 16:09:4

18   Q   And, in contrast, are you aware that there is a 52 percent       16:09:4

19   increase for OPP deputies during the same timeframe?                 16:09:4

20   A   Yes.  Again, the salaries escalate rather rapidly with          16:09:5

21   longevity.                                                           16:09:5

22   Q   And you were asked about some savings, questioned as to          16:10:0

23   whether you believe there were savings regarding removal of the      16:10:0

24   DOC inmates.  At $50 a day, if there were 900 DOC inmates            16:10:1

25   removed, is that going to save, whether it's the sheriff or the      16:10:2

1    City or the taxpayers, somewhere in the neighborhood of 15 to

2    $16 million a year?

3    A   Removing them would save them?

4    Q   Yes.  So that they would not be losing $52 a day, just based

5    upon your calculations --

6    A   Right.

7    Q   -- times eight or 900 DOC inmates, if those were removed and

8    -- does that mean that we would have a savings or a cost savings

9    of over $15 million?

10   A   Cost savings?

11   Q   You would not have to spend that money?

12   A   That's correct.

13   Q   That's what I'm trying to get to.

14   A   No, you wouldn't have to spend that money.

15   Q   And you --

16   A   I mean, the difference between what you're spending now.

17   Q   Exactly.

18   A   Yes.  You are spending -- it's an allusion if you think

19   you're -- that these are being paid.  They're not being paid

20   for.  You're spending money on them.

21   Q   Let me ask you this, sir.  You mentioned the relief factor.

22   The relief factor actually significantly reduces the overtime

23   expense that the sheriff had historically been incurring; isn't

24   that true?

25   A   Right.  They have no relief factor as of today.  They don't

1    have a relief factor.                                                16:11:4

2    Q    Still don't have a relief factor?                              16:11:4

3    A    Still, as of today, which is -- and the only way that          16:11:4

4    they've been able to manage the unconstitutional jail is by         16:11:5

5    requiring people to do double shifts, whatever.  Which I think      16:11:5

6    also adds to the turnover.                                          16:12:0

7    Q    And is a relief factor sort of standard operating procedure    16:12:0

8    within a correctional facility, in your experience?                 16:12:1

9    A    It's corrections 101, yes.                                     16:12:1

10   Q    You talked about training and some of these deputies          16:12:1

11   shipping off to Montgomery for training.  Are you aware that all    16:12:3

12   of the correctional experts who testified in April found that      16:12:4

13   the sheriff's training practices were abysmal?                     16:12:4

14   A    Yes, I read that.                                             16:12:4

15   Q    And so, would it make any sense to you to have more training  16:12:4

16   under his supervision without a jail administrator and new        16:12:5

17   training procedures?                                              16:13:0

18   A    Absolutely not.                                              16:13:0

19           And let me just add something else.  If you are          16:13:0

20   going to go to direct supervision, you'd better hire some people  16:13:0

21   full time, not just one person but several people, that know      16:13:1

22   direct supervision.                                              16:13:1

23           So a more meaningful use of those funds would be         16:13:1

24   to maybe we could get someone from Montgomery County, if that's   16:13:2

25   the model we're going to, to leave Montgomery County, become the  16:13:2

 1  jail administrator and develop direct supervision.  That's what        16:13:3

 2  it's going to take.  I've looked at direct supervision, it does         16:13:3

 3  not is happen with a field trip.                                        16:13:3

 4          MR. ROSENBERG:  Thank you.  You said it better than I          16:13:4

 5  could have.                                                             16:13:4

 6              Thank you, Dr. Austin.  I appreciate your patience          16:13:4

 7  with us.                                                                16:13:5

 8          THE COURT:  Anyone else?                                        16:13:5

 9              Thank you, sir.  Appreciate it.                             16:13:5

10              Who is next?                                                16:13:5

11          MR. ROSENBERG:  Your Honor, the City is going to call          16:14:0

12  Mr. Kopplin.                                                            16:14:0

13          THE COURT:  How long is Mr. Kopplin going to be?               16:14:0

14          MR. ROSENBERG:  Just long enough.  I would say -- I            16:14:0

15  don't mean to be smart-alecky, it's just late in the day for me.       16:14:1

16          THE COURT:  What about the earlier responses?                  16:14:1

17          MR. ROSENBERG:  The earlier responses were based upon          16:14:1

18  --  I don't want to say that because I'll be in Mr. Matthews'          16:14:2

19  custody, if you know what I mean.                                       16:14:2

20          THE COURT:  No.  Actually, the marshals' custody.              16:14:2

21              But how long do you anticipate?                            16:14:2

22          MR. ROSENBERG:  I would say that Mr. Kopplin should be         16:14:3

23  through with direct in about 30 minutes, if the Court please.          16:14:3

24          THE COURT:  Okay, great.                                        16:14:3

25              Is he your last witness?                                    16:14:3

Case 2:12-cv-00859-LMA-MBN   Document 544   Filed 08/20/13   Page 276 of 350

Jones vs. Gusman 08.05.13 Funding Hearing                276

1          MR. ROSENBERG:  Yes, sir.                          16:14:3

2          THE COURT:  Great.  Doing well.                    16:14:4

3          MR. ROSENBERG:  Thank you, Judge.                  16:14:4

4          THE COURT:  Yeah, doing well.                      16:14:4

5          MR. ROSENBERG:  Can I get a copy of that?          16:14:4

6          ANDREW KOPPLIN, being first duly sworn, testified  16:14:4

7    as follows:                                              16:15:0

8          CASE MANAGER:  Have a seat.  And state your name and  16:15:0

9    spell it for the record.                                 16:15:0

10         THE WITNESS:  Andy Kopplin.                        16:15:1

11         MR. ROSENBERG:  Your Honor, I'm going to pass on Mr.  16:15:1

12   Kopplin's past work experience, his credentials, because I know  16:15:2

13   last week that you told me you remembered them all.      16:15:2

14         THE COURT:  I do.                                  16:15:2

15                    DIRECT EXAMINATION                      16:15:2

16   BY MR. ROSENBERG:                                        16:15:2

17   Q   So, Mr. Kopplin, I'm just going to go to the more    16:15:2

18   substantial questions, as opposed to your background.    16:15:3

19         You're aware that Dr. Schwartz, one of the         16:15:3

20   plaintiff's expert correctional witnesses, testified that  16:15:3

21   community safety is paramount; is that right, sir?       16:15:4

22   A   Yes.                                                 16:15:4

23   Q   Is that the position of the City, that community safety is  16:15:4

24   paramount?                                               16:15:5

25   A   Yes.                                                 16:15:5

1   Q    And is it also the position of the City that the safety and        16:15:5

2   well-being of incarcerated individuals as well as        16:15:5

3   un-incarcerated individuals are primary concerns for the City?        16:16:0

4   A    Of course.        16:16:0

5   Q    Now, let me ask you, sir, you've reviewed some of these        16:16:0

6   projections by the experts for the plaintiffs and DOJ as well as        16:16:1

7   the sheriff in terms of projected costs; have you not?        16:16:2

8   A    Yes.        16:16:2

9   Q    If the City is order to pay those amounts to --        16:16:2

10        THE COURT:  Which amounts?  There's differences.        16:16:3

11        MR. ROSENBERG:  Everyone else -- well, Your Honor, I'm        16:16:3

12   going to try to just segregate the amounts that Dr. Austin        16:16:3

13   proposed from the amounts that DOJ, Southern Poverty and the        16:16:4

14   sheriff have all proposed.  And, take them, any of them.        16:16:5

15   BY MR. ROSENBERG:        16:16:5

16   Q    Are you with me, Mr. Kopplin?        16:16:5

17   A    Sure.        16:16:5

18   Q    If the City's required to pay any amount --        16:16:5

19        MR. ROSENBERG:  I'll put it this way, Judge, to make it        16:17:0

20   easier.        16:17:0

21   BY MR. ROSENBERG:        16:17:0

22   Q    If the City is required to pay any amount or a portion of        16:17:0

23   any amount other than the maximum figures suggested by        16:17:1

24   Dr. Austin, would that impact the City of New Orleans        16:17:1

25   financially?        16:17:2

1   A    Let me be clear.  The amount proposed by Dr. Austin would        16:17:2

2   significantly impact the City of New Orleans' budget.  So            16:17:2

3   clearly numbers that are triple that would have severe impact on     16:17:2

4   the City's budget.  There's no doubt.  That's consistent with        16:17:3

5   the advice that I gave the city council at their request earlier     16:17:4

6   in the year about the impact of the potential judgments in this      16:17:4

7   case.                                                                16:17:4

8   Q    Let me ask you this, sir.  Would there be a loss of police      16:17:4

9   if any of those reports are embraced and ordered by the Court        16:17:5

10  that the City pay the full amount of those expenses?                 16:18:0

11  A    Let me be clear.  The City, just as we did in 2010 when we      16:18:0

12  inherited a budget that was $100 million out of balance and we       16:18:0

13  had to make cuts everywhere, we do everything we could to meet       16:18:1

14  the City's primary interest, public safety being the top of the      16:18:1

15  list.  But, in that year, we cut contracts by tens of billions       16:18:2

16  of dollars and we furloughed every single employee from the         16:18:3

17  mayor on down, including every police officer, firefighter, EMS      16:18:3

18  worker, Homeland Security staff, and we had to furlough those        16:18:3

19  folks for 11 days.  And, again, that solved a portion of our         16:18:4

20  budget problem.  It solved a portion of our budget problem.          16:18:4

21          Since that time, the City's been spending about              16:18:5

22  $40 million a year less than we spent in 2009.  So we basically      16:18:5

23  implemented and memorialized that level of cutting into the          16:18:5

24  City's budget since that time.  So, we're spending a lot less,       16:19:0

25  we've stabilized the budget.  But we have zero in our bank           16:19:0

1    account.  We actually have a negative fund balance as a city.    16:19:1

2    The city of New Orleans is overdrawn in its bank account.  We    16:19:1

3    inherited a city that had an overdrawn bank account.  And,    16:19:1

4    again, we've had to stabilize it.    16:19:2

5              But the point I make about that is, there is no    16:19:2

6    bank account to reach back to for the city of New Orleans.  We    16:19:2

7    do not have one.  There's a no fund balance, there's no rainy    16:19:3

8    day fund, there's nothing.    16:19:3

9              So the only way to pay for increased costs this    16:19:3

10   year or next year is to cut something else.  That's the way the    16:19:3

11   math works.    16:19:4

12   Q    And has the City made it a practice under this    16:19:4

13   administration to preserve a balanced budget?    16:19:4

14   A    Yes.  That's something we have done now three years in a    16:19:5

15   row.  We've -- I think we've been producing not only balanced    16:19:5

16   budgets but better results for taxpayers in terms of    16:20:0

17   productivity and efficiency of our operations.    16:20:0

18             But, again, it's bare bones.  And the reason that,    16:20:0

19   you know, we spend as much time on costs and expenditures -- I    16:20:1

20   mean, I approve every requisition over $5,000 in the city to    16:20:1

21   this date because we want to make sure that nobody's buying    16:20:2

22   carpeting who doesn't need it.  We want to make sure nobody's    16:20:2

23   offices are being redone.  We are not buying vehicles that we    16:20:2

24   don't need because the budgets are that tight.  I've seen the    16:20:3

25   consequences.  We laid off folks, we've furloughed folks.  We    16:20:3

1  cut services to our citizens.  We are down several hundred                    16:20:3

2  police officers, we are down firefighters.  We are down in all                16:20:4

3  those categories because of our cost-cutting measures.                        16:20:4

4           So the reason I take it as seriously as I do is                      16:20:4

5  because I see the impact in those decisions every single day                  16:20:5

6  that I do my job.  And so, the rigger that I bring to the City's              16:20:5

7  budget process, I would expect to be brought to the costs in                  16:21:0

8  this Consent Decree, because it's the same New Orleans                        16:21:0

9  taxpayers.  Dr. Austin kept saying:  Well, somebody's going to                16:21:0

10  have to pay for it.  The New Orleans' taxpayers are paying for               16:21:1

11  any increased costs.  And, again, the same standard for what's               16:21:1

12  an excessive overspending piece in the City government ought to              16:21:2

13  be the same in the sheriff's office as well, we ought to                     16:21:2

14  minimize any expenses that are unnecessary.                                  16:21:2

15  Q   Is that true for all city agencies, that the administration             16:21:2

16  and the City you're speaking on behalf of, expects them to                   16:21:3

17  operate within their means or within a balanced budget?                      16:21:3

18  A   Yes.                                                                      16:21:3

19  Q   Let me just go back to the potential ramification of being               16:21:3

20  burdened with anything far beyond what even Dr. Austin proposed.            16:21:4

21           I know you've mentioned there was a presentation                    16:21:5

22  to the city council.  So I just want to ask you about that, sir.            16:22:0

23  Would the been a loss of police protection for the city of New              16:22:0

24  Orleans as a result of the numbers proposed by either the                    16:22:1

25  plaintiffs or the sheriff?                                                   16:22:1

1          MR. MATTHEWS:  Your Honor, I'm going to object.  This

2    has been asked and answered.

3          THE COURT:  We have been through this already.

4          MR. ROSENBERG:  Well, Your Honor, we haven't

5    established the actual numbers.

6              And, Your Honor, frankly, the Department of

7    Justice, again, in their appellate brief, in connection with

8    another case involving the City has raised that very issue and

9    said we needed to provide specific losses to show how it's going

10   to affect the City if the Court makes a decision that:  One,

11   something other than the $4 or $5 million as a portion of

12   Dr. Austin's numbers would not be used.

13         THE COURT:  Everything I've heard so far has been a

14   rehash of everything that I've heard previously.  I've heard the

15   arguments on paper, I've heard it through Mr. Kopplin.  So, if

16   there's something new, I'm glad to hear it.  But, otherwise,

17   you're wasting my time.

18         MR. ROSENBERG:  I don't want to waste Your Honor's

19   time; but the argument on paper as Your Honor knows are not in

20   evidence.

21         THE COURT:  Well, I've heard him testify, and we've

22   been through everything that's he's testifying about.  If you

23   have some new figures or more specific figures, I'll hear them.

24   Otherwise, let's move on.

25         MR. ROSENBERG:  If that's the case, Your Honor, what we

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 282 of 350

Jones vs. Gusman 08.05.13 Funding Hearing

282

1  would offer into evidence in conjunction with Mr. Kopplin's    16:23:3

2  testimony is the document that he presented to the city council    16:23:3

3  on March 28, 2013 that's going to show some of the effect if the    16:23:3

4  Court orders us -- orders the City, that is -- to pay an amount    16:23:4

5  far beyond its means.    16:23:4

6      THE COURT:  I haven't seen these documents.  Have the    16:23:5

7  other parties seen it?    16:23:5

8      MR. ROSENBERG:  It's a matter of public record.    16:23:5

9      THE COURT:  That's not the point.  The point is, have    16:23:5

10  they seen it prior to --    16:23:5

11      MR. ROSENBERG:  I don't know if they have pulled it up.    16:24:0

12      MR. MATTHEWS:  I haven't seen it.    16:24:0

13      MS. COON:  Is it marked as an exhibit?    16:24:0

14      MR. ROSENBERG:  It's not marked as an exhibit, Your    16:24:1

15  Honor.  It's a matter of public record.  And, you've asked us to    16:24:1

16  you short-circuit, and that's what I was trying to do.    16:24:1

17      THE COURT:  The exhibits have to be exchanged.  They    16:24:1

18  need time to look at what you have.  The documents have to be    16:24:2

19  exchanged.    16:24:2

20      What I would suggest doing is make sure they get a    16:24:2

21  copy of that and we'll handle it in the next hearing.    16:24:2

22      MR. ROSENBERG:  That's fine, Judge.    16:24:3

23  BY MR. ROSENBERG:    16:24:3

24  Q  So let me save that area, Mr. Kopplin, and come back to    16:24:3

25  another area.    16:24:3

1              Is the City of New Orleans amenable to the                16:24:3

2    consolidation, pooling of services, with the sheriff's office?      16:24:4

3    A    Yes.                                                           16:24:4

4    Q    And would that be true with respect to payroll functions?      16:24:4

5    A    Payroll, yeah.                                                 16:24:5

6    Q    Any other functions?                                          16:24:5

7    A    IT.                                                            16:24:5

8              You could do vehicle maintenance.                         16:24:5

9              There's a number of things -- fleet management --         16:24:5

10   where, certainly -- I think Dr. Austin just testified to this       16:25:0

11   point -- there are shared services that, as you put more people     16:25:0

12   on an email system, the marginal cost of adding sheriff's           16:25:0

13   deputies to our email system and supporting them is not             16:25:1

14   particularly high.  So, if we could remove those expenditures       16:25:1

15   from the sheriff's budget so he could hire mow deputies, as the     16:25:2

16   experts have suggested, the City could take on those things at a    16:25:2

17   significant cost savings.  And there are opportunities for that,    16:25:2

18   I suspect, elsewhere as well.                                       16:25:3

19         THE COURT:  Has the City previously suggested that to         16:25:3

20   the sheriff, or is it just a result of these hearings that you      16:25:3

21   wanted to pursue that?                                             16:25:4

22         THE WITNESS:  Certainly, I was not aware of the              16:25:4

23   expenditures that the sheriff was making for IT functions.  And,    16:25:4

24   if I would have seen those, I would have offered it up earlier.     16:25:5

25         THE COURT:  Which underscores the need for a thorough         16:25:5

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 284 of 350

Jones vs. Gusman 08.05.13 Funding Hearing

284

1    budget process by the City and the sheriff.                          16:25:5

2              MR. ROSENBERG:  I can assure Your Honor -- and I think     16:25:5

3    Deputy Mayor Kopplin will confirm this -- that there will be a       16:25:5

4    thorough analysis of the sheriff's proposals for this year once      16:26:0

5    we get them.                                                         16:26:0

6    BY MR. ROSENBERG:                                                    16:26:0

7    Q    Mr. Kopplin, let me ask you this.  There's also been some       16:26:0

8    reference to the Vira Institute and its use of Pretrial              16:26:1

9    Services.  Are you aware of that program, sir?                       16:26:1

10   A    Yes, sir.                                                       16:26:2

11   Q    Who pays for -- first of all, has it been effective in         16:26:2

12   reducing the population at OPP?                                      16:26:3

13   A    Yes.                                                            16:26:3

14   Q    And who is paying for the cost of that program today?          16:26:3

15   A    The city of New Orleans pays the vast majority of those        16:26:4

16   costs.  The Baptist Community Ministries pays for a small portio     16:26:4

17   of it.  And Vira contributes some in-kind services from the         16:26:4

18   national office.                                                     16:26:5

19             THE COURT:  Just for the record, if you look at page 76    16:26:5

20   of my opinion regarding the Consent Judgment, what I said, at        16:26:5

21   least in part, is because the costs of implementing the proposed     16:27:0

22   Consent Judgment and the party responsible for paying any           16:27:0

23   additional costs have not yet been determined, the Court            16:27:0

24   permitted the City to offer Mr. Kopplin's testimony regarding        16:27:0

25   the fact that a price tag of 22.5 million would have on the          16:27:1

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 285 of 350

Jones vs. Gusman 08.05.13 Funding Hearing                    285

```
1   City's budget should the City be required to pay such costs in        16:27:1
2   full.                                                                  16:27:2
3              So I'm very aware of this whole issue that the             16:27:2
4   City has.  Certainly sensitive to it and take it into                 16:27:2
5   consideration in determining ultimately what the Court's              16:27:2
6   judgment will be.                                                      16:27:2
7              MR. ROSENBERG:  Thank you, Judge.                          16:27:3
8   BY MR. ROSENBERG:                                                      16:27:3
9   Q   We've heard some -- or actually received some comments from       16:27:5
10  Mr. Laughlin about the condition of the sheriff's vehicular           16:27:5
11  fleet.  Are you aware of what condition the New Orleans Police        16:28:0
12  Department's fleet is in, sir?                                         16:28:0
13  A   Painfully, yes, sir.                                               16:28:0
14  Q   And could you just describe that to the Court.                     16:28:1
15  A   I think the New Orleans Police Department is down about 400        16:28:1
16  vehicles that have been taken out of service in the last four         16:28:1
17  years.  There are a number of vehicles that, you know, we run         16:28:2
18  24-hours a day, in three shifts.  They hand off the cars and          16:28:2
19  hand off the keys.                                                     16:28:3
20             For the first time since we've been in office,             16:28:3
21  we're able to buy 100 new police vehicles this year.  But the         16:28:3
22  fleet is aging.  And we struggle to maintain it with the              16:28:3
23  resources that we have.  We've prioritized having cops on the         16:28:4
24  street more than vehicles.  But we look with envy, generally          16:28:4
25  speaking, at the sheriff's vehicle when they're driving the           16:28:4
```

1    street.  They look better than ours.  And it's not because they    16:28:5

2    do a better job of maintaining them; it's because they newer and    16:28:5

3    they put less miles on them.    16:28:5

4              And so that's, again, part of what we propose.    16:29:0

5    Q   And, by the way, was that part also of the ability to    16:29:0

6    consolidate or pool services, was the maintenance of the    16:29:1

7    vehicular fleets to save money?    16:29:1

8    A   Certainly.  Again, we each have a shop, and we're repairing    16:29:1

9    similar type vehicles.  There's probably fleet management    16:29:2

10   efficiencies that a bigger fleet and a management system would    16:29:2

11   be able to enable the City to have.    16:29:3

12             And, again, that's the way consolidation works,    16:29:3

13   and we would actually be well advised to take advantage of it    16:29:3

14   every place we can do it.  Especially given the costs we're    16:29:4

15   looking at here.    16:29:4

16        MR. ROSENBERG:  Thank you, sir.  Those are all the    16:29:4

17   questions I have, Mr. Kopplin.    16:29:4

18        MR. MATTHEWS:  No questions.    16:29:5

19        MS. COON:  I have a couple questions, Your Honor.    16:29:5

20                   CROSS EXAMINATION    16:29:5

21   BY MS. COON:    16:29:5

22   Q   Deputy Mayor Kopplin, you've testified previously and today    16:29:5

23   about the potential financial impact on the City of having a    16:30:0

24   constitutional jail.  Do you know if there's any federal funding    16:30:1

25   that can be applied towards achieving a constitutional jail?    16:30:1

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 287 of 350

Jones vs. Gusman 08.05.13 Funding Hearing

287

1    A    Are you offering something?                               16:30:1

2    Q    I'm asking if you know about any.                        16:30:2

3    A    What's that?                                             16:30:2

4    Q    Asking if you know about any current federal funding that  16:30:2

5    the City has access to that can be applied towards having a   16:30:2

6    constitutional jail.                                          16:30:2

7    A    I'm hoping you're offering it.                           16:30:3

8         THE COURT:  Well, first of all, before she offers       16:30:3

9    anything, let's see if you're aware of any.                   16:30:3

10        THE WITNESS:  In terms of operating expenses?  I'm not   16:30:3

11   aware of any.                                                 16:30:4

12   BY MS COON:                                                   16:30:4

13   Q    How about in terms of capital expenses?                  16:30:4

14   A    Well, I'm certainly aware that both the City and the sheriff  16:30:4

15   have resources from FEMA due to the federal flood and the staff  16:30:4

16   for that that allows us to reimburse localities for public    16:30:5

17   infrastructure that's destroyed by disaster.  We have the     16:30:5

18   ability, both the sheriff and the City, to invest in new      16:31:0

19   facilities.  Which, of course, has been part of the conversation  16:31:0

20   here.  And in fact FEMA money is paying for the new jail.     16:31:1

21   Q    Do you know what amounts are available for physical      16:31:1

22   facilities or physical improvements for the jail?             16:31:1

23   A    Not off the top of my head, no, ma'am.                   16:31:1

24   Q    If I told you that the City had access to $61 million, does  16:31:2

25   that ring a bell or sound within the ballpark of what the City  16:31:2

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 288 of 350

Jones vs. Gusman 08.05.13 Funding Hearing                    288

1    has available?

2    A    The City has significant resources.

3                  And the more important question, I think, for this

4    Court and for all of us, is, how do you invest whatever's

5    required to meet the City's public safety needs in the smartest

6    possible way.  How do you build a safe and constitutional jail,

7    how do you staff it and how do you invest other resources to

8    promote public safety.  You can use the FEMA money for lots of

9    projects.  So we could have new police stations, we could have

10   new parks, we can have new streets lights, all of which promote

11   public safety.  So the mayor's position has been very clear in

12   terms of City prioritization of FEMA capital expenditures.

13   Which is:  Build only what you need, build it smart and

14   responsibly, don't build excessive, unnecessary,

15   expensive-to-operate facilities that don't serve a public

16   purpose.  Save that money and invest it somewhere we're going to

17   have a higher return on investment.

18                  And, again, when you look at the continuum -- and

19   I think Dr. Austin actually started referring to this -- we're

20   talking about only the back-end, but the front-end is far more

21   important to terms of trying to create the public safety that we

22   want to see.

23                  So, the new vehicles for the police department,

24   we're spending FEMA money on them.  Okay?  So we're trying to

25   make sure -- we could have taken the money in the excess of the

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 289 of 350

Jones vs. Gusman 08.05.13 Funding Hearing                289

1  kitchen warehouse building and invested it in smarter, more    16:32:4

2  thoughtful ways to promote public safety.  And so, again, it's    16:32:5

3  our view that we should invest the resources we need to build    16:32:5

4  the facilities that we need for the jail.  And, if we've got    16:32:5

5  excess resources available, then we should build the facilities    16:33:0

6  we need in the City to promote broader public safety.  And    16:33:0

7  includes particularly investments for the police department.    16:33:0

8  Q   So you mentioned new kitchen.  Such, using that money in a    16:33:1

9  different way, would that have been repurposing the money?    16:33:1

10  A   It would have been using FEMA's procedures that allow for    16:33:1

11  alternate projects or improved projects and those sorts of    16:33:2

12  things, yes.    16:33:2

13  Q   And so you're not aware of the specific amount of FEMA money    16:33:2

14  currently available as a result of the destruction of City-owned    16:33:2

15  jail facilities?    16:33:3

16  A   I'm certainly well aware that there is FEMA money available.    16:33:3

17        The question, I think for the City and for the    16:33:3

18  sheriff and for all of us, is, with that money, what's the best    16:33:3

19  return on the investment for improving public safety.    16:33:4

20        Again, most of what we've been talking about, Your    16:33:4

21  Honor, has been staffing the facility.  We're talking, with    16:33:4

22  regard to FEMA funds, for capital improvements.  And, again, the    16:33:5

23  lesson from Dr. Austin's testimony is that we've got to reduce    16:33:5

24  the population by removing the non-City responsible inmates,    16:34:0

25  increase the staffing.  Building a bigger building doesn't    16:34:0

1  advance that cause.  It just increase all of our expenses and        16:34:1

2  uses that capital for something that is a lesser worthy purpose       16:34:1

3  than some of the other investments that you could make in the        16:34:1

4  City of New Orleans that are desperately needed, like new police     16:34:2

5  stations and like new police vehicles.  And so, again, we would      16:34:2

6  propose using those resources for what is needed on the jail         16:34:2

7  side and then repurpose those for higher and better purposes if      16:34:3

8  there's a public safety purpose that is more warranted.              16:34:3

9           And, again, over-building on the jail side is not          16:34:3

10  a good investment for the taxpayers dollars, whether it's the       16:34:4

11  New Orleans' taxpayers or whether it's federal funds.               16:34:4

12  Q   Are you able to report to the Court yet on the City's           16:34:4

13  position with regard to the extent to which FEMA money should be    16:34:5

14  applied towards either a phase two or a phase three jail            16:34:5

15  building?                                                           16:34:5

16           I guess this might go towards a new deadline for          16:34:5

17  the City and the sheriff to respond to the Court since our          16:35:0

18  August 1st deadline was passed by.                                  16:35:0

19           THE COURT:  That's one the things --                      16:35:0

20           MS. COON:  I'll reserve that and I will finish my         16:35:0

21  questions for Mr. Kopplin.                                          16:35:1

22           THE COURT:  When are the City and the sheriff going to    16:35:1

23  agree on a plan for the new facility, the design modifications,     16:35:1

24  that's one of the questions the Court has.  I assume that's         16:35:1

25  still being talked about; is that right?                            16:35:2

Case 2:12-cv-00859-LMA-MBN   Document 544   Filed 08/20/13   Page 291 of 350

Jones vs. Gusman 08.05.13 Funding Hearing

291

1    MR. ACURI:  Judge, we provided a copy, two copies, to

2  the City of our proposed modifications.  I believe the City is

3  still working.  We haven't heard anything.  To my knowledge, our

4  client hasn't heard anything.  But I'd have to confirm that

5  first.

6    THE COURT:  That's important, that we get that as soon

7  as possible.  Because we have a September 30th hearing date

8  right now.  So we certainly need that.

9    What's the status of that with the City?

10    MR. ROSENBERG:  Your Honor, we reported to the Court

11  two days ago on this very issue; which is that, we received the

12  plans late last Friday night, and we're circulating those.

13  We're looking at them.  Friday, a week ago.  I don't mean to say

14  this past Friday.

15    THE COURT:  Right.

16    MR. ROSENBERG:  And that is what we told the Court two

17  days ago.

18    And we're looking at that to see what changes he's

19  making.  Because it affects -- as I think all these parties have

20  indicated -- it affects the number of inmates that can be housed

21  in the facility, at least appears to me.  And I'm trying to find

22  out if I'm correct in that understanding.  So that's the reason

23  I thought we were proceeding with the September 30th hearing.

24    THE COURT:  The sooner we can get a resolution of that,

25  the better.  Of course, in the mean time, we need to figure out

1    what the costs are for redesigning these facilities and go ahead        16:36:3

2    and bring things like that up to constitutional standards.              16:36:3

3                    What else?                                               16:36:4

4         MS. COON:  I have one more question for Mr. Kopplin.               16:36:4

5    BY MS. COON:                                                            16:36:4

6    Q    You heard Mr. Austin testify about various population             16:36:4

7    reductions that, I think we don't dispute, are a laudable goal.         16:36:5

8    My question is, what is the City doing currently in order to            16:37:0

9    achieve the population projections for Mr. Austin?                      16:37:0

10   A    We're doing quite a bit.  Thank you for the question.             16:37:0

11                   Back in the summer of 2010, at the sheriff's            16:37:1

12   request, the mayor agreed to review his proposal, which I think        16:37:1

13   at that time was to build about 6,000 new jail beds here in the        16:37:2

14   city, something like that.  And so he appointed me as the              16:37:2

15   chairman of a Criminal Justice Working Group, which was known          16:37:2

16   otherwise as kind of the jail task force.  It is our group that        16:37:3

17   commissioned Dr. Austin's first study.                                 16:37:3

18                   And out of that process came the legislation that      16:37:3

19   the city passed to change the treatment of minor marijuana            16:37:4

20   violations, for example, which would directly lower the prison        16:37:5

21   population, to change the police arrest practices.  Chief Serpas       16:37:5

22   was part of this group.  We found that we were regularly picking      16:38:0

23   folks up on out-of-parish warrants.  They would go into the           16:38:0

24   jail, it would take a cop off the street for a couple of hours,       16:38:1

25   they'd be admitted to the jail.  And we'd call up -- the jail         16:38:1

1    would call up the other parish and they would say let them go.                16:38:1

2    That's happening thousands of time a year, you know, providing                16:38:2

3    no public safety benefit to the citizens of New Orleans but a                 16:38:2

4    cost in terms of taking cops off the streets and racking up per               16:38:3

5    diems at the jail.  So we changed that and that dramatically had              16:38:3

6    an effect on a pretrial population.                                           16:38:3

7              THE COURT:  How did you change that?                                16:38:4

8              THE WITNESS:  The police chief gave new training and               16:38:4

9    guidance to his officers to not routinely imprison -- not                     16:38:4

10   routinely jail out-of-parish warrants, the folks picked up on                 16:38:5

11   out-of-parish warrants, unless the police determined that those              16:38:5

12   individuals were an imminent threat to public safety.  So, just              16:39:0

13   by having an outstanding warrant, was it sufficient for the                   16:39:0

14   chief to say have your officer pulled off the street, spend two              16:39:1

15   hours going through the intake process at the jail, so that                   16:39:1

16   tomorrow when jail calls up Jefferson Parish they say let them               16:39:1

17   go.  Which was happening routinely.  We were one of the few                   16:39:2

18   places that would pick up out-of-parish warrants routinely even              16:39:2

19   when there was no other underlying reason for an arrest.  And so             16:39:2

20   the police chief changed that.                                                16:39:3

21              The third prong to the strategy was getting the                    16:39:3

22   Pretrial Services program started.  So, again, we helped work                 16:39:4

23   with Vira Institute, which the Department of Justice was                       16:39:4

24   providing the initial funding for, coordinate the work with the              16:39:4

25   DA, with the public defender, with the judges in criminal court,             16:39:5

1   with the sheriff to get the protocols all set.                    16:39:5

2                And, again, the first big reduction in the OPP        16:40:0

3   population that was directed through this process was change of    16:40:0

4   police practices.  The second was the impact of the Pretrial      16:40:0

5   Services program.  And, again, as Dr. Austin testified, last      16:40:1

6   year, they were hitting about I think 60 percent of the pretrial  16:40:1

7   inmates during a risk assessment.  Through the City's funding of  16:40:1

8   the pretrial program, we've increased that to where, this year,   16:40:2

9   as program was getting fully implemented, it will up to 100       16:40:2

10  percent of pretrial inmates.  So, again, that's the reason        16:40:3

11  Dr. Austin suggested there's going to be a further reduction in   16:40:3

12  the local pretrial population, is because we're going from 60     16:40:3

13  percent to 100 percent in terms of te screening.                  16:40:4

14                So I guess what I would say is, it's not just that   16:40:4

15  this is a projection.  This is actually a plan being implemented  16:40:4

16  with the support of the mayor, the city council and the elected   16:40:5

17  officials in the parish that has had a significant impact in      16:40:5

18  already reducing the prison population of pretrial inmates.       16:40:5

19  When we started out it was about 22, 23 hundred local city of     16:41:0

20  New Orleans' responsibility inmates in the parish jail.  It is    16:41:0

21  now somewhere 16 to 17 hundred on an average day these days as a  16:41:0

22  direct result of concerted action that we've taken to reduce the  16:41:1

23  population.                                                        16:41:2

24                And, again, to be clear, so that no one            16:41:2

25  misunderstands our intent, we believe that dangerous folks who    16:41:2

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 295 of 350

Jones vs. Gusman 08.05.13 Funding Hearing                    295

1    are a threat to our community ought to be locked up in jail.                16:41:2

2    And the police chief understands that.  We support the judges              16:41:3

3    and the DA in prosecuting those folks.                                     16:41:3

4              But, for folks who can be released safely into the              16:41:3

5    community -- and, in many cases, the folks who were being                  16:41:4

6    detained, the biggest reason they were still being detained is             16:41:4

7    because they couldn't post the bond, the cash bond.  It wasn't             16:41:5

8    because they were deemed a risk to the community.  So, with this           16:41:5

9    risk assessment, with the practice of reducing arrests of folks            16:41:5

10   who are not an imminent threat, we've already done a significant           16:42:0

11   job in reducing that pretrial prison population.  But, as                  16:42:0

12   Dr. Austin said, it's still twice the national average per                 16:42:1

13   capita today.  Even though it's been reduced by a third, it's              16:42:1

14   still double what you would expect on national standards per               16:42:2

15   capita.  So there's still plenty of room for that 175 per person           16:42:2

16   reduction that Dr. Austin has proposed.                                    16:42:3

17             And, again, the reason I know about this is                      16:42:3

18   because I have a chaired 10, 12 meetings on this subject.  I'm             16:42:3

19   the recipient of Dr. Austin's reports, I commissioned them.  And           16:42:3

20   we get those on a regular basis.  Because, again, this has been            16:42:4

21   a concern of the City's back since 2010, make sure that we                 16:42:4

22   invest our public safety resources in the right way and in the             16:42:5

23   right time and in the right place.                                         16:42:5

24   Q   Is there anything more planned to achieve additional                   16:42:5

25   population reductions aside from what you've already mentioned?            16:42:5

1   A   So I think, again, the most important thing is getting it at

2   the frond-end and keeping folks doing well in school, having all

3   kinds of preventative activities.  Which, quite frankly, we've

4   raised a lot of private money to invest in.  And so, by

5   targeting our policing in smarter ways, which we've been doing,

6   the police chief has been leading an effort to make sure that

7   we're focused on interrupting crime before it happens in the hot

8   spots because we now have the technology to know where the

9   police officers ought to be deployed; by investing in programs

10  that keep young people off the street.  I mean, those are the

11  things that you're going to do as well.

12              But we are going to continue to work closely with

13  the criminal justice partners on implementing the pretrial

14  program.  We think that, if you get to 100 percent of felons and

15  you get to the misdemeanor, the municipal cases, that there

16  remains significant ability to achieve what is a pretty

17  conservative statement, in our view from Dr. Austin, about what

18  is appropriate.

19              THE COURT:  You heard Dr. Austin testify that there

20  hasn't been any real evaluation of how well this Vira program is

21  doing?  That is, what's happened to the people involved and the

22  failure rate, that sort of thing, there hasn't been any analysis

23  in New Orleans yet?

24              THE WITNESS:  Right.  We've actually requested one of

25  the Department of Justice, and a different arm of the Department

Jones vs. Gusman 08.05.13 Funding Hearing                  297

1    of Justice has agreed to look at that.  We spoke to them a                16:44:2

2    couple weeks ago about that analysis.                                     16:44:2

3                But there has been an analysis by Dr. Austin.  In             16:44:2

4    terms of the effect in terms of the population reduction at the           16:44:3

5    jail, it's been crystal clear.  The program has worked as it was          16:44:3

6    intended to reduce the pretrial population.  There's no doubt             16:44:3

7    about that.                                                               16:44:4

8    Q    Does the Criminal Justice Working Group continue to work on          16:44:4

9    population reduction issues?                                              16:44:4

10   A    I think members of it do.  I mean, the original purpose of           16:44:4

11   it was to evaluate the decision about which jail facilities to            16:44:4

12   build or not to build.  And so the folks who are party to that           16:44:5

13   working group still retain positions of responsibility in the            16:45:0

14   criminal justice systems:  The DA, it's the sheriff, it's the            16:45:0

15   public defender.  As a result of the conversations that we held          16:45:0

16   for the most part in 2010 and 2011, a little bit in 2012, they           16:45:1

17   continue to move forward in implementing these initiatives.              16:45:2

18   Q    Any is there plan to resurrect the Criminal Justice Working          16:45:2

19   Group?                                                                    16:45:2

20   A    There's a criminal justice coordinating committee that's            16:45:2

21   statutorily created that has that responsibility and probably is         16:45:3

22   best to subsume it.  Because the working groups' task was                16:45:3

23   looking at the population in so far as it was relevant to                 16:45:4

24   building new facilities.  But, ongoing, the criminal justice             16:45:4

25   coordinating commission, upon which I sit for the mayor, and             16:45:4

1   contains most of the same people, continues to have that as one    16:45:5

2   of their responsibilities in terms of efficiencies and    16:45:5

3   effectiveness to the system.    16:45:5

4        THE COURT:  Is the City willing to sit down with the    16:45:5

5   sheriff's office and meaningfully begin some plans for staffing?    16:46:0

6        MR. ROSENBERG:  Always willing.  Your Honor, we'd be    16:46:0

7   happy to take your direction on that.    16:46:1

8        THE COURT:  Thank you.    16:46:1

9        MS. COON:  Nothing further.    16:46:1

10        THE COURT:  That was helpful.    16:46:1

11            Anything else?    16:46:1

12        MR. ROSENBERG:  Your Honor, a few questions on    16:46:1

13   redirect.    16:46:2

14                    REDIRECT EXAMINATION    16:46:2

15   BY MR. ROSENBERG:    16:46:2

16   Q   Mr. Kopplin, you were asked about unnecessary expenses with    16:46:2

17   FEMA funds.  Was the kitchen built by the sheriff for $85    16:46:2

18   million that serves 25 to 50 thousand meals a day one of those    16:46:3

19   unnecessary meals?    16:46:3

20        THE COURT:  It's money spent.  I don't need to hear    16:46:4

21   anymore about the kitchen.    16:46:4

22        MR. ROSENBERG:  Okay, Your Honor.    16:46:4

23   BY MR. ROSENBERG:    16:46:4

24   Q   Is it still the City's goal to push to reduce the population    16:46:4

25   at Orleans Parish Prison?    16:46:5

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 299 of 350

Jones vs. Gusman 08.05.13 Funding Hearing                    299

1    A   Yes.                                                      16:46:5

2              And, again, Dr. Austin's projection seems           16:46:5

3    conservative and realistic.  And, collectively, to assure that   16:47:0

4    we have a high quality, well-run constitutional jail, you want   16:47:0

5    to make sure you have manageable population for all of the    16:47:0

6    reasons that we have heard in this courtroom.  And so, again,   16:47:1

7    the secret to that is reducing the population and increasing the   16:47:1

8    staffing.  That's what the experts that the City's hired say,   16:47:2

9    and that's the been the policy that the City's had long before   16:47:2

10   this case was started.  And we're continuing with that policy.   16:47:2

11   And, again, that's our public policy of the City in terms of the   16:47:3

12   council and the mayor, working with our partners in criminal   16:47:3

13   justice, the DA, the sheriff, et cetera.                      16:47:4

14   Q   So that's what I was going to ask you, Mr. Kopplin.  Before   16:47:4

15   this lawsuit was even filed in 2012, had the City been moving   16:47:4

16   toward reducing the population at OPP?                        16:47:5

17   A   Aggressively, yes, sir.                                   16:47:5

18   Q   And one other question.                                  16:47:5

19              You were asked about DOJ assistance.  Did the     16:48:0

20   Department of Justice of the United States offer the City of New   16:48:0

21   Orleans any grants or funds toward the costs of the Consent   16:48:0

22   Decree with respect to staffing or mental costs or mental health   16:48:1

23   treatment?                                                    16:48:1

24   A   No, sir.                                                  16:48:1

25              MR. ROSENBERG:  Thank you.                        16:48:1

1          Those are all the questions.  Thank you, Judge.      16:48:1

2          THE COURT:  All right, thank you.      16:48:2

3          Anything else?  Anybody?      16:48:2

4          MR. ROSENBERG:  No, Your Honor.      16:48:2

5          MS. COON:  No.      16:48:2

6          THE COURT:  All right.      16:48:2

7          Thank you, sir.  Appreciate it.      16:48:2

8          THE WITNESS:  Thank you.      16:48:2

9          THE COURT:  Any other witnesses?      16:48:3

10          MR. ROSENBERG:  Your Honor, that's what I was about to      16:48:3

11    address.  The only other open issue that Your Honor asked us to      16:48:3

12    consider was whether we could, on short notice, get some      16:48:3

13    indication directly from Secretary LeBlanc.  And I'd just ask      16:48:4

14    that, since we're close to the evening hour, that the Court      16:48:5

15    allow us a chance to do that so we can report to the Court the      16:48:5

16    first thing tomorrow morning.  But that would be the only other      16:48:5

17    witness for us.  We'll move forward with the other witnesses,      16:48:5

18    and we'll advise the Court first thing tomorrow morning.      16:49:0

19          THE COURT:  Obviously, the DOC population is an      16:49:0

20    important spoke in this wheel.      16:49:0

21          MR. ROSENBERG:  It is, Your Honor.      16:49:0

22          THE COURT:  So, to the extent I can get clarified what      16:49:1

23    the DOC position is on that, since they're not in the case, that      16:49:1

24    would be very helpful.      16:49:1

25          All right.  Well, listen, good work today.      16:49:1

Case 2:12-cv-00859-LMA-MBN    Document 544    Filed 08/20/13    Page 301 of 350
Jones vs. Gusman 08.05.13 Funding Hearing

301

1  Appreciate that.  And we will start again tomorrow at 8:30.           16:49:2

2           Who is going tomorrow?  DOJ and DLC?  How many              16:49:2

3  witnesses do you have?                                               16:49:2

4           MS. COON:  We have two experts and one fact witness.        16:49:3

5  And I would anticipate the total for direct would be three           16:49:3

6  hours.                                                               16:49:3

7           THE COURT:  And anybody after that?  Anyone else going      16:49:3

8  to have any witnesses after that?                                    16:49:4

9           MR. MATTHEWS:  No, Your Honor.                              16:49:4

10          THE COURT:  So we're going to finish by Wednesday, I        16:49:4

11 guess.                                                               16:49:4

12          MR. ROSENBERG:  I would hope to, Your Honor.  Unless        16:49:4

13 there is unexpected rebuttal witness.  But, short of that, I         16:49:4

14 think we could finish by that timeframe.                             16:49:5

15          THE COURT:  That's great.                                   16:49:5

16          And I want to meet with you all, have just a                16:49:5

17 status conference with respect to some of these other dates          16:50:0

18 coming up and that sort of thing.  So we can make sure that, if      16:50:0

19 we can, be ready for the September 30th.  But we talk about that     16:50:0

20 tomorrow.  Why don't you all think about that and discuss that       16:50:1

21 then.                                                                16:50:1

22          Thanks for your work today.  Appreciate it.  We'll         16:50:1

23 be in recess.                                                        16:50:1

24          (4:50 p.m., proceedings concluded.)                         16:50:5

25

CERTIFICATE


        I, Susan A. Zielie, Official Court Reporter, do hereby
certify that the foregoing transcript is correct.



                              /S/ SUSAN A. ZIELIE, FCRR
                              _____
                                Susan A. Zielie, FCRR

## $

**$10** [2] - 188:5, 230:21
**$10.18** [1] - 134:13
**$10.36** [2] - 133:24, 134:5
**$100** [7] - 110:14, 218:19, 219:3, 220:4, 220:6, 220:11, 278:12
**$11** [1] - 68:5
**$110** [1] - 213:20
**$12** [1] - 148:4
**$135** [1] - 257:1
**$14.50** [1] - 148:20
**$15** [1] - 273:9
**$16** [3] - 20:10, 219:8, 273:2
**$168,750** [1] - 256:22
**$18** [4] - 110:15, 150:20, 217:14, 217:20
**$195** [1] - 115:23
**$2,500** [1] - 143:7
**$2.70** [1] - 225:24
**$20** [3] - 213:3, 213:5, 248:2
**$200** [1] - 223:20
**$21** [6] - 10:18, 34:18, 64:21, 65:5, 66:13, 67:9
**$22** [2] - 20:9, 265:23
**$225** [3] - 115:12, 115:25, 116:4
**$23** [3] - 13:17, 245:18, 245:21
**$230** [1] - 150:21
**$231,000** [1] - 115:15
**$26** [13] - 56:20, 56:21, 58:1, 189:11, 189:13, 206:21, 216:19, 217:17, 218:3, 245:15, 247:16, 248:20, 264:7
**$27** [1] - 66:17
**$28** [2] - 36:24, 65:1
**$3,000** [2] - 143:8, 143:10
**$30** [1] - 17:24
**$300** [1] - 257:5
**$35,000** [1] - 37:11
**$36** [10] - 11:8, 36:17, 36:20, 36:25, 37:5, 37:6, 37:7, 37:9, 247:16
**$4.18** [1] - 224:22
**$40** [1] - 278:22
**$45** [4] - 207:2, 216:17, 247:21,

264:6
**$46** [1] - 248:8
**$47** [2] - 134:10, 216:12
**$5,000** [4] - 10:19, 41:17, 45:6, 279:20
**$50** [3] - 218:4, 219:8, 272:24
**$500** [1] - 34:21
**$52** [1] - 273:4
**$55** [1] - 143:2
**$57** [1] - 25:15
**$6.16** [1] - 134:12
**$60** [1] - 63:18
**$60,000** [1] - 41:11
**$61** [2] - 25:13, 287:24
**$64** [1] - 218:15
**$65** [1] - 207:4
**$65,000** [1] - 231:2
**$7,588,746** [1] - 145:19
**$70** [1] - 213:11
**$70,000** [2] - 44:8, 258:3
**$75,000** [1] - 213:22
**$79** [3] - 14:10, 216:11, 218:3
**$8** [2] - 133:22, 206:22
**$8.54** [2] - 133:24, 134:14
**$800** [2] - 226:3, 226:6
**$85** [1] - 298:17
**$9.69** [4] - 10:17, 23:10, 33:19, 34:17

## '

**'11** [1] - 28:4
**'12** [3] - 31:22, 67:7, 72:3
**'14** [1] - 49:19

## /

**/S** [1] - 303:6

## 1

**1** [5] - 24:19, 35:12, 68:22, 143:23, 271:3
**1,136** [2] - 235:14, 237:1
**1,200** [1] - 210:17
**1,314** [1] - 205:16
**1,377** [2] - 237:4, 237:15
**1,400** [1] - 266:10
**1,420** [1] - 205:15
**1,500** [5] - 59:24, 114:25, 115:4,

133:23, 171:22
**1,500-ish** [1] - 134:4
**1,521** [3] - 59:23, 61:18, 62:13
**1,583** [1] - 198:21
**1,600** [7] - 24:5, 226:2, 259:11, 261:8, 265:13, 265:15, 265:17
**1,650** [2] - 16:10, 16:13
**1,790** [5] - 53:7, 54:1, 54:9, 59:16, 235:16
**1.25** [1] - 267:22
**1.4** [1] - 261:22
**1.8** [3] - 262:19, 262:23, 263:6
**10** [5] - 43:15, 131:9, 199:10, 211:15, 295:18
**100** [12] - 14:8, 53:22, 54:11, 54:19, 55:21, 60:6, 201:2, 269:17, 285:21, 294:9, 294:13, 296:14
**100,000** [1] - 209:5
**101** [1] - 274:9
**103** [1] - 3:9
**10:40** [1] - 102:24
**11** [6] - 62:15, 67:25, 136:25, 137:2, 185:9, 278:19
**110** [2] - 35:13, 46:14
**111** [1] - 124:8
**115** [1] - 238:21
**117** [2] - 79:19, 79:20
**11:30** [2] - 102:25, 129:22
**11th** [3] - 59:22, 61:21, 62:11
**12** [10] - 24:22, 30:4, 35:15, 46:11, 47:24, 68:3, 72:5, 250:23, 269:23, 295:18
**12-859** [2] - 1:9, 4:5
**120** [2] - 269:14, 269:15
**122** [2] - 62:18, 62:21
**12:30** [2] - 129:6, 130:2
**12th** [1] - 46:15
**13** [8] - 137:18, 138:2, 140:15, 147:21, 151:19, 151:22, 151:23, 169:20
**130** [6] - 3:9, 10:10, 25:22, 244:1, 269:14, 269:15
**135** [5] - 207:17, 229:15, 250:3,

262:22, 264:19
**14** [4] - 35:21, 140:22, 147:21, 154:2
**145** [1] - 3:10
**14th** [1] - 154:10
**15** [7] - 43:15, 105:8, 134:2, 199:10, 223:21, 224:4, 273:1
**150** [1] - 269:17
**152** [1] - 235:14
**156** [1] - 3:10
**15th** [1] - 46:14
**16** [4] - 3:3, 105:8, 113:4, 294:21
**161** [1] - 3:12
**17** [3] - 217:14, 238:1, 294:21
**171** [2] - 3:13, 191:8
**175** [3] - 198:16, 269:18, 295:15
**178** [2] - 60:19, 60:20
**18** [4] - 110:15, 210:4, 210:8, 238:1
**19** [1] - 240:17
**190** [1] - 54:20
**1940** [1] - 183:7
**1950** [1] - 183:7
**198** [1] - 55:3
**1990s** [2] - 166:20, 167:17
**1996** [1] - 107:13
**1997** [1] - 163:5
**1998** [3] - 13:2, 133:22, 134:1
**1st** [8] - 37:20, 40:21, 141:4, 141:21, 142:2, 142:15, 142:24, 290:18

## 2

**2** [4] - 108:19, 190:4, 190:10, 197:5
**2,000** [1] - 24:4
**2,273** [1] - 191:4
**2,400** [17] - 92:11, 96:12, 96:13, 115:15, 210:16, 210:21, 213:2, 218:16, 220:6, 227:24, 228:7, 228:13, 242:21, 264:6, 265:16, 265:18, 265:22
**2,435** [1] - 117:13
**2,450** [1] - 132:20
**2,500** [2] - 114:25, 115:5
**2,540** [1] - 145:20
**2,825** [1] - 96:11

**2.6** [1] - 263:10
**20** [8] - 32:14, 51:8, 51:20, 107:21, 123:25, 255:13, 256:10, 272:16
**200** [4] - 20:16, 54:20, 210:15, 229:17
**2000** [4] - 105:1, 105:13, 135:22, 171:21
**2001** [1] - 133:20
**2002** [1] - 171:15
**2003** [2] - 109:11, 176:20
**2004** [2] - 104:21, 105:15
**2006** [3] - 78:20, 105:1, 123:3
**2009** [1] - 278:22
**2010** [10] - 20:5, 20:7, 168:5, 168:14, 181:20, 182:21, 278:11, 292:11, 295:21, 297:16
**2011** [5] - 69:25, 101:2, 134:4, 134:5, 297:16
**2012** [10] - 10:1, 32:21, 89:14, 92:5, 95:8, 95:13, 95:14, 101:4, 297:16, 299:15
**2013** [26] - 1:10, 4:1, 5:3, 6:20, 13:24, 24:20, 47:6, 101:13, 102:4, 102:7, 126:22, 145:6, 179:16, 179:17, 180:2, 180:16, 181:25, 191:2, 234:8, 235:23, 236:11, 237:10, 271:1, 271:5, 271:6, 282:3
**2014** [13] - 6:16, 38:20, 101:14, 102:4, 152:17, 199:6, 200:18, 205:9, 206:5, 207:13, 208:22, 222:10, 241:15
**21** [2] - 3:3, 182:13
**22** [4] - 9:14, 81:7, 185:8, 294:19
**22.5** [1] - 284:25
**220** [1] - 209:5
**223** [1] - 3:12
**23** [2] - 146:5, 294:19
**233** [1] - 3:13
**237** [1] - 191:12
**24** [6] - 87:13, 87:24,

87:25, 88:7, 119:13
**24-hour** [2] - 118:19, 120:1
**24-hours** [5] - 110:4, 119:19, 120:8, 285:18
**24/7** [1] - 30:3
**249** [1] - 3:13
**25** [2] - 163:9, 298:18
**25th** [1] - 272:13
**26** [2] - 5:3, 64:19
**27** [4] - 3:5, 108:21, 111:15, 153:25
**270** [1] - 3:12
**276** [1] - 3:15
**28** [9] - 28:12, 47:23, 64:19, 81:16, 95:3, 99:8, 150:15, 189:4, 282:3
**286** [1] - 3:15
**298** [1] - 3:15

## 3

**3** [14] - 19:19, 35:19, 114:21, 117:22, 117:23, 127:15, 135:17, 136:21, 193:6, 197:5, 197:13, 197:16, 234:5, 267:9
**3,200** [1] - 181:21
**3.2** [2] - 12:18, 13:22
**3.6** [1] - 20:8
**30** [23] - 6:20, 33:17, 33:20, 34:4, 43:16, 55:18, 74:4, 78:13, 78:15, 98:16, 101:7, 123:24, 150:15, 182:12, 182:14, 186:6, 187:5, 193:10, 200:23, 200:24, 201:1, 230:20, 275:23
**300** [1] - 22:16
**30th** [7] - 47:5, 74:16, 75:11, 237:11, 291:7, 291:23, 301:19
**31** [1] - 235:23
**31st** [11] - 7:7, 47:6, 53:6, 53:22, 54:15, 59:18, 59:19, 102:7, 200:18, 235:16, 236:15
**32** [1] - 32:18
**330** [1] - 9:23
**35** [2] - 28:10, 197:10
**350** [2] - 118:13, 266:10

**36** [2] - 36:23, 247:14
**361** [1] - 89:21
**37** [1] - 124:6
**380,000** [1] - 16:19
**381** [1] - 89:21
**385** [3] - 22:16, 22:21, 31:23
**390** [1] - 31:23

## 4

**4** [8] - 35:19, 117:21, 118:1, 118:11, 118:13, 118:15, 197:5, 281:11
**4,000** [1] - 133:23
**4,300** [1] - 251:15
**4.2** [1] - 263:12
**4.4** [2] - 261:19, 265:10
**40** [6] - 139:7, 182:14, 229:17, 251:13, 251:15, 256:10
**40-hour** [1] - 45:2
**400** [1] - 285:15
**406** [1] - 1:21
**408** [1] - 191:15
**41** [1] - 98:14
**420** [1] - 89:19
**44** [1] - 216:17
**440** [3] - 9:21, 31:13, 31:23
**445** [1] - 251:15
**45** [2] - 208:21, 216:12
**450** [1] - 263:24
**474** [2] - 198:2, 261:14
**48** [5] - 86:19, 86:24, 87:12, 87:23, 91:1
**4:50** [1] - 301:24
**4th** [1] - 74:20
**4x4s** [1] - 131:13

## 5

**5** [29] - 1:10, 4:1, 41:15, 119:16, 205:7, 205:20, 208:22, 208:24, 209:13, 210:1, 210:22, 242:23, 244:7, 244:9, 244:14, 244:21, 245:5, 249:25, 253:11, 253:13, 258:20, 266:3, 269:11, 269:13, 269:21, 281:11
**5.8** [2] - 261:13, 263:9
**50** [1] - 16:13, 63:18, 148:6, 185:9,

185:11, 197:5, 217:10, 229:17, 248:20, 298:18
**500** [3] - 1:21, 96:16, 250:12
**503** [1] - 54:16
**504.589.7781** [1] - 1:23
**52** [1] - 272:18
**543** [1] - 249:24
**542** [2] - 191:6, 195:20
**55,045** [1] - 112:24
**56** [1] - 3:6
**5:00** [1] - 223:2

## 6

**6** [8] - 51:12, 65:7, 66:15, 115:18, 121:2, 124:10, 188:6, 209:7
**6,000** [1] - 292:13
**60** [15] - 11:12, 37:22, 38:2, 38:15, 52:21, 54:7, 64:11, 64:14, 187:5, 229:17, 243:2, 243:6, 272:1, 294:6, 294:12
**626** [1] - 191:7
**628** [1] - 195:21
**64** [1] - 154:21
**65** [6] - 10:2, 96:17, 139:7, 213:11, 213:22, 216:8
**68** [1] - 134:10
**6th** [2] - 7:7, 21:18

## 7

**7** [13] - 14:16, 127:24, 149:25, 213:7, 214:10, 216:7, 218:6, 265:8, 265:19, 265:20, 265:21, 267:24, 268:20
**7,000** [1] - 41:17
**7.1** [2] - 212:14, 213:1
**7.5** [1] - 211:14
**700** [1] - 22:20
**70130** [1] - 1:22
**711** [1] - 267:14
**75** [5] - 45:13, 54:18, 55:9, 96:17, 248:20
**76** [1] - 284:19
**78** [2] - 191:7, 195:20

## 8

**8** [11] - 3:2, 41:16,

59:2, 118:1, 118:10, 118:13, 118:15, 215:24, 216:2, 216:3, 217:7
**8,000** [1] - 41:17
**80** [4] - 3:5, 3:7, 184:12, 199:1
**800** [4] - 22:20, 181:22, 209:7, 239:4
**80s** [1] - 48:8
**81** [2] - 129:17, 177:22
**82** [2] - 129:18, 267:8
**83** [1] - 253:2
**85** [1] - 251:16
**8:30** [3] - 4:2, 6:20, 301:1

## 9

**9** [1] - 267:14
**9.69** [2] - 34:7, 67:24
**90** [6] - 45:17, 46:13, 52:21, 60:6, 184:12, 224:1
**90-day** [1] - 215:2
**90-hour** [3] - 35:11, 35:14, 35:17
**90-hours** [1] - 35:22
**900** [3] - 239:4, 272:24, 273:7
**929** [1] - 108:22
**943** [1] - 109:17
**944** [1] - 145:4
**95** [1] - 3:8
**96** [2] - 45:15, 130:8
**98** [1] - 53:22
**982** [1] - 189:5
**996** [2] - 85:9, 88:19

## A

**A-U-S-T-I-N** [1] - 161:13
**a.m** [3] - 6:20, 129:22, 135:17
**A.M** [1] - 4:2
**A3** [2] - 85:17, 90:17
**ability** [4] - 210:7, 286:5, 287:18, 296:16
**able** [43] - 11:2, 11:9, 12:3, 12:9, 12:12, 25:7, 30:21, 33:1, 33:15, 34:23, 35:1, 35:2, 35:24, 36:18, 37:17, 37:25, 38:7, 44:6, 45:3, 49:24, 50:19, 52:17, 62:4, 75:20, 83:10, 126:1, 127:18, 135:7,

148:16, 149:21, 155:18, 157:25, 181:22, 205:12, 205:24, 210:11, 244:20, 248:12, 259:7, 274:4, 285:21, 286:11, 290:12
**aboard** [1] - 224:19
**absence** [1] - 7:23
**absent** [1] - 181:25
**absolute** [2] - 133:11, 133:15
**absolutely** [10] - 25:16, 121:23, 127:20, 159:23, 174:23, 232:23, 248:14, 266:23, 267:3, 274:18
**absorb** [4] - 97:14, 97:18, 149:21, 217:25
**abuse** [2] - 125:21, 172:20
**abysmal** [1] - 274:13
**ACA** [3] - 12:14, 44:23, 105:25
**academic** [1] - 130:12
**academy** [5] - 34:10, 46:3, 46:9, 46:16, 93:20
**accelerate** [1] - 19:4
**accept** [3] - 99:16, 175:5, 199:24
**acceptable** [2] - 41:4, 232:21
**accepted** [7] - 106:15, 106:16, 174:13, 174:17, 177:2, 177:3, 211:14
**accepting** [1] - 17:21
**access** [3] - 231:18, 287:5, 287:24
**accomplished** [1] - 24:6
**accomplishments** [1] - 168:20
**according** [6] - 39:4, 42:4, 196:9, 200:25, 224:20, 261:12
**accordingly** [1] - 174:6
**account** [16] - 20:21, 29:6, 77:8, 77:11, 124:6, 124:20, 211:3, 235:10, 253:23, 254:10, 254:25, 259:2, 279:1, 279:2, 279:3, 279:6

accountability [1] - 23:15
accounting [2] - 20:22, 26:4
accounts [1] - 110:10
accreditation [1] - 105:25
accurate [5] - 134:24, 136:17, 151:11, 155:16, 247:21
accurately [1] - 60:3
achieve [7] - 22:24, 180:15, 212:16, 221:14, 292:9, 295:24, 296:16
achieved [1] - 19:3
achieving [1] - 286:25
Act [1] - 45:9
action [2] - 25:11, 294:22
actions [1] - 24:7
active [1] - 121:11
activities [7] - 21:6, 91:24, 126:15, 131:6, 220:19, 271:25, 296:3
actual [7] - 141:5, 165:12, 216:15, 230:4, 266:15, 270:3, 281:5
actuality [1] - 154:15
Acuri [4] - 3:5, 3:7, 3:13, 73:7
ACURI [73] - 4:20, 8:23, 14:25, 26:24, 27:12, 27:20, 30:8, 30:20, 31:4, 31:21, 33:14, 34:16, 35:9, 37:16, 38:24, 39:13, 41:7, 42:15, 44:17, 47:15, 49:22, 50:18, 50:25, 53:1, 53:19, 54:3, 54:13, 56:3, 56:5, 72:19, 73:3, 73:13, 75:5, 75:24, 79:16, 79:22, 80:1, 80:10, 80:14, 80:23, 85:8, 88:17, 89:5, 90:16, 92:2, 93:4, 93:21, 94:16, 94:23, 98:4, 99:20, 100:4, 100:18, 102:21, 112:12, 233:19, 235:11, 236:10, 236:16, 236:21, 237:22, 238:4, 240:2, 240:6, 240:11, 241:1, 242:2, 243:9, 245:13, 246:14,
249:1, 249:20, 291:1
acute [5] - 59:8, 59:10, 59:13, 269:16
add [18] - 25:7, 48:9, 69:5, 90:1, 125:15, 145:18, 170:8, 184:11, 206:19, 212:12, 229:24, 236:22, 256:12, 262:25, 263:4, 268:10, 274:19
add-on [1] - 90:1
added [2] - 62:21, 145:11
adding [3] - 115:18, 262:22, 283:12
addition [11] - 17:24, 26:7, 54:9, 54:11, 105:4, 110:16, 118:21, 131:11, 135:21, 232:22, 242:23
additional [53] - 5:24, 6:2, 9:23, 10:10, 10:19, 11:12, 11:14, 12:1, 12:15, 13:4, 17:1, 17:6, 20:23, 21:9, 41:22, 44:4, 44:13, 59:5, 59:6, 65:7, 88:14, 91:17, 98:16, 107:19, 110:14, 123:17, 125:15, 128:7, 137:18, 137:19, 138:3, 140:9, 140:15, 152:13, 157:13, 161:3, 188:6, 196:20, 198:11, 199:6, 207:14, 213:5, 234:11, 240:12, 250:7, 253:17, 256:12, 260:12, 263:21, 264:19, 265:9, 284:23, 295:24
additions [1] - 178:23
address [5] - 5:19, 6:20, 10:9, 18:23, 23:16, 24:17, 26:1, 68:22, 154:21, 154:24, 157:11, 181:12, 210:24, 226:17, 232:12, 300:11
addressed [9] - 23:21, 23:23, 42:4, 42:9, 49:7, 100:17, 128:4, 271:2
addressing [1] - 25:19

adds [1] - 274:6
adequacy [1] - 128:13
adequate [6] - 22:24, 30:12, 133:9, 245:20, 268:25, 269:1
adequately [4] - 12:9, 132:8, 187:13, 199:25
adjoining [2] - 37:14, 114:15
adjust [2] - 127:18, 156:4
adjustment [2] - 78:13, 187:8
adjustments [4] - 71:15, 186:4, 230:3
administration [6] - 90:5, 90:15, 114:23, 143:25, 279:13, 280:15
administrative [16] - 17:7, 32:16, 32:19, 84:22, 90:4, 97:3, 97:18, 109:23, 116:7, 117:3, 128:6, 148:24, 166:5, 212:13, 269:3
administrator [26] - 75:9, 75:19, 116:5, 116:10, 116:13, 155:21, 180:21, 180:25, 181:9, 207:24, 213:25, 214:1, 215:17, 230:6, 230:9, 231:17, 231:22, 231:24, 232:22, 233:5, 256:16, 256:19, 256:20, 274:16, 275:1
administrators [1] - 200:13
admission [1] - 112:8
admitted [11] - 79:23, 79:24, 111:21, 111:24, 111:25, 112:15, 112:16, 129:15, 129:20, 176:12, 292:25
ads [2] - 36:1, 36:9
adult [1] - 164:8
adults [4] - 193:10, 193:16, 193:25, 211:7
advance [2] - 51:3, 290:1
advanced [1] - 93:20
advantage [2] - 78:4, 286:13

advertise [2] - 11:5, 36:6
advertisements [1] - 11:5
advertising [3] - 151:20, 152:19, 181:8
advice [3] - 170:6, 173:4, 278:5
advise [3] - 27:7, 232:17, 300:18
advised [2] - 286:13
advisory [1] - 232:7
Advocate [1] - 36:2
advocate [1] - 230:11
affairs [1] - 40:24
affect [6] - 18:23, 155:8, 159:2, 168:12, 220:1, 281:10
affected [2] - 19:23, 234:15
affects [2] - 291:19, 291:20
affirmed [1] - 165:3
afford [1] - 46:10
affordable [1] - 247:10
afforded [1] - 223:13
Africk [3] - 161:20, 164:23, 221:4
AFRICK [1] - 1:15
AFTERNOON [1] - 130:1
afternoon [5] - 159:15, 160:6, 161:16, 161:17, 233:22
agencies [12] - 28:11, 37:7, 37:13, 93:1, 161:23, 186:20, 231:8, 252:16, 257:19, 258:12, 280:15
agency [2] - 164:9, 187:23
agent [2] - 30:1, 43:2
aggressive [1] - 11:4
aggressively [2] - 38:6, 299:17
aggressors [1] - 22:12
aging [1] - 285:22
ago [26] - 12:19, 20:16, 32:15, 35:19, 36:11, 45:25, 50:6, 62:17, 67:24, 74:17, 74:21, 92:25, 95:7, 95:15, 95:21, 96:10, 156:3, 166:3, 166:4, 234:1, 261:10, 291:11, 291:13,

291:17, 297:2
agree [30] - 12:7, 24:15, 26:4, 26:9, 26:11, 58:5, 59:25, 112:9, 112:10, 123:5, 132:24, 159:23, 186:5, 200:9, 200:10, 201:20, 201:25, 202:11, 202:15, 203:15, 240:7, 240:12, 241:2, 241:12, 244:1, 247:25, 260:18, 267:17, 290:23
agreed [6] - 6:14, 10:10, 17:13, 112:3, 200:13, 207:21, 246:2, 246:9, 292:12, 297:1
agreeing [2] - 169:12, 205:22
agreement [6] - 5:4, 63:13, 78:19, 100:19, 203:7, 232:18
agreements [1] - 166:15
agrees [3] - 13:7, 159:16, 214:19
ahead [18] - 16:5, 31:3, 31:20, 33:13, 47:13, 50:22, 52:1, 56:2, 73:20, 92:1, 98:5, 167:7, 194:25, 200:1, 230:12, 242:11, 262:9, 292:1
aided [1] - 1:25
Air [2] - 104:14, 106:7
al [3] - 1:7, 4:6
Alabama [6] - 225:23, 249:3, 249:5, 249:7, 249:8, 249:12
alcohol [3] - 108:3, 125:21, 138:23
alecky [1] - 275:15
Alexandre [1] - 20:14
alive [1] - 100:10
alleviate [1] - 121:21
allocate [1] - 20:25
allocated [2] - 25:4, 255:13
allocation [2] - 16:23, 228:22
allow [8] - 175:19, 175:23, 180:17, 229:11, 236:4, 248:24, 289:10, 300:15
allowable [1] - 250:6

**allowed** [4] - 13:13, 145:9, 199:20, 216:21
**allowing** [1] - 167:15
**allows** [2] - 58:23, 287:16
**alluded** [1] - 222:14
**allusion** [1] - 273:18
**almost** [13] - 11:23, 18:11, 86:19, 102:24, 107:10, 124:15, 150:4, 182:16, 242:15, 248:11, 251:13, 255:7, 260:14
**alone** [2] - 88:16, 219:23
**alternate** [1] - 289:11
**alternative** [3] - 47:1, 51:11, 178:18
**alternatives** [1] - 168:11
**Ambruster** [1] - 228:11
**Ambruster's** [2] - 66:10, 228:4
**Ambulance** [1] - 135:23
**ambulance** [1] - 145:15
**amenable** [1] - 283:1
**America** [2] - 5:6, 5:20
**American** [8] - 29:21, 36:8, 44:21, 44:23, 45:7, 50:6, 52:22
**amount** [21] - 6:11, 17:11, 24:1, 63:17, 64:6, 110:10, 112:23, 122:25, 124:5, 139:1, 150:20, 220:1, 263:18, 264:10, 277:18, 277:22, 277:23, 278:1, 278:10, 282:4, 289:13
**amounts** [6] - 151:4, 277:9, 277:10, 277:12, 277:13, 287:21
**analogy** [1] - 217:2
**analyses** [1] - 22:18
**analysis** [16] - 13:7, 137:9, 188:12, 199:10, 214:3, 242:12, 242:17, 242:24, 253:3, 258:6, 258:22, 259:10, 284:4, 296:22, 297:2, 297:3

**ancillary** [4] - 110:12, 110:19, 117:3, 128:10
**ANDERSON** [1] - 1:5
**ANDREW** [1] - 276:6
**ANDY** [1] - 3:14
**Andy** [1] - 276:10
**Angeles** [2] - 136:6, 213:18
**animal** [1] - 94:11
**annual** [7] - 93:15, 124:1, 124:12, 124:13, 124:19, 145:4, 261:13
**answer** [10] - 16:3, 57:3, 71:14, 159:3, 174:16, 175:24, 214:7, 236:5, 272:5, 272:8
**answer's** [1] - 157:19
**answered** [2] - 126:24, 281:2
**answering** [1] - 128:14
**answers** [3] - 49:7, 127:14, 202:18
**ANTHONY** [1] - 1:5
**anticipate** [5] - 38:18, 40:20, 122:23, 275:21, 301:5
**anticipation** [1] - 177:20
**anxious** [2] - 75:12, 75:15
**anyway** [2] - 132:1, 237:8
**apart** [2] - 172:23, 254:21
**apologize** [5] - 50:11, 101:24, 144:6, 160:19, 216:11
**apparent** [1] - 18:1
**appeal** [2] - 7:11, 16:2
**Appeal** [3] - 7:7, 7:10, 7:19
**appealed** [1] - 165:3
**Appeals'** [1] - 4:25
**appear** [7] - 10:10, 13:9, 40:12, 103:17, 183:24, 184:14, 246:11
**appearance** [1] - 4:8
**APPEARANCES** [1] - 2:1
**appearing** [1] - 195:17
**appellate** [2] - 15:18, 281:7
**appended** [1] - 167:22
**apples** [2] - 217:3, 245:24

**applicant** [1] - 271:15
**applicants** [4] - 271:14, 271:24, 271:25, 272:3
**applications** [1] - 224:15
**applied** [5] - 211:22, 267:19, 286:25, 287:5, 290:14
**apply** [5] - 15:2, 134:11, 209:6, 239:16, 269:10
**applying** [1] - 150:11
**appointed** [6] - 6:17, 164:4, 166:11, 166:16, 166:22, 292:14
**appointment** [1] - 18:7
**appointments** [1] - 117:4
**appreciate** [7] - 102:22, 161:1, 275:6, 275:9, 300:7, 301:1, 301:22
**approach** [8] - 6:14, 19:10, 60:15, 178:18, 188:11, 246:13, 253:5, 267:4
**approaching** [1] - 248:11
**appropriate** [12] - 16:23, 115:8, 115:20, 123:7, 124:2, 126:15, 176:11, 187:8, 212:4, 248:4, 269:5, 296:18
**approval** [1] - 40:1
**approve** [2] - 21:12, 279:20
**approved** [5] - 40:23, 42:14, 82:20, 164:3, 189:22
**approving** [2] - 5:4, 42:5
**approximate** [1] - 24:1
**April** [4] - 18:4, 26:25, 191:2, 274:12
**Arcadian** [1] - 135:23
**archaic** [2] - 39:18, 48:9
**architect** [2] - 69:25, 211:13
**architects** [3] - 71:13, 258:23
**ARCURI** [1] - 2:11
**Arcuri** [2] - 4:20, 233:20
**area** [22] - 32:11, 36:5,

37:3, 114:15, 115:24, 121:12, 122:3, 146:25, 162:17, 165:22, 172:10, 175:10, 175:11, 175:18, 177:2, 221:15, 224:24, 239:7, 282:24, 282:25
**areas** [9] - 103:20, 107:24, 108:7, 172:13, 221:4, 222:23, 222:24, 222:25, 270:1
**argue** [5] - 70:16, 191:24, 227:10, 227:19
**argues** [2] - 24:3, 26:3
**arguing** [2] - 4:25, 15:14
**argument** [8] - 4:25, 14:1, 14:3, 14:16, 24:9, 155:4, 262:5, 281:19
**arguments** [1] - 281:15
**arm** [2] - 49:15, 296:25
**Armbruster** [2] - 103:7, 159:12
**armed** [1] - 86:3
**arrest** [4] - 121:9, 182:10, 292:21, 293:19
**arrested** [5] - 138:10, 182:4, 184:13, 196:12, 252:11
**arrestees** [3] - 121:4, 121:7, 141:7
**arresting** [1] - 138:19
**arrests** [9] - 182:5, 182:7, 183:24, 185:15, 209:8, 238:8, 252:13, 295:9
**arrive** [1] - 200:20
**arrived** [1] - 175:17
**Art** [1] - 50:8
**art** [3] - 40:7, 209:1, 209:15
**artfully** [1] - 173:2
**article** [1] - 12:23
**ASAP** [1] - 158:23
**aside** [4] - 124:19, 124:20, 257:16, 295:25
**assault** [2] - 22:9, 215:12
**assaults** [1] - 215:12
**asserted** [1] - 5:14
**assessed** [1] - 212:4
**assessment** [8] -

125:17, 162:6, 180:4, 183:20, 267:10, 267:17, 294:7, 295:9
**assigned** [12] - 32:2, 32:4, 43:14, 81:23, 84:21, 84:24, 85:20, 85:22, 85:23, 89:9, 93:6, 268:22
**assist** [4] - 6:17, 23:6, 29:23, 105:3
**assistance** [1] - 299:19
**assistant** [8] - 9:13, 43:24, 45:10, 81:3, 81:12, 82:16, 91:16, 118:14
**assistants** [6] - 110:1, 110:9, 119:6, 121:17, 123:22, 148:22
**associate** [2] - 83:3, 83:9
**associated** [5] - 6:6, 10:14, 12:2, 14:9, 46:1
**associates** [2] - 216:15, 244:17
**Association** [8] - 29:22, 36:8, 44:21, 44:23, 45:7, 50:7, 52:23
**assume** [6] - 24:18, 30:23, 200:9, 256:9, 268:8, 290:24
**assumed** [1] - 254:13
**assuming** [3] - 223:22, 257:16, 257:22
**assumption** [1] - 254:17
**assumptions** [2] - 229:1, 265:23
**assure** [3] - 151:6, 284:2, 299:3
**astronomical** [2] - 143:24, 220:7
**AT** [1] - 1:3
**atrocious** [1] - 25:6
**attached** [2] - 168:20, 172:8
**attacked** [2] - 87:9, 87:11
**attempt** [3] - 39:1, 102:12, 208:3
**attempting** [2] - 45:21, 200:17
**attend** [1] - 71:14
**attendance** [2] - 169:2, 209:18

**B**

**B3** [1] - 85:23
**B4** [4] - 85:25, 86:14, 86:16, 96:6
**bachelor's** [1] - 162:13
**back-end** [3] - 227:12, 228:1, 288:20
**background** [7] - 152:20, 162:11, 169:6, 181:20, 190:16, 197:2, 276:18
**backup** [3] - 88:11, 110:4, 136:9
**backyard** [1] - 18:17
**bad** [1] - 8:1
**bail** [1] - 183:6
**balance** [4] - 16:23, 278:12, 279:1, 279:7
**balanced** [3] - 279:13, 279:15, 280:17
**ballpark** [1] - 287:25
**bank** [5] - 247:11, 278:25, 279:2, 279:3, 279:6
**Baptist** [1] - 284:16
**bare** [3] - 133:11, 133:15, 279:18
**bars** [1] - 76:25
**base** [5] - 11:8, 41:19, 78:12, 230:15, 251:15
**based** [37] - 24:4, 29:2, 35:7, 65:14, 110:1, 114:2, 114:4, 117:10, 117:12, 124:12, 124:13, 137:22, 138:5, 140:2, 140:3, 150:18, 154:7, 156:4, 157:16, 176:17, 178:17, 180:4, 194:21, 197:19, 199:23, 218:15, 228:6, 236:12, 242:21, 243:24, 256:20, 259:10, 261:8, 262:1, 262:15, 273:4, 275:17
**bases** [2] - 36:12, 38:7
**basic** [5] - 22:3, 83:5, 179:24, 180:24, 215:8
**basing** [1] - 234:18
**basis** [12] - 36:25, 56:19, 57:6, 58:2, 63:10, 64:11, 91:25,

108:1, 118:4, 208:4, 269:8, 295:20
**batch** [1] - 51:22
**Bate** [2] - 85:9, 189:5
**Bate's** [3] - 108:21, 109:17, 145:4
**Bates** [1] - 147:9
**Baton** [1] - 182:3
**bear** [2] - 124:23, 134:16
**bearing** [1] - 140:7
**became** [2] - 62:18, 141:5
**become** [6] - 10:18, 10:24, 138:11, 181:8, 211:12, 274:25
**becomes** [1] - 206:17
**bed** [10] - 77:7, 83:5, 91:1, 114:25, 115:15, 132:20, 134:4, 173:16, 210:17, 250:12
**bedding** [1] - 94:10
**beds** [13] - 86:19, 133:23, 197:25, 198:1, 210:15, 211:18, 211:19, 211:23, 211:24, 211:25, 239:4, 292:13
**beep** [1] - 43:18
**BEFORE** [1] - 1:15
**began** [1] - 142:24
**begin** [13] - 7:3, 7:4, 8:22, 10:7, 11:7, 26:22, 28:19, 50:2, 152:24, 158:15, 158:23, 264:2, 298:5
**begun** [1] - 141:21
**behalf** [7] - 1:7, 4:11, 4:13, 4:15, 4:22, 4:25, 280:16
**belabor** [2] - 15:23, 117:19
**believes** [2] - 16:10, 18:16
**bell** [1] - 287:25
**belongs** [1] - 20:21
**below** [3] - 68:12, 121:14, 218:18
**benchmark** [2] - 215:10, 229:24
**beneath** [1] - 115:20
**benefit** [5] - 78:15, 168:20, 227:7, 227:10, 293:3
**benefits** [12] - 34:4, 78:12, 78:14, 110:16, 145:11,

150:16, 151:4, 223:14, 223:16, 259:2, 260:16
**Bernard** [6] - 37:11, 66:8, 67:14, 67:16, 68:1, 68:4
**best** [12] - 17:12, 25:20, 29:14, 51:10, 194:2, 209:22, 246:13, 263:3, 264:21, 265:20, 289:18, 297:22
**best-case** [1] - 25:20
**bet** [1] - 230:20
**better** [20] - 11:2, 26:3, 83:18, 92:24, 149:24, 188:8, 202:17, 247:9, 247:11, 247:17, 257:21, 274:20, 275:4, 279:16, 286:1, 286:2, 290:7, 291:25
**between** [17] - 5:4, 20:3, 22:20, 67:19, 84:8, 123:12, 136:19, 140:14, 201:1, 202:23, 203:7, 218:3, 226:1, 229:5, 229:16, 261:21, 273:16
**beyond** [5] - 22:16, 107:20, 150:10, 280:20, 282:5
**bid** [4] - 11:20, 11:22, 40:5, 49:13
**bidder** [2] - 11:23, 40:6
**big** [24] - 48:9, 113:8, 128:11, 173:17, 179:8, 182:11, 182:24, 183:7, 184:17, 184:24, 186:18, 199:15, 207:7, 213:4, 221:7, 225:10, 227:16, 227:20, 229:24, 231:5, 252:3, 256:7, 266:11, 294:2
**bigger** [3] - 183:9, 286:10, 289:25
**biggest** [3] - 216:14, 221:13, 295:6
**bill** [4] - 54:22, 58:23, 61:5, 143:23
**billets** [2] - 140:16, 140:21
**billing** [2] - 60:24, 237:8
**billions** [1] - 278:15

**attendant** [1] - 168:24
**attention** [1] - 128:17
**Attorney** [1] - 2:5
**attorney** [1] - 252:5
**Attorney's** [2] - 2:17, 28:15
**attorneys** [3] - 153:14, 153:15, 271:12
**attract** [6] - 10:23, 11:8, 11:10, 35:1, 35:5, 230:13
**attractive** [1] - 186:3
**attrition** [2] - 33:3, 33:22
**auditor** [2] - 20:5, 20:6
**audits** [2] - 191:20, 191:22
**August** [13] - 1:10, 46:14, 46:15, 81:19, 89:14, 92:4, 95:8, 95:13, 95:14, 95:15, 152:22, 242:14, 290:18
**AUGUST** [1] - 4:1
**Austin** [68] - 10:8, 18:24, 19:1, 109:16, 134:7, 137:25, 138:1, 161:8, 161:13, 161:16, 161:18, 162:11, 162:25, 166:11, 168:1, 168:22, 171:13, 172:5, 175:13, 175:20, 175:25, 176:1, 180:13, 190:3, 190:19, 197:18, 198:17, 202:24, 207:15, 208:20, 215:2, 215:24, 220:15, 220:20, 223:7, 223:11, 227:7, 228:17, 231:1, 233:4, 233:20, 235:12, 235:22, 237:23, 240:12, 242:3, 245:14, 249:24, 270:14, 270:24, 272:7, 275:6, 277:12, 277:24, 278:1, 280:9, 280:20, 283:10, 288:19, 292:6, 292:9, 294:5, 294:11, 295:12, 295:16, 296:17, 296:19, 297:3
**AUSTIN** [2] - 3:11, 161:9

**Austin's** [11] - 13:8, 137:16, 137:17, 141:17, 168:20, 169:24, 281:12, 289:23, 292:17, 295:19, 299:2
**authority** [4] - 214:2, 232:6, 232:7, 233:9
**automatically** [2] - 6:23, 40:15
**available** [3] - 5:11, 25:24, 146:1, 146:3, 146:8, 211:6, 211:19, 270:13, 287:21, 288:1, 289:5, 289:14, 289:16
**average** [26] - 55:18, 115:12, 115:19, 126:10, 133:23, 134:5, 134:11, 182:13, 186:19, 213:21, 218:15, 218:19, 219:1, 231:1, 234:6, 237:10, 237:11, 237:15, 240:15, 247:22, 250:5, 259:10, 261:8, 265:13, 294:21, 295:12
**awaiting** [1] - 53:9
**award** [1] - 43:2
**awarded** [4] - 40:6, 42:25, 162:14, 198:11
**aware** [43] - 57:18, 59:21, 71:4, 71:8, 78:19, 78:22, 79:2, 79:6, 79:8, 181:13, 186:17, 196:19, 205:12, 210:3, 214:24, 218:14, 218:22, 218:23, 224:10, 224:24, 225:18, 225:23, 226:13, 231:1, 235:16, 238:17, 238:19, 241:20, 252:9, 266:2, 272:12, 272:18, 274:11, 276:19, 283:22, 284:9, 285:3, 285:11, 287:9, 287:11, 287:14, 289:13, 289:16
**awhile** [2] - 129:4, 268:15

**bills** [5] - 141:10, 142:2, 142:15, 142:18, 142:22
**Biloxi** [1] - 104:15
**Biohazard** [1] - 136:2
**biohazardous** [1] - 145:15
**birth** [1] - 40:16
**bit** [12] - 61:16, 83:18, 104:6, 134:17, 150:2, 163:2, 169:10, 228:10, 228:11, 262:4, 292:10, 297:16
**Blake** [2] - 4:20, 233:20
**BLAKE** [1] - 2:11
**blanking** [1] - 165:10
**blind** [1] - 21:12
**bloated** [1] - 18:22
**block** [1] - 249:10
**blocks** [3] - 187:20, 231:11
**blood** [2] - 204:17, 204:18
**blow** [1] - 19:8
**blue** [1] - 208:4
**Board** [3] - 46:23, 116:21, 241:20
**board** [7] - 77:7, 107:7, 107:9, 107:14, 116:2, 150:16, 247:3
**boards** [2] - 107:11, 107:13
**body** [1] - 154:23
**bond** [5] - 29:2, 29:3, 29:4, 295:7
**bond-driven** [2] - 29:2, 29:4
**bonding** [1] - 29:6
**bonds** [1] - 86:3
**bone** [2] - 17:4, 29:3
**bones** [3] - 133:11, 134:16, 279:18
**book** [1] - 133:20
**booking** [4] - 121:5, 141:8, 143:20
**boot** [1] - 172:20
**born** [1] - 183:3
**bottom** [4] - 190:12, 204:1, 214:16, 234:8
**bought** [3] - 101:1, 101:4, 101:6
**boundaries** [1] - 102:3
**BOWDLER** [1] - 2:18
**Bowdler** [1] - 4:22
**boxes** [2] - 39:19, 40:8
**Boyer's** [1] - 160:18
**brand** [3] - 209:1,

254:19, 254:22
**brand-new** [3] - 209:1, 254:19, 254:22
**break** [1] - 129:1
**breaking** [1] - 247:11
**bridge** [2] - 48:17, 209:15
**brief** [3] - 7:12, 7:22, 281:7
**briefed** [2] - 7:13, 15:25
**briefly** [6] - 103:20, 116:16, 125:2, 215:25, 224:9, 246:15
**bring** [27] - 7:15, 8:8, 23:24, 29:21, 30:2, 34:13, 35:12, 37:21, 37:25, 38:2, 41:4, 46:3, 89:11, 111:14, 128:16, 135:20, 136:5, 136:16, 203:25, 204:8, 214:2, 233:10, 252:2, 252:4, 280:6, 292:2
**bringing** [4] - 6:6, 8:1, 87:19, 87:20
**Broad** [4] - 82:2, 82:4, 135:15, 135:16
**broadening** [1] - 14:6
**broader** [1] - 289:6
**broke** [3] - 109:24, 117:20, 120:20
**broken** [1] - 109:22
**brother** [1] - 105:6
**brought** [9] - 15:25, 121:5, 144:16, 196:12, 196:20, 199:12, 222:18, 249:2, 280:7
**Broward** [1] - 251:7
**Bryan** [1] - 4:22
**BRYAN** [1] - 2:18
**bucks** [1] - 217:10
**budget** [42] - 13:1, 26:5, 30:23, 42:6, 42:13, 44:7, 44:9, 106:8, 117:12, 133:15, 134:8, 134:11, 134:21, 139:8, 141:16, 141:17, 141:18, 145:5, 145:8, 145:19, 151:10, 202:4, 216:15, 220:7, 222:10, 225:11, 229:8, 241:15, 257:14, 278:2, 278:4,

278:12, 278:20, 278:24, 278:25, 279:13, 280:7, 280:17, 283:15, 284:1, 285:1
**budget's** [1] - 136:17
**budgetary** [6] - 6:15, 109:5, 109:14, 116:11, 145:14, 200:18
**budgeted** [3] - 105:24, 131:7, 131:24
**budgeting** [5] - 106:23, 106:25, 108:14, 113:15, 245:22
**budgets** [9] - 13:1, 78:24, 105:10, 105:18, 109:8, 253:20, 257:14, 279:16, 279:24
**buffering** [1] - 108:9
**build** [14] - 210:17, 210:20, 224:14, 226:22, 227:1, 288:6, 288:13, 288:14, 289:3, 289:5, 292:13, 297:12
**building** [34] - 19:15, 22:19, 37:22, 44:15, 51:4, 52:20, 52:24, 82:9, 82:17, 85:15, 117:17, 118:8, 119:5, 120:4, 120:20, 135:8, 135:9, 137:8, 137:21, 152:24, 209:1, 210:18, 244:4, 244:15, 250:7, 250:9, 250:10, 250:15, 289:1, 289:25, 290:9, 290:15, 297:24
**buildings** [15] - 32:2, 49:2, 94:18, 117:15, 117:21, 117:22, 117:24, 117:25, 118:10, 118:16, 118:17, 118:22, 131:17, 135:18, 250:6
**built** [5] - 64:8, 64:12, 178:15, 258:3, 298:17
**bulk** [3] - 109:22, 119:14, 120:25
**bump** [2] - 34:19, 248:21

**burden** [1] - 21:11
**burdened** [1] - 280:20
**Bureau** [1] - 173:19
**Burger** [1] - 34:8
**burned** [1] - 19:24
**bus** [1] - 101:18
**business** [7] - 20:16, 54:23, 93:2, 105:5, 183:9, 231:25, 251:23
**businesses** [2] - 16:21, 17:3
**buy** [4] - 44:2, 48:14, 285:21
**buying** [4] - 217:3, 245:24, 279:21, 279:23
**BY** [132] - 27:20, 30:8, 31:4, 31:21, 33:14, 34:16, 35:9, 37:16, 38:24, 39:13, 41:7, 42:15, 44:17, 47:15, 49:22, 50:25, 53:1, 53:19, 54:3, 54:13, 56:10, 57:4, 57:14, 58:25, 59:7, 60:17, 60:21, 61:14, 62:10, 67:12, 69:20, 70:18, 72:1, 74:14, 75:25, 80:1, 80:23, 85:8, 88:17, 89:5, 90:16, 92:2, 93:21, 94:16, 95:1, 95:19, 97:2, 97:17, 98:7, 100:22, 103:16, 103:25, 108:16, 108:23, 114:20, 123:15, 127:23, 130:7, 138:4, 140:8, 145:2, 145:25, 156:24, 157:21, 158:13, 161:15, 162:10, 162:24, 164:20, 166:10, 167:6, 167:25, 171:12, 172:4, 174:20, 177:5, 177:10, 177:17, 180:20, 188:25, 189:7, 190:14, 190:21, 193:7, 197:14, 198:19, 204:22, 207:12, 208:19, 209:23, 214:9, 216:5, 220:16, 223:10, 224:6, 225:22, 226:10, 230:25, 233:3, 233:19, 235:11, 236:10, 237:22,

238:4, 240:11, 241:1, 242:2, 243:9, 245:13, 246:14, 249:1, 249:23, 253:8, 254:24, 261:6, 262:12, 267:5, 270:23, 271:4, 272:6, 272:10, 276:16, 277:15, 277:21, 282:23, 284:6, 285:8, 286:21, 287:12, 292:5, 298:15, 298:23

## C

**C2** [2] - 88:24, 96:6
**C3** [1] - 88:22
**C4** [3] - 88:22, 88:25, 96:6
**Cadillac** [1] - 213:13
**calculate** [1] - 150:18
**calculated** [3] - 24:4, 211:13, 216:7
**calculation** [2] - 124:11, 139:23
**calculations** [2] - 264:9, 273:5
**calculators** [1] - 151:8
**calender** [2] - 6:1, 179:11
**California** [4] - 162:14, 164:19, 164:22, 219:14
**camp** [1] - 172:20
**campus** [1] - 52:24
**cancel** [1] - 19:11
**candidates** [1] - 23:12
**cannot** [11] - 10:23, 25:5, 27:8, 55:23, 56:1, 88:16, 195:1, 196:5, 203:11, 266:9
**capability** [1] - 150:5
**capable** [2] - 150:1, 229:18
**capacity** [6] - 83:6, 205:15, 211:10, 250:6, 250:12, 251:16
**capeous** [1] - 14:20
**capita** [2] - 295:13, 295:15
**capital** [6] - 25:24, 25:25, 287:13, 288:12, 289:22, 290:2
**capitelli** [1] - 4:24
**CAPITELLI** [1] - 2:15
**Capitelli** [1] - 2:16

**car** [1] - 101:19
**cardiology** [1] - 141:12
**care** [102] - 12:20, 12:24, 12:25, 13:23, 14:9, 14:14, 23:24, 93:2, 101:9, 105:7, 105:17, 105:23, 106:1, 106:2, 106:7, 106:11, 106:22, 107:1, 107:10, 107:11, 107:16, 108:8, 109:16, 110:17, 116:9, 116:24, 118:5, 118:14, 119:12, 119:13, 121:24, 122:24, 123:6, 127:25, 128:2, 128:3, 128:10, 128:15, 130:14, 131:12, 132:4, 132:5, 132:9, 133:20, 133:21, 134:2, 134:5, 134:13, 138:12, 139:1, 140:20, 141:6, 141:8, 142:1, 143:1, 143:6, 143:13, 144:18, 144:22, 145:19, 150:19, 152:6, 153:5, 153:10, 153:19, 153:21, 153:22, 154:2, 154:23, 160:25, 165:1, 168:24, 169:2, 169:3, 169:16, 169:18, 169:24, 170:7, 170:16, 170:22, 171:20, 175:8, 175:13, 175:15, 175:18, 175:24, 176:13, 177:8, 202:17, 212:17, 212:19, 221:7, 221:14, 223:18, 257:20, 264:12
**care/health** [1] - 148:18
**careful** [1] - 247:1
**carefully** [1] - 195:4
**cares** [1] - 143:19
**carpet** [1] - 254:8
**carpeting** [1] - 279:22
**carry** [1] - 135:9
**cars** [3] - 14:16, 14:17, 285:18
**cart** [2] - 135:8, 135:12

**case** [37] - 4:4, 15:16, 25:20, 26:25, 68:23, 79:3, 88:12, 91:14, 100:10, 100:12, 112:7, 138:11, 138:14, 144:21, 154:13, 164:19, 164:22, 164:24, 165:4, 166:23, 167:10, 167:12, 185:1, 185:17, 203:23, 203:25, 204:1, 204:7, 228:16, 246:6, 251:5, 272:4, 278:7, 281:8, 281:25, 299:10, 300:23
**Case** [2] - 1:9, 104:9
**CASE** [6] - 4:5, 27:16, 80:17, 103:10, 161:11, 276:8
**cases** [7] - 76:12, 185:3, 193:15, 196:3, 295:5, 296:15
**cash** [1] - 295:7
**catch** [2] - 117:2, 117:6
**catch-all** [2] - 117:2, 117:6
**catching** [1] - 113:9
**categories** [3] - 61:22, 237:9, 280:3
**category** [1] - 230:21
**cautioned** [1] - 228:10
**CEA** [2] - 63:11, 63:13
**ceased** [1] - 153:20
**cell** [8] - 43:13, 76:25, 86:13, 86:22, 88:6, 187:20, 231:10, 231:11
**cells** [9] - 25:8, 86:9, 86:12, 86:13, 86:21, 88:7, 211:6, 269:7
**census** [3] - 117:13, 147:2, 218:16
**Center** [9] - 2:3, 4:17, 77:3, 82:5, 112:13, 153:10, 153:19, 153:20, 164:1
**center** [19] - 51:23, 52:14, 52:16, 76:3, 76:4, 76:24, 82:3, 121:4, 153:6, 210:4, 210:7, 242:20, 266:9, 266:11, 266:16, 266:19, 268:2, 268:22
**centers** [1] - 14:14
**central** [1] - 19:3
**certain** [10] - 42:2,

42:3, 58:19, 95:23, 178:17, 221:24, 222:23, 257:11, 259:5
**certainly** [22] - 7:22, 48:23, 63:17, 75:6, 101:6, 115:19, 118:14, 124:19, 125:19, 132:5, 140:1, 141:2, 152:24, 230:11, 234:25, 283:10, 283:22, 285:4, 286:8, 287:14, 289:16, 291:8
**CERTIFICATE** [1] - 303:1
**certificates** [1] - 108:11
**certification** [1] - 107:14
**certifications** [1] - 130:16
**certified** [10] - 10:18, 32:17, 34:9, 34:20, 65:7, 65:9, 66:14, 66:19, 107:7, 107:9
**certify** [1] - 303:4
**certifying** [1] - 34:10
**cetera** [15] - 108:10, 114:1, 119:8, 131:1, 131:14, 146:6, 161:24, 185:4, 215:21, 251:11, 258:16, 259:2, 299:13
**chained** [1] - 245:2
**chaired** [1] - 295:18
**chairman** [1] - 292:15
**challenge** [2] - 51:9, 229:9
**challenges** [2] - 10:13, 130:25
**chambers** [1] - 70:3
**chance** [3] - 45:11, 194:17, 300:15
**change** [10] - 23:12, 67:25, 68:3, 142:25, 172:21, 263:21, 292:19, 292:21, 293:7, 294:3
**changed** [11] - 42:5, 64:21, 91:7, 95:16, 95:22, 123:3, 179:1, 191:2, 245:9, 293:5, 293:20
**changes** [14] - 6:3, 13:4, 28:23, 38:21, 38:25, 73:7, 91:6, 109:2, 134:9,

205:11, 205:14, 236:16, 291:18
**changing** [2] - 185:10, 216:17
**channel** [1] - 127:12
**character** [1] - 18:11
**characteristics** [1] - 173:23
**charge** [3] - 55:4, 141:23
**charged** [3] - 86:24, 185:11, 193:10
**charges** [19] - 29:3, 29:6, 53:12, 54:21, 182:10, 185:4, 191:17, 191:23, 192:9, 194:9, 194:12, 195:2, 195:10, 195:16, 195:19, 195:24, 196:7, 196:8, 196:20
**charging** [1] - 185:15
**Charity** [6] - 141:3, 141:4, 141:20, 142:9, 143:1, 143:16
**Charles** [10] - 34:12, 37:4, 37:9, 66:6, 66:7, 67:13, 67:17, 67:23, 144:4, 154:12
**chart** [3] - 195:19, 259:17, 265:18
**charts** [1] - 144:15
**chasing** [1] - 14:20
**cheapest** [1] - 134:20
**check** [5] - 14:4, 34:6, 76:11, 76:12, 152:20
**checked** [2] - 45:15, 269:8
**checking** [1] - 118:7
**checks** [1] - 76:13
**chief** [62] - 9:12, 9:13, 10:22, 11:3, 17:7, 27:25, 28:1, 28:2, 28:6, 28:16, 30:9, 30:15, 30:22, 30:25, 31:5, 32:11, 33:1, 33:6, 33:15, 34:23, 35:24, 36:19, 36:24, 37:17, 38:25, 39:14, 41:8, 42:16, 44:18, 45:20, 46:19, 48:5, 49:23, 49:24, 50:2, 50:12, 53:2, 56:25, 61:24, 63:11, 63:17, 73:4, 78:24, 80:2, 80:4, 81:3, 81:12, 81:21, 82:16, 82:23, 91:16, 92:12, 188:5, 242:25, 252:9, 293:8, 293:14,

293:20, 295:2, 296:6
**Chief** [24] - 10:12, 27:12, 27:21, 28:7, 30:18, 50:11, 56:11, 57:15, 59:21, 61:2, 63:16, 65:13, 81:21, 98:13, 98:23, 180:8, 186:14, 186:15, 187:16, 235:19, 235:22, 241:7, 247:25, 292:21
**child** [1] - 77:10
**children** [1] - 19:15
**chip** [1] - 43:18
**chips** [1] - 43:12
**choice** [1] - 220:23
**chooses** [1] - 17:22
**chose** [2] - 243:20, 269:25
**chunk** [1] - 182:24
**Circuit** [1] - 4:25
**circuit** [1] - 282:16
**circulated** [1] - 232:15
**circulating** [1] - 291:12
**citations** [2] - 7:23, 185:15
**citizen** [1] - 227:19
**citizens** [2] - 280:1, 293:3
**City** [153] - 2:14, 2:17, 3:3, 4:22, 5:1, 5:14, 5:15, 6:12, 7:6, 8:2, 9:9, 9:11, 13:9, 13:11, 14:7, 15:4, 15:8, 15:15, 16:1, 16:14, 16:16, 16:18, 16:20, 16:22, 17:1, 17:8, 17:12, 17:23, 17:24, 18:6, 18:14, 18:15, 18:17, 19:1, 19:6, 19:8, 19:15, 19:16, 19:24, 20:19, 22:17, 24:2, 24:16, 24:20, 24:23, 25:12, 26:3, 42:5, 47:9, 47:16, 54:6, 55:4, 56:8, 58:16, 61:5, 62:12, 69:25, 70:2, 77:3, 77:14, 78:5, 78:24, 80:5, 99:7, 99:13, 99:20, 100:2, 100:12, 100:17, 106:24, 108:6, 129:17, 141:1, 155:1, 156:13, 161:6, 161:8, 168:8, 183:6, 185:8, 201:13, 202:2, 203:25, 204:19,

208:2, 209:17,
210:16, 217:25,
225:14, 238:11,
240:4, 241:8,
241:20, 243:10,
244:9, 244:13,
244:22, 245:16,
249:13, 253:2,
257:19, 262:2,
262:3, 267:8, 273:1,
275:11, 276:23,
277:1, 277:3, 277:9,
277:22, 277:24,
278:2, 278:10,
278:11, 279:12,
280:12, 280:16,
281:8, 281:10,
282:4, 283:1,
283:16, 283:19,
284:1, 284:24,
285:1, 285:4,
286:11, 286:23,
287:5, 287:14,
287:18, 287:24,
287:25, 288:2,
288:12, 289:6,
289:14, 289:17,
289:24, 290:4,
290:17, 290:22,
291:2, 291:9, 292:8,
298:4, 299:11,
299:15, 299:20
**city** [20] - 210:3,
224:14, 225:23,
226:1, 257:20,
278:5, 279:1, 279:2,
279:3, 279:6,
279:20, 280:15,
280:22, 280:23,
282:2, 284:15,
292:14, 292:19,
294:16, 294:19
**City's** [38] - 13:15,
13:25, 14:16, 14:25,
16:8, 16:24, 17:4,
18:1, 18:18, 18:24,
19:6, 20:20, 24:20,
25:11, 47:3, 99:23,
109:16, 167:23,
237:4, 241:2,
245:16, 245:18,
246:2, 277:18,
278:4, 278:14,
278:21, 278:24,
280:6, 285:1, 288:5,
290:12, 294:7,
295:21, 298:24,
299:8, 299:9
**City-owned** [1] -
289:14
**City-related** [1] -

15:15
**Civil** [5] - 19:20, 20:3,
20:11, 167:16, 168:6
**civil** [13] - 4:5, 14:19,
81:25, 98:8, 98:12,
98:14, 98:19, 98:21,
99:2, 99:5, 99:14,
100:2, 199:11
**clamored** [1] - 18:11
**clarified** [2] - 266:7,
300:22
**clarify** [7] - 87:12,
171:14, 249:24,
261:7, 262:1,
263:14, 268:3
**clarity** [1] - 262:13
**class** [9] - 4:17, 5:5,
5:20, 46:7, 46:13,
46:14, 46:17, 164:5,
239:11
**classes** [1] - 19:11
**classification** [8] -
23:18, 28:24, 28:25,
48:12, 166:24,
172:10, 173:24,
173:25
**classing** [1] - 22:13
**classroom** [2] - 44:25,
45:3
**clean** [1] - 254:2
**cleaned** [1] - 253:15
**clear** [28] - 14:7,
23:13, 26:8, 26:10,
26:25, 53:8, 54:4,
57:15, 68:16, 69:17,
97:21, 99:6, 100:18,
120:22, 133:13,
143:21, 158:16,
164:7, 169:22,
175:12, 180:22,
246:21, 266:6,
278:1, 278:11,
288:11, 294:24,
297:5
**clearance** [2] - 143:20,
143:21
**clearly** [1] - 278:3
**clerical** [5] - 132:10,
132:18, 132:19,
148:23, 149:20
**clerk** [10] - 148:1,
148:3, 148:9,
148:13, 148:19,
149:6, 149:17,
150:10, 150:17
**clerk's** [3] - 55:15,
147:17, 148:14
**clerking** [1] - 117:5
**clerks** [7] - 131:25,
146:19, 147:21,

148:10, 148:24,
151:23, 151:24
**Cleveland** [1] - 104:10
**client** [1] - 291:4
**clients** [1] - 239:13
**cliff** [1] - 19:1
**clinic** [30] - 106:7,
108:5, 108:6,
109:25, 110:1,
110:2, 110:3, 110:4,
118:18, 118:24,
119:5, 119:7,
119:10, 119:12,
119:13, 119:19,
120:3, 120:5, 120:7,
120:17, 121:14,
124:11, 124:23,
128:5, 131:22,
132:6, 132:7, 135:11
**clinic's** [1] - 132:18
**clinical** [2] - 127:25,
128:4
**clinics** [5] - 118:1,
118:19, 118:22,
131:19, 131:20
**close** [8] - 133:6,
136:4, 197:9,
198:23, 198:25,
223:17, 245:7,
300:14
**closed** [5] - 25:22,
120:5, 203:20,
206:1, 210:5
**closely** [5] - 132:25,
133:2, 156:15,
191:20, 296:12
**closer** [3] - 54:19,
65:19, 138:22
**closest** [2] - 52:12,
52:18
**closing** [1] - 262:5
**clothes** [1] - 82:11
**clothing** [1] - 13:18
**CMEs** [1] - 130:16
**CNA** [3] - 173:15,
258:16, 258:21
**codes** [2] - 130:13,
254:25
**codified** [1] - 22:11
**coffers** [1] - 20:20
**cognitive** [1] - 149:23
**coin** [1] - 209:21
**coincides** [1] - 6:1
**cold** [1] - 131:1
**Coleman** [2] - 164:18,
251:5
**collapsed** [1] - 210:9
**collect** [1] - 118:3
**collecting** [1] - 119:8
**collectively** [1] - 299:3

**college** [1] - 272:2
**colleges** [2] - 11:7,
36:14
**Colonel** [16] - 9:13,
31:14, 66:12, 72:8,
73:5, 75:1, 75:2,
75:4, 80:14, 80:24,
81:20, 85:9, 89:13,
90:17, 129:12,
160:19
**colonel** [9] - 31:17,
80:19, 82:23, 88:18,
89:6, 91:13, 93:5,
94:17, 223:22
**colonels** [1] - 231:19
**Colorado** [1] - 173:18
**colored** [2] - 160:3,
160:21
**Columbia** [1] - 20:1
**column** [8] - 111:7,
111:10, 111:14,
112:17, 112:25,
147:14, 211:17,
237:24
**combining** [1] -
224:12
**coming** [14] - 47:24,
93:13, 104:22,
138:21, 144:1,
178:22, 206:2,
207:10, 211:2,
224:19, 237:17,
238:12, 265:9,
301:18
**commander** [2] -
43:23, 81:4
**commence** [1] - 130:4
**comment** [1] - 73:8
**commented** [1] -
156:6
**comments** [2] - 94:2,
285:9
**commissary** [4] -
48:25, 49:11, 179:2,
261:16
**commission** [1] -
297:25
**commissioned** [2] -
292:17, 295:19
**commissions** [1] -
20:10
**commitment** [1] -
16:14
**committed** [1] -
136:12
**committee** [6] - 42:25,
70:24, 71:2, 74:9,
75:14, 297:20
**committing** [1] -
184:20

**common** [6] - 156:10,
211:14, 212:17,
215:9, 218:20,
224:15
**commonly** [2] -
173:16, 173:19
**communicable** [1] -
130:25
**community** [15] -
21:24, 22:2, 22:6,
74:10, 76:8, 76:21,
76:22, 114:7,
114:10, 136:9,
276:21, 276:23,
295:1, 295:5, 295:8
**Community** [1] -
284:16
**company** [2] - 43:5,
168:13
**comparable** [3] -
194:1, 223:16,
223:17
**compare** [3] - 157:25,
158:2, 226:2
**compared** [11] - 48:4,
65:23, 66:24, 66:25,
67:13, 77:24,
186:19, 223:15,
246:16, 248:9, 249:3
**comparing** [3] - 68:2,
133:20, 246:18
**comparison** [6] - 66:3,
67:3, 67:4, 67:5,
246:22
**comparisons** [2] -
109:14, 246:20
**compatriot** [1] - 116:8
**compensated** [4] -
187:14, 206:21,
231:9, 231:15
**compensation** [4] -
208:1, 247:14,
259:22, 259:23
**competitive** [2] - 23:9,
37:3
**compile** [2] - 9:15,
93:6
**compiled** [5] - 10:8,
89:13, 89:17, 93:5,
93:10
**complaints** [3] - 5:14,
5:19, 98:24
**complement** [3] -
151:17, 152:13,
158:1
**complete** [7] - 11:23,
40:4, 41:16, 72:20,
72:21, 185:7, 240:21
**completed** [6] - 72:15,
72:16, 72:23, 73:2,

92:4, 92:8
**completely** [5] - 105:13, 241:2, 241:8, 262:18, 265:18
**completion** [1] - 104:16
**compliance** [8] - 6:7, 128:13, 128:23, 170:12, 179:9, 180:15, 251:21, 256:24
**comply** [23] - 9:25, 10:5, 11:9, 32:8, 34:24, 35:24, 36:18, 38:22, 39:1, 39:10, 39:15, 45:21, 49:24, 50:19, 91:16, 116:20, 133:9, 133:12, 133:16, 145:21, 145:22, 179:16, 253:13
**complying** [1] - 71:17
**component** [1] - 16:8
**components** [2] - 145:18, 220:25
**comprehensive** [1] - 21:18
**comprises** [1] - 9:4
**computer** [3] - 21:4, 43:8, 148:14
**Computer** [1] - 1:25
**Computer-aided** [1] - 1:25
**conceivable** [1] - 209:9
**concept** [3] - 189:21, 255:22, 255:23
**concern** [4] - 144:20, 179:14, 268:10, 295:21
**concerned** [14] - 8:1, 18:9, 18:10, 99:11, 99:25, 179:19, 179:22, 201:4, 203:1, 207:22, 207:24, 226:24, 226:25
**concerns** [2] - 260:21, 277:3
**concerted** [1] - 294:22
**Conchetta** [6] - 90:20, 91:3, 91:10, 117:24, 118:13, 198:24
**concluded** [2] - 18:5, 301:24
**concludes** [1] - 21:8
**conclusive** [1] - 10:7
**concrete** [1] - 24:24
**concur** [1] - 23:25

**condition** [2] - 285:10, 285:11
**conditional** [4] - 244:13, 244:23, 244:24, 245:8
**conditions** [13] - 5:8, 5:25, 21:19, 23:11, 25:6, 25:17, 25:19, 26:2, 26:16, 164:25, 226:17, 239:12, 239:16
**condone** [1] - 21:13
**conduced** [1] - 172:16
**conduct** [2] - 23:18, 254:7
**conducted** [3] - 22:18, 93:12, 157:22
**conference** [2] - 254:5, 301:17
**confidence** [2] - 188:22
**confident** [1] - 266:18
**confidentiality** [1] - 123:9
**confinement** [2] - 166:5, 174:4
**confirm** [1] - 99:9, 284:3, 291:4
**conflict** [1] - 202:22
**confused** [1] - 60:4
**conjunction** [3] - 150:14, 168:21, 282:1
**Connecticut** [2] - 219:7
**connection** [5] - 79:17, 92:16, 92:18, 166:19, 281:7
**consensus** [1] - 116:2
**Consent** [129] - 5:4, 5:7, 5:10, 5:17, 5:22, 6:3, 6:7, 6:12, 6:21, 8:25, 9:11, 9:25, 10:5, 11:9, 11:15, 15:5, 16:2, 18:25, 20:24, 21:9, 21:14, 21:21, 22:23, 23:21, 26:5, 26:15, 28:16, 28:20, 30:10, 32:8, 34:24, 35:25, 38:22, 39:1, 39:10, 39:15, 40:19, 42:19, 44:19, 45:21, 47:18, 48:21, 49:24, 50:19, 57:24, 70:6, 70:9, 70:20, 70:22, 71:4, 71:8, 71:17, 74:8, 91:13, 91:17, 93:18, 95:24, 99:21, 100:9, 104:2, 108:24, 109:12,

113:15, 113:21, 125:5, 125:6, 125:12, 126:17, 126:18, 126:20, 126:21, 127:5, 133:9, 133:12, 133:16, 134:21, 137:13, 145:21, 145:22, 147:4, 147:5, 152:6, 156:25, 158:3, 158:10, 158:16, 159:1, 164:2, 170:12, 177:24, 179:10, 179:16, 180:16, 181:10, 193:22, 193:23, 206:7, 206:17, 210:14, 210:17, 210:19, 212:5, 227:14, 232:6, 233:5, 239:9, 239:14, 239:15, 239:19, 239:24, 241:5, 241:9, 241:14, 241:18, 241:22, 242:9, 251:12, 251:17, 251:18, 251:22, 252:8, 253:13, 255:16, 257:12, 280:8, 284:20, 284:22, 299:21
**consequences** [3] - 18:22, 201:23, 279:25
**conservative** [3] - 270:2, 296:17, 299:3
**consider** [9] - 6:25, 14:12, 16:20, 18:22, 58:13, 160:2, 220:17, 223:14, 300:12
**considerable** [3] - 64:6, 192:10, 196:24
**considerably** [3] - 64:19, 64:25, 124:16
**considerate** [1] - 223:20
**consideration** [7] - 14:11, 122:1, 126:3, 142:12, 153:5, 222:2, 285:5
**considerations** [1] - 140:23
**Considerations** [1] - 142:14
**considered** [3] - 12:14, 92:23, 255:17
**considering** [3] - 6:9,

115:17, 158:25
**consisted** [1] - 172:16
**consistent** [3] - 176:4, 177:13, 278:4
**consisting** [1] - 5:5
**consists** [1] - 181:19
**consolidate** [1] - 286:6
**consolidation** [2] - 283:2, 286:12
**constant** [4] - 191:3, 228:14, 234:20, 256:5
**constantly** [1] - 29:18
**Constitution** [1] - 5:9
**constitutional** [18] - 16:16, 17:15, 23:24, 24:11, 165:18, 219:5, 220:9, 220:10, 226:21, 245:21, 265:6, 265:12, 286:24, 286:25, 287:6, 288:6, 292:2, 299:4
**constitutionally** [1] - 239:21
**constrained** [1] - 7:21
**constructed** [1] - 105:15
**construction** [4] - 25:7, 26:13, 71:1, 71:13
**consult** [1] - 105:6
**consultant** [2] - 163:14, 231:16
**consulted** [1] - 105:8
**consulting** [7] - 105:5, 105:10, 161:22, 162:1, 162:25, 258:10, 258:23
**contact** [4] - 82:14, 90:7, 131:14, 234:20
**contacts** [1] - 36:3
**contain** [1] - 242:3
**contained** [1] - 130:10
**contains** [1] - 298:1
**contemporary** [1] - 21:25
**contend** [1] - 99:1
**contends** [3] - 6:4, 19:18, 24:20
**contested** [1] - 13:17
**context** [1] - 169:24
**continual** [1] - 93:16
**continue** [10] - 22:5, 25:5, 25:16, 43:18, 98:5, 193:19, 234:10, 296:12, 297:8, 297:17
**CONTINUED** [2] -

130:6, 223:9
**continued** [3] - 117:9, 180:14, 217:19
**continues** [2] - 58:14, 298:1
**continuing** [5] - 107:20, 107:22, 130:12, 201:14, 299:10
**continuous** [1] - 93:18
**continuum** [1] - 288:18
**contract** [11] - 40:6, 41:20, 43:2, 49:11, 49:16, 135:21, 135:22, 168:18, 198:9, 212:18, 212:23
**contracted** [2] - 212:20, 212:22
**contractors** [1] - 30:1
**contracts** [1] - 116:12, 135:24, 278:15
**contrary** [1] - 194:18, 194:20
**contrast** [3] - 18:24, 19:18, 272:18
**contribute** [2] - 20:25, 174:21
**contributed** [1] - 267:7
**contributes** [1] - 284:17
**contribution** [1] - 223:19
**control** [9] - 88:10, 130:23, 131:4, 203:3, 203:17, 255:15, 268:2, 268:22, 269:1
**controlled** [1] - 138:18
**controversy** [1] - 208:13
**convened** [1] - 165:1
**convenient** [1] - 14:3
**conversation** [4] - 50:14, 52:1, 52:7, 287:19
**conversations** [9] - 50:8, 51:24, 51:25, 98:25, 108:25, 140:3, 176:22, 197:19, 297:15
**convert** [1] - 49:6, 49:8, 55:3
**converted** [1] - 254:6
**convicted** [5] - 47:23, 54:22, 55:5, 55:11, 76:10
**convinced** [1] - 177:1

**Cook** [1] - 136:7
**cooking** [1] - 249:8
**Coon** [2] - 3:15, 4:10
**COON** [25] - 2:7, 4:10, 21:17, 24:13, 73:21, 79:11, 99:4, 102:17, 112:6, 232:17, 232:23, 232:25, 239:14, 239:23, 240:8, 282:13, 286:19, 286:21, 287:12, 290:20, 292:4, 292:5, 298:9, 300:5, 301:4
**cooperative** [1] - 63:13
**coordinate** [2] - 131:19, 293:24
**coordinating** [2] - 297:20, 297:25
**coordination** [1] - 160:21
**coordinator** [4] - 45:10, 127:15, 256:24
**cop** [1] - 292:24
**copies** [1] - 291:1
**cops** [2] - 285:23, 293:4
**copy** [14] - 40:25, 55:15, 70:20, 70:22, 113:5, 147:11, 159:25, 160:7, 160:9, 192:21, 192:25, 276:5, 282:21, 291:1
**core** [2] - 11:20, 252:16
**COREY** [1] - 2:8
**corner** [1] - 85:16
**cornerstones** [1] - 181:6
**correct** [67] - 30:25, 35:21, 53:10, 54:5, 55:6, 63:6, 63:7, 64:12, 73:1, 82:22, 84:6, 88:8, 88:16, 89:1, 89:4, 89:15, 90:1, 96:19, 97:1, 97:10, 97:15, 98:20, 99:17, 104:4, 110:25, 111:12, 149:15, 149:16, 174:17, 184:22, 194:12, 210:2, 214:12, 215:1, 217:18, 217:22, 219:2, 222:6, 224:7, 225:17, 225:25, 228:8, 228:17,

231:23, 233:24, 233:25, 235:14, 238:7, 239:22, 239:23, 240:2, 241:24, 244:8, 245:15, 250:1, 253:22, 256:16, 261:16, 261:17, 261:20, 265:25, 267:12, 268:5, 271:8, 273:12, 291:22, 303:4
**correction** [1] - 248:2
**Correction** [5] - 54:14, 82:19, 199:22, 252:3, 266:25
**Correctional** [7] - 29:22, 36:8, 44:21, 44:23, 45:7, 50:6, 52:22
**correctional** [59] - 18:4, 37:4, 38:9, 39:5, 65:24, 65:25, 67:17, 67:18, 67:19, 67:22, 69:22, 74:9, 75:9, 77:25, 105:7, 105:17, 105:21, 106:2, 106:10, 106:22, 107:10, 107:11, 107:16, 108:8, 108:11, 108:13, 133:20, 140:20, 142:24, 161:23, 163:19, 164:7, 164:8, 164:9, 165:13, 165:19, 165:23, 167:10, 168:2, 168:23, 170:6, 172:15, 172:25, 175:15, 178:11, 220:19, 220:22, 225:15, 227:13, 231:17, 233:6, 248:8, 258:12, 260:1, 271:16, 274:8, 274:12, 276:20
**Corrections** [24] - 50:9, 52:10, 162:4, 163:6, 193:19, 195:10, 195:14, 197:21, 199:25, 202:16, 203:4, 203:5, 203:6, 203:8, 203:11, 203:23, 204:7, 204:12, 205:24, 209:18, 225:4, 246:18, 246:24, 247:9
**corrections** [7] - 22:6,

22:8, 89:25, 163:5, 198:7, 248:11, 274:9
**Corrections'** [1] - 246:17
**correctly** [1] - 70:5
**correspondingly** [1] - 156:8
**corrupt** [1] - 213:23
**corruption** [1] - 213:19
**Cory** [1] - 4:14
**cosmetic** [1] - 254:3
**cost** [63] - 9:1, 11:25, 14:9, 14:14, 15:4, 22:23, 51:10, 57:6, 58:13, 69:6, 69:14, 97:15, 104:1, 109:14, 110:17, 112:23, 113:11, 126:22, 132:22, 133:22, 133:24, 134:12, 139:7, 141:16, 151:4, 154:16, 154:17, 178:19, 178:24, 185:17, 206:25, 207:4, 212:14, 213:10, 213:12, 214:13, 216:6, 216:7, 217:20, 217:23, 217:24, 218:21, 219:1, 219:7, 225:5, 255:19, 256:19, 256:21, 256:24, 258:6, 259:7, 259:10, 262:2, 262:14, 264:5, 265:3, 273:8, 273:10, 280:3, 283:12, 283:17, 284:14, 293:4
**cost-cutting** [1] - 280:3
**cost-driver** [1] - 22:23
**cost-efficient** [1] - 11:25
**costing** [4] - 207:2, 219:3, 262:3, 264:7
**costly** [1] - 30:9
**costs** [114] - 5:16, 6:6, 6:21, 9:5, 10:14, 12:1, 12:20, 12:25, 14:8, 24:1, 24:3, 41:8, 44:16, 44:18, 44:20, 45:5, 46:1, 46:3, 58:19, 69:5, 97:18, 99:2, 110:12, 110:19, 110:20, 133:21, 133:25,

134:2, 134:5, 134:13, 136:3, 136:4, 136:8, 136:14, 136:20, 136:24, 137:5, 141:24, 143:6, 143:12, 143:14, 144:16, 144:22, 145:10, 150:19, 151:12, 155:1, 158:2, 168:24, 169:2, 178:21, 204:5, 206:13, 206:16, 206:20, 208:15, 208:16, 210:13, 212:1, 212:4, 214:10, 214:12, 215:24, 216:13, 217:12, 219:23, 221:6, 224:11, 224:20, 224:21, 224:25, 247:6, 249:2, 252:25, 253:1, 253:9, 253:23, 254:9, 254:10, 254:16, 254:19, 255:3, 255:4, 255:20, 256:8, 256:20, 257:3, 257:9, 257:22, 258:4, 259:9, 260:12, 260:16, 261:15, 264:12, 265:7, 265:12, 265:15, 277:7, 279:9, 279:19, 280:7, 280:11, 284:16, 284:21, 284:23, 285:1, 286:14, 292:1, 299:21, 299:22
**council** [12] - 42:11, 47:4, 70:2, 78:18, 78:23, 80:3, 154:24, 278:5, 280:22, 282:2, 294:16, 299:12
**Council** [1] - 163:8
**counsel** [8] - 4:8, 27:6, 27:10, 60:12, 112:7, 232:14, 237:4, 257:18
**counseling** [6] - 41:5, 125:17, 125:22, 126:11, 127:9, 127:13
**counselor** [1] - 125:21
**counselors** [1] - 158:9
**count** [8] - 53:6, 60:2,

60:9, 60:23, 60:24, 60:25, 62:13, 237:5
**counted** [1] - 9:18
**counter** [1] - 131:13
**counterintuitive** [1] - 263:17
**counterpart** [1] - 78:9, 223:24
**counterparts** [2] - 51:14, 223:15
**counties** [1] - 189:23
**country** [13] - 12:14, 13:20, 51:17, 133:21, 161:23, 195:15, 197:3, 209:5, 213:20, 217:14, 219:2, 224:25, 247:3
**County** [13] - 50:10, 51:2, 51:14, 51:15, 136:6, 136:7, 172:19, 213:18, 251:7, 256:2, 270:6, 274:24, 274:25
**couple** [15] - 50:6, 51:12, 62:17, 76:1, 76:16, 135:5, 147:16, 199:17, 254:5, 260:10, 267:6, 271:11, 286:19, 292:24, 297:2
**course** [36] - 18:13, 27:3, 27:9, 34:14, 35:11, 35:12, 35:14, 35:17, 35:20, 42:13, 44:24, 45:2, 45:12, 45:13, 45:16, 45:18, 50:5, 52:23, 58:19, 62:23, 75:19, 114:25, 130:3, 151:17, 155:8, 156:6, 156:16, 167:22, 200:8, 230:10, 260:21, 260:23, 266:20, 277:4, 287:19, 291:25
**court** [39] - 8:17, 14:19, 14:22, 24:7, 53:9, 60:7, 61:8, 77:10, 82:1, 82:8, 87:18, 98:8, 98:12, 98:15, 98:19, 98:21, 99:2, 99:5, 99:14, 99:19, 100:2, 100:3, 100:13, 100:20, 103:17, 108:2, 165:3, 166:14, 166:22, 173:8,

173:10, 174:14,
191:10, 195:17,
201:22, 251:6,
251:10, 293:25
**COURT** [436] - 1:1,
4:3, 4:8, 5:2, 7:12,
7:14, 7:25, 8:13,
8:16, 8:21, 14:24,
15:7, 15:11, 15:20,
15:22, 21:16, 24:9,
26:21, 27:2, 27:4,
29:20, 29:23, 30:5,
30:19, 30:22, 31:2,
31:19, 33:6, 33:12,
33:20, 33:23, 33:25,
35:6, 36:25, 37:6,
37:12, 37:24, 38:2,
38:9, 38:14, 38:18,
38:21, 39:3, 41:12,
41:14, 41:17, 41:19,
41:24, 42:20, 44:4,
44:9, 44:11, 44:13,
47:12, 49:16, 49:18,
49:20, 50:15, 50:21,
51:24, 52:7, 52:11,
53:11, 53:14, 53:16,
53:23, 54:1, 54:9,
54:11, 54:24, 55:6,
55:20, 55:24, 56:2,
56:7, 56:22, 57:8,
58:9, 58:16, 59:4,
60:16, 61:20, 61:22,
61:25, 62:4, 63:5,
66:13, 66:17, 66:20,
66:24, 67:8, 67:11,
70:12, 70:14, 71:19,
71:23, 72:22, 73:2,
73:11, 73:15, 73:18,
73:25, 74:6, 75:4,
75:6, 75:9, 75:17,
79:13, 79:20, 79:23,
80:9, 80:11, 80:20,
83:19, 84:3, 84:9,
84:13, 85:2, 85:4,
85:25, 86:5, 86:8,
86:14, 86:21, 86:24,
87:2, 87:8, 87:21,
87:25, 88:5, 88:9,
88:13, 88:22, 89:1,
89:3, 89:23, 90:4,
90:9, 90:11, 91:23,
92:12, 92:16, 92:20,
93:14, 94:9, 95:7,
95:10, 95:14, 95:18,
96:21, 96:24, 97:9,
97:12, 97:14, 97:19,
98:3, 98:5, 99:1,
99:9, 99:19, 99:25,
100:10, 100:21,
101:8, 101:11,
101:17, 101:22,

102:1, 102:8,
102:11, 102:15,
102:19, 102:22,
102:24, 103:2,
103:22, 106:25,
107:3, 107:6,
108:12, 108:20,
111:18, 111:24,
112:3, 112:10,
112:13, 112:15,
113:3, 113:6,
113:23, 114:7,
114:11, 114:17,
121:19, 121:24,
122:12, 122:25,
123:5, 126:2,
126:25, 127:18,
127:22, 128:25,
129:3, 129:13,
129:15, 129:20,
130:3, 136:18,
136:24, 137:14,
139:17, 140:2,
142:11, 142:23,
144:9, 144:20,
155:15, 156:14,
157:18, 158:6,
159:6, 159:9,
159:16, 159:22,
160:8, 160:13,
160:23, 161:1,
161:5, 162:1,
162:16, 162:19,
162:21, 164:15,
164:17, 165:4,
165:8, 165:14,
165:16, 165:20,
166:1, 166:3, 166:6,
166:9, 167:2,
167:12, 167:17,
168:25, 169:3,
169:6, 169:8,
169:13, 169:18,
169:21, 169:25,
170:4, 170:21,
171:1, 171:9,
171:23, 172:1,
172:23, 173:7,
173:10, 173:12,
174:10, 174:13,
174:16, 174:19,
175:3, 175:5,
175:16, 175:23,
176:6, 176:10,
176:15, 176:21,
176:25, 177:8,
177:15, 180:17,
182:6, 183:1,
183:11, 183:14,
184:3, 184:18,
184:22, 186:11,

186:14, 186:17,
187:16, 187:21,
187:25, 188:10,
188:15, 188:17,
188:24, 190:10,
191:16, 192:20,
194:6, 194:8,
194:11, 194:23,
194:25, 195:7,
195:11, 195:18,
195:23, 196:6,
196:19, 197:12,
199:17, 200:11,
201:10, 201:21,
202:2, 202:18,
203:5, 204:6,
204:17, 207:21,
208:2, 209:17,
214:3, 214:7, 216:2,
218:11, 218:14,
218:18, 218:25,
219:16, 219:23,
220:3, 220:11,
220:13, 222:9,
222:16, 223:1,
223:4, 223:8, 224:4,
225:15, 225:18,
226:7, 230:10,
232:3, 232:10,
232:16, 232:19,
233:2, 233:16,
235:2, 235:4, 236:3,
236:14, 236:19,
237:1, 237:7,
237:14, 237:19,
238:3, 239:8,
239:18, 239:21,
239:25, 240:4,
240:7, 240:9, 241:6,
241:22, 241:25,
243:4, 245:12,
246:6, 246:10,
248:15, 248:22,
248:24, 249:18,
249:21, 253:6,
254:14, 259:16,
259:25, 260:3,
260:21, 261:2,
261:4, 262:7,
266:20, 266:24,
270:17, 270:21,
272:5, 272:9, 275:8,
275:13, 275:16,
275:20, 275:24,
276:2, 276:4,
276:14, 277:10,
281:3, 281:13,
281:21, 282:6,
282:9, 282:17,
283:19, 283:25,
284:19, 287:8,

290:19, 290:22,
291:6, 291:15,
291:24, 293:7,
296:19, 298:4,
298:8, 298:10,
298:20, 300:2,
300:6, 300:9,
300:19, 300:22,
301:7, 301:10,
301:15
**Court** [114] - 1:20,
4:25, 5:3, 5:7, 5:15,
5:16, 5:18, 6:10,
6:17, 6:23, 6:25, 7:4,
7:8, 7:9, 7:11, 7:19,
7:20, 7:23, 8:25,
14:25, 15:1, 16:9,
16:18, 16:20, 16:22,
16:25, 17:19, 18:20,
19:2, 19:5, 19:10,
19:23, 20:14, 21:8,
21:11, 21:18, 21:21,
25:12, 26:14, 27:7,
28:17, 28:19, 28:25,
33:11, 39:14, 48:6,
53:4, 53:20, 55:3,
58:13, 63:10, 83:1,
91:14, 99:25, 104:6,
114:23, 117:16,
119:17, 121:19,
123:17, 125:3,
128:1, 129:7,
130:10, 133:13,
134:15, 140:1,
140:11, 140:23,
145:6, 151:14,
158:25, 159:20,
160:2, 160:18,
160:20, 160:21,
162:12, 167:24,
168:19, 178:7,
181:18, 188:20,
201:15, 203:1,
203:21, 203:24,
204:1, 221:18,
222:14, 222:22,
228:10, 233:1,
235:4, 236:18,
241:12, 243:22,
266:22, 275:23,
278:9, 281:10,
282:4, 284:23,
285:14, 288:4,
290:12, 290:17,
290:24, 291:10,
291:16, 300:14,
300:15, 300:18,
303:3
**Court's** [11] - 5:10,
6:15, 8:19, 16:17,
19:4, 57:13, 63:9,

102:5, 144:17,
180:14, 285:5
**court-ordered** [1] -
251:6
**courthouse** [2] -
222:3, 222:4
**courtroom** [7] - 19:22,
27:5, 42:7, 42:9,
98:18, 100:20, 299:6
**Courts** [1] - 252:20
**courts** [9] - 90:14,
99:15, 106:15,
106:16, 166:11,
195:17, 252:4,
252:22
**cover** [12] - 84:12,
85:23, 118:21,
118:23, 143:12,
169:3, 222:25,
253:9, 256:18,
257:13, 258:3, 263:3
**coverage** [3] - 109:5,
119:14, 120:3
**covered** [5] - 97:24,
141:22, 143:8,
222:24
**CPR** [1] - 130:15
**cradle** [3] - 43:7,
43:17, 43:20
**crafted** [1] - 243:19
**crafting** [1] - 165:6
**create** [1] - 288:21
**created** [5] - 29:17,
48:8, 87:15, 87:16,
297:21
**creating** [1] - 239:5
**credentials** [3] -
130:15, 271:14,
276:12
**credit** [1] - 192:11
**credited** [1] - 238:6
**Crime** [1] - 163:8
**crime** [9] - 181:24,
182:2, 185:12,
209:8, 227:20,
227:21, 238:8, 296:7
**crimes** [4] - 86:25,
89:3, 184:20, 252:12
**Criminal** [7] - 19:21,
20:4, 104:25,
166:19, 292:15,
297:8, 297:18
**criminal** [17] - 14:19,
16:8, 29:8, 47:4,
53:9, 99:19, 100:2,
100:7, 100:13,
100:20, 252:16,
293:25, 296:13,
297:14, 297:20,
297:24, 299:12

**criminological** [1] - 228:19
**criminologist** [2] - 161:22, 162:23
**criminology** [4] - 162:18, 162:21, 162:22, 163:1
**crisis** [2] - 22:3, 25:2
**critical** [6] - 9:6, 14:14, 74:12, 121:20, 232:19, 258:1
**critically** [1] - 133:14
**criticisms** [1] - 18:3
**criticized** [1] - 18:3
**CROSS** [8] - 56:9, 94:25, 145:24, 156:23, 223:9, 233:18, 249:22, 286:20
**cross** [3] - 3:6, 3:10, 194:18
**Cross** [4] - 3:8, 3:10, 3:13, 3:15
**crowding** [2] - 162:8, 162:9
**crunch** [2] - 178:16, 259:9
**crystal** [1] - 297:5
**CTA** [1] - 117:24
**cue** [1] - 55:9
**CUMMING** [1] - 2:4
**Cumming** [1] - 2:5
**current** [50] - 5:5, 6:7, 10:9, 10:14, 12:3, 12:7, 12:22, 13:10, 22:15, 22:20, 23:10, 25:6, 26:12, 31:6, 33:16, 44:7, 44:9, 49:11, 49:25, 59:13, 65:24, 68:25, 73:13, 83:6, 83:10, 85:19, 109:1, 110:9, 111:2, 113:21, 114:2, 115:15, 134:11, 147:2, 158:1, 158:2, 171:19, 178:18, 206:24, 206:25, 242:4, 243:10, 243:14, 244:2, 253:14, 254:16, 257:23, 258:17, 259:22, 287:4
**curriculum** [1] - 106:4
**curve** [1] - 231:4
**custody** [12] - 91:4, 167:15, 190:23, 190:25, 196:12, 236:24, 247:3, 247:4, 258:16,

269:3, 275:19, 275:20
**Customs** [1] - 39:24
**cut** [8] - 17:4, 180:13, 192:1, 241:2, 241:8, 278:15, 279:10, 280:1
**cuts** [1] - 278:13
**cutting** [2] - 278:23, 280:3
**CV** [2] - 106:17, 172:8

## D

**DA** [5] - 54:23, 293:25, 295:3, 297:14, 299:13
**daily** [20] - 58:2, 60:2, 60:9, 60:22, 61:18, 63:10, 76:7, 91:24, 108:1, 117:11, 117:13, 118:3, 134:12, 206:25, 216:6, 218:15, 250:5, 259:10, 261:8, 265:13
**damage** [1] - 25:14
**damaging** [1] - 18:23
**danger** [1] - 119:24
**dangerous** [5] - 21:19, 25:17, 187:15, 187:19, 294:25
**dangerously** [1] - 23:13
**data** [9] - 26:5, 148:10, 149:2, 190:23, 190:25, 215:7, 219:10, 246:21, 271:7
**database** [2] - 41:1, 132:13
**databases** [2] - 130:16, 131:7
**date** [8] - 8:1, 40:16, 62:14, 116:12, 191:4, 234:4, 279:21, 291:7
**dates** [3] - 5:23, 12:8, 301:17
**David** [2] - 178:19, 212:9
**David's** [1] - 219:20
**Davis** [1] - 162:15
**day's** [1] - 176:22
**day-room** [1] - 86:20
**day-to-day** [1] - 89:24
**days** [19] - 32:23, 46:14, 76:14, 115:17, 171:6, 171:18, 177:6,

182:13, 182:15, 184:2, 187:5, 240:17, 240:18, 260:10, 278:19, 291:11, 291:17, 294:21
**days'** [1] - 135:5
**daytime** [1] - 118:22
**DC** [1] - 136:6
**de** [1] - 158:12
**deadline** [2] - 290:16, 290:18
**deal** [15] - 48:9, 48:17, 90:2, 108:1, 119:20, 121:7, 141:2, 154:15, 154:17, 155:23, 162:8, 192:1, 204:13, 215:7
**dealing** [5] - 87:22, 121:8, 144:17, 149:1
**deals** [1] - 40:21
**dealt** [1] - 138:17
**Dean** [3] - 3:13, 4:12, 171:13
**DEAN** [18] - 2:7, 4:12, 169:10, 169:20, 171:12, 172:4, 174:20, 175:1, 249:23, 253:5, 253:8, 254:24, 261:6, 262:12, 267:4, 267:5, 270:14, 270:16
**debate** [1] - 247:13
**debates** [1] - 202:3
**decade** [2] - 12:19, 21:13
**decades** [2] - 22:4, 227:6
**December** [9] - 46:15, 47:6, 51:20, 51:22, 71:5, 102:7, 200:17, 229:6, 229:16
**decency** [1] - 22:1
**decent** [1] - 225:8
**decide** [2] - 26:14, 126:14
**decided** [1] - 158:22
**decides** [1] - 19:23
**deciding** [3] - 127:9, 144:18, 188:10
**decision** [7] - 32:15, 52:3, 52:5, 100:16, 241:2, 281:10, 297:11
**decisions** [3] - 159:2, 233:12, 280:5
**declines** [1] - 211:2
**decompensation** [1] - 22:10

**decrease** [2] - 156:9, 251:1
**decreased** [3] - 134:8, 155:11, 238:5
**decreases** [1] - 156:8
**decree** [1] - 17:16
**Decree** [93] - 9:11, 10:15, 11:15, 18:25, 20:24, 21:9, 21:14, 32:8, 34:24, 38:22, 39:1, 39:10, 39:15, 40:20, 42:19, 44:19, 45:21, 47:18, 48:21, 49:25, 57:24, 70:6, 70:9, 70:20, 70:22, 71:4, 71:9, 71:18, 74:8, 93:18, 95:24, 99:21, 100:9, 104:3, 108:24, 109:12, 113:16, 113:21, 126:17, 126:18, 126:20, 126:21, 127:5, 133:10, 133:12, 133:16, 134:21, 137:13, 145:21, 145:22, 147:4, 147:5, 152:6, 156:25, 158:3, 158:10, 158:16, 159:1, 164:2, 170:12, 177:24, 179:10, 179:16, 180:16, 181:10, 193:23, 206:7, 206:17, 210:14, 210:18, 210:19, 212:5, 227:15, 233:5, 239:9, 239:14, 239:19, 241:5, 241:9, 241:14, 241:18, 241:23, 242:9, 251:12, 251:17, 251:18, 252:8, 255:16, 257:12, 280:8, 299:22
**Decrees** [2] - 232:6, 251:22
**dedicated** [2] - 130:18, 131:3
**deducted** [1] - 78:5
**deemed** [1] - 295:8
**Defendant** [4] - 2:10, 2:14, 3:2, 3:3
**defendant** [2] - 203:23, 204:7
**defendant's** [1] - 257:18
**Defendants** [1] - 1:11
**defender** [3] - 252:4,

293:25, 297:15
**defer** [1] - 71:22
**deficiencies** [2] - 22:5, 25:4
**definitely** [2] - 148:12, 247:15
**degree** [9] - 68:7, 68:10, 149:6, 150:9, 162:13, 176:19, 272:2
**delay** [1] - 25:19
**Delgato** [2] - 36:15, 46:25
**Delinquency** [1] - 163:8
**delirium** [1] - 138:24
**deliver** [1] - 152:5
**delivering** [1] - 249:9
**delivery** [3] - 116:9, 143:14, 230:2
**delta** [2] - 218:3, 226:1
**DEMAREE** [3] - 3:9, 103:8, 103:13
**Demaree** [2] - 103:12, 103:13
**demonstrated** [1] - 214:3
**denied** [1] - 106:13
**dental** [9] - 87:17, 89:7, 89:8, 89:12, 132:3, 132:5, 132:6, 132:9
**dentists** [1] - 132:7
**deny** [1] - 175:8
**Department** [53] - 9:9, 12:7, 15:14, 15:17, 54:14, 73:18, 82:19, 104:2, 108:24, 111:22, 162:4, 163:6, 163:15, 163:22, 166:18, 167:9, 167:21, 168:5, 168:8, 168:13, 168:15, 193:18, 195:9, 195:14, 197:20, 199:22, 199:25, 202:16, 203:3, 203:5, 203:6, 203:8, 203:11, 203:23, 204:7, 204:12, 205:23, 209:18, 224:2, 225:4, 246:16, 246:18, 246:24, 247:9, 252:3, 271:13, 271:17, 281:6, 285:15, 293:23, 296:25, 299:20
**department** [36] -

9:14, 10:24, 20:4, 20:12, 32:8, 36:11, 49:7, 91:16, 105:14, 109:24, 128:8, 128:10, 128:12, 145:14, 147:4, 147:22, 148:18, 151:8, 152:5, 173:25, 178:15, 182:9, 198:7, 224:14, 227:15, 236:9, 236:23, 237:18, 237:20, 238:7, 248:10, 257:20, 266:24, 272:1, 288:23, 289:7
**department's** [1] - 234:19
**Department's** [1] - 285:12
**departmental** [1] - 84:23
**departments** [5] - 10:25, 19:13, 67:14, 105:18, 106:8
**depended** [1] - 84:16
**depleted** [1] - 101:15
**deployed** [1] - 296:9
**deposed** [1] - 72:13
**deposition** [8] - 68:17, 69:8, 103:7, 159:14, 159:16, 160:5, 160:14, 165:11
**deprived** [1] - 7:20
**deprives** [1] - 7:11
**Dept** [1] - 2:8
**depth** [1] - 119:11
**deputies** [86] - 9:19, 9:20, 10:16, 10:23, 11:1, 11:8, 11:21, 12:3, 13:19, 22:16, 22:17, 22:20, 23:3, 25:22, 31:11, 31:24, 32:6, 32:11, 33:18, 35:1, 36:19, 37:18, 39:11, 51:21, 52:2, 52:17, 52:21, 63:6, 64:2, 64:5, 64:10, 64:16, 66:13, 66:25, 67:4, 67:8, 67:17, 67:18, 67:19, 67:20, 68:6, 78:14, 78:21, 81:23, 83:13, 84:20, 84:24, 86:18, 88:11, 89:16, 89:24, 90:9, 91:8, 91:11, 92:18, 92:19, 96:1, 96:25, 98:8, 98:14, 98:22, 99:2, 99:5, 99:14, 99:15, 99:20, 99:21,

100:7, 100:13, 122:20, 207:14, 207:18, 212:12, 223:13, 223:18, 229:10, 229:12, 229:15, 231:19, 268:21, 272:19, 274:10, 283:13, 283:15
**deputies'** [2] - 67:13, 80:6
**Deputy** [6] - 27:12, 92:12, 236:3, 236:6, 284:3, 286:22
**deputy** [48] - 9:17, 11:20, 27:25, 28:1, 30:22, 33:6, 34:23, 36:19, 41:3, 43:13, 56:25, 63:12, 63:17, 67:2, 67:22, 77:21, 77:24, 78:8, 78:25, 80:4, 81:21, 83:22, 83:25, 84:4, 84:15, 85:19, 85:22, 85:23, 87:4, 88:2, 88:6, 88:9, 88:13, 89:9, 89:10, 98:18, 100:20, 122:6, 221:25, 223:21, 267:25, 268:2, 268:22, 271:16, 272:3
**deputy's** [1] - 84:2
**describe** [4] - 48:5, 82:8, 90:6, 285:14
**described** [1] - 89:6
**describes** [1] - 132:1
**describing** [1] - 86:11
**deserves** [2] - 14:15, 14:22
**design** [4] - 70:25, 172:18, 268:16, 290:23
**designated** [4] - 159:19, 160:8, 160:13, 160:14
**designations** [1] - 159:24
**designed** [6] - 36:1, 36:9, 105:8, 105:11, 106:8, 152:5
**designing** [1] - 147:4
**desk** [1] - 95:6
**desktop** [1] - 43:8
**desperately** [2] - 12:6, 290:4
**despite** [2] - 17:14, 151:1
**destroyed** [1] - 287:17
**destruction** [2] -

25:14, 289:14
**detail** [2] - 117:20, 222:15
**detailed** [2] - 26:5, 119:11
**detained** [2] - 295:6
**detainees** [4] - 22:9, 82:17, 126:7, 271:1
**detention** [10] - 51:23, 52:14, 52:16, 178:11, 199:12, 210:4, 210:7, 242:20, 242:22, 250:12
**determinations** [1] - 6:24
**determine** [5] - 150:5, 174:1, 179:15, 183:21, 188:12
**determined** [5] - 5:16, 51:10, 186:5, 284:23, 293:11
**determining** [1] - 285:5
**detriment** [1] - 21:12
**devastating** [1] - 131:2
**develop** [9] - 44:24, 48:12, 162:8, 168:11, 176:5, 176:24, 250:25, 258:4, 275:1
**developed** [7] - 11:4, 35:24, 137:8, 137:11, 205:14, 206:15, 260:13
**developing** [2] - 151:9, 229:8
**diagnoses** [1] - 149:4
**dialog** [1] - 222:13
**dialysis** [1] - 145:16
**Diamond** [2] - 135:22, 135:25
**die** [1] - 47:5
**diem** [16] - 54:24, 56:19, 57:6, 58:10, 58:24, 97:9, 213:20, 240:3, 245:15, 245:19, 245:22, 246:4, 246:12, 261:14, 261:15, 265:10
**diems** [1] - 293:5
**differ** [2] - 137:15, 160:2
**difference** [7] - 67:19, 136:19, 136:21, 213:4, 248:3, 263:12, 273:16
**differences** [1] -

277:10
**different** [35] - 28:22, 30:1, 32:2, 61:1, 69:2, 70:17, 81:22, 84:16, 92:9, 93:9, 94:11, 101:7, 105:8, 113:19, 117:21, 118:6, 131:19, 156:11, 156:12, 174:3, 197:3, 208:1, 211:8, 226:20, 227:2, 245:1, 260:16, 262:18, 265:18, 269:25, 271:14, 271:20, 271:21, 289:9, 296:25
**differential** [1] - 219:9
**differently** [1] - 218:5
**difficult** [5] - 92:14, 118:18, 215:8, 229:21, 234:25
**difficulties** [1] - 192:19
**digress** [1] - 41:25
**dime** [3] - 185:17, 217:3, 245:24
**diplomatic** [1] - 219:18
**DIRECT** [6] - 27:19, 80:22, 103:15, 130:6, 161:14, 276:15
**Direct** [3] - 3:5, 3:7, 3:9
**direct** [31] - 3:12, 3:15, 12:13, 51:5, 52:13, 52:19, 52:21, 52:23, 85:9, 94:12, 100:1, 109:1, 169:16, 255:21, 255:22, 256:3, 256:4, 261:10, 268:6, 268:8, 268:12, 268:13, 268:14, 274:20, 274:22, 275:1, 275:2, 275:23, 294:22, 301:5
**directed** [1] - 294:3
**direction** [2] - 215:17, 298:7
**directive** [2] - 16:17, 19:4
**directly** [5] - 118:7, 195:12, 202:25, 292:20, 300:13
**Director** [2] - 50:9, 52:9
**director** [26] - 12:21,

12:22, 104:18, 104:24, 106:6, 115:1, 115:2, 115:5, 115:11, 115:16, 115:22, 116:8, 116:14, 116:15, 116:17, 116:23, 122:17, 122:23, 127:8, 127:9, 144:14, 149:13, 149:14, 150:17, 176:2, 234:21
**director's** [2] - 116:7, 128:17
**directors** [4] - 115:13, 115:20, 122:5, 144:15
**disabled** [1] - 146:6
**disagree** [3] - 35:6, 132:24, 208:12
**disappearing** [1] - 255:10
**disaster** [1] - 287:17
**disciplinary** [1] - 269:3
**discipline** [2] - 41:5, 108:14
**discourse** [1] - 222:15
**discovering** [1] - 92:17
**discrimination** [2] - 167:14, 167:19
**discuss** [9] - 8:24, 9:10, 27:8, 27:10, 74:3, 131:9, 132:10, 232:13, 301:20
**discussed** [7] - 83:4, 98:25, 142:5, 155:5, 199:21, 212:2, 222:10
**discussing** [2] - 109:25, 269:23
**discussion** [2] - 118:12, 262:1
**discussions** [1] - 246:7
**disease** [2] - 22:9, 130:25
**dismissed** [1] - 34:1
**disposal** [1] - 145:15
**dispose** [1] - 185:1
**disposed** [1] - 193:15
**disposition** [2] - 185:3, 191:11
**dispute** [11] - 22:7, 22:15, 22:22, 24:2, 25:22, 25:25, 156:15, 187:21, 235:22, 240:8, 292:7
**disputes** [2] - 6:16, 6:18

**disputing** [1] - 235:25
**distinct** [2] - 19:21, 117:16
**DISTRICT** [3] - 1:1, 1:2, 1:16
**district** [16] - 14:19, 53:9, 81:25, 98:12, 98:14, 98:19, 98:21, 99:2, 99:14, 99:19, 100:2, 100:3, 100:7, 100:20, 252:5
**District** [4] - 5:11, 19:25, 28:15, 106:19
**disturbing** [1] - 230:8
**divided** [1] - 264:6
**Division** [7] - 19:20, 19:21, 20:3, 20:4, 20:11, 167:16, 168:6
**division** [7] - 14:20, 19:20, 81:5, 92:23, 98:9, 131:4, 133:1
**division's** [1] - 92:23
**divisions** [2] - 92:24, 128:10
**DLC** [1] - 301:2
**doable** [1] - 235:1
**doc** [1] - 270:11
**DOC** [106] - 24:7, 48:1, 53:11, 54:5, 54:20, 54:22, 54:23, 54:24, 55:2, 55:5, 55:7, 55:10, 55:13, 55:16, 55:20, 55:21, 55:25, 56:11, 56:12, 56:18, 57:1, 57:8, 57:9, 57:16, 58:2, 58:6, 58:14, 58:17, 58:20, 58:23, 62:18, 76:5, 76:8, 76:19, 77:4, 77:24, 78:9, 96:7, 96:15, 138:5, 138:8, 138:9, 138:11, 138:13, 139:10, 140:6, 141:22, 142:25, 143:2, 143:3, 143:5, 143:12, 143:21, 144:3, 144:14, 154:11, 191:6, 191:7, 193:17, 194:8, 194:11, 195:16, 195:19, 196:7, 196:18, 196:19, 196:25, 197:17, 203:2, 203:16, 204:2, 206:20, 207:2, 207:6, 207:10, 208:16, 217:2, 217:8, 217:13,

217:19, 217:22, 217:24, 223:15, 223:24, 228:22, 234:15, 235:2, 238:9, 238:17, 238:20, 239:1, 239:8, 239:25, 245:15, 261:14, 262:14, 264:14, 264:24, 272:24, 273:7, 300:19, 300:23
**doctor** [13] - 103:17, 108:17, 109:17, 113:14, 114:21, 123:16, 127:24, 130:8, 138:5, 139:22, 145:3, 176:7, 206:9
**Doctor** [7] - 116:5, 117:10, 124:10, 140:9, 145:23, 159:9, 170:22
**doctors** [2] - 170:20, 176:23
**document** [43] - 60:13, 60:18, 61:10, 61:15, 61:16, 62:12, 66:10, 72:13, 72:17, 73:5, 73:6, 73:9, 73:15, 75:18, 95:2, 95:5, 95:20, 97:23, 100:6, 100:23, 101:16, 102:4, 110:6, 111:14, 112:18, 139:13, 139:18, 150:14, 178:9, 178:10, 189:2, 189:5, 235:18, 235:20, 236:1, 236:4, 236:19, 237:8, 241:16, 261:11, 262:15, 265:1, 282:2
**documentation** [1] - 151:1
**documents** [10] - 26:6, 39:25, 96:1, 109:7, 236:14, 237:15, 237:19, 271:7, 282:6, 282:18
**DOJ** [13] - 18:21, 57:22, 99:1, 114:22, 133:12, 134:18, 145:5, 228:21, 246:4, 277:6, 277:13, 299:19, 301:2
**DOJ's** [3] - 13:7, 16:13, 109:16

**dollar** [2] - 34:7, 43:13
**dollars** [9] - 17:10, 17:23, 141:16, 142:4, 215:19, 240:3, 253:21, 278:16, 290:10
**DOMINICK** [1] - 1:5
**done** [52] - 31:22, 35:17, 45:9, 63:11, 72:2, 84:19, 95:5, 95:20, 105:21, 116:20, 121:21, 133:20, 134:3, 134:14, 139:23, 166:14, 171:1, 172:9, 179:24, 179:25, 180:2, 180:5, 180:15, 184:7, 184:8, 185:20, 186:9, 186:25, 188:17, 192:16, 195:6, 200:12, 201:13, 202:13, 203:4, 204:11, 212:9, 214:18, 220:24, 222:4, 222:19, 227:9, 232:20, 245:21, 246:22, 250:25, 251:1, 253:16, 258:12, 279:14, 295:10
**door** [1] - 33:19
**dorm** [4] - 86:12, 86:16, 87:13, 91:1
**double** [4] - 18:1, 218:6, 274:5, 295:14
**doubled** [1] - 256:11
**doubling** [1] - 255:13
**doubt** [3] - 16:7, 278:4, 297:6
**down** [69] - 8:18, 8:21, 11:21, 13:12, 14:20, 34:4, 39:19, 40:8, 43:18, 52:23, 61:8, 66:14, 74:10, 75:14, 76:22, 80:12, 83:4, 84:7, 84:25, 85:17, 85:21, 86:18, 89:11, 109:24, 114:11, 117:20, 120:20, 121:2, 127:24, 135:16, 139:23, 144:4, 150:17, 170:11, 171:6, 171:16, 181:3, 181:22, 181:24, 182:5, 182:8, 185:22, 198:25, 201:22, 206:13,

208:3, 208:10, 215:21, 222:23, 227:21, 227:22, 227:23, 229:4, 244:14, 250:6, 251:14, 254:18, 258:20, 264:18, 265:15, 278:17, 280:1, 280:2, 285:15, 298:4
**download** [1] - 43:20
**Dr** [138] - 10:8, 12:21, 13:6, 13:8, 18:4, 19:1, 103:6, 106:21, 109:1, 109:10, 109:15, 109:16, 115:7, 115:14, 115:22, 132:21, 132:23, 134:3, 134:7, 136:19, 136:22, 137:3, 137:9, 137:12, 137:14, 137:16, 137:17, 137:24, 137:25, 138:1, 139:22, 141:17, 146:1, 149:13, 150:9, 155:3, 156:3, 156:21, 156:25, 159:5, 161:8, 161:16, 161:18, 162:11, 162:25, 166:11, 168:1, 168:20, 168:22, 169:23, 169:24, 170:9, 170:10, 170:11, 170:13, 170:16, 170:19, 171:13, 171:15, 171:19, 171:23, 172:5, 175:13, 175:20, 175:25, 176:1, 176:2, 176:4, 176:6, 176:9, 176:10, 176:18, 176:19, 177:14, 180:8, 180:13, 190:3, 190:19, 197:18, 198:17, 202:1, 202:24, 207:15, 208:7, 208:12, 208:20, 215:2, 215:24, 220:15, 220:20, 223:7, 223:11, 227:7, 228:8, 228:17, 231:1, 233:4, 233:20, 235:12, 237:23, 240:12, 242:3, 245:14, 249:24,

253:25, 260:25, 261:1, 269:14, 270:14, 270:24, 272:7, 275:6, 276:19, 277:12, 277:24, 278:1, 280:9, 280:20, 281:12, 283:10, 288:19, 289:23, 292:17, 294:5, 294:11, 295:12, 295:16, 295:19, 296:17, 296:19, 297:3, 299:2
**dr** [1] - 171:25
**draft** [5] - 73:5, 73:6, 75:1, 95:6, 176:20
**drafts** [1] - 28:22
**dramatic** [2] - 179:12, 185:6
**dramatically** [5] - 134:3, 179:25, 182:2, 182:8, 293:5
**drastically** [1] - 92:9
**dreads** [1] - 128:22
**drive** [7] - 51:11, 64:16, 181:3, 181:22, 182:5, 208:15, 225:11
**driven** [3] - 29:2, 29:4, 182:17
**driver** [3] - 22:23, 184:24, 262:14
**drives** [1] - 206:16
**driving** [1] - 285:25
**drop** [7] - 39:19, 40:8, 55:21, 121:2, 198:15, 261:19, 262:23
**drop-down** [2] - 39:19, 40:8
**dropped** [2] - 182:2, 185:11
**dropping** [2] - 197:24, 200:25
**drops** [1] - 131:14
**drove** [1] - 29:3
**drug** [4] - 108:3, 125:21, 128:19, 138:23
**drugs** [2] - 149:3, 221:15
**due** [9] - 7:8, 156:5, 186:22, 196:16, 205:18, 219:12, 220:7, 241:13, 287:15
**duly** [5] - 27:14, 80:15, 103:8, 161:9, 276:6
**Dumas** [2] - 20:14,

20:15
**Dunbar** [1] - 2:14
**during** [11] - 16:25, 35:22, 45:22, 73:23, 76:14, 81:8, 157:11, 222:10, 272:16, 272:19, 294:7
**duties** [8] - 28:1, 32:19, 92:16, 110:2, 116:16, 118:8, 120:21, 122:5
**duty** [1] - 51:13

# E

**E4** [1] - 85:21
**earliest** [2] - 243:2, 243:4
**early** [12] - 11:16, 23:20, 40:19, 41:16, 48:8, 125:17, 153:1, 166:20, 167:17, 185:2, 187:1, 205:9
**earning** [3] - 68:9, 115:9, 186:18
**ease** [1] - 160:21
**easier** [3] - 160:17, 167:24, 277:20
**easily** [1] - 140:21
**Eastern** [2] - 5:11, 106:19
**EASTERN** [1] - 1:2
**easy** [5] - 101:24, 117:22, 118:1, 118:11, 140:17
**Eckenthall** [2] - 178:20, 212:9
**Eckenthall's** [1] - 179:6
**editions** [1] - 109:2
**educated** [1] - 47:19
**Education** [1] - 130:9
**education** [16] - 46:19, 93:16, 93:19, 93:20, 104:6, 104:16, 107:20, 107:22, 130:12, 150:10, 162:12, 193:14, 193:20, 194:1, 241:9, 241:23
**educational** [3] - 130:12, 241:7, 241:17
**educationally** [1] - 271:15
**effect** [4] - 151:7, 282:3, 293:6, 297:4
**effective** [2] - 18:5, 284:11
**effectiveness** [1] -

298:3
**efficiencies** [3] - 257:21, 286:10, 298:2
**efficiency** [1] - 279:17
**efficient** [2] - 11:25, 212:21
**effort** [2] - 229:6, 296:6
**efforts** [3] - 19:7, 19:16, 24:16
**eight** [6] - 17:15, 25:18, 46:9, 111:9, 120:14, 273:7
**either** [12] - 57:22, 71:16, 122:6, 141:18, 150:6, 158:10, 196:12, 224:11, 228:21, 267:2, 280:24, 290:14
**elected** [2] - 200:13, 294:16
**electronic** [12] - 11:17, 43:8, 48:20, 48:22, 48:23, 49:1, 49:12, 49:15, 132:11, 132:12, 132:13, 132:14
**electronically** [1] - 11:22
**elevators** [2] - 135:7, 249:14
**eliminate** [2] - 19:14, 246:4
**Elimination** [1] - 45:9
**ELIZABETH** [1] - 2:4
**Elizabeth** [1] - 2:2
**elsewhere** [3] - 179:24, 202:13, 283:18
**email** [3] - 108:25, 283:12, 283:13
**emailed** [1] - 109:5
**embraced** [2] - 17:9, 278:9
**emergencies** [2] - 115:17, 135:12
**emergency** [5] - 19:13, 106:6, 135:15, 143:19, 202:20
**emphasis** [1] - 125:16
**employed** [5] - 27:21, 28:9, 80:25, 81:6, 161:18
**employee** [8] - 34:12, 110:14, 111:8, 123:22, 150:5, 171:25, 172:2,

278:16
**employees** [10] - 31:24, 32:2, 84:12, 94:15, 130:17, 146:13, 186:11, 223:19, 231:2, 248:20
**employer** [1] - 110:15
**employment** [2] - 272:13
**empty** [2] - 23:1, 197:25
**EMS** [1] - 278:17
**enable** [2] - 23:14, 286:11
**encourage** [1] - 24:23
**end** [34] - 5:25, 6:5, 6:19, 11:11, 24:11, 47:6, 49:18, 49:20, 62:25, 64:18, 75:21, 95:15, 101:18, 101:19, 111:5, 117:23, 152:21, 155:19, 190:24, 198:9, 198:10, 198:13, 200:20, 201:1, 201:15, 204:15, 227:12, 228:1, 232:18, 236:24, 288:20, 296:2
**endeavor** [1] - 63:13
**endorsed** [1] - 17:15
**ends** [1] - 47:5
**enforcement** [9] - 10:21, 28:9, 37:13, 93:1, 186:20, 247:2, 247:5, 248:1, 271:20
**engage** [1] - 224:11
**engages** [1] - 91:24
**English** [2] - 49:4, 49:6
**enriched** [1] - 266:12
**ensure** [5] - 5:8, 16:15, 21:24, 71:7, 95:25
**ensuring** [1] - 5:22
**enter** [2] - 6:11, 148:14
**entered** [7] - 5:3, 8:25, 28:16, 91:14, 113:12, 132:13, 248:7
**entering** [1] - 247:12
**entertain** [1] - 209:12
**entire** [5] - 15:4, 71:8, 88:3, 123:25, 250:10
**entirely** [1] - 115:16
**entities** [2] - 179:5, 251:25

**entitled** [1] - 20:21
**entity** [1] - 179:6
**entry** [15] - 47:21, 47:24, 148:10, 238:17, 238:20, 239:1, 239:8, 239:22, 240:5, 248:6, 248:11, 248:13, 248:15, 248:19, 260:9
**environment** [3] - 16:16, 140:18, 206:11
**envision** [1] - 155:15
**envisioned** [1] - 154:13
**envy** [1] - 285:24
**equally** [1] - 19:5
**equation** [1] - 222:18
**equipment** [2] - 24:2, 68:25
**equivalent** [2] - 116:13, 120:12
**ER** [2] - 141:9, 141:10
**Erie** [1] - 154:12
**errors** [1] - 40:16
**escalate** [1] - 272:20
**especially** [4] - 24:19, 115:14, 131:17, 286:14
**ESQ** [12] - 2:3, 2:4, 2:7, 2:7, 2:8, 2:10, 2:11, 2:11, 2:14, 2:15, 2:17, 2:18
**essential** [4] - 17:3, 128:8, 128:11, 130:21
**establish** [2] - 156:9, 156:11
**established** [2] - 259:8, 281:5
**establishing** [1] - 257:13
**estimate** [6] - 117:12, 137:4, 206:24, 256:13, 257:3, 260:11
**estimates** [1] - 136:19, 136:20, 173:20, 178:23, 214:14, 214:15, 214:24, 258:15, 264:9, 265:22, 268:8
**estimating** [1] - 178:21
**et** [18] - 1:7, 4:5, 4:6, 108:9, 114:1, 119:8, 131:1, 131:14, 146:6, 161:24, 185:4, 215:21,

251:11, 258:16, 259:2, 299:13
**EUELL** [1] - 1:6
**evaluate** [2] - 270:4, 297:11
**evaluation** [4] - 157:12, 157:22, 166:23, 296:20
**evaluations** [3] - 172:14, 172:16, 172:20
**evening** [2] - 76:13, 300:14
**evenings** [1] - 82:13
**eventually** [2] - 11:24, 201:14
**everywhere** [1] - 278:13
**evidence** [19] - 6:5, 6:9, 6:23, 6:24, 13:22, 15:2, 16:11, 17:1, 31:17, 79:20, 111:17, 111:21, 129:10, 159:17, 236:14, 236:17, 236:19, 281:20, 282:1
**evident** [1] - 215:5
**exacerbated** [1] - 22:12
**exact** [6] - 101:3, 122:23, 151:9, 155:25, 207:17, 225:6
**exactly** [9] - 57:16, 102:8, 120:18, 147:12, 155:16, 155:17, 214:25, 247:20, 273:17
**Examination** [1] - 3:12
**EXAMINATION** [18] - 27:19, 56:9, 79:25, 80:22, 94:25, 103:15, 130:6, 145:24, 156:23, 161:14, 171:11, 223:9, 233:18, 249:22, 270:22, 276:15, 286:20, 298:14
**examine** [3] - 194:18, 210:11, 248:16
**example** [24] - 25:4, 59:22, 61:17, 77:23, 78:7, 83:23, 84:18, 85:17, 85:21, 96:5, 147:8, 147:17, 155:12, 172:18, 176:17, 202:1, 206:9, 212:17,

219:6, 221:18, 223:18, 269:7, 292:20
**examples** [1] - 251:3
**exceeded** [1] - 41:22
**exceedingly** [1] - 133:6
**exceeds** [2] - 58:1, 112:21
**excellent** [1] - 238:22
**except** [6] - 11:18, 68:20, 147:13, 180:18, 196:18, 242:19
**exception** [2] - 146:3, 150:24
**exceptions** [1] - 247:6
**excess** [2] - 288:25, 289:5
**excessive** [2] - 280:12, 288:14
**exchanged** [2] - 282:17, 282:19
**exchanges** [1] - 108:25
**exclude** [2] - 6:23, 263:9
**excluding** [1] - 69:5
**exclusively** [1] - 176:22
**excuse** [2] - 194:6, 259:16
**executive** [1] - 28:2
**exercising** [1] - 7:9
**exhaustive** [1] - 131:15
**exhibit** [2] - 282:13, 282:14
**Exhibit** [15] - 60:18, 79:18, 79:24, 81:16, 95:3, 99:8, 108:21, 111:15, 111:25, 112:16, 153:25, 177:22, 189:4, 253:2, 267:8
**exhibits** [3] - 8:6, 167:23, 282:17
**Exhibits** [1] - 129:17
**exist** [5] - 18:18, 113:17, 153:20, 244:5, 244:6
**existence** [2] - 237:12, 251:13
**existing** [3] - 207:8, 267:15, 267:20
**exists** [4] - 9:16, 107:12, 154:15, 220:21
**exit** [1] - 33:23
**expanding** [2] -

251:10
**expect** [5] - 17:5, 231:16, 269:15, 280:7, 295:14
**expectations** [1] - 113:20
**expected** [1] - 139:16
**expects** [1] - 280:16
**expedite** [1] - 196:3
**expedited** [1] - 74:1
**expediting** [1] - 251:9
**expenditure** [1] - 264:18
**expenditures** [4] - 279:19, 283:14, 283:23, 288:12
**expense** [6] - 68:24, 139:2, 140:25, 200:9, 213:5, 273:23
**expenses** [11] - 24:17, 26:9, 145:14, 222:3, 228:22, 278:10, 280:14, 287:10, 287:13, 290:1, 298:16
**expensive** [9] - 138:7, 139:4, 139:10, 140:6, 206:17, 213:19, 264:14, 265:16, 288:15
**expensive-to-operate** [1] - 288:15
**experience** [14] - 35:7, 38:5, 49:24, 84:20, 105:2, 114:6, 115:25, 116:4, 138:5, 222:7, 227:6, 271:24, 274:8, 276:12
**experienced** [1] - 52:21
**expert** [69] - 9:2, 10:4, 13:7, 13:20, 18:2, 18:5, 18:24, 22:18, 23:21, 24:21, 27:2, 27:5, 30:15, 35:4, 35:7, 73:11, 73:22, 74:9, 106:10, 106:15, 106:22, 107:16, 108:2, 108:12, 108:19, 109:15, 111:20, 112:8, 123:20, 129:12, 129:18, 133:17, 134:7, 135:5, 135:19, 142:6, 142:7, 159:12, 164:10, 165:6, 165:8, 166:12, 166:18,

168:20, 168:22, 170:5, 170:6, 170:15, 170:18, 172:24, 173:3, 173:4, 173:6, 174:7, 175:6, 175:8, 175:9, 175:10, 175:13, 175:18, 177:1, 177:2, 177:4, 194:21, 225:7, 244:25, 255:16, 276:20
**expert's** [1] - 137:23
**expertise** [5] - 103:23, 170:19, 171:8, 176:13, 268:13
**experts** [21] - 9:2, 12:17, 22:20, 30:17, 51:18, 109:16, 134:22, 170:24, 176:16, 178:3, 205:22, 228:20, 245:5, 246:12, 256:4, 257:8, 274:12, 277:6, 283:16, 299:8, 301:4
**expire** [1] - 49:16
**expires** [1] - 49:11
**explain** [17] - 19:2, 85:13, 103:20, 116:16, 117:15, 119:2, 119:17, 121:15, 123:17, 125:2, 128:1, 130:9, 145:7, 181:18, 261:12, 262:13, 264:21
**explained** [3] - 68:17, 120:17, 120:24
**explains** [1] - 264:20
**Express** [1] - 136:1
**expressed** [2] - 176:3, 215:1
**expression** [2] - 20:18, 48:13
**extended** [2] - 127:2, 138:14
**extends** [1] - 46:18
**extent** [12] - 26:3, 100:12, 144:23, 156:15, 162:12, 185:2, 194:4, 203:15, 222:2, 239:15, 290:13, 300:22
**extra** [1] - 134:16
**extract** [2] - 190:23, 236:23
**extracurricular** [1] - 21:6

**extraordinary** [1] - 231:23
**extreme** [4] - 22:7, 33:3, 251:3, 251:5
**extremely** [2] - 205:25, 213:21
**eye** [1] - 131:13

## F

**face** [1] - 208:4
**faced** [1] - 144:12
**facilities** [78] - 6:7, 9:15, 10:3, 10:9, 11:18, 12:13, 13:10, 22:3, 22:16, 22:21, 23:5, 23:12, 25:8, 25:14, 25:21, 30:12, 31:6, 51:17, 68:25, 73:14, 76:2, 81:9, 81:13, 83:11, 83:17, 91:9, 92:5, 92:6, 105:17, 118:6, 142:24, 144:5, 148:22, 154:1, 163:20, 168:23, 170:6, 178:12, 191:5, 197:11, 199:3, 199:7, 199:15, 206:1, 220:19, 220:22, 242:4, 242:5, 242:8, 242:10, 243:10, 243:14, 243:17, 244:2, 250:20, 254:17, 254:18, 254:19, 254:21, 258:18, 258:25, 259:12, 259:13, 267:11, 267:15, 267:20, 287:19, 287:22, 288:15, 289:4, 289:5, 289:15, 292:1, 297:11, 297:24
**facilities'** [1] - 13:1
**facility** [97] - 6:5, 10:11, 17:18, 24:5, 34:13, 50:3, 52:12, 68:18, 69:1, 69:3, 69:22, 70:1, 70:25, 71:16, 72:2, 72:6, 72:7, 72:24, 74:13, 76:19, 83:4, 83:22, 85:15, 90:20, 90:24, 91:2, 93:7, 93:13, 94:14, 105:24, 109:2, 109:3, 114:25, 116:18,

116:24, 138:13, 141:6, 145:17, 164:3, 164:6, 164:8, 165:19, 165:23, 172:25, 193:13, 194:3, 194:5, 199:8, 203:3, 204:3, 204:23, 204:25, 205:3, 205:9, 205:18, 205:19, 207:14, 209:1, 209:10, 209:11, 209:14, 209:15, 209:16, 209:25, 210:4, 210:8, 210:10, 210:17, 214:13, 214:15, 215:3, 221:12, 229:25, 238:23, 238:25, 239:4, 239:6, 239:11, 239:16, 240:14, 242:15, 242:16, 242:22, 244:18, 249:3, 249:5, 249:25, 250:12, 254:22, 256:16, 258:22, 274:8, 289:21, 290:23, 291:21
**facing** [1] - 191:17
**fact** [29] - 25:23, 27:1, 27:4, 27:6, 45:24, 64:10, 65:23, 99:7, 111:20, 122:1, 126:4, 136:25, 144:20, 151:8, 186:17, 187:21, 192:25, 197:19, 199:24, 203:10, 203:19, 211:4, 218:14, 241:10, 247:15, 266:21, 284:25, 287:20, 301:4
**factor** [28] - 58:13, 93:11, 93:13, 93:14, 124:13, 124:24, 178:13, 185:5, 210:22, 210:25, 211:11, 211:22, 255:5, 255:6, 255:8, 255:11, 255:14, 256:8, 260:17, 267:20, 267:21, 270:10, 273:21, 273:22, 273:25, 274:1, 274:2, 274:7
**factored** [1] - 111:9
**factors** [6] - 124:12,

181:23, 229:11,
269:24, 270:2
**facts** [1] - 18:6
**factual** [1] - 151:11
**Factual** [1] - 17:19
**faculty** [1] - 108:5
**fail** [2] - 16:20, 184:14
**failed** [2] - 7:21,
107:17
**failure** [2] - 183:24,
296:22
**fair** [8] - 121:22,
127:22, 135:3,
135:4, 149:17,
150:14, 179:14,
180:19
**fairly** [3] - 17:9, 24:21,
126:5
**fairs** [2] - 11:7, 36:13
**faith** [1] - 8:1
**faithfully** [1] - 5:22
**fall** [2] - 90:5, 229:1
**falling** [1] - 254:21
**familiar** [18] - 20:14,
30:23, 31:5, 31:8,
39:21, 61:25, 62:2,
81:12, 105:16,
105:25, 116:23,
142:7, 165:4, 183:2,
246:23, 249:5,
252:8, 257:22
**families** [1] - 22:6
**families'** [1] - 17:3
**family** [4] - 34:6, 77:9,
77:10
**far** [21] - 7:25, 26:17,
37:3, 48:1, 51:3,
68:12, 99:25,
115:20, 121:16,
133:17, 134:6,
134:21, 134:23,
152:25, 181:4,
183:5, 280:20,
281:13, 282:5,
288:20, 297:23
**farming** [4] - 10:24,
52:16, 225:16,
225:18
**fast** [3] - 11:1, 34:8,
198:14
**fast-food** [1] - 11:1
**faster** [2] - 188:6,
188:7
**fat** [2] - 133:15, 134:16
**fatal** [1] - 138:24
**faxing** [1] - 40:25
**FCRR** [3] - 1:20,
303:6, 303:7
**feasible** [1] - 198:23
**features** [1] - 39:20

**February** [1] - 242:12
**federal** [15] - 5:9,
25:23, 55:12,
106:16, 166:11,
166:14, 193:13,
201:22, 214:4,
235:12, 251:6,
286:24, 287:4,
287:15, 290:11
**feed** [1] - 225:24
**feeding** [1] - 264:15
**fees** [3] - 20:11, 21:4,
41:23
**Feliciana** [1] - 136:13
**fellowship** [1] -
108:11
**fellowships** [1] -
107:8
**felon** [4] - 47:23,
182:24, 198:15,
252:6
**felonies** [1] - 195:8
**felons** [2] - 236:24,
296:14
**felony** [6] - 192:7,
192:9, 236:13,
237:25, 252:12,
252:14
**felt** [1] - 248:14
**FEMA** [13] - 25:13,
25:15, 253:21,
287:15, 287:20,
288:8, 288:12,
288:24, 289:13,
289:16, 289:22,
290:13, 298:17
**FEMA's** [1] - 289:10
**female** [1] - 124:18
**females** [4] - 90:23,
117:25, 120:4,
124:15
**ferrated** [1] - 142:20
**few** [17] - 19:17,
122:18, 124:5,
140:14, 147:13,
179:21, 193:3,
220:14, 223:6,
224:8, 226:11,
233:21, 240:18,
270:19, 270:24,
293:17, 298:12
**fewer** [4] - 19:12,
19:13, 91:7, 264:11
**field** [9] - 40:8, 45:20,
106:22, 108:13,
165:5, 165:14,
175:6, 260:24, 275:3
**fields** [2] - 164:15,
164:17
**Fifth** [1] - 4:25

**fight** [3] - 143:18,
201:14, 245:3
**figure** [11] - 37:1,
64:12, 68:14, 116:2,
118:2, 120:8,
139:24, 155:25,
218:15, 228:14,
291:25
**figured** [1] - 110:12
**figures** [7] - 127:19,
175:17, 176:21,
188:12, 277:23,
281:23
**figuring** [3] - 151:2,
174:5, 214:18
**file** [7] - 18:7, 40:14,
79:18, 129:18,
185:16, 190:23,
236:24
**filed** [6] - 5:13, 7:6,
7:10, 79:2, 185:15,
299:15
**files** [4] - 130:17,
132:15, 132:16
**filing** [1] - 185:3
**fill** [10] - 12:4, 14:6,
23:1, 32:9, 46:4,
93:17, 124:9,
140:16, 157:7
**filled** [8] - 9:12, 9:25,
83:13, 83:20,
140:21, 157:10,
158:5, 199:6
**filling** [2] - 14:5, 91:17
**final** [5] - 73:9, 111:10,
111:14, 121:18,
249:2
**finalists** [1] - 74:11
**finally** [1] - 145:3
**finance** [1] - 19:9
**finances** [1] - 26:4
**financial** [8] - 17:1,
19:1, 19:24, 21:11,
26:6, 58:6, 58:15,
286:23
**financially** [1] - 277:25
**findings** [2] - 132:24,
172:6
**Findings** [1] - 17:19
**fine** [5] - 99:15,
101:23, 160:3,
161:5, 282:22
**fingerprints** [1] -
55:13
**fingertips** [1] - 131:21
**finish** [6] - 154:5,
160:9, 223:2,
290:20, 301:10,
301:14
**finished** [4] - 57:21,

172:18, 173:17,
262:7
**fire** [1] - 19:13
**firefighter** [1] - 278:17
**firefighters** [1] - 280:2
**firehouse** [1] - 76:24
**firms** [1] - 221:11
**first** [41] - 26:23,
27:14, 40:12, 44:22,
45:25, 61:23, 66:9,
76:22, 83:4, 103:8,
107:14, 123:19,
135:2, 158:21,
177:24, 181:12,
181:13, 183:4,
183:6, 184:2,
185:21, 197:12,
199:19, 200:5,
231:25, 232:12,
241:4, 242:9,
258:12, 266:14,
267:10, 272:13,
276:6, 284:11,
285:20, 287:8,
291:5, 292:17,
294:2, 300:16,
300:18
**fiscal** [4] - 5:25, 26:12,
200:19, 204:12
**fishing** [1] - 225:21
**fit** [1] - 250:17
**five** [17] - 65:18,
65:20, 66:22, 92:24,
105:11, 114:6,
115:24, 116:3,
152:1, 156:22,
163:9, 166:4, 182:1,
184:2, 222:22,
251:9, 272:13
**fix** [2] - 203:1, 204:20
**fixed** [3] - 58:19,
150:20, 187:10
**fleet** [8] - 100:24,
101:15, 283:9,
285:11, 285:12,
285:22, 286:9,
286:10
**fleets** [1] - 286:7
**flipped** [1] - 190:12
**flood** [1] - 287:15
**floor** [5] - 76:22,
82:10, 83:24, 254:4,
254:5
**floors** [1] - 249:13
**Florida** [4] - 167:10,
167:12, 167:14,
251:8
**flu** [1] - 131:2
**fluctuations** [1] -
205:18

**fluent** [2] - 122:6,
122:19
**flux** [1] - 155:23
**focus** [9] - 17:10,
166:6, 179:11,
204:6, 226:12,
226:16, 226:19,
228:11
**focused** [7] - 5:23,
6:1, 6:22, 172:13,
200:6, 228:12, 296:7
**folder** [1] - 40:14
**folks** [13] - 93:17,
278:19, 279:25,
292:23, 293:10,
294:25, 295:3,
295:4, 295:5, 295:9,
296:2, 297:12
**follow** [12] - 6:19,
57:12, 59:8, 63:9,
125:18, 179:18,
189:16, 209:24,
224:8, 230:23,
233:21, 270:19
**follow-up** [9] - 6:19,
57:12, 59:8, 63:9,
125:18, 189:16,
224:8, 230:23,
270:19
**follow-ups** [1] -
233:21
**following** [1] - 175:17
**follows** [5] - 27:15,
80:16, 103:9,
161:10, 276:7
**Folsom** [1] - 36:4
**food** [21] - 11:1, 13:18,
34:8, 77:7, 97:4,
200:7, 212:22,
221:8, 221:16,
224:20, 224:21,
224:25, 225:5,
225:7, 225:10,
225:16, 249:2,
249:8, 249:9,
249:12, 264:15
**foot** [2] - 47:20,
143:15
**footnotes** [1] - 210:22
**FOR** [1] - 1:1
**Force** [2] - 104:14,
106:7
**force** [5] - 40:22,
40:23, 41:4, 203:11,
292:16
**forced** [1] - 18:6
**forecast** [1] - 168:10
**foregoing** [1] - 303:4
**forever** [1] - 183:4
**forget** [1] - 51:4

**forgiveness** [1] - 20:9
**form** [3] - 113:24, 147:23, 221:23
**formal** [5] - 108:10, 132:11, 132:14, 150:10, 162:12
**format** [2] - 30:21, 61:1
**formed** [2] - 74:9, 104:4
**former** [1] - 12:21
**formerly** [1] - 90:18
**forming** [2] - 105:3, 174:24
**formulate** [1] - 24:24
**forth** [7] - 6:3, 85:24, 104:2, 116:21, 152:6, 196:9, 268:18
**fortunate** [1] - 43:5
**fortunately** [1] - 227:21
**forty** [1] - 139:6
**forward** [19] - 8:5, 8:9, 26:10, 39:17, 42:16, 42:19, 140:1, 179:17, 203:24, 203:25, 212:15, 214:19, 228:15, 229:8, 232:22, 246:5, 297:17, 300:17
**forwarded** [2] - 8:3, 109:7
**foundation** [13] - 30:16, 30:20, 31:17, 31:18, 33:5, 33:9, 35:4, 36:22, 36:24, 52:25, 103:22, 157:17, 249:17
**four** [19] - 64:7, 64:13, 64:22, 83:23, 85:15, 86:3, 86:12, 86:21, 120:11, 123:19, 126:10, 166:4, 184:2, 240:18, 244:5, 249:13, 251:9, 285:16
**four-story** [1] - 85:15
**four/off** [1] - 120:12
**fourths** [1] - 198:6
**fractured** [3] - 143:18, 206:10, 206:12
**frame** [1] - 133:19
**framework** [1] - 77:12
**frankly** [7] - 15:24, 156:3, 176:4, 194:21, 268:10, 281:6, 296:3
**free** [7] - 141:6, 141:8, 141:12, 141:15,

142:1, 153:10, 154:2
**Freeman** [1] - 4:18
**FREEMAN** [1] - 2:10
**French** [1] - 139:22
**frequently** [1] - 65:10
**Friday** [3] - 76:12, 291:12, 291:14
**friday** [1] - 291:13
**fringe** [1] - 150:16
**frond** [1] - 296:2
**frond-end** [1] - 296:2
**front** [5] - 111:11, 183:17, 190:12, 231:13, 288:20
**front-end** [1] - 288:20
**FTOs** [2] - 45:25, 46:2
**full** [13] - 5:15, 135:14, 135:16, 141:10, 143:15, 151:17, 197:2, 211:10, 222:13, 222:15, 274:21, 278:10, 285:2
**fully** [2] - 146:22, 294:9
**function** [4] - 107:15, 128:23, 149:17, 149:23
**functioning** [1] - 147:6
**functions** [16] - 97:3, 113:22, 117:3, 119:7, 122:22, 128:2, 128:3, 128:8, 132:1, 199:11, 221:25, 224:12, 283:4, 283:6, 283:23
**fund** [7] - 47:7, 47:17, 110:13, 245:20, 279:1, 279:7, 279:8
**fundamental** [1] - 180:24
**funded** [4] - 47:4, 47:8, 47:16, 257:15
**Funding** [1] - 1:10
**funding** [26] - 4:6, 5:18, 5:21, 5:23, 5:24, 6:2, 6:16, 7:1, 13:5, 23:23, 26:8, 26:12, 48:11, 57:23, 99:3, 99:11, 100:1, 154:23, 182:22, 198:12, 241:3, 241:8, 286:24, 287:4, 293:24, 294:7
**funds** [17] - 14:2, 17:5, 17:6, 20:23, 21:2, 21:9, 44:4, 44:6, 44:13, 77:3, 77:4, 241:20, 274:23,

289:22, 290:11, 298:17, 299:21
**furlough** [2] - 32:22, 278:18
**furloughed** [2] - 278:16, 279:25
**furloughs** [1] - 17:2
**future** [6] - 5:5, 6:21, 6:25, 227:20, 229:22, 260:14

## G

**Gage** [5] - 13:6, 109:15, 132:21, 132:23, 208:12
**Gage's** [4] - 141:17, 177:14, 208:7, 228:8
**gain** [1] - 126:13
**game** [1] - 216:21
**gauged** [1] - 232:20
**GED** [7] - 46:22, 47:8, 47:16, 240:13, 240:20, 241:5, 241:20
**General** [2] - 26:7, 206:25
**general** [9] - 34:8, 41:24, 91:5, 107:25, 119:5, 119:22, 247:6, 264:13, 269:18
**generally** [12] - 26:10, 114:13, 137:15, 162:16, 173:13, 211:1, 219:12, 219:13, 240:19, 271:18, 271:19, 285:24
**generated** [2] - 154:10, 178:23
**generating** [3] - 123:20, 137:25, 158:20
**generic** [2] - 267:19, 267:21
**gentleman** [1] - 178:19
**geographic** [1] - 151:5
**geographically** [1] - 136:4
**George** [4] - 103:6, 159:12, 163:2, 163:9
**Georgia** [2] - 166:15, 185:21
**Gerald** [1] - 27:18
**GERALD** [3] - 3:5, 27:14, 27:18
**germane** [2] - 102:5, 162:2

**Gerry** [2] - 27:12, 211:13
**GHOUSTAVIA** [1] - 1:5
**GI** [1] - 141:12
**girl** [1] - 217:3
**given** [26] - 10:20, 39:4, 53:22, 54:18, 55:9, 60:6, 112:21, 115:14, 124:15, 126:21, 142:22, 142:25, 143:2, 149:18, 155:4, 172:25, 173:4, 174:11, 203:19, 205:17, 223:14, 235:1, 236:2, 242:25, 286:14
**glad** [1] - 281:16
**goal** [3] - 206:6, 292:7, 298:24
**goals** [2] - 238:10, 238:11
**gold** [1] - 12:14
**goods** [2] - 136:5, 136:8
**gore** [16] - 115:7, 115:14, 134:3, 136:22, 137:3, 170:9, 170:19, 171:19, 171:23, 176:2, 176:4, 176:6, 180:8, 253:25, 260:25, 269:14
**Gore** [3] - 109:1, 149:13, 171:25
**gore's** [4] - 136:19, 137:9, 137:12, 137:14
**governance** [1] - 20:19
**government** [3] - 139:25, 174:8, 280:12
**governments** [1] - 227:17
**grab** [1] - 120:23
**grade** [1] - 45:14
**graduated** [3] - 35:19, 35:23, 45:24
**Grail** [1] - 12:24
**granted** [1] - 196:14
**grants** [1] - 299:21
**gratis** [1] - 108:5
**great** [15] - 14:3, 44:1, 47:22, 62:8, 140:6, 200:11, 200:19, 201:23, 232:6, 232:16, 234:21, 255:17, 275:24,

276:2, 301:15
**greater** [2] - 139:4, 146:5
**Green** [1] - 51:1
**green** [1] - 48:8
**GREG** [1] - 1:19
**grievance** [8] - 11:17, 48:20, 48:22, 48:23, 49:1, 49:5, 49:12, 49:15
**grievances** [1] - 128:15
**ground** [2] - 10:24, 34:11
**Group** [3] - 292:15, 297:8, 297:19
**group** [20] - 45:25, 173:15, 179:6, 184:14, 184:15, 192:7, 193:9, 193:10, 193:21, 194:2, 195:20, 212:10, 230:19, 231:5, 231:13, 231:14, 258:10, 292:16, 292:22, 297:13
**groups** [2] - 192:5, 254:7
**groups'** [1] - 297:22
**Grove** [2] - 164:3, 164:6
**grow** [1] - 225:16
**guarding** [2] - 221:23, 222:3
**guards** [1] - 246:17
**guess** [23] - 42:7, 55:20, 56:15, 60:4, 126:25, 170:24, 198:22, 221:24, 229:14, 248:5, 251:3, 251:21, 253:1, 254:13, 254:17, 257:18, 263:3, 263:13, 263:17, 264:2, 290:16, 294:14, 301:11
**guesses** [1] - 98:11
**guidance** [1] - 293:9
**Gusman** [11] - 2:10, 3:2, 4:6, 4:19, 4:20, 17:5, 17:9, 21:10, 69:24, 70:19, 79:3
**GUSMAN** [1] - 1:10
**guys** [2] - 47:19, 52:15
**GW** [1] - 163:4

# H

hair [2] - 37:10, 37:11
half [8] - 65:17, 78:9, 83:17, 110:11, 192:3, 197:3, 197:4, 240:2
halfway [2] - 82:3, 82:7
Hamilton [12] - 78:19, 79:3, 100:7, 100:9, 100:10, 100:12, 100:16, 176:20, 203:20, 204:1, 204:9, 246:6
hand [4] - 52:18, 285:18, 285:19
hand-in-hand [1] - 52:18
handle [4] - 31:9, 48:23, 69:19, 282:21
handling [2] - 69:25, 150:11
hands [3] - 18:3, 204:17, 204:18
hands-off [1] - 18:3
happy [5] - 62:6, 156:16, 156:20, 298:7
hard [3] - 233:12, 253:18, 257:15
harder [1] - 85:1
harm [3] - 22:5, 119:24, 127:12
harmed [1] - 22:5
Harris [1] - 270:6
Harry [1] - 4:21
HARRY [1] - 2:14
hate [1] - 129:3
HB [1] - 1:21
head [2] - 116:7, 287:23
headings [3] - 61:22, 62:1, 62:3
heads [1] - 197:20
health [113] - 12:24, 13:23, 22:8, 23:24, 24:1, 25:5, 25:8, 38:10, 59:4, 59:6, 59:8, 59:9, 59:13, 69:4, 78:1, 78:4, 94:7, 94:8, 94:11, 105:7, 105:23, 106:2, 106:11, 106:22, 107:1, 107:10, 107:11, 107:16, 108:8, 108:13, 109:16, 110:13, 110:17, 115:4, 116:5, 116:9,

116:10, 121:12, 121:24, 122:6, 122:11, 122:20, 123:6, 123:7, 123:10, 125:7, 125:18, 125:21, 126:16, 126:19, 127:15, 128:2, 128:3, 128:4, 128:10, 128:15, 130:11, 130:14, 130:24, 131:5, 132:4, 132:5, 133:1, 133:20, 133:21, 134:2, 134:5, 134:13, 137:18, 138:16, 138:17, 139:1, 140:20, 143:6, 144:18, 148:18, 150:19, 150:24, 151:2, 154:23, 158:9, 165:1, 168:24, 169:2, 169:3, 169:16, 169:18, 169:24, 170:7, 170:22, 175:8, 175:13, 175:15, 175:17, 175:24, 176:13, 177:8, 180:18, 205:13, 205:21, 206:22, 208:11, 209:2, 209:16, 212:17, 212:19, 221:7, 223:18, 245:6, 259:18, 264:12, 269:16, 299:22
hear [26] - 7:4, 9:2, 9:8, 12:17, 13:6, 15:8, 15:20, 15:21, 18:20, 73:18, 101:6, 157:15, 169:8, 169:10, 176:25, 177:1, 189:14, 196:15, 200:2, 208:6, 208:8, 236:6, 266:5, 281:16, 281:23, 298:20
heard [36] - 16:9, 63:3, 95:23, 100:5, 112:7, 156:3, 175:16, 181:8, 187:3, 194:21, 195:1, 199:5, 199:20, 199:23, 200:22, 202:6, 214:14, 219:16, 224:19, 229:9, 243:1, 244:24, 247:25, 253:20, 261:2,

281:13, 281:14, 281:15, 281:21, 285:9, 291:3, 291:4, 292:6, 296:19, 299:6
hearing [23] - 4:7, 5:21, 5:23, 6:1, 6:19, 6:22, 7:15, 8:5, 16:12, 16:25, 27:1, 70:2, 73:16, 73:24, 75:10, 160:24, 196:15, 209:19, 232:14, 246:2, 282:21, 291:7, 291:23
Hearing [1] - 1:10
hearings [5] - 5:18, 6:10, 202:4, 283:20
hearsay [1] - 50:12
heavily [1] - 121:10
Hebert [7] - 70:4, 70:9, 70:19, 71:7, 71:12, 71:16, 211:13
hefty [2] - 19:9, 19:23
held [5] - 28:3, 104:20, 193:12, 196:16, 297:15
hello [1] - 171:13
help [6] - 77:9, 121:21, 164:22, 203:16, 205:7, 253:2
helped [1] - 293:22
helpful [4] - 6:25, 209:19, 298:10, 300:24
helping [1] - 200:19
Herbert [1] - 70:2
Herculean [1] - 222:19
hereby [1] - 303:3
Higgins' [1] - 115:22
high [17] - 11:23, 16:11, 21:4, 68:7, 68:9, 86:3, 150:10, 183:22, 211:5, 211:6, 223:23, 227:21, 228:18, 262:14, 272:2, 283:14, 299:4
high-cost [1] - 262:14
high-priced [1] - 21:4
higher [21] - 16:13, 148:6, 148:7, 149:22, 150:20, 187:23, 188:7, 209:8, 209:9, 216:10, 217:23, 229:21, 232:1, 248:1, 248:22, 248:23, 260:9, 265:7, 271:21, 288:17, 290:7

highest [2] - 211:18, 211:19
highlight [1] - 160:1
highly [1] - 51:16
highly-rated [1] - 51:16
himself [1] - 176:12
hire [25] - 10:8, 23:2, 37:18, 46:5, 140:10, 148:13, 149:6, 149:20, 151:15, 151:17, 152:7, 152:13, 155:18, 158:17, 185:23, 199:6, 208:11, 227:3, 229:15, 230:12, 243:1, 243:2, 243:5, 274:20, 283:15
hired [15] - 11:12, 29:23, 65:10, 151:22, 157:6, 158:12, 163:14, 199:2, 207:18, 208:1, 230:16, 233:8, 243:6, 299:8
hires [2] - 45:17, 250:3
hiring [29] - 10:13, 11:4, 23:7, 35:8, 35:10, 35:24, 36:1, 36:16, 36:19, 37:21, 38:6, 39:6, 66:24, 114:3, 140:13, 151:20, 157:4, 157:12, 158:24, 159:2, 207:19, 207:25, 214:20, 229:9, 230:5, 230:10, 256:20, 264:19, 271:20
historically [1] - 273:23
history [2] - 29:7, 29:8
hit [5] - 36:12, 38:7, 49:5, 250:10, 251:16
hitting [1] - 294:6
HIV [4] - 108:5, 138:25, 143:6, 143:9
hmm [1] - 135:2
hoard [1] - 21:1
hold [11] - 42:11, 73:18, 86:12, 94:6, 104:23, 167:15, 198:17, 208:24, 209:1, 209:13, 234:4
holds [1] - 87:12
hole [1] - 46:5
holes [2] - 14:5, 46:4
Holy [1] - 12:24

home [2] - 21:5, 125:4
Homeland [1] - 278:18
homeless [1] - 146:7
honest [1] - 134:18
Honor [195] - 4:10, 4:12, 4:14, 4:21, 4:24, 7:6, 7:8, 7:13, 7:17, 7:22, 7:24, 8:11, 8:14, 8:20, 8:23, 15:9, 15:13, 16:6, 16:11, 18:4, 18:14, 18:18, 20:12, 20:19, 21:15, 21:17, 24:13, 26:18, 26:20, 26:24, 27:3, 30:14, 30:16, 31:16, 33:4, 33:8, 35:3, 36:21, 37:2, 39:21, 42:10, 42:22, 43:5, 44:8, 47:10, 49:17, 50:11, 50:13, 51:15, 52:6, 56:25, 57:12, 58:12, 60:12, 60:15, 60:20, 61:21, 61:23, 62:3, 69:18, 70:16, 71:20, 72:11, 73:1, 74:5, 75:24, 79:11, 79:12, 79:17, 79:21, 80:7, 91:20, 95:12, 97:22, 99:4, 99:6, 99:12, 99:17, 100:8, 101:10, 101:12, 101:15, 102:2, 102:9, 102:17, 102:18, 102:21, 106:24, 107:2, 108:15, 111:17, 111:19, 111:23, 112:1, 112:11, 112:12, 112:14, 129:2, 139:11, 147:25, 156:1, 156:6, 156:10, 156:19, 156:22, 156:9, 159:8, 159:11, 159:18, 159:21, 160:16, 160:25, 161:8, 168:19, 169:5, 169:10, 169:17, 169:20, 169:22, 175:2, 175:4, 175:12, 175:20, 175:22, 175:25, 176:14, 176:16, 176:24, 189:4, 190:9, 193:6, 194:16, 195:22, 201:4, 202:22, 203:19, 204:16,

204:19, 206:19,
207:18, 209:3,
209:22, 214:6,
216:3, 216:15,
219:19, 220:14,
222:21, 223:6,
230:19, 230:23,
232:12, 232:17,
232:23, 233:15,
235:24, 237:6,
239:10, 240:6,
241:13, 241:18,
242:1, 245:10,
246:1, 246:9,
249:16, 253:5,
255:23, 260:6,
262:5, 262:10,
270:19, 270:25,
275:11, 276:11,
277:11, 281:1,
281:4, 281:6,
281:19, 281:25,
282:15, 284:2,
286:19, 289:21,
291:10, 298:6,
298:12, 298:22,
300:4, 300:10,
300:11, 300:21,
301:9, 301:12
**Honor's** [1] - 281:18
**HONORABLE** [1] -
1:15
**hope** [11] - 6:15,
52:22, 58:3, 87:5,
179:8, 205:8, 222:9,
232:17, 233:8,
255:2, 301:12
**hopeful** [1] - 160:11
**hopefully** [3] - 24:11,
74:1, 251:18
**hopes** [1] - 17:11
**hoping** [5] - 63:4,
63:24, 217:4,
261:11, 287:7
**horrendous** [1] - 26:1
**horrific** [1] - 23:11
**hospital** [13] - 116:13,
116:14, 128:22,
132:14, 136:10,
141:5, 141:8, 142:2,
143:20, 143:23,
144:25, 146:4, 155:1
**Hospital** [6] - 141:3,
141:4, 141:20,
142:9, 143:1, 143:16
**hospitalized** [1] -
142:10
**hospitals** [1] - 117:5
**host** [1] - 126:1
**hot** [2] - 143:7, 296:7

**hour** [10] - 10:17,
23:10, 33:18, 34:7,
45:18, 46:11, 148:4,
149:25, 255:10,
300:14
**hourly** [2] - 110:10,
111:2
**hours** [21] - 32:19,
35:13, 41:21, 41:22,
46:9, 46:11, 46:12,
64:11, 64:15, 64:18,
107:21, 110:2,
110:11, 119:13,
146:5, 255:13,
256:10, 272:1,
292:24, 293:15,
301:6
**house** [21] - 25:5,
29:17, 48:13, 57:6,
58:6, 72:3, 76:5,
76:9, 76:25, 82:3,
82:7, 82:17, 83:7,
88:23, 88:24, 96:7,
204:25, 205:4,
207:2, 245:6
**housed** [16] - 56:18,
62:25, 76:18, 82:18,
84:17, 85:5, 85:25,
86:8, 90:18, 91:3,
96:22, 120:4,
217:19, 239:17,
291:20
**housekeeping** [1] -
129:8
**houses** [3] - 16:10,
76:6, 76:8
**housing** [24] - 13:18,
14:8, 15:4, 22:13,
58:14, 76:25, 174:3,
174:4, 193:24,
199:4, 207:1, 207:6,
207:9, 208:16,
217:2, 227:18,
254:2, 255:10,
268:1, 268:9,
268:18, 268:21,
268:24, 269:10
**hovering** [1] - 92:11
**HR** [1] - 66:11
**huge** [5] - 143:17,
185:4, 192:7,
216:13, 254:9
**hum** [3] - 61:7, 71:6,
196:22
**human** [1] - 21:25
**hundred** [4] - 238:1,
280:1, 294:19,
294:21
**hundreds** [4] - 141:15,
142:4, 189:23,

264:12
**Hunt** [1] - 55:19
**hurt** [1] - 201:17

# I

**I-C-E** [1] - 39:22
**I-N-G-L-E-S-E** [1] -
103:14
**I-period-C-period-E-
period** [1] - 39:23
**ICE** [2] - 39:22, 39:25
**idea** [14] - 37:18, 42:8,
59:12, 68:1, 68:14,
78:11, 101:21,
141:24, 142:15,
152:7, 152:9,
152:12, 183:23,
230:1
**ideal** [1] - 201:12
**ideas** [3] - 200:11,
200:19
**identification** [1] -
26:8
**identified** [5] - 45:10,
88:19, 92:5, 126:11,
251:8
**identify** [16] - 23:16,
29:9, 40:13, 40:14,
68:21, 81:16, 81:22,
81:10, 105:2,
109:18, 127:10,
140:23, 145:6,
257:16, 258:19,
260:8
**identifying** [2] - 93:11,
158:15
**ignore** [1] - 13:25,
15:1
**ill** [1] - 94:19
**ill** [1] - 119:20
**illness** [1] - 119:22
**illustration** [1] - 148:3
**image** [1] - 190:18
**imaginary** [1] - 18:17
**immediate** [2] - 203:1,
204:20
**immediately** [11] - 9:7,
10:8, 23:3, 26:1,
158:18, 197:17,
199:14, 199:16,
204:2, 244:15,
248:21
**Immigration** [1] -
39:23
**imminent** [2] - 293:12,
295:10
**impact** [20] - 168:12,
179:12, 179:25,
182:11, 182:23,

184:17, 199:15,
227:16, 227:20,
240:15, 240:25,
252:14, 277:24,
278:2, 278:3, 278:6,
280:5, 286:23,
294:4, 294:17
**impacted** [1] - 260:9
**implement** [18] - 6:3,
6:12, 11:15, 20:23,
21:9, 24:24, 37:17,
44:4, 44:19, 70:7,
70:10, 104:1,
126:16, 126:22,
134:20, 137:9,
137:12, 144:18
**implementation** [8] -
8:25, 19:4, 23:20,
26:15, 105:13,
127:7, 127:16, 212:5
**implemented** [14] -
5:22, 38:25, 105:8,
105:23, 106:8,
135:21, 135:22,
135:23, 143:5,
159:1, 165:7,
278:23, 294:9,
294:15
**implementing** [7] -
6:21, 28:20, 30:10,
251:11, 284:21,
296:13, 297:17
**implications** [1] - 71:8
**importance** [2] -
142:6, 185:19
**important** [15] - 19:5,
127:17, 128:22,
130:20, 130:24,
134:24, 187:9,
192:2, 193:1, 200:4,
288:3, 288:21,
291:6, 296:1, 300:20
**importantly** [2] - 21:2,
204:5
**impose** [1] - 19:23
**impossible** [4] - 23:4,
140:25, 141:19,
142:16
**impressed** [1] -
258:13
**imprison** [1] - 293:9
**improve** [1] - 255:18
**improved** [3] - 12:24,
256:8, 289:11
**improvement** [1] -
128:12
**improvements** [3] -
25:25, 287:22,
289:22
**improving** [1] - 289:19

**IN** [1] - 1:1
**in-depth** [1] - 119:11
**in-house** [3] - 29:17,
48:13, 72:3
**in-kind** [1] - 284:17
**inadequate** [3] - 12:8,
12:20, 22:13
**inappropriate** [1] -
235:25
**incarcerated** [9] -
16:15, 16:19,
119:21, 136:12,
146:9, 202:14,
277:2, 277:3
**incarceration** [4] -
24:17, 209:4,
217:13, 217:16
**incident** [8] - 39:17,
39:18, 40:8, 40:18,
40:22, 41:9, 41:10,
257:12
**incidents** [6] - 41:4,
206:11, 215:11,
215:20, 230:2, 258:1
**include** [18] - 23:17,
31:24, 32:5, 53:11,
53:16, 81:25, 82:2,
94:7, 94:18, 94:21,
96:5, 242:7, 243:10,
243:13, 244:9,
244:12, 257:7,
259:25
**included** [6] - 9:23,
90:11, 99:22,
239:11, 244:7,
266:13
**includes** [5] - 221:15,
259:18, 260:22,
266:16, 289:7
**including** [11] - 5:9,
11:6, 24:25, 97:3,
99:4, 108:13,
143:14, 151:24,
244:11, 262:17,
278:17
**incompetent** [1] -
119:25
**inconsistencies** [3] -
199:19, 199:23,
200:4
**incorrect** [1] - 187:4
**increase** [15] - 10:6,
34:15, 65:14, 79:3,
134:10, 134:12,
186:21, 199:3,
219:25, 230:15,
265:6, 272:16,
272:19, 289:25,
290:1
**increased** [10] - 9:7,

19:14, 202:5, 230:13, 230:14, 255:6, 259:23, 279:9, 280:11, 294:8

**increases** [4] - 42:12, 78:21, 80:6, 204:5

**increasing** [5] - 208:16, 254:20, 260:6, 262:21, 299:7

**incumbent** [1] - 130:22

**incur** [2] - 58:14, 58:21

**incurred** [2] - 44:18, 44:20

**incurring** [1] - 273:23

**indelible** [1] - 21:23

**independent** [4] - 137:3, 141:5, 171:1, 176:12

**INDEX** [1] - 3:1

**indicated** [4] - 59:16, 61:18, 100:8, 291:20

**indicates** [1] - 207:4

**indicating** [1] - 12:23

**indication** [1] - 300:13

**indirect** [4] - 78:14, 78:15, 253:1, 259:4

**individual** [7] - 76:13, 78:8, 86:9, 86:12, 110:25, 223:23, 224:1

**individuals** [6] - 76:18, 157:4, 158:15, 277:2, 277:3, 293:12

**industry** [2] - 11:1, 108:13

**inevitably** [2] - 17:16, 50:13

**infection** [2] - 130:23, 131:3

**infections** [2] - 121:9, 131:1

**infectious** [1] - 130:25

**inflated** [1] - 133:14

**influenza** [1] - 131:2

**information** [18] - 83:5, 109:13, 123:12, 128:18, 132:17, 149:22, 168:21, 179:7, 179:21, 196:23, 214:5, 215:8, 224:16, 224:21, 242:3, 257:23, 257:25

**infrastructure** [4] - 215:16, 226:23, 227:1, 287:17

**infusion** [1] - 199:7

**Inglese** [14] - 12:21, 103:6, 103:12, 103:13, 106:21, 146:1, 150:9, 155:3, 156:3, 156:21, 156:25, 159:5, 169:23, 176:18

**INGLESE** [2] - 3:9, 103:8

**Inglese's** [2] - 177:14, 202:1

**inherently** [1] - 136:13

**inherited** [2] - 278:12, 279:3

**initial** [3] - 26:12, 240:18, 293:24

**initials** [1] - 40:13

**initiate** [1] - 182:22

**initiatives** [1] - 297:17

**injured** [1] - 121:9

**injuries** [1] - 179:4

**inmate** [68] - 14:21, 19:2, 40:11, 40:13, 40:14, 43:14, 45:12, 49:8, 55:14, 58:2, 60:2, 60:9, 60:22, 60:25, 61:18, 62:12, 82:12, 87:4, 87:17, 89:7, 89:10, 89:11, 92:8, 92:11, 117:13, 122:10, 123:13, 123:14, 131:4, 133:22, 134:12, 136:4, 138:7, 138:8, 138:9, 138:11, 138:13, 138:15, 138:19, 139:2, 139:10, 143:17, 143:19, 155:17, 171:21, 171:22, 174:11, 206:10, 207:1, 213:11, 213:12, 216:6, 216:11, 217:10, 217:15, 217:24, 217:25, 218:4, 219:8, 220:3, 224:21, 226:2, 226:8, 227:7, 233:23, 238:5, 245:19

**inmate's** [2] - 40:11, 128:15

**inmates** [227] - 5:5, 10:3, 12:20, 13:19, 13:24, 14:2, 14:8, 14:15, 15:5, 16:10, 21:24, 22:13, 24:4, 24:5, 24:8, 25:6,

25:16, 40:14, 53:5, 53:8, 53:11, 53:17, 53:21, 53:23, 53:24, 54:4, 54:7, 54:14, 54:20, 54:25, 55:2, 55:4, 55:7, 55:18, 55:21, 56:12, 56:18, 57:1, 57:6, 57:9, 57:22, 58:6, 58:14, 58:20, 59:17, 59:23, 59:24, 60:1, 60:3, 60:4, 60:5, 60:7, 60:8, 60:10, 61:5, 62:18, 62:25, 63:5, 63:10, 63:21, 63:25, 76:5, 76:6, 76:19, 77:1, 82:10, 82:18, 82:19, 82:21, 83:6, 84:17, 84:22, 84:25, 85:5, 86:2, 86:12, 86:24, 87:13, 87:14, 87:19, 87:23, 88:25, 89:25, 90:2, 90:8, 96:7, 96:11, 96:15, 96:18, 96:21, 97:4, 97:12, 118:2, 118:13, 120:1, 123:1, 123:5, 125:17, 126:5, 127:2, 127:10, 127:11, 128:3, 128:15, 128:19, 131:12, 132:9, 132:15, 132:16, 138:5, 139:4, 139:6, 139:9, 140:5, 140:6, 142:2, 143:14, 144:22, 145:20, 146:1, 146:3, 153:11, 153:19, 153:21, 153:23, 154:2, 155:12, 156:5, 164:5, 169:24, 172:19, 174:2, 179:3, 179:13, 179:23, 185:9, 191:6, 191:7, 193:10, 194:9, 195:15, 195:18, 195:19, 196:7, 196:19, 196:20, 196:25, 197:11, 197:17, 197:21, 200:1, 201:6, 203:2, 203:7, 203:11, 203:16, 204:2, 205:1, 205:13, 206:12, 206:20, 207:3, 207:6, 207:11, 208:17, 211:5, 217:3, 217:8,

217:17, 217:19, 218:7, 218:16, 220:6, 225:1, 225:24, 226:7, 228:13, 228:22, 230:1, 234:16, 234:18, 235:13, 235:17, 236:15, 237:9, 238:9, 238:12, 238:21, 239:17, 240:17, 242:15, 245:15, 249:13, 251:15, 261:14, 261:15, 261:16, 261:22, 262:14, 263:24, 264:4, 264:11, 264:13, 264:15, 264:24, 269:9, 269:15, 269:18, 269:19, 269:20, 272:24, 273:7, 289:24, 291:20, 294:7, 294:10, 294:18, 294:20

**inmates'** [3] - 12:9, 123:6, 261:15

**inordinate** [1] - 58:15

**inpatient** [2] - 136:11, 146:4

**input** [2] - 73:9, 74:11

**inquiry** [1] - 102:5

**insecure** [1] - 202:9

**inservice** [1] - 256:9

**inside** [3] - 20:5, 88:5, 88:6

**inspect** [1] - 268:18

**inspection** [1] - 42:6

**Inspector** [2] - 26:7, 206:25

**inspectors** [1] - 19:16

**instance** [5] - 90:17, 118:13, 126:2, 126:6, 143:6

**instead** [9] - 17:9, 17:21, 24:3, 46:8, 46:13, 159:25, 186:21, 201:13, 226:16

**Institute** [14] - 161:19, 161:21, 168:7, 181:14, 182:22, 183:1, 183:11, 184:8, 188:10, 188:13, 189:17, 198:11, 284:8, 293:23

**institute** [1] - 163:4

**Institute's** [1] - 184:4

**institution** [2] - 164:7,

173:1

**institutional** [1] - 17:22

**instructed** [3] - 81:21, 81:25, 82:23

**instruction** [1] - 44:25

**instrument** [2] - 183:20, 183:21

**insufficient** [2] - 14:14, 23:15

**insurance** [5] - 77:23, 78:1, 110:13, 150:24, 151:2

**intake** [14] - 90:9, 121:4, 121:6, 121:12, 121:20, 121:25, 122:2, 266:7, 266:9, 266:11, 266:16, 266:19, 293:15

**intend** [1] - 51:7

**intended** [1] - 297:6

**intending** [3] - 97:23, 98:3, 160:17

**intensive** [5] - 94:14, 118:24, 119:10, 268:23, 269:5

**intent** [2] - 13:12, 294:25

**interact** [2] - 135:18, 136:3

**interaction** [1] - 45:12

**interest** [5] - 5:21, 17:12, 251:21, 278:14

**interested** [1] - 184:11

**interesting** [5] - 134:7, 209:4, 216:14, 217:12, 252:7

**interfacing** [2] - 116:11

**interfering** [1] - 259:21

**internal** [4] - 40:24, 104:14, 107:13, 107:21

**internet** [1] - 11:15

**internist** [6] - 105:4, 107:25, 108:5, 108:9, 115:12, 115:19

**internists** [1] - 106:5

**internship** [1] - 104:13

**interpret** [1] - 123:14

**interpreter** [1] - 122:11

**interpreters** [3] - 29:23, 122:1, 122:6

**interpreting** [2] - 29:24, 123:6

interrupt [3] - 129:3, 139:12, 176:14
interrupting [1] - 296:7
Intervenor [2] - 2:7, 3:3
intervenor [1] - 5:5
interview [1] - 55:13
interviewed [3] - 39:5, 180:7, 180:12
interviewing [2] - 92:18, 150:6
interviews [2] - 33:23, 178:14
intoxicated [2] - 121:10, 138:22
intoxication [1] - 108:3
introduce [3] - 79:18, 102:12, 129:19
introduced [2] - 159:17, 160:24
introducing [1] - 160:23
intuitively [1] - 142:8
inventories [2] - 131:19, 148:16
inventory [2] - 131:16, 150:11
invest [8] - 227:18, 287:18, 288:4, 288:7, 288:16, 289:3, 295:22, 296:4
invested [2] - 34:13, 289:1
investigation [1] - 40:3
investigations [1] - 23:19
investing [3] - 215:18, 215:20, 296:9
investment [3] - 288:17, 289:19, 290:10
investments [6] - 22:3, 227:19, 227:24, 227:25, 289:7, 290:3
involve [1] - 251:25
involved [19] - 39:6, 45:5, 89:24, 92:17, 144:23, 148:12, 156:17, 162:7, 173:13, 174:10, 220:18, 220:21, 220:23, 251:19, 252:17, 267:10, 270:6, 271:25, 296:21
involvement [1] -

69:21
involves [2] - 24:25, 55:13
involving [5] - 170:6, 173:4, 175:24, 200:7, 281:8
IP [2] - 43:9, 68:21
IPC [4] - 118:18, 119:1, 121:2, 121:3
irrelevant [2] - 241:11, 242:13
Island [1] - 185:8
isolated [1] - 224:18
issue [26] - 14:7, 71:21, 72:12, 99:3, 99:11, 100:13, 122:21, 168:15, 172:23, 187:9, 194:14, 201:14, 208:3, 223:11, 228:3, 235:5, 247:15, 252:18, 256:7, 262:18, 271:1, 271:22, 281:8, 285:3, 291:11, 300:11
issued [3] - 17:19, 168:14, 244:14
issues [30] - 7:1, 7:18, 35:8, 38:11, 39:6, 42:8, 97:24, 105:6, 107:1, 108:1, 109:5, 116:11, 121:8, 123:6, 127:13, 138:23, 167:10, 167:19, 169:18, 177:6, 177:9, 186:18, 209:20, 226:8, 232:9, 235:8, 240:19, 254:2, 297:9
IT [9] - 224:15, 257:9, 257:13, 257:14, 257:17, 257:20, 257:21, 283:7, 283:23
items [1] - 259:5
itself [5] - 5:11, 100:1, 136:16, 239:23, 247:15
IV [2] - 94:19, 94:21

J

jack [1] - 43:9
Jacobson [1] - 185:7
jail [257] - 6:4, 9:16, 9:18, 9:19, 9:22, 9:24, 10:2, 10:17, 11:16, 11:20, 11:24, 11:25, 12:5, 12:6,

12:10, 12:11, 12:21, 13:13, 14:17, 17:15, 18:5, 19:7, 22:15, 22:21, 22:24, 23:5, 23:11, 24:17, 25:7, 25:14, 25:20, 25:21, 25:24, 26:2, 26:9, 26:13, 26:16, 32:1, 32:12, 32:18, 32:20, 32:22, 32:25, 33:6, 33:16, 35:2, 35:13, 38:13, 38:15, 38:18, 38:25, 43:11, 44:2, 45:4, 46:5, 46:10, 46:12, 46:17, 48:5, 48:7, 48:10, 48:18, 48:22, 49:14, 49:25, 50:3, 50:20, 51:12, 51:17, 53:3, 53:5, 63:4, 63:24, 67:17, 73:23, 81:23, 81:24, 82:15, 83:11, 84:9, 88:20, 89:16, 90:5, 90:24, 92:14, 93:12, 94:8, 94:22, 99:15, 105:5, 105:8, 105:11, 108:4, 109:24, 114:8, 114:10, 114:13, 114:14, 115:15, 117:10, 117:11, 119:14, 121:12, 125:7, 125:8, 125:25, 126:15, 126:19, 126:21, 127:6, 128:8, 128:11, 128:23, 130:20, 130:25, 131:3, 131:5, 131:17, 132:3, 132:4, 132:20, 137:24, 138:14, 140:7, 140:18, 141:9, 141:16, 143:20, 155:21, 158:3, 158:6, 162:6, 165:22, 168:9, 168:10, 179:1, 179:9, 179:21, 180:1, 180:21, 180:24, 180:25, 181:8, 182:5, 182:11, 182:13, 182:17, 182:25, 183:12, 183:25, 184:1, 184:17, 184:25, 185:5, 185:7, 187:19, 188:9, 191:9, 192:3, 192:10, 193:12, 196:15, 198:21,

200:17, 201:17, 202:15, 203:17, 207:23, 207:24, 208:22, 209:7, 209:25, 210:3, 210:8, 210:10, 210:15, 210:16, 210:20, 211:12, 213:17, 213:19, 213:25, 214:1, 215:7, 215:14, 215:17, 219:3, 220:9, 220:10, 226:2, 226:21, 227:23, 228:1, 228:6, 230:6, 230:8, 230:16, 231:14, 231:17, 231:21, 231:24, 232:22, 233:5, 240:20, 240:23, 244:22, 245:21, 249:7, 249:25, 251:7, 256:15, 256:19, 256:20, 257:14, 264:3, 265:12, 266:3, 266:8, 266:10, 266:14, 266:17, 266:19, 268:4, 269:21, 269:24, 274:4, 274:16, 275:1, 286:24, 286:25, 287:6, 287:20, 287:22, 288:6, 289:4, 289:15, 290:6, 290:9, 290:14, 292:13, 292:16, 292:24, 292:25, 293:5, 293:10, 293:15, 293:16, 294:20, 295:1, 297:5, 297:11, 299:4
Jail [3] - 36:8, 132:22, 267:12
jail's [4] - 26:4, 118:24, 138:6, 142:10
jails [31] - 31:12, 48:25, 81:10, 81:22, 83:5, 90:7, 105:12, 105:22, 114:25, 115:14, 132:12, 133:21, 133:23, 134:1, 134:4, 143:4, 153:20, 154:23, 161:23, 196:17, 209:5, 212:17, 212:20, 218:19, 219:11, 220:25,

224:25, 246:19, 255:23
James [2] - 161:8, 161:13
JAMES [2] - 3:11, 161:9
January [2] - 237:11, 242:12
January/February [1] - 206:1
jaw [2] - 143:18, 206:10
jaws [1] - 206:12
Jay [1] - 66:11
jeans [1] - 82:12
Jefferson [10] - 28:14, 34:11, 37:4, 37:10, 66:7, 67:14, 67:16, 68:1, 68:3, 293:16
JENKINS [1] - 1:6
jeopardized [1] - 228:1
jeopardizing [3] - 181:4, 227:11, 252:13
Jerry [2] - 18:11, 70:2
JFA [2] - 161:19, 161:20
Jim [1] - 18:24
JIMMIE [1] - 1:5
job [10] - 11:7, 36:12, 126:14, 149:25, 150:11, 222:19, 223:23, 280:6, 286:2, 295:11
jobs [5] - 23:14, 76:7, 117:4, 271:25
John [1] - 234:20
john [1] - 34:12
join [1] - 26:19
joining [2] - 5:1, 186:19
joint [1] - 173:16
jointly [1] - 164:3
Joliet [1] - 163:6
JONES [1] - 1:5
Jones [1] - 4:5
journals [2] - 36:3, 36:5
JOURNEE [1] - 1:6
judge [16] - 19:22, 30:20, 62:23, 73:17, 85:13, 99:20, 102:23, 103:6, 106:18, 109:12, 153:4, 165:1, 183:14, 183:16, 194:20, 291:1
JUDGE [1] - 1:16
Judge [37] - 14:23,

56:3, 62:6, 72:19,
73:4, 73:13, 75:5,
91:22, 98:4, 100:4,
101:23, 106:21,
129:11, 161:20,
164:22, 176:5,
188:19, 190:7,
190:11, 192:23,
194:24, 199:13,
204:8, 205:23,
214:14, 215:19,
221:4, 221:19,
222:22, 226:9,
236:16, 267:3,
276:3, 277:19,
282:22, 285:7, 300:1
**judge's** [1] - 189:17
**judges** [7] - 24:7,
25:1, 98:12, 214:4,
252:5, 293:25, 295:2
**judgment** [2] - 6:11,
285:6
**Judgment** [35] - 5:4,
5:7, 5:10, 5:17, 5:22,
6:3, 6:8, 6:13, 6:21,
8:25, 9:25, 10:5,
11:9, 15:5, 16:3,
21:22, 22:23, 23:21,
26:5, 26:15, 28:16,
28:20, 30:10, 35:25,
50:19, 91:13, 91:17,
125:5, 125:6,
125:13, 239:15,
239:24, 253:14,
284:20, 284:22
**judgments** [1] - 278:6
**judicial** [1] - 221:19
**judicious** [1] - 127:13
**juggle** [2] - 84:8,
85:24
**July** [20] - 7:7, 10:1,
59:19, 74:20, 89:14,
92:4, 95:12, 105:1,
141:3, 141:20,
142:1, 142:14,
142:24, 234:4,
234:9, 235:16,
235:23, 236:15,
237:13, 270:25
**July/early** [1] - 95:15
**jump** [1] - 216:13
**June** [9] - 5:3, 7:7,
21:18, 28:17, 74:16,
134:3, 237:11,
271:5, 271:6
**junk** [2] - 206:2, 254:6
**jurisdiction** [7] - 7:10,
7:11, 7:20, 7:24,
15:15, 15:18, 195:13
**jurisdictions** [3] -

250:25, 269:25,
270:4
**justice** [8] - 16:8, 47:4,
252:16, 296:13,
297:14, 297:20,
297:24, 299:13
**Justice** [29] - 2:8, 9:9,
12:7, 15:14, 15:17,
73:19, 104:2,
108:24, 111:22,
163:15, 163:23,
166:19, 167:9,
167:16, 167:21,
168:5, 168:7, 168:8,
168:13, 168:16,
184:8, 281:7,
292:15, 293:23,
296:25, 297:1,
297:8, 297:18,
299:20
**juvenile** [5] - 161:24,
193:13, 194:3,
194:5, 212:18
**juveniles** [10] - 84:20,
193:10, 193:12,
193:14, 193:15,
193:17, 193:20,
193:24, 211:7,
241:23

## K

**KATHARINE** [1] - 2:3
**Katie** [1] - 4:16
**Katrina's** [1] - 25:14
**keep** [15] - 62:7,
130:16, 132:15,
144:19, 144:24,
198:4, 207:10,
218:5, 227:22,
231:15, 242:22,
244:19, 244:21,
245:5, 296:10
**keeping** [3] - 128:18,
217:17, 296:2
**Keisler** [1] - 104:15
**Ken** [1] - 173:15
**KENT** [1] - 1:5
**Kentucky** [3] - 173:18,
197:10, 219:8
**kept** [3] - 116:19,
266:8, 280:9
**KERRY** [1] - 2:7
**Kerry** [2] - 4:12,
171:13
**key** [1] - 232:24
**keys** [1] - 285:19
**kick** [3] - 13:12, 40:2,
201:22
**kind** [39] - 29:19, 43:4,

43:14, 53:23, 64:15,
77:7, 85:15, 94:6,
137:21, 140:19,
173:13, 174:2,
174:4, 178:20,
179:8, 179:24,
181:6, 183:9,
184:14, 186:1,
208:14, 209:12,
213:14, 215:9,
215:16, 216:14,
222:15, 229:14,
229:25, 232:7,
240:21, 254:21,
256:5, 257:15,
257:20, 263:17,
264:17, 284:17,
292:16
**kinds** [12] - 64:18,
162:7, 174:1,
180:11, 180:24,
185:14, 211:9,
211:19, 212:23,
221:10, 227:17,
296:3
**King** [2] - 34:8, 136:6
**kiosks** [1] - 48:25
**kitchen** [8] - 9:20,
32:3, 90:3, 224:19,
289:1, 289:8,
298:17, 298:21
**kitchens** [1] - 249:9
**knock** [1] - 251:13
**knocking** [1] - 259:4
**knowing** [2] - 39:6,
127:1
**knowledge** [8] -
36:19, 57:11, 63:16,
71:11, 92:13,
164:21, 233:6, 291:3
**known** [3] - 20:15,
94:19, 292:15
**knows** [5] - 15:9,
19:10, 70:13,
101:22, 281:19
**Kopplin** [16] - 275:12,
275:13, 275:22,
276:10, 276:17,
277:16, 281:15,
282:24, 284:3,
284:7, 286:17,
286:22, 290:21,
292:4, 298:16,
299:14
**KOPPLIN** [2] - 3:14,
276:6
**Kopplin's** [3] - 276:12,
282:1, 284:24

## L

**L-A-U-G-H-L-I-N** [1] -
80:21
**LA** [1] - 172:19
**lab** [2] - 116:12,
145:15
**labor** [1] - 94:14
**labs** [1] - 139:3
**lack** [10] - 15:14, 17:4,
18:10, 22:11, 23:13,
31:18, 157:17,
180:23, 199:5, 215:7
**lacked** [1] - 18:5
**lacking** [3] - 22:4,
230:7, 257:25
**laid** [1] - 279:25
**Lake** [2] - 144:4,
154:11
**LANCE** [1] - 1:15
**LANFORD** [1] - 1:6
**Langham's** [1] -
160:19
**language** [2] - 122:7,
122:8
**languages** [2] - 30:4,
49:3
**lap** [1] - 74:1
**large** [5] - 105:22,
121:13, 133:21,
209:2, 210:20
**largely** [2] - 13:7,
265:9
**larger** [3] - 115:14,
216:22, 265:13
**largest** [3] - 22:23,
76:18, 221:8
**LASHAWN** [1] - 1:5
**Lashawn** [1] - 4:5
**last** [44] - 9:8, 12:19,
17:15, 24:22, 25:18,
35:17, 45:15, 63:3,
63:23, 69:9, 70:7,
70:10, 71:4, 72:14,
78:17, 81:19, 109:3,
134:2, 137:1, 139:5,
144:1, 147:10,
147:19, 159:14,
160:24, 169:23,
172:9, 176:18,
179:21, 182:1,
191:3, 205:11,
222:14, 227:6,
230:19, 233:4,
246:2, 250:23,
259:7, 275:25,
276:13, 285:16,
291:12, 294:5
**late** [6] - 8:1, 30:15,
67:6, 198:3, 275:15,

291:12
**Latinos** [1] - 122:21
**laudable** [1] - 292:7
**LAUGHLIN** [2] - 3:7,
80:15
**Laughlin** [21] - 9:13,
66:12, 72:8, 73:5,
75:1, 75:2, 75:4,
80:14, 80:19, 80:24,
91:13, 94:17, 96:9,
180:8, 189:3,
189:11, 199:5,
244:16, 246:21,
285:10
**Laughlin's** [3] - 31:15,
31:17, 129:12
**LAURA** [1] - 2:7
**Laura** [1] - 4:10
**Law** [5] - 2:3, 2:5,
4:17, 112:13, 163:25
**law** [22] - 5:9, 10:21,
14:1, 14:7, 14:18,
15:1, 15:2, 28:9,
37:13, 58:10, 77:6,
93:1, 142:23, 153:9,
153:17, 153:18,
153:22, 186:19,
247:2, 247:5, 248:1,
271:19
**lawn** [1] - 93:2
**laws** [1] - 23:16
**lawsuit** [1] - 299:15
**lawyer** [4] - 8:4, 64:3,
95:2, 153:12
**lawyer's** [1] - 155:4
**lay** [3] - 30:20, 101:14,
103:22
**layout** [2] - 31:5,
135:17
**leadership** [6] - 18:6,
178:14, 180:11,
180:23, 213:24,
226:23
**leading** [3] - 47:11,
80:7, 296:6
**learn** [2] - 25:12,
149:21
**learning** [2] - 93:20,
150:1
**least** [20] - 10:10,
17:7, 25:18, 25:22,
26:11, 58:7, 85:2,
85:5, 153:17,
156:12, 201:15,
218:6, 254:20,
265:19, 265:20,
271:5, 271:24,
272:1, 284:21,
291:21
**leave** [18] - 34:6, 46:5,

82:21, 89:10, 93:16, 124:2, 124:12, 124:13, 124:18, 124:19, 124:20, 124:21, 132:16, 187:22, 188:4, 230:22, 274:25
**leaves** [3] - 92:13, 124:24, 269:17
**leaving** [17] - 33:10, 33:17, 33:22, 33:25, 34:2, 39:5, 92:18, 92:20, 92:22, 186:7, 187:1, 187:6, 187:7, 188:2, 255:9
**LeBlanc** [9] - 56:11, 57:1, 194:14, 194:17, 195:13, 197:20, 201:9, 239:3, 300:13
**LeBlanc's** [2] - 191:21, 202:23
**led** [1] - 21:13
**left** [12] - 90:14, 92:21, 92:25, 182:15, 186:12, 200:14, 200:15, 229:8, 242:19, 252:5, 258:19
**legal** [6] - 7:15, 20:3, 21:4, 105:6, 155:3, 195:22
**legally** [1] - 21:10
**legislation** [1] - 292:18
**legislature** [2] - 15:3, 58:17
**length** [4] - 126:10, 152:3, 234:21, 240:15
**lens** [1] - 131:14
**LEONARD** [1] - 1:6
**less** [17] - 36:19, 37:11, 127:3, 127:4, 131:25, 133:25, 134:6, 134:21, 140:18, 188:4, 206:17, 223:19, 227:23, 265:15, 278:22, 278:24, 286:3
**lesser** [1] - 290:2
**lesson** [1] - 289:23
**letter** [2] - 47:3, 139:25
**letters** [1] - 139:24
**level** [36] - 15:18, 26:1, 34:24, 35:2, 37:13, 42:3, 135:5, 165:24, 187:11, 200:25,

208:1, 210:21, 213:2, 213:10, 216:17, 217:17, 229:21, 230:4, 231:15, 235:1, 247:4, 247:14, 248:6, 248:11, 248:13, 248:15, 248:19, 254:22, 257:20, 258:11, 258:16, 259:1, 260:9, 271:21, 283:23
**Level** [1] - 35:12
**levels** [20] - 9:6, 113:15, 155:9, 158:1, 170:7, 170:12, 171:19, 173:16, 173:22, 173:24, 178:17, 180:18, 225:12, 251:17, 258:18, 258:24, 259:2, 259:8, 259:22, 259:24
**LEWIS** [1] - 1:6
**licensed** [1] - 125:22
**licenses** [1] - 130:15
**lieutenants** [1] - 44:23
**lifeblood** [1] - 16:22
**lights** [1] - 288:10
**likelihood** [1] - 151:15
**likely** [4] - 6:24, 23:9, 127:11, 127:12
**likewise** [1] - 166:22
**limit** [1] - 97:25
**limitation** [1] - 136:3
**limitations** [1] - 135:25
**limited** [4] - 16:24, 18:18, 97:25, 126:12
**line** [12] - 23:18, 23:19, 44:22, 61:19, 66:14, 122:9, 122:15, 147:19, 148:1, 208:12, 214:16, 231:13
**linear** [1] - 208:9
**lines** [2] - 159:20, 160:20
**lips** [1] - 16:9
**list** [9] - 9:11, 55:17, 118:8, 131:14, 137:20, 138:1, 222:13, 237:24, 278:15
**listed** [2] - 139:15, 172:3
**listen** [2] - 15:1, 300:25

**listening** [2] - 42:1, 99:10
**listing** [2] - 125:8, 159:25
**lists** [3] - 111:1, 237:9
**litigate** [1] - 80:6
**litigation** [2] - 176:20, 203:20
**live** [3] - 16:19, 18:15, 19:25
**lives** [3] - 18:15, 19:24, 25:9
**living** [1] - 25:18
**LLP** [1] - 2:14
**load** [1] - 48:15
**loan** [1] - 20:9
**local** [10] - 114:19, 115:24, 116:4, 136:9, 172:15, 174:8, 197:11, 217:17, 294:12, 294:19
**localities** [1] - 287:16
**locate** [2] - 44:6, 239:6
**located** [3] - 199:9, 199:10, 238:22
**locating** [1] - 239:5
**location** [3] - 77:6, 82:14, 205:22
**locations** [2] - 12:9, 87:19
**lock** [2] - 84:6, 89:11
**lockdown** [1] - 136:11
**locked** [2] - 84:25, 295:1
**locks** [1] - 82:10
**loft** [1] - 187:6
**logic** [1] - 208:18
**logistics** [1] - 11:19
**long-term** [2] - 6:24, 227:17
**longevity** [1] - 272:21
**look** [50] - 13:13, 29:7, 29:8, 30:1, 37:3, 62:20, 111:5, 112:22, 114:12, 115:6, 146:13, 147:5, 148:1, 158:4, 168:9, 170:16, 176:1, 178:25, 185:14, 190:4, 190:8, 194:4, 196:17, 205:8, 214:21, 215:2, 216:15, 217:7, 217:12, 222:24, 225:13, 231:4, 232:14, 237:14, 247:1, 247:17, 253:22, 255:18,

260:11, 260:19, 260:24, 263:20, 271:17, 272:14, 282:18, 284:19, 285:24, 286:1, 288:18, 297:1
**looked** [24] - 15:25, 29:3, 36:5, 42:23, 66:7, 66:9, 67:18, 75:1, 114:17, 114:18, 115:7, 133:23, 134:4, 146:10, 147:8, 178:13, 195:3, 204:25, 254:3, 258:17, 269:13, 271:22, 275:2
**looking** [30] - 47:17, 105:21, 113:23, 114:14, 117:24, 126:4, 126:25, 133:13, 136:25, 143:23, 147:2, 147:3, 156:11, 156:12, 157:25, 177:6, 180:22, 187:12, 192:5, 195:25, 204:20, 208:25, 226:22, 233:4, 242:8, 264:25, 286:15, 291:13, 291:18, 297:23
**looks** [8] - 51:7, 187:12, 244:18, 248:12, 263:14, 265:1, 266:7, 266:13
**lopsided** [2] - 231:18, 264:1
**Los** [2] - 136:5, 213:18
**lose** [14] - 34:7, 49:12, 94:10, 188:21, 193:21, 201:2, 204:6, 210:15, 229:16, 263:23, 264:1, 264:9, 264:10, 265:7
**loses** [1] - 11:1
**losing** [20] - 58:6, 58:7, 200:23, 201:1, 207:3, 207:6, 207:7, 208:17, 216:18, 216:19, 217:10, 245:14, 245:16, 245:17, 245:18, 263:15, 264:8, 264:23, 273:4
**loss** [7] - 58:15, 261:13, 261:21, 265:8, 265:10,

278:8, 280:23
**losses** [1] - 281:9
**lost** [12] - 10:2, 35:22, 41:1, 142:9, 178:25, 190:18, 192:17, 212:11, 243:7, 262:16, 263:9
**loud** [1] - 100:11
**Louisiana** [28] - 1:22, 10:20, 15:2, 105:9, 105:12, 105:17, 116:21, 126:22, 136:10, 145:11, 149:25, 153:6, 153:10, 153:19, 153:20, 162:4, 163:6, 166:16, 168:3, 185:21, 193:18, 197:3, 197:10, 197:23, 212:19, 213:13, 223:15, 223:24
**LOUISIANA** [2] - 1:2, 4:1
**Louisiana's** [1] - 5:11
**low** [12] - 48:3, 77:1, 115:23, 183:22, 183:23, 183:24, 184:14, 217:15, 218:21, 219:24, 229:7, 270:1
**low-risk** [1] - 77:1
**lower** [14] - 182:3, 186:19, 199:13, 219:13, 224:25, 225:5, 227:3, 229:6, 229:23, 247:7, 248:13, 251:14, 266:3, 292:20
**lowered** [1] - 234:23
**lowering** [1] - 165:2
**lowest** [9] - 37:2, 40:5, 66:4, 66:5, 67:2, 133:18, 217:13, 217:14, 217:15
**lowing** [1] - 236:12
**LPN** [7] - 111:8, 112:22, 113:25, 114:1, 114:5, 114:9, 114:10
**LPNs** [10] - 109:25, 110:8, 111:4, 113:1, 119:15, 120:19, 121:17, 123:20, 123:21, 137:20
**LSU** [1] - 212:19
**lucky** [1] - 35:15
**lump** [2] - 12:18, 99:20
**lunch** [1] - 129:22

**luxury** [1] - 45:3

## M

**ma'am** [1] - 287:23
**magistrate** [2] - 106:18, 109:12
**main** [3] - 118:24, 128:9, 227:4
**mainframe** [3] - 43:10, 68:22, 69:10
**maintain** [7] - 5:24, 39:9, 44:13, 123:9, 203:17, 254:16, 285:22
**maintaining** [4] - 24:11, 254:20, 259:25, 286:2
**maintenance** [12] - 221:10, 221:11, 221:12, 224:12, 254:10, 254:16, 254:18, 254:19, 254:23, 255:3, 283:8, 286:6
**Major** [1] - 66:11
**major** [4] - 48:16, 145:14, 219:3, 223:22
**majority** [6] - 9:4, 76:17, 141:14, 192:11, 192:12, 284:15
**majors** [1] - 231:19
**man's** [1] - 125:5
**manage** [1] - 274:4
**manageable** [2] - 205:25, 299:5
**managed** [1] - 193:14
**management** [17] - 12:6, 18:9, 43:21, 48:5, 48:7, 48:18, 48:22, 49:14, 49:25, 69:2, 69:3, 69:5, 215:14, 258:2, 283:9, 286:9, 286:10
**MANAGER** [6] - 4:5, 27:16, 80:17, 103:10, 161:11, 276:8
**manager** [1] - 18:3
**managers** [1] - 71:13
**mandate** [1] - 143:2
**mandates** [2] - 147:5, 153:10
**manner** [2] - 17:20, 21:25
**manpower** [3] - 30:11, 30:12, 84:11
**March** [6] - 32:21,

38:20, 51:8, 154:9, 282:3
**march** [1] - 37:23
**marginal** [3] - 240:15, 240:25, 283:12
**marginally** [1] - 158:11
**Mariano** [1] - 66:11
**Maricopa** [1] - 270:7
**marijuana** [1] - 292:19
**mark** [2] - 251:16, 252:12
**MARK** [1] - 1:6
**marked** [5] - 60:18, 81:16, 145:4, 282:13, 282:14
**marker** [1] - 160:3
**market** [1] - 38:3
**marketplace** [1] - 114:3
**MARLIN** [1] - 1:10
**marry** [1] - 43:8
**Marshals** [1] - 221:21
**marshals'** [1] - 275:20
**Marvin** [1] - 4:6
**Maryland** [4] - 50:10, 51:10, 52:10, 255:21
**massive** [1] - 199:7
**master** [3] - 172:14, 215:9, 258:2
**master's** [1] - 162:13
**matched** [2] - 132:25, 133:6
**matches** [1] - 137:11
**maternal** [1] - 124:18
**maternity** [1] - 124:21
**math** [4] - 111:3, 217:18, 226:5, 279:11
**MATHEWS** [1] - 99:17
**matter** [13] - 4:5, 4:6, 7:9, 7:11, 15:15, 15:18, 129:8, 136:25, 165:13, 174:22, 204:9, 282:8, 282:15
**matters** [2] - 195:9, 231:17
**MATTHEW** [1] - 129:11
**MATTHEWS** [34] - 2:10, 4:18, 102:23, 103:6, 103:16, 103:24, 103:25, 106:21, 107:2, 108:15, 108:16, 108:21, 108:23, 111:16, 114:20, 123:15, 127:23, 129:2, 130:5, 130:7,

138:4, 140:8, 145:2, 145:23, 159:8, 159:11, 160:5, 161:4, 175:4, 194:16, 281:1, 282:12, 286:18, 301:9
**Matthews** [4] - 2:12, 3:9, 4:18, 128:25
**Matthews'** [1] - 275:18
**mattresses** [1] - 13:18
**maximized** [1] - 211:10
**maximizing** [1] - 17:11
**maximum** [3] - 85:4, 87:22, 277:23
**Mayor** [2] - 284:3, 286:22
**mayor** [7] - 162:5, 222:17, 278:17, 292:12, 294:16, 297:25, 299:12
**mayor's** [2] - 252:9, 288:11
**MCD** [1] - 117:24
**McDaniel** [1] - 242:23
**McDonald's** [1] - 34:7
**McGee** [2] - 98:13, 98:23
**McGinnis** [8] - 173:15, 178:10, 267:9, 267:19, 267:24, 268:20, 269:23, 270:12
**McGinnis'** [2] - 267:7, 267:8
**McGinnis's** [4] - 174:9, 174:21, 179:6, 243:24
**McGuire** [1] - 18:11
**McKesson** [2] - 135:23, 136:1
**meals** [2] - 298:18, 298:19
**mean** [45] - 35:10, 44:15, 47:18, 47:21, 47:25, 48:16, 49:12, 55:4, 61:2, 62:20, 63:14, 68:14, 77:4, 78:4, 78:15, 82:8, 83:19, 87:1, 131:14, 139:11, 143:23, 168:1, 169:25, 176:14, 184:9, 193:11, 193:16, 195:7, 205:5, 219:25, 220:23, 235:6, 239:18, 254:14, 254:22,

264:8, 273:8, 273:16, 275:15, 275:19, 279:20, 291:13, 291:25, 296:10, 297:10
**meaningful** [2] - 74:2, 274:23
**meaningfully** [1] - 298:5
**means** [14] - 18:15, 20:25, 21:1, 182:4, 188:8, 189:25, 190:2, 201:1, 208:10, 210:24, 230:14, 280:17, 282:5
**meant** [1] - 160:20
**meantime** [1] - 202:20
**measures** [4] - 95:23, 95:25, 128:21, 280:3
**meat** [1] - 40:3
**mechanism** [1] - 257:12
**mechanisms** [1] - 23:15
**med** [2] - 118:7, 135:8
**median** [1] - 68:9
**Medicaid** [2] - 141:23, 146:8
**medical** [134] - 12:17, 12:20, 12:21, 12:22, 13:1, 14:9, 22:8, 23:24, 24:1, 25:7, 32:4, 49:6, 58:23, 87:17, 89:7, 89:8, 89:12, 104:1, 104:11, 104:18, 104:24, 105:6, 105:9, 105:11, 105:14, 106:3, 106:6, 107:20, 107:22, 109:1, 109:24, 110:1, 110:7, 110:8, 115:1, 115:11, 115:13, 115:16, 115:20, 116:7, 116:8, 116:9, 116:13, 116:14, 116:15, 117:1, 117:2, 117:5, 118:14, 118:25, 119:5, 119:6, 119:10, 121:6, 121:8, 121:17, 122:5, 122:17, 122:22, 123:10, 123:13, 123:21, 127:9, 128:8, 128:17, 130:12, 131:9, 131:12,

132:2, 132:4, 132:11, 132:14, 132:22, 134:8, 135:10, 138:6, 139:3, 139:8, 140:10, 144:5, 144:14, 144:22, 145:14, 145:15, 146:25, 147:22, 148:9, 148:11, 148:13, 148:15, 148:22, 149:1, 149:2, 149:9, 149:13, 150:12, 150:16, 151:8, 152:5, 153:5, 155:13, 156:4, 156:8, 157:13, 158:3, 164:25, 169:6, 169:12, 170:15, 170:18, 171:19, 171:20, 172:23, 176:2, 176:19, 202:17, 205:13, 206:13, 206:21, 208:9, 208:16, 212:13, 221:14, 259:22, 260:23, 261:7, 269:16
**Medical** [3] - 153:10, 153:19, 153:20
**medical-legal** [1] - 105:6
**medical/mental** [5] - 205:21, 208:11, 209:2, 209:16, 245:6
**medicals** [1] - 208:7
**Medicare** [3] - 110:13, 146:1, 146:8
**Medicare's** [1] - 146:3
**Medicare/Medicaid** [1] - 146:5
**medication** [8] - 119:25, 135:8, 135:12, 135:16, 138:16, 138:20, 264:14
**medications** [9] - 24:2, 119:8, 131:13, 135:14, 138:21, 143:6, 143:9, 143:10, 148:17
**Medicine** [2] - 104:12, 106:3
**medicine** [7] - 104:14, 106:4, 107:9, 107:13, 107:21, 107:24, 108:11
**medium** [2] - 105:22,

133:21
**medium-sized** [1] - 105:22
**meds** [4] - 118:2, 135:10, 138:25, 139:1
**meet** [17] - 71:1, 71:3, 114:22, 133:22, 134:18, 144:4, 145:5, 146:5, 146:7, 147:4, 152:4, 158:7, 158:22, 210:17, 278:13, 288:5, 301:16
**meeting** [4] - 9:10, 144:4, 158:18, 158:23
**meetings** [2] - 71:12, 295:18
**meets** [1] - 104:1
**member** [2] - 105:20, 130:18
**members** [5] - 35:20, 147:14, 180:6, 239:11, 297:10
**memorandums** [1] - 166:15
**memorialized** [1] - 278:23
**memorize** [1] - 62:4
**memory** [3] - 35:21, 70:5, 125:24
**mental** [33] - 22:8, 22:10, 23:24, 24:1, 25:5, 25:8, 38:10, 59:4, 59:6, 59:8, 59:9, 59:13, 94:7, 94:8, 94:11, 115:4, 125:7, 125:18, 125:21, 126:16, 127:15, 130:24, 132:5, 133:1, 138:16, 138:17, 158:9, 164:25, 205:13, 206:22, 269:16, 299:22
**mentality** [2] - 69:4, 126:19
**mentally** [2] - 119:20, 121:10
**mention** [3] - 78:12, 252:25, 255:2
**mentioned** [13] - 90:17, 96:6, 141:17, 142:13, 207:13, 250:22, 257:18, 259:15, 261:10, 273:21, 280:21, 289:8, 295:25
**mentioning** [2] -

182:19, 235:9
**mentions** [1] - 269:24
**messages** [1] - 231:12
**met** [7] - 83:3, 98:13, 113:16, 158:3, 171:5, 176:2, 257:17
**metal** [2] - 119:21, 135:11
**metro** [1] - 37:3
**MICHAEL** [2] - 3:7, 80:15
**Michael** [3] - 80:14, 80:19, 185:7
**mid** [4] - 37:23, 46:15, 51:8, 153:1
**Mid** [1] - 38:20
**mid-1980s** [1] - 12:8
**mid-December** [1] - 46:15
**mid-march** [2] - 37:23, 51:8
**Mid-March** [1] - 38:20
**mid-September** [1] - 153:1
**middle** [3] - 86:17, 88:7, 135:13
**might** [17] - 39:22, 39:23, 108:7, 119:23, 122:1, 160:11, 170:8, 203:19, 204:12, 209:4, 210:15, 247:17, 252:21, 256:8, 290:16
**Mike** [3] - 66:12, 180:8, 244:16
**miles** [1] - 286:3
**military** [2] - 36:12, 38:7
**million** [45] - 12:18, 13:23, 17:24, 19:19, 20:8, 20:9, 20:10, 25:13, 25:15, 134:10, 143:2, 212:14, 213:1, 213:3, 213:5, 214:10, 216:7, 216:18, 218:6, 240:3, 261:13, 261:19, 261:22, 262:19, 262:23, 263:6, 263:9, 263:10, 263:12, 264:6, 265:8, 265:11, 265:19, 265:20, 265:21, 265:23, 273:2, 273:9, 278:12, 278:22, 281:11, 284:25, 287:24,

298:18
**millions** [3] - 17:23, 215:18, 253:21
**mincing** [1] - 95:17
**mind** [4] - 144:19, 201:24, 209:9, 234:25
**mindful** [1] - 16:22
**mine** [3] - 133:5, 133:17, 134:23
**minimal** [2] - 16:15, 69:6
**minimize** [4] - 24:17, 192:6, 192:16, 280:14
**minimum** [10] - 77:15, 77:16, 77:18, 124:23, 133:11, 133:15, 143:22, 148:7, 150:1, 174:3
**Ministries** [1] - 284:16
**minor** [1] - 292:19
**minute** [4] - 102:24, 156:3, 205:11, 223:1
**minutes** [7] - 14:24, 43:15, 43:16, 50:6, 222:23, 275:23
**misdemeanor** [2] - 53:21, 296:15
**misheard** [1] - 157:14
**mismanagement** [1] - 21:13
**missing** [4] - 112:17, 113:9, 123:24, 147:13
**mission** [3] - 21:7, 205:12, 251:21
**missions** [1] - 227:4
**Mississippi** [4] - 36:5, 104:15, 164:2, 166:2
**misspelling** [1] - 40:10
**mistake** [1] - 74:20
**mistaken** [1] - 37:10
**misunderstands** [1] - 294:25
**mixing** [2] - 22:12, 247:2
**Mobile** [7] - 225:23, 226:2, 249:3, 249:5, 249:7, 249:8, 249:12
**mock** [1] - 130:13
**model** [5] - 52:19, 185:14, 206:4, 260:13, 274:25
**modeled** [1] - 260:15
**models** [1] - 178:16
**moderate** [1] - 183:22
**moderator** [1] - 156:4
**modern** [2] - 48:10,

49:14
**modest** [1] - 68:24
**modicum** [1] - 39:9
**modification** [1] - 210:12
**modifications** [6] - 41:11, 72:21, 109:2, 210:9, 290:23, 291:2
**modified** [2] - 25:7, 127:5
**modify** [2] - 128:17, 210:15
**moment** [11] - 7:5, 7:18, 51:3, 56:3, 181:9, 212:1, 215:24, 223:12, 228:3, 228:9, 261:10
**MONDAY** [1] - 4:1
**Monday** [6] - 6:20, 35:15, 46:8, 76:12, 160:15, 161:2
**money** [66] - 6:11, 13:16, 17:11, 18:12, 18:16, 20:6, 20:11, 20:17, 20:20, 20:22, 25:15, 25:23, 48:21, 80:3, 93:3, 99:14, 101:11, 154:25, 179:1, 179:3, 185:4, 185:18, 207:3, 207:7, 208:17, 213:9, 213:14, 213:16, 213:24, 215:20, 227:12, 229:10, 230:20, 232:1, 245:14, 245:16, 245:17, 245:18, 253:19, 253:20, 253:22, 262:15, 263:15, 263:16, 263:18, 264:23, 264:24, 273:11, 273:14, 273:20, 286:7, 287:20, 288:8, 288:16, 288:24, 288:25, 289:8, 289:9, 289:13, 289:16, 289:18, 290:13, 296:4, 298:20
**monitor** [23] - 6:17, 11:21, 23:6, 127:18, 127:20, 130:20, 131:6, 131:16, 155:21, 156:15, 163:19, 163:22, 166:16, 185:20, 190:25, 214:17, 232:3, 232:5, 232:8,

232:11, 232:21, 257:8
**monitor's** [2] - 232:5, 257:8
**monitoring** [6] - 116:19, 128:12, 128:16, 138:22, 215:4, 257:3
**monitors** [1] - 232:6
**Montgomery** [9] - 50:9, 51:1, 51:14, 51:15, 256:2, 274:11, 274:24, 274:25
**month** [22] - 34:21, 59:21, 69:9, 72:14, 73:10, 74:16, 74:21, 142:22, 143:8, 143:10, 151:19, 157:10, 187:6, 190:22, 190:24, 215:12, 223:20, 236:22, 236:25, 237:5, 237:10, 271:10
**months** [23] - 24:22, 25:9, 29:15, 32:15, 65:12, 66:14, 138:12, 140:14, 142:19, 142:21, 151:15, 151:21, 152:15, 152:23, 157:3, 157:8, 184:2, 210:4, 210:8, 240:18, 244:5, 250:23
**morning** [13] - 4:3, 4:10, 4:12, 4:14, 4:21, 7:15, 8:24, 15:15, 76:12, 160:6, 200:23, 300:16, 300:18
**mornings** [1] - 82:13
**Most** [1] - 149:1
**most** [31] - 18:21, 21:2, 30:9, 43:7, 44:24, 51:16, 115:20, 119:20, 119:22, 119:24, 127:11, 130:24, 132:11, 134:24, 135:4, 164:18, 172:9, 184:12, 196:17, 197:5, 213:19, 218:10, 227:2, 234:25, 243:20, 257:14, 289:20, 296:1, 297:16, 298:1
**mostly** [2] - 94:5,

251:9
**Motel** [1] - 51:12
**motels** [1] - 51:12
**motion** [3] - 18:7, 79:2, 79:6
**mount** [1] - 43:13
**move** [30] - 16:4, 29:19, 32:12, 44:2, 44:15, 50:19, 71:25, 99:16, 112:1, 117:14, 119:2, 119:9, 123:16, 125:1, 127:24, 177:15, 177:16, 185:3, 196:1, 196:2, 196:6, 196:7, 198:20, 208:20, 214:8, 226:11, 254:7, 281:24, 297:17, 300:17
**moved** [15] - 42:16, 63:25, 90:20, 90:23, 90:25, 91:1, 91:2, 111:16, 131:18, 196:5, 197:1, 197:22, 198:7, 203:2, 234:16
**movement** [1] - 11:22
**moves** [1] - 91:8
**moving** [7] - 42:18, 62:17, 230:5, 232:22, 246:4, 266:16, 299:15
**mow** [1] - 283:15
**MR** [347] - 4:14, 4:18, 4:20, 4:21, 7:4, 7:13, 7:17, 8:11, 8:14, 8:19, 8:23, 14:25, 15:9, 15:13, 15:21, 16:6, 26:24, 26:25, 27:3, 27:12, 27:20, 30:8, 30:14, 30:20, 31:4, 31:16, 31:21, 33:4, 33:8, 33:14, 34:16, 35:3, 35:9, 36:21, 37:16, 38:3, 38:24, 39:13, 41:7, 42:15, 44:17, 47:10, 47:14, 47:15, 49:22, 50:11, 50:18, 50:23, 50:25, 53:1, 53:19, 54:3, 54:13, 56:3, 56:5, 56:10, 56:24, 57:4, 57:12, 57:14, 58:11, 58:25, 59:7, 60:12, 60:15, 60:17, 60:20, 60:21, 61:14, 61:21, 61:23, 62:3, 62:6, 62:9, 62:10, 63:8, 67:12, 69:18,

69:20, 70:13, 70:16, 70:18, 71:20, 72:1, 72:11, 72:19, 73:1, 73:3, 73:13, 73:17, 74:7, 74:14, 75:5, 75:24, 75:25, 79:9, 79:16, 79:17, 79:21, 79:22, 80:1, 80:7, 80:10, 80:14, 80:23, 85:8, 87:1, 88:17, 89:5, 90:16, 92:2, 92:21, 93:4, 93:21, 94:16, 94:23, 95:1, 95:12, 95:17, 95:19, 97:2, 97:17, 97:20, 98:4, 98:6, 98:7, 99:6, 99:12, 99:17, 99:20, 100:4, 100:5, 100:18, 100:22, 101:10, 101:12, 101:23, 102:2, 102:9, 102:13, 102:21, 102:23, 103:6, 103:16, 103:24, 103:25, 106:21, 106:24, 107:2, 107:5, 108:15, 108:16, 108:21, 108:23, 111:19, 112:1, 112:4, 112:11, 112:12, 114:20, 123:15, 127:20, 127:23, 129:2, 129:11, 129:14, 129:17, 130:5, 130:7, 138:4, 139:11, 139:20, 140:8, 144:6, 145:2, 145:23, 145:25, 156:1, 156:19, 156:22, 156:24, 157:14, 157:21, 158:13, 159:5, 159:8, 159:11, 159:18, 160:5, 160:11, 160:16, 160:24, 161:4, 161:7, 161:15, 162:10, 162:24, 164:20, 166:10, 167:4, 167:6, 167:22, 167:25, 168:19, 169:1, 169:5, 169:17, 169:22, 171:25, 172:2, 175:4, 175:12, 175:20, 175:25, 176:14, 176:16, 176:24, 177:3, 177:5,

177:10, 177:17, 180:20, 188:25, 189:4, 189:7, 190:9, 190:11, 190:14, 190:18, 190:21, 192:18, 192:21, 192:25, 193:4, 193:7, 194:16, 194:20, 194:24, 195:22, 197:14, 198:17, 198:19, 202:22, 203:19, 204:19, 204:22, 207:12, 208:19, 209:22, 209:23, 214:9, 216:3, 216:5, 219:18, 220:14, 220:16, 222:12, 222:21, 223:6, 223:10, 224:5, 224:6, 225:21, 225:22, 226:9, 226:10, 230:23, 230:25, 232:12, 233:3, 233:14, 233:19, 235:11, 235:24, 236:10, 236:16, 236:21, 237:22, 238:4, 240:2, 240:6, 240:11, 241:1, 241:4, 241:10, 242:2, 243:9, 245:10, 245:13, 246:1, 246:14, 249:1, 249:16, 249:19, 249:20, 262:5, 262:10, 270:19, 270:23, 270:25, 271:4, 272:6, 272:10, 275:4, 275:11, 275:14, 275:17, 275:22, 276:1, 276:3, 276:5, 276:11, 276:16, 277:11, 277:15, 277:19, 277:21, 281:1, 281:4, 281:18, 281:25, 282:8, 282:11, 282:12, 282:14, 282:22, 282:23, 284:2, 284:6, 285:7, 285:8, 286:16, 286:18, 291:1, 291:10, 291:16, 298:6, 298:12, 298:15, 298:22, 298:23, 299:25, 300:4, 300:10,

300:21, 301:9, 301:12
**MRI** [1] - 141:12
**MS** [50] - 4:10, 4:12, 4:16, 21:17, 24:13, 26:19, 73:21, 79:11, 79:12, 99:4, 102:17, 102:18, 112:6, 112:14, 169:10, 169:20, 171:12, 172:4, 174:20, 175:1, 232:17, 232:23, 232:25, 239:10, 239:14, 239:20, 239:23, 240:8, 241:17, 241:24, 249:23, 253:5, 253:8, 254:24, 261:6, 262:12, 267:4, 267:5, 270:14, 270:16, 282:13, 286:19, 286:21, 287:12, 290:20, 292:4, 292:5, 298:9, 300:5, 301:4
**multiple** [1] - 131:17
**multiplier** [1] - 111:8
**Municipal** [1] - 54:6
**municipal** [24] - 16:10, 20:18, 53:9, 53:20, 53:24, 59:16, 59:23, 59:24, 60:3, 60:4, 60:5, 60:7, 60:9, 61:18, 126:7, 154:22, 178:21, 220:25, 235:13, 235:14, 257:19, 258:11, 296:15
**municipalities** [2] - 224:10, 224:24
**murder** [1] - 86:3
**MURPHY** [1] - 2:3
**Musketeers** [1] - 20:15
**must** [7] - 9:7, 19:8, 20:24, 20:25, 21:1, 21:3, 21:10
**myopic** [1] - 17:10

## N

**name** [13] - 10:3, 19:17, 27:16, 40:11, 80:17, 103:11, 103:12, 117:9, 149:9, 161:11, 161:13, 276:8
**named** [1] - 117:8
**names** [6] - 40:12,

148:17, 149:3, 149:4, 180:10, 232:15
**narrow** [2] - 179:11, 226:19
**narrowed** [2] - 74:10, 75:13
**nation** [1] - 134:5
**national** [8] - 183:7, 189:19, 218:18, 219:1, 219:10, 284:18, 295:12, 295:14
**National** [2] - 163:8, 168:7
**nationally** [6] - 105:22, 106:1, 109:14, 184:7, 209:5, 258:10
**nationwide** [2] - 29:8, 114:13
**nature** [4] - 86:4, 87:7, 93:16, 116:22
**NCCAC** [1] - 105:25
**NCCHC** [1] - 12:22
**near** [3] - 37:12, 37:22, 51:12
**nearly** [2] - 19:19, 179:19
**necessary** [12] - 24:25, 31:9, 38:21, 39:9, 88:14, 199:12, 220:8, 248:14, 250:16, 250:17, 254:1
**necessitated** [1] - 17:2
**need** [132] - 12:6, 15:22, 16:23, 18:25, 22:16, 22:24, 23:11, 25:4, 29:15, 31:10, 32:9, 40:19, 42:4, 43:8, 46:17, 62:5, 69:2, 73:15, 74:3, 91:7, 91:11, 94:14, 106:17, 107:15, 115:1, 115:5, 116:19, 118:9, 118:12, 118:19, 119:1, 120:8, 120:9, 120:10, 120:13, 120:14, 122:1, 124:2, 124:23, 125:20, 126:17, 128:12, 128:16, 128:23, 130:11, 131:3, 131:7, 131:15, 132:6, 132:7, 137:18, 138:2, 138:22,

147:11, 147:23,
149:4, 150:1,
156:18, 158:11,
158:17, 158:23,
160:3, 174:2,
175:17, 178:17,
183:14, 186:4,
195:17, 200:20,
201:18, 201:19,
202:6, 205:19,
207:14, 207:18,
207:19, 207:25,
208:10, 208:25,
209:2, 209:7,
210:18, 211:6,
211:7, 213:25,
214:19, 214:20,
215:2, 215:16,
216:24, 220:4,
227:23, 229:15,
229:23, 229:25,
230:3, 231:15,
232:1, 232:21,
233:10, 235:20,
235:21, 250:14,
251:12, 251:25,
252:17, 253:15,
253:17, 254:6,
254:7, 254:8,
257:25, 263:4,
269:7, 269:14,
279:22, 279:24,
282:18, 283:25,
288:13, 289:3,
289:4, 289:6, 291:8,
291:25, 298:20

**needed** [47] - 9:12,
9:24, 10:5, 10:11,
12:4, 13:4, 17:5,
20:23, 21:2, 23:23,
25:23, 26:1, 26:4,
26:11, 41:14, 44:4,
44:13, 47:19, 48:15,
91:2, 110:1, 114:24,
120:6, 120:18,
123:20, 124:8,
125:25, 130:19,
132:20, 145:10,
151:25, 152:1,
155:13, 155:17,
170:12, 172:24,
172:25, 173:4,
175:14, 203:16,
243:13, 244:1,
281:9, 290:4, 290:6

**needing** [1] - 179:3

**needs** [59] - 5:24, 6:2,
9:16, 21:8, 23:3,
23:6, 23:17, 26:14,
58:16, 75:7, 91:6,
100:12, 116:19,

118:25, 119:4,
119:15, 119:18,
120:1, 120:19,
121:6, 122:14,
122:23, 123:12,
128:8, 131:4,
132:15, 132:18,
133:7, 136:15,
157:2, 157:22,
157:25, 171:6,
174:6, 180:15,
183:16, 187:10,
188:19, 201:13,
202:5, 207:18,
207:19, 211:9,
214:18, 231:13,
242:4, 245:9,
245:20, 251:19,
252:20, 253:15,
253:22, 253:23,
255:18, 256:7,
257:17, 258:3,
267:11, 288:5

**negative** [1] - 279:1

**negotiated** [1] -
219:15

**neighborhood** [3] -
89:21, 207:1, 273:1

**neighboring** [1] -
37:13

**net** [4] - 19:19, 21:1,
261:21, 265:9

**never** [17] - 41:6,
59:24, 107:16,
107:17, 122:16,
122:21, 123:13,
135:7, 144:7,
174:13, 174:15,
174:16, 177:2,
177:4, 200:8,
205:16, 219:16

**NEW** [2] - 1:3, 4:1

**new** [129] - 6:4, 10:11,
11:10, 11:12, 11:19,
11:25, 12:11, 13:13,
23:5, 25:6, 25:21,
26:13, 35:1, 35:11,
35:12, 35:15, 37:21,
38:6, 38:15, 38:18,
39:17, 44:2, 44:15,
45:8, 45:17, 47:19,
47:25, 48:11, 48:18,
50:3, 50:20, 51:5,
68:18, 69:1, 69:3,
69:16, 69:22, 70:1,
70:25, 71:16, 72:2,
72:7, 72:24, 74:12,
75:19, 92:6, 93:7,
93:12, 93:13, 94:22,
101:1, 121:4, 121:7,

125:25, 141:14,
142:23, 143:8,
151:19, 187:14,
199:8, 204:23,
204:25, 205:3,
205:9, 205:17,
207:14, 207:17,
207:23, 208:22,
209:1, 209:10,
209:11, 209:25,
210:3, 210:8, 210:9,
210:15, 210:16,
215:3, 224:19,
229:9, 229:15,
229:18, 229:24,
230:10, 239:3,
242:10, 242:15,
242:16, 243:1,
243:17, 244:15,
249:25, 250:3,
254:19, 254:22,
258:22, 258:24,
260:11, 260:20,
263:8, 266:3, 266:8,
266:9, 266:10,
266:14, 266:17,
266:19, 268:4,
269:20, 269:24,
274:16, 281:16,
281:23, 285:21,
287:18, 287:20,
288:9, 288:10,
288:23, 289:8,
290:4, 290:5,
290:16, 290:23,
292:13, 293:8,
297:24

**New** [42] - 1:22, 2:14,
4:22, 5:14, 6:12, 7:6,
8:2, 11:1, 16:1,
18:14, 18:23, 42:5,
80:6, 108:6, 144:12,
155:2, 183:6, 185:8,
188:11, 188:15,
224:2, 262:2,
271:13, 271:17,
271:19, 277:24,
278:2, 279:2, 279:6,
280:8, 280:10,
280:23, 283:1,
284:15, 285:11,
285:15, 290:4,
290:11, 293:3,
294:20, 296:23,
299:20

**newer** [1] - 286:2

**news** [1] - 197:23

**newspaper** [1] - 36:4

**next** [24] - 21:16, 46:8,
49:13, 73:16, 75:10,

79:13, 80:13, 93:8,
113:13, 118:17,
119:3, 120:15,
159:10, 192:24,
193:3, 193:5,
204:12, 243:1,
243:3, 243:5, 243:6,
275:10, 279:10,
282:21

**nice** [1] - 255:21

**nicer** [1] - 140:19

**nickel** [2] - 217:4,
245:25

**night** [14] - 113:25,
114:1, 118:19,
118:21, 119:15,
120:9, 120:13,
120:15, 123:21,
135:13, 135:15,
267:25, 268:17,
291:12

**nights** [1] - 112:22

**nighttime** [3] - 118:23,
119:14, 120:3

**nine** [2] - 142:21,
272:15

**nobody** [3] - 30:5,
144:17, 155:16

**nobody's** [2] - 279:21,
279:22

**nominal** [1] - 69:14

**non** [2] - 32:22,
289:24

**non-City** [1] - 289:24

**non-secured** [1] -
32:22

**none** [2] - 42:13,
146:8

**nonetheless** [1] - 20:2

**nonexistent** [2] -
158:11, 158:14

**nonmedical** [1] -
146:16

**nonpsychiatric** [1] -
127:25

**nonstarter** [1] - 24:9

**noon** [1] - 160:15

**NOPD** [6] - 10:20,
19:11, 28:12, 38:5,
247:18, 272:15

**NORD** [1] - 19:14

**normal** [4] - 6:15,
82:15, 149:20,
251:23

**North** [1] - 11:6

**northeast** [1] - 219:13

**note** [3] - 13:9,
177:15, 229:14

**noted** [1] - 180:23

**notes** [6] - 24:21,

73:7, 149:2, 176:22,
193:23, 208:8

**nothing** [14] - 14:1,
14:4, 33:11, 56:5,
57:15, 57:16, 93:10,
94:23, 102:18,
107:5, 110:24,
134:19, 279:8, 298:9

**notice** [4] - 221:19,
244:6, 257:11,
300:12

**Notice** [3] - 7:6, 7:10,
7:19

**noticed** [1] - 266:5

**notions** [1] - 21:25

**November** [3] - 28:4,
51:7, 105:1

**novo** [1] - 158:12

**number** [74] - 10:2,
10:3, 16:11, 16:13,
18:20, 22:25, 40:15,
41:4, 53:11, 60:9,
81:23, 87:23, 90:6,
90:11, 98:22,
108:20, 110:24,
111:4, 111:6, 113:1,
113:3, 118:16,
120:6, 120:18,
120:20, 123:20,
123:21, 124:2,
128:19, 128:20,
132:19, 135:1,
137:25, 138:8,
145:9, 145:12,
146:13, 147:9,
147:14, 153:1,
155:16, 170:10,
180:9, 180:21,
181:1, 182:4, 189:1,
196:24, 205:1,
207:17, 208:9,
211:17, 225:6,
225:15, 230:14,
236:8, 236:11,
236:24, 237:3,
237:9, 238:2, 242:6,
243:13, 252:11,
256:15, 260:8,
260:24, 283:9,
285:17, 291:20

**numbers** [50] - 10:4,
10:7, 23:17, 40:15,
48:1, 68:12, 98:11,
110:7, 120:23,
121:1, 126:4, 133:8,
133:14, 138:2,
143:24, 155:22,
170:18, 177:13,
177:14, 178:16,
178:22, 200:12,

205:5, 205:6, 208:13, 212:13, 226:13, 237:11, 243:22, 243:24, 246:25, 250:11, 258:25, 259:9, 260:5, 260:10, 260:20, 261:7, 261:21, 265:17, 266:2, 266:4, 266:6, 266:18, 266:20, 267:1, 278:3, 280:24, 281:5, 281:12

**numerous** [1] - 116:1

**nurse** [12] - 114:8, 114:13, 114:14, 116:25, 117:15, 118:8, 122:16, 124:7, 124:15, 140:17, 140:20

**nurse/MA** [2] - 121:14, 123:17

**nurses** [31] - 116:20, 118:14, 118:16, 119:6, 120:6, 120:7, 120:9, 120:13, 120:14, 120:18, 121:7, 122:14, 122:18, 123:24, 123:25, 124:8, 124:11, 124:14, 124:17, 128:5, 131:20, 131:22, 131:25, 135:16, 136:7, 137:7, 152:13, 152:16

**nursing** [13] - 116:15, 116:17, 116:18, 116:23, 116:24, 117:16, 120:1, 123:25, 124:6, 130:15, 131:24

**Nursing** [1] - 116:21

**nutritional** [1] - 225:7

## O

**o'clock** [1] - 223:2

**oath** [1] - 130:3

**OB** [1] - 143:12

**object** [12] - 7:9, 31:18, 33:4, 47:10, 91:21, 157:17, 194:16, 235:24, 241:4, 241:10, 262:6, 281:1

**objected** [1] - 241:11

**objection** [19] - 8:9, 8:12, 8:16, 15:10,

31:2, 35:3, 35:8, 50:21, 79:22, 106:24, 111:18, 111:19, 129:5, 129:13, 129:20, 177:15, 241:25, 249:16, 262:11

**obligated** [3] - 6:12, 14:8, 21:10

**obligation** [1] - 14:18

**obligations** [1] - 25:13

**observation** [5] - 12:13, 25:8, 94:12, 159:19, 200:22

**observe** [3] - 118:7, 175:14, 255:21

**observed** [1] - 255:9

**observing** [1] - 256:5

**obtained** [1] - 12:24

**obvious** [2] - 136:13, 142:8

**obviously** [17] - 24:10, 29:6, 32:1, 39:3, 74:3, 122:7, 140:3, 183:14, 219:25, 222:16, 225:7, 227:15, 232:19, 234:16, 252:2, 254:1, 300:19

**occasion** [2] - 163:17, 164:13

**occasions** [2] - 84:1, 84:3

**occupancy** [1] - 244:15

**occupation** [1] - 104:17

**occupied** [1] - 244:22

**occurred** [2] - 7:18, 17:8

**occurring** [2] - 215:13

**occurs** [1] - 220:22

**Ochsner** [1] - 140:19

**October** [1] - 153:2

**odd** [1] - 89:19

**OF** [2] - 1:2, 1:14

**offend** [1] - 21:25

**offender** [6] - 84:19, 85:18, 90:18, 91:4, 91:5, 193:9

**offenders** [9] - 86:2, 86:5, 90:25, 91:3, 143:1, 143:3, 191:13, 191:17, 192:3

**offer** [11] - 11:2, 79:18, 97:23, 98:3, 129:18, 136:9, 154:2, 168:22, 282:1, 284:24, 299:20

**offered** [2] - 177:4, 283:24

**offering** [3] - 175:13, 287:1, 287:7

**offers** [1] - 287:8

**office** [38] - 9:10, 17:6, 28:7, 35:18, 36:23, 39:7, 41:8, 42:2, 45:22, 47:8, 55:15, 57:9, 65:14, 67:3, 80:2, 81:4, 81:6, 81:8, 104:23, 123:22, 139:24, 140:10, 141:1, 142:3, 144:21, 150:24, 151:12, 159:12, 167:18, 172:19, 180:7, 222:17, 271:8, 280:13, 283:2, 284:18, 285:20, 298:5

**Office** [17] - 2:17, 26:7, 27:23, 28:15, 30:24, 46:20, 49:23, 81:1, 104:19, 104:25, 146:15, 146:20, 166:20, 206:25, 217:9, 218:20, 271:9

**officer** [13] - 17:7, 22:11, 28:2, 45:20, 65:25, 66:1, 77:25, 224:2, 248:8, 259:1, 268:17, 278:17, 293:14

**officers** [29] - 10:21, 19:12, 23:9, 23:13, 23:16, 23:18, 23:19, 32:5, 37:4, 38:9, 39:5, 199:1, 199:4, 199:14, 201:2, 207:25, 213:21, 247:4, 247:11, 247:18, 248:1, 248:2, 255:9, 267:14, 271:13, 272:15, 280:2, 293:9, 296:9

**offices** [4] - 151:3, 224:10, 231:12, 279:23

**Official** [2] - 1:20, 303:3

**officials** [2] - 200:13, 294:17

**offline** [1] - 92:5

**often** [4] - 162:7, 191:18, 213:17

**Ohio** [1] - 104:10,

184:8

**OIG** [1] - 216:16

**Old** [1] - 49:2

**old** [3] - 39:18, 76:24, 254:21

**on-and-off** [1] - 120:16

**onboard** [4] - 23:6, 37:21, 75:13, 75:16

**once** [19] - 6:17, 15:22, 40:13, 40:23, 65:7, 65:9, 66:19, 71:1, 71:3, 95:24, 110:7, 154:1, 193:16, 215:2, 215:4, 259:8, 260:8, 284:4

**oncology** [1] - 108:9

**one** [148] - 6:4, 9:15, 12:7, 20:4, 20:12, 28:23, 30:3, 32:18, 32:19, 32:23, 35:7, 35:15, 35:19, 39:3, 43:9, 45:24, 46:24, 47:5, 48:21, 51:16, 56:3, 62:18, 64:7, 69:11, 72:3, 72:8, 75:7, 76:2, 76:13, 78:9, 78:17, 79:16, 83:25, 84:15, 84:16, 84:21, 85:2, 85:5, 86:2, 87:13, 87:21, 88:2, 88:6, 88:13, 92:23, 93:2, 93:10, 100:20, 105:6, 110:3, 111:3, 113:9, 117:8, 118:14, 119:2, 119:3, 119:24, 122:4, 122:22, 124:15, 126:11, 128:11, 130:24, 135:1, 136:12, 138:9, 147:21, 152:10, 155:6, 163:17, 164:5, 164:13, 165:10, 165:12, 167:23, 171:21, 173:17, 173:18, 173:19, 180:21, 181:1, 181:24, 182:20, 184:5, 184:11, 184:24, 186:18, 189:25, 190:2, 190:18, 192:4, 193:9, 194:3, 194:6, 198:17, 198:24, 201:7, 204:4, 206:19, 209:3, 210:22,

213:17, 213:24, 214:7, 214:24, 217:13, 217:15, 217:20, 221:7, 221:9, 224:18, 227:4, 230:7, 231:16, 233:4, 234:24, 236:2, 237:5, 238:11, 239:12, 244:22, 245:22, 249:2, 250:15, 251:3, 251:4, 251:5, 251:7, 256:15, 259:16, 260:21, 267:25, 274:21, 276:19, 279:7, 281:10, 290:19, 290:24, 292:4, 293:17, 294:24, 296:24, 298:1, 298:18, 299:18, 301:4

**ones** [11] - 56:13, 57:2, 119:22, 119:23, 119:25, 151:9, 187:20, 192:9, 195:11, 242:19

**ongoing** [2] - 210:9, 297:24

**online** [8] - 40:20, 40:21, 44:25, 45:13, 48:19, 92:6, 93:8, 93:13

**onsite** [1] - 132:6

**open** [25] - 25:21, 51:8, 53:12, 54:21, 63:24, 86:19, 96:4, 191:17, 194:9, 194:12, 195:2, 195:19, 195:24, 196:7, 196:8, 214:15, 239:4, 242:10, 242:23, 244:19, 244:21, 245:6, 250:7, 250:13, 300:11

**opened** [3] - 6:5, 63:4, 205:9

**Opening** [1] - 3:2

**opening** [8] - 7:3, 8:6, 8:10, 16:4, 37:22, 38:15, 38:19, 51:4

**opens** [6] - 23:5, 52:20, 52:24, 199:8, 215:3, 229:25

**operate** [10] - 10:11, 118:1, 124:24, 126:23, 168:3, 250:14, 250:15,

250:17, 280:17, 288:15
**operated** [5] - 17:14, 17:17, 81:9, 242:5, 244:2
**operates** [1] - 189:17
**operating** [11] - 10:2, 17:2, 17:20, 42:2, 136:14, 145:5, 172:19, 214:13, 242:19, 274:7, 287:10
**operation** [1] - 110:3
**operational** [3] - 180:22, 240:19, 245:4
**operations** [8] - 19:20, 22:4, 116:16, 117:1, 117:2, 147:3, 175:15, 279:17
**Operations** [1] - 81:4
**operative** [1] - 210:8
**opined** [1] - 176:3
**opinion** [23] - 30:16, 39:8, 39:19, 51:16, 91:21, 91:22, 104:4, 105:3, 108:18, 113:14, 117:10, 130:10, 135:3, 135:4, 180:14, 190:1, 205:3, 228:16, 228:24, 233:10, 245:8, 245:11, 284:20
**opinions** [2] - 166:12, 228:6
**OPP** [80] - 5:25, 6:7, 9:6, 9:12, 11:18, 12:21, 12:23, 16:10, 17:16, 17:19, 21:23, 21:24, 22:3, 22:15, 22:17, 23:1, 23:9, 25:2, 29:7, 49:2, 57:6, 58:14, 59:16, 59:23, 62:25, 64:5, 76:2, 83:23, 84:18, 85:14, 96:10, 97:25, 109:1, 109:11, 117:2, 117:21, 118:17, 118:24, 119:2, 119:4, 119:5, 119:10, 120:19, 123:3, 124:17, 125:23, 126:14, 132:6, 132:11, 134:11, 135:1, 135:7, 136:15, 136:16, 139:7, 141:11, 142:1, 143:9, 143:13,

143:22, 145:17, 146:13, 147:1, 147:5, 149:14, 152:4, 152:8, 154:15, 155:11, 155:13, 157:12, 157:22, 190:1, 242:24, 271:16, 272:3, 272:19, 284:12, 294:2, 299:16
**OPP's** [3] - 10:14, 13:1, 116:18
**opportunities** [1] - 283:17
**opportunity** [1] - 169:13
**opposed** [10] - 17:6, 48:12, 108:8, 116:14, 127:14, 144:24, 153:9, 217:22, 246:18, 276:18
**OPSB** [1] - 241:19
**OPSO** [7] - 20:25, 21:1, 21:2, 21:8, 28:19, 34:23, 270:1
**option** [1] - 243:20
**options** [1] - 87:4
**oral** [1] - 176:22
**order** [16] - 5:3, 5:15, 7:8, 8:19, 21:21, 22:23, 23:12, 26:14, 173:22, 178:7, 203:6, 204:1, 231:25, 251:25, 277:9, 292:8
**ordered** [8] - 9:13, 15:4, 21:18, 27:7, 165:2, 251:6, 278:9
**ordering** [1] - 139:3
**orders** [3] - 77:10, 282:4
**ordinance** [4] - 69:25, 70:4, 71:17, 210:3
**Oregon** [1] - 219:14
**organization** [7] - 32:1, 51:6, 163:10, 174:9, 183:8, 189:19, 190:22
**organize** [1] - 132:15
**original** [2] - 111:13, 297:10
**Orleanians** [1] - 18:23
**ORLEANS** [2] - 1:3, 4:1
**Orleans** [101] - 1:10, 1:22, 2:14, 4:23, 5:7, 5:8, 5:14, 6:12, 7:6, 8:2, 11:2, 16:1, 16:7,

18:14, 21:20, 27:23, 30:24, 42:5, 46:19, 46:23, 49:23, 54:21, 56:19, 57:23, 58:7, 58:20, 65:24, 66:25, 68:10, 77:24, 78:8, 80:6, 81:1, 97:4, 104:24, 105:13, 108:6, 113:15, 114:15, 114:18, 132:22, 144:12, 146:14, 146:19, 154:21, 155:1, 155:2, 166:19, 167:15, 167:17, 168:2, 176:2, 178:5, 180:6, 181:24, 184:6, 184:21, 184:25, 188:11, 188:15, 189:20, 204:3, 204:4, 206:18, 207:2, 209:6, 217:8, 217:19, 218:8, 218:20, 223:13, 224:2, 226:3, 228:25, 231:2, 234:11, 235:17, 238:18, 239:2, 241:19, 258:12, 262:2, 267:11, 271:9, 271:13, 271:17, 271:19, 277:24, 279:2, 279:6, 280:8, 280:24, 283:1, 284:15, 285:11, 285:15, 290:4, 293:3, 296:23, 298:25, 299:21
**Orleans'** [4] - 278:2, 280:10, 290:11, 294:20
**otherwise** [7] - 21:11, 23:4, 100:2, 201:23, 281:16, 281:24, 292:16
**ought** [5] - 72:17, 280:12, 280:13, 295:1, 296:9
**out-of-parish** [4] - 292:23, 293:10, 293:11, 293:18
**out-patient** [1] - 117:4
**outbreaks** [1] - 131:2
**outbursts** [1] - 201:17
**outpatient** [1] - 146:7
**outreach** [1] - 36:15
**outside** [6] - 20:5, 63:21, 100:19,

149:24, 173:10, 202:8
**outsource** [1] - 212:17
**outsourced** [2] - 221:25, 222:4
**outsourcing** [6] - 220:18, 221:2, 221:5, 221:14, 221:17, 221:23
**outstanding** [2] - 195:10, 293:13
**over-building** [1] - 290:9
**over-incarceration** [1] - 24:17
**over-the-counter** [1] - 131:13
**overall** [2] - 216:17, 265:6
**overcome** [1] - 21:22
**overcrowded** [1] - 211:12
**overdrawn** [2] - 279:2, 279:3
**overdue** [1] - 26:15
**overhead** [1] - 77:13
**overnight** [1] - 23:1
**overruled** [9] - 8:9, 8:15, 31:2, 31:19, 33:12, 35:8, 47:12, 50:21, 91:25
**oversee** [1] - 130:11
**overseeing** [4] - 117:5, 128:23, 150:6, 203:21
**oversees** [4] - 70:24, 116:10, 116:17, 116:24
**oversight** [4] - 17:17, 127:16, 127:17, 155:22
**overspending** [1] - 280:12
**overtime** [24] - 12:4, 46:6, 64:6, 64:8, 64:13, 110:11, 178:14, 215:8, 262:17, 262:18, 262:19, 262:22, 262:24, 263:4, 263:5, 263:7, 263:8, 263:9, 264:17, 264:18, 273:22
**overturn** [1] - 64:1
**own** [15] - 24:20, 77:4, 80:7, 92:22, 93:2, 96:23, 96:24, 97:12, 119:5, 137:11, 163:10, 225:16, 235:6, 252:20

**owned** [2] - 141:5, 289:14
**oxygen** [1] - 145:16

**P**

**P.M** [1] - 130:2
**p.m** [1] - 301:24
**package** [1] - 257:6
**packet** [2] - 55:12, 55:15
**packing** [1] - 131:13
**packs** [1] - 135:8
**pad** [1] - 143:15
**padlocking** [1] - 255:9
**page** [27] - 61:23, 85:13, 88:19, 108:19, 109:17, 112:21, 114:21, 117:21, 117:23, 119:16, 124:10, 127:24, 130:8, 131:9, 136:25, 137:2, 140:22, 147:10, 154:2, 169:20, 261:11, 267:9, 267:14, 267:24, 268:20, 269:23, 284:19
**pages** [3] - 123:19, 160:20, 169:15
**paid** [23] - 10:16, 10:19, 33:18, 34:22, 37:2, 44:11, 77:24, 131:25, 140:18, 142:3, 146:8, 148:4, 150:23, 218:22, 247:4, 247:18, 247:20, 248:1, 264:4, 271:20, 271:21, 273:19
**painfully** [1] - 285:13
**paired** [1] - 210:3
**pairing** [2] - 209:25, 222:23
**panel** [1] - 165:1
**panic** [1] - 144:3
**paper** [2] - 281:15, 281:19
**papers** [1] - 11:5
**paperwork** [2] - 197:7, 198:3
**paradigm** [1] - 17:16
**paragraph** [5] - 123:16, 125:1, 125:14, 127:25, 137:1
**paramount** [2] - 276:21, 276:24
**parcel** [2] - 20:11,

99:8
**pardon** [1] - 48:13
**Parish** [77] - 1:10, 5:7, 5:8, 16:7, 21:20, 27:23, 28:14, 30:24, 34:11, 37:4, 37:10, 46:19, 46:23, 49:2, 49:23, 53:16, 54:21, 56:19, 57:23, 58:7, 62:24, 63:2, 63:5, 63:6, 63:18, 65:24, 66:7, 66:25, 67:14, 67:16, 68:10, 77:24, 78:8, 81:1, 96:17, 96:21, 97:4, 97:7, 97:9, 104:18, 104:22, 104:25, 113:15, 114:15, 114:19, 132:22, 146:14, 146:19, 154:24, 166:19, 167:17, 168:2, 176:3, 178:5, 180:7, 189:20, 198:8, 204:3, 204:4, 217:9, 217:20, 218:8, 218:20, 223:13, 226:3, 228:25, 231:2, 234:11, 235:17, 238:18, 239:2, 241:19, 267:11, 271:9, 293:16, 298:25
**parish** [31] - 19:25, 26:17, 53:21, 54:5, 54:8, 105:12, 138:19, 139:4, 139:6, 139:9, 140:5, 143:4, 143:15, 143:17, 153:19, 153:21, 154:24, 181:21, 192:3, 196:21, 196:25, 213:13, 213:14, 246:19, 292:23, 293:1, 293:10, 293:11, 293:18, 294:17, 294:20
**parishes** [16] - 11:6, 34:11, 36:4, 37:14, 67:1, 67:20, 114:19, 144:13, 154:17, 154:21, 154:22, 189:23, 197:4, 217:16, 247:2, 248:10
**parks** [1] - 288:10
**parochial** [1] - 17:9
**parole** [11] - 54:17, 54:19, 191:9,

191:16, 191:22, 191:25, 195:23, 196:11, 196:13, 196:14
**Parrish** [1] - 228:11
**Parrish's** [7] - 207:4, 213:3, 218:11, 229:2, 242:22, 265:25, 268:7
**parrish's** [2] - 228:4, 266:2
**part** [73] - 5:20, 8:2, 20:11, 21:6, 30:9, 36:16, 40:18, 44:1, 44:24, 46:11, 68:16, 70:24, 74:8, 77:14, 85:11, 94:8, 94:9, 99:2, 99:8, 99:11, 99:18, 100:7, 100:18, 105:9, 106:3, 106:4, 109:18, 121:5, 121:20, 127:7, 128:6, 132:4, 159:2, 168:7, 168:17, 169:15, 175:15, 181:10, 187:15, 187:19, 195:21, 203:14, 203:24, 203:25, 205:9, 212:2, 215:6, 233:23, 235:7, 238:10, 239:8, 239:13, 239:14, 239:18, 239:25, 241:5, 241:14, 241:15, 241:16, 244:6, 244:9, 250:15, 255:11, 255:12, 258:6, 266:12, 284:21, 286:4, 286:5, 287:19, 292:22, 297:16
**partial** [2] - 17:21, 264:4
**participants** [1] - 119:21
**participated** [1] - 109:3
**particular** [9] - 84:15, 85:19, 85:22, 87:17, 110:2, 132:17, 162:17, 184:5, 239:11
**particularly** [4] - 24:20, 125:18, 283:14, 289:7
**parties** [17] - 6:14, 6:25, 9:3, 23:22,

23:23, 26:10, 27:10, 112:8, 156:14, 160:2, 201:11, 202:23, 204:13, 222:17, 246:11, 282:7, 291:19
**partners** [4] - 46:22, 46:25, 296:13, 299:12
**parts** [2] - 117:3, 206:7
**party** [10] - 5:13, 5:19, 7:2, 16:2, 50:14, 99:13, 203:5, 205:24, 284:22, 297:12
**Party** [2] - 2:14, 3:3
**pass** [6] - 78:5, 118:2, 118:7, 181:9, 233:15, 276:11
**pass-thru** [1] - 78:5
**passed** [5] - 15:3, 45:16, 107:13, 290:18, 292:19
**passing** [2] - 45:14, 119:7
**past** [11] - 6:10, 13:15, 29:7, 64:5, 141:9, 141:13, 181:22, 186:12, 238:6, 276:12, 291:14
**path** [2] - 26:10, 29:18
**patience** [1] - 275:6
**patient** [4] - 12:25, 117:4, 123:9, 143:9
**patients** [7] - 118:6, 119:21, 125:19, 132:18, 138:24, 138:25, 142:10
**patrol** [2] - 67:15, 196:8
**patrolling** [1] - 271:25
**pattern** [1] - 174:4
**Paul** [1] - 263:2
**Pause** [4] - 60:14, 61:13, 75:8, 198:18
**pause** [3] - 18:21, 56:4, 194:7
**pay** [63] - 5:15, 6:12, 10:20, 11:2, 14:4, 14:8, 15:4, 32:24, 34:15, 34:19, 34:21, 34:24, 35:2, 37:7, 37:12, 41:22, 54:24, 65:13, 65:23, 65:24, 67:13, 67:18, 67:20, 77:4, 77:11, 77:22, 78:18, 78:21, 78:25, 79:3, 80:3, 80:6, 110:13, 110:15,

110:17, 141:9, 142:10, 142:22, 143:3, 143:5, 143:9, 143:21, 149:23, 150:2, 152:9, 154:25, 213:21, 219:21, 231:1, 240:2, 240:5, 263:2, 263:7, 265:5, 277:9, 277:18, 277:22, 278:10, 279:9, 280:10, 282:4, 285:1
**paycheck** [1] - 64:17
**paying** [24] - 13:17, 56:18, 78:9, 114:2, 134:1, 148:19, 149:25, 154:12, 213:9, 216:13, 216:22, 217:8, 218:7, 218:9, 219:22, 223:23, 254:16, 263:6, 280:10, 284:14, 284:22, 287:20
**payment** [3] - 12:19, 18:1, 265:9
**payments** [3] - 14:12, 14:13, 77:14
**payroll** [3] - 224:12, 283:4, 283:5
**Pays** [1] - 239:25
**pays** [9] - 65:14, 97:9, 99:20, 110:12, 151:2, 239:25, 284:11, 284:15, 284:16
**peak** [3] - 211:1, 211:18, 211:20
**peaking** [3] - 210:22, 210:25, 211:11
**peeking** [2] - 211:22, 237:12
**peer** [1] - 128:14
**peer-reviewing** [1] - 128:14
**pending** [4] - 110:13, 192:8, 195:8, 195:16
**Penitentiary** [1] - 163:7
**Pennington** [1] - 36:11
**Pennsylvania** [1] - 104:12
**penny** [1] - 225:13
**people** [101] - 18:14, 32:23, 34:7, 35:10, 36:22, 37:24, 38:4, 38:12, 58:7, 76:10, 92:25, 93:19, 115:9, 124:3, 124:20,

126:12, 128:2, 135:3, 138:21, 140:12, 144:7, 151:18, 151:19, 152:21, 155:18, 158:18, 162:23, 180:9, 180:10, 180:11, 182:4, 182:12, 182:15, 182:18, 183:23, 184:12, 184:13, 185:11, 185:16, 185:23, 185:24, 186:7, 187:1, 187:6, 187:13, 187:14, 188:4, 188:22, 188:23, 191:4, 191:8, 191:12, 197:6, 198:5, 198:22, 201:17, 202:7, 206:2, 207:19, 209:2, 211:6, 214:17, 214:20, 218:5, 227:2, 227:3, 229:18, 230:3, 230:6, 230:10, 230:12, 230:13, 231:4, 231:19, 233:10, 242:11, 243:1, 243:2, 244:16, 245:1, 247:3, 247:5, 248:12, 252:11, 253:21, 255:8, 255:25, 256:3, 268:8, 268:9, 274:5, 274:20, 274:21, 283:11, 296:10, 296:21, 298:1
**people's** [1] - 20:17
**peoples'** [1] - 25:9
**per** [87] - 10:19, 33:18, 34:17, 54:24, 56:19, 57:6, 58:2, 58:10, 58:24, 63:18, 97:9, 100:20, 110:25, 111:8, 111:11, 111:13, 133:22, 134:5, 134:12, 134:13, 136:3, 137:21, 175:13, 189:21, 206:21, 207:5, 209:5, 212:14, 213:1, 213:3, 213:6, 213:8, 213:10, 213:11, 213:12, 213:14, 213:20, 213:22, 214:11, 214:12, 215:12, 216:11,

216:12, 217:8, 217:10, 217:15, 218:4, 218:15, 218:19, 218:21, 219:4, 219:8, 219:9, 220:1, 220:5, 220:6, 223:20, 224:21, 224:25, 225:5, 240:3, 244:13, 245:15, 245:18, 245:19, 245:22, 246:4, 246:12, 256:22, 261:14, 261:15, 264:7, 265:10, 293:4, 295:12, 295:14, 295:15
**Per** [1] - 220:3
**percent** [46] - 14:8, 16:13, 33:17, 33:20, 45:15, 47:23, 47:24, 65:17, 65:19, 66:21, 78:13, 78:16, 110:15, 134:10, 136:21, 139:6, 139:7, 139:8, 148:6, 150:15, 182:14, 184:12, 185:10, 185:12, 186:6, 197:5, 197:10, 200:24, 201:1, 206:22, 211:15, 223:12, 224:1, 230:21, 251:16, 272:15, 272:18, 294:6, 294:10, 294:13, 296:14
**percentage** [6] - 59:12, 150:18, 150:20, 150:22, 184:18, 187:22
**percentages** [4] - 150:23, 151:6, 151:7, 151:11
**percents** [1] - 240:20
**perfect** [2] - 45:1, 46:8
**perfectly** [2] - 134:19, 134:20
**perform** [7] - 23:14, 113:22, 116:6, 118:5, 119:6, 119:11, 149:17
**perhaps** [1] - 242:20
**period** [16] - 39:23, 45:4, 46:18, 99:13, 126:5, 126:6, 127:11, 138:15, 152:25, 176:8, 182:16, 192:10, 226:25, 272:12

**periods** [1] - 127:2
**permanently** [1] - 146:6
**permission** [1] - 253:5
**permit** [2] - 244:23, 245:8
**permits** [1] - 244:25
**permitted** [3] - 21:23, 175:9, 284:24
**perpetuated** [1] - 159:13
**person** [20] - 18:2, 19:22, 19:24, 34:3, 43:3, 66:11, 74:12, 75:16, 116:6, 136:12, 146:7, 150:3, 173:14, 183:21, 183:22, 206:21, 233:8, 252:3, 274:21, 295:15
**personal** [1] - 107:23
**personally** [1] - 105:11
**personnel** [8] - 32:22, 38:10, 45:11, 45:16, 109:23, 113:21, 118:23, 140:15
**persons** [10] - 86:21, 88:14, 92:14, 114:3, 146:9, 184:19, 195:2, 230:15, 230:16, 230:17
**perspective** [3] - 5:16, 182:20, 228:19
**Peter** [1] - 263:2
**PFM** [8] - 178:20, 212:10, 216:16, 258:7, 258:9, 258:25, 259:10, 259:23
**PFM's** [1] - 259:7
**Ph.D** [3] - 162:13, 162:14, 162:19
**pharmaceutical** [1] - 221:15
**pharmaceuticals** [1] - 131:11
**pharmacy** [4] - 116:11, 135:21, 143:7, 145:14
**phase** [3] - 267:10, 290:14
**Phelps** [1] - 2:14
**Philadelphia** [1] - 104:12
**phone** [4] - 87:6, 87:8, 88:10, 122:10
**phrase** [2] - 216:20, 264:2

**physical** [4] - 25:3, 253:14, 287:21, 287:22
**physically** [2] - 87:3
**physician** [3] - 128:20, 130:11, 130:16
**physicians** [4] - 105:21, 116:22, 122:19, 128:14
**Picayune** [1] - 36:2
**pick** [8] - 51:2, 55:24, 56:13, 56:22, 57:1, 57:10, 200:1, 293:18
**picked** [4] - 43:1, 51:15, 264:19, 293:10
**picking** [4] - 56:12, 87:19, 188:23, 292:22
**picture** [4] - 73:21, 179:8, 196:18, 225:10
**piece** [3] - 77:6, 259:7, 280:12
**piecemeal** [1] - 45:1
**pieces** [1] - 158:8
**pig** [1] - 252:18
**place** [34] - 12:12, 12:16, 20:18, 36:1, 49:25, 67:4, 67:5, 87:2, 134:9, 140:12, 140:19, 184:6, 185:22, 185:24, 185:25, 186:2, 186:8, 205:21, 206:2, 206:3, 206:7, 207:24, 215:17, 216:21, 216:23, 216:24, 242:9, 244:19, 251:2, 265:4, 286:14, 295:23
**placed** [4] - 11:24, 191:25, 192:11, 239:6
**places** [7] - 43:19, 126:9, 182:3, 198:24, 213:17, 248:12, 293:18
**placing** [2] - 22:8, 125:16
**plagued** [1] - 26:17
**plaintiff** [4] - 4:17, 5:4, 5:6, 5:19
**Plaintiff** [1] - 2:7
**plaintiff's** [4] - 13:7, 18:2, 246:3, 276:20
**Plaintiffs** [3] - 1:8, 2:3, 3:3
**plaintiffs** [13] - 19:9,

22:18, 23:25, 24:13, 24:15, 24:23, 99:1, 111:22, 164:4, 226:12, 228:21, 277:6, 280:25
**plan** [27] - 11:4, 12:12, 24:24, 35:24, 36:1, 36:16, 37:17, 37:21, 38:6, 39:15, 51:11, 78:5, 109:8, 143:5, 143:8, 165:7, 181:7, 202:12, 242:22, 243:19, 251:11, 251:24, 252:1, 254:15, 290:23, 294:15, 297:18
**planned** [2] - 232:13, 295:24
**planning** [4] - 24:18, 50:2, 69:21, 162:7
**plans** [14] - 12:12, 23:7, 151:3, 162:8, 165:16, 165:21, 172:14, 226:12, 251:1, 251:2, 251:14, 252:11, 291:12, 298:5
**plant** [1] - 25:3
**Plaquemines** [14] - 53:16, 62:24, 63:2, 63:3, 63:5, 63:6, 63:18, 63:23, 96:17, 96:21, 97:7, 97:9, 198:8, 235:3
**Plaquemines'** [1] - 261:14
**Plateau** [2] - 164:18, 251:5
**platform** [1] - 224:15
**play** [1] - 48:13
**players** [1] - 24:25
**pleas** [1] - 62:19
**pleasant** [1] - 186:7
**pleased** [1] - 48:2
**pleasure** [1] - 231:23
**plenty** [3] - 219:3, 219:21, 295:15
**plug** [3] - 43:9, 48:13, 69:11
**plug-n-play** [1] - 48:13
**plugged** [2] - 68:18
**plummeted** [1] - 185:12
**plus** [4] - 64:11, 66:14, 213:3, 265:23
**PMF** [1] - 253:2
**pocket** [1] - 193:22
**pod** [1] - 68:22
**point** [37] - 16:1, 24:10, 26:14, 42:1,

43:17, 55:20, 58:12, 74:15, 102:14, 140:5, 159:4, 175:1, 175:25, 188:19, 191:19, 192:2, 199:24, 202:25, 205:20, 205:23, 208:25, 209:12, 209:24, 219:17, 230:8, 232:4, 235:12, 245:4, 246:7, 247:17, 252:19, 255:6, 255:22, 279:5, 282:9, 283:11
**pointed** [1] - 234:6
**pointing** [1] - 254:1
**points** [2] - 125:4, 125:12
**Police** [5] - 224:2, 271:13, 271:17, 285:11, 285:15
**police** [35] - 19:12, 36:11, 64:23, 67:10, 82:3, 120:11, 182:9, 185:10, 227:15, 234:19, 238:7, 247:5, 252:7, 252:8, 252:9, 272:1, 278:8, 278:17, 280:2, 280:23, 285:21, 288:9, 288:23, 289:7, 290:4, 290:5, 292:21, 293:8, 293:11, 293:20, 294:4, 295:2, 296:6, 296:9
**policies** [7] - 23:13, 23:16, 128:13, 128:18, 128:24, 224:15
**policing** [1] - 296:5
**policy** [6] - 70:24, 71:2, 71:8, 299:9, 299:10, 299:11
**politic** [1] - 149:19
**pool** [2] - 263:7, 286:6
**pooling** [2] - 224:11, 283:2
**poor** [3] - 24:18, 125:5, 220:23
**pop** [2] - 61:18, 228:13
**pops** [1] - 156:11
**population** [161] - 19:2, 19:7, 24:6, 24:16, 24:21, 24:24, 53:2, 59:13, 59:15, 60:3, 83:6, 90:18, 91:5, 92:8, 92:11,

96:9, 96:14, 117:10,
117:11, 119:22,
124:19, 127:19,
127:21, 138:18,
155:8, 155:11,
155:17, 156:5,
156:7, 162:3, 162:6,
165:2, 165:7,
165:16, 165:20,
168:9, 168:10,
168:23, 169:1,
171:7, 171:21,
171:22, 172:10,
173:5, 173:17,
173:21, 173:23,
174:5, 174:11,
175:6, 175:7, 179:1,
181:3, 181:11,
181:21, 182:5,
182:17, 182:24,
182:25, 183:12,
183:25, 184:17,
184:25, 185:5,
185:8, 185:22,
186:9, 188:20,
189:25, 191:1,
191:2, 191:22,
192:3, 192:8, 197:4,
197:24, 198:15,
198:21, 199:14,
200:8, 200:14,
200:15, 204:4,
205:16, 206:23,
208:10, 208:14,
209:6, 210:15,
210:16, 211:1,
214:21, 227:8,
227:23, 228:3,
228:6, 228:14,
228:24, 229:4,
229:7, 229:11,
233:24, 234:10,
234:13, 234:23,
235:23, 236:13,
237:5, 238:5,
238:10, 239:13,
240:20, 250:5,
250:18, 250:22,
251:1, 252:6,
252:15, 258:15,
258:20, 259:8,
259:11, 261:8,
261:18, 261:23,
262:23, 263:15,
264:8, 264:13,
265:13, 265:14,
268:21, 268:24,
269:1, 269:2,
269:10, 269:18,
269:20, 284:12,
289:24, 292:6,

292:9, 292:21,
293:6, 294:3,
294:12, 294:18,
294:23, 295:11,
295:25, 297:4,
297:6, 297:9,
297:23, 298:24,
299:5, 299:7,
299:16, 300:19
**populations** [8] -
90:21, 134:9,
156:12, 192:16,
211:5, 227:4, 234:7,
266:22
**portio** [1] - 284:16
**portion** [9] - 21:11,
76:18, 192:12,
218:9, 264:5,
277:22, 278:19,
278:20, 281:11
**portions** [3] - 160:1,
160:13, 160:14
**posed** [1] - 271:12
**position** [41] - 13:15,
27:24, 28:3, 28:5,
33:9, 42:11, 81:2,
87:16, 88:18, 91:22,
104:20, 104:23,
110:20, 110:25,
111:1, 111:2, 111:6,
111:11, 111:13,
112:23, 117:8,
123:25, 130:18,
130:21, 134:17,
148:21, 178:22,
200:2, 200:3,
202:23, 238:20,
238:24, 239:1,
243:18, 246:3,
260:16, 276:23,
277:1, 288:11,
290:13, 300:23
**positions** [48] - 13:3,
32:16, 81:13, 81:22,
83:21, 84:12,
110:17, 110:21,
113:4, 113:12,
113:17, 115:7,
115:8, 115:9,
116:10, 124:7,
124:9, 124:22,
125:10, 125:20,
125:21, 125:22,
125:23, 126:1,
126:9, 126:13,
126:17, 131:8,
131:24, 132:18,
132:19, 137:4,
137:19, 146:24,
146:25, 148:17,

148:23, 149:20,
158:4, 158:10,
167:16, 178:12,
180:10, 199:5,
199:10, 232:24,
263:3, 297:13
**possibility** [4] - 94:6,
154:7, 154:14
**possible** [13] - 9:10,
39:24, 59:25, 123:9,
134:18, 142:17,
179:10, 215:18,
226:18, 251:22,
251:23, 288:6, 291:7
**possibly** [1] - 140:18
**post** [17] - 9:15, 10:18,
34:9, 34:10, 34:20,
35:12, 46:7, 65:7,
65:9, 66:14, 66:19,
81:13, 81:22, 83:20,
178:12, 295:7
**post-by-post** [1] -
9:15
**post-certified** [6] -
10:18, 34:9, 34:20,
65:7, 65:9, 66:14
**post-certifying** [1] -
34:10
**posthaste** [2] - 203:4,
204:15
**posts** [12] - 9:12, 9:24,
23:1, 31:8, 31:10,
32:9, 83:10, 83:13,
83:19, 91:18, 93:11,
255:9
**pot** [1] - 14:5
**potential** [5] - 29:10,
278:6, 280:19,
286:23
**pouring** [1] - 227:12
**Poverty** [6] - 2:3, 4:17,
112:13, 163:25,
164:4, 277:13
**power** [2] - 185:13,
231:24
**powers** [1] - 25:12
**Poydras** [1] - 1:21
**practical** [2] - 127:1,
198:6
**practicality** [1] -
123:11
**practically** [2] - 23:8,
127:21
**practice** [4] - 13:4,
29:14, 279:12, 295:9
**practices** [3] - 274:13,
292:21, 294:4
**practicing** [1] - 107:10
**pragmatic** [1] - 229:5
**PREA** [3] - 45:8,

45:10, 45:12
**precise** [3] - 22:19,
59:22, 177:11
**preconviction** [1] -
55:12
**predator** [1] - 29:10
**predecessor** [1] - 28:5
**predicate** [2] - 101:14,
107:4
**predictors** [1] - 184:10
**preferably** [1] - 159:25
**preference** [1] -
269:22
**pregnant** [3] - 124:17,
143:13, 143:14
**preliminary** [1] - 72:15
**premature** [1] - 262:11
**premise** [1] - 157:17
**premised** [3] - 17:17,
266:20, 266:21
**preparation** [2] -
171:18, 179:15
**prepare** [9] - 9:11,
60:24, 82:23,
108:17, 178:7, 234:1
**prepared** [13] - 11:4,
13:8, 72:9, 73:23,
83:1, 95:3, 95:21,
99:23, 177:19,
189:2, 189:5, 190:4,
225:7
**preparing** [2] -
107:24, 226:15
**prescriptions** [1] -
179:4
**presence** [3] - 121:12,
196:4
**present** [10] - 7:2,
11:19, 27:4, 70:15,
73:22, 90:21,
103:18, 104:17,
113:14, 209:18
**presentation** [1] -
280:21
**presented** [7] - 6:6,
6:9, 33:11, 74:16,
75:2, 246:21, 282:2
**presenting** [1] -
226:15
**preserve** [1] - 279:13
**president** [1] - 161:19
**presses** [1] - 20:2
**presumably** [1] - 17:4
**pretrial** [47] - 60:1,
60:7, 62:18, 82:17,
126:7, 138:7,
182:16, 182:18,
182:20, 182:21,
182:24, 183:17,
183:24, 184:4,

184:13, 184:16,
189:21, 189:24,
192:7, 198:12,
198:15, 234:18,
234:22, 235:12,
235:14, 235:16,
236:12, 236:15,
236:24, 237:25,
251:10, 252:6,
252:14, 252:18,
271:1, 293:6, 294:6,
294:8, 294:10,
294:12, 294:18,
295:11, 296:13,
297:6
**Pretrial** [8] - 24:6,
138:5, 181:13,
181:16, 184:8,
284:8, 293:22, 294:4
**pretty** [23] - 29:2, 29:4,
68:24, 92:10,
179:24, 184:10,
184:17, 191:3,
208:12, 210:18,
211:14, 215:5,
223:17, 231:8,
252:14, 257:24,
259:21, 260:8,
260:13, 260:15,
266:18, 296:16
**prevailing** [3] - 114:5,
114:7, 136:7
**prevent** [1] - 238:12
**preventative** [1] -
296:3
**prevention** [2] -
227:16, 227:17
**prevents** [3] - 14:1,
14:4, 57:16
**preview** [1] - 108:4
**previous** [2] - 170:13,
173:24
**previously** [11] - 5:13,
92:12, 104:24,
109:11, 128:4,
143:15, 202:7,
203:10, 281:14,
283:19, 286:22
**price** [2] - 141:10,
284:25
**priced** [1] - 21:4
**primarily** [5] - 124:14,
152:16, 152:17,
185:10, 218:21
**primary** [5] - 106:7,
179:14, 205:21,
277:3, 278:14
**principal** [1] - 18:5
**principally** [1] - 212:9
**printed** [3] - 112:20,

113:10, 215:14
**prioritization** [1] - 288:12
**prioritize** [1] - 21:3
**prioritized** [1] - 285:23
**Prison** [21] - 5:8, 16:7, 21:20, 45:9, 49:2, 56:19, 57:23, 97:5, 113:15, 168:2, 176:3, 178:5, 180:7, 198:8, 217:20, 228:25, 234:11, 235:17, 238:18, 239:2, 298:25
**prison** [28] - 24:10, 53:21, 54:8, 58:20, 138:14, 165:2, 165:25, 173:4, 175:6, 181:21, 192:3, 192:13, 196:21, 196:25, 197:4, 197:24, 200:8, 202:8, 213:13, 219:7, 219:10, 228:1, 241:3, 246:17, 292:20, 294:18, 295:11
**prisoners** [4] - 16:15, 22:5, 126:7, 262:3
**prisons** [1] - 161:24
**Prisons** [1] - 173:19
**private** [4] - 164:8, 221:11, 222:1, 296:4
**privately** [1] - 141:5
**privatization** [5] - 141:3, 220:19, 221:2, 221:17, 224:9
**privatized** [2] - 141:20, 154:1
**probability** [1] - 154:14
**probation** [10] - 54:17, 54:18, 191:13, 191:14, 191:17, 191:23, 192:1, 192:11, 195:23, 196:8
**problem** [17] - 49:10, 88:1, 88:5, 102:1, 122:3, 122:16, 128:19, 144:12, 186:6, 188:3, 198:1, 203:14, 204:21, 215:6, 261:4, 278:20
**problematic** [1] - 269:8
**problems** [8] - 121:21, 125:18, 138:16, 138:21, 139:3,

162:8, 162:9, 180:22
**procedure** [1] - 274:7
**procedures** [8] - 128:13, 128:14, 128:18, 128:24, 224:16, 242:13, 274:17, 289:10
**proceed** [2] - 26:11, 140:4
**proceeding** [6] - 15:9, 102:3, 144:8, 156:13, 176:5, 291:23
**Proceedings** [3] - 1:25, 103:1, 223:3
**proceedings** [9] - 56:4, 60:14, 61:13, 75:8, 129:22, 194:7, 198:18, 222:11, 301:24
**PROCEEDINGS** [2] - 1:14, 130:1
**process** [32] - 5:21, 6:15, 11:20, 11:22, 13:12, 20:25, 23:3, 26:16, 40:1, 41:1, 42:13, 82:20, 83:1, 107:15, 121:20, 122:2, 140:13, 158:19, 196:16, 200:18, 201:21, 202:19, 207:18, 242:14, 245:22, 259:6, 280:7, 284:1, 292:18, 293:15, 294:3
**processing** [3] - 121:4, 251:10, 266:7
**procure** [1] - 131:15
**produce** [3] - 24:16, 72:13, 166:23
**produced** [8] - 62:12, 72:16, 72:17, 73:15, 74:3, 129:10, 133:17, 139:16
**producing** [2] - 258:24, 279:15
**product** [1] - 36:13
**productivity** [1] - 279:17
**professing** [1] - 17:14
**professional** [2] - 105:2, 221:11
**professionally** [1] - 271:15
**professionals** [2] - 121:24, 130:15
**professions** [2] - 12:16, 44:21, 45:20, 46:22, 47:2, 47:16, 47:19,

47:21, 47:24, 47:25, 48:12, 48:17, 68:15, 68:17, 69:3, 76:20, 76:21, 104:1, 106:5, 108:10, 144:15, 172:14, 172:16, 172:18, 181:14, 181:18, 182:21, 182:23, 183:6, 189:20, 193:20, 198:12, 238:17, 238:20, 238:22, 239:1, 239:8, 239:18, 239:22, 239:23, 240:3, 240:5, 240:13, 240:21, 241:3, 241:8, 241:21, 284:9, 284:14, 293:22, 294:5, 294:8, 294:9, 296:14, 296:20, 297:5
**programmatic** [1] - 211:9
**programming** [4] - 41:21, 44:16, 48:15, 69:5
**programs** [16] - 19:14, 42:23, 46:19, 47:5, 47:8, 48:11, 69:2, 105:9, 105:23, 105:24, 172:20, 172:22, 189:24, 240:23, 240:24, 296:9
**progressive** [2] - 41:5, 51:16
**project** [5] - 141:1, 141:19, 142:16, 142:17, 207:13
**projected** [21] - 74:15, 98:8, 132:8, 133:6, 133:11, 133:24, 134:8, 137:5, 158:2, 168:12, 171:20, 212:1, 215:23, 216:6, 234:9, 235:13, 236:11, 261:13, 261:18, 263:11, 277:7
**projecting** [1] - 98:14
**projection** [3] - 270:2, 294:15, 299:2
**projections** [12] - 133:2, 162:3, 162:4, 162:5, 233:23, 243:11, 243:16, 244:7, 244:10, 260:22, 277:6, 292:9

**projects** [4] - 25:24, 288:9, 289:11
**promote** [4] - 288:8, 288:10, 289:2, 289:6
**promoted** [1] - 223:22
**prong** [1] - 72:23
**proper** [7] - 18:12, 127:7, 186:24, 193:19, 205:22, 231:15, 247:13
**properly** [3] - 180:24, 207:9, 216:21
**proposal** [2] - 75:22, 292:12
**proposals** [2] - 18:22, 284:4
**propose** [5] - 19:10, 158:7, 196:3, 286:4, 290:6
**proposed** [14] - 109:8, 115:23, 145:4, 152:8, 170:24, 277:13, 277:14, 278:1, 280:20, 280:24, 284:21, 291:2, 295:16
**proposes** [1] - 75:18
**proposing** [7] - 147:22, 148:4, 151:16, 152:14, 189:11, 196:1, 245:7
**proposition** [3] - 19:3, 58:6, 207:7
**prosecuted** [1] - 54:21
**prosecuting** [1] - 295:3
**prosecutor** [1] - 185:16
**prospectively** [1] - 127:10
**protecting** [1] - 16:20
**protection** [1] - 280:23
**protective** [2] - 91:4, 269:3
**protocols** [1] - 294:1
**prove** [2] - 6:24, 16:12
**proved** [1] - 221:5
**proven** [1] - 199:25
**provide** [29] - 7:22, 12:15, 12:20, 13:18, 13:23, 14:13, 14:14, 30:17, 70:22, 91:23, 98:18, 100:19, 110:4, 125:22, 126:3, 128:2, 128:3, 132:8, 153:10, 155:3, 160:21, 166:12, 172:5, 175:9, 221:11,

236:17, 243:22, 258:14, 281:9
**provided** [16] - 13:22, 17:24, 70:19, 99:23, 131:11, 133:9, 144:15, 160:19, 170:6, 172:24, 173:3, 233:23, 241:9, 241:19, 271:8, 291:1
**providers** [1] - 127:25
**provides** [6] - 100:6, 119:14, 120:3, 149:14, 149:15, 212:19
**providing** [13] - 5:16, 14:9, 30:15, 30:16, 91:22, 97:4, 100:1, 109:5, 128:4, 222:3, 267:25, 293:2, 293:24
**provision** [4] - 142:23, 143:3, 153:21, 153:22
**provisions** [5] - 28:20, 143:11, 144:2, 146:6
**proximal** [1] - 110:3
**psych** [3] - 118:17, 136:11
**Psych** [4] - 119:17, 120:1, 120:3, 120:7
**Psychiatric** [2] - 115:22, 127:8
**psychiatric** [10] - 107:25, 115:3, 115:5, 119:19, 125:2, 125:7, 126:1, 128:7, 138:24, 158:8
**psychiatrist** [4] - 115:24, 116:3, 128:21, 152:8
**public** [29] - 17:5, 17:12, 20:21, 22:2, 181:5, 202:13, 227:10, 227:11, 252:4, 252:13, 278:14, 282:8, 282:15, 287:16, 288:5, 288:8, 288:11, 288:15, 288:21, 289:2, 289:6, 289:19, 290:8, 293:3, 293:12, 293:25, 295:22, 297:15, 299:11
**publically** [1] - 245:22
**published** [1] - 219:2
**pull** [4] - 12:2, 32:23, 43:21, 271:3

**pulled** [3] - 179:7, 282:11, 293:14
**pulling** [1] - 32:18
**purchasing** [2] - 30:1, 43:2
**purpose** [10] - 50:15, 50:17, 52:1, 109:21, 226:15, 242:17, 288:16, 290:2, 290:8, 297:10
**purposes** [2] - 156:13, 290:7
**pursuant** [1] - 99:21
**pursue** [1] - 283:21
**pursuing** [1] - 15:16
**pursuits** [1] - 130:13
**purview** [1] - 107:25
**push** [1] - 298:24
**pushing** [3] - 19:1, 186:1, 251:24
**put** [37] - 11:18, 34:5, 39:22, 43:6, 48:25, 55:15, 55:16, 61:12, 84:14, 103:5, 104:2, 112:4, 122:10, 134:22, 147:15, 154:13, 155:16, 155:24, 186:22, 187:20, 192:22, 192:23, 194:5, 201:18, 211:6, 215:17, 218:5, 230:1, 243:20, 251:1, 255:4, 256:20, 256:24, 260:17, 277:19, 283:11, 286:3
**puts** [2] - 110:10, 218:15
**putting** [7] - 64:18, 68:25, 72:8, 191:21, 264:3, 268:8, 268:9
**puzzle** [2] - 230:7, 259:7

## Q

**qualifications** [3] - 120:7, 137:22, 169:11
**qualified** [14] - 22:25, 23:8, 23:12, 106:10, 108:2, 108:12, 113:22, 114:3, 159:3, 164:10, 165:21, 169:25, 170:5, 260:23
**qualify** [3] - 165:5, 165:14, 165:20
**quality** [6] - 128:11,

128:21, 255:15, 255:17, 256:7, 299:4
**quantity** [1] - 217:5
**quarrel** [1] - 219:20
**questionable** [1] - 8:8
**questioned** [1] - 272:22
**questionnaires** [1] - 29:9
**questions** [45] - 33:5, 56:6, 59:15, 64:3, 76:1, 79:9, 79:11, 79:12, 80:10, 94:24, 97:24, 98:1, 102:10, 102:11, 102:13, 102:16, 109:4, 120:24, 122:11, 123:6, 144:15, 147:16, 156:21, 156:22, 159:6, 169:14, 175:21, 175:24, 220:14, 223:7, 224:8, 226:11, 233:17, 249:20, 267:6, 271:12, 276:18, 286:17, 286:18, 286:19, 290:21, 290:24, 298:12, 300:1
**quick** [1] - 194:8
**quickly** [16] - 19:3, 75:16, 179:10, 181:1, 181:4, 190:13, 196:4, 198:20, 210:18, 215:5, 215:18, 226:17, 249:9, 251:22, 251:23, 260:8
**quite** [11] - 15:24, 20:16, 105:16, 115:13, 117:22, 140:13, 240:25, 262:3, 268:10, 292:10, 296:3
**quote** [4] - 5:15, 20:16, 245:24, 246:1

## R

**race** [1] - 40:15
**racked** [1] - 213:18
**racking** [1] - 293:4
**radius** [1] - 249:10
**rage** [1] - 114:5
**rainy** [1] - 279:7
**raise** [3] - 7:21, 21:1, 77:22, 134:17, 180:14, 223:12,

232:4, 241:14, 248:15, 248:19
**raised** [4] - 13:14, 15:19, 281:8, 296:4
**raises** [4] - 78:18, 78:25, 79:4, 80:3
**raising** [3] - 39:10, 227:7, 248:6
**RALPH** [1] - 2:15
**ramification** [1] - 280:19
**ramp** [2] - 198:12, 265:5
**ramping** [1] - 198:14
**ran** [1] - 135:1
**random** [1] - 120:23
**range** [4] - 63:18, 89:22, 96:16, 211:15
**rank** [5] - 9:19, 9:20, 50:12, 88:11
**ranking** [1] - 32:5
**rape** [1] - 86:3
**rapidly** [1] - 272:20
**Rate** [1] - 45:9
**rate** [22] - 33:3, 33:17, 33:21, 33:22, 48:4, 110:10, 182:2, 185:12, 186:7, 200:24, 209:4, 209:6, 209:8, 211:13, 215:12, 215:21, 217:17, 227:20, 227:21, 296:22
**rated** [1] - 51:16
**rates** [6] - 141:23, 141:24, 172:21, 183:24, 220:10, 240:25
**rather** [6] - 18:10, 23:2, 144:23, 223:20, 272:2, 272:20
**Ray** [1] - 136:1
**re** [10] - 47:21, 47:24, 184:13, 238:17, 238:20, 239:1, 239:8, 239:22, 240:5, 254:8
**re-arrested** [1] - 184:13
**re-carpet** [1] - 254:8
**re-entry** [8] - 47:21, 47:24, 238:17, 238:20, 239:1, 239:8, 239:22, 240:5
**reach** [3] - 232:18, 238:10, 279:6
**reached** [3] - 29:25, 36:3, 191:11

**reaching** [1] - 43:2
**read** [16] - 28:16, 91:13, 91:15, 108:24, 132:21, 153:14, 153:18, 154:1, 171:4, 177:24, 178:2, 218:11, 228:4, 274:14
**reading** [3] - 125:4, 171:2, 179:20
**reads** [1] - 135:5
**ready** [9] - 34:14, 36:9, 159:15, 160:5, 195:6, 197:1, 207:23, 242:15, 301:19
**real** [5] - 25:25, 151:7, 186:6, 190:13, 296:20
**realistic** [1] - 299:3
**realized** [2] - 142:9, 262:24
**reallocate** [1] - 232:1
**reallocated** [2] - 199:2, 229:12
**really** [27] - 39:18, 39:19, 40:7, 47:2, 48:1, 54:6, 101:9, 119:9, 122:16, 122:21, 133:12, 135:3, 148:17, 151:20, 165:20, 187:16, 191:2, 194:2, 199:11, 214:16, 215:2, 216:16, 227:4, 246:7, 263:23, 264:7
**reason** [20] - 25:16, 33:10, 40:2, 84:10, 84:11, 90:25, 187:2, 204:20, 228:18, 229:10, 230:11, 240:8, 246:17, 279:18, 280:4, 291:22, 293:19, 294:10, 295:6, 295:17
**reasonable** [3] - 51:13, 115:16, 148:20
**reasoning** [1] - 5:10
**reasons** [5] - 123:11, 134:25, 138:8, 198:3, 299:6
**rebuttal** [1] - 301:13
**recalculate** [1] - 229:3
**receding** [1] - 237:13
**receive** [9] - 10:18, 16:25, 17:11, 19:5,

63:10, 133:4, 150:25, 193:14, 194:1
**received** [3] - 182:22, 285:9, 291:11
**receiver** [1] - 18:7
**receiving** [1] - 191:23
**recently** [2] - 47:3, 164:18
**recertified** [1] - 107:16
**recess** [8] - 102:23, 102:25, 103:1, 129:6, 129:7, 223:1, 223:3, 301:23
**recessed** [1] - 129:22
**recidivism** [5] - 48:3, 172:21, 238:14, 240:13, 240:25
**recipient** [1] - 295:19
**recognize** [1] - 170:15
**recognized** [3] - 18:25, 20:6, 258:10
**recognizing** [1] - 17:4
**recommend** [2] - 22:20, 157:12
**recommendation** [2] - 250:11, 256:15
**recommendations** [5] - 22:19, 99:5, 182:20, 184:4, 258:21
**recommended** [7] - 26:8, 133:8, 184:18, 184:20, 198:2, 249:24, 267:14
**recommending** [1] - 178:24
**reconfigured** [1] - 209:10
**reconsideration** [1] - 142:20
**reconstructed** [1] - 105:14
**record** [24] - 4:9, 8:12, 8:13, 8:16, 15:13, 21:4, 27:17, 27:22, 80:18, 80:24, 103:11, 112:5, 132:11, 145:13, 155:15, 164:7, 177:16, 199:17, 208:2, 259:20, 276:9, 282:8, 282:15, 284:19
**record-setting** [1] - 21:4
**Recorded** [1] - 1:25
**recording** [1] - 131:7
**records** [4] - 117:5, 132:14, 145:15,

271:7
**recounting** [1] - 19:6
**recruit** [4] - 22:24,
23:2, 23:12, 226:23
**recruiting** [2] - 19:11,
23:8
**recruits** [2] - 35:15,
187:14
**redesigning** [1] -
292:1
**redirect** [5] - 79:15,
102:20, 159:7,
270:20, 298:13
**REDIRECT** [3] - 79:25,
270:22, 298:14
**redone** [1] - 279:23
**reduce** [22] - 19:7,
19:16, 21:3, 155:12,
183:12, 183:25,
196:4, 198:14,
200:7, 200:14,
204:4, 229:22,
240:13, 252:11,
252:13, 262:22,
263:5, 263:8,
289:23, 294:22,
297:6, 298:24
**reduced** [15] - 12:25,
92:24, 185:9,
198:21, 200:12,
214:13, 228:25,
229:11, 237:2,
238:8, 254:19,
255:3, 266:22,
295:13
**reduces** [2] - 204:5,
273:22
**reducing** [12] - 140:7,
189:25, 221:6,
238:10, 261:23,
263:15, 284:12,
294:18, 295:9,
295:11, 299:7,
299:16
**reduction** [19] - 19:2,
21:5, 24:16, 24:18,
24:19, 24:25, 165:7,
165:16, 165:21,
172:10, 175:7,
181:11, 208:9,
237:2, 294:2,
294:11, 295:16,
297:4, 297:9
**reductions** [6] - 24:6,
186:9, 206:8,
257:22, 292:7,
295:25
**redundancy** [1] -
224:14
**refer** [8] - 35:11, 62:5,

64:22, 82:4, 106:17,
109:17, 111:15,
139:14
**reference** [5] - 28:2,
133:19, 140:22,
234:5, 284:8
**referenced** [5] -
110:21, 139:16,
170:14, 173:15,
245:14
**references** [1] -
253:21
**referencing** [2] -
139:20, 248:3
**referred** [3] - 35:14,
129:9, 141:11
**referring** [10] - 60:22,
82:4, 88:18, 100:6,
139:14, 167:13,
176:19, 235:18,
235:19, 288:19
**refining** [1] - 182:10
**reflect** [2] - 6:6, 110:6
**reflected** [2] - 160:14,
195:18
**reflecting** [1] - 236:15
**reflects** [1] - 125:3
**reform** [2] - 21:19,
183:6
**reforming** [1] - 26:16
**reforms** [3] - 197:24,
251:9, 251:13
**regard** [8] - 25:2,
150:4, 164:25,
169:11, 227:3,
241:18, 289:22,
290:13
**regarding** [16] - 6:16,
71:16, 73:22, 93:7,
102:13, 128:19,
166:23, 167:10,
168:23, 168:25,
169:1, 184:4,
202:23, 272:23,
284:20, 284:24
**region** [6] - 10:25,
116:4, 136:15,
142:7, 151:5, 246:19
**regional** [1] - 11:5
**regionally** [1] - 106:1
**regrettably** [1] - 17:8
**regular** [9] - 64:11,
108:4, 119:7,
141:24, 148:9,
248:9, 260:1, 269:8,
295:20
**regularly** [3] - 17:11,
257:15, 292:22
**regulations** [1] - 84:23
**rehabilitative** [1] -

172:22
**rehash** [1] - 281:14
**reimburse** [1] - 287:16
**reimbursement** [1] -
202:3
**reinstated** [1] - 192:1
**reiterate** [3] - 13:14,
133:4, 134:15
**reiterating** [1] - 171:2
**rejoinder** [1] - 18:8
**related** [5] - 15:15,
105:6, 155:6,
199:21, 220:19
**relating** [1] - 99:14
**relationship** [1] -
190:17
**relative** [3] - 35:8,
39:6, 69:14
**release** [12] - 76:3,
76:18, 182:19,
182:20, 183:18,
184:4, 184:20,
191:7, 198:12,
251:10, 251:11,
252:19
**Release** [2] - 77:3,
135:15
**released** [8] - 14:21,
47:22, 47:23, 48:4,
94:9, 184:13,
190:24, 295:4
**releases** [1] - 184:19
**relevance** [6] - 58:9,
71:19, 71:23, 101:8,
241:6, 242:18
**relevant** [6] - 6:23,
71:24, 243:20,
245:1, 245:2, 297:23
**reliable** [1] - 184:3
**relied** [5] - 170:9,
170:19, 174:24,
258:7, 260:25
**relief** [23] - 5:17,
93:11, 93:13, 93:14,
124:12, 178:13,
255:5, 255:6,
255:11, 255:14,
260:17, 267:19,
267:21, 269:24,
270:1, 270:3,
270:10, 273:21,
273:22, 273:25,
274:1, 274:2, 274:7
**relieved** [1] - 255:8
**relocated** [1] - 242:16
**rely** [1] - 170:23
**relying** [2] - 170:13,
177:13
**remain** [6] - 5:20,
8:13, 21:23, 32:17,

228:14, 250:7
**remainder** [3] - 6:4,
6:13, 145:13
**remained** [2] - 9:24,
24:21
**remaining** [4] - 23:5,
32:9, 199:2, 199:14
**remains** [3] - 8:12,
26:13, 296:16
**remarks** [1] - 133:2
**remember** [6] - 64:2,
69:9, 180:9, 198:14,
254:4
**remembered** [3] -
109:13, 233:4,
276:13
**remembers** [1] - 18:4
**reminiscent** [1] -
20:13
**remiss** [2] - 7:22, 7:25
**remotest** [1] - 45:11
**removal** [2] - 24:7,
272:23
**Removal** [1] - 136:2
**remove** [4] - 127:5,
194:4, 197:16,
283:14
**removed** [7] - 11:24,
198:5, 204:3,
235:10, 239:2,
272:25, 273:7
**removing** [5] - 261:14,
261:22, 262:16,
273:3, 289:24
**renovation** [1] - 253:9
**repair** [1] - 249:13
**repairing** [1] - 286:8
**repeat** [2] - 15:12,
170:23
**repeatedly** [1] - 16:14
**rephrase** [1] - 173:1
**replace** [1] - 201:3
**replacement** [1] -
94:19
**replacing** [1] - 209:14
**replenish** [1] - 131:20
**report** [158] - 10:9,
12:9, 13:8, 31:15,
31:17, 31:22, 39:22,
40:2, 40:23, 62:2,
75:7, 81:17, 81:18,
81:20, 82:24, 83:16,
84:14, 84:19, 85:11,
89:13, 89:17, 92:4,
92:8, 93:5, 93:7,
93:9, 93:10, 93:12,
93:22, 94:7, 94:17,
95:2, 95:6, 95:17,
95:20, 96:1, 99:18,
99:22, 102:12,

102:14, 108:19,
108:20, 109:10,
109:12, 109:19,
109:22, 110:22,
111:15, 114:21,
117:12, 117:14,
117:22, 120:25,
123:20, 125:3,
127:3, 129:11,
129:12, 130:9,
132:21, 133:2,
133:5, 136:19,
137:1, 137:14,
137:16, 137:17,
137:20, 137:23,
138:1, 138:2,
139:15, 139:20,
139:21, 140:3,
140:22, 142:11,
144:16, 146:10,
147:3, 147:10,
153:8, 153:25,
154:10, 154:13,
158:21, 167:23,
168:14, 168:15,
168:21, 169:3,
169:15, 169:19,
169:24, 170:9,
170:17, 171:14,
171:15, 171:16,
171:18, 172:8,
173:15, 174:21,
174:24, 175:9,
176:1, 176:19,
176:20, 177:19,
178:8, 179:8,
179:15, 187:7,
190:3, 190:5,
191:21, 207:4,
208:8, 213:3, 215:1,
215:25, 218:11,
220:8, 226:15,
229:2, 233:23,
234:1, 234:2, 234:5,
242:3, 242:6, 242:7,
243:19, 243:24,
247:15, 247:19,
252:24, 253:9,
254:10, 254:12,
256:18, 258:6,
258:14, 265:25,
267:7, 267:8,
290:12, 300:15
**report's** [1] - 170:14
**reported** [1] - 291:10
**Reporter** [2] - 1:20,
303:3
**reporter** [2] - 8:17,
61:8
**reporting** [7] - 11:16,

39:17, 39:18, 40:18, 41:9, 41:10, 257:12
**reports** [25] - 23:21, 26:6, 43:21, 69:6, 109:15, 111:20, 112:9, 129:9, 129:18, 133:17, 137:25, 142:6, 166:23, 171:2, 171:5, 174:8, 178:2, 215:19, 228:4, 228:12, 228:20, 233:6, 255:16, 278:9, 295:19
**represent** [3] - 60:3, 151:11, 233:20
**representatives** [1] - 19:6
**represented** [1] - 72:14
**representing** [4] - 4:17, 4:18, 4:20, 164:5
**repurpose** [1] - 290:7
**repurposing** [1] - 289:9
**request** [10] - 18:1, 78:18, 98:21, 99:24, 151:1, 168:8, 168:15, 241:15, 278:5, 292:12
**requesting** [1] - 259:21
**requests** [2] - 119:8, 203:13
**require** [3] - 13:4, 23:9, 193:13
**required** [22] - 5:17, 11:9, 12:2, 19:19, 26:12, 81:23, 83:24, 84:2, 85:23, 114:13, 125:9, 155:9, 239:21, 239:23, 240:5, 257:13, 260:20, 271:14, 277:18, 277:22, 285:1, 288:5
**requirement** [3] - 47:18, 241:9, 241:22
**requirements** [14] - 23:25, 114:22, 116:22, 121:15, 123:17, 125:11, 134:18, 145:5, 239:15, 241:17, 256:9, 271:18,
271:20
**requires** [6] - 17:16, 26:5, 114:3, 174:3, 244:14, 255:24
**requiring** [2] - 93:18, 274:5
**requisition** [1] - 279:20
**rerun** [3] - 260:5, 260:7, 260:10
**research** [8] - 48:24, 66:12, 163:4, 163:7, 171:1, 183:8, 193:11, 227:9
**researching** [2] - 30:7, 116:1
**reserve** [1] - 290:20
**Reserve** [1] - 104:9
**reside** [1] - 119:6
**residency** [2] - 104:14, 106:5
**residential** [1] - 25:5
**residents** [1] - 16:19
**resistant** [1] - 131:1
**resolution** [3] - 6:18, 9:10, 291:24
**resolve** [4] - 6:16, 100:14, 208:3, 235:8
**resolved** [1] - 201:15
**resolving** [1] - 209:20
**resources** [17] - 16:24, 18:18, 25:4, 26:1, 26:11, 116:1, 138:6, 224:11, 227:12, 285:23, 287:15, 288:2, 288:7, 289:3, 289:5, 290:6, 295:22
**respect** [26] - 7:7, 7:8, 8:19, 14:15, 16:16, 26:11, 75:18, 107:1, 137:15, 163:19, 165:22, 170:22, 175:10, 176:13, 186:23, 194:8, 219:12, 220:7, 220:24, 241:13, 260:1, 260:22, 272:15, 283:4, 299:22, 301:17
**respected** [1] - 183:8
**respectfully** [2] - 20:19, 21:10
**respond** [9] - 30:19, 30:21, 88:12, 88:15, 135:12, 167:5, 218:24, 232:25, 290:17
**responder** [2] - 135:13, 135:14
**responding** [1] - 128:15
**response** [1] - 156:2
**responses** [3] - 109:6, 275:16, 275:17
**responsibilities** [3] - 115:21, 118:15, 298:2
**responsibility** [6] - 17:21, 17:22, 115:18, 294:20, 297:13, 297:21
**responsible** [5] - 14:20, 87:18, 267:25, 284:22, 289:24
**responsibly** [1] - 288:14
**rest** [3] - 77:8, 169:8, 197:3
**restate** [1] - 218:2
**restraints** [1] - 119:23
**rests** [1] - 161:4
**result** [15] - 19:12, 19:13, 23:17, 71:16, 91:6, 184:19, 217:2, 266:24, 270:2, 280:24, 283:20, 289:14, 294:22, 297:15
**resulted** [2] - 222:7, 237:15
**results** [2] - 250:3, 279:16
**resurrect** [1] - 297:18
**retain** [9] - 10:23, 11:10, 22:25, 33:1, 33:15, 92:14, 231:15, 248:12, 297:13
**retained** [7] - 166:18, 167:9, 167:18, 167:20, 167:21, 168:13, 170:16
**retaining** [1] - 10:13
**retaken** [1] - 107:18
**retention** [2] - 188:8
**retired** [2] - 28:12, 231:8
**retirement** [1] - 231:7
**retrieved** [1] - 132:17
**return** [6] - 14:22, 43:19, 73:8, 82:13, 288:17, 289:19
**returned** [1] - 94:2
**revenue** [13] - 19:19, 21:1, 212:11, 216:20, 261:13, 261:16, 263:10, 263:23, 263:25,
264:1, 264:10, 265:3, 265:7
**revenues** [4] - 178:25, 216:18, 253:18, 265:10
**reverse** [1] - 139:7
**review** [10] - 40:2, 72:10, 74:2, 132:21, 170:9, 170:11, 267:10, 292:12
**reviewed** [12] - 108:17, 109:6, 109:8, 109:10, 109:15, 156:25, 178:9, 178:12, 191:10, 228:20, 265:25, 277:5
**reviewing** [3] - 105:10, 128:14, 172:8
**revised** [1] - 74:22
**revocation** [2] - 191:10, 196:15
**revocations** [1] - 184:19
**RFI** [1] - 43:12
**RFP** [1] - 42:24
**Richard** [2] - 103:12, 103:13
**RICHARD** [4] - 1:6, 3:9, 103:8, 103:13
**rigger** [1] - 280:6
**Rights** [2] - 167:16, 168:6
**ring** [1] - 287:25
**risen** [1] - 134:3
**rises** [1] - 211:1
**risk** [19] - 22:9, 77:1, 87:2, 87:3, 125:17, 125:18, 127:12, 162:6, 183:19, 183:20, 183:21, 183:23, 184:14, 201:18, 202:7, 235:1, 294:7, 295:8, 295:9
**rivals** [1] - 13:1
**river** [1] - 36:4
**RMR** [1] - 1:20
**RN** [3] - 114:1, 114:5
**RNs** [10] - 109:25, 110:8, 111:4, 118:25, 119:1, 119:15, 120:20, 121:17, 123:21, 137:20
**road** [5] - 13:12, 34:5, 67:18, 67:20, 201:22
**robbery** [1] - 86:3
**robbing** [1] - 263:2
**Ron** [5] - 109:10, 170:10, 170:13, 176:9, 176:10
**room** [4] - 86:20, 106:6, 205:17, 295:15
**rooms** [2] - 254:5, 254:7
**Rosenberg** [11] - 3:6, 3:8, 3:10, 3:12, 3:15, 4:22, 56:5, 94:23, 234:6, 246:15, 249:2
**ROSENBERG** [234] - 2:14, 4:21, 7:4, 7:13, 7:17, 8:11, 8:14, 8:19, 15:9, 15:13, 15:21, 16:6, 26:25, 27:3, 30:14, 31:16, 33:4, 33:8, 35:3, 36:21, 38:3, 47:10, 47:14, 50:11, 50:23, 56:10, 56:24, 57:4, 57:12, 57:14, 58:11, 58:25, 59:7, 60:12, 60:15, 60:17, 60:20, 60:21, 61:14, 61:21, 61:23, 62:3, 62:6, 62:9, 62:10, 63:8, 67:12, 69:18, 69:20, 70:13, 70:16, 70:18, 71:20, 72:1, 72:11, 73:1, 73:17, 74:7, 74:14, 75:25, 79:9, 79:17, 79:21, 80:7, 87:1, 92:21, 95:1, 95:12, 95:17, 95:19, 97:2, 97:17, 97:20, 98:6, 98:7, 99:6, 99:12, 100:5, 100:22, 101:10, 101:12, 101:23, 102:2, 102:9, 102:13, 106:24, 111:19, 112:1, 112:4, 112:11, 127:20, 129:14, 129:17, 139:11, 139:20, 144:6, 145:25, 156:1, 156:19, 157:14, 159:18, 160:11, 160:16, 160:24, 161:7, 161:15, 162:10, 162:24, 164:20, 166:10, 167:4, 167:6, 167:22, 167:25, 168:19, 169:1, 169:5, 169:17,

169:22, 171:25, 172:2, 175:12, 175:20, 175:25, 176:14, 176:16, 176:24, 177:3, 177:5, 177:10, 177:17, 180:20, 188:25, 189:4, 189:7, 190:9, 190:11, 190:14, 190:18, 190:21, 192:18, 192:21, 192:25, 193:4, 193:7, 194:20, 194:24, 195:22, 197:14, 198:17, 198:19, 202:22, 203:19, 204:19, 204:22, 207:12, 208:19, 209:22, 209:23, 214:9, 216:3, 216:5, 219:18, 220:14, 220:16, 222:12, 222:21, 223:6, 223:10, 224:5, 224:6, 225:21, 225:22, 226:9, 226:10, 230:23, 230:25, 232:12, 233:3, 233:14, 235:24, 241:4, 241:10, 245:10, 246:1, 249:16, 249:19, 262:5, 262:10, 270:19, 270:23, 270:25, 271:4, 272:6, 272:10, 275:4, 275:11, 275:14, 275:17, 275:22, 276:1, 276:3, 276:5, 276:11, 276:16, 277:11, 277:15, 277:19, 277:21, 281:4, 281:18, 281:25, 282:8, 282:11, 282:14, 282:22, 282:23, 284:2, 284:6, 285:7, 285:8, 286:16, 291:10, 291:16, 298:6, 298:12, 298:15, 298:22, 298:23, 299:25, 300:4, 300:10, 300:21, 301:12
**Rosenberg's** [1] - 245:24
**Rosenthal** [2] - 257:18, 260:17

**roster** [1] - 258:2
**rosters** [2] - 215:8, 215:9
**Rouge** [1] - 182:3
**rough** [1] - 217:18
**roughly** [5] - 34:17, 110:14, 110:15, 115:25, 240:2
**round** [1] - 73:21
**rounds** [2] - 43:15, 43:25
**routine** [1] - 119:7
**routinely** [6] - 11:1, 215:14, 293:9, 293:10, 293:17, 293:18
**rover** [3] - 87:16, 87:18, 88:18
**rovers** [1] - 88:20
**row** [5] - 140:1, 234:7, 234:8, 237:10, 279:15
**rudimentary** [1] - 149:2
**RUDOLPH** [1] - 2:10
**Ruiz** [1] - 166:23
**rule** [1] - 55:3
**rules** [2] - 84:23, 146:5
**run** [29] - 29:15, 36:2, 43:12, 84:9, 108:5, 109:24, 110:2, 118:10, 123:3, 132:20, 134:19, 135:4, 137:7, 143:7, 158:3, 164:8, 180:23, 194:15, 202:9, 238:17, 240:24, 245:21, 252:21, 263:19, 266:9, 266:19, 285:17, 299:4
**running** [5] - 108:6, 155:19, 163:3, 240:24, 264:3
**runs** [3] - 118:13, 119:19, 299:1

## S

**safe** [13] - 17:14, 165:19, 185:22, 185:23, 185:24, 186:8, 206:3, 206:11, 213:17, 226:21, 238:23, 238:25, 288:6
**safely** [2] - 186:9, 295:4
**safer** [3] - 186:2,

188:8, 202:17
**safety** [37] - 16:21, 22:2, 123:11, 165:22, 165:24, 179:12, 179:22, 180:1, 181:5, 199:3, 199:16, 201:6, 202:13, 204:5, 227:10, 227:11, 227:16, 228:19, 231:14, 240:24, 252:13, 276:21, 276:23, 277:1, 278:14, 288:5, 288:8, 288:11, 288:21, 289:2, 289:6, 289:19, 290:8, 293:3, 293:12, 295:22
**sake** [1] - 123:11, 262:13
**salaried** [2] - 113:12, 115:1
**salaries** [27] - 37:3, 67:1, 110:9, 110:18, 110:19, 113:25, 114:1, 114:12, 114:18, 115:6, 116:2, 145:11, 186:21, 218:22, 219:13, 219:24, 219:25, 223:13, 223:16, 232:2, 246:16, 248:2, 248:9, 248:16, 259:25, 272:20
**salary** [45] - 10:17, 10:23, 11:8, 11:13, 23:9, 36:16, 37:21, 38:6, 42:12, 65:25, 77:5, 77:7, 78:13, 110:16, 111:2, 112:23, 114:14, 115:8, 115:10, 115:15, 115:23, 134:17, 147:17, 148:20, 150:19, 150:21, 150:22, 186:5, 187:9, 189:1, 189:11, 189:12, 189:14, 213:21, 223:11, 230:14, 231:6, 248:3, 248:6, 248:8, 259:2, 260:7, 265:24, 272:16
**salient** [1] - 125:12
**sample** [1] - 187:1
**Samuel** [1] - 109:1
**SANDERS** [8] - 2:8, 4:14, 107:5, 156:22,

156:24, 157:21, 158:13, 159:5
**Sanders** [2] - 3:10, 4:14
**sanitation** [2] - 19:16, 239:12
**sat** [2] - 139:23, 144:4
**satisfy** [2] - 18:25, 125:11
**save** [14] - 159:20, 159:22, 179:3, 185:17, 221:19, 224:11, 226:3, 226:5, 263:6, 272:25, 273:3, 282:24, 286:7, 288:16
**saved** [2] - 262:16
**saving** [2] - 207:3, 263:15
**savings** [26] - 77:8, 212:16, 212:24, 214:13, 221:13, 222:1, 222:7, 222:8, 225:8, 231:21, 259:4, 259:5, 259:15, 261:10, 261:18, 262:24, 263:10, 263:11, 264:11, 272:22, 272:23, 273:8, 273:10, 283:17
**saw** [7] - 40:16, 120:24, 144:1, 244:11, 246:20, 249:6, 272:17
**scale** [3] - 65:23, 65:24, 77:22
**scenario** [11] - 25:20, 154:13, 206:5, 206:14, 212:6, 212:7, 212:25, 213:11, 213:12, 229:15, 265:20
**scenarios** [2] - 171:7, 171:21
**schedule** [6] - 64:8, 64:14, 64:23, 67:10, 120:11, 242:11
**scheduled** [5] - 5:18, 6:20, 93:7, 126:11, 132:19
**scheduling** [2] - 117:4, 132:17
**school** [7] - 68:7, 68:10, 104:11, 150:10, 227:18, 272:2, 296:2
**School** [4] - 46:23, 104:12, 106:3,

241:20
**Schwartz** [2] - 18:4, 276:19
**SCHWARTZMAN** [2] - 102:18, 239:10
**Schwartzmann** [1] - 4:16
**SCHWARTZMANN** [8] - 2:3, 4:16, 26:19, 79:12, 112:14, 239:20, 241:17, 241:24
**scientific** [4] - 187:5, 188:1, 188:12, 196:22
**scientist** [1] - 186:24
**scratch** [2] - 105:15, 137:10
**scream** [1] - 87:5
**screen** [7] - 48:8, 61:11, 81:15, 85:10, 113:6, 147:15, 192:17
**screening** [4] - 82:20, 121:6, 121:7, 294:13
**scrutinize** [1] - 21:3
**se** [2] - 175:13, 189:21
**search** [1] - 39:24
**searchable** [1] - 40:9
**searches** [2] - 39:20, 39:21
**season** [1] - 131:2
**seasonal** [1] - 205:18
**seasonality** [1] - 210:25
**seat** [5] - 103:2, 103:10, 161:11, 223:4, 276:8
**second** [17] - 40:18, 41:25, 44:3, 75:7, 82:10, 147:10, 181:3, 189:15, 190:18, 194:6, 198:17, 200:6, 208:21, 221:8, 259:16, 261:11, 294:4
**secret** [1] - 299:7
**Secretary** [12] - 56:11, 56:25, 191:21, 194:13, 194:17, 195:13, 197:20, 199:22, 201:8, 202:23, 239:3, 300:13
**secretary** [6] - 56:24, 57:8, 57:16, 200:3, 201:11, 209:18
**secretary's** [1] - 200:2
**Section** [1] - 130:23

**section** [4] - 125:14, 128:1, 130:19, 203:22
**sections** [1] - 109:23
**secure** [2] - 206:3, 226:21
**secured** [2] - 32:22, 82:9
**security** [33] - 9:13, 9:18, 9:22, 10:2, 13:19, 31:11, 31:24, 32:4, 81:3, 81:12, 82:16, 85:4, 87:15, 89:16, 89:19, 89:23, 90:6, 99:18, 123:8, 123:10, 123:13, 172:25, 174:3, 174:6, 200:9, 211:5, 211:7, 221:20, 222:3, 226:8, 240:19, 249:25, 268:1
**Security** [2] - 91:16, 278:18
**see** [58] - 41:3, 43:21, 47:17, 53:6, 61:16, 72:18, 84:13, 85:19, 87:10, 108:3, 111:1, 115:7, 115:11, 117:21, 128:16, 128:20, 128:21, 137:10, 139:15, 141:21, 147:17, 147:23, 148:1, 156:20, 160:22, 173:1, 185:24, 188:8, 188:11, 188:21, 189:8, 189:12, 206:8, 208:17, 215:15, 215:22, 215:25, 219:9, 219:11, 222:24, 227:3, 229:4, 229:7, 230:19, 230:22, 231:25, 235:20, 235:21, 242:17, 243:23, 248:6, 254:1, 257:9, 257:19, 280:5, 287:9, 288:22, 291:18
**seeds** [1] - 119:12
**seeing** [4] - 142:21, 215:20, 215:21, 261:12
**seek** [1] - 21:1
**seeking** [1] - 57:5
**seem** [2] - 246:11, 246:12

**sees** [1] - 127:15
**segregate** [1] - 277:12
**segregation** [5] - 20:3, 84:22, 166:5, 269:3, 269:4
**segue** [1] - 228:3
**self** [3] - 119:24, 127:12, 215:5
**self-harm** [2] - 119:24, 127:12
**sell** [1] - 36:13
**selling** [2] - 217:4, 245:25
**send** [8] - 49:5, 49:8, 51:8, 51:20, 52:3, 55:16, 143:22, 144:21
**sending** [2] - 144:24, 264:24
**senior** [3] - 180:6, 180:11, 231:19
**sense** [5] - 34:10, 156:10, 196:10, 232:5, 274:15
**sensitive** [1] - 285:4
**sensors** [2] - 68:20, 68:21
**sent** [3] - 41:1, 141:7, 143:20
**sentence** [1] - 55:14
**sentenced** [20] - 53:4, 53:8, 53:20, 53:25, 54:4, 54:8, 55:21, 57:9, 60:1, 60:6, 60:8, 76:11, 86:2, 88:24, 138:10, 191:6, 193:16, 195:9, 197:7, 235:22
**separate** [5] - 193:24, 211:7, 241:21, 250:13, 264:17
**separated** [1] - 117:16
**separately** [5] - 20:7, 20:8, 20:10, 96:22
**separating** [1] - 123:9
**separation** [2] - 22:14
**September** [20] - 6:20, 24:19, 37:20, 40:21, 47:5, 69:19, 70:7, 70:11, 71:21, 71:22, 71:25, 74:4, 75:10, 153:1, 198:10, 234:7, 236:11, 291:7, 291:23, 301:19
**sequestered** [1] - 27:8
**sequestration** [1] - 27:1
**sergeants** [1] - 44:22
**series** [1] - 64:2

**serious** [3] - 86:24, 119:20, 119:22
**seriously** [1] - 280:4
**Serpas** [1] - 292:21
**serve** [4] - 14:18, 17:13, 231:22, 288:15
**served** [5] - 163:12, 163:19, 192:12, 194:3, 223:21
**server** [1] - 48:15
**serves** [3] - 35:21, 70:5, 298:18
**service** [15] - 76:8, 76:21, 76:22, 116:5, 116:6, 116:10, 182:21, 189:21, 189:24, 212:22, 221:8, 221:16, 225:5, 264:15, 285:16
**Services** [8] - 24:7, 115:22, 127:8, 181:14, 181:16, 284:9, 293:22, 294:5
**services** [34] - 17:3, 19:14, 115:3, 115:5, 116:12, 116:15, 116:17, 116:24, 122:11, 125:2, 125:7, 125:8, 127:10, 127:13, 127:14, 128:5, 132:3, 132:5, 132:6, 136:5, 136:8, 146:7, 148:18, 170:16, 172:24, 212:19, 212:23, 241:19, 280:1, 283:2, 283:11, 284:17, 286:6
**serving** [3] - 53:21, 271:15, 272:1
**session** [1] - 126:12
**sessions** [1] - 109:23
**set** [14] - 4:6, 6:3, 12:19, 15:3, 29:3, 48:6, 58:10, 105:18, 116:20, 152:6, 205:15, 251:17, 257:16, 294:1
**set-aside** [1] - 257:16
**setting** [2] - 21:4, 86:20
**settlement** [4] - 78:19, 100:8, 100:9, 100:19
**settles** [1] - 229:4
**seven** [5] - 86:13, 115:17, 254:17, 258:18, 267:11

**several** [23] - 5:18, 12:12, 28:18, 40:12, 42:23, 46:21, 108:25, 117:22, 122:20, 152:20, 165:11, 173:14, 186:12, 186:16, 208:24, 214:17, 215:11, 227:6, 244:21, 264:12, 270:1, 274:21, 280:1
**severe** [2] - 206:21, 278:3
**sex** [1] - 40:16
**Shansky** [15] - 109:10, 137:24, 170:10, 170:11, 170:13, 170:16, 170:19, 171:15, 172:5, 176:9, 176:10, 253:25, 261:1, 269:14
**Shansky's** [1] - 176:19
**shape** [1] - 247:10
**shaped** [1] - 85:16
**share** [2] - 21:11, 123:12
**shared** [4] - 69:24, 224:11, 224:17, 283:11
**sharing** [2] - 123:12, 257:19
**SHARONDA** [1] - 2:17
**Sharp** [1] - 28:6
**sharp** [1] - 101:25
**Sheriff** [9] - 1:10, 4:18, 4:20, 17:5, 17:9, 21:10, 69:24, 70:19, 79:3
**sheriff** [134] - 5:6, 5:13, 5:15, 5:24, 6:2, 7:3, 8:22, 9:9, 9:11, 9:21, 10:1, 10:5, 11:3, 12:16, 13:16, 14:2, 14:5, 14:16, 14:17, 18:16, 19:9, 19:18, 20:2, 20:24, 21:2, 22:17, 23:25, 24:23, 25:15, 26:6, 26:22, 27:12, 28:22, 32:15, 42:4, 44:6, 50:8, 51:1, 51:25, 52:8, 55:6, 56:11, 56:18, 57:5, 57:22, 61:17, 70:10, 71:11, 71:12, 71:14, 71:17, 72:10, 72:13, 72:16, 72:20, 73:6, 73:11, 74:1, 74:7, 74:9, 74:16, 74:25, 75:3,

75:12, 75:15, 75:18, 77:2, 77:13, 78:20, 79:7, 94:1, 94:18, 95:24, 97:22, 98:3, 99:12, 100:19, 101:1, 102:3, 103:5, 110:12, 156:12, 160:22, 161:4, 167:18, 167:21, 172:2, 172:3, 175:3, 186:15, 186:16, 189:4, 190:22, 201:13, 203:8, 203:20, 206:20, 208:3, 214:13, 217:24, 221:24, 226:12, 228:21, 231:23, 233:7, 233:20, 237:21, 238:11, 241:14, 242:5, 244:3, 244:14, 245:14, 245:16, 245:18, 246:20, 253:19, 272:25, 273:23, 277:7, 277:14, 280:25, 283:20, 283:23, 284:1, 287:14, 287:18, 289:18, 290:17, 290:22, 294:1, 297:14, 298:17, 299:13
**sheriff's** [78] - 5:19, 16:9, 17:6, 18:8, 20:5, 20:13, 20:20, 21:7, 25:12, 28:7, 35:18, 36:23, 39:7, 41:8, 42:2, 42:6, 45:22, 47:8, 47:17, 51:25, 57:9, 60:2, 62:11, 65:14, 67:3, 67:14, 73:25, 75:22, 77:24, 78:8, 80:2, 81:3, 81:6, 81:8, 81:16, 87:3, 95:6, 100:23, 123:22, 139:24, 140:10, 141:1, 142:3, 143:25, 144:21, 150:24, 151:3, 151:12, 159:12, 172:19, 173:25, 178:15, 180:7, 198:21, 207:1, 222:17, 224:10, 231:2, 236:9, 236:23, 237:5, 237:18, 237:19, 242:11, 244:16, 246:3, 271:8,

274:13, 280:13,
283:2, 283:12,
283:15, 284:4,
285:10, 285:25,
292:11, 298:5
**Sheriff's** [14] - 27:23,
30:24, 46:20, 49:23,
81:1, 104:18,
104:22, 104:25,
146:15, 146:20,
166:19, 217:9,
218:20, 271:9
**sheriffs'** [1] - 186:11
**shift** [6] - 17:16,
118:19, 118:20,
155:8, 256:6, 267:25
**shifted** [2] - 90:22,
91:9
**shifts** [7] - 46:11,
120:10, 120:21,
120:22, 268:22,
274:5, 285:18
**ship** [6] - 55:2, 55:7,
55:17, 194:11,
195:1, 265:3
**shipped** [1] - 197:7
**shipping** [1] - 274:11
**shop** [1] - 286:8
**Shore** [1] - 11:6
**short** [8] - 46:4,
102:23, 124:4,
126:5, 231:4,
282:16, 300:12,
301:13
**short-circuit** [1] -
282:16
**short-staffed** [1] -
46:4
**shortage** [3] - 22:7,
32:14, 51:9
**shortages** [2] -
157:11, 157:16
**shortcomings** [1] -
17:22
**shorter** [1] - 152:25
**shortly** [3] - 5:1,
65:10, 79:7
**show** [16] - 18:12,
50:16, 50:18, 60:9,
60:12, 60:18, 61:15,
61:17, 62:6, 66:3,
81:15, 189:2,
211:17, 271:5,
281:9, 282:3
**showed** [2] - 198:15,
237:4
**showing** [2] - 61:10,
62:12
**shows** [6] - 8:1, 85:13,
87:5, 96:1, 110:20,

147:14
**shut** [1] - 244:14
**sick** [8] - 93:15, 118:3,
118:5, 119:8, 119:9,
124:2, 124:19,
124:24
**side** [18] - 68:23,
86:19, 86:25, 87:13,
87:17, 87:23, 87:24,
87:25, 105:5, 127:1,
178:11, 199:11,
211:8, 213:15,
263:20, 290:7, 290:9
**sideline** [1] - 14:7
**sides** [2] - 86:17, 88:6
**sight** [2] - 193:21,
193:25
**sign** [2] - 118:7,
183:14
**signed** [4] - 20:24,
28:21, 95:24
**significant** [15] -
22:25, 23:17,
122:25, 144:11,
153:1, 179:12,
182:23, 192:15,
193:5, 227:14,
283:17, 288:2,
294:17, 295:10,
296:16
**significantly** [4] -
115:13, 199:3,
273:22, 278:2
**similar** [10] - 36:10,
115:21, 137:6,
151:3, 151:4,
224:12, 224:25,
269:25, 286:9
**similarly** [4] - 1:7,
133:25, 137:11,
152:12
**simple** [2] - 20:16,
139:25
**simply** [4] - 15:1,
18:22, 21:6, 263:14
**simulate** [1] - 260:15
**single** [6] - 20:12,
126:20, 130:24,
131:4, 278:16, 280:5
**singularly** [1] - 19:9
**sit** [7] - 8:18, 8:21,
83:4, 208:3, 297:25,
298:4
**sit-down** [1] - 83:4
**site** [2] - 171:17,
178:11
**sites** [1] - 209:21
**sitting** [4] - 25:13,
25:15, 191:9, 253:21
**situated** [1] - 1:7

**situation** [9] - 10:14,
89:6, 162:3, 201:5,
213:23, 226:20,
252:10, 263:8
**situations** [2] -
170:11, 207:8
**six** [15] - 28:8, 46:11,
46:12, 135:1,
138:12, 140:14,
142:19, 142:21,
151:15, 151:21,
152:15, 152:23,
157:3, 157:7, 157:10
**sixty** [1] - 38:1
**size** [8] - 109:4,
116:18, 140:7,
168:12, 171:8,
171:20, 178:19,
182:24
**sized** [3] - 105:22,
133:25, 224:25
**sizes** [1] - 178:17
**skills** [2] - 47:1, 108:9
**skinnier** [2] - 226:7,
226:8
**slots** [2] - 140:15,
157:7
**slotted** [1] - 203:22
**small** [5] - 145:16,
206:22, 235:7,
240:20, 284:16
**smaller** [1] - 124:17
**smart** [2] - 275:15,
288:13
**smart-alecky** [1] -
275:15
**smarter** [2] - 289:1,
296:5
**smartest** [1] - 288:5
**snapshot** [1] - 191:1
**so's** [1] - 83:23
**social** [2] - 125:20,
158:9
**society** [1] - 105:20
**Sociology** [1] - 162:14
**sociology** [5] -
162:16, 162:17,
162:20, 162:23,
163:1
**software** [4] - 48:14,
68:16, 258:4
**sold** [1] - 141:4
**solitary** [2] - 166:5,
174:4
**solutions** [1] - 131:14
**solved** [2] - 278:19,
278:20
**someone** [19] - 39:22,
50:13, 68:9, 122:8,
123:24, 126:2,

130:16, 132:14,
141:11, 149:4,
149:14, 149:20,
149:21, 183:17,
187:2, 207:2,
212:14, 253:22,
274:24
**sometimes** [5] -
46:16, 77:10, 84:2,
95:2, 196:19
**somewhat** [4] - 22:19,
202:9, 210:8, 223:25
**somewhere** [10] -
89:18, 89:21,
150:15, 253:20,
260:24, 273:1,
288:16, 294:21
**soon** [2] - 185:22,
291:6
**sooner** [1] - 291:24
**sorry** [26] - 30:14,
46:14, 61:3, 62:14,
65:6, 112:4, 113:9,
137:2, 139:11,
147:25, 157:14,
160:18, 164:16,
167:2, 167:4,
168:25, 169:17,
177:11, 190:9,
190:11, 190:20,
216:8, 222:20,
251:24, 261:3,
262:10
**sort** [20] - 105:25,
108:7, 116:13,
117:2, 117:6,
119:11, 122:4,
125:5, 125:8,
125:11, 127:12,
128:9, 132:13,
139:7, 160:11,
203:21, 266:25,
274:7, 296:22,
301:18
**sorts** [2] - 212:23,
289:11
**sound** [3] - 193:25,
247:21, 287:25
**sounds** [2] - 233:2,
255:21
**source** [2] - 190:16,
231:14
**south** [2] - 219:12,
219:13
**South** [1] - 225:19
**Souther** [1] - 112:13
**Southern** [5] - 2:3,
4:16, 163:25, 164:4,
277:13
**space** [2] - 91:2,

112:21
**Spanish** [9] - 49:4,
49:9, 122:4, 122:7,
122:13, 122:15,
122:17, 122:18,
122:20
**speakers** [1] - 122:4
**speaking** [5] - 23:8,
100:11, 152:16,
280:16, 285:25
**speaks** [2] - 122:8,
122:13, 122:17
**Special** [2] - 81:4,
142:13
**special** [14] - 119:4,
119:18, 136:15,
140:19, 140:23,
153:5, 194:15,
211:4, 255:24,
268:21, 268:23,
269:2, 269:10,
269:20
**specialist** [1] - 108:8
**specialized** [2] -
158:8, 193:18
**specialties** [2] - 105:7,
113:20
**specialty** [7] - 131:24,
131:25, 141:11,
148:12, 148:17,
149:4, 149:6
**specific** [13] - 106:18,
114:9, 116:25,
120:21, 131:19,
148:18, 193:20,
194:14, 271:22,
281:9, 281:23,
289:13
**specifically** [4] - 57:2,
99:22, 123:4, 162:2
**specifications** [1] -
104:2
**spectrum** [1] - 21:4
**speculation** [3] -
36:22, 154:7, 154:9
**speeding** [1] - 263:20
**spell** [6] - 27:16,
80:17, 80:20,
103:11, 161:12,
276:9
**spelled** [1] - 130:19
**spend** [10] - 19:19,
177:6, 182:13,
213:16, 240:18,
263:18, 273:11,
273:14, 279:19,
293:14
**spending** [16] - 13:16,
14:2, 21:3, 21:12,
178:21, 213:14,

216:12, 216:17,
226:3, 263:20,
273:16, 273:18,
273:20, 278:21,
278:24, 288:24

**spends** [1] - 225:23

**spent** [15] - 20:22,
41:11, 41:12, 41:14,
101:11, 107:23,
108:7, 109:22,
115:25, 123:19,
171:5, 171:18,
253:19, 278:22,
298:20

**spitting** [1] - 57:21

**split** [3] - 86:11, 86:16,
87:13

**spoken** [2] - 186:11,
186:14

**sport** [1] - 9:16

**spots** [3] - 12:4,
215:15, 296:8

**spreading** [1] - 207:8

**spreadsheet** [4] -
110:10, 120:24,
145:8, 266:15

**spreadsheets** [1] -
259:1

**spring** [6] - 211:2,
243:1, 243:3, 243:5,
243:6, 260:18

**spur** [1] - 7:18

**St** [36] - 12:22, 34:11,
34:12, 37:3, 37:9,
37:11, 66:5, 66:7,
66:8, 67:13, 67:14,
67:16, 67:17, 67:22,
68:1, 68:4, 93:1,
104:18, 104:22,
105:14, 114:19,
122:18, 124:16,
135:25, 136:1,
136:4, 139:5,
139:23, 141:11,
148:19, 149:13,
151:2, 151:10,
154:24

**stabilize** [1] - 279:14

**stabilized** [2] - 185:22,
278:25

**stable** [6] - 24:21,
138:12, 138:15,
139:2, 250:22

**staff** [122] - 9:18, 9:22,
10:2, 10:4, 10:6,
10:9, 10:10, 10:13,
11:10, 11:12, 22:6,
22:8, 22:25, 23:4,
23:18, 25:17, 33:1,
33:16, 35:2, 74:9,

83:21, 92:13, 98:13,
110:7, 116:18,
117:5, 120:2, 120:7,
122:6, 122:8,
122:20, 123:8,
124:2, 124:5,
124:21, 125:15,
125:24, 126:23,
128:6, 128:7,
130:18, 131:1,
131:5, 132:7,
137:18, 137:21,
137:22, 138:3,
140:9, 140:10,
145:10, 145:11,
146:16, 146:25,
147:14, 151:16,
152:4, 152:24,
155:13, 156:4,
156:8, 157:13,
158:14, 174:1,
174:6, 178:22,
178:23, 179:13,
179:23, 180:6,
187:22, 191:21,
199:6, 199:7, 201:6,
201:18, 202:5,
207:8, 208:9,
208:11, 212:12,
212:13, 215:10,
226:13, 229:20,
229:25, 231:22,
235:6, 242:4,
243:13, 244:1,
244:2, 249:25,
250:20, 252:9,
256:4, 256:12,
259:13, 259:22,
260:1, 260:9,
260:16, 262:22,
262:25, 263:4,
263:8, 263:22,
264:19, 266:7,
266:10, 266:11,
266:16, 268:11,
278:18, 287:15,
288:7

**staffed** [9] - 9:17,
46:4, 119:13,
124:23, 132:2,
158:6, 158:11,
207:9, 250:9

**staffing** [146] - 9:4,
9:6, 13:10, 22:3,
22:18, 22:22, 22:24,
23:17, 24:2, 25:3,
30:23, 39:9, 39:15,
72:2, 72:6, 72:24,
73:12, 73:13, 73:23,
74:12, 74:23, 91:6,
94:17, 97:25, 99:5,

105:18, 106:22,
106:25, 108:14,
109:4, 109:8,
110:20, 110:21,
113:12, 113:14,
114:22, 117:15,
117:16, 118:11,
120:25, 121:14,
122:24, 124:9,
127:3, 127:4, 132:8,
132:22, 133:1,
133:2, 133:6, 133:8,
133:9, 136:20,
137:3, 137:5, 137:9,
137:15, 137:19,
138:2, 145:9,
145:12, 146:10,
146:24, 152:4,
155:8, 157:2,
157:11, 157:16,
157:22, 157:25,
158:1, 159:12,
168:23, 168:25,
169:1, 169:2, 169:4,
169:11, 169:18,
170:7, 170:11,
170:22, 171:6,
171:19, 172:23,
172:24, 172:25,
173:4, 173:16,
173:22, 174:3,
174:10, 174:21,
175:6, 175:9,
175:14, 175:18,
175:24, 176:13,
177:6, 177:8,
178:10, 178:17,
180:18, 199:9,
200:25, 201:14,
201:21, 202:10,
214:3, 225:12,
230:4, 242:4,
242:12, 242:17,
242:24, 243:11,
244:4, 244:7,
252:25, 258:17,
258:18, 258:21,
258:22, 258:24,
258:25, 259:8,
259:18, 260:22,
262:21, 266:2,
266:3, 266:12,
267:11, 267:20,
268:23, 269:6,
270:3, 270:5, 270:8,
289:21, 289:25,
298:5, 299:8, 299:22

**staffs** [2] - 110:8,
123:13

**staffs'** [1] - 130:11

**stagnation** [1] - 21:22

**stain** [1] - 21:23

**stake** [1] - 25:9

**stakeholders** [1] -
74:10

**stamp** [2] - 85:9,
189:5

**stand** [2] - 10:12,
51:18

**standard** [7] - 12:14,
105:16, 152:5,
247:8, 254:13,
274:7, 280:11

**standardized** [1] -
116:8

**standards** [11] -
24:12, 45:8, 106:1,
113:16, 116:19,
116:20, 116:22,
165:18, 193:13,
292:2, 295:14

**stands** [1] - 158:16

**start** [47] - 23:3, 26:15,
35:14, 40:11, 41:2,
50:20, 52:15, 52:16,
114:23, 142:18,
142:21, 149:3,
152:21, 157:3,
157:9, 157:12,
158:18, 158:24,
163:12, 165:2,
173:19, 182:9,
188:4, 188:7,
189:12, 198:14,
201:6, 201:21,
202:6, 206:7,
207:19, 207:25,
208:25, 209:15,
210:18, 214:20,
215:4, 215:18,
219:22, 229:7,
230:1, 230:5,
230:10, 237:13,
301:1

**start-of-the-art** [1] -
209:15

**start-up** [1] - 189:12

**started** [20] - 28:21,
35:21, 50:5, 137:10,
140:13, 151:20,
152:19, 157:6,
163:5, 163:10,
178:15, 181:21,
183:5, 252:19,
259:3, 259:4,
288:19, 293:22,
294:19, 299:10

**starting** [17] - 10:17,
35:11, 46:8, 67:1,
70:10, 141:3,
205:25, 223:13,

230:17, 232:2,
240:21, 247:17,
247:22, 247:23,
248:8, 260:6, 265:24

**starts** [2] - 46:14,
211:2

**State** [2] - 116:21,
163:7

**state** [87] - 10:19,
10:21, 14:1, 14:7,
14:18, 15:1, 15:2,
19:25, 24:7, 27:16,
27:21, 34:21, 34:22,
40:7, 54:7, 54:21,
58:10, 60:8, 64:22,
64:23, 65:6, 66:1,
66:16, 67:9, 77:6,
80:17, 80:24, 86:2,
88:24, 103:10,
105:9, 136:10,
143:4, 153:9,
153:17, 153:18,
153:22, 154:20,
154:22, 161:11,
161:24, 162:4,
164:4, 164:24,
165:2, 165:7,
172:14, 173:17,
174:8, 191:8,
191:12, 191:16,
191:17, 192:3,
192:13, 195:15,
196:7, 196:8, 197:4,
197:9, 197:21,
197:23, 197:25,
198:7, 204:3, 207:6,
208:16, 209:1,
216:19, 217:13,
217:17, 218:5,
218:7, 218:9, 219:7,
219:10, 219:11,
223:19, 238:9,
253:14, 261:14,
263:24, 264:3,
264:24, 265:10,
276:8

**state-of-the-art** [2] -
40:7, 209:1

**statement** [6] - 7:3,
16:4, 121:22,
219:21, 268:20,
296:17

**Statements** [1] - 3:2

**statements** [2] - 8:6,
8:10

**states** [4] - 162:8,
166:17, 197:5, 267:9

**STATES** [2] - 1:1, 1:16

**States** [18] - 4:11,
4:13, 4:15, 5:6, 5:20,

26:19, 73:22,
102:16, 104:14,
106:7, 115:12,
115:19, 163:20,
189:18, 189:22,
218:19, 220:25,
299:20
**stating** [1] - 70:7
**stations** [2] - 288:9,
290:5
**statistic** [3] - 128:18,
136:24, 209:3
**statistics** [1] - 249:6
**status** [3] - 195:22,
291:9, 301:17
**statutes** [1] - 15:3
**statutorily** [1] - 297:21
**statutory** [1] - 77:12
**stay** [13] - 77:4, 119:2,
126:10, 146:4,
182:15, 184:2,
192:10, 210:19,
228:10, 230:13,
240:16, 242:21,
265:22
**staying** [1] - 228:9
**stays** [1] - 233:13
**steal** [2] - 245:24,
246:1
**Stenography** [1] -
1:25
**step** [4] - 61:2, 80:12,
135:2, 240:12
**steps** [8] - 11:15,
39:14, 50:2, 50:18,
71:7, 135:11,
234:11, 234:13
**Stericycle** [1] - 136:2
**STEVEN** [1] - 1:5
**still** [36] - 30:7, 32:25,
35:14, 38:8, 51:8,
62:24, 74:21, 91:10,
91:22, 93:17, 96:4,
100:10, 130:3,
135:25, 157:9,
158:25, 195:10,
195:15, 202:13,
208:11, 211:19,
211:24, 233:6,
246:6, 262:24,
269:17, 274:2,
274:3, 290:25,
291:3, 295:6,
295:12, 295:14,
295:15, 297:13,
298:24
**stipulate** [1] - 112:8
**stipulation** [1] - 112:6
**stock** [1] - 131:20
**stop** [3] - 43:17,

46:16, 197:18
**storage** [3] - 117:6,
132:16, 254:6
**stories** [1] - 83:23
**storing** [1] - 254:6
**story** [3] - 82:9, 85:15,
245:1
**strains** [1] - 17:1
**strategic** [2] - 162:7,
172:14
**strategy** [2] - 199:13,
293:21
**street** [12] - 14:6,
19:12, 69:11,
101:18, 138:20,
148:14, 149:21,
285:24, 286:1,
292:24, 293:14,
296:10
**Street** [6] - 1:21, 82:2,
82:4, 135:15,
135:17, 225:19
**streets** [4] - 194:2,
247:5, 288:10, 293:4
**stress** [1] - 229:22
**strictly** [3] - 38:12,
72:24, 94:8
**strike** [2] - 16:23,
163:12
**stripped** [1] - 32:16
**strive** [1] - 180:15
**strong** [3] - 5:21,
180:23, 231:24
**structurally** [1] - 254:2
**structure** [1] - 208:21
**struggle** [1] - 285:22
**student** [1] - 106:3
**studied** [1] - 271:19
**studies** [10] - 162:7,
173:14, 173:18,
174:11, 184:3,
184:8, 184:9, 270:6,
270:12
**study** [15] - 72:2,
72:14, 74:15, 74:23,
133:20, 134:3,
134:6, 139:5, 152:3,
172:18, 185:7,
186:24, 187:5,
188:1, 292:17
**stuff** [11] - 148:14,
149:1, 208:7,
215:14, 230:2,
231:12, 241:11,
254:2, 254:3, 254:7,
260:19
**subgroups** [1] -
192:14
**subject** [9] - 7:9, 7:11,
15:10, 15:15, 15:18,

25:16, 195:22,
221:5, 295:18
**submit** [2] - 13:10,
21:10
**submits** [1] - 20:19
**submitted** [9] - 23:22,
72:10, 72:20, 73:6,
78:24, 109:11,
133:5, 170:14, 234:2
**subpoena** [1] - 14:18
**subsidized** [1] -
217:11
**subsidizing** [1] -
217:16
**subspecialty** [1] -
162:22
**substance** [1] -
172:20
**substantial** [5] - 10:6,
34:15, 212:13,
252:14, 276:18
**substantive** [1] -
147:10
**subsume** [1] - 297:22
**success** [1] - 47:22
**successful** [3] - 19:7,
47:2, 221:6
**sucker's** [1] - 216:21
**sue** [1] - 80:5
**sued** [2] - 164:24,
167:16
**suffering** [1] - 22:2
**suffers** [1] - 143:17
**sufficient** [5] - 13:23,
118:23, 270:5,
270:8, 293:13
**suggest** [5] - 15:17,
127:3, 183:11,
223:12, 282:20
**suggested** [6] -
163:22, 260:18,
277:23, 283:16,
283:19, 294:11
**suggesting** [5] -
68:12, 121:25,
140:9, 157:8, 197:16
**suggestion** [1] - 20:13
**suggestions** [1] - 94:2
**suggests** [1] - 14:21
**suicide** [6] - 22:9,
25:8, 94:13, 119:24,
125:17, 125:19
**suicides** [2] - 130:14,
201:17
**suitable** [2] - 183:17,
225:8
**suitcase** [1] - 135:16
**suited** [1] - 91:23
**sum** [2] - 12:18, 99:21
**summarizing** [1] -

125:12
**summary** [6] - 125:6,
137:23, 138:1,
170:17, 179:8,
259:17
**summer** [6] - 67:6,
72:3, 72:5, 211:1,
292:11
**sums** [1] - 19:9
**Sunday** [1] - 76:12
**Superintendent** [1] -
36:11
**supervised** [2] - 63:6,
96:24, 207:10
**supervises** [1] - 97:12
**supervising** [1] -
89:25
**supervision** [31] -
22:11, 23:19, 25:3,
51:5, 52:13, 52:19,
52:21, 52:24, 84:4,
86:6, 89:24, 97:15,
183:22, 184:16,
191:25, 196:13,
255:22, 255:23,
256:4, 268:1, 268:6,
268:8, 268:12,
268:13, 268:14,
274:16, 274:20,
274:22, 275:1, 275:2
**supervisor** [2] - 40:1,
50:5
**supervisors** [3] -
44:22, 45:2, 51:8
**supplemental** [1] -
65:6
**supplies** [7] - 131:12,
131:16, 131:18,
132:2, 150:12,
154:23
**Supply** [1] - 135:23
**supply** [5] - 131:10,
131:23, 131:25,
145:16, 148:15
**support** [8] - 7:23,
24:14, 77:9, 77:10,
132:10, 294:16,
295:2
**supported** [2] - 268:1,
268:22
**supporting** [1] -
283:13
**supposed** [3] - 43:25,
160:5, 236:23
**supposedly** [1] -
19:20
**supreme** [1] - 165:3
**surgery** [2] - 124:21,
143:18
**surplus** [5] - 32:11,

211:18, 211:23,
211:24, 211:25
**surprise** [3] - 101:6,
231:3, 272:4
**surround** [1] - 246:19
**surrounding** [1] - 11:6
**SUSAN** [2] - 1:20,
303:6
**Susan** [2] - 303:3,
303:7
**susan_zielie@laed.
uscourts.gov** [1] -
1:22
**suspect** [2] - 73:10,
283:18
**sustain** [1] - 19:8
**sustained** [6] - 80:9,
157:20, 241:25,
245:12, 249:18
**sustains** [1] - 77:14
**swift** [1] - 25:11
**switched** [1] - 69:9
**sworn** [5] - 27:14,
80:15, 103:8, 161:9,
276:6
**SYLVESTER** [1] - 1:6
**synopsis** [1] - 125:9
**system** [97] - 11:16,
11:17, 11:20, 11:23,
12:6, 16:8, 23:20,
28:24, 28:25, 29:11,
29:15, 39:18, 40:8,
40:18, 40:19, 40:22,
41:9, 41:10, 41:16,
42:17, 42:20, 42:21,
43:12, 44:1, 44:3,
44:5, 48:5, 48:7,
48:8, 48:10, 48:18,
48:20, 48:22, 48:23,
49:1, 49:14, 49:15,
49:25, 55:12,
131:17, 135:18,
141:3, 141:14,
141:20, 142:7,
142:9, 148:11,
149:2, 154:20,
154:22, 162:6,
165:19, 165:25,
166:24, 168:1,
168:2, 174:1,
178:11, 178:17,
178:18, 179:9,
179:13, 180:1,
184:1, 188:13,
188:18, 188:19,
197:25, 199:4,
199:12, 205:8,
205:25, 207:1,
212:18, 215:7,
215:13, 215:14,

219:10, 227:13,
228:2, 238:12,
257:23, 258:2,
263:19, 264:3,
265:4, 265:5,
283:12, 283:13,
286:10, 298:3
**system's** [1] - 229:18
**systems** [11] - 43:7,
43:8, 105:11,
161:24, 162:6,
168:2, 172:15,
185:5, 219:3,
227:18, 297:14

## T

**table** [22] - 34:6,
113:13, 135:20,
136:16, 147:10,
190:4, 190:7,
190:10, 193:5,
193:6, 197:13,
197:16, 205:7,
208:20, 210:22,
215:24, 216:2,
216:3, 217:7, 234:5,
271:3
**tables** [1] - 193:3
**tag** [2] - 120:16,
284:25
**take-home** [2] - 21:5,
125:4
**talks** [2] - 113:25,
169:16
**Tammany** [21] - 12:22,
66:8, 93:1, 104:18,
104:22, 105:14,
114:19, 122:18,
124:16, 136:1,
136:4, 139:5,
139:23, 141:11,
148:19, 149:13,
151:2, 151:10,
154:24
**tandem** [3] - 17:8,
174:8, 203:22
**target** [3] - 62:17,
192:5, 207:11
**targeted** [1] - 239:12
**targeting** [1] - 296:5
**task** [5] - 145:16,
168:17, 222:19,
292:16, 297:22
**taught** [3] - 150:2,
163:1, 163:2
**taxpayer** [1] - 17:10
**taxpayers** [9] - 20:21,
206:18, 218:8,
273:1, 279:16,

280:9, 280:10,
290:10, 290:11
**taxpayers'** [1] - 21:12
**TB** [1] - 108:6
**TB-5** [1] - 117:25
**TDC** [1] - 117:25
**teach** [1] - 106:2
**team** [4] - 17:10, 71:1,
71:8, 173:20
**teams** [2] - 100:11,
120:16
**technical** [1] - 192:19
**technically** [1] -
203:21
**technology** [3] - 21:5,
224:13, 296:8
**telephone** [5] -
108:25, 122:9,
122:15, 179:1,
261:15
**temp** [1] - 90:24
**template** [1] - 112:20
**Templeman** [24] -
90:23, 94:19, 94:21,
205:20, 208:22,
208:24, 209:13,
210:1, 242:23,
244:7, 244:9,
244:14, 244:21,
245:4, 245:5,
249:25, 253:11,
253:13, 258:20,
266:3, 269:11,
269:13, 269:21
**temporal** [1] - 102:3
**temporary** [12] -
51:23, 52:13, 52:16,
90:24, 208:4, 210:4,
210:7, 242:20,
242:22, 249:9,
250:11, 266:16
**ten** [15] - 7:2, 29:15,
65:12, 65:18, 66:14,
66:22, 102:24,
107:14, 113:1,
123:23, 143:22,
182:1, 223:1,
223:12, 249:10
**ten-year** [1] - 107:14
**tend** [1] - 120:11
**tender** [1] - 106:21
**tens** [2] - 17:23,
278:15
**tents** [4] - 90:24,
135:10, 198:24
**tenure** [3] - 45:22,
65:14, 248:24
**term** [4] - 6:24, 64:2,
227:17, 231:5
**termination** [3] - 41:6,

187:1, 200:24
**terminology** [1] -
148:12
**terms** [46] - 15:5,
18:25, 50:19,
100:16, 110:16,
116:25, 125:7,
133:6, 136:9, 162:5,
164:24, 165:6,
165:12, 173:20,
174:5, 178:16,
178:20, 179:19,
180:24, 191:14,
192:6, 196:13,
201:5, 202:13,
205:1, 210:13,
214:10, 214:18,
215:10, 215:23,
221:6, 227:24,
257:25, 260:12,
277:7, 279:16,
287:10, 287:13,
288:12, 288:21,
293:4, 294:13,
297:4, 298:2, 299:11
**terrible** [1] - 213:22
**test** [2] - 45:12, 45:19
**tested** [1] - 131:4
**testified** [32] - 13:20,
27:14, 47:11, 70:10,
72:19, 80:2, 80:15,
92:12, 95:14, 97:19,
103:9, 129:9, 153:9,
156:3, 161:9, 165:8,
165:11, 173:3,
176:17, 187:17,
194:19, 241:7,
241:11, 247:25,
262:14, 265:2,
274:12, 276:6,
276:20, 283:10,
286:22, 294:5
**testify** [22] - 8:7,
10:13, 12:18, 13:3,
13:21, 70:12, 70:14,
70:15, 103:20,
144:7, 144:9, 170:1,
171:23, 175:19,
176:6, 176:10,
180:17, 194:23,
236:6, 281:21,
292:6, 296:19
**testifying** [3] - 75:4,
218:12, 281:22
**testimony** [62] - 9:2,
18:20, 19:6, 26:22,
27:8, 30:15, 30:17,
35:4, 35:7, 38:16,
39:4, 42:1, 50:12,
50:16, 58:9, 73:11,

73:22, 79:18, 91:21,
91:22, 91:24, 95:23,
96:9, 103:18, 129:3,
151:14, 153:24,
155:7, 159:14,
159:25, 160:18,
160:19, 165:12,
166:6, 166:12,
168:22, 169:12,
170:23, 177:20,
181:8, 187:3,
194:21, 195:1,
196:9, 199:20,
199:23, 200:4,
200:25, 203:10,
209:20, 226:16,
235:19, 236:4,
240:1, 243:2, 266:6,
266:21, 282:2,
284:24, 289:23
**Testimony** [1] - 3:4
**Texas** [3] - 166:25,
167:3, 167:8
**text** [1] - 39:20
**texting** [1] - 231:12
**Thanksgiving** [4] -
63:4, 63:22, 63:25,
235:6
**THE** [686] - 1:1, 1:2,
1:15, 4:3, 4:8, 5:2,
7:12, 7:14, 7:25,
8:13, 8:16, 8:21,
14:24, 15:7, 15:11,
15:20, 15:22, 21:16,
24:9, 26:21, 27:2,
27:4, 27:18, 29:20,
29:21, 29:23, 29:25,
30:5, 30:7, 30:19,
30:22, 31:1, 31:2,
31:19, 33:6, 33:12,
33:20, 33:22, 33:23,
33:24, 33:25, 34:2,
35:6, 36:25, 37:2,
37:6, 37:9, 37:12,
37:15, 37:24, 38:1,
38:2, 38:9, 38:12,
38:14, 38:17, 38:18,
38:20, 38:21, 38:23,
39:3, 39:12, 41:12,
41:13, 41:14, 41:15,
41:17, 41:18, 41:19,
41:20, 41:24, 42:10,
42:20, 42:21, 44:4,
44:6, 44:9, 44:10,
44:11, 44:12, 44:13,
44:14, 47:12, 49:16,
49:17, 49:18, 49:19,
49:20, 49:21, 50:15,
50:21, 50:24, 51:24,
52:5, 52:7, 52:9,

52:11, 52:12, 53:11,
53:13, 53:14, 53:15,
53:16, 53:18, 53:23,
53:24, 54:1, 54:2,
54:9, 54:10, 54:11,
54:12, 54:24, 55:1,
55:6, 55:8, 55:20,
55:23, 55:24, 56:1,
56:2, 56:7, 56:22,
57:8, 57:11, 58:9,
58:16, 58:22, 59:4,
59:6, 60:16, 61:20,
61:22, 61:25, 62:2,
62:4, 62:8, 63:5,
63:7, 66:13, 66:16,
66:17, 66:19, 66:20,
66:22, 66:24, 67:5,
67:8, 67:9, 67:11,
70:12, 70:14, 71:19,
71:23, 72:22, 73:2,
73:5, 73:11, 73:15,
73:18, 73:25, 74:5,
74:6, 75:4, 75:6,
75:9, 75:12, 75:17,
79:13, 79:20, 79:23,
80:9, 80:11, 80:19,
80:20, 80:21, 83:19,
83:21, 84:3, 84:6,
84:9, 84:11, 84:13,
84:14, 85:2, 85:3,
85:4, 85:7, 85:25,
86:1, 86:5, 86:7,
86:8, 86:10, 86:14,
86:16, 86:21, 86:23,
86:24, 87:2, 87:6,
87:8, 87:10, 87:21,
87:24, 87:25, 88:4,
88:5, 88:8, 88:9,
88:10, 88:13, 88:16,
88:22, 88:24, 89:1,
89:2, 89:3, 89:4,
89:23, 90:1, 90:4,
90:5, 90:9, 90:10,
90:11, 90:13, 91:20,
91:23, 92:12, 92:15,
92:16, 92:19, 92:20,
93:14, 93:15, 94:9,
94:10, 95:7, 95:9,
95:10, 95:11, 95:14,
95:15, 95:18, 96:21,
96:23, 96:24, 97:1,
97:9, 97:11, 97:12,
97:13, 97:14, 97:16,
97:19, 98:3, 98:5,
99:1, 99:9, 99:19,
99:25, 100:10,
100:15, 100:21,
101:8, 101:11,
101:17, 101:21,
101:22, 102:1,
102:8, 102:11,

102:15, 102:19,
102:22, 102:24,
103:2, 103:12,
103:22, 106:25,
107:3, 107:6, 107:9,
108:12, 108:20,
111:18, 111:24,
112:3, 112:10,
112:13, 112:15,
112:20, 113:3,
113:5, 113:6, 113:8,
113:23, 114:4,
114:7, 114:8,
114:11, 114:16,
114:17, 114:18,
121:19, 121:23,
121:24, 122:3,
122:12, 122:14,
122:25, 123:2,
123:5, 123:7, 126:2,
126:8, 126:25,
127:4, 127:18,
127:22, 128:25,
129:3, 129:13,
129:15, 129:20,
130:3, 136:18,
136:22, 136:24,
137:2, 137:14,
137:17, 139:17,
139:18, 139:21,
140:2, 140:5,
142:11, 142:13,
142:23, 142:25,
144:9, 144:14,
144:20, 155:15,
156:14, 157:18,
158:6, 158:8, 159:6,
159:9, 159:16,
159:22, 160:8,
160:13, 160:23,
161:1, 161:5,
161:13, 162:1,
162:2, 162:16,
162:18, 162:19,
162:20, 162:21,
162:22, 164:15,
164:16, 164:17,
164:18, 165:4,
165:6, 165:8,
165:10, 165:14,
165:15, 165:16,
165:17, 165:20,
165:23, 166:1,
166:2, 166:3, 166:4,
166:6, 166:8, 166:9,
167:2, 167:3,
167:12, 167:13,
167:17, 167:20,
168:25, 169:3,
169:6, 169:7, 169:8,
169:13, 169:18,

169:21, 169:25,
170:2, 170:4, 170:8,
170:21, 170:25,
171:1, 171:4, 171:9,
171:10, 171:23,
172:1, 172:23,
173:6, 173:7, 173:8,
173:10, 173:11,
173:12, 173:13,
174:10, 174:12,
174:13, 174:15,
174:16, 174:18,
174:19, 175:3,
175:5, 175:16,
175:23, 176:6,
176:9, 176:10,
176:15, 176:21,
176:25, 177:8,
177:15, 180:17,
180:19, 182:6,
182:7, 183:1, 183:3,
183:11, 183:13,
183:14, 183:16,
184:3, 184:5,
184:18, 184:21,
184:22, 184:23,
186:11, 186:13,
186:14, 186:15,
186:17, 186:22,
187:16, 187:18,
187:21, 187:24,
187:25, 188:2,
188:10, 188:14,
188:15, 188:16,
188:17, 188:18,
188:24, 190:7,
190:10, 190:13,
191:16, 191:18,
192:20, 192:24,
193:2, 193:5, 194:6,
194:8, 194:10,
194:11, 194:13,
194:23, 194:25,
195:3, 195:7, 195:8,
195:11, 195:12,
195:18, 195:20,
195:23, 195:25,
196:6, 196:11,
196:19, 196:22,
197:12, 197:13,
199:17, 200:10,
200:11, 200:21,
201:10, 201:20,
201:21, 201:25,
202:2, 202:11,
202:18, 203:5,
204:6, 204:16,
204:17, 207:21,
207:22, 208:2,
208:6, 209:17,
214:3, 214:6, 214:7,

216:2, 216:4,
218:11, 218:13,
218:14, 218:17,
218:18, 218:23,
218:25, 219:1,
219:16, 219:17,
219:20, 219:23,
220:2, 220:3, 220:4,
220:11, 220:12,
220:13, 222:9,
222:16, 223:1,
223:4, 223:8, 224:4,
225:15, 225:17,
225:18, 225:20,
226:7, 230:10,
230:18, 232:3,
232:4, 232:10,
232:16, 232:19,
232:24, 233:2,
233:16, 235:2,
235:3, 235:4, 235:9,
236:3, 236:7,
236:14, 236:19,
236:22, 237:1,
237:2, 237:7, 237:8,
237:14, 237:17,
237:19, 237:21,
237:24, 238:3,
239:8, 239:18,
239:21, 239:25,
240:4, 240:7, 240:9,
241:6, 241:22,
241:25, 242:1,
243:4, 243:7,
245:11, 245:12,
246:6, 246:9,
246:10, 248:15,
248:18, 248:22,
248:23, 248:24,
248:25, 249:18,
249:21, 253:6,
253:7, 254:14,
254:15, 259:16,
259:19, 259:25,
260:2, 260:3, 260:4,
260:21, 260:25,
261:2, 261:3, 261:4,
262:7, 266:20,
266:23, 266:24,
267:3, 270:15,
270:17, 270:21,
272:5, 272:9, 275:8,
275:13, 275:16,
275:20, 275:24,
276:2, 276:4,
276:10, 276:14,
277:10, 281:3,
281:13, 281:21,
282:6, 282:9,
282:17, 283:19,
283:22, 283:25,

284:19, 287:8,
287:10, 290:19,
290:22, 291:6,
291:15, 291:24,
293:7, 293:8,
296:19, 296:24,
298:4, 298:8,
298:10, 298:20,
300:2, 300:6, 300:8,
300:9, 300:19,
300:22, 301:7,
301:10, 301:15
**themselves** [2] - 1:7,
131:21
**theory** [1] - 20:2
**therapists** [1] - 158:9
**therapy** [5] - 118:7,
125:23, 126:3,
138:17, 254:7
**thereafter** [1] - 79:7
**they've** [22] - 35:23,
54:22, 65:10, 74:10,
75:13, 92:25, 93:17,
117:9, 132:12,
138:14, 148:15,
158:5, 183:4, 195:9,
203:22, 206:21,
231:8, 258:12,
260:13, 260:15,
263:6, 274:4
**thin** [1] - 207:8
**thinking** [1] - 252:10
**thinks** [2] - 11:11,
234:22
**third** [7] - 5:13, 5:19,
50:14, 147:19,
254:4, 293:21,
295:13
**Third** [2] - 2:14, 3:3
**third-party** [2] - 5:13,
5:19
**Third-Party** [1] - 3:3
**THOMAS** [1] - 2:11
**thorough** [2] - 283:25,
284:4
**thoroughly** [2] -
214:4, 222:10
**thoughtful** [1] - 289:2
**thousand** [58] - 10:18,
11:8, 34:18, 36:17,
36:20, 36:23, 36:24,
36:25, 37:5, 37:6,
37:7, 37:8, 37:10,
41:16, 64:20, 64:21,
65:1, 65:5, 65:7,
66:13, 66:15, 66:18,
67:9, 110:14,
110:15, 115:12,
115:18, 115:23,
115:25, 116:4,

143:23, 150:20,
150:21, 155:12,
182:12, 182:14,
185:9, 189:11,
189:13, 192:8,
198:15, 217:14,
217:20, 219:8,
219:9, 226:3, 226:6,
247:14, 247:16,
247:21, 248:2,
248:9, 248:20,
257:1, 257:5, 298:18
**thousands** [4] -
141:15, 142:4,
197:25, 293:2
**threat** [3] - 293:12,
295:1, 295:10
**Three** [1] - 20:15
**three** [46] - 40:12,
49:3, 65:18, 65:19,
66:20, 66:22, 86:10,
90:23, 114:5,
118:17, 120:12,
123:23, 124:7,
124:17, 128:9,
133:16, 138:12,
139:5, 139:9,
139:25, 140:14,
142:18, 151:15,
151:21, 152:15,
152:23, 157:3,
157:7, 157:10,
163:3, 165:1,
180:11, 181:23,
182:15, 184:2,
198:6, 217:7,
234:24, 235:2,
240:18, 279:14,
285:18, 290:14,
301:5
**three-fourths** [1] -
198:6
**three-judge** [1] - 165:1
**three/off** [1] - 120:11
**throughout** [7] -
13:11, 13:15, 19:16,
105:17, 161:23,
189:22, 220:25
**throw** [1] - 134:16
**Thursday** [2] - 160:10,
160:12
**tie** [1] - 114:11
**tier** [35] - 43:6, 43:15,
43:17, 43:19, 68:22,
69:4, 81:24, 83:9,
83:24, 84:5, 84:7,
84:19, 84:21, 84:22,
84:24, 85:1, 85:2,
85:5, 85:15, 85:16,
85:18, 85:20, 86:9,

86:23, 87:12, 88:2, 88:3, 89:9, 89:10, 89:11, 90:17, 91:4, 91:5, 96:23

**tiers** [20] - 11:21, 12:3, 83:25, 84:2, 84:3, 84:15, 85:4, 85:24, 86:10, 88:11, 88:22, 88:23, 90:21, 91:4, 91:7, 95:25, 96:4, 96:5, 96:6

**tight** [1] - 279:24

**timeframe** [4] - 95:18, 232:20, 272:19, 301:14

**timeframes** [1] - 272:14

**Times-Picayune** [1] - 36:2

**timetable** [1] - 75:15

**title** [1] - 220:8

**TNT** [1] - 117:25

**today** [34] - 8:3, 32:12, 34:3, 35:16, 53:6, 59:15, 68:12, 69:19, 72:12, 92:9, 96:10, 103:17, 105:3, 140:13, 148:7, 159:13, 164:11, 177:20, 201:5, 202:6, 202:7, 212:2, 218:12, 226:16, 242:25, 245:8, 247:10, 273:25, 274:3, 284:14, 286:22, 295:13, 300:25, 301:22

**today's** [2] - 6:1, 6:22

**together** [12] - 55:15, 72:8, 84:14, 145:19, 154:11, 171:18, 173:20, 174:5, 191:21, 201:19, 238:11, 264:22

**tomorrow** [19] - 25:21, 55:22, 55:24, 56:13, 56:23, 57:2, 57:10, 151:20, 157:9, 159:15, 160:6, 197:22, 293:16, 300:16, 300:18, 301:1, 301:2, 301:20

**ton** [2] - 185:18, 219:4

**took** [7] - 67:5, 107:13, 110:9, 117:24, 153:21, 178:21, 226:1

**top** [9] - 58:23, 119:16, 229:17, 232:1, 234:7,

237:10, 240:3, 278:14, 287:23

**topic** [3] - 160:17, 181:11, 249:2

**total** [27] - 25:25, 66:17, 89:16, 89:18, 91:6, 92:11, 96:14, 101:3, 110:7, 110:17, 110:19, 110:24, 111:8, 111:10, 112:22, 112:23, 113:2, 113:11, 118:16, 121:18, 124:11, 146:13, 191:7, 191:15, 228:13, 301:5

**totalled** [2] - 121:16, 121:17

**totally** [2] - 107:10, 255:11

**toto** [1] - 159:1

**touch** [2] - 226:9, 246:15

**touched** [2] - 215:25, 246:15

**tough** [1] - 222:19

**Tour** [5] - 42:16, 42:18, 42:21, 44:5, 68:15

**tour** [3] - 43:7, 43:8, 135:6

**toured** [2] - 253:11, 253:25

**tourists** [1] - 16:21

**tours** [3] - 44:5, 51:13, 178:11

**toward** [2] - 299:16, 299:21

**towards** [5] - 29:19, 286:25, 287:5, 290:14, 290:16

**tower** [1] - 268:17

**towers** [1] - 268:9

**track** [3] - 11:22, 12:9, 216:25

**tracking** [2] - 26:8, 41:2

**traditionally** [3] - 107:24, 125:23, 248:1

**tragic** [1] - 181:25

**train** [7] - 12:3, 12:13, 23:2, 37:18, 130:20, 201:3, 249:12

**trained** [9] - 11:12, 37:22, 45:16, 45:18, 186:18, 199:2, 229:11, 268:12, 268:14

**Training** [1] - 130:9

**training** [58] - 12:2, 12:15, 23:7, 23:14, 23:19, 25:3, 34:11, 34:13, 35:22, 44:19, 45:9, 45:20, 46:1, 46:12, 51:4, 52:2, 52:17, 93:19, 105:4, 106:4, 106:5, 107:19, 107:21, 107:23, 108:7, 108:10, 116:23, 116:25, 123:8, 130:12, 130:13, 130:21, 148:12, 149:5, 149:7, 149:11, 149:15, 149:18, 227:18, 255:4, 255:12, 255:13, 255:15, 255:17, 255:18, 256:7, 256:9, 256:10, 256:12, 274:10, 274:11, 274:13, 274:15, 274:17, 293:8

**TRANSCRIPT** [1] - 1:14

**transcript** [2] - 159:15, 303:4

**transcripts** [1] - 160:1

**transfer** [2] - 68:24, 238:8

**transferred** [2] - 193:17, 204:2

**transition** [2] - 12:12, 152:3

**Transitional** [1] - 82:5

**transitional** [8] - 46:24, 48:3, 76:4, 76:6, 76:20, 76:23, 76:24, 77:5

**transitioned** [1] - 252:20

**transitioning** [1] - 50:3

**translator/ interpreter** [1] - 122:9

**transparency** [2] - 18:10, 222:14

**transport** [1] - 196:9

**transportation** [3] - 9:19, 32:3, 90:2

**transports** [1] - 195:16

**TRAVERSE** [1] - 171:11

**Traverse** [1] - 3:12

**treat** [3] - 20:6, 20:7,

20:8

**treated** [2] - 20:9, 21:24

**treatment** [3] - 172:22, 292:19, 299:23

**tree** [2] - 18:17

**tremendously** [2] - 138:7, 139:3

**tremens** [1] - 138:24

**trends** [1] - 128:16

**triage** [1] - 118:4

**trial** [3] - 53:9, 60:6, 165:13

**trials** [1] - 62:19

**tried** [2] - 135:19, 222:12

**trigger** [1] - 26:14

**trip** [2] - 255:21, 275:3

**triple** [2] - 218:7, 278:3

**trouble** [4] - 35:10, 215:15, 216:23, 216:24

**true** [23] - 29:14, 48:12, 48:23, 55:14, 57:17, 76:19, 112:1, 148:8, 150:4, 150:7, 150:8, 151:11, 154:8, 154:9, 155:9, 223:21, 224:3, 228:13, 228:24, 271:16, 273:24, 280:15, 283:4

**trust** [1] - 233:11

**trusted** [1] - 119:25

**try** [9] - 36:13, 48:9, 61:15, 123:8, 156:17, 185:21, 194:4, 229:20, 277:12

**trying** [32] - 24:10, 35:14, 37:12, 48:12, 48:19, 61:12, 71:20, 76:17, 77:2, 95:18, 101:14, 110:18, 111:5, 149:19, 153:13, 156:7, 156:9, 172:21, 176:5, 192:6, 215:10, 216:20, 219:18, 225:13, 227:1, 242:16, 263:14, 273:13, 282:16, 288:21, 288:24, 291:21

**tuberculosis** [2] - 131:1, 131:4

**Tuesday** [1] - 55:18

**Tuesday/Wednesday** [1] - 76:15

**Tulane** [1] - 106:2

**turn** [12] - 16:18, 93:25, 124:10, 130:8, 145:3, 190:3, 215:24, 223:11, 267:9, 267:14, 267:24, 269:23

**turned** [2] - 93:22, 94:17

**turning** [1] - 252:24

**turnover** [6] - 64:1, 186:6, 200:24, 215:21, 230:21, 274:6

**tutoring** [1] - 256:5

**tweaking** [1] - 29:18

**twice** [3] - 135:8, 248:11, 295:12

**two** [84] - 5:13, 14:24, 32:23, 32:24, 34:14, 35:22, 35:23, 40:12, 45:25, 47:6, 51:13, 52:23, 59:21, 64:7, 64:13, 64:18, 64:22, 65:17, 66:21, 74:11, 75:14, 82:9, 84:2, 84:8, 84:20, 84:24, 85:20, 86:17, 91:4, 91:11, 105:12, 118:14, 120:13, 120:14, 120:15, 122:19, 124:8, 124:16, 129:18, 134:22, 134:25, 138:9, 151:18, 151:25, 166:16, 170:23, 171:5, 171:7, 171:18, 171:21, 176:8, 176:22, 176:23, 177:6, 179:5, 181:6, 181:7, 181:23, 182:14, 182:18, 191:15, 204:5, 206:1, 221:13, 232:24, 249:8, 250:6, 251:3, 254:18, 258:23, 259:12, 259:13, 261:25, 268:1, 268:21, 272:14, 290:14, 291:1, 291:11, 291:16, 293:14, 301:4

**two-day** [1] - 176:8

**two-story** [1] - 82:9

**two-week** [1] - 34:14

**type** [21] - 30:17, 40:11, 42:6, 49:4, 64:14, 69:3, 69:4,

83:6, 84:16, 86:20, 90:15, 91:23, 122:23, 131:3, 132:14, 148:10, 149:15, 150:3, 151:15, 162:1, 286:9
**types** [7] - 33:5, 86:10, 89:3, 110:8, 117:6, 126:13, 221:4
**typical** [1] - 115:24
**typically** [1] - 143:7
**typing** [2] - 149:2, 149:9

## U

**U-R-S-I-N** [1] - 27:18
**ultimately** [1] - 285:5
**Um-hum** [1] - 196:22
**um-hum** [2] - 61:7, 71:6
**un-incarcerated** [2] - 16:19, 277:3
**un-sentenced** [7] - 53:4, 53:8, 60:1, 60:8, 86:2, 88:24, 235:22
**unable** [1] - 159:13
**unacceptable** [2] - 17:20, 255:11
**unanimously** [1] - 9:3
**uncertainty** [1] - 214:23
**uncommon** [1] - 195:14
**unconscionable** [1] - 25:19
**unconstitutional** [10] - 17:18, 17:20, 21:19, 26:16, 164:25, 202:15, 226:17, 264:3, 265:4, 274:4
**undelivered** [1] - 25:13
**under** [30] - 14:18, 15:5, 17:2, 25:7, 25:20, 26:13, 36:11, 57:23, 78:19, 90:5, 109:11, 130:3, 130:9, 131:9, 142:13, 149:14, 171:7, 171:20, 195:13, 203:3, 208:21, 212:6, 212:7, 212:25, 213:10, 213:11, 215:17, 229:15, 274:16, 279:12
**undercut** [1] - 19:15

**undergone** [1] - 42:7
**undergraduate** [1] - 104:9
**underlying** [3] - 236:1, 236:4, 293:19
**underscores** [1] - 283:25
**understaffed** [2] - 124:22, 124:25
**understaffing** [1] - 22:12
**understandable** [1] - 86:15
**understood** [6] - 151:14, 153:8, 155:7, 202:24, 238:3, 262:3
**undisputed** [1] - 25:23
**unexcusable** [1] - 25:20
**unexpected** [1] - 301:13
**unfilled** [2] - 9:24, 83:15
**unfortunately** [1] - 47:1
**unhealthy** [1] - 25:17
**unheard** [1] - 255:7
**uniforms** [1] - 82:12
**unions** [1] - 219:14
**unique** [1] - 43:5
**unit** [14] - 25:5, 115:4, 118:25, 126:16, 126:19, 136:11, 136:12, 174:3, 174:4, 193:18, 193:24, 250:13, 268:9, 268:21
**United** [18] - 4:11, 4:13, 4:15, 5:6, 5:20, 26:19, 73:21, 102:16, 104:14, 106:7, 115:12, 115:19, 163:20, 189:17, 189:22, 218:19, 220:25, 299:20
**UNITED** [2] - 1:1, 1:16
**units** [8] - 199:4, 207:9, 250:13, 268:1, 268:18, 268:24, 269:6, 269:10
**University** [6] - 104:10, 104:11, 106:3, 162:14, 163:3, 184:9
**unless** [13] - 19:24, 55:7, 69:2, 127:5, 129:5, 136:12,

136:15, 210:19, 245:6, 248:13, 268:14, 293:11, 301:12
**unlike** [1] - 82:15
**unnecessarily** [2] - 201:5, 201:17
**unnecessary** [4] - 280:14, 288:14, 298:16, 298:19
**unquote** [1] - 5:17
**unrealistic** [1] - 155:20
**unrealized** [1] - 140:25
**unreasonable** [1] - 22:9
**unsafe** [1] - 17:20
**unsanitary** [1] - 23:13
**unstable** [2] - 121:10, 138:25
**unusual** [1] - 218:21
**up** [129] - 6:19, 7:15, 8:1, 8:8, 11:21, 15:25, 23:24, 26:23, 37:6, 40:15, 42:1, 48:6, 51:8, 51:21, 52:3, 52:20, 55:24, 56:12, 56:13, 56:23, 57:1, 57:10, 57:12, 59:8, 63:4, 63:9, 85:16, 86:12, 86:18, 87:1, 87:5, 87:19, 105:18, 110:7, 110:16, 110:19, 111:9, 113:1, 113:11, 116:3, 116:12, 116:19, 118:11, 118:15, 120:6, 120:25, 125:18, 135:9, 135:11, 135:12, 135:14, 139:3, 143:8, 145:9, 145:10, 155:19, 159:21, 160:9, 168:9, 170:17, 173:21, 178:22, 188:6, 189:1, 189:12, 189:16, 192:23, 197:20, 198:12, 198:14, 199:8, 200:1, 200:23, 201:11, 205:10, 208:21, 209:24, 211:2, 213:2, 213:11, 214:2, 214:15, 215:3, 216:11, 216:16, 217:4,

220:17, 223:5, 224:8, 226:22, 229:20, 230:23, 234:7, 239:4, 242:10, 248:20, 249:2, 249:13, 252:19, 253:15, 254:2, 255:20, 256:1, 256:10, 260:19, 261:11, 263:19, 263:21, 264:11, 264:19, 265:5, 265:18, 270:19, 271:3, 282:11, 283:24, 292:2, 292:23, 292:25, 293:1, 293:4, 293:10, 293:16, 293:18, 294:9, 295:1, 301:18
**up-kept** [1] - 116:19
**up-to-date** [1] - 116:12
**update** [2] - 63:23, 95:5
**upkeep** [1] - 77:7
**ups** [1] - 233:21
**upstairs** [1] - 135:10
**urged** [1] - 208:2
**urgent** [3] - 119:11, 119:12, 119:13
**URSIN** [2] - 3:5, 27:14
**Ursin** [26] - 9:12, 10:12, 10:22, 11:3, 27:13, 27:18, 27:21, 30:18, 56:11, 59:21, 60:18, 62:15, 68:13, 72:14, 74:15, 81:21, 92:12, 180:8, 186:14, 186:15, 187:16, 189:1, 236:3, 236:6, 241:7, 247:25
**Ursin's** [1] - 235:19
**Urslin's** [1] - 79:18
**US** [4] - 2:8, 104:2, 108:24, 221:21
**USA** [1] - 3:3
**useful** [4] - 109:13, 177:12, 240:23
**uses** [4] - 43:11, 77:2, 188:13, 290:2
**USRY** [1] - 2:11
**Usry** [1] - 2:12
**utilized** [1] - 146:22

## V

**vacant** [4] - 46:5, 95:25, 124:1, 146:25

**vacated** [1] - 95:25
**vacation** [5] - 123:23, 124:4, 124:7, 162:6
**vacations** [3] - 124:3, 124:6, 124:24
**vague** [1] - 137:17
**validated** [4] - 29:11, 188:20, 188:21, 189:21
**validation** [4] - 29:14, 29:19, 29:20, 184:7
**valuable** [1] - 19:14
**value** [2] - 29:2, 208:17
**van** [1] - 51:11
**VANTOS** [1] - 40:5
**varied** [2] - 22:19, 83:18
**various** [6] - 71:13, 78:14, 118:21, 180:10, 220:24, 292:6
**vary** [2] - 10:4, 150:22
**vast** [4] - 9:4, 138:8, 192:10, 284:15
**vastly** [1] - 216:22
**vehicle** [2] - 283:8, 285:25
**vehicles** [16] - 21:5, 101:1, 101:7, 101:13, 101:17, 101:19, 102:4, 102:6, 279:23, 285:16, 285:17, 285:21, 285:24, 286:9, 288:23, 290:5
**vehicular** [2] - 285:10, 286:7
**vendor** [7] - 41:21, 43:1, 48:25, 49:11, 49:13, 222:1
**vendors** [3] - 42:24, 135:24, 136:3
**ventilation** [1] - 254:1
**ventilator** [1] - 108:9
**venue** [1] - 123:8
**verified** [1] - 206:24
**versed** [1] - 148:11
**version** [1] - 74:22
**versus** [1] - 110:8
**vetted** [1] - 222:10
**victim** [1] - 29:10
**videotape** [1] - 256:6
**Vietnamese** [5] - 49:3, 49:4, 49:5, 49:8, 123:1
**view** [5] - 17:10, 210:9, 245:4, 289:3, 296:17
**viewed** [1] - 203:22

**views** [2] - 176:3, 176:4
**vigorously** [2] - 24:13, 24:16
**violate** [4] - 5:9, 23:16, 84:23, 196:14
**violated** [2] - 191:13, 196:13
**violation** [1] - 191:9
**violations** [1] - 292:20
**violator** [1] - 196:11
**violators** [6] - 54:17, 191:13, 191:23, 195:24, 196:8
**violence** [2] - 213:18, 213:22
**violent** [3] - 86:2, 86:5, 201:16
**Vira** [25] - 14:21, 181:14, 182:22, 183:1, 183:3, 183:11, 183:19, 184:4, 184:18, 184:19, 188:10, 188:13, 189:17, 189:22, 198:11, 234:18, 234:20, 235:2, 238:6, 252:19, 266:25, 284:8, 284:17, 293:23, 296:20
**visit** [2] - 141:10, 171:17
**visited** [2] - 238:19, 249:6
**visits** [3] - 82:14, 171:17
**visualize** [1] - 88:2
**vital** [1] - 118:7
**vocational** [1] - 227:18
**volunteer** [1] - 108:5
**vs** [2] - 4:6, 110:8
**vulnerable** [1] - 22:13

**W**

**wage** [4] - 114:7, 148:7, 150:1, 186:19
**wages** [3] - 39:10, 136:8, 187:23
**wait** [8] - 7:15, 10:7, 55:16, 66:20, 76:21, 157:3, 157:8, 201:22
**waiting** [7] - 55:10, 60:6, 74:8, 128:20, 191:10, 197:7
**walk** [4] - 43:20, 69:10, 86:18, 221:20
**walked** [2] - 83:9,

178:5
**wALKER** [1] - 1:7
**walks** [1] - 43:17
**walkway** [1] - 86:17
**Walnut** [2] - 164:3, 164:6
**wand** [3] - 43:7, 43:16, 43:18
**wands** [1] - 43:23
**wants** [3] - 140:17, 214:2, 241:14
**warden** [5] - 43:24, 49:6, 83:3, 83:4
**Warden** [1] - 51:1
**wardens** [2] - 83:8, 83:9
**warehouse** [1] - 289:1
**warning** [4] - 11:16, 23:20, 40:19, 41:16
**warrant** [1] - 293:13
**warranted** [1] - 290:8
**warrants** [4] - 292:23, 293:10, 293:11, 293:18
**warriors** [1] - 76:10
**wash** [1] - 82:11
**Washington** [5] - 136:6, 163:2, 163:9, 219:14
**waste** [4] - 18:10, 127:8, 145:15, 281:18
**Waste** [1] - 136:2
**wasting** [1] - 281:17
**Watch** [5] - 42:16, 42:18, 42:21, 44:5, 68:15
**watch** [6] - 11:20, 43:23, 44:5, 94:13, 119:24, 125:19
**watching** [2] - 230:1, 256:2
**ways** [4] - 47:25, 138:9, 289:2, 296:5
**wear** [1] - 82:11
**website** [1] - 5:12
**websites** [1] - 36:7
**Wednesday** [2] - 160:7, 301:10
**week** [27] - 25:12, 32:18, 32:23, 32:24, 34:14, 35:16, 43:2, 57:10, 62:18, 62:20, 64:11, 64:15, 71:2, 71:3, 73:24, 75:22, 76:14, 115:17, 151:18, 159:14, 222:14, 232:18, 232:25, 276:13, 291:13

**week's** [1] - 6:10
**week-in** [1] - 64:15
**week-out** [1] - 64:15
**weekend** [2] - 76:9, 82:14
**weekends** [1] - 76:11
**weekly** [2] - 36:3, 36:4
**Weeks** [1] - 2:12
**weeks** [14] - 32:24, 35:19, 45:25, 62:17, 64:18, 123:23, 123:24, 124:7, 124:8, 126:10, 151:18, 152:21, 297:2
**weigh** [1] - 75:20
**weighing** [1] - 232:8
**Weinstein** [1] - 50:9
**welcome** [3] - 171:10, 201:8, 203:24
**welfare** [1] - 16:21
**well-being** [1] - 277:2
**well-run** [1] - 296:4
**Western** [1] - 104:9
**whatever's** [1] - 288:4
**wheel** [2] - 135:16, 300:20
**whereas** [2] - 116:10, 118:25
**White** [1] - 225:19
**whole** [12] - 61:10, 61:16, 83:5, 87:12, 94:11, 160:14, 199:13, 235:7, 250:14, 250:15, 257:6, 285:3
**Wicker** [1] - 2:16
**wiggle** [1] - 205:17
**William** [1] - 28:6
**Williams** [1] - 4:24
**WILLIAMS** [1] - 2:17
**willing** [6] - 17:7, 55:7, 62:7, 152:9, 298:4, 298:6
**win** [1] - 49:13
**windows** [1] - 82:10
**winning** [1] - 43:1
**winter** [1] - 211:2
**wire** [1] - 43:11
**wisely** [2] - 20:22, 215:20
**wish** [1] - 32:13
**wit** [1] - 133:9
**withdrawal** [2] - 138:23
**withdrawals** [1] - 108:3
**withdrawing** [1] - 121:11
**withdrawn** [1] - 79:6

**WITNESS** [248] - 27:18, 29:21, 29:25, 30:7, 31:1, 33:22, 33:24, 34:2, 37:2, 37:9, 37:15, 38:1, 38:12, 38:17, 38:20, 38:23, 39:12, 41:13, 41:15, 41:18, 41:20, 42:10, 42:21, 44:6, 44:10, 44:12, 44:14, 49:17, 49:19, 49:21, 50:24, 52:5, 52:9, 52:12, 53:13, 53:15, 53:18, 53:24, 54:2, 54:10, 54:12, 55:1, 55:8, 55:23, 56:1, 57:11, 58:22, 59:6, 62:2, 62:8, 63:7, 66:16, 66:19, 66:22, 67:5, 67:9, 73:5, 74:5, 75:12, 80:19, 80:21, 83:21, 84:6, 84:11, 84:14, 85:3, 85:7, 86:1, 86:7, 86:10, 86:16, 86:23, 87:6, 87:10, 87:24, 88:4, 88:8, 88:10, 88:16, 88:24, 89:2, 89:4, 90:1, 90:5, 90:10, 90:13, 91:20, 92:15, 92:19, 93:15, 94:10, 95:9, 95:11, 95:15, 96:23, 97:1, 97:11, 97:13, 97:16, 100:15, 101:21, 103:12, 107:9, 112:20, 113:5, 113:8, 114:4, 114:8, 114:16, 114:18, 121:23, 122:3, 122:14, 123:2, 123:7, 126:8, 127:4, 136:22, 137:2, 137:17, 139:18, 139:21, 140:5, 142:13, 142:25, 144:14, 158:8, 161:13, 162:2, 162:18, 162:20, 162:22, 164:16, 164:18, 165:6, 165:10, 165:15, 165:17, 165:23, 166:2, 166:4, 166:8, 167:3, 167:13, 167:20, 169:7, 170:2, 170:8, 170:25, 171:4, 171:10, 173:6, 173:8, 173:11, 173:13, 174:12,

174:15, 174:18, 176:9, 180:19, 182:7, 183:3, 183:13, 183:16, 184:5, 184:21, 184:23, 186:13, 186:15, 186:22, 187:18, 187:24, 188:2, 188:14, 188:16, 188:18, 190:7, 190:13, 191:18, 192:24, 193:2, 193:5, 194:10, 194:13, 195:3, 195:8, 195:12, 195:20, 195:25, 196:11, 196:22, 197:13, 200:10, 200:21, 201:20, 201:25, 202:11, 204:16, 207:22, 208:6, 214:6, 216:4, 218:13, 218:17, 218:23, 219:1, 219:17, 219:20, 220:2, 220:4, 220:12, 225:17, 225:20, 230:18, 232:4, 232:24, 235:3, 235:9, 236:7, 236:22, 237:2, 237:8, 237:17, 237:21, 237:24, 242:1, 243:7, 245:11, 246:9, 248:18, 248:23, 248:25, 253:7, 254:15, 259:19, 260:2, 260:4, 260:25, 261:3, 266:23, 267:3, 270:15, 276:10, 283:22, 287:10, 293:8, 296:24, 300:8
**witness** [32] - 18:2, 27:1, 27:2, 47:11, 60:15, 79:13, 80:8, 80:13, 91:21, 103:3, 157:15, 159:10, 159:11, 164:10, 165:13, 166:18, 167:4, 168:22, 169:23, 170:13, 172:3, 173:24, 176:18, 176:21, 192:21, 193:1, 233:15, 275:25, 300:17, 301:4, 301:13
**witness's** [1] - 169:11

**witnesses** [15] - 16:12, 16:13, 18:21, 27:4, 27:5, 27:6, 27:7, 27:8, 103:4, 161:3, 276:20, 300:9, 300:17, 301:3, 301:8
**woefully** [3] - 12:8, 12:19, 124:25
**women** [1] - 167:15
**women's** [1] - 211:8
**won** [1] - 43:5
**word** [2] - 98:24, 156:17
**words** [5] - 48:10, 69:10, 89:25, 205:16, 220:23
**worker** [1] - 278:18
**workers** [1] - 158:9
**workers'** [1] - 125:20
**workforce** [6] - 231:10, 247:12, 255:24, 256:3, 268:11, 269:19
**workplace** [2] - 150:4, 167:14
**works** [6] - 34:17, 55:12, 122:15, 139:22, 279:11, 286:12
**workstation** [1] - 43:6
**world** [4] - 45:2, 46:9, 149:24, 201:12
**worried** [1] - 34:5
**worry** [2] - 34:3, 40:24
**worse** [1] - 154:12
**worst** [2] - 198:24, 245:23
**worth** [1] - 176:22
**worthy** [1] - 290:2
**wound** [2] - 118:5, 131:12
**write** [5] - 45:6, 48:17, 81:18, 154:1, 171:16
**writted** [2] - 56:13, 57:2
**written** [8] - 12:23, 81:17, 126:17, 139:24, 153:8, 154:3, 172:5, 227:10
**wrote** [4] - 20:15, 39:25, 95:8, 154:4

## X

**X-Ray** [1] - 136:1

## Y

**year** [108] - 5:25, 6:1, 6:4, 6:5, 6:13, 6:22, 7:7, 9:8, 10:19, 11:11, 17:25, 24:11, 26:6, 26:12, 29:16, 34:17, 37:19, 47:5, 49:17, 49:18, 49:20, 50:20, 59:23, 62:25, 65:12, 66:14, 67:6, 67:24, 81:19, 92:25, 93:8, 95:3, 95:7, 95:10, 95:15, 95:21, 96:10, 101:18, 101:20, 107:14, 107:21, 115:25, 123:23, 124:7, 131:5, 139:22, 141:4, 141:16, 141:21, 142:4, 142:18, 144:1, 151:10, 155:19, 173:14, 179:11, 179:20, 180:16, 182:13, 188:4, 188:6, 189:6, 191:3, 198:9, 198:10, 198:13, 200:19, 200:20, 201:2, 201:16, 204:12, 204:15, 211:12, 212:14, 213:1, 213:4, 213:6, 213:8, 213:22, 214:11, 214:12, 216:18, 217:15, 217:21, 218:1, 219:8, 219:9, 224:3, 226:4, 230:20, 231:2, 238:6, 256:22, 257:1, 257:5, 272:13, 273:2, 278:6, 278:15, 278:22, 279:10, 284:4, 285:21, 293:2, 294:6, 294:8
**years** [46] - 9:14, 17:15, 20:16, 21:22, 25:18, 28:8, 28:10, 28:12, 34:4, 36:11, 42:3, 42:6, 65:18, 65:20, 66:20, 66:22, 66:23, 81:7, 108:6, 114:6, 134:2, 135:1, 138:12, 139:6, 140:1, 163:3, 163:9, 166:4, 172:9, 179:22, 181:23, 182:1, 186:12, 208:24, 223:21, 224:4, 244:21, 251:13, 272:13, 272:16, 279:14, 285:17
**years'** [2] - 115:24, 116:3
**yellow** [1] - 160:22
**York** [2] - 183:6, 185:8
**young** [3] - 34:3, 124:18, 296:10
**youth** [8] - 84:19, 85:18, 90:18, 90:25, 91:3, 91:4, 91:5, 241:18
**youthful** [1] - 193:9

## Z

**Zainey** [1] - 204:8
**zero** [1] - 278:25
**ZIELIE** [2] - 1:20, 303:6
**Zielie** [2] - 303:3, 303:7
**zoom** [1] - 61:16