**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

_____

LASHAWN JONES, *et al.*, and )
THE UNITED STATES OF AMERICA, )
)        Civil Action No. 2:12-cv-00859
PLAINTIFFS, )        Section I
)        Judge Lance M. Africk
v. )        Magistrate Judge Chasez
)
MARLIN GUSMAN, Sheriff, )
)
)
DEFENDANT. )
_____ )

---

# Monitors' Report No. 1
# February 13, 2014

---

Susan W. McCampbell, M.C.R.P., C.J.M., Lead Monitor
Harry E. Grenawitzke, RS, MPH, DAAS, Environmental Health and Sanitation Monitor
Raymond F. Patterson, M.D., D.F.A.P.A., Mental Health Monitor
Robert B. Greifinger, M.D. Medical Monitor
Margo L. Frasier, J.D., Correctional Practices Monitor
Patricia L. Hardyman, Ph.D., Classification Monitor

McCampbell and Associates, Inc.
1880 Crestview Way
Naples, Florida 34119-3302
Email:  susanmccampbell@mccampbellassociates.com

# Compliance Report # 1

## LASHAWN JONES, *et.al.*  and the United States of America
### v.
## Marlin Gusman, Sheriff

## Consent Judgment

## January 21, 2014

### Table of Contents

|  |  | Page |
|---|---|---|
| Introduction | | 1 |
| Roadmap to Compliance and Baseline Data | | 2 |
| Review Process of Monitors' Draft Report | | 2 |
| Summary of Compliance | | 3 |
| Defendants' Activities to Date | | 3 |
| Challenges to Achieving Compliance | | 4 |
| Format of Monitoring Report # 1 | | 6 |
| Chart 1 - Summary of Findings of Compliance | | 7 |
| Substantive Provisions | | |
| A. | Protection from Harm | |
| | 1. Use of Force Policies and Procedures | 14 |
| | 2. Use of Force Training | 15 |
| | 3. Use of Force Reporting | 16 |
| | 4. Early Intervention System ("EIS") | 20 |
| | 5. Safety and Supervision | 21 |
| | 6. Security Staffing | 23 |
| | 7. Incidents and Referrals | 31 |
| | 8. Investigations | 30 |
| | 9. Pretrial Placement in Alternative Settings | 36 |
| | 10. Custodial Placement within OPP | 37 |
| | 11. Prisoner Grievance Process | 48 |
| | 12. Sexual Abuse | 51 |
| | 13. Access to Information | 52 |
| B. | Mental Health Care | 54 |
| | 1. Screening and Assessment | 55 |
| | 2. Treatment | 56 |
| | 3. Counseling | 58 |
| | 4. Suicide Prevention Training Program | 58 |
| | 5. Suicide Precautions | 60 |
| | 6. Use of Restraints | 62 |
| | 7. Detoxification and Training | 63 |
| | 8. Medical and Mental Health Staffing | 65 |

|  |  |  |
|---|---|---|
| | 9. Risk Management | 67 |
| C. | Medical Care | 72 |
| | 1. Quality Management of Medication Administration | 78 |
| | 2. Health Care Delivered | 80 |
| | 3. Release and Transfer | 81 |
| D. | Sanitation and Environmental Conditions | 83 |
| | 1. Sanitation and Environmental Conditions | 84 |
| | 2. Environment Control | 92 |
| | 3. Food Service | 93 |
| | 4. Sanitation and Environmental Conditions Reporting | 97 |
| E. | Fire and Life Safety | 98 |
| | 1. Fire and Life Safety | 98 |
| | 2. Fire and Life Safety Reporting | 103 |
| F. | Language Assistance | 105 |
| | 1. Timely and Meaningful Access to Services | 105 |
| | 2. Language Assistance Policies and Procedures | 105 |
| | 3. Language Assistance Training | 105 |
| | 4. Bilingual Staff | 106 |
| G. | Youthful Prisoners | 107 |
| H. | The New Jail Facility | 108 |
| I. | Compliance and Quality Improvement | 112 |
| J. | Reporting Requirements and Right of Access | 114 |
| Conclusions | | 116 |

Attachments

|  |  |  |
|---|---|---|
| | A – Documents Reviewed | 119 |
| | B – Best Practice Recommendations Sanitation and Environmental Conditions and Fire Life Safety | 126 |
| | C- Summary of Recommendations | 128 |

**Introduction**

      This is Compliance Report # 1 of the monitoring team in the matter of LaShawn Jones, *et.al.* and the United States of America v. Marlin Gusman, Sheriff.   This Consent Judgment was effective October 21, 2013.  The monitoring team was on-site for the week of December 16, 2013, with several team members on site before December.  This report provides an assessment of the compliance with Consent Judgment based on the pre-tour documents provided by the Orleans Parish Sheriff's Office, as well as the meeting, tours, observations, and interviews conducted by the monitoring team.

      The monitors sought to determine whether or not the Orleans Parish Sheriff's Office (OPSO) was in "substantial compliance" indicating that OPSO has achieved compliance with most or all components of the relevant provision of the Judgment;  "Partial Compliance" indicating that OPSO achieved compliance on some of the components of the relevant provision of the Judgment, but significant work remains; and/or  "non-compliance" indicating that OPSO has not met most or all of the components of the Judgment.  For this report, there are paragraphs for which these assessments are Not Applicable (NA) as the dates by which the work is due to be completed or implemented are after the date of the tour.

      This first monitoring report covers activities through the close of the first tour, December 20, 2013, and does not report on subsequent activities or deadlines.  At the start of this tour, the monitors' expectations were that there were not going to be a large number of paragraphs in either substantial compliance or even partial compliance.  This is because of the relatively short amount of time that has passed since the Consent Judgment became effective and the scope of conditions that need to be addressed that resulted in the Consent Judgment.  It is encouraging to see the efforts that the OPSO has made to begin the journey to reach compliance, which are noted below.

      Said succinctly, the inmates held in facilities operated by the OPSO continue to be at risk of serious harm.  The facilities have insufficient health professional and security staffing; insufficient policies; inadequate training and supervision; confusing and disorganized medical-record keeping practices.

      The monitoring team notes our thanks to Sheriff Gusman and his staff for timely

production of the majority of the materials requested by the monitoring team prior to the December '13 tour (see Attachment A).  This was a substantial amount of work, and we believe indicates the Sheriff's commitment to working collaboratively with the monitors.  Additionally, the cooperation during the on-site tour is appreciated, especially given the logistics of having six monitors touring simultaneously.

The monitors also extend their sincere appreciation to The Honorable Lance M. Africk, who toured several of the OPSO facilities with the lead monitor, Susan McCampbell, and mental health monitor, Dr. Raymond Patterson.  Judge Africk's focus on the critical elements of this case, along with bringing stakeholders together in his chambers, is an unquantifiable asset to the ultimate resolution of this Consent Judgment.

**Roadmap to Compliance and Baseline Data**

This first assessment of compliance also includes recommendations to help OPSO work toward meeting the requirements of all paragraphs of the Consent Judgment.  These initial recommendations informed by technical assistance and guided by financial and other challenges, will evolve over time.   As noted elsewhere in this Introduction, the monitors developed 'measures of compliance' to help direct OPSO's efforts.  There is a regular dialogue between the monitoring team and OPSO, which is aiding significantly in directing and prioritizing compliance efforts.

 A significant focus moving forward is the collection and analysis of reliable data that will form the basis for documenting improvements.  If results cannot be measured, then initiatives cannot be fully evaluated, trends noted, and action plans developed and put into place.  Data will be of particular concern to the monitoring team.  Critical to the requirements for accurate and timely data to support all parts of OPSO's operations is a jail management information system.  OPSO desires to update the current information system, but funding has not been identified.

**Review Process of Monitors' Draft Report**

The draft of Compliance Report # 1 was provided to all parties for review on January 20, 2014.  As contained in the Consent Judgment, a review period of 14 calendar days was provided.  The Department of Justice (DOJ) provided written comments on February 3, 2014.  The Orleans Parish Sheriff's Office indicated verbally on February 3rd that they had no comments.   In finalizing this report, the monitors considered DOJ's

comments.

**Summary of Compliance**

There are 171 discrete provisions in the Consent Judgment.  As of Report # 1, OPSO's compliance (see Chart 1, page 7) in summary:

| Status | # | % |
|---|---|---|
| Substantial Compliance | 0 | - |
| Partial Compliance | 10 | 6 |
| Non-Compliance | 85 | 50 |
| Not Applicable | 76 | 44 |
| Total | 171 | 100 |

**Defendants' Activities to Date**

It is evident to the monitoring team that OPSO has been working to comply with some of the provisions of the Consent Judgment before the monitors arrived on site.  While there remains substantial work yet to be done, these initiatives are positive steps. Among the OPSO's activities are:

- The Sheriff's commitment to achieving compliance can be seen in the information provided to all employees via the employee newsletter, and by inviting the monitors to appear at employee roll calls (which was accomplished in December).  The Sheriff has also directed communication to the staff regarding cooperation with the monitors, and the goal of achieving compliance.
- Hiring of a professional correctional administrator – The Sheriff initiated a national search, and hired Michael Tidwell who began work in OPSO on November 3, 2013.
- Naming PREA Coordinator – Deputy Hazel Bowser has been designated as OPSO's PREA Coordinator.  OPSO has also secured a grant to fund a counselor for PREA – related activities, who was on the job during our December tour.
- Beginning the process of overhauling the inmate classification system with the assistance of monitor Dr. Patricia Hardyman, starting in January 2014.
- A major milestone for OPSO and the City is the opening of a new direct supervision jail facility in Spring 2014.  Although the operational planning work was delayed, the OPSO has designated a transition team, and has assured that the team members

visited three direction supervision jails since mid-December, including one jail in Louisiana (Caddo Parish) and two in Texas (Brazos and Travis Counties).  The Sheriff requested Technical Assistance from the National Institute of Corrections' to provide the program *How To Open A New Institution.*

- OPSO has contracted for more hours of psychiatric care for inmates with mental illness.  While not an ideal or long-term solution, it begins to address current needs.

- OPSO has opened discussion with the City regarding the options of moving seriously mentally ill inmates from Templeman V to a renovated Temporary Detention Center.

- OPSO is reviewing options for medical/mental health and food service operations.

- OPSO has sought bids for a new contract for pest control.

- With a history of litigation, the Sheriff and the local plaintiffs have worked to improve collaboration and information exchange aimed at improved inmate safety.

- OPSO is actively exploring options for improved housing of special populations given the current facilities and needs of these populations.

- Finally, monitors McCampbell and Frasier toured OPSO facilities in October and November 2013, and noted improvements in the physical plant. Again, while not where the facilities need to be in terms of environmental health and sanitation, the work shows initiative toward improvement.  OPSO has initiated an internal inspection process to respond to concerns of safety for inmates with mental illness.

Although these are noteworthy improvements and initiatives, inmate safety, facility security, staffing, training, investigations, and medical and mental health care require substantial attention and resources to reach compliance.  Preparing to successfully open a new direct supervision facility also requires additional resources and talent, which will, in our view, strain OPSO.

**Challenges to Achieving Compliance**

The Sheriff and the City government face critical decisions that will impact OPSO's ability to reach substantial compliance, and operate a jail system that meets constitutional standards.   There has been substantial public discussion about that the costs of implementing the Consent Judgment; which may be more accurately represented as the

costs of maintaining a constitutional jail – a goal achieved by the vast majority of the jurisdictions who operate the more than 3,200 jails nationwide.

A meaningful budget process to support the City's jail system is new to all parties; departing from a traditional "per diem" based system, replacing it with a budgetary process more typical of local government.  This transition, like so many others facing all parties, may not be smooth, but ultimately the success is essential to the conditions of confinement in the short and long term.  In the interim the uncertainly plagues the decision –making processes surrounding contracting, hiring, and related functions.

Among the serious challenges facing the parties relative to this Consent Judgment are:

- Agreeing on the budget, for more than just the current fiscal year, needed to support the jail system, including:
    - Agreeing on the number of correctional security, support, tradespersons, and medical/mental health staff.
    - Agreeing on operational expenses.
    - Immediate funding for positions required to meet the work required by the Consent Judgment, including but not limited to:  compliance coordinator, investigators, grievance coordinator, trainers, policy/procedure writers.
    - Initiating critical activities such as recruitment and screening of new employees.
- Funding an entry-level and career path wage for corrections employees that will allow the OPSO to compete in the local public service job market, attracting and retaining individuals who can meet the requirements of working in a direct supervision jail.
- Making decisions about renovations of Templeman V to hold inmates with mental illness; and consideration of options involving renovations to the Temporary Detention Center.  The decisions regarding the ordinance related to the site's use also may help or hinder identification of suitable options.
- Addressing the court holding area in the soon-to-be-vacated Orleans Parish Prison (OPP) that does not now, nor will it in the future, meet the requirements of the Consent Judgment.

- Collaborating with criminal justice system stakeholders to improve processes and use technology to impact jail crowding.
- Upgrading/implementing a jail management information system, given the data required to document compliance with the Consent Judgment.
- Ensuring a successful transition of staff and inmates into the direct supervision facility.
- Training employees to support success in their job duties in the new jail, including supervisory and management training.  There has been an historical lack of training at OPSO, which requires remedy if all aspects of correctional activities are to improve.

The City's government and the Sheriff continue to debate the number of beds that ultimately should be built in the City.  While not directly part of the Consent Judgment, such decisions may impact the constitutional levels of confinement for inmates in the future.  More importantly, decisions about the critical issues identified in this report are, in the opinion of the monitoring team are being diverted and delayed during the debate about system bed size.

**Format of Monitoring Report # 1**

This Report's format follows the Consent Judgment's numbering system.  Chart 1  -  Summary of Findings of Compliance provides the page numbers of the discussion of each provision and the name of the monitor responsible for reviewing compliance.  Monitors provided their assessment of compliance, measures of compliance, their observations and findings, and in most cases, recommendations.  The recommendations are consecutively numbered (see also Attachment C).  The language from the Consent Judgment is highlighted in the narrative.

The monitors responsible for sections A. Protection from Harm, D. Sanitation and Environmental Conditions, E. Fire and Life Safety, and G. Youthful Prisoners developed measures of compliance for each of the paragraphs.  These were shared with the OPSO and the plaintiffs, and will be discussed as the compliance efforts evolve.  The measures of compliance are intended to provide direction and benchmarks for the OPSO.

Monitor Harry E. Grenawitzke developed recommendations of best practices, which are included in Appendix B.  These should be considered guidance for OPSO as the develop policies, procedures and practices related to Section IV.D. Sanitation and Environmental Conditions, and Section IV.E. Fire and Life Safety

**Chart 1 - Summary of Findings of Compliance**

| Section | Page in Report | Compliance | Partial Compliance | Non-Compliance | Notes |
|---|---|---|---|---|---|
| IV. A.  Protection from Harm | | | | | |
| IV.A. 1.  Use of Force Policies and Procedures/Margo Frasier | | | | | |
| IV. A. 1.a. | 14 | | | | NA – Due 2/21/14 |
| IV. A. 1.b. | 14 | | | | NA – Due 2/21/14 |
| IV. A. 1.c. | 14 | | | | NA – Due 4/21/14 |
| IV.A.2.  Use of  Force Training/Margo Frasier | | | | | |
| IV. A. 2. a. | 15 | | | | NA – Due 2/21/14 |
| IV. A. 2. b. | 15 | | | | NA – Due 2/21/14 |
| IV. A. 2. c. | 15 | | | | NA – Due 4/21/14 |
| IV.A.3.   Use of Force Reporting/Margo Frasier | | | | | |
| IV. A.3 a. | 16 | | | | NA – Due 2/21/14 |
| IV. A.3 b. | 16 | | | | NA – Due 2/21/14 |
| IV. A.3 c. | 16 | | | | NA – Due 2/21/14 |
| IV. A.3 d. | 16 | | | | NA – Due 2/21/14 |
| IV. A.3 e. | 16 | | | | NA – Due 2/21/14 |
| IV. A.3 f. | 16 | | | | NA – Due 2/21/14 |
| IV. A.3 g. | 16 | | | | NA – Due 2/21/14 |
| IV. A.3 h. | 16 | | | | NA – Due 4/21/14 |
| IV.A.4. Early Intervention System ("EIS") /Margo Frasier | | | | | |
| IV.A.4.a. | 20 | | | | NA – Due 4/21/14 |
| IV.A.4.b. | 20 | | | | NA – Due 4/21/14 |
| IV.A.4.c. | 20 | | | | NA – Due 4/21/14 |
| IV.A.4.d. | 20 | | | | NA – Due 1/21/14 |
| IV.A.4.e. | 20 | | | | NA – Due 8/21/15 |
| IV.A.5. Safety and Supervision/Margo Frasier | | | | | |
| IV.A.5.a. | 21 | | | | NA – Due 2/21/14 |
| IV.A.5.b. | 21 | | | | NA – Due 2/21/14 |
| IV.A.5.c. | 21 | | | | NA – Due 2/21/14 |
| IV.A.5.d. | 21 | | | | NA – Due 2/21/14 |
| IV.A.5.e. | 21 | | | | NA – Due 2/21/14 |
| IV.A.5.f. | 21 | | | | NA – Due 2/21/14 |
| IV.A.5.g. | 21 | | | | NA – Due 2/21/14 |
| IV.A.5.h. | 21 | | | | NA – Due 2/21/14 |
| IV.A.5.i. | 21 | | | | NA – Due 2/21/14 |
| IV.A.5.j. | 21 | | | | NA – Due 2/21/14 |
| IV.A.5.k. | 21 | | | | NA – Due 2/21/14 |

| Section | Page in Report | Compliance | Partial Compliance | Non-Compliance | Notes |
|---|---|---|---|---|---|
| IV.A.5.l. | 21 | | | | NA – Due 2/21/14 |
| IV.A.6.  Security Staffing/Susan McCampbell | | | | | |
| IV.A.6.a. | 22 | 12/20/13 (3) | | | NA – not due until 1/21/14 |
| IV.A.6.b. | 31 | | | | NA – not due until 1/21/14 |
| IV.A.7 Incidents and Referrals/Margo Frasier | | | | | |
| IV.A.7.a. | 31 | | | | NA – Due 2/21/14 |
| IV.A.7.b. | 31 | | | | NA – Due 2/21/14 |
| IV.A.7.c. | 31 | | | | NA – Due 2/21/14 |
| IV.A.7.d. | 31 | | | | NA – Due 2/21/14 |
| IV.A.7.e. | 31 | | | | NA – Due 2/21/14 |
| IV.A.7.f. | 31 | | | | NA – Due 2/21/14 |
| IV.A.7.g. | 31 | | | | NA – Due 2/21/14 |
| IV.A.7.h. | 31 | | | | NA – Due 2/21/14 |
| IV.A.7.i. | 31 | | | | NA – Due 2/21/14 |
| IV.A.7.j. | 31 | | | | NA – Due 2/21/14 |
| IV.A.8.  Investigations/Margo Frasier | | | | | |
| IV.A.8.a. | 20 | | | | NA – Due 2/21/14 |
| IV.A.8.b. | 20 | | | | NA – Due 2/21/14 |
| IV.A.8.c. | 20 | | | | NA – Due 2/21/14 |
| IV.A.8.d. | 20 | | | | NA – Due 2/21/14 |
| IV.A.8.e. | 20 | | | | NA – Due 2/21/14 |
| IV.A.8.f. | 20 | | | | NA – Due 4/21/14 |
| IV.A.9.  Pretrial Placement in Alternative Settings/Susan McCampbell | | | | | |
| IV.A.9.a. | 36 | | 12/20/13 | | |
| IV.A.9.b. | 36 | | 12/20/13 | | |
| IV.A.10. Custodial Placement within OPP/Patricia Hardyman | | | | | |
| IV.A.10.a. | 38 | | | 12/20/13 | OPSO system is subjective & has not been validated for OPSO populations |
| IV.A.10.b. | 41 | | | 12/20/13 | OPSO has no means of tracking classification by race |
| IV.A.10.c. | 42 | | | 12/20/13 | Classification staff receive bed counts/facility; no info re: separations or custody level |
| IV.A.10.d. | 43 | | | 12/20/13 | OPSO does not have reclassification process |
| IV.A.10.e. | 45 | | | 12/20/13 | Only classification intake staff has received classification training. |
| IV.A.10.f. | 46 | | | 12/20/13 | Classification system has never been validated |
| IV.A.10.g. | 47 | | | | NA – due 4/21/14. |
| IV.A.10.h. | 47 | | | | NA – due 4/21/14. |
| IV.A.11. Prisoner Grievance Process/Susan McCampbell | | | | | |

| Section | Page in Report | Compliance | Partial Compliance | Non-Compliance | Notes |
|---------|---------|---------|---------|---------|---------|
| IVA.11.a. | 48 | | 12/20/13 | | |
| IV.A.12. Sexual Abuse/Susan McCampbell | | | | | |
| IV.A.12. | 51 | | 12/20/13 | | |
| IV.A.13. Access to Information/Susan McCampbell | | | | | |
| IV.A.13. | 52 | | 12/20/13 | | |
| IV.B.  Mental Health Care | | | | | |
| IV.B.1. Screening and Assessment/Raymond Patterson | | | | | |
| IV.B.1.a. | 55 | | | 12/20/13 | |
| IV.B.1.b. | 55 | | | 12/20/13 | |
| IV.B.1.c. | 55 | | | 12/20/13 | |
| IV.B.1.d. | 55 | | | 12/20/13 | |
| IV.B.1.e. | 55 | | | 12/20/13 | |
| IV.B.1.f. | 55 | | | 12/20/13 | |
| IV.B.1.g. | 55 | | | 12/20/13 | |
| IV.B.1.h. | 55 | | | 12/20/13 | |
| IV.B.1.i. | 55 | | | 12/20/13 | |
| IV.B.1.j. | 55 | | | 12/20/13 | |
| IV.B.1.k. | 55 | | | 12/20/13 | |
| IV.B.1.l. | 5 | | | 12/20/13 | |
| IV.B.2. Treatment/Raymond Patterson | | | | | |
| IV.B.2.a. | 56 | | | 12/20/13 | |
| IV.B.2.b. | 56 | | | 12/20/13 | |
| IV.B.2.c. | 56 | | | 12/20/13 | |
| IV.B.2.d. | 56 | | | 12/20/13 | |
| IV.B.2.e. | 56 | | | 12/20/13 | |
| IV.B.2.f. | 56 | | | 12/20/13 | |
| IV.B.2.g. | 56 | | | 12/20/13 | |
| IV.B.2.h. | 56 | | | 12/20/13 | |
| IV.B.3.  Counseling/Raymond Patterson | | | | | |
| IV.B.3.a. | 58 | | | 12/20/13 | |
| IV.B.3.b. | 58 | | | 12/20/13 | |
| IV.B.4.  Suicide Prevention Training Program/Raymond Patterson | | | | | |
| IV.B.4.a. | 58 | | | 12/20/13 | |
| IV.B.4.b. | 58 | | | 12/20/13 | |
| IV.B.4.c. | 58 | | | 12/20/13 | |
| IV.B.4.d. | 58 | | | 12/20/13 | |
| IV.B.4.e. | 58 | | | 12/20/13 | |
| IV.B.4.f. | 58 | | | 12/20/13 | |
| IV.B.4.g. | 58 | | | 12/20/13 | |

| Section | Page in Report | Compliance | Partial Compliance | Non-Compliance | Notes |
|---|---|---|---|---|---|
| IV.B.5.  Suicide Precautions/Raymond Patterson | | | | | |
| IV.B.5.a. | 60 | | | 12/20/13 | |
| IV.B.5.b. | 60 | | | 12/20/13 | |
| IV.B.5.c. | 60 | | | 12/20/13 | |
| IV.B.5.d. | 60 | | | 12/20/13 | |
| IV.B.5.e. | 60 | | | | NA at this time |
| IV.B.5.f. | 60 | | | | NA at this time |
| IV.B.5.g. | 60 | | | 12/20/13 | |
| IV.B.5.h. | 60 | | | 12/20/13 | |
| IV.B.5.i. | 60 | | | 12/20/13 | |
| IV.B.5.j. | 60 | | | 12/20/13 | |
| IV.B.5.k. | 60 | | | 12/20/13 | |
| IV.B.6.  Use of Restraints/Raymond Patterson | | | | | |
| IV.B.6.a. | 62 | | 12/31/13 | | |
| IV.B.6.b. | 62 | | | 12/20/13 | |
| IV.B.6.c. | 62 | | 12/31/13 | | |
| IV.B.6.d. | 62 | | | | NA at this time |
| IV.B.6.e. | 62 | | | | NA at this time |
| IV.B.6.f. | 62 | | | 12/20/13 | |
| IV.B.6.g. | 62 | | | | NA at this time |
| IV.B.7.  Detoxification and Training/Robert Greifinger | | | | | |
| IV.B.7.a. | 63 | | | 12/20/13 | |
| IV.B.7.b. | 63 | | | 12/20/13 | |
| IV.B.7.c. | 63 | | | 12/20/13 | |
| IV.B.7.d. | 63 | | | 12/20/13 | |
| IV.B.8. Medical and Mental Health Staffing/Robert Greifinger | | | | | |
| IV.B.8.a. | 65 | | | 12/20/13 | |
| IV.B.8.b. | 65 | | | 12/20/13 | |
| IV.B.9.  Risk Management/Robert Greifinger | | | | | |
| IV.B.9.a. | 67 | | | 12/20/13 | |
| IV.B.9.b. | 67 | | | 12/20/13 | |
| IV.B.9.c. | 67 | | | 12/20/13 | |
| IV.B.9.d. | 67 | | | 12/20/13 | |
| IV.B.10.d. | 67 | | | 12/20/13 | |
| IV.B.10.e. | 67 | | | 12/20/13 | |
| IV.B.10.f. | 67 | | | 12/20/13 | |
| IV.C. Medical Care | | | | | |
| IV.C.1. Quality Management and Medication Administration/Robert Greifinger | | | | | |
| IV.C.1.a. | 56 | | | 12/20/13 | |

| Section | Page in Report | Compliance | Partial Compliance | Non-Compliance | Notes |
|---|---|---|---|---|---|
| IV.C.1.b. | 78 | | | 12/20/13 | |
| IV.C.1.c. | 78 | | | 12/20/13 | |
| IV.C.1.d. | 78 | | | 12/20/13 | |
| IV.C.2.  Health Care Delivered/Robert Greifinger | | | | | |
| IV.C.2.a. | 80 | | | | NA at this time |
| IV.C.2.b. | 80 | | | | NA at this time |
| IV.C.3.  Release and Transfer/Robert Greifinger | | | | | |
| IV.C.3.a. | 81 | | | 12/20/13 | |
| IV.C.3.b. | 81 | | | 12/20/13 | |
| IV.C.3.c. | 81 | | | 12/20/13 | |
| IV.C.3.d. | 81 | | | 12/20/13 | |
| IV.D.  Sanitation and Environmental Conditions/Harry Grenawitzke | | | | | |
| IV. D. 1. Sanitation and Environmental Conditions | | | | | |
| IV.D. 1.a. | 84 | | | 12/20/13 | |
| IV. D. 1.b. | 85 | | | 12/20/13 | |
| IV. D. 1.c. | 87 | | | 12/20/13 | |
| IV. D. 1.d. | 88 | | | 12/20/13 | |
| IV. D. 1.e. | 88 | | | 12/20/13 | |
| IV. D. 1.f. | 89 | | | 12/20/13 | |
| IV. D. 1.g. | 91 | | | 12/20/13 | |
| IV. D. 1.h. | 91 | | | 12/20/13 | |
| IV. D. 2. Environmental Control | | | | | |
| IV. D. 2.a. | 92 | | | 12/20/13 | |
| IV. D. 2.b. | 92 | | | 12/20/13 | |
| IV. D. 3. Food Service | | | | | |
| IV. D. 3.a. | 93 | | | 12/20/13 | |
| IV. D. 3.b. | 94 | | | 12/20/13 | |
| IV. D. 3.c. | 96 | | | 12/20/13 | |
| IV. D. 4. Sanitation and Environmental Conditions Reporting | | | | | |
| IV. D. 4.a. 1-7 | 97 | | | | NA - Due 2/21/14 |
| IV. D. 4.b. | 97 | | | | NA - Due 2/2/14 |
| IV.E. Fire and Life Safety | | | | | |
| IV. E. 1. Fire and Life Safety | | | | | |
| IV. E. 1.a. | 98 | | | 12/20/13 | |
| IV. E. 1.b. | 100 | | | 12/20/13 | |
| IV. E. 1.c. | 101 | | 12/31/13 | | |
| IV. E. 1.d. | 102 | | | 12/20/13 | |
| IV. E. 1.e. | 103 | | | | NA - Due 2/21/14 |
| IV. E. 2. Fire and Life Safety Reporting | | | | | |

| Section | Page in Report | Compliance | Partial Compliance | Non-Compliance | Notes |
|---|---|---|---|---|---|
| IV. E. 2.a.1-3 | 104 | | | | NA - Due 2/21/14 |
| IV. E. 2.b. | 104 | | | | NA - Due 2/21/14 |
| IV.F. Language Assistance | | | | | |
| IV.F.1. Timely and Meaningful Access to Services/Margo Frasier | | | | | |
| IV.F.1.a. | 105 | | | | NA – Due 4/21/14 |
| IV.F.2.  Language Assistance Policies and Procedures/Margo Frasier | | | | | |
| IV.F.2.a. | 105 | | | | NA – Due 4/21/14 |
| IV.F.2.b. | 105 | | | | NA – Due 4/21/14 |
| IV.F.3. Language Assistance Training/Margo Frasier | | | | | |
| IV.F.3.a. | 105 | | | | NA – Due 4/21/14 |
| IV.F.4. Bilingual Staff/Margo Frasier | | | | | |
| IV.F.4. | 105 | | | | NA – Due 4/21/14 |
| IV.G.  Youthful Prisoners/Susan McCampbell | | | | | |
| IV.G. | 107 | | 12/20/13 | | |
| VI. The New Jail Facility/Susan McCampbell | | | | | |
| VI. A. | 108 | | | | NA at this time |
| VI. B. | 108 | | | | NA at this time |
| VI. C. | 108 | | | | NA at this time |
| VI. D. | 108 | | | | NA at this time |
| VII.  Compliance and Quality Improvement/Susan McCampbell | | | | | |
| VII. A. | 112 | | | | NA – due 2/21/14 |
| VI. B. (H.) | 113 | | | | NA – due 4/21/14 |
| VI. C. (I.) | 113 | | 12/20/13 | | |
| VI. D. (J.) | 114 | | | | NA – due 4/21/14 |
| VIII. Reporting Requirements and Right of Access/Susan McCampbell/Robert Greifinger | | | | | |
| VIII.A. | 114 | | | | NA – Due 2/21/14 |
| VIII.B. | 114 | | 12/20/13 | | |
| VIII.C. | 115 | | 12/20/13 | | |

Attachment A – Documents Reviewed
Attachment B – Recommendations – Best Practices – Section IV.D. Sanitation and Environmental Conditions and Section IV.E. Fire and Life Safety
Attachment C – Summary of Recommendations

**IV. A.   Protection From Harm**

**1.        Use of Force**

**Introduction**

      This is a report on compliance with the provisions of the Consent Judgment relating to Protection from Harm, Language Assistance, and Youthful Prisoners.  The Defendant is not in compliance with any of the elements reviewed during the tours of October 22-24, 2013, November 18-19, 2013, and December 16-20, 2013.

      However, compliance is not yet required as to any of the provisions in these areas. It should be noted that the lack of adequate facilities, staff, policies, and training results in an Orleans Parish Prison system that fails to provide prisoners with a safe and secure environment.  There is a great likelihood that prisoners are subjected to unnecessary or excessive force by OPSO staff and/or violence by other prisoners. The situation is not likely to improve without a significant number of staff being hired, trained, and deployed.  In addition, while OPSO has developed some of the necessary policies, training on the policies and compliance with the policies is crucial to making the OPSO facilities a safe place for prisoners to be housed and staff to work.

**Assessment Methodology**

- Dates of tours
    - October 22-24, 2013
    - November 18-19, 2013
    - December 16-20, 2013
- Materials reviewed
    - Materials reviewed include the Consent Judgment, policies and procedures, use of force reports, incident reports, investigations conducted by Special Operations Division (SOD), investigations conducted by Internal Affairs Division (IAD), news articles, expert reports from underlying litigation, shakedown logs, and post logs.
- Interviews
    - Interviews included Sheriff, Sheriff's command staff, jail supervisors, deputies assigned to housing units, deputies assigned to specialty units, supervisor of SOD, supervisor of IAD, members of the District Attorney's staff, inmates, and architect and project management staff for new jail facility.

Consistent with constitutional standards, Defendant shall provide prisoners with a safe and secure environment and ensure their reasonable safety from harm.  OPSO shall take all reasonable measures to ensure that during the course of incarceration, prisoners are not subjected to unnecessary or excessive force by OPSO staff and are protected from violence by other prisoners.

## A.1.   Use of Force Policies and Procedures

a.      OPSO shall develop, implement, and maintain comprehensive policies and procedures (in accordance with generally accepted correctional standards) relating to the use of force with particular emphasis regarding permissible and impermissible uses of force.

b.      OPSO shall develop and implement a single, uniform reporting system under a Use of Force Reporting policy.  OPSO reportable force shall be divided into two levels, as further specified in policy:  Level 1 uses of force will include all serious uses of force (i.e., the use of force leads to injuries that are extensive, serious or visible in nature, including black eyes, lacerations, injuries to the mouth or head, multiple bruises, injuries to the genitals, etc.), injuries requiring hospitalization, staff misconduct, and occasions when use of force reports are inconsistent, conflicting, or otherwise suspicious.  Level 2 uses of force will include all escort or control holds used to overcome resistance that are not covered by the definition of Level 1 uses of force.

c.      OPSO shall assess, annually, all data collected regarding uses of force and make any necessary changes to use of force policies or procedures to ensure that unnecessary or excessive use of force is not used in OPP.  The review and recommendations will be documented and provided to the Monitor, DOJ, and SPLC.

Findings:
>           NA – IV. A. 1.a. – Due 2/21/14
>           NA – IV A. 1. b. – Due 2/21/14
>           NA – IV. A. 1. c. – Due 4/21/14

Measures of compliance:
1.      [1]Comprehensiveness of written policies,
2.      Training, data collection and analysis,
3.       Supervisory review of uses of force,
4.      Review of use of force reports, review of incident reports, review of investigations by SOD, review of investigations by IAD.

Observations:

The OPSO has in writing the basics of a use of force policy; including a reporting system.  However, neither the policies and procedures nor the reporting system is comprehensive and in accordance with generally accepted correctional standards.  The policy does not contain the mechanisms to allow OPSO to provide guidance to supervisors and deputies on how it is to be implemented or to train on the policy and hold staff accountable for following the policy.   In particular, there is

no mechanism to ensure that all uses of force are properly reported and investigated in accordance with the policy.

Recommendation:

1. Continue to work with Monitors to develop comprehensive policies and procedures and a reporting system that will enable OPSO to provide guidance, to train, and to hold accountable supervisors and deputies. In particular, include a mechanism to ensure that all uses of force are properly reported and investigated in accordance with the policy. The adequacy of the policies and procedures and reporting system is key to future compliance with IV. A. 1. c. that requires OPSO to assess, annually, all data collected to make any necessary changes.

| | |
|---|---|
| A. | 2. Use of Force Training |
| a. | OPSO shall ensure that all correctional officers are knowledgeable of and have the knowledge, skills, and abilities to comply with use of force policies and procedures. At a minimum, OPSO shall provide correctional officers with pre-service and annual in-service training in use of force, defensive tactics, and use of force policies and procedures. The training will include the following:<br>(1) instruction on what constitutes excessive force<br>(2) de-escalation tactics; and<br>(3) management of prisoners with mental illness to limit the need for using force. |
| b. | OPSO shall ensure that officers are aware of any change to policies and practices throughout their employment with OPP. At a minimum, OPSO shall provide pre-service and annual in-service use of force training that prohibits:<br>(1)    use of force as a response to verbal insults or prisoner threats where there is no immediate threat to the safety or security of the institution, prisoners, staff, or visitors;<br>(2)    use of force as a response to prisoners' failure to follow instructions where there is no immediate threat to the safety or security of the institution, prisoners, staff, or visitors;<br>(3)    use of force against a prisoner after the prisoner has ceased to offer resistance and is under control;<br>(4)    use of force as punishment or retaliation; and<br>(5)    use of force involving kicking, striking, hitting, or punching a       non-combative prisoner. |
| c. | OPSO shall randomly test five percent of the correctional officer staff on an annual basis to determine their knowledge of the use of force policies and procedures. The testing instrument and policies shall be approved by the Monitor. The results of these assessments shall be evaluated to determine the need for changes in training practices. The review and conclusions will be documented and provided to the Monitor. |

Findings:
IV. A. 2. a. – NA – Due 2/21/14
IV. A. 2. b. – NA – Due 2/21/14
IV. A. 2. c. – NA – Due 4/21/14

Measures of compliance:

1. Comprehensiveness of lesson plans.
2. Training material, evidence of knowledge gained.
3. Review of use of force reports.
4. Review of incident reports.
5. Review of investigations by SOD.
6. Review of investigations by IAD.

Observations:

The OPSO has in place a mechanism to provide training on the use of force policy.  However, given lack of comprehensiveness of the policies and procedures and the shortage of staff and training, neither deputies nor supervisors are being adequately trained, initially or annually. In particular, training needs to stress that all uses of force are to be reported and properly investigated and that failure to report will result in discipline.  In addition, supervisors need to be trained on the mechanisms to ensure that all uses of force are properly reported and investigated in accordance with the policy.

Recommendation:

2. Continue to work with Monitors to develop comprehensive policies and procedures and a reporting system that will form the foundation for the training on the use of force.  Once comprehensive policies and procedures and a reporting system are developed, work with Monitors to develop appropriate training for deputies and supervisors.  In particular, training needs to stress that all uses of force are to be reported and properly investigated and that failure to report will result in discipline.  In addition, supervisors need to be trained on the mechanisms to ensure that all uses of force are properly reported and investigated in accordance with the policy.  As noted in Recommendation 1, above, the adequacy of the policies and procedures and training is crucial to future compliance with IV. A. 2. c. that requires OPSO to randomly test five percent of the jail staff to determine their knowledge of use of force policies and procedures.

**3. Use of Force Reporting**

a.    Failure to report a use of force incident by any staff member engaging in the use of force or witnessing the use of force shall be grounds for discipline, up to and including termination.

b.    OPSO shall ensure that sufficient information is collected on uses of force to assess whether staff members complied with policy; whether corrective action is necessary including training or discipline; the effectiveness of training and policies; and whether the conditions in OPP comply with this Agreement.  At a minimum, OPSO will ensure that officers using or observing a Level 1 use of force shall complete a use of force report that will;

    (1)    include the names of all staff, prisoner(s), or other visual or oral witness(es);

    (2)    contain an accurate and specific account of the events leading to the use of force;

    (3)    describe the level of resistance and the type and level of force used, consistent with OPP use of force policy and procedure, as well as the precise actions taken by OPSO staff in response to the incident;

    (4)    describe the weapon or instrument(s) of restraint, if any, and the manner of such use;

    (5)    be accompanied by a prisoner disciplinary report, if it exists, pertaining to the events or prisoner activity that prompted the use of force incident;

    (6)    describe the nature and extent of injuries sustained by anyone involved in the incident;

    (7)    contain the date and time when medical attention, if any, was requested and actually provided;

    (8)    describe any attempts the staff took to de-escalate prior to the  use of force;

    (9)    include an individual written account of the use of force from every staff member who witnessed the use of force;

    (10)    include photographs taken promptly, but no later than two hours after a use of force incident, of all injuries sustained, or as evidence that no injuries were sustained, by prisoners and staff involved in the use of force incident;

    (11)    document whether the use of force was digitally or otherwise recorded.  If the use of force is not digitally or otherwise recorded, the reporting officer and/or watch commander will provide an explanation as to why it was not recorded; and

    (12)    include a statement about the incident from the prisoner(s) against whom force was used.

c.    All officers using a Level 2 use of force shall complete a use of force report that will:

    (1)    include the names of staff, prisoner(s), or other visual or oral witness(es);

    (2)    contain an accurate and specific account of the events leading to the use of force;

    (3)    describe the level of resistance and the type and level of force used, consistent with OPP use of force policy and procedure, as well as the precise actions taken by OPSO staff in response to the incident;

    (4)    describe the weapon or instrument(s) of restraint, if any, and the manner of such use;

    (5)    be accompanied by a prisoner disciplinary report, if it exists, pertaining to the events or prisoner activity that prompted the use of force incident;

    (6)    describe the nature and extent of injuries sustained by anyone involved in the incident;

    (7)    contain the date and time when medical attention, if any, was requested and actually provided; and

    (8)    describe any attempts the staff took to de-escalate prior to the use of force;

d.    OPSO shall require correctional officers to notify the watch commander as soon as practical of any use of force incident or allegation of use of force.  When notified, the watch commander will respond to the scene of all Level 1 uses of force.  When arriving on the scene, the watch commander shall:

    (1)    ensure the safety of everyone involved in or proximate to the incident;

    (2)    determine if any prisoner or correctional officer is injured and ensure that necessary medical care is provided;

    (3)    ensure that personnel and witnesses are identified, separated, and advised that communications with other witnesses or correctional officers regarding the incident are prohibited;

    (4)    ensure that witness and subject statements are taken from both staff and prisoner(s) outside of the presence of other prisoners and staff;

    (5)    ensure that the supervisor's use of force report is forwarded to IAD for investigation if, upon the supervisor's review, a violation of law or policy is suspected.  The determination of what type of investigation is needed will be based on the degree of the force used consistent with the terms of this Agreement;

(6)   If the watch commander is not involved in the use of force incident, the watch commander shall review all submitted use of force reports within 36 hours of the end of the incident, and shall specify his findings as to completeness and procedural errors.  If the watch commander believes that the use of force may have been unnecessary or excessive, he shall immediately contact IAD for investigation consideration and shall notify the warden or assistant warden; and

(7)   All Level 1 use of force reports, whether or not the force is believed by any party to be unnecessary or excessive, shall be sent to IAD for review.  IAD shall develop and submit to the Monitor within 90 days of the Effective Date clear criteria to identify use of force incidents that warrant a full investigation, including injuries that are extensive or serious, visible in nature (including black eyes, injuries to the mouth, injuries to the genitals, etc.), injuries requiring hospitalization, staff misconduct (including inappropriate relationships with prisoners), and occasions when use of force reports are inconsistent, conflicting, or otherwise suspicious.

e.   Ensure that a first-line supervisor is present during all pre-planned uses of force, such as cell extractions.

f.   Within 36 hours, exclusive of weekends and holidays, of receiving the report and review from the shift commander, in order to determine the appropriateness of the force used and whether policy was followed, the Warden or Assistant Warden shall review all use of force reports and supervisory reviews including:

(1)   the incident report associated with the use of force;
(2)   any medical documentation of injuries and any further medical care;
(3)   the prisoner disciplinary report associated with the use of force; and
(4)   the Warden or Assistant Warden shall complete a written report or written statement of specific findings and determinations of the appropriateness of force.

g.   Provide the Monitor a periodic report detailing use of force by staff.  These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement.  Each report will include the following information:

(1)   a brief summary of all uses of force, by type;
(2)   date that force was used;
(3)   identity of staff members involved in using force;
(4)   identity of prisoners against whom force was used;
(5)   a brief summary of all uses of force resulting in injuries;
(6)   number of planned and unplanned uses of force;
(7)   a summary of all in-custody deaths related to use of force, including the identity of the decedent and the circumstances of the death; and
(8)   a listing of serious injuries requiring hospitalization.

h.   OPSO shall conduct, annually, a review of the use of force reporting system to ensure that it has been effective in reducing unnecessary or excessive uses of force.  OPSO will document its review and conclusions and provide them to the Monitor, SPLC, and DOJ.

Findings:

IV. A. 3. a. – NA – Due 2/21/14

IV. A. 3. b. – NA – Due 2/21/14

IV. A. 3.c. – NA – Due 2/21/14

IV. A. 3.d. – NA – Due 2/21/14

IV.A. 3. e. – NA – Due 2/21/14

IV. A.3.f.  – NA – Due 2/21/14

IV. A. 3.g. – NA – Due 2/21/14

IV. A.3.h. – NA  - Due 4/21/14

Measures of compliance:
1. 1.    Comprehensiveness of written policies.
2.       Training, data collection and analysis.
3.       Supervisory review of uses of force.
4. 0     Review of use of force reports.
5.       Review of incident reports.
6.       Review of investigations by SOD.
7.       Review of investigations by IAD.


Observations:

        The OPSO has in place the basics of a policy requiring reporting of use of
force.  However, there is nothing in place to ensure all uses of force are being
reported and that use of force is being reported adequately and accurately.  A
review of a small sample of use of force reports revealed reports that were
inadequate and/or incomplete, but had been signed off on by supervisors. The
reports often contain boilerplate language that does not allow the reader to make an
evaluation of the level of resistance, the level of force used, and/or the
appropriateness of the force.  In addition, there is no automatic tracking system to
ensure timely notification is being made.

Recommendations:

3.  Continue to work with Monitors to develop comprehensive policies and
    procedures and a reporting system that will enable OPSO to provide guidance, to
    train, and to hold accountable supervisors and deputies. In particular, the
    policies and procedures must include a mechanism to ensure that all uses of
    force are properly reported and investigated in accordance with the policy. The
    adequacy of the policies and procedures and reporting system is crucial to the
    Monitor being able to rely on the accuracy of the periodic reports that are to be
    submitted under IV. A. 3. g. and the usefulness of the annual review that is to
    conducted under IV. A. 3. h. to future compliance with IV. A. 3. g. that requires
    OPSO to assess, annually, all data collected to make any necessary changes.

4.  OPSO policy/procedures should require those holding the rank of Major and
    above review all reports.  Based on that review, provide additional training to
    supervisors who are not requiring complete and thorough reports.

4.    **Early Intervention System ("EIS")**

a.    OPSO shall develop, within 120 days of the Effective Date, a computerized relational database ("EIS") that will document and track staff members who are involved in use of force incidents and any complaints related to the inappropriate or excessive use of force, in order to alert OPSO management to any potential problematic policies or supervision lapses or need for retraining or discipline.  The Chief of Operations Deputy, supervisors, and investigative staff shall have access to this information and shall review on a regular basis, but not less than quarterly, system reports to evaluate individual staff, supervisor, and housing area activity.  OPSO will use the EIS as a tool for correcting inappropriate staff behavior before it escalates to more serious misconduct.

b.    Within 120 days of the Effective Date, OPSO senior management shall use EIS information to improve quality management practices, identify patterns and trends, and take necessary corrective action both on an individual and systemic level.  IAD will manage and administer EIS systems.  The Special Operations Division ("SOD") will have access to the EIS.  IAD will conduct quarterly audits of the EIS to ensure that analysis and intervention is taken according to the process described below. Command staff shall review the data collected by the EIS on at least a quarterly basis to identify potential patterns or trends resulting in harm to prisoners.  The Use of Force Review Board will periodically review information collected regarding uses of force in order to identify the need for corrective action, including changes to training protocols and policy or retraining or disciplining individual staff or staff members.  Through comparison of the operation of this system to changes in the conditions in OPP, OPSO will assess whether the mechanism is effective at addressing the requirements of this Agreement.

c.    OPSO shall provide, within 180 days of the implementation date of its EIS, to SPLC, DOJ, and the Monitor, a list of all staff members identified through the EIS and corrective action taken.

d.    The EIS protocol shall include the following components:  data storage, data retrieval, reporting, data analysis, pattern identification, supervisory assessment, supervisory intervention, documentation, and audit.

e.    On an annual basis, OPSO shall review the EIS to ensure that it has been effective in identifying concerns regarding policy, training, or the need for discipline.  This assessment will be based in part on the number and severity of harm and injury identified through data collected pursuant to this Agreement.  OPSO will document its review and conclusions and provide them to the Monitor, who shall forward this document to DOJ and SPLC.

Finding:

IV. A. 4. a.  – NA - Due 01/21/14
IV. A. 4. b. – NA – Due 2/21/14
IV.A.4.c. – NA – Due 8/21/14
IV. A. 4.d. – NA - Due 01/21/14
IV. A. 4.e. – NA - NA - Due 8/21/15

Measures of compliance:
1.    Comprehensiveness of policy.
2.    Identification of patterns and trends.
3.    Evidence of review by command staff.
4.    Monitor's review of quarterly reports.

Observations:

Although the Early Intervention policy is to be in place by 01/21/14, very

little progress has been made on the development of the policy and the process by

which data will be collected and analyzed. The draft policy that purports to be an Early Intervention policy is, in reality, a system where staff with three formal complaints within a certain timeframe are reviewed.  A true Early Intervention or warning system would collect data such as uses of force, grievances, complaints handled at the facility level, absences, etc.

Recommendations:

5. Continue to work with Monitors to develop comprehensive policies and procedures for an Early Invention System. .  At the least, the Early Intervention or warning system would collect data such as uses of force, grievances, complaints handled at the facility level, absences, etc.

6. Assure policies/procedures are in place to direct how the EIS is implemented, and actions to be taken by OPSO when thresholds are triggered.

## 5.  Safety and Supervision

Recognizing that some danger is inherent in a jail setting, OPSO shall take all reasonable measures to ensure that prisoners are not subjected to harm or the risk of harm.  At a minimum, OPSO shall do the following:

a. Maintain security policies, procedures, and practices to provide a reasonably safe and secure environment for prisoners and staff in accordance with this Agreement.

b. Maintain policies, procedures, and practices to ensure the adequate supervision of prisoner work areas and trustees.

c. Maintain policies and procedures regarding care for and housing of protective custody prisoners and prisoners requesting protection from harm.

d. Continue to ensure that correctional officers conduct appropriate rounds at least once during every 30-minute period, at irregular times, inside each general population housing unit and at least once during every 15-minute period of special management prisoners, or more often if necessary.  All security rounds shall be documented on forms or logs that do not contain pre-printed rounding times.  In the alternative, OPSO may provide direct supervision of prisoners by posting a correctional officer inside the day room area of a housing unit to conduct surveillance.

e. Staff shall provide direct supervision in housing units that are designed for this type of supervision. Video surveillance may be used to supplement, but must not be used to replace, rounds by correctional officers.

f. Increase the use of overhead video surveillance and recording cameras to provide adequate coverage throughout the common areas of the Jail, including the Intake Processing Center, all divisions' intake areas, mental health units, special management units, prisoner housing units, and in the divisions' common areas.

g. Continue to ensure that correctional officers, who are transferred from one division to another, are required to attend training on division-specific post orders before working on the unit.

h. Continue to ensure that correctional officers assigned to special management units, which include youth tiers, mental health tiers, disciplinary segregation, and protective custody, receive eight hours of specialized training regarding such units on prisoner safety and security on at least an annual basis.

i. Continue to ensure that supervisors conduct daily rounds on each shift in the prisoner housing units, and document the results of their rounds.

j. Continue to ensure that staff conduct daily inspections of cells and common areas of the housing units to protect prisoners from unreasonable harm or unreasonable risk of harm.

k.  Continue to ensure that staff conduct random monthly shakedowns of cells and common areas so that prisoners do not possess or have access to dangerous contraband.

l.  Provide the Monitor a periodic report of safety and supervision at the Facility.  These periodic reports shall be provided to the monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement.  Each report will provide the following information:

    (1)  a listing of special management prisoners, their housing assignments, the basis for them being placed in the specialized housing unit, and the date placed in the unit; and

    (2)  a listing of all contraband, including weapons seized,  the type of contraband, date of seizure, location, and shift of seizure.

Findings:

IV. A. 5.a. – NA – Due 2/21/14
IV.A.5.b. – NA  – Due 2/21/14
IV.A.5.c – NA – Due 2/21/14
IV.A.5.d. – NA – Due 2/21/14
IV.A.5.e – NA – Due 2/21/14
IV.A.5.f. – NA – Due 2/21/14
IV.A.5.g. – NA – Due 2/21/14
IV.A.5.h. – NA – Due 2/21/14
IV.A.5.i. – NA – Due 2/21/14
IV.A.5.j. – NA – Due 2/21/14
IV.A.5.k – NA – Due 2/21/14
IV.A.5.l. – NA – due 2/21/14

Measures of compliance

1.  Comprehensiveness of policies and procedures
2.  Training materials
3.  Post orders
4.  Review of incident reports
5.  Installation of cameras
6.  Documentation of training
7.  Monitor's review of required semi-annual reports.

Observations:

The level of harm and risk of harm in the Orleans Parish Prison system is extremely high.  This is evident by the number of assaults on prisoners by other prisoners including sexual assaults.  Even more disturbing is that staff is often unaware that an assault is taking place due to the lack of supervision in the housing units.  Observation of staff and review of post logs revealed that deputies often did not conduct timely rounds; particularly in the special management housing units.  Due to shortage of staff, deputies are often called upon to work several tiers at once and do not receive the specialized training the tiers require.  Shakedowns are not

conducted with sufficient frequency as evidenced by the contraband items (particularly homemade shanks) used by prisoners to assault one another.

Many of the problems will not be lessened without an adequate number of properly trained staff. While the recruiting, hiring, and training of staff takes time, hiring qualified the staffing is an penultimate priority, not hiring just corrections deputies, but the support positions necessary for jail operations. One of the impediments to recruiting corrections staff in the view of the monitors is a non-competitive wage for potential employees, and the uncertainty created by the budget discussions for OPSO.

Recommendations:

7.    Continue to work with Monitors to develop comprehensive policies and procedures and a reporting system that will enable OPSO to provide guidance, to train, and to hold accountable supervisors and deputies. The adequacy of the policies and procedures and implementation of them is crucial to reducing the harm and risk of harm in the Orleans Parish Prison system.

8.    Make the recruiting, hiring, and training of custodial staff for the jail facilities the highest priority.

9.    Consider temporarily reassigning deputies from other duties to supplement the current custodial staff.

10.   If unable to hire sufficient custodial staff, explore alternatives for contract officers.

11.   Develop a risk management philosophy so that incidents are reviewed with a goal of determining actions need to be taken by OPSO to avoid such incidents in the future.

## 6.    Security Staffing[i]

a. (1) – (4) OPSO shall ensure that correctional staffing and supervision is sufficient to adequately supervise prisoners, fulfill the terms of this Agreement, and allow for the safe operation of the Facility, consistent with constitutional standards. OPSO shall achieve adequate correctional officer staffing in the following manner:

(1)        Within 90 days of the Effective Date, develop a staffing plan that will identify all posts and positions, the adequate number and qualification of staff to cover each post and position, adequate shift relief, and coverage for vacations. The staffing plan will ensure that there is adequate coverage inside each housing and specialized housing areas and to accompany

prisoners for court, visits and legal visits, and other operations of OPP and to comply with all provisions of this Agreement.  OPSO will provide its plan to the Monitor, SPLC, and DOJ for approval.  The Monitor, SPLC, or DOJ will have 60 days to raise any objections and recommend revisions to the staffing plan.

(2)     Within 120 days before the opening of any new facility, submit a staffing plan consistent with subsection (1) above.

(3)     Within 90 days after completion of the staffing study, OPSO shall recruit and hire a full-time professional corrections administrator to analyze and review OPP operations.   The professional corrections administrator shall report directly to the Sheriff and shall have responsibilities to be determined by the Sheriff.  The professional corrections administrator shall have at least the following qualifications:  (a) a bachelor's degree in criminal justice or other closely related field; (b) five years of experience in supervising a large correctional facility; and (c) knowledge of and experience in applying modern correctional standards, maintained through regular participation in corrections-related conferences or other continuing education.

(4)     Provide the Monitor a periodic report on staffing levels at the Facility.  These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement.  Each report will include the following information:

    i.   a listing of each post and position needed;

    ii.  the number of hours needed for each post and position;

    iii. a listing of staff hired and positions filled;

    iv. a listing of staff working overtime and the amount of overtime worked by each staff member;

    v.  a listing of supervisors working overtime; and a listing of and types of critical incidents reported.

Finding:

    IV. A. 6. a. (1), (2) - NA – the staffing plan is due 1/21/14

    IV. A. 6. a. (3) – The OPSO hired a full-time professional corrections administrator, who began work on November 11, 2013.

    IV.A.6.a. (4) – NA – Due 2/21/14.

Measures of Compliance:

1.     Written policy/procedure governing staffing, and reporting as required by consent agreement.

2.     Completion of a staffing analysis per http://static.nicic.gov/Library/016827.pdf

3.     Staffing plan (existing and new facilities); recruiting plan.

4.     Daily rosters.

5.     Overtime records.

6.     Housing unit logs.

7.     Hiring of professional corrections administrators (CV).  Post order/job description/organizational chart.

8.     Staffing report containing required information; conclusions; action plans, if any.

Observations:

OPSO has agreed to use the model in *Staffing Analysis Workbook for Jails*

http://static.nicic.gov/Library/016827.pdf to produce the staffing plan.  The City has

been notified of this strategy.  The City's consultants used this model for production

of a report in June 2013, but there was additional staffing information/data produced in April 2013 that the monitors have yet to receive.  It is anticipated that this staffing plan will address subparagraph (2), above, regarding the new facility.  Although the OPSO and the City are using the same methodology, there most likely will be differences in the conclusions, as a result of underlying assumptions about current and projected operations.  If these differences are documented, the Lead Monitor plans to meet with all parties to reach a resolution, as soon as all parties have a chance to analyze the information.

When the staffing plan is produced, the monitors will evaluate it to assure that there is adequate staffing to implement the Consent Judgment and assure safe jail operations.  A prolonged debate about the total number of staff needed should not defer funding of positions that can be hired, now.  Given the potential number of new employees that need to be hired, it is unlikely that full staffing can be achieved in 24 months; especially if salaries are not competitive in the region, and employee retention remains an issue.

It is important to note that the requirements of the Consent Judgment envision staffing of more than security/sworn corrections officers.  The analysis of staffing must include the support functions such classification, investigations, policy and procedure writing, training, etc., as noted in the Introduction to this report.

Starting salary at OPSO remains a critical issue.  The recently adjusted starting salary for OPSO is $21,169 ($10.77/hours).[1]  The starting salary for the New Orleans Police Department, which is *aggressively* recruiting, is $34,797[2] (64% higher at entry than OPSO); $27,504 in Jefferson Parish;[3] $35,604 for the Louisiana State Police,[4] and $36,000 for the Kenner Police Department.[5] Looking at federal entry-level jobs in the New Orleans area, TSA Security Officers starting salary is

---

[1] The minimum wage in Louisiana follows the federal rate of $7.25/hour for 2014.

[2] http://joinnopd.org/#career-path accessed February 8, 2014.

[3] http://www.jpso.com/documents/Job%20Depscription-Correctional%20Officer.pdf accessed on February 8, 2014.

[4] http://dpsweb.dps.louisiana.gov/lspfaqs.nsf/5f68eb9a6dfe5cf8862573130054f239/f415328353e9188986257306000bc596?OpenDocument accessed on February 9, 2014.

[5] http://www.kennerpd.com/misc/employment.htm accessed on February 8, 2014.

$29,422.[6]  The Bureau of Labor Statistics (BLS) reports that Louisiana's unemployment rate (preliminary), seasonally adjusted, for December 2013 is 5.7%.[7]  BLS reported that for the first quarter of 2013, "The Orleans Parish average weekly wage of $965 which led among the state's largest parishes . . ."[8] an annualized wage of $50,180.  Examining New Orleans' Civil Service website, many job opportunities are posted, including, as two examples, a senior maintenance worker at an entrance salary of $22,528,[9] and a basic emergency medical technician at an entry salary of $33,524.[10]  A Corrections Cadet for the Louisiana Dept. of Corrections is listed on the State's Civil Service website starting at $24,357/year.[11]

There is also competition in the private sector.  For example, on the State's employment services website, there are private security jobs in New Orleans listed starting at $14.00 - $15.00/hour.[12]  Additionally several website list jobs in the oil service industry in Louisiana, many at entry level.[13]

The point of this analysis is to more than just *suggest* that without a significant increase in starting salary, and considering the low unemployment rate in the state, and competition from inside the City itself, recruiting for OPSO is strangled.  While the monitors acknowledge that starting salary alone doesn't

---

[6] https://www.usajobs.gov/JobSearch/Search/GetResults?Keyword=tsa&Location=&search.x=0&search.y=0 accessed on February 8, 2014

[7] http://www.bls.gov/lau/home.htm accessed on February 8, 2013.

[8] http://www.bls.gov/ro6/fax/qcew_la.pdf accessed on February 8, 2014.

[9] http://www.nola.gov/getattachment/Civil-Service/Jobs/Job-Postings/Cc3304/Cc1720.pdf/ accessed on February 8, 204

[10] http://www.nola.gov/getattachment/Civil-Service/Jobs/Job-Postings/Cc5170/Cc5170rev.pdf/ accessed on February 8, 2014.

[11]
http://agency.governmentjobs.com/louisiana/default.cfm?action=viewJob&jobID=242302&hit_count=yes&headerFooter=1&promo=0&transfer=0&WDDXJobSearchParams=%3CwddxPacket%20version%3D%271%2E0%27%3E%3Cheader%2F%3E%3Cdata%3E%3Cstruct%3E%3Cvar%20name%3D%27CATEGORYID%27%3E%3Cstring%3E109%3C%2Fstring%3E%3C%2Fvar%3E%3Cvar%20name%3D%27PROMOTIONALJOBS%27%3E%3Cstring%3E0%3C%2Fstring%3E%3C%2Fvar%3E%3Cvar%20name%3D%27TRANSFER%27%3E%3Cstring%3E0%3C%2Fstring%3E%3C%2Fvar%3E%3Cvar%20name%3D%27FIND%5FKEYWORD%27%3E%3Cstring%3E%3C%2Fstring%3E%3C%2Fvar%3E%3C%2Fstruct%3E%3C%2Fdata%3E%3C%2FwddxPacket%3E accessed on February 9, 2014

[12]https://www.louisianaworks.net/hire/jobbanks/joblist.asp?session=jobsearch&t=q&gtype=ocde&geo=2260000001&ocde=33305100 accessed on February 9, 2014.

[13] For example, see: http://oil-and-gas.jobs.net/jobs/louisiana.aspx  accessed on February 9, 2014

guarantee a competent workforce, without the ability to attract qualified candidates, progress will be slow, and employee attrition will continue at an unacceptable rate.

In the only study of jail employees and their decisions about accepting jobs working in jails, 66% of respondents reported that an attractive salary and benefits was "very influential" to their taking a position. The only responses which received higher percentage responses were: a good retirement plan (67%) and having a "secure job" (81%), in terms of being "very influential" in a candidate's decision to work for an organization.[14]

Since the Consent Judgment was signed, OPSO has hired 44 individuals to assume positions as corrections deputies; and 20 left employment during that same period. A question that the monitors will seek to answer is how many applications must be received before one individual can be hired? Called the "yield ratio" this number is informative in designing recruitment plans, and evaluating the hiring process.

OPSO notes that as they plan to hire more corrections officers, the lack of agreement on the budget influences their decisions. At the same time individuals are hired, employees are leaving OPSO's employment, voluntarily and via termination. OPSO reported that 97 individuals had left employment in the first 9 months of 2013. Whether the departures from employment were expressly documented as the result of salary is unknown, and given the unreliability of "exit interviews", the collection of honest responses is unlikely. With an unemployment rate of less than 6% and with competition in the public and private sector, as well as what we know about the characteristics of the millennial workforce, salary and benefits can't help but be a major issue in voluntary separation.[15]

In the view of the monitors there is little doubt that the physical conditions in the current OPSO workplaces, the shortage of staff, and the difficult circumstances of working with inmates creates a tough "sell" for potential employees. The most

---

[14] Stinchcomb, Jeanne B., Susan W. McCampbell, Leslie Leip, The Future is Now: Recruiting, Retaining and Developing the 21st Century Jail Workforce, U. S. Dept. of Justice, Bureau of Justice Statistics, March 2009, page 197. http://www.cipp.org/pdf/Developingthe21stCenturyJailWorkforce05302011.pdf
[15] IBID, pp. 8 - 10.

effective tool in jail workforce recruitment is the jail's workforce itself – not the newspaper, not military outplacement centers, not government job service center, not job fairs – but employees.[16]  Thus, this is a further limiting influence on the ability of OPSO to recruit at this time.  The internal culture of OPSO needs to dramatically change.  Internal agency culture is comprised of leadership, management, supervision, consistency of operations, valued workers, and the foundation of policies/procedures/training and safety.  Changing the internal culture of an organization is a 10 – 15 years effort, requiring careful planning, diligence in defining the mission, and accountability through all levels of the organization.[17]

Orleans Parish will be opening a "direct supervision" jail in 2014.  This design has been used in hundreds of jails in the United States since the mid-1980s.   When properly administered, with qualified and trained officers, direct supervision facilities have been shown to be safer for inmates and staff.  Employees working in this environment need to be recruited, screened, and trained to support the design's operational dictates.  For example:

> "The housing unit officer's primary role is to manage inmate behavior, thus ensuring that the unit is safe, secure and orderly.  The officer interacts with inmates continuously to convey and reinforce expectations for positive behavior, provide incentives for positive behavior, and hold individual inmates accountable for negative behavior.  The officer is familiar with and addresses the behaviors and needs of individual inmates, is the primary source of information for inmates, and is a role model for positive behavior.   The officer is the authority in the housing unit and does not share that authority with inmates."[18]

---

[16] Op. Cit. Stinchcomb, et. al, page 196.

[17] For more information regarding change management in corrections, see: Cebula, Nancy, Elizabeth Craig, Christopher Innes, Theresa Lantz, Tanya Rhone, and Tom Ward, Culture and Change Management Using APEX to Facilitate Organizational Change: Achieving Performance Excellence (APEX) Guidebook Series, U. S. Department of Justice, National Institute of Corrections, April 2012 https://s3.amazonaws.com/static.nicic.gov/Library/025300.pdf, page 41.

[18] Bogard, David, Virginia A. Hutchinson and Vicci Persons, Direct Supervision Jails: The Role of the Administrator, U. S. Department of Justice, National Institute of Corrections, February 2010, page 2. https://s3.amazonaws.com/static.nicic.gov/Library/024192.pdf accessed on February 8, 2014.

This excerpt of a National Institute of Corrections (NIC) publication is provided to re-direct any currently held beliefs about the role and responsibilities of officers working in OPSO in the immediate future.   As noted above, hundreds of jails have made a successful transition to direct supervision, but the hiring and training of employees (new and existing) is critical. Without the ability to compete in the New Orleans job market, the repercussions for the operation of a safe jail environment are enormous, and not positive.[19]

In addition to immediately addressing the starting salary, a robust and focused recruitment plan needs to be in place, appropriately resourced.  The recruitment materials must reflect the skills, knowledge and abilities needed to work in a direct supervision facility.  A thorough background investigation process, conduced in a timely manner is required. Among the requirements are prohibitions against hiring individuals who have been convicted or engaged in sexual activity in the community facilitated by force, the threat of force, or coercion, or who has been civilly or administratively adjudicated to have engaged in such activity.  While not suggesting that OPSO would not screen out those with this background, this recitation of the requirements of the Prison Rape Elimination Act of 2003, place more responsibility on those background investigators as they examine candidates.[20] The monitors will assist OPSO in their recruitment planning, and review the current screening for new employees.

When new officers are hired, they must be trained on the policies, procedures, and skills, knowledge and abilities needed to manage direct supervision housing units.   To accomplish this OPSO must have qualified staff assigned to writing the directives needed for operations, and must employ individuals who can turn these into lesson plans, taught be qualified staff.

The monitors note that while it might be tempting to impose some sort of hiring quotas on OPSO, given the realities of competition noted above, that might not be the best course of action,  Rather, the monitors will examine the processes as

---

[19] For more information on hiring and training for direct supervision jails, see Bogard, IBID.

[20] 28 CFR Part 115, Prison Rape Elimination Act of 2003, Standard 115.16, Hiring and promotion decisions.

noted elsewhere in this section of the report, make the changes necessary, track data, and revise recommendations in the next reporting period.

Clearly hiring new staff is essential, working to keep the qualified staff working now at OPSO needs to be a priority. With the job market in Louisiana, there is always competition for workers. Development a "retention plan" needs to be on the OPSO's agenda – to keep the staff they worked hard to recruitment, screen and train.[21]

Per paragraph IV.A.6.a.(3), Michael Tidwell began work as the Chief of Corrections on November 11, 2013.

The monitors are working with OPSO and the plaintiffs to design the templates for required reporting in terms of hiring and attrition. This will include evaluating recruiting sources, determining the yield ratio for applications, examining the hiring process, and assessing the reasons why people are leaving employment.

Recommendations:

12.   OPSO and the City must engage in meaningful discussions regarding raising the starting salary for OPSO to a level competitive in the New Orleans job market. Time is of the essence.

13.   OPSO and the City need to adequately resource recruitment, background investigations, and training for newly hired employees.

14.   OPSO's  recruitment activities should highlight and focus on the skills, knowledge and abilities needed for officers in a direct supervision environment.

15.   OPSO's pre-service and in-service training needs to be substantially enhanced to include the soon-to-be updated policies and procedures.

16.   OPSO should develop a retention plan to keep officers and employees it worked hard to recruit, screen and train.[22]

17.   OPSO's staffing plan should include contingencies for circumstances in which not a sufficient number of employees can be hired, or retained.

---

[21] Op. Cit. Stinchcomb, et. al, pages 60 – 61.
[22] Op. Cit. Stinchcomb, et. al. page 88.

18.     OPSO should begin the process of keeping detailed data regarding

recruitment, applicant screening, and attrition.

**6.b.**     Review the periodic report to determine whether staffing is adequate to meet the requirements of this Agreement.  OPSO shall make recommendations regarding staffing based on this review.  The review and recommendations will be documented and provided to the Monitor.

Findings:  NA – staffing plan due 1/21/14

Measures of Compliance:
1.     See IV.A.6.a
2.     Updated of staffing plans, and shift relief factors (every four years)
3.     OPSO written recommendations regarding staffing; requests for funding.

Observations:

See IV. A. 6. a., above

Recommendations:  None at this time.  Future reports will be based on the staffing plan and compliance with that document.

## 7. Incidents and Referrals

a.     OPSO shall develop and implement policies that ensure that Facility watch commanders have knowledge of reportable incidents in OPP to take action in a timely manner to prevent harm to prisoners or take other corrective action.   At a minimum, OPSO shall do the following:
b.     Continue to ensure that Facility watch commanders document all reportable incidents by the end of their shift, but no later than 24 hours after the incident, including prisoner fights, rule violations, prisoner injuries, suicide attempts, cell extractions, medical emergencies, found contraband, vandalism, escapes and escape attempts, and fires.
c.     Continue to ensure that Facility watch commanders report all suicides and deaths no later than one hour after the incident, to a supervisor, IAD, the Special Operations Division, and medical and mental health staff.
d.     Provide formal pre-service and annual in-service training on proper incident reporting policies and procedures.
e.     Implement a policy providing that it is a disciplinary infraction for staff to fail to report any reportable incident that occurred on his or her shift.  Failure to formally report any observed prisoner injury may result in staff discipline, up to and including termination.
f.     Maintain a system to track all reportable incidents that, at a minimum, includes the following information:
    (1)     tracking number;
    (2)     the prisoner(s) name;
    (3)     housing classification and location;
    (4)     date and time;
    (5)     type of incident;
    (6)     injuries to staff or prisoner;
    (7)     medical care;
    (8)     primary and secondary staff involved;
    (9)     reviewing supervisor;
    (10)     external reviews and results;
    (11)     corrective action taken; and

(12)     administrative sign-off.

g.   Ensure that incident reports and prisoner grievances are screened for allegations of staff misconduct, and, if the incident or allegation meets established criteria in accordance with this Agreement, it is referred for investigation.

h.   Provide the Monitor a periodic data report of incidents at the Facility.  These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement.

i.   The report will include the following information:

(1)     a brief summary of all reportable incidents, by type and date;

(2)     a description of all suicides and in-custody deaths, including the date, name of prisoner, and housing unit;

(3)     number of prisoner grievances screened for allegations of misconduct; and

(4)     number of grievances referred to IAD or SOD for investigation.

j.   Conduct internal reviews of the periodic reports to determine whether the incident reporting system is ensuring that the constitutional rights of prisoners are respected.  Review the quarterly report to determine whether the incident reporting system is meeting the requirements of this Agreement.  OPSO shall make recommendations regarding the reporting system or other necessary changes in policy or staffing based on this review.  The review and recommendations will be documented and provided to the Monitor.

Findings:

IV.A.7.a. – NA – Due 2/21/14
IV.A.7.b. – NA – Due 2/21/14
IV.A.7.c. – NA – Due 2/21/14
IV.A.7.d. – NA – Due 2/21/14
IV.A.7.e. – NA – Due 2/21/14
IV.A.7.f. – NA – Due 2/21/14
IV.A.7.g. – NA – Due 2/21/14
IV.A.7.h. – NA – Due 2/21/14
IV.A.7.i – NA – Due 2/21/14
IV.A.7.j. – NA – Due 2/21/14

Measures of compliance

1.   Comprehensiveness of written policies
2.   Training
3.   Data collection and analysis
4.   Supervisory review of uses of force
5.   Review of use of force reports
6.   Review of incident reports, review of investigations by SOD
7.   Review of investigations by IAD
8.   Monitor's review of required semi-annual reports.

Observations:

The OPSO has in writing the basics of a policy requiring reporting of incidents.  However, there is nothing in place to ensure all incidents are being reported timely and accurately.  A review of a small sample of incident revealed

reports that were inadequate and/or incomplete, but had been signed off on by supervisors. The reports often contain boilerplate language that does not allow the reader to make an evaluation of the seriousness of the incident, the timeliness of the reporting of the incident, and/or the accuracy of the reporting of the incident. In addition, there is no automatic tracking system to ensure timely notification is being made.

Recommendation:

19.    Continue to work with Monitors to develop comprehensive policies and procedures and a reporting system that will enable OPSO to provide guidance, to train, and to hold accountable supervisors and deputies. Once comprehensive policies and procedures and a reporting system are developed, work with Monitors to develop appropriate training for deputies and supervisors.  In particular, training needs to stress that all uses of force are to be reported and properly investigated and that failure to report will result in discipline.  In addition, supervisors need to be trained on the mechanisms to ensure that all uses of force are properly reported and investigated in accordance with the policy.  The adequacy of the policies and procedures and reporting system is crucial to the Monitor being able to rely on the integrity of the periodic reports that are to be submitted under IV. A. 7. h.. and the sufficiency of the annual review that is to be conducted under IV. A. 7. j. which requires OPSO to assess whether the incident reporting system is meeting the requirements of the Consent Judgment.

## 20.    Investigations

OPSO shall ensure that it has sufficient staff to identify, investigate, and make recommendations correcting misconduct that has or may lead to a violation of the Constitution.   At a minimum, OPSO shall:
a.    Maintain implementation of comprehensive policies, procedures, and practices for the timely and thorough investigation of alleged staff misconduct, sexual assaults, and physical assaults of prisoners resulting in serious injury, in accordance with this Agreement.  Investigations shall:
   (1)    be conducted by persons who do not have conflicts of interest that bear on the partiality of the investigation;
   (2)    include timely, thorough, and documented interviews of all relevant staff and prisoners who were involved in or who witnessed the incident in question, to the extent practicable; and
   (3)    include all supporting evidence, including logs, witness and participant statements, references to policies and procedures relevant to the incident, physical evidence, and video or audio recordings.

b.   Continue to provide SOD and IAD staff with pre-service and annual in-service training on appropriate investigation policies and procedures, the investigation tracking process, investigatory interviewing techniques, and confidentiality requirements.

c.   Ensure that any investigative report indicating possible criminal behavior will be referred to IAD/SOD and then referred to the Orleans Parish District Attorney's Office, if appropriate.

d.   Provide the Monitor a periodic report of investigations conducted at the Facility.  These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement.

e.   The report will include the following information:

(1)   a brief summary of all completed investigations, by type and date;

(2)   a listing of investigations referred for administrative investigation;

(3)   a listing of all investigations referred to an appropriate law enforcement agency and the name of the agency; and

(4)   a listing of all staff suspended, terminated, arrested, or reassigned because of misconduct or violations of policy and procedures.  This list must also contain the specific misconduct and/or violation.

f.   OPSO shall review the periodic report to determine whether the investigation system is meeting the requirements of this Agreement and make recommendations regarding the investigation system or other necessary changes in policy based on this review.  The review and recommendations will be documented and provided to the Monitor.

Findings:

IV.A.8.a. - NA – Due 2/21/14

IV.A.8.b. - NA – Due 2/21/14

IV.A.8.c. - NA – Due 2/21/14

IV.A.8.d. - NA – Due 2/21/14

IV.A.8.e. - NA – Due 2/21/14

IV.A.8.f.  – NA – due 4/21/14

Measures of compliance:

1.   Review of incident reports,

2.   Review of use of force reports,

3.   Review of investigations by SOD,

4.   Review of investigations by IAD, and

5.   Monitor's review of required semi-annual reports.

Observations:

The OPSO has in writing the basics of policies requiring  investigation of incidents.  However, there is nothing in place to ensure all incidents are being investigated timely, thoroughly, adequately, and accurately.  One major issue with the quality of investigations is the delay in initially determining whether an incident needs to be investigated and by whom.  Often, the watch commander will undertake interviews of prisoners before calling SOD or IAD.  Unfortunately, the watch commanders often lack the investigative skills and actually hamper the ability of

SOD and IAD to conduct a thorough investigation. In particular, the lack of investigative skills possessed by watch commanders, particularly in regard to the investigation of sexual assaults, has the potential to further victimize prisoners. A review of a sample of investigations revealed that some of the investigations were inadequate and/or incomplete, but had been signed off on by supervisors. Additionally, often, there does not appear to be the desire and/or skill to conduct investigations when prisoners do not cooperate. To compound matters, the staff assigned to the SOD is required to fill numerous roles and is often pulled away from investigations for other duties that result in investigations not being conducted timely. While the SOD staff has some investigative training, it does not appear to corrections specific. For instance, investigations of sexual assaults in a correctional setting are not the same as investigations of sexual assaults in a non-custodial setting. The other division responsible for investigations is IAD. While IAD does not have the problem of filling numerous roles, the number of staff assigned to IAD is grossly inadequate to investigate all possible staff misconduct. Therefore, the case is often first investigated by SOD with the case only being passed on to IAD once it is determined that no criminal law violation has occurred. Given the age of the case, IAD is often required to rely on the evidence gathered and interviews conducted by SOD even though the emphasis of SOD was violation of criminal law as opposed to policy violation. Both IAD and SOD allow investigators appear to rely heavily on voice stress recognition to clear employees. There are frequent complaints that prisoners fear retaliation if they report staff misconduct.

Recommendations:

20.     Continue to work with Monitors to review and critique investigations. Provide additional training to investigators; particularly that which is corrections based. The adequacy of the investigations is crucial to the Monitor being able to rely on the accuracy of the periodic reports that are to be submitted under IV. A. 8. d. and the sufficiency of the review that is to be conducted under IV. A. 8. f. that requires OPSO to assess whether the investigation system is meeting the requirements of the Consent Judgment.

21.    Continue to work with Monitors to determine what unit or units should be tasked with investigating what types of matters.  For instance, all staff misconduct might be assigned to IAD for investigation.  However, for that to occur, procedures must be developed to protect the rights of staff members who are compelled to cooperate in the administrative investigation.  Additionally, the number of investigators assigned to IAD will need to be increased with an emphasis towards placing investigators with correctional experience in IAD.

## 9. Pretrial Placement in Alternative Settings

**9.a**. OPSO shall maintain its role of providing space and security to facilitate interviews conducted pursuant to the City's pretrial release program, which is intended to ensure placement in the least restrictive appropriate placement consistent with public safety.

Finding:  Partial Compliance

Measures of Compliance:
1.    Memorandum of understanding (MOU) with Pre-Trial Services.
2.    Observation
3.    Interview with pre-trial services staff
4.    Review of files
5.    Review of data regarding pre-trial diversion

Observations:

OPSO provides space for pre-trial services now, and has designated space in the new facility.  There is no formal, written, memorandum of understanding with the contractor (Vera) to guide this relationship.  Such an agreement would benefit both parties.  OPSO has indicated their willingness to develop this agreement.

A memorandum dated October 18, 2013 from the Assistant Chief of Security to the Chief Deputy notes that OPSO has agreed "to supply the Vera Group a deputy while working at IPC."   Vera was asked to provide a list of what they need from OPSO, this was provided and transmitted to OPSO on October 21, 2013.

Recommendation:
11.    Develop a written memorandum of agreement guiding the elements contained in this paragraph.

**9.b**. OPSO shall create a system to ensure that it does not unlawfully confine prisoners whose sole detainer is by Immigration and Customs Enforcement ("ICE"), where the detainer has expired.

Finding:  Partial Compliance

Measures of Compliance:
1.  Written policy/procedures regarding inmate record keeping, and release.
2.  List of inmates with ICE detainees and length of time in custody.
3.  Classification plan/policies/procedures
4.  Review of inmate release record.

Observation:

OPSO policy 50.15, Immigration and Customs Enforcement (ICE) Procedures, dated 6/21/13 provides that voluntary ICE detainers will be declined.  Monitors did not have an opportunity to do review files to determine how many inmates who are in OPSO custody who have ICE detainees, and the length of time in custody.  Monitors will conduct that review during the next tour.  The policy can be strengthened to assign the accountability for periodic review of inmates with ICE holds to insure they are not in custody after the detainer has expired.

This paragraph is in partial compliance pending review of files.

Recommendations:

22.    Update policy 50.15 to assign accountability for periodic review of ICE detainers to insure they not expired.

23.    Demonstrate that staff working in intake/records have been trained to monitor ICE detainers.

## IV. A. 10. Custodial Placement within OPP

**Introduction**

In sum, the OPSO is not in compliance with any of the elements of the Consent Judgment related to Custodial Placement within OPP (IV. A. 10) as the OPSO classification system is subjective; has not been statistically validated for OPSO populations; and does not include risk-based initial and reclassification processes. Classification-related management reports for tracking custody distributions by race, gender, or age (adult vs. youthful offenders); bed space availability, and separations by custody level and vulnerability were not available. Current classification staffing includes just two individuals

responsible for all initial intake assessments and housing assignments. While staff reported receiving introductory training on the classification instruments and processes, a handbook that documented the instructions for scoring of the risk factors, assigning an offender to a custody level, identifying his/her potential for victimization/predation, or overriding the scored custody, victimization, or predation assessment (PREA designations) was not available.

**Assessment Methodology**

This report was based on: 1.  Review of OPSO policies related to, but not limited to, classification, intake, disciplinary, housing, and sexual predatory/vulnerability screening; 2.  Interviews with OPSO executive, classification, information system, and housing staff; and 3. Observations of the intake classification processes.

IV.A.10. a.  OPP shall implement an objective and validated classification system that assigns prisoners to housing units by security levels, among other valid factors, in order to protect prisoners from unreasonable risk of harm.  The system shall include: consideration of a prisoner's security needs, severity of the current charge, types of prior commitments, suicide risk, history of escape attempts, history of violence, gang affiliations, and special needs, including mental illness, gender identity, age, and education requirements. OPSO shall anticipate periods of unusual intake volume and schedule sufficient classification staff to classify prisoners within 24 hours of booking and perform prisoner reclassifications, assist eligible DOC prisoners with re-entry assistance (release preparation), among other duties related to case management.

Finding:        Non-compliance

Measures of Compliance:
1.      Written policy/procedure governing the intake, booking, classification and re-classification process.
2.      Report including a statistical validation of the OPSO current custody classification system that includes statistical assessment of the risk and need factors of the inmate populations by gender and race.
3.      Implementation of the identified updates via an electronic file with the completed custody assessments for OPSO population.
4.      Report documenting required staffing needs.
5.      Implementation of viable classification/case management staffing plans.

Observations:

The Inmate Classification Policy and Procedures (501.14) dated 5/1/2009 are vague. The policy includes a set of vague factors for "classifying inmates into living units" but no instructions for assessment or prioritization of the respective factors. Of note is the fact that the classification policy is dated 5/1/2009, but the

classification screens used during the intake process are dated 3/21/2013. Clearly the policy has not been updated to include the forms used currently during the intake process.

The OPSO inmate classification system is actually a housing assignment process rather than a classification/risk assessment system to assess an offender's threat to institutional safety and security.  The OPSO classification process entails completion of three screens within the Jail Management System (JMS) prior to the offender's assignment to one of the OPSO housing units, e.g., the Tents, OPP (Orleans Parish Prison), Templeton V, etc.  The three forms are:

1. OPSO Classification System – Security Factors;
2. OPSO Sexual Victimization/Predatory Screening  -- Possible Victim Factors; and
3. OPSO Sexual Victimization/Predatory Screening  -- Possible Predatory Factors.

To its credit, the OPSO classification system forms are autoscored; OPSO classification staff had only to answer Yes/No to the respective factors to generate a security level and to identify the offender's potential for institutional predatory and victimization.  The automation also includes programming for reviewing the offender's prior OPSO bookings to identify prior criminal history and institutional incident reports (disciplinary infractions, etc.), thus staff are not required to page through the offender's prior OPSO bookings to score the risk factors regarding criminal history or institutional behavior. (Manual review of NCIC reports is required.) Staff did not have a handbook that documented the instructions for scoring of the risk factors, assigning an offender to a custody level, identifying his/her potential for victimization/predation, or overriding the scored custody, victimization, or predation assessment (PREA designations). Observation of the scoring of multiple offenders by the classification officers suggested significant inconsistencies in the scoring process between the two officers and among cases completed.

However, regardless of the security and PREA designations generated by the classification process, housing assignments are based primarily on the current offense and/or bond amount.[23] For example, an offender with a low security designation (based on his scored security factors) was assigned to TDC rather than the Tents due to his bond amount. The PREA designations did not figure into the housing assignment at intake. (However, if an offender requested protective custody or classification staff perceived the offender as vulnerable, the case was referred to Chief Weaver for review of the need for protective custody and the housing assignment.) Housing unit staff reported that offenders were allowed to select their own bunks or were assigned to the first available bed.

The OPSO classification system does not include a re-classification process that reviews an offender's security or PREA designation according to:

o *Events* – i.e., upon receipt of new information from the courts or other law enforcement agencies, institutional incident reports, or disciplinary reports, or

o *Periodic Schedule*  - examination of the risk factors and potential override factors every 120-days of incarceration.

**Classification Staffing** - Current classification staffing includes just two individuals who work between 5 am and 7 pm, Monday – Friday. While data was not available to determine the time between acceptance to booking and classification or if all offenders were classified prior to transfer to a housing unit; two individuals to classify all incoming offenders appeared woefully inadequate. Staff reported it takes, on average, 10 to 15 minutes to complete the security and PREA designation forms and assign an offender to a housing unit.  To generate an accurate assessment of the classification staffing needs will require additional information on any modifications to the intake process, classification intake and reclassification process, offender releases from booking, etc.

**Classification-related management reports -** Aggregate standardized reports to track offender security designations, PREA designations, override rates by type, and

---

[23] Offenders currently charged with murder or sexual assault or high bond amount are assigned to maximum custody; offenders charged with state charges are assigned to medium custody; and offenders charged with municipal and/or traffic charges are assigned to low/minimum security.

housing assignments by facility by unit were not available. Although the security and PREA designations are stored for each offender, routine classification management reports are not generated and distributed to classification staff, facility/supervisory staff, or executive staff to monitor the integrity of the classification system and ensure system safety and security.

Recommendation:

24.    Develop and implement an objective classification system based on the risks and needs of OPSO offender populations that include systematic initial and reclassification processes.

IV.A.10.b. Prohibit classifications based solely on race, color, national origin, or ethnicity.

Finding:  Non-compliance

Measures of Compliance:

1.    Implementation of a valid classification system based on the objective and reliable risk and need factors of the OPSO inmate populations as documented by a written report on the design/validation of the revised classification system and electronic file of custody assessments.

2.    Provide a quarterly report that tracks custody distributions by housing unit race, and gender to the Monitor.

Observations:

As indicated above (re: paragraph IV.A.10.a.), a statistical validation of the OPSO classification system has not been completed.  Dr. Gore reported that the classification system was modeled after the Northpointe Compas custody decision-tree process and the custody instruments of other jail systems. The OPSO's process for design of its classification system included pilot testing draft instruments to determine the custody distributions of maximum, medium, and low security inmates; and then adjusting the scores assigned to the respective risk factors and/or the security scale cut points to generate a housing process that appeared to address the OPSO housing requirements.  Thus, the selection, operational definition, and weights for the risk factor weights and custody scale cut points were not based on assessment of the OPSO offenders' threat to institutional safety and security. The same instruments are used for all offenders – male, female, and youthful offenders. Thus the gender- and age-specific validity of the factors' risks and needs of the OPSO

offenders has not been assessed. Written documentation of the processes for designing and pilot testing the current classification instruments was not available.

Of particular concern was the subjectivity of the scoring of the classification system and the relative weight assigned to criminal history and legal factors, e.g., bond amount, court (state/muni/DOC) that are generally weak to poor predictors of institutional risk.  As previously noted, the classification officers did not have a handbook with instruments for scoring of the risk factors; assigning an offender to a custody level; identifying his/her potential for victimization/ predation; or overriding the scored custody, victimization, or predation assessment (PREA designations).  Observation of classification process revealed inter-and intra-rater reliability concern, i.e., there were inconsistencies in the scoring of the security and PREA factors between the two classification officers as well as across offenders.

**Classification-related management reports:** Standardized aggregate reports to track custody decisions by housing unit race and gender during the last quarter were not available.

Recommendations:

25.   **Short-term:**  Develop a simple classification manual with instructions for scoring the current security and PREA risk factors, override criteria, and guidance for housing assignments**.**

26.   **Short-term:**  Create monthly statistical reports to track the custody distribution of OPSO offenders by housing unit race and gender during the last quarter

27.   **Long-term**: Document the development and statistical validation of an objective classification system based on the risk and needs of OPSO offender populations.

IV.A.10.c.  Ensure that the classification staff has sufficient access to current information regarding cell availability in each division.

Finding:  Non-compliance

Measures of Compliance:
1.   Develop and implement a housing unit assignment plan that outlines the mission, number of beds and custody level(s) for each OPSO housing unit.

2.      Provide a report of the daily counts to the classification housing staff as to the number of occupied, vacant, and out-of-order beds per pod per housing unit with electronic copies of the daily reports provided to the Monitor.

Observations:

The classification officers appeared to have clear understanding of the mission (gender, security level, and general needs [medical vs. mental health]) for each of the OPSO facilities, e.g., Templeton V, OPP, the Tents, etc.  However, with the exception of the Templeton medical/ mental health units, the OPSP Housing Unit Assignment Plan[24] did not include the individual units within each of the facilities. OPP staff indicated that an offender was assigned to a unit/housing type according to his risk to institutional security; these designations were not documented. The specific criteria for assignment of an inmate to the respective housing tiers were not provided.

Classification officers reported that the workday begins with calls to the respective facilities to determine the current bed availability.  One staff observed that the final tally of beds by security level is sometimes not complete until mid- to late morning. This delay slows down the classification process, as the options for assigning offenders to a facility are not available/ accurate.

Recommendations:

28.     **Short-term:**  Create an automated bed availability report within JMS that indicates the number and type of available beds for each of the units within OSPO facilities. At a minimum, the report should provide a count by unit and by facility.

29.     **Long-term:**  Develop and implement a housing unit assignment plan that outlines the mission, number of beds and custody level(s) for each OPSO housing unit. This HUAP must also incorporate adequate separation of offenders by PREA predatory and vulnerability designations.

IV.A.10. d. Continue to update the classification system to include information on each prisoner's history at OPSO.

---

[24] The HUAP was outlined in the inter-office memorandum dated November 13, 2013 from Colonel M. R. Laughlin to Sheriff M. N. Gusman entitled, "Overview of all OPSO facilities."

Finding:   Non-compliance

Measures of Compliance:

1.      Any automated management information system will include accurate data and within 8 hours of the custody assessment or status change, data regarding the inmates' custody level, medical, mental health, disciplinary infractions, and custody assessment (date, risk factor scoring, override reason [if applicable], and custody level).  Monitor will conduct audit of random sample of cases to determine accuracy and timely entry of data. Compliance standard will be 90% accurate and reliable.

2.      The custody assessments shall be updated/ reviewed following every 120 days, a hearing for a disciplinary infraction for major infraction, legal status change, new information from the court, and a major jail incident to include PREA or other major incident/investigation).  Monitor will conduct audit of random sample of cases to determine accuracy and timely entry of data. Compliance standard will be 90% accurate and reliable.

Observations:

The classification officers indicated that they are not responsible for updating information regarding the offender's case(s) on his/her return from court. In addition, housing units officers reported they did not systematically receive information on key risk-related factors (i.e., changes in bond amount/type, charges, sentence, etc.) on the offender's return from court.  It is unclear at this time who and when the data within JMS are updated.  Inquiries with JMS staff suggested that some of these key fields are unreliable.

Of particular concern was the JMS incident data. The JMS automation scans the OPSO incident reports to indicate whether the offender has a history of institutional misconduct, escape history, victimization, and/or predatory behaviors. However, some of the incident reports appeared incomplete, lacking documentation of the disciplinary hearing and/or finding(s). As a result, the scoring for critical risk factors was based on incomplete data.

Recommendations:

30. **Short-term:**  Review the post orders, directives, and training provided to OPSO records, disciplinary hearing, investigate staff to require timely input of all data regarding offender charges, bond amount, discipline, investigations, incidents, medical/mental health needs, custody assessment, and housing assignments

31. **Long-term:**  As previously indicated, an objective classification system based on the risk and needs of OPSO offender populations that includes systematic initial and reclassification processes is recommended. (See recommendations for IV. A. 10. a.)

IV.A.10. e. Continue competency-based training and access to all supervisors on the full capabilities of the OPSO classification and prisoner tracking system.

Finding:   Non-compliance

Measures of Compliance.
1. Written directive governing training of staff assigned to classification.
2. Curriculum for competency-based training regarding the custody classification system, housing assignment process, work/community assignments, and case management.  Evidence of knowledge gained.
3. Staff training roster(s) and competency tests following completion of competency-based training by current classification/case management staff.
4. Staff training roster(s) and competency tests following completion of competency-based training by all new or re-assigned staff on assignment to classification/case management duties.
5. Curriculum for classification module within the basic academy training curriculum for OPSO staff. Evidence of knowledge gained.
6. Staff training roster(s) and competency tests

Observations:

The classification officers indicated that training on the current classification system was provided when the automated instruments were rolled out in the JMS. However, they also reported that the instruments have evolved; and as previously noted, a classification handbook was not available.  The observed inconsistencies in the scoring of the security and PREA factors between the two classification officers, as well as across offenders, suggested the need for additional training.  Ad doc

conversations with security staff suggested that their understanding of classification was limited to the security designations based on current offense and bond amount. Recommendations:

32.   **Short-term:  a**. Provide current classification officers training on the current security and PREA instruments and process. The training should include testing with actual cases, as well as reliability testing, to ensure competency and consistence among staff.  **b**. Incorporate a basic description of principles of classification into the academy training provided to the classes of new officers and in-service training for current security staff.

33.   **Long-term:**  Provide competency-based training regarding the custody classification system, housing assignment process, work/community assignments, and case management to all OPSO staff.

IV.A. 10. f. Conduct internal and external review and validation of the classification and prisoner tracking system on at least an annual basis.

Finding:  Non-compliance

Measures of Compliance: the OPSO information system to monitor:
1.   Custody distributions by gender, race and special populations.
2.   Override rates.
3.   Housing by custody level/special needs, race.
4.   PREA separations.
5.   Custody re-assessments (regular and for-cause, # over-due, et al.).
6.   Electronic copies of the quarterly and annual reports shall be provided to the Monitor with documentation of steps (tasks and dates) taken to address any noted inconsistencies with OPSO policies.

Observations:

Quarterly tracking reports regarding OPSO custody distributions by gender, race and special populations; override rates; housing by custody level/special needs, race; PREA separations; and custody re-assessments were provided prior to the site visit or while on site. Subsequent inquiries with JMS staff indicated standardized classification reports do not exist at this time, however the data are available and that the reports could be created.

Recommendations:

34. **Short-term:** Create queries for simple classification-related management reports within the JMS. These reports should be reviewed at least monthly to monitor trends. However, classification staff should review the reports on PREA separations and housing by custody level daily to ensure that any discrepancies are corrected immediately. Note: the reports should include columns for noting the date and type(s) of corrective actions required addressing any discrepancies or problematic trends.

35. **Long-term:** Once the classification system has been updated to include a reclassification process, management reports to track custody re-assessments should be developed.

IV.A.10. g. Provide the Monitor a periodic report on classification at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. Each report will include the following information:
  (1) number of prisoner-on-prisoner assaults;
  (2) number of assaults against prisoners with mental illness;
  (3) number of prisoners who report having gang affiliations;
  (4) most serious offense leading to incarceration;
  (5) number of prisoners classified in each security level;
  (6) number of prisoners placed in protective custody; and
  (7) number of misconduct complaints.

Finding:  Not applicable to this reporting period. Report is due to the monitor on 2/21/2014.

Measures of Compliance:
1. Annual and bi-annual tracking reports within the OPSO information system to monitor number/rates during the last 12 months and for the stock population:
   o number of prisoner-on-prisoner assaults/custody level by gender;
   o number of assaults against prisoners with mental illness by gender;
   o number of prisoners who report having gang affiliations by gang affiliation;
   o most serious current offense leading to incarceration by gender;
   o number of prisoners currently classified in each security level;
   o number of prisoners placed in protective custody;
   o number of prisoners in administrative segregation; and
   o number of major and minor misconduct complaints.

Observations:  Not Applicable

Recommendations:  None at this time.

IV.A.10. h.        OPSO shall review the periodic data report and make recommendations regarding proper placement consistent with this Agreement or other necessary changes in policy based on this review. The review and recommendations will be documented and provided to the Monitor.

Finding:  Not applicable at this time.

Measures of compliance:
1.  Report to the Monitor with recommended change and rational/data regarding any policy changes.

Observations/Findings: Not Applicable.

Recommendations: None at this time.

## 11. Prisoner Grievance Process

11.a. (1)-(6) OPSO shall ensure that prisoners have a mechanism to express their grievances, resolve disputes, and ensure that concerns regarding their constitutional rights are addressed.  OPSO shall, at a minimum, do the following:

(1)  Continue to maintain policies and procedures to ensure that prisoners have access to an adequate grievance process and to ensure that grievances may be reported and filed confidentially, without requiring the intervention of a correctional officer.  The policies and procedures should be applicable and standardized across all the Facility divisions.

(2)  Ensure that each grievance receives appropriate follow-up, including providing a timely written response and tracking implementation of resolutions.

(3)  Ensure that grievance forms are available on all units and are available in Spanish and Vietnamese and that there is adequate opportunity for illiterate prisoners and prisoners who have physical or cognitive disabilities or language barriers to access the grievance system.

(4)  Separate the process of "requests to staff" from the grievance process and prioritize grievances that raise issues regarding prisoner safety or health.

(5)  Ensure that prisoner grievances are screened for allegations of staff misconduct and, if an incident or allegation warrants per this Agreement, that it is referred for investigation.

(6)  A member of the management staff shall review the grievance tracking system quarterly to identify areas of concerns.  These reviews and any recommendations will be documented and provided to the Monitor.

Finding:  Partial Compliance

Measures of Compliance:
1.  Written policy and procedures governing inmate grievances, and grievance appeals.   Directive shall include but not be limited to availability of grievance forms in required language, ability of inmates to secure forms upon request and deposit into secured boxes, prohibition against retaliation against inmates who file grievances, time deadlines on responses, assistance to inmates to file grievances (including assistance to inmates with mental illness, low functioning, non-English speaking).

2.  Written policies and procedures that designates a position/post responsible for assuring the collection and response to grievances, including maintenance of records, trends, and analysis of grievance data.

3.  An electronic tracking system.

4.  Written orientation to inmates regarding the grievance process.

5.  Inmate handbook.

6.      Curriculum/lesson plans to train staff (pre-service and in-service) regarding their roles and responsibilities regarding the inmate grievance process.
7.      Observation of inmate grievance boxes.
8.      Interviews with inmates.
9.      Interviews with employees.
10.     Observation of staff training.
11.     Observation of inmate orientation.
12.     Written policies/procedures governing the inmate request process.
13.     Inmate request forms.
14.     Review of referrals for investigation resulting from inmate grievances.
15.     Review of original inmate grievances and responses.
16.     Monitors' review of grievance logs, grievances, analysis of grievances conducted by OPSO.

Observations:

While OPSO has made a credible effort to improve inmate access to the grievance process, substantial work remains.   Paramount in the work needed is a fundamental change through education and supervision that the grievance process is important to the facility and staff need to manage it professionally.

OPSO policy 1301.7, Grievance Resolution:  Policy and Procedure, updated 7/1/13, sets out the guidelines for the grievance process.  OPSO has added a grievance screen to the stand-alone kiosks in all current facilities, except OPP, which allows inmates to enter a grievance, in either Spanish, Vietnamese, or English.

In response to the pre-tour document request, OPSO provide a summary of inmate grievances from January 1 – November 8, 2013.  The summary indicates that 1,431 grievances were received, the majority of which were reported as "request for services".  It is not clear why these grievances are identified as service requests, it may be because there is not a well developed grievance system, or it may be because there is no other means for inmates to formally get responses to their issues.

Regardless the reasons, efforts to improve the entire process are required, including, in the opinion of the monitors, the designation of a full-time grievance coordinator with the organizational placement and experience to manage the process, track data, and help solve inmate issues.  Another option for the consideration of OPSO is the hiring and/or designation of an ombudsperson with

the responsibility to be an inmate advocate, and work alongside OPSO to address systemic and individual problems.

The medical unit reported that grievances regarding medical care are reported as part of the Continuous Quality Improvement (CQI) process/meetings. Medical reported a total of 443 grievances for the period January – June, 2013, of which they report two were founded.  (See also, page 76 for Dr. Greifinger's review of the important of integrity in the medical grievance process.)

The Consent Judgment provides that grievance forms are available in Vietnamese, at the time of the tour, OPSO reported that there was one inmate of Vietnamese heritage in custody, and he spoke English.

Recommendations:

36.	Revise policy 1301.7 to assign the responsibility to a specific post/person for grievance management (rather than assign to the mail room).   Consider designating a position as Grievance Coordinator.   Consider designation of an ombudsperson.

37.	Assure that paragraph (6) is addressed in terms of reports to the monitor regarding inmate grievances.

38.	Refine the record keeping to ensure that the most prevalent grievances topics are documented, including trends.  Ensure that medical and mental health operational procedures are consistent with OPSO policies, and that there is consultation regarding grievances related to medical/mental health/dental care.

39.	Ensure that all employees are trained regarding the grievance process, and their role.

40.	Revise the policy to assure that that for the purposes of PREA compliance, there is no time limit imposed on inmates wishing to file grievances regarding sexual harassment, sexual assault, etc.

41.	Revise the inmate handbook to better explain the grievance and grievance appeal process.

42. Revise the policy to provide for assistance to inmates in filing a grievance, due to LEP, mental illness or disabilities, or when an inmate requests assistance.

43. Assure that there are either grievance forms in Vietnamese, per the Consent Judgment.

## 12. Sexual Abuse

OPSO will develop and implement policies, protocols, trainings, and audits, consistent with the requirements of the Prison Rape Elimination Act of 2003, 42 U.S.C. § 15601, et seq., and its implementation of regulations, including but not limited to, preventing, detecting, reporting, investigating, and collecting sexual abuse data, including prisoner-on-prisoner and staff-on-prisoner sexual abuse, sexual harassment, and sexual touching.

Finding:  Partial Compliance

Measures of Compliance:
1. Checklist of policies and procedures http://www.prearesourcecenter.org/sites/default/files/library/checklistofdocumentationfinal2.pdf
2. Auditor Compliance Tool http://www.prearesourcecenter.org/sites/default/files/library/auditorcompliancetoolfinal2.pdf
3. Completion of Jail Toolkit http://static.nicic.gov/Library/026880.pdf
4. Written policies and procedures, protocols, memorandum of agreement/understanding, training curriculum required by the standards.
5. Memorandum of agreement, sexual assault treatment center
6. Review of investigations.
7. Interviews with employees and inmates.
8. Referrals for prosecution
9. Qualifications of instructors.

Observations:

OPSO has named a PREA Compliance Coordinator, Deputy Hazel Bowser. OPSO has also been awarded a grant from the U. S. Dept. of Justice's Bureau of Justice Assistance's PREA Resource Center to hire a social worker specifically to provide PREA related services to inmates.  This Social Worker has begun work. The Coordinator and Social Worker have been tasked with working on PREA compliance.  The facilities have some PREA posters in inmate living areas.   OPSO has also provided staff training using the materials provided by the National Institute of Corrections, and using their webinars.

OPSO has two policies and procedures regarding PREA compliance:  1301.19, dated 10/14/13 Prison Rape Elimination Procedures, and 1301.17, Prison Rape Elimination Act (P.R.E.A.), dated 6/22/09.

OSPO has, at the Monitors' request, completed the self-assessment of their PREA readiness and identify the policies, procedures, training, etc. that need to be accomplished.   The document indicates the work that needs to be done, not just on a single PREA policy (1301.19), but with all other policies regarding classification, intake, housing, grievances, investigations, and data collection.

There is substantial work remaining to be done.   This includes, but is not limited to:  the investigative policies and procedures related to sexual assault, sexual harassment, voyeurism, etc.; development of memoranda of agreements with local sexual assault treatment centers; and collaboration with mental health services - both the jail's services as well as community services; and development and delivery of employee and contractor training, including training for investigators.

OPSO works with the District Attorney to prosecute inmates who are alleged to have sexually assaulted other inmates.  OPSO has a working relationship with a point person at the DA's office to review cases.  This collaboration resulted in recent indictments.

Recommendation:

44.    Based on the results of the analysis from the jail tool-kit, develop a specific action plan with due dates and benchmarks for compliance.

## 13. Access to Information

OPSO will ensure that all newly admitted prisoners receive information, through an inmate handbook and, at the discretion of the Jail, an orientation video, regarding the following topics:  understanding Facility disciplinary process and rules and regulations; reporting misconduct; reporting sexual abuse or assault; accessing medical and mental health care; emergency procedures; and sending and receiving mail; understanding the visitation process; and accessing the grievance process.

Findings:       Partial compliance

Measures of Compliance:
1.    Written policy/procedure governing inmate orientation, including but not limited to inmates with LEP, developmental disabilities, mental illness, etc.

2.      Inmate handbook; orientation videos in English, Spanish, Vietnamese.
3.      Observation of inmate orientation.
4.      Inmate interviews.
5.      Lesson plans, employee training, evidence of knowledge gained.
6.      Review of grievances.
7.      Post orders.

Observations:

OPSO's policy 501.12 Inmate Orientation, Inmate's Rights Form dated 9/1/2004 governs the orientation process.  OPSO also provided a two page "Inmate Orientation Form" (dated 5/1/07) that serves as the inmate handbook.  The document was provided in Spanish and English.

The process is insufficient in detail and assignment of responsibilities.  The policy doesn't address inmates with metal illness, how inmates with LEP are provided the information, or how inmates who are low functioning are oriented.

The inmate orientation materials will need substantial revision in preparation for the new jail.  PREA policy 1301.09 addresses inmate orientation regarding inmates watching a video regarding PREA, the OPSO's zero tolerance policy and reporting procedures.  The monitors did not have the opportunity to confirm this orientation process.

During tours of inmate housing units by members of the monitor team, when inmates were asked to produce an inmate handbook no inmate was able to produce one. In some units, information that should be included in an inmate handbook was taped to windows in the housing unit (and blocking the view into and out of the unit from the hallways).

Recommendations:

45.      Develop an inmate orientation process in English, Spanish and Vietnamese (written, video, and/or peer) that includes all elements of this paragraph, as well as the information required by the PREA standards.

46.      Assure that the materials are at a grade appropriate level, and in Spanish and Vietnamese.  Assure procedures for orientation of inmates who are illiterate, LEP, low functioning and/or have mental illness.

**IV.B.   Mental Health Care**

**Introduction**

This report is based on a review of the documents received, and December 16-20, 2013 onsite tours of the Orleans Parish Sheriff's Office jail facilities including interviews of 40 inmates and review of approximately 20 medical records.  Dr. Robert Greifinger, Monitor for Medical Services, and Dr. Raymond Patterson, Monitor for Mental Health Services, reviewed together a number of the areas listed in the Consent Judgment.  This report contains a brief introduction, my comments regarding specific elements of the Consent Judgment that pertain to mental health, and a summary of the findings.

The Orleans Parish Sheriff's Office (OPSO) has entered into a Consent Judgment with the Southern Poverty Law Office and U. S. Department of Justice as ordered by United States District Judge Lance M. Africk.  This report constitutes an initial assessment of the mental health services at OPSO correctional facilities based on a review of documents provided by OPSO, other documents relative to mental health services at OPSO facilities, and the Consent Judgment.

The OPSO has not demonstrated compliance with the Consent Judgment regarding mental health services.  The requirements of the Consent Judgment for mental health services may be generally divided into the following categories:

1. Staffing
2. Access to mental health care
3. Assessment of the mental health needs of inmates
4. A continuum of treatment services for inmates with mental health needs
5. Quality management including identification of performance indicators and measurement of those indicators to demonstrate the level of compliance with specific elements.  While there was one specific element that is in partial compliance based on the review and reports by OPSO staff, the other elements are not in full compliance or partial compliance.  The information in this report was shared at several meetings during the site visit, which included meetings with Judge Africk and the Chair of the City Council as well as other representatives of the City and representatives of the parties, the Sheriff and his administrative staff, the Chief

Deputy and Architect, and in discussions with the Medical Director, Chief

Psychiatrist, and other clinical and custody staff.

## B.  1.  Screening and Assessment:

a.    Develop and maintain comprehensive policies and procedures for appropriate screening and assessment of prisoners with mental illness. These policies should include definitions of emergent, urgent, and routine mental health needs, as well as timeframes for the provision of services for each category of mental health needs.

b.    Develop and implement an appropriate screening instrument that identifies mental health needs, and ensures timely access to a mental health professional when presenting symptoms require such care. The screening instrument should include the factors described in Appendix B. The screening instrument will be validated by a qualified professional approved by the Monitor within 180 days of the Effective Date and every 12 months thereafter, if necessary

c.    Ensure that all prisoners are screened by Qualified Medical Staff upon arrival to OPP, but no later than within eight hours, to identify a prisoner's risk for suicide or self-injurious behavior. No prisoner shall be held in isolation prior to an evaluation by medical staff.

d.    Implement a triage policy that utilizes the screening and assessment procedures to ensure that prisoners with emergent and urgent mental health needs are prioritized for services.

e.    Develop and implement protocols, commensurate with the level of risk of suicide or self-harm, to ensure that prisoners are protected from identified risks for suicide or self-injurious behavior. The protocols shall also require that a Qualified Mental Health Professional perform a mental health assessment, based on the prisoner's risk.

f.    For prisoners with emergent or urgent mental health needs, search the prisoner and monitor him/her with constant supervision until the prisoner is transferred to a Qualified Mental Health Professional for assessment.

g.    Ensure that a Qualified Mental Health Professional conducts appropriate mental health assessments within the following periods from the initial screen or other identification of need:

   1)    14 days, or sooner, if medically necessary, for prisoners with routine mental health needs;

   2)    48 hours, or sooner, if medically necessary, for prisoners with urgent mental health needs; and

   3)    immediately, but no later than two hours, for prisoners with emergent mental health needs.

h.    Ensure that a Qualified Mental Health Professional performs a mental health assessment no later than the next working day following any adverse triggering event (i.e., any suicide attempt, any suicide ideation, and any aggression to self resulting in serious injury)

i.    Ensure that a Qualified Mental Health Professional, as part of the prisoner's interdisciplinary treatment team, maintains a risk profile for each prisoner on the mental health case load based on the Assessment Factors identified in Appendix B, and develops and implements a treatment plan to minimize the risk of harm to each of these prisoners.

j.    Ensure adequate and timely treatment for prisoners whose assessments reveal mental illness and/or suicidal ideation, including timely and appropriate referrals for specialty care and visits with Qualified Mental Health Professionals, as clinically appropriate.

k.    Ensure crisis services are available to manage psychiatric emergencies. Such services include licensed in-patient psychiatric care, when clinically appropriate.

l.    On an annual basis, assess the process for screening prisoners for mental health needs to determine whether prisoners are being appropriately identified for care.  Based on this assessment, OPSO shall recommend changes to the screening system. The assessment and recommendations will be documented and provided to the Monitor.

Finding:    Non-compliance

Observations:

None of the items in the Screening Assessment Section for Mental Health Care are in compliance with the Consent Judgment.  The deficiencies are in the development and implementation of policies and screening instruments, and validation that the medical staff is indeed qualified to conduct screenings for risk of suicide or self-injurious behavior.  Additionally, the definitions required as well as policies and the utilization of a QMHP have not been achieved.  Therefore OPSO is not in compliance with these requirements.

| IV. B.2. | Treatment |
|---|---|

a.  Review, revise, and supplement its existing policies in order to implement a policy for the delivery of mental health services that includes a continuum of services, provides for necessary and appropriate mental health staff, includes a treatment plan for prisoners with serious mental illness and collects data and contains mechanisms sufficient to measure whether care is being provided in a manner consistent with the Constitution.
b.  Ensure that treatment plans adequately address prisoners' serious mental health needs and that the treatment plans contain interventions specifically tailored to the prisoners' diagnoses and problems.
c.  Provide group or individual therapy services by an appropriately licensed provider where necessary for prisoners with mental health needs.
d.  Ensure that mental health evaluations that are done as part of the disciplinary process include recommendations based on the prisoner's mental health status.
e.  Ensure that prisoners receive psychotropic medications in a timely manner and that prisoners have proper diagnoses and/or indications for each psychotropic medication they receive.
f.  Ensure that psychotropic medications are administered in a clinically appropriate manner as to prevent misuse, overdose, theft or violence related to the medication.
g.  Ensure that prescriptions for psychotropic medications are reviewed by a Qualified Mental Health Professional on a regular, timely basis and prisoners are properly monitored.
h.  Ensure that standards are established for the frequency of review and associated charting of psychotropic medication monitoring, including monitoring for metabolic effects of second generation psychotropic medications.

Finding:   Non-compliance

Observations:

None of the elements in the Treatment Section for mental health services is in compliance with the Consent Judgment.  More specifically, there is not a continuum of mental health services, there is not a provision for necessary and appropriate mental health staff, the treatment plans do not adequately address prisoner's serious mental health needs and do not contain interventions specifically tailored to the prisoner's diagnoses and problems.  In addition, there is no multidisciplinary treatment planning

process and there is no policy regarding the timeliness of treatment plans at any level of care including the "acute psychiatric unit", "step-down psychiatric unit", or for mentally ill inmates in general population.  There are inadequate individual therapy services for prisoners with mental health needs, and it appears there are no group therapy services. Mental health evaluations are not conducted as part of the disciplinary process.

For inmates receiving psychotropic medications, there are delays in the provision of psychotropic medications based on inadequate or untimely assessments of the prisoner's mental health needs and/or staff inattentiveness/disregard for the inmate's self-report of mental health diagnoses as well as past use of psychotropic medications.  The maintenance of inmates in the acute psychiatric and/or step-down units on 23-hour lockdown**,** with no medications being provided for several weeks to months despite opportunities to evaluate the mental health needs of these inmates and obtain past medical records and the availability of psychotropic medications is not adequate assessment or treatment.  In addition, psychotropic medication orders are written for 180 days, which is well beyond the appropriate standard for psychotropic medication orders, which are typically written for no more than 90 days**.**  In the case of many medications which are to be started at low dosages and then titrated to the inmate's specific needs, such 180 day prescriptions are well beyond acceptable timeframes and well below acceptable standards.  E-mails and memoranda were reviewed requiring that psychotropic medications be administered under Direct Observation Therapy (DOT) protocol rather than Keep On Person (KOP) protocols. These changes appear to have begun in September 2013**,** however prior to that time psychotropic medications were KOP and constituted a true and persistent risk for abuse and misuse, not only for the inmate for whom the medications were prescribed but also for other inmates in the environment who may have taken medications from vulnerable mentally ill inmates and misused them.

A review of two mortality reviews revealed that one inmate was able to overdose on psychotropic medications even though the prescription for the inmate was within the therapeutic guidelines**.**  The medications were provided KOP and therefore could have been stored by the inmate, as well as the inmate could have obtained medications from other inmates.  Lastly, there are no standards established for the

frequency of review and associated charting of psychotropic medication monitoring including monitoring for metabolic effects of second generation psychotropic medications as well as timely review of blood levels for medications such as mood stabilizers, which require timely blood level monitoring.

**IV. B.3.        Counseling**

a.   OPSO shall develop and implement policies and procedures for prisoner counseling in the areas of general mental health/therapy, sexual-abuse counseling, and alcohol and drug counseling. This should, at a minimum, include some provision for individual services.

b.   Within 180 days of the Effective Date, report all prisoner counseling services quarterly to the Monitor, which should include:

1)   the number of prisoners who report having participated in general mental health/therapy counseling at OPP;

2)   the number of prisoners who report having participated in alcohol and drug counseling services at OPP;

3)   the number of prisoners who report having participated in sexual-abuse counseling at OPP; and

4)   the number of cases with an appropriately licensed practitioner and related one-to-one counseling at OPP.

Finding:        Non-compliance

Observations:

This information has not been reported and given the staffing of the facility, i.e., one social worker providing mental health and substance abuse counseling services, and an additional social worker hired for PREA requirements to provide sexual abuse counseling, the staffing numbers are inadequate for the population of prisoners held under the custody of OPSO.

The counseling services provided at OPSO are not in compliance with the Consent Judgment.  In addition, there are requirements that mental health services and counseling be provided as appropriate for youth (inmates under the age of 18 and charged as adults) under the custody of OPSO which are also not being provided or reported to the monitor.

**IV.      B. 4.  Suicide Prevention Training Program**

a.   OPSO shall ensure that all staff who supervise prisoners have the adequate knowledge, skill, and ability to address the needs of prisoners at risk for suicide.  Within 180 days of the Effective Date, OPSO shall review and revise its current suicide prevention training curriculum, to include, the following topics:

1)   suicide prevention policies and procedures (as revised consistent with this Agreement);

2)   analysis of facility environments and why they may contribute to suicidal behavior;

3) potential predisposing factors to suicide;
4) high-risk suicide periods;
5) warning signs and symptoms of suicidal behavior;
6) case studies of recent suicides and serious suicide attempts;
7) mock demonstrations regarding the proper response to a suicide attempt;
8) differentiating between suicidal and self-injurious behavior; and
9) the proper use of emergency equipment.
b. Ensure that all correctional, medical, and mental health staff are trained on the suicide screening instrument and the medical intake tool.
c. Ensure that multi-disciplinary in-service training to include training on updated policies, procedures, and techniques is completed annually by all correctional, medical, and mental health staff. The training will be reviewed and approved by the Monitor.
d. Ensure that staff is trained in observing prisoners on suicide watch and step-down unit status.
e. Ensure that all staff that have contact with prisoners are certified in cardiopulmonary resuscitation ("CPR").
f. Ensure that an emergency response bag that includes a first aid kit and emergency rescue tool shall be in close proximity to all housing units. All staff that has contact with prisoners shall know the location of this emergency response bag and be trained to use its contents.
g. Randomly test five percent of relevant staff on an annual basis to determine their knowledge of suicide prevention policies. The testing instrument and policies shall be approved by the Monitor. The results of these assessments shall be evaluated to determine the need for changes in training practices. The review and conclusions will be documented and provided to the Monitor.

Finding:    Non-Compliance

Observations:

There is no multidisciplinary in-service training that is completed annually for OPSO staff, and the deputy staff members who are responsible for the observation of inmates on direct observation and suicide watch are not properly trained and the procedure is not properly conducted. On-site analysis of this process revealed one deputy responsible for 20+ inmates, three of whom were on direct observation and housed in different cells in the acute psychiatric unit and all others on suicide watch requiring documentation of that watch every 15 minutes. A review of the observation/restraint checklists for suicide watches and direct observations revealed that the checklists were not filled out in real time but later in the day after the actual observations were required, and that inmates under direct observation status were not under direct observation because it was simply impossible for one deputy to have direct observation on three inmates housed in different parts of the tier and not in direct line of site, which is what direct observation requires. These processes must be remedied by ensuring real and legitimate constant observation for inmates on direct observation and staggered at 15 minute checks for inmates on suicide watch. To

accomplish these tasks requires adequate security staffing (which is not present), an adequate physical plant which would allow for such observations, as well as suicide resistant cells and supplies including mattresses and suicide blankets which have not yet been adequately provided.  During this site visit, monitors did not verify the location and contents of the emergency response bag or that all staff having contact with prisoners are certified in CPR.  There was no testing of five percent of relevant staff on an annual basis to determine their knowledge of suicide prevention policies or the provision of the testing instrument and policies to be approved by the monitor.  OPSO is in non-compliance with the elements of this Consent Judgment requirement in those areas that were reviewed.  Monitors will review the emergency response bag and CPR provisions as well as the testing, instruments, policies and procedures, that OPSO intends to use prior to and during the next site visit.

## IV. B. 5. Suicide Precautions

a.   OPSO shall implement a policy to ensure that prisoners at risk of self harm are identified, protected, and treated in a manner consistent with the Constitution.
b.   Ensure that suicide prevention procedures include provisions for constant direct supervision of actively suicidal prisoners and close supervision of special needs prisoners   with lower levels of risk (at a minimum, 15 minute checks).  Correctional officers shall document their checks in a format that does not have pre-printed times.
c.   Ensure that prisoners on suicide watch are immediately searched and monitored with constant direct supervision until a Qualified Mental Health Professional conducts a suicide risk assessment, determines the degree of risk, and specifies the appropriate degree of supervision.
d.   Ensure that all prisoners discharged from suicide precautions receive a follow-up assessment within three to eight working days after discharge, as clinically appropriate, in accordance with a treatment plan developed by a Qualified Mental Health Care Professional. Upon discharge, the Qualified Mental Health Care Professional shall conduct a documented in-person assessment regarding the clinically appropriate follow-up intervals.
e.   Implement a step-down program providing clinically appropriate transition from suicide precautions for prisoners discharged from suicide precautions.
f.   Develop and implement policies and procedures for suicide precautions that set forth the conditions of the watch, incorporating a requirement of an individualized clinical determination of allowable clothing, property, and utensils. These conditions shall be altered only on the written instruction of a Qualified Mental Health Professional, except under emergency circumstances or when security considerations require.
g.   Ensure that cells designated by OPSO for housing suicidal prisoners are retrofitted to render them suicide-resistant (e.g., eliminating bed frames/holes, sprinkler heads, water faucet lips, and unshielded lighting or electrical sockets).
h.   Ensure that every suicide or serious suicide attempt is investigated by appropriate mental health and correctional staff, and that the results of the investigation are provided to the Sheriff and the Monitor.
i.   Direct observation orders for inmates placed on suicide watch shall be individualized by he ordering clinician based upon the clinical needs of each inmate, and shall not be more restrictive than is deemed necessary by the ordering clinician to ensure the safety and well being of the inmate.

j.  Provide the Monitor a periodic report on suicide and self-harm at the Facility.  These periodic reports shall be provided to the monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. The report will include the following:
    1)  all suicides;
    2)  all serious suicide or self-harm attempts; and
    3)  all uses of restraints to respond to or prevent a suicide attempt .
k.  Assess the periodic report to determine whether prisoners are being appropriately identified for risk of self harm, protected, and treated. Based on this assessment, OPSO shall document recommended changes to policies and procedures and provide these to the Monitor.

Finding: Non-compliance

Observations:

Several of these issues have been addressed in previous responses.  In summary, the suicide precautions implemented at OPSO are not in compliance with the requirements of the Consent Judgment.  The assessment process is seriously flawed, does not include a face-to-face assessment by a QMHP for each inmate prior to placement on the acute psychiatric unit or the step-down unit, but rather telephone consultation from the LPN in the IPC to the Medical Director or Chief Psychiatrist for placement in these units and for the level of supervision.  The level of supervision is not adequate and not appropriately conducted and the training does not address these issues.  The policies and procedures require review and improvement including the conditions of watch and the allowable items to be issued to inmates on suicide precaution.  The cells utilized are not suicide resistant.  The suicides or serious suicide attempts are investigated but inappropriately in that the Medical Director and Chief Psychiatrist are the investigators for the mortality and morbidity reviews and psychological autopsies, respectively, which are essentially review**s** of their own performance and without a focus on self-critical analysis of the individual inmate's care and treatment as well as policy and procedural system issues that do relate to policy and procedural deficiencies.  With an average daily population of approximately 2,200 prisoners for calendar year 2013, the two reported completed suicides result in a suicide rate of approximately 91/100,000 that is approximately twice the national

average for jails in the United States according to the United States Department of

Justice, Bureau of Justice Statistics.[25]

## IV. B. 6. Use of Restraints

a.  OPSO shall prevent the unnecessary or excessive use of physical or chemical restraints on prisoners with mental illness.
b.  Maintain comprehensive policies and procedures for the use of restraints for prisoners with mental illness consistent with the Constitution.
c.  Ensure that approval by a Qualified Medical or Mental Health Professional is received and documented prior to the use of restraints on prisoners living with mental illness or requiring suicide precautions.
d.  Ensure that restrained prisoners with mental illnesses are monitored at least every 15 minutes by Custody Staff to assess their physical condition.
e.  Ensure that Qualified Medical or Mental Health Staff document the use of restraints, including the basis for and duration of the use of restraints and the performance and results of welfare checks on restrained prisoners.
f.  Provide the Monitor a periodic report of restraint use at the Facility. These periodic reports shall be provided to the monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. Each report shall include:
    1)  A list of prisoners who were restrained;
    2)  A list of any self-injurious behavior observed or discovered while restrained; and
    3)  A list of any prisoners who were placed in restraints on three or more occasions in a thirty (30) day period or whom were kept in restraints for a period exceeding twenty-four (24) hours.
g.  Assess the periodic report to determine whether restraints are being used appropriately on prisoners with mental illness. Based on this assessment, OPSO shall document recommended changes to policies and procedures and provide these to the Monitor.

Finding:  Partial Compliance

Observations:

With regard to the use of restraints, OPSO staff report they have abolished their previous policy of placing inmates on suicide precautions or watch in five-point restraints.  The monitors were informed on site by Dr. Gore that there has not been the use of medical restraints for any reasons for the last several months and that use of medical restraints can be ordered only by the Medical Director.  Partial compliance on Items 6a and 6c is because of Dr. Gore's assurances that restraints for medical or psychiatric purposes have not been used in 2013, and restraints can only be ordered by him.  The monitors did not see use of restraints in incident reports or medical records the monitors reviewed.  Item 6b and 6f are not compliant and Item 6d, 6e, and 6g are not applicable (NA) at this time. The Medical Director assures the monitors that he has not

---

[25]United States Department of Justice, Bureau of Justice Statistics, Prison and Jail Deaths in Custody, 2000-2009, Statistical Tables, Dec. 2011, page 6. http://www.bjs.gov/content/pub/pdf/pjdc0009st.pdf accessed on February 8, 2014.

ordered medical restraints and no one else is authorized to do so.  The monitors did not receive any documents or updated policy regarding the use of medical restraints, which is required.  The will review all of these items for documentation at the next site visit.

## IV. B. 7.  Detoxification and Training

a.    OPSO shall ensure that all staff who supervise prisoners have the knowledge, skills, and abilities to identify and respond to detoxifying prisoners.  Within 180 days of the Effective Date, OPSO shall institute an annual in-service detoxification training program for Qualified Medical and Mental Health Staff and for correctional staff.  The detoxification training program shall include:

    (1)    annual staff training on alcohol and drug abuse withdrawal;

    (2)    training of Qualified Medical and Mental Health Staff on treatment of alcohol and drug abuse conducted by the Chief Medical Officer or his or her delegate;

    (3)    oversight of the training of correctional staff, including booking and housing unit officers, on the policies and procedures of the detoxification unit, by the Chief Medical Officer or his or her delegate;

    (4)    training on drug and alcohol withdrawal by Qualified Medical and Mental Health Staff;

    (5)    training of Qualified Medical and Mental Health Staff in providing prisoners with timely access to a Qualified Mental Health Professional, including psychiatrists, as clinically appropriate; and

    (6)    training of Qualified Medical and Mental Health Staff on the use and treatment of withdrawals, where medically appropriate.

b.    Provide medical screenings to determine the degree of risk for potentially life-threatening withdrawal from alcohol, benzodiazepines, and other substances, in accordance with Appendix B.

c.    Ensure that the nursing staff complete assessments of prisoners in detoxification on an individualized schedule, ordered by a Qualified Medical or Mental Health Professional, as clinically appropriate, to include observations and vital signs, including blood pressure.

d.    Annually, conduct a review of whether the detoxification training program has been effective in identifying concerns regarding policy, training, or the proper identification of and response to detoxifying prisoners. OPSO will document this review and provide its conclusions to the Monitor.

Finding:        Non-compliance

Measures of compliance:

1.  Document review of course outline, lesson plan, and training records.

Observations:

       The training outline for custody staff mentions the potentially life-threatening nature of withdrawal from alcohol or other substances on three slides used in pre-service training (Production 5.a.), there was no indication as to how many staff were trained, nor is there mention of annual training of custody staff or qualified medical and mental health staff.  There is no documentation of oversight of the training in the documents provided by OPSO to the monitor.

The Medical Receiving (Intake) Screening questionnaire has questions on drug and alcohol use in the past 30 days, including type, amount, frequency, and last use.  There is no inquiry into degree of risk (e.g., a history of severe withdrawal in the past) and no measurement of vital signs.  The CIWA-AR withdrawal scale mentioned in Appendix B of the Consent Order is not used at OPSO.  Provide medical screenings to determine the degree of risk for potentially life-threatening withdrawal from alcohol, benzodiazepines, and other substances, in accordance with Appendix B.

The review of medical records, the questionnaire was completed, but the positivity rates for alcohol or substance use were remarkably low for a jail.  One inmate was admitted to the hospital on November 19, 2013 with alcohol withdrawal related delirium; his booking screen was negative for mental illness and negative for alcohol.[26]  An inmate told the monitors that he had heavy use of alcohol and drugs, and that he had hepatitis C.[27] The latter was on his intake questionnaire, yet he had no follow up for this chronic and potentially fatal infection.  These suggest that the quality of intake screening might need to be enhanced.

Observation orders are individualized, though the monitors saw examples of failure to follow through with the orders.  As an example, an inmate was identified as at risk for alcohol withdrawal.[28]  He had an order for the medication clonidine, yet there was no indication on his medication administration record (MAR) that any doses were given.  Another inmate was booked on December 13, 2013 where it was documented that he was suicidal and was withdrawing from alcohol.[29]  His withdrawal history fell through the cracks and he was not monitored for his potentially life-threatening condition.

An annual review has not been performed yet.

Recommendations:

---

[26] # 2374757
[27] # 2365238
[28] # 2375999
[29] # 2376764

47.    OPSO should track and trend initial and annual training on withdrawal and detoxification for custody staff and medical and mental health staff and provide sufficient oversight to assure compliance.

48.    OPSO should add inquiry into the degree of risk of withdrawal and should require initial measurement of vital signs, in addition to periodic monitoring following the CIWA-AR protocol mentioned in Appendix B of the Consent Order.  Further, the OPSO should test the validity and reliability of nurses' performance on the initial screening and appropriate follow-up, according to policy and physician orders.

## IV. B. 8. Medical and Mental Health Staffing

a.   OPSO shall ensure that medical and mental health staffing is sufficient to provide adequate care for prisoners' serious medical and mental health needs, fulfill constitutional mandates and the terms of this Agreement, and allow for the adequate operation of the Facility, consistent with constitutional standards.
b.   Within 90 days of the Effective Date, OPSO shall conduct a comprehensive staffing plan and/or analysis to determine the medical and mental health staffing levels necessary to provide adequate care for prisoners' mental health needs and to carry out the requirements of this Agreement. Upon completion of the staffing plan and or analysis, OPSO shall provide its findings to the Monitor, SPLC, and DOJ for review. The Monitor, SPLC, and DOJ will have 60 days to raise any objections and recommend revisions to the staffing plan.

Finding:  Noncompliance

Observations:

By Dr. Patterson:

Prior to and during the course of the site visit, OPSO acknowledged that it has insufficient medical and mental health staffing.  During the site visit, frank discussions were held with the Sheriff, Jail Administrator, Medical Director and Chief Psychiatrist regarding the medical and mental health staffing needs and that OPSO is currently inadequately staffed for the provision of adequate health care as well as for the necessary infrastructure to document, demonstrate, analyze and report the provision of adequate medical and mental health care.  The staffing plan for the facility with regard to health care is due by January 21, 2014.  In discussions of the appropriate and necessary staffing levels for the provision of adequate medical and mental health care, specifically with regard to mental health care, it is very clear that this task is complicated/compromised by OPSO health care staff's

inability to adequately define the number of inmates receiving mental health services or requiring and/or receiving mental health services, the number of inmates who are receiving psychotropic medications for mental health conditions, and the adequacy of the intake, sick call and referral processes to determine the number of inmates who are identified by staff or by their self-report/request for mental health services.  The discussion focused on the facility's previous estimates of a prevalence of 6.5 percent of their inmate population with significant mental health needs, and 8 percent of their inmate population receiving psychotropic medications.  These numbers are gross underestimates of the need for mental health services and for the intervention of psychotropic medications, which should be a part of the therapeutic interventions provided rather than in many cases singular intervention provided for inmates with serious mental illness.  OPSO is not in compliance with the Consent Judgment regarding medical and mental health staffing.

By Dr. Greifinger:

Medical and mental health staffing is wholly inadequate to provide a constitutional level of medical and mental health care.  As an example, for medical, non-psychiatric care, there is a medical director who rarely sees patients, 0.8 FTE physician and 2.0 FTE nurse practitioners.  This is an approximate 50 percent or higher deficiency in primary care staffing.

OPSO plans to resubmit a staffing plan, following discussions with the medical and psychiatric monitors.

Recommendations:

49.     OPSO should increase professional staffing to provide sufficient access to qualified health professionals for patients with serious medical needs; increase support staffing to provide for constructive and meaningful clinical performance measurement to advise medical management of areas for intervention and to track performance in these areas over time; intensify training and supervision of nursing staff perform their duties in a timely and professional manner.

50.     OPSO should validate its screening instrument for mental health needs and
        assure that the actual need is met for mental health therapeutic interventions.

## IV.     B. 9. Risk Management

a.   OPSO shall develop, implement, and maintain a system to ensure that trends and incidents involving avoidable suicides and self-injurious behavior are identified and corrected in a timely manner. Within 90 days of the Effective Date, OPSO shall develop and implement a risk management system that identifies levels of risk for suicide and self-injurious behavior and requires intervention at the individual and system levels to prevent or minimize harm to prisoners, based on the triggers and thresholds set forth in Appendix B.

b.   The risk management system shall include the following processes to supplement the mental health screening and assessment processes: incident reporting, data collection, and data aggregation to capture sufficient information to formulate a reliable risk assessment at the individual and system levels; identification of at-risk prisoners in need of clinical treatment or assessment by the Interdisciplinary Team or the Mental Health Committee; and development and implementation of interventions that minimize and prevent harm in response to identified patterns and trends.

c.   OPSO shall develop and implement an Interdisciplinary Team, which utilizes intake screening, health assessment, and triggering event information for formulating treatment plans. The Interdisciplinary Team shall:

   1) include the Medical and Nursing directors, one or more members of the psychiatry staff, counseling staff, social services staff, and security staff, and other members as clinical circumstances dictate;
   2) conduct interdisciplinary treatment rounds, on a weekly basis, during which targeted patients are reviewed based upon screening and assessment factors, as well as triggering events; and
   3) provide individualized treatment plans based, in part, on screening and assessment factors, to all mental health patients seen by various providers.

d.   OPSO shall develop and implement a Mental Health Review Committee that will, on a monthly basis, review mental health statistics including, but not limited to, risk management triggers and trends at both the individual and system levels. The Mental Health Review Committee shall:

   1) include the Medical and Nursing Director, one or more members of the psychiatry staff and social services staff, the Health Services Administrator, the Warden of the facility housing the Acute Psychiatric Unit, and the Risk Manager.
   2) identify at-risk patients in need of mental health case management who may require intervention from and referral to the Interdisciplinary Team, the OPSO administration, or other providers.
   3) conduct department-wide analyses and validation of both the mental health and self-harm screening and assessment processes and tools, review the quality of screenings and assessments and the timeliness and appropriateness of care provided, and make recommendations on changes and corrective actions;
   4) analyze individual and aggregate mental health data and identify trends and triggers that indicate risk of harm;
   5) review data on mental health appointments, including the number of appointments and wait times before care is received; and
   6) review policies, training, and staffing and recommend changes, supplemental training, or corrective actions.

e.   OPSO shall develop and implement a Quality Improvement and Morbidity and Mortality Review Committee that will review, on at least a quarterly basis, risk management triggers and trends and quality improvement reports in order to improve care on a Jail-wide basis.

   1) The Quality Improvement Committee shall include the Medical Director, the Director of Psychiatry, the Chief Deputy, the Risk Manager, and the Director of Training. The Quality Improvement Committee shall review and analyze activities and conclusions of the Mental Health Review Committee and pursue Jail-wide corrective actions.
   2) The Quality Improvement Committee shall:

      (a)  monitor all risk management activities of the facilities through the review of risk data, identification of individual and systemic trends, and recommendation and monitored implementation of investigation or corrective action; and

      (b)  generate reports of risk data analyzed and corrective actions taken.

3)  The Morbidity and Mortality Review Committee shall include one or more members of Jail operations, the medical department, the mental health department, related clinical disciplines, corrections, and the Risk Manager. The Morbidity and Mortality Review Committee shall:

      (a)  Review suicides and serious suicide attempts in a morbidity and mortality capacity;

      (b)  outline the factors involved in each case, including the individual circumstances, identification of predisposing factors, documentation, medical and security procedures and training, and perform a psychological autopsy and morbidity report;

      (c)  recommend changes to medical and security policies and procedures;

      (d)  develop a written plan, with a timetable, for corrective actions; and

      (e)  Ensure a final mortality review report is completed within 30 days of a suicide or suicide attempt.

OPSO shall review mortality and morbidity reports quarterly to determine whether the risk management system is ensuring compliance with the terms of this Agreement. OPSO shall make recommendations regarding the risk management system or other necessary changes in policy based on this review. The review and recommendations will be documented and provided to the Monitor.

Finding: Non-compliance

Observations:

By Dr. Patterson:

      OPSO is not in compliance with these requirements of the Consent Judgment. Although the monitors were informed on site that an Interdisciplinary Team has been implemented, the actual policies and purpose of the risk management system as well as the identified components including the Interdisciplinary Team, Mental Health Review Committee, and Quality Improvement and Morbidity and Mortality Committee have not been formulated in policy or provided to the monitors for approval. Also, based on discussions the OPSO staff appeared to not clearly understand the distinct purposes and objectives to be achieved by these committees. Open discussion regarding the appropriate identification and mission of each of these risk management components, including: (1) the interdisciplinary treatment team to assess, review and implement individualized treatment plans for inmates receiving mental health services, (2) the Mental Health Committee to review the mental health programs and their functions along a continuum of mental health care, and (3) the Quality Improvement Committee and the Morbidity and Mortality Review Committee to review systems issues which will include individualized

Morbidity and Mortality Reviews of specific inmates receiving mental health and/or medical services, with an additional purpose being to assess the risk management issues on a systems-wide basis including but not limited to clinical care, custody supervision, physical plant deficiencies/needs/modifications for suicide resistant cells and supplies, and the effectiveness of the Suicide Prevention and Management Program as well as effectiveness of medical interventions for inmates under review by the Morbidity and Mortality Committee as primary responsibilities for the overall Quality Improvement and Morbidity and Mortality Committee.  OPSO is not in compliance with the risk management elements of the Consent Judgment.

During the course of the site visit , the monitors reviewed a significant number of medical records and interviewed inmates in Templeman V (the designated acute psychiatric units and step-down units), and in various other facilities including the tents (for female inmates), Conchetta (for youth inmates under the age of 18), and Orleans Parish Prison (segregation inmates) to get a better assessment of the overall programs, including input from inmates receiving services and/or in need of assessment of their mental health conditions and needs.  Although the Consent Judgment does not specifically identify the need for counseling/therapy for youth detainees and inmates, it does specify the requirement for the assessment of the mental health needs of youth. The monitors interviewed 13 youth inmates on Tiers 2T and 3T in the Conchetta facility, which includes inmates in general population and in segregation.  None of the youthful inmates that the monitors interviewed reported a need for mental health services or they had been receiving mental health services prior to incarceration, however the inmates the monitors interviewed in segregation expressed a need for (1) more contact with mental health and medical staff and reported that they did not have weekly visits in segregation by mental health staff, (2) more contact with family, and (3) they had questions regarding how long they might remain in segregation.  Based on the documents received there have been reported concerns that the youth inmates, particularly those in segregation but also generally, have been engaged in "acting out" behavior including throwing bodily fluids as well as being disruptive, and there has been limited supervision by deputies on these two tiers.

It is strongly recommend that there be at least weekly rounds on both units by mental health staff and the provision of out-of-cell contact with mental health staff on an individualized and/or group basis on at least a weekly basis for counseling, which would be greater than simply making rounds but more focused on at least one if not several hours per week on each tier to address issues raised by the youth in general population as well as in segregation status.

By Dr. Greifinger:

OPSO plans to develop, implement, and maintain a system to ensure that trends and incidents involving avoidable suicides and self-injurious behavior are identified and corrected in a timely manner.  Within 90 days of the Effective Date, OPSO shall develop and implement a risk management system that identifies levels of risk for suicide and self-injurious behavior and requires intervention at the individual and system levels to prevent or minimize harm to prisoners, based on the triggers and thresholds set forth in Appendix B.

OPSO has a Quality Improvement and Morbidity and Mortality Review Committee.  However, that committee does not meet to review additional autopsy and/or toxicology findings that may alter the conclusions of the committee.  As an example, there was a death in February 2013.[30]  Subsequent to the mortality review, one that found that general medical care standards were met, the autopsy and toxicology report noted toxic levels of a medication that had been prescribed for this patient.  The lack of a revisit to this case impeded OPSO's ability to attribute the overdose to keep-on-person policies for psychotropic medication and therefore impeded OPSO in developing a remedial action plan.  Further, the committee does not review risk management triggers and trends to improve care on a Jail-wide basis.

The Quality Improvement Committee does little clinical performance measurement.  It is recommended that the OPSO revise and adopt a clinical performance measurement program presented prior to the site visit, to measure, report, and trend in areas of high risk.  The OPSO chief medical officer has

---

[30] # 2328464

committed to provide these measurements to the monitoring team prior to the next site visit

OPSO has yet to review mortality and morbidity reports quarterly to determine whether the risk management system is ensuring compliance with the terms of this Consent Judgment.

Recommendations:

51.    OPSO should Improve tracking systems for follow-up appointments, medication orders, and laboratory testing and develop systems for documenting all care in a single, unit medical record, whether it be paper or electronic.

52.    Develop quantitative and qualitative data analysis for clinical data, including performance measuring, mortality review, grievance analysis, etc.  Use these analyses to drive constructive change in medical care policies and practices.

53.    OPSO should develop, implement, and maintain a system to ensure that trends and incidents involving avoidable suicides and self-injurious behavior are identified and corrected in a timely manner.

54.    OPSO should enhance its morbidity and mortality reviews to incorporate information received subsequent to the initial review and should amend corrective action plans therein.

**Mental Health Care - Summary**

In summary, OPSO is not in compliance with any of the elements of the Consent Judgment but has demonstrated some recent changes in their practices and procedures, including most notably the abolishment of the practice of Keep On Person psychotropic medications for inmates.  This practice does not appear to have been specified by policy and it is a strong recommendation that the policy on medication management for inmates on the mental health caseload be specific that not only psychotropics but all medications administered to inmates on the mental health caseload or receiving mental health services shall be administered via direct observation therapy (DOT).  To limit the DOT provision to only psychotropic medications for inmates receiving mental health services and/or acknowledged to be on the mental health caseload would be insufficient in that inmates at

greater risk of harm to self and/or compromised mental health functioning should also not have any medications in their possession that could be used for self-harm or could be cause for them to be victimized or harassed by other inmates for their medications.  The other area of significant change and improvement is in the use of restraints, and it is expected that the reporting requirements for the use of restraints as well as other reporting requirements, such as morbidity and mortality reviews for suicide, suicide attempts and self-injurious behaviors, will be met according to the timelines in the Consent Judgment. Moreover, it is imperative that mechanisms be devised and implemented by OPSO to accurately report the number of inmates who are receiving mental health services as well as the number of inmates who are identified as being on the mental health caseload, receiving psychotropic medications for mental health reasons, and/or placed on suicide precautions at any time.

This concludes the initial report on the mental health services provided by OPSO and compliance with the Consent Judgment.  The objective of this report is informative and the monitor looks forward to working with the mental health, medical, custody and administrative staff at OPSO to accomplish successful implementation of the requirements of the Consent Judgment.

## C.      Medical Care[ii]

### Introduction

This is a report on compliance with the medical care aspects of the Consent Judgment, including the treatment of intoxication and withdrawal.  The Defendants are not in compliance with any of the elements reviewed during the monitors' tour the week of December 16, 2013.  At the Orleans Parish prison there is risk of serious harm to prisoners with serious medical needs.  The facilities have insufficient health professional staffing; insufficient policies; inadequate training and supervision; confusing and disorganized medical-record keeping practices; insufficient performance measurement and self-critical analysis; and inattention to sanitation and public health practices as described in my findings, below.  There are a series of recommendations that follow findings.

### Assessment Methodology

- December 16 – 20, 2013 on-site.

- Materials reviewed included Consent Judgment and other Orders; OPSO documents produced by Defendants on November 24, 2013; OPSO documents produced on-site by Dr. Gore and on December 20, 2013 in scanned format; staffing plans; NCCHC reports; Policies & Procedures; budget; Plaintiffs' expert reports; mortality reviews, including autopsies (2); correspondence from Plaintiffs; news articles; off-site referral logs (routing sheets); and selected medical records.

- Interviews included Sheriff and Sheriff's staff; jail administration; Samuel Gore, MD, Medical Director; C. Michael Higgins, MD, Director of Psychiatry; Darryle Jackson, RN, Director of Nursing; Mary Benitez, RN, Medical Operations; Tonya Jones, RN, OPP Clinic Manager; Jose Ham, Health Services Administrator.  Also, the architect and project management staff for new jail.

IV. C. OPSO shall ensure constitutionally adequate treatment of prisoners' medical needs.  OPSO shall prevent unnecessary risks to prisoners and ensure proper medication administration practices.  OPSO shall assess on an annual or more frequent basis whether the medical services at OPP comply with the Constitution.  At a minimum, OPSO shall:

1.  Quality Management of Medication Administration
   a.  Within 120 days of the Effective Date, ensure that medical and mental health staff are trained on proper medication administration practices, including appropriately labeling containers and contemporaneously recording medication administration;
   b.  Ensure that physicians provide a systematic review of the use of medication to ensure that each prisoner's prescribed regimen continues to be appropriate and effective for his or her condition;
   c.  Maintain medication administration protocols that provide adequate direction on how to take medications, describe the names of the medications, how frequently to take medications, and identify how prisoners taking such medications are monitored; and
   d.  Maintain medication administration protocols that prevent misuse, overdose, theft, or violence related to medication.

2.  Health Care Delivered
   a.  Provide the Monitor a periodic report on health care at the Facility.  These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement.  Each report will include:
      (1)  number of prisoners transferred to the emergency room for medical treatment related to medication errors;
      (2)  number of prisoners taken to the infirmary for non-emergency treatment related to medication errors;
      (3)  number of prisoners prescribed psychotropic medications;
      (4)  number of prisoners prescribed "keep on person" medications; and
      (5)  occurrences of medication variances.
   b.  Review the periodic health care delivery reports to determine whether the medication administration protocols and requirements of this Agreement are followed.  OPSO shall make recommendations regarding the medication administration process, or other necessary changes in policy, based on this review.  The review and recommendations will be documented and provided to the Monitor.

3.  Release and Transfer

a.   OPSO shall notify Qualified Medical or Mental Health staff regarding the   release of prisoners with serious medical and/or mental health needs from OPSO custody, as soon as such information is available.

b.   When Qualified Medical or Mental Health staff are notified of the release of prisoners with serious medical and/or mental health needs from OPSO custody, OPSO shall provide these prisoners with at least a seven-day supply of appropriate prescription medication, unless a different amount is necessary and medically appropriate to serve as a bridge until prisoners can reasonably arrange for continuity of care in the community.

c.   For all other prisoners with serious medical and/or mental health needs who are released from OPSO custody without advance notice, OPSO shall provide the prisoner a prescription for his or her medications, printed instructions regarding prescription medications, and resources indicating where prescriptions may be filled in the community.

d.   For prisoners who are being transferred to another facility, OPSO shall prepare and send with a transferring prisoner, a transition summary detailing major health problems and listing current medications and dosages, as well as medication history while at the Facility. OPSO shall also supply sufficient medication for the period of transit for prisoners who are being transferred to another correctional facility or other institution, in the amount required by the receiving agency.

Finding:        Non-compliance

Measures of compliance:
1.      Quality management documents,
2.      Inmate complaints and grievances,
3.      Medical records.

Observations:

OPSO has not yet ensured constitutionally adequate treatment of prisoners' medical needs.

Safety and Hygiene - All of the medical care facilities were soiled.  The examination table covers were torn, making disinfection between patients impossible.  Each medical area had unsecured used sharps containers and improperly covered hazardous waste containers.  There were unsecured scissors and needles in several unlocked drawers in the Temporary IPC and unsecured sharps and accessible hazardous waste in Templeman A-4.

OPSO inmates are not provided with bed sheets and there is no disinfection of mattresses between inmates.  This puts both staff and inmates at serious risk of harm from communicable disease, especially methicillin-resistant Staphylococcus aureus disease (MRSA).

Medical Recordkeeping Practices - The medical records are a combination of paper and electronic, with laboratory reports and medication administration

records accessible at a computer terminal.  A new medical record is generated each time a prisoner is booked.  These processes are cumbersome for practical use by practitioners and cumbersome for clinical performance measurement.  The practices on the written record are also unnecessarily cumbersome.  An inmate was seen for asthma, hypertension, and elevated lipids.[31]  Because of the cumbersome system of forms, his progress note was five pages, yet there was no indication on any of those pages as to whether his laboratory values were checked and whether his disease was controlled.  These faulty practices interfere with continuity and coordination of medical care.

Utilization Management - OPSO has an arrangement with LA DOC to provide utilization management services and off-site care.  The DOC has engaged a managed care company to review and approve requests for outside care through a program called Eceptionist.  Routine GYN care and PAP smears are not covered.  There is no harm in using an efficient utilization management program to assure appropriate use of resources.  These programs, however, should have explicit written criteria based on nationally accepted and evidence-based guidelines.  The LA DOC program "is developing the guidelines to define medically necessary care" according to their document Healthcare Redesign."  The lack of rational criteria poses a risk of harm for patients and makes medical management quite challenging for the Medical Director of the OPSO.  The monitor was told that hernia surgery is routinely denied, unless the patient has a life-threatening strangulation.

Confidentiality - OPSO has no arrangement for language translation services.  As a result, inmates are used to translate.  This is a haphazard and unreliable practice.

Access to Acute Care –The monitor found serious delays in access to an appropriate level of care for patients with serious medical needs.[32]  One inmate had

---

[31] 12352441

[32] A serious medical need is a valid health condition that, without timely medical intervention, will cause (1) unnecessary pain, (2) measurable deterioration in function (including organ function), (3) death, or (4) substantial risk to the public health. (Greifinger RB. Health Care Quality Through Care Management, M. Puisis (ed). *Clinical Practice in Correctional Medicine, Second Edition*. St. Louis. Mosby 2006: p. 512)

had multiple hospital admissions for bacteremia (bloodstream infection).[33]  He was seen by a facility physician on December 11, 2013 and found to be unresponsive, yet the physician chose not to get vital signs or to examine him because the patient called the physician a "quack."  Two days later the patient was in the hospital, where he likely should have been two days prior.  Another patient complained of boils in a written request for care on September 18, 2013 but was not seen for two weeks.[34]  He was treated with an antibiotic and had wound care ordered, though he never got the wound care.  There was no follow-up to see if the treatment was working.  On December 2, 2013 he was admitted to the hospital for an out of control infection.  Another patient had a four-day lag in early December 2013 to being seen for abdominal pain and rectal bleeding; when he was seen on day four he had to be admitted to the hospital where he spent four days.[35]

The complacency evident in these cases is unacceptable.  Another patient is an elderly man with growths under his skin.[36]  He has congestive heart failure, hypertension, gastroesophageal reflux disease, elevated lipids and chronic obstructive pulmonary disease.  His facility physician ordered a surgical consultation six months ago, but it has not happened, with no apparent reason.  Further, he is on anticoagulation medication that requires regular monitoring and dosage adjustment if the blood levels are too high or too low.  This patient consistently had levels that put him at risk of hemorrhage, yet his physician failed to lower the dose.  The patient lowered the dose himself when he began to have excessive bleeding.  This patient is at risk of substantial harm because of poor medical care.

A patient repeatedly reported abdominal pain, yet he was not seen until he had a perforated ulcer.[37]  There was no outbound progress note, no copies of his written requests for care in the record, and no inbound progress note.

---

[33] See endnotes.
[34] # 2365375
[35] # 2374396
[36] See endnotes.
[37] See endnotes.

Several inmates stated that they had put in multiple written requests for medical care and had not been seen.  One had requested care for what she thought was a bacterial infection and wanted testing for sexually transmitted infection since she had had unprotected sex prior to her incarceration.[38]  She told me that she reported these conditions, as well as hepatitis C at booking.  Her intake screen was negative and there were no requests for care filed in her record.

A 17-year-old filed a written request for care (as documented in his record) for shortness of breath and has been waiting for two weeks to be seen.[39]  Another 17-year old filed a request for care for sleeplessness and needs follow-up for an elevated blood pressure.[40]

A woman in Tent 7 has been seen for chest pain.[41]  This occurred on the day she was interviewed her and she reported that she had fallen.  Though custody staff had been notified, health care staff did not arrange to see her in a timely way because "she had the same complaint 13 days prior.  This attitude puts patients at serious risk of harm.

<u>Chronic Care</u> – The monitor reviewed the records of six current patients, in custody for six months or more, who had a diagnosis of epilepsy.[42]  These patients were seen by nurse practitioners who followed nationally accepted clinical guidelines for clinical and laboratory monitoring.  The monitor also reviewed the medical care for seven current patients with diabetes, in custody for six months or more.[43]  The care for these patients was adequate, except a prescription for aspirin was ignored in six of the patients, an order for A1c hemoglobin was ignored and laboratory test results were routinely ignored.  In addition, one patient had poorly controlled blood pressured that was not followed, and another patient was assessed as "well controlled" despite having a laboratory test indicating terrible control (A1c hemoglobin = 11.9).

---

[38] # 2374515
[39] # 2359535
[40] # 2363992
[41] # 2372986
[42] # 2361777; 2338506; 2359311; 2368461; 2357103; 2364876
[43] # 2370284; 2355503; 2364926; 2360489; 2361729; 2328601; 2360793

A patient with HIV infection had to wait two months to be evaluated for treatment.[44]  Fortunately, he was not a candidate for treatment at this time, as his disease had not progressed.  Interestingly, this patient also had a negative intake screen

Taking Grievances Seriously **-** OPSO health care staff reports that more than 99 percent of inmate grievances are "unfounded."  It is the monitor's opinion that this is disingenuous and self-delusional.  There are substantial opportunities for improvement in the medical care for prisoners in Orleans Parish.  Inmate grievances are a valid source of information to identify opportunities for improvement and to track progress.  Finding grievances unfounded is like sticking one's head in the sand.

Further, these findings create anger and disrespect among inmate patients.

Balancing Dual Loyalties **-** Five nurses are commissioned Deputy Sheriffs and at least one wears her rank on her uniforms.  Behind bars, correctional health professionals have to balance the loyalties to their institution with their professional medical ethics.  The presence of nurses who have custody rank may be confusing to patients who might fear that telling a nurse about illicit drug use, particularly within the jail, may bring additional criminal charges.

Recommendations:

55.     OPSO should assure medical care facilities that are clean, safe, and secure.

56.     OPSO should provide clean linens for inmates and disinfection of mattresses between users.

57.     OPSO should assure that the utilization management system used for off-site services meets nationally-accepted criteria for medical necessity.

58.     OPSO should arrange for professional language interpretation services so as to provide confidentiality of medical information.

59.     OPSO should monitor timely access to care for patients with acute health care needs and for patients who need continuity of care and/or medications.

---

[44] See endnotes.

60.    OPSO should review and respond to grievances with a self-critical attitude and should track and trend health services grievances as part of its quality management program.

61.    OPSO should assure that health care staff conforms to standards of professional ethics in general, including assuring that health care and custody roles are clearly delineated and separated.

## IV.  C. 1.    Quality Management of Medication Administration

a.  Within 120 days of the Effective Date, ensure that medical and mental health staff are trained on proper medication administration practices, including appropriately labeling containers and contemporaneously recording medication administration;
b.  Ensure that physicians provide a systematic review of the use of medication to ensure that each prisoner's prescribed regimen continues to be appropriate and effective for his or her condition;
c.  Maintain medication administration protocols that provide adequate direction on how to take medications, describe the names of the medications, how frequently to take medications, and identify how prisoners taking such medications are monitored; and
d.  Maintain medication administration protocols that prevent misuse, overdose, theft, or violence related to medication.

Finding:        Non-compliance

Measures of compliance:
1.  Quality management documents
2.  Inmate complaints and grievances
3.  Medical records.

Observations:

OPSO was unable to provide a lesson plan or training records on medication administration practices.

OPSO was unable to provide data indicating physician review of appropriate and effective medication practices.

OPSO was unable to demonstrate that it maintains medication administration protocols that provide adequate direction on how to take medications, describe the names of the medications, how frequently to take medications, and identify how prisoners taking such medications are monitored. Typically, well running jails have a medication refusal policy that assures counseling the patient when they miss doses of medication and that they notify the prescribing practitioners when a patient misses his/her medication on three consecutive days.

This attention to medication adherence improves the quality of patient doctor communication and facilitates better outcomes.  OPSO has no such policy.

Inmates report significant lags to the first dose of medication.  The monitor documented a four-week lag to medications for a patient on the TDC handicap unit who had chronic pulmonary disease and hypertension.[45]  Another had a two-week lag to his blood pressure medication and a two-week lag to being seen for an acute problem at sick call.[46]

The monitor interviewed a woman who was seen on December 10 and had medication ordered for headache; she was charged for the visit and the medication, yet she never received it.[47]

The monitors did not review this element of the Consent Judgment requiring that OPSO maintain medication administration protocols that prevent misuse, overdose, theft, or violence related to medication on this visit.

Recommendations:

62.	OPSO should have documented expectations for medication practices, with a lesson plan, training, and training records.

63.	OPSO should develop and implement a policy for reporting serial medication refusals to the prescribing clinician to ascertain the reason for non-adherence and to develop a medication plan that will improve adherence.

64.	OPSO should track the time to first dose of prescribed medication and implement a system to eliminate time lags.

**IV.	C. 2. Health Care Delivered**

b.	Provide the Monitor a periodic report on health care at the Facility.  These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement.  Each report will include:

(1)	number of prisoners transferred to the emergency room for medical treatment related to medication errors;

(2)	number of prisoners taken to the infirmary for non-emergency treatment related to medication errors;

(3)	number of prisoners prescribed psychotropic medications;

(4)	number of prisoners prescribed "keep on person" medications; and

(5)	occurrences of medication variances.

---

[45] # 2370393

[46] # 2370478

[47] # 2373410

c.      Review the periodic health care delivery reports to determine whether the medication administration protocols and requirements of this Agreement are followed.  OPSO shall make recommendations regarding the medication administration process, or other necessary changes in policy, based on this review.  The review and recommendations will be documented and provided to the Monitor.

Finding:        Not applicable at this time.

Observations:

The reports in this section of the Judgment are not due at this time.  However, in the monitors' opinion, it would be quite difficult for OPSO to conform to items (1) and (2) and would not be worth the effort.  Item (4) would not be helpful; instead OPSO should monitor whether patients on the mental health caseload continue to be provided with keep on person medication.  In future tours, clarification of the intent of item (5) would be beneficial to the monitors.  The monitors are available to consult with the Parties to improve the structure of this section report.

## IV.C. 3.  Release and Transfer

e.      OPSO shall notify Qualified Medical or Mental Health staff regarding the release of prisoners with serious medical and/or mental health needs from OPSO custody, as soon as such information is available.

f.      When Qualified Medical or Mental Health staff are notified of the release of prisoners with serious medical and/or mental health needs from OPSO custody, OPSO shall provide these prisoners with at least a seven-day supply of appropriate prescription medication, unless a different amount is necessary and medically appropriate to serve as a bridge until prisoners can reasonably arrange for continuity of care in the community.

g.      For all other prisoners with serious medical and/or mental health needs who are released from OPSO custody without advance notice, OPSO shall provide the prisoner a prescription for his or her medications, printed instructions regarding prescription medications, and resources indicating where prescriptions may be filled in the community.

h.      For prisoners who are being transferred to another facility, OPSO shall prepare and send with a transferring prisoner, a transition summary detailing major health problems and listing current medications and dosages, as well as medication history while at the Facility. OPSO shall also supply sufficient medication for the period of transit for prisoners who are being transferred to another correctional facility or other institution, in the amount required by the receiving agency.

Finding:        Non-compliance

Measures of compliance:
1.      Interview

Observation:

OPSO has not developed a mechanism to notify qualified staff of impending releases.  As a result, bridge supplies of medication and prescriptions are not provided.

Recommendation:

65.    OPSO should develop and implement a mechanism to notify qualified health care staff of impending releases so as to provide bridge supplies of medication and prescriptions, as medically appropriate.

## IV. D. Sanitation and Environmental Conditions[48]

### Introduction

The purpose of the tour was to assess the conditions of confinement as they relate to the provisions of the Consent Judgment for sanitation, and environmental conditions, environmental controls, food service, and fire and life safety.  The conditions observed included, but were not limited to general sanitation, maintenance and preventative maintenance, housekeeping conditions, and practices, laundry, food service, control and use of potentially hazardous cleaning chemicals, waste handling, storage and disposal, fire and life safety practices, training, and staffing levels; all to assure the safety and public health

A first compliance report is typically the most challenging to write than those which will follow, and serves as the starting point for improvement.  The conditions in OPSO facilities did not evolve overnight.  It is expected that in future tours the monitor will see improved conditions of confinement for inmates and improved working environments for employees.

Prior to and during the tour, the monitor reviewed numerous policies and documents.  The content of these materials, interviews with employees and inmates, along with observations, provide the basis for this report.  Time constraints did not permit the monitor to visit every building, every cell, dayroom, or dormitory.  The monitor toured housing areas in Templeman V, Intake Processing Center, Orleans Parish Prison, the Tents, Docks, the new facility currently under construction and the newly opened Kitchen Warehouse. Understanding that many of the currently used facilities will be closing once the new jail is opened, served as the basis for selecting the facilities to tour.

To achieve compliance OPSO is encouraged to:

---

[48] See also Attachment B for "best practice" recommendations.

1. Develop policies and procedures that assign responsibility and accountability for functions, including the specific activities required of line staff, supervisors and management.

2. Develop and implement training based on those policies to assure employees' understanding, convey management's expectations and requirements and assure sustainability and enforcement;

3. Work to implement relevant policies and procedures prior to opening the new jail; and assure policies are updated in the facilities that will remain open.

4. Implement a maintenance system to support the jail.

5. Implement internal assessment and inspection processes to measure staff conformance with policies.

**Assessment Methodology**

Prior to arrival on-site policies and documents were for review provided by OPSO. During the tour the monitor met with management staff, interviewed both employees and inmates to understand specific issues and practices and provided a summary of findings to both the facility. The monitor also spoke with Department of Justice and the plaintiffs' representatives.  The parties were informed of findings each day.

The documents that were provided prior to the tour for review are listed in correspondence dated 11/14/13 from the Fire Safety Officer and the documents provided to Lead Monitor Susan McCampbell by OPSO on or around November 24, 2013.

Below is a list of key staff interviewed during the tour.

| | |
|---|---|
| Marlin Gusman, Sheriff | Mike Tidwell, Jail Administrator |
| Robert Martin, Director of Facilities Mgt. | Charles Reed, Dep. Dir. Facilities Mgt. |
| Capt. Sidney Holt, Transition Team Leader | Dep. Michael Holliday, Transition Team |
| Sgt. Nicole Harris, Transition Team | Cpl. Donna Watson, Laundry Services |
| Mary Goodwin, Mgr. Food Services | Maj. Phil Barre, Director of Inspections |
| Jamie Lampard, Fire Safety Officer | Warden Kevin Winfield, OPP |
| Co. Melvin Howard, Director of Operations | Terrell Robertson. Acting Dir. Training |
| Warden Gerrard Spinney, Templeman V | Warden, Tents |

**D. 1.  Sanitation and Environmental Conditions**

**IV. D. 1. a.** OPSO shall provide oversight and supervision of routine cleaning of housing units, showers, and medical areas.  Such oversight and supervision will include meaningful inspection processes and documentation, as well as establish routine cleaning requirements for toilets, showers, and housing units to be documented at least once a week but to occur more frequently.

Finding: Non-Compliance

Measures of Compliance:
1.  Written policies and procedures for cleaning and disinfecting, monitoring process with responsibility and accountability assigned developed in collaboration with monitor.
2.  List of controlled inventory of acceptable cleaning and disinfecting chemicals.
3.  Development and implementation of an effective weekly [or more frequently] auditing process with assigned responsibility and accountability and documentation.
4.  Monitor's onsite verification of implementation of both the policy(s) and the auditing process and report, along with corrective action when non-conformities to the policy/procedures are documented.
5.  Observation of conditions along with interviews with inmates and staff.

Observations:

In the facilities toured, there was insufficient cleanliness for the jail environment.  Throughout the tour of Templeman V, the Tents, OPP and the Docks, the monitor observed cells, dayrooms, common areas, and medical and dental areas that were not being maintained clean.  Inmates were keeping excess food from meal service in their cells.  Inmates 'personal belongings were stored on bunks and not in their personal property bags.  Inmates' mattresses and blankets were on the floor, or used to create visual privacy barriers make it impossible to keep cells clean or for staff to properly observe inmate activities.  Some inmates stored cleaning chemicals in their cells in unlabeled Styrofoam cups. There was no inventory system to control chemicals, and no processes to prevent inmates from using uncontrolled chemicals to injure other inmates or employees.  Policy 701.6, Storage, Control, and Disposal of Hazardous Materials, requires each facility to "establish a system for the control, handling, storing and use of flammable, toxic and caustic materials."  However, the monitor did not see any system in any facility.

The medical and dental clinics in Templeman V were disorganized, unclean, and had an accumulation of dirt, built up wax especially around the floor/wall junctures. There is no schedule or assigned responsibility to maintain cleanliness in the clinics.   Employees do not appear to be trained to use cleaning chemicals and supplies.

It was represented that a new inspection procedure was just being initiated at the time of the tour and therefore unable to assess the policy or the impact.  Draft Policy 1101.1 requires weekly housekeeping inspections and monthly Warden and Weekly Watch Commander inspections. It requires that the Warden or his designee will ensure that, "all areas are clean and orderly, that no fire, safety or health hazards, exist, no curtains, screens, paper, cellophane, or cardboard, etc. shall be hung in the cell or on cell doors because of the fire hazard and that the floor deputy shall inspect cells and living areas daily and report any infraction of these orders to his/her immediate Supervisor. It further requires that inspections shall be conducted of all institution areas by Shift Supervisors."

The Consent Judgment requires OPSO to provide oversight and supervision of routine cleaning of housing units, showers, and medical areas.

Recommendation:

66.     Revise the Housekeeping Procedures and Inspection Policy 1101.1 to include a facility specific housekeeping plan and schedule in accordance with this provision establishing routine cleaning requirements for toilets, showers, and housing units and schedule and a documented meaningful inspection process.  The policy should specify what has to be cleaned (floors, walls, showers, toilet/sink, beds, mattresses and etc., the required frequency for cleaning and disinfecting, who has which responsibilities, and how the cleaning is to be completed.

**IV. D .1. b.** OPSO shall continue the preventive maintenance plan to respond to routine and emergency maintenance needs, including ensuring that showers, toilets, and sink units are adequately installed and maintained.  Work orders will be submitted within 48 hours of identified deficiencies, or within 24 hours in the case of emergency maintenance needs.

Findings: Non-compliance

Measures of Compliance:
1.     Review of the preventative maintenance plan to determine who has responsibility to file work orders.
2.     Evidence of meeting the timelines for submission of work orders.
3.     Evidence of training of those assigned the responsibility to file work orders.
4.     Observation of practice and conditions.
5.     Work orders, invoices, and purchases in support of the preventive maintenance plan.

Observations:

Until recently maintenance tracking within OPSO was managed utilizing a system that was created internally by an IT department.  OPP has recently purchased and electronic preventative maintenance work order processing system, "Facility Dude".  The system will allow maintenance employees and those overseeing maintenance the ability to efficiently schedule and track maintenance requests from each facility, as well as schedule and assure completion of routine preventative maintenance requirements of equipment such as filter changes, lubrication, belt maintenance, generator testing, etc. OPSO is in the process of training staff to use the system and implement it.  It is currently only used for the Kitchen Warehouse and will be expanded to all other facilities sometime in February, 2014. Each facility will have trained designated employees on each shift to file work order requests meeting the 24 and 48-hour requirement in this provision.

OPSO is currently assessing the maintenance staffing needed to maintain the facilities.

The identification and training of staff should be a high priority before occupancy of the new jail so that designated employees there can submit all work orders within 48 hours of discovery of a deficiency and 24 hours in an emergency to assure prompt response.

Recommendations:

67.     Develop and implement written policies and procedures governing the provisions of this paragraph.  These policies and procedures may include, but are not limited to:

    a.   Training employees to file timely work orders meeting the 24 and 48 hour requirement of this provision.  Implement the "Facility Dude" work order system throughout OPSO.

    b.   Maintaining a facility specific tracking system of pending work orders by type to understand any changing needs for specific trades.

    c.   Establishing a system to assure an available supply of commonly needed and used parts such as shower heads, valves, electrical panels, lights, plumbing parts, electrical parts, paint, etc. to more efficiently handle routine maintenance repairs.

**IV. D. 1. c.** OPSO shall maintain adequate ventilation throughout OPSO facilities to ensure that prisoners receive adequate air flow and reasonable levels of heating and cooling.  Maintenance staff shall review and assess compliance with this requirement, as necessary, but no less than twice annually.

Findings: Non-compliance

Measures of Compliance:
1.    Written policy and procedure specifying the process of how adequacy of ventilation will be measured in accordance with the mechanical code adopted by the applicable state or local jurisdiction.
2.    Evidence of a contract with a qualified/licensed mechanical contractor to demonstrate that the ventilation system complies with the International Mechanical Code in effect in Louisiana.
3.    Reports from vendor regarding the ventilation system, air flow, etc.

Observations:

    The only air balance documentation reports available during this tour were for the new Kitchen Warehouse and the Temporary Detention Center. OPSO staff stated that they do not have ventilation issues in any other facility.  However, the Consent Judgment provision requires that, "OPSO shall maintain adequate ventilation throughout OPSO facilities to ensure that prisoner receive adequate air flow and reasonable levels of heating and cooling".

Recommendations:

68.    Develop and implement a written policy and procedure containing the requirements of this paragraph, which includes, but is not limited to:

    a.   Implementing a system to measure and assure adequate ventilation.

    b.   Documenting that the HVAC systems provide appropriate air flow

and appropriate heating and cooling for each OPSO building that will house inmates.

   c.   Completing an air balance report for each building once unless there are changes to the HVAC equipment or building renovations.

**IV.D.1.d.** OPSO shall ensure adequate lighting in all prisoner housing units and prompt replacement and repair of malfunctioning lighting fixtures in living areas within five days, unless the item must be specifically ordered.

Findings: Non-compliance

Measures of Compliance:
1.    Written policy and procedures.  Assurance that facility policy complies with the provision.
2.    Maintenance of pending work order list showing the purchase order for pending work order regarding lighting fixtures.  Review of work order lists.
3.    Visual observation conditions.

Observations:

The American Correctional Association's Performance-Based Standards for Adult Local Detention Facilities establishes a minimum of 20 foot-candles of light in personal grooming areas and at the writing surface in a single or multiple occupancy cells.  The monitor did not measure light intensity during this tour.  The monitor did observe several light fixtures in the cells at the Docks that were either not functioning or missing.  Additionally, several light fixtures in the chemical storeroom in Templeman V were not working. Maintenance staff indicated that light fixtures are frequently destroyed by inmates almost as soon as they are replaced.

Recommendation:

69.    Develop and implement a written policy and procedure including the provisions of this paragraph, including but not limited to:

    a.   Measuring light levels with light meters and documenting the findings.

**IV. D. 1. e**. OPSO shall ensure adequate pest control throughout the housing units, including routine pest control spraying on at least a quarterly basis and additional spraying as needed.

Findings: Non-compliance

Measures of Compliance:
1.    Written policy and procedures.

2.      Copy of valid contract for integrated pest control services with a licensed pest control contractor.

3.      Map showing the location of all bait and trap stations both internally and externally.

4.      Copies of pest control reports provided by the licensed pest control operator showing areas of concern, recommendations for corrective actions needed to be taken by sanitation and maintenance.

5.      Evidence of corrective action taken for recommendations provided by the licensed pest control contractor.

6.      Evidence of a pest control log where officers can log sighting of pest showing date, time, location, and type of pest.

7.      Visual observation of pest activity and inmate interviews.

8.      Inmate grievances regarding sanitation and maintenance.

Observations:

OPSO has recently published a "Request for Proposal" (RFP) for a pest control contract.  The bids were due November 13, 2013.  As of this tour, the contract had not yet been awarded.  It requires the successful contractor to "design and implement an exterminating program that ensures all buildings have adequate pest control and extermination coverage including seasonal pests.

During the tour this, the monitor observed several issues with insects especially in the Intake Processing Center.  Sandwiches intended for inmates were left on the floor and benches of holding cells and many of the sandwiches had become infested with hundreds of fruit flies. Inmates complained about insect issues in OPP.  The monitor also observed insects in the Docks holding areas of OPP.

Recommendations:

70.     Develop and implement written policies and procedures addressing the requirements of this paragraph, which may include, but not limited to:

    a.   Prohibition against inmates keeping leftover food from meals in cells, and require inmates to keep all commissary food items sealed in their personal property bags;

    b.   Monitoring of the pest control contractor to assure their work meets the requirements of this paragraph; and

    c.  Assure that the new contract for pest control provides for a minimum of quarterly spraying and a provision for additional treatments as pest activity dictate.

**IV. D. 1 .f.** OPSO shall ensure that any prisoner or staff assigned to clean a biohazardous area is properly trained in universal precautions, outfitted with protective materials, and properly supervised.

Findings: Non-compliance

Measures of Compliance:
1. Written policy and procedures.
2. Development and implementation of a training syllabus for blood borne pathogens. Qualifications of the trainer(s).
3. Documented list of officers and inmates trained in blood borne pathogens.
4. Development and implementation of a biohazardous waste policy and procedures for effective and safe clean-up of any spills.
5. Maintenance of a supply of biohazardous spill kits including personal protection items including, but limited to eye shield, mask, gloves, gown with cap, CPR barrier, towelettes, absorbent powder, scraper, scoop bag, and biohazard bag.
6. Observation and demonstration of knowledge by staff and trained prisoners.
7. Inmate interviews, inmate grievances.
8. Medical policy and procedures.

Observations:

      OPSO does not currently have any written policies and procedures governing the provisions of this paragraph.

Recommendations:

71. Develop and implement written policies and procedures addressing the requirements of this paragraph, including, but not limited to:

    a.  Designating one or two posts per shift that will responsible for managing bloodborne pathogen and biohazardous spill cleanup.

    b.  A step by step procedure that trained employees and/or inmates will be expected to follow including the use of spill kits, personal protective equipment (skin protection, gloves, face masks, designated red bags, disinfecting chemicals etc.

    c.  Training for all staff and inmates required to handle bio-waste. OSHA's Bloodborne Pathogens Standard, 29 CFR 1910.1030, requires that the

trainer be: "knowledgeable in the subject matter covered by the elements contained in the training program."

**IV. D. 1. g.** OPSO shall ensure the use of cleaning chemicals that sufficiently destroy the pathogens and organisms in biohazard spills.

Findings: Non-compliance

Measures of Compliance:
1. Written policy and procedures.
2. Inventory of cleaning and disinfecting chemicals.
3. Lesson plans/curriculum - evidence of effective training of officers and inmates responsible for cleaning and disinfecting surfaces in housing and common areas.
4. Policy and procedures an effective cleaning and disinfection policy and procedures for all facilities.
5. Observation of effective implementation and demonstration of knowledge.
6. Inmate interviews, inmate grievances.

Observations:

OPSO does not currently have any written policies and procedures governing the provisions of this paragraph.

Recommendations:

72.    Develop and implement written policies and procedures addressing this paragraph that includes, but is not limited to:

a.    Concentrations for cleaners and disinfectants to be used for clean-up from a biohazard spill.

b.    Conducting OSHA required training on the safe and effective use of any hazardous chemicals used to clean and disinfect surfaces.

**IV. D. 1 .h.** OPSO shall maintain an infection control plan that addresses contact, blood borne, and airborne hazards and infections.  The plan shall include provisions for the identification, treatment, and control of Methicillin-Resistant Staphylococcus aureus ("MRSA") at the Facility.

Findings: Non-compliance

Measures of Compliance:
1. Written policy and procedures for an infection control plan and policy following Center for Disease Control's recommendations.
2. Lesson plans/curriculum - evidence of training of all officers, staff and inmates responsible for cleaning and disinfecting all medical and dental areas within OPSO.

    3.      Demonstration of knowledge of the policy and plan.
    4.      Observation.
    5.      Inmate interview, inmate grievances.

Observations:

       OPSO does not currently have any written policies and procedures governing the provisions of this paragraph.

Recommendations:

73.     Develop and implement written policies and procedures governing the provisions of this paragraph that include, but is not limited to:

    a.   Management of contact with, Bloodborne, and airborne hazards and infections.

    b.   Identification, treatment, and control of Methicillin-Resistant Staphylococcus aureus ("MRSA") at the Facility.

    c.   Training of all affected employees on implementation of the plan.

## IV. D. 2. Environmental Control

**D. 2. a.** OPSO shall ensure that broken or missing electrical panels are repaired within 30 days of identified deficiencies, unless the item needs to be specially ordered.

Findings: Non-compliance

Measures of Compliance:
    1.      Written policy and procedure.
    2.      Evidence of implementation of the Provision in accordance with the National Electrical Code.
    3.      Maintenance of pending work order list showing the purchase order for pending work order regarding electrical panels.
    4.      Observation of practice.
    5.      Observation of facilities' conditions.

Observations::

       As discussed in IV. D.1. b., OPSO has purchased and is in the process of implementing an electronic work order system (Facility Dude) to track and schedule all work orders including missing electrical panels.

Recommendations:

74.    Develop and implement written policies and procedures addressing the
requirements of this paragraph including, but not limited to:

a.   Establishing a process to assure repairs/replacement is completed
within 30 days unless a longer time is necessary because of a special
part order.

2. b. OPSO shall develop and implement a system for maintenance and timely repair of electrical panels, devices, and exposed electrical wires.

Findings: Non-compliance

Measures of Compliance:
1.    Written policy and procedure for preventative maintenance and repairs
for electrical issues.
2.    Evidence that all repairs are completed in accordance with the National
Electrical Code.
3.    Evidence that all repairs are completed within a reasonable time to assure
that inmates and staff are not exposed to hazards that could cause injury.
4.    Observation of conditions.

Observations::

See Observations: and recommendations, above in IV.D.2.a

## IV. D. 3. Food Service

IV.D.3. a. OPSO shall ensure that food service staff, including prisoner staff, continues to receive in-service annual training in the areas of food safety, safe food handling procedures, and proper hygiene, to reduce the risk of food contamination and food-borne illnesses.

Findings: Non-compliance

Measures of Compliance:
1.    Written policy and procedure.
2.    Development of a training syllabus for annual training for food safety and
hygiene.[2]
3.    Evidence of Food Service Manager Certification in accordance with
Louisiana Retail Food Regulations.
4.    Evidence of training of food service staff and prisoner workers.
5.    Demonstration of knowledge by the food service staff and inmates.
6.    Observation.
7.   Inmate interviews, inmate grievances.
8.   Health Department inspection reports.

Observations:

No written directives were provided that addressed the provisions of this specific paragraph.

Recommendations:

75. Develop and implement written policies and procedures addressing this paragraph including, but not limited to:

    a. Providing evidence of annual training for all kitchen personnel including inmate workers in basic sanitation and in specific work assignments.

    b. Training records using should include the topic, the date of the course, name of the trainer, and evidence of knowledge gained by participants. (Could be a test or a supervisor's sign off demonstrating that the employee or inmate understands and practices sound food safety.

    c. Developing and using course outlines that are based on food code requirements and OPSO food service polices for all the topics needed for training including topics as: handwashing, cooking times and temperatures, food storage practices, equipment specific and area cleaning and sanitization requirements, maintenance of equipment, equipment specific use instructions, warewashing, employee health and personal hygiene requirements, hot and cold food holding times and temperature requirements, correct procedures for thawing foods etc.

**IV. D. 3. b.** OPSO shall ensure that dishes and utensils, food preparation and storage areas, and vehicles and containers used to transport food are appropriately cleaned and sanitized on a daily basis.

Findings: Non-compliance

Measures of Compliance:

1. Written policy and procedure for the cleaning and sanitization of all food service equipment following the equipment manufacturer's specified cleaning instructions.
2. Maintenance of a documented cleaning schedule for equipment and areas including kitchens, storage areas, ware washing, refrigerators and freezers with assigned responsibility for oversight.
3. Visual evidence of effective cleaning and interviews with staff and inmates on cleaning procedures

4.   Evidence of a cleaning log for all equipment and observation of practice meeting the policy/procedures.
5.   Inmate worker interviews.
6.   Health Department inspection reports.

Observations:

Policy 1001.8, updated 8/8/12 requires that all food service equipment be inspected to ensure it is operational and safe to use and that the food services director adhere to the State environmental health rules and regulations. It further requires that the Food Service Director or designee conduct weekly sanitation and safety inspections of all food service equipment and areas.  The policy does not include an inspection checklist, nor require that that inspection is documented, or how to address any areas of non-compliance.

Recommendations:

76.   Develop and implement written policies and procedures addressing this paragraph including but not limited to:

a.   Establishing requirements for cleaning and sanitization and a cleaning schedule and plan for each area and specific equipment, and include what is to be cleaned, how it is to be cleaned (following the equipment manufacturer's instructions from the operations manual), who is responsible for the cleaning, (if an inmate, who supervises him/her needs to be identified), and the frequency of the cleaning.  The completion of the cleaning should be documented on a form by the initials of the person completing it.  Those documents should be reviewed by the Food Services Director for completion and maintained in the Director's office.

b.   As a best practice it recommended that OPSO establish at least weekly inspections by a trained inspector who is independent of food service, if possible, with written documentation of the inspection and any non-compliance identified.  A corrective action process should be developed for areas of non-compliance that includes retraining of employees or inmates, required maintenance repairs etc.

**IV.D.3.c.** OPSO shall check and record on a daily basis the temperatures in the refrigerators, coolers, walk-in refrigerators, the dishwasher water, and all other kitchen equipment with a temperature monitor, to ensure proper maintenance of food service equipment.

Findings: Non-compliance

Measures of Compliance:
1. Written policy and procedures for measuring and recording temperatures of all refrigerators, freezers, hot food holding equipment, wash and rinse temperatures of ware washing equipment, in accordance with the Louisiana Food Regulations.
2. Development and implementation of temperature logs demonstrating effective measurements as required in this provision and/or the Louisiana Food Regulations.
3. Review of logs and direct observations of measurements being taken and recorded.
4. Observation of conditions.

Observations:

The monitor did not observe any temperature logs posted on any refrigerators, freezers or warewashing equipment.  That is not to say that temperatures are not being monitored or recorded.  However, no logs were observed. OPSO Policy 1001.8 requires that hot food temperature shall be checked and logged by kitchen staff just prior to dispatch to serving areas, but does not require regular monitoring and recording of temperatures of refrigerators, freezers, warewashers, hot and cold food holding units.

Recommendations:

77. Develop and implement written policies and procedures addressing this paragraph including, but not limited to:

a. Identifying all refrigerators, freezers, hot and cold food holding equipment, warewashing equipment located in all facilities.

b. Scheduling the times that temperatures are recorded as required by Louisiana food safety regulations.

c. Assuring supervisor review of temperatures, including developing corrective action plans.

d. Effectively training employees in the monitoring and recording process.

e.  Developing temperature logs for all equipment where potentially
hazardous food is held and where kitchenware and utensils are cleaned
and include a record retention schedule.

## IV. D. 4. Sanitation and Environmental Conditions Reporting

D. 4. a. (1) – (7). DUE 2/21/14 AND EVERY SIX MONTHS AFTER.
OPSO shall provide the Monitor a periodic report on sanitation and environmental conditions in the Facility.
These periodic reports shall be provided to the Monitor within four months of Effective Date; and every six
months thereafter until termination of this Agreement.  The report will include:
(1)  Number and type of violations reported by health and sanitation inspectors;
(2)  Number and type of violations of state standards;
(3)  Number of prisoner grievances filed regarding the environmental conditions at the Facility.
(4)  Number of inoperative plumbing fixtures, light fixtures, HVAC systems, fire protection systems, and
security systems that have not been repaired with 30 days of discovery;
(5)  Number of prisoner-occupied areas with significant vandalism, broken furnishings, or excessive
clutter;
(6)  Occurrences of insects and rodents in the housing units and dining halls; and
(7)  Occurrences of poor air circulation in housing units.

Findings: N/A.  This provision is required to be met no later than 2/21/14 and every six
months thereafter.

Measures of Compliance:
1.  Written policy and procedure governing reporting.
2.  Evidence of written report provided as specified in the provision.

Observations:

None at this time

Recommendations:

78.  Develop and implement written policies and procedures addressing this
paragraph including, but not limited to:

a.  Assuring that the tracking mechanisms are in place to record the
required information.  Such documentation may include health
department reports, pest control reports, preventive maintenance
work order system reports, inmate grievance logs, and maintenance
logs.

D. 4. b. Due 2/21/14 and every six months thereafter.
Review the periodic sanitation and environmental conditions reports to determine whether the prisoner
grievances and violations reported by health, sanitation, or state inspectors are addressed, ensuring that the
requirements of this Agreement are met.  OPSO shall make recommendations regarding the sanitation and
environmental conditions, or other necessary changes in policy, based on this review.  The review and
recommendations will be documented and provided to the Monitor.

Findings: N/A.  This provision is required to be met no later than 2/21/14 and every six months thereafter.

Measures of Compliance:
1.     Written policy and procedure governing reporting on environmental conditions.
2.     Evidence of formal review of the sanitation and environmental conditions report by staff responsible for implementing policies and procedures for food service, blood borne pathogens, chemical control, sanitation, and preventive maintenance.
3.     Evidence of written audits of the facilities.
4.     Evidence of command staff review.  Determination by OPSO that the implemented policies and procedures are effective to address the provisions of this Agreement.
5.     Evidence of effective Corrective Actions are taken to address non-conformities identified during the review process.
6.     Changes to policy, training curriculum, etc. resulting from these reviews.

Observations:

    None at this time

Recommendations:

79.     Develop and implement written policies and procedures addressing this paragraph including, but not limited to:

    a.   Using the data from IV. D. 4.a. (1)-(7) document trends and develop management responses to address provisions of the Consent Judgment.

### IV. E. Fire and Life Safety[49]

**IV. E. 1. a.** OPSO shall ensure that necessary fire and life safety equipment is properly maintained and inspected at least quarterly.  These inspections must be documented.

Findings: Non-compliance

Measures of Compliance:
1.     Written policy and procedure governing the procedures and staff responsibility and accountability assigned for a minimum of quarterly inspections, repair and/or replacement of all fire and life safety equipment, included in the controlled document inventory.
2.     Inspections shall be completed by competent fire inspector having at a

---

[49] See also Attachment B for "best practice" recommendations.

minimum successfully passed "Fire Inspector II" training and examination in accordance with NFPA 1031, Professional Inspector Level II Qualifications and all requirements of the Office of the Louisiana State Fire Marshall.

3.  Development and maintenance of a complete inventory of all fire and life safety equipment for each facility.  The list needs to include, but not limited to sprinkler heads, fire alarm pull boxes, smoke detectors, fire suppression systems, fire extinguishers, defibrillators, SCBA equipment and etc.

4.  Annual master calendar for all internal and external inspection of all fire and life safety system equipment.

5.  Development of a facility specific audit form that demonstrates the date of completion of inspection, identification of all non-conforming equipment, along with a corrective action report form that can demonstrate that effective corrective action was taken for all non-conformities.

6.  Lesson plans/curriculum for staff assigned as auditors/inspectors.

7.  Execution of contract with a qualified contractor to perform the inspections specified in this provision.

8.  Evidence of a completed, signed, and supervisory review of all inspection and testing reports, along with documented corrective actions taken to resolve identify issue on non-conformance.

9.  Fire Department inspection reports.

10. Interview with Fire Department officials.

Observations:

OPSO Policy 701.2 Fire Prevention Regulations; Annual Testing of Equipment dated 6/10/2008, last reviewed 10/16/2009 requires a system of fire equipment inspection and testing including fire sprinkler/suppression systems be completed at least quarterly.  Under the procedures section the policy requires that the Director of Maintenance shall, "upon notification that substandard conditions exist regarding fire-fighting equipment," take appropriate measures to correct substandard conditions and that inspection reports shall be kept on file with the Director of Maintenance.  The existing policy does not include any list of what equipment is included in the inspection and testing such as SCBA, sprinkler systems, fire alarms, fire extinguishers, smoke detectors, generators, hydrants, etc.

Documentation was provided prior to the tour included price quotes for conducting this year's inspections of fire and life safety equipment, but the contract had not been awarded.

The Orleans Parish Prison (OPP) and the House of Detention (currently not in use for inmate housing) buildings are owned by the City of New Orleans and OPP's fire systems are not functional and will require a substantial funding to make operational- $70,000. A contract to perform repairs to the OPP has been awarded to SimplexGrinnell Company.  However, after the initial repairs were completed, the contractor indicated that the system would still not function in accordance with the National Fire Code.  As a result, the New Orleans Fire Department ordered a "Fire watch" procedure requiring 30-minute checks in OPP until repairs are completed. As of the tour, they were not completed.  The "Fire watch" provisions are not specified in any OPSO policy and it is recommended that it be specifically referenced in the policy.

Fire extinguishers inspections for 2013 have been completed and documented.

Recommendations:

80.     Review and revise Policy 701.2 to include a building-specific list of all equipment to be inspected in the quarterly inspection/testing of fire and life safety equipment. The revisions should include, but are not limited to:

      a.  The posts and/or positions with responsibility to assure the testing is completed.

      b.  An inventory, by building, of the location and types of fire extinguishers

      c.  Review the Louisiana Fire Code to determine whether fire extinguishers in commercial buildings need to be checked monthly.

**IV.E.1. b.** OPSO shall ensure that a qualified fire safety officer conducts a monthly inspection of the facilities for compliance with fire and life safety standards (e.g., fire escapes, sprinkler heads, smoke detectors, etc.).

Findings: Non-compliance

Measures of Compliance:

1.     Job description/post orders, including qualifications for a fire safety officer in accordance with NFPA requirements for a "Certified Fire Inspector Level II"

2.     Written policy and procedures including evidence of attendance at any and all 3-year certification seminars for certification renewal or current license

from the Office of the State Fire Marshall
3.     Also include measures 3, 4, 5, 7 of IV.E.1.a.
4.     Review and observation of completed reports and corrective actions taken.
5.     Interview with fire safety officer.

Observations:

The Policy 701.1, Fire Inspections: Written Records updated 6/10/2008 and reviewed 10/16/09 requires that the OPSO's fire inspector shall conduct monthly inspections of the facilities to ensure compliance with safety and fire prevention standards and that they document corrective action taken.  These reports shall be kept on file in fire inspector's office.

The existing policy does not specify what requirements be included in the inspection such as cells, dayrooms, classrooms, chemical storerooms, offices, clinics, hallways, stairs, fire escapes, sprinkler heads, smoke detectors, fire extinguishers or ingresses and egresses.

The policy does not specify the qualifications of the fire safety inspector.

Recommendation:

81.  Either revise 701.1 or create a new written policy and procedure that identifies the specific requirements for monthly inspections.

**IV. E. 1. c.** OPSO shall ensure that comprehensive fire drills are conducted every six months.  OPSO shall document these drills, including start and stop times and the number and location of prisoners who were moved as part of the drills.

Findings: Partial Compliance

Measures of Compliance:
1.     Written policy and procedures governing staff responsibilities and accountability for conducting fire drills within each facility in accordance with the provision.  The policy shall include applicable drill reports that outline at a minimum start and stop times of the drills and the number and location of inmates who were moved as part of the drills, a formal review process for each drill that identifies the root cause and verification of effective corrective actions as necessary for non-conformities with the fire safety and evacuation plan(s)
2.     Development and implementation of  fire drill audit form(s)
3.     Annual schedule of drills for each facility; demonstrating rotating drills to assure all areas are drilled at a specified frequency.
4.     Observation of drills and/or drill reports.
5.     Evidence of collaboration with the NOFD; interview with NOFD.

6.      Interviews with inmates.

Observations:

OPSO Policy 701.4, "Written Evacuation Plan" establishes quarterly fire drills in all facility locations. The accompanying procedure establishes that each facility will conduct fire/emergency drills to ensure that all personnel are capable of carrying out fire/emergency plans and procedures.  If and when it is not a threat to facility security, inmates may be included in evacuation drills."  The policy does not require a schedule to assure that all areas of each facility are drilled over a specific time period.

A review of the records of five drills and found that the requirements of OPSO existing policy were not met.  There was a drill in Templeman Phase V (6/11/13), McDaniel's Facility (10/21/13), Conchetta (11/7/13), Intake Processing Center (8/6/13), and FEMA tents 2 and 3 (7/16/13).  This does not meet the existing policy of one drill quarterly in all facility locations.  There were no drill reports for OPP, Docks, and Kitchen Warehouse.  These five drills span a six-month period.

Recommendation:

82.      Review and revise Policy 701.4 Written Evacuation Plan to address this paragraph.

**IV.E. 1. d.** OPSO shall provide competency-based training to staff on proper fire and emergency practices and procedures at least annually.

Findings: Non-compliance

Measures of Compliance:
1.      Development and implementation of a competency-based training policy for all correction staff on safe and effective use of all fire and emergency equipment, firefighting, safe evacuation.
2.      Development and implementation of a fire and emergency practices and procedures training course syllabus/outline, along with a written exam that measures the competency of the corrections staff for the fire safety and evacuation plan and establishes an acceptable passing score.
3.      Written directive regarding how OPP will identify each officer and staff who is required to receive training, the training date, name of officer/staff trained.

Observations:

The monitor reviewed OPSO Policy 701.5 Training of Staff in Emergency Plans that requires training all facility personnel in the implementation of written emergency plans.  However, it does not require annual training as specified in the provision. Further it does not identify who needs general or enhanced training, who provides and what constitutes training, how competency will be measured or a process for maintaining accessible training records.

Recommendations:

83.    Revise existing written policies and procedures to address this paragraph including but not limited to:

a.    Assuring that the Fire Emergency Class meets the needs of OPSO, New Orleans Fire Department, and the State Fire Code.

b.    Assuring that the person conducting the fire safety training is qualified to conduct that training.

**IV. E.1.e.** Due 2/21/14. OPSO shall within 120 days of the Effective Date, ensure that emergency keys are appropriately marked and identifiable by touch and consistently stored in a quickly accessible location, and that staff are adequately trained in use of the emergency keys.

Findings: Non-compliance

Measures of Compliance:
1.    Written policy and procedures regarding staff responsibility and accountability for the systematic marking of all emergency keys, including sight and touch identification and designated locations for quick access for all keys.  All policies and procedures are to be reviewed and updated as necessary and at least annually on a schedule.
2.    Implementation of the policy and procedure
3.    Documented evidence of officer and staff training on the policy and procedure.
4.    Observation of keys.
5.    Observation of staff utilizing keys.

Observations:

There is not a policy that governs emergency keys.  Emergency keys are currently located in each facility.  However, according to the Fire Safety Officer they are not yet identifiable by touch.  There is no consistent key location within each facility.  Further there is no formal policy that defines emergency keys or where they

are to be stored.  There is no policy or procedure to identify whom in each facility on each shift has access to the emergency keys and therefore should be trained on their use.

Every jail building has a "Fire Packet" that contains key location, floor plans, and contact numbers of essential OPSO personnel.  It is to be given to the New Orleans Fire Department responding in case of fire or other emergency.  A list of the location of the emergency keys is part of the packet.

Recommendations:

84.      Develop and implement a written policy and procedure that addresses this paragraph.

## IV. E. 2 Fire and Life Safety Reporting

**IV. E.2.a. (1) – (3)** Due 2/21/14 and every six months thereafter.
OPSO shall provide the Monitor a periodic report on fire and life safety conditions at the Facility.  These periodic reports shall be provided to the Monitor within four months of the Effective Date and every six months thereafter until termination of this Agreement.  Each report shall include:
    (1) Number and type of violations reported by fire and life safety inspectors;
    (2) Fire code violations during annual fire inspections; and
    (3) Occurrences of hazardous clutter in housing units that could lead to a fire.

Findings: N/A.  This provision is required to be met no later than 2/21/14 and every six months thereafter.

Measures of Compliance:
1.      Written policy and procedure governing required reporting.
2.      Evidence of written report provided as specified in the provision.

Observations:

None at this time.

Recommendations:

85.      Develop written policy and procedures addressing the requirements of this provision.

**2. b.** OPSO shall review the periodic fire and life safety reports to determine whether the violations reported by fire and life safety inspectors are addressed, ensuring the requirements of this Agreement are being met. OPSO shall make recommendations regarding the fire and life safety conditions, or other necessary changes in policy, based on this review.  The review and recommendations will be documented and provided to the Monitor.

Findings: N/A.  This provision is required to be met no later than 2/21/14 and every six months thereafter.

Measures of Compliance:
1. Written policy and procedure governing required reporting.
2. Evidence of formal reviews of the fire and life safety conditions report by staff responsible for implementing policies and procedures for food service, blood borne pathogens, chemical control, sanitation, and preventive maintenance.
3. Evidence of written audits of the facilities.
4. Evidence of command staff review.  Determination by OPSO that the policies and procedures are effective to address the requirements of this Judgment.
5. Documentation of Corrective Actions taken to address non-conformities identified during the review process.
6. Changes to policy, training curriculum, etc. resulting from these reviews.
7. Review of Fire Department reports/inspections; interviews with NOFD.

Observations:

   None at this time

Recommendations:

86. Develop written policy and procedures addressing the requirements of this provision.

## F.    Language Assistance (IV. F.)

1. Timely and Meaningful Access to Services
   a. OPP shall ensure effective communication with, and provide timely and meaningful access to services at OPP to all prisoners at OPP, regardless of their national origin or limited ability to speak, read, write, or understand English.  To achieve this outcome, OPP shall:
   1. Develop and implement a comprehensive language assistance plan and policy that complies, at a minimum, with Title VI of the Civil Rights Act of 1964, as amended, (42 U.S.C. § 2000d et seq.) and other applicable law;
   2. Ensure that all OPP personnel take reasonable steps to provide timely, meaningful language assistance services to Limited English Proficient ("LEP") prisoners;
   3. At intake and classification, identify and assess demographic data, specifically including the number of LEP individuals at OPP on a monthly basis, and the language(s) they speak;
   4. Use collected demographic information to develop and implement hiring goals for bilingual staff that meet the needs of the current monthly average population of LEP prisoners;
   5. Regularly assess the proficiency and qualifications of bilingual staff to become an OPP Authorized Interpreter ("OPPAI");
   6. Create and maintain an OPPAI list and provide that list to the classification and intake staff; and
   7. Ensure that while at OPP, LEP prisoners are not asked to sign or initial documents in English without the benefit of a written translation from an OPPAI.
2. Language Assistance Policies and Procedures
   a. OPP shall develop and implement written policies, procedures and protocols for documenting, processing, and tracking of individuals held for up to 48 hours for the U.S. Department of Homeland Security ("DHS");
   b. Policies, procedures, and protocols for processing 48-hour holds for DHS will:
      (1) Clearly delineate when a 48-hour hold is deemed to begin and end;

    (2)      Ensure that, if necessary, an OPPAI communicates verbally with the OPP prisoner about when the 48-hour period begins and is expected to end;

    (3)      Provide a mechanism for the prisoner's family member and attorney to be informed of the 48-hour hold time period, using, as needed, an OPPAI or telephonic interpretation service;

    (4)      Create an automated tracking method, not reliant on human memory or paper documentation, to trigger notification to DHS and to ensure that the 48-hour time period is not exceeded.

    (5)      Ensure that telephone services have recorded instructions in English and Spanish;

    (6)      Ensure that signs providing instructions to OPP prisoners or their families are translated into Spanish and posted;

    (7)      Provide Spanish translations of vital documents that are subject to dissemination to OPP prisoners or their family members.  Such vital documents include, but are not limited to:

            i.    grievance forms;

            ii.   sick call forms;

            iii.  OPP inmate handbooks;

            iv.  Prisoner Notifications (e.g., rule violations, transfers, and grievance responses) and

            v.   "Request for Services" forms.

    (8)      Ensure that Spanish-speaking LEP prisoners obtain the Spanish language translations of forms provided by DHS; and

    (9)      Provide its language assistance plan and related policies to all staff within 180 days of the Effective Date of this Agreement.

3.      Language Assistance Training

    a.      Within 180 days of the Effective Date, OPP shall provide at least eight hours of LEP training to all corrections and medical and mental health staff who may regularly interact with LEP prisoners.

    (1)      LEP training to OPP staff shall include:

            i.    OPP's LEP plan and policies, and the requirements of Title VI and this Agreement;

            ii.   how to access OPP-authorized, telephonic and in-person OPPAIs; and

            iii.  basic commands and statements in Spanish for OPP staff.

    (2)      OPP shall translate the language assistance plan and policy into Spanish, and other languages as appropriate, and post the English and translated versions in a public area of the OPP facilities, as well as online.

    (3)      OPP shall make its language assistance plan available to the public.

4.      Bilingual Staff

    (1)      OPP shall ensure that adequate bilingual staff are posted in housing units where DHS detainees and other LEP prisoners may be housed.

    (2)      OPP shall ensure that an appropriate number of bilingual staff are available to translate or interpret for prisoners and other OPP staff.  The appropriate number of bilingual staff will be determined based on a staffing assessment by OPP.

Finding:

        IV.F.1.a. - NA – Due 4/21/14

        IV.F.2.a. - NA – Due 4/21/14

        IV.F.2.b. - NA – Due 4/21/14

        IV.F.3.a. - NA – Due 4/21/14

Measures of compliance:

    1.      Comprehensiveness of policy

2.      Training,
3.      Review of prisoner files
4.      Interviews

Observations:

Although certain policies of OPSO require provision of information in Spanish, there is not a comprehensive language assistance plan or policy in place.  When questioned as to how many limited English proficiency (LEP) prisoners were within the OPSO system, no one was able to answer the question or identify the accommodations being provided the LEP prisoners.

Recommendations:

87.     Continue to work with monitors to develop comprehensive policies and procedures for a Language Assistance Program.

## IV.G. Youthful Prisoners

Consistent with the Prison Rape Elimination Act of 2003, 42 U.S.C. § 15601, et seq., and its implementation of regulations, a youthful prisoner shall not be placed in a housing unit in which the youthful prisoner will have sight, sound, or physical contact with any adult prisoner through use of a shared dayroom or other common space, shower area, or sleeping quarters.  In areas outside of housing units, OPSO shall either:  maintain sight and sound separation between youthful prisoners and adult prisoners, or provide direct staff supervision when youthful prisoners and adult prisoners have sight, sound, or physical contact.  OPP shall ensure that youthful prisoners in protective custody status shall have no contact with, or access to or from, non-protective custody prisoners.  OPP will develop policies for the provision of developmentally appropriate mental health and programming services.

Findings:  Non-compliance

Measures of Compliance:
1.      Written policy/procedures governing classification and housing of youthful inmates, including but not to sight/sound separation, provision of services, protective custody, education and other services, services for youthful inmates with mental illness or who are developmentally disabled, access to medical and mental health services.
2.      Housing plan; classification plan.
3.      Observation
4.      Interview with youthful inmates.
5.      Review of recreation and program schedules.
6.      Review of inmate files (developmentally disabled, mental illness)
7.      Review of housing unit logs, program schedules.

Observations:

OPSO policy 901.10, effective date 9/1/2014 requires separation of inmates who are juveniles charged as juveniles.  The policy does meet the requirements of this paragraph.   (See also Dr. Patterson's review of treatment of youthful officers, page 69.)

Recommendation:

88.     Develop and implement written policies and procedures to comply with this paragraph.  See also the measures of compliance.

## VI.  The New Jail Facility

A.     The Parties anticipate that Defendant will build a new jail facility or facilities that will replace or supplement the current facility located at 2800 Gravier Street, New Orleans, Louisiana.  This Agreement shall apply to any new jail facility.

B.     Defendant shall obtain the services of a qualified professional to evaluate, design, plan, oversee, and implement the construction of any new facility.  At each major stage of the facility construction, Defendant shall provide the Monitor with copies of design documents.

C.     Defendant shall consult with a qualified corrections expert as to the required services and staffing levels needed for any replacement facility.  OPSO shall complete a staffing study to ensure that any new facility is adequately staffed to provide prisoners with reasonable safety.

D.     Defendant will ensure that the new jail facility will be built in accordance with:  (1) the American Correctional Association's standards in effect at the time of construction; (2) the American with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101-12213, including changes made by the ADA Amendments of 2008 (P.L. 110-325) and 47 U.S.C. §§ 225-661, and the regulations there under; and (3) all applicable fire codes and regulations.

Findings:  Non-compliance

Observations:

There are two issues for which this section is relevant.  Both areas are critical – "The Docks" inside OPP, and planning for the renovation of Templeman V to accommodate inmates on the acute and intermediate mental health caseload.

The Docks

When OPP is closed and inmates are moved to the new jail in the Spring 2014, the "docks" area of the building (3rd Floor) need to remain in use to stage/hold inmates for appearances in various courtrooms.   (See attached overview of area). Inmates are brought to this holding areas just before various courts begin, and remain there all day.  On some days, depending on the courts' calendar, there can be as many as 200 inmates held in this areas.

The following deficiencies remain in the inmate holding area are:

- The fire alarm/suppression system does not currently work and will need to be in working order per NOFD even if any percentage of the physical plant of OPP is used; approximate cost to repair the system is $300,000, plus annual fees for upkeep, inspections, testing, etc.

- There is no video surveillance system to support inmate, staff and courtroom safety, and the costs of installation are unknown at this time; if cameras are installed, an appropriately staffed control will be required to monitor the cameras and to direct staff responses in emergencies.

- The elevators do not support EMS equipment/stretchers and are often inoperable.

- The are an inadequate number of holding areas in which to separate inmates by the required categories (e.g., women, men, youthful offenders, adults, witnesses, keep separates, predators, potential victims (PREA categories), vulnerable inmates, inmates with mental illness, etc.)

- The inmate holding areas (and entire building) is not ADA compliant.

- The DA objects to having multiple inmates in courtroom because they are listening to other cases, learn the nature of those cases, information, etc., and potentially jeopardizing the DAs' cases and inmate safety.

- The physical plant allows comingling of inmates going to and from courtrooms, which creates a security/safety issues for inmates, staff, etc.

- There are insufficient numbers of toilets, including accessible toilets.

- There is insufficient staffing to immediately/promptly move inmates who have appeared in the courtroom back to their housing areas.

Other than using OPP for court staging, OPSO has no further use for the structure.

There is some question as to whether OPP is an "historic" structure. The process to evaluate this is through FEMA Section 106.[50]

---

[50] http://www.crt.state.la.us/culturalassets/fema106/

**Options**

1. <u>Status Quo</u> – An option is to do nothing.  This will result in the continued violation of the Consent Judgment regarding conditions of confinement, ADA, and PREA, as well as involve the NOFD.

2. <u>Keep area open and renovate</u>  - While reuse and renovation are always an option, the costs of the required renovations including infrastructure repair are formidable (as of yet unquantifiable).  Renovation will require reclaiming additional separate holding spaces, more toilets that are accessible, at least one control center, and the ability to secure the unused portion of the building.  Staffing will be required for supervision, central control, and to do security rounds in the entire building before, during and after court opens/closes.  There will be on-going maintenance costs associated with maintaining the integrity of the entire structure (e.g. roofs, pest control, water mitigation).  These costs are in addition to the work described above regarding installing a fire control system/cameras, etc.

    OPSO's architect is providing drawing regarding possible renovation plans.

3. <u>Replace the structure</u> – Replace the "docks" with a facility specific to the functions to accommodate the numbers of inmates moved to and from court based on historic flow.  Consider any potential increases of inmates due to increased arrests; or decrease in movement with use of options such as video appearances.  The OPSO's architect, Jerry Herbert, has recommended facility replacement

Since this issue was surfaced before the Court in November 2013, the parties have had an opportunity to discuss the options; and no agreement has been reached in terms of timetables, funding, options, and/or other plans.

Recommendations – The Docks:

89. The City and the OPSO should immediately name a working group to develop a recommendation based on identified options – status quo, renovation or new construction.  This group should be charged with developing a plan of

February 13, 2014

111

action based on recommendation, including dates, those responsible for actions, and funding options/contingencies.

90. The report of the working group should be due no later than May 1, 2014.

91. The City should ask FEMA to evaluate OPP's historical significance as a prelude to partial or complete demolition.

Renovation of Templeman V and/or Renovations of the Temporary Detention Center

The current plan is to renovate the Templeman V facility when the new jail is opened. This renovation is focused on upgrading the physical plant and security hardware/software. Inmates with acute and/or intermediate mental health needs, as well as medical needs, are to be housed in the renovated facility.

Other options discussed by the mental health monitor during the December 2013 tour. There is general consensus among the monitoring team and OPSO that even when Templeman V is renovated, it will not provide an acceptable housing environment for these populations. The facility is more suitable for a population requiring single cells, in a hardened environment (such as administrative or disciplinary segregation, or inmates whose behavior is inconsistent with the new, direct supervision jail).

An alternative discussed was renovation of the Temporary Detention Center to provide the housing and treatment options for the acute and intermediate mental health caseload. OPSO produced preliminary plans that were reviewed by the mental health monitor.

The parties have not reached agreement on these options; and the ordinance governing future changes to facilities on this footprint is going to the City Planning Commission on January 28, 2014. And discussion on these options appear, at this point, to be held in abeyance to the City's desire to have a broader conversation/decision concerning the ultimate inmate population of the jail system.

Failing to evaluate the implications of available options may result in ultimate non-compliance with some of the mental health provisions of the Consent Judgment (IV.B.), including safe conditions of confinement and treatment delivery and counseling.

Recommendations:

92.    The City and the Sheriff should immediately evaluate the options for safe and security housing and treatment of the acute and intermediate mental health caseload.  This evaluation should include assessment of the alternatives presented by the availability of the Temporary Detention Center.

93.    A report on options and plans for moving forward should be completed before any renovations are contracted for Templeman V.

94.    A report regarding options, alternatives, costs, and related information should be completed no later than April 1, 2014.

## VII. A. Compliance and Quality Improvement

Within 120 days of the Effective Date, OPSO shall revise and/or develop its policies, procedures, protocols, training curricula, and practices to ensure that they are consistent with, incorporate, address, and implement all provisions of this Agreement.  OPSO shall revise and/or develop, as necessary, other written documents, such as screening tools, logs, handbooks, manuals, and forms, to effectuate the provisions of this Agreement. OPSO shall send pertinent newly-drafted and revised policies and procedures to the Monitor as they are promulgated.  The Monitor will provide comments on the policies to OPSO, SPLC, and DOJ within 30 days. OPSO, SPLC, and DOJ may provide comments on the Monitor's comments within 15 days.  At that point, the Monitor will consider the Parties' comments, mediate any disputes, and approve the policies with any changes within 30 days.  If either party disagrees with the Monitor, they may bring the dispute to the Court. OPSO shall provide initial and in-service training to all Facility staff with respect to newly implemented or revised policies and procedures.  OPSO shall document employee review and training in new or revised policies and procedures.

Finding:    NA – Not due until 2/21/14

Measures of Compliance:
1.    Policies and procedures manual.
2.    Process/spreadsheet to identify all existing and planned written directives, dates when expected to be submitted for monitors' review.

Observations:

OPSO has funded additional resources to support the development of policies and procedures to meet the time line of the Consent Judgment.    OPSO is in regular consultation with the monitors regarding their efforts.

Recommendations:

None at this time.

## VII.(H). B. Compliance and Quality Improvement

Within 180 days of the Effective Date, Defendant shall develop and implement written quality improvement policies and procedures adequate to identify serious deficiencies in protection from harm, prisoner suicide prevention, detoxification, mental health care, environmental health, and fire and life safety in order to assess and ensure compliance with the terms of this Agreement on an ongoing basis.  Within 90 days after identifying serious deficiencies, OPSO shall develop and implement policies and procedures to address problems that are uncovered during the course of quality improvement activities.  These policies and procedures shall include the development and implementation of corrective action plans, as necessary, within 30 days of each biannual review.

Finding:   NA – Not due until 4/21/14

Measures of Compliance:
1.      Written policy/procedure governing quality improvement.
2.      Written report.
3.      Results of action plan from written report.

Observations:

OPSO, the plaintiffs, and the monitors have been engaged in conversations about how best to achieve these requirements, in terms of policies, procedures, form, templates, reports, etc.

Recommendations:

95.     OPSO continue to work with the monitors to develop this quality improvement system.

96.     Ensure that there are written policies and procedures that support these functions, including periodicity of reporting, and accountability.

## VII. (I). C. Compliance and Quality Improvement

The Parties agree that OPSO will hire and retain, or reassign a current OPSO employee for the duration of this Agreement, to serve as a full-time OPSO Compliance Coordinator.  The Compliance Coordinator will serve as a liaison between the Parties and the Monitor and will assist with OPSO's compliance with this Agreement.  At a minimum, the Compliance Coordinator will:  coordinate OPSO's compliance and implementation activities; facilitate the provision of data, documents, materials, and access to OPSO's personnel to the Monitor, SPLC, DOJ, and the public, as needed; ensure that all documents and records are maintained as provided in this Agreement; and assist in assigning compliance tasks to OPSO personnel, as directed by the Sheriff or his or her designee.  The Compliance Coordinator will take primary responsibility for collecting information the Monitor requires to carry out the duties assigned to the Monitor.

Finding:  Non-compliance

Observation:

OPSO's position is that the City has failed to fund this position.

Recommendation:

97.     As soon as possible, but no later than March 21, 2014, the City and Sheriff

         need to resolve this dispute.  A compliance coordinator is critical to an

         organized response to working toward compliance and a single point of

         contact for the monitoring team.

## VI. (J.) D. Compliance and Quality Improvement

On a bi-annual basis, OPSO will provide the public with a self-assessment in which areas of significant improvement or areas still undergoing improvement are presented either through use of the OPSO website or through issuance of a public statement or report.

Finding:         NA – Due date will be governed by OPSO policies and procedures, and monitored.

Observations:

         None at this time

Recommendations:

98.     Ensure that there are written policies and procedures that support these

         functions, including periodicity of reporting, and accountability.

## VIII.  Reporting Requirements and Right of Access

A.     OPSO shall submit periodic compliance reports to the Monitor.  These periodic reports shall be provided to the Monitor within four months from the date of a definitive judgment on funding; and every six months thereafter until termination of this Agreement.  Each compliance report shall describe the actions Defendant has taken during the reporting period to implement this Agreement and shall make specific reference to the Agreement provisions being implemented.  The report shall also summarize audits and continuous improvement and quality assurance activities, and contain findings and recommendations that would be used to track and trend data compiled at the Facility. The report shall also capture data that is tracked and monitored under the reporting provisions of the following provisions:  Use of Force; Suicide Prevention; Health Care Delivered; Sanitation and Environmental Conditions; and Fire and Life Safety.

Finding:         NA – not due until 2/21/14 (and every six months thereafter)

Observations:

         None at this time

Recommendation:

99.     Ensure that there are written policies and procedures that support these

         functions, including periodicity of reporting, and accountability.

B.     OPSO shall, within 24 hours, notify the Monitor upon the death of any prisoner.  The Monitor shall forward any such notifications to SPLC and DOJ upon receipt.  OPSO shall forward to the Monitor

incident reports and medical and/or mental health reports related to deaths, autopsies, and/or death summaries of prisoners, as well as all final SOD and IAD reports that involve prisoners.  The Monitor shall forward any such reports to SPLC and DOJ upon receipt.

Finding:          Partial Compliance

Observations:

OPSO is notifying the lead monitor immediately regarding an agreed upon set of events and incidents, other than deaths in custody.  The system is not yet perfected, but there is evidence of OPSO's commitment to the agreement regarding other than in-custody deaths.

This provision would be in full compliance if it were governed by written policy and procedure.

Recommendation:

100.   Ensure that there are written policies and procedures that support these functions, including periodicity of reporting, and accountability.

C.   Defendant shall maintain sufficient records to document that the requirements of this Agreement are being properly implemented and shall make such records available to the Monitor within seven days of request for inspection and copying.  In addition, Defendant shall maintain and provide, upon request, all records or other documents to verify that they have taken the actions described in their compliance reports (e.g., census summaries, policies, procedures, protocols, training materials, investigations, incident reports, tier logs, or use of force reports).

Finding:          Partial Compliance

Observations:

The monitoring team with work with OPSO regarding maintenance of records.

Recommendation:

93.   Ensure that there are written policies and procedures that support these functions, including periodicity of reporting, and accountability.

## CONCLUSIONS

The conditions in the jail facilities operated by the Orleans Parish Sheriff's Office and Orleans Parish that resulted in the U. S. Department of Justice's investigation, and subsequent Consent Judgment did not happen overnight; nor are solutions going to be achieved overnight.  There is a *substantial* amount of work to be done to comply with the provisions of the Consent Judgment, and then to remain in compliance for 24 months.

As noted in *Challenges to Achieving Compliance,* the strategies are multi-faceted, requiring collaboration, leadership, funding, staffing, vision, and commitment.  The dialogue about the work ahead in both OPSO and the City has often been about how to pay for the Consent Judgment.  The conversation should more accurately be focused on the responsibility for both parties to maintain a jail system that meets basic constitutional conditions of confinement.

The efforts of OPSO since the Consent Judgment was approved are, in the view of the monitors, very positive.  While we commend those initiatives and commitment, we do not want to diminish the amount of work remaining.  OPSO cannot achieve compliance without the cooperation and funding of the City.  There are critical deadlines ahead regarding the opening of the new jail facility, renovation of existing facilities to adequately secure the safety of inmates with acute mental illness, staffing and living wages for correctional employees, changes to court holding areas, and planning for future special use inmate beds. All these decisions, and the timeliness with which they are made have an enormous impact on achieving and sustaining compliance.  Many of the decisions are inextricably linked to other decisions; making sincere, honest, and transparent collaboration among all stakeholders essential.

The monitors will continue to provide technical assistance to OPSO and the City, and look forward to seeing improvements to ensure the safety of inmates.

**Endnotes:**

---

[i] Interviews conducted by Susan W. McCampbell during tours of October, November and December, 2013
- Southern Poverty Law Center, staff
- Mayor Mitch Landrieu and staff
- Orleans Parish Prison Reform Commission

- Graymond F. Martin, District Attorney's Office, Maggie Parker, Alex Calinda
- Honorable Leon A. Cannizzaro, Jr., District Attorney
- John Woll, Vera Institute
- Dr. Samuel Gore, Dr. Higgins
- Andrew Koppel, Sharonda Williams, City of New Orleans
- Rafel Goyeneche, Metropolitan Crime Commission
- Sheriff Marlin Gusman, Senior command staff, OPSO
- The Honorable Camille Buras

[ii] **Confidential Endnotes (Key Available Upon Request)**

1. A1
2. A2
3. A3
4. A4
5. A5
6. A6
7. A7
8. A8
9. A9
10. A10
11. A11
12. A12
13. A13, A14, A15; A16; A17; A19
14. A20
15. A21
16. A22
17. # 2361777; 2338506; 2359311; 2368461; 2357103; 2364876
18. # 2370284; 2355503; 2364926; 2360489; 2361729; 2328601; 2360793
19. A23
20. A24
21. A25
22. A26

## Attachment A – Documents Reviewed

1. Organizational chart(s); description of organization structure
   a. Names of individuals in key roles
2. Overview of all facilities:
   a. Date constructed;
   b. Type of structure (e.g. linear, remote supervision, single cells, dorms);
   c. # of Inmate beds and classification of inmates;
   d. # of staff assigned; and
   e. Blueprints/map of the interior layout of all facilities.
3. Inmate Handbook
4. Table of contents from department policies/procedures/written directives;  table of contents from policies/procedure/written directives/SOPs/post   Copies of these specific policies/procedures:
   a. Policy/procedure – incident reporting;
   b. Policy/procedure – inmate intake/booking;
   c. Policy/procedure – investigations of inmate allegations re: criminal conduct:
   d. Policy/procedure – inmate disciplinary procedures
   e. Policy/procedure – inmate grievance
   f. Policy/procedure – PREA sexual assault prevention, intervention, investigation
   g. Use of Force Policies and Documentation;
      1. Sample of 3 incident use of force reports for each month 1/13/13 – 9/30/13;
      2. Sample of digital recordings of planned uses of force (3 for each month 1/13/13 – 9/30/13);
      3. Reporting forms; and
      4. Policies and procedures – medical and mental health response to use of force; care of inmates.
   h. Written directive regarding critical incidents; tracking system, examples of reports generated.
   i. Policies/procedures/written directives regarding formal and informal inmate disciplinary procedures.
      1. Log of inmate disciplinary hearings since 1/1/13 (date of offense, date of report, date of hearing, any continuances, outcome of hearing) (no need to copy we can review originals)
   j. Written directive governing the employee early warning system.
   k. Policies/procedures/written directives regarding facility searches (shakedowns), including cells.
      1. Log noting what contraband was recovered (sample of 20 logs/records from each facility) since 1/1/13.
5. Description of employee training:
   a. Pre-service training - # of hours, overview of curriculum;
   b. In-service training - # of hours, overview of curriculum for 2013;
   c. Specialized training - # of hours, subjects/topics;
   d. Staff training curriculum/lesson plans on classification
   e. Staff training curriculum/lesson plans regarding sexual safety and PREA
   f. Specialized training for investigators (PREA and basic/advanced investigations); and

      g.  Pre-service and in-service curriculum re: use of force.
6.      Data - Incident reports pertaining to (since 1/1/13):
      a.  Staff sexual misconduct (see PREA definitions) with inmates;
      b.  Inmate/inmate sexual violence/abuse/assault;
      c.  Staff sexual harassment of inmates;
      d.  Inmate/inmate altercations, fights, assaults;  and
      e.  Uses of force.
7.      Investigative log(s), including for the following incidents (date incident reported to investigative functions, date investigation initiated, date investigation concluded, outcome, including referral for prosecution) since 1/1/13:
      a.  Staff sexual misconduct with inmates;
      b.  Inmate/inmate sexual violence/abuse/assault;
      c.  Staff sexual harassment of inmates; and
      d.  Use of force.
8.      Summary of inmate grievances by topic (since 1/1/13), or whatever is available.
      a.  Inmate grievance forms (no need to copy we can review originals)
9.      Survey of Sexual Violence (SSV) submitted to the Bureau of Justice Statistics (all years).[1]
10.    Names inmates who have injuries attributed to uses of force since 1/1/13.
      a.  Names of inmates who required outside medical treatment.
11.    Names of inmates who have injuries attributed to inmate/inmate altercations/fights/assaults since 1/1/13:
      a.  Names of inmates who required outside medical treatment.
12.    List of current/pending litigation involving OPP (inmate and employee).
13.    Staffing plan for OPP.
      a.  Roster for each facility/by shift; schedule of shifts (e.g. 8 hours, 12 hours); shift relief factor.  Number of full and part-time employees.
      b.  Current (10/1/13) officer vacancies.
      c.  Report of officer vacancies, by month since 1/1/13
      d.  Recruitment plan for officers
      e.  Salary profile for employees (entry level, by rank, etc.)
14.    PREA action/compliance plan.  Completed jail toolkit http://www.prearesourcecenter.org/sites/default/files/library/preatoolkitforjails.pdf or http://static.nicic.gov/Library/026880.pdf
      a.  Copy of the risk assessment tool for sexual victimization/predation.
15.    Summary of workers' compensation claims (1/1/13 – 10/1/13), including reason for claim (e.g., slip and fall, altercations)
16.    Names of employees, and/or contractors terminated for cause, and the cause 1/1/13 – 10/1/13; names of employees, contractors disciplined for violation of facility rules regulations since 1/1/13 and nature of the violations.
      a.  Names of employees, volunteers and/or contractors referred for prosecution for allegations of criminal conduct related to their employment with OPP.
17.    Copies of contracts with outside vendors.
18.    Memorandum of agreement/understanding with prosecutor, if any, regarding collaboration, review, etc. of inmate allegations of criminal conduct.
19.    Medical policies and procedures
      a.  Infection control manual

---

[1]For more information:  http://www.bjs.gov/index.cfm?ty=dcdetail&iid=406#Questionnaires

      b.  Bloodborne Pathogen Exposure Control Plan
      c.  Clinical guidelines for chronic disease and mental illness

20. Medical records on any complainants and/or deaths in the past two year
21. Mortality reviews for in-custody deaths for the last 24 months
22. Medication formulary
23. Quality management committee minutes and quantitative clinical performance measurement for the past two years
24. Minutes of other health care committees, e.g., pharmacy & therapeutics, infection control, etc.
25. Current chronic care registry
26. Staffing plan for medical*
27. Lesson plan for officers on the recognition of urgent medical conditions
28. Nursing protocols
29. Standing orders, if any
30. Suicide prevention program
31. List of ER trips and/or hospitalizations in the past six months, with date and reason
32. Medication administration records—current and for the past month, if the latter are not filed
33. Sick call log for the past three months
34. Log of specialty care outside the facility for the past three months
35. Appointment schedule for practitioners for the past three months
36. Census on first day of site visit, listing names and booking date
37. Medical grievances with responses, for the past year
38. Mental Health staffing, by program assignment
39. Mental Health caseload/census
40. Mental Health Programs/Levels of Care (inpatient, crisis beds, residential, outpatient
41. List of inmates on psychotropic meds, by gender
42. Completed suicides/serious attempts, with incident reports/investigations/psychological autopsies for last two years
43. Mental Health Policies and Procedures, and forms
44. List of inmates on caseload in segregation
45. List of inmates with use of restraints for past two years
46. List of inmates receiving substance abuse services
47. Policy regarding involuntary administration of psychotropic medication
48. Any/all Mental Health QA,QI, or QM meeting minutes for past two years
49. Classification Unit Staffing
      a.  List including names, titles, length of service of all staff assigned to the OPP inmate classification unit.
      b.  Proposed staff
      c.  Scheduled Staff Training in Inmate Classification and PREA
      d.  List including names and titles of all staff assigned to the Vera Pretrial Services unit
50. OPSO Classification System (draft 3/21/13) – Security Factors – JMS screens and hard copy
51. OPSO Medical Department Special Needs Communication Form
52. OPSO Medical Intake Screening Form – hard copy form completed by Medical staff as part of the booking process

121

53.    OPSO Sexual Victimization/Predatory Screening  -- Possible Predatory Factors (JMS screens and hard copy)

54.    OPSO Sexual Victimization/Predatory Screening  -- Possible Victim Factors (JMS screens and hard copy)

55.    Orleans Parish Sheriff's Office. (October 23, 2013). Presentation to Susan McCampbell Independent Monitor.

56.    Overview of all OPSO facilities (inter-office memorandum dated November 13, 2013 from Colonel M. R. Laughlin to Sheriff M. N. Gusman)

57.    Inmate Orientation Form (dated 5/1/07)  - (Includes disciplinary infractions severity ranking 1 – 3.)

58.    Classification Documents
    a.  Current Classification policies
    b.  Current Classification forms and manuals
    c.  Current PREA screening forms and manuals
    d.  Current Housing Plans by Facility/ Housing plan/designation of housing areas by classification

59.    Extract Data Files
    a.  *Snapshot of end of month current jail population* including socio-demographic, OPP admission date, current offense, current legal status, bail amount, current classification screening factors (initial or reclassification), PREA screening factors, special management flags, mental health flags, medical flags, and current bed/cell assignment.
    b.  *Past month of OPP admissions* including socio-demographic, OPP admission date, offense, legal status, initial classification screening factors, PREA screening factors, special management flags, mental health flags, and medical flags at admission.
    c.  *Past month of OPP releases* including socio-demographic, OPP admission date, OPP release date, method of release, offense, legal status, initial classification screening factors, PREA screening factors, special management flags, mental health flags, and medical flags at admission.
    d.  The production of these extract files has been on-going since 2011 as part of JFA's population monitoring and projection contract with the Mayor's office.  They are being produced on a monthly basis and forwarded to JFA for statistical analysis. Some modifications in the extract record layout will be required to expand the analysis of classifications and PREA  screening and housing decisions.

60.    Aggregate Data
    a.  Current population by classification categories by facility by gender
    b.  Current population by special management flags by facility by gender
    c.  Number of inmate on inmate assaults by type of assault by facility by month by gender (past 2 years and on-going)
    d.  Number of inmate on staff assaults by type of assault by facility by month by gender (past 2 years and on-going)
    e.  OPP admissions by type of admission by month by gender (past 2 years and on-going)
    f.  OPP releases by type of release by month by gender
    g.  Rates of custody overrides by custody assessment (initial vs. reclassification) by reason by gender
    h.  Number of unclassified inmates by gender by LOS

       i.   Number of inmates by gender incarcerated for greater than 90 days with no custody review

61.     Policies or General Orders governing:

     a.   Sanitation including frequency of cleaning and the copies of inspection reports for August, September, and October 2013 (Consent Agreement section D-1-a);

     b.   Preventative Maintenance Plan, along with the procedure for submitting, assuring completion of work orders (Consent Agreement sections D-1-b and d);

        1.   Plan for repair, or replacement or timely repair of electrical panels, devices, and exposed wires.

     c.   Employee and/or inmate training regarding cleanup of biohazards incidents Consent Agreement sections D-1-f);

     d.   Training of food service staff and inmate workers;

     e.   Measuring and monitoring temperatures in all refrigerators, ware washing water, and hot holding units (Consent Agreement D-3-c);

     f.   Inspection of fire an life safety equipment;

        1.   evidence of the quarterly inspections for the third quarter, 2013 and second quarter, 2013, if available;

     g.   Fire and emergency practices and procedures, including required training;

        1.   Documentation of annual competency-based training on fire and emergency practices and procedures.

     h.   Fire drills;

        1.   Reports of all fire drills conducted since 7/1/2013 through the October,2013;

        2.   review of fire and life safety reports and how non-conformities are corrected for the short and long term;

     i.   Key control, and emergency keys Policy*; and

     j.   Food service operation including sanitation (Consent Agreement D-3-b).

62.     Current air balance report for all facilities (Consent Agreement section D-1-c);

63.     The current pest control contract, and reports from the pest control vendor for months of August, September, and October, 2013 (Consent Agreement Section D-1-e).

64.     List of chemicals used to clean and disinfect biohazards incidents.

65.     Current infection control plan (Consent Agreement section D-1-h).

66.     Any inspection reports for sanitation or environmental conditions by any health agency having jurisdiction in the Parish for the period October 1, 2012 – present.

67.     Reports regarding sanitation and environmental conditions in the facilities (Consent Agreement E-4-a, 1-7).

68.     Fire and life safety inspections (Consent Agreement E-2-a-1-3).

**Additional Document Reviewed:**

- 28 CFR Part 115, National Standards to Prevent, Detect and Respond to Prison Rape
- American Correctional Association and the Commission on Accreditation for Corrections, Performance-Based Standards for Adult Local Detention Facilities, Fourth Edition, June 2004.
- American Psychiatric Association, Psychiatric Services in Jails and Prisons:  A Task Force Report of the American Psychiatric Association, Second Edition, 2000.
- American Psychiatric Association, Task Force Report, Outpatient Services for the Mentally Ill Involved in the Criminal Justice System, October 2009.

123

- Austin, James (April/May 2012) "Just the Right Size: Data Helps New Orleans Rebuild Its Prison." <u>Corrections Today</u>, pp. 94 – 96.
- Austin, James; Wendy Ware and Roger Ocker (March 2011). "Orleans Parish Prison Ten-Year Inmate Population Projections" Award No. 2009-IJ-CX-K010, awarded by the National Institute of Justice, Office of Justice Programs, U.S. Department of Justice.
- Austin, James., Strategic Plan for A Constitutional Jail Orleans Parish Prison, June 28, 2013 City Exhibit 81
- City of New Orleans, 2014 Annual Operating Budget
- Draft The PFM Group, Summary, Annual Fiscal Impact of Compliance with Jail Consent Decree Requirements, City Exhibit 83
- Gage, Bruce C., M. D.  Expert Evaluatoni:  Mental Health Care at the Oreleans Parish Prison, March 2, 2013.
- Glindmeyer, Daphne, Donna M. Mancuso, Janet Seligson-Dowie, Kristen A. Lucher, March 2, 2013, to Southern Poverty Law Center
- Inglese, Richard Demaree, March 14, 2013, Exhibit 27
- LaShawn Jones et. al. and the United States of America v. Marlin Gusman, Sheriff. Civil Action No. 2:12-cv-00859, Section I. Consent Judgment.
- LaShawn Jones et. al. and the United States of America v. Marlin Gusman, Sheriff. Civil Action No. 2:12-cv-00859, Section I. "Funding Hearing Before the Honorable Lance M. Africk United States District Judge" August 5 – 6, 2013.
- Laughlin, Michael, Current/Projected Staffing, Orleans Parish Prison Facility, OPSO Exhibit 115
- Lynch, Shannon, Dana DeHart, Joanne Belknap, Bonnie L. Green, "Women's pathways to jail: The roles and intersection of serious mental illness and trauma", September 2012, U. S. Dept. of Justice, Bureau of Justice Assistance https://www.bja.gov/Publications/Women_Pathways_to_Jail.pdf  accessed on 1/19/14.
- McGinnis, Kenneth and Karl Becker, Orleans Parish Jail Staffing Review, June 28, 2013
- Metropolitan Crime Commission. (August 27, 2013) "Orleans Parish Prison Inmate Population Snapshot July 24, 2013. www.metrocrime.org
- National Commission on Correctional Health Care, Accreditation Report of the Health Care Services at the Orleans Parish Criminal Sheriffs, Office, New Orleans, La., November 16, 2012.
- New Orleans Pretrial Services (October 18, 2013). "New Orleans Pretrial Services: Performance and Outcome Data." Presentation to Criminal Justice And Budget Committees New Orleans City Council.
- New Orleans Pretrial Services Pretrial Report
- New Orleans Pretrial Services, Performance and Outcome Data, Criminal Justice and Budget Committee, New Orleans City Council, October 18, 2013 (Vera)
- Office of Inspector General, City of New Orleans, Inspection of Taxpayer/City Funding to Orleans Parish Sheriff's Office in 2011, Final Report, June 6, 2013
- OPSO Newsletter. Volume 8, Issue 26.
- Orleans Parish Sheriff's Office,  Medical Department, NCCHC Accreditation 2012 – Corrective Action Plan, February 12, 2013
- Parrish, David M., Expert Witness Report, July 12, 2013, Plaintiff's Exhibit 387.
- Report of Armbruster and Associates, March 15, 2013
- Review Panel on Prison Rape, Report on Sexual Victimization in Prisons and Jails, April 2012, pp. 68-83.
- Romero, Manuel D. Expert Report on the Orleans Prison Parish,  New Orleans, Louisiana, March 4, 2013

124

- Samuel Gore, MD. CCHP, Medical Director, Orleans Parish Prison, New Orleans City Council Budget Hearing, October 12, 2013
- Schwartz, Jeffrey A. and Rod Miller (October 10, 2008). "An Operational Review of the Orleans Parish Jails." NIC Technical Assistance Report #08J1109). Washington, D.C.: National Institute of Justice.
- Schwartz, Jeffrey A., LaShawn Jones et. al. and the United States of America v. Marlin Gusman, Sheriff, March 2, 2013
- State of Louisiana, Title 22, Corrections, Criminal Justice and Law Enforcement Part III. Commission on Law Enforcement and Administration of Criminal Justice  Subpart 2. Minimum Jail Standards
- Testimony of David Eichenthal (Public Financial Management (PFM)), before the New Orleans City Council, Impact of Consent Decree on Orleans Parish Prison FY 2014 Budget, October 31, 2013.
- The PFM Group, A 21st Century Criminal Justice System, Part I:  Overview of the Criminal Justice System, is Costs and the Case for Better Cooperation, October 2012
- The PFM Group, A 21st Century Criminal Justice System, Part II:  Improving the Operation of the Court System, October 2012
- Title 51 Public Health (Louisiana) – Sanitary Code Part XVII. Jails, Prisons and Other Institutions of Detention or Incarceration.
- Transcript of Proceedings Before the Honorable Lance M. Africk, August 5 - 6, 2013, Funding Hearing
- U. S. Department of Justice, letter of findings, September 11, 2009.
- U. S. Department of Justice, Update to Letter of Findings, April 23, 2012.
- Vera Institute of Justice, Proposals for New Orleans' Criminal Justice System:  Best Practices to Advance Public Safety and Justice, A Report Submitted to the Criminal Justice Committee of the New Orleans City Council by The Vera Institute of Justice, June 2007.

125

**Attachment B – Recommendations – Best Practices – Section IV.D. Sanitation and Environmental Conditions and Section IV.E. Fire and Life Safety**

Provision **IV. D. 1. a**: The following recommendations represent best practices in correctional institutions and should be considered when the Housekeeping Procedures and Inspection Policy 1101.1 is reviewed/revised:

1.   Develop a policy and procedure implementing a training program for inmate workers assigned the responsibility for cleaning and maintaining dayrooms and other common areas.
2.   Develop a policy and procedure implementing a training program for all officers working posts which are required to oversee and manage housekeeping including employees who are conducting the inspections. Procedures should include measureable standards and accountability to assure a sustainable cleaning and housekeeping program.
3.   Revise Policy 701.6 to include procedures for inventory control, safe dilution and use of all cleaning chemicals.
4.   Develop a policy and procedure implementing a training program for all staff and inmates who will handle cleaning chemicals including, but not limited to: cleaning chemical safety, the effective use of any cleaning chemical, personal protective gear that anyone handling chemicals are required to use (gloves, face protection, eye protection, skin protection, etc.).

Provision **IV. D. 1. c.**
5.   The monitor recommends that an assessment of air balancing needs to be assessed as necessary, but no less than twice per year.  Air balancing needs to be completed for each building that will continue house inmates after the new jail is operational to assess adequacy of air flow and the ability of the system to provide appropriate levels of heating and cooling.  The Associated Air Balance Council can provide a list of contractors who have certified technicians to provide this service.

Provision **IV.D.1.d.**
6.   OPSO is urged to investigate alternative prison lighting fixtures for the facilities that will remain open after the new jail is occupied.  Energy grants may be available to help manage costs.

Provision **D. 2. a.**
7.   The monitor recommends that OPSO investigate relocating electrical panels to areas that are inaccessible to inmates; and/or secure the panels to prevent tampering by inmates, including regular inspections.

Provision **IV.D.3. a.**
8.   The monitor recommends that at least one food service manager on each shift is Certified as a Food Safety Manager from one of the accredited Food Safety Manager Certification programs.

Provision **IV.D.3.c**

126

9.      The monitor recommends establishing management review of the monitoring logs that demonstrates that corrective actions were completed anytime monitoring shows non-conformity with established limits.

Provision IV. **E. 1. a.**
10.     The monitor recommends that OPSO employees conducting extinguishers test  complete training as a Professional Inspector Level II.

Provision **IV.E.1. b.**
11.     The monitor recommends development of a uniform inspection report form that describes what constitutes conformance or non-conformance for the inspections.

Provision **IV. E. 1. c.**
12.     The monitor recommends that OPSO establish specific requirements and expectations for drills, drill schedule by facility, responsibility and accountability for the drills, the reports, corrective actions, and management oversight.
13.     The monitor recommends that OPSO modify the drill report format to assure all policy provisions are included.

Provision **IV.E. 1. d.**
14.     The monitor recommends that OPSO develop and implement a building specific orientation training module for employees using a qualified trainer.

Provision **IV. E.1.e.**
15.     The monitor recommends that OPSO policy should include the storage requirements, use, responsibility, training, and scheduled inspection to assure the emergency keys are able to open the doors for which they are intended
16.     The monitor recommends when the policy is completed, OPSO establish a documented training program for all control room officers on all shifts on the locations and use of emergency keys.

127

**Attachment C – Summary of Recommendations**

Protection from Harm

1.   Continue to work with Monitors to develop comprehensive policies and procedures and a reporting system that will enable OPSO to provide guidance, to train, and to hold accountable supervisors and deputies. In particular, include a mechanism to ensure that all uses of force are properly reported and investigated in accordance with the policy. The adequacy of the policies and procedures and reporting system is key to future compliance with IV. A. 1. c. that requires OPSO to assess, annually, all data collected to make any necessary changes.

2.   Continue to work with Monitors to develop comprehensive policies and procedures and a reporting system that will form the foundation for the training on the use of force. Once comprehensive policies and procedures and a reporting system are developed, work with Monitors to develop appropriate training for deputies and supervisors. In particular, training needs to stress that all uses of force are to be reported and properly investigated and that failure to report will result in discipline. In addition, supervisors need to be trained on the mechanisms to ensure that all uses of force are properly reported and investigated in accordance with the policy. As noted in Recommendation 1, above, the adequacy of the policies and procedures and training is crucial to future compliance with IV. A. 2. c. that requires OPSO to randomly test five percent of the jail.

3.   Continue to work with Monitors to develop comprehensive policies and procedures and a reporting system that will enable OPSO to provide guidance, to train, and to hold accountable supervisors and deputies. In particular, the policies and procedures must include a mechanism to ensure that all uses of force are properly reported and investigated in accordance with the policy.The adequacy of the policies and procedures and reporting system is crucial to the Monitor being able to rely on the accuracy of the periodic reports that are to be submitted under IV. A. 3. g. and the usefulness of the annual review that is to conducted under IV. A. 3. h. to future compliance with IV. A. 3. g. that requires OPSO to assess, annually, all data collected to make any necessary changes.

4.   OPSO policy/procedures should require those holding the rank of Major and above review all reports. Based on that review, provide additional training to supervisors who are not requiring complete and thorough reports.

5.   Continue to work with Monitors to develop comprehensive policies and procedures for an Early Invention System. . At the least, the Early Intervention or warning system would collect data such as uses of force, grievances, complaints handled at the facility level, absences, etc.

6.   Assure policies/procedures are in place to direct how the EIS is implemented, and actions to be taken by OPSO when thresholds are triggered.

7.   Continue to work with Monitors to develop comprehensive policies and procedures and a reporting system that will enable OPSO to provide guidance, to train, and to hold accountable supervisors and deputies. The adequacy of the policies and procedures and implementation of them is crucial to reducing the harm and risk of harm in the Orleans Parish Prison system.

8.   Make the recruiting, hiring, and training of custodial staff for the jail facilities the highest priority.

9.   Consider temporarily reassigning deputies from other duties to supplement the current custodial staff.

10.  If unable to hire sufficient custodial staff, explore alternatives for contract officers.

11.  Develop a risk management philosophy so that incidents are reviewed with a goal of determining actions need to be taken by OPSO to avoid such incidents in the future.

12.  OPSO and the City must engage in meaningful discussions regarding raising the starting salary for OPSO to a level competitive in the New Orleans job market.  Time is of the essence.

13.  OPSO and the City need to adequately resource recruitment, background investigations, and training for newly hired employees.

14.  OPSO's  recruitment activities should highlight and focus on the skills, knowledge and abilities needed for officers in a direct supervision environment.

15.  OPSO's pre-service and in-service training needs to be substantially enhanced to include the soon-to-be updated policies and procedures.

16.  OPSO should develop a retention plan to keep officers and employees it worked hard to recruit, screen and train.[2]

17.  OPSO's staffing plan should include contingencies for circumstances in which not a sufficient number of employees can be hired, or retained.

18.  OPSO should begin the process of keeping detailed data regarding recruitment, applicant screening, and attrition.

19.  Continue to work with Monitors to develop comprehensive policies and procedures and a reporting system that will enable OPSO to provide guidance, to train, and to hold accountable supervisors and deputies. Once comprehensive policies and procedures and a reporting system are developed, work with Monitors to develop appropriate training for deputies and supervisors.  In particular, training needs to stress that all uses of force are to be reported and properly investigated and that failure to report will result in discipline. In addition, supervisors need to be trained on the mechanisms to ensure that all uses of force are properly reported and investigated in accordance with the policy.  The adequacy of the policies and procedures and reporting system is crucial to the Monitor being able to rely on the integrity of the periodic reports that are to be submitted under IV. A. 7. h.. and the sufficiency of the annual review that is to be conducted under IV. A. 7. j. which requires OPSO to assess whether the incident reporting system is meeting the requirements of the Consent Judgment.

20.  Continue to work with Monitors to review and critique investigations.  Provide additional training to investigators; particularly that which is corrections based.  The adequacy of the investigations is crucial to the Monitor being able to rely on the accuracy of the periodic reports that are to be submitted under IV. A. 8. d. and the sufficiency of the review that is to be conducted under IV. A. 8. f. that requires OPSO to assess whether the investigation system is meeting the requirements of the Consent Judgment.

21.  Continue to work with Monitors to determine what unit or units should be tasked with investigating what types of matters.  For instance, all staff misconduct might be assigned to IAD for investigation.  However, for that to occur, procedures must be developed to protect the rights of staff members who are compelled to cooperate in the administrative investigation.  Additionally, the number of investigators assigned to IAD will need to be increased with an emphasis towards placing investigators with correctional experience in IAD.

---

[2] See Op. Cit. Stinchcomb, et. al. page 88.

22.  Update policy 50.15 to assign accountability for periodic review of ICE detainers to insure they not expired.

23.  Demonstrate that staff working in intake/records have been trained to monitor ICE detainers.

24.  Develop and implement an objective classification system based on the risks and needs of OPSO offender populations that include systematic initial and reclassification processes.

25.  Short-term:  Develop a simple classification manual with instructions for scoring the current security and PREA risk factors, override criteria, and guidance for housing assignments.

26.  Short-term:  Create monthly statistical reports to track the custody distribution of OPSO offenders by housing unit race and gender during the last quarter

27.  Long-term: Document the development and statistical validation of an objective classification system based on the risk and needs of OPSO offender populations.

28.  Short-term:  Create an automated bed availability report within JMS that indicates the number and type of available beds for each of the units within OSPO facilities. At a minimum, the report should provide a count by unit and by facility.

29.  Long-term:  Develop and implement a housing unit assignment plan that outlines the mission, number of beds and custody level(s) for each OPSO housing unit. This HUAP must also incorporate adequate separation of offenders by PREA predatory and vulnerability designations.

30.  Short-term:  Review the post orders, directives, and training provided to OPSO records, disciplinary hearing, investigate staff to require timely input of all data regarding offender charges, bond amount, discipline, investigations, incidents, medical/mental health needs, custody assessment, and housing assignments

31.  Long-term:  As previously indicated, an objective classification system based on the risk and needs of OPSO offender populations that includes systematic initial and reclassification processes is recommended. (See recommendations for IV. A. 10. a.)

32.  Short-term:  a. Provide current classification officers training on the current security and PREA instruments and process. The training should include testing with actual cases, as well as reliability testing, to ensure competency and consistence among staff.  b. Incorporate a basic description of principles of classification into the academy training provided to the classes of new officers and in-service training for current security staff.

33.  Long-term:  Provide competency-based training regarding the custody classification system, housing assignment process, work/community assignments, and case management to all OPSO staff.

34.  Short-term: Create queries for simple classification-related management reports within the JMS. These reports should be reviewed at least monthly to monitor trends. However, classification staff should review the reports on PREA separations and housing by custody level daily to ensure that any discrepancies are corrected immediately. Note: the reports should include columns for noting the date and type(s) of corrective actions required addressing any discrepancies or problematic trends.

35.  Long-term:  Once the classification system has been updated to include a reclassification process, management reports to track custody re-assessments should be developed.

36.  Revise policy 1301.7 to assign the responsibility to a specific post/person for grievance management (rather than assign to the mail room).   Consider designating a position as Grievance Coordinator.   Consider designation of an ombudsperson.

37.  Assure that paragraph (6) is addressed in terms of reports to the monitor regarding inmate grievances.

130

38.  Refine the record keeping to ensure that the most prevalent grievances topics are documented, including trends.  Ensure that medical and mental health operational procedures are consistent with OPSO policies, and that there is consultation regarding grievances related to medical/mental health/dental care.
39.  Ensure that all employees are trained regarding the grievance process, and their role.
40.  Revise the policy to assure that that for the purposes of PREA compliance, there is no time limit imposed on inmates wishing to file grievances regarding sexual harassment, sexual assault, etc.
41.  Revise the inmate handbook to better explain the grievance and grievance appeal process.
42.  Revise the policy to provide for assistance to inmates in filing a grievance, due to LEP, mental illness or disabilities, or when an inmate requests assistance.
43.  Assure that there are either grievance forms in Vietnamese, per the Consent Judgment.
44.  Based on the results of the analysis from the jail tool-kit, develop a specific action plan with due dates and benchmarks for compliance.
45.  Develop an inmate orientation process in English, Spanish and Vietnamese (written, video, and/or peer) that includes all elements of this paragraph, as well as the information required by the PREA standards.
46.  Assure that the materials are at a grade appropriate level, and in Spanish and Vietnamese. Assure procedures for orientation of inmates who are illiterate, LEP, low functioning and/or have mental illness.

Medical and Mental Health Care (see also text of report)

47.  OPSO should track and trend initial and annual training on withdrawal and detoxification for custody staff and medical and mental health staff and provide sufficient oversight to assure compliance.
48.  OPSO should add inquiry into the degree of risk of withdrawal and should require initial measurement of vital signs, in addition to periodic monitoring following the CIWA-AR protocol mentioned in Appendix B of the Consent Order.  Further, the OPSO should test the validity and reliability of nurses' performance on the initial screening and appropriate follow-up, according to policy and physician orders.
49.  OPSO should increase professional staffing to provide sufficient access to qualified health professionals for patients with serious medical needs; increase support staffing to provide for constructive and meaningful clinical performance measurement to advise medical management of areas for intervention and to track performance in these areas over time; intensify training and supervision of nursing staff perform their duties in a timely and professional manner.
50.  OPSO should validate its screening instrument for mental health needs and assure that the actual need is met for mental health therapeutic interventions.
51.  OPSO should Improve tracking systems for follow-up appointments, medication orders, and laboratory testing and develop systems for documenting all care in a single, unit medical record, whether it be paper or electronic.
52.  Develop quantitative and qualitative data analysis for clinical data, including performance measuring, mortality review, grievance analysis, etc.  Use these analyses to drive constructive change in medical care policies and practices.
53.  OPSO should develop, implement, and maintain a system to ensure that trends and incidents involving avoidable suicides and self-injurious behavior are identified and corrected in a timely manner.

131

54. OPSO should enhance its morbidity and mortality reviews to incorporate information received subsequent to the initial review and should amend corrective action plans therein.

55. OPSO should assure medical care facilities that are clean, safe, and secure.

56. OPSO should provide clean linens for inmates and disinfection of mattresses between users.

57. OPSO should assure that the utilization management system used for off-site services meets nationally-accepted criteria for medical necessity.

58. OPSO should arrange for professional language interpretation services so as to provide confidentiality of medical information.

59. OPSO should monitor timely access to care for patients with acute health care needs and for patients who need continuity of care and/or medications.

60. OPSO should review and respond to grievances with a self-critical attitude and should track and trend health services grievances as part of its quality management program.

61. OPSO should assure that health care staff conforms to standards of professional ethics in general, including assuring that health care and custody roles are clearly delineated and separated.

62. OPSO should have documented expectations for medication practices, with a lesson plan, training, and training records.

63. OPSO should develop and implement a policy for reporting serial medication refusals to the prescribing clinician to ascertain the reason for non-adherence and to develop a medication plan that will improve adherence.

64. OPSO should track the time to first dose of prescribed medication and implement a system to eliminate time lags.

65. OPSO should develop and implement a mechanism to notify qualified health care staff of impending releases so as to provide bridge supplies of medication and prescriptions, as medically appropriate.

Sanitation and Environmental Conditions

66. Revise the Housekeeping Procedures and Inspection Policy 1101.1 to include a facility specific housekeeping plan and schedule in accordance with this provision establishing routine cleaning requirements for toilets, showers, and housing units and schedule and a documented meaningful inspection process.  The policy should specify what has to be cleaned (floors, walls, showers, toilet/sink, beds, mattresses and etc., the required frequency for cleaning and disinfecting, who has which responsibilities, and how the cleaning is to be completed.

67. Develop and implement written policies and procedures governing the provisions of this paragraph.  These policies and procedures may include, but are not limited to:

   a. Training employees to file timely work orders meeting the 24 and 48 hour requirement of this provision.  Implement the "Facility Dude" work order system throughout OPSO.

   b. Maintaining a facility specific tracking system of pending work orders by type to understand any changing needs for specific trades.

   c. Establishing a system to assure an available supply of commonly needed and used parts such as shower heads, valves, electrical panels, lights, plumbing parts, electrical parts, paint, etc. to more efficiently handle routine maintenance repairs.

68. Develop and implement a written policy and procedure containing the requirements of this paragraph, which includes, but is not limited to:

132

a. Implementing a system to measure and assure adequate ventilation.
b. Documenting that the HVAC systems provide appropriate air flow and appropriate heating and cooling for each OPSO building that will house inmates.
c. Completing an air balance report for each building once unless there are changes to the HVAC equipment or building renovations.
d. Develop and implement a written policy and procedure including the provisions of this paragraph, including but not limited to:

69. Measuring light levels with light meters and documenting the findings.
70. Develop and implement written policies and procedures addressing the requirements of this paragraph, which may include, but not limited to:
    a. Prohibition against inmates keeping leftover food from meals in cells, and require inmates to keep all commissary food items sealed in their personal property bags;
    b. Monitoring of the pest control contractor to assure their work meets the requirements of this paragraph; and
    c. Assure that the new contract for pest control provides for a minimum of quarterly spraying and a provision for additional treatments as pest activity dictate.
71. Develop and implement written policies and procedures addressing the requirements of this paragraph, including, but not limited to:
    a. Designating one or two posts per shift that will responsible for managing bloodborne pathogen and biohazardous spill cleanup.
    b. A step by step procedure that trained employees and/or inmates will be expected to follow including the use of spill kits, personal protective equipment (skin protection, gloves, face masks, designated red bags, disinfecting chemicals etc.
    c. Training for all staff and inmates required to handle bio-waste.  OSHA's Bloodborne Pathogens Standard, 29 CFR 1910.1030, requires that the trainer be: "knowledgeable in the subject matter covered by the elements contained in the training program."
72. Develop and implement written policies and procedures addressing this paragraph that includes, but is not limited to:
    a. Concentrations for cleaners and disinfectants to be used for clean-up from a biohazard spill.
    b. Conducting OSHA required training on the safe and effective use of any hazardous chemicals used to clean and disinfect surfaces.
73. Develop and implement written policies and procedures governing the provisions of this paragraph that include, but is not limited to:
    a. Management of contact with, Bloodborne, and airborne hazards and infections.
    b. Identification, treatment, and control of Methicillin-Resistant Staphylococcus aureus ("MRSA") at the Facility
    c. Training of all affected employees on implementation of the plan.
74. Develop and implement written policies and procedures addressing the requirements of this paragraph including, but not limited to:
    a. Establishing a process to assure repairs/replacement is completed within 30 days unless a longer time is necessary because of a special part order.
75. Develop and implement written policies and procedures addressing this paragraph including, but not limited to:
    a. Providing evidence of annual training for all kitchen personnel including inmate workers in basic sanitation and in specific work assignments.
    b. Training records using should include the topic, the date of the course, name of the trainer, and evidence of knowledge gained by participants. (Could be a test or a

supervisor's sign off demonstrating that the employee or inmate understands and practices sound food safety.

    c.    Developing and using course outlines that are based on food code requirements and OPSO food service polices for all the topics needed for training including topics as: handwashing, cooking times and temperatures, food storage practices, equipment specific and area cleaning and sanitization requirements, maintenance of equipment, equipment specific use instructions, warewashing, employee health and personal hygiene requirements, hot and cold food holding times and temperature requirements, correct procedures for thawing foods etc.

76.    Develop and implement written policies and procedures addressing this paragraph including but not limited to:

    a.    Establishing requirements for cleaning and sanitization and a cleaning schedule and plan for each area and specific equipment, and include what is to be cleaned, how it is to be cleaned (following the equipment manufacturer's instructions from the operations manual), who is responsible for the cleaning, (if an inmate, who supervises him/her needs to be identified), and the frequency of the cleaning. The completion of the cleaning should be documented on a form by the initials of the person completing it. Those documents should be reviewed by the Food Services Director for completion and maintained in the Director's office.

    b.    As a best practice it recommended that OPSO establish at least weekly inspections by a trained inspector who is independent of food service, if possible, with written documentation of the inspection and any non-compliance identified. A corrective action process should be developed for areas of non-compliance that includes retraining of employees or inmates, required maintenance repairs etc.

77.    Develop and implement written policies and procedures addressing this paragraph including, but not limited to:

    a.    Identifying all refrigerators, freezers, hot and cold food holding equipment, warewashing equipment located in all facilities.

    b.    Scheduling the times that temperatures are recorded as required by Louisiana food safety regulations.

    c.    Assuring supervisor review of temperatures, including developing corrective action plans.

    d.    Effectively training employees in the monitoring and recording process.

    e.    Developing temperature logs for all equipment where potentially hazardous food is held and where kitchenware and utensils are cleaned and include a record retention schedule.

78.    Develop and implement written policies and procedures addressing this paragraph including, but not limited to:

    a.    Assuring that the tracking mechanisms are in place to record the required information. Such documentation may include health department reports, pest control reports, preventive maintenance work order system reports, inmate grievance logs, and maintenance logs.

79.    Develop and implement written policies and procedures addressing this paragraph including, but not limited to:

    a.    Using the data from IV. D. 4.a. (1)-(7) document trends and develop management responses to address provisions of the Consent Judgment.

Fire and Life Safety

134

80. Review and revise Policy 701.2 to include a building-specific list of all equipment to be inspected in the quarterly inspection/testing of fire and life safety equipment. The revisions should include, but are not limited to:

    a. The posts and/or positions with responsibility to assure the testing is completed.

    b. An inventory, by building, of the location and types of fire extinguishers

    c. Review the Louisiana Fire Code to determine whether fire extinguishers in commercial buildings need to be checked monthly.

81. Either revise 701.1 or create a new written policy and procedure that identifies the specific requirements for monthly inspections.

82. Review and revise Policy 701.4 Written Evacuation Plan to address this paragraph.

83. Revise existing written policies and procedures to address this paragraph including but not limited to:

    a. Assuring that the Fire Emergency Class meets the needs of OPSO, New Orleans Fire Department, and the State Fire Code.

    b. Assuring that the person conducting the fire safety training is qualified to conduct that training.

84. Develop and implement a written policy and procedure that addresses this paragraph.

85. Develop written policy and procedures addressing the requirements of this provision.

86. Develop written policy and procedures addressing the requirements of this provision.

87. Language Assistance Continue to work with monitors to develop comprehensive policies and procedures for a Language Assistance Program.

Youthful Prisoners

88. Develop and implement written policies and procedures to comply with this paragraph. See also the measures of compliance

The New Jail Facility

89. The City and the OPSO should immediately name a working group to develop a recommendation based on identified options – status quo, renovation or new construction.  This group should be charged with developing a plan of action based on recommendation, including dates, those responsible for actions, and funding options/contingencies.

90. The report of the working group should be due no later than May 1, 2014.

91. The City should ask FEMA to evaluate OPP's historical significance as a prelude to partial or complete demolition.

92. The City and the Sheriff should immediately evaluate the options for safe and security housing and treatment of the acute and intermediate mental health caseload.  This evaluation should include assessment of the alternatives presented by the availability of the Temporary Detention Center.

93. A report on options and plans for moving forward should be completed before any renovations are contracted for Templeman V.

94. A report regarding options, alternatives, costs, and related information should be completed no later than April 1, 2014.

Compliance and Quality Improvement

135

95.   OPSO continue to work with the monitors to develop this quality improvement system.

96.   Ensure that there are written policies and procedures that support these functions, including periodicity of reporting, and accountability.

97.   As soon as possible, but no later than March 21, 2014, the City and Sheriff need to resolve this dispute.  A compliance coordinator is critical to an organized response to working toward compliance and a single point of contact for the monitoring team.

98.   Ensure that there are written policies and procedures that support these functions, including periodicity of reporting, and accountability.

Reporting Requirements and Rights of Access

99.   Ensure that there are written policies and procedures that support these functions, including periodicity of reporting, and accountability.

100.  Ensure that there are written policies and procedures that support these functions, including periodicity of reporting, and accountability.