UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| LASHAWN JONES, ET AL, <br> Plaintiffs; and <br> UNITED STATES OF AMERICA, <br> Plaintiffs in Intervention <br> <br> v. <br> <br> MARLIN N. GUSMAN, ET AL, <br> Defendants <br> <br> MARLIN N. GUSMAN, <br> Third-Party Plaintiff <br> <br> v. <br> <br> THE CITY OF NEW ORLEANS, <br> Third-Party Defendant | Civil Action No. 2:12-cv-00859 <br> Section I, Division 1 <br> Judge Lance M. Africk <br> Magistrate Judge Sally Shushan |

## SHERIFF GUSMAN'S PROPOSAL MEMORANDUM
## FOR SHORT-TERM HOUSING OF ACUTE AND
## SUB-ACUTE MENTAL HEALTH POPULATIONS

The City of New Orleans is solely responsible for providing a good and sufficient jail, and that jail must be able to constitutionally house those prisoners with acute mental health conditions, all of whom are individuals arrested by the New Orleans Police Department. Three and a half years ago, the City Council passed an ordinance pertaining to the 1438 bed facility under construction which contains the following language:

> The applicant shall ensure that upon completion, the 1,438 bed facility at the Templeman III & IV site is designed to accommodate any type of prisoner under any jurisdiction. This includes, but is not limited to, state and federal prisoners, inmates that need substance abuse and mental health treatment *(except inmates that require acute mental health treatment)*, female inmates, and prisoners participating in a re-entry program and that the facility is able to provide a variety or programming aimed at reducing recidivism

including, but not limited to, medical care, educational services, including GED preparation, vocational and job training. (Emphasis added).

Inexplicably, there has been no step taken by the City towards either construction of or identification of a facility intended to house inmates with acute mental health conditions. The Court has advised the parties that it will address long-term housing at a later date.

In addition to the long-term needs relative to the mental health population, the City has failed to provide any current jail which can accommodate those prisoners, thus the Sheriff now presents the following proposal for short-term housing of acute and sub-acute mental health populations. This proposal is only intended to be a temporary solution until Phase III construction is completed.

In this memorandum, the Sheriff provides the Court and the parties with all known or estimated costs and timelines and notes that some costs will not be known until implementation of the proposal is underway and may change as this process develops.

## CURRENT HOUSING OF ACUTE AND SUB-ACUTE POPULATION

Both male and female prisoners with acute mental health conditions are currently housed in Templeman Phase V (hereinafter "TP5"). The specific units which are dedicated to housing those with acute mental health conditions are designed and operated as lockdown units with a very limited common area, no clinical or group therapy space, and poor sight lines. Inmates are housed with up to three other individuals in four man cells, and are provided with time out of their cells either individually or with small groups of other individuals throughout the day. Mental health staff enters the unit to perform routine treatment services and administer medication, while limited space results in medical staff needing to remove the prisoner from the unit for many types of treatment. Due to the burdensome sight lines, intense staffing is needed for observation, and security deputies are presently tasked with performing observation functions

on the unit.

The unit is designed in a straight, linear fashion, with cells along both sides of the unit and a dormitory area with tables, and staff must be directly in front of each particular cell to see inside that cell.  The doors on the units are solid metal, with a window being the only means by which inmates in the cells can be observed.  Camera coverage in the units is extremely limited.  The jail security system, which controls the locks on the doors, is outdated and requires constant repairs.  The company that designed the system is now defunct and no longer exists, and thus service must be performed in-house.  This system, which is at max capacity and which has no ports for additional cameras, functions on Windows XP, which is no longer supported by Microsoft and thus may not be serviceable for much longer.  The OPSO has been provided with no resources by the City to update any electronics or to paint or repair the building in any way.

## CORRECTIVE ACTION PLAN

### *Male Acute Mental Health*

The male acute mental health population will be housed at a facility located on the campus of Elayn Hunt Correctional Center (hereinafter referred to as "Hunt MHU"), located in St. Gabriel, Louisiana.  This facility has a design style which is more conducive to housing those with mental illness, featuring a semi-circular layout which provides staff, both on the unit and in the control area, with greatly improved vision of the insides of the cells.   This facility will be able to accommodate up to 44 special needs inmates in large, spacious cells which each contain a single bed.  Hunt MHU also features a large common area with several tables to accommodate out-of-cell time as well as on-unit group therapy.  There are also additional group therapy rooms, social workers' offices, exam rooms, secured pill storage and medical supply rooms, and a dumb-weight elevator allowing staff to safely transport medical equipment to both levels while

outside the reach of inmates. The Secretary of the Department of Corrections has agreed to lease this facility to the Sheriff at nominal cost for up to three years, which will allow time for the construction of the needed facility on the OPP campus.

The Hunt MHU building will first require some equipment to make the unit operational. The following supplies to operate the unit, which are the same supplies used throughout the Hunt facilities, will be purchased at the reduced cost at which the Department of Corrections is able to access them:

| Item | Quantity | Unit Cost | Total Cost |
|---|---|---|---|
| **Televisions** | 24 | $329.99 | $7,896 |
| **Chow Carts** | 2 | $5,000 | $10,000 |
| **Hot Food Table** | 2 | $1,689 | $3,378 |
| **Mattresses** | 30 | $44.85 | $1,345 |
| **Bedding** | 30 | $21.51 | $650 |
| **Office Furniture** | | | $1,000 |
| **Pill Cart** | 2 | $2012 | $4,024 |
| **TOTAL SUPPLIES:** | | | **$28,293** |

Inmates housed at Hunt MHU will be dressed in standard OPP uniforms, thus there will be no additional cost. Also, Hunt has agreed to provide laundry services on-site for no additional cost to the Sheriff. Hunt will require reimbursement of approximately $3.50 per inmate per day to cover all feeding costs associated with these prisoners, including special diets as required.

Occupation of this unit will also require minor renovations and repairs. Portions of this work can be accomplished at a low cost due to Hunt staff offering use of on-site contractors

which utilize inmate labor.  This section of costs includes:

| Task | Supplies + Labor |
|---|---|
| **Sidewalk to Rec. Yard** | $1,500 |
| **Fencing of Sidewalk** | $14,500 |
| **Cameras on Rec Yard** | $25,000 |
| **Electric Gate Lock** | $3,000 |
| **TOTAL:** | **$44,000** |

Because four cells will be designated to house inmates whom are suicidal, doors with security glass and/or Lexan glass coverings will be utilized in those cells prevent those inmates from accessing the bars and using them as potential ligature anchors.  The ventilation system of this facility is designed in a way in which air is pulled from the outside of the cells, directly through the cells, and up through the ceiling of the common area outside of the cells.  Because the glazing will prevent that airflow within those four cells, suicide resistant vents will be installed within the cells, and mechanical ventilation will likely need to be added to those cells.  Suicide resistant beds will need to be added in these four cells, and cost approximately $1000 each, with each mattress costing $250-$400 each depending on the type of mattress selected.  (See Attachment A)

It was originally thought that additional cameras would be required for this housing space; however, the monitors suggested that the proposed staffing level may be sufficient to negate the need to add camera equipment beyond what already exists within the unit, since it is not the intention of OPSO to use cameras for direct supervision purposes.  Staff is currently seeking a blueprint depicting current camera placement, and this will be provided to the monitors

for further review. Should their opinions of the space change review, cameras will be added as needed, and this work can be accomplished with inmates in the unit. It will be essential, however, to add recording capability to the existing cameras in the facility.

As indicated on the attached cost breakdown sheet (See Attachment B), the full cost materials and construction pertaining to modifying the suicide resistant cells, adding glazing and additional mechanical ventilation, adding suicide resistant vents, adding 60 day video recording capability with two additional monitors, adding video conferencing capability, adding multiuse conference and group therapy furniture to the facility will cost approximately $293,000.

Two medical transportation units will be needed to move inmates between Hunt MHU and the OPP campus, and these units are expected to cost approximately $15,000-20,000 each for used units based upon inquiries made by Chief Tidwell. These units will be operated on a daily basis for purposes of transporting inmates to Hunt MHU. Court appearances may require additional transportation depending on the duration of the proceeding. Video appearances via video conferencing equipment will be used whenever allowed under law to reduce unnecessary travel. The OPSO will utilize its current weekly Hunt run as an additional opportunity to return inmates from Hunt to OPP to avoid duplication of expenditures. It is anticipated that the total fuel costs to operate these vehicles will be between $2000-4000 per month.

It is expected that the OPSO could transfer its acute mental health males to this facility as soon as July 24. It is the OPSO's intention of operating this facility in the manner suggested by Dr. Patterson, whereby inmates are housed on this unit for a short period of time while they receive intense treatment and therapy, with the goal of transporting these inmates to the sub-acute/step-down mental health unit, and then back to general population.

*Staffing:*

The Hunt MHU will require additional staff, both mental health and security, to begin operations. Initially, mental health staff, including psychiatrists, social workers, and nurses, will be provided by CorrectHealth, which currently locates and provides medical and mental health staff in the OPP campus facilities. Dr. Musso's preliminary minimum staffing plan (See Attachment C) includes: 1 mental health RN, who will serve as unit supervisor and will work 5 days per week; LPNs staffing the unit 24/7; certified nursing assistants for direct observation purposes; LPC / LCSWs 5 days per week; a forensic psychologist 20 hours/ week; and APRN Psych nurse 20 hours per week with OPP's psychiatrist or the Medical Director available on a daily basis as needed with additional telemedicine appointments. CVs for the staff will be provided to the parties, and modifications to the plan will be made based upon any input from the monitoring team. The new medical / mental healthcare vendor selected by the committee will be required to provide adequate mental health staff for this facility as part of the contract process.

Being that security staffing at the OPP campus is still critically low, though improving, transfer of a substantial amount of staff to that facility would certainly lead to a further shortfall on the OPP campus. As such, security staff at the Hunt MHU facility will consist solely of Department of Corrections / Hunt Correctional guards. The first 30-60 days of staffing will require the utilization of overtime manpower to staff this facility, which is estimated to cost approximately $140,000 per month during those two months. The breakdown of posts, which will be fully staffed on all 4 shifts, covering 24 hours per day, is as follows:

| Officer | Pay Rate / Overtime Rate | # of Positions |
|---|---|---|
| MSgt | $20.95 / $31.43 | 5 |
| Lt | $25.66 / N.A. | 1 |
| **Total Per Month w/OT:** | | **$144,000 approx.** |

In the interim, the hiring of additional DOC guards for Elayn Hunt will begin, which will allow the phasing in of veteran Hunt staff who receive advanced quarterly training on securing special populations. These staff will be deployed to Hunt MHU on a regular-time basis at the above standard pay rate, steadily reducing overtime costs. Once this hiring is completed, the facility will be fully staffed at the standard pay rate. Warden Seth Smith has agreed to review the Consent Judgment with these members of staff, as well as to allow Mrs. McCampbell and/or members of her team to meet with and observe the staff. Training materials and policies are expected to be submitted to the monitoring team by the week of July 7. The immediate access to Hunt's security staff will allow the Sheriff to move inmates into this facility without delay, and will not result in a reduction of the security staff currently at the Orleans Parish Prison facilities.

Additionally, it should be noted that Hunt will provide medical (non-mental health) care, as well as any emergency routes, to those inmates housed at Hunt HMU, including the provision of medication needed as part of that medical care, and will seek reimbursement only for the medications administered or direct costs incurred. Medication costs are currently being estimated, but it is anticipated that these costs will be lower than what they currently are with respect to this population.

*Male Sub-Acute/Step-Down Mental Health*

True sub-acute male inmates will be housed at Hunt with the acute inmates. After

inmates have received an amount of treatment sufficient to stabilize their acute and serious sub-acute mental conditions, they will be returned to the OPP campus, where they will enter the sub-acute mental health unit, which will be located in building 4 of the Temporary Detention Center. Building 4 will require renovations to accommodate this sub-acute mental health population, and this work will begin in August of 2014.

The extent of this work is expected to include:

- A build out which creates direct supervision desks, multipurpose room, exam room, interview and counseling room, clinical work station with support areas including clean utility, storage, soiled utility, and staff toilet
- Replacement of the air conditioning system to meet Department of Health requirements
- Enclosing showers and providing proper moisture exhaust fans
- Providing beds of formed plastic for suicide prevention
- Providing furniture for the multipurpose and exam rooms, as well as staff seating
- Relocation of the temporary medical office building to the existing "yard" area at TDC.

This work is expected to cost approximately $1.2 million to $1.6 million and will carry the following timelines: 30 days for design, 30 days for the bid process, and 120 days for construction. Upon completion of this renovation work, all sub-acute and step-down inmates will be housed in this facility. In the interim, the male step-down units, which are units intended as a transition from acute and sub-acute to general population, will remain in TP5.

As with the acute mental health facility, OPSO intends to operate this facility in the

manner suggested by Dr. Patterson, wherein these inmates will be exposed to a therapeutic environment with substantial group interaction to prepare them for re-entry into general population. This facility will house approximately 26 male sub-acute and 27 step down male inmates upon completion.

*Female Acute Mental Health and Sub-Acute Mental Health*

Hunt MHU cannot accommodate female inmates; however, as of June 30, 2014, the OPSO has identified 2 acute-level females and 2 sub-acute level females, all of whom are currently housed in TP5. The monitoring team has expressed that based on national averages and their visits to the facilities; there could be as many as 6 more females with acute and or sub-acute conditions, as well as several others who may require housing on this unit for general mental illness.

As an immediate solution, as renovation begins on the first floor units of TP5 to develop an intermediate mental health unit while awaiting construction of Phase III, females with both acute and sub-acute mental health conditions, as well as those females who require permanent housing in a mental health treatment environment, will be temporarily relocated to the Temporary Detention Center. This transition is expected to occur on or before July 8, 2014.

These are, as the name suggests, temporary buildings which are intended to serve as a place-holder until permanent housing space is complete. Each building is divided into pods, with an elevated control room between the pods and having high visibility into both. The right pod of the building, where female acute and sub-acute mental health will be housed, is constructed in a large dormitory style, with five individual, glass-front holding cells located along the rear wall of the unit. The building is presently configured to hold approximately 60 inmates, featuring a combination of bunk and single beds, as well as 8 large tables with benches attached. The unit

contains two showers, and a common bathroom area with four toilets which are not partitioned from each other.  There are both telephones and video-conferencing stations directly inside the unit.

Mrs. McCampbell made two visits to the Temporary Detention Center Building 3 during the week of July 23, 2014.  She met with ranking staff and reviewed and assisted with development of a short-term housing plan for this special population.  To temporarily operate the unit in a way which accommodates this population, several changes must be made.

All bunk beds, with the exception of the three directly against the far wall, will be removed from the unit.  The single beds will remain in their current locations and will be used for the majority of this population.  Beds will remain in four of the five cells, with these cells being used only for inmates who require isolation from the inmates being housed in the dorm environment.  The middle cell will converted to a medical exam room / medical office, and the beds will be removed and replaced with a medical exam table.  A desk will be placed in that cell, and sliding privacy screens will be added for use during examinations.  Two of the eight tables will be removed from the unit to provide additional space, and the remaining tables will be sufficient for general dining or recreational use, as well as a classroom-style environment for group therapy sessions.  With the exception of the purchase of four suicide resistant beds and mattresses, medical privacy screens, as well as partitions to create bathroom "stalls," costs to retrofit this unit are expected to be very low.  It should be noted that the monitors have noted that this temporary retrofit will be tested for 60 days and that additional modifications may be necessary following their evaluation.

It has been made clear to the City that any proposal which results in the indefinite use of temporary housing facilities, such as the Temporary Detention Center, is unacceptable.  Females

with acute and sub-acute mental health conditions, as well as those with mental illnesses who must remain in a mental health treatment environment, will only remain in the Temporary Detention Center for the period of time it takes to complete renovations to the mental health units in TP5. The units will be renovated, and styled as an open dormitory-style unit, with two of the current four-person cells being converted to single or two-person cells.  The security locking system will be upgraded to a modern, fully functional system, security cameras will be added and reconfigured, and the cell doors will be replaced with doors better suited for observation. Common areas will be sanitized, reorganized, and repainted, providing space for group therapy, interaction with other inmates, telephone calls, and recreation.  TP5 renovations are expected to cost approximately $1.6 million to $2 million and will carry the following timelines: 90 days for design and the bid process, and 180 days for construction.    The unit will be operated in the method suggested by Dr. Patterson and described above.

**Staffing at the Acute and Sub-Acute Mental Health Units**

*Qualified Mental Health Professionals*

Staffing relative to mental health professionals will is anticipated to change upon execution of the contract with a vendor to provide both medical and mental healthcare for the jail facilities.  The requirements of the Consent Judgment compliance have been included as part of the RFP, and the vendor to which the contract is awarded with fully staff the facility with the appropriate number of mental health professionals required to comply. However, in the interim, the OPSO has added staff members and modified the deployment of that staff.

The Intake and Processing Center (IPC) staffing plan has been modified.  Registered nurses (RNs) are now solely responsible for conducting the medical intake screenings, which will allow more experienced nurses, with a higher level of training, to collect information on the

inmates' medical and mental health needs.  It is anticipated that this will improve the quality of medical Intake Screenings done, that it identify a greater breadth of medical and mental health needs, that it will obtain more clinically significant details for prompt treatment.  The previous staffing plan allowed intake screenings to be conducted by licensed nurse practitioners (LPNs), and members of the monitoring team had identified occasional inconsistent information between the intake screening (done by LPNs), and the health assessments (done by RNs) performed at day 14 of incarceration.  Having RNs perform the medical Intake Screenings should minimize these discrepancies.

Staffing relative to the psychiatric units has also changed.  CorrectHealth has provided valuable assistance in locating additional staff members to quickly deploy to these units. A second psychiatrist has been added to staff. A psychiatric nurse has also been added to staff, and is working full time with the mental health population.  The psychiatric unit is managed by an RN, and a total of 5 RNs and 2 LPN's have been assigned to that unit.  The OPSO recently brought on 10 certified nursing assistants, who actively work on the tiers housing the acutely mentally ill, providing direct observation and suicide watch monitoring.  The OPSO has additionally hired 5 social workers: two which assist with mental health assessments, one which provides counseling and meets with youth offenders, one which provides counseling and serves those with substance abuse issues, and one assigned to victims of sexual assaults.

The OPSO's staffing plan calls for 2 additional psychiatric nurses, 2 additional social workers, and 10 additional certified nursing assistants to assist with this population, and efforts are being made to retain these additional staff to further progress; however, a lack of funding has prevented the Sheriff from successfully retaining these staff thus far.

*Staffing Relative to Classification and Screening*

A major part of properly identifying the mental health population will be the overall classification process, aside from the medical intake screening described above. The current classification system in place is one which was developed in-house by several members of staff. This in-house system was the best that OPSO could utilize given the lack of resources provided to purchase a true classification system. This system was an improvement over the previous classification system, which was essentially driven by an inmate's bail; however, the monitoring team considered the classification system insufficient to comply with the terms of the Consent Judgment.

The OPSO has now contracted with Dr. Patricia Hardyman, the sub-monitor relative to classification in this case and one of the nation's foremost classification experts, to design a true classification system for the OPSO, and Dr. Hardyman's work is in the testing phase and nearing completion. Once in place, this classification system will assist OPSO in identification of the mental health population. This system will be validated after it is in place and established.

OPSO currently has a limited number of staff assigned to classify inmates, and will need additional staff members, specifically classification technicians, to implement this system. The Sheriff will contract with I/O Solutions, which has submitted a proposal which includes a job analysis and creation of job description, recruitment, and selection/hiring of a classification manager, classification technicians, and an administrative assistant for classifications. This proposal is extremely thorough, and has been provided to the other parties, as well as the City. It is the Sheriff's position that the work provided by I/O solutions, not just relative to classification, but to all the areas of the jail which are critically short on staffing, will substantially affect the Sheriff's ability to comply with the Consent Judgment.

*Security Staffing*

The Sheriff has prioritized staffing the mental health units of the jail, which has increased the number of deputies assigned to those units, and he will continue to do so.  It should be noted that these numbers fluctuate with the availability of staff in various parts of the facilities, and staff must sometimes be used to fill critical shortfalls in circumstances where employees call in sick or must accompany a hospital route.

As was previously discussed, the operation plan of these acute and sub-acute mental health units are primarily driven by qualified mental health professionals, and this has recently begun with the addition of the aforementioned nursing assistants, who are able to assist with the important task of direct observation and suicide watch.  This is allowing the OPSO to begin the practice of utilizing security deputies for just that: security.  While the nursing assistants are observing inmates, the deputies' presence on the unit can be better devoted to protecting the staff and inmates from other inmates, deterring improper conduct, serving as a second level of observation as the unit is patrolled, and managing daily tasks such as feed-up and recreational time without interrupting the needed observation.

*Medical and Mental Health Contract and Policies and Procedures*

The OPSO has also received six bid proposals from vendors seeking to be awarded the OPSO health services contract, which will include mental health services.  The selection committee has already met, and a second meeting is scheduled in July.  The Sheriff's goal is to award the contract in late August, and for contract negotiations to begin by September 1.

Once in place, this vendor will be responsible to provide appropriate mental health staff sufficient to comply with the terms of the Consent Judgment.  This will include all relevant portions of this provision which include assessment, re-assessment, and treatment by qualified

mental health providers.  These policies and procedures will be provided to the monitoring team for review and comment to ensure compliance with the Consent Judgment.

This process will take additional time, but in addition to the fiscal irresponsibility of contracting for immediate revision of policies relative to mental health which would last only a few months, the confusion and resulting problems caused in attempting to train both mental health and security staff on what would effectively be three major policy modifications in a matter of months would outweigh any benefits.

In the interim period, the OPSO will operate pursuant to the plan and policies established by CorrectHealth, along with existing policies and procedures pertaining to acute and sub-acute mental health patients.  CorrectHealth's operational plan has been submitted to Dr. Patterson for review and comment, and any required changes will be made.  While everyone is in agreement that this interim period is not optimal, it is the OPSO's position that this plan is more than sufficient to provide adequate treatment and care to those suffering from acute mental health and sub-acute mental health conditions, and that the combination of an increased number of staff, along with an improved living environment, will have a drastic and substantial impact on the quality of services provided.

## CONCLUSION

A lack of City action in taking any step to provide a good and sufficient jail to provide acute mental health housing has now placed the parties, the staff, and the inmates in a position of facing the reality of temporary facilities for three years.   The Sheriff again notes, however, that any proposal which looks to temporary facilities as an indefinite housing option, or as an option while awaiting a population decline, is unacceptable.  The Orleans Parish Sheriff's Office will operate *permanent* facilities, and will not allow the City's indifference to morph the Temporary

Detention Center into the second iteration of the Tents, a facility which had a planned 3 year lifespan and is still in use today, nearly 9 years after Hurricane Katrina.  It is essential that the City be ordered to comply with its obligation to provide a good and sufficient jail to accommodate acute mental health prisoners, and that the plan proposed by the Sheriff be implemented immediately and without delay.

        Respectfully submitted,

        **USRY, WEEKS & MATTHEWS**

        */s/Blake J. Arcuri*_____
        Freeman R. Matthews (9050)
        Blake J. Arcuri (32322)
        1615 Poydras St., Suite 1250
        New Orleans, LA 70112
         (t)504.592.4600; (f)504.592.4641
        Counsel for Sheriff Marlin N. Gusman

## **CERTIFICATE**

    I hereby certify that I have caused a copy of this pleading to be served upon all other parties hereto through the EM/CMF filing system, this the 30th day of June, 2014.

        */s/Blake J. Arcuri*_____