UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| LASHAWN JONES, KENT ANDERSON, STEVEN DOMINICK, ANTHONY GIOUSTAVIA, JIMMIE JENKINS, GREG JOURNEE, RICHARD LANFORD, LEONARD LEWIS, EUELL SYLVESTER, and MARK WALKER, on behalf of themselves and all other similarly situated, et al. | CIVIL ACTION NO. 12-859<br><br>JUDGE LANCE M. AFRICK<br><br>MAGISTRATE JUDGE CHASEZ |
| VERSUS | |
| MARLIN GUSMAN, Sheriff, Orleans Parish | |

### CITY OF NEW ORLEANS' MEMORANDUM REGARDING SHORT-TERM HOUSING OF MENTAL HEALTH POPULATIONS

MAY IT PLEASE THE COURT:

Marlin N. Gusman, Sheriff of Orleans Parish (the "Sheriff") is the statutory keeper of the public jail for Orleans Parish. *See* La. R.S. 15:704. Indeed, the Sheriff repeatedly has represented in pleadings to this Court (Sheriff's Third party Complaint against the City, Rec. Doc. 76), and in open Court that he singularly has the authority to control the operations of Orleans Parish Prison (OPP), which is the jail for Orleans Parish. The Sheriff has proclaimed that he and he alone is responsible for the care and custody of the inmates at OPP. It is fundamental that among the Sheriff's primary obligations is the operation of a constitutional jail

for the benefit of the inmates, his deputies as well as the residents of this City. Regrettably, he has not done so.

For nearly a decade, the Sheriff has not provided constitutional conditions for all classifications of inmates at Orleans Parish Prison, including those inmates with acute mental health conditions. The documentary evidence during the 2013 evidentiary hearings confirmed the Sheriff took no action after receiving written notification from the U.S. Department of Justice as far back as 2009. Even after signing the Consent Decree in 2012, the Sheriff did nothing for more than a year and a half – until confronted with a contempt motion.

Faced now with plaintiffs' motion as well as the Court's straightforward comments, the Sheriff has offered a proposal for housing inmates with acute and sub-acute mental health conditions. Once again, the Sheriff's response is to point the finger at everyone but himself. Indeed, the Sheriff even glosses over the import of the City Council's ordinance in 2011 which he cites in his submission; this ordinance required accommodations for any type of prisoner at the new jail (which still remains under construction for a cost in excess of $145 million) and which did not have any accommodation for medical or mental health treatment of inmates. After engaging in the construction of a new jail and a new warehouse/kitchen, which had a cost of an additional $85 million but lacked such rudimentary functions as a laundry, the Sheriff apparently has jumped to the quick fix that bigger is better; he proposes building yet another facility which he describes as Phase III to make OPP even larger. Furthermore, new, costly construction is not a substitute for proper management. The City understands that there is no authorization for the construction of Phase III (yet another complex) and that this issue will not be addressed by the Court during the July 14th hearing of this matter.

- 3 -

As the Court notified counsel during the June 25th, 2014 status conference, the July 14th hearing will be limited to a short-term resolution of treating and housing inmates with acute mental health conditions. Consequently, the City will limit its response to the issues identified by the Court.

The Sheriff proposes using a facility located on the campus of Elayn Hunt Correctional Center in St. Gabriel, Louisiana to house male inmates with acute mental health conditions; this proposal by the Sheriff is based upon what the Sheriff has described as a "nominal" cost lease for the next three years. At one juncture, the Sheriff stated the lease cost would be $1 per year.[1] The Sheriff indicates that the facility will be able to accommodate 44 male inmates with such special needs, though he has not stated how many inmates with acute mental health conditions are now housed at OPP.[2] But this is just another example of proposed spending with no careful analysis of the actual need for such spending and with no consultation with the City and its correctional experts. What follows are questions the City poses not so much about the relocation of these inmates at Hunt for up to three years but the costs and logistics of such a proposal. The City wishes to ensure that such measures will promptly address housing male inmates with mental conditions at a fiscally prudent cost and foster reaching compliance with the mental health requirements.

The City's initial concern is the Sheriff's proposed renovations and repairs to this facility. This is a new mental health facility that has never been used by the DOC due to budget restrictions and a declining prison population. The Sheriff likewise has not been clear as to whether the proposed construction/repair cost of $44,000 is the maximum extent of what is

---

[1] If the lease costs are market value or even a fraction of market value, just the use of Hunt could be several million dollars each year. However, the City assumes the Sheriff has documentation as to the "nominal" cost for annualizing leasing the Hunt facility and will share that documentation with the City before the July 14th hearing.

[2] In response to the City's inquiry, the Sheriff has represented that none of the 400 plus DOC and Plaquemines Parish inmates are classified with mental health conditions.

envisioned to be the cost for modifying this facility or will exceed $293,000 as also proposed by the Sheriff for equipment and renovations. In fact, according to the Sheriff's prior submissions, the construction/renovation costs was expected to far exceed the sum of $44,000.

In like fashion, the list of the array of equipment proposed by the Sheriff (Attachments A and B to the Sheriff's Memorandum) does not indicate actual costs, bids, or how the Sheriff arrived at the sum of $293,000. For example, without even knowing whether video conference capability is needed or can be used, the Sheriff has included that type of item as an essential expense.

Following the same pattern of carefree spending, the Sheriff proposes that two medical transportation units be acquired just to service the needs of a maximum of 44 inmates. Although the Sheriff states that the units will be operated on a daily basis, that again appears to be conjecture by the Sheriff. It has not been established that these 44 inmates or a fraction of them will need to be transported back and forth between St. Gabriel and New Orleans on a daily basis; nor have there been any facts offered to establish the need for daily transportation for this few number of inmates.[3] However, if the video conferencing equipment that the Sheriff proposes be purchased can, in fact, be used, the transportation costs should be reduced considerably.

Not being deterred by this inherent inconsistency, the Sheriff requests an allocation of $30,000 to $40,000 to purchase two additional vehicles and $2,000 to $4,000 per month solely for fuel cost. And annualized, the cost solely for fuel would be $48,000; the City believes this amount to be excessive. The distance between New Orleans and St. Gabriel, Louisiana is 68 miles. Even driving a vehicle that gets only 10 miles to a gallon, it would be approximately 14 gallons for each round trip between St. Gabriel and New Orleans. Using gas prices posted within

---

[3] The Sheriff apparently has not explored the feasibility of coordination with the District Attorney and courts to minimize transportation of these few inmates, which would be another taxpayers' savings.

- 4 -

- 5 -

the last several days in the metropolitan area for the everyday consumer, each trip would cost approximately $44.00 for gasoline.  And even if a round trip was required on a daily basis, it would only amount to $880.00 per month.  Nonetheless, the Sheriff once again relies upon exaggerated figures in an attempt to gain unnecessary income from the City and its taxpayers.

The Sheriff next proposes a sizable mental health and security staff for this limited number of inmates.  While the Sheriff attaches a summary of personnel from CorrectHealth (Attachment C to the Sheriff's motion), this document again lacks any specificity as to projected costs.  Other than indicating the use of a forensic psychologist 20 hours a week and a psychiatric nurse for 20 hours a week, the Sheriff's proposal fails to state how many LPN's (Licensed Practical Nurses) will be required, how many certified nursing assistants will be required, or how many LCSWS (social workers) will be required for this limited number of inmates and the corresponding costs.  The City is entitled to receive this information before it decides whether to question such costs as excessive.

As part of what seems to be a bloated budget, the Sheriff suggests an expense of $140,000 per month for security staff.  Notably, the Sheriff's proposal relies upon using DOC personnel and paying those individuals far in excess of what a correctional officer at OPP receives.  Although the Sheriff represents that this plan will avoid a reduction of the security staff at Orleans Parish Prison, the Court will recall that Deputy Sheriff Ursin recently testified that he would have no difficulty in hiring the number of correction deputies needed for OPP by May 2014; despite a sizable increase in starting salary, the Sheriff has opted to suggest that he pay considerably more for senior DOC personnel.  In fact, the Sheriff has not even explained why DOC master sergeants and lieutenants are needed for the security of these relatively few inmates.  More troubling is whether this deputy staffing cost of $140,000 each month will cease

after 30 to 60 days as the Sheriff represents in his proposal. Again, the Sheriff offers no specifics and the annualized cost at this rate would be 1.68 million dollars.

Although the Sheriff indicates that sub-acute male inmates also will be housed at Hunt, he represents that the inmates with sub-acute mental conditions will be returned to the OPP facility at which time they will enter the sub-acute mental health unit. Consequently, the population at Hunt likely will be smaller than the 44 inmates estimated by the Sheriff in his memorandum.

The Sheriff next proposes renovations to Building 4 that is part of the Temporary Detention Center in OPP to house another 50 male inmates. The Sheriff again fails to provide any documentation as to this projection of renovation costs of $1.2 million to $1.6 million; in other words, the Sheriff still fails to provide any details and merely offers a ball-park estimate. This projected cost of upwards to $1.6 million, or more, considering what has apparently been routine cost overruns affecting construction projects at OPP, will only accommodate approximately 50 inmates for re-entry into the general population. And absent specific figures or how these cost estimates were obtained, it is respectfully submitted that it is premature for the City to respond.[4]

The next proposal by the Sheriff relates to female inmates. The Sheriff has identified two female inmates with acute-level mental health conditions. Apparently recognizing that it is difficult to justify any renovation cost for two inmates, the Sheriff adds two female inmates that are at the sub-acute level. Nevertheless, even this aggregation of acute mental disorders with sub-acute female inmates totals four inmates. Perhaps realizing that this small population cannot

---

[4] The Court may have anticipated the reasonableness of having the Sheriff furnish these cost specifics to the City based upon the City's understanding that the Court will not consider any of the Sheriff's proposed expenditure at the July 14th hearing except those limited to short-term issues. But even with this limitation of topics to short-term housing, the Sheriff has not provided the City with core cost data.

PD.11759954.1

reasonably justify the type of expenses the Sheriff is proposing for the future, he then speculates that "there could be as many as six more females with acute and/or sub-acute conditions." However, the Sheriff's conjecture does not justify the expenses the Sheriff is proposing to incur with taxpayers' dollars.  The City is mindful of the fact that such expenses are associated with long-term housing and will be addressed at a later date. Yet if the Sheriff is willing to toss out seven figure estimates, he should be prepared to furnish the City with concrete details.

      For these four inmates, the Sheriff seems to recommend that a unit be allocated to these four inmates that would contain two showers and a common bathroom area with four toilets. Although the Sheriff seeks to rely upon a visit by the lead monitor to the Temporary Detention Center which he references occurred during the week of July 23rd *[sic]* (presumably it was June 23rd), the Sheriff does not explain why there needs to be such a low ratio of showers and toilets for these few female inmates.  He then lists an assortment of equipment that he plans to acquire, once more without identifying the expense or the need for this equipment.

      With regard to cost of retrofitting the unit for these four female inmates, the Sheriff merely states that he expects it to be very low.  Linking the renovation to the Temporary Detention Center is the Sheriff's proposal to renovate Templeman V for those female inmates with acute and sub-acute mental health conditions (again, that figure is currently four inmates). The Sheriff, nevertheless, suggests renovation expenditures of $1.6 million to $2.0 million for these four inmates.  Respectfully, the Sheriff's notion of what is a low cost has not always been the same as what many members of the public believe to be a low or nominal cost. With respect to the costs the Sheriff indicates is needed for the short-term accommodations for these four female inmates, the City has physically inspected these changes and expects to advise the Court such costs, projected to be about $5,000, are acceptable to the City.

The Sheriff proposes that staffing for mental health professionals will be accomplished through a vendor. That outside vendor will provide both medical and mental health care for the jail facilities. Because the members of the Selection Committee are still evaluating the responses to the RFPs, the City is unable to ascertain if the selected vendors will propose overstaffing or properly staffing each facility. While CorrectHealth, another outside vendor, has been retained by the Sheriff to locate staff for the psychiatric/mental health units, it is still absent from the Sheriff's submission as to the costs for these proposed staff members, and unclear as to the total number of staff members, or how they will be assigned. Still troubling is the fact that the City has never been provided a copy of the CorrectHealth contract, scope of services, or term of the agreement. Lacking this fundamental information, the City is unable to ascertain the reasonableness or excessiveness for such proposed costs. Unlike a dinner menu that has no prices at some swanky restaurants, the Sheriff must provide this basic information before he seeks funds from the public.

The Sheriff invokes a worn refrain that he lacks funding to retain staff, but that is not accurate. Not once but twice within the past eight months has the City augmented the Sheriff's finances with little or no accounting as to how these City dollars have been spent; these payments by the City were in addition to the 2 million dollar increase in the Sheriff's annual budget. Notably, the Sheriff does not mention the fact that the 2 million dollar grant from the Louisiana Commission on Law Enforcement (LCLE) has not been dedicated to the cost of implementing the Consent Decree, as the Sheriff represented to this Court would occur when he testified during a hearing relating to the Consent Decree. Instead, the Sheriff has taken these funds and according to his attorneys' representations, the Sheriff has depleted or plans to

disburse the LCLE funds for things other than implementation of the Consent Decree as he promised.[5]

As set forth by the City in the Joint Report submitted to the Court on June 24, 2014 and reiterated by the City during the status conference the following day, the City needs certain cost estimates from the Sheriff to fully evaluate the Sheriff's proposals that the Court will consider at the July 14th hearing. The Sheriff still has not provided the cost estimates the City anticipated receiving. It is respectfully submitted that there must be some proportionality between the benefits and costs that the Sheriff is proposing, which costs the taxpayers ultimately may absorb and which expenses are likely to deplete City revenue for processing public safety personnel, not the least of which is the paramount need for more NOPD officers. In addition, the Sheriff should be required to furnish specific cost figures and how they were determined instead of guesstimates by counsel.[6] The Sheriff's suggested hurried pace that may cost an inordinate amount of taxpayer dollars is not a solution to the Sheriff's abject failure to comply with the Consent Decree during the past year. The City requested invoices, estimates, staffing plans, and any other documents related to costs at these two facilities for short-term housing. The City has not yet been provided with all of the requested documents. Before the Court decides the Sheriff's motion, he should be required to furnish these documents and data.

## **CONCLUSION**

It is indeed ironic that the Sheriff opens and closes his submission with attempts to blame the City for his failures, particularly in the area of housing inmates with acute mental health

---

[5] The Sheriff mentions that DOC is allocating $3.50 per day to feed the 44 male inmates with mental health conditions, this would be an annualized costs of another $56,210. Similarly, the Sheriff's proposal does not even provide an estimated cost for medication; the Sheriff simply recites that medications will be charged at the DOC level.

[6] Again, the City understands that not all of these proposed expenses will be part of the July 14th hearing. The lead monitor and sub-monitors have planned to meet with representatives from the Sheriff and City on July 16th to discuss long term issues and related matters.

conditions. Certainly the Sheriff must have been aware of this issue during the nine years that preceded the Consent Decree. Certainly the Sheriff was aware of this issue when he negotiated and signed the Consent Decree. Certainly the Sheriff was aware of the acute mental health housing issue when this Court issued its June 6, 2013 opinion underscoring this precise concern and unconstitutional situation. Certainly the Sheriff was cognizant of what he agreed to do (but has not done) once the Consent Decree became effective. Conveniently, the Sheriff has forgotten this history of omissions and dereliction.

As the former heavyweight prize fighter Jack Dempsey was known to say, "The best defense is a good offense." That expression apparently has been embraced by the Sheriff, who would rather castigate others than defend his lack of action. The City, however, understands that the Court will not address the Sheriff's omissions during the July 14th hearing. Inasmuch as the Sheriff has made that approach a backdrop to his presentation regarding the present issue, namely, short-term plans for housing mental health prisoners, the City has been constrained to respond.

The more important issues and what the City believes the Court will consider during the forthcoming July 14th hearing are the means of improving the conditions of mental health inmates in the short-term, improving the overall condition of the jail facility that the Sheriff still operates, the true costs of the Sheriff's proposals (yet to be fully disclosed), and remaining mindful that the Sheriff should not be given *carte blanche* with public dollars given the competing interests embedded in the Prison Litigation Reform Act that include the safety of non-carcerated residents in this City as well as jailed individuals.

        Respectfully submitted,

BY:   */s/ Harry Rosenberg*
      Harry Rosenberg (Bar #11465)
      Bryan Edward Bowdler (Bar #32097)
      PHELPS DUNBAR LLP
      Canal Place | 365 Canal Street, Suite 2000
      New Orleans, Louisiana 70130-6534
      Telephone: 504-566-1311
      Telecopier: 504-568-9130
      Email: harry.rosenberg@phelps.com
             bryan.bowdler@phelps.com

      Sharonda R. Williams (Bar #28809)
      City Attorney
      1300 Perdido Street
      New Orleans, Louisiana 70112
      Telephone: 504-658-9800

      Ralph Capitelli (Bar #3858)
      CAPITELLI & WICKER LLP
      1100 Poydras Street, Suite 2950
      New Orleans, Louisiana 70163
      Telephone: 504-582-2425

**Attorneys for Third-Party Defendant, City of New Orleans**

- 12 -

**CERTIFICATE OF SERVICE**

This is to certify that a copy of the foregoing was filed on this 7th day of July, 2014, with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to all participating counsel of record.

                                     */s/Harry Rosenberg*
                                      Harry Rosenberg