UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

LASHAWN JONES ET AL.                                          CIVIL ACTION

                                                                    No. 12-859
VERSUS                                                             c/w 12-138
                                                                 REF: 12-859

MARLIN GUSMAN ET AL.                                           SECTION I

ORDER AND REASONS

Before the Court is a motion[1] by third-party plaintiff, the Sheriff of Orleans Parish

("Sheriff"), for approval of the implementation of the Sheriff's proposal for the short-term housing

of acute and subacute mental health populations and for an order directing third-party defendant, the

City of New Orleans ("City"), to pay all costs and expenses associated with the proposal. The City

has filed a response,[2] as have the Plaintiff Class and the United States of America (collectively

"Plaintiffs").[3]

BACKGROUND

Before the Court approved the Consent Judgment, the Sheriff filed two nearly identical third-

party claims against the City, one premised on the Plaintiff Class's complaint and the other premised

on the United States' complaint in intervention. Each complaint asserts:

> The City of New Orleans is responsible for funding jail facilities of the Orleans
> Parish Sheriff's Office pursuant to various provisions of Louisiana law. . . . To the
> extent that the Court should conclude that the Sheriff must provide prospective relief
> in the form of additional staffing, training, care, treatment or other services to

---

[1]R. Doc. No. 697.

[2]R. Doc. No. 698.

[3]R. Doc. No. 700.

Orleans Parish inmates which will necessitate funding over and above that currently provided by the City of New Orleans, judgment should also be entered in favor of the Sheriff ordering the City of New Orleans to pay the Sheriff the full cost, as determined by the Court, of providing such prospective relief.[4]

On June 6, 2013, after considering extensive briefing and a comprehensive fairness hearing, the Court entered the Consent Judgment.[5] The Consent Judgment is narrowly drawn, extends no further than necessary to correct the violation of the Plaintiff Class's federal rights, and is the least intrusive means necessary to do so. *See* 18 U.S.C. § 3626(a)(1)(A). The Consent Judgment "contemplates that the dispute between the Parties will be resolved by the continued development and implementation of [] measures" addressed in that document.[6] The Consent Judgment's effective date was October 21, 2013.[7]

The conditions experienced by inmates with mental health issues have long been at the forefront of the case.

> During the course of the fairness hearing, the evidence, including credible witness testimony, exposed stark, sometimes shocking, deficiencies in [Orleans Parish Prison]'s medical and mental health care system. Inmates with mental health issues are housed in deplorable conditions. Mental health units smell strongly of feces, urine, and rotting organic matter. Several inmates had floors and walls smeared with feces when Dr. Gage visited, and many cells had "evidence of the detritus of several days' food and utensils." *Compare Gates v. Cook*, 376 F.3d at 338 (Living in "extremely filthy" cells with "crusted fecal matter, urine, dried ejaculate, peeling and chipping paint, and old food particles on the walls . . . would present a substantial risk of serious harm to inmates."). Such unsanitary conditions can cause or exacerbate illness. Moreover, "mental health units, including those designed for suicide monitoring, were patently not suicide proof."

---

[4]R. Doc. No. 75, at 3 (referring to the complaint in intervention); R. Doc. No. 76, at 3 (referring to the Plaintiff Class's complaint).

[5]R. Doc. No. 466.

[6]R. Doc. No. 466, at 5. The City is not a party to the Consent Judgment. For a more detailed procedural history of the case, see *Jones v. Gusman*, 296 F.R.D. 415, 424-28 (E.D. La. 2013).

[7]R. Doc. No. 583, at 3.

. . . .
 The acute psychiatric unit's showers have large amounts of black mold on the ceilings and walls. Clouds of gnats have resulted in an increased incidence of skin problems. Cells housing mentally ill inmates have feces spread on the walls. Inmates, including inmates on the acute psychiatric unit, sometimes sleep on the floor or on bare steel bunks because they are not given mattresses.

. . . .
 As with security and safety, OPP's severe deficiencies in mental health and medical care are largely attributable to dramatically insufficient staffing. . . . Nurses report that there is no time to provide any formal mental health treatment, and that they engage in minimal contact usually only in the context of mandatory evaluations. Given the number of inmates and the number of nurses, it is impossible for the nurses to adequately evaluate and chart patients, administer medications, respond to emergencies, provide suicide monitoring, gather sick call information, and provide basic nursing services.

*Jones*, 296 F.R.D. at 443, 452, 449 (footnotes omitted).

The Consent Judgment requires constitutionally adequate mental health care[8] and that "prisoners are provided with constitutionally adequate sanitation and environmental conditions."[9] But the conditions described at the fairness hearing continue to plague Orleans Parish Prison ("OPP").[10] Such conditions are "incompatible with the concept of human dignity and [have] no place in civilized society." *Id.* at 451 (quoting *Brown v. Plata*, 131 S. Ct. 1910, 1928 (2011)). Dr. Raymond Patterson testified that "human pain and suffering, right now at this moment, is happening for anyone, in my opinion, who is being handled as an acute mental health person in Templeman V."[11]

In the months following the entry of the Consent Judgment, it became apparent that there was

---

[8]R. Doc. No. 466, at 24.

[9]R. Doc. No. 466, at 35.

[10]*E.g.*, Court Ex. 1; R. Doc. 713, at 32-39.

[11]R. Doc. No. 713, at 73. Dr. Patterson is the mental health sub-monitor. *See* R. Doc. No. 552-3 (summarizing Dr. Patterson's extensive experience in correctional mental health care).

no credible plan for complying with the Consent Judgment's provisions relative to treating and housing inmates with mental health issues. For example, in May of 2013, Plaintiffs asserted that "[t]he new jail does not have any space dedicated for the provision of mental health services, a mental health tier, or even any suicide resistant cells."[12] Over a period of months, the Court reiterated the need for cooperation between the City and the Sheriff to formulate an appropriate plan, and the parties attempted to amicably resolve mental health housing issues among themselves.[13] However, despite the fact that the Sheriff and the City had more than a year to resolve such issues, no agreement was reached.[14]

The motion before the Court addresses the costs associated with a short-term solution for housing inmates with acute and subacute mental health issues. The motion essentially requests that the Court determine whether the Sheriff's proposed solution is compliant with the Consent Judgment and whether the City is obligated to pay for the solution.[15] Accordingly, the purpose of the July 14, 2014 hearing was to address "solutions for short-term housing (including mental health care) for male and female inmates with acute or sub-acute mental health issues" and to "address the costs associated with such arrangements and whether the [Sheriff] is entitled to additional funding from the [City] for such costs."[16]

---

[12]R. Doc. No. 439, at 6; *see also* R. Doc. No. 732, at 2 (citing R. Doc. No. 722).

[13]R. Doc. No. 545.

[14]R. Doc. No. 685.

[15]*See also Jones*, 296 F.R.D. at 459 ("The Court has no intention of ordering the City, the Sheriff, or any other political entity, for that matter, to raise taxes or to construct yet another facility. To the extent our elected political leaders intend to house inmates at OPP facilities, however, these facilities must meet constitutional and statutory minimum requirements.").

[16]R. Doc. No. 689, at 1. Individuals with acute mental illness have "active symptoms of mental illness [that] affect their behavior and their ability to function." R. Doc. No. 713, at 7. Such symptoms include suicidal ideation, hallucinations, and delusions. R. Doc. No. 713, at 7-8. With

Of note, the issue of long-term care for such inmates remains contested by the City and Sheriff, who disagree as to whether a Phase III facility should be constructed[17] and as to whether the Phase II facility should be retrofitted.[18] The parties previously agreed that long-term solutions require additional discussion by the parties and the assistance of the mental health working group.[19]

Although the City acknowledges the unconstitutional conditions at OPP,[20] the City argued in its pre-hearing brief that the Sheriff's proposal lacks specific information justifying the proposed costs associated with implementing his plan.[21] For example, the City described its concerns as "not so much about the relocation of these inmates at Hunt for up to three years but the costs and logistics of such a proposal."[22] At the evidentiary hearing, however, the City's arguments included rhetoric more befitting a press conference than a judicial proceeding.[23] Counsel for the City of New Orleans compared the proposed costs associated with the treatment of mentally ill inmates, including providing a secure and safe environment, to "the cost of staying at a suite at the Windsor Court."[24]

Such arguments by the City trivialize the plight of vulnerable inmates in dire need of mental

---

respect to individuals with subacute mental illness, those same symptoms have been addressed or reduced, but the individuals are not yet ready to be in a general population in a correctional environment. R. Doc. No. 713, at 9.

[17]R. Doc. No. 688, at 2.

[18]R. Doc. No. 688, at 7-8.

[19]R. Doc. No. 689, at 2.

[20]R. Doc. No. 680; *see also* R. Doc. No. 715, at 3-4.

[21]R. Doc. No. 698, at 8.

[22]R. Doc. No. 698, at 3.

[23]Such rhetoric was reminiscent of that used at the fairness hearing, where the City suggested that inmates at OPP are "seeking 'steaks and cognac,'" *Jones*, 296 F.R.D. at 464 & n.523, a position that was characterized as "shocking and offensive" by family members of inmates who had died while at OPP. R. Doc. No. 250, at 1-2.

[24]R. Doc. No. 713, at 25.

health care. Comparing the cost of a hotel room with the cost of providing severely mentally ill inmates with constitutionally mandated mental health treatment in a secure correctional environment is misguided.

This Court will enforce the Consent Judgment, the appeal of which the City did not pursue, in accordance with well-established legal principles. When confronted with the City's ill-advised attempt to politicize a non-political issue and a lack of management by the Sheriff,[25] one begins to understand the glacial pace at which the Consent Judgment has been implemented thus far and the growing frustration of this Court. This is a matter that should have been resolved by the parties without incurring legal fees associated with the instant motion.

## LAW AND ANALYSIS

As noted above, for purposes of the instant motion, the sole issues are: (1) whether the Sheriff's proposed plan for acute and subacute mental health populations complies with the Consent Judgment; and (2) whether the City is obligated to provide funding for this plan, notwithstanding the reservation of the City's right to assert a claim for reimbursement, a set-off, or any other appropriate relief at a later date.[26] Insofar as the City contests specific costs associated with the Sheriff's proposal, these challenges will be considered with the substance of that proposal. Insofar as the City raises broader challenges, they will be considered separately.[27]

## I. Compliance with the Consent Judgment

---

[25]*E.g.*, R. Doc. No. 710.

[26]While Plaintiffs had initially indicated that they would move for an expedited hearing relative to compliance with the Consent Judgment's mental health care provisions, the parties' stipulation as to such noncompliance obviated the need for any such motion. *See* R. Doc. No. 680.

[27]The City has elected to withdraw its contentions relative to the Sheriff's finances for purposes of the instant motion and July 14 hearing. R. Doc. No. 727.

Both male and female inmates with acute and subacute mental health conditions are generally housed in Templeman Phase V ("Templeman V").[28] All parties agree that, pursuant to this arrangement, OPP is not in compliance with the Consent Judgment's provisions related to mental healthcare.[29] More specifically, Templeman V's lines of sight are inadequate, as are cell sizes and the condition of the physical plant.[30] As Dr. Patterson testified, housing inmates with acute and subacute mental health issues at Templeman V is simply not consistent with the Consent Judgment, and it is "absolutely not a viable option" going forward.[31]

### A. Female Population

The Sheriff has transferred the female acute and subacute mental health population to an area of the Temporary Detention Center ("TDC") that has been retrofitted for that purpose.[32] Chief Michael Tidwell ("Tidwell"), OPP's Chief Corrections Officer,[33] testified that physical alterations were made to TDC based on information provided by Lead Monitor Susan McCampbell ("McCampbell"),[34] and that such "minimal changes . . . offered maximum effect."[35] For example,

---

[28]R. Doc. No. 713, at 159; *see also Jones*, 296 F.R.D. at 424.

[29]R. Doc. No. 680.

[30]R. Doc. No. 713, at 63, 159-60.

[31]R. Doc. No. 713, at 66-67. Chief Deputy Jerry Ursin testified that Templeman V is not sufficient to accommodate acute or subacute populations, "but it was the best building I thought we had, and we put our best effort into trying to house them there," notwithstanding the difficulties inherent in the physical plant. R. Doc. No. 713, at 159-60.

[32]R. Doc. No. 713, at 39-40.

[33]R. Doc. No. 713, at 110; *see also* R. Doc. No. 466, at 17.

[34]McCampbell, who has worked in corrections since 1980, is an expert in corrections administration and corrections budgeting. *See* R. Doc. No. 552-1 (summarizing McCampbell's extensive background in corrections).

[35]R. Doc. No. 713, at 127-28.

OPP's plant control staff removed beds and tables and converted a cell to a medical office and exam room.[36] The Sheriff also ordered a suicide resistant bed and mattress and the installation of bathroom stalls.[37] Chief Tidwell further testified that the female acute and subacute population has already been transferred to TDC and that "to this point we think it's proven to be very successful."[38] Plaintiffs concur that "[t]he women are now in a much safer environment free of the physical plant challenges" associated with Templeman V.[39] The Sheriff's plan with respect to these inmates did not require any additional staffing.[40]

The costs of the retrofits for TDC amounted to $8,568, according to the Sheriff's proposed findings of fact and conclusions of law.[41] Similarly, at the hearing, Sheriff's counsel represented that the costs were approximately $8,200.[42] The Sheriff contends in his proposed findings that an invoice for $8,568.00 was previously provided to the City, but this document is not in the record.[43] Nonetheless, the City agrees in its proposed findings of fact that $8,568 was spent on retrofitting TDC.[44] Accordingly, the Court finds that the parties have stipulated as to the accuracy of this number.

With respect to female inmates, the City has "acquiesced" to the expenses associated with

---

[36]R. Doc. No. 713, at 175.

[37]R. Doc. No. 713, at 175.

[38]R. Doc. No. 713, at 128.

[39]R. Doc. No. 714, at 4.

[40]R. Doc. No. 713, at 128.

[41]R. Doc. No. 716, at 7.

[42]R. Doc. No. 713, at 23.

[43]R. Doc. No. 716, at 7.

[44]R. Doc. No. 715, at 16.

renovating TDC.[45] Although the City characterizes the expense as "inordinate," the City cites no evidence to support this characterization.[46] In sum, the Court finds that the City is responsible for reimbursing the Sheriff for the $8,568 used to renovate TDC to house acute and subacute female mental health populations.

### B. Male Population

The Sheriff proposes that the male acute and subacute mental health populations be housed at Elayn Hunt Correctional Center ("Hunt"), a facility owned by the Louisiana Department of Corrections ("DOC") and located in St. Gabriel, Louisiana.[47] DOC has agreed to lease the facility to the Sheriff for the nominal sum of $1 per year.[48] The Sheriff, however, will pay for the costs of necessary improvements to Hunt.[49] Presumably, when OPP's use of Hunt ceases, DOC will benefit from these improvements.[50]

### 1. Staffing

The Sheriff proposes using DOC security staff at Hunt,[51] and the evidence supports this proposal. McCampbell testified that she would not recommend attempting to staff Hunt with OPP deputies because "[t]here's insufficient staff currently to provide security at the facilities here in the

---

[45]R. Doc. No. 715, at 16. Likewise, the City acknowledged in a post-hearing brief on a separate subject that the "City agreed to the temporary use of TDC for female inmates with acute and sub-acute mental health conditions." R. Doc. No. 722, at 8.

[46]R. Doc. No. 715, at 16.

[47]R. Doc. No. 697-1, at 3-4; R. Doc. No. 713, at 18, 112, 161. Of note, the Sheriff's position in his motion initially reflected that only the male acute mental health population, and not the male subacute population, would be housed at Hunt. R. Doc. No 697-1, at 3.

[48]R. Doc. No. 713, at 113.

[49]*See, e.g.*, R. Doc. No. 713, at 114.

[50]*See e.g.*, R. Doc. No. 715, at 131-32.

[51]R. Doc. No. 716, at 5; R. Doc. No. 713, at 19.

parish, and the staff the [S]heriff has has not been given mental health training" comparable to that received by DOC staff.[52] In short, there are simply "not enough deputies at OPP to supervise" OPP's current population.[53] Moreover, as McCampbell testified, the distance between St. Gabriel and New Orleans would further burden OPP's existing staff.[54]

DOC security staff initially will need to be paid overtime at Hunt to maintain adequate staffing, but the Sheriff anticipates that, going forward, more DOC staff will be employed such that the overtime rate is no longer necessary.[55] The length of time needed to employ such additional officers is necessarily unknown.[56] At the overtime rate, the cost of employing DOC security staff is estimated to be approximately $144,000 per month for five guards and a supervisor.[57] Once the overtime rate is eliminated, the monthly cost is estimated to be approximately $90,000.[58]

The City criticizes the Sheriff's plan on the basis that DOC deputies are paid at a rate that is nearly twice that of OPP deputies and on the basis that the overtime payment of DOC deputies will increase the monthly costs associated with the use of Hunt.[59] McCampbell's testimony is extremely persuasive, however, that there is simply insufficient OPP security staff to permit the

---

[52]R. Doc. No. 713, at 43.

[53]R. Doc. No. 713, at 46.

[54]R. Doc. No. 713, at 43.

[55]R. Doc. No. 713, at 169.

[56]*See* R. Doc. No. 713, at 137. Chief Deputy Jerry Ursin testified that an approximate estimate would be 90 days, but there is no guarantee that such a time period will be sufficient. R. Doc. No. 713, at 169-71, 182. Even if it takes longer to hire additional DOC staff and reduce the payment of overtime, the Hunt proposal remains fiscally justifiable in light of the conditions at Templeman V.

[57]R. Doc. No. 713, at 137, 169.

[58]R. Doc. No. 713, at 171.

[59]R. Doc. No. 715, at 7.

transfer of OPP staff to Hunt, even assuming such a transfer were otherwise feasible.[60] That testimony is uncontroverted. In short, the City has failed to offer any means by which adequate staff could be provided by OPP to Hunt without further endangering the staff and inmates remaining at OPP.[61]

Dr. Patterson testified that more mental health professionals will be required to adequately staff Hunt,[62] and that mental health staffing at OPP is "[a]bsolutely not . . . sufficient to provide adequate mental health treatment for the people that are going to remain at OPP."[63] The Sheriff proposes using a mixture of CorrectHealth staff and currently employed OPP staff.[64] Although Dr. Patterson found the initial staffing plan submitted to him by the Sheriff insufficient, the second plan, which was discussed at the hearing, increases staffing to "acceptable levels."[65]

Dr. Patterson and Chief Tidwell worked together to negotiate a plan that would result in reduced mental health and medical staffing costs.[66] Chief Tidwell testified that, based on this plan, he estimates that CorrectHealth salaries will total $56,000 per month.[67]

The City criticizes the Sheriff for not considering alternatives to CorrectHealth for mental

---

[60]*See* R. Doc. No. 713, at 43.

[61]While the City suggests that OPP deputies should receive additional training in mental health care, a suggestion with which all parties would likely agree, such training would not do anything to address the fact that the number of staff available is insufficient. *See* R. Doc. No. 715, at 7.

[62]R. Doc. No. 713, at 60.

[63]R. Doc. No. 713, at 80.

[64]R. Doc. No. 713, at 120-21. CorrectHealth is the company hired by the Sheriff to assist with medical staffing. R. Doc. No. 713, at 120.

[65]R. Doc. No. 713, at 68.

[66]R. Doc. No. 713, at 124.

[67]R. Doc. No. 713, at 121-23.

health staffing.[68] However, whether the Sheriff complied with public bid laws is not before the Court. Moreover, the City has not identified any evidence that CorrectHealth comes at an unreasonable cost. Once again, the City has failed to offer an alternative solution, and the Court finds the criticism of CorrectHealth unpersuasive.

In sum, mental health and security staffing costs at Hunt are projected to total $200,000 per month.

### 2. Physical Renovations

Gerald D. Hebert ("Hebert"), the managing partner of GraceHebert Architects, testified regarding the assistance he provided to the Sheriff in estimating the costs to retrofit the Hunt facility.[69] Hebert is the chair of the facilities design committee of the American Correctional Association.[70] He has done most of the corrections-related architecture work for the State of Louisiana for the last 18 years, and he assisted the State when it originally established the Hunt facility.[71]

As highlighted by Dr. Patterson, none of the cells at Hunt are currently suicide-resistant, especially insofar as they have ligature points—namely, bars and vents.[72] Dr. Patterson testified that, based on his review to date, Hunt requires four suicide-resistant cells.[73] Rendering the cells suicide-resistant will require replacing the cell grating with Lexan glass and ensuring that cell vents are

---

[68]R. Doc. No. 715, at 13; *see also* R. Doc. No. 713, at 145.

[69]R. Doc. No. 713, at 211-12.

[70]R. Doc. No. 713, at 212.

[71]R. Doc. No. 713, at 212.

[72]R. Doc. No. 713, at 61-62.

[73]R. Doc. No. 713, at 62.

suicide resistant.[74] Hebert estimated that adding Lexan glass, installing new doors and vents, and installing video recording capabilities for existing cameras will cost $140,000.[75]

Hebert further estimated $20,000 in mechanical ventilation costs for the four cells that will have Lexan glass installed.[76] He explained that the building is not air conditioned and that, once installed, the Lexan glass will cut off the ventilation to these cells.[77]

The Sheriff intends to use videoconferencing as one means for inmates to contact their attorneys and, potentially, their families, consistent with any recommendations from mental health professionals.[78] The cost of such equipment, combined with the cost of purchasing furniture for multi-use conference and group therapy rooms, is $23,000.[79]

Hebert applied a 10% expense for "general conditions," totaling $18,700.[80] Hebert testified that general conditions costs are "basically your superintendent, you have project management costs, if you have a job trailer. You are working inside a secure facility, so you have some costs associated with tool tracking, all the stuff that goes into generally operating a construction project."[81]

---

[74]R. Doc. No. 713, at 62, 114-15.

[75]Sheriff Ex. 3. This estimate was at least partially based on conversations with the electronics and detention contractor who did the original Hunt building. R. Doc. No. 713, at 222.

[76]Sheriff Ex. 3.

[77]R. Doc. No. 713, at 220.

[78]R. Doc. No. 713, at 136.

[79]Sheriff Ex. 3.

[80]Sheriff Ex. 3.

[81]R. Doc. No. 713, at 221. Hebert's initial estimate included $4,000 for the purchase and installation of two televisions, which was ultimately subtracted from his final estimate. *See* Sheriff Ex. 3; R. Doc. No. 713, at 214-15. This subtraction will render subsequent calculations slightly inaccurate. Given that this is merely an estimate, however, and that the City will only need to pay for expenses actually incurred, the Court, like the parties, will not expressly take into account the $4,000 subtraction's effect on the percentage calculations.

Hebert testified that his estimate also included an expense of $11,827.75 for "soft costs," which he defined as costs for unanticipated issues, such as well testing.[82] His estimate also included a contingency expense of $26,719.60.[83] Both his soft costs and contingency expenses were based on a percentage calculation.[84]

Vincent Smith ("Smith"), the director of capital projects for the City, testified that he believed Hebert's soft costs estimate was high because Smith did not foresee costs associated with geotechnical material testing or additional construction.[85] With respect to this argument, the Court notes that Hebert's estimate is for work that his firm will not be performing, and there is a possibility that the Sheriff can find a lower estimate. In any case, however, while not denigrating Smith's experience and dedication to fiscal responsibility,[86] the Court found Hebert's testimony more persuasive, largely because Smith's experience does not include any involvement in jail construction for special needs inmates,[87] and his experience relative to corrections is very limited.[88] In contrast, Hebert's long-term practice in corrections architecture gives him a valuable specialized reference point from which to project estimates.

Hebert estimated architecture and engineering costs of $30,641, based on a state fee curve that reflects a logarithm for construction costs.[89] He testified that the total amount charged will not

---

[82]Sheriff Ex. 3; R. Doc. No. 713, at 217.

[83]Sheriff Ex. 3.

[84]R. Doc. No. 713, at 218.

[85]R. Doc. No. 713, at 238.

[86]R. Doc. No. 713, at 233-35.

[87]R. Doc. No. 713, at 235.

[88]R. Doc. No. 713, at 233-34.

[89]R. Doc. No. 713, at 217; Sheriff Ex. 3.

be more than in his estimate, and it could be less than that.[90] Hebert used a 1.25 fee factor, while Smith suggested that a 1.0 factor would be more appropriate in light of the complexity of the project.[91] The Court finds Hebert's fee factor reasonable in light of the testimony presented and the qualifications of the witnesses.

Hebert further testified that he included a 15% overhead and profit cost of $30,855, which would go to a contractor, and that such a percentage is not "unreasonable" for a contractor such as a detention electronics contractor.[92] The City did not present any evidence challenging the overhead and profit cost associated with the Sheriff's proposal, and the Court accepts it as a reasonable estimate.

According to the Sheriff, Hebert's total estimated construction costs total $289,915.60.[93] The Court finds that an award of the requested $289,915.60 is appropriate, subject to a request for extra funds if additional appropriate expenses are properly documented and, conversely, subject to a claim for a credit or reimbursement by the City if that sum is not actually needed to perform the renovations described above. Of note, Hebert testified that, with respect to facilities such as Hunt, "[w]e don't build them. We just draw them. So if it's done for less, yeah, obviously [there will be a lower bill]."[94]

Finally, Chief Ursin testified that walkways are needed to connect the recreation yard to the

---

[90]R. Doc. No. 713, at 218.

[91]R. Doc. No. 713, at 237.

[92]R. Doc. No. 713, at 228.

[93] This sum appears to not include the soft cost figure of $11,827.75, which would lead to a total of $301,743.35, a discrepancy not noted by any of the parties or acknowledged in their briefing. *See* Sheriff Ex. 3, R. Doc. No. 713, at 20, 214-15; R. Doc. No. 716, at 5; *see also* R. Doc. No. 715, at 6.

[94]R. Doc. No. 713, at 221.

physical facility, and that the recreation yard additionally requires the installation of cameras.[95] The costs associated with the walkways ($1,500), fencing of the walkways ($14,500), cameras for the recreational yard ($25,000), and an electric gate lock ($3,000) total $44,000.[96] This number reflects the cost associated with using offender labor and Hunt staff contractors.[97]

In sum, the evidence supports the Sheriff's contention that the Hunt proposal requires approximately $333,915.60 in renovation costs.

### 3. Supplies

As noted above, four suicide resistant cells are needed for the Hunt facility that will be used to house OPP inmates.[98] The cost to purchase four suicide resistant beds is estimated to be $5,400.[99] Chow carts, pill carts, hot food tables, and general (as opposed to suicide-resistant) mattresses must be obtained for Hunt.[100] There was no evidence presented that the Sheriff's request for funds for these items is unreasonably high or unnecessary, and the Court finds that such expenditures are appropriate. Accordingly, $10,000 is needed to purchase two chow carts, and $3,378 is needed to purchase two hot food tables.[101] Two pill carts must be purchased for a total of $4,024.00.[102] Thirty units of general mattresses and bedding must be purchased for a total of $1,345 for the mattresses

---

[95]R. Doc. No. 713, at 162.

[96]R. Doc. No. 713, at 162-63; Sheriff Ex. 7.

[97]R. Doc. No. 713, at 163; Sheriff Ex. 7.

[98]R. Doc. No. 713, at 62, 164.

[99]Sheriff Ex. 8; *see also* R. Doc. No. 713, at 164.

[100]R. Doc. No. 713, at 164; Sheriff Ex. 8.

[101]Sheriff Ex. 8.

[102]R. Doc. No. 713, at 164-65; Sheriff Ex. 7.

and $650 for the bedding.[103] Moreover, as the Hunt offices currently do not contain any furniture, office furniture must be purchased at a cost of $1,000.[104]

Consistent with Hebert's estimate, the Sheriff seeks to purchase 24 televisions, one for every two cells at Hunt, at a rate of $329.99 per television and a total purchase and installation cost of $7,896.[105] The City specifically challenges whether televisions are required by the Consent Judgment.[106] Hebert testified that his estimate for one television per two cells was "pretty normal" for "most state facilities," and that he was further surprised that there was no allocation for day room televisions.[107] Common sense suggests that access to televisions may be important where inmates with serious mental health issues are housed with little alternative means of stimulation or distraction. Nonetheless, there was no evidence to that effect, and Dr. Patterson was never asked about the issue. Accordingly, the Court will not order the City to finance the purchase and installation of the televisions at this time.

As Chief Tidwell testified, it is anticipated that inmates are going to be routinely coming and going from Hunt.[108] A vehicle is needed for such transportation.[109] Chief Tidwell was able to locate a suitable van at a cost of $45,000, with the price reflecting that the van had been used as a demonstration vehicle.[110] The van is specially designed to carry inmates in a "sheltered pod," and

---

[103]Sheriff Ex. 8; *see also* R. Doc. No. 713, at 165-67.

[104]R. Doc. No. 713, at 165; Sheriff Ex. 8.

[105]Sheriff Ex. 8.

[106]R. Doc. No. 715, at 17.

[107]R. Doc. No. 713, at 216.

[108]R. Doc. No. 713, at 157.

[109]R. Doc. No. 713, at 116.

[110]R. Doc. No. 713, at 116-17.

it would be strictly dedicated to the transportation of the mental health population.[111]

The City contends that the Sheriff has not established that he needs a new van at a cost of $45,000.[112] The Court disagrees. The straightforward and credible testimony of Chief Tidwell established that the Sheriff has "one or two" vehicles that could make the trip to St. Gabriel, but these vehicles will shortly reach the end of their "operational lifespan" if used for frequent trips."[113] Similarly, Chief Ursin testified that OPP's existing vans "are old, high mileage," and "really not made to transport people," insofar as they are "16-passenger vans" that were made into transport vans through the placement of "wire mesh on the outside."[114]

The evidence supports the Sheriff's contention that $70,797 is needed for supplies, furniture, and a van, although no funds will be awarded at this time for the purchase of televisions.

### 4. Additional Monthly Costs

Chief Ursin testified that estimated fuel costs for the van are $2,000 per month.[115]

DOC will charge OPP $3.50 per inmate per day for food, including any special diets for diabetic inmates.[116] Chief Tidwell testified that he negotiated this rate with DOC and that it is the same rate used across DOC facilities.[117] The monthly cost of food will be approximately $1,500, depending on the precise number of inmates housed at Hunt.[118] Chief Ursin testified that the Sheriff

---

[111]R. Doc. No. 713, at 118, 206.

[112]R. Doc. No. 715, at 14.

[113]R. Doc. No. 713, at 116.

[114]R. Doc. No. 713, at 206.

[115]R. Doc. No. 713, at 173-74.

[116]R. Doc. No. 713, at 172-73.

[117]R. Doc. No. 713, at 172.

[118]R. Doc. No. 713, at 173.

would "[a]bsolutely not" charge the City the full $1,500 if the monthly amount turned out to be less.[119]

In sum, the monthly costs associated with fuel and food are projected to total $3,500. Should such costs fall short of this amount, the Sheriff shall promptly notify the City, who will be entitled to a credit in accordance with the transparent accounting requirements set forth below.

## C. Plaintiffs' Concerns

### 1. Housing Determinations

Plaintiffs emphasize that it is "unclear what clinical criteria will be used to determine which prisoners should be transported to Hunt[, which prisoners should remain there,] and who will make that determination."[120] Dr. Patterson testified that the determination as to who goes to Hunt and who remains there must be a clinical one.[121] Chief Tidwell estimated that formulating such guidelines should take approximately two weeks.[122]

Similarly, Plaintiffs raised valid concerns regarding how to stabilize individuals, if necessary, prior to transportation to Hunt.[123] As Chief Tidwell acknowledged, efforts associated with such stabilization need to be developed by mental health professionals.[124]

Finally, the development of a staffing schedule will ensure that adequate security and mental health personnel are assigned to Hunt.[125] Chief Tidwell estimated that the development of a schedule

---

[119] R. Doc. No. 713, at 173.

[120] R. Doc. No. 714, at 5-6.

[121] R. Doc. No. 713, at 69-70.

[122] R. Doc. No. 713, at 147.

[123] R. Doc. No. 714, at 5-6.

[124] R. Doc. No. 713, at 149-50.

[125] R. Doc. No. 713, at 154-55.

should proceed relatively quickly, possibly within one day, once the Hunt plant is finalized.[126] In any event, it may take approximately 30 days for CorrectHealth to organize its staff and for the completion of renovations to Hunt.[127]

### 2. Step-Down Care

Plaintiffs continue to highlight that the successful housing of inmates with acute and subacute mental health needs is intertwined with the ability to successfully house inmates who require step-down care.[128] As Plaintiffs emphasize, the Hunt population "will largely be cycling back to OPP, and if housed in Templeman V, will decompensate and have to return to Hunt."[129] The Court has encouraged the parties to work together and with the Mental Health Committee to address the problems associated with step-down care,[130] and such problems may be addressed at a subsequent hearing if necessary.[131]

Plaintiffs persuasively conclude that, "[t]o avoid a repeat of past conduct in this case that has led to tragic and wasteful results, the Sheriff must create detailed operational plans that address the concerns by the Plaintiffs, and have those plans reviewed by the Monitor, the Plaintiffs and the

---

[126]R. Doc. No. 713, at 155.

[127]R. Doc. No. 713, at 207. When questioned about people who may have a low tolerance for excessive heat because of their use of certain medications, Hebert testified that it is possible to add some kind of air-conditioning to the cells if the mechanical ventilation does not work. R. Doc. No. 713, at 231; *see also* R. Doc. No. 714, at 6.

[128]R. Doc. No. 714, at 7. A step-down unit houses inmates who are ready to leave the subacute unit but are not yet ready to function in general population. R. Doc. No. 713, at 69.

[129]R. Doc. No. 714, at 7; *see also* R. Doc. No. 713, at 76 ("You can't just drop [a subacute inmate] in [general] population and say, 'Okay. We'll come and see you once every couple of months.'").

[130]R. Doc. No. 713, at 104.

[131]*See also* R. Doc. No. 725; R. Doc. Nos. 729-31.

City."[132]

The Court finds that Plaintiffs' concerns are well-founded but not an obstacle to the initial approval of the Hunt plan. Such concerns are best served by monitoring the implementation of the plan and setting deadlines relative to the issues discussed above. Of note, Plaintiffs themselves acknowledge that Hunt "appears to be the only proposed immediate solution for men with severe mental health needs at this time."[133]

## II. City's Funding Obligation

Louisiana law obligates the City to provide a "good and sufficient jail." La. Rev. Stat. § 33:4715; *see also id.* §§ 15:702, 704. Generally speaking, "the legislative scheme dictates that the City of New Orleans bears the obligation of satisfying the expenses of housing prisoners, while the sheriff has the duty of operating the facility." *Broussard v. Foti*, No. 00-2318, 2001 WL 258055, at *2 (E.D. La. Mar. 14, 2001) (Vance, J.); *see also Fairley v. Stalder*, 294 F. App'x 805, 812 (5th Cir. 2008) (" [W]e agree that day-to-day operation of the parish prison is the responsibility of the local sheriff, and that financing and maintenance are the responsibility of the local governing authority.").[134] Accordingly, Louisiana law provides that "the City-Parish is responsible for the expenses of establishing, maintaining and operating the jail and for all the expenses of feeding, clothing, and providing medical treatment to the prisoners while the sheriff has the duty of operating the jail and seeing to it that the prisoners are properly cared for, fed and clothed." *Amiss v. Dumas*,

---

[132]R. Doc. No. 714, at 8.

[133]R. Doc. No. 714, at 4.

[134]The nuances of this relationship are beyond the scope of the July 14 hearing. *See, e.g.*, *Prator v. Caddo Parish*, 900 So. 2d 350, 356 (La. App. 2 Cir. 2005) (noting that the presence of out-of-parish inmates could potentially increase fixed costs); *see also* R. Doc. No. 727.

411 So. 2d 1137, 1141 (La. App. 1 Cir. 1982); *see also* La. Rev. Stat. § 15:704 ("Each sheriff shall be the keeper of the public jail of his parish, and shall by all lawful means preserve the peace and apprehend all disturbers thereof, and other public offenders.").

As the City acknowledges, the Sheriff suggests that the projected costs associated with Hunt would require funding additional to that already provided by the City to the Sheriff to operate OPP.[135] This issue was not addressed in detail at the hearing, however, and the City is reserving its right to present it at a later date.[136]

### A. Absence of Alternatives

Hunt has been the only viable short-term solution proposed to the Court. As noted above, with respect to the substance of the Sheriff's proposal, the City initially described its contentions as "not so much about the relocation of these inmates at Hunt for up to three years but the costs and logistics of such a proposal."[137] The City now recommends, however, that male inmates with acute and subacute psychiatric conditions remain housed at Templeman V.[138] While the City suggested for the first time at the hearing that it may have an idea that would involve renovating Templeman V, the City admitted that it had not "been able to put pencil to paper" with respect to that idea.[139] The City further admitted that it has never presented anyone with a "formal plan" with respect to Templeman V.[140] Dr. Patterson testified that he had not been presented with options that were

---

[135]R. Doc. No. 715, at 15.

[136]R. Doc. No. 727.

[137]R. Doc. No. 698, at 3.

[138]R. Doc. No. 715, at 11.

[139]R. Doc. No. 713, at 89.

[140]R. Doc. No. 713, at 90.

acceptable or viable, other than Hunt.[141] Similarly, Chief Tidwell testified that he had not been presented with an alternative solution by the City.[142]

The Court finds that the evidence presented at the hearing, including Dr. Patterson's thoughtful and credible testimony, overwhelmingly supports proceeding with the Sheriff's plan to use Hunt, subject to certain safeguards associated with some of the concerns raised by Plaintiffs. Moreover, insofar as the City failed to present any specific plan regarding the use of Templeman V prior to the hearing, or even any evidence supporting such a plan at the hearing, the Court finds that the City's vague Templeman V proposal has been waived.

This is not to deny the legitimate criticisms raised by the City relative to the maintenance failures that contributed to the unacceptable conditions at Templeman V.[143] The Court acknowledges that a lack of maintenance was a contributing factor to the decay of Templeman V.[144] McCampbell testified that a cell had been flooded many times, for example, leading to the detachment of the linoleum from the floor, and that "years of neglect" were represented by the "appalling" condition of the showers at Templeman V.[145] Nonetheless, the City has not cited to *any* evidence to support its bald assertion that, if properly maintained, Templeman V could be used as a short-term solution.[146] The Court's present focus is on remedying non-compliance with the Consent Judgment.

---

[141]R. Doc. No. 713, at 72. Dr. Patterson noted that the City may have asked him something to the effect of, "'Would there be any number of staff that could be put on Templeman V that would make it an adequate acute mental health unit?' And my answer was no." R. Doc. No. 713, at 90.

[142]R. Doc. No. 713, at 129.

[143]*See, e.g.*, R. Doc. No. 715, at 12.

[144]*See* R. Doc. No. 713, at 33-34.

[145]R. Doc. No. 713, at 33-34.

[146]*See* R. Doc. No. 715, at 16.

The evidence is exceptionally clear that Templeman V is unsuitable regardless of whether a proper maintenance program were implemented prospectively.[147] In short, there has been no alternative to Hunt formally presented that would satisfactorily house male acute and subacute inmates.[148]

### B. Narrow Tailoring

The City broadly contends that the relief proposed by the Sheriff is not narrowly tailored as required by the Prison Litigation Reform Act, 18 U.S.C. § 3626[149] and that its own proposal "is the least intrusive interim means" to correct the conditions at OPP.[150] Given that the City has not come forward with any "pen to paper" proposal, this approach is baffling, in addition to being waived, as stated previously. Regardless of any such waiver, in light of the strong, uncontroverted evidence at the hearing that the continued use of Templeman V is "absolutely not" a viable means of complying with the Consent Judgment,[151] the City's approach falls short.

Insofar as the City contends that its financial resources could be used elsewhere to promote public safety, the Court has considered the circumstances specific to the July 14 hearing. Previously, the Court observed:

> The Court is well aware of New Orleans' high homicide rate and budgetary constraints, but the evidence shows that violent crime is endemic within OPP as well. OPP inmates, and particularly inmates with mental health issues, leave the facility

---

[147]R. Doc. No. 713, at 67.

[148]*E.g.*, R. Doc. No. 713, at 44. Of note, there were discussions at some point about renovating TDC. R. Doc. No. 713, at 64-66. Chief Ursin testified that the plan was "killed" because the City objected to it. R. Doc. No. 713, at 160-61, 179-80. The Court does not know the specifics of why the TDC plan was terminated, although the City did not present any evidence to counter the suggestion that it was the party responsible for terminating that plan. In any event, a TDC plan was not presented to the Court on July 14, 2014.

[149]R. Doc. No. 715, at 27-28.

[150]R. Doc. No. 715, at 29.

[151]R. Doc. No. 713, at 66-67.

> more damaged, and perhaps more dangerous, than when they arrived. Experts opined that OPP poses "clear and present dangers" of "life and death proportions" with respect to suicide . . . . The evidence shows that OPP itself presents a public safety crisis, which endangers inmates, staff, and the community at large.

*Jones*, 296 F.R.D. at 457-58 (citations and footnotes omitted). The Court has carefully considered the City's arguments and will "structure, and monitor, its ruling in a way that mitigates [adverse public safety] consequences while still achieving an effective remedy of the constitutional violation" at issue. Id. at 429-30 (quoting *Plata*, 131 S. Ct. at 1942).

### C. Other Arguments

#### 1. Daily Cost

The City has repeatedly attacked the daily cost per inmate associated with the Sheriff's plan.[152] The City implies, although it is too savvy to overtly state, that 10 or 20 inmates with acute mental health issues can continue to languish in barbaric conditions because remedying such conditions is costly. This is unacceptable. As the City knows:

> "It is well established that inadequate funding will not excuse the perpetuation of unconstitutional conditions of confinement . . . ." *Smith v. Sullivan*, 611 F.2d 1039, 1043-44 (5th Cir. 1980) (internal citations omitted). "That it may be inconvenient or more expensive for the [local government] to run its prison in a constitutional fashion is neither a defense to this action or a ground for modification of the judgment rendered in this case." *Gates v. Collier*, 501 F.2d 1291, 1309 (5th Cir. 1974).

*Jones*, 296 F.R.D. at 458 (modification omitted).

Although the City has devoted considerable resources to protesting the costs associated with Hunt, it has not identified any feasible alternative, much less a lower-cost alternative.[153]

---

[152]R. Doc. No. 713, at 47-48; *see also* R. Doc. No. 715, at 9-10.

[153]The City put forth no evidence to support its implication that the costs associated with care elsewhere are lower, R. Doc. No. 713, at 47, and even if that is the case, the City has not identified any location other than Hunt that would feasibly house the population currently housed at OPP.

The City also argues that some of these inmates are subject to relatively mild charges.[154] This argument is irrelevant for purposes of the July 14 hearing. There is no authority by which the Sheriff can unilaterally decide to release such inmates.[155]

### 2. Deference to Settlement Efforts

The City contends that the Sheriff's proposal is excessively expensive, "particularly while the parties, with the members of the mental health committee, are actively exploring a long-term solution."[156] The Court has incessantly encouraged the parties to cooperate in developing such a long-term solution,[157] but no such agreement has been forthcoming.[158] In addition, by focusing solely on a short-term solution at the July 14 hearing, the Court has permitted the parties even more time to work towards an agreement. Moreover, Dr. Patterson, the chair of the mental health committee that includes representatives for both the City and the Sheriff, testified that a court-ordered short-term solution "would be supportive" of the committee's efforts.[159]

### 3. Public Bid Process

The City emphasizes that the Sheriff has not elicited public bids for certain costs associated with the Hunt plan.[160] To the extent that this argument implicates state public bidding law, this issue is not presently before the Court, and it would be inappropriate for the Court to render an advisory opinion on the matter.

---

[154]R. Doc. No. 713, at 189.

[155]*See* R. Doc. No. 713, at 190-91.

[156]R. Doc. No. 715, at 15-16.

[157]*E.g.*, R. Doc. No. 668.

[158]*E.g.*, R. Doc. Nos. 722-23.

[159]R. Doc. No. 713, at 101.

[160]R. Doc. No. 715, at 13.

### 4. LCLE Grant

The City suggests that the Sheriff should implement his proposal using a $2 million grant from the Louisiana Commission on Law Enforcement ("LCLE").[161] The City argues that the Sheriff previously testified that such grant money could be used to comply with the Consent Judgment.[162] Chief Ursin's uncontroverted testimony, however, is that there is no remaining portion of the LCLE grant that can be used for the renovations, staffing, or other expenses needed to house the acute and subacute mental health populations.[163]

Insofar as the Sheriff arguably has other funds that he could use to implement his proposal, or insofar as the City may be entitled to reimbursement or some other form of relief relative to the expended grant money, such issues are not encompassed by the July 14 hearing.[164]

### 5. Distance

The Court, like the parties, is cognizant that Hunt is not optimal insofar as it requires the transport of inmates with acute and subacute mental health conditions away from their families and lawyers, and it increases operational costs.[165] However, as Plaintiffs acknowledge, there are no OPP facilities currently suitable for these inmates, and Hunt reflects a "marked improvement."[166]

The City criticizes the Sheriff for selecting a facility that is approximately 60 miles from

---

[161]R. Doc. No. 715, at 19-20; R. Doc. No. 713, at 191-92. Chief Ursin testified that this grant was intended to reimburse the Sheriff for DOC costs. R. Doc. No. 713, at 192.

[162]R. Doc. No. 715, at 19; *see also* R. Doc. No. 546, at 182-84.

[163]R. Doc. No. 713, at 193. Chief Ursin testified that the grant was used to pay down a loan and to meet payroll. R. Doc. No. 713, at 194.

[164]R. Doc. No. 727.

[165]R. Doc. No. 714, at 4; R. Doc. No. 715, at 13. The use of videoconferencing may help alleviate some of these concerns.

[166]R. Doc. No. 714, at 4-5.

OPP[167] but, yet again, the City has not identified any viable alternative. While the Court is cognizant of the concerns expressed by Dr. Patterson relative to the difficulties raised by such a distance,[168] the Court agrees with Dr. Patterson that the Hunt proposal is the sole viable option before the Court.[169]

### 6. Partial Settlement Agreement

Pursuant to their partial settlement agreement, the City and the Sheriff agreed upon certain transparency requirements that the City contends have not been fulfilled.[170] The Court is very concerned about the apparent failure of the Sheriff to move forward with the substantive measures associated with the partial settlement agreement entered into by the City and the Sheriff.[171] Nonetheless, these measures are outside the scope of the July 14 hearing, and neither the City nor Plaintiffs brought an action to enforce the partial settlement agreement or the corresponding Consent Judgment provisions prior to that hearing. Accordingly, the Court will not address such issues at this time. As the Court has advised the parties, it will not order the Sheriff to direct unspent funds associated with the partial settlement agreement to costs associated with the Hunt plan.[172] Both sets of obligations are critical components of compliance with the Consent Judgment.

### III. Conclusion

---

[167]R. Doc. No. 715, at 13.

[168]R. Doc. No. 713, at 84.

[169]R. Doc. No. 713, at 72.

[170]R. Doc. No. 713, at 199-200.

[171]See R. Doc. No. 715, at 20-25; see R. Doc. No. 710.

[172]Separately, however, the Court ordered that the "Sheriff shall disclose any documents that have not yet been disclosed pursuant to the April 17 partial settlement agreement no later than Monday, August 4, 2014." R. Doc. No. 721 (emphasis omitted).

The Court remains steadfastly committed to financial transparency and cost-savings measures. Such measures will ensure that the sums discussed in this opinion, which are necessarily speculative insofar as they are estimates, are refined based on the actual implementation of the Sheriff's plan such that the parties are satisfied that compliance with the Consent Judgment has been achieved in an expedient and fiscally sound manner. However, the evidence conclusively shows that inmates with acute and subacute mental health problems "cannot wait" any longer for meaningful change.[173]

Accordingly,

**IT IS ORDERED** that the Sheriff's motion is **GRANTED IN PART**. The Court finds that the Sheriff's proposed solution is potentially compliant with the Consent Judgment, although correct and careful implementation of that plan is necessary to ensure compliance. The Court additionally finds that the City of New Orleans is responsible for paying the costs of implementing the Hunt plan set forth above.

**IT IS FURTHER ORDERED** that the City is responsible for providing the initial sum of **$413,280.60**, which reflects $333,915.60 in renovation costs and $70,797 in supply costs for Hunt, as well as $8,568 for the renovation of TDC. The City shall provide the Sheriff with these funds no later than **September 1, 2014**. Moreover, the City will be responsible on a monthly basis for $203,500, which reflects $200,000 for security and mental health staffing and $3,500 for food and fuel. The City shall provide the Sheriff with two months' payments, or **$407,000**, no later than **September 30, 2014**, and shall provide the Sheriff with additional monthly payments of **$203,500** no later than the **thirtieth day of each subsequent month**.

---

[173]R. Doc. No. 713, at 73.

**IT IS FURTHER ORDERED** that all such funds described above shall be segregated in a single account, established and maintained by the Sheriff, that will be used solely for expenses and reimbursements related to the issues discussed herein.

**IT IS FURTHER ORDERED** that the Sheriff shall immediately inform the City in writing if the expenses associated with such funds are reduced, including any reductions associated with contract negotiation, a decrease in the need for overtime payments for security staff, a decrease in the number of inmates requiring food, or a decrease in the number of trips needed to and from Hunt. If the parties cannot agree among themselves on a means of adjusting the City's payments, they shall immediately schedule a status conference with the Court.

**IT IS FURTHER ORDERED** that the Court reserves ruling on the City's entitlement to any credit or reimbursement.

**IT IS FURTHER ORDERED** that each of the parties, the Monitor, and the Court shall have the ability to review any account activity. If the parties would like to suggest any additional accounting requirements, they shall agree among themselves to follow such requirements or, failing that, submit such proposals to the Court no later than **September 1, 2014**. Failure to comply with the accounting requirements set forth above may result in the suspension of the City's installment payments.

**IT IS FURTHER ORDERED** that, on or before **September 1, 2014**, the Sheriff shall provide the other parties and the monitoring team with OPP's guidelines as to the determination of which inmates will be transferred to and from Hunt, as well as the identities of the relevant decisionmakers.

**IT IS FURTHER ORDERED** that, on or before **September 1, 2014**, the Sheriff shall

provide the other parties and the monitoring team with OPP's guidelines as to how individuals will be stabilized before transport to Hunt.

**IT IS FURTHER ORDERED** that, on or before **September 1, 2014**, the Sheriff shall provide the other parties and the monitoring team with a copy of the security and mental health staffing schedule for Hunt.

**IT IS FURTHER ORDERED** that the motion is **DENIED** in all other respects.


New Orleans, Louisiana, August 13, 2014.

**LANCE M. AFRICK**
**UNITED STATES DISTRICT JUDGE**