**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

_____

LASHAWN JONES, *et al.*, and )
THE UNITED STATES OF AMERICA, )
                   ) Civil Action No. 2:12-cv-00859
       PLAINTIFFS, ) Section I
                   ) Judge Lance M. Africk
         v. )
                   )
MARLIN GUSMAN, Sheriff, )
                   )
                   )
       DEFENDANT. )
_____ )

---

# Independent Monitors' Report No. 4
# September 9, 2015

---

## www.nolajailmonitors.org

Susan W. McCampbell, M.C.R.P., C.J.M., Lead Monitor
Harry E. Grenawitzke, R.S., M.P.H., D.A.A.S., Environmental Health and Sanitation Monitor
Raymond F. Patterson, M.D., D.F.A.P.A., Mental Health Monitor
Robert B. Greifinger, M.D. Medical Monitor
Margo L. Frasier, J.D., C.P.O., Correctional Practices Monitor
Patricia L. Hardyman, Ph.D., Classification Monitor
Darnley R. Hodge, Sr., M.S. Correctional Practices Monitor

McCampbell and Associates, Inc.
1880 Crestview Way, Naples, Florida 34119-3302
Email:  susanmccampbell@mccampbellassoc.com
Web:  www.nolajailmonitors.org





Compliance Report # 4 - September 9, 2015

# Compliance Report # 4

### LASHAWN JONES, et al., and the United States of America
### v.
### Marlin Gusman, Sheriff

**Table of Contents**

| | | Page |
|---|---|---|
| I. | Executive Summary | 1 |
| II. | Compliance Report # 4 -Overview and Introduction | 3 |
| III. | Review Process of the Report # 4 | 4 |
| IV. | Summary of Compliance | 4 |
| V. | Defendant's Activities Since Compliance Report # 4 | |
| | Positive Changes, Challenges and Barriers to Compliance | 5 |
| VI. | Substantive Provisions | |
| | A. Protection from Harm | |
| | A.1. Use of Force Policies and Procedures | 12 |
| | A.2. Use of Force Training | 13 |
| | A.3. Use of Force Reporting | 16 |
| | A.4. Early Intervention System | 24 |
| | A.5. Safety and Supervision | 25 |
| | A.6. Security Staffing | 29 |
| | A.7. Incidents and Referrals | 36 |
| | A.8. Investigations | 39 |
| | A.9. Pretrial Placement in Alternative Settings | 44 |
| | A.10. Custodial Placement | 45 |
| | A.11. Prisoner Grievance Process | 57 |
| | A.12. Sexual Abuse | 61 |
| | A.13. Access to Information | 62 |
| | B. Mental Health Care | 64 |
| | C. Medical Care | 87 |
| | D. Sanitation and Environmental Conditions | 95 |
| | E. Fire and Life Safety | 114 |
| | F. Language Assistance | 123 |
| | G. Youthful Prisoners | 125 |
| | H. The New Jail Facility | 127 |
| | I. Compliance and Quality Improvement | 129 |
| | J. Reporting Requirements and Right of Access | 131 |
| VII. | Stipulated Agreements – February 11, 2015 and April 22, 2015 | 133 |
| VIII. | Conclusions | 144 |
| | Attachment A - Summary Compliance Findings (Chart) | 164 |

ii



## I.   Executive Summary

The independent Monitors report there is significant progress by the Orleans Parish Sheriff's Office toward compliance with the mandates of the Consent Judgment.[1] Compliance Report # 4 documents that there is an increase in areas of substantial compliance (N=173) from 1% to 7%, an increase in paragraphs in partial compliance from 35% to 66%, and a decrease in non-compliance from 65% of requirements to 25%.[2] This report highlights the progress made by OPSO – of which there is a credible amount, underscore what needs to be done to address critical shortfalls, and provide, once again, recommendations for a path forward.

As the work to achieve, and then maintain, a Constitutional jail is substantial in Orleans Parish, much remains to be done.  To steadily move toward compliance will require human and fiscal resources, as well as a successful transition of inmates to the new jail.   The Monitors applaud and commend Orleans Parish for working to decrease the number of its citizens held in the jail.  Saying that, however, the Monitors are tasked with assuring the requirements of the Consent Judgment are followed regardless of the jail's population.

There are significant unresolved issues that impact current and future compliance including, but, not limited to:

- replacing beds at Hunt for the acutely ill mental health population by July, 2017,
- providing adequate laundry services for inmates,
- expanding "step-down" housing for inmates returning from Hunt, and
- establishing appropriate salary levels for staff working in the jail in order to attract and retain staff.

While all parties involved in this initiative can take some level of satisfaction from the results of their hard work to date, there are difficult decisions ahead.  Putting off these decisions will delay compliance, negatively impact inmates and staff safety, and may be more costly in the long term.

---

[1] http://www.nolajailmonitors.org/uploads/3/7/5/7/37578255/tab_2_consent_judgment.pdf
[2] See Attachment A for a summary of compliance with each provision of the Consent Judgment.



Compliance Report # 4 - September 9, 2015

The Monitors are so concerned about the continuing inmate/inmate violence and the conditions in the current jail facilities (i.e., Conchetta, Orleans Parish Prison, Templeman V, and the Tents) that we advised the Court during the Status Conference of August 6, 2015, that, if the new jail does not begin to accept inmates by September 15, 2015, inmates must be housed in jails outside Orleans Parish. The Monitors' recommendation to the parties, and the Court, that inmates no longer be housed in current buildings after September 15th is in no way a push to have OPSO move inmates prior to the facility, inmates, and staff being ready to safety open.

The Monitors are confident that the Sheriff and the Chief of Corrections, Carmen DeSadier, will keep their promise that inmates will not be moved into the new jail before the building is ready for inmates, and the staff are ready for the new jail.

Adequate staffing for the new jail, including the new booking area, is a concern of the Monitors.  While OPSO believes it will have the individuals hired and trained in time to open the new jail, that is a long way from having a cadre of experienced officers and supervisors to operate the new direct supervision jail.   As has been reported in the three previous Compliance Reports, we believe that the organizational support infrastructure needs to be built back into OPSO.   Progress has been made regarding human resources, finance, and, recently, sanitation and inspections, however, in the view of the Monitors more resources are needed (e.g. maintenance).  Support services need to be judiciously rebuilt to obtain and sustain compliance.  A competitive salary schedule needs to be determined that will allow OPSO to recruit and *retain* employees.  OPSO must also work to improve the quality of the work environment, train supervisors and managers, and place a priority on retaining the staff who are hired.

OPSO has improved its compliance management process since January 2015.  The contracting of an experienced corrections professional to serve as compliance coordinator, as well as providing additional experienced officer support for this individual has facilitated OPSO's working to achieve deadlines in the Consent Judgment.  While these efforts are still evolving they represent, in the view of the Monitors, a commitment to the tasks.

2



The Monitors urge, again, that the time-sapping battles between the Sheriff's Office and the City government be redirected to meaningful mutual problem solving.  The OPSO (and, by association, the City) will not achieve and maintain compliance in such an atmosphere.

Finally, the Monitoring team expresses their thanks for the support of the Court to our work efforts.

## II.  Compliance Report # 4 - Overview and Introduction

This is Compliance Report # 4 of the Monitoring team in the matter *of LaShawn Jones, et al. and the United States of America v. Marlin Gusman, Sheriff, Orleans Parish Sheriff's Office* (OPSO) based on the tour by the Monitors during the week of August 3, 2015, and the documentation provided by OPSO.[3]  To prepare for this tour, the Monitors requested documents from OPSO on July 1, 2015.  Several of the Monitors conducted tours in the interim period since January 2015.[4]  Members of the Monitoring team speak and communicate frequently with the defendants as well as DOJ and the plaintiffs.  The monthly conference calls among all parties were reestablished in January and the level of meaningful discussion among the parties has begun to improve.

There are now two Stipulated Agreements between the parties that were intended to spur the defendants to faster progress on critical issues.  As such, this Compliance Report includes the OPSO's status on achieving the elements of these two Agreements.  This report links the three documents together (e.g., the Consent Judgment, February Agreement, April Agreement).

---

[3] Compliance Report # 1 - http://www.nolajailmonitors.org/uploads/3/7/5/7/37578255/nolajailmonitorsreport1-02_13_2014.pdf, Compliance Report # 2 - http://www.nolajailmonitors.org/uploads/3/7/5/7/37578255/compliance_report_2_08_26_2014.pdf, Compliance Report # 3 - http://www.nolajailmonitors.org/uploads/3/7/5/7/37578255/jones_et_al_v._gusman_3_compliance_report_02_25_15.pdf

[4] McCampbell:  January 7 – 8, 2015, March 24 – 26, 2015, June 23 – 25, 2015; Frasier, March 24 – 26, 2015, June 23 – 25, 2015; Hardyman, June 25 – 26th – Observation of classification process and training for classification specialists, May 20 – 22nd – Classification training for OPSO Facility Administrators and Executive Staff, May 22nd – Special Population Committee meeting; Greifinger – March 23 – 25, 2015.

3



Since the Monitors' website www.nolajailmonitors.org was established in September 2014, there have been more 15,000 "hits" on the site.  We are pleased for the interest in the work.  We frequently update the information.   We welcome input, information, and ideas from the community and stakeholders.

### III.   Review Process of Monitors' Report #4

The draft of Compliance Report #4 was provided to all parties for review on August 19, 2015.   In finalizing this report, the Monitors carefully reviewed and considered all comments.

### IV.   Summary of Compliance[5]

The following summarizes the status of compliance at the conclusion of the Monitor's tours in August 2015.[6]

| Status[7] | Report # 1 December 2013 | | Report # 2 July 2014 | | Report # 3 January 2015 | | Report # 4 August 2015 | |
|---|---|---|---|---|---|---|---|---|
| | # | % | # | % | # | % | # | % |
| Substantial Compliance | 0 | - | 2 | 1 | 2 | 1 | 12 | 7 |
| Partial Compliance | 10 | 6 | 22 | 13 | 60 | 35 | 114 | 66 |
| Non-Compliance | 85 | 50 | 149 | 85 | 110 | 63 | 43 | 25 |
| Not Applicable/Other | 76 | 44 | 1 | .57 | 2 | 1 | 4 | 2 |
| Total | 171 | 100 | 174 | 100 | 174 | 100 | 173[8] | 100 |

In addition, two stipulated agreements (February 11, 2015, April 22, 2015) have been agreed to by the parties since the January tour.  Compliance with these two orders are as follows: [See also page 133 ]

---

[5] See also http://www.nolajailmonitors.org/uploads/3/7/5/7/37578255/summaryreport12315.pdf

[6] The Consent Judgment defines compliance (paragraph 42.):  ""Substantial Compliance" indicates that Defendant has achieved compliance with most or all components of the relevant provision of the Agreement. "Partial Compliance" indicates that Defendant achieved compliance on some of the components of the relevant provision of the Agreement, but significant work remains.  "Non-compliance" indicates that Defendant has not met most or all of the components of the Agreement."

[7] Section IV.A.6. of the Consent Agreement was broken out into separate subparagraphs for the purpose of reporting.  This increased, therefore, the paragraphs from 171 to 174.

[8] IV.B.9.d. double-counted in last two reports (was noted as IV.B.10.d.)

4



| Status | Report # 4 August 2015 | |
|---|---|---|
| | # | % |
| Substantial Compliance | 21 | 61 |
| Partial Compliance | 12 | 35 |
| Non-Compliance | 1 | 3 |
| Not Applicable/Other | 0 | 0 |
| | 34 | 100 |

OPSO is urged to address the partially compliant and one non-compliant paragraphs as swiftly as possible.

## V.  Defendants' Activities Since Compliance Report # 4 – Positive Changes, Challenges and Barriers to Compliance

The Orleans Parish Sheriff's Office is simultaneously engaged in multiple critical priorities.  Building back an organizational infrastructure, gaining needed funding, completing policies/procedures, hiring and training employees, and preparing to open a new jail are individually daunting efforts – taken together – they are more than monumental challenges.

This is a list of OPSO's highlighted activities since Compliance Report # 3. Additional improvements and changes are described in each section of this report.

- Appointment of the Chief of Corrections – Carmen DeSadier assumed the responsibilities as Chief of Corrections on May 4, 2015.  The Monitors are very impressed with her insight and actions since taking over this position.

- A Budget - Through the work and leadership of Tommie Vassel, CPA, chair of the Court's Budget Committee, a budget for the jail system has an independent view and voice.   Mr. Vassel's efforts to bring the parties together has been essential to arriving at this budget, and associated documents.   The funding required to operate a Constitutional jail is an unsettling amount in the vacuum of not knowing the totality of the past (and future) financial obligation.  While the parties will continue to refine the budget for this year, and prepare a budget for 2016, there is now a place to begin the discussions.

5



- <u>New Jail Opening Date</u> – The date for opening the new jail to begin receiving inmates, as noted above, is now September 15th.   At the time of this Report, it is the OPSO's intention to begin moving inmates into the building by September 15th, as the City granted a Temporary Certificate of Occupancy on September 2, 2015.

- <u>FIT</u> – OPSO has designated a Force Investigation Team (FIT) to review/investigate uses of force, including allegations of excessive uses of force, as soon as the allegations/incidents are reported.  This organizational strategy is used in other jail systems.  The Team's policies/procedures need to be completed, as differentiated from OPSO's use of force policy, but the focus on investigations is in keeping with the mandates of the Consent Judgment.  The progress shown by the Investigative Services Bureau (ISB) (previously named the Special Operations Division SOD) in improving the quality of investigations continues to impress the Monitors.

- <u>Contract for Inmate Medical and Mental Health Care</u> – The Monitors believe that the medical and mental health care for inmates held in the Parish's jail has significantly improved, and most likely is as close to Constitutional requirements as in any recent years.  More work needs to be done, but the level of care has improved dramatically since CorrectCare Solutions, Inc. (CCS) began providing services to, perhaps, the most physically and mentally ill population in Orleans Parish.   As, prior to CCS' taking over care, the medical and mental health care was totally and grossly inadequate, it will take some time to put the systems of care into place.  The progress of OPSO and CCS is significant and substantial.

- <u>Inmate Classification</u> – The inmate classification system is implemented. This means that inmates who are properly classified and re-classified and housed will be in a safer environment, and staff will be safer as well.   There are issues to resolve in data collection and analysis.  The classification function is appropriately resourced. OPSO is acknowledged for the hard work to get this done.  Movement into the new jail will enhance these efforts, and, as noted

6



Compliance Report # 4 - September 9, 2015

above, is essential to inmate and staff safety.  The Monitors will continue to collaborate with OPSO to assess if modifications to policies, procedures and operations are needed as the new jail is opened for inmates.

- <u>Hunt</u> – All beds at Hunt are routinely filled with inmates with acute mental illnesses.  It is difficult  to envision how Orleans Parish would have been able to respond to this critical need without Hunt.  The facility will be available until July, 2017, and no other alternative will be, based on the pace of current activities, available by that date.  While Hunt is available, the Monitors strongly urge closer collaboration with the leadership at Hunt regarding the issues of the management of this challenging and unpredictable population.

- <u>Mental Health Working Group (MHWG)</u> - The Monitors note that the report of the Court-appointed Mental Health Working Group was delivered on September 8, 2014.[9]  While OPSO proposed and implemented Hunt as the immediate alternative to the needs, ultimately there are no credible or time-sensitive strategies to address the issues raised in that report, or move forward on plans to house this population after July 2017.

- <u>Policies and Procedures</u> – Work continues to develop these essential written directives, and in the view of the Monitors, needs an infusion of additional resources to complete the work; particularly to facilitate the opening of the new jail.  This is not a "one-time" effort, as the directives will be reviewed annually, and updated as necessary.

- <u>Food Services</u> – The Monitors note improvements in the food service management for OPSO's inmates.

The following summarizes barriers to compliance as of this Report.

- <u>Implementation of a staffing analysis/hiring</u> – As noted above, the Monitors are concerned about the staffing of the jail system, including the operational support infrastructure.  There is a credible staffing analysis that OPSO continues to refine

---

[9] To review the Mental Health Working Group's Report:
http://www.nolajailmonitors.org/uploads/3/7/5/7/37578255/mhwg_rpt_09_08_14.pdf



Compliance Report # 4 - September 9, 2015

which must serve as the basis for staffing. The Monitors recommend immediate hiring to address the Consent Judgment's requirements for youthful prisoners (IV. A. G.)

- "Docks" Committee – In previous Compliance Reports the Monitors addressed the inmate safety and security issues associated with holding inmates for court in the area in OPP known as "The Docks."[10]   The Sheriff advises the Monitors that the plan is to close the Docks when inmates are removed from OPP to the new jail. The court system needs to determine how and where inmates will be staged for court appearances. If inmates are not held in a facility of the Orleans Parish Sheriff's Office, the Consent Judgment's provisions are not guiding.   If, after inmates are removed from OPP  the Docks remain open, or re-open, the Monitors will re-engage this matter.

- Inmate Laundry – The inmate laundry is located in the House of Detention – essentially an abandoned jail. The services provided do not meet the health and safety needs of the jail, nor the Consent Judgment. The new jail will provide some capacity for some laundry.  OPSO has indicated to the Monitors that there is a plan to outsource these functions. The Monitors will review the outcome of this initiative at the time of the next tour, and in the interim as information is provided.

- Jail Management Information System – The jail's management information system needs to be upgraded and modernized. Jails are data rich environments with the information usable to more effectively manage the buildings, staff, and inmates. The jail information system is essential to the inmate classification system as well as generating reporting for documentation of compliance.

- Inmate Housing – When the new jail opens there will be insufficient beds for the current population when the other facilities are closed as required by the City's

---

[10] Initially the Monitors' attention was drawn to this area because of the crowding, reported inmate/inmate fights, non-functioning fire systems in OPP, issues with locking mechanisms, absence of adequate toilets, insufficient seating, etc.  Committee has met three times since Compliance Report #3 in an effort to move the decision process forward.  An architect was selected in October 2014, but the contract has not been finalized in the absence of a decision by the City on the scope of the work.

8



ordinance.  As noted above, the Monitors strongly believe these grossly inadequate facilities [e.g. OPP, Conchetta, TPV, tents] be closed as soon as absolutely possible.  The Monitors recommend that any inmates who cannot be housed (based on their classification) in the new jail facility or the Temporary Detention Center (TDC) be moved immediately to other parish jails.  The Monitors point out, however, that OPSO's inmates cannot be moved to jails that do not have a credible classification system, adequate medical and mental health care, compliance with the principles of the Prison Rape Elimination Act of 2003, and appropriate levels of staff supervision (among other things).   This fact is an important consideration as OPSO evaluates alternatives and as the funding authority considers options.

- <u>Youthful Inmates</u> – OPSO needs to immediately develop the internal resources <u>and</u> galvanize the community to assist in managing the almost 50 youths under 18 years of age held in the custody of OPSO.  This is a volatile and vulnerable population whose management requires urgent attention.

- <u>Continuing Institutional Violence</u> – For the period January 1 – July 31, 2015, OPSO continued to report to the Monitors serious incidents in the jail facilities. As noted in the discussion in Section IV. 7. Incidents and Referrals, since June 2015 OPSO has prioritized its efforts to assure that incidents are reported to the Monitors, even if an inmate injury does not result. The Monitors believe that the leadership at OPSO is reporting to the Monitors the incidents that are reported to them. This increased level of reporting provides a more accurate view of what is happening in the facilities.   The plaintiffs notify the Monitors  of incidents that the plaintiffs believe, based on discussions with their clients, are not reported as required by the Consent Judgment.[11]  The Monitors frequently urge the plaintiffs to notify OPSO of critical incidents, timely, to assure no harm to their clients. The plaintiffs assure the Monitors that they do report imminent harm and/or

---

[11] The concern about underreporting/non-reporting by staff at OPSO was also addressed by the February 11, 2015 Stipulated Agreement paragraphs 1.c., 3., 4.a-c. (See Section VII. of this Report)



Compliance Report # 4 - September 9, 2015

emergent medical issues.  OPSO evaluates the reports provided by the plaintiffs to determine if the plaintiffs' reports are accurate and, if needed, any policy violations for non-reporting by OPSO staff and/or supervisors.  This issue of what is or is not being reported to OPSO leadership will be remedied, in large part, when the new jail opens because of the strategic use of cameras through the facility.

<u>OSPO Reported Serious Incidents – January 1 – July 31, 2015</u>

| | |
|---|---|
| Alleged Sexual Assault | 11 |
| Assault Inmate on Civilian | 2 |
| Assault Inmate on Inmate | 126 |
| Assault Inmate on Staff | 22 |
| Attempt Suicide | 11 |
| Contraband | 22 |
| Death In-Custody | 2 |
| Disturbance | 1 |
| Inmate Assault/Staff/Sexual | 1 |
| Inmate Medical/Injury | 33 |
| Planned Use of Force | 1 |
| Property Damage | 3 |
| Shakedowns Conducted | 44 |
| Threats to Staff | 1 |
| Use of Force | 62 |
| Total Incidents Reported | 342 |

During the period January 1 – July 14, 2015, 157 inmates were removed from the facilities to emergency rooms for care of injuries resulting from inmate/inmate assaults,  and serious medical emergencies, and in some instances, inmates are sent to emergency rooms for evaluation in an abundance of caution.  (See also Section IV.C., Medical Care).   The medical provider is reporting these "routes".

These findings regarding violence, along with the grossly deteriorated conditions of the physical plant, are why the Monitors strongly urge moving inmates out of the current facilities if the new jail does not open by September 15, 2015.

10



The Monitors thank Sheriff Gusman, Chief Ursin, and Chief DeSadier and their team of committed staff in achieving the accomplishments noted in Compliance Report # 4. There is, as has been stated several times, much more work to be done.

## VI.   SUBSTANTIVE PROVISIONS

### IV. A.  Protection From Harm

### 1.   Use of Force
Consistent with constitutional standards, Defendant shall provide prisoners with a safe and secure environment and ensure their reasonable safety from harm.  OPSO shall take all reasonable measures to ensure that during the course of incarceration, prisoners are not subjected to unnecessary or excessive force by OPSO staff and are protected from violence by other prisoners.

**Introduction**

The Defendant has made improvement in the protection of inmates from harm, and is in partial compliance with the majority of the elements in these sections of the Consent Judgment - reviewed during the tours of March 24-27, 2015, June 23-25, 2015, and August 3-7, 2015.  The lack of adequate facilities, staff, policies, and training noted in the previous three compliance reports continue to exist and result in an Orleans Parish Jail system that fails to provide inmates with a safe and secure environment.  It was also noted that there was a great likelihood that inmates were being subjected to violence by other inmates.  A new program whereby an administrative segregation unit for high security inmates and protective custody inmates has been implemented in July 2015.  The Monitors will continue, with Chief DeSadier, to assess this classification/housing strategy, particularly as the new jail opens.   The improvements in staffing, supervision, and investigations have lessen the likelihood of inmates being subjected to unnecessary or excessive force by OPSO staff and/or it going undetected and/or punished.

Since January 2015, some change has been noted in these areas.  While there still has not been a sufficient number of corrections deputies hired, trained, and/or deployed to allow for sufficient staffing to properly supervise inmates, some progress made.  Redeployment of staff and mandatory staffing levels at the OPP has increased the staffing on the tiers in the OPP.  Progress on the policies on use of force that comply with the language of the Consent Judgment has been made.  During the site visit of August 2015, the

11



Monitors facilitated agreement between the parties on the final wording of the various use of force policies.   The next steps will be to finalize the policies, train staff on the policies, implement the policies and monitor strict compliance with the policies.    Compliance with the comprehensive policies on the use of force is crucial to making the OPSO facilities a safe place for inmates to be housed and staff to work.

For the period January 1 – July 31, 2015, OPSO reported to the Monitors 62 uses of force and one planned use of force.

**Assessment Methodology**

- Dates of tours
  - March 24-27, 2015
  - June 23-25, 2015
- August 3-7, 2015

- Materials reviewed
  - Materials reviewed include the Consent Judgment, policies and procedures, use of force reports, incident reports, investigations conducted by Investigative Services Bureau (ISB), investigations conducted by Internal Affairs Division (IAD), news articles, training materials, expert reports from underlying litigation, shakedown logs, and post logs.
- Interviews
  - Interviews included Sheriff, Sheriff's command staff, jail supervisors, deputies assigned to housing units, deputies assigned to specialty units, commander of ISB, various supervisors of units within ISB, inmates, and architect and project management staff for new jail facility.

**A. 1.   a. – c.  Use of Force Policies and Procedures**

a.      OPSO shall develop, implement, and maintain comprehensive policies and procedures (in accordance with generally accepted correctional standards) relating to the use of force with particular emphasis regarding permissible and impermissible uses of force.

b.      OPSO shall develop and implement a single, uniform reporting system under a Use of Force Reporting policy.  OPSO reportable force shall be divided into two levels, as further specified in policy:  Level 1 uses of force will include all serious uses of force (i.e., the use of force leads to injuries that are extensive, serious or visible in nature, including black eyes, lacerations, injuries to the mouth or head, multiple bruises, injuries to the genitals, etc.), injuries requiring hospitalization, staff misconduct, and occasions when use of force reports are inconsistent, conflicting, or otherwise suspicious.  Level 2 uses of force will include all escort or control holds used to overcome resistance that are not covered by the definition of Level 1 uses of force.

c.      OPSO shall assess, annually, all data collected regarding uses of force and make any necessary changes to use of force policies or procedures to ensure that unnecessary or excessive use of force is not used in OPP.  The review and recommendations will be documented and provided to the Monitors, DOJ, and SPLC.

12



Findings:
>    Partial compliance – IV. A. 1. a.
>    Partial compliance – IV. A. 1. b.
>    Partial compliance – IV. A. 1. c.

Measures of compliance:
1. Comprehensiveness of written policies,
2. Training, data collection and analysis,
3. Supervisory review of uses of force,
4. Review of use of force reports, review of incident reports, review of investigations by ISB.

Observations:

The vendor hired to draft written directives wrote the comprehensive use of force policy to comply with the Consent Judgment as well as the required policies for reporting, data collection, and data analysis. The policies had been forwarded to counsel for DOJ and the plaintiffs, but no agreement had been reached. While on site, the Monitors facilitated agreement between the parties on the final wording of the use of force related policies. OPSO, working with the Monitors and the DOJ/Plaintiffs completed a Use of Force policy during the August 2015 tour. On that basis, partial compliance is noted for these paragraphs. The Monitors will evaluate the implementation of this policy, review the training, and examine the outcomes during subsequent tours. Also needed are the standard operating procedures for the ISB to provide a comprehensive strategy to uses of force and investigation of uses of force. Data collection is proceeding, but is absent analysis, recommendations, plans of action, or reports of outcomes of plans of action.

Recommendation:

1. Develop not only the reporting systems (data collection) for uses of force, but the mechanics to analyze, produce summary reports, develop plans of action, and assess the impact of any plans of action.

A. 2. Use of Force Training
a.   OPSO shall ensure that all correctional officers are knowledgeable of and have the knowledge, skills, and abilities to comply with use of force policies and procedures. At a minimum, OPSO shall provide

13



Compliance Report # 4 - September 9, 2015

correctional officers with pre-service and annual in-service training in use of force, defensive tactics, and use of force policies and procedures.  The training will include the following:

    (1)  instruction on what constitutes excessive force;
    (2)  de-escalation tactics; and
    (3)  management of prisoners with mental illness to limit the need for using force.

b.    OPSO shall ensure that officers are aware of any change to policies and practices throughout their employment with OPP.  At a minimum, OPSO shall provide pre-service and annual in-service use of force training that prohibits:

(1)    use of force as a response to verbal insults or prisoner threats where there is no immediate threat to the safety or security of the institution, prisoners, staff, or visitors;

(2)    use of force as a response to prisoners' failure to follow instructions where there is no immediate threat to the safety or security of the institution, prisoners, staff, or visitors;

(3)    use of force against a prisoner after the prisoner has ceased to offer resistance and is under control;

(4)    use of force as punishment or retaliation; and

(5)    use of force involving kicking, striking, hitting, or punching a non-combative prisoner.

c.    OPSO shall randomly test five percent of the correctional officer staff on an annual basis to determine their knowledge of the use of force policies and procedures.  The testing instrument and policies shall be approved by the Monitors.  The results of these assessments shall be evaluated to determine the need for changes in training practices.  The review and conclusions will be documented and provided to the Monitors.

Findings:
    Non-compliance - IV. A. 2. a.
    Non-compliance - IV. A. 2. b.
    Non-compliance - IV. A. 2. c.

Measures of compliance:
1.    Comprehensiveness of lesson plans.
2.    Training material, evidence of knowledge gained.
3.    Review of use of force reports.
4.    Review of incident reports.
5.    Review of investigations by SOD.
6.    Review of investigations by IAD.

Observations:

    Staff members have not been training on the new use of force policies as they have yet to be finalized or training materials on them, specifically, written.

    The Monitors continued to be concerned about a disproportionate amount of time being spent on use of force training that is not geared towards corrections.  It is unclear how many hours are devoted to this training.  The training contains no



specific references to OPSO's current  or new Use of Force policy or Use of Force Reporting policy or the requirements of the Consent Judgment.[12]

As there is not currently a comprehensive OPSO policy in place, it goes without saying that the training does not cover a comprehensive policy on use of force that is compliance with the Consent Judgment. Therefore, given the lack of comprehensiveness of the policies and procedures currently in effect and the shortage of staff and training, neither deputies nor supervisors are being adequately trained; as they begin their careers, or through regular in-service training.  In particular, training needs to stress the proper uses of force in a jail setting, and that all uses of force are to be reported and properly investigated. As the vast majority of deputies hired by OPSO will be spent working in corrections, the training should use corrections based scenarios and emphasize working with inmates, especially inmates with mental illness. In addition, OPSO supervisors need to be trained on the mechanisms to ensure that all uses of force are properly reported and investigated in accordance with the policy.  All training, deputy and supervisor, should emphasize that failure to follow the policy will result in discipline. It is recommended that the mental health contract provider, CCS, be involved in the training as a way of providing expertise and promoting collaboration.

Recommendation:

2.      When the use of force policies are finalized, comprehensive lesson plans and training materials will need to be developed.  Given the current quality of the training material, it may be that the task of developing comprehensive lesson plans and training material will need to be outsourced (perhaps on the list for V/R Justice Service). Training needs to clearly delineate when force may be used, highlight strategies to de-escalate the need to use force, and stress that all uses of force must be reported and properly investigated.  As the vast majority of future deputy's time is spent working in corrections, the training

---

[12] OPSO is initiating training for trainers based on the Use of Force Policy beginning September 5, 2015. The training is being conducted by subject matter experts in corrections specific scenarios.



should use corrections based scenarios and emphasize working with inmates with mental illness.  In addition, supervisors need to be trained on the mechanisms to ensure that all uses of force are properly reported and investigated in accordance with the policy.   All training, for both deputy and supervisor levels, must emphasize that failure to follow the policy will result in discipline.  The adequacy of the policies and procedures and training is crucial to future compliance with IV. A. 2. c. that requires OPSO to randomly test five percent of the jail staff to determine their knowledge of use of force policies and procedures.

### 3.  a. – h. Use of Force Reporting

a.  Failure to report a use of force incident by any staff member engaging in the use of force or witnessing the use of force shall be grounds for discipline, up to and including termination.

b.  OPSO shall ensure that sufficient information is collected on uses of force to assess whether staff members complied with policy; whether corrective action is necessary including training or discipline; the effectiveness of training and policies; and whether the conditions in OPP comply with this Agreement.  At a minimum, OPSO will ensure that officers using or observing a Level 1 use of force shall complete a use of force report that will;

    (1)  include the names of all staff, prisoner(s), or other visual or oral witness(es);

    (2)  contain an accurate and specific account of the events leading to the use of force;

    (3)  describe the level of resistance and the type and level of force used, consistent with OPP use of force policy and procedure, as well as the precise actions taken by OPSO staff in response to the incident;

    (4)  describe the weapon or instrument(s) of restraint, if any, and the manner of such use;

    (5)  be accompanied by a prisoner disciplinary report, if it exists, pertaining to the events or prisoner activity that prompted the use of force incident;

    (6)  describe the nature and extent of injuries sustained by anyone involved in the incident;

    (7)  contain the date and time when medical attention, if any, was requested and actually provided;

    (8)  describe any attempts the staff took to de-escalate prior to the  use of force;

    (9)  include an individual written account of the use of force from every staff member who witnessed the use of force;

    (10)  include photographs taken promptly, but no later than two hours after a use of force incident, of all injuries sustained, or as evidence that no injuries were sustained, by prisoners and staff involved in the use of force incident;

    (11)  document whether the use of force was digitally or otherwise recorded.  If the use of force is not digitally or otherwise recorded, the reporting officer and/or watch commander will provide an explanation as to why it was not recorded; and

    (12)  include a statement about the incident from the prisoner(s) against whom force was used.

c.  All officers using a Level 2 use of force shall complete a use of force report that will:

    (1)  include the names of staff, prisoner(s), or other visual or oral witness(es);

    (2)  contain an accurate and specific account of the events leading to the use of force;

    (3)  describe the level of resistance and the type and level of force used, consistent with OPP use of force policy and procedure, as well as the precise actions taken by OPSO staff in response to the incident;

    (4)  describe the weapon or instrument(s) of restraint, if any, and the manner of such use;



Compliance Report # 4 - September 9, 2015

(5)     be accompanied by a prisoner disciplinary report, if it exists, pertaining to the events or prisoner activity that prompted the use of force incident;

(6)     describe the nature and extent of injuries sustained by anyone involved in the incident;

(7)     contain the date and time when medical attention, if any, was requested and actually provided; and

(8)     describe any attempts the staff took to de-escalate prior to the use of force;

d.     OPSO shall require correctional officers to notify the watch commander as soon as practical of any use of force incident or allegation of use of force. When notified, the watch commander will respond to the scene of all Level 1 uses of force. When arriving on the scene, the watch commander shall:

(1)     ensure the safety of everyone involved in or proximate to the incident;

(2)     determine if any prisoner or correctional officer is injured and ensure that necessary medical care is provided;

(3)     ensure that personnel and witnesses are identified, separated, and advised that communications with other witnesses or correctional officers regarding the incident are prohibited;

(4)     ensure that witness and subject statements are taken from both staff and prisoner(s) outside of the presence of other prisoners and staff;

(5)     ensure that the supervisor's use of force report is forwarded to IAD for investigation if, upon the supervisor's review, a violation of law or policy is suspected. The determination of what type of investigation is needed will be based on the degree of the force used consistent with the terms of this Agreement;

(6)     If the watch commander is not involved in the use of force incident, the watch commander shall review all submitted use of force reports within 36 hours of the end of the incident, and shall specify his findings as to completeness and procedural errors. If the watch commander believes that the use of force may have been unnecessary or excessive, he shall immediately contact IAD for investigation consideration and shall notify the warden or assistant warden; and

(7)     All Level 1 use of force reports, whether or not the force is believed by any party to be unnecessary or excessive, shall be sent to IAD for review. IAD shall develop and submit to the Monitors within 90 days of the Effective Date clear criteria to identify use of force incidents that warrant a full investigation, including injuries that are extensive or serious, visible in nature (including black eyes, injuries to the mouth, injuries to the genitals, etc.), injuries requiring hospitalization, staff misconduct (including inappropriate relationships with prisoners), and occasions when use of force reports are inconsistent, conflicting, or otherwise suspicious.

e.     Ensure that a first-line supervisor is present during all pre-planned uses of force, such as cell extractions.

f.     Within 36 hours, exclusive of weekends and holidays, of receiving the report and review from the shift commander, in order to determine the appropriateness of the force used and whether policy was followed, the Warden or Assistant Warden shall review all use of force reports and supervisory reviews including:

(1)     the incident report associated with the use of force;

(2)     any medical documentation of injuries and any further medical care;

(3)     the prisoner disciplinary report associated with the use of force; and

(4)     the Warden or Assistant Warden shall complete a written report or written statement of specific findings and determinations of the appropriateness of force.

g.     Provide the Monitors a periodic report detailing use of force by staff. These periodic reports shall be provided to the Monitors within four months of the Effective Date; and every six months thereafter until termination of this Agreement. Each report will include the following information:

(1)     a brief summary of all uses of force, by type;

(2)     date that force was used;

17



(3)     identity of staff members involved in using force;
(4)     identity of prisoners against whom force was used;
(5)     a brief summary of all uses of force resulting in injuries;
(6)     number of planned and unplanned uses of force;
(7)     a summary of all in-custody deaths related to use of force, including the identity of the decedent and the circumstances of the death; and
(8)     a listing of serious injuries requiring hospitalization.

h.     OPSO shall conduct, annually, a review of the use of force reporting system to ensure that it has been effective in reducing unnecessary or excessive uses of force.  OPSO will document its review and conclusions and provide them to the Monitors, SPLC, and DOJ.

Findings:

> Partial-compliance - IV. A. 3. a.
> Non-compliance - IV. A. 3. b.
> Non-compliance - IV. A. 3. c.
> Partial-compliance - IV. A. 3. d.
> Partial-compliance - IV. A. 3. e.
> Partial-compliance - IV. A. 3. f.
> Partial-compliance - IV. A. 3 .g.
> Non-compliance - IV. A. 3. h.

Measures of compliance:
1.     Comprehensiveness of written policies.
2.     Training, data collection and analysis.
3.     Supervisory review of uses of force.
4.     Review of use of force reports.
5.     Review of incident reports.
6.     Review of investigations by SOD.
7.     Review of investigations by IAD.

Observations:

The consultant is in the process of finalizing the policy requiring reporting of uses of force.  However, there is nothing in place to ensure all uses of force are being reported and that uses of force are being reported adequately and accurately. Simply having a policy that says all uses of force are to be reported is inadequate. There must be a system in place to check to make sure uses of force are being reported and that there are consequences when uses of force are not reported or not reported accurately.  The revised policy states that force is to be reported, and includes the Consent Judgment that failure to do so will result in discipline.

Currently, it appears that staff members often report that the incident involved a use of force when, in fact, it did not.  There are also circumstances where

18



Compliance Report # 4 - September 9, 2015

staff members do not indicate the incident involved a use of force and the text of the report clearly indicates that force was used.  This results in the data not being reliable and has resulted in unnecessary triggering of the Early Intervention System (EIS).  Also, since use of force reports is primary criteria for the EIS, if use of force is not being indicated, it is quite possible that there are staff members who should be triggering the EIS and are not.   There is currently an effort under way to require a specific check box in Vantos as to whether the incident involved a use of force.  When this is in place, the staff member will not be able to go forward on the documenting of an incident without indicating whether or not the incident involved a use of force.  This will also allow for greater accountability and tracking.  A staff member that does not accurately indicate the use of force could then be subject to remedial action and/or discipline.  The addition of the check-box is a priority.

The revised policy provides for the use of force reports to contain all of the provisions required in the Consent Judgment.  The policy does provide for first line supervisors to be present for all planned uses of force such as cell extractions.  Review of incident reports indicates the policy is being followed on a regular basis.  However, the mechanism is not in place to ensure presence of first line supervisors in all cases; thus, OPSO is in partial compliance with this requirement.

Supervisory review is taking place on a more regular basis, but there are still incidents in which supervisory review does not take place and/or it is not timely or thorough. As noted previously, the  use of force reports  which had been signed off on by supervisors were often inadequate and/or incomplete, and contained boilerplate and conclusory language that does not allow the reader to make an evaluation of the level of resistance, the level of force used, and/or the appropriateness of the force.  For instance, a report will state "appropriate force was used" without detailing what type of behavior prompted the use of force, de-escalation efforts, and the type of force used.  Seldom does a report indicate whether the use of force was documented by video.  The most common result of interviews of inmates by supervisors is a notation that they either did not see anything or did not

19



Compliance Report # 4 - September 9, 2015

wish to cooperate.  Since the reorganizing the Special Operations Division (SOD) into the ISB, there has been more success in obtaining statements from inmates during the ISB investigation.  However, often, by the time ISB interviews an inmate, the inmate has had time to talk to other inmates to agree on a "version" of events.  Therefore, it is important that the supervisors obtain timely and complete statements from inmates or take steps to separate witnesses.

While the new Force Investigation Team (FIT) looks at every use of force report, and issues a quarterly report, it is the Monitors' observation that without an updated policy and procedure, training for staff and supervisors, and an audit of the reporting procedure, there is no way to know if the reporting is accurate to not.  As noted above, staff often indicates that a use of force was involved when it was not.  It is unclear whether other uses of force go underreported.  The check box for whether a use of force was involved before the staff member can go forward in the incident reporting system should be helpful.  The chain of command of the various facilities still fail to refer uses of force to ISB for investigation.  Any investigations on use force during the past six month period were either initiated by ISB or as a result of a request from the Monitors.

In addition, there is no automatic tracking system to ensure timely notification is being made.  While completed reports are to be assigned a number, there is no follow up to make sure the reports are written and/or are reviewed within 36 hours and forwarded to the Internal Affairs Division (now a unit of the ISB).  A review of the documentation indicates that there are still incidents in which review is not taking place and the information provided did not allow for a determination of whether the review that had taken place had been done in a timely manner. There is  no tracking mechanism in place to make sure each of these steps is completed timely.  There is no system to alert the Warden or Assistant Warden if the shift/watch commander does not complete the initial review in a timely matter.  There is no system to alert the Chief of Corrections if the Warden or Assistant Warden does not complete the secondary review in a timely matter.  There is no

20



Compliance Report # 4 - September 9, 2015

system for tracking whether the reviews are being sent to ISB. While FIT does keep record of the results of the review, it is highly likely that a significant number of the reports never made it to ISB. It is clear that the reports are not being reviewed in compliance with the Consent Judgment.

No periodic reports detailing the use of force have been submitted to the Monitors as required under IV. A. 3. g. The "report" consists solely of sending to the Monitors the spreadsheet that is prepared by the Monitors on incidents. The new Chief of Corrections has implemented a new "monthly report card" which should help to provide some analysis of the uses of force and reporting.

Recommendations:

3.      The revise use of force is in sufficient detail to allow for auditing of compliance, and includes:

   a.  Each time an incident involving a use of force occurs; a unique number must be generated and assigned to the incident. The assignment of the number is in most agencies generated by a central control room or dispatch center, aided by the incident reporting system that provides the next number in sequence.

   b.  Unless the situation dictates an exception is identified in the policy, the initial incident report and supplements must be completed by the end of the officer's shift.

   c.  The shift/watch commander must ensure the report is written and then has 36 (or fewer) hours from the end of the incident to review and specify his/her findings for completeness and procedural errors.

   d.  When the watch commander completes his/her review, the Warden or Assistant Warden must conduct a review and issue a report. This report is to be completed within 36 hours (or fewer), exclusive of weekends and holidays, of receiving the report and review from the shift/watch commander.

21



e. A tracking system should be put in place to automatically alert the next in the chain of command and the ISB if reviews are not being timely performed.  Training, corrective action, and/or discipline should take place as to supervisors who are not timely performing their duties.

f. OPSO policy/procedures should require those holding the rank of Major and above review all reports.  Based on that review, additional training should be provided to supervisors who are not requiring complete and thorough reports.

4. Monitor Frasier has been given real time off site, read-only access to the incident reporting system (Vantos) so that incident reports can be reviewed on a contemporaneous basis.  This has been helpful. However, the Monitors do not have ready access to the results of the review of incident reports and any follow up.  The Monitors also do not have ready access to the investigations by ISB.  Access of the reviews, follow ups, and investigations would enable the Monitors to provide feedback on a timelier basis and assist in correcting deficiencies.  Steps are being taken to provide this access.

5. OPSO needs to timely produce the reports required by the Consent Judgment. The adequacy of the periodic reports (that are to be submitted under IV. A. 3. g.) and the usefulness of the annual review (that is to be conducted under IV. A. 3. h.) are crucial to future compliance with IV. A. 3. g. that requires OPSO to assess, annually, all data collected and make any necessary changes.

6. ISB has followed the previous recommendation that OPSO stop the practice of allowing investigators to use personal laptops or other computer equipment for OPSO investigations.  ISB has a draft of procedures on how records and investigations are to be stored and made accessible.  Progress has been made on providing those assigned to investigations with laptops and/or other computer equipment that provides the security necessary to the integrity of investigations.

22



Compliance Report # 4 - September 9, 2015

Use of Force and Inmates Held at Hunt

The Monitors have reviewed incident reports covering the period January – mid-July 2015 regarding inmates held at Hunt. Of concern are twenty-four incidents in which OC spray was used involving inmates on the acute mental health caseload by the officers of the Louisiana Department of Corrections and Public Safety.   The lead Monitor met with the Department's Director of Operations to discuss this issue along with OPSO representatives.  As a result of these discussions the following action plan was developed, the status of which will be reported no later than August 28, 2105:

- OPSO and LDCPS will jointly develop one form to be used to record uses of force assuring that OPSO's ISB has reviewed;

- OPSO will work with CCS to evaluate coverage on nights/weekends for mental health assistance to defuse situations, including training of the medical staff to do that;

- OPSO and LDCPS will evaluate options for secluding inmates who are disrupting the unit;

- OPSO and LDCPS will jointly develop a separate procedure for the HSU2 regarding use of force;

- OPSO will discuss with LDCPS video recording planned uses of force including cell extractions;

- OPSO will Assure LDCPS has a copy of the Consent Judgment;

- OPSO and LDCPS will assure that reportable incidents identified in the CJ are recorded by LADOC and promptly transmitted to OPSO; and

- OPOS and LDCPS will assure that inmate grievance forms are transmitted promptly to both CCS and OPSO's grievance coordinator.

The Monitors will continue to review the situation.



**4.    a. – e.  Early Intervention System ("EIS")**

a.      OPSO shall develop, within 120 days of the Effective Date, a computerized relational database ("EIS") that will document and track staff members who are involved in use of force incidents and any complaints related to the inappropriate or excessive use of force, in order to alert OPSO management to any potential problematic policies or supervision lapses or need for retraining or discipline.  The Chief of Operations Deputy, supervisors, and investigative staff shall have access to this information and shall review on a regular basis, but not less than quarterly, system reports to evaluate individual staff, supervisor, and housing area activity.  OPSO will use the EIS as a tool for correcting inappropriate staff behavior before it escalates to more serious misconduct.

b.      Within 120 days of the Effective Date, OPSO senior management shall use EIS information to improve quality management practices, identify patterns and trends, and take necessary corrective action both on an individual and systemic level.  IAD will manage and administer EIS systems.  The Special Operations Division ("SOD") will have access to the EIS.  IAD will conduct quarterly audits of the EIS to ensure that analysis and intervention is taken according to the process described below.  Command staff shall review the data collected by the EIS on at least a quarterly basis to identify potential patterns or trends resulting in harm to prisoners.  The Use of Force Review Board will periodically review information collected regarding uses of force in order to identify the need for corrective action, including changes to training protocols and policy or retraining or disciplining individual staff or staff members.  Through comparison of the operation of this system to changes in the conditions in OPP, OPSO will assess whether the mechanism is effective at addressing the requirements of this Agreement.

c.      OPSO shall provide, within 180 days of the implementation date of its EIS, to SPLC, DOJ, and the Monitors, a list of all staff members identified through the EIS and corrective action taken.

d.      The EIS protocol shall include the following components:  data storage, data retrieval, reporting, data analysis, pattern identification, supervisory assessment, supervisory intervention, documentation, and audit.

e.      On an annual basis, OPSO shall review the EIS to ensure that it has been effective in identifying concerns regarding policy, training, or the need for discipline.  This assessment will be based in part on the number and severity of harm and injury identified through data collected pursuant to this Agreement.  OPSO will document its review and conclusions and provide them to the Monitors, who shall forward this document to DOJ and SPLC.

Finding:
>        IV. A. 4. a. - Partial-compliance
>        IV. A. 4. b. -Partial-compliance
>        IV.A.4.c. –  Partial-compliance
>        IV. A. 4.d. - Non-compliance
>        IV. A. 4.e. – NA Due August 21, 2015

Measures of compliance:
1.      Comprehensiveness of policy.
2.      Identification of patterns and trends.
3.      Evidence of review by command staff.
4.      Monitors' review of quarterly reports.

Observations:

The responsibility for reviewing staff members who triggered the EIS was

transferred to the supervisor of the FIT about half way through the reporting

24



Compliance Report # 4 - September 9, 2015

period.  Since the transfer, the quality of the review is much higher and the documentation more complete.  The reporting could still use improvement on documenting why the system was triggered, but no action is warranted.  Also, proof needs to be provided as to the names of the staff members and the retraining received.  With the exception of the aforementioned, no evidence of compliance was provided for IV.A.4.  The Early Intervention system has been in place since January 21, 2014, and the policy by which data is collected, analyzed, and action taken has been approved by the parties and needs to be finalized. The only document that purports to be an Early Intervention policy is, in reality, a memorandum that sets up a system that flags an employee who has three formal complaints within a certain timeframe.  A credible Early Intervention or warning system collects data such as uses of force, grievances, complaints handled at the facility level, absences, etc. and causes a review, and, if necessary, remedial, documented action.  The current system relies totally on officers' self initiated reports of uses of force.

Recommendations:

7.      OPSO finalize the completion of the policy/procedure for the Early Intervention System.   The revised policy should include accountability mandates requiring the collection and analysis of data such as uses of force, grievances, and complaints handled at the facility level, absences, etc. Assure policies/procedures are in place to direct how the EIS is implemented, and actions to be taken by OPSO when thresholds are triggered.

8.      It is recommended that the Monitors Frasier and McCampbell be given real time off site access to the Early Intervention System, which is part of Vantos so that data can be reviewed on a more contemporaneous basis.  This would enable the Monitors to provide feedback on a timelier basis and assist in correcting deficiencies.

**A.  5. a. – l.  Safety and Supervision**

Recognizing that some danger is inherent in a jail setting, OPSO shall take all reasonable measures to ensure that prisoners are not subjected to harm or the risk of harm.  At a minimum, OPSO shall do the following:

a.   Maintain security policies, procedures, and practices to provide a reasonably safe and secure environment for prisoners and staff in accordance with this Agreement.

25



b. Maintain policies, procedures, and practices to ensure the adequate supervision of prisoner work areas and trustees.

c. Maintain policies and procedures regarding care for and housing of protective custody prisoners and prisoners requesting protection from harm.

d. Continue to ensure that correctional officers conduct appropriate rounds at least once during every 30-minute period, at irregular times, inside each general population housing unit and at least once during every 15-minute period of special management prisoners, or more often if necessary. All security rounds shall be documented on forms or logs that do not contain pre-printed rounding times. In the alternative, OPSO may provide direct supervision of prisoners by posting a correctional officer inside the day room area of a housing unit to conduct surveillance.

e. Staff shall provide direct supervision in housing units that are designed for this type of supervision. Video surveillance may be used to supplement, but must not be used to replace, rounds by correctional officers.

f. Increase the use of overhead video surveillance and recording cameras to provide adequate coverage throughout the common areas of the Jail, including the Intake Processing Center, all divisions' intake areas, mental health units, special management units, prisoner housing units, and in the divisions' common areas.

g. Continue to ensure that correctional officers, who are transferred from one division to another, are required to attend training on division-specific post orders before working on the unit.

h. Continue to ensure that correctional officers assigned to special management units, which include youth tiers, mental health tiers, disciplinary segregation, and protective custody, receive eight hours of specialized training regarding such units on prisoner safety and security on at least an annual basis.

i. Continue to ensure that supervisors conduct daily rounds on each shift in the prisoner housing units, and document the results of their rounds.

j. Continue to ensure that staff conduct daily inspections of cells and common areas of the housing units to protect prisoners from unreasonable harm or unreasonable risk of harm.

k. Continue to ensure that staff conduct random monthly shakedowns of cells and common areas so that prisoners do not possess or have access to dangerous contraband.

l. Provide the Monitors a periodic report of safety and supervision at the Facility. These periodic reports shall be provided to the Monitors within four months of the Effective Date; and every six months thereafter until termination of this Agreement. Each report will provide the following information:

    (1) a listing of special management prisoners, their housing assignments, the basis for them being placed in the specialized housing unit, and the date placed in the unit; and

    (2) a listing of all contraband, including weapons seized, the type of contraband, date of seizure, location, and shift of seizure.

Findings:

    Non-Compliance - IV. A. 5.a.
    Non-Compliance - IV.A.5.b.
    Non-Compliance- IV.A.5.c.
    Partial Compliance - IV.A.5.d.
    Partial-Compliance - IV.A.5.e
    Partial-Compliance - IV.A.5.f.
    Partial-Compliance - IV.A.5.g.
    Non-Compliance - IV.A.5.h.
    Partial-Compliance- IV.A.5.i.
    Partial Compliance - IV.A.5.j.
    Partial Compliance - IV.A.5.k
    Non-Compliance - IV.A.5.l.



Compliance Report # 4 - September 9, 2015

Measures of compliance
1. Comprehensiveness of policies and procedures
2. Training materials
3. Post orders
4. Review of incident reports
5. Installation of cameras
6. Documentation of training
7. Monitors' review of required semi-annual reports.

Observations:

Evidence of partial compliance with seven of the provisions was provided for IV.A.5.  The level of harm and risk of harm in the Orleans Parish Jail system continues to be extremely high despite the Consent Judgment having been in place for since October 21, 2013.  This danger is evident by the number of assaults on inmates by other inmates including sexual assaults as reported to the Monitors by OPSO.  Even more disturbing is that staff is often unaware that an assault is taking place due to the lack of supervision, or their physical proximity to the housing units in some OPSO facilities.  While OPSO provided proof of partial compliance by way of security check entries, it is clear that, often, deputies are not conducting timely rounds, particularly in the special management housing units.   This may be because of lack of staffing, or supervision.  Partial compliance is being given due to the placement of deputies inside the dayrooms of the housing units for inmates with mental health issues and the youthful offenders to supervise inmates.  Due to shortage of staff, deputies are often called upon to work several tiers (on different floors) simultaneously – which is an impossible work assignment to conduct with any level of effectiveness.  The new Chief of Corrections has implemented a new staffing plan and mandatory staffing at OPP that has helped to address the issue.

Staff received some specialized training required to work with some classifications of inmates (e.g. mental health).   Shakedowns are being conducted with much greater frequency, but are still not conducted with sufficient frequency as evidenced by the contraband items (particularly homemade shanks) used by inmates to assault one another and the large amount of contraband which is

27



Compliance Report # 4 - September 9, 2015

discovered each time shakedowns do occur.  There is limited effort to determine the source of the contraband and remediate the danger.  While there are inspections of housing units, there is no indication that there are consistent standards of what is expected, or that changes are made to the facilities as a result of the inspection findings.  In addition, it is apparent that some of the inspection reports do not reflect the reality of the facilities; thus, calling into question whether the inspection was performed or the ultimate purpose.

While OPSO documents were provided regarding inmates being housed in protective custody, documentation in accordance with the Consent Judgment was not provided.  It should be noted that protective custody status appears, in the past, to be used interchangeably for inmates who are high security risks and/or discipline problems.  Those are not appropriate uses of protective custody and increase the danger to the inmates who truly require protective custody.  A new program whereby an administrative segregation unit for high security inmates and protective custody inmates has been implemented in the past couple of months.  It appears to have had a positive effect on the inmates who are housed there and the inmates who no longer have to be housed with these extremely violent inmates.

Many of the situations will not be lessened without an adequate number of properly trained staff along with a sufficient number of supervisors.  While the recruiting, hiring, and training of staff takes time, there needs to be a sense of urgency to increase the hiring.

Recommendations:

9.      Policies regarding inmate supervision, rounds, inspections, shakedowns and communication need to be finalized.

   a.   The policy must include accountability methods for ensuring that deputies and supervisors conduct their rounds timely.  Anytime an incident occurs, it must be routine practice to include examination of source data to determine whether rounds have been conducted timely in the area.  The results of the determination should be documented.



b. The policy must include a supervisory/management evaluation to determine if an employee involved in a use of force should be temporarily assigned until at least a preliminary investigation has been conducted – to safeguard both the staff and inmates.

10. OPSO must make the recruiting, hiring, and training of custodial staff for the jail facilities the highest priority.  See Section 6.  Security Staffing.

11. OPSO must develop and implement a risk management philosophy so that incidents are routinely reviewed by subject matter experts with a goal of determining actions needed to be taken by OPSO to avoid such incidents in the future.

### 6.        Security Staffing

a. (1) – (4) OPSO shall ensure that correctional staffing and supervision is sufficient to adequately supervise prisoners, fulfill the terms of this Agreement, and allow for the safe operation of the Facility, consistent with constitutional standards.  OPSO shall achieve adequate correctional officer staffing in the following manner:

(1)         Within 90 days of the Effective Date, develop a staffing plan that will identify all posts and positions, the adequate number and qualification of staff to cover each post and position, adequate shift relief, and coverage for vacations.  The staffing plan will ensure that there is adequate coverage inside each housing and specialized housing areas and to accompany prisoners for court, visits and legal visits, and other operations of OPP and to comply with all provisions of this Agreement.  OPSO will provide its plan to the Monitors, SPLC, and DOJ for approval.  The Monitors, SPLC, or DOJ will have 60 days to raise any objections and recommend revisions to the staffing plan.

(2)         Within 120 days before the opening of any new facility, submit a staffing plan consistent with subsection (1) above.

(3)         Within 90 days after completion of the staffing study, OPSO shall recruit and hire a full-time professional corrections administrator to analyze and review OPP operations.   The professional corrections administrator shall report directly to the Sheriff and shall have responsibilities to be determined by the Sheriff.  The professional corrections administrator shall have at least the following qualifications:  (a) a bachelor's degree in criminal justice or other closely related field; (b) five years of experience in supervising a large correctional facility; and (c) knowledge of and experience in applying modern correctional standards, maintained through regular participation in corrections-related conferences or other continuing education.

(4)         Provide the Monitors a periodic report on staffing levels at the Facility.  These periodic reports shall be provided to the Monitors within four months of the Effective Date; and every six months thereafter until termination of this Agreement.  Each report will include the following information:

    i.   a listing of each post and position needed;
    ii.  the number of hours needed for each post and position;
    iii. a listing of staff hired and positions filled;
    iv.  a listing of staff working overtime and the amount of overtime worked by each staff member;
    v.   a listing of supervisors working overtime; and a listing of and types of critical incidents reported.

29



Findings:
>   IV. A. 6. a. (1), (2) - Partial Compliance
>   IV. A. 6. a. (3) – Compliant
>   IV.A.6.a. (4) – Partial Compliance

Measures of Compliance:
1.   Written policy/procedure governing staffing, and reporting as required by consent agreement.
2.   Completion of a staffing analysis per http://static.nicic.gov/Library/016827.pdf
3.   Staffing plan (existing and new facilities); recruiting plan.
4.   Daily rosters.
5.   Overtime records.
6.   Housing unit logs.
7.   Hiring of professional corrections administrators (CV).  Post order/job description/organizational chart.
8.   Staffing report containing required information; conclusions; action plans, if any.

Observations:

A staffing plan was submitted to all parties on February 13, 2014.  The plan continues to be updated as options and considerations for inmate management within the new jail facility are revised.  It is the opinion of the Monitors that if the staffing plan (February 13, 2015 and revisions pending from August 2015) is fully implemented – the entire plan- not just for the new jail - there is adequate staff coverage as required in paragraph IV.A.6.a. (1).  To reach this level will require the hiring of about 225 more individuals to support the entire OPSO operation.  The Monitors will review the updated plans as they are completed;  acknowledging that the staffing for the new jail is evolving based on the experience of operating the facility.  This does not mean that the numbers of needed staffing are increasing, but rather being refined in terms of posts and hours for that post.  While the funding authority rightfully wants to know the bottom line number of staffing as this is the primary cost in the jail's budget, the final number may not be known for another 9 – 12 months following the jail's opening.

Additionally, non-security positions that require on-going attention by the Sheriff include those jobs that assure there is a sufficient infrastructure to bring the jail into compliance, and to sustain compliance.  These staffing positions include, but

30



are not limited to:  finance (payroll, accounting, internal auditing, etc.), contract management, human resources (benefits, recruiting, background investigations), and purchasing.  These human resources did not exist, or existed to a insufficient level, when the monitoring began.  Regardless of the reason these positions did not exist, they are necessary for the operation of a jail system.  These positions are proposed by the Sheriff's Office and need to be filled at an operational level to allow for such things as recruiting, screening, hiring, and training new employees.[15]

The Chief of Corrections has revised current staffing plans to assure there are staff in units in OPP.

Recruiting and retaining deputy sheriffs to work in the new jail, and/or critical civilianized positions remain, as in the previous three compliance reports to be a major challenge. OPSO reports that newly hired deputies working with inmates are paid $11.91 per hour to start (annualized to $26,011.44).  After their six month probationary period they are paid $12.36/hour (annualized $26,994.24).  After completing the State's POST training, the State supplements the employee's salary by $6,000/year.  Thus after the employee completes this state training, their salary is $32,994.24.

In an agreement made two years ago between the City and the Sheriff, deputies seen as having no or limited inmate contact/supervision are paid $10.10 per hour to start.  These positions include intake, transportation, perimeter security and courts.  These positions, in the view of the Monitors, do have inmate contact, especially deputies assigned to intake in the new jail.  No matter the reason for the agreement, it is creating difficulty within OPSO in filling these lower paid positions, in the same organization, with the same job titles.

There remain significant challenges to hiring and retraining employees for the new jail, which have been largely unresolved over the last two years.  The public

---

[15] See also the recommendation for paragraph IV. G. Youthful Prisoners for a program coordinator to achieve and maintain compliance.



Compliance Report # 4 - September 9, 2015

record is clear about the salaries for public safety/law enforcement in the region. For example:

- NOPD - $49,517[16]
- Louisiana State Police - $ 3,884.17/month (in pre-service training); after completing the academy $4,120.71/month. [17]
- Jefferson Parish Sheriff's Office - $13.76/hour ($28,221)[18]
- Kenner Police Department - $36,000[19]
- East Baton Rouge Sheriff's Office - $36,792[20]]

The Bureau of Labor Statistics reports that the jobs that may be competing for the same labor pool have these annual mean wages:[21]

- TSA Officers - $36,770
- Security Guards - $29,930
- Gaming Surveillance Officers - $30,330

Two studies were conducted for the Sheriff regarding comparable salaries in September 2014 – one by CLG[22], and one conducted by Industrial/Organizational, Inc. also in September 2014.   The City commissioned a report produced in draft in January 2015 by the company PFM.    The primary salary comparison offered in the PFM draft was with Louisiana Department of Corrections.

---

[16] http://www.nola.gov/civil-service/jobs/police-recruiting/ accessed on 8/13/15.

[17] http://www.lsp.org/recruit.html accessed on 8/13/15

[18] https://www.jpso.com/Jobs.aspx?UniqueId=98&From=All&CommunityJobs=False&JobID=Corrections-Officer-11 accessed 8/13/15

[19] http://www.kennerpd.com/misc/employment.htm accessed 8/13/15

[20] http://theadvocate.com/csp/mediapool/sites/dt.common.streams.StreamServer.cls?STREAMOID=ZfniOzFK2zj3OX3qOW39qpM5tm0Zxrvol3sywaAHBAmrfyxtVcxIhycldJ2_qyIsE0$uXvBjavsllACLNr6VhLEUIm2tympBeeq1Fwi7sIigrCfKm_F3DhYfWov3omce$8CAqP1xDAFoSAgEcS6kSQ--&CONTENTTYPE=application/pdf&CONTENTDISPOSITION=LSP_Pay_Comparative_Study.pdf accessed 8/13/15, page 6.

[21] http://www.bls.gov/oes/current/oes_35380.htm#33-0000 accessed 8/13/15

[22] CLG, Orleans Parish Deputy Sheriff Salary Market Analysis, September 16, 2014,  prepared for the Orleans Parish Sheriff's Office, CLG,  1619 Sumter Street, Columbia, South Carolina 29201.



Compliance Report # 4 - September 9, 2015

Examining the hiring data reported for OPSO for the calendar year 2014, there was a net gain of 93 deputies.[23]  From January 1 – July 31, 2015, the OPSO reported hiring 141 individuals to work in the jail system, and during the same time period, 69 left employment, leaving a net gain of 72.  Of the 69 who left the organization, 46 resigned, 18 were terminated and 5 are listed as "retired/other".  While OPSO's Human Resources asks why those who resign are leaving, this is often, as could be anticipated, a personal matter they do not wish to discuss.  Some individuals noted it was for personal reasons, some for job advancement, compensation, some to other sheriffs' offices or law enforcement agencies.  An unknowable number is how many individuals did not apply for positions due to the salary when other career options were available.

Since Compliance Report # 3 was produced, OPSO has refined their staffing projections to approximately 850 staff for jail related activities (civilian and sworn).  Based on current staffing levels, the number of individuals set to graduate from the basic academy, and those being processed for a September academy, the OPSO asserts they will have the number of staff they need to operate the new jail/inmate housing; but not the number of staff needed for related functions (e.g. TCD, IPC (new jail), Investigative Services Bureau, OPP Docks (court holding), Transportation, Classification, kitchen/warehouse, training, visitation, administrative functions (see above), and chief of corrections' staff.[24]   If the TDC's renovations begin, there are staff who can be reassigned from those housing units to other posts.

The Monitors are concerned about staffing levels. These projections are a moving target, especially given the need for mature trained staff to work in a direct supervision environment and 54% attrition rate.[25]  While the OPSO established training consistent with accepted practice, the staff who will be working in direct

---

[23] See Monitors' Compliance Report # 3, pages 33- 34.
http://www.nolajailmonitors.org/uploads/3/7/5/7/37578255/jones_et_al_v._gusman_3_compliance_report_02_25_15.pdf
[24] Note this number does not include courthouse or civil, or other operations not directly associated the jail.
[25] For more information about direct supervision see Compliance Report # 1 pages 29-30
http://www.nolajailmonitors.org/uploads/3/7/5/7/37578255/nolajailmonitorsreport1-02_13_2014.pdf

33



supervision have had no opportunity to "practice" the skills sets, nor are all needed policies/procedures yet complete that would inform the training and operations.

For clarity, the Monitors are of the opinion that salary alone is not the reason why people don't  apply for a job, accept a job, or leave a job.  The quality of the workplace, the work hours and conditions, the effectiveness of supervisors, chances for upward mobility, and personal safety all figure into decisions.  While raising the salary for OPSO to a comparable level in the competitive market is important to retention as well as recruitment, changes in attrition will only be gained with improved institutional leadership, trained supervisors, and overall workplace quality.

Hiring of professional correctional support staff and managers.

OPSO hired Carmen DeSadier as Chief of Corrections.  She began work on May 4, 2015.  The Monitors are universally impressed with her knowledge and leadership skills.

We reiterate our recommendations from Compliance Report # 3 that OPSO also assure the hiring of individuals with experience in managing jail systems to assist the Chief of Corrections.  This is not to suggest that there are not talented and dedicated individuals working in OPSO just that there is a critical need for a skilled cadre of jail professionals, now.

Observation IV.A.6.a. (3)

Finding:  Compliance

Observation IV.A.6.a. (4):

Finding:  Partial compliance

OPSO needs to improve reporting.  Because of staffing changes there is no one set of uniform data regarding hiring and retention since the monitoring process began.  [See previous recommendation about administrative staff.]  Successful organizations focus on retention as well as hiring – if staff are retained, then there is less replacement hiring to be done, and, more importantly, a stable workforce.   The Monitors are of the opinion that the data such as reporting on use of overtime by

34



every employee, absent any summary or exception data, is in an of itself of marginal use in evaluating staffing, but that is a matter for the defendants and plaintiffs to resolve.

Recommendations:

12.    The Sheriff and the City should reach a decision soon regarding an appropriate salary for all deputies, doing away with the distinction between what were perceived as non-inmate supervisory jobs.

13.    The OPSO should add administrative staff to support gaining and sustaining compliance with the CJ.

14.    The hiring and retention processes should be evaluate to determine why more than half of individuals hired are leaving.  (See also .16 below).

15.    As noted in the previous compliance report, OPSO should develop a retention plan to keep deputies and employees it worked hard to recruit, screen, and train.

16.    As noted in the previous compliance report, OPSO should examine the background investigation and screening process to prevent hiring individual who are mismatched for the job.  There are specific competencies for officers working in direct supervision, different from tradition architecture.  These competencies (e.g. communications, problem solving) should be incorporated in advertising and screening.

17.    OPSO should begin the process of keeping detailed data regarding recruitment, applicant screening, and attrition.

18.    Work with the Monitors and Plaintiffs to revise reporting now in the Consent Judgment to more useful and relevant information. (Section IV.A.6.a.4.i-vi.)

**6.b**.      Review the periodic report to determine whether staffing is adequate to meet the requirements of this Agreement.  OPSO shall make recommendations regarding staffing based on this review.  The review and recommendations will be documented and provided to the Monitors.

Findings:  Partial Compliance

Measures of Compliance:
1.      See IV.A.6.a
2.      Updated of staffing plans, and shift relief factors (every four years)



3.      OPSO written recommendations regarding staffing; requests for funding.

Observations:  Until the final staffing plan is completed, this paragraph remains in partial compliance.  OPSO has done credible and supportable work to develop the plan, the posts, and shift relief factors.

<u>Recommendation:</u>

See IV.6. a.-d., above.

## 7. a. – j. Incidents and Referrals

a.    OPSO shall develop and implement policies that ensure that Facility watch commanders have knowledge of reportable incidents in OPP to take action in a timely manner to prevent harm to prisoners or take other corrective action.   At a minimum, OPSO shall do the following:

b.    Continue to ensure that Facility watch commanders document all reportable incidents by the end of their shift, but no later than 24 hours after the incident, including prisoner fights, rule violations, prisoner injuries, suicide attempts, cell extractions, medical emergencies, found contraband, vandalism, escapes and escape attempts, and fires.

c.    Continue to ensure that Facility watch commanders report all suicides and deaths no later than one hour after the incident, to a supervisor, IAD, the Special Operations Division, and medical and mental health staff.

d.    Provide formal pre-service and annual in-service training on proper incident reporting policies and procedures.

e.    Implement a policy providing that it is a disciplinary infraction for staff to fail to report any reportable incident that occurred on his or her shift.  Failure to formally report any observed prisoner injury may result in staff discipline, up to and including termination.

f.    Maintain a system to track all reportable incidents that, at a minimum, includes the following information:

(1)      tracking number;
(2)      the prisoner(s) name;
(3)      housing classification and location;
(4)      date and time;
(5)      type of incident;
(6)      injuries to staff or prisoner;
(7)      medical care;
(8)      primary and secondary staff involved;
(9)      reviewing supervisor;
(10)     external reviews and results;
(11)     corrective action taken; and
(12)     administrative sign-off.

g.    Ensure that incident reports and prisoner grievances are screened for allegations of staff misconduct, and, if the incident or allegation meets established criteria in accordance with this Agreement, it is referred for investigation.

h.    Provide the Monitors a periodic data report of incidents at the Facility.  These periodic reports shall be provided to the Monitors within four months of the Effective Date; and every six months thereafter until termination of this Agreement.

i.    The report will include the following information:

(1)      a brief summary of all reportable incidents, by type and date;
(2)      a description of all suicides and in-custody deaths, including the date, name of prisoner, and housing unit;



Compliance Report # 4 - September 9, 2015

(3)     number of prisoner grievances screened for allegations of misconduct; and
(4)     number of grievances referred to IAD or SOD for investigation.

j.   Conduct internal reviews of the periodic reports to determine whether the incident reporting system is ensuring that the constitutional rights of prisoners are respected.  Review the quarterly report to determine whether the incident reporting system is meeting the requirements of this Agreement.  OPSO shall make recommendations regarding the reporting system or other necessary changes in policy or staffing based on this review.  The review and recommendations will be documented and provided to the Monitors.

Findings:

Non-Compliance - IV.A.7.a.
Partial-Compliance - IV.A.7.b.
Partial-Compliance - IV.A.7.c.
Non-Compliance - IV.A.7.d.
Partial-Compliance - IV.A.7.e.
Partial-Compliance - IV.A.7.f.
Partial-Compliance - IV.A.7.g.
Partial-Compliance - IV.A.7.h.
Partial-Compliance - IV.A.7.i.
Non-Compliance - IV.A.7.j.

Measures of compliance
1.     Comprehensiveness of written policies
2.     Training
3.     Data collection and analysis
4.     Supervisory review of uses of force
5.     Review of use of force reports
6.     Review of incident reports, review of investigations by SOD
7.     Review of investigations by IAD
8.     Monitors' review of required semi-annual reports.

Observations:

When the policy on incidents and referrals is finalized, it will set out the process for documenting and referring incidents.[26]  However, there is nothing in place to ensure all reportable incidents are being documented and that the incidents are being recorded adequately and accurately.  As noted previously in this report, the review of reports reveals these problems still exist.   There are still reports that are not being reviewed and no process to insure what review that is taking place is occurring timely.  As with the use of force reports, incident reports examined by the Monitors were found to be inadequate and/or incomplete, and contained boilerplate

---

[26] See also Section V.  Defendant's Activities Since Compliance Report # 4 Positive Changes, Challenges and Barriers to   Compliance.



language and conclusory language that does not allow the reader to make an evaluation of what occurred, the reason for the occurrence, whether staff acted appropriately, and what steps should be taken to prevent a similar incident from occurring in the future.   Such reports are being signed off on by a supervisor.  As noted above, there is no automatic tracking system to ensure timely reviews and notifications are being made.  While completed reports are supposed to be assigned a number, there is no follow up to make sure the reports are written and/or are reviewed within the 24 hours required.  As noted above, the Monitor's review indicated some of the reports have not been reviewed and approved, and the content of the report did not allow for a determination of whether the review of had been done in a timely manner.  It appears that any review for the quality of the reports is often being done by the FIT, but only if it involves a use of force.

No periodic reports detailing reportable incidents have been submitted to the Monitors as required under IV. A. 7. f.  A report was provided, but it consisted of sending back to the Monitors the spreadsheet the Monitors maintain regarding reportable incidents, and provided no new information or analysis.

The adequacy of the policies and procedures and reporting system is crucial to the Monitors being able to rely on the accuracy of the periodic reports that are to be submitted under IV. A. 7. f. and g. and the sufficiency of the annual review that is to be conducted under IV. A. 7. h. which requires OPSO to assess whether the incident reporting system is meeting the requirements of the Consent Judgment.

Recommendations:

19.    Develop, implement, and train on the revised policy regarding incident reporting.

   a.    In particular, the policy and the training on the policy needs to stress that all reportable incidents are to be reported and properly investigated and that failure to report will result in discipline and/or remedial training.

38



b. In addition, supervisors need to be trained on the mechanisms to ensure that all reportable incidents are properly reported and investigated in accordance with the policy.

c. The policies will need to set out in detail the timelines and how each step of the review process and data collection is to take place and who is responsible for enforcement of each deadline.  See Section VII. and VIII.

## 8.   a. – f. Investigations

OPSO shall ensure that it has sufficient staff to identify, investigate, and make recommendations correcting misconduct that has or may lead to a violation of the Constitution.   At a minimum, OPSO shall:

a. Maintain implementation of comprehensive policies, procedures, and practices for the timely and thorough investigation of alleged staff misconduct, sexual assaults, and physical assaults of prisoners resulting in serious injury, in accordance with this Agreement.  Investigations shall:

   (1) be conducted by persons who do not have conflicts of interest that bear on the partiality of the investigation;

   (2) include timely, thorough, and documented interviews of all relevant staff and prisoners who were involved in or who witnessed the incident in question, to the extent practicable; and

   (3) include all supporting evidence, including logs, witness and participant statements, references to policies and procedures relevant to the incident, physical evidence, and video or audio recordings.

b. Continue to provide SOD and IAD staff with pre-service and annual in-service training on appropriate investigation policies and procedures, the investigation tracking process, investigatory interviewing techniques, and confidentiality requirements.

c. Ensure that any investigative report indicating possible criminal behavior will be referred to IAD/SOD and then referred to the Orleans Parish District Attorney's Office, if appropriate.

d. Provide the Monitors a periodic report of investigations conducted at the Facility.  These periodic reports shall be provided to the Monitors within four months of the Effective Date; and every six months thereafter until termination of this Agreement.

e. The report will include the following information:

   (1) a brief summary of all completed investigations, by type and date;

   (2) a listing of investigations referred for administrative investigation;

   (3) a listing of all investigations referred to an appropriate law enforcement agency and the name of the agency; and

   (4) a listing of all staff suspended, terminated, arrested, or reassigned because of misconduct or violations of policy and procedures.  This list must also contain the specific misconduct and/or violation.

f. OPSO shall review the periodic report to determine whether the investigation system is meeting the requirements of this Agreement and make recommendations regarding the investigation system or other necessary changes in policy based on this review.  The review and recommendations will be documented and provided to the Monitors.

Findings:
     Partial compliance - IV.A.8.a.
     Partial compliance - IV.A.8.b.
     Partial compliance - IV.A.8.c.
     Partial-compliance - IV.A.8.d.
     Partial-compliance - IV.A.8.e.



Partial-compliance - IV.A.8.f.

Measures of compliance:
1.       Review of incident reports,
2.       Review of use of force reports,
3.       Review of investigations by SOD,
4.       Review of investigations by IAD, and
5.       Monitors' review of required semi-annual reports.

Observations:

The investigative functions at OPSO underwent a major reorganization after Compliance Report #2.  All investigative activities are under the leadership of the commander of the Investigative Services Bureau (ISB).  The Internal Affairs Division (IAD), now a division within the ISB handles the administrative investigations (e.g. internal rule violations) while other ISB sections handle the criminal investigations of inmates and staff, reviews of use of force, EIS, and intelligence.  Significant evidence of partial compliance was provided for IV.A.8.  While ISB is still in the process of finalizing written policies and procedures, and/or job descriptions/post orders governing their work, very significant improvement has occurred in the quality of investigations occurring; especially regarding allegations of criminal behavior.  With a change in leadership of the Internal Affairs Unit, the quality and timeliness of internal investigations has improved.

The ISB commander and three of the five lieutenants in ISB have a background in law enforcement as opposed to jails/corrections.  As stated in a previous report, there is a similar skill set needed for law enforcement investigations in a jail setting, but there is a steep learning curve for those lacking jail experience as to how the inmate culture and the jail interpersonal dynamics influence allegations and investigations.  The leadership of ISB is attempted to overcome this lack of corrections experience by attending training directly related to investigations in corrections facility and specifically related to sexual assault (Prison Rape Elimination Act PREA).  The strides made in understanding the corrections environment has been impressive.

40



Another significant positive change is the timing on administrative investigations if the employee is being investigated for possible criminal conduct. Previously, if it appeared that a use of force may be unnecessary or excessive or other criminal conduct by a staff member had occurred, the Special Operations Division (SOD) (now the Investigative Services Bureau ISB) would investigate the matter and refer the completed investigation to the District Attorney's Office. Only when the District Attorney's Office declined to prosecute, which occurred in the vast majority of the referred cases, was the case referred by SOD to IAD for the administrative investigation. Given the "age" of the case by that point, IAD was often needed to rely on the evidence gathered and interviews conducted by SOD even though the emphasis of the SOD investigation was violation of criminal law as opposed to an administrative/policy violation. This process needlessly delayed the finding of fact and potentially jeopardized inmate safety. Such a lengthy process was particularly troublesome when the staff member involved remained on duty and in contact with inmates. This practice has now been changed. As soon as a possible policy violation is identified, the commander of ISB notifies the IAD supervisor to open an administrative investigation. This is an indication of the on-going changes to this process not only to comply with the Consent Judgment, but also to incorporate accepted practice.

The Monitors acknowledge that investigating incidents of inmate/inmate assaults, sexual assaults, staff/inmate assaults, etc. with a goal of seeking indictments is appropriate. In a jail setting, investigations play just as critical a role in terms of protecting inmates from staff, and correcting policy, practice, supervision and training. The Monitors continue to be concerned about solely approaching an investigation to seek criminal charges. In order to comply with the Consent Judgment, greater emphasis on the root causes of violence and disorder in the jail need to be addressed in the investigations and by the review of them.

A review of a sample of investigations conducted by ISB revealed a contrast between the investigations conducted by the criminal division and IAD. The

41



criminal division investigations appeared to be more thorough and complete.  With a change in leadership in the IAD, the quality of investigations has improved greatly.

While the number of staff assigned to ISB has been increased,  and some duties have been reassigned, the staff assigned to the ISB is still required to fill other job duties outside of ISB.  As such are often pulled away from investigations to other duties that result in investigations taking longer. For instance, ISB has been charged with transporting inmates to the Hunt facility.  While this activity initially was to be a once or twice a week trip, it is now once or twice a day.

One practice that continues that creates a potential conflict of interest is that ISB is often called in to respond to quell potential disturbances and act an emergency response team.  There was an incident where an ISB deputy was involved in a use of force during a call out which resulted in his suspension and an investigation by ISB.  While it is not questioned that the ISB agent assigned to the investigation did a thorough investigation, this conflict can be avoided by redefining ISB's responsibilities and creating a response team drawn from jail staff (when fully staffed).

The ISB administrative division (e.g., IAD) does not have the mandate to fill other job duties than their IAD duties.  IAD has a staff member deployed to assist in background investigation for new hires at OPSO.  While an appropriate use of individuals with investigative experience, this takes resources from internal administrative investigations. The number of cases referred to IAD has increased greatly since the change in policy discussed above.  The quality and timeliness of the IAD investigations should be closely reviewed to see if the change has a negative effect, or if additional resources are needed.  Additionally OPSO should determine the resources needed to conduct pre-employment background investigations and assign appropriate resources to that crucial function.

 ISB has received significant additional training.  Continued emphasis needs to be placed on having as one of ISB's goals the investigations to *prevent* future incidents from happening through analysis of the policy, procedures, training,

42



supervision, and physical plant contributors to the incident.  This level of assessment requires input from individuals who have experience in jail/corrections work.  This can be accomplished through a team approach in the ISB or by having their investigations reviewed by those in leadership positions who have more corrections experience.

Laptop computers, other equipment, and the capacity for file sharing have been made available to ISB agents.  The supervisors of the ISB are able to access the investigative files of the agents.  The Vantos system seems to be available.    Until the change in leadership in IAD, the practice of entering new cases in handwriting in a logbook instead of having the Vantos system generate a unique number continued.  This practice has been changed which make it easier of who is opening cases, preventing duplicate entries, and the timely handling of cases.

In addition to the investigators assigned to ISB, watch commanders have a role to fill.  Often the watch commander will undertake interviews of inmates involved in incidents before calling ISB.  Unfortunately, the watch commanders often lack the investigative knowledge or skills and thus actually hamper ISB's thorough investigation.  In particular, the lack of investigative knowledge and skills by watch commanders, especially in regard to the investigation of sexual assaults, has the potential to further victimize or re-traumatize inmates.  ISB is currently working on training to provide to both deputies and supervisors regarding crime scene preservation and interviewing, and their specific responsibilities.  These mandates will also need to be included in the relevant policies.

Recommendations:

20.    OPSO has made significant improvement in ISB and in formalizing the organizational structure, roles, mandates, responsibilities, placement in the chain-of-command, and job descriptions of both the criminal, FIT, intelligence, and administrative divisions of ISB.  OPSO should evaluate the needs for resources in conducting pre-employment background checks and provide those resources without depleting IAD.

43



21.     One of the confusing things in the past was the ranks and titles given to the different personnel in ISB.  With the change in leadership in the internal affairs unit, that has been remedied.  The title of agent is replacing the rank of sergeant so that there will be consistency throughout the bureau.

22.     ISB needs to finalize and implement written policies, procedures, and protocols for conducting all investigations.  The vendor responsible for developing jail-based policies and procedures should assist in formatting them to be consistent with other procedures.

23.     OPSO should continue to work with Monitors to periodically review and critique investigations.

24.     OPSO should provide additional training to investigators; particularly regarding corrections operations, or hire/promote individuals with corrections experience to be investigators.  Training for investigators needs to continue to meet the mandates in the PREA standards.  The two agents assigned to sexual assault investigations should be given the opportunity to attend additional PREA training.

25.     OPSO needs to produce the periodic reports required by the Consent Judgment.

26.     See Recommendation above regarding resources, accessibility of investigations, and confidentiality.

## 9.    Pretrial Placement in Alternative Settings

**9.a.** OPSO shall maintain its role of providing space and security to facilitate interviews conducted pursuant to the City's pretrial release program, which is intended to ensure placement in the least restrictive appropriate placement consistent with public safety.

Finding:          Compliance

Measures of Compliance:
1. Memorandum of understanding (MOU) with Pre-Trial Services.
2. Observation
3. Interview with pre-trial services staff
4. Review of files
5. Review of data regarding pre-trial diversion

44



Observations:

        OPSO and VERA executed a Cooperative Endeavor Agreement (CEA) on February 18, 2015 addressing the provisions of this paragraph.

**9.b.** OPSO shall create a system to ensure that it does not unlawfully confine prisoners whose sole detainer is by Immigration and Customs Enforcement ("ICE"), where the detainer has expired.

Finding:  Partial Compliance

Measures of Compliance:
1. Written policy/procedures regarding inmate record keeping, and release.
2. List of inmates with ICE detainees and length of time in custody.
3. Classification plan/policies/procedures
4. Review of inmate release record.

Observation:

        Essentially, there is no charge from the previous two reports.  OPSO policy 50.15, Immigration and Customs Enforcement (ICE) Procedures, dated June 21, 2013provides that voluntary ICE detainers will be declined.  This document addresses all relevant language in this paragraph.  The policy is being updated, but constitutes a proof of compliance.  No parties to the Cacho v. Gusman [Case 2:11-cv-00225-SS} matter have notified the Court of any concerns pursuant to that Consent Judgment and Settlement Agreement.

<u>Recommendations:</u>

27.     Update policy 50.15 into the new policy numbering system to assign accountability for periodic review of ICE detainers to conform to this provision.

## IV. A. 10. Custodial Placement

**Introduction**

        In sum, the OPSO is in partial-compliance with the elements of the Consent Judgment related to Custodial Placement within OPP (IV. A.10).  The OPSO has designed, validated, and implemented an objective classification to assess and house each OSPO male and female offender according to the risks he/she poses to institutional safety and security.  The new automated classification system was rolled out in the Jail Management System



(JMS) on January 15, 2015. A report entitled, "Design and Validation of an Objective Classification System for the Orleans Parish Sheriff's Office: Final Report" was submitted on July 16, 2015 to the plaintiffs and Department of Justice. [27] This report documented the design and validation of the OPSO classification system.  The new classification "unit" includes 15 classification specialists and a classification manager. It should be noted that the turnover rate among the classification specialist has been low (6.25%), only one of the sixteen individuals hired as a classification specialist has resigned.  All received training on the principles of objective classification and instruction for the new custody and PREA assessment instruments. The training included scoring of actual OPSO offenders and practice with the new automation.  One concern regarding staffing and training for the OPSO classification staff is the fact that only the classification manager and three of the classification specialists have a login/password for accessing the NCIC rap sheets.[28] Review of all detainees' criminal history is critical for an accurate assessment of the detainee's threat to institutional security and safety.

The OPSO has developed an automated housing assignment process that considers the offender's custody level, gender, special population status, PREA designations, enemies, and associates as well as bed availability to recommend an appropriate bed for the offender.  The classification specialist is provided a list of "appropriate" housing locations available for each detainee from which the classification specialist must select a housing assignment. However, this automation has not been fully implemented, as the Housing Unit Assignment Plan (HUAP) within JMS does not reflect the current mission of each of the OPSO housing units. In addition, a process for prompt and accurate identification of cells/units that are "closed or off-line" must be fully developed and implemented.  The Monitor worked with the Classification Manager and JMS staff to update the HUAP within the JMS and to identify appropriate housing units for each of the special populations.   Until

---

[27] Hardyman, Patricia L. (July 2015). "Design and Validation of an Objective Classification System for the Orleans Parish Sheriff's Office: Final Report." New Marlborough, MA: Criminal Justice Institute.

[28] Two individuals of the three classification specialists with a NCIC login were the two original classification officers prior to increased staffing of the classification unit.  The fourth member of the classification staff that has a NCIC login is the classification manager.  The process providing access to NCIC is moving very slowly and is hampering efficiency and timely completion go the initial classifications and custody reviews.

46



the HUAP is complete and has been accurately programmed into JMS, the accuracy of the housing assignments according to custody level, gender, special population status, PREA designations, enemies, and associates remains questionable. It is anticipated that the automated HUAP will be implemented by the end of August 2015.

Reports for tracking the classification process were included the JMS automation of the system.  The reports regarding the custody assessments completed between January and July, 2015 were incomplete and misleading. The reports, for example, did not provide tallies for the number of inmates involved in serious institutional infractions/month, number of inmates whose scored custody level was overridden, or the number of inmates assigned to protective custody or administrative segregation.  As these reports were intended to inform OPSO, as well as the Monitors, as to the integrity of the classification system, these reports must be revamped to provide useful and timely information.   It is also recommended that the classification manager implement a quality control/random audit process to ensure integrity of the custody assessment and housing processes.

The OPSO classification and discipline policies have been updated to reflect the new classification system. The Monitor reviewed drafts of the OPSO administrative segregation policy, offender handbook, and offender job-screening instrument.  Classification and PREA assessment handbooks that include rules for the when and how to score the respective instruments were developed and distributed to the classification staff as part of the implementation of the system.

**Assessment Methodology**

This report was based on: 1.  Work with OPSO staff to automate and implement the new OPSO classification system and to update the PREA assessment instruments; and 2. Meetings with OPSO classification, JMS, Transition Team, and Executive staff.

IV.A.10.
 a.  OPP shall implement an objective and validated classification system that assigns prisoners to housing
          units by security levels, among other valid factors, in order to protect prisoners from unreasonable
          risk of harm.  The system shall include: consideration of a prisoner's security needs, severity of the
          current charge, types of prior commitments, suicide risk, history of escape attempts, history of
          violence, gang affiliations, and special needs, including mental illness, gender identity, age, and
          education requirements.  OPSO shall anticipate periods of unusual intake volume and schedule
          sufficient classification staff to classify prisoners within 24 hours of booking and perform prisoner

47



reclassifications, assist eligible DOC prisoners with re-entry assistance (release preparation), among other duties related to case management.

Finding:        Compliance

Measures of Compliance:
1.      Written policy/procedure governing the intake, booking, classification and re-classification process.
2.      Report including a statistical validation of the OPSO current custody classification system that includes statistical assessment of the risk and need factors of the inmate populations by gender and race.
3.      Implementation of the identified updates via an electronic file with the completed custody assessments for OPSO population.
4.      Report documenting required staffing needs.
5.      Implementation of viable classification/case management staffing plans.

Observations:

- The new automated classification system was rolled out in the Jail Management System (JMS) on January 15, 2015.

- Classification and PREA assessment handbooks that include rules for the when and how to score the respective instruments were developed and distributed to the classification staff as part of the implementation of the new system.

- The new classification "unit" includes 15 classification specialists and a classification manager.  All received training on the principles of objective classification and instruction for the new custody and PREA assessment instruments. The training included scoring of actual OSPO offenders and practice with the new automation. A schedule for 24/7 coverage by the classification staff has been developed and implemented. Follow-up training for the classification staff was provided June 25-26th.

- Note, a validation report documenting the design and validation was submitted on July 16, 2015 to the plaintiffs and Department of Justice.

- Classification Management Reports - Aggregate standardized reports to track offender security designations, PREA designations, override rates by type, and housing assignments by facility by unit were provided, but did not provide an accurate account of the custody assessments or OPSO active

48



population. Although the security and PREA designations are stored for each offender, routine classification management reports are not generated and distributed to classification staff, facility/supervisory staff, or executive staff to monitor the integrity of the classification system and ensure system safety and security. OPSO has begun to develop manual reports for tracking housing and the classification system. Automation of these reports within the JMS rather maintaining the reports than as separate, manual spreadsheets is highly recommended. Manual reporting duplicates staff efforts and leads to inaccurate information for both the manual reports and JMS.

- OPSO JMS staff have been instrumental and diligent in the development, testing and implementation of automated classification and updated PREA assessments in the JMS. In particular Joe Simmons, OPSO Programmer Analyst, has automated the new custody and PREA scoring and designation processes. He is current working on development of the management reports to track offenders due for custody reviews and to manage the housing assignment process.

Recommendation:

28. Develop and circulate among OPSO executive and supervisory staff standardized automated reports that track offender security designations, PREA designations, override rates by type, and housing assignments by facility by unit.

IV.A.10.
b. Prohibit classifications based solely on race, color, national origin, or ethnicity.

Finding:  Compliance

Measures of Compliance:
1. Implementation of a valid classification system based on the objective and reliable risk and need factors of the OPSO inmate populations as documented by a written report on the design/validation of the revised classification system and electronic file of custody assessments.
2. Provide a quarterly report that tracks custody distributions by housing unit race, and gender to the Monitor.

Observations:

49



As the classification system was implemented in January 2015. Custody and PREA distributions by housing unit, race and gender for the entire OPSO population. Custody assessments based on the new objective classification system for the entire OPSO have been completed.   However, there is a lengthy backlog of offenders due for a custody review.

Accurate classification-related management reports: Standardized aggregate reports to track custody decisions by housing unit race and gender during the last quarter were not available. Custody distributions for the current active OPSO populations were provided. Questionable were the counts for the special populations – disciplinary, mental health, and medical.

Recommendations:

29.   Eliminate the backlog of cases due for a custody review. Custody reviews should be completed within 72 hours of the time the case appears on the classification monitoring log.

30.   Revise the monthly statistical reports to accurately track the custody distribution of OPSO offenders by housing unit race and gender during the last quarter.

IV.A.10.
c. Ensure that the classification staff has sufficient access to current information regarding cell availability in each division.

Finding:  Partial-compliance

Measures of Compliance:
1.   Develop and implement a housing unit assignment plan that outlines the mission, number of beds and custody level(s) for each OPSO housing unit.
2.   Provide a report of the daily counts to the classification housing staff as to the number of occupied, vacant, and out-of-order beds per pod per housing unit with electronic copies of the daily reports provided to the Monitor.

Observations:

The OPSO has developed an automated housing assignment process that considers the offender's custody level, gender, special population status, PREA designations, enemies, and associates as well as bed availability to recommend an

50



appropriate bed for the offender.  The classification specialist is provided a list of "appropriate" housing locations available for each detainee from which he/she must select a housing assignment for that individual. However, this process for assigning an individual to a housing unit is not fully implemented. The Housing Unit Assignment Plan (HUAP) within JMS does not reflect the current mission of each of the OPSO housing units. In addition, a process for prompt and accurate identification of cells/units that are "closed or off-line" must be fully developed and implemented.  The Monitor worked with the Classification Manager and JMS staff to update the HUAP and identify appropriate housing units for each of the special populations.  Until the HUAP is complete and has been accurately programmed into JMS, the accuracy of the housing assignments according to custody level, gender, special population status, PREA designations, enemies, and associates remains questionable. It is anticipated that the automated HUAP will be implemented by the end of August 2015.

Recommendations:

31.  Update custody level, gender, mission, and PREA designations with the JMS to reflect the current OPSO HUAP.   The HUAP within JMS must be current and complete, i.e., provide for a location for every combination of the housing criteria. The classification manager must develop the skills and daily, as needed process for updating the HUAP as any bed/cell is taken off line due for maintenance or there is a change in the mission of the bed/unit.

IV.A.10.
d. Continue to update the classification system to include information on each prisoner's history at OPSO.

Finding:   Partial-compliance

Measures of Compliance:

1.  Any automated management information system will include accurate data within eight hours of the custody assessment or status change, data regarding the inmates' custody level, medical, disciplinary infractions, mental health, and custody assessment (date, risk factor scoring, override reason [if applicable], and custody level).  Monitor will conduct audit of random sample of cases to determine accuracy and timely entry of data. Compliance standard will be 90% accurate and reliable.

51



2. The custody assessments shall be updated/reviewed every 120 days, a hearing for a disciplinary infraction for major infraction, legal status change, new information from the court, and a major jail incident to include PREA or other major incident/investigation. Monitor will conduct audit of random sample of cases to determine accuracy and timely entry of data. Compliance standard will be 90% accurate and reliable.

Observations:

Review of the housing population within each of the OPSO housing units indicated that a custody assessment has been completed for all detainees prior to their transfer from IPC (booking) to a housing unit.  As of September 6, 2015, there was a lengthy backlog  (700+ detainees) of cases due for a custody re-assessment. This backlog was due, at least in part, to an error in the JMS log that excluded cases due for a 60/90-day review from the list.   Thus, the new classification system has been implemented for the incoming offenders, however the reclassification process has not been fully implemented.  Classification staff complete custody reviews as evidenced by the observation of the classification processes in June and during the August monitoring tours, however the custody reviews have not been prioritized. The Unit must reorganize its workload assignments to ensure all custody reviews are completed in a timely fashion. The backlog of custody reviews has been prioritized by risk, e.g., offenders to be reclassified due to disciplinary infractions, security updates.  Despite the backlog, this section is rated as "partial compliance" because the initial custody assessments for incoming detainees are completed according to a timely process and some custody reviews for disciplinary infractions are conducted. However, the backlog of custody reviews must be addressed. A custody review should be completed within 72 hours.

Note, while the OPSO has put forth great efforts to update the classification process, the system is dependent on the reliability and accuracy of the OPSO disciplinary process. OSPO must develop QC processes to ensure the integrity of both the classification and disciplinary processes.

<u>Recommendation:</u>



32. Eliminate the backlog of cases due for a custody review. Develop QC processes to ensure the integrity of both the classification and disciplinary processes.

IV.A.10.
e. Continue competency-based training and access to all supervisors on the full capabilities of the OPSO classification and prisoner tracking system.

Finding:   Compliance

Measures of Compliance.
1. Written directive governing training of staff assigned to classification.
2. Curriculum for competency-based training regarding the custody classification system, housing assignment process, work/community assignments, and case management.  Evidence of knowledge gained.
3. Staff training roster(s) and competency tests following completion of competency-based training by current classification/case management staff.
4. Staff training roster(s) and competency tests following completion of competency-based training by all new or re-assigned staff on assignment to classification/case management duties.
5. Curriculum for classification module within the basic academy training curriculum for OPSO staff. Evidence of knowledge gained.
6. Staff training roster(s) and competency tests.

Observations:

Classification Unit and some of the Transition Team members received objective classification training as part of the design and testing of the classification system. Mandatory training regarding the classification system for OPSO leadership and facility manager was provided May 21-22nd. Chief DeSadier's introductory comments emphasized the Classification Unit's responsibility for all housing assignments as well as the security staff's role for documenting inmates' behavior to ensure objective, data-driven classification and housing processes. While the classification staff noted some resistance to the requirement for written rationale as to the reason(s) for requesting a detainee to be moved, the Chief and Classification Manager have been very clear in the enforcement of these changes. Additional training was provided for the classification specialists on June 25 – 26th. This training included detailed instruction of the custody review and housing processes.

<u>Recommendation:</u>

53



33.    Provide on-going training and monitoring to ensure the classification staff
       complete the custody and PREA assessments correctly. A systematic random
       audit process should be implemented to review staff competency.

IV.A.10.
f. Conduct internal and external review and validation of the classification and prisoner tracking system on at
least an annual basis.

Finding:  Non-compliance

Measures of Compliance: the OPSO information system to assess:
1.      Custody distributions by gender, race and special populations.
2.      Override rates.
3.      Housing by custody level/special needs, and race.
4.      PREA separations.
5.      Custody re-assessments (regular and for-cause, # over-due, et al.).
6.      Electronic copies of the quarterly and annual reports shall be provided to the Monitor
        with documentation of steps (tasks and dates) taken to address any noted
        inconsistencies with OPSO policies.

Observations:

       Tracking reports were included the JMS automation, but the classification
manager needs to implement a tracking and QC process to ensure integrity of the
custody assessment and housing processes.  On June 25- 26th, classification activities
by each of the classification teams was observed by the Monitor.  Follow-up training
was provided to address noted problems and questions.  However, the classification
manager needs to develop an ongoing process for auditing and monitoring custody
assessments and tracking the number of cases due for custody re-assessments.   A
key recommendation in the report documenting the design and validation of the
OPSO classification system (see IV.A.10.a.) was that the OPSO conduct a statistical
review of the classification system in early 2016.

Recommendation:

34.    Create queries for simple classification-related management reports within the
       JMS. These reports should be reviewed at least monthly to review trends.
       However, classification manager should review the reports on PREA
       separations and housing by custody level daily to ensure that any
       discrepancies are corrected immediately. Note: the reports should include

54



Compliance Report # 4 - September 9, 2015

columns for noting the date and type(s) of corrective actions required addressing any discrepancies or problematic trends.

IV.A.10.
g. Provide the Monitor a periodic report on classification at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date and every six months, thereafter, until termination of this Agreement. Each report will include the following information:
    (1) number of prisoner-on-prisoner assaults;
    (2) number of assaults against prisoners with mental illness;
    (3) number of prisoners who report having gang affiliations;
    (4) most serious offense leading to incarceration;
    (5) number of prisoners classified in each security level;
    (6) number of prisoners placed in protective custody; and
    (7) number of misconduct complaints.

Finding: Non-compliance

Measures of Compliance:
1. Annual and bi-annual tracking reports within the OPSO information system to review the number/rates during the last 12 months and for the stock population:
    o number of prisoner-on-prisoner assaults/custody level by gender;
    o number of assaults against prisoners with mental illness by gender;
    o number of prisoners who report having gang affiliations by gang affiliation;
    o most serious current offense leading to incarceration by gender;
    o number of prisoners currently classified in each security level;
    o number of prisoners placed in protective custody;
    o number of prisoners in administrative segregation; and
    o number of major and minor misconduct complaints.

Observations:

No change. Accurate data on the number/rates during the last six months and for the stock population were not provided to the Monitors:

- number of prisoner-on-prisoner assaults/custody level by gender;

- number of assaults against prisoners with mental illness by gender;

- number of prisoners who report having gang affiliations by gang affiliation;

- most serious current offense leading to incarceration by gender;

- number of prisoners currently classified in each security level;

- number of prisoners placed in protective custody;

- number of prisoners in administrative segregation; and

- number of major and minor misconduct complaints.

55



Recommendation:

35.    Create queries for simple classification and incident-related management reports within the JMS report module. These reports should be reviewed at least monthly to assess trends. However, classification staff should review the reports on general population, protective custody, medical, mental health, disciplinary, and administrative segregation housing by custody and PREA designation daily to ensure that any discrepancies are corrected immediately. Note: the reports should include columns for noting the date and type(s) of corrective actions required addressing any discrepancies or problematic trends. Optional formats for exporting the reports are important for facilitating analyses and developing charts to track behaviors over time. Options should include:  Excel, pdf (portable document format), and/or csv (comma separated values).

| IV.A. 10.h. | OPSO shall review the periodic data report and make recommendations regarding proper placement consistent with this Agreement or other necessary changes in policy based on this review.  The review and recommendations will be documented and provided to the Monitor. |
|---|---|

Finding:  Partial-compliance

Measures of compliance:
1.   Report to the Monitor with recommended change and rational/data regarding any policy changes.

Observations:

The Monitor has reviewed the OPSO revised classification policy and discipline code (policies 1301.06 and 1301.07).  Classification and PREA assessment handbooks were developed and distributed to the classification staff as part of the implementation of the system. The Monitor has provided feedback for the inmate handbook, administrative segregation policy, and a draft instrument for screening un-sentenced detainees for OPSO job assignments. It should be noted that the administrative segregation unit is a new unit implemented within the last 30 days, thus the absence of a fully developed and vetted policy was anticipated.  The OPSO

56



also only recently made the decision to allow un-sentenced detainees to work within the OPP. A preliminary draft of the detainee screening form was reviewed.

Recommendations:

36.    Implement the Inmate Classification Policy and Procedures (501.14), PREA Policy, and inmate discipline code to reflect revised policies.

37.    Promptly develop complete and viable policies for the use of protective custody and administrative segregation.  As administrative segregation and protective custody inmates represent two very different populations, separate policies for their placement, removal, housing and management should be developed as soon as possible

38.    Revise the inmate handbook to address questions and concerns noted by the Monitors.

### 11. Prisoner Grievance Process

11.a. (1)-(6) OPSO shall ensure that prisoners have a mechanism to express their grievances, resolve disputes, and ensure that concerns regarding their constitutional rights are addressed.  OPSO shall, at a minimum, do the following:

(1)    Continue to maintain policies and procedures to ensure that prisoners have access to an adequate grievance process and to ensure that grievances may be reported and filed confidentially, without requiring the intervention of a correctional officer.  The policies and procedures should be applicable and standardized across all the Facility divisions.

(2)    Ensure that each grievance receives appropriate follow-up, including providing a timely written response and tracking implementation of resolutions.

(3)    Ensure that grievance forms are available on all units and are available in Spanish and Vietnamese and that there is adequate opportunity for illiterate prisoners and prisoners who have physical or cognitive disabilities or language barriers to access the grievance system.

(4)    Separate the process of "requests to staff" from the grievance process and prioritize grievances that raise issues regarding prisoner safety or health.

(5)    Ensure that prisoner grievances are screened for allegations of staff misconduct and, if an incident or allegation warrants per this Agreement, that it is referred for investigation.

(6)    A member of the management staff shall review the grievance tracking system quarterly to identify areas of concerns.  These reviews and any recommendations will be documented and provided to the Monitors.

Finding:  Partial Compliance

Measures of Compliance:

1.    Written policy and procedures governing inmate grievances, and grievance appeals. Directive shall include but not be limited to availability of grievance forms in required language, ability of inmates to secure forms upon request and deposit into secured boxes, prohibition against retaliation against inmates who file grievances, time deadlines on responses, assistance to inmates to file grievances (including assistance to inmates with mental illness, low functioning, non-English speaking).

57



2.      Written policies and procedures that designates a position/post responsible for assuring the collection and response to grievances, including maintenance of records, trends, and analysis of grievance data.
3.      An electronic tracking system.
4.      Written orientation to inmates regarding the grievance process.
5.      Inmate handbook.
6.      Curriculum/lesson plans to train staff (pre-service and in-service) regarding their roles and responsibilities regarding the inmate grievance process.
7.      Interviews with inmates.
8.      Interviews with employees.
9.      Observation of staff training.
10.     Observation of inmate orientation.
11.     Written policies/procedures governing the inmate request process.
12.     Inmate request forms.
13.     Review of referrals for investigation resulting from inmate grievances.
14.     Review of original inmate grievances and responses.
15.     Monitors'' review of grievance logs, grievances, analysis of grievances conducted by OPSO.

Observations:

      OPSO has implemented a credible grievance process, except for the need to provide a working appeals process.  The plaintiffs report that the improvements in the grievance process are positive.  The upgrading of the current hardware and software to accommodate the appeals process needs to be completed.  OPSO is working with the vendor to allow the separation of inmate grievances and inmate requests (sometimes logged as grievances) either by the inmate or by the grievance staff, as well as to assist in the compilation of grievances by type.  OPSO currently separates the inmate grievances from requests for service per the Consent Judgment, but it is a manual rather than electronic process.  The compilation of grievances by type (and hopefully the inmate's location) will provide valuable information to the jail to examine practices and inmate supervision skills of employees.  If the software can be further modified, inmate medical/mental health and dental requests can be routed by the inmate and/or the grievance staff to the medical provider, saving a step in the process and automating sick call.

      As noted in February 2015 report, inmates can direct their grievance to the Monitor, to the grievance staff, or both – in both the kiosk and paper systems. Since January 2015 through August 12th , the Monitor has been forwarded 124 grievances. The topics included:  classification 3%, commissary 6%, conditions of confinement

58



17%, personal legal issues 5%, food service 6%, grievance process 2%, laundry 3%, law library 3%, medical/mental health care 40%, property 2%, protection from harm 2%, recreation 3%, request to speak to Monitor 1%, and staff misconduct 8%. Each grievance received a response and a referral as needed. Additionally the Monitor received 58 inmate letters for which each inmate received a response.

OPSO reports that for year to date (ending July 12, 2015) 3,440 grievances were received, including 12 related to sexual safety/PREA, 139 referred to the Investigative Services Bureau, and 298 to the Internal Affairs Division. There was an overwhelming 32,044 "requests for information." Medical (CCS) reported receiving 2,767 grievances for the first six months of 2015 (included in the total reported above for OPSO). Although classified as grievances, 1,628 (59%) were, in effect, sick call requests. This data speaks to the urgent need to use technology for inmates to communicate sick call requests to medical, as well as for OPSO to be able to more efficiently separate requests for service from actual grievances.

The Monitors can confirm that grievances are screened for allegations of staff misconduct, and forwarded to the Investigative Services Bureau. The ISB records indicate if an investigation is the result of a grievance.

OPSO needs to complete the policy governing inmate grievances, and train staff. OPSO also needs to orient and re-orient inmates to the process, as well a conduct the analysis noted in paragraph (6) of the CJ. The appeals process needs to be fully implemented. Additionally, continued attention needs to be paid to the quality of the responses to the inmates – that is – the response addresses the inmate's question(s), indicates whether the inmate's grievance is founded or not founded, and is in professional language.

Recommendations:

39. Provide the completed grievance written directive/policy, including the grievance appeal process, to the Monitors.

    a. Include in the policy categories of grievances that are meaningful and in sufficient detail to allow for review, analysis, and improvement of operations.

59



    b.  Using technology, separate the inmate grievance process from the inmate request for services as a matter of policy, then operationalize;  using technology, allow for the electronic transfer of sick leave requests to medical.

    c.  In the policy revision, assure that, for the purposes of PREA compliance, there is no time limit imposed on inmates wishing to file grievances regarding sexual harassment, sexual assault, etc.

40.  Refine the record keeping and data analysis ensuring that the most prevalent grievances topics are documented, including trends.

41.  Consider using the Early Warning System to track staff whose name appear in grievances who may need supplemental training.

42.  Continue periodic meetings between security and medical to discuss trends, data.

    a.  Assure that the numbers regarding grievances maintained by OPSO are consistent with those maintained by CCS.

43.  Ensure that all employees are trained regarding the grievance process, and their respective roles.

44.  Revise the inmate handbook to better explain the grievance and grievance appeal process; and how it is different from requests for information/service and sick call.

45.  Revise the grievance policy to provide for assistance to inmates in filing a grievance, due to LEP, mental illness or disabilities, or when an inmate requests assistance.

46.  Analyze the inmate requests for service/information, determine the most prevalent requests, and develop a plan to address those issues to help avoid the need for inmates to file "grievances".  This will be a critical part of the operation of direct supervision environment.  Integrate the approach into direct supervision management.



## 12. Sexual Abuse

OPSO will develop and implement policies, protocols, trainings, and audits, consistent with the requirements of the Prison Rape Elimination Act of 2003, 42 U.S.C. § 15601, et seq., and its implementation of regulations, including but not limited to, preventing, detecting, reporting, investigating, and collecting sexual abuse data, including prisoner-on-prisoner and staff-on-prisoner sexual abuse, sexual harassment, and sexual touching.

Finding:  Partial Compliance

Measures of Compliance:
1. Checklist of policies and procedures http://www.prearesourcecenter.org/sites/default/files/library/checklistofdocumentationfinal2.pdf
2. Auditor Compliance Tool http://www.prearesourcecenter.org/sites/default/files/library/auditorcompliancetoolfinal2.pdf
3. Completion of Jail Toolkit http://static.nicic.gov/Library/026880.pdf
4. Written policies and procedures, protocols, memorandum of agreement/understanding, training curriculum required by the standards.
5. Memorandum of agreement, sexual assault treatment center
6. Review of investigations.
7. Interviews with employees and inmates.
8. Referrals for prosecution.
9. Qualifications of instructors.

Observations:

OPSO continues to make progress on compliance with this paragraph and with sexual safety initiatives.  Other areas of note include:

- OPSO's PREA Coordinator has been certified as a PREA Auditor, only one of ten in Louisiana.[29]   This is significant as it means that OPSO's initiatives are consistent with accepted practice, and can leverage other resources around the state and the country.

- OPSO's PREA Coordinator is assigned to the Investigative Services Bureau that means coordination when there are allegations of sexual assault, harassment, and voyeurism.

- OPSO has completed two videos – one for female and one for male inmates explaining their right to be safe in  jail; and will implement in the new jail (or sooner if the technology in the older buildings permit).

---

[29] http://www.prearesourcecenter.org/audit/list-of-certified-auditors



Compliance Report # 4 - September 9, 2015

- The PREA hotline is functioning, with one call received since January (not unusual based on experience in other jails/prisons in the US).
- Continue to hold monthly SHARP (Sexual Harassment/Assault Review Panel) meetings.  Assure information is consistent with requirement of PREA standards; follow-up each month on previous month's recommendations.
- Collaboration between the newly implemented classification system and the PREA screening instruments, including designations of housing for potential vulnerable victims and potential sexual predators.
- Inmates who allege sexual assault are processed based on PREA standards.
- The PREA Audit is tentatively scheduled for summer 2016.[30]

Recommendations:

47.    Complete both the relevant OPSO policy on PREA and the ISB standard operating procedure for handling inmate allegations of sexual assault, harassment, and voyeurism.

48.    Develop the strategies to begin using the PREA videos, including assuring that staff see the videos and receive the relevant training.

49.    Continue to review reporting by VIA LINK.

50.    Assure that CCS' policies/procedures (B-05)are PREA compliance, including training for CCS staff on recognizing signs of sexual abuse.  Assure that other CCS policies are consistent with requirements of PREA (e.g. mental health care, follow-up medical care).

51.    Assure that resources are provided to facilitate an PREA audit in the summer of 2016.  These resources include, but are not is not limited to, the cost of the professional fees and travel expenses for the auditor, the human resources in OPSO to prepare the materials for the audit, and any staff training required prior to the audit.

---

[30] http://www.prearesourcecenter.org/audit/audit-process-and-appeals



## 13. Access to Information

OPSO will ensure that all newly admitted prisoners receive information, through an inmate handbook and, at the discretion of the Jail, an orientation video, regarding the following topics:  understanding Facility disciplinary process and rules and regulations; reporting misconduct; reporting sexual abuse or assault; accessing medical and mental health care; emergency procedures; and sending and receiving mail; understanding the visitation process; and accessing the grievance process.

Findings:        Partial compliance

Measures of Compliance:
1.        Written policy/procedure governing inmate orientation, including but not limited to inmates with LEP, developmental disabilities, mental illness, etc.
2.        Inmate handbook; orientation videos in English, Spanish, Vietnamese.
3.        Observation of inmate orientation.
4.        Inmate interviews.
5.        Lesson plans, employee training, evidence of knowledge gained.
6.        Review of grievances.
7.        Post orders.

Observations:

The inmate handbook and the orientation video are not yet completed.  OPSO's policies and procedures must be completed before the associated inmate materials can be done.   The Monitors have reviewed the drafts and made suggestions.  Monitors have discussed strategies to provide inmate materials on the housing units (e.g. notebook with laminated pages) and having the information available on the kiosks.  The direct supervision management should also rely on the officer in the housing unit as another source of information for the inmates.

Recommendations:

52.      Develop an inmate orientation process in English and Spanish (written, video, and/or peer) that includes all elements of this paragraph.

53.      Assure that the materials are at a grade appropriate level.  Assure procedures for orientation of inmates who are illiterate, LEP, low functioning and/or have mental illness.



## IV. B.        Mental Health Care

OPSO shall ensure constitutionally adequate intake, assessment, treatment, and monitoring of prisoners' mental health needs, including but not limited to, protecting the safety of and giving priority access to prisoners at risk for self-injurious behavior or suicide.  OPSO shall assess, on an annual or more frequent

### Executive Summary

This report includes the findings regarding mental health services as well as some findings on risk management and quality management based on the site visit (week of August 3, 2015) to the OPSO facilities and the OPSO mental health unit at Hunt.  As reflected in Compliance Report #3, Correct Care Solutions, Inc., (CCS) began providing medical and mental health care to OPSO on November 1, 2014.  CCS has assembled a team of mental health professionals lead by Dr. Audrey Townsel and supported by regional and corporate staff, including Dr. Cassandra Newkirk the chief psychiatric officer for CCS, Dr. Marc Quillen Deputy Director of Behavioral Health Services for CCS, Rainbow Brockenborough Regional Administrator, Dr. Carla Dunbar, Deputy Medical Director, and Dr. William Ruby, Acting Medical Director.

There are notable vacancies in the CCS staffing regarding mental health including the Chief Psychologist/Team Leader position at Hunt and the Psychiatric Nurse Practitioner at Hunt; these are essential positions.  CCS has reported difficulty filling both resulting in coverage for the psychologist position.  The psychiatric provider component at Hunt is currently inadequate in that a psychiatrist is onsite Mondays and Fridays for a total of 16 hours per week.  The Hunt facility requires a full-time, 40-hour per week, psychiatric provider FTE which can be split between a psychiatric nurse practitioner and a psychiatrist.   The Monitors recommend that there be a full time psychiatric nurse practitioner and a psychiatrist to continue to provide at least half days twice per week to support the treatment team.

Further, there have been difficulties at Hunt with the security operations in the use of OC spray on detainees and inmates transferred from OPSO.[31]  Ms. McCampbell met with the LADPSC administration and has secured corrective actions to address the issue of use of force and OC spray and the participation of mental health staff in planned uses of force events.

---

[31] See Page 31.



As reported during the status conference held on August 6, 2015 before Judge Africk, the mental health services provided by CCS to OPSO, both in OPSO facilities and the Hunt unit are the best, in the opinion of the Monitors since the Consent Judgment.  The Monitors anticipate that the services will improve considerably with the increased and adequate staffing.  The CCS staff also reported that they have requested an increase in staffing  to 3.2 FTE's to supplement their current mental health and medical staff to provide adequate services.

The Monitors toured the Hunt Unit, TDC male step-down unit, TDC female mental health unit and Templeman V A-4 Unit, which continues to be referred to as the "suicide tier" despite the intended placement of acute and sub-acute mental health services to be transferred to the Hunt Facility.  On August 5, 2015,  Hunt had a capacity of 39 beds, and a census of 34 inmates with 3 inmates anticipated to be transferred on that day and 2 additional inmates to be transferred by the end of the week making the Hunt Facility filled at maximum capacity.

However, TPV A-4 also had a census of approximately 30 on August 4th and 5th.  At least half, if not more of the inmates housed on the A-4 on those dates, were not believed to be in need of acute mental health services, or on suicide watch or precautions because of mental health reasons.  The inmates interviewed housed on the A-4 tier said that they self-reported themselves as being "suicidal" or having engaged in self-harm activities, such as putting sheets or clothing around their necks , out of OPP to the TPV A-4 because of personal safety concerns.  The conditions at OPP were eloquently described during the Status Conference by all Monitors, and particularly by Harry Grenawitzke, in terms of the dilapidated and failing conditions within the building and the use of building infrastructure (e.g., pipes, wires, frames) by inmates to fashion weapons for potential harm to other inmates and staff.  As noted by all Monitors during the Status Conference these conditions are unacceptable and can no longer be tolerated.

An inmate's behavior with the goal of what the inmate's perceives as self protection [e.g. removal from their current housing location] is at least partially the result of the absence of a housing unit and policies governing a behavioral housing unit. Inmates are aware that if they self-report suicide ideation, or demonstrate self-harm, OPSO must act, and this results in the inmates' removal to other housing. The use of TPV A-4 to house



65

inmates who are reporting suicidal ideation ,or who engage in self-harm activities largely for safety reasons, resulted in discussions with OPSO and CCS leadership to implement a "behavioral management" unit.  Such a housing location would address the management of inmates who have reported safety concerns and self-harm intent,  so they will be properly assessed and monitored in an environment that is protected, in a unit with enhanced mental health services.  While some may see this as "inmate manipulation" the Monitors emphasized that this is "adaptive" rather than "manipulative" behavior – and that change in view needs to pervade the implementation of reforms.

Lead Monitor Susan McCampbell, assistant monitors Drs. Greifinger and Patterson and Mr. Hodge met with Chief. DeSadier and Colonel Laughlin, Lieutenant Peters, and the CCS clinical and administrative staff to discuss the Behavioral Management Unit concept and modifications.  We emphasized not only the need for a hybrid unit with enhanced mental health presence and custody supervision but also the "culture" that is associated with "OPP" and the possible need for "marketing" of the unit to the inmate population and to staff as being different and distinct from other housing units.  The Monitors  emphasized the need for there being some single and double cells and the need for very clear policies and procedures as well as training for staff who may be assigned to those units and a very difficult populations to manage and/or transfer.

Accordingly, both OPSO and CCS are continuing their efforts to develop policies and procedures for such a unit for review by the Monitors. However it with the proposed imminent opening and beginning of transfer of inmates to the Phase II new jail the implementation of this unit may be deferred until the activities associated with the opening are completed.   This opening of such a unit is a priority to further appropriate allocation of mental health resources and assure inmate safety.

In reviewing medical records and discussions with CCS administrative and clinical staff (in the presence of plaintiff's and DOJ attorneys), CCS confirmed there have been difficulties in adequate medication management with unacceptable delays in provision of medications without clear explanations in some instances, but with references to inmate movement between OPSO facilities as well as inmate refusals of medications in some instances.  The Monitor reviewed a number of the inmate records with CCS staff in the presence of plaintiff's and DOJ attorneys regarding plaintiff's lists of inmate concern [e.g.



instances where there were indeed missed medications and/or delays in inmates being seen by psychiatric provider staff particularly or delays in responses to sick call by MHP's]. CCS acknowledged these departures from policy and provided corrective actions that included not only additional staff, but the acknowledgement that some of the issues may be largely addressed with the inmates' relocation to the new jail.  In terms of quality management and risk management from a mental health perspective, the mental health quality management performance indicators are not yet in place with sound methodology and analysis of data to provide a realistic picture of the services being provided.  [See also Dr. Greifinger's section of this Report]. In those instances where there was some analyses of the data from CCS, CCS acknowledges that performance indicators have not yet reached compliance levels for a number of the Consent Judgment requirements, referred to later in this report.

The Monitor also met with architect Jerry Hebert to review the plans for the renovation of TDC Building 4.  The Building 4 renovation plan includes Units 4A and 4B. Unit 4A is intended to be a male 13-bed acute unit (replacing TPV A-4) and 4B is intended to be a step-down/residential unit of 20 dormitory beds plus 3 individual cells for males. This unit will be for step-down care for inmates returning from Hunt, as well as inmates who may require residential care instead of general population or segregation housing but do not require acute or sub-acute mental health care.  The discussions, which included Margo Frasier, plaintiff's and DOJ counsel, centered on the utilization of the building and the possibility that it could be used for women when TPV is closed.  According to Mr. Hebert, the projected timeframe for completion is approximately nine months and the cost would be $2.8 million.  Suggestions were discussed regarding: the inclusion of nursing stations on both units, one to be enclosed on the step-down/residential unit; an open nursing station on the acute unit as well as the need; and medication room and treatment space.  There is no available treatment space on those units other than in the day room.  Mr. Hebert also offered that he could install partitions on the current TDC units that are in use in Building 1 for male step-down and in Building 3 for women's mental health services includes acute/sub-acute and step-down/residential to provide treatment space.  These enhancements are important and necessary as the current TDC facilities do not have any true treatment space.  In addition, none of the TDC units have office space for mental health



staff offices.   Mr. Hebert suggested having a "trailer" located outside of the units for the provision of office space for the mental health treatment staff.

On May 5, 2015, the Monitor participated in a conference call with the Special Care Populations Working Group (SCPWG), convened by Council Member Susan Guidry, and advised of concerns regarding the Group's continued focus on renovation of the 4th floor of Phase II new jail building to house mental health services and special care populations. At the time of the August 2015 tour, the SCPWG had not issued a final report and, therefore, the MHWG has no document or information on which to base any further discussion.

The Mental Health Working Group (MHWG) did not meet during this tour as we clearly had made recommendations to the Court in our report of September 9, 2014.[32] The MHWG will certainly respond to any request by the Court for further review of mental health services should that be considered in the future.

In the status conference of August 6, 2015 with Judge Africk,  the Monitor expressed his concerns that no action had taken place regarding the MHWG's recommendation that the Phase III building was the best available option and that the construction of Phase III should begin with all deliberate speed.

As a result of the Monitors' tour of  Phase II new jail both Monitors opined that the new building has a number of serious flaws, from a mental health operational perspective, that need to be addressed through physical plant refinements <u>and</u> operational practices.[33] The Monitors expressed their concerns regarding the actual layout of the building and what would require some retrofitting and modifications.

The Monitors reviewed a limited number of medical records (several were not available due to the inmate's release from custody).  Based on those reviews and discussion with CCS staff it was not necessary to review more records as the concerns expressed by the plaintiffs were reviewed by CCS.  The diversion of the Monitors' attention from specifically scheduled on-site activities occur when plaintiffs wait until just prior to the Monitors' tour to identify their concerns regarding inmate medical and mental health care.

---

[32] http://www.nolajailmonitors.org/uploads/3/7/5/7/37578255/mhwg_rpt_09_08_14.pdf

[33] The most serious concerns are the need to install suicide resistant cells or suicide resistant areas, including attention the outdoor recreation area that has a wire mesh screen that is easily climbable, and could be used by inmates to climb to the top and jump causing serious injury to themselves or others.



These "examples" of inmates care, although absent any description of whether the concern regarded that specific inmate or whether it was a systemic issue delayed on-site work. While the Monitors acknowledge this effort was meant to be helpful, it was not.[34]

The Monitor observed that the tour of the TPV A-4 unit with Judge Africk and Council Members Guidry and Cantrell immediately the following the tour of the Hunt was enlightening for Council Members Guidry and Cantrell, and the conditions and crowding was again of great concern to Judge Africk.  Council Member Gerard Brosette also toured the A-4 unit accompanied by the Judge and the Monitor.  The Monitor believes the tour was compelling with regard to the reality that the TPV A-4 unit is unfit for occupation by human beings, particularly those who may be suffering from mental illness and/or who have expressed personal safety concerns.

Recommendations:

54. The movement of inmates from OPSO facilities should proceed beginning on 9/15/15 either to the new jail or to other parishes as was recommended by all monitors at the hearing on August 6, 2015.

55. CCS to proceed with all deliberate speed and efforts at filling their staffing allocations and requests for additional staffing as necessary to provide adequate and constitutional mental health services.

56. CCS and OPSO develop policies and procedures as well as programmatic statements and staffing projections for a behavioral management unit to assist in the overall management and treatment of inmates who may have mental health concerns but are not in need of acute or sub-acute mental health services at Hunt and who present as suicidal or self-harming largely because of safety concerns.

57. OPSO, LDOC, and CCS implement protocols for use of force and participation of mental health staff and/or designated nursing staff with mental health consultation and review for use of force at Hunt.

---

[34] For example, the plaintiffs provided a list of "issues" for the Monitors' attention on July 30, 2015 (Monitors arrived on site on August 2nd.  Based on discussion during the tour the plaintiffs, we believe, are clearer about when this information is more timely and relevant.  The Monitors are <u>always</u> available to learn of concerns of the DOJ/plaintiffs.



## IV. B.   Mental Health Care

### IV.B.1 a-e:

a. Develop and maintain comprehensive policies and procedures for appropriate screening and assessment of prisoners with mental illness.  These policies should include definitions of emergent, urgent, and routine mental health needs, as well as timeframes for the provision of services for each category of mental health needs.

b. Develop and implement an appropriate screening instrument that identifies mental health needs, and ensures timely access to a mental health professional when presenting symptoms require such care.  The screening instrument should include the factors described in Appendix B.  The screening instrument will be validated by a qualified professional approved by the Monitor within 180 days of the Effective Date and every 12 months thereafter, if necessary.[35]

c. Ensure that all prisoners are screened by Qualified Medical Staff upon arrival to OPP, but no later than within eight hours, to identify a prisoner's risk for suicide or self-injurious behavior.  No prisoner shall be held in isolation prior to an evaluation by medical staff.

d. Implement a triage policy that utilizes the screening and assessment procedures to ensure that prisoners with emergent and urgent mental health needs are prioritized for services.

e. Develop and implement protocols, commensurate with the level of risk of suicide or self-harm, to ensure that prisoners are protected from identified risks for suicide or self-injurious behavior.  The protocols shall also require that a Qualified Mental Health Professional perform a mental health assessment, based on the prisoner's risk.

Finding:  Partial Compliance

Measures of Compliance:
1. Document review of mental health policies and procedures
2. Review of a limited number of medical records
3. Interviews of prisoners and staff at Hunt Correctional Facility, TPV, and TDC
4. Discussions with OPSO and CCS administrative staffs.

Observations:

CCS has provided the great majority of policies and procedures with regard to mental health.  There is a need for finalization of the suicide risk assessment tool with incorporation of other policies that reflect assessment and management plans into one document that will be utilized for suicide risk assessment, both for inmates presenting with increased risk factors and prior to release from suicide watch or suicide precautions.  There is also the need to finalize the levels of care, particularly in light of the probable addition of a behavioral management unit or other component for the populations that have been described in this report.  CCS did not provide the Monitor with psychological autopsies on the completed suicide of an inmate in March 2015 or the serious attempted suicide of another inmate in June

---

[35] The Monitors have previously indicated to the parties the Monitors are unaware of any "validation" process for such an instrument.  The Monitors recommend the language be clarified by the parties or deleted.



2015.  The Monitors did, however, review the events with CCS staff and anticipate that all suicides and serious suicide attempts will have psychological autopsies/review where indicated and those results will be discussed with the Monitors.  Further, at the time of this tour CCS was reviewing their overall mental health caseload numbers, including inmates who may be designated as "special needs," typically referred to as "serious mental illness (SMI)" in other systems. Implementation of the policies and procedures as well as their performance measures and analysis should also be conducted.

Further, the staffing deficiencies particularly at Hunt preclude there being the timeliness of assessments, particularly by a psychiatric provider (psychiatrist or psychiatric nurse practitioner) within specified timeframes.  Further, CCS has acknowledged that there have been delays in medication administration as well as some instances of medications not being given without clear explanation as to reasons, and delays in completing mental health assessments based on intake screening and/or referrals.  These areas have improved over time, however there needs to be not only the full compliment of staffing and additional staffing as necessary but also quality management performance indicators to appropriately assess the compliance in each of these areas with the Consent Judgment.

Recommendations:

58.     OPSO and CCS to finalize the policies noted above

59.     CCS should continue the process of identification of mental health caseload and their levels of care needs, and aggressively recruit for staffing necessary to provide services.

IV. B. 1. f
f.     For prisoners with emergent or urgent mental health needs, search the prisoner and monitor with constant supervision until the prisoner is transferred to a Qualified Mental Health Professional for assessment.

Finding:  Non-compliance

Measures of Compliance:
   1.   Document review, including incident reports and suicide watch checklists.
   2.   Observation of suicide watches on TD5 and TDC

Observations:



Inmates who are housed on TPV and TDC for suicide assessment and management, and specifically for "direct observation" continue to have certified nursing assistants (CNAs) providing observation that is not direct or consistent. Particularly on TPV there continues to be the practice of CNAs sitting at the desk and ostensibly being assigned to "direct watch" inmates in various cells on the unit, simultaneously. This is not possible given the configuration and the lack of line-of-sight from the desk area both in TPV, and in the area along the wall in TDC for women. The observation by staff at Hunt appears to be adequate for the suicide resistant cells as well as for the rest of the cells on the unit. These are areas that have been discussed before and are in need of corrective actions. Further, the CNAs should typically be supervised by nursing staff rather than behavioral health care staff. Lastly, three specific incidents since the last compliance report are of great concern: (1) completed suicide of an inmate in March 2015, which occurred in an attorney visiting room for an inmate who had been identified at increased risk for suicide and was awaiting a suicide risk assessment; (2) a serious suicide attempt in June 2015 of an inmate who was able to use a chair in a shower are as that chair ostensibly was left in the shower for use by handicapped individuals; and (3) a finding by security staff of a cell phone on an inmate who was dressed in a suicide smock and on direct observation at the time.

IV.B.1.g-k

g.  Ensure that a Qualified Mental Health Professional conducts appropriate mental health assessments within the following periods from the initial screen or other identification of need:
  1. 14 days, or sooner, if medically necessary, for prisoners with routine mental health needs;
  2. 48 hours, or sooner, if medically necessary, for prisoners with urgent mental health needs; and
  3. immediately, but no later than two hours, for prisoners with emergent mental health needs.

h.  Ensure that a Qualified Mental Health Professional performs a mental health assessment no later than the next working day following any adverse triggering event (i.e., any suicide attempt, any suicide ideation, or any aggression to self resulting in serious injury).

i.  Ensure that a Qualified Mental Health Professional, as part of the prisoner's interdisciplinary treatment team, maintains a risk profile for each prisoner on the mental health case load based on the Assessment Factors identified in Appendix B, and develops and implements a treatment plan to minimize the risk of harm to each of these prisoners.

j.  Ensure adequate and timely treatment for prisoners, whose assessments reveal mental illness and/or suicidal ideation, including timely and appropriate referrals for specialty care and visits with Qualified Mental Health Professionals, as clinically appropriate.

k.  Ensure crisis services are available to manage psychiatric emergencies. Such services include licensed in-patient psychiatric care, when clinically appropriate.

Finding:  Partial Compliance



72

Measures of Compliance
1. Document review of policies and procedures and medical records review
2. Interviews of prisoners and staff on TPV, TDC and Hunt Correctional Facility
3. Review of quality management data

Observations:

The identification of prisoners who should be on the mental health caseload, hiring of staff, implementation of the operations at Hunt, and transition from the TPV A-4 unit to Hunt for treatment of acute and sub-acute mentally ill prisoners and/or prisoners reporting/demonstrating increased risk for suicide or self-harm has improved, but must been fully operationalized.  Further, the documentation and quality management review of these mental health practices has not been fully implemented. The improvement in the services delivered at Hunt has been compromised by inadequate staffing and the continued housing of prisoners who have been designated as "suicidal" in the TPV A-4 unit.  There are clear indications that the A-4 unit houses a mixture of inmates who may have mental health concerns as well as the inmates' personal safety concerns and the need for assessment and appropriate management of these inmates either in an acute/sub-acute care setting, behavioral management unit, or other unit for similar purposes, and development of policies and procedures by CCS and OPSO and collaboration in these areas is necessary.

Recommendations:

60. CCS to aggressively recruit to fill the vacant positions at Hunt

61. Documentation of treatment team meetings and reviews of treatment plans

62. Documentation of referrals and risk profiles by CCS and security

63. Development of policies and procedures, staffing projections, and training for a behavioral management unit.

IV. B. 1. l.
l. On an annual basis, assess the process for screening prisoners for mental health needs to determine whether prisoners are being appropriately identified for care.  Based on this assessment, OPSO shall recommend changes to the screening system.  The assessment and recommendations will be documented and provided to the Monitor.

Finding:  Not Applicable at this time.



CCS has indicated they will conduct the assessment "per agreement at the time specified." This assessment is due on an annual basis that will require the assessment be completed by October 2015.

| IV. B. 2. a |
|---|
| a.   Review, revise, and supplement its existing policies in order to implement a policy for the delivery of mental health services that includes a continuum of services, provides for necessary and appropriate mental health staff, includes a treatment plan for prisoners with serious mental illness, and collects data and contains mechanisms sufficient to measure whether care is being provided in a manner consistent with the Constitution. |

Finding:   Partial compliance

Measure of Compliance:
1.   Review of policies and procedures, current staffing and staffing projections, and quality management data and analysis.

Observations:

CCS has produced policies and procedures, some of which will require review and revision as discussed with staff and in this report.  CCS has also indicated their proposal for increased staffing for mental health services; however, we have not been provided that staffing request.  Lastly, quality improvement performance measures are not yet fully implemented and the analysis of data has been inadequate to demonstrate compliance with this element.  The continuum of services necessary and appropriate for mental health services has not been fully implemented because of staffing deficiencies at Hunt

| IV. B. 2. b-d |
|---|
| b. Ensure that treatment plans adequately address prisoners' serious mental health needs and that the treatment plans contain interventions specifically tailored to the prisoner's diagnoses and problems. |
| c. Provide group or individual therapy services by an appropriately licensed provider where necessary for prisoners with mental health needs. |
| d. Ensure that mental health evaluations that are done as part of the disciplinary process include recommendations based on the prisoner's mental health status. |

Finding:  Non-compliance

Measure of Compliance:
1.   Review of draft policies and procedures, medical records, and data collection of performance indicators.

CCS staff have provided statistical information that licensed providers are providing group or individual therapy services.   The information provided documents the numbers of visits, evaluations, and contacts.  The data provided reflects only the actual



contacts rather than whether the contacts are sufficient for the populations.  The mental health data provided indicates the number of inmates on the special needs list is an average of 353.67; however the number of inmates on psychotropic medications is reported as an average of 387.00 – more than the number of inmates on the special needs list.  CCS is in the process of clarifying the actual number of inmates on their mental health caseload as well as those inmates who are designated as "special needs" and equivalent in other systems as "serious mental illness (SMI)."

Recommendations:

64.     Clarify the need for mental health evaluations for inmates NOT on the mental health caseload involved in disciplinary proceedings.  [Note:  based on discussions among the parties, this matter should be resolved in the next 30 days.]

65.     Revise quality improvement data collection documentation for specificity on these elements.

IV. B. 2. e-h
e.   Ensure that prisoners receive psychotropic medications in a timely manner and that prisoners have proper diagnoses and/or indications for each psychotropic medication they receive.
f.   Ensure that psychotropic medications are administered in a clinically appropriate manner as to prevent misuse, overdose, theft, or violence related to the medication
g.   Ensure that prescriptions for psychotropic medications are reviewed by a Qualified Mental Health Professional on a regular, timely basis and prisoners are properly monitored.
h.   Ensure that standards are established for the frequency of review and associated charting of psychotropic medication monitoring, including monitoring for metabolic effects of second generation psychotropic medications.

Finding:   Partial compliance

Measures of Compliance:
1.   Review of policies and procedures and medical records
2.   Discussions with CCS staff and plaintiffs
3.   Prisoner interviews
4.   Review of data collection practices.

Observations:

CCS continues to develop the process for appropriate medication management. CCS acknowledges that during the first several months of the contract implementation period there were delays in inmates receiving psychotropic medications on a timely basis and/or consistently.  The reviews and discussions with CCS indicate this has



improved over time, however it is necessary that CCS demonstrate through their quality management performance indicators that medication management practices are adequate and consistent and are administered appropriately; and, when medications are missed or inmates refuse medications, appropriate measures are taken to correct medication administrative and/or further evaluate the inmate for the need for medication.  Further, the practice, process, and review of the ordering and administration of prescriptions of non-formulary medications should be reflected in performance indicators.  CCS has implemented protocols that inmates transferred from Feliciana Forensic Facility or Hunt on specific medications will have those medications continued upon their return to OPSO facilities.

Recommendations:

66.   Full staffing for psychiatric and nursing providers

67.   Performance indicators for medication management practices with appropriate data collection and analysis

IV. B. 3. a-b
a. OPSO shall develop and implement policies and procedures for prisoner counseling in the areas of general mental health/therapy, sexual-abuse counseling, and alcohol and drug counseling.  This should, at a minimum, include some provision for individual services.
b. Within 180 days of the Effective Date, and quarterly thereafter, report all prisoner counseling services to the Monitor, which should include:
  (1) the number of prisoners who report having participated in general mental health/therapy counseling at OPP;
  (2) the number of prisoners who report having participated in alcohol and drug counseling services at OPP;
  (3) the number of prisoners who report having participated in sexual-abuse counseling at OPP; and the number of cases with an appropriately licensed practitioner and related one-to-one counseling at OPP.

Finding:  Non-compliance

Measures of Compliance:
1.   Review of policies and procedures performance indicators.
2.   Interviews with inmates and discussions with staff
3.   Review of mental health contacts performance indicators.

Observations:

The Monitor reported in Compliance Report #3 that CCS was in the process of developing and implementing policies and procedures for counseling in the areas of general mental health/therapy, sexual abuse counseling [consistent with PREA



requirements], and alcohol and drug counseling.   These areas have not been fully addressed and data collection for mental health contacts have not been delineated to describe the specific areas of counseling.  While the Health Services statistical report for January through June 2015 indicates an average of 212 individual therapy contacts and an average of 117.33 patients in group therapy sessions, the data is not specifically identified as addressing these elements of counseling in the Consent Judgment.  This information should be reflected very clearly and specifically with regard to the areas of general mental health/therapy, sexual abuse counseling, and alcohol and drug counseling for both individual and group therapies for inmates in OPSO facilities as well as Hunt.

Recommendations:

68.   Review policies for mental health services for these populations

69.   Develop performance indicators

**IV. B 4. a-d   Suicide Prevention and Training Program**

a. OPSO shall ensure that all staff who supervise prisoners have the adequate knowledge, skill, and ability to address the needs of prisoners at risk for suicide.  Within 180 days of the Effective Date, OPSO shall review and revise its current suicide prevention training curriculum to include the following topics:

(1)  suicide prevention policies and procedures (as revised consistent with this Agreement);
(2)  analysis of facility environments and why they may contribute to suicidal behavior;
(3)  potential predisposing factors to suicide;
(4)  high-risk suicide periods;
(5)  warning signs and symptoms of suicidal behavior;
(6)  case studies of recent suicides and serious suicide attempts;
(7)  mock demonstrations regarding the proper response to a suicide attempt;
(8)  differentiating  suicidal and self-injurious behavior; and

the proper use of emergency equipment.

b. Ensure that all correctional, medical, and mental health staff are trained on the suicide screening instrument and the medical intake tool.

c. Ensure that multi-disciplinary in-service training is completed annually by all correctional, medical, and mental health staff, to include training on updated policies, procedures, and techniques.  The training will be reviewed and approved by the Monitor.

d. Ensure that staff are trained in observing prisoners on suicide watch and step-down unit status.

e. Ensure that all staff that have contact with prisoners are certified in cardiopulmonary resuscitation ("CPR").

f. Ensure that an emergency response bag, which includes a first aid kit and emergency rescue tool, is in close proximity to all housing units.  All staff that has contact with prisoners shall know the location of this emergency response bag and be trained to use its contents.

g. Randomly test five percent of relevant staff on an annual basis to determine their knowledge of suicide prevention policies.  The testing instrument and policies shall be approved by the Monitor.  The results of these assessments shall be evaluated to determine the need for changes in training practices.  The review and conclusions will be documented and provided to the Monitor.

Findings:

a.   Partial Compliance
b.   Partial Compliance



c.   Partial Compliance
d.   Partial Compliance
e.   Partial Compliance
f.   Not audited[36]
g.   Compliance

Measures of Compliance:
1.   Review of policies and procedures
2.   Observation of clinical and custody staff at Hunt, TPV, and TDC
3.   Discussions with CCS staff.

Observations:

While CCS has submitted their training curriculum for suicide risk reduction and indicated completion of training of medical and behavioral health staff in suicide risk reduction, the implementation of that training is inadequate.  More specifically, CNAs who are responsible for direct observation are not performing direct observation of inmates on suicide watch at TPV or TDC.  Further, CNAs have essentially no interactions with inmates and it was recommended on-site that they be trained to interact with inmates much the same as others would in making rounds and with supervision by nursing staff with regard to direct observation. Further, the step-down units at TPV A-1 and A-3 for male prisoners returning from the Hunt or from TPV A-4 unit continue to have minimal treatment services and no group therapies are available because of the lack of treatment space and staffing issues.  CCS is working to consolidate their suicide risk assessment tool and the separate assessment/recommendations and management plan provided in the suicide watch documents into one document.

OPSO submitted documentation post-tour with the names of CCS staff and OPSO staff who participate in CPR training.  As the Monitors are not clear as to the definition of "certification" in the language of the Consent Judgment, partial compliance is noted.  When "certification" is defined (e.g. American Heart Association, American Red Cross, etc.) compliance will be reevaluated.

---

[36] Not audited.  Will be audited at next tour.



The Monitor did not evaluate the physical presence of the first aid kits and emergency equipment.  OPSO provided documentation; but the Monitors will defer evaluation until the next tour.

OPSO provided documentation regarding the testing of staff regarding suicide prevention policies.  As such, this provision is found in compliance at this time.  The provision will be reassessed during the next tour.

Recommendations:

70.    Provide training and supervision of CNAs with regard to direct observation, both in TPV and TDC as well as in the IPC as there have been suicide attempts in the IPC.

71.    Provide training to mental health staff and correctional staff with regard to direct observation of inmates who have been referred or presented with concerns for suicide or self-harm and appropriate direct observation/supervision of those inmates by custody staff until they are seen and evaluated by mental health staff.

**IV. B. 5   Suicide Precaution**

**IV.B.5 a-k**

a. OPSO shall implement a policy to ensure that prisoners at risk of self-harm are identified, protected, and treated in a manner consistent with the Constitution.

a.    Ensure that suicide prevention procedures include provisions for constant direct supervision of current suicidal prisoners and close supervision of special needs prisoners with lower levels of risk (at a minimum, 15 minute checks).  Correctional officers shall document their checks in a format that does not have pre-printed times.

b.    Ensure that prisoners on suicide watch are immediately searched and monitored with constant direct supervision until a Qualified Mental Health Professional conducts a suicide risk assessment, determines the degree of risk, and specifies the appropriate degree of supervision.

c.    Ensure that all prisoners discharged from suicide precautions receive a follow-up assessment within three to eight working days after discharge, as clinically appropriate, in accordance with a treatment plan developed by a Qualified Mental Health Care Professional.  Upon discharge, the Qualified Mental Health Care Professional shall conduct a documented in-person assessment regarding the clinically appropriate follow-up intervals.

d.    Implement a step-down program providing clinically appropriate transition  for prisoners discharged from suicide precautions.

e.    Develop and implement policies and procedures for suicide precautions that set forth the conditions of the watch, incorporating a requirement of an individualized clinical determination of allowable clothing, property, and utensils.  These conditions shall be altered only on the written instruction of a Qualified Mental Health Professional, except under emergency circumstances or when security considerations require



f. Ensure that cells designated by OPSO for housing suicidal prisoners are retrofitted to render them suicide-resistant (e.g., eliminating bed frames/holes, sprinkler heads, water faucet lips, and unshielded lighting or electrical sockets).

g. Ensure that every suicide or serious suicide attempt is investigated by appropriate mental health and correctional staff, and that the results of the investigation are provided to the Sheriff and the Monitor.

h. Direct observation orders for inmates placed on suicide watch shall be individualized by the ordering clinician based upon the clinical needs of each inmate, and shall not be more restrictive than is deemed necessary by the ordering clinician to ensure the safety and well being of the inmate.

i. Provide the Monitor a periodic report on suicide and self-harm at the Facility.  These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement.  The report will include the following:

    (1)     all suicides;

    (2)     all serious suicide or self-harm attempts; and

    (3)     all uses of restraints to respond to or prevent a suicide attempt.

j. Assess the periodic report to determine whether prisoners are being appropriately identified for risk of self-harm, protected, and treated.  Based on this assessment, OPSO shall document recommended changes to policies and procedures and provide these to the Monitor.

Findings:  Non-compliance

Measures of Compliance:
1. Review of policies and procedures
2. Discussion with CCS and OPSO staff
3. Observation and interview of prisoners
4. Review of incident reports.

Observations:

CCS has developed policies addressing these requirements of the Consent Judgment, but the implementation of those policies has been inadequate and inconsistent, particularly regarding inmates on constant direct observation and for close supervision of special needs prisoners with lower levels of risk.  From the security standpoint the proper supervision and direct observation of inmates awaiting mental health evaluation has been flawed; and the searches of inmate who have been placed on suicide precautions has been flawed.   From a clinical perspective the observation by CNA's for direct supervision was reported in the last compliance report and based on the Monitor's observations during this site visit have not improved or changed to indicate that CNAs are providing appropriate direct observation.  As reported previously, Hunt's observations demonstrated appropriate observation by staff as well as treatment services for prisoners on the acute mental health unit.  At Hunt, however, because of the staffing deficiencies the assessment by psychiatric providers within 24 hours of arrival has not been done



and the treatment planning process implementation and documentation has also not been fully implemented.

While CCS has reported that OPSO has two suicide resistant cells in the TPV A-4, and one suicide resistant cell in the TDC, in fact there are no suicide resistant cells in TPV and there are three suicide resistant cells in the women's unit in TDC. No other cells have been retrofitted or otherwise modified and there are no suicide resistant cells in the new jail at the present time. Inmates in TPV on suicide watch and provided with suicide resistant smocks, not paper smocks, are housed in cells with inmates who are clothed in jumpsuits, which is completely inappropriate and dangerous. Further, there is also a need for resolution of "suicide attempts" in the documentation between OPSO and CCS. While OPSO provides incident reports that specify "suicide attempt", CCS reports very few (approximately four) suicide attempts since January 2015. This is problematic and there must be a mechanism developed that while the referral or incident report may have specified 'suicide attempt', the actual findings by CCS to determine if the event was or was not a "suicide attempt" as defined in the Consent Judgment should be provided.

The morbidity and mortality review process appears to have been implemented by CCS, however psychological autopsies and psychological reviews for inmate who have completed suicide or made serious suicide attempts was not available at the time of the site visit and should be further developed as per the requirements of the Consent Judgment.

Recommendations:

72.    CCS to train and supervise CNA's on direct observations and interactions with prisoners

73.    CCS to develop and present a CNA to prisoner ratios of 1:1 or 1:2 for direct observation rather than the current practice of 1:5 or possibly more inmates who are inadequately observed.

**IV.B.6 a-g    Use of Physical and Chemical Restraints**
a.   OPSO shall prevent the unnecessary or excessive use of physical or chemical restraints on prisoners with mental illness.
b.   Maintain comprehensive policies and procedures for the use of restraints for prisoners with mental illness consistent with the Constitution.



c.  Ensure that approval by a Qualified Medical or Mental Health Professional is received and documented prior to the use of restraints on prisoners living with mental illness or requiring suicide precautions.
d.  Ensure that restrained prisoners with mental illnesses are monitored at least every 15 minutes by Custody Staff to assess their physical condition.
e.  Ensure that Qualified Medical or Mental Health Staff document the use of restraints, including the basis for and duration of the use of restraints and the performance and results of welfare checks on restrained prisoners.
f.  Provide the Monitor a periodic report of restraint use at the Facility.  These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement.  Each report shall include:
    (1) A list of prisoners whom were restrained;
    (2) A list of any self-injurious behavior observed or discovered while restrained; and
    (3) A list of any prisoners whom were placed in restraints on three or more occasions in a thirty (30) day period or whom were kept in restraints for a period exceeding twenty-four (24) hours.
g.  Assess the periodic report to determine whether restraints are being used appropriately on prisoners with mental illness.  Based on this assessment, OPSO shall document recommended changes to policies and procedures and  provide these to the Monitor.

Finding:  Partial Compliance

Measures of Compliance:
1.  Review of policies and procedures and medical records
2.  Discussions with OPSO, LDOC, and CCS staff
3.  Review of incident reports at OPSO and Hunt observations.

Observations:

CCS appears to have adopted the OPSO practice of not utilizing physical restraints under any circumstances.  However, incident reports indicate that there are some inmates who have been very agitated and the need for therapeutic restraints should have been assessed and may have been indicated.  While the use of chemical restraints is prohibited by CCS policies and procedures, the use of chemical agents, i.e., OC Spray, has been, in the view of the Monitors, overused at Hunt based on review of incident reports indicating inmates being "disruptive."  Further, there is need for policy development and collaboration at Hunt for compliance with the Consent Judgment and for the inclusion of mental health and trained nursing staff for de-escalation techniques prior to planned use of force at Hunt, including OC Spray.  [See also page 23 Use of Force.]

Recommendations:

74.  Assure that when therapeutic physical restraints may be indicated for prevention of self harm, they are indeed utilized for the shortest possible time period, and properly supervised, monitored, reported, and assessed



75.     Maintain use of restraint logs for both physical and chemical restraints

76.     Review, revise, and implement policies at Hunt to include mental health staff and possibly specifically trained nursing staff in de-escalation techniques.

### IV. B. 7. a. – d.  Detoxification and Training

a. OPSO shall ensure that all staff who supervise prisoners have the knowledge, skills, and abilities to identify and respond to detoxifying prisoners.  Within 180 days of the Effective Date, OPSO shall institute an annual in-service detoxification training program for Qualified Medical and Mental Health Staff and for correctional staff.  The detoxification training program shall include:

(1) annual staff training on alcohol and drug abuse withdrawal;

(2) training of Qualified Medical and Mental Health Staff on treatment of alcohol and drug abuse conducted by the Chief Medical Officer or his or her delegate;

(3) oversight of the training of correctional staff, including booking and housing unit officers, on the policies and procedures of the detoxification unit, by the Chief Medical Officer or his or her delegate;

(4) training on drug and alcohol withdrawal by Qualified Medical and Mental Health Staff;

(5) training of Qualified Medical and Mental Health Staff in providing prisoners with timely access to a Qualified Mental Health Professional, including psychiatrists, as clinically appropriate; and

(6) training of Qualified Medical and Mental Health Staff on the use and treatment of withdrawals, where medically appropriate.

b. Provide medical screenings to determine the degree of risk for potentially life-threatening withdrawal from alcohol, benzodiazepines, and other substances, in accordance with Appendix B.

c. Ensure that the nursing staff complete assessments of prisoners in detoxification on an individualized schedule, ordered by a Qualified Medical or Mental Health Professional, as clinically appropriate, to include observations and vital signs, including blood pressure.

d. Annually, conduct a review of whether the detoxification training program has been effective in identifying concerns regarding policy, training, or the proper identification of and response to detoxifying prisoners. OPSO will document this review and provide its conclusions to the Monitor.

Finding: Partial compliance

Measure  of compliance:
1.   Document review of course outline, lesson plan, training records, and medical records.

Observations:

CCS has a training curriculum and has trained health care staff.  The CCS intake screen has clear queries regarding the risk of withdrawal. The intake screen is in use. CCS has implemented Clinical Institute Withdrawal Assessment [CIWA] and Clinical Opiate Withdrawal Scale [COWS] monitoring for patients at risk of withdrawal

CCS has developed a curriculum for training custody staff on withdrawal and detoxification.  OPSO plans to begin the training on August 17, 2015.

There is no curriculum for custody staff for recognition of urgent medical conditions.

There is no current plan for oversight of the training program.



Recommendations:

77.   Initiate annual training for custody staff on withdrawal and detoxification and provide sufficient oversight to assure compliance.

78.   Revise the OPSO intake policy to reflect adequate screening for risk of withdrawal.

79.   Develop and implement training for custody staff on recognition of urgent medical conditions.

### IV. B. 8. Medical and Mental Health Staffing

a. OPSO shall ensure that medical and mental health staffing is sufficient to provide adequate care for prisoners' serious medical and mental health needs, fulfill constitutional mandates and the terms of this Agreement, and allow for the adequate operation of the Facility, consistent with constitutional standards. b. Within 90 days of the Effective Date, OPSO shall conduct a comprehensive staffing plan and/or analysis to determine the medical and mental health staffing levels necessary to provide adequate care for prisoners' mental health needs and to carry out the requirements of this Agreement.  Upon completion of the staffing plan and/or analysis, OPSO shall provide its findings to the Monitor, SPLC, and DOJ for review.  The Monitor, SPLC, and DOJ will have 60 days to raise any objections and recommend revisions to the staffing plan.

Findings:
a.   Partial compliance
b.   Partial compliance

Observation:

CCS has been actively recruiting health professionals.  There are currently approximately 10 nursing vacancies, which is five fewer than six months ago.  The medical director position is vacant, as is the psychiatric nurse practitioner position at Hunt.

CCS and OPSO budgeted fewer primary care and psychiatry staff than the Monitors recommended.  The Monitors will reevaluate budgeted staffing in the future.

Recommendations (verbatim from Compliance Report #1):

80.   Increase professional staffing to provide sufficient access to qualified health professionals for patients with serious medical needs; increase support staffing to provide for constructive and meaningful clinical performance measurement to advise medical management of areas for intervention and to track performance in these areas over time; intensify training and



supervision of nursing staff perform their duties in a timely and professional manner.

## IV. B. 9. Risk Management

a. OPSO shall develop, implement, and maintain a system to ensure that trends and incidents involving avoidable suicides and self-injurious behavior are identified and corrected in a timely manner.  Within 90 days of the Effective Date, OPSO shall develop and implement a risk management system that identifies levels of risk for suicide and self-injurious behavior and requires intervention at the individual and system levels to prevent or minimize harm to prisoners, based on the triggers and thresholds set forth in Appendix B.

b. The risk management system shall include the following processes to supplement the mental health screening and assessment processes:  incident reporting, data collection, and data aggregation to capture sufficient information to formulate a reliable risk assessment at the individual and system levels; identification of at-risk prisoners in need of clinical treatment or assessment by the Interdisciplinary Team or the Mental Health Committee; and development and implementation of interventions that minimize and prevent harm in response to identified patterns and trends.

c. OPSO shall develop and implement an Interdisciplinary Team, which utilizes intake screening, health assessment, and triggering event information for formulating treatment plans.  The Interdisciplinary Team shall:

    (1) include the Medical and Nursing directors, one or more members of the psychiatry staff, counseling staff, social services staff, and security staff, and other members as clinical circumstances dictate;

    (2) conduct interdisciplinary treatment rounds, on a weekly basis, during which targeted patients are reviewed based upon screening and assessment factors, as well as triggering events; and

    (3) provide individualized treatment plans based, in part, on screening and assessment factors, to all mental health patients seen by various providers.

d. OPSO shall develop and implement a Mental Health Review Committee that will, on a monthly basis, review mental health statistics including, but not limited to, risk management triggers and trends at both the individual and system levels.  The Mental Health Review Committee shall:

    (1) include the Medical and Nursing Director, one or more members of the psychiatry staff and social services staff, the Health Services Administrator, the Warden of the facility housing the Acute Psychiatric Unit, and the Risk Manager.

    (2) identify at-risk patients in need of mental health case management who may require intervention from and referral to the Interdisciplinary Team, the OPSO administration, or other providers.

    (3) conduct department-wide analyses and validation of both the mental health and self-harm screening and assessment processes and tools, review the quality of screenings and assessments and the timeliness and appropriateness of care provided, and make recommendations on changes and corrective actions;

    (4) analyze individual and aggregate mental health data and identify trends and triggers that indicate risk of harm;

    (5) review data on mental health appointments, including the number of appointments and wait times before care is received; and

    (6) review policies, training, and staffing and recommend changes, supplemental training, or corrective actions.

e. OPSO shall develop and implement a Quality Improvement and Morbidity and Mortality Review Committee that will review, on at least a quarterly basis, risk management triggers and trends and quality improvement reports in order to improve care on a Jail-wide basis.

    (1) The Quality Improvement Committee shall include the Medical Director, the Director of Psychiatry, the Chief Deputy, the Risk Manager, and the Director of Training.  The Quality Improvement Committee shall review and analyze activities and conclusions of the Mental Health Review Committee and pursue Jail-wide corrective actions.

    (2) The Quality Improvement Committee shall:

        i. monitor all risk management activities of the facilities through the review of risk data, identification of individual and systemic trends,  and recommendation and monitored implementation of investigation or corrective action; and

        ii. generate reports of risk data analyzed and corrective actions taken.



f. OPSO shall review mortality and morbidity reports quarterly to determine whether the risk management system is ensuring compliance with the terms of this Agreement.  OPSO shall make recommendations regarding the risk management system or other necessary changes in policy based on this review. The review and recommendations will be documented and provided to the Monitor.

Findings:

a.       Partial Compliance
b.       Partial Compliance
c.       Partial Compliance
d.       Non-compliance
e.       Partial Compliance
f.       Partial Compliance


Observations:

Dr. Grefinger:

CCS has increased its clinical performance monitoring, especially regarding medication management and lag time to access to nurse and practitioner encounters.  Performance has improved substantially, though there is opportunity for improvement.  In the mental health arena, CCS is targeting treatment planning and monitoring for metabolic effects of psychotropic medication.

Mortality reviews are appropriately self-critical, though the reviews need to be more explicit on opportunities for improvement.  Custody staff has not been involved in the mortality reviews because of appropriate concerns about confidentiality.

CCS is currently using corporate staff for clinical performance measurement. Data are being collected, but the data analysis has been flawed and there is no documented qualitative analysis and action planning.  On-site staff is not sufficiently involved in the quality management program.

As yet, there is insufficient system level analysis of data to develop and implement interventions to minimize harm in response to identified patterns and trends.

The mental health review committee has not been composed.  There are scant data and no data analysis of clinical performance.

Dr. Patterson:

86



The chief of psychiatric services for CCS has begun the process of meeting with psychiatric providers and the intent is to invite the HSA DON warden and CQI nurse.  The full compliment of these meetings has not yet been implemented and it will be necessary for the Mental Health Review Committee to review on a monthly basis the mental health statistics at OPSO and Hunt.

Recommendations:

81.     Continue to improve tracking systems for follow-up appointments, medication orders, and laboratory testing and develop systems for documenting all care in a single, unit medical record, whether it be paper or electronic.

82.     Fully implement its corporate quality improvement program, including developing an quality management plan, measurement of clinical performance, integration of all quality improvement activities under one committee, tracking and trending of results, and annual evaluation of the program.  On-site health care leadership should become more involved in the quality management program.

83.     Continue development of the Mental Health Review Committee including the designated membership and provision of minutes of those meetings to assure they address the appropriate mental health statistics as specified in the Consent Judgment.

## V.  C.   Medical Care

OPSO shall ensure constitutionally adequate treatment of prisoners' medical needs.  OPSO shall prevent unnecessary risks to prisoners and ensure proper medication administration practices.  OPSO shall assess on an annual or more frequent basis whether the medical services at OPP comply with the Constitution.

## Executive Summary

OPSO contracted with Correct Care Solutions, Inc. (CCS) to provide medical care for inmates in OPSO custody, beginning November 1, 2014.  Eight months into their contract, CCS has documented improved performance, especially in medication management and lag times to access to care.  With recruitment of a site medical director, further training, development of tracking systems, and expanded performance measurement, the Monitors expect to see substantial improvement during the next semi-annual visit.



CCS has been hiring, training staff, and developing improved systems of care.  Since our last tour in January 2015, CCS has demonstrated improvements in several critical areas, notably leadership, medication management, lag time to accessing nursing and medical care and training.  There are substantial opportunities for continued improvement, however.  Notwithstanding the abysmal conditions in the current facilities, CCS is making progress on improving the tone, attitude, and efficiency of care.

- CCS has recruited a talented health services administrator (HSA) who, among other things, is working to improve the health care staff's sense of ownership and accountability for the provision of continuity and coordination of care for patients.  CCS should continue to focus on risk reduction, improving handoffs and developing tracking systems.

- With a new Chief of Corrections and HSA, communication between custody staff and health care staff has improved.  Among other things, this should serve to improve the availability of escorts for health care encounters and notification of health staff prior to inmates' release.

- There are several CCS leadership vacancies including the medical director.  Strong medical leadership will help the health care program at OPSO gel.

- CCS is training practitioners and nursing staff on nursing pathways and clinical guidelines, setting clear expectations for adequate care and documentation.

- Custody staff has been trained on suicide risk reduction.

    For its part, the Sheriff's Office has to reduce barriers to timely access to an appropriate level of care for inmates in its custody.

- OPSO needs an electronic medical record system for a wide variety of reasons, not the least of which are appointment scheduling, locator linkage, tracking, and performance measurement.  I recommend an EMR that is independent of the vendor so that it can survive changes in vendors.

The electronic medical record system must:

  o be compatible with local hospital systems and community medical and mental health centers;



- o have a scheduling function, with flags for prisoners with outstanding orders and appointments when they are transferred within OPSO;
- o have a flag system to let staff know what they have to do each day, e.g., tell nurse X who needs what treatment; tell Dr. Y which lab reports she needs to read and acknowledge receipt;
- o have the ability for the reviewing clinician to alert patients that laboratory results are acceptable or schedule a visit to review the results;
- o have a mechanism for a nurse to notify a doctor that she would like her to see Patient Z the next day;
   be capable of working with a new OPSO jail management system;
- o provide daily lists to custody, by housing unit, for scheduled in-house and off-site appointments;
- o provide special orders to custody staff for transport, e.g., wheelchair, oxygen, no shackles for specific disabled inmates, etc.;
- o be compatible for ICD-10 diagnostic coding; and
- o be user-friendly for all users, especially physicians.

- OPSO must provide housing for special populations, including several levels for patients with mental illness; juveniles; intellectually and/or cognitively impaired; medical infirmary, etc.  Other than Phase III, no other reasonable options have been proposed.

- OPSO staff must develop and implement  a mechanism to notify health care staff of pending discharges, so that medications can be ordered for continuity on release.

- OPSO must provide a clean and sanitary environment for housing and medical care functions, including clean sheets and disinfected mattresses for all inmates.

**Assessment Methodology**

- August 4 - 6, 2015 on-site.

- Meetings with OPSO and CCS staff, tour of OPP and the Phase II facility

Finding:        Partial compliance

Measures of compliance:
1.        Quality management documents,
2.        Inmate complaints and grievances
3.        Medical records.

Observations:



<u>Access to care</u> – access has improved measurably, though there are lags to access for some inmates.

<u>Medical recordkeeping</u> - medical records remain disorganized and difficult to review.  Because of severely limited space, the records of recently discharged inmates are sent for archival storage, making them relatively unavailable for continuity of care and for clinical performance measurement.

There is no easy mechanism for amalgamating older medical records into the medical records of recently booked inmates.  This makes it difficult to provide continuity and coordination of care.

OPSO needs an electronic medical record that can survive changes in vendors.  Among other things, it needs to communicate with the jail management system for locator functions and the diagnostic laboratory.  Further, it should have a scheduling system and tracking system to be used for patient care and clinical performance measurement.

Each person should have a retrievable medical record, filed by person and not by booking.  Medical records should be filed by a personal identifier that remains with the person.

<u>Utilization management</u> – the CCS utilization management program is reasonable and based on commonly accepted precepts of resource management.

<u>Medication management</u>—there has been measurable improvement in medication management.  The lag time from prescription to first dose has decreased and there are fewer interruptions in continuity of medication.  Missed doses remain a problem.

<u>Continuity on release</u> - OPSO is not notifying CCS staff of impending discharges.  As a result, departing inmates are not getting medication.  CCS' plan is to provide a prepaid electronic prescription for seven days of medication, to be filled in a neighborhood pharmacy.  Though the Order requires actual provision of a seven-day supply of medication, a prepaid seven-day supply, with printed instructions, is equivalent and easier to manage.



<u>Continuity on transfer</u> - CCS is preparing transfer summaries to and from the Hunt facility and whenever necessary otherwise. The summaries are limited to diagnosis and medications.

<u>IPC design</u> - We toured the yet-to-be-opened Intake Processing Center. There is a notable lack of privacy for the medical and mental health intake process and an awkward bank-teller like window for taking vital signs. The distance between the nurse and the patient is too far to measure vital signs.

<u>New Jail housing</u> - There is no provision for housing patients with special needs, both medical and psychiatric, in the Phase II facility.

<u>Grievance Process</u> - The grievance process is timelier and somewhat more responsive, though CCS has yet to analyze data for the purpose of problem identification and implementation of remedies.

<u>Co-Pays</u> - OPSO has changed its practice for copayments. Inmates are now only charged for actual encounters, not for filing requests for care.

<u>Recommendations:</u>

84.  Provide medical care facilities that are clean, safe, and secure.

85.  Provide clean linens for inmates and disinfection of mattresses between users.

86.  Arrange for professional language interpretation services so as to provide confidentiality of medical information, *tracking usage and evaluating performance of these services.*

87.  Monitor timely access to care for patients with acute health care needs and for patients who need continuity of care and/or medications.

88.  Review and respond to grievances with a self-critical attitude and should track and trend health service grievances as part of its quality management program.

89.  Assure that co-payments are charged for actual visits, not intended visits.

90.  OPSO must revisit the design of the medical and mental health intake areas in the IPC in concert with health care providers, to provide easy flow and appropriate privacy.



91.     Develop and maintain an electronic medical record system that has

elements described in the executive summary portion of this report.

## IV. C. 1. Quality Management of Medication Administration

a. Within 120 days of the Effective Date, ensure that medical and mental health staff are trained on proper medication administration practices, including appropriately labeling containers and contemporaneously recording medication administration.

b. Ensure that physicians provide a systematic review of the use of medication to ensure that each prisoner's prescribed regimen continues to be appropriate and effective for his or her condition.

c. Maintain medication administration protocols that provide adequate direction on how to take medications, describe the names of the medications, how frequently to take medications, and identify how prisoners taking such medications are monitored; and

d. Maintain medication administration protocols that prevent misuse, overdose, theft, or violence related to medication.

Findings: Partial compliance

Measures of compliance:
1.  Quality management documents
2.  Inmate complaints and grievances
3.  Medical records.

Observations:

Nurses have been trained on medication administration and documentation. CCS has been measuring performance on a quarterly basis.

Recommendations:

92.     Continue to monitor the effectiveness of the medication administration

program, including time lag to first dose, management of serial non-

adherence, and missed doses.

93.     Communicate impending discharges to CCS so that a prescription for

medication can be prepared and delivered to the inmate.

## IV. C. 2. Health Care Delivered

a. Provide the Monitor a periodic report on health care at the Facility.  These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement.  Each report will include:

(1)  number of prisoners transferred to the emergency room for medical treatment related to medication errors;

(2)  number of prisoners taken to the infirmary for non-emergency treatment related to medication errors;

(3)  number of prisoners prescribed psychotropic medications;

(4)  number of prisoners prescribed "keep on person" medications; and

occurrences of medication variances.

b. Review the periodic health care delivery reports to determine whether the medication administration protocols and requirements of this Agreement are followed.  OPSO shall make recommendations regarding



the medication administration process, or other necessary changes in policy, based on this review.  The review and recommendations will be documented and provided to the Monitor.

Findings: Partial compliance

Measures of compliance:
1.       Reports on numbers, as specified in the Consent Judgment.
2.       Reports on clinical performance, with discussion of problem identification and remedies.

Observations:

CCS is reporting on staffing, clinical activity, and clinical performance.  This is a significant improvement.  Staff has been trained in medication administration.  Clinicians now have a checklist for chronic care that includes reminders for medication renewal, housing accommodations, and return visits.  Appropriate medication protocols are in place.

OPSO has a high rate of referrals to the hospital emergency department.  Approximately 40% of the visits are for trauma and 10% for signs and symptoms consistent with withdrawal from alcohol and other substances.

OPSO oversight has been limited to regurgitated administrative reports and delineation of liquidated damages.  There is no documentation of clinical oversight yet.

Recommendations:

94.     Continue current periodic audits of clinical performance, widening the scope of measurement and improving analysis of data as part of the quality management system.  This should include analysis of grievance data.

95.     Analyze trauma-related hospital referrals for the purposes of prevention (e.g., reducing on-site injuries) and diversion to on-site primary care.

96.     Develop and maintain a method for clinical oversight to eventually replace the current role of the Court-appointed Monitor and sub-Monitors.

**IV. C. 3. Release and Transfer**
a. OPSO shall notify Qualified Medical or Mental Health staff regarding the   release of prisoners with serious medical and/or mental health needs from OPSO custody, as soon as such information is available.
b. When Qualified Medical or Mental Health staff are notified of the release of prisoners with serious medical and/or mental health needs from OPSO custody, OPSO shall provide these prisoners with at least a seven-day supply of appropriate prescription medication, unless a different amount is necessary and medically appropriate to serve as a bridge until prisoners can reasonably arrange for continuity of care in the community.



c. For all other prisoners with serious medical and/or mental health needs who are released from OPSO custody without advance notice, OPSO shall provide the prisoner a prescription for his or her medications, printed instructions regarding prescription medications, and resources indicating where prescriptions may be filled in the community.

d. For prisoners who are being transferred to another facility, OPSO shall prepare and send with a transferring prisoner, a transition summary detailing major health problems and listing current medications and dosages, as well as medication history while at the Facility. OPSO shall also supply sufficient medication for the period of transit for prisoners who are being transferred to another correctional facility or other institution, in the amount required by the receiving agency.

Finding:        Partial compliance

Measure of compliance:
1.        Interview

Observation:

OPSO has not developed a mechanism to notify qualified staff of impending releases.  As a result, bridge supplies of medication and prescriptions are not supplied for patients released to the community.  CCS is providing transfer summaries for patients going to Hunt and the LADOC, but the information provided is limited to diagnosis and medications.  Transfer summaries must also include relevant data, such as recent laboratory testing, to document level of control for patients with chronic conditions, including mental illness.

Recommendations:

97.        Develop and implement a mechanism to notify qualified health care staff of impending releases so as to provide bridge supplies of medication and prescriptions, as medically appropriate.

98.        Enhance the data provided on transfer to enable receiving facilities to know more about patients' level of control of chronic conditions.



## D.      Sanitation and Environmental Conditions

## Executive Summary

Significant progress is noted since Compliance Report #3 toward meeting the provisions of the Consent Judgment in the areas of sanitation, environmental conditions, food service, and fire and life safety.[37] This report provides an assessment of compliance with the Consent Judgment based on the pre-tour documentation provided by the OPSO, as well as meetings, facility tours, observations, and interviews conducted during the tour. The Monitor assessed progress in the development of policies and procedures, training, inspections, implementation of contracts improvement in sanitation, the maintenance work order system and staffing as they relate to fire, life safety and environmental health. The Monitor was on site for four days, August 3-6, 2015.[38]

OPSO needs to immediately determine where, when and how inmate laundry services will be provided.  Currently male inmates' uniforms, linens, and inmates' non-issued personal laundry is cleaned in equipment housed at the House of Detention (HOD), the abandoned jail, which is owned by the City of New Orleans and could be demolished at any time.  The laundry at Conchetta (CTA) will be closed when the inmates are moved to the new jail.  Inmates' non-issued personal laundry is planned to be done on each tier at the new jail.[39]

The Monitor toured the new jail.   There are physical plant finishes that need to be completed and/or noted as part of the "punch list" activities for the building.[40]  Policies for

---

[37] Fourteen (14) provisions of the twenty-one (21) paragraphs addressing Fire and Life Safety, Sanitation and Environmental Conditions, Environmental Control, and Food Service are now in partial compliance.

[38] The key staff and contractors interviewed during the tour: Sheriff Marlin N. Gusman, Carmen DeSadier, Chief of Corrections, Col. Melvin Howard, Kitchen/Warehouse, Lt. Tyrone Sutherland, Kitchen/Warehouse, Major Wayne Watzke, Kitchen/Warehouse Robert Martin, Dir. of Facilities Mgt., Jamie Lampard, Fire Safety Officer, Capt. Sidney Holt, Transition Team Leader, Jerry Green, Sanitarian, Terrance Richard, inspector, Michael Moore, Capt. Washington, Warden TP5, Capt. Ruiz, Warden OPP, Major Winfield, Watch Commander Conchetta,  Sgt. Rickson, Transition Team, Deputy Walker, Transition Team, Blake Accuri, OPSO Counsel, Eric Foley Plaintiff's attorney representing the MacArthur Justice Center, Richard Analia, Aramark Food Services Director, OPSO, Glenn Hamlett, Aramark District Manager, Victor Contreras Service Manager for Orkin, and Ronald Mathieu, Service Representative, Orkin.

[39] See the Introduction of this report regarding OPSO's plans to "outsource" inmate laundry services.  The information was not provided in August that permitted the Monitors to evaluate this strategy.

[40] For example [and not an inclusive list]: The sinks located in the re-therm kitchens are not sealed to the diamond plate wall coverings along the top and both sides. This needs to be sealed using appropriate trim plates and sealed with a food grade sealant that is no wider than ¼ inch to prevent water and debris from



operating the tier laundries, food service re-therm kitchen, sanitation, maintenance, pest control, biohazardous waste, biohazardous spill response; chemical control, tool control, emergency keys, fire safety, and evacuation plans, life safety inspections, and training for these policies have not been provided for review.  No laundry, meal, or sanitation schedules were provided.

### D. 1.  Sanitation and Environmental Conditions

**IV. D. 1. a.** OPSO shall provide oversight and supervision of routine cleaning of housing units, showers, and medical areas.  Such oversight and supervision will include meaningful inspection processes and documentation, as well as establish routine cleaning requirements for toilets, showers, and housing units to be documented at least once a week but to occur more frequently.

Finding: Non-Compliance

Measures of Compliance:
1.  Written policies and procedures for cleaning and disinfecting, monitoring process with responsibility and accountability assigned developed in collaboration with Monitors.
2.  List of controlled inventory of acceptable cleaning and disinfecting chemicals.
3.  Development and implementation of an effective weekly [or more frequently] auditing process with assigned responsibility and accountability and documentation.
4.  Monitors' onsite verification of implementation of both the policy(s) and the auditing process and report, along with corrective action when non-conformities to the policy/procedures are documented.
5.  Observation of conditions along with interviews with inmates and staff.

Observations:

There is no change in OPSO's compliance from Compliance Report # 3.  OPSO recently hired both a Registered Sanitarian and an inspector who will be assigned "all sanitation responsibilities including chemical control" according to correspondence received from OPSO's Compliance Officer.  The sanitation policy that includes the procedures and schedule for all facilities is not completed.  While touring housing tiers at existing TPV, Conchetta, and OPP, the Monitor observed that cells and dayrooms continued to be cluttered.  Shower and toilet areas were not clean.  Most showers had an accumulation of dried soap residue and walls and ceilings that may not be capable of being cleaned because of rusted surfaces and broken tiles.  Maintaining cleanliness apparently continues to be a low priority for

collecting on the wall behind the sink.   It is also important that the lighting fixtures on the mezzanine-level cells be secure as inmates have easy access to them from the upper bunks.



housing unit officers as there is no policy or directive that establishes responsibility, standards, or accountability.

OPSO documentation dated July 24, 2015, indicated that "Sanitation inspections are performed daily and reports are completed." However, no reports were provided for review prior to the tour. Further the correspondence states that "Facility Wardens have also been charged with the responsibility of cleaning, inspection and audits for their respective facilities."

The Monitor continues to recommend that OPSO immediately identify and mandate cleanliness standards in all facilities to establish staff and inmate expectations of acceptability, along with training. If these activities are not undertaken, the sanitation in the new jail may not change from that in the existing facilities.

Recommendations:

99. OPSO must provide adequate laundry services for inmates – inmates' personal laundry, linens, uniforms, etc.

100. OPSO must immediately identify the officer(s) responsibility and accountability for cleanliness and sanitation in all existing housing units during the interim time as the policy, schedule and plan is being developed.

101. OPSO must immediately complete the policy regarding Housekeeping Procedures and Inspection Policy 1101.1. The policy must include a facility specific housekeeping plan and cleaning schedule and provides for regular inspections in accordance with this provision.

102. OPSO must immediately develop and conduct training on sanitation procedures and chemical safety to employees and inmate workers who are assigned cleaning responsibilities, including deputies required to supervise and/or inspect against the policy and procedure to assure cleaning and disinfection is completed effectively and as scheduled.

**IV. D .1. b.**
OPSO shall continue the preventive maintenance plan to respond to routine and emergency maintenance needs, including ensuring that showers, toilets, and sink units are adequately installed and maintained. Work orders will be submitted within 48 hours of identified deficiencies, or within 24 hours in the case of emergency maintenance needs.



Findings: Partial Compliance

Measures of Compliance:
1.    Review of the preventative maintenance plan to determine who has responsibility to file work orders.
2.    Evidence of meeting the timelines for submission of work orders.
3.    Evidence of training of those assigned the responsibility to file work orders.
4.    Observation of practice and conditions.
5.    Work orders, invoices, and purchases in support of the preventive maintenance plan.

Observations:

OPSO has no written policy and procedures for General and Preventative Maintenance.  OPSO uses the maintenance work order system, "Facility Dude." Officers from each facility, who are designated by the Warden, completed a two-hour training program educating them on how to enter work order requests into the system. OPSO provided copies of the sign-in sheets for the training.   While visiting several housing tiers in each facility when the Monitor asked officers if they submitted a work order request for a specific issue; the response was always "yes." However, there is no mechanism for the housing unit officer to demonstrate that he/she submitted the work order.  As a result of deputies not being able to know if a work order was submitted by peers, or learn the status of work order he/she submitted, duplicate work order requests are submitted.  The Monitor suggests that OPSO develop a system that tracks the hard copies of work orders, and communicate with the housing unit deputies.

Recommendation:

103.    Develop and implement written policies and procedures governing the provisions of this paragraph.  These policies and procedures may include, but are not limited to:

   a.  Train employees to file timely work orders meeting the 24-and-48 hour requirement of this provision.

   b.  Maintain a facility specific tracking system for pending work orders by type to document needs for effective resource allocation for specific trades.

   c.  Establish an maintenance/repair inventory to assure an available supply of regularly needed parts for repairs such belts, fans, and motors for



HVAC equipment; plumbing parts such as shower heads, valves, and faucets; and common electrical parts including electrical panels, lights to more efficiently handle routine maintenance repairs.

IV.        D. 1. c.
OPSO shall maintain adequate ventilation throughout OPSO facilities to ensure that prisoners receive adequate air flow and reasonable levels of heating and cooling.  Maintenance staff shall review and assess compliance with this requirement, as necessary, but no less than twice annually.

Findings: Partial compliance

Measures of Compliance:
1.    Written policy and procedure specifying the process of how adequacy of ventilation will be measured in accordance with the mechanical code adopted by the applicable state or local jurisdiction.
2.    Evidence of a contract with a qualified/licensed mechanical contractor to demonstrate that the ventilation system complies with the International Mechanical Code in effect in Louisiana.
3.    Reports from vendor regarding the ventilation system, air flow, etc.


Observations:

Air balance reports are documented for the Kitchen Warehouse completed in May, 2014; and for the Temporary Detention Center in February, 2012.  OPSO's Director of Facilities Maintenance stated in the pre-tour report that:  "There have been no updated air balance reports for OPSO jail facilities since December 1, 2015."

Because OPSO will no longer use TPV, OPP, Conchetta, or the Tents after the move to the new jail, other than changing filters and cleaning coils semi-annually or annually and cleaning return air grills and dampers frequently, OPSO is not performing other activities/maintenance to assure adequate air flow and reasonable levels of heating and cooling. There were no ventilation reports provided for the Intake Processing Center.

Recommendation:

104.    Develop and implement a written policy and procedure containing the requirements of this paragraph, which includes, but is not limited to:

a.   Implement  a system to measure and assure adequate ventilation.

b.   Document that the HVAC systems provide appropriate air flow,



heating and cooling for each OPSO building that will house inmates through testing, inspection and appropriate repairs.

c. Complete an air balance report for each building when there are changes to the HVAC equipment or building renovations.

d. Include a vent grill inspection item on the sanitation inspections form for housing units.

e. Train staff and inmate workers, as necessary to implement the provisions.

f. Contract with an appropriate vendor to inspect and document the conditions required by this provision.

**IV.D.1.d.**
OPSO shall ensure adequate lighting in all prisoner housing units and prompt replacement and repair of malfunctioning lighting fixtures in living areas within five days, unless the item must be specifically ordered.

Findings: Non-compliance

Measures of Compliance:
1.      Written policy and procedures.  Assurance that facility policy complies with the provision.
2.      Maintenance of pending work order list showing the purchase order for pending work order regarding lighting fixtures.  Review of work order lists.
3.      Visual observation conditions.

Observations:

There is no change in compliance from the previous Reports.   OPSO reports it continues to have difficulty hiring electricians.  OPSO did not provide any documentation to support that lighting and light fixture replacement times meets this provision.  The Maintenance Director reports that inmates continue to destroy lights within hours after they are repaired, particularly in OPP.  No incident or inspection reports were provided to support the Director's observations.[41] The Monitor did not evaluate if work orders had been submitted to address these deficiencies.

Recommendations:

---

[41] Conditions observed by the Monitor [not a exhaustive identification of deficiencies] in the existing facilities are unsafe, for example: While touring OPP, the Monitor observed an area within B-1 has no functioning lights in the rear of the corridor and in several cells. Four lights in cells of 2-1 of Conchetta were also not functioning, nor were there lights in the janitor's closet on the first floor.  There were exposed electrical wires hanging from the ceilings along A-1 specifically in cells 1-L, 1-R, and 3-R and the dayroom.



105. Develop and implement a written policy and procedure addressing the repair time provision of this paragraph and hire the appropriate number of electricians (or contracts) to assure timeliness of repairs.

106. Assure appropriate staffing of electricians to assure that the provision is met.

IV.      D. 1. e.
OPSO shall ensure adequate pest control throughout the housing units, including routine pest control spraying on at least a quarterly basis and additional spraying as needed.

Findings: Partial Compliance

Measures of Compliance:
1. Written policy and procedures.
2. Copy of valid contract for integrated pest control services with a licensed pest control contractor.
3. Map showing the location of all bait and trap stations both internally and externally.
4. Copies of pest control reports provided by the licensed pest control operator showing areas of concern, recommendations for corrective actions needed to be taken by sanitation and maintenance.
5. Evidence of corrective action taken for recommendations provided by the licensed pest control contractor.
6. Evidence of a pest control log where deputies can log sighting of pest showing date, time, location, and type of pest.
7. Visual observation of pest activity and inmate interviews.
8. Inmate grievances regarding sanitation and maintenance.

Observations:

OPSO contracts with a private pest control contractor to provide services for all facilities housing inmates and the kitchen/warehouse.  The Director of Facilities Management is responsible for overseeing this contract.  With the hiring of a Sanitarian, it may be more effective to designate the Sanitarian to provide oversight of the contract.[42] It is the Monitor's view that more aggressive OPSO oversight of the contract by a qualified person is essential.

---

[42] While touring facilities inmates complained of rodents and cockroaches particularly in the Tents.  The Monitor observed very few rodent traps around the outside perimeter of OPP, TPV, and the Tents.  There was only one rodent trap on the outside of each Tent.  During a meeting with the pest control contractor, OPSO staff and the Monitor, the vendor indicated that they have not completed any pest assessments for any of the facilities within OPSO, nor is there any documentation demonstrating the internal or external locations of all bait stations or traps. The vendor stated there are very few glue traps to even track pest activity.  The contractor agreed to provide a facility assessment within one week of the tour and also establish a more effective system for documenting pest activity and providing trending information to OPSO.  While the vendor's pest control reports show little pest activity, the contractor stated that the monthly visits have not been thorough.



Before this provision will be in full compliance a policy(ies), the facility sanitation plan, and the inmate handbook, must clearly designate what items inmates are permitted to maintain in their cells/housing unit, how much and where any commissary food is to be stored, and how long inmates are permitted to retain food from meal service (if at all). The sanitation plan must include the schedule for removing trash and garbage.

Recommendations:

107.   Complete the development of the sanitation policies, procedures and the inmate handbook to establish inmate expected practices that prevent and eliminate food and harborage for insect and rodents. Provide training.

108.   Evaluate the pest control contract and reports regularly to include:

a.   Assure that the pest control contractor is meeting all the terms of the contract to assure their work meets the requirements of this paragraph;

b.   Assure that service reports from the contractor are legible;

c.   Assure contractor is providing accurate and timely trend reports;

d.   Establish a process for officer and inmates to document pest activity within each facility;

e.   Review each pest control reports and assure that all recommendations are followed to prevent pest infestations and complaints; and

f.   Assure effective OPSO oversight of the contract.

IV. D. 1. f.
OPSO shall ensure that any prisoner or staff assigned to clean a biohazardous area is properly trained in universal precautions, outfitted with protective materials, and properly supervised. See also Paragraph 16., Stipulated Agreement of February 11, 2015.

Findings: Non-compliance

Measures of Compliance:
1.   Written policy and procedures.
2.   Development and implementation of a training syllabus for blood borne pathogens. Qualifications of the trainer(s).
3.   Documented list of deputies and inmates trained in blood borne pathogens.
4.   Development and implementation of a biohazardous waste policy and procedures for effective and safe clean-up of any spills.
5.   Maintenance of a supply of biohazardous spill kits including personal protection items



including, but limited to eye shield, mask, gloves, gown with cap, CPR barrier, towelettes, absorbent powder, scraper, scoop bag, and biohazard bag.

6. Observation and demonstration of knowledge by staff and trained inmates.
7. Inmate interviews, inmate grievances.
8. Medical policy and procedures.

Observations:

There is no change in compliance from Report # 3.  OPSO does not have written policies and procedures governing the provisions of this paragraph.  Prior to this tour OPSO provided correspondence dated July 24, 2015 stating that there is no change in the type of chemicals being used to clean and disinfect biohazard spills. OPSO stated that the recently hired Sanitarian and inspector will be assigned the responsibility to address this provision. Further there is no evidence of training for staff and/or inmates who are responsible for clean-up. OPSO stated they maintain a supply of spill kits, but the Monitor did not observe any while touring.

The Stipulated Agreement (paragraph 16) of February 11, 2015 mandated OPSO to address biohazardous spills.  OPSO is in partial compliance with this provision as OPSO provided a draft housing keeping plan on August 17, 2015.[43]  The Monitor has not had the opportunity to evaluate these drafts, but acknowledge that the information was provided.

Recommendation:

109. Develop and implement written policies and procedures addressing the requirements of this paragraph and paragraph 16 of the Stipulated Agreement of February 11, 2015, including, but not limited to:

   a. Designate posts per shift who will responsible for managing blood borne pathogen and biohazardous spill cleanup.

   b. Develop a-step-by-step procedures that trained employees and/or inmates will be expected to follow in responding to these incidents,

---

[43] Stipulated Agreement of 2/11/15, paragraph 16: OPSO shall issue a memorandum to all staff that that inmates and staff assigned to clean biohazards spills/incidents must be trained on doing so, outfitted with proper equipment, and properly supervised in accordance with § IV.D.1.f of the Consent Judgment. Following receipt of the Monitors' comments, OPSO will make any necessary revisions, consult with the Monitor(s) as needed, and provide a final draft to the Plaintiffs to provide substantive comments to both OPSO and the Monitor(s). In the event that the Monitor and/or the OPSO disagree with any comments or recommendations by the Plaintiffs, the Monitor will convene a conference call for the purpose of resolving issues.  The directive will be issued in accordance with the terms specified in Item 3 of this Stipulated Order.



including the use of spill kits, personal protective equipment (skin protection, gloves, face masks, designated red bags, disinfecting chemicals etc.

c.  Train all staff and inmates required to handle bio-waste.  OSHA's blood borne Pathogens Standard, 29 CFR 1910.1030, requires that the trainer be: "knowledgeable in the subject matter covered by the elements contained in the training program."

d.  Designate the position/post responsible for oversight for these functions; document training of staff and/or inmates who are responsible for clean-ups.

**IV. D. 1. g.**
OPSO shall ensure the use of cleaning chemicals that sufficiently destroy the pathogens and organisms in biohazard spills.  See Paragraph 16, Stipulated Agreement February 11, 2015.

Findings: Non-compliance

Measures of Compliance:
1.     Written policy and procedures.
2.     Inventory of cleaning and disinfecting chemicals.
3.     Lesson plans/curriculum - evidence of effective training of deputies and inmates responsible for cleaning and disinfecting surfaces in housing and common areas.
4.     Policy and procedures an effective cleaning and disinfection policy and procedures for all facilities.
5.     Observation of effective implementation and demonstration of knowledge.
6.     Inmate interviews, inmate grievances.

Observations:

There is no change of compliance from Report # 3.  OPSO has not established written policies and procedures that specify the chemicals to be used for cleanup of biohazardous spills nor procedures that are to be followed by staff or trained inmates (if OPSO decides to use inmates for this purpose). See observations in IV.D.1.f.)  Draft documents were provided after the tour was concluded.

Recommendation:

110.   Develop and implement written policies and procedures addressing this paragraph that include, but is not limited to:

a.  Specifying the concentrations/dilution of cleaners and disinfectants to be used for clean-up from a biohazard spill.



b. Conducting OSHA required training on the safe and effective use of any hazardous chemicals used to clean and disinfect contaminated surfaces for all staff supervising sanitation and inmate workers.

c. Assuring inmates are provided properly diluted cleaning and disinfection chemicals to clean and disinfect contaminated areas.

d. Designating the position/post responsible for oversight for this function.

IV. D. 1 .h.
OPSO shall maintain an infection control plan that addresses contact, blood borne, and airborne hazards and infections. The plan shall include provisions for the identification, treatment, and control of Methicillin-Resistant Staphylococcus aureus ("MRSA") at the Facility.

Findings: Partial Compliance

Measures of Compliance:
1. Written policy and procedures for an infection control plan and policy following Center for Disease Control's recommendations.
2. Lesson plans/curriculum - evidence of training of all deputies, staff and inmates responsible for cleaning and disinfecting all medical and dental areas within OPSO.
3. Demonstration of knowledge of the policy and plan.
4. Observation.
5. Inmate interview, inmate grievances.

Observations:

Correct Care Solutions provided a copy of the infection control program. In part it requires reviewing Environmental and Safety Inspections and that:

• The Health Services Administrator (HSA) participates in facility inspections and receives copies of monthly environmental inspection reports and that information is shared at the Infection Control Committee meetings.

• Conditions identified as adversely affecting the health and safety of the inmates and/or employees will be promptly reported, and remediated as necessary

• Autoclaves are tested routinely with the use of spore counts

• Negative pressure rooms are assessed for function prior to and during use.

There was no documentation provided that any of the functions listed above have been implemented. There are no negative pressure rooms within OPSO that



medical staff can use to isolate inmates.  There has been no evidence provided that demonstrates training of OPSO staff.

<u>Recommendation:</u>

111.   Develop and implement written policies and procedures governing the provisions of this paragraph that include, but is not limited to:

    a.   Management of contact with blood borne and airborne hazards and infections

    b.   Identification, treatment, and control of Methicillin-Resistant *Staphylococcus aureus* ("MRSA") at all facilities;

    c.   Training for all affected employees on the implementation of the plan.

    d.   Assure that the CCS Infection Control policy address these specific requirements.

### V. D. 2. Environmental Control

**D. 2. a.**
OPSO shall ensure that broken or missing electrical panels are repaired within 30 days of identified deficiencies, unless the item needs to be specially ordered.

Findings: Partial Compliance

Measures of Compliance:
1.   Written policy and procedure.
2.   Evidence of implementation of the Provision in accordance with the National Electrical Code.
3.   Maintenance of pending work order list showing the purchase order for pending work order regarding electrical panels.
4.   Observation of practice.
5.   Observation of facilities' conditions.

Observations:

    As discussed in IV. D.1. b., OPSO has implemented an electronic work order management system (Facility Dude) to schedule and track all work orders, including missing electrical panels.  The general and preventative maintenance policy governing this paragraph has not been completed.  The Director of Facilities Management advised that since the previous tour, there have been no work orders entered to repair any broken or missing electrical panels.  During the tour, the



Monitor did not observe any electrical panels that appeared to need repair or replacement.

Recommendation:

112. Develop and implement written maintenance policies and procedures addressing the requirements of this paragraph including necessary training and establishing a process to assure repairs/replacement is completed within 30 days unless a longer time is necessary because of a special part order.

   a. Designate the position/post responsible for oversight for these functions.

   b. Determine the number and type of trades that needed to be hired (or contracted) for the adequate and timely maintenance of OPSO facilities that will remain open.

   c. Provide and document training.

2. b.
OPSO shall develop and implement a system for maintenance and timely repair of electrical panels, devices, and exposed electrical wires.

Findings: Non-compliance

Measures of Compliance:
1. Written policy and procedure for preventative maintenance and repairs for electrical issues.
2. Evidence that all repairs are completed in accordance with the National Electrical Code.
3. Evidence that all repairs are completed within a reasonable time to assure that inmates and staff are not exposed to hazards that could cause injury.
4. Observation of conditions.

Observations:

See Observations and recommendations for IV.D.2.a., above. Electrical repairs are scheduled when work order requests are filed. On this tour, the Monitor noted numerous broken lights, exposed wires from missing on/off switches, destroyed conduit especially in Conchetta and OPP. According to OPSO, inmates are destroying repaired conduit and light fixtures within hours of repairs, although no incident reports were provided. OPSO needs to determine the number and type of trades necessary for the maintenance of the facilities which will remain open. See above recommendation.



107

## IV. D. 3. Food Service

**IV.D.3. a.**
OPSO shall ensure that food service staff, including prisoner staff, continues to receive in-service annual training in the areas of food safety, safe food handling procedures, and proper hygiene, to reduce the risk of food contamination and food-borne illnesses.

Findings: Partial Compliance

Measures of Compliance:
1.     Written policy and procedure.
2.     Development of a training syllabus for annual training for food safety and hygiene.[2]
3.     Evidence of Food Service Manager Certification in accordance with Louisiana Retail Food Regulations.
4.     Evidence of training of food service staff and inmate workers.
5.     Demonstration of knowledge by the food service staff and inmates.
6.     Observation.
7.     Inmate interviews, inmate grievances.
8.     Health Department inspection reports.

Observations:

OPSO contracts to provide inmate meals.  OPSO provided documentation that the contractor's Director of Food Services at OPSO maintains Serv-Safe Food Manager Certification and also holds a Certified Instructor and an examination proctor.  OPSO provided copies of Serv-Safe Certificates demonstrating current certifications for eleven contractors.  Further, twenty-eight (28) OPSO staff assigned to either the kitchen/warehouse and/or the facilities' re-therm kitchens have completed a basic Serv-Safe food handler training course including successful completion of a written test as evidence of 2015 annual training requirements. Inmate workers assigned to the kitchen are required to complete safety and hygiene classes prior to working in the kitchen.  The contractor provided copies of the Inmate Orientation Handbook for thirty-nine (39) inmate workers who signed documents that they understand the general rules for inmates (basic hygiene), the inmate job description, and the worker safety rules demonstrating inmate attendance for 2015 training. When inmates are assigned specific responsibilities, inmates receive on-the-job training for their assignment.  The contractor provided course outlines and a quarterly schedule for training topics for the second quarter of 2015.



Recommendation:

113.   The food service contractor, under the direction of an OPSO designated post/position, needs to develop and implement a documented tracking system that identifies the training topic completed including dates of completion to assure that staff and inmates receives annual training.

IV. D. 3. b.
OPSO shall ensure that dishes and utensils, food preparation and storage areas, and vehicles and containers used to transport food are appropriately cleaned and sanitized on a daily basis.

Findings: Partial Compliance

Measures of Compliance:
1.   Written policy and procedure for the cleaning and sanitization of all food service equipment following the equipment manufacturer's specified cleaning instructions.
2.   Maintenance of a documented cleaning schedule for equipment and areas including kitchens, storage areas, ware washing, refrigerators and freezers with assigned responsibility for oversight.
3.   Visual evidence of effective cleaning and interviews with staff and inmates on cleaning procedures
4.   Evidence of a cleaning log for all equipment and observation of practice meeting the policy/procedures.
5.   Inmate worker interviews.
6.   Health Department inspection reports.

Observations:

OPSO contracts for inmate food service.  OPSO has no written policy pertaining to food service, other than the vendor contract, and the written list of contractor/OPSO responsibilities/authority document that was agreed to by the Contractor on March 25, 2015.   An OPSO policy must be developed to govern kitchen operations including incorporation of the principles in the March 25th document.

The Monitor reviewed forms:  "Daily Kitchen Inspection", Satellite Kitchen Inspection", and a "Vehicle Inspection Sheet".  OPSO indicated these forms had recently been implemented; however, there is not a written policy that governs the purpose of the forms and the criteria for completion.  Also there were not a sufficient number of completed inspections to permit the Monitor to assess whether the forms will be a beneficial to document the requirements of this provision.  Just having the forms without a policy and procedure that establishes the schedule for



the inspections, how deficiencies are addressed, and who has the responsibility to complete the inspections provides no assurance of sustainability.

<u>Recommendation:</u>

114.   Develop and implement a food service policies and procedures addressing this paragraph including but not limited to:

a.   Establishing requirements for cleaning and sanitization and a schedule and plan for each area and specific equipment, and include what is to be cleaned, how it is to be cleaned (following the equipment manufacturer's instructions from the operations manual), who is responsible for the cleaning, (if an inmate, who supervises him/her needs to be identified), and the frequency of the cleaning.  The completion of the cleaning must be documented on the sanitation log documenting the initials of the person who completed the cleaning .  The logs need to be reviewed by an OPSO Food Services Kitchen Supervisor or Director for completion and maintained in the OPSO Director's office.

b.   As a best practice, it recommended that OPSO establish at least weekly documented inspections by a qualified inspector who is independent of the food service contractor to identify any contract non-compliance.  A written corrective action process must be required for areas of non-compliance that includes retraining of employees or inmates, required maintenance repairs, safe food handling, personal hygiene, etc.

c.   Designate the position/post responsible for oversight for these functions.

IV.D.3.c.
OPSO shall check and record on a daily basis the temperatures in the refrigerators, coolers, walk-in refrigerators, the dishwasher water, and all other kitchen equipment with a temperature Monitors, to ensure proper maintenance of food service equipment.

Findings: Partial Compliance

Measures of Compliance:
1.     Written policy and procedures for measuring and recording temperatures of all refrigerators, freezers, hot food holding equipment, wash and rinse temperatures of ware washing equipment, in accordance with the Louisiana Food Regulations.
2.     Development and implementation of temperature logs demonstrating effective measurements as required in this provision and/or the Louisiana Food Regulations.
3.     Review of logs and direct observations of measurements being taken and recorded.
4.     Observation of conditions.



Observations:

OPSO has no policy that incorporates the requirements of this provision. Prior to the tour OPSO provided copies of temperature logs for recording wash, rinse and final sanitizing rinse temperature for the "pot shack" dated from January 1-14, 2015.   OPSO also provided copies of the OPSO kitchen officer's completed daily "Cooler Temperature Log" from January 1, - July 2, 2015, and the corresponding contractor's temperature logs for all refrigerators and freezers. The Monitor reviewed corresponding data from both logs and noted no variations in temperatures as measured by OPSO and the contractor  No documentation was provided that demonstrates that the refrigerators located in the re-therm kitchen of each facility were being inspected for appropriate safe food temperatures.[44]

Recommendation:

115.   OPSO needs to develop and implement a food service policy addressing this paragraph including, but not limited to:

   a.   Identifying all refrigerators, freezers, hot and cold food holding equipment, and ware washing equipment located in all facilities.

   b.   Scheduling the frequency that temperatures are measured and recorded in accordance with the Louisiana food safety regulations.

   c.   Requiring a trained OPSO supervisor to review temperatures logs daily, and assure that work orders are submitted when inspections indicate equipment that is not operating as designed.

   d.   Training employees in temperature recording and review process for cold potentially hazardous food.

   e.   Developing temperature logs for all equipment where food is held including facility re-therm kitchens and where kitchenware and utensils are cleaned, including a record retention schedule.

---

[44] For example, the policy and operational practice must  specify refrigerator temperatures display showed a digital thermostat set temperature of 33° F. The Monitor measured the internal temperatures and found the temperatures to be between 48°F and 54°F.  Refrigerated potentially hazardous food need to be maintained at 41°F or below.



f. Establishing OPSO food service policy for safe food temperature monitoring to include corrective action procedures when issues are found.

g. Designating the position/post responsible for oversight for these functions.

## IV. D. 4. Sanitation and Environmental Conditions Reporting

D. 4. a. (1) – (7)
OPSO shall provide the Monitors a periodic report on sanitation and environmental conditions in the Facility. These periodic reports shall be provided to the Monitors within four months of Effective Date; and every six months thereafter until termination of this Agreement.  The report will include:
   (1) Number and type of violations reported by health and sanitation inspectors;
   (2) Number and type of violations of state standards;
   (3) Number of prisoner grievances filed regarding the environmental conditions at the Facility.
   (4) Number of inoperative plumbing fixtures, light fixtures, HVAC systems, fire protection systems, and security systems that have not been repaired with 30 days of discovery;
   (5) Number of prisoner-occupied areas with significant vandalism, broken furnishings, or excessive clutter;
   (6) Occurrences of insects and rodents in the housing units and dining halls; and
   (7) Occurrences of poor air circulation in housing units.

Findings: Partial Compliance

   Measures of Compliance:
   1.      Written policy and procedure governing reporting.
   2.      Evidence of written report provided as specified in the provision.

Observations:

OPSO has no written policy that will assure ongoing reporting.  The Director of Maintenance, along with the assistance of the Monitor, developed a new reporting format for Sanitation and Environmental Conditions that was used for the first six months of 2015.  Data was collected is facility specific.  Additionally OPSO provided copies of all regulatory inspections from the local health department that documented the detail of the violations.  Work order requests were completed for the deficiencies  identified.  Based on this first set of reporting data, for example, the data called into question the comprehensiveness of the pest control reporting and servicing of OPSO facilities by the contractor.[45]  As more data are available, the reporting format will need to be revised to capture information useful to OPSO

---

[45] More detail can be found in the pest control provision IV.D.1.e.



management to use in modifying policies, training, implementation issues, and inspections.  The forms are inadequate without a governing policy/procedure.

Recommendation:

116.   Develop and implement written policies and procedures addressing this paragraph including, but not limited to assuring that the tracking mechanisms are in place to record the required information.  Such documentation may include health department reports, pest control reports, preventive maintenance work order system reports, inmate grievance logs, and maintenance logs.

a.   Designate the position/post responsible for oversight for these functions.

D. 4. b.
Review the periodic sanitation and environmental conditions reports to determine whether the prisoner grievances and violations reported by health, sanitation, or state inspectors are addressed, ensuring that the requirements of this Agreement are met.  OPSO shall make recommendations regarding the sanitation and environmental conditions, or other necessary changes in policy, based on this review.  The review and recommendations will be documented and provided to the Monitors.

Findings:  Non-compliance

Measures of Compliance:
1.   Written policy and procedure governing reporting on environmental conditions.
2.   Evidence of a review of the sanitation and environmental conditions report by staff responsible for implementing policies and procedures for food service, blood borne pathogens, chemical control, sanitation, and preventive maintenance.
3.   Evidence of written audits of the facilities.
4.   Evidence of command staff review.  Determination by OPSO that the implemented policies and procedures are effective to address the provisions of this Agreement.
5.   Evidence of effective Corrective Actions are taken to address non-conformities identified during the review process.
6.   Changes to policy, training curriculum, etc. resulting from these reviews.

Observations:

There is no change in compliance since Report # 3.  There is no policy or process governing the elements of this paragraph.

Recommendation:

117.   Develop and implement written policies and procedures addressing this paragraph including, but not limited to using the data from IV. D. 4.a. (1)-(7)



document trends and develop management responses to address provisions of the Consent Judgment.

    a.   Designate the position/post responsible for oversight for these functions.

## IV. E. Fire and Life Safety

IV. E. 1. a.
OPSO shall ensure that necessary fire and life safety equipment is properly maintained and inspected at least quarterly.  These inspections must be documented.

Findings: Partial compliance

Measures of Compliance:
1.    Written policy and procedure governing the procedures and staff responsibility and accountability assigned for a minimum of quarterly inspections, repair and/or replacement of all fire and life safety equipment, included in the controlled document inventory.
2.    Inspections shall be completed by competent fire inspector having at a minimum successfully passed "Fire Inspector II" training and examination in accordance with NFPA 1031, Professional Inspector Level II Qualifications and all requirements of the Office of the Louisiana State Fire Marshall.
3.    Development and maintenance of a complete inventory of all fire and life safety equipment for each facility.  The list needs to include, but not limited to sprinkler heads, fire alarm pull boxes, smoke detectors, fire suppression systems, fire extinguishers, defibrillators, SCBA equipment and etc.
4.    Annual master calendar for all internal and external inspection of all fire and life safety system equipment.
5.    Development of a facility specific audit form that demonstrates the date of completion of inspection, identification of all non-conforming equipment, along with a corrective action report form that can demonstrate that effective corrective action was taken for all non-conformities.
6.    Lesson plans/curriculum for staff assigned as auditors/inspectors.
7.    Execution of contract with a qualified contractor to perform the inspections specified in this provision.
8.    Evidence of a completed, signed, and supervisory review of all inspection and testing reports, along with documented corrective actions taken to resolve identify issue on non-conformance.
9.    Fire Department inspection reports.
10.    Interview with Fire Department officials.

Observations:

       The policy governing Fire Safety and Evacuation has not yet been completed. OPSO's Fire Safety Officer provided a copy of the first and second quarter fire safety inspections for TPV, TDC, Tents, Intake Processing Center, Conchetta, McDaniel Work Release Center, and OPP.  The reports document the name of the individual who is assigned to correct the violations (either a private contractor or Facilities Management).  These inspection forms need to be included as appendices to the Fire



Safety Inspection Policy to assure that the form is a controlled document that can be revised as part of a policy review.

The Consent Judgment requires quarterly inspections of all "necessary fire and life safety equipment is properly maintained and inspected at least quarterly." Until policies are developed with assigned responsibility for oversight, the provision will not be in compliance with the provision.[46]

OPSO provided copies of the annual fire safety systems for the fire alarm panel, smoke detectors, control valves, and fire pump test. At OPP the fire alarm system was vandalized by inmates who removed and destroyed the conduit and wiring for the smoke detectors. OPSO did not provide a copy of any incident reports regarding inmate damage. The conduit and wiring have been replaced and the system is being reprogrammed at the time of the tour. The Monitor observed that the fire alarm and sprinkler system are showing "normal". The annual inspection was scheduled for the week of July 27, 2015. The Monitor did no receive a copy of the report.[47]

The fire safety and the ventilation hood inspection of the Kitchen/Warehouse was completed in September 2014 and is next scheduled for September 2015. When

---

[46] The existing OPSO Policy 701.2 Fire Prevention Regulations; Annual Testing of Equipment dated June 6, 2008, last reviewed October 10, 2009, requires a quarterly inspection of fire equipment inspection and testing including fire sprinkler/suppression systems. The title of this directive is misleading. The policy requires that the Director of Maintenance shall, "upon notification that substandard conditions exist regarding fire-fighting equipment," take appropriate measures to correct substandard conditions and that inspection reports shall be kept on file with the Director of Maintenance. The existing policy does not include any list of what equipment is included in the inspection and testing such as SCBA, sprinkler systems, fire alarms, fire extinguishers, smoke detectors, generators, hydrants, etc.

[47] Regarding currently operating facilities scheduled to be closed: At Templeman V, the automatic sprinkler system received a new Fire Pump. It was tested on July 6, 2015 and was issued a "green tag" demonstrating compliance. The annual inspection of the automatic sprinkler system and fire pump was completed on July 6, 2015 along with a completed a water flow test for the Intake Processing Center, Kitchen/Warehouse, TDC, and Conchetta. At the Intake Processing Center and the Kitchen Warehouse where violations were identified, OPSO Fire Safety Officer demonstrated corrective action was completed and the inspector had issued approval. The quarterly report of fire and life safety for the second quarter identified, as did the first quarter report that the fire alarm system at the Tents continues to inoperable. A "fire watch" continues to be in effect until the facility is vacated. On this tour the Monitor did not assess the fire watch documentation. At Conchetta the annual fire alarm inspection is scheduled for the week of July 28, 2015 and the report was provided subsequent to the tour. The system received a "green" tag signifying approval.



the OPSO policy is completed and the Monitor can verify all the requirements for the provision are met, this paragraph will be in compliance.

The copies of all warranties for the new facility's fire safety equipment need to be obtained from the construction company, reviewed, and catalogued for future reference, training and accountability.  OPSO employees need refrain from taking any actions (e.g. repairs, inspections) that would violate the warranties. Additionally, OPSO needs to assure that maintenance contracts are in place BEFORE the warranties end.  Otherwise there is a risk that the equipment will not be serviced properly.

<u>Recommendation:</u>

118.    Review and revise Policy 701.2 to include a building-specific list of all equipment to be inspected in the quarterly inspection/testing of fire and life safety equipment. The revisions include, but are not limited to:

     a.    The posts and/or positions having responsibility to assure the testing is completed.

     b.    An inventory, by building, of the location and types of fire extinguishers.

     c.    Review the Louisiana Fire Code to determine the inspection frequency requirement for fire extinguishers for commercial buildings.

     d.    Assure the new jail has received an inspection required by state law.

     e.    Designate the position/post responsible for oversight for these functions.

IV.E.1. b.
OPSO shall ensure that a qualified fire safety officer conducts a monthly inspection of the facilities for compliance with fire and life safety standards (e.g., fire escapes, sprinkler heads, smoke detectors, etc.).

Findings: Partial Compliance

Measures of Compliance:
1.    Job description/post orders, including qualifications for a fire safety officer in accordance with NFPA requirements for a "Certified Fire Inspector Level II"
2.    Written policy and procedures including evidence of attendance at any and all 3-year certification seminars for certification renewal or current license from the Office of the State Fire Marshall
3.    Also include measures 3, 4, 5, 7 of IV.E.1.a.
4.    Review and observation of completed reports and corrective actions taken.
5.    Interview with fire safety officer.

116



Observations:

Policy 701.1, Fire Inspections: last updated June 10, 2008 and reviewed October 16, 2009 requires that the OPSO's fire inspector shall conduct monthly inspections of the facilities to ensure compliance with safety and fire prevention standards and that they document corrective action taken.  These reports shall be kept on file in fire inspector's office.  The existing policy is inadequate as it does not specify the inspection criteria/parameters  to be included in the inspection such as cells, dayrooms, classrooms, chemical storerooms, offices, clinics, hallways, stairs, fire escapes, sprinkler heads, smoke detectors, fire extinguishers or ingresses and egresses and does not reflect current practice.

The existing policy does not specify the qualifications of the fire safety inspector or a facility safety officer.  OPSO Fire Safety Officer stated that current staffing levels do not allow for a safety officer position for each facility building. Policies were not provided for the Monitor's review.  Monthly facility inspections are currently completed by the OPSO Fire Safety Officer, reviewed and signed by the ranking officer of each building on duty at the time of the inspection.[48] When the revised policy is completed and the Monitor can verify all the requirements for the provision are met, it will be in compliance.

Recommendations:

119.    Either revise 701.1 or create a new OPSO policy and procedure that identifies the specific requirements for monthly inspections in accordance with the provision.

  a.    Designate the position/post responsible for oversight for these functions.

120.    Define the term "qualified fire safety officer".

IV. E. 1. c.
OPSO shall ensure that comprehensive fire drills are conducted every six months.  OPSO shall document these drills, including start and stop times and the number and location of prisoners who were moved as part of the drills.

Findings: Partial Compliance

---

[48] OPSO provided copies of the inspections for the months of January through June for Conchetta, FEMA Tents, OPP, TDC, Templeman V, McDaniels, Intake Processing Center, and the Kitchen/Warehouse.



Measures of Compliance:
1. Written policy and procedures governing staff responsibilities and accountability for conducting fire drills within each facility in accordance with the provision. The policy shall include applicable drill reports that outline at a minimum start and stop times of the drills and the number and location of inmates who were moved as part of the drills, a review process for each drill that identifies the root cause and verification of effective corrective actions as necessary for non-conformities with the fire safety and evacuation plan(s)
2. Development and implementation of fire drill audit form(s)
3. Annual schedule of drills for each facility; demonstrating rotating drills to assure all areas are drilled at a specified frequency.
4. Observation of drills and/or drill reports.
5. Evidence of collaboration with the NOFD; interview with NOFD.
6. Interviews with inmates.

Observations:

OPSO provided prior to this tour records of fire drills conducted since the January 2015 tour. There were two drill reports for McDaniel's Work Release Center (December 24, 2014 and June 1, 2015,, OPP (March 6, 2015 and July 7, 2015 at the Docks), Conchetta (December 30, 2014 and April 21, 2015), and TDC (December 11, 2014 and May 7, 2015) Intake Processing Center (December 29, 2014 and May 4, 2015). There was one drill report submitted for the Tents (March 3, 2015), and TPV (March 31, 2015).[49]   There were no fire drills completed for the Kitchen/Warehouse.

As part of the drill process, OPSO must document the outcomes, lessons learned, and recommendations – for pre-service and in-service training, for improving operational practices, and for inmate education.[50]

When the revised policy is completed and the Monitor can verify all the requirements for the provision are met, this paragraph will be in compliance, as long as the new jail's policies/procedures meet the requirements.

Recommendations:

---

[49] OPSO Policy 701.4, "Written Evacuation Plan" requires quarterly fire drills in all facilities. The accompanying procedure establishes that each facility will conduct fire/emergency drills to ensure that all personnel are capable of carrying out fire/emergency plans and procedures.  If and when it is not a threat to facility security, inmates may be included in evacuation drills."  The policy does not require a schedule to assure that all areas of each facility are drilled over a specific time period.

[50] OPSO provided copies of the sign-in sheets for 138 officers who participated in the "in-service training on "Fire Safety in Jails Re-Fresher" training conducted in February and March 2015.



121.   Review and revise Policy 701.4 Written Evacuation Plan to address the minimum requirements specified in the provision.  OPSO may conduct drills more frequently and I suggest that drills be conducted on all shifts to measure competency of staff to appropriately respond and move inmates as necessary.

   a.   Designate the position/post responsible for oversight for these functions.

122.   Assure that the new jail's policies/procedures and operations are in compliance with this paragraph.

IV.E.1. d.
OPSO shall provide competency-based training to staff on proper fire and emergency practices and procedures at least annually.

Findings: Non-compliance

Measures of Compliance:
1.   Development and implementation of a competency-based training policy for all correction staff on safe and effective use of all fire and emergency equipment, firefighting, safe evacuation.
2.   Development and implementation of a fire and emergency practices and procedures training course syllabus/outline, along with a written exam that measures the competency of the corrections staff for the fire safety and evacuation plan and establishes an acceptable passing score.
3.   Written directive regarding how OPP will identify each officer and staff who is required to receive training, the training date, name of officer/staff trained.

Observations:

There is no change in compliance from the previous Report.  OPSO Training Division provides initial training of new correction officers.  For 2015, OPSO reported that 107 new hires have received the training.  OPSO provided copies of the sign-in sheets for that training.

OPSO is considering the elimination of the SCBA units that will change the annual training.  The Fire Safety Officer will prepare a syllabus to address fire and life safety annual training provision.

Revision to the existing OPSO Policy 701.5 Training of Staff in Emergency Plans is necessary.  The current policy does not require annual training as specified in the Consent Judgment. Further it does not identify which staff needs general or

119



enhanced training, identifies the provider of the training, specifies the training content, and/or describes how post-training staff competency will be measured.

Recommendation:

123.   Revise existing written policies and procedures to address this paragraph including but not limited to:

    a.   Assuring that the Fire Emergency Class for all jail staff meets the needs of OPSO, New Orleans Fire Department, and the State Fire Code.

    b.   Assuring that the person conducting the fire safety training is qualified to conduct that training.

    c.   Designate the position/post responsible for oversight for these functions.

---

**IV. E.1.e.**
OPSO shall within 120 days of the Effective Date, ensure that emergency keys are appropriately marked and identifiable by touch and consistently stored in a quickly accessible location, and that staff are adequately trained in use of the emergency keys.

---

Findings: Partial Compliance

Measures of Compliance:
1.   Written policy and procedures regarding staff responsibility and accountability for the systematic marking of all emergency keys, including sight and touch identification and designated locations for quick access for all keys.  All policies and procedures are to be reviewed and updated as necessary and at least annually on a schedule.
2.   Implementation of the policy and procedure
3.   Documented evidence of officer and staff training on the policy and procedure.
4.   Observation of keys.
5.   Observation of staff utilizing keys.

Observations:

    There is no written OPSO policy that addresses emergency keys.  Emergency keys are currently located in each facility.  Red emergency key boxes are located in the Watch Commander's office for TDC, FEMA tents, Conchetta, McDaniel's, OPP, TPV, and the Intake Processing Center.  Glow sticks have been attached to all emergency key rings to allow for use in low light/no light.   The emergency keys for all facilities have also been color-coded by floor.[51]

---

[51] While touring Conchetta, the Monitor requested staff to only use the emergency keys to access all doors. The door on the inside of 2-3 did not open with the emergency key.



Every jail building has a prepared "Fire Packet" that contains key location, floor plans, and contact numbers of essential OPSO personnel. The packet can given to the responding New Orleans Fire Department in case of fire or other emergency. A list of the location of the emergency keys is part of the packet.

The policy, to meet the requirements of this provision also needs to identify who in each facility on each shift can access the emergency keys, and therefore trained on their use. At least quarterly OPSO must verify and document to the Fire Safety Officer by way of a written report that all locks for doors from which inmates may be moved can be opened by the emergency key.

Recommendations:

124. Develop and implement a written policy and procedure that addresses this paragraph.

    a. Designate the position/post responsible for oversight for these functions.

125. Complete the notching system for all emergency keys and complete the emergency key location system for TPV and OPP.

126. Establish a quarterly inspection process for testing the locks of all doors for which the emergency keys are expected to open.

## E. 2 Fire and Life Safety Reporting

IV. E.2.a. (1) – (3)
OPSO shall provide the Monitors a periodic report on fire and life safety conditions at the Facility. These periodic reports shall be provided to the Monitors within four months of the Effective Date and every six months thereafter until termination of this Agreement. Each report shall include:
(1) Number and type of violations reported by fire and life safety inspectors;
(2) Fire code violations during annual fire inspections; and
(3) Occurrences of hazardous clutter in housing units that could lead to a fire.

Findings: Partial Compliance

Measures of Compliance:
1. Written policy and procedure governing required reporting.
2. Evidence of written report provided as specified in the provision.

Observations:

Currently there is no policy for either supervisors or fire safety officers to routinely inspect all housing areas to identify fire hazards. This is required.

121



OPSO provided documentation that highlighted the violations identified through the internal monthly and quarterly fire and life safety inspections completed by the Fire Safety Officer.   Also provided were the specific reports that identified the detail for the non-conformities.  The buildings were cited for several violations by OPSO's contractors who review these functions.  In all cases corrective action was taken and documented.

Recommendation:

127.   Develop and implement written policy and procedures addressing the requirements of this provision.

   a.   Designate the position/post responsible for oversight for these functions.

2. b.
OPSO shall review the periodic fire and life safety reports to determine whether the violations reported by fire and life safety inspectors are addressed, ensuring the requirements of this Agreement are being met. OPSO shall make recommendations regarding the fire and life safety conditions, or other necessary changes in policy, based on this review.  The review and recommendations will be documented and provided to the Monitors.

Findings: Partial Compliance

Measures of Compliance:
1.      Written policy and procedure governing required reporting.
2.      Evidence of reviews of the fire and life safety conditions report by staff responsible for implementing policies and procedures.
3.      Evidence of written audits of the facilities.
4.      Evidence of command staff review.  Determination by OPSO that the policies and procedures are effective to address the requirements of this Judgment.
5.      Documentation of Corrective Actions taken to address non-conformities identified during the review process.
6.      Changes to policy, training curriculum, etc. resulting from these reviews.
7.      Review of Fire Department reports/inspections; interviews with NOFD.

Observations:

See above regarding policy required. There was no fire safety inspection and action policy developed and implemented for fire safety.

OPSO Fire Safety Officer provided evidence of corrective actions developed as a result of the quarterly and annual inspections.

Recommendation:

128.   Develop written policy and procedures to address the requirements of this provision and implement it.



122

a.  Designate the position/post responsible for oversight for these functions.

## IV. F.  Language Assistance

1.  Timely and Meaningful Access to Services
    a.  OPP shall ensure effective communication with, and provide timely and meaningful access to services at OPP to all prisoners at OPP, regardless of their national origin or limited ability to speak, read, write, or understand English.  To achieve this outcome, OPP shall:
        (1)  Develop and implement a comprehensive language assistance plan and policy that complies, at a minimum, with Title VI of the Civil Rights Act of 1964, as amended, (42 U.S.C. § 2000d et seq.) and other applicable law;
        (2)  Ensure that all OPP personnel take reasonable steps to provide timely, meaningful language assistance services to Limited English Proficient ("LEP") prisoners;
        (3)  At intake and classification, identify and assess demographic data, specifically including the number of LEP individuals at OPP on a monthly basis, and the language(s) they speak;
        (4)  Use collected demographic information to develop and implement hiring goals for bilingual staff that meet the needs of the current monthly average population of LEP prisoners;
        (5)  Regularly assess the proficiency and qualifications of bilingual staff to become an OPP Authorized Interpreter ("OPPAI");
        (6)  Create and maintain an OPPAI list and provide that list to the classification and intake staff; and
        (7)  Ensure that while at OPP, LEP prisoners are not asked to sign or initial documents in English without the benefit of a written translation from an OPPAI.

2.  Language Assistance Policies and Procedures
    a.  OPP shall develop and implement written policies, procedures and protocols for documenting, processing, and tracking of individuals held for up to 48 hours for the U.S. Department of Homeland Security ("DHS");
    b.  Policies, procedures, and protocols for processing 48-hour holds for DHS will:
        (1)  Clearly delineate when a 48-hour hold is deemed to begin and end;
        (2)  Ensure that, if necessary, an OPPAI communicates verbally with the OPP prisoner about when the 48-hour period begins and is expected to end;
        (3)  Provide a mechanism for the prisoner's family member and attorney to be informed of the 48-hour hold time period, using, as needed, an OPPAI or telephonic interpretation service;
        (4)  Create an automated tracking method, not reliant on human memory or paper documentation, to trigger notification to DHS and to ensure that the 48-hour time period is not exceeded.
        (5)  Ensure that telephone services have recorded instructions in English and Spanish;
        (6)  Ensure that signs providing instructions to OPP prisoners or their families are translated into Spanish and posted;
        (7)  Provide Spanish translations of vital documents that are subject to dissemination to OPP prisoners or their family members.  Such vital documents include, but are not limited to:
            i.  grievance forms;
            ii.  sick call forms;
            iii.  OPP inmate handbooks;
            iv.  Prisoner Notifications (e.g., rule violations, transfers, and grievance responses) and
            v.  "Request for Services" forms.
        (8)  Ensure that Spanish-speaking LEP prisoners obtain the Spanish language translations of forms provided by DHS; and
        (9)  Provide its language assistance plan and related policies to all staff within 180 days of the Effective Date of this Agreement.



3.  Language Assistance Training
    a.   Within 180 days of the Effective Date, OPP shall provide at least eight hours of LEP training to all corrections and medical and mental health staff who may regularly interact with LEP prisoners.
         (1)   LEP training to OPP staff shall include:
               i.    OPP's LEP plan and policies, and the requirements of Title VI and this Agreement;
               ii.   how to access OPP-authorized, telephonic and in-person OPPAIs; and
               iii.  basic commands and statements in Spanish for OPP staff.
         (2)   OPP shall translate the language assistance plan and policy into Spanish, and other languages as appropriate, and post the English and translated versions in a public area of the OPP facilities, as well as online.
         (3)   OPP shall make its language assistance plan available to the public.
4.  Bilingual Staff
         (1)   OPP shall ensure that adequate bilingual staff are posted in housing units where DHS detainees and other LEP prisoners may be housed.
         (2)   OPP shall ensure that an appropriate number of bilingual staff are available to translate or interpret for prisoners and other OPP staff.  The appropriate number of bilingual staff will be determined based on a staffing assessment by OPP.

Finding:
        Partial Compliance - IV.F.1.a.
        Partial Compliance - IV.F.2.a.
        Partial Compliance - IV.F.2.b.
        Partial Compliance - IV.F.3.a.

Measures of compliance:
    1.    Comprehensiveness of policy
    2.    Training,
    3.    Review of inmate files
    4.    Interviews

Observations:

        No change from Compliance Report # 3.

        The plaintiffs are assessing the provisions of IV.F.3.a. regarding the 8 hours of training.  When the plaintiffs and defendants have reached a conclusion the Monitors will reassess.

Recommendations:

129.    OPSO and the policy consultant should continue to work with the Monitors to develop comprehensive policies and procedures for a Language Assistance Program.

130.    When a comprehensive policy has been finalized, all corrections and mental and health staff should begin to receive the training required under the



Consent Judgment.  It may be possible for some of this training to be computer based.

131.   The plaintiffs and defendants should confer regarding the requirements of IV. F. 3.a. and advise the Monitors.

### IV.  G. Youthful Prisoners

Consistent with the Prison Rape Elimination Act of 2003, 42 U.S.C. § 15601, et seq., and its implementation of regulations, a youthful prisoner shall not be placed in a housing unit in which the youthful prisoner will have sight, sound, or physical contact with any adult prisoner through use of a shared dayroom or other common space, shower area, or sleeping quarters.  In areas outside of housing units, OPSO shall either:  maintain sight and sound separation between youthful prisoners and adult prisoners, or provide direct staff supervision when youthful prisoners and adult prisoners have sight, sound, or physical contact.  OPP shall ensure that youthful prisoners in protective custody status shall have no contact with, or access to or from, non-protective custody prisoners.  OPP will develop policies for the provision of developmentally appropriate mental health and programming services.  *See also paragraph 17. Stipulated Agreement of 2/11/15.*

Findings:  Partial-compliance

Measures of Compliance:
1.   Written policy/procedures governing classification and housing of youthful inmates, including but not to sight/sound separation, provision of services, protective custody, education and other services, services for youthful inmates with mental illness or who are developmentally disabled, access to medical and mental health services.
2.   Housing plan; classification plan.
3.   Observation
4.   Interview with youthful inmates.
5.   Review of recreation and program schedules.
6.   Review of inmate files (developmentally disabled, mental illness)
7.   Review of housing unit logs, program schedules.

Observations:

The City and Sheriff are commended for moving as many youthful prisoners out of Orleans Parish Jail to the Youth Study Center (YSC) as can be accommodated by the Center.  Sadly, this leaves almost 50 youthful offenders in OPSO's custody. The information provided to the Monitors indicates it will be several years before the YSC can be expanded to accommodate the need for housing.

During the recent tour, the Monitors noted that there were inmates under the age of 18 housed in general population solely because they were being changed as adults.  A review of the PREA standards with OPSO resulted in an immediate re-classification and re-housing of these individuals to the youthful offender tier in



Conchetta.  While the Monitors appreciate how expeditiously this was handled, placing all these youth in a tier with little or no programming is problematic.[52]

The Monitors recommended in March 2104 that OPSO hire/retain an individual with responsibilities to develop and operate programs for the youthful inmates.  This position was not hired.  During the tour the Monitors brought this to the attention of Chief DeSadier and provided to OPSO job descriptions and post orders from approximately 15 jails that OPSO can use to hire this position.  This position is absolutely essential to achieving compliance with this provision for developmentally appropriate mental health and programming services.

Housing juveniles in the new jail present some problematic operational issues.  All youthful prisoners do not the same classification, some need to be kept separate from each other, others are classified as potential predators or potential victims, and/or several have a diagnosis of mental illness.  That means that housing these inmates in the same unrestricted (or direct supervision) housing unit is not acceptable.  Having smaller units available in which to separate the inmates needing to be separated,

---

[52] **Do all inmates under the age of 18, regardless of court adjudication, need to be housed and managed in an area totally separate from adult inmates while residing in an adult jail or prison?**
PREA Standard 115.14 provides that *youthful inmates*, which the standards define as "any person under the age of 18 who is under adult court supervision and incarcerated or detained in a prison or jail," must be housed separately from adult inmates in a jail or prison, but may be managed together outside of a housing unit if supervised directly by staff. Standard 115.114 provides analogous but abbreviated standard requirements for lockups. The standard includes three requirements. First, no youthful inmate may be placed in a housing unit where he/she will have contact with any adult inmate through use of a shared day room or other common space, shower area, or sleeping quarters. Second, outside of housing units, agencies must either maintain "sight and sound separation" between youthful inmates and adult inmates— i.e., prevent adult inmates from seeing or communicating with youth—or provide direct staff supervision when youthful inmates and adult inmates are together. Third, agencies must make their best efforts to avoid placing youthful inmates in isolation to comply with this provision. Finally, absent exigent circumstances, agencies must comply with this standard in a manner that affords youthful inmates daily large-muscle exercise and any legally required special education services, and provides access to other programs and work opportunities to the extent possible. Persons under 18 who are charged with status offenses and/or delinquent offenses are not covered by Standard 115.14, but they are covered by the Juvenile Justice and Delinquency Prevention Act (JJDPA) and regulations promulgated pursuant to the JJDPA. These requirements ensure that states do not securely detain status offenders in adult facilities and severely limit the time in which accused delinquent youth may spend in adult facilities; status offending and delinquent youth must always be sight and sound separated from adult inmates in prisons, jails, and lockups. More information about JJDPA requirements is available at www.ojjdp.gov/compliance.mm in crafting this standard, DOJ was cognizant of agency concerns regarding cost, feasibility, and preservation of state law prerogatives related to youthful inmates. Accordingly, this standard affords facilities and agencies flexibility in devising an approach to separate youthful inmates. In particular, agencies can achieve compliance by 1) confining all youthful inmates to a separate housing unit; 2) transferring youthful inmates to a facility within the agency that enables them to be confined to a separate unit; 3) entering into a cooperative agreement with an outside jurisdiction to enable compliance; or 4) ceasing to confine youthful inmates in adult facilities as a matter of policy or law. Agencies may, of course, combine these approaches as they see fit. *Last updated February 7, 2013.* http://www.prearesourcecenter.org/faq#n1067  Accessed 8/17/15



avoiding locking inmates down to allow others out of cell time – present significant challenges.

Partial compliance is provided as the first part of this provision was met before the Monitors concluded their August tour.   The measures of compliance have yet to be developed of implemented.

Recommendations:

132.   Develop and implement written policies and procedures to comply with this paragraph.  [See also the measures of compliance.]

133.   Develop the housing plan for juveniles as the new jail opens.

134.   Immediately Hire/retain an individual(s) with the skills and qualifications to develop programs, solicit volunteers and other providers, and oversee the programming.

135.   Prepare the plan required by May 1, 2015 regarding programming that has not been provided to the Monitors.[53]

## VI.  A – D. The New Jail Facility and Related Issues

A.   The Parties anticipate that Defendant will build a new jail facility or facilities that will replace or supplement the current facility located at 2800 Gravier Street, New Orleans, Louisiana.  This Agreement shall apply to any new jail facility.

B.   Defendant shall obtain the services of a qualified professional to evaluate, design, plan, oversee, and implement the construction of any new facility.  At each major stage of the facility construction, Defendant shall provide the Monitors with copies of design documents.

C.   Defendant shall consult with a qualified corrections expert as to the required services and staffing levels needed for any replacement facility.  OPSO shall complete a staffing study to ensure that any new facility is adequately staffed to provide prisoners with reasonable safety.

D.   Defendant will ensure that the new jail facility will be built in accordance with:  (1) the American Correctional Association's standards in effect at the time of construction; (2) the American with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101-12213, including changes made by the ADA Amendments of 2008 (P.L. 110-325) and 47 U.S.C. §§ 225-661, and the regulations there under; and (3) all applicable fire codes and regulations.

Observations:

---

[53] Paragraph 17.c. of the Stipulated Agreement of 2/11/15: By May 1, 2015 OPSO shall provide a programming plan, based on the resources it has been able to secure, to include education, for all eligible youth in its custody, to Monitors for review. Following receipt of the Monitors' comments, OPSO will make any necessary revisions, consult with the Monitor(s) as needed, and provide a final draft to the Plaintiffs to provide substantive comments to both OPSO and the Monitor(s). In the event that the Monitor and/or the OPSO disagree with any comments or recommendations by the Plaintiffs, the Monitor will convene a conference call for the purpose of resolving issues.



A. New Jail

OPSO indicates the new jail will open for inmates in September 2015.

Finding – Substantial Compliance

B. Design and Design Document

Finding – Substantial Compliance

C. Staffing

Finding – Substantial Compliance

The staffing analysis has been completed (see IV.A.6.)

D. Compliance with Codes and Standards

Finding – Not evaluated. The Monitor's do not have the knowledge base to evaluate this paragraph.



**VII. A. Compliance and Quality Improvement**

Within 120 days of the Effective Date, OPSO shall revise and/or develop its policies, procedures, protocols, training curricula, and practices to ensure that they are consistent with, incorporate, address, and implement all provisions of this Agreement.  OPSO shall revise and/or develop, as necessary, other written documents, such as screening tools, logs, handbooks, manuals, and forms, to effectuate the provisions of this Agreement.  OPSO shall send pertinent newly-drafted and revised policies and procedures to the Monitors as they are promulgated.  The Monitors will provide comments on the policies to OPSO, SPLC, and DOJ within 30 days.  OPSO, SPLC, and DOJ may provide comments on the Monitors' comments within 15 days.  At that point, the Monitors will consider the Parties' comments, mediate any disputes, and approve the policies with any changes within 30 days.  If either party disagrees with the Monitors, they may bring the dispute to the Court.  OPSO shall provide initial and in-service training to all Facility staff with respect to newly implemented or revised policies and procedures.  OPSO shall document employee review and training in new or revised policies and procedures.

Finding:   Partial compliance

   Measures of Compliance:
   1.      Policies and procedures manual.
   2.      Process/spreadsheet to identify all existing and planned written directives, dates
           when expected to be submitted for Monitors' review.

Observations:

   Work continues to complete the written directive system.  The work is progressing too slowly in the view of the Monitors.   OPSO and the vendors are tracking the status of the elements of the written directive system.  Many of these policies/procedures need to be completed and staff trained before the new jail can open.

Recommendation:

136.   OPSO continue to Monitors the performance of the vendor, as well as provide internal assets to review the policy drafts before forwarding to the Monitors for review.

**VII.(H). B. Compliance and Quality Improvement**

Within 180 days of the Effective Date, Defendant shall develop and implement written quality improvement policies and procedures adequate to identify serious deficiencies in protection from harm, prisoner suicide prevention, detoxification, mental health care, environmental health, and fire and life safety in order to assess and ensure compliance with the terms of this Agreement on an ongoing basis.  Within 90 days after identifying serious deficiencies, OPSO shall develop and implement policies and procedures to address problems that are uncovered during the course of quality improvement activities.  These policies and procedures shall include the development and implementation of corrective action plans, as necessary, within 30 days of each biannual review.

Finding:   Non-compliance

Measures of Compliance:

129

1.  Written policy/procedure governing quality improvement.
2.  Written report.
3.  Results of action plan from written report.

Observations:

No change since Compliance Report # 3.

See above VII.A.

Recommendation:

See above VII.A.

## IV. (I). C. Compliance and Quality Improvement

The Parties agree that OPSO will hire and retain, or reassign a current OPSO employee for the duration of this Agreement, to serve as a full-time OPSO Compliance Coordinator.  The Compliance Coordinator will serve as a liaison between the Parties and the Monitors and will assist with OPSO's compliance with this Agreement.  At a minimum, the Compliance Coordinator will:  coordinate OPSO's compliance and implementation activities; facilitate the provision of data, documents, materials, and access to OPSO's personnel to the Monitors, SPLC, DOJ, and the public, as needed; ensure that all documents and records are maintained as provided in this Agreement; and assist in assigning compliance tasks to OPSO personnel, as directed by the Sheriff or his or her designee.  The Compliance Coordinator will take primary responsibility for collecting information the Monitors requires to carry out the duties assigned to the Monitors.

Finding:  Complaint

Observation:

OPSO has retained a qualified person to serve as compliance coordinator, and

provided additional resources to assist that person.

Recommendation:  None at this time.

## VI. (J.) D. Compliance and Quality Improvement

On a bi-annual basis, OPSO will provide the public with a self-assessment in which areas of significant improvement or areas still undergoing improvement are presented either through use of the OPSO website or through issuance of a public statement or report.

Finding:        Partial compliance

Observations:

Partial compliance is indicated as OPSO has provided bi-annual reports.

These reports need to be guided by written directives.  The scope and depth of the

reports needs to improve as the directives are completed, staff trained, and

experience using the reports for internal monitoring and improvement move

130

forward.   OPSO and the plaintiffs have discussed ways to improve reporting by clarifying requirements of the Consent Judgment and related due dates.

<u>Recommendations:</u>

137.    Ensure that there are written policies and procedures that support these functions, including periodicity of reporting, and accountability.

138.    Produce the required reports.

## VIII.  Reporting Requirements and Right of Access

**VIII. A.** OPSO shall submit periodic compliance reports to the Monitors.  These periodic reports shall be provided to the Monitors within four months from the date of a definitive judgment on funding; and every six months thereafter until termination of this Agreement.  Each compliance report shall describe the actions Defendant has taken during the reporting period to implement this Agreement and shall make specific reference to the Agreement provisions being implemented.  The report shall also summarize audits and continuous improvement and quality assurance activities, and contain findings and recommendations that would be used to track and trend data compiled at the Facility.  The report shall also capture data that is tracked and monitored under the reporting provisions of the following provisions:  Use of Force; Suicide Prevention; Health Care Delivered; Sanitation and Environmental Conditions; and Fire and Life Safety.

Finding:        Partial compliance

Observations:

The compliance report guiding the Monitors' tour in August was produced, but too late to be of assistance during the tour.  Additionally, the reporting is not included in the written directive system.

<u>Recommendation:</u>

139.    Prepare a  written policies and procedures that support these requirements, including periodicity of reporting, and accountability.

**VIII. B.** OPSO shall, within 24 hours, notify the Monitors upon the death of any prisoner.  The Monitors shall forward any such notifications to SPLC and DOJ upon receipt.  OPSO shall forward to the Monitors incident reports and medical and/or mental health reports related to deaths, autopsies, and/or death summaries of prisoners, as well as all final SOD and IAD reports that involve prisoners.  The Monitors shall forward any such reports to SPLC and DOJ upon receipt.

Finding:        Partial Compliance

Observations:

131

No change from last compliance report.  Notifications are provided.
Requirements need to be included in written directives to achieve substantial
compliance.

Recommendation:

140.    Ensure that there are written policies and procedures that support these
functions, including periodicity of reporting, and accountability.

**VIII. C**. Defendant shall maintain sufficient records to document that the requirements of this Agreement are being properly implemented and shall make such records available to the Monitors within seven days of request for inspection and copying.  In addition, Defendant shall maintain and provide, upon request, all records or other documents to verify that they have taken the actions described in their compliance reports (e.g., census summaries, policies, procedures, protocols, training materials, investigations, incident reports, tier logs, or use of force reports).

Finding:        Compliance

Observations:

OPSO maintains and provides records as required above.

Recommendation:  None at this time.

132

## VIII.   Stipulated Agreements

The Orleans Parish Sheriff's Office (OPSO) and the plaintiffs (U. S. Department of Justice, MacArthur Justice Center) negotiated two agreements since Compliance Report #3. The objective of these two agreements is to move critical requirements contained in the Consent Judgment, and not yet completed, to a faster track.  The Monitors periodically report to the parties and the Court regarding the defendants' compliance.

## Agreement/Order (2/11/15)

| # | Language | Due Date | Status | Notes on Compliance |
|---|---|---|---|---|
| **1.  OPSO Reporting on Compliance Status with the Consent Judgment** | | | | |
| 1.a. | At each of the scheduled Court status conferences, the Sheriff or his designee shall report to the Court regarding OPSO's compliance status with each section (e.g. Section IV.A, IV.B.) of the Consent Judgment.   This report shall include a summary of OPSO's progress since the immediate previously scheduled status conference, and will include in the reporting OPSO's planned actions in the next 60 days to come into compliance | 3/26/15 | Compliant | Chief DeSadier reported during the Status Conference of 8/6/15.  Prior to that time, compliance coordinator Gary Gremillion reported at the Status Conference on 6/25/15. |
| 1.b. | OPSO shall comply with the Consent Judgment's requirement for periodic a compliance report as set forth in Consent Judgment Section VIII.A.[54] The report shall describe the steps OPSO has taken in furtherance of compliance, and the activities planned during the next reporting period.  The first report is due by April 1, 2015, and periodic reports shall be due in accordance with Section VIII.A, and/or on dates mutually agreed to by the parties and the Monitors, and approved by the Court, as necessary. | 4/1/15 Future TBD | Partial Compliance | A report was provided on 7/31/15 providing OPSO's assessment of compliance, but does not include all the items required in the CJ (see footnote 1).  See also Consent Judgment VII. J. (D.), VIII. A. |
| 1.c. | Within 24 hours of the occurrence of any | On- | Partial | The Monitors' believe that |

---

[54] A. OPSO shall submit periodic compliance reports to the Monitor.  These periodic reports shall be provided to the Monitor within four months from the date of a definitive judgment on funding; and every six months thereafter until termination of this Agreement.  Each compliance report shall describe the actions Defendant has taken during the reporting period to implement this Agreement and shall make specific reference to the Agreement provisions being implemented.  The report shall also summarize audits and continuous improvement and quality assurance activities, and contain findings and recommendations that would be used to track and trend data compiled at the Facility.  The report shall also capture data that is tracked and monitored under the reporting provisions of the following provisions:  Use of Force; Suicide Prevention; Health Care Delivered; Sanitation and Environmental Conditions; and Fire and Life Safety.

133

| # | Language | Due Date | Status | Notes on Compliance |
|---|----------|----------|--------|---------------------|
| | of the following incidents, OSPO shall notify the Monitor via email: <br>• Death of an inmate/arrestee while held in custody (or housed in a hospital to which the inmate has been committed for care and remains in the custody of OPSO; or whose injury occurred while in custody and was subsequently released from custody); <br>• An inmate's/arrestee's suicide, suicide attempt, aborted suicide attempt, suicidal intent, and/or deliberate suicide self-harm gesture as defined by the American Psychiatric Association;[55] <br>• An inmate's allegation of sexual abuse, sexual assault, sexual harassment, or voyeurism whether the incident is between or among inmates, or between or among inmates and a staff/contractor or volunteer; <br>• An inmate's report, or a report by a staff/contractor or volunteer, of any inmate/inmate allegation of assault; or other inmate allegations of felonies occurring to them while in custody; <br>• An inmate's report, or a report by a staff/contractor or volunteer, of any allegation of use of excessive force by an employee, volunteer or contractor; <br>• Suspension or arrest of any OPSO employee, volunteer, or contractor for alleged criminal activities while on-duty and/or in a facility under the control of OPSO; and <br>• Recovery of significant contraband specifically weapons. | going | Compliance | OPSO is transmitting reportable incidents; Monitors verifying that all reports are getting to OPSO command by evaluating allegations provided by the plaintiffs. <br><br> See also Consent Judgment VIII. B. |
| **2. Policies and Procedures (All Relevant Sections)** | | | | |
| 2.a. | By March 31, 2015, OPSO shall provide a schedule for the drafting and finalizing of all policies and procedures required under the Consent Judgment.  This schedule shall include:  deadlines to <u>simultaneously</u> | 3/31/15 | Partial Compliance 7/26/15. | Updated Matrix provided on 7/26/15. <br><br> Need matrix/due dates for completed medical/mental |

[55] Suicide -self-inflicted death with evidence that the person intended to die.  Suicide attempt -self-injurious behavior with a nonfatal outcome and evidence that the person intended to die.  Aborted suicide attempt-potentially self-injurious behavior with evidence that the person intended to die but stopped before physical damage occurred. Suicide ideation- thoughts of serving as the agent of one's own death. Suicidal intent-subjective expectation and desire for self-destructive act to end in death. Deliberate self-harm/ (gesture) willful self-infliction of painful, destructive or injurious acts without intent to die.
(Reference: APA Practice Guidelines)

134

| # | Language | Due Date | Status | Notes on Compliance |
|---|----------|----------|--------|---------------------|
| | submit drafts to, and receive comments, from the Monitor(s), and from the Plaintiffs and USDOJ ("Plaintiffs"). The Plaintiffs will also provide a copy of their comments to the Monitor.  In the event that the Monitor or the OPSO disagree with any comments or recommendations by the Plaintiffs, the Monitor will convene a conference call for the purpose of resolving issues. | | | health/dental policies and procedures.<br><br>See also Consent Judgment VII. A. |
| 2.b. | The schedule shall identify the policies and procedures that are considered to be a priority including:  use of force, incidents and referrals, the early intervention system, inmate grievance process, and inmate classification.   The drafts of these policies shall be submitted to the Monitor(s) for initial review on or before March 31, 2015.  Following receipt of the Monitors' comments, OPSO will make any necessary revisions, consult with the Monitor(s) as needed, and provide a final draft to the Plaintiffs to provide substantive comments to both OPSO and the Monitor(s). In the event that the Monitor and/or the OPSO disagree with any comments or recommendations by the Plaintiffs, the Monitor will convene a conference call for the purpose of resolving issues. | On or before 3/31/15 | Partial compliance | All priority policies and procedures have not been transmitted to the monitors.<br><br>Updated listing provided to all parties on 7/26/15.<br><br>See also Consent Judgment VII. A. |
| **3.  Memoranda to Implement Substantive Provisions of the Consent Judgment** | | | | |
| 3. | Pending implementation of policies that implement the Consent Judgment, OPSO shall prepare a memoranda to all OPSO staff, contractors, and volunteers, as outlined in various provisions below.[56]  For each provision, the memoranda shall delineate the responsibilities of staff, contractors and/or volunteers under the terms of the Consent Judgment as well as the required procedures for notification/action.  OPSO shall submit each draft memoranda to Plaintiffs and the Monitor no later than March 1, 2015. Plaintiffs and the Monitor will have three business days to comment on the draft memoranda. In the event that the Monitor | 3/1/15 | Compliant | Provided in final 2/24/15; completed.<br><br>See also Consent Judgment VII. A. |

---

[56] The memorandum shall include the date of issue, date of expiration, subject, title of issuing authority, to whom the memorandum is directed, the dates for reading at roll call, the dates to be posted, and location of posting.

| # | Language | Due Date | Status | Notes on Compliance |
|---|---|---|---|---|
| | and/or the OPSO disagree with any comments or recommendations by the Plaintiffs, the Monitor will immediately convene a conference call for the purpose of resolving issues.  Within seven business days of finalizing the memoranda based on the comments of the Monitor(s) and Plaintiffs, OPSO will assure that the memoranda is read at roll call on all shifts, in all facilities, and in all locations (e.g. medical) for three consecutive days. Discrete memoranda regarding similar topics noted in this Stipulated Order may be combined into a single memorandum. OPSO will maintain a written list of staff, contractors and volunteers present during the reading of the memoranda and will produce that list on request.  OPSO will also post any memoranda in places where roll calls are held, locker rooms, and other non-inmate areas where staff may view the information. | | | |
| **4.  Use of Force Reporting** | | | | |
| 4.a. | OPSO shall issue a memorandum to OPSO staff and contractors regarding their obligation to report uses of force for inmates under the legal care, custody and control of OPSO and in any facility operated by OPSO, and including in vehicles, hospitals, during transports, and in court holding areas.  The memoranda will outline the requirements and timelines for reporting. | 3/1/15 | Compliant | Completed 2/24/15

See also Consent Judgment IV.A.3.a. |
| 4.b. | OPSO shall issue a memorandum to staff and contractors that all incident reports regarding a use of force will contain all Consent Judgment-required elements as outlined in § IV.A.3.b-c, e.  The memorandum will be issued in accordance with the terms specified in Item 3 of this Stipulated Order. | 3/1/15 | Compliant | Completed 2/24/15

See also Consent Judgment IV.A.3. |
| 4.c. | OPSO shall issue a memorandum to Watch Commanders and to Wardens to ensure that Watch Commanders and Wardens' reports contain all elements required under the Consent Judgment, as outlined in § IV.A.3.d.f.   The memorandum will be issued in accordance with the terms specified in Item 3 of this Stipulated Order. | 3/1/15 | Compliant | Completed 2/24/15

See also Consent Judgment IV.A.3. |
| **5.  Early Intervention Systems** | | | | |
| 5.a. | By February 15, 2015, OPSO shall identify | 2/15/15 | Compliant | 4/10/15 |

| # | Language | Due Date | Status | Notes on Compliance |
|---|----------|----------|--------|---------------------|
| | the names of the members of the Use of Force Review Board to the Monitor and the Plaintiffs/USDOJ. | | | Per Counsel: The members of the board, as it currently sits, are: Major Eddie Hosli Colonel Michael Laughlin Major Melvin Howard Mary Ann Benitez Lieutenant Terrell Robinson Lieutenant Catallanato does attend, but is not a member of the board.<br><br>See also Consent Judgment IV. A.4.b. |
| 5.b. | Commencing March 1, 2015, OPSO will make available to Monitors, at the Monitors' request, the quarterly reviews conducted by ISB and the command staff regarding the operation of the EIS system, including supporting documentation reviewed, as delineated by Section IV.A. 4.b., c., d., and e. of the Consent Judgment. | 3/1/15 | Partial compliance | Monitors have requested and reviewed information; suggested changes; reviewed modified reporting.<br><br>See also Consent Judgment IV. A.4.c. |
| **6. Safety and Supervision** | | | | |
| 6.a. | By February 15, 2015 in order that the housing for youthful offenders is continually staff by a deputy will assure that a deputy is working on every shift, on every day to on the unit housing youthful offenders.   This deputy may not be assigned to other tiers or other responsibilities, and shall be periodically relieved by another deputy and/or supervisor.   The evidence of compliance with this document will be the staffing assignments each day, each shift for the facility in which youthful offenders are held, and samples of the log books from that unit. | 2/15/15 | Compliant | Letter from Sheriff dated 12/29/14 OPSO provided logs as requested.<br><br>See also Consent Judgment IV. G. |
| 6.b. | OPSO shall ensure by May 15, 2015 that all staff assigned to the housing for inmates with acute and chronic mental health (in Templeman V, TDC, or other housing in which this population is held) attend training regarding working this population.  The lesson plans/curricula for this training shall be reviewed and approved by the Monitors.   The draft of the training curriculum and training plan is due to the Monitors by April 15, 2015, and should include participation by subject matter experts employed by the medical contractor. | 5/15/15 | Partial Compliance | Training materials provided for suicide prevention; but not for staff assigned to mental health housing.<br><br>See also Consent Judgment IV.B.4.a.,7.a. |

137

Compliance Report # 4 - September 9, 2015

| # | Language | Due Date | Status | Notes on Compliance |
|---|----------|----------|--------|---------------------|
| **7. Staffing, Staffing Plans, and Recruitment** | | | | |
| 7.a. | OPSO shall provide a monthly report to the Monitors, identifying the number of deputies hired the previous month; the number of deputies who resigned, if known, the reason for resignation, and the date the deputy entered service; and the number of deputies who were terminated, the reason for termination, and the date the deputy entered service.  The same report shall be provided for non-sworn (civilian staff).  A cumulative annual total will also be included as part of this report. | Monthly | Compliant | Monthly reports meeting required criteria; to the extent that applicants and employees provide the information to OPSO's Human Resources staff.

See also Consent Judgment IV. A.6. |
| 7.b. | By March 15, 2015, OPSO shall provide a recruitment plan for sworn (e.g. deputy sheriffs) and non-sworn/civilian staff that addresses current and anticipated vacancies for the next 18 months and based on the staffing plan.  The plan will be provided to the Monitors for comment and recommendations by March 1, 2015. | 3/15/15 | Compliant | Provided 3/17/15 Monitor provided comment to OPSO on 5/4/15.

See also Consent Judgment IV. A.6. |
| 7.c. | At the scheduled status conferences with the Court, OPSO shall report regarding progress to achieving hiring based on the plan, as well as any modifications and update to the plan (See paragraph 1, a., b., above.) | 3/26/15 | Compliant | Provided 7/1/15; updated monthly

See also Consent Judgment IV. A.6. |
| 7.d. | By April 30, 2015, OPSO will evaluate all posts to determine if use of contractors is feasible for non-inmate contact positions (e.g., perimeter security, security screening of staff and visitors).  The report will be provided to the Monitors and Plaintiffs for their review. | 4/30/15 | Compliant | Letter dated 7/7/15 from Chief DeSadier provided on 7/13/15.  No positions identified as of this date. |
| **8. Incidents and Referrals** | | | | |
| 8. | OPSO shall issue a memorandum to all staff and contractors regarding their responsibilities and the process to document all reportable incidents within 24 hours, identified in § IV.A.7 of the Consent.  The memorandum will be issued in accordance with the terms specified in Item 3 of this Stipulated Order. | | Compliant | Two separate memoranda provided:  one to Wardens and Watch Commanders and one to "each staff member and contractor", on 4/17/15 See also Consent Judgment IV.A.7.e. |
| **9. Investigations** | | | | |
| 9.a. | By March 31, 2014, OPSO shall develop policies and procedures governing the operations of the Investigative Services Bureau (ISB) including post orders for all positions within OPSO that have investigative responsibilities, criminal and/or administrative.   This draft will be | 3/31/15 | Partial Compliance | Updated drafts provided on 7/31/15.  Reviewed by Monitors with ISB staff during on-site tour. Modifications returned for additional work. |

138

| # | Language | Due Date | Status | Notes on Compliance |
|---|----------|----------|--------|---------------------|
| | provided to the Monitors.  Following receipt of the Monitors' comments, OPSO will make any necessary revisions, consult with the Monitor(s) as needed, and provide a final draft to the Plaintiffs to provide substantive comments to both OPSO and the Monitor(s). In the event that the Monitor and/or the OPSO disagree with any comments or recommendations by the Plaintiffs, the Monitor will convene a conference call for the purpose of resolving issues. | | | See also Consent Judgment IV.A.8.a. |
| 9.b. | By March 15, 2015 OPSO shall make available a laptop computer to investigative staff assigned full-time to ISB for use in the employees' official capacities. Supervisors shall have the ability access all files.  To the extent possible the laptop computers will be linked to a mainframe/cloud to facilitate the supervisor's remote access to the files. | 3/15/15 | Compliant | 3/20/15 - Provided purchase orders and memo from Major Hosli . OPSO indicated on 4/2 that the laptops had been received. |
| **10. Grievances** | | | | |
| 10. | By March 1, 2015, OPSO shall develop a job description for the Grievance Officer and revise OPSO's organizational chart to identify the chain-of-command for this position. | 3/1/15 | Compliant | Provided 3/9/15

See also Consent Judgment IV.A.11. |
| **11. PREA** | | | | |
| 11. | By March 15, 2015, OPSO shall produce to the Monitors the outline and production schedule for the video and orientation materials advising prisoners of the Prison Rape Elimination Act. Following receipt of the Monitors' comments, OPSO will make any necessary revisions, consult with the Monitor(s) as needed, and provide a final draft to the Plaintiffs to provide substantive comments to both OPSO and the Monitor(s). In the event that the Monitor and/or the OPSO disagree with any comments or recommendations by the Plaintiffs, the Monitor will convene a conference call for the purpose of resolving issues. | 3/1/15 | Compliant | Final product provided to lead Monitor for review on 5/14; with subsequent updates provided the following week.  Monitors have encouraged OPSO to provide these products to the plaintiffs.  Videos provided to plaintiffs on 6/3/15.

See also Consent Judgment IV.A.12. |
| **12.  Access to Information** | | | | |
| 12. | By April 1, 2015, OPSO shall produce to the Monitors the outlines and production schedule for the inmate orientation video and materials, including the revised inmate handbook.  OPSO shall also include | 4/1/15 | Partial-compliance | Revision provided on 7/31/15;  additional work required.

See also Consent Judgment |

139

Compliance Report # 4 - September 9, 2015

| # | Language | Due Date | Status | Notes on Compliance |
|---|---|---|---|---|
| | the strategy for orienting inmates, and maintenance of inmate handbooks throughout OPSO facilities, including language access requirements, Section IV. F. of the Consent Judgment. Following receipt of the Monitors' comments, OPSO will make any necessary revisions, consult with the Monitor(s) as needed, and provide a final draft to the Plaintiffs to provide substantive comments to both OPSO and the Monitor(s). In the event that the Monitor and/or the OPSO disagree with any comments or recommendations by the Plaintiffs, the Monitor will convene a conference call for the purpose of resolving issues. | | | IV.A.13. |
| **13. Medical Care** | | | | |
| 13. | By March 15, 2015 OPSO shall provide the Monitor with the medical and mental health care contractor's action plan for compliance with all the medical and mental health provisions of the Consent Judgment.  The action plan shall include the due dates for compliance with the paragraphs of the Consent Judgment, the individual(s) responsible for the activities, the specific activities to be undertaken. Following receipt of the Monitors' comments, OPSO will make any necessary revisions, consult with the Monitor(s) as needed, and provide a final draft to the Plaintiffs to provide substantive comments to both OPSO and the Monitor(s**)**. In the event that the Monitor and/or the OPSO disagree with any comments or recommendations by the Plaintiffs, the Monitor will convene a conference call for the purpose of resolving issues | 3/15/15 | Partial Compliance | Materials reviewed;  require additional work;  comments provided by Drs. Patterson and Greifinger.

See also Consent Judgment IV. B., C. |
| **14. Mental Health** | | | | |
| 14.a. | OPSO shall issue a memorandum requiring that inmates with mental illness housed in the mental health housing have access to non-contact family visitation and family telephone calls.  The decision as to visiting and telephone calls will be determined in consultation with the mental health staff assigned to that inmate's care. If an inmate is denied visiting and telephone calls the reasons are specifically included in the inmate's chart. | | Compliant | Provided by Col. Laughlin on April 9, 2015 |

140

Compliance Report # 4 - September 9, 2015

| # | Language | Due Date | Status | Notes on Compliance |
|---|---|---|---|---|
| 14.b. | By April 1, 2015, OPSO, in collaboration with CCS, will produce a management plan for inmates on the mental health caseload (Levels 1 – 4), whether these inmates are housed in the step-down unit, or in general population. | 4/1/15 | Partial Compliance | CCS Policy:  Mental Health Management Plan (undated) provided on 4/13/15. Comments from the monitors were provided via letter to the Sheriff on May 5, 2015.  No follow-up from CCS or OPSO.  This is in partial compliance as a document was provided.<br><br>See also Consent Judgment IV.B.2. |
| **15.  The New Jail Facility** | | | | |
| 15. | By April 30, 2015, OPSO shall submit to the Monitors the plan for opening the new jail, including the schedule for movement of inmates into the facility, and closing of existing facilities.   The schedule shall be predicated on the potential opening dates known at that time, including alternative scenarios. | 4/30/15 | Partial Compliance | A document was provided on 7/31/15.  Additional requests made for information (Transition Team scenarios).<br><br>See also Consent Judgment VI. |
| **16.  Sanitation and Environmental Conditions** | | | | |
| 16. | OPSO shall issue a memorandum to all staff that that inmates and staff assigned to clean biohazards spills/incidents must be trained on doing so, outfitted with proper equipment, and properly supervised in accordance with § IV.D.1.f of the Consent Judgment. Following receipt of the Monitors' comments, OPSO will make any necessary revisions, consult with the Monitor(s) as needed, and provide a final draft to the Plaintiffs to provide substantive comments to both OPSO and the Monitor(s). In the event that the Monitor and/or the OPSO disagree with any comments or recommendations by the Plaintiffs, the Monitor will convene a conference call for the purpose of resolving issues.  The directive will be issued in accordance with the terms specified in Item 3 of this Stipulated Order. | No date | Non-compliant | OPSO provided on 8/18/15 draft policies and procedures, which have not been evaluated by the Monitors.<br><br>See also Consent Judgment IV.D.f. |
| **17.  Youthful Offenders** | | | | |
| 17.a. | By March 1, 2015, OPSO shall contact the school board and community groups to solicit proposals for programming in the youthful offender unit. | 3/1/15 | Compliance | OPSO has reached out to several organizations. OPSO reports these organizations included:  Aspen Institute Partnership for Youth |

141

| # | Language | Due Date | Status | Notes on Compliance |
|---|----------|----------|--------|---------------------|
| | | | | Development, The Youth Empowerment Project, Orleans Parish School Board, Center for Educational Excellence in Alternative Settings, and the YCS. Several of these organizations indicated a proposal would be forthcoming, but apparently have not been provided to OPSO.<br><br>Regardless of the work to solicit proposals to conform with this paragraph of the Consent Judgment, other than the movement of 12 prisoners to YSC, no progress has been made.<br><br>See also Consent Judgment IV. G. |
| 17.b. | At the scheduled Court status conferences, OPSO shall report on progress in securing such programming, and/or the responses from the school board and stakeholders. | 3/26/15 | Compliance | See above |
| 17.c. | By May 1, 2015 OPSO shall provide a programming plan, based on the resources it has been able to secure, to include education, for all eligible youth in its custody, to Monitors for review. Following receipt of the Monitors' comments, OPSO will make any necessary revisions, consult with the Monitor(s) as needed, and provide a final draft to the Plaintiffs to provide substantive comments to both OPSO and the Monitor(s). In the event that the Monitor and/or the OPSO disagree with any comments or recommendations by the Plaintiffs, the Monitor will convene a conference call for the purpose of resolving issues. | 5/1/15 | Partial Compliance | On 8/18/15, OPSO provided a completed a draft of the OPSO Housekeeping Manual that includes detailed information on biohazard spills, clean up, protective equipment, and chemicals. CCS' policies concerning blood borne pathogens, etc. were also provided.<br><br>See also Consent Judgment IV. G. |

142

**Stipulated Agreement/Order (4/22/15)**

| # | Language | Due Date | Status | Compliance Notes |
|---|----------|----------|--------|------------------|
| 1. | By no later than April 24, 2015, the Orleans Parish Sheriff's Office ("OPSO") shall draft a memorandum to all staff members,[57] including supervisors, outlining the specific actions staff will take to respond if they observe a prisoner exhibiting signs or symptoms of a) suicidality or b) alcohol or drug intoxication or withdrawal.  This memorandum will be drafted by OPSO staff in collaboration with staff from Correct Care Solutions ("CCS").  This memorandum will be provided for review in draft form to the Lead Monitor and sub-monitors for Medical Care and Mental Health Care ("the Monitors").  Within three days of receiving any edits or revisions from the Monitors', OPSO shall incorporate those edits and/or revisions and issue the memorandum to all staff members, including supervisors.  The memorandum shall be read at daily staff briefings for three consecutive days and posted in locations where staff are likely to view it. | 4/24/15 | Compliant | Information provided.

See also Consent Judgment IV.B.5. |
| 2. | By no later than April 30, 2015, OPSO shall conduct a one-hour training for all clinical and custody staff (including supervisors) who have not been trained in the past 12 months regarding the signs or symptoms of a) suicidality or b) alcohol or drug intoxication or withdrawal, and the specific actions staff will take to respond if a prisoner exhibits such symptoms.  This training shall be developed and delivered in collaboration with staff from CCS and incorporate the specific language of the Consent Judgment. This interim training does not supplant any pre-service or annual training required by the Consent Judgment, which will be provided at a later date. | 4/30/15 | Compliant | Sign-in sheets for training provided.  All training as not completed by 4/30.

See also Consent Judgment IV.B.5. |
| 3. | By no later than April 30, 2015, OPSO shall submit all custodial and site-specific medical policy(ies) regarding a) suicide risk reduction and b) alcohol or drug | 4/30/15 | Compliance | See also Consent Judgment IV.B.5. |

[57] "Staff members" is defined in the Consent Judgment as "all employees, including correctional officers, who have contact with prisoners."  *See* Consent Judgment, ECF No. 466, at 8.

143

| # | Language | Due Date | Status | Compliance Notes |
|---|----------|----------|--------|------------------|
|   | intoxication and withdrawal required pursuant to Section IV.B.5 of the Consent Judgment.  The policies shall integrate and cross-reference all relevant CCS policies governing housing and custody decisions for individuals expressing suicidality or alcohol or drug withdrawal.  All OPSO policies and any updated CCS policies shall be submitted to the Monitor and Plaintiffs for review pursuant to Section VII.A of the Consent Judgment. |   |   |   |

## IX.    CONCLUSIONS

Orleans Parish jail facilities remain very dangerous for staff and inmates, and the facilities continue to deteriorate.  The physical plants, except for the Temporary Detention Center, are unsanitary, unsafe, and result in inmates being held in unconstitutional conditions of confinement.  If the new jail cannot safely house inmates in the very near future, the Monitors recommend that inmates be moved to housing in other parishes where they will be safer.

In spite of the deteriorating physical plant, the Monitors highlight that the Orleans Parish Sheriff's Office has made progress toward compliance with the Consent Judgment, and the two stipulated agreements.  Because the work required to achieve compliance is *substantial*, the progress has been slower than the Monitors or the parties' wish.   The Monitors particularly commend the progress that has been made in providing dramatically improved medical and mental health care.  This report highlights the progress in other areas including sanitation and environmental health, fire safety, classification, inmate grievance process, and prevention of sexual abuse.

The Monitors strongly urge the Sheriff's Office and the City of New Orleans, along with the community, to build a collaboration to gain compliance with the Consent Judgment.   The Monitors continue to be concerned by the on-going negative impact of the seemingly constant battling between the Sheriff, the City Council and City government – as measured by delaying compliance with the Consent Judgment, failing to arrive at solutions

144

to imminently urgent issues, and wasting resources that are diverted to continue the sparring.

Finally, the Monitors commend OPSO on the work accomplished to date.  As noted above, there is a substantial amount of work to be done, and to use the metaphor – the work is a marathon, not a sprint.  The work of OPSO needs to result in a sustainable Constitutional jail that uses resources effectively and efficiently.

145

**Attachment A - Summary of Compliance Findings – As of September 9, 2015**

| Section | Substantial Compliance | Partial Compliance | Non-Compliance | Notes |
|---|---|---|---|---|
| IV. A.  Protection from Harm | | | | |
| IV. A. 1.  Use of Force Policies and Procedures/Margo Frasier | | | | |
| IV. A. 1.a. | | 8/7/15 | 1/23/15, 7/18/14 | |
| IV. A. 1.b. | | 8/7/15 | 1/23/15, 7/18/14 | |
| IV. A. 1.c. | | 8/7/15 | 1/23/15, 7/18/14 | |
| IV.A.2.  Use of Force Training/Margo Frasier | | | | |
| IV. A. 2. a. | | | 8/7/15, 1/23/15, 7/18/14 | |
| IV. A. 2. b. | | | 8/7/15, 1/23/15, 7/18/14 | |
| IV. A. 2. c. | | | 8/7/15, 1/23/15, 7/18/14 | |
| IV.A.3.   Use of Force Reporting/Margo Frasier | | | | |
| IV. A.3 a. | | 8/7/15 | 1/23/15, 7/18/14 | See also SA 2/11/15 4.a., 4.b., 4.c. |
| IV. A.3 b. | | | 8/7/15, 1/23/15,  7/18/14 | |
| IV. A.3 c. | | | 8/7/15, 1/23/15, 7/18/14 | |
| IV. A.3 d. | | 8/7/15 | 1/23/15, 7/18/14 | |
| IV. A.3 e. | 8/7/15, 1/23/15 | | 7/18/14 | |
| IV. A.3 f. | | 8/7/15 | 1/23/15, 7/18/14 | |
| IV. A.3 g. | | 8/7/15 | 1/23/15, 7/18/14 | |
| IV. A.3 h. | | | 8/7/15, 1/23/15, 7/18/14 | |
| IV.A.4. Early Intervention System ("EIS") /Margo Frasier | | | | |
| IV.A.4.a. | | 8/7/15 | 1/23/15, 7/18/14 | |
| IV.A.4.b. | | 8/7/15 | 1/23/15, 7/18/14 | See also SA 2/11/15 5.b. |
| IV.A.4.c. | | 8/7/15 | 1/23/15, 7/18/14 | See also SA 2/11/15 5.c. |
| IV.A.4.d. | | | 8/7/15, 1/23/15, 7/18/14 | |
| IV.A.4.e. | | | | Due 8/21/15 |
| IV.A.5. Safety and Supervision/Margo Frasier | | | | |
| IV.A.5.a. | | | 8/7/15, 1/23/15, 7/18/14 | |
| IV.A.5.b. | | | 8/7/15, 1/23/15,  7/18/14 | |
| IV.A.5.c. | | | 8/7/15, 1/23/15, 7/18/14 | |
| IV.A.5.d. | 8/7/15, 1/23/15 | | 7/18/14 | |
| IV.A.5.e. | | 8/7/15 | 1/23/15, 7/18/14 | |
| IV.A.5.f. | | 8/7/15 | 1/23/15, 7/18/14 | |
| IV.A.5.g. | | 8/7/15 | 1/23/15, 7/18/14 | |
| IV.A.5.h. | | | 8/7/15, 1/23/15, 7/18/14 | |
| IV.A.5.i. | | 8/7/15 | 1/23/15, 7/18/14 | |
| IV.A.5.j. | 8/7/15, 1/23/15 | | 7/18/14 | |
| IV.A.5.k. | 8/7/15, 1/23/15 | | 7/18/14 | |



Compliance Report # 4 - September 9, 2015

| Section | Substantial Compliance | Partial Compliance | Non-Compliance | Notes |
|---|---|---|---|---|
| IV.A.5.l. | | | 8/7/15, 1/23/15, 7/18/14 | |
| IV.A.6.  Security Staffing/Susan McCampbell | | | | |
| IV.A.6.a.(1) | | 8/7/15, 1/23/15, 7/18/14 | | |
| IV.A.6.a.(2) | | 8/7/15, 1/23/15, 7/18/14 | | |
| IV.A.6.a.(3) | 8/7/15, 12/20/14 | | 1/23/15 | |
| IV.A.6.a.(4) | | 8/7/15, 1/23/15 | 7/18/14 | See also SA 2/11/15 7.a.,c. |
| IV.A.6.b. | | 8/7/15, 1/23/15 | 7/18/14 | |
| IV.A.7 Incidents and Referrals/Margo Frasier | | | | |
| IV.A.7.a. | | | 8/7/15, 1/23/15, 7/18/14 | |
| IV.A.7.b. | | 8/7/15 | 1/23/15, 7/18/14 | |
| IV.A.7.c. | | 8/7/15, 1/23/15 | 7/18/14 | |
| IV.A.7.d. | | | 8/7/15, 1/23/15, 7/18/14 | |
| IV.A.7.e. | | 8/7/15 | 1/23/15, 7/18/14 | See also SA 2/11/15 8. |
| IV.A.7.f. | | 8/7/15 | 1/23/15, 7/18/14 | |
| IV.A.7.g. | | 8/7/15 | 1/23/15, 7/18/14 | |
| IV.A.7.h. | | 8/7/15 | 1/23/15, 7/18/14 | |
| IV.A.7.i. | | 8/7/15 | 1/23/15, 7/18/14 | |
| IV.A.7.j. | | | 8/7/15, 1/23/15, 7/18/14 | |
| IV.A.8.  Investigations/Margo Frasier | | | | |
| IV.A.8.a. | | 8/7/15, 1/23/15 | 7/18/14 | See also SA 2/11/15 9.a. |
| IV.A.8.b. | | 8/7/15, 1/23/15 | 7/18/14 | |
| IV.A.8.c. | | 8/7/15, 8/7/15, 1/23/15 | 7/18/14 | |
| IV.A.8.d. | | 8/7/15 | 1/23/15, 7/18/14 | |
| IV.A.8.e. | | 8/7/15 | 1/23/15, 7/18/14 | |
| IV.A.8.f. | | 8/7/15 | 1/23/15, 7/18/14 | |
| IV.A.9.  Pretrial Placement in Alternative Settings/Susan McCampbell | | | | |
| IV.A.9.a. | 8/7/15 | 1/23/15, 7/18/14, 12/20/13 | | |
| IV.A.9.b. | 8/7/15 | 1/23/15, 7/18/14, 12/20/13 | | |
| IV.A.10. Custodial Placement within OPP/Patricia Hardyman | | | | |
| IV.A.10.a. | 8/7/15, 1/23/15 | 7/18/14 | 12/20/13 | |
| IV.A.10.b. | 8/7/15 | | 1/23/15,7/18/14, 12/20/13 | |
| IV.A.10.c. | | 8/7/15, 1/23/15 | 7/18/14, 12/20/13 | |
| IV.A.10.d. | | 8/7/15, 1/23/15 | 7/18/14, 12/20/13 | |
| IV.A.10.e. | 8/7/15 | 1/23/15 | 7/18/14, 12/20/13 | |
| IV.A.10.f. | | | 8/7/15, 1/23/15, 7/18/14, 12/20/13 | |
| IV.A.10.g. | | | 8/7/15,1/23/15, 7/18/14 | |
| IV.A.10.h. | | 8/7/15 | 1/23/15, 7/18/14 | |
| IV.A.11. Prisoner Grievance Process/Susan McCampbell | | | | |
| IVA.11.a. | | 8/7/15, 1/23/15, 7/18/14, | | See also SA 2/11/15 10. |

147



| Section | Substantial Compliance | Partial Compliance | Non-Compliance | Notes |
|---|---|---|---|---|
| | | 12/20/13 | | |
| IV.A.12. Sexual Abuse/Susan McCampbell | | | | |
| IV.A.12. | | 8/7/15, 1/23/15, 7/18/14, 12/20/13 | | See also SA 2/11/15 11. |
| IV.A.13. Access to Information/Susan McCampbell | | | | |
| IV.A.13. | | 8/7/15, 1/23/15, 7/18/14, 12/20/13 | | See also SA 2/11/15 12. |
| IV.B.  Mental Health Care | | | | See SA 2/11/15 13. |
| IV.B.1. Screening and Assessment/Raymond Patterson | | | | |
| IV.B.1.a. | | 8/7/15, 1/23/15 | 7/18/14, 12/20/13 | |
| IV.B.1.b. | | 8/7/15, 1/23/15 | 7/18/14, 12/20/13 | |
| IV.B.1.c. | | 8/7/15, 1/23/15 | 7/18/14, 12/20/13 | |
| IV.B.1.d. | | 8/7/15, 1/23/15 | 7/18/14, 12/20/13 | |
| IV.B.1.e. | | 8/7/15, 1/23/15 | 7/18/14, 12/20/13 | |
| IV.B.1.f. | | | 8/7/15, 1/23/15, 7/18/14, 12/20/13 | |
| IV.B.1.g. | | 8/7/15 | 1/23/15, 7/18/14, 12/20/13 | |
| IV.B.1.h. | | 8/7/15 | 1/23/15, 7/18/14, 12/20/13 | |
| IV.B.1.i. | | 8/7/15 | 1/23/15, 7/18/14, 12/20/13 | |
| IV.B.1.j. | | 8/7/15 | 1/23/15, 7/18/14, 12/20/13 | |
| IV.B.1.k. | | 8/7/15 | 1/23/15, 7/18/14, 12/20/13 | |
| IV.B.1.l. | | | 1/23/15, 7/18/14, 12/20/13 | 8/7/15 Not applicable |
| IV.B.2. Treatment/Raymond Patterson | | | | See SA 2/11/15 15. |
| IV.B.2.a. | | 8/7/15 | 1/23/15, 7/18/14, 12/20/13 | |
| IV.B.2.b. | | | 8/7/15, 1/23/15, 7/18/14, 12/20/13 | |
| IV.B.2.c. | | | 8/7/15, 1/23/15, 7/18/14, 12/20/13 | |
| IV.B.2.d. | | | 8/7/15, 1/23/15, 7/18/14, 12/20/13 | |
| IV.B.2.e. | | 8/7/15 | 1/23/15, 7/18/14, 12/20/13 | |
| IV.B.2.f. | | 8/7/15 | 1/23/15, 7/18/14, 12/20/13 | |
| IV.B.2.g. | | 8/7/15 | 1/23/15, 7/18/14, 12/20/13 | |
| IV.B.2.h. | | 8/7/15 | 1/23/15, 7/18/14, 12/20/13 | |
| IV.B.3.  Counseling/Raymond Patterson | | | | |
| IV.B.3.a. | | | 8/7/15, 1/23/15, 7/18/14, 12/20/13 | |
| IV.B.3.b. | | | 8/7/15, 1/23/15, 7/18/14, 12/20/13 | |
| IV.B.4.  Suicide Prevention Training Program/Raymond Patterson | | | | |
| IV.B.4.a. | | 8/7/15 | 1/23/15, 7/18/14, 12/20/13 | See also SA 2/11/15 6.b. |
| IV.B.4.b. | | 8/7/15 | 1/23/15, 7/18/14, 12/20/13 | |
| IV.B.4.c. | | 8/7/15 | 1/23/15, 7/18/14, 12/20/13 | |
| IV.B.4.d. | | 8/7/15 | 1/23/15, 7/18/14, 12/20/13 | |
| IV.B.4.e. | | 8/7/15 | 1/23/15, 7/18/14, 12/20/13 | |

148



| Section | Substantial Compliance | Partial Compliance | Non-Compliance | Notes |
|---|---|---|---|---|
| IV.B.4.f. | | | 1/23/15, 7/18/14, 12/20/13 | Not audited, will be audited at next tour. |
| IV.B.4.g. | 8/7/15 | | 1/23/15, 7/18/14; 12/20/13 | |
| IV.B.5.  Suicide Precautions/Raymond Patterson | | | | |
| IV.B.5.a. | | | 8/7/15,1/23/15, 7/18/14, 12/20/13 | |
| IV.B.5.b. | | | 8/7/15,1/23/15, 7/18/14, 12/20/13 | |
| IV.B.5.c. | | | 8/7/15,1/23/15, 7/18/14, 12/20/13 | |
| IV.B.5.d. | | | 8/7/15,1/23/15, 7/18/14, 12/20/13 | |
| IV.B.5.e. | | | 8/7/15,1/23/15, 7/18/14 | NA at time of first report |
| IV.B.5.f. | | | 8/7/15,1/23/15, 7/18/14 | NA at time of first report |
| IV.B.5.g. | | | 8/7/15,1/23/15, 7/18/14, 12/20/13 | |
| IV.B.5.h. | | | 8/7/15,1/23/15, 7/18/14, 12/20/13 | |
| IV.B.5.i. | | | 8/7/15,1/23/15, 7/18/14, 12/20/13 | |
| IV.B.5.j. | | | 8/7/15,1/23/15, 7/18/14, 12/20/13 | |
| IV.B.5.k. | | | 8/7/15,1/23/15, 7/18/14, 12/20/13 | |
| IV.B.6.  Use of Restraints/Raymond Patterson | | | | |
| IV.B.6.a. | | 8/7/15,1/23/15, 12/31/13 | 7/18/14 | |
| IV.B.6.b. | | 8/7/15,1/23/15 | 7/18/14, 12/20/13 | |
| IV.B.6.c. | | 8/7/15,1/23/15 | 7/18/14 | |
| IV.B.6.d. | | 8/7/15,1/23/15 | 7/18/14 | NA at time of first report |
| IV.B.6.e. | | 8/7/15,1/23/15 | 7/18/14 | |
| IV.B.6.f. | | 8/7/15,1/23/15 | 7/18/14, 12/20/13 | |
| IV.B.6.g. | | 8/7/15, 1/23/15 | 7/18/14 | NA at time of first report |
| IV.B.7.  Detoxification and Training/Robert Greifinger | | | | |
| IV.B.7.a. | | 8/7/15,1/23/15 | 7/18/14, 12/20/13 | See also SA 2/11/15 6.b. |
| IV.B.7.b. | | 8/7/15,1/23/15 | 7/18/14,12/20/13 | |
| IV.B.7.c. | | 8/7/15,1/23/15 | 7/18/14,12/20/13 | |
| IV.B.7.d. | | 8/7/15,1/23/15 | 7/18/14, 12/20/13 | |
| IV.B.8. Medical and Mental Health Staffing/Robert Greifinger | | | | |
| IV.B.8.a. | | 8/7/15,1/23/15 | 7/18/14, 12/20/13 | |
| IV.B.8.b. | | 8/7/15,1/23/15 | 7/18/14, 12/20/13 | |
| IV.B.9.  Risk Management/Robert Greifinger | | | | |
| IV.B.9.a. | | 8/7/15 | 1/23/15, 7/18/14, 12/20/13 | |
| IV.B.9.b. | | 8/7/15 | 1/23/15, 7/18/14, 12/20/13 | |
| IV.B.9.c. | | 8/7/15 | 1/23/15, 7/18/14, 12/20/13 | |
| IV.B.9.d. | | | 8/7/15,1/23/15, 7/18/14, 12/20/13 | |
| IV.B.9.e. | | 8/7/15 | 1/23/15, 7/18/14, 12/20/13 | |
| IV.B.9.f. | | 8/7/15 | 1/23/15, 7/18/14, 12/20/13 | |
| IV.C. Medical Care | | | | See SA 2/11/15 13. |


Orleans Parish
JAIL MONITORS

Compliance Report # 4 - September 9, 2015

| Section | Substantial Compliance | Partial Compliance | Non-Compliance | Notes |
|---|---|---|---|---|
| IV.C.1. Quality Management and Medication Administration/Robert Greifinger | | | | |
| IV.C.1.a. | | 8/7/15,1/23/15 | 7/18/14, 12/20/13 | |
| IV.C.1.b. | | 8/7/15,1/23/15 | 7/18/14, 12/20/13 | |
| IV.C.1.c. | | 8/7/15,1/23/15 | 7/18/14, 12/20/13 | |
| IV.C.1.d. | | 8/7/15,1/23/15 | 7/18/14, 12/20/13 | |
| IV.C.2.  Health Care Delivered/Robert Greifinger | | | | |
| IV.C.2.a. | | 8/7/15 | 1/23/15, 7/18/14, 12/20/13 | Recommendation to revise section, see also Report # 2 |
| IV.C.2.b. | | 8/7/15 | 1/23/15, 7/18/14, 12/20/13 | Recommendation to revise section, see also Report # 2 |
| IV.C.3.  Release and Transfer/Robert Greifinger | | | | |
| IV.C.3.a. | | 8/7/15 | 1/23/15, 7/18/14, 12/20/13 | |
| IV.C.3.b. | | 8/7/15 | 1/23/15, 7/18/14, 12/20/13 | |
| IV.C.3.c. | | 8/7/15 | 1/23/15, 7/18/14, 12/20/13 | |
| IV.C.3.d. | | 8/7/15 | 1/23/15, 7/18/14, 12/20/13 | |
| IV.D.  Sanitation and Environmental Conditions/Harry Grenawitzke | | | | |
| IV. D. 1. Sanitation and Environmental Conditions | | | | |
| IV.D. 1.a. | | | 8/7/15, 1/23/15, 7/18/14, 12/20/13 | |
| IV. D. 1.b. | | 8/7/15, 1/23/15 | 7/18/14, 12/20/13 | |
| IV. D. 1.c. | | 8/7/15, 1/23/15 | 7/18/14, 12/20/13 | |
| IV. D. 1.d. | | | 8/7/15, 1/23/15, 7/18/14, 12/20/13 | |
| IV. D. 1.e. | 8/7/15, 1/23/15, 7/18/14 | | 12/20/13 | |
| IV. D. 1.f. | | | 8/7/15, 1/23/15, 7/18/14, 12/20/13 | See also SA 2/11/15 16. |
| IV. D. 1.g. | | | 8/7/15, 1/23/15, 7/18/14, 12/20/13 | |
| IV. D. 1.h. | | 8/7/15 | 1/23/15, 7/18/14, 12/20/13 | |
| IV. D. 2. Environmental Control | | | | |
| IV. D. 2.a. | | 8/7/15,1/23/15 | 7/18/14, 12/20/13 | |
| IV. D. 2.b. | | | 8/7/15,1/23/15, 7/18/14, 12/20/13 | |
| IV. D. 3. Food Service | | | | |
| IV. D. 3.a. | | 8/7/15 | 1/23/15, 7/18/14, 12/20/13 | |
| IV. D. 3.b. | | 8/7/15 | 1/23/15, 7/18/14, 12/20/13 | |
| IV. D. 3.c. | | 8/7/15 | 1/23/15, 7/18/14, 12/20/13 | |
| IV. D. 4. Sanitation and Environmental Conditions Reporting | | | | |
| IV. D. 4.a. 1-7 | | 8/7/15,1/23/15 | 7/18/14 | |
| IV. D. 4.b. | | | 8/7/15,1/23/15, 7/18/14 | |
| IV.E. Fire and Life Safety/Harry Grenawitzke | | | | |
| IV. E. 1. Fire and Life Safety | | | | |
| IV. E. 1.a. | | 8/7/15,1/23/15, 7/18/14 | 12/20/13 | |
| IV. E. 1.b. | | 8/7/15 | 1/23/15, 7/18/14, 12/20/13 | |



Compliance Report # 4 - September 9, 2015

| Section | Substantial Compliance | Partial Compliance | Non-Compliance | Notes |
|---|---|---|---|---|
| IV. E. 1.c. | | 8/7/15, 1/23/15, 7/18/14; 12/31/13 | | |
| IV. E. 1.d. | | | 8/7/15, 1/23/15, 7/18/14, 12/20/13 | |
| IV. E. 1.e. | | 8/7/15, 1/23/15 | 7/18/14 | |
| IV. E. 2. Fire and Life Safety Reporting | | | | |
| IV. E. 2.a.1-3 | | 8/7/15,1/23/15 | 7/18/14 | |
| IV. E. 2.b. | | 8/7/15 | 1/23/15, 7/18/14 | |
| IV.F. Language Assistance | | | | |
| IV.F.1. Timely and Meaningful Access to Services/Margo Frasier | | | | |
| IV.F.1.a. | | 8/7/15, 1/23/15, 7/18/14 | | |
| IV.F.2.  Language Assistance Policies and Procedures/Margo Frasier | | | | |
| IV.F.2.a. | | 8/7/15, 1/23/15, 7/18/14 | | |
| IV.F.2.b. | | 8/7/15, 1/23/15, 7/18/14 | | |
| IV.F.3. Language Assistance Training/Margo Frasier | | | | |
| IV.F.3.a. | | 8/7/15, 1/23/15, 7/18/14 | | |
| IV.F.4. Bilingual Staff/Margo Frasier | | | | |
| IV.F.4. | | 8/7/15, 1/23/15, 7/18/14 | | |
| IV.G.  Youthful Prisoners/Susan McCampbell | | | | |
| IV.G. | | 8/7/15 | 1/23/15, 7/18/14, 12/20/13 | See also SA 2/11/15 6.a., 17.a., c. See also SA 4/22/14 17.c. |
| VI. The New Jail Facility/Susan McCampbell | | | | See also SA 2/11/5 15. |
| VI. A. | 8/7/15 | 1/23/15, 7/18/14 | | |
| VI. B. | 8/7/15, 1/23/15 | 7/18/14 | | |
| VI. C. | 8/7/15, 1/23/15 | 7/18/14 | | |
| VI. D. | | | | Monitors not able to evaluate. |
| VII.  Compliance and Quality Improvement/Susan McCampbell | | | | |
| VII. A. | | 8/7/15 | 1/23/15, 7/18/14 | See also SA 2/11/15 1.b. See also SA 2/11/15 2.a., 2.b., 3. |
| VI. B. (H.) | | | 8/7/15, 1/23/15, 7/18/14 | See SA 4/22/15 1.,2.,3. |
| VI. C. (I.) | 8/7/15, 7/18/14 | | 1/23/15, 12/20/13 | |
| VI. D. (J.) | | 8/7/15 | 1/23/15, 7/18/14 | See also SA 2/11/15 1.b. |
| VIII. Reporting Requirements and Right of Access/Susan McCampbell | | | | |
| VIII.A. | | 8/7/15, 7/18/14 | 1/23/15 | |
| VIII.B. | | 8/7/15, 1/23/15, 7/18/14, 12/20/13 | | See also SA 2/11/15 1.c. |
| VIII.C. | 8/7/15 | 1/23/15, 7/18/14,12/20/13 | | |
| | | | | |
| **Stipulated Agreement/Order (2/11/15)** | | | | |


Orleans Parish
JAIL MONITORS

Compliance Report # 4 - September 9, 2015

| Section | Substantial Compliance | Partial Compliance | Non-Compliance | Notes |
|---|---|---|---|---|
| 1.a. | 8/7/15 | | | |
| 1.b. | | 8/7/15 | | See also CJ VII. D., VIII.A. |
| 1.c. | | 8/7/15 | | See also CJ VIII.B. |
| 2.a. | | 8/7/15 | | See also CJ VII. A. |
| 2.b. | | 8/7/15 | | See also CJ VII. A. |
| 3. | 8/7/15 | | | See also CJ VII. A. |
| 4.a. | 8/7/15 | | | See also CJ IV.A.3. |
| 4.b. | 8/7/15 | | | See also CJ IV.A.3. |
| 4.c. | 8/7/15 | | | See also CJ IV.A.3. |
| 5.a. | 8/7/15 | | | See also CJ IV.A.4.b. |
| 5.b. | | 8/7/15 | | See also CJ IV..4.c. |
| 6.a. | 8/7/15 | | | See also CJ IV.G. |
| 6.b. | | 8/7/15 | | See also CJ IV.B.4.a.,7.a. |
| 7.a. | 8/7/15 | | | See also CJ IV.A.6. |
| 7.b. | 8/7/15 | | | See also CJ IV.A.6. |
| 7.c. | 8/7/15 | | | See also CJ IV.A.6. |
| 7.d. | 8/7/15 | | | |
| 8. | 8/7/15 | | | See also CJ IV.A.7. |
| 9.a. | | 8/7/15 | | See also CJ IV.A.8.a. |
| 9.b. | 8/7/15 | | | |
| 10. | 8/7/15 | | | See also CJ IV.A.11. |
| 11. | 8/7/15 | | | See also CJ IV.A.12 |
| 12. | | 8/7/15 | | See also CJ IV.A.13 |
| 13. | | 8/7/15 | | See also CJ IV.B., C. |
| 14.a. | 8/7/15 | | | |
| 14.b. | | 8/7/15 | | See also CJ IV.B.2. |
| 15. | | 8/7/15 | | See also CJ VI. |
| 16. | | | 8/7/15 | See also CJ IV.D.f. |
| 17.a. | 8/7/15 | | | See also CJ IV.G. |
| 17.b. | 8/7/15 | | | |
| 17.c. | 8/7/15 | | | See also CJ IV.G. |
| **Stipulated Agreement/Order (4/22/25)** | | | | |
| 1. | 8/7/15 | | | See also CJ IV.B.5. |
| 2. | 8/7/15 | | | See also CJ IV.B.5. |
| 3. | | 8/7/15 | | See also CJ IV.B.5. |


Orleans Parish
JAIL MONITORS

Compliance Report # 4 - September 9, 2015