**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| LASHAWN JONES, *et al*., <br> Plaintiffs, and <br><br> UNITED STATES OF AMERICA, <br> Plaintiff in Intervention, <br><br> v. <br><br> MARLIN GUSMAN, <br> Defendant. <br><br> MARLIN GUSMAN, <br> Third-Party Plaintiff <br><br> v. <br><br> THE CITY OF NEW ORLEANS, <br> Third-Party Defendant. | Civil Action No. 2:12-cv-00859 <br> Section I, Division 5 <br> Judge Lance M. Africk <br> Magistrate Judge Michael B. North |

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR AN ORDER TO SHOW CAUSE AND FOR APPOINTMENT OF A RECEIVER TO IMPLEMENT CONSENT JUDGMENT

The Plaintiff Class and the Plaintiff in Intervention United States (collectively, "Plaintiffs") hereby file this Memorandum in Support of their Motion for an Order to Show Cause Why Defendant Sheriff Marlin Gusman Should Not be Held in Contempt and for Appointment of a Receiver to Implement the Consent Judgment. More than two years after the Court entered the Consent Judgment, the conditions at the Orleans Parish jail system ("the Jail")[1]

---

[1]    The Jail includes the new Orleans Justice Center, the McDaniels Transitional Work Center, the Temporary Detention Center (currently not holding prisoners), and the 39-bed unit at the Elayn Hunt Correctional Center for Orleans Parish prisoners with acute and sub-acute mental health concerns. Currently, Orleans Parish prisoners also are held at the East Carroll

violate the Constitution in significant ways that affect the safety and health of the prisoners. Unacceptably high levels of prisoner assaults, staff excessive use of force, and suicide and self-harm continue to pose grave risks of harm, even in the brand new direct supervision Orleans Justice Center ("OJC"), where most prisoners are now housed.  Despite the Court Monitors notifying the Sheriff of suicide hazards before opening OJC, those suicide hazards were not removed, and just last month Cleveland Tumblin died by hanging himself from a known suicide hazard after a mental health evaluation flagged him for mental health follow-up that he did not receive.  April 2016 Status Conf. at 55:2-9; 56:5-14.

The Sheriff not only has failed or refused to comply with the Consent Judgment, he has proven to be incapable of taking action necessary to comply.  Indeed, the Court Monitors report that timely compliance is not possible under the Sheriff's leadership.  Urgent and extraordinary action is required of this Court to address the immediate risk of harm and death to the men, women and youth in the Jail.  Although there is no question that receivership is an extraordinary remedy, so too is the level of harm that continues to plague the Jail, with no apparent end in sight.  The history of this case, the current state of Consent Judgment compliance, and the ongoing dangerous conditions demonstrate that receivership is the only path forward.

Since October 21, 2013, ECF No. 583, the Sheriff has been bound by the terms of a Consent Judgment, ordered by this Court on June 6, 2013, ECF No. 465, which requires systemic reforms at the Jail to address widespread constitutional violations that place prisoners at risk of serious harm.  Consent Judgment § II.1, Jun. 6, 2013, ECF No. 466 ("Consent Judgment").  The Sheriff is not in compliance with the vast majority of the Consent Judgment's terms, which affect

---

Parish Detention Center, the Franklin Parish Detention Center, and the St. Charles Parish Nelson Coleman Correctional Center.  Transcript of Status Conference, at 13:2-3, Apr. 7, 2016, ("April 2016 Status Conf.").

nearly every aspect of safety and security for Orleans Parish prisoners.  Significantly, the most recent Court Monitors' report confirms not only the Sheriff's non-compliance, but also regression from the small degree of progress previously achieved.  Monitors' Report No. 5, at 21, Mar. 17, 2016, ECF No. 996 ("5th Monitors' Rpt.").  Plaintiffs respectfully request that this Court order the Sheriff to show cause why he should not be held in contempt of the Consent Judgment provisions related to:

1.  Providing adequate supervision of inmates, including ensuring appropriate staffing levels and providing direct supervision (Consent Judgment §§ IV.A.5-6);

2.  Implementing adequate suicide precautions (Consent Judgment § IV.B.5);

3.  Reforming use of force policies and procedures, training, reporting, and early intervention systems (Consent Judgment §§ IV.A.1-4; Stipulated Agreement, Feb. 2015 § 1.c.);

4.  Improving the incident reporting and tracking systems (Consent Judgment § IV.A.7);

5.  Providing an adequate grievance system (Consent Judgment § IV.A.11);

6.  Overhauling Jail investigations (Consent Judgment § IV.A.8);

7.  Ensuring proper custodial placement within the Jail (Consent Judgment § IV.A.10);

8.  Providing developmentally appropriate mental health, housing and programming services for youthful prisoners (Consent Judgment § IV.G); and

9.  Maintaining adequate sanitation and environmental conditions (Consent Judgment § IV.D. 1-4).

Significantly, with the exception of sanitation and environmental conditions, Plaintiffs have previously noticed non-compliance and obtained additional court-enforceable relief regarding each of these Consent Judgment areas.  *See* Order, Feb. 11, 2015, ECF No. 787; Order, Apr. 22, 2015, ECF No. 824.

Continued non-compliance with these core, substantive provisions of the Consent Judgment is resulting in serious harm and the risk of serious harm to Orleans Parish prisoners and Jail staff. The Sheriff will not be able to achieve compliance without extraordinary remedial measures. Plaintiffs therefore request that the Court find the Sheriff in contempt and appoint a receiver to administer operations of the Orleans Parish jail system. Given the findings of the Court Monitors, top-to-bottom staffing deficiencies, and the Sheriff's apparent inability to implement the changes required to achieve compliance, a receiver is necessary to implement the system-wide reforms essential to ensuring a constitutional Jail.

## I.      BACKGROUND

On June 6, 2013, this Court issued an order confirming that the Jail is a long-troubled institution in urgent need of reform. ECF No. 465. Following extensive briefing and a four-day evidentiary hearing involving nearly 400 exhibits and comprehensive expert and fact witness testimony, the Court approved and ordered a Consent Judgment that is narrowly tailored to remedying the unconstitutional conditions at the Jail. *Id.* at 46.

After approving the Consent Judgment, this Court conducted a series of hearings on funding the Consent Judgment. ECF Nos. 509, 527-28. Before the Court ruled, the Sheriff and the City entered into a settlement agreement, which the Court entered on October 21, 2013, thereby triggering the "effective date" of the Consent Judgment. ECF No. 583. Since then, the Sheriff and the City have had numerous and ongoing funding disputes, entered into partial settlements and agreements related to funding, and sought Court intervention multiple times on funding issues. In May 2014, the Court appointed Tommy Vassel to chair a budget working group designed to help mitigate and mediate the ongoing budget disputes between the Sheriff and the City. ECF No. 671. Despite significant time and effort from Mr. Vassel, protracted

funding disputes continue to divert important time and resources from focus on achieving compliance with the Consent Judgment.

While the Sheriff initially made some progress with regard to implementation of the Consent Judgment, the first five compliance assessments by the Court Monitors for the Consent Judgment demonstrate that the Sheriff continues to be non-compliant with the vast majority of the provisions.  Hearing Testimony of Lead Court Monitor Susan McCampbell, at 22:14-23:1, Mar. 20, 2014 ("McCampbell Mar. 2014 Tst."); Monitors' Report No. 1, at 3, Feb. 13, 2014, ECF No. 609 ("1st Monitors' Rpt."); Monitors' Report No. 2, at 10, Aug. 26, 2014, ECF No. 744 ("2d Monitors' Rpt."); Monitors' Report No. 3, at 8, Feb. 25, 2015, ECF No. 790 ("3d Monitors' Rpt."); and Monitors' Report No. 4, at 6, Sept. 9, 2015, ECF No. 881 ("4th Monitors' Rpt."). Indeed, the most recent Monitors' Report, filed on March 17, 2016, confirms both widespread non-compliance and regression from initial inklings of progress.  5th Monitors' Rpt. at 21.

The Court Monitors in fact believe that there is "no realistic strategy, or way forward, proposed by [the Orleans Parish Sheriff's Office ("OPSO")], even with the assistance of the Court Monitors, to accomplish timely compliance with the Consent Judgment."  *Id*. at 18.  Even more alarming, the Court Monitors have attributed the Sheriff's failure in achieving compliance with the Consent Judgment to OPSO's internal leadership.  As the recent Monitors' Report noted, "there is not a universally shared commitment toward compliance within OPSO's leadership."  *Id*. at 16.  Significantly, the Court Monitors believe that leadership is so insufficient that they cannot predict substantial compliance in the "near or far term."  *Id*. at 21.  In light of the Court Monitors' conclusions about the Sheriff's inability to achieve compliance and OPSO's leadership shortcomings, Plaintiffs are unconvinced that sustainable and durable reform is possible absent extraordinary relief from this Court.

5

Although Plaintiffs acknowledge that systemic change takes time, the slow pace of progress in this case is unacceptable.  From the outset, it appeared that the Sheriff would have difficulty implementing the provisions of the Consent Judgment.  After the first monitoring assessment, the Sheriff had not achieved substantial compliance with any provisions of the Consent Judgment.  1st Monitors' Rpt. at 3.  The Sheriff's poor performance continued during the next three monitoring reports, adding a greater urgency to need for improvement.  As a result of the Sheriff's continued non-compliance, Plaintiffs sought and obtained more specific remedies in February and April 2015.  ECF Nos. 787, 824.  These more specific orders pertained to status reporting, use of force reporting, internal accountability systems, safety and supervision, staffing, investigations, grievances, sexual abuse prevention, access to information, and medical and mental health care.  ECF Nos. 787, 824.  Even after receiving these carefully tailored orders, the Sheriff continued to fail to fully implement the corresponding provisions of the Consent Judgment and the additional remedial orders.

Grievous harm or the risk of such harm continues to be inflicted on prisoners as a result of the Jail's unconstitutional conditions.  The Sheriff's non-compliance with key provisions of the Consent Judgment broadly affects OPSO's ability to keep Orleans Parish prisoners safe.  Specifically, the Sheriff's non-compliance with the Consent Judgment provisions on prisoner supervision (§§ IV.A.5-6); suicide precautions (§ IV.B.5); use of force (§§ IV.A.1-4); incident reporting and tracking (§ IV.A.7); grievance system (§ IV.A.11); investigations (§ IV.A.8); classification (§ IV.A.10); youthful prisoners (§ IV.G); and sanitation and environmental health (§§ IV.D.1-4), allows violence and use of force at the Jail to continue unchecked; inhibits orderly operation of OJC; prevents OPSO from identifying and remedying deficient practices and misconduct; imposes severely restrictive and inappropriate conditions of confinement on

youthful prisoners; and subjects prisoners suffering from mental illness and suicidal ideation to unacceptable and serious risk of self-harm.

The Sheriff's non-compliance with these core provisions makes it difficult to move forward on compliance with many other provisions in the Consent Judgment and impossible to comply with its constitutional duty to provide a reasonably safe environment for prisoners. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Helling v. McKinney*, 509 U.S. 25, 33-35 (1993). Because the Sheriff has insufficient correctional staff assigned to the Jail, OPSO cannot provide adequate supervision to keep prisoners safe, to ensure their access to medical and mental health care, or to perform the myriad related custodial duties that are outlined in the Consent Judgment. Per the Consent Judgment, OPSO should have finalized and trained staff on Consent Judgment-required policies in 2014. Consent Judgment § VII.A. But incomplete policies and inadequate training have left correctional staff unprepared to conduct their duties, which further contributes to frequent staff turnover and high vacancy rates.

Dysfunctional systems for reporting, reviewing, and investigating incidents, grievances, and uses of force prevent OPSO from identifying and addressing misconduct. Because the Jail does not have adequate housing for youthful prisoners, OPSO has resorted to locking down the youthful prisoners in punitive isolation that is neither developmentally appropriate nor effective at keeping the youthful prisoners safe. Low staff ratios, inadequate training, and incomplete policies result in deficient suicide precautions, which endanger prisoners' lives.

Consent Judgment compliance remains abysmally low in spite of Plaintiffs having worked diligently with the Court Monitors, the Sheriff, the City, and this Court to address the non-compliance. Plaintiffs have spent hundreds of hours informally negotiating changed deadlines and agreements with the Sheriff only to have those deadlines missed. Plaintiffs have

sent four notices of non-compliance and have, over a period of several months, negotiated two formalized stipulated orders to attempt to resolve compliance issues. ECF Nos. 787, 824. Those deadlines also were missed. The Parties have participated in 80 status conferences and 4 evidentiary hearings.

The Court Monitors have provided the Sheriff with unprecedented levels of technical assistance, including 16 technical assistance visits by members of the Court Monitors just between August 2015 and February 2016. 5th Monitors' Rpt. at 15. OPSO has not successfully incorporated the numerous specific recommendations from the Court Monitors' compliance reports and many additional written and verbal technical assistance communications. *Id*. at 17 ("OPSO has not specifically addressed the recommendations which have been included in the previous four Compliance Reports, nor have they disputed or questioned these recommendations."). Significant areas of progress are largely due to time-intensive efforts by the Court Monitors or other outside entities, such as the Classification Monitor's top-to-bottom design of the Jail's classification system and the hiring of an outside vendor to provide medical and mental health services.

The Sheriff's response to Plaintiffs' most recent notice of non-compliance not only failed to demonstrate that OPSO had cured the noticed areas of non-compliance but also failed to provide assurance that OPSO understands what is necessary to achieve compliance and has the capacity to sufficiently plan for and execute the necessary steps to achieve compliance. The Sheriff's response consisted mainly of cutting and pasting the Court Monitors' compliance measures, listing the handful of individuals responsible for the respective substantive areas, and listing dates without clarifying what is scheduled to happen on the proposed date (e.g., finalizing policy, training, and auditing), how the proposed date was chosen, and how the proposed date

fits into an overall schedule for compliance.  For several of the areas of non-compliance, the

Sheriff's response simply lists "N/A" for both the responsible party and due date.  In sum, there

is still no full, deadline-drive plan for compliance – including policy development, training, and

implementation of audit measures – for any of the noticed areas of non-compliance.  In addition,

the Sheriff's response completely fails to address overarching barriers to compliance that the

Court Monitors have identified, such as organizational structure and leadership, staff retention,

and internal culture.

      With the advice and recruitment assistance of the Court Monitors, the Sheriff has hired

two professional jail administrators to help implement reform and compliance, as required by the

Consent Judgment.  Consent Judgment § IV.A.6.a(3).  Both jail professionals resigned in short

order after struggling to effect change.  Letter from Carmen I. DeSadier to Sheriff Marlin N.

Gusman, Feb. 19, 2016 (attached as Exhibit 1);[2] Jim Mustian, *Resignation by Top Orleans

Parish Prison Official Michael A. Tidwell Came Amid Rift with Sheriff Marlin Gusman*, The

Advocate, Dec. 8, 2014, http://theadvocate.com/news/neworleans/neworleansnews/11041662-

123/resignation-by-top-orleans-parish.  "The organization, in the view of the Monitors, just does

not have the internal capacity to make and sustain the necessary changes…."  5th Monitors' Rpt.

at 15.  Therefore, Plaintiffs request that the Court order appointment of a receiver who will have

the capacity, and authority, to address the Sheriff's non-compliance with the Consent Judgment

and provide for the safety of Orleans Parish prisoners.

      Specifically, Plaintiffs are seeking an order to show cause why the Sheriff is not in

contempt of Sections IV.A.1-8, 10-11, IV.B.5, IV.D.1-4, and IV.G. of the Consent Judgment,

---

[2]     We understand that, effective May 1, 2016, Ms. DeSadier will return to OPSO as
Chief of Corrections, following the recent resignation of the former Chief of Corrections.

and is requesting the appointment of a receiver to operate the Orleans Parish jail system until it is in compliance with the Consent Judgment.  *See Plata v. Schwarzenegger*, 603 F.3d 1088, 1094 (9th Cir. 2010).  The receiver would have full authority to administer operations of the Jail, including the ability to discipline, reassign, terminate, and promote Jail employees; develop and implement policies and procedures; allocate Jail budget funds; and enter into contracts for Jail services.

## II.    LEGAL STANDARD FOR CONTEMPT

It is widely established that district court judges retain the power to enforce consent decrees entered in their cases.  *See, e.g., Frew v. Hawkins*, 540 U.S. 431, 440 (2004) ("Federal courts are not reduced to approving consent decrees and hoping for compliance.  Once entered, a consent decree may be enforced."); *Spallone v. United States*, 493 U.S. 265, 276 (1990). "Courts possess the inherent authority to enforce their own injunctive decrees" and "do not sit for the idle ceremony of making orders and pronouncing judgments, the enforcement of which may be flouted, obstructed, and violated with impunity, with no power in the tribunal to punish the offender."  *Waffenschmidt v. MacKay*, 763 F.2d 711, 716 (5th Cir. 1985) (internal citations and quotations omitted).

Plaintiffs, as movants, bear "the burden of establishing by clear and convincing evidence: 1) that a court order was in effect, 2) that the order required certain conduct by the respondent, and 3) that the respondent failed to comply with the court's order."  *Am. Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 581 (5th Cir. 2000) (quoting *Martin v. Trinity Indus., Inc.*, 959 F.2d 45, 47 (5th Cir. 1992)); *see also Seven Arts Pictures, Inc. v. Jonesfilm*, 512 F. App'x 419, 422 (5th Cir. 2013).  Clear and convincing evidence is the "weight of proof which produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be

established, evidence so clear, direct, weighty and convincing as to enable fact finder to come to a clear conviction, without hesitancy, of the truth of the precise facts of the case." *Travelhost, Inc. v. Blandford*, 68 F.3d 958, 961 (5th Cir. 1995) (internal quotes omitted).

Plaintiffs need not demonstrate that the "contemptuous actions," or inaction, are willful, "so long as the contemnor actually failed to comply with the court's order." *Am. Airlines*, 228 F.3d at 581 (citing *N.L.R.B. v. Trailways, Inc.*, 729 F.2d 1013, 1017 (5th Cir. 1984)). "When a party violates a court order without objecting to it, asking the court to modify or vacate it, or even informing the court why it cannot or will not obey it, the court may hold the party in contempt without first deciding whether the disobedience was justified." *Seven Arts Pictures*, 512 F. App'x at 422.

In exercising its inherent authority to enforce a consent decree, a court may find that a defendant simply cannot meet the remedial targets set by the initial order, and therefore additional orders are needed to ensure that constitutional rights are not being violated. *See, e.g.*, *Hutto v. Finney*, 437 U.S. 678, 683-88 (1978) (district court was justified in issuing specific, comprehensive orders to defendants, where broad orders, giving corrections officers wide latitude to correct unconstitutional conditions, did not suffice to remedy unconstitutional conditions); *Berger v. Heckler*, 771 F.2d 1556, 1569 (2d Cir. 1985). The Court "has the discretion — indeed, the duty — to take immediate action in a manner coextensive with the degree of ongoing and persistent harm." *Plata v. Schwarzenegger*, No. 01-1351, 2005 WL 2932243, at *8 (N.D. Cal. May 10, 2005).

### III.   THE SHERIFF SHOULD BE HELD IN CONTEMPT FOR FAILURE TO COMPLY WITH CONSENT JUDGMENT REQUIREMENTS ESSENTIAL FOR PRISONER SAFETY

**A.   Inadequate Correctional Staffing Endangers Prisoners and Staff.**

Violence in the Orleans Parish Jail continues to spiral out of control.  April 2016 Status Conf. at 19:12-13.  Prisoners are largely unsupervised, which not only allows violence to occur but inhibits the Jail's ability to prevent suicides and to respond to other medical emergencies.  Much of the violence goes unreported.  5th Monitors' Rpt. at 20-21.  Fights and beatings occur off-camera and there is no staff present to witness it.  April 2016 Status Conf. at 29:10-30:1.

The lack of supervision was a major impetus for the adoption of the Consent Judgment almost three years ago.  As this Court found, "OPP inmates are subject to an epidemic of violence."  ECF No. 465 at 45.  The Court further found that "inadequate staffing is one of the most significant causes of the runaway violence at OPP."  *Id.* at 20.

The core mandate of the Consent Judgment requires that the Sheriff provide prisoners with a safe and secure environment.   Consent Judgment § IV.A.  The Consent Judgment requires that "OPSO . . . ensure that correctional staffing and supervision is sufficient to adequately supervise prisoners, fulfill the terms of this Agreement, and allow for the safe operation of the Facility, consistent with constitutional standards."  Consent Judgment § IV.A.6.  The Consent Judgment also requires that OPSO "take all reasonable measures to ensure that prisoners are not subjected to harm or the risk of harm" and "[a]t a minimum . . . maintain security policies, procedures, and practices to provide a reasonably safe and secure environment for prisoners and staff in accordance with this Agreement."  Consent Judgment § IV.A.5.a.  The Sheriff is in contempt of these requirements, and grave harm persists.  Although some of the harm in the Jail is due to staff inattention and misconduct, a primary obstacle to achieving

compliance and a primary cause of the "unacceptable" level of violence is the fact that OPSO has insufficient deputy and supervisory staff to supervise prisoners, conduct rounds, and search for contraband.   McCampbell Mar. 2014 Tst. at 28:16-19; 5th Monitors' Rpt. at 23-24.   Further, without sufficient staff, none of the other 172 Consent Judgment provisions can be implemented.

This point has been made from the first Monitors' report in 2014 (1st Monitors' Rpt. at 23-24) to the fifth Monitors' report in 2016:  "OPSO must make the recruiting, hiring and training of custodial staff for the jail facilities the highest priority."  5th Monitors' Rpt. at 37. "There is limited opportunity for compliance with the Consent Judgment unless hiring occurs; *and the staff who are hired are retained*."  3d Monitors' Rpt. at 34 (emphasis added).  The staff is the foundation upon which everything else depends, and yet the Sheriff has been completely unable to address this core deficiency of Jail operations, despite having had years to do so.  "As stressed in previous compliance reports, many of the (security) situations will not be lessened without an adequate number of properly trained staff along with a sufficient number of supervisors."  5th Monitors' Rpt. at 37.

In March 2014, Lead Monitor McCampbell testified, "there's insufficient staff to cover the tiers, insufficient trained staff, insufficient supervisors, and inmates are left to themselves to monitor their own activities.  And this puts them in grave harm."  McCampbell Mar. 2014 Tst. at 28:16-19.  Two years later during a status conference on April 7, 2016, Lead Monitor McCampbell confirmed that the Orleans Parish Jail is still insufficiently staffed by too few deputies who are insufficiently trained and insufficiently supervised.  April 2016 Status Conf. at 23:7-9.

Indeed, it does not seem that the Sheriff even knows how many staff actually are required to safely operate the Jail.  In August 2015, the Sheriff reported that OPSO needed an additional

176 staff to fully staff Jail operations, which would bring the full Jail staff to 800. 5th Monitors' Rpt. at 40. But in February 2016, OPSO identified only 575 budgeted positions for the Jail. *Id.* at 44 n.13. The Court Monitors expressed confusion around the moving target provided by OPSO between August 2015 and February 2016. *Id.* at 42.

Regardless of the different numbers reported for the adequate staffing required to safely operate the Jail, it is clear that there are not enough deputies. The Jail is not being operated as a direct supervision facility, and prisoners are left to fend for themselves for long periods of time. Although the consolidation from five building complexes to the single OJC, closure of the Temporary Detention Center, and housing of Orleans Parish prisoners in remote jurisdictions should have resolved OPSO's correctional staffing deficiencies, the remaining prisoners at OJC are still virtually or actually unsupervised at times. April 2016 Status Conf. at 29:10-16. "The Monitors continue to hear of housing units not being staffed or of deputies leaving housing units for long periods of time. Review of videos or incidents often demonstrate the absence of staff." 5th Monitors' Rpt. at 25. Amazingly, during the Court Monitors' pre-scheduled visit to OJC on April 6, 2016, they personally observed housing units in which no deputies were present. April 2016 Status Conf. at 23:12-14, 47:9-20. This demonstrates not only OPSO's inadequate supervision of prisoners, but also that the Sheriff does not recognize the serious problem this poses. *Id.* at 23:14-22. OPSO does not have "the background, experience, the staffing, and leadership they need to be able to pull it off." *Id.* at 24:3-5.

As of the most recent Monitors' Report, the Court Monitors' best estimate of additional staff required to fill necessary posts is at least 55. 5th Monitors' Rpt. at 43. Despite hiring being identified as the highest priority faced by the agency, for the calendar year 2015, OPSO experienced a 50% turnover of staff and a net gain of only 34 employees. *Id.* at 42. The Sheriff

blamed the City for lack of funding; then blamed the salary levels; and then said things would be ameliorated upon the move into OJC.  Prisoners still do not have adequate supervision, and OJC remains "plagued by violence."  *Id*. at 20.

Beyond the critical issue of the number of staff is the level of supervision provided by the staff that are on duty.  Specifically, staff often do not conduct timely rounds.  Due to the serious concern over whether staff were making rounds in housing units, the Sheriff adopted a system called TourWatch.  The system requires staff to approach certain points on the tier and press a button to demonstrate that they were present.  This system alone is not a fix to supervision problems, because staff must actually observe tier activities in addition to pushing the buttons, but it is at least a way of documenting staff's physical presence.  However, no one has seen any records from this system.  Both the Court Monitors and Plaintiffs have requested proof of security check entries, but it has not been provided.  *Id*. at 36.  This problem has persisted since the Court Monitors' first assessment.  1st Monitors' Rpt. at 23.  Such lack of supervision results in an extremely unsafe Jail.  McCampbell Mar. 2014 Tst. at 28:11-19.  In this manner, the Sheriff's non-compliance with the Consent Judgment translates into daily suffering by prisoners.

There is one final component to the staffing crisis at the Jail, and that is the potentially inappropriate deployment of OPSO staff outside of the Jail while the Jail sits unmanned.  First, there is the Sheriff's continued tolerance of off duty details by OPSO staff despite the Jail's staffing deficiencies.  "One of the obstacles to requiring deputies to work overtime in the jail in addition to the issues of working overtime after completing a 12 hour shift is the extent to which deputies assigned to the jail are regularly working secondary/off-duty employment/details that make them less alert and effective on their 12 hour shift, and/or unavailable for overtime, and/or do not come to work and are instead working off-duty details."  5th Monitors' Rpt. at 43.

Neither Plaintiffs nor the Court Monitors have been able to obtain overtime data from OPSO. 5th Monitors' Rpt. at 43.  In addition, while the Sheriff has responsibilities outside of the Jail, such as courthouse security, the Court Monitors appear to question the staffing levels in OPSO's non-Jail operations, noting:  "there are other options to evaluate the staffing in OPSO, for example the McDaniels Work Release Center and the courthouse/courtroom security.  These functional areas are outside the scope of the Consent Judgment, but given the critical issue of jail staffing, the Monitors are obligated to raise the matter."  *Id*. at 44.  How the Sheriff chooses to voluntarily deploy his staff has been left within his discretion, and he has opted to continue to staff details and other non-essential functions as the Jail has gone understaffed.  The Sheriff cannot continue to subject prisoners to the established serious risk of harm from lax (or nonexistent) supervision from its failures to recruit, retain, and appropriately deploy staff.

**B.**      **Inadequate Suicide Precautions Expose Prisoners to Risk of Death.**

The Sheriff is in complete non-compliance with the Consent Judgment's provisions requiring adequate suicide precautions.  Consent Judgment § IV.B.5.  The incidents of suicidal and self-injurious behavior and attempts have not decreased since the Sheriff opened OJC.  5th Monitors' Rpt. at 80.  The Court Monitors have been consistent and clear about the deficient treatment of suicidal prisoners:

> This is continuing to be an ongoing problem and it has deteriorated with the opening of OJC in that inmates in these categories are housed on multiple units in cells that are not suicide resistant in the presence of inmates who are not on the mental health caseload, and the planning for two suicide resistant cells at OJC is inadequate and their location is to be in the segregation unit.

*Id*. at 83.  Last month, Cleveland Tumblin, a 61-year-old boxing instructor, died after hanging himself in a shower stall at the Jail, locked from the inside, from a known suicide hazard that the

Court Monitor warned OPSO about months before the death.  April 2016 Status Conf. at 55:2-9.[3]

Orleans Parish prisoners are dying as a result of the Sheriff's unwillingness or inability to

comply with life saving measures.

Mr. Tumblin's tragic death demonstrates many flaws with the Jail's suicide prevention

practices.  Although Mr. Tumblin's intake screening indicated that he should have received a

mental health evaluation within 24 hours of admission, he hanged himself after five days at the

Jail without seeing a mental health provider.  April 2016 Status Conf. at 56:5-14.  Mr. Tumblin

hanged himself inside a shower stall that was locked from the inside.  *Id*. at 52:14-16.  Despite

many decades of experience in the corrections field, none of the Court Monitors have ever seen a

jail or prison shower with an interior lock.  *Id*. at 52:17-21.  A nurse was required to crawl under

the shower door and remove the noose with a pair of nursing shears because the Jail's cutdown

tool did not work.[4]  *Id*. at 53:3-8.  The deputy who first discovered Mr. Tumblin was alone on

the tier and, instead of radioing for back up while supporting Mr. Tumblin's weight to prevent

asphyxiation, left Mr. Tumblin to go back to the control booth to call for back up.  *Id*. at 54:6-17.

While OPSO and its medical provider, Correct Care Solution ("CCS"), did conduct a mortality

review of Mr. Tumblin's death, the review was not sufficiently self-critical to identify obvious

deficiencies so that the Jail could address the problems to prevent future tragedies.  *Id*. at 51:21-

---

[3]      *See also* Emily Lane, *In New Orleans Jail Suicide, Interior Shower Door Lock Baffle Expert,* The Times-Picayune, Apr. 7, 2016, http://www.nola.com/crime/index.ssf/2016/04/no_justification_for_lock_on_s.html; Jim Mustian, *Pastors Demand Orleans Sheriff Marlin Gusman's Resignation Over 'Culture of Violence and Neglect' at New Jail*, The Advocate, Mar. 21, 2016, http://theadvocate.com/news/neworleans/neworleansnews/15257508-176/pastors-demand-orleans-sheriff-marlin-gusmans-resignation-over-culture-of-violence-and-neglect-at-ne.

[4]      The Monitors subsequently checked three cutdown tools at OJC and found one that was so dull it could not cut paper.  April 2016 Status Conf. at 53:9-14.

52:2.  The Sheriff's ongoing non-compliance with the suicide prevention policy and training requirements continues to have tragic results.

On March 23, 2015, OPSO prisoner Ryan Miller died by suicide at the Jail.  Even though Jail staff was aware of his suicidality, Mr. Miller was placed in an attorney phone visitation booth without supervision.  While in the unmonitored room, Mr. Miller wrapped a telephone cord—an obvious suicide hazard—around his neck to commit suicide.  As a result of the Sheriff's continued failure to implement court-ordered reforms, designed to protect vulnerable prisoners, Plaintiffs negotiated for more specific remedial relief to assist the Sheriff in achieving compliance with provisions IV.B.4-5 of the Consent Judgment.  In April 2015, this Court ordered more specific relief regarding suicide risk prevention, including requirements for (a) responses to prisoners exhibiting signs or symptoms of suicidality or alcohol or drug withdrawal; (b) enhanced in-service training for all custody and clinical staff regarding signs or symptoms of suicidality or alcohol or drug withdrawal; and (c) careful review of all custody and site-specific medical policies regarding signs or symptoms of suicidality or alcohol or drug withdrawal.  ECF No. 824.  Unfortunately, neither these carefully tailored provisions nor the opening of a new jail facility have been enough to protect prisoners from the Jail's deficient suicide prevention practices.

Indeed, suicide attempts and other serious incidents in OJC's "Special Population" tiers have been alarmingly high this year.  Lead Monitor McCampbell compiled a spreadsheet of the serious incidents that occurred on OJC's tiers 2A ("Mental Health"), 2B (disciplinary and administrative segregation), and 2C (male juveniles), in the first three months of 2016.  *Spec Pop Housing CY16 YTD 3 31 16* (attached as Exhibit 2).  Although these units should have enhanced staffing by correctional officers and medical staff with additional mental health training, in that

three-month period, there were 35 attempted suicides, 35 prisoner-on-prisoner fights, and 25 uses of force.  *Id.*  CCS has offered to provide suicide prevention training to OPSO deputies, but OPSO has not provided the deputies to be trained.  April 2016 Status Conf. at 58:24-59:1. Precautions to prevent prisoners from engaging in self-harm are remarkably absent.  For example, on March 9, 2016, a prisoner on 2A requested to speak with a social worker due to suicidal thoughts.  Exhibit 2 at 8 (referencing prisoner II.YYYYY).  When a deputy opened the prisoner's cell door at the social worker's request, the prisoner ran out of the cell with a blanket and proceeded to the upper level mezzanine as he tied the blanket around his neck.  *Id.*  A deputy ran after the prisoner and untied the blanket before the prisoner fell from the balcony.  *Id.*  An hour and 17 minutes later, the same prisoner was returning from a medical examination to 2A when he began running around the second level mezzanine of the dorm, proceeded to climb over the upstairs railing with a torn piece of blanket in his possession, and attempted to jump down to the first level.  *Id.* at 9.  Fortunately, a deputy was able to unravel the blanket, which allowed the prisoner to descend to the floor where he was met by a sergeant, who placed him in handcuffs and escorted him to his cell.  *Id.*  This incident occurred with a known suicidal prisoner housed in the "Mental Health" tier.  Clearly, the Sheriff cannot provide a safe environment for prisoners in need of suicide precautions.

Deficient supervision also enables prisoners to engage in repeated incidents of self-harm. Between January 1 and March 21, 2016, one prisoner engaged in 10 incidents of self-harm at OJC, including attempted asphyxiation, attempting to swallow metal objects, cutting himself, and inserting a foreign object into his penis.  *Id.* at 2, 26-28, 31-33 (referencing prisoner I.J). After one incident, he stated that he was going to keep cutting himself until he was transferred. *Id.* at 33.  Indeed, the Mental Health Monitor, Dr. Raymond Patterson, testified that many

prisoners at OJC are engaging in self-harm in order to get transferred away from the harsh conditions and unacceptable level of violence at OJC.  April 2016 Status Conf. at 45:18-25, 50:6-16.  Lead Monitor McCampbell reported that there have already been 52 suicide attempts at OJC in the first three months of this year.  *Id*. at 20:5.  This should not occur in a direct supervision facility.

Despite the longstanding and widely known problem with suicides and suicide attempts by prisoners in OPSO custody, there are no suicide resistant cells for any of the prisoners who are on suicide watch or other constant observation at OJC at any given time.  5th Monitors' Rpt. at 92.  There also are no adequate mental health step down or residential mental health units at OJC.  *Id*.  OJC's 2A "Mental Health" unit is no different than the other units in OJC, which prevents staff from providing "necessary acute and sub-acute services other than medication management and suicide watch/direct observation in cells that are not suicide resistant."  *Id*. at 75.  This is not a new issue to this case.  During a status conference on November 19, **2013**, the Court "advised the parties that it remains concerned about ensuring that there are adequate facilities, including suicide-resistant cells, for inmates with mental health issues."  ECF No. 597.  In March 2016, OPSO reported that three OJC cells would be retrofitted to make them suicide resistant by July 2016, ten months after OJC opened.  A single suicide cell for female prisoners would be added sometime later.  Following Mr. Tumblin's tragic death and increasing pressure from the Court Monitors, Plaintiffs, and the media, OPSO reported on April 15 that they now plan to make five OJC cells suicide resistant and the process should be complete in May 2016.  There are over 1,200 prisoners at OJC, 15 of whom were on suicide watch during the most recent Court Monitors' site visit.  April 2016 Status Conf. at 42:18-43:1.  Five to-be-constructed suicide resistant cells are inadequate.  *Id*. at 40:20-23.

In addition to the blatant risk posed by OJC's lack of suicide resistant cells, the lapses in prisoner supervision at the Jail contribute to deficient suicide precautions. The Sheriff uses Certified Nurse Aides ("CNAs") to provide constant observation of prisoners on suicide watch, but there are not enough CNAs to provide adequate supervision for the number of prisoners on suicide watch or direct observation at OJC, and the level of observation is not consistent. 5th Monitors' Rpt. at 83, 91. These lapses in supervision have given rise to opportunities for prisoners to engage in serious and repeated acts of self-harm even when they are supposed to be on constant observation. Many of the acts of self-harm detailed in the spreadsheet of serious incidents that occurred on OJC's "Special Population" housing tiers occurred while the prisoners were supposed to be under constant supervision. *See* Exhibit 2. In addition, the CNAs provide no clinical interaction with prisoners on suicide watch, 5th Monitors' Rpt. at 90, which further exacerbates the deficiencies in both conditions of confinement and the mental health treatment system at OJC.

Unfortunately, the Hunt acute/sub-acute mental health unit does not resolve the lack of adequate suicide precautions at OJC. OPSO and CCS continue the unacceptable practice of housing prisoners who are on suicide watch or constant observation status at OJC for extended periods of time while undertaking further evaluation to determine whether they are appropriate for transfer to Hunt. *Id*. at 80. During the Court Monitors' February 2016 tour, there were 9 prisoners in suicide smocks on Unit 2A and another 3 who were in court that day, for a total of 12 individuals on suicide watch or direct observation. *Id*. at 76. An additional two to four prisoners were housed on Unit 2B (a segregation unit) in suicide smocks on suicide watch or direct observation. *Id*. When the Court Monitors toured on April 6, 2016, they learned that one prisoner had been held on suicide watch at OJC continuously since December. April 2016 Status

21

Conf. at 43:2-4.  "The number of suicide attempts or inmate reported suicidal or self-harm ideation and/or intent has not decreased but rather has increased since the opening of OJC and the management of these inmates has not resulted in their consistent transfer to Hunt but rather their housing on multiple units in OJC."  5th Monitors' Rpt. at 83.  When prisoners are released from suicide watch, the lack of a step down unit and inadequate supervision by correctional staff enables them to immediately reengage in self-injurious behavior.  April 2016 Status Conf. at 57:16-19, 59:13-20.

The CCS suicide prevention policies are still in development but not yet demonstrated. 5th Monitors' Rpt. at 91.  Although CCS reportedly is conducting mortality and morbidity reviews, the process of analyzing those reviews for prisoners with psychiatric disorders is still being developed and there has not been adequate analysis by CCS or OPSO of the conditions or situations that contribute to prisoners who report suicidal ideation or engage in self-harming behaviors.  *Id.* at 92.  Nor is there adequate clinical leadership with the Medical Director and Behavioral Health Director vacancies, which result in inadequate clinical oversight and significant barriers to compliance with multiple Consent Judgment provisions.  Without meaningful and effective morbidity and mortality reviews, CCS and OPSO lack the requisite information to address policy and practice deficiencies that contribute to suicides and suicide attempts.  April 2016 Status Conf. at 51:16-52:2.

In sum, the Jail has no suicide resistant cells, inadequate supervision for suicide watch, no final suicide prevention policies, no staff suicide prevention training, no adequate mental health step down unit, and insufficient mental health leadership and treatment.  The Sheriff's non-compliance with the suicide prevention requirements of the Consent Judgment places prisoners at demonstrated risk of death and serious injury.

**C.     Deficient Use of Force Policies, Procedures, Training, and Reporting Results in Inappropriate and Excessive Use of Force on Prisoners.**

OPSO's uses of force at the Jail go unreported, uninvestigated, and are out of control. 5th Monitors' Rpt. at 20-21.  The use of force provisions of the Consent Judgment require OPSO to develop and implement comprehensive use of force policies and procedures, a uniform and appropriate reporting system, adequate staff training, and an Early Intervention System to document and track staff members who are involved in use of force incidents and any complaints related to the inappropriate or excessive use of force.  Consent Judgment § IV.A.1-4.  The Sheriff is non-compliant on every level.  5th Monitors' Rpt. at 26-34.

Worse than mere non-compliance, the number of use of force incidents at the Jail is much higher than what the Sheriff has reported.  *Id*. at 25.  In December 2015, the Court Monitors discovered that a large number of OPSO's uses of force were not being reported at all.  This resulted in the Court Monitors downgrading the Sheriff from partial compliance to non-compliance on the Consent Judgment provisions related to use of force reporting.  *Id*. at 29.  OPSO has no system in place to ensure that uses of force are being reported and that there are consequences for not reporting.  *Id*. at 30.  When force is reported, the Court Monitors have concerns regarding accuracy and the use of boilerplate language.   April 2016 Status Conf. at 29:3-10.  The failure to report uses of force and inaccurate reporting has rendered the Early Intervention System "essentially useless."  5th Monitors' Rpt. at 30.  Members of the Emergency Response Team, who are frequently involved in uses of force, do not seem to be included in the Early Intervention System or provide the required use of force reports.  "Supervisory review has taken a giant step backward."  *Id*.

Initial progress on compliant use of force policies has been "stymied."  *Id*. at 25.  The parties reached agreement on the final wording of various use of force policies in August 2015,

but OPSO made no progress in finalizing the policies, training staff on the policies, implementing the policies, or monitoring compliance with the policies.  *Id.*  The large number of unreported uses of force and the inadequacy of use of force investigations at the facility level demonstrate that OPSO's "current use of force policy and the tenets of the new policy are not being followed."  *Id.* at 26.

OPSO staff have not been trained on the new use of force policies, and the training that is provided is not focused on corrections issues.  *Id.* at 27.  Staff are not learning and following use of force requirements.  All training must emphasize that failure to report uses of force will result in discipline, but the number of unreported uses of force and the inadequacy of the reports that are written demonstrate that OPSO's use of force training is ineffective.  *Id.* at 28.

The Sheriff touted the implementation of a new administrative segregation unit for high security prisoners as a "tremendous success," but the Court Monitors found that a large amount of violence and use of force occurred in this unit and went unreported, or was reported only through internal memoranda that were not entered into the Jail's incident reporting system, and were not referred to the Jail's Force Investigation Team for review.  *Id.* at 24.

With the movement to the new direct supervision Jail facility, increases in staffing through the closure of other buildings and the movement of Orleans Parish prisoners off-site, improved investigations, and two years of extensive technical assistance and detailed recommendations from the Court Monitors, it would be reasonable to expect that Orleans Parish prisoners would be less likely to suffer from unnecessary and excessive use of force by OPSO staff.  *Id.*  Unfortunately, "widespread under reporting" and a lack of consequences for inappropriate actions enables the practice of unacceptable uses of force to continue at the Orleans Parish Jail.  *Id.* at 24-25.

24

**D.** **Inadequate Incident Reporting and Tracking Systems Prevent OPSO from Identifying and Resolving Problems at the Jail.**

To address the epidemic of violence at the Jail, the Consent Judgment requires both line staff and ranking officials to fully document all prisoner fights, rule violations, prisoner injuries, suicide attempts, cell extractions, medical emergencies, contraband, escape attempts, fires and deaths in the Jail. Consent Judgment § IV.A.7. The incident reporting section is a critical component of the Consent Judgment because the first step to addressing the dangerous conditions is to understand exactly what is happening and why. The incident reporting system seeks to capture the scope, breadth and frequency of incidents in the Jail, with the objective that the information ultimately be used to identify trends, gaps in policy and management, and opportunities for reform. Despite the passage of years since the adoption of the Consent Judgment, this still is not happening at the Orleans Parish Jail. No one truly has an exact number of incidents in the Jail. There is a "prevalence of unreported violence within the Orleans Parish jail system." 5th Monitors' Rpt. at 20. As was the case at the Fairness Hearing in April 2013, the Jail's own records remain unreliable. One still can only deduce the number of violent incidents at the Jail by cross-referencing OPSO records, prisoner reports, medical records and hospital "routes." The continuation of this deficiency is extremely dangerous. Problems cannot be addressed unless they are 1) known and then 2) acted upon. OPSO's lack of incident reporting compliance remains an obstacle to meaningful reform of conditions.

This section of the Consent Judgment has remained in non-compliance for years. As of February 2015, no evidence of compliance was produced by the Sheriff for this section of the Consent Judgment. The Sheriff continued to fail to produce any periodic reports as required by the Consent Judgment. The Court Monitors noted that the individual incident reports they reviewed were "inadequate and/or incomplete, and contained boilerplate language…." 3d

Monitors' Rpt. at 40.  There was no follow up to ensure reports were written or were reviewed by supervisors as required by the Consent Judgment.  *Id.*

By the fifth report in March 2016, there still was no finalized incident reporting policy, which is naturally a barrier to OPSO's training staff on how to comply with the provision.  5th Monitors' Rpt. at 45.  "In fact, in two areas in which OPSO had (previously) been found to be in partial compliance, OPSO has now been found to be in non-compliance."  *Id.*  "The problem with the quality of reports not only exists, it is now of even greater concern.  The decline in the quality of the reports calls the Court Monitors to question whether new staff are receiving proper training in report writing."  *Id.*  The Court Monitors further note that the reports are not being reviewed and they continue to contain boilerplate language.  *Id.* at 46.  In sum, the exact same problems that have existed in the incident reporting system for years somehow continue to persist four years into this litigation.  Despite numerous conversations about the required content and deadlines, the Sheriff also is still not producing the required periodic reports to the Court Monitors.  *Id.*  The Court Monitors found the Sheriff's most recent compliance reports "wholly insufficient."  April 2016 Status Conf. at 22:19-21.  There can be no question that the incident reporting system is still not functioning, and thus the Sheriff is in contempt of this section of the Consent Judgment.

**E.     Deficient Grievance System Fails to Address Individual and System-wide Problems.**

The Jail's grievance system is non-compliant with Consent Judgment requirements, failing to provide (1) an adequate means for prisoners to have their individual grievances timely and adequately resolved and (2) a managerial system for early problem identification and resolution through identification and tracking of areas of concern.  Consent Judgment § IV.A.11; 5th Monitors' Rpt. at 67-70.  The Court Monitors report that the policy governing the grievance

process is in final form though not yet issued.  Consent Judgment § IV.A.11.a(1); 5th Monitors'
Rpt. at 67.  Staff cannot be trained on the policy until it is finalized, training curricula are
developed, and the trainers are prepared to conduct the training.

   Facility practices demonstrate the harm from delays in finalizing and training staff on the
grievance policy.  With regard to Consent Judgment requirements for a grievance system
adequate to address individual concerns (Consent Judgment § IV.A.11.a(1)-(4)), OPSO fails to
provide adequate access to the system and appropriate follow-up.  The first major complication
for access to the grievance system is that staffing shortages have resulted in widespread
lockdowns throughout the Jail.  Given the lockdowns, a prisoner generally has only half a day
out of his cell, during which he must compete with other prisoners for access to the kiosk (the
same kiosk for commissary and medical requests).  Even if adequate staffing could enable a
solution to the current lock-down conditions in the Jail, OPSO has not established the Consent
Judgment-required system to ensure that illiterate prisoners and prisoners who have physical or
cognitive disabilities or language barriers have an adequate opportunity to access the grievance
system.   Consent Judgment § IV.A.11.a(3); 5th Monitors' Rpt. at 68-70.

   Even if Orleans Parish prisoners are able to access the grievance system, OPSO does not
ensure that each grievance receives appropriate follow-up, including a timely written response
and tracking implementation of resolutions.  Consent Judgment § IV.A.11.a(2).  On a positive
note, the Sheriff recently assigned a new grievance coordinator whose duties include reviewing
staff's responses to grievances.  Review of the sample of 136 grievance responses the Sheriff
provided to the Court Monitors, however, reveals that OPSO does not yet consistently provide
quality responses and appropriate follow-up.  *OPSO Sample Grievances* (attached as Exhibit 3).
For example, on July 19, 2015, prisoner AA filed a grievance, seeking a change in housing after

he was beaten by multiple prisoners on his housing tier.  OPSO waited over 11 days before

finally sending an investigator to speak with AA about the battery.  During the 11 days that AA

waited for a response, he was constantly harassed by the prisoners who had beaten him earlier.

Prisoner BB filed a grievance on July 24 after multiple prisoners reportedly tried to rape him

while he was housed on the medical tier.  It took OPSO six days before it finally followed up on

this grievance, despite the seriousness of the complaint.  In another example, prisoner CC filed a

grievance on July 28, complaining about rampant illegal drug use on his housing tier.  It took

OPSO investigative staff members eight days before they finally responded to CC's grievance.

On August 4, prisoner DD filed a grievance, complaining about a deputy allowing widespread

fighting on the tier without intervening.  DD also complained that the deputy refused to allow

inmates to eat and did not allow access to commissary on the same date.  It took OPSO staff

members six days before they responded to DD's grievance.  Prisoner EE filed a grievance after

reportedly being beaten by an OPSO deputy multiple times on September 28.  It took OPSO's

investigative unit seven days before it finally responded to EE's grievance.  These and other

grievance responses fail to indicate whether OPSO followed up on and resolved the reported

problems.

        In addition to providing timely and appropriate grievance responses and follow-up, the

Sheriff's grievance system needs to function as a management tool to identify and facilitate early

resolution of systemic issues.  Consent Judgment § IV.A.11.a(6).  OPSO is not yet doing that.

Although OPSO management has reviewed grievance numbers, the review has not included

analysis of issues, identification of trends, or review of final outcomes of the grievances.  5th

Monitors' Rpt. at 68.  Nor has OPSO management been alerted of grievances reporting critical

issues.  *Id.*  Tracking of trends and significant issues are essential functions of the grievance

system.  OPSO does not yet have a reporting system that enables this review because the reporting is not being done in a meaningful way.  Grievances are not adequately categorized such that trends can be identified.  For example, recent reporting classified 2,600 grievances as "Warden Facility Issues."  The early problem identification and resolution function of the grievance system cannot be performed based on this inadequate reporting, potential problems remain unresolved, and this part of the Consent Judgment remains non-compliant.   Consent Judgment § IV.A.11.a(6); 5th Monitors' Rpt. at 68-70.

**F.      Ineffective Investigations Systems Perpetuate Staff Misconduct.**

The Consent Judgment requires that OPSO engage in timely and thorough investigation of alleged staff misconduct, sexual assaults, and physical assaults of prisoners resulting in visible or serious injury.  Consent Judgment § IV.A.8.  Investigations must be conducted by persons who do not have a conflict of interest, and must include timely and thorough documentation of interviews and evidence.

The investigations unit at OPSO has changed significantly since adoption of the Consent Judgment.  After initially showing no progress, the investigations unit made strides with hiring of additional outside staff and restructuring of the reporting.  3d Monitors' Rpt. at 42.  The new unit involved former members of the New Orleans Police Department, and thus there was an increased efficiency in cases involving criminal conduct.  Initially, investigations under this new unit were processed more quickly.  In late 2014, "the average time a case was open ranged from a few days to 54 days; a significant improvement from the last report when some cases were over 200 days old."  *Id.* at 43.  However, the Sheriff only produced criminal case documentation to the Court Monitors, and failed to produce any documentation of internal administrative investigations.  *Id.*

In February 2015, the Court Monitors emphasized the need for OPSO to conduct internal investigations focused on preventing the root cause of violence and disruption in the Jail, rather than solely targeting a goal of criminal indictments for misconduct. *Id*. at 44. The Court Monitors recommended increased investigations training for the Investigative Services Bureau ("ISB") staff, to focus on preventing an incident from happening via an analysis of the cause of the problem. *Id*. at 45. Unfortunately, this problem has persisted. 5th Monitors' Rpt. at 49. OPSO still does not adequately review incidents to determine what went wrong and how to prevent reoccurrence in the future. April 2016 Status Conf. at 30:11-22.

And OPSO's investigations again take too long to complete, in significant part because the incident reports received by the investigation units are of such poor quality that the unit then has to do supervisors' jobs in reviewing the initial incident. *Id*. at 27:20-28:7. A failure to timely complete and act upon investigations endangers people in OPSO custody as well as staff. Dangerous staff are able to continue working with prisoners, and unlawful behavior may continue on the tiers. *Id*. at 31:13-32:9. Timeliness of investigations and supervisory responsive action is critical to meaningful jail reform. 5th Monitors' Rpt. at 48-49.

The Sheriff also continues to struggle with the Consent Judgment mandate that investigations be performed by persons without a conflict of interest. As of one year ago, ISB was still investigating incidents involving ISB officers. 3d Monitors' Rpt. at 44. This particular practice was targeted by Plaintiffs in testimony at the Fairness Hearing and continues to be a priority; that it continued into 2015 is shocking and demonstrates a lack of commitment from the leadership of OPSO to genuine reform. That conflict has now been eliminated, but this year the Internal Administrative Division ("IAD") and the Intelligence Unit were moved under the supervision of the Chief of Corrections and Colonel Mike Laughlin. This is a significant conflict

of interest.  In response to objections by the Court Monitors, recently both criminal and IAD

investigative divisions were moved to report directly to the Sheriff.  5th Monitors' Rpt. at 47.

The infringement on the integrity of the investigations units indicates a deeply troubling lack of

high level commitment to the independence and efficacy of investigations.  In sum, the Sheriff

still is not in compliance with any of the Consent Judgment's investigations requirements.[5]

**G.      Inadequate Classification Systems Place Prisoners at Risk of Violence.**

Years after entry of the Consent Judgment, the Sheriff has failed to ensure that the

housing of persons in OPSO's custody and care is controlled by an objective and automated

system of classification that provides for housing based on custody level, PREA[6] status, special

population needs, and relevant separation (enemies and associates).  5th Monitors' Rpt. at 52-66.

Through contracting with Classification Monitor Dr. Patricia Hardyman, OPSO has designed and

validated the Jail Management System ("JMS"), as required by Consent Judgment §§ IV.A.10.a-

b.  The Sheriff has not, however, reached full compliance with the remaining provisions of the

Consent Judgment as to custodial placement (§§ IV.A.10.c-h).

As documented by the fifth Monitors' Report, the Sheriff's non-compliance has resulted

in OPSO's failure (1) to consistently house and transfer inmates in accordance with their JMS

housing assignment; (2) to provide for a routine disciplinary process by which guilt of

disciplinary code infractions may be assessed and transmitted to the JMS; (3) to accurately

interpret the criminal histories of those persons entering OPSO custody and to determine their

---

[5]      Remarkably, OPSO also still is not producing the investigations reports required
by the Consent Judgment.  5th Monitors' Rpt. at 51.  Only the Force Investigation Team
reporting was provided with any depth.  Otherwise, OPSO produced only a chart with no
indication of analytics or outcomes.

[6]      The Prison Rape Elimination Act of 2003, 42 U.S.C. § 15601 *et seq.*, ("PREA"),
and its implementing regulations, 28 C.F.R. § 115 *et seq.*, require that housing assignments are
based on intake screening that assesses prisoners' risk of being sexually abused by other
prisoners or sexually abusive toward other prisoners.  28 C.F.R. §§ 115.41-42.

appropriate custody level; and (4) to generate meaningful, robust, and accurate reports by which the efficiency and accuracy of the custodial placement system can be tracked and evaluated.  In fact, the Sheriff regressed in his compliance regarding the training of classification staff since the publication of the fourth Monitors' Report in September 2015, despite frequent and extensive technical assistance from Dr. Hardyman over the past six months.  5th Monitors' Rpt. at 15, 55.

Housing prisoners properly in specific units and cells of the Jail is integral to the overall safety of both prisoners and staff.  Vulnerable prisoners must be separated from prisoners with a propensity for violence, and enemies must be separated from one another.  The Consent Judgment requires that the Sheriff "ensure that the classification staff has sufficient access to current information regarding cell availability in each division" to allow them to efficiently and safely place prisoners within the Jail.  Consent Judgment § IV.A.10.c.  In assessing compliance with this provision, the Court Monitors have looked to whether the Jail has (1) developed and implemented a housing unit assignment plan that provides for the number of beds, custody level(s), and special population accommodations of each housing unit, and (2) provided accurate counts as to those beds occupied in each housing unit.  5th Monitors' Rpt. at 59.

Despite implementation of the JMS in January 2015, housing transfers and assignments are not consistently controlled by the system.  *Id*. at 53.  While the classification division now relies on the JMS to generate housing assignments for each person who enters and remains in OPSO custody, prisoners still are found to be housed on tiers and/or in cells that do not align with their housing assignment.  Furthermore, deputies have not consistently processed prisoner transfers through the classification unit, such that persons are moved from one tier and/or cell to another without this change in assignment being managed by the JMS.  On other occasions, the tier deputy has assigned a person to a bed or cell without regard for the housing assignment

specifically designated by a housing or transfer form.  *Id*.; *see also* Transcript of Status

Conference, 51, 56-57, Feb. 2, 2016, ECF No. 983 ("Feb. 2016 Status Conf.") (report by Dr.

Hardyman as to prisoner placed in bed and cell not assigned to by transfer sheet).  In some cases,

the prisoners themselves are allowed to disregard housing assignments by simply choosing a

different cell than the one assigned.  April 2016 Status Conf. at 36:5-8.

Thus, even where the classification unit has gone through the process of deciding where

best to house a prisoner, security staff have taken actions to override this designation.  There is

"no integrity" about housing assignments at the Jail.  *Id*. at 36:3-4.  Dr. Hardyman has cited to a

lack of training and supervision in failing to communicate and endorse the importance of

custodial placement to the security of the Jail.  Feb. 2016 Status Conf. at 53-54.  "Classification

is the hub or the driving part in terms of making sure that you have a safe and secure facility."

Feb. 2016 Status Conf. at 57.  When persons of incompatible security levels, PREA designations,

special population needs, and separation status are housed together, prisoner-on-prisoner

violence results, and the frequency of uses of force increases.  5th Monitors' Rpt. at 23.

While OPSO has recently provided for disciplinary code infractions (and their

dispositions) to be entered into the JMS system when a prisoner is moved to the disciplinary tier,

April Status Conf. at 35:15-21, only a fraction of incidents in the Jail result in the movement of a

person to the disciplinary tier.  This process was only recently instituted and, as Dr. Hardyman

testified in April 2016, OPSO will "have to maintain that and make sure that those rules get

understood and agreed with all the way up the line."  April Status Conf. at 35:22-24.  For all the

other incidents that do not result in the movement of a prisoner to the disciplinary tier, there

remains no standardized process by which OPSO routinely (a) documents alleged infractions by

report when an incident occurs, (b) reviews infractions and assesses guilt, and (c) enters findings

as to guilt into the JMS.  Further OPSO has not trained and established a full-time disciplinary hearing officer, as recommended by Dr. Hardyman.  April Status Conf. at 39:5-8.

Prior institutional behavior is one of the most important risk factors in classification assessments.  As Dr. Hardyman recently noted at the April status conference, because "institutional behavior is the best predictor of institutional adjustment and where they need to be placed in terms of their custody level, we're missing a very, very critical piece of information when we're making those custody reassessments."  April Status Conf. at 35:6-11.  Without a system by which OPSO assesses guilt of all disciplinary allegations, and feeds findings into the JMS, custody assessments will fail to accurately account for a prisoner's institutional behavior and risk level.  If information as to a prisoner's disciplinary infractions does not enter the JMS, the classification system is unable to adjust a prisoner's security level, PREA status, or separations (*i.e.* enemies) to account for past behavior, and OPSO underestimates the risk that individuals pose.   Feb. 2016 Status Conf. at 49:12-50:2.

This problem is further exacerbated due to OPSO's failure to timely complete incident reports.  5th Monitors' Rpt. at 21.  Where incident reports are not logged into the Jail's incident reporting system, VANTOS, information as to a prisoner's institutional behavior cannot be transmitted to the JMS and utilized to adjust a prisoner's custody and PREA status.  As Lead Monitor McCampbell reported to this Court at the February 2, 2016, status conference, OPSO's recent use of inter-office memos for use of force reporting enabled uses of force to escape transmission to VANTOS, defeating the early warning system in addition to the classification system.  Feb. 2016 Status Conf. at 17:18-25.

OPSO has not "continue[d] competency-based training and access to all supervisors on the full capabilities of the OPSO classification and prisoner tracking system" as required by

Consent Judgment § IV.A.10.e.  During her January 2016 onsite visit, Dr. Hardyman noted inaccurate scores for offenders' criminal history when reviewing initial custody assessments completed by the classification staff.  5th Monitors' Rpt. at 52.  These inaccuracies stemmed from the inability of the staff to correctly read and interpret National Crime Information Center (NCIC) criminal history reports.  *Id*.  Without accurate reading of NCIC reports by staff, persons in OPSO custody do not receive reliable initial security level assessments.  Such security level assessments should dictate the housing pod on which an offender is placed, such that only persons of compatible security levels are housed together.  As a result of Dr. Hardyman's assessment that the classification staff require additional training on how to read and interpret NCIC criminal history reports, the Sheriff has regressed in compliance with this provision of the Consent Judgment.  *Id*.

Finally, the Consent Judgment requires the Sheriff to provide the Court Monitors with a periodic report on classification at the Jail, including data as to the number of assaults, the number of persons classified at each security level, and the number of persons on protective custody.  Consent Judgment § IV.A.10.g.  The Sheriff remains non-compliant with this provision and has shown no progress in achieving compliance with this provision since entry of the Consent Judgment.  While the Sheriff has produced some reports tracking the classification process, reports on custody assessments for multiple months in 2015 were "incomplete and misleading."  5th Monitors' Rpt. at 53-54.  OPSO may be in the process of developing JMS reports that will provide "useful, accurate, and timely information," *id*. at 54, but the Sheriff has failed to do so to date.

In sum, despite very extensive technical assistance and complete design of a new classification system by the Court Monitors, the Sheriff remains non-compliant with the Consent

Judgment's classification requirements, a necessary foundation for separating prisoners as appropriate and protecting them from harm.

**H.     Inappropriate and Dangerous Isolation of Youthful Prisoners.**

This case began as a challenge to the unconstitutional conditions on the youth tier at the Orleans Parish Jail.  Civil Action No. 12-138, under seal.  That action was subsequently consolidated with the larger class action. Conditions for the youth have remained one of the most neglected and shameful components of this litigation.  Youthful prisoners—prisoners age 17 or younger—are small in number, but are a complex population with specific needs distinct from those of adults.

The Consent Judgment requires sight and sound separation of youthful prisoners from the rest of the Jail's population, separation of protective custody youthful prisoners from non-protective custody prisoners, and implementation of developmentally appropriate mental health and programming services.  Consent Judgment § IV.G.  The Consent Judgment's provisions are consistent with PREA and its implementing regulations, including 28 C.F.R. § 115.14(c), which emphasizes that correctional facilities must "make best efforts to avoid placing youthful inmates in isolation" to comply with the requirement for sight and sound separation of youthful prisoners from the Jail's adult population.  The PREA regulations also require that, absent exigent circumstances, facilities should "not deny youthful inmates daily large-muscle exercise and any legally required special education services . . . . "  28 C.F.R. § 115.14(c).  The Sheriff is in direct violation of PREA and this provision of the Consent Judgment.

OPSO youthful prisoners are either held without sight and sound separation or in long-term lockdown.  OPSO youthful females are housed with adults, in violation of the Consent Judgment and PREA.  5th Monitors' Rpt. at 140.  OPSO has a policy for separation of male

youthful prisoners.  1st Monitors' Rpt. at 109.  However, the Jail keeps most, and sometimes all, male youthful prisoners locked down in their cells most of the time, with inadequate out-of-cell time.  *Id.* at 70-71.  Because all male youth are kept on one tier, including co-defendants, there is no strategy other than lockdown in a cell as a means of safe housing.  5th Monitors' Rpt. at 139; April 2016 Status Conf. at 22:14-18.  This subjects youth to risk of serious psychological harm and also is a bad management strategy.  5th Monitors' Rpt. at 140.

The use of prolonged periods of isolation on young prisoners, rather than protecting them, may have devastating consequences.[7]  Prolonged periods of isolation can lead to the development of mental health problems, or exacerbate already-existing mental illness.  *See generally* Craig Haney, *Mental Health Issues in Long-Term Solitary and 'Supermax' Confinement*, 49 CRIME & DELINQUENCY 124 (2003); Holly A. Miller and Glenn R. Young, Prison, *Segregation: Administrative Detention Remedy or Mental Health Problem?*, 7 CRIM. BEHAV. & MENTAL HEALTH 85 (1997); Stanley L. Brodsky and Forrest R. Scogin, *Inmates in Protective Custody: First Data on Emotional Effects*, 1 FORENSIC REPS. 267 (1988).

Given the particular vulnerabilities of youthful prisoners, the mental health consequences of prolonged isolation are especially severe for youth.  *See Growing Up Locked Down: Youth in Solitary Confinement in Jails and Prisons Across the United States*, Oct. 2012, at 24, *available at* http://www.hrw.org/reports/2012/10/10/growing-locked-down.   Youth placed in solitary

---

[7]     On January 25, 2016, in response to a directive from the President, the Department of Justice released a report and recommendations on the use of restrictive housing in corrections.  U.S. Dep't of Justice, *Report and Recommendations Concerning the Use of Restrictive Housing*, Jan. 2016, *available at* http://www.justice.gov/restrictivehousing.  The Restrictive Housing Report includes a series of "Guiding Principles" for limiting the use of restrictive housing across the American criminal justice system, including a recommendation to prohibit restrictive housing for youthful offenders due to the potential of serious harm.  *Id.* at 101.

confinement are also at an increased risk for suicide. *See* Margaret Noonan & E. Ann Carson,

U.S. Dep't of Justice, Bureau of Justice Statistics, *Prison and Jail deaths in Custody, 2000-2009*

*- Statistical Tables* (2011), *available at* http://bjs.ojp.usdoj.gov/content/pub/pdf/pjdc0009st.pdf;

Lindsay M. Hayes, Dep't of Justice Office of Juvenile Justice and Delinquency Prevention,

*Juvenile Suicide in Confinement: A National Survey* (2009), *available at*

https://www.ncjrs.gov/pdffiles1/ojjdp/213691.pdf; Seena Fazel, Julia Cartwright, et al., *Suicide*

*in Prisoners: A Systematic Review of Risk Factors*, J. CLIN. PSYCHIATRY 69 (2008); Christopher

Muola, U.S. Dep't of Justice, Bureau of Justice Statistics, *Suicide and Homicide in State Prisons*

*and Local Jails* (2005), *available at* http://bjs.ojp.usdoj.gov/content/pub/pdf/shsplj.pdf.

Recognizing the unique needs of youthful prisoners, the Consent Judgment requires

developmentally appropriate programming for them.  Consent Judgment § IV.G.  The Sheriff has

been on notice of the need for remedies to address the youthful population at least since January

2012, yet the Sheriff continued not to prioritize the youth into the following years.  In February

2015, the Court Monitors noted, "youthful inmates continue to be housed in one tier in Conchetta

regardless of their classification, disciplinary status and 'keep separates' from other inmates. …

Inmates receive time out of their cells at different times to avoid mixing the inmates."  3d

Monitor Rpt. at 124.  Further, "there are no programs for youth, even youth who retain their

special education entitlement."  *Id*. at 124.

Holding the youth in lockdown has been due in part to inadequate staffing.  Even if there

were adequate staff to allow youthful prisoners out of their cells, the Jail does not have consistent

opportunities for out-of-cell recreation, visitation, education, or programming.  The Sheriff has

finally hired two individuals to address youth programming. However, due to the lack of staffing

and continued maintenance of youth on lockdown in their cells, the programming is functionally

reaching very little of its designed goals.  5th Monitors' Rpt. at 140.  Isolation and the absence of

Consent Judgment-required programming, along with the violent conditions plaguing all the Jail

units, pose serious threats to the physical and mental health of the youth in the Jail.

I.     **Deficient Sanitation and Environmental Conditions Endanger Prisoners, Staff, and the New Jail Facility.**

Despite the move from decaying, decades-old facilities to a newly constructed building,

the Sheriff's compliance with the Consent Judgment's provisions governing sanitation and

environmental conditions has not improved.  In fact, it has worsened since the previous

compliance report.  The Sheriff has reached substantial compliance with only 1 of the 15

provisions in Section IV.D. of the Consent Judgment and has now regressed from "partial

compliance" to "non-compliance" in 3 provisions.  5th Monitors' Rpt. at 162.  Non-compliance

or partial compliance with the remaining provisions exposes inmates and staff to continued

threats to their health and safety.

The Consent Judgment also requires the Sheriff to provide supervision and oversight of

cleaning of housing units, showers, and medical areas, to include routine cleaning schedules and

at least weekly inspections.  Consent Judgment § IV.D.1.a.  Not only has the Sheriff failed to

meet the Court Monitor's measures of compliance, but the Sheriff also failed to adopt most of

the interim remedial measures agreed upon during the Court Monitor's technical assistance visit

of October 2015.  5th Monitors' Rpt. at 108–11.  As the Court Monitors warned in September

2015, without policies for cleanliness standards and accompanying training in said policies, "the

sanitation in the new jail may not change from that in the existing facilities."  4th Monitors' Rpt.

at 97.

As of the Court Monitors' latest compliance report, OPSO has no final policy governing

the cleaning of the housing units, showers, or medical facilities.  Although the Sheriff's

Sanitarian created an interim directive of master cleaning schedules, it has never been implemented nor have the cleaning duties it describes been assigned.  5th Monitors' Rpt. at 110.  OPSO's interim directive relies heavily upon "sanitation officers" to direct housekeeping at the jail.  But these sanitation deputies have yet to be selected or trained.  *Id*. at 110.  Furthermore, OPSO lacks a policy for the control and distribution of the cleaning chemicals to complete these cleaning tasks.  Although the Sheriff has provided documentation of sanitation inspections, the inspections are not comprehensive and are rendered useless by the failure to take action to remedy the many deficiencies revealed by these inspections.  *Id*. at 111.  The cumulative effect of these missteps is the creation of an unsanitary, hazardous environment in a newly constructed building that has been occupied for only six months.  "Housing unit deputies do not seem to see cleanliness as a high priority given conditions observed during this tour."  *Id*. at 105.  Prisoners who wish to clean their cells and common areas are stymied by a denial of cleaning products and supplies.  *Id*. at 110.  Lack of cleaning and maintenance in the shower areas has led to standing water that creates a slip-and-fall hazard.  *Id*.

The lack of rules and procedures for these most basic housekeeping functions also causes security risks.  Brooms and mops are frequently left unattended on housing units and are utilized as weapons.  *Id*.  In a sanitation inspection conducted by OPSO staff on November 20, 2015, inspectors found that a broom or mop had been left unsecured on six tiers.  *OJC Inspection Report No. 8*, Nov. 20, 2015 (attached as Exhibit 4).

Causing further risk of serious harm, there has historically been a serious problem with Orleans Parish prisoners being left to clean up others' blood, feces and vomit, particularly where prisoners are detoxing in the Jail.  To address this situation, both § IV.D.1.f. of the Consent Judgment and the stipulated order of February 11, 2015, ECF No. 787 at 11, mandate the

creation and implementation of a biohazardous spill policy.  Over one year after the entry of the stipulated order and one day before the latest compliance tour, the Sheriff produced policy 1101.7 "Biohazardous Spills Cleaning Procedures."  5th Monitors' Rpt. at 117.  The policy stipulates that deputies instead of prisoners will be responsible for cleaning biohazardous spills like blood and bodily fluids.  Yet the "sanitation deputies" on whom the policy relies have not yet been identified, nor is there evidence that any deputies were trained on this new policy.  *Id*. at 117–18.  Furthermore, the Consent Judgment's requirement that OPSO develop an infection control policy, Section IV.D.1.h, has not been met.  *Id*. at 118.  Although the existence of an infection control policy created by CCS was previously seen as a step toward partial compliance, 4th Monitors' Rpt. at 105, OPSO's failure to implement that policy organization-wide, much less create its own policies and procedures for OPSO employees, caused the Court Monitors to move this provision back to a state of non-compliance.  5th Monitors' Rpt. at 119.

The Consent Judgment requirement for adequate air quality and ventilation, Section IV.D.1.c, has moved to non-compliance in the new OJC facility because of poor ventilation in the showers, lack of written policies for the measuring of air quality and scheduling of preventive maintenance, and a lack of budgeting for preventive maintenance.  *Id*. at 113-14.  The Court Monitors note that poor ventilation caused excessive condensation, which creates slip-and-fall hazards, obscured windows, and created unsanitary conditions such that the showers could not be properly cleaned and disinfected.  *Id*. at 117.  In an observation that applies equally to the lack of written policies, the Court Monitors remarked that without regular preventive maintenance "this building will begin to deteriorate, and there will be health/safety issues, and unnecessary long-term costs."  *Id*. at 114.

The Consent Judgment also calls for a preventive maintenance plan and repairs within 48 hours, or 24 hours in emergencies.  Consent Judgment § IV.D.1.b.  Yet, as noted above, OPSO has no preventive maintenance plan.  5th Monitors' Rpt. at 112.  Although the maintenance department has an electronic work order system, there was no evidence of deputy attendance at trainings in the use of this system, deputies interviewed by the Court Monitor did not know how to request a work order, and deputies did not know how to check on the status of work orders. *Id.* at 112–13.

The Sheriff has not yet developed policies to implement the reporting and quality control provisions applicable to sanitation and environmental conditions.  *Id.* at 127-28.  No member of the OPSO staff has been identified as responsible for coordinating the Sheriff's response to the ongoing six-month sanitation reports; *i.e.* ensuring review by administrators, auditing facilities, and suggesting policy changes.  *Id.* at 127-28.

With regard to food service, OPSO not only lacks a written policy to monitor and record temperatures of refrigerators, hot-food holding equipment, and dishware sanitizing equipment, but also fails to take corrective action when refrigerators and freezers reach potentially hazardous temperatures.  *Id.* at 124-26.  Daily temperature logs of refrigerators and freezers in the Kitchen/Warehouse were provided to the Court Monitor before the February site visit.

> [U]nacceptable temperatures were recorded for most days during November and December . . . [with] no written evidence provided that noted any corrective action taken by OPSO staff or the contractor, such as to repair the equipment [or] transfer food to functioning units. . . . When the Monitor asked staff taking temperatures what should be done when temperatures exceed the maximum permitted level, they could not correctly answer [ ] that the action must be to transfer or discard the food.

*Id.* at 125.

OPSO also fails to monitor the "potshack warewasher" to ensure that it is washing and sanitizing cookware at the correct temperature. *Id*. at 125. OPSO has no written policy for the daily cleaning and sanitizing of dishes, utensils, and food prep and storage areas. *Id*. at 122. The Court Monitors criticized the internal inspections conducted by OPSO, noting that they were unsigned and revealed repeated violations, such as no hand washing station immediately accessible in the food prep area, inadequately sealed food trays, insufficient use of sanitizer at dish washing stations, and various plumbing problems, without documenting corrective action. *Id*. at 122–23.

The Sheriff's ongoing non-compliance with the Consent Judgment's sanitation requirements endangers prisoners' health and safety and also places the integrity of the new facility at risk.

## IV.   APPOINTMENT OF A RECEIVER IS APPROPRIATE AND NECESSARY TO ENSURE CONSTITUTIONAL CONDITIONS

### A.   Receivership is Appropriate to Address "Otherwise Uncorrectable Violations."

While receivership is an extraordinary remedy, there is no doubt that the Court is authorized to appoint a receiver to remedy "otherwise uncorrectable violations of the Constitution or laws." *Plata v. Schwarzenegger*, 603 F.3d 1088, 1094 (9th Cir. 2010). The decision whether to appoint a receiver is a function of the court's discretion in evaluating what is reasonable under the particular circumstances of the case. *Dixon v. Barry*, 967 F. Supp. 535, 550 (D.D.C. 1997) (upholding appointment of a receiver over the District of Columbia's Commission on Mental Health Services). The factual and procedural record of this case demonstrates the appropriateness of a receiver given the Sheriff's demonstrated inability to correct the constitutional violations at the Orleans Parish Jail.

There is significant precedent for the use of receivership in the corrections context. *Plata v. Schwarzenegger (Plata I)*, No. C01-1351, 2005 WL 2932253, at *23 (N.D. Cal. Oct. 3, 2005) (ordering receivership for the delivery of medical services to all California state prisoners); *Inmates of D.C. Jail v. Jackson*, 158 F.3d 1357, 1359 (D.C. Cir. 1998) (recounting appointment of receiver for jail's medical and mental health services); *Shaw v. Allen*, 771 F. Supp. 760, 762 (S.D. W. Va. 1990) (appointing a receiver over a jail, noting, "a court acting within its equitable powers is justified, particularly in aid of an outstanding injunction in implementing . . . a receivership so as to achieve compliance with a constitutional mandate"); *Crain v. Bordenkircher*, 376 S.E.2d 140, 143 (W. Va. 1988) (holding that it "has authority to place the [West Virginia] penitentiary in receivership and appoint a receiver for the purpose of constructing a new facility"); *Newman v. Alabama*, 466 F. Supp. 628, 635 (M.D. Ala. 1979) (appointing receiver for Alabama State Prisons); *Wayne County Jail Inmates v. Wayne County Chief Executive Officer*, 444 N.W.2d 549, 560-61 (Mich. Ct. App. 1989) (affirming appointment of receiver in case where sheriff had failed over many years to implement court order requiring improvements in operation of correctional facility).

Courts have developed a multi-pronged test to determine whether receivership is appropriate:  (1) whether there is a grave and immediate threat or actuality of harm to plaintiffs; (2) whether the use of less extreme measures of remediation has been exhausted or proven futile; (3) whether continued lesser efforts to effect compliance would lead to confrontation and delay; (4) whether there is a lack of leadership to turn the tide within a reasonable period time; (5) whether there is bad faith; (6) what resources are being wasted; and (7) whether a receiver is likely to provide a relatively quick and efficient remedy.  *Plata I*, 2005 WL 2932253, at *23; *see also Dixon*, 967 F. Supp. at 550 (citing *Judge Rotenberg Educ. Ctr. Inc. v. Comm'r of the Dep't*

*of Mental Retardation*, 677 N.E.2d 127, 148-49 (Mass. 1997) (appointing receiver of state

Department of Mental Retardation)); *Morgan v. McDonough*, 540 F.2d 527, 533 (1st Cir. 1976)

(approving temporary receivership of South Boston High School for purpose of desegregation).

Here, all seven prongs weigh in favor of appointing a receiver to run the Orleans Parish Jail.

### 1.   Prisoners at Orleans Parish Jail are in Grave Danger.

Despite the long-awaited September 2015 move into the new jail facility, levels of

violence, excessive force, and self-harm remain unacceptably high.  Lead Monitor McCampbell

compiled a spreadsheet of over 300 incidents that the Sheriff reported occurred at the Jail in the

first 11 weeks of 2016.  *2016 OPP Incidents* (attached as Exhibit 5).  The list includes a prisoner

death by suicide; discovery of a fully loaded 9mm magazine inside of the toilet paper dispenser

in the prisoner intake area; 114 prisoner-on-prisoner fights; 12 prisoner assaults on staff; 53 uses

of force; 5 alleged sexual assaults; and 50 suicide attempts.  *Id.*  Obviously, incidents that

occurred in unsupervised tiers or cells, or that staff failed to report, are not included.  The level

of violence is unacceptable.  April 2016 Status Conf. at 19:12-13.  Prisoners at the Orleans

Parish Jail are in grave danger.

The fifth Monitors' report, issued just last month, confirms the grave and immediate

threat of harm to prisoners at the Orleans Parish Jail if the operational dysfunction is not

remedied as soon as possible.  Prisoners at the Jail are not adequately supervised as staff are

often absent from the tiers.  5th Monitors' Rpt. at 25.  Violence and use of force goes unreported.

*Id.*  at 20-21.  Lack of reporting compromises the Jail's investigations and Early Intervention

System, *Id.* at 20, 30, which prevents OPSO from identifying and addressing misconduct.  The

classification system is incomplete and has been compromised by staff who do not implement

the housing assignments.  *Id.* at 53-54.  This results in prisoners being housed on the same tiers

as their co-defendants and known enemies, and vulnerable prisoners being housed with potential predators.  Youthful prisoners are inappropriately subjected to restrictive housing, exposed to adult prisoners, and denied appropriate programming.  *Id*. at 139-40.  The new Jail facility is already deteriorating into unsanitary and unmaintained conditions.  *Id*. at 117.  OPSO is unable to keep suicidal prisoners safe.  *Id*. at 83, 92.  The prisoners are taking control of the Jail.  *Id*. at 21.  It is only a matter of time before more prisoners, or staff members, suffer serious injury or death.  In approving the Consent Judgment in 2013, this Court found that "that OPP itself presents a public safety crisis, which endangers inmates, staff, and the community at large." ECF No. 465 at 78.  In 2016, a public safety crisis still exists inside the Orleans Parish Jail.   The Sheriff has failed to demonstrate that OPSO can operate a safe jail, and a receiver is necessary to address the danger.

## 2.  Measures Short of Receivership Failed to Result in Reform.

The Orleans Parish jail system was under consent decree from 1969 until 2008. *Hamilton v. Nagin*, CIV. A. 69-2443, 2008 WL 2522129, at *1 (E.D. La. June 20, 2008). Despite the consent decree, conditions at the Jail remained abysmal.  In February 2008, the Civil Rights Division of the United States Department of Justice ("DOJ") notified City officials of its intention to investigate conditions of confinement at the Orleans Parish jail, pursuant to the Civil Rights of Institutionalized Persons Act, 42 U.S.C. § 1997 ("CRIPA").  In September 2009, DOJ issued a comprehensive letter describing its findings of unlawful conditions related to prisoner-on-prisoner physical and sexual violence, excessive use of force, inadequate suicide prevention and mental health care, and inadequate environmental and fire safety and sanitation.  DOJ presented the Sheriff with a detailed proposal of remedial measures and an offer to begin

settlement negotiations.  Years of negotiations ensued, during which the Sheriff assured DOJ that reforms were already under way.  Yet people continued to die and be seriously injured in the Jail.

Because conditions continued to deteriorate, on April 2, 2012, the men, women and youth imprisoned at the Jail filed class action litigation seeking federal court protection from abusive, dangerous, and unconstitutional conditions of confinement.  Conditions articulated by the prisoners were substantially similar to many of the conditions outlined in DOJ's September 2009 letter of findings.  ECF No. 1.  On September 25, 2012, the Court granted the United States leave to file its Complaint in Intervention in the class litigation.  ECF No. 70.  The Parties engaged in comprehensive settlement negotiations and, on December 11, 2012, Plaintiffs and the Sheriff filed the original proposed consent judgment.  ECF No. 101-3.  Following a multi-day evidentiary hearing and extensive briefing, the Court approved the Consent Judgment on June 6, 2013, and its terms became effective on October 21, 2013.  ECF Nos. 465 and 583.

Since then, OPSO's dysfunctional administration and unwillingness to cooperate has yielded little progress and nearly wholesale non-compliance.  The Court Monitors have conducted five formal compliance tours and issued five reports confirming non-compliance.  Indeed, the most recent Monitors' report found backsliding in compliance, with fewer paragraphs in substantial compliance than the prior report:  only 10 out of 173, compared to 12 out of 173 in the prior report.  5th Monitors' Rpt. at 1.

Compliance remains abysmal despite the Court Monitors having provided extensive technical assistance through numerous on-site visits, countless phone calls, and extensive document review and revision.  The Court Monitors have assisted the Sheriff in recruiting and hiring new jail leadership, but corrections professionals from the outside have resigned after finding OPSO unwilling to implement necessary changes.  Exhibit 1; Letter from Michael Moore

47

to Sheriff Marlin Gusman, Feb. 19, 2016 (attached as Exhibit 6).  The Parties and the Court have

participated in 80 status conferences.  In addition to issuing three notices of non-compliance and

negotiating two stipulated orders for more specific relief, ECF Nos. 787, 824, Plaintiffs have

attempted to engage the Sheriff on numerous occasions to resolve issues of non-compliance.

The Court Monitors have conducted weekly and monthly phone conferences in an effort to move

the Sheriff toward compliance.  Yet exceedingly dangerous conditions remain and compliance is

stalled.  Lead Monitor McCampbell noted on April 11, 2016, "[w]e are providing very specific

recommendations, as it is apparent to the Monitors that the OJC staff does not have the

experience, time, and/or leadership to identify the issues and fix the problems in other than a

temporary way."  Letter from S. McCampbell to Sheriff Marlin N. Gusman, Apr. 11, 2016

(attached as Exhibit 7).  Given the failure of technical assistance that has been provided to OPSO

by the Court Monitors and other entities arranged by the Court Monitors and Plaintiffs,[8] there is

no reason to believe that, even with additional orders for more specific relief, the Sheriff can or

will bring the Orleans Parish Jail into compliance with the Consent Judgment and the

Constitution.

     In the *Plata* case, the court appointed a receiver to reform and operate the medical care

program in the California prison system, including developing remedial plans and renovating

existing medical facilities.  *Plata*, 603 F.3d at 1097.  The Ninth Circuit upheld the appointment

as an appropriate remedy that was compliant with the Prison Litigation Reform Act ("PLRA")

requirements for prospective relief, 18 U.S.C. § 3626(a)(1)(A).  In *Plata*, the plaintiffs moved for

a receiver three years after entry of a voluntary consent decree, with one intervening remedial

order, to which the parties had stipulated.  *Id.* at 1091.  The court found that technical assistance

---

[8]     For example, the Monitors and Plaintiff United States have helped facilitate
OPSO staff attendance at National Institute of Corrections inmate management training.

and status conferences did not result in reform.  *Plata I*, 2005 WL 2932253, at *26-27.  In

appointing the receiver, the district court found, after an evidentiary hearing involving expert

testimony as to the "incompetence and indifference" of prison officials, that a receiver was

necessary to "dramatically overhaul[]" the operation.  *Plata*, 603 F.3d at 1091.  The Ninth

Circuit denied the state's challenge to the receiver appointment on the basis that "the record

simply does not support the State's contention that anything less than a receivership would have

remedied the undisputed constitutional deficiencies in prisoners' health care at the time the

receivership was imposed."  *Id.* at 1097.  Because the state had stipulated to both to a consent

decree and an additional remedial order intended to remedy the deficiencies, but the record

demonstrated a total lack of compliance, "the district court justifiably concluded that the State's

personnel simply could not or would not bring the State into constitutional compliance in the

foreseeable future."  *Id.*

As in *Plata*, this Court, the Court Monitors, and Plaintiffs have tried to encourage,

instruct, and compel OPSO to achieve compliance with the Consent Judgment.  The Sheriff and

OPSO have demonstrated an unwillingness or inability to do so.  And worse, OPSO has chased

off corrections professionals who have come in to attempt to implement reform, through the

Consent Judgment-mandated jail administrator position.  At this juncture, the only viable option

is to appoint a receiver with the authority to operate and staff the Orleans Parish Jail.

### 3. Continued Lesser Efforts to Effect Compliance with the Consent Judgment Will Lead to Confrontation and Delay.

Through numerous regular status conferences, site visits, monthly and weekly calls, the

Court and the Parties have spent thousands of hours trying to transform the Jail into a

professionally operated, reasonably safe place, as required by the Consent Judgment.  These

efforts have failed.  The Sheriff has not acknowledged the depth and seriousness of the

underlying problems causing the continued dangerous conditions, including the lack of stable

professional leadership and the broken culture cultivated and perpetuated by that lack of stable

professional leadership.  Indeed, the Sheriff currently denies that many of the problems plaguing

the Jail even exist.[9]  After hours of conversation with the Sheriff and the Court Monitors,

Plaintiffs have agreed repeatedly to informally modify various deadlines to be more attainable by

OPSO.  Still those extended deadlines requested by the Sheriff were missed.  Three times before,

Plaintiffs have sent notices of non-compliance in an effort to resolve the conditions causing

serious harm to prisoners through assaults, uses of force, and suicide and self-harm.  After weeks

to months of significant delay, the parties settled with stipulated orders that have proven to be

ineffective in curing the non-compliance.  OPSO again missed the deadlines the Sheriff had

renegotiated.

Plaintiffs' efforts to call the Sheriff's attention to major deficits in programming and

planning throughout this case have either been ignored or ridiculed.  For example, in May 2013,

Plaintiffs filed a brief highlighting concerns about the construction of OJC, particularly the

housing of special populations, in the hope that these problems might be addressed early in the

construction process.  ECF No. 439.  The Sheriff's initial response was to dismiss Plaintiffs'

concerns as either unfounded or unnecessary under the terms of the Consent Judgment.  ECF No.

447.  However, Plaintiffs' May 2013 pleading ultimately triggered a year of negotiations

between the City and the Sheriff and several hearings on short-term and long-term plans for

housing the mental health population.  In the course of those hearings, Plaintiffs emphasized the

need to clearly define clinical criteria to ensure transfer of prisoners with acute mental health

---

[9]       *OPSO State of the Sheriff's Office Address*, Apr. 5, 2016, *available at*
http://www.wdsu.com/news/local-news/new-orleans/orleans-parish-sheriff-marlin-gusman-to-
deliver-state-of-the-sheriffs-office-address/38879934.

needs and an appropriate step down program to avoid the risk of individuals decompensating upon return to OPSO custody.  ECF Nos. 714, 729.  The Court ultimately ordered the movement of acute mental health populations to OPSO's Hunt unit as a short-term plan.  ECF No. 738. Nearly two years later, there is no long-term plan for providing adequate mental health care and the identified deficiencies and harm persist.  5th Monitors' Rpt. at 11-12, 75; April 2016 Status Conf. at 41:3-8, 48:4-24, 57:14-19.

Indeed, OPSO has a history of entering into a jail conditions consent decree and failing to come into compliance for a protracted period of time.  Problems at the Orleans Parish Jail long pre-date this case.  In 1969, a prisoner named Louis Hamilton filed a class action lawsuit on behalf of all of the individuals in the Jail regarding conditions of confinement.  *Hamilton v. Schiro*, No. 69-2443 (E.D. La. 1969).  In 1970, the United States District Court for the District of Louisiana held, similarly to the Court's findings in its 2013 Order entering the Consent Judgment in this case, that:  "the conditions of confinement in Orleans Parish Prison so shock the conscience as a matter of elemental decency and are so much more cruel than is necessary to achieve a legitimate penal aim that such confinement constitutes cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments of the United States Constitution." *Hamilton v. Schiro*, 338 F.Supp. 1016, 1019 (E.D. La. 1970).   Despite this Court's powerful statement and finding of constitutional deficiencies at Orleans Parish Jail in 1970, the *Hamilton* case continued for nearly 40 years.  *Hamilton v. Nagin,* Civ. A. 69-2443, 2008 WL 2522129, at *1 (E.D. La. June 20, 2008).

Given the Court record as well as the Sheriff's persistent denials and minimizations of the conditions at the Jail, continued lesser efforts will only lead to further confrontation, delay, and serious harm to the people confined to the Jail.

**4. OPSO's Leadership Cannot or Will Not Comply in a Timely Manner.**

As the Court Monitors noted in their most recent report, the Court Monitors "will continue to support the work of OPSO staff who are legitimately trying to obtain compliance. But without organizational change in OPSO, these efforts will be insufficient and unsustainable." 5th Monitors' Rpt. at 18-19.  The record in this case and the Sheriff's response to Plaintiffs' current notice of non-compliance demonstrate that the necessary organizational changes to achieve compliance will not come without Court action to appoint a receiver.

Given the opportunity to demonstrate that it has cured, is in the process of curing, or has the ability and wherewithal to cure the ongoing Consent Judgment non-compliance, the Sheriff has provided assurances of none.  The Sheriff's response to Plaintiffs' notice of non-compliance provided no indication that OPSO understands how to achieve compliance and has the capacity to do so.  Rather than outlining the steps needed to achieve compliance with each provision in a logical fashion, the Sheriff's response merely cut and pasted the Court Monitors' compliance measures and, for some of the measures, listed the handful of individuals responsible for the respective substantive areas along with dates, some of which contain no explanation.  When dates were listed, it was unclear what is scheduled to happen on the proposed date (e.g., finalization of policy, training, auditing), how the proposed date was chosen, and how the proposed date fits into an overall schedule for compliance.  For the rest of the measures, the action letters simply listed "N/A" for both the responsible party and due date.  In sum, the Sheriff has not been able to generate a full, deadline-drive plan for compliance – including policy development, training, and implementation of audit measures – for any of the noticed areas of non-compliance.

In addition, the Sheriff has failed to address overarching barriers to compliance that the Court Monitors have identified, such as organizational structure and leadership, staff retention, and internal culture. Faced with a notice of non-compliance and a Monitors' Report summarizing compliance at approximately 5%, OPSO nonetheless has failed to incorporate the numerous specific recommendations from the Monitors' compliance reports and many additional written and verbal technical assistance communications into its response to the Plaintiffs. For these reasons, Plaintiffs notified the Sheriff on March 22, 2016 that extraordinary relief appeared warranted. Plaintiffs invited further discussion, which occurred on April 6, 2016.

Despite those good faith discussions, there remains no effective solution to the ongoing non-compliance, unacceptably slow rate of compliance, and dangerous jail conditions, other than a receiver. The Sheriff has had multiple opportunities to empower qualified corrections professionals to exercise leadership and management authority to marshal resources toward Consent Judgment compliance. Two corrections professionals came to OPSO ready to commit their time, knowledge, and expertise, as well as their ability to bring in additional professionals with subject matter expertise to address Consent Judgment deficiencies in various areas. Both of those corrections professionals resigned. While we understand that Ms. DeSadier has agreed to return to OPSO as Chief of Corrections, her return does not resolve the dysfunctional organizational and leadership structure that has stymied reform previously. Thus far, the establishment of a professional jail administrator position in the OPSO chain of command has proven to be an inadequate remedy. A receiver is necessary to address the lack of leadership contributing to the ongoing non-compliance.

**5. Bad Faith Is Not a Necessary Predicate for Receivership but Does Exist in this Case.**

Although bad faith need not be shown for the Court to order a receiver, it exists in this case. In *Plata,* the District Court noted, "While lack of will thus is a key factor contributing to this crisis, the Court need not ascribe ill will to defendants as a predicate to appointing a Receiver, and the Court declines to do so." *Plata*, 2005 WL 2932253 at *30. Here, though unnecessary to support receivership, bad faith is shown by the recent state legislative audit findings that OPSO deputies worked off-duty details during OPSO working hours. Orleans Parish Sheriff's Office Investigative Audit, Louisiana Legislative Auditor, March 30, 2016 (attached as Exhibit 8). The most recent jail administrator and transitional director also imputed bad faith to OPSO leadership, stating upon their resignations that certain leadership at OPSO "interfere with the forward progress [the former jail administrator] seek[s] to gain," and "there are individuals who lack the knowledge of corrections operations but who are making decisions for personal reasons that impede the forward progress of this agency." Exhibits 1, 6. Bad faith actions that impede and even thwart compliance have plagued the Jail for an extended period of time and stymied reform efforts by multiple individuals.

The state legislative audit findings further confirm serious problems with leadership and oversight of Jail operations that contribute to the level of dangerousness in the Jail, particularly the finding that OPSO deputies worked off-duty details during OPSO working hours. *See* Exhibit 8 at 11. As discussed above, non-compliance with the Consent Judgment's staffing and supervision requirements is a driving force behind the assaults and serious self-harm happening on a daily basis in the Jail. *See* Section IV.A.1., *supra*. OPSO has failed to achieve the necessary staffing and supervision levels to provide reasonable safety. The lack of supervisory oversight and basic systems to track how staff spend their time contribute to the lax supervision

of prisoners in the Jail, not to mention fraud and abuse of taxpayer dollars.  When staff are

working off-duty details during their regular work hours, as the audit found, they are unable to

complete their assigned job duties for OPSO, placing prisoners and staff in an already short-

staffed Jail at greater risk of harm.  *See Id.* (finding 156 instances in which 16 OPSO deputies

(including Col. Austin) appear to have worked off-duty security details during their regularly-

scheduled hours).  According to the audit, the Sheriff paid these deputies out of taxpayer funds

for time spent on private security details over an extended period of time as well, from at least

October 2010 till November 2014.  *Id.*  Precious staff resources that should have been allocated

to Jail supervision were knowingly diverted to private security details, at the expense of prisoner

safety and taxpayer money.  Though bad faith is not required, it exists.

### 6.  Resources Are Being Wasted.

While resources and costs have been hotly, extensively, and continuously debated in this

case, there is no question that the Sheriff's ongoing non-compliance is wasting time, money,

and effort by OPSO staff, the City, Plaintiffs, Chair of the Budgetary Working Group Tommie

Vassel, the Court Monitors, Magistrate Judge North, and this Court.  The Court Monitors have

spent countless hours on this matter, including 16 individual Monitor site visits in just the past

six months.   Indeed, the Court Monitors have provided extensive technical assistance to OPSO

throughout the Consent Judgment implementation phase, but their recommendations have not

been implemented.  The Sheriff has hired two vendors to write the policies required by the

Consent Judgment, but after more than two years, most are not finalized.  OPSO staff

desperately require training, but training is ineffective without final (and compliant) policies.

While the Sheriff fails to expend resources implementing the Court Monitors'

recommendations for achieving compliance, the Court Monitors recently criticized OPSO for

wasting money on welding metal plates over the bottom of metal screens in the recreation yard

to prevent prisoners from communicating with the people outside the Jail:

> This idea, however costly it is, creates a problem of airflow into the recreation
> yards, and it does not address the core issue – that is – lack of inmate supervision.
> If staff were performing their job they would prevent violation of facility rules,
> and initiate disciplinary action for inmates involved in prohibited behaviors. So at
> the end of the day, OPSO decided on a costly option not consistent with jail
> management principles. *Continued* problem-solving without subject matter
> expertise will *continue* to produce more "solutions" that do not address the
> causes.

Exhibit 7 at 5 (emphasis in original).

　　　Because influential OPSO leadership and staff have resisted reform, the negative culture

that led to this litigation remains entrenched, which contributes to the 50% attrition rate

plaguing Jail staff.  5th Monitors' Rpt. at 7.  The attrition rate for the professional Corrections

Administrator position required by the Consent Judgment is 100%.  There was a net loss of 23

security staff in January and February of 2016.  April 2016 Status Conf. at 22:3-4.  Every time

new staff need to be recruited, interviewed, screened, on-boarded, and trained, money is spent.

When those staff leave in short order, money is wasted.  Plaintiffs' previous attempts to resolve

issues of non-compliance resulted in months of attorney meetings that yielded minimal results

but plenty of fees.  The Sheriff spent $1.4 million on attorneys' fees directly related to the

Consent Judgment in 2015.[10]  *Id.* at 8:19-21.  A receiver may not be able to operate the Orleans

Parish Jail at a cheaper daily cost than OPSO.  But an independent entity — untethered from

local politics and with the authority and goal of operating a constitutional Jail without further

unnecessary delay and foot-dragging — will conserve resources in the long run.

---

[10]　　　OPSO also paid out more than $995,000 in legal settlements related to the Jail in
2015.  As the Court noted during the April 7, 2016 status conference, it is likely that some of
those costs, and the injuries associated with them, could have been avoided if OPSO had
complied with the Consent Judgment.  April 2016 Status Conf. at 9:10-16.

**7. A Receiver is Likely to Provide a Relatively Quick and Efficient Remedy.**

While receivership is an extraordinary remedy, the court is authorized to appoint a receiver when a defendant demonstrates an inability or unwillingness to comply with the court's order. *Plata*, 603 F.3d at 1094; *Dixon*, 967 F. Supp. at 550. The Orleans Parish Jail and its prisoners are not unique. With competent leadership and policies and systems that reflect generally accepted correctional standards — many of which have already been designed with the assistance and input of the Court Monitors — the Orleans Parish Jail can be operated in line with the Constitution and the Sheriff's responsibilities pursuant to the Consent Judgment. The road map to compliance is there. What is necessary is a leader who can ensure compliance by recruiting and promoting effective staff to implement the policies and practices essential to reform, while removing staff who refuse to adapt to the required changes. With the proper authority, a receiver can enable the culture change that has kept OPSO from making progress toward timely compliance. A receiver can establish the systems of oversight of staff, physical plant, and Jail resources that have been lacking. When the Court Monitors and the Court find that the receiver has enabled the Orleans Parish Jail to achieve substantial compliance with the Consent Judgment, authority to operate the Jail system will return to the Sheriff to demonstrate that compliance can be sustained throughout the two-year compliance period required by the Consent Judgment. Consent Judgment § XI.C.

**B.    Appointment of a Receiver Complies with the PLRA.**

The PLRA provides that courts shall not issue prospective relief with respect to jail conditions unless it is narrowly drawn, extends no further than necessary to correct the violation of a federal right, and is the least intrusive means necessary to correct the violation.  18 U.S.C. § 3626(a).  There is no question that appointment of a receiver is an intrusive remedy.  Critically, however, the Supreme Court has cautioned that "the PLRA should not be interpreted to place undue restrictions on the authority of federal courts to fashion practical remedies when confronted with complex and intractable constitutional violations."  *Brown v. Plata*, 131 S.Ct. 1910, 1938 (2011).  The Court is authorized to appoint a corrections receiver to remedy "otherwise uncorrectable violations of the Constitution or laws."  *Plata*, 603 F.3d at 1094 (upholding appointment of prison medical receiver); *Inmates of D.C. Jail*, 158 F.3d at 1359 (upholding appointment of receiver for jail's medical and mental health services).

As detailed above, the record is replete with evidence that the Constitutional and Consent Judgment violations in the Jail are otherwise uncorrectable.  In a case where abundant technical assistance, negotiated orders for more specific relief, myriad status conferences, and five consecutive reports of non-compliance have not yielded results, appointment of a receiver is narrowly tailored, necessary, and the least intrusive means necessary to correct the violations at the Orleans Parish Jail.  Although Plaintiffs have focused this motion on nine major areas of non-compliance, the Court Monitors' reports demonstrate the Sheriff's non-compliance spans the entire Consent Judgment, and there is no reasonable prospect that he will move significantly toward compliance on his own.

To address the long-standing Constitutional violations at the Jail, Plaintiffs request appointment of a receiver with full authority to administer operations of the Jail, including the

ability to discipline, reassign, terminate, and promote Jail employees; develop and implement policies and procedures; allocate Jail budget funds; and enter into contracts for Jail services. However, as discussed above, the receiver's authority (and position) should terminate as soon as the Court Monitors and the Court determine that the Jail has achieved substantial compliance with the Consent Judgment.  As a temporary remedy for otherwise intractable problems, receivership complies with the limitations of the PLRA.

## V.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court find the Sheriff in contempt with regard to Consent Judgment Sections IV.A.1-8, 10-11, IV.B.5, IV.D.1-4, and IV.G, and order (1) a briefing schedule for the parties to submit proposals for the logistics pertaining to the appointment of a receiver with full authority to administer operations of the Orleans Parish Jail, including the ability to discipline, reassign, terminate, and promote Jail employees; develop and implement policies and procedures; allocate Jail budget funds; and enter into contracts for Jail services, and (2) any additional relief that the Court deems necessary.

Respectfully submitted,


**FOR THE UNITED STATES:**          VANITA GUPTA
                                    Principal Deputy Assistant Attorney General
                                    Civil Rights Division


                                     _/s/ Kerry Krentler Dean_____
                                    STEVEN ROSENBAUM, Chief
                                    LAURA L. COON, Special Counsel
                                    COREY M. SANDERS
                                    KERRY KRENTLER DEAN
                                    Attorneys
                                    United States Department of Justice
                                    Civil Rights Division
                                    Special Litigation Section
                                    950 Pennsylvania Avenue, N.W.
                                    Washington, DC  20530
                                    (202) 514-6255


**FOR THE PLAINTIFF CLASS:**         _/s/ Katie Schwartzmann_____
                                    KATIE SCHWARTZMANN
                                    ELIZABETH CUMMING
                                    EMILY WASHINGTON
                                    ERIC FOLEY
                                    MacArthur Justice Center
                                    4400 S. Carrollton Avenue
                                    New Orleans, LA 70119
                                    (504) 620-2259
                                    katie.schwartzmann@macarthurjustice.org


DATED:  April 25, 2016

60

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 25, 2016, I served the foregoing via the Court's CM/ECF system, which will automatically provide notice to all counsel of record.

*s/ Kerry Krentler Dean*
KERRY K. DEAN, (DC 474260)
Senior Trial Attorney
Attorney for the United States
United States Department of Justice
Civil Rights Division, Special Litigation Section
950 Pennsylvania Avenue, NW
Washington, DC 20530
(202) 514-6255
kerry.k.dean@usdoj.gov

61