UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

_____ )
                                   )
LASHAWN JONES, ET AL,              )
Plaintiffs; and                    )
UNITED STATES OF AMERICA,          )
Plaintiffs in Intervention         )
                                   )
v.                                 )
                                   )
                                   )
MARLIN N. GUSMAN, ET AL,           )
Defendants                         )          Civil Action No. 2:12-cv-00859
_____ )          Section I, Division 1
                                   )          Judge Lance M. Africk
MARLIN N. GUSMAN,                  )          Magistrate Judge Michael North
Third-Party Plaintiff              )
                                   )
v.                                 )
                                   )
THE CITY OF NEW ORLEANS,           )
Third-Party Defendant              )
_____ )

## SUPPLEMENTAL COMPLIANCE ACTION PLAN

NOW INTO COURT comes Orleans Parish Jail's Independent Compliance Director Gary D. Maynard and Sheriff Marlin N. Gusman, who respectfully submit the following Supplemental Compliance Action Plan in accordance with the provisions of the Stipulated Order for Appointment of Independent Jail Compliance Director (R. Doc. 1082). This supplement is intended to be read and considered in conjunction with the Compliance Action Plan previously entered into record of this matter by the Court on December 2, 2016 (R. Doc. 1104):

### A. Introduction

On Tuesday, June 21, 2016, the Orleans Parish Sheriff's Office (OPSO), Department of Justice, and Plaintiffs signed a Stipulated Order creating the position of Independent Jail Compliance Director. The Compliance Director has final authority to operate the Orleans Parish Jail (OJC) and all jail facilities), including authority over the entire prisoner population in the custody of OPSO, housed inside or outside of Orleans Parish, and is charged with doing so in a manner to achieve substantial compliance with each provision of the Consent Judgment on a timely basis, as further described in the remedial action plan to be drafted by the Compliance Director. The Compliance Director shall seek advice and/or approval from the Sheriff regarding all decisions that materially impact compliance with the Consent Judgment, unless doing so would cause unreasonable delay, and otherwise regularly inform the Sheriff regarding jail operations.

Furthermore, the Stipulated Order requires the Compliance Director to make a recommendation to the Court by December 1, 2016 on three major topics that will have a lasting effect on the OPSO and City of New Orleans. The three topics are the youthful inmate population currently being housed in OJC, the "Docks" - which is a holding area for the inmate population going to and from Criminal District Court - and a decision on a long-term solution for the inmate population affected by acute and sub-acute mental health and medical needs. On December 2, 2016, the conceptual plans for housing youthful inmates and the renovation of the Docks was submitted to the court, but due to the complexity of the issues surrounding acute and sub-acute mental health and medical services, the Court granted the Compliance Director's request for a 30 day extension for the submission of the plan.

### B. Acute and Sub-Acute Mental Health and Medical Services

### 1. Review of Findings from Previous Efforts

In order to provide a proper context of the recommendation for providing compliant acute and sub-acute mental health and medical services for the Orleans Parish Jail, it is important to acknowledge the substantial work that has been done by the parties in the past three years. This section provides background into those efforts:

### a. Mental Health Working Group (MHWG) (2014)

Beginning on June 24, 2014, the Mental Health Working Group, created by Judge Africk, was charged with assisting the parties to obtain compliance with the Consent Judgment as it relates to providing adequate mental health services to the inmates of the Orleans Parish Jail. The MHWG consisted of OPSO, the City of New Orleans, as well Dr. John Thompson, chairman of Tulane's Department of Psychiatry, Dr. Robert Greifinger, the Medical Monitor, and Dr. Raymond Patterson, Mental Health Monitor, who served as Chair of the Working Group. The group had rigorous discussions over the course of 2014 and considered the following matters:

1. The unsuitability of continuing to use the Templeman V facilities for the treatment and management of inmates who are mentally ill or suicidal
2. Concerns over long term housing of inmates in need of mental health services at the Elayn Hunt Correctional Facility (Hunt), specifically the concerns centered around:
   o The distance to Orleans Parish
   o Logistical problems of inmate transport
   o Inmates' limited access to counsel
   o Living conditions at the facility
   o Overall annual per-diem cost of housing
   o Health Care and security staffing requirements
3. Discussion over the need for better diversion programs at the Court(s) to reduce the number of inmates with municipal charges and mental health needs that are awaiting adjudication at the jail
4. Review of the overall projected bed needs for inmates and those inmates with mental health needs in the Orleans Parish Jail

5. Use of the Temporary Detention Facility (TDC), located directly adjacent to OJC, for housing of the female population with mental health needs
6. Review of two capital program options to provide on-site facilities for mental health and medical services:
   o The Phase III expansion plan as proposed by OPSO
   o The renovation of the Fourth Floor of the Phase II facility as proposed by the City

In September 2014, the MHWG issued its third report which considered all of these issues and made the following recommendations:

1. Use of Hunt Correctional to house inmates with mental health needs would be a suitable short-term solution for up to three years (as ordered by the Court) but not a long term or permanent solution.
2. Use TDC for the provision of acute and sub-acute mental health services to female inmates and convert more space at TDC for the provision of step down facilities for male inmates who are returning from Hunt after being stabilized
3. Complete the Phase III facility as proposed by OPSO, given that limited progress had been made to develop other viable alternatives to provide adequate services at OPSO

The MHWG also assumed that OJC would have an average daily population (ADP) that would range between 1,400 to 2,100 total inmates for whom it would be responsible for the provision of constitutionally adequate mental health and medical care.

### b. Special Care Populations Working Group (SCPWG) (2015)

The Special Care Populations Working Group chaired by Councilmember Susan Guidry, who also chairs the City Council's Criminal Justice Committee, was created independently of the Court in 2015. The nine other members of the working group included Katie Schwartzmann, attorney for the Plaintiff class; Laura Coon, attorney for the United States Department of Justice; Inemesit O'Boyle, attorney for OPSO, Sharonda Williams, City Attorney; Charles West, Director of the Mayor's Office of Criminal Justice Coordination; Jon Wool, Director of the Vera Institute's New Orleans Office, which oversees New Orleans Pre-Trial Services; Derwyn Bunton, Chief Public Defender for Orleans Parish; Allen Patrick, FAIA architect; and Dr. James Austin of the JFA Institute. Significant contributions were also made by Sarah Schirmer, from the Mayor's Office of Criminal Justice Coordination, and Tyler Lee Gibson, Legislative Director of Councilmember Guidry's Office. While Monitors Susan McCampbell and Dr. Patricia Harydman contributed to the SCPWG, given their status as independent court monitors, they are precluded from making any endorsement of the findings or recommendations of the group.

The mission statement adopted by the SCWPG was as follows:

> The mission of the Special Care Populations Working Group is as expeditiously as possible to identify the current and future bed-space requirements of special populations in the care, custody and control of the Orleans Parish Sheriff's Office. The SCPWG's work will be in accordance with federal, state and local laws, and the requirements of the Consent Judgment. The SCPWG will identify short and long-term options and realistic opportunities for the housing of the special populations, including recommendations for alternatives to incarceration, and/or community-based

care, taking into account the fiscal implications of alternatives, and assuring the use of the least intrusive means necessary.

The SCPWG conducted an analysis of the populations that require special care or separate housing in the Orleans Parish Jail, including those with mental health or medical needs, youthful inmates, female inmates, inmates with disabilities, inmates under protective custody, and inmates under administrative or disciplinary segregation.

In its report issued in November 2015, the SCPWG concluded the following:

1. The number of inmates requiring mental health or medical housing can be reduced if OPSO discontinues housing prisoners of the Louisiana Department of Corrections (DOC) system that are not awaiting trials or hearings in the Orleans Parish system.
2. Expand the Youth Study Center (YSC) so that youthful inmates can be moved out of OJC permanently, which would provide a safer environment for the youth while freeing up capacity in the Jail for adult inmates.
3. Complete the renovations of the fourth floor of the OJC facility as proposed by the City for the following reasons:
   o The scope of the Phase III expansion plan included space for youthful inmates, which should be housed at an expanded YSC facility.
   o The scope of the Phase III expansion plan included space for an additional 300-700 inmates which is not required if DOC prisoners are transferred out of OPSO and proper jail reduction strategies are put into place.
   o The scope of the Phase III expansion plan was expected to require a construction timeline of 3 to 4 years, whereas the renovation plan was expected to only require 10 to 11 months to complete.
   o The scope of the Phase III expansion plan was significantly more costly than the Phase II retrofit plan in both capital costs and long term operational costs.

The SCPWG also assumed that the jail population would reach 1,700 by January 2016, 1,500 by January 2017, and 1,250 by January 2018. These projections were based on trends at the time and policies that can be put into place to reduce the jail population.

### c.  JFA Institute Review of Jail Population Trends (2016)

The following graph shows the reduction in the jail population since 2014 and the projections in the future population that have been provided by Dr. James Austin from the JFA Institute:



Since 2014, the ADP of the jail has, in fact, experienced a significant downward trend in its population. This is due in part to the New Orleans Criminal Justice Council and its Jail Population Management Subcommittee who has been working with the various stakeholders across the criminal justice system in Orleans Parish who have been following through on recent commitments to jail population management, such as increases in the number of pre-trial releases, reductions in the time required to dispose of criminal cases.

It was also due in large part to the significant reduction in the number of Department of Corrections (DOC) prisoners who were being held in the Orleans Parish Jail in early 2016 who were in the Re-Entry Program and Community Service Program. This represented approximately 350-400 inmates that were subtracted from the population. The projection also assumes there will be a steady number of DOC prisoners in the future, but it will only be those DOC prisoners awaiting trial on other charges in Orleans Parish that will be housed in OJC.

The Baseline forecast is based on the JFA Institute's review of historical data, status quo trends and current policy factors that are expected to remain consistent over the next two years. The Projected Total assumes that new initiatives being implemented under the MacArthur Foundation's Safety and Justice Challenge Grant are successful in further reducing the population of the Jail. Taken together, the forecasted ADP of the Jail is expected to range between 1,300 – 1,500 ADP.

Estimates for the male population provided below are consistent with the Baseline projection above, that is the status quo policies and trends are maintained with no new initiatives:

| Year | Total Avg. Daily Male Population | General Population | Acute Medical | Acute Mental Health | Direct Observation/ Suicide Watch | Step Down | Segregation | Protective Custody |
|------|------|------|------|------|------|------|------|------|
| 2016 | **1,349** | 1,164 | 66 | 46 | 15 | 20 | 32 | 6 |
| 2017 | **1,345** | 1,160 | 66 | 46 | 15 | 20 | 32 | 6 |
| 2018 | **1,303** | 1,120 | 64 | 46 | 15 | 20 | 32 | 6 |
| 2019 | **1,294** | 1,112 | 63 | 46 | 15 | 20 | 32 | 6 |

Estimates for the female population provided below are consistent with the Baseline projection above, that is the status quo policies and trends are maintained with no new initiatives:

| Year | Total Avg. Daily Female Population | General Population | Acute Medical | Acute Mental Health | Direct Observation/ Suicide Watch | Step Down | Segregation | Protective Custody |
|------|------|------|------|------|------|------|------|------|
| 2016 | **124** | 94 | 16 | 7 | 1 | 2 | 3 | 1 |
| 2017 | **123** | 93 | 16 | 7 | 1 | 2 | 3 | 1 |
| 2018 | **120** | 90 | 16 | 7 | 1 | 2 | 3 | 1 |
| 2019 | **118** | 89 | 15 | 7 | 1 | 2 | 3 | 1 |

These baseline projections, provided by the JFA Institute, are serving as the basis for Compliance Director's decision making on how future facilities should be programmed to house inmates with medical and mental health needs.

It should be noted that recent findings of the Department of Justice point out the fact that community mental health services are lacking in Louisiana.  In a letter to Governor John Bell Edwards dated December 21, 2016, the DOJ stated that the State has approximately 4,000 individuals suffering from mental illness who are housed in nursing homes. The DOJ encouraged the Governor to develop community resources to treat this population prior to admission to nursing homes and treat them in their homes. The same lack of community mental health services has similar impact on the inmates either being confined in the OJC or transitioning to the community.

## 2. Compliance Director Meetings with Stakeholders and Observations

Since his appointment, the Compliance Director has been in numerous meetings and discussions with advocacy groups, community groups, OPSO employees, Correct Care Solutions (CCS), architects, City administration, City Council Members, the Federal Monitors, the Federal Emergency Management Agency (FEMA), and citizens of New Orleans. From the onset, it was apparent each segment had their own vision and solutions, and was able to articulate their reasoning on how to proceed on this issue, which is important to many people in the community, not to mention the inmates themselves who suffer from medical and mental health illnesses. Options derived from these discussions were wide-ranging and included a Phase III Facility with approximately 380 beds, a smaller Phase III Facility with approximately 119 beds, retrofitting the fourth floor of OJC Facility, or not moving forward with any new facilities.

It is important to note that while different groups have divergent views on how to proceed, the Independent Compliance Director's role is to consider all alternatives and to recommend the best course of action using all the information available. After reviewing the findings asserted from prior Working Groups, evaluating the operational profile of the current jail facilities, and the overall cost of management of the status quo, the following observations are made:

1) The DOC authorized OPSO to house the acute mentally ill male inmate population at Hunt under a 3 year agreement in 2014, and that lease is set to expire in July 2017. The lease with DOC will need to be extended; however, DOC will require that we have a plan

in place to demonstrate we are moving forward on a long term solution to this critical issue. OJC, in its current configuration, would find it difficult and very labor intensive to house inmates with acute mental illness without major changes to the current OJC facilities. In the long run, to achieve compliance with the Consent Judgment, OPSO must provide housing for mental health and medical services for its inmate population and a permanent arrangement with DOC at Hunt is not feasible. For this reason, the option of not moving forward on any new facilities is not a feasible option to achieve compliance.

2)   Initial projections on jail population that were developed in 2014 that assumed an ADP of 1,400 - 2,100 are no longer appropriate. The elimination of the Re-Entry Program and jail reduction strategies proposed by the Criminal Justice Council have been implemented successfully and stakeholders are continuing to uphold their agreement to implement these measures.

3)   While there are a number of inmates with mental health issues, the inmates that require special housing needs is a subset of that population. The use of national trends on mental health needs of inmates is a useful benchmark, but based on the Compliance Director's experience, not only as a jail and prison administrator but as a trained psychologist, not every inmate requiring mental health care will require specialized housing in the Jail.

4)   Step down facilities, which are designed to act as a transition between isolated acute and sub-acute mental health housing and the housing of general populations do not have to be included in acute/sub-acute mental health facilities. Instead, space within the current OJC facility can be used to provide a safe place for inmates to return to the general population once they have completed treatment. Medication can be maintained and counseling can be provided to manage their cases without the need for additional bed space to be built to provide this service. In addition, while pods in the OJC facility are designed to hold 60 inmates, additional partitions can be built within pods if needed to accommodate the separation of special populations without the need for constructing new housing facilities.

5)   Many discussions were held and several options discussed by the MHWG regarding the physical housing of inmates with mental illness.  Several options were explored and discussed at length.  The discussion of how to provide sufficient housing for the acute and sub acute mental health and medical services ended up been primarily a choice between two options (Phase II renovation vs. Phase III expansion).  Only in the latter part of 2016 has there been consideration for other alternatives, such as a Phase III facility concept with a significantly reduced scope and construction timeline. Consequently, re-evaluations of the Phase III options by the Compliance Director began in October 2016. Many of the plans were consistent – the major difference noted was the size of the facility. Gaps noted in the current operations of the jail are the laundry service, food delivery service, and attorney / family visiting area. These areas are crucial as each one has a significant impact on the operation of the jail.

6)   While retrofitting the fourth floor of OJC could provide mental health and medical facilities, it would also come at the cost of reducing the capacity of OJC from between 100 to 292 beds, depending on the design concept. At best, the retrofitting model would

reduce the construction/renovation costs and time; however, the final resulting facilities would be less desirable, both in the functional end result, as well as the significant loss of bed space. As a result, even more inmates would need to be housed out of parish. Furthermore during the construction phase, the renovation would cause a strain on the daily operation inside OJC. While the concept plans appeared to address the issue of acute mental health needs, there was no clear vision for inmates with acute medical issues. Finally, upon further evaluation of the structural and program requirements involved in the renovation of the fourth floor, it appeared that the timeline for construction would take between 12 to 18 months to complete.

7) Continued reliance on out-of-parish facilities is not only a substantial cost for jail operations, but it results in inmates having limited access to legal counsel & family visitation, as well as presenting logistical issues for inmates to making timely appearances in Court. The most recent report of December 7, 2016 indicates OPSO has a total of 434 inmates out of parish. These inmates are spread across five different parishes, and these numbers change daily. Of those inmates housed out of parish, the majority (378) are housed at East Carroll Parish, which is approximately five and a half hours from Orleans Parish. This issue is a heavy burden on the taxpayers of the city, the budget, the Criminal Justice System, the inmate population and their families, and the operation of OPSO and CCS. Over the past two years, over $4.5 million has been spent on out of parish per diem costs. Until we reach a solution, the costs will continue to rise. It would be preferable to house *all* inmates under the jurisdiction of OPSO in facilities located in Orleans Parish.

### 3. Compliance Director Recommendations

The extension of time from the Court requested and granted on December 2, 2016 was needed to evaluate the alternatives and to determine what was best for the OPSO, the inmates and families concerned, and citizens of New Orleans. It is imperative to act quickly and responsibly.

#### a. Mental Health Housing Recommendation:

The recommendation of the Compliance Director is to address the acute and sub-acute mental health needs of the Jail by constructing housing in a Phase III Facility with a significantly reduced scope from what was originally proposed in 2014, by Sheriff Gusman and his team. That proposal suggested that 388 beds were needed in the Phase III facility to accommodate mental health and medical beds, as well as youthful and female inmates. The proposed facility by the Compliance Director would house male and female acute/sub-acute populations separately, and not include space for youthful inmates, which should be housed in a proposed YSC expansion which will have an additional 28 beds for youth. It would also not include general population beds for female offenders or bed space for step-down from acute or sub-acute mental health housing. Given OJC's current population and the population projections anticipated in the coming years as addressed in the section above, the Phase III Facility would require 77 beds to house the male population with acute and sub-acute mental health needs, and 12 beds to house the female population with acute and sub-acute mental health needs. An additional bed for female inmates with acute and sub-acute mental health needs was added above the population

projection to align with concerns from medical and mental health staff on the needed capacity. This would result in a total design plan to add 89 beds to the OJC facilities for acute and sub-acute needs. This plan would accommodate sufficient space for all inmates with acute and sub-acute mental health needs in the jail based on the population projections provided by JFA Institute and an additional peaking factor of 25%. The chart below outlines the mental health population assumptions by gender:

| Category | Population Projection | Peaking Factor (25%) | Total Bed Space Need |
|---|---|---|---|
| Male Acute Mental Health | 46 | 12 | 58 |
| Male Sub-Acute Mental Health (Direct Observation) | 15 | 4 | 19 |
| Total Male Mental Health Beds Needed | 61 | 16 | 77 |
| Female Acute Mental Health | 7 | 2 | 9 |
| Female Sub-Acute Mental Health (Direct Observation) | 2 | 1 | 3 |
| Total Female Mental Health Beds Needed | 9 | 3 | 12 |
| **Total Male and Female Mental Health Beds Needed** | **70** | **19** | **89** |

Step-down units are defined as those beds available to inmates that are in treatment in either acute or sub-acute mental health status that are transitioning to a living situation a step closer to the general population. They still remain in a treatment category, may be on medication, and are may be involved in individual or group treatment. Those beds that were originally planned for the Phase III facility for step-down should instead be designated from within the current operational footprint of the Phase II facilities as needed, rather than constructing new facilities. Space for individual and group mental health counseling and treatment will also be part of the design of the Phase III facility for both male and female inmates. A conceptual design of the male mental health facilities, developed by Grace Hebert Architects, is based on facilities currently used by inmates housed at Hunt and has been included as an appendix. This design is a concept only and is subject to refinement as more information is made available in the formal design development process.

### b. Medical Services Recommendation:

The recommendation of the Compliance Director to address the medical services needs of the Jail would be to construct an infirmary, clinic, and administrative medical/mental health space directly adjacent to the proposed mental health housing units described above as part of the Phase III plan. The infirmary would have approximately 10,000 sq. ft. of space with capacity to care for between 10-16 patients at once, with a mix of single occupancy and double occupancy units, and the inclusion of 2 negative pressure rooms. The clinic would have approximately 16,000 sq. ft. of space and would have 4-6 exam rooms, and space for dental services, phlebotomy, and storage. The administrative medical/mental health space would have approximately 13,000 sq. ft. of area with secure storage for medications, offices for medical staff, and sufficient storage for all inmate medical records. Consolidating the mental health inmate population with the providers – coupled with the infirmary and medical clinic – into one area would prove effective for better service delivery and supervision. The conceptual design for these facilities (developed by Grace Hebert Architects and included as an appendix) are subject to refinement as more information is made available in the formal design development process.

### c. Additional Facilities in Phase III Plan:

Currently, the OPSO uses the House of Detention (HOD) laundry area. This building is to be demolished and FEMA funds are available to achieve this, although the schedule for demolition has not been defined. It is also located outside of the secure perimeter of the OJC. It is expected that the square footage necessary for the laundry would be approximately 9,000 sq. ft., and require 8-10 commercial washers, and 8-10 commercial dryers. Some of the equipment in the current laundry may be reused, or repurposed for the new facility if feasible.

As it relates to the attorney visits, the OJC facility currently has only three face-to-face visiting rooms and two contact rooms. The face-to-face rooms serve a need, but they are located near the release area and require constant supervision. The OPSO also offers video conferencing visits; however, few attorneys use this option. At times, the line can be long even when visits are scheduled in advance. Even though there is a trend nationally to encourage video visitation, for both family and attorney visits, there are still strong preferences for personal visits, and consideration needs to be given to both. Given the need for additional attorney / client rooms, the Phase III addition should also include approximately 12,000 sq. ft. to accommodate additional family and attorney visitation space. The concept design would provide for at least 7 additional face-to-face attorney-visiting rooms, a waiting area, a contact family visitation area and an outdoor visitation area.

Food service delivery is another concern to both the leadership of the Jail and federal monitors. Currently, the food is non-refrigerated when it is delivered to the buildings. Vehicles used to transport the food are in poor condition. Therefore, the Phase III facility design should also include a connecting bridge to OJC and the Kitchen/Warehouse which will facilitate food delivery and connect the overall complex.

Designs provided in the appendix are a concept only and are subject to refinement as more information is made available in the formal design development process. The procurement of design and construction services to complete all recommended Phase III facilities modifications and additions will be managed by the City of New Orleans.

### d. Renovation of Temporary Detention Center (TDC):

The current capacity of OJC is 1,438 beds; however, in the past 15% of the jail capacity was set aside for classification and peaking factor purposes. Based on national norms and best practices, jail facilities can be properly managed that use up to 90% of its capacity, while leaving 10% available for classification and peaking factors. The resulting operational capacity of the jail is 144 fewer beds, or 1,294. While future jail population projections (based on JFA Institute & SCPWG data) indicate that capacity would be sufficient, given the special populations described above there would be a short term need to accommodate the anticipated population in facilities out of parish. As mentioned previously, the cost of out of parish housing has been substantial and a plan of action to mitigate that cost should begin with overall jail population reduction strategies. However, it may be required to hold additional inmates above the current effective capacity of 1,294 in the mid-term while these strategies are being adopted.

Therefore, it is the recommendation of the Compliance Director that the option of using TDC to house the overflow general population capacity be explored, so that out of parish inmates could be returned to Orleans Parish. At the request of the Compliance Director, City engineers this past month have evaluated the current condition of TDC and concur that it can be renovated to achieve this purpose. Reopening four units, and a limited number of beds in TDC (to increase temporary capacity by approximately 200) in the short term would alleviate the per diem costs on the City and greatly improve the inmates' access to counsel and family visitation. Inmates held in TDC would be those that are classified as low-medium risk. The four housing units at TDC each have 60 bunks in an open dorm setting, as well as four cells in each 60-man unit. These individual cells could be used for intake/classification housing as new inmates are received into the unit.  Obviously, the recruiting and training of deputies to staff the TDC is something that will be taken into account.  As the population continues to decrease over time, use of the TDC facilities will be incrementally discontinued, one building at a time, until the TDC facility is closed.  Based on the preliminary assessment of the City's engineers, it will not be difficult to bring the TDC on line, and it is expected it will be ready to occupy in 90 days. The expense of renovation to bring the TDC facilities back online is expected to be minimal, and the City will fund the costs.

###    e.  Housing of Youthful Inmates

As was stated in the Compliance Action Plan submitted to the Court on December 2, 2016, youthful inmate populations should no longer be housed at OJC. Instead, the Youth Study Center should be expanded to add 28 additional beds to accommodate all youthful inmates in the Orleans Parish criminal justice system as recommended by the SCPWG and approved by the City.  Construction is expected to begin in the second or third quarter of 2017 and will take approximately 10 months to complete, with the expansion opening in 2018. A conceptual design has been included in an appendix to this document. It has been requested by the City that the Compliance Director work with the design committee for the addition to the Youth Study Center to ensure that the security level is sufficient to hold the highest security classification of youth. Of course, it is possible that exceptional cases will arise where the YSC cannot handle the disruptive or violent behavior of a youthful offender.  In those unusual cases, the OJC is obligated to provide safe housing for those youth.

Currently there are between 10-20 youthful inmates that are being housed at OJC awaiting adjudication in the adult court system. These youth are placed into a single pod with capacity for 60 inmates, resulting in a loss of capacity of between 40-50 beds. While the long term plan for youthful inmates will be to move them all to YSC, in the interim, OPSO will coordinate with other jurisdictions in the immediate region to determine if these youth can be moved to juvenile facilities instead of having them remain at OJC. If sufficient space for the youthful inmates can be identified in out-of-parish juvenile facilities in the Greater New Orleans Area, it would also free up the capacity that is being lost due to classification standards being applied to house the youth at OJC, and allow for approximately 50 more inmates who are being housed out of parish to be returned to Orleans Parish.

During the interim between the current housing of the youthful offender in OJC, and the eventual movement to the increased capacity YSC in 2018, OPSO is still obligated to continue providing

responsible housing for the youthful offenders.  Either housing will be provided in the current OJC, or youth will be moved to other parishes that accommodate juveniles under constitutional conditions.  Conversations have been initiated with other parishes that have juvenile beds and are accustomed to housing out of parish juveniles.  Contracts will be developed with one or more parish options and executed when needed.  It is expected that those contingent contracts will be developed by February 1, 2017.  Whether the youth are moved to other parishes, or kept in the OJC, it is imperative to keep close contact with them.  For this reason, it is imperative that an expert in youth housing, security and programs be retained, as well as the continued contact with the youth relative to court dates and other needs to return to Orleans Parish.

### f.   Condition of the Docks

There has been extensive work done by the Docks Committee chaired by Sheriff Margo Frasier, a Compliance Monitor of the federal court. This group, which has relied upon the expertise of architects, judges, legal counsel and Jail leadership, has been studying the solution to the safe and efficient transporting of inmates to the Courts, and has developed a working document that will be made available to the contractor. It is hoped that this early work will not only speed up the design process, but will provide them with historical and current information from jail experts, which will enhance their recommendations.

As was stated in the Compliance Action Plan submitted to the Court on December 2, 2016, it is recommended to move forward with the development and design of a renovated Docks facility that is safe, secure, efficient, and above all, constitutional. The City has completed its award for design and construction documents are expected to be delivered in the second quarter of 2017. The budget for this project is estimated to be $3.325 million.

As the primary users of the Docks, OPSO through the Sheriff and Compliance Director as well as the Judges of the Criminal District Court will coordinate with the City so they are involved in the final design of the renovation of the Docks, and will continuously work with the team through its bid and construction. Vincent Smith, Director of Capital Projects, has indicated that he would keep OPSO advised of meetings and progress.  The staffing consultant, Rod Miller, is developing the staffing plan for the Docks operations.  The Docks renovation is expected to be completed in the first quarter of 2018.

Respectfully submitted,

Marlin N. Gusman
Sheriff
Orleans Parish Sheriff's Office
2800 Perdido St.
New Orleans, LA 70119
Tel: 504.679.6414

Gary D. Maynard
Independent Compliance Director
Orleans Parish Jail
2800 Perdido St.
New Orleans, LA 70119
Tel: 504.493.2895

## C.  Appendix

### 1.  Concept for Phase III - Mental Health Housing



**First Floor**



**Second Floor**

2.   **Concept for Phase III - Medical Services**



**Second Floor**

3.   **Concept for Phase III – Laundry and Attorney/Family Visitation**



**First Floor**

### 4. Concept for Youth Study Center Expansion



