# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| _____ | |
| LASHAWN JONES, *et al.*, and ) | |
| THE UNITED STATES OF AMERICA, ) | |
| ) | Civil Action No. 2:12-cv-00859 |
| PLAINTIFFS, ) | Section I, Division 5 |
| ) | Judge Lance M. Africk |
| v. ) | |
| ) | Magistrate Judge Michael B. North |
| MARLIN GUSMAN, Sheriff, ) | |
| ) | |
| ) | |
| DEFENDANT. ) | |
| _____ ) | |

---

## Report No. 7 of the Independent Monitors
## May 1, 2017

---

**www.nolajailmonitors.org**

Susan W. McCampbell, M.C.R.P., C.J.M., Lead Monitor
Harry E. Grenawitzke, R.S., M.P.H., D.A.A.S., Environmental Health and Sanitation Monitor
Raymond F. Patterson, M.D., D.F.A.P.A., Mental Health Monitor
Robert B. Greifinger, M.D. Medical Monitor
Margo L. Frasier, J.D., C.P.O., Correctional Practices Monitor
Patricia L. Hardyman, Ph.D., Classification Monitor
Darnley R. Hodge, Sr., M.S. Correctional Practices Monitor

McCampbell and Associates, Inc.
1880 Crestview Way, Naples, Florida 34119-3302
Email:  susanmccampbell@mccampbellassoc.com
Web:  www.nolajailmonitors.org





**Compliance Report # 7**
*LASHAWN JONES, et al., and the United States of America*
*v.*
*Marlin Gusman, Sheriff*

**Table of Contents**

**Page**

I.    Introduction    iv
    A.  Inmate Safety and Protection from Harm    iv
    B.  Summary of Compliance    v
    C.  Efforts Since Compliance Report #6 (September 2016)    vii
    D.  Critical Issues    ix
    E.  Review Process of Monitors' Compliance Report # 7    xi
    F.  Communication with Stakeholders    xii
    G.  Recommendations    xii
II.    Substantive Provisions
    A.  Protection from Harm    1
        A.1. Use of Force Policies and Procedures    4
        A.2. Use of Force Training    6
        A.3. Use of Force Reporting    7
        A.4.  Early Intervention System    11
        A.5. Safety and Supervision    12
        A.6. Security Staffing    16
        A.7. Incidents and Referrals    21
        A.8. Investigations    23
        A.9. Pretrial Placement in Alternative Settings    27
        A.10. Custodial Placement    28
        A.11. Prisoner Grievance Process    41
        A.12. Sexual Abuse    45
        A.13. Access to Information    47
    B.  Mental Health Care    53
    C.  Medical Care    71
    D.  Sanitation and Environmental Conditions    83
    E.  Fire and Life Safety    107
    F.  Language Assistance    116
    G.  Youthful Prisoners    117
    H.  The New Jail Facility    117
    I.  Compliance and Quality Improvement    118
    J.  Reporting Requirements and Right of Access    119
III.    Status of Stipulated Agreements – February 11, 2015 and
    April 22, 2015    121
IV.    Conclusions    132



|                                                                    | Page |
|--------------------------------------------------------------------|------|
| Table 1 – Summary of Compliance – All Tours                        | v    |
| Table 2 – Status of Compliance – Stipulated Agreements             | vi   |
| Table 3 – Summary of Incidents October 2016 – March 2017           | 14   |
| Table 4 – Classification – Rate of Housing Non-Compliance          | 34   |
| Table 5 – Classification Unit Internal Audits                      | 38   |
|                                                                    |      |
| Figure 1 – OPSO Disciplinary Infractions                           | 40   |
| Figure 2 – Types of Disciplinary Infractions                       | 41   |

Appendix A -  Summary Compliance Findings by Section Compliance
                 Reports 1 - 7
Appendix B – Summary of Recommendations



## I.      Introduction

This is Compliance Report #7, the first produced since the Independent Compliance Director Gary Maynard began his work at the Orleans Justice Center (OJC) on October 1, 2016.[1]  Director Maynard was selected to lead an organization that has significant challenges which not only resulted in the 2013 Consent Judgment (CJ), and also the organization's inability to move expeditiously to address the requirements of accepted correctional practice and achieve compliance with the CJ as measured by the six previous compliance reports.  This is a  challenging job, and the Monitors acknowledge Director Maynard's professional determination in accepting these responsibilities.  The Monitors and the Director are both seeking the same end – a safe, secure, and Constitutional jail.

The Monitors are encouraged by some of the work accomplished to date. However, compliance with the CJ has not improved since the last report; instead it has regressed. With the various initiatives which are underway, the Monitors are hopeful that significant progress will be made during the next compliance period.

### A.  Inmate Safety and Protection from Harm

Inmates in the custody of the Orleans Parish Sheriff's Office housed in OJC are marginally safer than when Compliance Report # 6 was produced.  The level of violence remains at unacceptable levels.  While the Defendants assert that the data indicates a positive trend, the data needs to be reviewed by comparing the number of inmates in-custody rather than inmates who have been removed from OJC to out-of-parish facilities.[2] The level of disorder remains at unacceptable levels.  There are also concerns about the

---

[1] This compliance report is based on a formal on-site tour by the Monitoring team on March 20 – 23, 2017. Additionally, various members of the team were on-site in New Orleans since the last tour in September 2016. These on-site tours include: McCampbell: January 5 – 6, 2017, March 7 -8, 2017; Frasier: December 7-8, 2016, January 4 – 6, 2017, and February 21-24, 2017; and Hardyman: October 7 – 18, 2016, November 15-17, 2016.

[2] The data reported by the Defendants for March 2017 should reflect that half the inmates are out-of-parish (the divisor), and secondly, that these are *reported* incidents.  [Se Section A.1. for a discussion of reported and unreported incidents].  The Defendants report that the number of inmate/inmate assaults was 35 in October 2016, and 24 in March 2017.  This represents a decrease of 25% in *reported* incidents; while the number of inmates held in OJC decreased approximately 50% in March 2016 compared to October.  Hence trending data needs to be reported reflecting the inmates in custody.

iv



safety and health care of inmates held in out-of-parish facilities[3].  Staffing remains a priority, and in our view OJC needs more depth of leadership and subject matter expertise to assist the Director to achieve substantial compliance.  About half of OJC inmates were removed and housed in other jails as part of a plan to allow "breathing space" for hiring and training staff (Operation Rewind).

There have been two inmate deaths and one disturbance that highlight the need to leverage outside expertise in the OJC's operation as soon as possible.

**B.  Summary of Compliance**

It is important to note that compliance with the 2013 Consent Judgment, 2015 Stipulated Agreements, and the 2016 Stipulated Agreement will result in a safer jail which meets Constitutional standards of care.  The goals of making OJC safe *and* compliant with the orders of the Court are compatible work.

Because of the significant amount of work that needed to be completed to achieve compliance with the provisions of the CJ, the Monitors anticipated that there would not be documented progress since the last report; and that is the case.

**Table 1 – Summary of Compliance – All Compliance Reports**[4]

| Compliance Report/Date | Substantial Compliance | Partial Compliance | Non-Compliance | NA/Other | Total |
|---|---|---|---|---|---|
| #1 – December 2013 | 0 | 10 | 85 | 76 | 171 |
| #2 – July 2014 | 2 | 22 | 149 | 1 | 174 |
| #3 – January 2015 | 2 | 60 | 110 | 2 | 174 |
| #4 – August 2015 | 12 | 114 | 43 | 4[5] | 173 |
| #5 – February 2016 | 10 | 96 | 63 | 4 | 173 |
| #6 – September 2016 | 20 | 98 | 53 | 2 | 173[6] |
| #7 – March 2017 | 17 | 99 | 55 | 2 | 173 |

---

[3] For example, a review of reported incidents involving Orleans inmates at the River Correctional Center shows 76 incidents where there were confrontations with staff during the month of March 2017.

[4] See Appendix A for a summary of historical compliance with each provision of the Consent Judgment.

[5] Section IV.A.6. of the Consent Agreement was broken out into separate subparagraphs for the purpose of reporting.  This increased, therefore, the paragraphs from 171 to 174.

[6] Paragraph IV.A.6. Security Staffing, (a.) is in non-compliance.  In fairness to the Defendants, the Monitors evaluated the sub-paragraphs of this section, and found that several are in compliance or partial compliance. These findings, however, do not erase the Defendants' non-compliance in the critical issue of lack of staffing.



In addition, the status of compliance with the two stipulated agreements (February 11, 2015, April 22, 2015) agreed to by the parties is as follows:

**Table 2 – Status of Compliance with 2015 Stipulated Agreements[7]**

|  | Substantial Compliance | Partial Compliance | Non-Compliance | NA | Total |
|---|---|---|---|---|---|
| March 23, 2017 | 28 | 4 | 1 | 1 | 34 |

The paragraphs of the Stipulated Agreement from February 11, 2015 that remain in partial compliance or non-compliance include:

- 1.b. – Compliance reporting (partial compliance);
- 1.c. – Report of incidents (partial compliance);
- 6.a. – Staffing of youth housing (non-compliance).  As reported in the investigation into the death of a young inmate in October 2016, some of OJC's leadership and/or facility administrators claimed to be unaware of the provision of the Stipulated Agreement, and the memo from Chief Laughlin (December 29, 2014), requiring continuous staffing of this housing unit.  This investigative finding is made although the Defendants write in each of their quarterly compliance reporting since March 2015 (most recently the reported dated March 15, 2017) that they are specifically in substantial compliance with this provision.  When this finding became known to the Monitors, a letter was directed on April 13th to the Compliance Director requesting an immediate plan of action to address this critical staffing and operational issue.
- 6.b. – Training for staff working with inmates with mental illness (partial compliance); and
- 14.b. – With CCS, a collaborative plan to manage the inmates on the mental health caseload (partial compliance).

These are obviously critical issues, and the lack of resolution after two years is a concern.

---

[7] See page 121 for details.



**C.  Efforts Since Compliance Report # 6 (September 2016)**

As noted above, the organizational structure of the Orleans Parish Sheriff's Office have been significantly altered by the naming of the independent Compliance Director to oversee the work required by the various orders of the Court.  Essentially, upon his appointment, the Director needed to begin from ground zero to build an organization with the capacity to achieve with and sustain compliance with the Court's orders. As no other jail in the United States has a Compliance Director/receiver, there is no blueprint for this work.

To highlight the challenge of this work, the Director was faced in October with the resignation of both the Chief of Corrections and the Human Resources Director, as well as the absence of the Facilities Management Director.  As noted herein, the Monitors believe that the Director should immediately identify  the knowledge and experience gaps that exist in OJC's leadership and management ranks, and fill these positions with qualified jail professionals – either as employees or contractors.

The Monitors have and will support the Director, and, respectfully offer advice to the him on the operational needs of the jail.  We trust that this professional communication will serve to strengthen the initiatives to reach the articulated goals and assure sustainability.  The Monitoring team is comprised of subject matter experts. The Monitors continue to be ready to assist.

Regarding the Director's initiatives, the Monitors comment as follows:

"Operation Rewind"

The Monitors are on the record, since 2015, that if the OPSO was unable to provide for safe confinement of inmates in OPSO facilities, the inmates needed to re-located to facilities where they would be safe.   While moving inmates out of the new Orleans Parish facility was the least appealing of options, it was the only strategy to allow for adequate staffing via hiring and training.

The Monitors will continue to follow the care, custody and control of inmates placed in other facilities, as the provisions of the Consent Judgment "follow" the inmates.  Members of the monitoring team visited two facilities in March, and will be following up based on findings regarding, specifically medical and mental health care.

vii



<u>Training</u>

The effectiveness of training for the staff who are now in (or recently completed) the POST academy, as well as newly hired deputies and correctional monitoring technicians, will be assessed as the facility re-opens to all inmates, and, if, and when, the Temporary Detention Center is re-opened.  We applaud the Director's implementation of a limited field training officer program, and look forward to its expansion in the future.

Those completing POST training will have an increased salary .  The POST academy, however, did not include the essential training needed to operate OJC as a direct supervision facility based on the completed policies and procedures for the facility, incorporated into sound lesson plans, and taught by qualified individuals.

The Monitors are concerned about the timing of training, other than the POST training.  The Director received a plan from the National Institute of Corrections (NIC) [8] to assist with crisis intervention training, direct supervision training, leadership development, and supervisory training. This final proposal was received on April 2nd, with dates still to be determined for the delivery of the training as the plan has not received approval at the NIC leadership level.   The training delivery has been delayed, whether due to uncertainty of federal government funding, or OJC's ability to provide the relevant internal policies and procedure is not known.

The Monitors note that while NIC's expertise is helpful this training is essential and should go forward whether NIC funds it or not. The Director has had the resources to develop similar planning and engagement of contractors (or training of the existing staff) since his appointment.

---

[8] For more information on NIC www.nicic.gov



<u>Administrative Segregation Housing</u>

The Monitors urge the Director to more fully evaluate strategies to manage inmates who are housed in segregation due to classification, disciplinary sanctions, and/or other reasons.  Application of ACA standards are insufficient, as these have been eclipsed by more progressive thinking and recommended strategies.[9]

## D.  **Critical Issues**

The following are issues that the Monitors believe need resolution as quickly as possible:

1. Executive/Leadership in OJC

   The Monitors suggest that the Director expeditiously identify needed expertise and fill executive leadership positions in OJC.  We are pleased that the Director has contracted a subject matter expert to address management of youthful inmates, women, and working on culture change. We note an expert in suicide prevention and training has also been engaged.  We are unsure how compliance will move forward expeditiously without an expanded team of dedicated and qualified jail professionals.[10]

2. Staffing (See Section IV.A.6. Security Staffing, page 16)

   We acknowledge the hard work of both the City and the Director to achieve a cogent budget for the jail. The jail's budget approved by the City, was developed according to the Director by the City's consultant, The PFM Group, with input by the Director.  While this process is laudable, it is the Monitors' position that the funded positions for the jail may be insufficient for a Constitutional level of inmate care, custody and control.  The Monitors' believe the shift relief factor used to compute the staffing is too low, resulting in both not

---

[9] For example, see https://www.justice.gov/archives/dag/file/815551/download accessed on April 7, 2017.

[10] The Defendants note in their response to the draft Compliance Report that there has been executive hiring: Human Resources Director (January 9, 2017); Chief of Corrections (May 1, 2017); Director of Maintenance (unknown, the Monitors not advised); and Medical/Mental Health Manager (March 27, 2017).  This hiring is of course welcome, but aside from the HR Director, very recent.  The consultants retained are since mid-February 2017.  The General Counsel position was filled in mid-March 2017, and it is our understanding that the Criminal Justice Administrator is not filled.  Despite the recent hiring, and the pending hire for the Training Director – recruitment began on April 28th - it is the Monitors' position that there remain insufficient subject matter experts to work toward compliance.

ix



enough staff, and mandatory overtime. All parties await the results of the study that was undertaken in June 2016 designed to help determine the appropriate level of staffing and update the shift relief factor.

3. Hiring Process

The current hiring process requires immediate attention. The processes and requirements are not guided by a sufficient written policies or procedures. As noted in this Report, all parties associated with this litigation are acutely aware of the need to hire staff.

4. Emergency Operations

The Monitors previously expressed concerns about the absence of mutual aid agreements for the jail. This is basic operational practice. The recent inmate disturbance highlighted the extreme risks to staff, inmates and the community when these mutual aid agreements do not exist and responding agencies can do little but secure the jail's perimeter. These agreements must address, at a minimum, fire, disturbances, weather (hurricane), and incidents on the jail's perimeter (i.e. accidents with hazardous materials implications on I-10). In addition to negotiating these agreements, there must be drills/table top exercises, and practice.

5. Phase III

The Compliance Director provided a required report to the Court and the community regarding the critical need to build a Phase III for at risk populations. Moving forward expeditiously is critical to achieving a Constitutional jail. The City is unable to tell the Monitors, the Court, or the Compliance Director when this work will begin and be competed. While we appreciate that the FEMA involvement is unpredictable in terms of plans, there must be an urgent push to get the project moving forward.

The Court has asked that Drs. Patterson and Greifinger be directly involved with the program planning for the new facility.

6. Medical and Mental Health Care

There has not been acceptable progress toward substantial compliance

x



with the medical and mental health provisions.  The vendor has not had a full-time medical director since assuming the contract more than three and a half years ago. In the absence of this leadership, the vendor is trying to achieve provision of basic care, but, based on the Monitors' review of their current operation, has not been successful.

The Monitors strongly urge the parties to engage in intensive problem-solving as soon as possible to find out what is needed to move toward compliance – organization, staffing, training, qualifications, collaboration, etc. The appointment by the Director of a medical/mental health coordinator should assist with this urgently needed initiative.

7. Critical Incident Review (CIR)

There have been several serious incidents in the last six months which warrant a "critical incident" review, root cause analysis, and development of corrective action plans to address  any identified operational deficiencies.  The ability to engage in objective self-critical analysis is necessary to improve operations and prevent similar incidents.  This represents a culture change for staff, supervisors, and jail management as well; but is essential.

8. Road Map to Compliance

The Monitors urge the Director to continue to develop a comprehensive road map to achieve compliance.  Whatever strategies are proposed must be accompanied by identification of needed resources, and when and how these resources will be secured.  Accountability for assuring continued compliance, and sustaining the work must also be included.

**E.   Review Process of Monitors' Compliance Report #7**

The draft of Compliance Report #7 was provided for review to all parties (DOJ/plaintiffs, OPSO) on April 11, 2017 with a due date for comments by the close of business on April 25, 2017.   The Defendants asked for, and were granted, an extension of time.  The Defendants' comments were provided to the Monitors on April 28, 2017.  The Plaintiffs were also provided additional time based on granting the Defendants' request; and their comments were received on April 28th.



The Monitors carefully reviewed all comments in finalizing this document.   The Monitors amended compliance ratings based both on the information provided by the parties, and the Monitors' re-review of the documentation prior to finalization.

**F.   Communication with Stakeholders**

The Monitors are committed to providing as much information as possible regarding the status of the Defendant's efforts to comply with all the orders of the Court. The www.nolajailmonitors.org website came on-line in September 2014, and since that date has had more than 48,000 "hits".  The finalized version of Compliance Report #7 will be placed on that site, joining all other reports, and a summary of compliance for each paragraph.

**G.   Recommendations (See Appendix D)**

Previous compliance reports have contained literally hundreds of recommendations. This report includes "new recommendations" only.  The reader may refer to Compliance Report # 6 to see previous recommendations which remain applicable.[11]  We do, however, include in this report the recommendations regarding Mental Health Care because we think these recommendations are very important.  We do include 40 new recommendations in this report, in addition to the eight critical areas noted above.

**The Monitors again thank and acknowledge the leadership, guidance and support of The Honorable Lance M. Africk and The Honorable Michael B. North.**

---

[11] http://www.nolajailmonitors.org/uploads/3/7/5/7/37578255/compliancereport610.25.16.pdf



## II.    SUBSTANTIVE PROVISIONS

## A.    Protection From Harm

**Introduction[1]**

Unreported Violence

As reported in Compliance Report # 5 and #6, the Monitors continue to believe, and the facts document, although there has been significant improvement, that there is unreported violence, including inmate/inmate assaults, and unreported uses of force occurring in the facility.  This is evidenced when reviewing the CCS clinic walk-in logs, CCS "route" logs (inmates being taken out of the facility to the hospital), inmate grievances, and reports by inmates to the plaintiffs' counsel.

Much has been said about the extensive camera system in the facility.  Cameras are not capable of intervening in violence.  If staff are monitoring cameras, cameras may result in staff being notified to intervene.  This does occur on occasion and the monitoring of the cameras should improve with the additional training and supervision of the Corrections Monitoring Technicians (CMTs). However, given the inadequate staffing, the cameras at OJC are, most often, used as an investigative tool that sometimes allows for the perpetrators of violence or users of force to be identified after the fact.  Additionally, there have been recent incidents where the cameras did not record incidents; which was attributed to system malfunctions.  Often the staff are not aware that the cameras did not record until a search is made for a particular incident.  This situation needs to be a priority in providing whatever technological fix is needed to provide close to 100% assurance that the cameras are recording.

The Monitors have continued to provide OPSO with information gleaned from the CCS route logs and clinic walk in logs that is, perhaps, indicative of unreported, or underreported violence.  What is disturbing is that these same logs are available to OPSO, but there has been no attempt by OPSO to gather and use this information.  While OPSO receives an update, twice a day from CCS, on injuries which are reported in medical as related to inmate/inmate violence and uses of force, only the uses of force have received

---

[1] Please see all recommendations contained in Compliance Report # 6 which remain relevant.



any significant scrutiny until now.  The Force Investigation Team (FIT) routinely compares the list to the reports that it has received and notifies the OJC warden if there appear to be uses of force which were not reported.  Most often, the result is that an untimely use of force report is then written and reviewed by FIT.  When, in February 2017, the Monitors against raised the issue of the lack of accountability for failure to report, several supervisors (including two captains) were disciplined or referred for investigation.  It should be noted that it had been over eight months since  any discipline had been taken for failure to report.  The discipline taken in May-June 2016 was also in response to criticism by the Monitors that the reporting provision was not being enforced.  In addition, the discipline taken in May-June 2016 and February 2017 was the minimum (counseling or referral to training) and the Monitors are concerned whether it has been seen as a deterrent.  In fact, one of the individuals, involved in the February 2017 discipline was referred to training back in May 2016 for the exact same conduct.

While CCS is to be commended for providing the twice daily injury report, there is a major deficiency in this approach.  CCS, most likely due to lack of training and protocol, does not include on the report a substantial number of the injuries that should be reported.  For instance, an inmate might be treated and routed for an orbital fracture, but it is not reported to OPSO unless the inmate states, or the provider infers, that the injury was caused by an assault or use of force.  An orbital fracture in a jail setting was most likely the result of a punch with a closed fist to the eye and should be reported regardless of how the inmate claims the injury was sustained.  An example of unreported incidents based on the Monitors' review of CCS clinic walk-in logs and "route" (inmates going out to the hospital) logs[2] for the last quarter of 2016 include:

- Inmate falls down the stairs
- Fractured hand
- Head injury and trauma to head
- Broken jaw
- Orbital fracture

---

[2] For the last quarter of 2016, the Monitors identified 37 incidents from the CCS "route" logs that did not appear to be reported.  These were reported to the Compliance Director on February 26, 2017.



- Facial injuries

The CCS logs are secondary indicators of incidents, but remain a valuable indicator of unreported facility violence.  In terms of the CCS walk-in logs – recording inmates brought to the medical clinic for care, the incidents included for the last quarter of 2016 that did not match up to what was reported by OJC or to the Monitors were:  uses of force, inmate/inmate altercations, and self-harm.

When the Plaintiffs' attorneys review the OJC reported incidents, they compare this information with what is reported to them by their clients.  The Plaintiffs' attorneys are judicious about what is forwarded to the Monitors and do not normally report incidents inmates claim occurred unless documentation or corroboration is likely to exist.  For the last quarter of 2016, among the reports verified by OJC as NOT REPORTED by OJC from the Plaintiffs' list included multiple incidents:

- Inmate beaten by broomstick with another inmate
- Uses of force
- Attempted self-harm
- Inmate/inmate altercations

Additionally, there are incidents identified by the Plaintiffs' attorneys for which ultimately a report is found to have been filed, but not reported as a serious incident to the Monitors.  Often the report was not timely, or did not include the relevant data to make the determination as to whether it was required to be reported to the Monitors (See also the narrative in Section IV.A.7., Incidents and Referrals).

The Monitors will be working with OJC and CCS to put some structure around the CCS logs and reporting to OJC, and/or OJC more regularly reviewing the logs to determine not only if a report exists, but whether the incident should be reported to ISB (FIT or Inmate Criminal Investigation) and/or the Monitors.    Also needed is additional training for medical staff in recognizing the signs and symptoms of trauma as well as sexual assault (See narrative regarding Section IV.A.12. Sexual Abuse).  Medical staff need to gain the trust of inmates as part of the treatment milieu, but the medical staff also needs to report violence, sexual assault, and self-harm to security staff as soon as they suspect such a case.



The level of violence and other incidents which occur in this facility are serious and symptomatic of larger critical issues such as: staffing deficiencies, lack of training, lack of supervision, deficiencies in data analysis, lack of knowledge about how to operate a direct supervision facility, uneven leadership skills, and an internal culture that undermines reform efforts and performs no self-critical analyses. For instance, time and time again, it is reported that an inmate being returned to a housing unit evaded staff, ran to the top of the stairs and threatened to jump or did jump. However, no change in the manner of escorting inmates or restraining inmates has been implemented nor has there been a review to determine if alterations to the facility are appropriate. Another example of the larger management issues is that a large percentage of the inmate/inmate assaults occur when staff leave the unit unsupervised and/or do not secure the doors before leaving. Regardless of this obvious issue, staff are still allowed to leave units unsupervised for an hour or more at a time and the proposed staffing memorializes this practice as the staffing plan does not provide for sufficient staff to relieve staff when they leave the unit for meal breaks and other reasons.

The recent incident on March 17, 2017 in which inmates took over a housing unit is further indication of the deep seated issue remaining in this jail. The two inmate deaths since October are also extremely troubling in and of themselves, without the overlay of staff misconduct.

## A. 1.   a. – c.  Use of Force Policies and Procedures

**Assessment Methodology**

- Dates of tours
  - December 7-8, 2016
  - January 4-6, 2017
  - February 21-24, 2017
  - March 20-23, 2017
- Materials reviewed
  - Materials reviewed include the Consent Judgment, policies and procedures, use of force reports, incident reports, investigations conducted by Investigative Services Bureau (ISB), investigations conducted by Internal Affairs Division (IAD), news articles, training materials, expert reports from underlying litigation, shakedown logs, and post logs.
- Interviews



o Interviews included command staff, jail supervisors, commander of ISB, commander of IAD-Administrative, chief of investigations, various supervisors of units within ISB, and inmates.

Findings:
  IV. A. 1. a. – Partial Compliance
  IV. A. 1. b. – Partial Compliance
  IV. A. 1. c.  – Partial Compliance

Measures of compliance:
1.  Comprehensiveness of written policies,
2.  Training, data collection and analysis,
3.  Supervisory review of uses of force,
4.  Review of use of force reports, review of incident reports, review of investigations by ISB.

Observations:

The use of force policy was signed in May 2016.  Training was developed, and OPSO reports that 99% of the staff have now been trained on the policy.  However, the effectiveness of training has yet to be determined.   Additionally, there are still uses of force that are either not reported at all or not accurately reported.  For example, in February 2017, it was determined that several uses of force were not reported despite a staff member of the rank of captain being present and involved in the use of force.  While in the past the quality of the investigations of uses of force at the facility level (as opposed to the investigations by FIT which were, and continue to be, of good quality) improved, a review indicates there is still a need for training of jail supervisors on the new policy and how to conduct investigations in general.

ISB has developed standard operating procedures that memorialize a comprehensive strategy to review and investigate uses of force.  The effectiveness of the FIT's investigations/reviews remains limited due to uses of force not being properly and timely reported.  The delay in incident reports being finalized by jail supervisors, and forwarded to FIT continues.  FIT has been able to reduce the backlog of investigations due to the quality of the facility investigations improving as the facility investigations now often contain more the information about uses of force as opposed to the FIT having to perform the tasks of the watch commanders. However, the length of time from the date the incident occurred until the decision is



made to administer or not administer discipline is still lengthy.   In some cases, this is because the decision has been made to wait for the District Attorney's Office to decide on charging the staff member.

OPSO needs to prevent staff who are under investigation for using excessive force from having inmate contact.   Part of the issue with confusion about who should have their contact with inmates limited is the length of time the investigations are taking and who has the authority to place and/or remove restrictions.  For instance, after a request by one of the Monitors, a lieutenant was supposed to be removed from inmate contact pending investigation of numerous allegations of excessive uses of force.  After a while, his name began to resurface on use of force reports.  This went unnoticed until pointed out to OPSO by the Plaintiffs' counsel and Monitors.  Only then was it discovered by OPSO that the lieutenant had essentially removed himself from restricted duty and was. not only in contact with inmates, but. involved in uses of force on inmates.  His presence within OJC and his involvement in uses of force went unnoticed by the leadership of OJC.   There is no reliable system in place for reviewing whether a staff member should be assigned to a "no inmate contact" assignment or suspended from duty, and ensuring the restriction is followed.

IV. A. 1. c. has been upgraded to partial compliance due to the improvement in the data collection on uses of force.  However, the analysis of that data, recommendations based on the analysis, plans of action, or reports of outcomes of plans of action are still lacking.

New Recommendations:

1.      Develop a reliable system for reassigning or suspending a staff member pending investigation unless approved the Director and documented in writing.

2.      Improve the timeliness of investigations by FIT and the IAD-Administrative into uses of force.



## A. 2.   Use of Force Training

Findings:
  IV. A. 2. a.  – Partial Compliance
  IV. A. 2. b. – Partial Compliance
  IV. A. 2. c. – Non-compliance

Measures of compliance:
1.    Comprehensiveness of lesson plans.
2.    Training material, evidence of knowledge gained.
3.    Review of use of force reports.
4.    Review of incident reports.
5.    Review of investigations by SOD.
6.    Review of investigations by IAD.

Observations:

The new use of force policies were finalized in May 2016, and training materials were developed.  OPSO reports that 99% of the staff have been trained on the policies, but the effectiveness of training and the related issues and problems are noted above.  Specifically, the training needs to be geared towards corrections and contain specific references to OPSO's Use of Force policy, the Use of Force Reporting policy, and the requirements of the CJ.  Testing needs to be done on retention of the training by the participant and reports and investigations need to be reviewed to evaluate the effectiveness of the training.   Documented remedial training needs to be provided where reviews of incidents and reports reveal a lapse in the deputy's of supervisor's skills.

In particular, training needs to stress the proper uses of force in a jail setting, and that all uses of force are to be reported and properly investigated. As the vast majority of deputies hired by OPSO will be working in corrections, the training should use corrections based hands-on scenarios and emphasize working with inmates, especially inmates with mental illness and other specialty populations. Sixty-eight percent (68%) of the reported uses of force involved inmates assigned to specialty units.  The Monitors understand that corrections specific training regarding working with inmates with mental illness is planned for the future.  While we applaud that initiative, the requirement  training for supervising inmates with



7

mental health issues is a provision in the CJ and is long overdue.  The training should reflect collaboration with the medical/mental health provider.    In addition, OPSO supervisors need to be trained on the mechanisms to ensure that all uses of force are properly reported and investigated in accordance with the policy.  All training, deputy and supervisor, should emphasize that failure to follow the policy will result in discipline. The need to emphasize consequences is evidenced by the continued failure to report all uses of force, the inadequacy of the reports that are written, the quality of supervisory review of the reports,  and timeliness of the use of force investigations performed at the facility level.

**A.  3.  a. – h. Use of Force Reporting**

Findings:
> IV. A. 3. a. – Partial Compliance
> IV. A. 3. b. – Partial Compliance
> IV. A. 3. c. – Partial Compliance
> IV. A. 3. d. – Partial Compliance
> IV. A. 3. e. – Partial Compliance
> IV. A. 3. f. – Partial Compliance
> IV. A. 3. g. – Partial Compliance
> IV. A. 3. h. – Non-compliance

Measures of compliance:
1. Comprehensiveness of written policies.
2. Training, data collection and analysis.
3. Supervisory review of uses of force.
4. Review of use of force reports.
5. Review of incident reports.
6. Review of investigations by SOD.
7. Review of investigations by IAD.

Observations:

The policy requiring reporting of uses of force was signed in May 2016, and OPSO reports that 99% of the staff have been trained.  However, the comprehensiveness and the effectiveness of the training has not been ascertained and is questionable given that all uses of force are still not being reported timely and accurately.  For example, in February 2017, it was determined that several uses of force were not reported despite a staff member of the rank of captain being present



and involved in the use of force.  When the issue of accountability was raised by the Monitors, the resulting discipline was light (letters of counseling and reprimand) and the Monitors are concerned lack of enforcement could undermine the provision which states that failure to report could result in termination.  Additionally, reviews of staff action and resulting discipline and corrective action should include supervisors who fail to do their jobs regarding reporting uses of force.

The Monitors continue to be concerned about absence of enforcement of practices, procedures, and policies to ensure all uses of force are being reported timely, adequately, and accurately.  Simply having a policy that says all uses of force are to be reported is inadequate.  While FIT does a good job following up on the inmate injuries reported by CCS, as noted above, there is a definite deficiency in what is being reported by CCS.  During review of administrative cases involving the failure to report a use of force, the Monitors have noticed discipline ranging from an oral counseling to referral to training.  The failure to report uses of force timely and accurately should be a separate issue from whether the force used was necessary and justified.

The failure to report uses of force or to inaccurately report compromises the Early Intervention System (EIS).  There still continues to be situations where staff sometimes report that the incident involved a use of force when, in fact, it did not.  There are also circumstances where staff members do not indicate the incident involved a use of force and the text of the report clearly indicates that force was used.  Also, since use of force reports is the primary criteria for the EIS, if use of force is not being indicated or reported, it is quite possible that there are staff members who should be triggering the EIS and are not.   History has shown that to be true. For over two years, there has been a request outstanding to require a specific check box in Vantos as to whether the incident involved a use of force.  The decision was made by OPSO to replace the Vantos system and that process is ongoing.  It is recommended that, in the new system, the staff member not being able to go forward on the documenting of an incident without indicating whether or not the incident involved a use of force.  This will also allow for greater



accountability and tracking.  A staff member who does not accurately indicate the use of force could then be subject to timely remedial action and/or discipline.

The OPSO policy provides for the use of force reports to contain all of the provisions required in the CJ.  The policy provides that first line supervisors to be present for all planned uses of force such as cell extractions.  Review of incident reports indicates that this section of the policy is being followed on a regular basis.  However, the mechanism is not in place to ensure presence of first line supervisors in all cases; thus, OPSO is in partial compliance with this requirement.

Supervisory review of use of force reports has improved.  This appears to be the result of a measure put in place where the watch commanders must submit all reports along with a log of incidents at the end of each shift to the OJC Warden.  This has resulted in an improvement in the timeliness of initial drafts of reports.  However, as noted previously, the incident reports and use of force reports which had been signed off on by supervisors and even jail administrators are often inadequate and/or incomplete, and contain boilerplate and conclusory language that does not allow the reader to make an evaluation of the level of resistance, the level of force used, and/or the appropriateness of the force.  For instance, reports continue to state, "appropriate force was used" or "inmate was assisted to the floor" without detailing what type of behavior prompted the use of force, de-escalation efforts, and the type of force used.  Reports do not routinely indicate whether the use of force was documented by video even though it most likely was captured due to the extensive video system in the jail.  If supervisors do interviews of inmates, the most common result of interviews of inmates by supervisors is a notation that they either did not see anything or did not wish to cooperate.  The ISB is more successful in obtaining statements from inmates during the ISB investigation.  However, often, by the time ISB interviews an inmate, the inmate has had time to talk to other inmates to agree on a "version" of events.  Therefore, it is important that the supervisors obtain timely and complete statements from inmates or take steps to separate witnesses.



During a May 2016, site visit, Monitor Frasier provided the Chief of Investigations and ISB Commander with a check off sheet that she helped another jurisdiction develop.  While the CJ does not require it, it is believed that it would provide guidance as to the different requirements of the policy and serve as a reminder to the shift supervisors and watch commanders.  The check list is not being utilized.

While FIT looks at every use of force report, and issues a quarterly report, it continues to be the Monitors' concern that without the implementation of the policy and procedure, effective training for staff and supervisors, and an audit of the reporting procedure, there is no way to know if the reporting is accurate or not. There are still incidents in which jail supervisors fail to recognize and refer questionable uses of force to ISB for investigation.  Most, of the investigations of an incident involving the questionable use of force are  being initiated by ISB or as a result of a grievance, a report from the plaintiffs' counsel, or a request from the Monitors – rather than a result of the request being submitted by OJC supervisory personnel.

There is no automated tracking system to ensure timely notification of a use of force is being made to the Warden.  While completed reports are to be assigned a number in the OPSO reporting system, there is no follow up to make sure the reports are written and/or are reviewed within 36 hours and forwarded to ISB.  A review of the documentation indicates that at least a cursory examination by the watch commanders and Warden of the reporting of uses of force is taking place, the information provided did not allow for a determination of whether the review that had taken place had been done in a timely manner as required by the policy. There is no tracking mechanism in place to make sure each of these steps is completed timely.  The OJP Warden has put in place a system which requires the off-going watch commander to submit a log of incidents and the corresponding reports. However, reports are often not written or finalized at that stage.  In addition, this is system that is reliant on the OJP Warden checking through the log and reports manually as opposed to an alert if the shift/watch commander does not submit a



report or complete the initial review in a timely matter There is no system to alert the Chief of Corrections if the Warden or Assistant Warden does not complete the secondary review in a timely manner.  There is no system for tracking whether the reviews are being sent to ISB in a timely manner.  While FIT does keep record of the results of the FIT review, it is clear that there are a number of use of force incidents that never made it to ISB.  The manner in which reports are being reviewed in only in Partial Compliance with the CJ.

There are periodic reports detailing the use of force that have been submitted to the Monitors as required under IV. A. 3. g.  However, the reports do not comply fully with the provisions of the CJ.  Uses of force of a significant nature are to be reported to the Monitors on a regular basis.  At one point in time, the notification was made weekly and contained incidents which occurred the week before.  For the past several months, the notification to the Monitors has been delayed; often three to four weeks.  This delay has hampered the Monitors' ability to request that investigations be conducted or find out the results of those investigations.

Monitor Frasier has real time off site, read-only access to the incident reporting system (Vantos) so that incident reports can be reviewed on a contemporaneous basis.  Unfortunately, the Vantos system has proven to be unreliable and is often not available off-site.  Also, while it is helpful to have access to Vantos, a large percentage of reports are not being entered timely. In addition, the Monitors do not have ready access to the results of the review of incident reports and any evidence upon which the review is based such as the videos and interviews. The Monitors also do not have ready access to the investigations by ISB.



## 4. a. – e.  Early Intervention System ("EIS")

Finding:
> IV. A. 4. a. – Non-Compliance
> IV. A. 4. b. – Partial Compliance
> IV. A. 4. c. – Partial Compliance
> IV. A. 4. d. – Partial Compliance
> IV. A. 4. e. – Non-compliance

Measures of compliance:
1.    Comprehensiveness of policy.
2.    Identification of patterns and trends.
3.    Evidence of review by command staff.
4.    Monitors' review of quarterly reports.

<u>Observations:</u>

The responsibility to review staff who triggered the EIS is assigned to  the supervisor of the FIT.  The quality of the review and the documentation is good.  However, there continues to be staff who are triggering the system who should not have.  More concerning, there continues to be staff who should have triggered the system due to the number of uses of force in which they have been involved, but do not trigger the EIS.

Over the past three and a half years, a variety of explanations for the failure of the EIS perform appropriately have been offered.  During a site visit in February 2017, yet another explanation was offered.  This continues to occur on a frequent enough basis to severely question the reliability of the EIS.  Due to it being a continuing issue that has not been shown to be satisfactorily resolved, this provision has been moved to Non-Compliance.

If the EIS continues to be shown as unreliable, it is not credible and should not be relied upon as the sole source of alerting FIT that a staff member should be reviewed.  Also, proof needs to be provided as to the names of the staff members and the retraining received.  The Monitors still contend that a credible early intervention or warning system collects data such as uses of force, grievances, complaints handled at the facility level, absences, etc. and causes a review, and, if



necessary, remedial, documented action.  The current system relies totally on deputy's self-initiated reports of uses of force that has proven to be unreliable.

The Use of Force Review Board has been meeting regularly, but it did not perform the evaluation necessary for compliance with IV. A .4. e.

### IV.    5. a. – l.  Safety and Supervision

Findings:
IV. A. 5. a. - Non-Compliance
IV. A. 5. b. - Non-Compliance
IV. A. 5. c. - Non-Compliance
IV. A. 5. d. - Non-Compliance
IV. A. 5. e. - Non-Compliance
IV. A. 5. f. -  Substantial Compliance
IV. A. 5. g. - Non-Compliance
IV. A. 5. h. - Non-Compliance
IV. A. 5. i. - Partial Compliance
IV. A. 5. j. - Non-Compliance
IV. A. 5. k. - Partial Compliance
IV. A. 5. l. -  Partial Compliance

Measures of compliance

1.    Comprehensiveness of policies and procedures
2.    Training materials
3.    Post orders
4.    Review of incident reports
5.    Installation of cameras
6.    Documentation of training
7.    Monitors' review of required semi-annual reports.

Observations:

For previous compliance reports, the only provision under IV. A.5 that OPSO provided sufficient proof of compliance was IV. A. 5. l. which dealt with increased use of surveillance due to the use of video cameras.  Due to the surveillance system being shown to be unreliable for a significant period of time, this provision has been moved to Partial Compliance.  Partial Compliance with three of the other provisions was observed by the Monitors.

The level of harm and risk of harm to inmates held in the Orleans Parish Jail system continues to be extremely high despite the CJ having been in place for since October 21, 2013.  This danger is evident by the number of assaults on inmates by



other inmates including sexual assaults as reported to the Monitors by OPSO and the evidence of numerous unreported incidents of inmate on inmate violence discovered by the Monitors through review of records, reports from Plaintiffs' counsel, and grievances.

Table 3 – OPSO Reported Incidents – October 2016 – March 2017[3]

| OJC Reported Incidents | Oct | Nov | Dec | Jan | Feb | Mar | Total |
|---|---|---|---|---|---|---|---|
| Contraband | 3 | 3 | 2 | 3 | 2 | 1 | 14 |
| Criminal Damage | 0 | 0 | 1 | | | | 1 |
| Death | | | | | 1 | | 1 |
| Disturbance | | | | | | 1 | 16 |
| Escape, Attempted | | 1 | | | | | 1 |
| Fire | 1 | | | | | | 1 |
| Inmate Assault on Staff | 2 | 2 | 2 | 6 | 1 | 2 | 15 |
| Inmate Medical/Route (Hospital) | 9 | 5 | 9 | 16 | 12 | | 51 |
| Inmate/Inmate Assaults | 36 | 22 | 33 | 18 | 32 | 20 | 161 |
| Sexual Assault, Alleged | | 1 | | 1 | | 2 | 2 |
| Sexual Harassment, Alleged | | | | 2 | 11 | | 13 |
| Suicide Death | 1 | | | | | | 1 |
| Suicide, Attempt/Gesture | 8 | 13 | 6 | 4 | | | 31 |
| Use of Force | 23 | 19 | 24 | 26 | 9 | 10 | 111 |
| Total | 83 | 66 | 77 | 76 | 68 | 36 | 419 |

OPSO has not provided proof of security check entries and it is clear from the review of incidents that checks are not being done timely on anything closely

---

[3] This data is based on the incidents reported by OJC to the Monitors, generally on a bi-weekly basis. The Monitors provided a year-end report regarding violence to all parties, including the Director on January 25, 2017. The Monitors analysis included: OJC reported incidents for each month of 2016; all incidents by time of day; all incidents by location in OJC; all uses of force by location in OJC.; uses of force by time of day; and a summary of the number of incidents that may have not been reported based on the Plaintiffs' attorney's review. If the Defendants have produced any other data than that provided in the response to the draft Compliance Report, this information has not been provided to the Monitors.


Orleans Parish
JAIL MONITORS

resembling a consistent basis.  There are units that are not staffed or where staff leave the unit unsupervised for over an hour at a time.  Disturbingly, there has been no documented effort by OPSO to audit compliance with this provision despite the availability of the information from the "TourWatch" system upon which significant resources were expended.  This includes special management housing units which OPSO has designated as mandatory posts; requiring constant staff presence.   There continues to be a pattern of staff staying behind the desk in a direct supervision unit as opposed to providing true direct supervision.

No proof that the current staff assigned to work the specialty units have received the required training was provided; thus A. 5. g and h. continue to be in Non-Compliance.   Shakedowns are reflected as being conducted, but are still not conducted with sufficient frequency as evidenced the amount of contraband which is discovered each time shakedowns do occur, the weapons being used in assaults, and drug use in the facility.  The Monitors recommend formalizing the effort to determine the source of the contraband and remediate the danger.   No proof of daily inspections was provided and the conditions of the living units found on tours certainly provides evidence that inspections are not taking place daily or that there are no consistent standards of what is expected, or that changes are made to the facilities as a result of the inspection findings.

While OPSO documents were provided regarding inmates being housed in protective custody, documentation in accordance with the CJ was not provided.  A list of all contraband in accordance with A. 5. l. (2) was provided.  The Stipulated Agreement requires a plan of action to address violence.  The Monitors have reviewed this plan, and find it deficient in terms of specific measurable strategies. While removing inmates from the facility, as discussed in the Introduction, "Operation Rewind" is endorsed by the Monitors (see previous Compliance Reports), the violence has not abated.



## A. 6.      Security Staffing

Findings:

    A. 6. – Non-Compliance

        A. 6. a.  (1) – Partial Compliance
        A. 6. a. (2) – Substantial Compliance
        A. 6. a. (3) – Noncompliance
        A. 6. a. (4) – Partial Compliance
        A. 6. b. – Partial Compliance

Measures of Compliance:

1. Written policy/procedure governing staffing, and reporting as required by consent agreement.
2. Completion of a staffing analysis per http://static.nicic.gov/Library/016827.pdf
3. Staffing plan (existing and new facilities); recruiting plan.
4. Daily rosters.
5. Overtime records.
6. Housing unit logs.
7. Hiring of professional corrections administrators (CV).  Post order/job description/organizational chart.
8. Staffing report containing required information; conclusions; action plans, if any.

<u>Observations:</u>

The review of this section of the CJ are guided by this language (IV.A.6):

"OPSO shall ensure that correctional staffing and supervision is sufficient to adequately supervise prisoners, fulfill the terms of this Agreement, and allow for the safe operation of the Facility, consistent with constitutional standards. . ."

As the governing section of this paragraph is in non-compliance, the entire section is determined to be in non-compliance.  The Monitors note, however, that the sub-provisions of the paragraph may be in substantial compliance or partial compliance, as noted above.  The Monitors are optimistic that the Compliance Director's and the City's initiatives will result in hiring and retaining qualified staff.  The Monitors acknowledge that when the jail comes closer to full staffing there may be cost savings because of the more efficient operation given trained and experienced personnel.

The Monitors requested information regarding the deliberations  between the Compliance Director and the City to fund the jail, including staffing starting in December 2016.  This information was not provided until after the City Council



approved the Director's proposed staffing plan in March 2017.  It was the Monitors' hope that any differences among what OJC, the City, and the Monitors identified regarding staffing could be resolved prior to City Council's action.[4]

It is the position of the Monitors, pursuant to our responsibilities under the CJ, and based on currently available information, that the staffing plan underlying the budget approved and funded by the City does not provide the staff necessary to operate the jail to protect inmates from harm.[5]  The Monitors discussed the staffing issues known at the time of the March tour with OJC leadership.[6]

When preparing this Compliance Report, based on the data and findings of the tour in March and in deliberations among the Monitors, the Monitors reassessed the recommendations discussed during the tour, and concluded that, given what is known at this time, these posts are needed to adequately staff the security and support operations of the OJC:[7]

- Two day posts, and one night post on each floor for escort/relief; these positions provide meal and break relief to all housing units and control centers; move inmates; provide emergency response as needed; supervise programs; escort and supervise volunteers; and assist as needed for other staff vacancies (example, sanitation, laundry, commissary) (total of 29 additional positions);

- Two posts assigned, at least in the day and when the medical clinic is open for security and overseeing inmates who are waiting, and who are being moved to and from housing units (total of 7 additional positions);

- One additional post in TDC (should it reopen) to supervise inmate recreation in the evenings and/or on weekends  (one new position);

---

[4] In March  2014, the Monitors agreed with the staffing plans developed by OJC.  However, the agreed upon staffing plan is not the one submitted as part of this year's budget.

[5] See Consent Judgment, Section IV. A. 6.

[6] This information has been provided to the Defendants to serve as a point of discussion.

[7] In the Defendants' note that the Monitors' proposed sergeant position to oversee facility sanitation and the sergeant position to oversee the laundry were not previously discussed with OJC.  This is true.  These additions to proposed staffing are based on the findings of the Monitors (see Section II.D.) that these functions were clearly deficient and lacked appropriate oversight and leadership attention.  This is the opinion of the Monitors, and as such do not require prior discussion with the Defendants to be included in this Report; nor in any future review of staffing.  See Consent Judgment, Section IV. A. 6.



- One sergeant position to oversee facility sanitation; staff are provided for critical sanitation functions but no supervision  (one new position);
- One sergeant position to oversee the laundry functions; staff are provided for critical laundry functions but no supervision.  The current laundry situation is clearly reflective (See Section IV.D. of this Report) of the impact of the lack of supervision (one new position);
- One post in TDC as a rover to facilitate inmate movement and provide security; (1.2 new positions); and
- Addition of a facility PREA coordinator (one new position).

The TDC post for recreation and rover, along with the PREA Coordinator, have been included by the Defendants in the revised staffing plan produced after City Council action.

An additional element in determining the correct staffing for OJC is the on-going work of a contractor, CRS, to develop a staffing plan pursuant to a contract signed with the Sheriff in June 2016.  This work, which took on a different profile following the requirements of the Stipulated Agreement to review ALL staffing in the Sheriff's Office, as of this date, is not complete.

Another critical factor in determining staffing is the determination/computation of the shift relief factor.   Succinctly, a shift relief factor provides the multiplier to determine how many persons are needed to assure staffing of a post for the required hours – for example, 24 hours a day, 7 days a week.  There are several credible ways to compute a shift relief factor, but the underlying data are how much vacation time, sick leave, FMLA, leave without pay, suspension, military leave, training hours, etc. an average employee takes by using an aggregate number.[8]  These available work hours are subtracted from the number of annual work hours, thus allowing a shift relief computation.  The factor generally changes every year based on actual employees' use of leave, the maturation of the workforce, and accumulation of, and taking of, leave hours.  How many hours of annual training an agency mandates also drives the shift relief factor.

---

[8] See http://static.nicic.gov/Library/016827.pdf



It is the position of the Monitors that the shift relief factor used to compute the OJC staffing plan that formed the basis for the City's budget approval needs refining, and therefore, we believe, may under estimate needed staffing.  Applying to the staffing formula a higher number of available work hours, and hence a smaller shift relief multiplier, means fewer staff are potentially budgeted and hired, and that overtime usage will be much higher to fill in for the staff that should be on the workforce.  Building in overtime through the use of an inaccurate shift relief factor is especially detrimental in a 12-hour work environment, where working more than 12 hours is a negative for both staff and inmate safety.

For example, we examined  a staffing plan based on an employee working on post 1,746 hours year.[9]   This number was derived for the purposes of this example as the mid-point between the preliminary estimate of work hours by the contractor, CRS (1,669) and the hours calculated by OJC (1,822).  Using 1,746 as the number to drive shift relief, the number of deputies needed rose from 234 to 285, just for OJC.  This minimal 5% change in the calculation has an enormous impact on staffing.[10]

Therefore, as stated previously, the Monitors believe that the required staffing for a Constitutional jail may require between 40 to 90 more positions than currently funded.[11] As the City has assured the Monitors that the staff positions are funded without an attrition or vacancy factor, and as there are now many vacant positions, whether or not these additional, at a minimum, 40 – 90 positions are funded may be irrelevant for this funding year.  However, agreement in least principle about the inclusion of this staffing is critical.

The data from OPSO indicates that for calendar year 2016 a total of 60 staff were hired to work in the jail, and 181 staff left employment.   Of this number 105

---

[9] This specific information has been provided to the Defendants as a discussion point as staffing is finalized.

[10] In the Defendant's suggest that the difference in the shift relief factors are inconsequential.  The data is still being refined, and should be the subject for on-going discussions.  The Monitors do not agree at this point that the difference is statistically insignificant until the final report is provided and the means of the calculation reviewed.

[11] This number may be amended upward when the relief factor is applied to other operational areas such as IPC, TDC [should it re-open], and to the Corrections Monitoring Technicians.



resigned, 53 were terminated, and 12 retired or were otherwise separated.   This is a benchmark that provides opportunity for positive change in the future.

Documentation of unstaffed units continue through this reporting period.  As of January 1, 2017, the Monitors requested, and the Defendants agreed to indicate in the description of reportable incidents if a deputy was present in the housing unit when the event occurred.   A review of the OJC reports indicates the following:[12]

- Death of an inmate in October 2016; staff not present.
- Disturbance in March 2017; staff not present.
- Of the thirteen incidents involving inmates taken to the hospital, in eight (61.5%) of the incidents, it was unknown/unreported if staff were present in the housing area.
- Of the seventy-nine incidents of inmate/inmate violence; OJC reported no staff was present in twenty-four (30%) of events, and in fifteen (19%) of incidents, it was undetermined if staff were present – either because the report was unclear, or the video was not accessible.

These issues, to be best of the Monitors' knowledge, remain unresolved.

The Monitors await information about how the OJC plans to assure that housing units are staffed including providing relief for meals and breaks during the 12-hour shifts – this is the purpose of the additional staffing noted in the first bullet, above.

An issue identified in the March tour is the hiring process itself for OJC. There are insufficient written directives governing this important process.  The Monitor reviewed files of 10 hired employees.  During discussion about these files it was identified that there are not written policies and procedures guiding the hiring process, according to the Human Resources Director. These findings were discussed with the Compliance Director at the conclusion of the tour.

The Defendants report that an applicant must "successfully pass" various enumerated steps in the hiring process.  However, the directive cited by the Defendants (policy 301.01) does not describe, for example, what constitutes a

---

[12] This data includes data for March and the first two weeks of April 2017.



successful completion of various steps.  The record indicates that the Monitors provided comments to OJC regarding this draft policy on July 28, 2016.[13]   The Monitors were unaware that the final policy was signed, or, as such, did not know the policy's final content.[14] The written processes needed for a credible and defensible hiring process, capable of audit/evaluation can be operating procedures for Human Resources and not, necessarily, contained in an agency-wide directive. The conflict and confusion in the Defendants' two divergent positions– that the directive was signed on February 8, 2017 (response to the draft Compliance Report - April 28, 2017) and the policy is still in draft (policy matrix reported on March 6, 2017 by the Defendants' in response to the Monitors' document request) needs to be clarified. Regardless of whether the directive is final or not, there must be written procedures that provide specific guidance on hiring; policy 301.01 is just the starting point.

To also enhance the hiring process the addition of job-related interview questions, with valid behavioral anchors related to specific job duties to rate the candidate, and documented training for all interviewers to assure their knowledge of the desired responses, and assure inter-rater reliability is recommended.[15]

A review of newly hired staff files did not contain documentation of all parts of the process nor evidence of administrative/leadership review synthesizing the information, and/or explaining arrests that were noted in the file.  There was no recommendation for approval of the person to be hired.

As to sub-paragraph IV.6.a. (3), it is now in non-compliance.  Chief of Corrections, Carmen DeSadier, resigned in October 2016.  Michael Tidwell has been re-hired effective May 1, 2017 for this position.  The Monitors are obviously pleased to have this critical position filled, but note that the seven months this position was

---

[13] The Monitors do not know if the Human Resources Director was aware or not during or after the March 2017 tour of  policy 301.01; we note the Human Resources Director requested the assistance of the Monitors on April 17, 2017, asking specifically for examples of written procedures, a template or an example.

[14] The steps in the process which need valid decision-points include:  "a battery of criminal background check [sic]; Securus review; CVSA; interview;  drug screen; and psychological evaluation.

[15] An alignment is also needed throughout the hiring process linking it to the specific job duties associated with direct supervision jails – which has been described in detail in previous Compliance Reports.



vacant as a significant barrier to both moving toward compliance and to a safely functioning jail.

Sub-paragraph IV.6.a. (4) is in partial compliance, as monthly reports are produced regarding hiring and termination of employees.  The Stipulated Agreement also provides for bi-monthly reports regarding hiring.

Sub-paragraph IV.6.b. is in partial compliance but may move to non-compliance without agreement between the parties and the Monitors regarding a staffing plan and the shift relief factor.

<u>New Recommendations:</u>

3.    Develop written policies and procedures (or divisional directives) to guide recruitment, background investigations, hiring processes, and required updates (e.g. PREA-related).  The directives should provide sufficient detail as to be able to be audited for compliance.

4.    Working with all parties, there needs to be a decision about the staffing plan and the calculation of the shift relief factor, at least given the current data.



## IV. 7.  a. – j. Incidents and Referrals

Findings:

IV. A. 7. a. - Partial Compliance

IV. A. 7. b. – Partial Compliance

IV. A. 7. c. – Substantial Compliance

IV. A. 7. d. - Non-Compliance

IV. A. 7. e. – Partial Compliance

IV. A. 7. f. – Partial Compliance

IV. A. 7. g. – Partial Compliance

IV. A. 7. h. – Partial Compliance

IV. A. 7. i. - Non-Compliance

IV. A. 7. j. - Non-Compliance

Measures of compliance
1. Comprehensiveness of written policies
2. Training
3. Data collection and analysis
4. Supervisory review of uses of force
5. Review of use of force reports
6. Review of incident reports, review of investigations by SOD
7. Review of investigations by IAD
8. Monitors' review of required semi-annual reports.

Observations:

When the policy on incidents and referrals is finalized, it will set out the
process for documenting and referring incidents.  However, there is nothing in place
to ensure all reportable incidents are being documented and that the incidents are
being recorded adequately, timely, and accurately.  The Monitors' concern in past
compliance reports about there being nothing in place to ensure all reportable
incidents and uses of force were being reported and that incidents and uses of force
were being reported adequately, timely, and accurately has proven to be warranted.
Simply having a policy that says all incidents and uses of force are to be reported is
inadequate (as noted in the discussion regarding Paragraph IV.A.3).  There must be
a system in place to check to make sure reportable incidents and uses of force are
being reported and that there are consequences when incidents and uses of force
are not reported or not reported accurately.  The proposed policy on incidents and
referrals states which incidents are to be reported, and includes the CJ language that
failure to do so will result in discipline.  The Monitors are concerned about apparent



inconsistencies in disciplining staff for no reporting.  During review of administrative cases involving the failure to report an incident, the Monitors have noticed discipline ranging from an oral counseling to attendance at training and times where no investigation of the failure to report was initiated.  The failure to report incidents timely and accurately should be a separate issue from whether the force used was necessary and justified.

The deficiencies in the quality of reports continues to exist; the failure to contain all of the information set out in the policy and the use of boilerplate language.  The requirement by the OJC Warden that a log on incidents occurring on each shift along with the reports has resulted in an improvement in the timeliness of initial drafts of reports. However, as with the use of force reports, incident reports examined by the Monitors were often found to be inadequate and/or incomplete, and contained boilerplate language and conclusory language that does not allow the reader to make an evaluation of what occurred, the reason for the occurrence, whether staff acted appropriately, and what steps should be taken to prevent a similar incident from occurring in the future.   Such reports are being signed off on by a supervisor.  As noted above, there is no automatic tracking system to ensure timely reviews and notifications are being made.  While completed reports are supposed to be assigned a number, there is no follow up to make sure the reports are written and/or are reviewed within the 24 hours required.

No periodic reports detailing reportable incidents have been submitted to the Monitors as required under IV. A. 7. f.  The reports that were provided were the list of inmate-on-inmate assaults and criminal investigations conducted by the Criminal Investigation Division of ISB.

The adequacy of the policies and procedures and reporting system is crucial to the Monitors being able to rely on the accuracy of the periodic reports that are to be submitted under IV. A. 7. f. and g. and the sufficiency of the annual review that is to be conducted under IV. A. 7. h. which requires OPSO to assess whether the incident reporting system is meeting the requirements of the CJ.



## 8. a. – f. Investigations

Findings:

       IV. A. 8. a. – Substantial Compliance
       IV. A. 8. b. - Substantial Compliance
       IV. A. 8. c. - Substantial Compliance
       IV. A. 8. d. - Substantial Compliance
       IV. A. 8. e. - Partial Compliance
       IV. A. 8. f. - Partial Compliance

Measures of compliance:
1.     Review of incident reports,
2.     Review of use of force reports,
3.     Review of investigations by SOD,
4.     Review of investigations by IAD, and
5.     Monitors' review of required semi-annual reports.

<u>Observations</u>:

The responsibility for the Criminal Investigation Division (investigates possible criminal activity by inmates), Internal Affairs Division-Criminal (investigates possible criminal activity by staff), and the FIT (investigates use of force by staff falls under the purview of the Investigative Services Bureau (ISB). Prior to the Fall of 2015, the Internal Affairs Division-Administrative (investigates possible violation of policies by staff) and the Intelligence Unit (provides information and intelligences regarding activities that have taken place or may take place in the jail or support activities) were part of the ISB. In the Fall of 2015, the Internal Affairs Division-Administrative, Internal Affairs Division-Criminal and Intelligence Unit were placed under the purview of the Chief of Corrections. This created a serious conflict of interest as the independence of these units was compromised. Responding to the pointed criticism of the Monitors, both the Administrative and Criminal Sections of the Internal Affairs Division (IAD) were moved organizationally so that the lieutenants in charge of those units reported directly to the Sheriff. The Intelligence Unit was placed under the supervision of the lieutenant supervising IAD-Administrative. After the creation of the Chief of Investigations position, the IAD-Criminal was returned to the purview of ISB and the IAD-Administrative (including the Intelligence Unit) reported to the Chief of Investigations. This was criticized in Compliance Report #6 as the Intelligence Unit



was more effective when it worked directly with IAD-Criminal and FIT.  In the Defendants' response to the draft of Compliance Report #7, they contend that the IAD-Administrative Division and the Intelligence Unit have been returned to the purview of ISB.  The Monitors applaud this move as it should make for better collaboration among the various divisions of the ISB.

Significant evidence of compliance was provided for IV. A. 8.  The training that has been provided is now in compliance with IV. 8. b.  ISB has finalized its written policies and procedures, and/or job descriptions/post orders governing their work.  The quality of the investigations of all of the various divisions has continued to improve.  The Monitors are hopeful that the issues with the quality of the reports from the Intelligence Unit will be quickly addressed by the ISB Commander.

The Monitors are concerned about the time investigations are taking, but part of that reflects the poor quality of the reports providing the basis for the investigations.

The ISB commander and the two of the three lieutenants in ISB have a background in law enforcement rather than experience in jails/corrections.  As stated in previous reports, there is a similar skill set needed for law enforcement investigations in a jail setting, but there is a steep learning curve for those lacking jail experience as to how the inmate culture and the jail interpersonal dynamics influence allegations and investigations.  The leadership of ISB has done a good job of overcoming this lack of corrections experience by attending training directly related to investigations in corrections facility and recruiting investigators who have corrections experience.  With the untimely death of Lt. Fred Austin, a person with corrections experience has been promoted to supervise FIT.

Previously noted in Compliance Reports as a significant positive change was the timing on administrative investigations if the employee is being investigated for possible criminal conduct. Previously, if it appeared that a use of force may be unnecessary or excessive or other criminal conduct by a staff member had occurred, IAD-Administrative would not take administrative action until the District



Attorney's Office decided whether to prosecute before the staff member.  This practice has now been changed.  Unless the decision has been made to make an exception to the practice, as soon as a possible policy violation is identified, the commander of ISB notifies the IAD-Administrative supervisor to open an administrative investigation.  This is an indication of the on-going changes to this process not only to comply with the CJ, but also to incorporate accepted practice.  However, as noted above, during the administrative investigation, the Monitors are aware of cases in which a staff member under investigation for a serious allegation were allowed to have contact with inmates.  This appears to be a result of not having a system in place to ensure the staff members who are under investigation for serious allegations are suspended or placed in a position where they do not have contact with inmates.

The Monitors acknowledge that investigating incidents of inmate/inmate assaults, sexual assaults, staff/inmate assaults, etc. with a goal of seeking indictments is appropriate.  In a jail setting, investigations play just as critical a role in terms of protecting inmates from staff, and correcting policy, practice, supervision and training.  The Monitors continue to urge that greater emphasis on the root causes of violence and disorder in the jail need to be addressed in the investigations and by the review of them.  The jail also has the ability and should initiate the inmate disciplinary process based on the inmate's rule violations.  Determination of sanctions, etc., may await a finding in the criminal investigation, but the internal, administrative sanctions must be part of the strategies to make the jail safer for inmates and staff.

In the past, reviews of a sample of investigations conducted by ISB revealed a contrast between the investigations conducted by the criminal division and administrative divisions of the IAD.  The IAD-Criminal investigations appeared to be more thorough and complete.  With a change in leadership in the IAD, the quality of investigations improved, but the quality of the investigations from the IAD-Administrative Division still lag the IAD-Criminal and FIT.  The Monitors are hopeful



that the movement of IAD-Administrative back under the ISB Commander will close this gap.

The number of staff assigned to ISB has been increased, and most duties have been reassigned.  However, on occasion, requests or demands are made that the staff assigned to the ISB fill other job duties outside of ISB.  This should not occur without the consent of the Chief of Investigations and the ISB Commander.  In terms of staffing, there are 56 staff in the budget for the investigative functions within OPSO.  This is a large number for this size organization.  While the Monitors are not, at this time, suggesting that fewer staff are needed, the better the jail staff can operate in terms of accurately reporting incidents and reducing violence in the jail, ultimately a fewer number of ISB staff will be needed.

ISB has received significant additional training.  However, additional training regarding investigations in a corrections setting regarding sexual abuse, assault, harassment, and voyeurism (PREA related) needs to provide.  Continued emphasis needs to be placed on having as one of goals of investigations being the prevention of future incidents through analysis of the policy, procedures, training, supervision, and physical plant contributors to the incident.  This level of assessment requires input from individuals who have a high level of experience in jail/corrections work. The Monitors are hopeful that the new Chief of Corrections, who has sufficient corrections experience, can assist in filling this role.

In addition to the investigators assigned to ISB, watch commanders and wardens have a role.  Watch commanders, and, sometimes, wardens should be undertaking interviews of inmates involved in incidents before calling ISB. Unfortunately, the watch commanders and wardens often lack the investigative knowledge or skills and thus actually hamper ISB's work to complete a thorough investigation.  In particular, the lack of investigative knowledge and skills by watch commanders and wardens, especially in regard to the investigation of sexual assaults, has the potential to further victimize or re-traumatize inmates.  ISB has provided training to provide to supervisors on crime scene preservation.  Further training of supervisors in interviewing and report writing and review needs to be



made a priority.  ISB should also be involved in the training of deputies on how to write proper reports.

<u>New Recommendation:</u>

5.      Provide additional training regarding how to conduct investigations in a corrections/jail setting regarding sexual abuse, assault, harassment, and voyeurism (PREA related).

**A. 9.      Pretrial Placement in Alternative Settings**

Findings:
   IV. A.9.a. – Substantial Compliance
   IV. A.9.b. - Substantial Compliance

Measures of Compliance:
   1.   Memorandum of understanding (MOU) with Pre-Trial Services.
   2.   Observation
   3.   Interview with pre-trial services staff
   4.   Review of files
   5.   Review of data regarding pre-trial diversion

<u>Observations:</u>

The Monitors have received no information from the City or the contractor (VERA)[16] regarding absence of compliance with this provision. There is no evidence the OJC holds inmates for ICE (IV.A.9.b).

---

[16] VERA will be transitioning this function to Criminal District Court.



## IV. A. 10. Custodial Placement within OPP

**Introduction**

OPSO has designed, validated, and implemented an objective classification to assess and house each OSPO male and female offender according to the risks he/she poses to institutional safety and security. The automated classification system was rolled out in the Jail Management System (JMS) on January 15, 2015.[17]  Staffing for the Classification Unit (Unit) was set at 15 classification specialists and a classification manager.  As of March 20th, the classification "unit" roster lists 10 individuals -- 8 classification specialists, 1 housing auditor, and a classification manager.  The roster lists two commissioned officers and eight civilians. The Unit is organized into two squads with two platoons. Each platoon has a shift coordinator, 1 classification specialist for initial classification and one for transfers/ reclassification. To staff the four "platoons," overtime for up to two shifts per day has been approved.

Each classification specialist has received training on the principles of objective classification and instruction on the custody and PREA assessment instruments and OPSO housing matrix. During this 6-month period, provided were in-service training and instruction on: OPSO Classification Policy 801.20, OPSO mission statement, disposition codes, mandatory restrictors and overrides, NCIC rap sheets, judicial writs; multi-point transfers; analytical thinking; reclassification interviews; standard (email) responses, transfer reconciliation; emergent notification; medical clearance; inmate worker clearance; critical review of documentation; and notification of unavailable housing.

OPSO has developed an automated housing assignment process that considers the offender's custody level, gender, special population status, PREA designations, enemies, and associates as well as bed availability to recommend an appropriate bed for the offender.  The JMS generates a list of "appropriate" housing locations from which the classification specialist must select a housing assignment/bed for the detainee.

---

[17] Hardyman, Patricia L. (2015). "Design and Validation of an Objective Classification System for the Orleans Parish Sheriff's Office: Final Report." Hagerstown, MD: Criminal Justice Institute, Inc.



Separations for special populations have fully identified and incorporated into the automated Housing Unit Assignment Plan (HUAP). Additional identification tags were created to identify individuals on suicide observation vs. suicide watch. The dormitories beds have been cataloged to allow classification to assign individuals to specific beds. Partial compliance with paragraph IV.A.10.c of the CJ rests with security/operation. Classification and JMS staff worked together to develop a sophisticated Inmate Separation Instrument (ISI) to guide pod deputies maintain out-of-cell separations. Classification staff provided training to supervisory staff that in turn, was asked to train pod deputies. Although training rosters for ISI training were received, during pod audits, pod deputies were not consistently using the ISI. Pod Separation errors continue. Also, quite problematic is the failure to ensure appropriate separations by custody level, PREA designations, and other separations concerns among OPSO detainees housed out-of-parish.

Previous problems of Security/Operations not are going through the Classification Unit for housing unit transfers appear to have been addressed. There are still instances in which the classification manager was notified of a "redefinition" of the mission for a unit by Security Administrators, but the problem of security staff moving inmates and then informing the classification unit, for the most part, has been addressed.

Monthly custodial, discipline and prisoner statistical reports have been received through February 2017. However, the reports were tardy. Many of the documents requested for this onsite visit were received after the visit was conducted. Data regarding OPSO detainee gang affiliations have been uploaded to the JMS and reports to track prevalence of gangs by housing unit are available.

**Summary**

In sum, the OPSO is in partial compliance with the elements of the CJ related to Custodial Placement within OPP (IV. A.10). Objective initial and custody-reassessment instruments and an automated housing assignment process have been implemented. The Unit struggles to keep up with the workload as Unit staffing has dropped to 66.6% of the allocated FTEs. There have been major steps to ensure the accuracy and reliability of the custody assessments as OPSO and out-of-parish disciplinary incidents are input into the JMS and scored for the custody assessments. Unfortunately, disciplinary reports/incidents



are received in monthly batches. This hampers the Unit's ability to complete accurate and timely assessments of the detainees' behaviors.  The Unit has made greater strides in the development of statistical reports as required under section IV.A.10.g and provision of in-service training.

**New Jail (Offender) Management Information Center**

OJC has contracted for the development and implementation of an offender management system.  If that software includes a classification module, the implementation must be coordinated with the Monitors to assure that the system is validated for the OJC.  There has been substantial work since Fall 2013 to develop and validate a system and a proposed new process needs to be carefully developed and implemented to insure inmate and staff safety.

**Assessment Methodology**

This report was based on: 1) Observation of the initial classification, custody review, housing transfer, pod housing audits, and disciplinary processes; 2) Work with OPSO and JMS staff re statistical reports; 3) Onsite meetings with OPSO classification and JMS staff; 4) Monthly custodial, disciplinary, training, and housing audit reports for September 2016 – February 2017; and 5) Site visits to review housing of OPSO detainees housed at CAT (Catahoula Parish) and RCC (River Correctional Center).

**IV.A.10. a.  Objective and validated classification system**

Finding:        Partial Compliance

Measures of Compliance:
1. Written policy/procedure governing the intake, booking, classification and re-classification process.
2. Report including a statistical validation of the OPSO current custody classification system that includes statistical assessment of the risk and need factors of the inmate populations by gender and race.
3. Implementation of the identified updates via an electronic file with the completed custody assessments for OPSO population.
4. Report documenting required staffing needs.
5. Implementation of viable classification/case management staffing plans.



Observations:

o The automated classification system was rolled out in the Jail Management System (JMS) on January 15, 2015.

o A validation report documenting the design and validation was submitted on July 16, 2015 to the Plaintiffs' attorneys and the Department of Justice.

o Classification and PREA assessment handbooks were updated in December 2016 to document changes to the scoring of convictions and the mandatory restrictors.

o As of March 20th, the classification (cls) "unit" roster lists 10 individuals -- 8 civilian classification specialists, 1 housing auditor/deputy, and a classification manager. (Staffing for the unit was originally set at 15 classification specialists.) To staff the four "platoons," overtime for up to two shifts per day has been approved.  The original staff roster specified 15 FTEs, thus staffing for the classification unit is at 66.6%. The classification manager does not appear to be able to keep up with his classification-rated tasks while the deputy and specialists routinely work overtime to ensure timely assessment and housing of all detainees.  Only two commissioned officers are assigned to the Unit; this limits the Unit's ability to complete timely audits and interviews of detainees on the pods.  Morale is low due, noted were late reports, numerous no-shows for calls/emails, and complaints of long hours and weekends.

## IV.A.10.b. Prohibit classifications based solely on race, color, national origin, or ethnicity.

Finding:  Substantial Compliance

Measures of Compliance:
1. Implementation of a valid classification system based on the objective and reliable risk and need factors of the OPSO inmate populations as documented by a written report on the design/validation of the revised classification system and electronic file of custody assessments.
2. Provide a quarterly report that tracks custody distributions by housing unit race, and gender to the Monitor.



Observations:

o Custody assessments are based on objective risk factors that have been validated for OPSO males and female detainees.  Race is not one of the objective risk factors.

o OPSO has created monthly statistical reports to track classifications by race.  However, timely reports were not submitted during this compliance period.

## IV.A.10.c. Access by staff to current information regarding cell availability

Finding:  Partial compliance

Measures of Compliance:
1. Develop and implement a housing unit assignment plan that outlines the mission, number of beds and custody level(s) for each OPSO housing unit.
2. Provide a report of the daily counts to the classification housing staff as to the number of occupied, vacant, and out-of-order beds per pod per housing unit with electronic copies of the daily reports provided to the Monitor.

Observations:

o OPSO has developed an automated housing assignment process that considers the offender's custody level, gender, special population status, PREA designations, enemies, and associates as well as bed availability to recommend an appropriate bed for the offender.  Separations for special populations have fully identified and incorporated into the automated HUAP.  Additional identification tags were created to identify individuals on suicide observation vs. suicide watch and alcohol/drug detox.  Classification specialists are provided a listing of mission of each unit to facilitate selection of the "best" bed from among those identified by the JMS as compatible based on the individual's custody, PREA designations, separations, medical, and mental health needs.

o Previous problems of Security/Operations not are going through the Classification Unit for housing unit transfers appear to have been addressed.

o The Housing Audits are key to tracking compliance with housing and separation requirements. However, it appeared that the audit schedule is "adjusted" according to "other assignments."  The Unit should ensure that each pod is



audited at least monthly.  Special units may require additional audits.  Unfortunately, pod separation error rate remains high.  As shown in Table, 1 within the general population units, the average rate of pod level separation errors across the 6-month reporting period was 20%.  Among the special management units, the average rate of pod level separation errors was 15%.

| Table 4: Rate of Housing Non-Compliance September 2016 – February 2017 | | | | |
|---|---|---|---|---|
| Month | GP-Pod[18] | GP-Cell | SP-Pod | SP-Cell |
| Sep-16 | 0% | 0% | 22% | 33% |
| Oct-16 | NA | NA | NA | NA |
| Nov-16 | 30% | 20% | 13% | 25% |
| Dec-16 | 10% | 0% | 10% | 0% |
| Jan-17 | 40% | 10% | 20% | 0% |
| Feb-17 | 20% | 10% | 10% | 0% |
| 6-mo Rate | 20% | 8% | 15% | 12% |
| NA – No housing audits were completed during October 2016. | | | | |

o  The audit reports as well as comments from the pod deputies suggested that deputies are not using the ISI to maintain appropriate separations for out of cell time.  Supervisors do not require pod deputies to use the ISI, but continue old patterns of upper vs. lower separations or hand written notes.

o  The custody level and PREA designations are provided to CAT, RCC, and ECP as part of the initial transport documents. (The Monitors' recommendations that OPSO not house maximum custody, known sexual predators, and known sexual victims out-of-parish have not been fully implemented.) OPSO detainees housed at CAT are not housed by custody level or PREA designations; all OPSO female detainees are housed together.  Detainees housed at RCC are housed by custody level, but there is very minimal consideration for separations by PREA

---

[18] For the purposes of the housing audits, a cell assignment error is defined as the detainee was living in cell other than to which he/she was assigned within the JMS as of the date and time of the audit. A pod-level error is defined as a detainee was out of his/her cell or living with an individual that violated required separations by custody or special management requirements.



designations.  No ECP housing lists or HUAP were provided, despite multiple requests.

<u>New recommendation:</u>

6.      Develop policies and procedures to require all pod deputies to use the ISI to maintain appropriate pod level separations.

## IV.A.10.d. Continue to update the classification system

Finding:   Partial compliance

Measures of Compliance:
1.   Any automated management information system will include accurate data within eight hours of the custody assessment or status change, data regarding the inmates' custody level, medical, disciplinary infractions, mental health, and custody assessment (date, risk factor scoring, override reason [if applicable], and custody level).  Monitor will conduct audit of random sample of cases to determine accuracy and timely entry of data. Compliance standard will be 90% accurate and reliable.
2.   The custody assessments shall be updated/reviewed every 120 days, a hearing for a disciplinary infraction for major infraction, legal status change, new information from the court, and a major jail incident to include PREA or other major incident/investigation.  Monitor will conduct audit of random sample of cases to determine accuracy and timely entry of data. Compliance standard will be 90% accurate and reliable.

<u>Observations:</u>

o   As per the Classification Monitor's report during the site visit (March 20th and 21st), the number of cases due for reclassification was ~30.  However, as of April 4th, the count was up to 120.  The jump in the number of detainees due for a custody assessment following the site visit is problematic.  This backlog may in part due to the staffing issues noted above (see IV.A.10.a).  In addition, the classification specialists noted that bed space was often very limited as numerous pods are closed under Operation Rewind. Custody assessments and reviews as well housing transfers were delayed for lack of bed space to house the detainees as staff had to wait until beds were available before completing the assessment and cutting the transfer orders. Further, frequent changes to the OJC housing assignment plan has taken time away from the routine audits, housing transfers, and overall ability of the Unit to keep up with the workload.  Hopefully,



these issues will be resolved with the successful completion of Operation Rewind.

o OPSO hired a disciplinary hearing officer and initiated a disciplinary hearing process. In addition, the disciplinary reports from detainees out-of-parish – Hunt, ECP, RCC, and CAT – are input into the JMS.  However, as the out-of-parish reports are received in monthly batches, there would appear to be a significant lag between an infraction and any event-driven custody re-assessment.  This creates questions as to whether the custody assessments are timely and/or accurate.

o The recommendation to promptly notify the out-of-parish facilities as to any changes in the detainees' custody or PREA designations was not heeded. However, as of March 30th, a notification form was created. Tracking of the out-of-parish custody re-assessments should be tracked.

o Disciplinary infractions that occurred at OJC as well as out-of-parish are entered in the JMS.  These institutional behaviors are considered for any reclassification as the classification unit is controlling housing assignments and has procedures requiring entry of disciplinary incidents and dispositions into the JMS prior to any move on and off the OJC disciplinary tier/cells. However, given the disparity in the reporting of incidents observed by the Monitors, the integrity of the incident reporting process is questionable as to whether pod officers are consistently writing up inmate behavior and supervisors are reviewing the incident reports and inputting the reports within the Vantos system.  The disciplinary officer now has access to the videos of incidents within OJC, however classification unit staff expressed concerns as to the rates of finding of guilt, reduced charges, and failure to differentiate fighting in self-defense vs. assaults and disorderly conduct.



## IV.A.10.e. Continue competency-based training and access to all supervisors

Finding: Substantial Compliance

Measures of Compliance:
1. Written directive governing training of staff assigned to classification.
2. Curriculum for competency-based training regarding the custody classification system, housing assignment process, work/community assignments, and case management.  Evidence of knowledge gained.
3. Staff training roster(s) and competency tests following completion of competency-based training by current classification/case management staff.
4. Staff training roster(s) and competency tests following completion of competency-based training by all new or re-assigned staff on assignment to classification/case management duties.
5. Curriculum for classification module within the basic academy training curriculum for OPSO staff. Evidence of knowledge gained.
6. Staff training roster(s) and competency tests.

Observations:

o   OSPO staff has been provided ongoing classification-related trainings:

- Pre-service academy classes - general classification principles and ISI reports.

- Classification Unit Staff:

  - Pre-Service/Academy – objective classification training

  - Monthly Classification In-service training. Training was based on errors noted and audits as well as new policies/procedures re: OPSO Classification Policy 801.20, OPSO MISSION STATEMENT, Disposition codes, Mandatory, Restrictors, Overrides and Attachments, NCIC rap sheets, Initial Classification of inmates on Judicial Writ; Multi-point transfers; Analytical thinking; Reclassification interviews; Standard (Email) Responses, Transfer Reconciliation; Emergent Notification; Medical Clearance; Inmate Worker Clearance; Critical Review of Documentation; and Notification of Unavailable Housing.



**IV.A.10.f. Conduct internal and external review and validation of the classification and prisoner tracking system on at least an annual basis.**

Finding:  Partial compliance

Measures of Compliance: the OPSO information system to monitor:
1. Custody distributions by gender, race and special populations.
2. Override rates.
3. Housing by custody level/special needs, and race.
4. PREA separations.
5. Custody re-assessments (regular and for-cause, # over-due, et al.).
6. Electronic copies of the quarterly and annual reports shall be provided to the Monitor with documentation of steps (tasks and dates) taken to address any noted inconsistencies with OPSO policies.

<u>Observations</u>**:**

o  Monthly custodial statistical reports by assessment type, gender and population were received through February 2107.  However, it should be noted that the monthly reports were not timely.  For example, the January and February 2017 custodial reports not received until late-March after the onsite visit.  Response to questions regarding the November and December reports were provided during the March 2017 site visit.  Work continues to address questions re: the January and February 2017 reports.

o  As part of the ongoing classification and housing processes, the classification specialists and auditor review the JMS reports to identify placement errors and ISI separation conflicts.  Errors are noted on the "Internal Audit Tracking Form."  Table 2 provides the September 2016 – Feb 207 internal audit data.  An error rate for the random audits of 14.3% is a bit high; in addition 96 errors were identified via routine custody reviews and housing assignments.



| Table 5: Classification Unit Internal Audits September 2016 – February 2017 | | | |
|---|---|---|---|
| Month/Year | # Random Audits | Error Rate/ Random Audits | Errors Discovered by a Supervisor |
| Sep-16 | 20 | 3 | 15.0% | 7 |
| Oct-16 | 14 | 4 | 28.6% | 14 |
| Nov-16 | 15 | 0 | 0.0% | 33 |
| Dec-16 | 20 | 4 | 20.0% | 14 |
| Jan-17 | 26 | 2 | 7.7% | 17 |
| Feb-17 | 20 | 3 | 15.0% | 11 |
| 6-Mo Rate | 115 | 16 | 14.3% | 96 |

- The OPSO classification system was due for a statistical review of the system in early 2016, but as the OPSO disciplinary process had not been maintained it was questionable that there were sufficient data to accurately assess the reliability or accuracy of the classification system. Further given the high number of detainees housed out-of-parish and the delay/absence of training on OPSO policies and direct supervision principles for line staff and supervisor, a statistical review of the classification system should be postponed until perhaps the last quarter of 2017. This will allow for reintegration and supervision of all OPSO detainees as per OPSO policies and procedures.

  New Recommendation:

  7.  Complete statistical review of the classification system in late 2017.

## III.    A. 10. g. Provide the Monitor a periodic report

Finding:  Partial compliance

Measures of Compliance:
1.  Annual and bi-annual tracking reports within the OPSO information system to monitor number/rates during the last 12 months and for the stock population:
    o  number of prisoner-on-prisoner assaults/custody level by gender;
    o  number of assaults against prisoners with mental illness by gender;
    o  number of prisoners who report having gang affiliations by gang affiliation;
    o  most serious current offense leading to incarceration by gender;
    o  number of prisoners currently classified in each security level;
    o  number of prisoners placed in protective custody;
    o  number of prisoners in administrative segregation; and
    o  number of major and minor misconduct complaints.



<u>Observations:</u>

o   Monthly custodial, discipline and prisoner statistical reports have been received through February 2016. No data were available for number of assaults against prisoners with mental illness.

o   Data for the number of prisoners who report having gang affiliations have been uploaded to the JMS. These data are available to track the prevalence of detainees per "gang" among OPSO populations as well as by OPSO building (OJC, ECP, RCC, etc.), tier, side and cell.  However, currently this information is not systematically used to inform housing assignments.  It appears that gang affiliation and conflicts across local gangs are rather fluid among New Orleans detainees.

o   Monthly disciplinary reports indicated a dramatic drop in the number disciplinary reports for this six-month period. For example, during September 2016 there were 324 infractions entered into JMS, by February 2017 the number had dropped to 158, yet the rate of infractions with a finding of guilt remained constant at ~80%. As the OPSO average daily population has increased slightly during this 6-month period and these counts include the disciplinary reports received for the out-of-parish detained, these numbers raise more questions than they answer, for example, "Are disciplinary reports written by OJC officers? Is OPSO receiving all disciplinary reports for the out-of-parish detainees?"



**Figure 1: OSPO Disciplinary Infractions - Sept 2016 - Feb 2017**



One final point regarding the OPSO disciplinary data, as shown in Figure 2, the numbers/rates of predatory and aggressive behaviors (i.e., assaults, battery, and fights) appear to have dropped during January and February 2017. However, given the previous questions about the number of disciplinary reports input into the JMS, and the reduction in jail population it would be premature to assert institutional violence is down.

**Figure 2: Types of Disciplinary Infractions of which OPSO Detainees were Found Guilty - Sept 2016 - Jan 201**



o Monitor, classification manager and JMS programmer continue to work to resolve the discrepancies in the disciplinary and custodial placement data. Hopefully, March 2017 data will be available promptly and will provide some insight to these trends. In addition, on successful completion of Operation Rewind and the return of the detainees currently housed out-of-parish any disparities across the respective disciplinary and incident processes will be eliminated.

## IV.A.10.h. Periodic data reporting

Finding:  Partial compliance

Measures of compliance:
1.   Report to the Monitor with recommended change and rational/data regarding any policy changes.

Observations:

• Monitor receives the daily "Active Inmates by Location" report.

• Concerns include changes to the HUAP without consultation with classification manager. The Monitors were not provided advance notice of placement of female detainees at CAT.  Despite repeated inquires, the HUAP for TDC has not been provided to the monitors.



## 11.    Prisoner Grievance Process

Finding:  Partial Compliance

Measures of Compliance:
1. Written policy and procedures governing inmate grievances, and grievance appeals. Directive shall include but not be limited to availability of grievance forms in required language, ability of inmates to secure forms upon request and deposit into secured boxes, prohibition against retaliation against inmates who file grievances, time deadlines on responses, assistance to inmates to file grievances (including assistance to inmates with mental illness, low functioning, non-English speaking).
2. Written policies and procedures that designates a position/post responsible for assuring the collection and response to grievances, including maintenance of records, trends, and analysis of grievance data.
3. An electronic tracking system.
4. Written orientation to inmates regarding the grievance process.
5. Inmate handbook.
6. Curriculum/lesson plans to train staff (pre-service and in-service) regarding their roles and responsibilities regarding the inmate grievance process.
7. Interviews with inmates.
8. Interviews with employees.
9. Observation of staff training.
10. Observation of inmate orientation.
11. Written policies/procedures governing the inmate request process.
12. Inmate request forms.
13. Review of referrals for investigation resulting from inmate grievances.
14. Review of original inmate grievances and responses.
15. Monitors'' review of grievance logs, grievances, analysis of grievances conducted by OPSO.

Observations:

A grievance system is intended to provide inmates a meaningful way to have legitimate issues raised and addressed.  Additionally, a grievance process provides an early warning system for emerging issues for the jail's leadership.   For example, increases in grievances regarding the food  and medical care are noted.

There is  policy guiding inmate grievances, and the mechanism for inmates, via the electronic kiosks to file grievances.  What is not in place is an adequate structure in the OCJ to meaningfully resolve inmate issues.  The organization and staffing of the jail is not geared toward accountable problem-solving.  Inmate grievances are referred to individuals in the organization who should have the capacity to review and resolve issues, but this is not often accomplished.[19]  This is

---

[19]The Defendant's indicate they are implementing "new process where trends/patterns discovered by the Grievance Coordinator's analysis are documented. . ."  We commend that work and look forward to seeing the



often because there is not a policy to guide response, or the person to whom the grievance is directed does not have the authority to resolve it.  Often grievances are not promptly answered.  Additionally, if inmate issues are resolved, there is no broader review to prevent similar grievances from the same, or other inmates.

A positive note is that there are fewer inmate grievances regarding the grievance process, or appeal processes.   Trend reports are maintained.  The grievance staff keep data regarding whether the grievances, and appeals,  were timely responded to, and if the response was appropriate or responsive.   The information is available, but what is unclear is who is reviewing and acting on the data or if action plans are initiated given the data from the grievance unit.   The grievance staff also tracks inmate allegations of staff misconduct, use of force, or criminal activity, and the referral to investigators.

Specifically, the monthly report identifies staff, by name, with overdue grievances.  Ranking officers are among those who have overdue grievances.  Either these individuals need to delegate the grievance to an appropriate person, or establish a process that responds timely.

In the current process, if the person to whom the grievance is directed forwards it to someone else to answer, this cannot be tracked.  Additionally, the response to the grievance is not provided back to the grievance office before being sent to the inmate to assure that the information provided is responsive.  This is evaluated later by the grievance staff during their monthly audits.  The Monitors hope that these process deficiencies, including separation of inmate requests from grievances, will be fixed with the new offender management information system.

The OJC is scheduled to have a new offender management system later this year, which will finally allow inmates, and staff to separate inmate requests for information (e.g. court dates, commissary account balance, etc.) from actual grievances.   For example, there were more than 5,000 "grievances" filed in December 2016, but after review only 628 were classified as an actual grievance.

---

analysis and action plans.  The Defendants also report that they recently hired medical/mental health coordinator is working with the medical contractor to improve timeliness and responsiveness to grievances.



For CY 2016, OJC reports 9,189 grievances were filed, an increase of 56% according to OJC quarterly report.

The data indicates for CY 2016:

- An increase in medically related grievances (including medical, dental, optical and prescriptions) increased 70%, comprising 29% of all grievances;

- A decrease in facility related grievances as would be expected with the opening of the new jail facility;

- An increase in sanitation and environmental conditions grievances by almost 300%, comprising 3% of all grievances filed;

- A decrease in grievances regarding staff misconduct, allegations of criminal behavior, inmate on inmate assault/misconduct, sexual misconduct, and use of force by 3%, comprising 3.5% of all grievances filed;

- A dramatic increase in requests regarding inmate services, largely related to "records" – which may constitute requests rather than grievances, or requests that were not promptly addressed;[20]

- An increase in food service related grievances; and

- An increase in grievances regarding inmate programs.

Inmates reports to the Monitor that they do have concerns regarding retaliation by staff against them for filing a grievance.  In several instances, inmates denied filing grievances when confronted by those trying to review the matter.

Inmates may direct grievances to the Monitors.  From October 1, 2016, to the present, the Monitors has reviewed and responded to more than 400 inmate grievances.  The topics included medical, mental health and dental care, safety, classification, allegations of staff misconduct, and other issues such as court dates, mail and library services which are not within the Monitors' purview.  By looking at grievances, the Monitors are able to see what issues are emerging; but do not see the responses.  In addition to grievances, inmates also correspond directly with the Monitors with their issues and concerns.  The content of letters is shared with OJC if

---

[20] An advantage of a fully functioning direct supervision facility is the expectation that the housing unit deputy handles such requests with real-time and immediate access to data sources.



there are significant complaints and/or allegations of misconduct.  The Lead Monitor responds to each letter and grievance.

The Monitors provided their contact information, on laminated pages, to all the jails in which Orleans Parish inmates are now held, and requested these be posted.

The Monitors are concerned that there is not an effective grievance process in place at East Carroll Parish (ECP).  The ECP Warden reports that he personally addressees all grievances, hence no need to write a grievance.  While a good goal, the Monitors are skeptical about that approach. Additionally, one inmate letter from an inmate held at ECP sent to the Monitor via a family confirmed concerns that letters addressed to the Monitors are diverted. Given the flow of grievances and correspondence from inmates held in OJC, it seems highly unlikely that only one letter and a handful of grievances have emerged from ECP since October 2015.

The Monitors also urge the medical staff and OJC's grievance staff to resolve current discrepancies between the reports of the number of grievances.  This surfaced during the tour while the Monitors attempted to resolve issues of the medical contractor's appropriate response to inmate grievances.

New recommendations:

8.      Resolve the discrepancy that exists between OJC's and CCS' data regarding the number and resolution of grievances.

9.      Assure that reviewers and investigators assess the extent to which staff are threatening inmates for filing grievances, or otherwise impacting an inmate's access to grievances, in a retaliation-free environment.



**12.   Sexual Abuse**

Finding:  Partial Compliance

Measures of Compliance:
1.   Checklist of policies and procedures
     http://www.prearesourcecenter.org/sites/default/files/library/checklistofdocumentationfinal2.pdf
2.   Auditor Compliance Tool
     http://www.prearesourcecenter.org/sites/default/files/library/auditorcompliancetoolfinal2.pdf
3.   Completion of Jail Toolkit http://static.nicic.gov/Library/026880.pdf
4.   Written policies and procedures, protocols, memorandum of agreement/understanding, training curriculum required by the standards.
5.   Memorandum of agreement, sexual assault treatment center
6.   Review of investigations.
7.   Interviews with employees and inmates.
8.   Referrals for prosecution
9.   Qualifications of instructors.

<u>Observations:</u>

PREA related policies are completed but not fully operationalized in terms of staff training and investigations.    As seen during the past few tours of the facility, OPSO's inmate PREA video was playing, in a loop, on the televisions in the housing areas during the tour.

A summary spreadsheet was provided of incidents of alleged sexual abuse, inmate/inmate, staff/inmate since the last tour.  Although a separate report was not provided regarding inmate calls to the PREA hotline, the summary indicated of the 26 investigations opened during this time, 10 incidents came via the hotline.

A review of the summaries of the investigations indicated that too many are being closed prior to completion of an investigation.  These are being closed because the inmate victim, witness or perpetrator was no longer in custody and/or refused to cooperate.  During an interview with the PREA coordinator, it was determined that these specific cases were not being forwarded to her for review prior the case being sent to the case file manager.  The PREA Coordinator indicted she did not concur with the way in which the investigations were handled, and reports developed.  She assured us that an organizational change had been made effective January 1, 2017, so that she was reviewing all cases and being more involved with



directing investigations.  She also indicated it was her intention to re-look at all investigations, at least back through September 2016 to determine if more work needed to be done.

To make these changes permanent – that being better case management of these PREA related allegations, modifications in ISB's written procedures need to be made as soon as possible.

The Monitors also determined that the PREA Coordinator had not been involved with training some volunteers, whose training was handled by an OJC program staff person, who did not have specific PREA training.  This was done, it was concluded because the program staff wanted a faster response to train volunteers.  All these volunteers NOT trained by the PREA coordinator have been identified and are being re-trained.

In discussion about whether or not medical staff are trained, and/or would recognize the signs and symptoms of sexual abuse in inmates presenting for medical care, the PREA Coordinator was not confident that they would.  This needs to be a point of collaboration between the local sexual assault treatment center, the PREA Coordinator, and CCS.   Evidence of this collaboration and training will be needed to be provided to the Monitors before the next tour.

The PREA Coordinator also reported she has been in touch with the Louisiana DOC about PREA-related investigative training for OPSO staff.  She indicated she was hopeful that this training was imminent.

To prepare for the PREA audit sometime in late 2017, OJC will require the appointment of a PREA compliance staff to cover OJC and, if re-opened, the Temporary Detention Center.  Since the tour, the Monitor has reviewed a draft of the job description for this position, which OJC has determined will be full-time.

A "mock" audit for the PREA audit will be held, according to the PREA Coordinator no later than August 2017.



New Recommendations:

10.     Provide training for medical staff regarding recognizing the signs and symptoms of inmate sexual abuse/assault.  Evidence of this training must be provided before the next tour.

11.     Revise the ISB written directives to provide a much higher level of quality control and review of all investigations into allegations of sexual abuse, assault, etc. It might be instructive to determine how the procedures migrated away from accepted practice to prevent it from happening again.

12.     Assure that no one other than the trained person(s) authorized by the PREA coordinator, or the PREA Coordinator herself, provides training to any staff, volunteer or contractor.  It might be instructive to determine how the procedures migrated away from accepted practice to prevent it from happening again.

## 13.   Access to Information

Findings:       Partial compliance

Measures of Compliance:
1.      Written policy/procedure governing inmate orientation, including but not limited to inmates with LEP, developmental disabilities, mental illness, etc.
2.      Inmate handbook; orientation videos in English, Spanish, Vietnamese.
3.      Observation of inmate orientation.
4.      Inmate interviews.
5.      Lesson plans, employee training, evidence of knowledge gained.
6.      Review of grievances.
7.      Post orders.

Observations:

As noted in the last Compliance Report, the basic work has been completed – the inmate handbook in English and Spanish.  OJC also reports that the inmate orientation videos are played on a continuous loop in housing units, also in both English and Spanish.

The missing link to gain compliance for this paragraph is the consistency of housing unit operations that provide the information and actions necessary to keep newly admitted inmates safe.   A number of grievances reviewed by the Monitors clearly indicate that depending upon who the deputy is working in a housing unit,



the answer to questions are different, and the structure of life in the housing unit is different.

This paragraph will gain substantial compliance with the training and supervision of housing unit staff.



## II.  B.  Mental Health Care

**Summary**

This report of the Mental Health Monitor provides the findings regarding mental health services, risk management, and quality management based on the March 20-22, 2017 site visit by the entire Monitoring team to the OPSO Orleans Justice Center (OJC) facility.  As has been customary in the past, during most of the site visit the Medical   and Mental Health Monitor met with CCS administrative, mental health, medical, and nursing staff in addition to touring the OJC mental health and medical units.  The Mental Health Monitor also toured the Hunt Facility on March 21, 2017.  The Mental Health and Medical Monitors participated in an exit briefing on March 22, 2017.

The Monitors concluded during this, and past site visits to the OJC, that the OJC is not equipped to provide adequate mental health and medical services as well as specific counseling services regarding youth, victims of sexual abuse, and other special populations including inmates on the mental health caseload who are victims of abuse.

CCS continues to have difficulties identifying their actual mental health case load. For example, all juveniles are identified as "special needs", however only one juvenile was receiving mental health services; all juveniles are offered "group therapy" which appears to be activities with an Activities Therapist but no formal mental health counseling. CCS reports more than 500 inmates are receiving psychotropic medications but not all are considered or counted as being on the mental health caseload, particularly those inmates prescribed medications and transferred to other parish jails.  CCS reported an average monthly mental health caseload of approximately 160 inmates, or 10-13% of the total population. This practice is of very serious and immediate concern as the Monitors discovered based on a site visit to River Correctional and Catahoula Correctional facilities that a non-psychiatric nurse practitioner (who spends 6 hours per week at each facility) is discontinuing psychotropic medications based on "correctional policy" and not based on mental health assessment by a qualified psychiatrist or psychiatric nurse practitioner. Further, an LPN at these facilities is responsible for mental health and suicide risk assessments, and deputies distribute medications; all of these practices are violations of the Consent Judgement and contrary to the exclusion criteria for transfer of inmates to other parishes.

Another discovery during this site visit is that CCS is not adhering to criteria regarding Suicide Prevention and Management that requires that only a psychiatrist or psychiatric nurse



practitioner are authorized to discontinue suicide watch/precautions: in practice, Qualified Mental Health Professional's [QMHP] are actually performing the Suicide Risk Evaluations (SRE) utilizing the Columbia Suicide Risk Screening, then reporting their findings to the psychiatrist/nurse practitioner who then changes or discontinues the suicide watch without documented and signatory review of the actual SRE. On site review of actual SRE's and Mortality Review of a completed suicide indicate the SRE's done by the QMHP's were inadequate and resulted in changes in management of inmates that should not have occurred. These are very serious concerns and need of immediate correction.

     While the treatment and management of inmates transferred to the Hunt facility appears to continue to be adequate and effective, approximately one-third of the inmates transferred for acute mental health needs remain for longer than six months and in some cases for more than one year. The movement of inmates and closures of specific units, including for a time the OJC 2A unit designated by OJC as a subacute/suicide unit, and OJC designation of OJC 3B unit as a "stepdown" unit continue to be extremely problematic.  Despite assurances by the Defendants that inmates returning from Hunt would be housed in a stepdown unit, in practice CCS reported:

- four of fourteen inmates in October 2016
- one of ten inmates in November 2016
- two of fifteen inmates in December 2016, and
- one of nine inmates in January 2017

were actually returned to OJC were housed on OJC units 2A or 3B. The reality of a true stepdown (residential/transitional) unit at OJC remains "aspirational".

     Inmate movement and unit closures have also adversely impacted the availability of suicide resistant cells with 2 identified on 2A (one being used for storage of bed frames), 1 on 3A (for juveniles that had a metal bar across the window that could be used as a tie-off point), 2 on 3B, 2 on 3D ( for females, although the one inmate on suicide watch was not housed in either of these cells), 2 on 4C, and 1 in IPC (with no bed). Notably, during the tour no deputy was present on 3B or 4C.

     There has been improvement in the collection of data in some areas regarding the quality improvement program, however there remain serious concerns regarding the mortality and morbidity review process, particularly for suicide prevention and management, identification of caseload inmates, timeliness of completion for referrals to mental health, counseling services for



54

specific populations identified in the Consent Judgement, treatment planning frequency at Hunt and OJC, and inadequate treatment programming at OJC.

Additional concerns are inadequate mental health staffing; additional positions were approved since the last site visit; however, no additional mental health staff was hired; further the Mental Health Coordinator position at Hunt was vacated last fall and the acting coordinator is not licensed. There also remain policies that have not been finalized or implemented including the Restraint policy, Referral policy and Involuntary Medication Administration policy, in part because of need for collaboration/coordination between CCS and OJC, review and comments by plaintiffs and DOJ, and compliance with Louisiana laws. The Monitors have been advised that it is extremely difficult under Louisiana law for the OJC to be designated as a treatment facility. The Monitors recommended an immediate collaboration with local hospitals to provide emergency services, including medication, for OJC inmates requiring these interventions. On site CCS, administrative staff confirmed concerns reported by plaintiffs and DOJ regarding continuity of psychotropic medications and delays in access to psychiatrists for assessments were legitimate.

As previously reported, the use of suicide watches and direct observations at OJC is much higher than at jails of similar size; and, in the Mental Health Monitor's view based on information from inmates and CCS, this is largely because of inmate concerns regarding their safety in other units. Despite reduction of the inmate population by transfers to other parishes, the suicide watches continue to be disproportionately high; for example, during this visit 16 inmates were on suicide watch or direct observation on 3/20/2017 which was reduced to 5-8 by the end of the day via the practice of QMHP's rather than psychiatrists/nurse practitioners conducting or confirming agreement by signature of the suicide risk assessment tool.

As previously reported by the Monitors, consistent onsite leadership, adequate staffing, and adequate personal staff and inmate safety in the institution are necessary components for compliance with the Consent Judgment.  These elements are required along with consistent and timely strategies to manage difficult inmates (e.g. behavior management plans).  Several inmates at OPSO have serious and persistent mental illness and/or personality dynamics, such that they engage in self-harming behaviors to manipulate or adapt to their housing.  These inmates *must* be



managed for OPSO to meet the requirements of the Consent Judgment and for CCS to adequately carry out their responsibilities to provide Constitutional levels of mental health and medical care.

The mental health and medical Monitors provided technical assistance to the CCS and OPSO during this site visit.

**Recommendations:  Although this report has not been repeating recommendations contained in previous Compliance Reports, we believe these recommendations, unheeded to date, must be repeated.**

13. The Defendants and CCS must immediately develop structural mechanisms (e.g. policies, procedures, strategies, meetings, accountability, leadership, multi-disciplinary team) to resolve how and where required and necessary services, both mental health and medical, are provided to inmates currently, and into the future. This recommendation is critical, and the negative results cannot be overstated.   If this means that CCS requires additional resources, this must be immediately negotiated with the City, and implemented, now.

14. CCS and OJC take steps to insure the actual and perceived safety of CCS and custody staff working in OJC.  The departure of staff because of their concerns for their safety is an extremely damaging circumstance.

15. CCS must recruit and retain a medical and mental health coordinator (at Hunt).  As stated in Compliance Report #6, the need for on-site leadership and programmatic direction for mental health and medical services, as well as assuring adequate clinical staffing, collaboration with custody, policy finalization, and training and supervision of staff are *essential* to provide mental health and medical programs in addition to the other services required by the Consent Judgment.  Sufficient custody staff are also required to provide security for medical staff, as well as for prompt movement of inmates to and from medical appointments, group sessions, etc.

16. As stated in Compliance Report #6, the Defendants must end the unacceptable practice of housing inmates who are on suicide watch or direct observation status in OCJ for extended periods of time. We have recommended suicide precautions/direct observations should not exceed 10 days at OJC as "crisis bed" services, including substantial out of cell time for structured and unstructured therapeutic activities.



Transfer to acute mental health services at Hunt for men or hospital for women should occur if the inmate has not been stabilized.

17.     The Defendants must assure that  suicide resistant cells are appropriately located where needed (based on classification of inmates, for example. The inmates who are housed in the cells that are not suicide resistant are held for 23-hours per day with minimal to no psychotherapeutic interventions other than medications and observation.  This constitutes isolation that may not be therapeutic and may be unsafe for inmates at increased risk of self-harm.

18.     Patients requiring mental health services housed in out-of-parish jails (this does not include Hunt) should be returned to OJC.

The Mental Health Monitor's findings with regard to specific items in the consent judgment are as follows:

### IV. B. 1. a. – e.  Screening and Assessment

Finding: Partial Compliance

**Measures of Compliance:**
1. Technical assistance to CCS mental health and administrative staff regarding policies and procedures
2. Document review of mental health policies and procedures
3. Review of a limited number of medical records and interviews of prisoners and staff
4. Discussions with CCS and OPSO administrative and line staff
5. Tour of OJC facility including all units designated as having a "mental health" designation.
6. Tour of Hunt Facility mental health unit

<u>Observations:</u>

CCS has provided the majority of policies and procedures with regard to mental health, however several have not been finalized and/or have not yet been measured for their effectiveness. The screening instrument is adequate and the referral policy has been drafted but not fully implemented or measured.  The policies and procedures for assessment of inmates involved in the disciplinary process has not been completed, in addition to the requirement for collaboration between the discipline process for inmates on the mental health caseload and mental health staff.

Inmates at OJC continue to be housed on units that are have inadequate suicide resistant cells, and do not have the physical space or custodial staffing support necessary to provide adequate psychotherapeutic programming for either the acute/sub-acute



designation or step down/residential designation. This condition applies to male and female inmates, and the female inmates do not have access to Hunt (or comparable services and housing). A number of inmates in acute crisis remained at OJC because of closure of Hunt due to flooding and needed emergency medications to address their needs; which is non-existent presently. OPSO, CCS, and plaintiffs/DOJ have researched Louisiana Law and there are significant barriers to administering emergency medications at OJC. Transfers to local hospital emergency departments for pretrial detainees is currently required but rarely used by CCS. These circumstances apply to juvenile and adult pretrial detainees.

The reported overall mental health caseload averaged approximately 160 inmates per month which is still underestimated in that CCS is providing treatment services to inmates that they do not report as being on their caseload and the designation of "special needs" includes youth offenders and others who are not on the mental health caseload. The estimate is lower than previous visits, which is very concerning as inmates were transferred to other parishes, none of whom should have been on the mental health caseload, however some were receiving psychotropic medications, or their medications were discontinued without appropriate staffing or compliance with the Consent Judgement in these facilities. The screening process should be enhanced to prevent inmates with mental health or medical needs from being transferred to other parish jails unless those jails can provide services which are in compliance with the Consent Judgment.

<u>Reiteration of Recommendations from Compliance Report # 6:</u>

19. OPSO and CCS must finalize, implement and measure compliance of the policies as required by the Consent Judgment including the suicide prevention and management policy, restraint policy, referral policy, and participation of mental health staff in the disciplinary process, counseling services to specific or identified groups, and performance measures to reflect performance. Training and supervision needs to take place and be documented.

20. CCS must begin tracking and provide services to inmates on the mental health caseload who have been identified as victims of assault or other crimes (including sexual assault) while at OJC or Hunt.

21. CCS should continue the process of identification of the mental health caseload and their level of care needs, and aggressively improve the



staffing necessary to provide services including onsite leadership staff as well as staff positions to provide direct services.  This will require collaboration with OPSO particularly regarding deputy staffing to include escorts for off-unit services and observation/monitoring of group therapies to maintain sound privacy.  Additional staff positions have been authorized by the City but none have been filled.

22.     Assure that suicide resistant cells are sufficient in number and located on appropriate housing units.   Audit housing areas to assure the physical plant poses as little risk as possible for inmates to harm themselves.

## IV. B. f. Screening and Assessment, Emergent

Finding: Non-compliance

Measures of Compliance:
1.   Document review, including incident reports and suicide watch checklists
2.   Observation of suicide watches at OJC

Observations:

There is insufficient and inconsistent observation of inmates who are at risk for suicide and self-harm, as well as inadequate supervision by deputies.  Certified Nursing Assistants (CNAs) and/or Licensed Practical Nurses (LPNs) are assigned to observe inmates housed at OJC who require suicide assessment and management, psychiatric observation, and for those specifically for "direct observation" and "suicide watch". This practice has continued to be an on-going problem in terms of effectiveness and has deteriorated with the opening of OJC.  This is because inmates in these categories are housed on multiple units and in cells that are not suicide resistant.  Inmates who are not on the mental health caseload are sometimes housed alongside these inmates (for example, use of 2B and 3D).  Whatever the processes for direct custody supervision and jail practices by operations staff and direct observation/suicide watch by clinical staff, the processes are failing as inmates continue to gain access to materials that can be used for self- harm or suicide.  These issues have been discussed throughout the course of the monitoring process.  The absence of a management strategy for these inmates has resulted in their inconsistent transfer to Hunt and placement in multiple units in OJC.

The female inmates at OJC continue to be housed in a standard non-mental



health unit despite their designation as having acute/sub- acute needs and/or step down/residential mental health needs.  Pregnant women are housed with these inmates instead of in general population.

There is also an immediate need for an emergency medication administration policy for inmates who are actively psychotic and/or suicidal, and present as imminent danger to themselves or others and/or are gravely disabled.  This will require collaboration between CCS and OPSO with possible assistance from plaintiffs and DOJ in satisfying Louisiana state law but also providing the necessary supports including nursing and operations staff as well as training of clinical and operations staff on the process for administration of emergency medications to meet the acute needs of inmates in distress.  Currently, transfers to local hospital emergency rooms or Hunt are the only available options for pretrial detainees.

Reiteration of Recommendations from Compliance Report # 6:

23.   CCS must utilize the existing emergency petition process and develop a policy to provide emergency medications to inmates, as needed.  This deficit results in direct harm to inmates, as well as a disruption to the facility, and danger to inmates and staff.

24.   The Defendants and the City must employ an adequate number of operations staff and clinical staff, with training and supervision.

25.   The Defendants and the City must obtain acute hospital level services for female inmates.  The absence of these critical services results in on-going harm to the inmates as well as facility disruptions.

## IV. B. 1. g. – k. Periodic Assessment of Processes

Finding: Non-compliance

Measures of Compliance:
1.   Document review of policies and procedures and medical records review
2.   Interviews of prisoners and staff at OJC and Hunt
3.   Review of quality management data



<u>Observations:</u>

As previously noted in this report the identification of inmates who should be on the mental health caseload and timely transfer of inmates to Hunt (or hospital emergency rooms) for treatment of acute mental health needs and/or inmates reporting/demonstrating increased risk for suicide or self-harm remains problematic. The suicide risk assessment tool has been recently implemented and has not yet been reviewed via performance measures by CCS. The tool is administered by QMHPs; documentation and signatory review by psychiatrists and nurse practitioners is required to ensure the adequacy of the assessments. Further, inmates who remain at OJC and are in need of acute/sub- acute mental health services include male and female inmates who are housed on various units in non-suicide resistant cells.

The policy and process for timeliness of responses to referrals has not been met, particularly for psychiatrists where the average wait time to be evaluated by a psychiatrist exceeds time frames, regardless of level of referral (emergent, urgent, or routine).

The quality management review of these practices is not fully implemented and despite attempts to improve the process with the development and review of the tool kit recommended by the Medical and Mental Health Monitors, the process has not yet been implemented.

The inmate mental health services at OJC are negatively impacted by the inadequate mental health staffing which affects not only the development of a comprehensive and multidisciplinary mental health services delivery system but also the limited treatment team meetings at both Hunt and OJC. The custody staffing and other limitations described herein at OJC are impacting the delivery of mental health services resulting in delays or cancellations of mental health services and medical services including risk assessments and treatment, referrals, medication management, and follow-up assessments by mental health staff based on referrals. The Compliance Director has hired an assistant medical/mental health administrator to facilitate the oversight of contractual services.



Reiteration of Recommendations from Compliance Report # 6:

26.  CCS must aggressively recruit and fill the vacant positions at Hunt and OJC.

27.  The Defendants and CCS must increase the frequency of treatment team meetings and reviews of treatment plans at Hunt and OJC with inclusion of inmates at the treatment plan meetings.

28.  CCS document the reasons for referrals and timeliness of responses to referrals by mental health staff.

29.  Pursuant to policies, continue at least monthly meetings of the Mental Health Review Committee, and appropriate documentation of identified concerns, problems and opportunities to improve care, and analysis of performance measures, mental health services and follow-up on implementation and results of corrective actions.

30.  Treatment planning for acute mental health patients should be provided within 4 days and every 30 days thereafter at both Hunt and OJC.

## IV. B. 1. l. Annual Assessment of the Process

Finding: Non-Compliance

Measure of Compliance:
   1.  The assessment was to be completed by October 2015

Observations:

The process for screening prisoners has been implemented, however there is no review of the effectiveness of the screening on an annual basis or recommendations for change in the screening process.

Reiteration of Recommendations from Compliance Report # 6:

31.  Complete the annual assessment of screening prisoners and identification of inmates in need of services, for effectiveness including comparison of current mental health caseload numbers and total number of inmates receiving mental health services.



## IV.B. 2. a. Treatment services and evaluations

**Finding:   Partial compliance**

Measures of Compliance:
1.   Review of policies and procedures, current staffing, and staffing projections, and quality management data and analysis
2.   Tour of OJC facility
3.   Review of medical records and quality improvement data.

Observations:

CCS has provided policies and procedures; however, the suicide prevention policy, restraint policy, and referral policy require revision/finalization.  Further, a policy on emergency medication administration needs to be developed and implemented, and the current process for emergency petitions effectively utilized.  The current allocated staffing is notable for staff vacancies at the direct service provider levels; the staffing projections need to include the necessary provisions for increased treatment planning services including treatment team meetings and the continuum of services from acute/sub-acute, step down/residential, and outpatient services for inmates on the mental health caseload as well as other specific populations who require counseling services by mental health. The continuum of services is inadequate.

Reiteration of Recommendations from Compliance Report # 6:

32.   CCS to hire necessary staff for OJC and Hunt.

## IV. B. 2. b.-d. Treatment services and evaluations

Finding: Non-compliance

Measures of Compliance:
1.   Review of the treatment services OJC
2.   Review of evaluations including suicide risk assessments at OJC, and availability of treatment
3.   Review of performance measures developed with technical assistance by the Medical and Mental Health Monitors
4.   Review of incident reports



Observations:

CCS provided total numbers of inmates participating in group sessions, individual therapy and counseling services conducted each month. The data does not demonstrate that the numbers for these services are sufficient for the populations in need. The number of inmates listed on the special needs caseload averaged 160/month in 2016 and 2017or approximately 10-13% of the overall OPSO census.  Based on review of the documents and discussion with CCS and OPSO staff, these numbers are underestimations and require further revision to clarify the number of those inmates who are on the mental health caseload as well as those who are receiving services as "special needs".

There is unclear data regarding inmates who need counseling services and those who are receiving counseling services.  The counseling services that are necessary for distinct populations as per the Consent Judgment have not been quantified specifically and for those instances where counseling services are provided there is no estimate or identification of the actual number of inmates who require such services. Therefore, although there is a reported and/or planned increase in counseling services, distinct populations including victims of sexual abuse and substance abusers, as well as youth offenders, are not adequately identified with regard to those who are in need of such counseling services compared to those who receive them.

These inadequacies in the delivery of services are also impacted by the programming space limitations at OJC and the lack of space at OJC for psychotherapeutic interventions, and more recently movement of inmates and closure of units.

The mental health evaluations to be done as part of the disciplinary process have been under discussion and while there appears to be agreement on policy that the inmates on the mental health caseload will be evaluated with regard to disciplinary charges, the process has not been implemented.



Reiteration of Recommendations from Compliance Report # 6:

33.     Defendants and CCS must develop policy and procedure for mental health evaluations for inmates on the mental health caseload involved in disciplinary proceedings.  This policy must identify the information to be provided to hearing officers regarding inmates on the mental health caseload.

34.     Develop quality improvement data, collection, and performance measures to demonstrate that evaluations are indeed conducted and the outcome of those evaluations are provided to inmate disciplinary hearing officers.  Track the outcome of disciplinary processes for inmates on the mental health caseload.

35.     Develop policy and procedure for identification and tracking of inmates on the mental health caseload who have been victims of violence while in OPSO custody (including Hunt and out of parish jails in which Orleans inmates are housed).

## IV. B. 2. e. and h. Diagnoses,  Records

Finding:   Partial compliance

**Measures of Compliance:**
1.   Review of policies and procedures and medical records
2.   Review of performance measures regarding referrals
3.   Review of adequacy of numbers of psychiatric providers and wait times for psychiatric assessments
4.   Inmate interviews

Observations:

The development of the process for appropriate medication management continues. The process for referrals to psychiatric providers has not yet been fully implemented within relevant and necessary timeframes.  Therefore, there continue to be unacceptable delays in the provision of assessments and psychotropic medications. Impeding adequate psychiatric medication management are CCS' staffing deficiencies of psychiatric providers, including nurse practitioners.  The inclusion of inmates in treatment team meetings to assure that inmates participate in their treatment and are reviewed in a timely manner with regard to their medication and programmatic needs is not done consistently.



Reiteration of Recommendations from Compliance Report # 6:

36.    CCS hire staff for psychiatric and psychiatric nurse practitioner positions.

37.    Implement performance indicators for medication management practices with appropriate data collection and analysis including inmates housed in OJC, Hunt, other correctional facilities, and Feliciana Forensic Facility.

38.    Implement performance measures to track the timeliness of the referral process.

## IV. B. 2. f. and g. Medication Administration, Review

Finding: Non-compliance

Measures of Compliance:
1.  Review of policies and procedures
2.  Monitors observations and review of medication management at our of parish jails.

Observations

Despite agreements that inmates receiving psychotropic medications would not be transferred to out of parish jails, review of inmates transferred to LaSalle facilities reveal inadequate staffing or absence of mental health staff as well as medication administration by deputies.

Reiteration of Recommendations from Compliance Report # 6:

39.    Return inmates housed out-of-parish who are receiving psychotropic medications to OJC.

40.    Discontinue transfer of inmates receiving mental health care to out-of-parish facilities.

## IV. B. 3. a. - b.  Counseling

Finding: Non-compliance

Measures of Compliance:
1.  Review of policies and procedures and performance indicators for counseling sessions to specific groups identified in the Consent Judgment
2.  Interviews with inmates and discussions with staff
3.  Review and analysis of mental health contacts via performance measures.

Observations:

CCS has not completed its process of developing and implementing policies and procedures for counseling in the areas of general mental health/therapy, sexual abuse



counseling, alcohol and drug counseling and counseling to youth offenders. CCS acknowledges that they have not engaged in counseling services in several of these areas and despite "lumping together" in data collection of counseling services, there is very limited specificity as to the specific groups or identification of the need for counseling services to inmates who are in the specific groups. The statistics provided by CCS on individual therapy contacts and group therapy sessions does not specifically identify whom the inmates are receiving such services nor does it identify the adequacy of services for identified treatment needs.

      As noted earlier in this report, CCS reports that an unacceptable number of the scheduled group therapies and/or counseling sessions are delayed or cancelled because of the lack of custody support to escort inmates to the sessions and/or provide supervision/observation of the sessions.  In those circumstances when groups are conducted by mental health staff, custody staff also attend the groups which limits their effectiveness because of confidentiality issues.  This is further complicated and diminished by the lack of available treatment space in OJC for counseling services and other structured therapeutic activities.

Reiteration of Recommendations from Compliance Report # 6:

41.    The Defendants and CCS review policies and procedures for mental health services for these populations to describe the actual services needed and staff required.

42.    CCS must identify the level of need for mental health and special population inmates in the OPSO with regard to specific services.

43.    CCS must develop performance indicators.



## IV. B. 4. a . -  g.  Suicide Prevention and Training Program

Findings:

IV. B. a. Partial Compliance
IV. B. b. Partial Compliance
IV. B. c. Partial Compliance
IV. B. d. Non-Compliance
IV. B. e. Partial Compliance
IV. B. f. Non-Compliance
IV. B. g. Non-Compliance

Measures of Compliance:
1.   Review of policies and procedures
2.   Observation of clinical and custody staff at OJC
3.   Discussions with CCS staff.
4.   Interviews with inmates
5.   Examination of emergency response bags

Observations:

The suicide risk reduction curriculum and training of custody and mental health staff in suicide reduction and implementation of that training is progressing, and the suicide risk assessment tool has been implemented.  However, administration of the suicide risk assessment tool has been inadequate, and utilization by QMHP's has not been reviewed for adequacy by psychiatrists or quality management staff.  The need to establish measures and assess the effectiveness of the training has not been completed.

CNAs and nurses are responsible for direct observation and suicide watch at OJC but CCS has not yet established adequate performance measures for the CNA's observation and participation in the direct observation and suicide watch processes. There continue to be inadequate numbers of CNAs available to provide direct observation and suicide watch as well as fulfill the responsibilities to document suicide prevention techniques and interventions other than documentation of watches every 15 minutes. Further, the direct observation and suicide watch by the CNAs appears to be only *observation* without any meaningful clinical interactions by the CNAs with the inmates who are under suicide protocols, or even talking to the inmates.  Past recommendations in Compliance Reports that CNAs be trained to interact with inmates under the supervision of nursing staff is not being demonstrated.

Inmates on suicide watch or direct observation have been able to obtain materials including clothing, towels, and sharps (paper clips, razors), even while in



68

isolation.  Further, deputies need additional training and supervision on the proper management and transport of inmates on suicide watch or precautions.

Reiteration of Recommendations from Compliance Report # 6:

44.    CCS continue to provide training and supervision of CNAs with regard to direct observation at OJC.   Train staff to interact appropriately with inmates they are observing.

45.    CCS provide training to mental health staff and correctional staff with regard to direct observation and transport/movement of inmates who have been referred or presented with concerns for suicide or self-harm, and document as well as analyze the direct observation/supervision of those inmates by custody staff until they are seen and evaluated by mental health staff.

46.    The Defendants must provide suicide precautions and observation in suicide resistant cells.  Due to movement and unit closures, some of the suicide resistant cells have also been moved and not available to inmates on watch. Some male and female inmates continue to be placed on suicide watch and direct observation in OJC in non-suicide resistant cells on multiple units.

47.    The emergency response bags must be properly stocked and monitored.

**IV. B. 5. a. - k. Suicide Precautions**

Findings:
IV. B. 5. a. Non-compliance
IV. B. 5. b. Non-compliance
IV. B. 5. c. Non-compliance
IV. B. 5. d. Non-compliance
IV. B. 5. e. Non-compliance
IV. B. 5. f. Non-compliance
IV. B. 5. g. Non-compliance
IV. B. 5. h. Non-compliance
IV. B. 5. i. Non-compliance
IV. B. 5. j. Non-compliance
IV. B. 5. k. Non-compliance



Measures of Compliance:
1.   Review of policies and procedures
2.   Discussion with CCS and OPSO staff
3.   Observation and interview of prisoners
4.   Review of incident reports.
5.   Review of reported suicide attempts

<u>Observations:</u>

The CCS policies have been developed but not finalized and adequate implementation has not yet been demonstrated. Further, the number of CNAs providing direct observation and suicide watch is inadequate for the number of inmates on suicide watch or direct observation at OJC.

The direct observation and suicide watches by clinical staff are inadequate, as inmates on these precautions continue to be able to obtain materials in their cells that can be used to harm themselves.  The direct supervision by deputies is inadequate for the same reasons, and because inmates have been able to evade deputies and run to the upper tiers (2nd level) and threaten to jump or actually jump or hang themselves from the tier while on suicide precautions.

As noted previously in this report, some of the suicide resistant cells in use at OJC were relocated and the continuation of high numbers of inmates on suicide watch or direct observation on multiple units at OJC has continued.  The designated mental health step down/residential unit at OJC for men is inadequate and the single mental health unit for women includes all levels of care and non-mentally ill women, including pregnant women and segregation.

The Mental Health Monitor was informed that mortality and morbidity reviews are being conducted by CCS.   The psychological autopsies and psychological reviews for inmates who have completed suicide or made serious suicide attempts were presented to the Monitors however corrective actions were not consistently identified and implemented. The process of reviewing morbidity and mortality for inmates with psychiatric disorders is still being developed and there is inadequate analysis by OPSO of the conditions or situations that contribute to inmates who report suicidal ideation or engage in suicidal or self-harming behaviors.  This is relevant as CCS reports their analysis of inmate threats of self-harm by many inmates is because of fear for their personal safety in other housing units.



Reiteration of Recommendations from Compliance Report # 6:

48.    OJC and CCS develop a collaborative process for the management and supervision of inmates on suicide precautions or at elevated risk for self-harm.

49.    CCS train and supervise CNA's on direct observations and interactions with prisoners.

50.    CCS develop and present CNA to prisoner ratios of 1:1 or 1:2 for direct observation rather than the current practice of 1:3 or more inmates, and one CNA or nurse for suicide watches for multiple inmates without evidence of interactions with those inmates regarding their mental status.

51.    OJC and CCS demonstrate reviews of all serious self-harm attempts and suicides and assess the periodic reports to determine if inmates are appropriately identified, adequately assessed via suicide risk assessment tools, protected and treated, including use of morbidity and mortality review and analysis.

## IV. B. 6. a. - g. Use of Physical and Chemical Restraints

Finding:

    IV. B. 6. a. Partial compliance
    IV. B. 6. b. Partial compliance
    IV. B. 6. c. Partial compliance
    IV. B. 6. d. Partial compliance
    IV. B. 6. e. Partial compliance
    IV. B. 6. f. Partial compliance
    IV. B. 6. g. Partial compliance

Measures of Compliance:
1. Review of policies and procedures and medical records
2. Discussions with OPSO, Hunt, and CCS staff
3. Review of incident reports at OPSO and Hunt.

Observations:

    CCS has developed a physical restraint policy to include use of physical restraints when necessary.  However, none of the incident reports presented reflect use of physical restraints in any instance for any period of time.  This lack of use of restraints for inmate protection is in spite of there being inmates who were agitated and in some instances able to jump from, or threaten to jump from, tiers or bunk beds.  The need for therapeutic restraints continues to require reassessment by both CCS and OJC.



A policy and performance measures regarding inclusion of trained mental health and nursing staff in the use of de-escalation techniques prior to planned use of force at Hunt or OJC should be developed and implemented. The incident reports do not reflect consistent mental health staff participation in the planned use of force.  Lastly, the need for a policy on emergency medications for mentally ill inmates needs to be developed and implemented to assist in reduction of use of force including chemical agents.

 Reiteration of Recommendations from Compliance Report # 6:

52.    CCS and the Defendants both develop coordinated policies regarding use of therapeutic physical restraints for prevention of self-harm; assure the policies provides, and practice requires that the restraints be used for the shortest possible time period, under proper supervision, monitored, reported, and assessed.

53.    CCS maintain "use of restraint logs" for both physical and chemical restraints at OJC and Hunt.

54.    CCS continue revision and implement of policies at Hunt to include mental health staff and possibly specifically trained nursing staff in de-escalation techniques prior to the use of planned uses of force including and specifically OC spray.

## IV. B. 7. a. – d.  Detoxification and Training

Finding:

> IV. B. 7. a. Partial compliance
> IV. B. 7. b. Partial compliance
> IV. B. 7. c. Partial compliance
> IV. B. 7. d. Partial compliance

Measure  of compliance:
1.   Document review of course outline, lesson plan, training records, and medical records.



<u>Observations:</u>

Performance has been static since Compliance Tour #6.  CCS has a training curriculum and has trained health care staff.  Though CCS has an intake screen that includes the appropriate inquiries for risk of withdrawal from alcohol and other substances, they have been relying on the JMS intake screen and/or a paper screen that does not have appropriate questions.  CCS intends to begin use of their intake screen through the electronic medical record (ERMA) on or about April 1, 2017.

Through an audit of medical records of patients who were identified as at risk for withdrawal, performance on completing the CIWA score-sheet has improved from 46% to 80%.  We identified supervision and training as continued opportunities for improvement. There is no current plan for oversight of the training program.

<u>New Recommendations:</u>

55.    OJC/CCS provide sufficient oversight to assure compliance.

56.    CCS implement the ERMA intake screen to reflect adequate screening for risk of withdrawal.

## IV. B. 8. a. – b.  Medical and Mental Health Staffing

Finding:

IV. B. 8. a. Partial compliance
IV. B. 8. b. Partial compliance

<u>Observations:</u>

Staff turnover at OJC remains a problem, however there are fewer nursing vacancies than there were in October 2016.  Mental health staffing is considerably below budgeted positions.

The medical director position has been vacant.  CCS plans to appoint a temporary medical director during April 2017 and to continue recruiting a permanent medical director.  This is a challenge in light of the paucity of custody staff.

Through medical record review, it is apparent that there are ample opportunities for improvement in training and supervision of practitioner staff.  For example, our audit of care for patients with diabetes who are insulin-dependent



demonstrated inadequate attention to control of the disease and inadequate treatment planning.  The potential consequences of this inattention might be apparent in poorly-timed meals and problems with housing accommodations, among others.

There has been no improvement in cross training of nursing and administrative staff.  The result of this is that if one staff member is not present at work there is no one who can fulfill the function.

Closer collaboration between health staff and custody leadership is an opportunity for improvement.

Staffing at the out-of-parish LaSalle facilities includes a nurse practitioner for six hours/week at each facility.  There is a physician who provides oversight, but no on-site care.  There is no registered nurse oversight of the practical nurses, though we believe that the Louisiana LPN Practice Act requires this oversight.  Further, the officers who serve as medical attendants for 16 hours/day on weekdays and 24 hours/day on weekends are not certified through a state-approved training program and are not supervised by a registered nurse.

New Recommendations:

57.    OJC evaluate and remedy the health care staffing, training, and supervision at out-of-parish facilities where Orleans inmate with chronic medical and mental health are housed.  As an alternative, return inmates with chronic medical conditions or mental illness to OJC.



## IV. B. 9. Risk Management

Findings:

  IV. B. 9. a. – Partial Compliance
  IV. B. 9. b. – Partial Compliance
  IV. B. 9. c. – Partial Compliance
  IV. B. 9. d. – Non-Compliance
  IV. B. 9. e. – Partial Compliance
  IV. B. 9. f. – Partial Compliance

Observations:

Dr. Greifinger:

At OJC, performance in this area has improved somewhat since Compliance Tour #6.  CCS has been using some (but not all) of the tools developed for clinical performance measurement more than a year ago for medical and nursing care and behavioral health care.  In addition to measurement, CCS has been developing and tracking corrective action plans in the areas they do measure.  They have demonstrated improvement in these specific areas.  The formula used for measurement of time lag from nurse referral to physician visits was inadequate; this lead CCS to believe that performance was improving, though they were underestimating the wait times to see a practitioner by half.  It does not appear to be improving.  Likewise, the analysis of grievance data is flawed, leaving CCS with inadequate information to use for quality management purposes.

CCS on-site nursing staff is revising systems and enhancing training and supervision to meet agreed upon standards of care, based on the clinical performance measurements.  For lack of a site medical director, there has not been much clinical supervision.

There were two deaths since Compliance Report #6.  The mortality reviews were substantially improved, though there are opportunities for improvement in self-critical analysis and collaboration with custody staff. Further, the corrective action plans are not tracked over time, so there is no opportunity to assess whether remedies have been effective.



CCS has yet to develop an adequate annual quality management plan, nor has it evaluated the effectiveness of the current program.

Performance on the mental health tools shows almost 100% compliance.  On the surface this appears good; however, the clinical supervisor performs the reviews and reliability has not been established.

At the LaSalle facilities, medical privacy is compromised and LPN staff seemed unsure of what to do if a patient expressed suicidal thoughts.

Dr. Patterson:

The Mental Health committee meets as part of the MAC meetings.  The results are that there is still only data reported, with little or no analysis; and no corrective action plans or follow-up.

New Recommendations:

58.   CCS expand clinical performance measurement to include effective grievance analysis and care provided by practitioners.

59.   CCS test the reliability of measurements by having a qualified reviewer who is not the supervisor of staff being reviewed.

60.   CCS track and evaluate the effectiveness of remedies implemented as a result of its quality management program, including grievance analysis, clinical performance measurement, and morbidity & mortality reviews.

61.   At the LaSalle facilities, assure privacy for patient encounters and assure that staff is trained in suicide risk reduction.



## IV.  C.  Medical Care

**Assessment Methodology**

- March 20 - 22, 2017 on-site tour.

- Meetings with OPSO and CCS staff, tour of OJC (IPC and special housing units)

- Medical record review and reliability testing of CCS clinical performance measurement

- Medical record reviews of selected incidents, patients referred to the emergency department for ambulatory sensitive conditions, trauma, detoxification and withdrawal, and referrals from Plaintiffs' attorneys.

Finding:        Partial Compliance (all paragraphs)

Measures of compliance:
1.      Quality management documents,
2.      Inmate complaints and grievances,
3.      Medical records.


<u>Observations:</u>

Performance in this area has been stable since Compliance Report #6.

<u>Access to care</u> – access has improved somewhat, though there are lags to access for some inmates who "fall through the cracks."  There are fewer inmate patients who "fall through the cracks" as time goes on, though we continue to identify patients whose follow-up is not timely.  Though access time has improved, access to physicians and psychiatrists is longer than satisfactory.

Housing for Pregnant Women – OPSO continues to house all pregnant women on 3D which is a mental health unit instead of housing them in general population.

<u>Medical recordkeeping</u> – CCS has implemented an electronic medical record called ERMA.  This enables a patient-specific record in lieu of a new record for each booking.  The medication management system will be integrated into ERMA during April 2017.

<u>Language assistance</u> – I did not evaluate this element on this tour.

<u>Utilization management</u> – The CCS utilization management program is reasonable and based on commonly accepted precepts of resource management.

77


Orleans Parish
JAIL MONITORS

<u>Medication management</u>—There is better continuity of medication at intake and better continuity for prescription renewal, though we identified some patients who had significant lapses due to problems with the process of verification of prescriptions prior to incarceration.   Review of records on-site demonstrated a seven-day mean lag time from nurse screening to practitioner visits (range = 1-14 days).  This is excessive.

There were two recent episodes (March 10 & 17) where groups of patients were held in the IPC pending movement from one OJC housing unit to another.  During those periods a total of 98 patients missed significant medications because the nurses were unable to determine their location.  These included medication for mental illness, insulin, HIV medications and medications for withdrawal, among others.

There has been improvement in notification of prescribing practitioners when patients refuse their doses, though opportunities for improvement remain.

As some housing units do not have deputies present (two of the five special needs units that we visited on March 20), nurses have had to delay medication passes.

<u>Continuity on release</u> – CCS data on release medication will not be useful until a denominator is used.  Some released patients get prescriptions, though a small proportion get those prescriptions filled (12-23%).  This is not atypical. None of the patients get a supply of medication, though a supply is specifically mentioned in the consent agreement.

<u>Continuity on transfer</u> - CCS is preparing transfer summaries to and from the Hunt facility and whenever necessary otherwise.  The summaries are more comprehensive than they had been in the past.

<u>IPC design</u> - We toured the Intake Processing Center.  There is a notable lack of privacy for the medical and mental health intake process and an awkward bank-teller like window for taking vital signs. The distance between the nurse and the patient is too far to measure vital signs.  Some mental health interviews are conducted through windows.

<u>Jail Design – Phase II</u> - Although medical and psychiatric patients are clustered on general population housing units, there is no provision for housing patients with special needs, both medical and psychiatric, in the OJC.  (See also Dr. Patterson's report.)  Plans for Phase III housing for patients with special needs remain elusive.

78



Grievance Process - The grievance process is timely, but the quality has deteriorated. Instead of being helpful, the CCS grievance coordinator is giving patients a runaround, for example, having them fill out more forms instead of helping the inmates with their legitimate problems.  CCS is attempting to analyze grievance data, but there are significant problems with the currently used methodology, a methodology that is incompatible with OPSO's and with no replicable way to compare denominators.

Emergency Preparedness – four of five units visited had a cut down tool.  None of the five housing units had an appropriately stocked first aid kit.  One of three deputies confirmed that they had been trained on medical emergencies.  Officer training data provided by OPSO suggests that 85% of deputies have been trained on suicide, medical emergencies, and withdrawal from alcohol and other substances.

Nursing Response to Use of Force – we examined the medical records of eight patients who were involved in an incident at the jail on March 17, 2017, of whom four were transferred to the hospital for evaluation.  There was inadequate history and physical examination.  The wounds were not adequately described; for example, one patient had a "hand injury" with no further description of the skin or bony structure of the hand.

Care for patients in medical restraints – there is no policy for this area, although there is a draft.

Care for patients at the out-of-parish LaSalle facilities – we noted that the nurse practitioner was discontinuing or changing some psychotropic medications that had been prescribed by the psychiatrist at OJC, without the benefit of psychiatric evaluation.  Some transfers to the LaSalle facilities were medically inappropriate.  Further, officers are administering medication without registered nurse supervision and there are many undocumented or missed medications without appropriate follow-up.

Pregnant inmates remain clustered on a  special needs unit, without any rationale.

New Recommendations:

62.     CCS revise the methodology for measuring discharge medications and grievances to that it produces reliable and useful information.

63.     Defendants assign security staff for continuous coverage on each housing unit.

79



64. OJC provide appropriately stocked first aid kits and cut-down tools for each housing unit.

65. CCS test the reliability of training log data against current staffing.

66. CCS evaluate the retention of training information with a 5% sample of deputies three months following their training.

67. CCS train and supervise nurses in proper history taking, physical examination and documentation following trauma.

68. CCS and OPSO develop and implement a policy on restraint use including training.

69. CCS discontinue recommending illness classification for pregnant inmates, unless they need to be on a medical housing unit.

70. Defendants assure that out-of-parish inmates at the LaSalle facilities have access to psychiatric care, where medically appropriate, for the purposes of evaluation and medication management.  In the alternative, return out-of-parish inmates with serious mental health needs or who are on psychotropic medication to OJC.

71. Defendants assure that out-of-parish inmates at the LaSalle facilities have proper oversight of medication administration.

72. OPSO and CCS assure that the screening process for out-of-parish transfers is medically appropriate.

## IV. C. 1. Quality Management of Medication Administration

Findings:

> IV. C. 1. a. Partial Compliance
> IV. C. 1. b. Partial Compliance
> IV. C. 1. c. Partial Compliance
> IV. C. 1. d. Partial Compliance

Measures of compliance:
1. Quality management documents
2. Inmate complaints and grievances
3. Medical records
4. Plaintiff complaints



<u>Observations:</u>

Performance in this area has been stable since Compliance Tour #6.

Nurses have been trained on medication administration and documentation. CCS has been measuring performance on a quarterly basis. By April 1, 2017 CCS will cease using the Sapphire pharmacy software and will do all ordering, renewal, and tracking through ERMA. This should be an improvement.

Information on discharge medication remains incomplete.

## IV. C. 2. Health Care Delivered

Findings:

IV. C. 2. a. Partial Compliance
IV. C. 2. b. Partial Compliance

Measures of compliance:
1.    Reports on numbers, as specified in the Consent Decree
2.    Reports on clinical performance, with discussion of problem identification and remedies
3.    Medical record review

<u>Observations:</u>

Performance in this area has improved since Compliance Tour #6.

CCS now has specific action plans in addition to data reporting on staffing, clinical activity, and clinical performance. This is a significant improvement. Staff has been trained in medication administration. Clinicians now have a checklist for chronic care that includes reminders for medication renewal, housing accommodations, and return visits. Appropriate medication protocols are in place.

CCS added a nurse practitioner for the night shift which has improved access somewhat. However, there are continuing delays in access to physician care on referral from nurses. This poses risk of harm.

On review of complaints from Plaintiffs, we found significant problems with care following return from the hospital. This includes medication recommendations and return visits for specialty care that "fell through the cracks."

There are delays in access to psychiatric care and follow-up. Dr. Patterson will discuss these in this report.

81



There is no documentation of ongoing oversight of CCS care by OPSO or the contractor, which is the City of New Orleans.  OPSO has hired a coordinator with jail experience who will begin work on March 27, 2017.  Though she has a job description, her role is not clear.

The CCS and OPSO infection control plans are deficient regarding the evaluation and treatment of high-risk exposure to blood and body fluids.  People with high risk exposures should be seen immediately by a physician familiar with HIV and viral hepatitis prophylaxis.

New Recommendations

73.     Immediately revise CCS and OPSO policies and train staff on the urgency of post-exposure prophylaxis.

## IV. C. 3. a. – d. Release and Transfer

Finding:

IV. C. 3. a. Partial Compliance
IV. C. 3. b. Partial Compliance
IV. C. 3. c. Partial Compliance
IV. C. 3. d. Partial Compliance

Measures of compliance:
1.     Interview
2.     CCS documents

Observation:

Performance in this area has not improved since Compliance Tour #6.

Very few released patients receive prescriptions for their chronic medical and mental illness.  There is no denominator data to assess the proportion of patients on medication who get prescriptions.  This should be simple to assess through medical holds and analysis of those data.

82



## IV. D. Sanitation and Environmental Conditions

## Introduction

This report summarizes the findings of compliance tour #7 for the Environmental Health and Fire and Life Safety provisions of the Consent Judgment.  The Monitor conducted the tour March 20-23, 2017.  The tour included meetings with key staff including the Compliance Director, Deputy Chief of Corrections, Warden, Interim Director of Facilities Management, Fire Safety Officer, Sanitarian, Kitchen/Warehouse (K/W) manager, Safety Sanitation Officer, food services contractor and pod deputies.  The Monitor toured inmate housing pods housing inmates of the Orleans Justice Center (OJC), speaking with inmates, touring TDC,  and touring the Kitchen/Warehouse.   In addition to observations, the Monitor reviewed a large volume of documents provided by OPSO to assess compliance with the applicable provisions.

This report identifies new recommendations for each paragraph of the Consent Judgement made as a result to this tour.  The recommendations from the previous tour continue to apply as well.

Since the previous tour in September 2016 there has been limited progress toward compliance.  This progress includes:

- OPSO Policy 701.06 "Emergencies –Fire/Smoke Events" and OPSO Policy 401.05, "Fire /Smoke Event and Evacuation Training and Drills are both implemented. Training of deputies is continuing with over 200 trained through February 2017.
-  The monthly and quarterly facility inspections are completed by the Fire Safety Officer and corrective actions for violations completed and documented.  Once OPSO Policy 701.01 is implemented, E. 1. A will be substantially compliant.  OPSO is conducting fire drills including objective assessments regularly at both OJC and the Kitchen/Warehouse;
- Emergency keys are tested quarterly by the Fire Safety Officer.  They are properly identifiable by touch and sight and safely and securely stored.  Once OPSO Policy 801.35 "Key Control" is implemented, the paragraph will be substantially compliant.
- A new foodservice contract has been approved with a new vendor.  CBM began providing meals March 1, 2017.  Several inmates stated meals have improved.



- OPSO provided the air balance report for OJC.  However, the air balance report  for TDC identified remaining deficiencies  of the HVAC and exhaust systems that need corrections  to comply with the design specifications. Until resolved, the provision remains partially compliant.

Considerable work remains to achieve compliance.  This work includes completing policies, deputy and staff training, evidence of policy and procedure implementation, and most important meaningful oversight to measure whether the policies and procedures are followed consistently throughout OPSO.

Since the previous tour there are areas that have either not progressed toward compliance or fallen out of partial compliance to non-compliance.  Shortage of staff with appropriate supervision in key support services and absence of appropriate prioritization by OJC leadership are negatively impacting implementation of policies including sanitation/housekeeping, laundry services/exchange, and meal delivery.  There is also an absence of qualified trainers with subject matter expertise and training skills to train and lead deputies.

The Monitor reviewed numerous grievances regarding laundry for January-March 2017 which identified issues no of detergent (10); deputies not allowing inmates to wash clothing (10), and no laundry exchange and inability to get clean linens (16).  Upon investigation, the Monitor learned that since the retirement of the laundry deputy in December 2016, OPSO did not appoint a permanent replacement to operate the laundry.

For example, the laundry deputy working on March 21st was pulled off on March 22nd because she was needed to transport sick inmates to medical.  As a result, laundry did not operate nor was the laundry exchanged on the 3rd floor of OJC as scheduled.  There is no back-up.  Further five of six deputies assigned to sanitation duties left without replacement to collect, transport, and distribute clothing.

Inoperable laundry equipment and not maintaining permanent laundry staff with back-up means that OPSS cannot clean and distribute clean clothing, linens and blankets. The laundry located in the House of Detention, is in disrepair and has numerous fire safety hazards.  Examples of deficiencies are:

- Inconsistent hours of operation to meet needs.



- Inadequate equipment – Of six washers – one leaks and of six dryers - only three function (one had a fire three years ago and has never been repaired or replaced; one no longer heats, and one has no door.
- No preventive maintenance plan or contract to maintain equipment. Including the chemical distribution system.
- Washer water leaking from washer door (broken gasket) onto floor creating slip, trip and fall hazards.
- Facility has no smoke alarms and no sprinkler system.  The Monitor requested OPSO to obtain a State Fire Marshall's inspection
- No clear second means of egress from the facility; no evacuation plan.
- Exposed electrical wires.
- Chemicals not controlled; no inventory maintained.
- Long extension cords used to power fans, charging phones as most electrical outlets are non-functional creating fire safety and trip hazard.
- Large fans being used to dry excessively wet floor and provide air movement.
- The insulation pipe wraps for hot water lines supplying the washers are rotted, torn and/or missing.
- No evidence that the chemical distribution system to the washers is properly dispensing the recommended amount of detergent, bleach and rinse agents.
- Laundry area disorganized with clothes spread on the floor and bags of clean clothes not stored on shelves, but on floor. Inoperable chest freezer used to store clothes; refrigerator not functioning; trash accumulating in several areas (cups/paper/rags).
- Inmate toilet is posted "out of order".
- Cleaning tools (mops/brooms, pails) not controlled.
- Lack of management oversight for laundry and laundry exchange.



The laundry exchange process at OJC is irregular primarily because of inadequate staffing and lack of management priority.  Examples:

- One Deputy is assigned to sanitation to do laundry exchange in addition to sanitation duties, meal delivery.  She has the assistance of one inmate worker.

- If the Deputy assigned to sanitation is not working (e.g. having scheduled days off when exchange is scheduled) there is no laundry exchange.

- The schedule of the Deputy assigned to sanitation has her not scheduled on days when the laundry is supposed to operate.

- The Deputy assigned to sanitation reported adequate sizes (4X, 6X, and 8X) for inmate uniforms are no longer available from the warehouse

- Laundry carts are missing and there is no process to clean and sanitize carts between uses.

OPSO has no written policies and procedures for operating the laundry or laundry exchange.  It is not clear who in jail leadership is responsible oversight for the laundry and laundry exchange.  The OPSO Sanitarian provided copies of a laundry room assessment dated December 29, 2016 and a description of the laundry process with suggestions dated August 17, 2016.  It is not clear who within OPSO reviewed either report.   Additional specific issues that need immediate attention by OPSO are:

- A plan to assure adequate and trained support services staff that impact inmate health and safety including food service, laundry, laundry exchange and inventory, provision of inmate hygiene supplies, sanitation and chemical distribution, biohazardous spill clean-up, inmate worker health screening, transportation and distribution meals, maintenance, and fire safety.

- Support Services Policies:  After more than three years following the Consent Judgment, three of the most important support services that impact inmates' health and safety, food service, laundry, and sanitation that there are no policies and procedures guiding management and oversight.

- <u>Food Service</u>:  Implementation of a written process for tool and chemical control in the Kitchen/Warehouse.



- Fire Safety: OPSO Policy 701.05 "Emergencies – Evacuation" needs to be completed and implemented. Once drafted it is paramount to have agreements and procedures in place in the event that would require a facility evacuation. A formal plan with review and acceptance by appropriate State and local agencies showing agreements to house and transport inmates and staff must be a high priority.

- Safety Sanitation Deputies on all shifts need to be appointed and trained for all facilities to assist with fire drills on all shifts

- Sanitation: Lack of pod deputy oversight of inmate living conditions and proper storage of inmate property to control excess clutter in cells, uncontrolled commissary items, reading and religious material as required in the inmate handbook.

- OJC Ventilation: The ventilation air balance of OJC is now complete. However, excessive condensation in the showers throughout OJC continue to create a slip and fall safety issue for inmates and staff and restricts deputy's ability to observe and supervise inmate activity. The Monitors continue to observe water pooling on the floor both inside the shower rooms and on the walkways outside the showers creating a slip and fall hazard. OPSO needs to consider implementing alternatives such as reducing shower run time and/or water temperature. Rusted fire sprinkler heads and screws in the stainless-steel panels need to be replaced as they continue to stain walls and partitions making it impossible to maintain clean.

- Inmate Actions to Block Air Vents: The Monitors observed blocked vents in inmate cells effectively restricting adequate air flow. It is unreported, and unrepaired by staff. Blocking air vents further unbalances the housing unit temperatures.

- Broken or missing glass panels not replaced: Several glass panels that had been broken apparently by inmates have not been replaced. Broken and missing glass panels present a safety and security risk for both inmates and staff. OPSO need



to assure the requisition/purchasing process is streamlined to allow fast receipt and installation of replacement panels.

- <u>Development and implementation of a comprehensive Infection Control Policy:</u> OPSO currently operates without an up-to-date infection control policy for deputies and staff.  For the health and safety of staff and inmates, it is imperative to complete it and train all staff as to its requirement   The Monitors expect to review the Policy and all training material and qualifications for trainers prior to its implementation.

- <u>Training:</u>  OPSO needs to create and utilize an ongoing training matrix for each staff identifying all training  required for each position, the date the training was completed, and by whom.  Sign-in sheets remain proof of attendance, but up-to-date matrix will assist management to identify qualified staff for specific assignments.  OPSO also needs to create and implement an objective process to assess effectiveness of training and the training process and make changes to training curriculums, trainers, and testing as necessary.

## V. D. 1.  Sanitation and Environmental Conditions

## IV. D. 1. a.  Oversight and Supervision of Routine Cleaning

Finding: Non-Compliance

Measures of Compliance:
1.      Written policies and procedures for cleaning and disinfecting, monitoring process with responsibility and accountability assigned developed in collaboration with Monitors.
2.      List of controlled inventory of acceptable cleaning and disinfecting chemicals.
3.      Development and implementation of an effective weekly [or more frequently] auditing process with assigned responsibility and accountability and documentation.
4.      Monitors' onsite verification of implementation of both the policy(s) and the auditing process and report, along with corrective action when non-conformities to the policy/procedures are documented.
5.      Observation of conditions along with interviews with inmates and staff.

<u>Observations:</u>

OPSO implemented two policies pertaining to this paragraph, but several policies are either in process or not yet started since the previous tour:

- OPSO Policy 1101.02, "Facility Trash Removal", effective date of November 28, 2016.



- OPSO Policy 1101.03 "Cleaning Procedures Pod/Housing Unit" effective date of December 8, 2016.
- OPSO Policy 1101.08 "Mattress Cleaning and Storage" effective date November 28, 2016.
- Policy 1101.09 "Cleanliness Inspections" drafted, reviewed by Monitor with comments, but not implemented.
- OPSO Policy 1101.04 "Cleaning Procedures – Facility" - not drafted
- OPSO Policy 1101.06 "Inmate Hygiene" - not drafted.
- OPSO Policy 1101.01 "Inmate Laundry" - not drafted.

OPSO developed but not implemented a detailed cleaning schedule that identifies the housekeeping frequency by area. However, it does not include the "how" process (such as cleaning methods, chemical to use, and tools necessary). However sufficient trained staff and inmate workers are critical to an effective sanitation program.  Further, OPSO has also developed but not implemented a "Pod Daily and Weekly Cleaning Schedule Checklist."  The checklist is to be completed by the pod deputy daily and submitted weekly to the Safety Sanitation Deputy (SSD). SSDs have yet to be designated nor has management decided to whom they will report.

OPSO has not developed a training program for sanitation that includes mattress cleaning, chemical use and control, cleanliness, and inmate worker supervision.  As of the tour training is not scheduled.  Further OPSO needs to create a written process detailing inmate worker selection criteria and the process for training them.

OPSO purchased two "All Surface Cleaning" machines, but the Sanitarian reports they are used infrequently due to shortage of staff/inmate workers to operate the equipment

OPSO provided several weeks of inspection reports completed by the environmental inspector working with the Sanitarian..  A review of several of the reports shows that deficiencies found one week continue to exist in subsequent reports for the same pods.  The reports identify numerous maintenance issues that



are provided to Facilities Maintenance to repairs.  The Sanitarian did not provide any evidence that the inspection reports are shared or discussed with OJC leadership or that the reports are used to improve sanitation within OJC.  The only exception is Facility Maintenance issues. The Monitor's observations of housing pods continued to show numerous examples of lack of housekeeping and excessive clutter.  Examples include

- Inmate's personal items stored on bunks, the shelf and on the floor and not contained in the personal property bags provided by OPSO.  Many empty commissary containers made of combustible materials including cups, food boxes, books, excess toilet paper and loose papers in the cells.
- Inmates keeping mattresses on the floor and not on the bunks.
- Several examples of uncleaned empty cells with waste accumulation (paper and towels)
- Mops, brooms, buckets stored unsecured in the dayroom which had no officer on the pod.
- Several broken or missing glass panels.
- Accumulation of lint on the floor and walls adjacent to clothes dryers that were not safely/securely creating a fire hazard.
- Inmate complaints about not having access to cleaning supplies.
- Screws on overhead stainless steel ducts in showers rusted.

**These are issues are identified in Compliance Report # 6.**

As reported previously, OPSO does not have sufficient staff to be selected and trained as sanitation officers responsible to manage and supervise inmate workers in the housing units. They also do not have any written selection process for inmate workers.  OPSO provided a draft list of implemented items inmates are allowed to maintain in their cell or living area, but it has not been incorporated in any policy, included in the Inmate Handbook, or enforced by deputies.

<u>New Recommendation:</u>

74.     Develop a cleaning and disinfection manual describing the methods to be used, chemical use, and tools needed for effective housekeeping.



## IV. D .1. b.  Preventive Maintenance

Findings: Partial Compliance

Measures of Compliance:
1. Review of the preventative maintenance plan to determine who has responsibility to file work orders.
2. Evidence of meeting the timelines for submission of work orders.
3. Evidence of training of those assigned the responsibility to file work orders.
4. Observation of practice and conditions.
5. Work orders, invoices, and purchases in support of the preventive maintenance plan.

<u>Observations:</u>

OPSO has implemented Policy 601.02 "Reporting Maintenance Problems," (August 5, 2016).  After its authorization, Facility Maintenance changed the process to require pod deputies and supervisors either call the maintenance hot line or email maintenance to initiate a work order request rather than enter work order requests online.   This process change needs to be added at the 2017 revision.

At the previous tour, Facilities Maintenance Director provided sign-in sheets demonstrating 107 staff had been trained on the procedure for reporting maintenance issues from July 7-28, 2016.  It appears that the training of deputies was discontinued as no further evidence of training for additional deputies was provided.   Without training, deputies and staff do not understand the how to initiate work orders.

During the tour OPSO provided copies of inspection reports of housing pods showing the Sanitarian and the inspector are providing work order reports to Maintenance that is being used to make repairs.  While helpful, the weekly inspections should verify whether pod deputies are initiating them to assure timely repairs.

The maintenance work order system, "Facility Dude" is designed to track work order requests from initiation to closure for OPSO and provide management reports to monitor the process, measure progress, backlogs, unnecessary delays, and staff performance including emergencies.  The Monitor also reviewed the Classification report of closed cells and identified that there is no process to notify



Classification when repairs to a cell have been completed so the affected cells can be used.

<u>New Recommendations:</u>

75.    Develop a process for Facilities Maintenance to provide electronic notification to Classification when repairs have been completed for a closed cell.

76.    Provide a current training schedule and tracking logs to demonstrate all deputies and supervisors are trained in the process of requesting work orders.

## IV. D. 1. c. Adequate Ventilation

Findings: Partial Compliance

Measures of Compliance:
1.    Written policy and procedure specifying the process of how adequacy of ventilation will be measured in accordance with the mechanical code adopted by the applicable state or local jurisdiction.
2.    Evidence of a contract with a qualified/licensed mechanical contractor to demonstrate that the ventilation system complies with the International Mechanical Code in effect in Louisiana.
3.    Reports from vendor regarding the ventilation system, air flow, etc.

<u>Observations:</u>

Prior to this tour OPSO provided a copy of the "Test and Balance Analysis Report" for OJC prepared by Coastal Air Balance Corp.  The report, dated December 9, 2016 states, "Air distribution system has been completely balanced as per requirements of specifications and results of the test herein listed".

During the tour OPSO provided a copy of the air balance report for the TDC dated February 12, 2012.  It states, "This is to certify that Melink Corporation has balanced the systems described herein (TDC) to their optimum performance capabilities." However, the report on page four identifies remaining deficiencies of the HVAC and exhaust systems that require corrections to comply with the design specifications.  Melink recommended a revisit to assure corrections were completed. Evidence of the revisit were not provided.

As noted above, during pod visits the Monitor identified that inmates had blocked numerous vents located in cells on several pods to prevent air flow.  For the



ventilation system to provide the air exchanges as designed, pod deputies and supervisors must remove blockages and not permit inmates to cover them.  Further, OPSO needs to clean the grills.  The Monitor did not receive any complaints, or grievances from inmates about heating or air conditioning issues.  Preventative maintenance on all HVAC systems is scheduled in "Facility Dude" system and the Facilities Maintenance Director stated it is aligned with the equipment manufacturer's scheduled maintenance recommendations.  The work order system provides appropriate advance notification when filter changes, belt inspections, etc. are due.   It is absolutely essential that these costs for all facilities are included in the budget and that the work is accomplished as required.  Otherwise, this building will begin to deteriorate, and there will be health/safety issues, and unnecessary long-term expense issues.

The Monitor again observed excessive condensation in some of the showers. At the previous tour OPSO provided correspondence dated August 30, 2016 from Huseman & Associates, Consulting Engineers to GraceHerbert Architects stating, in part:

> "The International Mechanical Code requires 25 cfm continuous exhausted or 50cfm of intermittent exhaust per head.  The *design* (emphasis added) exceeds this requirement. In addition the data in the Coastal Test and Balance report dated September 8, 2015 for the shower head exhaust grilles exceeded the International Mechanical Code requirements."

Correspondence from Huseman & Associates dated July 29, 2016 states in part:

> "The shower areas were designed for 150 CFM of exhaust or 75 CFM per shower head.  The 3rd floor mezzanine shower area was adjusted to meet that 150 CFM requirement and the 3rd floor shower area was balanced to 117 CFM, short of the design flow by 33 DFM.  Since the International Mechanical Code requires 25 CFM continuous exhaust or 50 CFM of intermittent exhaust per head, the 117 CFM exceeds the code requirement and is acceptable to Huseman & Associates if it is acceptable by the Sheriff's Office."

If the shower ventilation is in compliance with the IMC, OPSO needs to monitor all showers for excessive condensation that could cause inmates to slip and fall and block area observation by pod deputies.  If this is occurring, OPSO needs to



either limit the shower time (currently nine minutes per inmate), lower water temperature, or increase the time before the shower can be reactivated.

 New Recommendations:

77.     Provide evidence of corrective actions completed and reviewed by the air balance contractor for TDC.

78.     Monitor and adjust the shower run time as necessary to reduce condensation and lower the risk for accidental slips and falls.

## IV. D. 1. d.  Adequate Lighting

Findings: Substantial Compliance

Measures of Compliance:
1.      Maintenance of pending work order list showing the purchase order for pending work order regarding lighting fixtures.  Review of work order lists.
2.      Visual observation conditions.

Observations:

There is no change from the previous report.  Adequate lighting is provided throughout the facility.  The Monitor did not observe any malfunctioning light fixtures within the living areas.   OPSO now maintains a supply of replacement bulbs, transformers, or ballasts to repair malfunctioning lighting.  If TDC is reopened, assure replacement lighting, parts and fixtures are maintained.  At this tour, there were no outstanding electrical work orders.

## IV. D. 1. e. Pest Control

Findings: Partial Compliance

Measures of Compliance:
1.      Written policy and procedures.
2.      Copy of valid contract for integrated pest control services with a licensed pest control contractor.
3.      Map showing the location of all bait and trap stations both internally and externally.
4.      Copies of pest control reports provided by the licensed pest control operator showing areas of concern, recommendations for corrective actions needed to be taken by sanitation and maintenance.
5.      Evidence of corrective action taken for recommendations provided by the licensed pest control contractor.
6.      Evidence of a pest control log where deputies can log sighting of pest showing date, time, location, and type of pest.
7.      Visual observation of pest activity and inmate interviews.
8.      Inmate grievances regarding sanitation and maintenance.



<u>Observations:</u>

OPSO continues to maintain a pest control contract with a State licensed pest control company.   The OPSO Sanitarian manages the contract.  The contractor completed a pest control plan for OPSO that is reviewed quarterly with the Sanitarian and Facilities Maintenance.   The contract requires monthly service for all housing areas and bi-weekly service for the K/W.  The contractor also responds to immediate issues as they arise.  The OPSO Sanitarian meets regularly with the contractor to review all weekly pest reports including electronic trend reports to assure any issues identified by the contractor are resolved.  The trend reports provided for the third and fourth, 2016 identified minimal activity for insects and no rodent catches or sightings. The reports identify the amount of pesticides used and all pest activity at bait and glue trap stations.  The reports also include any recommendations for OPSO as necessary.  Since the last tour there have been no grievances or complaints from inmates or staff regarding pest issues.

OPSO Policy 601.03, "Preventative Maintenance" includes a provision for ongoing pest control services.  To prevent pest issues within facilities, the OPSO Inmate Handbook specifies that, "Food from the trays may not be saved or stored for later consumption unless it is provided as a snack as part of a special diet." It further states, "All property in your possession must be stored in your property bag."  This includes commissary.

The Monitor noted on this tour in every pod visited that inmates were maintaining trays with food in their cells or on bunks in the dormitories and that commissary was not stored in the personal property bags.  This paragraph will not become substantially compliant until food from meals is no longer permitted to be maintained by inmates after meal service and that commissary food items are stored in the personal property bags.



95

## IV. D. 1. f. Biohazardous Spills

Findings: Partial Compliance

Measures of Compliance:
1. Written policy and procedures.
2. Development and implementation of a training syllabus for blood borne pathogens. Qualifications of the trainer(s).
3. Documented list of deputies and inmates trained in blood borne pathogens.
4. Development and implementation of a biohazardous waste policy and procedures for effective and safe clean-up of any spills.
5. Maintenance of a supply of biohazardous spill kits including personal protection items including, but limited to eye shield, mask, gloves, gown with cap, CPR barrier, towelettes, absorbent powder, scraper, scoop bag, and biohazard bag.
6. Observation and demonstration of knowledge by staff and trained inmates.
7. Inmate interviews, inmate grievances.
8. Medical policy and procedures.

Observations:

The Stipulated Agreement (paragraph 16) of February 11, 2015 mandated OPSO to address biohazardous spills.  OPSO implemented Policy 1101.07, "Biohazardous Spill Cleaning Procedures" dated February 15, 2016.   The policy provides that only OPSO deputies trained in bio-hazardous spill response shall be utilized for cleaning up any biohazardous spills. Deputies will also need training by a qualified trainer on the Infection Control Policy once it is completed.

OPSO provided sign-in/out logs including pre-and post-test results for 341 deputies who have completed one of 35 spill response training classes held from May 28, 2016 through February 22, 2017.  The lesson plan and test instruments used were previously reviewed by the Monitor.

OPSO currently maintains a supply of spill kits that are stored in the chemical storage room on each floor at OJC and at the watch commander's desk in intake.   No reports were available regarding any use of the kits since they were purchased.

Once logs of spill responses are maintained and evidence of Infection Control Policy and procedures are completed, the provision will be in substantial compliance.

New Recommendation:

79.    Complete and authorize an up-to-date Infection Control Policy and provide evidence of training.



## IV. D. 1. g. Cleaning Chemicals

Findings: Partial Compliance

Measures of Compliance:
1. Written policy and procedures.
2. Inventory of cleaning and disinfecting chemicals.
3. Lesson plans/curriculum - evidence of effective training of deputies and inmates responsible for cleaning and disinfecting surfaces in housing and common areas.
4. Policy and procedures an effective cleaning and disinfection policy and procedures for all facilities.
5. Observation of effective implementation and demonstration of knowledge.
6. Inmate interviews, inmate grievances.

Observations:

OPSO maintains a supply of spill kits that includes a "Spill Clean-Up Pack" that includes the chemicals to be used for clean-up and disinfection. The kits have been distributed to the chemical storage rooms in OJC and at the watch commander's office at Intake. OPSO did not provide the Monitor with either incident reports or other evidence of use of the Spill Kits. Assure kits are readily available for TDC if it is occupied.

See recommendations from D. 1. F.

## IV. D. 1. h. Infection Control Plan

Findings: Non-compliance

Measures of Compliance:
1. Written policy and procedures for an infection control plan and policy following Center for Disease Control's recommendations.
2. Lesson plans/curriculum - evidence of training of all deputies, staff and inmates responsible for cleaning and disinfecting all medical and dental areas within OPSO.
3. Demonstration of knowledge of the policy and plan.
4. Observation.
5. Inmate interview, inmate grievances.

Observations:

The OPSO Sanitarian is a member of the OPSO Infection Control Committee. He reported that the committee meets monthly. Again, as noted in the previous report, no copies of the meeting summaries were provided to demonstrate meetings were actually held and what actions were taken OPSO has not developed an infection control policy to protect both inmates and staff. The Policy, once drafted



through the policy development process  will need to be reviewed  by the Monitors
and the Plaintiffs.  The Monitors also want to review the training curriculum and
qualifications of trainers prior to any training provided. OPSO also provided a copy
of CCS Policy B-01 Infection Control with a date of issuance of February 23, 2015.
The Medical Monitor will address the CCS Policy in his report.  Once the policy is
implemented, OPSO housing unit deputies, supervisors, and sanitation officers will
need training.

## IV. D. 2. Environmental Control

## IV D. 2. a. Electrical Panels

Findings: Substantial Compliance

Measures of Compliance:
1. Written policy and procedure.
2. Evidence of implementation of the Provision in accordance with the National Electrical
   Code.
3. Maintenance of pending work order list showing the purchase order for pending work
   order regarding electrical panels.
4. Observation of practice.
5. Observation of facilities' conditions.

Observations:

There is no change from the previous report.  All electrical panels at OJC are
located in secure areas inaccessible to inmates.  The interim Facility Maintenance
Manager stated that since opening OJC there have been no incidents of broken or
missing electrical panels.  The work order system schedules and tracks all work
orders.  During the tour the Monitor did not identify any panels in need of repair or
replacement.

Both Policy 601.02 "Reporting and Addressing Maintenance Needs" and
Policy 601.03 "Preventive Maintenance" and were implemented on August 15, 2016
and are being implemented.



**IV. D. 2. b. Maintenance of Electrical Panels, Etc.**

Findings: Partial Compliance

Measures of Compliance:
1.   Written policy and procedure for preventative maintenance and repairs for electrical issues.
2.   Evidence that all repairs are completed in accordance with the National Electrical Code.
3.   Evidence that all repairs are completed within a reasonable time to assure that inmates and staff are not exposed to hazards that could cause injury.
4.   Observation of conditions.

<u>Observations:</u>

Electrical repairs are scheduled when work order requests are entered in the work order request system established in Policy 601.02, "Reporting and Addressing/Repairing Maintenance Needs."

On this tour, the Monitor identified electrical issues only at the laundry located in the House of Detention (HOD). They included exposed wiring, non-functioning wall sockets, and excessive use of extension cords on wet floors which can create electrical shock and injury hazards for both laundry deputies and inmate workers assigned there. A fire safety inspection by the State Fire Marshall needs to be completed immediately or identify and implement an alternative to using the existing facility immediately.

<u>New Recommendation:</u>

80.   Either repair all electrical and fire safety hazards in the HOD laundry immediately or cease using the House of Detention as the laundry.



## IV. D. 3. Food Service

## IV. D. 3. a. Training

Findings: Non-Compliance

Measures of Compliance:
1.    Written policy and procedure.
2.    Development of a training syllabus for annual training for food safety and hygiene.[2]
3.    Evidence of Food Service Manager Certification in accordance with Louisiana Retail Food Regulations.
4.    Evidence of training of food service staff and inmate workers.
5.    Demonstration of knowledge by the food service staff and inmates.
6.    Observation.
7.    Inmate interviews, inmate grievances.
8.    Health Department inspection reports.

<u>Observations:</u>

Currently OPSO has not initiated development of any food service policies governing the requirements of this paragraph.  Since the last tour OPSO finalized a contract with a new food service contractor, CBM.  They began providing meals to inmates on March, 1, 2017.  As a result, no evidence of training for deputies assigned to the kitchen or inmate workers was provided and no evidence of training for CBM employees was provided prior to the tour.   Upon questioning, the Contractor will be responsible for training of inmate workers.

Touring the kitchen facilities, the Monitor observed uncontrolled kitchen tools and cleaning tools (brooms, dust pans, mops etc. and inmate workers not being directly supervised while using them.   OPSO has drafted Policy 1001.06, "Control of Kitchen Sharps, Utensils, and Sanitation Implements".  The Monitor has reviewed the draft and provided comments. It has not been implemented.  OPSO provided a copy of the sign-in/out sheet for tools for the day.  The Monitor's review showed that not all tools were signed out or in.  In addition to the sign out/in logs, OPSO needs to maintain an inventory of all kitchen tools including cleaning tools in the area where they are stored.  The inventory needs to be taken at the beginning and end of each shift.

In previous tour chemicals were being controlled.  However, on this tour the Monitor identified that chemicals were not being regularly inventoried by OPSO.



While the inventory of chemicals may be the responsibility of the food service contractor for ordering purposes,  OPSO has a responsibility to inventory chemicals at the beginning and end of each shift,  as chemicals can present a security risk to inmates and staff.  This may be the result of the transition to a new food service contractor and a new OPSO K/W manager, who had not been trained as to her responsibilities prior to the assignment; not having any implemented food service policies; and/or insufficient supervision from OPSO management.   The K/W manager deputy does not maintain a copy of the current contract from which to oversee contractual responsibilities.   The OPSO Food Services Manager must have the tools necessary including written policies, procedures, list of responsibilities and management oversight to manage food service effectively.

OPSO stated they have an existing policy 1601.4 that addresses the qualifying process . The Monitor has not reviewed that policy also continues to need to develop and implement a documented process for qualifying inmate workers for assignment in food service that includes health screening and approval by medical providers.

New Recommendations:

81.     Reinstitute an accurate inventory and sign-in/out process for chemicals and tools.

## IV. D. 3. b. Cleanliness

Findings: Non-Compliance

Measures of Compliance:
1.     Written policy and procedure for the cleaning and sanitization of all food service equipment following the equipment manufacturer's specified cleaning instructions.
2.     Maintenance of a documented cleaning schedule for equipment and areas including kitchens, storage areas, ware washing, refrigerators and freezers with assigned responsibility for oversight.
3.     Visual evidence of effective cleaning and interviews with staff and inmates on cleaning procedures
4.     Evidence of a cleaning log for all equipment and observation of practice meeting the policy/procedures.
5.     Inmate worker interviews.
6.     Health Department inspection reports.



<u>Observations:</u>

See observations and recommendations above and from Compliance Report # 6.

The OPSO Policy Tracking Log shows there is proposed, but not drafted a policy 1001.05, "Food Service Inspections and Reviews."  OPSO did provide copies of seven "internal inspections" completed between October 11, 2016 and February 17, 2017 to demonstrate OPSO oversight of the food service operation.  The reports were signed by the Sanitarian, the OPSO kitchen manager, and the contractor's food service manager.  To each report was attached a status note of each violation stating the steps taken to resolve identified deficiencies such as work orders submitted, getting a work quote, etc.  However, the reports do not reflect that the corrective actions were completed and the issue resolved or closed.  With the number of continuing repeat violations listed, there appears to be a lack of management oversight to assure corrections.  The Sanitarian needs to review the reports with OPSO management.  OPSO needs to recognize the value of the internal inspections especially considering there has been no regulatory inspection of the K/W since March 2016 (The only regulatory inspection report provided was for the Re-therm kitchen at OJC (completed February 27, 2017).  However, lack of timely follow-up and resolution by OPSO staff to the deficiencies identified is indicative not maintaining staff trained with the skills necessary to manage a foodservice program in compliance with any State regulations.  The risk is whether inmates can continually be assured safe meals.  Having a qualified foodservice contractor is one key to success, but that must be overseen by trained competent OPSO staff to assure the contract provisions are being met and policies and procedures, once developed, are followed consistently.

The Monitor toured the K/W.  The food preparation areas continued to be maintained clean.  However, several food service equipment items again were found inoperable and needed repairs.  Work orders have been filed, but there is considerable delay in getting and installing parts.  OPSO needs to consider retaining a maintenance contract for food service equipment repairs and parts so the contractor can utilize the equipment for food production.  OPSO needs to assure that



102

all equipment used is operated and maintained in accordance with the equipment manufacturer's recommendations and is included in the "Facility Dude" preventative maintenance schedule.

The contractor maintains a cleaning plan and schedule for all equipment and appears to follow the equipment manufacture's recommendations for cleaning and sanitizing.

## IV. D. 3. c. Record Keeping/Temperatures

Findings: Partial Compliance

Measures of Compliance:
1.  Written policy and procedures for measuring and recording temperatures of all refrigerators, freezers, hot food holding equipment, wash and rinse temperatures of ware washing equipment, in accordance with the Louisiana Food Regulations.
2.  Development and implementation of temperature logs demonstrating effective measurements as required in this provision and/or the Louisiana Food Regulations.
3.  Review of logs and direct observations of measurements being taken and recorded.
4.  Observation of conditions.

<u>Observations:</u>

As stated previously OPSO maintains no written policies or procedures for foodservice that incorporate the requirements of this paragraph.  Prior to the compliance tour, OPSO again provided copies of the daily cooler temperature logs for all refrigerators that were completed by OPSO staff assigned to the kitchen from October 2016 through January 2017, along with the previous foodservice contractor's temperature logs for the same time period.  OPSO also provided temperature logs for the warewashing machine for the same time period.  The logs were properly completed and The Monitor found no systemic issues the process or with equipment based on the log reports. Since the previous tour, the Monitor received copies of several grievances from inmates regarding cold food for a hot meal, poor quality, lack of adequate food, and officers not providing replacement trays.  That said, in questioning several inmates during this tour, they generally said that meals were significantly improved over the last couple of weeks.  The Monitor did not see any food grievances since the change in foodservice contractor.



OPSO stated that the new foodservice contractor is planning to change the meal preparation process from cook/chill/re-therm to cook/serve.  As a result, OPSO will no longer be using the re-therm kitchens at OJC.  This will now require that OPSO Policy 1001.03, "Meal Service – Inmates, implemented April 5, 2017which specifies how meals will be provided to inmates will need to be revised to reflect the new process. The proposed change will significantly increase the time needed to transport meals from the K/W to OJC and at TDC (when it re-opens) and ultimately make it more challenging to maintain hot food "hot" and cold food "cold".  The Monitor strongly urges OPSO and CBM develop and test the delivery system times from the K/W to all serving areas to assure inmates will receive hot meals that are hot at service in the pods well before implementation of the cook-serve process. The Monitor is available to work with OPSO to review the process and assist as necessary.

New Recommendation:

82.     Provide the Monitor with the process that is developed to transport food along with the results of the testing of the revised process.

## IV. D. 4. Sanitation and Environmental Conditions Reporting

## IV. D. 4. a. (1) – (7) Periodic Reporting

Findings: Partial Compliance

Measures of Compliance:
1.     Written policy and procedure governing reporting.
2.     Evidence of written report provided as specified in the provision.

Observations:

OPSO has developed Policy 101.04, "Administrative Reporting Requirements."   The Director of Facility Maintenance, along with the assistance of the Monitor, developed an initial reporting format for Sanitation and Environmental Conditions that was used for the two reports during 2015 and the first report for 2016.  The format was revised by the Monitor for the reporting period for the last six months of 2016 to provide more specific data by pod for OJC and for the K/W. If TDC reopens, the format will need to be amended again.



OPSO's latest report includes data collected from July-December 2016.  OPSO did not use the report form to collect the data.  The data submitted did not address the provision and was incomplete.  There was no grievance data provided including environmental issues or meal service; while the number of health department violations was provided, there was no summary of the types of violations provided as specified in the paragraph.  There was no mention in the report of any corrective actions taken by OPSO as a result of the report or whether there had been a follow up inspection by the Regulatory Agency.  Staff reported that there had been no inspection by the Louisiana Department of Corrections since the previous tour.  There is no evidence of management review of the data and as such does not provide much information that could improve policies, procedures, training and practices.

OPSO needs to review the paragraph and assure that the data provided follows the reporting requirement.

The spreadsheets need to be included in a governing policy/procedure that establishes who is responsible to review the report.  As part of this reporting process OPSO, needs to include the number of inmate grievances filed and resolved for environmental conditions.

## IV. D. 4. b. Review of Inmate Grievances

Findings:  Non-compliance

Measures of Compliance:
1. Written policy and procedure governing reporting on environmental conditions.
2. Evidence of a review of the sanitation and environmental conditions report by staff responsible for implementing policies and procedures for food service, blood borne pathogens, chemical control, sanitation, and preventive maintenance.
3. Evidence of written audits of the facilities.
4. Evidence of command staff review.  Determination by OPSO that the implemented policies and procedures are effective to address the provisions of this Agreement.
5. Evidence of effective Corrective Actions are taken to address non-conformities identified during the review process.
6. Changes to policy, training curriculum, etc. resulting from these reviews.

Observations:

There is no change in compliance from the previous report.  There is no implemented policy or process governing the elements of this paragraph.  There is



no evidence of management review of the information collected and any analysis of type of data being collected and how the data could benefit operations.  For example

- how did the environmental inspections benefit or improve the operation?
-  Did the inspections have any purpose other than to say, "we did an inspection"?
- What changes, if any are proposed for policies, training, or procedures?
- What is the assessment of inmate grievances regarding environmental conditions?
- The report provided to the Monitor provided was merely a summary of activities during the reporting period provided by the person that preparing the report.



## IV. E.   Fire and Life Safety

## IV. E. 1. a. Fire and Life Safety Equipment

Findings: Partial compliance

Measures of Compliance:
1. Written policy and procedure governing the procedures and staff responsibility and accountability assigned for a minimum of quarterly inspections, repair and/or replacement of all fire and life safety equipment, included in the controlled document inventory.
2. Inspections shall be completed by competent fire inspector having at a minimum successfully passed "Fire Inspector II" training and examination in accordance with NFPA 1031, Professional Inspector Level II Qualifications and all requirements of the Office of the Louisiana State Fire Marshall.
3. Development and maintenance of a complete inventory of all fire and life safety equipment for each facility.  The list needs to include, but not limited to sprinkler heads, fire alarm pull boxes, smoke detectors, fire suppression systems, fire extinguishers, defibrillators, SCBA equipment and etc.
4. Annual master calendar for all internal and external inspection of all fire and life safety system equipment.
5. Development of a facility specific audit form that demonstrates the date of completion of inspection, identification of all non-conforming equipment, along with a corrective action report form that can demonstrate that effective corrective action was taken for all non-conformities.
6. Lesson plans/curriculum for staff assigned as auditors/inspectors.
7. Execution of contract with a qualified contractor to perform the inspections specified in this provision.
8. Evidence of a completed, signed, and supervisory review of all inspection and testing reports, along with documented corrective actions taken to resolve identify issue on non-conformance.
9. Fire Department inspection reports.
10. Interview with Fire Department officials.

<u>Observations:</u>

According to the Policy Tracking spreadsheet provided by OPSO prior to the tour Policy 701.01 "Emergency Equipment Inspections and Testing" is drafted and is pending review and comments from the Plaintiffs.  The Monitor completed his review in December 2016.  OPSO provided the most current copy.  The draft policy includes a list of all fire and life safety equipment to be inspected, the assigned responsibility (either contractor or Fire Safety Officer) and the inspection/testing frequency.  The list includes all smoke detectors, fire alarm pull stations, fire alarm annunciation systems, smoke evacuation systems (kitchen/warehouse) sprinkler systems, fire pump, emergency keys/locks, kitchen hood automatic fire suppression equipment and automatic exterior defibrillators (AEDs).  The Fire Safety Officer is



responsible for assuring all inspections are completed in accordance with the inspection/testing frequency specified in the Policy.

The OPSO Fire Safety Officer is implementing the draft policy, as written. OPSO maintains contracts with licensed contractors to conduct annual inspections of all fire and life safety equipment.  OPSO provided copies of the most recent inspections of the kitchen/hood inspections completed December 27, 2016; fire alarm testing for K/W, completed November 7, 2016 and OJC completed September 27, 2016; fire sprinkler system inspection for OJC completed September 21, 2016 and the K/W completed in early November 2016; and fire extinguisher inspections for OJC completed January 26, 2016, K/W completed January 11, 2017, McDaniels completed January 1, 2016, and TDC completed September 5, 2016.  OPSO provided a current copy of the fire extinguisher inventory for both OJC and Kitchen/Warehouse (K/W).  All reports demonstrated acceptance with the National Fire Safety Code requirements.

OPSO provided copies of the annual Louisiana State Fire Marshall inspection of OJC and McDaniels completed on August 3, 2016 with a follow-up inspection at OJC completed on November 2, 2016.  All were accepted.  The only "cautionary" status listed was from too much combustible material found in pods of OJC.

OPSO provided copies of both all quarterly inspections conducted by the Fire Safety Officer for both K/W and OJC for the 3rd and 4th quarter, 2016 and the first quarter of 2017.  The reports were complete and corrective actions initiated for any violations.  The Consent Judgment requires quarterly inspections of all "necessary fire and life safety equipment is properly maintained and inspected at least quarterly."

When OPSO Policy 701.01 is implemented, and as long as the inspections continue to be completed in accordance with the policy, this provision will be substantially compliant with the paragraph.



## IV. E. 1. b.  Monthly Inspections

Findings: Partial Compliance

Measures of Compliance:
1.    Job description/post orders, including qualifications for a fire safety officer in accordance with NFPA requirements for a "Certified Fire Inspector Level II"
2.    Written policy and procedures including evidence of attendance at any and all 3-year certification seminars for certification renewal or current license from the Office of the State Fire Marshall
3.    Also include measures 3, 4, 5, 7 of IV.E.1.a.
4.    Review and observation of completed reports and corrective actions taken.
5.    Interview with fire safety officer.

<u>Observations:</u>

As reported above OPSO Policy 701.01 is drafted and awaiting review and comments from the Plaintiffs.  Copies of forms used for the monthly inspections are attached to the Policy as appendices.  The Policy establishes that implemented Safety Sanitation Deputies (DDAs) are required to conduct monthly inspections of facilities in compliance with the provision.  In their absence, the Fire Safety Officer (FSO) shall conduct the inspections/tests.  The monthly reports are provided to the FSO review all monthly inspections.

OPSO Policy 601.03 Preventive Maintenance (implemented August 15, 2016) establishes that Facilities Maintenance (FM) shall test all life safety equipment and systems in accordance with National Fire Protection Association (NFPA) and/or Authority Having Jurisdiction (AHJ).  FM conducts required monthly full load generator testing monthly. The monthly test reports are provided to the FSO.

As of this tour SSDs has not been appointed. As a result, the monthly fire safety inspections are completed by the FSO.  OPSO provided copies of the monthly reports for OJC and K/W from September 2016 through February 2017.  The monthly inspection reports are reviewed with the Warden who is required to discuss any identified violations with the watch commanders and directs them to provided priority attention of any identified deficiencies.  The reports are maintained by Fire Safety Officer.  The reports provided to the Monitor were thorough and when deficiencies were identified, follow-up inspections were completed.  Copies of the follow-up inspections were provided. All reports were



signed by the inspector and by the ranking officer of the facility.  No evidence was provided demonstrating a review of the report by the Warden or the watch commanders.  Touring the facility found numerous examples of uncontrolled excess flammable material maintained in housing units including newspaper, uncontrolled commissary items, legal materials, etc.  Control of flammable material is the responsibility of the pod deputies and supervisors.  Once Policy 701.01 is implemented, the SSDs trained to administer their assigned responsibilities and the Monitor can verify all the requirements of the policy pertaining to this provision are met. The provision will become substantially compliant.

### IV. E. 1. c. Fire Drills

Findings: Partial Compliance

Measures of Compliance:
1. Written policy and procedures governing staff responsibilities and accountability for conducting fire drills within each facility in accordance with the provision.  The policy shall include applicable drill reports that outline at a minimum start and stop times of the drills and the number and location of inmates who were moved as part of the drills, a review process for each drill that identifies the root cause and verification of effective corrective actions as necessary for non-conformities with the fire safety and evacuation plan(s)
2. Development and implementation of  fire drill audit form(s)
3. Annual schedule of drills for each facility; demonstrating rotating drills to assure all areas are drilled at a specified frequency.
4. Observation of drills and/or drill reports.
5. Evidence of collaboration with the NOFD; interview with NOFD.
6. Interviews with inmates.

Observations:

Policy 701.06 "Emergencies – Fire/Smoke Events" was implemented May 23, 2016.  It requires, "Staff knowledge and response are tested during monthly level 1 and quarterly level 2 fire drills conducted by the fire safety officer and/or safety and sanitation deputies.  Drills are required to be conducted in all facility locations, and on every shift including the kitchen, warehouse, and administrative areas. Additional fire drills may be held at the discretion of the fire safety officer and/or as indicated when staff are unfamiliar with drill procedures or unable to successfully respond during fire drills.  It further requires, "Fire/smoke event emergency plans



for OPSO facilities shall be reviewed by the New Orleans Fire Department (N.O.F.D.) and written approval provided to OPSO."

OPSO Policy 401.05, "Fire/Smoke Event and Evacuation Training and Drills, implemented October 14, 2016 establishes that level 1 fire and evacuation drills are required to be conducted on all shifts at least once each month and level 2 fire and evacuation drills be conducted quarterly.   The Policy further defines the elements of a Level 1 and Level 2 drill.  Appended to the Policy are the fire drill report forms to be used.

Prior to the tour OPSO provided copies of a quarterly fire drill evaluation report for OJC completed February 14, 2017 and for Kitchen/Warehouse completed March 3, 2017 on one shift.  Both reports recorded the number of inmates and staff moved.  Start and end time were recorded and the drills were reviewed with management staff at the facilities.  The report format is thorough and self-critical, and documents what occurred, who was involved in the drill and the time to move the inmates to the designated safe refuge area.  Once drills are completed on all shifts and more frequently, OPSO will be able to measure the effectiveness of the training started in 2016 and continuing in 2017.  Monthly Level 1 drills have not started or quarterly drills are not conducted on all shifts.

While the provision requires drills every six months, it is the policy of OPSO to conduct at least quarterly drills on each shift.  While staff shortage is claimed as the reason for not conducting drills on all shifts, it should be more the reason to conduct drills.  In addition to OJC and the Kitchen/Warehouse, drills need to be completed at McDaniels and at the House of Detention Laundry as long as it continues to be used by OPSO staff and inmate workers.  Evidence needs to be provided to demonstrate acceptance of the evacuation plans for fire safety by the NOPD.

"Draft Policy 701.05, "Emergencies – Evacuation" was initially drafted November 13, 2015.  The Monitor provided comments and suggestions on December 21, 2015.  It was revised several times but is not yet implemented. The draft policy requires an evacuation plan using the "all hazards" approach and needs to include review and acceptance in accordance with New Orleans Emergency



Response Plan and Louisiana Emergency Response organization. Once the policy and plan are completed, training provided and all required procedures implemented, this provision will become substantially compliant.

As part of the semi-annual review of fire safety provision established in Provision IV.E.2.a (1) -(3), OPSO needs to review the drills and document the outcomes, lessons learned and recommendations – to improve initial and annual in-service training, and improve operational practices.

## IV. E. 1. d. Competency-Based Training

Findings: Partial Compliance

Measures of Compliance:
1.   Development and implementation of a competency-based training policy for all correction staff on safe and effective use of all fire and emergency equipment, firefighting, safe evacuation.
2.   Development and implementation of a fire and emergency practices and procedures training course syllabus/outline, along with a written exam that measures the competency of the corrections staff for the fire safety and evacuation plan and establishes an acceptable passing score.
3.   Written directive regarding how OPP will identify each officer and staff who is required to receive training, the training date, name of officer/staff trained.

Observations:

OPSO Policy 401.05, "Fire/Smoke Event and Evacuation Training and Drills" was implemented on October 14, 2016. It requires OPSO to provided competency-based fire safety and evacuation training annually to deputies assigned to OPSO detention facilities. Additionally it requires civilian employees, including OPSO contractors and volunteers be provided basic fire safety protocols and training consistent with their job responsibilities during a fire/smoke event or evacuation emergency.

The Fire Safety Officer previously provided a copy of a training syllabus and curriculum for facility Safety Sanitation Deputies (SSDs) to the Monitor for review. It is well written and in accordance with 401.05 and 701.06. It is planned that the SSDs will go through 24-hour train-the-trainer program. They, in turn will train the rank and file officers in an 8-hour class. As indicated earlier in this report, the SSDs have not been selected or appointed primarily due to staff shortage. OPSO has



removed SCBA units. OPSO  provided a copy of the fire safety training lesson plan including the pre-and post-test instruments for all staff prior to the previous tour. OPSO is considering the elimination of the SCBA units that will change the annual training. OPSO has provided a copy of the fire safety training lesson plan including the pre-and post-test instruments for all staff prior to the previous tour.  At the last tour OPSO provided sign-in sheets 17 fire safety and response classes held for 119 deputies held from February 29, 2016 through July 18, 2016. In the pre-tour documents for this tour OPSO provided copies of sign-in sheets and post-test scores for 11 additional classes held for 192 deputies completed from August 20, 2016 through February 24, 2017. This is a significant improvement from the previous report.

However, because of staff retirements and resignations the Fire Safety Officer estimates that currently about 51% of staff has completed training.

## IV. E. 1. e. Emergency Keys

Findings: Partial Compliance

Measures of Compliance:
1.  Written policy and procedures regarding staff responsibility and accountability for the systematic marking of all emergency keys, including sight and touch identification and designated locations for quick access for all keys.  All policies and procedures are to be reviewed and updated as necessary and at least annually on a schedule.
2.  Implementation of the policy and procedure
3.  Documented evidence of officer and staff training on the policy and procedure.
4.  Observation of keys.
5.  Observation of staff utilizing keys.

Observations:

There is currently no implemented OPSO policy that addresses emergency keys.  OPSO draft policy 801.35 "Key and Key Card Control" dated September 26, 2016 is developed and was submitted to the Monitor for review in June 2016. Monitor's comments were provided.  However as of the tour the draft is awaiting. Section E establishes the provisions for emergency keys for all facilities and their use.  As currently drafted, the policy does not include a provision for at least quarterly testing of the keys or a requirement for training of identified staff in their use.



In practice the emergency keys for OJC are securely located in a fingerprint access control box located just inside the secure entrance.  The keys are identifiable by sight and by touch.  Glow sticks are attached to each key ring.   The emergency keys and locks have also been color-coded by floor and the doors they open. Since the last tour the door locks are also color coded with an iridescent paint dot that matches the color coding on the keys.

The Fire Safety Officer has developed a "Fire Packet" that contains key location, floor plans, and contact numbers of essential OPSO personnel to be provided to the responding New Orleans Fire Department in case of fire or other emergency.  A list of the location of the emergency keys is part of the packet.

The quarterly Safety Inspection Report form requires the Fire Safety Officer to verify that emergency exit keys are properly marked and securely stored and the emergency exit locks are tested and operational.  Emergency key testing is currently completed at all fire drills for all locks in the area of the drill for emergency evacuation.  Training for staff on the use of emergency keys is currently included in the fire and life safety training provided to all staff.

When the policy is implemented and the evidence is provided that demonstrates the requirements of the provision are implemented the provision will become substantially compliant.

## IV. E.2 Fire and Life Safety Reporting

## IV. E. 2. a. (1) – (3)  Periodic Reporting

Findings: Partial Compliance

Measures of Compliance:
1.   Written policy and procedure governing required reporting.
2.   Evidence of written report provided as specified in the provision.

Observations:

There is no change to this provision from Compliance Report # 6.  As of this compliance tour no policy has been developed that governs the requirements of the paragraph or assigns responsibility or parameters for either supervisors or fire safety officers to routinely inspect all housing areas to identify fire hazards or a summary report meeting the requirement of the provision.  This is required.



114

OPSO did provide prior to the tour a report of the number and type of violations identified by fire and life safety inspectors and the violations identified by the State Fire Marshall inspections, along with reinspection results.  As reported earlier, OPSO also provided copies of all internal monthly and quarterly fire and life safety inspections and copies of two fire drill evaluations.

## IV.  E.  2.  b. Addressing Deficiencies

Findings: Non-Compliance

Measures of Compliance:
3.      Written policy and procedure governing required reporting.
4.      Evidence of reviews of the fire and life safety conditions report by staff responsible for implementing policies and procedures.
5.      Evidence of written audits of the facilities.
6.      Evidence of command staff review.  Determination by OPSO that the policies and procedures are effective to address the requirements of this Judgment.
7.      Documentation of Corrective Actions taken to address non-conformities identified during the review process.
8.      Changes to policy, training curriculum, etc. resulting from these reviews.
9.      Review of Fire Department reports/inspections; interviews with NOFD.

<u>Observations:</u>

See above provision regarding policy required. There was no fire safety inspection and action policy implemented governing the requirements of the paragraph.

OPSO Fire Safety Officer provided evidence of corrective actions taken as a result of the quarterly internal and annual external inspections by the Fire Marshall and fire and life safety inspection and testing contractors.  OPSO needs to have more fire drills completed to assess the effectiveness of the recent fire safety training initiative.  The Monitor suggests OPSO conduct a post-training evaluation by the participants as one method to gauge needed changes to the training curriculum or methods.   There was no evidence provided that OPSO management staff reviewed the fire and life safety reports to assure the requirements of the Agreement are being met.  OPSO provided no evidence of changes in policy or training based on the review.



**IV. F.      Language Assistance**

Findings:
IV.F.1.a. - Partial Compliance
IV.F.2.a - Not Applicable
IV.F.2.b. - Not Applicable
IV.F.3.a. - Partial Compliance
IV.F.4 -Non-compliance

Measures of compliance:
1.      Comprehensiveness of policy
2.      Training,
3.      Review of inmate files
4.      Interviews

<u>Observations:</u>

OPSO's policy on Language Assistance (801.25) was effective in March 2016. OPSO indicates that training has not taken place and plans to train in the near future.

The contract for the "language line" providing translation services for the jail is held by the City.  OPSO requested the data from the City regarding the use of the language line during the last six months and this information was not provided. This collaboration needs to be established so that OJC and the Monitors can evaluate compliance.

Section IV.F.1.a. remains in partial compliance, and there has not been steady progress regarding the provisions for bi-lingual staff or a robust response the Limited English Proficient inmates in accordance with Federal guidelines.

Both paragraphs IV.F.2.a. and 2.b. are not applicable as the jail does not hold DHS/ICE inmates solely on those holds.

Paragraph IV.F.3a. remains in partial compliance only because the policy is completed.  There has been little activity to operationalize the policy or the requirements of this section.

Regarding paragraph IV.F. 1. a. (4) – the parties agreed that this evaluation could be annual, not monthly.  The data about language preference of inmates is collected at intake and a report was provided.



## IV. G.   Youthful Prisoners

Findings:  Non-compliance

Measures of Compliance:
1.      Written policy/procedures governing classification and housing of youthful inmates, including but not to sight/sound separation, provision of services, protective custody, education and other services, services for youthful inmates with mental illness or who are developmentally disabled, access to medical and mental health services.
2.      Housing plan; classification plan.
3.      Observation
4.      Interview with youthful inmates.
5.      Review of recreation and program schedules.
6.      Review of inmate files (developmentally disabled, mental illness)
7.      Review of housing unit logs, program schedules.

Observations:

There has been no progress toward establishing a credible program for youthful offenders that is 'developmentally appropriate'.   The Monitors have requested the information noted above, and have not received a response that indicates that there is any documented relevant programming.

The Monitors note that the Compliance Director has contracted with Dr. Mary Livers to develop and implement a program.  We anticipate that this provision of the Consent Judgment will be fully compliant by the next tour and Dr. Livers has the Monitors full confidence.

## VI.   A – D. The New Jail Facility and Related Issues

A.      New Jail

The Orleans Jail Center opened for inmates on September 15, 2015.

Finding – Substantial Compliance

B.      Design and Design Document

Finding – Substantial Compliance

C.      Defendant shall consult with a qualified corrections expert as to the required services and staffing levels needed for any replacement facility.  OPSO shall complete a staffing study to ensure that any new facility is adequately staffed to provide prisoners with reasonable safety.

Finding – Partial Compliance



117

OPSO has engaged a consultant to conduct a staffing analysis.  OPSO generated their own staffing analysis, using the NIC model (2nd edition) following the opening of the new jail.

As noted elsewhere in this report, no matter the outcome of the staffing study/analysis, the facility is currently understaffed, posing an on-going risk of harm to all inmates and staff.

D.    Compliance with Codes and Standards

Finding – Not evaluated.

The Monitor's do not have the knowledge base to evaluate compliance with this paragraph.

## VII.  Compliance and Quality Improvement

## VII. A. Policies, Procedures, Protocols, Training Curriculum and Practices

Finding:    Partial Compliance

Measures of Compliance:
1.    Policies and procedures manual.
2.    Process/spreadsheet to identify all existing and planned written directives, dates when expected to be submitted for Monitors' review.

Observations:

The work has not been completed.   There is a schedule; but 42 months into this process the work is not done.  Few, if any, training curriculum have been provided for review.

## VII.(H). B.  Written Quality Improvement Policies and Procedures

Finding:     Partial compliance

Measures of Compliance:
1.    Written policy/procedure governing quality improvement.
2.    Written report.
3.    Results of action plan from written report.

Observations:

An administrative reporting directive was finalized on November 30, 2016.  Quarterly reports continue to be submitted.  The quality improvement process is in its



early stages.  Future reporting will determine substantial compliance with this
provision.  No reports based on the policy have been reviewed to date by the Monitors.

### VII.  (I). C. Full-Time Compliance Coordinator

Finding:  Substantial Compliance.

Observation:

Capt. Bryan Peters is identified as the OPSO full-time compliance coordinator.

### VII.  (J.) D. Self-Assessment

Finding:        Partial Compliance

Observations:

Partial compliance is indicated as OPSO has provided  reports as required by
the Consent Judgment (and the scheduled approved by all parties).    As with the
Quality Improvement program, this is in the early stages of implementation.  As
noted in this Compliance Report, these assessments are not always accurate. J.
Reporting Requirements and Right of Access

### VIII.  Reporting Requirements and Right of Access

### VIII. A. Periodic Compliance Reporting

Finding:        Partial Compliance

Observations:

Reports are provided on schedule, but lack depth and insight into how the
OJC will come into compliance.  There is no summary as required above (VII. (J.) D.
The remedial action plans required by the June 2016 Stipulated Agreement do not
include the information required by the Stipulated Agreement.

### VIII. B.  Death of Any Prisoner

Finding:        Substantial Compliance

Observations:

Notifications are provided.  Better communication is needed regarding post-death
investigations between OJC and the Monitors.



## VIII. C. Records

Finding:        Non-Compliance

<u>Observations:</u>

The Monitors do not always receive replies to inquires and/or request for records in the time frames specified in this paragraph.  See the discussion regarding section IV. A.6. Security Staffing. There are also several instances in which the Plaintiffs have not received responses to critical information about their clients. Improvements can include better communication between OJC and the requesting party.



### III.    Stipulated Agreements

The Orleans Parish Sheriff's Office (OPSO) and the plaintiffs (U. S. Department of Justice, MacArthur Justice Center) negotiated two agreements after Compliance Report #3. Several of these areas considered critical are not yet in compliance.

## Agreement/Order (2/11/15)

| # | Language | Due Date | Status | Notes on Compliance |
|---|----------|----------|--------|---------------------|
| **1.  OPSO Reporting on Compliance Status with the Consent Judgment** | | | | |
| 1.a. | At each of the scheduled Court status conferences, the Sheriff or his designee shall report to the Court regarding OPSO's compliance status with each section (e.g. Section IV.A, IV.B.) of the Consent Judgment.  This report shall include a summary of OPSO's progress since the immediate previously scheduled status conference, and will include in the reporting OPSO's planned actions in the next 60 days to come into compliance | 3/26/15 | Substantial Compliance | |
| 1.b. | OPSO shall comply with the Consent Judgment's requirement for periodic a compliance report as set forth in Consent Judgment Section VIII.A.[1] The report shall describe the steps OPSO has taken in furtherance of compliance, and the activities planned during the next reporting period.  The first report is due by April 1, 2015, and periodic reports shall be due in accordance with Section VIII.A, and/or on dates mutually agreed to by the parties and the Monitors, and approved by the Court, as necessary. | 4/1/15 Future TBD | Partial Compliance | A compliance matrix was submitted to the Monitors prior to the on-site.  This report is not in sufficient detail.  See also the Stipulated Agreement 6/21/16. |
| 1.c. | Within 24 hours of the occurrence of any of the following incidents, OSPO shall notify the Monitor via email:<br>• Death of an inmate/arrestee while held in custody (or housed in a hospital to which the inmate has been committed for care and remains in the | On-going | Partial Compliance | The Monitors continue to document that all incidents are not reported OJC leadership. |

---

[1] A.  OPSO shall submit periodic compliance reports to the Monitor.  These periodic reports shall be provided to the Monitor within four months from the date of a definitive judgment on funding; and every six months thereafter until termination of this Agreement.  Each compliance report shall describe the actions Defendant has taken during the reporting period to implement this Agreement and shall make specific reference to the Agreement provisions being implemented.  The report shall also summarize audits and continuous improvement and quality assurance activities, and contain findings and recommendations that would be used to track and trend data compiled at the Facility.  The report shall also capture data that is tracked and monitored under the reporting provisions of the following provisions:  Use of Force; Suicide Prevention; Health Care Delivered; Sanitation and Environmental Conditions; and Fire and Life Safety.



| # | Language | Due Date | Status | Notes on Compliance |
|---|----------|----------|--------|---------------------|
| | custody of OPSO; or whose injury occurred while in custody and was subsequently released from custody); <br>• An inmate's/arrestee's suicide, suicide attempt, aborted suicide attempt, suicidal intent, and/or deliberate suicide self-harm gesture as defined by the American Psychiatric Association; <br>• An inmate's allegation of sexual abuse, sexual assault, sexual harassment, or voyeurism whether the incident is between or among inmates, or between or among inmates and a staff/contractor or volunteer; <br>• An inmate's report, or a report by a staff/contractor or volunteer, of any inmate/inmate allegation of assault; or other inmate allegations of felonies occurring to them while in custody; <br>• An inmate's report, or a report by a staff/contractor or volunteer, of any allegation of use of excessive force by an employee, volunteer or contractor; <br>• Suspension or arrest of any OPSO employee, volunteer, or contractor for alleged criminal activities while on-duty and/or in a facility under the control of OPSO; and <br>• Recovery of significant contraband specifically weapons. | | | See also Consent Judgment VIII. B. |
| **2. Policies and Procedures (All Relevant Sections)** | | | | |
| 2.a. | By March 31, 2015, OPSO shall provide a schedule for the drafting and finalizing of all policies and procedures required under the Consent Judgment.  This schedule shall include:  deadlines to <u>simultaneously</u> submit drafts to, and receive comments, from the Monitor(s), and from the Plaintiffs and USDOJ ("Plaintiffs"). The Plaintiffs will also provide a copy of their comments to the Monitor.  In the event that the Monitor or the OPSO disagree with any comments or recommendations by the Plaintiffs, the Monitor will convene a conference call for the purpose of resolving issues. | 3/31/15 | Substantial Compliance | |
| 2.b. | The schedule shall identify the policies and procedures that are considered to be a priority including:  use of force, incidents and referrals, the early intervention system, inmate grievance process, and | On or before 3/31/15 | Substantial Compliance | |



| # | Language | Due Date | Status | Notes on Compliance |
|---|---|---|---|---|
| | inmate classification.   The drafts of these policies shall be submitted to the Monitor(s) for initial review on or before March 31, 2015.  Following receipt of the Monitors' comments, OPSO will make any necessary revisions, consult with the Monitor(s) as needed, and provide a final draft to the Plaintiffs to provide substantive comments to both OPSO and the Monitor(s). In the event that the Monitor and/or the OPSO disagree with any comments or recommendations by the Plaintiffs, the Monitor will convene a conference call for the purpose of resolving issues. | | | |
| **3.  Memoranda to Implement Substantive Provisions of the Consent Judgment** | | | | |
| 3. | Pending implementation of policies that implement the Consent Judgment, OPSO shall prepare a memoranda to all OPSO staff, contractors, and volunteers, as outlined in various provisions below.  For each provision, the memoranda shall delineate the responsibilities of staff, contractors and/or volunteers under the terms of the Consent Judgment as well as the required procedures for notification/action.  OPSO shall submit each draft memoranda to Plaintiffs and the Monitor no later than March 1, 2015. Plaintiffs and the Monitor will have three business days to comment on the draft memoranda. In the event that the Monitor and/or the OPSO disagree with any comments or recommendations by the Plaintiffs, the Monitor will immediately convene a conference call for the purpose of resolving issues.  Within seven business days of finalizing the memoranda based on the comments of the Monitor(s) and Plaintiffs, OPSO will assure that the memoranda is read at roll call on all shifts, in all facilities, and in all locations (e.g. medical) for three consecutive days. Discrete memoranda regarding similar topics noted in this Stipulated Order may be combined into a single memorandum. OPSO will maintain a written list of staff, contractors and volunteers present during the reading of the memoranda and will produce that list on request.  OPSO will also post any memoranda in places where roll calls are held, locker rooms, and other | 3/1/15 | Substantial Compliance | Provided in final 2/24/15; completed.<br><br>See also Consent Judgment VII. A. |



| # | Language | Due Date | Status | Notes on Compliance |
|---|---|---|---|---|
| | non-inmate areas where staff may view the information. | | | |
| **4. Use of Force Reporting** | | | | |
| 4.a. | OPSO shall issue a memorandum to OPSO staff and contractors regarding their obligation to report uses of force for inmates under the legal care, custody and control of OPSO and in any facility operated by OPSO, and including in vehicles, hospitals, during transports, and in court holding areas.  The memoranda will outline the requirements and timelines for reporting. | 3/1/15 | Substantial Compliance | Completed 2/24/15<br><br>See also Consent Judgment IV.A.3.a. |
| 4.b. | OPSO shall issue a memorandum to staff and contractors that all incident reports regarding a use of force will contain all Consent Judgment-required elements as outlined in § IV.A.3.b-c, e.  The memorandum will be issued in accordance with the terms specified in Item 3 of this Stipulated Order. | 3/1/15 | Substantial Compliance | Completed 2/24/15<br><br>See also Consent Judgment IV.A.3. |
| 4.c. | OPSO shall issue a memorandum to Watch Commanders and to Wardens to ensure that Watch Commanders and Wardens' reports contain all elements required under the Consent Judgment, as outlined in § IV.A.3.d.f.   The memorandum will be issued in accordance with the terms specified in Item 3 of this Stipulated Order. | 3/1/15 | Substantial Compliance | Completed 2/24/15<br><br>See also Consent Judgment IV.A.3. |
| **5. Early Intervention Systems** | | | | |
| 5.a. | By February 15, 2015, OPSO shall identify the names of the members of the Use of Force Review Board to the Monitor and the Plaintiffs/USDOJ. | 2/15/15 | Substantial Compliance 4/10/15 | See also Consent Judgment IV. A.4.b. |
| 5.b. | Commencing March 1, 2015, OPSO will make available to Monitors, at the Monitors' request, the quarterly reviews conducted by ISB and the command staff regarding the operation of the EIS system, including supporting documentation reviewed, as delineated by Section IV.A. 4.b., c., d., and e. of the Consent Judgment. | 3/1/15 | Substantial Compliance | See also Consent Judgment IV. A.4.c. |
| **6. Safety and Supervision** | | | | |
| 6.a. | By February 15, 2015 in order that the housing for youthful offenders is continually staff by a deputy will assure that a deputy is working on every shift, on every day to on the unit housing youthful offenders.   This deputy may not be assigned to other tiers or other responsibilities, and shall be periodically relieved by another deputy and/or | 2/15/15 | Non-Compliance | Documentation that youth tier is not staffed on consistent basis. See also Consent Judgment IV. G. |



| # | Language | Due Date | Status | Notes on Compliance |
|---|----------|----------|--------|---------------------|
| | supervisor.   The evidence of compliance with this document will be the staffing assignments each day, each shift for the facility in which youthful offenders are held, and samples of the log books from that unit. | | | |
| 6.b. | OPSO shall ensure by May 15, 2015 that all staff assigned to the housing for inmates with acute and chronic mental health (in Templeman V, TDC, or other housing in which this population is held) attend training regarding working this population.  The lesson plans/curricula for this training shall be reviewed and approved by the Monitors.   The draft of the training curriculum and training plan is due to the Monitors by April 15, 2015, and should include participation by subject matter experts employed by the medical contractor. | 5/15/15 | Partial Compliance | Training materials provided for suicide prevention; but not for staff assigned to mental health housing.<br><br>See also Consent Judgment IV.B.4.a.,7.a. |
| **7.  Staffing, Staffing Plans, and Recruitment** | | | | |
| 7.a. | OPSO shall provide a monthly report to the Monitors, identifying the number of deputies hired the previous month; the number of deputies who resigned, if known, the reason for resignation, and the date the deputy entered service; and the number of deputies who were terminated, the reason for termination, and the date the deputy entered service.  The same report shall be provided for non-sworn (civilian staff).  A cumulative annual total will also be included as part of this report. | Monthly | Substantial Compliance | See also Consent Judgment IV. A.6. |
| 7.b. | By March 15, 2015, OPSO shall provide a recruitment plan for sworn (e.g. deputy sheriffs) and non-sworn/civilian staff that addresses current and anticipated vacancies for the next 18 months and based on the staffing plan.  The plan will be provided to the Monitors for comment and recommendations by March 1, 2015. | 3/15/15 | Substantial Compliance | See also Consent Judgment IV. A.6. |
| 7.c. | At the scheduled status conferences with the Court, OPSO shall report regarding progress to achieving hiring based on the plan, as well as any modifications and update to the plan (See paragraph 1, a., b., above.) | 3/26/15 | Substantial Compliance | See also Consent Judgment IV. A.6. |
| 7.d. | By April 30, 2015, OPSO will evaluate all posts to determine if use of contractors is feasible for non-inmate contact positions (e.g., perimeter security, security screening of staff and visitors).  The report will be | 4/30/15 | Substantial Compliance | |



| # | Language | Due Date | Status | Notes on Compliance |
|---|----------|----------|--------|---------------------|
| | provided to the Monitors and Plaintiffs for their review. | | | |
| **8. Incidents and Referrals** | | | | |
| 8. | OPSO shall issue a memorandum to all staff and contractors regarding their responsibilities and the process to document all reportable incidents within 24 hours, identified in § IV.A.7 of the Consent.  The memorandum will be issued in accordance with the terms specified in Item 3 of this Stipulated Order. | | Substantial Compliance 4/17/15 | See also Consent Judgment IV.A.7.e. |
| **9. Investigations** | | | | |
| 9.a. | By March 31, 2014, OPSO shall develop policies and procedures governing the operations of the Investigative Services Bureau (ISB) including post orders for all positions within OPSO that have investigative responsibilities, criminal and/or administrative.   This draft will be provided to the Monitors.  Following receipt of the Monitors' comments, OPSO will make any necessary revisions, consult with the Monitor(s) as needed, and provide a final draft to the Plaintiffs to provide substantive comments to both OPSO and the Monitor(s). In the event that the Monitor and/or the OPSO disagree with any comments or recommendations by the Plaintiffs, the Monitor will convene a conference call for the purpose of resolving issues. | 3/31/15 | Substantial Compliance | The Investigative Services Bureau SOPs were approved by the Monitor in March 2016;  the SOPs for the Force Investigative Team were approved by the Monitor in August 2016.  See also Consent Judgment IV.A.8.a. |
| 9.b. | By March 15, 2015 OPSO shall make available a laptop computer to investigative staff assigned full-time to ISB for use in the employees' official capacities. Supervisors shall have the ability access all files.  To the extent possible the laptop computers will be linked to a mainframe/cloud to facilitate the supervisor's remote access to the files. | 3/15/15 | Substantial Compliance | 3/20/15 - Provided purchase orders and memo from Major Hosli . OPSO indicated on 4/2 that the laptops had been received. |
| **10. Grievances** | | | | |
| 10. | By March 1, 2015, OPSO shall develop a job description for the Grievance Officer and revise OPSO's organizational chart to identify the chain-of-command for this position. | 3/1/15 | Substantial Compliance | Provided 3/9/15  See also Consent Judgment IV.A.11. |
| **11. PREA** | | | | |
| 11. | By March 15, 2015, OPSO shall produce to the Monitors the outline and production schedule for the video and orientation materials advising prisoners of the Prison Rape Elimination Act. Following receipt of | 3/1/15 | Substantial Compliance | Final product provided to lead Monitor for review on 5/14; with subsequent updates provided the following week.  Monitors |



| # | Language | Due Date | Status | Notes on Compliance |
|---|----------|----------|--------|---------------------|
| | the Monitors' comments, OPSO will make any necessary revisions, consult with the Monitor(s) as needed, and provide a final draft to the Plaintiffs to provide substantive comments to both OPSO and the Monitor(s). In the event that the Monitor and/or the OPSO disagree with any comments or recommendations by the Plaintiffs, the Monitor will convene a conference call for the purpose of resolving issues. | | | have encouraged OPSO to provide these products to the plaintiffs.  Videos provided to plaintiffs on 6/3/15.

See also Consent Judgment IV.A.12. |
| **12. Access to Information** | | | | |
| 12. | By April 1, 2015, OPSO shall produce to the Monitors the outlines and production schedule for the inmate orientation video and materials, including the revised inmate handbook.  OPSO shall also include the strategy for orienting inmates, and maintenance of inmate handbooks throughout OPSO facilities, including language access requirements, Section IV. F. of the Consent Judgment. Following receipt of the Monitors' comments, OPSO will make any necessary revisions, consult with the Monitor(s) as needed, and provide a final draft to the Plaintiffs to provide substantive comments to both OPSO and the Monitor(s). In the event that the Monitor and/or the OPSO disagree with any comments or recommendations by the Plaintiffs, the Monitor will convene a conference call for the purpose of resolving issues. | 4/1/15 | Substantial Compliance | See also Consent Judgment IV.A.13. |
| **13. Medical Care** | | | | |
| 13. | By March 15, 2015 OPSO shall provide the Monitor with the medical and mental health care contractor's action plan for compliance with all the medical and mental health provisions of the Consent Judgment.  The action plan shall include the due dates for compliance with the paragraphs of the Consent Judgment, the individual(s) responsible for the activities, the specific activities to be undertaken. Following receipt of the Monitors' comments, OPSO will make any necessary revisions, consult with the Monitor(s) as needed, and provide a final draft to the Plaintiffs to provide substantive comments to both OPSO and the Monitor(s). In the event that the Monitor and/or the OPSO disagree with any comments or | 3/15/15 | Substantial Compliance | The plan has been provided; but not effective to date based on the reviews in Compliance Report # 7. |



| # | Language | Due Date | Status | Notes on Compliance |
|---|----------|----------|--------|---------------------|
| | recommendations by the Plaintiffs, the Monitor will convene a conference call for the purpose of resolving issues | | | |
| **14. Mental Health** | | | | |
| 14.a. | OPSO shall issue a memorandum requiring that inmates with mental illness housed in the mental health housing have access to non-contact family visitation and family telephone calls.  The decision as to visiting and telephone calls will be determined in consultation with the mental health staff assigned to that inmate's care. If an inmate is denied visiting and telephone calls the reasons are specifically included in the inmate's chart. | | Substantial Compliance | Provided by Col. Laughlin on April 9, 2015 |
| 14.b. | By April 1, 2015, OPSO, in collaboration with CCS, will produce a management plan for inmates on the mental health caseload (Levels 1 – 4), whether these inmates are housed in the step-down unit, or in general population. | 4/1/15 | Partial compliance | No acceptable plan has been produced that has had an impact on the inmates.

See also Consent Judgment IV.B.2. |
| **15. The New Jail Facility** | | | | |
| 15. | By April 30, 2015, OPSO shall submit to the Monitors the plan for opening the new jail, including the schedule for movement of inmates into the facility, and closing of existing facilities.   The schedule shall be predicated on the potential opening dates known at that time, including alternative scenarios. | 4/30/15 | NA | See also Consent Judgment VI. |
| **16. Sanitation and Environmental Conditions** | | | | |
| 16. | OPSO shall issue a memorandum to all staff that that inmates and staff assigned to clean biohazards spills/incidents must be trained on doing so, outfitted with proper equipment, and properly supervised in accordance with § IV.D.1.f of the Consent Judgment. Following receipt of the Monitors' comments, OPSO will make any necessary revisions, consult with the Monitor(s) as needed, and provide a final draft to the Plaintiffs to provide substantive comments to both OPSO and the Monitor(s). In the event that the Monitor and/or the OPSO disagree with any comments or recommendations by the Plaintiffs, the Monitor will convene a conference call for the purpose of resolving issues.   The directive will be issued in accordance with the terms specified in Item 3 of this Stipulated Order. | No date | Substantial Compliance | See also Consent Judgment IV. D. f. |



| # | Language | Due Date | Status | Notes on Compliance |
|---|----------|----------|--------|---------------------|
| **17.  Youthful Offenders** | | | | |
| 17.a. | By March 1, 2015, OPSO shall contact the school board and community groups to solicit proposals for programming in the youthful offender unit. | 3/1/15 | Substantial Compliance | OPSO has reached out to several organizations. OPSO reports these organizations included:  Aspen Institute Partnership for Youth Development, The Youth Empowerment Project, Orleans Parish School Board, Center for Educational Excellence in Alternative Settings, and the YCS. Several of these organizations indicated a proposal would be forthcoming, but apparently have not been provided to OPSO. Regardless of the work to solicit proposals to conform with this paragraph of the Consent Judgment, other than the movement of 12 prisoners to YSC, no progress has been made.<br><br>See also Consent Judgment IV. G. |
| 17.b. | At the scheduled Court status conferences, OPSO shall report on progress in securing such programming, and/or the responses from the school board and stakeholders. | 3/26/15 | Substantial Compliance | |
| 17.c. | By May 1, 2015 OPSO shall provide a programming plan, based on the resources it has been able to secure, to include education, for all eligible youth in its custody, to Monitors for review. Following receipt of the Monitors' comments, OPSO will make any necessary revisions, consult with the Monitor(s) as needed, and provide a final draft to the Plaintiffs to provide substantive comments to both OPSO and the Monitor(s). In the event that the Monitor and/or the OPSO disagree with any comments or recommendations by the Plaintiffs, the Monitor will convene a conference call for the purpose of resolving issues. | 5/1/15 | Substantial Compliance | See also Consent Judgment IV. G. |



**Stipulated Agreement/Order (4/22/15)**

| # | Language | Due Date | Status | Compliance Notes |
|---|----------|----------|--------|------------------|
| 1. | By no later than April 24, 2015, the Orleans Parish Sheriff's Office ("OPSO") shall draft a memorandum to all staff members,[2] including supervisors, outlining the specific actions staff will take to respond if they observe a prisoner exhibiting signs or symptoms of a) suicidality or b) alcohol or drug intoxication or withdrawal.  This memorandum will be drafted by OPSO staff in collaboration with staff from Correct Care Solutions ("CCS").  This memorandum will be provided for review in draft form to the Lead Monitor and sub-monitors for Medical Care and Mental Health Care ("the Monitors").  Within three days of receiving any edits or revisions from the Monitors', OPSO shall incorporate those edits and/or revisions and issue the memorandum to all staff members, including supervisors.  The memorandum shall be read at daily staff briefings for three consecutive days and posted in locations where staff are likely to view it. | 4/24/15 | Substantial Compliance | See also Consent Judgment IV.B.5. |
| 2. | By no later than April 30, 2015, OPSO shall conduct a one-hour training for all clinical and custody staff (including supervisors) who have not been trained in the past 12 months regarding the signs or symptoms of a) suicidality or b) alcohol or drug intoxication or withdrawal, and the specific actions staff will take to respond if a prisoner exhibits such symptoms.  This training shall be developed and delivered in collaboration with staff from CCS and incorporate the specific language of the Consent Judgment.  This interim training does not supplant any pre-service or annual training required by the Consent Judgment, which will be provided at a later date. | 4/30/15 | Substantial Compliance | See also Consent Judgment IV.B.5. |
| 3. | By no later than April 30, 2015, OPSO shall submit all custodial and site-specific medical policy(ies) regarding a) suicide | 4/30/15 | Substantial Compliance | See also Consent Judgment IV.B.5. |

---

[2] "Staff members" is defined in the Consent Judgment as "all employees, including correctional officers, who have contact with prisoners."  *See* Consent Judgment, ECF No. 466, at 8.



| # | Language | Due Date | Status | Compliance Notes |
|---|----------|----------|--------|------------------|
|   | risk reduction and b) alcohol or drug intoxication and withdrawal required pursuant to Section IV.B.5 of the Consent Judgment.  The policies shall integrate and cross-reference all relevant CCS policies governing housing and custody decisions for individuals expressing suicidality or alcohol or drug withdrawal.  All OPSO policies and any updated CCS policies shall be submitted to the Monitor and Plaintiffs for review pursuant to Section VII.A of the Consent Judgment. |   |   |   |



**IV.     Conclusion**

The goal of all parties involved in this litigation, including the community and stakeholders, is to establish and sustain a jail that provides basic Constitutional conditions of care, custody and control for pre-trial detainees.  The historic conditions in the Orleans Parish Prison which resulted in the 2013 Consent Judgment and the 2016 Stipulated Agreement, removing the Sheriff from control of the jail and naming an independent compliance director, are unprecedented.

Since October 2016 the Compliance Director has initiated efforts to achieve the goal noted above, engaged the City (funding authority) in creating the first budget with detail and accountability, developed strategies to bring about a safer jail, hired and trained employees, and worked toward compliance with the various orders of the Court. Significant work remains to be done.  Success can only be accomplished, in the view of the Monitors, if the Director considers infusing into the organization experienced, competent jail professionals who can assist in all the required activities, as well as train and mentor existing staff.

We look forward to a collaborative effort with the Compliance Director.   These initiatives must focus on not only keeping inmates safe, but to sustain these changes.



Appendix A

Summary of Compliance by Tour
As of May 1, 2017

| Section | Report # 1 2/13/14 | Report # 2 8/26/14 | Report # 3 2/25/15 | Report # 4 9/9/15 | Report # 5 3/17/16 | Report # 6 10/25/16 | Report # 7 5/1/17 |
|---|---|---|---|---|---|---|---|
| IV. A.  Protection from Harm | | | | | | | |
| IV.A. 1.  Use of Force Policies and Procedures/Margo Frasier | | | | | | | |
| IV. A. 1.a. | ND | NC | NC | PC | NC | PC | PC |
| IV. A. 1.b. | ND | NC | NC | PC | NC | PC | PC |
| IV. A. 1.c. | ND | NC | NC | PC | NC | NC | PC |
| IV.A.2.  Use of  Force Training/Margo Frasier | | | | | | | |
| IV. A. 2. a. | ND | NC | NC | NC | NC | PC | PC |
| IV. A. 2. b. | ND | NC | NC | NC | NC | PC | PC |
| IV. A. 2. c. | ND | NC | NC | NC | NC | NC | NC |
| IV.A.3.   Use of Force Reporting/Margo Frasier | | | | | | | |
| IV. A.3 a. | ND | NC | PC | NC | PC | PC | PC |
| IV. A.3 b. | ND | NC | NC | NC | NC | NC | PC |
| IV. A.3 c. | ND | NC | NC | NC | NC | NC | PC |
| IV. A.3 d. | ND | NC | NC | PC | NC | NC | PC |
| IV. A.3 e. | ND | NC | PC | PC | PC | PC | PC |
| IV. A.3 f. | ND | NC | NC | PC | NC | PC | PC |
| IV. A.3 g. | ND | NC | NC | PC | PC | PC | PC |
| IV. A.3 h. | ND | NC | NC | NC | NC | NC | NC |
| IV.A.4. Early Intervention System ("EIS") /Margo Frasier | | | | | | | |
| IV.A.4.a. | ND | NC | NC | PC | PC | PC | NC |
| IV.A.4.b. | ND | NC | NC | PC | PC | PC | PC |
| IV.A.4.c. | ND | NC | NC | PC | PC | PC | PC |
| IV.A.4.d. | ND | NC | NC | NC | NC | PC | PC |
| IV.A.4.e. | ND | ND | ND | ND | NC | NC | NC |
| IV.A.5. Safety and Supervision/Margo Frasier | | | | | | | |
| IV.A.5.a. | ND | NC | NC | NC | NC | NC | NC |
| IV.A.5.b. | ND | NC | NC | NC | NC | NC | NC |
| IV.A.5.c. | ND | NC | NC | NC | NC | NC | NC |
| IV.A.5.d. | NC | NC | PC | PC | PC | NC | NC |
| IV.A.5.e. | ND | NC | NC | PC | PC | NC | NC |
| IV.A.5.f. | ND | NC | NC | PC | PC | SC | SC |
| IV.A.5.g. | ND | NC | ND | PC | NC | NC | NC |
| IV.A.5.h. | ND | NC | NC | NC | NC | NC | NC |
| IV.A.5.i. | ND | NC | NC | PC | PC | PC | PC |
| IV.A.5.j. | ND | NC | PC | PC | NC | NC | NC |
| IV.A.5.k. | ND | NC | PC | PC | PC | PC | PC |
| IV.A.5.l. | ND | NC | NC | NC | PC | PC | PC |
| IV.A.6.  Security Staffing/Susan McCampbell | | | | | | | |
| IV.A.6.a. | NC | NC | NC | NC | NC | NC | NC |
| IV.A.6.a.(1) | ND | PC | PC | PC | SC | SC | PC |
| IV.A.6.a.(2) | ND | PC | PC | PC | NC | SC | SC |
| IV.A.6.a.(3) | ND | SC | NC | SC | NC | SC | NC |
| IV.A.6.a.(4) | ND | NC | PC | PC | PC | PC | PC |
| IV.A.6.b. | ND | NC | PC | PC | NC | PC | PC |

Appendix A

Summary of Compliance by Tour
As of May 1, 2017

| Section | Report # 1 2/13/14 | Report # 2 8/26/14 | Report # 3 2/25/15 | Report # 4 9/9/15 | Report # 5 3/17/16 | Report # 6 10/25/16 | Report # 7 5/1/17 |
|---|---|---|---|---|---|---|---|
| IV.A.7 Incidents and Referrals/Margo Frasier | | | | | | | |
| IV.A.7.a. | ND | NC | NC | NC | NC | PC | PC |
| IV.A.7.b. | ND | NC | NC | PC | NC | PC | PC |
| IV.A.7.c. | ND | NC | PC | PC | PC | PC | SC |
| IV.A.7.d. | ND | NC | NC | NC | NC | NC | NC |
| IV.A.7.e. | ND | NC | PC | PC | PC | PC | PC |
| IV.A.7.f. | ND | NC | NC | PC | PC | PC | PC |
| IV.A.7.g. | ND | NC | NC | PC | PC | PC | PC |
| IV.A.7.h. | ND | NC | NC | PC | PC | PC | PC |
| IV.A.7.i. | ND | NC | NC | PC | NC | NC | NC |
| IV.A.7.j. | ND | NC | NC | NC | NC | NC | NC |
| IV.A.8.  Investigations/Margo Frasier | | | | | | | |
| IV.A.8.a. | ND | NC | PC | PC | PC | SC | SC |
| IV.A.8.b. | ND | NC | PC | PC | PC | SC | SC |
| IV.A.8.c. | ND | NC | PC | PC | PC | SC | SC |
| IV.A.8.d. | ND | NC | NC | PC | PC | SC | SC |
| IV.A.8.e. | ND | NC | NC | PC | PC | PC | PC |
| IV.A.8.f. | ND | NC | NC | PC | PC | PC | PC |
| IV.A.9.  Pretrial Placement in Alternative Settings/Susan McCampbell | | | | | | | |
| IV.A.9.a. | PC | PC | PC | SC | SC | SC | SC |
| IV.A.9.b. | PC | PC | PC | SC | SC | SC | SC |
| IV.A.10. Custodial Placement within OPP/Patricia Hardyman | | | | | | | |
| IV.A.10.a. | NC | PC | SC | SC | SC | SC | PC |
| IV.A.10.b. | NC | NC | NC | SC | SC | SC | SC |
| IV.A.10.c. | NC | NC | PC | PC | PC | PC | PC |
| IV.A.10.d. | NC | NC | PC | PC | PC | PC | PC |
| IV.A.10.e. | NC | NC | PC | SC | PC | PC | SC |
| IV.A.10.f. | NC | NC | NC | NC | NC | PC | PC |
| IV.A.10.g. | NC | NC | NC | NC | NC | PC | PC |
| IV.A.10.h. | ND | NC | NC | PC | PC | PC | PC |
| IV..A.11. Prisoner Grievance Process/Susan McCampbell | | | | | | | |
| IV.A.11.a | PC | PC | PC | PC | PC | PC | PC |
| IV.A.12. Sexual Abuse/Susan McCampbell | | | | | | | |
| IV.A.12. | PC | PC | PC | PC | PC | PC | PC |
| IV.A.13. Access to Information/Susan McCampbell | | | | | | | |
| IV.A.13. | PC | PC | PC | PC | PC | PC | PC |

2

Appendix A

Summary of Compliance by Tour
As of May 1, 2017

| Section | Report # 1 2/13/14 | Report # 2 8/26/14 | Report # 3 2/25/15 | Report # 4 9/9/15 | Report # 5 3/17/16 | Report # 6 10/25/16 | Report # 7 5/1/17 |
|---|---|---|---|---|---|---|---|
| IV. B. Mental Health Care | | | | | | | |
| IV.B.1. Screening and Assessment/Raymond Patterson | | | | | | | |
| IV.B.1.a. | NC | NC | PC | PC | PC | PC | PC |
| IV.B.1.b. | NC | NC | PC | PC | PC | PC | PC |
| IV.B.1.c. | NC | NC | PC | PC | PC | PC | PC |
| IV.B.1.d. | NC | NC | PC | PC | PC | PC | PC |
| IV.B.1.e. | NC | NC | PC | PC | PC | PC | PC |
| IV.B.1.f. | NC | NC | NC | NC | NC | NC | NC |
| IV.B.1.g. | NC | NC | NC | PC | NC | NC | NC |
| IV.B.1.h. | NC | NC | NC | PC | NC | NC | NC |
| IV.B.1.i. | NC | NC | NC | PC | NC | NC | NC |
| IV.B.1.j. | NC | NC | NC | PC | NC | NC | NC |
| IV.B.1.k. | NC | NC | NC | PC | NC | NC | NC |
| IV.B.1.l. | NC | NC | NC | NC | NC | NC | NC |
| B. 2.  Treatment/Raymond Patterson | | | | | | | |
| IV.B.2.a. | NC | NC | NC | PC | PC | PC | PC |
| IV.B.2.b. | NC | NC | NC | NC | NC | NC | NC |
| IV.B.2.c. | NC | NC | NC | NC | NC | NC | NC |
| IV.B.2.d. | NC | NC | NC | NC | NC | NC | NC |
| IV.B.2.e. | NC | NC | NC | PC | PC | PC | PC |
| IV.B.2.f. | NC | NC | NC | PC | PC | PC | NC |
| IV.B.2.g. | NC | NC | NC | PC | PC | PC | NC |
| IV.B.2.h. | NC | NC | NC | PC | PC | PC | PC |
| IV.B.3.  Counseling/Raymond Patterson | | | | | | | |
| IV.B.3.a. | NC | NC | NC | NC | PC | NC | NC |
| IV.B.3.b. | NC | NC | NC | NC | PC | NC | NC |
| IV.B.4.  Suicide Prevention Training Program/Raymond Patterson | | | | | | | |
| IV.B.4.a. | NC | NC | NC | PC | PC | PC | PC |
| IV.B.4.b. | NC | NC | NC | PC | PC | PC | PC |
| IV.B.4.c. | NC | NC | NC | PC | PC | PC | PC |
| IV.B.4.d. | NC | NC | NC | PC | NC | NC | NC |
| IV.B.4.e. | NC | NC | NC | PC | NA | PC | PC |
| IV.B.4.f. | NC | NC | NC | NC | PC | PC | NC |
| IV.B.4.g. | NC | NC | NC | SC | PC | NC | NC |
| IV.B.5.  Suicide Precautions/Raymond Patterson | | | | | | | |
| IV.B.5.a. | NC | NC | NC | NC | NC | NC | NC |
| IV.B.5.b. | NC | NC | NC | NC | NC | NC | NC |
| IV.B.5.c. | NC | NC | NC | NC | NC | NC | NC |
| IV.B.5.d. | NC | NC | NC | NC | NC | NC | NC |
| IV.B.5.e. | ND | NC | NC | NC | NC | NC | NC |
| IV.B.5.f. | ND | NC | NC | NC | NC | NC | NC |
| IV.B.5.g. | NC | NC | NC | NC | NC | NC | NC |
| IV.B.5.h. | NC | NC | NC | NC | NC | NC | NC |
| IV.B.5.i. | NC | NC | NC | NC | NC | NC | NC |
| IV.B.5.j. | NC | NC | NC | NC | NC | NC | NC |
| IV.B.5.k. | NC | NC | NC | NC | NC | NC | NC |

3

Appendix A
Summary of Compliance by Tour
As of May 1, 2017

| Section | Report # 1 2/13/14 | Report # 2 8/26/14 | Report # 3 2/25/15 | Report # 4 9/9/15 | Report # 5 3/17/16 | Report # 6 10/25/16 | Report # 7 5/1/17 |
|---|---|---|---|---|---|---|---|
| IV.B.6.  Use of Restraints/Raymond Patterson | | | | | | | |
| IV.B.6.a. | PC | NC | PC | PC | PC | PC | PC |
| IV.B.6.b. | NC | NC | PC | PC | PC | PC | PC |
| IV.B.6.c. | ND | NC | PC | PC | PC | PC | PC |
| IV.B.6.d. | ND | NC | PC | PC | PC | PC | PC |
| IV.B.6.e. | NC | NC | PC | PC | PC | PC | PC |
| IV.B.6.f. | NC | NC | PC | PC | PC | PC | PC |
| IV.B.6.g. | ND | NC | PC | PC | PC | PC | PC |
| IV.B.7.  Detoxification and Training/Robert Greifinger | | | | | | | |
| IV.B.7.a. | NC | NC | PC | PC | PC | PC | PC |
| IV.B.7.b. | NC | NC | PC | PC | PC | PC | PC |
| IV.B.7.c. | NC | NC | PC | PC | PC | PC | PC |
| IV.B.7.d. | NC | NC | PC | PC | PC | PC | PC |
| IV.B.8. Medical and Mental Health Staffing/Robert Greifinger | | | | | | | |
| IV.B.8.a. | NC | NC | PC | PC | PC | PC | PC |
| IV.B.8.b. | NC | NC | PC | PC | PC | PC | PC |
| IV.B.9.  Risk Management/Robert Greifinger | | | | | | | |
| IV.B.9.a. | NC | NC | NC | PC | PC | PC | PC |
| IV.B.9.b. | NC | NC | NC | PC | PC | PC | PC |
| IV.B.9.c. | NC | NC | NC | PC | PC | PC | PC |
| IV.B.9.d. | NC | NC | NC | NC | NC | NC | NC |
| IV.B.9.e. | NC | NC | NC | PC | PC | PC | PC |
| IV.B.9.f. | NC | NC | NC | PC | PC | PC | PC |
| IV.C. Medical Care | | | | | | | |
| IV. C. Quality Management of Medication Administration | | | | | | | |
| IV.C.1.a. | NC | NC | PC | PC | PC | PC | PC |
| IV.C.1.b. | NC | NC | PC | PC | PC | PC | PC |
| IV.C.1.c. | NC | NC | PC | PC | PC | PC | PC |
| IV.C.1.d. | NC | NC | PC | PC | PC | PC | PC |
| IV.C.2.  Health Care Delivered/Robert Greifinger | | | | | | | |
| IV.C.2.a. | NC | NC | NC | PC | PC | PC | PC |
| IV.C.2.b. | NC | NC | PC | PC | PC | PC | PC |
| IV.C.3.  Release and Transfer/Robert Greifinger | | | | | | | |
| IV.C.3.a. | NC | NC | NC | PC | PC | PC | PC |
| IV.C.3.b. | NC | NC | NC | PC | PC | PC | PC |
| IV.C.3.c. | NC | NC | NC | PC | PC | PC | PC |
| IV.C.3.d. | NC | NC | NC | PC | PC | PC | PC |
| IV.D.  Sanitation and Environmental Conditions/Harry Grenawitzke | | | | | | | |
| IV.D. 1.a. | NC | NC | NC | NC | NC | NC | NC |
| IV. D. 1.b. | NC | NC | PC | PC | PC | PC | PC |
| IV. D. 1.c. | NC | NC | PC | PC | NC | NC | PC |
| IV. D. 1.d. | NC | NC | NC | NC | SC | SC | SC |
| IV. D. 1.e. | NC | PC | PC | PC | PC | PC | PC |
| IV. D. 1.f. | NC | NC | NC | NC | PC | PC | PC |
| IV. D. 1.g. | NC | NC | NC | NC | PC | PC | PC |
| IV. D. 1.h. | NC | NC | NC | PC | NC | PC | NC |

4

Appendix A

Summary of Compliance by Tour
As of May 1, 2017

| Section | Report # 1 2/13/14 | Report # 2 8/26/14 | Report # 3 2/25/15 | Report # 4 9/9/15 | Report # 5 3/17/16 | Report # 6 10/25/16 | Report # 7 5/1/17 |
|---|---|---|---|---|---|---|---|
| IV. D. 2. Environmental Control | | | | | | | |
| IV. D. 2.a. | NC | NC | PC | PC | PC | SC | SC |
| IV. D. 2.b. | NC | NC | NC | NC | NC | SC | PC |
| IV. D. 3. Food Service | | | | | | | |
| IV. D. 3.a. | NC | NC | NC | PC | PC | PC | NC |
| IV. D. 3.b. | NC | NC | NC | PC | PC | PC | NC |
| IV. D. 3.c. | NC | NC | NC | PC | NC | NC | PC |
| IV. D. 4. Sanitation and Environmental Conditions Reporting | | | | | | | |
| IV. D. 4.a. 1-7 | NC | NC | PC | PC | PC | PC | PC |
| IV. D. 4.b. | NC | NC | NC | NC | PC | NC | NC |
| IV.E. Fire and Life Safety/Harry Grenawitzke | | | | | | | |
| IV. E. 1. Fire and Life Safety | | | | | | | |
| IV. E. 1.a. | NC | PC | PC | PC | PC | PC | PC |
| IV. E. 1.b. | NC | NC | NC | PC | PC | PC | PC |
| IV. E. 1.c. | PC | PC | PC | PC | NC | PC | PC |
| IV. E. 1.d. | NC | NC | NC | NC | NC | NC | PC |
| IV. E. 1.e. | NC | PC | PC | PC | PC | PC | PC |
| IV. E. 2. Fire and Life Safety Reporting | | | | | | | |
| IV. E. 2.a.1-3 | ND | PC | PC | PC | PC | PC | PC |
| IV. E. 2.b. | ND | NC | NC | PC | NC | NC | NC |
| IV.F. Language Assistance | | | | | | | |
| IV.F.1. Timely and Meaningful Access to Services/Susan McCampbell | | | | | | | |
| IV.F.1.a. | ND | PC | PC | PC | PC | PC | PC |
| IV.F.2.  Language Assistance Policies and Procedures/Susan McCampbell | | | | | | | |
| IV.F.2.a. | ND | PC | PC | PC | Not App | Not App | Not App |
| IV.F.2.b. | ND | PC | PC | PC | Not App | Not App | Not App |
| IV.F.3. Language Assistance Training/Susan McCampbell | | | | | | | |
| IV.F.3.a. | NC | PC | PC | PC | PC | PC | PC |
| IV.F.4. Bilingual Staff/Susan McCampbell | | | | | | | |
| IV.F.4. | NC | PC | PC | PC | PC | NC | NC |
| IV.G.  Youthful Prisoners/Susan McCampbell | | | | | | | |
| IV.G. | NC | NC | NC | PC | PC | PC | NC |
| VI. The New Jail Facility/Susan McCampbell | | | | | | | |
| VI. A. | ND | PC | PC | SC | SC | SC | SC |
| VI. B. | NC | PC | SC | SC | SC | SC | SC |
| VI. C. | ND | PC | SC | SC | PC | PC | PC |
| VI. D. | Monitors Not Qualified to Evaluate | | | | | | |
| VII.  Compliance and Quality Improvement/Susan McCampbell | | | | | | | |
| VII. A. | ND | NC | NC | PC | PC | PC | PC |
| VI. B. (H.) | NC | NC | NC | NC | NC | NC | PC |
| VI. C. (I.) | NC | NC | SC | SC | NC | SC | SC |
| VI. D. (J.) | ND | NC | NC | PC | PC | PC | PC |
| VIII. Reporting Requirements and Right of Access/Susan McCampbell | | | | | | | |
| VIII.A. | ND | PC | PC | PC | PC | PC | PC |
| VIII.B. | PC | PC | PC | PC | SC | SC | SC |
| VIII.C. | PC | PC | PC | SC | SC | SC | NC |

Appendix A                  Summary of Compliance by Tour
                                   As of May 1, 2017

| Section | Substantial Compliance | Partial Compliance | NC | Notes: |
|---|---|---|---|---|
| Stipulated Agreement 2/11/5 | | | | |
| 1.a. | x | | | |
| 1.b. | | x | | See also CJ VII. D., VIII.A. |
| 1.c. | | x | | See also CJ VIII.B. |
| 2.a. | x | | | See also CJ VII. A. |
| 2.b. | x | | | See also CJ VII. A. |
| 3 | x | | | See also CJ VII. A. |
| 4.a. | x | | | See also CJ IV.A.3. |
| 4.b. | x | | | See also CJ IV.A.3. |
| 4.c. | x | | | See also CJ IV.A.3. |
| 5.a. | x | | | See also CJ IV.A.4.b. |
| 5.b. | x | | | See also CJ IV..4.c. |
| 6.a. | | | x | See also CJ IV.G. |
| 6.b. | | x | | See also CJ IV.B.4.a.,7.a. |
| 7.a. | x | | | See also CJ IV.A.6. |
| 7.b. | x | | | See also CJ IV.A.6. |
| 7.c. | x | | | See also CJ IV.A.6. |
| 7.d. | x | | | |
| 8 | x | | | See also CJ IV.A.7. |
| 9.a. | x | | | See also CJ IV.A.8.a. |
| 9.b. | x | | | |
| 10 | x | | | See also CJ IV.A.11. |
| 11 | x | | | See also CJ IV.A.12 |
| 12 | x | | | See also CJ IV.A.13 |
| 13 | x | | | See also CJ IV.B., C. |
| 14.a. | x | | | |
| 14.b. | | x | | See also CJ IV.B.2. |

Appendix A

Summary of Compliance by Tour
As of May 1, 2017

| | | | | |
|---|---|---|---|---|
| 15 | NA | | | 2/19/16, Not applicable See also CJ VI. |
| 16 | x | | | See also CJ IV.D.f. |
| 17.a. | x | | | See also CJ IV.G. |
| 17.b. | x | | | |
| 17.c. | x | | | See also CJ IV.G. |
| Stipulated Agreement 4/22/16 | | | | |
| 1 | x | | | See also CJ IV.B.5. |
| 2 | x | | | See also CJ IV.B.5. |
| 3 | x | | | See also CJ IV.B.5. |

**Legend:**
**ND – Not scheduled for review**
**NC – Non-compliance**
**PC – Partial Compliance**
**C – Substantial Compliance**
**NA – Not Applicable**

Appendix B

Summary of Recommendations
Compliance Report # 7
May 1, 2017

| IV. A. Protection from Harm | | |
|---|---|---|
| **IV.A. 1. Use of Force Policies and Procedures** | | |
| IV. A. 1. | 1 | Develop a reliable system for reassigning or suspending a staff member pending investigation unless approved by Director Maynard and documented in writing. |
| IV. A. 1. | 2 | Improve the timeliness of investigations by FIT and the IAD-Administrative into uses of force. |
| **IV.A.6. Security Staffing** | | |
| IV.A.6.a. - b. | 3 | Develop written policies and procedures (or divisional directives) to guide recruitment, background investigations, hiring processes, and required updates (e.g. PREA-related). The directives should provide sufficient detail as to be able to be audited for compliance. |
| IV.A.6.a. - b. | 4 | Working with all parties, there needs to be a decision about the staffing plan and the calculation of the shift relief factor, at least given the current data. |
| **IV.A.8. Investigations** | | |
| IV.A. 8. a. -f. | 5 | Provide additional training regarding how to conduct investigations in a corrections/jail setting regarding sexual abuse, assault, harassment, and voyeurism (PREA related). |
| **IV.A.10. Custodial Placement within OPP** | | |
| IV.A.10.c. | 6 | Develop policies and procedures to require all pod deputies to use the ISI to maintain appropriate pod level separations. |
| IV.A.10.f. | 7 | Complete statistical review of the classification system in late 2017. |
| **IV..A.11. Prisoner Grievance Process** | | |
| IV.A.10.h. | 8 | Resolve the discrepancy that exists between OJC's and CCS' data regarding the number and resolution of grievances. |
| IV.A.10.h. | 9 | Assure that reviewers and investigators assess the extent to which staff are threatening inmates for filing grievances, or otherwise impacting an inmate's access to grievances, in a retaliation-free environment. |
| **IV.A.12. Sexual Abuse** | | |
| IV.A.12. | 10 | Provide training for medical staff regarding recognizing the signs and symptoms of inmate sexual abuse/assault. Evidence of this training must be provided before the next tour. |
| IV.A.12. | 11 | Revise the ISB written directives to provide a much higher level of quality control and review of all investigations into allegations of sexual abuse, assault, etc. It might be instructive to determine how the procedures migrated away from accepted practice to prevent it from happening again. |
| IV.A.12. | 12 | Assure that no one other than the trained person(s) authorized by the PREA coordination, or the PREA coordinator herself, provides training to any staff, volunteer or contractor. It might be instructive to determine how the procedures migrated away from accepted practice to prevent it from happening again. |

1

Appendix B

Summary of Recommendations
Compliance Report # 7
May 1, 2017

| IV. B. Mental Health Care  NOTE: Green shading indicates the recommendations were included in Compliance Report # 6. | | |
|---|---|---|
| IV. B. | 13 | The Defendants and CCS must immediately develop structural mechanisms (e.g. policies, procedures, strategies, meetings, accountability, leadership, multi-disciplinary team) to resolve how and where required and necessary services, both mental health and medical, are provided to inmates currently and into the future.  This recommendation is critical, and the negative results cannot be overstated.   If this means that CCS requires additional resources, this must be immediately negotiated with the City, and implemented, now. |
| IV. B. | 14 | CCS and OJC take steps to insure the actual and perceived safety of CCS and custody staff working in OJC.  The departure of staff because of their concerns for their safety is an extremely damaging circumstance |
| IV. B. | 15 | CCS must recruit and retain a medical and mental health coordinator (at Hunt).  As stated in Compliance Report #6, the need for on-site leadership and programmatic direction for mental health and medical services, as well as assuring adequate clinical staffing, collaboration with custody, policy finalization, and training and supervision of staff are essential to provide mental health and medical programs in addition to the other services required by the Consent Judgment.  Sufficient custody staff are also required to provide security for medical staff, as well as for prompt movement of inmates to and from medical appointments, group sessions, etc. |
| IV. B. | 16 | As stated in Compliance Report #6, the Defendants must end the unacceptable practice of housing inmates who are on suicide watch or direct observation status in OJC for extended periods of time. We have recommended suicide precautions/direct observations should not exceed 10 days at OJC as "crisis bed" services, including substantial out of cell time for structured and unstructured therapeutic activities.  Transfer to acute mental health services at Hunt for men or hospital for women should occur if the inmate has not been stabilized. |
| IV. B. | 17 | The Defendants must assure that  suicide resistant cells are appropriately located where needed (based on classification of inmates, for example. The inmates who are housed in the cells that are not suicide resistant are held for 23-hours per day with minimal to no psychotherapeutic interventions other than medications and observation.  This constitutes isolation that may not be therapeutic and may be unsafe for inmates at increased risk of self-harm |
| IV. B. | 18 | Patients requiring mental health services housed in out-of-parish jails (this does not include Hunt) should be returned to OJC. |
| IV.B.1. Screening and Assessment | | |
| IV.B.1.a. - e. | 19 | OJC and CCS must finalize, implement and measure compliance of the policies as required by the Consent Judgment including the suicide prevention and management policy, restraint policy, referral policy, and participation of mental health staff in the disciplinary process, counseling services to specific or identified groups, and performance measures to reflect performance. Training and supervision needs to take place and be documented. |

2

Appendix B

Summary of Recommendations
Compliance Report # 7
May 1, 2017

| IV.B.1.a. - e. | 20 | CCS must begin tracking and provide services to inmates on the mental health caseload who have been identified as victims of assault or other crimes (including sexual assault) while at OJC or Hunt. |
|---|---|---|
| IV.B.1.a. - e. | 21 | CCS should continue the process of identification of the mental health caseload and their level of care needs, and aggressively improve the staffing necessary to provide services including onsite leadership staff as well as staff positions to provide direct services. This will require collaboration with OJC particularly regarding deputy staffing to include escorts for off-unit services and observation/monitoring of group therapies to maintain sound privacy. Additional staff positions have been authorized by the City but none have been filled. |
| IV.B.1.a. - e. | 22 | Assure that suicide resistant cells are sufficient in number and located on appropriate housing units. Audit housing areas to assure the physical plant poses as little risk as possible for inmates to harm themselves. |
| IV.B.1.f. | 23 | CCS must utilize the existing emergency petition process and develop a policy to provide emergency medications to inmates, as needed. This deficit results in direct harm to inmates, as well as a disruption to the facility, and danger to inmates and staff. |
| IV.B.1.f. | 24 | The Defendants and the City must employ an adequate number of operations staff and clinical staff with training and supervision. |
| IV.B.1.f. | 25 | The Defendants and the City must obtain acute hospital level services for female inmates. The absence of these critical services results in on-going harm to the inmates as well as facility disruptions. |
| IV.B.1.g. - k. | 26 | CCS must aggressively recruit and fill the vacant positions at Hunt and OJC. |
| IV.B.1.g. - k. | 27 | The Defendants and CCS must increase the frequency of treatment team meetings and reviews of treatment plans at Hunt and OJC with inclusion of inmates at the treatment plan meetings. |
| IV.B.1.g. - k. | 28 | CCS document the reasons for referrals and timeliness of responses to referrals by mental health staff. |
| IV.B.1.g. - k. | 29 | Pursuant to policies, continue at least monthly meetings of the Mental Health Review Committee, and appropriate documentation of identified concerns, problems and opportunities to improve care, and analysis of performance measures, mental health services and follow-up on implementation and results of corrective actions. |
| IV.B.1.g. - k. | 30 | Treatment planning for acute mental health patients should be provided within 4 days and every 30 days thereafter at both Hunt and OJC. |
| IV.B.1.l. | 31 | Complete annual assessment of screening prisoners and identification of inmates in need of services, for effectiveness including comparison of current mental health caseload numbers and total number of inmates receiving mental health services |
| B. 2.  Treatment | | |
| IV.B.2.a. | 32 | CCS to hire necessary staff for OJC and Hunt |
| IV.B.2.b. - d. | 33 | Defendants must develop policy and procedure for mental health evaluations for inmates on the mental health caseload involved in disciplinary proceedings. This policy must identify the information to be provided to hearing officers regarding inmates on the mental health caseload. |

Appendix B

Summary of Recommendations
Compliance Report # 7
May 1, 2017

| IV.B.2.b. - d. | 34 | Develop quality improvement data, collection, and performance measures to demonstrate that evaluations are indeed conducted and the outcome of those evaluations are provided to inmate disciplinary hearing officers.  Track the outcome of disciplinary processes for inmates on the mental health caseload. |
|---|---|---|
| IV.B.2.b. - d. | 35 | Develop policy and procedure for identification and tracking of inmates on the mental health caseload who have been victims of violence while in OJC custody (including Hunt and out of parish jails in which Orleans inmates are housed). |
| IV.B.2.e. & h. | 36 | CCS hire staff for psychiatric and psychiatric nurse practitioner positions. |
| IV.B.2.e. & h. | 37 | Implement performance indicators for medication management practices with appropriate data collection and analysis including inmates housed in OJC, Hunt, other correctional facilities, and Feliciana Forensic Facility. |
| IV.B.2.e. & h. | 38 | Implement performance measures to track the timeliness of the referral process. |
| IV.B.2.f. & g. | 39 | Return inmates receiving psychotropic medications to OJC. |
| IV.B.2.f. & g. | 40 | Discontinue transfer of inmates receiving mental health care to out of parish facilities. |
| IV.B.3.  Counseling | | |
| IV.B.3.a. - b. | 41 | The Defendants and CCS review policies and procedures for mental health services for these populations to describe the actual services needed and staff required. |
| IV.B.3.a. - b. | 42 | CCS must identify the level of need for mental health and special population inmates in the OJC with regard to specific services. |
| IV.B.3.a. - b. | 43 | CCS must develop performance indicators. |
| IV.B.4.  Suicide Prevention Training Program | | |
| IV.B.4.a. - g. | 44 | CCS continue to provide training and supervision of CNAs with regard to direct observation at OJC.   Train staff to interact appropriately with inmates they are observing. |
| IV.B.4.a. - g. | 45 | CCS provide training to mental health staff and correctional staff with regard to direct observation and transport/movement of inmates who have been referred or presented with concerns for suicide or self-harm, and document as well as analyze the direct observation/supervision of those inmates by custody staff until they are seen and evaluated by mental health staff. |
| IV.B.4.a. - g. | 46 | The Defendants must provide suicide precautions and observation in suicide resistant cells. Due to movement and unit closures, some of the suicide resistant cells have also been moved and not available to inmates on watch. Some male and female inmates continue to be placed on suicide watch and direct observation in OJC in non-suicide resistant cells on multiple units. |
| IV.B.4.a. - g. | 47 | The emergency response bags must be properly stocked and monitored. |

Appendix B

Summary of Recommendations
Compliance Report # 7
May 1, 2017

| IV.B.5.  Suicide Precautions | | |
|---|---|---|
| IV.B.5.a. - k. | 48 | OJC and CCS develop a collaborative process for the management and supervision of inmates on suicide precautions or at elevated risk for self-harm. |
| IV.B.5.a. - k. | 49 | CCS train and supervise CNA's on direct observations and interactions with prisoners. |
| IV.B.5.a. - k. | 50 | CCS develop and present CNA to prisoner ratios of 1:1 or 1:2 for direct observation rather than the current practice of 1:3 or more inmates, and one CNA or nurse for suicide watches for multiple inmates without evidence of interactions with those inmates regarding their mental status. |
| IV.B.5.a. - k. | 51 | OJC and CCS demonstrate reviews of all serious self-harm attempts and suicides and assess the periodic reports to determine if inmates are appropriately identified, adequately assessed via suicide risk assessment tools, protected and treated, including use of morbidity and mortality review and analysis. |
| IV.B.6.  Use of Restraints | | |
| IV.B.6.a.- g. | 52 | CCS and the Defendants both develop coordinated policies regarding use of therapeutic physical restraints for prevention of self-harm; assure the policies provides, and practice requires that the restraints be used for the shortest possible time period, under proper supervision, monitored, reported, and assessed. |
| IV.B.6.a.- g. | 53 | CCS maintain "use of restraint logs" for both physical and chemical restraints at OJC and Hunt. |
| IV.B.6.a.- g. | 54 | CCS continue revision and implement of policies at Hunt to include mental health staff and possibly specifically trained nursing staff in de-escalation techniques prior to the use of planned uses of force including and specifically OC spray. |
| IV.B.7.  Detoxification and Training | | |
| IV.B.7.a.- d. | 55 | OJC/CCS provide sufficient oversight to assure compliance. |
| IV.B.7.a.- d. | 56 | CCS implement the ERMA intake screen to reflect adequate screening for risk of withdrawal. |
| IV.B.8.  Medical and Mental Health Staffing | | |
| IV.B.8.a. - b. | 57 | OJC evaluate and remedy the health care staffing, training, and supervision at out-of-parish facilities where Orleans inmate with chronic medical and mental health are housed.  As an alternative, return inmates with chronic medical conditions or mental illness to OJC. |
| IV.B.9.  Risk Management | | |
| IV.B.9.a. - f. | 58 | CCS expand clinical performance measurement to include effective grievance analysis and care provided by practitioners. |
| IV.B.9.a. - f. | 59 | CCS test the reliability of measurements by having a qualified reviewer who is not the supervisor of staff being reviewed |
| IV.B.9.a. - f. | 60 | CCS track and evaluate the effectiveness of remedies implemented as a result of its quality management program, including grievance analysis, clinical performance measurement, and morbidity & mortality reviews. |

Summary of Recommendations
Compliance Report # 7
May 1, 2017

| | | |
|---|---|---|
| IV.B.9.a. - f. | 61 | At the LaSalle facilities, assure privacy for patient encounters and assure that staff is trained in suicide risk reduction. |
| **IV.C. Medical Care** | | |
| IV.C. | 62 | CCS revise the methodology for measuring discharge medications and grievances to that it produces reliable and useful information. |
| IV.C. | 63 | Defendants assign security staff for continuous coverage on each housing unit. |
| IV.C. | 64 | OJC provide appropriately stocked first aid kits and cut-down tools for each housing unit. |
| IV.C. | 65 | CCS test the reliability of training log data against current staffing. |
| IV.C. | 66 | CCS evaluate the retention of training information with a 5% sample of deputies three months following their training. |
| IV.C. | 67 | CCS train and supervise nurses in proper history taking, physical examination and documentation following trauma. |
| IV.C. | 68 | CCS and OJC develop and implement a policy on restraint use including training. |
| IV.C. | 69 | CCS discontinue recommending illness classification for pregnant inmates, unless they need to be on a medical housing unit. |
| IV.C. | 70 | OJC assure that out-of-parish inmates at the LaSalle facilities have access to psychiatric care, where medically appropriate, for the purposes of evaluation and medication management.  In the alternative, return out-of-parish inmates with serious mental health needs or who are on psychotropic medication to OJC. |
| IV.C. | 71 | OJC assure that out-of-parish inmates at the LaSalle facilities have proper oversight of medication administration. |
| IV.C. | 72 | OJC and CCS assure that the screening process for out-of-parish transfers is medically appropriate. |
| **IV.C.2.  Health Care Delivered** | | |
| IV.C.2. | 73 | Immediately revise CCS and OJC policies and train staff on the urgency of post-exposure prophylaxis immediately. |
| **IV.D.  Sanitation and Environmental Conditions** | | |
| IV.D. 1.a. | 74 | Develop a cleaning and disinfection manual describing the methods to be used, chemical use, and tools needed for effective housekeeping. |
| IV. D. 1.b. | 75 | Develop a process for Facilities Maintenance to provide electronic notification to Classification when repairs have been completed for a closed cell. |
| IV. D. 1.b. | 76 | Provide a current training schedule and tracking logs to demonstrate all deputies and supervisors are trained in the process of requesting work orders. |
| IV. D. 1.c. | 77 | Provide evidence of corrective actions completed and reviewed by the air balance contractor for TDC. |

Appendix B

Summary of Recommendations
Compliance Report # 7
May 1, 2017

| IV. D. 1.c. | 78 | Monitor and adjust the shower run time as necessary to reduce condensation and lower the risk for accidental slips and falls. |
| IV. D. 1.f. | 79 | Complete and authorize an up-to-date Infection Control Policy and provide evidence of training. |
| IV. D. 2. Environmental Control | | |
| IV. D. 2.b. | 89 | Either repair all electrical and fire safety hazards in the HOD laundry immediately or cease using the House of Detention as the laundry. |
| IV. D. 3. Food Service | | |
| IV. D. 3.a. | 81 | Reinstitute an accurate inventory and sign-in/out process for chemicals and tools. |
| IV. D. 3.c. | 82 | Provide the Monitor with the process that is developed to transport food along with the results of the testing of the revised process. |