UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


LASHAWN JONES, et al.           *     Docket 12-CV-859
                                *
versus                          *     Section I
                                *
MARLIN N. GUSMAN, et al.        *     June 8, 2017
                                *
* * * * * * * * * * * * * * * * * *


STATUS CONFERENCE BEFORE THE
HONORABLE LANCE M. AFRICK
UNITED STATES DISTRICT JUDGE


Appearances:


For the Plaintiffs:          MacArthur Justice Center
                             BY:  EMILY M. WASHINGTON, ESQ
                                  ELIZABETH CUMMING, ESQ.
                                  KATHARINE SCHWARTZMANN, ESQ.
                             4400 South Carrollton Avenue
                             New Orleans, Louisiana 70119


For the United States        U.S. Attorney's Office
of America:                  BY:  THEODORE R. CARTER III, ESQ.
                             650 Poydras Street, Suite 1600
                             New Orleans, Louisiana 70130


For the United States        U.S. Department of Justice
of America:                  Civil Rights Division
                             BY:  LAURA COON COWALL, ESQ.
                                  MEGAN R. MARKS, ESQ.
                                  KERRY DEAN, ESQ.
                             950 Pennsylvania Avenue, N.W.
                             Washington, D.C. 20530

<u>Appearances</u>:

| | |
|---|---|
| For the Orleans Parish<br>Sheriff's Office: | Usry Weeks & Matthews, APLC<br>BY:  BLAKE J. ARCURI, ESQ.<br>     FREEMAN R. MATTHEWS, ESQ.<br>1615 Poydras Street, Suite 1250<br>New Orleans, Louisiana 70112 |
| For the City of<br>New Orleans: | City Attorney's Office<br>BY:  REBECCA H. DIETZ, ESQ.<br>1300 Perdido Street, 5th Floor<br>New Orleans, Louisiana 70112 |
| Official Court Reporter: | Toni Doyle Tusa, CCR, FCRR<br>500 Poydras Street, Room HB-275<br>New Orleans, Louisiana 70130<br>(504) 589-7778 |

Proceedings recorded by mechanical stenography using
computer-aided transcription software.

<u>**PROCEEDINGS**</u>

**(June 8, 2017)**

**THE COURT:**  Thank you.  Good morning, everybody.

Let's call the case, please.  Of course, we also have Judge North.

**THE DEPUTY CLERK:**  Civil Matter 12-859, *Lashawn Jones, et al. v. Marlin N. Gusman, et al.*  This matter is set for status hearing.  Counsel, please make your appearance for the record.

**MS. COWALL:**  Good morning, Your Honor.  Laura Cowall on behalf of the United States.  With me also from the Department of Justice Civil Rights Division is Megan Marks.

**THE COURT:**  Good morning.

**MR. CARTER:**  Your Honor, Theodore Carter also on behalf of the United States.

**MS. WASHINGTON:**  Good morning, Your Honor.  On behalf of the plaintiff class, I am Emily Washington with Elizabeth Cumming and Katie Schwartzmann.

**MR. ARCURI:**  Good morning, Judge.  Blake Arcuri and Freeman Matthews on behalf of the Sheriff's Office.  Also present at the table are Director Gary Maynard and Sheriff Marlin Gusman.

**THE COURT:**  Welcome.  Thank you.

**MS. DIETZ:**  Good morning, Your Honor.  Rebecca Dietz on behalf of the City of New Orleans.

09:04

1    **THE COURT:**  Thank you.  Good morning, everybody.  We

2  are very happy to have our monitors here and our budget monitor

3  as well.  Would you all please stand up and introduce

4  yourselves.

5    **MR. VASSEL:**  Good morning, Your Honor.  Tommie

6  Vassel, the chairman of the working group.

7    **MS. MCCAMPBELL:**  Good morning, Your Honor.  Susan

8  McCampbell, lead monitor.

9    **MS. FRASIER:**  Good morning, Your Honor.  Margo

10  Frasier, monitor.

11    **THE COURT:**  Thank you.  I think we have Dr. Robert

12  Greifinger on the phone.

13    Doctor, is that you on the phone?

14    **DR. GREIFINGER:**  That's me.  Good morning.

15    **THE COURT:**  Good morning, sir.

16    And Dr. Raymond Patterson.  Dr. Patterson, my

17  friend, are you on the phone as well?

18    **DR. PATTERSON:**  I'm here, Your Honor.  Thank you very

19  much.

20    **THE COURT:**  Thank you.

21    And Dr. Patricia Hardyman.  Are you there,

22  Dr. Hardyman?

23    **DR. HARDYMAN:**  Good morning.

24    **THE COURT:**  Thank you.  Good morning.

25    And Harry Grenawitzke.  Harry, are you there?

09:05

1        **MR. GRENAWITZKE:**  Good morning.  Yes.

2        **THE COURT:**  Good morning.

3        Is there anyone else participating by telephone?

4 Is there an assistant U.S. attorney participating by telephone?

5        **MS. DEAN:**  Yes, Your Honor.  Kerry Dean for the

6 Department of Justice.

7        **THE COURT:**  Well, welcome.  Thank you for

8 participating as well.

9        Did I miss anybody?  Great.

10        Well, the way we are going to proceed, this of

11 course is a status hearing.  I have a few remarks that I would

12 like to make.  Then we will hear from the plaintiffs and the

13 Department of Justice.  Then we will hear from any of the

14 monitors, including of course Ms. McCampbell, our head monitor,

15 who wants to say something.  Then I will ask Director Maynard

16 to respond in any way appropriate and hear what he has to say.

17 Then U.S. Magistrate Judge Michael North, who has just been

18 instrumental in helping us achieve a constitutional jail, I

19 want to hear from him with respect to any remarks he may have.

20        Let me begin.  Four years ago, this Court

21 approved a Consent Judgment with respect to the Orleans Parish

22 Prison.  There's no need to rehash the horrific conditions at

23 the former facility except to emphatically say that this Court

24 will never allow that to happen again.  When society

25 incarcerates human beings, it takes from them the means to

09:06

1    provide for their own needs.  The Constitution guarantees that
2    officials will not be deliberately indifferent to the rights of
3    inmates to be safe and secure and free from violence and sexual
4    assaults.  The Constitution also guarantees that inmates will
5    receive adequate medical and mental health care.  The Consent
6    Judgment, narrowly tailored as it must be, attempts to ensure
7    that all Orleans Parish inmates are treated constitutionally.
8                Now, everyone here agrees that we have not yet
9    reached that goal.  Everyone here agrees that acts of violence
10   and suicide in the jail are still unacceptably high.  Everyone
11   here agrees that we have a lot of work to do.  Needless to say,
12   15-year-olds should not be hanging themselves in the jail.
13               Nonetheless, we are now on the right track to
14   achieving a constitutional jail.  For example, we expect the
15   jail to be close to fully staffed this summer.  Many key
16   leadership and administrative positions have been and are being
17   filled.  POST certification training is up and running, which
18   results in a better trained and better salaried staff.  Having
19   recently attended new deputy graduations, I can attest that
20   their enthusiasm and dedication to the mission is contagious.
21               We are also making progress in areas beyond
22   staffing.  A necessary medical and mental health facility will
23   be built to address critical inmate needs.  Thanks to the
24   efforts of Director Maynard, Mayor Landrieu, the City Council,
25   City Attorney Rebecca Dietz, the Sheriff's Office and the City

09:08

1   have been amicably working together to accomplish our mission.

2   However, those successes should not mask the enormity of the

3   challenge in front of us.  Decades of neglect cannot be erased

4   overnight.  So while I wish it were otherwise, future tragedies

5   and tears are inevitable as we try to bring what was described

6   as the worst jail in America into constitutional compliance.

7          A structure is finally starting to be put in

8   place to address our shortfalls and to learn from our mistakes.

9   For example, having compared recent figures from the Sheriff's

10  Office, the plaintiffs, and the monitors, we all now recognize

11  that our existing system for tracking inmate-on-inmate violence

12  needs to be improved, so that's going to be a priority for

13  everyone in the next six months.

14         We owe it to each and every inmate in the jail,

15  as well as their loved ones, to learn from the mistakes of the

16  past in order to minimize future tragedies.  Getting accurate

17  data on violence and addressing the number of unreported

18  incidents is a necessary first step in that process.

19         At times there will be disagreements between the

20  parties as the best way forward.  Given the challenges that we

21  face, those disagreements are inevitable, but those

22  disagreements are also productive.  Between them, the monitors

23  and Director Maynard bring literally centuries of correctional

24  experience to bear.  So when they discuss and debate the best

25  way forward and critically examine the other's assumptions,

09:09

1   they help ensure that we are not overlooking anything.

2            The same is true of the plaintiffs and the

3   Department of Justice.  Counsel for those parties provide an

4   invaluable outside perspective that helps expose what we are

5   getting wrong and helps light the path forward.  I thank them

6   all for their dedication and tireless efforts to our mission of

7   achieving a constitutional jail.

8            Now, right after he came on board,

9   Director Maynard told me something that has stuck with me.  As

10  I'm sure all of you know, in addition to having been a

11  brigadier general, he has been a director of corrections in

12  four states and seen a few correctional issues in his day.

13  After completing his initial assessment of the jail, he told me

14  that he has seen all the problems we have in the jail, just

15  never all in the same place at the same time.

16           What that ultimately tells me is that even

17  though the challenge before us is immense, each of the problems

18  we face is ultimately solvable provided that all stakeholders

19  work together.  After all, it is hard work and cooperation and

20  not finger-pointing and demagoguery that will solve the

21  problems we face.  In that spirit, today we move forward

22  knowing that the inmates of the jail and the people of

23  New Orleans are counting on us.

24           Let me hear from the plaintiffs and the

25  Department of Justice.  I would like to hear what you think are

09:11

1   still outstanding issues that you are concerned about as well

2   as any positive things that you think need to be addressed at

3   this point.

4          Please identify yourself for the record.

5          **MS. WASHINGTON:**  Thank you, Your Honor.  Emily

6   Washington for the plaintiff class.

7          Good morning, Your Honor.  Good morning,

8   Judge North.

9          The plaintiff class and the Department of

10  Justice appreciate the opportunity to address the Court and the

11  public about the current conditions in the jail and where we

12  are on moving forward towards compliance with the

13  Consent Judgment.

14         This is our first status conference since

15  Director Maynard began in his position as the independent jail

16  compliance director.  When that position was agreed upon by the

17  parties and ordered by the Court last year, we knew that the

18  work of reforming the jail was serious and substantial and

19  urgent.

20         Since October, the director has had to tackle

21  some significant areas that are integral to the management of

22  the jail, including budget development, improving the

23  relationship between the City of New Orleans and the Sheriff's

24  Office, and creating a recommendation for the future housing of

25  acute mentally ill inmates who are housed in the jail.

09:12

1        The director has also focused on and prioritized

2   staff recruitment, an effort that we are very supportive of.

3   As has long been acknowledged in this case, many of the reforms

4   that are needed to bring the jail into compliance with the

5   Consent Judgment are, frankly, impossible without a fully

6   staffed jail that is competently trained.

7        We continue to support the director's efforts in

8   all of these areas, but we believe it is our obligation, as the

9   representatives of the men, women, and kids in OPSO's custody,

10  to make sure that the focus of this case does remain on the

11  safety of those persons housed in the jail and the need to

12  create the constitutional conditions in the facility.  That's

13  what this case is about, and we remain concerned about the

14  safety and care of our clients.  Unfortunately, since the last

15  status conference, three young men have died in OJC:  Jaquin

16  Thomas, Colby Crawford, and Jamaine Johnson.

17       The work of moving the jail towards compliance

18  has to start with an assessment and acknowledgment of the

19  ongoing problems at the facility and sincere commitment to

20  putting concrete strategies into place.  I wanted to briefly,

21  as you mentioned, Your Honor, highlight five areas where we

22  remain concerned about the ongoing conditions at the jail.

23       The first is safety.  We are concerned about the

24  ongoing level of violence in the jail, including assaults, uses

25  of force, and other incidents that have resulted in serious

09:13

1    injuries and hospital routes for our clients.

2              The second is policies and training.  We are

3    almost four years into the Consent Judgment, and OPSO specific

4    policies that are needed to guide the management of the jail

5    have yet to be developed.  Further, OPSO is going to need to

6    train all staff, line deputies all the way up through

7    supervisors, on these facility-specific policies and to audit

8    compliance with those policies.  That work remains to be done.

9              The third is suicide prevention.  Deaths by

10   suicide and serious attempts at self-harm continue in the jail.

11   We believe our clients are currently at risk.  We are concerned

12   that despite two suicides since the last status conference --

13   that being Jaquin Thomas in October and Jamaine Johnson just

14   last month -- that strategies have not been developed and

15   implemented to prevent suicides and self-harm in the facility.

16             The fourth is staffing and supervision.  Tiers

17   in the jail continue to go unsupervised even while almost half

18   of the jail population has been held out of parish.  The

19   consequences of that are significant, both deaths and serious

20   harm to clients who are housed in the jail.

21             It's not just about hiring staff, which the

22   director is ardently working on.  It's also about supervision.

23   Someone must be holding deputies and staff accountable for

24   being present on the tiers performing their jobs.

25             The stipulated order and the director's action

09:15

1   plan both spoke of a comprehensive review of all OPSO staff.

2   We don't believe that that has occurred to date, but we very

3   much encourage the director to do so.  Where OPSO personnel are

4   either unwilling or unable to work towards reform, changes need

5   to be made.

6         The last is medical and mental health care for

7   persons housed in the jail.  Health care is contracted to

8   Correct Care Solutions, but ultimately it is the Sheriff's

9   Office's responsibility for the medical and mental health care

10   of those persons in custody.  We continue to see systemic

11   breakdowns in the areas of medication continuity, medical care

12   for chronic conditions, cooperation between the medical and

13   security staff, and delays in sick call and grievance

14   responses.

15         All that being said, we have had some very

16   productive conversations with Director Maynard, with the OPSO

17   staff, and with the monitors over the past two days.  We

18   believe that the focus has to be on accuracy and transparency

19   in assessing the current areas of noncompliance and then on

20   developing concrete and measurable corrective actions for

21   moving forward.  I think the Department of Justice has a couple

22   of comments on our vision for how to work on moving forward.

23         **THE COURT:**  Thank you.

24         **MS. WASHINGTON:**  Thank you.

25         **THE COURT:**  I would also be remiss if I didn't

09:16

acknowledge the fact that the sheriff made a great choice when
he recommended to the Court that Director Maynard become the
compliance director, so we certainly thank the sheriff for
that.

All right.  Let me hear from the Department of
Justice.

**MS. COWALL:**  Thank you, Your Honor.  The Department
of Justice, myself and Megan Marks and also Mr. Ted Carter, we
appreciate the opportunity to be here today, but more
importantly the opportunity to work together with all the
parties in this case to achieve our mutual goal.  We all agree
the most important thing here is the safety and care of the
people in the jail and the public safety of this community,
which depends on a safe and secure jail.

As Ms. Washington mentioned, there have been two
suicides and overdose deaths since our last time here in court
in September, which everyone agrees is unacceptable.
Everyone's goal is a safe and secure jail, and the parties
agree that we are not here yet.  That's why we agreed last year
to this new compliance director framework to expedite Consent
Judgment compliance, and we appreciate Mr. Maynard and the
Court continuing to work with him.

We are at a turning point now.  The director has
been on board for eight months.  Under his leadership we have
seen positive changes.  Deputy recruiting has increased

09:18

1    significantly, key leadership vacancies have been filled, staff
2    are receiving POST training and will be receiving additional
3    training and salary increases, but we all agree there is
4    significant work to be done.

5              The challenges faced by the compliance director
6    and OPSO are well documented in the monitors' reports, most
7    recently in the seventh report.  Violence and serious injuries
8    continue, the risks of suicide and self-harm are unacceptably
9    high, and there are not yet adequate systems to ensure
10   continuity of care and adequate mental health treatment, but
11   all parties, the compliance director, and the monitors have
12   committed to dedicating resources to address these ongoing
13   serious issues.

14             Director Maynard has committed to achieve full
15   staffing by July 15, and there is a further commitment for OPSO
16   to draft all of the Consent Judgment required policies and
17   train staff on them by October 1.  Director Maynard also
18   continues with the 60-day updates to his remedial plan.  As
19   ordered by the Court, this plan is to outline strategies to
20   address priority areas of the Consent Judgment with concrete
21   deadlines toward achieving substantial compliance.

22             We look forward to seeing additional details and
23   deadlines on this plan, particularly in priority areas of
24   violence reduction, suicide prevention, medical and mental
25   health care, staffing, policies, and training.  We hope to see

09:19

1  increased progress under the Consent Judgment provisions as

2  efforts shift from capacity building to targeted compliance

3  efforts.  This will require leadership, project management, and

4  collaboration.  The Court has provided all the necessary tools

5  for that.

6            The stipulated order grants the compliance

7  director authority to hire subject matter experts, and Director

8  Maynard has done that.  He has brought in Mary Livers and

9  Lindsay Hayes, both of whom are respected experts in their

10 fields.  We look forward to seeing their recommendations and,

11 more importantly, seeing Director Maynard and OPSO implement

12 those recommendations.

13            Director Maynard also has authority to conduct a

14 comprehensive staffing review and to make personnel changes

15 where they are necessary to achieve compliance with the

16 Consent Judgment.  Director Maynard also has the ability to

17 obtain adequate financial resources needed for compliance.  We

18 look forward to the continued cooperation between Director

19 Maynard, OPSO, and the City in making sure there are adequate

20 resources to achieve compliance with the Consent Judgment.

21 With all these tools, the Department of Justice looks forward

22 to working closely with the parties, the director, the

23 monitors, and the Court on expedited compliance efforts over

24 the next several months.

25            **THE COURT:**  Thank you so much.  Also, I want to

09:20

1   recognize Rick Stanley, who is in the courtroom, one of

2   New Orleans' brightest and finest lawyers.  He is assisting the

3   director in assessing and evaluating legal issues that come

4   before the Sheriff's Office and also in reducing the amount of

5   legal fees that have been paid in the past that can be used to

6   hire staff and do other things important to the running of the

7   Sheriff's Office.

8                    Mr. Stanley, I certainly thank you for all that.

9                    Does the City want to say anything?

10        **MS. DIETZ:**  Yes, Your Honor.  We would like to

11   report.  Good morning, Your Honor.

12        **THE COURT:**  Good morning.

13        **MS. DIETZ:**  I would like to start by highlighting a

14   positive.  Since Director Maynard has come on board, the level

15   of direct communication between the City and the Sheriff's

16   Office has improved dramatically.  I would say that our

17   participation and collaboration in the budget process has been

18   instrumental to the success of all of our efforts, and we

19   expect to continue that.  The City certainly will continue to

20   support the director in his efforts to bring the jail into

21   constitutional compliance.  We would like to highlight and

22   thank Judge North for all of his assistance with the parties in

23   this effort.

24                    I also wanted to provide the Court with an

25   update on the capital improvements.  In consultation with the

09:22

1    director and consistent with the stipulated order, the City has

2    three capital improvement projects ongoing pertaining to both

3    the housing of mental health and medical needs inmates at the

4    jail and holding of inmates awaiting court appearances.

5                With respect to the first improvement, the docks

6    project, this is the third floor renovation of the docks

7    facility.  This is a $3.3 million construction project.

8    Construction is expected to begin in November of 2007 and

9    completion will be June 2018.  I will also mention that the

10   docks committee has participated in the design of this

11   facility, including the monitors' participation.

12               The second capital project is the addition of

13   the 28-bed wing on the existing Youth Study Center.  This will

14   allow for additional youth inmates to be housed at the Youth

15   Study Center.  This project is in final design.  Construction

16   will begin in August 2017 and completion in August 2018.

17               Finally, the construction of an inmate mental

18   and medical health care facility and laundry, the RFP for

19   design professionals is being finalized this week.  The City

20   will make sure that the monitors have an opportunity to review

21   that RFP before it goes out to the public.  Then once design is

22   completed and construction can begin, depending on the project

23   delivery method -- which, as Your Honor knows, is a little

24   dependent on FEMA, although we are not holding anything back

25   now because of FEMA.  We are not waiting on them.  We are

09:24

1  moving forward.  This project should be completed within 24 to

2  40 months.

3           If you have any questions, I'm happy to answer

4  them.

5           **THE COURT:**  No.  I think that's wonderful.  I'm glad

6  to hear all that.  Thank you for all that.  You have been doing

7  a wonderful job as far as coordinating all the parties and

8  communicating with the Court, so we thank you for that.

9           **MS. DIETZ:**  Thank you.

10          **THE COURT:**  Let me hear from our lead monitor,

11 Susan McCampbell.  And then if any of the other monitors or our

12 budget chairman, Tommie Vassel, want to speak, or anyone on the

13 phone, we certainly will be happy to hear from you.

14          Thank you for coming, Ms. McCampbell.  As you

15 know, this process would have been virtually impossible if I

16 would not have had the assistance of the monitors all these

17 years to go ahead and help us evaluate what needs to be done at

18 the jail and provide guidance.

19          **MS. MCCAMPBELL:**  Thank you, Your Honor.  I wasn't

20 comfortable with the "centuries" part.

21          **THE COURT:**  Well, it wasn't just you; it was

22 everybody.

23          **MS. MCCAMPBELL:**  Thank you, Your Honor.  We are very

24 pleased to be here today and certainly agree with the comments

25 made by the plaintiffs, DOJ, and the City regarding sort of

09:25

1   light at the end of this tunnel, and it's very gratifying to

2   us.

3                   I don't really believe I need to recapitulate

4   everything that's in our seventh monitoring report except to

5   note that we were on site the week of March 20 and the report

6   was finalized on May 1.  There are essentially eight

7   recommendations we made in the report, which echo a lot of what

8   we heard today, and I will just mention them quickly.

9                   One is we encourage the director to continue to

10  add to the executive leadership, as Ms. Cowall.  We believe

11  that he needs more help, and we would encourage him to do that.

12                  Secondly, staffing.  We have been struggling, as

13  you know, with staffing studies and how much staffing is

14  needed.  We had a terrific meeting yesterday regarding that and

15  the budget, and we agreed that we will revisit the issue on

16  September 1.  We will by then have a fully staffed jail, and we

17  will be able to evaluate what posts are needed, what posts

18  aren't needed, and have a really strong look at shift relief

19  factors.  We will visit that again.

20                  The hiring process, I didn't have a chance to

21  meet with the HR director.  I would just say that I'm

22  encouraged by the fact that she is producing a written policy

23  and procedure to guide hiring.  I will get back with her about

24  that.

25                  The other area was emergency operations and

09:26

1    making sure that the policies and procedures are in place to

2    address all emergencies, whether it's an overturned tanker

3    truck on I-10 or whether it's an inmate incident.  Chief

4    Tidwell has told me that he anticipates having all the policies

5    and procedures done mid-July for our review, so I'm

6    anticipating seeing that then.

7                    Phase III, we are just thankful, very thankful

8    we got Phase III, nothing more to say about that.

9                    The seventh area was critical incident review,

10   which you mentioned, Your Honor.  We are working with the staff

11   there to produce a process that we don't continue to repeat the

12   same mistakes.  That's critical incident review, root cause

13   analysis, and action planning.  Colonel Colvin [phonetic], on

14   the staff there, has been working with Sheriff Frasier, and we

15   will continue to do that.  I think that it's always difficult

16   to engage in objective self-critical analysis no matter who we

17   are, but it's essential to not repeating the same mistakes, so

18   we will continue that process.

19                   Then the other thing to mention, as Ms. Cowall

20   did, was the road map to compliance, so let me address some

21   things that we have concluded in the last two days.  If I

22   haven't accurately captured these, I'm sure Director Maynard

23   will correct me.

24                   First of all, we have committed to improved

25   communications at a personal and more general level.

09:27

1    Director Maynard and I will speak at least every week and more
2    often if we need to, even if it's just to say hello, so we can
3    make sure that the list of what we need to accomplish doesn't
4    get lost and that we can challenge each other, as you said,
5    about whether or not we need to move forward.
6               Compliance updates, we spoke yesterday -- and I
7    hope that I'm saying this right, Director Maynard -- that
8    Captain Peters will now produce monthly compliance reports that
9    will be used by Chief Tidwell so it's not additional work.  So
10   we will see the kind of things that Ms. Cowall talked about,
11   which are what is the paragraph, what is the goal, who is in
12   charge of it, and what's the date it's going to be due.
13              So we will see that every month, and then we can
14   dispense with this other sort of extraneous efforts to do
15   better communications and just focus on compliance.  Then that
16   way it gives us the opportunity, if we have something to offer
17   or a suggestion, to do that.  We are looking forward to that.
18              In that same vein, Chief Tidwell and the
19   director committed to doing a training matrix which lists all
20   the training that will happen between now and October, which
21   will include the topic, the status of the lesson plan, when the
22   training would be delivered, how the training will be
23   delivered, and the due dates.  Very positive.
24              As you mentioned, Your Honor, we also had a
25   very, very productive meeting yesterday regarding the issue of

09:29

1   accuracy of data and reporting.  We had a very long list of the

2   possible indicators, and we agreed on four of the major

3   indicators.  Chief Laughlin is drafting a hopefully very short

4   summary of what we talked about yesterday and how that will be

5   implemented.  We agreed that we will look at the revision on

6   how we are going to look at reports and the reporting that they

7   get and evaluate it after two months.

8           The information system currently in use in the

9   Sheriff's Office goes back, I was told yesterday, to 1983,

10  which means it's like twice as old as most of the people

11  working there right now.  Even though there's a lot of

12  information in the system, it's not user-friendly, and the new

13  JMS is scheduled to be online the first of the year.  So we

14  don't want to create a workflow that will be changed on the

15  first of the year.  When we finish that, Your Honor, we will

16  report back to you.

17          I do want to emphasize that the reporting that

18  we are not getting, the monitors are not getting, is because

19  OPSO's leadership isn't getting it.  So we are not suggesting

20  for a minute that someone at the top of the organization is not

21  telling us.  It's people in the organization aren't telling

22  them.  As you would guess, that can be kind of a strained

23  relationship.  We worked through that yesterday with all

24  parties, and I think we are all very satisfied with that.

25          **THE COURT:**  Glad to hear that.

09:30

1          **MS. MCCAMPBELL:**  The last thing I wanted to mention

2    was -- and we have Dr. Greifinger and Dr. Patterson on the

3    phone, and we have the CCS executive staff here -- we are very

4    concerned about putting together a cogent, date-driven,

5    responsibility-driven plan to get in compliance with the

6    provisions of the medical and mental health parts of the

7    Consent Judgment.

8               I appreciate Ms. Dietz volunteering to put

9    together a group to look at the contract and to look at

10   performance measures, which I think are very important

11   components.  But I also think, in that same vein, there has to

12   be a plan going forward to address the issues that

13   Dr. Patterson and Dr. Greifinger reported out.

14              The last thing I would say, Your Honor, is that

15   as we anticipated when we prepared compliance report No. 7, we

16   didn't anticipate a lot of forward progress only because the

17   hole was so deep.  So we did find that compliance did not

18   improve dramatically, and we didn't anticipate it would.  We

19   are now, I think, along with the parties in the room -- our

20   next tour is scheduled for the week of October 9.  We

21   anticipate, through the collaboration that's been described

22   here today, that we will have progress forward on our part of

23   it, which is compliance.

24              And also to note as well, working towards

25   compliance and working towards the other issues in the

09:32

1    constitutional jail are not mutually exclusive things.  They

2    will achieve the same end.  We want to be very cautious and

3    conscientious about not requiring the defendants to do double

4    work, stuff for us and stuff for them.  That's why we have had

5    this conversation about how can we consolidate where we are

6    going.

7            The last thing I would add is that we are also

8    trying to be extremely transparent and available.  Since we put

9    up the website in -- oh, wow, I think it was September of 2014.

10   I checked today with my web guru.  There has been almost 50,000

11   hits on that website.  So we are very happy to know that the

12   community -- and I know from getting emails from staff.  We are

13   very happy to know that people are looking at the work,

14   assessing the work, and hopefully helping the sheriff and

15   Director Maynard achieve compliance.

16           **THE COURT:**  Thank you.  As you know, I'm so grateful

17   for the efforts of the monitors and the budget guru, Tommie

18   Vassel.  We would not be able to achieve success without you

19   all, so thank you so much.

20           Do any of the monitors wish to address the Court

21   in any way?  The budget chairman?  Anybody?

22           That being the case, Director Maynard, would you

23   like to say a few words?  Thank you for coming.

24           **MR. MAYNARD:**  Yes, sir.

25           **THE COURT:**  I thank the sheriff for coming.

09:33

1          **MR. MAYNARD:**  Thank you, Your Honor.  Gary Maynard,

2    independent compliance director, OPSO.

3          I did want to indicate that we had filed a

4    response to the monitors' report No. 7.  I thought we had.  I

5    sent a document and thought it was filed, but it was not.  So

6    we may consider filing that tomorrow.  We did send it to all

7    parties, so they are aware of what our response was.

8          As has been mentioned, I think the most positive

9    things, the past two days we have had really good conversations

10   with the plaintiffs and the monitors and DOJ and our staff

11   about some of the common problems.  One of the most encouraging

12   things to me -- which I knew but reaffirmed -- is that we all

13   have the same objective in mind, and that's compliance and a

14   safer place for inmates to live and the staff to work and safer

15   for the community.

16         I'll just kind of walk along some of the

17   comments that were made and reiterate the example of safety,

18   the level of violence.  I was asked at one point what level

19   would be acceptable, and there is no acceptable level of

20   violence.  There's no acceptable level of suicide.  There's no

21   acceptable level of use of force.  Those things are anomalies

22   that should not occur, but they always do.  Our objective is to

23   get all of those down to zero.

24         We have worked with the plaintiffs especially in

25   looking at ways to evaluate violence and how it occurs and

09:35

1    taking steps to reduce that.  It has not been reduced as much
2    as I would like.  Since September to date, it's probably about
3    a 10 percent reduction in violence, which is not enough.  It's
4    better than nothing, but it's not enough.
5              The reduction in use of force has been more
6    significant, as has the reduction in the inmate assaults on
7    staff has been reduced significantly but still something that
8    is an issue, something we think about every day.  There's
9    nobody who hates any more that somebody is injured -- an inmate
10   is injured or a staff is injured -- than me.  We will work to
11   continually try to reduce those numbers and make it a safer
12   place to be.
13             Relative to the policies and the training, we
14   indicated in our initial remedial action plan that we would
15   have all the policies in the Consent Judgment by October 1
16   completed and trained on.  I think it may not be as fast as
17   everyone wants, but it's a steady progress.  I was assured
18   again yesterday by the people who work with the policies and
19   training that we will have all of those policies in place and
20   trained on by October 1 of this year.
21             Suicide prevention.  As Ms. Washington
22   mentioned, Lindsay Hayes has come in.  He has spent five days
23   here in his initial assessment.  I just got last night his
24   initial rough draft response.  I haven't had a chance to really
25   study it, but we will be getting a response from him pretty

09:36

1   soon.  Whatever recommendations he makes, I talked to him about
2   running that by Dr. Patterson just to make sure that we are in
3   concert with Dr. Patterson's ideas on suicide prevention as
4   well as Lindsay Hayes, another national expert.
5          Staffing.  As was mentioned, we are making
6   tremendous progress in staffing.  Ms. Stase [phonetic] in the
7   HR department, has done an excellent job.  We have a task force
8   on recruitment we set up about three months ago.  We have
9   participants from plaintiffs and monitors and our staff working
10  on that.
11         One of the things we decided to do was to start
12  sort of an advertising campaign.  We committed $60,000 to
13  advertising and making some videos, and those are going out.
14  You may see them on the air.  We think they are making a big
15  difference.  The quality of recruits that we are getting today,
16  as you noted and the monitors and DOJ noted, we have
17  enthusiastic classes now coming in.  They are very excited
18  about working here.
19         Sort of our model on recruiting is that we are a
20  great place to start.  If you want a career in criminal
21  justice, then there is no better place to start than the
22  corrections side.  If you get involved in that, even if you go
23  to law enforcement, you will be a much better law enforcement
24  officer.  Some jurisdictions say, well, if you train everybody
25  really well and you teach them leadership skills, they will go

09:38

somewhere else.  We are really not concerned about that.  If
you train people well, you give them leadership skills, and you
treat them right, we think they will stay with us.  We are very
excited about the staffing.

About the training, we have the National
Institute of Corrections in this week.  They are doing the
crisis intervention training with about 30 of our staff.
That's a very exciting training.  It's a de-escalation training
on working with mentally ill and working with troubled inmates,
and we think that's going to make a difference in the use of
force reductions and how we deal with inmates.

The area of medical and mental health is always
a concern.  Mental health and medical is such a big part of
jail or prison operations.  It is always something that has to
be focused on.  We have a task force on medical and mental
health as chaired by Chief of Corrections Tidwell.  It involves
sort of all parties in that task force looking at how we can
better move toward the end goal of good medical and mental
health treatment for all our offenders.  That task force will
be involved, as will Dr. Patterson and Dr. Greifinger, in our
Phase III mental health facility when it gets built.  So this
committee that Chief Tidwell is chairing now, the mental
health/medical, part of its work will be a transition to the
mental health facility when it's built.

Ms. McCampbell mentioned some of the compliance

09:39

1    update that we talked about with Captain Peters.  He is very

2    comfortable doing that.  It's not extra work, but it's

3    something he can do monthly and provide that update to the

4    monitors and to the plaintiffs about what policies we are

5    working on, when will those policies be completed, and when

6    that training is going to take place on those policies.  I

7    think the monthly update, as we agreed, would replace the

8    quarterly updates, which I think is a good idea, and it will

9    give the monitors and all parties better information.

10                One thing that was mentioned was the unreported.

11   As Ms. McCampbell mentioned, we did have a good meeting on that

12   with the plaintiffs and the monitors and the DOJ and Chief

13   Tidwell and Chief Laughlin about all the many sources of data

14   about incidents.  We know that there are incidents that go

15   unreported for one reason or another.  We are not satisfied

16   with that at all.  We are striving for a goal of no incidents

17   being unreported.  We know that's very difficult to achieve,

18   but we just know that the value of our data about incidents is

19   tainted by the fact that there's one incident that was not

20   reported, so it throws the whole value of that data off.

21                We know that very well, and that's something

22   from that meeting yesterday -- it was a very productive

23   meeting.  We agreed to start this new process of sort of

24   instant reporting of incidents coming from four different

25   sources of data, try that for three months, see how that works.

09:41

1   At the same time, we will continue the current process, which

2   is a little complicated.  We will continue that process, but at

3   the same time look at this new process of daily incident

4   reporting and see how that works.  I think it will be better.

5           The compliance issues.  As Ms. McCampbell

6   mentioned, we probably haven't made a lot of progress in the

7   compliance area as we have been working on recruiting and

8   training and some of these other issues.  Chief Tidwell, he is

9   charged with the compliance team now.  He oversees that team.

10  He will be paying attention to all of those issues and having

11  progress reports to all the parties.

12          Again, I think the very positive thing is that

13  everything that the plaintiffs and the monitors spoke to are

14  issues that we concur with are issues that need to be

15  addressed.  We think, again, it's been a very, very productive

16  last two days.  I think we are going to be moving forward.

17          **THE COURT:**  Thank you, Director.  I have all the

18  confidence in the world in your abilities to turn this thing

19  around.

20          **MR. MAYNARD:**  Thank you.

21          **THE COURT:**  Is there anyone else that needs to be

22  heard or would like to be heard?

23          All right.  Well, then, I am going to let the

24  last word come from U.S. Magistrate Judge Michael North.  I can

25  tell you, from the Court's standpoint, the light at the end of

09:42

1   the tunnel is very much brighter because of the assistance he

2   has rendered to the parties and the Court.  He has been

3   excellent at promoting communications between the parties,

4   keeping me involved, and acting as a liaison in this case.  He

5   has just played a critical role in this entire process.  The

6   Court is very grateful for his assistance.

7                        Judge North.

8           **MAGISTRATE JUDGE NORTH:**  Thank you, Judge Africk.

9                        As many of you know, in September of 2015,

10  Judge Africk asked that I become actively involved in this case

11  for the first time to work with the parties, the monitors, and

12  other interested individuals and entities to achieve, wherever

13  possible, the amicable resolution of numerous and varied

14  disputes and issues that are important if not crucial to

15  attaining the Sheriff's Office's compliance with the

16  requirements of the consent decree.

17                       Over the past 20 months, I have spent probably

18  hundreds of hours with Judge Africk and his staff,

19  Sheriff Gusman and his staff and counsel, Mayor Landrieu,

20  numerous deputy mayors and city council persons, along with

21  their respective staffs, their outside counsel, and two

22  different city attorneys, each of the independent court

23  monitors, various attorneys with the Department of Justice

24  based here in New Orleans and in Washington, D.C., attorneys

25  for the plaintiffs in this case, and the compliance director,

Mr. Maynard.

In addition, on multiple occasions I have had
the opportunity to meet with and discuss the issues in the case
with deputies and rank at OJC, inmates at the jail, and
numerous nonparties, both individuals and representatives of
various organizations, including the judges of the Orleans
Parish Criminal District Court and that court's judicial
administrator; the Orleans Parish district attorney,
Mr. Cannizzaro; the secretary of the Louisiana Department of
Corrections, James LeBlanc; sheriffs of some of our neighboring
parishes; the city's criminal justice coordinator, Judge Calvin
Johnson; as well as other various interested community leaders,
the Vera Institute, and the Business Council of New Orleans and
the River Region.

I have also had the opportunity to meet with and
spend time with the architects for both the Sheriff's Office
and the City concerning the housing of special populations at
OJC and the Court-appointed monitors whose expertise is
particularly germane to that area.

Now, I don't share this laundry list of
individuals and people just for the sake of doing so.  I
mention all this now because, as a result of these many
interactions with all of these people and entities, I have come
to one clear and firm conclusion.  If we are to be successful
in solving the many problems with the jail, as Judge Africk

09:45

1    alluded to, problems that have been decades in the making, we

2    will need the talent, effort, vision, and cooperation of

3    everyone I have mentioned.

4             The Court is not naive enough to think that many

5    or all of these persons or institutions will not sometimes have

6    competing interests or that their counsel or advocates will

7    always agree on the best solutions to the many challenges we

8    face in achieving compliance with the consent decree.  There

9    are many legitimate bases for honest disagreement.

10            Indeed, our collective experience in this case

11   has taught that even in the face of the most challenging

12   disagreements, compromise and amicable resolution is possible

13   when everyone involved acts in good faith and with candor, both

14   toward each other and toward the Court.

15            Ultimately the legitimate aims and objectives of

16   each of these groups and individuals must coalesce around one,

17   single, overarching goal, the achievement of substantial

18   compliance with the consent decree, which can only happen when

19   we are able to say that every inmate in the custody of the

20   Orleans Parish Sheriff's Office is housed and treated in a

21   constitutional fashion, male or female, adult or youth, healthy

22   or infirmed, whether medically or psychologically.

23            In the event that it was ever in question, I

24   want to make two things clear to the parties and the interested

25   citizens of Orleans Parish when it comes to the jail and our

09:46

1    efforts to achieve compliance with the terms of the Consent
2    Judgment.
3              First, that I sincerely commend the efforts of
4    all the parties and the monitors over the past months in
5    getting us to where we are today, and I thank them all for
6    their hard work.  I know that because of the efforts of
7    Judge Africk, the monitors, the parties, the compliance
8    director, the men and women of the Sheriff's Office who have
9    committed to solving the problems we face that we are in a
10   better place today vis-à-vis the jail than we have been in
11   many, many years.
12             In this regard, I simply do not believe the
13   conditions in the jail have regressed.  I echo Judge Africk's
14   comments regarding the exceptional efforts of Mr. Maynard, who
15   was a stranger to this city just eight months ago.  This Court,
16   the Sheriff's Office, and the City of New Orleans are extremely
17   fortunate to have such a capable and committed leader in the
18   important role of compliance director.
19             Second and possibly more important, while I do
20   commend everyone's work thus far, I have great expectations --
21   and I know Judge Africk shares those expectations -- that the
22   spirit of cooperation and collaboration that we have seen in
23   this case to this point must and will continue for as long as
24   it takes us to get to the finish line with regard to the jail
25   and the treatment of the city's inmate population.

09:48

1      We know that good faith disagreements among the

2 various interests will always be a challenge for us, but we

3 also know and resolve to face those differences and challenges

4 in good faith and to work to resolve them in good faith.  The

5 citizens of New Orleans expect and deserve no less.  I look

6 forward to continuing to work with the parties to deliver on

7 those expectations.  So thank you all for everything that you

8 have put in to getting the case to this point.

9      Thank you, Judge Africk.

10     **THE COURT:**  Thank you.  Judge, well, thank you for

11 those very, very thoughtful remarks, which I echo.  I'm always

12 reluctant to work with anyone who was first in his law school

13 class, but I do make an exception for Judge North.

14     Well, I have nothing else unless you all do.

15 Thank you.  We are really headed, as Judge North said, in the

16 right direction with a spirit of camaraderie between us that

17 makes me feel good about where we are going.  We will be in

18 recess.

19     I'm going to speak to Ms. McCampbell.  I hope to

20 set another status hearing sometime in September, see how we

21 are doing.  We will get a date on that.  Of course, I will put

22 out a minute entry.  Unless there's any further business before

23 the Court, we will be in recess.  Thank you so much.

24     **THE DEPUTY CLERK:**  All rise.

25     (Proceedings adjourned.)

09:49

1                              * * *

2                          **<u>CERTIFICATE</u>**

3            I, Toni Doyle Tusa, CCR, FCRR, Official Court

4     Reporter for the United States District Court, Eastern District

5     of Louisiana, certify that the foregoing is a true and correct

6     transcript, to the best of my ability and understanding, from

7     the record of proceedings in the above-entitled matter.

8

9

10                           *s/ Toni Doyle Tusa*
                             Toni Doyle Tusa, CCR, FCRR
11                           Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25