# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

_____

LASHAWN JONES, *et al.*, and                    )
THE UNITED STATES OF AMERICA,         )
                                                             )      Civil Action No. 2:12-cv-00859
                PLAINTIFFS,                           )      Section I, Division 5
                                                             )      Judge Lance M. Africk
                       v.                                   )
                                                             )      Magistrate Judge Michael B. North
MARLIN GUSMAN, Sheriff,                       )
                                                             )
                                                             )
                DEFENDANT.                         )
_____       )

---

## Report No. 8 of the Independent Monitors
## January 12, 2018

---

Margo L. Frasier, J.D., C.P.O., Lead Monitor
Robert B. Greifinger, M.D. Medical Monitor
Harry E. Grenawitzke, R.S., M.P.H., D.A.A.S., Environmental Health and Sanitation Monitor
Patricia L. Hardyman, Ph.D., Classification Monitor
Darnley R. Hodge, Sr., M.S. Correctional Practices Monitor
Susan W. McCampbell, M.C.R.P., C.J.M., Administrative/Correctional Practice Monitor
Raymond F. Patterson, M.D., D.F.A.P.A., Mental Health Monitor

Email: nolajailmonitors@nolajailmonitors.org
Web:   www.nolajailmonitors.org





**Compliance Report # 8**
*LASHAWN JONES, et al., and the United States of America*
*v.*
*Marlin Gusman, Sheriff*

**Table of Contents**

|  |  | Page |
|---|---|---|
| I. | Introduction | iv |
|  | A.  Summary of Compliance | v |
|  | B.  Critical Issues – Opportunities for Progress | vi |
|  | C.  Review Process of Monitors' Compliance Report #8 | x |
|  | D.  Communication with Stakeholders | x |
|  | E.  Recommendations | x |
|  | F.  Conclusion and Path Forward | x |
| II. | Substantive Provisions |  |
|  | A.  Protection from Harm | 1 |
|  | A.1. Use of Force Policies and Procedures | 6 |
|  | A.2. Use of Force Training | 9 |
|  | A.3. Use of Force Reporting | 12 |
|  | A.4.  Early Intervention System | 18 |
|  | A.5. Safety and Supervision | 20 |
|  | A.6. Security Staffing | 31 |
|  | A.7. Incidents and Referrals | 40 |
|  | A.8. Investigations | 43 |
|  | A.9. Pretrial Placement in Alternative Settings | 46 |
|  | A.10. Custodial Placement | 47 |
|  | A.11. Prisoner Grievance Process | 71 |
|  | A.12. Sexual Abuse | 74 |
|  | A.13. Access to Information | 77 |
|  | B.  Mental Health Care | 78 |
|  | C.  Medical Care | 102 |
|  | D.  Sanitation and Environmental Conditions | 113 |
|  | E.  Fire and Life Safety | 145 |
|  | F.  Language Assistance | 156 |
|  | G.  Youthful Prisoners | 158 |
|  | H.  The New Jail Facility | 160 |
|  | I.  Compliance and Quality Improvement | 161 |
|  | J.  Reporting Requirements and Right of Access | 164 |
| III. | Status of Stipulated Agreements – February 11, 2015 and April 22, 2015 | 165 |



Page

**Tables**

Table 1 – Summary of Compliance – All Tours                          v
Table 2 – Status of Compliance – Stipulated Agreements               v
Table 3 – Summary of Incidents January – October 2017                25
Table 4 – OPSO Staffing Comparisons                                  34
Table 5 – Security and PREA Designations of OPSO                     60
Inmates Housed at East Carroll Parish

**Figures**

Figure 1 – Rates and Completion Time of Initial Custody
Assessments 2017 YTD                                                 57
Figure 2 – ISI Usage Errors Noted During Housing Audit               64
Figure 3 – Numbers of Total and Guilty Disciplinary Infractions
September 2016 – October 2017                                        68
Figure 4: - Types of Disciplinary Infractions of which OPSO Detainees
Were Found Guilty September 2016 – October 2017                      69

**Appendices[1]**

Appendix A -  Summary Compliance Findings by Section Compliance
Reports 1 – 8                                                        176
Appendix B – Section IV. A – Protection from Harm – Summary of
Outstanding Recommendations                                         183
Appendix C – Section IV. B – Mental Health Care – Summary of
 Outstanding Recommendations                                        188
Appendix D – Section IV. C – Medical Care - Summary of Outstanding
Recommandations                                                     190
Appendix E – Section IV. D – Sanitation and Environmental Health –
Summary of Outstanding Recommendations                              192
Appendix F – Section IV. F – Language Assistance - Summary of
Outstanding Recommendations                                         195
Appendix G – Section IV. G – Youthful Prisoners - Summary of
Outstanding Recommendations                                         196
Appendix H – Section VII. Compliance and Quality Improvement –
Summary of Outstanding Recommendations                              197
Appendix I – VIII. Reporting and Right of Access - Summary of
Outstanding Recommendations                                         198

---

[1] There are no outstanding recommendations for paragraphs: Section IV. E., Fire and Life Safety, and VI. The New Jail Facility.

iii



## I.    Introduction

This is the eighth report, "Compliance Report #8" submitted by the Independent Monitors of their assessment of the Orleans Parish Sheriff's Office's (OPSO) compliance with the Consent Judgment of June 6, 2013.[2] Report # 8 reflects compliance as of November 8, 2017; reviewed for this Report are incidents and compliance-related activities between April 1st and October 31, 2017.  This is the second report prepared since the appointment of the Independent Compliance Director (ICD) Gary Maynard, who began work on October 1, 2016.

The Monitors continue to provide technical assistance as requested by the ICD. Pursuant to the Stipulated Order dated June 21, 2016, the ICD prepared "60-day" update reports for the Court as a record of the OPSO's activities and efforts to achieve compliance. In the preparation of this report, the Monitors reviewed the IDC's reports as one source of documentation to support the findings reported herein.  The Monitors carefully reviewed the documents provided by OPSO, conducted on-site meetings, interviewed staff and inmates, and observed operations.

Report #8 not only assesses OPSO's current status of compliance, but also provides new recommendations to further sustainable achievement of the Consent Judgment's requirements.  Appendices B through I summarize outstanding recommendations made by the Monitoring team in the previous seven reports.

In summary, the Monitors find that safety, medical and mental health care, and environment conditions of inmates held in both the Orleans Justice Center (OJC) and the Temporary Detention Center (TDC) has improved, marginally, since the assessment provided to the Court in March 2017.

---

[2] This compliance report is based on formal the on-site tours by Monitoring Team members. The tour was originally scheduled for the week of October 9th, but because of expected severe weather, was postponed – and occurred the weeks of October thru November 8th.  Additionally, members of the Team were on-site in New Orleans since the March 2017 compliance tour to provide technical assistance: McCampbell: June 5 - 7, July 17 – 19. and September 25 – 27; Frasier: May 25, June 6 - 8, July 16 - 19, August 10 - 11, and September 25 - 27; Grenawitzke: August 9 – 11; and Hardyman: July 26 - 29.



## A.  Summary of Compliance

Achievement of compliance with Consent Judgment, Stipulated Agreements, and Stipulated Order will bring the Orleans Parish Sheriff's Office (OPSO) and its' correctional facilities -- Orleans Justice Center (OJC) and the Temporary Detention Center (TDC) -- closer to operating and sustaining a Constitutional jail system.

**Table 1 – Summary of Compliance – All Compliance Reports[3]**

| Compliance Report/Date | Substantial Compliance | Partial Compliance | Non-Compliance | NA/Other | Total |
|---|---|---|---|---|---|
| #1 – December 2013 | 0 | 10 | 85 | 76 | 171 |
| #2 – July 2014 | 2 | 22 | 149 | 1 | 174 |
| #3 – January 2015 | 2 | 60 | 110 | 2 | 174 |
| #4 – August 2015 | 12 | 114 | 43 | 4[4] | 173 |
| #5 – February 2016 | 10 | 96 | 63 | 4 | 173 |
| #6 – Sept 2016 | 20 | 98 | 53 | 2 | 173[5] |
| #7 – March 2017 | 17 | 99 | 55 | 2 | 173 |
| #8 – November 2017 | 23 | 104 | 44 | 2 | 173 |

The status of compliance with the two stipulated agreements (February 11, 2015 and April 22, 2015) is as follows:

**Table 2 – Status of Compliance with 2015 Stipulated Agreements[6]**

| | Substantial Compliance | Partial Compliance | Non-Compliance | NA | Total |
|---|---|---|---|---|---|
| August 2015 | 21 | 12 | 1 | 0 | 34 |
| February 2016 | 21 | 12 | 1 | 1 | 34 |
| September 2016 | 26 | 7 | 1 | 0 | 34 |
| March 2017 | 28 | 4 | 1 | 1 | 34 |
| November 2017 | 21 | 11 | 1 | 1 | 34 |

---

[3] See Appendix A for a summary of historical compliance with each provision of the Consent Judgment.

[4] Section IV.A.6. of the Consent Agreement was broken out into separate subparagraphs for the purpose of reporting.  This increased, therefore, the paragraphs from 171 to 174.

[5] Paragraph IV.A.6. Security Staffing (a.) is in non-compliance.  In fairness to OPSO, the Monitors evaluated the sub-paragraphs of this section and found that several are in compliance or partial compliance.  These findings, however, do not erase OPSOs non-compliance in the critical issue of lack of staffing.

[6] See page 165 for details.



**B.  Critical Issues – Opportunities for Progress**

The Monitors summarize below the critical issues identified in preparation of this report.  These findings form the basis for new recommendations to assist OPSO to achieve and sustain compliance.

1. **Foundational Work** - The essential, core work required to achieve compliance includes:

    a. Policies and Procedures – OPSO must complete the policies and procedures that prescribe how the facility operates and assure inmate and safety, in accordance with the Consent Judgment and accepted correctional practice.  The Court has ordered that drafts of 34 of the outstanding policies and procedures be provided to the Monitors and the parties by January 23, 2018.  Importantly, these policies include those to guide emergency operations in the facilities.

    b. Adequate staffing – There is inadequate staffing in the facilities (OJC and TDC), based on OPSO's staffing analysis.  Housing units do not have assigned staffing; further assigned staff leave housing units unattended for meal breaks, other duties, et al.  These deficiencies include supervisory, mid-management, and leadership positions with insufficient subject matter expertise to achieve and sustain compliance.  The findings reported in Section IV.A.6, Security Staffing, overview compliance issues, and provide specific recommendations.  However, of particular concern is the OPSO's human-resources capacity. In order to achieve adequate staffing, the OPSO's hiring requirements and background investigation protocols need to be reviewed and revised to address the high attrition rate among newly hired employees.

    c. Training – Employee training, both pre-service and in-service, requires attention to ensure consistency with OPSO policies and procedures.  The foundational work requires includes preparation of lesson plans to provide for a consistent instruction message, teaching by qualified individuals, and demonstration and documentation of knowledge gained.



d. <u>Supervision</u> – Safe operation of OPSO's facilities requires adequate and sufficient first-line and mid-management supervision. The need for mentoring, coaching, and accountability for newly hired or prompted employees, as well as fulfilling the Consent Judgment's requirements, dictate this as a foundational need.

2. **Medical and Mental Health Care** – The Medical and Mental Health Monitors report challenges remain in the provision of basic case, staffing, and recordkeeping as well as collaboration with custody/security staffing. Harm to inmates continues, particularly regarding mental health care.

3. **Inmate Safety and Protection from Harm** - The following issues continue to jeopardize the safe and security of the OPSO facilities:

a. <u>Violence</u> - The level of violence within the facilities remains high – including inmate on inmate assaults. High levels of disorder and non-compliance to the institutional rules result in staff's over-reliance on use of force. No matter the data used to review violence-related trends, none is sustainability downward. Incidents involving substance abuse overdoses inside the facilities, disturbances, and deaths of inmates continue to present serious challenges to the OPSO.

b. <u>Early Warning System</u> (EIS) – The EIS remains compromised and precludes the required prompt identification of staff whose actions threaten inmate and facility safety. In the absence of a workable software/technology, a "human work around" is in place to track this information. This manual process requires significant expenditure of time and resources within a system already hampered by inadequate staffing.

c. <u>Classification</u> – The classification processes require attention to ensure housing decisions and placements are consistent with OPSO policies and objective classification principles and credible auditing identifies issues and corrects placements.

d. <u>Inmate grievances</u> – Questions and concerns submitted by inmates are forwarded to the unit/individuals responsible for addressing the



respective issues, but attention is required as to the timeliness and adequacy of responses.  Sustainable problem-solving and systemic fixes, as discussed as part of the review of "Quality Improvement," need attention.  Collaboration between OPSO and the medical/mental health contractor to address these grievances also requires work.

e.  <u>Incident Reporting</u> - Collaboration efforts for the reporting of incidents continues among the Monitors, OPSO, and the attorneys for the Plaintiff class/DOJ.  As discussed in this Report, progress toward identifying and reporting has improved, but continues to require significant attention by all involved.  There are still serious incidents for which no report is prepared by OPSO staff; including inmate on inmate assaults resulting in hospitalization.

4.  **Sanitation and Environment Conditions** – Significant work remains regarding the public health and inmate/staff safety risks inside the facility.  Again, the staffing challenges impact the ability of OPSO to develop and sustain the work needed as required by the Consent Judgment.

5.  **Youthful Prisoners** – The Monitors acknowledge and commend the educational program established in OJC in the last six months.  There are additional requirements of the Consent Judgment that remain to be met, including provision of age appropriate mental health services and adequate housing for female youth.

6.  **Inmate Sexual Safety** – OPSO continues to prepare for its required audit of compliance with the Prison Rape Elimination Act of 2003 (PREA).  More collaboration is needed regarding assessments of inmates as potential victims and potential predators in conjunction with the contract medical/mental health provider.  Increases in inmate reports of sexual assault and sexual harassment are generally positive indicators of the inmates' trust in the system; however, the unidentified changes in assessments occurring about the same time as the upward reporting trend require attention and analysis.

viii



7. **Compliance, Quality Reporting, and Quality Improvement** – An essential element to ensure inmate safety is OPSO's timely review of serious incidents to assess cause(s) and then to develop and implement actions plans to address the issue(s).  This is not done. Systemic issues remain unaddressed and continue to create risks to institutional safety and security.  There have been several serious incidents in the past year that warrant analyses including deaths in custody, disturbances, inmate on inmate assaults resulting in serious injuries, and inmate drug overdoses.  This process – that is quality improvement – can also be used to confront and solve issues such as employee attrition and inmates held for extended periods of time in the OJC's booking areas awaiting housing.

8. **Stipulated Agreements 2015** – OPSO should review its on-going compliance with the two Stipulated Agreements from 2015.  As noted in this most recent tour, areas of compliance within these Agreements have regressed.

9. **Acknowledgement of Work to Date -**

   a. <u>Youthful Prisoners</u> – OJC is commended for starting educational and related programming for the youthful prisoners.  While there remains significant work to reach compliance with the Consent Judgment – this work is a welcome positive accomplishment

   b. <u>Investigations</u> – Work to credibly review the critical incidents and allegations of staff misconduct is a positive for OPSO.  What remains is to integrate the findings of these investigations with Quality Improvement initiatives (root cause analysis and critical incident reviews) to improve safety for staff and inmates.

   c. <u>Fire and Life Safety</u> – OPSO has provided documentation of important fire and life safety requirements.  Work remains on internal collaboration and development and training regarding emergency operations.

   d. The 60-day reports submitted by the ICD highlighted progress during the last six months in the areas of:  the return of inmates from out-of-parish facilities, opening of the Temporary Detention Center, implementation of an electronic monitoring program to reduce the inmate population, the



implementation of the school program for youthful prisoners, and plans for improved inmate access to programming.  The ICD also identified plans for modification of the management of the work release program, revision of "the Docks," and selection of the architect for Phase III as progress.

**C.   Review Process of Monitors' Compliance Report #8**

The draft of Compliance Report #8 was provided for review to all parties (DOJ/attorneys for Plaintiff class, OPSO) on November 29, 2019 with a due date for comments by the close of business December 13, 2017.

The Monitors carefully reviewed all comments in finalizing this document.   The Monitors amended compliance ratings based both on the information provided by the parties, and the Monitors' re-review of the documentation prior to finalization of this report.

**D.   Communication with Stakeholders**

The Monitors are committed to providing as much information as possible regarding the status of OPSO's efforts to comply with all orders of the Court.  The www.nolajailmonitors.org website came on-line in September 2014. As of December 31, 2017, there have been more than 64,400"hits".  Joining all other reports, the finalized version of Compliance Report #8 will be posted on that site and a summary of compliance for each paragraph.

**E.   Recommendations**

This report includes only "new" recommendations; and there are 122 additional, new recommendations.   Since the production of the first compliance report in January of 2014, the Monitors carefully considered and offered recommendations to OPSO to achieve compliance.  To provide the context of the recommendations, Appendices B – I lists the outstanding recommendations from prior reports.

**F.   Conclusions and Path Forward**

OPSO has been operating under the provisions of the Consent Judgment for more than four years.  Improvements have been made during that time, but vital, urgent work is required to comply with the provisions of the Consent Judgment in order to bring and

x



sustain the OPSO facilities and operations to constitutional standards.  Currently the environment is not safe for inmates or staff.  The Monitors continue to recommend that the provisions of the Consent Judgment be prioritized, and detailed action plans developed and implemented providing the path to compliance.

The level of violence is unacceptable and very serious incidents occur with frequency.  The amount of contraband smuggled into the facility as well as the number of weapons confiscated from inmates are unacceptable.  Only by collecting accurate data, analyzing the root cause of the issues, and engaging in problem solving will in a sustainable reduction in inmate on inmate assaults, inmate on staff assaults, uses of force, contraband and property damage be achieved.

As the level of staffing for the housing units, as well as staffing to provide escort for other necessary functions (medical, mental health, court) is critically inadequate, a plan to recruit, screen, train, and mentor qualified staff is viewed by the Monitors as of the highest priority.  For the training to be meaningful, the policies, procedures, and post-orders must be completed, and appropriate lesson plans prepared.

Medical and mental health care continues to be dangerously short of the requirements of the Consent Judgment after more than four years of work, and compliance will require a combined effort of OPSO, the medical contractor, and the City to remedy.

The Monitors remain committed to the Court and the parties to provide assistance, where needed.  The Monitors have discussed with the ICD and OJC leadership the need to prioritize areas to be addressed, and work together on solutions.  The Monitors are hopeful that this collaborative approach will result in significant improvement towards compliance with the provisions of the Consent Judgment and achievement of constitutional conditions.[7]

**The Monitors again thank and acknowledge the leadership, guidance and support of The Honorable Lance M. Africk and The Honorable Michael B. North.**

---

[7] The Consent Judgment is available at:
http://www.nolajailmonitors.org/uploads/3/7/5/7/37578255/tab_2_consent_judgment.pdf



## IV. A.  Protection from Harm
### Introduction

This section of the Consent Judgment addresses basic correctional functions including the use of force (policies, training, and reporting), identification of staff involved in uses of force through an early intervention system, safety and supervision of inmates, staffing, incidents and referrals, investigations, pre-trial placement of inmates in the facility, classification, the inmate grievance process, sexual safety of inmates, and inmates' access to information.

A core requirement of the Consent Judgment is that OPSO operate the facility to assure inmates are "reasonably safe and secure."  Based on objective review of data, the facility is critically unsafe for inmates and staff.   OPSO has not consistently engaged in accepted correctional practices to minimize harm, and has not fully analyzed the data to develop specific plans to address these findings.  Data generated are often incomplete and misleading.  For example, the "per 100" rate regarding inmate/inmate assaults contained in the November 1, 2017 report, filed by the IDC fails to recognize the decrease in the inmate population in OJC during mid-2017.[7]

The November 1, 2017 Report's findings for inmate-on-inmate alterations (page 11), inmate-on-staff altercations (page 12), and uses of force (page 12) do not acknowledge the unacceptable level of these incidents, and importantly offer no specific, concrete plans to address the findings.

Behind the data is the specific harm that OPSO inmates are experiencing.  Alarming is the severity of injuries experienced by the inmates.  Examples during 2017 include:

- In November:
  - An inmate on the mental health caseload after gaining access to un-prescribed medications and swallowing the pills attempted to hang himself on the stairway in the mental health unit.
  - An inmate housed in the mental health unit attempted suicide by taking pills, and had to be hospitalized for several days.

---

[7] November 1, 2017, report of the Independent Compliance Director, page 11.

- o Four inmates ingested illegal substances, and were hospitalized.  Naloxene was administered to each of the four inmates.
- o Two inmates died in custody, with a potential findings of a drug overdose of an illegal substance, and a yet unspecified medical emergency.

- In October:
  - o In an unstaffed housing unit, two female inmates engaged in a fight resulting in injuries to one woman's facial, back, and rib cage sufficient to send her to the hospital.
  - o A male inmate was assaulted in an open dorm, requiring hospitalization to repair/wire his jaw, and multiple facial fractures.   The assailants used a mop handle, striking the inmate three or four times in the face.  The mop itself should have been secured.  It is unclear from either OPSO's description of the incident or from the arrest sheet for the inmate/aggressor if a deputy was working inside this dormitory at the time of the attack. OPSO did not respond to questions to confirm or deny whether a deputy was inside the dormitory at the time of the attack.   The inmate victim had been held in OJC for six days prior to the assault and had been given multiple housing assignments. Additionally, the inmate, upon his return from the hospital, required the intervention of the attorney for the Plaintiff class to gain access medical care for the injuries suffered.
  - o Inmates attacked other inmates requiring OJC staff ultimately to rely on a planned use of force to regain control of the unit.

- In September:
  - o Even after a male inmate informed the staff of specific known enemies in the unit to which he was assigned, he was assaulted by inmates. The victim's injuries required hospital evaluation and treatment.
  - o At least five inmates were held for at least five days in interview rooms adjacent to inmate living areas (no toilets, sinks, beds).  No action was taken by either first or mid-line supervisors during the five-day period. The



practice of using interview rooms to house inmates was reported to OJC leadership by the attorneys for the Plaintiff class.

- In August:
  - Reports of contraband recovered by OPSO during the first six months of 2017 indicated: inmate-manufactured "weight bags", a razor, nail clippers, clothing from outside the facility, medication, shanks and homemade knives, cigarettes, and a crack pipe. While discovering and seizing contraband is positive, addressing the source is vital. The OJC reports did not include a review as to the potential source(s) or entry point(s) for the items into the facility or a plan to address the findings.

- In July:
  o A male inmate on the mental health caseload, on suicide watch, was able to obtain and ingest cleaning chemicals. In addition, as noted in his medical record, there were at least two previous incidents in which this inmate had been able to access cleaning chemicals while on suicide watch. The inmate had reported prior substance abuse and current auditory hallucinations and was placed on medication. But despite a recent history of psychiatric symptoms and a prior placement at the acute mental health unit at Hunt, he was not seen by a psychiatrist. An entry in his medical record speculated that the inmate was "malingering."

- In May:
  o A male inmate died by suicide by hanging.
  o In disciplinary housing unit while no staff were present, an inmate was able to release himself from his cell, put on a deputy's official jacket that had been left in the unit, and fool the Corrections Monitoring Technician (CMT) working in the floor control center into thinking he was a deputy. After signaling the CMT to return control of the housing unit's computerized panel to him [the inmate], the inmate released other inmates from their cells and a disturbance ensued.



- In April:
  - An inmate with a history of mental health needs while in the mental health unit, drank cleaning fluid, as well as self-injured.  Just prior to this incident, the inmate had evaded staff and jumped from the mezzanine of the tier.  He was at least the fourth inmate to evade staff and jump, or threatened to jump, from the mezzanine of this unit.
- In March:
  - In an incident described by OJC as a "riot," a group of inmates took over a housing unit.  The housing unit held inmates of mixed classifications (i.e., mental health, disciplinary, and administrative segregation).  After gaining control of the unit's control panel, the inmates opened cell doors and proceeded to assault the most vulnerable inmates.  It was several hours before OJC staff regained control of the unit.
  - An inmate held in the mental health unit was able to fashion a rope and tie it around his neck.
- In February:
  - An inmate was found dead in his cell; the cause of death was determined to be an overdose of illegal drugs smuggled into the OJC.

This list is not intended to be exhaustive of the incidents that have occurred since February 2017 or provide the descriptive details of these incidents, but rather to highlight the fact that the level of violence and disorder in the facility causes direct and serious harm to inmates.   As noted in Table 3, 265 inmate/inmate assaults were reported for the first 10 months of 2017; and 191 uses of force against inmates by staff.  There were 42 inmate assaults on staff.  In sum, these incidents indicate an unacceptable and dangerous environment within OJC.

It is important to place these data regarding inmate in-custody deaths into context.  The annual rate of inmate mortality in OJC is more than four times the national average for jail.  The six in-custody deaths in the last twelve months is a rate per 100,000, of 616.  The national data for jails is 137 deaths per 100,000.[8]

---

[8]  https://www.bjs.gov/content/pub/pdf/mlj0014st.pdf, page 5.

As noted in this Compliance Report regarding Section VII. B. Compliance and Quality Improvement, OPSO has failed to analyze critical incidents (e.g. suicides, "riots" and disturbances) to determine what happened and how to prevent future harm.

**Assessment Methodology**

- Dates of tours:
  - May 25, 2017
  - June 6-8, 2017
  - July 16-19, 2017
  - August 10-11, 2017
  - September 25-27, 2017
  - October 23-26, 2017

- Materials reviewed:
  - Materials reviewed include the Consent Judgment, OPSO policies and procedures, use of force reports, incident reports, investigations conducted by Investigative Services Bureau-Internal Affairs Division (ISB-IAD), investigations conducted by ISB-Criminal Division (ISB-Criminal), investigations conducted by ISB-Inmate Division, news articles, training materials, shakedown logs, and post logs.

- Interviews:
  - Interviews included command staff, jail supervisors, commander of ISB, commander of IAD-Administrative, chief of investigations, various supervisors of units within ISB, and inmates.

- Recommendations:
  - A summary of outstanding recommendations complied from the previous seven compliance report are included in Appendix B.



## IV. A. 1. Use of Force Policies and Procedures

Findings:
        A. 1. a. – Partial Compliance
        A. 1. b. – Partial Compliance
        A. 1. c.  – Partial Compliance

**Measures of compliance:**
1.       Comprehensiveness of written policies,
2.       Training, data collection and analysis,
3.       Supervisory review of uses of force,
4.       Review of use of force reports, review of incident reports, review of investigations by ISB.

<u>Observations:</u>

The current OPSO use of force policy was effective as of May 2016.  Training was provided for corrections staff employed at the time of its adoption.  New corrections staff received use of force training in the pre-service academy.

The effectiveness of the use of force training, both the in-service as well as that provided through the pre-service academy, continues to be in question.  One concern is the lack of practical skills training in the pre-service academy.  It is not sufficient to state that there are permissible and impermissible uses of force.  Staff must be provided with reality-based examples as well as an opportunity for hands on training.  During the October 2017 monitoring tour, Monitor Frasier met extensively with the staff of the OPSO Training Academy regarding the need to increase the use of practical skills training.  Identified as a key impediment for the pre-service academy training was the large class size of 50-60 students due to the efforts to fill the large number of vacancies at the OJC.  The most recent class sizes have stabilized between15-25 students.  Another concern expressed by Monitor Frasier was whether the students had all received a medical examination and been cleared to participate in the level of physical activity required in practical skills training.

Additionally, there are still uses of force that are not reported timely, not reported at all, and/or not reported accurately.  For August 2017, the Monitors were provided with an additional fourteen (14) incidents which were not timely reported



to OPSO and/or the Monitors; six (6) of these involved uses of force.  For October 2017, the Monitors were provided with an additional twenty-two (22) incidents which had not been timely reported to OPSO and/or the Monitors; twelve (12) of them involved a use of force.  The Monitors were not provided with a list for September 2017.  At the end of each month, the Monitors compile the incidents reported by OPSO (timely and untimely) and distribute to all parties.  Attorneys for the Plaintiff class review the compilation and provide additional incidents reported to them, but were not reported by OPSO.  Each month, this list included additional uses of force.  As the use of force policy requires the notification of a supervisor, in each of the cases where the use of force was not reported timely, a supervisor did not follow policy.

The quality of the use of force reports continued to illustrate a need for training on the use of force policy and how to conduct investigations among the jail supervisors.  The reports continued to rely on boilerplate language such as "using necessary force," "guided inmate into cell," and "took control of inmate."

As has been previously reported, the ISB has done a good job of developing standard operating procedures that memorialize a comprehensive strategy to review and investigate uses of force.  There is a backlog of cases for review, but ISB has steadily reduced the backlog by having agents from other divisions assist FIT when possible.  It is the goal of ISB to complete the 2016 cases by the end of 2017.  The main reasons for the backlog are that FIT is tasked with reviewing medical records regarding treatment of inmates for injuries to uncover uses of force that are not reported that as per the use of force policy are the responsibility of the watch commanders and wardens and the number of cases.  Lack of sufficient supervisory staff in the OJC appears to be contributing to this phenomenon.

IV. A. 1. c. is rated partial compliance due to collection of data on the uses of force.  However, the analysis of that data, recommendations based on the analysis, plans of action, or reports of outcomes of plans of action are still lacking, if non-existent.  For instance, numerous uses of force occur as a result of assaults between inmates who are out of their cells for medication.  However, there does not appear



to have been any analysis, evaluation, and change(s) in procedure to lessen the likelihood of future assaults and/or the use of force.

New Recommendations:

1.  Limit the size of pre-service academy classes to 15 to 25 students.  If it is necessary to increase the size of the pre-service academy class to meet the staffing demands of OJC, assign additional instructors to assist with the practical skills training.

2.  New hires for deputy positions should undergo a pre-employment physical examination to ensure they are capable of participating safely in practical skills training and in performing their job duties (based on a validated fitness standards for jails and consistent with the Americans with Disabilities Act, as amended).[9]  As the use of the techniques learned in the practical skills training are an essential part of the job function of staff who have contact with inmates, the physical would serve the purpose of ensuring prospective employees can perform the essential functions of the job.

---

[9] A review of the Internet will provide examples of corrections related entry level fitness standards.  Closer to New Orleans, for example, see NOPD's fitness requirements and physical agility test:
joinnopd.org/public/downloads/_READ_BEFORE_YOU_APPLY.pdf
   **STEP #3 – PHYSICAL AGILITY TEST –** Applicants who pass the written test will be scheduled for the agility test. The test consists of the following events:
   • Sit-ups – fourteen (14) repetitions in one (1) minute
   • Push-ups – ten (10) repetitions
   • 1.5 mile run- completed in a maximum of nineteen (19) minutes and fifty (50) seconds
   • 300-meter sprint – completed in a maximum of two (2) minutes
**East Baton Rouge Sheriff** - Step 2: Physical Fitness Assessment
You must participate in a Physical Fitness Assessment and obtain passing scores on all of the exercises. It is recommended that you practice the exercises prior to scheduling a date to take the test.  The test is given on most Fridays throughout the year.
**PHYSICAL FITNESS EVALUATON PASSING SCORES for Law Enforcement and Corrections Positions**
Communications and Corrections Deputies:
   1.5 mile run 20 minutes or less;
   10 Push-ups; and
   10 Sit-ups in 60 seconds.

## IV. A. 2.        Use of Force Training

> Findings:
> > A. 2. a.  – Partial Compliance
> > A. 2. b. – Partial Compliance
> > A. 2. c. – Non-compliance
>
> **Measures of compliance:**
> 1.   Comprehensiveness of lesson plans.
> 2.   Training material, evidence of knowledge gained.
> 3.   Review of use of force reports.
> 4.   Review of incident reports.
> 5.   Review of investigations by ISB.
> 6.   Review of investigations by IAD.

<u>Observations:</u>

The current use of force policy has been in effect since May 2016.  Training has been completed for corrections staff who were employed at the time of its adoption.  New corrections staff receive use of force training as part of the pre-service academy.

The effectiveness of training and the related issues and problems are noted above.  One concern that requires repeating is the lack of practical skills training for use of force in the pre-service academy.  It is insufficient to didactically teach permissible and impermissible uses of force.  Staff <u>must</u> be provided with reality-based examples <u>and</u> opportunities for hands on training.  Practical, supervised, critique and remediation of the application of required skill sets are not only accepted practices, but mandated in many states as part of pre-service training.

During the October 2017 monitoring tour, Monitor Frasier met with the staff of the OPSO Training Academy regarding the need to increase the use of practical skills training and to identify OPSO impediments to doing so.  Impediments identified were the large class sizes (50-60 students) in the pre-service academy driven by the effort to fill the large number of vacancies at the OJC.  As of the late, the class sizes have stabilized to between15-25 students.  Another concern identified by Monitor Frasier was whether all students received a medical examination and were cleared to participate in the level of physical activity required



in practical skills training and to perform the basic functions of their jobs once training is completed.

The Consent Judgment requires both pre-service and annual in-service training. It became apparent after review of documentation provided, and during discussions with the OPSO Training Academy staff, that annual in-service training is only being provided to POST-certified deputies. They are scheduled for a week-long in-service training during their birth month. No in-service training is provided to corrections staff who are classified as "Recruits" or non-POST certified or CMTs. On review of the annual POST training curriculum, it was clear that all corrections staff would benefit from attending this same training program. The one exception is the day spent at the firing range. As this group is the least experienced staff in OJC, the Monitor discussed with the OPSO Training Academy staff how to use that day [fire arms training] to provide additional instruction on direct supervision, inmate management, and practical skills training.

While the Consent Judgment requires annual random testing of 5% of the corrections officer staff (deputies) on use of force policies and procedures, no testing has been performed since the use of force policy went into effect in May 2016. Although OPSO's Compliance Matrix indicates that OPSO intended to upload the *approved* test into the online testing system and send it to fifty (50) employees by the end of 2017, no test has been approved by the Monitors as required by the Consent Judgment. Also, given the shortcomings in the knowledge of the use of force policy at the supervisory level as indicated by reporting and supervision, testing of supervisors is recommended. When testing is performed, the results should be analyzed to determine what, if any, adjustments need to be made in the training.

Given the deficiencies noted, even without the benefit of the random testing required by the Consent Judgment, it is clear that OPSO supervisors need to be trained as to proper reporting and investigation of use of force in accordance with the OPSO use of force policy. All training for deputies and supervisors should emphasize the critical importance of reporting all uses of force and that failure to follow the use of force policy will result in discipline. The need to emphasize consequences is evidenced by the continued failure to report all uses of force, the

inadequacy of the reports that are written, the quality of supervisory review of the reports, and the backlog in the use of force investigations performed at the facility level.

<u>New Recommendations:</u>

3.  Require all corrections staff to attend the annual POST training, except for the firearms training.  On the day of the firearms training, provide additional skills training in direct supervision and practical skills training.

4.  Maintain the size of pre-service academy classes to 15 to 25 students.  If it is necessary to increase the size of the pre-service academy class to meet the staffing demands of OJC, assign additional instructors to assist with the practical skills training.



## IV. A. 3. Use of Force Reporting

Findings:
 A. 3. a. – Partial Compliance
 A. 3. b. – Partial Compliance
 A. 3. c. – Partial Compliance
 A. 3. d. – Partial Compliance
 A. 3. e. – Partial Compliance
 A. 3. f. – Partial Compliance
 A. 3. g. – Partial Compliance
 A. 3. h. – Non-compliance

**Measures of compliance:**
1. Comprehensiveness of written policies.
2. Training, data collection and analysis.
3. Supervisory review of uses of force.
4. Review of use of force reports.
5. Review of incident reports.
6. Review of investigations by ISB.
7. Review of investigations by IAD.

Observations:

 The current use of force policy has been in effect since May 2016.  Training on the reporting requirements for the use of force policy has been completed of corrections staff, including supervisors, who were employed at the time of its adoption.  New corrections staff receive training on the reporting requirements of the use of force policy in the pre-service academy.

 Force is used in OJC, in the opinion of the Monitors, too frequently.  For the first ten months of 2017, OJC reported 186 uses of force.  For CY 2016, OJC reported a total number of uses of force as 265.  There was a *lower average daily population in CY 2017, year to date*, thus requiring clarification of the data.  This is not to infer that the majority of the uses of force were excessive.  While OPSO, the Monitors, and the attorneys for the Plaintiff class could debate the actual number of uses of force, it is clear to all that the level of use of force is high.  The need to use force is generally a combination of critical factors including the mental health of the inmate population, the efficacy of the inmate classification system, the quality and training of deputies and supervisors, the presence of staff to deescalate inmate altercations, the absence



of practice skills application in pre-service training, and the quality of inmate supervision and management.  These areas all require attention by the OPSO, as there continue to be harm to inmates and to staff.

The Monitors continue to be concerned about failure to enforce employees' noncompliance with the reporting requirements as per the OPSO use of force policy.  Simply having a policy that mandates reporting of all uses of force and that staff who do not follow the policy are subject to discipline, including termination, is inadequate.  During review of administrative cases involving the failure to report a use of force, the Monitors have found that the discipline given to supervisors for failing to follow the reporting requirements of the use of force policy, if discipline was taken at all, consisted of a DM-1 counseling memo by the Administrative Warden rather than referral to the Internal Affairs Division for more substantive actions.  While a counseling may be appropriate for a first-time offense, OPSO should monitor the consistency of discipline as there were several multi-day suspensions of *line staff* for failure to report incidents which did not involve a use of force.  Inconsistent application of the employee disciplinary process may be seen or be interpreted as favoritism towards supervisors and/or an indication that reporting uses of force is not taken seriously by the organization.  Ultimately the supervisors are responsible, up through and including the mid-management ranks, for all failures to report use of force.

The quality of the use of force reports indicates a continuing need for training of the line supervisors on the use of force policy and the reporting requirements.  The Consent Judgment lists specific items that are to be included in use of force reports.  It is common for one or more the specific items to be missing from a report.   The continued use of boilerplate language such as "using necessary force," "guided inmate into cell," and "took control of inmate" is unacceptable as the report must accurately describe the actions.  Such actions should be reviewed and assessed through viewing the recordings of the event.

In May 2016, Monitor Frasier provided to OPSO a suggested checklist as one option to ensure the completeness of use of force reports, compliance, and documentation of the requirements of the Consent Judgment (i.e., supervisor

present at a planned use of force, notify watch commander of use of force, etc.). OPSO indicated in the Compliance Matrix that a checklist will be developed, and the items included.

The watch commanders, assistant wardens, and wardens are <u>not</u> consistently complying with the requirements of the Consent Judgment (IV. A. 3. d. and 3. f.) as to their specific duties relating to the uses of force.  Their failure to perform their duties completely and timely has added to the workload of FIT and contributed to the backlog of investigations, ultimately resulting in harm to the inmate population as well as safety issues for employees.

Some of the deficiencies noted in the use of force reporting system are:

- No mechanism to ensure presence of first line supervisors in all incidents of planned use of force and documentation of their presence. OPSO is in partial compliance with this requirement.

- Use of force reports signed off by the watch commanders and wardens are often inadequate and/or incomplete. The reports contain boilerplate and conclusory language that does not allow the reader to make an evaluation of the level of resistance, the level of force used, and/or the appropriateness of the force.  For instance, reports continue to state, "appropriate force was used" or "inmate was *assisted* to the floor" without detailing what type of inmate behavior prompted the use of force, de-escalation efforts, or the type of force used.

- Reports do not routinely indicate whether the use of force was documented by video even though the incident most likely was recorded due to the extensive video system in the jail.  [See the findings in Section IV.A.5.f. regarding deficiencies in the current video recording system.]

- If supervisors interview inmates, the most common result of interviews is a notation that the inmate(s) reported they did not see anything or did not wish to cooperate.  Fortunately, the ISB is more



successful in obtaining statements from inmates during their investigations. However, often, by the time ISB interviews an inmate, the inmate has had time to talk to other inmates to agree on a "version" of events. Therefore, it is important that the supervisors obtain timely, credible, and complete statements from inmates and/or take steps to separate witnesses. Additional training would be helpful.

- Watch commanders routinely do not submit the use of force report within 36 hours, provide specific findings as to completeness and procedural errors, indicate whether the supervisor believes the force was excessive or unnecessary, or indicate whether the warden and IAD were notified.

- As required, within 36 hours of receipt of watch commander's report, the wardens do not submit a written report or statement of specific findings and determination of appropriateness of the force after their review of the use of force report, medical documentation, and inmate discipline.

Because of the failure of the watch commanders and wardens noted above, the majority of the investigations of incidents involving the questionable uses of force are initiated by the ISB as a result of an inmate grievance, a report from the attorneys for the Plaintiff class, or a request from the Monitors rather than at the request of OJC supervisory personnel. The sheer number of use of force incidents strains the system's resources, requiring overtime by all staff involved, from the reporting deputy to the ISB/FIT functions to adequately and timely do their jobs.

FIT issues a quarterly report, but the report does not contain all the information required by IV. A. 3. g. OPSO indicates in its Compliance Matrix that the Monitors are provided with notification of incidents. Those notifications do not satisfy the requirement of the Consent Judgment as they do not provide the necessary information in the required. The annual review



of use of force incidents as required by IV. A. 3. h. has not been provided to the Monitors or parties.  The tallying of data and tracking of numbers on a chart does not satisfy the requirements that a *review* be conducted and analyses as to effectiveness of the use of force reporting system to reduce excessive and unnecessary uses of force.  As noted in this report, the unacceptable number of uses of force indicates the systems are not working.

One obstacle to compliance is the absence of an automated tracking system to ensure timely notification of a use of force to the wardens.  While completed incidents are assigned a number in the OPSO reporting system, the system does not automatically track the incident to ensure the reports are written and/or are reviewed within 36 hours and forwarded to ISB.  A review of the system documentation indicates that at least a cursory examination by the watch commanders and wardens of the use of force reporting occurs, but this information did not enable the Monitor to determine whether the reviews are completed as per the timetable stipulated by the policy.  The system does not: 1)  Include a mechanism to track timely completion of each step; 2) generate alerts to notify the Chief of Corrections if the wardens do not complete a timely secondary review; or 3) a mechanism to track timely referrals to the ISB.  Therefore, the review of use of use force reports is only in partial compliance with the Consent Judgment.

Monitor Frasier has real-time, off-site, read-only access to the incident reporting system (Vantos) in order to review incident reports on a contemporaneous basis.  Unfortunately, the Vantos system has proven to be unreliable and is often not available off-site.  Also, while it is helpful to have access to Vantos, a large percentage of reports are not being entered timely.  In addition, the Monitors do not have ready access to the findings from the reviews of the incident reports or key evidence on which the review was based, i.e., the videos and/or staff and inmate interviews.  The Monitors also do not have ready access to the investigations by ISB.  OPSO is planning to implement a new jail management information system in the future, but it is



unknown to the Monitors if any of these deficiencies will be corrected through the new system.

<u>New Recommendations:</u>

5.    A checklist should be finalized, and training provided to supervisors.

6.    OPSO should assure that the new jail management information system provides the data, timely to manage these use of force reports.



## IV. A. 4. Early Intervention System ("EIS")

Finding:
        A. 4. a. – Non-Compliance
        A. 4. b. – Partial Compliance
        A. 4. c. – Partial Compliance
        A. 4. d. – Non-compliance
        A. 4. e. – Non-compliance

**Measures of compliance:**
1.     Comprehensiveness of policy.
2.     Identification of patterns and trends.
3.     Evidence of review by command staff.
4.     Monitors' review of quarterly reports.

<u>Observations:</u>

Over the past four years, a variety of explanations have been offered by OPSO for the failure of the EIS to perform appropriately. It has now become clear, and OPSO acknowledges, that the EIS system is non-functional and will not become functional due to lack of technical support. An electronic based EIS system will not exist until the new Jail Management System (JMS) comes on line. The earliest date given for the JMS to come on line is May 2018. Therefore, both IV A. 4. a. and 4. d. are in Non-compliance.

As a remedy for this important requirement of the Consent Judgment, OPSO agreed to assign a staff member to FIT to maintain a data-base regarding uses of force to notify FIT to review a staff member. OPSO has improved its documentation to the Monitors as to the names of the staff members who are flagged for uses of force, if a review is conducted, and any retraining received, if required.

The Monitors find that a credible early intervention or warning system collects data on a variety of indicators such as uses of force, grievances, complaints handled at the facility level, absences, etc. and as a result of a totality of incidents causes a review of an employee, and, if necessary, remedial action which is documented. The OPSO current system, as noted above, relies totally on the deputy's self-initiated reports of uses of force, an assumption that has proven to be unreliable. OPSO has indicated that FIT will be involved in the creation and



implementation process of the EIS in the JMS.  Such a plan is supported by the Monitor.

The Use of Force Review Board has met regularly, but it did not perform the evaluation necessary for compliance with IV. A .4. e.

The Monitor has no new recommendations.  Appendix B lists outstanding recommendations.



## IV. 5.  Safety and Supervision

Findings:

    A. 5. a. - Non-Compliance
    A. 5. b. - Non-Compliance
    A. 5. c. – Partial Compliance
    A. 5. d. - Non-Compliance
    A. 5. e. - Non-Compliance
    A. 5. f. -  Partial Compliance
    A. 5. g. - Non-Compliance
    A. 5. h. - Non-Compliance
    A. 5. i. - Partial Compliance
    A. 5. j. - Non-Compliance
    A. 5. k. - Partial Compliance
    A. 5. l. -  Partial Compliance

**Measures of compliance:**
1. Comprehensiveness of policies and procedures
2. Training materials
3. Post orders
4. Review of incident reports
5. Installation of cameras
6. Documentation of training
7. Monitors' review of required semi-annual reports.

Observations:

    While some of the policies have been adopted, as will be discussed below, they have not been fully implemented. As result, the level of harm and risk of harm to inmates held in the Orleans Parish Jail system continues to be at an unacceptable level.  Thus, IV. A. 5. a. is in non-compliance.  The policy regarding inmate workers has not been finalized, thus section IV A. 5. b. is in non-compliance.

    The dangers to inmate safety and security are evident by the number of inmate-on-inmate assaults, including sexual assaults reported to the Monitors by OPSO.  The dangers are further evidenced by the numerous unreported incidents of inmate-on-inmate violence discovered by the Monitors through review of records, reports from attorneys for the Plaintiff class, and grievances.   While the Monitors and OPSO may disagree as to the exact numbers, even selecting the lower number identifies a jail in which there is too high a level of violence.  The 2017 reports need



to be adjusted to reflect the decrease in the average daily population for several months of the year.

To assess the level of violence in OJC, the Monitors reviewed two additional pieces of data, both routinely available to OJC.  These data are from CCS:  the 'routes' – inmates with serious medical or trauma injuries that they are transferred to the emergency room, and clinic walk-in logs.  These data were analyzed for the period of September 1 – December 15, 2017.   OPSO was provided the same analyzed data and asked for their assessment.

Analyzing the "route" logs for these 106 days provided this overview of the level of violence in the facility:[10]

- 233 total "routes" during the period reviewed;
- 87 indicated violence may have been the proximate cause of the need for an emergency room transfer;
- 58 of these events were not reported to the Monitors, including 37 for which there was an incident report in the OJC Vantos system, and included injuries requiring emergency room attention such as (not all injuries included below):
    - Trauma to eye (2), fractured hand (6) attributed to altercation, facial lacerations attributed to altercations (2), blunt head trauma, lip laceration (2), orbital fracture (3), cut ear lobe, facial contusion, shoulder dislocation, blunt trauma to face (2) – human bite- displace fracture of bone in hands, head injury, and
- OJC indicated there are no reports for 21 of the emergency room transfers – for injuries noted by CCS as including, for example:
    - Fracture of metatarsal bone; facial lacerations (4); open finger fracture, facial swelling and contusion of left eye, fracture of hand, metacarpal fracture, scalp laceration, closed boxer's fracture (2), closed fracture of proximal end of fibula, closed

---

[10] This data was reviewed by OJC and feedback provided to the Monitors.

> fracture of mandible, fracture of left heel, fracture of finger (2), subconjunctival hemorrhage of left eye, eyebrow laceration.

OJC was not able to provide an explanation of why reports on these injuries were not reported to the Monitors; nor why reports were not written on 21 apparent injuries serious enough to warrant emergency room transfer.

A review of the clinic walk-in logs for the same 106-day period provided this information:

- Of the 1,019 clinic walk-in log entries for this time period, 46% (N=469) appear to be related to inmate altercations, suicide attempts, and trauma. Approximately 300 of these were not reported to the Monitors. Examples of the unreported incidents captured on the CCS logs include:
  - Use of pepper spray and uses of force, unresponsive patient, head trauma, "swallowed heroin", altercations, suicidal, eye trauma (3), head injury (2), ingestion of unknown substance, laceration to head, fractured jaw (2), broken nose, ingestion of pills.

OPSO was provided this list compiled by the Monitors from the CCS logs, and as of this date has not provided a review.

While it is, perhaps, not optimal to use this secondary data to evaluate the level of violence, the findings are significant enough to permit a conclusion that there are not only incidents which are not reported to the OJC leadership, but there are incidents for which decisions are made not to report to the Monitors as required by the Consent Judgment.

Several different approaches to resolve the unreliability of the reporting for serious incidents with OPSO have been initiated especially since June 2017, when the Court specifically requested that this issue be promptly resolved. The most recent effort was that OPSO assigned the responsibilities for the data collection and reporting to Monitors to the Administrative Warden at OJC. The data was to be assembled from the incident reported in the Vantos system and the daily shift reports from the watch commanders. As seen by the review of the CCS data noted

above, OPSO conducts only limited reviews to determine if there are corresponding entries between the medical logs as to inmates treated for injuries and the serious incident reports. Recently, it was identified that the inmate disciplinary data base was not reviewed as a source of information.  For example, as noted in Section E, Fire and Life Safety of this Compliance Report, the Monitors identified that 57 inmates were administratively charged with setting fires through a review of the inmate disciplinary logs. The majority of these incidents were <u>not</u> reported to the facility's Fire Safety Officer.

OPSO agreed to report incidents to the Monitors which OPSO identified *after* monthly notifications were provided to the Monitors (termed "late reports").  In the August "late" report, OJC included documentation of the reasons why some of the incidents were not reported timely, and whether the staff member responsible would face disciplinary action. No "late" report was submitted for September; OPSO, in response to the Monitors' questions, indicated there were no "late" reports. Although this was a helpful practice, it does appear that it currently being done.

To further attempt to generate accurate data, attorneys for the Plaintiff class review OPSO's reported incidents each month and compiles a list of additional reportable incidents based on reporting by their clients they believed occurred.  The reports from the attorneys for the Plaintiff class are forwarded to OPSO for further examination.  The Monitors and OPSO have found that the reports from the attorneys for the Plaintiff class have proven to be very reliable[11].

Table 3 includes the revised January – April 2017 data as reported to the Monitors and from the attorneys for the Plaintiff class.  The monthly reviews by both the attorneys for Plaintiff class and OPSO continue to assess the veracity of the

---

[11]  For example, the attorney for the Plaintiff class reported 69 additional incidents they believed occurred for January – April 2017.  Upon review by OPSO, 48 (69%) were determined to have occurred and to be reportable to the Monitors, but were <u>not</u> reported by OPSO.  Eight incidents (12%) meeting the criteria as reportable were <u>not</u> reported to OPSO leadership by OPSO employees (included in the 48 incidents not reported to the Monitors); and six additional incidents (9%) occurred, but the facts were different than reported by attorney for the Plaintiff class.  Of the remaining reports - for 6 (9%) OPSO was not able to determine if the incident occurred or not; 3 (4%) of incidents probably happened but there is not sufficient documentation to fully determine; 1 (1%) did not happen; 4 (6%) – OPSO considered as not reportable (mostly medical route/emergencies issues); and 2 (2%) OPSO indicated the narrative was part of another reported incident.

Plaintiffs' additionally reported incidents.  The data harvested from the reports of the attorneys for the Plaintiff class should be included in the revised data generated by OPSO for inclusion in reports, and in internal reviews, analysis and plans of action.  These efforts to sort and verify the incidents are complicated and time consuming, but to date, have been the best approach to improve the reporting of incidents both from line staff to the OJC leadership, and from OPSO to the Monitors. As OPSO responds to the incidents identified by the attorneys for the Plaintiff class, the Monitors will be able to assess if the considerable efforts taken to date are resulting in more accurate incident reporting.

Because of the issues identified above, the data produced by OJC in the 60-day reports are likely inaccurate.  The Monitors welcome initiatives and strategies from the OPSO to improve incident reporting and hence the ability to develop action plans targeted using the data, and evaluation of the initiatives to improve OJC safety for inmates and staff.



### Table 3 OJC Reported Incidents – Calendar Year 2017

| | Jan | Feb | March | April | May | June | July | Aug | Sept | Oct | Nov | Dec[12] | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Arrest of Employee | | | | | | | | | | | | 1 | 1 |
| Alleged Sexual Assault/ Misconduct/ Inmate Complaint of Sexual Harassment | 3 | | 2 | | 1 | | 11 | 11 | | 4 | 2 | | 34 |
| Contraband | 4 | 3 | 3 | 1 | 1 | 1 | | | 2 | | 2 | 10 | 27 |
| Criminal Damage | | | | | | 1 | 1 | 2 | 6 | 4 | 5 | 4 | 23 |
| Death | | 1 | | | 1 | | | | | | 1 | 1 | 4 |
| Disturbance | | | 1 | | 1 | | | | 1 | | | 6 | 9 |
| Internal Escape | | | | | | | | | | | | 4 | 4 |
| Inmate Assault on Staff | 6 | | 2 | 1 | 5 | 9 | 6 | 3 | 8 | 2 | 7 | 11 | 60 |
| Inmate medical route/emergency | 19 | 12 | | 4 | | | | | | 1 | | | 36[13] |
| Inmate/Inmate Assault | 21 | 39 | 26 | 21 | 25 | 25 | 21 | 28 | 29 | 30 | 37 | 42 | 344 |
| Suicide Gesture/Self-Harm/Suicide Attempt | 6 | 12 | 3 | 6 | 1 | | 1 | 1 | | | 1 | 9 | 40 |
| Suspicious Inmate Injury | 1 | | 1 | 2 | 6 | 4 | 1 | | | 2 | 1 | 6 | 24 |
| Use of Force | 29 | 10 | 11 | 16 | 17 | 26 | 15 | 28 | 20 | 19 | 15 | 14 | 220 |
| Total | 89 | 77 | 49 | 51 | 58 | 66 | 56 | 73 | 66 | 62 | 71 | 108 | 826 |
| Average Daily Population | 1019 | 977 | 647 | 653 | 676 | 1024 | 1186 | 1218 | 1237 | 1237 | 1127 | 1105 | |

OPSO has not documented that security rounds are conducted timely manner (30 minutes or 15 minutes depending on the unit). It is clear from the review of records, observations, and investigations that timely rounds are not consistently conducted as per OPSO policy.  Some units are routinely not adequately staffed or where staff is absent from the unit for over an hour at a time, sometimes for three hours or longer.  During the most recent tour, Monitor McCampbell visited OJC unannounced and found four housing units without assigned staff, two housing unit control centers without assigned staffing, a first line supervision position vacant, four vacant relief/rover positions [to provide staff assigned to housing units or

---

12 Does not include any "late entries" from OJC for December 2017 which may be pending at this time.

13 See page 41 for discussion of "routes" to the emergency room.

Case 2:12-cv-00859-LMA-MBN   Document 1143   Filed 01/18/18   Page 37 of 209

control housing units with regular, bathroom or meal breaks}. Three sergeants were responsible for the entire jail. No watch commander was on duty. Only one rank employee (a captain) was responsible for both the jail and intake functions; no mid-manager (lieutenants) were on duty. The Monitor observed deputies coming back into the facility after a lunch break *outside* the facility, resulting in even fewer staff in the facility. [See section IV.A.6 Security Staffing, below]. During this tour, Monitor Frasier visited the fourth floor of OJC during noon feeding time. Despite the fact this was at one of the busiest times of the day, only four (4) deputies were assigned to the six housing units. In addition, all of the CMTs had gone on a meal break *at the same time*.

As it has been previously noted that OPSO has made no effort to audit compliance with this provision (IV.A.5) despite the availability of the information from the TourWatch [a proprietary system] upon which significant resources were expended to purchase and install as part of the new jail security software. The reason jails install such a system is allow staff to "record" their rounds by pushing buttons located at intervals throughout the housing unit. The record/data generated by the buttons being pushed is evidence that rounds are conducted, or at least that the staff person walked past the button and pushed it. Additionally, the control panel in housing units is linked to the system, and alerts employees when the rounds are not conducted based on pre-programmed intervals. In order words, if a staff misses a round, the panel alerts, visually and audibly.

Monitor Frasier requested data from the TourWatch system as part of the document request for this tour. OPSO was unable to provide the data requested citing a significant expenditure of time and resources. It seems inconsistent with management practice to install a system to track a basic correctional function, but from which data are then difficult to retrieve to verify the rounds – the original purpose of the software. Instead, OPSO provided data from the first four days of October 2017. Review of these data indicated that rounds are seldom recorded at a time interval in accordance with OPSO policy. When the findings were shared with OPSO administration, it was suggested that deputies may be performing the rounds, but not properly recording them – by pushing the button as they walk past. Based

Compliance Report # 8 – January 12, 2018

26

on other evidence, the Monitors believe this explanation is the exception rather than the standard practice.

No matter the reason(s) the rounds are not recorded or are not taking place, it is recommended that roll-call training be provided to deputies on the importance and use of the TourWatch system.  In addition, the TourWatch system was found to be inoperable on one of the control panels in a housing unit.  Also, when Monitor Frasier visited the main control room and asked for a CMT to pull up what the CMTs or a supervisor can observe about rounds that are overdue, it was discovered that the TourWatch system had been removed (or suspended) from the panels in the main control room.  Thus, the TourWatch system is incapable of being used real time by the watch commander to determine if rounds are being performed timely. It is recommended that the watch commander's live access to the TourWatch system be immediately restored.  Further, it is recommended that, as part of the daily watch report, watch commanders print the TourWatch reports for their shift, append it to their shift reports, be required to offer an explanation if timely rounds were not conducted, and indicate their strategies to address any shortcoming(s).

As related to the on-going theme in this report about staff shortages, it is the Monitors' view that it is extremely unlikely that one deputy can effectively perform rounds in more than one housing unit- unless their sole task is to push the TourWatch buttons as opposed to viewing and assessing the condition of each inmate.

An insufficient number of staff is assigned per shift to relieve deputies assigned to housing units and CMTs for meal breaks.  The practice is to leave the housing units unstaffed during those times.  This includes the special management housing units that OPSO has designated as mandatory posts, i.e., requiring constant staff presence.  [See Section IV.A.6., below]

While OPSO reported in its Compliance Matrix that direct supervision was occurring in three housing units, this constitutes only about 10 percent of the housing units.  In addition, there are times that the deputies are not in those housing units.  Thus, IV. A. 5. e. is in non-compliance.  Additionally, the Monitors were prepared to conduct a modified direct supervision audit, using the format developed

by the National Institute of Corrections.  After conferring with the ICD, it was determined that the audit would be unlikely to demonstrate compliance and thus the initiative was postponed until the next tour.[14]

Regarding overhead video surveillance and recording cameras for OJC (A.5.f.), there are on-going issues as some of the 700 cameras are not recording. This is most often discovered when investigators try to retrieve the videos. The system is unreliable as at times the videos are missing, but at other times a video is available.  OPSO itself attributed the problem to faulty wiring (memo of September 27, 2017).   OPSO has been unable resolve the problem with the vendor.  Thus, the problem remains unresolved.  More energy and expertise should be devoted to finding a solution to this technical issue, as the absence of recording cameras is necessary for compliance as well as inmate and staff safety.  As such, this paragraph is found to be in partial compliance.

Staff transferred from other divisions to work in the OJC and/or assigned to work in the specialty units do not receive the required training; thus A. 5. g. and h. continue to be in non-compliance.   This is of particular concern as OPSO has had four years to devise and implement this training.

Shakedowns are conducted. But as evidenced the amount of contraband discovered during each time shakedowns, the number and type of weapons used in the inmate-on-inmate assaults, and the drug use/overdoses in the facility, the shakedowns do not occur at sufficient regularity and are not sufficiently thorough. Monitor Frasier had the opportunity to observe a shakedown in November 2017. Monitor Frasier shared her multiple criticisms with the Chief of Corrections and ICD. For instance, most of the deputies who were not members of the ISB, seemed unclear as to how to conduct a proper shakedown and did not follow the instructions given by the ISB supervisor.  Further, when medication is found, there is no coordination with the medical provider to assess if the medical administration policies are followed and correct the deficiencies. There is no analysis of the shakedown reports as to the location of findings, linkages to previous shakedowns,

---

[14] https://s3.amazonaws.com/static.nicic.gov/Library/019640.pdf

specific items found, and/or the inmates involved.  The Monitors have provided information regarding the procedures used in other jails to identify and mitigate contraband. The Monitors recommend formalizing the effort to determine the source of the contraband and remediate the danger.   In addition, the contraband reports provided to the Monitors do not list the contraband found as a result of a non-routine shakedown such as those conducted by ISB.  It is clear from the ISB reports that additional stashes of drugs, cell phones, and/or weapons were uncovered though the non-random shakedowns.  Therefore, IV A. 5. k. and 5. l. continue to be in partial compliance.

No proof of daily inspections of housing units was provided.  Simple observation of the conditions of the living units provides evidence that daily inspections are not conducted, consistent inspection standards are communicated to the line staff, or that any changes are made to the facilities as a result of the inspection findings.  Thus, VI. A. 5. j. continues to be in non-compliance.  [See also IV.D. Sanitation and Environmental Conditions for additional findings.]

While the policy on protective custody inmates has been finalized, those inmates continued to be housed with, and exposed to, non-protective custody inmates.  Additionally, inmates in protective custody status are scattered in other units, such as the mental health unit, for reasons not articulable to the Monitors. There have been numerous incidents where protective custody inmates have been targeted for violence including the incident which occurred on March 17, 2017. Completion of the policy warrants a partial compliance of IV. A. 5. c.

New Recommendations:

7.      Ensuring the video system is working properly and included in ongoing inspections.  If the system is not properly recording, find a solution, new vendor, or other options.

8.      Roll call training should be provided to remind deputies how to use the TourWatch system.

9.      The ability of the watch commander to observe the TourWatch system live time should be immediately restored.



Compliance Report # 8 – January 12, 2018

10.   As part of the daily watch report, watch commanders should be required to print the TourWatch report for their shift and be required to offer an explanation if rounds are not being conducted timely and how they intend to address the shortcoming.



## IV. A. 6. Security Staffing

Findings:
    A. 6. – Non-Compliance
            A. 6. a. (1) – Partial Compliance
            A. 6. a. (2) – Substantial Compliance
            A. 6. a. (3) – Substantial Compliance
            A. 6. a. (4) – Partial Compliance
            A. 6. b. – Partial Compliance

**Measures of Compliance:**
1.      Written policy/procedure governing staffing, and reporting as required by consent agreement.
2.      Completion of a staffing analysis per http://static.nicic.gov/Library/016827.pdf
3.      Staffing plan (existing and new facilities); recruiting plan.
4.      Daily rosters.
5.      Overtime records.
6.      Housing unit logs.
7.      Hiring of professional corrections administrators (CV). Post order/job description/organizational chart.
8.      Staffing report containing required information; conclusions; action plans, if any.

Observations:

The finding of compliance for this section of the Consent Judgment is guided by this language (IV.A.6):

"OPSO shall ensure that correctional staffing and supervision is sufficient to adequately supervise prisoners, fulfill the terms of this Agreement, and allow for the safe operation of the Facility, consistent with constitutional standards. . ."

As the governing section of this paragraph is non-compliant, the entire section is non-compliance. The Monitors note, however, that the sub-provisions of the paragraph may be in substantial compliance or partial compliance, as noted above; and want to acknowledge progress or work in those areas.

There is insufficient staffing in OJC – in the inmate housing areas, in first line supervision, in support functions, and in facility leadership. The infusion in the last year of newly hired staff, the turnover of these new employees (as well as longer term employees), the instability of the workforce, the uneven knowledge about jail operations/practices, and the absence of first line supervision has resulted in a staffing and safety crisis.



As an example, a recent Monitor's tour in OJC, on a day-shift documented: four housing units without assigned staff, a first line supervision position vacant and three sergeants working to cover the jail and intake functions, four vacant relief/rover positions [to provide staff assigned to housing units or control housing units with regular, bathroom or meal breaks], and two housing unit control centers without assigned staffing.  There was only one rank (Captain) employee working for both the jail and intake functions, and no mid-manager (lieutenants) assigned/working.  The Monitor observed deputies coming back into the facility after a lunch breaks *outside* the facility, resulting in even fewer staff in the facility.  Additionally, there was confusion by OJC supervisors as to whether the Daily Building Roster, which is the documentation of who was supposed to be working, and who was actually working, was accurate.

While not suggesting that the day described above represents a typical day in OJC, the evidence is that there continues to be housing units that are not staffed; or are overseen from the housing unit control center.  Often the inmates in the housing units are out of their cells, making the lack of direct supervision more concerning.  There are incidents of inmate on inmate assaults in housing units for which OPSO acknowledges staff was not present.[15]   Even if staff are "assigned" to housing units (or other duties), the behavior is that, if the staff is not relieved (as noted above for bathroom breaks, other breaks, or lunch/dinner), most leave the post unattended.  As there are insufficient number of relief positions, the danger to inmates and other staff is magnified.  The inmates wait until the staff leave the housing unit to assault other inmates and cause property damage.

As of October 29, 2017, OJC reported there are a total of 196 jail-staffing related vacancies[16]; importantly 73 (21% of staffing required per the staffing plan) in deputy and supervisor coverage for OJC; and 33 (32% of staffing required per the staffing plan) for corrections monitoring technicians (CMT) – those employees

---

[15] The ICD's 60-day report, September 1, 2017 notes that "The OPSO leadership believes as we continue to "staff up" it will have a direct correlation with the reduction in violence in the jail." (page 6)

[16] On October 19, 2017 OJC reported a total of 253 vacancies; for this review the 41 vacancies in courts, capias and the docks, the 12 vacancies in administrative services, and the 4 vacancies in the detail department were not included.



assigned to the control centers in the facility.   OPSO reported in January 2017 that there were 104 vacancies for jail-related staffing (including only deputies, not CMTs).

OPSO revised hiring data reports that 309 individuals were hired to work in the jail (not for other OPSO operational areas) between January 1, 2017 and December 31, 2017; and 281 individuals ended employment during that time period; a net gain of 28 staff, although the data is not clear in terms of the number of those leaving employment who worked in OJC.  Of the 281 individuals who left employment since January 1, 2017, 140 (50%) had been hired since January 1, 2017.[17]

Relying on OJC staffing plan data for January 17, 2017, showing a total of 537 for jail-related functions (including intake, classification, transportation, training, kitchen and outside security, McDaniel, investigative services), the annualized attrition rate is 44% not including administrative services, detail department and court/capias/docks.

As noted in Compliance Report # 7, the Monitors recommend an overhaul of the hiring process to address the issue of turnover among recently hired staff.

---

[17] The OPSO Human Resources monthly report for November 2017, added an additional category titled "jail rehires indicating 36 individuals had been re-hired since January 2017.  The Monitors requested these files, and reviewed 30 provided by HR.  Of these 30 it appears that there were 19 rehires for OJC, with the other 11 reviewed for other OPSO functions i.e., (judicial enforcement deputy, finance).  The Monitors urge that when the hiring procedures, standards, and oversight for all OJC employees are updated, attention also be focused as well on the "rehires".  Findings from the file review indicated that there was, for example, no follow-up on previous law enforcement/jail references/investigations as required by Section 115.17 of the Prison Rape Elimination Act of 2003, and that inconsistencies in the backgrounds indicate the need for more diligence before rehiring decisions are made, including provisions of specific reasons for the rehire.

**Table 4 – OPSO Staffing Comparisons**

| Facility/Function | Staffing Plan – 1/17/17 | | | Staffing Plan 10/19/17 | | |
|---|---|---|---|---|---|---|
| | Required | Current | Difference | Required | Current | Difference |
| OJC | 288 | 230 | -58 | 353 | 280 | -73 |
| Intake | 103 | 84 | -19 | | Included in OJC | |
| Corr. Mon. Tech | 102 | | | 102 | 69 | -33 |
| Classification | 21 | 10 | -11 | 32 | 15 | -17 |
| Transportation | 24 | 21 | -3 | 33 | 21 | -12 |
| Training | 11 | 7 | -4 | | | |
| Kitchen/Outside Sec | 32 | 38 | -4 | 22 | 20 | -2 |
| McDaniel | 21 | 20 | -1 | | Closed | |
| Investigations | 53 | 49 | -4 | 55 | 53 | -2 |
| Temporary DC | | Closed | | 75 | 50 | -25 |
| | | | | | | |
| Compliance Director | 11 | | | 21 | 10 | -11 |
| Chief of Corrections | 17 | | | 17 | 13 | -4 |
| Detail Office | 4 | | | 6 | 2 | -4 |
| Facility Mgmt. | 41 | | | 60 | 43 | -17 |
| Admin Srvcs. | 53 | | | 48 | 36 | -12 |
| Courts/Capias/Docks | | | | 86 | 45 | -41 |

OPSO's data for January – December 2017 indicates that most of those leaving employment did so for unspecified personal reasons (30%), followed by job abandonment/no show (24%), and for advancement (12%).  Ten percent (10%) left employment due to misconduct; and 2% resigned while under investigation.

In June 2016, OPSO contracted with CRS, a consulting company, to produce a staffing plan, and compute the shift relief multiplier.  This work has not been completed to date.

Subparagraph 6.a.(1) - OPSO has completed a required staffing analysis as required by subparagraph a. (1).  As OJC has not achieved full staffing, it will be assessed at that time if the positions/posts are adequate to cover each post and position with adequate shift relief.

Documentation of unstaffed units continues through this reporting period; as well as observation by the Monitors.   The Monitors await information about how the OPSO plans to assure that housing units are staffed including providing relief for



meals and breaks during the 12-hour shifts – this is the purpose of the additional staffing noted in the first bullet, above.

An issue identified in the March tour is the hiring process itself for OJC. There are insufficient written directives governing this important process. Periodic review of files of those hired since January 1, 2017, provide opportunities for improvement. The ICD has indicated a commitment to engage appropriate subject matter experts to review and update the hiring procedures as well as mentor and coach the staff assigned to Human Resources.

Sub-paragraph IV.6.a. (2) – This provision is in substantial compliance at this time. With the planning for Phase III, the Monitors look forward to reviewing the staffing plan.

Sub-paragraph IV.6.a. (3) – This provision it is now in substantial compliance with the re-hiring of Chief Michael Tidwell as the Chief of Corrections.

Sub-paragraph IV.6.a. (4) – This paragraph is in partial compliance, as monthly reports are produced regarding hiring and termination of employees. The Stipulated Agreement also provides for bi-monthly reports regarding hiring.

Sub-paragraph IV.6.b. – This provision is in partial compliance, as noted above, as full-staffing has not been achieved, it is not possible to determine if the requirements of the Consent Judgement are met.

Looking ahead, OPSO has prepared a budget request to the City for 2018 which adds more staffing to the facility and supporting operations.

In the previous seven compliance reports, thirty-six recommendations are made regarding staffing, with some of these recommendations repeated from report-to-report[18]. Only a handful have been addressed – mostly regarding hiring of a Chief of Corrections and Compliance Coordinator. The *continuing* unresolved critical recommendations address:

- Salary – There needs to be a salary adjustment for: entry level, career, and additional adjustments for consistency. The gap between the public safety pay in the City and the surrounding area makes OPSO's salaries the lowest. The ICD

---

[18] See Appendix B.

provided an opportunity for staff, hired in previous years, to complete POST certification, resulting in the State of Louisiana contributing an additional $6000 in annual salary.  The ICD also adjusted some salaries for consistency and based on job duties.  What remains is the gap among public safety jobs in the metropolitan area, and absence of a career ladder, both critically important recruitment and retention issues.   The jail system cannot operate safely without qualified staff who are trained, supervised, and retained.  Among the challenges which remain unaddressed are:

- According to OPSO, the starting salary for newly hired staff to work in the jail is $11.91/hour (annualized $24,773), and after six months, raised to $12.36/hour (annualized $25,709).  When the employee attends and successfully completed the POST academy (state certification), there is an increase of $6,000 – to $31,709.
  - The ICD is proposing a $1,500 (5%) increase in salaries during CY 2018 – bringing the salary to $32,209.
  - The U. S. Dept. of Labor notes that the average mean wage for correction employees nationally is $46,750.[19]
- The entry-level salary for New Orleans Police Department officers is $51,450, approximately 42% more than OPSO's starting salary.[20]  This is not to suggest that the agencies are necessarily recruiting the same pool of candidates, but rather to highlight the deficit position for recruiting of qualified individuals for OPSO.
- The mean hourly wage in the New Orleans-Metairie Metropolitan Statistical Area for protective service jobs is $17.70/hour (annualized $36,816).[21]  The jobs included in this category include a variety of occupations which are direct competition for the hiring at OPSO.[22]

---

[19] https://www.bls.gov/oes/current/oes333012.htm accessed on November 15, 2017.

[20] This percentage difference is based on the Orleans Parish Sheriff's Office press release of December 28, 2017 reporting on budgeted pay increases for the Calendar Year 2018.

[21] https://www.bls.gov/regions/southwest/news-release/occupationalemploymentandwages_neworleans.htm accessed on November 15, 2017

[22] https://www.bls.gov/oes/current/oes330000.htm accessed on November 15, 2017

- o Compliance Report #1 (2014) reviews the salaries of nearby jurisdictions and other security-related jobs in the region.  Nothing has changed since this report, except that the disparities for OJC staff continue to grow.
- o The average weekly wage for Orleans Parish, as reported by the Bureau of Labor Statistics is $1,023 for the first quarter of 2017, annualizes to $63,000[23].

On a positive note, the ICD's 60-day report, filed on December 29, 2017, reports that raises are included in the 2018 budget.  These raises, reported in a press release from the OPSO dated December 28, 2017 indicates that deputies' base salaries will increase $2,000 as of January 5, 2018, with an additional $1,500 on July 1, 2018.  OPSO reports these increase will raise the deputies' starting salary to $29,500, and if they qualify for statue supplemental pay of $6,000, the salary will increase to $35,500.

The Monitors are not suggesting that raising the starting salary, and establishing a career ladder are the only steps that need to be taken to recruit and retain qualified staff.  The recommendations and suggestions provided to the Defendants since 2014 have included:

- • Refinement of the recruitment and background screening processes.
- • Improvement of pre-service training to be more relevant to the job duties, including direct supervision, provided by qualified instructors.
- • Competent first-line supervision.
- • Adequate staffing at all levels.
- • Implementation of accepted correctional practices to assure inmate and staff safety.
- • Consistent mid-management leadership.
- • Introduction of subject matter experts to update operations and mentor employees.

[23] https://www.bls.gov/regions/southwest/news-release/countyemploymentandwages_louisiana.htm#table1

- In-service training to refine skills and address deficiencies in operations revealed by internal review of incidents.

Technical assistance has also been offered by the Monitors for each of the areas noted.

The Monitors are obligated to recommend that if there are insufficient, qualified and trained staff to supervise inmates, including staff to provide relief to deputies and CMTs: (1) consideration be given to reducing the population to match the available required staffing; and (2) that the facility consider other, safer, inmate management strategies, including limiting the number of inmates who are out-of-cell simultaneously.

The other general topic areas which have been repeated in Compliance Reports, and unresolved/unaddressed include:

- Human Resources Management – There are consistent and continual recommendations from Compliance Report #1 urging OPSO to address needed upgrades in written policies, procedures, and operating directives for recruitment, retention, background investigations/screenings/record-keeping and analysis/benchmarking.  The turnover rate, and the rate at which new employees leave are red flags.  There are monetary and organization costs to these high rates.

- Training – Needed improvements in pre-service training, and addition of in-service training are needed to address the skills, knowledge and abilities to work in a jail – particularly a direct supervision jail.

- Staffing Planning and Contingencies – Recommendations have been made since Compliance Report #1 to develop staffing contingencies to operate a safe, Constitutional jail.

- Subject Matter Experts – The Monitors have consistently recommended hiring of jail subject matter experts at the executive and mid-management levels to operate the jail, model the way for OPSO staff, and create a sustainable legacy.



- Organizational Structure and Span of Control - The Monitors have consistently recommended attention to the organizational structure and assurance that there is appropriate number of first, mid, and upper level managers, supervising the right number of line and support staff.

No additional recommendations are included in Compliance Report # 8 as there remains significant work on the recommendations contained in all previous Compliance Reports.  See Appendix B for the summary of outstanding recommendations.



## IV. 7.  Incidents and Referrals

Findings:
- A. 7.  a. - Partial Compliance
- A. 7.  b. – Partial Compliance
- A. 7.  c. – Substantial Compliance
- A. 7.  d. – Partial Compliance
- A. 7.  e. – Partial Compliance
- A. 7.  f. – Partial Compliance
- A. 7.  g. – Partial Compliance
- A. 7.  h. – Partial Compliance
- A. 7.  i. - Non-Compliance
- A. 7.  j. - Non-Compliance

**Measures of compliance:**
22. Comprehensiveness of written policies
23. Training
24. Data collection and analysis
25. Supervisory review of uses of force
26. Review of use of force reports
27. Review of incident reports, review of investigations by SOD
28. Review of investigations by IAD
29. Monitors' review of required semi-annual reports.

Observations:

While there is a policy on incidents and referrals that sets out the process for documenting and referring incidents, there is not a sufficient process in place to ensure all reportable incidents are being documented and that the incidents are being recorded adequately, timely, and accurately.  As previously and repeatedly stated, simply having a policy that says all incidents and uses of force are to be reported is inadequate (See Paragraph IV.A.3).  There must be a system in place to check to make sure reportable incidents are being documented and that there are consequences when incidents are not reported or not reported accurately.  The policy on incidents and referrals identifies which incidents are to be reported, and includes the Consent Judgment language that failure to do so will result in discipline. The Monitors continue to identify apparent inconsistencies in disciplining staff who are found to not report incidents timely.  During review of administrative cases involving the failure to report an incident, the Monitors have noticed discipline



ranging from an oral counseling to a three-day suspension with no apparent basis for the different treatment.

To assess the level of violence in OJC, the Monitors reviewed 'routes' – inmates with serious medical or trauma injuries that they are transferred to the emergency room, and clinic walk-in logs.  These data were analyzed for the period of September 1 – December 15, 2017.   In addition to the issues identified pertaining to the safety and security of the inmates, it bears repeating that there were no incident reports for 21 of the emergency room transfers.   If reports are not being written a quarter of the time for incidents serious enough to warrant hospitalization, it calls into question how many other events are not being properly reported and memorialized in an incident report.  OJC was not able to provide an explanation of why reports were not written on 21 apparent injuries serious enough to warrant emergency room transfer.

A review of the clinic walk-in logs for the same 75-day period provided this information:

- Of the 1,019 clinic walk-in log entries for this time period, 46% (N=469) appear to be related to inmate altercations, suicide attempts, and trauma.  Approximately 300 of these were not reported to the Monitors.  Examples of the unreported incidents captured on the CCS logs include:
  - Use of pepper spray and uses of force, unresponsive patient, head trauma, "swallowed heroin", altercations, suicidal, eye trauma (3), head injury (2), ingestion of unknown substance, laceration to head, fractured jaw (2), broken nose, ingestion of pills.

OPSO was provided this list compiled by the Monitors from the CCS logs, and as of this date has not provided a review.

While it is, perhaps, not optimal to use this secondary data to evaluate the level of violence, the findings are significant enough to permit a conclusion that there are not only incidents which are not reported to the OJC leadership, but there



are incidents for which decisions are made not to report to the Monitors as required by the Consent Judgment.

The deficiencies in the quality of reports continues to exist; the failure of the reports to contain all the information required in OPSO's policy and the too often use of boilerplate language.  The incident reports examined by the Monitors were often found to be inadequate and/or incomplete, and conclusory language that does not allow the reader to make an evaluation of what occurred, the reason for the occurrence, whether staff acted appropriately, and what steps should be taken to prevent a similar incident from occurring in the future.   Such reports are being approved by a supervisor.  As with use of force reports, there is no automatic tracking system to ensure timely reviews and notifications are being made.  While completed reports are required to be assigned a number, there is no follow up to make sure the reports are written and/or are reviewed within the 24 hours required by the Consent Judgment.

No periodic reports detailing reportable incidents have been submitted to the Monitors as required under IV. A. 7. f.  The reports that were provided are the list of inmate-on-inmate assaults and criminal investigations conducted by the Criminal Investigation Division of ISB.  [See also VII.B. regarding identification of serious deficiencies]

The adequacy of the policies and procedures and reporting system is crucial to the Monitors, and the leadership of OPSO, being able to rely on the accuracy of the periodic reports that are to be submitted under IV. A. 7. f. and g. and the sufficiency of the annual review that is to be conducted under IV. A. 7. h. which requires OPSO to assess whether the incident reporting system is meeting the requirements of the Consent Judgment.



## IV. A. 8.  Investigations

Findings:
>A. 8. a. – Substantial Compliance
>A. 8. b. - Substantial Compliance
>A. 8. c. - Substantial Compliance
>A. 8. d. - Substantial Compliance
>A. 8. e. - Substantial Compliance
>A. 8. f. - Partial Compliance

**Measures of compliance:**
1. Review of incident reports,
2. Review of use of force reports,
3. Review of investigations by SOD,
4. Review of investigations by IAD, and
5. Monitors' review of required semi-annual reports.

Observations:

The Investigative Services Division (ISB) is responsible for:  the Criminal Investigation Division (investigates possible criminal activity by inmates), Internal Affairs Division-Criminal (investigates possible criminal activity by staff), the FIT (investigates use of force by staff), the Internal Affairs Division-Administrative (investigates possible violation of policies by staff), and the Intelligence Unit (provides information and intelligences regarding activities that have taken place or may take place in the jail or support activities).  At one time, some of the divisions had been moved out from under the supervision of ISB.  The Monitors urge that all of the divisions remain under one command as it makes for better collaboration among the various groups conducting investigations.

Significant evidence of substantial compliance was provided for IV. A. 8.  The Monitors are concerned about the time investigations are taking, but part of that reflects the poor quality of the reports providing the basis for the investigations as well as the sheer volume of incidents requiring the attention of ISB.  Improvements in all other areas from hiring, training, supervision, and adequate staffing will enhance the safety of staff and inmates – and ultimately decrease the workload of ISB.

The leadership of ISB has successfully overcome their lack of corrections experience by attending training directly related to investigations in corrections



facility and recruiting investigators who have corrections experience.  Closer collaboration with the staff of OJC would further benefit both groups.

The Monitors acknowledge that investigating incidents of inmate on inmate assaults, sexual assaults, staff on inmate assaults, etc. with a goal of seeking indictments is appropriate; but the overall goal is to create a safe jail.  In a jail setting, investigations play just as critical a role in terms of protecting inmates from inappropriate or illegal staff actions, protecting inmates from each other, and correcting policy, practice, supervision and training.  Continued emphasis needs to be placed on having as one of goals of investigations being the *prevention* of future incidents through analysis of the policy, procedures, training, supervision, and physical plant contributors to the incident.  This function cannot and should not be performed by ISB alone.  This level of assessment requires input from individuals who have a high level of experience in jail/corrections work. The Monitors are hopeful that the Chief of Corrections, who has sufficient corrections experience, can assist in filling this role.  The OJC staff should take the lead in the root cause analysis with ISB providing information gathered during the investigation.

In the past, the Monitor's reviews of a sample of investigations conducted by ISB revealed a contrast between the investigations conducted by the criminal division and administrative divisions of the IAD.  The IAD-Criminal investigations appeared to be more thorough and complete.  The quality of the investigations from the IAD-Administrative Division has continued to improve since responsibility for oversight was returned to ISB.

ISB has received significant additional training.  However, additional training regarding investigations in a corrections setting regarding sexual abuse, assault, harassment, and voyeurism (PREA related) needs to be provided.

In addition to the investigators assigned to ISB, watch commanders and wardens have a role in investigations.  Unfortunately, the watch commanders and wardens often lack the investigative knowledge or skills and thus actually hinder ISB's work to complete a thorough investigation.  In particular, the lack of investigative knowledge and skills by watch commanders and wardens, especially in regard to the investigation of sexual assaults, has the potential to further victimize

or re-traumatize inmate victims.  ISB has provided training to supervisors on crime scene preservation, but incidents continue to occur where the crime scene is comprised before the arrival of ISB.

ISB is now providing reports in substantial compliance with IV. A. 8. e.  The one item left in this section that is not in substantial compliance is IV. A. 8. f.  The reports must be reviewed to determine whether the investigation system is meeting the requirements of the Consent Judgment and any recommendations forwarded to the Monitors.



**IV. A. 9.     Pretrial Placement in Alternative Settings**

Findings:

A.9.a. – Substantial Compliance

A.9.b. - Substantial Compliance

**Measures of Compliance:**
1.  Memorandum of understanding (MOU) with Pre-Trial Services.
2.  Observation
3.  Interview with pre-trial services staff
4.  Review of files
5.  Review of data regarding pre-trial diversion

Observations:

The Monitors have received no information from the City or the contractor (VERA)[24] regarding absence of compliance with this provision. There is no evidence provided to the Monitors that OJC holds inmates for ICE (IV.A.9.b)

---

[24] VERA will be transitioning this function to Criminal District Court.

## IV. A. 10.  Custodial Placement in OPP

**Introduction**

OPSO has designed, validated, and implemented an objective classification system to assess and house each OSPO inmate according to the risks he/she poses to institutional safety and security. The automated classification system was rolled out in the Jail Management System (JMS) on January 15, 2015.[25] Staffing for the Classification Unit was set at 18 classification specialists and a classification manager. As of October 31st, the Classification Unit roster listed 15 individuals – 13 civilian classification specialists, 1 housing auditor/deputy, and a classification manager. Three additional employees are in training. One of the current classification specialists is slated to become a deputy. The Unit is organized into two squads with two platoons. Each platoon has a shift coordinator, one classification specialist for initial classification and one for transfers/reclassification.

Each classification specialist has received training on the principles of objective classification and instruction on the custody and PREA assessment instruments and OPSO housing matrix. During this compliance period -- April – October 2017 -- no in-service training was provided, despite the fact that the Unit staffing increased by eight new classification specialists.

OPSO has developed an automated housing assignment process that considers the inmate's custody level, gender, special population status, PREA designations, enemies, and associates as well as bed availability to recommend an appropriate bed for the inmate. The JMS generates a list of appropriate housing locations from which the classification specialist must select a housing assignment/bed for the inmate.

Separations for special populations have been incorporated into an automated Housing Unit Assignment Plan (HUAP) that controls the specific inmate population(s) to be assigned to each OPSO housing unit.[26] Identification tags have been created to

---

[25] Hardyman, Patricia L. (2015). "Design and Validation of an Objective Classification System for the Orleans Parish Sheriff's Office: Final Report." Hagerstown, MD: Criminal Justice Institute, Inc.

[26] The HUAP identifies the appropriate pod, cell, and bunk for an inmate according to his/her gender, age (youthful vs. adult), custody level, PREA designations, identified enemies and/or associates, medical and mental health needs, and status as to disciplinary, administrative segregation, and/or protective custody.

identify inmates on suicide observation vs.  suicide watch, those undergoing detox for alcohol and/or controlled substances, and participation in the school. The OJC and TDC dormitories beds have been cataloged to  enable the classification specialists to assign inmates to specific beds. Although  Classification and JMS staff worked together to develop a sophisticated Inmate Separation Instrument (ISI) to maintain out-of-cell separations, housing unit deputies responded with blank stares when asked about ISI and routinely let all inmates out together. It is unclear if the housing unit deputies hired and trained during this compliance period received ISI training as no ISI training logs were received. Observation of the housing audits confirmed that housing unit deputies were not consistently using the ISI. Therefore, Housing unit Separation errors continue, resulting in unsafe conditions where inmates who have been identified as needing to be separated from one another are out of their cells together at the same time. Separations by custody level, PREA designations, and other separations concerns among OPSO inmates housed out-of-parish are still problematic.

Previous problems of Security/Operations not are going through the Classification Unit for housing unit transfers appear to have been addressed. However, there were at  least two incidents during this compliance period in which an inmate was moved from the  housing unit to a "holding cell" which is not designed to house inmates as they have no facilities for sleeping, toilet, sink, etc.  Classification Unit staff were not promptly notified or  requested to re-assign the inmate to a different location.

Monthly custodial, discipline and prisoner statistical reports have been received as  scheduled. The documents requested for this compliance visit were received promptly.

Summary

In sum, the OPSO is in partial compliance with the elements of the Consent Judgment related to Custodial Placement within OPP (IV. A.10). During this six-month period, the OPSO moved from partial compliance to substantial compliance on one section of the Consent Judgment.  On the other hand, for two sections, compliance was reduced to a lower grade.  Section d. -- *Continue to update the classification system to include information on each prisoner's history at OPSO* -- moved from partial compliance to non-compliance and  Section e. -- *Continue competency-based training and  access to all*

*supervisors on the full capabilities of the OPSO classification and prisoner tracking system* - - changed from substantial compliance to partial compliance. These rating changes are due to failure to maintain the housing and custody audit protocols, failure to provide in-service training for staff, and failure to fully assess the inmates' stability, criminal and institutional histories for the custodial and PREA assessments. Recognition is due for OPSO's efforts to bring the Classification Unit staffing back up to requirements, to implement and develop its objective classification system and automated housing assignments, and to develop statistical reports as required under section IV.A.10.g. The only statistical report <u>not</u> provided is the rates of victimization of inmates on the mental health caseload. These data are dependent upon timely information from the mental health provider. OPSO is working with Correct Care Solutions (CCS) to reestablish the automated exchange of data between the electronic medical records and the JMS. There have been shifts in the classification unit leadership and additional changes are anticipated. These changes have contributed to confusion and conflict among the line staff as to their roles and responsibilities. Open communication and strong leadership are critical to ensure that the Classification Unit is actively integrated into the agency and there is strong cooperation and cohesion within the Classification Unit. **Assessment Methodology**

This report was based on: 1) Observation of initial classification and housing assignment process and housing unit audits; 2) Onsite meetings with OPSO classification and JMS staff; and 3) Review of monthly custodial, disciplinary, training, and housing unit audit reports for April – October 2017).



**IV. A. 10. a.  OPP shall implement an objective and validated classification system that assigns prisoners to housing units by security levels, among other valid factors, in order to protect prisoners from unreasonable risk of harm.  The system shall include: consideration of a prisoner's security needs, severity of the current charge, types of prior commitments, suicide risk, history of escape attempts, history of violence, gang affiliations, and special needs, including mental illness, gender identity, age, and education requirements. OPSO shall anticipate periods of unusual intake volume and schedule sufficient classification staff to classify prisoners within 24 hours of booking and perform prisoner reclassifications, assist eligible DOC prisoners with re-entry assistance (release preparation), among other duties related to case management.**

Finding:          Partial Compliance

**Measures of Compliance:**
1. Written policy/procedure governing the intake, booking, classification and re-classification   process.
2. Report including a statistical validation of the OPSO current custody classification system that   includes statistical assessment of the risk and need factors of the inmate populations by gender   and race.
3. Implementation of the identified updates via an electronic file with the completed custody   assessments for OPSO population.
4. Report documenting required staffing needs.
5. Implementation of viable classification/case management staffing plans.

<u>Observations</u>:

o   The automated classification system was rolled out in the Jail Management  System (JMS) on January 15, 2015.

o   A validation report documenting the design and validation was submitted on July 16, 2015 to the attorneys for the Plaintiff class and DOJ.

o   Classification and PREA assessment handbooks were updated in December 2016 to document changes to the scoring of convictions and the mandatory restrictors.

o   As of October 25th, the Classification Unit roster lists 18 individuals -- The roster  lists two deputies (Captain Harris (Classification Manager) and one deputy) and  13 civilian classification specialists. Three additional individuals were in  training; they will begin a regular schedule on November 13th. Only

Compliance Report # 8 – January 12, 2018



one deputy is assigned to the Classification Unit.  This limits the Classification Unit's ability to complete housing audits, respond to grievances, and conduct interviews regarding the need for protective custody and housing re-assignments.

However, one of the classification specialists is slated to become a deputy.  This should facilitate the scheduling of housing audits throughout the month as well as on both the evening and day shifts.

o   Leadership within the Unit shifted from Lt. Holliday to Capt. Harris. This responsibility is expected to change again as Capt. Harris assumes her new role as Warden for OJC.  These shifts have created some confusion and conflict among the line staff as to their roles and responsibilities.  The voice of classification needs to remain strong to ensure the Classification Unit is actively integrated into the agency and there is strong cooperation and cohesion within the Classification Unit.

o   "Implementation" of the classification system includes not only staff to complete the custody assessments, but also maintenance of the integrity of the classification system. During this compliance period, the integrity of the classification system was compromised due to:

- A significant decline in the percentages of inmates for which an initial classification was completed as well as an increase in the time between booking and completion of the initial custody assessment. Initial custody assessments and housing assignments were not completed as per OPSO policy of within 24 hours of booking.

- Custody Re-assessments were not timely, nor did they fully consider the inmate's current and prior criminal history data, and institutional behaviors. For example, the Classification Monitor List (List) as of October 27th indicated that 144 inmates were due for a custody re-assessment and that the average length of  time the custody re-assessments were overdue was 27.5 days. By October  31st, the List had dropped to 115 inmates, but



Compliance Report # 8 – January 12, 2018

51

the average length of delay had increased to 30.8 days. Classification staff reported that custody re-assessments were not routinely completed because of a lack of bed space and/or the housing unit assignment plan did not match the custody requirements of the inmates.

- The PREA assessments completed did not fully consider the individual's medical/mental health screening data as the CCS medical/mental health electronic records were no longer uploaded to the JMS.

- Training of the eight new classification specialists was problematic as the hands-on practice did not include accurate instructions for completing the custody assessments.

New Recommendations:

11.    Develop and circulate among OPSO executive and supervisory staff standardized automated reports.

12.    Continue the audit process to verify the actual housing location of the inmate matches housing assignments generated by classification.

13.    Recruit, hire, and train a Classification Manager who does not have other duties.



**A. 10. b. Prohibit classifications based solely on race, color, national origin, or ethnicity.**

Finding:  Substantial Compliance

**Measures of Compliance:**
1.    Implementation of a valid classification system based on the objective and reliable risk and need   factors of the OPSO inmate populations as documented by a written report on the   design/validation of the revised classification system and electronic file of custody assessments.
2.    Provide a quarterly report that tracks custody distributions by housing unit race, and gender to   the Monitor.

Observations:

o   Custody assessments are based on objective risk factors that have been validated for OPSO males and female inmates.  Race is not one of the objective risk factors.

o   OPSO has created monthly statistical reports to track classifications by race.  Timely reports were submitted during this compliance period.



**IV. A. 10. c. Ensure that the classification staff has sufficient access to current information regarding cell availability in each division.**

Finding: Substantial Compliance

**Measures of Compliance:**
1. Develop and implement a housing unit assignment plan that outlines the mission, number of  beds and custody level(s) for each OPSO housing unit.
2. Provide a report of the daily counts to the classification housing staff as to the number of  occupied, vacant, and out-of-order beds per pod per housing unit with electronic copies of the   daily reports provided to the Monitor.

Observations:

o  OPSO has developed an automated housing assignment process that considers the inmate's custody level, gender, special population status, PREA designations, enemies, and associates as well as bed availability to recommend an appropriate bed for the inmate.  Separations for special populations have been fully identified and  incorporated into the automated HUAP.  Additional identification tags were  created to identify inmates on suicide observation vs. suicide watch, alcohol/drug detoxification, and school participation.  Classification specialists are provided a listing of mission of each unit to facilitate selection of the "best" bed from among those identified by the JMS as compatible based on the inmate's custody, PREA designations, separations, medical, and mental health needs.

o  Previous problems of Security/Operations not going through the Classification Unit for housing unit transfers appear to have been addressed except as to transfers out of parish, which are being done by security staff with no classification review.  However, there were at least two incidents in which an inmate was moved from  his/her housing assignment without notification of the Classification Unit to identify appropriate housing assignments.

o  Closed housing locations are printed on the daily population sheets generated by the JMS. Any closed locations are removed from the housing options listed by the JMS when the classification specialist assigns an inmate to a cell/bed and generates a housing transfer order.



o   Classification specialists maintain a running inventory of bed assignments to avoid duplications due to delays between the housing assignments and physical transfer of the inmate to the designated housing unit.



**IV. A. 10. d. Continue to update the classification system to include information on each prisoner's history at OPSO.**

Finding:    Non-Compliance

**Measures of Compliance:**

1. Any automated management information system will include accurate data within eight hours of the custody assessment or status change, data regarding the inmates' custody level, medical, disciplinary infractions, mental health, and custody assessment (date, risk factor scoring, override reason ,if applicable, and custody level). Monitor will conduct audit of random sample of cases to determine accuracy and timely entry of data. Compliance standard will be 90% accurate and reliable.

2. The custody assessments shall be updated/reviewed every 120 days, a hearing for a disciplinary infraction for major infraction, legal status change, new information from the court, and a major jail incident to include PREA or other major incident/investigation. Monitor will conduct audit of random sample of cases to determine accuracy and timely entry of data. Compliance standard will be 90% accurate and reliable.

Observations:

o   As shown in Figure 1, the monthly custodial reports, as provided by OPSO, have indicated a significant decline in the percentages of inmates for which an initial classification was completed as well as an increase in the time between booking and completion of the initial custody assessment. For example:

▪   % Initial custody Assessments: In January 2017, initial custody assessments were completed for 92.9% of the inmates booked into OJC. By October 2017, initial custody assessments were completed for only 69.9% of the inmates booked into OJC. (Note, custody and PREA assessments were completed for all inmates prior to their transfer from the booking area to an OPSO housing unit.)

▪   % - 8 Hours: January 2017, initial custody assessments were completed within the first eight hours of booking for 92 percent (91.9%) of the OPSO inmates. During October 2017, the initial custody assessment was completed within 8 hours of booking for only 51.4% of the inmates. This was sharp increase from the rate of 33.8% in September. % - 24+ Hours:



January 2017, the lag time between booking and the initial custody assessment was more than 24 hours for only .1% of the inmates. By the September, the initial classification and housing were not completed within 24 hours of booking for 12.8% of the inmates.



**Figure 1: Rates and Completion Time for Initial Custody Assessments YTD 2017**

o   The Classification Monitor List (List) as of October 27th indicated that 144 inmates were due for a custody re-assessment and that the average length of time the custody re-assessments were overdue was 27.5 days. By October 31st, the List had dropped to 115 inmates, but the average length of delay had increased to 30.8 days.  Classification staff reported that custody re-assessments were not routinely completed because of a lack of bed space and/or the housing unit assignment plan did not match the custody requirements of the inmates.  (Note OPSO classification policy requires all custody assessments to be completed within 24 hours.)

o   Medical/mental health assessment data are no longer uploaded to the JMS from the CCS electronic medical records. Thus, information on seven of the



risk factors for the PREA victimization and predation assessments are not available to the classification specialists. These risk factors include:

1. Physical stature - The JMS looks for the height and weight as input as part of the initial medical assessment by Correct Care Solutions (CCS).
2. Developmental/Medical Disability (Medical Special Needs)?
3. Psychiatric patient (Mental Health Special Needs)?
4. Gay/Lesbian/Bisexual/Transgender/Intersex or overtly effeminate?
5. History of any sexual abuse within the community during the past 15 years?
6. Does the inmate feel vulnerable in jail?
7. Overtly masculine (females only)?

While a classification specialist interviews each inmate as part of the initial classification process, information from the medical/mental health intake assessment is critical for complete PREA victimization and predation assessments.  In October, on learning from the Monitor that the medical/mental health assessment data were not available for the PREA assignments, OSPO took steps to work with CCS to rebuild  the linkages between the medical records and JMS as well as ensure that the medical/mental health assessment data linked to the new jail management  system.  However, these data were not available for the PREA assessments  during this compliance period.

o  The OPSO disciplinary process tracks the institutional misconduct among OSPO  inmates housed at OJC, TDC, Hunt, and RCC. These data are input into the JMS and used for the scoring of the custody and PREA assessments. However, the dispositions from the September disciplinary hearings held for OPSO inmates housed out of parish at ECP were not available.  OPSO has requested the dispositions, however to date, ECP has not provided the dispositions. This created  additional delay to the lag between the infraction



and any event-driven  custody re-assessments for the out-of-parish inmates. This created questions as to whether their custody assessments were timely and accurate.

o   Observation of the custody assessments completed by the new classification specialists revealed that they are not instructed to review the NCIC (National Criminal Information Center) criminal rap sheets, to create attachment to update the data within the JMS regarding out-of-parish convictions and detainers, or as to the correct procedures for completing the custody and housing assessments.  Further, it appeared as least some of the "long-term" staff did not understand or follow the correct procedures for the custody or PREA assessments.  Thus, the classification specialists are not conducting full reviews of the inmates' criminal and institutional histories for the custody and housing assessments.

o   Notification of the out-of-parish facilities as to any changes in the inmates' custody or PREA designations did not occur during this compliance period.

o   Custody level and PREA designations are provided to RCC and ECP as part of the initial transport documents. Our recommendations that OPSO not house maximum custody inmates, known sexual predators, and known sexual victims out-of-parish have not been followed.  In fact, on multiple occasions, OPSO has moved inmates with extensive disciplinary problems out-of-parish. As shown in Table 5, the security and PREA designations of the OPSO inmates housed at ECP include  three inmates identified for special population housing (administration  segregation [2] and disciplinary tier [1]) as well as a mixture of maximum, high and medium custody inmates in <u>one</u> dormitory.



| Table 5: Security and PREA Designations of OPSO Inmates Housed at ECP | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Custody Level | N | % | Victim Potential | N | % | Predator Potential | N | % |
| Maximum | 1 | 1.5% | Known | 0 | 0.0% | Known | 1 | 1.5% |
| High | 41 | 61.2% | Potential | 0 | 0.0% | Potential | 18 | 26.9% |
| Medium | 25 | 37.3% | Non-Victim | 67 | 100.0% | Non-Predator | 48 | 71.6% |
| Total | 67 | 100.0% | | 67 | 100.0% | | 67 | 100.0% |

New Recommendations:

14.    Eliminate the backlog of cases due for a custody review.

15.    Develop QC processes to ensure the integrity of both the classification and disciplinary processes such as not using out of parish housing for administrative segregation and disciplinary inmates and ensure that disciplinary information is communicated between OPSO and the out of parish facilities.



**IV. A. 10. e. Continue competency-based training and access to all supervisors on the full capabilities of the OPSO classification and prisoner tracking system.**

Finding: Partial Compliance

**Measures of Compliance:**
1. Written directive governing training of staff assigned to classification.
2. Curriculum for competency-based training regarding the custody classification system, housing assignment process, work/community assignments, and case management. Evidence of knowledge gained.
3. Staff training roster(s) and competency tests following completion of competency-based training by current classification/case management staff.
4. Staff training roster(s) and competency tests following completion of competency-based training by all new or re-assigned staff on assignment to classification/case management duties.
5. Curriculum for classification module within the basic academy training curriculum for OPSO staff. Evidence of knowledge gained.
6. Staff training roster(s) and competency tests.

Observations:

1. Training was provided to the eight new classification specialists on their assignment to the Classification Unit. This training included review of the principles of objective classification as well as hands-on practice with OPSO cases using the JMS test data site. The Classification specialists were required to pass a competency test. New classification specialists were also provided copies of the custody and assessment handbooks.

2. Quality of the hands-on training was questionable as the classifications specialists did not understand the basic functions within the JMS for completing the custody and PREA assessments, reviewing the criminal records, inputting out-of-parish criminal history or detainer data, or how to use the data from the classification interviews. Specialists were observed, for example, to print the custody armbands PRIOR to completing the custody screens within the JMS.

3. No in-service training was provided during this compliance period (April – October 2017) despite the fact that staffing was increased by eight new classification specialists. Ongoing follow-up checks of the new



Compliance Report # 8 – January 12, 2018

61

classification  specialists work has not occurred.

New Recommendations:

16.     Provide on-going training and monitoring to ensure the classification staff complete the custody and PREA assessments correctly. A systematic random audit process should be implemented to monitor accuracy of the risk factor scoring as well as housing assignments.

17.     Provide remedial training on how to complete custody and PREA assessments.



**IV. A. 10. f. Conduct internal and external review and validation of the classification  and prisoner tracking system on at least an annual basis.**

Finding:  Partial-compliance

**Measures of Compliance** OPSO information system to monitor:
1. Custody distributions by gender, race and special populations.
2. Override rates.
3. Housing by custody level/special needs, and race.
4. PREA separations.
5. Custody re-assessments (regular and for-cause, # over-due, et al.).
6. Electronic copies of the quarterly and annual reports shall be provided to the Monitor with    documentation of steps (tasks and dates) taken to address any noted inconsistencies with OPSO    policies.

Observations:

1. Timely monthly custodial statistical reports by assessment type, gender and population were received through September 2017.

2. Monitor receives the OPSO daily population sheet that tracks the number of inmates by location.

3. Housing unit audit reports and on-site observations of the housing audits indicated that housing unit deputies do not use the ISI to maintain housing unit level separations. During each of the audits observed for this compliance report, as well as those observed during the July site visit, all inmates were out of their cells.  When asked about the ISI, housing unit deputies indicated they did not know about the ISI and that it was standard practice to have all inmates out of their cells.  Supervisors do not require  housing unit deputies to use the ISI, but continue old patterns of upper vs.  lower separations or rely on hand written notes. As shown in Figure 2, ISI usage errors are common notations during the housing audits.





**Figure 2: ISI Usage Errors noted during the Housing Audits.**

As shown in Figure 2, ISI use error data were not available for the August housing audits. The data from September and October audits suggested that the housing unit deputies were using the ISI as no ISI errors were recorded. However, on further exploration of these data, it was learned that most housing audits were scheduled according the availability of the pod deputies and when the inmates were in their cells, thus the questions of the presence of the pod deputy on the unit and the housing unit separation errors or usage errors of the ISI were moot. (The November error rate of 100% was based on the observations of the audits conducted for this compliance report.)

o   Current housing audit process raised several concerns that suggested the audits were not providing a full picture of the integrity of the housing assignments and housing unit-level separations within OPSO housing units:

1.   Schedule: Most audits were conducted during the last week of the month rather than randomly throughout the month. The audit schedule should ensure each housing unit is audited at least monthly. Special units may require additional audits.

2.   Time: Most audits were completed during the early morning or periods of



the day when the inmates were locked down, thus checks of housing unit level separations were moot or at least incomplete. Staff also reported that the audits were scheduled according to the availability of the pod deputies. This compromised any data collected as to whether "staff present on tier" at the time of the audit.

3. Staffing: One deputy is responsible for the housing audits. (The deputy assigned to auditing switched as of May. Currently, the task is assigned to only one person whose work schedule is Monday – Friday, 8 AM to 5 PM.)

4. Audit worksheets: Notes on the audit score sheets and housing rosters were inconsistent, for example, a specific mark/note on various worksheets was reported differently across audit score sheets.

5. Coverage: Audits of the OJC and TDC dormitory-style housing units have not been completed.

6. Detail: The current audit protocol checks if the inmate is living in the cell to which he/she was assigned as per the most recent housing transfer order. Compliance with upper vs. low bunk assignments is not checked. This is noted as OPSO has recently implemented a policy that requires inmates with specific medical needs be assigned to a lower bunk.

o As part of the ongoing classification and housing processes, the classification shift supervisor reviews the JMS reports to identify placement errors and ISI separation conflicts.

o In October 2016, an internal auditing/quality control program to review the custody assessments was implemented by Lt. Holiday.  However, no internal audits of the custody assessments have been completed since March 2017. Even though during this six-month period, Unit staffing increased by eight new classification specialists, the Unit has failed to maintain this critical process.  Thus, during a period during which quality control audits were most critical, random reviews of the custody/PREA assessments were not completed.



- o  The OPSO has contracted with Dr. Edward Latessa (University of Cincinnati) and Dr. Brian Lovins for a revalidation of the classification system to be completed by August 2018.  Electronic data for all persons booked in to OJC between September 1, 2015 and October 26, 2017 were provided to Dr. Lovins. The revalidation methodology has not been submitted to the Monitors.

New Recommendations:

18.  Complete statistical review of the classification system in late 2017.

19.  Adjust the housing audit schedule to include all housing units and to ensure random scheduling of the audits throughout the month, day, and evening shifts. Audits should be unannounced to protect the integrity of the audit process.

20.  Re-institute the quality control process to ensure the integrity of the custody and PREA assessments.



**IV. A. 10. g. Provide the Monitor a periodic report on classification at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date and every six months, thereafter, until termination of this Agreement.  Each report will include the following information:**

    (1)    **number of prisoner-on-prisoner assaults;**
    (2)    **number of assaults against prisoners with mental illness;**
    (3)    **number of prisoners who report having gang affiliations;**
    (4)    **most serious offense leading to incarceration;**
    (5)    **number of prisoners classified in each security level;**
    (6)    **number of prisoners placed in protective custody; and**
    (7)    **number of misconduct complaints.**

Finding:  Partial-compliance

**Measures of Compliance:**

1. Annual and bi-annual tracking reports within the OPSO information system to monitor   number/rates during the last 12 months and for the stock population:
2. number of prisoner-on-prisoner assaults/custody level by gender;
3. number of assaults against prisoners with mental illness by gender;
4. number of prisoners who report having gang affiliations by gang affiliation;
5. most serious current offense leading to incarceration by gender;  o number of prisoners currently classified in each security level;   o number of prisoners placed in protective custody;
6. number of prisoners in administrative segregation; and
7. number of major and minor misconduct complaints.

Observations:

- Monthly custodial, discipline and inmate statistical reports have been received through September 2017. OPSO has made great strides in the development of statistical reports as required under section IV.A.10.g. The only data <u>not</u> provided were the rates of victimization of inmates on the mental health caseload. These data are dependent upon timely information from the mental health provider. As previously noted, OSPO has taken steps to work with CCS to rebuild the linkages between the mental health records and JMS to ensure that the mental health caseload data are available for these statistical reports.

- Data for the number of inmates who report having gang affiliations have been uploaded to the JMS. These data are available to track the prevalence of



inmates per "gang" among OPSO populations as well as by OPSO building (OJC, ECP, RCC, etc.), tier, side and cell.

o OPSO Monthly disciplinary data indicated that the number disciplinary reports fluctuated during the last 13 months -- September 2016 – October 2017.  Overall, the green trend-line for the number of formal disciplinary reports written/month indicated an increase in disciplinary reports/ month over the last 12 months.  On the other hand, the rate of infractions with a finding of guilt remained constant at ~77.5%.



**Figure 3: Numbers of Total and Guilty Disciplinary Infractions: Sept 2016 - 2017**

Figure 4 provides a breakdown of the most serious type of infraction of which the inmate was found guilty for the infractions during September 2016 through September 2017. The numbers/rates of predatory and aggressive behaviors (i.e., assaults, battery, and fights) appeared to have dropped during January and February 2017.  However, during July – October 2017, the numbers of predatory and aggressive infractions returned to those reported for September – November 2016  Note, the data provided in Figure 4 illustrate the raw number and types of infractions among OPSO inmates. Disciplinary data from ECP, Hunt and RCC were inputted into the JMS, however disparities between the disciplinary processes of the four systems (OPSO, ECP, RCC, and



Hunt) as well as the facility staffing levels, and the numbers of inmates housed in the respective facilities may have impacted the disciplinary rates.



**Figure 4: Types of Disciplinary Infractions of which OPSO Inmates were Found Guilty - Sept 2016 - September 2017**

New Recommendation:

21.     Rebuild linkages between the electronic medical records and JMS.



**IV. A. 10. h. OPSO shall review the periodic data report and make recommendations regarding proper placement consistent with this Agreement or other necessary changes in policy based on this review.  The review and recommendations will be documented and provided to the Monitor.**

Finding: Partial Compliance

**Measures of compliance:**
1. Report to the Monitor with recommended change and rational/data regarding any policy   changes.

Observations:

- Monitor receives the daily "Active Inmates by Location" report.

- Monitor receives monthly custodial reports for tracking the initial and reclassification process, ADP custody distributions by gender, and disciplinary reports. However, there appears to little systematic review of these data or updates to the system in response to the various reports by OPSO.

- Monitor was not notified of changes of classification leadership, contract with Dr. Latessa and Dr. Lovins, or ongoing HUAP changes.

- On-going dialogue between the Monitor and OPSO has been sporadic and at times non-responsive. It appears that communication has been re-established. Hopefully this will continue as the Classification Unit leadership and staff  shift in the coming months.

New Recommendation:

22. Maintain a schedule for ongoing email/conference calls between classification unit leadership and Monitor.



## IV. A. 11.          Prisoner Grievance Process

Finding:  Partial Compliance

**Measures of Compliance:**

1.    Written policy and procedures governing inmate grievances, and grievance appeals. Directive shall include but not be limited to availability of grievance forms in required language, ability of inmates to secure forms upon request and deposit into secured boxes, prohibition against retaliation against inmates who file grievances, time deadlines on responses, assistance to inmates to file grievances (including assistance to inmates with mental illness, low functioning, non-English speaking).
2.    Written policies and procedures that designates a position/post responsible for assuring the collection and response to grievances, including maintenance of records, trends, and analysis of grievance data.
3.    An electronic tracking system.
4.    Written orientation to inmates regarding the grievance process.
5.    Inmate handbook.
6.    Curriculum/lesson plans to train staff (pre-service and in-service) regarding their roles and responsibilities regarding the inmate grievance process.
7.    Interviews with inmates.
8.    Interviews with employees.
9.    Observation of staff training.
10.   Observation of inmate orientation.
11.   Written policies/procedures governing the inmate request process.
12.   Inmate request forms.
13.   Review of referrals for investigation resulting from inmate grievances.
14.   Review of original inmate grievances and responses.
15.   Monitors' review of grievance logs, grievances, analysis of grievances conducted by OPSO.

<u>Observations:</u>

A grievance system provides inmates a meaningful way to raise legitimate issues for resolution.  Additionally, a grievance process is an early warning system for emerging issues for the jail's leadership.

The Monitors view inmate grievances when an inmate asks that their issue be forwarded to the Monitors.  The Monitors have been forwarded 284 grievances since the beginning of 2017, allowing for a first-hand look at issues where inmates feel their issues have not been resolved.

The current system (kiosks) does not easily separate an inmate's grievance from "requests for service" – often questions about inmate accounts, mail, etc.  The new jail management information system planned for the next year will allow an



easier disaggregation of this information.  This will be of assistance, as the "requests for service" for the second quarter of 2017 were more than 9,000.

OJC's Grievance Coordinator maintains information and summaries regarding specific inmate grievances, by name, delays in staff responses to grievances as guided by policy, and grievance appeals.  Monthly reports track trends – increases and decreases by category, as well as reporting on the audit process – mostly about timeliness of responses.  The Grievance Coordinator also audits the responsiveness of the staff's response to the inmate.  This represents an enormous amount of work, which is not tremendously supported by the current automated process.

There is policy guiding inmate grievances, and the mechanism for inmates, via the electronic kiosks to file grievances.  As noted in Compliance Report # 7, the paperwork process is in place, but the ability to resolve the inmate's issue, as well as systemic issues is lagging behind.  For example, inmates' grievances regarding food service, medical-ordered diets, and medical care allowed the Monitors to see how OJC and CCS resolved issues, as well as see if systemic issues are solved.  This latter issue – resolution of systemic issues – is the challenge for OJC.

The data examined for this report, provided by OPSO, was thru the second quarter of 2017.   Of the 1,435 grievances logged in the second quarter of 2017:

- 23% - medical care
- 19% for facility related (unspecified grievances)
- 12% for food service

are the largest three categories of complaints.

The areas needing improvement to gain compliance are:

- Tracking the implementation of resolutions (IV. A. 11. (2)) – OPSO needs to use the information identified in the grievance process to resolve *systemic* issues – such as medically-ordered diets.  The OPSO staff assured the Monitors that the grievance trends are discussed at staff meetings, what is missing are action plans or other relevant problem-solving as indicated by the data/trends.

72



- Referrals (IV.A.11(5)) – There are grievances the Monitor sees that should be, but are not consistently referred to ISB.
- Reviews and recommendations (IV.A.11(6)) – as noted above, documentation was not provided indicating that there is a quarterly review to identify areas of concerns, and recommendations.  The reports provided don't cover the requirements of this paragraph.

The medical Monitors reviewed CCS' response to grievances.

OPSO may achieve compliance with the provisions of the paragraph when OJC documents that issues are timely addressed/satisfied.  Additionally, when direct supervision is trained and implemented, OPSO can anticipate that appropriate problem-solving and information gathering roles of the deputies working in the housing units will assist with lowering grievances and in resolution of issues before a grievance is needed.



## IV. A. 12.  Sexual Abuse

Finding:  Partial Compliance

**Measures of Compliance**:
1. Checklist of policies and procedures
   http://www.prearesourcecenter.org/sites/default/files/library/checklistofdocumentationfinal2.pdf
2. Auditor Compliance Tool
   http://www.prearesourcecenter.org/sites/default/files/library/auditorcompliancetoolfinal2.pdf
3. Completion of Jail Toolkit http://static.nicic.gov/Library/026880.pdf
4. Written policies and procedures, protocols, memorandum of agreement/understanding, training curriculum required by the standards.
5. Memorandum of agreement, sexual assault treatment center
6. Review of investigations.
7. Interviews with employees and inmates.
8. Referrals for prosecution
9. Qualifications of instructors.

Observations:

OPSO continues to make progress toward achieving compliance with this provision, including the recent designation of facility-level PREA managers, as required by the PREA standards.  The PREA audit will be scheduled in 2018. [https://www.prearesourcecenter.org/audit ]

OPSO is weighing options for a "mock" audit.

Documentation was provided for receipt of inmate allegations against both staff and other inmates via the third party-hotline, grievances, and medical/mental health referrals.  Though August 2017, a total of 130 complaints had been received. The PREA coordinator reports that for through August 2017, 87 of the allegations were found to be unsubstantiated, 3 substantiated, and 11 unfounded (total of 101).

The allegations regarding inmate sexual safety began to trend upward in the second quarter of 2017, when the inmate population was in the mid-600s. Generally, a trend toward more reporting is not concerning as it may indicate that inmates are reporting, and are trusting the system.  In OPSO's case however, this trend upward in reports is contemporaneous to the implement of the medical vendor's electronic medical record.  Starting with the new electronic medical record (EMR) in March 2017, the information from the medical/mental health intake

74



assessment that was used to inform the assessment of the inmate's possible risk as a potential victim or predator was not transferred to the OPSO classification system from CCS' EMR. This gap in critical data was not identified until October 2017 by the Monitor working with the Classification Unit.  This was confirmed by the JMS programmer for OPSO.  The Monitors alerted the ICD on November 11, 2017 of this situation and were assured that the facility will promptly address this matter.

In addition to the concern about the availability of the data, inquiry regarding causes of the upward trend in reports should have been explored by OPSO, and perhaps this information transfer issue would have been identified sooner.

A sample of investigative files was reviewed during the tour.  During the last tour, a quality control issue with the investigations was identified, as the PREA coordinator had been removed from this review process.  This was remedied, and the PREA Coordinator is providing this oversight. The Monitors made a recommendation to including any recommendations/observations/etc. from the mental health provider be included in the findings.  The files include recorded interviews, which are not transcribed or summarized.  The report should stand on its own in terms of findings, which may require the investigator to *summarize* the interviews to support the finding.   The files should also include if the inmate was referred to the administrative disciplinary process, and the outcome the hearing.

The newly appointed facility PREA managers do not have a job description. This should be completed as soon as possible so that the facility wardens know and understand their role, and there is reporting and accountability for their work. Whether in the job description or through some other documentation, the work of the managers should be spelled-out, measures of their work established, and outcomes tracked.

As noted in previous reports, it is essential that all contractors working with OPSO receive face-to-face training from the PREA Coordinator regarding sexual safety.  CCS reports that it provides an approximately 60 minute on-line PREA training.  This is insufficient, and will not enable OPSO to successfully complete the PREA audit.  This needs to be remedied.  The medical and mental health staff must



also be able to recognize the signs and symptoms of sexual abuse in their patients. This recommendation for specialized training was included in Compliance Report # 6 – and has previously been discussed with CCS.[27]

      The PREA Coordinator also reported some difficulty in learning of other contractors working with inmates (food service for example) and documenting that they have received the required training.  This also needs to be immediately remedied, for all contractors.

      Appendix B provides a summary and status of recommendations made in previous reports.

Recommendations which are reiterated and/or updated are:

23.    Provide training, including specialized training for medical staff regarding recognizing the signs and symptoms of inmate sexual abuse/assault. Evidence of this training must be provided before the next tour.

24.    Develop and implement job descriptions/post orders and performance measures of the newly appointed facility-based PREA managers – with the goal of gaining compliance on the PREA audit.

25.    Develop a system of assuring all newly appointed contractors (those who will have inmate contact) receive training as soon as possible after being hired. (PREA standard 115.32).

26.    Review the format and contents of the final report of investigations to assure that the report itself provides all relevant information, including summaries of relevant interviews, and documentation regarding prosecutions, declination of prosecution, and initiation of the administrative discipline process, if indicated.  A file reviewer should not have to look at recorded interviews to determine the efficacy and completeness of the investigation.

---

[27] See PREA standards 115.31, 115.32, and 15.35  https://www.prearesourcecenter.org/training-technical-assistance/prea-101/prisons-and-jail-standards



76

## IV. A. 13.        Access to Information

Findings:        Partial compliance

**Measures of Compliance:**
1. Written policy/procedure governing inmate orientation, including but not limited to inmates with LEP, developmental disabilities, mental illness, etc.
2. Inmate handbook; orientation videos in English, Spanish, Vietnamese.
3. Observation of inmate orientation.
4. Inmate interviews.
5. Lesson plans, employee training, evidence of knowledge gained.
6. Review of grievances.
7. Post orders.

Observations:

The work required by this paragraph is completed, although the inmate handbook is currently being revised.  However, the implementation is lacking in terms of consistent housing unit operations that support the contents of the inmate handbook.   As noted throughout this report, the reality of OJC's operation is outside the requirements of the inmate handbook.   The paragraph remains in partial compliance as inmates are not able to produce an inmate handbook, deny being briefed, and the grievances support the inmates' lack of understanding how to address medical and mental health care.  No lesson plans have been provided that describe employee training or post orders that reference enforcement of the inmate handbook.



## IV. B. Mental Health Care

**Summary**

OPSO continues to struggle with providing adequate mental health care and achieving compliance with the Consent Judgement. The Mental Health Monitor has made multiple and repeated recommendations, provided technical assistance, and engaged in discussions with administrative, clinical and custody staff, as well as the attorneys for the Plaintiff class and DOJ. The Medical and Mental Health Monitors have collaborated in on- site reviews of overlapping services and quality management, and provided compliance analyses and recommendations throughout this process.

The specific onsite activities of the Mental Health Monitor during the visit November 6 – 8, 2017 included a visit to the Hunt facility accompanied by Judge Africk and his law clerks, DOJ attorney Kerry Dean, and attorney for Plaintiff class Elizabeth Cumming. During the remainder of the tour, the Mental Health and Medical Monitors, assisted by the nurse sub-monitor, visited OJC and had multiple discussions with CCS staff, reviewed documents and specific units, and met with the ICD, and several administrative staff. The Monitors held an exit conference on November 8, 2017 attended by OPSO and CCS staff.

In summary, OPSO, the City, and CCS have not demonstrated substantial compliance with the mental health requirements of the Consent Judgment in the areas of adequate staffing, training and supervision, accessible mental health care, or adequate mental health treatment. Specifically, inadequate services include suicide prevention and management, therapies and counseling, and quality improvement and management.

Specific findings and recommendations are provided below as well as Appendix C demonstrating a longitudinal review of outstanding recommendations.



## IV. B. 1.   Screening and Assessment

Findings:

               B. 1. a. - Partial Compliance
               B. 1. b. - Partial Compliance
               B. 1. c. - Partial Compliance
               B. 1. d. - Partial Compliance
               B. 2. e. - Partial Compliance
               B. 1. f. - Non-compliance
               B. 1. g. - Non-compliance
               B. 1. h. - Non-compliance
               B. 1. i. - Non-compliance
               B. 1. j. - Non-compliance
               B. 1. k. - Non-compliance
               B. 1. l. - Non-compliance

**Measures of Compliance:**

1. Technical assistance to CCS mental health and administrative staff regarding policies, procedures   and practices
2. Document review of mental health policies and procedures
3. Review of a limited number of medical records and interviews of prisoners and staff
4. Discussions with CCS and OJC administrative and line staff
5. Tour of OJC facility including all units designated as having a "mental health" designation, and/or   suicide resistant cells.
6. Tour of Hunt Facility mental health unit
7. Review of new data from CCS regarding emergency, urgent, and routine referrals and sick call   responses.
8. Review of new data from CCS regarding numbers of inmates prescribed psychotropic   medications, and/or identified as on the mental health caseload

Observations:

      CCS and OPSO have not finalized and/or demonstrated implementation and training on all mental health-related policies and procedures.  CCS has modified the previously approved Columbia-Suicide Severity Rating Scale  (C-SSRS SAFE-T Protocol) to include only reduced versions of the screen to track  changes or discontinue suicide precautions.  Deficiencies in custody and mental  health staffing limit the availability of treatment services including group and individual counseling services and therapies, medication management, and  confidentiality of assessments. The current continuum of mental health services does not adequately provide for



time-limited crisis intervention services, "step- down" or residential/transitional services, acute inpatient services for women, and full services for outpatients (general population and disciplinary populations).

CCS has begun to provide some counseling services for some special needs populations. The quantity of these services is inadequate, and the quality of services  have not been measured. Similarly, initial administrations of psychotropic medications are not timely, largely because of the deficiencies in the assessment  process at IPC and the referral processes to psychiatrists/nurse practitioners.

CCS has provided the majority of their corporate mental health-related policies and procedures to OPSO and the Monitor. However, several of these policies  have not been finalized and/or have not yet been measured for their effectiveness.  For example, the screening instrument is adequate except for the referral criteria categories while the draft referral policy has not been fully implemented or  measured. The policies and procedures for assessment of inmates involved in the disciplinary process have not been completed, nor has the requirement for collaboration between the mental health staff and OPSO disciplinary process for  inmates on the mental health caseload been established.

Inmates continue to be housed on OJC units that have inadequate suicide resistant cells and do not have the physical space or corrections staffing support necessary to provide adequate psychotherapeutic programming for inmates designated for either the acute/sub-acute designation or step down/residential services. This condition applies to both male and female inmates.  Female inmates do not have access to Hunt or comparable acute care services and housing. A number of inmates in acute crisis remain at OJC and need receiving emergency medications to address their mental health needs. OPSO, CCS, and the attorneys for  the Plaintiff class/DOJ have researched Louisiana Law identified significant barriers  to administering emergency medications at OJC. Although transfers to local hospital  emergency departments for pretrial detainees is currently required,



this option is rarely used by CCS to stabilize inmates. These circumstances apply to both juvenile and adult, male and female pretrial detainees.

There is insufficient and inconsistent observation of inmates who are at increased risk for suicide and/or self-harm, as well as inadequate supervision by deputies for extended time periods. Certified Nursing Assistants (CNAs) and/or Licensed Practical Nurses (LPNs) are assigned to observe inmates housed at OJC who require "direct observation" and "suicide watch". Inmates in these categories are housed on multiple units and in some cells, that are not suicide resistant. Whatever the processes for direct custody supervision and direct observation/ suicide watch by clinical staff, the processes are failing as inmates continue to gain access to materials that can be used for self- harm or suicide. These issues have been discussed throughout the course of the monitoring process.

Female inmates continue to be housed in the OJC general population, non-mental health units, with only two suicide resistant cells available despite the unit's designation as housing inmates with acute/sub-acute and step down/residential mental health needs. Pregnant women are now housed in general population, which is an improvement from past tours.

CCS policy and process requirements as to the timeliness of responses to referrals have not been met, particularly by psychiatrists. The average wait time for an inmate to be evaluated by a psychiatrist exceeds the required time frames, regardless of level of referral (emergent, urgent, or routine). Only during this site visit has CCS been able to quantify the level of referrals; 95% of all referrals are reported as "routine".

The available number of assigned corrections staffing, and other limitations described herein at OJC and TDC are negatively impacting the delivery of mental health services resulting in delays or cancellations of mental health and medical services such as risk assessments and treatment, referrals, medication management, and follow-up assessments by mental health staff.

The inmate screening process has been implemented. However, the



effectiveness of the screening process has not been reviewed. Recommended changes in the screening process, have not been implemented.

<u>New Recommendations:</u>

27.  OPSO and CCS must finalize, implement, and measure compliance with policies and procedures.  Training and supervision needs to take place and be documented.

28.  CCS must track and provide services to inmates on the mental health caseload who have been identified as victims of assault or other crimes (including sexual assault) while at OJC, TDC, or Hunt.

29.  CCS should continue the process of identification of the mental health caseload and their level of care needs, and aggressively improve the staffing necessary to provide services including both onsite leadership staff as well as  staff positions to provide direct services. This will require collaboration with  OPSO particularly regarding deputy staffing to include escorts for off unit  services, observation/ monitoring of group and individual therapies, and  counseling to maintain sound privacy.

30.  Complete necessary suicide resistant cells. Inspect housing areas to assure the physical plant poses minimal risk for inmates to harm themselves.

31.  OPSO employ an adequate number of operations and clinical staff with  training and supervision to facilitate the provision of adequate and  appropriate mental health services.

32.  OPSO and the City obtain acute hospital level services for the female inmates. The absence of these critical services creates on-going harm to the women as well as facility disruptions.

33.  CCS increase the frequency of treatment team meetings and reviews of treatment plans at Hunt and OJC. Inmates should be included in the treatment plan meetings.  Hunt treatment plans should begin with a Master Treatment Plan with 14 days and every 30 days thereafter.



34.   Pursuant to policies, continue at least monthly meetings of the Mental Health  Review Committee to a document appropriately, any identified concerns,  problems and opportunities to improve care, and to analyze performance  measures of mental health services and follow-up on implementation and  results of corrective actions.

35.   Complete annual assessments of the screening of inmates and identification of inmates in need of services for effectiveness, including comparison of current mental health caseload numbers and total number of inmates receiving mental health services and/or services to special needs inmates.



**IV. B. 2.  Treatment**

Findings:

> B. 2. A.  Partial Compliance
> B. 2. b. - Non-compliance
> B. 2. c. - Non-compliance
> B. 2. d. - Non-compliance
> B. 2. e. - Non-compliance
> B. 2. f. - Partial Compliance
> B. 2. g. -Partial Compliance
> B. 2. h. -Partial Compliance

**Measures of Compliance:**

1. Review of policies and procedures, medical records, current staffing, and quality management data and analysis.
2. Tour of Hunt and OJC facilities, and review of treatment team procedures and treatment  services.
3. Discussions with CCS and OJC staff.
4. Review of suicide risk assessments.
5. Review of incident reports.
6. Review of sick call requests, plaintiffs' correspondence and grievances.

Observations:

CCS and OPSO need to implement appropriate mental health treatment policies and procedures.  The current continuum of services is inadequate.  CCS has provided data on the total numbers of inmates participating in group sessions, individual therapy, and counseling services monthly. The data do <u>not</u> demonstrate that the numbers of inmates receiving these services are sufficient for the populations in need:

- The number of inmates listed on the mental health and/or special needs caseload averaged 160/month in 2016 and early 2017, or approximately 10-13% of the overall OPSO census.[29]

---

[29] During this reporting period, the average daily population of OJC dropped, as inmates were sent out of parish.  The average daily population needs to be acknowledged and accounted for if used to assess or measure services.



- CCS reported "caseload" inmates from March through September 2017 ranged from a low of 701 in September to a high of 876 in August.  The percentages of inmates prescribed psychotropic medications for greater than 90 days from August through November 2017 ranged from 13% to 27% of the ADP of approximately 1600.
- The number of inmates prescribed psychotropic medications for greater than 90 days was reported as 777.  When the number of inmates  prescribed Librium (detox) was deducted, the total reported dropped to  541.

Based on review of the documents and discussion with CCS and OPSO staff, these numbers require further analysis to clarify the number of inmates on the mental  health caseload as well as those who are receiving services as "special needs". There is  unclear, and potentially unreliable data regarding inmates who need counseling  services versus those receiving counseling services. The counseling services that are  necessary for distinct populations as per the Consent Judgment, have not been  quantified specifically.  For those instances where counseling services are provided,  there is no reliable estimate or identification of the actual number of inmates who  require such services. Therefore, although there is a reported and/or planned increase  in counseling services, the distinct populations of victims of sexual abuse and  substance abusers, as well as youth offenders, are not adequately identified with   regard to those who need specific counseling services compared to those who receive them.

These inadequacies in the delivery of services are also negatively impacted by the limited spaces in which to conduct programs at OJC or TDC, and the lack of space  within OJC for psychotherapeutic interventions.  The housing changes at OJC – movement of inmates in and out of parish and the opening and closing of units have contributed to the problem.  The OPSO's decision to designate space for the school program has eliminated previously available program areas.



The mental health evaluations required as part of the disciplinary process have been under discussion for some time. While there appears to be agreement on policy that the inmates on the mental health caseload will be evaluated with regard to disciplinary charges, the process for evaluating the needs and risks of the inmates has

not been implemented.   When the process is implemented, documentation of the required requests for reviews, the timeliness of the reviews, the outcome of the reviews, and assessment of the impact of the process is essential.

Development of the process for appropriate medication management continues. The process for referrals to psychiatric providers has not yet been fully implemented within relevant and necessary timeframes. Therefore, there continue to be unacceptable delays in the provision of assessments for psychotropic medications and other mental health therapeutic programming.

Impeding adequate psychiatric medication management are deficiencies in the CCS psychiatric staffing, including nurse practitioners. Deficiencies at both OJC and Hunt also include failure to include inmates in treatment team meetings to assure that inmates participate in their treatment, and to conduct timely reviews of inmates in regard to their medication and programmatic needs.

Despite agreements that inmates receiving psychotropic medications would not be transferred to out of parish jails, review of transfer criteria does not exclude all inmates prescribed psychotropic medications including antidepressants and mood stabilizers.  It is known to all parties that these outlying parish jails do not have appropriate mental health services.

New Recommendations:

36. CCS to fill vacant positions and hire necessary staff for OJC and Hunt; OPSO to hire necessary security staff.

37. Defendants develop and implement policy and procedure for mental health evaluations for inmates on the mental health caseload involved in disciplinary proceedings.



38. Develop quality improvement data, collection, and performance measures to demonstrate that evaluations are indeed conducted, and the outcome of those evaluations are provided to inmate disciplinary hearing officers. Track the outcome of disciplinary processes and determinations for inmates on the mental health caseload.

39. Develop policy and procedure for identification and tracking of inmates on the mental health caseload who have been victims of violence while in OPSO custody (including Hunt and out of parish jails in which Orleans inmates are housed).

40. Implement performance indicators for medication management practices with appropriate data collection and analysis including inmates housed in OJC, Hunt, and other correctional facilities.

41. Implement performance measures to track the timeliness of the referral and sick call processes, and responses by mental health staff.

42. Return inmates receiving psychotropic medications to OJC.

43. Discontinue transfer of inmates receiving mental health care to out of parish facilities.



## IV. B. 3.   Counseling Services

Finding:
B.3. a. Partial Compliance
B.3. b. Partial Compliance

**Measures of Compliance:**
1. Review of mental health caseload and diagnostic categories.
2. Review of performance indicators and data for services to specific special needs   populations.
3. Interviews with inmates and staff.

Observations:

CCS has begun to distinguish mental health contacts/services provided to specific and identified groups, and acknowledges only partial services are delivered  to some groups and no services to others (including victims of assault or sexual abuse and substance abusers and individuals in general population in need of mental health therapy). The number of inmates requiring these services has not been specifically identified. The availability of these services is also compromised by inadequate numbers of staff and non-confidential (sound privacy) treatment space.

New Recommendations:

44.     The OPSO and CCS to review data on population needs, and develop and implement policies and procedures for mental health services for these populations to determine the actual services needed and staff required.

45.     CCS must identify the levels of need for mental health and special population inmates, and develop performance indicators.



### IV. B. 4.  Suicide Prevention and Training Program

**Findings:**
B.  4. a. - Partial Compliance
B.  4. b. - Partial Compliance
B.  4. c. - Partial Compliance
B.  4. d. - Non-Compliance
B.  4. e. - Partial Compliance
B.  4. f. - Non-Compliance
B.  4. g. - Non-Compliance

**Measures of Compliance:**
1.  Review of policies, procedures and training/test documents
2.  Discussions with staff
3.  Review of incident reports and plaintiffs/DOJ correspondence
4.  Observations and interviews of inmates
5.  Review of reported suicidal ideations, attempts and completed suicides

<u>Observations:</u>

Training for clinical and custody staff has been ongoing. However, CCS has yet to provide basic information on the numbers of CCS staff currently on duty who have been trained.  An inadequate training curriculum lesson plan was provided, which was really bulleted talking points, and not a lesson plan.  Testing for a randomly selected 5% of the staff trained on suicide prevention has not been completed. The draft of the test was reviewed by the Monitors prior to this visit and while on site.

The suicide risk assessment tool has been modified and reduced from the tool approved by the Monitors; thus, is not acceptable.  CCS staff administers the risk assessments in a non-confidential setting (i.e., cell front in the presence of other inmates). Documentation of the administration of the modified and unacceptable tool was not readily available in ERMA (the electronic medical record).

The presence of required emergency equipment was not demonstrated as staff were able to locate the suicide cut down tool in only one of six control pods. The OPSO policy requires that deputies have the cut down tools on their



persons rather than in a control pod. The observations of inmates on suicide precautions are compromised by allowing ratios of 1:2 for direct observation and 1:5 for suicide precautions; CNAs were seen not observing inmates within designated timeframes; and CCS reported that the CNAs/LPNs are required to leave the units when a deputy is not present exposing vulnerable inmates to unacceptable risk.[30]

 New Recommendations:

46.    CCS continue to provide and enhance training and supervision of CNAs with regard to direct observation and suicide watch at OJC. Train staff to appropriately interact and document observations of the inmate(s).

47.    CCS to provide training to mental health staff and corrections staff with regard to direct observation and transport/movement of inmates who have been referred or presented with concerns for suicide or self-harm, and document as well as analyze the direct observation/supervision of those inmates by corrections staff until they are seen and evaluated by mental health staff.

48.    OPSO conduct suicide precautions and observation in suicide resistant cells. Due to movement and unit closures, some of the suicide resistant cells have been moved and not available to inmates on watch. Male and female inmates continue to be placed on suicide watch and direct observation in OJC in non- suicide resistant cells on multiple units for extended periods of time (greater than 72 hours).

49.    The emergency response bags must be properly stocked and monitored.

50.    OPSO policy requires cut down tools be kept on person by deputies.

---

[30] In a recent tour, a Monitor observed several CNAs/LPNs who were supposed to be observing inmates either on   direct observation or on suicide watch engaged talking with inmates who were out of their cells, doing "word  games" on their clip boards (and concern about clip boards in these units as sources of contraband and weapons), and generally failing to give their attention to the inmates under their care. The Monitor's observation of these activities is consistent with findings in past tours in terms of the providers' attention to their patients.



## IV. B. 5.   Suicide Precautions

Findings:
- B.  5. a. – Partial Compliance
- B.  5. b. - Partial Compliance
- B.  5. c. - Partial Compliance
- B.  5. d. - Non-Compliance
- B.  5. e. - Non-Compliance
- B.  5. f. - Non-Compliance
- B.  5. g. - Non-Compliance
- B.  5. h - Partial Compliance
- B.  5. i. – Partial Compliance
- B.  5. j. – Partial Compliance
- B.  5. k. – Partial Compliance

**Measures of Compliance:**
1. Review of medical records, incident reports, mortality reviews
2. Discussions with staff
3. Observation of inmates on suicide precautions and staff monitoring inmates

Observations:

OPSO policies for suicide prevention and management are being developed and/or reviewed.  However, some procedures have been modified (including the  suicide risk assessment tool) and require further revision, approval and/or  implementation (including the restraint policy). The reported number of inmates with suicidality/self-harm varies greatly as those numbers reported by CCS are  much higher than those reported by OPSO.  Numbers reported by OPSO are  inconsistent, without adequate explanation or resolution.[31] Ten suicide resistant  cells were identified during this site visit, with reported planned renovations for  other cells. During this visit, the number of inmates on

---

[31]The issue of the integrity and credibility of all data remains in question.  For example, data provided in the ICD's report documented 16 incidents of inmate suicide ideation for the first six months of 2017; and for the same period of time CCS reported 438 incidents. For the months of April, May, and June, OPSO did not notify the monitors of any inmate suicide ideations. Although the Monitors brought this discrepancy in the data   to the attention of both parties (OPSO and CCS) on at least two occasions, neither party was able to provide an explanation.



suicide watch or direct observation ranged from 8 to 16, many of whom had been on precautions for longer than 72 hours without removal or recommendations for transfer to Hunt for acute care. Inmates assessed for reduction or discontinuation of precautions were

The designated "subacute" and "step-down" units for males and females include a mixture of mentally ill and non-mentally ill inmates. There is no appreciable therapeutic milieu in <u>any</u> unit in OJC. The Hunt acute care unit provides  acute care services for men only.  Between the months of January through August  2017, approximately 115 inmates were transferred to Hunt. Approximately 46 had lengths of stay of 30 days or less, 29 lengths of stay of 31 to 60 days, and 40 with  lengths of stay over 61 days. The longest length of stay reported was for 278 days.

The length of stay combined with the limited number of beds at Hunt (39 acute care beds) limits the actual number of available acute care inpatient beds for men at any given time. No acute care inpatient beds are available for women.

<u>New Recommendations:</u>

51.  OPSO and CCS develop a collaborative process for the management and supervision of inmates on suicide precautions or at elevated risk for self- harm, including staffing.

52.  CCS train and supervise CNA's on the requirements for direct observations and interactions with inmates.

53.  CCS establish and present CNA to inmate ratios of 1:1 for direct observation  rather than the current practice of 1:2 or 1:3 or more inmates, and one CNA or nurse for suicide watches for multiple inmates (up to 1:5) without evidence of clinical interactions with those inmates regarding their mental status.

54.  OPSO and CCS document reviews of all serious self-harm attempts and suicidal behaviors and assess the periodic reports to determine if inmates are appropriately identified, adequately assessed via



appropriate suicide risk  assessment tools, and protected and treated, including use of morbidity and mortality review and analysis.



## IV. B. 6.   Use of Physical and Chemical Restraints

Findings:

        B. 6. a. – Partial Compliance
        B. 6. b.  – Partial Compliance
        B. 6. c.  – Partial Compliance
        B. 6. d. – Partial Compliance
        B. 6. e. – Partial Compliance
        B. 6. f. –  Partial Compliance
        B. 6. g. – Partial Compliance

**Measures of Compliance:**

1. Review of policies and procedures
2. Discussions with staff at OJC and Hunt
3. Review of incident reports
4. Review of correspondence from plaintiffs/DOJ

Observations:

OPSO and CCS continue development of the Use of Restraints policies. Draft policies should be reviewed for internal consistency.  CCS reports the use of handcuffs and/or shackles for transport of inmates on suicide precautions as a safety measure; these procedure and practices are inconsistent with OPSO policy. Episodes of lack of staff supervision – for example acute inmates running away from  staff, running up to a mezzanine and threatening suicide or self-harm continue, even  when the inmates were already on suicide precautions at the time - a documented  pattern at OJC since the building opened two years ago.

The use of force at Hunt including use of chemical munitions, i.e., OC Spray has increased, despite assurances that mental health staff were involved in planned uses of force, and medical clearances were provided to Hunt staff by the CCS clinicians,  documentation of **participation and clearance by CCS has not been provided.**



New Recommendations:

55.     Develop policy and procedures regarding use of therapeutic physical restraints for prevention of self-harm; assure the policy provides and  practice requires that the restraints be used for the shortest possible time period, under proper supervision, and is monitored, reported, and assessed.

56.     CCS maintain consistent "use of restraint logs" for both physical and chemical restraints at OJC and Hunt.

57.     CCS continue revision and implementation of policies at Hunt to include mental health staff and possibly specifically trained nursing staff in de-escalation techniques prior to the use of planned uses of force including and specifically OC spray.



## IV. B. 7.   Detoxification and Training

Finding:
　　　B. 7. a. – Partial Compliance
　　　B. 7. b. – Partial Compliance
　　　B. 7. c. – Partial Compliance
　　　B. 7 d. – Partial Compliance

**Measure of compliance:**
　　1.　　Document review of course outline, lesson plan, training records, and medical records.

Observations:

Performance has improved in this area since Compliance Report #7, including: 1) The CCS intake screen that includes clear queries regarding the risk of withdrawal is used; 2) CCS has implemented CIWA and COWS medical tags for monitoring for patients at risk of withdrawal; and 3) CCS staff is now well-trained and is performing well.

However, substantial improvement is needed. For example, a focused review of patients monitored for withdrawal from drugs and/or alcohol indicated that most were seen every 12 hours instead of every eight hours. Further, there is no curriculum (lesson plans) for corrections staff recognition of urgent medical conditions.  There is no current plan for oversight of the training program.  Some inmates at risk of withdrawal spend more hours, or days, in IPC than they should; this puts them at risk of harm.

New Recommendations:

58.　　OPSO provide sufficient corrections staff for oversight to assure compliance  with the medical care requirements.

59.　　OPSO, in conjunction with CCS, develop and implement training for corrections staff on recognition of urgent medical conditions.

60.　　OPSO and CCS improve communication regarding the need for rapid transfer out of IPC to appropriate housing (monitoring, bottom bunk, etc.) for patients at risk.

Compliance Report # 8 – January 12, 2018



## IV. B. 8.   Medical and Mental Health Staffing

Finding:
B. 8. a. – Partial Compliance
B. 8. b.  – Partial Compliance

<u>Observations:</u>

Staff turnover appears to have stabilized, though some nursing staff express reluctance to go to housing units because of the paucity of corrections staff  supervision.

Finally, CCS has engaged a full-time, qualified medical director.  This should  lead to better clinical care through supervision.

Through medical record review, it is apparent that there are ample opportunities for improvement in training and supervision of clinical staff.  CCS is actively involved in this enhanced training and supervision.

There is very little cross training of nursing and administrative staff.  The result of this is that if one staff member is not present at work there is no one who can fulfill the function.  CCS has begun to cross-train staff, for example, the CNAs w h o  watch suicidal inmates rotate to the medical area to work as medical assistants. The nurse doing infection control has someone cross-trained.  The nurse engaged for  performance measurement has been on long term leave and no one was cross trained to perform these duties in her absence.

There is no one cross-trained as the grievance coordinator for CCS.

Closer collaboration between health staff and OJC leadership remains as an  opportunity for improvement.



New Recommendations:

61.     OPSO increase staffing on units housing inmates.

62.     CCS continue training and supervision of all clinical staff, including cross  training for all nursing and administrative functions.

63.     OPSO evaluate and remedy the health care staffing, training, and supervision at out-of-parish facilities where OPSO inmate with chronic medical and  mental health are housed.



## IV. B. 9. Risk Management

Finding:
B. 9. a – Partial Compliance
B. 9. b. – Partial Compliance
B. 9. c. – Partial Compliance
B. 9. d – Non-compliance
B. 9. e. – Partial Compliance
B. 9. f. – Partial Compliance

**Measures of Compliance:**
1. Review of quality management information from CCS
2. Review of minutes of meetings
3. Interviews of staff

Observations:

Dr. Greifinger:

Performance measurement and quality management program – during the past few months this program has deteriorated.   While CCS continues to measure clinical performance, we found that the chart abstraction has become unreliable. CCS is writing corrective action plans, but they are general, e.g., training, and not followed  over time to see if the actions have been implemented.  Data analysis is weak and there has been very little trending of performance data to see if actions have been effective.

Dr. Patterson:

The Mental Health committee meets as part of the MAC meetings.  The results are that there is still only data reported, with little or no analysis; and no corrective action plans or follow-up.

While there are meetings held to discuss quality management and data presented, there is very little to no analysis of the information, trend analysis, or corrective actions/recommendations to implement a comprehensive risk

Compliance Report # 8 – January 12, 2018



management system to address the mental health screening and assessment process, suicide risk assessment and management, timeliness of responses to inmate sick call requests and staff referrals, provision of acute care inpatient services for women, and the provision of an adequate continuum of mental health care and the effectiveness of mental health treatment planning and services to minimize and prevent harm.

New Recommendations:

64.    CCS expand clinical performance measurement to include effective analysis of access to care provided by practitioners.

65.    CCS test the reliability of measurements by having a qualified reviewer who is not the supervisor of staff being reviewed.

66.    OPSO assure sound privacy for patient encounters and assure that staff is trained in suicide risk reduction by appropriate testing and supervision.

67.    CCS continue to improve tracking systems for follow-up appointments, medication orders, release medication, and laboratory testing and develop systems for documenting all care in a single, unit medical record, whether it be paper or electronic.

68.    CCS revisit the quality management program to assure reliable data abstraction, quantitative and qualitative data analysis, with trending, and implementation of specific corrective action plans to remedy identified opportunities for improvement.  This program should integrate clinical performance measurement, morbidity and mortality review, grievance analysis and other elements of a comprehensive quality management program including a program plan and annual evaluation.

69.    Continue monthly meetings of the Mental Health Review Committee with the designated membership and provision of minutes of those meetings to assure they address the appropriate mental health issues as specified in the Consent Judgment.



70.     CCS expand clinical performance measurement to include effective grievance analysis and care provided by practitioners.

71.     CCS test the reliability of measurements by having a qualified reviewer who is not the supervisor of staff being reviewed.



## IV.  C.  Medical Care

**Summary**

Since Compliance Tour 7, CCS (Correct Care Solutions) has engaged a new on-site leadership team:  a full-time medical director, a health services administrator, and a director of nursing.  This team has the motivation and creative energy to put the OPSO health care services program on a fast and constructive trajectory.  This is a notable improvement that should help OPSO move more quickly toward compliance with the medical care requirements of the Consent Judgment.  However, clinical performance measurement has stalled in the past few months, as is described below.

Corrections staff are consistently unavailable to escort nurses onto the housing u n i t s  and to escort patients to the medical clinic.  This is a substantial barrier to the provision of timely care for patients with acute and chronic medical needs, including timely receipt of medication.

There are no special needs beds at OJC and no specific plans to provide this much- needed space.  The OJC is neither designed nor equipped for housing special populations and is poorly designed for the efficient delivery of medical care.

**Assessment Methodology**

- November 6 - 8, 2017 on-site tour.
- Meetings with OPSO and CCS staff, tour of OJC (IPC).
- Medical record review and reliability testing of CCS clinical performance measurement.
- Medical record reviews of selected incidents, patients referred to the emergency department for ambulatory sensitive conditions, trauma, detoxification and withdrawal, intake screening, sick call, chronic disease (anticoagulants, asthma, diabetes, seizure disorder, medication management) and referrals from the attorneys for the Plaintiff class.
- Performance measurement and quality management documents, grievances, grievance analyses.



**Measures of compliance:**
1. Quality management documents,
2. Inmate complaints and grievances,
3. Medical records.

Observations:

Medical Care services have been stable since Compliance Report #7.

Access to care: There are substantial lags to access to care, in large part because there are insufficient numbers of deputies to escort nursing staff onto housing units for medication passes and sick call and to escort patients to the medical area for practitioner visits.  According to CCS data for the month of October 2017, for example, only 40 percent of medication passes occur within one hour of the prescribed times.  These delays lead to nurse and practitioner "down-time," and  reduced staff 's ability to meet the demand for clinical encounters.  As a result, waiting time for acute and chronic visits necessarily increases.  Of patients referred by the sick call nurses to a practitioner, only 7 percent were seen within 48 hours.

In addition, many patients "fall through the cracks," meaning that intended visits required by policy or practitioner orders do not get scheduled and accomplished.  This continues to be an ongoing problem. Though access time (from nurse referral to practitioner) has improved somewhat during the past three years,  access to nurse practitioners, physicians and psychiatrists is longer than  satisfactory.

Based on a focused study of incoming inmates, only 60 percent were screened within five hours. While, 80 percent had timely follow-up for acute conditions, only 57 percent with chronic disease were seen by a practitioner within  48 hours. Only 29% of health assessments performed by RNs were reviewed by a  licensed independent practitioner within one business day.

Housing for Pregnant Women: Pregnant inmates are now housed in general population.  This is an improvement.



Medical recordkeeping: Medication administration records are now integrated into the electronic medical record (ERMA) via hand-held tablets. One downside the current EMRA system at OPSO is that nurses do not have tablets on which to record clinical encounters. Instead, they must rely on paper worksheets, the information from which is later put into the electronic record. This is not only inefficient, it is a set-up for error.

Language assistance: Bilingual officers assist clinical staff with services for Spanish-only speaking patients. The CCS language line is used for others. For the six-month period ending September 30, the language line was used on 23 occasions.

Utilization management: The CCS utilization management program is reasonable and based on commonly accepted precepts of resource management. Further, the Louisiana DOC, which administers state funds for hospitalization and specialty care, reviews and approves requests for care. Care does not appear to be withheld by CCS or the DOC.

Medication management: Continuity of medication on intake remains far below expectations. For example, in a focused study of incoming inmates with chronic disease, only 66 percent had orders written within 24 hours of intake and only 75 percent received their first dose within 24 hours of the order.

In a focused study of inmates with seizure disorder, only 63 percent had appropriate blood level testing for adjustments to dosing. Only 17 percent of inmates on medication for mood disorder had appropriate laboratory testing to assess for toxic effects of the medications.

According to our record reviews and CCS, practitioners are inconsistently notified when patient are refusing their medication.

As some housing units do not have deputies present (two of the five special needs units that we visited on November 7th), nurses have had to delay medication passes.



One recent improvement is that CCS is currently notified when contraband medication is found during cell searches.  CCS identifies the medication, attempts to identify the source, and reports the results to custody staff.

Continuity on release: During the month of September 2017, 78 prescriptions were written of which 36 were filled for outbound inmates on chronic medication(s).  While these numbers are higher than in the past, it is estimated that 80 to 90 percent of inmate patients who would be eligible for medication on release do not receive any medication(s). The factors that attribute to these high rates of missed medications could not be documented, though health staff believe that they are not notified in most cases, despite "medical hold" flags that are attached to the inmate's jail record.  The practice by CCS is to provide a prescription that the inmate can fill at a pharmacy of their choice.  None of the patients get a supply of medication, though a supply is specifically mentioned in the Consent Judgment.

Continuity on transfer: CCS is preparing transfer summaries to and from the Hunt facility and whenever necessary otherwise.  The summaries are more comprehensive than they had been in the past.

IPC design:  The Intake Processing Center was toured.  As before, there is a notable lack of privacy for the medical and mental health intake process. Interviews  are conducted at two booths, across a wide counter with walls on either side. Two  inmates sit on stools opposite two nurses. The separation between nurse and inmate is such that it is difficult to hear what the other is saying and, yet the inmates are sitting next to each other and can easily hear what the other is telling the nurse  about their health and habits.   Some mental health interviews are conducted  through bank teller-type windows adjacent to the medical screening booths.

Review of intake screening results in comparison to more robust information obtained in later clinical encounters suggests that the screening environment inhibits the collection of candid and reliable health information from incoming



inmates necessary to provide for their health and safety.

Jail Design – Phase II: Although medical and psychiatric patients are clustered on general population housing units, there is no provision for housing patients with special needs, neither medical nor psychiatric, in the OJC.  Plans for  Phase III housing for inmates with special needs remain elusive.

Grievance Process: The grievance process is timely, but the quality of the responses remain poor.  Too many of the responses are unnecessarily bureaucratic (e.g., telling the inmate that they filled out the wrong form) or unhelpful (e.g., telling the inmate that the grievance coordinator will notify the medical administrator, without helping the patients solve their problem).  This continues to be a runaround  that does little to engender trust in the health care providers.  CCS is counting and  categorizing grievances, but there is scant analysis and no trending over time.  Further, there are numerous patient complaints that some grievances filed go unanswered.

Emergency Preparedness: The availability of cut-down tools on the housing units has deteriorated.  While there were two accessible tools in the IPC, in only one of  six control centers visited were staff members able to locate the tool.  This puts inmates at high risk of serious harm.  None of the five housing units visited had an  appropriately stocked first aid kit. In addition, during this visit, no data were  available as to the proportion of current custody staff trained for medical emergencies.

Nursing Response to Use of Force: – A focused review of nursing care following use of force indicated:.1) Deputies (who are not trained to evaluate health  conditions) determine whether an inmate gets referred to a nurse for evaluation  following an episode of use of force; 2) Nurses are not using the CCS nursing  pathway for documentation when an inmate has been brought to the medical area for evaluation.  As a result, many of the nursing notes do not adequately document  the history of the incident and/or the physical assessment



of the inmate(s) after a use of force incident.

     Care for inmates in medical restraints: There is still no policy for this area.

     Care for inmates at the out-of-parish facilities: The out-of-parish facilities that currently houses approximately 100 OPSO inmates were not visited during this site visit. We were told that the criteria for out-of-parish have been tightened up in a positive way, however the written transfer criteria do not preclude sending inmates on mood stabilizers or antidepressants out-of-parish.

New Recommendations:

72.     OPSO assure medical care facilities that are clean, safe, and secure.

73.     Increase privacy during medical screening by reducing the width of the counter on the inmate side and move the stools in between the walls between screening booths.

74.     OPSO provide dedicated units for inmates with medical and mental health special needs.

75.     CCS revise the methodology for tracking discharge medications and grievances to provide for reliable and useful information

76.     OPSO assign corrections staff for continuous coverage on each housing unit and provide sufficient escort staff to keep health care practitioners productive, thereby reducing the lag time from referral to clinical encounters.

77.     OPSO provide appropriately stocked first aid kits and cut-down tools for each housing unit.

78.     CCS test the reliability of training log data against current staff lists.

79.     CCS evaluate the retention of training information three months following their training for a 5% sample of deputies.

80.     CCS train and supervise nurses in proper protocols for history taking, physical examination, and documentation of trauma.

81.     CCS and OPSO develop and implement a policy on the use of medical



restraints that includes training for security, mental health and medical staff.

82. OPSO assure that all out-of-parish inmates have proper oversight of medication administration.

83. CCS implement out-of-parish transfer criteria to preclude transfer of inmates on mood stabilizers and antidepressant medication to out-of-parish facilities.

84. CCS and OPSO ascertain as to whether out-of-parish transfers are being made without CCS prior review for medical suitability.

85. CCS revise the methodology for tracking discharge medications and grievances to provide for reliable and useful information.



## IV. C. 1. Quality Management of Medication Administration

Findings:

C. 1. a. Partial Compliance
C. 1. b. Partial Compliance
C. 1. c. Partial Compliance
C. 1. d. Partial Compliance

**Measures of compliance:**
1. Quality management documents
2. Inmate complaints and grievances
3. Medical records
4. Plaintiff complaints

Observations:

Performance in this area has been stable since Compliance Tour #7. There has been no substantial progress nor regression regarding compliance in these sections of the Consent Judgment.  However, information on discharge medication remains incomplete.

New Recommendations:

86.    CCS continue to monitor the effectiveness of the medication administration program, including time lag to first dose, management of serial non- adherence, and missed doses.

87.    OPSO communicate impending discharges to CCS and CCS communicate to corrections staff regarding medical holds, so that a prescription for medication can be prepared and delivered to the inmate prior to release from custody.



## IV. C. 2. Health Care Delivered

Findings:

      C. 2. a. Partial Compliance
      C. 2. b. Partial Compliance

**Measures of compliance:**
1. Reports on numbers, as specified in the Consent Decree
2. Reports on clinical performance, with discussion of problem identification and   remedies
3. Medical record review

Observations:

Performance in this area has been stable since Compliance Tour #7.

Clinicians are beginning to use a checklist for chronic care that includes reminders for  medication renewals, housing accommodations, and return visits. Appropriate medication protocols are in place.

The night nurse practitioner is no longer working at OJC and there are continuing delays in access to physician care on referral from nurses.

On review of complaints from the attorneys for Plaintiff class and a focused  review of records for inmates with ambulatory sensitive conditions returning from the hospital, found significant problems were found.  For example, 50 percent of the  sample of ten randomly selected in the focused review had conditions that had  deteriorated unnecessarily during the period prior to the hospital visit because of  difficulty in access to care; 40 percent of inmates returning from a hospital had no  inbound nursing note summarizing the findings at the hospital. Documentation that the hospital recommendations were followed was available for only 63 percent of  the sample.

There is no documentation of ongoing oversight of CCS care by OPSO or the contractor, the City of New Orleans.



<u>New Recommendations:</u>

88.     Reduce the barriers to timely access to care.

89.     Train and supervise nursing and practitioner staff to provide clinical care in conformance with policy, procedure and protocol that adhere to institutional health care standards.

90.     CCS continue its current periodic audits of clinical performance and grievance data and to develop strategies for opportunities for improvement.

91.     CCS continue to provide training and supervision of clinical staff.

92.     OPSO and the City of New Orleans develop and maintain a method for clinical oversight to eventually replace the current role of the court-appointed Monitor and sub-Monitors.



## IV. C. 3.  Release and Transfer

Finding:

C. 3. a. Partial Compliance
C. 3. b. Partial Compliance
C. 3. c. Partial Compliance
C. 3. d. Partial Compliance

**Measures of compliance:**
1.    Interview
2.    CCS documents

Observation:

Performance in this area has not improved since Compliance Tour #7.

Very few released patients receive prescriptions for their chronic medical and mental illness and very few get transition planning.  Despite the availability of data as on medical holds, there is no denominator data to assess the proportion of patients on medication who get prescriptions.

New Recommendation:

93.    OPSO and CCS revisit the process for notification and implementation for provision of medications and/or a prescription at the time of an inmate's release from custody.  One option is to include a step where CCS directly places a medical flag (called a "hold" by OPSO and CCS) for the patient in the jail management system, to the extent that such a flag would serve as a notice only, and not delay release.



## IV. D. Sanitation and Environmental Conditions

**Introduction**

This report summarizes the findings for the Sanitation, Environmental Conditions and Fire and Life Safety provisions of the Consent Judgment based on the Monitor's tour conducted October 30-November 2, 2017 and materials provided prior to initiation of the on-site work.[32] The Monitor toured inmate housing units housing inmates of the Orleans Justice Center (OJC) and Temporary Detention Center (TDC) and touring the Kitchen/Warehouse speaking with inmates, deputies and supervisors. Time did not permit the Monitor to tour all housing units.

This report includes new recommendations for OJC to achieve compliance for provisions of the Consent Judgment.  Outstanding recommendations from previous tours, are noted Appendix E.

Since the previous tour in March 2017 there has been progress toward compliance with the Sanitation and Environmental Conditions and Fire and Life Safety provisions.  This progress includes:

- Substantial Compliance with three of the seven fire and life safety provisions; inspections, fire drills and training.
- OPSO completion of policies since the previous tour including: 101.04, Administrative Reporting Requirements; 701.01, Emergency Equipment Inspections and Testing; 1001.03, Meal Service – Inmates, and 1101.09, Cleanliness Inspections. Importantly, completion of these policies does not mean that training has been initiated or completed; nor that the policies have been fully implemented.
- Records of temperature monitoring in the kitchen and documentation of employee training regarding these specific provisions are improved since the last compliance report.

---

[32] The on-site work included meetings with key staff including the Independent Compliance Director, Chief of Corrections, Director of Facilities Management, Fire Safety Officer, Environmental Inspector, Kitchen/Warehouse (K/W) manager, and food services contractor. In addition, the Monitor was accompanied by Eric Foley, attorney for the Plaintiff class.



- With provision of evidence of completion of the air balancing at TDC, the provision for providing adequate ventilation to all housing units is substantially compliant.
- Elimination of the laundry at HOD and contracting for laundry service addresses serious deficiency findings during the last tour.

Work remains for OPSO to achieve compliance including, but not limited to: completing policies, developing lesson plans, conducting employee and contractor training, providing documentation of policy and procedure implementation and compliance, and most importantly, assuring meaningful leadership oversight to objectively measure whether the policies and procedures are followed consistently throughout OJC facilities and are that the policies are achieving the requirements of the Consent Judgment. The absence of qualified staff - in key positions, in inmate housing units, as supervisors, and the lack of full-time assigned Safety Sanitation Deputies (who are not reassigned to other duties) to assure housekeeping, chemical control, tool control, laundry, etc. are impacting progress. These circumstances negatively impact the functioning of key support services and implementation of policies including sanitation/housekeeping, laundry services/exchange, and meal delivery.

The IDC's November 1, 2017, 60-day report notes that additional sanitation staff are being assigned to achieve work objectives. It is not clear who in the Environmental Section is assigned to train and supervise the newly staff assigned sanitation workers, inmate workers, or the six Sanitation Officers.

The quarterly Grievance Report from April through June 2017 reported 1435 grievances filed in 23 categories. Particularly concerning was that 12% (172) were regarding food service. This is the third highest category of grievances filed behind Medical and Facility. Additionally, the fifth highest category were environmental complaints (sanitation) representing 7.8% (113) of all grievances filed. Those grievances parallel with the Monitor's observations during the tour of housing units. The Monitor reviewed several grievances received since the previous tour related to meals, and while speaking with inmates while touring housing units at TDC and OJC, the Monitor heard from virtually all that hot meals were served cold or, at best, slightly warm.



OPSO's food service contractor is no longer using the re-therm kitchens located inside OJC.   The re-therm kitchen was intended to facilitate/improve food service by allowing the central kitchen to cook food, tray the food, rapidly chill the food, transport the chilled food to OJC, re-heat (re-therm) the meals inside OJC, and move the food to inmates. By not utilizing the re-therm kitchen. the time to transport hot (or cool) food from the kitchen to the housing units at OJC is increased.   The central kitchen transports food to OJC and TDC in insulated, but non-heated, tray carts.  The change in how hot food is served, coupled with the delays in moving the food into housing units due to staff shortages, jeopardizes food safety, and, thus, inmate safety. If eliminating the use of the re-therm kitchens is to be continued, OJC Policy 1001.03, "Meal Service – Inmates" [April 5, 2017] should be revised.

The Monitor urges OPSO and its contractor review all the steps along the entire food delivery process to identify opportunities to reduce delays and make improvements to assure hot meals are served hot [from hot food holding to filling the trays, transportation times, delays in food service at both facilities, and delays in serving the food to the inmate]. Any subsequent changes in practice should including measuring and recording hot food temperatures and times at each step in the process.[33] The logs can then be reviewed by OPSO to determine root causes of delays and make modifications to the process.

During the tour, the Monitor participated in a meeting chaired by the Chief of Corrections to address the timely provision of medically ordered diet meals, including assuring the correct foods, and process and notification of the end-date of the medical diet.[34] Following extensive discussion, the Chief of Corrections requested CCS, CBM, OJC's

---

[33] Temperatures and times should be recorded on a tracking log that follows the food in trays from the time they are placed in the insulated transport carts throughout the process with the final temperature measured when the meal is served to the inmate. The Monitor requested temperatures be taken for the hot food items on medical diet trays in the kitchen. These measured at 108°, 102°, 88°, and 86° *before* transport to housing units for service. Chicken patties in the kitchen for the regular noon meal were measured at 120°, 141°, 117°, and 124°F just *after* the patties were put on the trays and before transport from the kitchen to the housing facilities for distribution to the housing units, and ultimately to the inmates. The Monitor requested that temperatures and times be taken at time of service to the inmates, but the results of those measurements were not provided during or subsequent to this tour. For the hot food to be served hot, the temperature of the hot food as it is served to the inmates should be at 110°F or higher.

[34] Issues identified included: understanding by medical staff and OJC deputies about what types of medical diets are available (example vegetarian and vegan are not medical diets); lack of policy and/or training of a



Grievance Coordinator, and OJC Foodservice Director meet and provide a resolution within one week.  As this compliance report is written, the Monitor has received no communications from OPSO regarding the resolution and its implementation.

The plan to relocate the inmate laundry, which is currently contracted, is not complete as of this tour.  No timetable is yet established for its completion or how inmate laundry will be processed.   The clothes dryers currently used throughout OJC to wash inmate uniforms, linens, and personal clothing are continuing to need repairs. The volume of washing and drying of inmates' personal laundry appears to be beyond the capacity of the current equipment, especially if there is no preventive maintenance and given the current dangerous conditions of the equipment.

- The lint vents have been vandalized by the inmates; and provide a source of weapons;
- There was missing vent tubing, broken flexible vents, missing clamps used to secure the vents to the dryer, wall vents torn, and missing lint traps inside the dryers.

The reality of the current conditions creates safety and security issues for inmates and deputies including potential fire hazards from the lint issues. The Monitor suggests that OJC consider alternatives to address this safety and sanitation issue including, but not limited to, improved inmate supervision, contracting all laundry including what is now attempted to be done in the washers and dryers located on inmate housing units, using ventless dryers, daily monitoring of the vents by staff, and submitting timely work orders for needed repairs.

Additional issues addressed in the Consent Judgment needing attention, include, but are not limited to:

---

consistent process for CCS staff to order medical diets; delays from the time medical diets are ordered until they are received by the food service provider [resulting in unnecessary and unhealthy delays until the inmate actually receives a medical diet actually]; deputies' inability to respond to inmates' questions resulting in staff ignoring inmates or telling inmates to file a grievance; slow response time to grievances; medical provider's either putting inappropriate end dates for diets (for example establishing a 30-day end date for an allergy diet such as nuts or fish) or not providing timely review of patients who are on medical diets, and/or no communication with them resulting in pre-established medical diet end date expiration and inmates being transferred to regular diets before they are capable of consuming food from that diet.



- Development and implementation of a plan to assure adequate trained staff for support services.
- Completion of, training in, and implementation of support services policies.
- Training and implementation of a written processes for tool and chemical inventory and control in the Kitchen/Warehouse.
-  Completion, training and implementation of OJC Policy 701.13 Hazardous Material Incidents, 701.16 Emergency – Power Failure.
- Appointment and training of a sufficient  number of deputies assigned as safety sanitation deputies on all shifts, at all facilities, to oversee and provide accountability for sanitation, biohazardous spill response, laundry exchange, chemical control, fire inspections, and fire drills.
- Assignment of a sufficient number of deputies in inmate housing units to manage and oversee inmate living conditions as well as supervise proper storage of inmate property to control clutter and fire hazards in cells as required in the Inmate Handbook.
- Address the lack of daily inspections of housing units/cells to identify and eliminate blocked air vents in inmate cells effectively restricting adequate air flow.
- Timely replacement of broken, damaged, or missing glass panels.[35]
- Develop, train, and implement a comprehensive Infection Control Policy.

---

[35] Several glass panels that had been broken, apparently by inmates, have not been replaced.  Facilities Maintenance reported 45 broken glass panels in all of 2016 and as of this tour 39 broken panels continue to present a safety and security risk for both inmates and staff.  Time to replace the glass panels are reported by OJC to be about three weeks as the glazing are non-standard sizes and the glass is ordered from another state. OPSO should assure the requisition/purchasing process is streamlined to allow fast receipt and installation of replacement panels.



Orleans Parish
JAIL MONITORS

## V. D. 1.  Sanitation and Environmental Conditions

## IV. D. 1. a. Oversight and Supervision of Routine Cleaning

Finding: Non-Compliance

**Measures of Compliance:**
1.  Written policies and procedures for cleaning and disinfecting, monitoring process with responsibility and accountability assigned developed in collaboration with Monitors.
2.  List of controlled inventory of acceptable cleaning and disinfecting chemicals.
3.  Development and implementation of an effective weekly [or more frequently] auditing process with assigned responsibility and accountability and documentation.
4.  Monitors' onsite verification of implementation of both the policy(s) and the auditing process and report, along with corrective action when non-conformities to the policy/procedures are documented.
5.  Observation of conditions along with interviews with inmates and staff.

Observations:

OPSO has not completed two policies pertaining to this paragraph, 1101.04, "Cleaning Procedure-Facility", and 1101.06, "Inmate Hygiene."  OPSO has not provided any evidence of training for inmate workers, or the employees assigned to manage housekeeping.  When OPSO Policy 1101.04 is developed, it should include the detailed cleaning process including cleaning methods and appropriate chemicals and tools to use for specific cleaning tasks.

OPSO provided a cleaning schedule that identifies the housekeeping frequency, by area, for both OJC and TDC.  However, no evidence was provided to demonstrate implementation.

OPSO has also developed a "Pod Daily and Weekly Cleaning Schedule Checklist."  The checklist is to be completed daily by the deputy assigned to a housing unit and submitted weekly to the Safety Sanitation Deputy (SSD).  There was no evidence provided that the checklist process has been implemented, and no SSDs were assigned to the work.  Staff reported that previously designated SSDs were pulled/re-assigned from managing housekeeping and chemical control to assist with meal service, laundry exchange, inmate movement; impeding the full-time work to which they were assigned.



As reported in Compliance Report #7, OJC had not developed a staff and/or inmate training program for sanitation that includes mattress cleaning, chemical use and control.  No evidence was provided to demonstrate that this has changed. OPSO also should develop and implement a process for selection and training of inmate workers.

OPSO purchased two "All Surface Cleaning" machines to clean inmate showers.  OPSO recently assigned a deputy to environmental services functions to clean "inmate showers."  The Environmental Inspector stated that this deputy is responsible to manage shower cleanliness in all housing units.  The Monitor observed that shower cleanliness has significantly improved from previous tour in OJC.  However, the showers in TDC require attention.

The Environmental Inspector continues to conduct inspections at all housing units.   The resignation of the Sanitarian resulted in the work not done according to policy. The Environmental Inspector also reported that he discusses the inspection reports with a supervisor, when the supervisor is available. However, the Environmental Inspector continues to identify the same housekeeping issues in the same units at subsequent inspections.

In touring inmate housing units, the Monitor identified several safety/security and cleanliness issues that will benefit from effective and consistent oversight as well as direct supervision of inmates.  Examples include, but not limited to:

- Accumulation of lint behind dryers resulting from missing or broken dryer vents in numerous OJC housing units (4-A, 4-E, 3-D).  For solutions, OPSO should identify a safe solution, as flexible vent materials containing wire are a security risk to both inmates and staff.
- Clamps used to secure flexible vent tubing to the dryer and the wall are missing. Some flexible vent tubing was damaged as the supporting wires were removed.
- Inmates' personal items (paperwork, commissary purchases, and other approved items) are not stored as prescribed in OJC's Inmate



Handbook in the personal property bags provided by OJC.  Several inmates are without the facility-issued property storage bags. The Inmate Handbook includes what may and may not be kept by the inmate, and how items must be stored.  Either the person who assisted the Monitor on the tour was not aware of this; or the Inmate Handbook is not widely available.

- Inmates are hoarding mattresses in their cells, mattresses are stored on the floor of cells rather than on assigned bunks.
- The Monitor found two inmate workers sitting in a closed, but unlocked janitorial closet in IPC without a deputy present.
- Empty cells observed with either the previously assigned inmate's trash or being used by other inmates for trash or contraband.[36]
- Numerous exhaust and return air vents in inmate cells at OJC blocked by inmates to reduce air flow, clearly visible during a housing unit inspection.
- Cell door key holes filled with toothpaste.
- Cell windows covered with soap to block deputy's observation.
- Lower bunks wrapped with a blanket to prevent deputy's observation,
- Numerous handmade ropes in TDC 2-E used to hang clothing, towels, and blankets.
- Laundry at TDC returned wet from the contract laundry service and no apparent process to return it to the vendor to be completely dried.
- Dayroom chairs in cells in OJC, chairs stacked to block deputy vision into toilet areas in OJC, and chairs in showers.
- Empty milk cartons found in cells which could provide a vehicle for an ignition point.

---

[36] The Monitor was unable to establish whether there is a procedure to clean and disinfect cell furnishings after vacancy and before the next inmate is assigned, and whether there is documentation that this procedure is routinely followed.



- Lack of supervision and accountability for cleaning chemicals and tools:
  - o Missing cleaning spray bottles in housing units; chemical spray bottles found in inmate cells;
  - o Lockable chemical storage closet doors in a housing unit  was blocked open with a "wet floor" sign allowing chemicals and cleaning tools to be accessible to inmates;[37]
  - o Floor mops in mop buckets holding dirty water, not allowing mops to be cleaned and dried between uses;  mop heads secured to a mop thus making the mop head unable to be properly cleaned, disinfected and dried between uses; dust mops with no process or schedule to clean.
  - o Brooms with detachable handles making the handles into weapons, which has been documented in inmate on inmate assaults by OPSO.
- Complaints from inmates of chemicals not available for cleaning cells or dormitories.
- Insulated meal trays kept in inmate cells.
- Excess inmate uniforms in cells.
- Numerous occurrences of cell light shields covered with paper glued to the covering with toothpaste.  Deputies have no tools to remove or clean the light shields.
- Security camera in OJC dayroom 2-B under the staircase covered with toothpaste preventing observation.
- No apparent process to clean and disinfect inmate accessible portable water coolers before refilling; no process to clean and disinfect inmate drinking cups.
- Broken glass panels.

---

[37] OJC reports inmates, including inmates on the mental health caseload have ingested cleaning chemicals.



These issues were identified in previous compliance reports.

New Recommendations:

94.   Develop and provide to the Monitor an organizational plan that provides the reporting structure, provides job descriptions, and the working relationship among the Environmental Inspector, Sanitation Supervisor, CMT sanitation workers, the not yet identified Sanitation  Officers, and the Safety Sanitation Deputies.

95.   Complete the housekeeping policies; develop meaningful training materials [lesson plans] and implement training of deputies, supervisors, SSDs and inmate workers.

96.   Assure inmates understand OPSO's expectation for cleanliness and housekeeping procedures.

97.   Establish housekeeping as a priority for both deputies assigned to a housing unit, supervisors and leadership.

98.   Enforce inmate rules and regulations specified in the Inmate Handbook.



## IV.  D .1. b.  Preventive Maintenance

Findings: Partial Compliance

**Measures of Compliance:**
1. Review of the preventative maintenance plan to determine who has responsibility to file work orders.
2. Evidence of meeting the timelines for submission of work orders.
3. Evidence of training of those assigned the responsibility to file work orders.
4. Observation of practice and conditions.
5. Work orders, invoices, and purchases in support of the preventive maintenance plan.

Observations:

OPSO appointed a new Facility Maintenance Director in August 2017, the appointee having previously worked as contractor overseeing the construction of OJC.

Facility Maintenance did not provide any evidence of deputy training for how to submit work orders since the documentation submitted in July 2016.  To gain compliance, OPSO should provide evidence of deputy training either completed at the Training Academy for new deputies and any in-service training for current deputies.

A review of tracking reports from "Facility Dude" documents that many, if not most all work orders are not submitted by deputies or supervisors, but rather are the result of inspections conducted by the Environmental Inspector or by maintenance staff.   During the tour of TDC, the Monitor identified numerous plumbing and electrical issues for which work orders should be in process.  The sergeant on duty could not demonstrate that work orders for the identified issues had been submitted.

The Environmental Inspector reported to the Monitor that because of additional work assigned to him with the resignation of the Sanitarian and the absence of full-time dedicated Safety/Sanitation Deputies, he is no longer able to complete weekly housing unit inspections.  The result is longer delays in reporting



maintenance repair issues as the reporting is done, based on the data, not by line staff as it should be, but by the inspectors.

"Facility Dude" software provides management reports to allow OPSO's leadership to assess timely completion of work orders, identify backlogs, track delays in obtaining parts, and staff performance.  One report shared with the Monitor demonstrates that once the work orders are submitted, maintenance staff does respond and close them quickly.  The only exception is delays in obtaining parts and warranty work.

New Recommendations:

99.    Provide a training schedule and tracking logs to demonstrate that deputies and supervisors are trained in the process of submitting work orders and require deputies and supervisors implement and follow Policy 601.02. Establish a process to track compliance.

100.   Establish a process, either electronically (preferred) or manually, so that deputies and supervisors can track work order submissions to closure to eliminate duplicate work orders and be aware of the status of repairs in their assigned work areas.



## IV. D. 1. c. Adequate Ventilation

Findings: Substantial Compliance

**Measures of Compliance:**
1. Written policy and procedure specifying the process of how adequacy of ventilation will be measured in accordance with the mechanical code adopted by the applicable state or local jurisdiction.
2. Evidence of a contract with a qualified/licensed mechanical contractor to demonstrate that the ventilation system complies with the International Mechanical Code in effect in Louisiana.
3. Reports from vendor regarding the ventilation system, air flow, etc.

Observations:

OJC's Test and Balance Report dated December 9, 2016 from Coastal Air Balance Corporation demonstrates the ventilation system there is balanced as per the specifications for that system. During this tour, the Facilities Maintenance Director provided correspondence dated November 1, 2017 that DB Services completed all punch list items from the Melink Test and Balance Report.

During the tour of OJC, as noted earlier in this report, the Monitor identified several blocked supply and return air vents.

The Monitor continues to observe excessive condensation in some showers of the dormitory housing units in OJC.  For example, in 4E, offensive odors, indicating problems with possible mold, etc., along with the excessive condensation were observed.  In housing unit 4-A, maintenance staff removed the window in the shower door.  In that area, the Monitor did not observe any offensive odors and there was considerably less condensation on the glass windows which allowed deputies to maintain supervision of inmates.



## IV. D. 1. d. Adequate Lighting

Findings: Substantial Compliance

**Measures of Compliance**:

1. Maintenance of pending work order list showing the purchase order for pending work order regarding lighting fixtures.  Review of work order lists.
2. Visual observation conditions.

Observations:

Sufficient lighting is provided in housing units of both OJC and TDC.  OJC continues to maintain a supply of replacement bulbs, transformers, or ballasts to repair malfunctioning lighting.  At this tour, there were no outstanding electrical work orders.



## IV. D. 1. e. Pest Control

Findings: Substantial Compliance

**Measures of Compliance:**

1. Written policy and procedures.
2. Copy of valid contract for integrated pest control services with a licensed pest control contractor.
3. Map showing the location of all bait and trap stations both internally and externally.
4. Copies of pest control reports provided by the licensed pest control operator showing areas of concern, recommendations for corrective actions needed to be taken by sanitation and maintenance.
5. Evidence of corrective action taken for recommendations provided by the licensed pest control contractor.
6. Evidence of a pest control log where deputies can log sighting of pest showing date, time, location, and type of pest.
7. Visual observation of pest activity and inmate interviews.
8. Inmate grievances regarding sanitation and maintenance.

Observations:

OPSO continues to maintain a pest control contract with a State licensed pest control company requiring monthly service for all housing areas and bi-weekly service for the Kitchen/Warehouse.

To prevent pest issues within facilities, the OJC Inmate Handbook specifies that, “Food from the trays may not be saved or stored for later consumption unless it is provided as a snack as part of a special diet.” The Handbook further states, “All property in your [inmate’s] possession must be stored in your property bag.” This includes commissary. As in past tours the Monitor observed inmates maintaining food service trays from previous meals in their cells (staff removed 18 trays from 4-B while the Monitor was there). Increased pest infestation issues may occur if inmates continue to be permitted to maintain food from commissary stored on window ledges, upper bunks and not stored in their personal property bags, and food left over from meals in their cells as observed on this tour. All food from meal service should be removed from all inmates promptly following meal service.

## IV. D. 1. f. Biohazardous Spills

Findings: Partial Compliance

**Measures of Compliance:**
1. Written policy and procedures.
2. Development and implementation of a training syllabus for blood borne pathogens. Qualifications of the trainer(s).
3. Documented list of deputies and inmates trained in blood borne pathogens.
4. Development and implementation of a biohazardous waste policy and procedures for effective and safe clean-up of any spills.
5. Maintenance of a supply of biohazardous spill kits including personal protection items including, but limited to eye shield, mask, gloves, gown with cap, CPR barrier, towelettes, absorbent powder, scraper, scoop bag, and biohazard bag.
6. Observation and demonstration of knowledge by staff and trained inmates.
7. Inmate interviews, inmate grievances.
8. Medical policy and procedures.

Observations:

Policy 1101.07, "Bio-hazardous Spill Cleaning Procedures" [February 15, 2016] establishes in Section VIII. A. 1 a-c, "(a). Only OJC deputies trained in bio-hazardous spill response and the proper use of PPEs shall be used to clean-up bio-hazardous spills which occur outside medical treatment areas. (b) In the medical treatment areas only, the medical staff assume the responsibility to clean-up bio-hazardous spills, however, OJC is responsible for providing the necessary spill kits. (c) Inmates shall not be used to clean biohazardous spills." Section VIII. A. 3 of OJC Policy 1101.03, "Cleaning Procedures-Pods" states, "Inmates shall never be asked, allowed, or required to clean up bio-hazardous spills. Designated and trained staff will don protective clothing and equipment (PPE), and use designated cleaning supplies to clean up bio-hazardous materials."

During this tour, staff reported that inmates were assigned to bio-hazardous spill response. Prior to this tour, the Monitor requested evidence of current employee training including the name of deputies trained since March 1, 2017; none was provided. No evidence of inmate training was provided. Prior to previous tours, OPSO provided sign-in logs including pre-and post-test results for 341



deputies who had completed in one of the 35 spill response training classes held from May 2016 to February 2017.[38]

If inmates will be assigned bio-hazardous spill clean-up as currently reported by OJC staff, OPSO must provide training regarding required OSHA regulations and OPSO Policy procedures.  Additionally, all staff and inmates must be trained on OPSO's Infection Control Policy, once it is completed.  OPSO will also should revise both policies referenced above.

The locations for spill kits and evidence of an inventory maintained was not provided.  Also, requested evidence of use of the spill kits since March 1, 2017; which was not provided.

New Recommendations:

101.   Implement the policies addressing this provision.  If OPSO is changing assigned responsibilities specified in the policy to allow inmate workers to respond to spills, revise the applicable policy to reflect current and expected practice and provide evidence of training.

102.   Establish a process to maintain a current record of training for both employees and inmate workers (if permitted by policy) assigned to respond and clean up biohazardous spills including bloodborne pathogens.

103.   Provide evidence of completion  of bio-hazardous and bloodborne pathogen training meeting OSHA requirements and OPSO Policy procedures for any staff and inmate workers assigned to clean up spills.

104.   Provide evidence of inventory for spill kits, location of the spill kits and procedures for replacement of items after a spill is cleaned.

105.   Provide incident reports documenting spills kits were used for all biohazardous including, but not limited to: date, time and location of the spill,

---

[38] The Occupational Safety and Health Administration (OSHA) Bloodborne Pathogen Standard [29 CFR 1910.1030] requires employers to provide information and training to workers.  Employers must ensure that their workers receive regular training that covers all elements of the standard including, but not limited to: information on bloodborne pathogens and diseases, methods used to control occupational exposure, hepatitis B vaccinations, and medical evaluation, including post exposure follow-up procedures.  Employers must offer this training on initial assignment, at least annually thereafter, and when new or modified tasks or procedures affect a worker's risk of occupational exposure.



reason the incident occurred, clean-up workers involved,  whether spill kits were utilized and waste disposal.

106.    Demonstrate updating of the Infection Control Policy and provide evidence of training of all staff having contact with inmates.



## IV. D. 1. g. Cleaning Chemicals

Findings: Partial Compliance

**Measures of Compliance:**
1. Written policy and procedures.
2. Inventory of cleaning and disinfecting chemicals.
3. Lesson plans/curriculum - evidence of effective training of deputies and inmates responsible for cleaning and disinfecting surfaces in housing and common areas.
4. Policy and procedures an effective cleaning and disinfection policy and procedures for all facilities.
5. Observation of effective implementation and demonstration of knowledge.
6. Inmate interviews, inmate grievances.

Observations:

Policy 1101.03, "Cleaning Procedures – Pods" [December 6, 2016] establishes the requirements for cleaning supplies and equipment.  The policy requires that when not in use, cleaning supplies and equipment shall be stored in locked, sanitation closets/areas that are inaccessible to inmates.  During the tour, the Monitor observed cleaning supplies in both TDC and OJC that were not securely stored in locked sanitation closets/areas in the housing units.  Chemical closets in several housing units were blocked open using wet floor signs. In Unit 4A (a dorm housing inmates with medical conditions), chemicals were stored in the interview room.  In OJC, the Monitor observed chemical spray bottles in an inmate cells (two chemical spray bottles were found in housing unit 4-B; and, in housing units 4-E and F, there was no cleaning cart.

Deputies at OJC explained to the Monitor the reasons cleaning chemicals were not available when needed are:  (1) *that inmates remove the spray bottles from the carts and keep them in the cells and (2) deputies from other housing units take chemicals from one housing unit for use in their housing unit and do not return them or record the exchange.*  Staff reported there are supposed to be five spray bottles in each housing unit; most housing units had two or fewer. While the cleaning chemicals should be of such a dilution not to cause permanent harm if ingested by a healthy inmate, control of chemicals is a priority in jail safety as chemical can be splashed in the faces of staff and inmates for distract or otherwise disable.



Policy 1101.03 Section VIII C.3.a-c states, "Deputies assigned to the pods shall be responsible for conducting an inventory of cleaning supplies and equipment at the beginning and end of each shift and for requesting replacement items as needed. The supervisor shall conduct at least one check of the sanitation closet in their area of responsibility to ensure the deputy has completed the inventory and that it is accurate. The safety and sanitation deputy shall conduct daily inventories of the areas in which cleaning chemicals and supplies are stored to ensure they are replenished as needed." This is not being accomplished; or at least done on a regular or documented basis.

Policy 1101.03 Section IX. A.1-2 establishes the "Cleaning Supplies and Equipment Inventory and Replacement" procedures and requires the Safety/Sanitation Deputy to initiate the ordering process for items needed and delivers the items to the housing unit closet and the deputy assigned to the housing unit notes the replacement item on the Pod Cleaning Supply Log Sheet in the sanitation closet. The Monitor observed that the policy was not being followed. There were no "Pod Cleaning Supply Log Sheets" in any housing unit's sanitation closet. Deputies at OJC reported there is no chemical inventory maintained in the housing units. There was no evidence provided of supervisors checking the sanitation closet. The Monitor observed TDC maintained a documented inventory of chemicals in the chemical storage shed, but not as required in the housing units.

OPSO appointed a Sanitation Supervisor to work with the Environmental Section. This person is responsible to ensure consistency in laundry exchange, chemical control, cleaning supplies, equipment procurement and storage, supervision of sanitation deputies and assuring the implementation of the OJC Comprehensive Cleaning Plan. However, chemical control has not been implemented.



<u>New Recommendations:</u>

107.     Implement the OPSO policies that address the provision.

108.     Provide evidence that all measures of compliance for this provision are being met.

109.     Implement the recommendations in IV.D.1f above as it pertains to chemicals.



**IV. D. 1. h. Infection Control Plan**

Findings: Non-compliance

**Measures of Compliance:**
1.  Written policy and procedures for an infection control plan and policy following Center for Disease Control's recommendations.
2.  Lesson plans/curriculum - evidence of training of all deputies, staff and inmates responsible for cleaning and disinfecting all medical and dental areas within OJC.
3.  Demonstration of knowledge of the policy and plan.
4.  Observation.
5.  Inmate interview, inmate grievances.

Observations:

On September 26, 2017, OPSO provided draft copies of OJC Policy 1201.11, Infection Control and CCS Policy B.01, Infection Control for the Monitor's review. The policies are not yet completed.  The OJC Sanitarian, a member of the OJC Infection Control Committee, resigned in August and has not been replaced.  As documented in the previous Compliance Reports, no evidence has been provided to demonstrate meetings were held or meeting summaries identifying the results of discussions, action plans assignments and follow-up.

New Recommendation:

110.   Complete the OPSO Policy 1201.11, Infection Control and implement its provisions.



## IV. D. 2. Environmental Control

## IV. D. 2. a. Repair of Electrical Panels

Findings: Substantial Compliance

**Measures of Compliance:**
1.  Written policy and procedure.
2.  Evidence of implementation of the Provision in accordance with the National Electrical Code.
3.  Maintenance of pending work order list showing the purchase order for pending work order regarding electrical panels.
4.  Observation of practice.
5.  Observation of facilities' conditions.

<u>Observations:</u>

OPSO Policies 601.02 "Reporting and Addressing Maintenance Needs" and Policy 601.03 "Preventive Maintenance" [August 15, 2016] and are being implemented.  All electrical panels at OJC and TDC are located in secure areas inaccessible to inmates.  During the tour, the Monitor did not identify any panels in need of repair or replacement.  The provision continues to be substantially compliant.



**IV. D. 2. b. Implement a System for Maintenance of Electrical Panels, Devices & Wires**

Findings: Substantial Compliance

**Measures of Compliance:**
1. Written policy and procedure for preventative maintenance and repairs for electrical issues.
2. Evidence that all repairs are completed in accordance with the National Electrical Code.
3. Evidence that all repairs are completed within a reasonable time to assure that inmates and staff are not exposed to hazards that could cause injury.
4. Observation of conditions.

Observations:

Policy 601.02, "Reporting and Addressing/Repairing Maintenance Needs" has been implemented. "Facility Dude," the software work order system, tracks all work order requests, including electrical issues. On this tour, the Monitor identified only one electrical issue at TDC in 2 West and 4 West.  Power strips located on the wall that supports the televisions were hanging below them from the socket behind the televisions and were accessible to inmates.  The strip in 2 West had what appeared to be a 100-ft. extension cord attached to an electric shaver on the half wall near the lavatory sinks approximately 15 feetaaway, creating a trip hazard. The sergeant on duty did not know whether a work order had been submitted for eliminating or securing either power strip.

Since the previous tour, the House of Detention (HOD) laundry is closed. The electrical issues identified in the previous report no longer impact inmates or staff.



## IV. D. 3. Food Service

## IV. D. 3. a. Training

Findings: Partial Compliance

**Measures of Compliance:**

1. Written policy and procedure.
2. Development of a training syllabus for annual training for food safety and hygiene.[2]
3. Evidence of Food Service Manager Certification in accordance with Louisiana Retail Food Regulations.
4. Evidence of training of food service staff and inmate workers.
5. Demonstration of knowledge by the food service staff and inmates.
6. Observation.
7. Inmate interviews, inmate grievances.
8. Health Department inspection reports.

Observations:

OPSO drafted Policy 1001.01, Meal Preparation and Transport.  Section VII.B.1. a. establishes requirements for kitchen staff and inmate worker training; but it is not yet final.

OPSO provided evidence of Accredited Food Manager Certification for the contracted food service manager and for the OPSO Director of Food Service.  The OPSO Director of Food Service also maintains a certificate of completion of an _on-line_ Foodservice Worker Safety Course provided by the National Institute of Corrections (www.nicic.gov).

OPSO also provided a Food Service Training Log for both the contractor's staff and OPSO staff for monthly online classes created by CBM, the food service contractor.  The training topics, for example, include labeling, equipment cleaning, handwashing, use of disposable gloves, allergies, thermometer calibration etc. OPSO requires that all contractor employees are required to attend an eight-hour OPSO contactor/volunteer training class.  To date that has not occurred.

CBM staff are also required to complete the training on the Prison Rape Elimination Act (PREA) held on-site.  Evidence of completion of this in-person training will be required for OPSO to achieve success in the PREA audit. (See section IV.A.12 Sexual Abuse).



OPSO did not provide any evidence of inmate worker training nor have they established any specific training requirements for inmate workers assigned to the kitchen.

Touring the kitchen, the Monitor observed numerous operational and safety issues including lack of towels and waste containers at several handwashing sinks, handwashing stations that were dry indicating no handwashing by employees and inmate workers in areas where food was being prepared, fruit fly infestation in a case of bananas stored in the bakery, and bulk food containers that had food debris around the lids and seams and needed cleaning. These issues are indicators of lack of training of staff and/or inmate workers, ineffective training delivery methods, lack of a measurement tool to demonstrate understanding of the material, and ineffective supervision.

To achieve substantial compliance, and insure inmate safety, the OPSO Food Services Manager must have the tools necessary including written policies, procedures, list of responsibilities for all staff, meaningful inspections, effective staff supervision and management oversight to effectively manage food service preparation, sanitation, transportation, and delivery of meals to inmates.

New Recommendations:

111.    Complete and authorize all necessary food service polices and establish an initial orientation program, and, at least annual, food safety, safe food handling procedures and hygiene training for contracted staff and inmate workers, along with evidence of completion and demonstrate oversight of contract requirements and supervision of inmate workers.

112.    Assure all food service contractors receive PREA training.



## IV. D. 3. b. Cleanliness

Findings: Non-Compliance

**Measures of Compliance:**
1. Written policy and procedure for the cleaning and sanitization of all food service equipment following the equipment manufacturer's specified cleaning instructions.
2. Maintenance of a documented cleaning schedule for equipment and areas including kitchens, storage areas, ware washing, refrigerators and freezers with assigned responsibility for oversight.
3. Visual evidence of effective cleaning and interviews with staff and inmates on cleaning procedures
4. Evidence of a cleaning log for all equipment and observation of practice meeting the policy/procedures.
5. Inmate worker interviews.
6. Health Department inspection reports.

Observations:

A draft policy requires completion and implementation to achieve substantial compliance. Issues identified during the tour of the kitchen include, but are not limited to:

- An infestation of fruit flies in a box of bananas in the immediate vicinity of uncovered corn bread and cookies cooling in the bakery.

- Bulk food containers located in the bakery with an accumulation of dried food debris even though contractor completed check sheets for August and September showed that ingredient bins were checked at kitchen opening, twice during the day, and at closing.

- Exposed prepared cold cut sandwiches stored in a walk-in refrigerator, allowing the bread and meat to dry.

- Several hand sinks located in the kitchen that were not provided with drying towels or waste containers.

- Meal trays stored on racks in a manner that does not allow them to effectively self-drain and dry.

- Food waste on clean trays staged for filling for the next meal.



- Filled medical diet hot food trays prepared well in advance waiting to be loaded into the insulated carts, along with regular trays to transport to inmates.
- Supplies stored in unsecure areas of the kitchen including clear tape, salt, and lubricants in the bakery and in the area where medical diet meals were being prepared.
- Incomplete kitchen tool logs, not signed by the supervisor indicating review.  A broken tool was found taped to the log book and not recorded and disposed in accordance with the tool control policy.
- The chemical log does not have an orderly pre-printed list of all chemicals maintained in the Kitchen/Warehouse making it very difficult to complete and demonstrate tracking the amount of each chemical on hand, received that day or, and used that day.

OPSO provided copies of completed inspections by the OPSO Sanitarian for March, April, June and July 2017.  As required by the form, the reports were <u>not</u> signed by the Sanitarian completing the inspection, the OPSO kitchen manager, and the contractor's food service manager.  The reports do not indicate if corrective actions suggested by the findings were ever completed and/or the issue resolved or closed.  There is no evidence that the inspection reports are shared with OPSO leadership, a deficiency noted in the previous Compliance Reports.

The OPSO Sanitation Inspection reports documented food service equipment that were identified inoperable and needing repairs.  Work orders were filed, but there appears to be considerable delay in getting and installing parts. OPSO should assure that all equipment used is operated and maintained in accordance with the equipment manufacturer's recommendations and is included in the "Facility Dude" preventative maintenance schedule.



<u>New Recommendations:</u>

113.    Complete the policies addressing the provision and implement its requirements.

114.    Provide evidence of corrective actions taken for all internal and regulatory inspections.



## IV. D. 3. c. Record Keeping/Temperatures

Findings: Partial Compliance

**Measures of Compliance:**
1. Written policy and procedures for measuring and recording temperatures of all refrigerators, freezers, hot food holding equipment, wash and rinse temperatures of ware washing equipment, in accordance with the Louisiana Food Regulations.
2. Development and implementation of temperature logs demonstrating effective measurements as required in this provision and/or the Louisiana Food Regulations.
3. Review of logs and direct observations of measurements being taken and recorded.
4. Observation of conditions.

Observations:

As noted above, OPSO has not completed the food service policies that incorporate the requirements of this paragraph.  Prior to the compliance tour, OPSO provided requested copies of the daily cooler temperature logs for all refrigerators that were completed by OPSO staff assigned to the kitchen.  The refrigeration logs were properly completed and the Monitor found no systemic issues the process or with equipment based on the log reports.

The Monitor did not receive any temperature logs for the warewashing machine for the same time period as requested.

One "Hot Holding Equipment Temperature" log was submitted for September, but it did not identify which of several hot food holding units the log represented. Touring the kitchen, the Monitor observed that no temperature monitoring was occurring with any of several hot food holding units nor did the units have any identifying information such as a unit number.

New Recommendation:

115.    Complete the policy addressing temperature monitoring and recording and provide evidence the requirements of the provision are met daily.



**IV. D. 4. Sanitation and Environmental Conditions Reporting**

**IV. D. 4. a. (1) – (7) Periodic Reporting**

Findings: Partial Compliance

**Measures of Compliance:**
1.       Written policy and procedure governing reporting.
2.       Evidence of written report provided as specified in the provision.

Observations:

Policy 101.04, "Administrative Reporting Requirements" [July 17, 2017] establishes required periodic reporting, report contents, analysis and responsibilities of the reviewing authority including sanitation and environmental conditions.  Section VIII. D.1. does not include the requirement for the specific semi-annual "sanitation and environmental conditions report specified in the provision. Section VIII. E. 1. q specifies an annual report and assigns the Sanitarian the responsibility.  The policy should be revised to meet the provision IV. D. 4. a. (1) – (7).

OPSO should establish reporting formats and reports to assist in assuring these provisions gain substantial compliance, including the number of sanitation and environmental issues identified by the OPSO Environmental Inspector during his weekly inspections of all housing units.  Such reports are tools for leadership to review to understand and act on the specific sanitation and environmental issues identified in facilities and the frequency and severity of those conditions.

New Recommendation:

116.    OJC should review the paragraph and assure that the data provided follows the reporting requirement.



**IV. D. 4. b. Review of Sanitation and Environmental Conditions Report**

Findings:  Partial compliance

**Measures of Compliance:**
1. Written policy and procedure governing reporting on environmental conditions.
2. Evidence of a review of the sanitation and environmental conditions report by staff responsible for implementing policies and procedures for food service, blood borne pathogens, chemical control, sanitation, and preventive maintenance.
3. Evidence of written audits of the facilities.
4. Evidence of command staff review.  Determination by OJC that the implemented policies and procedures are effective to address the provisions of this Agreement.
5. Evidence of effective Corrective Actions are taken to address non-conformities identified during the review process.
6. Changes to policy, training curriculum, etc. resulting from these reviews.

Observations:

Policy 101.04 [July 17, 2017] establishes that the OPSO Management Team review the periodic management reports during regularly scheduled meetings.  No documentation of the management review process was provided.



## IV. E.   Fire and Life Safety

### IV. E. 1. a. Fire and Life Safety Equipment

Findings: Substantial compliance

**Measures of Compliance:**

1. Written policy and procedure governing the procedures and staff responsibility and accountability assigned for a minimum of quarterly inspections, repair and/or replacement of all fire and life safety equipment, included in the controlled document inventory.
2. Inspections shall be completed by competent fire inspector having at a minimum successfully passed "Fire Inspector II" training and examination in accordance with NFPA 1031, Professional Inspector Level II Qualifications and all requirements of the Office of the Louisiana State Fire Marshall.
3. Development and maintenance of a complete inventory of all fire and life safety equipment for each facility.  The list needs to include, but not limited to sprinkler heads, fire alarm pull boxes, smoke detectors, fire suppression systems, fire extinguishers, defibrillators, SCBA equipment and etc.
4. Annual master calendar for all internal and external inspection of all fire and life safety system equipment.
5. Development of a facility specific audit form that demonstrates the date of completion of inspection, identification of all non-conforming equipment, along with a corrective action report form that can demonstrate that effective corrective action was taken for all non-conformities.
6. Lesson plans/curriculum for staff assigned as auditors/inspectors.
7. Execution of contract with a qualified contractor to perform the inspections specified in this provision.
8. Evidence of a completed, signed, and supervisory review of all inspection and testing reports, along with documented corrective actions taken to resolve identify issue on non-conformance.
9. Fire Department inspection reports.
10. Interview with Fire Department officials.

Observations:

Policy 701.01, "Emergency Equipment Inspections and Testing" [April 12, 2017] establishes that all fire and life safety equipment is to be inspected and/or tested, the assigned responsibility (either contractor or Fire Safety Officer), and the inspection/testing frequency.

The OPSO Fire Safety Officer continues to implement the policy.  "Facility Dude" work order system maintains the schedule of inspections and notifies him when an inspection is due.  OPSO continues to maintain contracts with licensed vendors to complete annual inspections of all fire and life safety equipment.  Prior to



this tour, OPSO provided evidence of the most recent inspections, which is in accordance with policy.

OPSO provided copies of quarterly inspections conducted by the Fire Safety Officer for Kitchen/Warehouse, and OJC, for 1st three quarters of 2017, and provided copies of quarterly inspection for TDC for the 2nd and 3rd quarter, 2017. (TDC reopened in June 2017)  OJC continues to maintain a current location list of fire extinguishers for OJC, TDC and Kitchen/Warehouse.

The reports were complete and corrective actions taken for any violations identified.  The provision is substantially compliant with the consent judgement.

No further recommendations.



## IV. E. 1. b. Monthly Inspections

Findings: Partial Compliance

**Measures of Compliance:**
1. Job description/post orders, including qualifications for a fire safety officer in accordance with NFPA requirements for a "Certified Fire Inspector Level II"
2. Written policy and procedures including evidence of attendance at any and all 3-year certification seminars for certification renewal or current license from the Office of the State Fire Marshall
3. Also include measures 3, 4, 5, 7 of IV.E.1.a.
4. Review and observation of completed reports and corrective actions taken.
5. Interview with fire safety officer.

Observations:

Policy 701.01 addresses all fire and life safety inspections and frequency of the inspections.  Policy 601.03, "Preventive Maintenance" [August 15, 2016] requires the Facilities Maintenance (FM) test all life safety equipment and systems in accordance with National Fire Protection Association (NFPA) and/or Authority Having Jurisdiction (AHJ) requirements.

In preparation for the tour, OPSO provided copies of all monthly inspections for the Kitchen/Warehouse and OJC from January through September 2017; and for TDC the monthly reports from July through September 2017. The reports are thorough and complete.

OPSO Policy 701.01 also establishes a review of the report between the warden of each facility and the watch commander. It also requires a review by the Chief of Corrections.  No evidence was provided that either of the required reviews occurred.   This documentation is required to obtain and maintain substantial compliance.

During this tour, the Monitor observed numerous examples of uncontrolled excess flammable material in housing units including paperback books, uncontrolled commissary items, legal materials, etc. at both OJC and TDC.  Also observed was an accumulation of lint from broken or missing dryer vents at OJC. Inmates are required to maintain all cell/bunk property in the place/container provided for storage.  OJC provides inmate storage bags for all inmates.



The violations in OJC this have been noted on virtually all monthly of the fire safety officer's inspections as "Housekeeping needs improvement."  Once evidence that the required reviews are consistently occurring, and appropriate corrective actions occur, and the Monitor can verify that flammable materials are controlled in the housing units, the policy will be substantially compliant.

New Recommendations:

117.    Provide evidence of the required management reviews form monthly inspections.

118.    Provide evidence of that excess flammable materials in the cells is controlled consistently

119.    Effectively vent clothes dryers and maintain housing units having them free of lint.



## IV. E. 1. c. Fire Drills

Findings: Substantial Compliance

**Measures of Compliance:**
1. Written policy and procedures governing staff responsibilities and accountability for conducting fire drills within each facility in accordance with the provision. The policy shall include applicable drill reports that outline at a minimum start and stop times of the drills and the number and location of inmates who were moved as part of the drills, a review process for each drill that identifies the root cause and verification of effective corrective actions as necessary for non-conformities with the fire safety and evacuation plan(s)
2. Development and implementation of fire drill audit form(s)
3. Annual schedule of drills for each facility; demonstrating rotating drills to assure all areas are drilled at a specified frequency.
4. Observation of drills and/or drill reports.
5. Evidence of collaboration with the NOFD; interview with NOFD.
6. Interviews with inmates.

Observations:

Policy 401.05, "Fire/Smoke Event and Evacuation Training and Drills" [October 14, 2016] establishes that level 1 fire and evacuation drills are required to be conducted on all shifts at least once each month and level 2 fire and evacuation drills be conducted quarterly. Policy 701.06, "Emergencies – Fire/Smoke Events" [May 23, 2016] requires staff be knowledgeable to appropriately respond to drills.

OPSO provided copies of quarterly fire drill level 2 evaluation reports for OJC, and TDC, completed on both shifts for the second and third quarter and copies of quarterly fire drill level 2 evaluation reports for Kitchen/Warehouse for one shift as the kitchen currently only operates one shift. All drills were conducted under the direction of the Fire Safety Officer. Each drill report documented that the Fire Safety Officer tested all exit doors with the emergency key set and verified that the fire alarm activation was received by ADS, the company responsible for annual testing and monitoring of the fire alarm system. The Fire Safety Officer reported that the fire drill response continues to improve as more deputies have complete required fire and life safety training. Monthly level 1 fire drills, required under OPSO Policy 701.06, have not started.



The provision requires comprehensive fire drills are to be conducted every six months.  OPSO is in substantial compliance with the provision.

New Recommendation:

120.    As part of the semi-annual review of fire safety provision established in Provision IV.E.2.a (1) - (3), OPSO must review the fire drill assessments.  To improve that process it is important to complete a self-critical assessment of each drill identifying specific non-conformances to policies and procedures with the response and/or evacuation process and include it in the drill reports.  That information then should be used to update annual required refresher training and improve initial fire safety lesson plan at the training academy.



**IV. E. 1. d. Competency-Based Training**

Findings: Substantial Compliance

**Measures of Compliance:**
1. Development and implementation of a competency-based training policy for all correction staff on safe and effective use of all fire and emergency equipment, firefighting, safe evacuation.
2. Development and implementation of a fire and emergency practices and procedures training course syllabus/outline, along with a written exam that measures the competency of the corrections staff for the fire safety and evacuation plan and establishes an acceptable passing score.
3. Written directive regarding how OPP will identify each officer and staff who is required to receive training, the training date, name of officer/staff trained.

Observations:

Policy 401.05, "Fire/Smoke Event and Evacuation Training and Drills" [October 14, 2016] establishes the requirements for competency-based fire safety and evacuation training annually for deputies assigned to OPSO detention facilities.

It is planned that the SSDs will complete a 24-hour train-the-trainer program. They, in turn, will conduct the 8-hour annual refresher training for deputies and supervisors.  They have not been selected.

New Recommendation:

121.    Complete the training of SSDs and initiate the required annual refresher training for employees.



## IV. E. 1. e. Emergency Keys

Findings: Partial compliance

**Measures of Compliance:**
1. Written policy and procedures regarding staff responsibility and accountability for the systematic marking of all emergency keys, including sight and touch identification and designated locations for quick access for all keys.  All policies and procedures are to be reviewed and updated as necessary and at least annually on a schedule.
2. Implementation of the policy and procedure
3. Documented evidence of officer and staff training on the policy and procedure.
4. Observation of keys.
5. Observation of staff utilizing keys.

Observations:

OPSO authorized Policy 801.35 "Key and Key Card Control" on July 28, 2017. Section VIII.E.1-9 establishes the procedures for maintaining, testing, and inventory of emergency keys for all facilities and their use.

The OPSO security specialist reported that watch commanders are not conducting the daily emergency key inventory as required in  the policy.   The Fire Safety Officer verifies and records emergency exit keys are properly marked and securely stored in their assigned quickly accessible location during the monthly fire safety inspections.   The policy should reflect OPSO management's assigned responsibility (either the watch commander or the Fire Safety Officer.)

The Fire Safety Officer maintains a "Fire Packet" stored in Central Control that contains emergency key location, floor plans, and contact numbers of essential OPSO personnel for use by the responding New Orleans Fire Department in case of fire or other emergency.

Training for staff on the use of emergency keys is currently included in the fire and life safety training curriculum provided to all staff at the training academy.

New Recommendation:

122.    Review Policy 801.35 and either implement its requirements to comply with the provision or revise to current practice.



**IV. E.2 Fire and Life Safety Reporting**

**IV. E. 2. a. (1) – (3)  Periodic Reporting**

Findings: Partial Compliance

**Measures of Compliance:**
1. Written policy and procedure governing required reporting.
2. Evidence of written report provided as specified in the provision.

Observations:

Policy 101.04, "Administrative Reporting Requirements" [July 17, 2017] establishes required periodic reporting, report contents, analysis, and responsibilities of the reviewing authority.

For this tour, OPSO provided the most recent semi-annual report for January-June.  It included copies of the monthly and quarterly fire and life safety inspections conducted by the Fire Safety Officer, and copies of the external inspections by the State Fire Marshall.  What was not provided (as established in the provision) is **a summary** of:

1. The number and type of violations reported by fire and life safety inspectors (internal inspectors);
2. The fire code violations during annual fire inspections (in this period there were none reported according to the specific reports for OJC and TDC.);
3. The number of occurrences of hazardous clutter in housing units that could lead to a fire (in virtually every monthly report for OJC, it was noted as a violation "housekeeping needs improvement.").

An additional concerning issue identified by the Monitors, in terms of fires in the facilities, is communication between the corrections staff and Fire Safety Officer. Inmate disciplinary reports for the January – August 2017 recorded that there were 57 instances in which inmates had been administratively charged with rule violation "111 – Inmates shall not set or start a fire."  Most of these incidents were not reported to the Fire Safety Officer.  The reason noted by OJC was that the inmates



involved may have been trying to spark a fire, or had sparked a small fire.  In any case, the Fire Safety Officer should have been notified. The matter is now identified and corrective action taken.  It is however, imperative that reports of relevant management information are provided to those who are responsible for overseeing critical inmate/staff safety issues.



**IV. E.  2.  b. Addressing Deficiencies**

Findings: Partial compliance

**Measures of Compliance:**
1. Written policy and procedure governing required reporting.
2. Evidence of reviews of the fire and life safety conditions report by staff responsible for implementing policies and procedures.
3. Evidence of written audits of the facilities.
4. Evidence of command staff review.  Determination by OJC that the policies and procedures are effective to address the requirements of this Judgment.
5. Documentation of Corrective Actions taken to address non-conformities identified during the review process.
6. Changes to policy, training curriculum, etc. resulting from these reviews.
7. Review of Fire Department reports/inspections; interviews with NOFD.


Observations:

Policy 101.04 [July 17, 2017] establishes that the OPSO Management Team review the periodic management reports during regularly scheduled meetings. These reports were not provided.



**IV. F.   Language Assistance**

Findings:
> F.1.a. - Partial Compliance
> F.2.a - Not Applicable
> F.2.b. - Not Applicable
> F.3.a. - Partial Compliance
> F.4 - Non-compliance

**Measures of compliance:**
1. Comprehensiveness of policy; comprehensive language assistance plan
2. Training
3. Review of inmate files
4. Interviews

Observations:

OPSO's policy on Language Assistance (801.25) [March 2016.] addresses the provisions of the paragraph, but the critical step of implementation has not occurred.  Partial compliance is noted based on the existence of a policy only.  OPSO's required work to gain compliance includes:

- Develop and implement a comprehensive language assistance plan (separate from the policy).

- Annually identify and assess demographic data collected through the intake and classification processes. Specifically, track the number of Limited English Proficiency (LEP) individuals.  (Note, the attorneys for the Plaintiff class, OPSO, and Monitors mutually agreed to change this requirement from monthly to annual reporting.).

- Document the provision of timely, meaningful language assistance services for LEP inmates by OPSO staff.  ("Meaningful services" must extend beyond the availability of the language line.)

- Assess regularly the proficiency and qualifications of bilingual staff to serve as authorized interpreters.

- Create and maintain a list of authorized interpreters.  (This list should be posted on the OSPO shared drive to ensure ready access by all staff, particularly intake and classification officers.



- Document that LEP inmates are <u>not</u> asked to sign or initial documents in English without the benefit of a translation from an authorized interpreter.
- Provide at least eight (8) hours of LEP training for all corrections and medical/mental health staff who have direct contact with LEP inmates.
- Post bilingual staff in housing units.
- Ensure at least one bilingual staff member is available on each shift.

See section(s) of the Consent Judgment for provisions that address treatment of inmates held by OPSO for the U. S. Department of Homeland Security (DHS). OPSO has not held DHS inmates since monitoring began, thus these two provisions are noted as "not applicable."  If OPSO were to again contract with DHS to hold of inmates, these provisions will be revisited.

OPSO contracts with the City's Office of Homeland and Security and Emergency Preparedness for language line services.  OPSO provided a service list of times/dates for approximately 160 calls between January 1, 2017 and September 19, 2017.  The list indicated that the service was used all times of the day and night. While access to this language line is a positive, the service list indicates neither the language needed nor the underlying purpose of call (i.e., intake/booking, classification, medical, housing, etc.)  This documentation is required to achieving compliance with this section of the Consent Judgment.

Appendix F provides a list of recommendations regarding these provisions of the Consent Judgment, Compliance Reports 1 – 7.   No additional recommendations are made in Compliance Report #8.



### IV. G.   Youthful Prisoners

Findings:  Non-compliance

**Measures of Compliance**:
1. Written policy/procedures governing classification and housing of youthful inmates, including but not to sight/sound separation, provision of services, protective custody, education and other services, services for youthful inmates with mental illness or who are developmentally disabled, access to medical and mental health services.
2. Housing plan; classification plan.
3. Observation
4. Interview with youthful inmates.
5. Review of recreation and program schedules.
6. Review of inmate files (developmentally disabled, mental illness)
7. Review of housing unit logs, program schedules.

<u>Observations:</u>

This paragraph of the Consent Judgment has several provisions.  Two draft policies and procedures have been prepared, but not yet provided to the Monitors for review.[39]   While the Monitors readily acknowledge that the recent implementation of a school program represents significant progress toward compliance, the specifics of the paragraph remain in non-compliance.

Youthful inmates must be housed with sight, sound, and physical separation from adult inmates.  This provision is, for the most part, met; although sight and sound separation from adult inmates housed in the adjoining housing unit is sometimes problematic.  Youthful inmates are held in one unit in OJC, mixing all by classification, mental health need, protective custody, medical, and/or disciplinary status.  The average daily population (ADP) of 15 youthful inmates occupy a small number of the available cells in one 60-bed unit. This contributes to the housing issue in OJC.

As youthful inmates on protective custody status have contact with and access to or from non-protective custody youth, OPSO is in non-compliance with Section IV.A.12 of the Consent Judgment.

---

[39] 801.41 and 1401.08



On the occasion, a female youthful offender is held in OSPO custody, she is segregated in a single cell on an adult female unit with access to the dayroom/shower/telephone only when the adult female inmates are in their cells.  This circumstance, which is really all OPSO can do given the current facilities, results in non-compliance with this provision.

OPSO is commended for its' progress to provide educational services for the youthful inmates.  As observed by the Monitors, the program, in collaboration with the Youth Study Center's Travis Hill School, includes dedicated teachers, classroom spaces, resources, and guidance. The school is located in the program space on the second floor of OJC.   A Cooperative Agreement between the Children's Bureau and the OPSO has been proposed to provide additional services to youthful prisoners. (the copy provided to the Monitor had not yet been fully executed via the signature of the CEO of the Children's Bureau).

An inmate handbook appropriate for youthful offenders is being drafted by OPSO.   Preliminary drafts of the text and related appendices were provided to the Monitor for review.

No information was provided regarding the requirements of the Consent Judgment for provision of developmentally appropriate mental health services.  (See also the discussion regarding mental health services, IV. B.)

The City has proposing expansion of the Youth Study Center to house all youthful offenders. This expansion is not anticipated to completed for several years.

Appendix G provides a list of recommendations regarding these provisions of the Consent Judgment, Compliance Reports 1 – 7.   No additional recommendations are included in Compliance Report #8, except to address the previous recommendations.



## VI.  A – D. The New Jail Facility and Related Issues

A.      <u>New Jail</u>

Finding – Substantial Compliance.

The Orleans Jail Center opened for inmates on September 15, 2015.

B.      <u>Design and Design Document</u>

Finding – Substantial Compliance

This provision provides that, "*The Defendant shall obtain the services of a qualified professional to evaluate, design, plan, oversee, and implement the construction of **any new facility** [emphasis added].  At each major stage of the facility construction, Defendant shall provide the Monitor with copies of design documents.*"

Judge Africk has directed that the City provide plans for the Phase III (a special needs' facility) to Drs. Patterson and Greifinger for review as available.

Therefore, the finding of compliance for the new jail is substantial compliance.  For Phase III, compliance is pending.

C.      Defendant shall consult with a qualified corrections expert as to the required services and staffing levels needed for any replacement facility.  OPSO shall complete a staffing study to ensure that any new facility is adequately staffed to provide prisoners with reasonable safety.

Finding – Partial Compliance.

OPSO has engaged a consultant to conduct a staffing analysis.  OPSO generated their own staffing analysis, using the NIC model (2nd edition) following the opening of the new jail.  There are no preliminary plans regarding the staffing for Phase III.   As noted in this and previous the Compliance Report, no matter the outcome of the staffing study/analysis, the facility is currently understaffed, posing an on-going risk of harm to all inmates and staff.

D.      <u>Compliance with Codes and Standards</u>

Finding – Not evaluated

The Monitor's do not have the knowledge base to evaluate compliance with this paragraph.



## VII.  Compliance and Quality Improvement

## VII. A. Policies, Procedures, Protocols, Training Curriculum and Practices

Finding:   Partial Compliance

**Measures of Compliance:**
1.  Policies and procedures manual.
2.  Process/spreadsheet to identify all existing and planned written directives, dates when expected to be submitted for Monitors' review.

Observations:

      This is basic foundational work must be completed before actual progress on any of the provisions of the Consent Judgment is achieved.  This work has <u>not</u> been completed.  As per the status order entered October 25, 2017 Judge Africk stipulated that all draft policies to submitted to the Monitors and parties by January 23, 2018.  To date, few training curriculum/lesson plans have been provided for review to either the Monitors or parties.

      There are no new recommendations provided.  Appendix H notes the recommendations in prior Compliance Reports.

## VII. (H). B.  Written Quality Improvement Policies and Procedures

Finding:    Partial compliance

**Measures of Compliance:**
1.  Written policy/procedure governing quality improvement.
2.  Written report.
3.  Results of action plan from written report.

Observations:

      This provision requires OPSO to develop and implement written quality improvement policies and procedures adequate to identify serious deficiencies in protection from harm, prisoner suicide prevention, detoxification, mental health care, environmental health, and fire and life safety to assess and ensure continued compliance with the terms of the Consent Judgment.  Action is also required by the OPSO to address the problems uncovered during the course of the quality improvement activities.



Partial compliance with this paragraph is based on OPSO's policy 801.21 (dated April 5, 2016) regarding critical incident reviews. However, despite the requirement of its' own policy, the OPSO has <u>not</u> produced documentation of any critical incident reviews of the applicable serious incidents that have occurred during the last twelve months.  As a policy on paper alone is not policy, but rather an empty statement, to maintain even partial compliance, it is *imperative* that OPSO perform critical incident reviews to prevent future inmate harm. There have been six in-custody deaths in the last year, several disturbances, and multiple inmate drug overdoses.  Numerous inmates have sustained serious injuries from assaults by other inmates.

Without OPSO's performance of this essential function to drill down to the root cause of and address the findings, the harm continues.  This is a significant deficiency in OPSO operations.

There are no new recommendations provided.  Appendix I notes the recommendations in prior Compliance Reports.

## VII. (I). C. Full-Time Compliance Coordinator

Finding:  Non-Compliance.

<u>Observation:</u>

As of August 1 – November 14, 2017, the Compliance Coordinator position was vacant.  In this interim, Lt. Harris acted in this capacity, in addition to overseeing other operational areas (e.g., the classification unit).   While a Director of Policy and Compliance was hired effective November 15, 2017, the absence of the compliance coordinator, according to the ICD, attributed to OPSO's non-responsiveness in providing the pre-tour documents to the Monitors.  Although the list of critical documents was provided six weeks ahead of the scheduled tour, several documents previously provided prior to the tours were not available prior or during the tours.

The Monitors will need to verify that the newly hired position will achieve compliance with this paragraph –-- a *full-time* OPSO Compliance Coordinator is



required by the Consent Judgment.  Our review of any updated/revised post-order/job description for the "Director of Policy and Compliance" is a first step in this process.  This documentation should also delineate other resources required to achieve compliance by OPSO.

## VII.  (J.) D. Self-Assessment

Finding:    Non-Compliance.

<u>Observations:</u>

The provision provides "*On a bi-annual basis, OPSO will provide the public with a self-assessment in which areas of significant improvement or areas still undergoing improvement are presented either through use of the OPSO website or through issuance of a public statement or report.*"

Partial compliance had previously been given on the basis of the bi-annual report provide to the Monitors, even though this report was not publically available. The last two submissions were non-responsive to the requirements of this paragraph; thus, the compliance rating has been down-graded to non-compliance.



## VIII.  Reporting Requirements and Right of Access

## VIII.  A. Periodic Compliance Reporting

Finding:    Non-Compliance.

Observations:

This provision requires that OPSO submit periodic compliance reports describing the OPSO's actions during the reporting period to implement the Consent Judgment.  The report also must summarize audits, continuous improvement plans, quality assurance activities as well as any findings and recommendations.

No such report has been provided for either 2016 or to-date for 2107. See also the discussion in VII. B. regarding the quality improvement program.

## VIII. B.  (Notification of) **Death of Any Prisoner**

Finding:    Substantial Compliance

Observations:

Notifications have been provided within 12 hours of an inmate's death. Better communication between the OPSO and the Monitors and attorneys for the Plaintiff class/DOJ is needed as to the post-death *investigations*.

## VIII. C. Records

Finding:    Non-Compliance

Observations:

The Monitors do not always receive replies to inquiries and/or request for records in the time frames specified in this paragraph. There are continuing instances in which responses to critical inquires by the attorneys for the Plaintiff class/DOJ were tardy, incomplete, and/or did not address key questions/concerns. Despite multiple strategies to improve/address communication among the parties of this Consent Judgment barriers continue.



### III.    Stipulated Agreements

OPSO and the Plaintiffs/DOJ negotiated two agreements after Compliance Report #3.  This presents the current status of these provisions as well as cross-referencing the relevant paragraphs of the Consent Judgment.

### Agreement/Order (2/11/15)

| # | Language | Due Date | Status | Notes on Compliance |
|---|----------|----------|--------|---------------------|
| **1.  OPSO Reporting on Compliance Status with the Consent Judgment** | | | | |
| 1.a. | At each of the scheduled Court status conferences, the Sheriff or his designee shall report to the Court regarding OPSO's compliance status with each section (e.g. Section IV.A, IV.B.) of the Consent Judgment.  This report shall include a summary of OPSO's progress since the immediate previously scheduled status conference, and will include in the reporting OPSO's planned actions in the next 60 days to come into compliance. | 3/26/15 | Substantial Compliance | |
| 1.b. | OPSO shall comply with the Consent Judgment's requirement for periodic a compliance report as set forth in Consent Judgment Section VIII.A.[40]  The report shall describe the steps OPSO has taken in furtherance of compliance, and the activities planned during the next reporting period.  The first report is due by April 1, 2015, and periodic reports shall be due in accordance with Section VIII.A, and/or on dates mutually agreed to by the parties and the Monitors, and approved by the Court, as necessary. | 4/1/15 Future TBD | Partial Compliance | A compliance matrix was submitted to the Monitors prior to the on-site.  This report is not in sufficient detail.  See also the Stipulated Agreement 6/21/16. |

---

[40] A.  OPSO shall submit periodic compliance reports to the Monitor.  These periodic reports shall be provided to the Monitor within four months from the date of a definitive judgment on funding; and every six months thereafter until termination of this Agreement.  Each compliance report shall describe the actions Defendant has taken during the reporting period to implement this Agreement and shall make specific reference to the Agreement provisions being implemented.  The report shall also summarize audits and continuous improvement and quality assurance activities, and contain findings and recommendations that would be used to track and trend data compiled at the Facility.  The report shall also capture data that is tracked and monitored under the reporting provisions of the following provisions:  Use of Force; Suicide Prevention; Health Care Delivered; Sanitation and Environmental Conditions; and Fire and Life Safety.



| 1.c. | Within 24 hours of the occurrence of any of the following incidents, OSPO shall notify the Monitor via email:<br>• Death of an inmate/arrestee while held in custody (or housed in a hospital to which the inmate has been committed for care and remains in the custody of OPSO; or whose injury occurred while in custody and was subsequently released from custody);<br>• An inmate's/arrestee's suicide, suicide attempt, aborted suicide attempt, suicidal intent, and/or deliberate suicide self-harm gesture as defined by the American Psychiatric Association;<br>• An inmate's allegation of sexual abuse, sexual assault, sexual harassment, or voyeurism whether the incident is between or among inmates, or between or among inmates and a staff/contractor or volunteer;<br>• An inmate's report, or a report by a staff/contractor or volunteer, of any inmate/inmate allegation of assault; or other inmate allegations of felonies occurring to them while in custody;<br>• An inmate's report, or a report by a staff/contractor or volunteer, of any allegation of use of excessive force by an employee, volunteer or contractor;<br>• Suspension or arrest of any OPSO employee, volunteer, or contractor for alleged criminal activities while on-duty and/or in a facility under the control of OPSO; and<br>• Recovery of significant contraband specifically weapons. | On-going | Partial Compliance | The Monitors continue to document that all incidents are not reported OJC leadership.<br><br>See also Consent Judgment VIII. B. |
| --- | --- | --- | --- | --- |
| **2. Policies and Procedures (All Relevant Sections)** | | | | |
| 2.a. | By March 31, 2015, OPSO shall provide a schedule for the drafting and finalizing of all policies and procedures required under the Consent Judgment.  This schedule shall include:  deadlines to <u>simultaneously</u> submit drafts to, and receive comments, from the Monitor(s), and from the Plaintiffs and USDOJ ("Plaintiffs"). The Plaintiffs will also provide a copy of their comments to the Monitor.  In the event that the Monitor or the OPSO disagree with any comments or recommendations by the Plaintiffs, the Monitor will convene a | 3/31/15 | Substantial Compliance | The schedule is produced, the work is not done. |



| | | | | |
|---|---|---|---|---|
| | conference call for the purpose of resolving issues. | | | |
| 2.b. | The schedule shall identify the policies and procedures that are considered to be a priority including:  use of force, incidents and referrals, the early intervention system, inmate grievance process, and inmate classification.   The drafts of these policies shall be submitted to the Monitor(s) for initial review on or before March 31, 2015.  Following receipt of the Monitors' comments, OPSO will make any necessary revisions, consult with the Monitor(s) as needed, and provide a final draft to the Plaintiffs to provide substantive comments to both OPSO and the Monitor(s). In the event that the Monitor and/or the OPSO disagree with any comments or recommendations by the Plaintiffs, the Monitor will convene a conference call for the purpose of resolving issues. | On or before 3/31/15 | Substantial Compliance | The schedule is produced, the work is not done. |
| **3.  Memoranda to Implement Substantive Provisions of the Consent Judgment** | | | | |
| 3. | Pending implementation of policies that implement the Consent Judgment, OPSO shall prepare a memoranda to all OPSO staff, contractors, and volunteers, as outlined in various provisions below.  For each provision, the memoranda shall delineate the responsibilities of staff, contractors and/or volunteers under the terms of the Consent Judgment as well as the required procedures for notification/action.  OPSO shall submit each draft memoranda to Plaintiffs and the Monitor no later than March 1, 2015. Plaintiffs and the Monitor will have three business days to comment on the draft memoranda. In the event that the Monitor and/or the OPSO disagree with any comments or recommendations by the Plaintiffs, the Monitor will immediately convene a conference call for the purpose of resolving issues.  Within seven business days of finalizing the memoranda based on the comments of the Monitor(s) and Plaintiffs, OPSO will assure that the memoranda is read at roll call on all shifts, in all facilities, and in all locations (e.g. medical) for three consecutive days. Discrete memoranda regarding similar topics noted in this Stipulated Order may be combined into a single memorandum. OPSO will maintain a written list of staff, | 3/1/15 | Substantial Compliance | Provided in final 2/24/15; completed.<br><br>See also Consent Judgment VII. A. |



| | contractors and volunteers present during the reading of the memoranda and will produce that list on request.  OPSO will also post any memoranda in places where roll calls are held, locker rooms, and other non-inmate areas where staff may view the information. | | | |
|---|---|---|---|---|
| **4. Use of Force Reporting** | | | | |
| 4.a. | OPSO shall issue a memorandum to OPSO staff and contractors regarding their obligation to report uses of force for inmates under the legal care, custody and control of OPSO and in any facility operated by OPSO, and including in vehicles, hospitals, during transports, and in court holding areas.  The memoranda will outline the requirements and timelines for reporting. | 3/1/15 | Substantial Compliance | Completed 2/24/15

See also Consent Judgment IV.A.3.a. |
| 4.b. | OPSO shall issue a memorandum to staff and contractors that all incident reports regarding a use of force will contain all Consent Judgment-required elements as outlined in § IV.A.3.b-c, e.  The memorandum will be issued in accordance with the terms specified in Item 3 of this Stipulated Order. | 3/1/15 | Partial Compliance | See IV.A.3. in this Compliance Report.

See also Consent Judgment IV.A.3. |
| 4.c. | OPSO shall issue a memorandum to Watch Commanders and to Wardens to ensure that Watch Commanders and Wardens' reports contain all elements required under the Consent Judgment, as outlined in § IV.A.3.d.f.   The memorandum will be issued in accordance with the terms specified in Item 3 of this Stipulated Order. | 3/1/15 | Partial Compliance | See IV.A.3. in this Compliance Report.

See also Consent Judgment IV.A.3. |
| **5.  Early Intervention Systems** | | | | |
| 5.a. | By February 15, 2015, OPSO shall identify the names of the members of the Use of Force Review Board to the Monitor and the Plaintiffs/USDOJ. | 2/15/15 | Substantial Compliance 4/10/15 | See also Consent Judgment IV. A.4.b. |
| 5.b. | Commencing March 1, 2015, OPSO will make available to Monitors, at the Monitors' request, the quarterly reviews conducted by ISB and the command staff regarding the operation of the EIS system, including supporting documentation reviewed, as delineated by Section IV.A. 4.b., c., d., and e. of the Consent Judgment. | 3/1/15 | Partial compliance | See also IV.A.4. of this Report.
See also Consent Judgment IV. A.4.c. |
| **6.  Safety and Supervision** | | | | |
| 6.a. | By February 15, 2015 in order that the housing for youthful offenders is continually staff by a deputy will assure that a deputy is working on every shift, on every day to on the unit housing youthful offenders.   This deputy may not be | 2/15/15 | Non-Compliance | Documentation that youth tier is not staffed on a consistent basis.
See also Consent Judgment IV. G. |



|  | | | | |
|---|---|---|---|---|
|  | assigned to other tiers or other responsibilities, and shall be periodically relieved by another deputy and/or supervisor.  The evidence of compliance with this document will be the staffing assignments each day, each shift for the facility in which youthful offenders are held, and samples of the log books from that unit. | | | |
| 6.b. | OPSO shall ensure by May 15, 2015 that all staff assigned to the housing for inmates with acute and chronic mental health (in Templeman V, TDC, or other housing in which this population is held) attend training regarding working this population.  The lesson plans/curricula for this training shall be reviewed and approved by the Monitors.   The draft of the training curriculum and training plan is due to the Monitors by April 15, 2015, and should include participation by subject matter experts employed by the medical contractor. | 5/15/15 | Partial Compliance | Training materials provided for suicide prevention; but not for staff assigned to mental health housing.<br><br>See also Consent Judgment IV.B.4.a.,7.a. |
| **7.  Staffing, Staffing Plans, and Recruitment** | | | | |
| 7.a. | OPSO shall provide a monthly report to the Monitors, identifying the number of deputies hired the previous month; the number of deputies who resigned, if known, the reason for resignation, and the date the deputy entered service; and the number of deputies who were terminated, the reason for termination, and the date the deputy entered service.  The same report shall be provided for non-sworn (civilian staff).  A cumulative annual total will also be included as part of this report. | Monthly | Substantial Compliance | See also Consent Judgment IV. A.6. |
| 7.b. | By March 15, 2015, OPSO shall provide a recruitment plan for sworn (e.g. deputy sheriffs) and non-sworn/civilian staff that addresses current and anticipated vacancies for the next 18 months and based on the staffing plan.  The plan will be provided to the Monitors for comment and recommendations by March 1, 2015. | 3/15/15 | Substantial Compliance | See also Consent Judgment IV. A.6 See 60 day reports. |
| 7.c. | At the scheduled status conferences with the Court, OPSO shall report regarding progress to achieving hiring based on the plan, as well as any modifications and update to the plan (See paragraph 1, a., b., above.) | 3/26/15 | Substantial Compliance | See also Consent Judgment IV. A.6. See 60 day reports. |
| 7.d. | By April 30, 2015, OPSO will evaluate all posts to determine if use of contractors is feasible for non-inmate contact positions (e.g., perimeter security, security screening | 4/30/15 | Substantial Compliance | |



| | | | | |
|---|---|---|---|---|
| | of staff and visitors).  The report will be provided to the Monitors and Plaintiffs for their review. | | | |
| **8.  Incidents and Referrals** | | | | |
| 8. | OPSO shall issue a memorandum to all staff and contractors regarding their responsibilities and the process to document all reportable incidents within 24 hours, identified in § IV.A.7 of the Consent.  The memorandum will be issued in accordance with the terms specified in Item 3 of this Stipulated Order. | | Substantial Compliance 4/17/15 | See also Consent Judgment IV.A.7.e. |
| **9.  Investigations** | | | | |
| 9.a. | By March 31, 2014, OPSO shall develop policies and procedures governing the operations of the Investigative Services Bureau (ISB) including post orders for all positions within OPSO that have investigative responsibilities, criminal and/or administrative.  This draft will be provided to the Monitors.  Following receipt of the Monitors' comments, OPSO will make any necessary revisions, consult with the Monitor(s) as needed, and provide a final draft to the Plaintiffs to provide substantive comments to both OPSO and the Monitor(s). In the event that the Monitor and/or the OPSO disagree with any comments or recommendations by the Plaintiffs, the Monitor will convene a conference call for the purpose of resolving issues. | 3/31/15 | Substantial Compliance | The Investigative Services Bureau SOPs were approved by the Monitor in March 2016;  the SOPs for the Force Investigative Team were approved by the Monitor in August 2016.  See also Consent Judgment IV.A.8.a. |
| 9.b. | By March 15, 2015 OPSO shall make available a laptop computer to investigative staff assigned full-time to ISB for use in the employees' official capacities.  Supervisors shall have the ability access all files.  To the extent possible the laptop computers will be linked to a mainframe/cloud to facilitate the supervisor's remote access to the files. | 3/15/15 | Substantial Compliance | 3/20/15 - Provided purchase orders and memo from ISB . OPSO indicated on 4/2/15 that the laptops had been received. |
| **10.  Grievances** | | | | |
| 10. | By March 1, 2015, OPSO shall develop a job description for the Grievance Officer and revise OPSO's organizational chart to identify the chain-of-command for this position. | 3/1/15 | Substantial Compliance | Provided 3/9/15  See also Consent Judgment IV.A.11. |
| **11. PREA** | | | | |
| 11. | By March 15, 2015, OPSO shall produce to the Monitors the outline and production schedule for the video and orientation materials advising prisoners of the Prison | 3/1/15 | Substantial Compliance | Final product provided to lead Monitor for review on 5/14/15; with subsequent updates provided the |



| | | | | |
|---|---|---|---|---|
| | Rape Elimination Act. Following receipt of the Monitors' comments, OPSO will make any necessary revisions, consult with the Monitor(s) as needed, and provide a final draft to the Plaintiffs to provide substantive comments to both OPSO and the Monitor(s). In the event that the Monitor and/or the OPSO disagree with any comments or recommendations by the Plaintiffs, the Monitor will convene a conference call for the purpose of resolving issues. | | | following week.  Monitors have encouraged OPSO to provide these products to the plaintiffs.  Videos provided to plaintiffs on 6/3/15.<br><br>See also Consent Judgment IV.A.12. |
| **12.  Access to Information** | | | | |
| 12. | By April 1, 2015, OPSO shall produce to the Monitors the outlines and production schedule for the inmate orientation video and materials, including the revised inmate handbook.   OPSO shall also include the strategy for orienting inmates, and maintenance of inmate handbooks throughout OPSO facilities, including language access requirements, Section IV. F. of the Consent Judgment. Following receipt of the Monitors' comments, OPSO will make any necessary revisions, consult with the Monitor(s) as needed, and provide a final draft to the Plaintiffs to provide substantive comments to both OPSO and the Monitor(s). In the event that the Monitor and/or the OPSO disagree with any comments or recommendations by the Plaintiffs, the Monitor will convene a conference call for the purpose of resolving issues. | 4/1/15 | Substantial Compliance | See also Consent Judgment IV.A.13. |
| **13.  Medical Care** | | | | |
| 13. | By March 15, 2015 OPSO shall provide the Monitor with the medical and mental health care contractor's action plan for compliance with all the medical and mental health provisions of the Consent Judgment.  The action plan shall include the due dates for compliance with the paragraphs of the Consent Judgment, the individual(s) responsible for the activities, the specific activities to be undertaken. Following receipt of the Monitors' comments, OPSO will make any necessary revisions, consult with the Monitor(s) as needed, and provide a final draft to the Plaintiffs to provide substantive comments to both OPSO and the Monitor(s**)**. In the event that the Monitor and/or the OPSO disagree with any comments or recommendations by the Plaintiffs, the | 3/15/15 | Partial compliance | See Report # 8, IV.B. and C. |



| | Monitor will convene a conference call for the purpose of resolving issues | | | |
|---|---|---|---|---|
| **14.** | **Mental Health** | | | |
| 14.a. | OPSO shall issue a memorandum requiring that inmates with mental illness housed in the mental health housing have access to non-contact family visitation and family telephone calls.  The decision as to visiting and telephone calls will be determined in consultation with the mental health staff assigned to that inmate's care. If an inmate is denied visiting and telephone calls the reasons are specifically included in the inmate's chart. | | Substantial Compliance | Provided by OPSO on April 9, 2015. |
| 14.b. | By April 1, 2015, OPSO, in collaboration with CCS, will produce a management plan for inmates on the mental health caseload (Levels 1 – 4), whether these inmates are housed in the step-down unit, or in general population. | 4/1/15 | Partial compliance | No acceptable plan has been produced that has had an impact on the inmates.

See also Consent Judgment IV.B.2. |
| **15.** | **The New Jail Facility** | | | |
| 15. | By April 30, 2015, OPSO shall submit to the Monitors the plan for opening the new jail, including the schedule for movement of inmates into the facility, and closing of existing facilities.   The schedule shall be predicated on the potential opening dates known at that time, including alternative scenarios. | 4/30/15 | NA | See also Consent Judgment VI. |
| **16.** | **Sanitation and Environmental Conditions** | | | |
| 16. | OPSO shall issue a memorandum to all staff that that inmates and staff assigned to clean biohazards spills/incidents must be trained on doing so, outfitted with proper equipment, and properly supervised in accordance with § IV.D.1.f of the Consent Judgment. Following receipt of the Monitors' comments, OPSO will make any necessary revisions, consult with the Monitor(s) as needed, and provide a final draft to the Plaintiffs to provide substantive comments to both OPSO and the Monitor(s). In the event that the Monitor and/or the OPSO disagree with any comments or recommendations by the Plaintiffs the Monitor will convene a conference call for the purpose of resolving issues.  The directive will be issued in accordance with the terms specified in Item 3 of this Stipulated Order. | No date | Partial compliance | See also Consent Judgment IV. D. f.

See Report # 8, IV. D, |
| **17.** | **Youthful Offenders** | | | |
| 17.a. | By March 1, 2015, OPSO shall contact the school board and community groups to | 3/1/15 | Substantial Compliance | See also Consent Judgment IV. G. |



| | | | | |
|---|---|---|---|---|
| | solicit proposals for programming in the youthful offender unit. | | | |
| 17.b. | At the scheduled Court status conferences, OPSO shall report on progress in securing such programming, and/or the responses from the school board and stakeholders. | 3/26/15 | Substantial Compliance | |
| 17.c. | By May 1, 2015 OPSO shall provide a programming plan, based on the resources it has been able to secure, to include education, for all eligible youth in its custody, to Monitors for review. Following receipt of the Monitors' comments, OPSO will make any necessary revisions, consult with the Monitor(s) as needed, and provide a final draft to the Plaintiffs to provide substantive comments to both OPSO and the Monitor(s). In the event that the Monitor and/or the OPSO disagree with any comments or recommendations by the Plaintiffs, the Monitor will convene a conference call for the purpose of resolving issues. | 5/1/15 | Substantial Compliance | See also Consent Judgment IV. G. |

**Stipulated Agreement/Order (4/22/15)**

| # | Language | Due Date | Status | Compliance Notes |
|---|----------|----------|--------|------------------|
| 1. | By no later than April 24, 2015, the Orleans Parish Sheriff's Office ("OPSO") shall draft a memorandum to all staff members,[41] including supervisors, outlining the specific actions staff will take to respond if they observe a prisoner exhibiting signs or symptoms of a) suicidality or b) alcohol or drug intoxication or withdrawal.  This memorandum will be drafted by OPSO staff in collaboration with staff from Correct Care Solutions ("CCS").  This memorandum will be provided for review in draft form to the Lead Monitor and sub-monitors for Medical Care and Mental Health Care ("the Monitors").  Within three days of receiving any edits or revisions from the Monitors', OPSO shall incorporate those edits and/or revisions and issue the memorandum to all staff members, including supervisors.  The memorandum shall be read at daily staff briefings for three consecutive days and posted in locations where staff are likely to view it. | 4/24/15 | Substantial Compliance | See also Consent Judgment IV.B.5.  Memorandum completed; compliance with the principles outlined in the paragraph yet to be achieved. |
| 2. | By no later than April 30, 2015, OPSO shall conduct a one-hour training for all clinical and custody staff (including supervisors) who have not been trained in the past 12 months regarding the signs or symptoms of a) suicidality or b) alcohol or drug intoxication or withdrawal, and the specific actions staff will take to respond if a prisoner exhibits such symptoms.  This training shall be developed and delivered in collaboration with staff from CCS and incorporate the specific language of the Consent Judgment.  This interim training does not supplant any pre-service or annual training required by the Consent Judgment, which will be provided at a later date. | 4/30/15 | Partial Compliance | See also Consent Judgment IV.B.5.  See Report # 8 IV.B. |
| 3. | By no later than April 30, 2015, OPSO shall submit all custodial and site-specific medical policy(ies) regarding a) suicide risk reduction and b) alcohol or drug | 4/30/15 | Partial Compliance | See also Consent Judgment IV.B.5. See Report # 8 IV.B. |

[41] "Staff members" is defined in the Consent Judgment as "all employees, including correctional officers, who have contact with prisoners."  *See* Consent Judgment, ECF No. 466, at 8.



| # | Language | Due Date | Status | Compliance Notes |
|---|----------|----------|--------|------------------|
| | intoxication and withdrawal required pursuant to Section IV.B.5 of the Consent Judgment.  The policies shall integrate and cross-reference all relevant CCS policies governing housing and custody decisions for individuals expressing suicidality or alcohol or drug withdrawal.  All OPSO policies and any updated CCS policies shall be submitted to the Monitor and Plaintiffs for review pursuant to Section VII.A of the Consent Judgment. | | | |

Appendix A

| Section | Report # 1 2/13/14 | Report # 2 8/26/14 | Report # 3 2/25/15 | Report # 4 9/9/15 | Report # 5 3/17/16 | Report # 6 10/25/16 | Report # 7 5/1/17 | Report # 8 1/12/18 |
|---|---|---|---|---|---|---|---|---|
| IV. A.  Protection from Harm | | | | | | | | |
| IV.A. 1.  Use of Force Policies and Procedures/Margo Frasier | | | | | | | | |
| IV. A. 1.a. | ND | NC | NC | PC | NC | PC | PC | PC |
| IV. A. 1.b. | ND | NC | NC | PC | NC | PC | PC | PC |
| IV. A. 1.c. | ND | NC | NC | PC | NC | NC | PC | PC |
| IV.A.2.  Use of  Force Training/Margo Frasier | | | | | | | | |
| IV. A. 2. a. | ND | NC | NC | NC | NC | PC | PC | PC |
| IV. A. 2. b. | ND | NC | NC | NC | NC | PC | PC | PC |
| IV. A. 2. c. | ND | NC | NC | NC | NC | NC | NC | NC |
| IV.A.3.  Use of Force Reporting/Margo Frasier | | | | | | | | |
| IV. A.3 a. | ND | NC | NC | PC | NC | PC | PC | PC |
| IV. A.3 b. | ND | NC | NC | NC | NC | NC | PC | PC |
| IV. A.3 c. | ND | NC | NC | NC | NC | NC | PC | PC |
| IV. A.3 d. | ND | NC | NC | PC | NC | NC | PC | PC |
| IV. A.3 e. | ND | NC | NC | PC | PC | PC | PC | PC |
| IV. A.3 f. | ND | NC | NC | PC | NC | PC | PC | PC |
| IV. A.3 g. | ND | NC | NC | PC | PC | PC | PC | PC |
| IV. A.3 h. | ND | NC | NC | NC | NC | NC | NC | NC |
| IV.A.4. Early Intervention System ("EIS") /Margo Frasier | | | | | | | | |
| IV.A.4.a. | ND | NC | NC | PC | PC | PC | NC | NC |
| IV.A.4.b. | ND | NC | NC | PC | PC | PC | PC | PC |
| IV.A.4.c. | ND | NC | NC | PC | PC | PC | PC | PC |
| IV.A.4.d. | ND | NC | NC | NC | NC | PC | PC | NC |
| IV.A.4.e. | ND | ND | ND | ND | NC | NC | NC | NC |
| IV.A.5. Safety and Supervision/Margo Frasier | | | | | | | | |
| IV.A.5.a. | ND | NC | NC | NC | NC | NC | NC | NC |
| IV.A.5.b. | ND | NC | NC | NC | NC | NC | NC | NC |
| IV.A.5.c. | ND | NC | NC | NC | NC | NC | NC | PC |
| IV.A.5.d. | NC | NC | PC | PC | NC | NC | NC | NC |
| IV.A.5.e. | ND | NC | NC | PC | PC | NC | NC | NC |
| IV.A.5.f. | ND | NC | NC | PC | PC | SC | SC | PC |
| IV.A.5.g. | ND | NC | ND | PC | NC | NC | NC | NC |
| IV.A.5.h. | ND | NC | NC | NC | NC | NC | NC | NC |
| IV.A.5.i. | ND | NC | NC | PC | PC | PC | PC | PC |
| IV.A.5.j. | ND | NC | PC | PC | NC | NC | NC | NC |
| IV.A.5.k. | ND | NC | PC | PC | PC | PC | PC | PC |
| IV.A.5.l. | ND | NC | NC | NC | PC | PC | PC | PC |
| IV.A.6.  Security Staffing/Susan McCampbell | | | | | | | | |
| IV.A.6.a. | NC | NC | NC | NC | NC | NC | NC | NC |
| IV.A.6.a.(1) | ND | PC | PC | PC | SC | SC | PC | PC |
| IV.A.6.a.(2) | ND | PC | PC | PC | NC | SC | SC | SC |
| IV.A.6.a.(3) | ND | SC | NC | SC | NC | SC | NC | SC |
| IV.A.6.a.(4) | ND | NC | PC | PC | PC | PC | PC | PC |
| IV.A.6.b. | ND | NC | PC | PC | NC | PC | PC | PC |

Appendix A

| Section | Report # 1 2/13/14 | Report # 2 8/26/14 | Report # 3 2/25/15 | Report # 4 9/9/15 | Report # 5 3/17/16 | Report # 6 10/25/16 | Report # 7 5/1/17 | Report # 8 1/12/18 |
|---|---|---|---|---|---|---|---|---|
| IV.A.7 Incidents and Referrals/Margo Frasier | | | | | | | | |
| IV.A.7.a. | ND | NC | NC | NC | NC | PC | PC | PC |
| IV.A.7.b. | ND | NC | NC | PC | NC | PC | PC | PC |
| IV.A.7.c. | ND | NC | PC | PC | PC | PC | SC | SC |
| IV.A.7.d. | ND | NC | NC | NC | NC | NC | NC | PC |
| IV.A.7.e. | ND | NC | PC | PC | PC | PC | PC | PC |
| IV.A.7.f. | ND | NC | NC | PC | PC | PC | PC | PC |
| IV.A.7.g. | ND | NC | NC | PC | PC | PC | PC | PC |
| IV.A.7.h. | ND | NC | NC | PC | PC | PC | PC | PC |
| IV.A.7.i. | ND | NC | NC | PC | NC | NC | NC | NC |
| IV.A.7.j. | ND | NC | NC | NC | NC | NC | NC | NC |
| IV.A.8.  Investigations/Margo Frasier | | | | | | | | |
| IV.A.8.a. | ND | NC | PC | PC | PC | SC | SC | SC |
| IV.A.8.b. | ND | NC | PC | PC | PC | SC | SC | SC |
| IV.A.8.c. | ND | NC | PC | PC | PC | SC | SC | SC |
| IV.A.8.d. | ND | NC | NC | PC | PC | SC | SC | SC |
| IV.A.8.e. | ND | NC | NC | PC | PC | PC | PC | SC |
| IV.A.8.f. | ND | NC | NC | PC | PC | PC | PC | PC |
| IV.A.9.  Pretrial Placement in Alternative Settings/Susan McCampbe | | | | | | | | |
| IV.A.9.a. | PC | PC | PC | SC | SC | SC | SC | SC |
| IV.A.9.b. | PC | PC | PC | SC | SC | SC | SC | SC |
| IV.A.10. Custodial Placement within OPP/Patricia Hardyman | | | | | | | | |
| IV.A.10.a. | NC | PC | SC | SC | SC | SC | PC | PC |
| IV.A.10.b. | NC | NC | NC | SC | SC | SC | SC | SC |
| IV.A.10.c. | NC | NC | PC | PC | PC | PC | PC | SC |
| IV.A.10.d. | NC | NC | PC | PC | PC | PC | PC | NC |
| IV.A.10.e. | NC | NC | PC | SC | PC | PC | SC | PC |
| IV.A.10.f. | NC | NC | NC | NC | NC | PC | PC | PC |
| IV.A.10.g. | NC | NC | NC | NC | NC | PC | PC | PC |
| IV.A.10.h. | ND | NC | NC | PC | PC | PC | PC | PC |
| IV..A.11. Prisoner Grievance Process/Susan McCampbell | | | | | | | | |
| IV.A.11.a | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.A.12. Sexual Abuse/Susan McCampbell | | | | | | | | |
| IV.A.12. | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.A.13. Access to Information/Susan McCampbell | | | | | | | | |
| IV.A.13. | PC | PC | PC | PC | PC | PC | PC | PC |

Appendix A

| Section | Report # 1 2/13/14 | Report # 2 8/26/14 | Report # 3 2/25/15 | Report # 4 9/9/15 | Report # 5 3/17/16 | Report # 6 10/25/16 | Report # 7 5/1/17 | Report # 8 1/12/18 |
|---|---|---|---|---|---|---|---|---|
| **IV. B. Mental Health Care** | | | | | | | | |
| **IV.B.1. Screening and Assessment/Raymond Patterson** | | | | | | | | |
| IV.B.1.a. | NC | NC | PC | PC | PC | PC | PC | PC |
| IV.B.1.b. | NC | NC | PC | PC | PC | PC | PC | PC |
| IV.B.1.c. | NC | NC | PC | PC | PC | PC | PC | PC |
| IV.B.1.d. | NC | NC | PC | PC | PC | PC | PC | PC |
| IV.B.1.e. | NC | NC | PC | PC | PC | PC | PC | PC |
| IV.B.1.f. | NC | NC | NC | NC | NC | NC | NC | NC |
| IV.B.1.g. | NC | NC | NC | NC | NC | NC | NC | NC |
| IV.B.1.h. | NC | NC | NC | NC | NC | NC | NC | NC |
| IV.B.1.i. | NC | NC | NC | NC | NC | NC | NC | NC |
| IV.B.1.j. | NC | NC | NC | PC | NC | NC | NC | NC |
| IV.B.1.k. | NC | NC | NC | PC | NC | NC | NC | NC |
| IV.B.1.l. | NC | NC | NC | NC | NC | NC | NC | NC |
| **B. 2. Treatment/Raymond Patterson** | | | | | | | | |
| IV.B.2.a. | NC | NC | NC | PC | PC | PC | PC | PC |
| IV.B.2.b. | NC | NC | NC | NC | NC | NC | NC | NC |
| IV.B.2.c. | NC | NC | NC | NC | NC | NC | NC | NC |
| IV.B.2.d. | NC | NC | NC | NC | NC | NC | NC | NC |
| IV.B.2.e. | NC | NC | NC | PC | PC | PC | PC | NC |
| IV.B.2.f. | NC | NC | NC | PC | PC | PC | NC | PC |
| IV.B.2.g. | NC | NC | NC | PC | PC | PC | NC | PC |
| IV.B.2.h. | NC | NC | NC | PC | PC | PC | PC | PC |
| **IV.B.3. Counseling/Raymond Patterson** | | | | | | | | |
| IV.B.3.a. | NC | NC | NC | NC | PC | NC | NC | PC |
| IV.B.3.b. | NC | NC | NC | NC | PC | NC | NC | PC |
| **IV.B.4. Suicide Prevention Training Program/Raymond Patterson** | | | | | | | | |
| IV.B.4.a. | NC | NC | NC | PC | PC | PC | PC | PC |
| IV.B.4.b. | NC | NC | NC | PC | PC | PC | PC | PC |
| IV.B.4.c. | NC | NC | NC | PC | PC | PC | PC | PC |
| IV.B.4.d. | NC | NC | NC | PC | NC | NC | NC | NC |
| IV.B.4.e. | NC | NC | NC | PC | NA | PC | PC | PC |
| IV.B.4.f. | NC | NC | NC | PC | PC | PC | NC | NC |
| IV.B.4.g. | NC | NC | NC | SC | PC | NC | NC | NC |
| **IV.B.5. Suicide Precautions/Raymond Patterson** | | | | | | | | |
| IV.B.5.a. | NC | NC | NC | NC | NC | NC | NC | PC |
| IV.B.5.b. | NC | NC | NC | NC | NC | NC | NC | PC |
| IV.B.5.c. | NC | NC | NC | NC | NC | NC | NC | PC |
| IV.B.5.d. | NC | NC | NC | NC | NC | NC | NC | NC |
| IV.B.5.e. | NC | NC | NC | NC | NC | NC | NC | NC |
| IV.B.5.f. | NC | NC | NC | NC | NC | NC | NC | NC |
| IV.B.5.g. | NC | NC | NC | NC | NC | NC | NC | NC |
| IV.B.5.h. | NC | NC | NC | NC | NC | NC | NC | PC |
| IV.B.5.i. | NC | NC | NC | NC | NC | NC | NC | PC |
| IV.B.5.j. | NC | NC | NC | NC | NC | NC | NC | PC |
| IV.B.5.k. | NC | NC | NC | NC | NC | NC | NC | PC |

Appendix A

| Section | Report # 1 2/13/14 | Report # 2 8/26/14 | Report # 3 2/25/15 | Report # 4 9/9/15 | Report # 5 3/17/16 | Report # 6 10/25/16 | Report # 7 5/1/17 | Report # 8 1/12/18 |
|---|---|---|---|---|---|---|---|---|
| IV.B.6.  Use of Restraints/Raymond Patterson | | | | | | | | |
| IV.B.6.a. | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.6.b. | NC | NC | PC | PC | PC | PC | PC | PC |
| IV.B.6.c. | ND | NC | PC | PC | PC | PC | PC | PC |
| IV.B.6.d. | ND | NC | PC | PC | PC | PC | PC | PC |
| IV.B.6.e. | NC | NC | PC | PC | PC | PC | PC | PC |
| IV.B.6.f. | NC | NC | PC | PC | PC | PC | PC | PC |
| IV.B.6.g. | NC | NC | PC | PC | PC | PC | PC | PC |
| IV.B.7.  Detoxification and Training/Robert Greifinger | | | | | | | | |
| IV.B.7.a. | NC | NC | PC | PC | PC | PC | PC | PC |
| IV.B.7.b. | NC | NC | PC | PC | PC | PC | PC | PC |
| IV.B.7.c. | NC | NC | PC | PC | PC | PC | PC | PC |
| IV.B.7.d. | NC | NC | PC | PC | PC | PC | PC | PC |
| IV.B.8. Medical and Mental Health Staffing/Robert Greifinger | | | | | | | | |
| IV.B.8.a. | NC | NC | PC | PC | PC | PC | PC | PC |
| IV.B.8.b. | NC | NC | PC | PC | PC | PC | PC | PC |
| IV.B.9.  Risk Management/Robert Greifinger | | | | | | | | |
| IV.B.9.a. | NC | NC | NC | PC | PC | PC | PC | PC |
| IV.B.9.b. | NC | NC | NC | PC | PC | PC | PC | PC |
| IV.B.9.c. | NC | NC | NC | NC | PC | PC | PC | PC |
| IV.B.9.d. | NC | NC | NC | NC | NC | NC | NC | NC |
| IV.B.9.e. | NC | NC | NC | NC | PC | PC | PC | PC |
| IV.B.9.f. | NC | NC | NC | NC | PC | PC | PC | PC |
| IV.C. Medical Care | | | | | | | | |
| IV. C. Quality Management of Medication Administration | | | | | | | | |
| IV.C.1.a. | NC | NC | PC | PC | PC | PC | PC | PC |
| IV.C.1.b. | NC | NC | PC | PC | PC | PC | PC | PC |
| IV.C.1.c. | NC | NC | PC | PC | PC | PC | PC | PC |
| IV.C.1.d. | NC | NC | PC | PC | PC | PC | PC | PC |
| IV.C.2.  Health Care Delivered/Robert Greifinger | | | | | | | | |
| IV.C.2.a. | NC | NC | NC | PC | PC | PC | PC | PC |
| IV.C.2.b. | NC | NC | PC | PC | PC | PC | PC | PC |
| IV.C.3.  Release and Transfer/Robert Greifinger | | | | | | | | |
| IV.C.3.a. | NC | NC | NC | PC | PC | PC | PC | PC |
| IV.C.3.b. | NC | NC | NC | PC | PC | PC | PC | PC |
| IV.C.3.c. | NC | NC | NC | PC | PC | PC | PC | PC |
| IV.C.3.d. | NC | NC | NC | PC | PC | PC | PC | PC |
| IV.D.  Sanitation and Environmental Conditions/Harry Grenawitzke | | | | | | | | |
| IV.D.1.a. | NC | NC | NC | NC | NC | NC | NC | NC |
| IV. D. 1.b. | NC | NC | PC | PC | PC | PC | PC | PC |
| IV. D. 1.c. | NC | NC | PC | PC | NC | NC | PC | SC |
| IV. D. 1.d. | NC | NC | NC | NC | SC | SC | SC | SC |
| IV. D. 1.e. | NC | PC | PC | PC | PC | PC | PC | SC |
| IV. D. 1.f. | NC | NC | NC | NC | PC | PC | PC | PC |
| IV. D. 1.g. | NC | NC | NC | NC | PC | PC | PC | PC |
| IV. D. 1.h. | NC | NC | NC | PC | NC | PC | NC | NC |

Appendix A

| Section | Report # 1 2/13/14 | Report # 2 8/26/14 | Report # 3 2/25/15 | Report # 4 9/9/15 | Report # 5 3/17/16 | Report # 6 10/25/16 | Report # 7 5/1/17 | Report # 8 1/12/18 |
|---|---|---|---|---|---|---|---|---|
| **IV. D. 2. Environmental Control** | | | | | | | | |
| IV. D. 2.a. | NC | NC | PC | PC | PC | SC | SC | SC |
| IV. D. 2.b. | NC | NC | NC | NC | NC | SC | PC | SC |
| **IV. D. 3. Food Service** | | | | | | | | |
| IV. D. 3.a. | NC | NC | NC | PC | PC | PC | NC | PC |
| IV. D. 3.b. | NC | NC | NC | PC | PC | PC | NC | NC |
| IV. D. 3.c. | NC | NC | NC | PC | NC | NC | PC | PC |
| **IV. D. 4. Sanitation and Environmental Conditions Reporting** | | | | | | | | |
| IV. D. 4.a. 1-7 | NC | NC | PC | PC | PC | PC | PC | PC |
| IV. D. 4.b. | NC | NC | NC | NC | PC | NC | NC | PC |
| **IV.E. Fire and Life Safety/Harry Grenawitzke** | | | | | | | | |
| **IV. E. 1. Fire and Life Safety** | | | | | | | | |
| IV. E. 1.a. | NC | PC | PC | PC | PC | PC | PC | SC |
| IV. E. 1.b. | NC | NC | NC | PC | PC | PC | PC | PC |
| IV. E. 1.c. | PC | PC | PC | PC | NC | PC | PC | SC |
| IV. E. 1.d. | NC | NC | NC | NC | NC | NC | PC | SC |
| IV. E. 1.e. | ND | NC | PC | PC | PC | PC | PC | PC |
| **IV. E. 2. Fire and Life Safety Reporting** | | | | | | | | |
| IV. E. 2.a.1-3 | ND | NC | PC | PC | PC | PC | PC | PC |
| IV. E. 2.b. | ND | NC | NC | PC | NC | NC | NC | PC |
| **IV.F. Language Assistance** | | | | | | | | |
| **IV.F.1. Timely and Meaningful Access to Services/Susan McCampbell** | | | | | | | | |
| IV.F.1.a. | ND | PC | PC | PC | PC | PC | PC | PC |
| **IV.F.2.  Language Assistance Policies and Procedures/Susan McCampbell** | | | | | | | | |
| IV.F.2.a. | ND | PC | PC | PC | Not App | Not App | Not App | Not App |
| IV.F.2.b. | ND | PC | PC | PC | Not App | Not App | Not App | Not App |
| **IV.F.3. Language Assistance Training/Susan McCampbell** | | | | | | | | |
| IV.F.3.a. | NC | PC | PC | PC | PC | PC | PC | PC |
| **IV.F.4. Bilingual Staff/Susan McCampbell** | | | | | | | | |
| IV.F.4. | NC | PC | PC | PC | PC | NC | NC | NC |
| **IV.G.  Youthful Prisoners/Susan McCampbell** | | | | | | | | |
| IV.G. | NC | NC | NC | PC | PC | PC | NC | NC |
| **VI. The New Jail Facility/Susan McCampbell** | | | | | | | | |
| VI. A. | ND | PC | PC | SC | SC | SC | SC | SC |
| VI. B. | NC | PC | SC | SC | SC | SC | SC | SC |
| VI. C. | ND | PC | SC | SC | PC | PC | PC | PC |
| VI. D. | Monitors Not Qualified to Evaluate | | | | | | | |
| **VII.  Compliance and Quality Improvement/Susan McCampbell** | | | | | | | | |
| VII. A. | ND | NC | NC | PC | PC | PC | PC | PC |
| VI. B. (H.) | NC | NC | NC | NC | NC | NC | PC | PC |
| VI. C. (I.) | NC | NC | SC | SC | NC | SC | SC | NC |
| VI. D. (J.) | ND | NC | NC | PC | PC | PC | PC | NC |
| **VIII. Reporting Requirements and Right of Access/Susan McCampbell** | | | | | | | | |
| VIII.A. | ND | NC | NC | PC | PC | PC | PC | NC |
| VIII.B. | PC | PC | PC | PC | SC | SC | SC | SC |
| VIII.C. | PC | PC | PC | SC | SC | SC | NC | NC |

Appendix A

| Section | Substantial Compliance | Partial Compliance | NC | Notes: |
|---|---|---|---|---|
| Stipulated Agreement 2/11/5 | | | | |
| 1.a. | x | | | |
| 1.b. | | x | | See also CJ VII. D., VIII.A. |
| 1.c. | | x | | See also CJ VIII.B. see also Stipulated Order 6/21/17 |
| 2.a. | x | | | See also CJ VII. A. |
| 2.b. | x | | | See also CJ VII. A. |
| 3 | x | | | See also CJ VII. A. |
| 4.a. | x | | | See also CJ IV.A.3. |
| 4.b. | | x | | See also CJ IV.A.3. |
| 4.c. | | x | | See also CJ IV.A.3. |
| 5.a. | x | | | See also CJ IV.A.4.b. |
| 5.b. | | x | | See also CJ IV..4.c. |
| 6.a. | | | x | See also CJ IV.G. |
| 6.b. | | x | | See also CJ IV.B.4.a.,7.a. |
| 7.a. | x | | | See also CJ IV.A.6. |
| 7.b. | x | | | See also CJ IV.A.6. |
| 7.c. | x | | | See also CJ IV.A.6. |
| 7.d. | x | | | |
| 8 | x | | | See also CJ IV.A.7. |
| 9.a. | x | | | See also CJ IV.A.8.a. |
| 9.b. | x | | | |
| 10 | x | | | See also CJ IV.A.11. |
| 11 | x | | | See also CJ IV.A.12 |
| 12 | x | | | See also CJ IV.A.13 |
| 13 | | x | | See also CJ IV.B., C. |
| 14.a. | x | | | |

Appendix A

| | | | | |
|---|---|---|---|---|
| 14.b. | | x | | See also CJ IV.B.2. |
| 15 | NA | | | 2/19/16, Not applicable See also CJ VI. |
| 16 | | x | | ...e also CJ IV.D.f. |
| 17.a. | x | | | See also CJ IV.G. |
| 17.b. | x | | | |
| 17.c. | x | | | See also CJ IV.G. |
| Stipulated Agreement 4/22/16 | | | | |
| 1 | x | | | See also CJ IV.B.5. |
| 2 | | x | | See also CJ IV.B.5. |
| 3 | | x | | See also CJ IV.B.5. |

**Legend:**
**ND – Not scheduled for review**
**NC – Non-compliance**
**PC – Partial Compliance**
**C – Substantial Compliance**
**NA – Not Applicable**

**Appendix B**

**Section IV. A. Protection from Harm Outstanding Recommendations (Compliance Reports #1-7)**

**IV. A. 1. Use of Force Policies and Procedures - Outstanding Recommendations**

1. Continue to work with Monitors to develop comprehensive policies and procedures and a reporting system that will enable OPSO to provide guidance, to train, and to hold accountable supervisors and deputies. In particular, include a mechanism to ensure that all uses of force are properly reported and investigated in accordance with the policy. The adequacy of the policies and procedures and reporting system is key to future compliance with IV. A. 1. c. that requires OPSO to assess, annually, all data collected to make any necessary changes.

2. Develop not only the reporting systems (data collection) for uses of force, but the mechanics to analyze, produce summary reports, develop plans of action, and assess the impact of any plans of action.

3. Continue to train staff and supervisors on the use of force policies and evaluate the effectiveness of the training.

4. Prohibit jail leadership and supervisors from being able to override the recommendation of the ISB Commander to reassign or suspend a staff member pending investigation unless the override has been approved by Director Maynard and documented in writing.

**IV. A. 2. Use of Force Training- Outstanding Recommendations**

1. When the use of force policies is completed, comprehensive lesson plans and training materials will need to be developed. Given the current quality of the training material, it may be that the task of developing comprehensive lesson plans and training material will need to be outsourced (perhaps on the list for either V/R Justice Service or Carter Goble Lee). Training needs to clearly delineate when force may be used, highlight strategies to de-escalate the need to use force, and stress that all uses of force must be reported and properly investigated. In addition, supervisors need to be trained on the mechanisms to ensure that all uses of force are properly reported and investigated in accordance with the policy. All training, for both deputy and supervisor levels, must emphasize that failure to follow the policy will result in discipline. The adequacy of the policies and procedures and training is crucial to future compliance with IV. A. 2. c. which requires OPSO to randomly test five percent of the jail staff to determine their knowledge of use of force policies and procedures.

**IV. A. 3. Use of Force Reporting - Outstanding Recommendations**

1. OPSO policy/procedures should require those holding the rank of Major and above review all reports. Based on that review, provide additional training to supervisors who are not requiring complete and thorough reports.

2. OPSO needs to timely produce the reports required by the Consent Judgment. The adequacy of the periodic reports (that are to be submitted under IV. A. 3. g.) and the usefulness of the annual review (that is to be conducted under IV. A. 3. h.) are crucial to future compliance with IV. A. 3. g. that requires OPSO to assess, annually, all data collected and make any necessary changes.

3. Monitor Frasier has been given real time off site, read-only access to the incident reporting system (VANTOS) so that incident reports can be reviewed on a contemporaneous basis. This has been helpful. However, the Monitors do not have ready access to the results of the review of incident reports and any follow up. The Monitors also do not have ready access to the investigations by ISB. Access of the reviews, follow ups, and investigations would enable the Monitors to provide feedback on a timelier basis and assist in correcting deficiencies.



**IV. A. 4. Early Intervention System - Outstanding Recommendations**

1.     Continue to work with Monitors to develop comprehensive policies and procedures for an Early Invention System.  At the least, the Early Intervention or warning system would collect data such as uses of force, grievances, complaints handled at the facility level, absences, etc.

2.     It is recommended that the Monitors Frasier and McCampbell be given real time off site access to the Early Intervention system (VANTOS) so that data can be reviewed on a more contemporaneous basis.  This would enable the Monitors to provide feedback on a timelier basis and assist in correcting deficiencies.

**IV. A. 5. Safety and Supervision - Outstanding Recommendations**

1.     Policies regarding inmate supervision, rounds, inspections, shakedowns and communication need to be finalized.

   a.     The policy must include accountability methods for ensuring that deputies and supervisors conduct their rounds timely.  Anytime an incident occurs, it must be routine practice to include examination of source data to determine whether rounds have been conducted timely in the area.  The results of the determination should be documented.

**IV. A. 6. Security Staffing – Outstanding Recommendations**

1.     OPSO and the City must engage in meaningful discussions regarding raising the starting salary for OPSO to a level competitive in the New Orleans job market.  Time is of the essence.

2.     OPSO and the City need to adequately resource recruitment, background investigations, and training for newly hired employees.

3.     OPSO's recruitment activities should highlight and focus on the skills, knowledge and abilities needed for officers in a direct supervision environment.

4.     OPSO's pre-service and in-service training needs to be substantially enhanced to include the soon-to-be updated policies and procedures

5.     OPSO should develop a retention plan to keep officers and employees it worked hard to recruit, screen and train.

6.     OPSO's staffing plan should include contingencies for circumstances in which not a sufficient number of employees can be hired, or retained.

7.     OPSO should begin the process of keeping detailed data regarding recruitment, applicant screening, and attrition.

8.     The Sheriff should provide data to the Court and the City regarding hiring difficulties, or employee retention issues, based on salary.

9.     The Sheriff should fully implement the provisions of the Partial Settlement Agreement.  This includes analysis, and hiring for mid-management and leadership positions from a candidate pool with jail/corrections experience.

10.    Working with the OPSO's human resources professionals, develop a meaningful list of benchmarks for hiring and retention, as well as to proactively problem-solve regarding overtime and supervisory oversight.

11.    OPSO must generate a credible and resourced hiring plan. Working with the OPSO's human resources professionals, develop a meaningful list of benchmarks for hiring and retention, as well as to proactively problem-solve regarding overtime and supervisory oversight.

12.    OPSO should examine the background investigation and screening process to prevent hiring individual who are mismatched for the job.  There are specific competencies for officers working in direct supervision, different from tradition architecture.  These competencies (e.g. communications, problem solving) should be incorporated in advertising and screening.

13.    Work with the Monitors and Plaintiffs to revise reporting now in the Consent Judgment to more useful and relevant information. (Section IV.A.6.a.4.i-vi.)

14.    The OPSO should add administrative staff to support gaining and sustaining compliance with the Consent Judgment.

15.    Complete, with the assistance of the Monitors, an adequate staffing plan.  This includes an examination of the rank structure, span-of-control, and deployment.



16. OPSO must produce an organizational chart that maximizes staffing and accountability.
17. Develop written policies and procedures (or divisional directives) to guide recruitment, background investigations, hiring processes, and required updates (e.g. PREA-related). The directives should provide sufficient detail as to be able to be audited for compliance.
18. Working with all parties, there needs to be a decision about the staffing plan and the calculation of the shift relief factor, at least given the current data.

## IV. A. 7. Incidents and Referrals - Outstanding Recommendations

1. Develop, implement, and train on the revised policy regarding incident reporting.
   a. In particular, the policy and the training on the policy needs to stress that all reportable incidents are to be reported and properly investigated and that failure to report will result in discipline and/or remedial training.
   b. In addition, supervisors need to be trained on the mechanisms to ensure that all reportable incidents are properly reported and investigated in accordance with the policy.
   c. The policies will need to set out in detail the timelines and how each step of the review process and data collection is to take place and who is responsible for enforcement of each deadline. See Section VII. and VIII. (Compliance Report #1)
   d. The policies will need to set out in detail the timelines and how each step of the review process and data collection is to take place and who is responsible for enforcement of each deadline. See Section VII. and VIII. (Compliance Report #3)

## IV. A. 7. Investigations – no outstanding recommendations

## IV. A. 8 Investigations - Outstanding Recommendations

1. Provide additional training regarding how to conduct investigations in a corrections/jail setting regarding sexual abuse, assault, harassment, and voyeurism (PREA related).

## IV. A. 9. Pre-Trial Placement in Alternative Settings – Outstanding Recommendations

1. Update policy 50.15 to assign accountability for periodic review of ICE detainers to ensure they not expired.
2. Demonstrate that staff working in intake/records has been trained to monitor ICE detainers.

## IV. A. 10. Custodial Placement within OPP – Outstanding Recommendations

1. Develop and circulate among OPSO executive and supervisory staff standardized automated reports.
2. Continue the audit process to verify the actual housing location of the inmate to ensure matches housing assignments generated by classification.
3. Hire four classification specialists to fill the unit roster and additional classification auditor for housing audits and interviews/contact of detainees on the pods.
4. Complete custody reviews within 72 hours of the time the case appears on the classification monitor log.
5. Revise the monthly statistical reports to accurately track the custody distribution of OPSO offenders by housing unit race and gender during the last quarter.
6. Generate monthly custodial reports by 10th of month.
7. Require all pod deputies to use the ISI to maintain appropriate pod level separations.
8. Develop QC processes to ensure the integrity of both the classification and disciplinary processes.
9. Provide access to the videos of disciplinary incidents to the DHO and Deputy.
10. Provide ongoing training and monitoring to ensure the classification staff complete the custody and PREA assessments correctly. A systematic random audit process should be implemented to monitor accuracy of the risk factor scoring as well as housing assignments.
11. Provide remedial training on how to read and interpret NCIC criminal history reports and review mandatory restrictors to the classification specialists.



12.     Provide remedial training on how to complete custody and PREA assessments.
13.     Create statistical reports to track offender populations.
14.     Implement the Inmate Classification Policy and Procedures (501.14), PREA Policy, and inmate discipline code to reflect revised policies.
15.     Revise the inmate handbook to address questions and concerns noted by the monitors.

**IV. A. Prisoner Grievance Process – Outstanding Recommendations**
1.     Refine the record keeping ensuring that the most prevalent grievances topics are documented, including trends.  Ensure that medical and mental health operational procedures are consistent with OPSO policies, and that there is consultation regarding grievances related to medical/mental health/dental care.
2.     Ensure that all employees are trained regarding the grievance process, and their role.
3.     Revise the policy to provide for assistance to inmates in filing a grievance, due to LEP, mental illness or disabilities, or when an inmate requests assistance.
4.     Assure that paragraph (6) is addressed in terms of reports to the Monitors regarding inmate grievances.
5.     Ensure that medical and mental health contract provider's procedures are consistent with OPSO policies, and that there is consultation regarding grievances related to medical/mental health/dental care.
    a.   Work with CCS to resolve the grievance backlog.
    b.   Arrange for periodic meetings to discuss trends, data, and assure that the numbers regarding grievances maintained by OPSO are consistent with those maintained by CCS.
6.     Analyze the inmate requests for service/information, determine the most prevalent requests, and develop a plan to address those issues to help avoid the need for inmates to file "grievances".  This will be a critical part of the operation of direct supervision environment.
7.     Consider using the Early Warning System to track staff whose name appear in grievances who may need supplemental training.
8.     Continue periodic meetings between security and medical to discuss trends, data.
    a.   Assure that the numbers regarding grievances maintained by OPSO are consistent with those maintained by CCS.
9.     Continue periodic meetings between security and medical to discuss trends, data.  Assure that the numbers regarding grievances maintained by OPSO are consistent with those maintained by CCS.
10.    Develop lesson plans, and train staff, contractors and inmates.
11.    Consider using the Early Warning System to track staff whose name appear in grievances who may need supplemental training.
12.     Resolve the discrepancy that exists between OJC's and CCS' data regarding the number and resolution of grievances.
13.    Assure that reviewers and investigators assess the extent to which staff are threatening inmates for filing grievances, or otherwise impacting an inmate's access to grievances, in a retaliation-free environment.

**IV. A. 12. Sexual Abuse – Outstanding Recommendations**
1.     Continue to work on implementation and the results of the PREA-self audit.
2.     Arrange for training for SOD and IAD investigators.
3.     Assure that there is a plan for collaboration between classification and PREA initiatives in terms of process and content going forward.
4.     Develop the strategies to begin using the PREA videos, including assuring that staff see the videos and receive the relevant training.
5.     Assure that CCS' policies/procedures (B-05) are PREA compliance, including training for CCS staff on recognizing signs of sexual abuse.  Assure that other CCS policies are consistent with requirements of PREA (e.g. mental health care, follow-up medical care).



6.    Assure any and all new contracts for services at OPSO require vendor compliance with applicable PREA standards.
7.    Conduct the mock audit; prepare for full audit.
8.    Provide training for medical staff regarding recognizing the signs and symptoms of inmate sexual abuse/assault.  Evidence of this training must be provided before the next tour.

**IV. A. 13. Access to Information - Outstanding Recommendations**
1.    Complete OPSO policies and procedures, edit the Inmate Handbook, produce.  Assure that there is consistency of housing unit operation through requirement of staff/inmate meetings, and establishment of measureable ways to assure housing units are effectively managed (e.g. cleaning standards, grievances, noise, condition of individual cells, laundry, etc.).
2.    Prepare lesson plans and train staff.



**Appendix C**

**IV. B. Mental Health Care – Outstanding Recommendations**

1. OPSO should increase professional staffing to provide sufficient access to qualified health professionals for patients with serious medical needs; increase support staffing to provide for constructive and meaningful clinical performance measurement to advise medical management of areas for intervention and to track performance in these areas over time; intensify training and supervision of nursing staff perform their duties in a timely and professional manner.
2. OPSO and CCS should finalize drafts for review by the parties.
3. OPSO should validate its screening instrument for mental health needs and assure that the actual need is met for mental health therapeutic interventions.
4. CCS should continue the process of identification of mental health caseload prisoners and their level of care (acute, residential/step-down, and outpatient) needs.
5. CCS to submit staff composition of each treatment team, schedules, and reviews of treatment plans.
6. CCS document and log referrals and risk profiles.
7. CCS to complete initial assessment of the screening process.
8. CCS to fill all budgeted staffing positions, and assess for adequacy to provide full array of mental health services.
9. CCS to continue to develop and implement Quality Improvement Performance Measures.
10. CCS to collect and analyze specific data regarding counseling services provided in each category.
11. Complete in-service training for all staff as per Consent Judgment.
12. CCS to aggressively recruit to fill the vacant positions at Hunt
13. Revise quality improvement data collection documentation for specificity on these elements.
14. Provide training and supervision of CNAs with regard to direct observation, both in TPV and TDC as well as in the IPC as there have been suicide attempts in the IPC.
15. Provide training to mental health staff and correctional staff with regard to direct observation of inmates who have been referred or presented with concerns for suicide or self-harm and appropriate direct observation/supervision of those inmates by custody staff until they are seen and evaluated by mental health staff.
16. CCS to develop and present a CNA to prisoner ratios of 1:1 or 1:2 for direct observation rather than the current practice of 1:5 or possibly more inmates who are inadequately observed.
17. Assure that when therapeutic physical restraints may be indicated for prevention of self-harm, they are indeed utilized for the shortest possible time period, and properly supervised, monitored, reported, and assessed
18. Maintain use of restraint logs for both physical and chemical restraints
19. Review, revise, and implement policies at Hunt to include mental health staff and possibly specifically trained nursing staff in de-escalation techniques.
20. The movement of inmates from OPSO facilities did proceed in September 2015 and was completed with the transfer of TDC inmates who were receiving male step-down mental health services and female acute/sub-acute and step down mental health services in TDC during February 2016.  While the purpose of this movement was to transfer inmates out of OPSO facilities, it has not gone smoothly with regard to mental health services in that the collaboration between mental health and custody for the provision of adequate suicide prevention and management, structured therapeutic activities and unstructured out-of-cell time to promote appropriate behavior by inmates with other inmates and staff, and counseling services is inadequate and unacceptable.- The immediate need for resolution of how and where these services, both mental health and medical, are provided to inmates currently and in the future cannot be overstated.
21. The practice of placing inmates who are on suicide watch or constant observation status as determined by CCS but remain housed at OJC for extended periods of time while undergoing



further evaluation to determine whether they are appropriate for transfer to the Hunt acute/sub-acute services is continuing at unacceptable levels. This includes inmates on constant observation or suicide watch, housed in cells that are not suicide resistant for 23 hours/day, and minimal to no psychotherapeutic interventions other than medications and observation. The services provided at OJC are not adequate for acute/sub-acute or step down/residential services. To label these units or services as "mental health" is simply that, "a label", but certainly not accurate or adequate in that the services required to meet the necessary mental health needs of inmates are not being provided.

22. Increase the frequency of treatment team meetings and reviews of treatment plans at Hunt and OJC.

23. Continued monthly meetings of the Mental Health Review Committee, and appropriate documentation of identified performance measures, problems and issues with regard to mental health services and follow-up on corrective actions.

24. Clarify the information to be provided to hearing officers regarding inmates on the mental health caseload.

25. Identify the level of need for inmates in the OPSO with regard to the specific services.

26. Provide suicide prevention and observation in suicide resistant cells, and there are none at OJC despite male and female inmates being placed on suicide watch and direct observation in OJC in unsafe and non-suicide resistant cells on multiple units.

27. CCS to demonstrate reviews of all serious self-harm attempts and assess the periodic reports to determine if inmates are appropriately identified, protected and treated.

28. CCS must begin tracking and provide services to inmates on the mental health caseload who have been identified as victims of assault or other crimes (including sexual assault) while at OJC or Hunt.

29. The defendants must develop a policy to provide emergency medications to inmates, as needed. This deficit results in direct harm to inmates, as well as a disruption to the facility, and danger to inmates and staff.

30. The defendants and the City must obtain acute hospital level services for female inmates. The absence of these critical services results in on-going harm to the inmates as well as facility

31. Documentation of the reasons for and timeliness of responses to referrals and risk profiles by CCS and security.

32. The Defendants and CCS change the referral policy to include revised timeframes as discussed on-site, and included in this report, as well as those timeframes being applicable to all staff based on the level of referral which will include psychiatrists, nurse practitioners, and mental health professionals.

33. OPSO and CCS develop a collaborative process for the management and supervision of inmates on suicide precautions.



**Appendix D**

**IV. C. Medical Care – Outstanding Recommendations**

1. OPSO should track and trend initial and annual training on withdrawal and detoxification for custody staff and medical and mental health staff and provide sufficient oversight to assure compliance.

2. OPSO should add inquiry into the degree of risk of withdrawal and should require initial measurement of vital signs, in addition to periodic monitoring following the CIWA-AR protocol mentioned in Appendix B of the Consent Order.  Further, the OPSO should test the validity and reliability of nurses' performance on the initial screening and appropriate follow-up, according to policy and physician orders.

3. OPSO should initiate annual training for custody staff on withdrawal and detoxification and provide sufficient oversight to assure compliance.

4. OPSO should revise its intake policy to reflect adequate screening for risk of withdrawal.

5. Develop and implement training for custody staff on recognition of urgent medical conditions.

6. OPSO resume pre-service training and provide annual training for custody staff on withdrawal and detoxification.  OPSO provide sufficient oversight to assure compliance.

7. OPSO, in conjunction with CCS, develop and implement training for custody staff on recognition of urgent medical conditions.

8. OPSO provide sufficient oversight to assure compliance.

9. OPSO increase staffing on units housing inmates.  This may result in closed housing units.  It is better to have fewer housing units that are safe than more housing units that appear to be unsafe for the provision of health care services.

10. OPSO provide, and CCS use, radios for health care staff working on housing units.

11. CCS continue training and supervision of nursing staff, including cross training for all nursing and administrative functions.  *Nursing supervision has improved.  Cross-training is deficient.*

12. OPSO should improve tracking systems for follow-up appointments, medication orders, and laboratory testing and develop systems for documenting all care in a single, unit medical record, whether it be paper or electronic.  *Currently, there is a unit medical record.  Tracking systems remain deficient.*

13. Develop quantitative and qualitative data analysis for clinical data, including performance measuring, mortality review, grievance analysis, etc.  Use these analyses to drive constructive change in medical care policies and practices.  *Current process has improved, but remains seriously deficient.*

14. OPSO should develop, implement, and maintain a system to ensure that trends and incidents involving avoidable suicides and self-injurious behavior are identified and corrected in a timely manner.

15. OPSO should enhance its morbidity and mortality reviews to incorporate information received subsequent to the initial review and should amend corrective action plans therein.  *No progress.*

16. Fully implement its corporate quality improvement program, including developing a quality management plan, measurement of clinical performance, integration of all quality improvement activities under one committee, tracking and trending of results, and annual evaluation of the program.  On-site health care leadership should become more involved in the quality management program. *Repeat recommendations; no progress.*

17. Continue development of the Mental Health Review Committee including the designated membership and provision of minutes of those meetings to assure they address the appropriate mental health statistics as specified in the Consent Judgment.

18. Continue monthly meetings of the Mental Health Review Committee with the designated membership and provision of minutes of those meetings to assure they address the appropriate mental health issues as specified in the Consent Judgment.



19.     CCS test the reliability of measurements by having a qualified reviewer who is not the supervisor of staff being reviewed. *No progress.*

20.     CCS track and evaluate the effectiveness of remedies implemented as a result of its quality management program, including grievance analysis, clinical performance measurement, and morbidity & mortality reviews. *Repeat recommendations.*

21.     At the LaSalle facilities, assure privacy for patient encounters and assure that staff is trained in suicide risk reduction.

22.     OPSO should assure medical care facilities that are clean, safe, and secure.

23.     OPSO should provide clean linens for inmates and disinfection of mattresses between users.

24.     OPSO should assure that the utilization management system used for off-site services meets nationally-accepted criteria for medical necessity.

25.     OPSO should monitor timely access to care for patients with acute health care needs and for patients who need continuity of care and/or medications.

26.     OPSO should review and respond to grievances with a self-critical attitude and should track and trend health services grievances as part of its quality management program.

27.     OPSO should assure that health care staff conforms to standards of professional ethics in general, including assuring that health care and custody roles are clearly delineated and separated.

28.     OPSO should assure that co-payments are charged for actual visits, not intended visits.

29.     CCS continue to measure and track clinical performance as part of its quality management program.

30.     CCS revisit its policies and clinical guidelines for pregnant inmates, consistent with nationally-accepted recommendations for obstetrical care for high risk patients.

31.     CCS cease classifying pregnancy as an illness requiring housing on a special housing unit, unless the patient is particularly vulnerable.

32.     CCS revise the methodology for measuring discharge medications and grievances to that it produces reliable and useful information.

33.     Defendants assign security staff for continuous coverage on each housing unit.

34.     OJC provide appropriately stocked first aid kits and cut-down tools for each housing unit.

35.     CCS test the reliability of training log data against current staffing.

36.     CCS evaluate the retention of training information with a 5% sample of deputies three months following their training.

37.     CCS train and supervise nurses in proper history taking, physical examination and documentation following trauma.

38.     CCS and OPSO develop and implement a policy on restraint use including training.

39.     Defendants assure that out-of-parish inmates at the LaSalle facilities have access to psychiatric care, where medically appropriate, for the purposes of evaluation and medication management.  In the alternative, return out-of-parish inmates with serious mental health needs or who are on psychotropic medication to OJC.

40.     Defendants assure that out-of-parish inmates at the LaSalle facilities have proper oversight of medication administration.

41.     OPSO and CCS assure that the screening process for out-of-parish transfers is medically appropriate.



**Appendix E**

**IV. D. Sanitation and Environmental – Outstanding Recommendations**

1. Develop a policy and procedures implementing a training program for all officers working posts which are required to oversee and manage housekeeping including employees who are conducting the inspections. Procedures should include measureable standards and accountability to assure a sustainable cleaning and housekeeping program. (IV.D.1.a.)

2. Develop a policy and procedures implementing a training program for all staff and inmates who will handle cleaning chemicals including, but not limited to:
   a. Cleaning chemical safety, the effective use of any cleaning chemical, personal protective gear that anyone handling chemicals are required to use (gloves, face protection, eye protection, skin protection, etc.). (IV.D.1.a.)

3. Develop a cleaning and disinfection manual describing the methods to be used, chemical use, and tools needed for effective housekeeping. (IV.D1. a.)

4. Develop a process for Facilities Maintenance to provide electronic notification to Classification when repairs have been completed for a closed cell. (IV.D.1. a.)

5. Provide a current training schedule and tracking logs to demonstrate all deputies and supervisors are trained in the process of requesting work orders. (IV.D.1. a.)

6. implement written policies and procedures governing the provisions regarding preventive maintenance plans (IV.D.1.b.). These policies and procedures may include, but are not limited to:
   a. Training employees to file timely work orders meeting the 24 and 48-hour requirement of this provision.

7. Monitor and adjust the shower run time as necessary to reduce condensation and lower the risk for accidental slips and falls. (IV.D.1.c.)

8. OPSO establish a documented training program for all employees who are assigned, or will work in control room on all shifts on the locations and use of emergency keys. (IV.E.1.e.)

9. Provide training to inmates, housing officers and supervisors on rules for food storage and trash removal and the items inmates are permitted to keep in their cells and/or included in the inmate handbook. (IV. D.1. e.)

10. Enforce what is permitted and where personal items and food are to be stored by inmates (IV. D.1. e.)

11. Implement written policies and procedures addressing the requirements of biohazardous cleaning and universal precautions (IV.D.1.f.) which may include, but not limited to:
    a. Designating one or two posts per shift responsible for managing bloodborne pathogen and biohazardous spill cleanup.
    b. Creating a step by step procedure that trained employees and/or inmates will be expected to follow, including the use of spill kits, personal protective equipment (skin protection, gloves, face masks, designated red bags, disinfecting chemicals etc.
    c. Training for all staff and inmates required to handle bio-waste.

12. Complete and authorize an up-to-date Infection Control Policy and provide evidence of training. (IV.D.1.f.)

13. implement written policies and procedures addressing cleaning chemicals that sufficiently destroy the pathogens and organisms in biohazard spills (IV.D.1.g.) that includes, but is not limited to:
    a. Concentrations for cleaners and disinfectants to be used for clean-up from a biohazard spill.
    b. Conducting OSHA-required training on the safe and effective use of any hazardous chemicals used to clean and disinfect surfaces.
    c. Assuring inmates who are provided training are provided properly diluted cleaning and disinfection chemicals to clean and disinfect all areas within housing dorms, tiers, and cells.



14. Provide evidence of use of the biohazardous waste spill kits including, but not limited to: Incident reports, spill response and inspection reports, number of spill kits used and where on the semi-annual report. (IV.D.1.g.)

15. Develop and implement written policies and procedures governing an infection control plan (IV.D.1.h.) that includes, but is not limited to:
    a. Management of contact with bloodborne, and airborne hazards and infections
    b. Identification, treatment, and control of Methicillin-Resistant Staphylococcus aureus ("MRSA") at the Facility.
    c. Training of all affected employees on implementation of the plan.

16. When the responsibility to implement this provision regarding annual training for food service staff, and assigned inmates (IV.D.3.a.)  is determined, either the food service contractor or OPSO develop and implement written policies and procedures addressing this paragraph that includes, but not limited to:
    a. Providing evidence of annual training for all kitchen personnel including inmate workers in basic sanitation and in specific work assignments.
    b. Training records note the topic, the date of the course, name of the trainer, and evidence of knowledge gained by participants.
    c. Developing and using course outlines/lesson plans that are based on food code requirements and OPSO food service polices for all the topics, including:  handwashing, cooking times and temperatures, food storage practices, equipment specific and area cleaning and sanitization requirements, maintenance of equipment, equipment specific use instructions, warewashing, employee health and personal hygiene requirements, hot and cold food holding times and temperature requirements, correct procedures for thawing foods etc.

17. Reinstitute an accurate inventory and sign-in/out process for chemicals and tools. (IV.D.3.a.)

18. Develop and implement written policies and procedures addressing cleaning of and sanitized food service related equipment (IV. D. 3.b.) that includes but not limited to:
    a. Establishing requirements for cleaning and sanitization and a cleaning schedule and plan for each area and specific equipment, and include what is to be cleaned, how it is to be cleaned (following the equipment manufacturer's instructions from the operations manual), who is responsible for the cleaning, (if an inmate, who supervises him/her needs to be identified), and the frequency of the cleaning.  The completion of the cleaning should be documented on a form by the initials of the person completing it.  Those documents should be reviewed by the Food Services Director for completion and maintained in the Director's office.

19. OPSO, working with the food service vendor, develop and implement written policies and procedures addressing checking and recording temperatures (IV.D. 3. c.) that includes, but is not limited to:
    a. Identifying all refrigerators, freezers, hot and cold food holding equipment, and warewashing equipment located in all facilities.
    b. Scheduling the frequency that temperatures are measured and recorded in accordance with the Louisiana food safety regulations.
    c. If the food service contractor is responsible, a trained OPSO supervisor should review temperatures logs, and assure that work orders are submitted when monitoring indicates equipment that is not operating as designed.
    d. Training of employees in the monitoring and recording process.
    e. Developing temperature logs for all equipment where potentially hazardous food is held and where kitchenware and utensils are cleaned and include a record retention schedule.

20. Establish management review of the logs that demonstrate that corrective actions were completed when logs indicate non-conformities to policy/procedures. (IV.D.3.c.)

21. implement written policies and procedures addressing periodic reporting on sanitation and environmental conditions (IV. D. 4.a.) that includes, but is not limited to:



a. Assuring that the tracking mechanisms are in place to record the required information. Such documentation may include health department reports, pest control reports, preventive maintenance work order system reports, inmate grievance logs, and maintenance logs.
b. Analyzing and using the data to document trends and develop management responses to address provisions of the Consent Judgment.



**Appendix F**

**IV. F. Language Assistance – Outstanding Recommendations**

1.    Continue to work with monitors to develop comprehensive policies and procedures for a Language Assistance Program.

2.    Once a comprehensive policy has been written, all corrections and mental and health staff should begin to receive the training required under the Consent Judgment.  It may be possible for some of this training to be computer based.

3.    OPSO and the policy consultant should continue to work with the Monitors to develop comprehensive policies and procedures for a Language Assistance Program.

4.    When a comprehensive policy has been finalized, all corrections and mental and health staff should begin to receive the training required under the Consent Judgment.  It may be possible for some of this training to be computer based.

5.    The plaintiffs and defendants should confer regarding the requirements of IV. F. 3.a. and advise the Monitors.



**Appendix G**

**IV. G. Youthful Prisoners – Outstanding Recommendations**

1. Develop and implement written policies and procedures to comply with this paragraph.  See also the measures of compliance.
2. Continue to work with the staff at the Youth Study Center to identify opportunities for programming and collaboration.
3. Carefully oversee the upcoming mental health contract for services to assure that programming is provided to the juveniles in custody.
4. The City's Office of Criminal Justice Coordination should work with all criminal justice system partners to examine ways to reduce the number of juveniles charged as adults, and/or other options to prevent their being held in an adult jail.
5. Prepare the plan required by May 1, 2015 regarding programming
6. Immediately Hire/retain an individual(s) with the skills and qualifications to develop programs, solicit volunteers and other providers, and oversee the programming.
7. The Sheriff and the City need to develop strategies to bring compliance with this requirements (sight and sound separation for female juveniles and appropriate separate for male juveniles) and to the extent possible given the physical plant limitations, not use locking down juveniles as a means of population control.
8. Find alternative housing for juveniles other than OJC.



**Appendix H**

**VII.  Compliance and Quality Improvement – Outstanding Recommendations**
1.   OPSO continue to work with the monitors to develop this quality improvement system.
2.   Ensure that there are written policies and procedures that support these functions, including periodicity of reporting, and accountability.
3.   OPSO continue to monitor the performance of the vendor, as well as provide internal assets to review the policy drafts before forwarding to the Monitors for review.
4.   Produce the required reports.
5.   Complete the lesson plans, train the trainers, schedule, conduct, and evaluate the training.
6.   OPSO should consider hiring staff who are qualified to assist in the collection, analysis and management to data (e.g. a planning and research person).
7.   Complete the relevant written directive.



**Appendix I**

**VIII.  Reporting Requirements and Right of Access**

1. Ensure that there are written policies and procedures that support these functions, including periodicity of reporting, and accountability.

2. Prepare a written policies and procedures that support these requirements, including periodicity of reporting, and accountability.

3. Complete written directives required by the Consent Judgment and those needed to operate a jail system.

