# Orleans Justice Center
## 60 Day Update – May 1, 2018

**Inmate Safety**

The first priority is a reduction in the number of inmate assaults, regardless of whether they are inmate-on-inmate or inmate-on-staff, as well as total prevention of suicides and a reduction in the number of suicide attempts. Staffing is an obvious impediment to accomplishment of many of our goals, and this is no exception. Recently, the leadership team under the direction of Director Hodge considered and has adopted a new approach to managing jail operations prior to reaching our full staffing strength.

For several years, the OPSO has made efforts to operate each of its pods in a direct supervision model. Those efforts have fallen short, first and foremost due to a chronic lack of staff available to man all posts, essentially setting staff up for failure from the start, as it is impossible for proper direct supervision to occur when a deputy is assigned to more than one unit. Recognizing that this strategy will continue to increase the stress on our staff while reinforcing practices which contradict the principles of direct supervision, the OPSO will temporarily utilize a hybrid operation model to more effectively manage the facility. We note that this plan is still under development and is subject to modification as the team continues to move forward.

We will operate several special-population pods under direct supervision, utilizing post-orders, policies, and a supervisory model intended to ensure that staff remain on housing units, interact with inmates, and apply the principles of direct supervision. Direct supervision operations will initially be targeted at special population housing pods:

    2-A   Mental Health

    2-B   Administrative Segregation / Protective Custody

    2-C   Youth

    3-B   Mental Health Step Down

  3-C   Disciplinary

  3-D   Female Mental Health / Disciplinary

  4-A   Low/Medium Security Medical

  4-B   High Security Medical / High Security Overflow

The remainder of the facility will be operated in an indirect supervision format. OJC is physically constructed in a way to allow indirect supervision of inmates from each of the control booths overlooking two pods. These units will be supervised by a single deputy who is assigned to both pods on a wing (A/B, C/D, E/F). All control pods will be manned by a civilian monitoring technician. Post orders will direct the assigned deputy to rotate between both housing units and to conduct all 30-minute security checks on indirect supervision units, speaking with inmates, visually inspecting cells, and resolving any issues which are apparent. The civilian monitoring technician will supplement this supervision from the control booth through a combination of use of visual observation, video observation, and audio observation. A rover will be assigned to each floor and will be responsible for handling all transports, feed-up management, and will supplement with security checks when not otherwise occupied.

Any situation involving a need for assistance on the unit would prompt an immediate radio call from either the pod deputy or control booth civilian monitoring technician to main control to provide that assistance. Main control would issue an "all call" code signaling all deputies (with the exception of those assigned to special population pods) to immediately lock down their units and relocate to a predetermined area to stage a response to the situation. The leadership team met several times, including on April 23, 2018, and is developing an emergency response protocol and the training materials associated with that plan.

It is critical that both direct and indirect supervision post-orders be promulgated and trained upon for this hybrid system to work. Deputies must have a core understanding of both operational models as well as the ability to quickly access post orders to address issues as they arise. The leadership team under the direction of Colonel Colvin is already in the process of developing these materials on an emergency basis.

Part of the post-order and training process will be an emphasis on both deputy and supervisor log entry, an area in which we presently lack. Some of our deputies do a very good job at maintaining their respective logs, and copies of sample logs have been provided to other deputies. Complete and accurate log entry, along with supervisor review, analysis, and corrective action, are key to ensuring that staff maintain a constant presence at their posts and that supervisors are effectively doing their jobs.

It is our ultimate intention to implement the direct supervision version of our Unit Management plan, discussed later in this update, on all units. We will begin the first unit with the upcoming recruit class and will phase in additional units as additional staff become available. However, we believe that this recognition that we are not staffed sufficiently to fully implement the principles of direct supervision, as well as implementation of a supervision model which is capable of providing a safe and secure environment while staffing builds, will be an effective strategy to address several provisions of the stipulated order and increase compliance with the consent judgment.

**Operational Strategy: Unit Management**

The ultimate goal of the OPSO is to operate OJC, TDC, and the IPC under a unit management method in which all staff apply the principles of direct supervision. Unit management divides OJC into individualized and independent units, each consisting of one floor of the facility (six pods) managed by a "unit team." Each unit team is led by a lieutenant, who serves as the unit manager. The remainder of the unit team consists of two sergeants, six pod deputies, two rover deputies, and three control booth civilian monitoring technicians ("CMTs"). When applying the relief factor, a total of 1 lieutenant, 5 sergeants, 30 deputies, and 12 CMTs will be required to staff each direct supervision unit. An indirect supervision unit will require 1 lieutenant, 5 sergeants, 16 deputies, and 12 CMTs.

Staff will be assigned to, and remain with, a designated shift and unit. This serves as a departure from a building-wide operation where inmates may see different staff members every day as they are assigned to various locations throughout the building. This continuity will allow staff to

familiarize themselves with their fellow deputies and supervisors, to learn their individual capabilities, strengths, and weaknesses, and to grow as a unit within the chain of command. The unit team will know the inmates within their unit by name, and will learn their personalities, concerns, and how to quickly address their issues.

At the beginning of each shift, unit staff will meet with the departing shift to be briefed on any notable or ongoing issues. The shift will deploy from roll call with a sense of camaraderie, knowledge of what they are about to encounter that day, confidence that their teammates are there to assist with any issues they may have, and a sense of pride in their unit. Unit management will reduce staff turnover, develop a professional staff who strive for advancement in a career at OPSO, and expand our recruitment base.

Unit management also requires buy-in from the inmate population. Inmates must be educated on the process and informed that they are an integral part of the success of their unit being well run. The inmates will be provided with a wide range of on-pod programs and services, will perform jobs inside their pods and in the common areas of the units, and will develop a rapport with the unit team. A sense of trust between the inmates and the staff to resolve issues and disputes before they escalate is key to keeping the unit in control. If the unit is clean, calm, and quiet, inmates will be given more freedoms and privileges. Competitions for the cleanest cell, pod, and unit (which also had no incidents) will be conducted to provide incentives for the inmates to follow the rules.

A customized plan which is catered to the specific population(s) within that unit will be developed by the unit management team and approved by the facility captain and warden. The plan will outline the profile of the populations on each pod, contain policies and post-orders for operation of that unit, and establish schedules for the unit. Additionally, the unit team will collaborate and develop unit objectives, which are measurable goals based on persistent issues and which give staff a targeted objective over a predetermined period of time. For example, a unit team may decide that its unit objective will be to decrease inmate-on-inmate altercations by 15% over the period of a quarter. In the interim period between now and the point at

which we reach full staffing strength, the OPSO will operate even its indirect supervision units under a unit management protocol.

The Compliance Bureau will be tasked with assembling relevant data from each unit on altercations, uses of force, sanitation, grievances, adherence to classification, timeliness of feed-up and medication pass, and other data which can be used to score the units. Unit managers will be required to appear before the Compliance Bureau and executive team and discuss the reasons for any shortfalls, the formulas for any successes, and strategies to continue progress throughout the building. Effective analysis of the data will not only allow OJC to fine-tune its policies and operations to increase the safety of the staff and the inmates, but also to continue to improve quality of life for both groups as well.

**Sustainable Hiring**

The OPSO's Human Resources Director position became vacant in late February, 2018. The agency quickly collaborated with Segal Waters (an outside consultant), the monitoring team, and its internal staff to refine the position's job description. The job posting was widely circulated and 23 applications were received. A three-member panel was set up to review the applications for compliance with the position requirements and to thereafter narrow the applicant field to six candidates. Those six candidates each participated in an hour-long interview conducted by the panel and observed by Director Hodge and Sheriff Gusman. At the conclusion of the interviews, the panel collaborated and scored the applicants, after which a recommendation was made to the Director and the Sheriff.

The Director and Sheriff agreed with the recommendation and moved forward with the offer and hiring process, which was completed on April 12, 2018. The selected applicant has accepted the position and will begin the job on May 7, 2018. The HR Director has already been informed that recruiting and retention is OPSO's current first priority. The HR Director will be given full autonomy to structure the human resources department as deemed necessary to accomplish this task. The Director, the Chief Financial Officer, the General Counsel, and the training division will be working closely with the HR Director to ensure that all strategies for recruitment

and retention are fully and quickly implemented in an effort to rapidly increase staffing. The HR Director will utilize the assistance of Segal Waters and their forthcoming reporting as part of this effort.

In February, OJC/IPC lost 12 security deputies and 5 CMTs/intake clerks. In March, OJC lost 8 security deputies and 1 ISB agent. Hiring has not been completed during those two months, largely due to the departure of the previous HR Director. However, the agency still continues to move forward in the interim period 40 recruits participated in orientation on April 20, 2018, and began training on April 23, 2018. These recruits have an expected graduation date in June. Our plan is to train and utilize these new recruits to operate our first direct supervision unit under our upcoming Unit Management structure, described below.

Chief Tidwell resigned in March, and we will quickly move to fill that critical position. The job descriptions for the Chief of Corrections and for a corrections captain were posted on April 24, 2018, on ADP and to various national corrections-based resources. Those positions are posted "until filled," but the agency is moving with the appropriate haste to fill these critical posts. A $1,500.00 per year pay increase goes into effect on July 1, 2018, and we hope this furthers our efforts at retention and recruiting.

The promotion process will also undergo changes, with the agency implementing a test based upon policies and procedures and a panel interview. The testing instruments are currently in the early stages of development. We believe that this will increase morale agency-wide and provide incentive for all staff to strive for promotion.

In future reports, the agency will provide a more detailed explanation of the strategies that the new HR Director employs, as well as the results of those strategies on recruiting and retention.

**Policies**

Policy Director Debra Hammons continues to work to implement the changes suggested to the last round of policies sent to the monitoring team for review. On the last bi-weekly call with the parties, the Plaintiffs noted that the stage and extent of their involvement in the current policy review process is still not clear, and we agree that despite attempts to refine the

process, it remains cumbersome at best. While the updated tracking spreadsheet will be sent to the plaintiffs, actual improvements in efficiency of the process itself are elusive, and there is little to add other than restating the fact that the plaintiffs will be part of the process before the remaining policies are finalized. All approved policies have been added to a Dropbox which provides access to the parties.

We are beginning the process of a sixty (60) day phase-out process of the contractor presently working on the policies and will recruit and hire an additional staff member to add to the policy department to work under the supervision of Director Hammons. We believe this will expedite future work and provide a firm basis for the already necessary annual policy reviews and updates.

## PREA

The agency is making a significant effort, led by the Compliance Bureau manager Alexis Kyman and Sergeant Hazel Bowser, to achieve compliance with PREA and to complete its audit. The PREA team meets weekly and addresses five standards, the actions necessary to gain compliance, and identifies the accountable staff. The overarching issue of PREA training is actively being addressed, with over 300 staff being assigned to one of Sergeant Bowser's 180 minute PREA training, scheduled twice a week until completion. PREA First Responder cards are being passed out to all staff in the training, and these can be carried by staff to remind them what to do after any PREA incident is reported to them. Our goal is to successfully complete the audit by July.

## Stipulated Order Action Plan

The parties developed a Stipulated Order Action Plan as a way to outline and provide regular updates on the provisions of the stipulated order. The Plan has provided some benefit to OPSO through required analysis of already existing data which was not previously occurring, or it if was, it was not being documented. The process of taking these types of steps and documenting the actions taken is a critical one which will be applied to many more operational areas, which we believe will lead towards increased compliance with provisions of the consent judgment.

However, the plan needs some modification and reworking, as some of the actions are either not useful and/or already obsolete, and there are new action plan items which would likely be beneficial to all the parties. We believe that to be most effective, the plan should evolve as OPSO progresses through various stages of moving towards compliance. Depending on timing and availability of staff, we may have an updated version of the plan to share with the Plaintiffs by June.

**Incident Updates and Outcome Data**

February and March were both months which had a higher number of incidents than we consider acceptable in OJC. We continue to work on accurately capturing all incidents and timely notifying the monitors of those incidents. We received a suggested protocol from Ms. McCampell on April 14 pertaining to capturing of all data and are in the process of reviewing it to determine the feasibility and frequency of each step, as well as whether a separate position needs to be created to accomplish the processes laid out therein. In the interim, we provide the following incident and outcome data based on what we have provided to the monitoring team. As the footnotes indicate, any April data is through April 19, 2018.

*Inmate-on-Inmate Altercations*

| Month | 2F | 3D | 3F | Pods > 3 altercations | Disciplinary |
|---|---|---|---|---|---|
| February | 4 | 5 | 5 | 6 | 358 |
| March | 3 | 5 | 6 | 10 | 408 |
| April[1] | 0 | 1 | 3 | 0 | 236 |

In February there were 39 inmate-on-inmate altercations. 3F (female general population) had the most altercations with 5 and 2F (high security general population males) with 4 altercations. When taking a closer look at 3F, it appears that most altercations and other incidents which led to disciplinary write-ups occurred between the hours of 3:00 p.m. – 10:30 p.m. Pod 2F had a significant number of total reportable items at 71, mostly comprised of the 54 disciplinary write-ups, and it should be noted that the

---

[1] Through April 19, 2018.

vast majority of those incidents occurred between 7:00 a.m. and 7:00 p.m., with a drastic reduction in incidents thereafter.

In March there were 51 inmate-on-inmate altercations, with 3D (female mental health & disciplinary) and 3F (female general population) having the most altercations for the month with a total of 11 altercations between the two pods. While 2F again led the facility in the total number of incidents at 58, it was a significant reduction from February, and there was 1 fewer altercation in March. Once again on 3F, the majority of altercations and other incidents which led to disciplinary write-ups occurred between the hours of 3:00 p.m. – 10:30 p.m., which was the only consistent pattern seen between pod comparisons during this time period. The jail's leadership is analyzing the cause of the spike in incidents during that timeframe, and the lack of incidents in the morning hours despite the inmates being out, to determine whether the cause is because of a particular staff member, classification, or any specific operational issue. 2F's peak incident times shifted to 11:00 a.m. – 10:30 p.m. for March, a time period more consistent with the rest of the facility's general population inmates than what February depicted. Overall, there was no spike in altercations on any particular unit; rather, the number of units with 3 altercations or more increased from 6 in February to 10 in March, meaning that 42% of the pods experienced more than 3 inmate-on-inmate altercations for the month.

As seen in the data, 2F provides a continuous challenge to the facility, largely due to the security level of the inmates housed there combined with an effort to provide as much out-of-cell time as possible. In coming weeks as unit management is implemented, we believe that increased adherence to classification's separation instrument (ISI) and more responsibility placed upon our supervisors will reduce the number of incidents on several of our problem pods.

> The facility also wrote more inmates up for disciplinary infractions in March, and we hope that inmates being held responsible for their actions translates to a reduced number of incidents in coming months. Pod 2F (high security general population males) led the month of March with 45 disciplinary write-ups, significantly higher than the housing unit average of 16, and 19 write-ups higher than the next two

9

most written-up pods for March, 2E (high security general population males) and 3D (female mental health and disciplinary). An effort is underway to determine what impact the disciplinary housing on 3-C will have on subsequent months' data as inmates return to their units of origin and again have access to commissary and out-of-cell time.

*Inmate-on-Staff Altercations*

| Month | 2B | 3E | 2A | 3C | Pods w/Zero | Pods w/ >1 |
|---|---|---|---|---|---|---|
| February | 3 | 3 | 2 | 1 | 17 | 3 |
| March | 1 | 0 | 1 | 2 | 14 | 1 |
| April[2] | 1 | 1 | 1 | 1 | 15 | 0 |

There were 11 inmate-on-staff altercations in February, with 2A (male mental health) having 2 incidents, 2B (male administrative segregation / protective custody) having 3 incidents, and 3E (general population female) having 3 incidents.

There were 12 inmate-on-staff altercations in March, but the incidents were more spread out throughout the facility, with 3C (male disciplinary) being the lone unit with 2 incidents for the month. There was no discernable pattern of time of day or location for inmate-on-staff altercations. This is understood to some extent due to this being the disciplinary housing unit and houses only inmates already found to have violated facility rules, but any inmate-on-staff infraction is unacceptable. It should be noted that the females involved in the altercation on 3E were moved to female disciplinary (3D) and there were zero inmate-on-staff altercations, as well as a reduction in inmate-on-inmate altercations, in March.

---

[2] Through April 19, 2018.

*Suicide Attempts*

| Month | 2A | 2B | 3B | 3C | 4B |
|---|---|---|---|---|---|
| February | 8 | 4 | 0 | 6 | 1 |
| March | 2 | 1 | 2 | 1 | 0 |
| April[3] | 0 | 1 | 0 | 0 | 0 |

There has not been a suicide at OJC in 355 days. February had 21 incidents classified as suicide attempts. This number is excessive for any facility. A few units bore the bulk of the attempts: 2A (male mental health) had 8 attempts; 2B (administrative segregation / protective custody) had 4 attempts and 3C (male disciplinary) had 6 attempts. No other unit had more than 1 attempt. Attempts, when they occur, would be expected on 2A, given that that pod houses OJC's most seriously mentally ill males (outside of those housed at Hunt MHU), though 8 is an unacceptably high figure. On 2B and on 3C, a cursory review suggests that the attempts were efforts to manipulate their housing assignment from the two most restrictive units in the facility to less restrictive units. Because 3C was in its early days as a full-on disciplinary environment (meaning inmates have no commissary, drastically limited out of cell time, no televisions, and access to phones only to call an attorney), the facility expected an initial attempt to manipulate housing through suicidal attempts or ideations. Once inmates learned that the operational plan involved direct observation being conducted on 3C instead of via a relocation to 2A, inmates ceased this behavior.

March had 9 incidents classified as suicide attempts, a 57% decrease from February. The only units with multiple suicide attempts for March were 2A (male mental health) and 3B (mental health step-down), and many of the inmates on these units are already experiencing some form of distress. While it appears that these individuals were properly classified and housed, our goal is to have no attempts through a combination of treatment, programming, and identifying risk at its earliest stages. Our goal is to continue to see suicide attempts decline, particularly once we fully implement unit management.

---

[3] Through April 19, 2018.

8 PREA investigations were opened in February, and 11 were opened in March. As of April 20, ISB has opened 6 PREA investigations for the month. The facility's push towards PREA certification and the increased training of our staff will serve to reduce the number of the incidents leading to these investigations.

**Excessive Force:**

For the months of February through April, the FIT team is aware of one incident which they preliminary suspect could be determined excessive force. This incident is still under investigation; thus no details will be disclosed at this time. The individual involved is no longer employed by the contractor. The FIT team is handling several other force investigations, including several where the allegation of excessive force was made, but the preliminary review does not suggest that the investigation will conclude in a finding of excessive force.

**Out of Parish:**

Out of parish numbers continue to decline, with 49 in East Carroll Parish as of May 1, 2018, down from 91 in East Carroll Parish and 12 in River Correctional Center on March 1, 2018. This corresponds with a decline in total population to 1,334, down from 1425 on March 1, 2018 and 1,579 on May 1, 2017.