# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

_____

LASHAWN JONES, *et al.*, and ) 
THE UNITED STATES OF AMERICA, )

         )   Civil Action No. 2:12-cv-00859

   PLAINTIFFS,      )   Section I, Division 5

         )   Judge Lance M. Africk

     v.        )

         )   Magistrate Judge Michael B. North

MARLIN GUSMAN, Sheriff,    )

         )

         )

   DEFENDANT.      )

_____ )

_____

_____

### Report No. 9 of the Independent Monitors
### August 29, 2018

_____

Margo L. Frasier, J.D., C.P.O., Lead
Monitor Robert B. Greifinger, M.D.
Medical Monitor
Patricia L. Hardyman, Ph.D., Classification Monitor
Susan W. McCampbell, M.C.R.P., C.J.M., Administrative/Correctional Practice
Monitor Raymond F. Patterson, M.D., D.F.A.P.A., Mental Health Monitor
Shane J. Poole, M.S., C.JM., Environmental Fire Life Safety Monitor
Diane Skipworth, M.C.J., R.D.N., L.D., R.S., C.C.H.P., C.L.L.M., Food Safety Monitor

Email:
nolajailmonitors@nolajailmonitors.org
Web: www.nolajailmonitors.org





**Compliance Report # 9**
*LASHAWN JONES, et al., and the United States of*
*America v.*
*Marlin Gusman, Sheriff*

**Table of Contents**

|  |  | Page |
|---|---|---|
| I. | Introduction | |
| | A.  Summary of Compliance | i |
| | B.  Critical Issues – Opportunities for Progress | viii |
| | C.  Review Process of Monitors' Compliance Report #9 | xiii |
| | D.  Communication with Stakeholders | xiv |
| | E.  Recommendations | xiv |
| | F.  Conclusions and Path Forward | xiv |
| II. | Substantive Provisions | |
| | A.  Protection from Harm | 1 |
| | A.1. Use of Force Policies and Procedures | 6 |
| | A.2. Use of Force Training | 9 |
| | A.3. Use of Force Reporting | 11 |
| | A.4.  Early Intervention System | 16 |
| | A.5. Safety and Supervision | 18 |
| | A.6. Security Staffing | 24 |
| | A.7. Incidents and Referrals | 29 |
| | A.8. Investigations | 32 |
| | A.9. Pretrial Placement in Alternative Settings | 35 |
| | A.10. Custodial Placement | 36 |
| | A.11. Prisoner Grievance Process | 63 |
| | A.12. Sexual Abuse | 67 |
| | A.13. Access to Information | 70 |
| | B.  Mental Health Care | 71 |
| | C.  Medical Care | 90 |
| | D.  Sanitation and Environmental Conditions | 97 |
| | E.  Fire and Life Safety | 128 |
| | F.  Language Assistance | 141 |
| | G.  Youthful Prisoners | 143 |
| | H.  The New Jail Facility | 145 |
| | I.  Compliance and Quality Improvement | 146 |
| | J.  Reporting Requirements and Right of Access | 148 |
| III. | Status of Stipulated Agreements – February 11, 2015 and April 22, 2015 | 150 |



|  | **Page** |
|---|---|
| **Tables** | |
| Table 1 – Summary of Compliance – All Tours | v |
| Table 2 – Status of Compliance – Stipulated Agreements | v |
| Table 3 – Summary of Incidents January – June 2018 | 19 |
| | |
| **Figures** | |
| Figure 1 – Rates and Completion Time of Initial Custody Assessments 2017 to May 2018 | 47 |
| Figure 2 – Total and Guilty Inmate Disciplinary Infraction January 2017 – May 2018 | 59 |
| Figure 3 – Rate of Disciplinary Infractions June 2017 – May 2018 | 60 |
| Figure 4 – Rate of Disciplinary Infractions Inmates Found Guilty January 2017 – May 2018 | 61 |
| | |
| **Appendices** | |
| Appendix A - Summary Compliance Findings by Section Compliance Reports 1 – 9 | 161 |
| Appendix B – Summary of <u>New</u> Recommendations | 167 |



**Introduction**

  This is the ninth report, "Compliance Report #9" submitted by the Independent Monitors of their assessment of the Orleans Parish Sheriff's Office's (OPSO) compliance with the Consent Judgment of June 6, 2013. Report # 9 reflects compliance as of June 14, 2018; reviewed for this Report are incidents and compliance-related activities between November 2017 and July 2018.

  This report is prepared during the time OPSO's jail is under the leadership of Interim Independent Compliance Director Darnley R. Hodge, Sr., who was appointed by the Court on January 29, 2018, and who began work on February 19, 2018. Interim Director Hodge brings substantial knowledge of jail operations and has worked to gain compliance with the Consent Judgment.

  In summary, the Monitors find that safety, medical and mental health care, and environment conditions of inmates held in both the Orleans Justice Center (OJC) and the Temporary Detention Center (TDC) has improved, marginally, since the assessment provided to the Court in January 2018.   The specific initiatives are addressed in this report.



## A.  Summary of Compliance

Achievement of compliance with Consent Judgment, Stipulated Agreements, and Stipulated Order will bring the Orleans Parish Sheriff's Office (OPSO) and its correctional facilities -- Orleans Justice Center (OJC) and the Temporary Detention Center (TDC) -- closer to operating and sustaining a Constitutional jail system.

**Table 1 – Summary of Compliance – All Compliance Reports[1]**

| Compliance Report/Date | Substantial Compliance | Partial Compliance | Non-Compliance | NA/Other | Total |
|---|---|---|---|---|---|
| #1 – December 2013 | 0 | 10 | 85 | 76 | 171 |
| #2 – July 2014 | 2 | 22 | 149 | 1 | 174 |
| #3 – January 2015 | 2 | 60 | 110 | 2 | 174 |
| #4 – August 2015 | 12 | 114 | 43 | 4[2] | 173 |
| #5 – February 2016 | 10 | 96 | 63 | 4 | 173 |
| #6 – Sept 2016 | 20 | 98 | 53 | 2 | 173[3] |
| #7 – March 2017 | 17 | 99 | 55 | 2 | 173 |
| #8 – November 2017 | 23 | 104 | 44 | 2 | 173 |
| #9 – June 2018 | 26 | 99 | 46 | 2 | 173 |

The status of compliance with the two stipulated agreements (February 11, 2015 and April 22, 2015) is as follows:

**Table 2 – Status of Compliance with 2015 Stipulated Agreements[4]**

| | Substantial Compliance | Partial Compliance | Non-Compliance | NA | Total |
|---|---|---|---|---|---|
| August 2015 | 21 | 12 | 1 | 0 | 34 |
| February 2016 | 21 | 12 | 1 | 1 | 34 |
| September 2016 | 26 | 7 | 1 | 0 | 34 |
| March 2017 | 28 | 4 | 1 | 1 | 34 |
| November 2017 | 21 | 11 | 1 | 1 | 34 |
| June 2018 | 23 | 8 | 2 | 1 | 34 |

---

[1]   See Appendix A for a summary of historical compliance with each provision of the Consent Judgment.

[2]   Section IV.A.6. of the Consent Agreement was broken out into separate subparagraphs for the purpose of reporting.  This increased, therefore, the paragraphs from 171 to 174.

[3]   Paragraph IV.A.6. Security Staffing (a.) is in non-compliance. In fairness to OPSO, the Monitors evaluated the sub-paragraphs of this section and found that several are in compliance, partial compliance or non-compliance. These findings, however, do not erase OPSOs non-compliance in the critical issue of lack of staffing.

[4]   See page 150 for details.



For OPSO to demonstrate, obtain and sustain compliance with the requirements of the Consent Judgment and Stipulated Agreements (2015), OPSO must develop an infrastructure to support this work including alignment of policies, procedures, practices. The requirements of the Consent Judgment represent accepted correctional practice, while providing flexibility to OPSO for the application of the mandates.

Since 2013, OPSO has achieved compliance or partial compliance with more than 70% of the provisions; and substantial compliance has been achieved for only 16% of the provisions. Forty-seven of the 173 provisions remain in non-compliance.  To progress from partial compliance to substantial compliance (and sustain the substantial compliance), OPSO must build on the work it has done to date. OPSO must consistently implement policies and procedures, develop and provide the training necessary for staff to follow the policies and procedures, develop supervisors and mid- managers to lead both staff and operations, analyze data in a meaningful and useful manner to inform activities, and engage in root cause review and self-critical assessments.

The results of this organizational and management approach must then be reported to the Monitors in an organized, complete and accurate manner to demonstrate compliance. This strategy not only will allow the Monitors to measure compliance but allow the leadership of OPSO to make the improvements necessary to operate the OPSO correctional facilities in a Constitutional manner which complies with the Consent Judgment and Stipulated Agreements.

One example of how OPSO's compliance initiatives require attention is documented in the recent tour relates to the jail's video camera system. There have been frequent, documented problems with the jail's video camera system where, when supervisors or investigators attempt to look at the video footage of an incident, the investigators discover that a particular camera, or cameras, did not record. In Compliance Report #8, due to the frequency of the problem, the Monitors recommended that to ensure cameras were recording, periodic review of the cameras' functioning be made part of the inspection process. In preparation for the June 2018 tour, OPSO was asked for the "Documentation and analysis regarding any incidents where the video system was found to not be working properly." The response from OPSO was "[T]here



was no analysis of this request due the fact that they have not encountered any incidents this reporting period where the Video

Surveillance array had failed or individual cameras inoperable." The Monitors are aware that the video system failed multiple times during the reporting period including for investigative activities for serious altercations between inmates, uses of force, and an arson.

Another example of compliance deficiency relates to response to the Monitors' requests for data regarding discipline of staff members for failure to comply with the use of force policy. OPSO asserts it is in substantial compliance as no staff members were subject to discipline for failing to report a use to force during the first five months of 2018. While it is acknowledged that OPSO has made vast improvement in reporting of incidents, including uses of force, there are still incidents that are not reported, or are not reported timely.  The Monitors have received documentation of incidents where staff members failed to report a use of force or failed to meet the time requirements set out in the use of force policy for reporting and reviewing reports, but there was no discipline taken, despite a policy which requires documentation and appropriate discipline.

These circumstances reflect a failure to adequately and accurately assess and oversee compliance-related activities in preparation for the bi-annual Monitors' assessments as well as OPSO's ability to adhere to policy and engage in meaningful self- criticism.

After five years of insufficient progress, the Monitors recommend that OPSO examine current strategies to obtain and sustain compliance, consider structural and organizational changes necessary to achieve compliance, review subject matter expertise and staffing resources assigned to the initiative, develop accountability systems, and implement a supportive and responsive infrastructure. Working to achieve compliance with the Consent Agreement and Stipulated Agreements is consistent with the actions needed to operate a Constitutional jail.



**B.      Critical Issues – Opportunities for Progress**

The Monitors summarize below the critical matters identified in preparation of this report regarding OPSO's compliance with the Consent Judgment. These findings form the basis for new recommendations to assist OPSO to achieve and sustain compliance.

1. **Foundational Work** - The essential, core work required to achieve compliance includes:

    a. <u>Policies and Procedures</u> – OPSO completed drafts of the 34 outstanding policies and procedures by the court deadline of January 23, 2018. Since that time, much effort has gone into refining the drafts to ensure the policies and procedures prescribe how the facility operates and assure inmate and safety, in accordance with the Consent Judgment and accepted correctional practice. Importantly, these policies include those to guide emergency operations in the facilities. Work remains to review policies and procedures signed in 2017 which did not incorporate the comments/recommendations of the Monitors, DOJ, nor the attorneys for the Plaintiff class, as required by the Consent Judgment.  Additionally, lesson plans must be developed, reviewed, approved and implemented corresponding to the policies.  OPSO's newly adopted written directive system will also result in improvements to the policy/procedure process, allowing organizational components to develop their own specific operational practices that will be reviewed by OPSO administration.

    b. <u>Adequate staffing</u> – There is inadequate staffing in the facilities (OJC and TDC), based on OPSO's staffing analysis. Interim Independent Compliance Director Hodge has addressed part of the shortage by utilization of overtime. Despite these efforts, frequently, there are still housing units and control rooms that do not have assigned staffing; further assigned staff leave housing units and control pods unattended for meal breaks and other duties. These deficiencies include supervisory, mid-management, and leadership positions who,



viii

generally, do not have sufficient subject matter expertise to achieve and sustain compliance. The findings reported in Section IV.A.6, Security Staffing, overview compliance issues, and provide specific recommendations. One bright spot is the emphasis in the human resources division of OPSO on recruitment efforts, hiring requirements, and background investigation protocols to address the high attrition rate among newly hired employees. (See below discussion of recommendations of consultant for human resources.)

c. <u>Training</u> – Employee training, both pre-service and in-service, requires attention to ensure consistency with OPSO policies and procedures. The foundational work requires preparation of lesson plans to provide for a consistent instruction content, teaching by qualified individuals, and demonstration and documentation of students' knowledge gained. Recommended changes to the pre-service academy as far as class size, screening of recruits for ability to perform the essential functions, including physical requirements of the job, and skill-based training are in the process of being implemented.  One of challenges for the training academy is to train all employees on the newly implemented policies as having the policies on paper will not matter if staff are not properly trained.

d. <u>Supervision</u> – Safe operation of OPSO's facilities requires adequate and sufficient first-line and mid-management supervision.  Interim Independent Compliance Director Hodge has implemented the unit management approach and provided training and mentoring for the supervisors performing these roles.  Mentoring, coaching, and accountability for newly hired employees, as well as fulfilling the Consent Judgment's requirements, is a foundational need.

2. **Medical and Mental Health Care** – The Medical and Mental Health Monitors report challenges remain in the provision of basic case, staffing, and recordkeeping as well as collaboration with custody/security staffing.   Harm to inmates continues, particularly regarding mental health care.

ix



3. **Inmate Safety and Protection from Harm** - Providing a safe and secure jail continues to be a challenge.

   a. Unit Management—As noted above, Interim Independent Compliance Director Hodge implemented unit management to supervision of the housing units.  Each floor of the OJC, IPC, and TDC have been designed as a "unit". Under this strategy, a team is permanently assigned to each unit and responsible for all operations within the unit.  For example, for each floor at OJC, there is a team consisting of a lieutenant, sergeants, and deputies who work that floor exclusively.  This allows them to get to know the inmates, coordinate management of housing unit operations, work to insure consistency of work, and results in greater accountability for both staff and the inmates.  Since unit management has been put in place, the medical/mental health care provider has begun to assign medical personnel to be part of the teams and a classification specialist is also assigned to the teams.

   b. Violence - The level of violence within the facilities remains high – including inmate on inmate assaults.  High levels of disorder and non-compliance to the institutional rules result in staff's over-reliance on use of force to gain control and compliance.  No matter the data used to review violence-related trends, none is sustainability downward.  Incidents involving substance abuse overdoses inside the facilities, disturbances, and deaths of inmates continue to present serious challenges to the OPSO.

   c. Early Warning System (EIS) – The EIS remains compromised and precludes the required prompt identification of staff whose actions threaten inmate and facility safety.  The FIT Commander has developed a "work around" of the available software options of the EIS system both by use of technology and staff resources to track the required information.

   d. Classification – The classification processes require attention to ensure housing decisions and placements are consistent with OPSO policies and objective classification principles and credible auditing identifies issues

x



and corrects placements.   This includes development of subject matter expertise, accountability systems, interface with unit management, and collection, analysis, and development of corrective action plans, as needed.

e.  <u>Inmate grievances</u> – Questions and concerns, with the advent of unit management, are now submitted by inmates and forwarded to the unit/individuals responsible for addressing the respective issues, but attention is required as to the timeliness and adequacy of responses. Sustainable problem-solving and systemic fixes, as discussed as part of the review of "Quality Improvement," need attention.  Collaboration between OPSO and the medical/mental health contractor to address these grievances also requires work.

f.  <u>Incident Reporting</u> - Collaboration efforts for the reporting of incidents continues among the Monitors, OPSO, and the attorneys for the Plaintiff class/DOJ.  As discussed in this Report, progress toward identifying and reporting has improved, but continues to require significant attention by all involved.  There are still serious incidents for which no report or no timely report is prepared by OPSO staff; including inmate on inmate assaults resulting in hospitalization.

g.  <u>Jail Management System</u> – An integral part of any the jail's operational improvements is tied to an effective jail management system to provide the on-demand, routine, and periodic information to inform leadership and management decisions.  This information system has not been implemented, and while OPSO is working to implement a new JMS as well as interface with any new court systems, the delays in the implementation of a new JMS are an impediment to progress.



Compliance Report # 9 – August 29, 2018

4. **Sanitation and Environment Conditions** – Significant work remains regarding the public health and inmate/staff safety risks inside the facility. Again, the staffing challenges impact the ability of OPSO to develop and sustain the work and systems required by the Consent Judgment.

5. **Youthful Prisoners** – The Monitors acknowledge and commend the educational program established in OJC in past year.  There are additional requirements of the Consent Judgment that remain unmet, including provision of age appropriate mental health services and adequate housing for female youth.

6. **Inmate Sexual Safety** – OPSO continues to prepare for its required audit of compliance with the Prison Rape Elimination Act of 2003 (PREA).  More collaboration is needed regarding assessments of inmates as potential victims and potential predators in conjunction with the contract medical/mental health provider.  Increases in inmate reports of sexual assault and sexual harassment are generally positive indicators of the inmates' trust in the system; however, the unidentified changes in assessments occurring about the same time as the upward reporting trend require attention and analysis. OPSO has reassigned the responsibility for supervision of the investigation of allegations of PREA violations to its most experienced ISB supervisor which should improve the quality of PREA related investigations.

7. **Compliance, Quality Reporting, and Quality Improvement** – An essential element to ensure inmate safety is OPSO's timely review of serious incidents to assess root cause(s) and then to develop, implement and track actions plans to address the issue(s).  OPSO is beginning to undertake this function. Interim Independent Compliance Director Hodge recognizes that systemic issues which remain unaddressed will continue to create risks to institutional safety and security.  There have been several serious incidents since October 2017 that warrant analyses including the flow of contraband into the jail, deaths in custody, disturbances, inmate on inmate assaults resulting in serious injuries, and inmate drug overdoses.  While progress is



being made, the Monitors encourage OPSO to dedicate more time and resources to this process of quality improvement.

8. **Stipulated Agreements 2015** – OPSO should review its on-going compliance with the two Stipulated Agreements from 2015.  As noted in this most recent tour, the status of compliance within these Agreements has changed.

9. **Acknowledgement of Work to Date**

   a. <u>Youthful Prisoners</u> – OJC is commended for continuing educational and related programming for the youthful prisoners.

   b. <u>Investigations</u> – Work to credibly review the critical incidents and allegations of staff misconduct is a positive for OPSO.  What remains is to integrate the findings of these investigations with Quality Improvement initiatives (root cause analysis and critical incident reviews) to improve safety for staff and inmates.

   c. <u>Fire and Life Safety</u> – OPSO has provided documentation of important fire and life safety requirements.  Work remains on internal collaboration and development and training regarding emergency operations.

   d. <u>The Docks</u> – A plan to renovate the Docks has been formulated.  The notice to proceed has been slow in obtaining, but there are assurances from the City that it should occur in September 2018.

   e. <u>Phase III</u>-- A contract for architectural services for Phase III has been awarded.  The contract for the project manager has yet to be awarded which has resulted in a delay in the notice to proceed being issued.  The Monitors are hopeful that the City will make the design and building of this additional facility a priority as it is critical to the provision of mental and medical health services.

   f. <u>Human Resources' Initiatives</u> – As noted in Section IV. A. 6. Security Staffing, OPSO engaged a consultant to review current human resources functions and provide recommendations.  The interim recommendations seem on-point, but remain to be implemented.  Hiring and retention of qualified employees is essential to achieving and sustaining compliance with the



Consent Judgment.   As part of this work, the consultant reviewed pay plans for the OPSO.  The Monitors believe more analysis needs to be done, timely, to permit meaningful review of requirements which will be related to budget development.

**C.   Review Process of Monitors' Compliance Report #9**

A draft of this report was provided to OPSO, Counsel for the Plaintiff Class, and the Department of Justice (DOJ) on July 30, 2018.  Comments were provided by Counsel for the Plaintiff Class and DOJ on August 20, 2018.  OPSO's medical contractor, CCS, provided comments regarding the relevant paragraphs of the CJ on August 20th.  OPSO opted not to provide additional comments beyond those of CCS.

**D.   Communication with Stakeholders**

The Monitors are committed to providing as much information as possible regarding the status of OPSO's efforts to comply with all orders of the Court.  The www.nolajailmonitors.org website came on-line in September 2014. As of June 30, 2018, there have been more than 74,000 "hits".  Joining all other reports, the finalized version of Compliance Report #9 will be posted on that site and a summary of compliance for each paragraph.

**E.   Recommendations**

This report includes only "new" recommendations, provided as a list in Appendix to this report.  Where OPSO adopted the Monitors' prior recommendations, this is noted in this report.  We reference Appendix B to Compliance Report # 8 for the list of previous recommendations.[5]

**F.   Conclusions and Path Forward**

OPSO has been operating under the provisions of the Consent Judgment since June 2013.  Improvements have been made during that time, but vital, urgent work is required to comply with the provisions of the Consent Judgment in order to bring and sustain the OPSO facilities and operations in line with constitutional standards.  Currently, the environment is not safe for inmates or staff.  The Monitors continue to recommend that the provisions of the Consent Judgment be prioritized, and detailed action plans developed and

---

[5] http://www.nolajailmonitors.org/uploads/3/7/5/7/37578255/_8_compliance_report.pdf



implemented, providing a clear path to compliance. This has begun to take place under the leadership of Interim Independent Compliance Director Hodge.

The level of violence is unacceptable and very serious incidents frequently occur. The amount of contraband smuggled into the facility and the number of weapons confiscated from inmates is unacceptable. Only by collecting accurate data, analyzing the root cause of the issues, and engaging in problem solving will a sustainable reduction in inmate on inmate assaults, inmate on staff assaults, uses of force, contraband and property damage be achieved. OPSO has begun to collect the data and has improved its accuracy. However, the skills for the analysis of the root causes, subject matter expertise, and problem-solving abilities remain lacking.

As staffing for the housing units, as well as employees to provide escort for other necessary functions (medical, mental health, court) is critically inadequate, a plan to recruit, screen, train, and mentor qualified staff is viewed by the Monitors as of the highest priority. The hiring of the new Human Resources Director appears to be a positive step forward in this area. For the training to be meaningful, the policies, procedures, and post-orders must be completed, and appropriate lesson plans prepared.

Medical and mental health care initiatives continue to work to meet the requirements of the Consent Judgment, but also, as with OPSO's initiatives, needs a clear path, with measurable benchmarks.

The Monitors remain committed to the Court, and the parties to provide assistance, where needed. The Monitors have discussed with the Interim Independent Compliance Director and OJC leadership the need to prioritize areas to be addressed and work collaboratively with the Monitors and DOJ and attorneys for Plaintiff class on solutions. The Monitors are hopeful that this collaborative approach will result in significant improvement towards compliance with the provisions of the Consent Judgment and achievement of constitutional conditions. [6]

**The Monitors again thank and acknowledge the leadership, guidance and support of The Honorable Lance M. Africk and The Honorable Michael B. North.**

---

[6] The Consent Judgment is available at:
http://www.nolajailmonitors.org/uploads/3/7/5/7/37578255/tab_2_consent_judgment.pdf



## IV. A.  Protection from Harm
## Introduction

This section of the Consent Judgment addresses core correctional functions including the use of force (policies, training, and reporting), identification of staff involved in uses of force through an early intervention system, safety and supervision of inmates, staffing, incidents and referrals, investigations, pre-trial placement of inmates in the facility, classification, the inmate grievance process, sexual safety of inmates, and inmates' access to information.

The Consent Judgment requires that OPSO operate the facility to assure inmates are "reasonably safe and secure."  Based on objective review of data, the facility has shown improvement in inmate and staff safety, but still remains critically unsafe for inmates and staff.

Reaching and sustaining compliance with provisions of the Consent Judgment, particularly this section, relies on the collection, analysis, and corrective action planning using available data.  Jails are data rich environments, and the Monitors are encouraging OPSO to develop the capacity to collect relevant accurate data, analyze that data, draw supportable conclusions to inform decisions throughout the organization and develop corrective action plans, as indicated.  When the organization has achieved this capacity, this will be a significant step toward sustainable compliance.

The Monitors reported during the Status Conference before the Court on January 29, 2018, the issues with unreported or underreported incidents in the jail.  (See also Compliance Report # 8)   The unwillingness and/or inability of OPSO, at that time, to insist that staff report incidents, gather data, and report to both the organization and to the Monitors inhibited the ability of OJC to develop effective strategies to address the level of disorder.

The Monitors report in Compliance Report #9 that OPSO is now much more transparent about reporting incidents.   There is still progress to be made.  Evaluation of whether there are unreported or underreported incidents is made by examining the CCS logs recording the names of those inmates who have been brought into the clinic for treatment for treatment subsequent to an altercation or a use of force and/or the names of those inmates routed to the hospital with trauma related injuries.  The attorneys for the Plaintiffs also learn about incidents from their clients.



1

Increased transparency in reporting will likely result in the appearance of an increase in the violence in OPSO.  As the reporting in 2017 did not acknowledge the decrease in the inmate population as they were sent to out-of-parish jails, this trend will be more notable.

The Monitors do not minimize the level of violence in the facility.  Since production of Compliance Report #8, examples of the harm to inmates include, but are not limited to:

- In December 2017:
    - An inmate was transported to the hospital with eye trauma following an altercation, in an incident not reported to the Monitors, as noted on CCS' "route log";
    - Contraband recovery from the disciplinary housing unit of a handcuff key, a shank, a cell phone charger, a cigarette lighter, and unauthorized clothing;
    - An inmate in the mental health unit escaped from his unlocked cell and jumped off the mezzanine level; and then two other inmates who were not in their cells threatened to jump;
    - An inmate in the booking area attacked by another inmate, and the victim required transport to the hospital; and
    - Death of an inmate who was on detox protocol.
- In January 2018:
    - In an unstaffed unit, a fight between two inmates resulted in one being transported to the hospital with blunt head trauma;
    - In a unit which could not be verified as staffed or not, an inmate was transported to the hospital for treatment of a closed fracture of the nasal bone; and
    - In an unstaffed unit, following an inmate/inmate altercation, one inmate was routed to the hospital with a head injury.
- In February 2018:
    - There were 14 incidents classified as attempted self-harm;
    - In an unstaffed unit, an inmate fight resulted in an inmate being transported to the hospital with multiple fractures;



2

- o An inmate was the victim of a sexual assault allegedly perpetrated by another inmate;
  - o An inmate/staff altercation in the booking area resulted in a use of force and the inmate involving being sent to the hospital with lacerations to his eyelid; and
  - o Recovery of contraband:   suspected marijuana, phone and charger, currency, shank.
- In March 2018:
  - o In an unstaffed unit, an inmate/inmate altercation resulted in an inmate sent to the hospital for a right orbital fracture;
  - o In a staffed unit, an inmate/inmate altercation resulted in an inmate transported to the hospital with a suspected hip fracture;
  - o An inmate housed on the mental health unit, unsupervised, threw over chairs, avoided staff, and threatened to jump off the mezzanine;
  - o An inmate attempted self-harm/suicide while housed on the mental health unit, NOFD EMS responded, the inmate was revived and sent to the hospital; and
  - o An inmate attempted self-harm/suicide, was unresponsive, revived and routed to the hospital.
- In April 2018:
  - o In an incident unreported to the Monitors, and located on the CCS "route" log, an inmate involved in an altercation was transported to the hospital with fractured facial bones;
  - o In an inmate/inmate altercation, one victim was transported to the hospital with head injuries, and a possible jaw fracture; and
  - o In an unstaffed unit, an inmate involved in an altercation with another inmate was routed to the hospital with a closed fracture of the nasal bone.



- In May 2018:
  - An inmate started fires using his uniform and mattress on three separate occasions during a twenty-four-hour period;
  - An inmate died following a medical emergency related to detox;
  - There were 52 inmate/inmate assaults, resulting in 6 transports of inmates to the hospital for blunt trauma, perforated wounds, lacerations, chronic pain, and a closed hand fracture. (from CCS route log)
- In June 2018:
  - Inmates were discovered with homemade "brew" behind a clothes dryer, which ignited a piece of paper;
  - In an inmate/inmate altercation, one inmate was taken to the hospital to be assessed; and
  - There were 25 uses of force reported in the month.

While not an inclusive list of the serious incidents occurring since November 2017, the Monitors highlight the unacceptable level of violence and disorder in the facility causes direct and serious harm to inmates and staff.   In addition to incidents, the staff's intervention into the violence resulted in almost 1,200 inmates being cited for facility disciplinary violations in the first four months of 2018.   Section IV.A.5., below, provides additional data regarding incidents.   The Monitors acknowledge that the 2016 and 2017 data (and probably the data before that time) has accuracy issues.. Conclusions and trends are noted with this caveat.

In addition to record-keeping, analyses and corrective actions planning using operational data, it is important that OPSO develop the timely capacity for self-critical analysis of major events.   Without these two strategies, it will be challenging to gain and sustain compliance.  Incidents, sometimes very critical, happen in jails; the leadership needs to immediately learn from these circumstances to prevent them for happening again.



**Assessment Methodology**

- Dates of tours:
  - November 27-29, 2017
  - December 11-13, 2017
  - January 2-4, 2018
  - January 16-18, 2018
  - January 29-31, 2018
  - February 20-22, 2018
  - February 27-28, 2018
  - March 19-21, 2018
  - April 16-18, 2018
  - May 22-24, 2018
  - June 11 – 14, 2018

- Interim Tours – Various monitors worked in OPSO between the time of the October 2017 tour and the June 2018 tour.  This was for the purpose of assisting the Court and the Independent Compliance Director.

- Materials reviewed:
  - Materials reviewed include the Consent Judgment, OPSO policies and procedures, use of force reports, incident reports, investigations conducted by Investigative Services Bureau-Internal Affairs Division (ISB-IAD), investigations conducted by ISB-Criminal Division (ISB-Criminal), investigations conducted by ISB-Inmate Division, news articles, training materials, shakedown logs, and post logs.

- Interviews:
  - Interviews included command staff, jail supervisors, commander of ISB, commander of IAD-Administrative, chief of investigations, various supervisors of units within ISB, and inmates.

- Recommendations:
  - A summary of outstanding recommendations compiled from the first eight compliance reports are included in Compliance Report # 8, Appendix B.  As noted in the Introduction to Compliance Report #9, new recommendations are provided, where necessary and summarized in Appendix B.



## IV. A. 1. Use of Force Policies and Procedures

Findings:

A. 1. a. – Partial Compliance

A. 1. b. – Substantial Compliance

A. 1. c.  – Partial Compliance

**Measures of compliance:**

1.        Comprehensiveness of written policies,
2.        Training, data collection and analysis,
3.        Supervisory review of uses of force,
4.        Review of use of force reports, review of incident reports, review of investigations by ISB.

Observations:

The current OPSO use of force policy was effective as of May 2016.  The policy has not been reviewed since then and is overdue for a review.  The policy remains in partial compliance.  Plans are in place by OPSO to review the policy once all the other policies have been finalized. Training was provided for corrections staff employed at the time of its adoption.  New corrections staff receive use of force training in the pre-service academy.  The annual training has not been provided timely and on a consistent basis due to staffing issues. This has resulted in staff being past due on their training requirements. OPSO has a plan in place to provide the training by the end of 2018.

There has been recent improvement in the use of force training provided at the academy.  In response to a recommendation by the Monitors, there has been an increased emphasis on practical skills training in the pre-service academy.  Staff are now being provided with reality-based examples as well as an opportunity for hands on training.  One of impediments for the pre-service academy training was the large class size of 50-60 students due to the efforts to fill the large number of vacancies at the OJC.  Given the new emphasis of quality as opposed to quantity, class sizes have stabilized between 15-30 students.  Efforts are being made to address the concern expressed by Monitor Frasier as to whether the students had all received a medical examination and been cleared to participate in the level of physical activity required in practical skills training.

The quality of the use of force reports has shown slight improvement but continue to illustrate a need for training on the use of force policy and how to conduct



investigations among the jail supervisors.  Several of the supervisors recently promoted have prior experience as investigators in the Investigative Services Bureau (ISB) which may account for the improvement.  There are still reports which continue to rely on boilerplate language such as "using necessary force," "guided inmate into cell," and "took control of inmate."

As has been previously reported, the ISB has done a good job of developing standard operating procedures that memorialize a comprehensive strategy to review and investigate uses of force.  There is a backlog of cases for review, but ISB has steadily reduced the backlog by having agents from other divisions assist FIT when possible.  ISB met its goal of eliminating the 2016 cases by the end of 2017.  The main reasons for the backlog are that FIT is saddled with assembling the materials necessary for a proper review even though it is the responsibility of the watch commanders and wardens at OJC and FIT is tasked with reviewing medical records regarding treatment of inmates for injuries to uncover uses of force that are not reported properly.  Lack of sufficient supervisory staff in the OJC appears to be contributing to this phenomenon.

IV. A. 1 b. is now in substantial compliance as OPSO has developed and implemented a single use reporting system which complies with the provisions of the Consent Judgment.

IV. A. 1. c. is rated partial compliance due to collection of data on the uses of force.  However, the analysis of that data, recommendations based on the analysis, plans of action, or reports of outcomes of plans of action are still lacking, if non-existent.  For instance, numerous uses of force occur due to the need to control inmates who force their way out of their cells during medication and assault another inmate or leave the housing area without authorization.  However, there does not appear to have been any analysis, evaluation, and change(s) in procedure to lessen the likelihood of future assaults and/or the use of force.  While FIT provides an annual report, an analysis on how to reduce the need for use of force or unnecessary or excessive use of force is not part of that report.  There has been no analysis as to whether changes need to be made to the use of force policies.



7

<u>New Recommendation</u>:

1. OJC and FIT work together to assess the use of force data to determine what changes need to be made to the use of force policies to eliminate unnecessary or excessive force and reduce the need for use of force in general.



## IV. A. 2.        Use of Force Training

Findings:
> A. 2. a.  – Partial Compliance
> A. 2. b. – Partial Compliance
> A. 2. c. – Partial Compliance

**Measures of compliance:**
1.  Comprehensiveness of lesson plans.
2.  Training material, evidence of knowledge gained.
3.  Review of use of force reports.
4.  Review of incident reports.
5.  Review of investigations by ISB.
6.  Review of investigations by IAD.

<u>Observations</u>:

The Monitors acknowledge that there has been significant improvement in the use of force training provided by the training academy.  The training academy staff has been very receptive to recommendations on how to improve the quality of training provided to both new and current staff.

The current use of force policy has been in effect since May 2016.  Training has been completed for corrections staff who were employed at the time of its adoption. New corrections staff receive use of force training as part of the pre-service academy. The annual training has not been provided timely and on a consistent basis due to staffing issues. This has resulted in staff being past due on their training requirements. OPSO has a plan in place to provide the training by the end of 2018.  This results in IV. A. 2. a. continuing to be only in partial compliance.

The effectiveness of training and the related issues and problems are noted above.  It is a significant improvement that the pre-service academy has begun to use practical skills training for use of force training in the training academy.  It is insufficient to didactically teach permissible and impermissible uses of force.  The Monitors look forward to continuing to work with training staff to fully incorporate training that includes application of required skill sets.

After the October 2017 monitoring tour, Monitor Frasier recommended that the class size be reduced as the large class sizes (50-60 students) in the pre-service academy, which were driven by the effort to fill the large number of vacancies at the



OJC, were an impediment to conducting practical skills training.  Given the new emphasis on quality as opposed to quantity, class sizes have stabilized between15-30 students.  Efforts are being made to address the concern expressed by Monitor Frasier as to whether the students had all received a medical examination and been cleared to participate in the level of physical activity required in practical skills training.

The Consent Judgment requires both pre-service and annual in-service training. During the October 2017 tour, it became apparent after review of documentation provided, and during discussions with the OPSO Training Academy staff, that annual in-service training was only being provided to POST-certified deputies.   No in-service training was provided to corrections staff who are classified as "Recruits" or non-POST certified or CMTs.  Monitor Frasier recommended that all corrections staff be provided training with an emphasis on direct supervision, inmate management, and practical skills.  The academy staff has developed a training curriculum based on that recommendation, but the staffing shortage has resulted in the training not being provided timely. The failure to timely provide the annual training has resulted in IV. A. 2. b. remaining in partial compliance.

The Consent Judgment requires annual random testing of 5% of the corrections officer staff (deputies) on use of force policies and procedures. The academy staff worked with Monitor Frasier to develop an approved test which was given to 50 corrections staff members which included 10 supervisors as had been recommended by the Monitor.  None of the supervisors failed the test.  Thirteen of the 40 deputies tested did fail the test.  A passage rate of less than 68% of the deputies indicates that there is a need for remedial training of deputies.  As the test has been developed, approved, implemented, and the results analyzed, IV. A. 2. c. is now in partial compliance.  Once the changes have been made to training and implemented, this section can be assessed as to substantial compliance.

 New Recommendation:

2.      Analyze the results of the use of force policy testing to determine changes that need to be made to the use of force training.



## IV. A. 3. Use of Force Reporting

Findings:

    A. 3. a. – Partial Compliance
    A. 3. b. – Partial Compliance
    A. 3. c. – Partial Compliance
    A. 3. d. – Partial Compliance
    A. 3. e. – Substantial Compliance
    A. 3. f. –  Partial Compliance
    A. 3. g. – Substantial Compliance
    A. 3. h. – Partial Compliance

**Measures of compliance:**

1. Comprehensiveness of written policies.
2. Training, data collection and analysis.
3. Supervisory review of uses of force.
4. Review of use of force reports.
5. Review of incident reports.
6. Review of investigations by ISB.
7. Review of investigations by IAD.

<u>Observations</u>:

The current use of force policy has been in effect since May 2016.  The policy requires all uses of force to be reported timely and completely and sets out the potential discipline if the policy is not followed.  There are still circumstances where uses of force are not properly reported and the use of force policies are not followed.  OPSO contends it is in substantial compliance due to there being no reports written regarding staff not following the policy during 2018.  As there have been incidents where the policy has not been followed, including by supervisors, the fact that no reports have been written or discipline taken for staff to follow the policy is in and of itself proof that OPSO is not in substantial compliance.

The Monitors continue to be concerned about the failure to address the issue of noncompliance with the use of force reporting policy by both deputies and supervisors.  The failure to follow the use of force reporting policy includes watch commanders and wardens.   Review of the use of force investigations continues to reveal that the failure of supervisors, including watch commanders and wardens, to follow the reporting requirements of the use of force policy are not being addressed. While sending a



document or use of force packet back to the supervisor to complete appropriately may be appropriate for a first-time offense, OPSO should monitor whether this is sufficient to correct the behavior.  Inconsistent application of the employee disciplinary process may be seen or be interpreted as favoritism towards supervisors and/or an indication that reporting uses of force is not taken seriously by the organization.  Ultimately the supervisors are responsible, up through and including the warden ranks, for all failures to properly report uses of force.

In May 2016, Monitor Frasier provided to OPSO a suggested checklist as one option to ensure the completeness of use of force reports, compliance, and documentation of the requirements of the Consent Judgment (i.e., supervisor present at a planned use of force, notify watch commander of use of force, etc.).  OPSO has recently begun using a version of that checklist, but review of the documentation forwarded to FIT by OJC indicates that the checklist and the policy are not followed.

The watch commanders and wardens are <u>not</u> consistently complying with the requirements of the Consent Judgment (IV. A. 3. d. and 3. f.) as to their specific duties relating to the uses of force.  Their failure to perform their duties completely and timely has added to the workload of FIT and contributed to the backlog of investigations, ultimately resulting in harm to the inmate population as well as safety issues for employees.

Some of the deficiencies noted in the use of force reporting system are:

- Use of force reports signed off by the watch commanders and wardens are often inadequate and/or incomplete. The reports contain boilerplate and conclusory language that does not allow the reader to make an evaluation of the level of resistance, the level of force used, and/or the appropriateness of the force.  For instance, reports continue to state, "appropriate force was used" or "inmate was *assisted* to the floor" without detailing what type of inmate behavior prompted the use of force, de-escalation efforts, or the type of force used.
- Reports do not routinely indicate whether the use of force was documented by video even though the incident most likely was recorded



due to the extensive video system in the jail.  [See the findings in Section IV.A.5.f. regarding deficiencies in the current video recording system.]

- If supervisors interview inmates, the most common result of interviews is a notation that the inmate(s) reported they did not see anything or did not wish to cooperate.  Fortunately, the ISB is more successful in obtaining statements from inmates during their investigations.  However, often, by the time ISB interviews an inmate, the inmate has had time to talk to other inmates to agree on a "version" of events.  Therefore, it is important that the supervisors obtain timely, credible, and complete statements from inmates and/or take steps to separate witnesses.  Additional training would be helpful.

- Watch commanders routinely do not submit the use of force report within 36 hours, provide specific findings as to completeness and procedural errors, indicate whether the supervisor believes the force was excessive or unnecessary, or indicate whether the warden and IAD were notified.

- As required, within 36 hours of receipt of watch commander's report, the wardens do not submit a written report or statement of specific findings and determination of appropriateness of the force after their review of the use of force report, medical documentation, and inmate discipline.

Because of the failure of the watch commanders and wardens noted above, many of the investigations of incidents involving the questionable uses of force are initiated by the ISB as a result of an inmate grievance, a report from the attorneys for the Plaintiff class, or a request from the Monitors rather than at the request of OJC supervisory personnel.  The sheer number of use of force incidents strains the system's resources, requiring overtime by all staff involved, from the reporting deputy to the ISB/FIT functions to adequately and timely do their jobs.  These deficiencies result in IV. A. 3. a., b., c., d., and f. continuing to remain in partial compliance.  Proof has been shown that supervisors are



present for planned uses of force; therefore, IV. A. 3. e. has been upgraded to substantial compliance.

FIT issues a quarterly report which has been modified to contain all the information required by IV. A. 3. g.  Thus, this section is now in substantial compliance.  The annual review of use of force incidents as required by IV. A. 3. h. has not been provided to the Monitors or parties.  Partial compliance is being given due to the collection of data, but the tallying of data and tracking of numbers on a chart does not satisfy the requirements that a *review* be conducted and analyses as to effectiveness of the use of force reporting system to reduce excessive and unnecessary uses of force.

One obstacle to compliance is the absence of an automated tracking system to ensure timely notification of a use of force to the wardens.  While completed incidents are assigned a number in the OPSO reporting system, the system does not automatically track the incident to ensure the reports are written and/or reviewed within 36 hours and forwarded to ISB.  A review of the system documentation indicates that at least a cursory examination by the watch commanders and wardens of the use of force reporting occurs, but this information did not enable the Monitor to determine whether the reviews are completed as per the timetable stipulated by the policy.  The system does not: 1) include a mechanism to track timely completion of each step; 2) generate alerts to notify the Chief of Corrections if the wardens do not complete a timely secondary review; or 3) a mechanism to track timely referrals to the ISB.  Therefore, the review of use of use force reports is only in partial compliance with the Consent Judgment.

Monitor Frasier has real-time, off-site, read-only access to the incident reporting system (Vantos) in order to review incident reports on a contemporaneous basis.  Unfortunately, the Vantos system has proven to be unreliable and is often not available off-site.  Also, while it is helpful to have access to Vantos, a large percentage of reports are not being entered timely. In addition, the Monitors do not have ready access to the findings from the reviews of the incident reports or key evidence on which the review was based, i.e., the



14

videos and/or staff and inmate interviews.  The Monitors also do not have ready access to the investigations by ISB.  OPSO is planning to implement a new jail management information system in the future, but it is unknown to the Monitors if any of these deficiencies will be corrected through the new system.



## IV. A. 4. Early Intervention System ("EIS")

Findings:
      A. 4. a. – Partial compliance
      A. 4. b. – Partial Compliance
      A. 4. c. – Substantial Compliance
      A. 4. d. – Non-compliance
      A. 4. e. – Non-compliance

**Measures of compliance:**
1. Comprehensiveness of policy.
2. Identification of patterns and trends.
3. Evidence of review by command staff.
4. Monitors' review of quarterly reports.

Observations:

Since the inception of the Consent Judgment, a variety of explanations have been offered by OPSO for the failure of the EIS to perform appropriately.  It has now become clear, and OPSO acknowledges, that the EIS system is non-functional and will not become functional due to lack of technical support.  An electronic based EIS system will not exist until the new Jail Management System (JMS) comes on line.  When the JMS will come on line is uncertain.  As a remedy for this important requirement of the Consent Judgment, OPSO has assigned a staff member to FIT to maintain a data-base regarding uses of force to notify FIT to review a staff member.  In addition, the Commander of FIT developed a computer-based work around the current EIS system.  Therefore, IV A. 4. a. is in partial compliance, but IV. A. 4. d. remains in Non-compliance.

OPSO has improved its documentation to the Monitors as to the names of the staff members who are flagged for uses of force, if a review is conducted, and any retraining received, if required.  IV. A. 4. c. is now in substantial compliance.

The Monitors find that a credible early intervention or warning system collects data on a variety of indicators such as uses of force, grievances, complaints handled at the facility level, absences, etc. and as a result of a totality of incidents causes a review of an employee, and, if necessary, remedial action which is documented.  The OPSO current system, as noted above, relies totally on the deputy's self-initiated reports of uses of force, an assumption that has proven to be unreliable.  OPSO has indicated that



16

FIT will be involved in the creation and implementation process of the EIS in the JMS. Such a plan is supported by the Monitor.

The Use of Force Review Board has met regularly, but it did not perform the evaluation necessary for compliance with IV. A .4. e.



17

## IV. 5.  Safety and Supervision

Findings:
    A. 5. a. - Non-Compliance
    A. 5. b. - Non-Compliance
    A. 5. c. – Partial Compliance
    A. 5. d. - Partial Compliance
    A. 5. e. - Non-Compliance
    A. 5. f. -  Partial Compliance
    A. 5. g. - Non-Compliance
    A. 5. h. - Non-Compliance
    A. 5. i. – Substantial Compliance
    A. 5. j. – Partial Compliance
    A. 5. k. - Partial Compliance
    A. 5. l. -  Partial Compliance

**Measures of compliance:**
1. Comprehensiveness of policies and procedures
2. Training materials
3. Post orders
4. Review of incident reports
5. Installation of cameras
6. Documentation of training
7. Monitors' review of required semi-annual reports.

Observations:

OPSO continues to face the challenge of finalizing policies and procedures, developing credible training lesson plans, recruiting staff, training staff, remediating staff who do not have the required level of proficiency, and supervising employees.

As noted in the Introduction, the Interim Independent Compliance Director's initiation of unit management will assist in the daily supervision of housing unit management and increase accountability.

Even as this transition occurs including the hiring of qualified staff, training, and increasing the capacity of first line staff and mid-managers, the level of harm and risk of harm to inmates held in the Orleans Parish Jail system continues to be at an unacceptable level.  Thus, IV. A. 5. a. is in non-compliance.  The policy regarding inmate workers has not been finalized, thus section IV A. 5. b. is in non-compliance.

While the policy on protective custody inmates has been finalized, those inmates continued to be housed with, and exposed to, non-protective custody inmates.



Additionally, inmates in protective custody status are scattered in other units, such as the mental health unit, for reasons not articulable to the Monitors. There have been numerous incidents where protective custody inmates have been targeted for violence. Completion of the policy warrants a partial compliance of IV. A. 5. c.

Because OPSO's current leadership has accepted that there was underreporting of serious incidents in the past, we collectively can move away from documenting this finding to focusing on solutions.

With the caveats noted about comparing incidents, this information has been provided by OPSO and assembled by the Monitors based on OPSO regular reporting.

### Table 3 OJC Reported Incidents – YTD 2018

|  | January | February | March | April | May | June | July | Total |
|---|---|---|---|---|---|---|---|---|
| Attempt Suicide/ideation | 6 | 14 | 4 | 5 | 0 | 6 | 9 | 44 |
| Contraband | 9 | 15 | 5 | 5 | 10 | 9 | 13 | 66 |
| Criminal Damage | 3 | 10 | 11 | 12 | 8 | 3 | 3 | 50 |
| Death |  |  |  |  | 1 |  |  | 1 |
| Disturbance | 2 |  |  |  |  |  |  | 2 |
| Internal Escape | 2 | 2 | 3 | 4 | 5 | 7 | 3 | 26 |
| Fire | 1 |  |  |  |  | 2 |  | 3 |
| Inmate Injury/Inmate Medical | 9 | 5 | 22 | 22 | 19 | 32 | 30 | 139 |
| Inmate Misconduct |  |  | 1 | 1 |  |  |  | 2 |
| Inmate/Inmate Assault | 38 | 28 | 38 | 38 | 52 | 46 | 30 | 270 |
| Staff Misconduct |  | 2 |  |  |  | 1 |  | 3 |
| Inmate Staff Altercation | 7 | 6 | 7 | 8 |  | 7 | 4 | 39 |
| PREA | 2 | 4 | 5 | 3 | 5 | 5 | 4 | 28 |
| Use of Force | 13 | 10 | 21 | 22 | 24 | 26 | 20 | 136 |
| Total | 92 | 96 | 117 | 120 | 124 | 144 | 116 | 809 |

In reviewing this data it is critical to acknowledge the average daily population. Because of "Operation Rewind" in 2017, OJC's average daily population was 895. For 2018 (through July 2018) the average daily population is 1,147. There were a total of 831 incidents reported to the Monitors in 2017. Computation of rates is not included here as the reliability of the data is in question, and establishing rates contributes to

Orleans Parish
JAIL MONITORS

19

more misunderstanding rather than to problem-solving. To develop strategies to address incidents in OJC, having the accurate data and analyzing the data (e.g. by housing unit, time of day, day of week, type of incident, inmate involved, staff involved) is essential. This data is the foundation of meaningful corrective action plans.

The Monitors also examined the CCS clinic walk-in logs to discern if there were any trends related to reporting.  For the period of January – mid-April there were 437 inmates who came to the CCS clinic with potentially reportable injuries, mostly related to altercations or uses of force.   Some of these names are also duplicated on the emergency department "route" log noted below.  The Monitors identified approximately 31% that might have been reportable to the Monitors but not reported. Further review by OPSO and the Monitors indicated the discrepancies might be related to labeling and late reporting (which is preferable as opposed to not reporting).

The data reported by CCS for inmates taken to the hospital for trauma related incidents were also examined.   For the period January-April 17, 2018, there were 95 inmates taken to the emergency department, 38 for trauma-related (e.g. serious injuries that the medical provider referred to the emergency department for events such altercations, attempt suicides, uses of force, ingestions).  The Monitors' preliminary findings was that 65% were reported; and note there are questions about the accuracy of reported data for January/February.  OPSO found in their review of data from the same period three incidents it was unable to determine (fracture of facial bones, eye injury, pain arm/leg), six were not reported (fracture of metacarpal, suspected fractured arm, head injury (2), hand fracture, eyebrow laceration), and two were duplicates.  The remaining incidents were reported (may have had different date/name.

The conclusion from this review is, as noted above, the level of disorder remains too high, but at least now the Monitors and OPSO are reaching agreement on the potential number of incidents.   The data provided by OPSO also indicates upward trends for several categories.[7]

---

[7] Two undated memoranda from Major Carols Louque to Margo Frasier both entitled Document Request 125.



There are no recommendations forthcoming from OPSO regarding addressing the data.  Going forward the OPSO will be expected to analyze and address the findings in a corrective action plan.

OPSO has shown significant improvement since March 2018 in the conducting and documenting of security rounds (30 minutes or 15 minutes depending on the unit).  However, it is clear from the review of records, observations, and investigations that timely rounds are still not being consistently conducted as per OPSO policy.  OPSO has instituted a practice of having some staff assignments designated as mandatory assignments which has resulted in those units being staffed in a more consistent manner.  However, some units are routinely not adequately staffed or staff is absent from the unit for over an hour at a time, sometimes for two hours or longer.  During the tour, it was noted that there were units which were unstaffed, including mandatory posts.  If staff are not present, it impossible to make the required rounds.  The improvement has resulted in OPSO being found in partial compliance with IV. A. 5. d.

Due to unreliability of the TourWatch system, OPSO reverted to paper logs.  While there is now a policy in place which requires supervisors, up to the level of Watch Commander to review the paper logs to ensure rounds are being conducted, OPSO has not audited compliance with this policy and review of the paper logs during the tour revealed that rounds are not being timely performed.

As related to the on-going theme in this report about staff shortages, it is the Monitors' view that it is extremely unlikely that one deputy can effectively perform rounds in more than one housing unit- unless their sole task is to push the TourWatch buttons as opposed to viewing and assessing the condition of each inmate.

An insufficient number of staff is assigned per shift to relieve deputies assigned to housing units and CMTs for meal breaks.  The practice is to leave the housing units and control rooms unstaffed during those times.  This includes the special management housing units that OPSO has designated as mandatory posts, i.e., requiring constant staff presence.  [See Section IV.A.6., below]

While OPSO reported in its Compliance Matrix that direct supervision was occurring in three housing units, this constitutes only about 10 percent of the housing



units.  In addition, there are times that the deputies are not in those housing units.  Thus, IV. A. 5. e. is in non-compliance.

Regarding overhead video surveillance and recording cameras for OJC (A.5.f.), there are on-going issues as some of the 900 cameras are not recording.  This is most often discovered when investigators try to retrieve the videos. The system is unreliable as at times the videos are missing, but at other times a video is available.  More energy and expertise should be devoted to finding a solution to this technical issue, as the absence of recording cameras is necessary for compliance as well as inmate and staff safety.  As such, this paragraph is found to be in partial compliance.

Staff transferred from other divisions to work in the OJC and/or assigned to work in the specialty units do not receive the required training; thus A. 5. g. and h. continue to be in non-compliance.   This is of particular concern as OPSO has had almost five years to devise and implement this training.

IV. A. 5. i. is now in substantial compliance as there is proof that supervisors are conducting daily rounds and noting their findings in the paper logs.

The daily inspections of housing units required by VI. A. 5. j. is in partial compliance.  With the introduction of unit management, unit managers and deputies are required to conduct daily inspections.  However, simple observation of the conditions of the living units provides evidence that, while daily inspections may be conducted, consistent inspection standards need to be communicated to the line staff and inmates, and corrective action taken as a result of the inspection findings.   [See also IV.D. Sanitation and Environmental Conditions for additional findings.]

Shakedowns are conducted. But as evidenced the amount of contraband discovered during each time shakedowns, the number and type of weapons used in the inmate-on-inmate assaults, and the drug use/overdoses in the facility, the shakedowns do not occur at sufficient regularity and are not sufficiently thorough.  A prime example is the set of fires that occurred in May 2018.  An inmate was able to secure a lighter and start a fire in his cell.  Despite him having been supposedly searched when he was moved to another cell, he started another fire using a second lighter.  Once again, he was moved to another cell and supposedly searched.  He was then able to start a third fire with another lighter.

The Monitors are pleased that the Interim Independent Compliance Director has devoted significant resources and effort to the address the issue of contraband.  The courts, intake, and inmate workers appear to be the most common sources of contraband.  There continue to be circumstances where staff are responsible for smuggling contraband into the facility.  Preventing the introduction of contraband must be the goal as opposed to discovering it later during shakedowns.

OPSO has begun the process of conducting an analysis of the shakedown reports as to the location of findings, linkages to previous shakedowns, specific items found, and/or the inmates involved.  The Monitors have provided information regarding the procedures used in other jails to identify and mitigate contraband. The Monitors recommend formalizing the effort to determine the source of the contraband and remediate the danger.   In addition, the contraband reports provided to the Monitors do not list the contraband found as a result of a non-routine shakedown such as those conducted by ISB.  It is clear from the ISB reports that additional stashes of drugs, cell phones, and/or weapons were uncovered though the non-random shakedowns.  Therefore, IV A. 5. k. and 5. l.  continue to be in partial compliance.



## IV.  A.  6.  Security Staffing

Findings:
A. 6. – Non-Compliance
A. 6. a.  (1) – Partial Compliance
A. 6. a. (2) – Substantial Compliance
A. 6. a. (3) – Non-compliance
A. 6. a. (4) – Partial Compliance
A. 6. b. – Partial Compliance

**Measures of Compliance:**
1. Written policy/procedure governing staffing, and reporting as required by consent agreement.
2. Completion of a staffing analysis per http://static.nicic.gov/Library/016827.pdf
3. Staffing plan (existing and new facilities); recruiting plan.
4. Daily rosters.
5. Overtime records.
6. Housing unit logs.
7. Hiring of professional corrections administrators (CV).  Post order/job description/organizational chart.
8. Staffing report containing required information; conclusions; action plans, if any.

Observations:

The finding of compliance for this section of the Consent Judgment is guided by this language (IV.A.6):

"OPSO shall ensure that correctional staffing and supervision is sufficient to adequately supervise prisoners, fulfill the terms of this Agreement, and allow for the safe operation of the Facility, consistent with constitutional standards. . ."

As the governing section of this paragraph is non-compliant, the entire section is non-compliance.

There continues to be is insufficient staffing in OJC – in the inmate housing areas, in first line supervision, in support functions, and in facility leadership.   Current OPSO leadership has advised the Monitors that they are unable to verify the data for the hiring and termination data provided over the last two years.  This makes problem-identification and corrective action planning difficult with the absence of baseline data. OPSO reported in a Memorandum dated June 27, 2018, that OPSO was not able to provide the current staffing analysis and the current vacancies, indicating the newly



appointed Human Resources Director is working to obtain a count of active staff and provide an accurate number of vacancies.[8]

OPSO hired a new human resource director effective May 7, 2018.  There was a vacancy in this position since February 21, 2018.   The newly hired Human Resources Director is aware of the tasks before her.   She plans to have a recruitment plan done in mid-July.  The leadership is focusing on quality applicants, not hiring just to achieve numbers of hires.

The newly hired Human Resources Director produced hiring and termination data for the first six months of 2018, with the caveat that the process is being evaluated for accuracy.  Given this, the data provided indicates that 57 individuals were hired to work in the OJC in the first six months, including 8 Corrections Monitoring Technicians, and 31 recruits to, when trained, work in OJC.  The remaining hires were for administrative/leadership positions hired including in addition to the Human Resource Director, a director of sanitation, and a compliance manager.  During this same time period, OPSO data indicates that there were 102[9] departures of jail-related staff, including recruit deputies, human resources, kitchen/warehouse, and classification.  As noted in previous compliance reports, the reasons for separation might inform the recruitment and hiring processes.  For those leaving in the first five months of 2018, the reasons given were for:

- Corrections Monitoring Technicians – 1 for misconduct, 1 resigned under investigation, 10 failed to show up for work, and 6 noted "personal" for the reason for their departure;

- Deputies – 1 deceased, 6 for misconduct, 13 failed to show up for work, 16 for personal reasons, including health and relocation, 3 resigned while under investigation, and 2 for unspecified reasons.

---

[8] Memorandum of June 27, 2018 from Director Debra Hammons to Susan McCampbell

[9] As evidence of the need for review of the data, information provided by OPSO indicates 102 individuals related to jail functions terminated employment in the same time period.  Reasons noted for leaving employment were: misconduct (14), "no-shows" (32), personal reasons (43), resigned while under investigation or suspension (7), retired (1), problems with attendance (1), advancement (1), promotion (1), deceased (1), and "change in tax status" (1).

- For 46 deputies hired in 2017 and 2018 and leaving the within the first five months of 2018, their length of stay in employment was less than one year, some only a few days or weeks.
- Twenty individuals hired between 1987 and 2016 left employment during the first five months of 2018; the reasons cited were: 1 deceased, 2 misconduct, 1 resigned under investigation, 1 failed to show up for work, 12 noted personal reasons, including 1 relocation, 1 retired, and 1 reason is unspecified.

The Human Resources Director reports that more attention will be paid to not only improved hiring, but better data collection and analysis.

On February 1, 2018, OPSO entered into a contract with Segal Waters, a human resources consulting firm for the purposes of auditing OPSO's human resources department, examining the timeliness of recruitment, selection and on-boarding functions, reviewing selection methods, evaluating training and leadership development of employees, looking at the organizational structure and chain of command, and, finally, to assist with development of standard operating procedures for the human resources department.  Other tasks were also enumerated.

Although the contract does not provide a timeframe for completion of work, the company has provided to date:

- Draft – Recommendations for Recruiting, Retaining and Developing OPSO Correctional Deputy Sheriffs: Correctional Best Practices (6/4/18;)
- Memorandum from Adler to Bowie with summary of findings and suggested next steps (6/15/18);
- Preliminary Findings – Audit of Human Resources Functions;
- Draft – Assessment of HR Functions – Suggestions for Moving Forward (5/31/18);
- Draft Report # 3 – Assessment of the HR Function Short and Mid-Term Recommendations (5/31/18);
- Draft – Revised - 2018 Corrections Market Survey (June 2018); and



- Memorandum from Adler to Hodge/Bowie – OPSO Salary Survey (6/11/18) – 3 pages.

These preliminary documents provide insight into the issues facing OPSO and suggest some solutions.  The responsibility of OPSO appears to be to examine the information and develop specific corrective action plans.  To date, this has not been accomplished.

As the Monitors are aware that the 2016-2017 data is unreliable, it is challenging to make any comparisons or track any trends.  The Monitors can assert that, as noted above, there is insufficient staffing.  We look forward to the review and action regarding the Segal Waters work to date, and the to-be-produced recruitment plan.

As noted in previous compliance reports, the Monitors recommend an overhaul of the hiring process to address the issue of turnover among recently hired staff.

<u>Subparagraph 6.a.(1)</u> - OPSO has completed a required staffing analysis as required by subparagraph a. (1).  The analysis was conducted in October 2017 and does not reflect the Interim Independent Compliance Director's view of staffing (such as unit management).  It appears that this work, as expected, needs to be updated.  OPSO may wish to review the report produced pursuant to the Stipulated Agreement of February 11, 2015, paragraph 7.d. in which OPSO evaluated if the use of civilians is feasible for non-inmate contact positions, and also assess if there are posts currently held by sworn staff that can be converted safely to civilian staff (e.g. sanitation, kitchen).

The Monitors are not able to determine the number of current vacancies for OJC.  The effect of the high number of vacancies is reflected in the number of deputies and CMTs available to staff the housing units.  A review of the staff rosters reflects that, despite significant use of overtime, there are housing units and control rooms for which no staff is assigned, or a deputy is assigned to cover two housing units.  In addition, very seldom, are there sufficient staff to relieve the CMTs and deputies for breaks.  This results in housing units and control rooms being unstaffed for long periods of time.  The resulting harm is real.  Of the 542 incidents serious enough to be reported to the Monitors for the period of January-May 2018, OJC reported that no staff

27

was present in 95 of the incidents and OPSO was unable to determine staff presence in another 19 incidents.  Thus, one-fifth of the incidents occurred when OPSO acknowledges there either was not staff present or they do not know.  Experience tells the Monitors that there are other incidents occurring during the time staff is not present which are never reported to OPSO or the Monitors.

Sub-paragraph IV.6.a. (2) – This provision is in substantial compliance at this time.  With the planning for Phase III, the Monitors look forward to examining the staffing plan.

Sub-paragraph IV.6.a. (3) – This provision it is now in non-compliance with the departure of the Chief of Corrections in March.  There currently is recruitment for this position.

Sub-paragraph IV.6.a. (4) – This paragraph is in partial compliance, as monthly reports have not been produced regarding hiring and termination of employees.  The Stipulated Agreement also provides for bi-monthly reports regarding hiring.

Sub-paragraph IV.6.b. – This provision is in partial compliance, as noted above, as full-staffing has not been achieved, it is not possible to determine if the requirements of the Consent Judgment are met.

As noted in previous compliance reports on-going concerns include:

- Entry level and career salary ladders;
- Competency based training for supervisors and managers;
- Refinement of the entire process for recruitment, background investigation, selection, and on-boarding for new employees (pursuant to Segal Waters' recommendations);
- Continued improvements in pre-service training;
- In-service training to refine skills and address deficiencies in operations revealed by internal review of incidents; and
- Organizational Structure and Span of Control - The Monitors have consistently recommended attention to the organizational structure and assurance that there is appropriate number of first, mid, and upper level managers, supervising the right number of line and support staff.



## IV. 7.  Incidents and Referrals

Findings:
      A. 7.  a. - Partial Compliance
      A. 7.  b. – Partial Compliance
      A. 7.  c. – Substantial Compliance
      A. 7.  d. – Partial Compliance
      A. 7.  e. – Partial Compliance
      A. 7.  f. – Partial Compliance
      A. 7.  g. – Partial Compliance
      A. 7.  h. – Partial Compliance
      A. 7.  i. -  Non-Compliance
      A. 7.  j. -  Non-Compliance

**Measures of compliance:**
1. Comprehensiveness of written policies
2. Training
3. Data collection and analysis
4. Supervisory review of uses of force
5. Review of use of force reports
6. Review of incident reports, review of investigations by SOD
7. Review of investigations by IAD
8. Monitors' review of required semi-annual reports.

<u>Observations</u>:

OPSO has long had a policy on incidents and referrals that sets out the process for documenting and referring incidents.  What has been lacking is a sufficient process to ensure all reportable incidents are being documented and that the incidents are being recorded adequately, timely, and accurately.  OPSO has shown improvement in the reporting of incidents, but there are still incidents which are not timely reported to OPSO and/or the Monitors.

One of the methods for determining whether incidents are being reported is to review 'routes' – inmates with serious medical or trauma injuries ((e.g. serious injuries that the medical provider referred to the emergency department for events such altercations, attempt suicides, uses of force, ingestions)that they are transferred to the emergency room, and clinic walk-in logs.  These data were analyzed for the period of January 1, 2018-April 17, 2018.   In addition to the issues identified pertaining to the safety and security of the inmates, it bears repeating that there were no incident reports for six of the emergency room transfers (for January – mid-April) and it



appears all trauma related transfers have been reported for the period mid-April - June.  It is also noted that the CCS Medical Director revised practices that resulted in decreases of emergency room transfers significantly, (e.g. 50%), as noted in the Medical Monitor's section of this report.

A review of the clinic walk-in logs for the same period provided this information:

- Of the 1,019 clinic walk-in log entries for this time period January thru mid-April, 42% (N=433) appear to be related to inmate altercations, suicide attempts, and trauma.  In initial review by the Monitors, approximately 145 of these appeared not to have been reported to the Monitors.  Examples of the unreported incidents captured on the CCS logs include:
  - Use of pepper spray and uses of force, unresponsive patient, head trauma, "swallowed heroin", altercations, suicidal, eye trauma (3), head injury (2), ingestion of unknown substance, laceration to head, fractured jaw (2), broken nose, ingestion of pills.
- Ninety percent (90%) of reportable incidents **not** reported occurred between January 1 and February 28th.

OPSO was provided this list compiled by the Monitors from the CCS walk-in logs, and noted that of the incidents in question and reports:  54 were reportable and **not** reported; 34 were considered non-reportable to the Monitors (e.g. medical emergencies not related to altercations, uses of force); 1 was a duplicate, 1 was undetermined; and 11 were avertedly not reported due to a clerical error.  The remainder of the incidents, OPSO claims were reported.  The discrepancy may be due to names and dates as the Monitors reviewed the data.

While the quality of report overall has improved, the deficiencies in the quality of reports continues to exist; the failure of the reports to contain all the information required in OPSO's policy and the too often use of boilerplate language.  The incident reports examined by the Monitors were often found to be inadequate and/or incomplete, and conclusory language that does not allow the reader to make an evaluation of what occurred, the reason for the occurrence, whether staff acted



appropriately, and what steps must be taken to prevent a similar incident from occurring in the future.   Such reports are being approved by a supervisor.  As with use of force reports, there is no automatic tracking system to ensure timely reviews and notifications are being made.  While completed reports are required to be assigned a number, there is no follow up to make sure the reports are written and/or are reviewed within the 24 hours required by the Consent Judgment.

No periodic reports detailing reportable incidents have been submitted to the Monitors as required under IV. A. 7. f.  The reports that were provided are the list of inmate-on-inmate assaults and criminal investigations conducted by the Criminal Investigation Division of ISB.  [See also VII.B. regarding identification of serious deficiencies]

The adequacy of the policies and procedures and reporting system is crucial to the Monitors, and the leadership of OPSO, being able to rely on the accuracy of the periodic reports that are to be submitted under IV. A. 7. f. and g. and the sufficiency of the annual review that is to be conducted under IV. A. 7. h. which requires OPSO to assess whether the incident reporting system is meeting the requirements of the Consent Judgment.



## IV. A. 8.  Investigations

Findings:
> A. 8. a. – Substantial Compliance
> A. 8. b. - Substantial Compliance
> A. 8. c. - Substantial Compliance
> A. 8. d. - Substantial Compliance
> A. 8. e. - Substantial Compliance
> A. 8. f. - Substantial Compliance

**Measures of compliance:**
1. Review of incident reports,
2. Review of use of force reports,
3. Review of investigations by SOD,
4. Review of investigations by IAD, and
5. Monitors' review of required semi-annual reports.

Observations:

The Investigative Services Division (ISB) is responsible for:  the Criminal Investigation Division (investigates possible criminal activity by inmates), Internal Affairs Division-Criminal (investigates possible criminal activity by staff), the FIT (investigates use of force by staff), the Internal Affairs Division-Administrative (investigates possible violation of policies by staff), and the Intelligence Unit (provides information and intelligences regarding activities that have taken place or may take place in the jail or support activities).  At one time, some of the divisions had been moved out from under the supervision of ISB.  The Monitors urge that all of the divisions remain under one command as it makes for better collaboration among the various groups conducting investigations.

Significant evidence of substantial compliance was provided for IV. A. 8.  The Monitors are concerned about the time investigations are taking, but part of that reflects the poor quality of the reports providing the basis for the investigations as well as the sheer volume of incidents requiring the attention of ISB.  Improvements in all other areas from hiring, training, supervision, and adequate staffing will enhance the safety of staff and inmates – and ultimately decrease the workload of ISB.

After several years at OPSO, the leadership of ISB has been exposed to corrections long enough to overcome their initial lack of corrections experience.



The Monitors acknowledge that investigating incidents of inmate on inmate assaults, sexual assaults, staff on inmate assaults, etc. with a goal of seeking indictments is appropriate; but the overall goal is to create a safe jail.  In a jail setting, investigations play just as critical a role in terms of protecting inmates from inappropriate or illegal staff actions, protecting inmates from each other, and correcting policy, practice, supervision and training.  Continued emphasis needs to be placed on having as one of goals of investigations being the *prevention* of future incidents through analysis of the policy, procedures, training, supervision, and physical plant contributors to the incident.  This function cannot and should not be performed by ISB alone.  This level of assessment requires input from individuals who have a high level of experience in jail/corrections work. In short, it requires collaboration between ISB and OJC which continues to be wanting.  The OJC staff should take the lead in the root cause analysis with ISB providing information gathered during the investigation.

In the past, the Monitor's reviews of a sample of investigations conducted by ISB revealed a contrast between the investigations conducted by the criminal division and administrative divisions of the IAD.  The IAD-Criminal investigations appeared to be more thorough and complete.  The quality of the investigations from the IAD-Administrative Division has continued to improve.

ISB has received significant additional training.  However, additional training regarding investigations in a corrections setting regarding sexual abuse, assault, harassment, and voyeurism (PREA related) needs to be provided.  ISB has made contact with an outside expert to arrange for the needed training.

In addition to the investigators assigned to ISB, watch commanders and wardens have a role in investigations.  Unfortunately, the watch commanders and wardens often lack the investigative knowledge or skills and thus actually hinder ISB's work to complete a thorough investigation.  In particular, the lack of investigative knowledge and skills by watch commanders and wardens, especially in regard to the investigation of sexual assaults, has the potential to further victimize or re-traumatize inmate victims.  ISB has provided training to supervisors on crime scene preservation, but incidents continue to occur where the crime scene is comprised before the arrival of ISB.  The recent promotion of several investigators from ISB to supervisory positions

with OJC will, hopefully, help bridge the knowledge gap.  In addition, IAD-Criminal has set up a procedure where agents are available during ISB's off duty hours to respond to OJC if a significant incident occurs, such as a sexual assault, suicide, or arson, to take the lead on the investigation and collect forensic evidence.

ISB provides reports in substantial compliance with IV. A. 8. e.  The one item left in this section that was not in substantial compliance was IV. A. 8. f.  ISB has now begun to review the reports to determine whether the investigation system was meeting the requirements of the Consent Judgment and forward any recommendations to the Monitors.  ISB has done so as evidenced not only by their analysis, but also the movement of PREA investigations under IAD-Criminal and the formalization of a call out policy for the collection of forensic evidence in serious incidents.



## IV. A. 9.    Pretrial Placement in Alternative Settings

Findings:

        A.9.a. – Substantial Compliance

        A.9.b. - Substantial Compliance

**Measures of Compliance:**
1. Memorandum of understanding (MOU) with Pre-Trial Services.
2. Observation
3. Interview with pre-trial services staff
4. Review of files
5. Review of data regarding pre-trial diversion

<u>Observations:</u>

      The Monitors have received no information regarding absence of compliance with this provision.  OPSO provided a Policy and Procedure Manual for the Orleans Parish Criminal District Court, Court Intervention Services, Pretrial Services Program.

      OPSO provided a memorandum stating they are in compliance with sub-paragraph A.9.b. regarding holding inmates for ICE.  The assertion is based on a spreadsheet noting refusals.



## IV. A. 10. Custodial Placement within OPP

**Introduction**

OPSO has designed, validated, and implemented an objective classification to assess and house each OSPO inmate according to the risks he/she poses to institutional safety and security. The automated classification system was rolled out in the Jail Management System (JMS) on January 15, 2015.[10] According to the OPSO staffing plan, staffing for the Classification Unit (Unit) was set at 18 classification specialists and a classification manager.  As of June 11, 2018 the classification "unit" staffing roster lists 12 individuals – 11 civilian classification specialists and a classification manager.  As of April 2018, the single deputy assigned to the Classification Unit resigned. Two of the 11 classification specialists are on maternity leave; the dates for their return have not been set. Thus, the active roster includes 10 staff members for the 18 positions identified for the Classification Unit in the October 2017 OPSO staffing analysis. This creates challenges for the 24/7 coverage at the OJC to ensure that the custody assessments, housing assignments, classification-related grievances, and audits are completed in accordance with OPSO policies.

Each classification specialist has received training on the principles of objective classification and instruction, the custody and PREA assessment instruments, and the OPSO housing matrix. During this compliance reporting period – November 2017 – May 2018 – in-service training topics included: Use of Attachments for the custody assessments, Instructions for reading the National Criminal Information Center Reports (NCIC rap sheets), and Sexual Preference/Identification screens within the JMS.

To assign inmates to a housing unit and bed, OPSO has developed an automated housing assignment process that considers the inmate's custody level, gender, special population status, PREA designations, enemies, and associates as well as bed availability to recommend an appropriate bed for the inmate housing locations for each inmate

---

[10] Hardyman, Patricia L. (2015). "Design and Validation of an Objective Classification System for the Orleans Parish Sheriff's Office: Final Report." Hagerstown, MD: Criminal Justice Institute, Inc.



according to his/her custody level, PREA designations, reported enemies and/or associates, gender, age, medical, and mental health needs from which the classification specialist must select a housing assignment/bed. Separations for special populations have been incorporated into the automated Housing Unit Assignment Plan (HUAP). Identification tags have been created to identify inmates on suicide observation vs. suicide watch, those undergoing detox for alcohol and/or controlled substances, and those participating in the Travis Hill High School. The OJC and TDC dormitory-style units have been cataloged in the automated system to enable the classification specialists to assign inmates to specific beds. Although Classification and JMS staff worked together to develop an Inmate Separation Instrument (ISI) to maintain out-of- cell separations, the ISI is used by deputies assigned to inmate housing units only within the special management pods. The Housing Audits did not consistently track or report use of the ISI, thus the integrity of the housing separations by custody level, PREA designations, and other separations concerns among OPSO inmates housed out-of-parish is questionable. This absence of integrity in this important process poses an on-going, unnecessary threat to inmate and staff safety within the special population pods, i.e., those that house a mixture of inmates by custody level and/or special management requirements.

The standardized monthly statistical reports as to the timeliness of the initial custodial assessments; the custody distributions; prevalence of special populations; as well as the rates and types of disciplinary infractions were submitted to the Monitor as scheduled. However, many of the documents provided in response to the formal document request for this compliance visit did not address compliance inquiry. For example, in response to a request for documentation of the reclassification process, specifically the housing backlog, a set of Housing Monitor Lists was provided, but no analyses of OPSO findings or corrective action plans. In response to the request for a description of in-service training during the compliance period, provided was a document that simply read, "*Currently the Classification Division has been placing attachments in the correct places for the initial classification as well as Re-classifying inmates. Reading the NCIC screens and Rap sheets to retrieve the pertinent-information that qualifies to place in AS 400 for every inmate.*" *The actual training* schedule and topics; lesson plans; attendance reports; and



demonstration of knowledge would have been more complete response to the document request.

**Summary:** In sum, the OPSO is in partial-compliance with the paragraphs of the Consent Judgment related to Custodial Placement within OPP (IV. A.10). During this six-month period, the OPSO moved from Non-Compliance to Partial-Compliance on Section d. (*Continue to update the classification system*) but from Partial-Compliance to Non-Compliance on Section f. *(Conduct internal and external review and validation of the classification and prisoner tracking system on at least an annual basis)* due to the failure to maintain the on-going housing and custody audit protocols. The compliance rating for the remaining six sections did not change.

Notable observations for this compliance period include:

- Active staffing levels for the classification unit slipped back to 10 from 15 individuals. It is anticipated that the two individuals on maternity leave will return within the next few months;

- The only monthly statistical report specified in the Consent Judgment <u>not</u> provided was the rates of victimization of inmates on the mental health caseload. OPSO reports these data should be available for the July 2018 monthly reports as CCS' electronic medical record created the linkages for updating medical and mental health data for the custody and PREA assessments.

- Completion of the statistical validation of the OPSO objective classification system and PREA assessments. Latessa and Lovins (April 2018)[10][11] found that the OSPO objective classification instruments provide for validation assessments of infractions for both male and female inmates, although the ability of the reclassification instrument to separate medium and high-risk females was minimal.  Further the current classification assessment provided a valid measure of risk for both Caucasians and individuals of color.

---

[11] Lovins, Brian K. and Edward Latessa. (April 2018) "Revalidation of the Orleans Parish Classification System. Cincinnati, Ohio: University of Cincinnati Corrections Institute.



**Assessment Methodology**

This report was based on observation of the initial classification and housing assignment processes; onsite meetings with OPSO and JMS staff; and review of monthly custodial, disciplinary, training, and housing audit reports for November 2017– May 2018, and review of documents provided prior to and during the compliance visit.

**IV.A.10. a. OPP shall implement an objective and validated classification system that assigns prisoners to housing units by security levels, among other valid factors, in order to protect prisoners from unreasonable risk of harm.  The system shall include: consideration of a prisoner's security needs, severity of the current charge, types of prior commitments, suicide risk, history of escape attempts, history of violence, gang affiliations, and special needs, including mental illness, gender identity, age, and education requirements. OPSO shall anticipate periods of unusual intake volume and schedule sufficient classification staff to classify prisoners within 24 hours of booking and perform prisoner reclassifications, assist eligible DOC prisoners with re-entry assistance (release preparation), among other duties related to case management.**

Finding:   Partial Compliance

Measures of Compliance:

1. Written policy/procedure governing the intake, booking, classification and re-classification process.
2. Report including a statistical validation of the OPSO current custody classification system that includes statistical assessment of the risk and need factors of the inmate populations by gender and race.
3. Implementation of the identified updates via an electronic file with the completed custody assessments for OPSO population.
4. Report documenting required staffing needs.
5. Implementation of viable classification/case management staffing plans.

Observations:

The classification specialists did not have a complete copy of the current classification or PREA handbooks readily available in their work areas as reference tools for checking offense severity, codes for disciplinary infractions, and the like. The offense and disciplinary severity indexes, for example, were missing every other page. Staff was not familiar with the handbooks, in particular the Offense Severity Index for coding the type of crime within the custody attachments.



As of June 11th, the Classification Unit roster lists 12 individuals -- The Classification Manager and 11 civilian classification specialists -- for the 18 positions assigned to the Classification Unit as per the OPSO 2017 staffing analysis plan. The one deputy assigned to the Unit resigned in April and the OPSO has no immediate plans for filling that position. This staffing limits the Unit's ability to complete required housing audits, respond to grievances, and conduct interviews regarding protective custody and housing re-assignments. Responsibility for addressing custody and housing-related grievances and conducting interviews of individuals requesting protective custody have been assumed by the Classification Manager and one of the shift leaders. Importantly, housing audits have not been conducted since March. The classification shift leaders and specialists work overtime to keep up with the workload. In order to ensure the integrity of the classification system and prevent burnout of the Classification Unit staff, the OPSO should assign a deputy for conducting the housing audit <u>or </u>modify its' policy/procedures to allow the civilian classification specialists to conduct the housing audits.

Leadership within the Classification Unit shifted to the Classification Manager, who in turn reports to the Independent Compliance Director Hodge. The voice of the Classification Unit needs to be strong to ensure the Unit is actively integrated into the agency to ensure, for example, the Unit controls all housing transfers and assignments and to facilitate timely identification and resolution of problems. Problems such as missing/incomplete audit files; missing medical/mental health data; absence of classification handbooks within the classification work areas, and errors in the recording of criminal history data should not be identified by the Monitor's inquiries, but by OPSO.

<u>New Recommendations:</u>

3.   Assign a deputy to the Classification Unit or modify policy to allow the classification specialists to conduct the housing audits, interviews, etc.

4.   Restart the audit process as soon as possible to verify the actual housing location of the inmate to ensure matches housing assignments generated by classification.



5.      Distribute the Classification and PREA Handbooks to each classification specialists and place copy(s) in the classification interview area to ensure quick and easy access to all.



**IV.A.10.b. Prohibit classifications based solely on race, color, national origin, or ethnicity.**

Finding:  Substantial Compliance

Measures of Compliance:

1.  Implementation of a valid classification system based on the objective and reliable risk and need factors of the OPSO inmate populations as documented by a written report on the design/validation of the revised classification system and electronic file of custody assessments.
2.  Provide a quarterly report that tracks custody distributions by housing unit race, and gender to the Monitor.

**Observations:**

Custody assessments are based on objective risk factors that have been validated for OPSO males and female inmates. Race is not one of the objective risk factors. OPSO has created monthly statistical reports to track classifications by race. Timely reports were submitted to the Monitor during this compliance period.

As the Consent Judgment specifically prohibits classification by race, immediate concerns were raised when two of the classification specialists indicated that race was a criterion for matching "cell-mates." Observation of the housing assignments revealed that custody level, PREA designation, age and race were considered when selecting among the potential beds identified by the automated housing module when assigning an inmate to a specific bed. This was not a consistent pattern across all of the classification specialists as when observing other classification specialists, race was not a considered when selecting a specific cell/bed for inmates. The inconsistencies in the housing criteria among the classification specialists indicated inadequacies on the initial training protocols as well as inadequate supervision and quality assurance protocols for the custody assessment and housing processes.   Although the majority of the classification special did not appear to use race as <u>one</u> of the criteria for matching "cell-mates," this issue will be closely monitored during the upcoming compliance period. Failure to address these concerns and recommendations will cause this provision to revert to non-compliance.



<u>New Recommendation:</u>

6.    Implement ongoing audit/quality assurance protocol to ensure consistent compliance with OPSO classification policies and classification and housing procedures as defined in the OPSO Classification and PREA handbooks and to ensure that race is not used as a housing criterion.



**IV.A.10.c Ensure that the classification staff has sufficient access to current information regarding cell availability in each division.**

Finding: Substantial Compliance

Measures of Compliance:

1. Develop and implement a housing unit assignment plan that outlines the mission, number of beds and custody level(s) for each OPSO housing unit.
2. Provide a report of the daily counts to the classification housing staff as to the number of occupied, vacant, and out-of-order beds per pod per housing unit with electronic copies of the daily reports provided to the Monitor.

<u>Observations:</u>

OPSO has developed an automated housing assignment process that considers the inmate's custody level, gender, special population status, PREA designations, enemies, and associates as well as bed availability to recommend an appropriate bed for the inmate. Separations for special populations have fully identified and incorporated into the automated HUAP. Identification tags are used to identify inmates on suicide observation vs. suicide watch, alcohol/drug detox, and school participation. Classification specialists are provided a listing of mission of each unit to facilitate selection of the "best" bed from among those identified by the JMS as compatible based on the inmate's custody, PREA designations, separations, medical, and mental health needs.

Previous problems of Security/Operations moving inmates without going through the Classification Unit for housing unit transfers appear to have been addressed.

Housing units closed due to staff and/or fluctuations on the average daily OPSO population as well as cells/beds take off-line for repairs are printed on the daily population sheets generated by the JMS did not appear to be a full listing of the cells closed for maintenance. However, the classification specialists maintain a separate inventory of cells/beds that are off-line for maintenance as well as a list of cell restrictions for medical isolations. While this manual process does not appear to hamper the classification specialists' ability to identify an appropriate bed for an inmate, it suggests inefficiencies between the automated Jail Management System, and the classification, housing, and facility maintenance processes.



Classification specialists also maintain a current inventory of bed assignments to avoid duplications due to delays between the housing assignments and physical transfer of the inmate to the designated housing unit. Thus, as required by the Consent Judgment, the classification specialists appear to have access to current information regarding bed availability throughout the OJC, however the current process entails maintaining multiple manual lists creating opportunity for housing errors and backlogs for moving inmates from booking to the appropriate housing pod.

New Recommendation:

7.   Use the efficiencies of the automated workflow processes within the JMS to eliminate duplication of effort, numerous emails, and miscommunication across divisions/unit of the OPSO.



**IV.A.10.d. Continue to update the classification system to include information on each prisoner's history at OPSO.**

Finding:   Partial Compliance

Measures of Compliance:

1.  Any automated management information system will include accurate data within eight hours of the custody assessment or status change, data regarding the inmates' custody level, medical, disciplinary infractions, mental health, and custody assessment (date, risk factor scoring, override reason [if applicable], and custody level). Monitor will conduct audit of random sample of cases to determine accuracy and timely entry of data. Compliance standard will be 90% accurate and reliable.
2.  The custody assessments shall be updated/reviewed every 120 days, a hearing for a disciplinary infraction for major infraction, legal status change, new information from the court, and a major jail incident to include PREA or other major incident/investigation. Monitor will conduct audit of random sample of cases to determine accuracy and timely entry of data. Compliance standard will be 90% accurate and reliable.

<u>Observations:</u>

As shown in Figure 1, the monthly custodial reports, as provided by OPSO, have indicated a significant decrease in the lag-time between booking and the initial classification. Further when the percentage of inmates for whom initial custody and housing assessments were completed improved. For example:

o   Percent Initial Custody Assessments: As of October 2017, initial custody assessments were completed for only 69.9 percent of the inmates booked into OJC.  Custody and PREA assessments WERE completed for all inmates prior to their transfers from the booking area to OPSO housing units, however approximately 30 percent were released from OPSO prior to completion of the initial classification process.  Over the last six months – November – May 2018 - the percentage of inmates for which an initial custody assessment was completed increased to 80.1 percent. However, this rate is still below the January 2017 rate of 91.9 percent.

o   Percent Within 8 Hours: As of January 2017, initial custody assessments were completed within the first eight hours of booking for 92 percent (91.9%) of the OPSO inmates. As of October 2017, the initial custody assessment was completed within eight hours of booking for only 51.4 percent of the inmates, but by May 2018, the initial classification was completed for three quarters (74.8 percent) of



the inmates within the first eight hours of detention.

o Percent Greater Than 24 Hours: As of January 2017, the lag time between booking and the initial custody assessment was more than 24 hours for only .1 percent of the inmates, but by October 2017, 12.8 percent of the inmates remained in booking for more than 24 hours prior to their initial classification. As of May 2018, the lag time between booking and classification was 24+ hours for only .4 percent of the inmates. Thus, the lag time between booking and classification improved significantly during this compliance period.



**Figure 1: Rates and Completion Time for Initial Custody Assessments: 2017 - May 2018**

The Classification Monitor List (List) is an ad hoc report that identifies all inmates for whom a custody review is required for a regular 90-day re-assessment or because of some change or event within their jail records, i.e., change in their charge(s), bail amount, disciplinary record, detainer lodged/lifted, and/or sentence. As of October 27, 2017, 144 inmates were due for a custody re-assessment. As of June 11, 2018, the number of inmates on the List had been reduced significantly; a custody review was pending for only 27 inmates. While the number of inmates on the list varies throughout a day according to the flow of inmates back from court, through booking process, etc., at least one classification specialist is assigned to the

task of completing the custody reviews on each of the shifts.

Following Compliance Report #8, OSPO took immediate steps to work with CCS to rebuild the linkages between the medical records and JMS as well as ensure that the medical/mental health assessment data were linked to the new jail management system. Initial medical/mental health assessment data from the intake processes <u>are</u> uploaded to the JMS from the CCS electronic medical records.[12] Thus, information on the following risk factors for the PREA victimization and predation assessments <u>are available</u> to the classification specialists for the <u>initial</u> classification and housing assessments:

- Physical stature - The JMS looks for the height and weight input as part of the initial medical assessment by Correct Care Solutions (CCS).
- Developmental/Medical Disability (Medical Special Needs)?
- Psychiatric patient (Mental Health Special Needs)?
- Gay/Lesbian/Bisexual/Transgender/Intersex or overtly effeminate?
- History of any sexual abuse within the community during the past 15 years?
- Does the individual feel vulnerable in jail?
- Overtly masculine (females only)?

However, the linkages between electronic medical records (ERMA) and the JMS to update the medical/mental health data have not been completed. As of June 28, 2018, CCS indicated that the linkages have been built and data were passed to the JMS. OPSO reports that verification that the CCS data were properly uploaded to the JMS and linked to the custody and PREA assessment programs should be completed by July 1, 2018. Thus, critical information for custody re-assessments and housing assignments were not at the time of the compliance tour available to the classification specialists. Subsequent inquiries as to the status of the data sharing, revealed another delay. The data are now projected to be available by July 15th. .

---

[12] As identified by the Monitor in the preparation of Compliance Report #8, beginning in March 2017, the medical/mental health assessment data from the CCS electronic medical records were not uploaded to the OPSO JMS. Thus, information required for PREA victimization and predation assessments were not available to the classification specialists.



New screening questions as to identify inter-sex and transgender inmates were built into the JMS to better track inmate's sexual identification and search preferences. These data were recommended for the compliance with the PREA standards and have been built into the PREA vulnerability assessments.

The OPSO disciplinary process tracks the institutional misconduct among OSPO inmates housed at OJC, TDC, and Hunt. Disciplinary data for the inmates housed at out-of-parish at the Riverbend Correctional Center (RCC) and East Carroll Parish (ECP) were also input into the JMS. As of June 6, 2018, all of the OPSO inmates have been transferred back to OJC from ECP and RCC. Thus, going forward, the delay in the entry of the disciplinary dispositions into the JMS and thus available for the custody re-assessments should be minimized.

The Monitor's review of the custody assessments completed by the classification specialists as part of a technical assistance (TA) visit in April 2018 revealed that the prior criminal history data were not correctly entered into the JMS. Thus, while they were reviewing the NCIC rap sheets, the custody and PREA assessments were still not correctly scored.[13] The Monitor's observations of the initial classification process during this compliance tour indicated that, for the most part, the criminal history data were now reviewed and input into the JMS.  However, there were inconsistencies in the interpretation of the criminal history data and classification specialists were not routinely using the offense and disciplinary severity indexes created for the OPSO classification system. Again, this absence of integrity in these important processes poses an ongoing, unnecessary threat to inmate and staff safety.

The Monitor's assessment of the reclassification process indicated that the classification specialists were not reviewing the criminal rap sheets. When asked, staff explained that the criminal history factors did not change from initial to reclassification, thus did not have to be rechecked. This rational is problematic given that, prior to April 2018, criminal history data were not properly reviewed and input into the system; thus, for

---

[13]Additional immediately instruction was provided by the Monitor and the need for additional training as to how to read a NCIC report and to input these data within the JMS was recommended to the Classification Manager.



many custody assessments, the data were incomplete. The reclassification process was merely rubber-stamping the errors of the initial custody assessments. The previous recommendation to develop and implement an on-going quality control process to ensure the integrity of both the initial and reclassification processes remains unheeded.

While custody re-assessments are completed for OPSO inmates housed out-of-parish, notification of the out-of-parish facilities as to any changes in the custody or PREA designations did not occur during this compliance period for the inmates housed at ECP, RCC, or Hunt. At this point , the notifications are no longer relevant for the OPSO inmates are no longer housed at RCC and ECP. At Hunt, the housing is single-cells, thus separation by custody level and PREA designation are maintained, except if the individuals mingle are simultaneously released for recreation, group, etc.

New Recommendations:

8.      Provide additional training as to how to read a NCIC report and to input these data within the JMS.

9.      Require review the criminal history rap sheets as part of the custody review process to ensure data are complete and up-to-date.



**IV.A.10.e. Continue competency-based training and access to all supervisors on the full capabilities of the OPSO classification and prisoner tracking system.**

Finding: Partial Compliance

Measures of Compliance:
1. Written directive governing training of staff assigned to classification.
2. Curriculum for competency-based training regarding the custody classification system, housing assignment process, work/community assignments, and case management. Evidence of knowledge gained.
3. Staff training roster(s) and competency tests following completion of competency-based training by current classification/case management staff.
4. Staff training roster(s) and competency tests following completion of competency-based training by all new or re-assigned staff on assignment to classification/case management duties.
5. Curriculum for classification module within the basic academy training curriculum for OPSO staff. Evidence of knowledge gained.
6. Staff training roster(s) and competency tests.

Observations:

During this compliance period, the Classification Manager and/or shift supervisors provided instruction to the classification specialists regarding the importance and how to input the criminal history data from the NCIC rap sheets and how to complete the new PREA sexual identification tracking screens within the JMS. Due to staffing schedules, formal training sessions were not held; a shift leader or the classification manager simply provided informal instruction to the classification specialists. Training "rosters" indicate that each of the classification specialist received the instruction related to: "Criminal History & Attachments" and "Updating the Inmate Locations, Bottom Bunks, and Review of Previous Classification Notes." A "roster" was not available to verify instruction for all specialists as to the new PREA sexual identification tracking screens.

The quality and consistency of the verbal instruction provided by the shift supervisors/classification manager were questionable as the classifications specialists clearly had different understandings of the attachment screens, were inputting the incorrect dates[14], and were not using the OPSO offense severity and disciplinary indexes.

---

[14]For example, while observing the custody assessments during this site visit, it was noted that the classification specialists, for example, were inputting the date of the custody assessment rather than the dates of the prior convictions on the attachments. Thus, the JMS incorrectly computed the time since the conviction. Again, routine quality control checks or even just shadowing of the classification specialists would have quickly identified the error.



There did not appear to be a protocol for auditing the assessments following the verbal instruction is completed to ensure the data were correctly input from the NCIC rap sheets. While classification staff shortages across the multiple shifts pose challenges for any training process, the inconsistent and/or incomplete training does little but to confuse and frustrate staff. The product -- the custody assessments -- is not improved. Again as previously recommended, a systematic random audit process should be implemented to monitor accuracy of the risk factor scoring as well as housing assignments in order to address the on-going, unnecessary threat to inmate and staff safety.



**IV.A.10.f. Conduct internal and external review and validation of the classification and prisoner tracking system on at least an annual basis.**

Finding: Non-compliance

**Measures of Compliance:** the OPSO information system to monitor:
1. Custody distributions by gender, race and special populations.
2. Override rates.
3. Housing by custody level/special needs, and race.
4. PREA separations.
5. Custody re-assessments (regular and for-cause, # over-due, et al.).
6. Electronic copies of the quarterly and annual reports shall be provided to the Monitor with documentation of steps (tasks and dates) taken to address any noted inconsistencies with OPSO policies.

Observations:

Timely monthly custodial statistical reports for October 2017 – May 2018 as to the number custody assessments by type, gender and population were submitted the Monitor. The Monitor received the OPSO daily population sheet that tracks the number of inmates by location.

Housing audit summary reports were received for October 2017 – March 2018. Although the folders with the audit score sheets were reviewed during the April TA visit, the forms could not be found for the June compliance tour. During the April TA visit, the Monitor worked with the classification deputy to update the audit score sheet and monthly summary reports to record checks of bunk assignments, use of the ISI, and presence of the pod deputy on the unit. As the audit score sheets were not available for the June visit, the October – March audit summary reports were not updated, and no audits were conducted in April – June, the integrity of the housing assignment process could not be assessed for this compliance report. OPSO has failed to maintain critical processes of auditing and enforcing the housing assignments as identified by the objective classification and housing assessment processes.

OPSO has proposed that responsibility for the housing audits be transferred from the Classification Unit to the newly designated Unit Managers as part of their role of maintaining the integrity of housing and separations within the pods. While this idea has merit as ensuring inmates are in their assigned cells and bunks are fundamental tasks for



the Unit Managers, random independent audits by the Classification Unit are essential to ensure classification maintains control of the housing assignment process.

Regardless of who is assigned responsibility for conducting the housing audits, written procedures for the housing audit process based on the updated the audit score-sheets must be developed. As noted in Compliance Report # 8, the housing audit process raised several concerns that suggested the audits were not providing a full picture of the integrity of the housing assignments and pod-level separations within OPSO housing units. These concerns must be addressed as part of the written procedures for the housing audit process:

- Schedule: The audit schedule should ensure each pod is audited randomly throughout the month.  Special units may require additional audits.
- Time: Audits should occur across all shifts.
- Staffing: More than one individual (deputy or civilian) should be responsible for the housing audits to ensure checks across shift, schedule, and inter-rater reliability.
- Audit worksheets: Update the audit score sheets and housing rosters to provide for standardized scoring, for example, a specific mark/note should have the same meaning across audit score-sheets.
- Coverage: All OJC and TDC housing units should be audited.
- Detail: The updated audit score-sheet records compliance with cell and bunk assignments as per the most recent housing transfer.
- Reporting: Responsibility for compiling a summary the individual pod level audits must be determined. The individual should have skills for data computation, graphing, analyses of trends, and generating recommendations for addressing problems or patterns.

As part of the ongoing classification and housing processes, the classification shift supervisor reviews the JMS reports to identify placement errors and ISI separation conflicts. Errors are corrected immediately. Thus, the housing separation errors detected by the JMS are resolved quickly to prevent conflicts and enhance staff and inmate safety. However, reliance on the automated housing violation reports to detect housing and



custody assessment errors is insufficient to ensure institutional safety and security.

An internal auditing/quality control process was re-started in November 2017. The monthly reports indicate 102 cases were audited between November 2017 and May 2018. This represented about .7% of the 15,093 custody assessments completed during this six-month period. The process for selecting cases to be audited remains unclear, or at the least, inconsistent as the auditors described conflicting procedures. Nonetheless, the system should be revamped to ensure larger samples and consistency across auditors.

OPSO contracted with Dr. Edward Latessa and Dr. Brian Lovins (University of Cincinnati) for a revalidation of the classification system as required by the Consent Judgment. The final report was submitted to the OPSO on April 30, 2018.[15] The report was based on the custody and PREA assessments completed between September 1, 2015 and October 18, 2017.  Key findings included:

- o *"Current initial classification instrument provides a valid assessment for infractions for both male and female inmates. There are also clear demarcations between minimum, medium, and high classification."*
- o *"Current reclassification instrument is valid for both the males and females, although the ability of the instrument to separate medium and high-risk females was minimal."*
- o PREA Assessments: The predation assessment appeared to differentiate high risk from the potential/low risk.
- o Victim Potential: The validity of the victim assessments could not be assessed, as the OPSO data do not consistently track victimization.
- o Recommendations for improving the system included:
  - ▪ Initial classification instrument - Recode the risk factors for Institutional Violence, Open warrant, and Current Age factors as well as remove the factors for Escape History, Severity of Prior Convictions and Number of Prior Convictions.
  - ▪ Reclassification instrument – Use the revised initial classification

---

[15]  Op Cit. Lovins, Brian K. and Edward Latessa (April 30, 2018).



instrument but add the current reclassification risk factors for number and severity of disciplinary reports.

- Develop a screener instrument to expedite the intake process.

While it is important to recognize that the current initial and custody reviews as well as the predation assessments were found to be valid assessments of OSPO inmates' threats to institutional violence and disruption, OPSO should carefully consider Latessa and Lovins' recommendations for implementation. As the underlying intent of the CJ requirement for annual reviews and validation is to ensure that the system is accurate for the OPSO <u>current </u>inmate population, OPSO should take advantage of these detailed statistical analyses of the system. The breadth and quality of data, particularly that associated with institutional disciplinary and incidents, currently available to inform any updates to the system is well beyond that which was available for the original design and validation of the system. OPSO should not rest on its laurels of a valid objective system, but step forward and implement updates to make it even better.

<u>New Recommendations:</u>

10.   Develop written procedures and training materials for the housing audit process; train those assigned.

11.   Re-start the housing audit process with audits by Unit Managers and Classification Unit.

12.   Expand the internal audits of the custody and housing assessments to include a random sample of 1-2% of the assessments completed.

13.   Address the recommendations by Lovins and Latessa.



**IV.A.10.g.**  Provide the Monitor a periodic report on classification at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date and every six months, thereafter, until termination of this Agreement. Each report will include the following information:

(1)     number of prisoner-on-prisoner assaults;
(2)     number of assaults against prisoners with mental illness;
(3)     number of prisoners who report having gang affiliations;
(4)     most serious offense leading to incarceration;
(5)     number of prisoners classified in each security level;
(6)     number of prisoners placed in protective custody; and
(7)     number of misconduct complaints.

Finding: Partial-compliance

Measures of Compliance:

1. Annual and bi-annual tracking reports within the OPSO information system to monitor number/rates during the last 12 months and for the stock population:
   o  number of prisoner-on-prisoner assaults/custody level by gender;
   o  number of assaults against inmates with mental illness by gender;
   o  number of inmates who report having gang affiliations by gang affiliation;
   o  most serious current offense leading to incarceration by gender;
   o  number of inmates currently classified in each security level;
   o  number of inmates placed in protective custody;
   o  number of inmates in administrative segregation; and
   o  number of major and minor misconduct complaints.

<u>Observations:</u>

Monthly custodial, discipline and inmate statistical reports were received through May 2018. OPSO has improved in the development of statistical reports as required under section IV.A.10.g, but work remains. The only data <u>not</u> provided were the rates of victimization of inmates on the mental health caseload. As noted earlier, these data are dependent upon timely information from the mental health provider.

Updated data for the inmates identified as having gang affiliations were to be uploaded to the JMS in early June. Unfortunately, ongoing data files/uploads have not been coordinated between OPSO and NOPD during this compliance period. Thus, it is questionable if the gang-related data within the JMS reflected current gang affiliations as identified by NOPD investigations. OPSO has re-assigned a liaison between the NOPD and OPSO to ensure ongoing sharing of these data. The liaison will need to establish a written process/procedures to share gang-related information between the OPSO and NOPD. The



OPSO is also notified by the district attorney's office as to inmates identified by the courts as gang affiliated. Thus, data are available to track the prevalence of inmates per "gang" among OPSO populations as well as by location (i.e., tier, side and cell of OJC).

Figure 2 provides the OPSO monthly disciplinary data as recorded in the JMS. The number disciplinary reports have fluctuated over last 17 months -- January 2017 -- May 2018. Overall, the trend-line for the number of formal disciplinary reports written per month is flat to a slight decrease in May. These fluctuations appear to mirror the fluctuations in the OPSO ADP. On the other hand, the rate of infractions with a finding of guilt has increased from about 72 percent in January 2017 to 92 percent by May 2018. It is unclear if the increase in the percentage of guilty findings to 92 percent guilty is an indication that the incident report writing and documentation have improved, the disciplinary process is simply a rubber stamp of the disciplinary reports, the change from a civilian hearing officer to a sworn hearing officer, or some combination. The integrity of the disciplinary process to consistently identify and sanction misconduct among the inmates is key as the severity and prevalence of institutional misconduct are the most important classification factors for determining an inmate's threat to institutional safety and security. Without accurate disciplinary data, the classification and housing process will fail to control institutional violence.



**Figure 2: Total and Guilty Inmate Disciplinary Infractions: Jan 2017 – May 2018**



Figure 3 illustrates the rate of disciplinary infractions among the OSPO inmate population between January 2017 and May 2018. The rates of predatory (assaults or battery) and aggressive behaviors (i.e., fights or threats) based on the OSPO average daily population were fairly constant over the 17-month period.  In January 2017, for example, 1.2 percent of the inmates were found guilty of a predatory infraction and/or an aggressive infraction, in May 2018, 3.0 percent were found guilty of an aggressive infraction and 1.5 percent for a predatory infraction. Overall, although the rates changed little over this 17-month period, on average 15 percent of the inmates were written up for a disciplinary infraction per month. This would suggest that institutional violence and misconduct have not decreased, but rather remained constant over this 17-month period.

Figure 4 provides a breakdown of the most serious type of infraction of which the inmate was found guilty between January 2017 and May 2018. The numbers of predatory (assaults or battery) and aggressive behaviors (i.e., fights or threats) were fairly constant over the 17-month period. While, clearly the number of management problem and disruptive behaviors fluctuated throughout the 17-month period -- January 2017 and May 2018 -- again the numbers of predatory and aggressive behaviors were fairly constant indicating little to no change in the threats to inmate and staff safety.



**Figure 3: Rate of Disciplinary Infractions – January 2017 – May 2018**





Figure 4: Types of Disciplinary Infractions of which OPSO Detainees were Found Guilty -
January 2017 - May 2018

**IV.A.10.h. OPSO shall review the periodic data report and make recommendations regarding proper placement consistent with this Agreement or other necessary changes in policy based on this review. The review and recommendations will be documented and provided to the Monitor.**

Finding: Partial Compliance

Measures of Compliance:

1. Report to the Monitor with recommended change and rationale/data regarding any policy changes.

Observations:

The Monitor receives the daily "Active Inmates by Location" report. During this compliance period, there has been on-going dialogue between the Monitor and OPSO regarding the importance of staff training, housing and internal audits, tweaks to the HUAP, and the monthly custodial reports. Discontinuation of the housing audit forms open and incomplete housing audit reports created sobering concerns about the integrity of classification data and records and oversight of the Unit.

The Monitor receives the monthly statistical reports as required; however, there appears to be little independent analyses of the data. Further, the numbers do not always tally, requiring multiple emails to clarify or rerun the reports.

New Recommendation:

14. Careful review and analyses of the statistical reports to identify adjustments to the classification and housing processes are responsive to the current OSPO system needs and trends.



## IV. A. 11.       Prisoner Grievance Process

Finding:  Partial Compliance

**Measures of Compliance:**
1.  Written policy and procedures governing inmate grievances, and grievance appeals. Directive shall include but not be limited to availability of grievance forms in required language, ability of inmates to secure forms upon request and deposit into secured boxes, prohibition against retaliation against inmates who file grievances, time deadlines on responses, assistance to inmates to file grievances (including assistance to inmates with mental illness, low functioning, non-English speaking).
2.  Written policies and procedures that designates a position/post responsible for assuring the collection and response to grievances, including maintenance of records, trends, and analysis of grievance data.
3.  An electronic tracking system.
4.  Written orientation to inmates regarding the grievance process.
5.  Inmate handbook.
6.  Curriculum/lesson plans to train staff (pre-service and in-service) regarding their roles and responsibilities regarding the inmate grievance process.
7.  Interviews with inmates.
8.  Interviews with employees.
9.  Observation of staff training.
10. Observation of inmate orientation.
11. Written policies/procedures governing the inmate request process.
12. Inmate request forms.
13. Review of referrals for investigation resulting from inmate grievances.
14. Review of original inmate grievances and responses.
15. Monitors' review of grievance logs, grievances, analysis of grievances conducted by OPSO.

Observations:

The grievance process provides a means for inmates to raise issues regarding their incarceration and to reach a resolution consistent with OPSO policies and the Inmate Handbook.  The grievance process also serves as notice to OPSO for emerging issues.  For example, in the recent Ramadan observance, the grievance process flagged continuing issues with conformance to dietary requirements for observant inmates.   For the grievance process to be effective, the responses must be timely, professional, and, to the extent possible, address the inmate's concerns. The analysis of grievances must be provided to the facility's leadership to inform decision-making, identify areas where additional supervision and training are needed, and adjust policies and procedures.

As noted in previous reports, the grievance software used by the inmates at the kiosks in housing units does not easily separate requests for service (e.g.



property, programs, records) from grievable matters.  For example, OPSO's reporting shows more than 7,200 grievances for CY 2017 and almost 6,000 requests for service.  For 2017, the largest number of issues are in a category called "facility (grievable)", and medical.  For the first four months of 2018, OPSO reports more than 2,000 grievances and 16,564 requests for service.

OPSO provided evidence that inmate grievances are tracked, information compiled, and the OJC's leadership informed of findings and trends.  For example, the coordinator provided the executive review of grievances for March 2018 for each area (e.g. sanitation, commissary, inmate/inmate altercations).   Minutes of meetings held to review the trends and patterns were also provided.   While this work responds to previous recommendations, and will improve the processes, what is missing are action plans to meaningful identify how to resolve the issues.   For example, the discussion of the grievances regarding commissary concluded that no one in the meeting had knowledge of the vendor's contract, nor were next steps or delegation of tasks recorded.  Those involved in the grievance issue, such as the individual overseeing the commissary vendor, the sanitation director, and an ISB representative, may make these meetings more useful.

The work since the last Compliance Report identifies the attempts to improve the system, but the effectiveness is impacted by the absence of staff to first, intercede before a grievance is needed, and, secondly, to respond to not only the inmate, but to address, correct, and evaluate ongoing solutions to the systemic issues.   Interim Independent Compliance Director Hodge's implementation of the unit management concept should impact both these matters substantially.  By having trained deputies who know the scope of their role, inmates should not have to send grievances (or requests) for indigent supplies, clothing, or to address the laundry and cleaning supply issues.  The unit manager should be on top of all these issues.  This is not to suggest that the measure should be no grievances, but rather that matters are appropriately resolved at the housing unit level.  The Consent Judgment requires that inmates have access to a confidential system.

OPSO also audited 10% of the grievances, including medical-related grievances, to assess whether responses are within policy guidelines (23% were not

timely), and whether appropriate responses were given (23% were not deemed appropriate).   [See also Medical Grievances, page 92.]  In previous compliance reports, the Monitors noted that there needed to be a reconciliation between the grievance numbers of OPSO and those of CCS.  The coordinator has documented these attempts at reconciliation taking place in the last six months.

The Monitor also reviewed on-site grievances for the first four months of 2018 and identified the same issues as noted above, particularly about answers to inmates which were non-responsive.  This was noted in the OPSO April 2018 grievance report regarding inmates who requested information on programming.

The Monitors view inmate grievances when an inmate asks that their issue be forwarded to the Monitors.  The Monitors have been forwarded 121 grievances since the beginning of 2018, allowing for a first-hand look at issues where inmates feel their issues have not been resolved.   In many instances, the inmates are frustrated because their issues are not resolved, in their view.  Repeated grievances from an inmate prompt the coordinator to visit with that inmate to see if matters can be resolved.  This is a good approach and has been successful with the majority of inmates.

There is policy guiding inmate grievances, and the mechanism for inmates, via the electronic kiosks to file grievances.  As noted in Compliance Report # 7, the paperwork process is in place, but the ability to resolve the inmate's issue, as well as systemic issues is lagging behind.  For example, inmates' grievances regarding food service, medical-ordered diets, and medical care allowed the Monitors to see how OJC and CCS resolved issues, as well as see if systemic issues are solved.  This latter issue – resolution of systemic issues – is the challenge for OJC.

It is unclear at this time how and if the new jail management information system will include/adapt the current grievance mechanisms (kiosks).  This is a matter which should be addressed to allow inmates continued access, separate the requests from grievances, and allow for more analysis through the software, rather than personnel resources.   As this system is developed, OPSO should redefine the category "facility grievances" to more discrete descriptors to allow for problem identification and problem solving.

The Monitor notes substantial improvements and note these areas require attention to achieve compliance:

- Tracking the implementation of resolutions (IV. A. 11. (2)) – OPSO needs to use the information identified in the grievance process to resolve *systemic* issues – such as medically-ordered diets. The OPSO staff assured the Monitors that the grievance trends are discussed at staff meetings, what is missing are action plans or other relevant problem-solving as indicated by the data/trends.

- Reviews and recommendations (IV.A.11(6)) – as noted above, documentation was provided indicating that there is a quarterly review to identify areas of concerns, and what is missing are the specific actions needed to address systemic issues, accountability for those actions, and a review of the impact.

OPSO addressed several of the recommendations in Compliance Report # 8 and their hard work is noted by the Monitors.



## IV. A. 12.  Sexual Abuse

Finding:  Partial Compliance

**Measures of Compliance**:
1. Checklist of policies and procedures.
   http://www.prearesourcecenter.org/sites/default/files/library/checklistofdocumentationfinal2.pdf
2. Auditor Compliance Tool
   http://www.prearesourcecenter.org/sites/default/files/library/auditorcompliancetoolfinal2.pdf
3. Completion of Jail Toolkit http://static.nicic.gov/Library/026880.pdf
4. Written policies and procedures, protocols, memorandum of agreement/understanding, training curriculum required by the standards.
5. Memorandum of agreement, sexual assault treatment center.
6. Review of investigations.
7. Interviews with employees and inmates.
8. Referrals for prosecution.
9. Qualifications of instructors.

Observations:

   The on-site tour, and work with OPSO since Compliance Tour # 8, has identified the following:[16]

- The organizational responsibility for PREA compliance has been moved to the Compliance Bureau along with the supervision of the PREA Manager and PREA Facility Coordinators;

- The PREA related policies, signed by the Independent Compliance Director in 2016, require updating as comments by the Monitors, Attorneys for the Plaintiff Class and the Dept. of Justice were not incorporated.  The process to accomplish this as part of the annual review is underway at this time;

- Documentation of training, including on-going training, for employees, contractors, and volunteers was required;

- OPSO reports eight (8) calls to the PREA "hotline" for 2018 year-to-date; compared to sixty (60) calls for the first ten months of 2017.  Although

---

[16] PREA related incidents include allegations of:  sexual abuse, sexual harassment, and voyeurism
https://www.prearesourcecenter.org/training-technical-assistance/prea-101/prisons-and-jail-standards



these 60 calls, as reported by OPSO, do not all relate to PREA, the calls do indicate that inmates are using the "hotline." Of the eight calls for which documentation was provided by OPSO for March – May 2018, and for those where a name was provided, those names do not appear on OPSO's tracking spreadsheet for PREA related investigations;

- Job descriptions/post orders for the PREA Manager and facility coordinators were developed, addressing the Monitor's previous recommendations;
- There are open investigations from late 2017;
- Supervision of PREA investigations was changed in May 2018, expanding the pool of available investigators, necessitating the need for investigator training on PREA standards; and
- The PREA audit will be scheduled for late 2018.

As such there is no change to the compliance rating for this paragraph.

OPSO's own assessment of compliance concurs with this finding of partial compliance for this provision.

Data from OPSO for inmate grievances related to sexual safety report a total of 81 in 2017, and for the first four months of 2018, 31(inmate/inmate and staff/inmate). Examining incident reporting data, with the caveats noted earlier shows a trend in incidents from 6 reports of PREA-related incidents in CY 2016, 34 incidents in 2017, and for the first five months of 2018, 18 reports to the Monitors. OPSO data indicates there were 50 PREA-related investigations opened in CY2018.

OPSO has indicated they are not planning a "mock" audit prior to the formal audit, which is at their discretion.

<u>New Recommendations</u>:

15. Investigations - assure that investigations proceed and are concluded in a timely manner, revise standard operating procedures to conform investigative findings with those required by PREA standards and Bureau of



Justice Statistics' Survey Sexual Victimization [17] , and train newly assigned investigators;

16.    Review reporting to the Monitors regarding relevant incidents to address the differences in data (e.g. 18 reports to the Monitors and 50 investigations opened);

17.    Evaluate staffing of the PREA initiative in OPSO;

18.    Implement systems to immediately train newly hired employees, volunteers, and contractors;

19.    Assure the data collected regarding incidents is analyzed to inform plans of action and other needed corrective measures; and

20.    Conduct reliability testing of the PREA hotline – to assess its availability to and use by inmates, timely reporting of the information by the vendor to OPSO, compliance with PREA standards (115.51(b)), and initiation of prompt investigative review of these calls.

---

[17] https://www.bjs.gov/content/pub/pdf/ssv3_2016.pdf



## IV. A. 13.         Access to Information

Findings:        Partial compliance

**Measures of Compliance:**
1. Written policy/procedure governing inmate orientation, including but not limited to inmates with LEP, developmental disabilities, mental illness, etc.
2. Inmate handbook; orientation videos in English, Spanish, Vietnamese.
3. Observation of inmate orientation.
4. Inmate interviews.
5. Lesson plans, employee training, evidence of knowledge gained.
6. Review of grievances.
7. Post orders.

Observations:

As noted in Compliance Report # 8 -  no lesson plans have been provided that guide employee training, nor documentation of training.  If this is provided, this paragraph will gain compliance.

The Monitor notes that in the first four months of 2018, almost 1,100 inmates were charged with disciplinary infractions, based on the data provided by OPSO.  This finding presents an opportunity to examine if inmates are clear about facility rules as contained in the Inmate Handbook, and develop corrective action plans.  With the implementation of unit management, more and better training for housing unit deputies and supervisors, clearer expectations and consequences can more uniformly be provided to inmates on at least a daily basis.



## IV. B. Mental Health Care

**Summary**

OPSO and CCS struggle to provide adequate mental health care and achieve compliance with the Consent Judgment. The Mental Health Monitor has made multiple and repeated recommendations, provided technical assistance, and engaged in discussions with administrative, clinical and custody staff, as well as the attorneys for the Plaintiff class and DOJ.  The Medical and Mental Health Monitors and Nursing Sub-monitor have collaborated in on-site reviews of the overlapping medical and mental health services and quality management, and provided compliance analyses and recommendations since 2014.

Due to unavailability during the week of June 11-14, the specific onsite activities of the Mental Health Monitor occurred on June 20, 2018. The Mental Health Monitor toured OJC and had multiple discussions with CCS staff, reviewed documents, toured specific units, and met with Interim Independent Compliance Director Darnley Hodge.[18]

In summary, OPSO and CCS did not demonstrate substantial compliance with the mental health requirements of the Consent Judgment in the areas of:  adequate staffing, training and supervision, accessible mental health services, or adequate mental health treatment. Specifically, inadequate services include suicide prevention and management, medication management, therapies and counseling, and quality improvement and risk management. There is also significant CCS staff turnover, including a newly appointed temporary Mental Health Director, addition of a Mental Health Coordinator at OJC, coverage of inmate mental health needs by multiple contract psychiatrists, and supplemental by support by regional and central office CCS staff. CCS has reported it is fully staffed; however substantial services, including timely assessments and participation by psychiatrists in treatment planning and quality management activities, as well as defined, scheduled and completed programmatic requirements of the Consent Judgment remain problematic. In addition, suicide

---

[18] The Monitors held an exit conference on June 14, 2018 attended by OPSO and CCS  staff plaintiffs and DOJ, and the Mental Health Monitor (via telephone).



prevention and management, risk management, and training and supervision of staff are areas in need of substantial improvement. CCS has developed Action Plans which are essentially "plans to develop plans".   An area with promising implications is the potential collaboration of OPSO and CCS with Tulane University Department of Psychiatry to provide psychiatric services.

The need for greater collaboration by OPSO and CCS as "one Team" has been very clearly articulated by Interim Independent Compliance Director Hodge and staff morale, despite long standing staffing shortages, appears to be improving.

Specific findings and recommendations are provided below.

## IV. B. 1.   Screening and Assessment

Findings:
>B. 1. a. - Partial Compliance
>B. 1. b. - Partial Compliance
>B. 1. c. – Substantial Compliance
>B. 1. d. - Partial Compliance
>B. 2. e. - Partial Compliance
>B. 1. f. - Non-compliance
>B. 1. g. - Partial Compliance
>B. 1. h. - Partial Compliance
>B. 1. i. - Non-compliance
>B. 1. j. - Non-compliance
>B. 1. k. - Non-compliance
>B. 1. l. - Non-compliance

**Measures of Compliance:**
- Technical assistance to CCS mental health and administrative staff regarding policies, procedures, structured therapeutic programming and practices.
- Document review of OPSO and CCS policies and procedures.
- Review of a limited number of medical records and interviews of inmates and staff.
- Discussions with CCS and OJC administrative and line staff.
- Tour of OJC facility including units designated as having a "mental health" designation, and/or   suicide resistant cells.
- Review of new data from CCS regarding emergency, urgent, and routine referrals and sick call   responses.
- Review of new data from CCS regarding numbers of inmates prescribed. psychotropic   medications, and/or identified as on the mental health caseload.
- Review of new data regarding numbers of special needs inmates.



Observations:

CCS and OPSO have not finalized and/or demonstrated adequate implementation and training on all mental health-related policies and procedures. CCS has amended the previously unapproved suicide risk assessment (SRA) tool. This work appears to be an improvement and adequate; the use of the tool should be closely monitored.  Deficiencies in custody and mental  health staffing levels limit the availability of treatment services including group and individual counseling services and therapies, medication management, and  confidentiality of assessments. CCS has recently begun the process of including inmates in the treatment planning meetings and increased the frequency of individualized treatment plans for inmates. The current continuum of mental health services does not adequately provide for timely crisis intervention services, "step-down" or residential/transitional services, acute inpatient services for women, or full services for outpatients (general population and disciplinary/segregated populations). There is some progress in the provision of services in a step-down unit; however, the unit currently houses mentally ill inmates as well as inmates over the age of 18 who require school. A mental health program including a therapeutic milieu is needed.  This combination of populations is problematic to coordinated provision of services.

CCS has begun to provide some counseling services for some special needs populations. The quantity of these services is inadequate, and the quality of services  has not been measured.  Initial administrations of psychotropic medications are not timely; largely because of the deficiencies in the assessment process at IPC and the referral processes to psychiatrists/nurse practitioners. The referral policies have undergone necessary revisions and still require further modifications for internal consistency.

CCS has provided most of their corporate mental health-related  policies and procedures to OPSO and the Monitors. However, several of these policies have not been finalized and/or have not yet been measured for effectiveness.  For example, the screening instrument is adequate except for the referral criteria categories, but the draft referral policy has not been fully implemented or



measured. The policies and procedures for mental health assessment of inmates involved in the disciplinary process have not been completed, nor has the requirement for collaboration between the mental health staff and OPSO disciplinary process for  inmates on the mental health caseload been established.

Inmates in mental health crises continue to be housed on OJC units that do not have adequate numbers of suicide  resistant cells nor the physical space or corrections staffing support  necessary to provide adequate psychotherapeutic programming for inmates designated for either the acute/sub-acute designation or step down/residential   services. This condition applies to both male and female inmates.  Female inmates  do not have access to Hunt or comparable acute care services and housing. A  number of inmates in acute crisis remain at OJC and need to receive emergency medications to address their mental health needs. OPSO, CCS, and the attorneys for  the Plaintiff class/DOJ have researched Louisiana Law and have identified significant barriers  to administering emergency medications in the jail setting.

There is insufficient and inconsistent observation of inmates who are at increased risk for suicide and/or self-harm, as well as inadequate supervision by deputies for extended time periods. Certified Nursing Assistants (CNAs) and/or Licensed Practical Nurses (LPNs) are assigned to observe inmates housed at OJC who require "direct observation" and "suicide watch".  Inmates in these categories are housed in multiple units and some in cells which are not suicide resistant. Whatever the processes for direct custody supervision and direct observation/ suicide watch by clinical staff, the processes are failing as inmates continue to gain access to materials that can be used for self- harm or suicide. These issues have been  discussed throughout the course of the monitoring process.

Female inmates continue to be housed in the OJC general population, non-mental health units, with only two suicide resistant cells available despite the unit's designation as housing inmates with acute/sub-acute and step down/residential mental health needs.



The inmate screening process has been implemented. However, the effectiveness of the screening process has not been reviewed. Recommended changes in the screening process have not been implemented.

New Recommendations:

21. CCS must provide, track and assess services to inmates on the mental health caseload who have been identified as victims of assault or other crimes (including sexual assault) while at OJC or Hunt.

22. Determine and complete the number of necessary suicide resistant cells. Inspect housing areas to assure the physical plant poses minimal risk for inmates to harm themselves. Increase the ratio of CNA's conducting suicide watches to 1:2 and direct observation to 1:1.

23. Pursuant to policies, continue at least monthly meetings of the Mental Health Review Committee to document appropriately any identified concerns, problems and opportunities to improve care, and to analyze performance measures of mental health services and follow-up on implementation and results of corrective actions, including morbidity reviews inmates who have made serious and/or repeated suicide attempts.



**IV. B. 2.  Treatment**

Findings:
> B. 2. a.- Partial Compliance
> B. 2. b. - Non-compliance
> B. 2. c. - Non- Compliance
> B. 2. d. - Non-compliance
> B. 2. e. - Non-compliance
> B. 2. f. - Partial Compliance
> B. 2. g. -Partial Compliance
> B. 2. h. - Non-compliance

**Measures of Compliance:**
- Review of policies and procedures, medical records, current staffing, and quality management data and analysis.
- Tour of OJC, and review of treatment team procedures and treatment  services.
- Discussions with CCS and OJC staff.
- Review of incident reports.
- Review of sick call requests, plaintiffs' correspondence and grievances.

Observations:

CCS and OPSO must implement appropriate mental health treatment policies and procedures.  The current continuum of services is inadequate.  CCS has provided monthly data of inmates on the caseload, numbers of inmates participating in group sessions, individual therapy, and counseling services. The data do <u>not</u> demonstrate that the numbers of inmates receiving these services are sufficient for the populations in need.

Based on review of the documents and discussion with CCS and OPSO staff, the numbers of inmates needing services requires further analysis to clarify or explain the wide fluctuations in the number of inmates on the mental health caseload as well as those who are receiving services as "special needs".  Better reporting of the data is required regarding inmates who are receiving counseling services. The counseling services that are necessary for distinct populations as per the Consent Judgment, have not been adequately provided to all required populations.  For those instances where counseling services are provided,  there is no reliable estimate or identification of the actual number of inmates who require such services with the exceptions of juveniles and substance abusers. Therefore, although there is a reported and/or planned increase  in counseling services, the distinct



populations of victims of sexual abuse and inmates on the caseload who are victims of assault are not defined, compared to those who receive them.

The mental health evaluations required as part of the review of inmates who have been charged with internal rule violations  have  been under discussion for some time. While there appears to be agreement on policy that the inmates on the mental health caseload will be evaluated with regard to  disciplinary charges, the process for evaluating the needs and risks of the inmates have not been implemented.   When the process is implemented, documentation of the  required requests for reviews, the timeliness of the reviews, the outcome of the  reviews, and assessment of the impact of the process are essential.

Development of the process for appropriate medication management continues; including the planned use of "med holds" to assure inmates coming into OJC are assessed for their medication needs in a timely manner. The process for referrals to psychiatric providers within relevant and necessary timeframes has not yet been fully  implemented. Therefore, there continue to be unacceptable delays in the provision of assessments for psychotropic medications and other mental health therapeutic programming.

<u>New Recommendation</u>:

24.   OJC and CCS (including psychiatrists) implement performance indicators for medication management practices with appropriate data collection and analysis including inmates housed in OJC, Hunt, and other correctional facilities.



## IV. B. 3.   Counseling Services

Finding:
> B.3. a. Partial Compliance
> B.3. b. Partial Compliance

**Measures of Compliance:**
- Review of mental health caseload and diagnostic categories.
- Review of performance indicators and data for services to specific special needs populations.
- Interviews with inmates and staff.

Observations:

CCS has begun to distinguish mental health contacts/services provided to specific and identified groups and acknowledges only partial counseling services are being recently delivered to some groups and minimal to no services to others (including victims of assault or sexual abuse, substance abusers and individuals in general population in need of mental health therapy). The number of inmates requiring these services has not been specifically identified. The availability of these services is also compromised by inadequate numbers of staff and non-confidential (sound privacy) treatment space.

New Recommendation:

25.   CCS and OPSO must continue to identify the levels of need for mental health and special population inmates, and develop performance indicators for each group.



## IV. B. 4.  Suicide Prevention and Training Program

**Findings:**

B.  4. a. - Non-Compliance
B.  4. b. - Partial Compliance
B.  4. c. - Partial Compliance
B.  4. d. - Non-Compliance
B.  4. e. - Partial Compliance
B.  4. f. -  Substantial Compliance
B.   4. g. - Non-Compliance

**Measures of Compliance:**
- Review of policies, procedures and training/lesson plans.
- Discussions with staff.
- Review of incident reports and Plaintiffs/DOJ correspondence.
- Observations and interviews of inmates.
- Review of reported suicidal ideations, attempts and completed suicides.

Observations:

Training for clinical and custody staff has been ongoing.  An inadequate training curriculum/lesson plan was provided and was essentially a cognitive/information plan rather than a performance based (what should I do?) plan.  Testing for a  randomly selected 5% of the staff trained on suicide prevention has not been completed.

The suicide risk assessment tool has been amended again since the last compliance tour and appears to be adequate and acceptable; training and implementation monitoring is essential.  CCS staff administers the risk assessments in a non-confidential setting (i.e., cell front in the presence of other inmates) which requires correction.

During this compliance tour, the presence and accessibility of required emergency equipment including the cut down tools was demonstrated as  staff were able to locate the suicide cut down tool in all control pods observed.  OPSO rank are also required to have the tool on their persons and nearly all requested did.

The observations of inmates on suicide precautions are  compromised by allowing ratios of 1:2 for direct observation and 1:5 for suicide precautions and on the acute/subacute unit 2A; one CNA was responsible for 10 inmates, 4 of



whom were not in suicide resistant cells, because the other CNA assigned had gone to lunch. CCS reported that the CNAs/LPNs are required to leave the units when a deputy is not present exposing vulnerable inmates to unacceptable risk and inadequate protection.

CCS reviews all completed suicides; however, the mortality reviews are not self-critical and do not include analysis of systemic and recurring concerns and opportunities to improve care. CCS does not conduct morbidity reviews of serious and/or repeat suicide attempts. Case reviews and mock demonstrations are planned or just beginning.

New Recommendations:

26.    CCS revise and enhance training and supervision of CNAs with regard to direct observation and suicide watch at OJC. Train staff to appropriately interact and document observations of the inmate(s).

27.    CCS provide training to mental health staff and corrections staff with regard to direct observation and transport/movement of inmates who have been referred or presented with concerns for suicide or self-harm, and document as well as analyze the direct observation/supervision of those inmates by corrections staff until they are seen and evaluated by mental health staff. Provide documentation that deputies are trained, and inmates are adequately searched when placed on suicide precautions.

28.    OPSO and CCS implement performance-based training to provide a baseline; consider purchasing training packages to achieve these goals.

29.    Immediately develop a process for which inmates on suicide precautions receive the required continual observation even when OPSO deputies must leave the unit. For example, require a supervisor to relieve a deputy in a housing unit rather than remove the medical staff who are charged with helping assure the safety of vulnerable inmates.



## IV. B. 5.   Suicide Precautions

Findings:
    B.  5. a. – Partial Compliance
    B.  5. b. - Partial Compliance
    B.  5. c. - Partial Compliance
    B.  5. d. - Partial Compliance
    B.  5. e. - Non-Compliance
    B.  5. f. - Non-Compliance
    B.  5. g. - Non-Compliance
    B.  5. h - Non- Compliance
    B.  5. i. – Partial Compliance
    B.  5. j. – Partial Compliance
    B.  5.  k. – Non-Compliance

**Measures of Compliance:**
1. Review of medical records, incident reports, mortality reviews.
2. Discussions with staff.
3. Observation of inmates on suicide precautions and staff monitoring inmates.
4. Plaintiffs' Reports and Grievances.

## Observations:

OPSO policies for suicide prevention and management are being developed and/or reviewed.  Some procedures have been modified (including the suicide risk assessment tool) and appear to be adequate; however, approval and/or  implementation is pending for others (including the restraint policy, referral policy, and emergency medication policy). The reported number of inmates with suicidality/self-harm varies; the numbers reported by CCS are significantly different from those reported by OPSO.  Numbers reported are inconsistent, without adequate explanation or resolution. Twelve suicide resistant cells were identified during this site visit. During this compliance tour, the number of inmates on suicide watch was 12 (four were not in suicide resistant cells), many of whom had been on precautions for longer than 72 hours without adequate treatment or removal or recommendations for transfer to Hunt for acute care.

The designated "acute/subacute" and "step-down" units for males and females  include a mixture of mentally ill and non-mentally ill inmates. There is no



appreciable therapeutic milieu on <u>any</u> unit in OJC. The Hunt acute care unit provides  acute care services for men only.  The length of stay combined with the limited number of beds at Hunt (39 acute care  beds) limits the actual number of available acute care inpatient beds for men at any  given time. No acute care inpatient beds are available for women.

An internal audit by CCS (CSSR) in December 2017 found multiple areas of deficiencies and/or opportunities for improvement at both OPSO and Hunt. Their findings were very consistent with previous findings and recommendations by the Monitors and reflected in multiple Compliance Reports.

<u>New Recommendations:</u>

30.    OPSO and CCS conduct all suicide precautions and direct observations in suicide resistant cells. Limit use of crisis cells to 72 hours, unless active and progressive treatment out of cell is conducted to allow a maximum length of stay of 10 days with transfer to Hunt or step down/residential as indicated.

31.    As part of the Morbidity and Mortality Review process, conduct self-critical analysis of all completed suicides and serious and/or repeat suicide attempts.

32.    Implement recommendations of the CCS (CSSR) audit from December 2017.



## IV. B. 6.  Use of Physical and Chemical Restraints

Findings:

        B. 6. a. – Non-Compliance
        B. 6. b. – Partial Compliance
        B. 6. c. -  Non-Compliance
        B. 6. d. – Non-Compliance
        B. 6. e. - Non-Compliance
        B. 6. f. – Non-Compliance
        B. 6. g.- Non-Compliance

**Measures of Compliance:**
1. Review of policies and procedures.
2. Discussions with staff at OJC.
3. Review of incident reports.
4. Review of correspondence from Plaintiffs/DOJ.

Observations:

        OPSO and CCS continue to develop the use of restraints policies. Draft policies should be reviewed for internal consistency. OPSO and CCS report that therapeutic restraints are not used, even when indicated for inmates who become extremely agitated and possibly dangerous to themselves and others and cannot receive involuntary or emergency medications due to the current state of law in Louisiana.  CCS reports the use of  handcuffs and/or shackles for transport of inmates on suicide precautions as a  safety measure; these procedures and practices are inconsistent with OPSO policy.  Episodes of lack of staff supervision – for example acute inmates running away from  staff or running up to a mezzanine and threatening suicide or self-harm continue, even  when the inmates were already on suicide precautions at the time - a documented  pattern at OJC since the building opened. Of the 36 reported suicide attempts at OJC from January thru June 15, 2018, at least four involved use of force and/or use of physical restraints, including an inmate handcuffed to a chair while on suicide watch in IPC. These areas and appropriate review by CCS and OPSO are not being done, nor adequately addressed in policies, supervision and/or training.

        The use of force at Hunt including use of chemical munitions, i.e., OC spray, uses of force and restriction of basic programming has increased. Documentation that mental health staff were involved in planned uses of force,



and medical clearances were provided to Hunt staff by the CCS clinicians; documentation of <u>participation and clearance by CCS has not been provided.</u> Similarly, in the two reported planned uses of force at OJC, documentation of CCS involvement was absent.

There must be comprehensive policies that staff have been trained to use in the event of the need for therapeutic restraints to prevent injury.

<u>New Recommendations:</u>

33.     Assure and document CCS participation in planned uses of force at OJC and Hunt to de-escalate the inmate and the situation prior to the use of force, except in an emergency, as well as medical clearance.

34.     Review OJC policies and reporting of two planned uses of force from Jan. thru May 2018.

35.     Resolve differences/conflicts in OPSO, Hunt and CCS Restraint Policies to limit overuse and underuse of therapeutic physical restraints and chemical restraints, and escort of inmates on suicide precautions.



## IV. B. 7. Detoxification and Training

Finding:
>   B. 7. a. – Partial Compliance
>   B. 7. b. – Partial Compliance
>   B. 7. c. – Partial Compliance
>   B. 7 d. – Partial Compliance

**Measure of compliance:**
>   1   Document review of course outline, lesson plan, training records, and medical records.

Observations:

Performance has improved in this area since Compliance Report #8, including: 1) the CCS intake screen that includes clear queries regarding the risk of withdrawal is used; 2) CCS has implemented CIWA and COWS medical tags for monitoring for patients at risk of withdrawal; and 3) CCS staff is now well-trained and is performing well.

However, substantial improvement is needed. For example, a focused review of patients monitored for withdrawal from drugs and/or alcohol indicated that most were seen every 12 hours instead of every eight hours. Further, there is no curriculum (lesson plans) for corrections staff recognition of urgent medical conditions. There is no current plan for oversight of the training program. Some inmates at risk of withdrawal spend more hours, or days, in IPC rather than being assigned to a bed in a housing unit; this puts them at risk of harm.

New Recommendations:

36.   OPSO, in conjunction with CCS, develop and implement training for corrections staff on recognition of urgent medical conditions.

37.   OPSO and CCS improve communication regarding the need for rapid transfer out of IPC to appropriate housing (monitoring, bottom bunk, etc.) for patients at risk.

38.   CCS should revise the detox protocols to include practitioner visits, especially for those at high risk. CCS should oversee implementation of the detox protocol to assure staff adherence.



### IV. B. 8. Medical and Mental Health Staffing

Finding:
  B. 8. a. – Partial Compliance
  B. 8. b.  – Partial Compliance

<u>Observations:</u>

CCS staff turnover appears to have stabilized, though some nursing staff express reluctance to go to housing units because of the paucity of corrections staff  supervision in inmate living areas.      CCS has engaged a full-time, qualified medical director.  This should  lead to better clinical care through supervision.

Through medical record review, it is apparent that there are ample opportunities for improvement in training and supervision of clinical staff.  CCS is actively involved in this enhanced training and supervision.

There is very little cross training of nursing and administrative staff.  The result is that if one staff member is not present at work there is no one who can fulfill the function.  CCS has begun to cross-train staff; for example, the CNAs w h o watch suicidal inmates rotate to the medical area to work as medical assistants. The nurse doing infection control has someone cross-trained.  The nurse engaged for performance measurement has been on long term leave and no one was cross-trained to perform these duties in her absence. There is no one cross-trained as the grievance coordinator for CCS.

Closer collaboration between health staff and OJC leadership remains as an  opportunity for improvement.

<u>New Recommendations:</u>

39.      CCS continue training and supervision of all clinical staff, including cross  training for all nursing and administrative functions.



## IV. B. 9. Risk Management

Findings:
B. 9. a – Partial Compliance
B. 9. b. – Partial Compliance
B. 9. c. – Partial Compliance
B. 9. d. – Non-Compliance
B. 9. e. – Non-Compliance
B. 9. f. – Non-Compliance

**Measures of Compliance:**

1. Review of quality management information from CCS.
2. Review of minutes of meetings.
3. Interviews of staff.

Observations:

Dr. Greifinger:

Performance measurement and quality management program – the program is limping along, with continuing unreliability in some areas of measurement. Reliability was fair for chronic disease, ambulatory sensitive conditions requiring emergency room visits, and health assessments. Measurement of the timing of intake screening was inaccurate; the sample was not selected properly for health assessment and reviewers were understating missed opportunities for patients sent to the ER for ambulatory sensitive conditions. Reliability is poor for detox services and mental health treatment planning. Data analysis is weak and there has been very little trending of performance data to see if actions have been effective.

There is scant organized supervision of mid-level practitioners and no focused audits of their care.

Dr. Patterson:

The Mental Health committee meets after the MAC meetings. The results are that there is still only data reported, with little or no analysis; and no corrective action plans or follow-up. Neither the Mental Health Review Committee nor the Morbidity and Mortality Review Committee review serious or repeat suicide attempts; inmate incident reports in which de-escalation techniques by CCS and/or therapeutic restraints may have prevented or reduced



the likelihood of harm are not reviewed. There were 36 reported suicide attempts from January thru June 15, 2018, with at least 4 involving use of force and/or restraints. NONE of these incidents were reviewed by CCS and OPSO jointly to assess individual or systemic issues or to determine the root causes of the behaviors. OPSO reports a general downward trend in altercations and determined that inmates on the mental health caseload were involved in inmate on inmate altercations in 45% for males and 64% for females in May 2018. The Interim Independent Compliance Director has ordered an analysis of the possible role of medication refusals in  incidents of altercations involving caseload inmates. CCS is required to provide counseling to inmates on the caseload.

While there are meetings held to discuss quality management and data presented, there is very little to no analysis of the information, trend analysis, or corrective actions/recommendations to implement a comprehensive risk management system to address the mental health screening and assessment process, suicide risk assessment and management, timeliness of responses to inmate sick call requests and staff referrals, provision of acute care inpatient services for women, the provision of an adequate continuum of mental health care, and the effectiveness of mental health treatment planning and services to minimize and prevent harm. Analysis, corrective actions, and collaboration between OPSO, CCS, and Hunt are necessary. Composition of the Interdisciplinary Team includes the Medical Director and Director of Nursing for functions that appear to be appropriate for the Multidisciplinary Treatment Teams.

New Recommendations:

40.    CCS develop and implement an organized process for evaluation and feedback regarding care provided by mid-level practitioners and staff physicians.

41.    CCS, OPSO and Hunt revisit the quality management program and composition of committees to assure reliable data abstraction, quantitative



and qualitative data analysis, with trending, and  implementation of specific corrective action plans to remedy identified opportunities for improvement.  This program should integrate clinical performance measurement,  morbidity and mortality review, grievance  analysis and other elements of a comprehensive quality management program including a program plan and annual evaluation.

42.     The need for quality review of suicide attempts cannot be overemphasized. Inmates in need of treatment must be identified and services provided, while those who may engage in threatening and/or self- destructive behaviors require appropriate management and possibly treatment to reduce the likelihood of harm to themselves and others. CCS and OPSO should review and assess these incidents and determine strategies and corrective actions.



## IV.  C.  Medical Care

**Summary**

Since Compliance Tour 8, CCS has had significant leadership turnover, including the mental health director, health services administrator and director of nursing.  In that committee minutes are scant and poorly documented, institutional memory is lost with employee turnover of the on-site leadership team.

Corrections staff are often unavailable to escort nurses onto the housing units and to escort patients to the medical clinic.  CCS is not keeping track of missed appointments on-site due to lack of security escort, therefore is not possible to quantify this barrier to the  provision of timely care for patients with acute and chronic medical needs, including timely  receipt of medication.

There are no special needs beds (e.g. infirmary) at OJC and no specific plans to provide this much-needed space, except for the vague promise of a Phase III building.  An architect has been selected and program planning is scheduled for September 2018.   The OJC is neither designed nor equipped for housing special populations  and is poorly designed for the efficient delivery of medical care.

Assessment Methodology

- June 11 – 14, 2018 on-site tour.
- Meetings with OPSO and CCS staff, tour of OJC.
- Medical record review and reliability testing of CCS clinical performance measurement.
- Medical record reviews of selected incidents, patients referred to the emergency department for ambulatory sensitive conditions, trauma, detoxification and withdrawal, intake screening, sick call, chronic disease  (anticoagulants, asthma, diabetes, seizure disorder, medication management) and referrals from the attorneys for the Plaintiff class.
- Performance measurement and quality management documents, grievances, grievance analyses.



**Measures of compliance:**
1. Quality management documents.
2. Inmate complaints and grievances.
3. Medical records.

Observations:

Medical Care services have been stable since Compliance Report #8.

Access to care: There are continuing lags in access to care.  The monitoring team reviewed the intake assessments of 29 inmates, selected randomly and booked between since December 2017.  Only 55 percent were seen within five hours of admission; only 53 percent of patients with significant chronic disease were seen by a practitioner within 24 hours; and only 75 percent of critical medications were ordered within 24 hours.  History and physical examinations are only performed within 14 days on 82 percent of inmates in custody for more than 14 days; and only 21 percent of the histories and physicals are reviewed by a practitioner within 24 hours.

Sick call performance has ample opportunities for improvement; requests are not screened in a timely manner, patients are not seen by practitioners in a timely manner, and nursing documentation is insufficient.  Patients with chronic disease are not seen in a timely manner and nationally-accepted clinical guidelines are not routinely followed.

Emergency room utilization:  CCS has been able to reduce the use of the ER by 50% since the peak in August 2017, with most recent downward trend in April -May 2018.  Both trauma-related and medical "routes" have declined, with no adverse consequences for patients.

Housing for Pregnant Women:  Pregnant inmates are now housed in general population.  This is an improvement.  CCS issued a policy on counseling care for pregnant patients on May 24, 2018.  The policy includes access to counseling and assistance provided in accord with the patient's expressed desires

Medical recordkeeping:  Medication administration records are now integrated into the electronic medical record (ERMA) via hand-held tablets.  The tablets have just been issued and training is ongoing.  This is an improvement.



Language assistance:   Bilingual officers assist clinical staff with services for Spanish-only speaking patients.  The CCS language line is used for others, although documentation was not available as to how often it is used (as of tour #8).

Medication management: Continuity of medication on intake remains far below expectations.  For example, in a focused study of incoming inmates with chronic disease, only 75 percent had orders written within 24 hours of intake and only 89 percent received their first dose within 24 hours of the order.

In a focused study of inmates with seizure disorder, 86 percent had appropriate blood level testing for adjustments to dosing; this is improved from 63 percent six months ago.

As noted above, CCS and OPSO need to work together to mitigate any delayed medication passes due to short-staffing of security posts.

Continuity on release: The provision of discharge medication continues to be scant, with only three patients picking up discharge medication in May 2018 out of less than approximately two dozen ordered.  One significant reason for small numbers is that CCS does not receive timely notice of impending releases, where available.

Continuity on transfer: CCS is preparing transfer summaries to and from the Hunt facility and whenever necessary otherwise.  The summaries are more comprehensive than they had been in the past.

IPC design: There is no change from prior periods.

Jail Design – Phase II: Although medical and psychiatric patients are clustered on general population housing units, there is no provision for housing patients with special needs, neither medical nor psychiatric, in the OJC.  Plans for  Phase III housing for inmates with special needs remain elusive.

Grievance Process: Grievance responses are more respectful.  Three of seven grievances reviewed did not address all aspects of the complaint.  The grievances reflected delays in care and lapses in medication that were valid.  There is no substantive analysis of grievance data to inform staff of persistent barriers to medication and care.

Emergency Preparedness: Cut-down tools and first aid kits were present in the IPC



and all housing units.  This is an improvement.  No data were  available as to the proportion of current custody staff trained for medical  emergencies.  Medical urgency training has not begun and medical response to urgent/emergent needs is inadequate.  Members of the monitoring team, along with Plaintiffs' counsel, observed an emergency response and noted opportunities for improvement.

<u>Nursing Response to Use of Force</u>: Not evaluated on this tour.

<u>Care for inmates in medical restraints</u>: A policy has recently been developed.  No training data were available.

<u>Care for inmates at the out-of-parish facilities</u>: Transfer criteria have been developed.  At the time of this tour, OPSO represented there were no inmates housed in out-of-parish facilities.



**IV. C. 1. Quality Management of Medication Administration**

Findings:

C. 1. a. Partial Compliance
C. 1. b. Partial Compliance
C. 1. c. Partial Compliance
C. 1. d. Partial Compliance

**Measures of compliance:**

1. Quality management documents.
2. Inmate complaints and grievances.
3. Medical records.
4. Plaintiffs' complaints.

<u>Observations:</u>

Performance in this area has been stable since Compliance Tour #8. There has been no substantial progress nor regression regarding compliance in these sections of the Consent Judgment.  Information on discharge medication remains incomplete.  As noted above, very few prescriptions are written for discharging inmates and fewer are picked up.

<u>New Recommendation:</u>

43.  CCS attend to the matter of lost institutional memory with staff turnover by keeping of meaningful and complete minutes of meetings and recording relevant procedural information.



**IV. C. 2. Health Care Delivered**

Findings:

C. 2. a. Partial Compliance

C. 2. b. Partial Compliance

**Measures of compliance:**

1. Reports on numbers, as specified in the Consent Judgment.
2. Reports on clinical performance, with discussion of problem identification and   remedies.
3. Medical record review.

<u>Observations:</u>

Performance in this area has been stable since Compliance Tour #8.

A review of complaints from the attorneys for Plaintiff class and a focused review of records for inmates with ambulatory sensitive conditions returning from the hospital, found significant problems.  For example, 30 percent of the sample of ten randomly selected inmates in the focused review had conditions that had  deteriorated unnecessarily during the period prior to the hospital visit. Documentation that the hospital recommendations were followed by CCS was available for only 90 percent of  the sample.  This is an improvement.

There is no documentation of ongoing oversight of CCS care by OPSO or the contractor, the City of New Orleans.  The Interim Independent Compliance Director is searching for a medical liaison who will, among other things, provide some oversight for OPSO.



## IV. C. 3.  Release and Transfer

Finding:

        C. 3. a. Partial Compliance
        C. 3. b. Partial Compliance
        C. 3. c. Partial Compliance
        C. 3. d. Partial Compliance

**Measures of compliance:**

    1.      Interviews.
    2.      CCS documents.

Observation:

Performance in this area has not improved since Compliance Tour #8.

Very few released patients receive prescriptions for their chronic medical and mental illness and very few get transition planning.  Despite the availability of data on medical holds, there is no denominator data to assess the proportion of patients on medication who get prescriptions.



## IV. D. Sanitation and Environmental Conditions

### Introduction

This report summarizes the compliance findings for the Sanitation, Environmental Conditions and Fire and Life Safety provisions of the Consent Judgment.   The conclusions are based on the Monitor's tour conducted June 11-14, 2018, and review of materials provided prior to the on-site work.[19]

The Monitor toured:  inmate housing units in the Orleans Justice Center (OJC), the Temporary Detention Center (TDC), and the Kitchen/Warehouse/Central Plant.  The Monitor spoke with inmates, deputies, and supervisors.

This report includes new recommendations for OPSO's consideration for the purpose of achieving compliance.  Outstanding recommendations from previous tours, are noted Appendix B in Compliance Report # 8.

Since the previous tour in November 2017, there is progress toward compliance with the Sanitation and Environmental Conditions and Fire and Life Safety provisions including:

- Hiring of a full-time Sanitarian in February 2018; and

- Findings in this report of Substantial Compliance with four of the seven fire and life safety provisions, inspections, fire drills, training and emergency keys.

Work remains to achieve compliance including, but not limited to:

- completing policies;

- developing lesson plans;

- conducting employee and contractor training, including measuring knowledge of trainees;

- providing documentation of policy and procedure implementation and compliance; and

---

[19] The on-site work included meetings with key staff including the Independent Compliance Director, Chief of Corrections, Director of Facilities Management, Fire Safety Officer, and Environmental Inspector. In addition, the Monitor was accompanied by on the first day by Eric Foley, attorney for the Plaintiff class.



- assuring meaningful leadership oversight to objectively assess if the policies and procedures are consistently followed and achieve the requirements of the Consent Judgment.

Impacting sustainable compliance is the need for staff in key positions including full-time Safety Sanitation Deputies (who are assigned only to these duties) to assure duties are consistently performed related to housekeeping, chemical control, tool control, and laundry.      The Independent Compliance Director's (ICD) report of November 1, 2017, 60-day noted that four "Sanitation Deputies" were authorized to work under the supervision of the Sanitarian.  However, at the time of this compliance tour, only two of the four positions were filled.  The Sanitarian reported that these two deputies are frequently reassigned by "rank" to perform other security tasks.  The Stipulated Action Plan dated June 15, 2018, noted that a staffing requisition was posted April 23, 2018, and that there was "Still an ongoing effort to get a fully staff (sic) sanitation department."

Cleaning and sanitation of common and administrative areas was observed by the Monitor and found to be at an acceptable level.  However, housekeeping in inmate living areas and cells continues to be a challenge.  Inmates interviewed in two inmate living areas reported inadequate or missing cleaning supplies. The Monitor observed supplies to be missing from the carts and supply closets in several inmate living areas. Spray bottles in several inmate living areas were observed by the Monitor to be in the possession of inmates throughout open dorms and in individual cells. These observations indicate either a lack of training or unit supervision on the part of the deputies assigned to the units. The

Monitor also observed that at least two chemical concentrate dispensers located in the supply closets had been tampered with indicating a lack of supervision by deputies when inmates accessed the secure closets.  Unsupervised access to the equipment and concentrated chemicals presents a potential safety and security risk to both inmates and staff.

The OPSO April 2018 Grievance Monthly Trend Report notes for the  period January - April, there were a total of 530 environmental and sanitation grievances.  Although the



number decreased from 95 in March to 65 in April, environmental complaints involving sanitation constituted 12% of the total filed in April, a substantial number.

The inmate laundry operation is currently contracted to an outside vendor. The laundry exchange plan calls for inmate uniforms to be exchanged twice weekly. The Sanitarian reports that due to the lack of Sanitation Deputies and chronic performance issues with the contractor, uniform exchange is only accomplished once a week with no additional clean uniforms provided in the interim period. This practice leads to inmates hoarding uniforms and destroying or altering uniform items for other than their intended purpose. The Monitor observed, in the majority of inmate living areas inspected, an excessive number and/or altered uniform items. The inmates also attempt to wash uniform items either in hand sinks or the washing machines, then hang the clothing from bunks to dry which obstruct the deputies' clear view into these areas. The clothes dryers located in OJC's inmate housing units intended to dry inmates' personal clothing continue to need repairs and are routinely vandalized – thus creating contraband and significant security issues. The volume of washing and drying of inmates' personal laundry appears to be beyond the capacity of the current equipment, especially as there is no preventive maintenance. As noted in previous Compliance Reports, the dryers are in dangerous condition:

- The lint vents have been vandalized by the inmates and provide a source of weapons; and
- There was missing vent tubing, broken flexible vents, missing clamps used to secure the vents to the dryer, wall vents torn, and missing lint traps inside the dryers.

The current conditions of the dryers create safety and security issues for inmates and deputies including potential fire hazards from the lint. The Monitor's suggestions in this regard have not changed since the last report.

Additional issues required by the Consent Judgment needing attention, include, but are not limited to:

- Development and implementation of a plan to assure adequate trained staff for support services.



- Completion of, training in, and implementation of support services policies.
- Training and implementation of a written processes for tool and chemical inventory and control in the Kitchen/Warehouse.
- Assignment of a sufficient number of deputies in inmate housing units to manage and oversee inmate living conditions as well as supervise proper storage of inmate property to control clutter and fire hazards in cells as required in the Inmate Handbook.
- Address the lack of daily inspections of housing units/cells to identify and eliminate blocked air vents in inmate cells effectively restricting adequate air flow.
- Timely replacement of broken, damaged, or missing glass panels.
- Develop, train, and implement a comprehensive Infection Control Policy.

Additionally, as noted below, it is recommended that OPSO consider hiring qualified civilian employees to perform sanitation and life safety duties in all facilities and on all shifts.  This will allow the deployment of sworn personnel to inmate supervision and security duties.   These civilian employees can be supervised by qualified personnel, and trained for their specific duties.



## V. D. 1.  Sanitation and Environmental Conditions

## IV. D. 1. a. Oversight and Supervision of Routine Cleaning

Finding: Non-Compliance

**Measures of Compliance:**
1. Written policies and procedures for cleaning and disinfecting, monitoring process with responsibility and accountability assigned developed in collaboration with Monitors.
2. List of controlled inventory of acceptable cleaning and disinfecting chemicals.
3. Development and implementation of an effective weekly [or more frequently] auditing process with assigned responsibility and accountability and documentation.
4. Monitors' onsite verification of implementation of both the policy(s) and the auditing process and report, along with corrective action when non-conformities to the policy/procedures are documented.
5. Observation of conditions along with interviews with inmates and staff.

Observations:

OPSO has not finalized two policies pertaining to this paragraph, 1101.04, "Cleaning Procedure-Facility", and 1101.06, "Inmate Hygiene."  OPSO has not provided any evidence of training for inmate workers, or the employees assigned to manage housekeeping.

OPSO provided a cleaning schedule that identifies the housekeeping frequency, by area, for both OJC and TDC.  However, no documentary evidence was provided to demonstrate implementation.  The Sanitarian and Environmental Officer commented that maintaining regular cleaning schedules was inconsistent due to staffing levels. This observation was supported by the Life Safety inspection documentation consistently reporting "housekeeping" issues primarily in inmate living areas.

OPSO has also developed a "Pod Daily and Weekly Cleaning Schedule Checklist."  The checklist is to be completed daily by the deputy assigned to a housing unit and submitted weekly to the Safety Sanitation Deputy (SSD).  As reported in the last Compliance Report, there was no evidence provided that the checklist process has been implemented, and the Sanitarian reported that no SSDs are assigned to these duties due to a lack of staff.  Staff reported that previously



designated SSDs are pulled/re-assigned from managing housekeeping and chemical control to assist with other line and support functions.

As reported in Compliance Report #7, OJC had not developed a staff and/or inmate training program for sanitation that includes mattress cleaning, and chemical use and control. No evidence was provided to demonstrate that this has changed. The Monitor observed mattresses which were improperly stored in an outside hallway at the TDC facility.

Based on the findings in Compliance Report # 6, OPSO purchased two "All Surface Cleaning" machines to clean inmate showers. OPSO recently assigned a deputy to environmental services to clean "inmate showers." The Environmental Inspector stated that the deputy responsible for managing shower cleanliness in all housing units is unable to perform this function due to staffing shortages. The Environmental Inspector reported that he attempts to accomplish this task as his schedule permits.

The Environmental Inspector and Life Safety Officer continue to conduct inspections of all housing units. The Monitor reviewed the periodic inspection reports provided by OPSO for 2017 and for the period since the October 2017 compliance tour. The reports identify the same housekeeping issues in the same units at subsequent inspections. The Monitor believes the housekeeping issues persist due to a lack of training for the deputies assigned to housing units, or if the staff are adequately trained, then the problem may lie with inadequate staffing, a lack of initiative/responsibility on the individual deputy's part and/or the failure of supervisory staff to hold the staff accountable when deficiencies are observed. The lack of security, supervision and accountability with cleaning supplies continues to contribute to the problem as well.

In touring inmate housing units, the Monitor identified several safety/security and cleanliness issues that will benefit from effective and consistent oversight by deputies and supervisors as well as direct supervision of inmates. Examples include, but not limited to:



- Accumulation of lint behind dryers resulting from missing or broken dryer vents in numerous OJC housing units.  For solutions, OPSO should identify a safe solution to the vent issue as well as anchoring the machines themselves to prevent inmates from moving the machines; or remove the washers and dryers completely and develop other options for the laundering of the inmates' personal items.

- Inmates' personal items (paperwork, commissary purchases, and other approved items) are not stored as prescribed in OJC's Inmate Handbook in the personal property bags provided by OJC.  The inmates are either not instructed in what they may keep and where to store it; or staff choose to ignore the issue.

- Inmates are hoarding mattresses, and mattresses are placed/stored on the floor of cells rather than on assigned bunks.

- Numerous exhaust and return air vents in inmate cells at OJC blocked by inmates to reduce air flow, clearly visible during a housing unit inspection.

- Cell door/ food pass locks tampered with thus making them inoperable and a security threat.

- Lower bunks wrapped with a blanket to prevent deputy's observation of the inmate.

- Dayroom chairs in cells in OJC, chairs stacked to block deputy vision into toilet areas in OJC, and chairs in showers.

- Lack of supervision and accountability for cleaning chemicals and tools:
  - Missing cleaning spray bottles in housing units; chemical spray bottles found in inmate cells;
  - Chemical storage closet door in a housing unit was tampered with to prevent it from securing;
  - Floor mops in mop buckets holding dirty water, not allowing mops to be cleaned and dried between uses, mop heads unable to be



properly cleaned, disinfected and dried between uses; dust mops with no process or schedule to clean; and

o   Brooms had detachable handles making the handles into weapons, documented in inmate on inmate assaults by OPSO. Several handles were in the possession of inmates in dayrooms.

- Complaints from inmates of chemicals not available for cleaning cells or dormitories.

- Insulated meal trays kept in unit which are to be returned after each meal service.

- Excess inmate uniforms and blankets in cells.

- Numerous occurrences of cell light shields covered with paper "glued" to the covering with toothpaste.  Deputies have no tools to remove or clean the light shields.

- Broken glass panels in shower windows (two locations).

- Graffiti on walls in dormitories and cells.

These issues were identified in previous compliance reports.

<u>New Recommendations</u>:

44.   OPSO develop and implement a process for selection and training of inmate workers.

45.   OPSO immediately consider options to relocate the clothes dryers located in inmate housing units, including removal to prevent vandalism, fire risk, and fires.



## IV. D .1. b.  Preventive Maintenance

Findings: Partial Compliance

### Measures of Compliance:

1. Review of the preventative maintenance plan to determine who has responsibility to file work orders.
2. Evidence of meeting the timelines for submission of work orders.
3. Evidence of training of those assigned the responsibility to file work orders.
4. Observation of practice and conditions.
5. Work orders, invoices, and purchases in support of the preventive maintenance plan.

Observations:

OPSO Policy 601.02, Reporting and Addressing/Repairing Maintenance Needs specifically requires that any staff member observing a maintenance issue "shall call the CMMS work order facilitator" to report the issue, "or leave a message". The Monitor observed that this policy and procedure, as written, likely results in miscommunication of maintenance issue and may result in unnecessary delay of any repairs.  For example, neither the housing unit deputy nor control room staff could verify whether work orders had been submitted to repair obvious issues such as broken glass, damaged dry vent lines, broken washer/dryer, etc.  Deputies working in a housing unit and control room staff report they cannot learn whether work orders had been submitted for on-going, visible issues.  Further, the Maintenance Director confirmed no work order existed for the broken glass panels observed by the Monitor. The Monitor's interviews with both staff and the Facility Maintenance Director provided conflicting information as to why line staff were permitted to enter work orders using the on-line system.  Line staff stated that "Maintenance" did not want them to enter work orders   to avoid "duplicating" work orders.

The Facility Maintenance Director stated it is desirable line staff have first-hand knowledge of the problem which have been previously entered into the work order system.  As noted in the previous Compliance Reports, staff assigned to perform inspections typically enter work orders.  It is the Monitor's view that this strategy does not facilitate efficient and timely fixes of maintenance issues nor allow



line staff to check the status of pending work orders.  Allowing line staff to directly enter and track maintenance issues will address the problems noted above, and also be consistent with the Unit Management concept being implemented.

Most if not all work orders continue to be generated as a result of inspections conducted by the Environmental Inspector or by maintenance staff which, again, does not result in the timely and efficient repair of maintenance repair issues.

The Environmental Inspector did advise that he has resumed more frequent inspections of housing units along with the submission of observed maintenance issues since the hiring of the Sanitarian in February 2018.

The Facility Maintenance Director was able to provide system reports demonstrating that maintenance staff did respond to and repair issues in a timely fashion once the issues were reported.

<u>New Recommendations</u>:

46.     OPSO revise policy 601.02 to allow any staff member observing a maintenance issue to enter the work order directly into the reporting system.

47.     OPSO develop specific training for all line staff on utilizing the work order system and provide evidence of deputy training regarding the entering work orders.



## IV. D. 1. c. Adequate Ventilation

Findings: Partial Compliance

### Measures of Compliance:
1. Written policy and procedure specifying the process of how adequacy of ventilation will be measured in accordance with the mechanical code adopted by the applicable state or local jurisdiction.
2. Evidence of a contract with a qualified/licensed mechanical contractor to demonstrate that the ventilation system complies with the International Mechanical Code in effect in Louisiana.
3. Reports from vendor regarding the ventilation system, air flow, etc.

Observations:

During the tour of OJC, the Monitor identified several blocked supply and return air vents in individual inmate cells. Several cells (upper and lower tier) in the same quadrant of a housing unit were also noted to be considerably warmer than other cells in the same unit indicating a potential issue with a damper/VAV unit supplying the area. The Facility Maintenance Director stated the control system had been checked and stated there was no issue with the functioning of the equipment.

The Monitor observed excessive condensation in some showers of the dormitory housing units in OJC. This is the same findings as the previous two Compliance Reports. While no significant mold or mildew issues were noted during the compliance tour, the condensation continues to pose a slip/fall risk, risk for mold/mildew growth, and obscures security staff's view of the area during security checks.

The Facility Maintenance Director provided building specifications noting that exhaust fans were properly sized for these multi-head showers. There was no evidence that this issue had been further addressed from the previous compliance tours. In an attempt to address the issues, as noted in the previous Compliance Reports, maintenance staff had removed the window in the shower door in Unit 4A. The increase in make-up air appears to have mitigated the condensation problems in that unit, somewhat, but will cause maintenance issues with the door itself due to moisture damage/rust in the future and is not a properly engineered or long-term



107

solution.   Similarly designed shower rooms (multi-head) should be reviewed by Maintenance staff to determine the extent to which the problem persists in other areas.



## IV. D. 1. d. Adequate Lighting

Findings: Substantial Compliance

**Measures of Compliance**:

1. Maintenance of pending work order list showing the purchase order for pending work order regarding lighting fixtures. Review of work order lists.
2. Visual observation conditions.

<u>Observations:</u>

Sufficient lighting is provided in housing units of both OJC and TDC. OJC continues to maintain a supply of replacement bulbs, transformers, or ballasts to repair malfunctioning lighting. At this tour, there were no outstanding electrical work orders beyond routine bulb replacement.

It was noted in at least one pod that lights in several cells were completely out. Upon inspection, the Monitor was advised that the pod deputies had the ability to turn off all lighting in individual cells and apparently were doing so on demand from the inmates.

<u>New Recommendation:</u>

48. The Wardens consult with the Maintenance Director to determine if lighting capability can be adjusted to ensure some level of lighting in individual cells (e.g. "night light") at all times to ensure the safety and security of the inmates and staff.



## IV. D. 1. e. Pest Control

Findings:  Partial Compliance

**Measures of Compliance:**

1. Written policy and procedures.
2. Copy of valid contract for integrated pest control services with a licensed pest control contractor.
3. Map showing the location of all bait and trap stations both internally and externally.
4. Copies of pest control reports provided by the licensed pest control operator showing areas of concern, recommendations for corrective actions needed to be taken by sanitation and maintenance.
5. Evidence of corrective action taken for recommendations provided by the licensed pest control contractor.
6. Evidence of a pest control log where deputies can log sighting of pest showing date, time, location, and type of pest.
7. Visual observation of pest activity and inmate interviews.
8. Inmate grievances regarding sanitation and maintenance.

Observations:

OPSO continues to maintain a pest control contract with a State licensed company resulting in monthly service for all housing areas and bi-weekly service for the Kitchen/Warehouse.

As noted in the previous Compliance Reports, the Monitor observed inmates keeping food from previous meals in their cells, in violation of OPSO policy, along with opened commissary food items being not stored in the inmates' property bags. Dirty food service trays were also observed stored in the cabinets located near the deputy work station.

Increased pest infestation opportunities will occur if inmates continue to be permitted to maintain opened food from commissary stored on window ledges, upper bunks and not stored in their personal property bags, and food left over from meals in their cells.  As per OPSO policy, all food must be removed promptly following meal service.

"Drain flies" were noted in and around the drain in an open dorm shower and in a floor drain in the meal tray service area on the second floor of the OJC.  Ants were noted on the dust mops in the occupied TDC dorms as the mops were not cleaned after use and stored with the heads on the floor.  A non-functioning bug-light was observed in a food storage area of the main kitchen facility. These issues



were pointed out to staff and the pest control contractor was on-site the next day. The presence of these insects observed during the compliance tour indicates that while issues such as drain flies are being noted on inspections, the requisite follow-up to have the pest control contractor address the issue is not being done or there is a lack of documentation noting such follow-up. As such documentation is specifically required, this requirement is to be in partial compliance.



## IV. D. 1. f. Biohazardous Spills

Findings: Partial Compliance

**Measures of Compliance:**
1. Written policy and procedures.
2. Development and implementation of a training syllabus for blood borne pathogens.  Qualifications of the trainer(s).
3. Documented list of deputies and inmates trained in blood borne pathogens.
4. Development and implementation of a biohazardous waste policy and procedures for effective and safe clean-up of any spills.
5. Maintenance of a supply of biohazardous spill kits including personal protection items including, but limited to eye shield, mask, gloves, gown with cap, CPR barrier, towelettes, absorbent powder, scraper, scoop bag, and biohazard bag.
6. Observation and demonstration of knowledge by staff and trained inmates.
7. Inmate interviews, inmate grievances.
8. Medical policy and procedures.

Observations:

Policy 1101.07, "Bio-hazardous Spill Cleaning Procedures" [Revised 1/18/2018] establishes in Section VIII. A. 1, "With the exception of bio-hazardous spills that occur in medical treatment areas, OPSO deputies trained in bio-hazardous spill response procedures and the proper use of PPEs shall be responsible for training and supervising inmate workers assigned to clean up any bio-hazardous spill areas." This revision permits properly trained, supervised and equipped inmates to clean bio-hazardous spills.  (One instance of a bio-hazard cleanup process being performed by an inmate was observed by a monitor during the compliance tour.)  However, Section VIII. A. 3 of OJC Policy 1101.03, "Cleaning Procedures-Pods" appears to be in conflict with this revision stating "Inmates shall never be asked, allowed, or required to clean up bio-hazardous spills.  Designated and trained staff will don protective clothing and equipment (PPE), and use designated cleaning supplies to clean up bio-hazardous materials."

Training curricula indicated that all staff are receiving initial training in bio-hazardous cleanup procedures. No documentation was provided to indicate that inmates receive the requisite training prior to performing such tasks. Section IX. B.



4. a-c. requires the deputy assigned to the spill area to "complete an incident report" to include staff and inmates involved in the cleanup, training, direction and PPE provided to the inmate(s), and that the issue was reported to a supervisor. Supervisors are required by policy to ensure the Sanitarian is advised of the incident to ensure bio-hazard spill kits are replenished as soon as possible.  Both the Sanitarian and the Environmental Officer reported that they do not receive reports or official notification of such incidents and only become aware during inspections or when speaking with line staff. Documentation provided prior to the compliance tour noted only *one* bio-hazard cleanup incident since December 2017, but the Environmental Officer stated he had replaced "several" response kits documenting that the reporting process is not being trained, enforced or both.  An inventory of spill response kits is not being maintained by the Sanitarian therefore, the total number of kits used could not be verified.

If inmates will be assigned bio-hazardous spill clean-up as currently reported by OJC staff, OPSO must provide training regarding required OSHA regulations and OPSO Policy procedures.  Additionally, all staff and inmates must be trained on OPSO's Infection Control Policy, once it is completed.

New Recommendations:

49.     Review policy changes/updates to ensure no conflict arises with other related policies.

50.     Devise and implement a procedure that ensures bio-hazardous cleanup incidents are reported to the Sanitarian and Environmental Officer within one business day of the incident in order to comply with existing policy requiring a copy of bio-hazard incident reports be provided to the Sanitarian. The reports may be provided via manual copies, automated reporting processes, or by providing the Sanitarian and Environmental Officer with the necessary access and training to obtain the reports themselves from the system on a daily basis.



### IV. D. 1. g. Cleaning Chemicals

Findings: Partial Compliance

**Measures of Compliance:**
1. Written policy and procedures.
2. Inventory of cleaning and disinfecting chemicals.
3. Lesson plans/curriculum - evidence of effective training of deputies and inmates responsible for cleaning and disinfecting surfaces in housing and common areas.
4. Policy and procedures an effective cleaning and disinfection policy and procedures for all facilities.
5. Observation of effective implementation and demonstration of knowledge.
6. Inmate interviews, inmate grievances.

Observations:

Policy 1101.03, "Cleaning Procedures – Pods" [December 6, 2016] establishes the requirements for cleaning supplies and equipment.  The policy requires that when not in use, cleaning supplies and equipment shall be stored in locked, sanitation closets/areas that are inaccessible to inmates.  During the tour, the Monitor observed cleaning supplies in OJC that were not securely stored in locked sanitation closets/areas in the housing units.  All but one closet in a housing unit was properly secured, with the one door having had the lock tampered with/jammed, allowing inmate access. The Monitor noted that the mop racks in every closet not of a sufficient height to allow the mops to hang and dry properly. Many mops were not placed in the racks at all.  Two units had mop buckets with dirty water remaining in them and one with the mop resting in the dirty water. Several chemical dispensers were observed to have been tampered with or damaged indicating a lack of supervision and/or correction by staff. The Environmental Officer noted that inmates routinely have access to and remove concentrated cleaning chemicals from the damaged dispensers making impossible an accurate inventory of the chemicals used or replaced. In OJC, the Monitor observed chemical spray bottles in several inmate cells and stored on top of bunks and on the floor in the dorms in plain view of staff.

The Sanitarian provided documentation noting that five spray bottles had been labeled and provided to each housing unit. The Monitor noted discrepancies in



the number of bottles present, and that labels did not match the designated housing unit, in many cases indicating bottles were being pilfered or swapped around among housing unit by staff and/or inmates. Most housing units had two or fewer.

As previously noted, policy (1101.03) requires pod deputies routinely inventory cleaning supplies and equipment and log chemical usage.  Based on observations in virtually every housing unit visited, this is not being accomplished. This is further exacerbated by the routine replacement of chemicals without an accurate accounting of their usage.



**IV. D. 1. h. Infection Control Plan**

Findings: Non-compliance

**Measures of Compliance:**
1. Written policy and procedures for an infection control plan and policy following Center for Disease Control's recommendations.
2. Lesson plans/curriculum - evidence of training of all deputies, staff and inmates responsible for cleaning and disinfecting all medical and dental areas within OJC.
3. Demonstration of knowledge of the policy and plan.
4. Observation.
5. Inmate interview, inmate grievances.

Observations:

OPSO hired the new Sanitarian in February 2018. Final infection control policy is not in place. No additional documentation was available to the Monitor regarding compliance regarding the requisite training of staff and the meetings of the OJC Infection Control Committee.



**IV. D. 2. Environmental Control**
**IV. D. 2. a. Repair of Electrical Panels**

Findings: Partial Compliance

**Measures of Compliance:**
1.   Written policy and procedure.
2.   Evidence of implementation of the Provision in accordance with the National Electrical Code.
3.   Maintenance of pending work order list showing the purchase order for pending work order regarding electrical panels.
4.   Observation of practice.
5.   Observation of facilities' conditions.

Observations:

OPSO Policies 601.02 "Reporting and Addressing Maintenance Needs" and Policy 601.03 "Preventive Maintenance" [August 15, 2016] and are implemented. Major electrical panels at OJC and TDC are located in secure maintenance spaces inaccessible to inmates.

During the recent tour, however, the Monitor identified unsecured breaker panels and disconnect boxes in the food tray prep area where inmate workers are routinely present. Keyed locks on the breaker panels were not in use and padlocks or "lockouts" were not in use on the disconnects. The lack of security provides inmates with the opportunity to tamper with live electrical circuits creating an electrocution hazard, disrupt power to affected areas, and shut off power to food warmers without staff being aware.

The central plant area had no major issues aside from an uncovered junction box and a missing cover/exposed wiring on a generator control system that was reportedly being worked on by a contractor. Wiring should not be left uncovered when workers are not present.

New Recommendations:

51.   Immediately secure electrical breaker panels and disconnects accessible to inmates; develop a system for daily checking of the security of the areas.



**IV. D. 2. b. Implement a System for Maintenance of Electrical Panels, Devices & Wires**

Findings: Substantial Compliance

**Measures of Compliance:**

1. Written policy and procedure for preventative maintenance and repairs for electrical issues.
2. Evidence that all repairs are completed in accordance with the National Electrical Code.
3. Evidence that all repairs are completed within a reasonable time to assure that inmates and staff are not exposed to hazards that could cause injury.
4. Observation of conditions.

Observations:

Policy 601.02, "Reporting and Addressing/Repairing Maintenance Needs" is implemented.   The Monitor finds that the issue is not about maintenance, but rather basic correctional practice. The breaker box panels were not broken, just not locked/secured.  The inmates could access the panels to turn off equipment, lights, whatever is controlled by that box.  It's also a safety issue in that the inmates could potentially access the higher voltage feeder lines inside the boxes.

Exposed/damaged wiring/cabling was observed in several housing pod cleaning supply closets and a missing outlet cover in unit 2F. The Safety Officer advised that work orders would be submitted to repair, remove or otherwise make safe the wiring issues.



## IV. D. 3. Food Service

This report summarizes the findings for the Food Service provisions of the Consent Judgment based on the Monitor's tour conducted June 11-12, 2018, and review of documents.  The Monitor inspected the Orleans Justice Center (OJC) Kitchen/Warehouse and second floor retherm kitchen; observed meal service activities; and spoke with OPSO supervisors and deputies, Catering by Marlins (CBM) contracted food service employees, and inmates.  Please note that the Food Service Monitor began work on January 1, 2018, and this was the Monitor's first official tour.

Since the last tour on October 30, 2017 through November 2, 2017, there has been progress toward compliance with the Food Service provisions.  This progress includes drafts of the 1001.01, Meal Preparation and Transport and 1001.04, Food Service Inspections and Reviews policies and it is expected that they will be finalized before the next scheduled tour.  However, completion of the food service policies does not mean that training has been initiated or completed; nor that the policies have been fully implemented. The provision of documented orientation and training for newly assigned inmate kitchen workers that includes watching a video on basic sanitation and safety followed by a written test of comprehension is progress towards compliance with the food service training requirements specified in Compliance Report #8, Appendix E, IV., D., 16.  Outstanding recommendations from previous tours, are noted Compliance Report #8, Appendix E.

The April 2018 Inmate Grievance System Monthly Trend Report indicates that 545 grievances were filed in 23 categories, with 60 grievances filed regarding food service.  This is the fourth highest category of grievances filed behind Medical, Facility, and Environmental Complaints (Sanitation).



## IV. D. 3. a. Training

Findings: Partial Compliance

### Measures of Compliance:
1. Written policy and procedure.
2. Development of a training syllabus for annual training for food safety and hygiene.
3. Evidence of Food Service Manager Certification in accordance with Louisiana Retail Food Regulations.
4. Evidence of training of food service staff and inmate workers.
5. Demonstration of knowledge by the food service staff and inmates.
6. Observation.
7. Inmate interviews, inmate grievances.
8. Health Department inspection reports.

Observations:

OPSO drafted Policy 1001.01, Meal Preparation and Transport, Section VIII. establishes requirements for kitchen staff and inmate worker training. New inmate kitchen worker orientation, including watching a contractor provided video accompanied by a written exam to test comprehension, was observed on June 12, 2018. Additionally, records of prior kitchen worker orientations were provided and comply with the requirement for inmate kitchen worker orientation training. However, the kitchen training logs reveal that the monthly training that was scheduled for January, February, and March of 2018 was all conducted on April 17, 2018, rather than during the specified month. CBM's Employee Safety and Training document acknowledges that training is an "essential element" and that a failure to provide consistent, well planned, mandatory training is not only a "breach of contract" but also a "disservice" to their employees and clients.

OPSO requires that all contractor employees are required to attend an eight-hour OPSO contactor/volunteer training class. To date, that has not occurred.

CBM staff are also required to complete the training on the Prison Rape Elimination Act (PREA) held on-site. Evidence of completion of this in-person training will be required for OPSO to achieve success in the PREA audit. (See section IV.A.12 Sexual Abuse).

Violations of the Louisiana Food Regulations and OPSO policies were observed. These findings are indicators of a lack of training or ineffective training as



well as ineffective supervision.  Significant findings are summarized below, and additional examples can be found in sections IV. D. 3. b. Cleanliness and IV. D. 3. c. Record Keeping/Temperatures of this report.

- OPSO Policy 1001.06, Control of Kitchen Sharps, Utensils, and Cleaning Tools, was authorized on April 12, 2017.  Problems were observed regarding the control of kitchen knives and utensils.  A 10" knife was not properly checked in and an extra set of metal tongs was found in the shadow board cabinet.  Kitchen staff stated that the tongs were mistakenly placed in the shadow board cabinet and should have been stored in the party room.  This is a violation of OPSO policy 1001.06, VIII, A. 1., as it specifies that all kitchen sharps and utensils shall be etched, checked in/out, and inventoried.  The mishandling of a 10" knife and metal tongs presents a serious safety and security threat.

- The CBM Food Service Director was unable to demonstrate knowledge of the required sanitizing temperature for the automatic dishwasher or the maximum temperature for thawing food under running water.  Working knowledge of food code temperatures is fundamental for someone in her position and cause for concern regarding her ability to train others and provide meaningful supervision.

- Inmates report that the food portion sizes are small.  A random dinner tray was examined, and the portion size of the coleslaw was found to be half of the amount specified on the dietitian certified menu. Inadequate portion sizes cause problems with facility morale and can negatively impact nutritional adequacy.

To achieve substantial compliance, OPSO and CBM must fully implement and adhere to food service policies and procedures that ensure food safety, provide documented, effective training in a timely manner, and ensure that managers and supervisors are proficient and provide competent supervision.



## IV. D. 3. b. Cleanliness

Findings: Non-Compliance

**Measures of Compliance:**

1. Written policy and procedure for the cleaning and sanitization of all food service equipment following the equipment manufacturer's specified cleaning instructions.
2. Maintenance of a documented cleaning schedule for equipment and areas including kitchens, storage areas, ware washing, refrigerators and freezers with assigned responsibility for oversight.
3. Visual evidence of effective cleaning and interviews with staff and inmates on cleaning procedures
4. Evidence of a cleaning log for all equipment and observation of practice meeting the policy/procedures.
5. Inmate worker interviews.
6. Health Department inspection reports.

Observations:

      Completion and successful implementation of draft policies 1001.01, Meal Preparation and Transport and 1001.04, Food Service Inspections and Reviews, along with compliance with all previous implemented policies and the Louisiana Food Regulations is required to achieve substantial compliance.  Issues and violations identified during the inspection of the kitchen include, but are not limited to:

- A CBM employee was observed cleaning a probe thermometer with a plain paper towel, instead of a sanitizing wipe, while taking the temperature of food on meal trays.  This is an unsafe practice because the thermometer itself can cross contaminate bacteria between foods.

- An infestation of drain flies was found in the OJC 2nd floor kitchen.  The OPSO Sanitarian previously reported drain flies or live flying insects in her inspection reports on February 15, 2018, February 26, 2018, and March 2, 2018.  Drain flies are filth flies and can be controlled with good cleaning practices.

- The CBM "Items Requiring Daily Cleaning - Checklist" does not adequately document cleaning.  This is demonstrated by the fact the form is not properly completed.  The instructions indicate that the



employee that performs the cleaning is supposed to initial the box, but instead there is simply a checkmark in every box, which does not specify the employee that was assigned and responsible for performing the cleaning task.

- Numerous plastic insulated food carrier boxes, referred to as "suitcases" were found to be in poor condition as they were cracked and broken, exposing the inner insulation.  The condition of the boxes is not conducive to proper cleaning and sanitizing.



## IV. D. 3. c. Record Keeping/Temperatures

Findings: Partial Compliance

**Measures of Compliance:**
1. Written policy and procedures for measuring and recording temperatures of all refrigerators, freezers, hot food holding equipment, wash and rinse temperatures of ware washing equipment, in accordance with the Louisiana Food Regulations.
2. Development and implementation of temperature logs demonstrating effective measurements as required in this provision and/or the Louisiana Food Regulations.
3. Review of logs and direct observations of measurements being taken and recorded.
4. Observation of conditions.

<u>Observations:</u>

As noted above, OPSO has not completed the food service policies that incorporate the requirements of this paragraph.

Refrigeration temperature logs continue to remain in compliance, except that the temperatures of the OJC 2nd Floor Kitchen walk-in cooler are not logged. The staff stated that they did not log temperatures because the cooler is not used; however, a crate of milk was observed stored in the cooler, indicating that it is used for the storage of food.

"Hot Holding Equipment Temperatures" logs were submitted, but they did not identify which of several hot food holding units the log represented, nor did they specify the food item. Therefore, the logs do not provide sufficient information to effectively document food temperatures. Additionally, problems were found with the completion of food production records, that should log the temperatures of cooked food. When the Monitor requested the food production records for one of the dinner meals, the CBM Food Service Director stated that they were not done.

Significant problems were found related to food holding temperatures that place inmates at risk of foodborne illness. After cooking, food items are deposited into metal pans, which are placed in plastic insulated carrier boxes, and then allowed to sit at room temperature for hours before being transported to the OJC 2nd floor kitchen and placed in the warming ovens. CBM staff report that they do not



take the temperatures of the food when it is transferred from the carrier boxes into the warming ovens.  When food temperatures were measured by the Monitor, numerous foods were found to be below the Louisiana Food Regulation minimum required temperature, in a range known as the temperature danger zone, which is conducive to the growth of disease causing microorganisms.[20]

This serious food safety issue can be corrected by placing the pans of food into the warming ovens in the main kitchen while awaiting transport to the OJC 2nd floor kitchen, thereby significantly reducing the amount of time that foods are held outside of safe temperature control.

The temperatures of the automatic dishwasher have not been logged since April 25, 2018.  OPSO staff report that they stopped logging the temperatures upon directive of the Compliance Director and that CBM is supposed to log them. However, the CBM Food Service Director confirmed that dishwasher temperatures are not logged.

To achieve substantial compliance, OPSO and CBM must understand and acknowledge that temperature monitoring, logging, and taking documented corrective action when problems are found is a critical aspect of operating a safe kitchen and not simply logging temperatures for the sake of creating documentation.

---

[20] The Louisiana Food Code specifies that hot foods must be held at a temperature of 135°F or above. Random temperatures were taken of the dinner food items on June 11, 2018.  Sausage was measured at 125°F and 127°F; rice was at 102°F, 106°F, 114°F, and 129°F; and mixed vegetables were found at 123°F and 129°F.  Corrective action was taken.  Random food temperatures were also taken during the June 12, 2018 lunch meal service.  All temperatures exceeded the minimum 135°F requirement, except for the hot dogs which were found to be at 114°F, 122°F, and 128°F.  Corrective action was taken, and the hot dogs were reheated to a safe temperature.



125

## IV. D. 4. Sanitation and Environmental Conditions Reporting
## IV. D. 4. a. (1) – (7) Periodic Reporting

Findings: Non-Compliance

**Measures of Compliance:**
1. Written policy and procedure governing reporting.
2. Evidence of written report provided as specified in the provision.

Observations:

      The 2017 Sanitation and Environmental report was available to the Monitor in the requisite format and substantial reporting of information noted by the end of CY2017. No semi-annual report was received prior to the compliance tour on June 11-14, 2018.



**IV. D. 4. b. Review of Sanitation and Environmental Conditions Report**

Findings:  Partial compliance

**Measures of Compliance:**
1.   Written policy and procedure governing reporting on environmental conditions.
2.   Evidence of a review of the sanitation and environmental conditions report by staff responsible for implementing policies and procedures for blood borne pathogens, chemical control, sanitation, and preventive maintenance.
3.   Evidence of written audits of the facilities.
4.   Evidence of command staff review.  Determination by OJC that the implemented policies and procedures are effective to address the provisions of this Agreement.
5.   Evidence of effective Corrective Actions are taken to address non-conformities identified during the review process.
6.   Changes to policy, training curriculum, etc. resulting from these reviews.

<u>Observations</u>

Policy 101.04 [July 17, 2017] establishes that the OPSO Management Team review the periodic management reports during regularly scheduled meetings.  No documentation of the management review process was provided.  OPSO provided the Monitor with detailed sanitation reports covering each inmate housing area from January 2018 thru March 2018 in addition to the Life Safety monthly inspections.  These reports repeatedly note sanitation issues in common areas and individual cells as well as inmates accumulating excess food items, uniforms, blankets, books and paper items. There is no indication that effective corrective action was taken as the Monitor observed the same conditions during the recent compliance tour.



## IV. E.   Fire and Life Safety

## IV. E. 1. a. Fire and Life Safety Equipment

Findings:  Partial compliance

**Measures of Compliance:**

1. Written policy and procedure governing the procedures and staff responsibility and accountability assigned for a minimum of quarterly inspections, repair and/or replacement of all fire and life safety equipment, included in the controlled document inventory.
2. Inspections shall be completed by competent fire inspector having at a minimum successfully passed "Fire Inspector II" training and examination in accordance with NFPA 1031, Professional Inspector Level II Qualifications and all requirements of the Office of the Louisiana State Fire Marshall.
3. Development and maintenance of a complete inventory of all fire and life safety equipment for each facility.  The list needs to include, but not limited to sprinkler heads, fire alarm pull boxes, smoke detectors, fire suppression systems, fire extinguishers, defibrillators, SCBA equipment and etc.
4. Annual master calendar for all internal and external inspection of all fire and life safety system equipment.
5. Development of a facility specific audit form that demonstrates the date of completion of inspection, identification of all non-conforming equipment, along with a corrective action report form that can demonstrate that effective corrective action was taken for all non-conformities.
6. Lesson plans/curriculum for staff assigned as auditors/inspectors.
7. Execution of contract with a qualified contractor to perform the inspections specified in this provision.
8. Evidence of a completed, signed, and supervisory review of all inspection and testing reports, along with documented corrective actions taken to resolve identify issue on non-conformance.
9. Fire Department inspection reports.
10. Interview with Fire Department officials.

<u>Observations:</u>

Policy 701.01, "Emergency Equipment Inspections and Testing" [April 12, 2017] establishes that all fire and life safety equipment is to be inspected and/or tested, the assigned responsibility (either contractor or Fire Safety Officer), and the inspection/testing frequency.

The OPSO Fire Safety Officer continues to implement the policy.  The "Facility Dude" work order system maintains the schedule of inspections and notifies the Officer when an inspection is due.  OPSO continues to maintain contracts with licensed vendors to complete annual inspections of all fire and life safety equipment. Prior to this tour, OPSO provided evidence of the most recent equipment inspections, in accordance with policy.



OPSO provided copies of quarterly inspections conducted by the Fire Safety Officer for Kitchen/Warehouse, OJC, and TDC for first quarter of 2018.  This documentation, supported by observations during the compliance tour, indicates that OPSO ensures that necessary fire and life safety equipment is properly maintained and inspected at required intervals.  These inspections are conducted by a qualified fire safety officer or a qualified contractor, as required by the Consent Judgment.

The Monitor noted two fire extinguishers were out of date located in the OJC staff locker rooms. The date of last inspection of these extinguishers was 2015 indicating that the required inventory of such equipment is not complete.

No lesson plans/curriculum for staff assigned as auditors/inspectors was provided. Chief Lampard who is trained and experienced in performing the in-house life safety inspections is the only Life Safety Officer for the all facilities. Supervisory review consists of the Life Safety Officer presenting inspection forms/results to supervisors who sign off on the forms. There is no documentation to reflect that any corrective action is taken unless the issue is a specific repair addressed by a contractor or facility maintenance staff.



## IV. E. 1. b. Monthly Inspections

Findings: Partial Compliance

**Measures of Compliance:**
1. Job description/post orders, including qualifications for a fire safety officer in accordance with NFPA requirements for a "Certified Fire Inspector Level II"
2. Written policy and procedures including evidence of attendance at any and all 3-year certification seminars for certification renewal or current license from the Office of the State Fire Marshall
3. Also include measures 3, 4, 5, 7 of IV.E.1.a.
4. Review and observation of completed reports and corrective actions taken.
5. Interview with fire safety officer.

Observations:

Policy 701.01 addresses all fire and life safety inspections and frequency of the inspections.  Policy 601.03, "Preventive Maintenance" [August 15, 2016] requires the Facilities Maintenance (FM) test all life safety equipment and systems in accordance with National Fire Protection Association (NFPA) and/or Authority Having Jurisdiction (AHJ) requirements.

The Monitor was provided with the monthly inspection documents for the Kitchen & Warehouse, OJC, and TDC facilities from October 2017 thru May 2018. The reports are thorough and complete, except as noted below.

OPSO Policy 701.01 also establishes a review of the report between the warden of each facility and the watch commander. It also requires a review by the Chief of Corrections.  The Safety Officer stated that his practice is to review the reports with command staff, and noted that the chronic issues continue to be housekeeping and inmates being allowed to accumulate excess items in their cells and bunk areas.  Evidence of such accumulation was noted by the Monitor in every housing unit observed.  Such accumulation of excess flammable materials such as books, paperwork, excess uniforms and blankets creates a significant hazard in terms of fire threat particularly given the chronic contraband issue with lighters. This problem was evidenced on May 17, 2018, when, on three separate occasions during a twenty-four hour period, an inmate was able to ignite and fuel a significant fire in his cell that caused a major response by staff and posed a significant risk to



the inmate in question and other inmates in the unit. The Monitor also observed chronic issues with damaged or missing dryer vent lines in most every housing unit. This also poses a fire risk as does the lack of staff supervision of inmates using the dryers. The implementation of the "unit management" scheme of supervision may address this issue going forward.

During the tour, the Monitor observed three instances where items were stored too close to the ceiling in the Warehouse and in an Intake area closet, and several instances where access to fire extinguishers and alarm pull stations were blocked by surplus or broken equipment and chairs in the Warehouse and wheeled carts in the Kitchen. Exit signs were functional throughout the facilities, but evacuation routes were not sufficiently posted in the Kitchen/Warehouse facility. Only one of the deficiencies were noted on the monthly and quarterly inspection reports provided for the period October 2017 through May 2018. Each monthly report did note that evacuation routes were not sufficiently posted in the Kitchen/Warehouse, but no action was taken to remedy the deficiency observed by the Life Safety Officer.  Other than items entered as maintenance issues in "Facility Dude", there is no corrective action report form that can demonstrate that effective corrective action was taken for all non-conformities.

No lesson plans/curriculum for staff assigned as auditors/inspectors was submitted by OPSO for review.

These provisions are in partial compliance because the documentation of chronic safety issues with no corrective action(s).

New recommendations:

52.     Add recurring issues to the inspection forms; specifically, items stored too close to the ceilings in storage areas and blocked access to fire extinguishers/fire alarm pulls.

53.     Paint, tape or otherwise mark all storage room and warehouse walls with the maximum height items can be stored in a given area to ensure fire suppression systems are not compromised.



54.   Require that inspection form "remarks" indicate the person responsible for corrective action/due date/re-inspection date and result.

55.   Document corrective action plan(s) for any deficiencies that are reviewed/signed by supervisory personnel in the quarterly/monthly reports.

56.   Devise a bracket or brace system that can be installed on the dryers and washers in the housing units effectively anchoring the appliances to the floor at the optimal distance from the wall to allow the vent lines to work but not allow easy access to back of the machines by inmates; or identify other options.



## IV. E. 1. c. Fire Drills

Findings: Partial Compliance

**Measures of Compliance:**
1. Written policy and procedures governing staff responsibilities and accountability for conducting fire drills within each facility in accordance with the provision. The policy shall include applicable drill reports that outline at a minimum start and stop times of the drills and the number and location of inmates who were moved as part of the drills, a review process for each drill that identifies the root cause and verification of effective corrective actions as necessary for non-conformities with the fire safety and evacuation plan(s)
2. Development and implementation of fire drill audit form(s)
3. Annual schedule of drills for each facility; demonstrating rotating drills to assure all areas are drilled at a specified frequency.
4. Observation of drills and/or drill reports.
5. Evidence of collaboration with the NOFD; interview with NOFD.
6. Interviews with inmates.

Observations:

Policy 401.05, "Fire/Smoke Event and Evacuation Training and Drills" [October 14, 2016] establishes that Level 1 fire and evacuation drills are required to be conducted on all shifts at least once each month and Level 2 fire and evacuation drills be conducted quarterly.    Policy 701.06, "Emergencies – Fire/Smoke Events" [May 23, 2016] requires staff be knowledgeable to appropriately respond to drills.

The CJ requires comprehensive fire drills every six months.  OPSO provided copies of the monthly and quarterly fire drills which meet the CJ requirements including start and stop times and the number and location of inmates who were moved as part of the drills.  All drills were conducted under the direction of the Fire Safety Officer. Each drill report documented that the Fire Safety Officer tested all exit doors with the emergency key set and verified that the fire alarm activation was received by the company responsible for annual testing and monitoring of the fire alarm system.

Per OPSO policy, the participation of all staff in at least one drill per quarter could not be readily verified by the manual drill records. The Fire Safety Officer reported that he could not confirm that all current staff were up-to-date on drills per OPSO policy as he did not have an up-to-date staffing roster for the facility.



Documentation of the drill's conduct and participation reflects an adequate response by staff based upon comments by the Life Safety Officer.   The drill reports themselves contain bulleted comments related to the sequence of events and actions by staff. There are no comments or review that note whether or not the drill conformed with the relative training, procedures, plans, etc. The CJ requires a review process for each drill that identifies the root cause and verification of effective corrective actions as necessary for non-conformities with the fire safety and evacuation plan(s)

Performance under actual conditions is a prime indicator of a successful training and drill program. However, the actual response by staff to the May 17, 2018, fire events in an inmate cell demonstrated a lack of training by staff directly responding as evidenced by video footage of the incident viewed by the Monitor. Too many staff responded directly into the unit and the cell without *any* fire extinguishers or other response gear.  No one took charge of the chaotic scene and an individual deputy attempted to drag flaming material from the cell across the length of the entire dayroom to the recreation yard, effectively spreading flames and smoke throughout the dayroom.

As this was a single incident, it is not clear if it is indicative of endemic problems with the drills and training, and OPSO should use this event as a training example going forward. The same review process/root cause analysis and corrective action plan required of drills should also be required, per OPSO policy, with actual fire or emergency events that occur in the facilities. OPSO does not maintain a master schedule of required drills. As of the date of the compliance tour, no critical incident review had been completed nor had staff reports and incident video been provided to the Life Safety Officer for review.

OPSO is in partial compliance with the provision.



<u>New Recommendations</u>:

57.     Conduct timely critical reviews/root cause analysis of fire and fire-related events and responses.  Develop specific corrective action plans to address identified deficiencies.

58.     Identify specific corrective actions based on the May and subsequent fire incidents in the OJC, identifying supervisors, training, response, and equipment issues.



## IV. E. 1. d. Competency-Based Training

Findings:  Partial Compliance

### Measures of Compliance:

1. Development and implementation of a competency-based training policy for all correction staff on safe and effective use of all fire and emergency equipment, firefighting, safe evacuation.
2. Development and implementation of a fire and emergency practices and procedures training course syllabus/outline, along with a written exam that measures the competency of the corrections staff for the fire safety and evacuation plan and establishes an acceptable passing score.
3. Written directive regarding how OPP will identify each officer and staff who is required to receive training, the training date, name of officer/staff trained.

The CJ requires competency-based training to staff on proper fire and emergency practices and procedures at least annually.  OPSO has developed the requisite policy, training course syllabus/outline and written directives. However, the performance by staff during an actual fire event on May 17, 2018, calls into question compliance with these initiatives as their application results in partial compliance with this section.

The absence of sworn staff assigned as Life Safety Officers has exacerbated this issue in the opinion of the Monitor. The hiring of at least two qualified civilian employees to serve in the Life Safety Officer role and augment Chief Lampard's efforts is recommended.  The hiring of civilian staff would obviate the practice of pulling deputies in support roles to fill line function vacancies.  An example would be hiring off-duty NOFD firefighters in a part-time capacity and training them in specific OPSO policies, procedures, and practices.

Observations:

Through observation and staff interviews, the Monitor noted that while Chief Lampard is putting forth a tremendous effort in keeping up with all life safety drills and inspections, the Monitor does not believe the current levels of performance are sustainable long-term due to a lack of trained staff who are able to assist in these tasks and carry them out in Chief Lampard's absence.  The Monitor was advised that two additional Safety Officers were to have been hired but this has not materialized.



<u>New Recommendation</u>:

59.     Hire two full time equivalents to perform the role of Fire Safety Officer.  Off
        duty NOFD firefighters could be hired part time.



**IV. E. 1. e. Emergency Keys**

Findings: Substantial compliance

**Measures of Compliance:**

1. Written policy and procedures regarding staff responsibility and accountability for the systematic marking of all emergency keys, including sight and touch identification and designated locations for quick access for all keys. All policies and procedures are to be reviewed and updated as necessary and at least annually on a schedule.
2. Implementation of the policy and procedure
3. Documented evidence of officer and staff training on the policy and procedure.
4. Observation of keys.
5. Observation of staff utilizing keys.

Observations:

The Monitor found the physical security and accountability for emergency keys to be in substantial compliance with Policy 801.35 "Key and Key Card Control" on July 28, 2017. Inspection reports note the routine verification of the keys and the Fire Safety Officer documents the periodic testing of the keys to verify they are operational and the Fire Safety Officer trains staff on the use of the location and use of the keys during the fire and life safety training curriculum provided to all staff at the training academy. As the in-service training is developed, life safety training to include the use of emergency keys should be incorporated in the training each year.



**IV. E.2 Fire and Life Safety Reporting**

**IV. E. 2. a. (1) – (3) Periodic Reporting**

Findings: Partial Compliance

**Measures of Compliance:**

1. Written policy and procedure governing required reporting.
2. Evidence of written report provided as specified in the provision.

Observations:

      Policy 101.04, "Administrative Reporting Requirements" [July 17, 2017] establishes required periodic reporting, report contents, analysis, and responsibilities of the reviewing authority.

      The most recent semi-annual report was not available for review at the time of the inspection. Monthly and quarterly inspection reports, external reports and inspections were provided, but as noted in the last report, no summary as required by the CJ was provided of the following:

1. The number and type of violations reported by fire and life safety inspectors (internal inspectors);

2. The fire code violations during annual fire inspections (in this period there were none reported according to the specific reports for OJC and TDC.);

3. The number of occurrences of hazardous clutter in housing units that could lead to a fire (in virtually every monthly report for OJC, it was noted as a violation "housekeeping needs improvement" with no action plan or progress noted).

      The lack of communication from security staff to the Fire Safety Officer is an on-going concern as noted previously.  For example, the reports and video of the May 17, 2018 fire incident mentioned previously had not been provided to the Fire Safety Officer for review as of the date of the compliance tour in June 2018.  See the recommendation above, regarding critical incident reviews/root cause analysis of fire and fire-related incidents, as well as corrective action plans.



**IV. E.  2.  b. Addressing Deficiencies**

Findings: Partial compliance

**Measures of Compliance:**
1. Written policy and procedure governing required reporting.
2. Evidence of reviews of the fire and life safety conditions report by staff responsible for implementing policies and procedures.
3. Evidence of written audits of the facilities.
4. Evidence of command staff review.  Determination by OJC that the policies and procedures are effective to address the requirements of this Judgment.
5. Documentation of Corrective Actions taken to address non-conformities identified during the review process.
6. Changes to policy, training curriculum, etc. resulting from these reviews.
7. Review of Fire Department reports/inspections; interviews with NOFD.

<u>Observations</u>:

Policy 101.04 [July 17, 2017] establishes that the OPSO Management Team review the periodic management reports during regularly scheduled meetings. These reports were not provided.  The paragraph remains in partial compliance as the policy is completed; but there is no documentation of implementation.  This is a serious matter as there have been escalating number of fire-related incidents.  A coordinated initiative, along with decreasing contraband flow in the facility, needs to be a priority.



## IV. F.   Language Assistance

Findings:
> F.1.a. - Partial Compliance
> F.2.a - Not Applicable
> F.2.b. - Not Applicable
> F.3.a. - Partial Compliance
> F.4 - Non-compliance

**Measures of compliance:**
1. Comprehensiveness of policy; comprehensive language assistance plan.
2. Training.
3. Review of inmate files.
4. Interviews.

Observations:

OPSO's policy on Language Assistance (801.25) [March 2016.] addresses the provisions of the paragraph, but as noted in previous compliance reports, the critical step of implementation has not occurred.  OPSO assessed compliance as partial.   OPSO's required work to gain compliance includes:

- Develop and implement a comprehensive language assistance plan (separate from the policy).

- Annually identify and assess demographic data collected through the intake and classification processes. Specifically, track the number of Limited English Proficiency (LEP) individuals.  (Note, the attorneys for the Plaintiff class, OPSO, and Monitors mutually agreed to change this requirement from monthly to annual reporting.).

- Document the provision of timely, meaningful language assistance services for LEP inmates by OPSO staff.  ("Meaningful services" must extend beyond the availability of the language line.)

- Assess regularly the proficiency and qualifications of bilingual staff to serve as authorized interpreters.

- Create and maintain a list of authorized interpreters.  (This list should be posted on the OSPO shared drive to ensure ready access by all staff, particularly intake and classification officers.



- Document that LEP inmates are <u>not</u> asked to sign or initial documents in English without the benefit of a translation from an authorized interpreter.
- Provide at least eight (8) hours of LEP training for all corrections and medical/mental health staff who have direct contact with LEP inmates.
- Post bilingual staff in housing units.
- Ensure at least one bilingual staff member is available on each shift.

As OPSO states that they do not hold ICE inmates, in compliance with Section IV. A. 9. b. of the Consent Judgment, the Monitors consistently evaluate paragraphs IV. F. 1. and 2. as not applicable.

OPSO contracts with the City's Office of Homeland and Security and Emergency Preparedness for language line services.  OPSO has not be able to provide a record of these calls since September 2017.

OPSO notes that although there is a policy regarding bi-lingual staff (301.25), it is not implemented.  The responsibility to do so has been delegated to the newly hired Human Resources Director who anticipated implementation 90 days from June 12, 2018.  As there is no movement regarding this paragraph (IV.F.4.) since the last compliance report, this remains in non-compliance.



## IV. G.   Youthful Prisoners

Findings:   Partial compliance

**Measures of Compliance**:
1. Written policy/procedures governing classification and housing of youthful inmates, including but not to sight/sound separation, provision of services, protective custody, education and other services, services for youthful inmates with mental illness or who are developmentally disabled, access to medical and mental health services.
2. Housing plan; classification plan.
3. Observation.
4. Interview with youthful inmates.
5. Review of recreation and program schedules.
6. Review of inmate files (developmentally disabled, mental illness).
7. Review of housing unit logs, program schedules.

<u>Observations</u>:

This paragraph of the Consent Judgment has several provisions:

- maintenance of separation of youthful inmates from adults, unless providing direct supervision of the inmates,

- assure youthful inmates in protective custody status shall have no contact with, or access to or from, non-protective custody inmates, and

- provision of developmentally appropriate mental health and programming services.

As these requirements are in a single paragraph,  OPSO believes it has achieved partial compliance; the Monitor finds this paragraph in partial compliance as well.

The housing options in OJC, that is, the large housing units, prevent the separation of youth who are in protective custody from non-protective custody. Female juvenile inmates held in OJC, although not as large a number of male youthful inmates, cannot be separated from adult female inmates.  OPSO continues to work with the Youth Study Center to find a way to move juveniles to that facility.

OPSO provided two-months of staffing logs indicating that the unit holding youthful males was staffed on all shifts. (See also Stipulated Agreement of February



11, 2015, paragraph 7.b.) What is not documented is whether deputies are relieved when they take meal breaks or escort an inmate.

Completed policies to guide operations for these inmates are not completed, pending since Compliance Report #8. Also, as referenced in the last Compliance Report, an inmate handbook appropriate for youthful offenders is being drafted by OPSO.   Preliminary drafts of the text and related appendices were provided to the Monitor for review.

The Monitors acknowledge that the implementation of a school program represents significant progress toward compliance.

CCS is responsible for providing developmentally appropriate mental health services for this population.  The CCS psychologist provided a schedule of activities, which include card games, strategy games, educational games, paper games, sleep hygiene, creative therapy, anger management, coping skills, social skills, leisure activity and board games.  The Monitor requested additional information providing the bases for the programming offered, specifically a needs assessment or similar document connecting the programming offered with the diagnoses of the youthful offenders.  Although additional information was provided, this specific information was not.   The Monitors look forward to the maturation of these two programs – Travis Hill School and developmentally appropriate mental health services and seeing progress at the next tour.



## VI.   A – D. The New Jail Facility and Related Issues

A.   <u>New Jail</u>

Finding – Substantial Compliance.

The Orleans Jail Center opened for inmates on September 15, 2015.

B.   <u>Design and Design Document</u>

Finding – Substantial Compliance

This provision provides that, "*The Defendant shall obtain the services of a qualified professional to evaluate, design, plan, oversee, and implement the construction of **any new facility** [emphasis added].  At each major stage of the facility construction, Defendant shall provide the Monitor with copies of design documents.*"

Judge Africk has directed that the City provide plans for the Phase III (a special needs' facility) to Drs. Patterson and Greifinger for review as available.

Therefore, the finding of compliance for the new jail is substantial compliance.  For Phase III, implementation is pending.

C.   <u>Staffing</u> -   The Consent Judgment requires that the Defendant **shall** consult with a qualified corrections expert as to the required services and staffing levels needed for any replacement facility.  The Monitors will await planning for Phase III to ascertain future compliance. For now, the paragraph is in substantial compliance.

D.   <u>Compliance with Codes and Standards</u>

Finding – Not evaluated

The Monitors do not have the knowledge base to evaluate compliance with this paragraph.



## VII.  Compliance and Quality Improvement

## VII. A. Policies, Procedures, Protocols, Training Curriculum and Practices

Finding:    Partial Compliance

**Measures of Compliance:**
1.   Policies and procedures manual.
2.   Process/spreadsheet to identify all existing and planned written directives, dates when expected to be submitted for Monitors' review.

Observations:

Policies and procedures are not completed.  The in-process, almost complete, policy governing the written directive system is a step forward, and will require standard operating procedures for the OPSO's organizational components.   OPSO self-assesses that this provision is in partial compliance.

## VII. (H). B.  Written Quality Improvement Policies and Procedures

Finding:    Partial compliance

**Measures of Compliance:**
1.   Written policy/procedure governing quality improvement.
2.   Written report.
3.   Results of action plan from written report.

Observations:

Partial compliance with this paragraph is based on OPSO's policy 801.21 (dated April 5, 2016) regarding critical incident reviews.  OPSO has produced, to the Monitor's knowledge, one critical incident review.  There have been many incidents which require review for improvement.   Once the Monitors can evaluate the reviews, the aligned corrective action plans, and the implementation, this paragraph will gain compliance.  OPSO self-assesses that this provision is in partial compliance.



## VII. (I). C. Full-Time Compliance Coordinator

Finding:  Partial Compliance.

Observation:

Debra Hammons was hired as the compliance coordinator in November 2017, and has done extraordinary work to frame the compliance initiatives.  Based on the specific language of the Consent Judgment, however, the Monitors assess partial compliance.  The areas requiring attention are described in the Introduction to this report (based on the language of the Consent Judgment).[21]

## VII. (J.) D. Self-Assessment

Finding:    Non-Compliance.

Observations:

The provision provides "*On a bi-annual basis, OPSO will provide the public with a self-assessment in which areas of significant improvement or areas still undergoing improvement are presented either through use of the OPSO website or through issuance of a public statement or report.*"

OPSO asserts that they are in substantial compliance with this paragraph as town hall meetings are held quarterly.  OPSO provided the PowerPoint presentations used at those meetings.  The Monitor believes that this paragraph is not about the townhall meetings, conducted pursuant to the Stipulated Agreement of 2016, but rather in writing on the website or through issuance of a public statement.

---

[21] The Parties agree that OPSO will hire and retain, or reassign a current OPSO employee for the duration of this Agreement, to serve as a full-time OPSO Compliance Coordinator. The Compliance Coordinator will serve as a liaison between the Parties and the Monitor and will assist with OPSO's compliance with this Agreement. At a minimum, the Compliance Coordinator will: coordinate OPSO's compliance and implementation activities; facilitate the provision of data, documents, materials, and access to OPSO's personnel to the Monitor, SPLC, DOJ, and the public, as needed; ensure that all documents and records are maintained as provided in this Agreement; and assist in assigning compliance tasks to OPSO personnel, as directed by the Sheriff or his or her designee. The Compliance Coordinator will take primary responsibility for collecting information the Monitor requires to carry out the duties assigned to the Monitor.



## VIII.  Reporting Requirements and Right of Access
## VIII.  A. Periodic Compliance Reporting

Finding:    Non-Compliance.

Observations:

This provision requires that OPSO submit periodic compliance reports to the Monitors describing the OPSO's actions during the reporting period to implement the Consent Judgment.  The report is also required to summarize audits and continuous improvement plans, quality assurance activities and contain findings and recommendations that would be used to track and trend data.  The report is also to capture data that is tracked and monitored under the reporting provisions related to use of force, suicide prevention, health care delivered, sanitation and environmental conditions, and fire and life safety.

OPSO asserts that it is in substantial compliance with this paragraph.  OPSO provided documentation. [22]

The OPSO Compliance "master document" provided does not include information on the specific activities that OPSO is undertaking to gain and sustain compliance by paragraph.  OPSO provided a memorandum that there is currently a review of what incidents will be reviewed as critical incidents.

Based on the information provided and the requirements of this paragraph, the Monitors assess this paragraph as being in non-compliance.  The compliance

---

[22] A summary page of the responsibilities of staff vis-à-vis the early intervention system, grievances, mental health counseling and risk management reports (the last two assigned to a CCS staff no longer employed);  No such report has been provided for either 2016 or to-date for 2107; a review of the Early Intervention System (EIS) (4/2/18); a spreadsheet with EIS alerts;  the report of the 1st quarter of 2018 regarding the inmate grievance system;  a Quarterly Compliance Report from CCS for the 2018, which does not include suicide prevention activities or respond directly to the requirements of the health care section of the Consent Judgment;  the inmate disciplinary track spreadsheet, which will include, according to OPSO, analysis and tracking in the future; the tentative in-service training schedules for both sworn and civilian staff; a programming master schedule; May 2018 IAD Investigative Review;  inmate classification summaries, internal audits and training (see also Section IV.A. 10); staffing overtime report for May 2018; list of approved paid details worked May 2018' What is unlabeled but appears to be a listing of hours worked by reserve deputies in OJC; list of missed medical appointments from CCS, with no analysis or action plan;  policy index and due dates;  Use of Force Review Board Dispositions (January through May 2018); Use of Force reviews for what appears to be 2018 quarterly (unable to open document); 2018 EIS alerts; and  6/15/18 – Stipulated Audit Action Plan Environmental/Sanitation Department.



initiatives of OPSO should address the specific requirements of this paragraph and develop the systems needed.  This will be essential to sustainability of the requirements.

## VIII. B.  (Notification of) **Death of Any Prisoner**

Finding:    Substantial Compliance

<u>Observations</u>:

Notifications have been provided within 12 hours of an inmate's death. Better communication between the OPSO and the Monitors and attorneys for the Plaintiff class/DOJ is needed as to the post-death *investigations*.

## VIII. C. **Records**

Finding:    Partial Compliance

<u>Observations</u>:

The Monitors are heartened by the improvement in the production of accurate and meaningful data.   OPSO self-assesses that this provision is in partial compliance.



| Section | Report # 1 2/13/14 | Report # 2 8/26/14 | Report # 3 2/25/15 | Report # 4 9/9/15 | Report # 5 3/17/16 | Report # 6 10/25/16 | Report # 7 5/1/17 | Report # 8 1/12/18 | Report # 9 8/25/18 |
|---|---|---|---|---|---|---|---|---|---|
| **7/30/18** | | | | | | | | | |
| **IV.A. 1.  Use of Force Policies and Procedures/Margo Frasier** | | | | | | | | | |
| IV. A. 1.a. | ND | NC | NC | PC | NC | PC | PC | PC | PC |
| IV. A. 1.b. | ND | NC | NC | PC | NC | PC | PC | PC | SC |
| IV. A. 1.c. | ND | NC | NC | PC | NC | NC | PC | PC | PC |
| **IV.A.2.  Use of Force Training/Margo Frasier** | | | | | | | | | |
| IV. A. 2. a. | ND | NC | NC | NC | NC | PC | PC | PC | PC |
| IV. A. 2. b. | ND | NC | NC | NC | NC | PC | PC | PC | PC |
| IV. A. 2. c. | ND | NC | NC | NC | NC | NC | NC | NC | PC |
| **IV.A.3.   Use of Force Reporting/Margo Frasier** | | | | | | | | | |
| IV. A.3 a. | ND | NC | NC | PC | NC | PC | PC | PC | PC |
| IV. A.3 b. | ND | NC | NC | NC | NC | NC | PC | PC | PC |
| IV. A.3 c. | ND | NC | NC | NC | NC | NC | PC | PC | PC |
| IV. A.3 d. | ND | NC | NC | PC | NC | NC | PC | PC | PC |
| IV. A.3 e. | ND | NC | NC | PC | PC | PC | PC | PC | SC |
| IV. A.3 f. | ND | NC | NC | PC | NC | PC | PC | PC | PC |
| IV. A.3 g. | ND | NC | NC | PC | PC | PC | PC | PC | SC |
| IV. A.3 h. | ND | NC | NC | NC | NC | NC | NC | NC | PC |
| **IV.A.4. Early Intervention System ("EIS") /Margo Frasier** | | | | | | | | | |
| IV.A.4.a. | ND | NC | NC | PC | PC | PC | NC | NC | PC |
| IV.A.4.b. | ND | NC | NC | PC | PC | PC | PC | PC | PC |
| IV.A.4.c. | ND | NC | NC | PC | PC | PC | PC | PC | SC |
| IV.A.4.d. | ND | NC | NC | NC | NC | PC | PC | NC | NC |
| IV.A.4.e. | ND | ND | ND | ND | NC | NC | NC | NC | NC |
| **IV.A.5. Safety and Supervision/Margo Frasier** | | | | | | | | | |
| IV.A.5.a. | ND | NC | NC | NC | NC | NC | NC | NC | NC |
| IV.A.5.b. | ND | NC | NC | NC | NC | NC | NC | NC | NC |
| IV.A.5.c. | ND | NC | NC | NC | NC | NC | NC | PC | PC |
| IV.A.5.d. | NC | NC | PC | PC | NC | NC | NC | NC | PC |
| IV.A.5.e. | ND | NC | NC | PC | PC | NC | NC | NC | NC |
| IV.A.5.f. | ND | NC | NC | PC | PC | SC | SC | PC | PC |
| IV.A.5.g. | ND | NC | ND | PC | NC | NC | NC | NC | NC |
| IV.A.5.h. | ND | NC | NC | NC | NC | NC | NC | NC | NC |
| IV.A.5.i. | ND | NC | NC | PC | PC | PC | PC | PC | SC |
| IV.A.5.j. | ND | NC | PC | PC | NC | NC | NC | NC | PC |
| IV.A.5.k. | ND | NC | PC | PC | PC | PC | PC | PC | PC |
| IV.A.5.l. | ND | NC | NC | NC | PC | PC | PC | PC | PC |
| **IV.A.6.  Security Staffing/Susan McCampbell** | | | | | | | | | |
| IV.A.6.a. | NC | NC | NC | NC | NC | NC | NC | NC | NC |
| IV.A.6.a.( | ND | PC | PC | PC | SC | SC | PC | PC | PC |
| IV.A.6.a.( | ND | PC | PC | PC | NC | SC | SC | SC | SC |
| IV.A.6.a.( 2) | ND | SC | NC | SC | NC | SC | NC | SC | NC |
| IV.A.6.a.( | ND | NC | PC | PC | PC | PC | PC | PC | PC |
| IV.A.6.b. | ND | NC | PC | PC | NC | PC | PC | PC | PC |

August 29, 2018

| Section | Report # 1 2/13/14 | Report # 2 8/26/14 | Report # 3 2/25/15 | Report # 4 9/9/15 | Report # 5 3/17/16 | Report # 6 10/25/16 | Report # 7 5/1/17 | Report # 8 1/12/18 | Report # 9 8/25/18 |
|---|---|---|---|---|---|---|---|---|---|
| **IV.A.7 Incidents and Referrals/Margo Frasier** | | | | | | | | | |
| IV.A.7.a. | ND | NC | NC | NC | NC | PC | PC | PC | PC |
| IV.A.7.b. | ND | NC | NC | PC | NC | PC | PC | PC | PC |
| IV.A.7.c. | ND | NC | PC | PC | PC | PC | SC | SC | SC |
| IV.A.7.d. | ND | NC | NC | NC | NC | NC | NC | PC | PC |
| IV.A.7.e. | ND | NC | PC | PC | PC | PC | PC | PC | PC |
| IV.A.7.f. | ND | NC | NC | PC | PC | PC | PC | PC | PC |
| IV.A.7.g. | ND | NC | NC | PC | PC | PC | PC | PC | PC |
| IV.A.7.h. | ND | NC | NC | PC | PC | PC | PC | PC | PC |
| IV.A.7.i. | ND | NC | NC | PC | NC | NC | NC | NC | NC |
| IV.A.7.j. | ND | NC | NC | NC | NC | NC | NC | NC | NC |
| **IV.A.8.  Investigations/Margo Frasier** | | | | | | | | | |
| IV.A.8.a. | ND | NC | PC | PC | PC | SC | SC | SC | SC |
| IV.A.8.b. | ND | NC | PC | PC | PC | SC | SC | SC | SC |
| IV.A.8.c. | ND | NC | PC | PC | PC | SC | SC | SC | SC |
| IV.A.8.d. | ND | NC | NC | PC | PC | SC | SC | SC | SC |
| IV.A.8.e. | ND | NC | NC | PC | PC | PC | PC | SC | SC |
| IV.A.8.f. | ND | NC | NC | PC | PC | PC | PC | PC | SC |
| **IV.A.9.  Pretrial Placement in Alternative Settings/Susan McCamp** | | | | | | | | | |
| IV.A.9.a. | PC | PC | PC | SC | SC | SC | SC | SC | SC |
| IV.A.9.b. | PC | PC | PC | SC | SC | SC | SC | SC | SC |
| **IV.A.10. Custodial Placement within OPP/Patricia Hardyman** | | | | | | | | | |
| IV.A.10.a. | NC | PC | SC | SC | SC | PC | PC | PC | PC |
| IV.A.10.b. | NC | NC | NC | SC | SC | SC | SC | SC | SC |
| IV.A.10.c. | NC | NC | PC | PC | PC | PC | PC | SC | SC |
| IV.A.10.d. | NC | NC | PC | PC | PC | PC | PC | NC | PC |
| IV.A.10.e. | NC | NC | PC | SC | PC | PC | SC | PC | PC |
| IV.A.10.f. | NC | NC | NC | NC | NC | PC | PC | PC | NC |
| IV.A.10.g. | NC | NC | NC | NC | NC | PC | PC | PC | PC |
| IV.A.10.h. | NC | NC | PC | PC | PC | PC | PC | PC | PC |
| **IV..A.11. Prisoner Grievance Process/Susan McCampbell** | | | | | | | | | |
| IV.A.11.a | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| **IV.A.12. Sexual Abuse/Susan McCampbell** | | | | | | | | | |
| IV.A.12. | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| **IV.A.13. Access to Information/Susan McCampbell** | | | | | | | | | |
| IV.A.13. | PC | PC | PC | PC | PC | PC | PC | PC | PC |

| Section | Report # 1 2/13/14 | Report # 2 8/26/14 | Report # 3 2/25/15 | Report # 4 9/9/15 | Report # 5 3/17/16 | Report # 6 10/25/16 | Report # 7 5/1/17 | Report # 8 1/12/18 | Report # 9 8/25/18 |
|---|---|---|---|---|---|---|---|---|---|
| **IV. B. Mental Health Care** | | | | | | | | | |
| **IV.B.1. Screening and Assessment/Raymond Patterson** | | | | | | | | | |
| IV.B.1.a. | NC | NC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.1.b. | NC | NC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.1.c. | NC | NC | PC | PC | PC | PC | PC | PC | SC |
| IV.B.1.d. | NC | NC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.1.e. | NC | NC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.1.f. | NC | NC | NC | NC | NC | NC | NC | NC | NC |
| IV.B.1.g. | NC | NC | NC | NC | NC | NC | NC | NC | PC |
| IV.B.1.h. | NC | NC | NC | NC | NC | NC | NC | NC | PC |
| IV.B.1.i. | NC | NC | NC | NC | NC | NC | NC | NC | NC |
| IV.B.1.j. | NC | NC | NC | PC | NC | NC | NC | NC | NC |
| IV.B.1.k. | NC | NC | NC | PC | NC | NC | NC | NC | NC |
| IV.B.1.l. | NC | NC | NC | NC | NC | NC | NC | NC | NC |
| **B. 2.  Treatment/Raymond Patterson** | | | | | | | | | |
| IV.B.2.a. | NC | NC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.2.b. | NC | NC | NC | NC | NC | NC | NC | NC | NC |
| IV.B.2.c. | NC | NC | NC | NC | NC | NC | NC | NC | NC |
| IV.B.2.d. | NC | NC | NC | NC | NC | NC | NC | NC | NC |
| IV.B.2.e. | NC | NC | NC | PC | PC | PC | PC | NC | NC |
| IV.B.2.f. | NC | NC | NC | PC | PC | PC | NC | PC | PC |
| IV.B.2.g. | NC | NC | NC | PC | PC | PC | NC | PC | PC |
| IV.B.2.h. | NC | NC | NC | PC | PC | PC | PC | PC | NC |
| **IV.B.3.  Counseling/Raymond Patterson** | | | | | | | | | |
| IV.B.3.a. | NC | NC | NC | PC | NC | NC | PC | PC | PC |
| IV.B.3.b. | NC | NC | NC | NC | PC | NC | PC | PC | PC |
| **IV.B.4.  Suicide Prevention Training Program/Raymond Patterson** | | | | | | | | | |
| IV.B.4.a. | NC | NC | NC | PC | PC | PC | PC | PC | NC |
| IV.B.4.b. | NC | NC | NC | PC | PC | PC | PC | PC | PC |
| IV.B.4.c. | NC | NC | NC | PC | PC | PC | PC | PC | PC |
| IV.B.4.d. | NC | NC | NC | PC | NC | NC | NC | NC | NC |
| IV.B.4.e. | NC | NC | NC | PC | NA | PC | PC | PC | PC |
| IV.B.4.f. | NC | NC | NC | NC | PC | PC | NC | NC | SC |
| IV.B.4.g. | NC | NC | NC | SC | PC | NC | NC | NC | NC |
| **IV.B.5.  Suicide Precautions/Raymond Patterson** | | | | | | | | | |
| IV.B.5.a. | NC | NC | NC | NC | NC | NC | NC | PC | PC |
| IV.B.5.b. | NC | NC | NC | NC | NC | NC | NC | PC | PC |
| IV.B.5.c. | NC | NC | NC | NC | NC | NC | NC | PC | PC |
| IV.B.5.d. | NC | NC | NC | NC | NC | NC | NC | NC | PC |
| IV.B.5.e. | NC | NC | NC | NC | NC | NC | NC | NC | NC |
| IV.B.5.f. | NC | NC | NC | NC | NC | NC | NC | NC | NC |
| IV.B.5.g. | NC | NC | NC | NC | NC | NC | NC | NC | NC |
| IV.B.5.h. | NC | NC | NC | NC | NC | NC | NC | PC | NC |
| IV.B.5.i. | NC | NC | NC | NC | NC | NC | NC | PC | PC |
| IV.B.5.j. | NC | NC | NC | NC | NC | NC | NC | PC | PC |
| IV.B.5.k. | NC | NC | NC | NC | NC | NC | NC | PC | NC |

| Section | Report # 1 2/13/14 | Report # 2 8/26/14 | Report # 3 2/25/15 | Report # 4 9/9/15 | Report # 5 3/17/16 | Report # 6 10/25/16 | Report # 7 5/1/17 | Report # 8 1/12/18 | Report # 9 8/25/18 |
|---|---|---|---|---|---|---|---|---|---|
| **IV.B.6.  Use of Restraints/Raymond Patterson** | | | | | | | | | |
| IV.B.6.a. | PC | NC | PC | PC | PC | PC | PC | PC | NC |
| IV.B.6.b. | NC | NC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.6.c. | ND | NC | PC | PC | PC | PC | PC | PC | NC |
| IV.B.6.d. | ND | NC | PC | PC | PC | PC | PC | PC | NC |
| IV.B.6.e. | NC | NC | PC | PC | PC | PC | PC | PC | NC |
| IV.B.6.f. | NC | NC | PC | PC | PC | PC | PC | PC | NC |
| IV.B.6.g. | NC | NC | PC | PC | PC | PC | PC | PC | NC |
| **IV.B.7.  Detoxification and Training/Robert Greifinger** | | | | | | | | | |
| IV.B.7.a. | NC | NC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.7.b. | NC | NC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.7.c. | NC | NC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.7.d. | NC | NC | PC | PC | PC | PC | PC | PC | PC |
| **IV.B.8. Medical and Mental Health Staffing/Robert Greifinger** | | | | | | | | | |
| IV.B.8.a. | NC | NC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.8.b. | NC | NC | PC | PC | PC | PC | PC | PC | PC |
| **IV.B.9.  Risk Management/Robert Greifinger** | | | | | | | | | |
| IV.B.9.a. | NC | NC | NC | PC | PC | PC | PC | PC | PC |
| IV.B.9.b. | NC | NC | NC | PC | PC | PC | PC | PC | PC |
| IV.B.9.c. | NC | NC | NC | NC | PC | PC | PC | PC | PC |
| IV.B.9.d. | NC | NC | NC | NC | NC | NC | NC | NC | NC |
| IV.B.9.e. | NC | NC | NC | NC | PC | PC | PC | PC | NC |
| IV.B.9.f. | NC | NC | NC | NC | PC | PC | PC | PC | NC |
| **IV.C. Medical Care** | | | | | | | | | |
| **IV. C. Quality Management of Medication Administration** | | | | | | | | | |
| IV.C.1.a. | NC | NC | PC | PC | PC | PC | PC | PC | PC |
| IV.C.1.b. | NC | NC | PC | PC | PC | PC | PC | PC | PC |
| IV.C.1.c. | NC | NC | PC | PC | PC | PC | PC | PC | PC |
| IV.C.1.d. | NC | NC | PC | PC | PC | PC | PC | PC | PC |
| **IV.C.2.  Health Care Delivered/Robert Greifinger** | | | | | | | | | |
| IV.C.2.a. | NC | NC | NC | PC | PC | PC | PC | PC | PC |
| IV.C.2.b. | NC | NC | NC | PC | PC | PC | PC | PC | PC |
| **IV.C.3.  Release and Transfer/Robert Greifinger** | | | | | | | | | |
| IV.C.3.a. | NC | NC | NC | PC | PC | PC | PC | PC | PC |
| IV.C.3.b. | NC | NC | NC | PC | PC | PC | PC | PC | PC |
| IV.C.3.c. | NC | NC | NC | PC | PC | PC | PC | PC | PC |
| IV.C.3.d. | NC | NC | NC | PC | PC | PC | PC | PC | PC |
| **IV.D.  Sanitation and Environmental Conditions/Shane Poole** | | | | | | | | | |
| IV.D. 1.a. | NC | NC | NC | NC | NC | NC | NC | NC | NC |
| IV. D. 1.b. | NC | NC | PC | PC | PC | PC | PC | PC | PC |
| IV. D. 1.c. | NC | NC | PC | PC | NC | NC | PC | SC | PC |
| IV. D. 1.d. | NC | NC | NC | NC | SC | SC | SC | SC | SC |
| IV. D. 1.e. | NC | PC | PC | PC | PC | PC | PC | SC | |
| IV. D. 1.f. | NC | NC | NC | NC | PC | PC | PC | PC | PC |
| IV. D. 1.g. | NC | NC | NC | NC | PC | PC | PC | PC | PC |
| IV. D. 1.h. | NC | NC | NC | PC | NC | PC | NC | NC | NC |

August 29, 2018

| Section | Report # 1 2/13/14 | Report # 2 8/26/14 | Report # 3 2/25/15 | Report # 4 9/9/15 | Report # 5 3/17/16 | Report # 6 10/25/16 | Report # 7 5/1/17 | Report # 8 1/12/18 | Report # 9 8/25/18 |
|---|---|---|---|---|---|---|---|---|---|
| IV. D. 2. Environmental Control/Shane Poole | | | | | | | | | |
| IV. D. 2.a. | NC | NC | PC | PC | PC | SC | SC | SC | PC |
| IV. D. 2.b. | NC | NC | NC | NC | NC | SC | PC | SC | SC |
| IV. D. 3. Food Service/Diane Skipworth | | | | | | | | | |
| IV. D. 3.a. | NC | NC | NC | PC | PC | PC | NC | PC | PC |
| IV. D. 3.b. | NC | NC | NC | PC | PC | PC | NC | NC | NC |
| IV. D. 3.c. | NC | NC | NC | PC | NC | NC | PC | PC | PC |
| IV. D. 4. Sanitation and Environmental Conditions Reporting/Shane Poole | | | | | | | | | |
| IV. D. 4.a. 1-7 | NC | NC | PC | PC | PC | PC | PC | PC | NC |
| IV. D. 4.b. | NC | NC | NC | NC | PC | NC | NC | PC | PC |
| IV.E. Fire and Life Safety/Shane Poole | | | | | | | | | |
| IV. E. 1. Fire and Life Safety | | | | | | | | | |
| IV. E. 1.a. | NC | PC | PC | PC | PC | PC | PC | SC | PC |
| IV. E. 1.b. | NC | NC | NC | PC | PC | PC | PC | PC | PC |
| IV. E. 1.c. | PC | PC | PC | PC | NC | PC | PC | SC | PC |
| IV. E. 1.d. | NC | NC | NC | NC | NC | NC | PC | SC | PC |
| IV. E. 1.e. | ND | NC | PC | PC | PC | PC | PC | PC | SC |
| IV. E. 2. Fire and Life Safety Reporting | | | | | | | | | |
| IV. E. 2.a.1-3 | ND | NC | PC | PC | PC | PC | PC | PC | PC |
| IV. E. 2.b. | ND | NC | NC | PC | NC | NC | NC | PC | PC |
| IV.F. Language Assistance | | | | | | | | | |
| IV.F.1. Timely and Meaningful Access to Services/Susan McCampbell | | | | | | | | | |
| IV.F.1.a. | ND | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.F.2.  Language Assistance Policies and Procedures/Susan McCampbell | | | | | | | | | |
| IV.F.2.a. | ND | PC | PC | PC | Not App | Not App | Not App | Not App | Not App |
| IV.F.2.b. | ND | PC | PC | PC | Not App | Not App | Not App | Not App | Not App |
| IV.F.3. Language Assistance Training/Susan McCampbell | | | | | | | | | |
| IV.F.3.a. | NC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.F.4. Bilingual Staff/Susan McCampbell | | | | | | | | | |
| IV.F.4. | NC | PC | PC | PC | PC | PC | NC | NC | NC |
| IV.G.  Youthful Prisoners/Susan McCampbell | | | | | | | | | |
| IV.G. | NC | NC | NC | PC | PC | PC | NC | NC | PC |
| VI. The New Jail Facility/Susan McCampbell | | | | | | | | | |
| VI. A. | ND | PC | PC | SC | SC | SC | SC | SC | SC |
| VI. B. | NC | PC | SC | SC | SC | SC | SC | SC | SC |
| VI. C. | ND | PC | SC | SC | PC | PC | PC | PC | SC |
| VI. D. | Monitors Not Qualified to Evaluate | | | | | | | | |
| VII.  Compliance and Quality Improvement/Susan McCampbell | | | | | | | | | |
| VII. A. | ND | NC | NC | PC | PC | PC | PC | PC | PC |
| VI. B. (H.) | NC | NC | NC | NC | NC | NC | PC | PC | PC |
| VI. C. (I.) | NC | NC | SC | SC | NC | SC | SC | NC | PC |
| VI. D. (J.) | ND | NC | NC | PC | PC | PC | PC | NC | NC |
| VIII. Reporting Requirements and Right of Access/Susan McCampbell | | | | | | | | | |
| VIII.A. | ND | PC | NC | PC | PC | PC | PC | NC | NC |
| VIII.B. | PC | PC | PC | PC | SC | SC | SC | SC | SC |
| VIII.C. | PC | PC | PC | SC | SC | SC | NC | NC | PC |

| Section | Substantial Compliance | Partial Compliance | NC | Notes: 8/25/18 |
|---|---|---|---|---|
| **Stipulated Agreement 2/11/5** | | | | |
| 1.a. | x | | | |
| 1.b. | | x | | See also CJ VII. D., VIII.A. |
| 1.c. | | x | | See also CJ VIII.B. |
| 2.a. | x | | | See also CJ VII. A. |
| 2.b. | x | | | See also CJ VII. A. |
| 3 | x | | | See also CJ VII. A. |
| 4.a. | x | | | See also CJ IV.A.3. |
| 4.b. | x | | | See also CJ IV.A.3. |
| 4.c. | x | | | See also CJ IV.A.3. |
| 5.a. | x | | | See also CJ IV.A.4.b. |
| 5.b. | x | | | See also CJ IV..4.c. |
| 6.a. | x | | | See also CJ IV.G. |
| 6.b. | | x | | See also CJ IV.B.4.a.,7.a. |
| 7.a. | | | x | See also CJ IV.A.6. |
| 7.b. | | | x | See also CJ IV.A.6. |
| 7.c. | x | | | See also CJ IV.A.6. |
| 7.d. | x | | | |
| 8 | x | | | See also CJ IV.A.7. |
| 9.a. | x | | | See also CJ IV.A.8.a. |
| 9.b. | x | | | |
| 10 | x | | | See also CJ IV.A.11. |
| 11 | x | | | See also CJ IV.A.12 |
| 12 | x | | | See also CJ IV.A.13 |
| 13 | | x | | See also CJ IV.B., C. |
| 14.a. | x | | | |
| 14.b. | | x | | See also CJ IV.B.2. |
| 15 | NA | | | 2/19/16,  Not applicable See also CJ VI. |
| 16 | | x | | See also CJ IV.D.f. |
| 17.a. | x | | | See also CJ IV.G. |
| 17.b. | x | | | |
| 17.c. | x | | | See also CJ IV.G. |
| **Stipulated Agreement 4/22/16** | | | | |
| 1 | x | | | See also CJ IV.B.5. |
| 2 | | x | | See also CJ IV.B.5. |
| 3 | | x | | See also CJ IV.B.5. |

**Legend:**
**ND – Not scheduled for review**
**NC – Non-compliance**
**PC – Partial Compliance**
**C – Substantial Compliance**
**NA – Not Applicable**

## Appendix B – Compliance Report # 9 - New Recommendations

<u>Protection from Harm</u>

1.  OJC and FIT work together to assess the use of force data to determine what changes need to be made to the use of force policies to eliminate unnecessary or excessive force and reduce the need for use of force in general.
2.  Analyze the results of the use of force policy testing to determine changes that need to be made to the use of force training.
3.  Assign a deputy to the Classification Unit or modify policy to allow the classification specialists to conduct the housing audits, interviews, etc.
4.  Restart the audit process as soon as possible to verify the actual housing location of the inmate to ensure matches housing assignments generated by classification.
5.  Distribute the Classification and PREA Handbooks to each classification specialists and place copy(s) in the classification interview area to ensure quick and easy access to all.
6.  Implement ongoing audit/quality assurance protocol to ensure consistent compliance with OPSO classification policies and classification and housing procedures as defined in the OPSO Classification and PREA handbooks and to ensure that race is not used as a housing criterion.
7.  Use the efficiencies of the automated workflow processes within the JMS to eliminate duplication of effort, numerous emails, and miscommunication across divisions/unit of the OPSO.
8.  Provide additional training as to how to read a NCIC report and to input these data within the JMS.
9.  Require review the criminal history rap sheets as part of the custody review process to ensure data are complete and up-to-date.
10. Develop written procedures and training materials for the housing audit process; train those assigned.
11. Re-start the housing audit process with audits by Unit Managers and Classification Unit.
12. Expand the internal audits of the custody and housing assessments to include a random sample of 1-2% of the assessments completed.
13. Address the recommendations by Lovins and Latessa.
14. Careful review and analyses of the statistical reports to identify adjustments to the classification and housing processes are responsive to the current OSPO system needs and trends.
15. Investigations - assure that investigations proceed and are concluded in a timely manner, revise standard operating procedures to conform investigative findings with those required by PREA standards and Bureau of Justice Statistics' Survey Sexual Victimization, and train newly assigned investigators;
16. Review reporting to the Monitors regarding relevant incidents to address the differences in data (e.g. 18 reports to the Monitors and 50 investigations opened);
17. Evaluate staffing of the PREA initiative in OPSO;
18. Implement systems to immediately train newly hired employees, volunteers, and contractors;



19. Assure the data collected regarding incidents is analyzed to inform plans of action and other needed corrective measures; and

20. Conduct reliability testing of the PREA hotline – to assess its availability to and use by inmates, timely reporting of the information by the vendor to OPSO, compliance with PREA standards (115.51(b)), and initiation of prompt investigative review of these calls.

<u>Mental Health Care</u>

21. CCS must provide, track and assess services to inmates on the mental health caseload who have been identified as victims of assault or other crimes (including sexual assault) while at OJC or Hunt.

22. Determine and complete the number of necessary suicide resistant cells. Inspect housing areas to assure the physical plant poses minimal risk for inmates to harm themselves. Increase the ratio of CNA's conducting suicide watches to 1:2 and direct observation to 1:1.

23. Pursuant to policies, continue at least monthly meetings of the Mental Health Review Committee to document appropriately any identified concerns, problems and opportunities to improve care, and to analyze performance measures of mental health services and follow-up on implementation and results of corrective actions, including morbidity reviews inmates who have made serious and/or repeated suicide attempts.

24. OJC and CCS (including psychiatrists) implement performance indicators for medication management practices with appropriate data collection and analysis including inmates housed in OJC, Hunt, and other correctional facilities.

25. CCS and OPSO must continue to identify the levels of need for mental health and special population inmates, and develop performance indicators for each group.

26. CCS revise and enhance training and supervision of CNAs with regard to direct observation and suicide watch at OJC. Train staff to appropriately interact and document observations of the inmate(s).

27. CCS provide training to mental health staff and corrections staff with regard to direct observation and transport/movement of inmates who have been referred or presented with concerns for suicide or self-harm, and document as well as analyze the direct observation/supervision of those inmates by corrections staff until they are seen and evaluated by mental health staff. Provide documentation that deputies are trained, and inmates are adequately searched when placed on suicide precautions.

28. OPSO and CCS implement performance-based training to provide a baseline; consider purchasing training packages to achieve these goals.

29. Immediately develop a process for which inmates on suicide precautions receive the required continual observation even when OPSO deputies must leave the unit. For example, require a supervisor to relieve a deputy in a housing unit rather than remove the medical staff who are charged with helping assure the safety of vulnerable inmates.



30. OPSO and CCS conduct all suicide precautions and direct observations in suicide resistant cells. Limit use of crisis cells to 72 hours, unless active and progressive treatment out of cell is conducted to allow a maximum length of stay of 10 days with transfer to Hunt or step down/residential as indicated.

31. As part of the Morbidity and Mortality Review process, conduct self-critical analysis of all completed suicides and serious and/or repeat suicide attempts.

32. Implement recommendations of the CCS (CSSR) audit from December 2017.

33. Assure and document CCS participation in planned uses of force at OJC and Hunt to de-escalate the inmate and the situation prior to the use of force, except in an emergency, as well as medical clearance.

34. Review OJC policies and reporting of two planned uses of force from Jan. thru May 2018.

35. Resolve differences/conflicts in OPSO, Hunt and CCS Restraint Policies to limit overuse and underuse of therapeutic physical restraints and chemical restraints, and escort of inmates on suicide precautions.

36. OPSO, in conjunction with CCS, develop and implement training for corrections staff on recognition of urgent medical conditions.

37. OPSO and CCS improve communication regarding the need for rapid transfer out of IPC to appropriate housing (monitoring, bottom bunk, etc.) for patients at risk.

38. CCS should revise the detox protocols to include practitioner visits, especially for those at high risk. CCS should oversee implementation of the detox protocol to assure staff adherence.

39. CCS continue training and supervision of all clinical staff, including cross training for all nursing and administrative functions.

40. CCS develop and implement an organized process for evaluation and feedback regarding care provided by mid-level practitioners and staff physicians.

41. CCS, OPSO and Hunt revisit the quality management program and composition of committees to assure reliable data abstraction, quantitative and qualitative data analysis, with trending, and implementation of specific corrective action plans to remedy identified opportunities for improvement. This program should integrate clinical performance measurement, morbidity and mortality review, grievance analysis and other elements of a comprehensive quality management program including a program plan and annual evaluation.

42. The need for quality review of suicide attempts cannot be overemphasized. Inmates in need of treatment must be identified and services provided, while those who may engage in threatening and/or self-destructive behaviors require appropriate management and possibly treatment to reduce the likelihood of harm to themselves and others. CCS and OPSO should review and assess these incidents and determine strategies and corrective actions.

<u>Medical Care</u>

43. CCS attend to the matter of lost institutional memory with staff turnover by keeping of meaningful and complete minutes of meetings and recording relevant procedural information.



<u>Sanitation and Environmental Conditions</u>

44. OPSO develop and implement a process for selection and training of inmate workers.

45. OPSO immediately consider options to relocate the clothes dryers located in inmate housing units, including removal to prevent vandalism, fire risk, and fires.

46. OPSO revise policy 601.02 to allow any staff member observing a maintenance issue to enter the work order directly into the reporting system.

47. OPSO develop specific training for all line staff on utilizing the work order system and provide evidence of deputy training regarding the entering work orders.

48. The Wardens consult with the Maintenance Director to determine if lighting capability can be adjusted to ensure some level of lighting in individual cells (e.g. "night light") at all times to ensure the safety and security of the inmates and staff.

49. Review policy changes/updates to ensure no conflict arises with other related policies.

50. Devise and implement a procedure that ensures bio-hazardous cleanup incidents are reported to the Sanitarian and Environmental Officer within one business day of the incident in order to comply with existing policy requiring a copy of bio-hazard incident reports be provided to the Sanitarian. The reports may be provided via manual copies, automated reporting processes, or by providing the Sanitarian and Environmental Officer with the necessary access and training to obtain the reports themselves from the system on a daily basis.

51. Immediately secure electrical breaker panels and disconnects accessible to inmates; develop a system for daily checking of the security of the areas.

<u>Fire and Life Safety</u>

52. Add recurring issues to the inspection forms; specifically, items stored too close to the ceilings in storage areas and blocked access to fire extinguishers/fire alarm pulls.

53. Paint, tape or otherwise mark all storage room and warehouse walls with the maximum height items can be stored in a given area to ensure fire suppression systems are not compromised.

54. Require that inspection form "remarks" indicate the person responsible for corrective action/due date/re-inspection date and result.

55. Document corrective action plan(s) for any deficiencies that are reviewed/signed by supervisory personnel in the quarterly/monthly reports.

56. Devise a bracket or brace system that can be installed on the dryers and washers in the housing units effectively anchoring the appliances to the floor at the optimal distance from the wall to allow the vent lines to work but not allow easy access to back of the machines by inmates; or identify other options.

57. Conduct timely critical reviews/root cause analysis of fire and fire-related events and responses.  Develop specific corrective action plans to address identified deficiencies.



58.    Identify specific corrective actions based on the May and subsequent fire incidents in the OJC, identifying supervisors, training, response, and equipment issues.

59.    Hire two full time equivalents to perform the role of Fire Safety Officer.  Off duty NOFD firefighters could be hired part time.

