# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| _____ | ) |
| LASHAWN JONES, *et al.*, and | ) |
| THE UNITED STATES OF AMERICA, | ) |
| | ) Civil Action No. 2:12-cv-00859 |
| PLAINTIFFS, | ) Section I, Division 5 |
| | ) Judge Lance M. Africk |
| v. | ) |
| | ) Magistrate Judge Michael B. North |
| MARLIN GUSMAN, Sheriff, | ) |
| | ) |
| | ) |
| DEFENDANT. | ) |
| _____ | ) |

## Report No. 10 of the Independent Monitors
## March 18, 2019

Margo L. Frasier, J.D., C.P.O., Lead Monitor
Robert B. Greifinger, M.D. Medical Monitor
Patricia L. Hardyman, Ph.D., Classification Monitor
Susan W. McCampbell, M.C.R.P., C.J.M., Administrative/Correctional Practice
Raymond F. Patterson, M.D., D.F.A.P.A., Mental Health Monitor
Shane J. Poole, M.S., CJM, Environmental Fire Life Safety Monitor
Diane Skipworth, M.C.J., R.D.N., L.D., R.S., C.C.H.P., C.L.L.M., Food Safety Monitor

Email :   nolajailmonitors@nolajailmonitors.org
Web :   www.nolajailmonitors.org





*Compliance Report # 10*
***LASHAWN JONES, et al., and the United States of America v.***
***Marlin Gusman, Sheriff***

Table of Contents

|  |  | **Page** |
|---|---|---|
| I. | Introduction | 4 |
|  | A. Summary of Compliance | 4 |
|  | B. Critical Issues – Opportunities for Progress | 7 |
|  | C. Review Process of Monitors' Compliance Report #10 | 13 |
|  | D. Communication with Stakeholders | 13 |
|  | E. Recommendations | 13 |
|  | F. Conclusions and Path Forward | 13 |
| II. | Substantive Provisions |  |
|  | A. Protection from Harm | 15 |
|  | A.1. Use of Force Policies and Procedures | 22 |
|  | A.2. Use of Force Training | 22 |
|  | A.3. Use of Force Reporting | 24 |
|  | A.4.  Early Intervention System | 27 |
|  | A.5. Safety and Supervision | 28 |
|  | A.6. Security Staffing | 33 |
|  | A.7. Incidents and Referrals | 39 |
|  | A.8. Investigations | 42 |
|  | A.9. Pretrial Placement in Alternative Settings | 44 |
|  | A.10. Custodial Placement | 45 |
|  | A.11. Prisoner Grievance Process | 61 |
|  | A.12. Sexual Abuse | 63 |
|  | A.13. Access to Information | 63 |
|  | B. Mental Health Care | 64 |
|  | C. Medical Care | 85 |
|  | D. Sanitation and Environmental Conditions | 88 |
|  | E. Fire and Life Safety | 102 |
|  | F. Language Assistance | 107 |
|  | G. Youthful Prisoners | 109 |
|  | H. The New Jail Facility | 109 |
|  | I. Compliance and Quality Improvement | 110 |
|  | J. Reporting Requirements and Right of Access | 112 |
| III. | Status of Stipulated Agreements – February 11, 2015 and April 22, 2015 | 114 |



**Page**

**Tables**
Table 1 – Summary of Compliance – All Compliance Reports                6
Table 2 – Status of Compliance – Stipulated Agreements                7
Table 3 – Summary of Incidents CY 2018                                16
Table 4 – CY 2018 All OJC Reported Incidents by Type by Month         16
Table 5 – CY 2018 – OJC Reported Incidents                            30

**Figures**
Figure 1 – Distribution of Race of Inmates Housed in TDC vs. Racial
Distribution within OJC and TCD Units July-Nov 2018                   49
Figure 2 – 2018 Rates and Completion Time of initial Custody
Assessments                                                          52
Figure 3 – Number of Total and Guilty Disciplinary Infractions 2018   58
Figure 4 – Rate of Disciplinary Infractions Against OPSO ADP 2018     59
Figure 5 – Types of Disciplinary Infractions of which OPOS Inmates
Were Found Guilty 2018                                                60

**Appendices**
Appendix A - Summary Compliance Findings by Section Compliance
Reports 1 – 10                                                        116
Appendix B - CY 2018 OJC Reported Hires and Terminations             123



**Compliance Report # 10 - Introduction**

This is Compliance Report #10 submitted by the Independent Monitors providing assessment of the Orleans Parish Sheriff's Office's (OPSO) compliance with the Consent Judgment of June 6, 2013. Report #10 reflects the status of OPSO's compliance as of January 17, 2019.  The bases for this Report are incidents and compliance-related activities between July 2018 and December 2018.

In February 2018, the OPSO's jail was placed under the leadership of Darnley R. Hodge, Sr., who was appointed by the Court on January 29, 2018, as the Independent Compliance Director (ICD) on an interim basis.  Director Hodge began work on February 19, 2018 and was appointed to the position permanently on October 12, 2018. Director Hodge brought substantial knowledge of jail operations and has worked diligently to make significant efforts towards compliance with the Consent Judgment.

In summary, the Monitors find that safety, medical and mental health care, and environment conditions of inmates held in both the Orleans Justice Center (OJC) and the Temporary Detention Center (TDC) has made meaningful and noteworthy improvement since the previous assessment report provided to the Court in August 2018.  While there is still significant work to be done to properly staff the facility, curb violence, and improve medical and mental health care, the trend is positive.   The specific initiatives are addressed in this report.

A.    **Summary of Compliance**

Achievement of compliance with Consent Judgment, Stipulated Agreements, and Stipulated Order will bring the Orleans Parish Sheriff's Office (OPSO) and its correctional facilities -- Orleans Justice Center (OJC) and the Temporary Detention Center (TDC) closer to operating and sustaining a Constitutional jail system.

For OPSO to demonstrate, obtain and sustain compliance with the requirements of the Consent Judgment and Stipulated Agreements (2015), OPSO must develop an infrastructure to support this work including alignment of policies, procedures, training, and consistent practices. The requirements of the Consent Judgment represent accepted correctional practice, while providing flexibility to OPSO for the application of the mandates.



Combined, the Consent Judgment and Stipulated Agreements contain 207 provisions.  Based on the current assessment, OPSO has achieved compliance or partial compliance with 94% of the provisions.  Substantial compliance has been achieved for 37% of the provisions. Fifty-six percent (56%) of the provisions are in partial compliance.  Eight (less than 6%) of the 173 provisions remain in non-compliance.  The improvement since the last assessment is noteworthy when only 24% of the provisions were in substantial compliance and 23% of the provisions were in non-compliance.

To progress from partial compliance to substantial compliance (and sustain the substantial compliance), OPSO must continue to build on the work it has done to date. The ability to maintain sustained compliance in all provisions is essential as the terms of the Consent Judgment require maintenance of substantial compliance in each and every provision for a period of 24 months.  OPSO must consistently implement policies and procedures, develop and provide the training necessary for staff to follow the policies and procedures, develop supervisors and mid- managers to lead both staff and operations, analyze data in a meaningful and useful manner to inform activities, and engage in root cause review and self-critical assessments.

This strategy for organizational and management approach must then be documented and reported to the Monitors in an organized, complete and accurate manner to demonstrate on-going compliance. Such initiatives not only will allow the Monitors to measure compliance but allow the leadership of OPSO to make the improvements necessary to operate the OPSO correctional facilities in a Constitutional manner which complies with the Consent Judgment and Stipulated Agreements.  OPSO has made significant strides in its reporting to the Monitors; but root cause review and self-critical assessments are of insufficient quantity and quality and do not inform decisions.

One example of compliance deficiency relates to the response to the Monitors' requests for data regarding watch commanders filing incident reports by the end of the shift, or in no case more than twenty-four hours after the incident.  OPSO asserts it is in substantial compliance with this provision and its own policy, but documentation indicates that reports are often not filed timely.  At least 110 incidents of late reporting were acknowledged by OPSO during the last six months of 2018.  It is acknowledged that



OPSO has made vast improvement in reporting of incidents, including uses of force, but there are still incidents that are not reported, or are not reported timely.  Despite the acknowledgement of violation of this provision of the Consent Judgment and OPSO policy, no discipline was taken against the deputies or supervisors despite the existence of a policy which requires timely documentation of incidents and appropriate discipline for non-adherence to the policy.

This circumstance reflects a failure to adequately and accurately assess and oversee compliance-related activities in preparation for the bi-annual Monitors' assessments as well as OPSO's ability to adhere to policy and engage in meaningful self- criticism.

The Monitors are pleased to report that OPSO, under the leadership of Independence Compliance Director Hodge, has begun to examine its strategies to obtain and sustain compliance and make structural and organizational changes necessary to achieve compliance.

**Table 1 – Summary of Compliance – All Compliance Reports[1]**

| Compliance Report/Date | Substantial Compliance | Partial Compliance | Non-Compliance | NA/Other | Total |
|---|---|---|---|---|---|
| #1 – December 2013 | 0 | 10 | 85 | 76 | 171 |
| #2 – July 2014 | 2 | 22 | 149 | 1 | 174 |
| #3 – January 2015 | 2 | 60 | 110 | 2 | 174 |
| #4 – August 2015 | 12 | 114 | 43 | 4[2] | 173 |
| #5 – February 2016 | 10 | 96 | 63 | 4 | 173 |
| #6 – Sept 2016 | 20 | 98 | 53 | 2 | 173[3] |
| #7 – March 2017 | 17 | 99 | 55 | 2 | 173 |
| #8 – November 2017 | 23 | 104 | 44 | 2 | 173 |
| #9 – June 2018 | 26 | 99 | 46 | 2 | 173 |
| #10 – January 2019 | 65 | 98 | 8 | 2 | 173 |

The status of compliance with the two stipulated agreements (February 11, 2015 and April 22, 2015) is as follows:

---

[1] See Appendix A for historical detail of compliance, by paragraph.



**Table 2 – Status of Compliance with 2015 Stipulated Agreements**

|  | Substantial Compliance | Partial Compliance | Non-Compliance | NA | Total |
|---|---|---|---|---|---|
| August 2015 | 21 | 12 | 1 | 0 | 34 |
| February 2016 | 21 | 12 | 1 | 1 | 34 |
| September 2016 | 26 | 7 | 1 | 0 | 34 |
| March 2017 | 28 | 4 | 1 | 1 | 34 |
| November 2017 | 21 | 11 | 1 | 1 | 34 |
| June 2018 | 23 | 8 | 2 | 1 | 34 |
| January 2019 | 28 | 5 | 0 | 1 | 34 |

B.   **Critical Issues – Opportunities for Continued Progress**

     The Monitors summarize below the critical matters identified in preparation of this report regarding OPSO's compliance with the Consent Judgment.

     **1.**   **Foundational Work** - The essential, core work required to achieve compliance includes:

        a.   <u>Policies and Procedures</u> – OPSO has completed all drafts of the essential policies and procedures.  While there is still work to be done to finalize the policies, a tremendous amount of effort has been expended by staff into refining these drafts to ensure the policies and procedures prescribe how the facility operates and assure inmate and safety, in accordance with the Consent Judgment and accepted correctional practice. The task has been made more challenging because of the number of policies and procedures approved and signed into effect in 2017 by the former Independent Compliance Director which did not incorporate the comments/recommendations of the Monitors, DOJ, nor the attorneys for the Plaintiff class, as required by the Consent Judgment.  An additional task is the development and approval process of lessons plans corresponding to the policies followed by implementation.  OPSO's newly adopted policy governing its written directive system will also result in improvements to the policy/procedure process, allowing



organizational components to develop specific operational practices that will be reviewed by OPSO administration.

b.  <u>Inadequate staffing</u> – There is inadequate staffing in the facilities (OJC and TDC), based on OPSO's staffing analysis and the Monitors' assessment.  Director Hodge has addressed part of the shortage by using employee overtime.  The use of overtime on a long-term basis is not a viable strategy to staff a jail as it has both negative human and fiscal impacts.   Even with the use of overtime, frequently, there are housing units and control rooms that do not have assigned staffing; further assigned staff sometimes leave housing units and control pods unattended for meal breaks and other duties. The staffing deficiencies include supervisory, mid-management, and leadership positions. Some of the staff in mid-management and leadership positions lack sufficient subject matter expertise to achieve and sustain compliance. In February 2019, a new Chief of Corrections joined OPSO who has the appropriate background and expertise to assist in the operation of the jail on a daily basis and assist in compliance efforts.

c.  <u>Training</u> – Employee training, both pre-service and in-service, requires attention to ensure consistency with OPSO policies and procedures. Foundational work requires preparation of lesson plans to provide for a consistent instruction content, instruction by qualified individuals, and demonstration and documentation of students' knowledge gained. Recommended changes in the class size of the pre-service academy, better screening of recruits for ability to perform the essential functions, including physical requirements of the job, and skill-based training are in the process of being implemented.  One of the challenges is to train all employees on the newly implemented policies.  Providing a policy without training is not effective implementation.

d.  <u>Supervision</u> – Safe operation of OPSO's facilities requires an adequate number of sufficiently trained first-line and mid-management



supervisors.  Director Hodge implemented the unit management approach and continues to provide training and mentoring for the individuals performing these roles.  Mentoring, coaching, and accountability for newly hired and employees in supervisory positions, as well as fulfilling the Consent Judgment's requirements, remains a foundational need.

2.      **Medical and Mental Health Care** – The Medical and Mental Health Monitors report challenges remain in the provision of basic case, staffing, and recordkeeping, as well as the need for improved collaboration with custody/security staffing.  There has been improvement in the areas of medical and mental health care.  The addition of resources from Tulane University has been particularly helpful in providing mental health care.

3.      **Inmate Safety and Protection from Harm** - Providing a safe and secure jail continues to be a challenge.

a.      <u>Unit Management</u>—As noted above, Director Hodge implemented unit management to supervision of the housing units.  Each floor of the OJC, IPC, and TDC have been designed as a "unit". The purpose of this strategy is to allow the staff to get to know the inmates, coordinate management of housing unit operations, work to insure consistency of work, and is intended to result in greater accountability for both staff and the inmates.  While  the Unit Management approach has shown to be helpful, there are inconsistencies and lack of uniformity  in the areas of staff discipline and application of facility rules to inmates.  Efforts to refine and successfully implement the strategy require additional training and mentoring.

b.      <u>Violence</u> – There are still significant incidents of violence occurring within the facilities – including inmate on inmate assaults and assaults on staff.  High levels of disorder and non-compliance to the institutional rules result in staff's over-reliance on use of force to gain control and compliance.  Incidents involving substance abuse overdoses inside the facilities, disturbances, and deaths of inmates



continue to present serious challenges to the OPSO.

c.    <u>Early Intervention System</u> (EIS) – The EIS remains compromised and hinders the required prompt identification of staff whose actions threaten inmate and facility safety.  The Force Investigation Team (FIT) Commander continues to use the "work around" of the current software options of the EIS system relying both by use of technology and staff resources to track the required information.

d.    <u>Inmate Classification</u> – The inmate classification processes require continued attention to ensure housing decisions and placements are consistent with OPSO policies and objective classification principles. Credible auditing needs to continue to focus on identifying  issues and correcting placements.    Improving inmate classification includes development of subject matter expertise in the Unit, accountability systems, interface with unit management, and collection, analysis, and development of corrective action plans, as needed.

e.    <u>Inmate grievances</u> – Inmates' questions and concerns using the grievance process, require attention as to the timeliness and adequacy of responses.    The system is intended to provide fixes to systems as well as to individual inmate's needs.

f.    <u>Incident Reporting</u> - Collaboration efforts to improve reporting of incidents continues among the Monitors, OPSO, and the attorneys for the Plaintiff class/DOJ.  As discussed in this Report  progress toward promptly identifying and reporting has improved, but continues to require significant attention.  There remain serious incidents for which no report or no timely report is prepared by OPSO staff; including inmate on inmate assaults resulting in hospitalization.  The analysis of incident reports and development of corrective action plans occurs, but would benefit from be much more robust and defined.

g.    <u>Jail Management System</u> – An integral part of any the jail's operational improvements is tied to an effective jail management system.  Such



capacity provides on-demand, routine, and periodic data to inform critical leadership and management decisions.  This information system has not been implemented.  OPSO cancelled the contract with the provider who was to supply a new JMS.  Development of a JMS which will interface with any new court systems is an impediment to progress.

h.   **Sanitation and Environment Conditions** – Challenges remain regarding the public health and inmate/staff safety risks.  While the staff working on these issues have made gains, the challenge to fill support positions identified in OPSO's staffing analysis negatively impacts the ability of OPSO to develop and sustain the requirements of the Consent Judgment and align with accepted correctional practice.

4.   **Youthful Prisoners** – The Monitors acknowledge and commend the educational program established in OJC.  Provision of age appropriate mental health services has improved with the addition of the Tulane University resources; and remains to be better documented.  Adequate housing for female youth has still not been addressed and is difficult to implement given the facility design.

5.   **Inmate Sexual Safety** – OPSO continues to prepare for its required audit of compliance with the standards of the Prison Rape Elimination Act of 2003 (PREA).  Continued internal collaboration is needed regarding assessments of inmates as potential sexual victims and potential sexual predators in coordination with the contract medical/mental health provider.  The reassignment of the responsibility for supervision of the investigation of allegations of PREA violations to its most experienced ISB supervisor has improved the quality of these investigations.

6.   **Compliance, Quality Reporting, and Quality Improvement** – An essential element to ensure inmate safety is OPSO's timely review of serious incidents which then permits assessment of root cause(s) and then to develop, implement and track actions plans to address the issue(s).  This activity focuses on repairing systems.  OPSO has made efforts to undertake this



function.  Director Hodge recognizes that systemic issues, which remain unaddressed, will continue to create risks to institutional safety and security. While progress is being made, the Monitors encourage OPSO to dedicate more time and knowledgeable resources to this process of quality improvement.

7.   **Stipulated Agreements 2015** – OPSO should review its on-going compliance with the two Stipulated Agreements from 2015.  As noted in this most recent tour, the status of compliance within these Agreements has changed.

8.   **Acknowledgement of Work to Date**

   a.   Youthful Prisoners – OJC is commended for continuing educational and related programming for the youthful prisoners.

   b.   Investigations – Work to credibly review the critical incidents and allegations of staff misconduct is a positive for OPSO.  What remains to be done is to integrate the findings of these investigations with Quality Improvement initiatives (root cause analysis and critical incident reviews) to improve safety for staff and inmates.

   c.   Fire and Life Safety – OPSO has provided documentation of important fire and life safety requirements.  Work remains on internal collaboration and development and training regarding emergency operations.

   d.   The Docks – Construction of the renovations on the Docks, providing court-holding, has begun.

   e.   Phase III - A contract for architectural services and project manager for Phase III has been awarded by the City.  The Monitors are hopeful that the City will make the design and building of this additional facility a priority as it is critical to the provision of mental and medical health services.  In the meantime, the renovation of the Temporary Detention Center (TDC) to house and provide programming for both female and male inmates is critical.

   f.   Human Resources – The recruiting, screening, on-boarding, and



performance appraisals of employees is critical to achieving sustained compliance with the Consent Judgment, and keeping staff and inmate safe.  The Monitors urge the Director to invest resources to reform and finalize these processes.  With the churn in hires/terminations, there are tangible costs of time and fiscal resources, as well as undermining morale.

C. **Review Process of Monitors' Compliance Report #10**

A draft of this report was provided to OPSO, Counsel for the Plaintiff Class, and the Department of Justice (DOJ) on February 26, 2019.  Comments were provided by OPSO and Counsel for the Plaintiff Class and DOJ on March 13, 2019.  OPSO's medical contractor, Wellpath (formerly known as CCS), provided comments regarding the relevant paragraphs of the Consent Judgment on March 13, 2019.

D. **Communication with Stakeholders**

The Monitors are committed to providing as much information as possible regarding the status of OPSO's efforts to comply with all orders of the Court.  The [www.nolajailmonitors.org](http://www.nolajailmonitors.org) website came on-line in September 2014. As of late February 2019, there have been more than 90,400 "hits".  Joining all other reports, the finalized version of Compliance Report #10 will be posted on that site and a summary of compliance for each paragraph.

E. **Recommendations**

This report includes only "new" recommendations within the body of the report.

F. **Conclusions and Path Forward**

OPSO has been operating under the provisions of the Consent Judgment since June 2013, with monitoring beginning in the fall of 2013.  During the past year, under the leadership of Director Hodge, significant improvements are acknowledged by the Monitors.  Vital and significant work remain to comply with the provisions of the Consent Judgment in order to bring and sustain constitutional standards.  Director Hodge has begun to prioritize to address paragraphs of the Consent Judgment.  The Monitors note that detailed action plans need to be



developed and implemented; providing a clear path to compliance.

Serious incidents and harm to inmates frequently occur.  There continues to be contraband smuggled into the facility and weapons confiscated from inmates.  Only by elevating security operations – including collecting accurate data, analyzing the root cause of the issues, and engaging in problem solving will a sustainable reduction in inmate on inmate assaults, inmate on staff assaults, uses of force, contraband and property damage be achieved.  OPSO has begun to collect the data and has improved its accuracy.  However, the skills for the analysis of the data and conduct of root cause reviews required additional subject matter expertise.

As staffing for the housing units, as well as employees to provide escort for other necessary functions (medical, mental health, court) is critically inadequate, a plan to recruit, screen, train, and mentor qualified staff continues to be viewed by the Monitors as of the highest priority.  For the training to be meaningful, the policies, procedures, and post-orders must be finalized, and appropriate lesson plans prepared.

Medical and mental health care initiatives continue to work to meet the requirements of the Consent Judgment.  Wellpath has improved in the development and implementation of a clear path forward with measurable benchmarks.

The Monitors remain committed to the Court, and the parties to provide assistance, where requested.  As Director Hodge and OPSO leadership prioritize areas to be addressed, the Monitors will continue to collaborate on solutions that will result in significant improvement towards compliance with the provisions of the Consent Judgment and achievement of constitutional conditions.

**The Monitors again thank and acknowledge the leadership, guidance and support of
The Honorable Lance M. Africk and The Honorable Michael B. North.**



## II. A.   Protection from Harm

### Introduction

This section of the Consent Judgment addresses core correctional functions including the use of force (policies, training, and reporting), identification of staff involved in uses of force through an early intervention system, safety and supervision of inmates, staffing, incidents and referrals, investigations, pre-trial placement of inmates in the facility, classification, the inmate grievance process, sexual safety of inmates, and inmates' access to information.

The Consent Judgment requires that OPSO operate the facility to assure inmates are "reasonably safe and secure."  Based on objective review of data, the facility has shown improvement in inmate and staff safety, but there are still significant incidents occurring which result in serious injury to inmates and staff.

Reaching and sustaining compliance with provisions of the Consent Judgment, particularly this section, relies on the collection, analysis, and corrective action planning using available data.  The Monitors are encouraged by OPSO's efforts to develop the capacity to collect relevant accurate data, analyze that data, draw supportable conclusions to inform decisions throughout the organization and develop corrective action plans, as indicated.   As OPSO's capacity to collect, analyze, and plan is enhanced, the ability to achieve sustainable compliance will be strengthened.

The Monitors reported in Compliance Report #9 that OPSO was much more transparent about reporting incidents.   A sergeant in the Administrative Warden's office is now assigned to  review the medical logs recording the names of those inmates who have been brought into the clinic for treatment for treatment subsequent to an altercation or a use of force and/or the names of those inmates routed to the hospital with trauma related injuries and cross check them against reported incidents.  The sergeant also compares the Watch Commander's Log (which lists significant events and incidents occurring during the shift) to the incident reports to detect if reports are missing.  What still appears to be lacking is consequence to supervisors who are consistently not following the various reporting policies resulting in late reports or unreported incidents and incomplete reports on the use of force.



A review of reported incidents for 2018 was conducted by the Monitors.

**Table 3 - All OJC Reported Incidents CY 2018**



**Table 4 – CY 2018 All OJC Reported Incidents by Type by Month**





During a review of the more than 1,300 incidents reportable to the Monitors for calendar year 2018 (which is a smaller subset of all incidents), the following examples of serious incidents during the last six months of 2018 were noted:

- Disturbances – incidents involving more than two inmates included:
  - In December, inmates were able to retrieve a sharpened object and a fight occurred, including a stabbing, during which a deputy was not working on the unit.  A total of five inmates were involved.
  - In December, five inmates were involved in an altercation in a unit with no deputy working.
  - In November, five inmates were involved in a fight inside a cell, with no deputy working in the housing unit.
  - In November, seven inmates were involved in an attack/altercation, which resulted in one inmate being routed to an outside emergency room to assess head trauma.
  - In November, eight inmates were involved with a disturbance while OPSO indicates staff was present, resulting in an inmate being sent out to emergency treatment.  Also, during this incident, staff was also assaulted.
  - In October, five inmates were involved in a disturbance on an unstaffed unit in which one inmate required outside medical care for a head laceration, in a fight the inmates reported was due to stolen commissary and threats.
- Contraband – numerous incidents were reported involving unknown substances and suspected illegal substances:
  - In December, an inmate died, and an overdose of drugs smuggled into the facility is suspected to be the cause of death.
  - In December, there were a reported 14 incidents involving outside food, a cellphone, medication, scissors, three shanks, two unidentified smoking substance, two suspected marijuana, and a "white powdery" substance.
  - In November, there were seven contraband incidents reported, with four incident descriptions not identifying the contraband, one involving a lighter,



one involving suspected marijuana, and one involving outside individuals trying to introduce contraband.

- o In October, the seven reported contraband incidents involved tobacco and lighters, suspected marijuana, and an unidentified substance in a small brown bag.
- o In September, contraband incidents were reported to have involved a "foreign" metal object, a shank, tobacco, suspected marijuana, pills, a white powdery substance, and an unidentified find.
- o In August, contraband incidents involved a cell phones, suspected marijuana (x2), a shank, tobacco, and a white powdery substance.
- o In July, the 13 incidents reported involved contraband included glass, clothing, lighter (x4), tobacco (x3), pills (x2), a wire, and a white powdery substance.

- Inmate/Inmate altercations:
  - o In November, an inmate was routed to the off-site emergency room when attacked by two other inmates, reportedly over marijuana, in a unit where it was unspecified if a deputy was working.
  - o In November, two inmates were fighting in a unit with no deputy working in it, in which one inmate was routed to an outside emergency room due to lacerations on his head, face, arms and stomach.  The source of the any cutting instrument was not identified.
  - o In November, an inmate involved in an inmate/inmate altercation and a subsequent use of force, was transported to the outside emergency room to evaluate facial trauma.
  - o In September, in two separate incidents, inmates were routed to the emergency room for an eye injury, with no additional information as to how or when the inmate was injured.
  - o In September, three inmates were involved in an altercation, in which one inmate was sent to the emergency room to receive stitches; and no deputy was reported working in that housing unit.



- In August, an inmate was routed to the outside emergency room after being involved in an altercation, initially claiming to be a fall down the stairs, but determined to be the result of an altercation.  It was unknown if a deputy was working in the unit at the time.

- In August, an inmate involved in an altercation was routed to the outside emergency room for a closed displaced fracture, and orbital hematoma for a fight that took place in the inmate's assigned cell with a deputy reported as present in the unit at the time.

- In August, an inmate was sent the outside emergency room for an evaluation of blunt force trauma obtained in an inmate/inmate altercation, involving an inmate with a knife.

- In July, an inmate was transported to the outside emergency room to evaluate a bilateral mandible fracture for an altercation with a deputy reported as present in the unit at the time.

• Suspected Overdoses/Unresponsive Inmate – There are approximately 20 incidents reported involving unresponsive inmates, and inmates who are suspected of overdosing.  This number does not include suspected "seizures" or other medical emergencies that resulted in reports of "slip and falls" (see below):

- In December, an inmate died, and an overdose of drugs smuggled into the facility is suspected to be the cause of death.

- In October, an inmate was sent out to the emergency room, with a possible attribution to pain killers found in his pocket.

- In September, an inmate was found unresponsive, and routed to an outside emergency room after two doses of Naloxone (Narcan) were administered; no deputy was reported working on the unit.

- In September, an inmate was found unresponsive, and reported to have been smoking an unknown substance, ultimately routed to an outside emergency room for treatment.

- In August, an inmate suspected of an overdose was administered Naloxone, and routed to the outside emergency room; deputy reported as working in the unit at the time the inmate was found.



- In July, an inmate was found staggering and "out of it" and unresponsive. He was routed to an outside emergency room.
- In July, two inmates were found unresponsive (on different days and different units), and both routed to an outside emergency room.
- In July, an inmate is suspected to have overdosed, and was taken to outside medical care for evaluation.

- Inmate "Slip and Falls" – OPSO reported more than 260 incidents where inmates were injured and the specific cause was not identified, hence the "slip and fall" designation. Most often the inmates (those directly involved and those who were reporters) attributed the injuries to a fall from their bunk, a basketball injury, or a fall in the shower. However, the prevalence and severity of these injuries warrants further review, to rule in, or rule out, inmate/inmate altercations, medication complications, or self-harm.
  - In September, an inmate was routed to the emergency room for a possible fractured elbow.
  - In September, an inmate required a gurney to be moved from his housing unit to medical, and ultimately to the emergency room for a "fall from his bunk".
  - In August, an inmate was routed to the outside emergency room for a reported fall from her bunk resulting in large abrasions on her forehead and blood on her face.
  - Although identified by OPSO as a "slip and fall", in August an inmate was sent to the outside emergency room just after his admission into the jail.

- Uses of Force –Of the 260 reported use of force incidents, some resulted in the inmate involved being transported to an outside emergency room, either as a result of the precipitating event (generally inmate/inmate altercation), or the result of the application of force.
  - In July, an inmate was taken to the outside emergency room after a use of force to evaluate blunt force trauma.

- Sexual Assault/Misconduct/Harassment – OPSO reported there were a total of 66 incidents categorized as "PREA" in the last six months of the year. These involved



allegations of "consensual" sexual activity between inmates, inmate/inmate sexual assault (15%), and sexual harassment (48%).

- o In November, an inmate was taken to outside care due to an allegation of sexual assault by his cellmate.
- Emergency Room Transports – for the period July – November 2018, OPSO reported 34 transports for injuries involving inmate/inmate altercations, and an additional 29 transports for trauma related needed care.

Staff filed 3,136 disciplinary reports against an inmate in CY 2018, with 2,291 resulting in a finding of guilty in the administrative disciplinary process.   Of these guilty findings, 392 were for inmate fights, 72 for inmate batteries or assaults, 48 for inmate assault on staff, and 4 involving an inmate on the mental health caseload. Three hundred and eight-seven (387) inmates were found not guilty via the disciplinary process.

In addition to record-keeping, analyses and corrective action planning using operational data, it is important that OPSO develop the timely capacity for self-critical analysis of major events.   These two strategies will assist OPSO in gaining and sustaining compliance.

**Assessment Methodology**
- Dates of tours:
  - o August 27-28, 2018
  - o November 13-16, 2018
  - o December 10-12, 2018
  - o January 14-17, 2019

- Interim Tours – Various monitors worked in OPSO between the time of the June 2018 tour and January 2019 tour.  This was to assist the Court and the Independent Compliance Director.
- Materials reviewed:
  - o Materials reviewed include the Consent Judgment, OPSO policies and procedures, use of force reports, incident reports, investigations conducted by Investigative Services Bureau-Internal Affairs Division (ISB-IAD), investigations conducted by ISB-Criminal Division (ISB-Criminal),



investigations conducted by ISB-Inmate Division, training materials, shakedown logs, and post logs.

- Interviews:
    - ○ Interviews included command staff, jail supervisors, commander of ISB, commander of IAD-Administrative, chief of investigations, director of training, various supervisors of units within ISB, and inmates.

## IV. A. 1. Use of Force Policies and Procedures

A. 1.a. OPSO shall develop, implement, and maintain comprehensive policies and procedures (in accordance with generally accepted correctional standards) relating to the use of force with particular emphasis regarding permissible and impermissible uses of force.

A. 1.b. OPSO shall develop and implement a single, uniform reporting system under a Use of Force Reporting policy.  OPSO reportable force shall be divided into two levels, as further specified in policy:  Level 1 uses of force will include all serious uses of force (i.e., the use of force leads to injuries that are extensive, serious or visible in nature, including black eyes, lacerations, injuries to the mouth or head, multiple bruises, injuries to the genitals, etc.), injuries requiring hospitalization, staff misconduct, and occasions when use of force reports are inconsistent, conflicting, or otherwise suspicious.  Level 2 uses of force will include all escort or control holds used to overcome resistance that are not covered by the definition of Level 1 uses of force.

A. 1.c. OPSO shall assess, annually, all data collected regarding uses of force and make any necessary changes to use of force policies or procedures to ensure that unnecessary or excessive use of force is not used in OPP.  The review and recommendations will be documented and provided to the Monitor, DOJ, and SPLC.

Findings:
A. 1. a. –  Substantial Compliance
A. 1. b. –  Substantial Compliance
A. 1. c.  –  Substantial Compliance

Observations:

The current OPSO use of force policy was effective as of May 2016.  OPSO has conducted the annual review of the policy for 2018.  Concerns regarding timeliness of training and submission of use of force report and reviews are addressed in those sections.

## IV. A. 2.        Use of Force Training

A. 2. a. OPSO shall ensure that all correctional officers are knowledgeable of and have the knowledge, skills, and abilities to comply with use of force policies and procedures.   At a minimum, OPSO shall provide correctional officers with      pre-service and annual in-service training in use of force, defensive tactics, and use of force policies and procedures.  The training will include the following:
    (1)  instruction on what constitutes excessive force;
    (2)  de-escalation tactics; and
    (3)  management of prisoners with mental illness to limit the need for using force.



A. 2. b. OPSO shall ensure that officers are aware of any change to policies and practices throughout their employment with OPP.  At a minimum, OPSO shall provide pre-service and annual in-service use of force training that prohibits:
 (1) use of force as a response to verbal insults or prisoner threats where there is no immediate threat to the safety or security of the institution, prisoners, staff, or visitors;
 (2) use of force as a response to prisoners' failure to follow instructions where there is no immediate threat to the safety or security of the institution, prisoners, staff, or visitors;
 (3) use of force against a prisoner after the prisoner has ceased to offer resistance and is under control;
 (4) use of force as punishment or retaliation; and
 (5) use of force involving kicking, striking, hitting, or punching a  non-combative prisoner.

A. 2. c. OPSO shall randomly test five percent of the correctional officer staff on an annual basis to determine their knowledge of the use of force policies and procedures.  The testing instrument and policies shall be approved by the Monitor.   The results of these assessments shall be evaluated to determine the need for changes in training practices.  The review and conclusions will be documented and provided to the Monitor.

Findings:
A. 2. a.  –  Partial Compliance
A. 2. b. –  Partial Compliance
A. 2. c. –   Partial Compliance

<u>Observations</u>:

The Monitors acknowledge that there has been significant improvement in the use of force training provided by the training academy.  The training academy staff has been very receptive to recommendations on how to improve the quality of training provided to both new and current staff.

New corrections staff receive use of force training as part of the pre-service academy which meets the requirements of A. 2. a. and A. 2. b.  The annual training has not been provided timely and on a consistent basis.  OPSO developed a plan which was approved by the Monitors to provide the required training by the end of 2018.  Review of training records indicates that OPSO did not fully implement the plan and that a significant percent of staff did not receive their annual use of force training. This results in IV. A. 2. a. continuing to be in partial compliance.

The Consent Judgment requires annual random testing of 5% of the corrections officer staff (deputies) on use of force policies and procedures. The academy staff worked with Monitor Frasier to develop an approved test which was given to 50 corrections staff members which included 10 supervisors as had been recommended by the Monitor.  None of the supervisors failed the test.  Thirteen of the 40 deputies tested did fail the test.  A passage rate of less than 68% of the



deputies indicates that there is a need for remedial training of deputies.  As the test had been developed, approved, implemented, and the results analyzed, during 2018, IV. A. 2. c. was found to be in partial compliance.  The review for changes in training practices has still not taken place despite the test having been given over six months ago.

## IV. A. 3. Use of Force Reporting

A.3 a. Failure to report a use of force incident by any staff member engaging in the use of force or witnessing the use of force shall be grounds for discipline, up to and including termination.

A.3 b. OPSO shall ensure that sufficient information is collected on uses of force to assess whether staff members complied with policy; whether corrective action is necessary including training or discipline; the effectiveness of training and policies; and whether the conditions in OPP comply with this Agreement.  At a minimum, OPSO will ensure that officers using or observing a Level 1 use of force shall complete a use of force report that will:

(1)     include the names of all staff, prisoner(s), or other visual or oral witness(es);
(2)     contain an accurate and specific account of the events leading to the use of force;
(3)     describe the level of resistance and the type and level of force used, consistent with OPP use of force policy and procedure, as well as the precise actions taken by OPSO staff in response to the incident;
(4)     describe the weapon or instrument(s) of restraint, if any, and the manner of such use;
(5)     be accompanied by a prisoner disciplinary report, if it exists, pertaining to the events or prisoner activity that prompted the use of force incident;
(6)     describe the nature and extent of injuries sustained by anyone involved in the incident;
(7)     contain the date and time when medical attention, if any, was requested and actually provided;
(8)     describe any attempts the staff took to de-escalate prior to the  use of force;
(9)     include an individual written account of the use of force from every staff member who witnessed the use of force;
(10)    include photographs taken promptly, but no later than two hours after a use of force incident, of all injuries sustained, or as evidence that no injuries were sustained, by prisoners and staff involved in the use of force incident;
(11)    document whether the use of force was digitally or otherwise recorded.  If the use of force was not digitally or otherwise recorded, the reporting officer and/or watch commander will provide an explanation as to why it was not recorded; and
(12)    include a statement about the incident from the prisoner(s) against whom force was used.

A.3 c. All officers using a Level 2 use of force shall complete a use of force report that will:

(1)     include the names of staff, prisoner(s), or other visual or oral witness(es);
(2)     contain an accurate and specific account of the events leading to the use of force;
(3)     describe the level of resistance and the type and level of force used, consistent with OPP use of force policy and procedure, as well as the precise actions taken by OPSO staff in response to the incident;
(4)     describe the weapon or instrument(s) of restraint, if any, and the manner of such use;
(5)     be accompanied by a prisoner disciplinary report, if it exists, pertaining to the events or prisoner activity that prompted the use of force incident;
(6)     describe the nature and extent of injuries sustained by anyone involved in the incident;
(7)     contain the date and time when medical attention, if any, was requested and actually provided; and
(8)     describe any attempts the staff took to de-escalate prior to the use of force.

A.3 d. OPSO shall require correctional officers to notify the watch commander as soon as practical of any use of force incident or allegation of use of force.  When notified, the watch commander will respond to the scene of all Level 1 uses of force.  When arriving on the scene, the watch commander shall:

(1)     ensure the safety of everyone involved in or proximate to the incident;
(2)     determine if any prisoner or correctional officer is injured and ensure that necessary medical care is provided;
(3)     ensure that personnel and witnesses are identified, separated, and advised that communications with other witnesses or correctional officers regarding the incident are prohibited;
(4)     ensure that witness and subject statements are taken from both staff and prisoner(s) outside of the presence of other prisoners and staff;
(5)     ensure that the supervisor's use of force report is forwarded to IAD for investigation if, upon the supervisor's review, a violation of law or policy is suspected.  The determination of what type of



investigation is needed will be based on the degree of the force used consistent with the terms of this Agreement;

(6)    If the watch commander is not involved in the use of force incident, the watch commander shall review all submitted use of force reports within 36 hours of the end of the incident, and shall specify his findings as to completeness and procedural errors.  If the watch commander believes that the use of force may have been unnecessary or excessive, he shall immediately contact IAD for investigation consideration and shall notify the warden or assistant warden; and

(7)    All Level 1 use of force reports, whether or not the force is believed by any party to be unnecessary or excessive, shall be sent to IAD for review.  IAD shall develop and submit to the Monitor within 90 days of the Effective Date clear criteria to identify use of force incidents that warrant a full investigation, including injuries that are extensive or serious, visible in nature (including black eyes, injuries to the mouth, injuries to the genitals, etc.), injuries requiring hospitalization, staff misconduct (including inappropriate relationships with prisoners), and occasions when use of force reports are inconsistent, conflicting, or otherwise suspicious.

A.3 e. Ensure that a first-line supervisor is present during all pre-planned uses of force, such as cell extractions.

A.3 f. Within 36 hours, exclusive of weekends and holidays, of receiving the report and review from the shift commander, in order to determine the appropriateness of the force used and whether policy was followed, the Warden or Assistant Warden shall review all use of force reports and supervisory reviews including:

(1)    the incident report associated with the use of force;
(2)    any medical documentation of injuries and any further medical care;
(3)    the prisoner disciplinary report associated with the use of force; and
(4)    the Warden or Assistant Warden shall complete a written report or written statement of specific findings and determinations of the appropriateness of force.

A.3 g. Provide the Monitor a periodic report detailing use of force by staff.  These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. Each report will include the following information:

(1)    a brief summary of all uses of force, by type;
(2)    date that force was used;
(3)    identity of staff members involved in using force;
(4)    identity of prisoners against whom force was used;
(5)    a brief summary of all uses of force resulting in injuries;
(6)    number of planned and unplanned uses of force;
(7)    a summary of all in-custody deaths related to use of force, including the identity of the decedent and the circumstances of the death; and
(8)    a listing of serious injuries requiring hospitalization.

A.3 h. OPSO shall conduct, annually, a review of the use of force reporting system to ensure that it has been effective in reducing unnecessary or excessive uses of force.  OPSO will document its review and conclusions and provide them to the Monitor, SPLC, and DOJ.

Findings:

A. 3. a. – Partial Compliance

A. 3. b. – Partial Compliance

A. 3. c. – Partial Compliance

A. 3. d. – Partial Compliance

A. 3. e. – Substantial Compliance

A. 3. f. – Partial Compliance

A. 3. g. – Substantial Compliance

A. 3. h. – Substantial Compliance

Observations:

The use of force policy requires all uses of force to be reported timely and completely and sets out the potential discipline if the policy is not followed However, for the period April – December 2018, the Monitors noted that there were



110 "late" reports, those submitted by supervisors/staff outside the time provisions of the Consent Judgment.  Of these, 52 involved uses of force, the largest percentage (followed by inmate/inmate altercations, and inmate "slip/falls").   The vast majority of  these late use of force reports were written after the failure to report the use of force was discovered by the review of medical records or grievances. OPSO did not implement disciplinary measures in these cases.  Having a policy which states that uses of force are be reported, while not holding deputies and supervisors accountable when uses of force are, at the least, not timely reported, results in partial compliance with A. 3. a,

Provisions A. 3. b. and c. remain in partial compliance due to the significant number of use of force reports not including the required information.  The use of force policy includes the provisions required by the Consent Judgment, but it is not being followed on a consistent basis.  A checklist was provided by the Monitor to assist supervisors in making sure reports included all necessary items.  A review of those checklists and accompanying reports frequently indicates that the information is not contained in the use of force report.  As with the failure to timely report uses of force, deputies and supervisors are not being held accountable for failure to include required information.

The unit managers, watch commanders, and wardens are  not consistently compliant with the requirements of the Consent Judgment (IV. A. 3. d. and 3. f.) as to their specific duties and the time requirement for performance of these duties under the policies.  As a result, the use of force packets are forwarded to FIT without the required information upon which any meaningful review should be based.  This places FIT in the position of screening the packets for completeness and having to return the majority of them to the Warden due to incompleteness along with a list of missing items.  It also renders any previous review by the Warden to be suspect. FIT issues a quarterly report which contains all the information required by IV. A. 3. g. Thus, this section is in substantial compliance.  The annual review of use of force incidents as required by IV. A. 3. h. has been provided to the Monitors or parties. While the rating of substantial compliance has been noted, the annual review requires improvement to provide the necessary guidance to OPSO to achieve and



sustain compliance in the area of use of force. Further examining the uses of force, OPSO reports detail that the precipitating incident for the use of force was:

- 54 - to intervene in an inmate/inmate altercation;
- 42 – an inmate's refusal to obey an order by staff;
- 37 – an inmates' refusal to obey staff's order to lockdown;
- 18 – to intervene in an inmate's attempt at self-harm;
- 17 – an inmate's refusal to obey a staff order and refusal to lockdown;
- 15 – an inmate's refusal to be restrained; and
- 9 – to intervene in a disturbance.

## IV. A. 4. Early Intervention System ("EIS")

A.4.a. OPSO shall develop, within 120 days of the Effective Date, a computerized relational database ("EIS") that will document and track staff members who are involved in use of force incidents and any complaints related to the inappropriate or excessive use of force, in order to alert OPSO management to any potential problematic policies or supervision lapses or need for retraining or discipline. The Chief of Operations Deputy, supervisors, and investigative staff shall have access to this information and shall review on a regular basis, but not less than quarterly, system reports to evaluate individual staff, supervisor, and housing area activity. OPSO will use the EIS as a tool for correcting inappropriate staff behavior before it escalates to more serious misconduct.

A.4.b. Within 120 days of the Effective Date, OPSO senior management shall use EIS information to improve quality management practices, identify patterns and trends, and take necessary corrective action both on an individual and systemic level. IAD will manage and administer EIS systems. The Special Operations Division ("SOD") will have access to the EIS. IAD will conduct quarterly audits of the EIS to ensure that analysis and intervention is taken according to the process described below. Command staff shall review the data collected by the EIS on at least a quarterly basis to identify potential patterns or trends resulting in harm to prisoners. The Use of Force Review Board will periodically review information collected regarding uses of force in order to identify the need for corrective action, including changes to training protocols and policy or retraining or disciplining individual staff or staff members. Through comparison of the operation of this system to changes in the conditions in OPP, OPSO will assess whether the mechanism is effective at addressing the requirements of this Agreement.

A.4.c. OPSO shall provide, within 180 days of the implementation date of its EIS, to SPLC, DOJ, and the Monitor, a list of all staff members identified through the EIS and corrective action taken.

A.4.d. The EIS protocol shall include the following components: data storage, data retrieval, reporting, data analysis, pattern identification, supervisory assessment, supervisory intervention, documentation, and audit.

A.4.e. On an annual basis, OPSO shall review the EIS to ensure that it has been effective in identifying concerns regarding policy, training, or the need for discipline. This assessment will be based in part on the number and severity of harm and injury identified through data collected pursuant to this Agreement. OPSO will document its review and conclusions and provide them to the Monitor, who shall forward this document to DOJ and SPLC.

Findings:
A. 4. a. –  Partial Compliance
A. 4. b. –  Substantial Compliance
A. 4. c. –  Substantial Compliance
A. 4. d. –   Partial Compliance



A. 4. e. –   Substantial Compliance

<u>Observations</u>:

Since the inception of the Consent Judgment, the electronic EIS has not performed appropriately on a consistent basis.  OPSO has finally abandoned the original system and is attempting to fashion an alternative version by use of the AS400. In the meantime, OPSO has assigned a staff member to FIT to maintain a data-base manually regarding uses of force to alert FIT to review a staff member. Therefore, IV A. 4. a. and d. are in partial compliance.

OPSO has improved its documentation to the Monitors as to the names of the staff members who are flagged for uses of force, if a review is conducted, and any retraining received, if required.  IV. A. 4. c. is now in substantial compliance.

The Use of Force Review Board has met regularly and performed  the evaluation necessary for substantial compliance with IV. A .4. e. for the 2018 data.

## IV. 5.  Safety and Supervision

A.5.a. Maintain security policies, procedures, and practices to provide a reasonably safe and secure environment for prisoners and staff in accordance with this Agreement.
A.5.b. Maintain policies, procedures, and practices to ensure the adequate supervision of prisoner work areas and trustees.
A.5.c. Maintain policies and procedures regarding care for and housing of protective custody prisoners and prisoners requesting protection from harm.
A.5.d. Continue to ensure that correctional officers conduct appropriate rounds at least once during every 30-minute period, at irregular times, inside each general population housing unit and at least once during every 15-minute period of special management prisoners, or more often if necessary.  All security rounds shall be documented on forms or logs that do not contain pre-printed rounding times.  In the alternative, OPSO may provide direct supervision of prisoners by posting a correctional officer inside the day room area of a housing unit to conduct surveillance.
A.5.e. Staff shall provide direct supervision in housing units that are designed for this type of supervision. Video surveillance may be used to supplement, but must not be used to replace, rounds by correctional officers.
A.5.f. Increase the use of overhead video surveillance and recording cameras to provide adequate coverage throughout the common areas of the Jail, including the Intake Processing Center, all divisions' intake areas, mental health units, special management units, prisoner housing units, and in the divisions' common areas.
A.5.g. Continue to ensure that correctional officers, who are transferred from one division to another, are required to attend training on division-specific post orders before working on the unit.
A.5.h. Continue to ensure that correctional officers assigned to special management units, which include youth tiers, mental health tiers, disciplinary segregation, and protective custody, receive eight hours of specialized training regarding such units on prisoner safety and security on at least an annual basis.
A.5.i. Continue to ensure that supervisors conduct daily rounds on each shift in the prisoner housing units, and document the results of their rounds.
A.5.j. Continue to ensure that staff conduct daily inspections of cells and common areas of the housing units to protect prisoners from unreasonable harm or unreasonable risk of harm.



A.5.k. Continue to ensure that staff conduct random monthly shakedowns of cells and common areas so that prisoners do not possess or have access to dangerous contraband.

A.5.l. Provide the Monitor a periodic report of safety and supervision at the Facility. These periodic reports shall be provided to the monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. Each report will provide the following information:

    (1)     a listing of special management prisoners, their housing assignments, the basis for them being placed in the specialized housing unit, and the date placed in the unit; and

    (2)     a listing of all contraband, including weapons seized, the type of contraband, date of seizure, location, and shift of seizure.

Findings:

A. 5. a. -   Partial Compliance
A. 5. b. -   Partial Compliance
A. 5. c. –   Partial Compliance
A. 5. d. -   Partial Compliance
A. 5. e. -   Partial Compliance
A. 5. f. -   Partial Compliance
A. 5. g. -   Partial Compliance
A. 5. h. -   Partial Compliance
A. 5. i. –   Partial Compliance
A. 5. j. –   Partial Compliance
A. 5. k. -   Partial Compliance
A. 5. l. -   Partial Compliance

<u>Observations:</u>

      OPSO has worked very hard to finalize policies, procedures, and post orders. However, the challenge of developing credible training lesson plans, recruiting staff, training staff, remediating staff who do not have the required level of proficiency, and supervising employees to hold them accountable for not following policy remains.

      OPSO has made significant progress under the leadership of the current Independent Compliance Director and his initiation of unit management to assist in the daily supervision of housing units and increase accountability. Thus, IV. A. 5. a. is in partial compliance. Significant incidents occurred in CY 2018. The lack of staff in the housing units on a consistent basis is the largest impediment to effective supervision of the inmates.



**Table 5 CY 2018 OJC Reported Incidents**

|  | Jan | Feb | Mar | Apl | May | June | July | Aug | Sept | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Attempt Suicide/ideation | 6 | 14 | 4 | 4 | 0 | 6 | 9 | 13 | 7 | 3 | 5 | 7 | 78 |
| Contraband | 9 | 15 | 5 | 5 | 10 | 9 | 13 | 6 | 6 | 7 | 7 | 14 | 106 |
| Criminal Damage | 3 | 10 | 11 | 12 | 8 | 3 | 3 | 6 | 4 | 2 | 3 | 4 | 69 |
| Death |  |  |  |  | 1 |  |  |  |  |  |  | 1 | 2 |
| Disturbance | 2 |  |  |  |  |  |  | 0 |  | 0 | 0 | 3 | 5 |
| Internal Escape | 2 | 2 | 3 | 3 | 5 | 7 | 3 | 2 | 5 | 0 | 8 | 8 | 48 |
| Fire | 1 |  |  |  |  | 2 |  | 3 |  | 0 |  | 0 | 6 |
| Inmate Injury/Inmate Medical (AKA slip/falls) | 9 | 5 | 18 | 22 | 19 | 32 | 30 | 30 | 35 | 26 | 18 | 18 | 262 |
| Inmate Misconduct |  |  | 1 | 1 |  |  |  | 0 |  | 0 |  |  | 2 |
| Inmate/Inmate Assault | 38 | 28 | 37 | 39 | 52 | 46 | 30 | 39 | 33 | 32 | 31 | 37 | 442 |
| Motor Vehicle Accident |  |  |  |  |  |  |  |  |  | 1 | 1 | 0 | 2 |
| Staff Misconduct |  | 2 |  |  |  | 1 |  | 0 |  | 0 |  | 0 | 3 |
| Inmate Staff Altercation | 7 | 6 | 7 | 9 |  | 7 | 4 | 3 | 6 | 9 | 6 |  | 64 |
| PREA | 2 | 4 | 5 | 4 | 5 | 5 | 4 | 3 | 2 | 5 | 5 | 3 | 47 |
| Use of Force | 13 | 10 | 21 | 22 | 24 | 26 | 20 | 27 | 14 | 28 | 21 | 34 | 260 |
| Total | 92 | 96 | 112 | 121 | 124 | 144 | 116 | 132 | 112 | 113 | 105 | 129 | 1396 |

      The policy regarding inmate workers has not been finalized but is in the review process which places section IV A. 5. b. is in partial compliance.

      While the policy on protective custody inmates has been finalized, those inmates continued to be housed with, and exposed to, non-protective custody inmates including inmates who are segregated due to significant incidents of misconduct.  Additionally, inmates in protective custody status are scattered in other units, such as the mental health unit, for reasons not articulable to the



Monitors.  There have been numerous incidents where protective custody inmates have been targeted for violence. Completion of the policy warrants a partial compliance of IV. A. 5. c.

The remaining 21 reported uses of force included incidents involving contraband, escape attempts, searches, and court-room actions.

In reviewing this data it is critical to acknowledge the average daily population.   Because of "Operation Rewind" in 2017, OJC's average daily population was 895.  For 2018 (through November 2018) the average daily population is 1,119.  There were a total of 831 incidents reported to the Monitors in 2017.  Computation of rates is not included here as the reliability of the data is in question, and establishing rates contributes to more misunderstanding rather than to problem-solving. To develop strategies to address incidents in OJC, having the accurate data and analyzing the data (e.g. by housing unit, time of day, day of week, type of incident, inmate involved, staff involved) is essential. This data is the foundation of meaningful corrective action plans.

OPSO has shown significant improvement under unit management in the conducting and documenting of security rounds (30 minutes or 15 minutes depending on the unit). However, it is clear from the review of records, observations, and investigations that timely rounds and direct supervision surveillance are still not being consistently conducted as per OPSO policy.  Direct supervision requires surveillance of all of the inmates and cannot be properly performed by sitting behind a desk and not walking around the unit and looking into the individual cells.  OPSO's use of  designated mandatory assignments has resulted in those units being staffed in a more consistent manner, but some units are routinely not adequately staffed, or staff is absent from the unit for over an hour at a time.  During the tour, it was noted that there were units which were unstaffed, including mandatory posts.  If staff are not present, it impossible to make the required rounds.  The improvement has resulted in OPSO being found in partial compliance with IV. A. 5. d.

Due to unreliability of the TourWatch system, OPSO reverted to paper logs.  While there is now a policy in place which requires supervisors, up to the level of



Watch Commander to review the paper logs to ensure rounds are being conducted, OPSO has not audited compliance with this policy and review of the paper logs during the tour revealed that rounds are not being timely performed.

All twenty-four (24) of the housing units are designed for direct supervision. OPSO reported in its Compliance Matrix that it has twelve mandatory posts. Six of these mandatory posts are the control pods and six are housing units.  That results in twenty-five percent of the housing units being staffed as  direct supervision.  In addition, there are times that the deputies are not in those housing units.  Thus, IV. A. 5. e. is in partial compliance.

Regarding overhead video surveillance and recording cameras for OJC (A.5.f.), there are on-going issues as some of the 900 cameras are not recording. This is most often discovered when investigators try to retrieve the videos. The system is unreliable as at times the videos are missing, but at other times a video is available.  More energy and expertise should be devoted to finding a solution to this technical issue, as the presence of recording cameras is necessary for compliance as well as inmate and staff safety.  As such, this paragraph is found to be in partial compliance.

All staff transferred from other divisions to work in the OJC and/or assigned to work in the specialty units do not receive the required training.  Proof of training for the juvenile unit and mental health units and use of a training mentor for individual transferred from other divisions allows  A. 5. g. and h. to be in partial compliance.

IV. A. 5. i. was in substantial compliance at the time of Report No. 9 as there was proof that supervisors are conducting daily rounds and noting their findings in the paper logs.  However, while supervisors claim to conduct rounds, documentation is lacking for this compliance period; thus, IV. A. 5. i. is now in partial compliance.

The daily inspections of housing units required by VI. A. 5. j. is in partial compliance.  With the introduction of unit management, unit managers and deputies are required to conduct daily inspections.  However, simple observation of the conditions of the living units provides evidence that, while daily inspections may be



conducted, consistent inspection standards need to be communicated to the line staff and inmates, and corrective action taken as a result of the inspection findings. [See also IV.D. Sanitation and Environmental Conditions for additional findings.]

Monthly shakedowns are conducted. But as evidenced the amount of contraband discovered during each time shakedowns, the number and type of weapons used in the inmate-on-inmate assaults, and the drug use/overdoses in the facility, the shakedowns do not occur at sufficient regularity and are not sufficiently thorough to prevent inmates from having frequent access to dangerous contraband. Thus, VI. A. 5. k. continues to be in partial compliance.

The Independent Compliance Director continues to devote significant resources and effort to the address the issue of contraband.  The courts, intake, and inmate workers appear to be a common source of contraband.  There continue to be circumstances where staff are responsible for smuggling contraband into the facility.

OPSO has continued to  conduct an analysis of the shakedown reports from the monthly unit shakedown as to the location of findings, linkages to previous shakedowns, specific items found, and/or the inmates involved.   OPSO provides a list of special management unit, but the contraband reports provided to the Monitors do not list the contraband found as a result of a non-routine shakedown such as those conducted by ISB.  It is clear from the ISB reports that additional stashes of drugs, cell phones, and/or weapons were uncovered though the non-random shakedowns.  Therefore, IV A. 5. l.  continues to be in partial compliance.

## IV.  A.  6.  Security Staffing

A.6.a. OPSO shall ensure that correctional staffing and supervision is sufficient to adequately supervise prisoners, fulfill the terms of this Agreement, and allow for the safe operation of the Facility, consistent with constitutional standards.

    (1)     OPSO shall achieve adequate correctional officer staffing in the following manner: Within 90 days of the Effective Date, develop a staffing plan that will identify all posts and positions, the adequate number and qualification of staff to cover each post and position, adequate shift relief, and coverage for vacations.  The staffing plan will ensure that there is adequate coverage inside each housing and specialized housing areas and to accompany prisoners for court, visits and legal visits, and other operations of OPP and to comply with all provisions of this Agreement.  OPSO will provide its plan to the Monitor, SPLC, and DOJ for approval.  The Monitor, SPLC, or DOJ will have 60 days to raise any objections and recommend revisions to the staffing plan.



(2)    Within 120 days before the opening of any new facility, submit a staffing plan consistent with subsection (1) above.

(3)    Within 90 days after completion of the staffing study, OPSO shall recruit and hire a full-time professional corrections administrator to analyze and review OPP operations.  The professional corrections administrator shall report directly to the Sheriff and shall have responsibilities to be determined by the Sheriff.  The professional corrections administrator shall have at least the following qualifications: (a) a bachelor's degree in criminal justice or other closely related field; (b) five years of experience in supervising a large correctional facility; and (c) knowledge of and experience in applying modern correctional standards, maintained through regular participation in corrections-related conferences or other continuing education.

(4)    Provide the Monitor a periodic report on staffing levels at the Facility.  These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement.   Each report will include the following information:

      i.    a listing of each post and position needed;
      ii.    the number of hours needed for each post and position;
      iii.    a listing of staff hired and positions filled;
      iv.    a listing of staff working overtime and the amount of overtime worked by each staff member;
      v.    a listing of supervisors working overtime; and
      vi.    a listing of and types of critical incidents reported.

Findings:
  A. 6. – Non-Compliance
      A. 6. a.  (1) – Substantial Compliance
      A. 6. a. (2) –  Substantial Compliance
      A. 6. a. (3) – Substantial Compliance
      A. 6. a. (4) – Partial Compliance

<u>Observations:</u> (See also Appendix B)

The finding of compliance for this section of the Consent Judgment is guided by this language (IV.A.6):

"OPSO shall ensure that correctional staffing and supervision is sufficient to adequately supervise prisoners, fulfill the terms of this Agreement, and allow for the safe operation of the Facility, consistent with constitutional standards. . ."

As the governing section of this paragraph is non-compliant, the entire section is non-compliance.  The sub-paragraphs have been given a compliance rating to provide guidance to OPSO.

There continues to be is insufficient staffing of posts in OJC as evidenced by the Monitors' evaluation of staffing rosters provided for June – November 2018.  These rosters indicate the individuals assigned to posts; not whether or not the person worked in that post, or worked at all.  The reporting provided by OPSO does



not address all the requirements of IV. A.6. (4), specifically sections iv., and v.   Even with the use of overtime, units are left unstaffed (see below).  The work required by different paragraphs of the Consent Judgment are not being met because of the lack of staffing (e.g. sanitation).

The Monitors reviewed a sample from the OPSO OJC Staff on Duty reports.  The documents list the staff who are assigned to specific posts on shifts, also identifying posts for which there is no staff assigned, not including IPC operations.  The staffing for IPC was not provided.  The sample included 10 days in June 2018 and 10 days in November 2018, covering 20 total shifts, both day and night.  The findings of this review are:

- 100% of shifts has a watch commander recorded as working.
- None of the 20 shifts had all posts filled.
- The Unit Managers for day shifts are frequently recorded as not working on the day shifts; rarely are Unit Managers recorded as working night shifts, leaving a watch commander to oversee all floors, and a sergeant for each floor.
- Reports from nights shifts frequently use the phases "remote observation", "rotating deputy", "in rotation", "in rotation/remote observation" although it is not clear from where this staff is pulled.  There also does not appear to be a commonly shared definition of the terms used.  There is no indication what staff are available to relieve deputies working in the housing units; including if there is staff in IPC that can be/are pulled to provide this coverage.
- The unit pod controls are shown as staffed on all shifts, except in one instance where the information was not provided.  Where there is "remote observation", there are not corresponding resources in central control, raising the question of the location of the "remote observation."
- The sanitation deputy post, when staffed, is the same person for all four floors.  The June reports do not indicate a sanitation deputy was



assigned; for November there are 12/20 shifts in which a sanitation deputy was reported; generally, the same person for all floors.

- There is no laundry deputy in these posts, except one day where Tracie Jefferson, the sanitarian, is listed.

- Rover posts are infrequently filled; and in some cases, filled by CMTs. For the November sample, the 160 shifts for which rovers could be assigned (2 x shift x 4 floors x 2 shifts), 19 rovers were assigned (12%) – and of those, 4 were CMTs, who cannot be assigned as relief inside inmate housing units. For the June sample, rovers are noted in 16 shifts (10%), in about half the days, the report provided no note as to whether the posts were filled or no (e.g. it was blank).

- The scanner posts on the first and second floor; for the 40 posts (20 shifts x 2 posts) – it was filled 16 times (40%), with one filled by a CMT and one "in rotation." This assignment pattern appears to impact both day and night shifts.

- For the night shift on November 30, 2018, there only 28 staff were in the jail (recall IPC information not available for review)– there is only one person assigned to the central control or communications posts; 16 units were not staffed;

- For the night shift on November 4, 2018, 24 staff were assigned in the jail; 18 units were not staffed; four communications posts were filled.

- The youth tier -2C - is filled on <u>all </u>shifts of the day/night examined for all shifts reviewed.

- For the 20 shifts - cross-checking revealed reported incidents for those dates/times found in 79% of the incidents, staff was assigned to the unit. Six of 29 (21%) incidents occurred in a unit were no staff were assigned.

- There is a pattern as to what units are not staffed, or are overseen with "remote or rotating deputies". These are:
  - 4-B, 4-D, 4E, 4-F



- 3-B, 3-E, 3-F
- 1-B
- 1-D - this unit with a deputy assigned of 4/20 shifts (20%)
- 1-F – this unit with a deputy assigned 6/20 shifts (30%)
- There are 24 housing units in OJC; the nine unit are 37% of the total units. These nine units accounted for 33% of the reported incidents in OJC for the entire month of November; and 38% of the incidents for the sample period.
- The types of incidents which occurred in these specific units when unstaffed, according to OJC reporting, during the two months of the sample included:
  - 12 inmate/inmate altercations;
  - 2 criminal damage to property;
  - 1 seizure;
  - 1 attempted suicide;
  - 7 unobserved inmate injuries; and
  - 2 internal escapes (inmates breaching or attempting to breach internal doors).

- It is unclear how the staffing is pulled for hospital details.  These assignments are noted in the report.  This is important as the 20 shifts reviewed for November noted 46 staff assigned to the hospital (unable to determine if for an entire or partial shift).
- There are shifts when deputies are not listed as assigned to the medical clinic, including 5 consecutive shifts in the November sample.
- The report does not identify if staff are pulled for/assigned training from the shifts, whether on overtime, or staff pulled from OJC posts.
- The Monitors were unable to determine from the reporting which posts were filled with overtime, except for a very few notes.
- In the sample for the 20 shifts in November, 76 staff were noted as calling in sick, 59 on annual leave, and 30 reporting tardy for work.



Updated data from OPSO for CY2018 indicates that 126 jail security and support-related positions were hired (e.g. not including Sheriff's staff, Young Marines, civil district court, Council Drivers); and during this same period, data provided in January 2019 indicates 201 individuals were terminated, with a net loss of 75 individuals. This data may be contrasted to OPSO reported data for CY2017, 315 hired and 299 terminated, a net gain of 16 employees.   For CY 2018, 42 of the 126 were hired and terminated in CY2018.  Of the 126 positions OPSO reported hiring, 27 were Corrections Monitoring Technicians (CMTs) (staffing the pod control centers and other duties as assigned), and 67 "recruit" staff.  For CY 2018, of the 27 CMTs hired, 42 were terminated; of the 67 recruits hired, 107 deputies/recruits were terminated.  The reasons OPSO provided for departures from employment of the recruits:

- 19 no-shows/abandoned job
- 5 for "advancement"
- 16 for misconduct;
- 9 for personal reasons (health, relocation, "other);
- 7 resigned while under investigation; and
- 1 resigned while under suspension.

The remaining number (9) were reported as terminated for attendance, unable to perform duties, and 1, no reason given.

OPSO updated its staffing plan on October 1, 2018.  Although the nexus between the staffing plan and the monthly reports provided by Human Resources remains to be completed, it can be concluded that an additional 30% staff is needed, provided the retention rate is improved.  As noted in previous compliance report, neither the Monitors, nor OPSO can track vacancies by posts/positions.

Sub-paragraph IV.6.a. (2) – This provision is in substantial compliance at this time.  With the planning for Phase III, the Monitors look forward to reviewing the staffing plan.



Sub-paragraph IV.6.a. (3) – The chief of corrections position has been vacant since March 2018.  OPSO has extended an offer to a qualified individual who will begin work on February 19, 2019.

Sub-paragraph IV.6.a. (4) – This paragraph is in partial compliance, as monthly reports have not been produced regarding hiring and termination of employees.  The Stipulated Agreement also provides for bi-monthly reports regarding hiring.   Paragraph 7.a. of the Stipulated Agreement of February 11, 2015 requires monthly reporting.[2]

> A.6.b. Review the periodic report to determine whether staffing is adequate to meet the requirements of this Agreement.  OPSO shall make recommendations regarding staffing based on this review.  The review and recommendations will be documented and provided to the Monitor.

Finding:  Substantial Compliance

The staffing plan indicates what staff are required; the issue is that the staff have not been hired/retained.

## IV. 7.  Incidents and Referrals

> A.7.a. OPSO shall develop and implement policies that ensure that Facility watch commanders have knowledge of reportable incidents in OPP to take action in a timely manner to prevent harm to prisoners or take other corrective action.  At a minimum, OPSO shall do the following:
> A.7.b. Continue to ensure that Facility watch commanders document all reportable incidents by the end of their shift, but no later than 24 hours after the incident, including prisoner fights, rule violations, prisoner injuries, suicide attempts, cell extractions, medical emergencies, found contraband, vandalism, escapes and escape attempts, and fires.
> A.7.c. Continue to ensure that Facility watch commanders report all suicides and deaths no later than one hour after the incident, to a supervisor, IAD, the Special Operations Division, and medical and mental health staff.
> A.7.d. Provide formal pre-service and annual in-service training on proper incident reporting policies and procedures.
> A.7.e. Implement a policy providing that it is a disciplinary infraction for staff to fail to report any reportable incident that occurred on his or her shift.  Failure to formally report any observed prisoner injury may result in staff discipline, up to and including termination.
> A.7.f. Maintain a system to track all reportable incidents that, at a minimum, includes the following information:
>     (1)     tracking number;
>     (2)     the prisoner(s) name;
>     (3)     housing classification and location;
>     (4)     date and time;
>     (5)     type of incident;

---

[2] OPSO shall provide a monthly report to the Monitors, identifying the number of deputies hired the previous month; the number of deputies who resigned, if known, the reason for resignation, and the date the deputy entered service; and the number of deputies who were terminated, the reason for termination, and the date the deputy entered service.  The same report shall be provided for non-sworn (civilian staff).  A cumulative annual total will also be included as part of this report.



(6)     injuries to staff or prisoner;
(7)     medical care;
(8)     primary and secondary staff involved;
(9)     reviewing supervisor;
(10)    external reviews and results;
(11)    corrective action taken; and
(12)    administrative sign-off.

A.7.g. Ensure that incident reports and prisoner grievances are screened for allegations of staff misconduct, and, if the incident or allegation meets established criteria in accordance with this Agreement, it is referred for investigation.

A.7.h. Provide the Monitor a periodic data report of incidents at the Facility.  These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement.

A.7.i. The report will include the following information:

(1)     a brief summary of all reportable incidents, by type and date;
(2)     a description of all suicides and in-custody deaths, including the date, name of prisoner, and housing unit;
(3)     number of prisoner grievances screened for allegations of misconduct; and
(4)     number of grievances referred to IAD or SOD for investigation.

A.7.j. Conduct internal reviews of the periodic reports to determine whether the incident reporting system is ensuring that the constitutional rights of prisoners are respected.  Review the quarterly report to determine whether the incident reporting system is meeting the requirements of this Agreement.  OPSO shall make recommendations regarding the reporting system or other necessary changes in policy or staffing based on this review.  The review and recommendations will be documented and provided to the Monitor.

Findings:

A. 7.  a. -  Partial Compliance
A. 7.  b. – Partial Compliance
A. 7.  c. –  Substantial Compliance
A. 7.  d. –  Partial Compliance
A. 7.  e. –  Partial Compliance
A. 7.  f. –  Partial Compliance
A. 7.  g. –  Substantial Compliance
A. 7.  h. – Partial Compliance
A. 7.  i. -   Partial Compliance
A. 7.  j. -   Substantial Compliance

<u>Observations</u>:

OPSO has long had a policy on incidents and referrals that sets out the process for documenting and referring incidents.  What has been lacking is a sufficient process to ensure all reportable incidents are being documented and that the incidents are being recorded adequately, timely, and accurately.  OPSO has shown improvement in the reporting of incidents, but there are still incidents which are not timely reported to OPSO and/or the Monitors.

As noted earlier in this report, the Monitors identified 110 late reports for the period April – December 2018.  The incidents were:



- o 7—attempted suicide;
- o 3 – contraband;
- o 6 – criminal damage to property;
- o 15 – inmate "slip/falls";
- o 1 – inmate misconduct;
- o 24 – inmate/inmate altercations;
- o 52 – uses of force/including inmate/staff altercations; and
- o 3 – sexual assault/misconduct.

The majority of these incidents occurred in unit 3C, (N=22) (disciplinary housing) and in male mental health housing 2A (N=12).  OPSO reports note that of these "late" incidents, 12 occurred in units with no staff present; 91 in units where staff was present, and 8 in which staff was unknown/unspecified.

One of the methods for determining whether incidents are being reported is to review 'routes' – inmates with serious medical or trauma injuries ((e.g. serious injuries that the medical provider referred to the emergency department for events such altercations, attempt suicides, uses of force, ingestions)that they are transferred to the emergency room, and clinic walk-in logs.  This function used to be performed by the Monitors.  OPSO has implemented a process where a sergeant performs this function and follow up on missing reports.  This is an example of OPSO incorporating processes which allow OPSO to audit its compliance.  What continues to be lacking is holding the supervisors accountable for the late reports.  Sections A. 7. a. and b. remain in partial compliance.

Suicides and deaths are reported within an hour to the proper persons which results in A. 7. c. being in substantial compliance.  Annual training was provided on incident reporting, but a significant number of staff did not attend as schedule which results in partial compliance for A. 7. d.  There is a policy which requires the reporting of incidents and that it be timely, but, as highlighted above, in at least 110 instances, incidents were not reported timely and no  corrective action was taken which results in partial compliance for A. 7. e. There is not a system to track the information required in A. 7. f., but partial compliance is given due to the information being gathered by the administrative sergeant.  Incidents and



grievances are being reviewed for misconduct and referred for investigation where appropriate in substantial compliance with A. 7. g.   The Monitors are provided a semi-annual report of incidents, but it does not contain all of the required information and, thus, A. 7. h. and i. are in partial compliance.  OPSO performed an assessment of whether the reporting system is meeting the requirements of the Consent Judgment and is given substantial compliance for A. 7. j. even though the assessment did not address the lack of timeliness.  Future assessments of the reporting system will need to be more robust and refined to maintain substantial compliance.

## IV. A. 8.  Investigations

A.8.a. Maintain implementation of comprehensive policies, procedures, and practices for the timely and thorough investigation of alleged staff misconduct, sexual assaults, and physical assaults of prisoners resulting in serious injury, in accordance with this Agreement.  Investigations shall:
    (1)   be conducted by persons who do not have conflicts of interest that bear on the partiality of the investigation;
    (2)   include timely, thorough, and documented interviews of all relevant staff and prisoners who were involved in or who witnessed the incident in question, to the extent practicable; and
    (3)   include all supporting evidence, including logs, witness and participant statements, references to policies and procedures relevant to the incident, physical evidence, and video or audio recordings.
A.8.b. Continue to provide SOD and IAD staff with pre-service and annual in-service training on appropriate investigation policies and procedures, the investigation tracking process, investigatory interviewing techniques, and confidentiality requirements.
A.8.c. Ensure that any investigative report indicating possible criminal behavior will be referred to IAD/SOD and then referred to the Orleans Parish District Attorney's Office, if appropriate.
A.8.d. Provide the Monitor a periodic report of investigations conducted at the Facility.  These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement.
A.8.e. The report will include the following information:
    (1)   a brief summary of all completed investigations, by type and date;
    (2)   a listing of investigations referred for administrative investigation;
    (3)   a listing of all investigations referred to an appropriate law enforcement agency and the name of the agency; and
    (4)   a listing of all staff suspended, terminated, arrested, or reassigned because of misconduct or violations of policy and procedures.  This list must also contain the specific misconduct and/or violation.
A.8.f. OPSO shall review the periodic report to determine whether the investigation system is meeting the requirements of this Agreement and make recommendations regarding the investigation system or other necessary changes in policy based on this review.  The review and recommendations will be documented and provided to the Monitor.

Findings:
A. 8. a. – Substantial Compliance
A. 8. b. – Substantial Compliance
A. 8. c. -  Substantial Compliance



A. 8. d. -  Substantial Compliance
A. 8. e. -  Substantial Compliance
A. 8. f. -  Substantial Compliance

<u>Observations</u>:

The Investigative Services Division (ISB) is responsible for:  the Criminal Investigation Division (investigates possible criminal activity by inmates), Internal Affairs Division-Criminal (investigates possible criminal activity by staff), the FIT (investigates use of force by staff), the Internal Affairs Division-Administrative (investigates possible violation of policies by staff), and the Intelligence Unit (provides information and intelligence regarding activities that have taken place or may take place in the jail or support activities).

Significant evidence of substantial compliance was provided for IV. A. 8. a. The Monitors are concerned about the time investigations are taking, but part of that reflects the quality of the reports providing the basis for the investigations as well as the sheer volume of incidents requiring the attention of ISB.  Improvements in all other areas from hiring, training, supervision, and adequate staffing will enhance the safety of staff and inmates – and ultimately decrease the workload of ISB.

The Monitors acknowledge that investigating incidents of inmate on inmate assaults, sexual assaults, staff on inmate assaults, etc. with a goal of seeking indictments is appropriate; but the overall goal is to create a safe jail.  In a jail setting, investigations play just as critical a role in terms of protecting inmates from inappropriate or illegal staff actions, protecting inmates from each other, and correcting policy, practice, supervision and training.  Continued emphasis needs to be placed on having as one of goals of investigations being the *prevention* of future incidents through analysis of the policy, procedures, training, supervision, and physical plant contributors to the incident.  This function cannot and should not be performed by ISB alone.  This level of assessment requires input from individuals who have a high level of experience in jail/corrections work. In short, it requires collaboration between ISB and OJC which continues to be wanting.  The OJC staff



should take the lead in the root cause analysis with ISB providing information gathered during the investigation.

The quality of sexual assault investigations has improved since those investigations were moved under the supervision of the Lieutenant responsible for IAD-Criminal investigations.

ISB continues to receive significant additional training in substantial compliance with A. 8. b. During the monitoring period, ISB contracted with an expert on sexual assault and PREA investigations who provided training.

Investigations which reveal potential criminal activity are referred to the Orleans Parish District Attorney's Office in substantial compliance with A. 8. c. ISB provides reports in substantial compliance with IV. A. 8. d. and e. ISB performs the review of the investigation system to determine whether the investigation system is meeting the requirements of the Consent Judgment and forward any recommendations to the Monitors. ISB's substantial compliance is evidenced not only by their analysis, but also the movement of PREA investigations under IAD-Criminal, additional sexual assault investigation training, and the formalization of a call out policy for the collection of forensic evidence in serious incidents.

## IV. A. 9.    Pretrial Placement in Alternative Settings

A.9.a. OPSO shall maintain its role of providing space and security to facilitate interviews conducted pursuant to the City's pretrial release program, which is intended to ensure placement in the least restrictive appropriate placement consistent with public safety.
A.9.b. OPSO shall create a system to ensure that it does not unlawfully confine prisoners whose sole detainer is by Immigration and Customs Enforcement ("ICE"), where the detainer has expired.

Findings:
A.9.a. – Substantial Compliance
A.9.b. - Substantial Compliance

Observations:

OPSO provided a memorandum noting that the pretrial program is no longer managed by VERA, but rather Criminal District Court, and that the same space is provided. OPSO also provided a memorandum that ICE detainers are only accepted for a specified list of offenses; and that OPSO has not detained any individuals under an ICE detained during 2018.



## IV. A. 10. Custodial Placement within OPP

**Introduction**

OPSO has designed, validated, and implemented an objective classification system to assess and house each OSPO inmate according to the risks he/she poses to institutional safety and security.  The automated classification system was rolled out in the Jail Management System (JMS) on January 15, 2015.[3]  The OPSO staffing plan set the classification staff FTEs at 18.  As of January 14, 2019, the classification "unit" staffing was reported as 13 individuals – 12 civilian classification specialists and a classification manager.[4] This creates challenges for the 24/7 coverage at the OJC to ensure that the custody assessments, housing assignments, classification-related grievances, and audits are completed in accordance with OPSO policies.  As of April 2018, the single deputy assigned to the Classification Unit resigned and OPSO has decided not to fill this position.  These duties have been re-assigned to the lead classification specialist.

Two classification specialists were hired during this compliance period.  Staff reported that "hands-on" training for the custody and PREA assessment instruments and the OPSO housing matrix was provided.  A memo outlining the training was provided. No post-test competency tests were available.  During this compliance reporting period, no in-service training for the classification specialists was provided.

To assign inmates to a housing unit and bed, OPSO has developed an automated housing assignment process that considers the inmate's custody level, gender, special population status, PREA designations, enemies, and associates as well as bed availability to recommend an appropriate bed for the inmate.  The JMS generates a list of appropriate housing locations for each inmate according to his/her custody level, PREA designations, reported enemies and/or associates, gender, age, medical, and mental health needs from which the classification specialist must select a housing assignment/bed.  Separations for special populations have been incorporated into the automated Housing Unit Assignment Plan (HUAP).  Identification tags have been created to identify inmates on suicide

---

[3] Hardyman, Patricia L. (2015). "Design and Validation of an Objective Classification System for the Orleans Parish Sheriff's Office: Final Report." Hagerstown, MD: Criminal Justice Institute, Inc.

[4] The current staffing roster was not included in the documents provided for this compliance report, thus the classification unit numbers and assignments could not be verified.



observation vs. suicide watch, those undergoing detoxification protocol for alcohol and/or controlled substances, and those participating in the Travis Hill High School. The OJC and TDC dormitory-style units have been cataloged in the automated system to enable the classification specialists to assign inmates to specific beds. Although Classification and JMS staff worked together to develop an Inmate Separation Instrument (ISI) to maintain out-of-cell separations, the ISI is used only within the special management pods.

A positive point of this compliance tour was that housing audits to verify the placement of the inmates within the assigned beds were restarted as of July 2018. Random housing audits were conducted by a classification specialist and corrections security staff. On the other hand, of concern was the observation that the classification specialists use discretionary overrides of the scored custody levels when assigning inmates to a housing unit/bed in order to expand the housing/bed options. These overrides appeared to be initiated in order to transfer low custody inmates from the "Booking" area to the new intake housing unit, 1-F. It appeared at least in some incidences, the override of the scored custody level was continued when the inmate was transferred from 1-F (intake housing) to a general population housing unit and bed. The monthly classification indicated that while the rate of discretionary overrides increased for November and December over previous months of 2018, the rates were well within the recommended override rates of 5 to 15 percent.[5] The most troubling point is that "housing, i.e., bed availability" is NOT a legitimate reason for a discretionary override.

OPSO modified its document submittal process to exclude standardized monthly statistical reports as to the timeliness of the initial custodial assessments; the custody distributions; housing monitor lists (i.e., a log of cases due for a custody re-assessment); the prevalence of special populations; as well as the rates and types of disciplinary infractions. However, the JMS reports were reviewed as part of the onsite tour. While this change hampers the Monitor's ability to track the ongoing process and shifts within the system, it appears that both the initial and reclassification assessments were completed within a timely basis.

---

[5] Austin, James and Hardyman, Patricia L. (2004) "Objective Prison Classification: A Guide for Correctional Agencies." pp. 19. Washington, D.C: National Institute of Corrections.



**Summary:**  In sum, the OPSO is in partial compliance with the paragraphs of the Consent Judgment related to Custodial Placement within OPP (IV. A.10).  During this six-month period, the OPSO moved from Non-Compliance to Substantial-Compliance on Section f (*Conduct internal and external review and validation of the classification and prisoner tracking system on at least an annual basis*) and from Partial-Compliance to Substantial Compliance on Sections d (Continue to update the classification system to include information on each prisoner's history) and Section g *(*Provide the Monitor a periodic report on classification at the Facility.  The compliance rating for the remaining five sections did not change.   OPSO is in substantial compliance with five of the ten elements of the Consent Judgment regarding Custodial Placement.

**Assessment Methodology**

This report was based on observation of the initial classification and housing assignment processes; onsite meetings with OPSO and JMS staff; and review of monthly custodial, disciplinary, training, and housing audit data for June 2018 – December 2018, and review of documents provided prior to and during the compliance visit.

> IV.A.10. a.  OPP shall implement an objective and validated classification system that assigns prisoners to housing units by security levels, among other valid factors, in order to protect prisoners from unreasonable risk of harm.  The system shall include consideration of a prisoner's security needs, the severity of the current charge, types of prior commitments, suicide risk, history of escape attempts, history of violence, gang affiliations, and special needs, including mental illness, gender identity, age, and education requirements.  OPSO shall anticipate periods of unusual intake volume and schedule sufficient classification staff to classify prisoners within 24 hours of booking and perform prisoner reclassifications, assist eligible DOC prisoners with re-entry assistance (release preparation), among other duties related to case management.

> Finding:        Partial Compliance

> **Observations:**

As of January 14th, the Classification Unit roster lists 13 individuals -- a classification manager and 12 civilian classification specialists -- for the 18 positions assigned to the Classification Unit as per the OPSO 2018 staffing analysis plan.[6]  As per the OSPO October 2018 staffing plan, "All posts were civilianized."  The lead classification specialist has been

---

[6] Hodge, Darnley (October 1, 2018). "Updated Coverage Plans for the OPSO (Civil Division excluded)." Orleans Parish Sheriff's Office, Independent Compliance Director. pp. 12.



assigned the tasks of completing housing audits, responding to grievances, and conducting interviews regarding protective custody and housing re-assignments in addition to responsibilities for supervising the classification specialists, processing housing transfers, and conducting custody re-assessments.   The classification shift leaders and specialists work overtime to keep up with the workload, some working on average 40+ hours of overtime per month.

The classification manager oversees the Classification Unit who in turn reports to the Captain of the Intake Processing Center (IPC).  A strong voice for the Classification Unit is important for ensuring that the Unit controls all housing transfers and assignments and is actively integrated into the all OPSO classification and housing-related decisions.

The classification specialist did not have a complete copy of the current classification or PREA handbooks readily available in their work areas as reference tools for checking offense severity, codes for disciplinary infractions, and the like.  The offense and disciplinary severity indexes, for example, were missing every other page.  The new specialists reported that "hands-on" training for the custody and PREA assessment instruments and the OPSO housing matrix was provided.  A memo outlining the training was provided, but no post-test competency tests were available.  Staff reported reviewing the handbooks as part of their initial training but did not have individual copies available within their work areas or even a link via the shared drive. The OPSO Offense Severity Index is critical, for example, to accurately code out-of-parish crimes within the custody attachments. During this compliance reporting period, no in-service training for the classification specialists was provided.

IV.A.10.b. Prohibit classifications based solely on race, color, national origin, or ethnicity

Finding:  Substantial Compliance

**Observations**:

Custody assessments are based on objective risk factors that have been validated for OPSO males and female inmates. The inmate's race is not one of the objective risk factors. Observation of the housing assignments by the classification specialists revealed that custody level, PREA designation, age, and charges were considered when selecting among the potential beds identified by the automated housing module when assigning an inmate to a specific bed.  To track this element of the Consent Judgment, OPSO has a created



monthly statistical report to track classifications by race and housing location.  The monthly reports were provided to the Monitor as part of the onsite tour.  Analyses of these reports by the Monitor suggested that the OJC housing assignments were not by race as the housing distributions across the OJC housing units were generally consistent with the overall distributions of inmates by race within the facility.  However, as shown in Figure 1, the percentage of white inmates within the TDC housing units exceeded their proportions within the overall inmate population for each of the population reports provided for this compliance period – July through November 2018.  As shown in Figure 1, in July 91.1 percent of the inmates housed by OPSO were Black, however, only 80.0 percent of the inmates housed in TDC were Black. There appeared to be about a 10 percent discrepancy between the percentage of Blacks housed in TDC and the percentage of Black inmates within the OPSO facilities for each of the months -- July – December 2018.

Figure 1: Distribution by Race of Inmates Housed at TDC Versus Racial Distribution within the OJC & TDC Units – July – November 2018



As during this compliance period, the kitchen/maintenance and off-site workers were housed at TDC, these data might raise questions or concerns about the worker selection/assignment process rather than "classification by race."



IV.A.10.c Ensure that the classification staff has sufficient access to current information regarding cell availability in each division

Finding: Substantial Compliance

**Observations:**

OPSO has developed an automated housing assignment process that considers the inmate's custody level, gender, special population status, PREA designations, enemies, and associates as well as bed availability to recommend an appropriate bed for the inmate. Separations for special populations have fully identified and incorporated into the automated HUAP.  Identification tags are used to identify inmates on suicide observation vs. suicide watch, alcohol/drug detoxification protocol, and school participation. Classification specialists are provided a listing of potential beds for each inmate to facilitate selection of the "best" bed from among those identified by the JMS as compatible based on the inmate's custody, PREA designations, separations, medical, and mental health needs. Previous problems of Security/Operations moving inmates without going through the Classification Unit for housing unit transfers appear to have been addressed.

Housing units closed due to staff and/or fluctuations on the average daily OPSO population as well as cells/beds taken off-line for repairs are printed on the daily population sheets generated by the JMS did not appear to be a full listing of the cells closed for maintenance.  A listing of cells with maintenance problems with the warning, "DO NOT USE THE FOLLOWING CELLS" was posted on the wall in the work area for the classification specialists. The list did not have any dates to indicate when the various cells were taken off-line.  Further, only one of the cells on the posted list was on the JMS daily list of cells off-line for that day or any of the days of the previous week or for the days following the tour.   It appeared that the classification specialists are given a separate inventory of cells/ beds that are off-line for maintenance as well as a list of cell restrictions for medical isolations.  While this manual process does not appear to hamper the classification specialists' ability to identify an appropriate bed for an inmate, it suggests inefficiencies between the automated Jail Management System, and the classification, housing, and facility maintenance processes.

Classification specialists also maintain a current inventory of bed assignments to avoid duplications due to delays between the housing assignments and physical transfer of



the inmate to the designated housing unit.  Thus, as required by the Consent Judgment, the classification specialists appear to have access to current information regarding bed availability throughout the OJC, however, the current process entails maintaining multiple manual lists creating the risk of housing errors and backlogs for moving inmates from booking to the appropriate housing pod.

**IV. A. 10. d. Continue to update the classification system to include information on each prisoner's history at OPSO.**

Finding:   Substantial Compliance

**Observations:**

As shown in Figure 1, the monthly custodial reports, as provided by OPSO, have indicated a significant decrease in the lag-time between booking and the initial classification.  Further when the percentage of inmates for whom initial custody and housing assessments were completed improved. For example:

- o   Percent Initial Custody Assessments: As of June 2018, initial custody assessments were completed for only 82.0 percent of the inmates booked into OJC.[7]  Over the last six months – June – December 2018, this rate has averaged at about 83.9 percent.   However, this rate is still below the January 2017 rate of 92.9 percent.
- o   Percent Within 8 Hours: As of June 2018, initial custody assessments were completed within the first eight hours of booking for 69 percent (68.8%) of the OPSO inmates.  By December 2018, the initial custody assessment was completed within eight hours of booking was up to 82.1 percent of the inmates.
- o   Percent Greater Than 24 Hours:  As of June 2018, the lag time between booking and the initial custody assessment was more than 24 hours was 1.3 percent of the inmates, but by December 2018, only .5 percent of the inmates remained in booking for more than 24 hours prior to their initial classification.

---

[7]  Custody and PREA assessments WERE completed for all inmates prior to their transfers from the booking area to OPSO housing units.



Thus, the data clearly indicated that the percentage of inmates for whom an initial classification was completed has stabilized and the lag time between booking and classification improved significantly during this compliance period.

Figure 2: 2018 Rates and Completion Time for Initial Custody Assessments



OPSO has created a new initial classification/housing process in which male inmates are housed on OJC 1-F for the first 72 hours of their incarceration.  The classification specialist completes an initial classification to identify the custody level, PREA vulnerabilities, separation requirements, etc. prior to the inmate's transfer from the IPC booking area to 1-F.  This process was created to facilitate movement of the inmates (from the booking area to a "general population bed," to and from the court hearings, releases, and the like) thereby reducing the workload for the transfer deputies.  From a classification perspective, the intake housing process creates greater demands as two initial classification assessments and housing transfer forms must be generated for each inmate that remains in OPSO custody for more than 72 hours.  The classification shift supervisors, for example, have the added duties of reviewing the housing list for 1-F, generating



appropriate housing transfers, and providing an "orientation" for the pod.  In addition to the workload demands, the new process creates concerns about the additional risks from the assignment of Low, Medium, and High custody inmates with different PREA designations to the same housing unit. It is critical that the pod deputy fully adheres to the ISI for this housing unit to maintain appropriate separations of inmates during their out-of-cell times.

Of concern was the observation that when pressed for bed-space, the classification specialists use a discretionary override of the scored custody level in order to assign the inmate to a bed.  These overrides appeared to be initiated in order to transfer low custody inmates from "Booking" to the new intake housing unit, 1-F.  However, at least in some incidences, the overrides of the scored custody level were continued when the inmates were transferred from 1-F (intake housing) to a general population housing unit and bed. The monthly classification indicated that while the rate of discretionary overrides increased for November and December over previous months of 2018, the rates were well within the recommended override rates of 5 to 15 percent.[8]  The most troubling point is that "bed availability" is NOT a legitimate reason for a discretionary override as this type of override is not an adjustment of the custody level according to the risk posed by the inmate.  Rather than overriding the inmates' custody levels "to fit the beds," there may need to be adjustments to the housing matrix within the JMS to better fit the custody distribution of the OPSO population.

The Classification Monitor List (List) is an ad hoc report that identifies all inmates for whom a custody review is due for a regular 90-day re-assessment or because of some change or event within their jail records, i.e., change in their charge(s), bail amount, disciplinary record, detainer lodged/lifted, and/or sentence. The number of inmates on the list varies throughout a day according to the flow of inmates back from court, through the booking process, etc. At least one classification specialist is assigned to the task of completing the custody reviews on each of the shifts.   The average number of inmates pending a custody review on the July – December 2018 Lists was only 18.04.  Further, the

---

[8] Austin, James and Hardyman, Patricia L. (2004) "Objective Prison Classification: A Guide for Correctional Agencies." pp. 19. Washington, D.C: National Institute of Corrections.



majority of the inmates on the list were "New Inmates" in some stage of the intake processing rather than awaiting a custody reclassification.  The average number of "New Inmates" was 11.08 while the average number of inmates awaiting reclassification was 6.96.

Following Compliance Report #8, OSPO took immediate steps to work with CCS to rebuild the linkages between the medical/mental health records and JMS.   These data are important for seven of the PREA victimization and predation risk factors.  In addition, the medical/mental health information is critical for the housing assignments for the inmates with medical and/or mental health needs.  While the linkage between the electronic medical records (ERMA) and the JMS to provide the intake data has been completed, the programming to generate the updates throughout the inmate's incarceration is still problematic. Reliable electronic updates to the JMS re: medic.al/mental health needs data are now projected to be available by early Spring.

Observation of the custody assessments completed by the classification specialists as part of this compliance tour visit revealed that the classification specialists are correctly inputting the prior criminal history data into the JMS.  The new classification specialists were not familiar with the offense and disciplinary severity indexes created for the OPSO classification system, however as they work side-by-side with another classification specialist they will become more familiar with the system.  Nonetheless, it is critical that both electronic and hardcopy versions of the handbook are readily available for all of the classification specialists.

Observation of the reclassification process indicated that the classification specialists are reviewing the criminal rap sheets for the custody reviews.  Thus, the reclassification process does not merely rubber-stamp the initial custody assessments.  As previously noted that the discretionary overrides of the initial custody level to facilitate the inmates' move to 1-F from the Booking area were not corrected, but rather continued when the inmate's custody level was reviewed for his transfer from 1-F to a general population housing unit.   The classification specialist considered closely with whom the "low custody" inmate with the custody override to medium custody was housed but disregarded the scored custody level and left the custody level at medium.



IV.A.10.e. Continue competency-based training and access to all supervisors on the full capabilities of the OPSO classification and prisoner tracking system.

Finding:   Partial Compliance

**Observations:**

During this compliance period, the two new classification specialists were hired. Staff reported that training on the custody and PREA assessment instruments, and the OPSO housing matrix were provided.  However, documentation of this training or post-test competency tests were not available.  During this compliance reporting period, no in-service training for the classification specialists was provided.  The quality of instruction provided by the shift supervisors/classification manager was questionable as the classification specialists were still struggling with attachment screens and were not familiar with the OPSO offense severity and disciplinary indexes.  Again, the importance of both electronic and hardcopy versions of the handbook are readily available for all of the classification specialists was apparent. While the system is highly automated within the JMS, the automation should not be expected to replace the staff's understanding of the underlying risk factor scoring.

IV.A.10.f. Conduct internal and external review and validation of the classification and prisoner tracking system on at least an annual basis.

Finding:   Substantial Compliance

**Observations:**

OPSO population sheet that tracks the number of inmates by location were received daily.  Custodial statistical reports for June – September 2018 as to the number of custody assessments by type, gender and population were submitted. These reports enable the Monitors to monitor the timeliness of the initial custodial assessments; the custody distributions; housing monitor lists (i.e., the log of cases due for a custody re-assessment); the prevalence of special populations; as well as the rates and types of disciplinary infractions. OPSO modified its' document submittal process to exclude standardized monthly statistical reports for October – December.  Although the custodial and disciplinary reports were collected as part of the compliance tour, this new submittal



process hampers the ongoing ability to track the system and diverts attention onsite from actual observation of the classification processes.

Housing audit score sheets were submitted for July – November 2018 documenting that the housing audit process has been re-started.   The audits suggested that the inmates are housed according to bed assignments generated by the classification unit.  The audit sheets indicated only one, perhaps two incidents, in which inmates were not in their assigned beds. Audits were conducted of the open dormitories as well as the pods with cells.  OPSO has expanded the audit process to include audits by the corrections security staff[9] on the night shifts as well as by a classification specialist.  While the audits conducted by the classification specialist were complete, the audits by the corrections security staff were not.  No summary or analyses of the audits was generated by OPSO; nor were the supervisors aware of the missing data/incomplete audits.

Regardless of who is assigned responsibility for conducting the housing audits, written procedures for the housing audit process based on the updated the audit score-sheets should be developed and provided to all staff participating in the audit process.  The written procedures for the housing audit process as to the schedule, time of day, staff responsible, audit worksheet instructions, OPSO housing units to be audited, and summary analyses.

As part of the ongoing classification and housing processes, the classification shift supervisor reviews the JMS reports to identify placement errors and ISI separation conflicts.  Errors are corrected immediately.  Thus, the housing separation errors detected by the JMS are resolved quickly to prevent conflicts and enhance staff and inmate safety. However, reliance on automated housing violation reports to detect housing and custody assessment errors is insufficient to ensure institutional safety and security.

Documentation of the internal  auditing/quality control  process was provided for July - December 2018.  The logs indicate 67 custody assessments were randomly selected for auditing; this represented about .54% of the 12,455 custody assessments completed

---

[9] OPSO has assigned partial responsibility for the housing audits to the Unit Managers as part of their role of maintaining the integrity of housing and separations within the pods. This idea has merit as ensuring inmates are in their assigned cells and bunks are fundamental tasks for the Unit Managers.  However, the Classification Unit maintains overall responsibility for the housing assignment and audit processes.



during this six-month period. This low rate of audits is troubling as the October audit log listed a total of 14 custody assessments audited (10 were "errors discovered" and 4 "randomly selected" for audit. No "errors discovered" were reported for the other months.

OPSO contracted with Dr. Edward Latessa and Dr. Brian Lovins (University of Cincinnati) for revalidation of the classification system as required by the Consent Judgment.  The final report was submitted to the OPSO on April 30, 2018.[10]  This validation study serves as documentation of the CJ requirement for "external review and validation of the classification and prisoner tracking system on at least an annual basis." Although statistical validation of an objective classification system is generally recommended every three to five years,[11] continuous monitoring and process evaluation are essential for ensuring the integrity of the system for the OPSO <u>current</u> inmate population.

IV.A.10.g. Provide the Monitor a periodic report on classification at the Facility.  These periodic reports shall be provided to the Monitor within four months of the Effective Date and every six months, thereafter, until termination of this Agreement.  Each report will include the following information:
    (1)      number of prisoner-on-prisoner assaults;
    (2)      number of assaults against prisoners with mental illness;
    (3)      number of prisoners who report having gang affiliations;
    (4)      most serious offense leading to incarceration;
    (5)      number of prisoners classified in each security level;
    (6)      number of prisoners placed in protective custody; and
    (7)      number of misconduct complaints.

Finding:   Substantial compliance

**Observations:**

Monthly custodial, discipline and inmate statistical reports were reviewed for June – December 2018.  OPSO has developed reports to track the statistics as required under section IV.A.10.g. The only exception is the rates of victimization of inmates on the mental health caseload.  As noted earlier, these data are dependent upon timely information from the mental health provider.

Updated data for the inmates with gang affiliations were input to the JMS throughout the compliance period.  OPSO, NOPD, and the Orleans Parish Office of the

---

[10]Lovins, Brian K. and Edward Latessa (April 30, 2018). "Revalidation of the Orleans Parish Classification System." Cincinnati, Ohio: University of Cincinnati Corrections Institute.

[11] Austin, James and Hardyman, Patricia L. (2004) "Objective Prison Classification: A Guide for Correctional Agencies." Washington, D.C.: National Institute of Corrections. pp. iv.



District Attorney have created an ongoing process for notifying the OPSO of offenders identified as members of a "gang." Thus, these data are available to track the prevalence of inmates per "gang" among OPSO populations as well as by location (i.e., tier, side, and bed).

Figure 3 provides the OPSO monthly disciplinary data as recorded in the JMS.  The number of disciplinary reports has fluctuated over the last 12 months -- January - December 2018.  These fluctuations appear to mirror the fluctuations in the OPSO average daily population (ADP)  Overall, the trend-line for the number of formal disciplinary reports written per month indicates a decline in the number of disciplinary reports.  On the other hand, the rate of infractions with a finding of guilt held steady at about 88 percent throughout the year.

Figure 3: Numbers of Total and Guilty Disciplinary Infractions: 2018



Figure 4 illustrates the rate of disciplinary infractions among the OSPO inmate population during 2018. The rates of predatory (e.g., assaults or battery) and aggressive behaviors (e.g., fights or threats) based on the OSPO ADP were fairly constant over the 12-month period.  In January 2018, for example, 2.6 percent of the inmates were found guilty of a predatory infraction; 2.0 percent were found guilty of an aggressive infraction, in December 2018, 2.2 percent were found guilty of a predatory infraction and 2.5 percent of an aggressive infraction.  Overall, although the rates changed little over this 12-month



period.  On average 17.2 percent of the inmates were written up for a disciplinary infraction per month; 14.7 were found guilty of a disciplinary infraction.  For this compliance period (July - December, there was a decrease in the percentage of inmates with a predatory infraction, 1.8 percent from 2.3 for January – June.  The rate of aggressive infractions was 2.5 percent for July – December compared to 2.6 percent for January – June 2018.

Figure 4: Rate of Disciplinary Infractions Among OPSO Average Daily Population – 2018



Figure 5 provides a breakdown of the most serious type of infraction of which the inmate was found guilty during 2018. The numbers of predatory (assaults or battery) and aggressive behaviors (i.e., fights or threats) dropped during the last six months of 2018. For example, the average number of predatory infractions for July – December was 22.3/month; for January – June, the average number of predatory infractions per month was 31.   A similar pattern was observed for the aggressive infractions, the average number of aggressive infractions for July – December was 30.7/month; for January – June, the average number of predatory infractions per month was 35.3.  Clearly, the numbers of



management problem and disruptive behaviors fluctuated throughout the 12-month period -- January - December 2018.

Figure 5: Types of Disciplinary Infractions of which OPSO Inmates were Found Guilty - 2018

| Month | # Predatory | # Aggressive | # Management | # Disruptive | # Nuisance |
|-------|-------------|--------------|--------------|--------------|------------|
| 1 | 38 | 29 | 84 | 34 | |
| 2 | 30 | 30 | 102 | 28 | |
| 3 | 30 | 35 | 102 | 38 | |
| 4 | 30 | 48 | 84 | 30 | |
| 5 | 32 | 37 | 70 | 19 | |
| 6 | 26 | 33 | 124 | 79 | |
| 7 | 24 | 34 | 120 | 46 | |
| 8 | 26 | 42 | 126 | 44 | |
| 9 | 19 | 16 | 89 | 27 | |
| 10 | 16 | 35 | 56 | 43 | |
| 11 | 23 | 28 | 70 | 17 | |
| 12 | 26 | 29 | 77 | 15 | |

IV.A.10.h. OPSO shall review the periodic data report and make recommendations regarding proper placement consistent with this Agreement or other necessary changes in policy based on this review.  The review and recommendations will be documented and provided to the Monitor.

Finding: Partial Compliance

**Observations:**

The Monitor receives the daily "Active Inmates by Location" report.   During this compliance period, there was little dialogue between the Monitor and OPSO.  The Monitor no longer receives the monthly statistical reports and as previously indicted this creates challenges for monitoring the system. Further, there appeared to be little independent analyses of the data.



### IV. A. 11.        Prisoner Grievance Process

A. 11.a. OPSO shall ensure that prisoners have a mechanism to express their grievances, resolve disputes, and ensure that concerns regarding their constitutional rights are addressed.  OPSO shall, at a minimum, do the following:

(1)    Continue to maintain policies and procedures to ensure that prisoners have access to an adequate grievance process and to ensure that grievances may be reported and filed confidentially, without requiring the intervention of a correctional officer.  The policies and procedures should be applicable and standardized across all the Facility divisions.

(2)    Ensure that each grievance receives appropriate follow-up, including providing a timely written response and tracking implementation of resolutions.

(3)    Ensure that grievance forms are available on all units and are available in Spanish and Vietnamese and that there is adequate opportunity for illiterate prisoners and prisoners who have physical or cognitive disabilities or language barriers to access the grievance system.

(4)    Separate the process of "requests to staff" from the grievance process and prioritize grievances that raise issues regarding prisoner safety or health.

(5)    Ensure that prisoner grievances are screened for allegations of staff misconduct and, if an incident or allegation warrants per this Agreement, that it is referred for investigation.

(6)    A member of the management staff shall review the grievance tracking system quarterly to identify areas of concerns.  These reviews and any recommendations will be documented and provided to the Monitor.

Finding:   Partial Compliance

<u>Observations:</u>

Inmates have access to the grievance process via electronic kiosks located in housing units.  In the four units in which the kiosks are inoperable, and beyond repair, (4E, 4F, 2F, and 3E), staff are required to visit the units daily to retrieve grievances written forms.  This strategy compromises the confidentiality of the process. OPSO is negotiating a new contract to provide upgraded kiosks in the housing units.  Grievance forms are available on all units, as determined by observation, interviews with inmates, and interviews with staff.

The staff assigned to grievance section are commended for the files and data they manage, and the trending of data they conduct.  The information includes the number and type of grievances received, staff who are behind in their responses, and trends for the previous three months.   For the first eleven months of 2018, more than 4,200 grievances were received.  The largest number of grievances, 25%, are a category named "facility grievable (miscellaneous)".   Medical and mental health grievances accounted for 24% of grievances.  (See Sections B. and C. for a discussion of medical grievances.) Annualizing the 2018 data, it appears that the number of grievances are down when compared to 2017.



The grievance section also manages inmate "requests", which totaled 27,109 for June – November 2018.  The categories of the largest number of these requests are:  medical, classification, environmental conditions, facility grievances (miscellaneous), inmate programs, legal and records.    Grievances and requests are separated.  Inmates appear to not always be clear about what constitutes a grievance and what constitutes a request (and in some cases a medical request for service).  There are grievances which may be classified as requests, and requests that are actually grievances.  With the implementation of an upgraded automated system (new contractor) perhaps the confusion may be eliminated; and as deputies working in direct supervision units are equipped with information and access to things such as uniforms, bedding, indigent supplies, etc. to manage their units, the numbers of requests/grievances, will decline.

The staff of the grievance section log and assign grievances to staff to respond.   Each grievance receives a response.  Review of a sample of grievances shows that not all the responses are directly on-point to the grievance, not solving the issue.   For example, reviewing grievance responses identified that for the same date, one unit manager responded to several inmates' grievances about getting shorts, that OPSO does not issue shorts; while another Unit Manager noted that the shorts have been issued.    Assessing if the grievance response is correct and assuring a correct response is provided is not the responsibility of the grievance staff, although they are conducting qualitative reviews of responses which promise future improvements.  Other responses reviewed did not address the inmate's grievance, either just restating the response or just not answering the issue.  While the process exists, it does not consistently resolve issues or track implementation of resolutions.

Evidence was provided that grievances alleging misconduct or threats are referred to ISB for immediate action.

Monthly and quarterly reports regarding grievances are provided to OPSO leadership, as evidenced by copies of email transmissions.   Documentation was not provided – that being memoranda, minutes of meetings, directives, etc. evidencing that "A member of the management staff shall review the grievance tracking system



quarterly to identify areas of concerns.  These reviews and any recommendations will be documented and provided to the Monitor."

## IV. A. 12.  Sexual Abuse

A.12. OPSO will develop and implement policies, protocols, trainings, and audits, consistent with the requirements of the Prison Rape Elimination Act of 2003, 42 U.S.C. § 15601, et seq., and its implementation of regulations, including but not limited to, preventing, detecting, reporting, investigating, and collecting sexual abuse data, including prisoner-on-prisoner and staff-on-prisoner sexual abuse, sexual harassment, and sexual touching.

Finding:  Partial Compliance

Observations:

OPSO reports that it anticipates having the PREA audit before the next scheduled Monitors' tour (https://www.prearesourcecenter.org/audit )  When the audit process is successfully completed, this provision will gain substantial compliance.

## IV. A. 13.        Access to Information

A.13. OPSO will ensure that all newly admitted prisoners receive information, through an inmate handbook and, at the discretion of the Jail, an orientation video, regarding the following topics:  understanding Facility disciplinary process and rules and regulations; reporting misconduct; reporting sexual abuse or assault; accessing medical and mental health care; emergency procedures; and sending and receiving mail; understanding the visitation process; and accessing the grievance process.

Findings:  Substantial Compliance

Observations:

Materials were provided indicating the requirements of this paragraph have been met.



## IV. B. Mental Health Care and C. Medical Care

**Introduction**

The Monitors have consistently reported their concerns and recommendations regarding the requirements of the Consent Judgment.  During site visits, and in reports, the Monitors provided recommendations to attain and maintain Substantial Compliance with the Consent Judgment and Stipulated Agreements.   The Monitors have provided technical assistance via conference calls and on-site visits to assist and support necessary development and implementation. The Mental Health Monitor has had conference calls with OPSO and CCS/Wellpath since the last monitor's tour (June 2018), including an on-site visit in December 2018.

to participate in meetings to review the plans and discuss options for the temporary housing of mentally ill prisoners considering the forthcoming unavailability of Hunt and before Phase III is completed.

As with past reports, the Monitors rate compliance levels based on the documents requested and reviewed, observations and discussions during on-site visits, review of medical records, and any additional information provided by the parties.

The Monitors are pleased to report significant improvement in performance in many areas of the Consent Judgment. The contributing factors for these improvements are the current leadership by the Independent Compliance Director, OPSO executive staff, and Wellpath's local and regional clinical leadership at OJC and Hunt.  The addition of the Tulane Department of Psychiatry staff and leadership is an invaluable asset in providing required and consistent psychiatric services for prisoners at OJC.  There is positive progress with Tulane's interface with Wellpath.  There are efforts to improve the real-time support and supervision by OPSO to provide dedicated deputies and space for the mental health and medical staff to be able to perform their duties and responsibilities. OPSO's accommodations are essential and vital to provide inmates access to constitutionally adequate care and treatment and to attain and maintain compliance.

Several paragraphs remain in non-compliance where necessary improvements are required by the Consent Judgment to provide the full range and quality of medical care and mental health/counseling services for inmates incarcerated in OJC and Hunt.  These



concerns are deeply impacted by the lack of progress in developing the required services and programs recommended in 2014, including permanent acute care and step-down programing and services for mental health and acute medical services.

General recommendations:

1)   Continue leadership, initiatives, and direction by OPSO and Wellpath;

2)   Increase correctional security staffing to provide adequate and ongoing dedicated support for mental health and medical services consistently;

3)   Continue to develop full services and continuity of services for male and female prisoners including all levels of care, staffing and space; and

4)   Continue to evaluate and pursue full services for mentally ill prisoners, including medication management, and acute, residential, and outpatient care.

Specific findings and recommendations regarding mental health services are provided below.

## IV. B.  Mental Health Care

B.  OPSO shall ensure constitutionally adequate intake, assessment, treatment, and monitoring of prisoners' mental health needs, including but not limited to, protecting the safety of and giving priority access to prisoners at risk for self-injurious behavior or suicide.  OPSO shall assess, on an annual or more frequent basis, whether the mental health services at OPP comply with the Constitution.  In order to provide mental health services to prisoners, OPSO, at a minimum, shall:

B.1.a. Develop and maintain comprehensive policies and procedures for appropriate screening and assessment of prisoners with mental illness.  These policies should include definitions of emergent, urgent, and routine mental health needs, as well as timeframes for the provision of services for each category of mental health needs.

Finding:  Substantial Compliance

During the site visit Wellpath demonstrated improved efforts to provide consistent response timelines, however implementation of the proposed and newly initiated timelines has not been measured.

Recommendation:  Wellpath has different timeframes for timeliness of responses; suggest review and revise for consistency.

B.1.b. Develop and implement an appropriate screening instrument that identifies mental health needs, and ensures timely access to a mental health professional when presenting symptoms require such care.  The screening instrument should include the factors described in Appendix B.  The screening instrument will be validated by a qualified professional approved by the Monitor within 180 days of the Effective Date and every 12 months thereafter, if necessary.



Finding:  Substantial Compliance

B.1.c. Ensure that all prisoners are screened by Qualified Medical Staff upon arrival to OPP, but no later than within eight hours, to identify a prisoner's risk for suicide or self-injurious behavior.  No prisoner shall be held in isolation prior to an evaluation by medical staff.

Finding:  Substantial Compliance

The annual review of the screening instrument has been implemented and Wellpath appropriately validated on March 6, 2019.

B.1.d. Implement a triage policy that utilizes the screening and assessment procedures to ensure that prisoners with emergent and urgent mental health needs are prioritized for services.

Finding:  Substantial Compliance

The triage policy has been implemented. Inmates in IPC are seen within 6 hours, with priorities sooner. Wellpath has provided data.

B.1.e. Develop and implement protocols, commensurate with the level of risk of suicide or self-harm, to ensure that prisoners are protected from identified risks for suicide or self-injurious behavior.  The protocols shall also require that a Qualified Mental Health Professional perform a mental health assessment, based on the prisoner's risk.

Finding:  Partial Compliance

The Columbia Suicide Risk Assessment with Wellpath modifications is in use. Additional changes were recommended by Tulane during the site visit.

<u>Recommendation:</u> Provide documentation and analysis of completion and consistent use of the Columbia Suicide Risk Assessment with modifications.

B.1.f. For prisoners with emergent or urgent mental health needs, search the prisoner and monitor with constant supervision until the prisoner is transferred to a Qualified Mental Health Professional for assessment.

Finding:  Partial Compliance

The staff and inmates report the practice is to hold inmates in front of the deputies' work station until transported to medical or a QMHP arrives. There needs to be better documentation of constant supervision and searches.



<u>Recommendation:</u> Provide documentation of searches and constant supervision by corrections security staff until mental health staff arrives and conducts assessment.

B.1.g. Ensure that a Qualified Mental Health Professional conducts appropriate mental health assessments within the following periods from the initial screen or other identification of need:

 (1)  14 days, or sooner, if medically necessary, for prisoners with routine mental health needs;

 (2)  48 hours, or sooner, if medically necessary, for prisoners with urgent mental health needs; and

 (3)  immediately, but no later than two hours, for prisoners with emergent mental health needs.

Finding:  Partial Compliance

<u>Recommendation:</u> Provide documentation that inmates in population (after IPC) receive appropriate assessments within these required timeframes.

B.1.h. Ensure that a Qualified Mental Health Professional performs a mental health assessment no later than the next working day following any adverse triggering event (i.e., any suicide attempt, any suicide ideation, or any aggression to self , resulting in serious injury).

Finding:  Substantial Compliance

 The increased staffing and coverage by Wellpath and Tulane has improved the timeliness of responses to adverse triggering events.

<u>Recommendation:</u>

Continue the process, and documentation and analysis of timeliness of responses to adverse triggering events as defined.

B.1.i. Ensure that a Qualified Mental Health Professional, as part of the prisoner's interdisciplinary treatment team, maintains a risk profile for each prisoner on the mental health case load based on the Assessment Factors identified in Appendix B, and develops and implements a treatment plan to minimize the risk of harm to each of these prisoners.

Finding: Partial Compliance

<u>Recommendation:</u> Provide documentation of timeliness of treatment plans for all inmates on the mental health caseload including risk profiles.

B.1.j. Ensure adequate and timely treatment for prisoners, whose assessments reveal mental illness and/or suicidal ideation, including timely and appropriate referrals for specialty care and visits with Qualified Mental Health Professionals, as clinically appropriate.

Finding: Partial Compliance



The timeliness and adequacy of treatment has improved for inmates in the area of psychiatric services, including individual counseling/treatment, and is slowly improving for group therapies; however, the services are not yet adequate for the total population in need, particularly female inmates. The inadequate security staffing, and lack of adequate space for programs adversely impacts access to treatment services.

<u>Recommendation:</u> Provide documentation of scheduled and completed adequate and timely treatment for inmates including individual and group treatments, and referrals for specialty services for male and female inmates.

B.1.k. Ensure crisis services are available to manage psychiatric emergencies. Such services include licensed in-patient psychiatric care, when clinically appropriate.

Finding: Non-Compliance

<u>Recommendation:</u> OPSO does not have access to any inpatient services for female inmates and access to non-licensed acute care services for male inmates at Hunt. Provide documentation that all psychiatric emergencies are sent to an emergency department and the crisis is adequately resolved. Provide documentation that all inmates have access to licensed inpatient psychiatric care, when clinically appropriate.

B.1.l. On an annual basis, assess the process for screening prisoners for mental health needs to determine whether prisoners are being appropriately identified for care. Based on this assessment, OPSO shall recommend changes to the screening system. The assessment and recommendations will be documented and provided to the Monitor.

Finding: Substantial Compliance

Annual report was provided by Wellpath on March 6, 2019; analysis was the screening process is working well and inmates are being appropriately identified for care. OPSO in its annual report did not recommend changes.

<u>Recommendation:</u> Continue to provide report of annual assessment and recommendations of the process for screening inmates for mental health needs to determine whether inmates are being appropriately identified for care.



## IV. B. 2. Treatment

B.2.a. Review, revise, and supplement its existing policies in order to implement a policy for the delivery of mental health services that includes a continuum of services, provides for necessary and appropriate mental health staff, includes a treatment plan for prisoners with serious mental illness, and collects data and contains mechanisms sufficient to measure whether care is being provided in a manner consistent with the Constitution.

Finding: Partial Compliance

Recommendation: Wellpath and OPSO have completed the majority of necessary policies. Suggest revision and completion of incomplete policies/procedures regarding services for use of clinical restraints, continuum of services for female inmates and counseling services for specific groups identified in this Consent Judgment.

B.2.b. Ensure that treatment plans adequately address prisoners' serious mental health needs and that the treatment plans contain interventions specifically tailored to the prisoner's diagnoses and problems.

Finding: Partial Compliance

Recommendation: Continue very good progress on documentation in treatment plans at OJC. Provide documentation of additional training and quality management review of treatment plans at Hunt.

B.2.c. Provide group or individual therapy services by an appropriately licensed provider where necessary for prisoners with mental health needs.

Finding: Partial Compliance

Inmates on the identified mental health caseload are receiving more group and individual services, however other specific populations as identified in this Consent Judgement are not receiving the required services, The staffing and space deficiencies continue and will continue to adversely impact the delivery of services until adequately remedied.

Recommendation: Provide documentation of data and analysis of numbers and percentages of inmates in need of individual and/or group therapies and counseling, and numbers and percentages of individual and group services offered and



received/completed for inmates in need. Continue and expand impressive data on Disruption of Services forms, and provide analysis of that data and corrective action plans.

**B.2.d. Ensure that mental health evaluations that are done as part of the disciplinary process include recommendations based on the prisoner's mental health status.**

Finding: Non- Compliance

<u>Recommendation:</u> Provide documentation that ensures mental health evaluations are done as part of the disciplinary process and include recommendations based on the inmate's mental health status.

**B.2.e. Ensure that prisoners receive psychotropic medications in a timely manner and that prisoners have proper diagnoses and/or indications for each psychotropic medication they receive.**

Finding: Partial Compliance

<u>Recommendation:</u> Continue very good improvement demonstrated with the addition of Tulane psychiatric providers. Provide documentation and analysis of data that inmates receive psychotropic medications in a timely manner and that inmates have proper diagnosis and/or indications for each psychotropic medication they receive.

**B.2.f. Ensure that psychotropic medications are administered in a clinically appropriate manner as to prevent misuse, overdose, theft, or violence related to the medication.**

Finding: Partial Compliance

There clearly remain serious challenges of medication/ substance misuse in OJC, however the medication administration process is for direct observation which appears to be consistent; more analysis is needed to determine the impact of other sources of medication misuse, overdose, theft, or violence.

**B.2.g. Ensure that prescriptions for psychotropic medications are reviewed by a Qualified Mental Health Professional on a regular, timely basis and prisoners are properly monitored.**

Finding: Substantial Compliance



There continue to be instances where inmates have raised concerns or questions about their medications. Wellpath and Tulane have improved medication management practices. Plaintiffs' have appropriately raised concerns and were present during review of their reported concerns with the Monitor during the site visit. Wellpath acknowledged and corrected errors/delays in appropriate medication and other issues. That does not excuse errors or failures but the landscape has changed regarding psychiatric care and medication management.

Recommendation: Continue to provide documentation of data collection and analysis of psychotropic medication prescriptions.

B.2.h. Ensure that standards are established for the frequency of review and associated charting of psychotropic medication monitoring, including monitoring for metabolic effects of second generation psychotropic medications.

Finding: Partial Compliance

Wellpath and Tulane have improved in appropriately implementing the Tool Kit recommended by the Monitors.

Recommendation: Provide documentation of data collection and analysis of psychotropic medication monitoring for metabolic effects of second generation psychotropic medications. Compliance has been compromised by variability in availability of corrections security staff and timeliness of laboratory services with associated inmate refusals.

## IV. B. 3. Counseling

B.3.a. OPSO shall develop and implement policies and procedures for prisoner counseling in the areas of general mental health/therapy, sexual-abuse counseling, and alcohol and drug counseling. This should, at a minimum, include some provision for individual services.

Finding: Partial Compliance

Recommendation: Provide policies and procedures specifically for inmate counseling in the areas of general mental health/therapy, sexual abuse counseling, and alcohol and drug counseling, including some provisions for individual services.

B.3.b. Within 180 days of the Effective Date, and quarterly thereafter, report all prisoner counseling services to the Monitor, which should include:
(1)  the number of prisoners who report having participated in general mental health/therapy counseling at OPP;



> (2)  the number of prisoners who report having participated in alcohol and drug counseling services at OPP;
> (3)  the number of prisoners who report having participated in sexual-abuse counseling at OPP; and
> (4)  the number of cases with an appropriately licensed practitioner and related one-to-one counseling at OPP.

Finding: Partial Compliance

<u>Recommendation:</u> Provide data and analysis for the numbers and percentages for inmates with needs for these specific services and numbers and percentages of inmates who receive these services. Compliance has been compromised by staffing deficiencies and lack of adequate space.

## IV. B. 4. Suicide Prevention Training Program

> B.4.a. OPSO shall ensure that all staff who supervise prisoners have the adequate knowledge, skill, and ability to address the needs of prisoners at risk for suicide.  Within 180 days of the Effective Date, OPSO shall review and revise its current suicide prevention training curriculum to include the following topics:
> (1)  suicide prevention policies and procedures (as revised consistent with this Agreement);
> (2)  analysis of facility environments and why they may contribute to suicidal behavior;
> (3)  potential predisposing factors to suicide;
> (4)  high-risk suicide periods;
> (5)  warning signs and symptoms of suicidal behavior;
> (6)  case studies of recent suicides and serious suicide attempts;
> (7)  mock demonstrations regarding the proper response to a suicide attempt;
> (8)  differentiating  suicidal and self-injurious behavior; and
> (9)  the proper use of emergency equipment.

Finding: Partial Compliance

      Wellpath is meeting the majority of these curriculum requirements.

<u>Recommendation:</u> Provide documentation of all staff who supervise inmates have the adequate knowledge, skill, and ability to address the needs of inmates at risk for suicide. Provide documentation the suicide prevention training curriculum includes all of the elements listed, and specifically to include (in addition to previously submitted documentation) elements (6) case studies of recent suicides and serious suicide attempts, (7) mock demonstrations regarding the proper response to a suicide attempt, (8) differentiating suicidal and self-injurious behavior, and (9) the proper use of emergency equipment.

> B.4.b. Ensure that all correctional, medical, and mental health staff are trained on the suicide screening instrument and the medical intake tool.

Finding: Partial Compliance



<u>Recommendation:</u> Provide documentation that all current correctional, medical, and mental health staff are trained on the suicide screening instrument and the medical intake tool.

B.4.c. Ensure that multi-disciplinary in-service training is completed annually by all correctional, medical, and mental health staff, to include training on updated policies, procedures, and techniques.  The training will be reviewed and approved by the Monitor.

Finding: Partial Compliance

<u>Recommendation:</u> Provide documentation that multidisciplinary in-service training has been completed annually for all current correctional, medical, and mental health staff, to include training on updated policies, procedures, and techniques.

B.4.d. Ensure that staff are trained in observing prisoners on suicide watch and step-down unit status.

Finding: Partial Compliance

Wellpath has provided additional training and increased supervision, and onsite  interviews of CNA's confirm improved understanding of their responsibilities and functions; however additional training, and supervision, including possible restructuring is recommended.

<u>Recommendation:</u> Provide documentation that current staff are trained, specifically, in observing prisoners on suicide watch and step-down status.

B.4.e. Ensure that all staff that have contact with prisoners are certified in cardiopulmonary resuscitation ("CPR").

Finding: Partial Compliance

<u>Recommendation:</u> Provide documentation that all current staff, (including OPSO and Wellpath) are certified in CPR.

B.4.f. Ensure that an emergency response bag, which includes a first aid kit and emergency rescue tool, is in close proximity to all housing units.  All  staff that has contact with prisoners shall know the location of this emergency response bag and be trained to use its contents.

Finding: Substantial Compliance



Onsite observations across visits by Monitors and documentation by OPSO confirm emergency response bags are in place, staff are trained and know the locations.

B.4.g. Randomly test five percent of relevant staff on an annual basis to determine their knowledge of suicide prevention policies.  The testing instrument and policies shall be approved by the Monitor.  The results of these assessments shall be evaluated to determine the need for changes in training practices.  The review and conclusions will be documented and provided to the Monitor.

Finding: Partial Compliance

Documentation of testing was presented; however it was unclear if the 5% tested are currently on staff.

Recommendation: Provide documentation of 5% of current relevant staff testing to determine their knowledge of suicide prevention policies, and evaluation of the results, review, and conclusions of the assessments to determine the need for changes in training practices.

## IV. B. 5. Suicide Precautions

B.5.a. OPSO shall implement a policy to ensure that prisoners at risk of self-harm are identified, protected, and treated in a manner consistent with the Constitution.

Finding: Partial Compliance

Recommendation: Provide documentation of utilization of suicide resistant cells and nonresistant cells (with direct observation), and treatment services provided to inmates at risk for self-harm.

B.5.b. Ensure that suicide prevention procedures include provisions for constant direct supervision of current suicidal prisoners and close supervision of special needs prisoners with lower levels of risk (at a minimum, 15 minute checks).  Correctional officers shall document their checks in a format that does not have pre-printed times.

Finding: Substantial Compliance

There continue to be instances where suicide watches/precautions have been very concerning, and the staffing, training and supervision issues must be continuously addressed, however the current leadership, and increase mental health staffing, including Tulane psychiatrists have very positively impacted



implementation of these provisions. The procedures include the required provisions.

<u>Recommendation:</u> Provide constant direct supervision for any inmate placed in a non-resistant cell on suicide watch, and documentation.

B.5.c. Ensure that prisoners on suicide watch are immediately searched and monitored with constant direct supervision until a Qualified Mental Health Professional conducts a suicide risk assessment, determines the degree of risk, and specifies the appropriate degree of supervision.

Finding: Partial Compliance

<u>Recommendation:</u> Provide documentation that demonstrates that inmates are immediately searched and monitored with constant direct supervision until a QMHP conducts a suicide risk assessment, determines the degree of risk, and specifies the appropriate degree of supervision.

B.5.d. Ensure that all prisoners discharged from suicide precautions receive a follow-up assessment within three to eight working days after discharge, as clinically appropriate, in accordance with a treatment plan developed by a Qualified Mental Health Care Professional.  Upon discharge, the Qualified Mental Health Care Professional shall conduct a documented in-person assessment regarding the clinically appropriate follow-up intervals.

Finding: Partial Compliance

Based on reports by mental health staff of being denied access to inmates on follow-up from suicide precautions during lockdowns, this requirement cannot be in substantial compliance.

<u>Recommendation:</u> Wellpath staff report they have been denied access to inmates for follow-up during lockdowns. This should not occur and recommend corrective action to assure all follow-up appointments are completed.

B.5.e. Implement a step-down program providing clinically appropriate transition for prisoners discharged from suicide precautions.

Finding: Partial Compliance

There have been some improvements in the step-down unit as reported by inmates and staff, including the removal of non-mentally ill inmates and more on unit programming; however more is needed for a consistent therapeutic milieu and programming. Step-down services and programming remain inadequate for



women.

Recommendation: The placements for male inmates in a true step-down/residential unit and program have begun, with the necessary exclusivity of an identified mentally ill population, however the programming is not yet sufficient although improved. Similar services and housing do not currently exist for female inmates. Recommend continued vigilance in developing these programs.

B.5.f. Develop and implement policies and procedures for suicide precautions that set forth the conditions of the watch, incorporating a requirement of an individualized clinical determination of allowable clothing, property, and utensils. These conditions shall be altered only on the written instruction of a Qualified Mental Health Professional, except under emergency circumstances or when security considerations require.

Finding: Partial Compliance

Recommendation: Policy is in place. Provide documentation of implementation of policy regarding individualized determinations of the conditions of watch at OJC (especially for suicide watches/direct observation in non-resistant cells), and at Hunt.

B.5.g. Ensure that cells designated by OPSO for housing suicidal prisoners are retrofitted to render them suicide-resistant (e.g., eliminating bed frames/holes, sprinkler heads, water faucet lips, and unshielded lighting or electrical sockets).

Finding: Partial Compliance

Recommendation: OPSO reports 12 suicide resistant cells for OJC and 3 suicide resistant cells at Hunt. Facility staff utilize non-suicide resistant cells at both facilities for overflow. When overflow cells are utilized, it is strongly recommended the inmates in those cells be placed on direct constant observation to best provide for their safety.

B.5.h. Ensure that every suicide or serious suicide attempt is investigated by appropriate mental health and correctional staff, and that the results of the investigation are provided to the Sheriff and the Monitor.

Finding: Partial Compliance

The Morbidity and Mortality reviews have expanded to begin to review serious suicide attempts; more self-critical analysis of findings of the reviews is necessary.



<u>Recommendation:</u> Continue to expand Morbidity and Mortality reviews, including aggregation of data, self-critical analysis and corrective action plans.

B.5.i. Direct observation orders for inmates placed on suicide watch shall be individualized by the ordering clinician based upon the clinical needs of each inmate, and shall not be more restrictive than is deemed necessary by the ordering clinician to ensure the safety and well being of the inmate.

Finding: Substantial Compliance

The addition of Tulane psychiatrists and integration with Wellpath staff has substantially improved this process.

B.5.j. Provide the Monitor a periodic report on suicide and self-harm at the Facility.  These periodic reports shall be provided to the monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement.  The report will include the following:
(1)  all suicides;
(2)  all serious suicide or self-harm attempts; and
(3)  all uses of restraints to respond to or prevent a suicide attempt.

Finding: Partial Compliance

<u>Recommendation</u>: OPSO and Wellpath provide reports on suicides, suicide attempts and self harm, however the numbers differ significantly. Provide documentation for each category, with resolution of inconsistencies based on review and discussion in the bi-annual reports.

B.5.k. Assess the periodic report to determine whether prisoners are being appropriately identified for risk of self-harm, protected, and treated.  Based on this assessment, OPSO shall document recommended changes to policies and procedures and provide these to the Monitor.

Finding: Partial Compliance

The reports have been discussed and recently provided, however documentation of analysis of the findings and assessment is needed.

<u>Recommendation:</u> Provide an assessment of the periodic reports required in B.5.j., above.

## IV. B. 6. Use of Restraints

B.6.a. OPSO shall prevent the unnecessary or excessive use of physical or chemical restraints on prisoners with mental illness.

Finding: Partial Compliance



Recommendation: Provide documentation/information regarding use of de-escalation techniques at OJC and Hunt.

**B.6.b. Maintain comprehensive policies and procedures for the use of restraints for prisoners with mental illness consistent with the Constitution.**

Finding: Partial Compliance

There has been significant progress in resolving differences in policies, including reviews and discussion on site. Wellpath and OPSO continue to report no use of clinical restraints for inmates in OJC.

Recommendation: Complete comprehensive policies for OPSO compatible with Wellpath policy.

**B.6.c. Ensure that approval by a Qualified Medical or Mental Health Professional is received and documented prior to the use of restraints on prisoners living with mental illness or requiring suicide precautions.**

Finding: Partial Compliance

Recommendation: Complete comprehensive policies. Define and document process of indications and/or notifications from OPSO regarding possible need or use of restraints.

**B.6.d. Ensure that restrained prisoners with mental illnesses are monitored at least every 15 minutes by Custody Staff to assess their physical condition.**

Finding: Partial Compliance

Recommendation: Complete comprehensive policies. Provide documentation of monitoring as necessary; very strongly suggest monitoring should be constant rather than 15 minutes.

**B.6.e. Ensure that Qualified Medical or Mental Health Staff document the use of restraints, including the basis for and duration of the use of restraints and the performance and results of welfare checks on restrained prisoners.**

Finding: Partial Compliance

Recommendation: Complete comprehensive policies. Provide documentation of use of restraints as necessary.


Orleans Parish
JAIL MONITORS

B.6.f. Provide the Monitor a periodic report of restraint use at the Facility. These periodic reports shall be provided to the monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. Each report shall include:
    (1) A list of prisoners whom were restrained;
    (2) A list of any self-injurious behavior observed or discovered while restrained; and
    (3) A list of any prisoners whom were placed in restraints on three or more occasions in a thirty (30) day period or whom were kept in restraints for a period exceeding twenty-four (24) hours.

Finding: Partial Compliance

Recommendation: OPSO and Wellpath report no use of clinical or therapeutic restraints. Provide supporting documentation, based on incident reports and transports to outside hospitals where acute mental illness and/or agitation based on mental health dysfunction is causation.

B.6.g. Assess the periodic report to determine whether restraints are being used appropriately on prisoners with mental illness. Based on this assessment, OPSO shall document recommended changes to policies and procedures and provide these to the Monitor.

Finding: Partial Compliance

Recommendation: Provide comprehensive report with supporting documentation that clinical or therapeutic restraints have not been used nor should have been used in the treatment and management of inmates.

## IV. B. 7. Detoxification and Training

7.a. OPSO shall ensure that all staff who supervise prisoners have the knowledge, skills, and abilities to identify and respond to detoxifying prisoners. Within 180 days of the Effective Date, OPSO shall institute an annual in-service detoxification training program for Qualified Medical and Mental Health Staff and for correctional staff. The detoxification training program shall include:
    (1)    annual staff training on alcohol and drug abuse withdrawal;
    (2)    training of Qualified Medical and Mental Health Staff on treatment of alcohol and drug abuse conducted by the Chief Medical Officer or his or her delegate;
    (3)    oversight of the training of correctional staff, including booking and housing unit officers, on the policies and procedures of the detoxification unit, by the Chief Medical Officer or his or her delegate;
    (4)    training on drug and alcohol withdrawal by Qualified Medical and Mental Health Staff;
    (5)    training of Qualified Medical and Mental Health Staff in providing prisoners with timely access to a Qualified Mental Health Professional, including psychiatrists, as clinically appropriate; and
    (6)    training of Qualified Medical and Mental Health Staff on the use and treatment of withdrawals, where medically appropriate.



Finding:  Partial compliance

Qualified Medical and Mental Health Staff are trained regarding care for patients who have orders for monitoring and treatment of withdrawal.  Only half of corrections security staff are trained.

<u>Recommendation</u>: Increase training of corrections security staff from 50% to close to 100%.  Develop program oversight and evaluation.

7.b. Provide medical screenings to determine the degree of risk for potentially life-threatening withdrawal from alcohol, benzodiazepines, and other substances, in accordance with Appendix B.

Finding: Substantial Compliance

Incoming inmates are screened for withdrawal, in accordance with Appendix B,  Wellpath quarterly performance measurement demonstrates sustained compliance.  Monitors find Wellpath measurement reliable, through medical record review.

7.c. Ensure that the nursing staff complete assessments of prisoners in detoxification on an individualized schedule, ordered by a Qualified Medical or Mental Health Professional, as clinically appropriate, to include observations and vital signs, including blood pressure.

Finding: Partial Compliance

Wellpath quarterly performance measurement and Monitor's reliability audits demonstrate that nursing care for inmate patients on the detoxification protocol has improved, however, an insufficient proportion of nursing assessments are timely, excluding those that are out of staff control, such as "out to Court."

<u>Recommendation</u>:  Enforce timely assessments on inmate patients who are on the detoxification protocol.

7.d. Annually, conduct a review of whether the detoxification training program has been effective in identifying concerns regarding policy, training, or the proper identification of and response to detoxifying prisoners. OPSO will document this review and provide its conclusions to the Monitor.

Finding:  Non-Compliance

An annual review has not been conducted during the past year, according to Wellpath.



<u>Recommendation</u>: Conduct annual review of the detoxification training and implementation and report on effectiveness to the Monitors.

## IV. 8. Medical and Mental Health Staffing

8.a. OPSO shall ensure that medical and mental health staffing is sufficient to provide adequate care for prisoners' serious medical and mental health needs, fulfill constitutional mandates and the terms of this Agreement, and allow for the adequate operation of the Facility, consistent with constitutional standards.

Finding: Partial Compliance

Medical and mental health staffing is sufficient for most care functions. However, there is insufficient funding and mental health staffing for groups and special programs, as required in the Consent Judgment. A proposal has been submitted for these staff.

<u>Recommendation</u>:  Fund and authorize mental health staff for special programs, as per Wellpath proposal.  Cross-train staff for grievance review, response, and analysis.  OPSO to ensure sufficient corrections security staffing for efficient and timely health care operations.

8.b. Within 90 days of the Effective Date, OPSO shall conduct a comprehensive staffing plan and/or analysis to determine the medical and mental health staffing levels necessary to provide adequate care for prisoners' mental health needs and to carry out the requirements of this Agreement.  Upon completion of the staffing plan and/or analysis, OPSO shall provide its findings to the Monitor, SPLC, and DOJ for review.  The Monitor, SPLC, and DOJ will have 60 days to raise any objections and recommend revisions to the staffing plan.

Finding: Substantial Compliance

The Monitors approve the current staffing plan, including the staff proposed by the vendor to OPSO and the City.

## IV. B. 9. Risk Management

B.9.a. OPSO shall develop, implement, and maintain a system to ensure that trends and incidents involving avoidable suicides and self-injurious behavior are identified and corrected in a timely manner.  Within 90 days of the Effective Date, OPSO shall develop and implement a risk management system that identifies levels of risk for suicide and self-injurious behavior and requires intervention at the individual and system levels to prevent or minimize harm to prisoners, based on the triggers and thresholds set forth in Appendix B.

Finding: Partial Compliance

<u>Recommendation</u>: Provide documentation of a system of data collection and analysis of trends and incidents involving avoidable suicides and self-injurious



behaviors to determine required interventions at the individual and system levels to prevent or minimize harm to inmates.

B.9.b. The risk management system shall include the following processes to supplement the mental health screening and assessment processes:  incident reporting, data collection, and data aggregation to capture sufficient information to formulate a reliable risk assessment at the individual and system levels; identification of at-risk prisoners in need of clinical treatment or assessment by the Interdisciplinary Team or the Mental Health Committee; and development and implementation of interventions that minimize and prevent harm in response to identified patterns and trends.

Finding: Partial Compliance

Recommendation: Provide documentation of analysis of risk management system processes including the listed criteria, with more attention to data aggregation and analysis, and development and implementation of interventions that minimize and prevent harm in response to identified patterns and trends.

B.9.c. OPSO shall develop and implement an Interdisciplinary Team, which utilizes intake screening, health assessment, and triggering event information for formulating treatment plans.  The Interdisciplinary Team shall:
(1) include the Medical and Nursing directors, one or more members of the psychiatry staff, counseling staff, social services staff, and security staff, and other members as clinical circumstances dictate;
(2) conduct interdisciplinary treatment rounds, on a weekly basis, during which targeted patients are reviewed based upon screening and assessment factors, as well as triggering events; and
(3) provide individualized treatment plans based, in part, on screening and assessment factors, to all mental health patients seen by various providers.

Finding: Partial Compliance

Recommendation: Provide documentation of completion of mental health Interdisciplinary treatment team meetings and rounds, and provision of individualized treatment plans to all mental health patients seen by various providers at OJC and Hunt.

B.9.d. OPSO shall develop and implement a Mental Health Review Committee that will, on a monthly basis, review mental health statistics including, but not limited to, risk management triggers and trends at both the individual and system levels.  The Mental Health Review Committee shall:
(1) include the Medical and Nursing Director, one or more members of the psychiatry staff and social services staff, the Health Services Administrator, the Warden of the facility housing the Acute Psychiatric Unit, and the Risk Manager.
(2) identify at-risk patients in need of mental health case management who may require intervention from and referral to the Interdisciplinary Team, the OPSO administration, or other providers.
(3) conduct department-wide analyses and validation of both the mental health and self-harm screening and assessment processes and tools, review the quality of screenings and assessments



and the timeliness and appropriateness of care provided, and make recommendations on changes and corrective actions;

(4) analyze individual and aggregate mental health data and identify trends and triggers that indicate risk of harm;

(5) review data on mental health appointments, including the number of appointments and wait times before care is received; and

(6) review policies, training, and staffing and recommend changes, supplemental training, or corrective actions.

Finding: Partial Compliance

Wellpath has a functioning Mental Health Review Committee. The committee collected data and information, particularly with regard to missed or cancelled access to mental health appointments due to deputy staffing shortages. Analysis of data regarding trends and utilization of mental health services for safety concerns are necessary.

<u>Recommendation</u>: Provide documentation of Mental Health Review Committee meetings addressing all the listed elements.

B.9.e. OPSO shall develop and implement a Quality Improvement and Morbidity and Mortality Review Committee that will review, on at least a quarterly basis, risk management triggers and trends and quality improvement reports in order to improve care on a Jail-wide basis.

(1) The Quality Improvement Committee shall include the Medical Director, the Director of Psychiatry, the Chief Deputy, the Risk Manager, and the Director of Training. The Quality Improvement Committee shall review and analyze activities and conclusions of the Mental Health Review Committee and pursue Jail-wide corrective actions.

(2) The Quality Improvement Committee shall:

i. monitor all risk management activities of the facilities through the review of risk data, identification of individual and systemic trends, and recommendation and monitored implementation of investigation or corrective action; and

ii. generate reports of risk data analyzed and corrective actions taken.

Finding: Partial Compliance

Wellpath has a functioning Quality Improvement Committee. There is insufficient participation at committee meetings by OPSO staff, as per QIC and MAC meeting attendance lists. Performance data is collected, however there is insufficient reporting of trended data, qualitative analysis, and corrective action plans in the meeting minutes. According to the minutes, risk management activities such as morbidity and mortality reviews, grievance analysis, and sanitation do not appear to be addressed at the meetings. The medical and psychiatric staff report a



large number of obstacles to access because of corrections security staff.  There are insufficient data to support these credible anecdotes.

<u>Recommendation</u>:  Incorporate performance data, analysis, and trending into QI committee minutes.  Improve analysis and corrective action plans generally, with specificity for root cause analysis, process design, and effective improvement strategies.  Continue to improve reliability of clinical performance measurement.  Ensure that the Chief Deputy (or equivalent) and Director of Training participate in meetings, with documentation.  Collect and report reliable data on visit disruptions due to the unavailability of corrections security staff for escort and/or transportation.

B.9.f. OPSO shall review mortality and morbidity reports quarterly to determine whether the risk management system is ensuring compliance with the terms of this Agreement.  OPSO shall make recommendations regarding the risk management system or other necessary changes in policy based on this review. The review and recommendations will be documented and provided to the Monitor.

Finding:        Non - Compliance

Wellpath has just begun morbidity reviews on suicide attempts.  The mortality and morbidity reviews are perfunctory and lack self-critical analysis.  Corrective action plans are not well-documented and there is no annual review of findings.

<u>Recommendation</u>: Enhance analysis and problem identification in morbidity and mortality reviews.  Improve corrective action plans generally, with specificity for root cause analysis, process design, and effective improvement strategies.



## IV. C.   Medical Care

### IV. C. 1. Quality Management of Medication Administration

OPSO shall ensure constitutionally adequate treatment of prisoners' medical needs.  OPSO shall prevent unnecessary risks to prisoners and ensure proper medication administration practices.  OPSO shall assess on an annual or more frequent basis whether the medical services at OPP comply with the Constitution.  At a minimum, OPSO shall:

1. Quality Managing of Medication Administration:
   a. Within 120 days of the Effective Date, ensure that medical and mental health staff are trained on proper medication administration practices, including appropriately labeling containers and contemporaneously recording medication administration;
   b. Ensure that physicians provide a systematic review of the use of medication to ensure that each prisoner's prescribed regimen continues to be appropriate and effective for his or her condition;
   c. Maintain medication administration protocols that provide adequate direction on how to take medications, describe the names of the medications, how frequently to take medications, and identify how prisoners taking such medications are monitored; an
   d. Maintain medication administration protocols that prevent misuse, overdose, theft, or violence related to medication.

Findings:
C.1.a. – Substantial compliance
C.1.b. – Partial compliance
C.1.c. – Substantial compliance
C.1.d. – Substantial compliance

a.  Wellpath provided documentation on training for medication administration.

b.   Wellpath reliably monitors clinical performance for urgent and chronic conditions.  Performance has improved over time.  There are opportunities for further improvement with care for chronic disease and laboratory testing for patients on psychotropic medications.

c.  Protocols for direction on medication is acceptable.

d.  Protocols  inventory integrity and safety are acceptable.

<u>Recommendation:</u>  Continue to improve performance on conformance to chronic disease protocols for medical and psychiatric conditions.

### IV. C. 2. Health Care Delivered

2.a. Provide the Monitor a periodic report on health care at the Facility.  These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement.  Each report will include:
   (1) number of prisoners transferred to the emergency room for medical treatment related to medication errors;



(2)   number of prisoners taken to the infirmary for non-emergency treatment related to medication errors;
(3)   number of prisoners prescribed psychotropic medications;
(4)   number of prisoners prescribed "keep on person" medications; and
(5)   occurrences of medication variances.
2.b. Review the periodic health care delivery reports to determine whether the medication administration protocols and requirements of this Agreement are followed.  OPSO shall make recommendations regarding the medication administration process, or other necessary changes in policy, based on this review.  The review and recommendations will be documented and provided to the Monitor.

Finding:
C.2.a. –Non-Compliance
C.2.b. – Non- Compliance

Neither OPSO nor Wellpath have provided recent periodic reports to the Monitors.

C.2.a. - Recommendation: Provide reports every six months.

C.2.b. – Recommendation: Review reports, once written, and make

recommendations.

## IV. C. 3. Release and Transfer

3.a. OPSO shall notify Qualified Medical or Mental Health staff regarding the   release of prisoners with serious medical and/or mental health needs from OPSO custody, as soon as such information is available.
3.b. When Qualified Medical or Mental Health staff are notified of the release of prisoners with serious medical and/or mental health needs from OPSO custody, OPSO shall provide these prisoners with at least a seven-day supply of appropriate prescription medication, unless a different amount is necessary and medically appropriate to serve as a bridge until prisoners can reasonably arrange for continuity of care in the community.
3.c. For all other prisoners with serious medical and/or mental health needs who are released from OPSO custody without advance notice, OPSO shall provide the prisoner a prescription for his or her medications, printed instructions regarding prescription medications, and resources indicating where prescriptions may be filled in the community.
3.d. For prisoners who are being transferred to another facility, OPSO shall prepare and send with a transferring prisoner, a transition summary detailing major health problems and listing current medications and dosages, as well as medication history while at the Facility. OPSO shall also supply sufficient medication for the period of transit for prisoners who are being transferred to another correctional facility or other institution, in the amount required by the receiving agency.

Findings:
3.a. – Partial Compliance
3.b. - Partial Compliance
3.c. – Partial Compliance
3.d. – Substantial compliance

OPSO has improved notice to qualified staff, especially through the posting of a

nurse in the discharge area.  The proportion of patients with serious needs reached is

increasing, yet the total numbers are low.  Once identified, the patients are receiving either



a supply or a prescription that can be filled at no cost.  For those released without advance notice, it is difficult to arrange for a prescription; however, inmates with serious needs are notified during their incarceration as to how to get a prescription once they leave.  Transfer information and medication appears to be working well.

C.3.a.- Recommendation: Improve notifications.

C.3.b. -Recommendations:  Build on recent progress to increase numbers.  Continue to counsel patients face-to-face.

C.3.c. - Comment:  If there is no notice, it is not possible to provide prescriptions. Partial is achieved through pre-release notification to patients.



## IV. D. Sanitation and Environmental Conditions

### Introduction

This report summarizes the compliance findings for the Sanitation, Environmental Conditions and Fire and Life Safety provisions of the Consent Judgment. The findings are based both on the Monitor's tour conducted January 14-17, 2019, and review of materials provided prior to the on-site work.  The Monitor toured: inmate housing units in the Orleans Justice Center (OJC), the Temporary Detention Center (TDC), and the Kitchen/Warehouse/Central Plant. The Monitor spoke with inmates, deputies, and supervisors.

Since the previous tour in June 2018, there is progress toward substantial compliance with the Sanitation and Environmental Conditions and Fire and Life Safety provisions including:

- Establishing and implementing a regular cleaning schedule
- Establishing and implementing a process to provide timely notification to the Sanitarian of incidents involving biohazard spills and use of biohazard clean-up kits; and
- Improving sanitation, reduced clutter in cells and dayrooms in most the housing units observed, and fewer obstructed HVAC supply/return grills in inmate housing areas.

### V. D. 1.  Sanitation and Environmental Conditions

IV. D. 1. a.  OPSO shall provide oversight and supervision of routine cleaning of housing units, showers, and medical areas.  Such oversight and supervision will include meaningful inspection processes and documentation, as well as establish routine cleaning requirements for toilets, showers, and housing units to be documented at least once a week but to occur more frequently.

Finding: Partial Compliance

Observations:

OPSO provided a cleaning schedule/supervisor inspection check list that identifies the frequency of housekeeping, by area, for both OJC and TDC. However, no evidence was provided to demonstrate implementation.

The Sanitarian and Environmental Officer reported to the Monitor that the ability to maintain regular cleaning schedules had improved since the last



compliance tour, but is still a challenge. The Life Safety and Sanitation inspection documentation provided by OPSO consistently showed "housekeeping" issues primarily in inmate living areas.   The Sanitarian reported that no Safety and Sanitation Deputies (SSDs) are assigned full-time to these duties due to lack of overall staffing, and if SSDs are placed on the daily staffing roster, they are re-assigned from managing housekeeping and chemical control to assist with other line and support functions.  A review of a ten-day sample of staffing reports for OJC for the November 2018 found that a sanitation officer was assigned on 50% of the days, with the same person most often assigned to all four floors.  The post for laundry deputy was filled on one shift during the sample period.

OPSO has also developed a "Pod Daily and Weekly Cleaning Schedule Checklist." The checklist is to be completed daily by the deputy assigned to a housing unit and submitted weekly to the Safety Sanitation Deputy (SSD). There was no evidence provided that the checklist process has been implemented since the last compliance tour.

The Monitor observed the on-going housekeeping issues and noted the level of overall cleanliness to be improved since the last inspection except for several showers and cells, primarily in lockdown and high security pods. Attention to cleanliness in single/two-person cell pods and showers in these areas (typically lockdown units) is needed.

Inmates reported inadequate or missing cleaning supplies. The Monitor observed supplies to be missing from the carts and supply closets in several inmate living areas and excess supplies found in others. The Monitor observed in the supply closets unauthorized chemicals (e.g. Tilex, bleach) with no Material Safety Data Sheets provided.   The Monitor observed spray bottles containing cleaning substances not stored in the required central location.  Inmates had the spray bottes in the open dorms and in individual cells.  Such an absence of inmate supervision prevents the supplies from being used throughout the unit, and may result in shortages of cleaning chemicals. Unsupervised access by inmates to the equipment and concentrated chemicals still presents a potential



safety and security risk to both inmates and staff.

The Monitor also observed in most every housing pod that the chemical concentrate dispensers located in the supply closets appeared to be in generally good condition and working order. The Monitor observed one pod's outer door to the supply closet blocked open and the inner door open allowing unsupervised access to the chemicals by inmates. The closet had spray bottles/chemicals missing. When asked by the Monitor, the two deputies assigned to the pod said they had neither inspected the closet as required nor were monitoring the inmates accessing the closet. These findings indicate either a lack of training or unit supervision on the part of the deputies assigned to the units.

Based on the findings in Compliance Report # 6, OPSO purchased two "All Surface Cleaning" machines to clean inmate shower floors. These machines are used by the Environmental Officer on an as-needed basis to supplement regular cleaning by inmate workers.

Integral to sanitation, infection control and disease prevention is regular the provision of clean inmate clothing and bedding and appropriate inventory of these supplies.  The inmate laundry function for uniforms and bedding is currently contracted to an outside vendor. The laundry exchange plan calls for inmate uniforms to be exchanged twice weekly.  Inmates' personal laundry (e.g. underwear, shorts) are left to the inmates to wash and dry, using machines located in each housing unit.

The Sanitarian reports that inventory issues for uniforms have been resolved, however, adequate uniform storage space in the OJC hinders and limits the uniform exchange to weekly. This practice leads to inmates hoarding uniforms.

The absence of inmate supervision results in inmates destroying or altering uniform items for other than their intended purpose. The Monitor observed, in the several of inmate living areas inspected, an excessive number and/or altered uniform items. The hoarding of uniforms presents sanitation and infection control issues.  Because of the lack of predictability in receiving clean uniforms, inmates wash uniform items either in hand sinks or the washing machines, then hang the clothing from bunks to dry.  This practice further erodes sanitation and results in



the drying clothing blocking the view of deputies.   The clothes dryers located in OJC's inmate housing units intended to dry inmates' personal clothing continue to need repairs and are routinely vandalized – thus creating contraband and significant security issues. The volume of washing and drying of inmates' personal laundry appears to be beyond the capacity of the current equipment, especially as there is no preventive maintenance. As noted in previous Compliance Reports, the dryers are in dangerous condition:

- Several driers had the flexible vent tubing entirely missing.

- Several driers were pushed against the wall rendering the vent tubing ineffective and a potential fire hazard due to lint accumulation.

- Driers in at least two units were being used by inmates to "heat" water for mixing with commissary coffee, soup packets, etc.

The current physical and maintenance conditions of the dryers continue to pose safety and security issues for inmates and deputies including potential fire hazards from the lint.

The Sanitarian continues to conduct bi-weekly inspections of all housing units. The Monitor reviewed the reports for July - December 2018 which consistently identified the same housekeeping issues by cell and pod location. Examples of these issues include, but not limited to:

- Accumulation of lint behind dryers resulting from missing or broken dryer vents in numerous OJC housing units. The Monitor also noted orange lint accumulating on several return air vents, particularly in dorm pods, indicating that significant amounts of drier lint becomes airborne and circulates in these areas.   The accumulation of such organic material can promote the growth of mold and mildew on surfaces if not regularly inspected and cleaned.

- In both open dorms and in cells inmates' personal items (paperwork, commissary purchases, and other approved items) are not stored as required in OJC's Inmate Handbook in the personal property bags provided



by OJC.

- Inmates appear to be blocking numerous supply and return air vents to reduce air flow and change the cell's temperature.

- Several lower bunks are wrapped with a blanket to prevent deputy's observation of the inmate in both dorm pods and individual cells.

- Complaints from inmates of cleaning chemicals not available.

- Excess inmate uniforms and blankets in cells and dorms.

- Broken glass panels in cell doors and windows shower windows (three locations).

- Graffiti on walls in dormitories and cells (improved since last compliance tour).

IV. D. 1. b. Continue the preventive maintenance plan to respond to routine and emergency maintenance needs, including ensuring that showers, toilets, and sink units are adequately installed and maintained.  Work orders will be submitted within 48 hours of identified deficiencies, or within 24 hours in the case of emergency maintenance needs.

Findings:     Substantial Compliance

Observations:

The Monitor reviewed the Sanitation and Environmental Conditions report from August 2018, a maintenance operations executive summary report, and other supporting documentation provided by the Maintenance supervisor. The documentation reflected an on-going preventive maintenance program for major building systems and components consistent with OPSO policy and the Consent Judgment.

For routine mechanical, electrical and plumbing work orders, OPSO Policy 601.02, Reporting and Addressing/Repairing Maintenance Needs, specifically requires that any staff member observing a maintenance issue "shall call the CMMS work order facilitator" to report the issue, "or leave a message".  OPSO has recently implemented a revised procedure whereby pod deputies are now required to inspect their assigned posts at the beginning of the shift noting any maintenance issues on a paper inspection form. This form is provided to the on-duty unit managers who forward the form to the facility captain for review and the captain's submission of necessary work orders. The forms are maintained by



command staff for review. This procedure has not been in effect for sufficient time for the Monitor to determine its effectiveness in meeting the requirements of the Consent Judgment that "Work orders will be submitted within 48 hours of identified deficiencies, or within 24 hours in the case of emergency maintenance needs". A review of work orders showed that routine plumbing and electrical repairs were completed within one to three business days once the issue was reported.

IV. D. 1. c. Maintain adequate ventilation throughout OPSO facilities to ensure that prisoners receive adequate air flow and reasonable levels of heating and cooling.  Maintenance staff shall review and assess compliance with this requirement, as necessary, but no less than twice annually.

Findings:   Partial Compliance

Observations:

Adequate air flow is maintained in the facilities, and is impeded in some housing units by inmates' blocking air vents. Test and balance reports for the Kitchen/Warehouse (2014), OJC (2017) and TDC (2012) were provided. The reports noted numerous exceptions regarding improper installation or non-testable devices/fixtures. No documentation was provided to demonstrate those issued had been subsequently corrected. Lacking is documentation that a comprehensive review and assessment of compliance has taken place twice annually.

IV. D. 1. d. Ensure adequate lighting in all prisoner housing units and prompt replacement and repair of malfunctioning lighting fixtures in living areas within five days, unless the item must be specially ordered.

Findings: Substantial Compliance

Observations:

Sufficient lighting is provided in housing units of both OJC and TDC. OJC continues to maintain a supply of replacement bulbs, transformers, or ballasts to repair malfunctioning lighting. At this tour, there were no outstanding electrical work orders beyond routine bulb replacement.

IV. D. 1. e. Ensure adequate pest control throughout the housing units, including routine pest control spraying on at least a quarterly basis and additional spraying as needed.

Findings:  Substantial Compliance



Observations:

A review of the documentation submitted found sufficient evidence of a pest control program that meets the intent of the Consent Judgment.

OPSO continues to maintain a pest control contract with a State licensed company resulting in monthly service for all housing areas and bi-weekly service for the Kitchen/Warehouse.

"Drain flies" were noted in and around the toilet and drain in the IPC "roll out" changing rooms and on restroom and shower walls in several pods. Advice from the pest control contractor was provided to the Environmental Officer on how to best address the issue of drain flies. Two non-functioning bug lights were observed in a food storage area of the main kitchen facility. These issues were pointed out to staff and the pest control contractor was on-site the next day to replace bulbs and fixtures.

Environmental, Sanitation and Life-Safety staff performing inspections and responding to pest control grievances are now initiating work orders for pest control issues to document how, when and where issues are identified and remedied.

IV. D. 1.f. Ensure that any prisoner or staff assigned to clean a biohazardous area is properly trained in universal precautions, outfitted with protective materials, and properly supervised.

Findings: Partial Compliance

Observations:

Policy 1101.07, "Bio-hazardous Spill Cleaning Procedures" [Revised 1/18/2018] Section VIII. A. 1 has been revised to allow both deputies and inmates who are properly trained and equipped to perform bio-hazardous spill cleanup procedures. Training materials were devised by the Sanitarian and training was provided to designated inmates, and documentation provided. This section remains in partial compliance until the recently -implemented reporting process can be verified again during the next compliance tour.

Gaps in the implementation of the procedures included the timely notification of the Sanitation and/or Environmental Officer of bio-hazard incidents. As of November 2018, the Sanitation and/or Environmental Officer is



required to be notified of such incidents each business day to enable them to replace any bio-hazard clean up protective materials used and inspect the area to ensure it was properly cleaned and sanitized. The Sanitarian reported that timeliness of notification has improved since the implementation of the new process.

Training curricula and documentation indicated that all staff are receiving initial training in bio- hazardous cleanup procedures.

**IV. D. 1. g.** Ensure the use of cleaning chemicals that sufficiently destroy the pathogens and organisms in biohazard spills.

Findings: Substantial Compliance

Observations:

The Monitor observed that the chemicals on-hand and available to staff were sufficient to destroy the pathogens and organisms in biohazard spills common in the jail environment.

**IV. D. 1. h.** Maintain an infection control plan that addresses contact, blood borne, and airborne hazards and infections.  The plan shall include provisions for the identification, treatment, and control of Methicillin-Resistant Staphylococcus Aureus ("MRSA") at the Facility.

Findings: Partial compliance

Observations:

OPSO submitted infection control policy 1201.11.  This policy does not include "provisions for the identification, treatment and control of" MRSA. The medical contractor's policy on infection control is included in 1201.11 by reference, but was not provided to the Monitors for this compliance tour.

OPSO has provided for annual review the policy and SOP for the handling of inmate mattresses to include staff and/or inmate training program for sanitation that includes mattress cleaning, and chemical use and control. This procedure is specifically required by the Infection Control Plan. The Monitor observed that mattresses improperly stored in an outside hallway at the TDC facility during previous tours had been corrected. The Monitor recommended that wooden pallets used for clean mattress storage in the OJC



be exchanged for plastic or metal pallets. This exchange was made prior to the end of this compliance tour.

## IV. D. 2. Environmental Control

**IV. D. 2. a.** OPSO shall ensure that broken or missing electrical panels are repaired within 30 days of identified deficiencies, unless the item needs to be specially ordered.

Findings: Substantial Compliance

Observations:

OPSO Policies 601.02 "Reporting and Addressing Maintenance Needs" and Policy 601.03 "Preventive Maintenance" [August 15, 2016] and are implemented. Major electrical panels at OJC and TDC are located in secure maintenance spaces inaccessible to inmates.

**IV. D. 2. b.** Develop and implement a system for maintenance and timely repair of electrical panels, devices, and exposed electrical wires.

Findings: Substantial Compliance

Observations:

Exposed/damaged wiring/cabling was observed during the previous compliance tour in several housing pod cleaning supply closets were repaired immediately prior to the current compliance tour.

## IV. D. Sanitation and Environmental Conditions

## IV. D. 3. Food Service

This report summarizes the findings for the Food Service provisions of the Consent Judgment based on the Monitor's document reviews and tour conducted January 14-16, 2019. The Monitor inspected the Orleans Justice Center (OJC) Kitchen/Warehouse; observed meal service activities; and spoke with OPSO supervisors and deputies, CBM Summit's employees (the contracted food service provider), inmate kitchen workers, and inmates in housing units.

Since the last tour, (June 11-12, 2018), there has been progress toward compliance with the Food Service provisions. One of the most significant improvements was moving the production of meal trays to the main kitchen and discontinuing the practice of transporting pans of heated foods to the 2nd floor OJC Kitchen for meal tray production. Even though food temperature violations that place inmates at risk of food-borne illnesses



were found during this tour, performing the meal tray production activities in the main kitchen facility allows for quicker corrective action when food temperature problems are found.

However, concerning is that the final versions of the 1001.01, Meal Preparation and Transport and 1001.04, Food Service Inspections and Reviews policies have not been provided to the Monitor and revisions have not been provided since prior to the June 2018 tour.

The OJC reported grievances for January through November 2018 indicates that 447 food service grievances were filed, which represents 9.5% of the total grievances for the 11-month period.  This is the fourth highest category of grievances behind Facility/Miscellaneous, Medical, and Environmental/Sanitation Complaints.

IV. D. 3. a. OPSO shall ensure that food service staff, including prisoner staff, continues to receive in-service annual training in the areas of food safety, safe food handling procedures, and proper hygiene, to reduce the risk of food contamination and food-borne illnesses.

Findings: Partial Compliance

Observations:

The Monitors observed violations of the Louisiana Food Regulations and significant findings are summarized in sections IV. D. 3. b. Cleanliness and IV. D. 3. c. Record Keeping/Temperatures of this report.  These findings are indicators of a lack of training or ineffective training.  To achieve substantial compliance, OPSO and CBM Summit must ensure that food service staff receive effective training in the areas of food safety, including safe food handling procedures.

IV. D. 3. b. Ensure that dishes and utensils, food preparation and storage areas, and vehicles and containers used to transport food are appropriately cleaned and sanitized on a daily basis.

Findings: Non-Compliance

Observations:

Completion and implementation of draft policies 1001.01, Meal Preparation and Transport and 1001.04, Food Service Inspections and Reviews, along with compliance with all previous implemented policies and the Louisiana Food Regulations is required to achieve substantial compliance.  Some issues and



violations identified during the inspection of the kitchen include, but are not limited to:

- On January 15, 2019, the "Detergent Empty" audible and visible alarms were alerting on the back of the automatic dishwasher.  The dishwasher was in use, the detergent canister was empty, and it is unknown how long the dishwasher was running without detergent.  The detergent was refilled after the Monitor reported the problem to kitchen staff.  A properly functioning dishwasher including dispensing of detergent is fundamental in ensuring that dishes and utensils are appropriately cleaned and sanitized between uses.

- On January 15, 2019, the Monitor observed a piece of potato on the kitchen floor and found it to still be there over 24-hours later.  Upon closer examination, the Monitor found that it was covered in mold.  Based on this observation, it is evident that the floor in this area was not cleaned and sanitized on a daily basis.

- Bakery equipment was observed to be dirty with dried, caked on food debris. The Monitor was informed that one of the pieces of equipment had not been operational since 2015 and another piece of equipment had not worked "for years".  OPSO and CBM Summit is clearly not ensuring that food preparation equipment is cleaned and sanitized on a daily basis as is essential to maintain a hygienic kitchen environment.

IV. D. 3. c. Check and record on a daily basis the temperatures in the refrigerators, coolers, walk-in refrigerators, the dishwasher water, and all other kitchen equipment with a temperature monitor, to ensure proper maintenance of food service.

Findings: Partial Compliance

Observations:

The Consent Judgment requires that OPSO "Check and record daily the temperatures in the refrigerators, coolers, walk-in refrigerators, the dishwasher water, and all other kitchen equipment with a temperature monitor, to ensure proper maintenance of food service equipment."  The importance of maintaining the temperatures specified in the Louisiana Food Code in all aspects of the food service operation is to ensure safe food and prevent foodborne illness.  Therefore, the Monitor reviewed temperature documentation, checked random food and water



temperatures, and used the temperatures as a benchmark for determining OPSO's compliance with the Louisiana Food Code.  Hence, if OPSO complies with the Louisiana Food Code, they will also comply with the section of the Consent Judgment requiring "proper maintenance of food service equipment."  Conversely, documenting temperatures simply for the sake of documentation, without regard to the Louisiana Food Code minimum temperatures, and not subsequently taking and documenting corrective actions when problems are found, is not only a poor practice, but also unsafe and can lead to foodborne illness outbreaks.

OPSO has not completed the food service policies that incorporate the requirements of this paragraph.  Refrigeration temperature logs continue to remain in compliance.  The previous "Hot Holding Equipment Temperatures" logs have been replaced with a form that logs only a single temperature of hot foods at one point "out of pot" and "out of warmer."  The form also logs a single "time"; however, it does not indicate what specific time is referenced.  The new form is an improvement, but further refinement is required; technical assistance was provided and enthusiastically received.

Evidence that OPSO does not comply with this provision includes:

- On January 14, 2019, the CBM Summit Food Service Director (FSD) provided documentation that indicated the Salisbury steaks prepared for the lunch meal were at a temperature of 213°F "out of the pot", which according to the FSD indicated the cooking temperature and 182°F "out of the warmer", which indicated the temperature when removed from the food warmer and placed on the tray serving line.  However, when random temperatures were taken of four random pans of Salisbury steaks still held in the food warmers, temperatures below the Louisiana Food Code minimum required temperature of 135°F were found as temperatures measured at 112°F, 114°F, 119°F, 120°F and 125°F.  While several other temperature measurements exceeded the minimum requirement, none came to those documented by the kitchen employee.  Corrective action was taken and the Salisbury steaks were reheated to a safe temperature.  The Monitor's finding



of Salisbury steaks at a temperature of 112°F when the kitchen staff documented the product had been cooked to 213°F and were at 182°F when removed from the warmer clearly indicates a failure of equipment or procedure used to measure the temperature at some point in the operation.

- The October 2018 Dishwasher Temperature Log provided by OPSO indicates that the dishwasher final rinse temperatures did not comply with the Louisiana Food Code dishwasher final rinse water temperature requirement of not less than 180°F for the dates of October 1, 2018 through October 7, 2018.  The only corrective action logged on the form was a notation of "reported to Ruiz" on October 1, 2018.  OPSO reported that the machine's heating element went out causing the temperature shortfalls.  A final minimum dishwasher rinse temperature of 180°F is required to kill bacteria. Therefore, it is imperative that OPSO employ and document other procedures when the dishwasher is not functioning properly such as serving meals on disposable trays or washing dishes in a 3-compartment sink.

- The water temperature of three of four random handwashing sinks tested on January 15, 2019 were found to be below the Louisiana Food Code required minimum water temperature of at least 85°F (dishwashing room = 68°F, small kettle/tray line area = 52°F, bakery = 65°F, ice machine room = 104°F). The Monitor was advised that the low water temperatures were related to problems with the hot water heaters and that the OPSO Facility Engineer was working on it.  However, handwashing sink water temperatures below the minimum state requirement were again found on January 16, 2019 (small kettle/tray line area = 52°F, cook pit area #1 = 60°F, cook pit area #2 = 90°F, near office = 97°F, bakery inside door = 66°F, bakery = 70°F, ice maker room = 66°F, dish wash area = 73°F).  Hands are a primary mode of transmission of disease-causing agents.  Therefore, it is essential that OPSO ensure proper maintenance of the hot water heaters that supply the kitchen sinks.  Cold water, especially the chilly water temperature (52°F) found in the handwashing sink near the kettle where the lunch entrees were being heated



and the trays were being prepared serves as a deterrent to proper handwashing.  Furthermore, it is also important for OPSO to measure, record, and maintain temperatures of the water in the handwashing sinks in the kitchen on a routine basis, as covered under the Louisiana Food Code.

- Random temperatures were also taken of pans of rice in the warmers prior to the lunch meal on January 15, 2019.  Temperatures below the minimum required hot holding temperature were measured at 76°F and 80°F.  A pan of rice on the steamtable for the tray serving line was measured at 95°F and 103°F.  Corrective action was taken and the rice was reheated to a safe temperature.  Although rice may seem like a relatively "safe" food, the bacteria Bacillus cereus is associated with rice and can cause diarrhea and vomiting.  Therefore, it is important to ensure that rice is held at the required temperatures after cooking to prevent foodborne illness.

## IV. D. 4.  Sanitation and Environmental Conditions Reporting

IV. D. 4. a. Provide the Monitor a periodic report on sanitation and environmental conditions in the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement.  The report will include
- (1)  number and type of violations reported by health and sanitation inspectors;
- (2)  number and type of violations of state standards;
- (3)  number of prisoner grievances filed regarding the environmental conditions at the Facility;
- (4)  number of inoperative plumbing fixtures, light fixtures, HVAC systems, fire protection systems, and security systems that have not been repaired within 30 days of discovery;
- (5)  number of prisoner-occupied areas with significant vandalism, broken furnishings, or excessive clutter;
- (6)  occurrences of insects and rodents in the housing units and dining halls; and
- (7)  occurrences of poor air circulation in housing units.

Findings: Substantial Compliance

Observations:

The July – December 2018 Sanitation and Environmental report was made available to the Monitor on 2/5/2019. The report contained the requisite information spelled out by the Consent Judgement as well as supporting documentation.

IV. D. 4. b. Review the periodic sanitation and environmental conditions reports to determine whether the prisoner grievances and violations reported by health, sanitation, or state inspectors are addressed, ensuring that the requirements of this Agreement are met.  OPSO shall make recommendations regarding the sanitation and environmental conditions, or other necessary



changes in policy, based on this review.  The review and recommendations will be documented and provided to the Monitor.

Findings:  Substantial Compliance

Observations:

The Consent Judgment requires a review of the periodic sanitation and environmental conditions reports be made to ensure issues are addressed along with making recommendations regarding sanitation and environmental conditions and policy changes based upon the review. Such reviews are to be documented and provided to the Monitor.

The Monitor reviewed the supporting documentation provided by OPSO and determined that it was sufficient to satisfy the requirements of the Consent Judgment. OPSO provided documentation of the required review and basic analysis of prisoner grievances and inspection violations noted regarding sanitation and environmental conditions during the rating period. The Sanitation Officer has revised the procedure to exclude the classification of routine requests for clothing items as grievances to provide a more accurate accounting of grievances. No policy or procedure changes were recommended to the Monitor.

## IV. E. 1. Fire and Life Safety

IV. E. 1. a. Ensure that necessary fire and life safety equipment is properly maintained and inspected at least quarterly.  These inspections must be documented.

Findings:  Partial compliance

Observations:

The fire and life safety equipment was not properly maintained at the time of this compliance tour.  The OJC main Fire Alarm Control Panel (FACP) had received a "Yellow Tag" by the fire alarm contractor due to a faulty filter in one of the smoke detection systems.  The Monitor was informed of a second "Yellow Tag" that was added to the FACP due to the malfunctioning of key aspects of the smoke evacuation system in several inmate housing units (recreation yard doors failing to automatically open for make-up air when the smoke evacuation



fans actuate). The Monitor was advised by Chief Lampard that the repairs are being coordinated but will require significant additional funding. In the interim, Chief Lampard had received approval from the Fire Marshal for a temporary work around requiring security staff to keep a designated recreation door unsecured at all times.

The "Facility Dude" work order system maintains the schedule of inspections and notifies the Fire Safety Officer when an inspection is due. OPSO continues to maintain contracts with licensed vendors to complete annual inspections of all fire and life safety equipment. Prior to this tour, OPSO provided evidence of the most recent equipment inspections, in accordance with the Consent Judgment and policy. OPSO provided copies of quarterly inspections conducted by the Fire Safety Officer for Kitchen/Warehouse, OJC, and TDC for the third and fourth quarters of 2018. This documentation, supported by observations during the compliance tour, indicates that OPSO ensures that necessary fire and life safety equipment is properly maintained and inspected at required intervals with the exception noted below. These inspections are conducted by a qualified fire safety officer or a qualified contractor, as required by the Consent Judgment.

The Monitor noted all fire extinguishers observed were within their inspection window and up to date. One exit sign in TDC Bldg. 1 East and Bldg. 1 West were noted to be unlit. Chief Lampard initiated work orders to replace the bulbs.

IV. E. 1. b. Ensure that a qualified fire safety officer conducts a monthly inspection of the facilities for compliance with fire and life safety standards (e.g., fire escapes, sprinkler heads, smoke detectors, etc.).

Findings: Substantial Compliance

Observations:

Except for the month of November 2018 when no monthly inspections were performed, the Monitor was provided with the monthly inspection documents for the Kitchen & Warehouse, OJC, and TDC facilities performed since the June 2018 compliance tour. The reports are thorough and complete.

Examples of these issues noted in the reports and observed by the Monitor



during this inspection include, but were not limited to:

- Accumulation of lint behind dryers resulting from missing or broken dryer vents in numerous OJC housing units and presenting a fire safety hazard.
- In both open dorms and in cells inmates' personal items (paperwork, commissary purchases, and other approved items) are not stored as required in OJC's Inmate Handbook in the personal property bags provided by OJC and in several instances, appeared excessive presenting a fire safety hazard.
- Excess inmate uniforms and blankets in cells presenting a fire safety hazard.
- Broken glass panels in cell doors and windows shower windows (three locations) which may decrease the glass' capacity to impede the spread of smoke or fire.

**IV. E. 1. c. Ensure that comprehensive fire drills are conducted every six months.  OPSO shall document these drills, including start and stop times and the number and location of prisoners who were moved as part of the drills.**

Findings: Substantial Compliance

Observations:

The Consent Judgment requires comprehensive fire drills every six months. OPSO provided documentation for a fire drill conducted in August 2018.

**IV. E. 1. d. Provide competency-based training to staff on proper fire and emergency practices and procedures at least annually.**

Findings:  Substantial Compliance

Observation:

OPSO has developed the requisite policy, training course syllabus/outline and written directives. The Monitor was provided with documentation reflecting the requisite training was provided to all pre-service and in-service classes in 2018.

**IV. E. 1. e. Within 120 days of the Effective Date, ensure that emergency keys are appropriately marked and identifiable by touch and consistently stored in a quickly accessible location, and that staff are adequately trained in use of the emergency keys.**



Findings: Substantial compliance

Observations:

The Monitor found the physical security and accountability for emergency keys to be in substantial compliance with the Consent Judgment and Policy 801.35 "Key and Key Card Control". Inspection reports note the routine verification of the keys and the Fire Safety Officer documents the periodic testing of the keys to verify they are operational. The Fire Safety Officer trains staff on the use of the location and use of the keys during the fire and life safety training curriculum provided to all staff at the training academy.

## IV. E. 2. Fire and Life Safety Reporting

IV. E. 2. a. (1) – (3) Provide the Monitor a periodic report on fire and life safety conditions at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date and every six months thereafter until termination of this Agreement.   Each report shall include:
    (1)   number and type of violations reported by fire and life safety inspectors;
    (2)   fire code violations during annual fire compliance tours; and
    (3)   occurrences of hazardous clutter in housing units that could lead to a fire.

Findings: Substantial Compliance

Observations:

The July-December 2018 Fire and Life Safety Conditions report was made available to the Monitor on February 5, 2019.  The report contained the requisite information spelled out by the Consent Judgment as well as supporting documentation.

IV. E. 2. b. Review the periodic fire and life safety reports to determine whether the violations reported by fire and life safety inspectors are addressed, ensuring the requirements of this Agreement are being met.  OPSO shall make recommendations regarding the fire and life safety conditions, or other necessary changes in policy, based on this review.  The review and recommendations will be documented and provided to the Monitor.

Findings: Substantial Compliance

Observations:

The Consent Judgment requires a review of the periodic fire and life safety reports be made to ensure issues are addressed along with making



recommendations regarding the fire and life safety conditions and policy changes based upon the review. Such reviews are to be documented and provided to the Monitor.

The Monitor reviewed the supporting documentation provided by OPSO and determined that it was sufficient to satisfy the requirements of the Consent Judgment. OPSO provided documentation of the required review and basic analysis of fire and life safety conditions as well as any necessary changes in policy or procedure. The OPSO Life Safety Officer has communicated changes in the following: procedures for the conduct of fire drills to enhance staff participation; procedures for documenting staff participation in drills; documentation of life safety issues/corrective action in the facility maintenance management system; and new procedures for coordinating with the Unit Managers specifically in regard to the control of clutter and contraband in the units. No other policy or procedure changes were recommended to the Monitor.



## IV. F.   Language Assistance

F.1.a. OPP shall ensure effective communication with, and provide timely and meaningful access to services at OPP to all prisoners at OPP, regardless of their national origin or limited ability to speak, read, write, or understand English.  To achieve this outcome, OPP shall:

    (1)    Develop and implement a comprehensive language assistance plan and policy that complies, at a minimum, with Title VI of the Civil Rights Act of 1964, as amended, (42 U.S.C. § 2000d et seq.) and other applicable law;

    (2)    Ensure that all OPP personnel take reasonable steps to provide timely, meaningful language assistance services to Limited English Proficient ("LEP") prisoners;

    (3)    At intake and classification, identify and assess demographic data, specifically including the number of LEP individuals at OPP on a monthly basis, and the language(s) they speak;

    (4)    Use collected demographic information to develop and implement hiring goals for bilingual staff that meet the needs of the current monthly average population of LEP prisoners;

    (5)    Regularly assess the proficiency and qualifications of bilingual staff to become an OPP Authorized Interpreter ("OPPAI");

    (6)    Create and maintain an OPPAI list and provide that list to the classification and intake staff; and

    (7)    Ensure that while at OPP, LEP prisoners are not asked to sign or initial documents in English without the benefit of a written translation from an OPPAI.

F.2.a. OPP shall develop and implement written policies, procedures and protocols for documenting, processing, and tracking of individuals held for up to 48 hours for the U.S. Department of Homeland Security ("DHS");

F.2.b. Policies, procedures, and protocols for processing 48-hour holds for DHS will:

    (1)    Clearly delineate when a 48-hour hold is deemed to begin and end;

    (2)    Ensure that, if necessary, an OPPAI communicates verbally with the OPP prisoner about when the 48-hour period begins and is expected to end;

    (3)    Provide a mechanism for the prisoner's family member and attorney to be informed of the 48-hour hold time period, using, as needed, an OPPAI or telephonic interpretation service;

    (4)    Create an automated tracking method, not reliant on human memory or paper documentation, to trigger notification to DHS and to ensure that the 48-hour time period is not exceeded.

    (5)    Ensure that telephone services have recorded instructions in English and Spanish;

    (6)    Ensure that signs providing instructions to OPP prisoners or their families are translated into Spanish and posted;

    (7)    Provide Spanish translations of vital documents that are subject to dissemination to OPP prisoners or their family members.  Such vital documents include, but are not limited to:

        i.    grievance forms;
        ii.    sick call forms;
        iii.    OPP inmate handbooks;
        iv.    Prisoner Notifications (e.g., rule violations, transfers, and grievance responses) and
        v.    "Request for Services" forms.

    (8)    Ensure that Spanish-speaking LEP prisoners obtain the Spanish language translations of forms provided by DHS; and

    (9)    Provide its language assistance plan and related policies to all staff within 180 days of the Effective Date of this Agreement.

F.3.a. Within 180 days of the Effective Date, OPP shall provide at least eight hours of LEP training to all corrections and medical and mental health staff who may regularly interact with LEP prisoners.

    (1)    LEP training to OPP staff shall include:

        i.    OPP's LEP plan and policies, and the requirements of Title VI and this Agreement;
        ii.    how to access OPP-authorized, telephonic and in-person OPPAIs; and
        iii.    basic commands and statements in Spanish for OPP staff.



(2)      OPP shall translate the language assistance plan and policy into Spanish, and other languages as appropriate, and post the English and translated versions in a public area of the OPP facilities, as well as online.

(3)   OPP shall make its language assistance plan available to the public.

F.4.

(1)      OPP shall ensure that adequate bilingual staff are posted in housing units where DHS detainees and other LEP prisoners may be housed.

(2)      OPP shall ensure that an appropriate number of bilingual staff are available to translate or interpret for prisoners and other OPP staff.  The appropriate number of bilingual staff will be determined based on a staffing assessment by OPP.

Findings:

F.1.a. -   Partial Compliance

F.2.a -    Not Applicable

F.2.b. -   Not Applicable

F.3.a. -    Partial Compliance

F.4 -   Partial Compliance

<u>Observations</u>:

The Language Assistance Plan required by this paragraph has not been prepared, or reviewed by the parties.

As OPSO asserts that DHS and ICE inmates are not detained, two subsections are deemed to by Not applicable.

Paragraph F.3.a. is determined in partial compliance as the Language Assistance plan has not been completed.

OPSO provided documentation regarding the use of the language line; however, did not address compliance with the specific requirements of F. 4. (2).



### IV. G.  Youthful Prisoners

Consistent with the Prison Rape Elimination Act of 2003, 42 U.S.C. § 15601, et seq., and its implementation of regulations, a youthful prisoner shall not be placed in a housing unit in which the youthful prisoner will have sight, sound, or physical contact with any adult prisoner through use of a shared dayroom or other common space, shower area, or sleeping quarters.  In areas outside of housing units, OPSO shall either:  maintain sight and sound separation between youthful prisoners and adult prisoners, or provide direct staff supervision when youthful prisoners and adult prisoners have sight, sound, or physical contact.  OPP shall ensure that youthful prisoners in protective custody status shall have no contact with, or access to or from, non-protective custody prisoners.  OPP will develop policies for the provision of developmentally appropriate mental health and programming services.

Findings:  Partial compliance

Observations:

OPSO continues the Travis Hill School to provide programming to eligible inmates.   OPSO has appropriately linked compliance with this provision to IV. A. 12., Sexual Abuse and the upcoming PREA audit.

OPSO policy (1401.08) requires that programming to meet the developmentally appropriate mental health and programming needs are provided; but declined to provide examples of the programming.

### VI.  A – D. The New Jail Facility and Related Issues

A.   <u>New Jail</u>

The Parties anticipate that Defendant will build a new jail facility or facilities that will replace or supplement the current facility located at 2800 Gravier Street, New Orleans, Louisiana.  This Agreement shall apply to any new jail facility.

Finding – Substantial Compliance.

B.   <u>Design and Design Document</u>

Defendant shall obtain the services of a qualified professional to evaluate, design, plan, oversee, and implement the construction of any new facility.  At each major stage of the facility construction, Defendant shall provide the Monitor with copies of design documents.

Finding – Substantial Compliance

This provision provides that, "*The Defendant shall obtain the services of a qualified professional to evaluate, design, plan, oversee, and implement the*



*construction of **any new facility** [emphasis added].  At each major stage of the facility construction, Defendant shall provide the Monitor with copies of design documents.*"

C.    Staffing

Defendant shall consult with a qualified corrections expert as to the required services and staffing levels needed for any replacement facility.  OPSO shall complete a staffing study to ensure that any new facility is adequately staffed to provide prisoners with reasonable safety.

The Consent Judgment requires that the Defendant **shall** consult with a qualified corrections expert as to the required services and staffing levels needed for any replacement facility.  The Monitors will await planning for Phase III to ascertain future compliance. For now, the paragraph is in substantial compliance.

D.    Compliance with Codes and Standards

Defendant will ensure that the new jail facility will be built in accordance with:  (1) the American Correctional Association's standards in effect at the time of construction; (2) the American with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101-12213, including changes made by the ADA Amendments of 2008 (P.L. 110-325) and 47 U.S.C. §§ 225-661, and the regulations there under; and (3) all applicable fire codes and regulations.

Finding – Monitors not qualified to evaluate.

The Monitors do not have the knowledge or expertise to evaluate compliance with this paragraph.   OPSO asserts that it is in compliance with this provision, without offering documentation.

## VII.  Compliance and Quality Improvement

## VII. A. Policies, Procedures, Protocols, Training Curriculum and Practices

Within 120 days of the Effective Date, OPSO shall revise and/or develop its policies, procedures, protocols, training curricula, and practices to ensure that they are consistent with, incorporate, address, and implement all provisions of this Agreement.  OPSO shall revise and/or develop, as necessary, other written documents, such as screening tools, logs, handbooks, manuals, and forms, to effectuate the provisions of this Agreement.  OPSO shall send pertinent newly-drafted and revised policies and procedures to the Monitor as they are promulgated.  The Monitor will provide comments on the policies to OPSO, SPLC, and DOJ within 30 days.  OPSO, SPLC, and DOJ may provide comments on the Monitor's comments within 15 days.  At that point, the Monitor will consider the Parties' comments, mediate any disputes, and approve the policies with any changes within 30 days.  If either party disagrees with the Monitor, they may bring the dispute to the Court.  OPSO shall provide initial and in-service training to all Facility staff with respect to newly implemented or revised policies and procedures.  OPSO shall document employee review and training in new or revised policies and procedures.

Finding:    Partial Compliance

Observations:


Orleans Parish
JAIL MONITORS

OPSO continues to make progress on the policies, procedures and other written documentation as specified in this paragraph.

## VII. (H). B.  Written Quality Improvement Policies and Procedures

Within 180 days of the Effective Date, Defendant shall develop and implement written quality improvement policies and procedures adequate to identify serious deficiencies in protection from harm, prisoner suicide prevention, detoxification, mental health care, environmental health, and fire and life safety in order to assess and ensure compliance with the terms of this Agreement on an ongoing basis.  Within 90 days after identifying serious deficiencies, OPSO shall develop and implement policies and procedures to address problems that are uncovered during the course of quality improvement activities.  These policies and procedures shall include the development and implementation of corrective action plans, as necessary, within 30 days of each biannual review.

Finding:    Partial compliance

Observations:

Partial compliance with this paragraph is based on OPSO's policy 801.21 (dated April 5, 2016) regarding critical incident reviews.  OPSO has not provided any reports "…identifying serious deficiencies, OPSO shall develop and implement policies and procedures to address problems that are uncovered during the course of quality improvement activities."

## VII.  (I). C. Full-Time Compliance Coordinator

The Parties agree that OPSO will hire and retain, or reassign a current OPSO employee for the duration of this Agreement, to serve as a full-time OPSO Compliance Coordinator.  The Compliance Coordinator will serve as a liaison between the Parties and the Monitor and will assist with OPSO's compliance with this Agreement.  At a minimum, the Compliance Coordinator will:  coordinate OPSO's compliance and implementation activities; facilitate the provision of data, documents, materials, and access to OPSO's personnel to the Monitor, SPLC, DOJ, and the public, as needed; ensure that all documents and records are maintained as provided in this Agreement; and assist in assigning compliance tasks to OPSO personnel, as directed by the Sheriff or his or her designee.  The Compliance Coordinator will take primary responsibility for collecting information the Monitor requires to carry out the duties assigned to the Monitor.

Finding:  Substantial Compliance.

## VII.  (J.) D. Self-Assessment

On a bi-annual basis, OPSO will provide the public with a self-assessment in which areas of significant improvement or areas still undergoing improvement are presented either through use of the OPSO website or through issuance of a public statement or report.

Finding:    Non-Compliance.



Observations:

The provision provides "*On a bi-annual basis, OPSO will provide the public with a self-assessment in which areas of significant improvement or areas still undergoing improvement are presented either through use of the OPSO website or through issuance of a public statement or report.*"

OPSO asserts that they are in substantial compliance with this paragraph as town hall meetings are held quarterly.  OPSO provided the PowerPoint presentations used at those meetings.  The Monitor believes that this paragraph is not about the town hall meetings, conducted pursuant to the Stipulated Agreement of 2016, but rather in writing on the website or through issuance of a public statement.

Written self-assessment of adherence to policy/standard operating procedures, including internal audits, results in critical self-assessments, and then, as needed, measurable action plans.

## VIII.  Reporting Requirements and Right of Access

## VIII.  A. Periodic Compliance Reporting

OPSO shall submit periodic compliance reports to the Monitor.  These periodic reports shall be provided to the Monitor within four months from the date of a definitive judgment on funding; and every six months thereafter until termination of this Agreement.  Each compliance report shall describe the actions Defendant has taken during the reporting period to implement this Agreement and shall make specific reference to the Agreement provisions being implemented.  The report shall also summarize audits and continuous improvement and quality assurance activities, and contain findings and recommendations that would be used to track and trend data compiled at the Facility.  The report shall also capture data that is tracked and monitored under the reporting provisions of the following provisions:  Use of Force; Suicide Prevention; Health Care Delivered; Sanitation and Environmental Conditions; and Fire and Life Safety.

Finding:   Partial Compliance

Observations:

This provision requires that OPSO submit periodic compliance reports to the Monitors describing the OPSO's actions during the reporting period to implement the Consent Judgment.  The report is also required to summarize audits and continuous improvement plans, quality assurance activities and contain findings and recommendations that would be used to track and trend data.  The report is also to capture data that is tracked and monitored under the reporting provisions



related to use of force, suicide prevention, health care delivered, sanitation and environmental conditions, and fire and life safety.

OPSO asserts that it is in substantial compliance with this paragraph.  OPSO provided documentation. [12]The OPSO Compliance "master document" provided does not include information on the specific activities that OPSO is undertaking to gain and sustain compliance by paragraph.  OPSO provided a memorandum that there is currently a review of what incidents will be reviewed as critical incidents.

Based on the information provided and the requirements of this paragraph, the Monitors assess this paragraph as being in partial compliance.  The compliance initiatives of OPSO should address the specific requirements of this paragraph and develop the systems needed.  This will be essential to sustainability of the requirements.  What is needed to achieve compliance are:

- Summarize audits and continues improvement and quality assurance activities.
- Findings and recommendations
- Identification of data that is tracked for: use of force, suicide prevention, health care delivered, sanitation and environmental conditions, and fire and life safety.

## VIII. B.  (Notification of) **Death of Any Prisoner**

OPSO shall, within 24 hours, notify the Monitor upon the death of any prisoner.  The Monitor shall forward any such notifications to SPLC and DOJ upon receipt.  OPSO shall forward to the Monitor incident reports and medical and/or mental health reports related to deaths, autopsies, and/or death summaries of prisoners, as well as all final SOD and IAD reports that involve prisoners.  The Monitor shall forward any such reports to SPLC and DOJ upon receipt.

---

[12] A summary page of the responsibilities of staff vis-à-vis the early intervention system, grievances, mental health counseling and risk management reports (the last two assigned to a CCS staff no longer employed);  No such report has been provided for either 2016 or to-date for 2107; a review of the Early Intervention System (EIS) (4/2/18); a spreadsheet with EIS alerts;  the report of the 1st quarter of 2018 regarding the inmate grievance system;  a Quarterly Compliance Report from CCS for the 2018, which does not include suicide prevention activities or respond directly to the requirements of the health care section of the Consent Judgment;  the inmate disciplinary track spreadsheet, which will include, according to OPSO, analysis and tracking in the future; the tentative in-service training schedules for both sworn and civilian staff; a programming master schedule; May 2018 IAD Investigative Review;  inmate classification summaries, internal audits and training (see also Section IV.A. 10); staffing overtime report for May 2018; list of approved paid details worked May 2018' What is unlabeled but appears to be a listing of hours worked by reserve deputies in OJC; list of missed medical appointments from CCS, with no analysis or action plan;  policy index and due dates;  Use of Force Review Board Dispositions (January through May 2018); Use of Force reviews for what appears to be 2018 quarterly (unable to open document); 2018 EIS alerts; and  6/15/18 – Stipulated Audit Action Plan Environmental/Sanitation Department.



Finding:    Substantial Compliance

## VIII. C. Records

Defendant shall maintain sufficient records to document that the requirements of this Agreement are being properly implemented and shall make such records available to the Monitor within seven days of request for inspection and copying.  In addition, Defendant shall maintain and provide, upon request, all records or other documents to verify that they have taken the actions described in their compliance reports (e.g., census summaries, policies, procedures, protocols, training materials, investigations, incident reports, tier logs, or use of force reports).

Finding:    Partial Compliance

Observations:

The Monitors continue to be encouraged by the work of OPSO to address this paragraph; and look forward to reviewing " . . . the actions described in their compliance reports (e.g., census summaries, policies, procedures, protocols, training materials, investigations, incident reports, tier logs, or use of force reports)." Substantial Compliance requires the defendants to promptly fulfill reasonable document requests from the parties.  Emphasis on compiling and tracking requests and dates and nature of the responses will help achieve substantial compliance.

## III.    Stipulated Agreements

OPSO and the Plaintiffs/DOJ negotiated two agreements after Compliance Report #3.   The language of the Agreed Orders linked directly to the Consent Judgment and represented priority areas for inmate safety.

The three provisions of the April 22, 2015 are in compliance.  The provisions in the Agreed Order of February 11, 2015 require additional attention.  See the section of the Consent Judgment as noted.

1.b. OPSO shall comply with the Consent Judgment's requirement for periodic a compliance report as set forth in Consent Judgment Section VIII.A The report shall describe the steps OPSO has taken in furtherance of compliance, and the activities planned during the next reporting period.  The first report is due by April 1, 2015, and periodic reports shall be due in accordance with Section VIII.A, and/or on dates mutually agreed to by the parties and the Monitors, and approved by the Court, as necessary.  See CJ Section VIII. A.

6.b. OPSO shall ensure by May 15, 2015 that all staff assigned to the housing for inmates with acute and chronic mental health (in Templeman V, TDC, or other housing in which this population is held) attend training regarding working this population.  The lesson plans/curricula for this training shall be reviewed and approved by the Monitors.   The draft of the training curriculum and training plan is due to the Monitors



by April 15, 2015, and should include participation by subject matter experts employed by the medical contractor.  See also CJ IV.B.4.a.,7. a.

OPSO shall provide a monthly report to the Monitors, identifying the number of deputies hired the previous month; the number of deputies who resigned, if known, the reason for resignation, and the date the deputy entered service; and the number of deputies who were terminated, the reason for termination, and the date the deputy entered service.  The same report shall be provided for non-sworn (civilian staff).  A cumulative annual total will also be included as part of this report.

13.  Medical Care – The health care provider has not provided their action plan for achieving compliance with the provisions of the Consent Judgment, as required by this paragraph.
14.b. By April 1, 2015, OPSO, in collaboration with CCS, will produce a management plan for inmates on the mental health caseload (Levels 1 – 4), whether these inmates are housed in the step-down unit, or in general population. See CJ IV. B. 2.



Status of Compliance by Tour

| | Report # 1 2/13/14 | Report # 2 8/26/14 | Report # 3 2/25/15 | Report # 4 9/9/15 | Report # 5 3/17/16 | Report # 6 10/25/16 | Report # 7 5/1/17 | Report # 8 1/12/18 | Report # 9 8/25/18 | Report # 10 3/18/19 |
|---|---|---|---|---|---|---|---|---|---|---|
| **IV.A. 1.  Use of Force Policies and Procedures/Margo Frasier** | | | | | | | | | | |
| IV. A. 1.a. | ND | NC | NC | PC | NC | PC | PC | PC | PC | SC |
| IV. A. 1.b. | ND | NC | NC | PC | NC | PC | PC | PC | SC | SC |
| IV. A. 1.c. | ND | NC | NC | PC | NC | NC | PC | PC | PC | SC |
| **IV.A.2.  Use of  Force Training/Margo Frasier** | | | | | | | | | | |
| IV. A. 2. a. | ND | NC | NC | NC | NC | PC | PC | PC | PC | PC |
| IV. A. 2. b. | ND | NC | NC | NC | NC | PC | PC | PC | PC | PC |
| IV. A. 2. c. | ND | NC | NC | NC | NC | NC | NC | NC | PC | PC |
| **IV.A.3.   Use of Force Reporting/Margo Frasier** | | | | | | | | | | |
| IV. A.3 a. | ND | NC | NC | PC | NC | PC | PC | PC | PC | PC |
| IV. A.3 b. | ND | NC | NC | NC | NC | NC | PC | PC | PC | PC |
| IV. A.3 c. | ND | NC | NC | NC | NC | NC | PC | PC | PC | PC |
| IV. A.3 d. | ND | NC | NC | PC | NC | NC | PC | PC | PC | PC |
| IV. A.3 e. | ND | NC | NC | PC | PC | PC | PC | PC | SC | SC |
| IV. A.3 f. | ND | NC | NC | PC | NC | PC | PC | PC | PC | PC |
| IV. A.3 g. | ND | NC | NC | PC | PC | PC | PC | PC | SC | SC |
| IV. A.3 h. | ND | NC | NC | NC | NC | NC | NC | NC | PC | SC |
| **IV.A.4. Early Intervention System ("EIS") /Margo Frasier** | | | | | | | | | | |
| IV.A.4.a. | ND | NC | NC | PC | PC | PC | NC | NC | PC | PC |
| IV.A.4.b. | ND | NC | NC | PC | PC | PC | PC | PC | PC | SC |
| IV.A.4.c. | ND | NC | NC | PC | PC | PC | PC | PC | SC | SC |
| IV.A.4.d. | ND | NC | NC | NC | NC | PC | PC | NC | NC | PC |
| IV.A.4.e. | ND | ND | ND | ND | NC | NC | NC | NC | NC | SC |
| **IV.A.5. Safety and Supervision/Margo Frasier** | | | | | | | | | | |
| IV.A.5.a. | ND | NC | NC | NC | NC | NC | NC | NC | NC | PC |
| IV.A.5.b. | ND | NC | NC | NC | NC | NC | NC | NC | NC | PC |
| IV.A.5.c. | ND | NC | NC | NC | NC | NC | NC | PC | PC | PC |
| IV.A.5.d. | NC | NC | PC | PC | NC | NC | NC | NC | PC | PC |
| IV.A.5.e. | ND | NC | NC | PC | PC | NC | NC | NC | NC | PC |
| IV.A.5.f. | ND | NC | NC | PC | SC | SC | PC | PC | PC | PC |
| IV.A.5.g. | ND | NC | ND | PC | NC | NC | NC | NC | NC | PC |
| IV.A.5.h. | ND | NC | NC | NC | NC | NC | NC | NC | NC | PC |
| IV.A.5.i. | ND | NC | NC | PC | PC | PC | PC | PC | SC | PC |
| IV.A.5.j. | ND | NC | PC | PC | NC | NC | NC | NC | PC | PC |
| IV.A.5.k. | ND | NC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.A.5.l. | ND | NC | NC | NC | PC | PC | PC | PC | PC | PC |

March 18, 2019

Status of Compliance by Tour

| Section | Report # 1 2/13/14 | Report # 2 8/26/14 | Report # 3 2/25/15 | Report # 4 9/9/15 | Report # 5 3/17/16 | Report # 6 10/25/16 | Report # 7 5/1/17 | Report # 8 1/12/18 | Report # 9 8/25/18 | Report # 10 3/18/19 |
|---|---|---|---|---|---|---|---|---|---|---|
| **IV.A.6.  Security Staffing/Susan McCampbell** | | | | | | | | | | |
| IV.A.6.a. | NC | NC | NC | NC | NC | NC | NC | NC | NC | NC |
| IV.A.6.a.(1) | ND | PC | PC | PC | SC | SC | PC | PC | PC | SC |
| IV.A.6.a.(2) | ND | PC | PC | PC | NC | SC | SC | SC | SC | SC |
| IV.A.6.a.(3) | ND | SC | NC | SC | NC | SC | NC | SC | NC | SC |
| IV.A.6.a.(4) | ND | NC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.A.6.b. | ND | NC | PC | NC | PC | PC | PC | PC | PC | SC |
| **IV.A.7 Incidents and Referrals/Margo Frasier** | | | | | | | | | | |
| IV.A.7.a. | ND | NC | NC | NC | NC | PC | PC | PC | PC | PC |
| IV.A.7.b. | ND | NC | NC | PC | NC | PC | PC | PC | PC | PC |
| IV.A.7.c. | ND | NC | PC | PC | PC | PC | SC | SC | SC | SC |
| IV.A.7.d. | ND | NC | NC | NC | NC | NC | NC | PC | PC | PC |
| IV.A.7.e. | ND | NC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.A.7.f. | ND | NC | NC | NC | PC | PC | PC | PC | PC | PC |
| IV.A.7.g. | ND | NC | NC | PC | PC | PC | PC | PC | PC | SC |
| IV.A.7.h. | ND | NC | NC | PC | PC | PC | PC | PC | PC | PC |
| IV.A.7.i. | ND | NC | NC | PC | NC | NC | NC | NC | NC | PC |
| IV.A.7.j. | ND | NC | NC | NC | NC | NC | NC | NC | NC | SC |
| **IV.A.8.  Investigations/Margo Frasier** | | | | | | | | | | |
| IV.A.8.a. | ND | NC | PC | PC | PC | SC | SC | SC | SC | SC |
| IV.A.8.b. | ND | NC | PC | PC | PC | SC | SC | SC | SC | SC |
| IV.A.8.c. | ND | NC | PC | PC | PC | SC | SC | SC | SC | SC |
| IV.A.8.d. | ND | NC | NC | PC | PC | SC | SC | SC | SC | SC |
| IV.A.8.e. | ND | NC | NC | PC | PC | PC | PC | SC | SC | SC |
| IV.A.8.f. | ND | NC | NC | PC | PC | PC | PC | SC | SC | SC |
| **IV.A.9.  Pretrial Placement in Alternative Settings/Susan McCampbell** | | | | | | | | | | |
| IV.A.9.a. | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.9.b. | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC |
| **IV.A.10. Custodial Placement within OPP/Patricia Hardyman** | | | | | | | | | | |
| IV.A.10.a. | NC | PC | SC | SC | SC | SC | PC | PC | PC | SC |
| IV.A.10.b. | NC | NC | NC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.10.c. | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC |
| IV.A.10.d. | NC | NC | PC | PC | PC | PC | PC | NC | PC | SC |
| IV.A.10.e. | NC | NC | PC | SC | PC | PC | SC | PC | PC | PC |
| IV.A.10.f. | NC | NC | NC | NC | NC | PC | PC | PC | NC | SC |
| IV.A.10.g. | NC | NC | NC | NC | NC | PC | PC | PC | PC | SC |
| IV.A.10.h. | ND | NC | NC | PC | PC | PC | PC | PC | PC | PC |

March 18, 2019

Status of Compliance by Tour

| Section | Report # 1 2/13/14 | Report # 2 8/26/14 | Report # 3 2/25/15 | Report # 4 9/9/15 | Report # 5 3/17/16 | Report # 6 10/25/16 | Report # 7 5/1/17 | Report # 8 1/12/18 | Report # 9 8/25/18 | Report # 10 3/18/19 |
|---|---|---|---|---|---|---|---|---|---|---|
| **IV..A.11. Prisoner Grievance Process/Susan McCampbell** | | | | | | | | | | |
| IV.A.11.a | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| **IV.A.12. Sexual Abuse/Susan McCampbell** | | | | | | | | | | |
| IV.A.12. | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| **IV.A.13. Access to Information/Susan McCampbell** | | | | | | | | | | |
| IV.A.13. | PC | PC | PC | PC | PC | PC | PC | PC | PC | SC |
| **IV. B. Mental Health Care** | | | | | | | | | | |
| **IV.B.1. Screening and Assessment/Raymond Patterson** | | | | | | | | | | |
| IV.B.1.a. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC |
| IV.B.1.b. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC |
| IV.B.1.c. | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC |
| IV.B.1.d. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC |
| IV.B.1.e. | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.1.f. | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC |
| IV.B.1.g. | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC |
| IV.B.1.h. | NC | NC | NC | NC | NC | NC | NC | NC | PC | SC |
| IV.B.1.i. | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC |
| IV.B.1.j. | NC | NC | NC | PC | NC | NC | NC | NC | NC | PC |
| IV.B.1.k. | NC | NC | NC | PC | NC | NC | NC | NC | NC | NC |
| IV.B.1.l. | NC | NC | NC | NC | NC | NC | NC | NC | NC | SC |
| **B. 2. Treatment/Raymond Patterson** | | | | | | | | | | |
| IV.B.2.a. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.2.b. | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC |
| IV.B.2.c. | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC |
| IV.B.2.d. | NC | NC | NC | NC | NC | NC | NC | NC | NC | NC |
| IV.B.2.e. | NC | NC | NC | PC | PC | PC | PC | NC | NC | PC |
| IV.B.2.f. | NC | NC | NC | PC | PC | PC | NC | PC | PC | PC |
| IV.B.2.g. | NC | NC | NC | PC | PC | PC | NC | PC | PC | SC |
| IV.B.2.h. | NC | NC | NC | PC | PC | PC | PC | PC | NC | PC |
| **IV.B.3. Counseling/Raymond Patterson** | | | | | | | | | | |
| IV.B.3.a. | NC | NC | NC | NC | PC | NC | NC | PC | PC | PC |
| IV.B.3.b. | NC | NC | NC | NC | PC | NC | NC | PC | PC | PC |

March 18, 2019

Status of Compliance by Tour

| Section | Report # 1 2/13/14 | Report # 2 8/26/14 | Report # 3 2/25/15 | Report # 4 9/9/15 | Report # 5 3/17/16 | Report # 6 10/25/16 | Report # 7 5/1/17 | Report # 8 1/12/18 | Report # 9 8/25/18 | Report # 10 3/18/19 |
|---|---|---|---|---|---|---|---|---|---|---|
| **IV.B.4.  Suicide Prevention Training Program/Raymond Patterson** | | | | | | | | | | |
| IV.B.4.a. | NC | NC | NC | PC | PC | PC | PC | PC | NC | PC |
| IV.B.4.b. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.4.c. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.4.d. | NC | NC | NC | PC | NC | NC | NC | NC | NC | PC |
| IV.B.4.e. | NC | NC | NC | PC | NA | PC | PC | PC | PC | PC |
| IV.B.4.f. | NC | NC | NC | NC | PC | PC | NC | NC | SC | SC |
| IV.B.4.g. | NC | NC | NC | SC | PC | NC | NC | NC | NC | PC |
| **IV.B.5.  Suicide Precautions/Raymond Patterson** | | | | | | | | | | |
| IV.B.5.a. | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC |
| IV.B.5.b. | NC | NC | NC | NC | NC | NC | NC | PC | PC | SC |
| IV.B.5.c. | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC |
| IV.B.5.d. | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC |
| IV.B.5.e. | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC |
| IV.B.5.f. | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC |
| IV.B.5.g. | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC |
| IV.B.5.h. | NC | NC | NC | NC | NC | NC | NC | PC | NC | PC |
| IV.B.5.i. | NC | NC | NC | NC | NC | NC | NC | PC | PC | SC |
| IV.B.5.j. | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC |
| IV.B.5.k. | NC | NC | NC | NC | NC | NC | NC | PC | NC | PC |
| **IV.B.6.  Use of Restraints/Raymond Patterson** | | | | | | | | | | |
| IV.B.6.a. | PC | NC | PC | PC | PC | PC | PC | PC | NC | PC |
| IV.B.6.b. | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.6.c. | ND | NC | PC | PC | PC | PC | PC | PC | NC | PC |
| IV.B.6.d. | ND | NC | PC | PC | PC | PC | PC | PC | NC | PC |
| IV.B.6.e. | NC | NC | PC | PC | PC | PC | PC | PC | NC | PC |
| IV.B.6.f. | NC | NC | PC | PC | PC | PC | PC | PC | NC | PC |
| IV.B.6.g. | NC | NC | PC | PC | PC | PC | PC | PC | NC | PC |
| **IV.B.7.  Detoxification and Training/Robert Greifinger** | | | | | | | | | | |
| IV.B.7.a. | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.7.b. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC |
| IV.B.7.c. | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.7.d. | NC | NC | PC | PC | PC | PC | PC | PC | PC | NC |
| **IV.B.8. Medical and Mental Health Staffing/Robert Greifinger** | | | | | | | | | | |
| IV.B.8.a. | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.8.b. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC |

March 18, 2019

Status of Compliance by Tour

| Section | Report # 1 2/13/14 | Report # 2 8/26/14 | Report # 3 2/25/15 | Report # 4 9/9/15 | Report # 5 3/17/16 | Report # 6 10/25/16 | Report # 7 5/1/17 | Report # 8 1/12/18 | Report # 9 8/25/18 | Report # 10 3/18/19 |
|---|---|---|---|---|---|---|---|---|---|---|
| **IV.B.9.  Risk Management/Robert Greifinger** | | | | | | | | | | |
| IV.B.9.a. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.9.b. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.9.c. | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC |
| IV.B.9.d. | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC |
| IV.B.9.e. | NC | NC | NC | NC | PC | PC | PC | PC | NC | PC |
| IV.B.9.f. | NC | NC | NC | NC | PC | PC | PC | PC | NC | NC |
| **IV.C. Medical Care** | | | | | | | | | | |
| **IV. C. Quality Management of Medication Administration** | | | | | | | | | | |
| IV.C.1.a. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC |
| IV.C.1.b. | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.C.1.c. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC |
| IV.C.1.d. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC |
| **IV.C.2.  Health Care Delivered/Robert Greifinger** | | | | | | | | | | |
| IV.C.2.a. | NC | NC | NC | PC | PC | PC | PC | PC | PC | NC |
| IV.C.2.b. | NC | NC | NC | PC | PC | PC | PC | PC | PC | NC |
| **IV.C.3.  Release and Transfer/Robert Greifinger** | | | | | | | | | | |
| IV.C.3.a. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC |
| IV.C.3.b. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC |
| IV.C.3.c. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC |
| IV.C.3.d. | NC | NC | NC | PC | PC | PC | PC | PC | PC | SC |
| **IV.D.  Sanitation and Environmental Conditions/Shane Poole** | | | | | | | | | | |
| IV. D. 1.a. | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC |
| IV. D. 1.b. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC |
| IV. D. 1.c. | NC | NC | PC | PC | NC | NC | SC | PC | PC | PC |
| IV. D. 1.d. | NC | NC | NC | NC | SC | SC | SC | SC | SC | SC |
| IV. D. 1.e. | NC | PC | PC | PC | PC | PC | PC | SC | PC | SC |
| IV. D. 1.f. | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC |
| IV. D. 1.g. | NC | NC | NC | NC | PC | PC | PC | PC | PC | SC |
| IV. D. 1.h. | NC | NC | NC | PC | NC | PC | NC | NC | NC | PC |
| **IV. D. 2. Environmental Control/Shane Poole** | | | | | | | | | | |
| IV. D. 2.a. | NC | NC | PC | PC | PC | SC | SC | SC | PC | SC |
| IV. D. 2.b. | NC | NC | NC | NC | NC | SC | PC | SC | SC | SC |
| **IV. D. 3. Food Service/Diane Skipworth** | | | | | | | | | | |
| IV. D. 3.a. | NC | NC | NC | PC | PC | PC | NC | PC | PC | PC |
| IV. D. 3.b. | NC | NC | NC | PC | PC | PC | NC | NC | NC | NC |
| IV. D. 3.c. | NC | NC | NC | PC | NC | NC | PC | PC | PC | PC |

March 18, 2019

Status of Compliance by Tour

| Section | Report # 1 2/13/14 | Report # 2 8/26/14 | Report # 3 2/25/15 | Report # 4 9/9/15 | Report # 5 3/17/16 | Report # 6 10/25/16 | Report # 7 5/1/17 | Report # 8 1/12/18 | Report # 9 8/25/18 | Report # 10 3/18/19 |
|---|---|---|---|---|---|---|---|---|---|---|
| **IV. D. 4. Sanitation and Environmental Conditions Reporting/Shane Poole** | | | | | | | | | | |
| IV. D. 4.a. 1-7 | NC | NC | PC | PC | PC | PC | PC | PC | NC | SC |
| IV. D. 4.b. | NC | NC | NC | NC | PC | NC | NC | PC | PC | SC |
| **IV.E. Fire and Life Safety/Shane Poole** | | | | | | | | | | |
| **IV. E. 1. Fire and Life Safety** | | | | | | | | | | |
| IV. E. 1.a. | NC | PC | PC | PC | PC | PC | PC | SC | PC | PC |
| IV. E. 1.b. | NC | NC | NC | PC | PC | PC | PC | PC | PC | SC |
| IV. E. 1.c. | PC | PC | PC | PC | NC | PC | PC | SC | PC | SC |
| IV. E. 1.d. | NC | NC | NC | NC | NC | NC | PC | SC | PC | SC |
| IV. E. 1.e. | ND | NC | PC | PC | PC | PC | PC | PC | SC | SC |
| **IV. E. 2. Fire and Life Safety Reporting** | | | | | | | | | | |
| IV. E. 2.a.1-3 | ND | NC | PC | PC | PC | PC | PC | PC | PC | SC |
| IV. E. 2.b. | ND | NC | NC | PC | NC | NC | NC | PC | PC | SC |
| **IV.F. Language Assistance** | | | | | | | | | | |
| **IV.F.1. Timely and Meaningful Access to Services/Susan McCampbell** | | | | | | | | | | |
| IV.F.1.a. | ND | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| **IV.F.2.  Language Assistance Policies and Procedures/Susan McCampbell** | | | | | | | | | | |
| IV.F.2.a. | ND | PC | PC | PC | Not App | Not App | Not App | Not App | Not App | Not App |
| IV.F.2.b. | ND | PC | PC | PC | Not App | Not App | Not App | Not App | Not App | Not App |
| **IV.F.3. Language Assistance Training/Susan McCampbell** | | | | | | | | | | |
| IV.F.3.a. | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| **IV.F.4. Bilingual Staff/Susan McCampbell** | | | | | | | | | | |
| IV.F.4. | NC | PC | PC | PC | NC | NC | NC | NC | NC | PC |
| **IV.G.  Youthful Prisoners/Susan McCampbell** | | | | | | | | | | |
| IV.G. | NC | NC | NC | PC | PC | PC | NC | NC | PC | PC |
| **VI. The New Jail Facility/Susan McCampbell** | | | | | | | | | | |
| VI. A. | ND | PC | PC | SC | SC | SC | SC | SC | SC | SC |
| VI. B. | NC | PC | SC | SC | SC | SC | SC | SC | SC | SC |
| VI. C. | ND | PC | SC | SC | PC | PC | PC | PC | SC | SC |
| VI. D. | Monitors Not Qualified to Evaluate | | | | | | | | | |

March 18, 2019

Status of Compliance by Tour

| Section | Report # 1 2/13/14 | Report # 2 8/26/14 | Report # 3 2/25/15 | Report # 4 9/9/15 | Report # 5 3/17/16 | Report # 6 10/25/16 | Report # 7 5/1/17 | Report # 8 1/12/18 | Report # 9 8/25/18 | Report # 10 3/18/19 |
|---|---|---|---|---|---|---|---|---|---|---|
| **VII.  Compliance and Quality Improvement/Susan McCampbell** | | | | | | | | | | |
| VII. A. | ND | NC | NC | PC | PC | PC | PC | PC | PC | PC |
| VI. B. (H.) | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC |
| VI. C. (I.) | NC | NC | SC | SC | NC | SC | SC | NC | PC | SC |
| VI. D. (J.) | ND | NC | NC | PC | PC | PC | PC | NC | NC | NC |
| **VIII. Reporting Requirements and Right of Access/Susan McCampbell** | | | | | | | | | | |
| VIII.A. | ND | PC | NC | PC | PC | PC | PC | NC | NC | PC |
| VIII.B. | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC |
| VIII.C. | PC | PC | PC | SC | SC | SC | NC | NC | PC | PC |

**Legend:**                               **NA - Not Applicable**
**ND - Not scheduled for review**
**NC - Non-compliance**
**PC - Partial Compliance**
**C - Substantial Compliance**

March 18, 2019

## Appendix B - CY 2018 OJC Reported Hires and Terminations

| OPSO Reports | Hired 1/1/18 - 12/31/18 | Ended Employment 1/1/18 - 12/31/18 | Plus or Minus |
|---|---|---|---|
| Administrative Clerical Specialist | 2 | 4 | -2 |
| Agent 1, 2 | | 2 | -2 |
| Analyst | | 1 | -1 |
| Area Supervisor | | 1 | -1 |
| Associate Warden | | 2 | -2 |
| Attorney | 1 | | 1 |
| Captain | | 1 | -1 |
| Case Manager | | 1 | -1 |
| Chief of Corrections | | 1 | -1 |
| Chief of Staff | | 1 | -1 |
| Career Counselor | 1 | | 1 |
| Classification (auditor, specialists) | 3 | 6 | -3 |
| Compliance Manager/Coordinator | 1 | 1 | 0 |
| CMT | 27 | 42 | -15 |
| Crime Victim Adm. Asst | 1 | | 1 |
| Day Reporting Counselors | | 2 | -2 |
| Deputy 1 | 1 | 8 | -7 |
| Deputy 2 | | 20 | -20 |
| Deputy 4 | | 1 | -1 |
| Director/HR | 1 | 1 | 0 |
| Director of Sanitation | 1 | | 1 |
| Facility/Electricians/Maintenance/warehouse | 8 | 9 | -1 |
| Grievance Clerk | 1 | 2 | -1 |
| HR Manager | | 1 | -1 |
| MH/Med Services Manager | 1 | 1 | 0 |
| Instructor | | 1 | -1 |
| Intake and Processing Clerk | 7 | 14 | -7 |
| IPC Director | 1 | 1 | 0 |
| Justice Systems Manager | | 1 | -1 |
| Lieutenant | | 2 | -2 |
| Program Coordinator | | 1 | -1 |
| Recruits | 67 | 66 | 1 |



| OPSO Reports | Hired 1/1/18 - 12/31/18 | Ended Employment 1/1/18 - 12/31/18 | Plus or Minus |
|---|---|---|---|
| Sergeant | 2 | 4 | -2 |
| Warden | | 3 | -3 |
| Total | 126 | 201 | -75 |

| 2018 Reason | All | Recruits | CMTs |
|---|---|---|---|
| Abandoned Job/No-Show | 50 | 19 | 22 |
| Advancement | 16 | 5 | 2 |
| Attendance | 1 | | 1 |
| Change Tax Status | 3 | | |
| Deceased | 2 | | |
| Misconduct | 34 | 16 | 5 |
| Retirement | 3 | | |
| Personal/Personal-Other | 61 | 12 | 8 |
| Personal-Health | 5 | 2 | |
| Personal-Relocation | 4 | | 1 |
| Resigned Under Investigation | 14 | 7 | 2 |
| Resigned While on Suspension | 3 | 2 | 1 |
| Unspecified | 3 | 1 | |
| Unable to Perform Duties | 2 | 2 | |
| | 201 | 66 | 42 |

