# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| _____ | ) |
| LASHAWN JONES, *et al.*, and | ) |
| THE UNITED STATES OF AMERICA, | ) |
| | ) Civil Action No. 2:12-cv-00859 |
| PLAINTIFFS | ) Section I, Division 5 |
| | ) Judge Lance M. Africk |
| v. | ) |
| | ) Magistrate Judge Michael B. North |
| MARLIN GUSMAN, Sheriff, | ) |
| | ) |
| | ) |
| DEFENDANT. | ) |
| _____ | ) |

---

## Report No. 11 of the Independent Monitors
## January 19, 2020

---

Margo L. Frasier, J.D., C.P.O., Lead Monitor
Robert B. Greifinger, M.D. Medical Monitor
Patricia L. Hardyman, Ph.D., Classification Monitor
Raymond F. Patterson, M.D., D.F.A.P.A., Mental Health Monitor
Shane J. Poole, M.S., C.JM., Environmental Fire Life Safety Monitor
Diane Skipworth, M.C.J., R.D.N., L.D., R.S., C.C.H.P., C.L.L.M., Food Safety Monitor

Email : nolajailmonitors@nolajailmonitors.org
Web :   www.nolajailmonitors.org





***Compliance Report #11***
***LASHAWN JONES, et al., and the United States of America v.***
***Marlin Gusman, Sheriff***

Table of Contents

**Page**

I.    Introduction                                                             4
   A.  Summary of Compliance                                     5
   B.  Opportunities for Progress                                7
   C.  Review Process of Monitors' Compliance Report #11        13
   D.  Communication with Stakeholders                          13
   E.  Recommendations                                          13
   F.  Conclusions and Path Forward                             13
II.   Substantive Provisions
   A.  Protection from Harm                                      15
     A.1. Use of Force Policies and Procedures            18
     A.2. Use of Force Training                           19
     A.3. Use of Force Reporting                          20
     A.4.  Early Intervention System                      24
     A.5. Safety and Supervision                         25
     A.6. Security Staffing                               29
     A.7. Incidents and Referrals                         31
     A.8. Investigations                                  33
     A.9. Pretrial Placement in Alternative Settings      35
     A.10. Custodial Placement                            36
     A.11. Prisoner Grievance Process                     54
     A.12. Sexual Abuse                                   57
     A.13. Access to Information                          58
   B.  Mental Health Care                                       58
   C.  Medical Care                                             78
   D.  Sanitation and Environmental Conditions                  80
   E.  Fire and Life Safety                                     95
   F.  Language Assistance                                     101
   G.  Youthful Prisoners                                      101
   H.  The New Jail Facility                                   103
   I.  Compliance and Quality Improvement                      104
   J.  Reporting Requirements and Right of Access              104
III.  Status of Stipulated Agreements – February 11, 2015 and
   April 22, 2015                                             105



|  | Page |
|---|---|
| **Tables** | |
| Table 1 – Summary of Compliance – All Compliance Reports | 6 |
| Table 2 – Status of Compliance – Stipulated Agreements | 7 |
| Table 3 – Summary of Incidents CY 2019 | 16 |
| Table 4 – CY 2018-CY 2019 All OJC Reported Incidents by Type by Month | 17 |
| Table 5 – CY 2018-CY 2019 OJC Reported Incidents | 27 |
| | |
| **Figures** | |
| Figure 1 – Distribution of Inmates by Race by OPSO Facility | 40 |
| Figure 2 – Rates and Completion Time of Initial Custody Assessments | 42 |
| Figure 3 – Number of Attachments Input by Classification Staff | 45 |
| Figure 4 – Attachment Reason by Month | 46 |
| Figure 5 – Number of Total and Guilty Disciplinary Infractions | 51 |
| Figure 6 – Rate of Disciplinary Infractions Against OPSO ADP | 52 |
| Figure 7 – Types of Disciplinary Infractions of which OPSO Inmates Were Found Guilty | 53 |
| | |
| **Appendices** | |
| Appendix A -  Summary Compliance Findings by Section Compliance Reports 1 – 11 | 107 |

## Compliance Report # 11 - Introduction

This is Compliance Report #11 submitted by the Independent Monitors providing assessment of the Orleans Parish Sheriff's Office's (OPSO) compliance with the Consent Judgment of June 6, 2013. Report #11 reflects the status of OPSO's compliance as of September 19, 2019. This Report is based on incidents and compliance-related activities between January 2019 and June 2019. It is also based on the observations of the Monitors during the site visit.

The OPSO's jail is under the leadership of Darnley R. Hodge, Sr., who was appointed by the Court on January 29, 2018, as the Independent Compliance Director (ICD) on an interim basis and was appointed to the position permanently on October 12, 2018. In February 2019, Byron LeCounte joined the OPSO administrative staff as the Chief of Corrections. Chief LeCounte and Director Hodge both have substantial knowledge of jail operations and have worked diligently to achieve compliance with the Consent Judgment.

In summary, the Monitors find that safety, medical and mental health care, and



environment conditions of inmates held in both the Orleans Justice Center (OJC) and the Temporary Detention Center (TDC) has made meaningful and noteworthy improvement since Compliance Report #10 provided to the Court in March 2019. While there is still significant work to be done to properly staff the facility, finalize training on policies, curb violence, and improve medical and mental health care, the positive trends continue. The specific initiatives are addressed in this report.

A.     **Summary of Compliance**

The requirements of the Consent Judgment represent accepted correctional practice, while providing flexibility for OPSO to address its mandates. Achievement of compliance with Consent Judgment, Stipulated Agreements, and Stipulated Order will bring the Orleans Parish Sheriff's Office (OPSO) and its correctional facilities -- Orleans Justice Center (OJC) and the Temporary Detention Center (TDC) closer to operating and sustaining a Constitutional jail system.

The Consent Judgment contains 174 provisions which are separately rated. Based on the current assessment, OPSO has achieved substantial or partial compliance with 97% of the provisions. Substantial compliance has been achieved for 59% of the provisions. Thirty-eight percent (38%) of the provisions are in partial compliance. Five (3%) of the 174 provisions remain in non-compliance. All of the ratings of non-compliance are in the medical/mental health care areas. The improvement since the last assessment is noteworthy when only 37% of the provisions were in substantial compliance while 6% of the provisions were in non-compliance.

To progress from partial compliance to substantial compliance (and to sustain substantial compliance), OPSO must continue to build its work done to date. The ability to maintain sustained compliance in all provisions is essential as the Consent Judgment requires maintenance of substantial compliance in each and every provision for a 24-month period. OPSO must consistently implement policies and procedures, develop and provide the training necessary for staff to adhere to the policies and procedures, develop supervisors and mid-managers to lead both staff and operations, analyze data in a meaningful and useful manner to inform activities, and engage in root cause reviews and self-critical assessments.



Documentation of on-going compliance requires organized, complete, and accurate report of the OPSO's organizational and management strategies to the Monitors. Such initiatives will allow the Monitors to measure compliance and allow the OPSO leadership to make the improvements necessary to operate the OPSO correctional facilities in a Constitutional manner and to sustain compliance with the Consent Judgment and Stipulated Agreements. OPSO has made significant strides in its reporting to the Monitors and has improved in root cause reviews and self-critical assessments. However, the reviews and assessments have room for significant improvement both in terms of quantity and quality so as to inform decisions.

The Monitors are pleased to report that OPSO, under the leadership of Director Hodge and Chief LeCounte, continues to examine its strategies to obtain and sustain compliance and make the structural and organizational changes necessary to achieve compliance.

**Table 1 – Summary of Compliance – All Compliance Reports[1]**

| Compliance Report/Date | Substantial Compliance | Partial Compliance | Non-Complianc | NA/Other | Total |
|---|---|---|---|---|---|
| #1 – December 2013 | 0 | 10 | 85 | 76 | 171 |
| #2 – July 2014 | 2 | 22 | 149 | 1 | 174 |
| #3 – January 2015 | 2 | 60 | 110 | 2 | 174 |
| #4 – August 2015 | 12 | 114 | 43 | 4 | 173 |
| #5 – February 2016 | 10 | 96 | 63 | 4 | 173 |
| #6 – September 2016 | 20 | 98 | 53 | 2 | 173 |
| #7 – March 2017 | 17 | 99 | 55 | 2 | 173 |
| #8 – November 2017 | 23 | 104 | 44 | 2 | 173 |
| #9 – June 2018 | 26 | 99 | 46 | 2 | 173 |
| #10 – January 2019 | 65 | 98 | 8 | 2 | 173 |
| #11-September 2019 | 103 | 66 | 5 | 0 | 174 |

The status of compliance with the two stipulated agreements (February 11, 2015 and April 22, 2015) is as follows:

---

[1] See Appendix A for historical detail of compliance, by paragraph.



**Table 2 – Status of Compliance with 2015 Stipulated Agreements**

|  | Substantial Compliance | Partial Compliance | Non-Compliance | NA | Total |
|---|---|---|---|---|---|
| August 2015 | 21 | 12 | 1 | 0 | 34 |
| February 2016 | 21 | 12 | 1 | 1 | 34 |
| September 2016 | 26 | 7 | 1 | 0 | 34 |
| March 2017 | 28 | 4 | 1 | 1 | 34 |
| November 2017 | 21 | 11 | 1 | 1 | 34 |
| June 2018 | 23 | 8 | 2 | 1 | 34 |
| January 2019 | 28 | 5 | 0 | 1 | 34 |
| September 2019 | 28 | 5 | 0 | 1 | 34 |

B.     **Opportunities for Continued Progress**

        The Monitors summarize below the areas identified in preparation of this report regarding OPSO's compliance with the Consent Judgment.

   1.   **Foundational Work** - The essential, core work required to achieve compliance includes:

        a.   <u>Policies and Procedures</u> – OPSO has completed all drafts of the essential policies and procedures and a large percentage have been finalized. While there is still some work to be done to finalize the policies, staff have expended a tremendous amount of effort staff to refine these drafts to ensure the policies and procedures prescribe how the facility operates and to assure inmate and staff safety, in accordance with the Consent Judgment and accepted correctional practice. Essential is the development, approval, and implementation of lessons plans that correspond with each of the policies. OPSO's policy governing its written directive system has significantly improved the policy/procedure process. This process allows for organizational components to develop specific operational practices for reviewed by OPSO administration. Adherence to the policies, procedures, and training is essential. OPSO has yet to develop a reliable process to consistently audit adherence.

        b.   <u>Inadequate staffing</u> – Despite improved staffing levels due to increased



hiring, and even more importantly, decreased turnover, inadequate staff in the facilities (OJC and TDC) and support functions (transportation, courthouse security, investigations) continues to hamper OPSO's ability to comply with the Consent Judgment. OPSO continues to use employee overtime to address the staff shortages. Even with substantial overtime, frequently, there are housing units and control rooms with no assigned staffing, Further, almost daily, assigned staff leave housing units and control pods unattended for meal breaks and other duties. Recent promotions have helped to address the staffing deficiencies at the supervisory level. As previously reported, in February 2019, Byron LeCounte joined OPSO as Chief of Corrections.  Chief LeCounte has the appropriate background and expertise to oversee daily operation of OPSO facilities and assist in compliance efforts. Vacancies at the upper management level (rank of Major) need to be addressed. Another challenge is to implement a pay scale which provides for adequate compensation to increase retention of staff and assist recruitment efforts.

c.  <u>Training</u> – Employee training, both pre-service and in-service, has become more in line with OPSO policies and procedures. Foundational work, such as preparation of lesson plans to provide for a consistent instruction content, instruction by qualified individuals, and demonstration and documentation of students' knowledge gained, needs to continue. Providing a policy without training is not effective implementation. Once effective training has been provided, there needs to be auditing of staff adherence to policies.

d.  <u>Supervision</u> – Safe operation of OPSO's facilities requires an adequate number of sufficiently trained first line and mid-management supervisors. Director Hodge implemented the unit management approach and continues to provide training and mentoring for the managers. Recently, a systematic promotional process for sergeants and lieutenants was developed and implemented. This process has



resulted in a significant reduction in vacancies at supervisory positions. OPSO is encouraged to finalize its organizational chart. Currently, there are vacancies at the upper management level (rank of Major). It is highly likely that at least one of those positions needs to be filled as the functions are currently being performed by the Chief of Corrections and Chief of Security in addition to their other duties. Another challenge is to provide the essential training and mentoring for the new supervisors.

2. **Medical and Mental Health Care** – Despite improvement in the areas of medical and mental health care, the Medical and Mental Health Monitors report challenges remain in the provision of basic case, staffing, and recordkeeping, as well as the need for improved collaboration with custody/security staffing. Resources from Tulane University continue to be particularly helpful in providing mental health care. The long-term solution is the design and construction of Phase III, a specialized building which contain an infirmary and housing for inmates with acute mental health issues.

3. **Inmate Safety and Protection from Harm** - Providing a safe and secure jail continues to be a challenge.

   a. <u>Unit Management</u>—The Unit Management approach is being used in the supervision of the OPSO housing units.  Each floor of the OJC, IPC, and TDC have been designated as a "unit". The purpose of this strategy is to enhance accountability for both staff and the inmates by allowed the staff to get to know the inmates, coordinating management of housing unit operations, and ensuring among staff. While the Unit Management approach has shown to be helpful, there are inconsistencies and lack of uniformity in the areas of staff discipline and application of facility rules to inmates. Efforts to refine and successfully implement the strategy require additional training, mentoring, and accountability.

   b. <u>Violence</u> – There are still significant incidents of violence occurring



within the facilities – including inmate on inmate assaults and assaults on staff. Disorder and non-compliance to the institutional rules result in staff having to use force to gain control and compliance. There has been a decrease in substance abuse overdoses. There was not a death of an inmate during the calendar year of 2019.

c.  <u>Inmate Classification</u> – The inmate classification processes require continued attention to ensure housing decisions and placements are consistent with OPSO policies and objective classification principles. Auditing, which is credible, needs to focus on identifying issues and correcting placements. Consistent and adequate training was identified as an issue in compliance and a plan to address the issue has been agreed upon between OPSO and the Monitors.

d.  <u>Inmate grievances</u> – Inmates' questions and concerns using the grievance process, require attention as to the timeliness and adequacy of responses. The system is intended to provide fixes to systems as well as to individual inmate's needs. In order to intensely focus on the areas of the grievance process which are lacking, each of the subdivisions will be rated separately.

e.  <u>Incident Reporting</u> - Collaboration efforts to improve reporting of incidents continues among the Monitors, OPSO, and the attorneys for the Plaintiff class/DOJ. As discussed in this Report, progress toward promptly reporting incidents has improved, but continues to require attention. There remain serious incidents for which no report or no timely report is prepared by OPSO staff; including incidents in which staff had to be physically restrained to keep the staff member from assaulting an inmate. There are reports which are incomplete and do not provide the necessary information for the reader to determine what occurred and why it occurred. Analysis of incident reports and development of corrective action plans occurs to a limited degree, but would benefit from staff dedicated to the effort.

f.  <u>Jail Management System</u> – An integral part of the jail's operational



improvements is tied to an effective jail management system. Such capacity provides on-demand, routine, and periodic data to inform critical leadership and management decisions. Such an information system has not been implemented. OPSO cancelled the contract with the provider who was to supply a new JMS when it became apparent that the system would not interface with the Orleans Parish court system. The current plan is for the City of New Orleans to purchase a JMS which will interface the Orleans Parish court system and the OPSO information systems, but there does not appear to be a definite timeline for that process. In the meantime, OPSO has modified its current system to provide more of the required JMS functions.

4. **Sanitation and Environment Conditions** – Challenges remain regarding the public health and inmate/staff safety risks. The staff working on these issues are extremely dedicated and have made significant gains, but the inability to fill support positions identified in OPSO's staffing analysis negatively impacts the ability of OPSO to develop and sustain the requirements of the Consent Judgment and align with accepted correctional practice.

5. **Youthful Inmates** – The Monitors acknowledge and commend the educational program established in OJC. Provision of age appropriate mental health services has improved with the addition of the Tulane University resources. Due to lack of adequate housing options, a female youthful inmate(s) must be housed alone in TDC; often by herself. This creates a double quandary; the young woman faces isolation and the OPSO staffing challenges are intensified. The design of the Phase III facility must address this issue as there are no feasible options within OJC and TDC will cease to be occupied once Phase III is opened.

6. **Inmate Sexual Safety** – OPSO underwent its required audit of compliance with the Prison Rape Elimination Act of 2003 (PREA).  OPSO received word that it had passed its audit. OPSO must consistently follow the policies and procedures which were exhibited during the audit. If the policies and procedures are not adhered to in the absence of the PREA Auditors,



substantial compliance will not be maintained. Continued internal collaboration among OPSO security, classification, and the medical/mental health provider is needed for the assessments of inmates' potential for sexual victimization and aggression.

7. **Compliance, Quality Reporting, and Quality Improvement** – An essential element of inmate safety is OPSO's timely review of all serious incidents. This ensures assessment of root cause(s) and then the development, implementation, and tracking of action plans to address the issue(s). This activity focuses on repairing systems. OPSO has made efforts to undertake this function but would benefit from a more robust effort. Systemic issues, which remain unaddressed, will continue to create risks to institutional safety and security. While progress is being made, the Monitors encourage OPSO to dedicate more time and knowledgeable resources to quality improvement. Impediments include the lack of staff with the skills and/or time to devote to the task. Utilizing one of the vacant Major positions to fulfill this role is suggested.

8. **Stipulated Agreements 2015** – OPSO should review its on-going compliance with the two Stipulated Agreements from 2015.

9. **Construction Projects** –

   a.  The Docks – Construction of the renovations on the Docks, providing court-holding, has continued. The Docks will be ready for occupancy by January 2020. OPSO has begun identifying staff for operation of the Docks. OPSO has been encouraged to have a robust training plan for the operation of the Docks and to not take possession until all system are in proper working order.

   b.  Phase III – Progress on the project continues and is now in the design development stage. The Monitors continue to urge the City to seek the input of the various stakeholders and the Monitors are decisions are being made about the design and construction of the facility. The process would be greatly enhanced if the City would adhere to the agreement to hold quarterly executive committee meetings with the



stakeholders. The construction and occupation of Phase III is critical to the provision of mental and medical health services in accordance with the Consent Judgment. The Temporary Detention Center (TDC) is being renovated to house and provide programming for both female and male inmates who suffer from acute mental illness in the interim. Renovation of TDC is slated for completion in April 2020. Extensive training for staff will be necessary to facilitate the successful transition of inmates from Hunt to TDC.

C.   **Review Process of Monitors' Compliance Report #11**

A draft of this report was provided to OPSO, Counsel for the Plaintiff Class, and the Department of Justice (DOJ) on November 25, 2019.  Comments were provided by OPSO, Counsel for the Plaintiff Class, Wellpath (OPSO's medical contractor) and DOJ on December 13, 2019.

D.   **Communication with Stakeholders**

The Monitors are committed to providing as much information as possible regarding the status of OPSO's efforts to comply with all orders of the Court.  The www.nolajailmonitors.org website came on-line in September 2014. Joining all other reports, the finalized version of Compliance Report #11 will be posted on that site.

E.   **Recommendations**

Only "new" recommendations are included within the body of this report.

F.   **Conclusions and Path Forward**

OPSO has been operating under the provisions of the Consent Judgment since June 2013; monitoring began in Fall 2013.  During the past year and a half, under the leadership of Director Hodge, significant improvements are acknowledged by the Monitors. The hiring of Byron LeCounte as Chief of Corrections in February 2019 has been beneficial to the vital work which remains to comply with the provisions of the Consent Judgment. His additional expertise and experience have allowed Director Hodge to focus on the Consent Judgment.

Serious incidents and harm to inmates continue to occur. OPSO efforts to identify and address sources of contraband have facilitated its ability to decrease



the amount of narcotic contraband from being smuggled into the facility. However, the amount of other contraband discovered continues to be an issue. There has been some improvement in OPSO's data collection routines which should allow for better problem solving with a goal of a sustainable reduction in inmate-on-inmate assaults, inmate-on-staff assaults, uses of force, contraband and property damage. However, OPSO requires additional subject matter expertise as the skills for the analysis of the data and root cause reviews are lacking.

For meaningful training to occur, OPSO policies, procedures, and post-orders must be finalized, and appropriate lesson plans prepared.

Medical and mental health care initiatives continue to progress toward the requirements of the Consent Judgment. Wellpath has improved in the development and implementation of a clear path forward with measurable benchmarks.

The Monitors remain committed to the Court, and the parties to collaborate on solutions that will result in significant improvement towards compliance with the provisions of the Consent Judgment and achievement of constitutional conditions.

**The Monitors again thank and acknowledge the leadership, guidance and support of The Honorable Lance M. Africk and The Honorable Michael B. North.**



## II. A.   Protection from Harm

## Introduction

This section of the Consent Judgment addresses core correctional functions including the use of force (policies, training, and reporting), identification of staff involved in uses of force through an early intervention system, safety and supervision of inmates, staffing, incidents and referrals, investigations, pre-trial placement of inmates in the facility, classification, the inmate grievance process, sexual safety of inmates, and inmates' access to information.

The Consent Judgment requires that OPSO operate the facility to assure inmates are "reasonably safe and secure." Based on objective review of data, the facility has shown improvement in inmate and staff safety, but significant incidents that result in serious injury to inmates and staff continue to occur.

Reaching and sustaining compliance with provisions of the Consent Judgment, particularly this section, relies on the collection, analysis, and corrective action planning using accurate and reliable data. The Monitors encourage OPSO to continue efforts to build its capacity to collect and analyze relevant accurate data, draw supportable conclusions to inform decisions throughout the organization, and develop corrective action plans, as indicated. As OPSO's capacity to collect, analyze, and plan is enhanced, the ability to achieve and maintain compliance will be strengthened.

The Monitors reported in Compliance Report #9 about OPSO's efforts to be much more transparent in the reporting of incidents. The transparency continues. A sergeant assigned to the administrative section reviews the daily medical logs for inmates taken to the clinic for treatment subsequent to an altercation or a use of force as well as the transport logs of inmates routed to the hospital with trauma related injuries and cross checks them against reported incidents.  The sergeant also compares the Watch Commander's Log (which lists significant events and incidents occurring during the shift) and the incident reports to detect missing reports. What still appears to be lacking are meaningful consequences for supervisors who fail to comply with the reporting policies resulting in late, incomplete, or missing incident reports.



A review of reported incidents for 2019 was conducted by the Monitors. The following charts compare the totals for the CY years of 2018 and 2019.

**Table 3 - All OJC Reported Incidents for CY 2018 and CY 2019**





| | Inmate/ Inmate Assault | Inmate Staff Altercation | Use of Force | PREA | Death | Attempt Suicide/ Ideation | Internal Escape | Criminal Damage | Inmate Injury/ Inmate Medical (AKA slip/falls/ overdoses) | Contraband | Staff Arrest | Staff Misconduct/ Suspension | Other |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2018 | 442 | 64 | 260 | 47 | 2 | 78 | 48 | 69 | 262 | 106 | 3 | 0 | 15 |
| 2019 | 440 | 117 | 358 | 42 | 0 | 82 | 6 | 47 | 145 | 302 | 0 | 0 | 6 |



**Table 4 –All OJC Reported Incidents by Type by Month CY 2018 and CY 2019**



| Month-by-Month | Jan | Feb | March | April | May | June | July | August | September | October | November | December | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2018 | 92 | 96 | 112 | 121 | 124 | 144 | 116 | 132 | 112 | 113 | 105 | 129 | 1396 |
| 2019 | 123 | 93 | 105 | 112 | 127 | 148 | 131 | 163 | 107 | 153 | 160 | 123 | 1545 |

**Assessment Methodology**

- Dates of tours:
    - February 18-20, 2019
    - March 18-20, 2019
    - April 15-17, 2019
    - May 6-7, 2019
    - June 18-19, 2019
    - July 15-17, 2019
    - August 19-21, 2019
    - September 16-19, 2019
    - October 14-16, 2019
    - December 9-11, 2019



- Materials reviewed:
  - Materials reviewed include the Consent Judgment, OPSO policies and procedures, use of force reports, incident reports, investigations conducted by Investigative Services Bureau-Internal Affairs Division (ISB-IAD), investigations conducted by ISB-Criminal Division (ISB-Criminal), investigations conducted by ISB-Inmate Division, training materials, shakedown logs, and post logs.
- Interviews:
  - Interviews included command staff, jail supervisors, commander of ISB, commander of IAD-Administrative, chief of investigations, director of training, various supervisors of units within ISB, and inmates.

## IV. A. 1. Use of Force Policies and Procedures

A. 1.a. OPSO shall develop, implement, and maintain comprehensive policies and procedures (in accordance with generally accepted correctional standards) relating to the use of force with particular emphasis regarding permissible and impermissible uses of force.
A. 1.b. OPSO shall develop and implement a single, uniform reporting system under a Use of Force Reporting policy. OPSO reportable force shall be divided into two levels, as further specified in policy: Level 1 uses of force will include all serious uses of force (i.e., the use of force leads to injuries that are extensive, serious or visible in nature, including black eyes, lacerations, injuries to the mouth or head, multiple bruises, injuries to the genitals, etc.), injuries requiring hospitalization, staff misconduct, and occasions when use of force reports are inconsistent, conflicting, or otherwise suspicious. Level 2 uses of force will include all escort or control holds used to overcome resistance that are not covered by the definition of Level 1 uses of force.
A. 1.c. OPSO shall assess, annually, all data collected regarding uses of force and make any necessary changes to use of force policies or procedures to ensure that unnecessary or excessive use of force is not used in OPP. The review and recommendations will be documented and provided to the Monitor, DOJ, and SPLC.

Findings:
A. 1. a.   Substantial Compliance
A. 1. b.   Substantial Compliance
A. 1. c.   Substantial Compliance

Observations:

The current OPSO use of force policy was effective as of May 2016. OPSO has conducted the 2018 annual review of the policy. Given the increase in the use of force, OPSO needs to conduct a more robust assessment for CY 2019 to maintain substantial compliance. Concerns regarding timeliness of training and submission of use of force report and reviews are addressed in those sections.



## IV. A. 2.        Use of Force Training

A. 2. a. OPSO shall ensure that all correctional officers are knowledgeable of and have the knowledge, skills, and abilities to comply with use of force policies and procedures. At a minimum, OPSO shall provide correctional officers with pre-service and annual in-service training in use of force, defensive tactics, and use of force policies and procedures. The training will include the following:
(1) instruction on what constitutes excessive force;
(2) de-escalation tactics; and
(3) management of prisoners with mental illness to limit the need for using force.
A. 2. b. OPSO shall ensure that officers are aware of any change to policies and practices throughout their employment with OPP. At a minimum, OPSO shall provide pre-service and annual in-service use of force training that prohibits:
(1) use of force as a response to verbal insults or prisoner threats where there is no immediate threat to the safety or security of the institution, prisoners, staff, or visitors;
(2) use of force as a response to prisoners' failure to follow instructions where there is no immediate threat to the safety or security of the institution, prisoners, staff, or visitors;
(3) use of force against a prisoner after the prisoner has ceased to offer resistance and is under control;
(4) use of force as punishment or retaliation; and
(5) use of force involving kicking, striking, hitting, or punching a non-combative prisoner.
A. 2. c. OPSO shall randomly test five percent of the correctional officer staff on an annual basis to determine their knowledge of the use of force policies and procedures. The testing instrument and policies shall be approved by the Monitor. The results of these assessments shall be evaluated to determine the need for changes in training practices. The review and conclusions will be documented and provided to the Monitor.

Findings:
A. 2. a.   Substantial Compliance
A. 2. b.   Substantial Compliance
A. 2. c.   Substantial Compliance

Observations:

The Monitor reviewed the training materials and documentation submitted by training staff for the rating period. The Monitor also randomly reviewed several staff training files maintained by the training staff. Interviews were conducted with senior security staff, Academy leadership, and administrative staff.

The proof of training records indicated that the 8-hour use of force in-service training class was offered to all four squads during the month of April 2019. Overall, records indicate that 96% of all requisite OJC staff attended the April training, a 29% increase over CY2018 (67%)—a substantial improvement. Seven (7) employees failed to attend. Ninety-one percent (91%) of TDC staff attended the April training; two (2) failed to attend. The documentation lists, by name, all delinquent staff that failed to attend the April training event as scheduled. A make-up training date was offered in May 2019 and six (6)



of the nine (9) staff noted as delinquent completed the training. Training staff advised that an additional make-up class would be provided for the remaining staff by the end of CY2019 at the request of the Chief of Corrections.

The Monitor observed the Academy training staff maintained detailed, comprehensive, and very well-maintained files.

The Monitor's review of the use of force training materials noted that the lesson plan, PowerPoint presentation and testing materials substantively covers the requisite information in A. 2. c. 1-5. The proof of training documentation indicates that the OPSO staff received the required training on policies and practices by the training staff.

The Monitor reviewed training documentation provided by training staff specific to the 5% annual testing requirement for this section. The testing was conducted from February 28, 2019 to March 6, 2019. Training staff reported that 100% of the OPSO staff tested passed with an overall average of 85%. This is a significant improvement over the 68% passing rate for the testing conducted in CY2018, particularly considering that the annual in-service use of force training was not scheduled until April 2019.

Training staff indicated that their recommendation to the Chief of Corrections was to test more than 5% of the required staff, however, this effort meets the requirements of the Consent Judgment.

Documentation of the results reviewed by command staff included an analysis of the questions missed and recommended changes in training in response to the deficiencies in knowledge noted.

## IV. A. 3. Use of Force Reporting

A.3 a. Failure to report a use of force incident by any staff member engaging in the use of force or witnessing the use of force shall be grounds for discipline, up to and including termination.

A.3 b. OPSO shall ensure that sufficient information is collected on uses of force to assess whether staff members complied with policy; whether corrective action is necessary including training or discipline; the effectiveness of training and policies; and whether the conditions in OPP comply with this Agreement. At a minimum, OPSO will ensure that officers using or observing a Level 1 use of force shall complete a use of force report that will:

    (1)    include the names of all staff, prisoner(s), or other visual or oral witness(es);

    (2)    contain an accurate and specific account of the events leading to the use of force;

    (3)    describe the level of resistance and the type and level of force used, consistent with OPP use of force policy and procedure, as well as the precise actions taken by OPSO staff in response to the incident;

    (4)    describe the weapon or instrument(s) of restraint, if any, and the manner of such use;



(5)      be accompanied by a prisoner disciplinary report, if it exists, pertaining to the events or prisoner activity that prompted the use of force incident;

(6)      describe the nature and extent of injuries sustained by anyone involved in the incident;

(7)      contain the date and time when medical attention, if any, was requested and actually provided;

(8)      describe any attempts the staff took to de-escalate prior to the use of force;

(9)      include an individual written account of the use of force from every staff member who witnessed the use of force;

(10)    include photographs taken promptly, but no later than two hours after a use of force incident, of all injuries sustained, or as evidence that no injuries were sustained, by prisoners and staff involved in the use of force incident;

(11)    document whether the use of force was digitally or otherwise recorded.  If the use of force is not digitally or otherwise recorded, the reporting officer and/or watch commander will provide an explanation as to why it was not recorded; and

(12)    include a statement about the incident from the prisoner(s) against whom force was used.

A.3 c. All officers using a Level 2 use of force shall complete a use of force report that will:

(1)      include the names of staff, prisoner(s), or other visual or oral witness(es);

(2)      contain an accurate and specific account of the events leading to the use of force;

(3)      describe the level of resistance and the type and level of force used, consistent with OPP use of force policy and procedure, as well as the precise actions taken by OPSO staff in response to the incident;

(4)      describe the weapon or instrument(s) of restraint, if any, and the manner of such use;

(5)      be accompanied by a prisoner disciplinary report, if it exists, pertaining to the events or prisoner activity that prompted the use of force incident;

(6)      describe the nature and extent of injuries sustained by anyone involved in the incident;

(7)      contain the date and time when medical attention, if any, was requested and actually provided; and

(8)      describe any attempts the staff took to de-escalate prior to the use of force.

A.3 d. OPSO shall require correctional officers to notify the watch commander as soon as practical of any use of force incident or allegation of use of force.  When notified, the watch commander will respond to the scene of all Level 1 uses of force.  When arriving on the scene, the watch commander shall:

(1)      ensure the safety of everyone involved in or proximate to the incident;

(2)      determine if any prisoner or correctional officer is injured and ensure that necessary medical care is provided;

(3)      ensure that personnel and witnesses are identified, separated, and advised that communications with other witnesses or correctional officers regarding the incident are prohibited;

(4)      ensure that witness and subject statements are taken from both staff and prisoner(s) outside of the presence of other prisoners and staff;

(5)      ensure that the supervisor's use of force report is forwarded to IAD for investigation if, upon the supervisor's review, a violation of law or policy is suspected.  The determination of what type of investigation is needed will be based on the degree of the force used consistent with the terms of this Agreement;

(6)      If the watch commander is not involved in the use of force incident, the watch commander shall review all submitted use of force reports within 36 hours of the end of the incident, and shall specify his findings as to completeness and procedural errors.  If the watch commander believes that the use of force may have been unnecessary or excessive, he shall immediately contact IAD for investigation consideration and shall notify the warden or assistant warden; and

(7)      All Level 1 use of force reports, whether or not the force is believed by any party to be unnecessary or excessive, shall be sent to IAD for review.  IAD shall develop and submit to the Monitor within 90 days of the Effective Date clear criteria to identify use of force incidents that warrant a full investigation, including injuries that are extensive or serious, visible in nature (including black eyes, injuries to the mouth, injuries to the genitals, etc.), injuries requiring hospitalization, staff misconduct (including inappropriate relationships



with prisoners), and occasions when use of force reports are inconsistent, conflicting, or otherwise suspicious.

A.3 e. Ensure that a first-line supervisor is present during all pre-planned uses of force, such as cell extractions.

A.3 f. Within 36 hours, exclusive of weekends and holidays, of receiving the report and review from the shift commander, in order to determine the appropriateness of the force used and whether policy was followed, the Warden or Assistant Warden shall review all use of force reports and supervisory reviews including:

(1)     the incident report associated with the use of force;
(2)     any medical documentation of injuries and any further medical care;
(3)     the prisoner disciplinary report associated with the use of force; and
(4)     the Warden or Assistant Warden shall complete a written report or written statement of specific findings and determinations of the appropriateness of force.

A.3 g. Provide the Monitor a periodic report detailing use of force by staff.  These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement.  Each report will include the following information:

(1)     a brief summary of all uses of force, by type;
(2)     date that force was used;
(3)     identity of staff members involved in using force;
(4)     identity of prisoners against whom force was used;
(5)     a brief summary of all uses of force resulting in injuries;
(6)     number of planned and unplanned uses of force;
(7)     a summary of all in-custody deaths related to use of force, including the identity of the decedent and the circumstances of the death; and
(8)     a listing of serious injuries requiring hospitalization.

A.3 h. OPSO shall conduct, annually, a review of the use of force reporting system to ensure that it has been effective in reducing unnecessary or excessive uses of force.  OPSO will document its review and conclusions and provide them to the Monitor, SPLC, and DOJ.

Findings:
            A. 3. a.  Substantial Compliance
            A. 3. b.  Partial Compliance
            A. 3. c.  Partial Compliance
            A. 3. d.  Partial Compliance
            A. 3. e.  Substantial Compliance
            A. 3. f.  Partial Compliance
            A. 3. g.  Substantial Compliance
            A. 3. h.  Substantial Compliance

Observations:

As to provision A. 3. a., the use of force policy requires all uses of force to be reported timely and completely and sets out the potential discipline if the policy is not followed. While there continue to be late reports, OPSO provided documentation that supervisors were verbally counseled for failure to follow policy and failure to report use of force. There is an ongoing investigation, however, of the failure of a supervisor to report a deputy's attempt to assault an inmate that required the deputy had to be restrained to protect the inmate. Continued substantial compliance



will require a reduction of late reports and appropriate discipline, including progressive discipline.

Provisions A. 3. b. and c. remain in partial compliance due to the significant number of incomplete/inadequate use of force reports. The use of force policy includes required provisions required of the Consent Judgment, but adherence is inconsistent. The Monitor provided a checklist of the report requirements to assist supervisors in making sure reports included all necessary items. A review of those checklists and accompanying reports indicates that the required information was frequently missing from the use of force reports. As with the failure to timely report all uses of force, deputies and supervisors are not consistently held accountable for failure to include required information. In addition, the Louisiana Department of Corrections often does not comply with the requires of these provisions in relation to uses of force involving inmates housed at Hunt due to acute mental illness.

The unit managers and watch commanders are not consistently compliant with the requirements of the Consent Judgment (IV. A. 3. d. and 3. f.) as to their specific duties and the time requirement for performance of these duties under the policies. As a result, the use of force packets lack the required information for meaningful reviews by FIT (Force Investigation Team). This requires FIT screen each packet for completeness and return many of them with requests for the missing items. This renders any previous reviews to be suspect. FIT issues a quarterly report which contains all the information required by IV. A. 3. g.  Thus, this section is in substantial compliance. The annual review of use of force incidents as required by IV. A. 3. h. was provided to the Monitors and all parties.  Although a rating of substantial compliance has been noted for Report #11, to remain in substantial compliance, the CY 2019 annual review will require improvement. The provision requires OPSO to "ensure that it has been effective in reducing unnecessary or excessive uses of force." OPSO reported a 37% increase in the use of force during CY 2019. More analysis of the incidents of use of force found to be excessive and unnecessary is required. Also, collection of data and analysis of the data and trends of the trends in use of force along with development of corrective



action plans would likely reduce the need for force and the accompanying risk to staff and inmates.

## IV. A. 4. Early Intervention System ("EIS")

A.4.a. OPSO shall develop, within 120 days of the Effective Date, a computerized relational database ("EIS") that will document and track staff members who are involved in use of force incidents and any complaints related to the inappropriate or excessive use of force, in order to alert OPSO management to any potential problematic policies or supervision lapses or need for retraining or discipline. The Chief of Operations Deputy, supervisors, and investigative staff shall have access to this information and shall review on a regular basis, but not less than quarterly, system reports to evaluate individual staff, supervisor, and housing area activity. OPSO will use the EIS as a tool for correcting inappropriate staff behavior before it escalates to more serious misconduct.

A.4.b. Within 120 days of the Effective Date, OPSO senior management shall use EIS information to improve quality management practices, identify patterns and trends, and take necessary corrective action both on an individual and systemic level. IAD will manage and administer EIS systems. The Special Operations Division ("SOD") will have access to the EIS. IAD will conduct quarterly audits of the EIS to ensure that analysis and intervention is taken according to the process described below. Command staff shall review the data collected by the EIS on at least a quarterly basis to identify potential patterns or trends resulting in harm to prisoners. The Use of Force Review Board will periodically review information collected regarding uses of force in order to identify the need for corrective action, including changes to training protocols and policy or retraining or disciplining individual staff or staff members. Through comparison of the operation of this system to changes in the conditions in OPP, OPSO will assess whether the mechanism is effective at addressing the requirements of this Agreement.

A.4.c. OPSO shall provide, within 180 days of the implementation date of its EIS, to SPLC, DOJ, and the Monitor, a list of all staff members identified through the EIS and corrective action taken.

A.4.d. The EIS protocol shall include the following components: data storage, data retrieval, reporting, data analysis, pattern identification, supervisory assessment, supervisory intervention, documentation, and audit.

A.4.e. On an annual basis, OPSO shall review the EIS to ensure that it has been effective in identifying concerns regarding policy, training, or the need for discipline. This assessment will be based in part on the number and severity of harm and injury identified through data collected pursuant to this Agreement. OPSO will document its review and conclusions and provide them to the Monitor, who shall forward this document to DOJ and SPLC.

Findings:
  A. 4. a.  Substantial Compliance
  A. 4. b.  Substantial Compliance
  A. 4. c.  Substantial Compliance
  A. 4. d.  Substantial Compliance
  A. 4. e.  Substantial Compliance

Observations:

Since the inception of the Consent Judgment, the electronic EIS has been unreliable. OPSO abandoned the original system and fashioned an alternative version within the AS400. A FIT staff member manually monitors the database to alert FIT staff as to the need to review any uses of force by a staff member.



OPSO has improved its documentation to the Monitors as to the names of the staff members who are flagged for uses of force, if a review is conducted, and any retraining received, if required.

The Use of Force Review Board has met regularly and evaluated the 2018 data as required for substantial compliance with IV. A .4. e.

While the EIS would ideally be part of the jail management system, as one does not yet exist, the efforts made by OPSO to craft an alternative EIS warrant a rating of substantial compliance on all provisions.

## IV. A. 5.  Safety and Supervision

A.5.a. Maintain security policies, procedures, and practices to provide a reasonably safe and secure environment for prisoners and staff in accordance with this Agreement.

A.5.b. Maintain policies, procedures, and practices to ensure the adequate supervision of prisoner work areas and trustees.

A.5.c. Maintain policies and procedures regarding care for and housing of protective custody prisoners and prisoners requesting protection from harm.

A.5.d. Continue to ensure that correctional officers conduct appropriate rounds at least once during every 30-minute period, at irregular times, inside each general population housing unit and at least once during every 15-minute period of special management prisoners, or more often if necessary.  All security rounds shall be documented on forms or logs that do not contain pre-printed rounding times.  In the alternative, OPSO may provide direct supervision of prisoners by posting a correctional officer inside the day room area of a housing unit to conduct surveillance.

A.5.e. Staff shall provide direct supervision in housing units that are designed for this type of supervision.  Video surveillance may be used to supplement, but must not be used to replace, rounds by correctional officers.

A.5.f. Increase the use of overhead video surveillance and recording cameras to provide adequate coverage throughout the common areas of the Jail, including the Intake Processing Center, all divisions' intake areas, mental health units, special management units, prisoner housing units, and in the divisions' common areas.

A.5.g. Continue to ensure that correctional officers, who are transferred from one division to another, are required to attend training on division-specific post orders before working on the unit.

A.5.h. Continue to ensure that correctional officers assigned to special management units, which include youth tiers, mental health tiers, disciplinary segregation, and protective custody, receive eight hours of specialized training regarding such units on prisoner safety and security on at least an annual basis.

A.5.i. Continue to ensure that supervisors conduct daily rounds on each shift in the prisoner housing units and document the results of their rounds.

A.5.j. Continue to ensure that staff conduct daily inspections of cells and common areas of the housing units to protect prisoners from unreasonable harm or unreasonable risk of harm.

A.5.k. Continue to ensure that staff conduct random monthly shakedowns of cells and common areas so that prisoners do not possess or have access to dangerous contraband.

A.5.l. Provide the Monitor a periodic report of safety and supervision at the Facility.  These periodic reports shall be provided to the monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement.  Each report will provide the following information:

(1)      a listing of special management prisoners, their housing assignments, the basis for them being placed in the specialized housing unit, and the date placed in the unit; and

(2)      a listing of all contraband, including weapons seized, the type of contraband, date of seizure, location, and shift of seizure.



Findings:
A. 5. a.  Partial Compliance
A. 5. b.  Substantial Compliance
A. 5. c.   Substantial Compliance
A. 5. d.  Partial Compliance
A. 5. e.  Partial Compliance
A. 5. f.  Partial Compliance
A. 5. g.  Substantial Compliance
A. 5. h.  Partial Compliance
A. 5. i.   Partial Compliance
A. 5. j.  Partial Compliance
A. 5. k.  Substantial Compliance
A. 5. l.   Substantial Compliance

Observations:

OPSO has worked very hard to finalize policies, procedures, and post orders. The implementation of those policies, procedures, and practices and the adequate supervision of inmate working areas results in substantial compliance as to A. 5. b. and c. The level of violence, an average of 36 inmate on inmate assaults/altercations per month and almost 10 assaults on staff per month, are indicative that OPSO has not substantially complied with the requirement that the facility be reasonably safe for staff and inmates. The challenges of developing credible training lesson plans, recruiting staff, training staff, remediating staff who do not have the required level of proficiency, and supervising employees to hold them accountable for not following policy remains.

OPSO has made significant progress under the leadership of the Independent Compliance Director and his initiation of unit management to assist in the daily supervision of housing units and increase accountability. However, review of the CY 2019 significant incidents indicates that the failure of staff to follow policy consistently is a serious impediment to effective supervision of the inmates. There are inmates who repeatedly do not follow the rules of OJC including assaulting other inmates, assaulting staff, destroying property, and/or threatening self-harm. Individual inmate plans need to be developed for those and consistently followed by all staff.



## Table 5 CY 2018 and CY 2019 OJC Reported Incidents

| 2018 | January | February | March | April | May | June | July | Aug | Sept | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Attempt Suicide/ideation | 6 | 14 | 4 | 4 | 0 | 6 | 9 | 13 | 7 | 3 | 5 | 7 | 78 |
| Contraband | 9 | 15 | 5 | 5 | 10 | 9 | 13 | 6 | 6 | 7 | 7 | 14 | 106 |
| Criminal Damage | 3 | 10 | 11 | 12 | 8 | 3 | 3 | 6 | 4 | 2 | 3 | 4 | 69 |
| Death | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 2 |
| Internal Escape | 2 | 2 | 3 | 3 | 5 | 7 | 3 | 2 | 5 | 0 | 8 | 8 | 48 |
| Inmate Injury/Inmate Medical (AKA slip/falls) | 9 | 5 | 18 | 22 | 19 | 32 | 30 | 30 | 35 | 26 | 18 | 18 | 262 |
| Inmate/Inmate Assault | 38 | 28 | 37 | 39 | 52 | 46 | 30 | 39 | 33 | 32 | 31 | 37 | 442 |
| Staff Suspension | 0 | 2 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| Staff Arrest | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Inmate Staff Altercation | 7 | 6 | 7 | 9 | | 7 | 4 | 3 | 6 | 9 | 6 | 0 | 64 |
| PREA | 2 | 4 | 5 | 4 | 5 | 5 | 4 | 3 | 2 | 5 | 5 | 3 | 47 |
| Use of Force | 13 | 10 | 21 | 22 | 24 | 26 | 20 | 27 | 14 | 28 | 21 | 34 | 260 |
| Other | 3 | 0 | 1 | 1 | 0 | 2 | 0 | 3 | 0 | 1 | 1 | 3 | 15 |
| Total | 92 | 96 | 112 | 121 | 124 | 144 | 116 | 132 | 112 | 113 | 105 | 129 | 1396 |
| 2019 | January | February | March | April | May | June | July | Aug | Sept | Oct | Nov | Dec | Total |
| Attempt Suicide/ideation | 15 | 13 | 6 | 3 | 13 | 13 | 6 | 7 | 2 | 1 | 0 | 3 | 82 |
| Contraband | 14 | 11 | 21 | 27 | 25 | 23 | 13 | 35 | 24 | 33 | 42 | 34 | 302 |
| Criminal Damage | 7 | 0 | 2 | 3 | 2 | 2 | 3 | 8 | 1 | 7 | 6 | 6 | 47 |
| Death | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Internal Escape | 3 | 1 | 1 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 6 |
| Inmate Injury/Inmate Medical (AKA slip/falls) | 14 | 4 | 16 | 15 | 11 | 16 | 8 | 20 | 10 | 18 | 5 | 8 | 145 |
| Inmate/Inmate Assault | 40 | 26 | 25 | 28 | 36 | 55 | 50 | 32 | 32 | 38 | 55 | 23 | 440 |
| Staff Suspension | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Staff Arrest | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Inmate Staff Altercation | 1 | 7 | 4 | 7 | 11 | 9 | 15 | 17 | 4 | 15 | 12 | 15 | 117 |
| PREA | 2 | 2 | 1 | 1 | 6 | 4 | 5 | 6 | 3 | 4 | 7 | 1 | 42 |
| Use of Force | 27 | 29 | 26 | 26 | 22 | 26 | 31 | 37 | 31 | 37 | 33 | 33 | 358 |
| Other | 0 | 0 | 3 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6 |
| Total | 123 | 93 | 105 | 112 | 127 | 148 | 131 | 163 | 107 | 153 | 160 | 123 | 1545 |

OPSO has significantly improved in the conducting and documenting of security rounds (30 minutes or 15 minutes depending on the unit). However, review of records, observations, and investigations clearly indicates that rounds and direct supervision surveillance are still not consistently conducted as per OPSO policy. Direct supervision requires surveillance of all of the inmates and cannot be properly performed by sitting behind a desk or in the control module. It requires walking around the unit, looking into the individual cells, and actively engaging with the inmates. Use of designated mandatory assignments has improved the consistency of staffing within those units, but for other units staffing was routinely inadequate or inconsistent throughout the shift. During the tour, units were noted to be unstaffed, including mandatory posts. If staff are not present, it impossible to make the



required rounds. The improvement has resulted in OPSO being found in partial compliance with IV. A. 5. d.

Due to unreliability of the TourWatch system, OPSO reverted to paper logs. While the current OPSO policy requires supervisors, up to the level of Watch Commander to review the paper logs to ensure rounds are being conducted, OPSO has not audited compliance with this policy. Review of the paper logs during the tour revealed that rounds are not being timely performed.

All twenty-four (24) of the housing units are designed for direct supervision. OPSO's Compliance Matrix identified twelve (12) mandatory posts. Six of these mandatory posts are the control pods and six are housing units. Thus, only 25% of the housing units are staffed as direct supervision. In addition, at times the deputies were not in those housing units.  Thus, IV. A. 5. e. remains in partial compliance.

Regarding overhead video surveillance and recording cameras for OJC (A.5.f.), there are on-going issues with quite a few of the 900 cameras not recording. Frequently, a nonfunctional camera is discovered only when an investigator tries to retrieve the videos. OPSO now audits the system by having a supervisor test the various cameras on a monthly basis and preparing a report for the Chief of Security. The system is in the process of being replaced. Until the replacement is complete and OPSO demonstrates that the system is functioning on a consistent and regular basis, IV. A. 5. f. remains in partial compliance.

Documentation was provided that staff transferred from other divisions to work in the OJC received the required training; thus, IV. A. 5. g. is in substantial compliance. Proof of training for the specialized units was not provided, but interviews of deputies revealed some training; IV. A. 5. h. remains in partial compliance.

Documentation is lacking that supervisors consistently conduct daily rounds during this compliance period; thus, IV. A. 5. i. continues to be in partial compliance.

The daily inspections of housing units as required by VI. A. 5. j. has improved, but are still only in partial compliance. With the introduction of unit management, unit managers and deputies were required to conduct daily inspections. However, simple observation of the conditions of the living units provides evidence that, while



---

daily inspections may be conducted, consistent inspection standards need to be communicated to the line staff and inmates. Further, corrective actions to address the inspection findings are essential.

Monthly shakedowns are conducted in substantial compliance with VI. A. 5. k. The number of contraband reports has increased significantly in 2019. It is unclear whether this is a result of more contraband in the facility or if it is a result of more frequent and effective contraband shakedowns. The review of contraband reports clearly indicate that the same issues reoccur which is indicative of a need to analyze the data and develop a corrective action plan to reduce, if not stop, the flow of contraband into the facility.

OPSO continues to review the monthly shakedown reports as to the locations of the contraband, linkages to previous shakedowns, specific items found, and the inmates involved. OPSO provided a list of special management units in compliance with the provision. Thus, IV A. 5. l.  is now in substantial compliance.

## IV.  A.  6.  Security Staffing

A.6.a. OPSO shall ensure that correctional staffing and supervision is sufficient to adequately supervise prisoners, fulfill the terms of this Agreement, and allow for the safe operation of the Facility, consistent with constitutional standards.

    (1)    OPSO shall achieve adequate correctional officer staffing in the following manner: Within 90 days of the Effective Date, develop a staffing plan that will identify all posts and positions, the adequate number and qualification of staff to cover each post and position, adequate shift relief, and coverage for vacations.  The staffing plan will ensure that there is adequate coverage inside each housing and specialized housing areas and to accompany prisoners for court, visits and legal visits, and other operations of OPP and to comply with all provisions of this Agreement.  OPSO will provide its plan to the Monitor, SPLC, and DOJ for approval.  The Monitor, SPLC, or DOJ will have 60 days to raise any objections and recommend revisions to the staffing plan.

    (2)    Within 120 days before the opening of any new facility, submit a staffing plan consistent with subsection (1) above.

    (3)    Within 90 days after completion of the staffing study, OPSO shall recruit and hire a full-time professional corrections administrator to analyze and review OPP operations.   The professional corrections administrator shall report directly to the Sheriff and shall have responsibilities to be determined by the Sheriff.  The professional corrections administrator shall have at least the following qualifications: (a) a bachelor's degree in criminal justice or other closely related field; (b) five years of experience in supervising a large correctional facility; and (c) knowledge of and experience in applying modern correctional standards, maintained through regular participation in corrections-related conferences or other continuing education.

    (4)    Provide the Monitor a periodic report on staffing levels at the Facility.  These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement.   Each report will include the following information:



i.   a listing of each post and position needed;
ii.   the number of hours needed for each post and position;
iii.   a listing of staff hired and positions filled;
iv.   a listing of staff working overtime and the amount of overtime worked by each staff member;
v.   a listing of supervisors working overtime; and
vi.   a listing of and types of critical incidents reported.

A.6.b. Review the periodic report to determine whether staffing is adequate to meet the requirements of this Agreement.  OPSO shall make recommendations regarding staffing based on this review.  The review and recommendations will be documented and provided to the Monitor

Findings:
 A. 6. a.  Substantial Compliance
 A. 6. b.  Substantial Compliance

An overall rating of A. 6. was provided in the previous reports. This was inconsistent with the other introductory paragraphs and has now been discontinued.

Observations:

Insufficient staffing of posts in OJC continues. This is evidenced by the extensive use of overtime and numerous incident reports and investigations that reveal posts were not constantly staffed. While provision IV. A. 6. a. (2) continues to be in substantial compliance due to the submission of the staffing plan, failure to consistently adhere to the staff plan results in IV. A. 6. a. (1) being in partial compliance. The Monitors look forward to reviewing the staffing plan for the occupation of TDC and Phase III.

Provision IV. 6. a. (3) is in substantial compliance with the hiring of Byron LeCounte as the Chief of Corrections as of February 19, 2019.

Paragraph IV. 6. a. (4) is in substantial compliance, as monthly reports are produced to document hiring and termination of employees.  The Stipulated Agreement also provides for bi-monthly reports regarding hiring.   Paragraph 7.a. of the Stipulated Agreement of February 11, 2015 requires monthly reporting. Overall, A. 6. a. is in substantial compliance.

OPSO is in substantial compliance with A. 6. b. as OPSO periodically reviews the staffing plan and has designated which posts are mandatory. The problem is that staff have not been hired/retained to consistently fill those mandatory posts.



## IV. A. 7.  Incidents and Referrals

A.7.a. OPSO shall develop and implement policies that ensure that Facility watch commanders have knowledge of reportable incidents in OPP to take action in a timely manner to prevent harm to prisoners or take other corrective action.   At a minimum, OPSO shall do the following:

A.7.b. Continue to ensure that Facility watch commanders document all reportable incidents by the end of their shift, but no later than 24 hours after the incident, including prisoner fights, rule violations, prisoner injuries, suicide attempts, cell extractions, medical emergencies, found contraband, vandalism, escapes and escape attempts, and fires.

A.7.c. Continue to ensure that Facility watch commanders report all suicides and deaths no later than one hour after the incident, to a supervisor, IAD, the Special Operations Division, and medical and mental health staff.

A.7.d. Provide formal pre-service and annual in-service training on proper incident reporting policies and procedures.

A.7.e. Implement a policy providing that it is a disciplinary infraction for staff to fail to report any reportable incident that occurred on his or her shift.  Failure to formally report any observed prisoner injury may result in staff discipline, up to and including termination.

A.7.f. Maintain a system to track all reportable incidents that, at a minimum, includes the following information:

    (1)      tracking number;
    (2)      the prisoner(s) name;
    (3)      housing classification and location;
    (4)      date and time;
    (5)      type of incident;
    (6)      injuries to staff or prisoner;
    (7)      medical care;
    (8)      primary and secondary staff involved;
    (9)      reviewing supervisor;
    (10)    external reviews and results;
    (11)    corrective action taken; and
    (12)    administrative sign-off.

A.7.g. Ensure that incident reports and prisoner grievances are screened for allegations of staff misconduct, and, if the incident or allegation meets established criteria in accordance with this Agreement, it is referred for investigation.

A.7.h. Provide the Monitor a periodic data report of incidents at the Facility.  These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement.

A.7.i. The report will include the following information:

    (1)      a brief summary of all reportable incidents, by type and date;
    (2)      a description of all suicides and in-custody deaths, including the date, name of prisoner, and housing unit;
    (3)      number of prisoner grievances screened for allegations of misconduct; and
    (4)      number of grievances referred to IAD or SOD for investigation.

A.7.j. Conduct internal reviews of the periodic reports to determine whether the incident reporting system is ensuring that the constitutional rights of prisoners are respected.  Review the quarterly report to determine whether the incident reporting system is meeting the requirements of this Agreement.  OPSO shall make recommendations regarding the reporting system or other necessary changes in policy or staffing based on this review.  The review and recommendations will be documented and provided to the Monitor.

Findings:
A. 7.  a.  Substantial Compliance
A. 7.  b.  Partial Compliance
A. 7.  c.  Substantial Compliance



A. 7. d.  Substantial Compliance
A. 7. e.  Substantial Compliance
A. 7. f.   Partial Compliance
A. 7. g.  Substantial Compliance
A. 7. h.  Substantial Compliance
A. 7. i.   Substantial Compliance
A. 7. j.   Substantial Compliance

<u>Observations</u>:

OPSO has long had a policy on incidents and referrals that sets out the process for documenting and referring incidents. What has been lacking is a sufficient process to ensure all reportable incidents are being documented and that all incident reports are complete, prompt and accurate. OPSO has improved in its reporting of incidents, but all incidents are still not timely reported to OPSO and/or the Monitors. Thus, A. 7. b. remains in partial compliance.

One of the methods for determining whether incidents are reported is to review "routes" of inmates with serious medical or trauma injuries to the hospital emergency and the OPSO clinic walk-in logs. This function used to be performed by the Monitors. OPSO has implemented a process where a sergeant performs this function and follow up on missing reports. This is an example of OPSO incorporating processes which allow OPSO to audit its compliance. What had been lacking was holding the supervisors accountable for the late reports. Documentation of accountability in the form of counseling was presented. Accountability has improved, but progressive discipline should be used for those who continue to not meet the requirement for provisions IV. A. 7. a. and e. to remain in substantial compliance and A. 7. b. to achieve substantial compliance.

During the reporting period, there were no deaths, but serious attempts at suicide were reported within an hour to the proper persons; thus IV. A. 7. c. is in substantial compliance.  Annual training was provided on incident reporting, and documentation indicates that staff were required to attend; IV. A. 7. d. is in substantial compliance. OPSO has transitioned to the AS 400 system to track the information required in IV. A. 7. f., but all of the required information is frequently not gathered and reflected in the reports such as medical care, external reviews and



results, and corrective action. To obtain substantial compliance, OPSO should prepare supplemental reports which contain the information. In substantial compliance with A. 7. g., incidents and grievances are reviewed for misconduct and referred for investigation where appropriate. The Monitors were provided a semi-annual report of incidents, that now, with the supplementation by the daily/weekly reports, which contains all of the required information and, thus, A. 7. h. and i. are in substantial compliance. OPSO performed an assessment of whether the reporting system is meeting the requirements of the Consent Judgment and is given substantial compliance for A. 7. j. as OPSO is now addressing the lack of timeliness. However, to maintain substantial compliance, future assessments of the reporting system will need to be more robust and refined.

## IV. A. 8.  Investigations

A.8.a. Maintain implementation of comprehensive policies, procedures, and practices for the timely and thorough investigation of alleged staff misconduct, sexual assaults, and physical assaults of prisoners resulting in serious injury, in accordance with this Agreement.  Investigations shall:

    (1)    be conducted by persons who do not have conflicts of interest that bear on the partiality of the investigation;

    (2)    include timely, thorough, and documented interviews of all relevant staff and prisoners who were involved in or who witnessed the incident in question, to the extent practicable; and

    (3)    include all supporting evidence, including logs, witness and participant statements, references to policies and procedures relevant to the incident, physical evidence, and video or audio recordings.

A.8.b. Continue to provide SOD and IAD staff with pre-service and annual in-service training on appropriate investigation policies and procedures, the investigation tracking process, investigatory interviewing techniques, and confidentiality requirements.

A.8.c. Ensure that any investigative report indicating possible criminal behavior will be referred to IAD/SOD and then referred to the Orleans Parish District Attorney's Office, if appropriate.

A.8.d. Provide the Monitor a periodic report of investigations conducted at the Facility.  These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement.

A.8.e. The report will include the following information:

    (1)    a brief summary of all completed investigations, by type and date;

    (2)    a listing of investigations referred for administrative investigation;

    (3)    a listing of all investigations referred to an appropriate law enforcement agency and the name of the agency; and

    (4)    a listing of all staff suspended, terminated, arrested, or reassigned because of misconduct or violations of policy and procedures.  This list must also contain the specific misconduct and/or violation.

A.8.f. OPSO shall review the periodic report to determine whether the investigation system is meeting the requirements of this Agreement and make recommendations regarding the investigation system or other necessary changes in policy based on this review.  The review and recommendations will be documented and provided to the Monitor.

Findings:
A. 8. a.  Substantial Compliance



A. 8. b.  Substantial Compliance
A. 8. c.  Substantial Compliance
A. 8. d.  Substantial Compliance
A. 8. e.  Substantial Compliance
A. 8. f.  Substantial Compliance

Observations:

The Investigative Services Division (ISB) is responsible for:  the Criminal Investigation Division (investigates possible criminal activity by inmates), Internal Affairs Division-Criminal (investigates possible criminal activity by staff), the FIT (investigates use of force by staff), the Internal Affairs Division-Administrative (investigates possible violation of policies by staff), and the Intelligence Unit (provides information and intelligence regarding activities that have taken place or may take place in the jail or support activities).

Significant evidence of substantial compliance was provided for IV. A. 8. a. The Monitor continues to be concerned about the time investigations are taking, but the length of time for investigations decreased to the additional ISB staff and an improvement in quality of the reports on which the investigations are based. As the volume of incidents requiring the attention of ISB decreases, the timeliness of investigations should improve. Improvements in all other areas from hiring, training, supervision, and adequate staffing will enhance the safety of staff and inmates and, ultimately, decrease the workload of ISB.

The Monitor acknowledges that investigating incidents of inmate on inmate assaults, sexual assaults, staff on inmate assaults, etc. with a goal of seeking indictments is appropriate; but the overall goal is to create a safe jail. In a jail setting, investigations play a critical role in protecting inmates from inappropriate or illegal staff actions, protecting inmates from each other, and correcting policy, practice, supervision and training. Continued emphasis is needed on the goal of investigations to prevent future incidents through analysis of the policy, procedures, training, supervision, and physical plant contributors to the incident. This function cannot and should not be performed by ISB alone. This level of assessment requires input from individuals who have a high level of experience in jail/corrections work. In short, it requires collaboration between ISB and OJC which continues to be



wanting. The OJC staff should take the lead in the root cause analysis with ISB providing information gathered during the investigation.

The quality of sexual assault investigations has improved since those investigations were moved under the supervision of the Lieutenant responsible for IAD-Criminal investigations.

ISB continues to receive significant additional training in substantial compliance with A. 8. b. ISB contracted with an expert on sexual assault and PREA investigations to provide training to guide implementation of the new skills.

Investigations which reveal potential criminal activity are referred to the Orleans Parish District Attorney's Office in substantial compliance with A. 8. c. ISB provides reports in substantial compliance with IV. A. 8. d. and e. ISB reviews the investigation system to determine whether the investigation system is complies with the requirements of the Consent Judgment and forwards any recommendations to the Monitors. ISB's substantial compliance is evidenced not only by their analysis, but adjustments such as the movement of PREA investigations under IAD-Criminal, additional sexual assault investigation training, and the formalization of a call out policy for the collection of forensic evidence in serious incidents.

## IV. A. 9.   Pretrial Placement in Alternative Settings

A.9.a. OPSO shall maintain its role of providing space and security to facilitate interviews conducted pursuant to the City's pretrial release program, which is intended to ensure placement in the least restrictive appropriate placement consistent with public safety.
A.9.b. OPSO shall create a system to ensure that it does not unlawfully confine prisoners whose sole detainer is by Immigration and Customs Enforcement ("ICE"), where the detainer has expired.

Findings:
A. 9. a.  Substantial Compliance
A. 9. b.  Substantial Compliance

Observations:

OPSO provided a memorandum noting that the pretrial program is no longer managed by VERA, but rather by the Criminal District Court, and that the same space is provided. OPSO also provided a memorandum that ICE detainers are only accepted for a specified list of offenses; and that OPSO has not detained any individuals under an ICE detained during 2019.



## IV. A. 10. Custodial Placement within OPP

**Introduction**

OPSO has designed, validated, and implemented an objective classification system to assess and house each OSPO inmate according to his/her risks posed to institutional safety and security. The automated classification system was rolled out in the Jail Management System (JMS) on January 15, 2015.[2] The OPSO staffing plan set the classification staff FTEs at 18. As of September 19, 2019, the Classification Unit staffing was 14 -- 13 civilian classification specialists and a classification manager. In addition, designated for the Classification Unit were two civilians currently enrolled in the Academy. Thus, it appeared the Classification Unit staffing was adequate.

Hired were four (4) classification specialists during this compliance period. Staff provided a memorandum outlining the classification-specific training schedule. While the schedule listed instruction for the custody and PREA assessment instruments, the OPSO housing matrix, and housing assignments, it did not appear that the schedule was followed or reflected actual training provided to the new staff members. Two in-service training topics during this compliance period addressed housing assignments. The training materials, pre- and post-tests, and attendance logs were not available to document staff's competencies. Overall, the training provided to the classification staff was inadequate; comprehensive classification training was recommended for all and arrangement made for the necessary training.

An automated housing assignment process (HUAP) identifies housing options for inmates according to their custody level, gender, special population status, PREA designations, enemies, and associates. The classification specialist selects from the potential housing locations to match the inmates by age, crime/criminal history, custody level, and PREA designations. Special population tags identify inmates for suicide observation versus suicide watch, medical housing/isolation, academic education, or special diets. The OJC and TDC dormitory-style units have been cataloged in the automated HUAP to enable the classification specialists to assign inmates to specific beds. Although

---

[2] Hardyman, Patricia L. (2015). "Design and Validation of an Objective Classification System for the Orleans Parish Sheriff's Office: Final Report." Hagerstown, MD: Criminal Justice Institute, Inc.



Classification Unit and JMS staff worked together to develop an Inmate Separation Instrument (ISI) to maintain out-of-cell separations, current OPSO operational procedures only require use of the ISI is not systematically used in either the general population or special management units.

During this compliance period, classification specialist and corrections security staff conducted housing audits to verify the inmates were in their assigned beds. However, most of the audit sheets were incomplete and inconsistent. Further, the auditors did not verify the inmates were sleeping in their assigned beds. Thus, the integrity of the housing audit process was highly questionable.

OPSO modified its document submittal process to exclude standardized monthly classification statistical reports. These reports were retrieved while onsite for the full review of the System. It appears the classification specialists complete the initial and reclassification assessments within 24 hours of intake or status change for most inmates.

**Assessment Methodology**

The compliance review included observation of the custody assessment, housing assignment, and audit processes as well as meetings with OPSO staff. A follow-up visit to observe the classification training for new classification specialists occurred in October. Following the site visit, analyzed were the monthly statistical reports, housing audit data, and monitor logs. Further, reviewed were miscellaneous documents provided before or during the compliance visit. Thus, compliance was assessed using multiple data sources and methods. The data for this compliance report focused primarily on the period between December 2018 and June 2019. For some analyses, thirteen (13) months was used to allow for tracking trends and to account for seasonal variations.

**Summary**

In sum, the OPSO is in partial compliance overall with the paragraphs of the Consent Judgment related to Custodial Placement within OPP (IV. A.10).  During this six-month period, the OPSO moved from Partial Compliance to Substantial-Compliance on Sections a. *(OPP shall implement an objective and validated classification system)* and h. *(OPSO shall review the periodic data report and make recommendations)*. There were no changes on Sections b., c., and g.  Sections d. and f. regressed from Substantial to Partial Compliance. Section d. (*Continue to update the classification system to include information on each*



*prisoner's history*) regressed as the inmate's non-Orleans criminal histories were not scored for the custody and PREA assessments. Section f. *(Conduct internal and external review and validation of the classification and prisoner tracking system on at least an annual basis.)* regressed due to the poor quality of the housing audits, in particular the failure to verify the inmates' bed assignments. Further, the internal audits failed to identify and address the missing criminal history attachments. OPSO is in substantial compliance with five of the eight elements of the Consent Judgment regarding Custodial Placement.

    Findings:
    A. 10. a.  Substantial Compliance
    A. 10. b.  Substantial Compliance
    A. 10. c.  Substantial Compliance
    A. 10. d.  Partial Compliance
    A. 10. e.  Partial Compliance
    A. 10. f.  Partial Compliance
    A. 10. g.  Substantial Compliance
    A. 10. h.  Substantial Compliance

IV.A.10. a.  OPP shall implement an objective and validated classification system that assigns prisoners to housing units by security levels, among other valid factors, in order to protect prisoners from unreasonable risk of harm.  The System shall include consideration of a prisoner's security needs, the severity of the current charge, types of prior commitments, suicide risk, history of escape attempts, history of violence, gang affiliations, and special needs, including mental illness, gender identity, age, and education requirements.  OPSO shall anticipate periods of unusual intake volume and schedule sufficient classification staff to classify prisoners within 24 hours of booking and perform prisoner reclassifications, assist eligible DOC prisoners with re-entry assistance (release preparation), among other duties related to case management.

Finding:  Substantial Compliance

**Observations:**

As of January 14, the Classification Unit roster lists 14 individuals -- a classification manager and 13 civilian classification specialists. As per the OPSO 2018 staffing analysis plan 18 "civilianized" positions are assigned to the Classification Unit.[3] The Classification Unit Manager reports to the Captain of the Intake Processing Center (IPC). An assertive voice for the Classification Unit is important to ensure its' control of all housing transfers and assignments and participation in OPSO housing-related decisions.

---

[3] Hodge, Darnley (October 1, 2018). "Updated Coverage Plans for the OPSO (Civil Division excluded)." Orleans Parish Sheriff's Office, Independent Compliance Director. pp. 12.



The 1st shift lead classification specialist is responsible for completing housing audits, responding to grievances, and conducting interviews regarding protective custody and housing re-assignments in addition to supervising the classification specialists, processing housing transfers, and conducting custody re-assessments.  The classification shift leaders and specialists work overtime to complete the initial classification, reclassification, vulnerability assessments, and housing assignments. They averaged 42 hours of overtime per month; the range was 32.95 to 61.64 hours.

During this compliance tour the current classification and PREA handbooks were readily available in the classification work area as reference tools for checking offense severity, codes for disciplinary infractions, and the like. Available was a memo outlining the training schedule for new classification specialists; however, the specific content and format of the various sessions were unclear.  The new specialists reported participating in "hands-on" training for the custody and PREA assessment instruments and housing processes matrix.[4] During this compliance reporting period, the classification manager/team leaders provided ad hoc remedial instruction, as needed.

<div style="background-color:#e8e8e8">

IV.A.10.b. Prohibit classifications based solely on race, color, national origin, or ethnicity

</div>

Finding:  Substantial Compliance

**Observations**:

The custody assessments consider objective risk factors validated for the OPSO males and female inmates. The inmate's race is not one of the objective risk factors. The classification specialists consider the inmate's custody level, vulnerability designation, age, and charges when selecting from the beds identified by the JMS.

To track this element of the Consent Judgment, OPSO created a monthly statistical report to track classifications by race and housing location. Analyses of these reports by the Monitor suggested that the OJC housing assignments were not by race. The housing distribution across the OJC housing units were generally consistent with the overall distributions of inmates by race within the OPSO inmate population. However, the

---

[4] The "hands-on" training was simply "on-the-job" training shadowed by the shift supervisor.



percentage of white inmates assigned to TDC exceeded their proportions within the overall inmate population. In June 2019, 87.0 percent of the OPSO inmates was Black; however, only 77.2 percent of the inmates housed in TDC were Black. (See Figure 1.) There was about a 10 percent discrepancy between the percentage of Blacks housed in TDC versus the overall percentage of OPSO inmates for each of the months -- December 2018 through June 2019. During this compliance period, TDC housed the kitchen/maintenance and off-site workers. These data raise questions about the worker selection/assignment process.



**Figure 1: Distribution of Inmates by Race by OPSO Facility**

> IV.A.10.c Ensure that the classification staff has sufficient access to current information regarding cell availability in each division.

Finding: Substantial Compliance

**Observations:**

OPSO automated housing assignment process (HUAP) considers the inmate's custody level, gender, special population status, PREA designations, enemies, and associates as well as bed availability to recommend an appropriate bed for the inmate. Housing tags, for example, identify inmates on suicide observation versus suicide watch, alcohol/drug detoxification protocol, gang affiliation, school participation, and special diets. The HUAP provides the classification specialists a list of potential beds for each inmate.

The JMS daily population report lists the units, cells, and beds offline for maintenance or staffing as recorded in the AS400. These were <u>not</u> a full or accurate listing of the cells



closed for maintenance and the like. Tacked on the walls of classification specialists' work areas were post-it notes and lists of cells with maintenance problems. The lists/notes did not indicate when the various cells went offline. Further, the posted offline cells did not match those listed on the JMS daily population report. The classification specialists must manually compare the posted lists of cells/beds offline with the bed assignments generated by the HUAP. This manual process creates inefficiencies among the automated HUAP, housing assignment/transfer, and the facility maintenance processes. The reason(s) for the disparity between the manual lists/notes and the JMS records of cells/beds offline was unclear. The classification unit manager has the option to update the status of beds within the JMS as well as to input requests within the facility maintenance log.

Classification specialists also maintain a list of daily bed assignments to avoid duplications due to delays between the housing assignments and physical transfer of the inmate to the designated housing unit. Thus, as required by the Consent Judgment, the classification specialists appear to have access to current information regarding bed availability throughout the OJC. However, the current process entails maintaining multiple manual lists creating the risk of housing errors and backlogs for moving inmates from the booking area to the appropriate housing pod. Further, the manual lists and notes are inefficient and impede the housing assignment process. To maintain substantial compliance for this paragraph, OPSO will need to progress from its' current manual process to a fully automated process within the JMS.

### IV. A. 10. d. Continue to update the classification system to include information on each prisoner's history at OPSO.

Finding:   Partial Compliance

**Observations:**

As shown in Figure 2, the monthly custodial reports provided by OPSO indicated a significant increase in the lag-time between booking and the initial classification. However, the percentage of inmates for whom initial custody and housing assessments were completed remained stable. In particular:

- o   Percent Initial Custody Assessments: During this compliance period, initial custody assessments were completed for 81.9 percent of the inmates booked



into OJC.[5] Between December 2018 and June 2019, the rate dropped slightly from 83.0 to 80.0 percent.

o   Percent Within 8 Hours: As of June 2019, initial custody assessments were completed within the first eight hours of booking for only 51.6 percent of the OPSO inmates. Between December 2018 and June 2019, the percentage initial classifications completed within the first eight hours of booking rate dropped. The most precipitous decrease was between April and June 2019, i.e., from 88.8 to 51.6 percent.

o   Percent Greater Than 24 Hours: As of June 2019, the lag time between booking and the initial custody assessment was more than 24 hours for only 1.4 percent of the inmates. This was an uptick from .5 percent in December of 2018. This shift should be closely monitored over the next six months.



Figure 2: Rates and Completion Time for the Initial Custody Assessments – Dec 2018 – June 2019

These data suggested that the percentage of inmates for whom an initial classification was completed has remained stable. Yet, the lag time between booking and classification/housing increased sharply during the latter half of this compliance period. The slowdown in the initial classification and housing process appears, at least in part, to be linked back to the intake housing process/unit implemented by OPSO in October 2018.

---

[5] Custody and PREA assessments were completed for all inmates prior to their transfers from the booking area to OPSO housing units.



All male inmates are housed on 1-F for the first 72 hours on incarceration; staff reported that bed assignments for some inmates are delayed for lack of appropriate beds on the unit. Housing challenges centered on maintaining adequate separations by custody level and PREA designations as well as the availability of lower bunks for inmates with medical, mental, or detoxication requirements. In addition to slowing the initial classification/housing process, the Intake Unit creates concerns about the additional risks from the assignment of Low, Medium, and High custody inmates with different PREA designations to the same housing unit. The only out-of-pod separations maintained by the security staff were for medical and mental health needs, not custody or PREA requirements.

During the previous compliance period, as needed the inmates' initial custody level were overridden for housing purposes. However, this practice was modified as housing is NOT a legitimate reason for a discretionary override. Yet, concerns remain that the classification specialists use discretionary overrides of the scored custody levels when assigning inmates to a bed to expand the housing options.[6] The posted memo was confusing as to whether discretionary overrides were forbidden or merely required supervisor approval.

The JMS override data indicated that 57.1 percent of the overrides during 2019 were for housing purposes. Many of these overrides were initiated to transfer low custody inmates from the "Booking" area to the Intake Unit, 1-F.  The monthly classification indicated that the rate of discretionary overrides at initial classification for the men peaked in January 2019 at 19.2 percent. By May, the discretionary override rate had dropped to 2.9 percent.  The classification specialists were careful to "match" inmates by age, current offense, and final custody level for the housing assignments, particularly for the "low" custody inmates.

The Classification Monitor List (List) is an ad hoc report that identifies inmates for whom a custody review is due. Custody re-assessment reasons include a regular 60/90-day re-assessment or because of some change or event within their jail records, i.e., change in

---

[6]A memo dated May 7, 2019, instructed staff that "bumps" from low to medium custody for initial housing required approval from the team leader or classification manager. However, at reclassification, previous overrides from low to medium custody were to be continued.



their charge(s), bail amount, disciplinary record, detainer lodged/lifted, or sentence. The number of inmates on the list fluctuates as inmates return from court, move through the booking process, and the like. At least one classification specialist per shift is assigned the task of completing the custody reviews. The average number of pending custody assessments between January 1, 2019, and June 30, 2019, was 29.4. The lists were evenly split between those awaiting an initial classification (13.47) versus those awaiting a custody re-assessment (15.95). As the average number of pending custody assessments during the previous compliance period was 18.04[7], there appeared to be a slowdown of both the initial and reclassification processes during this compliance period.

Following Compliance Report #8, OSPO took immediate steps to work with CCS (now Wellpath) to rebuild the linkages between the medical/mental health records and JMS. These data are essential for seven of the PREA victimization and predation risk factors. Also, medical and mental health information is critical for the inmates' housing assignments. The linkage between the electronic medical records (ERMA) and the JMS for the intake data is complete, but the programming to update the records throughout the inmate's incarceration is still problematic.

Observation of the custody assessment process suggested that the classification specialists were not inputting prior criminal history data into the JMS for inmates with non-Orleans Parish felony convictions. Staff generated and reviewed the rap sheets for the initial custody assessments. However, they did not automatically generate the required attachments to ensure the JMS scored the individuals' criminal histories for the custody and PREA assessments. When asked about the attachment process, the team lead guided the classification specialists through the process as they were not familiar with the task. Further, observation of the reclassification process revealed that the criminal rap sheets were not reviewed for the custody re-assessments.

These observations prompted concern as to whether staff routinely used the attachment option within the JMS to input non-Orleans Parish convictions and warrants. As staff may be nervous or confused by the observation process, data were retrieved from the

---

[7]For the compliance period of July 2018 and December 2018, the average number of pending initial classifications was 11.08; 6.96 inmates were awaiting a custody review.



JMS to track the use of the attachment option by date, reason, and staff identification. As shown in Figure 3, the number of attachments input by the classification staff has dwindled from a high of 1,140 in June 2018 to only 3 in June 2019.[8] Further, as shown in Figure 4, in January 2018, 93.9 percent of the attachments updated the inmate's criminal history. Only 14.3 percent of the August 2019 attachments pertained to the inmates' criminal histories.[9] In June and July of 2019, zero (0) criminal history attachments were inputted. These data indicated that staff did not link the tasks of reviewing the rap sheets, inputting Non-OPSO convictions, and generating the custody and PREA assessments.



**Figure 3: Number of Attachments Input by Classification Staff -- January 2018 - August 2019**

[8] The decline in OPSO's average daily OPSO population (from 1,451 in January 2018 to 1167 as of June 2019) does not account for this precipitate drop in the use of the attachment option by the classification staff. A 20% drop in the ADP would suggest a 20% decrease in the number of attachments input. Further, the number of initial custody assessments completed has remained constant during this period – 979 in January and 1025 in June. Thus, the dramatic drop in the number of attachments input per month is not explained by the OPSO ADP or the number of initial classifications completed.

[9] "Other" attachments record, for example, the assignment of inmate workers.





**Figure 4: Attachment Reason by Month -- January 2018 – August 2019**

       The failure to generate criminal history attachments within the JMS for the custody and PREA assessments raised questions as to the integrity of the classification training, audits, and supervision as well as the accuracy of the custody assessments. The absence of relevant attachments, for example, should have been detected by classification supervisors during the random audits of the custody assessments or by the team leaders when completing the custody re-assessments.

IV.A.10.e. Continue competency-based training and access to all supervisors on the full capabilities of the OPSO classification and prisoner tracking system.

Finding:   Partial Compliance

**Observations:**

       During this compliance period, four new classification specialists were hired. Staff reported training on the custody and PREA assessment instruments and the OPSO housing matrix. However, documentation of this training was not available. The classification manager reported providing ad hoc remedial instruction as needed. Given the attachment data detailed in Figures 3 and 4 and the fact that staff may be nervous or confused by the observation process, a second onsite visit was conducted to observe the training for new



classification specialists. The staff had easy access to the classification handbook.[10] However, the quality of instruction provided by the shift supervisors/classification manager was questionable. As previously noted, the classification specialists were not routinely inputting attachments and struggled when prompted to generate an attachment.[11] Further, not all staff was familiar with OPSO offense and disciplinary severity indexes. While the System is highly automated within the JMS, the automation should not be expected to replace the staff's understanding of the underlying scoring of the risk factors.

IV.A.10.f. Conduct internal and external review and validation of the classification and prisoner tracking system on at least an annual basis.

Finding:  Partial Compliance

**Observations:**

OPSO population reports as to the number of inmates by location were received daily by the Monitor. Custodial statistical reports for December 2018 through June 2019 as to the number of custody assessments by type, gender, and population were also available. These reports track the timeliness of the initial custodial assessments; the custody distributions; housing monitor lists (i.e., the log of cases due for a custody assessment); the prevalence of special populations; as well as the rates and types of disciplinary infractions. OPSO has both housing and internal audit protocols; both processes were reviewed for this compliance report.

**<u>Housing Audits – Checking the Veracity of the Inmate Housing Assignments</u>**

A total of 212 housing audit score sheets were generated for December 2018 – June 2019. Each audit sheet (and roster, when provided) was reviewed. Commendations to OPSO security supervisors for their work. These data suggested that OPSO has addressed previous problems of security supervisors moving inmates without going through the Classification Unit for housing unit transfers. However, the audit sheets raised several

---

[10] The handbook distributed to staff was outdated as Appendix C. OPSO Disciplinary Codes – Severity Scale for Classification had not been updated to reflect OPSO disciplinary code as of October 2016.

[11] Inputting criminal history attachments is a fundamental task for the custody assessments.



concerns. As required by OPSO's housing audit protocol, not all pods were audited monthly and pods with cell or pod separation errors were not re-audited. Most of the audit sheets were incomplete; missing were information as to the integrity of the cell and bed assignments, pod level separations, and auditor. For most of the audits, recorded were the pod, date, and start time. The staff did not document that each inmate was in his/her assigned bunk.[12] Their comments indicated the inmates were standing by/in their assigned cells or sleeping on the floor. A second red flag was the time staff spent auditing the respective pods. The start times for many of the audits were 5 to 10 minutes apart. Thus, the auditor identified each inmate's assigned location, checked the security and operational items, and walked to the next OJC pod within 5 to 10 minutes? During the audit observed for this compliance visit, 23 of the 57 inmates were not in their assigned beds. The audit time was from 10:05 to 11:03 AM. Many of the audit sheets appeared to have been completed by security staff. This is fine. However, in violation of the audit protocol, it appeared that the Unit's supervisor conducted the audits.

Therefore, it was inconclusive whether the units maintain the housing assignments as generated by the classification unit. OPSO did not provide a summary or analysis of the audits. The supervisors expressed surprise as to the incomplete and inconclusive housing audits suggesting that the audit sheets were not routinely reviewed.

### **Internal Audits – Checking the Accuracy of the Custody and PREA Assessments**

As part of the ongoing classification and housing processes, the classification shift supervisor reviews the JMS reports to identify placement errors and ISI separation conflicts. Supervisors/team leaders indicated that errors were corrected immediately. Thus, the housing separation errors detected by the JMS were resolved quickly to prevent conflicts and to enhance staff and inmate safety. Reliance on automated housing violation reports to detect housing and custody assessment errors is insufficient to ensure

---

[12] The audit instructions define cell assignment errors as "An instance in which an Inmate or Inmates are found to be residing in a cell to which He or She is not assigned to by the Classification Division." (See slide 5 of training PowerPoint entitled. "The Classifications Housing Unit Audit System.") Thus, it appeared that the Classification Unit did not instruct the security staff to verify bed assignments. The classification unit auditor was aware of the requirement to verify the bed assignments, but it was apparent that these were not checked for every audit. This auditor had not seen the audit training PowerPoint but instead was instructed by the previous auditor.



institutional safety and security.

Reviewed were the January – June 2019 internal audit logs. Audited were a total of 79 custody assessments; this represented about .60% of the 13,103 custody assessments completed during this six-month period. This low rate of audits is troubling. No "errors discovered" was reported for each of the custody assessments audited. However, for the internal audits observed, errors were detected, i.e., the staff member did not input the required criminal history attachment. A random sample of the audited custody assessments was re-audited; errors, in particular missing criminal history attachments were noted for multiple assessments. The integrity of the audits, or at least the audit protocol, is insufficient. Further, when observing the reclassification process, the staff member identified housing errors that required adjustment of the housing matrix. These observations suggested that the internal audit process was insufficient to identify assessment errors and that the audit logs were not complete.

### Revalidation of the Classification System – Assessing the Validity of the System

OPSO contracted with Dr. Edward Latessa and Dr. Brian Lovins (University of Cincinnati) for revalidation of the classification system as required by the Consent Judgment.  Lovins and Latessa submitted their final report to the OPSO on April 30, 2018.[13] This validation study serves as documentation of compliance with the Consent Judgment requirement for "external review and validation of the classification and prisoner tracking system on at least an annual basis*."* Although statistical validation of an objective classification system is generally recommended every three to five years,[14] continuous monitoring and process evaluation are essential for ensuring the integrity of the System for the OPSO <u>current</u> inmate population. OPSO should review and address Lovins and Latessa's recommendations and plan to revalidate the System by 2021 as recommended.

IV.A.10.g. Provide the Monitor a periodic report on classification at the Facility.  These periodic reports shall be provided to the Monitor within four months of the Effective Date and every six months, thereafter, until termination of this Agreement.  Each report will include the following information:
     (1)        number of prisoner-on-prisoner assaults;
     (2)        number of assaults against prisoners with mental illness;

---

[13] Lovins, Brian K. and Edward Latessa (April 30, 2018). "Revalidation of the Orleans Parish Classification System." Cincinnati, Ohio: University of Cincinnati Corrections Institute.
[14] Austin, James and Hardyman, Patricia L. (2004) "Objective Prison Classification: A Guide for Correctional Agencies." Washington, D.C.: National Institute of Corrections. pp. iv.



(3)      number of prisoners who report having gang affiliations;
(4)      most serious offense leading to incarceration;
(5)      number of prisoners classified in each security level;
(6)      number of prisoners placed in protective custody; and
(7)      number of misconduct complaints.

Finding:   Substantial compliance

**Observations:**

Reviewed were the monthly custodial, discipline, and inmate statistical reports for December 2018 – June 2019. OPSO has developed reports to track the statistics as required under section IV.A.10.g. The only exception is the rates of victimization of inmates on the mental health caseload. As noted earlier, these data are dependent upon timely caseload information from the mental health provider. As noted in reports, OPSO and the medical/mental health provider worked together to line the JMS and electronic medical data to generate timely and accurate counts of victimization. However, these efforts appear to have stalled. As victimization of inmates on the mental health caseload is specifically required by the Consent Judgment, OPSO and the mental health provider will need to complete this process to maintain substantial compliance with this item.

Updated data as to the inmates with gang affiliations were inputted to the JMS throughout the compliance period. OPSO, New Orleans Police Department, and the Orleans District Attorney have created an ongoing process for notifying the OPSO of offenders identified as members of a "gang." Thus, these data are available to track the prevalence of inmates per "gang" among OPSO populations as well as by their location (i.e., tier, side, and bed).

Figure 5 provides the OPSO monthly disciplinary data as recorded in the JMS. The number of disciplinary reports has fluctuated over the last 13 months – June 2018 - June 2019. These fluctuations appear to mirror the fluctuations in the OPSO average daily population (ADP). Overall, the trend-line for the number of formal disciplinary reports written per month indicates a decline in the number of disciplinary reports between June 2018 – March 2019. In April, however, the number of disciplinary reports jumped from 128 to 293. The number of reports continued to rise in May and June (May, 318; and June, 322). The rate of infractions with a finding of guilt held steady at about 82 percent through March 2019, but then dropped to ~65 percent for the remainder of the period.





Figure 5: Numbers of Total and Guilty Disciplinary Infractions: June 2018 – June 2019

Figure 6 illustrates the rate of disciplinary infractions among the OSPO inmate population for June 2018 – June 2019.[15] The rates of predatory (e.g., assaults or battery) and aggressive behaviors (e.g., fights or threats) based on the OSPO ADP were steady over the 13 months. In June 2018, for example, 2.0 percent of the inmates were found guilty of a predatory infraction; 2.6 percent were found guilty of an aggressive infraction. In June 2019, 3.7 percent were found guilty of a predatory infraction and 2.8 percent of an aggressive infraction. The percentage of the inmates written up for a disciplinary infraction per month increased from 22.8 to 27.6 percent. On the other hand, the rate of guilty findings dropped from 21.1 to 17.5 percent.

For this compliance period (December 2018 – June 2019), there was a slight increase in the percentage of inmates with a predatory infraction, i.e., from 2.2 to 2.7 percent. The rate of aggressive infractions also edged up slightly – December, 2.5 percent to 2.8 percent in June 2019. Thus, despite the decrease in the ADP at OJC, the rates of predatory and aggressive infractions increased slightly.

---

[15] Thirteen (13) months of disciplinary data are provided to account for short-term variations and seasonal trends.





Figure 6: Rate of Disciplinary Infractions Among OPSO Average Daily Population – June 2018 – June 2019.

Figure 7 provides a breakdown of the most severe type of infraction of which the inmate was found guilty between June 2018 and June 2019. During the first six months of 2019, the numbers of predatory (assaults or battery) increased while the numbers of disruptive and management problems decreased. Specifically, the average number of predatory infractions for June – December 2018 was 22.9/month. For January – June 2019, the average number of predatory infractions per month was 35.3. The number of management problem infractions recorded dropped from an average of 94.6 during the latter half of 2018 to 86.2/month during the first half of 2019. Further during the first half of 2019, the number of disruptive infractions dropped to average of 22.2/month. The number of aggressive infractions was stable at ~ 30/month during the last 13 months.





Figure 7: Types of Disciplinary Infractions of which OPSO Inmates were Found Guilty – June 2018 – June 2019

IV.A.10.h. OPSO shall review the periodic data report and make recommendations regarding proper placement consistent with this Agreement or other necessary changes in policy based on this review.  The review and recommendations will be documented and provided to the Monitor.

Finding: Substantial Compliance

**Observations:**

The Monitor receives the daily "Active Inmates by Location" report.   During this compliance period, there was little dialogue between the Monitor and the Classification Unit.  The Monitor no longer receives the monthly statistical reports, and as previously indicated, this creates challenges for monitoring the System.  These reports were, however, available onsite. There appeared to be little independent analyses of the data as the memos submitted along with the compliance documents were cursory. However, Chief LeCounte has re-opened communications and information sharing.



## IV. A. 11.        Prisoner Grievance Process

A. 11.a. OPSO shall ensure that prisoners have a mechanism to express their grievances, resolve disputes, and ensure that concerns regarding their constitutional rights are addressed. OPSO shall, at a minimum, do the following:

(1) Continue to maintain policies and procedures to ensure that prisoners have access to an adequate grievance process and to ensure that grievances may be reported and filed confidentially, without requiring the intervention of a correctional officer.  The policies and procedures should be applicable and standardized across all the Facility divisions.

(2) Ensure that each grievance receives appropriate follow-up, including providing a timely written response and tracking implementation of resolutions.

(3) Ensure that grievance forms are available on all units and are available in Spanish and Vietnamese and that there is adequate opportunity for illiterate prisoners and prisoners who have physical or cognitive disabilities or language barriers to access the grievance system.

(4) Separate the process of "requests to staff" from the grievance process and prioritize grievances that raise issues regarding prisoner safety or health.

(5) Ensure that prisoner grievances are screened for allegations of staff misconduct and, if an incident or allegation warrants per this Agreement, that it is referred for investigation.

(6) A member of the management staff shall review the grievance tracking system quarterly to identify areas of concerns.  These reviews and any recommendations will be documented and provided to the Monitor.

Findings:
A. 11. a. (1)  Substantial Compliance
A. 11. a. (2)  Partial Compliance
A. 11. a. (3)  Substantial Compliance
A. 11. a. (4)  Substantial Compliance
A. 11. a. (5)  Substantial Compliance
A. 11. a. (6)  Partial Compliance

In the previous ten reports, one rating was given for the entire section for the Prisoner Grievance Process. In order to highlight which provisions are in substantial compliance versus those which fall short, the decision was made to rate each provision separately.

As reported by the OPSO Grievance staff, for the first six months of 2019, a total of 1166 grievances were received; the average was 194 forms per month. For CY2018, a total of 5005 grievances were received for an average of 417 grievances per month. This is an approximately 53% decrease in the monthly average from CY2018 to the current rating period (January through June 2019). This trend continues that noted in the previous report of a substantial decline in grievances from CY2017 to CY2018.

Inmates have access to the grievance process via electronic kiosks located in the housing units throughout OJC and TDC. In the eight units in which the kiosks are inoperable, and beyond repair, (1A, 1C, 1D, 3C, 3D, 3E, 3F, and 4C), staff are required to



visit the units twice daily to retrieve written grievance forms. While inspecting every housing unit, the Monitor observed a locked and labeled "grievance box" next to the medical form boxes in each housing unit with inoperable kiosks. While this manual work-around has the potential to compromise the confidentiality of the process (as opposed to the electronic process), it has been the Monitor's experience and observations in other facilities that such a manual system meets the letter of the Consent Judgment requirement for this paragraph. OPSO continues to negotiate a new contract to provide upgraded kiosks in all housing units. As the use of paper grievances and medical request is far less efficient than the electronic system and poses issues related to confidentiality, OPSO is encouraged to complete the negotiations and have the new kiosks installed and operational as soon as possible.

During the inspection, the Monitor reviewed weekly and monthly audit documentation (statistics and actual grievance documentation) compiled by the Grievance staff as well as the second quarterly management review of the system. The Monitor also interviewed inmates, Grievance staff, and the senior staff member responsible for addressing inmate grievance appeals and ensuring staff respond to grievances in a timely and substantive manner.

The Monitor specifically reviewed the trend reports provided by the Grievance staff for CY2018 and the current rating period. The information indicated that the Grievance staff audit approximately 10 to 12 percent of the grievances received in a given month. The number of grievances not replied to within the allotted time frame increased from approximately 11% of the grievances audited in CY2018 to approximately 29% for January through June 2019. However, for grievances not receiving a substantive response or closed with no response, the percentage not replied to within the allotted time frame decreased from 24% in CY2018 to approximately 5% for January through June 2019.  Several inmates interviewed confirmed that timely and substantive responses continue to be an issue.

It should be noted that, given the overall volume of grievances and requests received, the Grievance staff does an excellent job tracking grievances and requests and reporting as to the timeliness of responses and quality of the responses to address the inmates' issues.

The Monitor observed Grievance forms freely available on all units with non-



functioning kiosks and confirmed the manual process through interviews with inmates and interviews with staff. The Grievance staff maintains a by-name/housing listing of all OPSO inmates identified as needing Grievance staff assistance to access the grievance system due to either a language barrier or illiteracy. The Monitor reviewed the first and second quarter reports and noted up-to-date housing changes for disadvantaged inmates; thus, the list appears to be actively managed.

Grievance staff provided detailed documentation provided of their separate handling of the January-June 2019 inmate requests, grievances, and complaints related to inmate safety or health. Grievance staff were also interviewed as to their daily procedure.

Review of the documentation demonstrated that all inmate submissions are reviewed by Grievance staff, categorized into requests and grievances, and forwarded to the appropriate staff for response. Both requests and grievances are further sorted by type. Specific grievances related to inmate safety, medical issues, PREA, etc., are documented to reflect the date received, inmate information, type of grievance, time of notification made to the appropriate staff member, and the staff member making the notification. Grievance staff processed a total of 88 grievances related to inmate safety, medical issues, PREA, etc. during the rating period.

The Monitor reviewed detailed documentation provided by Grievance staff for the rating period regarding the screening of grievances for staff misconduct. Grievance staff were interviewed as to the daily procedure and notification process. The documentation demonstrated that all inmate submissions are reviewed by Grievance staff and those regarding staff misconduct are separately documented for appropriate referral to the administrative level for appropriate follow-up. Grievance staff processed a total of 134 such staff misconduct related grievances during the rating period.

Grievance staff also separately document grievances that require specific referral to IAD, ISB, PREA and FIT staff for review and investigation. Detailed information along with the date assigned and disposition is maintained as well as email transmission receipts. Grievance staff referred a total of 110 grievances for investigation during the rating period.

The Monitor reviewed the first and second quarterly of grievance reports. Specific discussion by management staff regarding the grievance documentation and reports was noted. However, there were no specific changes to the grievance process recommended



despite the obvious need to address the timeliness and thoroughness of responses. Perhaps the grading of each provision separately will further highlight what issues need to be addressed to bring this section into substantial compliance.

Recommendations:

- Grievance staff should produce detailed reports (by name) of all staff receiving and responding to grievances in a given month. These reports should flag staff members who either fail to respond in the allotted time or fail to provide a substantive response to the inmate. In addition to these reports, Grievance staff should notify staff members along with their supervisors when deficiencies are found. It is recommended that senior management staff utilize these reports to verify that the deficiencies are resolved through documented training, corrective action, etc., as the situation warrants.

- While the grievance process, to include appeals, is documented in the inmate handbook, it is recommended that final responses to inmates include a brief notation as to the right to appeal as well as the procedure and time requirements.

- It is recommended that the management team review the weekly and monthly audit findings (IV.A.11(2)) provided by grievance staff to determine any specific measures that can be taken to reduce the number of late/no response or non-substantive responses from individual staff members.

## IV. A. 12.  Sexual Abuse

A.12. OPSO will develop and implement policies, protocols, trainings, and audits, consistent with the requirements of the Prison Rape Elimination Act of 2003, 42 U.S.C. § 15601, et seq., and its implementation of regulations, including but not limited to, preventing, detecting, reporting, investigating, and collecting sexual abuse data, including prisoner-on-prisoner and staff-on-prisoner sexual abuse, sexual harassment, and sexual touching.

Finding:

A. 12.  Substantial Compliance

Observations:

OPSO reports that it successfully completed its PREA audit. Continuing to implement the requirements of PREA will be necessary to maintain substantial compliance.



## IV. A. 13.        Access to Information

A.13. OPSO will ensure that all newly admitted prisoners receive information, through an inmate handbook and, at the discretion of the Jail, an orientation video, regarding the following topics:  understanding Facility disciplinary process and rules and regulations; reporting misconduct; reporting sexual abuse or assault; accessing medical and mental health care; emergency procedures; and sending and receiving mail; understanding the visitation process; and accessing the grievance process.

Finding:

A. 13.  Substantial Compliance

Observations:

Materials were provided indicating the requirements of this paragraph have been met.

## IV. B. Mental Health Care and C. Medical Care

Introduction

As with past reports, the Monitors rate the compliance levels based on the documents requested and reviewed, observations and discussions during on-site visits, review of medical records, and any additional information provided by the parties.

The Monitors are pleased to report step-by-step improvement in performance in many areas of the Consent Judgment. The addition of the Tulane Department of Psychiatry staff and leadership is an invaluable asset in providing required and consistent psychiatric services for prisoners at OJC. There is positive progress with Tulane's interface with Wellpath, though Wellpath might integrate with Tulane, with mortality and morbidity reviews, as an example.

Wellpath continues to have difficulty with counting, for example, calculating the mental health caseload and counting the number of patients with acute and chronic disease who receive counseling and discharge medications. Practitioner productivity, especially for somatic practitioners, is remarkably low, a situation that exacerbates backlogs to access to care and subsequent lags to and lapses in medication. Visit refusal rates are high for unidentified or poorly identified reasons.

Several paragraphs remain where necessary improvements are required by the Consent Judgment to provide the full range and quality of medical care and mental health/counseling services for inmates incarcerated in OJC and Hunt. These concerns are



deeply impacted by the lack of progress in developing the required services and programs recommended in 2014, including permanent acute care and step-down programing and services for mental health and acute medical services.

General recommendations are to: Continue leadership, initiatives, and direction by OPSO and Wellpath; Increase correctional security staffing to provide adequate and ongoing dedicated support for mental health and medical services consistently; Continue to develop full services and continuity of services for male and female prisoners including all levels of care, staffing and space; and Continue to evaluate and pursue full services for mentally ill prisoners, including medication management, and acute, residential, and outpatient care;

Specific findings and recommendations regarding medical and mental health services are provided below. For those paragraphs that have previously demonstrated Substantial Compliance the monitors recommend, encourage and support the diligent and consistent efforts by OPSO and the medical and mental health providers to continue to demonstrate Substantial Compliance.

## B.  Mental Health Care

B.  OPSO shall ensure constitutionally adequate intake, assessment, treatment, and monitoring of prisoners' mental health needs, including but not limited to, protecting the safety of and giving priority access to prisoners at risk for self-injurious behavior or suicide.  OPSO shall assess, on an annual or more frequent basis, whether the mental health services at OPP comply with the Constitution.  In order to provide mental health services to prisoners, OPSO, at a minimum, shall:

Findings:
B. 1. a.  Substantial Compliance
B. 1. b.  Substantial Compliance
B. 1. c.  Substantial Compliance
B. 1. d.  Substantial Compliance
B. 1. e.  Substantial Compliance
B. 1. f.   Partial Compliance
B. 1. g.  Partial Compliance
B. 1. h.  Substantial Compliance
B. 1. i.   Partial Compliance
B. 1. j.   Partial Compliance
B. 1. k.  Partial Compliance
B. 1. l.   Substantial Compliance

B.1.a. Develop and maintain comprehensive policies and procedures for appropriate screening and assessment of prisoners with mental illness.  These policies should include definitions of emergent, urgent,



COMPLIANCE REPORT # 11                                        59

and routine mental health needs, as well as timeframes for the provision of services for each category of mental health needs.

Finding: Substantial Compliance

Recommendation: Wellpath has different timeframes for timeliness of responses; suggest review and revise for consistency.

B.1.b. Develop and implement an appropriate screening instrument that identifies mental health needs, and ensures timely access to a mental health professional when presenting symptoms require such care. The screening instrument should include the factors described in Appendix B. The screening instrument will be validated by a qualified professional approved by the Monitor within 180 days of the Effective Date and every 12 months thereafter, if necessary.

Finding: Substantial Compliance

B.1.c. Ensure that all prisoners are screened by Qualified Medical Staff upon arrival to OPP, but no later than within eight hours, to identify a prisoner's risk for suicide or self-injurious behavior. No prisoner shall be held in isolation prior to an evaluation by medical staff.

Finding: Substantial Compliance

B.1.d. Implement a triage policy that utilizes the screening and assessment procedures to ensure that prisoners with emergent and urgent mental health needs are prioritized for services.

Finding: Substantial Compliance

B.1.e. Develop and implement protocols, commensurate with the level of risk of suicide or self-harm, to ensure that prisoners are protected from identified risks for suicide or self-injurious behavior. The protocols shall also require that a Qualified Mental Health Professional perform a mental health assessment, based on the prisoner's risk.

Finding: Substantial Compliance

Recommendation: Continue to provide documentation and analysis of completion and consistent use of the Columbia Suicide Risk Assessment.

B.1.f. For prisoners with emergent or urgent mental health needs, search the prisoner and monitor with constant supervision until the prisoner is transferred to a Qualified Mental Health Professional for assessment.

Finding: Partial Compliance

Recommendation: Provide documentation of searches and constant supervision by security until mental health staff arrives and conducts assessment.

B.1.g. Ensure that a Qualified Mental Health Professional conducts appropriate mental health assessments within the following periods from the initial screen or other identification of need:
      (1)      14 days, or sooner, if medically necessary, for prisoners with routine mental health needs;



(2)     48 hours, or sooner, if medically necessary, for prisoners with urgent mental health needs; and

(3)     immediately, but no later than two hours, for prisoners with emergent mental health needs.

Finding:  Partial Compliance

<u>Recommendation:</u> Provide documentation that inmates in population (after IPC) consistently receive appropriate and complete assessments within the required timeframes.

B.1.h. Ensure that a Qualified Mental Health Professional performs a mental health assessment no later than the next working day following any adverse triggering event (i.e., any suicide attempt, any suicide ideation, or any aggression to self, resulting in serious injury).

Finding:  Substantial Compliance

B.1.i. Ensure that a Qualified Mental Health Professional, as part of the prisoner's interdisciplinary treatment team, maintains a risk profile for each prisoner on the mental health case load based on the Assessment Factors identified in Appendix B, and develops and implements a treatment plan to minimize the risk of harm to each of these prisoners.

Finding: Partial Compliance

<u>Recommendation:</u> Provide documentation of timeliness of treatment plans for all inmates on the mental health caseload at all levels of care including risk profiles.

B.1.j. Ensure adequate and timely treatment for prisoners, whose assessments reveal mental illness and/or suicidal ideation, including timely and appropriate referrals for specialty care and visits with Qualified Mental Health Professionals, as clinically appropriate.

Finding: Partial Compliance

<u>Recommendation:</u> Provide documentation of scheduled and completed adequate and timely treatment for all caseload inmates including individual and group treatments, and referrals for specialty services for male and female inmates. This should include prisoners at Hunt, extended suicide watches at OJC when beds are available at Hunt, acute care services for female inmates, step down units, and outpatients in population.

B.1.k. Ensure crisis services are available to manage psychiatric emergencies.  Such services include licensed in-patient psychiatric care, when clinically appropriate.

Finding: Partial Compliance



<u>Recommendation:</u> OPSO does not have access to any licensed inpatient services for female inmates and continues to have access to non-licensed acute care services for male inmates at Hunt. Provide documentation that all psychiatric emergencies are sent to an emergency department and any crisis is adequately resolved. Provide documentation that all inmates have access to licensed inpatient psychiatric care, when clinically appropriate.

B.1.l. On an annual basis, assess the process for screening prisoners for mental health needs to determine whether prisoners are being appropriately identified for care.  Based on this assessment, OPSO shall recommend changes to the screening system.  The assessment and recommendations will be documented and provided to the Monitor.

Finding: Substantial Compliance

<u>Recommendation:</u> The report of annual assessment and recommendations of the process for screening prisoners for mental health needs to determine whether prisoners are being appropriately identified for care has been provided.

Findings:
B. 2. a.  Partial Compliance
B. 2. b.  Partial Compliance
B. 2. c.  Partial Compliance
B. 2. d.  Non-Compliance
B. 2. e.  Substantial Compliance
B. 2. f.   Substantial Compliance
B. 2. g.  Substantial Compliance
B. 2. h.  Substantial Compliance

B.2.a. Review, revise, and supplement its existing policies in order to implement a policy for the delivery of mental health services that includes a continuum of services, provides for necessary and appropriate mental health staff, includes a treatment plan for prisoners with serious mental illness, and collects data and contains mechanisms sufficient to measure whether care is being provided in a manner consistent with the Constitution.

Finding: Partial Compliance

<u>Recommendation:</u> Wellpath and OPSO have completed the majority of necessary policies including the use of restraints policies. Suggested are the revision and completion of incomplete policies/procedures regarding continuum of services for female prisoners and counseling services for specific groups identified in this Consent Judgment.



**B.2.b.** Ensure that treatment plans adequately address prisoners' serious mental health needs and that the treatment plans contain interventions specifically tailored to the prisoner's diagnoses and problems.

Finding: Partial Compliance

<u>Recommendation</u>: Continue the very good progress on documentation in treatment plans at OJC. Provide documentation of additional training and quality management review of treatment plans at Hunt, including appropriate timeframes for treatment planning at Hunt consistent for acute care services and outpatients at OJC.

**B.2.c.** Provide group or individual therapy services by an appropriately licensed provider where necessary for prisoners with mental health needs.

Finding: Partial Compliance

<u>Recommendation:</u> Provide documentation of data and analysis of numbers and percentages of inmates at all levels of care in need of individual and/or group therapies and counseling as well as the numbers and percentages of individual and group services offered and received/completed for prisoners in need. Continue and expand impressive data on Disruption of Services forms and provide analysis of that data and corrective action plans, including staffing and space needs as necessary.

**B.2.d.** Ensure that mental health evaluations that are done as part of the disciplinary process include recommendations based on the prisoner's mental health status.

Finding: Non-compliance

<u>Recommendation:</u> Provide documentation that ensures mental health evaluations are done as part of the disciplinary process and include recommendations based on the prisoner's mental health status. Wellpath has begun to identify a process and needs to provide policy approved by OPSO regarding mental health participation in the disciplinary process, as well as necessary training for OPSO and Wellpath staff.

**B.2.e.** Ensure that prisoners receive psychotropic medications in a timely manner and that prisoners have proper diagnoses and/or indications for each psychotropic medication they receive.

Finding:  Substantial Compliance

<u>Recommendation:</u> Continue very good improvement demonstrated with the addition of Tulane psychiatric providers. Continue to provide documentation and analysis of data that inmates receive psychotropic medications in a timely manner



and that inmates have proper diagnosis and/or indications for each psychotropic medication they receive, including particular emphasis on juveniles.

B.2.f. Ensure that psychotropic medications are administered in a clinically appropriate manner as to prevent misuse, overdose, theft, or violence related to the medication.

Finding: Substantial Compliance

B.2.g. Ensure that prescriptions for psychotropic medications are reviewed by a Qualified Mental Health Professional on a regular, timely basis and prisoners are properly monitored.

Finding: Substantial Compliance

Recommendation: Continue to provide documentation of data collection and analysis of psychotropic medication prescriptions.

B.2.h. Ensure that standards are established for the frequency of review and associated charting of psychotropic medication monitoring, including monitoring for metabolic effects of second generation psychotropic medications.

Finding: Substantial Compliance

Recommendation: Continue to provide documentation of data collection and analysis of psychotropic medication monitoring for metabolic effects of second-generation psychotropic medications. Timeliness of laboratory services and associated inmate refusals have improved.

B. 3. Findings:
B. 3. a.  Partial Compliance
B. 3. b.  Partial Compliance

B.3.a. OPSO shall develop and implement policies and procedures for prisoner counseling in the areas of general mental health/therapy, sexual-abuse counseling, and alcohol and drug counseling.  This should, at a minimum, include some provision for individual services.

Finding: Partial Compliance

Recommendation: Provide policies and procedures specifically for inmate counseling in the areas of general mental health/therapy, sexual abuse counseling, and alcohol and drug counseling, including some provisions for individual services.

B.3.b. Within 180 days of the Effective Date, and quarterly thereafter, report all prisoner counseling services to the Monitor, which should include:



> (1) the number of prisoners who report having participated in general mental health/therapy counseling at OPP;
> (2) the number of prisoners who report having participated in alcohol and drug counseling services at OPP;
> (3) the number of prisoners who report having participated in sexual-abuse counseling at OPP; and
> (4) the number of cases with an appropriately licensed practitioner and related one-to-one counseling at OPP.

Finding: Partial Compliance

<u>Recommendation:</u> Provide data and analysis for the numbers and percentages for inmates with needs for these specific services and numbers and percentages of inmates who receive these services. Compliance has been compromised by staffing deficiencies and lack of adequate space.

B. 4. Findings:
B. 4. a.  Partial Compliance
B. 4. b.  Substantial Compliance
B. 4. c.  Partial Compliance
B. 4. d.  Partial Compliance
B. 4. e.  Partial Compliance
B. 4. f.   Substantial Compliance
B. 4. g.  Non-Compliance

> B.4.a. OPSO shall ensure that all staff who supervise prisoners have the adequate knowledge, skill, and ability to address the needs of prisoners at risk for suicide.  Within 180 days of the Effective Date, OPSO shall review and revise its current suicide prevention training curriculum to include the following topics:
> (1) suicide prevention policies and procedures (as revised consistent with this Agreement);
> (2) analysis of facility environments and why they may contribute to suicidal behavior;
> (3) potential predisposing factors to suicide;
> (4) high-risk suicide periods;
> (5) warning signs and symptoms of suicidal behavior;
> (6) case studies of recent suicides and serious suicide attempts;
> (7) mock demonstrations regarding the proper response to a suicide attempt;
> (8) differentiating suicidal and self-injurious behavior; and
> (9) the proper use of emergency equipment.

Finding: Partial Compliance

<u>Recommendation:</u> Provide documentation that all staff who supervise inmates have the adequate knowledge, skill, and ability to address the needs of inmates at risk for suicide. Improvement is noted, however prisoners on suicide precautions or watch continue to obtain contraband that can be used to harm themselves. Provide documentation the suicide prevention training curriculum includes all of the



elements listed, and specifically to include (in addition to previously submitted documentation) elements (7) mock demonstrations regarding the proper response to a suicide attempt, (8) differentiating suicidal and self-injurious behavior, and (9) the proper use of emergency equipment.

B.4.b. Ensure that all correctional, medical, and mental health staff are trained on the suicide screening instrument and the medical intake tool.

Finding: Substantial Compliance

Recommendation: Documentation provided indicates that 89% of correctional, and all medical and mental health staff are trained on the suicide screening instrument and the medical intake tool.

B.4.c. Ensure that multi-disciplinary in-service training is completed annually by all correctional, medical, and mental health staff, to include training on updated policies, procedures, and techniques.  The training will be reviewed and approved by the Monitor.

Finding: Partial Compliance

Recommendation: Continue to provide documentation that multidisciplinary in-service training has been completed annually for all current correctional, medical, and mental health staff, to include training on updated policies, procedures, and techniques. OPSO/Wellpath need to provide documentation regarding training for staff on the use of therapeutic restraints.

B.4.d. Ensure that staff are trained in observing prisoners on suicide watch and step-down unit status.

Finding: Partial Compliance

Recommendation: Provide documentation that current staff are trained, specifically, in observing prisoners on suicide watch and step-down status. Prisoners on suicide watch continue to obtain contraband that can be used to harm themselves.

B.4.e. Ensure that all staff that have contact with prisoners are certified in cardiopulmonary resuscitation ("CPR").

Finding: Partial Compliance



<u>Recommendation:</u> Provide documentation that all current staff, (including OPSO and Wellpath) are certified in CPR.

B.4.f. Ensure that an emergency response bag, which includes a first aid kit and emergency rescue tool, is in close proximity to all housing units. All staff that has contact with prisoners shall know the location of this emergency response bag and be trained to use its contents.

Finding: Substantial Compliance

B.4.g. Randomly test five percent of relevant staff on an annual basis to determine their knowledge of suicide prevention policies. The testing instrument and policies shall be approved by the Monitor. The results of these assessments shall be evaluated to determine the need for changes in training practices. The review and conclusions will be documented and provided to the Monitor.

Finding: Non-Compliance

<u>Recommendation:</u> Provide documentation of testing of 5% of current relevant staff to determine their knowledge of suicide prevention policies, and evaluation of the results, review, and conclusions of the assessments to determine the need for changes in training practices. The last testing reported was in May 2018.

Findings:
B. 5. a.  Partial Compliance
B. 5. b.  Partial Compliance
B. 5. c.  Partial Compliance
B. 5. d.  Substantial Compliance
B. 5. e.  Partial Compliance
B. 5. f.  Substantial Compliance
B. 5. g.  Partial Compliance
B. 5. h.  Partial Compliance
B. 5. i.  Substantial Compliance
B. 5. j.  Partial Compliance
B. 5. k.  Partial Compliance

B.5.a. OPSO shall implement a policy to ensure that prisoners at risk of self-harm are identified, protected, and treated in a manner consistent with the Constitution.

Finding: Partial Compliance

<u>Recommendation:</u> Provide documentation of implementation of policy for utilization of suicide resistant cells and nonresistant cells (with direct observation), and treatment services provided to inmates at risk for self-harm. Inmates on suicide watch continue to be placed in non-suicide resistant cells without direct



observation, even when beds are available at Hunt. Treatment services are very limited and inadequate for inmates on suicide watch because of staffing and space needs.

B.5.b. Ensure that suicide prevention procedures include provisions for constant direct supervision of current suicidal prisoners and close supervision of special needs prisoners with lower levels of risk (at a minimum, 15 minute checks).  Correctional officers shall document their checks in a format that does not have pre-printed times.

Finding:  Partial Compliance

<u>Recommendation:</u> Provide constant direct supervision for any prisoner placed in a non-resistant cell on suicide watch, and documentation. See B.5.a.

B.5.c. Ensure that prisoners on suicide watch are immediately searched and monitored with constant direct supervision until a Qualified Mental Health Professional conducts a suicide risk assessment, determines the degree of risk, and specifies the appropriate degree of supervision.

Finding: Partial Compliance

<u>Recommendation:</u> Provide documentation that demonstrates that inmates are immediately searched and monitored with constant direct supervision until a QMHP conducts a suicide risk assessment, determines the degree of risk, and specifies the appropriate degree of supervision. This paragraph requires collaboration and documentation by OPSO deputies and Wellpath QMHP's.

B.5.d. Ensure that all prisoners discharged from suicide precautions receive a follow-up assessment within three to eight working days after discharge, as clinically appropriate, in accordance with a treatment plan developed by a Qualified Mental Health Care Professional.  Upon discharge, the Qualified Mental Health Care Professional shall conduct a documented in-person assessment regarding the clinically appropriate follow-up intervals.

Finding: Substantial Compliance

<u>Recommendation:</u> Wellpath staff report they have been denied access to inmates for follow-up during lockdowns. This should not occur; immediate corrective action is recommended. Provide documentation of follow-up appointments as required by policy.

B.5.e. Implement a step-down program providing clinically appropriate transition for prisoners discharged from suicide precautions.



Finding: Partial Compliance

<u>Recommendation:</u> The placements for male inmates in a true step-down/residential unit and program have continued, with the necessary exclusivity of an identified mentally ill population, and the programming is not yet sufficient, although improved, because of inadequate staffing and space. Similar services and housing do not currently exist for female inmates. Recommend continued vigilance in developing these programs.

B.5.f. Develop and implement policies and procedures for suicide precautions that set forth the conditions of the watch, incorporating a requirement of an individualized clinical determination of allowable clothing, property, and utensils.  These conditions shall be altered only on the written instruction of a Qualified Mental Health Professional, except under emergency circumstances or when security considerations require.

Finding: Partial Compliance

<u>Recommendation:</u> Policy is in place. Provide documentation of implementation of policy regarding individualized determinations of the conditions of watch at OJC (especially for suicide watches/direct observation in non-resistant cells), and at Hunt.

B.5.g. Ensure that cells designated by OPSO for housing suicidal prisoners are retrofitted to render them suicide-resistant (e.g., eliminating bed frames/holes, sprinkler heads, water faucet lips, and unshielded lighting or electrical sockets).

Finding: Partial Compliance

<u>Recommendation:</u> OPSO reports 13 suicide resistant cells for OJC and 3 suicide resistant cells at Hunt. Facility staff utilize non-suicide resistant cells at both facilities for overflow. When overflow cells are utilized, it is strongly recommended the inmates in those cells be placed on direct constant observation to best provide for their safety.

B.5.h. Ensure that every suicide or serious suicide attempt is investigated by appropriate mental health and correctional staff, and that the results of the investigation are provided to the Sheriff and the Monitor.

Finding: Partial Compliance



<u>Recommendation:</u> Continue to expand Morbidity and Mortality reviews, these reviews should be structured to conduct clinical investigation, including aggregation of data, self-critical analysis and corrective action plans regarding individual inmate deaths or intended death but also systemic concerns.

B.5.i. Direct observation orders for inmates placed on suicide watch shall be individualized by the ordering clinician based upon the clinical needs of each inmate, and shall not be more restrictive than is deemed necessary by the ordering clinician to ensure the safety and well being of the inmate.

Finding: Substantial Compliance

B.5.j. Provide the Monitor a periodic report on suicide and self-harm at the Facility.  These periodic reports shall be provided to the monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement.  The report will include the following:
    (1)  all suicides;
    (2)  all serious suicide or self-harm attempts; and
    (3)  all uses of restraints to respond to or prevent a suicide attempt.

Finding: Partial Compliance

<u>Recommendation:</u> OPSO and Wellpath provide reports on suicides, suicide attempts and self-harm, however the numbers differ significantly. Provide documentation for each category, with resolution of inconsistencies based on review and discussion in the bi-annual reports. Use of the restraint chair was not provided in mental health committee or quality management documents and did not follow policy (single episode). The single episode involved an inmate being placed in the restraint chair and observed because of reporting his intent to kill himself, however, policies regarding notification of mental health staff, and required documentation of the therapeutic use and monitoring was not reported. Any and all uses of clinical or therapeutic restraints must be appropriately implemented, monitored and documented.

B.5.k. Assess the periodic report to determine whether prisoners are being appropriately identified for risk of self-harm, protected, and treated.  Based on this assessment, OPSO shall document recommended changes to policies and procedures and provide these to the Monitor.

Finding: Partial Compliance

<u>Recommendation:</u> Provide an assessment of the periodic reports required in B.5.j., above. Numbers were provided for #1 and #2 above, not #3. The assessment should



include not only the reported numbers but also any recommended changes to policies and procedures to address identification, protection, and treatment.

Findings:
B. 6. a.  Partial Compliance
B. 6. b.  Substantial Compliance
B. 6. c.  Non-Compliance
B. 6. d.  Substantial Compliance
B. 6. e.  Non-Compliance
B. 6. f.   Substantial Compliance
B. 6. g.  Non-Compliance

B.6.a. OPSO shall prevent the unnecessary or excessive use of physical or chemical restraints on prisoners with mental illness.

Finding: Partial Compliance

Recommendation: Wellpath has begun to provide documentation/information regarding use of de-escalation techniques at OJC and Hunt. OPSO and Hunt need to report all uses of physical and chemical restraint. Discussion onsite and during conference calls indicated significant problems with de-escalation practices at Hunt including unavailability of mental health staff at night, and deviations from policy.

B.6.b. Maintain comprehensive policies and procedures for the use of restraints for prisoners with mental illness consistent with the Constitution.

Finding:  Substantial Compliance

Recommendation: A comprehensive policy by OPSO compatible with Wellpath policy for use of restraints has been completed.

B.6.c. Ensure that approval by a Qualified Medical or Mental Health Professional is received and documented prior to the use of restraints on prisoners living with mental illness or requiring suicide precautions.

Finding: Non-compliance

Recommendation: Define and document process of indications and/or notifications from OPSO regarding possible need or use of restraints. The single incidence of restraint chair use for inmate reporting intent to harm self was not approved by Qualified Medical or Mental Health Professional.



B.6.d. Ensure that restrained prisoners with mental illnesses are monitored at least every 15 minutes by Custody Staff to assess their physical condition.

Finding:  Substantial Compliance

Recommendation: Provide documentation of monitoring as necessary; very strongly suggest constant monitoring rather than 15 minutes. Single use of restraint chair was properly monitored as per policy.

B.6.e. Ensure that Qualified Medical or Mental Health Staff document the use of restraints, including the basis for and duration of the use of restraints and the performance and results of welfare checks on restrained prisoners.

Finding: Non-compliance

Recommendation: Provide documentation of use of restraints as necessary. See B. 5. j., B. 6. c., and B. 6. d.

B.6.f. Provide the Monitor a periodic report of restraint use at the Facility.  These periodic reports shall be provided to the monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement.  Each report shall include:
(1)  A list of prisoners whom were restrained;
(2)  A list of any self-injurious behavior observed or discovered while restrained; and
(3)  A list of any prisoners whom were placed in restraints on three or more occasions in a thirty (30) day period or whom were kept in restraints for a period exceeding twenty-four (24) hours.

Finding: Substantial Compliance

Recommendation: OPSO reports one use of clinical or therapeutic restraints. The OPSO semi-annual report did report the use of the restraint chair in a single episode. However, policies regarding medical and mental health assessments and orders, as well as supporting documentation was not provided.

B.6.g. Assess the periodic report to determine whether restraints are being used appropriately on prisoners with mental illness.  Based on this assessment, OPSO shall document recommended changes to policies and procedures and provide these to the Monitor.

Finding: Non-compliance

Recommendation: Provide required report and assessment with supporting documentation that clinical or therapeutic restraints have been used appropriately



on inmates with mental illness, including, and specifically, the use of the restraint chair referenced in this report.

Findings:
B. 7. a.  Partial Compliance
B. 7. b.  Substantial Compliance
B. 7. c.  Partial Compliance
B. 7. d.  Partial Compliance

7.a. OPSO shall ensure that all staff who supervise prisoners have the knowledge, skills, and abilities to identify and respond to detoxifying prisoners.  Within 180 days of the Effective Date, OPSO shall institute an annual in-service detoxification training program for Qualified Medical and Mental Health Staff and for correctional staff.  The detoxification training program shall include:

(1)     annual staff training on alcohol and drug abuse withdrawal;
(2)     training of Qualified Medical and Mental Health Staff on treatment of alcohol and drug abuse conducted by the Chief Medical Officer or his or her delegate;
(3)     oversight of the training of correctional staff, including booking and housing unit officers, on the policies and procedures of the detoxification unit, by the Chief Medical Officer or his or her delegate;
(4)     training on drug and alcohol withdrawal by Qualified Medical and Mental Health Staff;
(5)     training of Qualified Medical and Mental Health Staff in providing prisoners with timely access to a Qualified Mental Health Professional, including psychiatrists, as clinically appropriate; and
(6)     training of Qualified Medical and Mental Health Staff on the use and treatment of withdrawals, where medically appropriate.

Finding:  Partial compliance

Qualified Medical and Mental Health Staff are trained regarding care for patients who have orders for monitoring and treatment of withdrawal.  Some of custody staff are trained. During the tour, neither OPSO nor Wellpath was able to provide any data on custody staff training.

<u>Recommendation</u>: Increase training of deputies to close to 100%.  Develop program oversight and evaluation.

7.b. Provide medical screenings to determine the degree of risk for potentially life-threatening withdrawal from alcohol, benzodiazepines, and other substances, in accordance with Appendix B.

Finding: Substantial Compliance

Incoming inmates are screened for withdrawal, in accordance with Appendix B, Wellpath quarterly performance measurement demonstrates sustained compliance.  Monitors find Wellpath measurement reliable.



7.c. Ensure that the nursing staff complete assessments of prisoners in detoxification on an individualized schedule, ordered by a Qualified Medical or Mental Health Professional, as clinically appropriate, to include observations and vital signs, including blood pressure.

Finding: Partial Compliance

Wellpath quarterly performance measurement and Monitor's reliability audits demonstrate that nursing care for patients on the detox protocol has improved, however, there are lags to first dose of vital medication.

Recommendation:  Enforce timely assessments and medication for patients who are on the detox protocol.

7.d. Annually, conduct a review of whether the detoxification training program has been effective in identifying concerns regarding policy, training, or the proper identification of and response to detoxifying prisoners. OPSO will document this review and provide its conclusions to the Monitor.

Finding:  Partial Compliance

An annual review has not been conducted during June 2018-June 2019, according to Wellpath.

Recommendation: Conduct annual review of the detoxification training and implementation and report on effectiveness to the monitors.

Findings:
B. 8. a.  Partial Compliance
B. 8. b.  Substantial Compliance

8.a. OPSO shall ensure that medical and mental health staffing is sufficient to provide adequate care for prisoners' serious medical and mental health needs, fulfill constitutional mandates and the terms of this Agreement, and allow for the adequate operation of the Facility, consistent with constitutional standards.

Finding: Partial Compliance

Medical and mental health staffing is sufficient for most care functions. However, there is insufficient funding and MH staffing for groups and special programs.  A proposal has been submitted for these staff.

Recommendation:  Fund and authorize MH staff for special programs, as per Wellpath proposal.  Cross-train staff for grievance review, response, and analysis.



OPSO to ensure sufficient custody staffing for efficient and timely health care operations.

8.b. Within 90 days of the Effective Date, OPSO shall conduct a comprehensive staffing plan and/or analysis to determine the medical and mental health staffing levels necessary to provide adequate care for prisoners' mental health needs and to carry out the requirements of this Agreement. Upon completion of the staffing plan and/or analysis, OPSO shall provide its findings to the Monitor, SPLC, and DOJ for review. The Monitor, SPLC, and DOJ will have 60 days to raise any objections and recommend revisions to the staffing plan.

Finding: Substantial Compliance

Findings:
B. 9. a.  Partial Compliance
B. 9. b.  Partial Compliance
B. 9. c.  Partial Compliance
B. 9. d.  Partial Compliance
B. 9. e.  Partial Compliance
B. 9. f.   Partial Compliance

B.9.a. OPSO shall develop, implement, and maintain a system to ensure that trends and incidents involving avoidable suicides and self-injurious behavior are identified and corrected in a timely manner. Within 90 days of the Effective Date, OPSO shall develop and implement a risk management system that identifies levels of risk for suicide and self-injurious behavior and requires intervention at the individual and system levels to prevent or minimize harm to prisoners, based on the triggers and thresholds set forth in Appendix B.

Finding: Partial Compliance

Recommendation:  Data collection has improved; analysis of trends and incidents involving avoidable suicides and self-injurious behaviors to determine required interventions at the individual and system levels to prevent or minimize harm to inmates requires further development.

B.9.b. The risk management system shall include the following processes to supplement the mental health screening and assessment processes:  incident reporting, data collection, and data aggregation to capture sufficient information to formulate a reliable risk assessment at the individual and system levels; identification of at-risk prisoners in need of clinical treatment or assessment by the Interdisciplinary Team or the Mental Health Committee; and development and implementation of interventions that minimize and prevent harm in response to identified patterns and trends.

Finding: Partial Compliance

Recommendation: Provide documentation of analysis of risk management system processes including the listed criteria, with more attention to data aggregation and analysis, and development and implementation of interventions that minimize and prevent harm in response to identified patterns and trends. The risk assessments at



the individual level by the Interdisciplinary Treatment Team and at the systems level by the Mental Health Committee should include analysis of current practices such as the use of non-suicide resistant cells and appropriateness of transfers to Hunt.

B.9.c. OPSO shall develop and implement an Interdisciplinary Team, which utilizes intake screening, health assessment, and triggering event information for formulating treatment plans.  The Interdisciplinary Team shall:
 (1)  include the Medical and Nursing directors, one or more members of the psychiatry staff, counseling staff, social services staff, and security staff, and other members as clinical circumstances dictate;
 (2)  conduct interdisciplinary treatment rounds, on a weekly basis, during which targeted patients are reviewed based upon screening and assessment factors, as well as triggering events; and
 (3)  provide individualized treatment plans based, in part, on screening and assessment factors, to all mental health patients seen by various providers.

Finding: Partial Compliance

<u>Recommendation</u>: Provide documentation of completion of mental health Interdisciplinary Treatment Team meetings and rounds, and provision of adequate and timely individualized treatment plans to all mental health patients seen by various providers at OJC and Hunt.

B.9.d. OPSO shall develop and implement a Mental Health Review Committee that will, on a monthly basis, review mental health statistics including, but not limited to, risk management triggers and trends at both the individual and system levels.  The Mental Health Review Committee shall:
 (1)  include the Medical and Nursing Director, one or more members of the psychiatry staff and social services staff, the Health Services Administrator, the Warden of the facility housing the Acute Psychiatric Unit, and the Risk Manager.
 (2)  identify at-risk patients in need of mental health case management who may require intervention from and referral to the Interdisciplinary Team, the OPSO administration, or other providers.
 (3)  conduct department-wide analyses and validation of both the mental health and self-harm screening and assessment processes and tools, review the quality of screenings and assessments and the timeliness and appropriateness of care provided, and make recommendations on changes and corrective actions;
 (4)  analyze individual and aggregate mental health data and identify trends and triggers that indicate risk of harm;
 (5)  review data on mental health appointments, including the number of appointments and wait times before care is received; and
 (6)  review policies, training, and staffing and recommend changes, supplemental training, or corrective actions.

Finding: Partial Compliance



<u>Recommendation</u>: Provide documentation of Mental Health Review Committee meetings addressing all of the listed elements, including analysis of the data collected.

B.9.e. OPSO shall develop and implement a Quality Improvement and Morbidity and Mortality Review Committee that will review, on at least a quarterly basis, risk management triggers and trends and quality improvement reports in order to improve care on a Jail-wide basis.
    (1)     The Quality Improvement Committee shall include the Medical Director, the Director of Psychiatry, the Chief Deputy, the Risk Manager, and the Director of Training. The Quality Improvement Committee shall review and analyze activities and conclusions of the Mental Health Review Committee and pursue Jail-wide corrective actions.
    (2)     The Quality Improvement Committee shall:
    i.    monitor all risk management activities of the facilities through the review of risk data, identification of individual and systemic trends, and recommendation and monitored implementation of investigation or corrective action; and
    ii.    generate reports of risk data analyzed and corrective actions taken.

Finding: Partial Compliance

The medical and psychiatric staff report a large number of obstacles to access patients due to a lack of custody staff.  There are insufficient data to support these anecdotes.  Answers to medical and mental health grievances are unresponsive, for the most part.  The management team does not appear to fully utilize data that derives from clinical performance measurement.

<u>Recommendation</u>:  Incorporate performance data, analysis, and trending into QI Committee minutes.  Improve analysis and corrective action plans generally, with specificity for root cause analysis, process design, and effective improvement strategies.  Continue to improve reliability of clinical performance measurement.  Ensure that the Chief Deputy (or equivalent) and Director of Training participate in meetings, with documentation.  Collect and report reliable data on visit disruptions due to the unavailability of custody staff for escort and/or transportation.  Improve responsiveness of answers to grievances.  Utilize clinical performance data for management purposes.

B.9.f. OPSO shall review mortality and morbidity reports quarterly to determine whether the risk management system is ensuring compliance with the terms of this Agreement.  OPSO shall make recommendations regarding the risk management system or other necessary changes in policy based on this review. The review and recommendations will be documented and provided to the Monitor.



Finding: Partial compliance

The mortality and morbidity reviews are perfunctory and lack self-critical analysis. Clinical analyses are incomplete. Psychiatrists are remarkably uninvolved in morbidity reviews for patients with suicide attempts. Corrective action plans are not well-documented and there is no annual review of findings.

<u>Recommendation</u>: Enhance analysis and problem identification in morbidity and mortality reviews. Improve corrective action plans generally, with specificity for root cause analysis, process design, and effective improvement strategies. Include psychiatric physicians in all mortality and morbidity reviews.

## C.    Medical Care

OPSO shall ensure constitutionally adequate treatment of prisoners' medical needs. OPSO shall prevent unnecessary risks to prisoners and ensure proper medication administration practices. OPSO shall assess on an annual or more frequent basis whether the medical services at OPP comply with the Constitution. At a minimum, OPSO shall:

1. Quality Managing of Medication Administration:
   a.    Within 120 days of the Effective Date, ensure that medical and mental health staff are trained on proper medication administration practices, including appropriately labeling containers and contemporaneously recording medication administration;
   b.    Ensure that physicians provide a systematic review of the use of medication to ensure that each prisoner's prescribed regimen continues to be appropriate and effective for his or her condition;
   c.    Maintain medication administration protocols that provide adequate direction on how to take medications, describe the names of the medications, how frequently to take medications, and identify how prisoners taking such medications are monitored; an
   d.    Maintain medication administration protocols that prevent misuse, overdose, theft, or violence related to medication.

Findings:
C. 1. a.  Substantial compliance
C. 1. b.  Partial compliance
C. 1. c.  Substantial compliance
C. 1. d.  Substantial compliance

Substantial lags to laboratory testing, chronic care visits and medication continue. The lags to laboratory testing and to chronic care visits lead to lags to medication.



**Recommendation:** Continue to improve performance on conformance to chronic disease protocols for medical and psychiatric conditions. Reduce lags to and lapses in medication.

2.a. Provide the Monitor a periodic report on health care at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. Each report will include:
    (1)    number of prisoners transferred to the emergency room for medical treatment related to medication errors;
    (2)    number of prisoners taken to the infirmary for non-emergency treatment related to medication errors;
    (3)    number of prisoners prescribed psychotropic medications;
    (4)    number of prisoners prescribed "keep on person" medications; and
    (5)    occurrences of medication variances.
2.b. Review the periodic health care delivery reports to determine whether the medication administration protocols and requirements of this Agreement are followed. OPSO shall make recommendations regarding the medication administration process, or other necessary changes in policy, based on this review. The review and recommendations will be documented and provided to the Monitor.

Findings:
C. 2. a. Partial Compliance
C. 2. b. Partial Compliance

Periodic reports have been sporadic. There is no indication that Wellpath has used data to improve timely access to care.

C. 2. a. <u>Recommendation</u>: Provide reports every six months.

C. 2. b. <u>Recommendation</u>: Review reports, once written, and make recommendations. Recommendations should be reviewed at committee meetings to assure multidisciplinary input.

3.a. OPSO shall notify Qualified Medical or Mental Health staff regarding the release of prisoners with serious medical and/or mental health needs from OPSO custody, as soon as such information is available.
3.b. When Qualified Medical or Mental Health staff are notified of the release of prisoners with serious medical and/or mental health needs from OPSO custody, OPSO shall provide these prisoners with at least a seven-day supply of appropriate prescription medication, unless a different amount is necessary and medically appropriate to serve as a bridge until prisoners can reasonably arrange for continuity of care in the community.
3.c. For all other prisoners with serious medical and/or mental health needs who are released from OPSO custody without advance notice, OPSO shall provide the prisoner a prescription for his or her medications, printed instructions regarding prescription medications, and resources indicating where prescriptions may be filled in the community.
3.d. For prisoners who are being transferred to another facility, OPSO shall prepare and send with a transferring prisoner, a transition summary detailing major health problems and listing current medications and dosages, as well as medication history while at the Facility. OPSO shall also supply sufficient medication for the period of transit for prisoners who are being transferred to another correctional facility or other institution, in the amount required by the receiving agency.



Findings:
C. 3. a. Partial Compliance
C. 3. b. Partial Compliance
C. 3. c. Partial Compliance
C. 3. d. Substantial compliance

The proportion of patients with serious needs reached is increasing, yet the total numbers of patients remains very low.  Once identified, the patients are receiving either a supply or a prescription that can be filled at no cost; although medication pickup rates are low.  Wellpath is collecting data, but these data are unreliable.  Transfer of information and medication appears to be working well.

C. 3. a. <u>Recommendation:</u> Improve notifications.

C. 3. b. <u>Recommendations:</u>  Build on recent progress to increase numbers.  Continue to counsel patients face-to-face.

C. 3. c. Comment:  If there is no notice, it is not possible to provide prescriptions. Partial is achieved through pre-release notification to patients.

## IV. D. Sanitation and Environmental Conditions

Introduction

This report summarizes the compliance findings for the Sanitation, Environmental Conditions and Fire and Life Safety provisions of the Consent Judgment. The findings are based both on the Monitor's tour conducted September 16-19, 2019 and review of materials provided prior to the on-site work.

The Monitor toured all of the inmate housing units in the Orleans Justice Center (OJC) and the Temporary Detention Center (TDC), and the Kitchen/Warehouse/Central Plant. The Monitor spoke with inmates, deputies, and supervisors.

Since the previous tour in January 2019, additional progress in the area of sanitation and environmental conditions was noted, including:

- Consistent documentation indicating a regular cleaning schedule was followed.

- Establishing and implementing a process to provide timely notification to the Sanitarian of incidents involving biohazard spills and use of biohazard cleanup kits; and



- Improving sanitation by reducing clutter in cells and dayrooms in most of the housing units observed and removing obstructions from the HVAC supply/return grills in the inmate housing areas.

**V. D. 1. Sanitation and Environmental Conditions**

Findings:
D. 1. a.  Partial Compliance
D. 1. b.  Substantial Compliance
D. 1. c.  Substantial Compliance
D. 1. d.  Substantial Compliance
D. 1. e.  Substantial Compliance
D. 1. f.  Substantial Compliance
D. 1. g.  Substantial Compliance
D. 1. h.  Partial Compliance

IV. D. 1. a. OPSO shall provide oversight and supervision of routine cleaning of housing units, showers, and medical areas. Such oversight and supervision will include meaningful inspection processes and documentation, as well as establish routine cleaning requirements for toilets, showers, and housing units to be documented at least once a week but to occur more frequently.

Finding: Partial Compliance

Observations:

OPSO provided a cleaning schedule/supervisor inspection check list that identifies the frequency of housekeeping, by area, for both OJC and TDC. Additionally, OPSO provided documentation of area specific cleaning schedules (housing unit showers) implemented since the last inspection tour.

OPSO provided substantial and improved documentation of monthly housing unit inspections by the Environmental Officer in addition to daily/weekly inspections by security staff. While the Monitor observed improvement in the overall unit and cell cleanliness since the last inspection, the monthly inspection reports continue to note cleanliness issues primarily in unit showers and individual cells. Typical inspection notations included dirty floors/walls, lavatories, trash/excess clutter, and obstructed cell vents. The Monitor noted similar issues during the inspection, primarily in the two high security units (lockdown)—this was also noted during the previous inspection and continues to be a challenge with primarily lockdown inmate populations.



The documentation and observed conditions throughout the housing units at the time of the inspection indicate the ability of the Sanitarian and Environmental Officer to maintain regular cleaning schedules has continued to improve since the last inspection. The Sanitarian reported that the staffing issue for the section has improved. The June Staffing Differential report indicated that, while the Sanitation section was still short two deputies, two additional civilian workers and a CMT were assigned to the section.

Grievances (4) and inmate reports of inadequate or missing cleaning supplies has dropped substantially since the last inspection. The Monitor observed supplies and equipment in the housing units to be in sufficient quantities and in serviceable condition on the day of the inspection. The Monitor found no chemicals in inmate housing areas or storage locations that were not on the authorized chemical list nor without a corresponding Material Safety Data Sheet. Again, much improved since the previous inspection. No cleaning supply closets in the housing units were found unsecured during the inspection indicating an improvement in staff supervision of these areas.

As previously noted, regular provision of clean inmate closing and bedding and appropriate inventory of these supplies are integral to sanitation, infection control and disease prevention. The Monitor observed the inmate clothing storage areas to be inadequately stocked at the time of the inspection. The Monitor was advised by the Sanitarian that OPSO was maintaining an adequate supply of inmate clothing but that the laundry vendor was behind in the processing and return of the inmate clothing and bedding.  This issue was noted during the two previous inspections and needs to be remedied. The OPSO laundry exchange plan calls for inmate uniforms to be exchanged twice weekly. The Monitor observed markedly fewer instances of inmates having what appeared to be excess uniform items indicating staff have improved in this area of supervision and control since the last inspection.

Inmates continue to laundry their person items (e.g. underwear, shorts) in the washing machines and dryers located in each housing unit. The Monitor observed the majority of the clothes dryers located in OJC's inmate housing units were generally serviceable although several had effectively non-functional exhaust lines; the lines were crushed against the wall, torn, or, as noted for two units, missing altogether. The Monitor was advised by a deputy in unit 4B that the dryer had been out of service approximately



five weeks, but a work order was pending. The dryer in unit 4A had been completely removed; according to the inmates present, the dryer had been gone "about four months." No other provision had been made for the inmates to dry their personal items in this particular housing unit. The Monitor inquired with the Maintenance Supervisor regarding this issue and was advised that "security staff" along with Maintenance had decided to remove the dryer completely due to repeated vandalism. After further inquiry with management staff, the Monitor was advised that the dryer removal was a result of a miscommunication and the dryer was returned prior to the end of the inspection tour.

As noted in previous Compliance Reports, several dryers remain in dangerous condition:

- At least two dryers had the flexible vent tubing entirely missing.
- Several dryers were pushed against the wall rendering the exhaust tubing ineffective and a potential fire hazard due to lint accumulation.
- The dryer in one dorm unit was being used by inmates to "heat" water for mixing with commissary coffee, soup packets, etc. The exhaust line was completely missing, and the dryer pulled away from the wall. This was immediately visible with only cursory observation by the Monitor.

The physical condition and maintenance of the dryers was observed to have improved since the last inspection but continues to pose safety and security issues for inmates and deputies including potential fire hazards from the lint. The Monitor observed an accumulation of lint behind dryers, on the walls and shelving of the pod laundry rooms, and on the dayroom return air vents of the affected housing units indicating that significant amounts of dryer lint becomes airborne and circulates in these areas. The accumulation of such organic material can promote the growth of mold and mildew on surfaces if not regularly inspected and cleaned.

During the inspection, the Monitor noted that the accumulation of inmates' personal items (paperwork, commissary purchases, and other approved items) had significantly declined with notable exceptions in two high-security units where personal papers and items were placed on window ledges, affixed to the walls, etc. Inmates blocked numerous air vents in the same two housing units to reduce air flow and change the cell's



COMPLIANCE REPORT # 11                                          83

temperature. This problem was observed by the Monitor to have been substantially curtailed by security staff throughout the rest of the OPJ housing units. At least two broken glass panels in shower windows were observed but the requisite work orders were pending. Observance of graffiti on dormitory and cell walls declined substantially since the last inspection.

IV. D. 1. b. Continue the preventive maintenance plan to respond to routine and emergency maintenance needs, including ensuring that showers, toilets, and sink units are adequately installed and maintained. Work orders will be submitted within 48 hours of identified deficiencies, or within 24 hours in the case of emergency maintenance needs.

Finding: Substantial Compliance

Observations:

The Monitor reviewed the Sanitation and Environmental Conditions report from August 2019, the OPSO Preventive Maintenance Plan, the Preventive Maintenance Schedule Summary report as well as inmate grievances related to maintenance issues. During the Monitor's inspection, staff and inmates were also interviewed regarding maintenance issues. The documentation reflected an on-going preventive maintenance program for major building systems and components consistent with OPSO policy and the Consent Judgment.

For routine mechanical, electrical and plumbing work orders, OPSO Policy 601.02, Reporting and Addressing/Repairing Maintenance Needs, specifically requires that any staff member observing a maintenance issue "shall call the CMMS work order facilitator" to report the issue, "or leave a message." As noted in the previous report, OPSO implemented a revised inspection and reporting procedure for line security staff just prior to the current reporting period. The "new" procedure has been in effect over six months and appears to be achieving the desired results. Inmates interviewed generally reported no issues with basic plumbing, mechanical or electrical services in their cells or dayrooms, or if an issue was reported, the problem was typically remedied within 48 to 72 hours indicating that work orders are being submitted in a timely manner as required by the Consent Judgment ("Work orders will be submitted within 48 hours of identified deficiencies, or within 24 hours in the case of emergency maintenance needs").



IV. D. 1. c. Maintain adequate ventilation throughout OPSO facilities to ensure that prisoners receive adequate air flow and reasonable levels of heating and cooling. Maintenance staff shall review and assess compliance with this requirement, as necessary, but no less than twice annually.

Finding: Substantial Compliance

Observations:

Adequate air flow is maintained in the facilities but continues to be impeded in some housing units by inmates' blocking air vents. Airflow in at least three individual cells brought to the attention of the Monitor by inmates was observed to be markedly decreased as compared to others not in the same area in the pod. Two HVAC control panels in pod control rooms were observed to be out of service. (Security staff are able to make minor adjustments within the parameters set by the Maintenance Director.) The Monitor observed the majority of housing dayrooms and cells to be at a relatively reasonable levels of heating and cooling.

As noted in the January 2019 inspection report, test and balance reports for the Kitchen/Warehouse (2014), OJC (2017) and TDC (2012) were the latest available to the Monitor. Lacking is documentation that a comprehensive review and assessment of compliance has taken place "twice annually" as spelled out in the Consent Judgment.

Recognizing that such comprehensive "test and balance" assessments are very expensive and typically performed only during the commissioning of new or replacement HVAC systems, the Monitor met with the Maintenance Director specifically to discuss the status and capabilities of the OPJ Building Automation System that controls the heating and cooling throughout all occupied areas in OPJ. The Maintenance Director was able to demonstrate the system's real-time monitoring of temperature sensors, variable air volume boxes (metered air flow), exhaust fans, chilled water systems, etc. through the systems graphical user interface. He also demonstrated the system's warning and alarm capabilities to alert staff if the system malfunctions or falls out of specified parameters, and how designated staff are able to address such issues through either adjustment or emergency/planned replacement of the component. Further, the Maintenance Director was able to produce reports on demand to document any such failures over time.



It is the Monitor's opinion that the OPJ Building Automation System, as currently operated, meets the intent of the Consent Judgment with regard to this section.

IV. D. 1. d. Ensure adequate lighting in all prisoner housing units and prompt replacement and repair of malfunctioning lighting fixtures in living areas within five days, unless the item must be specially ordered.

Finding: Substantial Compliance

Observations:

The Monitor observed sufficient lighting being provided in housing units of both OJC and TDC. Maintenance staff continue to maintain a supply of replacement bulbs, transformers, or ballasts to repair malfunctioning lighting. During this inspection, the Monitor observed no outstanding electrical work orders beyond routine bulb replacement.

IV. D. 1. e. Ensure adequate pest control throughout the housing units, including routine pest control spraying on at least a quarterly basis and additional spraying as needed.

Finding: Substantial Compliance

Observations:

A review of the documentation submitted found sufficient evidence of a pest control program that meets the intent of the Consent Judgment. OPSO continues to maintain a pest control contract with a State licensed company for monthly service of all housing areas and bi-weekly service for the Kitchen/Warehouse. Inmate grievances related to pest control were reviewed and found to have been addressed in a timely manner. Some evidence was found that "drain flies" were recently in and around the toilet and drain in the IPC "roll out" changing rooms and on restroom and shower walls in three housing pods. This is a marked improvement compared to the last inspection and demonstrates an active control and cleaning program is in place. In contrast to previous inspections, no spider webs or infestations were observed in the recreation yards.

Environmental, Sanitation and Life-Safety staff performing inspections and responding to pest control grievances continue to initiate work orders for pest control and to document how, when and where infestations are identified and remedied. The staff reported a small increase in the number of grievances submitted related to pest control in the semi-annual report. The cause was attributed to the hot weather during the latter part of the rating period and commissary debris/trash present in cells. Given the size of the



inmate population and the facility, the Monitor did not consider the total number to be unreasonable.

IV. D. 1.f. Ensure that any prisoner or staff assigned to clean a biohazardous area is properly trained in universal precautions, outfitted with protective materials, and properly supervised.

Finding: Substantial Compliance

Observations:

As noted in the previous inspection, Policy 1101.07, "Bio-hazardous Spill Cleaning Procedures" [Revised 1/18/2018] Section VIII. A. 1 has been revised to allow properly trained and equipped inmates and deputies to clean-up bio-hazardous spills. Training materials were devised by the Sanitarian and training was provided to designated inmates in May 2019, and documentation provided. The Monitor also reviewed training curricula and documentation indicating that during 2019, all staff received eight hours of training in bio-hazardous cleanup procedures as part of their initial training or in-service training. As of 6/30/19, documentation indicated that 91% of the required staff had completed the bio-hazardous clean-up training for 2019. Additionally, the Sanitarian developed and implemented bio-hazardous cleanup Roll Call training and submitted documentation of participation by all four squads during the rating period.

As of November 2018, the Sanitation and/or Environmental Officer is required to be notified of such incidents each business day to enable them to replace any bio-hazardous clean up protective materials used and inspect the area to ensure it was properly cleaned and sanitized. The Sanitarian reported that no such incidents reports were received during the rating period covered by this inspection.

IV. D. 1. g. Ensure the use of cleaning chemicals that sufficiently destroy the pathogens and organisms in biohazard spills.

Findings: Substantial Compliance

Observations:

The Monitor observed that the chemicals on-hand and available to staff were sufficient to destroy the pathogens and organisms in biohazardous spills common in a jail environment.



The chemical inventory documentation submitted demonstrated availability of a consistent supply of the required chemicals being maintained by the designated staff.

IV. D. 1. h. Maintain an infection control plan that addresses contact, blood borne, and airborne hazards and infections. The plan shall include provisions for the identification, treatment, and control of Methicillin-Resistant Staphylococcus Aureus ("MRSA") at the Facility.

Findings: Partial compliance

Observations:

The Monitor reviewed the OPSO infection control policy 1201.11 as well as the WellPath Infection Control Program document (rev. 8/30/18) submitted by OPSO. The medical contractor's policy on infection control is included in 1201.11 by reference. Neither the OPSO policy nor the WellPath document specifically include "provisions for the identification, treatment and control of" MRSA as required by the Consent Judgment. The document provided only references HIV, HBV, and HCV exposures. Additionally, the WellPath document notes in Section 3 that "Site Specific Policy Required". Specific information required, but not provided, include:

1. Insert site-specific infection control plan.
2. Identify the person responsible for infection control at the site.
3. Describe how infection control activity is recorded.
4. List location(s) where infection control policies are kept.
5. Describe how biomedical wastes are managed.
6. Identify who prepares and completes reports.

OPSO has previously provided for annual review of the policy and standard operating procedures for the handling of inmate mattresses to include staff and/or inmate sanitation training program that includes mattress cleaning, and chemical use and control. This procedure is specifically required by the Infection Control Plan. The Monitor observed that mattresses were properly stored at both the OJC and TDC facilities.

## IV. D. 2. Environmental Control

Findings:



D. 2. a.  Substantial Compliance
D. 2. b.  Substantial Compliance

**IV. D. 2. a. OPSO shall ensure that broken or missing electrical panels are repaired within 30 days of identified deficiencies, unless the item needs to be specially ordered.**

Findings: Substantial Compliance

Observations:

OPSO Policies 601.02 "Reporting and Addressing Maintenance Needs" and Policy 601.03 "Preventive Maintenance" [August 15, 2016] and are implemented. Major electrical panels at OJC and TDC are located in secure maintenance spaces inaccessible to inmates.

**IV. D. 2. b. Develop and implement a system for maintenance and timely repair of electrical panels, devices, and exposed electrical wires.**

Findings: Substantial Compliance

Observations:

Repairs to exposed/damaged wiring/cabling noted by the Monitor during previous inspections were observed to be in good condition throughout the facility.

## IV. D. 3. Food Service

This report summarizes the findings for the Food Service provisions of the Consent Judgment based on the Monitor's document reviews and tour conducted September 17-18, 2019. The Monitor inspected the Orleans Justice Center (OJC) Kitchen/Warehouse; observed meal service activities; and spoke with OPSO supervisors and deputies, Summit employees, and inmates. Summit purchased the former contracted food service provider CBM and has fully transitioned to running the food service operations at OPSO. The former owner of CBM is now the President of Summit and the company retained the same District Manager and OPSO Food Service Director. Due to the change of contracted food service provider, OPSO had prudently requested and was awaiting a copy of Summit's policies and procedures for review, to ensure they align with OPSO draft policies 1001.01, Meal



Preparation, Transport and 1001.04, Food Service Inspections and Reviews, and 1001.06 Control of Kitchen Sharps and Cleaning Tools before finalization of the policies.

Since the last tour on January 14-16, 2019, there has been significant progress toward compliance with the Food Service provisions and a substantial improvement in the cleanliness and sanitation of the OJC Main Kitchen resulted in section IV.D.3.b. of the Consent Judgment moving from non-compliance to partial compliance.

As discussed in Compliance Report #5 – March 17, 2016, the issue of tool control in the kitchen is not specifically addressed in the Consent Judgment. However, the same problem of no supervisor's signature indicating that the daily kitchen tool inventory had been reviewed (as required on the inventory form) was found for September 1, 2019 through September 17, 2019, just as was previously found for January and February 2016. The consequences of failing to control culinary utensils includes unacceptable health and safety hazards, including the introduction of contraband into the jail.

Findings:
D. 3. a.  Substantial Compliance
D. 3. b.  Partial Compliance
D. 3. c.  Partial Compliance

IV. D. 3. a. OPSO shall ensure that food service staff, including prisoner staff, continues to receive in-service annual training in the areas of food safety, safe food handling procedures, and proper hygiene, to reduce the risk of food contamination and food-borne illnesses.

Findings: Substantial Compliance

Observations:

OPSO and Summit provided documentation of ongoing annual in-service food safety training for staff, including inmate workers. However, for food service training to reduce the risk of food contamination and food-borne illness, it requires more than providing a curriculum and roster of names. The most successful training programs are tailored to the needs of the department focus on fostering a culture that promotes good sanitation practices in all aspect of the food service operation. The Monitor observed violations that posed a risk of food contamination and food-borne illness and significant finding are summarized sections IV. D. 3. b. Cleanliness



and IV. D. 3. c. Recordkeeping/Temperatures of this report; these findings are indicators of areas where additional or more effective training is needed.

IV. D. 3. b. Ensure that dishes and utensils, food preparation and storage areas, and vehicles and containers used to transport food are appropriately cleaned and sanitized on a daily basis.

Findings: Partial Compliance

Observations:

Significant improvement in the overall cleanliness of the OJC Main Kitchen resulting at least in part from improved communication between OPSO kitchen and Summit staff and their willingness to work together to resolve problems resulted in the change from non-compliance to partial compliance. Completion and implementation of all draft policies along with compliance with all previous implemented policies and the Louisiana Food Regulations is required to achieve substantial compliance. Some issues and violations identified during the inspection include, but are not limited to:

- On September 17, 2019, the Monitor observed dirty carts being utilized to transport meal trays to the inmate housing units. The meal trays are delivered by the main kitchen to the jail in cabinet style carts and then transferred by deputies onto dolly style carts for transport to each individual housing unit and the trays are then distributed to the inmates from the cart. Upon inspection of the dolly carts, a buildup of grime and old dried out food debris was observed. The dolly carts are kept in the jail and are not transported back to the main kitchen for cleaning and sanitizing. However, based on the unsanitary condition of the carts, it was evident that they had not been cleaned after the previous meal and most of them had not been properly cleaned for an extended period of time. When asked about the sanitation of the carts, a deputy stated that they were cleaned in the 2nd floor OJC kitchen; however, inspection of the kitchen did not support this claim as the area was not stocked with the necessary supplies nor did it appear that it had been used for any type of cleaning activities and supervisory staff confirmed the observations.



- Despite being advised that the 2nd floor OJC kitchen was not in use, on September 17, 2019, the cooler door was found ajar and the following items were found: baskets containing numerous sack lunches that were not labeled or dated (therefore, it was unknown how long they had been stored in the cooler), an undated Styrofoam meal tray labeled for an inmate in housing unit 3C, and milk crates containing several dozen 8-ounce cartons of milk, including outdated milk with best-by dating of September 15, 2019, were found stored on dirty carts. The food and milk posed a foodborne illness risk and it was apparent that someone had been drinking the milk. Use of the cooler for the storage of food and milk necessitates checking and recording of the cooler temperatures as required per section IV.D.3.c. of the Consent Judgment.

IV. D. 3. c. Check and record on a daily basis the temperatures in the refrigerators, coolers, walk-in refrigerators, the dishwasher water, and all other kitchen equipment with a temperature monitor, to ensure proper maintenance of food service equipment.

Findings: Partial Compliance

Observations:

The Consent Judgment requires that OPSO "Check and record on a daily basis the temperatures in the refrigerators, coolers, walk-in refrigerators, the dishwasher water, and all other kitchen equipment with a temperature monitor, to ensure proper maintenance of food service equipment." Temperatures are used as a means of confirming the working condition of kitchen equipment by measuring with a properly calibrated thermometer or temperature measuring device and documenting the operating temperature to ensure that it complies with the temperatures specified in the Louisiana Food Code. Therefore, the Monitor reviewed temperature documentation, checked random food and water temperatures, and used the temperatures as a benchmark for determining OPSO's compliance with the Louisiana Food Code.

A problem was found with the refrigeration temperature logs. Although the state food code does not specify a temperature at which refrigeration must be set, it requires that it must be adequate to maintain all potentially hazardous foods (foods



that require temperature control for safety) at 41°F or colder. The Monitor found numerous refrigeration log entries of 44°F or higher for one of the walk-in coolers, specifically 245 Prep Cooler A1B[16]. Summit staff record the temperatures of the various coolers and freezers twice daily on a paper form, titled Cooler Temperature Log.  "Cooler Temperatures: 35 to 40 Degrees Fahrenheit is acceptable", "Corrective Actions Noted for temperatures out of range: Cooler #, Time, Temp, Work Order", and a supervisor signature line is printed on the bottom of every Cooler Temperature Log form. However, despite the fact that the form clearly states the acceptable cooler temperature range and indicates that corrective action is to be documented, corrective action was not documented on a single form provided for the period of December 2018 through June 2019.

It is important to note that refrigeration temperatures do not necessarily represent food temperatures and should not be interpreted at face value to suggest unsafe food. The OPSO main kitchen is a large facility and the temperatures of 15 different coolers and freezers were documented on the logs. The Monitor inspected Prep Cooler 245 and measured the ambient temperature at 38°F on September 18, 2019 and discussed these findings with OPSO and Summit staff. The Summit Food Service Director stated that food was not stored in Prep Cooler 245 and no food was observed stored therein, however it was readily accessible for use and signage indicated that it was a "Prepared Ingredients Cooler." After discussion with the OPSO Facility Engineer, he reported that the external temperature thermometer gauge was not working properly and that a new one would be procured. The Summit Food Service Director also stated that she would order a refrigerator

---

[16] Cooler Temperature Log data summary for 245 Prep Cooler A1B.  December 2018: 56% of temperatures were warmer than 41°F (46°F = 15 entries and 44°F = 11 entries); January 2019: 30% of temperatures were warmer than 41°F (46°F = 4 entries and 44°F = 12 entries); February 2019: 8% of temperatures were warmer than 41°F; March 2019: 66% of temperatures were warmer than 41°F (44°F = 39 entries); April 2019: 48% of temperatures were warmer than 41°F (48°F = 1 entry, 46°F = 4 entries, 45°F = 2 entries, and 44°F = 17 entries); May 2019: 33% of temperatures were warmer than 41°F (48°F = 3 entries, 46°F = 1 entry, 45°F = 4 entries, and 44°F = 10 entries); and June 2019: 24% of temperatures were warmer than 41°F (44°F = 14 entries). Some log entries were missing.



thermometer to place inside the cooler to serve as a backup to the external thermometer gauge.

Nevertheless, it is a serious problem that refrigeration temperatures well above those considered to be able to maintain the safe food temperatures established by the Louisiana Food Code as well as those printed on the cooler temperature log form itself were documented month after month without corrective action. Temperatures were being checked and recorded however, the documentation clearly indicated that there was a potential problem with Prep Cooler 245 that required investigation to ensure proper maintenance and operation of the refrigeration.

To achieve substantial compliance, OPSO must ensure that temperatures are not recorded simply for the sake of documentation. Not subsequently taking and documenting corrective actions when temperature problems are found is not only a poor practice, it is unsafe and can lead to foodborne illness outbreaks.

## IV. D. 4. Sanitation and Environmental Conditions Reporting

Findings:
D. 4. a.  Substantial Compliance
D. 4. b.  Substantial Compliance

IV. D. 4. a. Provide the Monitor a periodic report on sanitation and environmental conditions in the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. The report will include
(1) number and type of violations reported by health and sanitation inspectors;
(2) number and type of violations of state standards;
(3) number of prisoner grievances filed regarding the environmental conditions at the Facility;
(4) number of inoperative plumbing fixtures, light fixtures, HVAC systems, fire protection systems, and security systems that have not been repaired within 30 days of discovery;
(5) number of prisoner-occupied areas with significant vandalism, broken furnishings, or excessive clutter;
(6) occurrences of insects and rodents in the housing units and dining halls; and
(7) occurrences of poor air circulation in housing units.

Findings: Substantial Compliance

Observations:

The January – June 2019 Sanitation and Environmental report was



made available to the Monitor prior to the September 2019 inspection tour. The report contained the requisite information spelled out by the Consent Judgement as well as supporting documentation.

IV. D. 4. b. Review the periodic sanitation and environmental conditions reports to determine whether the prisoner grievances and violations reported by health, sanitation, or state inspectors are addressed, ensuring that the requirements of this Agreement are met. OPSO shall make recommendations regarding the sanitation and environmental conditions, or other necessary changes in policy, based on this review. The review and recommendations will be documented and provided to the Monitor.

Findings: Substantial Compliance

Observations:

The Consent Judgment requires a review of the periodic sanitation and environmental conditions reports to ensure issues are addressed along with making recommendations regarding sanitation and environmental conditions and policy changes based upon the review. Such reviews are to be documented and provided to the Monitor.

The Monitor reviewed the supporting documentation provided by OPSO and determined that it was sufficient to satisfy the requirements of the Consent Judgment. OPSO provided documentation of the required review and basic analysis of prisoner grievances and inspection violations noted regarding sanitation and environmental conditions during the rating period.

The revised procedure implemented prior to the rating period whereby routine requests for clothing items were no longer classified as grievances was observed to have had the desired effect. The documentation reviewed reflected a more accurate accounting of grievances and their disposition which should assist management staff in their analysis.

**IV. E. 1. Fire and Life Safety**

Findings:
E. 1. a.  Partial Compliance
E. 1. b.  Substantial Compliance
E. 1. c.  Substantial Compliance
E. 1. d.  Substantial Compliance
E. 1. e.  Substantial Compliance

IV. E. 1. a. Ensure that necessary fire and life safety equipment is properly maintained and



inspected at least quarterly. These inspections must be documented.

Finding: Partial compliance

Observations:

The Monitor toured the entire facility with the Facility Life Safety Officer. The Monitor observed that the fire and life safety equipment issues noted during the previous inspection had been corrected resulting in a "Green Tag" being issued for the system in August 2019. The original issue was related to the operation of the recreation yard doors in each housing unit. The doors are an integral part of the facility's smoke removal system. The Monitor observed the doors to be operational at the time of the inspection.

The Monitor observed three minor "trouble" warnings on the panel display at the time of the inspection. All three were minor issues routinely corrected by the Life-Safety Officer and Maintenance/contractor staff.

Life Safety staff continue to use the "Facility Dude" work order system to maintain the schedule of required inspections. The system notifies the Fire Safety Officer when an inspection is due. OPSO continues to maintain contracts with licensed vendors to complete annual inspections of all fire and life safety equipment. Prior to this tour, OPSO provided evidence of the most recent equipment inspections, in accordance with the Consent Judgment and policy. OPSO provided copies of quarterly inspections conducted by the Fire Safety Officer for Kitchen/Warehouse, OJC, and TDC for the first and second quarters of 2019. This documentation, supported by observations during the compliance tour, indicates that OPSO ensures that necessary fire and life safety equipment is properly maintained and inspected at required intervals. These inspections are conducted by a qualified fire safety officer or a qualified contractor, as required by the Consent Judgment. The Monitor noted all fire extinguishers observed were within their inspection window and up to date. One exit sign light was observed to be out of order, but an associated work order was noted to have already been submitted. The next annual inspection of the detection, alarm and sprinkler systems is due in November 2019.

IV. E. 1. b. Ensure that a qualified fire safety officer conducts a monthly inspection of the facilities for compliance with fire and life safety standards (e.g., fire escapes, sprinkler heads, smoke detectors, etc.).



Finding: Substantial Compliance

Observations:

The Monitor was provided with the monthly inspection documents for the Kitchen & Warehouse, OJC, and TDC facilities performed during the current inspection period. The reports are thorough and complete with all noted discrepancies listed with the associated work order number.

Examples of these issues noted in the reports and observed by the Monitor during this inspection include, but were not limited to:

• Accumulation of lint behind dryers resulting from missing or broken dryer vents in numerous OJC housing units constitute a significant fire safety hazard.

• In inmate cells, inmates' personal items (paperwork, commissary purchases, and other approved items) are not stored as required in OJC's Inmate Handbook in the personal property bags provided by OJC and in some instances, appeared excessive presenting a fire safety hazard. The Monitor noted, however, that this condition has improved substantially since the last inspection.

• Broken glass panels in cell doors and windows shower windows (two locations).

• The Monitor noted that a previously removed glass panel in a dorm shower door had been replaced.

IV. E. 1. c. Ensure that comprehensive fire drills are conducted every six months. OPSO shall document these drills, including start and stop times and the number and location of prisoners who were moved as part of the drills.

Finding: Substantial Compliance

Observations:

The Consent Judgment requires comprehensive fire drills every six months. OPSO provided documentation for fire drills for all facilities and shifts conducted during the current rating period. Documentation reviewed by the Monitor noted approximately 95% of all required staff had participated in at least one drill during the rating period. In addition to the detailed drill reports, the documentation lists, by name, any delinquent staff with the listing provided to senior management for the coordination of make-up training.



IV. E. 1. d. Provide competency-based training to staff on proper fire and emergency practices and procedures at least annually.

Finding: Substantial Compliance

Observation:

OPSO has developed the requisite policy, training course syllabus/outline and written directives. The Monitor was provided with documentation reflecting the requisite training was provided during in-service classes held in February 2019. The completion rate for the training was approximately 95% of OJC staff. However, it appeared that none of the TDC staff participated in the February 2019 training. Additionally, the documentation lists, by name, any delinquent staff with the listing provided to senior management for the coordination of make-up training. The Life Safety Officer notes all requisite staff are expected to complete the requisite annual training prior to the end of 2019.

IV. E. 1. e. Within 120 days of the Effective Date, ensure that emergency keys are appropriately marked and identifiable by touch and consistently stored in a quickly accessible location, and that staff are adequately trained in use of the emergency keys.

Finding: Substantial compliance

Observations:

The Monitor found the physical security and accountability for emergency keys to be in substantial compliance with the Consent Judgment and Policy 801.35 "Key and Key Card Control". Inspection reports note the routine verification of the keys and the Fire Safety Officer documents the periodic testing of the keys to verify they are operational. The Fire Safety Officer trains staff on the use of the location and use of the keys during the fire and life safety training curriculum provided to all staff at the training academy.

### IV. E. 2. Fire and Life Safety Reporting

Findings:
E. 2. a.  Substantial Compliance
E. 2. b.  Substantial Compliance

IV. E. 2. a. (1) – (3) Provide the Monitor a periodic report on fire and life safety conditions at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date and every six months thereafter until termination of this Agreement. Each report shall include:
(1) number and type of violations reported by fire and life safety inspectors;
(2) fire code violations during annual fire compliance tours; and



(3) occurrences of hazardous clutter in housing units that could lead to a fire.

Finding: Substantial Compliance

Observations:

The January – June 2019 Fire and Life Safety Conditions report was made available to the Monitor prior to the September 2019 inspection. The report contained the requisite information spelled out by the Consent Judgment as well as supporting documentation.

IV. E. 2. b. Review the periodic fire and life safety reports to determine whether the violations reported by fire and life safety inspectors are addressed, ensuring the requirements of this Agreement are being met. OPSO shall make recommendations regarding the fire and life safety conditions, or other necessary changes in policy, based on this review. The review and recommendations will be documented and provided to the Monitor.

Finding: Substantial Compliance

Observations:

The Consent Judgment requires a review of the periodic fire and life safety reports to ensure issues are addressed along with making recommendations regarding the fire and life safety conditions and policy changes based upon the review. Such reviews are to be documented and provided to the Monitor.

The Monitor reviewed the supporting documentation provided by OPSO and determined that it was sufficient to satisfy the requirements of the Consent Judgment. OPSO provided documentation of the required review and basic analysis of fire and life safety conditions as well as any necessary changes in policy or procedure.

Meeting minutes from the review indicated the OPSO Life Safety Officer communicated the information in IV. E. 2. a. (1) – (3) and reiterated the changes in the following implemented prior to the current reporting period:

- procedures for the conduct of fire drills to enhance staff participation
- procedures for documenting staff participation in drills
- documentation of life safety issues/corrective action in the facility maintenance management system
- new procedures for coordinating with the Unit Managers specifically in regard to the control of clutter and contraband in the units.



## IV. F.   Language Assistance

F.1.a. OPP shall ensure effective communication with, and provide timely and meaningful access to services at OPP to all prisoners at OPP, regardless of their national origin or limited ability to speak, read, write, or understand English.  To achieve this outcome, OPP shall:

    (1)    Develop and implement a comprehensive language assistance plan and policy that complies, at a minimum, with Title VI of the Civil Rights Act of 1964, as amended, (42 U.S.C. § 2000d et seq.) and other applicable law;

    (2)    Ensure that all OPP personnel take reasonable steps to provide timely, meaningful language assistance services to Limited English Proficient ("LEP") prisoners;

    (3)    At intake and classification, identify and assess demographic data, specifically including the number of LEP individuals at OPP on a monthly basis, and the language(s) they speak;

    (4)    Use collected demographic information to develop and implement hiring goals for bilingual staff that meet the needs of the current monthly average population of LEP prisoners;

    (5)    Regularly assess the proficiency and qualifications of bilingual staff to become an OPP Authorized Interpreter ("OPPAI");

    (6)    Create and maintain an OPPAI list and provide that list to the classification and intake staff; and

    (7)    Ensure that while at OPP, LEP prisoners are not asked to sign or initial documents in English without the benefit of a written translation from an OPPAI.

F.2.a. OPP shall develop and implement written policies, procedures and protocols for documenting, processing, and tracking of individuals held for up to 48 hours for the U.S. Department of Homeland Security ("DHS");

F.2.b. Policies, procedures, and protocols for processing 48-hour holds for DHS will:

    (1)    Clearly delineate when a 48-hour hold is deemed to begin and end;

    (2)    Ensure that, if necessary, an OPPAI communicates verbally with the OPP prisoner about when the 48-hour period begins and is expected to end;

    (3)    Provide a mechanism for the prisoner's family member and attorney to be informed of the 48-hour hold time period, using, as needed, an OPPAI or telephonic interpretation service;

    (4)    Create an automated tracking method, not reliant on human memory or paper documentation, to trigger notification to DHS and to ensure that the 48-hour time period is not exceeded.

    (5)    Ensure that telephone services have recorded instructions in English and Spanish;

    (6)    Ensure that signs providing instructions to OPP prisoners or their families are translated into Spanish and posted;

    (7)    Provide Spanish translations of vital documents that are subject to dissemination to OPP prisoners or their family members.  Such vital documents include, but are not limited to:

        i.    grievance forms;

        ii.    sick call forms;

        iii.    OPP inmate handbooks;

        iv.    Prisoner Notifications (e.g., rule violations, transfers, and grievance responses) and

        v.    "Request for Services" forms.

    (8)    Ensure that Spanish-speaking LEP prisoners obtain the Spanish language translations of forms provided by DHS; and

    (9)    Provide its language assistance plan and related policies to all staff within 180 days of the Effective Date of this Agreement.

F.3.a. Within 180 days of the Effective Date, OPP shall provide at least eight hours of LEP training to all corrections and medical and mental health staff who may regularly interact with LEP prisoners.

    (1)    LEP training to OPP staff shall include:

        i.    OPP's LEP plan and policies, and the requirements of Title VI and this Agreement;

        ii.    how to access OPP-authorized, telephonic and in-person OPPAIs; and

        iii.    basic commands and statements in Spanish for OPP staff.



(2)     OPP shall translate the language assistance plan and policy into Spanish, and other languages as appropriate, and post the English and translated versions in a public area of the OPP facilities, as well as online.

(3)   OPP shall make its language assistance plan available to the public.

F.4.

(1)     OPP shall ensure that adequate bilingual staff are posted in housing units where DHS detainees and other LEP prisoners may be housed.

(2)     OPP shall ensure that an appropriate number of bilingual staff are available to translate or interpret for prisoners and other OPP staff.  The appropriate number of bilingual staff will be determined based on a staffing assessment by OPP.

Findings:
F. 1. a.  Partial Compliance
F. 2. a.  Substantial Compliance
F. 2. b.  Substantial Compliance
F. 3. a.  Partial Compliance
F. 4.     Substantial Compliance

Observations:

The Language Assistance Plan required by this paragraph has not been prepared or reviewed by the parties.

While OPSO asserts that DHS and ICE inmates are not detained, OPSO has developed a policy which was submitted to the Monitors which brings provisions F. 2. a. and b. into substantial compliance.

Provision IV. F. 3. a. is determined in partial compliance as the Language Assistance plan has not been completed.

OPSO provided documentation regarding the use of the language line. OPSO has provided documentation regarding the number of bilingual staff and the manner in which the needs of language assistance are provided bringing provisions of F. 4. Into substantial compliance.

## IV. G.  Youthful Prisoners

Consistent with the Prison Rape Elimination Act of 2003, 42 U.S.C. § 15601, et seq., and its implementation of regulations, a youthful prisoner shall not be placed in a housing unit in which the youthful prisoner will have sight, sound, or physical contact with any adult prisoner through use of a shared dayroom or other common space, shower area, or sleeping quarters.  In areas outside of housing units, OPSO shall either:  maintain sight and sound separation between youthful prisoners and adult prisoners, or provide direct staff supervision when youthful prisoners and adult prisoners have sight, sound, or physical contact.  OPP shall ensure that youthful prisoners in protective custody status shall have no contact with, or access to or from, non-protective custody prisoners.  OPP will develop policies for the provision of developmentally appropriate mental health and programming services.



IV. G. Finding:  Partial compliance

Observations:

OPSO has provided documentation that its separation of youthful inmates from adult inmates was found in compliance during its recent PREA audit. Youthful female inmates are now housed in TDC. Documentation has not been presented regard the developmentally appropriate mental health and programming services.

## VI.  A – D. The New Jail Facility and Related Issues

A.    <u>New Jail</u>

The Parties anticipate that Defendant will build a new jail facility or facilities that will replace or supplement the current facility located at 2800 Gravier Street, New Orleans, Louisiana.  This Agreement shall apply to any new jail facility.

VI. A. Finding:  Substantial Compliance.

B.    Design and Design Document

Defendant shall obtain the services of a qualified professional to evaluate, design, plan, oversee, and implement the construction of any new facility.  At each major stage of the facility construction, Defendant shall provide the Monitor with copies of design documents.

VI B. Finding:  Substantial Compliance

This provision provides that, "*The Defendant shall obtain the services of a qualified professional to evaluate, design, plan, oversee, and implement the construction of **any new facility** [emphasis added].  At each major stage of the facility construction, Defendant shall provide the Monitor with copies of design documents.*"

C.    Staffing

Defendant shall consult with a qualified corrections expert as to the required services and staffing levels needed for any replacement facility.  OPSO shall complete a staffing study to ensure that any new facility is adequately staffed to provide prisoners with reasonable safety.

VI. C. Finding:  Substantial Compliance

The Consent Judgment requires that the Defendant **shall** consult with a qualified corrections expert as to the required services and staffing levels needed for any replacement facility.  The Monitors will await planning for Phase III to ascertain future compliance. For now, the paragraph is in substantial compliance.



D.   Compliance with Codes and Standards

Defendant will ensure that the new jail facility will be built in accordance with:  (1) the American Correctional Association's standards in effect at the time of construction; (2) the American with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101-12213, including changes made by the ADA Amendments of 2008 (P.L. 110-325) and 47 U.S.C. §§ 225-661, and the regulations there under; and (3) all applicable fire codes and regulations.

Finding – Monitors not qualified to evaluate.

The Monitors do not have the knowledge or expertise to evaluate compliance with this paragraph.   OPSO asserts that it is in compliance with this provision, without offering documentation.

## VII.  Compliance and Quality Improvement

## VII. A. Policies, Procedures, Protocols, Training Curriculum and Practices

Within 120 days of the Effective Date, OPSO shall revise and/or develop its policies, procedures, protocols, training curricula, and practices to ensure that they are consistent with, incorporate, address, and implement all provisions of this Agreement.  OPSO shall revise and/or develop, as necessary, other written documents, such as screening tools, logs, handbooks, manuals, and forms, to effectuate the provisions of this Agreement. OPSO shall send pertinent newly-drafted and revised policies and procedures to the Monitor as they are promulgated.  The Monitor will provide comments on the policies to OPSO, SPLC, and DOJ within 30 days. OPSO, SPLC, and DOJ may provide comments on the Monitor's comments within 15 days.  At that point, the Monitor will consider the Parties' comments, mediate any disputes, and approve the policies with any changes within 30 days.  If either party disagrees with the Monitor, they may bring the dispute to the Court. OPSO shall provide initial and in-service training to all Facility staff with respect to newly implemented or revised policies and procedures.  OPSO shall document employee review and training in new or revised policies and procedures.

VII. A. Finding: Substantial Compliance

Observations:

OPSO has now completed the development of the requires policies. There are still procedures and lesson plans which must be completed to remain in substantial compliance.

## VII. (H). B.  Written Quality Improvement Policies and Procedures

Within 180 days of the Effective Date, Defendant shall develop and implement written quality improvement policies and procedures adequate to identify serious deficiencies in protection from harm, prisoner suicide prevention, detoxification, mental health care, environmental health, and fire and life safety in order to assess and ensure compliance with the terms of this Agreement on an ongoing basis.  Within 90 days after identifying serious deficiencies, OPSO shall develop and implement policies and procedures to address problems that are uncovered during the course of quality improvement activities.  These policies and procedures shall include the development and implementation of corrective action plans, as necessary, within 30 days of each biannual review.



VII. B. Finding:  Partial compliance

Observations:

OPSO has provided documentation that it is now developing plans to identify serious deficiencies, and to address problems that are uncovered during the course of quality improvement activities to warrant a finding of partial compliance. These plans could benefit from being more thorough such as the development of corrective action to be taken and the auditing of adherence to the action plan.

## VII. (I). C. Full-Time Compliance Coordinator

The Parties agree that OPSO will hire and retain, or reassign a current OPSO employee for the duration of this Agreement, to serve as a full-time OPSO Compliance Coordinator.  The Compliance Coordinator will serve as a liaison between the Parties and the Monitor and will assist with OPSO's compliance with this Agreement.  At a minimum, the Compliance Coordinator will:  coordinate OPSO's compliance and implementation activities; facilitate the provision of data, documents, materials, and access to OPSO's personnel to the Monitor, SPLC, DOJ, and the public, as needed; ensure that all documents and records are maintained as provided in this Agreement; and assist in assigning compliance tasks to OPSO personnel, as directed by the Sheriff or his or her designee.  The Compliance Coordinator will take primary responsibility for collecting information the Monitor requires to carry out the duties assigned to the Monitor.

VII. C. Finding:  Substantial Compliance.

## VII. (J.) D. Self-Assessment

On a bi-annual basis, OPSO will provide the public with a self-assessment in which areas of significant improvement or areas still undergoing improvement are presented either through use of the OPSO website or through issuance of a public statement or report.

VII. D. Finding:  Substantial Compliance

Observations:

OPSO is now in substantial compliance as, in addition to holding town hall meetings quarterly and providing PowerPoint presentations at those meetings, OPSO posts those PowerPoint presentations on its website.

## VIII.  Reporting Requirements and Right of Access

## VIII.  A. Periodic Compliance Reporting

OPSO shall submit periodic compliance reports to the Monitor.  These periodic reports shall be provided to the Monitor within four months from the date of a definitive judgment on funding; and every six months thereafter until termination of this Agreement.  Each compliance report shall describe the actions Defendant



has taken during the reporting period to implement this Agreement and shall make specific reference to the Agreement provisions being implemented. The report shall also summarize audits and continuous improvement and quality assurance activities, and contain findings and recommendations that would be used to track and trend data compiled at the Facility. The report shall also capture data that is tracked and monitored under the reporting provisions of the following provisions: Use of Force; Suicide Prevention; Health Care Delivered; Sanitation and Environmental Conditions; and Fire and Life Safety.

VIII. A. Finding: Substantial Compliance

Observations:

The reports provided by OPSO are now sufficient to address the requirements of this provision,

## VIII. B. (Notification of) **Death of Any Prisoner**

OPSO shall, within 24 hours, notify the Monitor upon the death of any prisoner. The Monitor shall forward any such notifications to SPLC and DOJ upon receipt. OPSO shall forward to the Monitor incident reports and medical and/or mental health reports related to deaths, autopsies, and/or death summaries of prisoners, as well as all final SOD and IAD reports that involve prisoners. The Monitor shall forward any such reports to SPLC and DOJ upon receipt.

Finding: Substantial Compliance

## VIII. C. Records

Defendant shall maintain sufficient records to document that the requirements of this Agreement are being properly implemented and shall make such records available to the Monitor within seven days of request for inspection and copying. In addition, Defendant shall maintain and provide, upon request, all records or other documents to verify that they have taken the actions described in their compliance reports (e.g., census summaries, policies, procedures, protocols, training materials, investigations, incident reports, tier logs, or use of force reports).

VIII. C. Finding: Substantial Compliance

Observations:

OPSO now generally provides responses with seven days of a request by the Monitors. Some of the requests made regarding Classification are now timely. The monthly reports provided to the Monitors greatly decreases the need for document requests.

## III. Stipulated Agreements



OPSO and the Plaintiffs/DOJ negotiated two agreements after Compliance Report #3. The language of the Agreed Orders linked directly to the Consent Judgment and represented priority areas for inmate safety.

The three provisions of the April 22, 2015 are in compliance.  The provisions in the Agreed Order of February 11, 2015 require additional attention.  See the section of the Consent Judgment as noted.

> 6.b. OPSO shall ensure by May 15, 2015 that all staff assigned to the housing for inmates with acute and chronic mental health (in Templeman V, TDC, or other housing in which this population is held) attend training regarding working this population.  The lesson plans/curricula for this training shall be reviewed and approved by the Monitors.   The draft of the training curriculum and training plan is due to the Monitors by April 15, 2015, and should include participation by subject matter experts employed by the medical contractor.  See also Consent Judgment IV. B. 4. a. and 7. a.

> 13.  Medical Care – The health care provider has not provided their action plan for achieving compliance with the provisions of the Consent Judgment, as required by this paragraph.
> 14.b. By April 1, 2015, OPSO, in collaboration with CCS, will produce a management plan for inmates on the mental health caseload (Levels 1 – 4), whether these inmates are housed in the step-down unit, or in general population. See Consent Judgment IV. B. 2.



**Appendix A** - Summary Compliance Findings by Section Compliance Reports 1 – 11

| | Report # 1 2/13/14 | Report # 2 8/26/14 | Report # 3 2/25/15 | Report # 4 9/9/15 | Report # 5 3/17/16 | Report # 6 10/25/16 | Report # 7 5/1/17 | Report # 8 1/12/18 | Report # 9 8/25/18 | Report # 10 3/18/19 | Report #11 9/19/19 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **IV.A. 1.  Use of Force Policies and Procedures/Margo Frasier** | | | | | | | | | | | |
| IV. A. 1.a. | ND | NC | NC | PC | NC | PC | PC | PC | PC | SC | SC |
| IV. A. 1.b. | ND | NC | NC | PC | NC | PC | PC | PC | SC | SC | SC |
| IV. A. 1.c. | ND | NC | NC | PC | NC | NC | PC | PC | PC | SC | SC |
| **IV.A.2.  Use of  Force Training/Margo Frasier and Shane Poole** | | | | | | | | | | | |
| IV. A. 2. a. | ND | NC | NC | NC | NC | PC | PC | PC | PC | PC | SC |
| IV. A. 2. b. | ND | NC | NC | NC | NC | PC | PC | PC | PC | PC | SC |
| IV. A. 2. c. | ND | NC | NC | NC | NC | NC | NC | NC | PC | PC | SC |
| **IV.A.3.   Use of Force Reporting/Margo Frasier** | | | | | | | | | | | |
| IV. A.3 a. | ND | NC | NC | PC | NC | PC | PC | PC | PC | PC | SC |
| IV. A.3 b. | ND | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC |
| IV. A.3 c. | ND | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC |
| IV. A.3 d. | ND | NC | NC | PC | NC | PC | PC | PC | PC | PC | PC |
| IV. A.3 e. | ND | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC |
| IV. A.3 f. | ND | NC | NC | PC | NC | PC | PC | PC | PC | PC | PC |
| IV. A.3 g. | ND | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC |
| IV. A.3 h. | ND | NC | NC | NC | NC | NC | NC | NC | PC | SC | SC |
| **IV.A.4. Early Intervention System ("EIS") /Margo Frasier and Shane Poole** | | | | | | | | | | | |
| IV.A.4.a. | ND | NC | NC | PC | PC | PC | NC | NC | PC | PC | SC |
| IV.A.4.b. | ND | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC |
| IV.A.4.c. | ND | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC |
| IV.A.4.d. | ND | NC | NC | NC | NC | PC | PC | NC | NC | PC | SC |
| IV.A.4.e. | ND | ND | ND | ND | NC | NC | NC | NC | NC | SC | SC |
| **IV.A.5. Safety and Supervision/Margo Frasier** | | | | | | | | | | | |
| IV.A.5.a. | ND | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC |
| IV.A.5.b. | ND | NC | NC | NC | NC | NC | NC | NC | NC | PC | SC |
| IV.A.5.c. | ND | NC | NC | NC | NC | NC | NC | NC | PC | PC | SC |
| IV.A.5.d. | NC | NC | PC | PC | NC | NC | NC | NC | PC | PC | PC |
| IV.A.5.e. | ND | NC | NC | PC | PC | NC | NC | NC | NC | PC | PC |
| IV.A.5.f. | ND | NC | NC | PC | PC | SC | SC | PC | PC | PC | PC |
| IV.A.5.g. | ND | NC | ND | PC | NC | NC | NC | NC | NC | PC | SC |
| IV.A.5.h. | ND | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC |
| IV.A.5.i. | ND | NC | NC | PC | PC | PC | PC | PC | SC | PC | PC |
| IV.A.5.j. | ND | NC | PC | PC | NC | NC | NC | NC | PC | PC | PC |
| IV.A.5.k. | ND | NC | PC | PC | PC | PC | PC | PC | PC | PC | SC |
| IV.A.5.l. | ND | NC | NC | NC | PC | PC | PC | PC | PC | PC | SC |
| **IV.A.6.  Security Staffing/Margo Frasier** | | | | | | | | | | | |
| IV.A.6.a. | ND | PC | PC | PC | SC | SC | PC | PC | PC | SC | SC |



| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| IV.A.6.b. | ND | NC | PC | PC | NC | PC | PC | PC | PC | SC | SC |
| IV.A.7 Incidents and Referrals/Margo Frasier | | | | | | | | | | | |
| IV.A.7.a. | ND | NC | NC | NC | NC | PC | PC | PC | PC | PC | SC |
| IV.A.7.b. | ND | NC | NC | PC | NC | PC | PC | PC | PC | PC | PC |
| IV.A.7.c. | ND | NC | PC | PC | PC | PC | SC | SC | SC | SC | SC |
| IV.A.7.d. | ND | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC |
| IV.A.7.e. | ND | NC | PC | PC | PC | PC | PC | PC | PC | PC | SC |
| IV.A.7.f. | ND | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.A.7.g. | ND | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC |
| IV.A.7.h. | ND | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC |
| IV.A.7.i. | ND | NC | NC | PC | NC | NC | NC | NC | NC | PC | SC |
| IV.A.7.j. | ND | NC | NC | NC | NC | NC | NC | NC | NC | SC | SC |
| IV.A.8.  Investigations/Margo Frasier | | | | | | | | | | | |
| IV.A.8.a. | ND | NC | PC | PC | PC | SC | SC | SC | SC | SC | SC |
| IV.A.8.b. | ND | NC | PC | PC | PC | SC | SC | SC | SC | SC | SC |
| IV.A.8.c. | ND | NC | PC | PC | PC | SC | SC | SC | SC | SC | SC |
| IV.A.8.d. | ND | NC | PC | PC | PC | SC | SC | SC | SC | SC | SC |
| IV.A.8.e. | ND | NC | NC | PC | PC | PC | PC | SC | SC | SC | SC |
| IV.A.8.f. | ND | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC |
| IV.A.9.  Pretrial Placement in Alternative Settings/Margo Frasier | | | | | | | | | | | |
| IV.A.9.a. | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.9.b. | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.10. Custodial Placement within OPP/Patricia Hardyman | | | | | | | | | | | |
| IV.A.10.a. | NC | PC | SC | SC | SC | SC | PC | PC | PC | PC | SC |
| IV.A.10.b. | NC | NC | NC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.10.c. | NC | NC | PC | PC | PC | PC | SC | SC | SC | SC | SC |
| IV.A.10.d. | NC | NC | PC | PC | PC | PC | PC | NC | PC | SC | PC |
| IV.A.10.e. | NC | NC | PC | SC | PC | PC | SC | PC | PC | PC | PC |
| IV.A.10.f. | NC | NC | NC | NC | NC | PC | PC | PC | NC | SC | PC |
| IV.A.10.g. | NC | NC | NC | NC | NC | PC | PC | PC | PC | SC | SC |
| IV.A.10.h. | ND | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC |
| IV..A.11. Prisoner Grievance Process/Margo Frasier and Shane Poole | | | | | | | | | | | |
| IV.A.11.a | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | |
| IV.A.11.a.(1) | | | | | | | | | | | SC |
| IV.A.11.a.(2) | | | | | | | | | | | PC |
| IV.A.11.a.(3) | | | | | | | | | | | SC |
| IV.A.11.a.(4) | | | | | | | | | | | SC |
| IV.A.11.a.(5) | | | | | | | | | | | SC |
| IV.A.11.a.(6) | | | | | | | | | | | PC |
| IV.A.12. Sexual Abuse/Margo Frasier | | | | | | | | | | | |
| IV.A.12. | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | SC |
| IV.A.13. Access to Information/Margo Frasier | | | | | | | | | | | |
| IV.A.13. | PC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC |
| IV. B. Mental Health Care | | | | | | | | | | | |
| IV.B.1. Screening and Assessment/Raymond Patterson | | | | | | | | | | | |
| IV.B.1.a. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC |
| IV.B.1.b. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC |
| IV.B.1.c. | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC |



| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| IV.B.1.d. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC |
| IV.B.1.e. | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | SC |
| IV.B.1.f. | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC |
| IV.B.1.g. | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC |
| IV.B.1.h. | NC | NC | NC | NC | NC | NC | NC | NC | PC | SC | SC |
| IV.B.1.i. | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC |
| IV.B.1.j. | NC | NC | NC | PC | NC | NC | NC | NC | NC | PC | PC |
| IV.B.1.k. | NC | NC | NC | PC | NC | NC | NC | NC | NC | NC | PC |
| IV.B.1.l. | NC | NC | NC | NC | NC | NC | NC | NC | NC | SC | SC |
| **B. 2.  Treatment/Raymond Patterson** | | | | | | | | | | | |
| IV.B.2.a. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.2.b. | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC |
| IV.B.2.c. | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC |
| IV.B.2.d. | NC | NC | NC | NC | NC | NC | NC | NC | NC | NC | NC |
| IV.B.2.e. | NC | NC | NC | PC | PC | PC | PC | NC | NC | PC | SC |
| IV.B.2.f. | NC | NC | NC | PC | PC | PC | NC | PC | PC | PC | SC |
| IV.B.2.g. | NC | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC |
| IV.B.2.h. | NC | NC | NC | PC | PC | PC | PC | PC | NC | PC | SC |
| **IV.B.3.  Counseling/Raymond Patterson** | | | | | | | | | | | |
| IV.B.3.a. | NC | NC | NC | NC | PC | NC | NC | PC | PC | PC | PC |
| IV.B.3.b. | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC |
| **IV.B.4.  Suicide Prevention Training Program/Raymond Patterson** | | | | | | | | | | | |
| IV.B.4.a. | NC | NC | NC | PC | PC | PC | PC | PC | NC | PC | PC |
| IV.B.4.b. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC |
| IV.B.4.c. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.4.d. | NC | NC | NC | PC | NC | NC | NC | NC | NC | PC | PC |
| IV.B.4.e. | NC | NC | NC | PC | NA | PC | PC | PC | PC | PC | PC |
| IV.B.4.f. | NC | NC | NC | NC | PC | PC | NC | NC | SC | SC | SC |
| IV.B.4.g. | NC | NC | NC | SC | PC | NC | NC | NC | NC | PC | NC |
| **IV.B.5.  Suicide Precautions/Raymond Patterson** | | | | | | | | | | | |
| IV.B.5.a. | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC |
| IV.B.5.b. | NC | NC | NC | NC | NC | NC | NC | PC | PC | SC | PC |
| IV.B.5.c. | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC |
| IV.B.5.d. | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | SC |
| IV.B.5.e. | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC |
| IV.B.5.f. | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | SC |
| IV.B.5.g. | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC |
| IV.B.5.h. | NC | NC | NC | NC | NC | NC | NC | PC | NC | PC | PC |
| IV.B.5.i. | NC | NC | NC | NC | NC | NC | NC | PC | PC | SC | SC |
| IV.B.5.j. | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC |
| IV.B.5.k. | NC | NC | NC | NC | NC | NC | NC | PC | NC | PC | PC |
| **IV.B.6.  Use of Restraints/Raymond Patterson** | | | | | | | | | | | |
| IV.B.6.a. | PC | NC | PC | PC | PC | PC | PC | PC | NC | PC | PC |
| IV.B.6.b. | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | SC |
| IV.B.6.c. | ND | NC | PC | PC | PC | PC | PC | PC | NC | PC | NC |
| IV.B.6.d. | ND | NC | PC | PC | PC | PC | PC | PC | NC | PC | SC |
| IV.B.6.e. | NC | NC | PC | PC | PC | PC | PC | PC | NC | PC | NC |
| IV.B.6.f. | NC | NC | PC | PC | PC | PC | PC | PC | NC | PC | SC |


Orleans Parish
JAIL MONITORS

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| IV.B.6.g. | NC | NC | PC | PC | PC | PC | PC | PC | NC | PC | NC |
| IV.B.7. Detoxification and Training/Robert Greifinger | | | | | | | | | | | |
| IV.B.7.a. | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.7.b. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC |
| IV.B.7.c. | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.7.d. | NC | NC | PC | PC | PC | PC | PC | PC | PC | NC | PC |
| IV.B.8. Medical and Mental Health Staffing/Robert Greifinger | | | | | | | | | | | |
| IV.B.8.a. | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.8.b. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC |
| IV.B.9. Risk Management/Robert Greifinger | | | | | | | | | | | |
| IV.B.9.a. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.9.b. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.9.c. | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.9.d. | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC |
| IV.B.9.e. | NC | NC | NC | NC | PC | PC | PC | PC | NC | PC | PC |
| IV.B.9.f. | NC | NC | NC | NC | PC | PC | PC | PC | NC | NC | PC |
| IV.C. Medical Care<br>See SA 2/11/15 13. | | | | | | | | | | | |
| IV. C. Quality Management of Medication Administration | | | | | | | | | | | |
| IV.C.1.a. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC |
| IV.C.1.b. | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.C.1.c. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC |
| IV.C.1.d. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC |
| IV.C.2. Health Care Delivered/Robert Greifinger | | | | | | | | | | | |
| IV.C.2.a. | NC | NC | NC | PC | PC | PC | PC | PC | PC | NC | PC |
| IV.C.2.b. | NC | NC | NC | PC | PC | PC | PC | PC | PC | NC | PC |
| IV.C.3. Release and Transfer/Robert Greifinger | | | | | | | | | | | |
| IV.C.3.a. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.C.3.b. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.C.3.c. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.C.3.d. | NC | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC |
| IV.D. Sanitation and Environmental Conditions/Shane Poole | | | | | | | | | | | |
| IV.D. 1.a. | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC |
| IV. D. 1.b. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC |
| IV. D. 1.c. | NC | NC | PC | PC | NC | NC | PC | SC | PC | PC | SC |
| IV. D. 1.d. | NC | NC | NC | NC | SC | SC | SC | SC | SC | SC | SC |
| IV. D. 1.e. | NC | PC | PC | PC | PC | PC | PC | SC | PC | SC | SC |
| IV. D. 1.f. | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | SC |
| IV. D. 1.g. | NC | NC | NC | NC | PC | PC | PC | PC | PC | SC | SC |
| IV. D. 1.h. | NC | NC | NC | PC | NC | PC | NC | NC | NC | PC | PC |
| IV. D. 2. Environmental Control/Shane Poole | | | | | | | | | | | |
| IV. D. 2.a. | NC | NC | PC | PC | PC | SC | SC | SC | PC | SC | SC |
| IV. D. 2.b. | NC | NC | NC | NC | NC | SC | PC | SC | SC | SC | SC |
| IV. D. 3. Food Service/Diane Skipworth | | | | | | | | | | | |
| IV. D. 3.a. | NC | NC | NC | PC | PC | PC | NC | PC | PC | PC | SC |
| IV. D. 3.b. | NC | NC | NC | PC | PC | PC | NC | NC | NC | NC | PC |
| IV. D. 3.c. | NC | NC | NC | PC | NC | NC | PC | PC | PC | PC | PC |



| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **IV. D. 4. Sanitation and Environmental Conditions Reporting/Shane Poole** | | | | | | | | | | | |
| IV. D. 4.a. 1-7 | NC | NC | PC | PC | PC | PC | PC | PC | NC | SC | SC |
| IV. D. 4.b. | NC | NC | NC | NC | PC | NC | NC | PC | PC | SC | SC |
| **IV.E. Fire and Life Safety/Shane Poole** | | | | | | | | | | | |
| **IV. E. 1. Fire and Life Safety** | | | | | | | | | | | |
| IV. E. 1.a. | NC | PC | PC | PC | PC | PC | PC | SC | PC | PC | PC |
| IV. E. 1.b. | NC | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC |
| IV. E. 1.c. | PC | PC | PC | PC | NC | PC | PC | SC | PC | SC | SC |
| IV. E. 1.d. | NC | NC | NC | NC | NC | NC | PC | SC | PC | SC | SC |
| IV. E. 1.e. | ND | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC |
| **IV. E. 2. Fire and Life Safety Reporting** | | | | | | | | | | | |
| IV. E. 2.a.1-3 | ND | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC |
| IV. E. 2.b. | ND | NC | NC | PC | NC | NC | NC | PC | PC | SC | SC |
| **IV.F. Language Assistance** | | | | | | | | | | | |
| **IV.F.1. Timely and Meaningful Access to Services/Margo Frasier** | | | | | | | | | | | |
| IV.F.1.a. | ND | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| **IV.F.2.  Language Assistance Policies and Procedures/Margo Frasier** | | | | | | | | | | | |
| IV.F.2.a. | ND | PC | PC | PC | Not App | Not App | Not App | Not App | Not App | Not App | SC |
| IV.F.2.b. | ND | PC | PC | PC | Not App | Not App | Not App | Not App | Not App | Not App | SC |
| **IV.F.3. Language Assistance Training/Margo Frasier** | | | | | | | | | | | |
| IV.F.3.a. | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| **IV.F.4. Bilingual Staff/Margo Frasier** | | | | | | | | | | | |
| IV.F.4. | NC | PC | PC | PC | PC | NC | NC | NC | NC | PC | SC |
| **IV.G.  Youthful Prisoners/Margo Frasier** | | | | | | | | | | | |
| IV.G. | NC | NC | NC | PC | PC | PC | NC | NC | PC | PC | PC |
| **VI. The New Jail Facility/Margo Frasier** | | | | | | | | | | | |
| VI. A. | ND | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC |
| VI. B. | NC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| VI. C. | ND | PC | SC | SC | PC | PC | PC | SC | SC | SC | SC |
| VI. D. | Monitors Not Qualified to Evaluate | | | | | | | | | | |
| **VII.  Compliance and Quality Improvement/Margo Frasier** | | | | | | | | | | | |
| VII. A. | ND | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC |
| VI. B. (H.) | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC |
| VI. C. (I.) | NC | NC | SC | SC | NC | SC | SC | NC | PC | SC | SC |
| VI. D. (J.) | ND | NC | NC | PC | PC | PC | PC | NC | NC | NC | SC |
| **VIII. Reporting Requirements and Right of Access/Margo Frasier** | | | | | | | | | | | |
| VIII.A. | ND | PC | NC | PC | PC | PC | PC | NC | NC | PC | SC |
| VIII.B. | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC |
| VIII.C. | PC | PC | PC | SC | SC | SC | NC | NC | PC | PC | SC |

**Legend:**
**ND - Not scheduled for review**
**NC - Non-compliance**
**PC - Partial Compliance**
**SC - Substantial Compliance**
**NA - Not Applicable**



