**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **LASHAWN JONES, ET AL.** | * | **CIVIL ACTION** |
| | * | **No. 12-00859** |
| **VERSUS** | * | |
| | * | **HON. LANCE M. AFRICK** |
| **MARLIN GUSMAN, ET AL.** | * | **SECTION: I** |
| | * | |
| | * | **MAG. MICHAEL B. NORTH** |
| | * | **SECTION: 5** |

* * * * * * * * * * * * * * * * * * * *

**MEMORANDUM IN SUPPORT OF MOTION TO TERMINATE CONSENT DECREE PURSUANT TO 18 U.S.C. §3626(b) AND MOTION TO TERMINATE THE STIPULATED ORDER FOR APPOINTMENT OF INDEPENDENT JAIL COMPLIANCE DIRECTOR**

**MAY IT PLEASE THE COURT:**

Defendant, Marlin N. Gusman, Sheriff of the Parish of Orleans (hereinafter referred to as "Sheriff Gusman" or "OPSO"), respectfully moves this Honorable Court to terminate the Consent Decree (R. Doc. 466) pursuant to 18 U.S.C. §3626(b) and, further, to terminate the Stipulated Order for Appointment of Independent Jail Compliance Director (hereinafter referred to as the "Stipulated Agreement") (R. Doc. 1082). For the reasons more fully detailed herein, OPSO has reached compliance with the provisions of the Consent Decree and the continued enforcement of the Consent Decree violates 18 U.S.C. §3626, the Prison Litigation Reform Act, warranting termination.

**I.     INTRODUCTION**

The Consent Judgment (hereinafter referred to as the "Consent Decree") was executed on June 6, 2013 in response to ongoing litigation regarding the alleged unconstitutional conditions of confinement at OPSO.[1] This litigation was the result of a 2012 Class Action Complaint filed by the Southern Poverty Law Center on behalf of prisoners detained in the Orleans Parish Prison ("Plaintiffs' Complaint")[2]. Plaintiffs' Complaint alleged, *inter alia*, that the conditions of

---

[1] See Consent Decree, R. Doc. 466.
[2] See Plaintiffs' 2012 Complaint, R. Doc. 1.

confinement at OPSO placed inmates in imminent risk of serious harm and failed to meet their basic fundamental rights under the Constitution. When it was executed, the Consent Decree was intended to be a guiding roadmap for ensuring OPSO and its then dilapidated jail facilities would be improved to meet the standards for constitutional compliance as set forth in the Prison Litigation Reform Act ("PLRA"). Since then, OPSO has made drastic and unprecedented steps improving its operations and jail facility. Despite this significant progress, however, the Consent Decree is presently being implemented in a manner that demands prospective relief which far exceeds the constitutional minimum standards under the PLRA.

The PLRA, 18 U.S.C. §3626, establishes a comprehensive set of standards to govern prospective relief in prison condition cases. It provides that prospective relief shall "*extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs*."[3] Relief must be narrowly drawn, extend no further than necessary to correct the violation, and be the least intrusive means necessary to correct the violation.[4] Further, courts must "*give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief*."[5] The PLRA represents the statutory authority enacted by the United States Congress to achieve several goals in prison litigation. Primarily, the PLRA has been enacted to prevent federal courts from micromanaging prisons by consent decrees and to return control of the prison system from courts to "*the elected officials accountable to the taxpayer*."[6] "*[N]o longer may courts grant or approve relief that binds prison administrators to do more than the constitutional minimum*."[7] This, therefore, is the standard by which OPSO must be judged.

OPSO is in compliance with the Consent Decree based on the applicable constitutional

---

[3] 18 U.S.C. §3626(a)(1).
[4] Id.
[5] Id.
[6] Gilmore v. California, 220 F.3d 987, 996 (9th Cir. 2000).
[7] Id. at 999.

minimum standards in the PLRA.  There are no current or ongoing federal violations of inmates' constitutional rights that warrant the continued enforcement of this Consent Decree.  The Consent Decree was executed to correct the alleged constitutional violations as they existed at the time of Plaintiffs' Complaint in 2012.  Those alleged federal violations were the result of a different time under a different organizational structure, wherein overpopulation plagued an understaffed and under-resourced office operating in decaying jail facilities.  Those conditions no longer exist.  The alleged constitutional violations from 2012 have been remedied by means far exceeding the constitutional minimum demanded under the PLRA.  Continued enforcement of the Consent Decree seeks a jail utopia, reflective of the Court appointed Monitors' personal preferences and idealistic aspirations, not the "*narrowly drawn…least intrusive means necessary to correct the violation*" requirement that controls prospective relief for jail conditions.

The Monitors, appointed by the Court to assess OPSO's compliance with the Consent Decree, are not applying the proper legal standard under the PLRA.  Instead, they are requiring OPSO to meet a standard of unwavering perfection, which is not the law.  For example, OPSO's inexplicable "Partial Compliance" with Section IV.A.5.f. of the Consent Decree illustrates the improper standards the Monitors have placed on OPSO.  This Section of the Consent Decree encompasses surveillance in the jail and provides that OPSO must: "*Increase the use of overhead video surveillance and recording cameras to provide adequate coverage throughout the common areas of the jail, including the Intake Processing Center, all divisions' intake areas, mental health units, special management units, prisoner housing units, and in the divisions' common areas.*"[8]  At the time when this language was drafted, OPSO was housing inmates in the former dilapidated Orleans Parish Prison ("OPP") facility, which had only twenty-four (24) outdated and poorly working cameras. The recently constructed state-of-the-art Orleans Justice Center ("OJC"), which now houses the inmates, has over

---

[8] See Section IV.A.5.f of the Consent Decree, R. Doc. 466.

nine hundred (900) ultra-modern cameras operating throughout the facility including all locations required by the Consent Decree. Since OPSO increased the number of jail cameras from 24 to 900, in all locations described in the Consent Decree, it is unquestionably in Substantial Compliance with the jail camera provision. The Monitors, however, have refused to find OPSO in Substantial Compliance with this provision for the last two years because, on occasion, technical issues occur with the camera system and every single one of the 900 cameras may not work simultaneously.[9] The jail camera provision of the Consent Decree does not set forth that technical issues with the cameras would result in Non or Partial Compliance. It simply calls for the increased use of overhead video surveillance and recording cameras throughout the common areas of the jail, which OPSO has indisputably accomplished.

The jail camera issue is just one of many instances that exposes the unattainable and improper standard to which OPSO is being held by the current Monitors. OPSO and the City have spent 7 years, 11 Monitors, 2 Compliance Directors, and $3,740,723.38[10] in monitoring fees yet the Monitors claim to have only brought OPSO into Substantial Compliance with 59% of the Consent Decree.[11] The progress at OPSO since 2012 is undeniable, and there are no current and ongoing violations at OPSO which warrant the overly broad, highly intrusive Consent Decree to continue. As such, this Honorable Court should grant this Motion to Terminate, and bring an end to the Consent Decree.

## II.   PROCEDURAL AND FACTUAL HISTORY

### A.  State of the Jail Pre-Sheriff Gusman and the Progress Thereafter

---

[9] Of note, several district courts have even refused to order the installation of video cameras to increase inmate security, finding that "*[A] proposed order directing the installation of security cameras – is beyond the narrow scope permitted by the PLRA*." Houston v. Collerman, 2016 WL 6267968 at *12 (N.D.N.Y. Oct. 26, 2016). See also Oliver v. Gafford, 2016 WL 3247618 at *3 (N.D. Fla. May 9, 2016); Begay v. United States, 2015 WL 1540982, at *5 (D. Colo. Apr. 1, 2015); Deas v. Ingham Cty. Jail, 2018 WL 3853521, at *4 (W.D. Mich. Aug. 14, 2018); Stockenauer v. Ball, 2015 WL 4509130, at *6 (E.D. Mich. July 24, 2015).

[10] As of the date of filing, the Court appointed Monitors have billed $3,740,723.38 for their services from 2013 to present. See Declaration of Elizabeth Boyer, attached hereto as Exhibit 1.

[11] See Monitors' Report No. 11, R. Doc. 1259.

Understanding OPSO's past is necessary to understand the substantial progress it has achieved.  In 1969, a class action was filed regarding conditions of confinement at the Orleans Parish jail system.  The original title of that case reveals the longevity of the litigation: <u>Hamilton v. Schiro</u>, ELDA Docket No. 69-243.  That consent decree litigation continued for nearly forty years until 2008.  During this time, numerous consent decrees regarding various conditions of confinement were confected.

The current Orleans Parish Sheriff, Marlin Gusman, was elected by the public in 2004.  This historic election made Sheriff Gusman the first African American Sheriff in the (then) 286-year history of the City of New Orleans.  However, the change was more than symbolic.  Sheriff Gusman ushered in a new and compassionate era of corrections in Orleans Parish.  Before Sheriff Gusman's arrival, OPSO received a per diem or pre-determined amount of money for each day that each inmate was housed in an Orleans Parish jail.  This meant that OPSO received more revenue for housing more inmates – and that OPSO received more money the longer they held inmates.  This created an incentive to increase the inmate population and to hold those inmates in jail longer.  Under this per diem system, the prior Sheriff amassed a plethora of inmates as the inmate population ballooned to 6,500 inmates.  To accommodate the increased population, the prior Sheriff increased the capacity of existing jail buildings and acquired other neighborhood properties (e.g. hotel, school, office buildings) to convert them into additional jail buildings.  These buildings were almost entirely run-down facilities that were housing inmates in conditions that were arguably unsafe for both the inmates and the staff guarding them.  Sheriff Gusman worked diligently over the years after taking office and ultimately abolished this archaic and problematic long-standing per diem funding system thereby removing the incentive to maintain such an enormous inmate population.  Sheriff Gusman's commitment to humane treatment for inmates and an appropriate inmate population size led him to change this decades long practice.

Sheriff Gusman further endeavored to reduce the inmate population and improve the physical plant of the OPSO jail buildings.  Unfortunately, nine months after his election, Hurricane Katrina devastated the City of New Orleans.  OPSO was not spared in the devastation.  This meant that the already old, crumbling, and overused buildings were now in even greater disrepair.  Nevertheless, Sheriff Gusman continued working towards his goal and dramatically reduced the inmate population to the more reasonable level that it is today.  Sheriff Gusman has also closed almost every old jail building and the inmates of Orleans Parish are now housed in the new, state-of-the-art, Orleans Justice Center ("OJC").[12]

### B.  Plaintiffs' 2012 Class Action Complaint

On September 11, 2009, the Department of Justice ("DOJ") issued a Findings Letter[13] following its investigation of conditions at OPP pursuant to the Civil Rights of Institutionalized Persons Act ("CRIPA"), 42 U.S.C. §1997.  CRIPA gives the DOJ authority to seek a remedy for a pattern or practice of conduct that violates the constitutional rights of inmates in adult detention and correctional facilities.  The DOJ's Letter acknowledged that OPSO was still recovering from the devastating effects of Hurricane Katrina, and even commended the efforts of Sheriff Gusman and his staff on their extraordinary efforts in repairing the facilities following Katrina.[14] The DOJ's Letter ultimately concluded, however, that certain conditions at OPP violated the constitutional rights of inmates.[15]

On April 2, 2012, the Southern Poverty Law Center filed a class action complaint against

---

[12] The Temporary Detention Center ("TDC") remains open for the purpose of housing work release inmates and inmates with acute mental health needs.  The use of TDC for these purposes was approved by this Court and the New Orleans City Council.

[13] See DOJ's September 11, 2009 Letter, attached hereto as Exhibit 2.

[14] Id. at p. 2.

[15] Id. Specifically, the DOJ's Letter found that inmates confined at OPP were not adequately protected from harm, including physical harm from excessive use of force by staff and inmate-on-inmate violence.  In addition, the DOJ found that inmates did not receive adequate mental health care, including proper suicide prevention.  The Letter also found that OPP inmates faced serious risks posed by inadequate environmental and sanitation conditions.

Sheriff Gusman and OPSO on behalf of the prisoners detained in the Orleans Parish Prison.  The Plaintiffs' Complaint was largely based on the DOJ's 2009 Findings Letter.  The Plaintiffs' Complaint alleged, *inter alia*, that the conditions of confinement at the jail were unconstitutional and abusive to the inmates.  On September 24, 2012, the United States, through the DOJ, intervened into the legal proceedings and aligned its interests with the Plaintiffs.  On October 1, 2012, OPSO brought the City of New Orleans, who is responsible for funding the operations of the jail, into the case via a third-party complaint.

The allegations contained in Plaintiffs' Complaint are necessary to analyze because, in Plaintiffs' own words, they ". . . *describe conditions that <u>currently exist</u> and gives examples involving specific individuals who are or were incarcerated at OPP. . ..*"[16] That is, Plaintiffs' Complaint describes and complains of unsafe and unconstitutional conditions as they existed in April 2012, over eight years ago.  The Complaint makes pointed, and specific allegations, which are no longer at issue presently.  This is a position Defendants, Plaintiffs, the Monitors, and the Court would agree.  For instance, Plaintiffs' Complaint makes the following allegations:

> *Individuals housed at the jail are at imminent risk of serious harm. Rapes, sexual assaults and beatings are common place throughout the facility.  The facility is full of homemade knives, or "shanks."  People living with serious mental illnesses languish without treatment, left vulnerable to physical and sexual abuse.  These conditions have created a public safety crisis that affects the entire City of New Orleans.  The jail is oversized, understaffed, and Sheriff Gusman's classification and security policies and practices are dangerously deficient.  The men and women housed there are at constant risk of physical harm due to the presence of contraband and weapons in the facility, which, coupled with the absence of meaningful mental health services, places the lives of people incarcerated there in immediate jeopardy.*[17]

Inmates are no longer in imminent risk of rapes, sexual assaults and beatings as alleged in

---

[16] See Plaintiffs' Complaint, para. 42, R. Doc. 1.
[17] See Plaintiffs' Complaint, para. 2, R. Doc. 1.

Plaintiffs' Complaint.  Prisoners with mental illnesses are receiving sufficient, constitutionally compliant, care at the OJC.  The jail is no longer oversized, grossly understaffed[18], and the classification and security policies and practices have been corrected and brought into constitutional compliance.  The conditions described in Plaintiffs' Complaint do not represent current and ongoing conditions in 2020.

As will be more fully shown herein, in deciding OPSO's requested relief, the Court must consider evidence on **_current_** jail conditions.[19] Evidence of current and ongoing violations must reflect conditions "*as of the time termination is sought*."[20] Thus, the law does not permit this Court to analyze the prospective relief requested under the Consent Decree based on past conditions and violations nor can it predict future violations. It must look at the current conditions and make its findings as to whether or not the prospective relief represents the constitutional minimum required to cure the ongoing federal violation.  If the violation has been cured, or if the prospective relief goes beyond the constitutional minimum set forth in the PLRA, the provision must be terminated.

### C.  The Consent Decree

After months of litigation and negotiations, Sheriff Gusman determined that it would be in OPSO's best interest if it worked hand in hand with the DOJ, the City of New Orleans, and Plaintiffs to improve the conditions of confinement in Orleans Parish.  Sheriff Gusman was cognizant that the dilapidated jail facilities and understaffing caused by budget constraints would not be easily fixed without the cooperation of all parties involved.  With these good faith intentions in mind, the parties entered into the Consent Decree, which was signed by this Court and entered into the record on June 6, 2013.[21]

---

[18] The staffing issues in 2020, while they still exist, are nothing like the understaffing concerns that were raised in the 2012 Complaint.
[19] See Gilmore v. California, 220 F.3d 987-1010 (9th Cir. 2000).
[20] Id.
[21] See R. Doc. 466.

Despite the good intentions of Sheriff Gusman and OPSO, it quickly became apparent that the provisions of the Consent Decree were extraordinarily broad and overreaching, and the DOJ and Plaintiffs sought to hold Sheriff Gusman and OPSO to much different standards than what is constitutionally required for a jail facility. Pursuant to the PLRA, "*prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right.*"[22] The Consent Decree, which was drafted in 2013, was 44 pages long and encompassed approximately 174 areas of compliance that Sheriff Gusman and OPSO are required to achieve "Substantial Compliance" with, all of which are evaluated by the Court appointed Monitors. Simply put, the depth and breadth of the Consent Decree governing OPSO goes far beyond requiring a constitutionally compliant jail facility. Again, the legal standard for prospective relief under the PLRA is maintaining the constitutional minimum to correct the federal wrong. Section IV(D)(1)(d) is an example of the Consent Decree's overreach stating that OPSO must, "*ensure adequate lighting in all prisoner housing units and prompt replacement and repair of malfunctioning lighting fixtures in living areas within five days, unless the item must be specially ordered.*" This is an actual provision included as one of the 174 areas of compliance within the Consent Decree. Under this provision, if OPSO fails to replace a burnt-out lightbulb within 5 days, it is deemed non-compliant with the Consent Decree even though a burnt-out lightbulb does not make the conditions of a jail unconstitutional. And yet, partial compliance with this provision could prevent Sheriff Gusman and OPSO from being released from the Consent Decree.

In Section XII. of the Consent Decree, the parties "stipulated" that, as of the time of

---

[22] 18 U.S.C. §3626.

execution, the provisions of the Consent Decree complied with the requirements set forth in the PLRA. Sheriff Gusman now rejects this stipulation as no longer accurate. The Plaintiffs have not complied with their obligations under this stipulation and have consistently required prospective relief which blatantly violates the provisions of the PLRA. Thus, this "stipulation" in the Consent Decree is null and void and has no bearing on the relief sought in this Motion. Furthermore, it is well settled law that stipulations between parties are not binding on the Court. The Fifth Circuit Court of Appeal has opined that "*We note that we are not bound to accept stipulations as to questions of law.*"[23] The law requires that the Consent Decree not be overly broad, be narrowly drawn, and be the least intrusive means necessary to correct the violation of the federal right as required under the PLRA. The opposite has proven true and the Monitor's micro-managed enforcement of the Consent Decree violates the PLRA and makes demands well outside of the constitutional requirements..

The termination provisions of the Consent Decree, under Section XI(C), state that, "*This Agreement shall terminate when Defendant has achieved Substantial Compliance with each provisions of the Agreement and has maintained Substantial Compliance with the Agreement for a period of two years.*" This is an unconstitutional and overly burdensome requirement. Under this provision, OPSO could achieve perfection -which is <u>not</u> the legal standard- for 23 months, fall out of Substantial Compliance with one of the 174 provisions of the Consent Decree, and be forced into two more years of oversight. This provision violates the PLRA. Under the PLRA, a Consent Decree is terminable upon the motion of any party or intervener two years after a district court has granted or approved the prospective relief.[24] This Court granted the Consent Decree *sub judice* nearly seven years ago. Consequently, Sheriff Gusman is well within his legal rights to seek termination of the Consent Decree without complying with the restrictive, legally unsupported, termination provision

---

[23] <u>Equitable Life Assurance Soc. V. Macgill</u>, 551 F.2d 978, 983 (5th Cir. 1977); <u>Overton v. Austin</u>, 748 F.2d 941, 957 (5th Cir. 1984); <u>Provident Financial Inc. V. Strategic Energy L.L.C.</u>, 2010 WL 5093884, footnote 3 (5th Cir. 2010).
[24] 18. U.S.C. §3626(b).

in Section XI(C) of the Consent Decree.

### D.  Move into the Orleans Justice Center

At the heart of the 2012 Complaint filed by Plaintiffs was the unconstitutional conditions of confinement in OPP and several other jail facilities in the area.[25] There was no dispute from Sheriff Gusman that many of the jail facilities he inherited, specifically the OPP building, were in ruin. Upon his first election, Sheriff Gusman inherited jail facilities that were already beyond repair.  This fact was exacerbated by the devastation wreaked on these already corroded facilities during Hurricane Katrina.  Following Katrina, the Federal Emergency Management Agency ("FEMA") allocated funds for the construction of a new jail facility.  By the time Plaintiffs filed their Complaint in 2012, plans were already underway for the construction of the new jail facility.  All parties understood that the new facility would eliminate many of the alleged constitutional violations outlined in Plaintiffs' Complaint.  Section VI of the Consent Decree was specifically dedicated to the "New Jail Facility" and outlined the expectations of the parties for the construction of this constitutionally compliant building.

On September 14, 2015, OPSO began transitioning inmates from the old jail facilities into the OJC.  The OJC contains state-of-the-art jail technology and is functionally designed to house inmates in constitutional living conditions, all while keeping both inmates and OPSO staff members safe and secure.  The living conditions for inmates in the OJC are drastically improved from those of the former Orleans Parish jail facilities.

---

[25] See R. Doc. 1.






No longer are inmates housed in the run-down facilities of the past. Now, inmates are housed in one of the most modern and functional jail facilities in the country.

### E.  Receivership Proceedings - The Stipulated Agreement

It is well settled among experts that transferring inmates into a new jail will always present a significant challenge. A move in the corrections context is a complex set of tasks that requires staff and other resources working together to ensure the move is successful. As stated in the Resource Manual for Transition to a New Jail, "*no matter how skilled in current operations staff are, they will not know where everything is and how it works in the new facility.*"[26] The manual further provides, "*in the best of all possible worlds, transition teams would have all the time they need.*"[27] The

---

[26] Gail Elias & John Milosovich, Resource Manual for Transition to a New Jail, Ch. 1, p. 6, March 2005, NIC Accession No. 020159.
[27] Id. at Ch. 2, p. 4.

transition into the OJC was not simply moving inmates from one building to another. Rather, it would take months or even up to a year to transition the inmates into their new accommodations and train staff on the requirements of the new jail environment.

Everyone knew this transition would take time, but Sheriff Gusman was not afforded the time needed to transition successfully.  On April 25, 2016, only a few months after the transfer of inmates from the old jail facilities into the OJC, the Plaintiffs filed a Motion for an Order to Show Cause and for Appointment of a Receiver to Implement Consent Judgment (the "Motion for Receivership").[28] In their Motion for Receivership, the Plaintiffs sought the overly broad relief of asking the Court to appoint a Receiver to assist in the administration of the Orleans Parish Jail.  This included the ability to discipline, reassign, terminate, and promote Jail employees; develop and implement policies and procedures; allocate Jail budget funds; and enter into contracts for Jail services.[29] In support of this requested relief, Plaintiffs argued that there was a regression from the progress with compliance with the Consent Decree from the Monitors' Report No. 4 to No. 5, which was finalized on March 17, 2016. Although the Plaintiffs and the Court were warned that rushing the inmate transfer from the old to the new facility would likely result in a slight regression due to the complexities of the entire transition, the Plaintiffs nevertheless seized on their opportunity to move for the drastic remedy of receivership following Monitor Report No. 5.

Sheriff Gusman ardently opposed the Motion for Receivership.  Sheriff Gusman, after all, was the publicly elected, multi-term Sheriff who successfully guided OPSO through the aftermath of Katrina, drastically reduced the inmate population and bed count, and opened a state-of-the-art constitutional jail facility in the OJC.  Although there was still room for improvement to be made at OPSO, the appointment of a receiver to completely take over operations of the jail was an

---

[28] See R. Doc. 1009.
[29] Id. at para. 8.

extraordinary remedy that was not warranted under the circumstances. The court conducted an evidentiary hearing on Plaintiffs' motion which lasted several weeks. However, after significant negotiations, but before Sheriff Gusman concluded his defense to the motion, the parties reached a Court approved settlement.[30] This Stipulated Agreement established that a Compliance Director would be appointed to provide expertise and technical assistance with the operations of the jail and help bring OPSO into compliance with the Consent Decree. Although the law favored Sheriff Gusman's legal position, Sheriff Gusman once again made a good faith and unselfish decision to enter into the Stipulated Agreement. Sheriff Gusman has always, and will always, do what is best for OPSO. Bringing in a corrections specialist who could assist OPSO in achieving substantial compliance with the Consent Decree seemed prudent. Unfortunately, the Stipulated Agreement was never implemented as intended.

### F. Appointment of Compliance Director

#### i.   Former Director Maynard's Unsuccessful Stint as Compliance Director

On September 15, 2016, this Court ordered that Gary Maynard would serve as Compliance Director at OPSO, with an effective start date of October 1, 2016.[31] Gary Maynard boasted an impressive resume which included stints serving as corrections chief for Iowa, South Carolina, and Maryland. The Monitors collaborated with the Plaintiffs and DOJ to recommend Gary Maynard for the Compliance Director position. The Monitors previously claimed that OPSO could be brought into compliance in a brief amount of time once a corrections expert was appointed within the jail. Inexplicably, they reversed course and subsequently claimed that their preferred expert could not bring the jail into compliance. On January 18, 2018, the Monitors filed Monitors' Report No. 8 into the record.[32] This Monitors' Report emphasized that Director Maynard was not making the progress

---

[30] R. Doc. 1082.
[31] See R. Doc. 1097.
[32] See Monitors' Report No. 8, R. Doc. 1143.

envisioned under the Stipulated Agreement, and in fact his inability to meet even minimal milestones as the overseer of jail operations was alarming.

On January 29, 2018, less than two weeks after Monitors' Report No. 8 was filed, Director Maynard submitted his resignation as Compliance Director after only 18 months.  The parties who previously recommended Director Maynard now questioned his ability to do the job.  One of the Plaintiffs' lead counsel was quoted stating the following: "*Gary Maynard's tenure has been marked with a deterioration of the conditions in the jail, not progress.*"[33] In addition to the Plaintiffs' criticisms of Director Maynard, the Court likewise issued a stern criticism of Director Maynard stating: ". . . *While there has been some improvement in compliance over the course of Director Maynard's tenure, the Court is nonetheless dissatisfied with the pace of reform and lack of compliance relating to numerous mandates of the consent decree. . .".*[34]

### ii.   Director Hodge's Assistance with Achieving Compliance

Following former Director Maynard's resignation, the Court ordered that then Monitor Darnley Hodge serve as interim Compliance Director until a new, permanent Compliance Director could be selected by the Sheriff and approved by the Court.[35] After several months of searching for a permanent replacement for former Director Maynard, the only candidate that was ultimately proposed to Sheriff Gusman for his approval was acting interim Director Hodge. Sheriff Gusman had built a solid professional relationship with Director Hodge during his interim stint and believed Director Hodge would be a valuable asset to OPSO.  On October 12, 2018, Sheriff Gusman informed the Court that he would accept interim Director Hodge to serve as OPSO's Compliance Director.[36]

Director Hodge previously served as the Court appointed Monitor overseeing correctional

---

[33] See https://www.nola.com/news/courts/article_65ea59af-87cf-58c0-b5b1-90b90e7be01c.html
[34] See R. Doc. 1151.
[35] See R. Doc. 1151
[36] See R. Doc. 1202.

practices.   He has over forty (40) years of experience in law enforcement, jail leadership, management, military, and consulting services.  Among his many accomplishments, Director Hodge has led two regional jails from the design and construction through activation and daily operation. He did this while achieving 100% compliance with Virginia Board of Correction standards.  Director Hodge has provided consultation, evaluation, and policy guidelines for jails in the United States and the U.S. Virgin Islands.  He was named "Correctional Administrator of the Year" for Large Jails by the American Jail Association.

In the two years that Director Hodge has served as Compliance Director, OPSO has made significant advancements in complying with the provisions of the Consent Decree.  Prior to Director Hodge's appointment, OPSO was in Substantial Compliance with 23 provisions, Partial Compliance with 104 provisions, and Non-Compliance with 44 provisions.[37] As of the most recent Monitors' Report, based upon the Monitors' tour and evaluation in September 2019, OPSO is in Substantial Compliance with 103 provisions, Partial Compliance with 66 provisions, and Non-Compliance with only 5 provisions.[38] This represents a 97% compliance rate, be it Substantial or Partial, with the Consent Decree.

It is well-documented that Director Hodge, Sheriff Gusman, and OPSO have made the material progress necessary to terminate the Stipulated Agreement and abolish the position of Compliance Director.  This progress, however, does more than support termination of the Stipulated Agreement.  The progress achieved at OPSO is sufficient to satisfy the minimum standards of the Constitution.  As such, pursuant to Section §3626(b) of the PLRA, the entirety of the Consent Decree should be terminated.

**III.    PRISON LITIGATION REFORM ACT – 18 U.S.C. §3626**

---

[37] See Monitors' Report No. 8, R. Doc. 1143.
[38] See Monitors' Report No. 11, R. Doc. 1259.

### A.  History and Purpose of the PLRA

For decades preceding its implementation, criticism regarding prisoner litigation culminated in the Prison Litigation Reform Act of 1995.  Prisoners, taking advantage of the increased availability of civil rights claims, were one of the fastest growing plaintiff classes in the federal courts from 1960 to the present.[39]  In 1994, only a year before Congress introduced the PLRA, prisoners filed 60,086 cases in federal courts.[40]  In 1990, over 1,200 local prison systems, including those in major cities such as New York, Philadelphia, and Detroit, were under federal court supervision.[41]  The rise in prisoner litigation and prospective relief calling for extensive court involvement in prisons generated significant negative attention.[42] Prison administrators expressed frustration with judges taking on a "micro-managing" function in the remedy phase of meritorious cases.[43] Although the vast majority of cases were deemed without merit, administrators were overwhelmed by having to answer discovery requests and make court appearances.[44]  Local officials complained of the enormous financial and political costs of complying with court-ordered relief and any effort to alter those terms.[45]  Legislators blamed judicial activism for the state of prison litigation, finding unjustified usurpation of local criminal justice systems.[46]  Many judges, burdened with increasing numbers of pro se inmate complaints on crowded dockets and prison condition class actions, called for legislative reform.[47]

---

[39] See Due Process Rights and Their Termination of Decrees Under the Prison Litigation Reform Act, Anne K. Heidel, University of Pennsylvania Journal of Constitutional Law, April 2002, 4 U. Pa. J. Const. L. 561.  *Citing* 142 Cong. Rec. 23,255 (1996)(statement of Sen. Abraham indicating that in 1995, inmates filed 63,550 federal actions.)

[40] Id. (citing 141 Cong. Rec. 14,572 (1995)(statement of Sen. Kyl citing statistics compiled by the Administrative Office of the U.S. Courts.)

[41] Id. (citing Criminal Oversight, Wall St. J., June 10, 1996, at A18.)

[42] Id.

[43] Id. (citing John W. Palmer & Stephen E. Palmer, Constitutional Rights of Prisoners 338-39 (6th Ed. 1999).

[44] Id.

[45] Id. (citing Criminal Oversight, supra note 5, at A18 ("[T]he National Association of attorneys General estimates that states spend $81 million a year on prisoner's litigation."); Inmates' Suits No Joke, Boston Herald, Jan. 11, 1997, at 12.)

[46] Id. (citing 149 Cong. Rec. 18,695 (1994)(statement of Sen. Dole, future PLRA sponsor, supporting the nomination of Justice Breyer to the Supreme Court.))

[47] Id. (citing, e.g., Gabel v. Lynaugh, 835 F.2d 124, 125, n.1 (5th Cir. 1988)(per curiam)(noting the court's impatience with "frivolous or malicious appeals" and threatening future sanctions.))

In 1995, Congress responded with the PLRA, which was signed by President Clinton as part of the 1996 Appropriations Bill.[48] The PLRA sponsors described "*overzealous Federal courts...micromanaging our Nation's prisons*,"[49] and criticized "*judicial orders entered under Federal law [which] have effectively turned control of the prison system away from elected officials accountable to the taxpayer, and over to the courts*."[50]  In response to these types of concerns, the PLRA was enacted to require that remedies in prison condition lawsuits "*do not go beyond the measures necessary to remedy federal rights violations*,"[51] but rather are limited "*to the minimum necessary to correct the violation of the federal right*."[52]  In narrowing the scope of prospective relief to be issued in prison litigation, the PLRA also sought to diminish the discretion of federal district judges.[53] By requiring that relief be the least intrusive means of remedying a violation of a federal right, the PLRA "*stops judges from imposing remedies intended to effect an overall modernization of local prison systems or provide an overall improvement in prison conditions*."[54]

**B.  Requirements of the PLRA**

Congress enacted the PLRA to prevent federal courts from micromanaging prisons with consent decrees and to return control of the prison system form courts to "*the elected officials accountable to the taxpayer*."[55]  "*[N]o longer may courts grant or approve relief that binds prison administrators to do more than the constitutional minimum*."[56] The PLRA requires that prospective relief regarding prison conditions extend no further than necessary to correct the violation of the

---

[48] Id. (citing Pub. L. No. 104-134, 110 Stat. 1321 (1996).)
[49] 141 Cong. Rec. S14418 (daily ed. Sept. 27, 1995)(remarks of Sen. Hatch).
[50] Id. at S14419 (remarks of Sen. Abraham).
[51] H.R. Rep. No. 104-378, at 166 (1995)H.R. Rep. No. 104-378, at 166 (1995).
[52] Id. at 24 n.2.
[53] See, e.g., Miller v. French, 530 U.S. 327, 328, 120 S. Ct. 2246, 147 L.Ed.2d 326 (2000)(explaining that "*curbing the equitable discretion of district courts was one of the PLRA's principal objectives....*").
[54] H.R. Rep. No. 104-378 H.R. Rep. No. 104-378 at 166.
[55] Gilmore v. California, 220 F.3d 987, 996 (9th Cir. 2000).
[56] Id. at 999.

Federal right of a particular plaintiff or plaintiffs.[57]  Relief must be narrowly drawn, extend no further than necessary to correct the violation, and be the least intrusive means necessary to correct the violation.[58] Further, courts must give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief.[59]

These are codified requirements in the PLRA, and the United States legislative branch drafted these direct and pointed restrictions with the full intention of the judiciary branch upholding them in the court system.

### C. Legal Standards for Termination of Prospective Relief Pursuant to 18 U.S.C. §3626(b)

The PLRA provides that any order for prospective relief regarding prison conditions is terminable upon the motion of any party or intervener two years after a district court has granted or approved the prospective relief.  Specifically, 18. U.S.C. §3626(b) sets forth the standards for termination of prospective relief, such as the Consent Decree, as follows:

> *(b) Termination of relief.--*
> *(1) Termination of prospective relief.--(A) In any civil action with respect to prison conditions in which prospective relief is ordered, such relief shall be terminable upon the motion of any party or intervener--*
> *(i) 2 years after the date the court granted or approved the prospective relief;*
> *(ii) 1 year after the date the court has entered an order denying termination of prospective relief under this paragraph; or*
> *(iii) in the case of an order issued on or before the date of enactment of the Prison Litigation Reform Act, 2 years after such date of enactment.*
> *(2) Immediate termination of prospective relief.--In any civil action with respect to prison conditions, a defendant or intervener shall be entitled to the immediate termination of any prospective relief if the relief was approved or granted in the absence of a finding by the court that the relief is narrowly drawn, extends no further than necessary to correct the violation*

---

[57] 18 U.S.C. §3626(a)(1).
[58] Id.
[59] Id.

*of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right.*

*(3)* ***Limitation.***--*Prospective relief shall not terminate if the court makes written findings based on the record that prospective relief remains necessary to correct a current and ongoing violation of the Federal right, extends no further than necessary to correct the violation of the Federal right, and that the prospective relief is narrowly drawn and the least intrusive means to correct the violation.*

*(4)* ***Termination or modification of relief.*** --*Nothing in this section shall prevent any party or intervener from seeking modification or termination before the relief is terminable under paragraph (1) or (2), to the extent that modification or termination would otherwise be legally permissible.*

### i.   Relevant Period for a "Current and Ongoing" Violation of a Federal Right

To make the findings required to terminate prospective relief, the Court must take evidence on current jail conditions, at least with respect to those remedies Plaintiffs do not concede Defendants comply with constitutional requirements.[60] Evidence of "current and ongoing" violations must reflect conditions "*as of the time termination is sought*."[61] As such, in determining whether or not prospective relief should be terminated, this Honorable Court must look at current and ongoing jail conditions, not a history of previous jail conditions or those conditions that were in existence at the time the Plaintiffs' Complaint was filed or the Consent Decree was executed.

### ii.   Section 3626(b)(3) Findings

Under Section 3626(b)(3) of the PLRA, prospective relief shall not terminate only if the court makes written findings based on the record that prospective relief remains necessary to correct a current and ongoing violation of the Federal right, extends no further than necessary to correct the violation of the Federal right, and that the prospective relief is narrowly drawn and the least intrusive means to correct the violation.

---

[60] See <u>Gilmore v. California</u>, 220 F.3d 987-1010 (9th Cir. 2000).
[61] <u>Id.</u>; accord <u>Pierce</u>, 526 F.3d at 1205.

The United States Fifth Circuit Court of Appeal, as stated in <u>Ruiz v. Ortiz</u>[62], has outlined the procedure necessary for this Court to follow in analyzing whether or not prospective relief should be terminated or continue.

Although a district court's decision to terminate or continue prospective relief is to be reviewed for an abuse of discretion, where the court's decision to terminate or continue such relief "*turns on the application of § 3626(b) of the PLRA, that interpretation is reviewed de novo.*"[63]

Under § 3626, unless a court makes specific written findings regarding the continuing necessity of prospective relief, it must terminate such relief.  Specifically, under § 3626(b)(3), a court may not terminate prospective relief if it makes written findings based on the record that such relief (1) "*remains necessary to correct a current and ongoing violation of the Federal right,*" (2) "*extends no further than necessary to correct the violation of the Federal right,*" and (3) "*is narrowly drawn and the least intrusive means to correct the violation.*"[64]

Section 3626(b)(3) outlines specific standards to be followed when a district court considers whether to terminate a consent decree providing for prospective relief.  It requires "*particularized findings, **on a provision-by-provision basis**, that each requirement imposed by the consent decree satisfies the need-narrowness-intrusiveness criteria, given the nature of the current and ongoing violation.*"[65] "*It is not enough [for the district court] to simply state in conclusory fashion that the requirements of the consent decree satisfy those criteria.*"[66] Rather, "*the district court should engage in specific, provision-by-provision examination of the consent decree, measuring each requirement against the statutory criteria.*"[67]

To comply with the standards set forth in § 3626(b)(3), a district court should first give the

---

[62] 243 F.3d 941 (5th Cir. 2001).
[63] See <u>Castillo v. Cameron County, Texas</u>, 238 F.3d 339, 347 (5th Cir. 2001).
[64] 18 U.S.C. § 3626(b)(3).
[65] <u>Cason v. Seckinger</u>, 231 F.3d 777, 785 (11th Cir. 2000).
[66] <u>Id</u>.
[67] <u>Id</u>.

parties an opportunity to present evidence regarding whether or not there are any existing unconstitutional conditions at the institution that is the subject of the consent decree.[68] Next, the court should review the record and determine whether there are indeed ongoing constitutional violations.[69]

The court should then consider each provision of the consent decree in light of the current and ongoing constitutional violations, if there are any, and determine which aspects of the decree remain necessary to correct those violations.[70]  In Ruiz, the Court gave the following example:

> . . .if the court finds a constitutional violation in the area of inmate protection, a section of the consent decree regarding staffing issues may be necessary if under staffing is contributing to the unconstitutional conditions.  However, if the excessive use of force is the only constitutional violation found, then a provision regarding crowding issues may no longer be necessary.[71]

Finally, if there are remaining aspects of the decree which are still necessary, the court should determine whether those parts of the decree are narrowly drawn and the least intrusive means to correct the applicable violation.[72]  Ruiz again gave the following example:

> . . . with respect to a violation in the area of inmate protection, if a staffing provision remains necessary, it might not involve relief that is narrowly drawn and the least intrusive if it covers positions that are not commonly associated with the protection of inmates, such as security positions or certain administrative positions dealing with the reporting and investigation of complaints from inmates.[73]

The procedure outlined above is mandated by § 3626(b)(3) and cannot be circumvented by a mere recitation of the key statutory language.  Instead, the requisite findings must be put in writing with respect to each remaining aspect of prospective relief.  See Cason[74] (finding that § 3626(b)(3) requires "[p]articularized findings, analysis, and explanations [to] be made as to the application of

---

[68] See Castillo, 238 F.3d at 355; Cason, 231 F.3d at 781–83; Ruiz, 243 F.3d at 950-951.
[69] Id.
[70] Ruiz, 243 F.3d at 950-951.
[71] Id. at 951.
[72] Id.
[73] Id.
[74] 231 F.3d at 785.

*each criteria to each requirement imposed by the consent decrees.*")  Otherwise, the district court should terminate the unnecessary relief, assuming the other requirements for termination under § 3626 are met.

### iii.    Prospective Relief Defined under the PLRA

The PLRA explicitly defines "prospective relief" as "*all relief other than compensatory monetary damages.*"[75] The term "relief," in turn, is defined as "*all relief in any form that may be granted or approved by the court, and includes consent decrees but does not include private settlement agreements.*"[76] When a statute includes an explicit definition, that statutory definition is given controlling weight.[77] Thus, the Court need look no further than the definitions found within the PLRA to make the determination that the Consent Decree provides prospective relief that is subject to termination.

## IV.    THE COURT APPOINTED JAIL MONITORS

### A.  The Original Purpose of the Monitors

After executing the Consent Decree, the parties acknowledged that a Jail Monitor would be necessary to oversee the implementation of the Consent Decree and offer practical advice to OPSO for obtaining compliance.  By their own description, the Monitors are, "*. . . appointed by and work for and with the Federal Court.  The monitoring team works closely with the Orleans Parish Sheriff's Office (OPSO), the City of New Orleans, the plaintiff class, the U.S. Department of Justice, and citizens in assessing the OPSO's compliance with the Consent Judgment governing conditions at the Parish's jail.*"[78] At the fairness hearing in 2013, the DOJ's counsel described the purpose of the Monitors as follows:

---

[75] § 3626(g)(7).
[76] § 3626(g)(9).
[77] See, e.g., <u>Meese v. Keene</u>, 481 U.S. 465, 484, 107 S. Ct. 1862, 95 L.Ed.2d 415 (1987).
[78] See www.nolajailmonitors.org/

> *In addition, the decree calls for an independent monitor, and that's exactly what the independent monitor will do. The independent monitor will look to see what's being done at the facility and what's not. The monitor is not just someone to assess compliance. The monitor also will guide compliance and provide technical assistance to the facility to assist them in coming into compliance.*[79]

Sheriff Gusman welcomed the expertise of the Monitors as a valuable resource for OPSO. Unfortunately, even though OPSO began to hit noteworthy milestones and achievements with compliance, the Monitors refused to fairly evaluate their progress towards compliance. As time has endured, it has become more than evident that OPSO's compliance with the Consent Decree is not being judged on the narrowly drawn, least intrusive means necessary standards set forth in the PLRA, but rather moving targets and the impossible unconstitutional standard of absolute perfection.

Congress addressed this issue head on with the enactment of the PLRA and the limitations for prospective relief for jails. The PLRA provides that prospective relief should "*extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs.*"[80] Relief must be narrowly drawn, extend no further than necessary to correct the violation, and be the least intrusive means necessary to correct the violation.[81] Further, courts must "*give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief.*"[82] This is not what is being applied to OPSO.

### B.  The United States Attorney General's November 7, 2018 Memorandum

The Monitor issues OPSO faces are not unique to OPSO. Rather, many other jails throughout the country are similarly plagued with Monitors imposing their idealistic preferences in the enforcement of consent decrees while turning a blind eye to the PLRA. The Attorney General of the United States took notice and addressed this issue directly. On November 7, 2018, Attorney General

---

[79] See April 4, 2013 transcript of the fairness hearing, p. 66-67, R. Doc. 412.
[80] 18 U.S.C. §3626(a)(1).
[81] Id.
[82] Id.

Jeff Sessions issued a memorandum to the Department of Justice entitled: "*Principles and Procedures for Civil Consent Decrees and Settlement Agreements with State and Local Governmental Entities.*" (the "Memorandum").[83]  In his Memorandum, the Attorney General discussed the use of monitors for state and local governmental entities.  Among the many issues detailed concerning monitors, the Memorandum emphasized that monitors should operate with sufficient accountability and oversight, and should adhere to a code of ethics so that conflicts of interest – including a financial interest in prolonging the duration or expanding the scope of the monitorship – are avoided.[84] The Memorandum goes on to state:

> *In light of the monitor's role in overseeing compliance with a settlement that the Department believes is necessary to remedy a legal violation and is otherwise in the interests of justice, good government principles require that the Department structure agreements to ensure that monitors have appropriate incentives to work efficiently and effectively to bring the defendant into compliance with the terms of the settlement agreement or consent decree and to ensure that monitors act in the interests of justice and not in their own interest.[85]*

The Memorandum then dictates that for cases in which a monitor is appointed, the following guidelines must be followed, unless an exception is approved by the Deputy Attorney General or the Associate Attorney General:

1. The settlement agreement or consent decree must create incentives for the monitor to encourage early compliance with and conclusion of the settlement agreement or consent decree.

2. In most cases, the monitor must be replaced at an appropriate interval, usually of no more than two to three years.

3. Payment of costs and fees for the monitor's services must be specified in the settlement agreement or consent decree and capped at a reasonable amount (requiring the monitor to complete remaining tasks even if the cap is met).

---

[83] See United States Attorney General's November 7, 2018 Memorandum, attached hereto as Exhibit 3.
[84] Id.
[85] Id. at p. 7.

4. The monitor must be selected in accordance with the guidance set forth in the Memorandum from Acting Associate Attorney General Stuart F. Delery dated April 13, 2016, entitled *Statement of Principles for Selection of Corporate Monitors in Civil Settlements and Resolutions*, to avoid conflicts of interest and ensure that monitors are independent and highly qualified.[86]

As will be detailed below, several issues currently facing OPSO are in direct conflict with the dictates of the PLRA and are the types of issues the Attorney General warns the DOJ of in his Memorandum. These issues are precisely why the Attorney General felt it necessary to revise the method in which the DOJ permits monitors in consent decree cases.

### C. Jail Monitor Compliance Issues

This Motion to Terminate repeatedly discusses the absolute perfection standard being imposed by the Monitors, as opposed to the constitutional minimum standard they should be applying under the PLRA. The following sections detail specific incidents in which the Monitors are preventing OPSO from achieving Substantial Compliance by applying these unreasonable standards.

### i. Prison Rape Elimination Act Certification

Section IV.G of the Consent Decree relates to Youthful Prisoners. The Consent Decree identifies the Prison Rape Elimination Act of 2003 ("PREA"), 42 U.S.C. §15601, et seq., as the controlling source of Federal law which governs compliance with Section IV.G. OPSO was informed by the Monitors that if it were to obtain a PREA Certification by an independent PREA auditor, it would be in Substantial Compliance with all provisions of the Consent Decree related to PREA, including Section IV.G. In fact, in Monitors' Report No. 10, the Monitors' observation stated that, "*OPSO has appropriately linked compliance with this provision to IV.A.12., Sexual Abuse and the upcoming PREA audit.*"[87] This evidences the statements made by the Monitors that should OPSO successfully pass the PREA audit, it would be in Substantial Compliance with Section IV.G. of the

---

[86] Id.
[87] See Monitors' Report No. 10, p. 109, R. Doc. 1226.

Consent Decree.

From August 23 through August 25, 2019, an independent certified PREA auditor toured OPSO and inspected documentation, including its policies and procedures. After touring the facility and drafting her final report[88], the auditor issued a Certificate of Achievement[89], finding OPSO in compliance with the Prison and Jails Standards set forth by the Prison Rape Elimination Act of 2003. The auditors final report noted that, after a thorough audit, OPSO exceeded 6 standards, met 38 standards, and failed to meet 0 standards in the audit.[90] The PREA auditor was highly impressed with OPSO's PREA compliance, and noted that it is exceptionally rare that a jail passes a PREA audit on the first try, but OPSO did just that.

As this Court is aware, in preparation for a Monitors' Report, the Monitors typically make an on-site visit at the OJC wherein they collect data and make site walks to compile the necessary information to draft the Monitors' Reports. After the initial visit, the Monitors will issue a draft report to the Plaintiffs and OPSO for review and comment. Once the parties have an opportunity to object or raise concerns to any issues in the draft reports, the Monitors will thereafter make a final report which is filed into the record of this matter.

The site visit prior to Monitors' Report No. 11 took place in September 2019. In the Draft Report[91], circulated on November 27, 2019, the Monitors listed Section IV.G. in the Consent Decree in Substantial Compliance due to OPSO's successful passing of its PREA Audit. Therefore, OPSO submitted no comments in the Draft Report. In the Final Report, however, the Monitors lowered the grade to Partial Compliance, stating that "*Documentation has not been presented regarding [sic] the developmentally appropriate mental health and programming services.*"[92] OPSO, however, had

---

[88] See PREA Final Audit Report, attached hereto as Exhibit 4.
[89] See Certificate of Achievement, attached hereto as Exhibit 5.
[90] See PREA Final Audit Report, p. 10, attached hereto as Exhibit 4.
[91] See Draft Report of Monitors' Report No. 11, attached hereto as Exhibit 6.
[92] See Monitors' Report No. 11, p. 102, R. Doc. 1259.

submitted its PREA policies, its Juvenile Policies, and the completed PREA Audit Report to the Monitors as requested.

OPSO passed the highly stringent certified PREA Audit from an independent qualified auditor, yet the Monitors found that Section IV.G, which is governed by PREA, is not in Substantial Compliance.  Obtaining a PREA Certification is a significant accomplishment, but at a minimum, it represents that OPSO is compliant with PREA and is ensuring constitutional compliance.  It is puzzling why the Monitors graded this provision in Partial instead of Substantial Compliance, especially considering that in the previous report and in prior conversations they informed OPSO that obtaining a PREA Certification would result in Substantial Compliance.  This is an example of a "moving target" evaluation by the Monitors that has plagued OPSO and the citizens of New Orleans who bear this cost.

### ii.   Food Service Non-Compliance in Report No. 10

OPSO's Non-Compliance with Section IV.D.3.b. in Monitors' Report No. 10 is a keen example of the overreaching standards demanded by the Monitors that far exceed the constitutional minimum.   Section IV.D. covers Sanitation and Environmental Conditions.   Section IV.D.3.b. provides that OPSO, "*Ensure that dishes and utensils, food preparation and storage areas, and vehicles and containers used to transport food are appropriately cleaned and sanitized on a daily basis."[93]* OPSO was found in Non-Compliance with this provision in Report No. 10. The Monitors issued the following reasons in support of its decision to find Non-Compliance:

> - *On January 15, 2019, the "Detergent Empty" audible and visible alarms were alerting on the back of the automatic dishwasher.  The dishwasher was in use, the detergent canister was empty, and it is unknown how long the dishwasher was running without detergent. The detergent was refilled after the Monitor reported the problem to kitchen staff.   A properly functioning dishwasher including dispensing of detergent is fundamental in ensuring that dishes and*

---

[93] See Monitors' Report No. 10, p. 97-98, R. Doc. 1226.

> *utensils are appropriately cleaned and sanitized between uses.[94]*

This issue was addressed with the kitchen staff and they informed OPSO that when the "Detergent Empty" sign comes on, they will refill the detergent and re-run the dishwasher.  The Monitor just happened to walk through this area at the exact time the "Detergent Empty" signal had turned on.  This was explained to the Monitor, but it did not affect the finding of Non-Compliance.

> - *On January 15, 2019, the Monitor observed a piece of potato on the kitchen floor and found it to still be there over 24-hours later. Upon closer examination, the Monitor found that it was covered in mold.  Based on this observation, it is evident that the floor in this area was not cleaned and sanitized on a daily basis.[95]*

Once this was relayed to OPSO's attention, the kitchen staff found this small potato skin on the floor in an area under a cart.  It was hidden from sight and had to be specially sought out as it was not in the main area and was under equipment.

> - *Bakery equipment was observed to be dirty with dried, caked on food debris.  The Monitor was informed that one of the pieces of equipment had not been operational since 2015 and another piece of equipment had not worked "for years." OPSO and CBM Summit is clearly not ensuring that food preparation equipment is cleaned and sanitized on a daily basis as is essential to maintain a hygienic kitchen environment.[96]*

By her own admission, the Monitor acknowledges in the report that she was informed that the alleged "dirty" equipment was not operational and had not been in use for years.  Since it was not in use, OPSO was not using this alleged "dirty" equipment to prepare or serve food to the inmates.  In fact, upon information and belief it was kept in a closet away from the main cooking areas.  Nevertheless, the Monitor used this alleged dirty equipment that was not in use to give OPSO a designation of Non-Compliance with the Consent Decree.

Non-Compliance is the worst designation OPSO can receive for a provision of the Consent

---

[94] Id. at p. 98.
[95] Id.
[96] Id.

Decree.  Non-Compliance should mean that the condition is unconstitutional and constitutes a federal wrong to the inmates.  To recap, this Monitor found Non-Compliance based on: dishwashing detergent running out; a potato skin stuck to the floor under a cart; and a dirty piece of equipment that was not in use and not in the main cooking area.  Assume OPSO was in Substantial Compliance with every provision of the Consent Decree for 18 months and then this Monitor issues a finding of Non-Compliance for the above reasons.  OPSO would thereafter have the clock on termination re-set for another two years for Substantial Compliance.

This type of perfection standard was never anticipated when the Consent Decree was executed, and it certainly exceeds the constitutional minimums under the PLRA.  "*The Eighth Amendment requires only that prisoners receive food that is adequate to maintain health; it need not be tasty or aesthetically pleasing.  The fact that food sometimes is served cold, while unpleasant, does not amount to a constitutional deprivation.*"[97]  Similarly, the above instances noted by the Monitors certainly do not rise to the level of a constitutional deprivation.  This example, similar to the Jail Camera example discussed in the introduction, are the types of nitpicked findings that are keeping OPSO from reaching Substantial Compliance with the Consent Decree pursuant to the Monitors' perfection standards.

### iii.    Reduction from Substantial to Partial Compliance without Explanation or Warning

There has been a troubling pattern wherein OPSO was given the designation of Substantial Compliance in the Draft Report, but in the Final Report the grading was reduced to Partial Compliance without any warning or notice to OPSO.  This is a major concern because OPSO relies on the designation of Substantial Compliance when commenting on the Draft Reports.  If a designation of Substantial Compliance is given, there is no need for OPSO to comment or defend

---

[97] <u>LeMaire v. Maass</u>, 12 F.3d 1444, 1456 (9th Cir. 1993); *see also* <u>Toussaint v. Yockey</u>, 722 F.2d 1490, 1493 (9th Cir. 1984).

itself because it has achieved its goal.  For some inexplicable reason, on several occasions with Monitors' Report No. 11, areas were marked in Substantial Compliance in the Draft Report, but when the final report was released, OPSO was downgraded to Partial Compliance.  Of course, since these designations were changed without warning, OPSO was unable to offer feedback on these positions as it was unaware they changed.  The following are examples of this occurrence in Monitors' Report No. 11:

- In the Draft Report, Section IV.A.7.b. was graded as Substantially Compliant.  This provision of the Consent Decree provides that OPSO must: "*Continue to ensure that Facility watch commanders document all reportable incidents by the end of their shift, but no later than 24 hours after the incident, including prisoner fights, rule violations, prisoner injuries, suicide attempts, cell extractions, medical emergencies, found contraband, vandalism, escapes and escape attempts and fires.*"  In the Final Report, however, this grade was dropped down to partially compliant without any explanation.  The Final Report simply states that because all reports are not timely submitted, this section is in Partial Compliance, without citing to any specific incidents warranting this demoted designation.

- In the Draft Report, Section IV.A.7.f. was graded as Substantially Compliant.  This provision of the Consent Decree provides that OPSO must: "*Maintain a system to track all reportable incidents that, at a minimum, includes the following information . . ..*"  Although previously deemed in Substantial Compliance in the Draft Report, when the Final Report was released, this grade was dropped down to Partial Compliance without explanation.[98]  This Section only requires that a system be put in place to track incidents, and lists the required information that the system must track.  OPSO successfully updated the AS400 system to include all of the required elements.  In the Draft Report, the Monitors found that the AS400 met these requirements.  In the Final Report, however, the Monitors state that some information is not gathered by staff.

- In the Draft Report, Section IV.B.8.a. was given a grade of Substantial Compliance.  When the Final Report was issued, however, this Section was downgraded to Partial Compliance without warning.  The comments by the Monitors in the Draft Report and Final Report were identical, and there was no information on why the grade was demoted to Partial Compliance.  Furthermore, this Section only requires that OPSO have staffing sufficient to provide "adequate care" and "fulfill

---

[98] See Monitors' Report No. 11, page 32, R. Doc. 1259.

31

constitutional mandates."   OPSO maintains that it has sufficient staffing to satisfy this Consent Decree requirement.

- In the Draft Report, regarding Section VII.B., the Monitors state that "*OPSO has provided documentation that it now [sic] developing plans to identify serious deficiencies, and to address problems that are uncovered during the course of quality improvement activities to warrant a finding of substantial compliance.*"[99] Then, once again without warning or additional feedback, the Monitors changed this Section from Substantial Compliance to Partial Compliance in the Final Report, even stating the same language verbatim from the Draft Report (which found Substantial Compliance). The Final Report goes on to state that "*These plans could benefit from being more thorough such as the development of corrective action to be taken and the auditing of adherence to the action plan.*"[100] OPSO complied with this provision in the Consent Decree, which the Monitors agreed, but then once again they inexplicably reduced the findings to Partial Compliance stating that it could simply be better.

These instances wherein the Monitors reduce areas from Substantial to Partial Compliance without forewarning to OPSO has caused significant issues and persists to be an unnecessary hurdle OPSO must overcome.

### iv.    Findings of Partial or Non-Compliance without a Legitimate Basis

The Monitors often give a designation of Partial or Non-Compliance for an area of the Consent Decree even though there is clear documentation to the contrary and no basis for not finding Substantial Compliance.  In the Draft Report, the Monitors stated that Section IV.A.5.h. was not in Substantial Compliance because no documentation or proof of training was provided.  This was not accurate.  OPSO submitted a comment to the Draft Report stating that the documentation was in fact provided and was still available on the DropBox link to be viewed at any time.[101]  In the Final Report, the Monitors' kept the same language as the Draft Report, with zero changes, despite being informed that their position was incorrect.[102]

---

[99] See Draft Report of Monitors' Report No. 11, page 104, attached hereto as Exhibit 6.
[100] Id.
[101] See Draft Report of Monitors' Report No. 11, page 104, attached hereto as Exhibit 6.
[102] See Monitors' Report No. 11, p. 28, R. Doc. 1259.

As another example, in the Draft Report, the Monitors listed Section IV.D.1.h. in Partial Compliance, stating that the policy is not complete.   Section IV.D.1.h. provides that OPSO: "*Maintain an infection control plan that addresses contact, blood borne, and airborne hazards and infections.  The plan shall include provisions for the identification, treatment, and control of Methicillin-Resistant Staphylococcus Aureus ("MRSA") at the Facility.*"  OPSO, however, created, submitted, and had this exact policy <u>approved</u> by the Monitors on October 31, 2018.   OPSO challenged this designation of Partial Compliance in the Draft Report, but received no feedback and the Final Report still listed this Section in Partial Compliance.  Again, this policy was approved by the Monitors in 2018, yet they continue to find only Partial Compliance with the Consent Decree.

###       v.      Request for Guidance but Receiving Little to No Feedback

There have been several instances wherein the Monitors do not find OPSO to be in Substantial Compliance but have not provided feedback on what is needed for Substantial Compliance.  For instance, in Section IV.A.10 of the Consent Decree, OPSO submitted several comments requesting more information on what is needed to achieve Substantial Compliance.[103] OPSO received no response to this request for information.

Section IV.B. of the Consent Decree provides another good example.  Throughout the entirety of this Section on Mental Health Care, the Monitors often only write 1-2 sentences without any actual substance.[104] It is difficult to determine from these vague, uninformative sentences what OPSO is failing to do to achieve Substantial Compliance.  Consequently, OPSO often requests additional information.  No additional information is provided.  Furthermore, these sentences from the Monitors remain the same from one report to the next and often simply parrot the language of the Consent Decree.

---

[103] See Draft Report of Monitors' Report No. 11, page 104, attached hereto as Exhibit 6.
[104] See Monitors' Report No. 11, R. Doc. 1259.

###### vi.    Failure to Find Substantial Compliance with Semi-Annual Reports

Sections IV.B.5.j, IV.B.5.k, IV.B.6.g., IV.C.2.a, and IV.C.2.b. of the Consent Decree relate to the required semiannual reports, which OPSO has consistently and timely submitted as required in the Consent Decree.   OPSO has received a marking of Substantial Compliance from all other Monitors for timely submitting their semiannual reports except for Drs. Greifinger and Patterson (see, e.g., Sections IV.A.3.g., IV.A.5.l, IV.A.6.a, IV.A.6.b., IV.A.7.h., IV.A.7.i., IV.A.7.j, IV.A.8.d, IV.A.8.e, IV.A.8.f, IV.A.10.g, IV.A.10.h., IV.B.6.f., IV.D.4.a., IV.D.4.b, IV.E.2.a., IV.E.2.b, VIII.A.)  Drs. Greifinger and Patterson refuse to find OPSO in Substantial Compliance with these provisions because they desire extra documentation and analysis outside of the requirements set forth in the Consent Decree.  After the Draft Report was issued, OPSO immediately submitted comments challenging these findings, however, only Section IV.B.6.f. was changed from Non-Compliance to Substantial Compliance.  Drs. Greifinger and Patterson refused to change the remaining Sections into Substantial Compliance and have provided no feedback as to why.

###### vii.    Drawn Out Monitor Reports Provide Minimal Time for Corrective Actions

In September 2019, the Monitors toured the OPSO facility and began gathering their information in anticipation of drafting Monitors' Report No. 11.  On November 27, 2019, the Monitors provided OPSO with the Draft Report.  Thereafter, OPSO provided its feedback and challenged many of the findings (some of which are described above).  Many of these concerns were never addressed.  The Final Report, Monitors' Report No. 11, was then submitted to the Court on January 19, 2020, approximately five (5) months after the Monitors toured the OJC.  Then, the Monitors were set to return for the next site visit for Report No. 12 in March 2020.[105] As stated in the sections above, many areas were reduced from Substantial Compliance to Partial Compliance in the Draft Report to the Final Report without providing OPSO with reasons or knowledge that the

---

[105] Note that this tour did not take place as a result of the Covid-19 pandemic.

Monitors intended to reduce these areas. By delaying the time from their physical tours to issuance of the Final Report, the Monitors essentially set OPSO up for failure because of the timeliness associated with fixing issues identified by them.

### D. Costs/Expenses Associated with Monitors

#### i. The Cost of the Monitors has been significant for OPSO and the City.

During the fairness hearing on April 4, 2013, the Court asked counsel for the DOJ if the federal government was willing to pay the cost of an independent monitor.[106] In response, counsel for the DOJ stated that the issue had not been discussed, "*But we are always happy to sit down and have discussions.*"[107] Unfortunately, the cost associated with the Monitors was passed along to the taxpayers of New Orleans. OPSO must include the costs for the Consent Decree into its budget which is funded by the City.[108] Thus, the City of New Orleans funds all things related to compliance with the Consent Decree. A breakdown of the costs to date are as follows:

- Since it was executed in 2013, there have been 11 Monitors, 2 Compliance Directors and the following hard costs have been paid to the Monitors and Plaintiffs' attorneys
  - \* Monitors' Costs: **$3,740,723.38**
  - \* Plaintiffs' Fees: **$2,600,000.34**
    - \* TOTAL: **$6,340,723.72**

- This does not include other fees associated with the Consent Decree, such as Compliance Director salary and related positions.

OPSO avers that it is in compliance with the Consent Decree and it should be terminated. If ended, the resources expended by the City in the continued efforts to meet these shifting standards would also end.

#### ii. Lack of incentive to find Substantial Compliance.

As noted by the United States Attorney General in his November 7, 2018 Memorandum,

---

[106] See April 4, 2013 Transcript of Fairness Hearing, p. 65, R. Doc. 412.
[107] Id.
[108] See Declaration of Elizabeth Boyer, para. 9, attached hereto as Exhibit 1.

"*Monitors should operate with sufficient accountability and oversight, and should adhere to a code of ethics so that conflicts of interest – including a financial interest in prolonging the duration or expanding the scope of the monitorship – are avoided.*"[109] The Attorney General incorporated this into his Memorandum because of his awareness that Monitors, who are paid by the hour for the work completed at jails, could have a potential conflict of interest for not finding Substantial Compliance with the Consent Decree. The Attorney General found it necessary to have renewed guidelines for the appointment, compensation and duration of Monitors to "*ensure that monitors have appropriate incentives to work efficiently and effectively to bring the defendant into compliance with the terms of the settlement agreement or consent decree and to ensure that monitors act in the interests of justice and not in their own interest.*"[110] Regrettably, there is presently no incentive for the Monitors to find OPSO in Substantial Compliance with the Consent Decree. Thus, when this Court considers the findings of the Monitors in the Monitors' Reports, it must be cognizant of this inherent conflict of interest.

### V.   TERMINATION OF THE CONSENT DECREE IS WARRANTED PURSUANT TO 18 U.S.C. §3626(b)

#### A. OPSO is Eligible for Termination of the Consent Decree

18 U.S.C.A. §3626(b) sets forth the statutory provisions which provide for termination of a civil action with respect to prison conditions. Specifically, §3626(b) sets forth the following:

> *(b) Termination of relief.--*
> *(1) Termination of prospective relief.--(A) In any civil action with respect to prison conditions in which prospective relief is ordered, such relief shall be terminable upon the motion of any party or intervener--*
> > *(i) 2 years after the date the court granted or approved the prospective relief;*
> > *(ii) 1 year after the date the court has entered an order denying termination of prospective relief under this paragraph; or*

---

[109] See Attorney General's November 7, 2018 Memorandum, page 6, attached hereto as Exhibit 3.
[110] Id. at p. 7.

> *(iii) in the case of an order issued on or before the date of enactment of the Prison Litigation Reform Act, 2 years after such date of enactment.*

The Consent Decree was approved by this Court on June 6, 2013, nearly 7 years ago.  Thus, this Motion to Terminate satisfies §3626(b)(1)(i) as it is filed more than 2 years after the date the Court granted or approved the Consent Decree.

The language in Section XI.(C) of the Consent Decree stating that it shall not terminate until Substantial Compliance with the Consent Decree is maintained for a period of two years is of no consequence.  Section XI.(C) clearly violates federal law in that it directly contradicts the rights afforded to OPSO in section §3626(b)(1)(i) of the PLRA.

## B.  The Consent Decree Must Be Terminated

### i.  OPSO is in compliance with the Consent Decree, despite the findings of the Monitors.

As argued throughout this Motion, the standard currently being applied by the Monitors in the enforcement of the Consent Decree is not the legal standard for prospective relief in prison litigation under the PLRA.  Thus, it is immaterial if the Monitors only found 103 of 174 areas of the Consent Decree in Substantial Compliance based on their standards.  The standard that applies to OPSO, the constitutional minimum standard, has been achieved.  There are no current or ongoing violations that warrant the prospective relief set forth in the Consent Decree.

In U.S. v. Territory of the Virgin Islands, the court addressed this exact issue.[111]  There, the court concluded that a March 2011 Special Master Report evaluating the prison's compliance with the consent decree,

> *. . . evaluates Defendants' actions through the prism of compliance rather than considering whether Defendants' responses, while potentially falling short of compliance, were nonetheless sufficient to rise above the constitutional floor.  See Hadix v. Johnson, 228 F.3d 662, 670 (6th Cir. 2000) ("The fundamental problem with the district*

---

[111] 884 F. Supp. 2d, 399, 417 (2012).

> *court's order is that it focused not on the inquiry required by the*
> *PLRA, but rather on the question whether the consent decree had been*
> *substantially complied with.") In other words, there is reason to be*
> *concerned that the undergirding purpose of the March 2011 Special*
> *Master Report – to evaluate Defendants' compliance with the Orders*
> *of the Court – has caused the Special Master's analysis to be filtered*
> *through the perspective of compliance in such a way as to diminish its*
> *utility for the constitutional inquiry. Thus, if the Court were to embrace*
> *the Special Master's characterizations of the judgments about*
> *Defendants' failures and improvements vis-à-vis compliance, it may*
> *run the risk of obscuring the inquiry regarding the conditions at*
> *Golden Grove relative to the constitutional baseline.[112]*

Similarly, this Court must not look at the Monitors' findings regarding compliance with the Consent Decree because any of the findings of Non or Partial Compliance are immaterial to its ultimate analysis. Rather, this Court must focus its inquiry on the requirements of the PLRA, and the constitutional floor set forth therein. OPSO has worked tirelessly on achieving a constitutionally compliant jail facility since the Consent Decree was executed seven years ago. It has achieved this goal. No longer can Plaintiffs claim that individuals housed in the OJC are at imminent risk of serious harm, such as rapes, sexual assaults and beatings.[113] No longer can Plaintiffs claim that inmates with serious mental illnesses languish without treatment.[114] No longer can Plaintiffs claim that an over populated jail has dangerously deficient classification and security policies which pose a constant risk of harm.[115] Once this Court applies the appropriate standard under the PLRA, it will inevitably conclude that there are no current or ongoing violations of the inmates constitutional rights.

### ii. The Court must consider current jail conditions, not those alleged when the Consent Decree was executed.

When deciding whether to terminate the Consent Decree, the Court must take evidence on

---

[112] Id.
[113] See Plaintiffs' Complaint, para. 2, R. Doc. 1.
[114] Id.
[115] Id.

current jail conditions with respect to those remedies Plaintiffs do not concede comply with constitutional requirements.[116] In a recently decided case, <u>J.U. v. Salt Lake County</u>,[117] the district court granted Defendants' Motion to Terminate Consent Decree because circumstances at the jail changed since the entry of the consent decree in that matter. The court opined that:

> *Put plainly, history has moved on and the Consent Decree is simply out of date. The old Salt Lake County Jail was abandoned. The new Salt Lake County Jail was built. . . . The Consent Decree sought to correct conditions in a markedly different facility than exists currently and it imposed requirements on specific units of the Third East facility that simply no longer exist. . . . In addition to physical changes, there has been a shift in attitude toward mental illness since the Consent Decree was entered. The Complaint filed in 1982 alleged nightmarish scenarios in which Defendants largely ignored mentally-ill inmates. . . It is against this backdrop the parties settled their differences and the court entered the Consent Decree. There is no evidence in this record to suggest defendants currently exhibit this type of indifference to inmates' mental health. Accordingly, the court will vacate the Consent Decree. The court does so, in part, because the facility at issue in the Consent decree no longer exists. . . In sum, the Consent Decree is not necessary to correct any current or ongoing comparable violation at the new Salt Lake County Jail.[118]*

A keenly similar scenario exists here. The Court cannot look at the conditions that existed at the time the Consent Decree was executed in 2013, or when Plaintiffs' Complaint was filed in 2012. Those complaints of federal violations were based on conditions that existed at that time, in the old OPP and prior to the substantial changes made at OPSO. Like the court found in <u>J.U. v. Salt Lake County</u> above, history has moved on since the execution of the Consent Decree, especially in light of the new jail facility. There are no current and ongoing federal violations at OPSO which warrant the intrusive relief outlined in the Consent Decree, and thus it should be terminated.

> **iii.  If the Court determines that a current or ongoing violation exists, it must then conduct a § 3626(b)(3) analysis to determine if the provision satisfies the need-narrowness-intrusiveness criteria.**

---

[116] See <u>Gilmore v. California</u>, 220 F.3d 987, 1010 (9th Cir. 2000).
[117] 2019 WL 1170767 (D. Utah 2019).
[118] 2019 WL 1170767 at 3-4.

If the Plaintiffs object to this Motion to Terminate, under the PLRA, the Court is thereafter required to conduct an evidentiary hearing and give the parties an opportunity to present evidence regarding whether or not there are any current or ongoing constitutional violations.[119] If the Court determines that there is a constitutional violation, it must then analyze the provision of the Consent Decree applicable to this violation and determine if the provision satisfies the need-narrowness-intrusiveness criteria.

A Section 3626(b)(3) analysis requires "*particularized findings, on a provision-by-provision basis, that each requirement imposed by the consent decree satisfies the need-narrowness-intrusiveness criteria, given the nature of the current and ongoing violation.*"[120] "*It is not enough [for the district court] to simply state in conclusory fashion that the requirements of the consent decree satisfy those criteria.*"[121] Rather, "*the district court should engage in specific, provision-by-provision examination of the consent decree, measuring each requirement against the statutory criteria.*"[122]

There should be no dispute that at least 103 provisions of the Consent Decree warrant immediate termination.  The Court appointed Monitors have found that OPSO is in Substantial Compliance with 103 provisions of the Consent Decree.  Thus, the analysis at the evidentiary hearing should focus on the remaining provisions of the Consent Decree, and analyze on a provision-by-provision basis whether the 66 areas in Partial Compliance, and the 5 areas in Non-Compliance, satisfy the need-narrowness-intrusiveness criteria of the PLRA, should the Court determine a constitutional violation still exists. If this Honorable Court determines that these provisions satisfy this statutory requirement, it must then make written findings based on the record that such relief (1)

---

[119] See <u>Castillo</u>, 238 F.3d at 355; <u>Cason</u>, 231 F.3d at 781–83; <u>Ruiz</u>, 243 F.3d at 950-951.
[120] <u>Cason v. Seckinger</u>, 231 F.3d 777, 785 (11th Cir. 2000).
[121] <u>Id</u>.
[122] <u>Id</u>.

"*remains necessary to correct a current and ongoing violation of the Federal right,*" (2) "*extends no further than necessary to correct the violation of the Federal right,*" and (3) "*is narrowly drawn and the least intrusive means to correct the violation.*"[123]

### iv. Director Hodge believes OPSO is in Substantial Compliance with the Consent Decree.

On May 1, 2020, Director Hodge was quoted in an article published by thelensnola.org regarding his opinions on Sheriff Gusman's recent court filing seeking to terminate the Stipulated Agreement and the position of Compliance Director.[124] When asked about his thoughts on the filing, Director Hodge stated:

> *Well that is what is outlined in the consent judgment, if the sheriff gets to a point where he feels that the compliance director had made – what are the exact words – 'material compliance,' he can petition the court to remove the compliance director on that basis. So I think that's a good thing that he feels that I have made material progress.  I believe that we have done more than make material progress.[125]*

Director Hodge, however, believes the progress has been more than material.  Director Hodge went on to be quoted saying, "*I personally believe that we are in substantial compliance with 100 percent of that consent judgment.  That's just my opinion.*"[126]

Director Hodge's position regarding compliance with the Consent Decree is correct.  He possesses the keen insight as acting Compliance Director, and one-time Court appointed jail Monitor, to offer this factually based determination.  He is intimately familiar with the Consent Decree, the standard being applied to OPSO, and the progress that has been made.  This Honorable Court should defer to Director Hodge's assessment and so too find that OPSO is in compliance with the Consent Decree.

---

[123] 18 U.S.C. §3626(b)(3).
[124]  See  https://thelensnola.org/2020/05/01/official-in-charge-of-jail-says-he-thinks-its-in-shape-for-sheriff-gusman-to-retake-control/
[125] Id.
[126] Id.

## VI.   IMMEDIATE TERMINATION OF THE STIPULATED AGREEMENT – COMPLIANCE DIRECTOR APPOINTMENT – IS WARRANTED

### A.  Procedure for Termination of Compliance Director Position

Section E(2) of the Stipulated Agreement provides the termination procedure for terminating the position of Compliance Director as follows:

> *No sooner than nine months after the appointment of the Compliance Director, the Sheriff may file a motion to terminate the Compliance Directorship on the basis that the Compliance Director has enabled the Orleans Parish Jail to **achieve material progress with substantial compliance with all provisions of the Consent Judgment**, as defined in Paragraph A.2. Prior to filing such a motion, the moving Party shall request a status conference with the Court.  The other parties shall have an opportunity to respond to or oppose that motion.  The Court will order an evidentiary hearing and permit all reasonable discovery associated with the Motion.*(emphasis added)

### B.  Material Progress with Substantial Compliance Has Been Achieved

OPSO is in Substantial Compliance with the Consent Decree, which warrants termination of the entirety of the Consent Decree.  Thus, at a minimum OPSO has achieved *material progress* with Substantial Compliance with all provisions of the Consent Decree, which satisfies the standard necessary to terminate the Stipulated Agreement under Section E(2).

Monitors' Report No. 5 was based on the Monitors' tour that occurred in February 2016.  This Report was filed into the record on March 17, 2016.[127] The Stipulated Agreement was approved by this Court on June 21, 2016.  Therefore, improvement from the areas found to be in Substantial Compliance in Monitors' Report No. 5 is the measure by which the Court must judge whether "*material progress with substantial compliance*" has been achieved per the Stipulated Agreement.

In Monitors' Report No. 5, OPSO was in Substantial Compliance with 10 provisions, Partial Compliance with 96 provisions, and Non-Compliance with 63 provisions.[128] As of the most recent

---

[127] See Monitors' Report No. 5, R. Doc. 996.
[128] See Monitors' Report No. 5, R. Doc. 996.

Monitors' Report, based upon the Monitors' tour and evaluation in September 2019, OPSO is in Substantial Compliance with 103 provisions, Partial Compliance with 66 provisions, and Non-Compliance with only 5 provisions.[129] Thus, Director Hodge has facilitated OPSO improving the areas of Substantial Compliance from 10 to 103. This material progress is precisely what is contemplated in Section E(2) of the Stipulated Agreement and, therefore, the Stipulated Agreement, and the position of Compliance Director, should be terminated immediately.

## VII.   REQUEST FOR EVIDENTIARY HEARING

OPSO further respectfully requests an evidentiary hearing on this matter.  Under Section E(2) of the Stipulated Agreement, the Court must order an evidentiary hearing and permit all reasonable discovery associated with the Motion.  Furthermore, an evidentiary hearing is required on OPSO's Motion to Terminate the Consent Decree if the Plaintiffs or DOJ object to the Motion.

## VIII.  CONCLUSION

For the reasons discussed hereinabove, OPSO respectfully moves this Honorable Court to terminate the Consent Decree, and, further, to terminate the Stipulated Order for Appointment of Independent Jail Compliance Director.

Respectfully submitted,

**CHEHARDY, SHERMAN, WILLIAMS,
MURRAY, RECILE, STAKELUM
& HAYES, LLP**

*/s/ James M. Williams*
JAMES M. WILLIAMS, BAR NO. 26141
INEMESIT U. O'BOYLE, BAR NO. 30007
PATRICK R. FOLLETTE, BAR NO. 34547
One Galleria Boulevard, Suite 1100
Metairie, Louisiana 70001
Telephone: (504) 833-5600
Facsimile: (504) 833-8080

-and-

---

[129] See Monitors' Report No. 11, R. Doc. 1259.

**ORLEANS PARISH SHERIFF'S OFFICE**
BLAKE J. ARCURI, BAR NO. 32322
LAURA C. RODRIGUE, BAR NO. 30428
FREEMAN R. MATTHEWS, BAR NO. 9050
2800 Perdido Street
New Orleans, LA 70119
Tel: 504.202.9404 Fax: 504.202.9454
arcurib@opso.us; rodriguela@opso.us

## CERTIFICATE OF SERVICE

I do hereby certify that on this 26th day of May 2020, a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this filing will be sent by operation of the court's electronic filing system.  I also certify that a copy of the foregoing will be sent to all non-CM/ECF participants by United States Mail, properly addressed and postage pre-paid.

*/s/ James M. Williams*_____
James M. Williams