## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| LASHAWN JONES, *et al.*, and ) | |
| THE UNITED STATES OF AMERICA, ) | |
| ) | Civil Action No. 2:12-cv-00859 |
| PLAINTIFFS, ) | Section I, Division 5 |
| ) | Judge Lance M. Africk |
| v. ) | |
| ) | Magistrate Judge Michael B. North |
| MARLIN GUSMAN, Sheriff, ) | |
| ) | |
| ) | |
| DEFENDANT. ) | |
| ) | |

**Report No. 11 of the Independent Monitors**

**November , 2019**

Margo L. Frasier, J.D., C.P.O., Lead Monitor
Robert B. Greifinger, M.D. Medical Monitor
Patricia L. Hardyman, Ph.D., Classification Monitor
Raymond F. Patterson, M.D., D.F.A.P.A., Mental Health Monitor
Shane J. Poole, M.S., CJM., Environmental Fire Life Safety Monitor
Diane Skipworth, M.C.J., R.D.N., L.D., R.S., C.C.H.P., C.L.L.M., Food Safety Monitor

Email :    nolajailmonitors@nolajailmonitors.org
Web :    www.nolajailmonitors.org





DRAFT COMPLIANCE REPORT # 11

***Compliance Report # 10***
***LASHAWN JONES, et al., and the United States of America v.***
***Marlin Gusman, Sheriff***

Table of Contents

**Page**
I.   Introduction                                                            4
     A.   Summary of Compliance                                              4
     B.   Critical Issues – Opportunities for Progress                       7
     C.   Review Process of Monitors' Compliance Report #10                  13
     D.   Communication with Stakeholders                                    13
     E.   Recommendations                                                    13
     F.   Conclusions and Path Forward                                       13
II.  Substantive Provisions
     A.   Protection from Harm                                               15
          A.1. Use of Force Policies and Procedures                          22
          A.2. Use of Force Training                                         22
          A.3. Use of Force Reporting                                        24
          A.4.  Early Intervention System                                    27
          A.5. Safety and Supervision                                        28
          A.6. Security Staffing                                             33
          A.7. Incidents and Referrals                                       39
          A.8. Investigations                                                42
          A.9. Pretrial Placement in Alternative Settings                    44
          A.10. Custodial Placement                                          45
          A.11. Prisoner Grievance Process                                   61
          A.12. Sexual Abuse                                                 63
          A.13. Access to Information                                        63
     B.   Mental Health Care                                                 64
     C.   Medical Care                                                       85
     D.   Sanitation and Environmental Conditions                           88
     E.   Fire and Life Safety                                               102
     F.   Language Assistance                                                107
     G.   Youthful Prisoners                                                 109
     H.   The New Jail Facility                                              109
     I.   Compliance and Quality Improvement                                 110
     J.   Reporting Requirements and Right of Access                         112
III. Status of Stipulated Agreements – February 11, 2015 and
     April 22, 2015                                                          114



|  | Page |
|---|---|
| **Tables** | |
| Table 1 – Summary of Compliance – All Compliance Reports | 6 |
| Table 2 – Status of Compliance – Stipulated Agreements | 7 |
| Table 3 – Summary of Incidents CY 2018 | 16 |
| Table 4 – CY 2018-CY 2019 All OJC Reported Incidents by Type by Month | 16 |
| Table 5 – CY 2018-CY 2019 OJC Reported Incidents | 30 |
| | |
| **Figures** | |
| Figure 1 – Distribution of Race of Inmates Housed in TDC vs. Racial Distribution within OJC and TCD Units July-Nov 2018 | 49 |
| Figure 2 – 2019 Rates and Completion Time of initial Custody Assessments | 52 |
| Figure 3 – Number of Total and Guilty Disciplinary Infractions 2019 | 58 |
| Figure 4 – Rate of Disciplinary Infractions Against OPSO ADP 2019 | 59 |
| Figure 5 – Types of Disciplinary Infractions of which OPOS Inmates Were Found Guilty 2019 | 60 |
| | |
| **Appendices** | |
| Appendix A - Summary Compliance Findings by Section Compliance Reports 1 – 11 | 116 |

## Compliance Report # 11 - Introduction

This is Compliance Report #11 submitted by the Independent Monitors providing assessment of the Orleans Parish Sheriff's Office's (OPSO) compliance with the Consent Judgment of June 6, 2013. Report #11 reflects the status of OPSO's compliance as of September 19, 2019. The bases for this Report are incidents and compliance-related activities between January 2019 and June 2019.

The OPSO's jail is under the leadership of Darnley R. Hodge, Sr., who was appointed by the Court on January 29, 2018, as the Independent Compliance Director (ICD) on an interim basis and was appointed to the position permanently on October 12, 2018. In February 2019, Bryon LeCounte joined the administrative staff of OPSO as the Chief of Corrections. Chief LeCounte and Director Hodge both have substantial knowledge of jail operations and have worked diligently to make significant efforts towards compliance with the Consent Judgment.

In summary, the Monitors find that safety, medical and mental health care, and environment conditions of inmates held in both the Orleans Justice Center (OJC) and the



Temporary Detention Center (TDC) has made meaningful and noteworthy improvement since the previous assessment report provided to the Court in February 2019. While there is still significant work to be done to properly staff the facility, curb violence, and improve medical and mental health care, the trend continues to be positive. The specific initiatives are addressed in this report.

A.     **Summary of Compliance**

    The requirements of the Consent Judgment represent accepted correctional practice, while providing flexibility to OPSO for the application of the mandates. Achievement of compliance with Consent Judgment, Stipulated Agreements, and Stipulated Order will bring the Orleans Parish Sheriff's Office (OPSO) and its correctional facilities -- Orleans Justice Center (OJC) and the Temporary Detention Center (TDC) closer to operating and sustaining a Constitutional jail system.

    The Consent Judgment contains 173 175 provisions. Based on the current assessment, OPSO has achieved compliance or partial compliance with 96% of the provisions. Substantial compliance has been achieved for 62% of the provisions. Thirty-four percent (34%) of the provisions are in partial compliance. Six (3%) of the 173 provisions remain in non-compliance. The improvement since the last assessment is noteworthy when only 37% of the provisions were in substantial compliance and 6% of the provisions were in non-compliance.

> **Commented [AK1]:** Due to restructuring of sections, OPSO believes the new number is 175

    To progress from partial compliance to substantial compliance (and sustain the substantial compliance), OPSO must continue to build on the work it has done to date. The ability to maintain sustained compliance in all provisions is essential as the terms of the Consent Judgment require maintenance of substantial compliance in each and every provision for a period of 24 months. OPSO must consistently implement policies and procedures, develop and provide the training necessary for staff to follow the policies and procedures, develop supervisors and mid-managers to lead both staff and operations, analyze data in a meaningful and useful manner to inform activities, and engage in root cause review and self-critical assessments.

    This strategy for organizational and management approach must then be documented and reported to the Monitors in an organized, complete and accurate



manner to demonstrate on-going compliance. Such initiatives will allow the Monitors to measure compliance and allow the leadership of OPSO to make the improvements necessary to operate the OPSO correctional facilities in a Constitutional manner and in compliance with the Consent Judgment and Stipulated Agreements. OPSO has made significant strides in its reporting to the Monitors and has improved in root cause review and self-critical assessments. The reviews and assessments have room for improvement both in terms of quantity and quality so as to inform decisions.

The Monitors are pleased to report that OPSO, under the leadership of Director Hodge and Chief LeCounte, continues to examine its strategies to obtain and sustain compliance and make structural and organizational changes necessary to achieve compliance.

**Table 1 – Summary of Compliance – All Compliance Reports[1]**

| Compliance Report/Date | Substantial Compliance | Partial Compliance | Non-Compliance | NA/Other | Total |
|---|---|---|---|---|---|
| #1 – December 2013 | 0 | 10 | 85 | 76 | 171 |
| #2 – July 2014 | 2 | 22 | 149 | 1 | 174 |
| #3 – January 2015 | 2 | 60 | 110 | 2 | 174 |
| #4 – August 2015 | 12 | 114 | 43 | 4[2] | 173 |
| #5 – February 2016 | 10 | 96 | 63 | 4 | 173 |
| #6 – Sept 2016 | 20 | 98 | 53 | 2 | 173[3] |
| #7 – March 2017 | 17 | 99 | 55 | 2 | 173 |
| #8 – November 2017 | 23 | 104 | 44 | 2 | 173 |
| #9 – June 2018 | 26 | 99 | 46 | 2 | 173 |
| #10 – January 2019 | 65 | 98 | 8 | 2 | 173 |
| #11-September 2019 | | | | | |

The status of compliance with the two stipulated agreements (February 11, 2015 and April 22, 2015) is as follows:

---

[1] See Appendix A for historical detail of compliance, by paragraph.



**Table 2 – Status of Compliance with 2015 Stipulated Agreements**

|  | Substantial Compliance | Partial Compliance | Non-Compliance | NA | Total |
|---|---|---|---|---|---|
| August 2015 | 21 | 12 | 1 | 0 | 34 |
| February 2016 | 21 | 12 | 1 | 1 | 34 |
| September 2016 | 26 | 7 | 1 | 0 | 34 |
| March 2017 | 28 | 4 | 1 | 1 | 34 |
| November 2017 | 21 | 11 | 1 | 1 | 34 |
| June 2018 | 23 | 8 | 2 | 1 | 34 |
| January 2019 | 28 | 5 | 0 | 1 | 34 |
| September 2019 |  |  |  |  |  |

B.   **Opportunities for Continued Progress**

    The Monitors summarize below the areas identified in preparation of this report regarding OPSO's compliance with the Consent Judgment.

    1.   **Foundational Work** - The essential, core work required to achieve compliance includes:

        a.   <u>Policies and Procedures</u> – OPSO has completed all drafts of the essential policies and procedures and a large percentage have been finalized. While there is still some work to be done to finalize the policies, a tremendous amount of effort has been expended by staff into refining these drafts to ensure the policies and procedures prescribe how the facility operates and assure inmate and safety, in accordance with the Consent Judgment and accepted correctional practice. Essential is the completion of development and approval of lessons plans corresponding to the policies followed by implementation. OPSO's policy governing its written directive system has resulted in improvement to the policy/procedure process, as its allows for organizational components to develop specific operational practices that will be reviewed by OPSO administration.

        b.   <u>Inadequate staffing</u> – There continue to be inadequate staffing in the facilities (OJC and TDC), based on OPSO's staffing analysis and the Monitors' assessment. There has been improvement in the level of



staffing due to increased hiring, and even more importantly, decreased turnover. OPSO continues to use employee overtime to address the staff shortage. Even with the use of overtime, frequently, there are housing units and control rooms that do not have assigned staffing; further assigned staff sometimes leave housing units and control pods unattended for meal breaks and other duties. Recent promotions have helped to address the staffing deficiency at the supervisory level. In February 2019, a new Chief of Corrections, Bryon LeCounte joined OPSO who has the appropriate background and expertise to assist in the operation of the jail on a daily basis and assist in compliance efforts.

c.  <u>Training</u> – Employee training, both pre-service and in-service, has become more in line with OPSO policies and procedures. Foundational work, such as preparation of lesson plans to provide for a consistent instruction content, instruction by qualified individuals, and demonstration and documentation of students' knowledge gained, needs to continue. Providing a policy without training is not effective implementation.

d.  <u>Supervision</u> – Safe operation of OPSO's facilities requires an adequate number of sufficiently trained first line and mid-management supervisors. Director Hodge implemented the unit management approach and continues to provide training and mentoring for the individuals performing these roles. Recently, a promotional process for the ranks of sergeant and lieutenant was developed and implemented. It has resulted in a significant reduction in vacancies at supervisory positions. OPSO is encouraged to finalize the organizational chart. The next challenge will be providing the necessary training and mentoring for the new supervisors.

2.  **Medical and Mental Health Care** – The Medical and Mental Health Monitors report challenges remain in the provision of basic case, staffing, and recordkeeping, as well as the need for improved collaboration with



custody/security staffing. There has been improvement in the areas of medical and mental health care. Resources from Tulane University continue to be particularly helpful in providing mental health care.

3. **Inmate Safety and Protection from Harm** - Providing a safe and secure jail continues to be a challenge.

    a. <u>Unit Management</u>—The Unit Management approach is being used in the supervision of the housing units.  Each floor of the OJC, IPC, and TDC have been designed as a "unit". The purpose of this strategy is to allow the staff to get to know the inmates, coordinate management of housing unit operations, work to ensure consistency of work, and result in greater accountability for both staff and the inmates. While the Unit Management approach has shown to be helpful, there are inconsistencies and lack of uniformity in the areas of staff discipline and application of facility rules to inmates. Efforts to refine and successfully implement the strategy require additional training, mentoring, and accountability.

    b. <u>Violence</u> – There are still significant incidents of violence occurring within the facilities – including inmate on inmate assaults and assaults on staff. High levels of disorder and non-compliance to the institutional rules result in staff having to use force to gain control and compliance. There has been a decrease in substance abuse overdoses and deaths of inmates.

    c. <u>Inmate Classification</u> – The inmate classification processes require continued attention to ensure housing decisions and placements are consistent with OPSO policies and objective classification principles. Credible auditing needs to continue to focus on identifying issues and correcting placements. Consistent and adequate training was identified as an issue in compliance and a plan to address the issue has been agreed upon between OPSO and the Monitors.

    d. <u>Inmate grievances</u> – Inmates' questions and concerns using the grievance process, require attention as to the timeliness and adequacy

**Commented [AK2]:** This same language has been used verbatim continuously from report to report despite noted progress.  While OPSO strives to have zero serious incidents, that number is a goal, not a requirement.  As with all institutional facilities throughout the country, incidents are bound to happen.  In comparing the numbers from the last compliance period to this period, numbers are generally trending downwards.  What is the basis for this claim during this compliance period?



DRAFT COMPLIANCE REPORT # 11          9

of responses. The system is intended to provide fixes to systems as well as to individual inmate's needs. In order to intensely focus on the areas of the grievance process which are lacking, each of the subdivisions will be rated separately.

e.  Incident Reporting - Collaboration efforts to improve reporting of incidents continues among the Monitors, OPSO, and the attorneys for the Plaintiff class/DOJ. As discussed in this Report, progress toward promptly reporting incidents has improved, but continues to require attention. There remain serious incidents for which no report or no timely report is prepared by OPSO staff; including incidents in which staff had to be physically restrained to keep the staff member from assaulting an inmate. Analysis of incident reports and development of corrective action plans occurs but would benefit from staff dedicated to the effort.

f.  Jail Management System – An integral part of the jail's operational improvements is tied to an effective jail management system. Such capacity provides on-demand, routine, and periodic data to inform critical leadership and management decisions. Such an information system has not been implemented. OPSO cancelled the contract with the provider who was to supply a new JMS when it became apparent that the system would not interface with the Orleans Parish court system. The decision has been made that OPSO will be part of a system to be purchased by the City of New Orleans that will provide a JMS which will interface with the court systems. In the meantime, OPSO has modified a current system to provide some of the functions expected with a JMS.

4.  **Sanitation and Environment Conditions** – Challenges remain regarding the public health and inmate/staff safety risks. The staff working on these issues are extremely dedicated and have made significant gains, but the inability to fill support positions identified in OPSO's staffing analysis negatively impacts the ability of OPSO to develop and sustain the requirements of the Consent



DRAFT COMPLIANCE REPORT # 11                                      10

Judgment and align with accepted correctional practice.

5.  **Youthful Inmates** – The Monitors acknowledge and commend the educational program established in OJC. Provision of age appropriate mental health services has improved with the addition of the Tulane University resources. Due to lack of adequate housing for female youthful inmates, if a female youthful inmate is to be housed, she is housed in TDC; often by herself. This results in a situation that is undesirable for the female youthful inmate as she is being held in what amounts to isolation and it is staffing intensive. This issue will need to be addressed in the design of Phase III as it is not possible to address in the current facility design.

6.  **Inmate Sexual Safety** – OPSO underwent its required audit of compliance with the standards of the Prison Rape Elimination Act of 2003 (PREA).  OPSO received word that it had passed its audit. OPSO needs to consistently follow the policies and procedures which were exhibited during the audit. Continued internal collaboration is needed regarding assessments of inmates as potential sexual victims and potential sexual predators in coordination with the contract medical/mental health provider.

7.  **Compliance, Quality Reporting, and Quality Improvement** – An essential element to ensure inmate safety is OPSO's timely review of serious incidents which then permits assessment of root cause(s) and then to develop, implement and track actions plans to address the issue(s). This activity focuses on repairing systems. OPSO has made efforts to undertake this function. Systemic issues, which remain unaddressed, will continue to create risks to institutional safety and security. While progress is being made, the Monitors encourage OPSO to dedicate more time and knowledgeable resources to this process of quality improvement. One impediment is the lack of staff with the skills and/or time to devote to the task.

8.  **Stipulated Agreements 2015** – OPSO should review its on-going compliance with the two Stipulated Agreements from 2015.

9.  **Construction Projects** –

    a.   The Docks – Construction of the renovations on the Docks, providing

**Commented [AK3]:** In reviewing this report, all sections under the heading "Sanitation and Environment Conditions" (IV.D.1) are in substantial compliance, with the exception of two, which are both in partial compliance.  Those two outstanding sections pertain to the finalization of a policy, and the documentation of routine cleaning, neither of which has to do with staffing. Under the consent judgment, there are no specific requirements pertaining to Sanitation positions. Furthermore, all relevant sections relating to staffing (IV.A.6) are now is substantial compliance.  This language has remained the same over several reports despite significant improvement.  Therefore, OPSO requests this this language be removed or modified to better fit the current status of compliance.

**Commented [AK4]:** This is what is required both under the Consent Judgment and PREA standards.  The only reason female juvenile inmates are housed alone is because there are so few of them, often only one or two at a time, if any.  Due to PREA standards (which is required by the Consent Judgment), this will likely continue at Phase III.



DRAFT COMPLIANCE REPORT # 11                    11

court-holding, has continued. It is expected that the Docks will be ready for occupancy December 2019. OPSO has begun identifying staff for operation of the Docks. OPSO has been encouraged to have a robust training plan for the operation of the Docks.

b.    Phase III - A contract for architectural services and project manager for Phase III has been awarded by the City. The project is now in the design development stage. The Monitors are hopeful that the City will continue to make the design and building of this additional facility a priority as it is critical to the provision of mental and medical health services. In the meantime, Temporary Detention Center (TDC) is being renovated to house and provide programming for both female and male inmates who suffer from acute mental illness is critical. Renovation of TDC is slated for completion in April 2020. Extensive training for staff will be necessary to facilitate the successful transition of inmates from Hunt to TDC.

C.    **Review Process of Monitors' Compliance Report #11**

A draft of this report was provided to OPSO, Counsel for the Plaintiff Class, and the Department of Justice (DOJ) on November 2527, 2019.  Comments were provided by OPSO, Counsel for the Plaintiff Class, Wellpath (OPSO's medical contractor) and DOJ on December ▨, 2019.

> Commented [AK5]: Correct date

D.    **Communication with Stakeholders**

The Monitors are committed to providing as much information as possible regarding the status of OPSO's efforts to comply with all orders of the Court.  The www.nolajailmonitors.org website came on-line in September 2014. As of late N0vember 2019, there have been more than 90,400 "hits".  Joining all other reports, the finalized version of Compliance Report #11 will be posted on that site and a summary of compliance for each paragraph.

E.    **Recommendations**

This report includes only "new" recommendations within the body of the report.

F.    **Conclusions and Path Forward**



DRAFT COMPLIANCE REPORT # 11                    12

OPSO has been operating under the provisions of the Consent Judgment since June 2013, with monitoring beginning in the fall of 2013.  During the past year and a half, under the leadership of Director Hodge, significant improvements are acknowledged by the Monitors. The hiring of Bryon LeCounte as Chief Deputy in February 2019 has been beneficial to the vital work which remains to comply with the provisions of the Consent Judgment as he brings additional expertise and it has allowed Director Hodge to focus on addressing the Consent Judgment.

Serious incidents and harm to inmates continue to occur. OPSO is doing a better job at preventing contraband from being smuggled into the facility due to its efforts to identify the sources of the contraband and address them. OPSO has improved at collecting the data with which to engage in problem solving to provide a sustainable reduction in inmate on inmate assaults, inmate on staff assaults, uses of force, contraband and property damage.  and has improved its accuracy. However, the skills for the analysis of the data and root cause reviews required additional subject matter expertise.

For the training to be meaningful, the policies, procedures, and post-orders must be finalized, and appropriate lesson plans prepared.

Medical and mental health care initiatives continue to work to meet the requirements of the Consent Judgment. Wellpath has improved in the development and implementation of a clear path forward with measurable benchmarks.

The Monitors remain committed to the Court, and the parties to collaborate on solutions that will result in significant improvement towards compliance with the provisions of the Consent Judgment and achievement of constitutional conditions.

**The Monitors again thank and acknowledge the leadership, guidance and support of The Honorable Lance M. Africk and The Honorable Michael B. North.**

> **Commented [AK6]:** This same language has been used verbatim continuously from report to report despite reported progress.  While OPSO strives to have zero serious incidents, that number is a goal, not a requirement.  As with all institutional facilities throughout the country, incidents are bound to happen. In comparing the numbers from the last compliance period to this period, numbers are generally trending downwards.  Additionally, this issue was already discussed on pg. 9 above.  Therefore, OPSO requests this language be removed or modified to reflect that progress is being made in the number of serious incidents and harm to inmates.



**II. A.   Protection from Harm**

**Introduction**

This section of the Consent Judgment addresses core correctional functions including the use of force (policies, training, and reporting), identification of staff involved in uses of force through an early intervention system, safety and supervision of inmates, staffing, incidents and referrals, investigations, pre-trial placement of inmates in the facility, classification, the inmate grievance process, sexual safety of inmates, and inmates' access to information.

The Consent Judgment requires that OPSO operate the facility to assure inmates are "reasonably safe and secure." Based on objective review of data, the facility has shown improvement in inmate and staff safety, but there are still significant incidents occurring which result in serious injury to inmates and staff.

Reaching and sustaining compliance with provisions of the Consent Judgment, particularly this section, relies on the collection, analysis, and corrective action planning using available data. The Monitors are encouraged by OPSO's continued efforts to develop the capacity to collect relevant accurate data, analyze that data, draw supportable conclusions to inform decisions throughout the organization and develop corrective action plans, as indicated. As OPSO's capacity to collect, analyze, and plan is enhanced, the ability to achieve and maintain compliance will be strengthened.

The Monitors reported in Compliance Report #9 that OPSO was much more transparent about reporting incidents. The transparency continues. A sergeant in the Administrative Warden's office is assigned to review the medical logs recording the names of those inmates who have been brought into the clinic for treatment for treatment subsequent to an altercation or a use of force and/or the names of those inmates routed to the hospital with trauma related injuries and cross check them against reported incidents. The sergeant also compares the Watch Commander's Log (which lists significant events and incidents occurring during the shift) to the incident reports to detect if reports are missing. What still appears to be lacking is consequence to supervisors who are consistently not following the various reporting policies resulting in late reports or unreported incidents and incomplete reports on the use of force.



A review of reported incidents for 2019 through October was conducted by the Monitors.

**Table 3 - All OJC Reported Incidents for CY 2018 and CY 2019 (through 11/13/19)**

### 2018-2019 Report Categories Comparison

|  | Inmate/ Inmate Assault | Inmate Staff Altercation | Use of Force | PREA | Death | Attempt Suicide/ Ideation | Internal Escape | Criminal Damage | Inmate Injury/ Inmate Medical | Contraband | Staff Arrest | Staff Misconduct/ Suspension | Other |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2018 | 442 | 64 | 260 | 47 | 2 | 78 | 48 | 69 | 262 | 106 | 3 | 0 | 15 |
| 2019 | 391 | 99 | 307 | 38 | 0 | 79 | 6 | 38 | 134 | 239 | 0 | 0 | 6 |



**Table 4 –All OJC Reported Incidents by Type by Month CY 2018 and CY 2019 (through 11/13/19)**



|      | Jan | Feb | Mar | April | May | June | July | Aug | Sept | Oct | Nov | Dec | Total |
|------|-----|-----|-----|-------|-----|------|------|-----|------|-----|-----|-----|-------|
| 2018 | 92  | 96  | 112 | 121   | 124 | 144  | 116  | 132 | 112  | 113 | 105 | 129 | 1396  |
| 2019 | 123 | 93  | 105 | 112   | 127 | 148  | 131  | 163 | 107  | 153 | 75  | 0   | 1337  |

**Assessment Methodology**

- Dates of tours:
  - February 18-20, 2019
  - March 18-20, 2019
  - April 15-17, 2019
  - May 6-7, 2019
  - June 18-19, 2019
  - July 15-17, 2019
  - August 19-21, 2019
  - September 16-19, 2019
  - October 14-16, 2019

- Materials reviewed:



- o Materials reviewed include the Consent Judgment, OPSO policies and procedures, use of force reports, incident reports, investigations conducted by Investigative Services Bureau-Internal Affairs Division (ISB-IAD), investigations conducted by ISB-Criminal Division (ISB-Criminal), investigations conducted by ISB-Inmate Division, training materials, shakedown logs, and post logs.
- Interviews:
  - o Interviews included command staff, jail supervisors, commander of ISB, commander of IAD-Administrative, chief of investigations, director of training, various supervisors of units within ISB, and inmates.

### IV. A. 1. Use of Force Policies and Procedures

A. 1.a. OPSO shall develop, implement, and maintain comprehensive policies and procedures (in accordance with generally accepted correctional standards) relating to the use of force with particular emphasis regarding permissible and impermissible uses of force.

A. 1.b. OPSO shall develop and implement a single, uniform reporting system under a Use of Force Reporting policy. OPSO reportable force shall be divided into two levels, as further specified in policy: Level 1 uses of force will include all serious uses of force (i.e., the use of force leads to injuries that are extensive, serious or visible in nature, including black eyes, lacerations, injuries to the mouth or head, multiple bruises, injuries to the genitals, etc.), injuries requiring hospitalization, staff misconduct, and occasions when use of force reports are inconsistent, conflicting, or otherwise suspicious. Level 2 uses of force will include all escort or control holds used to overcome resistance that are not covered by the definition of Level 1 uses of force.

A. 1.c. OPSO shall assess, annually, all data collected regarding uses of force and make any necessary changes to use of force policies or procedures to ensure that unnecessary or excessive use of force is not used in OPP. The review and recommendations will be documented and provided to the Monitor, DOJ, and SPLC.

Findings:
A. 1. a.  Substantial Compliance
A. 1. b.  Substantial Compliance
A. 1. c.  Substantial Compliance

Observations:

The current OPSO use of force policy was effective as of May 2016. OPSO has conducted the annual review of the policy for 2018. Concerns regarding timeliness of training and submission of use of force report and reviews are addressed in those sections.

### IV. A. 2.        Use of Force Training

A. 2. a. OPSO shall ensure that all correctional officers are knowledgeable of and have the knowledge, skills, and abilities to comply with use of force policies and procedures. At a minimum, OPSO shall provide



correctional officers with pre-service and annual in-service training in use of force, defensive tactics, and use of force policies and procedures. The training will include the following:
(1) instruction on what constitutes excessive force;
(2) de-escalation tactics; and
(3) management of prisoners with mental illness to limit the need for using force.
A. 2. b. OPSO shall ensure that officers are aware of any change to policies and practices throughout their employment with OPP. At a minimum, OPSO shall provide pre-service and annual in-service use of force training that prohibits:
(1) use of force as a response to verbal insults or prisoner threats where there is no immediate threat to the safety or security of the institution, prisoners, staff, or visitors;
(2) use of force as a response to prisoners' failure to follow instructions where there is no immediate threat to the safety or security of the institution, prisoners, staff, or visitors;
(3) use of force against a prisoner after the prisoner has ceased to offer resistance and is under control;
(4) use of force as punishment or retaliation; and
(5) use of force involving kicking, striking, hitting, or punching a non-combative prisoner.
A. 2. c. OPSO shall randomly test five percent of the correctional officer staff on an annual basis to determine their knowledge of the use of force policies and procedures. The testing instrument and policies shall be approved by the Monitor. The results of these assessments shall be evaluated to determine the need for changes in training practices. The review and conclusions will be documented and provided to the Monitor.

Findings:
A. 2. a.   Substantial Compliance
A. 2. b.   Substantial Compliance
A. 2. c.   Substantial Compliance

<u>Observations:</u>

The Monitor reviewed the training materials and training documentation submitted by training staff for the rating period. The Monitor also randomly reviewed several staff training files maintained by the training staff. Interviews were conducted with senior security staff, Academy leadership and administrative staff.

The proof of training records indicated that the 8-hour use of force in-service training class was offered to all four squads during the month of April 2019. Overall, records indicate that 96% of all requisite OJC staff attended the April training, a 29% increase over CY2018 (67%)—a substantial improvement. Seven (7) employees failed to attend. Ninety-one percent (91%) of TDC staff attended the April training; two (2) failed to attend. The documentation lists, by name, all delinquent staff that failed to attend the April training event as scheduled. A make-up training date was offered in May 2019 and six (6) of the nine (9) staff noted as delinquent completed the training. Training staff advised that an additional make-up class would be provided for the remaining staff by the end of CY2019 at the request of the Chief of Corrections.



The Monitor observed the training files to be detailed, comprehensive and very well-maintained by the responsible training staff.

The Monitor's review of the use of force training materials noted that the lesson plan, PowerPoint presentation and testing materials substantively covers the requisite information in A.2.c.1-5. The proof of training documentation indicates that the OPSO required to have such training received the latest information on policies and practices presented by the training staff.

The Monitor reviewed training documentation provided by training staff specific to the 5% annual testing requirement for this section. The testing was conducted from February 28, 2019 to March 6, 2019. Training staff reported that 100% of the OPSO staff tested passed with an overall average of 85%. This is a significant improvement over the 68% passing rate for the testing conducted in CY2018, particularly considering that the annual in-service use of force training was not scheduled to occur until April 2019.

Training staff indicated that their recommendation to the Chief of Corrections was to test more than 5% of the required staff, however, this effort meets the requirements of the Consent Judgement.

Documentation of the results reviewed by command staff included an analysis of the questions missed and recommended changes in specific questions for subsequent testing.

## IV. A. 3. Use of Force Reporting

A.3 a. Failure to report a use of force incident by any staff member engaging in the use of force or witnessing the use of force shall be grounds for discipline, up to and including termination.
A.3 b. OPSO shall ensure that sufficient information is collected on uses of force to assess whether staff members complied with policy; whether corrective action is necessary including training or discipline; the effectiveness of training and policies; and whether the conditions in OPP comply with this Agreement. At a minimum, OPSO will ensure that officers using or observing a Level 1 use of force shall complete a use of force report that will:

    (1)     include the names of all staff, prisoner(s), or other visual or oral witness(es);
    (2)     contain an accurate and specific account of the events leading to the use of force;
    (3)     describe the level of resistance and the type and level of force used, consistent with OPP use of force policy and procedure, as well as the precise actions taken by OPSO staff in response to the incident;
    (4)     describe the weapon or instrument(s) of restraint, if any, and the manner of such use;
    (5)     be accompanied by a prisoner disciplinary report, if it exists, pertaining to the events or prisoner activity that prompted the use of force incident;
    (6)     describe the nature and extent of injuries sustained by anyone involved in the incident;



| | |
|---|---|
| (7) | contain the date and time when medical attention, if any, was requested and actually provided; |
| (8) | describe any attempts the staff took to de-escalate prior to the use of force; |
| (9) | include an individual written account of the use of force from every staff member who witnessed the use of force; |
| (10) | include photographs taken promptly, but no later than two hours after a use of force incident, of all injuries sustained, or as evidence that no injuries were sustained, by prisoners and staff involved in the use of force incident; |
| (11) | document whether the use of force was digitally or otherwise recorded.  If the use of force is not digitally or otherwise recorded, the reporting officer and/or watch commander will provide an explanation as to why it was not recorded; and |
| (12) | include a statement about the incident from the prisoner(s) against whom force was used. |

A.3 c. All officers using a Level 2 use of force shall complete a use of force report that will:

| | |
|---|---|
| (1) | include the names of staff, prisoner(s), or other visual or oral witness(es); |
| (2) | contain an accurate and specific account of the events leading to the use of force; |
| (3) | describe the level of resistance and the type and use of force used, consistent with OPP use of force policy and procedure, as well as the precise actions taken by OPSO staff in response to the incident; |
| (4) | describe the weapon or instrument(s) of restraint, if any, and the manner of such use; |
| (5) | be accompanied by a prisoner disciplinary report, if it exists, pertaining to the events or prisoner activity that prompted the use of force incident; |
| (6) | describe the nature and extent of injuries sustained by anyone involved in the incident; |
| (7) | contain the date and time when medical attention, if any, was requested and actually provided; and |
| (8) | describe any attempts the staff took to de-escalate prior to the use of force. |

A.3 d. OPSO shall require correctional officers to notify the watch commander as soon as practical of any use of force incident or allegation of use of force.  When notified, the watch commander will respond to the scene of all Level 1 uses of force.  When arriving on the scene, the watch commander shall:

| | |
|---|---|
| (1) | ensure the safety of everyone involved in or proximate to the incident; |
| (2) | determine if any prisoner or correctional officer is injured and ensure that necessary medical care is provided; |
| (3) | ensure that personnel and witnesses are identified, separated, and advised that communications with other witnesses or correctional officers regarding the incident are prohibited; |
| (4) | ensure that witness and subject statements are taken from both staff and prisoner(s) outside of the presence of other prisoners and staff; |
| (5) | ensure that the supervisor's use of force report is forwarded to IAD for investigation if, upon the supervisor's review, a violation of law or policy is suspected.  The determination of what type of investigation is needed will be based on the degree of the force used consistent with the terms of this Agreement; |
| (6) | If the watch commander is not involved in the use of force incident, the watch commander shall review all submitted use of force reports within 36 hours of the end of the incident, and shall specify his findings as to completeness and procedural errors.  If the watch commander believes that the use of force may have been unnecessary or excessive, he shall immediately contact IAD for investigation consideration and shall notify the warden or assistant warden; and |
| (7) | All Level 1 use of force reports, whether or not the force is believed by any party to be unnecessary or excessive, shall be sent to IAD for review.  IAD shall develop and submit to the Monitor within 90 days of the Effective Date clear criteria to identify use of force incidents that warrant a full investigation, including injuries that are extensive or serious, visible in nature (including black eyes, injuries to the mouth, injuries to the genitals, etc.), injuries requiring hospitalization, staff misconduct (including inappropriate relationships with prisoners), and occasions when use of force reports are inconsistent, conflicting, or otherwise suspicious. |



A.3 e. Ensure that a first-line supervisor is present during all pre-planned uses of force, such as cell extractions.

A.3 f. Within 36 hours, exclusive of weekends and holidays, of receiving the report and review from the shift commander, in order to determine the appropriateness of the force used and whether policy was followed, the Warden or Assistant Warden shall review all use of force reports and supervisory reviews including:

(1)     the incident report associated with the use of force;
(2)     any medical documentation of injuries and any further medical care;
(3)     the prisoner disciplinary report associated with the use of force; and
(4)     the Warden or Assistant Warden shall complete a written report or written statement of specific findings and determinations of the appropriateness of force.

A.3 g. Provide the Monitor a periodic report detailing use of force by staff.  These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement.  Each report will include the following information:

(1)     a brief summary of all uses of force, by type;
(2)     date that force was used;
(3)     identity of staff members involved in using force;
(4)     identity of prisoners against whom force was used;
(5)     a brief summary of all uses of force resulting in injuries;
(6)     number of planned and unplanned uses of force;
(7)     a summary of all in-custody deaths related to use of force, including the identity of the decedent and the circumstances of the death; and
(8)     a listing of serious injuries requiring hospitalization.

A.3 h. OPSO shall conduct, annually, a review of the use of force reporting system to ensure that it has been effective in reducing unnecessary or excessive uses of force.  OPSO will document its review and conclusions and provide them to the Monitor, SPLC, and DOJ.

Findings:

A. 3. a.  Substantial Compliance
A. 3. b.  Partial Compliance
A. 3. c.  Partial Compliance
A. 3. d.  Partial Compliance
A. 3. e.  Substantial Compliance
A. 3. f.  Partial Compliance
A. 3. g.  Substantial Compliance
A. 3. h.  Substantial Compliance

Observations:

As to provision A. 3. a., the use of force policy requires all uses of force to be reported timely and completely and sets out the potential discipline if the policy is not followed. While there continue to be late reports, OPSO has now presented documentation that supervisors are being held accountable for failure to follow policy and failure to report use of force results in discipline. These failures resulted in verbal counseling. In addition, there is an ongoing investigation regarding the failure of a supervisor to report a deputy's attempt to assault an inmate in which the



deputy had to be restrained. Continued substantial compliance will require appropriate discipline including progressive discipline.

Provisions A. 3. b. and c. remain in partial compliance due to the significant number of use of force reports not including the required information. The use of force policy includes the provisions required by the Consent Judgment, but it is not being followed on a consistent basis. A checklist was provided by the Monitor to assist supervisors in making sure reports included all necessary items. A review of those checklists and accompanying reports frequently indicates that the information is not contained in the use of force report. As with the failure to timely report uses of force, deputies and supervisors are not being held accountable for failure to include required information.

The unit managers, watch commanders, and wardens are not consistently compliant with the requirements of the Consent Judgment (IV. A. 3. d. and 3. f.) as to their specific duties and the time requirement for performance of these duties under the policies. As a result, the use of force packets forwarded to FIT without the required information upon which any meaningful review should be based. This puts FIT in the position of screening the packets for completeness and having to return the majority of them to the Warden due to incompleteness along with a list of missing items. It also renders any previous review by the Warden to be suspect. FIT issues a quarterly report which contains all the information required by IV. A. 3. g. Thus, this section is in substantial compliance. The annual review of use of force incidents as required by IV. A. 3. h. has been provided to the Monitors or parties. While the rating of substantial compliance has been noted, the annual review requires improvement to provide the necessary guidance to OPSO to achieve and sustain compliance in the area of use of force.

### IV. A. 4. Early Intervention System ("EIS")

A.4.a. OPSO shall develop, within 120 days of the Effective Date, a computerized relational database ("EIS") that will document and track staff members who are involved in use of force incidents and any complaints related to the inappropriate or excessive use of force, in order to alert OPSO management to any potential problematic policies or supervision lapses or need for retraining or discipline. The Chief of Operations Deputy, supervisors, and investigative staff shall have access to this information and shall review on a regular basis, but not less than quarterly, system reports to evaluate individual staff, supervisor, and housing area



activity.  OPSO will use the EIS as a tool for correcting inappropriate staff behavior before it escalates to more serious misconduct.

A.4.b. Within 120 days of the Effective Date, OPSO senior management shall use EIS information to improve quality management practices, identify patterns and trends, and take necessary corrective action both on an individual and systemic level.  IAD will manage and administer EIS systems.  The Special Operations Division ("SOD") will have access to the EIS.  IAD will conduct quarterly audits of the EIS to ensure that analysis and intervention is taken according to the process described below.  Command staff shall review the data collected by the EIS on at least a quarterly basis to identify potential patterns or trends resulting in harm to prisoners.  The Use of Force Review Board will periodically review information collected regarding uses of force in order to identify the need for corrective action, including changes to training protocols and policy or retraining or disciplining individual staff or staff members.  Through comparison of the operation of this system to changes in the conditions in OPP, OPSO will assess whether the mechanism is effective at addressing the requirements of this Agreement.

A.4.c. OPSO shall provide, within 180 days of the implementation date of its EIS, to SPLC, DOJ, and the Monitor, a list of all staff members identified through the EIS and corrective action taken.

A.4.d. The EIS protocol shall include the following components:  data storage, data retrieval, reporting, data analysis, pattern identification, supervisory assessment, supervisory intervention, documentation, and audit.

A.4.e. On an annual basis, OPSO shall review the EIS to ensure that it has been effective in identifying concerns regarding policy, training, or the need for discipline.  This assessment will be based in part on the number and severity of harm and injury identified through data collected pursuant to this Agreement.  OPSO will document its review and conclusions and provide them to the Monitor, who shall forward this document to DOJ and SPLC.

Findings:
   A. 4. a.  Substantial Compliance
   A. 4. b.  Substantial Compliance
   A. 4. c.  Substantial Compliance
   A. 4. d.  Substantial Compliance
   A. 4. e.  Substantial Compliance

Observations:

     Since the inception of the Consent Judgment, the electronic EIS has not performed appropriately on a consistent basis.  OPSO has finally abandoned the original system and has fashioned an alternative version by use of the AS400. There is also a staff member that is assigned to FIT who monitors and data-base manually regarding uses of force to alert FIT to review a staff member.

     OPSO has improved its documentation to the Monitors as to the names of the staff members who are flagged for uses of force, if a review is conducted, and any retraining received, if required.

     The Use of Force Review Board has met regularly and performed the evaluation necessary for substantial compliance with IV. A .4. e. for the 2018 data.



While the EIS would ideally be part of the jail management system, as one does not yet exist, the efforts made by OPSO to craft an EIS warrant a rating of substantial compliance on all provisions.

### IV. A. 5.  Safety and Supervision

A.5.a. Maintain security policies, procedures, and practices to provide a reasonably safe and secure environment for prisoners and staff in accordance with this Agreement.

A.5.b. Maintain policies, procedures, and practices to ensure the adequate supervision of prisoner work areas and trustees.

A.5.c. Maintain policies and procedures regarding care for and housing of protective custody prisoners and prisoners requesting protection from harm.

A.5.d. Continue to ensure that correctional officers conduct appropriate rounds at least once during every 30-minute period, at irregular times, inside each general population housing unit and at least once during every 15-minute period of special management prisoners, or more often if necessary.  All security rounds shall be documented on forms or logs that do not contain pre-printed rounding times.  In the alternative, OPSO may provide direct supervision of prisoners by posting a correctional officer inside the day room area of a housing unit to conduct surveillance.

A.5.e. Staff shall provide direct supervision in housing units that are designed for this type of supervision. Video surveillance may be used to supplement, but must not be used to replace, rounds by correctional officers.

A.5.f. Increase the use of overhead video surveillance and recording cameras to provide adequate coverage throughout the common areas of the Jail, including the Intake Processing Center, all divisions' intake areas, mental health units, special management units, prisoner housing units, and in the divisions' common areas.

A.5.g. Continue to ensure that correctional officers, who are transferred from one division to another, are required to attend training on division-specific post orders before working on the unit.

A.5.h. Continue to ensure that correctional officers assigned to special management units, which include youth tiers, mental health tiers, disciplinary segregation, and protective custody, receive eight hours of specialized training regarding such units on prisoner safety and security on at least an annual basis.

A.5.i. Continue to ensure that supervisors conduct daily rounds on each shift in the prisoner housing units and document the results of their rounds.

A.5.j. Continue to ensure that staff conduct daily inspections of cells and common areas of the housing units to protect prisoners from unreasonable harm or unreasonable risk of harm.

A.5.k. Continue to ensure that staff conduct random monthly shakedowns of cells and common areas so that prisoners do not possess or have access to dangerous contraband.

A.5.l. Provide the Monitor a periodic report of safety and supervision at the Facility.  These periodic reports shall be provided to the monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement.  Each report will provide the following information:

   (1)    a listing of special management prisoners, their housing assignments, the basis for them being placed in the specialized housing unit, and the date placed in the unit; and

   (2)    a listing of all contraband, including weapons seized, the type of contraband, date of seizure, location, and shift of seizure.

Findings:
A. 5. a.  Substantial Compliance
A. 5. b.  Substantial Compliance
A. 5. c.  Substantial Compliance
A. 5. d.  Partial Compliance
A. 5. e.  Partial Compliance
A. 5. f.  Partial Compliance
A. 5. g.  Substantial Compliance



A. 5. h.  Partial Compliance
A. 5. i.  Partial Compliance
A. 5. j.  Partial Compliance
A. 5. k.  Substantial Compliance
A. 5. l.  Substantial Compliance

<u>Observations:</u>

OPSO has worked very hard to finalize policies, procedures, and post orders.
OPSO is in substantial compliance with A. 5. a., b., and c. However, the challenge of
developing credible training lesson plans, recruiting staff, training staff, remediating
staff who do not have the required level of proficiency, and supervising employees
to hold them accountable for not following policy remains.

OPSO has made significant progress under the leadership of the current
Independent Compliance Director and his initiation of unit management to assist in
the daily supervision of housing units and increase accountability. Significant
incidents occurred in CY 2019 and review of the report indicate that the lack of staff
in the housing units who follow policy on a consistent basis is the largest
impediment to effective supervision of the inmates.

**<u>Table 5 CY 2018 and CY 2019 (Through 11/13/19) OJC Reported Incidents</u>**



| 2018 | January | February | March | April | May | June | July | Aug | Sept | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Attempt Suicide/ideation | 6 | 14 | 4 | 4 | 0 | 6 | 9 | 13 | 7 | 3 | 5 | 7 | 78 |
| Contraband | 9 | 15 | 5 | 5 | 10 | 9 | 13 | 6 | 6 | 7 | 7 | 14 | 106 |
| Criminal Damage | 3 | 10 | 11 | 12 | 8 | 3 | 3 | 6 | 4 | 2 | 3 | 4 | 69 |
| Death | | | | | 1 | | | | | | | 1 | 2 |
| Internal Escape | 2 | 2 | 3 | 3 | 5 | 7 | 3 | 2 | 5 | 0 | 8 | 8 | 48 |
| Inmate Injury/Inmate Medical (AKA slip/falls) | 9 | 5 | 18 | 22 | 19 | 32 | 30 | 30 | 35 | 26 | 18 | 18 | 262 |
| Inmate/Inmate Assault | 38 | 28 | 37 | 39 | 52 | 46 | 30 | 39 | 33 | 32 | 31 | 37 | 442 |
| Staff Suspension | | 2 | | | | 1 | | 0 | | | | 0 | 3 |
| Staff Arrest | | | | | | | | | | | | | |
| Inmate Staff Altercation | 7 | 6 | 7 | 9 | | 7 | 4 | 3 | 6 | 9 | 6 | | 64 |
| PREA | 2 | 4 | 5 | 4 | 5 | 5 | 4 | 3 | 2 | 5 | 5 | 3 | 47 |
| Use of Force | 13 | 10 | 21 | 22 | 24 | 26 | 20 | 27 | 14 | 28 | 21 | 34 | 260 |
| Other | 3 | | | | | | | | | 1 | 1 | 3 | |
| Total | 92 | 96 | 111 | 120 | 124 | 142 | 116 | 129 | 112 | 113 | 105 | 129 | 1389 |

| 2019 | January | February | March | April | May | June | July | Aug | Sept | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Attempt Suicide/ideation | 15 | 13 | 6 | 3 | 14 | 13 | 6 | 7 | 2 | 1 | 0 | | 80 |
| Contraband | 14 | 11 | 21 | 27 | 27 | 23 | 13 | 35 | 24 | 33 | 13 | | 241 |
| Criminal Damage | 7 | 4 | 2 | 3 | 2 | 2 | 3 | 8 | 1 | 7 | 3 | | 42 |
| Death | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 |
| Internal Escape | 3 | 1 | 1 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | | 6 |
| Inmate Injury/Inmate Medical (AKA slip/falls) | 14 | 9 | 16 | 15 | 12 | 16 | 8 | 20 | 10 | 18 | 2 | | 140 |
| Inmate/Inmate Assault | 40 | 26 | 25 | 28 | 33 | 55 | 50 | 32 | 32 | 38 | 29 | | 388 |
| Staff Suspension | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 |
| Staff Arrest | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 |
| Inmate Staff Altercation | 1 | 7 | 4 | 7 | 8 | 9 | 15 | 17 | 4 | 15 | 9 | | 96 |
| PREA | 2 | 2 | 1 | 1 | 6 | 4 | 5 | 6 | 3 | 4 | 4 | | 38 |
| Use of Force | 27 | 29 | 26 | 26 | 19 | 26 | 31 | 37 | 31 | 37 | 15 | | 304 |
| Other | 0 | 0 | 3 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 |
| Total | 123 | 102 | 105 | 112 | 122 | 148 | 131 | 163 | 107 | 153 | 75 | | 1341 |

OPSO has shown significant improvement under unit management in the conducting and documenting of security rounds (30 minutes or 15 minutes depending on the unit). However, it is clear from the review of records, observations, and investigations that timely rounds and direct supervision surveillance are still not being consistently conducted as per OPSO policy. Direct supervision requires surveillance of all of the inmates and cannot be properly performed by sitting behind a desk and not walking around the unit and looking into the individual cells. OPSO's use of designated mandatory assignments has resulted in those units being staffed in a more consistent manner, but some units are routinely not adequately staffed, or staff is absent from the unit for over an hour at a time. During the tour, it was noted that there were units which were unstaffed, including mandatory posts. If staff are not present, it impossible to make the



required rounds. The improvement has resulted in OPSO being found in partial compliance with IV. A. 5. d.

Due to unreliability of the TourWatch system, OPSO reverted to paper logs. While there is now a policy in place which requires supervisors, up to the level of Watch Commander to review the paper logs to ensure rounds are being conducted, OPSO has not audited compliance with this policy and review of the paper logs during the tour revealed that rounds are not being timely performed.

All twenty-four (24) of the housing units are designed for direct supervision. OPSO reported in its Compliance Matrix that it has twelve mandatory posts. Six of these mandatory posts are the control pods and six are housing units. That results in twenty-five percent of the housing units being staffed as direct supervision. In addition, there are times that the deputies are not in those housing units.  Thus, IV. A. 5. e. is in partial compliance.

Regarding overhead video surveillance and recording cameras for OJC (A.5.f.), there are on-going issues as some of the 900 cameras are not recording. This is most often discovered when investigators try to retrieve the videos. OPSO now audits the system. The system is in the process of being replaced. Until then IV. A. 5. f. remains in partial compliance.

Documentation was provided that staff transferred from other divisions to work in the OJC receive required training; thus, IV. A. 5. g. is in substantial compliance. Proof of training for the specialized units was not provided, but interviews of deputies revealed some training; IV. A. 5. h. remains in partial compliance.

Documentation is lacking that supervisors daily rounds during this compliance period; thus, IV. A. 5. i. continues to be in partial compliance.

The daily inspections of housing units required by VI. A. 5. j. have improved, but are still in partial compliance. With the introduction of unit management, unit managers and deputies are required to conduct daily inspections. However, simple observation of the conditions of the living units provides evidence that, while daily inspections may be conducted, consistent inspection standards need to be

**Commented [AK7]:** This documentation was timely provided and can be found in dropbox under section IV.A.5.h.  Per OPSO's self-assessment report, all mental health training is provided in annual training that all employees receive.  Due to the volume of this documentation, it was not uploaded to dropbox, but was available for viewing onsite.  Additionally, this documentation was presented to Monitor Poole during his tour of the training facility.  OPSO requests the Monitors review the Dropbox documentation and reconsider the status of this provision.



communicated to the line staff and inmates, and corrective action taken as a result of the inspection findings.

Monthly shakedowns are conducted in substantial compliance with VI. A. 5. k. The number of contraband reports has increased significantly in 2019. Rather than being an indication of more contraband in the facility, they appear to be the result of an increase in the quantity and quality of contraband shakedowns.

OPSO has continued to conduct an analysis of the shakedown reports from the monthly unit shakedown as to the location of findings, linkages to previous shakedowns, specific items found, and/or the inmates involved.   OPSO provides a list of special management units in compliance with the provision. Thus, IV A. 5. l.  is now in substantial compliance.

## IV.  A.  6.  Security Staffing

A.6.a. OPSO shall ensure that correctional staffing and supervision is sufficient to adequately supervise prisoners, fulfill the terms of this Agreement, and allow for the safe operation of the Facility, consistent with constitutional standards.

    (1)    OPSO shall achieve adequate correctional officer staffing in the following manner: Within 90 days of the Effective Date, develop a staffing plan that will identify all posts and positions, the adequate number and qualification of staff to cover each post and position, adequate shift relief, and coverage for vacations.  The staffing plan will ensure that there is adequate coverage inside each housing and specialized housing areas and to accompany prisoners for court, visits and legal visits, and other operations of OPP and to comply with all provisions of this Agreement.  OPSO will provide its plan to the Monitor, SPLC, and DOJ for approval.  The Monitor, SPLC, or DOJ will have 60 days to raise any objections and recommend revisions to the staffing plan.

    (2)    Within 120 days before the opening of any new facility, submit a staffing plan consistent with subsection (1) above.

    (3)    Within 90 days after completion of the staffing study, OPSO shall recruit and hire a full-time professional corrections administrator to analyze and review OPP operations.   The professional corrections administrator shall report directly to the Sheriff and shall have responsibilities to be determined by the Sheriff.  The professional corrections administrator shall have at least the following qualifications: (a) a bachelor's degree in criminal justice or other closely related field; (b) five years of experience in supervising a large correctional facility; and (c) knowledge of and experience in applying modern correctional standards, maintained through regular participation in corrections-related conferences or other continuing education.

    (4)    Provide the Monitor a periodic report on staffing levels at the Facility.  These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement.   Each report will include the following information:

        i.    a listing of each post and position needed;
        ii.    the number of hours needed for each post and position;
        iii.    a listing of staff hired and positions filled;
        iv.    a listing of staff working overtime and the amount of overtime worked by each staff member;
        v.    a listing of supervisors working overtime; and



> vi.    a listing of and types of critical incidents reported.
> A.6.b. Review the periodic report to determine whether staffing is adequate to meet the requirements of
> this Agreement.  OPSO shall make recommendations regarding staffing based on this review.  The review
> and recommendations will be documented and provided to the Monitor

A. 6. Findings:
  A. 6. a.  Substantial Compliance
  A. 6. b.  Substantial Compliance

An overall rating of A. 6. was provided in the previous reports. This was inconsistent with the other introductory paragraphs and has now been discontinued.

<u>Observations:</u>

There continues to be is insufficient staffing of posts in OJC as evidenced by the expansive use of overtime and a review of the incident reports and investigation that reveal posts are not constantly staffed. Provision IV. 6. a. (1) and (2) continue to be in substantial compliance. With the planning for Phase III, the Monitors look forward to reviewing the staffing plan.

Provision IV. 6. a. (3) is in substantial compliance with the hiring of Chief LeCounte as the chief of corrections position has been filled as February 19, 2019.

Paragraph IV. 6. a. (4) is in substantial compliance, as monthly reports have are being produced regarding hiring and termination of employees.  The Stipulated Agreement also provides for bi-monthly reports regarding hiring.    Paragraph 7.a. of the Stipulated Agreement of February 11, 2015 requires monthly reporting.

The staffing plan indicates what staff are required; the issue is that the staff have not been hired/retained.

## IV. 7.  Incidents and Referrals

> A.7.a. OPSO shall develop and implement policies that ensure that Facility watch commanders have
> knowledge of reportable incidents in OPP to take action in a timely manner to prevent harm to prisoners or
> take other corrective action.   At a minimum, OPSO shall do the following:
> A.7.b. Continue to ensure that Facility watch commanders document all reportable incidents by the end of
> their shift, but no later than 24 hours after the incident, including prisoner fights, rule violations, prisoner
> injuries, suicide attempts, cell extractions, medical emergencies, found contraband, vandalism, escapes and
> escape attempts, and fires.
> A.7.c. Continue to ensure that Facility watch commanders report all suicides and deaths no later than one
> hour after the incident, to a supervisor, IAD, the Special Operations Division, and medical and mental health
> staff.
> A.7.d. Provide formal pre-service and annual in-service training on proper incident reporting policies and
> procedures.



A.7.e. Implement a policy providing that it is a disciplinary infraction for staff to fail to report any reportable incident that occurred on his or her shift.  Failure to formally report any observed prisoner injury may result in staff discipline, up to and including termination.

A.7.f. Maintain a system to track all reportable incidents that, at a minimum, includes the following information:

(1)     tracking number;
(2)     the prisoner(s) name;
(3)     housing classification and location;
(4)     date and time;
(5)     type of incident;
(6)     injuries to staff or prisoner;
(7)     medical care;
(8)     primary and secondary staff involved;
(9)     reviewing supervisor;
(10)    external reviews and results;
(11)    corrective action taken; and
(12)    administrative sign-off.

A.7.g. Ensure that incident reports and prisoner grievances are screened for allegations of staff misconduct, and, if the incident or allegation meets established criteria in accordance with this Agreement, it is referred for investigation.

A.7.h. Provide the Monitor a periodic data report of incidents at the Facility.  These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement.

A.7.i. The report will include the following information:

(1)     a brief summary of all reportable incidents, by type and date;
(2)     a description of all suicides and in-custody deaths, including the date, name of prisoner, and housing unit;
(3)     number of prisoner grievances screened for allegations of misconduct; and
(4)     number of grievances referred to IAD or SOD for investigation.

A.7.j. Conduct internal reviews of the periodic reports to determine whether the incident reporting system is ensuring that the constitutional rights of prisoners are respected.  Review the quarterly report to determine whether the incident reporting system is meeting the requirements of this Agreement.  OPSO shall make recommendations regarding the reporting system or other necessary changes in policy or staffing based on this review.  The review and recommendations will be documented and provided to the Monitor.

IV. A. 7. Findings:
A. 7.  a.  Substantial Compliance
A. 7.  b.  Substantial Compliance
A. 7.  c.  Substantial Compliance
A. 7.  d.  Substantial Compliance
A. 7.  e.  Substantial Compliance
A. 7.  f.  Substantial Compliance
A. 7.  g.  Substantial Compliance
A. 7.  h.  Substantial Compliance
A. 7.  i.  Substantial Compliance
A. 7.  j.  Substantial Compliance

Observations:

OPSO has long had a policy on incidents and referrals that sets out the

process for documenting and referring incidents. What been lacking is a


Orleans   Parish
JAIL MONITORS

DRAFT COMPLIANCE REPORT # 11                          30

sufficient process to ensure all reportable incidents are being documented and that the incidents are being recorded adequately, timely, and accurately. OPSO has shown improvement in the reporting of incidents, but there are still incidents which are not timely reported to OPSO and/or the Monitors.

One of the methods for determining whether incidents are being reported is to review 'routes' – inmates with serious medical or trauma injuries ((e.g. serious injuries that the medical provider referred to the emergency department for events such altercations, attempt suicides, uses of force, ingestions)that they are transferred to the emergency room, and clinic walk-in logs. This function used to be performed by the Monitors. OPSO has implemented a process where a sergeant performs this function and follow up on missing reports. This is an example of OPSO incorporating processes which allow OPSO to audit its compliance. What had been lacking was holding the supervisors accountable for the late reports. Documentation of accountability was presented. Accountability has improved, but progressive discipline should be used for those who continue to not meet the requirement for provisions A. 7. a., b., and e. to remain in substantial compliance.

Suicides and deaths are reported within an hour to the proper persons which results in A. 7. c. being in substantial compliance.  Annual training was provided on incident reporting, and documentation indicates that staff are being required to attend which results in substantial compliance for A. 7. d. A system to track the information required in A. 7. f. has been implemented with the transition to the AS 400 system. Incidents and grievances are being reviewed for misconduct and referred for investigation where appropriate in substantial compliance with A. 7. g. The Monitors are provided a semi-annual report of incidents, that now, with the supplementation by the daily/weekly reports, which contains all of the required information and, thus, A. 7. h. and i. are in substantial compliance. OPSO performed an assessment of whether the reporting system is meeting the requirements of the Consent Judgment and is given substantial compliance for A. 7. j. as OPSO is now addressing the lack of timeliness.  Future assessments of the reporting system will need to be more robust and refined to maintain substantial compliance.



DRAFT COMPLIANCE REPORT # 11                    31

**IV. A. 8.  Investigations**

A.8.a. Maintain implementation of comprehensive policies, procedures, and practices for the timely and thorough investigation of alleged staff misconduct, sexual assaults, and physical assaults of prisoners resulting in serious injury, in accordance with this Agreement.  Investigations shall:

    (1)    be conducted by persons who do not have conflicts of interest that bear on the partiality of the investigation;

    (2)    include timely, thorough, and documented interviews of all relevant staff and prisoners who were involved in or who witnessed the incident in question, to the extent practicable; and

    (3)    include all supporting evidence, including logs, witness and participant statements, references to policies and procedures relevant to the incident, physical evidence, and video or audio recordings.

A.8.b. Continue to provide SOD and IAD staff with pre-service and annual in-service training on appropriate investigation policies and procedures, the investigation tracking process, investigatory interviewing techniques, and confidentiality requirements.

A.8.c. Ensure that any investigative report indicating possible criminal behavior will be referred to IAD/SOD and then referred to the Orleans Parish District Attorney's Office, if appropriate.

A.8.d. Provide the Monitor a periodic report of investigations conducted at the Facility.  These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement.

A.8.e. The report will include the following information:

    (1)    a brief summary of all completed investigations, by type and date;

    (2)    a listing of investigations referred for administrative investigation;

    (3)    a listing of all investigations referred to an appropriate law enforcement agency and the name of the agency; and

    (4)    a listing of all staff suspended, terminated, arrested, or reassigned because of misconduct or violations of policy and procedures.  This list must also contain the specific misconduct and/or violation.

A.8.f. OPSO shall review the periodic report to determine whether the investigation system is meeting the requirements of this Agreement and make recommendations regarding the investigation system or other necessary changes in policy based on this review.  The review and recommendations will be documented and provided to the Monitor.

Findings:

A. 8. a.  Substantial Compliance

A. 8. b.  Substantial Compliance

A. 8. c.  Substantial Compliance

A. 8. d.  Substantial Compliance

A. 8. e.  Substantial Compliance

A. 8. f.  Substantial Compliance

<u>Observations</u>:

       The Investigative Services Division (ISB) is responsible for:  the Criminal Investigation Division (investigates possible criminal activity by inmates), Internal Affairs Division-Criminal (investigates possible criminal activity by staff), the FIT (investigates use of force by staff), the Internal Affairs Division-Administrative (investigates possible violation of policies by staff), and the Intelligence Unit



(provides information and intelligence regarding activities that have taken place or may take place in the jail or support activities).

Significant evidence of substantial compliance was provided for IV. A. 8. a. The Monitor continues to be concerned about the time investigations are taking, but the length of time for investigations has been shorten due to the addition of staff and an improvement in quality of the reports providing the basis for the investigations. As the volume of incidents requiring the attention of ISB lessens, the timeliness of investigations should improve. Improvements in all other areas from hiring, training, supervision, and adequate staffing will enhance the safety of staff and inmates – and ultimately decrease the workload of ISB.

The Monitor acknowledges that investigating incidents of inmate on inmate assaults, sexual assaults, staff on inmate assaults, etc. with a goal of seeking indictments is appropriate; but the overall goal is to create a safe jail. In a jail setting, investigations play just as critical a role in terms of protecting inmates from inappropriate or illegal staff actions, protecting inmates from each other, and correcting policy, practice, supervision and training. Continued emphasis needs to be placed on having as one of goals of investigations being the *prevention* of future incidents through analysis of the policy, procedures, training, supervision, and physical plant contributors to the incident. This function cannot and should not be performed by ISB alone. This level of assessment requires input from individuals who have a high level of experience in jail/corrections work. In short, it requires collaboration between ISB and OJC which continues to be wanting. The OJC staff should take the lead in the root cause analysis with ISB providing information gathered during the investigation.

The quality of sexual assault investigations has improved since those investigations were moved under the supervision of the Lieutenant responsible for IAD-Criminal investigations.

ISB continues to receive significant additional training in substantial compliance with A. 8. b. ISB contracted with an expert on sexual assault and PREA investigations who provided training and continued to implement the skills learned.



Investigations which reveal potential criminal activity are referred to the Orleans Parish District Attorney's Office in substantial compliance with A. 8. c. ISB provides reports in substantial compliance with IV. A. 8. d. and e. ISB performs the review of the investigation system to determine whether the investigation system is meeting the requirements of the Consent Judgment and forward any recommendations to the Monitors. ISB's substantial compliance is evidenced not only by their analysis, but adjustments such as the movement of PREA investigations under IAD-Criminal, additional sexual assault investigation training, and the formalization of a call out policy for the collection of forensic evidence in serious incidents.

**IV. A. 9.    Pretrial Placement in Alternative Settings**

A.9.a. OPSO shall maintain its role of providing space and security to facilitate interviews conducted pursuant to the City's pretrial release program, which is intended to ensure placement in the least restrictive appropriate placement consistent with public safety.
A.9.b. OPSO shall create a system to ensure that it does not unlawfully confine prisoners whose sole detainer is by Immigration and Customs Enforcement ("ICE"), where the detainer has expired.

Findings:
A. 9. a.  Substantial Compliance
A. 9. b.  Substantial Compliance

Observations:

OPSO provided a memorandum noting that the pretrial program is no longer managed by VERA, but rather Criminal District Court, and that the same space is provided. OPSO also provided a memorandum that ICE detainers are only accepted for a specified list of offenses; and that OPSO has not detained any individuals under an ICE detained during 2018.

**IV. A. 10. Custodial Placement within OPP**

**Introduction**

OPSO has designed, validated, and implemented an objective classification system to assess and house each OSPO inmate according to his/her risks posed to institutional safety and security. The automated classification system was rolled out in the Jail Management


Orleans Parish
JAIL MONITORS

System (JMS) on January 15, 2015.[2] The OPSO staffing plan set the classification staff FTEs at 18. As of September 19, 2019, the Classification Unit staffing was 14 -- 13 civilian classification specialists and a classification manager. In addition, designated for the Classification Unit were two civilians currently enrolled in the Academy. Thus, it appeared the Classification Unit staffing was adequate.

 Hired were four (4) classification specialists during this compliance period. Staff provided a memorandum outlining the classification-specific training schedule. This schedule included instruction for the custody and PREA assessment instruments, the OPSO housing matrix, and housing assignments. Competency pre and post-tests for the classification-specific training were available. The two in-service training topics during this compliance period addressed housing assignments.

Commented [AK8]: See below IV.A.10.e

An automated housing assignment process (HUAP) identifies housing options for inmates according to their custody level, gender, special population status, PREA designations, enemies, and associates. The classification specialist selects from the potential housing locations to match the inmates by age, crime/criminal history, and custody level. Special population tags identify inmates for suicide observation versus suicide watch, medical housing/isolation, academic education, or special diets. The OJC and TDC dormitory-style units have been cataloged in the automated HUAP to enable the classification specialists to assign inmates to specific beds. Although Classification Unit and JMS staff worked together to develop an Inmate Separation Instrument (ISI) to maintain out-of-cell separations, the ISI is used only within the special management pods.

During this compliance period, classification specialist and corrections security staff conducted housing audits to verify the inmates were in their assigned beds. Many of the audit sheets were incomplete and inconsistent; thus, the integrity of the housing audit process was questionable.

OPSO modified its document submittal process to exclude standardized monthly classification statistical reports. These reports were retrieved while onsite for the full

---

[2]  Hardyman, Patricia L. (2015). "Design and Validation of an Objective Classification System for the Orleans Parish Sheriff's Office: Final Report." Hagerstown, MD: Criminal Justice Institute, Inc.



review of the System. It appears the classification specialists complete the initial and reclassification assessments within 24 hours of intake or status change for most inmates.

**Assessment Methodology**

The compliance review included observation of the custody assessment, housing assignment, and audit processes as well as meetings with OPSO staff. A follow-up visit to observe the classification training for new classification specialists occurred in October. Following the site visit, analyzed were the monthly statistical reports, housing audit data, and monitor logs. Further reviewed were miscellaneous documents provided before or during the compliance visit. Thus, compliance was assessed using multiple data sources and methods. The data for this compliance report focused primarily on the period between December 2018 and June 2019. For some analyses, thirteen (13) months was used to allow for tracking trends and to account for seasonal variations.

**Summary**

In sum, the OPSO is in partial compliance overall with the paragraphs of the Consent Judgment related to Custodial Placement within OPP (IV. A.10). During this six-month period, the OPSO moved from Partial Compliance to Substantial-Compliance on Sections a. *(OPP shall implement an objective and validated classification system)* and h. *(OPSO shall review the periodic data report and make recommendations)*. There were no changes on Sections b., c., and g. Sections d. and f. regressed from Substantial to Partial Compliance. Section d. (*Continue to update the classification system to include information on each prisoner's history*) regressed as the inmate's non-Orleans criminal history was not scored for the custody and PREA assessments. Section f. *(Conduct internal and external review and validation of the classification and prisoner tracking system on at least an annual basis.)* regressed due to the poor quality of the housing audits, in particular the failure to verify the inmates' bed assignments. Further, the internal audits failed to identify and address the missing criminal history attachments. OPSO is in substantial compliance with five of the eight elements of the Consent Judgment regarding Custodial Placement.

 **Commented [AK9]:** OPSO addresses comments for each section below.

Findings:
A. 10. a.  Substantial Compliance
A. 10. b.  Substantial Compliance
A. 10. c.  Substantial Compliance
A. 10. d.  Partial Compliance



A. 10. e.  Partial Compliance
A. 10. f.  Partial Compliance
A. 10. g.  Substantial Compliance
A. 10. h.  Substantial Compliance

IV.A.10. a.   OPP shall implement an objective and validated classification system that assigns prisoners to housing units by security levels, among other valid factors, in order to protect prisoners from unreasonable risk of harm.  The System shall include consideration of a prisoner's security needs, the severity of the current charge, types of prior commitments, suicide risk, history of escape attempts, history of violence, gang affiliations, and special needs, including mental illness, gender identity, age, and education requirements.  OPSO shall anticipate periods of unusual intake volume and schedule sufficient classification staff to classify prisoners within 24 hours of booking and perform prisoner reclassifications, assist eligible DOC prisoners with re-entry assistance (release preparation), among other duties related to case management.

Finding:  Substantial Compliance

**Observations:**

As of January 14, the Classification Unit roster lists 14 individuals -- a classification manager and 13 civilian classification specialists. As per the OPSO 2018 staffing analysis plan 18 "civilianized" positions are assigned to the Classification Unit.[3] The Classification Unit Manager reports to the Captain of the Intake Processing Center (IPC). An assertive voice for the Classification Unit is important to ensure its' control of all housing transfers and assignments and participation in OPSO housing-related decisions.

The 1st shift lead classification specialist is responsible for completing housing audits, responding to grievances, and conducting interviews regarding protective custody and housing re-assignments in addition to responsibilities for supervising the classification specialists, processing housing transfers, and conducting custody re-assessments.  The classification shift leaders and specialists work overtime to complete the initial classification, reclassification, vulnerability assessments, and housing assignments. They averaged 42 hours of overtime per month; the range was 32.95 to 61.64 hours.

During this compliance tour, a complete copy of the current classification and PREA handbooks were readily available in the classification work area as reference tools for checking offense severity, codes for disciplinary infractions, and the like. Available was a memo outlining the training schedule for new classification specialists; however, the

---

[3] Hodge, Darnley (October 1, 2018). "Updated Coverage Plans for the OPSO (Civil Division excluded)." Orleans Parish Sheriff's Office, Independent Compliance Director. pp. 12.



specific content and format of the various sessions were unclear.  The new specialists reported participating in "hands-on" training for the custody and PREA assessment instruments and housing processes matrix.[4] During this compliance reporting period, the classification manager/team leaders provided ad hoc remedial instruction, as needed.

IV.A.10.b. Prohibit classifications based solely on race, color, national origin, or ethnicity

Finding:  Substantial Compliance

**Observations**:

The custody assessments consider objective risk factors validated for the OPSO males and female inmates. The inmate's race is not one of the objective risk factors. The classification specialists consider the inmate's custody level, vulnerability designation, age, and charges when selecting from the beds identified by the JMS.

To track this element of the Consent Judgment, OPSO created a monthly statistical report to track classifications by race and housing location. Analyses of these reports by the Monitor suggested that the OJC housing assignments were not by race. The housing distributions across the OJC housing units were generally consistent with the overall distributions of inmates by race within the OPSO inmate population. However, the percentage of white inmates assigned to TDC exceeded their proportions within the overall inmate population. In June 2019, 87.0 percent of the OPSO inmates was Black; however, only 77.2 percent of the inmates housed in TDC were Black. (See Figure 1.) There was about a 10 percent discrepancy between the percentage of Blacks housed in TDC versus the overall percentage of OPSO inmates for each of the months -- December 2018 through June 2019. During this compliance period, TDC housed the kitchen/maintenance and off-site workers. These data raise questions about the worker selection/assignment process.

---

[4] The "hands-on" training was simply "on-the-job" training shadowed by the shift supervisor.





**Figure 1: Distribution of Inmates by Race by OPSO Facility**

IV.A.10.c Ensure that the classification staff has sufficient access to current information regarding cell availability in each division.

Finding: Substantial Compliance

**Observations:**

OPSO automated housing assignment process (HUAP) considers the inmate's custody level, gender, special population status, PREA designations, enemies, and associates as well as bed availability to recommend an appropriate bed for the inmate. Housing tags, for example, identify inmates on suicide observation versus suicide watch, alcohol/drug detoxification protocol, gang affiliation, school participation, and special diets. The HUAP provides the classification specialists a list of potential beds for each inmate.

The JMS daily population report lists the units, cells, and beds offline for maintenance or staffing as recorded in the AS400. These were <u>not</u> a full or accurate listing of the cells closed for maintenance and the like. Tacked on the walls of classification specialists' work areas were post-it notes and lists of cells with maintenance problems. The lists/notes did not indicate when the various cells went offline. Further, the posted offline cells did not match those listed on the JMS daily population report. The classification specialists must manually compare the posted lists of cells/beds offline with the bed assignments generated by the HUAP. This manual process creates inefficiencies among the automated HUAP, housing assignment/transfer, and the facility maintenance processes. The reason(s) for the disparity between the manual lists/notes and the JMS records of cells/beds offline was



DRAFT COMPLIANCE REPORT # 11                    39

unclear. The classification unit manager has the option to update the status of beds within the JMS as well as to input requests within the facility maintenance log.

Classification specialists also maintain a list of daily bed assignments to avoid duplications due to delays between the housing assignments and physical transfer of the inmate to the designated housing unit. Thus, as required by the Consent Judgment, the classification specialists appear to have access to current information regarding bed availability throughout the OJC. However, the current process entails maintaining multiple manual lists creating the risk of housing errors and backlogs for moving inmates from the booking area to the appropriate housing pod. Further, the manual lists and notes are inefficient and impede the housing assignment process.

IV. A. 10. d. Continue to update the classification system to include information on each prisoner's history at OPSO.

Finding:   Partial Compliance

**Observations:**

As shown in Figure 2, the monthly custodial reports provided by OPSO indicated a significant increase in the lag-time between booking and the initial classification. However, the percentage of inmates for whom initial custody and housing assessments were completed remained stable. In particular:

o   Percent Initial Custody Assessments: During this compliance period, initial custody assessments were completed for 81.9 percent of the inmates booked into OJC.[5] Between December 2018 and June 2019, the rate dropped slightly from 83.0 to 80.0 percent.

o   Percent Within 8 Hours: As of June 2019, initial custody assessments were completed within the first eight hours of booking for only 51.6 percent of the OPSO inmates. Between December 2018 and June 2019, the percentage initial classifications completed within the first eight hours of booking rate dropped. The most precipitous decrease was between April and June 2019, i.e., from 88.8 to 51.6 percent.

> **Commented [AK10]:** OPSO objects to this data being used as a measure, as the consent judgment does not require assessments be completed within any timeframe.

---

[5] Custody and PREA assessments were completed for all inmates prior to their transfers from the booking area to OPSO housing units.



○ Percent Greater Than 24 Hours: As of June 2019, the lag time between booking and the initial custody assessment was more than 24 hours for only 1.4 percent of the inmates. This was an uptick from .5 percent in December of 2018. This shift should be closely monitored over the next six months.



Figure 2: Rates and Completion Time for the Initial Custody Assessments – Dec 2018 – June 2019

These data suggested that the percentage of inmates for whom an initial classification was completed has remained stable. Yet, the lag time between booking and classification/housing increased sharply during the latter half of this compliance period. The slowdown in the initial classification and housing process appears, at least in part, appeared to be linked back to the intake housing process/unit implemented by OPSO in October 2019.  All male inmates are housed on 1-F for the first 72 hours on incarceration; staff reported that bed assignments for some inmates are delayed for lack of appropriate beds on the unit. Housing challenges centered on maintaining adequate separations by custody level and PREA designations as well as the availability of lower bunks for inmates with medical, mental, or detoxication requirements. In addition to slowing the initial classification/housing process, the Intake Unit creates concerns about the additional risks from the assignment of Low, Medium, and High custody inmates with different PREA designations to the same housing unit. The only out-of-pod separations maintained by the security staff were for medical and mental health needs, not custody or PREA requirements.



During the previous compliance period, as needed the inmates' initial custody level were overridden for housing purposes. However, this practice was modified as housing is NOT a legitimate reason for a discretionary override. Yet, concerns remain that the classification specialists use discretionary overrides of the scored custody levels when assigning inmates to a bed to expand the housing options.[6] The posted memo was confusing as to whether discretionary overrides were forbidden or merely required supervisor approval.

The JMS override data indicated 57.1 percent overrides during 2019 were for housing. Many of these overrides were initiated to transfer low custody inmates from the "Booking" area to the Intake Unit, 1-F.  The monthly classification indicated that the rate of discretionary overrides at initial classification for the men peaked in January 2019 at 19.2 percent. By May, the discretionary override rate had dropped to 2.9 percent.  The classification specialists were careful to "match" inmates by age, current offense, and final custody level for the housing assignments, particularly for the "low" custody inmates.

The Classification Monitor List (List) is an ad hoc report that identifies inmates for whom a custody review is due. Custody re-assessment reasons include a regular 90-day re-assessment or because of some change or event within their jail records, i.e., change in their charge(s), bail amount, disciplinary record, detainer lodged/lifted, or sentence. The number of inmates on the list fluctuates as inmates return from court, move through the booking process, and the like. At least one classification specialist per shift is assigned the task of completing the custody reviews. The average number of pending custody assessments between January 1, 2019, and June 30, 2019, was 29.4. The lists were evenly split between those awaiting an initial classification (13.47) versus those awaiting a custody re-assessment (15.95). As the average number of pending custody assessments during the previous compliance period was 18.04[7], there appeared to be a slowdown of both the initial and reclassification processes during this compliance period.

_____

[6]A memo dated May 7, 2019, instructed staff that "bumps" from low to medium custody for initial housing required approval from the team leader or classification manager. However, at reclassification, previous overrides from low to medium custody were to be continued.
[7]For the compliance period of July 2018 and December 2018, the average number of
 pending initial classifications was 11.08; 6.96 inmates were awaiting a custody review.



Following Compliance Report #8, OSPO took immediate steps to work with CCS (now Wellpath) to rebuild the linkages between the medical/mental health records and JMS. These data are essential for seven of the PREA victimization and predation risk factors. Also, medical and mental health information is critical for the inmates' housing assignments. The linkage between the electronic medical records (ERMA) and the JMS for the intake data is complete, but the programming to update the records throughout the inmate's incarceration is still problematic.

Observation of the custody assessment process suggested that the classification specialists were not inputting prior criminal history data into the JMS for inmates with non-Orleans Parish felony convictions. Staff generated and reviewed the rap sheets for the initial custody assessments. However, they did not automatically generate the required attachments to ensure the JMS scored the individuals' criminal histories for the custody and PREA assessments. When asked about the attachment process, the team lead guided the classification specialists through the process as they were not familiar with the task. Further, observation of the reclassification process revealed that the criminal rap sheets were not reviewed for the custody re-assessments.

These observations prompted concern as to whether staff routinely used the attachment option within the JMS to input non-Orleans Parish felony convictions and warrants. As staff may be nervous or confused by the observation process, data were retrieved from the JMS to track the use of the attachment option by date and reason. As shown in Figure 3, the number of attachments input by the classification staff has dwindled from a high of 1,140 in June 2018 to only 3 in June 2019.[8] Further, as shown in Figure 4, in January 2018, 93.9 percent of the attachments updated the inmate's criminal history. Only 14.3 percent of the August 2019 attachments pertained to the inmates' criminal histories.[9] In June and July of 2019, zero (0) criminal history attachments were inputted. These data

---

[8] The decline in OPSO's average daily OPSO population (from 1,451 in January 2018 to 1167 as of June 2019) does not account for this precipitate drop in the use of the attachment option by the classification staff. A 20% drop in the ADP would suggest a 20% decrease in the number of attachments input. Further, the number of initial custody assessments completed has remained constant during this period – 979 in January and 1025 in June. Thus, the dramatic drop in the number of attachments input per month is not explained by the OPSO ADP or the number of initial classifications completed.

[9] "Other" attachments record, for example, the assignment of inmate workers.



indicated that staff did not link the tasks of reviewing the rap sheets, inputting Non-OPSO
convictions, and generating the custody and PREA assessments.

**Commented [AK11]:** While OPSO strives to meet all of the Monitors' suggestions, this section only requires that the classification system continue to be updated "to include information on each prisoner's history *at OPSO*", not previous criminal history outside of Orleans Parish. Therefore, this is not a valid measure of this section and should not be used as a reason to demote this section from substantial compliance to partial compliance. OPSO continues to successfully update the classification system to include information on each prisoner's history while they are housed at OPSO. As OPSO is achieving all of the requirements of this section, OPSO believes this section is in substantial compliance with the language as written and agreed upon.



**Figure 3: Number of Attachments Input by Classification Staff -- January 2018 - August 2019**



**Figure 4: Attachment Reason by Month -- January 2018 – August 2019**

The failure to generate criminal history attachments within the JMS for the custody
and PREA assessments raised questions as to the integrity of the classification training,
audits, and supervision as well as the accuracy of the custody assessments. The absence of
relevant attachments, for example, should have been detected by classification supervisors



during the random audits of the custody assessments or by the team leaders when completing the custody re-assessments.

Commented [AK12]: After reviewing the entirety of this section, it remains unclear why OPSO was demoted from substantial compliance to partial compliance, when OPSO submitted documentation showing the continued updating of each inmate's history at OPSO, as required by this section.

IV.A.10.e. Continue competency-based training and access to all supervisors on the full capabilities of the OPSO classification and prisoner tracking system.

    Finding:   Partial Compliance
    **Observations:**
    During this compliance period, four new classification specialists were hired. Staff reported training on the custody and PREA assessment instruments and the OPSO housing matrix. However, documentation of this training was not available. The classification manager reported providing ad hoc remedial instruction as needed. Given the attachment data detailed in Figures 3 and 4 and the fact that staff may be nervous or confused by the observation process, a second onsite visit was conducted to observe the training for new classification specialists. The staff had easy access to the classification handbook.[10] However, the quality of instruction provided by the shift supervisors/ classification manager was questionable. As previously noted, the classification specialists were not routinely inputting attachments and struggled when prompted to generate an attachment.[11] Further, not all staff was familiar with OPSO offense and disciplinary severity indexes. While the System is highly automated within the JMS, the automation should not be expected to replace the staff's understanding of the underlying risk factor scoring.

Commented [AK13]: OPSO requests this language be amended. Training documentation was timely provided, and may still be found on dropbox under IV.A.10.e. These documents were also available on site. Additionally, Monitor Hardyman specifically states in her introduction that training documentation was provided. (See pg. 35)

IV.A.10.f. Conduct internal and external review and validation of the classification and prisoner tracking system on at least an annual basis.

    Finding:   Partial Compliance

---

[10] The handbook distributed to staff was outdated as Appendix C. OPSO Disciplinary Codes – Severity Scale for Classification had not been updated to reflect OPSO disciplinary code as of October 2016.
[11] Inputting criminal history attachments is a fundamental task for the custody assessments.


JAIL MONITORS

**Observations:**

OPSO population reports as to the number of inmates by location were received daily by the Monitor. Custodial statistical reports for December 2018 through June 2019 as to the number of custody assessments by type, gender, and population were also available. These reports track the timeliness of the initial custodial assessments; the custody distributions; housing monitor lists (i.e., the log of cases due for a custody assessment); the prevalence of special populations; as well as the rates and types of disciplinary infractions. OPSO has both housing and internal audit protocols; both processes were reviewed for this compliance report.

<u>**Housing Audits – Checking the Veracity of the Inmate Housing Assignments**</u>

A total of 212 housing audit score sheets were generated for December 2018 – June 2019. Each audit sheet (and roster, when provided) was reviewed. Commendations to OPSO security supervisors for their work. These data suggested that OPSO has addressed previous problems of security supervisors moving inmates without going through the Classification Unit for housing unit transfers. However, the audit sheets raised several concerns. As required by OPSO's housing audit protocol, not all pods were audited monthly and pods with cell or pod separation errors were not re-audited. Most of the audit sheets were incomplete; missing were information as to the integrity of the cell and bed assignments, pod level separations, and auditor. For most of the audits, recorded were the pod, date, and start time. The staff did not document that each inmate was in his/her assigned bunk.[12] Their comments indicated the inmates were standing by/in their assigned cells or sleeping on the floor. A second red flag was the time staff spent auditing the respective pods. The start times for many of the audits were 5 to 10 minutes apart. Thus, the auditor identified each inmate's assigned location, checked the security and operational items, and walked to the next OJC pod within 5 to 10 minutes? During the audit observed

---

[12] The audit instructions define cell assignment errors as "An instance in which an Inmate or Inmates are found to be residing in a cell to which He or She is not assigned to by the Classification Division." (See slide 5 of training PowerPoint entitled. "The Classifications Housing Unit Audit System.") Thus, it appeared that the Classification Unit did not instruct the security staff to verify bed assignments. The classification unit auditor was aware of the requirement to verify the bed assignments, but it was apparent that these were not checked for every audit. This auditor had not seen the audit training PowerPoint but instead was instructed by the previous auditor.


Orleans Parish
JAIL MONITORS

**Commented [AK14]:** Housing audits are not required by the consent judgment, and therefore OPSO objects to them being used as a measure of compliance.

**Commented [AK15]:** This section only requires an annual review, not monthly audits, therefore this is not an appropriate measure for this section.

for this compliance visit, 23 of the 57 inmates were not in their assigned beds. The audit time was from 10:05 to 11:03 AM. Many of the audit sheets appeared to have completed by security staff. This is fine. However, in violation of the audit protocol, it appeared that the Unit's supervisor conducted the audits.

Therefore, it was inconclusive whether the units maintain the housing assignments as generated by the classification unit. OPSO did not provide a summary or analysis of the audits. The supervisors expressed surprise as to the incomplete and inconclusive housing audits suggesting that the audit sheets were not routinely reviewed.

### Internal Audits – Checking the Accuracy of the Custody and PREA Assessments

As part of the ongoing classification and housing processes, the classification shift supervisor reviews the JMS reports to identify placement errors and ISI separation conflicts. Supervisors/team leaders indicated that errors were corrected immediately. Thus, the housing separation errors detected by the JMS were resolved quickly to prevent conflicts and to enhance staff and inmate safety. Reliance on automated housing violation reports to detect housing and custody assessment errors is insufficient to ensure institutional safety and security.

Reviewed were the January – June 2019 internal audit logs. Audited were a total of 79 custody assessments; this represented about .60% of the 13,103 custody assessments completed during this six-month period. This low rate of audits is troubling. No "errors discovered" was reported for each of the custody assessments audited. However, for both of the internal audits observed, errors were detected, i.e., the staff member did not input the required criminal history attachment. A random sample of the audited custody assessments was re-audited; errors, in particular missing criminal history attachments were noted for multiple assessments. The integrity of the audits, or at least the audit protocol, is insufficient. Further, when observing the reclassification process, the staff member identified housing errors that required adjustment of the housing matrix. These observations suggested that the internal audit process was insufficient to identify assessment errors and that the logs were not complete.

### Revalidation of the Classification System – Assessing the Validity of the System

OPSO contracted with Dr. Edward Latessa and Dr. Brian Lovins (University of

<div style="border:1px solid #9cf; background:#eef6ff; padding:4px;">

**Commented [AK16]:** Housing audits are not required by the consent judgment, and therefore should not be measured here. The purpose of classification is to allot a housing assignment, not ensure that it is enforced. This section of the consent judgment serves only to ensure OPSO conducts a review of the classification computer system once a year. Furthermore, it is security staff, not classification staff, who are responsible for ensuring that inmates are in their appropriate cell. This is completed both during formal counts at shift change, and during the required security checks. As this is a security issue, not a classification issue, it is better measured under section IV.A.5 and should not be measured here.

</div>

<div style="border:1px solid #9cf; background:#eef6ff; padding:4px;">

**Commented [AK17]:** The current Monitor approved system that OPSO uses for classification was designed to automatically check its system to avoid errors. By using this check, it also avoids human error. As this is how the system is designed, and how it has always been used, it is unclear why the Monitors now find this process unacceptable. Furthermore, it is unclear what the alternative is except to go back to a manual check which leaves room for human error. Please explain why this is no longer sufficient.

</div>



Cincinnati) for revalidation of the classification system as required by the Consent Judgment.  Lovins and Latessa submitted their final report to the OPSO on April 30, 2018.[13] This validation study serves as documentation of the Consent Judgment requirement for "external review and validation of the classification and prisoner tracking system on at least an annual basis." Although statistical validation of an objective classification system is generally recommended every three to five years,[14] continuous monitoring and process evaluation are essential for ensuring the integrity of the System for the OPSO <u>current</u> inmate population. OPSO should review and address Lovins and Latessa's recommendations and plan to revalidate the System by 2021 as recommended.

Commented [AK18]: After reviewing the entirety of this section, it remains unclear why OPSO was demoted from substantial compliance to partial compliance.  In her introduction, the Monitor states that this section regressed due to housing audits and lack of criminal history data.  As neither of those are required by any section of the consent judgment , OPSO objects to these being used as a measure and a means for demotion. OPSO believes this section continues to be in substantial compliance.

> IV.A.10.g. Provide the Monitor a periodic report on classification at the Facility.  These periodic reports shall be provided to the Monitor within four months of the Effective Date and every six months, thereafter, until termination of this Agreement.  Each report will include the following information:
> (1)     number of prisoner-on-prisoner assaults;
> (2)     number of assaults against prisoners with mental illness;
> (3)     number of prisoners who report having gang affiliations;
> (4)     most serious offense leading to incarceration;
> (5)     number of prisoners classified in each security level;
> (6)     number of prisoners placed in protective custody; and
> (7)     number of misconduct complaints.

Finding:   Substantial compliance

**Observations:**

Reviewed were the monthly custodial, discipline, and inmate statistical reports for December 2018 – June 2019. OPSO has developed reports to track the statistics as required under section IV.A.10.g. The only exception is the rates of victimization of inmates on the mental health caseload. As noted earlier, these data are dependent upon timely caseload information from the mental health provider.

Updated data as to the inmates with gang affiliations were inputted to the JMS throughout the compliance period. OPSO, New Orleans Police Department, and the Orleans District Attorney have created an ongoing process for notifying the OPSO of offenders

---

[13] Lovins, Brian K. and Edward Latessa (April 30, 2018). "Revalidation of the Orleans Parish Classification System." Cincinnati, Ohio: University of Cincinnati Corrections Institute.
[14] Austin, James and Hardyman, Patricia L. (2004) "Objective Prison Classification: A Guide for Correctional Agencies." Washington, D.C.: National Institute of Corrections. pp. iv.



identified as members of a "gang." Thus, these data are available to track the prevalence of inmates per "gang" among OPSO populations as well as by location (i.e., tier, side, and bed).

Figure 5 provides the OPSO monthly disciplinary data as recorded in the JMS. The number of disciplinary reports has fluctuated over the last 13 months – June 2018 - June 2019. These fluctuations appear to mirror the fluctuations in the OPSO average daily population (ADP). Overall, the trend-line for the number of formal disciplinary reports written per month indicates a decline in the number of disciplinary reports between June 2018 – March 2019. In April, the number of disciplinary reports jumped from 128 to 293. The number of reports continued to rise in May and June (May, 318; and June, 322). The rate of infractions with a finding of guilt held steady at about 82 percent through March 2019, but then dropped to ~65 percent for the remainder of the period.



Figure 5: Numbers of Total and Guilty Disciplinary Infractions: June 2018 – June 2019

Figure 6 illustrates the rate of disciplinary infractions among the OSPO inmate population for June 2018 – June 2019.[15] The rates of predatory (e.g., assaults or battery) and aggressive behaviors (e.g., fights or threats) based on the OSPO ADP were steady over the 13 months. In June 2018, for example, 2.0 percent of the inmates were found guilty of a predatory infraction; 2.6 percent were found guilty of an aggressive infraction. In June 2019, 3.7 percent were found guilty of a predatory infraction and 2.8 percent of an

---

[15] Thirteen (13) months of disciplinary data are provided to account for short-term variations and seasonal trends.



aggressive infraction. The percentage of the inmates written up for a disciplinary infraction per month increased from 22.8 to 27.6 percent. On the other hand, the rate of guilty findings dropped from 21.1 to 17.5 percent.

For this compliance period (December 2018 – June 2019), there was a slight increase in the percentage of inmates with a predatory infraction, i.e., from 2.2 to 2.7 percent. The rate of aggressive infractions also edged up slightly – December, 2.5 percent to 2.8 percent in June 2019. Thus, despite the decrease in the ADP at OJC, the rates of predatory and aggressive infractions increased slightly.



Figure 6: Rate of Disciplinary Infractions Among OPSO Average Daily Population – June 2018 – June 2019.

Figure 7 provides a breakdown of the most severe type of infraction of which the inmate was found guilty between June 2018 and June 2019. During the first six months of 2019, the numbers of predatory (assaults or battery) increased while the numbers of disruptive and management problems decreased. Specifically, the average number of predatory infractions for June – December 2018 was 22.9/month. For January – June 2019, the average number of predatory infractions per month was 35.3. The number of management problem infractions recorded dropped from an average of 94.6 during the latter half of 2018 to 86.2/month during the first half of 2019. Further during the first half of 2019, the number of disruptive infractions dropped to average of 22.2/month. The number of aggressive infractions was stable at ~ 30/month during the last 13 months.





Figure 7: Types of Disciplinary Infractions of which OPSO Inmates were Found Guilty –
June 2018 – June 2019

IV.A.10.h. OPSO shall review the periodic data report and make recommendations regarding proper placement consistent with this Agreement or other necessary changes in policy based on this review. The review and recommendations will be documented and provided to the Monitor.

Finding: Substantial Compliance

**Observations:**

The Monitor receives the daily "Active Inmates by Location" report.   During this compliance period, there was little dialogue between the Monitor and OPSO.  The Monitor no longer receives the monthly statistical reports, and as previously indicated, this creates challenges for monitoring the System.  These reports were, however, available onsite. There appeared to be little independent analyses of the data as the memos submitted along with the compliance documents were cursory.



| IV. A. 11. | Prisoner Grievance Process |
|---|---|

A. 11.a. OPSO shall ensure that prisoners have a mechanism to express their grievances, resolve disputes, and ensure that concerns regarding their constitutional rights are addressed.  OPSO shall, at a minimum, do the following:

(1)   Continue to maintain policies and procedures to ensure that prisoners have access to an adequate grievance process and to ensure that grievances may be reported and filed confidentially, without requiring the intervention of a correctional officer.  The policies and procedures should be applicable and standardized across all the Facility divisions.

(2)   Ensure that each grievance receives appropriate follow-up, including providing a timely written response and tracking implementation of resolutions.

(3)   Ensure that grievance forms are available on all units and are available in Spanish and Vietnamese and that there is adequate opportunity for illiterate prisoners and prisoners who have physical or cognitive disabilities or language barriers to access the grievance system.

(4)   Separate the process of "requests to staff" from the grievance process and prioritize grievances that raise issues regarding prisoner safety or health.

(5)   Ensure that prisoner grievances are screened for allegations of staff misconduct and, if an incident or allegation warrants per this Agreement, that it is referred for investigation.

(6)   A member of the management staff shall review the grievance tracking system quarterly to identify areas of concerns.  These reviews and any recommendations will be documented and provided to the Monitor.

Findings:
A. 11. a. (1)  Substantial Compliance
A. 11. a. (2)  Partial Compliance
A. 11. a. (3)  Substantial Compliance
A. 11. a. (4)  Substantial Compliance
A. 11. a. (5)  Substantial Compliance
A. 11. a. (6)  Partial Compliance

In the previous ten reports, one rating was given for the entire section for the Prisoner Grievance Process. In order to highlight which provisions are in substantial compliance versus those which fall short, the decision was made to rate each provision separately.

As reported by the OPSO Grievance staff, for the first six months of 2019, a total of 1166 grievances were received or an average of 194 per month. For CY2018, a total of 5005 grievances were received for an average of 417 grievances per month. This is approximately a 53% decrease in the monthly average from CY2018 to the current rating period (January through June 2019). This trend continues that noted in the previous report of a substantial decline in grievances from CY2017 to CY2018.

Inmates have access to the grievance process via electronic kiosks located in the housing units throughout OJC and TDC. In the eight units in which the kiosks are inoperable, and beyond repair, (1A, 1C, 1D, 3C, 3D, 3E, 3F, and 4C), staff are required to



visit the units twice daily to retrieve written grievance forms. While inspecting every housing unit, the Monitor observed a locked and labeled "grievance box" next to the medical form boxes in each housing unit with inoperable kiosks. While this manual work-around has the potential to compromise the confidentiality of the process (as opposed to the electronic process), it has been the Monitor's experience and observations in other facilities that such a manual system meets the letter of the Consent Judgment requirement for this paragraph. OPSO continues to negotiate a new contract to provide upgraded kiosks in all housing units.

During the inspection, the Monitor reviewed weekly and monthly audit documentation (statistics and actual grievance documentation) compiled by the Grievance staff along with the management review of the second quarterly documentation. The Monitor also interviewed inmates, Grievance staff, and the senior staff member responsible for addressing inmate grievance appeals and ensuring staff respond to grievances in a timely and substantive manner.

The Monitor specifically reviewed the audit findings in the trend reports provided by the Grievance staff for CY2018 and the current rating period. The information showed that Grievance staff audit approximately 10 to 12 percent of the grievances received in a given month. The number of grievances not replied to within the allotted time frame increased from approximately 11% of the grievances audited in CY2018 to approximately 29% for January through June 2019. For those grievances not receiving a substantive response or closed with no response, the percentage decreased from 24% in CY2018 to approximately 5% for January through June 2019.  Several inmates interviewed confirmed that timely and substantive responses continue to be an issue.

It should be noted that, given the overall volume of grievances and requests received, the Grievance staff does an excellent job tracking and reporting on both grievances and requests in terms of timeliness of responses and well as whether those responses are substantive towards addressing the inmates' issues.

The Monitor observed Grievance forms freely available on all units with non-functioning kiosks and confirmed the process through interviews with inmates and interviews with staff. The Grievance staff maintains a by-name/housing, listing of all OPSO inmates identified as needing Grievance staff assistance availing themselves of the



DRAFT COMPLIANCE REPORT # 11                             53

grievance system due to either a language barrier or illiteracy. The Monitor reviewed the first and second quarter reports which noted up-to-date housing changes for the inmates indicating the listing is being actively managed.

The Monitor reviewed detailed documentation provided by Grievance staff for the rating period regarding the separation of inmate requests from grievances and the handling of grievances related to prisoner safety or health. Grievance staff were interviewed as to the daily procedure.

The documentation demonstrated that all inmate submissions are reviewed by Grievance staff, categorized into requests and grievances, and forwarded to the appropriate staff for response. Both categories are further sorted by type. Specific grievances related to inmate safety, medical issues, PREA, etc., are documented to reflect the date received, inmate information, type of grievance, time of notification made to the appropriate staff member, and the staff member making the notification. Grievance staff processed a total of 88 such grievances during the rating period.

The Monitor reviewed detailed documentation provided by Grievance staff for the rating period regarding the screening of grievances for staff misconduct. Grievance staff were interviewed as to the daily procedure and notification process. The documentation demonstrated that all inmate submissions are reviewed by Grievance staff and those regarding staff misconduct are separately documented for appropriate referral to the administrative level for appropriate follow-up. Grievance staff processed a total of 134 such grievances during the rating period.

Grievance staff also separately document grievances that require specific referral to IAD, ISB, PREA and FIT staff for review and investigation as appropriate. Detailed information along with the date assigned and disposition is maintained as well as email transmission receipts. Grievance staff referred a total of 110 grievances for investigation during the rating period.

The Monitor reviewed the first and second quarterly review reports. Specific discussion by management staff regarding the grievance documentation and reports was noted. However, no specific recommendations regarding changes to the grievance process were made despite the obvious issues regarding the timeliness and thoroughness of responses which need to be addressed. Perhaps the grading of each provision separately

> **Commented [AK19]:** The Consent Judgment does not require that specific recommendations be made, only that "reviews and *any* recommendations be documented and provided to the Monitor." Therefore, OPSO should not be punished for not making the specific recommendations as long as a review and analysis was documented and provided to the monitors. OPSO did conduct the required review and analysis and documented what was discussed and recommended in the meeting. Lack of a specific recommendations is not an appropriate measure of this section. Since OPSO conducted a quarterly review and provided documentation of this, this section should be in substantial compliance.



Orleans Parish
JAIL MONITORS

will further highlight what issues need to be addressed to bring this section into substantial compliance.

Recommendations:

- Grievance staff produce detailed reports (by name) of all staff receiving and responding to grievances in a given month. These reports flag staff members who either fail to respond in the allotted time or fail to provide a substantive response to the inmate. In addition to these reports, Grievance staff notify staff members along with their supervisors when deficiencies are found. It is recommended that senior management staff utilize these reports to verify that the deficiencies are resolved through documented training, corrective action, etc., as the situation warrants.

- While the grievance process, to include appeals, is documented in the inmate handbook, it is recommended that final responses to inmates include a brief notation of the right to appeal, the procedure and time requirements.

- It is recommended that the management team review the weekly and monthly audit findings (IV.A.11(2)) provided by grievance staff to determine any specific measures that can be taken to reduce the number of late/no response or non-substantive responses from individual staff members.

## IV. A. 12.  Sexual Abuse

A.12. OPSO will develop and implement policies, protocols, trainings, and audits, consistent with the requirements of the Prison Rape Elimination Act of 2003, 42 U.S.C. § 15601, et seq., and its implementation of regulations, including but not limited to, preventing, detecting, reporting, investigating, and collecting sexual abuse data, including prisoner-on-prisoner and staff-on-prisoner sexual abuse, sexual harassment, and sexual touching.

Finding:

A. 12.  Substantial Compliance

Observations:

OPSO reports that it successfully completed its PREA audit. Continuing to implement the requirements of PREA will be necessary to maintain substantial compliance.

## IV. A. 13.      Access to Information



A.13. OPSO will ensure that all newly admitted prisoners receive information, through an inmate handbook and, at the discretion of the Jail, an orientation video, regarding the following topics: understanding Facility disciplinary process and rules and regulations; reporting misconduct; reporting sexual abuse or assault; accessing medical and mental health care; emergency procedures; and sending and receiving mail; understanding the visitation process; and accessing the grievance process.

Finding:

A. 13.  Substantial Compliance

Observations:

Materials were provided indicating the requirements of this paragraph have been met.

## IV. B. Mental Health Care and C. Medical Care

Introduction

As with past reports, the Monitors rate the compliance levels based on the documents requested and reviewed, observations and discussions during on-site visits, review of medical records, and any additional information provided by the parties.

The Monitors are pleased to report step-by-step improvement in performance in many areas of the Consent Judgment. The addition of the Tulane Department of Psychiatry staff and leadership is an invaluable asset in providing required and consistent psychiatric services for prisoners at OJC. There is positive progress with Tulane's interface with Wellpath, though Wellpath might integrate with Tulane, with mortality and morbidity reviews, as an example.

Wellpath continues to have difficulty with counting, for example, calculating the mental health caseload and counting the number of patients with acute and chronic disease who receive counseling and discharge medications. Practitioner productivity is remarkably low, a situation that exacerbates backlogs to access to care and subsequent lags to and lapses in medication. Visit refusal rates are high for unidentified reasons.

Several paragraphs remain where necessary improvements are required by the Consent Judgment to provide the full range and quality of medical care and mental health/counseling services for inmates incarcerated in OJC and Hunt. These concerns are deeply impacted by the lack of progress in developing the required services and programs



recommended in 2014, including permanent acute care and step-down programing and services for mental health and acute medical services.

General recommendations are to continue leadership, initiatives, and direction by OPSO and Wellpath; Increase correctional security staffing to provide adequate and ongoing dedicated support for mental health and medical services consistently; Continue to develop full services and continuity of services for male and female prisoners including all levels of care, staffing and space; and Continue to evaluate and pursue full services for mentally ill prisoners, including medication management, and acute, residential, and outpatient care;

Specific findings and recommendations regarding medical and mental health services are provided below. For those paragraphs that have previously demonstrated Substantial Compliance the monitors recommend, encourage and support the diligent and consistent efforts by OPSO and the medical and mental health providers to continue to demonstrate Substantial Compliance.

**B.  Mental Health Care**

B.  OPSO shall ensure constitutionally adequate intake, assessment, treatment, and monitoring of prisoners' mental health needs, including but not limited to, protecting the safety of and giving priority access to prisoners at risk for self-injurious behavior or suicide.  OPSO shall assess, on an annual or more frequent basis, whether the mental health services at OPP comply with the Constitution.  In order to provide mental health services to prisoners, OPSO, at a minimum, shall:

B. 1. Findings:
B. 1. a.  Substantial Compliance
B. 1. b.  Substantial Compliance
B. 1. c.  Substantial Compliance
B. 1. d.  Substantial Compliance
B. 1. e.  Substantial Compliance
B. 1. f.  Partial Compliance
B. 1. g.  Partial Compliance
B. 1. h.  Substantial Compliance
B. 1. i.  Partial Compliance
B. 1. j.  Partial Compliance
B. 1. k.  Partial Compliance
B. 1. l.  Substantial Compliance

B.1.a. Develop and maintain comprehensive policies and procedures for appropriate screening and assessment of prisoners with mental illness.  These policies should include definitions of emergent, urgent, and routine mental health needs, as well as timeframes for the provision of services for each category of mental health needs.



DRAFT COMPLIANCE REPORT # 11                    57

Finding:  Substantial Compliance

Recommendation:  Wellpath has different timeframes for timeliness of responses; suggest review and revise for consistency.

B.1.b. Develop and implement an appropriate screening instrument that identifies mental health needs, and ensures timely access to a mental health professional when presenting symptoms require such care.  The screening instrument should include the factors described in Appendix B.  The screening instrument will be validated by a qualified professional approved by the Monitor within 180 days of the Effective Date and every 12 months thereafter, if necessary.

Finding:  Substantial Compliance

B.1.c. Ensure that all prisoners are screened by Qualified Medical Staff upon arrival to OPP, but no later than within eight hours, to identify a prisoner's risk for suicide or self-injurious behavior.  No prisoner shall be held in isolation prior to an evaluation by medical staff.

Finding:  Substantial Compliance

B.1.d. Implement a triage policy that utilizes the screening and assessment procedures to ensure that prisoners with emergent and urgent mental health needs are prioritized for services.

Finding:  Substantial Compliance

B.1.e. Develop and implement protocols, commensurate with the level of risk of suicide or self-harm, to ensure that prisoners are protected from identified risks for suicide or self-injurious behavior.  The protocols shall also require that a Qualified Mental Health Professional perform a mental health assessment, based on the prisoner's risk.

Finding:  Substantial Compliance

Recommendation: Continue to provide documentation and analysis of completion and consistent use of the Columbia Suicide Risk Assessment.

B.1.f. For prisoners with emergent or urgent mental health needs, search the prisoner and monitor with constant supervision until the prisoner is transferred to a Qualified Mental Health Professional for assessment.

Finding:  Partial Compliance

Recommendation: Provide documentation of searches and constant supervision by security until mental health staff arrives and conducts assessment.

B.1.g. Ensure that a Qualified Mental Health Professional conducts appropriate mental health assessments within the following periods from the initial screen or other identification of need:
    (1)    14 days, or sooner, if medically necessary, for prisoners with routine mental health needs;
    (2)    48 hours, or sooner, if medically necessary, for prisoners with urgent mental health needs; and



(3)     immediately, but no later than two hours, for prisoners with emergent mental health needs.

Finding:  Partial Compliance

Recommendation: Provide documentation that inmates in population (after IPC) consistently receive appropriate and complete assessments within these required timeframes.

B.1.h. Ensure that a Qualified Mental Health Professional performs a mental health assessment no later than the next working day following any adverse triggering event (i.e., any suicide attempt, any suicide ideation, or any aggression to self, resulting in serious injury).

Finding:  Substantial Compliance

B.1.i. Ensure that a Qualified Mental Health Professional, as part of the prisoner's interdisciplinary treatment team, maintains a risk profile for each prisoner on the mental health case load based on the Assessment Factors identified in Appendix B, and develops and implements a treatment plan to minimize the risk of harm to each of these prisoners.

Finding: Partial Compliance

Recommendation: Provide documentation of timeliness of treatment plans for all inmates on the mental health caseload at all levels of care including risk profiles.

B.1.j. Ensure adequate and timely treatment for prisoners, whose assessments reveal mental illness and/or suicidal ideation, including timely and appropriate referrals for specialty care and visits with Qualified Mental Health Professionals, as clinically appropriate.

Finding: Partial Compliance

Recommendation: Provide documentation of scheduled and completed adequate and timely treatment for all caseload inmates including individual and group treatments, and referrals for specialty services for male and female inmates. This should include prisoners at Hunt, extended suicide watches at OJC when beds are available at Hunt, acute care services for female inmates, step down units, and outpatients in population.

B.1.k. Ensure crisis services are available to manage psychiatric emergencies.  Such services include licensed in-patient psychiatric care, when clinically appropriate.

Finding: Partial Compliance

Recommendation: OPSO does not have access to any licensed inpatient services for female inmates and continues to have access to non-licensed acute care services for


DRAFT COMPLIANCE REPORT # 11                    59

**Commented [AK20]:** OPSO provided proof of compliance with both listed timelines in its CQI data which covers both IPC and "after IPC."  OPSO believes this section is in substantial compliance.  OPSO requests the Monitors provide more detailed feedback as to why this section remains in partial compliance and what exactly is needed for substantial compliance.

**Commented [WU21]:** The Mental Health Evaluation at Intake CQI measures appropriate and timely referrals. In 2019, referrals were appropriate in 93% of cases measured and 83% were timely. Additionally, the Mental Health Referral Report (monthly) provides a breakdown of referrals made from IPC and the clinic to Mental Health as well as Mental Health referrals to Psychiatry. The additional requirement of measuring extended suicide watches vs. availability at Hunt was not included in the suggestions in the previous report, nor is it required by the consent judgement, and therefore it is not a valid measure of this sections.  It is impractical to provide monitors with updated chart information on every inmate included in the Mental Health Caseload, nor is this a requirement. Therefore, OPSO believes this section should be in substantial compliance.  As OPSO is currently achieving such high percentages in adequacy and timeliness, OPSO believes this section should be in substantial compliance.

male inmates at Hunt. Provide documentation that all psychiatric emergencies are sent to an emergency department and the crisis is adequately resolved. Provide documentation that all inmates have access to licensed inpatient psychiatric care, when clinically appropriate.

B.1.l. On an annual basis, assess the process for screening prisoners for mental health needs to determine whether prisoners are being appropriately identified for care. Based on this assessment, OPSO shall recommend changes to the screening system. The assessment and recommendations will be documented and provided to the Monitor.

Finding: Substantial Compliance

Recommendation: The report of annual assessment and recommendations of the process for screening prisoners for mental health needs to determine whether prisoners are being appropriately identified for care has been provided.

B. 2 Findings:
B. 2. a.  Partial Compliance
B. 2. b.  Partial Compliance
B. 2. c.  Partial Compliance
B. 2. d.  Non-Compliance
B. 2. e.  Substantial Compliance
B. 2. f.   Substantial Compliance
B. 2. g.  Substantial Compliance
B. 2. h.  Substantial Compliance

B.2.a. Review, revise, and supplement its existing policies in order to implement a policy for the delivery of mental health services that includes a continuum of services, provides for necessary and appropriate mental health staff, includes a treatment plan for prisoners with serious mental illness, and collects data and contains mechanisms sufficient to measure whether care is being provided in a manner consistent with the Constitution.

Finding: Partial Compliance

Recommendation: Wellpath and OPSO have completed the majority of necessary policies including the use of restraints policies. Suggest revision and completion of incomplete policies/procedures regarding continuum of services for female prisoners and counseling services for specific groups identified in this Consent Judgment.

B.2.b. Ensure that treatment plans adequately address prisoners' serious mental health needs and that the treatment plans contain interventions specifically tailored to the prisoner's diagnoses and problems.

Finding: Partial Compliance



<u>Recommendation</u>: Continue very good progress on documentation in treatment plans at OJC. Provide documentation of additional training and quality management review of treatment plans at Hunt, including appropriate timeframes for treatment planning at Hunt consistent for acute care services and outpatients at OJC.

B.2.c. Provide group or individual therapy services by an appropriately licensed provider where necessary for prisoners with mental health needs.

Finding: Partial Compliance

<u>Recommendation</u>: Provide documentation of data and analysis of numbers and percentages of inmates at all levels of care in need of individual and/or group therapies and counseling, and numbers and percentages of individual and group services offered and received/completed for prisoners in need. Continue and expand impressive data on Disruption of Services forms and provide analysis of that data and corrective action plans, including staffing and space needs as necessary.

B.2.d. Ensure that mental health evaluations that are done as part of the disciplinary process include recommendations based on the prisoner's mental health status.

Finding: Non-compliance

<u>Recommendation:</u> Provide documentation that ensures mental health evaluations are done as part of the disciplinary process and include recommendations based on the prisoner's mental health status. Wellpath has begun to identify a process and needs to provide policy approved by OPSO regarding mental health participation in the disciplinary process, as well as necessary training for OPSO and Wellpath staff.

B.2.e. Ensure that prisoners receive psychotropic medications in a timely manner and that prisoners have proper diagnoses and/or indications for each psychotropic medication they receive.

Finding:  Substantial Compliance

<u>Recommendation:</u> Continue very good improvement demonstrated with the addition of Tulane psychiatric providers. Continue to provide documentation and analysis of data that inmates receive psychotropic medications in a timely manner and that inmates have proper diagnosis and/or indications for each psychotropic medication they receive, including particular emphasis on juveniles.

**Commented [WU22]:** The treatment plans meet the qualifications outlined in the consent judgement. The plans are also measured via our quality improvement process through use of a toolkit. In 2019, the sufficiency of treatment plans has remained steady at 100%, the timeliness of treatment plans is at 95%, and appropriateness of plans is at 100%. The treatment plans are also reviewed by a multi-disciplinary team on a weekly basis. All of this documentation is provided to the monitors as well as sample copies of the forms used.  Any training or training documents is not relevant under this section, and therefore is not an appropriate measure for this section.  The documentation listed under "recommendation" is not required under this section of the consent judgment, and therefore is not a valid measure.  Due to the high percentages attained in this sections, OPSO believes this section should be in substantial compliance.  OPSO the Monitors provide more detailed feedback stating exactly what is required for substantial compliance.

**Commented [WU23]:** The monitors have access to the group therapy schedule which is maintained on a daily basis. Notes regarding individual level of participation are recorded in patient charts. Attendance data is also provided to the monitors on a regular bases. A credentialing log is provided monthly to demonstrated that all services are provided by licensed and qualified professionals. Disruption data is reviewed with security every month. Corrective actions from these reviews have resulted in fewer interruptions. The documentation and analysis listed under "recommendation" is not required under this section of the consent judgment, and therefore is not a valid measure.  As OPSO is providing the required therapy services by a licensed provider, OPSO believes this sections should be in substantial compliance.  OPSO requests the Monitors provide more detailed feedback stating exactly why this section is in partial compliance and what is required for substantial compliance.



B.2.f. Ensure that psychotropic medications are administered in a clinically appropriate manner as to prevent misuse, overdose, theft, or violence related to the medication.

Finding: Substantial Compliance

B.2.g. Ensure that prescriptions for psychotropic medications are reviewed by a Qualified Mental Health Professional on a regular, timely basis and prisoners are properly monitored.

Finding: Substantial Compliance

<u>Recommendation:</u> Continue to provide documentation of data collection and analysis of psychotropic medication prescriptions.

B.2.h. Ensure that standards are established for the frequency of review and associated charting of psychotropic medication monitoring, including monitoring for metabolic effects of second generation psychotropic medications.

Finding: Substantial Compliance

<u>Recommendation:</u> Continue to provide documentation of data collection and analysis of psychotropic medication monitoring for metabolic effects of second-generation psychotropic medications. Timeliness of laboratory services and associated inmate refusals have improved.

B. 3. Findings:
B. 3. a.  Partial Compliance
B. 3. b.  Partial Compliance

B.3.a. OPSO shall develop and implement policies and procedures for prisoner counseling in the areas of general mental health/therapy, sexual-abuse counseling, and alcohol and drug counseling.  This should, at a minimum, include some provision for individual services.

Finding: Partial Compliance

<u>Recommendation:</u> Provide policies and procedures specifically for inmate counseling in the areas of general mental health/therapy, sexual abuse counseling, and alcohol and drug counseling, including some provisions for individual services.

> **Commented [WU24]:** These are covered in the Mental Health Services policy. This policy has been in place for a few years and has been provided to the monitors.  As this policy has been previously approved and provided, OPSO believes this section is in substantial compliance.  OPSO requests the Monitors provide more detailed feedback stating exactly what is required for substantial compliance.

B.3.b. Within 180 days of the Effective Date, and quarterly thereafter, report all prisoner counseling services to the Monitor, which should include:
(1)  the number of prisoners who report having participated in general mental health/therapy counseling at OPP;
(2)  the number of prisoners who report having participated in alcohol and drug counseling services at OPP;
(3)  the number of prisoners who report having participated in sexual-abuse counseling at OPP; and



(4)  the number of cases with an appropriately licensed practitioner and related one-to-one counseling at OPP.

Finding: Partial Compliance

Recommendation: Provide data and analysis for the numbers and percentages for inmates with needs for these specific services and numbers and percentages of inmates who receive these services. Compliance has been compromised by staffing deficiencies and lack of adequate space.

Commented [WU25]: All information required by the consent judgement is included in quarterly reports. Quarterly reports have been submitted consistently and timely.  Per this section, analysis is not required, only data submission.  The data and analysis listed under "Recommendation" is not required under the consent judgment, and therefore is not a valid measure. Furthermore, this section only lists the data required for the quarterly report.  Therefore any issue with staffing or space is not a valid measure under this section.  As the quarterly report with all required data was timely submitted to every monitor, OPSO believes this section is in substantial compliance.  Therefore, OPSO requests the Monitors review the submitted quarterly reports and amend this this language to reflect the current status of compliance.

B. 4. Findings:
B. 4. a.  Partial Compliance
B. 4. b.  Substantial Compliance
B. 4. c.  Partial Compliance
B. 4. d.  Partial Compliance
B. 4. e.  Partial Compliance
B. 4. f.  Substantial Compliance
B. 4. g.  Non-Compliance

B.4.a. OPSO shall ensure that all staff who supervise prisoners have the adequate knowledge, skill, and ability to address the needs of prisoners at risk for suicide.  Within 180 days of the Effective Date, OPSO shall review and revise its current suicide prevention training curriculum to include the following topics:
(1)  suicide prevention policies and procedures (as revised consistent with this Agreement);
(2)  analysis of facility environments and why they may contribute to suicidal behavior;
(3)  potential predisposing factors to suicide;
(4)  high-risk suicide periods;
(5)  warning signs and symptoms of suicidal behavior;
(6)  case studies of recent suicides and serious suicide attempts;
(7)  mock demonstrations regarding the proper response to a suicide attempt;
(8)  differentiating suicidal and self-injurious behavior; and
(9)  the proper use of emergency equipment.

Finding: Partial Compliance

Recommendation: Provide documentation of all staff who supervise prisoners have the adequate knowledge, skill, and ability to address the needs of inmates at risk for suicide. Improvement is noted, however prisoners on suicide precautions or watch continue to obtain contraband that can be used to harm themselves. Provide documentation the suicide prevention training curriculum includes all of the elements listed, and specifically to include (in addition to previously submitted documentation) elements (7) mock demonstrations regarding the proper response



to a suicide attempt, (8) differentiating suicidal and self-injurious behavior, and (9) the proper use of emergency equipment.

B.4.b. Ensure that all correctional, medical, and mental health staff are trained on the suicide screening instrument and the medical intake tool.

Finding: Substantial Compliance

Recommendation: Documentation provided indicates that 89% of correctional, and all medical, and mental health staff are trained on the suicide screening instrument and the medical intake tool.

B.4.c. Ensure that multi-disciplinary in-service training is completed annually by all correctional, medical, and mental health staff, to include training on updated policies, procedures, and techniques. The training will be reviewed and approved by the Monitor.

Finding: Partial Compliance

Recommendation: Continue to provide documentation that multidisciplinary in-service training has been completed annually for all current correctional, medical, and mental health staff, to include training on updated policies, procedures, and techniques.

B.4.d. Ensure that staff are trained in observing prisoners on suicide watch and step-down unit status.

Finding: Partial Compliance

Recommendation: Provide documentation that current staff are trained, specifically, in observing prisoners on suicide watch and step-down status. Prisoners on suicide watch continue to obtain contraband that can be used to harm themselves.

B.4.e. Ensure that all staff that have contact with prisoners are certified in cardiopulmonary resuscitation ("CPR").

Finding: Partial Compliance

Recommendation: Provide documentation that all current staff, (including OPSO and Wellpath) are certified in CPR.

Commented [WU26]: Required annual training has been completed. Monitors were provided with documentation for both Wellpath and OPSO showing proof of training. OPSO believes this section is in substantial compliance. OPSO requests the Monitors provide further explanation as to why this section remains in partial compliance and what exactly is needed for substantial compliance.

Commented [WU27]: All suicide watch training is up to date. Additionally, suicide watch training is an ongoing activity that is covered during staff meetings and daily roll call. All relevant training documentation has been submitted to Monitors. Any issues with contraband are not relevant under this section and are therefore not a valid measure here. Contraband is specifically discussed and graded in section IV.A.5.k. During this compliance tour, section IV.A.5.k was given a grade of substantial compliance. As all required training has been completed, OPSO believes this section should be in substantial compliance. OPSO requests that the Monitors provide more detailed feedback stating why this section remains in partial compliance and exactly what is required for substantial compliance.

Commented [WU28]: All staff who have contact with prisoners are certified in CPR. Per this section of the consent judgment, specific documentation is not required. During their last visit, the Monitors were made aware that CPR credentials for correctional staff were available on site. The Monitors acknowledged this and turned down an offer for Wellpath staff to reach out to the OPSO training division for documentation on CPR certification. As all necessary staff have the required certification, OPSO believes this section should be in substantial compliance. In reviewing past Monitor Reports, it is unclear why this section continues to remain in partial compliance. OPSO requests that the Monitors provide more detailed feedback stating exactly why this section is in partial compliance and what is required for substantial compliance.



B.4.f. Ensure that an emergency response bag, which includes a first aid kit and emergency rescue tool, is in close proximity to all housing units.  All  staff that has contact with prisoners shall know the location of this emergency response bag and be trained to use its contents.

Finding: Substantial Compliance

B.4.g. Randomly test five percent of relevant staff on an annual basis to determine their knowledge of suicide prevention policies.  The testing instrument and policies shall be approved by the Monitor.  The results of these assessments shall be evaluated to determine the need for changes in training practices.  The review and conclusions will be documented and provided to the Monitor.

Finding: Non-Compliance

Recommendation: Provide documentation of 5% of current relevant staff testing to determine their knowledge of suicide prevention policies, and evaluation of the results, review, and conclusions of the assessments to determine the need for changes in training practices. The last testing reported was in May 2018.

**Commented [WU29]:** Per this section of the consent judgment, testing is required once a year.  In 2018, this testing was conducted in May.  In 2019, this testing was conducted in November.  Therefore, simply because the training was not conducted during the most recent compliance period should not warrant this section being demoted from partial compliance to noncompliance. Furthermore, it is unclear why the previous testing was not adequate enough to receive a grade of substantial compliance.  In Report #10, the Monitors acknowledge that testing was completed, and documentation was submitted.  However, based on the one sentence of feedback that was provided, the Monitors have a grade of only partial compliance because "it was unclear if the 5% tested are currently on staff."  OPSO objects to this measure.  Testing was completed in May of 2018, but the Monitor Report was not published until March 2019. As turnover is inevitable, whether the same staff was employed during those two separate time periods is irrelevant.  OPSO believes this section should be in substantial compliance, as the required training has been completed in both 2018 and 2019. At a minimum, the grade of partial compliance should be carried over from the previous report, as the 2019 training had not yet been completed during the most recent compliance tour.  OPSO requests that rather than providing a recommendation, the Monitors provide more detailed feedback stating exactly what is required for substantial compliance.

B. 5. Findings:
B. 5. a.  Partial Compliance
B. 5. b.  Partial Compliance
B. 5. c.  Partial Compliance
B. 5. d.  Substantial Compliance
B. 5. e.  Partial Compliance
B. 5. f.  Substantial Compliance
B. 5. g.  Partial Compliance
B. 5. h.  Partial Compliance
B. 5. i.  Substantial Compliance
B. 5. j.  Partial Compliance
B. 5. k.  Partial Compliance

B.5.a. OPSO shall implement a policy to ensure that prisoners at risk of self-harm are identified, protected, and treated in a manner consistent with the Constitution.

Finding: Partial Compliance

Recommendation: Provide documentation of implementation of policy for utilization of suicide resistant cells and nonresistant cells (with direct observation), and treatment services provided to inmates at risk for self-harm. Inmates on suicide watch continue to be placed in non-suicide resistant cells without direct observation, even when beds are available at Hunt. Treatment services are very limited and inadequate for inmates on suicide watch because of staffing and space needs.



B.5.b. Ensure that suicide prevention procedures include provisions for constant direct supervision of current suicidal prisoners and close supervision of special needs prisoners with lower levels of risk (at a minimum, 15 minute checks). Correctional officers shall document their checks in a format that does not have pre-printed times.

Finding: Partial Compliance

<u>Recommendation:</u> Provide constant direct supervision for any prisoner placed in a non-resistant cell on suicide watch, and documentation. See B.5.a.

B.5.c. Ensure that prisoners on suicide watch are immediately searched and monitored with constant direct supervision until a Qualified Mental Health Professional conducts a suicide risk assessment, determines the degree of risk, and specifies the appropriate degree of supervision.

Finding: Partial Compliance

<u>Recommendation:</u> Provide documentation that demonstrates that inmates are immediately searched and monitored with constant direct supervision until a QMHP conducts a suicide risk assessment, determines the degree of risk, and specifies the appropriate degree of supervision. This paragraph requires collaboration and documentation by OPSO deputies and Wellpath QMHP's.

B.5.d. Ensure that all prisoners discharged from suicide precautions receive a follow-up assessment within three to eight working days after discharge, as clinically appropriate, in accordance with a treatment plan developed by a Qualified Mental Health Care Professional. Upon discharge, the Qualified Mental Health Care Professional shall conduct a documented in-person assessment regarding the clinically appropriate follow-up intervals.

Finding: Substantial Compliance

<u>Recommendation:</u> Wellpath staff report they have been denied access to inmates for follow-up during lockdowns. This should not occur and recommend corrective action.

B.5.e. Implement a step-down program providing clinically appropriate transition for prisoners discharged from suicide precautions.

Finding: Partial Compliance

<u>Recommendation:</u> The placements for male inmates in a true step-down/residential unit and program have continued, with the necessary exclusivity of an identified mentally ill population, and the programming is not yet sufficient, although



improved, because of inadequate staffing and space. Similar services and housing do not currently exist for female inmates. Recommend continued vigilance in developing these programs.

B.5.f. Develop and implement policies and procedures for suicide precautions that set forth the conditions of the watch, incorporating a requirement of an individualized clinical determination of allowable clothing, property, and utensils.  These conditions shall be altered only on the written instruction of a Qualified Mental Health Professional, except under emergency circumstances or when security considerations require.

Finding: Partial Compliance

Recommendation: Policy is in place. Provide documentation of implementation of policy regarding individualized determinations of the conditions of watch at OJC (especially for suicide watches/direct observation in non-resistant cells), and at Hunt.

B.5.g. Ensure that cells designated by OPSO for housing suicidal prisoners are retrofitted to render them suicide-resistant (e.g., eliminating bed frames/holes, sprinkler heads, water faucet lips, and unshielded lighting or electrical sockets).

Finding: Partial Compliance

Recommendation: OPSO reports 13 suicide resistant cells for OJC and 3 suicide resistant cells at Hunt. Facility staff utilize non-suicide resistant cells at both facilities for overflow. When overflow cells are utilized, it is strongly recommended the inmates in those cells be placed on direct constant observation to best provide for their safety.

B.5.h. Ensure that every suicide or serious suicide attempt is investigated by appropriate mental health and correctional staff, and that the results of the investigation are provided to the Sheriff and the Monitor.

Finding: Partial Compliance

Recommendation: Continue to expand Morbidity and Mortality reviews, including aggregation of data, self-critical analysis and corrective action plans.

Commented [WU30]: Both OPSO and Wellpath investigate every suicide and suicide attempt as required. OPSO continues to be in substantial compliance under section VIII.B.  Additionally, Monitors receive a daily update of every incident reported in the jail.  All investigation results are also forwarded to the Monitors. While not required by the consent judgment, OSPO and Wellpath continue to meet monthly for the Morbidity and Mortality reviews.  Per this section of the consent judgment, only an investigation report is required.  Any "aggregation of data, self-critical analysis, or corrective action" plans are not required by the consent judgment, and therefore are not a valid measure of this section. However, Wellpath did create a Morbidity Analysis that includes but is not limited to data on methods, contraband, and suicide watch status. This analysis was provided to the Monitors.  As all requirements of this section are being met, OPSO believes this section should be in substantial compliance.  OPSO requests that the Monitors provide more detailed feedback stating why this section remains in partial compliance and exactly what is required for substantial compliance.

B.5.i. Direct observation orders for inmates placed on suicide watch shall be individualized by the ordering clinician based upon the clinical needs of each inmate, and shall not be more restrictive than is deemed necessary by the ordering clinician to ensure the safety and well being of the inmate.

Finding: Substantial Compliance



B.5.j. Provide the Monitor a periodic report on suicide and self-harm at the Facility.  These periodic reports shall be provided to the monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement.  The report will include the following:
    (1)  all suicides;
    (2)  all serious suicide or self-harm attempts; and
    (3)  all uses of restraints to respond to or prevent a suicide attempt.

Finding: Partial Compliance

Recommendation: OPSO and Wellpath provide reports on suicides, suicide attempts and self-harm, however the numbers differ significantly. Provide documentation for each category, with resolution of inconsistencies based on review and discussion in the bi-annual reports. Use of the restraint chair was not provided in documents and did not follow policy (single episode).

B.5.k. Assess the periodic report to determine whether prisoners are being appropriately identified for risk of self-harm, protected, and treated.  Based on this assessment, OPSO shall document recommended changes to policies and procedures and provide these to the Monitor.

Finding: Partial Compliance

Recommendation: Provide an assessment of the periodic reports required in B.5.j., above. Numbers were provided for #1 and #2 above, not #3. The assessment should include not only the reported numbers but also any recommended changes to policies and procedures to address identification, protection, and treatment.

B. 6. Findings:
B. 6. a.  Partial Compliance
B. 6. b.  Substantial Compliance
B. 6. c.  Non-Compliance
B. 6. d.  Substantial Compliance
B. 6. e.  Non-Compliance
B. 6. f.  Non-Compliance
B. 6. g.  Non-Compliance

B.6.a. OPSO shall prevent the unnecessary or excessive use of physical or chemical restraints on prisoners with mental illness.

Finding: Partial Compliance

**Commented [AK31]:** This section specifically addresses the semiannual report that was timely submitted. The semiannual report reflecting all data for this compliance period was submitted on 8/15/19 at 12:05pm, in accordance with the previously agreed upon schedule. All requested data was provided, including a discussion of the use of the restraint chair (See pg. 10 of the Semiannual Report).  The use of the restraint chair in this single episode was ordered by Director Hodge in his authority as the Independent Compliance Director.  As this section only requires data submission, not analysis, this section should be in substantial compliance. Therefore, OPSO requests the Monitors review the previously submitted semiannual report and amend this this language to better fit the current status of compliance.

**Commented [AK32]:** The data for #3, as well as the recommendation of an OPSO restraint policy, was timely submitted to the Monitors in the Semiannual Report.  The semiannual report reflecting all data for this compliance period was submitted on 8/15/19 at 12:05pm, in accordance with the previously agreed upon schedule. This report included recommendations for changes to policies and procedures (see pg. 10 of the Semiannual Report).  Additionally, OPSO has acted on this recommendation, which will be discussed in the upcoming Monitor visit.  As discussed above, this single incident using a restraint chair was directly ordered by Director Hodge in his capacity as Independent Compliance Director.   No restraints were ordered to be used during this time period by medical staff. As all requirements for this section have been met, OPSO believes this section should be in substantial compliance. OPSO requests the Monitors review the previously submitted semiannual report and amend this this language to better fit the current status of compliance.



Recommendation: Wellpath has begun to provide documentation/information regarding use of de-escalation techniques at OJC and Hunt. OPSO and Hunt need to report all uses of physical and chemical restraint.

B.6.b. Maintain comprehensive policies and procedures for the use of restraints for prisoners with mental illness consistent with the Constitution.

Finding: Substantial Compliance

Recommendation: A comprehensive policy by OPSO compatible with Wellpath policy for use of restraints has been completed.

B.6.c. Ensure that approval by a Qualified Medical or Mental Health Professional is received and documented prior to the use of restraints on prisoners living with mental illness or requiring suicide precautions.

Finding: Non-compliance

Recommendation: Define and document process of indications and/or notifications from OPSO regarding possible need or use of restraints. Single use of restraint chair for inmate reporting intent to harm self was not approved by Qualified Medical or Mental Health Professional.

B.6.d. Ensure that restrained prisoners with mental illnesses are monitored at least every 15 minutes by Custody Staff to assess their physical condition.

Finding: Substantial Compliance

Recommendation: Provide documentation of monitoring as necessary; very strongly suggest monitoring should be constant rather than 15 minutes. Single use of restraint chair was properly monitored.

B.6.e. Ensure that Qualified Medical or Mental Health Staff document the use of restraints, including the basis for and duration of the use of restraints and the performance and results of welfare checks on restrained prisoners.

Finding: Non-compliance

**Commented [AK33]:** In Report #10, the Monitors "recommended" that OPSO "provide documentation/information regarding use of de-escalation techniques at OJC and Hunt" (Monitor Report #10, pg. 78). Here, the Monitors admit that OPSO is now providing the requested documentation. However, the Monitors have still graded this section as partial compliance because "OPSO and Hunt need to report all uses of physical and chemical restraint." OPSO objects to this being used as a measure, as it is not required under this section of the consent judgement and therefore is not a valid measure. Furthermore, all restraint use for suicide prevention data is required to be sent in the semiannual report under section IV.B.5.j. During this compliance period, neither physical nor chemical restraints were utilized by Medical or Mental Health staff. There was a single incident where restraints were ordered to be used for a non-medical purpose by Director Hodge in his capacity as Independent Compliance Director. As discussed above, this was reported in the Semiannual report, per IV.B.5.j. As this section only requires that prevention of unnecessary or excessive use of restraints, OPSO believes this section should be in substantial compliance. OPSO requests that the Monitors provide more detailed feedback stating why this section remains in partial compliance and exactly what is required for substantial compliance.

**Commented [AK34]:** As discussed above, the single incident of restraint chair use during this compliance period was directly ordered by Director Hodge in his capacity as Independent Compliance Director. As discussed in the Semiannual Report, clinical or therapeutic restraints are not used by Wellpath per policy, therefore no documentation is required to be submitted. OPSO requests that the Monitors provide more detailed feedback stating exactly what is required for substantial compliance.


Orleans Parish
JAIL MONITORS

<u>Recommendation:</u> Provide documentation of use of restraints as necessary. See

B.6.c.

B.6.f. Provide the Monitor a periodic report of restraint use at the Facility.  These periodic reports shall be provided to the monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement.  Each report shall include:
> (1) A list of prisoners whom were restrained;
> (2) A list of any self-injurious behavior observed or discovered while restrained; and
> (3) A list of any prisoners whom were placed in restraints on three or more occasions in a thirty (30) day period or whom were kept in restraints for a period exceeding twenty-four (24) hours.

Finding: Non-compliance

<u>Recommendation:</u> OPSO reports one use of clinical or therapeutic restraints. Supporting documentation was not provided.

**Commented [WU35]:** As discussed above, the single incident of restraint chair use during this compliance period was directly ordered by Director Hodge in his capacity as Independent Compliance Director.  In section IV.B.6.d, the Monitors state that the restrained inmate was "properly monitored" based on the documentation reviewed.  It is unclear how section IV.B.6.d is in substantial compliance, but this section is in noncompliance.  As the Monitors refer to section IV.B.6.c., please refer to those comments as well.  As the Monitors specifically state that the inmate was properly monitored, the documentation must have been adequate.  Furthermore, this data was submitted in the Semiannual Report as required.  Therefore, OPSO believes this section should be in substantial compliance.

**Commented [AK36]:** This section lists the required data to be submitted in the Semiannual Report.  Specifically, it requires only three lists.  Any other "supporting documentation" is not required by this section.  This required information was timely submitted in the Semiannual Report.   The semiannual report reflecting all data for this compliance period was submitted on 8/15/19 at 12:05pm, in accordance with the previously agreed upon schedule.  As stated above, no clinical or therapeutic restraints were used during this compliance period by medical staff.  Per policy (and as discussed in the Semiannual Report) Wellpath does not use clinical or therapeutic restraints.  A singular use of restraints was ordered by Director Hodge in his capacity as Independent Compliance Director.  This incident was reported in the Semiannual Report as required.  As all required data was timely sent in the Semiannual Report, OPSO believes this section is in substantial compliance.  Therefore, OPSO requests the Monitors review the submitted semiannual report and amend this this language to better fit the current status of compliance.



B.6.g. Assess the periodic report to determine whether restraints are being used appropriately on prisoners with mental illness.  Based on this assessment, OPSO shall document recommended changes to policies and procedures and provide these to the Monitor.

Finding: Non-compliance

Recommendation: Provide required report and assessment with supporting documentation that clinical or therapeutic restraints have been used appropriately on prisoners with mental illness.

B. 7. Findings:
B. 7. a.  Partial Compliance
B. 7. b.  Substantial Compliance
B. 7. c.  Substantial Compliance
B. 7. d.  Partial Compliance

7.a. OPSO shall ensure that all staff who supervise prisoners have the knowledge, skills, and abilities to identify and respond to detoxifying prisoners.  Within 180 days of the Effective Date, OPSO shall institute an annual in-service detoxification training program for Qualified Medical and Mental Health Staff and for correctional staff.  The detoxification training program shall include:
(1)     annual staff training on alcohol and drug abuse withdrawal;
(2)     training of Qualified Medical and Mental Health Staff on treatment of alcohol and drug abuse conducted by the Chief Medical Officer or his or her delegate;
(3)     oversight of the training of correctional staff, including booking and housing unit officers, on the policies and procedures of the detoxification unit, by the Chief Medical Officer or his or her delegate;
(4)     training on drug and alcohol withdrawal by Qualified Medical and Mental Health Staff;
(5)     training of Qualified Medical and Mental Health Staff in providing prisoners with timely access to a Qualified Mental Health Professional, including psychiatrists, as clinically appropriate; and
(6)     training of Qualified Medical and Mental Health Staff on the use and treatment of withdrawals, where medically appropriate.

Finding:  Partial compliance

Qualified Medical and Mental Health Staff are trained regarding care for patients who have orders for monitoring and treatment of withdrawal.  Some of custody staff are trained.

Recommendation: Increase CO training to close to 100%.  Develop program oversight and evaluation.

7.b. Provide medical screenings to determine the degree of risk for potentially life-threatening withdrawal from alcohol, benzodiazepines, and other substances, in accordance with Appendix B.

Finding: Substantial Compliance



**Commented [AK37]:** This analysis was provided in the Semiannual Report that was timely submitted.  The semiannual report reflecting all data for this compliance period was submitted on 8/15/19 at 12:05pm, in accordance with the previously agreed upon schedule. The only required data submission is a list of prisoners, which was provided.  Any other "supporting documentation" is not required by this section.  As stated above, clinical or therapeutic restraints were not used during this compliance period by medical staff.  The Semiannual Report included recommendations for changes to policies and procedures (see pg. 11 of the Semiannual Report).  As all requirements of this section have been met, OPSO believes this section should be in substantial compliance.  Therefore, OPSO requests the Monitors review the submitted semiannual report and amend this this language to better fit the current status of compliance.

**Commented [WU38]:** OPSO officers and all new recruits receive training on detox and withdrawal which comes close to 100%. Training material, attendance, and test results were provided to the monitors. All required topics are covered within the training.  As all requirements of this section are met, OPSO believes this section is in substantial compliance.  OPSO requests that the Monitors provide more detailed feedback stating why this section remains in partial compliance and exactly what is required for substantial compliance.

Incoming inmates are screened for withdrawal, in accordance with Appendix B, Wellpath quarterly performance measurement demonstrates sustained compliance.  Monitors find Wellpath measurement reliable.

7.c. Ensure that the nursing staff complete assessments of prisoners in detoxification on an individualized schedule, ordered by a Qualified Medical or Mental Health Professional, as clinically appropriate, to include observations and vital signs, including blood pressure.

Finding: Substantial Compliance

Wellpath quarterly performance measurement and Monitor's reliability audits demonstrate that nursing care for patients on the detox protocol has improved, however, there are lags to first dose of vital medication.

Recommendation:  Enforce timely assessments and medication for patients who are on the detox protocol.

7.d. Annually, conduct a review of whether the detoxification training program has been effective in identifying concerns regarding policy, training, or the proper identification of and response to detoxifying prisoners. OPSO will document this review and provide its conclusions to the Monitor.

Finding:  Partial Compliance

An annual review has not been conducted during the past year, according to Wellpath.

Recommendation: Conduct annual review of the detoxification training and implementation and report on effectiveness to the monitors.

B. 8. Findings:
B. 8. a.  Substantial Compliance
B. 8. b.  Substantial Compliance

8.a. OPSO shall ensure that medical and mental health staffing is sufficient to provide adequate care for prisoners' serious medical and mental health needs, fulfill constitutional mandates and the terms of this Agreement, and allow for the adequate operation of the Facility, consistent with constitutional standards.

Finding: Substantial Compliance

Medical and mental health staffing is sufficient for most care functions. However, there is insufficient funding and MH staffing for groups and special programs.  A proposal has been submitted for these staff.

**Commented [WU39]:** An annual review covering 2018 was submitted. As 2019 is still in progress, an annual report has not been submitted. This report will be submitted in March 2020, as per the previously agreed upon schedule.  During the last visit, the Monitors requested to see the detoxification evaluation and stated they would change this from partial to substantial upon receipt. The evaluation was provided to the Monitors at that time.  OPSO requests the Monitors review the previously submitted annual report and amend this language to better fit the current status of compliance.



<u>Recommendation</u>:  Fund and authorize MH staff for special programs, as per Wellpath proposal.  Cross-train staff for grievance review, response, and analysis. OPSO to ensure sufficient custody staffing for efficient and timely health care operations.

8.b. Within 90 days of the Effective Date, OPSO shall conduct a comprehensive staffing plan and/or analysis to determine the medical and mental health staffing levels necessary to provide adequate care for prisoners' mental health needs and to carry out the requirements of this Agreement.  Upon completion of the staffing plan and/or analysis, OPSO shall provide its findings to the Monitor, SPLC, and DOJ for review.  The Monitor, SPLC, and DOJ will have 60 days to raise any objections and recommend revisions to the staffing plan.

Finding: Substantial Compliance

B. 9. Findings:
B. 9. a.  Partial Compliance
B. 9. b.  Partial Compliance
B. 9. c.  Partial Compliance
B. 9. d.  Partial Compliance
B. 9. e.  Partial Compliance
B. 9. f.  Partial Compliance

B.9.a. OPSO shall develop, implement, and maintain a system to ensure that trends and incidents involving avoidable suicides and self-injurious behavior are identified and corrected in a timely manner.  Within 90 days of the Effective Date, OPSO shall develop and implement a risk management system that identifies levels of risk for suicide and self-injurious behavior and requires intervention at the individual and system levels to prevent or minimize harm to prisoners, based on the triggers and thresholds set forth in Appendix B.

Finding: Partial Compliance

<u>Recommendation</u>:  Data collection has improved; analysis of trends and incidents involving avoidable suicides and self-injurious behaviors to determine required interventions at the individual and system levels to prevent or minimize harm to inmates requires further development.

**Commented [WU40]:** Items covered in Appendix B are addressed on all assessments relating to Mental Health. Patients are classified as low, intermediate, or high risk depending on assessment outcomes. This information is captured in the Suicide Watch Assessment Report as well as the Suicide Watch log, both of which have been provided to the Monitors. This is also reflected in the Daily Whiteboard Report. Due to patient privacy issues, we are unable to provide the Whiteboard report via email. OPSO requests that rather than providing a recommendation, the Monitors provide more detailed feedback stating exactly what is required for substantial compliance.

B.9.b. The risk management system shall include the following processes to supplement the mental health screening and assessment processes:  incident reporting, data collection, and data aggregation to capture sufficient information to formulate a reliable risk assessment at the individual and system levels; identification of at-risk prisoners in need of clinical treatment or assessment by the Interdisciplinary Team or the Mental Health Committee; and development and implementation of interventions that minimize and prevent harm in response to identified patterns and trends.

Finding: Partial Compliance



<u>Recommendation</u>: Provide documentation of analysis of risk management system processes including the listed criteria, with more attention to data aggregation and analysis, and development and implementation of interventions that minimize and prevent harm in response to identified patterns and trends. The risk assessments at the individual level by the Interdisciplinary Treatment Team and at the systems level by the Mental Health Committee should include analysis of current practices such as the use of non-suicide resistant cells and appropriateness of transfers to Hunt, for example.

B.9.c. OPSO shall develop and implement an Interdisciplinary Team, which utilizes intake screening, health assessment, and triggering event information for formulating treatment plans.  The Interdisciplinary Team shall:
   (1)  include the Medical and Nursing directors, one or more members of the psychiatry staff, counseling staff, social services staff, and security staff, and other members as clinical circumstances dictate;
   (2)  conduct interdisciplinary treatment rounds, on a weekly basis, during which targeted patients are reviewed based upon screening and assessment factors, as well as triggering events; and
   (3)  provide individualized treatment plans based, in part, on screening and assessment factors, to all mental health patients seen by various providers.

Finding: Partial Compliance

<u>Recommendation</u>: Provide documentation of completion of mental health Interdisciplinary treatment team meetings and rounds, and provision of adequate and timely individualized treatment plans to all mental health patients seen by various providers at OJC and Hunt.

**Commented [WU41]:** MDT meetings that are led by psychiatric providers occur on a weekly basis. Agendas and attendance sheets are available on Share Point while documentation on patients who were discussed are added to the patients' charts. Monitors may view the minutes in person on site as they do with the Morbidity / Mortality reviews.  As all requirements of this section are being met, OPSO believes this section is in substantial compliance.  OPSO requests that the Monitors provide more detailed feedback stating exactly what is required for substantial compliance.

B.9.d. OPSO shall develop and implement a Mental Health Review Committee that will, on a monthly basis, review mental health statistics including, but not limited to, risk management triggers and trends at both the individual and system levels.  The Mental Health Review Committee shall:
   (1)  include the Medical and Nursing Director, one or more members of the psychiatry staff and social services staff, the Health Services Administrator, the Warden of the facility housing the Acute Psychiatric Unit, and the Risk Manager.
   (2)  identify at-risk patients in need of mental health case management who may require intervention from and referral to the Interdisciplinary Team, the OPSO administration, or other providers.
   (3)  conduct department-wide analyses and validation of both the mental health and self-harm screening and assessment processes and tools, review the quality of screenings and assessments and the timeliness and appropriateness of care provided, and make recommendations on changes and corrective actions;
   (4)  analyze individual and aggregate mental health data and identify trends and triggers that indicate risk of harm;
   (5)  review data on mental health appointments, including the number of appointments and wait times before care is received; and



(6)  review policies, training, and staffing and recommend changes, supplemental training, or corrective actions.

Finding: Partial Compliance

<u>Recommendation</u>: Provide documentation of Mental Health Review Committee meetings addressing all of the listed elements, including analysis of the data collected.

**Commented [AK42]:** The Mental Health Review Committee meeting minutes are included in the monthly MAC meeting data submission to the Monitors. OPSO requests the monitors provide more detail as to why this section remains in partial compliance and exactly what is needed for substantial compliance.

B.9.e. OPSO shall develop and implement a Quality Improvement and Morbidity and Mortality Review Committee that will review, on at least a quarterly basis, risk management triggers and trends and quality improvement reports in order to improve care on a Jail-wide basis.

(1)      The Quality Improvement Committee shall include the Medical Director, the Director of Psychiatry, the Chief Deputy, the Risk Manager, and the Director of Training.  The Quality Improvement Committee shall review and analyze activities and conclusions of the Mental Health Review Committee and pursue Jail-wide corrective actions.

(2)      The Quality Improvement Committee shall:

i.   monitor all risk management activities of the facilities through the review of risk data, identification of individual and systemic trends, and recommendation and monitored implementation of investigation or corrective action; and

ii.  generate reports of risk data analyzed and corrective actions taken.

Finding: Partial Compliance

The medical and psychiatric staff report a large number of obstacles to access because of custody staff.  There are insufficient data to support these credible anecdotes.  Answers to medical and mental health grievances are unresponsive, for the most part.  The management team does not appear to fully utilize data that derives from clinical performance measurement.

**Commented [WU43]:** Per this section of the consent judgment, the required committee has been formed. While only required to meet quarterly, this committee meets on a monthly basis.  All meetings are documented. CQI Nurse conducts quality studies utilizing a set of toolkits. The results are immediately made available to the monitors. The monitors then perform a quality study on the results. At the time of the last monitor visit, Wellpath had scored 91% on the reliability study. Results of these studies are also discussed in depth at monthly MAC meetings. All required data has been consistently provided to the monitors.  OPSO objects to grievance responses being used as a measure here. Grievances are specifically measured and graded in section IV.A.11, and therefore should not be graded here.  OPSO also objects to the language "The medical and psychiatric staff report a large number of obstacles to access because of custody staff.  There are insufficient data to support these credible anecdotes" as this is not a valid measure for this section.   As all the requirements of this section are being met, OPSO believes this section is in substantial compliance.  OPSO requests the monitors provide more detail as to why this section remains in partial compliance and exactly what is needed for substantial compliance.

<u>Recommendation</u>:  Incorporate performance data, analysis, and trending into QI committee minutes.  Improve analysis and corrective action plans generally, with specificity for root cause analysis, process design, and effective improvement strategies.  Continue to improve reliability of clinical performance measurement.  Ensure that the Chief Deputy (or equivalent) and Director of Training participate in meetings, with documentation.  Collect and report reliable data on visit disruptions due to the unavailability of custody staff for escort and/or transportation.  Improve responsiveness of answers to grievances.  Utilize clinical performance data for management purposes.



B.9.f. OPSO shall review mortality and morbidity reports quarterly to determine whether the risk management system is ensuring compliance with the terms of this Agreement. OPSO shall make recommendations regarding the risk management system or other necessary changes in policy based on this review. The review and recommendations will be documented and provided to the Monitor.

Finding:        Partial compliance

The mortality and morbidity reviews are perfunctory and lack self-critical analysis. Clinical analyses are incomplete. Psychiatrists are remarkably uninvolved in morbidity reviews for patients with suicide attempts. Corrective action plans are not well-documented and there is no annual review of findings.

<u>Recommendation</u>: Enhance analysis and problem identification in morbidity and mortality reviews. Improve corrective action plans generally, with specificity for root cause analysis, process design, and effective improvement strategies. Include psychiatric physicians in all mortality and morbidity reviews.



**C.    Medical Care**

OPSO shall ensure constitutionally adequate treatment of prisoners' medical needs.  OPSO shall prevent unnecessary risks to prisoners and ensure proper medication administration practices.  OPSO shall assess on an annual or more frequent basis whether the medical services at OPP comply with the Constitution.  At a minimum, OPSO shall:

1. Quality Managing of Medication Administration:

     a.     Within 120 days of the Effective Date, ensure that medical and mental health staff are trained on proper medication administration practices, including appropriately labeling containers and contemporaneously recording medication administration;

     b.     Ensure that physicians provide a systematic review of the use of medication to ensure that each prisoner's prescribed regimen continues to be appropriate and effective for his or her condition;

     c.     Maintain medication administration protocols that provide adequate direction on how to take medications, describe the names of the medications, how frequently to take medications, and identify how prisoners taking such medications are monitored; an

     d.     Maintain medication administration protocols that prevent misuse, overdose, theft, or violence related to medication.

C. 1. Findings:
C. 1 .a.  Substantial compliance
C. 1 .b.  Partial compliance
C. 1. c.  Substantial compliance
C. 1. d.  Substantial compliance

Wellpath continues to have substantial lags to laboratory testing, chronic care visits and medication.  The lags to laboratory testing and to chronic care visits leads to lags to medication.

<u>Recommendation:</u>  Continue to improve performance on conformance to chronic disease protocols for medical and psychiatric conditions.  Reduce lags to and lapses in medication.



2.a. Provide the Monitor a periodic report on health care at the Facility.  These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement.  Each report will include:

     (1)     number of prisoners transferred to the emergency room for medical treatment related to medication errors;

     (2)     number of prisoners taken to the infirmary for non-emergency treatment related to medication errors;

     (3)     number of prisoners prescribed psychotropic medications;

     (4)     number of prisoners prescribed "keep on person" medications; and

     (5)     occurrences of medication variances.

2.b. Review the periodic health care delivery reports to determine whether the medication administration protocols and requirements of this Agreement are followed.  OPSO shall make recommendations regarding the medication administration process, or other necessary changes in policy, based on this review.  The review and recommendations will be documented and provided to the Monitor.

C. 2. Findings:
C. 2. a.  Partial Compliance
C. 2. b.  Partial Compliance

Periodic reports have been sporadic.  There is no indication that Wellpath has used data to improve timely access to care.

C. 2. a. <u>Recommendation</u>: Provide reports every six months.

C. 2. b. <u>Recommendation</u>: Review reports, once written, and make recommendations.

**Commented [AK44]:** This section lists all of the requirements for the semiannual report, which is timely sent every six months.  The semiannual report reflecting all data for this compliance period was submitted on 8/15/19 at 12:05pm, in accordance with the previously agreed upon schedule.  OPSO objects to the misleading language "Periodic reports have been sporadic" as reports are only required every six months, as per the previously agreed upon schedule, and therefore are periodic by design.  Furthermore, all required data and analysis was provided in the Semiannual Report (see pg. 11-12).  As all requirements have been met, OPSO believes this section is in substantial compliance.  Therefore, OPSO requests the Monitors review the previously submitted semiannual report and that this this language be removed or modified to better fit the current status of compliance.

3.a. OPSO shall notify Qualified Medical or Mental Health staff regarding the  release of prisoners with serious medical and/or mental health needs from OPSO custody, as soon as such information is available.
3.b. When Qualified Medical or Mental Health staff are notified of the release of prisoners with serious medical and/or mental health needs from OPSO custody, OPSO shall provide these prisoners with at least a seven-day supply of appropriate prescription medication, unless a different amount is necessary and medically appropriate to serve as a bridge until prisoners can reasonably arrange for continuity of care in the community.
3.c. For all other prisoners with serious medical and/or mental health needs who are released from OPSO custody without advance notice, OPSO shall provide the prisoner a prescription for his or her medications, printed instructions regarding prescription medications, and resources indicating where prescriptions may be filled in the community.
3.d. For prisoners who are being transferred to another facility, OPSO shall prepare and send with a transferring prisoner, a transition summary detailing major health problems and listing current medications and dosages, as well as medication history while at the Facility. OPSO shall also supply sufficient medication for the period of transit for prisoners who are being transferred to another correctional facility or other institution, in the amount required by the receiving agency.

C. 3. Findings:
C. 3. a. Partial Compliance
C. 3. b. Partial Compliance
C. 3. c. Partial Compliance
C. 3. d. Substantial compliance



The proportion of patients with serious needs reached is increasing, yet the total numbers of patients remains very low.  Once identified, the patients are receiving either a supply or a prescription that can be filled at no cost.  Wellpath is collecting data, but these data are unreliable.  Transfer information and medication appears to be working well.

C. 3. a.- Recommendation: Improve notifications.

C. 3. b. <u>Recommendations:</u>  Build on recent progress to increase numbers.  Continue to counsel patients face-to-face.

C. 3. c. Comment:  If there is no notice, it is not possible to provide prescriptions.  Partial is achieved through pre-release notification to patients.

## IV. D. Sanitation and Environmental Conditions

Introduction

This report summarizes the compliance findings for the Sanitation, Environmental Conditions and Fire and Life Safety provisions of the Consent Judgment. The findings are based both on the Monitor's tour conducted September 16-19, 2019 and review of materials provided prior to the on-site work.

The Monitor toured inmate housing units in the Orleans Justice Center (OJC), the Temporary Detention Center (TDC), and the Kitchen/Warehouse/Central Plant. The Monitor spoke with inmates, deputies, and supervisors.

Since the previous tour in January 2019, additional progress in the area of sanitation and environmental conditions was noted.

- Consistent documentation indicating a regular cleaning schedule was being followed.
- Establishing and implementing a process to provide timely notification to the Sanitarian of incidents involving biohazard spills and use of biohazard cleanup kits; and
- Improving sanitation, reduced clutter in cells and dayrooms in most the housing units observed, and fewer obstructed HVAC supply/return grills in inmate housing areas.

## V. D. 1. Sanitation and Environmental Conditions



D. 1. Findings:
D. 1. a.  Partial Compliance
D. 1. b.  Substantial Compliance
D. 1. c.  Substantial Compliance
D. 1. d.  Substantial Compliance
D. 1. e.  Substantial Compliance
D. 1. f.  Substantial Compliance
D. 1. g.  Substantial Compliance
D. 1. h.  Partial Compliance

IV. D. 1. a. OPSO shall provide oversight and supervision of routine cleaning of housing units, showers, and medical areas. Such oversight and supervision will include meaningful inspection processes and documentation, as well as establish routine cleaning requirements for toilets, showers, and housing units to be documented at least once a week but to occur more frequently.

Finding: Partial Compliance

Observations:

OPSO provided a cleaning schedule/supervisor inspection check list that identifies the frequency of housekeeping, by area, for both OJC and TDC. Additionally, OPSO provided documentation of area specific cleaning schedules (housing unit showers) implemented since the last inspection tour.

OPSO provided substantial and improved documentation of monthly housing unit inspections performed by the Environmental Officer in addition to daily/weekly inspections by security staff. While the monitor's observations of overall unit and cell cleanliness were noted to have improved since the last inspection, the monthly inspection reports continue to note cleanliness issues primarily in unit showers and individual cells. Typical notations included floors/walls, lavatories, trash/excess clutter, and obstructed cell vents. The Monitor noted similar issues during the inspection, primarily in two high security units (lockdown)—this was also noted during the previous inspection and continues to be a challenge with certain inmate populations.

The documentation and observed conditions throughout the housing units at the time of the inspection indicate that the ability of the Sanitarian and Environmental Officer to maintain regular cleaning schedules has continued to improve since the last inspection. The Sanitarian reported that the staffing issue for the section has improved. The last Staffing Differential report submitted the month of June indicated that, while the Sanitation

Commented [AK45]: While OPSO continues to work with inmates to achieve higher cleanliness levels, OPSO believes these two paragraphs show OPSO is meeting the requirements of this section. This section does not require the elimination of all cleanliness issues, but rather routine cleaning and documentation. OPSO believes it is meeting all the requirements set forth in this section, and therefore believes it is in substantial compliance. Furthermore, OPSO believes that the concerns listed here are better measured in section IV.A.5.j and should not be measured here.



section was still short two deputies, two additional civilian workers and a CMT were assigned to the section.

Grievances (4) and inmate reports of inadequate or missing cleaning supplies has dropped substantially since the last inspection. The Monitor observed supplies and equipment in the housing units to be in sufficient quantities and in serviceable condition on the day of the inspection. The Monitor found no chemicals in inmate housing areas or storage locations that were not on the authorized chemical list nor without a corresponding Material Safety Data Sheet present. Again, much improved since the previous inspection. No cleaning supply closets in the housing units were found unsecured during the inspection indicating an improvement in staff supervision of these areas.

As previously noted as being integral to sanitation, infection control and disease prevention is the regular provision of clean inmate clothing and bedding and appropriate inventory of these supplies. The Monitor observed the inmate clothing storage areas to be inadequately stocked at the time of the inspection. The Monitor was advised by the Sanitarian that OPSO was maintaining an adequate supply of inmate clothing but that the laundry vendor was behind in the processing and return of the inmate clothing and bedding.  This issue was noted during the two previous inspections and needs to be remedied. The OPSO laundry exchange plan calls for inmate uniforms to be exchanged twice weekly. The Monitor observed markedly fewer instances of inmates having what appeared to be excess uniform items indicating staff  have improved in this area of supervision and control since the last inspection.

Inmates' personal laundry (e.g. underwear, shorts) continues to be left to the inmates to wash and dry, using machines located in each housing unit. The Monitor observed the majority of the clothes dryers located in OJC's inmate housing units to be in generally serviceable condition although several had exhaust lines that were effectively non-functioning due to being crushed against the wall, torn or as noted in two units, missing altogether. The Monitor was advised by the deputy in unit 4B that the dryer had been out of service approximately 5 weeks, but a work order was pending. The dryer in unit 4A had been completely removed, and according to inmates present, had been gone "about 4 months". No other provisions had been made for the inmates to dry their personal items they were required to wash themselves in this particular housing unit. The Monitor



DRAFT COMPLIANCE REPORT # 11                                    81

inquired with the Maintenance Supervisor regarding this issue and was advised that "security staff" along with Maintenance had decided to remove the dryer completely due to repeated vandalism. After further inquiry with management staff, the Monitor was advised that the dryer removal was a result of a miscommunication and the dryer was returned prior to the end of the inspection tour.

As noted in previous Compliance Reports, several dryers remain in dangerous condition:

- At least two dryers had the flexible vent tubing entirely missing.
- Several dryers were pushed against the wall rendering the exhaust tubing ineffective and a potential fire hazard due to lint accumulation.
- The dryer in one dorm unit was being used by inmates to "heat" water for mixing with commissary coffee, soup packets, etc. The exhaust line was completely missing, and the dryer pulled away from the wall. This was immediately visible with only cursory observation by the Monitor.

The current physical and maintenance conditions of the dryers was observed to have improved since the last inspection but continues to pose safety and security issues for inmates and deputies including potential fire hazards from the lint. The Monitor observed an accumulation of lint behind dryers, on the walls and shelving of the pod laundry rooms, and on the dayroom return air vents of the affected housing units indicating that significant amounts of dryer lint becomes airborne and circulates in these areas. The accumulation of such organic material can promote the growth of mold and mildew on surfaces if not regularly inspected and cleaned.

During the inspection, the Monitor noted that the clutter of inmates' personal items (paperwork, commissary purchases, and other approved items) had significantly declined with notable exceptions in two high security pods where personal papers and items were placed on window ledges, affixed to the walls, etc. Inmates appeared to be blocking numerous supply and return air vents in the same two housing units to reduce air flow and change the cell's temperature. This problem was observed by the Monitor to have been substantially curtailed by security staff throughout the rest of the OPJ housing units. At least two broken glass panels in shower windows were observed but had the requisite



work orders pending. Observance of graffiti on walls in dormitories and cells declined substantially since the last inspection.

IV. D. 1. b. Continue the preventive maintenance plan to respond to routine and emergency maintenance needs, including ensuring that showers, toilets, and sink units are adequately installed and maintained. Work orders will be submitted within 48 hours of identified deficiencies, or within 24 hours in the case of emergency maintenance needs.

Finding: Substantial Compliance

Observations:

The Monitor reviewed the Sanitation and Environmental Conditions report from August 2019, the OPSO Preventive Maintenance Plan, the Preventive Maintenance Schedule Summary report as well as inmate grievances related to maintenance issues. Staff and inmates were also interviewed during the inspection regarding maintenance issues during the Monitor's inspection. The documentation reflected an on-going preventive maintenance program for major building systems and components consistent with OPSO policy and the Consent Judgment.

For routine mechanical, electrical and plumbing work orders, OPSO Policy 601.02, Reporting and Addressing/Repairing Maintenance Needs, specifically requires that any staff member observing a maintenance issue "shall call the CMMS work order facilitator" to report the issue, "or leave a message". As noted in the previous report, OPSO implemented a revised procedure inspection and reporting procedure for line security staff just prior to the current reporting period. The new procedure has been in effect over six months and appears to be achieving the desired results. Inmates interviewed generally reported no issues with basic plumbing, mechanical or electrical services in their cells or dayrooms, or if an issue was reported, the problem was typically remedied within 48 to 72 hours indicating that work orders are being submitted in a timely manner as required by the Consent Judgment ("Work orders will be submitted within 48 hours of identified deficiencies, or within 24 hours in the case of emergency maintenance needs").

IV. D. 1. c. Maintain adequate ventilation throughout OPSO facilities to ensure that prisoners receive adequate air flow and reasonable levels of heating and cooling. Maintenance staff shall review and assess compliance with this requirement, as necessary, but no less than twice annually.

Finding: Substantial Compliance



Observations:

      Adequate air flow is maintained in the facilities and continues to be impeded in some housing units by inmates' blocking air vents. Airflow in at least three individual cells brought to the attention of the Monitor by inmates was observed to be markedly decreased as compared to others not in the same area in the pod. Two HVAC control panels in pod control rooms were observed to be out of service. (Security staff are able to make minor adjustments within the parameters set by the Maintenance Director.) The Monitor observed the majority of housing dayrooms and cells to be at a relatively reasonable levels of heating and cooling.

      As noted in the January 2019 inspection report, test and balance reports for the Kitchen/Warehouse (2014), OJC (2017) and TDC (2012) were the latest available to the Monitor. Lacking is documentation that a comprehensive review and assessment of compliance has taken place "twice annually" as spelled out in the Consent Judgment.

      Recognizing that such comprehensive "test and balance" assessments are very expensive and typically performed only during the commissioning of new or replacement HVAC systems, the Monitor met with the Maintenance Director specifically to discuss the status and capabilities of the OPJ Building Automation System that controls the heating and cooling throughout all occupied areas in OPJ. The Maintenance Director was able to demonstrate the systems' real-time monitoring of temperature sensors, variable air volume boxes (metered air flow), exhaust fans, chilled water systems, etc. through the systems graphical user interface. He was also able to demonstrate the system's warning and alarm capabilities should any given component in the system malfunction or fall out of specified parameters, and how designated staff are able to address such issues through either adjustment or emergency/planned replacement of the component. Further, the Maintenance Director was able to produce reports on demand to document any such failures over time.

      It is the Monitor's opinion that the OPJ Building Automation System, as currently operated, meets the intent of the Consent Judgment with regard to this section.



IV. D. 1. d. Ensure adequate lighting in all prisoner housing units and prompt replacement and repair of malfunctioning lighting fixtures in living areas within five days, unless the item must be specially ordered.

Finding: Substantial Compliance

Observations:

The Monitor observed sufficient lighting being provided in housing units of both OJC and TDC. Maintenance staff continue to maintain a supply of replacement bulbs, transformers, or ballasts to repair malfunctioning lighting. During this inspection, the Monitor observed no outstanding electrical work orders beyond routine bulb replacement.

IV. D. 1. e. Ensure adequate pest control throughout the housing units, including routine pest control spraying on at least a quarterly basis and additional spraying as needed.

Finding: Substantial Compliance

Observations:

A review of the documentation submitted found sufficient evidence of a pest control program that meets the intent of the Consent Judgment. OPSO continues to maintain a pest control contract with a State licensed company resulting in monthly service for all housing areas and bi-weekly service for the Kitchen/Warehouse. Inmate grievances related to pest control were reviewed and found to have been addressed in a timely manner. Some evidence was found that "drain flies" were recently in and around the toilet and drain in the IPC "roll out" changing rooms and on restroom and shower walls in three housing pods. This is a marked improvement compared to the last inspection and demonstrates and active control and cleaning program is in place. No spider webs or infestations were observed in the recreation yard areas as during the previous inspection.

Environmental, Sanitation and Life-Safety staff performing inspections and responding to pest control grievances continue to initiate work orders for pest control issues to document how, when and where issues are identified and remedied. The staff reported a small increase in the number of grievances submitted related to pest control in the semi-annual report. The cause was attributed to the hot weather during the latter part of the rating period and commissary debris/trash present in cells. Given the size of the inmate population and the facility, the Monitor did not consider the total number to be unreasonable.



IV. D. 1.f. Ensure that any prisoner or staff assigned to clean a biohazardous area is properly trained in universal precautions, outfitted with protective materials, and properly supervised.

Finding: Substantial Compliance

Observations:

As noted in the previous inspection, Policy 1101.07, "Bio-hazardous Spill Cleaning Procedures" [Revised 1/18/2018] Section VIII. A. 1 has been revised to allow both deputies and inmates who are properly trained and equipped to perform bio-hazardous spill cleanup procedures. Training materials were devised by the Sanitarian and training was provided to designated inmates in May 2019, and documentation provided. The Monitor also reviewed training curricula and documentation indicating that all staff are receiving 8 hours training in bio-hazardous cleanup procedures during 2019 either in their initial training or during mandatory training for incumbent staff. As of 6/30/19, Training staff reported that 91% of the required staff had completed the training for 2019. Additionally, the Sanitarian developed and implemented bio-hazardous cleanup Roll Call training and submitted documentation demonstrating participation by all four squads during the rating period.

As of November 2018, the Sanitation and/or Environmental Officer is required to be notified of such incidents each business day to enable them to replace any bio-hazard clean up protective materials used and inspect the area to ensure it was properly cleaned and sanitized. The Sanitarian reported that no such incidents reports were received during the rating period covered by this inspection.

IV. D. 1. g. Ensure the use of cleaning chemicals that sufficiently destroy the pathogens and organisms in biohazard spills.

Findings: Substantial Compliance

Observations:
The Monitor observed that the chemicals on-hand and available to staff were sufficient to destroy the pathogens and organisms in biohazard spills common in the jail environment. Chemical inventory documentation submitted demonstrated a consistent supply of such chemicals is being maintained by designated staff.



IV. D. 1. h. Maintain an infection control plan that addresses contact, blood borne, and airborne hazards and infections. The plan shall include provisions for the identification, treatment, and control of Methicillin-Resistant Staphylococcus Aureus ("MRSA") at the Facility.

Findings: Partial compliance

Observations:

The Monitor reviewed the OPSO infection control policy 1201.11 as well as the WellPath Infection Control Program document (rev. 8/30/18) submitted by OPSO. The medical contractor's policy on infection control is included in 1201.11 by reference. Neither the OPSO policy nor the WellPath document specifically include "provisions for the identification, treatment and control of" MRSA as required by the Consent Judgment. The document provided only references HIV, HBV, and HCV exposures. Additionally, the WellPath document notes in Section 3 that "Site Specific Policy Required". Specific information required, but not provided, include:

1. Insert site-specific infection control plan.
2. Identify person responsible for Infection Control at the site.
3. Describe how Infection Control activity is recorded.
4. List location where Infection Control policies are kept.
5. Describe how biomedical wastes are managed.
6. Identify who prepares and completes reports.

OPSO has previously provided for annual review the policy and SOP for the handling of inmate mattresses to include staff and/or inmate training program for sanitation that includes mattress cleaning, and chemical use and control. This procedure is specifically required by the Infection Control Plan. The Monitor observed that mattresses were properly stored at both the OJC and TDC facilities.

**IV. D. 2. Environmental Control**

D. 2. Findings:
D. 2. a.  Substantial Compliance
D. 2. b.  Substantial Compliance

IV. D. 2. a. OPSO shall ensure that broken or missing electrical panels are repaired within 30 days of identified deficiencies, unless the item needs to be specially ordered.

Findings: Substantial Compliance

Observations:



DRAFT COMPLIANCE REPORT # 11                    87

Commented [AK46]: OPSO Policy 1201.11 regarding Infection Control was approved and finalized by the Monitors on 10/31/18. As this policy was specifically approved by the Monitors after ample time for review and comment, OPSO believes this section is in substantial compliance.

OPSO Policies 601.02 "Reporting and Addressing Maintenance Needs" and Policy 601.03 "Preventive Maintenance" [August 15, 2016] and are implemented. Major electrical panels at OJC and TDC are located in secure maintenance spaces inaccessible to inmates.

**IV. D. 2. b. Develop and implement a system for maintenance and timely repair of electrical panels, devices, and exposed electrical wires.**

Findings: Substantial Compliance

Observations:

Repairs to exposed/damaged wiring/cabling noted by the Monitor during previous inspections were observed to be in good condition throughout the facility.

### IV. D. 3. Food Service

This report summarizes the findings for the Food Service provisions of the Consent Judgment based on the Monitor's document reviews and tour conducted September 17-18, 2019. The Monitor inspected the Orleans Justice Center (OJC) Kitchen/Warehouse; observed meal service activities; and spoke with OPSO supervisors and deputies, Summit employees, and inmates. Summit purchased the former contracted food service provider CBM and has fully transitioned to running the food service operations at OPSO. The former owner of CBM is now the President of Summit and the company retained the same District Manager and OPSO Food Service Director. Due to the change of contracted food service provider, OPSO had prudently requested and was awaiting a copy of Summit's policies and procedures for review, to ensure they align with OPSO draft policies 1001.01, Meal Preparation, Transport and 1001.04, Food Service Inspections and Reviews, and 1001.06 Control of Kitchen Sharps and Cleaning Tools before finalization of the policies.

Since the last tour on January 14-16, 2019, there has been significant progress toward compliance with the Food Service provisions and a substantial improvement in the cleanliness and sanitation of the OJC Main Kitchen resulted in section IV.D.3.b. of the Consent Judgment moving from non-compliance to partial compliance.

As discussed in Compliance Report #5 – March 17, 2016, the issue of tool control in the kitchen is not specifically addressed in the Consent Judgment. However, the same problem of no supervisor's signature indicating that the daily kitchen tool inventory had been reviewed (as required on the inventory form) was found for September 1, 2019



through September 17, 2019, just as was previously found for January and February 2016. The consequences of failing to control culinary utensils includes unacceptable health and safety hazards, including the introduction of contraband into the jail.

D. 3. Findings:
D. 3. a.  Partial Compliance
D. 3. b.  Partial Compliance
D. 3. c.   Partial Compliance



IV. D. 3. a. OPSO shall ensure that food service staff, including prisoner staff, continues to receive in-service annual training in the areas of food safety, safe food handling procedures, and proper hygiene, to reduce the risk of food contamination and food-borne illnesses.

Findings: Partial Compliance

Observations:

The Monitor observed violations of the Louisiana Food Code and significant findings are summarized in sections IV. D. 3. b. Cleanliness and IV. D. 3. c. Record Keeping/Temperatures of this report. These findings are indicators of a lack of training or ineffective training. To achieve substantial compliance, OPSO and Summit must ensure that food service staff receive effective training in the areas of food safety.

> **Commented [AK47]:** OPSO objects to being docked twice for the same issue. Any alleged violations of the LA Food Code are not relevant under this section, and therefore not a valid measure. Furthermore, as the Consent Judgment never requires compliance with the Louisiana Food Code (as compared to requiring compliance with PREA) OPSO objects to this being used as a measure in any section. Per this section of the consent judgment, all required training was completed and documentation was submitted. As all requirements of this section have been met, OPSO believes this section is in substantial compliance.

IV. D. 3. b. Ensure that dishes and utensils, food preparation and storage areas, and vehicles and containers used to transport food are appropriately cleaned and sanitized on a daily basis.

Findings: Partial Compliance

Observations:

Significant improvement in the overall cleanliness of the OJC Main Kitchen resulting at least in part from improved communication between OPSO kitchen and Summit staff and their willingness to work together to resolve problems resulted in the change from non-compliance to partial compliance. Completion and implementation of all draft policies along with compliance with all previous implemented policies and the Louisiana Food Regulations is required to achieve substantial compliance. Some issues and violations identified during the inspection include, but are not limited to:

> **Commented [AK48]:** This is not a requirement of the consent judgment and therefore is not an appropriate measure for this section.

- On September 17, 2019, the Monitor observed dirty carts being utilized to transport meal trays to the inmate housing units. The meal trays are delivered by the main kitchen to the jail in cabinet style carts and then transferred by deputies onto dolly style carts for transport to each individual housing unit and the trays are then distributed to the inmates from the cart. Upon inspection of the dolly carts, a buildup of grime and old dried out food debris was observed. The dolly carts are kept in the jail and are not transported back to the main


JAIL MONITORS

kitchen for cleaning and sanitizing. However, based on the unsanitary condition of the carts, it was evident that they had not been cleaned after the previous meal and most of them had not been properly cleaned for an extended period of time. When asked about the sanitation of the carts, a deputy stated that they were cleaned in the 2nd floor OJC kitchen; however, inspection of the kitchen did not support this claim as the area was not stocked with the necessary supplies nor did it appear that it had been used for any type of cleaning activities and supervisory staff confirmed the observations.

- Despite being advised that the 2nd floor OJC kitchen was not in use, the cooler door was found ajar and baskets containing numerous sack lunches that were not labeled or dated (therefore, it was unknown how long they had been stored in the cooler), an undated Styrofoam meal tray labeled for an inmate in housing unit 3C, and milk crates containing several dozen 8-ounce cartons of milk, including outdated milk with best-by dating of September 15, 2019, were found stored on dirty carts on September 17, 2019. The food and milk posed a foodborne illness risk and it was apparent that someone had been drinking the milk. Use of the cooler for the storage of food and milk necessitates checking and recording of the cooler temperatures as required per section IV.D.3.c. of the Consent Judgment.

IV. D. 3. c. Check and record on a daily basis the temperatures in the refrigerators, coolers, walk-in refrigerators, the dishwasher water, and all other kitchen equipment with a temperature monitor, to ensure proper maintenance of food service equipment.

Findings: Partial Compliance

Observations:

The Consent Judgment requires that OPSO "Check and record on a daily basis the temperatures in the refrigerators, coolers, walk-in refrigerators, the dishwasher water, and all other kitchen equipment with a temperature monitor, to ensure proper maintenance of food service equipment." Temperatures are used as a means of confirming the working condition of kitchen equipment by measuring with a properly calibrated thermometer or temperature measuring device and



DRAFT COMPLIANCE REPORT # 11                              91

documenting the operating temperature to ensure that it complies with the temperatures specified in the Louisiana Food Code. Therefore, the Monitor reviewed temperature documentation, checked random food and water temperatures, and used the temperatures as a benchmark for determining OPSO's compliance with the Louisiana Food Code.

A problem was found with the refrigeration temperature logs. Although the state food code does not specify a temperature at which refrigeration must be set, it requires that it must be adequate to maintain all potentially hazardous foods (foods that require temperature control for safety) at 41°F or colder. The Monitor found numerous refrigeration log entries of 44°F or higher for one of the walk-in coolers, specifically 245 Prep Cooler A1B[16]. Summit staff record the temperatures of the various coolers and freezers twice daily on a paper form, titled Cooler Temperature Log.  "Cooler Temperatures: 35 to 40 Degrees Fahrenheit is acceptable", "Corrective Actions Noted for temperatures out of range: Cooler #, Time, Temp, Work Order", and a supervisor signature line is printed on the bottom of every Cooler Temperature Log form. However, despite the fact that the form clearly states the acceptable cooler temperature range and indicates that corrective action is to be documented, corrective action was not documented on a single form provided for the period of December 2018 through June 2019.

It is important to note that refrigeration temperatures do not necessarily represent food temperatures and should not be interpreted at face value to suggest unsafe food. The OPSO main kitchen is a large facility and the temperatures of 15 different coolers and freezers were documented on the logs. The Monitor inspected Prep Cooler 245 and measured the ambient temperature at 38°F on September 18,

---

[16] Cooler Temperature Log data summary for 245 Prep Cooler A1B.  December 2018: 56% of temperatures were warmer than 42°F (46°F = 15 entries and 44°F = 11 entries); January 2019: 30% of temperatures were warmer than 42°F (46°F = 4 entries and 44°F = 12 entries); February 2019: 8% of temperatures were warmer than 42°F; March 2019: 66% of temperatures were warmer than 42°F (44°F = 39 entries); April 2019: 48% of temperatures were warmer than 42°F (48°F = 1 entry, 46°F = 4 entries, 45°F = 2 entries, and 44°F = 17 entries); May 2019: 33% of temperatures were warmer than 42°F (48°F = 3 entries, 46°F = 1 entry, 45°F = 4 entries, and 44°F = 10 entries); and June 2019: 24% of temperatures were warmer than 42°F (44°F = 14 entries). Some log entries were missing.



2019 and discussed these findings with OPSO and Summit staff. The Summit Food Service Director stated that food was not stored in Prep Cooler 245 and no food was observed stored therein, however it was readily accessible for use and signage indicated that it was a "Prepared Ingredients Cooler." After discussion with the OPSO Facility Engineer, he reported that the external temperature thermometer gauge was not working properly and that a new one would be procured. The Summit Food Service Director also stated that she would order a refrigerator thermometer to place inside the cooler to serve as a backup to the external thermometer gauge.

Nevertheless, it is a serious problem that refrigeration temperatures well above those considered to be able to maintain the safe food temperatures established by the Louisiana Food Code as well as those printed on the cooler temperature log form itself were documented month after month without corrective action. Temperatures were being checked and recorded however, the documentation clearly indicated that there was a potential problem with Prep Cooler 245 that required investigation to ensure proper maintenance and operation of the refrigeration.

To achieve substantial compliance, OPSO must ensure that temperatures are not recorded simply for the sake of documentation. Not subsequently taking and documenting corrective actions when temperature problems are found is not only a poor practice, it is unsafe and can lead to foodborne illness outbreaks.

**IV. D. 4. Sanitation and Environmental Conditions Reporting**

D. 4. Findings:
D. 4. a.  Substantial Compliance
D. 4. b.  Substantial Compliance

IV. D. 4. a. Provide the Monitor a periodic report on sanitation and environmental conditions in the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. The report will include
(1) number and type of violations reported by health and sanitation inspectors;
(2) number and type of violations of state standards;
(3) number of prisoner grievances filed regarding the environmental conditions at the Facility;
(4) number of inoperative plumbing fixtures, light fixtures, HVAC systems, fire protection systems, and security systems that have not been repaired within 30 days of discovery;
(5) number of prisoner-occupied areas with significant vandalism, broken furnishings, or excessive



clutter;
(6) occurrences of insects and rodents in the housing units and dining halls; and
(7) occurrences of poor air circulation in housing units.

Findings: Substantial Compliance

Observations:

The January – June 2019 Sanitation and Environmental report was
made available to the Monitor prior to the September 2019 inspection tour. The report
contained the requisite information spelled out by the Consent Judgement as well as
supporting documentation.

IV. D. 4. b. Review the periodic sanitation and environmental conditions reports to determine whether the
prisoner grievances and violations reported by health, sanitation, or state inspectors
are addressed, ensuring that the requirements of this Agreement are met. OPSO shall make
recommendations regarding the sanitation and environmental conditions, or other necessary
changes in policy, based on this review. The review and recommendations will be documented and
provided to the Monitor.

Findings: Substantial Compliance

Observations:

The Consent Judgment requires a review of the periodic sanitation and
environmental conditions reports be made to ensure issues are addressed along with
making recommendations regarding sanitation and environmental conditions and policy
changes based upon the review. Such reviews are to be documented and provided to the
Monitor.

The Monitor reviewed the supporting documentation provided by OPSO and
determined that it was sufficient to satisfy the requirements of the Consent Judgment.
OPSO provided documentation of the required review and basic analysis of prisoner
grievances and inspection violations noted regarding sanitation and environmental
conditions during the rating period.

The revised procedure implemented prior to the rating period whereby routine
requests for clothing items were no longer classified as grievances was observed to have
had the desired effect. The documentation reviewed reflected a more accurate accounting
of grievances and their disposition which should assist management staff in their analysis.



**IV. E. 1. Fire and Life Safety**

E. 1. Findings:
E. 1. a.  Partial Compliance
E. 1. b.  Substantial Compliance
E. 1. c.  Substantial Compliance
E. 1. d.  Substantial Compliance
E. 1. e.  Substantial Compliance

IV. E. 1. a. Ensure that necessary fire and life safety equipment is properly maintained and inspected at least quarterly. These inspections must be documented.

Findings: Partial compliance

Observations:

The Monitor toured the entire facility accompanied by the Facility Life Safety Officer. The Monitor observed that the fire and life safety equipment issues noted during the previous inspection had been corrected resulting in a "Green Tag" being issued for the system in August 2019. The original issue was related to the operation of the recreation yard doors in each housing unit. The doors are an integral part of the facility's smoke removal system. The Monitor observed the doors to be operational at the time of the inspection.

The Monitor observed three minor "trouble" warnings on the panel display at the time of the inspection. All three were minor issues routinely corrected by the Life-Safety Officer and Maintenance/contractor staff.

Life Safety staff continue to use the "Facility Dude" work order system to maintain the schedule of required inspections. The system notifies the Fire Safety Officer when an inspection is due. OPSO continues to maintain contracts with licensed vendors to complete annual inspections of all fire and life safety equipment. Prior to this tour, OPSO provided evidence of the most recent equipment inspections, in accordance with the Consent Judgment and policy. OPSO provided copies of quarterly inspections conducted by the Fire Safety Officer for Kitchen/Warehouse, OJC, and TDC for the first and second quarters of 2019. This documentation, supported by observations during the compliance tour, indicates that OPSO ensures that necessary fire and life safety equipment is properly maintained and inspected at required intervals. These inspections are conducted by a



qualified fire safety officer or a qualified contractor, as required by the Consent Judgment. The Monitor noted all fire extinguishers observed were within their inspection window and up to date. One exit sign light was observed to be out of order, but an associated work order was noted to have already been submitted. The next annual inspection of the detection, alarm and sprinkler systems is due November 2019.

IV. E. 1. b. Ensure that a qualified fire safety officer conducts a monthly inspection of the facilities for compliance with fire and life safety standards (e.g., fire escapes, sprinkler heads, smoke detectors, etc.).

Findings: Substantial Compliance

Observations:

The Monitor was provided with the monthly inspection documents for the Kitchen & Warehouse, OJC, and TDC facilities performed during the current inspection period. The reports are thorough and complete with all noted discrepancies listed with the associated work order number.

Examples of these issues noted in the reports and observed by the Monitor during this inspection include, but were not limited to:

• Accumulation of lint behind dryers resulting from missing or broken dryer vents in numerous OJC housing units and presenting a fire safety hazard.

• In inmate cells, inmates' personal items (paperwork, commissary purchases, and other approved items) are not stored as required in OJC's Inmate Handbook in the personal property bags provided by OJC and in some instances, appeared excessive presenting a fire safety hazard. The Monitor noted that this condition has improved substantially since the last inspection.

• Broken glass panels in cell doors and windows shower windows (two locations).

• The Monitor noted that a previously removed glass panel in a dorm shower door had been replaced.

IV. E. 1. c. Ensure that comprehensive fire drills are conducted every six months. OPSO shall document these drills, including start and stop times and the number and location of prisoners who were moved as part of the drills.

Findings: Substantial Compliance



Observations:

The Consent Judgment requires comprehensive fire drills every six months. OPSO provided documentation for fire drills conducted in during the current rating period for all facilities and shifts. Documentation reviewed by the Monitor noted approximately 95% of all required staff had participated in at least one drill during the rating period. In addition to detailed drill reports, the documentation lists, by name, any delinquent staff with the listing provided to senior management for the coordination of make-up training.

IV. E. 1. d. Provide competency-based training to staff on proper fire and emergency practices and procedures at least annually.

Findings: Substantial Compliance

Observation:

OPSO has developed the requisite policy, training course syllabus/outline and written directives. The Monitor was provided with documentation reflecting the requisite training was provided during in-service classes held in February 2019. The completion rate for the training was approximately 95% of OJC staff. No TDC staff were noted to have participated in the training held February 2019. Additionally, the documentation lists, by name, any delinquent staff with the listing provided to senior management for the coordination of make-up training. The Life Safety Officer notes all requisite staff are expected to complete the requisite annual training prior to the end of 2019.

IV. E. 1. e. Within 120 days of the Effective Date, ensure that emergency keys are appropriately marked and identifiable by touch and consistently stored in a quickly accessible location, and that staff are adequately trained in use of the emergency keys.

Findings: Substantial compliance

Observations:

The Monitor found the physical security and accountability for emergency keys to be in substantial compliance with the Consent Judgment and Policy 801.35 "Key and Key Card Control". Inspection reports note the routine verification of the keys and the Fire Safety Officer documents the periodic testing of the keys to verify they are operational. The Fire



Safety Officer trains staff on the use of the location and use of the keys during the fire and life safety training curriculum provided to all staff at the training academy.

**IV. E. 2. Fire and Life Safety Reporting**

      E. 2. Findings:
      E. 2. a.  Substantial Compliance
      E. 2. b.  Substantial Compliance

IV. E. 2. a. (1) – (3) Provide the Monitor a periodic report on fire and life safety conditions at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date and every six months thereafter until termination of this Agreement. Each report shall include:
(1) number and type of violations reported by fire and life safety inspectors;
(2) fire code violations during annual fire compliance tours; and
(3) occurrences of hazardous clutter in housing units that could lead to a fire.

Findings: Substantial Compliance

Observations:

      The January – June 2019 Fire and Life Safety Conditions report was made available to the Monitor prior to the September 2019 inspection. The report contained the requisite information spelled out by the Consent Judgment as well as supporting documentation.

IV. E. 2. b. Review the periodic fire and life safety reports to determine whether the violations reported by fire and life safety inspectors are addressed, ensuring the requirements of this Agreement are being met. OPSO shall make recommendations regarding the fire and life safety conditions, or other necessary changes in policy, based on this review. The review and recommendations will be documented and provided to the Monitor.

Findings: Substantial Compliance

Observations:

      The Consent Judgment requires a review of the periodic fire and life safety reports be made to ensure issues are addressed along with making recommendations regarding the fire and life safety conditions and policy changes based upon the review. Such reviews are to be documented and provided to the Monitor.

      The Monitor reviewed the supporting documentation provided by OPSO and determined that it was sufficient to satisfy the requirements of the Consent Judgment. OPSO provided documentation of the required review and basic analysis of fire and life safety conditions as well as any necessary changes in policy or procedure.



Meeting minutes from the review indicated the OPSO Life Safety Officer communicated the information in IV. E. 2. a. (1) – (3) and reiterated the changes in the following implemented prior to the current reporting period:

- procedures for the conduct of fire drills to enhance staff participation
- procedures for documenting staff participation in drills
- documentation of life safety issues/corrective action in the facility maintenance management system
- new procedures for coordinating with the Unit Managers specifically in regard to the control of clutter and contraband in the units.



## IV. F.   Language Assistance

F.1.a. OPP shall ensure effective communication with, and provide timely and meaningful access to services at OPP to all prisoners at OPP, regardless of their national origin or limited ability to speak, read, write, or understand English.  To achieve this outcome, OPP shall:

  (1)   Develop and implement a comprehensive language assistance plan and policy that complies, at a minimum, with Title VI of the Civil Rights Act of 1964, as amended, (42 U.S.C. § 2000d et seq.) and other applicable law;

  (2)   Ensure that all OPP personnel take reasonable steps to provide timely, meaningful language assistance services to Limited English Proficient ("LEP") prisoners;

  (3)   At intake and classification, identify and assess demographic data, specifically including the number of LEP individuals at OPP on a monthly basis, and the language(s) they speak;

  (4)   Use collected demographic information to develop and implement hiring goals for bilingual staff that meet the needs of the current monthly average population of LEP prisoners;

  (5)   Regularly assess the proficiency and qualifications of bilingual staff to become an OPP Authorized Interpreter ("OPPAI");

  (6)   Create and maintain an OPPAI list and provide that list to the classification and intake staff; and

  (7)   Ensure that while at OPP, LEP prisoners are not asked to sign or initial documents in English without the benefit of a written translation from an OPPAI.

F.2.a. OPP shall develop and implement written policies, procedures and protocols for documenting, processing, and tracking of individuals held for up to 48 hours for the U.S. Department of Homeland Security ("DHS");

F.2.b. Policies, procedures, and protocols for processing 48-hour holds for DHS will:

  (1)   Clearly delineate when a 48-hour hold is deemed to begin and end;

  (2)   Ensure that, if necessary, an OPPAI communicates verbally with the OPP prisoner about when the 48-hour period begins and is expected to end;

  (3)   Provide a mechanism for the prisoner's family member and attorney to be informed of the 48-hour hold time period, using, as needed, an OPPAI or telephonic interpretation service;

  (4)   Create an automated tracking method, not reliant on human memory or paper documentation, to trigger notification to DHS and to ensure that the 48-hour time period is not exceeded.

  (5)   Ensure that telephone services have recorded instructions in English and Spanish;

  (6)   Ensure that signs providing instructions to OPP prisoners or their families are translated into Spanish and posted;

  (7)   Provide Spanish translations of vital documents that are subject to dissemination to OPP prisoners or their family members.  Such vital documents include, but are not limited to:

   i.     grievance forms;
   ii.    sick call forms;
   iii.   OPP inmate handbooks;
   iv.    Prisoner Notifications (e.g., rule violations, transfers, and grievance responses) and
   v.     "Request for Services" forms.

  (8)   Ensure that Spanish-speaking LEP prisoners obtain the Spanish language translations of forms provided by DHS; and

  (9)   Provide its language assistance plan and related policies to all staff within 180 days of the Effective Date of this Agreement.

F.3.a. Within 180 days of the Effective Date, OPP shall provide at least eight hours of LEP training to all corrections and medical and mental health staff who may regularly interact with LEP prisoners.

  (1)   LEP training to OPP staff shall include:

   i.     OPP's LEP plan and policies, and the requirements of Title VI and this Agreement;
   ii.    how to access OPP-authorized, telephonic and in-person OPPAIs; and
   iii.   basic commands and statements in Spanish for OPP staff.



| | |
|---|---|
| (2) | OPP shall translate the language assistance plan and policy into Spanish, and other languages as appropriate, and post the English and translated versions in a public area of the OPP facilities, as well as online. |

(3)   OPP shall make its language assistance plan available to the public.

F.4.

| | |
|---|---|
| (1) | OPP shall ensure that adequate bilingual staff are posted in housing units where DHS detainees and other LEP prisoners may be housed. |
| (2) | OPP shall ensure that an appropriate number of bilingual staff are available to translate or interpret for prisoners and other OPP staff.  The appropriate number of bilingual staff will be determined based on a staffing assessment by OPP. |

IV. F. Findings:

F. 1. a.  Partial Compliance

F. 2. a.  Substantial Compliance

F. 2. b.  Substantial Compliance

F. 3. a.  Partial Compliance

F. 4.     Substantial Compliance

<u>Observations</u>:

The Language Assistance Plan required by this paragraph has not been prepared or reviewed by the parties.

While OPSO asserts that DHS and ICE inmates are not detained, OPSO has developed a policy which was submitted to the Monitors which brings provisions F. 1. a. and b. into substantial compliance.

Provision IV. F. 3. a. is determined in partial compliance as the Language Assistance plan has not been completed.

OPSO provided documentation regarding the use of the language line. OPSO has provided documentation regarding the number of bilingual staff and the manner in which the needs of language assistance is provided bringing provisions of F. 4. Into substantial compliance.



**IV. G.   Youthful Prisoners**

Consistent with the Prison Rape Elimination Act of 2003, 42 U.S.C. § 15601, et seq., and its implementation of regulations, a youthful prisoner shall not be placed in a housing unit in which the youthful prisoner will have sight, sound, or physical contact with any adult prisoner through use of a shared dayroom or other common space, shower area, or sleeping quarters.  In areas outside of housing units, OPSO shall either:  maintain sight and sound separation between youthful prisoners and adult prisoners, or provide direct staff supervision when youthful prisoners and adult prisoners have sight, sound, or physical contact.  OPP shall ensure that youthful prisoners in protective custody status shall have no contact with, or access to or from, non-protective custody prisoners.  OPP will develop policies for the provision of developmentally appropriate mental health and programming services.

IV. G. Finding:  Substantial compliance

<u>Observations</u>:

OPSO has provided documentation that its separation of youthful inmates from adult inmates was found in compliance during its recent PREA audit. Youthful female inmates are now housed in TDC.

**VI.   A – D. The New Jail Facility and Related Issues**

A.    <u>New Jail</u>

The Parties anticipate that Defendant will build a new jail facility or facilities that will replace or supplement the current facility located at 2800 Gravier Street, New Orleans, Louisiana.  This Agreement shall apply to any new jail facility.

VI. A. Finding:  Substantial Compliance.

B.    <u>Design and Design Document</u>

Defendant shall obtain the services of a qualified professional to evaluate, design, plan, oversee, and implement the construction of any new facility.  At each major stage of the facility construction, Defendant shall provide the Monitor with copies of design documents.

VI B. Finding:  Substantial Compliance

This provision provides that, "*The Defendant shall obtain the services of a qualified professional to evaluate, design, plan, oversee, and implement the construction of **any new facility** [emphasis added].  At each major stage of the facility construction, Defendant shall provide the Monitor with copies of design documents.*"

C.    <u>Staffing</u>

Defendant shall consult with a qualified corrections expert as to the required services and staffing levels needed for any replacement facility.  OPSO shall complete a staffing study to ensure that any new facility is adequately staffed to provide prisoners with reasonable safety.



VI. C. Finding:  Substantial Compliance

The Consent Judgment requires that the Defendant **shall** consult with a qualified corrections expert as to the required services and staffing levels needed for any replacement facility.  The Monitors will await planning for Phase III to ascertain future compliance. For now, the paragraph is in substantial compliance.

D. Compliance with Codes and Standards

Defendant will ensure that the new jail facility will be built in accordance with:  (1) the American Correctional Association's standards in effect at the time of construction; (2) the American with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101-12213, including changes made by the ADA Amendments of 2008 (P.L. 110-325) and 47 U.S.C. §§ 225-661, and the regulations there under; and (3) all applicable fire codes and regulations.

Finding – Monitors not qualified to evaluate.

The Monitors do not have the knowledge or expertise to evaluate compliance with this paragraph.   OPSO asserts that it is in compliance with this provision, without offering documentation.

## VII.  Compliance and Quality Improvement

### VII. A. Policies, Procedures, Protocols, Training Curriculum and Practices

Within 120 days of the Effective Date, OPSO shall revise and/or develop its policies, procedures, protocols, training curricula, and practices to ensure that they are consistent with, incorporate, address, and implement all provisions of this Agreement.  OPSO shall revise and/or develop, as necessary, other written documents, such as screening tools, logs, handbooks, manuals, and forms, to effectuate the provisions of this Agreement. OPSO shall send pertinent newly-drafted and revised policies and procedures to the Monitor as they are promulgated.  The Monitor will provide comments on the policies to OPSO, SPLC, and DOJ within 30 days. OPSO, SPLC, and DOJ may provide comments on the Monitor's comments within 15 days.  At that point, the Monitor will consider the Parties' comments, mediate any disputes, and approve the policies with any changes within 30 days.  If either party disagrees with the Monitor, they may bring the dispute to the Court. OPSO shall provide initial and in-service training to all Facility staff with respect to newly implemented or revised policies and procedures.  OPSO shall document employee review and training in new or revised policies and procedures.

VII. A. Finding: Substantial Compliance

Observations:

OPSO has now completed the development of the requires policies. There are still procedures and lesson plans which must be completed to remain in substantial compliance.

### VII. (H). B.  Written Quality Improvement Policies and Procedures



Within 180 days of the Effective Date, Defendant shall develop and implement written quality improvement policies and procedures adequate to identify serious deficiencies in protection from harm, prisoner suicide prevention, detoxification, mental health care, environmental health, and fire and life safety in order to assess and ensure compliance with the terms of this Agreement on an ongoing basis. Within 90 days after identifying serious deficiencies, OPSO shall develop and implement policies and procedures to address problems that are uncovered during the course of quality improvement activities. These policies and procedures shall include the development and implementation of corrective action plans, as necessary, within 30 days of each biannual review.

VII. B. Finding:  Substantial compliance

<u>Observations</u>:

OPSO has provided documentation that it now developing plans to identify serious deficiencies, and to address problems that are uncovered during the course of quality improvement activities to warrant a finding of substantial compliance. These plans could be improved.

## VII. (I). C. Full-Time Compliance Coordinator

The Parties agree that OPSO will hire and retain, or reassign a current OPSO employee for the duration of this Agreement, to serve as a full-time OPSO Compliance Coordinator. The Compliance Coordinator will serve as a liaison between the Parties and the Monitor and will assist with OPSO's compliance with this Agreement. At a minimum, the Compliance Coordinator will:  coordinate OPSO's compliance and implementation activities; facilitate the provision of data, documents, materials, and access to OPSO's personnel to the Monitor, SPLC, DOJ, and the public, as needed; ensure that all documents and records are maintained as provided in this Agreement; and assist in assigning compliance tasks to OPSO personnel, as directed by the Sheriff or his or her designee. The Compliance Coordinator will take primary responsibility for collecting information the Monitor requires to carry out the duties assigned to the Monitor.

VII. C. Finding:  Substantial Compliance.

## VII. (J.) D. Self-Assessment

On a bi-annual basis, OPSO will provide the public with a self-assessment in which areas of significant improvement or areas still undergoing improvement are presented either through use of the OPSO website or through issuance of a public statement or report.

VII. D. Finding:  Substantial Compliance

<u>Observations</u>:

OPSO is now in substantial compliance as, in addition to holding town hall meetings quarterly and providing PowerPoint presentations at those meetings, OPSO is now positing those PowerPoint presentations on its website.

## VIII.  Reporting Requirements and Right of Access



DRAFT COMPLIANCE REPORT # 11                    104

**VIII.  A. Periodic Compliance Reporting**

OPSO shall submit periodic compliance reports to the Monitor.  These periodic reports shall be provided to the Monitor within four months from the date of a definitive judgment on funding; and every six months thereafter until termination of this Agreement.  Each compliance report shall describe the actions Defendant has taken during the reporting period to implement this Agreement and shall make specific reference to the Agreement provisions being implemented.  The report shall also summarize audits and continuous improvement and quality assurance activities, and contain findings and recommendations that would be used to track and trend data compiled at the Facility.  The report shall also capture data that is tracked and monitored under the reporting provisions of the following provisions:  Use of Force; Suicide Prevention; Health Care Delivered; Sanitation and Environmental Conditions; and Fire and Life Safety.

VIII. A. Finding:  Substantial Compliance

<u>Observations</u>:

The reports provided by OPSO are now sufficient to address the requirements of this provision,

**VIII. B.**  (Notification of) **Death of Any Prisoner**

OPSO shall, within 24 hours, notify the Monitor upon the death of any prisoner.  The Monitor shall forward any such notifications to SPLC and DOJ upon receipt.  OPSO shall forward to the Monitor incident reports and medical and/or mental health reports related to deaths, autopsies, and/or death summaries of prisoners, as well as all final SOD and IAD reports that involve prisoners.  The Monitor shall forward any such reports to SPLC and DOJ upon receipt.

Finding:   Substantial Compliance

**VIII. C. Records**

Defendant shall maintain sufficient records to document that the requirements of this Agreement are being properly implemented and shall make such records available to the Monitor within seven days of request for inspection and copying.  In addition, Defendant shall maintain and provide, upon request, all records or other documents to verify that they have taken the actions described in their compliance reports (e.g., census summaries, policies, procedures, protocols, training materials, investigations, incident reports, tier logs, or use of force reports).

VIII. C. Finding:  Substantial Compliance

<u>Observations</u>:

OPSO now generally provides responses with seven days of a request by the Monitors. Some of the requests made regarding Classification are now timely. The



monthly reports provided to the Monitors greatly decreases the need for document requests.

**III.    Stipulated Agreements**

OPSO and the Plaintiffs/DOJ negotiated two agreements after Compliance Report #3.   The language of the Agreed Orders linked directly to the Consent Judgment and represented priority areas for inmate safety.

The three provisions of the April 22, 2015 are in compliance.  The provisions in the Agreed Order of February 11, 2015 require additional attention.  See the section of the Consent Judgment as noted.

6.b. OPSO shall ensure by May 15, 2015 that all staff assigned to the housing for inmates with acute and chronic mental health (in Templeman V, TDC, or other housing in which this population is held) attend training regarding working this population.  The lesson plans/curricula for this training shall be reviewed and approved by the Monitors.   The draft of the training curriculum and training plan is due to the Monitors by April 15, 2015, and should include participation by subject matter experts employed by the medical contractor.  See also Consent Judgment IV. B. 4. a. and 7. a.

13.  Medical Care – The health care provider has not provided their action plan for achieving compliance with the provisions of the Consent Judgment, as required by this paragraph.
14.b. By April 1, 2015, OPSO, in collaboration with CCS, will produce a management plan for inmates on the mental health caseload (Levels 1 – 4), whether these inmates are housed in the step-down unit, or in general population. See Consent Judgment IV. B. 2.

> **Commented [AK49]:** As the Monitors state, the Stipulated Agreement was negotiated between OPSO and the Plaintiffs/DOJ.  As this agreement is not measured by the Monitors, OPSO objects to the grading of these sections.

