UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **LASHAWN JONES, ET AL.** | * | CIVIL ACTION |
| | * | No. 12-00859 |
| **VERSUS** | * | |
| | * | HON. LANCE M. AFRICK |
| **MARLIN GUSMAN, ET AL.** | * | SECTION: I |
| | * | |
| | * | MAG. MICHAEL B. NORTH |
| | * | SECTION: 5 |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

### THE CITY OF NEW ORLEANS' MEMORANDUM IN SUPPORT OF MOTION FOR RELIEF FROM COURT ORDERS OF JANUARY 25, 2019 (Rec. Doc. 1221) AND MARCH 18, 2019 (Rec. Doc. 1227) REGARDING PHASE III JAIL FACILITY

**MAY IT PLEASE THE COURT:**

The City of New Orleans (the "City") respectfully submits this memorandum in support of its Motion for Relief from Court Orders of January 25, 2019 (Rec. Doc. 1221), and March 18, 2019 (Rec. Doc. 1227) Regarding Phase III Jail Facility, pursuant to Fed. R. Civ. P. 60, because there has been a significant change in the factual conditions which makes the continued programming, design, and construction of Phase III unsustainable. First, the Orleans Justice Center ("OJC") currently provides medical and mental healthcare that is above the minimal constitutional standard; second, the unexpected COVID-19 pandemic will cause a significant budgetary shortfall for the City; third, the decrease in the inmate population makes the programming, design, and construction of a new Phase III jail facility unnecessary. Finally, as a result, the City requests that this Honorable Court grant the City's Motion and modify the Court's Orders by indefinitely suspending the programming, design, and construction of a new Phase III jail facility.

1

## I. **INTRODUCTION**

The Home Rule Charter for the City of New Orleans dictates that the residents of Orleans Parish shall elect a Mayor.[1] The duly elected Mayor serves as the Chief Executive Officer of the City of New Orleans, and in this role, is responsible for overseeing all City operations. While the City has indisputably made a tremendous investment in the Orleans Parish jail over the past six years to ensure constitutional operations and adequate programming for all OJC inmates, the Mayor is also accountable to the people of New Orleans to adequately manage scarce resources in serving all of Orleans Parish. This includes the responsibilities, for example, of addressing aged and failing infrastructure, making constitutional policing and public safety a priority, offering services for historically vulnerable and underserved populations, and responding to a global pandemic which has shut down the City and severely impacted the local economy.

The Consent Decree of record simply does not require that the City of New Orleans build a sprawling new jail facility. Moreover, the City's jail investment to date, as described herein, demonstrates that the City continues to invest significantly in the Orleans Parish jail in a manner which exceeds constitutional requirements. While the Court is to be commended for its efforts to date in working to ensure constitutional operations at OPSO facilities, the Court should not ignore the City's tremendous jail investment, the declining jail population, and the notable and significant progress of OPSO in meeting constitutional requirements.[2]

For all of the reasons stated herein, including but not limited to, the significantly reduced and declining jail population, anticipated revenue shortfalls, and the ability to constitutionally accommodate the jail population within current facilities, the City of New Orleans respectfully requests that this Honorable Court grant the City's Motion for Relief, and suspend all orders

---

[1] Home Rule Charter of the City of New Orleans, § 4-201. *See also id.* at § 1-102.
[2] *See* Rec. Doc. 1274.

2

regarding the programming, design, and construction of a new Phase III jail facility at this time.

## II. PROCEDURAL BACKGROUND

On June 6, 2013, this Court approved a Consent Judgement regarding the conditions of the Orleans Parish Prison.[3] An area of concern was the treatment of inmates with mental health and medical conditions, as outlined in Section IV (B) and Section IV (C) of the Consent Decree. As part of this litigation matter, a new facility dedicated to accommodating mental health and medical beds was contemplated as Phase III of the OJC.

On January 25, 2019, and March 18, 2019, the Court entered Orders regarding the programming, design, and construction of a new Phase III jail facility addition to the OJC. The January 2019 Order required the City to direct the City's architect to begin the programming phase of the proposed new Phase III jail facility as soon as possible.[4] The March 2019 Order required the City to move forward with renovating the Temporary Detention Center ("TDC") to accommodate OPSO's mental health population, to continue the programming of a new Phase III jail facility and to work collaboratively with the parties to design and build a new Phase III jail facility.[5] It is from these Orders that the City seeks relief in the form of modification.

## III. LAW AND ARGUMENT

Rule 60 of the Federal Rules of Civil Procedure provides in pertinent part:

**(b) Grounds for Relief from a Final Judgment, Order, or Proceeding.** On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:

**(1)** mistake, inadvertence, surprise, or excusable neglect;

**(2)** newly discovered evidence that, with reasonable, diligence, could not have been discovered in time to move for a new trial under Rule 59(b);

---

[3] *See* Rec. Docs. 465, 583 (setting the Effective Date of the Consent Judgment approved and entered on June 6, 2013, at Rec. Doc. 465).
[4] Rec. Doc. 1221, at 3.
[5] Rec. Doc. 1227, at 2.

3

> **(3)** fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;
>
> **(4)** the judgment is void;
>
> **(5)** the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or
>
> **(6)** any other reasons that justifies relief.

In this case, the City seeks relief from the Court's Orders regarding the programming, design, and construction of Phase III of the OJC. Phase III was proposed to accommodate the mental health needs of inmates incarcerated at the OJC. It is the City's position that a significant change in circumstances has occurred, which makes the construction of Phase III unsustainable. Additionally, the OJC currently provides mental health and medical services that meet or exceed constitutional requirements. In addition, COVID-19 has significantly impacted the City's budget, and any continuation of the programming, design, and construction of Phase III would pose a significant threat to the City's ability to provide needed services to the public. Finally, the steady decrease in the inmate population has rendered Phase III unnecessary at this time.

**A. There have been significant factual changes that make programming, design, and construction of the Phase III facility substantially more onerous.**

Even "a party seeking modification of a consent decree may meet its initial burden by showing a significant change either in factual conditions or in law."[6] Modification of a consent decree may be warranted when changed factual conditions make compliance with the decree substantially more onerous, when a decree proves to be unworkable because of unforeseen obstacles, or when enforcement of the decree without modification would be detrimental to the public interest.[7] Here, there is a significant change in facts based on a significantly reduced and

---

[6] *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 384 (1992).
[7] *Id*.

4

declining jail population, anticipated revenue shortfalls, and an existing ability to meet constitutional requirements within current facilities.  Given the current facts, any Court Order to proceed with a sprawling new Phase III jail facility will be detrimental to the public interest.

1. **Orleans Parish Jail Investment**

When the Consent Judgement was announced in October 2012, the average daily population in the jail was 2,645 and the City's General Fund contribution to jail operations was approximately $22M.[8]  By 2019, the jail had an average daily population of 1,160 inmates and a General Fund contribution of $53M, which is expected to rise to $59M by the end of 2020.[9]  Thus, in the span of eight years, the City increased its allocation of operating funding to OPSO by a total of 140% and expects this allocation to increase further still (to 173% of 2012 funding levels) before year's end, all while the jail population has in fact been decreasing.[10]

The OJC is currently among the most staffed and well-funded jails of its size in the United States.  OPSO staffing and related funding have increased significantly—particularly regarding security staffing and deputy wages—since the Consent Decree was implemented.  For example, in July 2013, OPSO had 602 non-medical staff in their Criminal Division, with 274 assigned to detention security.[11]  By March 2020, total staffing for the Criminal Division had grown to 774 employees and security staffing had increased to 386 employees.[12]  This represents an overall staffing increase of 22%.  When trends in jail population are considered, OPSO employed one security staff for every 9.7 inmates in 2013; whereas by 2020, OPSO employed one security staff for every 3 inmates.[13]  The cost per deputy has also increased significantly since 2012, as the City

---

[8] Exhibit A, Affidavit of Jonathan T. Wisbey (City of New Orleans Chief Administrative Officer's Financial Liaison to OPSO), at ¶¶ 5, 20.
[9] *Id.*
[10] *See id.* at ¶¶ 5-6, 20.
[11] *Id.* at ¶ 10.
[12] *Id.*
[13] *Id.* at ¶ 11.

has funded at least three distinct pay raises for OPSO personnel to help with retention and recruitment.[14] Today, starting pay for Deputies is $33,000, which can increase to $39,000 annually if they obtain POST certification. This puts OPSO Deputy pay above correctional deputy pay in many other Louisiana Parishes, including Jefferson, St. Tammany, Caddo, Lafourche, Terrebonne, and Tangipahoa.[15]

The significant increase in funding for OPSO over the last eight years has made OPSO one of the most well-funded local jails of its size in the country based on a review of eleven other mid-sized jails, including: Jefferson Parish, Nashville, Charlotte, Charleston (S. Carolina), Reno, St. Louis, Albuquerque, Daytona Beach, Milwaukee, Pittsburgh, and Memphis.[16] Whereas Orleans Parish spends approximately **$73,007 per inmate**[17], eight of the eleven jails surveyed spent less than $50,000 per inmate. The highest spending found at another jail was $67,416 in Nashville.[18] And while specific budgetary levels for medical services were not readily available for several of the jurisdictions surveyed, medical spending could be identified for six of the eleven jails. Orleans Parish spent the most on medical services among these jails, with an annual cost of $15,363 per inmate.[19] By contrast, the next highest was Nashville (Davidson County, TN), which spends $10,692 on medical services annually per inmate.[20] Jefferson Parish spends only $3,956 per inmate on medical services.[21] Clearly, the OJC exceeds its mid-size jail counterparts in terms of funding, staffing, and medical services provided.

---

[14] Exhibit A, at ¶ 12.
[15] *Id.*
[16] *Id.* at ¶ 16.
[17] The City respectfully notes that its use of bold font is to provide emphasis, as is common in legal pleadings, and should not otherwise be interpreted as "hollering" before this Honorable Court.
[18] Exhibit A, at ¶ 17.
[19] *Id.* at ¶ 18.
[20] *Id.*
[21] *Id.*

**B. The OJC currently provides medical and healthcare that meets or exceeds constitutional standards.**

The Orleans Justice Center was opened in 2015 as the new jail facility run by the OPSO, replacing the prior Orleans Parish Prison ("OPP") facility. The OPP facility, an outdated prison, was at the heart of the issuance of the Consent Decree by this Court. The conditions of the facility were not up to the standards for a constitutional facility and subjected those incarcerated there to less than optimal conditions. The OJC, on the other hand, is a modern facility that provides conditions for inmates that are vastly improved to those of the OPP. The conditions described in the Plaintiffs' complaint no longer represent the current conditions, as inmates are no longer at imminent risk of rapes, sexual assaults and beatings. Further, inmates with mental illness are receiving constitutionally compliant care at the OJC.

**1. Inmate conditions have improved, especially for special populations.**

When the Plaintiffs filed their complaint in 2012, there were allegations that the jail population was in imminent danger due to overcrowding, understaffing, and undertrained prison employees.[22] The OPSO improved training for employees, which has led to the increased safety of inmates currently at the facility. As an example of the success of this increased training, the OPSO noted that it received its certification on the Prison Rape Elimination Act ("PREA") audit from an independent monitor.[23]

On January 25, 2019, this Court entered an Order wherein it emphasized the importance of a permanent solution to provide constitutionally mandated mental health treatment for all OJC prisoners.[24] The City was ordered to collaborate with Director Hodge to submit a short-term plan for mental health related matters, especially with respect to prisoners in need of acute and sub-

---

[22] *See* Rec. Doc. 1, at ¶ 2.
[23] Rec. Doc. 1274-1, at 27 (noting that OPSO meets or exceeds all standards set forth by the PREA).
[24] Rec. Doc. 1221, at 2.

acute mental health treatment.[25]  On March 18, 2019, the Court entered an Order approving the City's plan to renovate the Temporary Detention Center ("TDC") and ordering the parties to work to design and build a facility that provides for the constitutional treatment of the special populations, *i.e.*, prisoners with mental health issues, without undue delay, expense or waste.[26] The Court specifically found that the Orders extend no further than necessary to correct violations of the federal rights of the plaintiff class.[27]  Given all relevant facts, and considering the City's continuing jail investment, the City specifically seeks to prevent undue expense or waste, as set forth in the Court's Order.

In compliance with requirements to provide constitutional treatment for special populations, the City provided for improved and constitutional conditions at the OJC through the medical and mental health services provided by Wellpath LLC.  Wellpath provides healthcare services at nearly 500 government correctional or mental health facilities across approximately 33 states.[28]  Wellpath's Senior Vice President, William P. Kissel, notes that the healthcare program provided by Wellpath for the OPSO meets the national standards set forth by the National Commission on Correctional Health Care ("NCCHC") and is fully accredited by NCCHC.[29]  The healthcare program provided by Wellpath for the patients of OPSO meets or exceeds the standards of facilities with comparable infrastructure and average daily populations in urban settings when comparing scores related to continuous quality improvement and critical issues, such as staffing levels and suicide rates.[30]  In 2019, the City spent $17.8M on Wellpath's services for OPSO inmates.[31]

---

[25] Rec. Doc. 1221, at 3.
[26] Rec. Doc. 1227, at 2-3.
[27] *Id*. at 3.
[28] Exhibit B, Declaration of William P. Kissel (Senior Vice President of Wellpath), at ₱ 3.
[29] *Id*. at ₱ 5.
[30] *Id*. at ₱ 6.
[31] Exhibit A, at ₱ 15.

Mr. Kissel confirms that Wellpath has developed and implemented policies at OPSO for screening, assessment, and treatment of medical and mental health care issues, counseling, suicide prevention and precautions, use of restraints, and detoxification, which provide access to adequate medical care and would not permit deliberate indifference to a patient's serious medical needs.[32] In fact, many Wellpath staff members and contractors performing healthcare services for patients of OPSO are also engaged by other healthcare facilities in the community, such as Tulane Medical Center, Children's Hospital New Orleans, West Jefferson Medical Center, and University Medical Center.[33] Most importantly, Mr. Kissel attests that healthcare experts of Wellpath in the areas of psychiatry, behavioral health, general medicine, and nursing have reviewed the staffing plan for OPSO and the programming in each of their areas and have opined to him personally that the staffing levels are adequate to perform all objectives under the Consent Judgment.[34]

Increased staff training and improved medical and mental health services, in conjunction with the vastly upgraded facilities, have greatly improved the conditions for those incarcerated at the OJC. This is evident especially in comparison to the conditions for those that were incarcerated at the antiquated OPP when the Consent Decree was enacted. The improvements as outlined above support the argument that the OJC is a facility that meets or exceeds constitutional standards for inmates and that those incarcerated at the OJC, or any other OPSO-supported facility, are not subject to violations of any constitutional rights.[35]

**2. The Phase III infirmary is not necessary to provide adequate medical care.**

Dr. Ronald Shansky, an expert in prison healthcare, asserts that many jails do not have

---

[32] *See*, *e.g.*, Exhibit B, at ¶ 7.
[33] *Id.* at ¶ 26.
[34] *Id.* at ¶ 27.
[35] The personal preferences of Federal Court-Appointed Monitors should in no way dictate whether minimal constitutional standards are being met.

infirmaries and are able to meet an adequate care standard. If there is access to a local hospital that can meet or exceed the level of care provided by a jail infirmary, the need for a jail infirmary can be eliminated.[36]

Dr. Shansky is of the opinion that in lieu of an infirmary, the reasonable, cost-effective and constitutional solution is for the local public hospital to provide infirmary-level care at a hospital outside of the jail.[37] Those hospitals are better equipped to meet unanticipated needs of inmates requiring critical medical care.[38] Further, the infirmary will not negate the need for emergency room visits from the jail. Emergency room visits will continue at the same rate, as no infirmary is equipped to handle serious and life-threatening injuries or conditions that trigger an emergency room request.

Dr. Shansky is the court-appointed expert who is monitoring the jail system in Erie County, New York,[39] which has a prison population of approximately 1,400. In that system there is one requirement and that is whenever a clinical decision is made, there must be a timely transfer. There is no requirement for an infirmary in the Consent Decree.[40]

As the OPSO is at near full compliance with the rigorous Consent Decree without the Phase III facility, the City and OPSO are well poised to develop a new plan to continue providing constitutionally adequate services for those with serious mental illness in its custody in lieu of constructing the Phase III facility. According to a recent report prepared by Policy Research, Inc. and JFA Institute, adequate medical and mental health services are being provided to all inmates

---

[36] *See* Exhibit D, Affidavit of Dr. Ronald Shansky, ¶¶ 19-22 (suggesting that rendering medical and mental healthcare at a local hospital is a superior alternative to a jail infirmary).
[37] *See id.* at ¶ 21.
[38] *Id.* at ¶ 20.
[39] *Id.* at ¶ 9.
[40] *See id.* at ¶¶ 14-17. *See also* n. 36, *supra*. The Consent Decree does not specifically mandate construction of an infirmary as the only means to ensure protocols that provide access to adequate medical care and that would not permit deliberate indifference to a patient's serious medical needs.

at the OJC.[41]  Other key findings included that the number of inmates classified as acute and sub-acute has been declining since the Supplemental Compliance Plan was submitted in January 2017.[42]  Considerable progress has been made by Wellpath and Tulane University School of Medicine ("Tulane") in reaching compliance with the Consent Decree.  Particularly, the initial assessment, screening and re-assessment tasks performed by the duo are compliant with the Consent Decree as reported by the Independent Monitor.[43]  Finally, there are sufficient staff, services and facility space at the OJC to provide necessary treatment services to people assigned to the mental health caseload.[44]

Compared to similarly sized jails in other jurisdictions, the City is spending notably more on medical and behavioral health services for its jail as compared to similar jails throughout the state and country.[45]  Not all jail facilities have formally staffed infirmaries as proposed in the Phase III facility, as needed medical care can be effectively outsourced to existing hospitals.  Further, with renovations to the TDC buildings there will be capacity to house, manage, and treat the jail population, including acute and sub-acute male and female populations.

### 3. TDC, as designed, will provide accommodations for the OJC's acute, sub-acute, and step-down populations.

TDC is a facility located on the grounds of the OJC, which is being renovated by the City to facilitate inmates with special needs (acute, sub-acute, and step-down populations).  The total projected cost for the project is $6.27M.[46]  TDC Buildings #1 and #2 will have two pods each for a total capacity for 61 inmates.[47]

---

[41] *See generally* Exhibit C, *A Review of Orleans Parish Acute, Sub-Acute, And Step-Down Jail Populations* (2019).
[42] *See*, *e.g.*, *id*. at 3.
[43] *Id*.
[44] *Id. See also* Exhibit D, at ¶ 17.
[45] Exhibit A, at ¶ 18.
[46] Exhibit E, Declaration of Vincent A. Smith (Dir., City of New Orleans Capital Projects Administration), at ¶ 5.
[47] *Id*. at ¶ 7.

When TDC opens (the building is projected to be complete in July 2020), it will represent a modern facility that is able to assist with providing for the mental health and medical needs of OPSO's population. The facility will be able to house 39 mental health beds for male inmates and 22 mental health beds for female inmates.[48] TDC will include a female pod with 3 single cells, 2 double cells, and a dormitory layout with 15 beds for 22 female inmates as well as a male pod with 6 double bed cells and 1 isolation cell (with capacity for 13 inmates each) to accommodate 39 male inmates.[49] Moreover, the City continues to explore and implement strategies to reduce the number of inmates with mental health issues being placed in jail.

The City has requested a feasibility study funded by the MacArthur Foundation to develop processes to divert people on the City's behavioral caseload from jail, and to transition patients from jail upon their release.[50] With a retrofitted TDC, an average daily jail population of less than 1,000, and the continuing trend of a declining jail population, the facts have changed significantly since the City and OPSO envisioned a Phase III facility in January of 2017.

**C. Continuing with Phase III programming, design, and construction will significantly impact the City's ability to provide essential services.**

COVID-19 has had a devastating impact on the nation's health and economy. Based on numbers published by the Centers for Disease Control and Prevention ("CDC"), as of June 26, 2020, more than 2,374,282 people in the United States have been diagnosed with COVID-19.[51] The City has been particularly hit hard by COVID-19, at one point having the second highest infection rate per capita in the nation based on an analysis by WWL-TV.[52] Currently, New Orleans

---

[48] Exhibit A, at ¶¶ 8-9.
[49] *Id.* at ¶¶ 13-14.
[50] *See generally* Exhibit C.
[51] Centers for Disease Control and Prevention, *Cases in the US* (June 26, 2020 statistics compilation), *available at* https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fcases-in-us html
[52] Mike Perlstein, *New Orleans is Second Only to Seattle in COVID-19 Cases Per Capita,* WWL-TV (March 16, 2020), *available at* https://www.wwltv.com/article/news/health/coronavirus/perl-stats-story/289-f2e70da4-3e5b-

12

has nearly 8,000 confirmed cases of COVID-19, according to the CDC.[53] To flatten the COVID-19 curve, Mayor Cantrell issued an Emergency Proclamation; and on guidance from the City and State Health Departments, the City implemented several orders which prohibited or limited nonessential business operations for approximately four months.[54] The loss of tax revenue as a result of the global pandemic has had a significant negative impact on the City's finances and will make compliance with programming, design, and construction of a new Phase III jail facility burdensome in ways not previously known or contemplated. This burden, coupled with a significantly reduced and declining jail population, and considering the ability to meet constitutional requirements within current facilities, strongly indicates that a Phase III facility, as previously contemplated, is unnecessary and not in the public's best interest.

1. **The City of New Orleans has invested significantly in its continued commitment to constitutional jail operations.**

Prior revenue growth has helped meet increased demand for City services and has funded compliance efforts associated with both the New Orleans Police Department's ("NOPD") Consent Decree and the OPSO Consent Judgment. For example, since the Consent Decree was executed in 2013, the City has been responsible for $3,740,723.38 paid to the Court-appointed Monitors, and $2,600,000.34 paid to the Plaintiffs' attorneys in this case.[55] In total, $6,340,723.73 has been paid to these two entities alone, at the City's sole expense and with no City oversight of work performed. An additional expense is the Federal Court-appointed Compliance Director's

---

48b5-8684-a0dd5dc0361d.

[53] Centers for Disease Control and Prevention, *Cases by County* (June 17, 2020 statistics compilation), *available at* https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/county-map.html?state=LA

[54] *See* City of New Orleans Mayor's Office, *Emergency Declarations*, *available at* https://www.nola.gov/mayor/executive-orders/.

[55] Rec. Doc. 1274-1, at 35. On June 28, 2020, the City received the federal Court-appointed Monitors' recurring invoices for Monitors' fees, as the City does each month, most recently totaling $81,162.50, attached hereto as Exhibit F (*in globo*). This additional amount has not yet been paid. The City has no oversight over the work performed.

13

compensation to run the jail, which to date, has totaled approximately $832,695.42. This expense is in addition to the duly elected Sheriff's annual salary.

As the chart below demonstrates, the percentage of funding growth for the OPSO has far exceeded the growth of the General Fund during the relevant time period. Although the growth in General Fund revenues has enabled significant investments in both NOPD and OPSO over the last several years, much of this growth has come from non-recurring one-time revenue.[56] This increased reliance on one-time revenues means that the growth experienced over the last several years may not be sustainable long-term even in a booming economy.[57]



### 2. The COVID-19 pandemic continues to have a significant negative impact on current and future investment funding.

The COVID-19 pandemic and resulting economic fallout has clouded the City's revenue forecast and made it extremely likely that overall revenues will drop substantially in 2020 and 2021, if not for years to come.[58] The unprecedented nature of the COVID-19 pandemic means

---

[56] Exhibit A, at ¶ 22.
[57] Id.
[58] Id. ¶ 23.

that its full impact on the national and local economy is still not clearly understood. However, the City is currently projecting a $136M shortfall in General Fund revenues in 2020 (a 19% decline from original forecasts) primarily because of diminished tax collections.[59] While that number is continually being revised as new data is received, there is no doubt that the final negative impact will be massive. Furthermore, the City's ability to finance infrastructure projects was recently impacted by Fitch Ratings' May 4th announcement that they were downgrading the City's default bond rating and placing the City on a negative rating watch, as a result of the effects of COVID-19 on tourism-dependent cities.[60]

Given these new financial realities, it is imperative that this Honorable Court consider and address the City's concerns with the ongoing design work on the OJC Phase III facility. This project, as ordered by the Court, is already projected to cost $51M, which is $15M over budget, and will require the commitment not only of additional bond funds, but also a substantial operating budget.[61] Accommodating this budget increase would require the City to sell new bonds to finance construction during a time of economic uncertainty and the recent default bond rating downgrade.[62] As a result, funding this budget shortfall is likely to be more expensive than it would have been prior to COVID-19.[63] Furthermore, the significant strides that the City has made over the past five years in reducing the jail population has alleviated a need for expanded jail capacity. Since funding is not readily available due to the projected budget shortfall, it must be obtained through future bond sales that will be influenced by the pandemic's economic impact. Moreover, such a facility is neither specifically required by the Consent Decree, nor is a sprawling new facility

---

[59] Exhibit A, at 23.
[60] *Id.* at ¶ 25.
[61] *Id.* at ¶¶ 26-27.
[62] *Id.* at ¶ 26.
[63] *Id.* at ¶ 25.

required to meet minimum constitutional standards.

### 3. The steady reduction of the inmate population at the OJC currently makes Phase III unnecessary.

The proposal to build Phase III has two primary costs: the capital cost of building the facility and the operational cost once it is opened. To evaluate the potential costs of operating Phase III, the City conferred with national correctional experts, including Dr. Ronald Shansky. The experts estimated that an additional 109 OPSO staff would be required to operate Phase III as previously contemplated, along with 14 additional medical staff.[64] The City projects that operating costs for the facility will total a net $9.5M per year.[65] This would necessitate an 18% increase in the City's General Fund contribution to the Sheriff's budget, which has already seen a massive increase since the Consent Judgement was implemented.

Accommodating an additional increase of nearly $10M in operating costs would be challenging under normal circumstances. In the context of recovering from the sharpest decline in economic activity in U.S. history, it would be devastating. In other words, it would mean cutting City services and, potentially, reducing funding for needed infrastructure, public safety, and programs that support other vulnerable populations in Orleans Parish.[66]

Steady and consistent jail population trends have diminished the need to expand jail capacity by 89 beds, as the City originally agreed to do in 2017. With $3.5M in grant support from the John D. and Catherine T. MacArthur Foundation, the City has been working directly with criminal justice stakeholders over the past several years to explore and implement initiatives to reduce the jail population. In 2019, the average daily jail population decreased below 1,200 for the first time, a 25% reduction compared to 2016. At the same time, the City anticipates

---

[64] Exhibit A, at ¶ 27.
[65] *Id.*
[66] *See id.* at ¶¶ 28-30.

completing work on renovations to TDC Buildings 1 and 2 by July 2020, which will provide additional jail capacity. As previously stated, TDC will provide 39 mental health beds for male inmates and 22 mental health beds for female inmates.

In addition, as a result of the COVID-19 global pandemic, the jail population has declined even further, with the average daily jail population currently below 900.[67] While it is still unclear if a sub-900 average daily jail population is sustainable in the long-term, courts and law enforcement are implementing new strategies that are likely to continue to exert downward pressure on the jail population even once the epidemic recedes.[68]



Moreover, in full implementation of Louisiana's "Raise the Age" law the City has completed an expansion of the Juvenile Justice Intervention Center ("JJIC") to house juveniles currently held at the OJC. It is anticipated that the remaining juveniles currently housed at the OJC will either be largely or entirely moved to the JJIC later this year, thus further reducing supervisory demands on OPSO.

---

[67] Exhibit A, at ¶ 21.
[68] See id.

## IV. CONCLUSION

For all the aforementioned reasons, the City is requesting that this Honorable Court indefinitely suspend the programming, design, and construction of Phase III.  This request will not affect OPSO's ability to meet consent decree mandates as specifically described in the Consent Decree.  Importantly, the Consent Judgment does not require that the City build yet another new jail facility.  As a result of the City's substantial jail investment to date, OPSO inmates are receiving adequate mental health and medical services as provided by Wellpath and Tulane – two highly qualified and competent service providers.  The OJC currently has existing facilities to fully implement Section IV (B) which governs the mental health care of inmates, and Section IV (C) which governs the medical care of inmates.  Finally, considering the financial constraints of the City, a significantly reduced and declining jail population, and the ability to meet constitutional standards in current facilities, a modification indefinitely suspending the programming, design, and construction of Phase III is appropriate and prudent.  The City therefore respectfully requests that this Honorable Court grant the City's Motion and modify the Court's Orders by indefinitely suspending the programming, design, and construction of a new Phase III jail facility.

Respectfully submitted,

  **/s/ Sunni J. LeBeouf**
**SUNNI J. LeBEOUF (LSBA #28633)**
CITY ATTORNEY
Email: Sunni.LeBeouf@nola.gov
**DONESIA D. TURNER (LSBA #23338)**
Email: Donesia.Turner@nola.gov
**CHURITA H. HANSELL (LSBA #25694)**
Email: chhansell@nola.gov
1300 PERDIDO STREET
CITY HALL – ROOM 5E03
NEW ORLEANS, LOUISIANA 70112
TELEPHONE: (504) 658-9800
FACSIMILE:   (504) 658-9868
*Counsel for the City of New Orleans*

**CERTIFICATE OF SERVICE**

    I do hereby certify that on this 29th day of June 2020, a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this filing will be sent by operation of the court's electronic filing system.  I also certify that a copy of the foregoing will be sent to all non-CM/ECF participants by United States Mail, properly addressed and postage pre-paid.

                                                       /s/ Sunni J. LeBeouf
                                                       **SUNNI J. LeBEOUF**