UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| LASHAWN JONES, ET AL., | * | |
| | * | CIVIL ACTION CASE |
| Plaintiffs, | * | |
| | * | NO. 2:12-cv-00859 |
| VERSUS | * | |
| | * | SECTION "I" |
| MARLIN GUSMAN, ORLEANS PARISH | * | JUDGE LANCE M. AFRICK |
| SHERIFF, ET AL., | * | |
| | * | MAGISTRATE "5" |
| Defendants. | * | MICHAEL B. NORTH |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM IN OPPOSITION TO THE MOTION FILED BY
## THE CITY OF NEW ORLEANS FOR RELIEF FROM THE COURT'S ORDERS

Independent Jail Compliance Director Darnley R. Hodge, Sr., through undersigned counsel, respectfully submits this memorandum in opposition to the motion filed by the City of New Orleans for relief from Court orders. Doc. No. 1281.

For years, the parties to this litigation have been working to program, design, and construct an 89-bed jail facility that will house inmates with mental and medical health issues ("Phase III") in a sustainably constitutional manner. On June 5, 2020, the City of New Orleans ("City") unilaterally and without notice to the Court or the other parties halted the progress on Phase III by suspending the services of the architect. In doing so, the City ran afoul of at least two of this Court's orders. *See, e.g.,* Doc. No. 1221 (The "City shall direct the architect chosen to design the permanent facility . . ."); Doc. No. 1227 (The "City and the Orleans Parish Sheriff's Office are directed to continue the programming phase of Phase III."). By stopping work on Phase III, moreover, the City not only violated Court orders, it also breached its agreement with the Orleans Parish Sheriff's Office ("OPSO") regarding the exclusive use of the Templeman II FEMA funds under the Stipulated Order. Doc. No. 1082.

1

Although the City cited Federal Rule of Civil Procedure 60(b) as its authority to ignore prior orders and not build Phase III, the City's motion does not meet the standards of Rule 60(b). The Court should deny the motion, and the parties must continue without further delay to program, design and construct the 89-bed Phase III facility to address the legitimate needs of the Orleans Parish inmates with medical or mental health issues.

I.      **FACTS AND BACKGROUND**

    A.      **The quality of mental health care provided to inmates has been a central issue of concern throughout the *Jones* litigation.**

In April 2012, the Plaintiffs in this action, prisoners incarcerated at the Orleans Parish Jail, filed a putative class action against defendants Sheriff Marlin Gusman (the "Sheriff") and other prison officials, alleging that inmates were subjected to various unconstitutional conditions of confinement and seeking injunctive relief to remedy those alleged conditions. Doc. No. 1.  The United States intervened pursuant to 42 U.S.C. § 1997, also alleging constitutional and statutory violations and seeking injunctive relief. Doc. No. 70.  The Plaintiffs, the United States, and Sheriff Gusman ultimately entered into an agreement that was adopted by this Court in June 2013 as a Consent Judgment, which set forth detailed and extensive procedures and protocols to be followed by the OPSO in operating the Orleans Parish Jail, for the purpose of addressing the alleged unconstitutional conditions.  *See* Doc. No. 466 (the "Consent Judgment").

Concern about the mental health of inmates housed in the jail facility has been a continuing issue of concern in the *Jones* litigation since the filing of the original Complaint.  *See, e.g.*, Doc. No. 1 at ¶¶ 2–3, 6–7, 35, 39, 41, 84–133.  The Consent Judgment set forth specific provisions relating to mental health care that the OPSO would be required to meet to achieve standard of compliance. *See* Doc. No. 466 at 24-33.  Under the Consent Judgment provisions relating to mental health care, the OPSO "shall ensure constitutionally adequate intake, assessment, treatment, and

2

monitoring of prisoners' mental health needs, including but not limited to, protecting the safety of and giving priority access to prisoners at risk for self-injurious behavior or suicide." *Id.* at 24. In approving these provisions in the Consent Judgment, the Court found that the evidence showed the "deficiencies with respect to medical and mental health care are widespread, and the deficiencies with respect to mental health care are particularly obvious and pervasive." Doc. No. 465 at 64; *see also id.* at 46–65 (describing evidence that justified the inclusion of the provisions of the Consent Judgment relating to mental and medical health care).

As a short-term measure to handle inmates with mental health issues, in an Order issued on August 13, 2014, the Court approved Sheriff Gusman's plan to house temporarily acute and subacute male mental health populations[1] at Elayn Hunt Correctional Center ("Hunt"), a state Department of Corrections facility located in St. Gabriel, Louisiana, and required the City to fund the plan. Doc. No. 738 at 29. This short-term housing plan was developed and approved while the Sheriff and the City continued to work on a long-term sustainable solution to house inmates with acute mental health needs. *Id.* at 3–5.

In 2016, the parties to this litigation stipulated to the appointment of an Independent Compliance Director. Doc. No. 1082. In the Stipulated Order, the Court noted that tasks and reforms relating to medical and mental health care would be essential to meeting the "sustained, durable change required by the Consent Judgment." *Id.* at 8. In pursuit of this goal, the Court ordered the City, the Sheriff, and the Compliance Director to develop and finalize a plan for the

---

[1] Individuals with acute mental illness have "active symptoms of mental illness [that] affect their behavior and their ability to function." Doc. No. 738 at 4 n.16. Such symptoms include suicidal ideation, hallucinations, and delusions. *Id.* With respect to individuals with subacute mental illness, those same symptoms have been addressed or reduced, but the individuals are not yet ready to be in a general population in a correctional environment. *Id.*

3

appropriate housing for inmates with mental health issues and medical needs within 60 days of the Compliance Director's appointment. *Id.* at 14.

At the time the Stipulated Order was under consideration, the City and OPSO also were involved in a dispute over which entity would receive FEMA funding of approximately $70 million to replace the Templeman II facility that had been destroyed by Hurricane Katrina.[2] As part of the Stipulated Order, OPSO purposely gave up its rights to control Templeman II FEMA funding of approximately $70 million in exchange for a commitment by the City to use the Templeman II funds for the construction of a facility to house inmates with mental health and medical needs. The Stipulated Order expressly confirmed the agreement:

> Within 60 days of appointment, the City, the Sheriff, and the Compliance Director shall develop and finalize a plan for (1) appropriate housing for prisoners with mental health issues and medical needs, (2) addressing the housing needs of youthful offenders, and (3) addressing the current conditions of the "Docks" facility, consistent with the terms of the Consent Judgment. ***The City of New Orleans shall maintain final authority and approval over capital expenditures associated with that plan, including use of the Templeman II FEMA funding exclusively for implementation of the plan.*** The City and the Compliance Director shall consult with the Monitors and the Plaintiffs to ensure that the proposed resolutions meet the standards required by the Consent Judgment.

*Id.* at ¶ 22 (emphasis added). The City, as a party to the Stipulated Order, therefore agreed that (a) a facility would be constructed to address the mental health and medical needs of inmates,[3] and

---

[2] The Templeman II facility was entirely owned by OPSO. It was constructed on land that the OPSO purchased from the City for $2 million. Furthermore, all of the funds used to construct the Templeman II building were OPSO funds raised by OPSO through a bond issuance. No City money was used to construct Templeman II. *See* Exh. "1," Affidavit of Michael G. Gaffney, Esq. ("Gaffney Affidavit") at ¶ VII.

[3] The reference to FEMA funding for implementation of the plan confirms the intent of the parties that the items listed would be permanent facilities to be constructed, as required by FEMA guidelines and regulations.

(b) the Templeman II FEMA funds would be used *exclusively* for (1) the renovation of the Docks, (2) construction of a youth facility, and (3) construction of the mental health facility, *i.e.*, Phase III.

In accordance with the requirement to develop a long-term plan to address mental health housing, the initial Compliance Director, Gary Maynard, submitted a "Supplemental Compliance Action Plan" on January 4, 2017 that recommended the construction of the "Phase III" Facility.[4] Doc. No. 1106 at 8–9. The parties agreed on the general parameters of Phase III, including that the facility will house male and female acute and subacute populations separately, with 77 beds to house the male population, and 12 beds to house the female population, for a total design plan of 89 beds, along with space for individual and group mental health counseling and treatment. *Id.* Beyond these 89 beds, Phase III would additionally house an infirmary, clinic, administrative medical/mental health space directly adjacent to the proposed mental health housing units, laundry facilities, and additional family and attorney visitation space. *Id.* at 9–10.

There is no doubt that the City fully supported the 89-bed Phase III facility. Three years ago, at a June 8, 2017 status conference, then-City Attorney Rebecca Dietz confirmed in open court:

> Finally, the construction of an inmate mental and medical health care facility and laundry, the RFP for design professionals is being finalized this week. The City will make sure that the monitors have an opportunity to review that RFP before it goes out to the public. Then once design is completed and construction can begin, depending on the project delivery method -- which, as Your Honor knows, is a little dependent on FEMA, although we are not holding anything back now because of FEMA. We are not waiting on them. *We are moving forward. This project should be completed within 24 to 40 months.*

---

[4] The OPSO refers to the Phase III Facility as the "Special Needs Facility."

Doc. No. 1127 at 17-18 (emphasis added). By Ms. Dietz's longest estimate of 40 months, Phase III or the Special Needs Facility should have been completed by the end of calendar year 2020.

**B.    The Monitors repeatedly have cited the need for mental health services in their reports.**

Not only did the City, the Compliance Director, and OPSO fully support Phase III, so have the Monitors. Pursuant to the Consent Judgment, the Monitors have filed eleven reports on the progress in implementing the Consent Judgment. Doc. Nos. 609, 744, 790, 881, 996, 1101, 1120, 1143, 1188, 1226, 1259.  One thing has been consistent in these reports. The Monitors observed and understood the compelling and "critical" need for the Phase III facility. Their reports repeatedly confirm the need for the Phase III facility and the confirmed expectation that it will be constructed to satisfy the need for medical and mental health services to inmates.

> "OPSO must provide housing for special populations, including several levels for patients with mental illness; juveniles; intellectually and/or cognitively impaired; medical infirmary, etc. Other than Phase III, no other reasonable options have been proposed." Doc. No. 609, filed February 13, 2014, at 88;

> "[Mental Health Working Group]'s recommendation that the Phase III building was the best available option and that the construction of Phase III should begin with all deliberate speed." Doc. No. 881, filed September 9, 2015, at 70;

> "The mental health Monitor also . . .advised that the [Mental Health Working Group]'s recommendation to build Phase III remained the best option for comprehensive mental health services." Doc. No. 996, filed March 17, 2016, at 80;

> "The Monitors have concluded during this, and past site visits to the OJC, that the OJC is not equipped to provide adequate mental health and medical services as well as specific counseling services regarding youth, victims of sexual abuse, and other special populations including inmates on the mental health caseload who are victims of abuse." Doc. No. 1101, filed October 25, 2016, at 51;

> "The defendants and the City must move forward as expeditiously as possible to construct the appropriate housing for inmates on the

mental health caseload, and the physical plant to adequately provide medical care (e.g. examination rooms, triage rooms, office and storage space, and an infirmary). Each day this physical plant is not in existence constitutes on-going harm to inmates." Doc. No. 1101 at 59;

"As stated in Compliance Report #6, the Defendants must end the unacceptable practice of housing inmates who are on suicide watch or direct observation status in OJC for extended periods of time." Doc. No. 1120, filed May 1, 2017, at 68;

"The Compliance Director provided a required report to the Court and the community regarding the critical need to build a Phase III for at risk populations. Moving forward expeditiously is critical to achieving a Constitutional jail. . . . [T]here must be an urgent push to get the project moving forward." Doc. No. 1120 at 10;

"With the planning for Phase III, the Monitors look forward to reviewing the staffing plan." Doc. No. 1143, filed January 18, 2018, at 46;

"For Phase III, compliance is pending." Doc. No. 1143, at 171;

"The Monitors are hopeful that the City will make the design and building of this additional facility a priority as it is critical to the provision of mental and medical health services." Doc. No. 1188, filed August 29, 2018, at 13;

"There are no special needs beds (e.g. infirmary) at OJC and no specific plans to provide this much-needed space, except for the vague promise of a Phase III building." Doc. No. 1188, at 104;

"The Monitors are hopeful that the City will make the design and building of this additional facility a priority as it is critical to the provision of mental and medical health services." Doc. No. 1226, filed March 18, 2019, at 12;

"Despite improvement in the areas of medical and mental health care, the Medical and Mental Health Monitors report challenges remain in the provision of basic [care], staffing, and recordkeeping, as well as the need for improved collaboration with custody/security staffing. . . . The long-term solution is the design and construction of Phase III, a specialized building which contain[s] an infirmary and housing for inmates with acute mental health issues." Doc. No. 1259, filed January 22, 2020, at 8; and,

> "The process would be greatly enhanced if the City would adhere to the agreement to hold quarterly executive committee meetings with the stakeholders. The construction and occupation of Phase III is critical to the provision of mental and medical health services in accordance with the Consent Judgment." Doc. No. 1259, at 11-12.

Most recently, on January 19, 2020, the Monitors summarized their observations as a need to "[1] Continue leadership, initiatives, and direction by OPSO and Wellpath; [2] Increase correctional security staffing to provide adequate and ongoing dedicated support for mental health and medical services consistently; [3] Continue to develop full services and continuity of services for male and female prisoners including all levels of care, staffing and space; and [4] Continue to evaluate and pursue full services for mentally ill prisoners, including medication management, and acute, residential, and outpatient care." Doc. No. 1259 at 58.

**C.    The City confirms its commitment to build Phase III, and then recently and unilaterally suspends work on it.**

The City, OPSO, Monitors, DOJ, the Plaintiffs, and the Compliance Director proceeded, albeit slowly, with the implementation of the Special Needs Facility. In 2019, those plans accelerated. The OPSO received a letter from the Louisiana Department of Public Safety and Corrections ("Corrections") that the Hunt facility would no longer be made available to house Orleans Parish inmates with mental health needs. At a status conference on January 25, 2019, the Court addressed the issue:

> The situation facing prisoners with mental health needs – both the male prisoners at Hunt and the female prisoners at the OJC – is dire: with Hunt no longer available as of October 2019, there is no plan in place regarding housing and treatment for male prisoners with significant mental health needs. Equally as troubling is the fact that there simply *is* no facility to address the needs of female prisoners with significant mental health issues. *Despite repeated assurances from the City, little progress has been made. As the Court advised the parties, action must be taken on an emergency basis to avert a crisis.*

8

*See* Doc. No. 1221 (emphasis added). In addition to ordering the City and Compliance Director to propose a temporary solution (the "Short-Term Plan") to solve the issue of housing inmates with mental needs, the Court also addressed the permanent facility:

> **IT IS FURTHER ORDERED** that the City shall direct the architect chosen to design the permanent facility described in the Supplemental Compliance Action Plan,[5] filed into the record on January 4, 2017 (the "Phase III facility"), to begin the programming phase of the Phase III facility as soon as possible and to update the Court on the progress of those efforts at the next scheduled status conference.

*Id.*

The City changed administrations when the new Mayor was sworn in on May 7, 2018. The change in City administration, however, did not change the City's commitment to Phase III. On December 13, 2018, Vincent Smith, Director of Capital Projects for the City, wrote to the Independent Compliance Director and noted that "the City has appropriated $58.337 million in the Criminal Justice and Public Safety roll up towards the renovation of the Docks ($5.252 million), YSC 28-bed addition ($17 million) and *OJC Medical Services Building* ($*36.048 million*)." *See* Exh. "A" to Exh. "2," to Affidavit of Darnley R. Hodge ("Hodge Affidavit") (italics added).

The City also issued a response to the Court's January 25, 2019 Order that reconfirmed dedicating at least $36.1 million for Phase III. *See* Doc. No. 1222. *First*, the City "recognize[d] the need and urgency to meet the requirements of the Consent Decree." *Id. Second*, as part of the Mayoral transition, the City "initiated an analysis of *all* options to construct Phase III." *Id.* (emphasis added). Some of these options included the possible use of the Temporary Detention Center ("TDC") as a permanent facility for inmates with medical and mental health needs and renovating the fourth floor of OJC. *Id.* Ultimately, those options were rejected. *Id. Third*, the City

---

[5] R. Doc. No. 1106.

estimated the costs of the TDC renovations at a "range of $4.5-$5 million, for the renovation of TDC buildings one and two." *Id.* Regarding the three projects it had agreed to complete under the Stipulated Order, the City estimated the following overall costs:

> With the requested renovations to TDC, the City's OPSO capital investment will total **$63.4 million** (including the OPP Docks Renovation, $5.3 million; Youth Study Center 28-bed addition, $17 million; and OJC Medical Services Phase III Building, $36.1 million). Notably, the City has been informed by the leadership of FEMA Region 6 that there will be no additional FEMA funding forthcoming for this project. The City will therefore have to identify an alternate funding source for the TDC renovations.

*Id.* (emphasis in original). *Finally*, the City confirmed that it was "actively working with Director Hodge, Sheriff Gusman and the monitors to program, design, and construct a Phase III project that meets the requirements of the Consent Decree, and does so in a cost-effective manner." *Id.*

The City and the Compliance Director then submitted the Short-Term Plan to renovate and use the TDC to house inmates with medical and mental health needs, while Phase III simultaneously would be designed and constructed. *See* Doc. No. 1227. The Court adopted the Short-Term Plan and also further ordered the City to proceed with design and construction of the permanent Phase III 89-bed facility.

> **IT IS FURTHER ORDERED** that the City and the Orleans Parish Sheriff's Office are directed to continue the programming phase of Phase III.

> **IT IS FURTHER ORDERED** that the parties are to work collaboratively to design and build a facility that provides for the constitutional treatment of the special populations discussed herein without undue delay, expense or waste. The parties may seek the assistance of United States Magistrate Judge Michael North in that regard.

*Id.* The Court also ordered the City to submit status reports on the progress of the Short-Term Plan, as well as an update on "the City's progress toward construction of Phase III." *Id.*

From its first status report issued on April 18, 2019, up to and through its report issued on

April 17, 2020, the City showed full support of and progress in completing the Phase III facility.

"The current projected finish date for the Phase III facility is June 2022. The City will update the Court and the parties of any changes to the projected dates submitted herein." Doc. No. 1231, filed April 18, 2019;

"The current target . . . finish date for Phase III is June, 2022" Doc. No. 1234, filed May 17, 2019;

"The current projected start of construction is October, 2020 and the projected completion date for Phase III is June, 2022." Doc. No. 1238, filed June 18, 2019;

"The current projected completion of Phase III is June, 2022, assuming no unforeseen delays." Doc. No. 1243, filed July 18, 2019;

"Significant progress continues to occur in moving both projects forward." Doc. No. 1244, filed August 14, 2019;

"Noteworthy progress continues in moving both projects forward." Doc. No. 1249, filed September 18, 2019;

"At present, the projected completion date for Phase III is summer 2022." Doc. No. 1252, filed October 18, 2019;

"We are currently in the Design Development ("DD") Phase of Phase III and the estimated projected completion date remains June 2022." Doc. No. 1253, filed November 19, 2019;

"Grace/Hebert Architects ("GHA") is in the final stages of Design Development ("DD") for the Phase III project of the Orleans Justice Center. . . . The projected completion date for Phase III is June 2022." Doc. No. 1256, filed December 18, 2019;

"The City awaits final [Design Development] documents . . . . The projected completion date for Phase III is Summer 2022." Doc. No. 1258, filed January 17, 2020;

"The City has issued a Notice to Proceed to Grace Hebert Curtis Architects to begin the final stage of design . . . . The projected completion date for Phase III is Summer 2022." Doc. No. 1261, filed February 21, 2020;

"The City issued a March 2, 2020, [Notice To Proceed] to Grace/Hebert Architects to start the Construction Document ("CD") Phase of OJC – Phase III." Doc. No. 1266, filed March 18, 2020; and,

"The architect, Grace/Hebert Architects, is currently engaged in the Construction Document ("CD") phase of Phase III. The projected project completion is summer 2022." Doc. No. 1268, filed April 17, 2020.

The City filed another Status Report on May 31, 2020. Doc. No. 1276. Once again the City confirmed that "[a]s Ordered by the Court, *Phase III design work remains ongoing*, and documents were previously shared with all parties." *See* Doc. No. 1276 (emphasis added). But the City suddenly struck a different tone, stating that the "project is already projected to cost $51M, which is $15M over budget" and that the "operating costs of the facility will total a net $9.5M per year." *Id.*

Then, on June 5, 2020, unknown to the Court, the Compliance Director, or the OPSO, five days after the Status Report represented "work remains ongoing," the City unilaterally halted work on Phase III by suspending the work of the architect. *See* Doc. No. 1280. Suspending the services of the architect violated at least two of the Court's Orders. *See, e.g.,* Doc. No. 1221 (The "City shall direct the architect chosen to design the permanent facility . . ."); Doc. No. 1227 (The "City and the Orleans Parish Sheriff's Office are directed to continue the programming phase of Phase III.").

The Court's status conference on June 10, 2020 discussed, among other things, a motion to terminate the appointment of the Compliance Director. At that status conference, the City confirmed that, despite the Court's clear prior Orders, it had unilaterally suspended work on the Special Needs Facility. After the status conference, on that same day, the City filed an Updated

12

Status Report where it confirmed that it "request[ed] that the architect suspend Phase III construction design work." *See* Doc. No. 1279. The City further noted:

> **To the extent the Court is further ordering that Construction Design work continue on a facility where adjustments and decisions will need to be made going forward consistent with the current facts, this will be a waste of taxpayer dollars, financially benefitting only the architect, which should be avoided.**

*Id.* (emphasis in original).

On June 29, 2020, the City filed its motion for relief from the Court's orders in an effort to obtain, after the fact, Court authority for the step it already had taken. Doc. No. 1281. In that motion, the City argues that it does not have sufficient remaining funds available from FEMA to build Phase III and that other options previously rejected, such as the permanent use of TDC or the renovation of the fourth floor of OJC, should now be reconsidered or pursued. As shown below, the City's motion must fail.

## II.    LAW AND ARGUMENT

The Stipulated Order requires (a) a permanent housing facility to be constructed to address the mental health and medical needs of inmates and that (b) the Templeman II FEMA funds must be *exclusively used* for (1) the renovation of the Docks, (2) construction of a youth facility, and (3) construction of the housing for prisoners with mental health issues and medical needs, *i.e.*, Phase III. The Stipulated Order was "**AGREED by the parties and ORDERED by the Court.**" R. Doc. 1082, at 2. According to the Supreme Court, like consent decrees, stipulated orders have the binding force of a contract. *Neirbo Co. v. Bethlehem Shipbuilding Corp.*, 308 U.S. 165, 175 (1939). Quoting then-Judge Cardozo, the Court stated "[t]he stipulation is . . . a true contract." *Id.*   As a contract, the City cannot breach the terms of the Stipulated Order.

13

Institutional reform litigation that results in an agreement between the parties memorialized in a consent decree at times can be subject to modification under Federal Rule of Civil Procedure Rule 60(b)(5). *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 378 (1992). Under exceptional circumstances, modification of an institutional reform decree is permitted because such orders often bind the parties for long periods of time, and the relevant factual circumstances or law may change. *Id.* Additional concerns regarding "federalism, separation of powers, democratic accountability, and deference to those state officials responsible for administering public institutions and programs" also may be present. *Frazer v. Ladd*, 457 F.3d 432, 436 (5th Cir. 2006). *See also Horne v. Flores*, 557 U.S. 433, 447 (2009). Because of these concerns, the Supreme Court and the Fifth Circuit have adopted a two-pronged test for Rule 60(b) motions for modification of an institutional reform decree. ("*Rufo* test"). *Rufo,* 502 U.S. at 384; *Cooper v. Noble,* 33 F.3d 540, 544 (5th Cir. 1994); *United States v. New Orleans,* 947 F. Supp. 2d 601, 615-16 (E.D. La. 2013).

*First*, the moving party must show a significant change either in factual conditions or law that either (1) "make[s] compliance with the decree substantially more onerous," (2) makes the decree "unworkable because of unforeseen obstacles," or (3) makes enforcement of the original decree "detrimental to the public interest." *Rufo*, 502 U.S. at 384. Additionally, evidence that a consent decree failed to achieve its intended purpose also may support a modification under Rule 60(b)(5). *League of United Latin American Citizens, Dist. 19 v. City of Boerne*, 659 F.3d 421, 438 (5th Cir. 2011). A party also can meet the first prong by showing the object of the decree has in fact been achieved and that a durable remedy has been implemented. *Horne*, 557 U.S. at 455. The Eastern District of Louisiana favors a stricter test because "policy considerations do not favor setting aside a consensual judgment on a Rule 60(b) motion." *See New Orleans*, 947 F. Supp. 2d at 616.

14

*Second*, the party seeking relief also must show that the proposed modification is narrowly tailored to address the changed circumstance. *Rufo*, 502 U.S. at 391. Impermissible modifications include those that rewrite the agreement solely to meet the constitutional floor, or that abrogate the primary objective of a consent decree. *Id.*; *Ruiz v. Lynaugh*, 811 F.2d 856, 859 (5th Cir. 1987). State and local officials may factor in financial constraints when tailoring a modification, but budgetary considerations cannot be used as an excuse to create or perpetuate a constitutional violation. *Horne,* 557 U.S. at 450; *New Orleans*, 947 F. Supp. 2d at 619. A party seeking relief must establish both prongs.

Rather than addressing the standards of Rule 60, however, the City's motion focuses on three main arguments: (1) the current jail population does not justify a Phase III facility, (2) the City cannot afford an 89-bed mental and medical health facility, and (3) other previously-rejected options now have become suitable for addressing the needs of inmates with medical and mental health needs. Each argument is without merit, and none meet the standard to require modification of the Consent Decree and Stipulated Order in this case.

### A.    Today's jail population does not justify abandoning Phase III, and Phase III is not a "jail expansion."

Initially, the City argues that the decreasing jail population in OJC means the Special Needs Facility is unnecessary. That argument entirely misses the mark. The City points to the reduction of inmates over the years from OJC and also the recent reduction in the OJC population after the spread of COVID-19. The City's first error is that the reduction of inmates in OJC has no bearing on the number of inmates with mental health issues because all inmates with mental health needs are not currently housed at OJC. The City has not shown any reduction to inmates with mental health needs. Moreover, although the spread of COVID-19 may have contributed to a decrease in the number of inmates, the spread of COVID-19 also has made OJC less flexible to handle

15

additional inmates, particularly those with mental or medical health issues. *See* Hodge Affidavit. Stated simply, the need for an 89-bed Phase III facility has not been diminished simply because the inmate count in the general population at OJC at this particular point in time has been reduced.

The City's argument that Phase III will result in a "jail expansion" also is without merit. The agreement to proceed with Phase III in fact already has led to a **reduction** in the inmate capacity of the OPSO facilities. Prior to the compromise that led to the decision to move forward with Phase III, the OJC facility was authorized for 1438 beds. As part of the agreement to proceed with constructing Phase III with 89 beds to serve inmates with mental health needs, the OPSO agreed to limit the facility to a total inmate population of not more than 1250 inmates at any one time. *See* Exh. "3," City of New Orleans Ordinance No. 28,300. Thus, by committing to Phase III, both the City and the OPSO already have achieved an overall reduction in the capacity of the jail facility, a reduction that took account of the planned capacity of the Phase III facility.

The OPSO, moreover, has little to no control over the number of inmates in the jail population housed at OJC. Though a fundamental and perhaps obvious point, it bears repeating that the OPSO does not control those parts of the criminal process that either add or subtract persons from its inmate population. The NOPD, which the OPSO does not control, but which the City does control, is responsible for nearly all of the arrests and bookings of accused persons who become inmates of the OJC while they await trial. Similarly, the OPSO has no authority over the judicial system, or the speed at which criminal cases are processed by the courts. The OPSO, therefore, can neither slow down arrests leading to pretrial incarceration, nor can it accelerate the departure of inmates through the judicial system. The only interests of the OPSO are that it has the ability to house the inmates in pretrial detention in a manner that meets adequate constitutional standards, and that it has the necessary facilities to do so.

16

**B.     The City cannot avoid its constitutional duties because of purported budget constraints**.

The City's next argument is that it cannot afford the Phase III facility to handle inmates with mental and medical health issues. That argument fails both as a matter of law and fact. As a matter of law, the City cannot evade its constitutional duties because of purported budget shortfalls. As this Court has acknowledged, "Louisiana law obligates the City to provide a 'good and sufficient jail.'"  Doc. No. 738 at 21 (quoting La. Rev. Stat. 33:4715); *see also* La. Rev. Stat. 15:702 and 15:704.  The Court also has acknowledged case law that places the burden of funding the jail on the City, although the Sheriff has the obligation to operate the facility.  Doc. No. 738 at 21; *see also Broussard v. Foti*, No. 00-2318, 2001 WL 258055, at *2 (E.D. La. Mar. 14, 2001) (Vance, J.) ("[T]he legislative scheme dictates that the City of New Orleans bears the obligation of satisfying the expenses of housing prisoners, while the sheriff has the duty of operating the facility."); *Fairley v. Stalder*, 294 F. App'x 805, 812 (5th Cir. 2008) ("[W]e agree that day-to-day operation of the parish prison is the responsibility of the local sheriff, and that financing and maintenance are the responsibility of the local governing authority."); *Amiss v. Dumas*, 411 So. 2d 1137, 1141 (La. App. 1st Cir. 1982) ("[T]he City-Parish is responsible for the expenses of establishing, maintaining and operating the jail and for all the expenses of feeding, clothing, and providing medical treatment to the prisoners while the sheriff has the duty of operating the jail and seeing to it that the prisoners are properly cared for, fed and clothed."). [6]

---

[6] The City administration recently expressed on social media that it wishes to invest in "people," not in "jails." Such remarks overlook the "people" who find themselves arrested by the City's police force and are then incarcerated in the jails. Those people also have rights, including the right to adequate and constitutional medical and mental health services. The concerns expressed by the Court's Consent Order and the Stipulated Order, and both by the Compliance Director and the Monitors, have been focused on providing these necessary services to the people who become the subject of the criminal justice system. The Court, the Compliance Director and OPSO are "not

17

The City now insists that perceived budget shortfalls should excuse it from the Consent Judgment. Stated differently, the City asks the Court to ignore the minimum requirements of the United States Constitution. This the Court cannot do. The City cannot evade its constitutional obligation to provide adequate care to those in custody. As this Court stated, "[w]hether 'budget shortfalls, a lack of political will in favor of reform,' and/or other factors are responsible for OPP's deficiencies, these deficiencies must be remedied." Doc. No. 465, at 103 (citing *Brown v. Plata*, 131 S. Ct. 1910, 1936). The Constitution of the United States is not optional, and the City must meet its constitutional obligations to fund the construction and the operation of a medical and mental health facility, *i.e.,* Phase III.[7]

Moreover, with regard to funding, the City is fortunate that it should have sufficient FEMA funds to build the Special Needs Facility. The funds for construction of Phase III are federal funds from FEMA, *not* City tax dollars. In fact, the FEMA funds have been available to and solely under the control of the City since the Stipulated Order in 2016.

After Katrina, the OPSO and City disputed which entity should control FEMA funds allocated and earmarked to rebuild various facilities that were part of the Criminal Justice Complex. Initially, both OPSO and the City sought control of the funds for the repair and restoration of the Community Corrections Center ("CCC"), which was destroyed by Hurricane

---

insensitive to the plight of New Orleans Parish inmates, especially women, who for years have been denied their right to constitutional medical and mental health care." Doc. No. 1280.

[7] The City attaches a graph to its memorandum to assert that the funding of OPSO is growing exponentially. The percentage funding graph is misleading. The expenditures that OPSO incurred and that were funded by the City rose over the last several years because of (1) salary increases approved by the City, (2) medical costs associated with the contract the City has with Wellpath, and (3) maintenance contracts on OJC. *See* Exh. "4," Affidavit of Sean Bruno. The OPSO does not anticipate significant increases in future expenditures even with Phase III. *Id.*

Katrina.[8] Eventually, the OPSO deferred and did not contest City control of the FEMA monies allocated for the OPP and CCC facilities. The CCC funds amounted to more than a net of $16 million of repair funds and an additional $2 million of Project Management funds for the City's use. Gaffney Affidavit, at ¶ X. The City was free to use this combined $18 million for the construction of Phase III, but it chose not to do so. *Id.*

As previously mentioned, the City and the OPSO also disagreed over control of the funds that FEMA awarded to replace the Templeman II facility. By the Stipulated Order, the OPSO gave up its rights of control over these Templeman II funds in exchange for the stipulated promise by the City to renovate the Docks, build the juvenile detention facility, and build the Phase III housing facility for "prisoners with mental health issues and medical needs." As the Stipulated Order stated, "The City of New Orleans shall maintain final authority and approval over capital expenditures associated with the Plan, *including use of the Templeman II FEMA funds exclusively* for implementation of the plan," which includes "(1) appropriate housing for prisoners with mental health issues and medical needs, (2) addressing the housing needs of the youthful offenders, and (3) addressing the current condition of the "Dock" facility." Doc. No. 1082 at ¶22 (emphasis added). OPSO gave up control of its claim to these funds in express reliance on the agreement by the City that Phase III would be built as confirmed by the Stipulated Order. The City cannot now repudiate its agreement.

Upon the filing of the City's motion for relief, public records requests were made to the Governor's Office of Homeland Security and Emergency Preparedness ("GOSHEP"). Gaffney

---

[8] The Orleans Parish Prison ("OPP") housed inmates. The CCC not only housed inmates; it was the location of the administrative offices for the OPSO. Additionally, the CCC was a location that provided necessary medical services to inmates, in addition to the Templeman I and Templeman II facilities.

Affidavit, at ¶ III. The records requests were issued to determine how the Templeman II monies were being directed by the City in light of the agreement and Stipulated Order to use them exclusively for the Docks, the Youth Study Center, and a permanent facility to house inmates with medical or mental health issues.

The records show that the combined FEMA funding attributable to the Templeman I and Templeman II Buildings was $115,620,949.00. *Id.* at ¶ XI. Of that amount, $70,482,530.51 was attributable to Templeman II funds. *Id.* The City represented in pleadings in this case that it spent $5.3 million to repair the Docks and $17.3 million to build the Youth Study Center. Doc. No. 1222, at p. 3. Thus, accepting those numbers at face value, the remaining Templeman II funds should be as follows:

| | |
|---|---|
| Templeman II Funds | $70.5 million |
| Docks Repair | ($5.3 million) |
| Youth Study Center | ($17.3 million) |
| Remaining Templeman II Funds | $47.9 million |

*Id.* The City, therefore, should have at least $47.9 million to build Phase III from the Templeman II funds. Even more FEMA money, however, is available to build Phase III. An additional $4 million in FEMA funds is available if the City simply enters into a cooperative endeavor agreement with the OPSO regarding the Central Plant. *Id.* Signing a cooperative endeavor agreement will bring the total amount of funds to $52.9 million to build Phase III. *Id.* And, once again, that amount

20

does not include the net amount of $18 million the City already received for CCC. *Id.* There should be no dispute that the City has enough FEMA funding to build Phase III.[9]

Indeed, the issue here is not whether there are sufficient FEMA funds to build the Special Needs Facility, but rather whether the City simply prefers to use the Templeman II funds for projects other than Phase III. The public records show that the City has directed the Templeman I and II funds, along with funds for other FEMA projects, into a large funding pool for "Combined Criminal Justice Alternate Projects." *Id.*, at ¶ XIII. When a FEMA applicant, such as the City is here, determines that the public welfare would not be best served by restoring a damaged facility or its function, the applicant may request approval of any alternate project from FEMA. 44 CFR § 206.203(d)(2). Funds contributed for alternate projects may be used to repair or expand other selected public facilities, to construct new facilities, or to fund hazard mitigation measures. 44 CFR § 206.203(d)(2)(iv). In total, the City directed the FEMA funds from more than seventy-five different projects into a "Combined Criminal Justice Alternate Projects" pool for a combined total of at least $146 million in funding. Gaffney Affidavit, at ¶ XIII. Some of the projects that donated funds to the pool include:

| Project | Name | Donation Amount |
|---------|------|----------------|
| PW 1050 | MTA East Draught Pit Canopy | $2,330.60 |
| PW 1057 | MTA East Apparatus Bldg | $50,469.68 |
| PW 1065 | MTA East Ladder training | $8,811.50 |
| PW 1086 | MTA East Toilet Bldg | $3,208.85 |
| PW 1118 | MTA East Burn Bldg | $11,797.50 |
| PW 1120 | MTA East Classroom | $21,663.00 |
| PW 5456 | MTA East Firing Range | $162,680.00 |
| PW 8483 | NO Police 5th District Station | $3,915,371.00 |
| PW 11714 | MTA East Administration B | $313,953.00 |

---

[9] The City argues that the cost of the TDC renovations should be used to reduce the amount of Templeman II funds available to build Phase III. That argument fails for at least two reasons. *First,* FEMA would not allow the use of Templeman II funds for the renovations to TDC. Gaffney Affidavit, at ¶ XII. *Second,* the City never requested funds from FEMA to renovate TDC. *Id.*

| | | |
|---|---|---|
| PW 12206 | CNO Crime Lab | $3,146,461.01 |
| PW 13608 | Police Maintenance Wareh | $3,683,793.93 |
| PW 13923 | Community Corrections Cen | $22,160,540.00 |
| PW 13946 | Police Carpenters Shop | $438,742.72 |
| PW 19038 | NO Police Dept 7th District | $3,234,274.00 |
| PW 13923 | V1 Community Corrections IT | $143,439.00 |
| | Fire Station 22/39 relocation | $19,333.00 |
| | Mobile video units | $289,870.00 |
| PW 1051 | NOFD 3 | $976,246.56 |
| PW 1082 | NOFD Supply Shop | $276,333.15 |
| PW 2048 | Juvenile & Civil Court | $1,016,686.00 |
| PW 8744 | NOFD Station 11 | $294,834.07 |
| PW 13999 | Irish Bayou Communications | $162,942.05 |
| **Total** | | **$40,333,780.62** |

*Id.* The City also dedicated to the same funding pool approximately another $106 million from the Templeman I and II funds. The Templeman funds, therefore, made up the vast majority of the total pooled money of at least $146 million. *Id.* And the Templeman II funds – *i.e.*, the funds that are exclusively dedicated to complete Phase III by the Stipulated Order – make up the greatest single contribution to the pool. *Id.* An additional $9 million in Templeman I and II funds are in another FEMA project worksheet for Project Management. *Id.*

Because the City created this pool for "Combined Criminal Justice Alternate Projects," the City was required to designate the projects that the pool would fund. Gaffney Affidavit, at ¶ XIV. For many City submissions to FEMA regarding these "Combined Criminal Justice Alternate Projects," Phase III was never mentioned. *Id.* The City's latest submission lists includes thirty-four different projects, including Phase III, which is listed simply at number 32 as "Mental and Medical needs." *Id.* Moreover, twenty-nine of the alternate projects already have been provided funds from the pool or are approved from FEMA:

| Project | Name | Allocated Amount |
|---|---|---|
| 1 | MTA East Training Enhancements | $420,162.66 |

| 2 | NOPD 5th District Station Replacement | $3,448,765.00 |
|---|---|---|
| 3 | NOPD 7th District Station Replacement | $2,757,904.00 |
| 4 | Criminal Evidence and Processing Complex | $11,554,473.21 |
| 5 | Community Corrections Center Demolition | $5,553,455.87 |
| 6 | NOFD Station 31 | $210,081.33 |
| 7 | EMS Headquarters | $5,102,033.28 |
| 8 | Municipal and Traffic Court Bldg Enhancement | $2,100,813.31 |
| 9 | Police vehicles | $5,088,501.74 |
| 10 | CCC IT relocation | $170,669.28 |
| 11 | NOFD Station 22/39 | $741,401.58 |
| 12 | NOPD 1st District Station | $120,000.00 |
| 13 | Mobile video Units | Removed |
| 14 | Municipal Traffic Court | $2,000,000.00 |
| 15 | Additional Police Vehicles | $3,531,023.09 |
| 16 | NOPD Data storage | $525,203.33 |
| 17 | Early Warning System | $210,081.33 |
| 18 | Additional Police vehicles | $1,452,475.17 |
| 19 | License plate recognition system | $525,203.33 |
| 20 | Juvenile Justice Center Complex | $6,348,119.25 |
| 21 | Gallier Hall Preservation /restoration | $1,550,000.00 |
| 22 | NOPD 3rd District Station | |
| 23 | Police Training Academy | |
| 24 | EMD Central Maintenance Bldg | |
| 25 | Criminal District Court | $4,626,829.95 |
| 26 | Youth Detention Center | |
| 27 | Juvenile Justice Center In-Line Grinder | |
| 28 | NOFD Headquarters at Naval Support Act Bldg | |
| 29 | Gallier Hall Exterior repairs | |
| 30 | Desire Florida Community Center | |
| 31 | NOPD 4th District Station | |
| 32 | Mental and Medical needs | |
| 33 | Old Parish Prison Docks | |
| 34 | Project Management | |

| | | |
|---|---|---|
| **Total Pool Funds Allocated to Date** | | **$58,037,196.71** |

*Id.* Thus, the City already has received approval for the reimbursement for $58 million in projects other than Phase III, including over $1.5 million for work on Gallier Hall, $8 million for police vehicles, and $2 million for the Municipal Traffic Court. *Id.* The City may no longer wish to use FEMA-pooled monies to build Phase III, but the funds are available to do so. Indeed, the City has indicated an intent to use available FEMA funds in the future for other City projects.

With reimbursements to date of $58 million, approximately $88 million still remains in the "Combined Criminal Justice Alternate Project" pool. Other than Phase III, only four of the listed projects remain: (#28) NOFD Headquarters, (#30) Desire Florida Community Center, (#31) NOFD 4th District Station, and (#34) Project Management. *Id.* The City has not shown with any competent evidence how these projects or any of the other approved projects are more important than Phase III and how, even if these four projects were funded, there will not be sufficient monies left to build Phase III.

By pooling the Templeman II funds for "Combined Criminal Justice Alternate Projects," the City actually created, or contributed to, the issues that now confront it. Prior to Katrina, the Templeman II Building addressed the needs of inmates with medical and mental health issues. *Id.*, at ¶ XVI. As such, if the Templeman II funds had not been pooled for alternate projects, as the City has done here, FEMA would have replaced the facility for inmates with mental or medical issues *regardless of increased costs*. *Id.* Stated differently, if Phase III was estimated to cost $36 million, but new construction standards and increased construction costs raised that price to $51 million, FEMA would have covered those extra costs. *Id.* However, by electing to pool the

Templeman II monies into "Combined Criminal Justice Alternate Projects," the cost to build Phase III as the alternate to the services provided previously at Templeman II effectively was capped by FEMA at the time of the City's election to direct those funds into the pool. *Id; see also* FEMA Policy 9525-13 Alternate Projects.

In sum, the issue regarding construction costs is not whether there are FEMA funds to build Phase III, but rather the priority of the Special Needs Facility compared to other City-identified "Combined Criminal Justice Alternate Projects" in the funding pool it created.

**C.     The City's other proposed options to address inmates run afoul of FEMA regulations.**

The City's reference to using the fourth floor of OJC or using TDC as a permanent solution is not only a departure from its confirmed obligations, it is seriously problematic and likely impermissible. As an initial matter, both of these options were considered and rejected as recently as 2019. *See* Doc. No. 1222. But more importantly, these options do not conform to FEMA regulations. *First*, OJC cannot now be retrofitted to provide these services. *Second*, the permanent use of TDC is foreclosed by FEMA regulations.

**1.     OJC cannot be retrofitted as a mental health facility under FEMA regulations.**

Since FEMA funds were used to replace much of the jail complex, such as the Kitchen Warehouse, Templeman III and IV ("OJC"), Templeman I and II, TDC, and Phase III, FEMA's regulations govern the design and use of the Kitchen Warehouse, OJC, Templeman I and II, TDC, and Phase III. The Stafford Act authorizes FEMA to provide grant assistance "to a State or local government for the repair, restoration, reconstruction, or replacement of a public facility damaged or destroyed by a major disaster." Stafford Act Section 406, 42 U.S.C. § 5172(a)(1)(A); 44 C.F.R. § 206.226. When FEMA funded the replacement of Templeman III and IV, it was providing

funding for a "Permanent Work" under FEMA regulations. "Permanent Work" is "restorative work that must be performed through repairs or replacement, to restore an eligible facility on the basis of its predisaster design and current applicable standards."  44 C.F.R. § 206.201(i); *see also* 44 C.F.R. § 206.226 (providing for "[r]estoration of damages facilities."); FEMA Public Assistance Policy Digest, FEMA Report 321/October 2001, page 88; FEMA Public Assistance Guide, FEMA Report 322, page 79; FEMA Public Assistance Program and Policy Guide ("PAPPG"), at 140 (Version 4, eff. June 1, 2020) ("Permanent Work . . . is work required to restore a facility to its pre-disaster design (size and capacity) and function . . ."). Thus, under FEMA regulations a "Permanent Work" such as OJC must have the same design, capacity, and function of the prior facility that is being replaced. *See* 44 C.F.R. § 206.201(i) ("Predisaster design means the size or capacity of a facility as originally designed and constructed or subsequently modified by changes or additions to the original design."). For that reason, OJC was designed as a general population jail with precisely 1,438 beds because the two facilities it replaced, Templeman III and IV, had precisely 1,438 beds for general population inmates and *did not* accommodate inmates with medical or mental health needs.

The City cannot now retrofit with other FEMA funds the fourth floor of OJC to accommodate inmates with mental and medical health issues. To do so would violate both the design capacity requirement and, more importantly, the function requirement of OJC. As to the capacity requirement, OJC was specifically designed to house 1,438 general population inmates, the exact number Templeman III and IV housed prior to Hurricane Katrina. The City cannot now use FEMA funds to reduce the general population capacity of OJC to meet the bed requirements of inmates with mental health needs, as those inmates were not part of the prior 1,438-bed facility. To do so again would violate the design and capacity restrictions that are required to obtain FEMA

funds. *See* 44 C.F.R. § 206.201(i); PAPPG, at 140; FEMA Public Assistance Policy Digest, FEMA Report 321/October 2001, page 88. To receive "at cost" FEMA funding, the medical functions were contained in the Templeman I, Templeman II, and CCC buildings, and must be restored from FEMA funding associated with those facilities.

As to the function requirement, OJC was designed to fulfill the pre-disaster function of housing general population inmates. Because modifications to accommodate inmates with mental health needs necessarily would change that function, OJC may not now be retrofitted in order to fulfill that modified function, as that is not the purpose for which the FEMA funds were designated. *See* 44 C.F.R. § 206.203(d)(2) (providing for additional pre-construction requirements for approval of "Alternate projects" that will alter the function of a facility); *see also* PAPPG, at 140 n.258 & 163–64. Thus, retrofitting the fourth floor of OJC would run afoul of the capacity and function requested of a Permanent Work restoration.[10]

> ### 2.   TDC is not a long-term solution to house inmates with mental or medical health issues.

The notion of converting TDC to a "permanent" facility is also problematic. As an initial matter, temporary relocation facilities, such as TDC, must be used only for "the *originally authorized purpose.*" 2 C.F.R. § 200.311(b) (emphasis added); *see also* Stafford Act Section 403(a)(3)(D); 42 USC § 5170b(A)(3)(D) (providing for temporary facilities for essential community services); FEMA Public Assistance Policy Digest, FEMA Report 321/October 2001,

---

[10] The OPSO complied with all FEMA rules and regulations for the funding of the construction of the OJC which was an "At Cost" project fully funded by FEMA. The exceptions to the general rule are for improved and alternate funding projects. However, for improved and alternate funding projects, the FEMA funding is capped. For example, if Templeman III and IV had been capped, then either the OPSO or the City would have needed to contribute approximately $70 million to fund the construction of the OJC. Of course, that did not occur in the construction of OJC. By comparison, the City effectively capped the funding for Templeman I and II by pooling those funds for alternative projects. Gaffney Affidavit, at ¶ XVI.

page 105; FEMA Public Assistance Guide, FEMA 382, page 32; Provision of Temporary Relocation Facilities, FEMA Recovery Policy 9523.3 (July 16, 1998) (superseded on Dec. 14, 2010). The original authorized purpose of TDC was a *temporary* detention center for the housing of inmates pending completion of the Inmate Housing facility that replaced Templeman III and IV. The authorized purpose of TDC was not a permanent housing facility for inmates with mental health needs. In addition, when TDC is no longer needed for its originally authorized purpose, FEMA, not the City, will control its disposition. *See* 2 C.F.R. § 200.311(c). FEMA could require the City to (1) retain TDC and repay FEMA out of its own funds for the facility, (2) sell TDC and compensate FEMA from the proceeds of the sale, or (3) transfer title of TDC to a FEMA-approved third party. 2 CFR § 200.311(c). In addition, just as FEMA did with the temporary Intake and Processing Center, it could simply require the facility to be demolished. None of these options supports using TDC on a permanent basis to house inmates who require mental or medical health assistance. Furthermore, to retain TDC and attempt to make the necessary upgrades for it to be a permanent facility under the construction standards of the American Correctional Association, the cost to taxpayers likely would exceed the alleged incremental cost to construct Phase III, regardless of the method of assessing the available FEMA funding. Put simply, not only would the City possibly be required to pay FEMA for the facility out of the City's own funds, it then would be required also to spend many millions more in non-FEMA funds to make the facilities permanent. In sum, making TDC permanent is equally or more problematic as retrofitting the fourth floor of OJC.

The current use of TDC is authorized only because FEMA granted an extension of time for its continued use. Stafford Act Section 403(a)(3)(D); 42 USC 5170b; 2 CFR § 200.311(b); FEMA Public Assistance Policy Digest, FEMA Report 321/October 2001, page 105; FEMA Public

Assistance Guide, FEMA 322, page 32; Provision of Temporary Relocation Facilities, FEMA Policy 9523.3 (July 16, 1998). The use of the TDC is only authorized until August 31, 2022, and only to allow time for the design and construction of the City's permanent facility to house those inmates with medical or mental health needs. FEMA authorized the extension based upon the representation by OPSO that the City would complete the construction of Phase III by August 29, 2022. That representation by OPSO was based upon the representation made by the City to this Court along with the City's construction schedule which was provided to OPSO.[11]

**D.    The City's Motion does not meet the standards of Rule 60(b).**

The City fails to meet its burden under the *Rufo* test. First, the City has not shown a significant change in circumstances that warrants relief from the order. All it can show, at most, is that it is "no longer convenient to live with the terms of a consent decree," which cannot sustain a Rule 60(b)(5) modification. *See Rufo*, 502 U.S. at 383; *New Orleans*, 947 F. Supp. 2d at 620. Second, the City's proposed modification impermissibly seeks to modify the Order to only meet the constitutional floor. Third, the City has failed to implement an equivalent, durable remedy that would constitute a significant change under the first prong of *Rufo*. The City's request for relief, therefore, should be denied.

**1.    The City did not present any significant changes that would make compliance with the order more onerous.**

The City argues that because of the decline in the average number of inmates at the OJC and budgetary constraints from COVID-19, it would be injurious to the public good for the City

---

[11] *See* Exhibit "A" to Gaffney Affidavit, FEMA correspondence dated September 10, 2019 granting a time extension request. It is also significant to note that the Period of Performance ("PoP") to complete facility damage during Hurricane Katrina is August 29, 2023. The PoP is generally the time during which the Grantee (State of Louisiana) is expected to complete the grant activities and to incur and expend approved funds. The State is responsible for ensuring that all approved activities are completed by the end of the PoP.

to expend additional funds on Phase III. Doc. No. 1281, at 14-17. This argument does not support a Rule 60(b)(5) modification.

*First*, as part of the agreement to build Phase III, the OPSO agreed to decrease the maximum capacity of the jail, such that the agreed-upon reduction of the inmate population at the jail was a condition the City knew about when it agreed to fund Phase III. *See* Exh. 3, City of New Orleans Ordinance No. 28,3000. A core requirement of the *Rufo* test is that the change must be *significant and unexpected*. *Rufo*, 502 U.S. at 385. While the decrease in the jail population that may be due to COVID-19 certainly was unexpected, it was not significant. Conversely, the pre-COVID-19 drop in average jail population was significant, but was not unexpected.[12] The City cannot now argue that the decrease in inmates warrants relief under Rule 60(b)(5) because the City knew this would happen before entering the Order. All the City can show, at most, is that it is "no longer convenient to live with the terms of a consent decree." *Rufo*, 502 U.S. at 383; *New Orleans*, 947 F. Supp. 2d at 620.

*Second*, the Supreme Court and the Fifth Circuit have been explicit that a lack of resources cannot justify an infringement on constitutional rights. *Horne,* 557 U.S. at 450; *New Orleans*, 947 F. Supp. 2d at 619. State and local officials may factor in financial constraints when tailoring a modification, but budgetary considerations cannot be used as an excuse to create or perpetuate a constitutional violation. *Horne,* 557 U.S. at 450; *New Orleans*, 947 F. Supp. 2d at 619. In *United States v. New Orleans*, the City of New Orleans argued a consent decree with the police department (NOPD decree) should be modified because the City was not aware that it would also have to use

---

[12] Between 2016 and 2019, the average daily jail population fell by an estimated 392 inmates. Doc. No. 1281-1, at 17. The decrease from 2019 to 2020, supposedly due to COVID-19, has only been 183 inmates. *Id.* It should be noted that the drop in average daily number of inmates was greater between 2017 and 2018 than it was between 2019 and 2020. *See id*.

city funds pursuant to another consent decree entered with the Sheriff's Office. 947 F. Supp. 2d at 617-18. The district court understood that the City had finite resources, but it declined any modification to the NOPD decree because "inadequate resources can never be an adequate justification for depriving any person of his constitutional rights." *Id.* at 619. As in *United States v. New Orleans*, the City cannot rely on financial constraints to modify the Order to provide a lower standard of care than required by the Constitution. *See also Rufo*, 502 U.S. at 392.

*Third*, the City argues that the unforeseen decrease in tax revenue and bond sales from COVID-19 has put a strain on the City's budget and therefore it would be against public interest to enforce the Order. Doc. No. 1281, at 14-15. However, as stated in the Stipulated Order, Phase III construction must be funded "*exclusively*" from the Templeman II FEMA funds. Doc. No. 1082, at ¶ 22. A decrease in the City's revenue is irrelevant to this motion. To the extent that the City may have to adjust its budget, that is only because the City has used Templeman II FEMA funds elsewhere in its funding pool that could have been used for the Special Needs Facility. The City should not be released from its obligation under the Order because of its own choices regarding the allocation of funds. While tax and bond revenue may be important for future operating costs, Phase III also will not be operational until mid to late 2022, and those costs were known from the outset. It is also impossible to predict what impact, if any, that COVID-19 will have on tax and bond revenue that far into the future. Since these concerns are speculative, they cannot sustain a Rule 60(b)(5) modification. The City has not shown that budgetary constraints make compliance with the Order more onerous, but rather only that the decree is "no longer convenient because the City anticipates that, at some undetermined point in the future, the City will incur additional financial liability." *New Orleans*, 947 F. Supp. 2d at 620.

2. **The City cannot modify the order simply to meet the bare constitutional minimum requirement for inmate mental health care.**

The City argues that the OJC "currently provides medical and [mental] healthcare that meets or exceeds constitutional standard," [13] and therefore the City should be released from its obligations under the Consent Judgment and Stipulated Order. Doc. No. 1281-1, at 7. While the Supreme Court supports the ability of district courts to modify institutional reform decrees in light of significant changes, the Court also cautioned that "[a] proposed modification should not strive to rewrite a consent decree so that it conforms to the constitutional floor." *Rufo*, 502 U.S. at 391. Similarly, the Fifth Circuit has recognized that "a court may enforce agreements in consent judgments that are not constitutionally mandated." *Cooper*, 33 F.3d at 545. To allow otherwise would indicate "that the only *legally enforceable* obligation assumed by the state under the consent decree was that of ultimately achieving minimal constitutional prison standards." *Id.* at 390 (emphasis in original) (quoting *Plyler v. Evatt*, 924 F.2d 1321, 1327 (4th Cir. 1991)). While courts cannot order states to go above the constitutional floor, "petitioners could settle the dispute over the proper remedy for the constitutional violations that had been found by undertaking to do more than the Constitution itself requires." *Rufo,* 502 U.S. at 389. Therefore, if parties agreed to a remedy above the constitutional minimum, that agreement should be honored. *See Cooper*, 33 F.3d at 545; *Rufo*, 502 U.S. at 389.

For example, in *Cooper v. Noble*, the Fifth Circuit held that a consent decree would not be modified simply based on a showing that the jail complied with constitutional standards, when the

---

[13] This statement itself is likely open to debate. In a document filed January 22, 2020 the Monitors stated, "The construction and occupation of Phase III is critical to the provision of mental and medical health services in accordance with the Consent Judgment." Doc. No. 1259, at 11-12. The Medical and Mental Health Monitors recognized that the OJC was still facing many challenges and the only long-term solution is construction of the Phase III facility. Doc. No. 1259, at 8.

parties agreed to go beyond that standard in the decree. 33 F.3d at 544-45. First, the court found construction of a new jail and changes within the prison system did not "affect compliance with, or the workability of or enforcement of, the final judgment." *Id.* at 544. Second, the court reasoned that because the "very nature of a consent agreement is such that the parties will agree to act in ways they do not believe the Constitution requires in order to 'save themselves the time, expense, and inevitable risk of litigation,'" the court should enforce orders that are above what is constitutionally mandated to protect the parties' bargained-for agreement. *Id.* at 545 (quoting *Rufo*, 502 U.S. at 389).

The City originally agreed to use FEMA funds for a facility that would meet or even perhaps exceed the constitutional minimum. Now, the City argues the renovation of the TDC provides constitutionally adequate mental health care to inmates. Doc. No 1281, at 8. However, even if this were true (and feasible for the future), the renovation plans for the TDC "extend *no further than necessary to correct violations of the federal rights*" of inmates. *Id.* (emphasis added). The City agreed to allocate and use FEMA funds for the construction of the Phase III facility to fulfill its obligation to provide constitutionally adequate mental health services to inmates. It should not be allowed to reduce its obligations and provide a facility that meets lesser-but-adequate constitutional requirements.

### 3.   The City has not presented a durable solution to provide constitutionally adequate mental health care to inmates.

Neither of the City's two proposed plans, the conversion of the fourth floor of the OJC nor the renovation of the TDC, is a durable remedy that will provide the same level of care as required by the Order. To meet the changed circumstances requirement of the *Rufo* test, a moving party can show that the object of the decree has been achieved through the implementation of a durable remedy. *Horne,* 557 U.S. at 455. When "a *durable* remedy has been implemented, continued

enforcement of the order is not only unnecessary, but improper." *Id.* at 450 (emphasis added). *But see Frazar v. Ladd,* 457 F.3d 432, 436 (5th Cir. 2006) (holding that merely meeting the objectives of a consent decree was *not* a significant change to satisfy the first prong of the *Rufo* test).

According to the Stipulated Order, "appropriate housing for prisoners with mental health issues and medical needs" has to be funded from the Templeman II FEMA funds. Doc. No. 1082, at ¶ 22. Therefore, the City must use the Templeman II FEMA funds according to the Stipulated Order, unless it is able to demonstrate a durable and equivalent resolution to the inadequate medical and mental health facilities at the OJC. The City has failed to do so.

*First*, the City failed to present a plan that would provide the same level of care as planned for in the Phase III facility. The City argues that increased funding, staffing and quality of medical services should release them from the obligation to fund Phase III. Doc. No. 1281, at 6. The City states the jail facility is "one of the most well-funded local jails of its size in the country based on a review of eleven other mid-sized jails." *Id.* The issue, however, is not how the jail facility may or may not compare to others, but if it provides the level of healthcare contemplated by the parties in the Stipulated Order. The Phase III facility will have 89 beds plus an infirmary, clinic, administrative medical/mental health space, laundry, and additional family and attorney visitation space. Doc. No. 1106, at 9-10. Comparatively, the renovated TDC falls short at only 61 beds for inmates with mental health issues. Doc. No. 1281, at 12.

*Second*, neither the TDC nor the renovated OJC is a durable remedy. A "durable remedy" is a sustainable solution that will continue to meet the end goal of the original decree. The TDC was intended to be a temporary facility from the beginning. The City's own memorandum states that the TDC was intended to be a "short-term plan for mental health related matters." Doc. No 1281, at 7. Further, FEMA regulations will not allow either of the City's suggestions to be a

permanent solution. The City cannot renovate the fourth floor of the OJC to house those with mental needs because the FEMA funds for the facility may only be used to restore a facility to its original purpose, and the OJC has never accommodated inmates with medical or mental health needs. Similarly, the TDC can only be used for its originally authorized purpose, which was temporary housing for inmates, not as a permanent facility to treat those with acute or subacute mental health issues. Once the TDC is no longer needed, control will pass back to FEMA which has every right to demolish the facility or direct its sale to another party.

**III.    CONCLUSION**

For the foregoing reasons, the City's motion should be denied; and the parties must continue to program, design and construct the 89-bed Phase III or the Special Needs Facility to address the needs of Orleans Parish inmates with medical or mental health issues as required by the Consent Order and the Stipulated Order entered by this Court.

Respectfully submitted,

*/s/ Richard C. Stanley*
Richard C. Stanley, 8487
Bryan C. Reuter, 23910
Stanley, Reuter, Ross, Thornton & Alford, L.L.C.
909 Poydras Street, Suite 2500
New Orleans, Louisiana 70112
Telephone: 504-523-1580
Facsimile: 504-524-0069
rcs@stanleyreuter.com
bcr@stanleyreuter.com

*Attorneys for Darnley R. Hodge, Sr.*

35

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on July 22, 2020, a copy of the foregoing Memorandum in Opposition to the Motion Filed by the City of New Orleans for Relief from the Court's Order was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to all counsel of record by operation of the Court's electronic filing system. I also certify that a copy of Exhibit A to the Affidavit of Michael G. Gaffney, Esq. (a flash drive) will be provided to the Clerk of Court via hand delivery, counsel for Plaintiff, the City of New Orleans, the Department of Justice, and the Orleans Parish Sheriff's Office via Federal Express, Priority Overnight.

*/s/ Bryan C. Reuter*