# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| LASHAWN JONES, *et al.*, and ) | |
| THE UNITED STATES OF AMERICA, ) | |
| ) | Civil Action No. 2:12-cv-00859 |
| PLAINTIFFS ) | Section I, Division 5 |
| ) | Judge Lance M. Africk |
| v. ) | |
| ) | Magistrate Judge Michael B. North |
| MARLIN GUSMAN, Sheriff, ) | |
| ) | |
| ) | |
| DEFENDANT. ) | |
| ) | |

---

## Report No. 12 of the Independent Monitors
### July 27, 2020

---

Margo L. Frasier, J.D., C.P.O., Lead Monitor
Robert B. Greifinger, M.D. Medical Monitor
Patricia L. Hardyman, Ph.D., Classification Monitor
Raymond F. Patterson, M.D., D.F.A.P.A., Mental Health Monitor
Shane J. Poole, M.S., C.JM., Environmental Fire Life Safety Monitor
Diane Skipworth, M.C.J., R.D.N., L.D., R.S., C.C.H.P., C.L.L.M., Food Safety Monitor

Email:   nolajailmonitors@nolajailmonitors.org
Web:    www.nolajailmonitors.org





*Compliance Report #12*
*LASHAWN JONES, et al., and the United States of America v.*
*Marlin Gusman, Sheriff*

Table of Contents

|  |  | **Page** |
|---|---|---|
| I. | Introduction | 3 |
|  | A.  Summary of Compliance | 4 |
|  | B.  Opportunities for Progress | 7 |
|  | C.  Review Process of Monitors' Compliance Report #11 | 13 |
|  | D.  Communication with Stakeholders | 13 |
|  | E.  Recommendations | 14 |
|  | F.  4 |  |
| II. | Substantive Provisions |  |
|  | A.  Protection from Harm | 16 |
|  | A.1. Use of Force Policies and Procedures | 19 |
|  | A.2. Use of Force Training | 20 |
|  | A.3. Use of Force Reporting | 20 |
|  | A.4.  Early Intervention System | 26 |
|  | A.5. Safety and Supervision | 27 |
|  | A.6. Security Staffing | 31 |
|  | A.7. Incidents and Referrals | 34 |
|  | A.8. Investigations | 36 |
|  | A.9. Pretrial Placement in Alternative Settings | 38 |
|  | A.10. Custodial Placement | 38 |
|  | A.11. Prisoner Grievance Process | 56 |
|  | A.12. Sexual Abuse | 60 |
|  | A.13. Access to Information | 60 |
|  | B.  Mental Health Care | 60 |
|  | C.  Medical Care | 81 |
|  | D.  Sanitation and Environmental Conditions | 83 |
|  | E.  Fire and Life Safety | 98 |
|  | F.  Language Assistance | 102 |
|  | G.  Youthful Prisoners | 104 |
|  | H.  The New Jail Facility | 105 |
|  | I.  Compliance and Quality Improvement | 106 |
|  | J.  Reporting Requirements and Right of Access | 107 |
| III. | Status of Stipulated Agreements – February 11, 2015 and |  |
|  | April 22, 2015 | 109 |



Page

**Tables**
Table 1 – Summary of Compliance – All Compliance Reports             6
Table 2 – Status of Compliance – Stipulated Agreements              7
Table 3 – Summary of Incidents CY 2019-CY 2020                      16
Table 4 – CY 2018-CY 2020 All OJC Reported Incidents by Type by Month   18
Table 5 – CY 2018-CY 2020 OJC Reported Incidents                    29

**Figures**
Figure 1 – Distribution of Inmates by Race by OPSO Facility         43
Figure 2 – Rates and Completion Time of Initial Custody Assessments   45
Figure 3 – Number of Attachments Input by Classification Staff      45
Figure 4 – Attachment Reason by Month                               48
Figure 5 – Number of Total and Guilty Disciplinary Infractions      48
Figure 6 – Rate of Disciplinary Infractions Against OPSO ADP        53
Figure 7 – Types of Disciplinary Infractions of which OPSO Inmates
              Were Found Guilty                                     54

**Appendices**
Appendix A - Summary Compliance Findings by Section Compliance
Reports 1 – 12                                                      110

## Compliance Report # 12 - Introduction

This is Compliance Report #12 submitted by the Independent Monitors providing assessment of the Orleans Parish Sheriff's Office's (OPSO) compliance with the Consent Judgment of June 6, 2013. Report #12 reflects the status of OPSO's compliance as of March 31, 2020. This Report is based on incidents, documents, and compliance-related activities between July 1, 2019 and March 31, 2020. Originally, the site visit was set for March 16-19, 2020 but was postponed due to the COVID-19 pandemic. When it became apparent that an onsite visit posed unreasonable risks, the decision was made to conduct the visit virtually. The virtual visit was conducted May 18-22, 2020. This report is also based on the observations and review of OPSO documents by the Monitors during the virtual site visit.

Throughout the time the Monitors have been involved in enforcement of the Consent Judgment, the site visits have played an integral role. During the site visits and the monthly site visits by the Lead Monitor in between, the Monitors have endeavored to provide guidance to OPSO as to how to remedy the unsafe and unconstitutional conditions which existed when we began monitoring in late 2013. The Monitors have



constantly urged OPSO to put in place the necessary processes and procedures to not only obtain compliance, but to sustain compliance. Such processes and procedures would allow OPSO to provide adequate proof of compliance and assess compliance with the Consent Judgment and its own policies and procedures and address shortcomings without intervention of the Monitors. Despite encouragement and guidance as to how to set up the various review functions and an inspection unit that would operate independently of those whose performance would be assessed; only minimal progress has been made in this area. Instead, there is often pushback against the Monitors and claims that the Monitors are "demanding perfection," "moving the goalpost," or that the Consent Judgment only requires them to review data, not to remedy the obvious deficiencies any meaningful review would reveal. Even more disturbing is that when individual staff members of OPSO have followed the guidance provided and collected and analyzed performance data, there has been, at times, a reluctance to address the deficiencies and, in some instances, animosity shown towards OPSO staff who provided the information.

The OPSO's jail is currently under the leadership of Darnley R. Hodge, Sr., who was appointed by the Court on January 29, 2018, as the Independent Compliance Director (ICD) on an interim basis and was appointed to the position permanently on October 12, 2018. In February 2019, Byron LeCounte joined the OPSO administrative staff as the Chief of Corrections. Prior to the interim appointment of Director Hodge, Gary Maynard served as the Independent Compliance Director. Chief LeCounte and Director Hodge both have substantial knowledge of jail operations.

In summary, the Monitors find that safety, medical and mental health care, and environment conditions of inmates held in both the Orleans Justice Center (OJC) and the Temporary Detention Center (TDC) has made meaningful and noteworthy improvement since Compliance Report #11 provided to the Court in January 19, 2020. However, there is still significant work to be done to properly staff the facility, finalize training on policies, curb violence, reduce the necessity to use force, and improve medical and mental health care if the positive trend is to continue and be sustained. The specific initiatives are addressed in this report.

## A.    Summary of Compliance

The requirements of the Consent Judgment represent correctional practice



recognized as required for the operation of a Constitutional jail system. While there is some flexibility for how OPSO addresses the mandates, achieving substantial compliance with the Consent Judgment, Stipulated Agreements, and Stipulated Order, are necessary to bring OPSO and its correctional facilities into adherence with Constitutional requirements. The Consent Judgment contains 174 separately rated provisions. While they are separately rated, they are often intertwined. For example, effective implementation of a policy requires not only the drafting of a suitable policy, but appropriate training on the policy and enforcement of the policy. Enforcement of the policy is contingent on assessing whether the policy is being followed which requires supervision, analysis of incidents and data, and objective confirmation of compliance. A meaningful annual review of the adequacy of the policy does not just mean to determine whether the wording of the policy should be changed, but also includes determining adherence to the policy and whether the objectives of the policy are being met, which again requires objective data collection and analysis and development of corrective action plans.

Based on the current assessment, OPSO has achieved either substantial or partial compliance with 100% of the provisions.  Substantial compliance has been achieved for 68% of the provisions. Thirty-two percent (32%) of the provisions are in partial compliance. For the first time, none of 174 provisions remain in non-compliance.

OPSO has made material progress as indicated by the movement of non-compliance to partial compliance to substantial compliance. At different times during the duration of the Consent Judgment, there has been regression in the progress towards compliance. One of those periods was shortly after OPSO transitioned into the new jail. Despite repeated warnings from the Monitors that there needed to be a transition plan which allowed for hiring and extensive training of staff on the direct supervision model and a phasing in of the movement into the OJC, OPSO chose to move all inmates into the OJC before the policies, procedures, training, and staffing were sufficiently prepared and executed. When the move did not go smoothly, instead of acknowledging the problem created by not having an adequate transition plan, some members of OPSO leadership attempted to create a false sense of progress by underreporting inmate violence and unnecessary and/or excessive uses of force. The underreporting was uncovered by the Monitors and reflected in the ratings in the next Monitors' report (Compliance Report #5).



As will be addressed in individual areas, OPSO is at risk of regression from the progress reflected in Compliance Reports #10 and #11 due to failure to consistently follow and enforce policies and procedures.

The Monitors are encouraged that during the virtual site visit, Chief LeCounte relayed recent efforts to rely on in-depth analyses of data, including grievance data and use of force data to determine policy adherence and develop action plans to address shortcomings and make decisions. Once decisions are made, they need to be implemented and enforced.

Similarly, the Monitors are pleased to report that OPSO, under the leadership of Director Hodge and Chief LeCounte, continues to examine its strategies to obtain and sustain compliance and make the structural and organizational changes necessary to achieve compliance. For compliance to be obtained and sustained, those strategies need to be implemented and embraced by the organization as a whole.

**Table 1 – Summary of Compliance – All Compliance Reports[1]**

| Compliance Report/Date | Substantial Compliance | Partial Compliance | Non-Compliance | NA/Other | Total |
|---|---|---|---|---|---|
| #1 – December 2013 | 0 | 10 | 85 | 76 | 171 |
| #2 – July 2014 | 2 | 22 | 149 | 1 | 174 |
| #3 – January 2015 | 2 | 60 | 110 | 2 | 174 |
| #4 – August 2015 | 12 | 114 | 43 | 4 | 173 |
| #5 – February 2016 | 10 | 96 | 63 | 4 | 173 |
| #6 – September 2016 | 20 | 98 | 53 | 2 | 173 |
| #7 – March 2017 | 17 | 99 | 55 | 2 | 173 |
| #8 – November 2017 | 23 | 104 | 44 | 2 | 173 |
| #9 – June 2018 | 26 | 99 | 46 | 2 | 173 |
| #10 – January 2019 | 65 | 98 | 8 | 2 | 173 |
| #11 – September 2019 | 103 | 66 | 5 | 0 | 174 |
| #12 – May 2020 | 118 | 56 | 0 | 0 | 174 |

The status of compliance with the two stipulated agreements (February 11, 2015 and April 22, 2015) is as follows:

---

[1] See Appendix A for historical detail of compliance, by paragraph.



**Table 2 – Status of Compliance with 2015 Stipulated Agreements**

| Compliance Report/Date | Substantial Compliance | Partial Compliance | Non-Compliance | NA | Total |
|---|---|---|---|---|---|
| August 2015 | 21 | 12 | 1 | 0 | 34 |
| February 2016 | 21 | 12 | 1 | 1 | 34 |
| September 2016 | 26 | 7 | 1 | 0 | 34 |
| March 2017 | 28 | 4 | 1 | 1 | 34 |
| November 2017 | 21 | 11 | 1 | 1 | 34 |
| June 2018 | 23 | 8 | 2 | 1 | 34 |
| January 2019 | 28 | 5 | 0 | 1 | 34 |
| September 2019 | 28 | 5 | 0 | 1 | 34 |
| May 2020 | 28 | 5 | 0 | 1 | 34 |

**B.      Opportunities for Continued Progress**

The Monitors summarize below the areas identified in preparation of this report regarding OPSO's current level of compliance with the Consent Judgment.

1. **Foundational Work** - The essential, core work required to achieve compliance includes:

   a. <u>Policies and Procedures</u> – OPSO has completed the essential policies and procedures. The Policy Manager has continued to review policies and perform updates. It was noted during the virtual site visit that some of the policies do not match current practice. One in particular is the Use of Force Reporting policy. OPSO advised that it was scheduled for review and would be updated. Essential is the continued development, approval, and implementation of lessons plans that correspond with each of the policies. OPSO's policy governing its written directive system has significantly improved the policy/procedure process. This process allows for organizational components to develop specific operational practices for review by OPSO administration. Adherence to the policies, procedures, and training is essential. OPSO has yet to develop a reliable process for objective consistent auditing of adherence.

   b. <u>Inadequate staffing</u> – OPSO has continued to hire staff but has not been



able to gain ground on vacancies due to the number of terminations and resignations. Inadequate staff in the facilities (OJC and TDC) and support functions (transportation, program supervision, courthouse security, use of force investigations) continues to hamper OPSO's ability to consistently comply with the Consent Judgment. OPSO continues to use employee overtime to address the staff shortages. Even with substantial overtime, frequently, there are housing units and control rooms with no assigned staffing, Further, almost daily, assigned staff leave housing units and control pods unattended for meal breaks and other duties. Recent promotions have helped to address the staffing deficiencies at the supervisory level. While a pay scale which provides for improvement in compensation with the goal of increased retention of staff and assistance in the recruitment efforts has been developed, a plan to secure the necessary funding and implement the pay scale has not been advanced.

c.  <u>Training</u> – Employee training, both pre-service and in-service, has become more in line with OPSO policies and procedures. Foundational work, such as preparation of lesson plans to provide for a consistent instruction content, instruction by qualified individuals, and demonstration and documentation of students' knowledge gained, needs to continue. Providing a policy without training is not effective implementation. Once effective training has been provided, auditing of staff adherence to policies is essential. When non-adherence to policy is discovered on a consistent basis, training should be reviewed to determine whether revised and improved training would be beneficial.

d.  <u>Supervision</u> – Safe operation of OPSO's facilities requires an adequate number of sufficiently trained first line and mid-management supervisors. Director Hodge implemented the unit management approach and provided training and mentoring for the managers. A promotional process for sergeants and lieutenants was developed and implemented. The unit managers were reclassified as captains instead of lieutenants. This process has resulted in a significant reduction in vacancies at supervisory positions. OPSO is



encouraged to finalize its organizational chart. OPSO provided training and mentoring for the new supervisors. Lacking is evaluation of supervisors on a consistent basis and the provision of additional training and other remedial action where appropriate.

2. **Medical and Mental Health Care** – Despite improvement in the areas of medical and mental health care, the Medical and Mental Health Monitors report challenges remain in the provision of basic case, staffing, and recordkeeping, as well as the need for improved collaboration with custody/security staffing. Resources from Tulane University continue to be particularly helpful in providing mental health care. An important part of the long-term solution to the lack of compliance with the Consent Judgment in the areas of medical and mental health is the design and construction of Phase III, a specialized building which will contain an infirmary and housing for inmates with acute mental health issues.

3. **Inmate Safety and Protection from Harm** - Providing a safe and secure jail continues to be a challenge.

 a. <u>Unit Management</u>—The Unit Management approach is being used in the supervision of the OPSO housing units. Each floor of the OJC, IPC, and TDC have been designated as a "unit". The purpose of this strategy is to enhance accountability for both staff and the inmates by allowing the staff to get to know the inmates. While the Unit Management approach has shown to be somewhat helpful, there are inconsistencies in the adherence to policy among the units. Efforts to refine and successfully implement the strategy require additional training, mentoring, and accountability.

 b. <u>Violence</u> – There are still significant incidents of violence occurring within the facilities – including inmate on inmate assaults and assaults on staff. Disorder and non-compliance to the institutional rules cause staff to use force to gain control and compliance. There has been a decrease in substance abuse overdoses, but a large amount of prescription medication continues to be found during shakedowns. While there was not a death of an inmate during this monitoring period, two inmates died while in custody in



June 2020.

c.    <u>Inmate Classification</u> – The inmate classification processes require continued attention to ensure housing decisions and placements are consistent with OPSO policies and objective classification principles. Credible auditing needs to focus on identifying issues and correcting placements. Consistent and adequate training was identified as an issue in compliance in Compliance Report #11 and a plan to address the immediate issue was been agreed upon and executed by OPSO and the Monitors. Ongoing competency based training is required to ensure the classification specialists perform their duties appropriately.

d.    <u>Inmate grievances</u> – As of Report #11, the ratings of the subdivisions in the grievance provision were individually given. The separate ratings allowed the areas in which deficiency existed to be highlighted. While timeliness and adequacy of responses is still subpar, there has been improvement. The trend data from the grievance system is now being used to identify problems to be addressed.

e.    <u>Incident Reporting</u> –The accurate timely reporting of incidents has been a constant area of concern. There remain serious incidents for which no report or no timely report is prepared by OPSO staff, including incidents involving the serious injury of inmates. There continue to be reports which are incomplete and do not provide the necessary information for the reader to determine what occurred and why it occurred. It is particularly concerning that incomplete and sometime inarticulate reports have been reviewed by and approved by a supervisor. During the virtual visit, development of a corrective action plan to address was discussed which includes training and remedial action including discipline.

f.    <u>Jail Management System</u> **–** An integral part of the jail's operational improvement is tied to an effective jail management system. Such capacity provides on-demand, routine, and periodic data to inform critical



leadership and management decisions. Such an information system has not been implemented. After OPSO cancelled the contract with the provider who was to supply a new JMS due to the inability to interface with the Orleans Parish court system, the City of New Orleans was to purchase a JMS which will interface with the Orleans Parish court system and the OPSO information systems. Despite passage of significant time, there is no definite timeline for that process. In the meantime, OPSO has modified its current system to provide more of the required JMS functions.

4.    **Sanitation and Environment Conditions** – Challenges remain regarding the public health and inmate/staff safety risks. The COVID-19 pandemic has presented additional challenges for the extremely dedicated sanitation staff. The inability to fill support positions identified in OPSO's staffing analysis negatively impacts the ability of OPSO to sustain compliance with the requirements of the Consent Judgment and align with accepted correctional practice. Sanitation and cleanliness of the cells and housing areas are not solely the responsibility of the sanitation staff. The unit managers and pod deputies have the first responsibility for ensuring inmates keep their cells and dayroom areas clean and uncluttered.

5.    **Youthful Inmates** – The Monitors acknowledge and commend the educational program established in OJC. Provision of age appropriate mental health services has improved with the addition of the Tulane University resources. Due to lack of adequate housing options, a female youthful inmate(s) must be housed alone in TDC; often by herself. This creates a double quandary; the young woman faces isolation and the OPSO staffing challenges are intensified. The design of the Phase III facility must address this issue as there are no feasible options within OJC and TDC will cease to be occupied once Phase III is opened.

6.    **Inmate Sexual Safety** – OPSO underwent its required audit of compliance with the Prison Rape Elimination Act of 2003 (PREA) and passed. Continued internal collaboration among OPSO security, classification, and the medical/mental health provider is needed for the assessments of inmates' potential for sexual victimization and aggression. The necessity of separation



of inmates testing positive for COVID-19 has resulted in the need for additional attention to inmates' PREA designation.

7. **Compliance, Quality Reporting, and Quality Improvement** – An essential element of inmate safety is OPSO's timely review of all serious incidents as well as of non-violent incidents to determine if there are trends and/or patterns. This ensures assessment of root causes and then the development, implementation, and tracking of action plans to address the issues. This activity focuses on resolving problems. OPSO has made efforts to undertake this function but would benefit from a more robust effort. Especially concerning are systemic issues, which if remain unaddressed, will continue to create risks to institutional safety and security. While progress is noted, the Monitors encourage OPSO to dedicate more time and knowledgeable resources to quality improvement. Impediments include the lack of staff with the skills and/or time to devote to the task. Establishment of an Inspection/Accreditation Unit is suggested.

8. **Stipulated Agreements 2015** – OPSO should review its on-going compliance with the two Stipulated Agreements from 2015.

9. **Construction Projects** –

   a.  The Docks – Construction of the renovations on the Docks has been completed. Due to COVID-19, almost all of the court dockets have either been discontinued or are conducted virtually. The Docks have not been used yet for court holding.  OPSO is encouraged to review its operational plans in light of the likely need to separate COVID-19 positive inmates when court dockets resume. The Monitors continue to encourage OPSO to have a robust training plan for the operation of the Docks and to not take possession until all systems are in proper working order.

   b.  TDC Mental Health – Two TDC housing areas are in the process of being renovated as a temporary space to hold acute male inmates in light of the pending unavailability of the Hunt unit and to house acute female inmates. A good plan had been developed for the training and



staffing of the housing areas but was halted by COVID-19. OPSO is encouraged to fully implement the training plan for the operation of the mental health housing areas before attempting to occupy the units. While TDC is not a suitable solution to meeting the requirements of the Consent Judgment as to medical and mental health services, it is a necessary interim step given the impending unavailability of Hunt and no satisfactory housing for acute inmates in OJC. It is important to note that TDC does nothing to address the lack of an infirmary and medical housing in OJC.

c.   Phase III – This project has progressed to the phase of drawing construction documents. The Monitors continue to urge the City to seek input on decisions from the various stakeholders and the Monitors. In early June 2020, it came to light that the City of New Orleans unilaterally stopped work on the project. The Monitors and other stakeholders were unaware of the stoppage as the City had not adhered to the agreement for quarterly executive committee meetings with all stakeholders. The construction and occupation of Phase III are critical to the provision of mental and medical health services in accordance with the Consent Judgment.

C.   **Review Process of Monitors' Compliance Report #12**

A draft of this report was provided to OPSO, Counsel for the Plaintiff Class, and the Department of Justice (DOJ) on June 15, 2020. Comments were provided by OPSO, Counsel for the Plaintiff Class, Wellpath (OPSO's medical contractor) and DOJ on July 1, 2020. The parties exchanged their comments and were afforded the opportunity to provide further comment and information to the Monitors on July 15, 2020. The Monitors considered the comments of the parties in finalizing Report #12.

D.   **Communication with Stakeholders**

The Monitors are committed to providing as much information as possible regarding the status of OPSO's efforts to comply with all orders of the Court. The www.nolajailmonitors.org website came on-line in September 2014. Joining all other reports, the finalized version of Compliance Report #12 will be posted on that



site.

E.  **<u>Recommendations</u>**

Over the years, the Monitors have provided multiple recommendations to OPSO to achieve and maintain compliance with the Consent Judgment. Often these recommendations have been met with resistance and OPSO has claimed that the Monitors were "moving the goalpost" or "demanding perfection." The purpose of the recommendations continues to be to assist OPSO in achieving and maintaining compliance.  As much progress has been accomplished, only "new" recommendations are included within the body of this report.

F.  **<u>Conclusions and Path Forward</u>**

OPSO has been operating under the provisions of the Consent Judgment since June 2013; monitoring began in Fall 2013.  During the past two years, under the leadership of Director Hodge, significant improvements are acknowledged by the Monitors. The hiring of Byron LeCounte as Chief of Corrections in February 2019 has been beneficial to the vital work which remains to comply with the provisions of the Consent Judgment. His additional expertise and experience have allowed Director Hodge to focus on the Consent Judgment.

Concerning is that the same issues continue to arise and are not being thoroughly resolved. Serious incidents and harm to inmates continue to occur. OPSO efforts to identify and address sources of contraband have facilitated its ability to decrease, although not eliminate, the amount of narcotic contraband smuggled into the facility by staff and inmate workers. However, dangerous medication is frequently found during cell shakedowns suggesting that the medication distribution process is seriously flawed.

There has been some improvement in OPSO's data collection routines which should allow for better problem solving with a goal of a sustainable reduction in inmate-on-inmate assaults, inmate-on-staff assaults, uses of force, contraband, and property damage. However, corrective action plans seldom are developed through analysis of the data and root cause reviews. When they are developed, follow through on implementation is severely lacking, especially at the Unit Manager level.

Medical and mental health care initiatives continue to progress toward the



requirements of the Consent Judgment. Wellpath has improved in the development and implementation of a clear path forward with measurable benchmarks.

The Monitors remain committed to the Court and the parties to collaborate on solutions that will result in significant improvement towards compliance with the provisions of the Consent Judgment and achievement of constitutional conditions.

**The Monitors again thank and acknowledge the leadership, guidance, and support of The Honorable Lance M. Africk and The Honorable Michael B. North.**



## II. A.   Protection from Harm

## Introduction

This section of the Consent Judgment addresses core correctional functions including the use of force (policies, training, and reporting), identification of staff involved in uses of force through an early intervention system, safety and supervision of inmates, staffing, incidents and referrals, investigations, pre-trial placement of inmates in the facility, classification, the inmate grievance process, sexual safety of inmates, and inmates' access to information.

The Consent Judgment requires that OPSO operate the facility to assure inmates are "reasonably safe and secure." Based on objective review of data, the facility has shown improvement in inmate and staff safety, but significant incidents that result in serious injury to inmates and staff continue to occur.

Reaching and sustaining compliance with provisions of the Consent Judgment, particularly this section, relies on the collection, analysis, and corrective action planning using accurate and reliable data. The Monitors encourage OPSO to continue efforts to build its capacity to collect and analyze relevant accurate data, draw supportable conclusions to inform decisions throughout the organization, develop corrective action plans, implement corrective action plans, and hold staff accountable for non-adherence to corrective action plans and policies. As OPSO's capacity to collect, analyze, plan, and implement is enhanced, the ability to achieve and maintain compliance will be strengthened.

The Monitors reported in Compliance Report #9 about OPSO's efforts to be much more transparent in the reporting of incidents. A lieutenant assigned to the administrative section reviews the daily medical logs for inmates taken to the clinic for treatment subsequent to an altercation or a use of force as well as the transport logs of inmates routed to the hospital with trauma-related injuries and cross checks them against reported incidents. The lieutenant also compares the Watch Commander's Log (which lists significant events and incidents occurring during the shift) and the incident reports to detect missing reports. Comparison of the medical logs to the incidents calls into question whether all of the inmates who are being seen by medical are being logged. Another issue is the lack of reporting of inmates transported to the hospital for medical emergencies. A continuing issue is the lack of meaningful consequences for supervisors who fail to comply with the reporting policies resulting in late, incomplete, or missing



incident reports.

The Monitors reviewed all reported incidents for 2019. The following charts compare the totals for the calendar years (CY) 2018 and 2019 and January - March 2020.

### Table 3 - All OJC Reported Incidents for CY 2018, CY 2019, and Jan-March 2020

**2018-2020 Report Categories Comparison**

| | Inmate/Inmate Assault | Inmate Staff Altercation | Use of Force | PREA | Death | Attempt Suicide/ Ideation | Internal Escape | Criminal Damage | Inmate Injury/ Inmate Medical | Contraband | Staff Arrest | Staff Misconduct/ Suspension | Other |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2018 | 442 | 64 | 260 | 47 | 2 | 78 | 48 | 69 | 262 | 106 | 3 | 0 | 15 |
| 2019 | 440 | 117 | 358 | 42 | 0 | 82 | 6 | 47 | 145 | 302 | 0 | 0 | 6 |
| 2020 | 90 | 29 | 93 | 7 | 0 | 4 | 1 | 7 | 26 | 99 | 0 | 0 | 1 |

If the trend continues throughout CY 2020, the number of inmate-staff altercations, use of force and contraband will exceed both CY 2018 and CY 2019.



**Table 4 –All OJC Reported Incidents by Type by Month CY 2018, CY 2019, and Jan-March- 2020**

### 2018-2020 Month By Month Comparison



| Month-by-Month Comparison | Jan | Feb | March | April | May | June | July | August | September | October | November | December | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2018 | 92 | 96 | 112 | 121 | 124 | 144 | 116 | 132 | 112 | 113 | 105 | 129 | 1396 |
| 2019 | 123 | 93 | 105 | 112 | 127 | 148 | 131 | 163 | 107 | 153 | 160 | 123 | 1545 |
| 2020 | 118 | 129 | 110 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 357 |



**Assessment Methodology**

- Dates of tours:
    - August 19-21, 2019
    - September 15-19, 2019
    - October 14-16, 2019
    - December 9-11, 2019
    - February 17-19, 2020
    - March 2-3, 2020
    - May 18-22, 2020 (virtual)

- Materials reviewed:
    - Materials reviewed include the Consent Judgment, OPSO policies and procedures, use of force reports, incident reports, and investigations conducted by Investigative Services Bureau-Internal Affairs Division (ISB-IAD), investigations conducted by ISB-Criminal Division (ISB-Criminal), investigations conducted by ISB-Inmate Division, training materials, shakedown logs, and post logs.

- Interviews:
    - Interviews included command staff, jail supervisors, commander of ISB, commander of IAD-Administrative, chief of investigations, director of training, and various supervisors of units within ISB. Given the limitations of the virtual tour, inmates were not able to be interviewed.

## IV. A. 1. Use of Force Policies and Procedures

A. 1.a. OPSO shall develop, implement, and maintain comprehensive policies and procedures (in accordance with generally accepted correctional standards) relating to the use of force with particular emphasis regarding permissible and impermissible uses of force.

A. 1.b. OPSO shall develop and implement a single, uniform reporting system under a Use of Force Reporting policy. OPSO reportable force shall be divided into two levels, as further specified in policy: Level 1 uses of force will include all serious uses of force (i.e., the use of force leads to injuries that are extensive, serious or visible in nature, including black eyes, lacerations, injuries to the mouth or head, multiple bruises, injuries to the genitals, etc.), injuries requiring hospitalization, staff misconduct, and occasions when use of force reports are inconsistent, conflicting, or otherwise suspicious. Level 2 uses of force will include all escort or control holds used to overcome resistance that are not covered by the definition of Level 1 uses of force.

A. 1.c. OPSO shall assess, annually, all data collected regarding uses of force and make any necessary changes to use of force policies or procedures to ensure that unnecessary or excessive use of force is not used in OPP. The review and recommendations will be documented and provided to the Monitor, DOJ, and SPLC.

Findings:
A. 1. a.   Substantial Compliance
A. 1. b.   Substantial Compliance
A. 1. c.   Partial Compliance



<u>Observations</u>:

The current OPSO use of force policy was effective as of May 2016. OPSO has conducted the 2019 annual review of use of force data and the policy. OPSO analysis of the data has improved, but it is concerning that the same issues such as poorly written reports, backlog in the number of use of force incidents to be reviewed, high level of use of force on specialty pods (particularly the discipline pod and the mental health pod), and the failure to faithfully report uses of force continue, but no recommendations were documented and provided to the Monitors and DOJ and counsel for the Plaintiffs. Identifying the problem is just the first step in addressing the reoccurring issues. Examination of the use of force reports by the Monitors revealed that often the use of force is precipitated by a failure to follow policy such as not restraining the inmate prior to movement or allowing an inmate out of his/her cell with another inmate(s) from whom he/she is to be kept separate. In order to warrant a rating of substantial compliance OPSO needed to address the issues; not just identify them. Therefore, the compliance rating has been lowered to Partial Compliance. Concerns regarding timeliness of submission of use of force report and reviews are addressed in those sections.

### IV. A. 2.        Use of Force Training

A. 2. a. OPSO shall ensure that all correctional officers are knowledgeable of and have the knowledge, skills, and abilities to comply with use of force policies and procedures. At a minimum, OPSO shall provide correctional officers with pre-service and annual in-service training in use of force, defensive tactics, and use of force policies and procedures. The training will include the following:
(1) instruction on what constitutes excessive force;
(2) de-escalation tactics; and
(3) management of prisoners with mental illness to limit the need for using force.
A. 2. b. OPSO shall ensure that officers are aware of any change to policies and practices throughout their employment with OPP. At a minimum, OPSO shall provide pre-service and annual in-service use of force training that prohibits:
(1) use of force as a response to verbal insults or prisoner threats where there is no immediate threat to the safety or security of the institution, prisoners, staff, or visitors;
(2) use of force as a response to prisoners' failure to follow instructions where there is no immediate threat to the safety or security of the institution, prisoners, staff, or visitors;
(3) use of force against a prisoner after the prisoner has ceased to offer resistance and is under control;
(4) use of force as punishment or retaliation; and
(5) use of force involving kicking, striking, hitting, or punching a non-combative prisoner.
A. 2. c. OPSO shall randomly test five percent of the correctional officer staff on an annual basis to determine their knowledge of the use of force policies and procedures. The testing instrument and policies shall be approved by the Monitor. The results of these assessments shall be evaluated to determine the need for changes in training practices. The review and conclusions will be documented and provided to the Monitor.

Findings:
A. 2. a.   Substantial Compliance



A. 2. b.   Substantial Compliance
A. 2. c.   Substantial Compliance

Observations:

The Monitor reviewed the training materials and documentation and the supplemental documentation submitted by training staff for the rating period. As the tour was conducted virtually, the Monitor was unable to randomly review  staff training files maintained by the training staff. However, interviews were conducted with senior security staff and Academy leadership. The proof provided by the Academy staff regarding the annual training on use of force demonstrate that the 8-hour use of force in-service training class was offered to all staff who come into direct contact with inmates. Over 98 percent of the required staff received timely annual training. This is a commendable accomplishment by the Academy staff and is a direct reflection of their willingness to adjust their schedules to facilitate training and of the leadership of Chief LeCounte as he has made training a priority.

The Monitor has, in the past, observed the Academy staff maintained detailed, comprehensive, and very well-maintained files. In response to our request for documentation, the Academy staff provided succinct and thorough reports as to who had and who had not completed the required use of force training.

The Monitor's review of the use of force training materials noted that the lesson plan, PowerPoint presentation, and testing materials substantively cover the requisite information in A. 2. c. 1-5. The proof of training documentation indicates that the OPSO staff received the required training on policies and practices by the Academy staff. However, a thorough review of the CY 2019 use of force reports reveals the need for additional training which emphasize de-escalation and provide deputies with additional tools when dealing with inmates with mental health issues and inmates who routinely exhibited behavioral problems.

The Monitor reviewed training documentation provided by training staff specific to the 5 percent annual testing requirement for this section. The testing was conducted from June 1, 2019 to August 1, 2019. Training staff tested more than the 5 percent required and reported that 100 percent of the OPSO staff tested passed. It appears that the Academy staff did not understand that they were required to obtain annual approval of the testing instrument by the Monitor. The same test was used from the previous year.



The results were analyzed by the Academy staff and reviewed by command staff. It was discussed with the Academy staff and OPSO leadership that the recommended changes appeared to focus on simplifying the test rather than determining if the training required revision to the test to address any deficiencies in knowledge of policies. The Academy staff has demonstrated proficiency in analyzing data. When drafting the next annual test, it is recommended that the Academy staff coordinate with the Force Investigation Team (FIT) regarding adherence to the use of force policy to include those portions in the test instrument.

## IV. A. 3. Use of Force Reporting

A.3 a. Failure to report a use of force incident by any staff member engaging in the use of force or witnessing the use of force shall be grounds for discipline, up to and including termination.

A.3 b. OPSO shall ensure that sufficient information is collected on uses of force to assess whether staff members complied with policy; whether corrective action is necessary including training or discipline; the effectiveness of training and policies; and whether the conditions in OPP comply with this Agreement. At a minimum, OPSO will ensure that officers using or observing a Level 1 use of force shall complete a use of force report that will:

    (1)    include the names of all staff, prisoner(s), or other visual or oral witness(es);
    (2)    contain an accurate and specific account of the events leading to the use of force;
    (3)    describe the level of resistance and the type and level of force used, consistent with OPP use of force policy and procedure, as well as the precise actions taken by OPSO staff in response to the incident;
    (4)    describe the weapon or instrument(s) of restraint, if any, and the manner of such use; be accompanied by a prisoner disciplinary report, if it exists, pertaining to the events or prisoner activity that prompted the use of force incident;
    (5)    describe the nature and extent of injuries sustained by anyone involved in the incident;
    (6)    contain the date and time when medical attention, if any, was requested and actually provided;
    (7)    describe any attempts the staff took to de-escalate prior to the use of force;
    (8)    include an individual written account of the use of force from every staff member who witnessed the use of force;
    (9)    include photographs taken promptly, but no later than two hours after a use of force incident, of all injuries sustained, or as evidence that no injuries were sustained, by prisoners and staff involved in the use of force incident;
    (10)    document whether the use of force was digitally or otherwise recorded. If the use of force is not digitally or otherwise recorded, the reporting officer and/or watch commander will provide an explanation as to why it was not recorded; and
    (11)    include a statement about the incident from the prisoner(s) against whom force was used.

A.3 c. All officers using a Level 2 use of force shall complete a use of force report that will:

    (1)    include the names of staff, prisoner(s), or other visual or oral witness(es);
    (2)    contain an accurate and specific account of the events leading to the use of force;
    (3)    describe the level of resistance and the type and level of force used, consistent with OPP use of force policy and procedure, as well as the precise actions taken by OPSO staff in response to the incident;
    (4)    describe the weapon or instrument(s) of restraint, if any, and the manner of such use;
    (5)    be accompanied by a prisoner disciplinary report, if it exists, pertaining to the events or prisoner activity that prompted the use of force incident;
    (6)    describe the nature and extent of injuries sustained by anyone involved in the incident;



(7)    contain the date and time when medical attention, if any, was requested and actually provided; and

(8)    describe any attempts the staff took to de-escalate prior to the use of force.

A.3 d. OPSO shall require correctional officers to notify the watch commander as soon as practical of any use of force incident or allegation of use of force. When notified, the watch commander will respond to the scene of all Level 1 uses of force. When arriving on the scene, the watch commander shall:

(1)    ensure the safety of everyone involved in or proximate to the incident;

(2)    determine if any prisoner or correctional officer is injured and ensure that necessary medical care is provided;

(3)    ensure that personnel and witnesses are identified, separated, and advised that communications with other witnesses or correctional officers regarding the incident are prohibited;

(4)    ensure that witness and subject statements are taken from both staff and prisoner(s) outside of the presence of other prisoners and staff;

(5)    ensure that the supervisor's use of force report is forwarded to IAD for investigation if, upon the supervisor's review, a violation of law or policy is suspected. The determination of what type of investigation is needed will be based on the degree of the force used consistent with the terms of this Agreement;

(6)    If the watch commander is not involved in the use of force incident, the watch commander shall review all submitted use of force reports within 36 hours of the end of the incident, and shall specify his findings as to completeness and procedural errors. If the watch commander believes that the use of force may have been unnecessary or excessive, he shall immediately contact IAD for investigation consideration and shall notify the warden or assistant warden; and

(7)    All Level 1 use of force reports, whether or not the force is believed by any party to be unnecessary or excessive, shall be sent to IAD for review. IAD shall develop and submit to the Monitor within 90 days of the Effective Date clear criteria to identify use of force incidents that warrant a full investigation, including injuries that are extensive or serious, visible in nature (including black eyes, injuries to the mouth, injuries to the genitals, etc.), injuries requiring hospitalization, staff misconduct (including inappropriate relationships



with prisoners), and occasions when use of force reports are inconsistent, conflicting, or otherwise suspicious.

A.3 e. Ensure that a first-line supervisor is present during all pre-planned uses of force, such as cell extractions.

A.3 f. Within 36 hours, exclusive of weekends and holidays, of receiving the report and review from the shift commander, in order to determine the appropriateness of the force used and whether policy was followed, the Warden or Assistant Warden shall review all use of force reports and supervisory reviews including:

(1)    the incident report associated with the use of force;
(2)    any medical documentation of injuries and any further medical care;
(3)    the prisoner disciplinary report associated with the use of force; and
(4)    the Warden or Assistant Warden shall complete a written report or written statement of specific findings and determinations of the appropriateness of force.

A.3 g. Provide the Monitor a periodic report detailing use of force by staff. These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. Each report will include the following information:

(1)    a brief summary of all uses of force, by type;
(2)    date that force was used;
(3)    identity of staff members involved in using force;
(4)    identity of prisoners against whom force was used;
(5)    a brief summary of all uses of force resulting in injuries;
(6)    number of planned and unplanned uses of force;
(7)    a summary of all in-custody deaths related to use of force, including the identity of the decedent and the circumstances of the death; and
(8)    a listing of serious injuries requiring hospitalization.

A.3 h. OPSO shall conduct, annually, a review of the use of force reporting system to ensure that it has been effective in reducing unnecessary or excessive uses of force. OPSO will document its review and conclusions and provide them to the Monitor, SPLC, and DOJ.

Findings:
A. 3. a.  Partial Compliance
A. 3. b.  Partial Compliance
A. 3. c.  Partial Compliance
A. 3. d.  Partial Compliance
A. 3. e.  Substantial Compliance
A. 3. f.   Partial Compliance
A. 3. g.  Substantial Compliance
A. 3. h.  Partial Compliance

Observations:

As to provision A. 3. a., the use of force policy requires all uses of force to be reported timely and completely and sets out the potential discipline if the policy is not followed. Review of documentation revealed that there were thirty-six (36) incidents between July 1, 2019 and January 30, 2020 where supervisors failed to report force within a month of the incident and only did so as a result of being instructed to file a report. There were many other untimely reports, but the period was less than a month. Therefore, the supervisor is being given the benefit of the doubt that it constituted a situation of untimeliness as opposed to failure to file. No documentation of discipline was administered



in any of these cases; not even as much as written reprimand or verbal counseling. It is important to note that there are <u>supervisors</u> who failed to file report on the use of force on multiple occasions including two (2) that had four (4) incidents and one (1) that had five (5) incidents of failing to report a use of force. One of these is the supervisor mentioned in Compliance Report #11 who failed to report a deputy's attempt to assault an inmate that required the deputy had to be restrained to protect the inmate. Having a policy which states that failure to report a use of force shall be grounds for discipline, but not enforcing it has resulted in compliance being reduced to Partial Compliance.

Provisions A. 3. b. and c. remain in partial compliance due to the significant number of incomplete/inadequate use of force reports. The use of force policy includes the provisions required by the Consent Judgment, but adherence is inconsistent. The Monitor provided a checklist of the report requirements to assist supervisors in ensuring reports included all necessary items. A review of those checklists and accompanying reports indicates that the required information was frequently missing from the use of force reports such as what led up to the incident, details of actions taken during the use of force, and conclusion/resolution of the incident. Seldom do reports include an articulation of any de-escalation tactics, description of injuries sustained, and when medical attention was provided. As with the failure to timely report all uses of force, deputies and supervisors are not consistently held accountable for failure to include required information. In addition, the Louisiana Department of Corrections often does not comply with the requirements of these provisions when reporting uses of force involving inmates housed at Hunt.

The unit managers and watch commanders are not consistently compliant with the requirements of the Consent Judgment (IV. A. 3. d.) as to their specific duties and the time requirement for performance of these duties under the policies. The Consent Judgment requires submission of the packet within 36 hours not three (3) days. Although improvement has been shown in the first quarter of 2020, there is seldom adherence to the policy timelines and information is often missing from the original packet which requires it to be sent back to the supervisors for correction. Improvement has been made in the quality of the packets sent to FIT, but errors occur every week. Communication between FIT and OJC leadership appears to have improved and it appears that, as of late, the issues are being addressed.

The position of Assistant Warden or Warden has been vacant for over a year. Until



recently, there was not a position of the rank of Major (the normal rank of a Warden or Assistant Warden) assigned to OJC. Instead, the reviews required under IV. A. 3. f. were conducted by a sergeant who was later promoted to lieutenant. While the person assigned to these duties is a very capable individual, the policy requires review by a high-ranking individual, not a person who was often outranked by the person whose work she was evaluating. FIT issues a quarterly report which contains all the information required by IV. A. 3. g. Thus, this section is in substantial compliance. The annual review of use of force incidents as required by IV. A. 3. h. was provided to the Monitors and all parties. While the review contained a much-improved analysis and confirmed the issues pointed out above, no recommendations as to remedies were made and provided. In order to warrant a rating of substantial compliance OPSO needed to address the issues; not just identify them. Therefore, the compliance rating has been lowered to Partial Compliance.

## IV. A. 4. Early Intervention System ("EIS")

A.4.a. OPSO shall develop, within 120 days of the Effective Date, a computerized relational database ("EIS") that will document and track staff members who are involved in use of force incidents and any complaints related to the inappropriate or excessive use of force, in order to alert OPSO management to any potential problematic policies or supervision lapses or need for retraining or discipline. The Chief of Operations Deputy, supervisors, and investigative staff shall have access to this information and shall review on a regular basis, but not less than quarterly, system reports to evaluate individual staff, supervisor, and housing area activity. OPSO will use the EIS as a tool for correcting inappropriate staff behavior before it escalates to more serious misconduct.

A.4.b. Within 120 days of the Effective Date, OPSO senior management shall use EIS information to improve quality management practices, identify patterns and trends, and take necessary corrective action both on an individual and systemic level. IAD will manage and administer EIS systems. The Special Operations Division ("SOD") will have access to the EIS. IAD will conduct quarterly audits of the EIS to ensure that analysis and intervention is taken according to the process described below. Command staff shall review the data collected by the EIS on at least a quarterly basis to identify potential patterns or trends resulting in harm to prisoners. The Use of Force Review Board will periodically review information collected regarding uses of force in order to identify the need for corrective action, including changes to training protocols and policy or retraining or disciplining individual staff or staff members. Through comparison of the operation of this system to changes in the conditions in OPP, OPSO will assess whether the mechanism is effective at addressing the requirements of this Agreement.

A.4.c. OPSO shall provide, within 180 days of the implementation date of its EIS, to SPLC, DOJ, and the Monitor, a list of all staff members identified through the EIS and corrective action taken.

A.4.d. The EIS protocol shall include the following components: data storage, data retrieval, reporting, data analysis, pattern identification, supervisory assessment, supervisory intervention, documentation, and audit.

A.4.e. On an annual basis, OPSO shall review the EIS to ensure that it has been effective in identifying concerns regarding policy, training, or the need for discipline. This assessment will be based in part on the number and severity of harm and injury identified through data collected pursuant to this Agreement. OPSO will document its review and conclusions and provide them to the Monitor, who shall forward this document to DOJ and SPLC.



Findings:
    A. 4. a.  Substantial Compliance
    A. 4. b.  Substantial Compliance
    A. 4. c.  Substantial Compliance
    A. 4. d.  Substantial Compliance
    A. 4. e.  Substantial Compliance

<u>Observations</u>:

Since the inception of the Consent Judgment, the electronic EIS has been unreliable. OPSO abandoned the original system and fashioned an alternative version within the AS400. A FIT staff member manually monitors the database to alert FIT staff as to the need to review any uses of force by a staff member.

OPSO has improved its documentation to the Monitors as to the names of the staff members who are flagged for uses of force, if a review is conducted, and any retraining received, if required.

The Use of Force Review Board met regularly and evaluated the 2019 data as required for substantial compliance with IV. A .4. e. The inadequacies of the review are addressed in other sections.

While the EIS would ideally be part of the jail management system, as one does not yet exist, the efforts made by OPSO to craft an alternative EIS warrant a rating of substantial compliance on all provisions.

## IV. A. 5.  Safety and Supervision

A.5.a. Maintain security policies, procedures, and practices to provide a reasonably safe and secure environment for prisoners and staff in accordance with this Agreement.

A.5.b. Maintain policies, procedures, and practices to ensure the adequate supervision of prisoner work areas and trustees.

A.5.c. Maintain policies and procedures regarding care for and housing of protective custody prisoners and prisoners requesting protection from harm.

A.5.d. Continue to ensure that correctional officers conduct appropriate rounds at least once during every 30-minute period, at irregular times, inside each general population housing unit and at least once during every 15-minute period of special management prisoners, or more often if necessary. All security rounds shall be documented on forms or logs that do not contain pre-printed rounding times. In the alternative, OPSO may provide direct supervision of prisoners by posting a correctional officer inside the day room area of a housing unit to conduct surveillance.

A.5.e. Staff shall provide direct supervision in housing units that are designed for this type of supervision. Video surveillance may be used to supplement, but must not be used to replace, rounds by correctional officers.

A.5.f. Increase the use of overhead video surveillance and recording cameras to provide adequate coverage throughout the common areas of the Jail, including the Intake Processing Center, all divisions' intake areas, mental health units, special management units, prisoner housing units, and in the divisions' common areas.

A.5.g. Continue to ensure that correctional officers, who are transferred from one division to another, are



required to attend training on division-specific post orders before working on the unit.

A.5.h. Continue to ensure that correctional officers assigned to special management units, which include youth tiers, mental health tiers, disciplinary segregation, and protective custody, receive eight hours of specialized training regarding such units on prisoner safety and security on at least an annual basis.

A.5.i. Continue to ensure that supervisors conduct daily rounds on each shift in the prisoner housing units and document the results of their rounds.

A.5.j. Continue to ensure that staff conduct daily inspections of cells and common areas of the housing units to protect prisoners from unreasonable harm or unreasonable risk of harm.

A.5.k. Continue to ensure that staff conduct random monthly shakedowns of cells and common areas so that prisoners do not possess or have access to dangerous contraband.

A.5.l. Provide the Monitor a periodic report of safety and supervision at the Facility. These periodic reports shall be provided to the monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. Each report will provide the following information:

  (1)  a listing of special management prisoners, their housing assignments, the basis for them being placed in the specialized housing unit, and the date placed in the unit; and

  (2)  a listing of all contraband, including weapons seized, the type of contraband, date of seizure, location, and shift of seizure.

Findings:

A. 5. a.  Partial Compliance
A. 5. b.  Substantial Compliance
A. 5. c.  Substantial Compliance
A. 5. d.  Partial Compliance
A. 5. e.  Partial Compliance
A. 5. f.  Substantial Compliance
A. 5. g.  Substantial Compliance
A. 5. h.  Substantial Compliance
A. 5. i.  Partial Compliance
A. 5. j.  Partial Compliance
A. 5. k.  Substantial Compliance
A. 5. l.  Substantial Compliance

Observations:

  OPSO has worked hard to finalize policies, procedures, and post orders. The implementation of those policies, procedures, and practices and the adequate supervision of inmate working areas results in substantial compliance as to A. 5. b. and c. The level of violence, an average of 35 inmate on inmate assaults/altercations per month and almost 10 assaults on staff per month, are indicative that OPSO has not substantially complied with the requirement that the facility be reasonably safe for staff and inmates. The challenges of developing credible training lesson plans, recruiting staff, training staff, remediating staff who do not have the required level of proficiency, and supervising employees to hold them accountable for not following policy remains.

  OPSO has made significant progress under the leadership of the Independent Compliance Director and his initiation of unit management to assist in the daily supervision of housing units and increase accountability. However, review of the CY 2019



significant incidents indicates that the failure of staff to follow policy consistently is a serious impediment to effective supervision of the inmates. There are inmates who repeatedly do not follow the rules of OJC including assaulting other inmates, assaulting staff, destroying property, and/or threatening self-harm. While not expressly required by the Consent Judgment, Director Hodge had indicated he instructed the Unit Managers to develop individual inmate management plans as the same inmates are involved in violence and uses of force. If done routinely and consistently followed by all staff, it would likely reduce the level of violence in the facility.

### Table 5 CY 2018-CY 2020 OJC Reported Incidents

| 2018 | Inmate/ Inmate Assault | Inmate Staff Altercation | Use of Force | PREA | Death | Attempt Suicide/ Ideation | Internal Escape | Criminal Damage | Inmate Injury/ Inmate Medical (AKA slip/falls/ overdoses) | Contraband | Staff Arrest | Staff Misconduct/ Suspension | Other | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| January | 38 | 7 | 13 | 2 | 0 | 6 | 2 | 3 | 9 | 9 | 0 | 0 | 3 | 92 |
| February | 28 | 6 | 10 | 4 | 0 | 14 | 2 | 10 | 5 | 15 | 2 | 0 | 0 | 96 |
| March | 37 | 7 | 21 | 5 | 0 | 4 | 3 | 11 | 18 | 5 | 0 | 0 | 1 | 112 |
| April | 39 | 9 | 22 | 4 | 0 | 4 | 3 | 12 | 22 | 5 | 0 | 0 | 1 | 121 |
| May | 52 | 0 | 24 | 5 | 1 | 0 | 5 | 8 | 19 | 10 | 0 | 0 | 0 | 124 |
| June | 46 | 7 | 26 | 5 | 0 | 6 | 7 | 3 | 32 | 9 | 1 | 0 | 2 | 144 |
| July | 30 | 4 | 20 | 4 | 0 | 9 | 3 | 3 | 30 | 13 | 0 | 0 | 0 | 116 |
| Aug | 39 | 3 | 27 | 3 | 0 | 13 | 2 | 6 | 30 | 6 | 0 | 0 | 0 | 132 |
| Sept | 33 | 6 | 14 | 2 | 0 | 7 | 5 | 4 | 35 | 6 | 0 | 0 | 0 | 112 |
| Oct | 32 | 9 | 28 | 5 | 0 | 3 | 0 | 2 | 26 | 7 | 0 | 0 | 1 | 113 |
| Nov | 31 | 6 | 21 | 5 | 0 | 5 | 8 | 3 | 18 | 7 | 0 | 0 | 1 | 105 |
| Dec | 37 | 0 | 34 | 3 | 1 | 7 | 8 | 4 | 18 | 14 | 0 | 0 | 3 | 129 |
| Total | 442 | 64 | 260 | 47 | 2 | 78 | 48 | 69 | 262 | 106 | 3 | 0 | 15 | 1396 |

| 2019 | Inmate/ Inmate Assault | Inmate Staff Altercation | Use of Force | PREA | Death | Attempt Suicide/ Ideation | Internal Escape | Criminal Damage | Inmate Injury/ Inmate Medical (AKA slip/falls/ overdoses) | Contraband | Staff Arrest | Staff Misconduct/ Suspension | Other | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| January | 40 | 1 | 27 | 2 | 0 | 15 | 3 | 7 | 14 | 14 | 0 | 0 | 0 | 123 |
| February | 26 | 7 | 29 | 2 | 0 | 13 | 1 | 0 | 4 | 11 | 0 | 0 | 0 | 93 |
| March | 25 | 4 | 26 | 1 | 0 | 6 | 1 | 2 | 16 | 21 | 0 | 0 | 3 | 105 |
| April | 28 | 7 | 26 | 1 | 0 | 3 | 0 | 3 | 15 | 27 | 0 | 0 | 2 | 112 |
| May | 36 | 11 | 22 | 6 | 0 | 13 | 0 | 2 | 11 | 25 | 0 | 0 | 1 | 127 |
| June | 55 | 9 | 26 | 4 | 0 | 13 | 0 | 2 | 16 | 23 | 0 | 0 | 0 | 148 |
| July | 50 | 15 | 31 | 5 | 0 | 6 | 0 | 3 | 8 | 13 | 0 | 0 | 0 | 131 |
| Aug | 32 | 17 | 37 | 6 | 0 | 7 | 1 | 8 | 20 | 35 | 0 | 0 | 0 | 163 |
| Sept | 32 | 4 | 31 | 3 | 0 | 2 | 0 | 1 | 10 | 24 | 0 | 0 | 0 | 107 |
| Oct | 38 | 15 | 37 | 4 | 0 | 1 | 0 | 7 | 18 | 33 | 0 | 0 | 0 | 153 |
| Nov | 55 | 12 | 33 | 7 | 0 | 0 | 0 | 6 | 5 | 42 | 0 | 0 | 0 | 160 |
| Dec | 23 | 15 | 33 | 1 | 0 | 3 | 0 | 6 | 8 | 34 | 0 | 0 | 0 | 123 |
| Total | 440 | 117 | 358 | 42 | 0 | 82 | 6 | 47 | 145 | 302 | 0 | 0 | 6 | 1545 |

| 2020 | Inmate/ Inmate Assault | Inmate Staff Altercation | Use of Force | PREA | Death | Attempt Suicide/ Ideation | Internal Escape | Criminal Damage | Inmate Injury/ Inmate Medical (AKA slip/falls/ overdoses) | Contraband | Staff Arrest | Staff Misconduct/ Suspension | Other | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| January | 31 | 8 | 29 | 4 | 0 | 3 | 0 | 1 | 7 | 35 | 0 | 0 | 0 | 118 |
| February | 35 | 12 | 33 | 2 | 0 | 0 | 1 | 3 | 13 | 29 | 0 | 0 | 1 | 129 |
| March | 24 | 9 | 31 | 1 | 0 | 1 | 0 | 3 | 6 | 35 | 0 | 0 | 0 | 110 |
| April | | | | | | | | | | | | | | 0 |
| May | | | | | | | | | | | | | | 0 |
| June | | | | | | | | | | | | | | 0 |
| July | | | | | | | | | | | | | | 0 |
| Aug | | | | | | | | | | | | | | 0 |
| Sept | | | | | | | | | | | | | | 0 |
| Oct | | | | | | | | | | | | | | 0 |
| Nov | | | | | | | | | | | | | | 0 |
| Dec | | | | | | | | | | | | | | 0 |
| Total | 90 | 29 | 93 | 7 | 0 | 4 | 1 | 7 | 26 | 99 | 0 | 0 | 1 | 357 |

OPSO still does not conduct and document security rounds (30 minutes or 15 minutes depending on the unit) nor perform direct supervision surveillance consistent with the requirements of the Consent Judgment or OPSO policy.



Direct supervision requires surveillance of all of the inmates and cannot be properly performed by sitting behind a desk or in the control module. It requires walking around the unit, looking into the individual cells, and actively engaging with the inmates. Use of designated mandatory assignments has improved the consistency of staffing within those units, but for other units staffing was routinely inadequate or inconsistent throughout the shift. Review of incident reports revealed that units were often unstaffed, including mandatory posts. If staff are not present, it impossible to make the required rounds. The improvement has resulted in OPSO being found in partial compliance with IV. A. 5. d.

Due to unreliability of the TourWatch system, OPSO reverted to paper logs. While the current OPSO policy requires supervisors, up to the level of Watch Commander, to review the paper logs to ensure rounds are being conducted, OPSO has not audited compliance with this policy. Even a cursory review of the paper logs reveals that timely rounds were not performed. OPSO should consider a reliable system that would allow for rounds, by both deputies and supervisors, to be recorded electronically. Not only would it allow for supervisors to quickly determine whether rounds were being conducted timely, it would allow for OPSO to prove compliance and address non-adherence.

All twenty-four (24) of the housing units are designed for direct supervision. The Consent Judgment requires that staff shall provide direct supervision in housing units that are designed for this type of supervision. Instead, OPSO's Compliance Matrix identified twelve (12) mandatory posts. Six of these mandatory posts are the control pods and six are housing units. Thus, only 25% of the housing units are staffed for direct supervision despite all of them being designed for direct supervision. In addition, at times the deputies were not even in those housing units designated by OPSO as mandatory. Thus, IV. A. 5. e. remains in partial compliance.

Regarding overhead video surveillance and recording cameras for OJC (A.5.f.), there were on-going issues where the majority of the 900 cameras were not recording. Frequently, a nonfunctional camera was discovered only when a supervisor or an investigator tried to retrieve the videos. OPSO now audits the system by having a supervisor test the various cameras on a monthly basis and preparing a report for the Chief of Security. The system was repaired during the compliance period and has been demonstrated to be functioning on a consistent and regular basis; IV. A. 5. f. is now in



substantial compliance.

Documentation was provided that staff transferred from other divisions to work in the OJC received the required training; thus, IV. A. 5. g. is in substantial compliance. Proof of training for the specialized units was provided; IV. A. 5. h. is now in substantial compliance. Given the high level of incidents in the specialized units, it is recommended that the training be reviewed and deficiencies addressed.

Documentation is lacking that supervisors consistently conduct daily rounds during this compliance period; thus, IV. A. 5. i. continues to be in partial compliance. The daily inspections of housing units as required by VI. A. 5. j. has improved but are still only in partial compliance. With the introduction of unit management, unit managers and deputies were required to conduct daily inspections. However, by OPSO's own admission, the inspections are only performed weekly. The daily inspection required by the Consent Judgment is not the same as the observations made on rounds. Further, corrective actions to address the inspection findings are essential.

Monthly shakedowns are conducted in substantial compliance with VI. A. 5. k. However, no reports were provided for the first quarter of 2020, and the raw data provided indicates that no shakedowns were conducted during March 2020. The number of contraband reports increased significantly in 2019. It is unclear whether this is a result of more contraband in the facility or if it is a result of more frequent and effective contraband shakedowns. The review of contraband reports clearly indicates reoccurring issues. For example, there continues to be a serious issue with the presence of medication contraband. This indicates the need to analyze the data and develop a corrective action plan to reduce, if not stop, the hoarding of medication and the flow of contraband into the facility.

OPSO continues to review the monthly shakedown reports as to the locations of the contraband, linkages to previous shakedowns, specific items found, and the inmates involved. OPSO provided a list of special management units in compliance with the provision. Thus, IV A. 5. l. is now in substantial compliance.

## IV.  A.  6.  Security Staffing

A.6.a. OPSO shall ensure that correctional staffing and supervision is sufficient to adequately supervise prisoners, fulfill the terms of this Agreement, and allow for the safe operation of the Facility, consistent with



constitutional standards.

(1) OPSO shall achieve adequate correctional officer staffing in the following manner: Within 90 days of the Effective Date, develop a staffing plan that will identify all posts and positions, the adequate number and qualification of staff to cover each post and position, adequate shift relief, and coverage for vacations. The staffing plan will ensure that there is adequate coverage inside each housing and specialized housing areas and to accompany prisoners for court, visits and legal visits, and other operations of OPP and to comply with all provisions of this Agreement. OPSO will provide its plan to the Monitor, SPLC, and DOJ for approval. The Monitor, SPLC, or DOJ will have 60 days to raise any objections and recommend revisions to the staffing plan.

(2) Within 120 days before the opening of any new facility, submit a staffing plan consistent with subsection (1) above.

(3) Within 90 days after completion of the staffing study, OPSO shall recruit and hire a full-time professional corrections administrator to analyze and review OPP operations. The professional corrections administrator shall report directly to the Sheriff and shall have responsibilities to be determined by the Sheriff. The professional corrections administrator shall have at least the following qualifications: (a) a bachelor's degree in criminal justice or other closely related field; (b) five years of experience in supervising a large correctional facility; and (c) knowledge of and experience in applying modern correctional standards, maintained through regular participation in corrections-related conferences or other continuing education.

(4) Provide the Monitor a periodic report on staffing levels at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. Each report will include the following information:

    i. a listing of each post and position needed;
    ii. the number of hours needed for each post and position;
    iii. a listing of staff hired and positions filled;
    iv. a listing of staff working overtime and the amount of overtime worked by each staff member;
    v. a listing of supervisors working overtime; and
    vi. a listing of and types of critical incidents reported.

A.6.b. Review the periodic report to determine whether staffing is adequate to meet the requirements of this Agreement. OPSO shall make recommendations regarding staffing based on this review. The review and recommendations will be documented and provided to the Monitor

Findings:
A. 6. a.  Substantial Compliance
A. 6. b.  Substantial Compliance

An overall rating of A. 6. was provided in the previous reports. This was inconsistent with the other introductory paragraphs and has now been discontinued.

Observations:

Insufficient staffing of posts in OJC continues. This is evidenced by the extensive use of overtime, numerous incident reports, and investigations that reveal posts were not constantly staffed. While provision IV. A. 6. a. (2) continues to be in substantial compliance due to the submission of the staffing plan, failure to consistently adhere to the staff plan results in IV. A. 6. a. (1) being in partial compliance. The Monitors look forward to reviewing the staffing plan for



the occupation of TDC and Phase III.

Provision IV. 6. a. (3) is in substantial compliance with the hiring of Byron LeCounte as the Chief of Corrections as of February 19, 2019.

Paragraph IV. 6. a. (4) is in substantial compliance, as monthly reports are produced to document hiring and termination of employees. The Stipulated Agreement also provides for bi-monthly reports regarding hiring. Paragraph 7.a. of the Stipulated Agreement of February 11, 2015 requires monthly reporting. Overall, A. 6. a. is in substantial compliance.

OPSO is in substantial compliance with A. 6. b. as OPSO periodically reviews the staffing plan and has designated which posts are mandatory. The problem is that staff have not been hired/retained to consistently fill those mandatory posts.



## IV. A. 7.  Incidents and Referrals

A.7.a. OPSO shall develop and implement policies that ensure that Facility watch commanders have knowledge of reportable incidents in OPP to take action in a timely manner to prevent harm to prisoners or take other corrective action. At a minimum, OPSO shall do the following:

A.7.b. Continue to ensure that Facility watch commanders document all reportable incidents by the end of their shift, but no later than 24 hours after the incident, including prisoner fights, rule violations, prisoner injuries, suicide attempts, cell extractions, medical emergencies, found contraband, vandalism, escapes and escape attempts, and fires.

A.7.c. Continue to ensure that Facility watch commanders report all suicides and deaths no later than one hour after the incident, to a supervisor, IAD, the Special Operations Division, and medical and mental health staff.

A.7.d. Provide formal pre-service and annual in-service training on proper incident reporting policies and procedures.

A.7.e. Implement a policy providing that it is a disciplinary infraction for staff to fail to report any reportable incident that occurred on his or her shift. Failure to formally report any observed prisoner injury may result in staff discipline, up to and including termination.

A.7.f. Maintain a system to track all reportable incidents that, at a minimum, includes the following information:

| | |
|---|---|
| (1) | tracking number; |
| (2) | the prisoner(s) name; |
| (3) | housing classification and location; |
| (4) | date and time; |
| (5) | type of incident; |
| (6) | injuries to staff or prisoner; |
| (7) | medical care; |
| (8) | primary and secondary staff involved; |
| (9) | reviewing supervisor; |
| (10) | external reviews and results; |
| (11) | corrective action taken; and |
| (12) | administrative sign-off. |

A.7.g. Ensure that incident reports and prisoner grievances are screened for allegations of staff misconduct, and, if the incident or allegation meets established criteria in accordance with this Agreement, it is referred for investigation.

A.7.h. Provide the Monitor a periodic data report of incidents at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement.

A.7.i. The report will include the following information:

| | |
|---|---|
| (1) | a brief summary of all reportable incidents, by type and date; |
| (2) | a description of all suicides and in-custody deaths, including the date, name of prisoner, and housing unit; |
| (3) | number of prisoner grievances screened for allegations of misconduct; and |
| (4) | number of grievances referred to IAD or SOD for investigation. |

A.7.j. Conduct internal reviews of the periodic reports to determine whether the incident reporting system is ensuring that the constitutional rights of prisoners are respected. Review the quarterly report to determine whether the incident reporting system is meeting the requirements of this Agreement. OPSO shall make recommendations regarding the reporting system or other necessary changes in policy or staffing based on this review. The review and recommendations will be documented and provided to the Monitor.

Findings:

A. 7. a.  Substantial Compliance

A. 7. b.  Substantial Compliance

A. 7. c.  Substantial Compliance



A. 7. d.  Substantial Compliance
A. 7. e.  Substantial Compliance
A. 7. f.   Substantial Compliance
A. 7. g.  Substantial Compliance
A. 7. h.  Substantial Compliance
A. 7. i.   Substantial Compliance
A. 7. j.   Substantial Compliance

 Observations:

OPSO has long had a policy on incidents and referrals that sets out the process for documenting and referring incidents. What has been lacking is a sufficient process to ensure all reportable incidents are being documented and that all incident reports are complete, prompt, and accurate. OPSO has improved in its reporting of incidents as well as its timeliness of the reporting of incidents. A failure to continue improvement in the timely reporting of incident may result in a finding of partial compliance, but, as of now, A. 7. b. remains in substantial compliance.

One of the methods for determining whether incidents are reported is to review "routes" of inmates with serious medical or trauma injuries to the hospital emergency and the OPSO clinic walk-in logs. This function used to be performed by the Monitors. OPSO has implemented a process where a lieutenant performs this function and follow up on missing reports. This is an example of OPSO incorporating processes which allow OPSO to audit its compliance. What continues to be lacking is holding the supervisors accountable for the late reports. No documentation was provided of accountability in the form of counseling or discipline was presented.

During this reporting period, there were no deaths, the serious attempts at suicide were reported within an hour to the proper persons; thus IV. A. 7. c. is in substantial compliance. As noted earlier, two in custody deaths occurred in June 2020 and were timely reported. Annual training was provided on incident reporting, and documentation indicates that staff were required to attend; IV. A. 7. d. is in substantial compliance. OPSO has transitioned to the AS 400 system to track the information required in IV. A. 7. f.  and is now in substantial compliance. While OPSO makes little use of the information, that failure is reflected elsewhere. In substantial compliance with A. 7. g., incidents and grievances are reviewed for misconduct and referred for investigation where appropriate. The Monitors were provided a semi- annual report of incidents, that now, with the supplementation by the daily/weekly reports, which contains all of



the required information and, thus, A. 7. h. and i. are in substantial compliance. OPSO performed an assessment of whether the reporting system is meeting the requirements of the Consent Judgment and is given substantial compliance for A. 7. j. as OPSO is now addressing the lack of timeliness. However, to maintain substantial compliance, future assessments of the reporting system will need to be more robust and refined.

## IV. A. 8.  Investigations

A.8.a. Maintain implementation of comprehensive policies, procedures, and practices for the timely and thorough investigation of alleged staff misconduct, sexual assaults, and physical assaults of prisoners resulting in serious injury, in accordance with this Agreement. Investigations shall:

 (1) be conducted by persons who do not have conflicts of interest that bear on the partiality of the investigation;

 (2) include timely, thorough, and documented interviews of all relevant staff and prisoners who were involved in or who witnessed the incident in question, to the extent practicable; and

 (3) include all supporting evidence, including logs, witness and participant statements, references to policies and procedures relevant to the incident, physical evidence, and video or audio recordings.

A.8.b. Continue to provide SOD and IAD staff with pre-service and annual in-service training on appropriate investigation policies and procedures, the investigation tracking process, investigatory interviewing techniques, and confidentiality requirements.

A.8.c. Ensure that any investigative report indicating possible criminal behavior will be referred to IAD/SOD and then referred to the Orleans Parish District Attorney's Office, if appropriate.

A.8.d. Provide the Monitor a periodic report of investigations conducted at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement.

A.8.e. The report will include the following information:

 (1) a brief summary of all completed investigations, by type and date;

 (2) a listing of investigations referred for administrative investigation;

 (3) a listing of all investigations referred to an appropriate law enforcement agency and the name of the agency; and

 (4) a listing of all staff suspended, terminated, arrested, or reassigned because of misconduct or violations of policy and procedures. This list must also contain the specific misconduct and/or violation.

A.8.f. OPSO shall review the periodic report to determine whether the investigation system is meeting the requirements of this Agreement and make recommendations regarding the investigation system or other necessary changes in policy based on this review. The review and recommendations will be documented and provided to the Monitor.

Findings:

A. 8. a. Substantial Compliance

A. 8. b.  Substantial Compliance
A. 8. c.  Substantial Compliance
A. 8. d.  Substantial Compliance
A. 8. e.  Substantial Compliance
A. 8. f.   Substantial Compliance

Observations:

 The Investigative Services Division (ISB) is responsible for: the Criminal Investigation



Division (investigates possible criminal activity by inmates), Internal Affairs Division-Criminal (investigates possible criminal activity by staff), the FIT (investigates use of force by staff), the Internal Affairs Division-Administrative (investigates possible violation of policies by staff), and the Intelligence Unit (provides information and intelligence regarding activities that have taken place or may take place in the jail or support activities).

Significant evidence of substantial compliance was provided for IV. A. 8. a.  The Monitor continues to be concerned about the time investigations are taking, but the length of time for investigations decreased due to the additional ISB staff and an improvement in the quality of the reports on which the investigations are based. As the volume of incidents requiring the attention of ISB decreases, the timeliness of investigations should improve. The quality of the investigations in the future is of concern due to the resignations of the three most experienced investigators. Improvements in all other areas from hiring, training, supervision, and adequate staffing will enhance the safety of staff and inmates and, ultimately, decrease the workload of ISB.

The Monitor acknowledges that investigating incidents of inmate on inmate assaults, sexual assaults, staff on inmate assaults, etc. with a goal of seeking indictments is appropriate; but the overall goal is to create a safe jail. In a jail setting, investigations play a critical role in protecting inmates from inappropriate or illegal staff actions, protecting inmates from each other, and correcting policy, practice, supervision and training. Continued emphasis is needed on the goal of investigations to prevent future incidents through analysis of the policy, procedures, training, supervision, and physical plant contributors to the incident. This function cannot and should not be performed by ISB alone. This level of assessment requires input from individuals who have a high level of experience in jail/corrections work. In short, it requires collaboration between ISB and OJC which continues to be wanting. The OJC staff should take the lead in the root cause analysis with ISB providing information gathered during the investigation.

The quality of sexual assault investigations remained improved during the compliance period. The Lieutenant who was responsible for IAD-Criminal investigations is no longer employed at OPSO and supervision of sexual assault investigations has been added to the duties of the FIT supervisor.



ISB continues to receive significant additional training. In substantial compliance with A. 8. b., ISB contracted with an expert on sexual assault and PREA investigations to provide training to guide implementation of the new skills.

Investigations which reveal potential criminal activity are referred to the Orleans Parish District Attorney's Office in substantial compliance with A. 8. c. ISB provides reports in substantial compliance with IV. A. 8. d. and e. ISB reviews the investigation system to determine whether the investigation system complies with the requirements of the Consent Judgment and forwards any recommendations to the Monitors.

## IV. A. 9.    Pretrial Placement in Alternative Settings

A.9.a.  OPSO shall maintain its role of providing space and security to facilitate interviews conducted pursuant to the City's pretrial release program, which is intended to ensure placement in the least restrictive appropriate placement consistent with public safety.
A.9.b.  OPSO shall create a system to ensure that it does not unlawfully confine prisoners whose sole detainer is by Immigration and Customs Enforcement ("ICE"), where the detainer has expired.

Findings:
A. 9. a.  Substantial Compliance
A. 9. b.  Substantial Compliance

Observations:

OPSO provided a memorandum noting that the pretrial program is no longer managed by VERA, but rather by the Criminal District Court, and that the same space is provided. OPSO also provided a memorandum that ICE detainers are only accepted for a specified list of offenses.  OPSO has not detained any individuals under an ICE detainer during 2019 or the first three months of 2020.

## IV. A. 10. Custodial Placement within OPP

### Introduction

OPSO has designed, validated, and implemented an objective classification system to assess and house each OSPO inmate according to his/her risks posed to institutional safety and security. The automated classification system was rolled out in the Jail Management System (JMS) on January 15, 2015.[1] The OPSO staffing plan set the classification unit staff

---

[1] Hardyman, Patricia L. (2015). "Design and Validation of an Objective Classification System for the Orleans Parish

ORLEANS PARISH
JAIL MONITORS

FTEs at 18. As of May 20, 2020, the Classification Unit staffing was 15 – 14 civilian classification specialists and a classification manager. Thus, it appeared the Classification Unit staffing was adequate.   During this compliance period, three (3) classification specialists joined the Unit; one (1) resigned. In December 2019, the Monitor provided training for the entire OPSO classification staff.  Training topics included the principles of objective classification and instruction on OPSO custody, predation, and vulnerability assessments, and the housing assignment process.  No in-service training was documented for this compliance period, although the classification manager reported some instruction on the internal housing audit process.

An automated housing assignment process (HUAP) identifies housing options for inmates according to their custody level, gender, special population status, PREA designations, enemies, and associates. The classification specialist selects from the potential housing locations to match the inmates by age, crime/criminal history, custody level, and PREA designations. Special population tags identify inmates for suicide observation versus suicide watch, medical housing/isolation, academic education, or special diets. The OJC and TDC dormitory-style units have been cataloged in the automated HUAP to enable the classification specialists to assign inmates to specific beds. Classification Unit and JMS staff worked together to develop an Inmate Separation Instrument (ISI) to maintain out-of-cell separations.  Current OPSO operational procedures do not require use of the ISI for the general population or special management units. However, OPSO reported using the ISI to identify appropriate out-of-cell separations within the mixed custody, COVID-19 populations units.

During July-November 2019, classification specialists and corrections security staff conducted some housing audits to verify the inmates were in their assigned cells and beds. However, most of the audit sheets were incomplete and inconsistent. It was still unclear if the security staff auditors verified the inmates were sleeping in their assigned beds. Thus, the integrity of the housing audit process remains questionable.

OPSO modified its document submittal process to exclude standardized monthly classification statistical reports. These reports, however, were provided as



Sheriff's Office: Final Report." Hagerstown, MD: Criminal Justice Institute, Inc.



documentation for the May 2020 virtual tour. The classification specialists complete most initial and reclassification assessments within 24 hours of intake or status change for most inmates.

### Assessment Methodology

The compliance review was limited to a review of the documents provided by OPSO and a virtual meeting with OPSO staff.  Examined throughout the compliance period were ad hoc reports regarding custody reviews, arrests/releases, housing, and inmate disciplinary/incidents.  For this compliance review, analyzed were the monthly statistical reports, housing audit data, and monitor logs.  Thus, compliance was assessed using multiple data sources and methods; however, sorely missed were the on-site observations of the custody assessment, housing, and audit processes as a means of reviewing compliance.  This compliance report focuses primarily on the July 2019 and March 2020 data. For some analyses, considered were the trends over a fifteen-month (15) period to allow for seasonal variations.

**Summary**

In sum, the OPSO is in partial compliance overall with the paragraphs of the Consent Judgment related to Custodial Placement within OPP (IV. A.10). During these nine months, the OPSO moved from Partial Compliance to Substantial-Compliance on Sections d. *(Continue to update the classification system to include information on each inmate's history at OPSO)* and h. (Continue competency-based training and access to all supervisors on the full capabilities of the OPSO classification and prisoner tracking system*). There were no changes for Sections a., b., c., f., and g. OPSO did not regress on any sections of the Custodial Placement requirements.  Section f. remains the only Custodial Placement paragraph with which OPSO is not in Substantial Compliance.  While the internal audits by the classification specialists improved somewhat during November and December, OSPO discontinued the housing audits in December.  Further, it appears there is still little review and follow-up of the audits to ensure that problems detected are addressed.   The internal housing audits by security staff were discontinued in October. Audits by security staff are not essential to achieve compliance with Section f. of the Consent Judgment. As the Classification Unit audits are restarted, additional training for the classification staff will be important to create a credible audit process.

Findings:



A. 10. a.   Substantial Compliance
A. 10. b.   Substantial Compliance
A. 10. c.   Substantial Compliance
A. 10. d.   Substantial Compliance
A. 10. e.   Partial Compliance
A. 10. f.   Partial Compliance
A. 10. g.   Substantial Compliance
A. 10. h.   Substantial Compliance

> IV.A.10. a. OPP shall implement an objective and validated classification system that assigns prisoners to housing units by security levels, among other valid factors, in order to protect prisoners from unreasonable risk of harm. The System shall include consideration of a prisoner's security needs, the severity of the current charge, types of prior commitments, suicide risk, history of escape attempts, history of violence, gang affiliations, and special needs, including mental illness, gender identity, age, and education requirements. OPSO shall anticipate periods of unusual intake volume and schedule sufficient classification staff to classify prisoners within 24 hours of booking and perform prisoner reclassifications, assist eligible DOC prisoners with re-entry assistance (release preparation), among other duties related to case management.

Finding: Substantial Compliance

**Observations:**

As of May 20, 2020, the Classification Unit roster lists 15 individuals -- a classification manager and 14 civilian classification specialists. As per the OPSO 2018 staffing analysis plan, the Classification Unit includes 18 "civilianized" positions.[2] The Classification Unit Manager reports to the Captain of the Intake Processing Center (IPC). An assertive voice for the Classification Unit is vital to ensure its control of all housing transfers and assignments and participation in OPSO housing-related decisions.  For October – December, the classification shift supervisors assumed responsibility for completing housing audits in addition to their responsibilities for supervising the classification specialists, processing housing transfers, and conducting custody re-assessments. The classification manager oversees the responses to grievances and conducts interviews regarding protective custody and housing re-assignments.

The classification shift leaders and specialists work overtime to complete the initial classification, reclassification, vulnerability assessments, and housing assignments. In January – April 2020, the Classification Unit logged 2,538.99 hours of overtime.  This computes to an average of 634.7 hours per month; the average/month by classification

---

[2] Hodge, Darnley (October 1, 2018). "Updated Coverage Plans for the OPSO (Civil Division excluded)." Orleans Parish Sheriff's Office, Independent Compliance Director. pp. 12.



specialist was 39.7 hours.[3]   These hours were, at least in part, due to the COVID-19 pandemic, as the Classification Unit's workload increased as inmates' housing assignments were modified to maintain appropriate separations. In contrast, during the first four months of 2019, the Classification Unit logged 1,758.27 hours of overtime.  This computes to average of 439.6 hours per month; the average/month by classification specialist was 38.97 hours.   These numbers raise questions and concerns for staff burnout and efficiencies.

As part of the December 2019 classification training, updated custody and PREA handbooks were provided to the classification specialists.   During this compliance reporting period, the classification manager/team leaders provided ad hoc remedial instruction.

IV.A.10.b. Prohibit classifications based solely on race, color, national origin, or ethnicity

Finding: Substantial Compliance

**Observations**:

The custody assessments consider objective risk factors validated for the OPSO males and female inmates. The inmate's race is not one of the objective risk factors. The classification specialists consider the inmate's custody level, vulnerability designation, age, and charges when selecting from the beds identified by the JMS.

To track this element of the Consent Judgment, OPSO created a monthly statistical report to track classifications by race and housing location. Analyses of these reports by the Monitor suggested that the OJC housing assignments were not by race. The housing distribution across the OJC housing units was generally consistent with the overall distributions of inmates by race within the OPSO inmate population. However, the percentage of white inmates assigned to TDC exceeded their proportions within the total inmate population. In July 2019, 87.3 percent of the OPSO inmates were Black; however, only 72.1 percent of the inmates housed in TDC were Black. (See Figure 1.) During July 2019 through April 2020, there was a ~10 percent discrepancy between the percentage of Blacks housed in TDC versus the overall OPSO population.  Despite the decrease in the

---

[3] Overall, for January – April 2020, the average hours of overtime worked per person/month across the "Home Department" units was 79.88 hours. The Classification Unit overtime rate was 158.7/month; Outside Security staff provided 317.37 hours, and Transportation logged 217.00 hours/month. "OJC Security Staff Home Department" provided an average of 64.9 hours per month in 2020.



proportion of white males within the OPSO population during March and April 2020, the percentage of OPSO white inmates housed in TDC changed little.  During this compliance period, TDC primarily housed the kitchen/maintenance and off-site workers. These data raise questions about the worker selection/assignment process. As these disparities have continued from the previous reporting period, recommended are review of the worker selection/assignment process and policies to identify inherent bias as a safeguard against systemic bias.



Figure 1: Distribution of Inmates by Race by OPSO Facilities – July 2019 – April 2020

IV.A.10.c Ensure that the classification staff has sufficient access to current information regarding cell availability in each division.

Finding: Substantial Compliance

**Observations:**

OPSO automated housing assignment process (HUAP) considers the inmate's custody level, gender, special population status, PREA designations, enemies, and associates as well as bed availability to recommend an appropriate bed for the inmate.  For example, housing tags, identify inmates on suicide observation versus suicide watch, alcohol/drug detoxification protocol, gang affiliation, school participation, and special diets. The HUAP provides the classification specialists a list of potential beds for each inmate.

The JMS daily population report lists the units, cells, and beds offline for maintenance or staffing, as recorded in the AS400. The virtual tour protocol precluded a full review of the veracity of the closed-cell counts within the data population reports.  It is assumed that the



classification specialists continue to manually compare the posted lists of cells/beds offline with the bed assignments generated by the HUAP.  As previously lamented, this manual process creates inefficiencies among the automated HUAP, housing assignment/transfer, and the facility maintenance processes. The classification unit manager has the option to update the status of beds within the JMS and to input requests within the facility maintenance log.

Classification specialists have maintained a list of daily bed assignments to avoid duplications due to delays between the housing assignments and physical transfer of the inmate to the designated housing unit. Thus, as required by the Consent Judgment, the classification specialists appear to have access to current information regarding bed availability throughout the OJC.  However, the process, unless changed during the last six months, entails maintaining multiple manual lists creating the risk of housing errors and backlogs for moving inmates from the booking area to the appropriate housing pod. The manual lists and notes are inefficient and impede the housing assignment process. Progressing from the current manual process to an automated process within the JMS would enhance the reliability, accuracy, and efficiency of the housing assignment process.

### IV. A. 10. d. Continue to update the classification system to include information on each prisoner's history at OPSO.

Finding:   Substantial Compliance

**Observations:**

As shown in Figure 2, the monthly custodial reports provided by OPSO indicated a significant decrease in the lag-time between booking and the initial classification. Further, the percentage of inmates for whom initial custody and housing assessments were completed increased by nearly eight percent (7.5%). In particular:

- o   Percent Initial Custody Assessments: During this compliance period, initial custody assessments were completed for 85.0 percent of the inmates booked into OJC. Between July 2019 and March 2020, the rate increased from 78.5 to 85.0 percent.

- o   Percent Within 8 Hours: As of March 2020, initial custody assessments were completed within the first eight hours of booking for 73.5 percent of the OPSO inmates. Between July 2019 and March 2020, the percentage of initial



classifications completed within the first eight hours of booking fluctuated between 45.6 and 88.5 percent; the average rate across the nine months was 68.6 percent.  Likewise, the percentage of cases completed between 8.01 and 24 hours vacillated between 10.9 and 48.4 percent; the average was 29.0 percent. Thus, almost three in ten inmates remained in the booking area for more than eight hours before assigned to a bed.

o   Percent Greater Than 24 Hours: As of July 2019, the time between booking and the initial custody assessment was more than 24 hours for only 1.3 percent of the inmates. By March of 2020, this rate had dropped to 1.0 percent.  Hopefully, this trend will continue to decline over the next six months.



Figure 2: Rates and Completion Time of Initial Custody Assessments

These data suggested that the percentage of inmates for whom an initial classification was completed has remained stable. Yet, the lag time between booking and classification/ housing has fluctuated. As the System adjusts to the COVID-19 pandemic pressures, the lag time between booking and housing will probably continue to vacillate.

With the onset of the COVID-19 pandemic, the OPSO Housing Matrix was adjusted on multiple occasions to ensure appropriate separations for observation, quarantine, and the like.  These special pods create concerns about the additional risks from the assignment of Low, Medium, and High custody inmates with different PREA designations to the same housing unit. Within these units, OPSO's protocol was to provide separate out-



of-cell time as per the automated ISI (Inmate Separation Instrument) or individual out-of-cell times/inmate. Unfortunately, the limitations of the remote tour precluded systematic verification of out-of-call separations. Regardless, the sub-standard practice of mixed custody/vulnerability housing units prompted by the pandemic should be reviewed and discontinued as soon as possible. In the interim, refresher ISI training for seasoned staff as well as introductory training for new line staff is critical.

During the previous compliance period, noted were the dangers of overriding the inmate custody levels for housing purposes. As shown in Figure 3, during this compliance period – July 2019 – March 2020, about a third (34.2%) of the custody overrides were for housing purposes. This is undoubtedly an improvement over the rate of 84.9% observed for January 2019, but the practice continues.  The monthly classification reports indicated that the initial classification discretionary override rate for the men peaked in January 2019 at 19.2 percent. As of March 2020, the initial discretionary override rate was 3.5 percent. The classification specialists were careful to "match" inmates by age, current offense, and final custody level for the housing assignments, particularly for the "low" custody inmates.



Figure 3: Percent Housing Overrides for Housing Purposes – January 2019 - March 2020

The Classification Monitor List (List) is an ad hoc report that identifies inmates for whom a custody review is due. Custody re-assessment reasons include a regular 60/90-day re-assessment or because of some change or event within their jail records, i.e., change in their charge(s), bail amount, disciplinary history, detainer lodged/lifted, or sentence. The number of inmates on the list fluctuates as inmates return from court, move through



the booking process, and the like.  At least one classification specialist per shift is tasked with completing the custody reviews. For the Classification Monitor lists available for this compliance period, the average number of pending custody assessments was 18.4. The cases were evenly split between those awaiting an initial classification (9.89) versus those awaiting a custody re-assessment (8.67). The average number of pending custody assessments during the previous compliance period was 29.4. It appears that the wait-times for initial and reclassification processes decreased during this compliance period.

Following Compliance Report #8, OSPO took steps to work with Wellpath to rebuild the linkages between the medical/mental health records and JMS. These data are essential for scoring seven of the PREA victimization and predation risk factors.  Also, medical and mental health information is critical for the inmates' housing assignments. The linkage between the electronic medical records (ERMA) and the JMS for the intake data is complete. Still, the programming to update the records throughout the inmate's incarceration was not finished.

Observation of the custody assessment process for the previous compliance report suggested that the classification specialists were not inputting prior criminal history data into the JMS for inmates with non-Orleans Parish felony convictions.  This prompted concern as to whether staff routinely used the attachment option within the JMS to input non-Orleans Parish convictions and warrants.  Generated were JMS data to track the use of the attachment option by date, reason, and staff identification. As shown in Figure 4, the number of attachments input by the classification staff had dwindled to four (4) in July 2019. However, in October 2019, the process restarted; for October 2019 – March 2020, the classification staff input on average 318.5 attachments/month. Further, as shown in Figure 5, on average, 97 percent of the attachments updated the inmate's criminal history.





Figure 4 Number of Attachments Input by Classification Staff -- July 2019 - March 2020



Figure 5 Attachment Reason by Month – July 2019 – March 2020

IV.A.10.e. Continue competency-based training and access to all supervisors on the full capabilities of the OPSO classification and prisoner tracking system.

Finding: Substantial Compliance

**Observations:**

During this compliance period, four classification specialists joined the Unit. Staff



reported training on the custody and PREA assessment instruments and the OPSO housing matrix.  In October, following a review of the classification training process, distributed were updated classification handbooks.  Training was provided to the entire OPSO classification staff in mid-December 2019. The training topics included the principles of objective classification and instruction on OPSO custody, predation, and vulnerability assessments, and the housing assignment process.

No OPSO in-service training was documented for this compliance period, although the classification manager reported some instruction on the internal housing audit process. Quality consistent in-service, as well as introductory training for new staff members, must be maintained to ensure reliable and accurate custody assessments, housing assignments, and audits. While the System is highly automated within the JMS, the automation should not replace the staff's understanding of the objective classification principles and the scoring rules for the risk factors, custody levels, or housing standards.

IV.A.10.f. Conduct internal and external review and validation of the classification and prisoner tracking system on at least an annual basis.

Finding: Partial Compliance

**Observations:**

OPSO population reports as to the number of inmates by location were received daily by the Monitor. Custodial statistical reports for July 2019 through March 2020 as to the number of custody assessments by type, gender, and population were also available. These reports track the timeliness of the initial custodial assessments; the custody distributions; the cases due for a custody assessment; the prevalence of special populations; as well as the rates and types of disciplinary infractions. OPSO has both housing and internal audit protocols; both processes were reviewed for this compliance report.

**<u>Housing Audits – Checking the Veracity of the Inmate Housing Assignments</u>**

A total of 74 housing audit score sheets were generated for July through November 2019.  Each audit sheet (and roster, when provided) was reviewed. The audit sheets raised several concerns. Despite standards set by the OPSO's housing audit protocol, not all pods were audited monthly, and pods with cell or pod separation errors were not re-audited. Most of the audit sheets were incomplete; missing were vital information as to



the integrity of the cell and bed assignments, pod level separations, and auditor.  For most of the audits, recorded were the pod, date, and start time. The security staff audits did not document that each inmate was in his/her assigned bunk.  A second red flag was the time staff spent auditing the respective pods. The start times for many of the audits were 5 to 10 minutes apart. Thus, the auditor identified each inmate's assigned location, checked the security and operational items, and walked to the next OJC pod within 5 to 10 minutes? The concerns are with the audit process's integrity, not the process developed by OPSO.

A positive observation was the "Housing Audit Corrective Action" created to summarize the auditor's inspections. While these summaries are certainly a step forward, simple changes such as adding a date and documenting the "corrective" actions to be addressed would be useful. It is important to emphasize that housing audits are a means of ensuring the classification system's integrity.  Merely filling out a custody assessment form and assigning an inmate to bed does not fulfill the requirement of a validated classification system.  OPSO must be sure that all inmates are in the assigned cells and beds according to their risks and needs. Otherwise, classification becomes just another form.

The "virtual" tour process precluded observation of the housing audits. Further, OPSO submitted a memorandum indicating the intention to revamp the housing audit process by the security staff and the suspension of the housing audits by the classification unit as of January 2020.  The intent was to restart audits in March; however, the COVID-19 pandemic precluded their moving forward on this initiative.  The last set of inspections completed by two of the classification shift supervisors highlight the importance of restarting audits:

| Pod | Date | Comments |
|-----|------|----------|
| 3A | 11/17/19 | 1 on the floor, 1 wrong bunk |
| 3B | 11/17/19 | All inmates in beds and cells assigned |
| 3C | 11/17/19 | 1 on the floor |
| 3D | 11/18/19 | All inmates in beds and cells assigned |
| 3E | 11/18/19 | 1 inmate on the floor |
| 4A | 11/8/19 | 12 inmates in wrong beds |
| 4B | 11/8/19 | 1 on floor |
| 4C | 11/9/19 | 4 wrong cell, 1 on floor, & 6 in wrong beds |
| 4D | 11/11/19 | 10 wrong beds |



| Pod | Date | Comments |
|-----|------|----------|
| 4E | 11/10/19 | 15 wrong beds |
| 4F | 11/10/19 | 6 wrong beds |
| 4A | 12/7/19 | 19 wrong beds |

Although many of the "audits" reported no errors, the number of housing errors observed across multiple pods within these two-weeks suggests a pattern. Further, the data raise questions for the integrity of the housing assignments generated by the classification unit.

### Internal Audits – Checking the Accuracy of the Custody and PREA Assessments

As part of the ongoing classification and housing processes, the classification shift supervisor reviews the JMS reports to identify placement errors and ISI separation conflicts. Supervisors/team leaders indicated that errors were corrected immediately. Thus, the housing separation errors detected by the JMS were resolved quickly. Total reliance on automated housing violation reports to detect housing and custody assessment errors is insufficient to ensure institutional safety and security.

Reviewed were the July 2019 – March 2020 internal audit logs. Audited were 72 custody assessments; this represented about .4 percent of the 20,529 custody assessments completed during this nine-month period. This low rate of audits is troubling.  Errors were "discovered" for 19 of the custody assessments audited.  The most common mistake was the absence of attachment(s) for prior/out-of-parish convictions. This problem appeared to have been addressed for the January – March audits.

### Revalidation of the Classification System – Assessing the Validity of the System

OPSO contracted with Dr. Edward Latessa and Dr. Brian Lovins (University of Cincinnati) for revalidation of the classification system as required by the Consent Judgment. Lovins and Latessa submitted their final report to the OPSO on April 30, 2018.[4] This validation study serves as documentation of compliance with the Consent Judgment requirement for "external review and validation of the classification and prisoner tracking system on at least an annual basis." Although statistical validation of an objective classification system is generally recommended every three to five years,[5] continuous

---

[4] Lovins, Brian K. and Edward Latessa (April 30, 2018). "Revalidation of the Orleans Parish Classification System." Cincinnati, Ohio: University of Cincinnati Corrections Institute.
[5] Austin, James and Hardyman, Patricia L. (2004) "Objective Prison Classification: A Guide for Correctional Agencies." Washington, D.C.: National Institute of Corrections. pp. iv.



monitoring and process evaluation are essential for ensuring the system's integrity for the OPSO <u>current</u> inmate population. OPSO should review and address Lovins and Latessa's recommendations and plan to revalidate the System by 2021 as recommended.

IV.A.10.g. Provide the Monitor a periodic report on classification at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date and every six months, thereafter, until termination of this Agreement. Each report will include the following information:
  (1)     number of prisoner-on-prisoner assaults;
  (2)     number of assaults against prisoners with mental illness;
  (3)     number of prisoners who report having gang affiliations;
  (4)     most serious offense leading to incarceration;
  (5)     number of prisoners classified in each security level;
  (6)     number of prisoners placed in protective custody; and
  (7)     number of misconduct complaints.

Finding: Substantial compliance

**Observations:**

Reviewed were the monthly custodial, discipline, and inmate statistical reports for July 2019 – March 2020. OPSO has developed reports to track the statistics as required under section IV.A.10.g. The only exception is the rates of victimization of inmates on the mental health caseload. As noted earlier, these data are dependent upon timely caseload information from the mental health provider. As noted in previous reports, OPSO and Wellpath worked together to align the JMS and electronic medical data to generate timely and accurate counts of victimization. These efforts appear to have stalled. As the Consent Judgment specifically requires victimization rates for inmates on the mental health caseload, OPSO and Wellpath must complete this process to maintain substantial compliance with this item.

Updated data as to the inmates with gang affiliations were inputted to the JMS throughout the compliance period. OPSO, New Orleans Police Department, and the Orleans District Attorney have created an ongoing process for notifying the OPSO of offenders identified as members of a "gang." Thus, these data are available to track the prevalence of inmates per "gang" among OPSO populations as well as by their location (i.e., tier, side, and bed).

Figures 6 and 7 provide the OPSO monthly disciplinary data as recorded in the JMS. The number of disciplinary reports has fluctuated over the last 16 months – January 2019 – April 2020. These fluctuations appear to mirror the changes in the OPSO average daily population (ADP). (Sixteen (16) months of disciplinary data are provided to account for



short-term variations, seasonal trends, the new incident reporting module within JMS, and the population shifts due to the pandemic.) Overall, the trendline for the number of formal disciplinary reports written per month indicates an increase in the number of disciplinary reports between January 2019 – April 2020.  As of January 2019, the rate of disciplinary reports for the OPSO detainees was 25.7 percent, i.e., 1 in 4 inmates received a disciplinary report. The rate jumped to 50.4 percent for January 2020 but dropped to only 23.3 percent in February.  By April, the rate stood at  44.0 percent.  These fluctuations are due at least partially to the OPSO's moving its incident reporting process from Vantos to the JMS as of March 2019. OPSO needs to track the disciplinary trendlines with the new incident reporting module as well as those for the population and housing shifts due to the pandemic.

Figure 6 also illustrates the rates of predatory (e.g., assaults or battery) and aggressive behaviors (e.g., fights or threats) based on the OPSO ADP. These rates were steady during most of 2019, but in December, the rates began to rise.  As of April 2020, the rate of predatory infractions among OPSO inmates was 8.6 percent – nearly 1 in 10 inmates was involved institutional violence. However, the rate of aggressive violations (e.g., fights, threats, etc.) increased slightly – January 2019 = 3.2 percent versus April 2020 = 4.3 percent.



Figure 6: Rate of Disciplinary Infractions Among OPSO Average Daily Population - 2019 - April 2020





Figure 7 Numbers of Total and Guilty Disciplinary Infractions: January 2019 – April 2020

Figure 8 provides a breakdown of the most severe infraction/report of which the inmate was found guilty between January 2019 and April 2020. During the last six months of 2019, each of the types of infractions -- predatory (assaults or battery), aggressive (fights and threats), management problems (e.g., disobey a direct order) increased. Specifically, the average number of predatory infractions/month for January – June 2019 36.5 versus July – December was 46.7 per month.  The average number of aggressive infractions/month for January – June 2019 35.5 versus July – December was 48.8/month. The overall number of infractions dropped sharply in February and March 2020 but appeared to rebound in April.





Figure 8 Types of Disciplinary Infractions of which OPSO Inmates were Found Guilty – January 2019 – April 2020

IV.A.10.h. OPSO shall review the periodic data report and make recommendations regarding proper placement consistent with this Agreement or other necessary changes in policy based on this review. The review and recommendations will be documented and provided to the Monitor.

Finding: Substantial Compliance

**Observations:**

The Monitor receives the daily "Active Inmates by Location" report. During this compliance period, there was little dialogue between the Monitor and the Classification Unit. The Monitor no longer receives the monthly statistical reports, and as previously indicated, this creates challenges for monitoring the System. These reports were, however, provided for the virtual tour. There appeared to be little independent analyses of the data as the memos submitted along with the compliance documents were cursory and absent of any strategies for addressing trends. However, Chief LeCounte has re-opened communications and information sharing.



## IV. A. 11.        Prisoner Grievance Process

A. 11.a. OPSO shall ensure that prisoners have a mechanism to express their grievances, resolve disputes, and ensure that concerns regarding their constitutional rights are addressed. OPSO shall, at a minimum, do the following:

(1)    Continue to maintain policies and procedures to ensure that prisoners have access to an adequate grievance process and to ensure that grievances may be reported and filed confidentially, without requiring the intervention of a correctional officer. The policies and procedures should be applicable and standardized across all the Facility divisions.

(2)    Ensure that each grievance receives appropriate follow-up, including providing a timely written response and tracking implementation of resolutions.

(3)    Ensure that grievance forms are available on all units and are available in Spanish and Vietnamese and that there is adequate opportunity for illiterate prisoners and prisoners who have physical or cognitive disabilities or language barriers to access the grievance system.

(4)    Separate the process of "requests to staff" from the grievance process and prioritize grievances that raise issues regarding prisoner safety or health.

(5)    Ensure that prisoner grievances are screened for allegations of staff misconduct and, if an incident or allegation warrants per this Agreement, that it is referred for investigation.

(6)    A member of the management staff shall review the grievance tracking system quarterly to identify areas of concerns. These reviews and any recommendations will be documented and provided to the Monitor.

Findings:
A. 11. a. (1)  Substantial Compliance
A. 11. a. (2)  Partial Compliance
A. 11. a. (3)  Substantial Compliance
A. 11. a. (4)  Substantial Compliance
A. 11. a. (5)  Substantial Compliance
A. 11. a. (6)  Partial Compliance

Until the September 2019 report, one rating was given for the entire section for the Prisoner Grievance Process. In order to highlight which provisions are in substantial compliance versus those which fall short, the decision was made to rate each provision separately.

This review covers July 2019 through March 2020. While there were some issues with the Weekly and Monthly Grievance Reports for July and August making some of the data unavailable for the inclusion in the analysis (the July/August data was combined for the Overdue Reports), the Monitor was able to analyze the available data from September forward to assess the timeliness of staff responses.

As reported by the OPSO Grievance staff, for the last six months of the rating period, a total of 1,648 grievances were received; the average was 275 forms per month. This represents a 29% increase in the monthly average over the previous reporting period.  A review of the individual categories did not point to any particular cause for the jump. There was a rise in grievances across almost every category from August through



November 2019.  December through March 2020 began showing a general decline, despite the restrictions on inmate activities due to COVID-19.

Inmates have access to the grievance process via electronic kiosks located in the housing units throughout OJC and TDC.  In the seven units in which the kiosks are inoperable, and beyond repair, staff are required to visit the units twice daily to retrieve written grievance forms. The facility continues to use a locked and labeled "grievance box" next to the medical form boxes in the housing units with inoperable kiosks. As noted previously, this manual work-around has the potential to compromise the confidentiality of the process (as opposed to the electronic process). However, it has been the Monitor's experience and observations in other facilities that such a manual system meets the letter of the Consent Judgment requirement for this paragraph. OPSO continues to negotiate a new contract to upgrade the kiosks in all housing units. As the use of paper grievances and medical request is far less efficient than the electronic system and poses issues related to confidentiality, OPSO is encouraged to complete the negotiations and have the new kiosks installed and operational as soon as possible.

For this compliance review, the Monitor reviewed weekly and monthly audit documentation (statistics and actual grievance documentation) compiled by the Grievance staff. The Monitor was unable to interview inmates. The Monitor participated in a video conference with the OPSO Grievance Lieutenant.

For this rating period, the Monitor specifically reviewed the trend reports provided by the Grievance staff for July 2019 through March 2020. The Grievance Weekly Response Audit reports continue to reflect a diligent effort by Grievance staff to review and notify responsible staff when responses are insufficient or incomplete. Timely response continues to be an issue as indicated by the chart below.





Of concern to the Monitor is the substantial rise in grievances awaiting a response beyond 10 days (red trend line) beginning in December 2019 and continuing through February 2020. Grievance staff has recently implemented weekly over monthly updates of this information with the expectation that the timeliness of grievance responses will improve. The Grievance Lieutenant stated that early indications are positive. This will be reviewed again in detail during the next site visit. Grievance staff maintain a by-name listing of staff responding to grievances as well as the timeliness of their responses. Given that a substantial number of grievances involve medical issues, it may be informative for OPSO Grievance staff to group these respondents (and the timeliness of responses) separately for analysis purposes.

It should be noted that, given the overall volume of grievances and requests received, the Grievance staff continues to do an excellent job tracking grievances and requests and reporting as to the timeliness and quality of the responses to address the inmates' issues.

The Monitor reviewed documentation that supports previous observations regarding the use and tracking of paper Grievance forms made available to all units with non-functioning kiosks. Unlike the previous site visits, the Monitor could not confirm the manual process through interviews with inmates. Documentation reflected that Grievance staff continue to maintain a by-name/housing listing of all OPSO inmates identified as needing Grievance staff assistance to access the grievance system due to either a language barrier or illiteracy. The Monitor reviewed the third and fourth quarter CY 2019 reports



and noted up-to-date housing changes for disadvantaged inmates; thus, the list continues to appear to be actively managed.

Grievance staff provided detailed documentation as to their separate handling of the July 2019 through March 2020 inmate requests, grievances, and complaints related to inmate safety or health.

Review of the documentation demonstrated that all inmate submissions are reviewed by Grievance staff, categorized into requests and grievances, and forwarded to the appropriate staff for response. Both requests and grievances are further sorted by type. Specific grievances related to inmate safety, medical issues, PREA, etc., are documented to reflect the date received, inmate information, type of grievance, time of notification made to the appropriate staff member, and the staff member making the notification.

The Monitor reviewed detailed documentation provided by Grievance staff for the rating period regarding the screening of grievances for staff misconduct. The documentation demonstrated that all inmate submissions are reviewed by Grievance staff and those regarding staff misconduct are separately documented for appropriate referral to the administrative level for follow-up. Grievance staff processed a total of 147 such staff misconduct related grievances during the latter half of 2019 versus 134 grievances for the first half of 2019.

Grievance staff also separately document grievances that require specific referral to IAD, ISB, PREA, or FIT staff for review and investigation. Detailed information along with the date assigned and disposition is maintained as well as email transmission receipts. Grievance staff referred a total of 145 grievances for investigation during the latter half of 2019 versus 110 grievances for the first half of 2019.

The Monitor reviewed the CY 2019 third and fourth quarterly executive analysis of the grievance reports. Specific discussion by executive staff regarding the grievance documentation and reports was noted. However, there were no specific changes to the grievance process recommended. The review of the CY 2020 first quarterly executive analysis of the grievance reports included a recommendation that the Grievance Lieutenant provide weekly reports.

With regard to the Monitor's recommendations on the previous inspection report, the Monitor would like to note that OPSO has increased the frequency of reporting of delinquent



grievance responses from monthly to weekly to enhance accountability and response times and installed a general notice of the grievance appeal process on the inmate kiosks.

### IV. A. 12.  Sexual Abuse

A.12. OPSO will develop and implement policies, protocols, trainings, and audits, consistent with the requirements of the Prison Rape Elimination Act of 2003, 42 U.S.C. § 15601, et seq., and its implementation of regulations, including but not limited to, preventing, detecting, reporting, investigating, and collecting sexual abuse data, including prisoner-on-prisoner and staff-on-prisoner sexual abuse, sexual harassment, and sexual touching.

Finding:

A. 12. Substantial Compliance

Observations:

OPSO successfully completed its PREA audit. Continuing to implement the requirements of PREA will be necessary to maintain substantial compliance. Supervision of the investigation of PREA complaints has been added to the duties of the FIT supervisor due to the departure of the lieutenant who previously oversaw them.

### IV. A. 13.          Access to Information

A.13. OPSO will ensure that all newly admitted prisoners receive information, through an inmate handbook and, at the discretion of the Jail, an orientation video, regarding the following topics: understanding Facility disciplinary process and rules and regulations; reporting misconduct; reporting sexual abuse or assault; accessing medical and mental health care; emergency procedures; and sending and receiving mail; understanding the visitation process; and accessing the grievance process.

Finding:

A. 13. Substantial Compliance

Observations:

Materials were provided indicating the requirements of this paragraph have been met.

### IV. B. Mental Health Care and C. Medical Care

Introduction

As with past reports, the Monitors rate the compliance levels based on the documents requested and reviewed, observations, discussions during visits, (including this recent virtual visit) review of medical records, and any additional information provided by the parties.



The Monitors observed very little improvement in performance in many areas of the Consent Judgment since Compliance Tour #11. The addition of the Tulane Department of Psychiatry staff and leadership remains an invaluable asset in providing required and consistent psychiatric services for prisoners at OJC. There is positive progress with Tulane's interface with Wellpath.

Wellpath continues to have difficulty with counting, for example, calculating the mental health caseload, counting the number of patients with acute and chronic disease who receive counseling, and tracking discharge medications. Practitioner productivity remains an issue.  Visit refusal rates are high for unidentified or poorly identified reasons.

Several paragraphs remain where necessary improvements are required by the Consent Judgment to provide the full range and quality of medical care and mental health/counseling services for inmates incarcerated in OJC and Hunt. These concerns are deeply impacted by the lack of progress in developing the required services and programs recommended in 2014, including permanent acute care and step-down programing and services for mental health and acute medical services. There is still no acute care mental health services for women, except via emergency transfer to hospital emergency departments, and limited health stepdown and outpatient programmatic activities.

General recommendations are to: continue leadership initiatives and direction by OPSO and Wellpath; increase correctional security staffing to consistently provide adequate and ongoing dedicated support for mental health and medical services; continue to develop full services and continuity of services for both male and female prisoners including all levels of care, staffing and space; and continue to evaluate and pursue full services for mentally ill prisoners, including medication management, and acute, residential, and outpatient care.

The monitors are very concerned with the proposal to cut health care staff by 20%, particularly when it has been so difficult to provide timely services with current staffing levels.

The monitors are also concerned about the inability of patients on 2A and 3C to receive the full range of timely and appropriate mental health care.

Recommendations regarding containment and mitigation of COVID-19:

- Enforce masking and social distancing throughout the facility.
- Provide and enforce masking for all inmates.



- Assure the use of proper masks, e.g., N95 (NIOSH/FDA approved, not Chinese KN95) for all health care staff and custody staff working with test-positive and suspect cases; surgical masks for all others, where available (cloth masks where not available).
- Test staff on housing units when positive cases are detected, e.g., 2F.
- Ensure intake sequestration and all cohorting is static, i.e., reset the 14-day clock on intake unit when new persons are introduced into the unit.

Specific findings and recommendations regarding medical and mental health services are provided below. For those paragraphs that have previously demonstrated Substantial Compliance the monitors recommend, encourage, and support the diligent and consistent efforts by OPSO and the medical and mental health providers to continue to demonstrate Substantial Compliance.

## B. Mental Health Care

B. OPSO shall ensure constitutionally adequate intake, assessment, treatment, and monitoring of prisoners' mental health needs, including but not limited to, protecting the safety of and giving priority access to prisoners at risk for self-injurious behavior or suicide. OPSO shall assess, on an annual or more frequent basis, whether the mental health services at OPP comply with the Constitution. In order to provide mental health services to prisoners, OPSO, at a minimum, shall:

Findings:
A. 1. a.  Substantial Compliance
B. 1. b.  Substantial Compliance
B. 1. c.  Substantial Compliance
B. 1. d.  Substantial Compliance
B. 1. e.  Substantial Compliance
B. 1. f.   Partial Compliance
B. 1. g.  Partial Compliance
B. 1. h.  Substantial Compliance
B. 1. i.   Partial Compliance
B. 1. j.   Partial Compliance
B. 1. k.  Partial Compliance
B. 1. l.   Substantial Compliance

B.1.a. Develop and maintain comprehensive policies and procedures for appropriate screening and assessment of prisoners with mental illness. These policies should include definitions of emergent, urgent, and routine mental health needs, as well as timeframes for the provision of services for each category of mental health needs.



Finding: Substantial Compliance

Recommendation: Wellpath has different timeframes for timeliness of responses; suggest review and revise for consistency.

B.1.b. Develop and implement an appropriate screening instrument that identifies mental health needs, and ensures timely access to a mental health professional when presenting symptoms require such care. The screening instrument should include the factors described in Appendix B. The screening instrument will be validated by a qualified professional approved by the Monitor within 180 days of the Effective Date and every 12 months thereafter, if necessary.

Finding:  Substantial Compliance

B.1.c. Ensure that all prisoners are screened by Qualified Medical Staff upon arrival to OPP, but no later than within eight hours, to identify a prisoner's risk for suicide or self-injurious behavior. No prisoner shall be held in isolation prior to an evaluation by medical staff.

Finding:  Substantial Compliance

B.1.d. Implement a triage policy that utilizes the screening and assessment procedures to ensure that prisoners with emergent and urgent mental health needs are prioritized for services.

Finding:  Substantial Compliance

B.1.e. Develop and implement protocols, commensurate with the level of risk of suicide or self-harm, to ensure that prisoners are protected from identified risks for suicide or self-injurious behavior. The protocols shall also require that a Qualified Mental Health Professional perform a mental health assessment, based on the prisoner's risk.

Finding: Substantial Compliance

Recommendation: Continue to provide documentation and analysis of completion and consistent use of the Columbia Suicide Risk Assessment.

B.1.f. For prisoners with emergent or urgent mental health needs, search the prisoner and monitor with constant supervision until the prisoner is transferred to a Qualified Mental Health Professional for assessment.

Finding: Partial Compliance

Recommendation: Provide documentation of searches and constant supervision by security until mental health staff arrives and conducts assessment for all emergent and urgent referrals.

B.1.g. Ensure that a Qualified Mental Health Professional conducts appropriate mental health assessments within the following periods from the initial screen or other identification of need:
     (1)      14 days, or sooner, if medically necessary, for prisoners with routine mental health needs;



| (2) | 48 hours, or sooner, if medically necessary, for prisoners with urgent mental health needs; and |
|-----|-----|
| (3) | immediately, but no later than two hours, for prisoners with emergent mental health needs. |

Finding: Partial Compliance

Recommendation: Provide documentation that inmates in population (after IPC) consistently receive appropriate and complete assessments within the required timeframes. Completion of referrals is determined from the time of submission to time of completion by the appropriate mental health professional and provider.

B.1.h. Ensure that a Qualified Mental Health Professional performs a mental health assessment no later than the next working day following any adverse triggering event (i.e., any suicide attempt, any suicide ideation, or any aggression to self, resulting in serious injury).

Finding: Substantial Compliance

B.1.i. Ensure that a Qualified Mental Health Professional, as part of the prisoner's interdisciplinary treatment team, maintains a risk profile for each prisoner on the mental health case load based on the Assessment Factors identified in Appendix B, and develops and implements a treatment plan to minimize the risk of harm to each of these prisoners.

Finding: Partial Compliance

Recommendation: Provide documentation of timeliness of treatment plans for all inmates on the mental health caseload at all levels of care including risk profiles. Include focus on inmates in stepdown and outpatient programs.

B.1.j. Ensure adequate and timely treatment for prisoners, whose assessments reveal mental illness and/or suicidal ideation, including timely and appropriate referrals for specialty care and visits with Qualified Mental Health Professionals, as clinically appropriate.

Finding: Partial Compliance

Recommendation: Provide documentation of scheduled and completed adequate and timely treatment for all caseload inmates including individual and group treatments, and referrals for specialty services for male and female inmates. This should include prisoners at Hunt, extended suicide watches at OJC when beds are available at Hunt, acute care services for female inmates, step down units, and outpatients in population. The need for the full range of mental health services for women remains. The future utilization of TDC and Phase III were unclear at the time of this review and report.



B.1.k. Ensure crisis services are available to manage psychiatric emergencies. Such services include licensed in-patient psychiatric care, when clinically appropriate.

Finding: Partial Compliance

Recommendation: OPSO does not have access to any licensed inpatient services for female inmates; access to non-licensed acute care services for male inmates are only available at Hunt. Provide documentation that all psychiatric emergencies are sent to an emergency department and any crisis is adequately resolved. Provide documentation that all inmates have access to licensed inpatient psychiatric care, when clinically appropriate.

B.1.l. On an annual basis, assess the process for screening prisoners for mental health needs to determine whether prisoners are being appropriately identified for care. Based on this assessment, OPSO shall recommend changes to the screening system. The assessment and recommendations will be documented and provided to the Monitor.

Finding: Substantial Compliance

Recommendation: The report of annual assessment and recommendations of the process for screening prisoners for mental health needs to determine whether prisoners are being appropriately identified for care has been provided.

Findings:
B. 2. a.  Partial Compliance
B. 2. b.  Partial Compliance
B. 2. c.  Partial Compliance
B. 2. d. Partial Compliance
B. 2. e.  Substantial Compliance
B. 2. f.   Partial Compliance
B. 2. g.  Substantial Compliance
B. 2. h.  Substantial Compliance

B.2.a. Review, revise, and supplement its existing policies in order to implement a policy for the delivery of mental health services that includes a continuum of services, provides for necessary and appropriate mental health staff, includes a treatment plan for prisoners with serious mental illness, and collects data and contains mechanisms sufficient to measure whether care is being provided in a manner consistent with the Constitution.

Finding: Partial Compliance

Recommendation: Wellpath and OPSO have completed the majority of necessary policies including the use of restraints policies. Suggested are the revision and completion of incomplete policies/procedures regarding continuum of services for female prisoners and counseling services for specific groups identified in this



Consent Judgment. Protocols needed for confidential individual and group therapies for inmates on segregation units.

B.2.b. Ensure that treatment plans adequately address prisoners' serious mental health needs and that the treatment plans contain interventions specifically tailored to the prisoner's diagnoses and problems.

Finding: Partial Compliance

Recommendation: Continue the very good progress on documentation in treatment plans at OJC. Provide documentation of individualized treatment plans for women at all levels of care, including acute care.

B.2.c. Provide group or individual therapy services by an appropriately licensed provider where necessary for prisoners with mental health needs.

Finding: Partial Compliance

Recommendation: Provide documentation of data and analysis of numbers and percentages of inmates at all levels of care in need of individual and/or group therapies and counseling as well as the numbers and percentages of individual and group services offered and received/completed for inmates in need. Progress has been made in identification of inmates who have been victims of sexual assault as ranging between 12 to 15 percent of Special Needs per month. Provide analysis of numbers of inmates who received counseling for sexual abuse and for those inmates who received counseling for alcohol and drug abuse. Continue and expand impressive data on Disruption of Services forms and provide analysis of that data and corrective action plans, including staffing and space needs as necessary.

B.2.d. Ensure that mental health evaluations that are done as part of the disciplinary process include recommendations based on the prisoner's mental health status.

Finding: Partial Compliance

Recommendation: This process has begun during the last three months of the monitoring period. Data provided indicates that four of the 332 mental health evaluations resulted in placement on mental health unit. The data needs analysis to assess impact of mental health evaluation on disciplinary sanctions. Wellpath needs to provide policy approved by OPSO regarding mental health participation in the disciplinary process, as well as necessary training for OPSO and Wellpath staff.

B.2.e. Ensure that prisoners receive psychotropic medications in a timely manner and that prisoners have proper diagnoses and/or indications for each psychotropic medication they receive.



Finding: Substantial Compliance

<u>Recommendation:</u> Continue very good improvement demonstrated with the addition of Tulane psychiatric providers. Continue to provide documentation and analysis of data that inmates receive psychotropic medications in a timely manner and that inmates have proper diagnosis and/or indications for each psychotropic medication they receive, including particular emphasis on juveniles.

B.2.f. Ensure that psychotropic medications are administered in a clinically appropriate manner as to prevent misuse, overdose, theft, or violence related to the medication.

Finding: Partial Compliance

<u>Recommendation:</u> The compliance rating has been lowered to partial compliance due to the large number of psychotropic medications found in shakedowns. OPSO and Wellpath need to develop and execute a corrective action plan to address the inadequacies in the medication distribution.

B.2.g. Ensure that prescriptions for psychotropic medications are reviewed by a Qualified Mental Health Professional on a regular, timely basis and prisoners are properly monitored.

Finding: Substantial Compliance

<u>Recommendation:</u> Continue to provide documentation of data collection and analysis of psychotropic medication prescriptions.

B.2.h. Ensure that standards are established for the frequency of review and associated charting of psychotropic medication monitoring, including monitoring for metabolic effects of second generation psychotropic medications.

Finding: Substantial Compliance

<u>Recommendation:</u> Continue to provide documentation of data collection and analysis of psychotropic medication monitoring for metabolic effects of second-generation psychotropic medications. Timeliness of laboratory services and associated inmate refusals have improved.

B. 3. Findings:
B. 3. a.  Partial Compliance
B. 3. b.  Partial Compliance

B.3.a. OPSO shall develop and implement policies and procedures for prisoner counseling in the areas of general mental health/therapy, sexual-abuse counseling, and alcohol and drug counseling. This should, at a minimum, include some provision for individual services.



Finding: Partial Compliance

<u>Recommendation:</u> Provide documentation of implementation of policies and procedures specifically for inmate counseling in the areas of general mental health/therapy, sexual abuse counseling, and alcohol and drug counseling, including some provisions for individual services. Continue to track disruptions of services and percentages of inmates identified as in need compared to those who receive services.

B.3.b. Within 180 days of the Effective Date, and quarterly thereafter, report all prisoner counseling services to the Monitor, which should include:
(1) the number of prisoners who report having participated in general mental health/therapy counseling at OPP;
(2) the number of prisoners who report having participated in alcohol and drug counseling services at OPP;
(3) the number of prisoners who report having participated in sexual-abuse counseling at OPP; and
(4) the number of cases with an appropriately licensed practitioner and related one-to-one counseling at OPP.

Finding: Partial Compliance

<u>Recommendation:</u> Provide data and analysis for the numbers and percentages for inmates with needs for these specific services and numbers and percentages of inmates who receive these services. Compliance has been compromised by staffing deficiencies and lack of adequate space.

B. 4. Findings:
B. 4. a.  Partial Compliance
B. 4. b.  Substantial Compliance
B. 4. c.  Substantial Compliance
B. 4. d.  Partial Compliance
B. 4. e.  Substantial Compliance
B. 4. f.   Substantial Compliance
B. 4. g.  Partial Compliance



B.4.a. OPSO shall ensure that all staff who supervise prisoners have the adequate knowledge, skill, and ability to address the needs of prisoners at risk for suicide. Within 180 days of the Effective Date, OPSO shall review and revise its current suicide prevention training curriculum to include the following topics:

    (1)  suicide prevention policies and procedures (as revised consistent with this Agreement);
    (2)  analysis of facility environments and why they may contribute to suicidal behavior;
    (3)  potential predisposing factors to suicide;
    (4)  high-risk suicide periods;
    (5)  warning signs and symptoms of suicidal behavior;
    (6)  case studies of recent suicides and serious suicide attempts;
    (7)  mock demonstrations regarding the proper response to a suicide attempt;
    (8)  differentiating suicidal and self-injurious behavior; and
    (9)  the proper use of emergency equipment.

Finding: Partial Compliance

Recommendation: Provide documentation that all staff who supervise inmates have the adequate knowledge, skill, and ability to address the needs of inmates at risk for suicide. Improvement is noted, however inmates on suicide precautions or watch continue to obtain contraband that can be used to harm themselves. During the virtual site visit, an inmate housed on the mental health unit was observed making a rope out of a blanket while four inmates were on suicide watch in nearby cells being what supposed to be conducted by a CNA. The CNA was observed to be at the desk of the deputy talking to the deputy instead of being located adjacent to the cells she was supposed to be observing. Documentation provided the suicide prevention training curriculum which includes all of the elements listed above.

B.4.b. Ensure that all correctional, medical, and mental health staff are trained on the suicide screening instrument and the medical intake tool.

Finding: Substantial Compliance

Recommendation: Continue to provide documentation that multi-disciplinary in-service training has been completed annually for all current correctional, medical, and mental health staff to include training on updated policies, procedures, and techniques.

B.4.c. Ensure that multi-disciplinary in-service training is completed annually by all correctional, medical, and mental health staff, to include training on updated policies, procedures, and techniques. The training will be reviewed and approved by the Monitor.

Finding: Substantial Compliance



Recommendation: Continue to provide documentation that multidisciplinary in-service training has been completed annually for all current correctional, medical, and mental health staff, to include training on updated policies, procedures, and techniques. OPSO/Wellpath need to provide documentation regarding training for staff on the use of therapeutic restraints.

B.4.d. Ensure that staff are trained in observing prisoners on suicide watch and step-down unit status.

Finding: Partial Compliance

Recommendation: Continue to provide documentation that current staff are trained, specifically, in observing prisoners on suicide watch and step-down status. Inmates on suicide watch continue to obtain contraband that can be used to harm themselves.

B.4.e. Ensure that all staff that have contact with prisoners are certified in cardiopulmonary resuscitation ("CPR").

Finding: Substantial Compliance

Recommendation: Continue to provide documentation that all current staff, (including OPSO and Wellpath) are certified in CPR.

B.4.f. Ensure that an emergency response bag, which includes a first aid kit and emergency rescue tool, is in close proximity to all housing units. All staff that has contact with prisoners shall know the location of this emergency response bag and be trained to use its contents.

Finding: Substantial Compliance

B.4.g. Randomly test five percent of relevant staff on an annual basis to determine their knowledge of suicide prevention policies. The testing instrument and policies shall be approved by the Monitor. The results of these assessments shall be evaluated to determine the need for changes in training practices. The review and conclusions will be documented and provided to the Monitor.

Finding: Partial Compliance

Recommendation: Documentation of testing of 5% of current relevant staff to determine their knowledge of suicide prevention policies was provided. Provide the evaluation of the results, review, and conclusions of the assessments to determine the need for changes in training practices.

Findings:
B. 5. a.  Partial Compliance



B. 5. b.  Partial Compliance
B. 5. c.  Partial Compliance
B. 5. d.  Substantial Compliance
B. 5. e.  Partial Compliance
B. 5. f.  Partial Compliance
B. 5. g.  Partial Compliance
B. 5. h.  Substantial Compliance
B. 5. i.   Substantial Compliance
B. 5. j.   Substantial Compliance
B. 5. k.  Partial Compliance

B.5.a. OPSO shall implement a policy to ensure that prisoners at risk of self-harm are identified, protected, and treated in a manner consistent with the Constitution.

Finding: Partial Compliance

Recommendation: Provide documentation of implementation of policy for utilization of suicide resistant cells and nonresistant cells (with direct observation), and treatment services provided to inmates at risk for self-harm. Inmates on suicide watch continue to be placed in non-suicide resistant cells without direct observation, even when beds are available at Hunt. Contraband and misuse of supplies (blankets, cleaning supplies, and medications) have been obtained by inmates while on suicide watch unit or detox protocols. Treatment services are very limited and inadequate for inmates on suicide watch because of staffing and space needs.

B.5.b. Ensure that suicide prevention procedures include provisions for constant direct supervision of current suicidal prisoners and close supervision of special needs prisoners with lower levels of risk (at a minimum, 15 minute checks). Correctional officers shall document their checks in a format that does not have pre-printed times.

Finding: Partial Compliance

Recommendation: Provide constant direct supervision for any prisoner placed in a non-resistant cell on suicide watch, and documentation. See B.5.a.

B.5.c. Ensure that prisoners on suicide watch are immediately searched and monitored with constant direct supervision until a Qualified Mental Health Professional conducts a suicide risk assessment, determines the degree of risk, and specifies the appropriate degree of supervision.

Finding: Partial Compliance

Recommendation: Provide documentation that demonstrates that inmates are immediately searched and monitored with constant direct supervision until a QMHP



conducts a suicide risk assessment, determines the degree of risk, and specifies the appropriate degree of supervision. This paragraph requires collaboration and documentation by OPSO deputies and Wellpath QMHP's.

B.5.d. Ensure that all prisoners discharged from suicide precautions receive a follow-up assessment within three to eight working days after discharge, as clinically appropriate, in accordance with a treatment plan developed by a Qualified Mental Health Care Professional. Upon discharge, the Qualified Mental Health Care Professional shall conduct a documented in-person assessment regarding the clinically appropriate follow-up intervals.

Finding: Substantial Compliance

Recommendation: Wellpath staff report denial of access to inmates for follow-up during lockdowns. This should **not** occur; immediate corrective action is recommended. Provide documentation of follow-up appointments as required by policy.

B.5.e. Implement a step-down program providing clinically appropriate transition for prisoners discharged from suicide precautions.

Finding: Partial Compliance

Recommendation: The placements for male inmates in a true step-down/residential unit and program have continued, with the necessary exclusivity of an identified mentally ill population. Although improved, the programming is not yet sufficient, , because of inadequate staffing and space.  Similar services and housing do not currently exist for female inmates. Recommend continued vigilance in developing these programs.

B.5.f. Develop and implement policies and procedures for suicide precautions that set forth the conditions of the watch, incorporating a requirement of an individualized clinical determination of allowable clothing, property, and utensils. These conditions shall be altered only on the written instruction of a Qualified Mental Health Professional, except under emergency circumstances or when security considerations require.

Finding: Partial Compliance

Recommendation: Policy is in place. Provide documentation of implementation of policy regarding individualized determinations of the conditions of watch for male and female inmates at OJC (especially for suicide watches/direct observation in non-resistant cells), and at Hunt.



B.5.g. Ensure that cells designated by OPSO for housing suicidal prisoners are retrofitted to render them suicide-resistant (e.g., eliminating bed frames/holes, sprinkler heads, water faucet lips, and unshielded lighting or electrical sockets).

Finding: Partial Compliance

Recommendation: OPSO reports 13 suicide resistant cells for OJC and 3 suicide resistant cells at Hunt. Facility staff utilize non-suicide resistant cells at both facilities for overflow. When overflow cells are utilized, it is strongly recommended the inmates in those cells be placed on direct constant observation to best provide for their safety.

B.5.h. Ensure that every suicide or serious suicide attempt is investigated by appropriate mental health and correctional staff, and that the results of the investigation are provided to the Sheriff and the Monitor.

Finding: Substantial Compliance

Recommendation: Continue to expand Morbidity and Mortality reviews, these reviews should be structured to conduct clinical investigation, including aggregation of data, self-critical analysis and corrective action plans regarding individual inmate deaths or intended death but also systemic concerns. The addition of the CQI Workgroup is helpful and should focus more on systems issues and self-critical analysis.

B.5.i. Direct observation orders for inmates placed on suicide watch shall be individualized by the ordering clinician based upon the clinical needs of each inmate, and shall not be more restrictive than is deemed necessary by the ordering clinician to ensure the safety and well being of the inmate.

Finding: Substantial Compliance

B.5.j. Provide the Monitor a periodic report on suicide and self-harm at the Facility. These periodic reports shall be provided to the monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. The report will include the following:
    (1)  all suicides;
    (2)  all serious suicide or self-harm attempts; and
    (3)  all uses of restraints to respond to or prevent a suicide attempt.

Finding: Substantial Compliance

Recommendation: OPSO and Wellpath provide periodic reports on suicides, suicide attempts and self-harm. Wellpath has indicated their intent to clarify and determine status of attempts as serious or not. There have been no reported completed



suicides for 2019 and 2020 to date. There have been no reported use of restraints for this monitoring period.

B.5.k. Assess the periodic report to determine whether prisoners are being appropriately identified for risk of self-harm, protected, and treated. Based on this assessment, OPSO shall document recommended changes to policies and procedures and provide these to the Monitor.

Finding: Partial Compliance

Recommendation: Provide an assessment of the periodic reports required in B.5.j., above, particularly with regard to adequacy of treatment for inmates with multiple suicide or self-harm attempts.

Findings:
B. 6. a.  Partial Compliance
B. 6. b.  Substantial Compliance
B. 6. c.  Substantial Compliance
B. 6. d.  Substantial Compliance
B. 6. e.  Substantial Compliance
B. 6. f.  Substantial Compliance
B. 6. g.  Substantial Compliance

B.6.a. OPSO shall prevent the unnecessary or excessive use of physical or chemical restraints on prisoners with mental illness.

Finding: Partial Compliance

Recommendation: Wellpath has begun to provide documentation/information regarding use of de-escalation techniques at OJC and Hunt. OPSO and Hunt need to report all uses of physical and chemical restraint. Discussion onsite and during conference calls indicated significant problems with de-escalation practices at Hunt including unavailability of mental health staff at night, and deviations from policy.

B.6.b. Maintain comprehensive policies and procedures for the use of restraints for prisoners with mental illness consistent with the Constitution.

Finding: Substantial Compliance

B.6.c. Ensure that approval by a Qualified Medical or Mental Health Professional is received and documented prior to the use of restraints on prisoners living with mental illness or requiring suicide precautions.

Finding: Substantial Compliance



B.6.d. Ensure that restrained prisoners with mental illnesses are monitored at least every 15 minutes by Custody Staff to assess their physical condition.

Finding: Substantial Compliance

B.6.e. Ensure that Qualified Medical or Mental Health Staff document the use of restraints, including the basis for and duration of the use of restraints and the performance and results of welfare checks on restrained prisoners.

Finding: Substantial Compliance

B.6.f. Provide the Monitor a periodic report of restraint use at the Facility. These periodic reports shall be provided to the monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. Each report shall include:
   (1)   A list of prisoners whom were restrained;
   (2)   A list of any self-injurious behavior observed or discovered while restrained; and
   (3)   A list of any prisoners whom were placed in restraints on three or more occasions in a thirty (30) day period or whom were kept in restraints for a period exceeding twenty-four (24) hours.

Finding: Substantial Compliance

B.6.g. Assess the periodic report to determine whether restraints are being used appropriately on prisoners with mental illness. Based on this assessment, OPSO shall document recommended changes to policies and procedures and provide these to the Monitor.

Finding: Substantial Compliance

B. 7. a.  Substantial Compliance
B. 7. b.  Substantial Compliance
B. 7. c.  Partial Compliance
B. 7. d.  Partial Compliance

7.a. OPSO shall ensure that all staff who supervise prisoners have the knowledge, skills, and abilities to identify and respond to detoxifying prisoners. Within 180 days of the Effective Date, OPSO shall institute an annual in-service detoxification training program for Qualified Medical and Mental Health Staff and for correctional staff. The detoxification training program shall include:
   (1)   annual staff training on alcohol and drug abuse withdrawal;
   (2)   training of Qualified Medical and Mental Health Staff on treatment of alcohol and drug abuse conducted by the Chief Medical Officer or his or her delegate;
   (3)   oversight of the training of correctional staff, including booking and housing unit officers, on the policies and procedures of the detoxification unit, by the Chief Medical Officer or his or her delegate;
   (4)   training on drug and alcohol withdrawal by Qualified Medical and Mental Health Staff;
   (5)   training of Qualified Medical and Mental Health Staff in providing prisoners with timely access to a Qualified Mental Health Professional, including psychiatrists, as clinically appropriate; and
   (6)   training of Qualified Medical and Mental Health Staff on the use and treatment of withdrawals, where medically appropriate.

Finding: Substantial compliance

Qualified Medical and Mental Health Staff are trained regarding care for

patients who have orders for monitoring and treatment of withdrawal. Some of



custody staff are trained. Custody staff were trained in early 2019 and WellPath reports that new custody hires are trained during orientation.

7.b. Provide medical screenings to determine the degree of risk for potentially life-threatening withdrawal from alcohol, benzodiazepines, and other substances, in accordance with Appendix B.

Finding: Substantial Compliance

Incoming inmates are screened for withdrawal, in accordance with Appendix B. Wellpath quarterly performance measurement demonstrates sustained compliance. Monitors find Wellpath measurement reliable.

7.c. Ensure that the nursing staff complete assessments of prisoners in detoxification on an individualized schedule, ordered by a Qualified Medical or Mental Health Professional, as clinically appropriate, to include observations and vital signs, including blood pressure.

Finding: Partial Compliance

Wellpath quarterly performance measurement and Monitor's reliability audits demonstrate that nursing care for patients on the detox protocol has improved, however, there are lags to first dose of vital medication and missed assessments.

Recommendation: Enforce timely assessments and medication for patients who are on the detox protocol.

7.d. Annually, conduct a review of whether the detoxification training program has been effective in identifying concerns regarding policy, training, or the proper identification of and response to detoxifying prisoners. OPSO will document this review and provide its conclusions to the Monitor.

Finding: Partial Compliance

An annual review was conducted, but the review lacks any evaluation or discussion of the effectiveness of training (increase in post-test scores, number needing training, etc.).

Recommendation: Report on the program effectiveness to the Monitors.


Findings:
B. 8. a. Partial Compliance
B. 8. b. Substantial Compliance



8.a. OPSO shall ensure that medical and mental health staffing is sufficient to provide adequate care for prisoners' serious medical and mental health needs, fulfill constitutional mandates and the terms of this Agreement, and allow for the adequate operation of the Facility, consistent with constitutional standards.

Finding: Partial Compliance

Medical and mental health staffing is sufficient for most care functions at the current time. However, there is insufficient funding and MH staffing for groups and special programs. To the extent that the proposed staffing cut is implemented, and access to care is negatively affected, this element of the agreement is at risk being reduced to non-compliance.

Recommendation: Fund and authorize MH staff for special programs, as per Wellpath's earlier proposal. OPSO to ensure sufficient custody staffing for efficient and timely health care operations.

8.b. Within 90 days of the Effective Date, OPSO shall conduct a comprehensive staffing plan and/or analysis to determine the medical and mental health staffing levels necessary to provide adequate care for prisoners' mental health needs and to carry out the requirements of this Agreement. Upon completion of the staffing plan and/or analysis, OPSO shall provide its findings to the Monitor, SPLC, and DOJ for review. The Monitor, SPLC, and DOJ will have 60 days to raise any objections and recommend revisions to the staffing plan.

Finding: Substantial Compliance

Findings:
B. 9. a.  Partial Compliance
B. 9. b.  Partial Compliance
B. 9. c.  Partial Compliance
B. 9. d.  Partial Compliance
B. 9. e.  Partial Compliance
B. 9. f.   Partial Compliance

B.9.a. OPSO shall develop, implement, and maintain a system to ensure that trends and incidents involving avoidable suicides and self-injurious behavior are identified and corrected in a timely manner. Within 90 days of the Effective Date, OPSO shall develop and implement a risk management system that identifies levels of risk for suicide and self-injurious behavior and requires intervention at the individual and system levels to prevent or minimize harm to prisoners, based on the triggers and thresholds set forth in Appendix B.

Finding: Partial Compliance

Recommendation: Data collection has improved; analysis of trends and incidents involving avoidable suicides and self-injurious behaviors to determine required interventions at the individual and system levels to prevent or minimize harm to



inmates requires further development, particularly with regard to inmates who have repeated suicidal or self-harming behaviors and need for revisions in their treatment plans and treatment activities. The addition of the QI (Quality Insurance) Work Group since December 2019 should be helpful to addressing trends and systems analysis.

B.9.b. The risk management system shall include the following processes to supplement the mental health screening and assessment processes: incident reporting, data collection, and data aggregation to capture sufficient information to formulate a reliable risk assessment at the individual and system levels; identification of at-risk prisoners in need of clinical treatment or assessment by the Interdisciplinary Team or the Mental Health Committee; and development and implementation of interventions that minimize and prevent harm in response to identified patterns and trends.

Finding: Partial Compliance

Recommendation: Provide documentation of analysis of risk management system processes including the listed criteria, with more attention to data aggregation and analysis, and development and implementation of interventions that minimize and prevent harm in response to identified patterns and trends. The risk assessments at the individual-level by the Interdisciplinary Treatment Team and at the system-level by the Mental Health Committee and QI Work Group should include analysis of current practices such as the need for out-of-cell treatment services for inmates on the mental health caseload in segregated housing, and mental health staff participation the disciplinary process.

B.9.c. OPSO shall develop and implement an Interdisciplinary Team, which utilizes intake screening, health assessment, and triggering event information for formulating treatment plans. The Interdisciplinary Team shall:
(1) include the Medical and Nursing directors, one or more members of the psychiatry staff, counseling staff, social services staff, and security staff, and other members as clinical circumstances dictate;
(2) conduct interdisciplinary treatment rounds, on a weekly basis, during which targeted patients are reviewed based upon screening and assessment factors, as well as triggering events; and
(3) provide individualized treatment plans based, in part, on screening and assessment factors, to all mental health patients seen by various providers.

Finding: Partial Compliance

Recommendation: Provide documentation of completion of mental health Interdisciplinary Treatment Team meetings and rounds, and provision of adequate and timely individualized treatment plans to all mental health patients seen by various providers at OJC and Hunt.



B.9.d. OPSO shall develop and implement a Mental Health Review Committee that will, on a monthly basis, review mental health statistics including, but not limited to, risk management triggers and trends at both the individual and system levels. The Mental Health Review Committee shall:

(1) include the Medical and Nursing Director, one or more members of the psychiatry staff and social services staff, the Health Services Administrator, the Warden of the facility housing the Acute Psychiatric Unit, and the Risk Manager.

(2) identify at-risk patients in need of mental health case management who may require intervention from and referral to the Interdisciplinary Team, the OPSO administration, or other providers.

(3) conduct department-wide analyses and validation of both the mental health and self-harm screening and assessment processes and tools, review the quality of screenings and assessments and the timeliness and appropriateness of care provided, and make recommendations on changes and corrective actions;

(4) analyze individual and aggregate mental health data and identify trends and triggers that indicate risk of harm;

(5) review data on mental health appointments, including the number of appointments and wait times before care is received; and

(6) review policies, training, and staffing and recommend changes, supplemental training, or corrective actions.

Finding: Partial Compliance

Recommendation: Provide documentation of Mental Health Review Committee meetings addressing all of the listed elements, including analysis of the data collected. The addition of the QI Work Group should assist in compliance with these provisions. See IV. B. 9. a. and b.

B.9.e. OPSO shall develop and implement a Quality Improvement and Morbidity and Mortality Review Committee that will review, on at least a quarterly basis, risk management triggers and trends and quality improvement reports in order to improve care on a Jail-wide basis.

(1) The Quality Improvement Committee shall include the Medical Director, the Director of Psychiatry, the Chief Deputy, the Risk Manager, and the Director of Training. The Quality Improvement Committee shall review and analyze activities and conclusions of the Mental Health Review Committee and pursue Jail-wide corrective actions.

(2) The Quality Improvement Committee shall:

i. monitor all risk management activities of the facilities through the review of risk data, identification of individual and systemic trends, and recommendation and monitored implementation of investigation or corrective action; and

ii. generate reports of risk data analyzed and corrective actions taken.

Finding: Partial Compliance

The medical and psychiatric staff report a large number of obstacles to access patients due to a lack of custody staff. WellPath reported data that about one-third of intended clinical encounters do not occur because security staff is not available. Outside appointment attendance is only 42%, yet there is no cogent plan to improve this performance. This is one of the most serious problems with timely access to care, yet it is not discussed at the MAC or Quality Management meetings.  Likewise,



the ongoing issue of contraband medication found during shakedowns is not discussed at these meetings.  Qualitative analysis of data yielded from clinical performance measurement is shallow. This leads to shallow corrective action plans that lack accountability and timelines. For the most part, answers to medical and mental health grievances are unresponsive. Reliability of clinical performance measurement is good.  However, the management team does not appear to fully utilize data that derives from clinical performance measurement.

Recommendations: Incorporate performance data, analysis, and trending into QI Committee minutes. Improve analysis and corrective action plans generally, with specificity for root cause analysis, process design, and effective improvement strategies. Continue to improve reliability of clinical performance measurement. Ensure that the Chief Deputy (or equivalent) and Director of Training participate in meetings, with documentation. Continue to collect and report reliable data on visit disruptions due to the unavailability of custody staff for escort and/or transportation. In collaboration with custody staff, develop interventions, with accountabilities and timelines for addressing disruptions in services. Improve responsiveness of answers to grievances. Utilize clinical performance data for management purposes.  Continue to improve reliability of clinical performance monitoring.  Secure corporate assistance with evaluation methodology.

B.9.f. OPSO shall review mortality and morbidity reports quarterly to determine whether the risk management system is ensuring compliance with the terms of this Agreement. OPSO shall make recommendations regarding the risk management system or other necessary changes in policy based on this review. The review and recommendations will be documented and provided to the Monitor.

Finding: Partial compliance

The mortality and morbidity reviews remain perfunctory and they lack self-critical analysis. Clinical analyses are incomplete. Psychiatrists are remarkably uninvolved in morbidity reviews for patients with suicide attempts. Corrective action plans are not well-documented and there is no annual review of findings.

Recommendation: Enhance analysis and problem identification in morbidity and mortality reviews. Improve corrective action plans generally, with specificity for root cause analysis, process design, and effective improvement strategies. Include psychiatric physicians in all mortality and morbidity reviews.  Evaluate and report

Orleans Parish
JAIL MONITORS

on the effectiveness of the mortality and morbidity review process.  Secure

corporate assistance on evaluation methodology.

| C. | Medical Care |
|---|---|

OPSO shall ensure constitutionally adequate treatment of prisoners' medical needs. OPSO shall prevent unnecessary risks to prisoners and ensure proper medication administration practices. OPSO shall assess on an annual or more frequent basis whether the medical services at OPP comply with the Constitution. At a minimum, OPSO shall:

1. Quality Managing of Medication Administration:
   a.  Within 120 days of the Effective Date, ensure that medical and mental health staff are trained on proper medication administration practices, including appropriately labeling containers and contemporaneously recording medication administration;
   b.  Ensure that physicians provide a systematic review of the use of medication to ensure that each prisoner's prescribed regimen continues to be appropriate and effective for his or her condition;
   c.  Maintain medication administration protocols that provide adequate direction on how to take medications, describe the names of the medications, how frequently to take medications, and identify how prisoners taking such medications are monitored; an
   d.  Maintain medication administration protocols that prevent misuse, overdose, theft, or violence related to medication.

Findings:
C. 1. a.  Substantial compliance
C. 1. b.  Partial compliance
C. 1. c.  Substantial compliance
C. 1. d.  Substantial compliance

Significant lags to laboratory testing, chronic care visits and medication continue

through the period ending March 31.  Staff report, anecdotally, that there are no

longer any backlogs, yet the data on missed appointments bely that statement. The

lags to laboratory testing and to chronic care visits lead to lags to medication.

There are significant lags to first dose of medication prescribed for detoxification.

The monitors identified four very serious medication errors, including documentation of

duplicate orders resulting in excessive medication administration for syphilis, serious

mental illness, and cancer.[6]  These were discussed with the Health Services Administrator

in March.   These medication errors should have been subjected to root cause analysis or

any other technique intended to identify the means to prevent future errors of a similar

---

[6] Patient #2490893 had two orders (unintended duplicates) for benzathine penicillin for syphilis. Patient #2489383 received duplicate does of prazosin on 12/9-14/2019 and 12/18-19/2019. Patient #2420127 received triple doses of quetiapine on 1/29-31/2020. Patient #2468418 received duplicate does of capecitabine on 11/27-12/2/2019, 12/4/2019, 12/6/2019 and 2/3/2020.



nature.  No corrective action had been taken by the time of the virtual site visit.

Recommendations: Continue to improve performance on conformance to chronic disease protocols for medical and psychiatric conditions. Reduce lags to and lapses in medication. Submit the identified medication errors to root cause analysis to identify means to prevent future errors. Discuss the findings, corrective action taken and results at CQI meetings. Report the errors and results of analysis to the pharmacy and request a solution to identify and delete duplicate orders before dispensing the medication. Monitor complicated dosing regimens to ensure patients are not harmed.

2.a. Provide the Monitor a periodic report on health care at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. Each report will include:
    (1)     number of prisoners transferred to the emergency room for medical treatment related to medication errors;
    (2)     number of prisoners taken to the infirmary for non-emergency treatment related to medication errors;
    (3)     number of prisoners prescribed psychotropic medications;
    (4)     number of prisoners prescribed "keep on person" medications; and
    (5)     occurrences of medication variances.
2.b. Review the periodic health care delivery reports to determine whether the medication administration protocols and requirements of this Agreement are followed. OPSO shall make recommendations regarding the medication administration process, or other necessary changes in policy, based on this review. The review and recommendations will be documented and provided to the Monitor.

Findings:
C. 2. a.  Partial Compliance
C. 2. b.  Partial Compliance

Submission of the periodic reports have been sporadic. There is no indication that Wellpath has used data to improve timely access to care.  There are no reports on medication contraband, with analysis of data and corrective action plans.  There are no reports of medication errors, such as the ones mentioned in IV. C. 1. B.

C. 2. a. Recommendation: Provide reports every six months.

C. 2. b. Recommendation: Review reports, once written, and make recommendations. Recommendations should be reviewed at committee meetings to assure multidisciplinary input. Report on medication contraband and efforts to reduce diversion of prescribed medication.



3.a. OPSO shall notify Qualified Medical or Mental Health staff regarding the release of prisoners with serious medical and/or mental health needs from OPSO custody, as soon as such information is available.

3.b. When Qualified Medical or Mental Health staff are notified of the release of prisoners with serious medical and/or mental health needs from OPSO custody, OPSO shall provide these prisoners with at least a seven-day supply of appropriate prescription medication, unless a different amount is necessary and medically appropriate to serve as a bridge until prisoners can reasonably arrange for continuity of care in the community.

3.c. For all other prisoners with serious medical and/or mental health needs who are released from OPSO custody without advance notice, OPSO shall provide the prisoner a prescription for his or her medications, printed instructions regarding prescription medications, and resources indicating where prescriptions may be filled in the community.

3.d. For prisoners who are being transferred to another facility, OPSO shall prepare and send with a transferring prisoner, a transition summary detailing major health problems and listing current medications and dosages, as well as medication history while at the Facility. OPSO shall also supply sufficient medication for the period of transit for prisoners who are being transferred to another correctional facility or other institution, in the amount required by the receiving agency.

Findings:
C. 3. a.  Partial Compliance
C. 3. b.  Partial Compliance
C. 3. c.  Partial Compliance
C. 3. d.  Substantial compliance

The proportion of patients with serious needs reached is increasing, yet the total numbers of patients remains very low. Once identified, the patients are receiving either a supply or a prescription that can be filled at no-cost; although medication pickup rates are low. There is no cogent analysis of why the numbers are low and thereby, no way to develop an effective action plan. Transfer of information and medication appears to be working well.

C. 3. a. <u>Recommendation:</u> Improve notifications.

C. 3. b. <u>Recommendation:</u> Build on recent progress to increase numbers. Continue to counsel patients face-to-face.

C. 3. c. Comment: If there is no notice, it is not possible to provide prescriptions. Partial is achieved through pre-release notification to patients.

## IV.   D. 1. Sanitation and Environmental Conditions

Findings:
D.1. a.  Partial Compliance
D. 1. b.  Substantial Compliance
D. 1. c.  Substantial Compliance
D. 1. d.  Substantial Compliance
D. 1. e.  Substantial Compliance



D. 1. f.  Substantial Compliance
D. 1. g.  Substantial Compliance
D. 1. h.  Partial Compliance

IV. D. 1. a. OPSO shall provide oversight and supervision of routine cleaning of housing units, showers, and medical areas. Such oversight and supervision will include meaningful inspection processes and documentation, as well as establish routine cleaning requirements for toilets, showers, and housing units to be documented at least once a week but to occur more frequently.

Finding: Partial Compliance

Observations:

OPSO provided a cleaning schedule and supervisor inspection check list that identify the frequency of housekeeping, by area, for both OJC and TDC. Additionally, OPSO provided documentation of area specific cleaning schedules (e.g., housing unit showers) implemented previously. Prior to the COVID-19 restrictions, OPSO dedicated a staff member to focus on the cleaning of showers throughout the inmate housing areas. Beginning February 2020, the Environmental Officer reported that he was completing this task whenever the deputy was unavailable due to other assignments. During the virtual tour, inmate showers were specifically viewed by the Monitor. Given the quality of the video, the majority of the showers appeared to be generally clean and free of trash, soap residue and drain flies. Some condensation was noted in three showers.

OPSO continues to provide substantial documentation of monthly housing unit inspections by the Environmental Officer in addition to daily/weekly inspections by security staff. While the Monitor observed a generally acceptable level of cleanliness in the units viewed during the virtual tour, the monthly environmental inspection reports continue to note clutter and cleanliness issues primarily in individual cells, but also some common areas. Typical inspection notations included dirty floors/walls, lavatories, and trash/excess clutter. The documentation showed a reduction in the frequency of obstructed cell vents. The Monitor noted some clutter issues during the inspection, primarily in units with individual cells. This was also noted during the previous inspection and continues to be a challenge primarily for the lockdown inmate populations.

The documentation and observed conditions throughout the housing units at the time of the inspection indicate the ability of the Sanitarian and Environmental Officer to maintain consistent, regular cleaning schedules since the last inspection. The Sanitarian



reported that the staffing issue for the section has continued to improve both in terms of assigned staff and staff availability.

Grievances regarding sanitation issues averaged approximately 6 per month during the rating period. Inmate reports of inadequate or missing cleaning supplies dropped substantially since the last inspection. Conversely, the environmental inspection reports noted regular observations of missing or inadequate cleaning supplies throughout OJC. The few cleaning carts observed by the Monitor during the virtual tour in OJC did not appear to be sufficiently supplied. In one instance, the monitor/guide asked the pod deputy where were the supplies that were missing from the cart. The deputy stated that the supplies were in use but had no accountability as to which inmates were using the supplies. The Sanitarian has taken the initiative to conduct "town hall" meetings with all housing pods on a monthly basis and provided documentation of inmate comments regarding a lack of cleaning supplies as well throughout the rating period.

The Sanitarian advised that security staff requested a change in January 2020 as to how cleaning supplies are made available to inmates in the housing units. Cleaning carts were consolidated with one provided for every two housing pods on a given floor. Prior to this date, each housing pod had its own cleaning cart and chemicals. It is the Monitor's opinion that this practice has substantially limited the availability of cleaning supplies to the inmates as they are now shared, particularly in lockdown and COVID-19 units. It is reasonable to assume that cleaning chemicals may be consumed faster from shared carts, particularly in open dorm pods that do not have chemical dispensers located in the pods. It is also the Monitor's opinion that accountability for the chemicals and cleaning equipment would suffer with the practice of sharing carts if the carts are not inventoried when passed from pod to pod. Documentation of any such inventories was not available. The Sanitarian advised that she had recommended returning to the previous practice of providing a cleaning cart to each pod, but no change had been made in the new practice as of the date of the inspection. Given the concerns surrounding sanitation in the jail in general and COVID-19 in particular, the Monitor supports the Sanitarian's recommendation to provide one cleaning cart with supplies to each housing pod.

Directly related to sanitation in the inmate housing units and the control of infectious disease within the jail is the Monitor's observations of the OPSO COVID-19 policy/procedures related to social distancing within the units and the sanitation of



common areas.

While the OPSO COVID-19 policy does not specifically address social distancing, the Monitor observed several housing pods with one/two person cells being managed so as to promote social distancing. The procedure consisted of allowing only a fraction of the inmates access to the dayroom at any given time for a two-hour period on a rotational basis. However, the Monitor observed virtually every food chute open allowing inmates in the dayroom to freely converse with inmates locked in their cells, pass items, and even play board games through the opening. Further, inmates were observed to be using furniture, fixtures and equipment (e.g., phone handsets and video screens) without any efforts at sanitation between uses. OPSO is encouraged to review the actual management of these activities by line staff to ensure the greatest possible benefit is realized from their efforts to control the spread of COVID-19 within the jail.

The Monitor's limited observations found no chemicals in inmate housing areas or storage locations that were not on the authorized chemical list nor without a corresponding Material Safety Data Sheet. No cleaning supply closets in the housing units were found unsecured during the inspection indicating an improvement in staff supervision of these areas.

As previously noted, regular provision of clean inmate clothing and bedding and appropriate inventory of these supplies are essential to sanitation, infection control and disease prevention. The Sanitarian reported that she was able to maintain an adequate supply of inmate clothing for issue and exchange. She also reported an increase in the frequency of clothing exchange for inmates in COVID-19 affected pods. The Sanitarian further noted that the laundry vendor's performance had improved somewhat in terms of turn-a-round time since the last inspection.

- Inmates continue to launder their personal items (e.g. underwear, shorts) in the washing machines and dryers located in each housing unit. The Monitor observed the majority of the clothes dryers located in OJC's inmate housing units were generally serviceable although several had effectively non-functional exhaust lines. The lines were crushed against the wall, torn, or, as noted in at least two pods, missing altogether. These observations were almost exclusively in the open dorm style pods. Several dryers were observed to have been tampered with and/or used to heat water-filled latex gloves stuffed into the lint traps or placed under a towel



draped over the dryer exhaust port. The tampering was readily apparent to the Monitor, but apparently not so to the pod officer. It should be noted that since the last inspection, the Maintenance Section has hired a dedicated staff member to repair the washers and driers as issues arise. This increased attention was more apparent in the pods where the laundry area is secured. The accumulation of lint behind and above the driers as well as on the surface of return-air grills was noted to be less prevalent than during previous inspections.

During the inspection, the Monitor noted via video that the accumulation of inmates' personal items (paperwork, commissary purchases, and other approved items) was at acceptable levels in most areas. As noted previously, the most problematic areas continue to be the high-security units. Where observations could be made, the Monitor noted very few blocked return-air vents in the inmate cells. The Monitor noted no broken glass panels in shower windows or graffiti on dormitory and cell walls.

IV. D. 1. b. Continue the preventive maintenance plan to respond to routine and emergency maintenance needs, including ensuring that showers, toilets, and sink units are adequately installed and maintained. Work orders will be submitted within 48 hours of identified deficiencies, or within 24 hours in the case of emergency maintenance needs.

Finding: Substantial Compliance

Observations:

The Monitor reviewed the Sanitation and Environmental Conditions report, the OPSO Preventive Maintenance Plan, the Preventive Maintenance Schedule Summary report, and a Preventive Maintenance work orders status report as well as inmate grievances related to maintenance issues. In addition to the limited video inspection of the inmate housing areas, the Monitor conducted a video conference with the Maintenance Director on May 18, 2020. The documentation reflected an on-going preventive maintenance program for major building systems and components consistent with OPSO policy and the Consent Judgment. However, some deficiencies were noted within the documentation provided. For example, there were several instances where regularly scheduled preventive maintenance was deferred to the next service period.

Subsequent conversations were held with the Maintenance Director on June 1, 2020 to determine the extent of the practice, who could authorize such deferrals and on what type of systems (e.g., Life/Safety systems, critical building MEP or security systems, etc.).



Ideally, all manufacturer-required preventive maintenance checks and services are performed on all equipment and systems according to the manufacturer's recommended schedule. As noted by the Maintenance Director, staffing constraints, budgetary considerations, and actual conditions will affect OPSO's ability to perform such services. The Maintenance Director was able to provide examples where actual conditions warranted the deferral of a preventive maintenance service. One such example was that of a 700-hour service on a fire pump that was automatically generated in the work order system. The actual run-time hours on the pump had not reached the 700-hour interval and thus the service was deferred.

The issue of accountability for such deferrals was also discussed. The Maintenance Director advised that, while any maintenance worker could place a preventive work order in deferred or closed status, the Department's practice is to administratively review all work orders daily for proper disposition. Preventive work orders on critical systems that are deferred are referred to supervisor staff for further review and action as warranted. One possible solution that would further support the Department's preventive work order operations would be to formally establish the review and accountability practices recounted by the Maintenance Director in written policy and procedure.

For routine mechanical, electrical and plumbing work orders, OPSO Policy 601.02, Reporting and Addressing/Repairing Maintenance Needs, specifically requires that any staff member observing a maintenance issue "shall call the CMMS work order facilitator" to report the issue, "or leave a message." As individual inmate interviews were impractical during the virtual tour of the facility, a review of grievance documentation related to maintenance issues was completed by the Monitor. The was no marked increase/decrease in the number of grievances received on a monthly basis indicating that routine issues with basic plumbing, mechanical or electrical services in inmate cells or dayrooms are typically remedied within 48 to 72 hours indicating that work orders are being submitted in a timely manner as required by the Consent Judgment ("Work orders will be submitted within 48 hours of identified deficiencies, or within 24 hours in the case of emergency maintenance needs").

IV. D. 1. c. Maintain adequate ventilation throughout OPSO facilities to ensure that prisoners receive adequate air flow and reasonable levels of heating and cooling. Maintenance staff shall review and assess compliance with this requirement, as necessary, but no less than twice annually.



Finding: Substantial Compliance

Observations:

Adequate air flow is maintained in the facilities but continues to be impeded in a few inmate cells when inmates block the air vents. The Monitor was unable to ascertain whether air circulation was adequate through direct observation due to the limitations of the inspection process. Alternatively, additional review of grievance documentation related to adequate air flow and heating/cooling was made by the Monitor. Additionally, the Life/Safety staff member conducting the virtual tour noted no significant issues and that the majority of housing dayrooms and cells to be at a relatively reasonable levels of heating and cooling.

As noted in the two previous reports, test and balance reports for the Kitchen/Warehouse (2014), OJC (2017) and TDC (2012) were the latest available to the Monitor.

Prior to the September 2019 report, this section had been interpreted as requiring comprehensive "test and balance" assessments on a semi-annual basis. Such assessments are very expensive and typically performed only during the commissioning of new or replacement HVAC systems. During the previous inspection, the Monitor met with the Maintenance Director specifically to discuss the status and capabilities of the OJC Building Automation System that controls the heating and cooling throughout all occupied areas in OJC. The Maintenance Director was able to demonstrate the system's real-time monitoring of temperature sensors, variable air volume boxes (metered air flow), exhaust fans, chilled water systems, etc. through the systems graphical user interface. He also demonstrated the system's warning and alarm capabilities to alert staff if the system malfunctions or falls out of specified parameters, and how designated staff are able to address such issues through either adjustment or emergency/planned replacement of the component. Further, the Maintenance Director was able to produce reports on demand to document any such failures over time.

For the purposes of verifying compliance with this section during this inspection, the Monitor reviewed actual screen images of the BAS monitoring system noting the status of all monitored equipment, air flow and temperatures throughout the facility. While the system can automatically compensate for changes in climate and heat load as well as increased or decreased



demand for air flow, mechanical breakdowns typically require physical repair by Maintenance staff. The Maintenance Director was able to provide documentation reflecting work orders generated for the repair/replacement of mechanical system components restoring the system to normal operation. It is the Monitor's opinion that the OJC Building Automation System, as currently operated, meets the intent of the Consent Judgment with regard to this section.

IV. D. 1. d. Ensure adequate lighting in all prisoner housing units and prompt replacement and repair of malfunctioning lighting fixtures in living areas within five days unless the item must be specially ordered.

     Finding: Substantial Compliance

Observations:

     The Monitor observed sufficient lighting being provided in housing units of both OJC and TDC. Maintenance staff continue to maintain a supply of replacement bulbs, transformers, or ballasts to repair malfunctioning lighting. During this inspection, the Monitor observed no outstanding electrical work orders beyond routine bulb replacement.

IV. D. 1. e. Ensure adequate pest control throughout the housing units, including routine pest control spraying on at least a quarterly basis and additional spraying as needed.

     Finding: Substantial Compliance

Observations:

     A review of the documentation submitted found sufficient evidence of a pest control program that meets the intent of the Consent Judgment. OPSO continues to maintain a pest control contract with a state licensed company for monthly service of all housing areas and bi-weekly service for the Kitchen/Warehouse. Inmate grievances related to pest control were reviewed and found to have been addressed in a timely manner. The Monitor specifically inquired of the Environmental Officer as to the status of previous "drain fly" issues. The Environmental Officer confirmed that there were no significant on-going issues with drain flies. None were noted by the Monitor in the areas viewed by video.

     Environmental, Sanitation and Life-Safety staff performing inspections and responding to pest control grievances continue to initiate work orders for pest control and to document how, when. and where infestations are identified and remedied.

IV. D. 1.f. Ensure that any prisoner or staff assigned to clean a biohazardous area is properly trained in universal precautions, outfitted with protective materials, and properly supervised.



Finding: Partial Compliance

Observations:

As noted in the previous inspection, Policy 1101.07, "Bio-hazardous Spill Cleaning Procedures" [Revised 1/18/2018] Section VIII. A. 1 has been revised to allow properly trained and equipped inmates and deputies to clean-up bio-hazardous spills. Training materials were devised by the Sanitarian and training was provided to designated inmates in December 2019, the only inmate training date documented during the rating period. The Monitor also reviewed training curricula and documentation indicating that during 2019, all staff received eight hours of training in bio-hazardous cleanup procedures as part of their initial training or in-service training prior to this rating period. As of 6/30/19, documentation indicated that 91% of the required staff had completed the bio- hazardous clean-up training for 2019. Two pre-service classes were conducted in the Fall of 2019. No additional roll-call training was offered during the rating period.

As of November 2018, the Sanitation and/or Environmental Officer is required to be notified of such incidents each business day to enable them to replace any bio-hazardous clean up protective materials used and inspect the area to ensure it was properly cleaned and sanitized. The Sanitarian reported that no such incidents reports were received during the rating period covered by this inspection, however, the Sanitarian reported replacing at least five (5) bio-hazard clean-up kits during the rating period that had been used but not reported as required. The failure to make this notification made it impossible for the Sanitarian to properly inspect the affected area in a timely manner as required by policy. The Monitor strongly urges the supervisory chain address this deficiency given the potential health and safety impact.

IV. D. 1. g. Ensure the use of cleaning chemicals that sufficiently destroy the pathogens and organisms in biohazard spills.

Findings: Substantial Compliance

Observations:

The Monitor was unable to make direct observation of the chemicals on-hand and available to staff were sufficient to destroy the pathogens and organisms in bio-hazardous spills common in a jail environment. The Sanitarian stated that there had been no changes



in the types of chemicals used or vendors. Based upon this statement and observations made during previous inspections, the Monitor is continuing to rate this section as being in substantial compliance.

Additionally, the chemical inventory documentation submitted demonstrated availability of a consistent supply of the required chemicals being maintained by the designated staff.

IV. D. 1. h. Maintain an infection control plan that addresses contact, blood borne, and airborne hazards and infections. The plan shall include provisions for the identification, treatment, and control of Methicillin-Resistant Staphylococcus Aureus ("MRSA") at the Facility.

Findings: Partial compliance

Observations:

As with the previous inspection, the Monitor reviewed the OPSO infection control policy 1201.11 as well as the WellPath Infection Control Program document (rev. 8/30/18) submitted by OPSO. The medical contractor's policy on infection control is included in 1201.11 by reference. Neither the OPSO policy nor the WellPath document specifically include "provisions for the identification, treatment and control of" MRSA as required by the Consent Judgment. The document provided only references HIV, HBV, and HCV exposures. Additionally, the WellPath document notes in Section 3 that "Site Specific Policy Required". Specific information required, but not provided, include:

1. Insert site-specific infection control plan.
2. Identify the person responsible for infection control at the site.
3. Describe how infection control activity is recorded.
4. List location(s) where infection control policies are kept.
5. Describe how biomedical wastes are managed.
6. Identify who prepares and completes reports.

OPSO has stated that, because the Monitors have reviewed and approved the infection control policy, that this area should be in substantial compliance. The policy review noted that including the WellPath policy on infection control by reference was acceptable. The WellPath policy had not been provided at that point in time. Once provided and reviewed, the Monitor noted the information noted above was deficient and



remains so at the time of this inspection. As such, this section remains in Partial Compliance.

The Monitor was unable to directly observe the handling and sanitation of inmate mattresses in OJC. No violations were observed via virtual tour at the TDC facility. OPSO has previously provided for annual review of the policy and standard operating procedures for the handling of inmate mattresses to include staff and/or inmate sanitation training program that includes mattress cleaning, and chemical use and control. This procedure is specifically required by the Infection Control Plan.

### IV. D. 2. Environmental Control

Findings:
D. 2. a.  Substantial Compliance
D. 2. b.  Substantial Compliance

IV. D. 2. a. OPSO shall ensure that broken or missing electrical panels are repaired within 30 days of identified deficiencies, unless the item needs to be specially ordered.

Findings: Substantial Compliance

Observations:

OPSO Policies 601.02 "Reporting and Addressing Maintenance Needs" and Policy 601.03 "Preventive Maintenance" [August 15, 2016] and are implemented. Major electrical panels at OJC and TDC are located in secure maintenance spaces inaccessible to inmates.

IV. D. 2. b. Develop and implement a system for maintenance and timely repair of electrical panels, devices, and exposed electrical wires.

Findings: Substantial Compliance

Observations:

The Monitor noted no new issues related to exposed/damaged wiring/cabling during the limited virtual tour. A review of the Life/Safety inspections noted some minor exposed low-voltage wiring with an accompanying work order. The Monitor considers this to be sufficient to support a continued finding of Substantial Compliance.



## IV. D. 3. Food Service

This report summarizes the findings for the Food Service provisions of the Consent Judgment based on the Monitor's document reviews and virtual tour conducted May 18-22, 2020. The Monitor virtually inspected the Orleans Justice Center (OJC) Kitchen/ Warehouse on May 22, 2020 and interviewed OPSO staff and the Summit Food Service Director via video calls.

Since the last tour on September 17-19, 2019, there has been significant progress toward compliance with the Food Service provisions resulting in sections IV. D. 3. b. and IV. D. 3. c. of the Consent Judgment moving from partial compliance to substantial compliance and therefore all three of the food service provisions are now in substantial compliance.

Findings:
D. 3. a. Substantial Compliance
D. 3. b. Substantial Compliance
D. 3. c. Substantial Compliance

IV. D. 3. a. OPSO shall ensure that food service staff, including prisoner staff, continues to receive in-service annual training in the areas of food safety, safe food handling procedures, and proper hygiene, to reduce the risk of food contamination and food-borne illnesses.

Findings: Substantial Compliance

Observations:

OPSO and Summit continue to provide documentation of ongoing annual in-service food safety training for staff, including inmate workers, and therefore D. 3. a. remains in Substantial Compliance for the period of July 2019 through March 2020.

However, for an in-service training program to effectively reduce the risk of food contamination and food-borne illness, it requires that management detect and subsequently retrain employees that exhibit deficiencies in food safety and sanitation. The Monitor observed food temperature violations during the virtual inspection and found problems during the document review. The most significant findings are summarized in section IV. D. 3. c. Recordkeeping/Temperatures of this report; accompanied by a specific recommendation regarding the need for retraining of food service staff on proper food thermometer procedures, thermometer calibration, and completion of food temperature



records to ensure food safety.

IV. D. 3. b. Ensure that dishes and utensils, food preparation and storage areas, and vehicles and containers used to transport food are appropriately cleaned and sanitized on a daily basis.

Findings: Substantial Compliance

Observations:

OPSO and Summit food service management staff have continued to exhibited eagerness to implement and maintain significant improvements in cleaning and sanitization. Summit implemented new kitchen cleaning logs in October 2019 and the kitchen appeared clean and compliant with Louisiana food regulations during the virtual inspection. Furthermore, OPSO has demonstrated compliance with policies and continued to develop and implement new policies as needed. Therefore, IV. D. 3. b. has moved from partial compliance to substantial compliance.

IV. D. 3. c. Check and record on a daily basis the temperatures in the refrigerators, coolers, walk-in refrigerators, the dishwasher water, and all other kitchen equipment with a temperature monitor, to ensure proper maintenance of food service equipment.

Findings: Substantial Compliance

Observations:

The Consent Judgment requires that OPSO "Check and record on a daily basis the temperatures in the refrigerators, coolers, walk-in refrigerators, the dishwasher water, and all other kitchen equipment with a temperature monitor, to ensure proper maintenance of food service equipment." Temperatures are used as a means of confirming the working condition of kitchen equipment by measuring with a properly calibrated thermometer or temperature measuring device and documenting the operating temperature to ensure that it complies with the temperatures specified in the Louisiana Food Code. The Monitor reviewed temperature documentation and requested that random food temperatures be checked during the virtual tour. Food temperature and thermometer related concerns were found during the virtual tour. The refrigeration/cooler and dishwasher temperature logs were reviewed and found to be compliant. IV. D. 3. c. moved from partial compliance to substantial compliance for the rating period of July 2019 through March 2020.

During the virtual tour, kitchen inspection pans of turkey ala king were observed as

they were being transferred into a food warmer to be held until they were needed for meal service on the tray line. The food temperature was measured at 147°F, 126°F, and 127°F. The Louisiana Food Code specifies that hot foods must be held at a temperature of 135°F or above. The temperatures were also well below the cooking temperatures of 210°F and 170°F that were reported by the cook. However, it was stated that the cook had used an infrared (laser) thermometer to obtain the cooking temperatures. Infrared thermometers only measure the surface temperature and not the internal food temperature and therefore the cook did not obtain an accurate temperature reading which may account for the significant difference between the reported 210°F cooking temperature and the observed 126/127°F measurement. OPSO and Summit staff took appropriate corrective actions to ensure food safety. The February 14, 2020 food production log indicates the same holding temperature problem with turkey ala king documenting a 279°F cooking temperature at 4:30; 188.1°F holding temperature at 6:32; and down to 91.6°F holding temperature at 7:40. However, the log does not indicate that documented corrective action was taken in regards to the 91.6°F holding temperature, which is well below the required minimum 135°F hot food holding temperature required by the state food code.

Maintaining thermometer calibration logs is an excellent practice. However, serious concerns related to thermometer calibration were found. Improperly calibrated thermometers are a potential hazard because they do not provide accurate readings. The Summit Food Safety Manual specifies that the 'ice point method' is to be used for thermometer calibration. This commonly used and simple technique involves immersing the stem of a probe thermometer in an ice water bath, waiting for the temperature to stabilize, if it reads 32°F the thermometer is in calibration, if it does not read 32°F the thermometer should be adjusted in accordance with the manufacturers' directions. Thermometers must be accurate within +/- 2°F. However, on December 21, 2019, a Summit employee documented calibrating a thermometer to 20°F and on January 24, 2020 and January 30, 2020 a Summit employee documented calibrating a thermometer to 39°F, instead of 32°F and a Summit supervisor signed-off on the logs at the end of each month. An undated Thermometer Calibration Log was provided with the February 2020 documents, indicating a thermometer was calibrated to 38.2°F on day 7 and 41°F on day 21, the log was signed-off by a supervisor.



To maintain substantial compliance, OPSO must ensure that temperatures are not recorded simply for the sake of documentation. Not subsequently taking and documenting corrective actions when temperature problems are found is not only a poor practice, it is unsafe and can lead to foodborne illness outbreaks.

- OPSO and Summit should immediately implement the Thermometer Guidelines found in section 1.6 of the Summit Food Safety Manual and all kitchen staff, including supervisors should be retrained in accordance with the Corrective Action specified in the Summit Food Safety Manual on proper food thermometer procedures, thermometer calibration, and completion of food temperature records.

- OPSO should hold their food service contractor (Summit) accountable for ensuring that the food service supervisors are thoroughly reviewing the kitchen logs and documentation, identifying problems or potential problems and investigating discrepancies, documenting corrective actions, and following-up to ensure issues are resolved.

## IV. D. 4. Sanitation and Environmental Conditions Reporting

Findings:
D. 4. a. Substantial Compliance
D. 4. b. Substantial Compliance

IV. D. 4. a. Provide the Monitor a periodic report on sanitation and environmental conditions in the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. The report will include
(1) number and type of violations reported by health and sanitation inspectors;
(2) number and type of violations of state standards;
(3) number of prisoner grievances filed regarding the environmental conditions at the Facility;
(4) number of inoperative plumbing fixtures, light fixtures, HVAC systems, fire protection systems, and security systems that have not been repaired within 30 days of discovery;
(5) number of prisoner-occupied areas with significant vandalism, broken furnishings, or excessive clutter;
(6) occurrences of insects and rodents in the housing units and dining halls; and
(7) occurrences of poor air circulation in housing units.

Findings: Substantial Compliance

Observations:

The July - December 2019 Sanitation and Environmental report was



made available to the Monitor prior to the May 2020 inspection tour. The report contained the requisite information spelled out by the Consent Judgement as well as supporting documentation.

IV. D. 4. b. Review the periodic sanitation and environmental conditions reports to determine whether the prisoner grievances and violations reported by health, sanitation, or state inspectors are addressed, ensuring that the requirements of this Agreement are met. OPSO shall make recommendations regarding the sanitation and environmental conditions, or other necessary changes in policy, based on this review. The review and recommendations will be documented and provided to the Monitor.

Findings: Substantial Compliance

Observations:

The Consent Judgment requires a review of the periodic sanitation and environmental conditions reports to ensure issues are addressed along with making recommendations regarding sanitation and environmental conditions and policy changes based upon the review. Such reviews are to be documented and provided to the Monitor.

The Monitor reviewed the supporting documentation provided by OPSO and determined that it was sufficient to satisfy the requirements of the Consent Judgment. OPSO provided documentation of the required review and basic analysis of prisoner grievances and inspection violations noted regarding sanitation and environmental conditions during the rating period.

**IV. E. 1. Fire and Life Safety**

Findings:
E. 1. a.  Substantial Compliance
E. 1. b.  Substantial Compliance
E. 1. c.  Substantial Compliance
E. 1. d.  Substantial Compliance
E. 1. e.  Substantial Compliance

IV. E. 1. a. Ensure that necessary fire and life safety equipment is properly maintained and inspected at least quarterly. These inspections must be documented.



Finding: Substantial Compliance

<u>Observations</u>:

The Monitor was able to conduct a virtual tour of the majority of OJC, all of TDC, and the Kitchen/Warehouse facility on May 19, 2020 with the Facility Life Safety Officer. The Monitor observed no issues with the fire and life safety equipment. The Fire Alarm Control Panel in OJC indicated no faults and had been "Green Tagged" during the latest contractor and Fire Marshall inspections. The FACP in TDC Building 4 indicated a backflow preventer "trouble" alarm that was related to the construction and was being addressed. The Monitor also reviewed all monthly and quarterly inspection documentation as well as outside inspection documentation noting no significant issues and that requisite work orders had been generated when warranted.

Life Safety staff continue to use the "Facility Dude" work order system to maintain the schedule of required inspections. The system notifies the Fire Safety Officer when an inspection is due. OPSO continues to maintain contracts with licensed vendors to complete annual inspections of all fire and life safety equipment. OPSO provided copies of quarterly inspections conducted by the Fire Safety Officer for Kitchen/Warehouse, OJC, and TDC for the third and fourth quarters of 2020. This documentation, supported by limited observations during the compliance tour, indicates that OPSO ensures that necessary fire and life safety equipment is properly maintained and inspected at required intervals. These inspections are conducted by a qualified fire safety officer or a qualified contractor, as required by the Consent Judgment.

IV. E. 1. b. Ensure that a qualified fire safety officer conducts a monthly inspection of the facilities for compliance with fire and life safety standards (e.g., fire escapes, sprinkler heads, smoke detectors, etc.).



Finding: Substantial Compliance

Observations:

The Monitor was provided with the monthly inspection documents for the Kitchen /Warehouse, OJC, and TDC facilities performed during the current inspection period. The reports are thorough and complete with all noted discrepancies listed with the associated work order number.

IV. E. 1. c. Ensure that comprehensive fire drills are conducted every six months. OPSO shall document these drills, including start and stop times and the number and location of prisoners who were moved as part of the drills.

Finding: Substantial Compliance

Observations:

The Consent Judgment requires comprehensive fire drills every six months. OPSO provided documentation for fire drills for all facilities and shifts conducted during the current rating period. Documentation reviewed by the Monitor noted approximately 96% to 98% of OJC staff (by squad) and 99%-100% of TDC staff (by squad) had participated in at least one drill during the rating period. In addition to the detailed drill reports, the documentation lists, by name, any delinquent staff with the listing provided to senior management for the coordination of make-up training.

IV. E. 1. d. Provide competency-based training to staff on proper fire and emergency practices and procedures at least annually.

Finding: Substantial Compliance

Observations:

OPSO has developed the requisite policy, training course syllabus/outline and written directives. The Monitor was provided with documentation reflecting the requisite training was provided during in-service classes held in February 2019. The completion rate for the training was approximately 95% of OJC staff. However, it appeared that none of the TDC staff participated in the February 2019 training. Additionally, the documentation lists, by name, any delinquent staff with the listing provided to senior management for the coordination of make-up training.



IV. E. 1. e. Within 120 days of the Effective Date, ensure that emergency keys are appropriately marked and identifiable by touch and consistently stored in a quickly accessible location, and that staff are adequately trained in use of the emergency keys.

Finding: Substantial Compliance

Observations:

Inspection reports note the routine verification of the keys and the Fire Safety Officer documents the periodic testing of the keys to verify they are operational. The Fire Safety Officer trains staff on the use of the location and use of the keys during the fire and life safety training curriculum provided to all staff at the training academy.

## IV. E. 2. Fire and Life Safety Reporting

Findings:
E. 2. a. Substantial Compliance
E. 2. b. Substantial Compliance

IV. E. 2. a. (1) – (3) Provide the Monitor a periodic report on fire and life safety conditions at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date and every six months thereafter until termination of this Agreement. Each report shall include:
(1) number and type of violations reported by fire and life safety inspectors;
(2) fire code violations during annual fire compliance tours; and
(3) occurrences of hazardous clutter in housing units that could lead to a fire.

Finding: Substantial Compliance

Observations:

The July – December 2020 Fire and Life Safety Conditions report was made available to the Monitor prior to the May 2020inspection. The report contained the requisite information spelled out by the Consent Judgment as well as supporting documentation.

IV. E. 2. b. Review the periodic fire and life safety reports to determine whether the violations reported by fire and life safety inspectors are addressed, ensuring the requirements of this Agreement are being met. OPSO shall make recommendations regarding the fire and life safety conditions, or other necessary changes in policy, based on this review. The review and recommendations will be documented and provided to the Monitor.

Finding: Substantial Compliance

Observations:

The Consent Judgment requires a review of the periodic fire and life safety reports



to ensure issues are addressed along with making recommendations regarding the fire and life safety conditions and policy changes based upon the review. Such reviews are to be documented and provided to the Monitor.

The Monitor reviewed the supporting documentation provided by OPSO and determined that it was sufficient to satisfy the requirements of the Consent Judgment. OPSO provided documentation of the required review and basic analysis of fire and life safety conditions as well as any necessary changes in policy or procedure.

Meeting minutes from the review indicated the OPSO Life Safety Officer communicated the information in IV. E. 2. a. (1) – (3), however, the Monitor noted a change in OPSO counting rules for reporting the number of violations relative to Item#3 above and addressed during the monthly Fire and Life/Safety inspections. Prior to this submission, each violation was counted each month if observed and reported cumulatively. The change in reporting resulted in a single violation being counted only once regardless of the number of times the violation was observed during subsequent inspections. This resulted in a precipitous, and somewhat misleading, drop in the number of violations reported in the Semi-Annual Report. The Monitor discussed the change with OPSO and recommended alternative methods of reporting that may reflect a clearer picture of the actual conditions over time. As the information was still available in the monthly inspection reports and reviewable by the Monitor, the Monitor believes a continued finding of Substantial Compliance is justified but will critically review any changes in reporting methodology during the next rating period.

## IV. F. Language Assistance

F.1.a. OPP shall ensure effective communication with and provide timely and meaningful access to services at OPP to all prisoners at OPP, regardless of their national origin or limited ability to speak, read, write, or understand English. To achieve this outcome, OPP shall:

    (1)    Develop and implement a comprehensive language assistance plan and policy that complies, at a minimum, with Title VI of the Civil Rights Act of 1964, as amended, (42 U.S.C. § 2000d et seq.) and other applicable law;

    (2)    Ensure that all OPP personnel take reasonable steps to provide timely, meaningful language assistance services to Limited English Proficient ("LEP") prisoners;

    (3)    At intake and classification, identify and assess demographic data, specifically including the number of LEP individuals at OPP on a monthly basis, and the language(s) they speak;

    (4)    Use collected demographic information to develop and implement hiring goals for bilingual staff that meet the needs of the current monthly average population of LEP prisoners;

    (5)    Regularly assess the proficiency and qualifications of bilingual staff to become an OPP Authorized Interpreter ("OPPAI");



(6) Create and maintain an OPPAI list and provide that list to the classification and intake staff; and

(7) Ensure that while at OPP, LEP prisoners are not asked to sign or initial documents in English without the benefit of a written translation from an OPPAI.

F.2.a. OPP shall develop and implement written policies, procedures and protocols for documenting, processing, and tracking of individuals held for up to 48 hours for the U.S. Department of Homeland Security ("DHS");

F.2.b Policies, procedures, and protocols for processing 48-hour holds for DHS will:

(1) Clearly delineate when a 48-hour hold is deemed to begin and end;

(2) Ensure that, if necessary, an OPPAI communicates verbally with the OPP prisoner about when the 48-hour period begins and is expected to end;

(3) Provide a mechanism for the prisoner's family member and attorney to be informed of the 48-hour hold time period, using, as needed, an OPPAI or telephonic interpretation service;

(4) Create an automated tracking method, not reliant on human memory or paper documentation, to trigger notification to DHS and to ensure that the 48-hour time period is not exceeded.

(5) Ensure that telephone services have recorded instructions in English and Spanish;

(6) Ensure that signs providing instructions to OPP prisoners or their families are translated into Spanish and posted;

(7) Provide Spanish translations of vital documents that are subject to dissemination to OPP prisoners or their family members. Such vital documents include, but are not limited to:
   i. grievance forms;
   ii. sick call forms;
   iii. OPP inmate handbooks;
   iv. Prisoner Notifications (e.g., rule violations, transfers, and grievance responses) and
   v. "Request for Services" forms.

(8) Ensure that Spanish-speaking LEP prisoners obtain the Spanish language translations of forms provided by DHS; and

(9) Provide its language assistance plan and related policies to all staff within 180 days of the Effective Date of this Agreement.

F.3.a. Within 180 days of the Effective Date, OPP shall provide at least eight hours of LEP training to all corrections and medical and mental health staff who may regularly interact with LEP prisoners.

(1) LEP training to OPP staff shall include:
   i. OPP's LEP plan and policies, and the requirements of Title VI and this Agreement;
   ii. how to access OPP-authorized, telephonic and in-person OPPAIs; and
   iii. basic commands and statements in Spanish for OPP staff.

(2) OPP shall translate the language assistance plan and policy into Spanish, and other languages as appropriate, and post the English and translated versions in a public area of the OPP facilities, as well as online.

(3) OPP shall make its language assistance plan available to the public.

F.4.

(1) OPP shall ensure that adequate bilingual staff are posted in housing units where DHS detainees and other LEP prisoners may be housed.

(2) OPP shall ensure that an appropriate number of bilingual staff are available to translate or interpret for prisoners and other OPP staff. The appropriate number of bilingual staff will be determined based on a staffing assessment by OPP.


Findings:
   F.1. a.  Substantial Compliance
   F. 2. a.  Substantial Compliance
   F. 2. b.  Substantial Compliance
   F. 3. a.  Partial Compliance
   F. 4.   Substantial Compliance



Observations:

The Language Assistance Plan required by this paragraph has now been prepared and finalized.

While OPSO asserts that DHS and ICE inmates are not detained, OPSO has developed a policy which was submitted to the Monitors which brings provisions F. 2. a. and b. into substantial compliance.

OPSO provided documentation regarding the use of the language line. OPSO has provided documentation regarding the number of bilingual staff and the manner in which the needs of language assistance are provided bringing provisions of F. 4. into substantial compliance. The Consent Judgment specifically requires at least eight hours of LEP training to all corrections and mental health staff who may regularly interact with LEP inmates. Provision IV. F. 3. a. is determined in partial compliance as the training is not provided. Training of security and medical staff assigned to the IPC should be sufficient.

## IV. G.   Youthful Prisoners

IV. G. Finding: Substantial Compliance

Consistent with the Prison Rape Elimination Act of 2003, 42 U.S.C. § 15601, et seq., and its implementation of regulations, a youthful prisoner shall not be placed in a housing unit in which the youthful prisoner will have sight, sound, or physical contact with any adult prisoner through use of a shared dayroom or other common space, shower area, or sleeping quarters. In areas outside of housing units, OPSO shall either: maintain sight and sound separation between youthful prisoners and adult prisoners, or provide direct staff supervision when youthful prisoners and adult prisoners have sight, sound, or physical contact. OPP shall ensure that youthful prisoners in protective custody status shall have no contact with, or access to or from, non-protective custody prisoners. OPP will develop policies for the provision of developmentally appropriate mental health and programming services.

Observations:

OPSO has provided documentation that its separation of youthful inmates from adult inmates was found in compliance during its recent PREA audit. Youthful female inmates are now housed in TDC. Tulane is providing developmentally appropriate mental health services to youthful inmates. Travis School continues to provide educational and programming services. The requirement for developmentally appropriate mental health and programming services is separate and apart from PREA.



**VI. A – D. The New Jail Facility and Related Issues**

A.    <u>New Jail</u>

The Parties anticipate that Defendant will build a new jail facility or facilities that will replace or supplement the current facility located at 2800 Gravier Street, New Orleans, Louisiana. This Agreement shall apply to any new jail facility.

VI. A. Finding: Substantial Compliance.

B.    <u>Design and Design Document</u>

Defendant shall obtain the services of a qualified professional to evaluate, design, plan, oversee, and implement the construction of any new facility. At each major stage of the facility construction, Defendant shall provide the Monitor with copies of design documents.

VI B. Finding:  Substantial Compliance

<u>Observations</u>:

This provision provides that, "*The Defendant shall obtain the services of a qualified professional to evaluate, design, plan, oversee, and implement the construction of **any new facility** [emphasis added]. At each major stage of the facility construction, Defendant shall provide the Monitor with copies of design documents.*"

C.    <u>Staffing</u>

Defendant shall consult with a qualified corrections expert as to the required services and staffing levels needed for any replacement facility. OPSO shall complete a staffing study to ensure that any new facility is adequately staffed to provide prisoners with reasonable safety.

VI. C. Finding: Substantial Compliance

<u>Observations</u>:

The Consent Judgment requires that the Defendant **shall** consult with a qualified corrections expert as to the required services and staffing levels needed for any replacement facility. The Monitors will await planning for Phase III to ascertain future compliance. For now, the paragraph is in substantial compliance.

D.    <u>Compliance with Codes and Standards</u>

Defendant will ensure that the new jail facility will be built in accordance with: (1) the American Correctional Association's standards in effect at the time of construction; (2) the American with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101-12213, including changes made by the ADA Amendments of 2008 (P.L. 110-325) and 47 U.S.C. §§ 225-661, and the regulations there under; and (3) all applicable fire codes and regulations.

Finding – Monitors not qualified to evaluate.

Observations:



The Monitors do not have the knowledge or expertise to evaluate compliance with this paragraph. OPSO asserts that it is in compliance with this provision, without offering documentation.

## VII. Compliance and Quality Improvement

## VII. A. Policies, Procedures, Protocols, Training Curriculum and Practices

### VII. A. Finding: Substantial Compliance

Within 120 days of the Effective Date, OPSO shall revise and/or develop its policies, procedures, protocols, training curricula, and practices to ensure that they are consistent with, incorporate, address, and implement all provisions of this Agreement. OPSO shall revise and/or develop, as necessary, other written documents, such as screening tools, logs, handbooks, manuals, and forms, to effectuate the provisions of this Agreement. OPSO shall send pertinent newly-drafted and revised policies and procedures to the Monitor as they are promulgated. The Monitor will provide comments on the policies to OPSO, SPLC, and DOJ within 30 days. OPSO, SPLC, and DOJ may provide comments on the Monitor's comments within 15 days. At that point, the Monitor will consider the Parties' comments, mediate any disputes, and approve the policies with any changes within 30 days. If either party disagrees with the Monitor, they may bring the dispute to the Court. OPSO shall provide initial and in-service training to all Facility staff with respect to newly implemented or revised policies and procedures. OPSO shall document employee review and training in new or revised policies and procedures.

Observations:

OPSO has now completed the development of the required policies. There are still procedures and lesson plans which must be completed to remain in substantial compliance.

## VII. (H). B.  Written Quality Improvement Policies and Procedures

Within 180 days of the Effective Date, Defendant shall develop and implement written quality improvement policies and procedures adequate to identify serious deficiencies in protection from harm, prisoner suicide prevention, detoxification, mental health care, environmental health, and fire and life safety in order to assess and ensure compliance with the terms of this Agreement on an ongoing basis.  Within 90 days after identifying serious deficiencies, OPSO shall develop and implement policies and procedures to address problems that are uncovered during the course of quality improvement activities. These policies and procedures shall include the development and implementation of corrective action plans, as necessary, within 30 days of each biannual review.

### VII. B. Finding: Partial compliance

Observations:

OPSO has provided documentation that it is now developing plans to identify serious deficiencies, and to address problems that are uncovered during the course of



quality improvement activities to warrant a finding of partial compliance. These plans could benefit from being more thorough such as the development of corrective action to be taken and the auditing of adherence to the action plan.

## VII. (I). C. Full-Time Compliance Coordinator

The Parties agree that OPSO will hire and retain, or reassign a current OPSO employee for the duration of this Agreement, to serve as a full-time OPSO Compliance Coordinator. The Compliance Coordinator will serve as a liaison between the Parties and the Monitor and will assist with OPSO's compliance with this Agreement. At a minimum, the Compliance Coordinator will: coordinate OPSO's compliance and implementation activities; facilitate the provision of data, documents, materials, and access to OPSO's personnel to the Monitor, SPLC, DOJ, and the public, as needed; ensure that all documents and records are maintained as provided in this Agreement; and assist in assigning compliance tasks to OPSO personnel, as directed by the Sheriff or his or her designee. The Compliance Coordinator will take primary responsibility for collecting information the Monitor requires to carry out the duties assigned to the Monitor.

VII. C. Finding: Substantial Compliance.

## VII. (J.) D. Self-Assessment

On a bi-annual basis, OPSO will provide the public with a self-assessment in which areas of significant improvement or areas still undergoing improvement are presented either through use of the OPSO website or through issuance of a public statement or report.

VII. D. Finding: Substantial Compliance

Observations:

OPSO is now in substantial compliance as, in addition to holding town hall meetings quarterly and providing PowerPoint presentations at those meetings, OPSO posts those PowerPoint presentations on its website.

## VIII. Reporting Requirements and Right of Access

## VIII. A. Periodic Compliance Reporting



OPSO shall submit periodic compliance reports to the Monitor. These periodic reports shall be provided to the Monitor within four months from the date of a definitive judgment on funding; and every six months thereafter until termination of this Agreement. Each compliance report shall describe the actions Defendant has taken during the reporting period to implement this Agreement and shall make specific reference to the Agreement provisions being implemented. The report shall also summarize audits and continuous improvement and quality assurance activities, and contain findings and recommendations that would be used to track and trend data compiled at the Facility. The report shall also capture data that is tracked and monitored under the reporting provisions of the following provisions: Use of Force; Suicide Prevention; Health Care Delivered; Sanitation and Environmental Conditions; and Fire and Life Safety.

VIII. A. Finding: Substantial Compliance

Observations:

The reports provided by OPSO are now sufficient to address the requirements of this provision,

## VIII. B.  (Notification of) **Death of Any Prisoner**

OPSO shall, within 24 hours, notify the Monitor upon the death of any prisoner. The Monitor shall forward any such notifications to SPLC and DOJ upon receipt. OPSO shall forward to the Monitor incident reports and medical and/or mental health reports related to deaths, autopsies, and/or death summaries of prisoners, as well as all final SOD and IAD reports that involve prisoners. The Monitor shall forward any such reports to SPLC and DOJ upon receipt.

Finding:   Substantial Compliance

## VIII. C. Records

Defendant shall maintain sufficient records to document that the requirements of this Agreement are being properly implemented and shall make such records available to the Monitor within seven days of request for inspection and copying. In addition, Defendant shall maintain and provide, upon request, all records or other documents to verify that they have taken the actions described in their compliance reports (e.g., census summaries, policies, procedures, protocols, training materials, investigations, incident reports, tier logs, or use of force reports).

VIII. C. Finding: Substantial Compliance

Observations:

OPSO now generally provides responses with seven days of a request by the Monitors. Some of the requests made regarding Classification are now timely. The monthly reports provided to the Monitors greatly decreases the need for document requests.



## III.    Stipulated Agreements

OPSO and the Plaintiffs/DOJ negotiated two agreements after Compliance Report #3. The language of the Agreed Orders linked directly to the Consent Judgment and represented priority areas for inmate safety.

The three provisions of the April 22, 2015 are in compliance. The provisions in the Agreed Order of February 11, 2015 require additional attention. See the section of the Consent Judgment as noted.

6.b. OPSO shall ensure by May 15, 2015 that all staff assigned to the housing for inmates with acute and chronic mental health (in Templeman V, TDC, or other housing in which this population is held) attend training regarding working this population. The lesson plans/curricula for this training shall be reviewed and approved by the Monitors. The draft of the training curriculum and training plan is due to the Monitors by April 15, 2015, and should include participation by subject matter experts employed by the medical contractor. See also Consent Judgment IV. B. 4. a. and 7. a.

13.  Medical Care – The health care provider has not provided their action plan for achieving compliance with the provisions of the Consent Judgment, as required by this paragraph.

14.b. By April 1, 2015, OPSO, in collaboration with CCS, will produce a management plan for inmates on the mental health caseload (Levels 1 – 4), whether these inmates are housed in the step-down unit, or in general population. See Consent Judgment IV. B. 2.



Appendix A: Summary of Compliance Findings by Compliance Section Reports 1 - 12

| | Report # 1 2/13/14 | Report # 2 8/26/14 | Report # 3 2/25/15 | Report # 4 9/9/15 | Report # 5 3/17/16 | Report # 6 10/25/16 | Report # 7 5/1/17 | Report # 8 1/12/18 | Report # 9 8/25/18 | Report # 10 3/18/19 | Report # 11 9/19/19 | Report # 12 5/21/20 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **IV.A. 1. Use of Force Policies and Procedures/Margo Frasier** | | | | | | | | | | | | |
| IV. A. 1.a. | ND | NC | NC | PC | NC | PC | PC | PC | PC | SC | SC | SC |
| IV. A. 1.b. | ND | NC | NC | PC | NC | PC | PC | PC | SC | SC | SC | SC |
| IV. A. 1.c. | ND | NC | NC | PC | NC | NC | PC | PC | SC | SC | SC | PC |
| **IV.A.2. Use of Force Training/Margo Frasier and Shane Poole** | | | | | | | | | | | | |
| IV. A. 2. a. | ND | NC | NC | NC | NC | PC | PC | PC | PC | SC | SC | SC |
| IV. A. 2. b. | ND | NC | NC | NC | NC | PC | PC | PC | PC | PC | SC | SC |
| IV. A. 2. c. | ND | NC | NC | NC | NC | NC | NC | NC | PC | PC | SC | SC |
| **IV.A.3. Use of Force Reporting/Margo Frasier** | | | | | | | | | | | | |
| IV. A.3 a. | ND | NC | NC | PC | NC | PC | PC | PC | PC | PC | SC | PC |
| IV. A.3 b. | ND | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC |
| IV. A.3 c. | ND | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC |
| IV. A.3 d. | ND | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC |
| IV. A.3 e. | ND | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC | PC |
| IV. A.3 f. | ND | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC |
| IV. A.3 g. | ND | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC | SC |
| IV. A.3 h. | ND | NC | NC | NC | NC | NC | NC | NC | PC | SC | SC | PC |
| **IV.A.4. Early Intervention System ("EIS") /Margo Frasier and Shane Poole** | | | | | | | | | | | | |
| IV.A.4.a. | ND | NC | NC | PC | PC | PC | NC | PC | PC | SC | SC | SC |
| IV.A.4.b. | ND | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC |
| IV.A.4.c. | ND | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC | SC |
| IV.A.4.d. | ND | NC | NC | NC | NC | PC | PC | NC | NC | PC | SC | SC |
| IV.A.4.e. | ND | ND | ND | ND | NC | NC | NC | NC | NC | SC | SC | SC |
| **IV.A.5. Safety and Supervision/Margo Frasier** | | | | | | | | | | | | |
| IV.A.5.a. | ND | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC |
| IV.A.5.b. | ND | NC | NC | NC | NC | NC | NC | NC | PC | SC | SC | SC |
| IV.A.5.c. | ND | NC | NC | NC | NC | NC | PC | PC | PC | SC | SC | SC |
| IV.A.5.d. | NC | NC | PC | PC | NC | NC | NC | NC | PC | PC | PC | PC |
| IV.A.5.e. | ND | NC | NC | PC | PC | NC | NC | NC | NC | PC | PC | PC |
| IV.A.5.f. | ND | NC | NC | PC | PC | SC | SC | PC | PC | PC | PC | PC |
| IV.A.5.g. | ND | NC | ND | NC | NC | NC | NC | NC | NC | PC | SC | SC |
| IV.A.5.h. | ND | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | SC |
| IV.A.5.i. | ND | NC | NC | PC | PC | PC | PC | SC | PC | PC | PC | PC |
| IV.A.5.j. | ND | NC | PC | PC | NC | NC | NC | NC | PC | PC | PC | PC |
| IV.A.5.k. | ND | NC | PC | PC | NC | PC | PC | PC | PC | PC | SC | SC |
| IV.A.5.l. | ND | NC | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC |
| **IV.A.6. Security Staffing/Margo Frasier** | | | | | | | | | | | | |
| IV.A.6.a. | ND | PC | PC | SC | SC | PC | PC | PC | SC | SC | SC | SC |
| IV.A.6.b. | ND | NC | PC | PC | NC | PC | PC | PC | SC | SC | SC | SC |
| **IV.A.7 Incidents and Referrals/Margo Frasier** | | | | | | | | | | | | |
| IV.A.7.a. | ND | NC | NC | NC | NC | PC | PC | PC | PC | SC | SC | SC |
| IV.A.7.b. | ND | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | SC |
| IV.A.7.c. | ND | NC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC |
| IV.A.7.d. | ND | NC | NC | NC | NC | NC | NC | PC | PC | PC | SC | SC |
| IV.A.7.e. | ND | NC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC |



Appendix A: Summary of Compliance Findings by Compliance Section Reports 1 - 12

| | Report # 1 2/13/14 | Report # 2 8/26/14 | Report # 3 2/25/15 | Report # 4 9/9/15 | Report # 5 3/17/16 | Report # 6 10/25/16 | Report # 7 5/1/17 | Report # 8 1/12/18 | Report # 9 8/25/18 | Report # 10 3/18/19 | Report # 11 9/19/19 | Report # 12 5/21/20 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IV.A.7.f. | ND | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | SC |
| IV.A.7.g. | ND | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC |
| IV.A.7.h. | ND | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC |
| IV.A.7.i. | ND | NC | NC | PC | NC | NC | NC | NC | NC | PC | SC | SC |
| IV.A.7.j. | ND | NC | NC | NC | NC | NC | NC | NC | NC | SC | SC | SC |
| IV.A.8. Investigations/Margo Frasier | | | | | | | | | | | | |
| IV.A.8.a. | ND | NC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.8.b. | ND | NC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC |
| IV.A.8.c. | ND | NC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC |
| IV.A.8.d. | ND | NC | NC | PC | PC | PC | SC | SC | SC | SC | SC | SC |
| IV.A.8.e. | ND | NC | NC | PC | PC | PC | PC | SC | SC | SC | SC | SC |
| IV.A.8.f. | ND | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC | SC |
| IV.A.9. Pretrial Placement in Alternative Settings/Margo Frasier | | | | | | | | | | | | |
| IV.A.9.a. | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.9.b. | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.10. Custodial Placement within OPP/Patricia Hardyman | | | | | | | | | | | | |
| IV.A.10.a. | NC | PC | SC | SC | SC | SC | PC | PC | PC | PC | SC | SC |
| IV.A.10.b. | NC | NC | NC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.10.c. | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC |
| IV.A.10.d. | NC | NC | PC | PC | PC | PC | PC | NC | PC | SC | PC | SC |
| IV.A.10.e. | NC | NC | PC | SC | PC | PC | SC | PC | PC | PC | PC | SC |
| IV.A.10.f. | NC | NC | NC | NC | NC | PC | PC | PC | NC | SC | PC | PC |
| IV.A.10.g. | NC | NC | NC | NC | NC | PC | PC | PC | PC | SC | SC | SC |
| IV.A.10.h. | ND | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC |
| IV.A.11. Prisoner Grievance Process/Margo Frasier and Shane Poole | | | | | | | | | | | | |
| IV.A.11.a | PC | PC | PC | PC | PC | PC | PC | PC | PC | | | |
| IV.A.11.a.(1) | | | | | | | | | | | SC | SC |
| IV.A.11.a.(2) | | | | | | | | | | | PC | PC |
| IV.A.11.a.(3) | | | | | | | | | | | SC | SC |
| IV.A.11.a.(4) | | | | | | | | | | | SC | SC |
| IV.A.11.a.(5) | | | | | | | | | | | SC | SC |
| IV.A.11.a.(6) | | | | | | | | | | | PC | PC |
| IV.A.12. Sexual Abuse/Margo Frasier | | | | | | | | | | | | |
| IV.A.12. | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC |
| IV.A.13. Access to Information/Margo Frasier | | | | | | | | | | | | |
| IV.A.13. | PC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC |
| IV. B. Mental Health Care | | | | | | | | | | | | |
| IV.B.1. Screening and Assessment/Raymond Patterson | | | | | | | | | | | | |
| IV.B.1.a. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC |
| IV.B.1.b. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC |
| IV.B.1.c. | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC |
| IV.B.1.d. | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC |
| IV.B.1.e. | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC |
| IV.B.1.f. | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC |
| IV.B.1.g. | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC |



Orleans Parish JAIL MONITORS

Appendix A: Summary of Compliance Findings by Compliance Section Reports 1 - 12

| | Report # 1 2/13/14 | Report # 2 8/26/14 | Report # 3 2/25/15 | Report # 4 9/9/15 | Report # 5 3/17/16 | Report # 6 10/25/16 | Report # 7 5/1/17 | Report # 8 1/12/18 | Report # 9 8/25/18 | Report # 10 3/18/19 | Report # 11 9/19/19 | Report # 12 5/21/20 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IV.B.1.h. | NC | NC | NC | NC | NC | NC | NC | NC | PC | SC | SC | SC |
| IV.B.1.i. | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC |
| IV.B.1.j. | NC | NC | NC | PC | NC | NC | NC | NC | NC | PC | PC | PC |
| IV.B.1.k. | NC | NC | NC | PC | NC | NC | NC | NC | NC | NC | PC | PC |
| IV.B.1.l. | NC | NC | NC | NC | NC | NC | NC | NC | NC | SC | SC | SC |
| **B. 2. Treatment/Raymond Patterson** | | | | | | | | | | | | |
| IV.B.2.a. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.2.b. | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC |
| IV.B.2.c. | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC |
| IV.B.2.d. | NC | NC | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC |
| IV.B.2.e. | NC | NC | NC | PC | PC | PC | PC | PC | NC | PC | SC | SC |
| IV.B.2.f. | NC | NC | NC | PC | PC | PC | NC | PC | PC | PC | SC | SC |
| IV.B.2.g. | NC | NC | NC | NC | NC | NC | PC | NC | PC | SC | SC | SC |
| IV.B.2.h. | NC | NC | NC | PC | PC | PC | PC | PC | NC | PC | SC | SC |
| **IV.B.3. Counseling/Raymond Patterson** | | | | | | | | | | | | |
| IV.B.3.a. | NC | NC | NC | | PC | NC | NC | PC | PC | PC | PC | PC |
| IV.B.3.b. | NC | NC | NC | NC | PC | NC | NC | PC | PC | PC | PC | PC |
| **IV.B.4. Suicide Prevention Training Program/Raymond Patterson** | | | | | | | | | | | | |
| IV.B.4.a. | NC | NC | NC | PC | PC | PC | PC | PC | NC | PC | PC | PC |
| IV.B.4.b. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC |
| IV.B.4.c. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | SC |
| IV.B.4.d. | NC | NC | NC | PC | NC | NC | PC | NC | NC | PC | PC | PC |
| IV.B.4.e. | NC | NC | NC | PC | NA | NC | NC | PC | PC | PC | PC | SC |
| IV.B.4.f. | NC | NC | NC | NC | PC | PC | NC | NC | SC | SC | SC | SC |
| IV.B.4.g. | NC | NC | SC | PC | NC | NC | NC | NC | NC | PC | NC | PC |
| **IV.B.5. Suicide Precautions/Raymond Patterson** | | | | | | | | | | | | |
| IV.B.5.a. | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC |
| IV.B.5.b. | NC | NC | NC | NC | NC | NC | NC | PC | PC | SC | PC | PC |
| IV.B.5.c. | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC |
| IV.B.5.d. | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | SC | SC |
| IV.B.5.e. | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC |
| IV.B.5.f. | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | SC | SC |
| IV.B.5.g. | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC |
| IV.B.5.h. | NC | NC | NC | NC | NC | NC | NC | PC | NC | PC | PC | PC |
| IV.B.5.i. | NC | NC | NC | NC | NC | NC | NC | NC | PC | SC | SC | SC |
| IV.B.5.j. | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | SC |
| IV.B.5.k. | NC | NC | NC | NC | NC | NC | NC | PC | NC | PC | PC | PC |
| **IV.B.6. Use of Restraints/Raymond Patterson** | | | | | | | | | | | | |
| IV.B.6.a. | PC | NC | PC | PC | PC | PC | PC | PC | NC | PC | PC | PC |
| IV.B.6.b. | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC |
| IV.B.6.c. | ND | NC | PC | PC | PC | PC | PC | PC | NC | PC | NC | SC |
| IV.B.6.d. | ND | NC | PC | PC | PC | PC | PC | PC | NC | PC | SC | SC |
| IV.B.6.e. | NC | NC | PC | PC | PC | PC | PC | PC | NC | PC | NC | SC |
| IV.B.6.f. | NC | NC | PC | PC | PC | PC | PC | PC | NC | PC | SC | SC |
| IV.B.6.g. | NC | NC | PC | PC | PC | PC | PC | PC | NC | PC | NC | SC |



Appendix A: Summary of Compliance Findings by Compliance Section Reports 1 - 12

| | Report # 1 2/13/14 | Report # 2 8/26/14 | Report # 3 2/25/15 | Report # 4 9/9/15 | Report # 5 3/17/16 | Report # 6 10/25/16 | Report # 7 5/1/17 | Report # 8 1/12/18 | Report # 9 8/25/18 | Report # 10 3/18/19 | Report # 11 9/19/19 | Report # 12 5/21/20 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **IV.B.7. Detoxification and Training/Robert Greifinger** | | | | | | | | | | | | |
| IV.B.7.a. | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | SC |
| IV.B.7.b. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC |
| IV.B.7.c. | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.7.d. | NC | NC | PC | PC | PC | PC | PC | PC | PC | NC | PC | PC |
| **IV.B.8. Medical and Mental Health Staffing/Robert Greifinger** | | | | | | | | | | | | |
| IV.B.8.a. | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.8.b. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC |
| **IV.B.9. Risk Management/Robert Greifinger** | | | | | | | | | | | | |
| IV.B.9.a. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.9.b. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.9.c. | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.9.d. | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC |
| IV.B.9.e. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.9.f. | NC | NC | NC | NC | PC | PC | PC | PC | NC | NC | PC | PC |
| **IV.C. Medical Care  -- See SA 2/11/15 13.** | | | | | | | | | | | | |
| **IV. C. Quality Management of Medication Administration** | | | | | | | | | | | | |
| IV.C.1.a. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC |
| IV.C.1.b. | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.C.1.c. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC |
| IV.C.1.d. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC |
| **IV.C.2. Health Care Delivered/Robert Greifinger** | | | | | | | | | | | | |
| IV.C.2.a. | NC | NC | NC | PC | PC | PC | PC | PC | PC | NC | PC | PC |
| IV.C.2.b. | NC | NC | NC | PC | PC | PC | PC | PC | PC | NC | PC | PC |
| **IV.C.3. Release and Transfer/Robert Greifinger** | | | | | | | | | | | | |
| IV.C.3.a. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.C.3.b. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.C.3.c. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.C.3.d. | NC | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC |
| **IV.D. Sanitation and Environmental Conditions/Shane Poole** | | | | | | | | | | | | |
| IV.D. 1.a. | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC |
| IV.D. 1.b. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC |
| IV.D. 1.c. | NC | NC | PC | PC | NC | NC | PC | SC | PC | SC | SC | SC |
| IV.D. 1.d. | NC | NC | NC | NC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.D. 1.e. | NC | PC | PC | PC | PC | SC | PC | SC | PC | SC | SC | SC |
| IV.D. 1.f. | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC |
| IV.D. 1.g. | NC | NC | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC |
| IV.D. 1.h. | NC | NC | NC | PC | NC | PC | NC | NC | NC | PC | PC | PC |
| **IV.D. 2. Environmental Control/Shane Poole** | | | | | | | | | | | | |
| IV.D. 2.a. | NC | NC | PC | PC | PC | SC | SC | SC | PC | SC | SC | SC |
| IV.D. 2.b. | NC | NC | NC | NC | PC | SC | PC | SC | SC | SC | SC | SC |
| **IV. D. 3. Food Service/Diane Skipworth** | | | | | | | | | | | | |
| IV.D. 3.a. | NC | NC | NC | PC | PC | PC | NC | PC | PC | PC | SC | SC |
| IV.D. 3.b. | NC | NC | NC | PC | PC | PC | NC | NC | NC | NC | PC | SC |
| IV.D. 3.c. | NC | NC | NC | PC | NC | NC | PC | PC | PC | PC | PC | SC |



Appendix A: Summary of Compliance Findings by Compliance Section Reports 1 - 12

| | Report # 1 2/13/14 | Report # 2 8/26/14 | Report # 3 2/25/15 | Report # 4 9/9/15 | Report # 5 3/17/16 | Report # 6 10/25/16 | Report # 7 5/1/17 | Report # 8 1/12/18 | Report # 9 8/25/18 | Report # 10 3/18/19 | Report # 11 9/19/19 | Report # 12 5/21/20 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IV. D. 4. Sanitation and Environmental Conditions Reporting/Shane Poole | | | | | | | | | | | | |
| IV. D. 4.a. 1-7 | NC | NC | PC | PC | PC | PC | PC | PC | NC | SC | SC | SC |
| IV. D. 4.b. | NC | NC | NC | PC | NC | NC | PC | PC | SC | SC | SC | SC |
| IV.E. Fire and Life Safety/Shane Poole | | | | | | | | | | | | |
| IV. E. 1. Fire and Life Safety | | | | | | | | | | | | |
| IV. E. 1.a. | NC | PC | PC | PC | PC | PC | PC | SC | PC | PC | PC | SC |
| IV. E. 1.b. | NC | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC |
| IV. E. 1.c. | PC | PC | PC | PC | NC | PC | PC | SC | PC | SC | SC | SC |
| IV. E. 1.d. | NC | NC | NC | NC | NC | NC | PC | SC | PC | SC | SC | SC |
| IV. E. 1.e. | ND | NC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC |
| IV. E. 2. Fire and Life Safety Reporting | | | | | | | | | | | | |
| IV. E. 2.a.1-3 | ND | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC |
| IV. E. 2.b. | ND | NC | NC | PC | NC | NC | NC | PC | PC | SC | SC | SC |
| IV.F. Language Assistance | | | | | | | | | | | | |
| IV.F.1. Timely and Meaningful Access to Services/Margo Frasier | | | | | | | | | | | | |
| IV.F.1.a. | ND | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | SC |
| IV.F.2. Language Assistance Policies and Procedures/Margo Frasier | | | | | | | | | | | | |
| IV.F.2.a. | ND | PC | PC | PC | Not App | Not App | Not App | Not App | Not App | Not App | SC | SC |
| IV.F.2.b. | ND | PC | PC | PC | Not App | Not App | Not App | Not App | Not App | Not App | SC | SC |
| IV.F.3. Language Assistance Training/Margo Frasier | | | | | | | | | | | | |
| IV.F.3.a. | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.F.4. Bilingual Staff/Margo Frasier | | | | | | | | | | | | |
| IV.F.4. | NC | PC | PC | PC | NC | NC | NC | NC | PC | SC | SC | SC |
| IV.G. Youthful Prisoners/Margo Frasier | | | | | | | | | | | | |
| IV.G. | NC | NC | NC | PC | PC | PC | NC | NC | PC | PC | PC | SC |
| VI. The New Jail Facility/Margo Frasier | | | | | | | | | | | | |
| VI. A. | ND | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| VI. B. | NC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| VI. C. | ND | PC | SC | SC | PC | PC | PC | PC | SC | SC | SC | SC |
| VI. D. | Monitors Not Qualified to Evaluate | | | | | | | | | | | |
| VII. Compliance and Quality Improvement/Margo Frasier | | | | | | | | | | | | |
| VII. A. | ND | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC |
| VI. B. (H.) | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC |
| VI. C. (I.) | NC | NC | SC | SC | NC | SC | SC | NC | SC | SC | SC | SC |
| VI. D. (J.) | ND | NC | NC | PC | PC | PC | PC | NC | NC | NC | SC | SC |
| VIII. Reporting Requirements and Right of Access/Margo Frasier | | | | | | | | | | | | |
| VIII.A. | ND | PC | PC | PC | PC | PC | PC | NC | NC | PC | SC | SC |
| VIII.B. | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC |
| VIII.C. | PC | PC | PC | SC | SC | SC | NC | NC | PC | PC | SC | SC |
| Not Rated # | 62 | 1 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Non-Compliance # | 98 | 147 | 106 | 51 | 62 | 52 | 53 | 43 | 44 | 8 | 5 | 0 |
| Partial Compliance # | 9 | 21 | 57 | 106 | 94 | 97 | 98 | 103 | 98 | 96 | 66 | 56 |



Appendix A: Summary of Compliance Findings by Compliance Section Reports 1 - 12

| | Report # 1 2/13/14 | Report # 2 8/26/14 | Report # 3 2/25/15 | Report # 4 9/9/15 | Report # 5 3/17/16 | Report # 6 10/25/16 | Report # 7 5/1/17 | Report # 8 1/12/18 | Report # 9 8/25/18 | Report # 10 3/18/19 | Report #11 9/19/19 | Report #12 5/21/20 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Substantial Compliance # | 0 | 0 | 4 | 11 | 10 | 18 | 16 | 21 | 25 | 63 | 103 | 118 |
| Legend: ND - Not scheduled for review NC - Non-compliance PC - Partial Compliance SC - Substantial Compliance NA - Not Applicable | | | | | | | | | | | | |

