UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

_____ )
LASHAWN JONES, ET AL, )
Plaintiffs; and )
UNITED STATES OF AMERICA )
Plaintiffs in Intervention )
)
v. )          Civil Action No. 2:12-cv-00859
)          Section I, Division 5
MARLIN N. GUSMAN, ET AL, )          Judge Lance M. Africk
Defendants )          Magistrate Judge Michael B. North
_____ )
)
MARLIN N. GUSMAN, )
Third-Party Plaintiff )
)
v. )
)
THE CITY OF NEW ORLEANS, )
Third-Party Defendant )
_____)

**THE UNITED STATES' AND PLAINTIFF CLASS' RESPONSE TO CITY'S MOTION
FOR RELIEF FROM COURT ORDERS OF JANUARY 25, 2019 AND MARCH 18, 2019
REGARDING PHASE III JAIL FACILITY**

NOW INTO COURT, through undersigned counsel, comes the Plaintiff Class and the

United States Department of Justice (hereinafter "Plaintiffs") who file this response to the City's

Motion for Relief. ECF No. 1281.

## I.      INTRODUCTION

The Consent Judgment requires the Orleans Parish Sheriff's Office ("OPSO") to provide

prisoners with constitutional medical and mental health care. The Orleans Justice Center ("OJC"),

which opened in 2015, has physical and structural deficiencies that impede OPSO's ability to

provide such care. Those deficiencies include the inability to safely house prisoners with acute

1

and sub-acute mental illness, tier mezzanine levels which allow prisoners with mental illness to engage in self-harm, a lack of an adequate number of suicide-resistant cells, and a lack of programming space for individual and group therapy. The Court, the parties, and the monitors have recognized the significance of those deficiencies. To address them, the City agreed to be bound by a plan developed in 2017 to build a new facility for prisoners with serious mental health needs, and the Court has entered orders to implement that plan.

The City now seeks relief from those orders, pursuant to Fed.R.Civ.P. 60(b), claiming that circumstances have changed since entry of those orders. Specifically, the City argues that: (1) medical and mental health care at the jail is already constitutionally adequate; (2) the City expects budget shortfalls due to the COVID-19 epidemic; and (3) the prisoner population has been reduced and will be reduced further. However, medical and mental health care at the jail is not constitutionally adequate and does not comply with the Consent Judgment due in part to long-standing structural deficiencies with OPSO's current facilities. Further, population reduction alone cannot solve these structural problems. And finally, lack of funding is not a defense to unconstitutional conditions. For these reasons, the City's motion should be denied.

## II.    ARGUMENT

### A.    Background

The Plaintiff Class filed this action against Orleans Parish Sheriff Marlin Gusman in April 2012, challenging the unconstitutional conditions of confinement that each person in the jail suffered. ECF No. 1. In September 2012, the Court granted the United States' Motion to Intervene. ECF No. 69. Sheriff Gusman brought the City into the action as a Third-Party Defendant, alleging that the City had failed to honor its obligations to provide adequate funding for a constitutional jail. ECF No. 76. The Sheriff and the Plaintiffs filed a Consent Judgment as a

2

proposed settlement to the action in December 2012. ECF No. 101-3. The City objected to entry of the Consent Judgment, primarily based on potential costs. ECF No. 151. After a four-day fairness hearing, the Court entered the Consent Judgment in June 2013. ECF No. 465.

In May 2013, after the fairness hearing but prior to final entry of the Consent Judgment, Plaintiffs filed a motion raising concerns about the proposed designs for construction of OJC. ECF No. 439. Specifically, the design plans did not comply with the City Council's January 2011 ordinance requiring the building to be equipped to house any type of prisoner, including people in need of mental health and/or substance abuse treatment, as well as to provide adequate and appropriate space for a variety of programming. ECF No. 439. Plaintiffs noted that because OJC would include only 60-bed units, it would not be possible to house people with mental illness safely in accordance with accepted classification principles; that there was no space to provide mental health or medical services; and that there was not adequate space for suicide watch. ECF No. 439 at 4-6. The Plaintiffs' asked "what happens to the special populations when the new jail becomes operational and the Sheriff is forced by ordinance to close all other buildings? How is this facility going to come into compliance with the proposed Consent Judgment if it does not even have a facility in which it can house its current populations?" ECF No. 439 at 9.

In light of these concerns, the Court ordered briefing and hearings to assess various plans relative to the Consent Judgment's medical and mental health requirements. ECF No. 597; ECF No. 641. In June 2014, the Court directed the Sheriff and the City to appoint members to a Mental Health Working Group to propose solutions to compliance-related issues with the Consent Judgment's mental health provisions and to assess submissions by OPSO and the City regarding the provision of long-term mental health services for OPSO prisoners. ECF No. 668; ECF No. 750 at 1. The Mental Health Working Group included representatives appointed by OPSO and

the City with expertise in corrections, mental health, and the associated legal issues, as well as the Medical Monitor, Dr. Robert Greifinger, and Dr. John Thompson, Chairman of the Tulane Department of Psychiatry. Mental Health Monitor Dr. Raymond Patterson chaired the Working Group. ECF No. 712.

In August 2014, the Court issued an order and findings related to planning and funding obligations of what had become known as the "short-term solution" for housing of men and women with acute and sub-acute mental health care needs. ECF No. 738 at 30. Under the plan, men with acute mental illness would be held at and receive treatment at a unit of Elayn Hunt Correctional Center ("Hunt"), pursuant to a contract with the Louisiana Department of Public Safety and Corrections. Women with acute and sub-acute mental health needs would receive treatment at the Temporary Detention Center ("TDC"), after modifications to that unit's physical space. ECF No. 738.

In September 2014, after review and consideration of proposals for how to provide housing and mental health care in the long term, the Mental Health Working Group unanimously recommended the adoption of the Sheriff's plan which included construction of a Phase III facility with a base bed capacity of 380 total beds and space for medical and mental health care services. ECF No. 750 at 4; ECF No.723-1. Voting in favor of the Phase III proposal, the City's representative to the Mental Health Working Group noted that it was "clinically and humanely inappropriate not to act." ECF No. 750 at 4.

Despite the Working Group's recommendation, there was functionally no movement towards implementing a long-term solution over the next year and a half. The Court continued to encourage the City and the Sheriff to reach resolution. *See, e.g.,* ECF No. 941 (ordering the City

and the Sheriff to arrive at agreement as to how to house acutely mentally ill prisoners on or prior

to December 11, 2015).

In September 2015, the new OJC facility was completed and occupied, yet serious

deficiencies continued to cause harm to prisoners with mental illness and those who were suicidal.

The Fifth Monitors' Report documented the impact of the opening of OJC on people with mental

illness:

> This significant change in the housing of inmates, that is – opening
> the new jail, transfer of inmates out-of-parish and closing the TDC
> – resonates in primarily negative ways, and may continue to do so
> into the foreseeable future. While the opening of the OJC should
> have been a positive impetus to reform, this milestone was
> overshadowed and diminished for the following reasons: . . .
> absences of appropriate in-custody treatment for inmates with acute
> mental illness, the lack of services and programs for acute and sub-
> acute care, and absence of step-down/residential mental health
> housing.

ECF No. 996 at 6.

In 2016, men and women with mental health care needs were moved from TDC to the

massive 60-bed OJC units consisting of cells that are identical to every other unit in OJC.[1] ECF

No. 966 at 79, 81, and 86. The Fifth Monitors' Report specifically noted the "designation of Unit

2A as a 'mental health' unit is absolutely unacceptable as the unit does not have the space,

configuration or milieu that is necessary and required for an acute/sub-acute or step-

down/residential mental health unit." ECF No. 996 at 82. Further, "the current realignment in the

OJC does not allow for any psychotherapeutic out-of-cell activities for men or women other than

the day room and four off-unit multipurpose rooms. These spaces are inadequate for provision of

necessary mental health services . . . ." ECF No. 996 at 79. Today, an inadequate "mental health"

---

[1] Hunt remained in use as an acute mental health unit for men.

unit remains in 2A, with the same physical space limitations to necessary mental health services described in the Monitors' reports.

In April 2016, Plaintiffs moved for an order to show cause why the Sheriff should not be held in contempt and to place the jail into receivership. ECF No. 1009. Plaintiffs detailed OPSO's litany of failures to provide safe housing and treatment to individuals with serious mental illness or who were suicidal. ECF No. 1009-1 at 16-18. Plaintiffs highlighted the contribution of the long-standing structural problems with the jail's physical space to these failures. Specifically, Plaintiffs cited to the Monitors' reports regarding the lack of adequate mental health step-down or residential mental health units, the lack of spaces for mental health services, and the lack of suicide-resistant cells. ECF No. 1009-1 at 20.

The City did not dispute any part of the Plaintiffs' motion, including the significant structural problems impeding the constitutional provision of mental health care at the jail. In fact, the City filed a memorandum *in support of* Plaintiffs' motion. ECF No. 1018. Plaintiffs' receivership motion was ultimately resolved by settlement between the Sheriff, the Plaintiffs, and the City, which was approved and entered by the Court as the Stipulated Order for Appointment of Independent Compliance Director ("Stipulated Order") in June 2016. ECF No. 1082.

Precisely because the structural deficiencies of OJC to the provision of mental health care and safe housing remained unresolved, the Stipulated Order provided that within 60 days of appointment, the City, the Sheriff, and the Compliance Director would develop and finalize a plan for the appropriate housing of prisoners with mental health issues and medical needs.[2] ECF No. 1082 at 14, ¶ 22.

---

[2] The Stipulated Order also requires the City, the Sheriff, and the Compliance Director to address the needs of youthful offenders. ECF No. 1082 at 14. Director Maynard ultimately recommended a 28-bed expansion to the Youth Study Center ("YSC") such that OJC would only be used as a last resort for housing pre-trial youth. ECF No. 1106 at 11. However, to the extent that any youth detainees are in OPSO custody, the recommendation requires use of an

After holding public meetings and reviewing plans proposed by the Sheriff and the City, Compliance Director Gary Maynard filed a Supplemental Compliance Action Plan on January 4, 2017, outlining the long-term plan for appropriate housing of prisoners with mental health and medical needs. ECF No. 1106. In developing the plan, Director Maynard considered the recommendations of the Mental Health Working Group in 2014, the Special Populations Working Group in 2015,[3] and the City-funded 2016 JFA Institute review of jail population trends which predicted a reduction in the jail population below 1400 by 2019.[4] Director Maynard also received input from community groups, OPSO employees, the jail's medical and mental health care provider, architects, the City and City Council members, FEMA, and the citizens of New Orleans. ECF No. 1106 at 3-5, 7. Ultimately Director Maynard recommended the building of a Phase III facility, with bed capacity significantly reduced from the Sheriff's proposed 380 beds to 89 beds for men and women with acute and sub-acute mental health care needs. ECF No. 1106 at 9. Critically, Director Maynard concluded that "[s]pace for individual and group mental health counseling will also be part of the design of the Phase III facility for both male and female inmates." ECF No. 1106 at 9.

Director Maynard also recommended that the construction of Phase III address the medical services needs of the jail to provide an infirmary and clinic, including negative pressure

---

entire housing unit so the youth detainees are properly separated from adult prisoners. Although the YSC's 28-bed annex has been completed, OPSO continues to hold several youth on a single unit in OJC. Last year, the City contributed to this population by advocating for the transfer of several youth from the YSC to OJC. *See* https://www.wdsu.com/article/da-cannizzaro-security-incident-at-youth-study-center-described-as-riot/28719759 (reporting a conversation between Criminal Justice Commissioner Tenisha Stevens and the District Attorney's Office regarding seeking court orders to move two youth from YSC to OJC). The City's motion makes no reference to youth detainees. Plaintiffs raise this now only as a reminder that these additional problems in housing special populations persist, given OJC's unit structure.

[3] The Special Populations Working Group was formed in 2015, and in November 2015 issued recommendations to retrofit the fourth floor of OJC. This recommendation was formed prior to the occupancy of the new jail facility (OJC) and was issued as the new building was being occupied. Any implications for renovations once OJC was no longer a construction site, but rather now an inhabited jail facility, do not appear to have been considered.

[4] The JFA Institute is a non-profit organization that works in partnership with local government agencies to evaluate criminal justice practices.

rooms and space to care for 10-16 patients with infirmary level care. ECF No. 1106 at 9. And finally, Director Maynard recommended administrative space be provided directly adjacent to the proposed mental health housing units for use by the jail medical and mental health care providers.

Over the next two years, the City and the Sheriff failed to implement Director Maynard's recommendation for the Phase III facility or any alternative plan for housing and care of the prisoners who would be served at the new building. In January 2019, the Louisiana Department of Public Safety and Corrections advised that the Hunt unit would no longer be available as the "short-term" housing solution for Orleans Parish male prisoners with acute mental health needs, starting in October 2019. ECF No. 1213-1 at 4-5; ECF No. 1221 at 2.

In light of the impending loss of the Hunt unit, the Court scheduled a status conference on January 25, 2019, to discuss "pressing matters related to the medical and acute and subacute mental health needs" of prisoners in OPSO custody. ECF No. 1221 at 1. The Court noted that the situation facing these prisoners was "dire," and further remarked that "[d]espite repeated assurances from the City, little progress has been made" on plans for housing and treating male and female prisoners with significant mental health issues. *Id*. at 2. "During the conference, the Court . . . emphasized the importance of a permanent solution designed to provide constitutionally mandated mental health treatment for all OJC prisoners." *Id*. The Court ordered the City, in collaboration with the current Independent Jail Compliance Director, Darnley R. Hodge, Sr., to develop a short-term solution for mental health housing, and further ordered the City to "direct the architect chosen to design the permanent facility described in the Supplemental Compliance Action Plan . . . to begin the programming phase of the Phase III facility as soon as possible . . . ." *Id*. at 3. This is the first order of the Court from which the City seeks relief.

In response to the Court's order, the City recognized "the need and urgency to meet the requirements of the Consent Decree regarding the Orleans Parish Sheriff's Office" and proposed the renovation of two TDC buildings "for use as a *temporary* acute medical services facility." ECF No. 1222 (emphasis added). The City advised that it was "actively working" with the Compliance Director, the Sheriff, and the monitors, as well as with the medical services provider and the City's selected architecture firm, "to program, design, and construct a Phase III project that meets the requirements of the Consent Decree." *Id.* at 4. As the Court has since noted, the City "made the decision to construct Phase III as a response to unconstitutional violations at the jail." ECF No. 1285 at 2.

On March 18, 2019, the Court ordered commencement of the proposed TDC renovations and continuance of the programming phase of Phase III. ECF No. 1227. The Order also required the parties to work collaboratively on the Phase III design to create "a facility that provides for the constitutional treatment of the special populations discussed herein without undue delay, expense or waste." ECF No. 1227 at 2-3. This is the second order of the Court from which the City seeks relief.

Over the next year, planning for Phase III slowly progressed until June 2020, when the City unilaterally suspended work on Phase III without notice to the Court or the parties, in contravention of the Court's prior orders. ECF No. 1285 at 1. After prompting from the Court, the City filed its Motion asking the Court to "indefinitely suspend[] the programming, design, and construction of a new Phase III facility," without offering any resolution to the continued lack of adequate housing and space to provide mental health services in OPSO facilities. ECF No. 1281-1 at 1.

**B.**     **The City Has Not Established a Basis for Modification of the Court's Orders Requiring Constitutional Housing and Mental Health Care in Compliance with the Consent Judgment.**

Despite agreeing to follow the Compliance Director's plan for the "appropriate housing for prisoners with mental health issues and medical needs," ECF No. 1082 at 14,[5] the City now seeks relief from the Court's 2019 orders related to implementation of that plan. The City's argument for relief from the Court's orders falls along three lines: (1) medical and mental health care at the jail is already constitutionally adequate; (2) the City expects budget shortfalls due to the COVID-19 epidemic; and (3) the prisoner population has been reduced and will be reduced further. However, medical and mental health care at the jail is not constitutionally adequate and does not comply with the Consent Judgment, in part due to long-standing structural deficiencies with OPSO's current facilities. Further, population reduction alone cannot solve these structural problems. And finally, lack of funding is not a defense to unconstitutional conditions. Although the City has not put forth an actual solution for how to provide constitutional medical and mental health care and services for individuals in its jail, it seeks relief from the Court's orders regarding the only current plan to resolve these deficiencies.

The City asks for relief from two specific Court Orders from January 25, 2019 and March 18, 2019 "regarding the programming, design, and construction of Phase III of the OJC," ECF No. 1281-1 at 3, pursuant to Rule 60(b) of the Federal Rules of Civil Procedure. Rule 60(b) permits relief from a court order due to (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence that, with reasonable, diligence, could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party; (4) the judgment is void; (5)

---

[5] Transcript of June 8, 2017 Status Conference, ECF No. 1127 at 17-18 (statements by City Attorney Rebecca Dietz).

the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or (6) any other reasons that justifies relief. F.R.C.P. 60(b).

The City has not satisfied these requirements because, although the City's Motion goes into great detail on the impact of COVID-19, partial renovations to a temporary facility, and OPSO's budget over the years, the City has not demonstrated a change in the circumstances that "the Court's Orders regarding the programming, design, and construction of Phase III of the OJC" was intended to address – the structural deficiencies of OPSO's facilities that prevent compliance with the Consent Judgment and provision of adequate mental health care for OPSO prisoners. OJC remains dangerous for prisoners with mental illness. As those circumstances that prevent Consent Judgment compliance have not changed, and the City has not provided a plan to address them, the City's Motion must fail.

<b>1.    <u>There Has Been No Change to the Structural Deficiencies That the Parties Have Long Agreed Prevent Compliance with the Mental Health Provisions of the Consent Judgment.</u></b>

For the first time in the history of this litigation, the City contends that OPSO is providing constitutional medical and mental health care. However, the physical and structural barriers at OJC that have prevented compliance with the Consent Judgment have not been fixed. Because OPSO is not providing constitutional care, the City has not demonstrated a change in circumstance warranting relief from the Court's 2019 orders.[6]

---

[6] To be clear, OPSO and Wellpath have not achieved substantial compliance with other Consent Judgment provisions because of additional systemic problems. But in responding to the City's motion, Plaintiffs will confine analysis of unconstitutional medical and mental health care at the jail only to those areas that continue to be impacted by the failure to develop long-term structural solutions to mental health housing and treatment.

a.   <u>There is no space at OJC for adequate housing of men and women with acute and sub-acute mental health needs.</u>

The Monitors have repeatedly noted the serious risks posed by OJC's lack of appropriate housing for prisoners with mental illness.[7] Since TDC closed for female mental health housing in 2016,[8] women with serious mental illness have been held on general population units at OJC. Women have access to only two suicide-resistant cells, ECF No. 1188 at 88, and there is no designated step-down unit for women, nor appropriate space for mental health therapy.

In April 2020, K.W., a woman with serious mental illness, was held on OJC 3E, a tier designated for general population. She decompensated to such an extent that she was sent to University Medical Center ("UMC") for "psychosis".[9] Upon her return from the hospital, K.W. was placed on OJC 1C, a tier which again was not a designated mental health unit. After her return, K.W. was subjected to a use of force by deputies after she grabbed a deputy's jacket and began crying, begging "don't leave me" as deputies were attempting to lock her cell door.[10]

OJC 2A remains a designated sub-acute mental health unit for men in OJC. As outlined above, when OJC was first occupied, the Monitors' Report specifically noted that this unit was unacceptable for an acute/sub-acute unit. ECF No. 996 at 82. Compliance Director Hodge concedes in his opposition to the City's Motion that OJC was designed "for general population inmates and *did not* accommodate inmates with medical or mental health needs." ECF No. 1301 at 26 (emphasis in original). It was never intended that acute or sub-acute prisoners would be housed at OJC long-term.

---

[7] *See, e.g.*, Report No. 9 of the Independent Monitors, ECF No. 1188 at 13; Report No. 10 of the Independent Monitors, ECF No. 1226 at 10; Report No. 11 of the Independent Monitors, ECF No. 1259 at 8.
[8] TDC now holds only DOC-sentenced work release and "kitchen worker" male prisoners.
[9] Exhibit 1, April 2020 ER Route Log.
[10] Exhibit 2, 4/10/2020 K.W. incident report.

The City contemplates use of the renovated TDC to provide some beds for men and women with acute mental health needs beginning in July 2020. ECF No. 1281-1 at 12-13. TDC has not been occupied as of July 28, 2020. Further, TDC has only been granted a conditional use permit on the basis of its status as a temporary facility, *see, e.g.,* ECF No. 1301 at 29, and the City has not proffered TDC as a long-term solution. Further, a City representative recently made public statements suggesting that TDC would only be in use until 2022, without explanation for what would happen after 2022.[11] Compliance Director Hodge confirmed that TDC is not a long-term solution to house prisoners with mental health needs. ECF No. 1301 at 27. Plaintiffs have not been included in the specific programming, classification, somatic medicine, or staffing plans for how the renovated TDC space will be used, were not included in the physical re-design of the TDC units, and have not evaluated the renovation. The City has not demonstrated that the renovated TDC units will provide adequate mental health housing in the long-term, or even as a short-term solution.

   b.   OJC is not sufficiently equipped with suicide-resistant cells for persons with acute mental health needs.

The jail's medical provider, Wellpath, acknowledges that access to suicide-resistant cells within OJC remains a problem. In its self-assessment in advance of the May 2020 compliance tour, Wellpath rated itself in Partial Compliance with provision IV.B.5.g., which requires suicidal prisoners to be housed in suicide-resistant cells.[12] The Monitor's most recent report reflects that non-suicide-resistant cells are used to house an overflow of patients on suicide watch.[13]

---

[11] Sledge, Matt, "New Orleans asks court to indefinitely suspect jail expansion plan," June 29, 2020, accessed at https://www.nola.com/news/courts/article_edf57f5e-ba51-11ea-a865-37c98d8bc368.html (referring to statements by the City's infrastructure chief Ramsey Green that TDC would be adequate through 2022).
[12] Wellpath also acknowledged its partial compliance with multiple medical and mental health provisions of the Consent Judgment during the May 2020 jail tour in a meeting specifically addressing partial compliance ratings, which William Kissel, the City's Declarant and Wellpath Senior Vice President, did not participate in.
[13] Monitor's Report No. 12, ECF No. 1303 at 73.

Although suicidal patients who are not placed in suicide-resistant cells must be under direct observation, this is routinely not the case. For example, in January 2019, D.B., an adult male, was moved onto the disciplinary unit, OJC 3C, but he had also been identified as suicidal by a social worker.[14] All of the suicide-resistant cells on that unit were occupied, so D.B. was placed in a non-resistant cell on the mezzanine level of the tier.[15] There was no staff assigned to perform direct observation on D.B. and a suicide observation checklist was not completed from 11:48 a.m. until 7:04 p.m.[16]

Further, direct observation alone is recognized as a dangerous substitute for access to suicide-resistant cells. As noted in the Monitors' reports, Wellpath has struggled with ensuring staff provide appropriate direct observation. In Report No. 9, Dr. Patterson, the Mental Health Monitor, noted:

> There is insufficient and inconsistent observation of inmates who are at increased risk for suicide and/or self-harm, as well as inadequate supervision by deputies for extended time periods. Certified Nursing Assistants (CNAs) and/or Licensed Practical Nurses (LPNs) are assigned to observe inmates housed at OJC who require "direct observation" and "suicide watch." Inmates in these categories are housed in multiple units and some in cells which are not suicide resistant. Whatever the process for direct custody supervision and direct observation/suicide watch by clinical staff, the processes are failing as inmates continued to gain access to materials that can be used for self-harm or suicide.[17]

Direct observation of people who are suicidal in non-suicide-resistant cells remains a current problem at OJC. In July 2020, while G.B. was housed on a designated mental health unit,

---

[14] Exhibit 3, D.B. medical records.
[15] Exhibit 3.
[16] Exhibit 3.
[17] ECF No. 1188 at 88; *see also* Report No. 10 of the Independent Monitors, ECF No. 1226 at 73 (finding partial compliance for IV.B.4.d. and recommending further training for observation of people on suicide watch); Report No. 11 of the Independent Monitors, ECF No. 1259 at 65 (finding partial compliance for IV.B.4.d and noting that prisoners on suicide watch continue to obtain contraband that can be used to harm themselves).

OJC 2A, he had to be sent to the hospital upon being found tying a ligature around his neck after stating that he was suicidal. Although G.B. should have been on direct observation until he could be evaluated by a mental health provider, G.B. was able to "move[] out of site" of the deputy.[18] While G.B. was "out of site," the deputy did not open G.B.'s cell door until after a supervisor arrived on the tier. G.B. was found sitting on the floor with a ligature around his neck.[19] Later that evening, G.B. had to be moved to OJC 3C, the disciplinary unit, only because there were no available suicide-resistant cells on the designated mental health unit.[20]

Given the ongoing deficits in the performance of direct observation, sufficient suicide-resistant cells remain a critical component of the jail's suicide risk reduction program.[21]

        c.    <u>The physical structure of the OJC units, including an unprotected mezzanine level, continues to cause harm to people in OPSO custody</u>.

In the 2016 receivership motion, Plaintiffs chronicled multiple incident reports in which individuals with serious mental health needs ran up to a tier's mezzanine level to engage in self-harm. ECF No. 1009-1 at 19. This structural problem continues unabated today.[22] For example:

- In May 2020, while K.A. was on OJC 2A, a designated mental health step-down unit, he accessed the security railing on the mezzanine level. The deputy on the unit called a Code White[23] to summon the MHP to the unit.[24]

---

[18] Exhibit 4, G.B. medical records.

[19] Exhibit 4.

[20] Exhibit 4. Only a few months earlier, in March 2020, G.B. engaged in self-harming actions on the OJC 3C unit by wrapping a ligature around his neck and tying the ligature to the cell door. He then was able to run up and jump off the mezzanine level twice. Exhibit 2, 3/14/2020 G.B. incident report.

[21] *See* Consent Judgment provisions IV.B.4-5; ECF No. 824 (second stipulated order regarding suicide risk reduction).

[22] Report No. 9 of the Independent Monitors, ECF No. 1188 at 97 ("Episodes of lack of staff supervision – for example acute inmates running away from staff or running up to a mezzanine and threatening suicide or self-harm continue, even when the inmates were already on suicide precautions at the time – a documented pattern at OJC since the building opened.").

[23] Code White is a call for assistance when a prisoner has expressed or is behaving in a manner that presents a suicide risk.

[24] Exhibit 5, K.A. medical records.

- In April 2020, C.P. climbed onto the rail of the mezzanine level and threatened to jump off. Deputies grabbed C.P.'s clothing as he pulled away, which prevented him from falling.[25]

- In March 2020, J.F. was able to hang off the railing of the mezzanine level and threaten to jump. After deputies pulled him up and handcuffed him, he was seen by the social worker and placed on suicide watch.[26]

- In February 2020, J.M. was housed on a designated mental health unit, OJC 2A. He walked up the stairs to the mezzanine level, tied a blanket to the railing, and slid under the railing in an effort to hang himself before he was stopped by OPSO deputies.[27]

OPSO incident reports highlight that people with serious mental health needs remain at risk of harm from the physical structure of OJC that was not built to safely accommodate them.[28]

> d. Constitutional mental health services, including group and individual programming, remain limited in OJC, hindered by the lack of appropriate physical space to provide these services.

The Consent Judgment includes specific provisions for both individual and group programming for people with multiple, defined needs.[29] The Monitors' reports confirm that compliance with the Consent Judgment counseling provisions has been compromised because of a lack of adequate space. *See* Report No. 9 of the Independent Monitors, ECF No. 1188 at 92; Report No. 10 of the Independent Monitors, No. 1226 at 68, Report No. 11 of the Independent

---

[25] Exhibit 2, 4/19/20 C.P. incident report. Although this incident occurred on OJC 4C, which is not designated as a mental health unit, C.P. has significant mental health needs, is on the mental health case load, and has been found incompetent to proceed in his criminal case.

[26] Exhibit 2, 3/24/20 J.F. incident report. Although OJC 3C is not designated as a mental health unit, J.F. has significant mental health needs and is on the mental health case load.

[27] Exhibit 2, 2/27/20 J.M. incident report.

[28] The "mental health unit" also continues to use cells with sliding doors. OPSO incident reports are replete with accounts in which the time required for the sliding door to close created risks to prisoners with mental health needs. *See, e.g.*, Exhibit 2, G.B. 5/19/20 incident report, describing takedown of prisoner while awaiting cell door closing.

[29] The Consent Judgment requires that OPSO:
- Provide group and individual therapy services by an appropriately licensed provider where necessary for prisoners with mental health needs. ECF No. 466 at § IV.B.2.c.
- Shall develop and implement policies and procedures for prisoner counseling in areas of general mental health/therapy, sexual-abuse counseling, and alcohol and drug counseling. This should, at a minimum, include some provision for individual services. ECF No. 466 at § IV.B.3.a.
- Develop policies for the provision of developmentally appropriate mental health and programming services. ECF No. 466 at § I.V.G.

Monitors, ECF No. 1259 at 58, 62, 64, 67, 68; Report No. 12 of the Independent Monitors, ECF No. 1303 at 64-66. While programming availability has increased since 2016, access to both group and individual programming remains inadequate. Wellpath's current data and service interruption forms reflect that space is an ongoing barrier to providing necessary care.

Routinely, group programs face conflicts over available space or cannot meet because a room is unavailable.[30] Space conflicts persist even though the current number of prisoners in need of group programming is under-represented. OPSO and Wellpath exclude all prisoners held on the "Receiving Tier 1F, the Disciplinary Tier 3C and Segregation/Maximum Security 2B" from such services, ECF No. 1281-3 at 57, which include some of the most vulnerable populations in OPSO custody.[31] In addition, Wellpath's continued deficits in the documentation of treatment plan recommendations make it difficult to determine the full number of individuals who meet clinical criteria for group psychotherapy and other programing, further suggesting that the current number of individuals participating in groups is under-representative of the need.[32] This lack of access to group programming causes significant harm to prisoners in need of mental health care.

For example, J.H. suffers from Post-Traumatic Stress Disorder for which group programming is both clinically-indicated and of documented help to him.[33] Although J.H.'s long-standing treatment plan prescribes group attendance, he was not provided access to such programs from February 2019 through August 2019 after he was moved onto a general population unit.[34] J.H. made repeated requests to access groups, noting "I used to do groups . . . that were very

---

[30] Exhibit 6, 2019 spreadsheet reflecting mental health service disruptions.

[31] Plaintiffs also note that those persons classified as protective custody are housed on the same tier as those persons classified as administrative segregation. Thus the protective custody special population is also deprived of all access to group programming. *See also* Exhibit 7, December 2019 Housing Unit Assignment Plan.

[32] Report No. 11 of the Independent Monitors, ECF No. 1259 at 60-62, 75; Report No. 10 of the Independent Monitors, ECF No. 1226 at 67-69, 82; Report No. 9 of the Independent Monitors, ECF No. 1188 at 85, 87-89, 101-102.

[33] Exhibit 8, J.H. medical records and sick calls.

[34] Exhibit 8 at 3.

effective,"[35] and in a follow up encounter with an MHP continued to report that there were no groups available to him.[36] While his access to programming was denied, he reported having intense nightmares, "becoming very emotional and depressed," avoided being with others, and experienced "extreme cold sweats".[37]

Similarly, in part because of OJC's space limitations, individual mental health assessments are routinely and inappropriately conducted in non-confidential and non-therapeutic "cell-front" settings. *See, e.g.*, Report No. 9 of the Independent Monitors, ECF No. 1188 at 92 (noting mental health services were compromised by inadequate numbers of staff and non-confidential treatment space); Report No. 11 of the Independent Monitors, ECF No. 1259 at 64 (also noting compliance with provision of mental health services has been compromised by staffing deficiencies and lack of adequate space). During these cell-front contacts, the mental health provider stands in front of the person's cell door and attempts to engage the patient through the closed door. Even if the door is open, the person may be restrained, and there is no visual or audio privacy from other prisoners or staff. This lack of privacy does not allow patients to fully disclose concerns and prevents mental health providers from developing a full portrait of a new patient's needs or how a patient may be managing on a given day.[38]

These cell-front encounters are particularly damaging for assessing how an individual is managing after stepping down from a higher level of care, or from suicide watch. In the course of the May 2020 compliance tour, T.M., an adult male with serious mental illness and a history of delusions and self-harming behavior, was seen fashioning a rope in his cell on OJC 2A, a

---

[35] Exhibit 8 at 4.
[36] Exhibit 8 at 3.
[37] Exhibit 8 at 5.
[38] In August 2019, L.A., a pre-trial youth, was transferred from YSC to OJC. L.A.'s access to medication necessary for his mental health care was delayed in part because the MHP could not have L.A. complete a release of information during the assessment because the MHP was "talking to the patient through a small slit" on the housing unit. Exhibit 9, L.A. medical record.

designated sub-acute mental health unit.[39] Multiple notes indicate that the MHP only saw T.M. cell-front after prior instances of potential self-harm.[40] Additionally, the MHP reportedly could not understand T.M. at times during these encounters because of the low tone of his voice.[41] After T.M. was found making the rope in his cell, another cell-front interaction occurred in which the MHP could not fully understand the patient, and there was no documentation of any discussion about the fact that T.M. was engaging in potential preparation for self-harm.[42] The inadequacy of patient interactions with MHPs may arise from a variety of factors, but the impossibility of having a full discussion with a seriously mentally ill individual due to the non-confidential cell-front setting is certainly a significant contributing factor.

Although Wellpath's documentation confirms that space is an ongoing barrier to providing necessary care and that there are conflicts over room availability,[43] the City relies on a report prepared by Policy Research, Inc. and JFA for its representation that interview rooms and multi-purpose rooms in OJC are sufficient to meet the need for all group programming and individual therapy. ECF No. 1281-6 at 14. Such a conclusion is predicated on a myriad of false premises. First, this assessment fails to take into account that these rooms are not used exclusively for mental health services. These rooms are used for investigative interviews, occasionally for attorney visitation, to separate prisoners on a unit, and sometimes for storage.[44] Additionally, larger multi-purpose rooms are used for the bulk of the weekday hours to provide school for youth

---

[39] Exhibit 10, T.M. medical records; Report No. 12 of Independent Monitors, ECF No. 1303 at 69.
[40] Exhibit 10 at 1-2.
[41] Exhibit 10 at 2.
[42] Exhibit 10 at 3.
[43] ECF No. 1281-6 at 13; Exhibit 6, 2019 Mental Health Service Disruptions.
[44] Exhibit 2, incident reports 4/13/20 on OJC 2C (interview room used to separate prisoners); 4/14/20 on OJC 4B (interview room used to hold prisoner after he attempted to jump from mezzanine); 4/22/20 on OJC 4A (interview room used to hold prisoner after deputy discovered him at tier door with bloody nose); 5/7/20 on OJC 2E (interview room used to hold prisoner after altercation); 5/21/20 on OJC 4A (interview room used to hold prisoner pending disciplinary and re-classification after altercation); 5/23/20 on OJC 1E (interview room used to hold prisoner awaiting route to UMC after altercation).

detainees.[45] As such, OJC continues to have insufficient space to provide group and individual programming to meet the needs of prisoners with mental illness and for compliance with the Consent Judgment.[46]

Secondly, JFA's approach does not assess space needs based upon individualized treatment plans or the need to separate individuals based on history or classification status. ECF No. 1281-6 at 14. Simply slotting abstract numbers of patients into a room for a hypothetical group ignores the obvious fact that not all groups will be responsive to patient treatment needs, that some patients will need multiple services, and that some patients will be unable to attend the same group as others due to classification barriers. For example, in 2019 there were 840 unique patients reporting drug and/or alcohol abuse history.[47] Each of these patients requires treatment pursuant to Consent Judgment provision IV.B.3.a. Some of these patients are also on the mental health case load with varying individualized needs.[48] JFA's purely numerical analysis is not a reasonable guide to determine the full extent of the space necessary to accommodate the full range of group and individual programming required by prisoners' clinical need and the Consent Judgment.[49]

---

[45] Exhibit 11, CEA between Orleans Parish School Board and OPSO outlining commitment to provide space in OJC for school programming; ECF No. 1129 at 50 (noting the MOU between OPSB and OPSO had been adopted and finalized to expand educational offerings).

[46] Report No. 9 of the Independent Monitors, ECF No. 1188 at 92; Report No. 10 of the Independent Monitors, ECF No. 1226 at 68; Report No. 11 of the Independent Monitors, ECF No. 1259 at 58, 62, 64, 67-68; Report No. 12 of the Independent Monitors, ECF No. 1303 at 64-66.

[47] Exhibit 12, Wellpath substance abuse caseload spreadsheet.

[48] ECF No. 1281-3 at 58 (Wellpath estimated 41% of patients on the mental health case load have substance abuse treatment needs).

[49] Further, JFA includes a table of missed medical and mental health appointments in its report. ECF No. 1281-6 at 13. It is unclear what this data considers as a missed appointment. Plaintiffs note that there are significant discrepancies between this data and Wellpath's self-compiled data reflecting disruptions of mental health group services. For example, deputy unavailability accounted for 247 service disruptions to group and psychiatric services per Wellpath's own records, in contrast to the 53 missed appointments described in the JFA report. Exhibit 6, 2019 Service Disruptions.

Additionally, Wellpath's continued problems with documenting treatment plan recommendations makes it difficult to determine how Wellpath is identifying people in need of various programs and cast doubt on whether Wellpath is currently providing therapy to all individuals who meet clinical criteria.[50] Wellpath's data also significantly over-counts the number of true individual therapy sessions currently provided because it includes non-confidential cell-front encounters as counseling sessions or therapy, and under-counts the number of individuals in need of group therapy by not offering such services to vulnerable persons held on several tiers. ECF No. 1281-3 at 57. Thus, the City's own exhibits, as supplied by Wellpath, confirm that serious gaps in access to constitutionally-adequate programming remain, while also calling into question the data the City used to conduct its analysis.

In multiple compliance reports, including the most recent report, the Monitors have noted a lack of adequate space as a significant reason for the lack of compliance with the programming and counseling provisions of the Consent Judgment. *See, e.g.,* Report No. 9 of the Independent Monitors, ECF No. 1188 at 92; Report No. 10 of the Independent Monitors, ECF No. 1226 at 72; Report No. 11 of the Independent Monitors, ECF No. 1259 at 64; Report No. 12, ECF No. 1301 at 64-66.

## 2. Population Reduction Does Not Resolve the Structural Problems That Have Necessitated a Long-Term Solution to the Provision of Adequate Medical and Mental Health Care to People in OPSO Custody.

As noted as early as May 2013, the physical structure of OJC does not allow for compliance with the mental health treatment and suicide prevention provisions of the Consent Judgment. ECF No. 439 at 6-7. Further, the Supplemental Compliance Action Plan that

---

[50] Report No. 11 of the Independent Monitors, ECF No. 1259 at 60-62; 75; Report No. 10 of the Independent Monitors, ECF No. 1226 at 67-69; 82; Report No. 9 of the Independent Monitors, ECF No. 1188 at 85; 87-89; 101-102.

recommended construction of an 89-bed medical and mental health facility to address Consent Judgment non-compliance specifically considered the population decline that had already occurred and that was anticipated by the City's expert. ECF No. 1106 at 6 ("These baseline [population] projections, provided by the JFA Institute, are serving as the basis for the Compliance Director's decision making on how future facilities should be programmed to house inmates with medical and mental health needs."). Even with a dramatic population reduction, the physical structure of OJC, including the large capacity of the individual units, the minimal number of suicide-resistant cells, the dangers posed by the two-level tiers, and the critical lack of spaces where mental health assessments as well as programming and counseling services can be provided, all create barriers to providing constitutionally adequate mental health care. *See, e.g.*, Report No. 9 of the Independent Monitors, ECF No. 1188 at 92 (noting mental health services were compromised by inadequate numbers of staff and non-confidential treatment space); Report No. 11 of the Independent Monitors, ECF No. 1259 at 64 (noting compliance with provision of mental health services has been compromised by staffing deficiencies and lack of adequate space). The City's Motion for relief from this Court's 2019 orders does not propose any plan that substantively addresses how to solve these problems for the plaintiff class members who are currently in OPSO custody and will be in the future. The Compliance Director has taken the position that retrofitting OJC and permanent use of TDC are not feasible. ECF No. 1301 at 25-28. The City has taken no position except to request the indefinite suspension of construction of Phase III.

Finally, JFA's projections for population reduction operate on the assumption that the population of people with serious mental illness will drop in tandem with the population at large. ECF No. 1281-6 at 5. The basis for these assumptions is optimistic at best. JFA's recommendation

is to rely on linkages to care with community-based mental health resources. ECF No. 1281-6 at 4. The primary problem with this approach is that Louisiana continues to lack a robust network of community-based mental health resources.[51]

Thus, the assumption that a decrease in the total jail population will result in a concomitant decrease in OJC's mental health case load is flawed.

### 3.   The City's Funding Concerns Do Not Constitute a Change in Circumstances.

Over forty years ago, the Fifth Circuit held: "That it may be inconvenient or more expensive for the [local government] to run its prison in a constitutional fashion is neither a defense to this action or a ground for modification of the judgment rendered in this case." ECF No. 465 at 79 (citing *Gates v. Collier*, 501 F. 2d 1291, 1322 (5th Cir. 1974)).

When entering the Consent Judgment, in response to the City's concerns about cost, this Court relied on the Fifth Circuit's long line of jurisprudence holding, "it is well established that inadequate funding will not excuse the perpetuation of unconstitutional conditions of confinement, nor will an allegedly contrary duty at state law." ECF No. 465 at 79 (citing *Smith v. Sullivan*, 611 F. 2d 1039, 1043-44 (5th Cir. 1980)).

Plaintiffs support cost-effective ways to meet the obligation to provide constitutionally-adequate mental health care to OPSO's prisoners. And Compliance Director Hodge's opposition to the City's Motion lays out in detail the funding that is available to the City for Phase III. ECF No. 1301 at 18-24. But, the City's cost arguments – and its proposal to not move forward on

---

[51] A 2017 study from Louisiana Public Health Institute (LPHI) found that although New Orleans has a long list of community-based behavioral health clinics, significant barriers to community-based behavioral health care persist including a lack of substance abuse treatment, wait lists extending months to access outpatient care, and significant limitations to case management programs like Assertive Community Treatment (ACT) and Forensic Assertive Community Treatment (FACT). LPHI, "New Orleans Behavioral Health Crisis System, 2017 Report" at 26-32, accessed at
https://lphi.org/wp-content/uploads/2018/03/FINALTransformingNewOrleansBehavioralHealthCrisisSystem.pdf.

Phase III nor otherwise address the physical and structural barriers at OJC to provide constitutional care – do not justify the City's requested relief from the existing court orders.

### III. CONCLUSION

For the foregoing reasons, the City's Motion should be denied.

**FOR THE UNITED STATES:**

PETER G. STRASSER
U.S. Attorney
Eastern District of Louisiana

ERIC S. DREIBAND
Assistant Attorney General
Civil Rights Division

STEVEN H. ROSENBAUM
Chief
Special Litigation Section

*/s/Theodor Carter III*
THEODORE CARTER III,
(IL 6188964)
Assistant United States Attorney
U.S. Attorney's Office
Eastern District of Louisiana
650 Poydras Street, Suite 1600
New Orleans, LA 70130

*/s/ George Eppsteiner*
KERRY KRENTLER DEAN,
(DC 474260)
Acting Special Counsel (T.A.)
GEORGE EPPSTEINER (NC 42812)
Special Litigation Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C.  20530
Telephone: (202) 305-4044
george.eppsteiner@usdoj.gov

**FOR THE PLAINTIFF CLASS:**

*/s/ Elizabeth Cumming*
EMILY WASHINGTON, LSBN 34143
ELIZABETH CUMMING, LSBN 31685
ERIC FOLEY, LSBN 34199
MacArthur Justice Center
4400 S. Carrollton Avenue
New Orleans, LA 70119
Telephone: (504) 620-2259
emily.washington@macarthurjustice.org

Date: July 28, 2020