UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| LASHAWN JONES, ET AL. | * | CIVIL ACTION |
| | * | No. 12-00859 |
| VERSUS | * | |
| | * | HON. LANCE M. AFRICK |
| MARLIN GUSMAN, ET AL. | * | SECTION: I |
| | * | |
| | * | MAG. MICHAEL B. NORTH |
| | * | SECTION: 5 |

* * * * * * * * * * * * * * * * * * * *

## THE CITY OF NEW ORLEANS' REPLY MEMORANDUM IN SUPPORT OF MOTION FOR RELIEF FROM COURT ORDERS OF JANUARY 25, 2019 (Rec. Doc. 1221) AND MARCH 18, 2019 (Rec. Doc. 1227) REGARDING PHASE III JAIL FACILITY

**MAY IT PLEASE THE COURT:**

The City of New Orleans (the "City") respectfully submits this Reply Memorandum in support of its Motion for Relief from Court Orders of January 25, 2019 (Rec. Doc. 1221), and March 18, 2019 (Rec. Doc. 1227) Regarding the Phase III Jail Facility ("Motion for Relief").[1] This Reply Memorandum will address the three opposition memoranda filed by the United States Department of Justice and the Plaintiff Class[2] (hereinafter, the "Plaintiffs"), the Court-Appointed Compliance Director Darnley R. Hodge, Sr.[3] ("Dir. Hodge" or "Mr. Hodge"), and Sheriff Marlin N. Gusman[4] ("Sheriff Gusman"). This Reply Memorandum also responds to the Court's inquiries directed in its Order of July 29, 2020.[5] Consistent with the Court's instructive, no Motion for Leave to Exceed the Page Limitation has been filed, because same has already been granted at Rec. Doc. 1309.

---

[1] Rec. Doc. 1281.
[2] Rec. Doc. 1304.
[3] Rec. Doc. 1301.
[4] Rec. Doc. 1305.
[5] Rec. Doc. 1309.

I.     **The Court's March 18, 2019 Order violates the Prison Litigation Reform Act ("PLRA") because the PLRA prohibits the Court from Ordering the construction of prisons.**

Under the PLRA, prospective relief "shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs."[6]  The relief contemplated under the Act does not include the construction of prison facilities.  Under 18 U.S.C. § 3626(a)(1)(C) ("Subsection (a)(1)(C)"), "Nothing in this section shall be construed to authorize the courts, in exercising their remedial powers, to order the construction of prisons[.]"[7]  In the Court's Order of July 1, 2020, the Court chastises the City for "violating a court order" by temporarily suspending design work for the new Phase III jail building in response to the economic impact of a global pandemic.[8]  Importantly, however, the PLRA explicitly prohibits the Court from Ordering the City to build a new jail building, and correspondingly the Act statutorily prevents the Court from Ordering the City to continue with design and construction work with the intention of creating a new jail building when circumstances have changed so dramatically that action must be taken to avoid detriment to the public interest.[9]

As similarly argued by Plaintiffs, "[T]he Prison Litigation Reform Act ('PLRA') places barriers on the Court's authority to enter any such order.  The PLRA imposes a number of restrictions on the prospective relief a court can order in any civil action involving 'prison conditions.' 18 U.S.C. § 3626(a).  All relief must be narrowly drawn, extend no further than necessary, and be the least intrusive means necessary to correct a violation of federal rights. 18

---

[6] 18 U.S.C. § 3626(a)(1)(A).
[7] 18 U.S.C. § 3626(a)(1)(C).
[8] Rec. Doc. 1285.
[9] At Rec. Doc. 1274, Sheriff Gusman maintains that the PLRA must give substantial weight to public safety.

U.S.C. § 3626(a)(1)(A)."[10]   According to Plaintiffs' pleadings in this litigation, the Plaintiffs' specific request is for a solution that will ensure adequate housing and services.  Notably, Plaintiffs did not previously advocate for a new jail building.[11]   Plaintiffs further confirmed that neither Plaintiffs, nor the Court, can impose a specific housing decision affecting the Orleans Parish Prison (now OJC) without a finding that the relief complies with the PLRA.[12]   Plaintiffs also confirmed that neither Plaintiffs nor the Court were seeking to disrupt City and Parish political processes for determining the best solution to the Phase II design problems—and that the decision on how and where to house prisoners with mental illness and other medical needs must be determined through the proper political and administrative processes.[13]   Consistent with the PLRA, the same logic applies here, and even more so given the current unprecedented challenges and changed circumstances that our elected officials are obligated to address on behalf of all Orleans Parish residents.  Many elected officials accountable to their constituents regarding services provided by Orleans Parish have specifically expressed concern and opposition to a new Phase III jail building. The concerns of officials elected to serve the people of Orleans Parish, and the needs of all Orleans Parish residents, including those who are not in jail, should not be ignored.[14]

A court's power to compel a municipality to allocate funds towards a project cannot be read into the PLRA.  This reading would clearly run afoul of bedrock principles such as federalism and separation of powers.  Such a power would be akin to making the court an unelected member of the municipality's legislative branch.  In fact, prior to the PLRA, courts uniformly concluded that their power did not extend to ordering prison construction to remedy constitutional violations:

---

[10] Rec. Doc. 930 at 4.
[11] *Id.*
[12] Rec. Doc. 930 at 5.
[13] *Id.*
[14] *See* Orleans Parish State Legislators' Correspondence, attached hereto as *in globo* Exhibit A.

"A decision such as that is a decision to be made by the political process, not by judicial fiat."[15]

Even if federal courts once had the power to order prison construction, that power was curtailed by the passage of the PLRA.  The Supreme Court confirmed in *Miller v. French*[16] that Congress intended to limit the scope of federal courts' equitable authority in ordering prospective relief.  At issue in *Miller* was 18 U.S.C. § 3626(e)(2), which provides that "[a]ny motion to modify or terminate prospective relief made under subsection (b) shall operate as a stay," such that while a motion to terminate prospective relief is pending, the relief at issue is stayed.[17]  In doing so, the Court concluded that, given Congress's intent to curb the equitable discretion of the district courts, it would have been an anomaly for Congress to have left § 3626(e)(2) vulnerable to that very same discretion.[18]

Likewise, in prohibiting district courts from using their remedial powers to order construction of prison facilities, Congress intended to restrict the scope of district courts' equitable powers and acknowledge the federal court's constitutional limitations.  Subsection (a)(1)(C) expressly references the courts' remedial powers, indicating that Congress fully intended to limit the courts' equitable authority in ordering prospective relief.  Moreover, as in *Miller*, Congress's intent to restrict federal courts from using their equitable powers to order construction of prisons (if it ever existed) is palpably evident from the PLRA's statutory scheme.  It would be incongruous for Congress to prohibit the construction of prisons under the PLRA and provide limitations on other prospective relief in subsection (a)(1)(A)-(B) but nevertheless to contemplate that district courts could use their inherent equitable power to circumvent these statutory limitations.

---

[15] *Reece v. Gragg*, 650 F. Supp. 1297, 1306 (D. Kan. 1986).  *See also Padgett v. Stein*, 406 F. Supp. 287, 303 (M.D. Pa. 1975) ("this court lacks the power to order public funds expended to build a prison"); *Jones v. Wittenberg*, 330 F. Supp. 707, 712 (N.D. Ohio 1971) (holding that the court has no power to require the public to fund new jails).

[16] 530 U.S. 327, 340-41 (2000).

[17] 530 U.S. at 340-41.

[18] *Id.*

**II.     The Memorandum in Opposition to the City's Motion for Relief filed by the Court-Appointed Compliance Director should be stricken.**

The City specifically objects to any consideration of the Memorandum in Opposition to the City's Motion for Relief[19] filed by the former Court-Appointed Dir. Hodge, in response to the City's Motion for Relief, and respectfully submits that Mr. Hodge's Opposition should be stricken from the record altogether.   On May 26, 2020, Sheriff Gusman filed a Motion to Terminate Consent Decree Pursuant to 18 U.S.C. § 3626 (b) and Motion to Terminate the Stipulated Order for Appointment of an Independent Jail Compliance Director.[20]   Sheriff Gusman's Motion to Terminate the Stipulated Order for Appointment of Independent Jail Monitor was unopposed.  Just over two months after filing, the Court granted the Sheriff's Motion to Terminate the Stipulated Order for Appointment of an Independent Jail Monitor.[21]   The Court Order terminating the appointment of the Independent Jail Compliance Director should act as cessation of Mr. Hodge's appointment.  In sum, the removal of the Compliance Director was based on substantial or partial compliance with 100% of the Consent Judgment having been achieved.[22]   The removal of the Compliance Director was also based on the Court's determination that sustained and sustainable material progress with substantial compliance with the Consent Decree had been achieved[23].  It follows that private counsel should not appear before this Court on behalf of the removed Compliance Director, nor should that law firm continue billing at the City's expense.

The Court first appointed a Jail Compliance Director via a Court Order dated September 15, 2016.[24]  It appears that at some time thereafter the Compliance Director retained the services

---

[19] Rec. Doc. 1301.
[20] Rec. Docs. 1272-1 and 1274.
[21] Rec. Doc. 1311.
[22] *Id.*
[23] Rec. Doc. 1082.
[24] *See* Rec. Doc. 1097.

of a private law firm, Stanley, Reuter, Ross, Thornton & Alford, LLC ("Stanley Reuter"), at the City's expense.  This is in addition to the Court-Appointed Compliance Director's annual salary of more than $200,000 each year, also at the City's expense.  The City specifically objects, and does not consent to, any additional costs or legal fees generated by the former Compliance Director or his private counsel, including legal fees generated by Stanley Reuter on behalf of the terminated Compliance Director.

Ironically, on behalf of the former Compliance Director, Stanley Reuter argues that costs do not matter, a global pandemic does not matter, the City's anticipated revenue shortfall does not matter, and the significantly decreased inmate population similarly does not matter.[25]   And notwithstanding all of the challenging circumstances that the duly elected Mayor and other elected officials of the City of New Orleans are challenged with balancing on behalf of all Orleans Parish residents during this unprecedented crisis, the City is obligated to move forward with building a new Phase III jail building despite the statutory proscription in the PLRA.[26]

The former Compliance Director's hand-selected law firm also argues that the Compliance Director is empowered to dictate to the duly elected Mayor of the City of New Orleans and other elected officials how criminal justice related FEMA dollars should be allocated and prioritized within the City of New Orleans at this time, despite statutory wording to the contrary.  While the ex-Compliance Director seemingly prefers to instruct the Mayor on how City FEMA dollars should be allocated for public safety in this community prior to his anticipated departure, he offers no plan for the millions in operations costs that the City will be responsible for well into the future following the proscribed construction and attendant construction expenses of a new jail building. The Court appointed former Compliance Director's lack of concern regarding millions in future

---

[25] Rec. Doc. 1301.
[26] *See in globo* Exhibit A.

operating costs for a new jail facility in Orleans Parish is understandable as he prepares to depart Orleans Parish, because it won't be his burden to bear, but instead will be that of the Mayor, other elected officials in Orleans Parish, and the tax paying citizens of Orleans Parish.

The Sheriff's Motion to Terminate the Stipulated Order for Appointment of Independent Jail Compliance Director has been granted. As a result, Mr. Hodge does not and should not have the ability to continue in this litigation matter, litigating against the City, while he and his private lawyers operate and bill the City at an inordinate expense. Moreover, because Mr. Hodge is not a party to this lawsuit, the opposition pleadings filed by his contemporaneously former private counsel in response to the City's Motion for Relief, along with all exhibits, should be stricken, and his law firm counsel should not be allowed to be an interloper, particularly when Mr. Hodge is not a party to the subject litigation.

### III. The City of New Orleans has demonstrated a continuing commitment to providing adequate funding to OPSO to meet Consent Judgment requirements.

#### A. The City has demonstrated a continuing commitment to providing adequate funding for the medical and mental health care of OPSO inmates.

The conditions that precipitated the Plaintiffs' Complaint[27] of April 2, 2012 no longer exist. In 2019 alone, the City invested $17.8M in healthcare services for OPSO inmates.[28] Notably, as confirmed by Sheriff Gusman, the OPSO inmate population most recently declined to just over 700 inmates in total.[29] This further demonstrates what strategic efforts by the City and others to reduce the jail population can yield. While the Plaintiffs' Opposition mistakenly argues that structural deficiencies exist which prevent compliance with the mental health provisions of the consent judgment, it cannot be disputed that the conditions for special populations have

---

[27] Rec. Doc. 1.
[28] Rec. Doc. 1281-2 at ¶15.
[29] Rec. Doc. 1305.

significantly improved and will continue to improve with the addition of the Temporary Detention Center (TDC).

Wellpath's requirements for treatment plans and documentation of treatments plans for OPSO patients currently meet the standards set forth by the National Commission on Correctional Health Care and will be unaffected by the elimination of Phase III. Beginning at intake, patients with mental health needs are assessed and placed on the mental health caseload as clinically indicated. Every patient who is on the mental health caseload receives a treatment plan. Licensed clinicians in conjunction with the patient complete the patients' treatment plans. Tulane psychiatrists then review and sign the treatment plans. To ensure the treatment plans are accurate and meeting patients' mental health needs, clinicians utilize the evidenced-based Adolescent and Adult Psychotherapy Treatment Planner by E. Jongsma, L. Peterson, W. McInnis and T. Bruce.[30]

Although Plaintiffs contend that there is currently no space in the OJC for adequate housing of men and women with acute and sub-acute mental health needs and further argue that women currently have access to only two suicide resistant cells without a designated step-down unit for women, nor space for mental health therapy, a modified TDC will provide special accommodations for the acute and sub-acute females. As stated in the City's Motion for Relief, TDC will provide 22 mental health beds for female inmates.[31]

Plaintiffs also expressed concern with the availability of multipurpose rooms for group programming and generally assert that the Plaintiffs "group programs currently face conflicts over available space or cannot meet because a room is unavailable."[32] Plaintiffs offer no information as to how often this occurs, and the fact that there may be a conflict for room space on occasion,

---

[30] *See* Declaration of Carin Kottraba, Ph.D., CCHP, attached hereto as Exhibit B.
[31] Rec. Doc. 1281-1 at 12.
[32] Rec. Doc. 1304 at 17.

should not deem a jail facility unconstitutional.  Plaintiffs also argue that because of the referenced space limitations, Wellpath engages in cell front contact sessions which prohibit privacy.[33]  It is industry standard for cell front sessions lasting 15 to 20 minutes and including substantive treatment to qualify as individual treatment.[34]  Additionally, the modified TDC will provide additional space for group programming, and for confidential individual treatment for the OPSO inmate population.

Plaintiffs further express concern that OJC is not sufficiently equipped with suicide-resistant cells for persons with acute mental health needs.[35]  In support of this argument, the Plaintiffs contend that Wellpath acknowledges that "access to suicide[-]resistant cells within OJC remains a problem."[36]  Importantly, however, TDC will likely provide sufficient suicide-resistant cells to house patients designated by OPSO as suicidal, as required by the Consent Judgment.  To the extent a suicide resistant cell is not available, however, suicide-resistant cells are not the only method of ensuring the safety of suicidal patients and may not be necessary for constitutional compliance if other means, such as direct observation, are available to prevent self-harm.[37]

Finally, the Plaintiffs' accusation casting doubt on whether Wellpath is "identifying people in need of various programs" and whether Wellpath "over-counts the number of individual therapy sessions"[38] falls flat.  Wellpath and Tulane are nationally recognized health care providers who are providing constitutionally compliant care to OPSO inmates.  Contrary to Plaintiffs' critique, Wellpath and Tulane are meeting national standards in the provision of mental health care services to OPSO inmates.  Simply stated, there are no purported gaps in healthcare as the Plaintiffs

---

[33] Rec. Doc. 1304 at 18.
[34] Exhibit B at ⁋ 11.
[35] Rec. Doc. 1304 at 13-15.
[36] *Id.*
[37] *See* Exhibit B at ⁋ 8.
[38] Rec. Doc. 1304 at 21.

erroneously argue; but instead, both Wellpath and Tulane's practices counter the Plaintiffs' assertions.  Based on all reasonably available information, the mental health care provided by Wellpath (and Tulane) for OPSO inmates meets constitutional requirements, and the elimination of a new Phase III jail building will not prohibit Wellpath from continuing to meet constitutional requirements.[39]

### B.  Notwithstanding a Tremendous Investment by the City, the OPSO Phase II Jail Building Remains Understaffed.

According to Report No. 12 of the Independent Monitors dated July 27, 2020, safety, medical and mental health care, and environment conditions of inmates held in both the OJC and TDC made meaningful and noteworthy improvement.[40]  The Monitors also confirmed that based on their assessment, OPSO has achieved either substantial or partial compliance with 100% of the provisions of the Consent Judgment.[41]  The Court agreed.[42]  This impressive accomplishment is directly attributable to the overriding fact that OPSO's budget will have increased by 173% since 2012, by year's end, all while the inmate population has significantly decreased (ranging from one-third to one half of the 2012 population size).[43]

In response to the Monitor staffing complaints, the City of New Orleans evaluated the ratio of correctional staff to inmates at OPSO as compared to other jails of a similar size using the United States Bureau of Justice Statistics' 2018 Annual Survey of Jails.[44]  The Annual Survey of Jails is a national survey of local and regional jails conducted by the Bureau of Justice Statistics to provide nationwide statistics on the number and characteristics of local jail inmates and the usage

---

[39] Exhibit B at ⁋ 12.

[40] Rec. Doc. 1303.

[41] *Id.*

[42] *See* Rec. Doc. 1311 (Order Granting OPSO Motion to Terminate Compliance Dir.).

[43] Rec. Doc. 1281-2 at 2 (¶ 6).

[44] Affidavit of Jonathan Wisbey, Chief Technology Officer for the City of New Orleans, attached hereto as Exhibit C.  The relevant dataset is described at https://www.bjs.gov/index.cfm?ty=dcdetail&iid=261 and the data itself can be found at https://doi.org/10.3886/ICPSR37392.v1.

of jail space.  A sample of 871 jails were surveyed in 2018, with 797 responding to the survey.  Of these jails, 108 were mid-sized jails (defined as having an average daily population between 1,000 and 2,500).  For each of these jurisdictions, the data includes how many correctional officers were employed and the average daily population of the jail as of the end of June of 2018.  Although Orleans Parish was one of the 108 mid-sized jails evaluated in 2018, for purposes of this comparison, updated staffing and inmate numbers using available OPSO 2019 data was used to ensure an up-to-date comparison for OPSO's more current staffing numbers.

With an inmate:staff ratio of 2.6:1, Orleans Parish seemingly has the 11th lowest ratio of the 108 mid-sized jails surveyed.[45]  Altogether, 90% of mid-sized jails had fewer staff per inmate than Orleans Parish based on the information reported.  The scatterplot below illustrates the 90th percentile line and shows how only a few outliers had notably more staff than Orleans Parish.



---

[45] Exhibit C at ¶ 6.

While the City acknowledges there are many factors that can impact appropriate staffing levels, a comparison of staffing at comparable facilities further confirms that the City is investing in OPSO in a manner that is considerably better than, or at least comparable to, the investment in other comparable jails.  The City's ongoing and continuing investment in OPSO operations allows for adequate staffing for OPSO.  Notwithstanding the City's continuing investment, and this staffing comparison with other comparable jail facilities, the Court appointed Monitors complain that OPSO remains understaffed.  Strangely, while a complaint persists that OPSO is understaffed in its Phase II (1,438 beds) jail building, even with a current inmate population that has fallen to just over 700 inmates most recently, the City apparently is being ordered to build a new Phase III jail building which inevitably will require substantially more staffing to meet Consent Judgment requirements.  Besides the statutory prohibition of a court ordering the construction of a jail facility, the City respectfully suggests that given the historic OPSO staffing deficiencies described by the Monitors, staffing complaints will logically not improve with a new jail facility creating a need for significantly more staff.

### C.  A new phase III jail building is not required by the Consent Judgment.

The City has always maintained that there are options other than Phase III which could satisfy the Plaintiffs' concerns under the Consent Judgment.  As confirmed by Plaintiffs, "Throughout the course of this litigation, Plaintiffs have maintained only that the Orleans Sheriff must comply with the terms of the Consent Judgment, including the provisions requiring constitutional medical and mental health care at the Orleans jail, regardless of any specific solution adopted by the Sheriff and the City to achieve this requirement."[46]

Consent Judgment requirements should continue to be addressed through a reasonable, fiscally

---

[46] Rec. Doc. 1286-1.

responsible investment in the OJC, which will include the TDC renovation and a continuing investment in providing medical and mental health services to OPSO inmates.  Additionally, a retrofit and/or renovation of the second floor of OJC is ripe for further consideration, especially given the steadily declining and historic lows of the inmate population.

### D.  Mr. Hodge and Sheriff Gusman have failed to demonstrate why the City's request for relief from Court Orders should not be granted.

In his opposition, Mr. Hodge's argument that the Stipulated Order requires the City to build Phase III is without merit.  The Stipulated Order requires the City to provide "appropriate housing" for certain populations which would comport with the requirements of the Consent Judgment.[47] Furthermore, the Court recently eliminated the need for a Compliance Director.[48]

Mr. Hodge's unsupported belief that a suspension of Phase III design work will somehow amount to the City shirking its constitutional duties under the Consent Judgment is incorrect because the Consent Judgment does not require the City to build a new Phase III jail facility, nor could the Consent Judgment, which was not signed by the City, force construction of a new jail building.[49]  The Plaintiffs' concerns can be addressed in other ways, including with the addition of TDC, ongoing outpatient treatment and a continuing investment in external healthcare services. Additionally, how and in what manner the City's FEMA funds are expended is not appropriately before this Court.  The City's concerns regarding its current and future ability to fund the OJC's growing operations cost can neither be addressed by FEMA, the Court, nor the Court appointed Compliance Director.

Sheriff Gusman argues that he relinquished his claim over Templeman II funds because the City agreed to construct Phase III.  But his argument is not consistent with the wording of the

---

[47] Rec. Doc. 1082 at 14-15 (¶ 22).
[48] Rec. Doc. 1311.
[49] Rec. Doc. 466.

June 2016 Stipulated Order.  The Stipulated Order does not reference a new Phase III jail building.

Importantly, what is very clear in the record is that the Stipulated Order specifically vests "final

authority and approval over capital expenditures [ . . . ] including use of Templeman II [ . . . ]

funding" with the City and lacks mention of a requirement to build Phase III.[50]

### 1.   The Stipulated Order does not require the City to construct Phase III.

While it is correct that a Stipulated Order "is a contract and its interpretation is governed by

the basic rules of contract construction,"[51] as with any contract, the understanding of the agreement

begins within its "four corners."[52]  When a contract is expressed in unambiguous language, its

terms will be given its plain meaning, and should be enforced as written.[53]

The rules of interpretation will be governed by the substantive law of the state where the

Stipulated Order was entered.[54]  Under Louisiana's contract interpretation rules, "the [c]ourt is to

determine the parties' common intent as reflected by the words of the contract."[55]  "Such intent is

to be determined in accordance with the general, ordinary, meaning of the language used . . . ."[56]

And "[w]hen the words of a contract are clear and explicit and lead to no absurd consequences, no

further interpretation may be made in search of the parties' intent."[57]

A court can look outside of the "four corners" of the Stipulated Order only if the terms are

ambiguous.  A term is considered ambiguous "when it is reasonably susceptible to more than one

meaning, in light of surrounding circumstances and established rules of construction."[58]  A

contract is not ambiguous, however, when only one of two competing interpretations is reasonable,

---

[50] Rec. Doc. 1082 at 14-15 (¶ 22).
[51] *In re Continental Airlines Corp.*, 907 F.2d 1500, 1508, n. 6 (5th Cir. 1990).
[52] *U.S. v. Chromalloy American Corp.*, 158 F.3d 345, 350 (5th Cir. 2012).
[53] *Id.*
[54] *See In re Lilijeberg Enters.*, 304 F.3d 410, 439-40 (5th Cir. 2002).
[55] La. Civ. Code art. 2045
[56] La. Civ. Code art. 2047.
[57] La. Civ. Code art. 2046.
[58] *Dean v. City of Shreveport*, 438 F.3d 448, 460-61 (5th Cir. 2006).

or merely because one party can create a dispute in hindsight.[59] Nor is a contract ambiguous because the parties disagree as to the contract's correct interpretation.[60] In other words, "the rules of contractual interpretation do not authorize a perversion of the words or the exercise of inventive powers to create an ambiguity where none exists."[61]

The Stipulated Order specifically and unequivocally established that "[t]he City…shall maintain final authority and approval over capital expenditures associated with the plan, including use of Templeman II FEMA funding exclusively for implementation of the plan," which shall meet the standards required by the Consent Judgment.[62] In other words, it is clear that the City fully retained authority and discretion over how funding obligated by FEMA would be appropriated for housing.

The Consent Judgment requires the OPSO to provide the following regarding constitutionally appropriate Mental Health Care: screening and assessment; treatment; counseling; suicide prevention training programs; suicide precautions; use of restraints; detoxification and training; medical and mental health staffing; and risk management.[63] Regarding constitutionally appropriate Medical Care, the Consent Judgment only requires: quality management of medication administration; health care delivery; and release and transfer of prisoners with serious medical and/or mental health needs from OPSO custody. [64] The Consent Judgment does not require a new Phase III jail building.

Mr. Hodge refers to the Supplemental Compliance Action Plan ("Plan") submitted by former Compliance Director Gary Maynard as an agreement between the Sheriff, the Compliance

---

[59] *Tex. E. Transmission Corp. v. Amerada Hess Corp.*, 145 F.3d 737, 741 (5th Cir. 1998).

[60] *D.E.W., Inc. v. Local 93, Laborer's Int'l Union of N. Am.*, 857 F.2d 196, 199 (5th Cir. 1992).

[61] *Succession of Fannaly v. Lafayette Ins. Co.*, 01-1355 (La. 1/15/02), 805 So.2d 1134.

[62] Rec. Doc. 1082 at 15.

[63] Rec. Doc. 466 at 24-33 (§ IV(B)).

[64] *Id.* at 34-35 (§ IV(C)).

Director, and the City.[65]  He contends this document evidences an agreement to the plan referenced in the Stipulated Order.  He is wrong.  Review of the record confirms that the Plan does not confirm an agreement among the three parties and that, notably, the City is not a party to the referenced plan.  Instead, the Plan consists of recommendations by Dir. Maynard.  That very Plan concedes that the City considered alternatives to Phase III.[66]  Moreover, the City retained the authority to refine the design process as "more information is made available in the formal design development process."[67]  This would naturally include significant changes in the Orleans Parish prison population, unsustainable operating costs, and unforeseen contingencies, including an unanticipated global pandemic resulting in a shutdown of the Orleans Parish economy for the indefinite future and an unprecedented loss of revenue for the City and its residents.  Moreover, consistent with the Stipulated Order, the City retained control over future "facilities modifications and additions."[68]

Given the foregoing, it is clear the Stipulated Order does not require the construction of a new Phase III jail building to accomplish the Consent Judgment's goals.  It is also plain that the City retained control and discretion to determine the best course of action "as more information" became available.

## 2. The City has always maintained that there were more fiscally appropriate remedies to address Plaintiffs' concerns.

Phase III does not represent the best and most cost-efficient means of providing medical and mental health services to the OJC's special populations given all reasonably available facts and information, including that: 1) the OPSO inmate population has declined significantly and

---

[65] Rec. Doc. 1106.
[66] *Id.* at 7.
[67] *Id.* at 9-10.
[68] Rec. Doc. 1106 at 9-10.

steadily over the last several years; 2) OPSO's current Phase II jail building includes 1,438 beds, with an OPSO jail population that most recently declined to a historic low of just over 700 inmates; 3) notwithstanding a substantial and ongoing financial investment by the City, including an anticipated budget increase of 173% by year's end since 2012, the Monitors complain that OPSO's Phase II building remains understaffed; and 4) the City is anticipating significant revenue shortfalls in response to the unprecedented economic crisis created by the COVID-19 global pandemic.

The City has historically and consistently maintained that there were more appropriate alternatives to address Plaintiff's concerns, with a Phase III being built "only if absolutely necessary." [69]  The City suggested three alternatives to Phase III: 1) utilize the TDC as a permanent location for mental health services; 2) renovate three of the existing TDC buildings to provide a permanent 91 bed male and female acute and sub-acute facility; and 3) renovate the 2nd floor pod of the OJC which held youthful offenders.[70] These options were rejected by the OPSO as not "a long term solution for housing the mental health and medical populations at the jail";[71] but these alternative options can provide a permanent housing solution, and if not viable, the City respectfully submits that correctional and healthcare professionals should create a working group to examine all options in the context of current jail population, expected population decreases, and the welfare of the general public.  In response, the City agreed to a temporary solution while "simultaneously continuing to explore other options which may be more feasible[.]"[72]

The City maintains there are options other than Phase III available to address the Plaintiffs' concerns and ensure that OJC's populations are receiving medical and mental health care services

---

[69] Rec. Doc. 722 at 3, 5.  Distinguished Professor of Law Andrea Armstrong, a leading national expert on prison and jail conditions, seemingly agrees with the City's position.  See Correspondence from Professor Armstrong, attached hereto as Exhibit L.
[70] Rec. Doc. 1222-1 at 2.
[71] Rec. Doc. 1222-2.
[72] Rec. Doc. 1222-1 at 4.

consistent with the Consent Judgment and in conformity with national standards.  The first option retains TDC as a long-term facility for acute and sub-acute female prisoners and renovating OJC pod 2 to accommodate the sub-acute males.[73]  The second option renovates TDC buildings 3 and 4 to accommodate the 33 OJC sub-acute males in OJC  Pod A.[74]  An additional option includes renovating OJC pods 2A, 2C, and 2D and subsequently closing TDC once those renovations are complete.[75]  As the City's Motion for Relief makes clear, the City is seeking to suspend the current programming, design and construction of Phase III to further explore productive alternatives in light of the dramatically changed circumstances the City is now required to address for all Orleans Parish residents while still ensuring healthcare that satisfies constitutional criteria.

While Plaintiffs and Mr. Hodge assert that the City made the decision to construct Phase III, the City certainly did not do so voluntarily.  As is well documented in the record, the City has always been an unwilling participant to the decision to construct Phase III, and has always advocated for other, more reasonable options that result in healthcare consistent with constitutional expectations.  In 2014, Plaintiffs approved of a renovated TDC as a means of addressing their concerns. [76]  The Plaintiffs seemingly questioned the propriety of ordering the construction of Phase III, "believing it to be outside of the scope of this litigation, and an inappropriate remedy to a discrete problem, and not a proper matter for determination" by the Court. As recently as July 13, 2020, the Plaintiffs only concern was whether the OJC complied with the Consent Judgment "regardless of any specific solutions adopted."[77]  The City appreciates the Plaintiffs' desire to confirm adequate medical and mental health services for the OJC's population, but Phase III is not

---

[73] Report: "Alternatives to the Phase 3 Facility Program," attached hereto as Exhibit D.
[74] *Id*.
[75] *Id.*
[76] Rec. Doc. 737 at 4.
[77] Rec. Doc. 1286-1 at 2.

the only "remedy for a discrete problem" of providing medical and mental health services consistent with the Consent Judgment.

The City has always maintained that a new Phase III jail building is not required to provide adequate medical and mental health services to special populations.  Accordingly, the Court should grant the City's Motion for Relief and suspend the programming, design and construction of a new Phase III jail building at this time.

### 3.   The Stipulated Order gives the City final authority and approval of capital projects, including the use of Templeman II funds.

The Stipulated Order gave the City discretion and final decision-making authority over how Templeman II FEMA funds are used.  Mr. Hodge's argument that suspending the programming and construction of Phase III is an attempt by the City to shirk its constitutional duties lacks merit even if his views as a former compliance director are considered.  The City has demonstrated an ongoing and continuing commitment to investing in OPSO in an effort to assist OPSO with meeting Consent Judgment requirements and constitutional safeguards for all.  The Consent Judgment simply does not require the construction of a brand-new Phase III jail building as a requirement for providing appropriate medical and mental health care.

Many of Mr. Hodge's arguments regarding the use of FEMA funds are not a justiciable controversy before this Court. Nevertheless, his private lawyers spend a substantial amount of time and paper opining about the City's use of its FEMA funds, which have been approved by FEMA. The dispute over control of the FEMA funds is a non-issue.  With the Stipulated Agreement, the City retained final authority to appropriate the funds, including for the use of appropriate housing for prisoners with mental health and medical needs.

Mr. Hodge questions the City's motivations for the FEMA funding: "the issue here is not whether there are sufficient FEMA funds to build the Special Needs Facility, but rather whether

19

the City simply prefers to use Templeman II funds for projects other than Phase III." The City is obligated to use City resources, from any source, in a manner that best addresses the needs of Orleans Parish, including for criminal justice and incarceration. Moreover, FEMA has approved the referenced Criminal Justice/Public Safety Alternate Projects. The City will be required to address its criminal justice needs holistically, long after the termination of Mr. Hodge.

## IV.   The City's request for relief is appropriate.

Under *Rufo v. Inmates of Suffolk County Jail*,[78] a Court can modify a consent order if the movant establishes "a significant change…in factual conditions."[79]  For a modification based on changed factual conditions, the movant must demonstrate: (1) that "changed factual conditions make compliance with the decree substantially more onerous"; (2) that "a decree proves unworkable because of unforeseeable obstacles"; or (3) that "enforcement of the decree without modification would be detrimental to the public interest."[80]  Once the requesting party has met its burden of establishing factual conditions that warrant a modification, the Court "must determine whether the modification is suitably tailored to the changed circumstance."[81]

The City has established that its bleak financial prospects now and for years to come post-COVID-19 constitutes a significant change in factual conditions which inevitably will make the programming, design and construction of a new Phase III jail building, consistent with the Court's March 18, 2019 Order substantially more onerous.  Equally important, maintaining these two Orders would be detrimental to the public interest.[82]  Moreover, the City's request for relief from Court Orders in the form of a suspension of Phase III's programming, design and construction for

---

[78] 502 U.S. 367 (1992).
[79] *Id*. at 384.
[80] 502 U.S. at 384.
[81] *Id*. at 391.
[82] *See in globo* Exhibit A.

further evaluation of a more efficient manner in which to address Plaintiffs' concerns given the present facts and circumstances—is narrowly tailored to meet the need at issue.  In short, the *Rufo* factors have been satisfied in the City's Motion.

### A.   The City Has Established a factual change in circumstances since the Court's January 25, 2019 and March 18, 2019 Orders.

Mr. Hodge and others cavalierly suggest that the City's current financial outlook does not matter.  To compare the City's current knowledge of the financial impacts of an unexpected and unprecedented global pandemic to those that were present during *United States v. New Orleans*[83] is irregular—at best.  There is no recently analogous event that compares to the extraordinary impact of COVID-19, and the ongoing economic and health-related devastation is increasing daily.  However, the U.S. Fourth Circuit's decision in *Small v. Hunt*[84] is instructive.

In *Small*, the State of North Carolina, entered into a consent judgment to provide constitutionally acceptable living conditions in the state's 49 medium and minimum-security prisons.[85]  The consent judgment required the state to provide 50 square feet of living space per inmate.[86]  In addition, the settlement agreement provided that it would be effective upon ratification of the state legislature, which approved "funds necessary to satisfy" the consent judgment.[87]

Despite North Carolina's efforts to abide by the consent judgment, the prison population exploded far beyond North Carolina's projections, causing great strain on the state's general fund.[88]  From 1988 to 1994, general operating expenses for the prison system more than doubled.[89]

---

[83] 947 F.2d 601 (E.D. La. 2013).
[84] 98 F.3d 789 (4th Cir. 1996).
[85] *Id.* at 792.
[86] *Id.*
[87] *Id.*
[88] *Id.*
[89] *Id.* at 793.

As a result, North Carolina requested a modification of the consent judgment's requirement of providing 50 square feet of living space per inmate.[90]

North Carolina alleged "a drastic, unanticipated increase in prison admissions rates that had made performance of the Agreement's terms related to dormitory living space inequitable."[91] After an evidentiary hearing, the district court concluded North Carolina established its need for a modification under the *Rufo* factors.[92]   The plaintiffs' appealed.

In affirming the district court's decision, the Fourth Circuit concluded that the explosion in the prison population constituted a significant change in factual circumstances that would be detrimental to the public interest.[93] In the court's view "the public [was] entitled to have public funds directed to the most important state projects and to reap the fullest benefit from the dollars spent."[94]

Likewise, the New Orleans taxpayers have a right to expect that public funds will be used efficiently and appropriately directed to the most important and beneficial city projects in a manner that is comparable to the need.  Notably, in the Court's Order at Rec. Doc. 1311, the Court correctly asserts that whether OPSO is responsible for one inmate, or thousands, appropriate accommodations must be provided.[95]   The City agrees.  The City would add, however, that given the limited resources available, the City must respond to the need in the most efficient and effective manner possible, with consideration given to inmate population trends.  Presently, due in large part to strategic and continuing efforts by the City, Criminal Court Judges, law enforcement, and other stakeholders, the inmate population has declined significantly and steadily, even to levels far

---

[90] 98 F.3d at 793.
[91] *Id*.
[92] *Id*. at 794.
[93] *Id*. at 796.
[94] *Id*. at 796 (citing the district court's decision, 858 F. Supp. at 523).
[95] Rec. Doc. 1311.

exceeding expectations. Presently, OPSO has a Phase II building with 1,438 beds, which must be fully staffed, but an inmate population that has most recently dipped to just over 700 inmates, according to the OPSO. The rampant inefficiencies that will be created through the construction of a new Phase III jail building, including when OPSO is unable to properly staff the current Phase II building, should be thoughtfully addressed. Moreover, the City is anticipating historic revenue shortfalls as a result of the global pandemic, which must also thoughtfully be addressed.

While the costs associated with programming, design and construction of Phase III may be ameliorated through FEMA, it is uncontroverted that such an unneeded expansion will also include substantial operating costs which will need to be funded annually from the City's general fund in perpetuity. This will undoubtedly subtract more resources from the City's essential health and protective services as well as other support for vulnerable populations throughout the City of New Orleans who are not in jail[96]. As described in the City's Motion for Relief, the OPSO's budget continues to increase in a manner that is unsustainable for the City of New Orleans, and this must be addressed in the interest of all Orleans Parish residents, not just those who have been incarcerated.

The ongoing and back-to-back cancellations of major events in the City of New Orleans will represent a multimillion-dollar negative impact on our City in the form of City tax revenue and a customer base for the businesses owned and run by New Orleanians. If ordered to continue with the programming, design and construction of a new Phase III jail building, it is certain that the OPSO's budget will continue to take on a larger percentage and disproportionate share of the City's general fund, even with a steadily decreasing inmate population. This will naturally result in a reduction in funds that can be directed to services the residents of Orleans Parish desperately

---

[96] *See* 18 U.S.C. § 3626(a).

need, from EMS to sustaining fire departments and other means of safeguarding Orleans Parish residents.  The required funding for Phase III was previously projected to include more than $9M annually for operations costs which will inevitably exacerbate an already challenging financial situation for Orleans Parish.[97]

Mr. Hodge believes that the City's grave concerns regarding revenue shortages are unwarranted because "Phase III construction must be funded '*exclusively*' from Templeman II FEMA funds,"[98]  Putting aside his legal and factual errors, he makes no reference to the exorbitant operations costs.  The City's concerns are not merely limited to the construction of Phase III, but also the future operations cost of a new Phase III jail building even if the OPSO could properly staff it.  Furthermore, Mr. Hodge's suggestion that the City's budgetary concerns are "speculative" is without merit.  The Mayor and other elected officials are charged with making difficult decisions on behalf of all Orleans Parish residents, based on all information reasonably available.  At no time prior to March 2020 was there a reasonable expectation that the Orleans Parish economy would grind to a halt.  As such, given the dramatically changed circumstances, the City is requesting that this Honorable Court grant the City's Motion for Relief.

### B.  The proposed modification is suitably tailored to the changed circumstances.

A proposed modification should not strive to rewrite a consent decree so that it conforms to the constitutional floor.[99]  Dir. Hodge seems to misunderstand, or misrepresent, what the City is requesting.   The City is not requesting that the Consent Judgment be rewritten to conform "to

---

[97] In June 2020, OPSO provided the City with updated anticipated salary information which could suggest a lower operations costs of potentially $8M per year.  Given historic practices and recurring OPSO requests for budget increases, however, the City anticipates that the operations costs will ultimately be greater.  What is very clear is that the operations costs of a new Phase III jail building will be exorbitant, and likely unsustainable for the City long-term.
[98] Rec. Doc. 1297-2 at 31.
[99] 502 U.S. at 391.

the constitutional floor."[100]  The City is requesting relief from the Court's January 25, 2019 and

March 18, 2019 Orders which required the immediate programming, design and construction of a

new Phase III jail building.  A request for suspension of these orders is based on reasonable

assumptions of the City's budgetary forecast during an unprecedented economic crisis and is also

based on the significantly reduced and continuously declining inmate population (more than a 50%

reduction), which has created a reasoned need for further evaluation around creating needed

efficiencies.

It is quite clear that the Consent Judgment does not require the construction of a new Phase

III jail building.  Moreover, to comply with the requirements of the Consent Judgment, a new

Phase III jail building is not needed and cannot be a byproduct of a court order.   Consequently,

the City's Request for Relief is a request that is narrowly tailored to address a situation that is

unprecedented and fluid.

## V.    Responses to questions posed by Judge Michael North at Rec. Doc. 1309.

1. *Does the City agree that the Stipulated Order signed by the Parties (rec. doc. 1082) obligates it to use FEMA funds designated to replace the Templeman II facility "exclusively for implementation of the plan [for] (1) appropriate housing for prisoners with mental health issues and medical needs, (2) addressing the housing needs of youthful offenders, and (3) addressing the current conditions of the 'Docks' facility?" (Id.).*

*See supra*.  The Stipulated Order requires the City to use Templeman II related FEMA

funds for the referenced purpose, with no mention whatsoever of a new Phase III jail building.

The Stipulated Order did however, specifically and unequivocally establish that the City shall

maintain final authority and approval over capital projects associated with a referenced plan.  To

the extent the "plan" referenced in the Stipulated Order, includes the recommendations of the now

twice removed former Court Appointed Compliance Director, Gary Maynard at Rec. Doc. 1106,

---

[100] 502 U.S. at 391.

who was either released or resigned -- the City retained the authority to refine the design process as "more information is made available in the formal design development process." This would reasonably include significant changes in the Orleans Parish inmate population, unsustainable operating costs, and unforeseen contingencies such as an unanticipated global pandemic resulting in a shutdown of the Orleans Parish economy for the indefinite future and an unprecedented loss of revenue for the City and its residents. Notably, the City was not a party to the referenced "plan" at Rec. Doc. 1106, which is signed only by the former Compliance Director, Mr. Maynard, and the Sheriff.

> **2.** *If the City does not agree with that proposition, explain why.*
>
> *See supra.*
>
> **3.** *What is the amount of Templeman II FEMA funds that remain available to build "appropriate housing for prisoners with mental health issues and medical needs?" (Id.)*

The City has allocated $30M towards the design and construction of the Phase III facility to house incarcerated individuals with mental and medical needs. There is an additional $6,048,227.83 reserved for anticipated project management costs associated with this project.[101]

> **4.** *How did the City arrive at the figure of $36.1 million it claims is available to be applied to construction of the Special Needs Facility, as stated in its "Response to Court Order Dated 1/25/19?" (Rec. doc. 1222).*

In 2017, a Conceptual Parameter Estimate of Construction Costs for the OPSO Phase III Building and an estimated design and construction timeline were developed by architect, Allen Patrick.[102]

> **5.** *Prior to filing its "Response to Court Order Dated 1/25/19 (Id.), did the City ever seek FEMA's approval or otherwise vet with FEMA that agency's willingness to allow the City and OPSO to proceed with any of its proposals to renovate TDC and/or OJC as a*

---

[101] Declaration of LaNitrah Hasan, Federal Grants Manager for the City of New Orleans, attached hereto as Exhibit M.

[102] *Id.*

*long-term and durable solution to housing inmates with mental health issues and medical needs? If so, when did that occur and what was FEMA's response?*

Informal Conversations were had with FEMA representatives on December 11, 2018 in preparation for a quarterly meeting with FEMA's Regional Administrator about the walk-through, 4th floor of the OPSO Administrative building/Inmate facility, and the development of alternative construction options for a new Phase III building. Following Dir. Hodge's rejection of all alternative options, the City proceeded as requested by Dir. Hodge and as Ordered by the Court with a renovation of TDC and with programming for a Phase III facility. The TDC renovation is nearing completion, and the City has incurred more than $6M in associated costs.[103]

   **6.** *Does the City agree with the Compliance Director (and Mr. Gaffney) that an additional $4 million in FEMA funds are available for use in constructing Phase III if the City enters into a cooperative endeavor agreement with OPSO concerning the Central Plant?*

Although it is unclear exactly how the Compliance Director (and Mr. Gaffney) have calculated this $4M figure, the City is not in possession of any official documentation supporting that an additional $4M in FEMA funds is available for use in constructing Phase III if it enters into a cooperative endeavor agreement with OPSO regarding the Central Plant. Without production from OPSO of formal, written approval from FEMA, the availability of this funding to OPSO cannot be verified. The City is unable to make a $4M commitment on a capital project, without confirmation of a payment source. Additionally, it does not appear that Mr. Gaffney has made any suggestions regarding how operations costs can be addressed long-term.[104]

   **7.** *To what extent, if any, did the City consult with or otherwise involve Plaintiffs' counsel and the monitors in the design for the temporary use of TDC for housing for prisoners with mental health issues and medical needs?*

All parties to the subject litigation, along with the Federal Monitors and WellPath were

---

[103] Exhibit M.
[104] *Id.*

consulted on the design for use of TDC to accommodate inmates with mental health issues and medical needs. TDC design plans were shared with all parties and feedback was requested. An in-person meeting also occurred with the architect, project manager, Plaintiffs, OPSO, the Court Appointed Monitors (and others) present on May 6, 2019 to describe the TDC design and to answer questions and receive feedback. Examples of TDC design related communications with the monitors and parties include, but are not limited to:

- *See* February 12, 2019 Grace Hebert meeting minutes describing a meeting re TDC, including representatives from CNO, OPSO, Wellpath, GraceHebert Architects, Hill International, and the Monitors, at Exhibit E.

- *See* February 15, 2019 correspondence to Mr. Hodge regarding TDC renovations, at Exhibit F.

- *See* April 23, 2019 email to Lead Monitor Margo Frasier, Plaintiffs and OPSO with TDC plans attached, at Exhibit G.

- *See* May 2, 2019 email to all parties and the lead monitor, with TDC plans attached, at Exhibit H.

- *See* May 3, 2019 email to Lead Monitor Margo Frasier, Plaintiffs and OPSO with TDC plans attached, at Exhibit. I.

- *See* August 23, 2019 email to Lead Monitor Margo Frasier, advising that a TDC Notice to Proceed was issued, at Exhibit J.

- *See* August 25, 2019 email from Lead Monitor Margo Frasier, attached at Exhibit K.

**8.** *What specific, durable solution, if any, for the appropriate housing for prisoners with mental health issues and medical needs is the City suggesting it be permitted to pursue in lieu of the promised construction of the Special Needs Facility?*

In light of the unprecedented circumstances the City is currently facing, the City has been

working with a number of experts in the fields of correctional facility planning, design, construction, health care, and jail classification to explore viable options to the Phase III facility that will meet the requirements of the Consent Decree. These efforts have intensified as the jail population has now dropped to below 900 and is projected to stay near or below that level as the City continues to implement a number of pretrial release reforms.

The options being explored will expedite continuing delivery of mental health services to the acute and sub-acute populations at a cost that is substantially below the same costs for a Phase III facility.[105]   Specifically, all such patients would be housed in renovated housing units that provide adequate safety and access to individualized treatment services within a year. Conversely, the Phase III facility will take longer to open and will require a large number of medical and security staff to open. This is concerning since the Monitors continue to note insufficient staffing within the current OJC building.

The proposed alternatives can be summarized as follows:

**Option 1:** Retain TDC Buildings 1 and 2 as a long-term facility for the Acute Males and Acute/Sub-Acute Females and renovate vacated OJC Pod 2C to accommodate the Sub-Acute Males now housed in OJC Pod 2A. Close OJC Pod 2A. Additional security staff needed to operate TDC Buildings 1 and 2. and escort patients to and from the TDC. No additional Wellpath or Tulane staff required.

This option is the most expedient but does require a renovation of Pod 2C in OJC at a cost of $3 million and additional security staff (at a cost of $3 million) to operate TDC buildings 1 and 2 which has not occurred as of this date. It assumes the long-term use of the TDC and the cost of purchasing the TDC buildings from FEMA.

---

[105] *See* Exhibit M.

**Option 2:** Renovate TDC buildings 3 and 4 to accommodate the 33 OJC Sub-Acute Males in OJC Pod 2A. Substantial number security staff are needed to operate entire TDC building and escort patients to and from the TDC. No additional Wellpath or Tulane staff required.

This option eliminates the need to renovate any portion of the OJC but it has significantly higher annual operation cost for TDC buildings 1, 2, 3 and 4 ($6 million per year). As with Option 1, the City will need to purchase the TDC buildings.

**Option 3:** Renovate OJC Pods 2A, 2C and 2D and close TDC when completed. No additional security, Wellpath or Tulane staff required.

This option is by far the least expensive option as it proposes to consolidate all of the Acute, Sub-Acute and Step-Down patients on the 2nd floor of OJC where the medical clinic also exist and which is already staffed by security, Wellpath and Tulane. Because all the necessary staff (medical, mental health and security) are already budgeted for to the various housing units in the OJC, there are no additional operating cost (staff or maintenance) with option 3. There are no operational deficiencies as Wellpath and Tulane staff are located within the OJC.

Conversely, over a 10-year horizon, the Phase III facility will consume an additional $8-9.5M in operating cost (security and medical staff for the infirmary) annually.

The City welcomes any suggestions that would enhance these three options. The City recommends Option 3 be substituted for the Supplemental Compliance Action Plan submitted on January 4, 2017.

<u>**CONCLUSION**</u>

For all of the aforementioned legal and factual reasons, the City respectfully request that

the City's Motion for Relief should be granted thereby suspending the programming, design and construction of a new Phase III jail building to permit implementation of a better-suited option.

Respectfully submitted,

  /s/ Sunni J. LeBeouf
**SUNNI J. LeBEOUF (LSBA #28633)**
CITY ATTORNEY
Email: Sunni.LeBeouf@nola.gov
**DONESIA D. TURNER (LSBA #23338)**
Email: Donesia.Turner@nola.gov
**CHURITA H. HANSELL (LSBA #25694)**
Email: chhansell@nola.gov
1300 PERDIDO STREET
CITY HALL – ROOM 5E03
NEW ORLEANS, LOUISIANA 70112
TELEPHONE: (504) 658-9800
FACSIMILE:  (504) 658-9868
*Counsel for the City of New Orleans*

## CERTIFICATE OF SERVICE

I do hereby certify that on this 12th day of August 2020, a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this filing will be sent by operation of the court's electronic filing system.  I also certify that a copy of the foregoing will be sent to all non-CM/ECF participants by United States Mail, properly addressed and postage pre-paid.

   /s/ Sunni J. LeBeouf
**SUNNI J. LeBEOUF**