UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| LASHAWN JONES, ET AL., | * | |
| | * | CIVIL ACTION CASE |
| Plaintiffs, | * | |
| | * | NO. 2:12-cv-00859 |
| VERSUS | * | |
| | * | SECTION          "I" |
| MARLIN GUSMAN, ORLEANS PARISH | * | JUDGE LANCE M. AFRICK |
| SHERIFF, ET AL., | * | |
| | * | MAGISTRATE          "5" |
| Defendants. | * | MICHAEL B. NORTH |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## POST-HEARING BRIEF OF THE INDEPENDENT JAIL COMPLIANCE DIRECTOR

Independent Jail Compliance Director Darnley R. Hodge, Sr., through undersigned counsel, respectfully submits his Post-Hearing Brief regarding the City of New Orleans' (the "City") Motion for Relief from Court Orders. Doc. No. 1281. The City's arguments and evidence utterly fail to meet its burden under Rule 60 and provide no justification for the City to intentionally breach its agreement to construct a Phase III facility for inmates with medical and mental health needs. The City's motion should be denied.

## I.     BACKGROUND

The City agreed to construct the Special Needs Facility. For the better part of four years, the City never objected to the implementation, planning, or construction of Phase III. To the contrary, the previous City Attorney confirmed the City's intention and agreement to go forward with the implementation of Phase III in open Court, and the previous Mayor reconfirmed in writing the City's preparation to construct Phase III. (Testimony of Rebecca Dietz; R. Doc. 1336-52). A change of Mayors did not alter this commitment. In December 2018, the City's Director of Capital Projects reconfirmed in writing (including attaching the Supplemental Compliance Action Plan)

1

the City's intention to go forward with Phase III construction. R. Doc. 1336-55. The issue of housing inmates with special needs became critical when the Elayn Hunt Correctional Facility would no longer be an option for short-term housing of inmates with special needs. The Court held a status conference and subsequently confirmed that the City would, *inter alia*, "direct the architect chosen to design the permanent facility described in the Supplemental Compliance Action Plan, filed into the record on January 4, 2017 (the 'Phase III facility'), to begin the programming phase of the Phase III facility as soon as possible and to update the Court on the progress of those efforts at the next scheduled status conference." R. Doc. 1221 at 3. The Court thereafter confirmed the parties' commitment "to continue the programming phase of Phase III" and "work collaboratively to design and build a facility that provides for the constitutional treatment of the special populations discussed herein without undue delay, expense or waste."[1] R. Doc. 1227 at 2–3. The City repeatedly confirmed it was following through with its agreement to build Phase III.

In June 2020, the City unilaterally halted work on Phase III and filed its Motion for Relief. R. Doc. 1281. The motion requested relief based on alleged changes in circumstances. In its reply memorandum, the City then improperly attempted to expand its requested relief with additional arguments and proposed alternatives to Phase III. None of the City's arguments—whether timely raised or otherwise—are supported by any evidence that warrants relief.

---

[1] The Court specifically found that such orders "extend no further than necessary to correct violations of the federal rights of the plaintiff class. . . . [S]uch relief is narrowly drawn, extends no further than necessary to correct the violations of federal rights, and is the least intrusive means necessary to correct such violations. The Court has given substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief ordered herein." R. Doc. 1227 at 3.

## II.      THE CITY'S MOTION MUST BE DENIED

The City's motion and evidence does not meet the standards of Rule 60. The City has submitted no viable alternative to its agreement to construct Phase III. In fact, the evidence underscored that Phase III remains the only durable, long-term solution to house inmates with medical or mental issues.

### A.   The City's Initial Arguments Are Unsupported by the Evidence.

The City's motion for relief under Rule 60 rested on two alleged changes in circumstances: (1) the COVID-19 pandemic has made the additional obligation of City funds too onerous, and (2) a reduced jail population makes construction of the Phase III jail facility unnecessary. Both arguments fail as a matter of law and of fact.

*First*, the City did not establish that COVID-19 foreclosed the City from funding the operation of Phase III. The City has a mandatory obligation under state law to fund the jail's operations. *See* R. Doc. 738 at 21 (providing that Louisiana law obligates the City to provide a 'good and sufficient jail'") (quoting La. Rev. Stat. 33:4715); *see also* La. R.S. 15:702; 704. The anticipated revenue reductions alleged by the City are relevant only to operational costs, and the testimony confirmed Phase III will not come on-line until 2023. In a late submission to the Court, the City confirmed that construction of Phase III will be complete in 31 months, R. Doc. 1356-2, while the City itself projects full recovery from COVID in 3.5 years. (Testimony of Gilbert Montano.) The economic effects of COVID will likewise be mitigated by the receipt of any federal relief funds, separate and apart from the City's own $31 million "rainy day" fund, which it has not yet used.[2] (Testimony of Gilbert Montano.) Moreover, because FEMA funds are available for the

---

[2] Testimony also indicated that the City has failed to properly manage its own operational costs throughout this pandemic; the City has not until recently furloughed employees, while the OPSO immediately implemented furloughs to reduce operating costs.

construction of Phase III, the City's general fund budget will not be impacted. (Testimony of Gilbert Montano.)

The City's second change in circumstance—an alleged decreasing jail population—fares no better. As an initial matter, testimony repeatedly confirmed that jail population is *increasing* and is currently over 900 and climbing. (Testimony of Michael Laughlin.) Jail population will likely further increase due to the lessened restrictions from COVID and local trends in violent crime. (Testimony of Michael Lauglin; Alexander Calenda). The City's jail population reduction efforts are—much like its alternative plans for Phase III—speculative and unsupported by the record. (Testimony of William Snowden; Tenisha Stevens.) Even if the City's assertions as to a declining jail population were supported by the evidence, and they are not, there is no correlation between the general jail population and the number of inmates who have medical or mental health needs. (Testimony of Raymond Patterson.) Indeed, Wellpath, the mental health services provider selected by the City, established that 93% of the current inmate population is under some form of mental health care. (Testimony of William Kissel; Carin Kottraba.) In any event, the current jail population is generally in line with predictions going back years, including those predictions in the Supplemental Compliance Action Plan, and those predictions noted as recently as February 2019 in the City's own submissions to this Court. *See* R. Doc. 1222-1 at 3. There are simply no changes in circumstances.

**B. The City's Additional Arguments Likewise Do Not Establish a Basis for Relief.**

The City raises additional arguments that likewise lack merit.[3] *First*, in its motion, the City proposed the use of the Temporary Detention Facility ("TDC") instead of Phase III to handle

---

[3] As an initial matter, arguments not raised in an initial motion or brief are properly deemed waived and need not be considered. *See Winward Grp., LLC v. Reva Solutions, Inc.*, No. 17-5748, 2017 WL 6388510, at *3 n.11 (E.D. La. Dec. 13, 2017) (Africk, J.) ("Nor must the Court consider Reva's

inmates with special needs. But as the City's own witnesses confirmed, the TDC has always previously been a "stop gap" or "bridge" to a long-term solution.[4] (Testimony of Ramsey Green; William Kissel).

After the City filed its motion, it only then engaged Dr. James Austin to develop alternatives to Phase III. In only twenty-two days, he developed three options, two of which contemplated retrofitting TDC, which he admitted at the hearing was not a "viable" option. His third option was the retrofitting of OJC, which the City said was the "best cost" solution and "adequate" for the housing of inmates with special needs. But "best cost" is not the standard for compliance with the terms of the Consent Decree. The standard is a "long-term durable solution." As Director Maynard explained, the success of treating inmates with medical and mental health needs is greater if the treatment occurs outside the confines of the general population in a stand-alone facility such as Phase III, where specially-trained deputies and staff are able to become an integrated part of the treatment team. (Testimony of Director Maynard).

Moreover, any OJC retrofit proposal is simply a rushed, hypothetical scenario that the City's own witnesses confirm lacks a set timeline, is based on assumptions as to the budget, fails to account for construction issues, and included no significant input from the federal monitors, OPSO staff, Tulane doctors, or medical service contractors. (Testimony of James Austin; Raymond Patterson; James Rouse.) Perhaps most importantly, this entire argument is an attempt to re-do the process outlined in the Stipulated Order. A similar retrofit idea was proposed in 2017 and rejected as part of that process. (Testimony of Gary Maynard; Rebecca Dietz.)

---

argument concerning contract modification, as '[a]rguments raised for the first time in a reply brief are generally waived.' *Jones v. Cain*, 600 F.3d 527, 541 (5th Cir. 2010).")

[4] During the hearing, the TDC in fact had to be evacuated due to an approaching hurricane, further illustrating its temporary nature.

Importantly, the City made no showing that FEMA funds could be used for an OJC retrofit. The record includes no agreement from FEMA, in writing or otherwise, no evidence that FEMA "obtain and maintain" insurance requirements can be met, and no evidence of OPSO's agreement to modify its building. The City has never submitted a proposed OJC retrofit to FEMA as a recipient project; and a Section 106 Historic review of a proposed OJC retrofit has not been requested by the City. The City, moreover, did not show how a retrofit of OJC will not put the OPSO at risk of up to $75 million of FEMA's "at cost" reimbursement for OJC, a project that has not been closed and a project that will not meet FEMA's "design," "function," and "capacity" requirements for "at cost" reimbursement if OJC is retrofitted.

*Second*, the City argues that it never agreed to build Phase III. This argument is belied by the facts. The City Attorney, under the powers of the Home Rule Charter, executed on behalf of the City the Stipulated Order that provided a definitive process to bring the special needs housing issue to a final resolution (Testimony of Rebecca Dietz). Once the Phase III plan was selected by then-Compliance Director Maynard, the City did not object (Testimony of Rebecca Dietz; Gary Maynard). Instead, the City reconfirmed its agreement on multiple occasions both in open Court and in writing (Testimony of Rebecca Dietz; R. Doc. 1336-52; 1336-55). The City Council itself voted in 2017 to send the Phase III plans to the City Planning Commission. Such plans were simply never sent, for no discernible reason. (Testimony of Susan Guidry.)

*Third*, the City argues that it is required to exercise its discretion in approving Phase III and may consider a "land use" veto to any Phase III construction. As an initial matter, the Stipulated Order contains no such "conditional" promise by the City. This belated claim to a land-use veto is entirely inconsistent with the City's representations and promises to the Court and to the other parties, and with the law. OPSO abandoned its claims regarding the Templeman II FEMA

6

funds in complete reliance on the City's promise and contractual agreement to use those funds "exclusively" for the implementation of a plan to house special needs inmates. The City is estopped now from taking a contrary position.

To the extent the City continues to rely on any such land use permit issue, it is a resolutory condition, wholly within the will of the City and thus must be fulfilled in good faith under Louisiana law. *See* La. Civ. Code art. 1767; 1770. The evidence shows no good-faith basis exists for refusing to grant a conditional land use permit for Phase III, if one is even required. The location of Phase III is within the currently existing secure perimeter of OJC, and there is no other conceivable use for the land other than a correctional use. Any failure to uniformly apply zoning regulations or refuse to grant a permit where no other conceivable use of the land is possible would be arbitrary and capricious.[5] Indeed, Ms. Dietz cautioned the City Council that, if Phase III did not go forward, the City would be in contempt of this Court.

Moreover, the City itself has submitted various alternative proposals up to and including the final day of the hearing on this motion, *none* of which mention or contemplate any similar conditional use permit issues. *See* R. Doc. 1337-1; 1356-2. The City may not now adopt contrary positions on a whim, one day asserting that conditional use permits are within its sole control and discretion and present an overriding obstacle to any proposed construction, and the next day submitting plans and proposals that contain no similar limitations. *See infra* p. 10.

---

[5] "Zoning regulations must be uniformly applied within each district or zone of the municipality." *K.G.T. Holdings, LLC v. Parish of Jefferson*, 14-872 (La. App. 5 Cir. 3/25/15); 169 So. 3d 628, 634, *writ denied*, 2015-0810 (La. 6/19/15); 172 So. 3d 652 (Mem) (citing *Jenkins v. St. Tammany Parish Police Jury*, 98–2627 (La.7/2/99); 736 So. 2d 1287, 1291). "When applications are granted in similar situations and refused in others, the refusal to grant an application may constitute nonuniform application of zoning ordinances that is arbitrary and capricious." *Id.* (citing *Papa v. City of Shreveport*, 27,045 (La. App. 2 Cir. 9/29/95); 661 So.2d 1100, *writ denied*, 95–2544 (La. 1/5/96); 666 So. 2d 295."

*Fourth*, the City argues that Phase III is not now needed because constitutional standards for mental health care are currently met. This contention was completely rejected by the federal monitors and should be rejected by the Court. Each of the Monitors confirmed that Phase III is necessary to fulfill the Consent Decree. (Testimony of Raymond Patterson, Robert Greifinger, Patricia Hardyman, Margo Frasier.) The TDC is merely a temporary solution, not a viable or durable option for long-term, substantial compliance with the terms of the Consent Decree.

*Fifth*, the City argues that an infirmary as contemplated by Phase III is not necessary to address the medical needs of inmates. Although the City called Dr. Ronald Shansky on the issue, he supported the Compliance Director's position, not the City's. Dr. Shansky discussed several conditions which must be met for a jail not to have an infirmary. Dr. Shanksky agreed that none of conditions are met by OJC. He likewise testified that it is common for mid-sized jails—one with over 500 inmates— to have infirmaries on site. OJC is, at the very least. a mid-sized jail; and the conditions which would render an on-site infirmary unnecessary simply do not exist at OJC. Moreover, all of the monitors agreed that an infirmary is required.

*Sixth*, the City argues that the Court's orders violate the Prison Litigation Reform Act ("PLRA"). This argument (1) was not raised in the City's initial motion and is properly deemed waived; and (2) misconstrues the factual record. The Court has never ordered the City to build a jail, but it does have the authority to enforce the City's agreement with the parties to build Phase III. In fact, the City agreed in the Stipulated Order to an express provision that the Stipulated Order complies with the PLRA. This language was not "boilerplate" but rather included input and consideration from all parties, including the City. (Testimony of Rebecca Dietz.) The Court's Order of March 18, 2019 likewise provides that its "relief is narrowly drawn, extends no further than necessary to correct the violations of federal rights, and is the least intrusive means necessary

to correct such violations" and that the Court "has  given substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief ordered herein." R. Doc. 1227 at 3.

Nothing in the PLRA limits a Court's authority to enforce its own orders or to require a party to fulfill its contractual agreements and promises. *See Plata v. Schwarzenegger*, No. C01-1351, 2008 WL 4847080, at *7 (N.D. Cal. Nov. 7, 2008). The site of Phase III is already selected and FEMA funds are available to cover all costs of construction. Neither of the Court's orders violate any provisions of the PLRA. *Cf. Harris v. City of Philadelphia*, No. 82–1847, 2000 WL 1978, at *17 (E.D. Pa. Dec. 23, 1999) (finding Section 3626(a)(1)(C) not implicated where the City's decision to build a Women's Detention Facility was already made and the site selected and prepared by City officials, not the court, and the court otherwise ordered that certain justice lease revenue bond funds "shall  not be diverted, expended or committed by presently binding obligation or transferred except for the construction of a Women's Detention Facility at the City's prison campus").

*Seventh*, more than sufficient FEMA funds are available to construct Phase III.  Michael Gaffney testified that $48 million dollars of the $70 million in Templeman II funds remain for the construction of Phase III, and the City agreed in paragraph 22 of the Stipulated Order  that those funds would be used *exclusively* for the construction of a facility addressing housing for special needs inmates. Even though the City moved Templeman II FEMA funds to a Criminal Justice Public Safety Consolidated Alternate Project Worksheet , it admitted that the funds in that project worksheet can be reallocated to build Phase III, and the funds that remain available in that project worksheet  are at least $81 million.  (Testimony of Ramsey Green, LaNitrah Hassan).  The issue

is not whether sufficient FEMA funds remain for building a Special Needs Facility, but whether the City wants to spend these funds on other things, such as renovating Gallier Hall.

*Finally*, the City is estopped from adopting contrary positions with respect to the construction of Phase III (especially as regards the PLRA and land use arguments) after representing to the Court and the parties to this longstanding litigation, until as recently as April 2020, that it had every intention of going forward with the construction of the same. *See* R. Doc. 1268 ("The architect, . . . is currently engaged in the Construction Document ("CD") phase of Phase III. The projected project completion is summer 2022."). The City has taken an established position with respect to the construction of Phase III since at least 2017, and the Court and the parties have relied on that position. The City's recent about-face is "clearly inconsistent" with its prior representations; and the OPSO would have never relinquished control of the Templeman II FEMA funds if the City can now ignore its agreement to build the Special Needs Facility. The Special Needs Facility is the only durable, long-term solution to the problem of inmates with medical and mental health needs.

## III.    CONCLUSION

The City's motion does not meet the burden of Rule 60. The motion improperly seeks to undo and rewind the previously agreed-to process for implementing a long-term solution for inmates with medical and mental health needs housed at OJC which was embodied in a Stipulated Order. The City's motion is not justified by the law nor by the facts and, accordingly, must be denied.

Respectfully submitted,

*/s/ Richard C. Stanley*
Richard C. Stanley, 8487
Bryan C. Reuter, 23910
Stanley, Reuter, Ross, Thornton & Alford, L.L.C.
909 Poydras Street, Suite 2500
New Orleans, Louisiana 70112
Telephone: 504-523-1580
Facsimile: 504-524-0069
rcs@stanleyreuter.com
bcr@stanleyreuter.com

*Attorneys for Darnley R. Hodge, Sr.*

## CERTIFICATE OF SERVICE

I hereby certify that on October 30, 2020, a copy of the foregoing Post-Hearing Brief of the Independent Jail Compliance Director was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to all counsel of record by operation of the Court's electronic filing system.

*/s/ Bryan C. Reuter*

11