UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| LASHAWN JONES, ET AL, Plaintiffs; and UNITED STATES OF AMERICA Plaintiffs in Intervention<br><br>v.<br><br>MARLIN N. GUSMAN, ET AL, Defendants<br><br>MARLIN N. GUSMAN, Third-Party Plaintiff<br><br>v.<br><br>THE CITY OF NEW ORLEANS, Third-Party Defendant | Civil Action No. 2:12-cv-00859<br>Section I, Division 5<br>Judge Lance M. Africk<br>Magistrate Judge Michael B. North |

## **PLAINTIFF CLASS' POST-HEARING MEMORANDUM**

The Plaintiff Class respectfully submit this Post-Hearing Memorandum on the City of New Orleans' Motion for Relief from Court Orders of January 25, 2019 (Rec. Doc. 1221) and March 18, 2019 (Rec. Doc. 1227) Regarding Phase III Jail Facility ("City's Motion"). ECF No. 1281.

The City's Motion seeks relief from two orders issued to effectuate the parties' negotiated process for devising the solution to the Orleans Justice Center's ("OJC's) structural deficiencies that impede compliance with the medical and mental health care provisions of the Consent Judgment. Specifically, the City seeks to "indefinitely suspend[ ] the programming, design and construction of a new Phase III jail facility," ECF No. 1281, based on its contentions about budget shortfalls due to the COVID-19 pandemic, overall jail population reduction, and

the constitutionality of medical and mental health care currently provided. None of these bases justifies the drastic relief the City seeks. The City also did not demonstrate that its *post hoc* alternatives, formulated in a few weeks without any input from the other parties or the independent monitors and advanced for the first time in its Reply brief, are adequate to remedy the OJC structural deficiencies that prevent Consent Judgment compliance.[1]

The 2016 Stipulated Order for Appointment of Independent Jail Compliance Director ("Stipulated Order"), ECF No. 1082, requires the City to allocate FEMA funding from the Templeman II building exclusively to implement the Compliance Director's recommendation for resolving the OJC's structural deficiencies. In exchange, the City gained control of the funds and the Sheriff dismissed his lawsuit regarding that issue. Rebecca Dietz, City Attorney for the City of New Orleans from 2015 through 2018, confirmed this agreement, and further testified that the purpose of the Order was to "resolve" the issues regarding the housing of prisoners with mental health needs. Ms. Dietz confirmed that the City did not oppose Director Maynard's January 4, 2017 Supplemental Compliance Action Plan, ECF No. 1106; to the contrary, in a meeting between Maynard, Dietz, and the Mayor, the City pledged its support for the Plan, and the City's agreement to the Plan was later affirmed in public statements to the Court on June 6, 2017.[2] Status Conf. Tr. 17-18, ECF No. 1127.

---

[1] In its closing remarks, the City raised for the first time yet another alternative and unjustified request for relief – namely, that it be provided 60 days to request authorization to use FEMA funds for an OJC retrofit. It is not clear why the City did not already request FEMA authorization, which does not require Court approval, during the more than four months that its motion has been pending. This last-minute request is unnecessary and unjustified.
[2] The City argued in its closing statement that, although Ms. Dietz was able to bind the City, the City Council is ultimately responsible for land use decisions. This argument was not briefed anywhere in the City's filings and is not properly before the Court. In any event, the parties must be able to rely on the City Attorney to effectuate a settlement that she indisputably had authority to enter.

2

**I.     ARGUMENT**

    **A. Structural Deficiencies at the OJC Continue to Inhibit Compliance with the Medical and Mental Health Care Provisions of the Consent Judgment and the Constitution.**

The City seeks relief on the basis that "the Orleans Justice Center currently provides medical and mental healthcare that is above the minimal constitutional standard." ECF No. 1281-1 at 1. Testimony from the Court's monitors demonstrates how the current structure of the OJC[3] continues to impede compliance with the medical and mental health care provisions of the Consent Judgment.

The physical structures of the OJC's units prevent Consent Judgment and constitutional requirements to mitigate risk to people with suicidal and self-harming impulses. Dr. Patterson, the mental health monitor, testified about the regular use of non-suicide-resistant cells to hold people who have voiced intent or acted to harm themselves. The staffing-intensive direct supervision necessary to help keep these people safe is simply not accomplished at the OJC. The City's witness, Dr. Rouse, lead psychiatrist at the jail, testified to his concerns about the poor sight lines of the rectangular units and the inability to readily observe people held in mezzanine-level cells.

Multiple witnesses also testified about the regularity of mezzanine safety issues for prisoners with mental health needs. Dr. Patterson described "countless" incidents of harm from mezzanines, and Lead Monitor Frasier testified that the mezzanine was a "pretty constant issue." The examples of prisoners jumping off of and attempted hangings from the mezzanine that

---

[3] The City's expert architectural witness, Allen Patrick, testified to his previous description of "significant deficiencies in the original design of the Phase 2 facility" as early as 2015. ECF No. 843 at 6. The structural problems of the current OJC building have been known and acknowledged by the parties for years.

3

Plaintiffs included in their filings were a picture of the pervasive pattern of harm that occurs due to the structural deficiencies of the OJC.  *See e.g.*, ECF No. 1334-1; ECF No. 1304-2.

Dr. Patterson also testified, consistent with the findings of many of the compliance reports, that the OJC has never had housing units appropriate for acute, sub-acute, and step-down populations.  People with serious mental health needs have always been held on large 60-bed units, virtually identical to every other unit in the facility, with poor sight lines and mezzanine levels.  Dr. Patterson testified that unstructured out of cell time is a critical component of mental health treatment for people with mental health needs.  But as classification monitor Dr. Hardyman and Lead Monitor Frasier confirmed in their testimony, classification considerations for such large 60-bed units create significant difficulties ensuring safety while prisoners are out of cell.  Further, Dr. Patterson described the women as the "forgotten population" of the OJC; they have never received acute or sub-acute level care because there has simply never been an acute or sub-acute unit dedicated to their safe housing and treatment needs.

Although two of the City's witnesses claimed, "Wellpath is in compliance with all areas of the Consent Judgment regarding healthcare," ECF No. 1281-3 at para. 28, on the witness stand, Mr. Kissel admitted that several provisions of the Consent Judgment were not in substantial compliance, including the lack of an acute unit for women and the failure to place prisoners in a safe environment when prisoners exhibit self-injurious behavior.

Dr. Patterson testified at length, consistent with findings in multiple compliance reports,[4] that the OJC lacks sufficient space for individual and group programming.  Both group and

---

[4] *See, e.g.,* Report No. 11 of the Independent Monitors, ECF No. 1259 at 58, 62, 64, 67, 68; Report No. 12 of the Independent Monitors, ECF No. 1303 at 64-66.

individual counseling spaces must afford some level of confidentiality to allow detainees and providers to have a frank exchange of personal information essential for treatment,[5] but these spaces do not exist at the OJC.  Dr. Patterson testified that the individual and group programming requirements of the Consent Judgment are not limited to the mental health caseload or to specific tiers, but extend to prisoners in general population.  He confirmed that there are hundreds of prisoners who are required to receive group programming pursuant to the Consent Judgment but are not receiving these services.  Two of the City's witnesses, Mr. Kissel and Dr. Kottraba, acknowledged that people on certain tiers, including protective custody and administrative segregation, as well as those on the disciplinary tier, simply do not have access to group programming.  In response, Dr. Patterson testified that "custody level does not negate the mental health need."  As long as these mental health needs goes unanswered, OPSO and Wellpath cannot come into compliance with the Consent Judgment or the Constitution.

The Court's medical monitor, Dr. Greifinger, testified that of the medical portions of the Consent Judgment that he is responsible for, only 7 of 18, or 39%, are in substantial compliance.  Dr. Greifinger also testified how prisoners returning from the emergency room are currently assigned to general population, where they do not receive adequate treatment or follow-up care, due to the lack of an infirmary at the OJC.

---

[5] Dr. Patterson further testified about the insufficient space for individual counseling at the OJC. Dr. Patterson's testimony was consistent with guidance on confidentiality from the National Center for Correctional Health Care (NCCHC), which the City cited in support of its care arguments. This testimony undermined testimony from Wellpath executive, Dr. Kottraba, that cell-front visits by a mental health professional should be considered individual therapy sessions, and that they are standard industry practice. Dr. Patterson's findings regarding the negative impact of the lack of private interview space are also well documented in the monitors' reports. *See, e.g.,* Report No. 9 of the Independent Monitors, ECF No. 1188 at 92; Report No. 11 of the Independent Monitors, ECF No. 1259 at 64.

The City's medical expert, Dr. Ronald Shansky, testified that he would expect a jail of the OJC's size to have an infirmary. Dr. Shansky also testified that he had assumed, but was unaware, whether his factors (ECF No. 1281-7 at para. 21) for a sufficient hospital-based alternative to an infirmary were actually in place in New Orleans. Testimony confirmed these factors are absent. Dr. Greifinger testified that there is no legal agreement between the City and local hospital for dedicated use of a secure 10-12 bed ward for OJC patients. The City presented no evidence that the jail medical director has admitting or discharge privileges at the local hospital.

Medical and mental health care continue to be insufficient to achieve substantial compliance with the Consent Judgment or the Constitution, in part, because of long-identified structural deficiencies in the OJC.

### B. Overall Population Reduction Has Not Significantly Reduced the Population with Mental Health Needs.

Multiple witnesses testified about the jail's changing prisoner population, which has trended down since the OJC opened in September 2015, as predicted for years by the City. However, there have also been periods of increasing prisoner population over the last three years, including in recent months.[6] And even with a lower overall population, as Dr. Hardyman testified, the large 60-bed units will continue to present classification dilemmas for smaller populations, including acute, sub-acute, step-down, and other special populations.

A lower overall jail population has not resulted in a proportionate decline in prisoners with mental health needs, as City witnesses William Snowden, Jonathan Wisbey, and Dr. Rouse

---

[6] The population of prisoners in OPSO custody had dropped from 1045 on March 13, 2020, at the start of the pandemic, to 804 a month later, but as of October 30, 2020, the population has risen to 938.

testified. Dr. Rouse testified that, although he has observed the number of prisoners decreasing over time, psychiatric patients are not declining in a proportionate manner. And William Snowden confirmed that the City of New Orleans continues to lack community-based mental health care that would be necessary for any concentrated effort to divert people with mental health needs from the jail. Nor did the City show any funded commitment to provide such services. As discussed in greater detail above, the general reduction in jail population does not address the hundreds of prisoners who require, and often do not receive, individual counseling, group programming, and appropriate, safe housing, contrary to the requirements of the Consent Judgment and the Constitution. Thus, a general population decline (especially one contemplated by the City for years) cannot be a changed circumstance warranting the relief the City seeks.

### C. The City Cannot Demonstrate that Lack of Funding Justifies Its Request for Relief.

The City argues that budget shortfalls due to the COVID-19 global pandemic constitute a change in circumstances sufficient for Rule 60 relief. But well-established jurisprudence of this Circuit and the law of this case establish that cost is not a defense to Constitutional violations. ECF No. 465 at 79 (citing *Gates v. Collier*, 501 F. 2d. 1291, 1322 (5th Cir. 1974); *Smith v. Sullivan*, 611 F.2d 1039, 1043–44 (5th Cir.1980)). Rights violations at the jail, particularly related to medical and mental health care, are ongoing. The City's cost arguments – and its proposal to not move forward on Phase III nor otherwise appropriately address the physical and structural barriers at OJC to provide constitutional care – do not justify the City's requested relief from the existing court orders.

### D. The City Has Not Sought to Solve the Structural Deficiencies Impeding Compliance with the Medical and Mental Health Care Provisions of the Consent Judgment.

After the City's Motion requested only that it be permitted to indefinitely suspend work on Phase III, the Court ordered the City to provide any contemplated alternate plans in its Reply. ECF No. 1309 at 2. Only then did the City present three alternatives: the first two related to a renovation of the TDC, and the third, a second floor retrofit to the OJC. But during the hearing, the City's lead expert witness, Dr. James Austin, admitted that the two TDC options were "not viable."[7] During closing statements, the City acknowledged that it was no longer pursuing the two "not viable" alternatives.

Both iterations of Dr. Austin and Mr. Patrick's Alternatives Report, ECF No. 1312-4 and ECF No. 1337-1, lacked any robust analysis of whether a retrofit would remedy all of the OJC's structural deficiencies impeding substantial compliance with the Consent Judgment. Testimony confirmed that it would not.

Dr. Austin and Mr. Patrick both testified, consistent with their report, that they had not considered the number of suicide-resistant cells that would be necessary for a second floor retrofit. Both testified that any suicide-resistant cells could be on the mezzanine level, but there was no discussion of how sight lines and staff access would be maintained for these most vulnerable prisoners. Neither Dr. Austin nor Mr. Patrick offered any level of detail or reassurance about how the risk of harm posed by the mezzanine itself would be remedied while not impeding both visual and physical access to people held in the mezzanine-level cells. And

---

[7] This was particularly evident when the Court needed to adjourn early one day during the hearing so that OPSO could evacuate TDC due to an approaching hurricane.

the City's witness, Dr. Rouse, directly testified to his concern that the fix for the mezzanine not be chicken wire.

Dr. Austin did not examine classification requirements such as PREA designations, security threat groups, "keep separates," and other designations in his analysis of the feasibility of a second floor retrofit. Dr. Hardyman testified that she was "surprised" and would have expected such classification considerations to have been included in his Alternatives Report. Dr. Austin testified that his Alternatives Report assumed an entire pod would be vacant from the transfer of all juveniles out of the OJC, when juveniles are consistently housed at the OJC at the sole discretion of state court judges.

Further, Dr. Austin's other report, ECF No. 1281-6, provides unsupported and incorrect conclusions as to the adequacy of individual and group programming space at the OJC. These conclusions appear to rest solely on the number of spaces included in the OJC design, divided by the number of patients on Wellpath's mental health caseload. This simplistic arithmetic ignores the multitude of current uses for these spaces, Consent Judgment requirements for programming and counseling for general population prisoners, necessary classification considerations and separations, and the different types of treatment needed by different prisoners.

The City also has not shown that the multiple conditions precedent to a second floor retrofit have been met – or could be met – such as obtaining FEMA approval to modify an at-cost facility and securing a dedicated hospital wing for provision of medical care to OPSO prisoners in lieu of an infirmary. Perhaps most importantly, the City has not obtained the agreement and cooperation of the Orleans Parish Sheriff's Office to modify its own building.

9

## II. CONCLUSION

For the foregoing reasons, the Court should deny the City's Motion for Relief from Court Orders of January 25, 2019 (Rec. Doc. 1221) and March 18, 2019 (Rec. Doc. 1227) Regarding Phase III Jail Facility ("City's Motion"). ECF No. 1281.

Respectfully Submitted,

*/s/ Emily Washington*
EMILY WASHINGTON, LSBN 34143
ELIZABETH CUMMING, LSBN 31685
Roderick & Solange MacArthur Justice Center
4400 S. Carrollton Avenue
New Orleans, LA 70119
Telephone: (504) 620-2259
emily.washington@macarthurjustice.org

*Counsel for Plaintiff Class*

Date: October 30, 2020