UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| LASHAWN JONES, ET AL. | CIVIL ACTION NO. 12-859 |
| VERSUS | SECTION I, DIVISION 5 |
| MARLIN GUSMAN, ET AL. | JUDGE LANCE M. AFRICK<br>MAGISTRATE JUDGE NORTH |

## CITY OF NEW ORLEANS' POST-HEARING MEMORANDUM

The City of New Orleans (the "City") respectfully submits this Post-Hearing Memorandum in support of its Motion for Relief from Court Orders Regarding the Phase III Jail Facility ("Motion for Relief").[1]

The City has demonstrated a significant change in circumstances sufficient to justify relief from the Court's Order to construct a Phase III new jail building. Moreover, a Court Order to construct a new jail building is statutorily proscribed, in accordance with the Prison Litigation Reform Act ("PLRA"). The City has further demonstrated that a retrofit of the second floor of the Orleans Justice Center ("OJC") is the least intrusive and most efficient way for the Orleans Parish Sheriff's Office ("OPSO" or the "Sheriff") to provide constitutional medical and mental health care services to OPSO inmates.

The power and authority of our local elected officials as established by the Home Rule Charter of the City of New Orleans cannot and should not be usurped via a Court Order to build a new jail building. Indeed, the District Court has acknowledged previously that this decision-making authority belongs to those local officials responsible to the taxpayers and vested with the legal authority to exercise this role. Testimony throughout the hearing on the City's Motion for

---

[1] Rec. Doc. 1281.

1

Relief demonstrates that any expansion of the Orleans Parish jail complex will require increased funding to the detriment of Orleans Parish residents.  Moreover, testimony further confirmed that a new jail building will not address the provision of services for OPSO inmates, and it is the provision of services, not the provision of buildings, that the Consent Judgment is meant to address.  Equally important is the fact that a possible Phase III new jail building will likely delay rather than foster compliance with the Consent Judgment.

### I. Significant and Unexpected Change in Circumstances

The City has demonstrated a significant and unexpected change in circumstances following entry of the Stipulated Order, which makes the Court's Order to construct a new jail building untenable, contrary to public safety, contrary to the City's criminal justice reform efforts, and likely to create an additional tax burden on the residents of Orleans Parish.  By all accounts, the City has met its burden for relief under Fed. R. Civ. P. 60 and the *Rufo*[2] factors.  Consequently, the City's Motion for Relief must be granted.

#### A. COVID-19 Global Pandemic

This Honorable Court should not overlook the unprecedented financial toll of the COVID-19 global pandemic on Orleans Parish residents.  The City's Chief Administrative Officer, Gilbert Montaño ("Montaño"), testified that the City's current financial position is dire as a result of the COVID-19 global pandemic.  Mr. Montaño's testimony was uncontested.  Since the onset of the COVID-19 global pandemic, the City has implemented hiring and spending freezes, and experienced an unprecedented 34% drop in the GDP, accounting for an anticipated $150 million revenue loss.  Mr. Montaño testified that because of reduced revenue, the City has been compelled to take the significant step of furloughing employees, including the New Orleans Police

---

[2] *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367 (1992).

2

Department, the New Orleans Fire Department, and New Orleans Emergency Medical Services. The economic fallout for Orleans Parish has no end in sight. According to Mr. Montaño, the City's financial losses from COVID-19 will leave the City with a deficit which has already diminished the City's ability to provide essential services, including public safety services for Orleans Parish residents.

While other essential City services are currently being *decreased* parish wide, by contrast the Orleans Parish Sheriff's Office will need *increased* funding to support a new jail building. Jonathan Wisbey, the City's OPSO budget liaison, testified that the OPSO budget has increased by more than 140% since 2012, despite a significant decline in the jail's population. Changes in City revenue, jail investment, and a significant decline in the inmate population are unprecedented and create a factual scenario which makes compliance with the Court's January 25, 2019, and March 18, 2019, Orders more onerous, unworkable due to unforeseen circumstances, and detrimental to the public interest and safety guideposts in the PLRA.

### B. Declining Jail Population

The undisputed testimony of Will Snowden ("Snowden"), Director of the Vera Institute of Justice ("Vera"), and the Criminal Justice Commissioner for the City of New Orleans, Tenisha Stevens ("Commissioner Stevens"), demonstrates that OJC's jail population has decreased significantly, and in a manner which establishes available space in existing facilities for a retrofit. As part of a process that began in 2006, the City adopted Vera's recommendations aimed at safely reducing the jail population (*e.g.*, pre-trial diversion programs, LEAD, restorative justice programs, drug court, warrant clinic, and the issuance of summons in lieu of arrests). It is undisputed that around the time of Hurricane Katrina, the jail population at OPSO exceeded 6,000

inmates.  Since then, the jail population has steadily declined and is now less than 1,000 inmates.[3]  Any Court ordered expansion of the jail at this time would be in stark contrast to the City's criminal justice reform efforts, and contrary to criminal justice reform efforts throughout the country.

Commissioner Stevens testified that with the anticipated new Jail Release Navigator position, the acute and subacute OPSO special inmate population will likely continue to decline because this position aimed at reducing recidivism will link those with mental health needs to health care facilities and/or services upon release from jail.  It is undisputed that incarceration is not the appropriate means to receive health care.

The testimony of Dr. James Austin, a nationally recognized expert in jail population projections and prison classification systems, further supports the City's request for relief from Court Orders to build a new jail building in support of a retrofit.  Dr. Austin testified that of the twenty-six (26) jail sites across the country that he works with to reduce jail population, New Orleans has the largest reduction in jail population and that reduction will continue.

While the youthful offender population has been presented as a purported reason why a retrofit is not feasible, this dubious argument falls flat.  OPSO currently has approximately two youthful offenders in custody, with even that very limited number expected to dwindle (down to zero) shortly.  The City of New Orleans cannot and should not be forced to build a new jail building to accommodate at most two (2) youthful offenders when the City has invested in a $17 million expansion of the Juvenile Justice Intervention Center (JJIC), with twenty-eight beds available, for this very purpose.  Moreover, City Code Section 102-2 establishes the JJIC, formerly the Youth Study Center, as the appropriate adult facility for the pre-trial detention of youth charged as adults.

---

[3] Notably, housing reports submitted by OPSO appear inflated through the inclusion of DOC inmates who should have been transferred to DOC, as DOC itself acknowledged in earlier proceedings, and whose population is artificially increased by federal inmates not physically housed at OJC as well as work release inmates that are part of DOC.

4

### C. OPSO Staffing Deficiencies

The OPSO Federal Monitors have consistently concluded that OPSO is unable to hire adequate staff, has experienced sizeable attrition and turnover, and has failed to adequately train staff. This trend has continued despite the City's efforts to support OPSO. Michael Laughlin, the Chief of Investigations at OPSO, testified that there are currently one hundred (100) personnel vacancies at OPSO. OPSO's Chief Financial Officer, Sean Bruno, and the Independent Jail Compliance Director, Darnley Hodge, also confirmed that hiring and retention of OPSO staff has been a significant problem. It is undisputed that OPSO has historically been unable to hire and retain the staff needed for OPSO to meet the monitors' standards. The correctional staff at the Temporary Detention Center cannot simply be transferred to a Phase III new jail building because OPSO has never demonstrated an ability to hire and retain staff. Moreover, adding a permanent new jail building to OPSO's large jail complex will undoubtedly result in OPSO having inadequate staff in two jail buildings.

Dr. Jeffrey Rouse ("Rouse"), Lead Psychiatrist at OPSO, testified that staffing shortages are a critical factor in impairing healthcare services.[4] There is no ability to transfer correctional staff to alleviate this problem when staff do not exist.[5] Michael Laughlin estimated that the staffing needs for a Phase III new jail building will range from 105 to 108 new personnel. Therefore, considering the currently existing one hundred (100) OPSO personnel vacancies, OPSO will need to hire more than two hundred (200) new employees, train them properly, and avoid the ongoing and consistent trend of employee attrition, in order to have even a chance at adequately staffing their multiple buildings to meet the monitors' standards for jail staffing. This assumes proper

---

[4] The Monitors agree with Dr. Rouse. *See* Rec. Doc. 1303 (Monitors Report No. 12) at 79 (noting that lack of custodial staff presents an obstacle to treatment).

[5] Notably, Dr. Kottraba testified that staffing difficulties may be regional in nature given consistent and longstanding challenges in this area.

training of and retention of staff, which OPSO has had great difficulty accomplishing. To assume that OPSO can now magically resolve this longstanding staffing problem is flawed logic. Efficiencies in staffing are needed. History reveals that OPSO will never secure needed staffing levels if the Court Order to build a Phase III new jail building is upheld. Given OPSO's current staffing struggles, ordering the City of New Orleans to build a new jail building when OPSO cannot staff it to meet the monitors' standards, will impede compliance and will ultimately cause irreparable and long-term harm to the residents of the City of New Orleans.

## II.     The PLRA Limits Court Authority

The Prison Litigation Reform Act ("PLRA") limits the ability of a Court to grant prospective relief. The Court's power can go "no further than necessary to correct the violation of the Federal right of . . . plaintiffs."[6] Relief must be "narrowly drawn" and extend "no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal Right."[7] Pointedly, there was no evidence introduced during the hearing on the City's Motion for Relief that demonstrates that a federal right has been violated for any OPSO inmate. To the contrary, Wellpath representatives and Dr. Rouse testified that OPSO inmates receive medical and mental health services that meet or exceed care standards for this community. The PLRA specifically recognizes the limited role of the Federal Court. "A discernable—and legitimate—purpose of the PLRA is to preserve state sovereignty by protecting states from overzealous supervision by the federal courts[.]"[8] The PLRA thus allows local governments "to run the prisons as they see fit unless there is a constitutional violation"[9]—and none has been proven.

---

[6] 18 U.S.C.A. § 3626(a)(1)(A).
[7] *Id*.
[8] *Imprisoned Citizens Union v. Shapp*, 11 F. Supp. 2d 586 (E.D. Penn. 1998) (internal quotations omitted).
[9] *Inmates at Suffolk County Jail v. Rouse*, 129 F.3d 649, 660 (1st Cir. 1997).

### A. There Is No Need for a New Jail Building.

This recognition of the limits of the PLRA is consistent with Federalism and Separation of Powers' precepts. Therefore, the PLRA explicitly prohibits a court from ordering the construction of a jail facility "or the raising of taxes[.]"[10] These actions are exclusively the province of local governments. "When courts substitute their judgment for judgments made by the executive or legislative branches, courts exceed their authority[.]"[11] The decision to construct a new jail facility should be decided by elected officials responsible to the taxpayers and the legislative process, including adherence to the City's Home Rule Charter and conditional use permitting requirements.

### B. Evidence Supports the Conclusion That Current Facilities Are Adequate.

Neither the Constitution, nor the Consent Judgment, require a new jail building. Dr. Bill Kissell testified that the medical and mental health services currently provided to OPSO inmates exceeds that of numerous other jail facilities. Additionally, Dr. Carin Kottraba, testified that the mental health programming offered by Wellpath meets constitutional and appropriate standards of care. Dr. Kottraba opined that a new jail building is neither needed to meet the requirements of the Consent Judgment, nor required to provide constitutional care to OPSO inmates. Dr. Kottraba has performed oversight and designed mental health care programs for over one hundred jail facilities, including facilities under court-orders. Based on Dr. Kottraba's twenty (20) years of experience, a separate jail building for medical and mental health services is not required to meet the constitutional and appropriate standards of care. Notably, she testified that a retrofit of the current jail building would provide the best option for improved care to the acute and subacute special population. Dr. Kottraba also testified that OPSO's staffing shortages create an impediment to providing the services needed where there is no correctional staff to ensure inmates

---

[10] 18 U.S.C.A. § 3626(a)(1)(C).
[11] *SH3 Health Consulting, LLC v. Page*, 450 F. Supp. 3d 1212 (E.D. Mo. 2020).

are able to participate in the many therapeutic programs and counseling services offered by Wellpath.  Additionally, Dr. Kottraba testified that having the acute and subacute population at OJC instead of being housed in a separate building will allow for improvements to staffing coverage, a collaborative approach to treatment, and simultaneous health services across disciplines for the acute and subacute OPSO special population.

### III. A Retrofit of Existing Jail Facilities is the Most Efficient and Expedient, Least Intrusive Path Forward to Providing Services to OPSO Inmates.

#### A. The COVID-19 Global Pandemic's Persistent Adverse Effects on the Budget Requires Reconsideration of Cost-Effective Options.

At the hearing on the City's Motion for Relief, the City provided testimony and evidence that a retrofit of Orleans Parish existing jail facilities is the better and quicker approach to supporting OPSO in sustaining compliance.  Allen Patrick ("Patrick"), an architect specializing in criminal justice and security facilities, testified that a retrofit of the existing jail facility is feasible. This retrofit will be accomplished by renovating three pods on the second floor of the existing OJC.  Mr. Patrick also testified that the OJC mezzanine and cell fronts can be renovated to assist with protecting against the potential for inmate self-harm.  Further, there will be no disruption in the OPSO correctional deputies' ability to provide security within OJC during construction.  Mr. Patrick testified that the OJC second floor retrofit is the most efficient, least intrusive means of providing an environment for staff to deliver services to OPSO inmates.

Evidence and testimony demonstrated that the retrofit of the existing jail facility will cost approximately $9 million and will take approximately one year to complete, with no added annual operating costs borne by taxpayers of the City. Alternatively, a Phase III new jail building will be much more costly to construct and will take years to complete, assuming a conditional use permit is approved by the City Council.  Further, there will be substantial additional annual operating expenses required for a Phase III new jail building.  Any suggestion to the contrary is simply

8

incorrect. A retrofit is the better and quicker path forward for the City of New Orleans to efficiently meet the needs of OPSO inmates.

### B. FEMA Funding

FEMA Funding is sufficiently flexible to adapt to Orleans Parish policymakers' decisions as to whether there is a need for a Phase III new jail building or whether a retrofit is preferable. Furthermore, FEMA must approve Phase III and has not yet done so. Deputy CAO of Infrastructure, Ramsey Green, testified that FEMA will consider a retrofit of the current OJC facility to house inmates with medical and mental health needs. On October 22, 2020, the Mayor met with FEMA Region VI Administrator, Tony Robinson, to in part advise that the City intended to submit a formal request to amend the scope of work for Phase III to recommend approval of the retrofit of the OJC. The City subsequently transmitted this request to GOHSEP. Under the Criminal Justice and Public Safety Alternate Project Fund, the City of New Orleans is appropriately authorized to prioritize the City's current criminal justice and public safety needs, instead of forcibly building structures that do not comport with current needs (*e.g.*, jail kitchen warehouse with capacity to provide 25,000 meals/day).[12] This flexibility by FEMA, as has been demonstrated in the past, will undoubtedly allow the City to provide for the Orleans Parish community's current needs and concurrently provide a jail facility that complies with the Consent Judgment's mandates.

### C. The Orleans Parish Community Rejects the Need for a New Jail Building.

The Orleans Parish Community has been loud and clear in establishing there is no desire for a new jail building in Orleans Parish. The Community has sent this Honorable Court more

---

[12] In response to the Court's inquiry during his testimony, Mr. Green has requested confirmation from FEMA that the retrofit can be paid for with FEMA dollars as an alternate PW and awaits FEMA's response. FEMA's formal response is expected within 30-60 days.

than nine hundred (900) letters and correspondence expressing the community's demand that Orleans Parish not invest in yet another jail building. This is in addition to the public comments and countless correspondence expressing this same sentiment to the New Orleans City Council and Mayoral Administrations over the years. The Mayor of the City of New Orleans, and the New Orleans City Council, have expressed their collective desire that Orleans Parish not be required to invest in another jail building. Similarly, our State Senators and Representatives have expressed concern that a new jail building will further reduce already limited resources available to the constituents they were elected to serve in Orleans Parish.

This Honorable Court should not replace the authority of our duly elected officials, who are responsible to the taxpayers of Orleans Parish, and undermine the community, by requiring the City of New Orleans to build a new jail building—which is contrary to the City's criminal justice reform efforts and contrary to the current needs of Orleans Parish residents. A retrofit of existing jail facilities will allow the City to best address the needs of OPSO inmates, and the City respectfully submits that the City's Motion for Relief should be granted.[13]

## CONCLUSION

Based on the aforementioned, and for all of the reasons set forth in the City's Motion for Relief at R. Doc. 1281, along with other supporting evidence and documentation throughout the record in this longstanding litigation matter, the City of New Orleans respectfully submits that the City's Motion for Relief should be granted. In the alternative, the City respectfully submits that the City's Motion for Relief should be granted, and the City should be given thirty (30) to sixty (60) days to receive confirmation from FEMA regarding FEMA funding available for a retrofit.

---

[13] A retrofit of existing jail facilities will provide more single cells to better accommodate the acute and subacute OPSO special population and will allow for the acute and sub-acute patients to receive better accommodations approximately two years sooner than a Phase III new jail building.

       Respectfully submitted,

       __/s/ Sunni J. LeBeouf_____
       **SUNNI J. LeBEOUF (LSBA #28633)**
       CITY ATTORNEY
       Email: Sunni.LeBeouf@nola.gov
       **DONESIA D. TURNER (LSBA #23338)**
       Email: Donesia.Turner@nola.gov
       **CHURITA H. HANSELL (LSBA #25694)**
       Email: chhansell@nola.gov
       1300 PERDIDO STREET
       CITY HALL – ROOM 5E03
       NEW ORLEANS, LOUISIANA 70112
       TELEPHONE: (504) 658-9800
       FACSIMILE:   (504) 658-9868

       - and -

       __/s/ Harry Rosenberg_____
       **HARRY ROSENBERG (LSBA #11465)**
       Email: harry.rosenberg@phelps.com
       PHELPS DUNBAR, LLP
       365 CANAL STREET
       CANAL PLACE – SUITE 2000
       NEW ORLEANS, LOUISIANA 70130
       TELEPHONE: (504) 584-9219
       FACSIMILE:   (504) 568-9130

       *Counsel for the City of New Orleans*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on October 30, 2020, a copy of the foregoing was served, contemporaneously or prior, upon counsel to all parties to this proceeding via the court's CM/ECF system.

       __/s/ Sunni LeBeouf_____
       **SUNNI LeBEOUF**