UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

LASHAWN JONES, ET AL.                          CIVIL ACTION

VERSUS                                         NUMBER: 12-0859

MARLIN N. GUSMAN, ET AL.                       SECTION: "I"(5)

## REPORT AND RECOMMENDATION

When we, as a society, incarcerate one of our citizens – when we deprive them of their liberty – we obligate ourselves, constitutionally and morally, to house and care for that person according to his or her particular needs.  Most of us don't think very much about jails or the people in them or how they are treated when they are there.  This is probably human nature and basic instinct, but it's an instinct at the root of a very real and profound problem we have faced in this City and in this case for years.  Apathy around these problems empowered prior Sheriffs and administrations to preside over a jail complex that, while metastasizing beyond comprehension, simultaneously mocked fundamental constitutional protections owed to the City's inmates.  While the darkest days may be behind us, a similar apathy is creeping in, apparently encouraging the powers that be to come before this Court and brazenly ask permission to indefinitely ignore the needs of the most vulnerable of us who find ourselves in the custody of the City of New Orleans – in our jail.

There are, to be sure, serious and committed people who are laser-focused on real jail reform, who care about every single person incarcerated in our jail, and who are straining to be heard.  I hope they can believe they are being heard, because they are.  We hear and respect their voices – voices of reform that plead for a path for our mentally ill brothers and

1

sisters that doesn't start with a bed at the jail.  In this case, though, Judge Africk and I can only be concerned with the folks who actually wind up in one of those beds.

On any given day, our jail is populated by around 1,000 people.  On any given day, one of those inmates might be your child or mine or your family's or your neighbors'.  One thing we know for sure – everyone there is someone's child.  That is what drives us to get this right and to fix this problem once and for all.  And we will.

Many people who find themselves in the jail require no special care at all, but many do.  There is and always will be a cohort of inmates who present a risk of harm to themselves or otherwise require treatment, monitoring, and care for serious mental-health and medical reasons.  This case and this motion are about them.

How are the sons and daughters of this City and of parents around the country and the globe treated when they find themselves in jail here, in the custody of the City of New Orleans?  How can their loved ones expect them to be treated in our jail?  Will they be afforded basic constitutional treatment and protections?  These questions are what this case is about.  It's about ensuring the constitutional treatment of everyone who winds up in our jail.  That is all the case is about.

What is this case not about?  It's not about politics or policy or money or spending that money on people who are not in jail.  It's not about building playgrounds or schools or fixing potholes or turbines at the Sewerage and Water Board.  It has never been about those things and, despite the City's recent rhetorical onslaught, it never will be.

For far too many years, the real needs of the people in jail in New Orleans have been ignored by the City and the Sheriff, largely as a consequence of a scorched-earth, politically driven fight between these two parties and their lawyers about money, politics, power, and

control.  We – the parties, their lawyers and the Court – have worked very hard to transcend those battles and, at long last, we believed for good reason we had succeeded.  Then along came a group of under-informed newcomers representing the City who now want to rewrite a history they weren't a part of and ask us to jettison a well-developed, agreed-to plan in favor of embarking on a course to nowhere.  The Court must decline that invitation.

To the credit of a great many serious and dedicated people, many of the jail's profound constitutional shortcomings have been fixed – but many have not.  We've made real progress, albeit slowly, toward solving many of the systemic and structural problems that have plagued the jail for decades and there's real reason for optimism on that front.  Yet the problems of housing and treating our special populations persist, which I consider an enduring failure in this case.  At this point, the City of New Orleans is primarily responsible for the persistence of that failure.

The City, over many years and through multiple administrations, has been promising to abide by its obligation to implement a durable solution to the problem of housing special populations in the jail – to provide "a good and sufficient jail."[1]  Yet here we are in late 2020 with little to nothing to show for years of discussion, debate, handwringing, empty promises, and court orders regarding the treatment of special-needs inmates.

This much is clear:  The Court can no longer allow the City to commit to plans for a concrete and durable solution to this problem in one breath and then sabotage those plans in the next.  This has happened over and over, whether by a failure of political will, the inevitable changeover of city government leadership, petty rivalries, crass calculations about

---

[1] This is the City's statutory obligation under Louisiana law.  La. R.S. 33:4715.

community "support" and its hoped-for impact on the Court, or good faith turned to bad. Why it keeps happening is not as important as this – it cannot continue.

The Court simply cannot allow the City to keep running this game plan when the United States Constitution, the Consent Judgment, the Court, and common decency demand otherwise.

Engaging in the same conduct over and over and over again and expecting a different result – there's a well-worn cliché that defines that behavior.  But that's exactly what the City asks this Court to do – for the <u>fourth</u> time, incredibly enough.  I have been immersed in this case since 2014 when I was appointed to the bench and inherited the case from my predecessor as the assigned Magistrate Judge.  I've spent years working toward a solution to this challenge with three City Attorneys, multiple Chief Administrative Officers and Deputy Mayors along with key administration staff, former and present City Councilpersons, and two Mayors and I thought, after long last, we had an agreed-to solution and smooth path forward. Alas, I was wrong.

The City's present motion, requesting after all this time to be excused indefinitely from addressing this dire problem, is disappointing to say the least.  The positions advocated by the City and its attorneys and their conduct around this entire episode have compounded that disappointment.

When a district court is called upon to manage litigation involving a political entity like the City, it must be able to take that entity, acting through its legally designated representatives, at its word.  For years, despite all the difficult moments, the Court has been able to do that.  Unfortunately, owing to the conduct of the City and its counsel in relation to this motion and the attendant proceedings, that has become difficult, if not impossible.

The Court has lost trust in the City as a litigant – in the truth of its representations to the Court and in the sincerity of its professed commitment to solving this problem.

The time for speechifying and empty promises is over.  The Court, the parties, and the individuals in our jail who continue to suffer from the City's failure to understand and seriously address its constitutional responsibilities to them deserve and demand more.  The City has been promising for years to solve this problem.  At long last we demand that the City stop talking and start doing.  At long last, it's time to get to work.

For many reasons, I cannot recommend to the District Judge any course of action other than to deny the City's motion and hold the City to its years-long commitment to construct a special-needs facility adjacent to the Orleans Justice Center to house and treat inmates with special needs.  Here are those reasons.

I.      **Why Are We Still Here?  The Relevant Procedural History of the Court's Efforts to Permanently Address the Problem of Housing Special Populations**

The Consent Judgment in this case was issued June 6, 2013 – seven and a half years ago.  (Rec. docs. 465, 466).  That Judgment sets forth extensive, detailed procedures and requirements intended to address decades-long shortcomings in the constitutional care of inmates in Orleans Parish custody.  The Consent Judgment consists of 174 separate provisions, many of which concern housing and treatment of inmates with medical or mental-health issues.  Over the years we have come to refer to these inmates as part of the jail's "special population" or as "special-needs inmates."[2]

---

[2]  These descriptors have also included youthful offenders (those under 18 years old).  This Report and Recommendation concerns only those inmates with medical and mental-health needs, not the youthful offenders.

Concerns about the housing and treatment of these special-needs inmates have been at the forefront of this case for years. Yet these concerns persist, despite the Court's active and vocal insistence that they be meaningfully addressed. To understand the magnitude of the problem and the Court's profound frustration at the fact that it remains essentially unaddressed after almost eight years, an examination of the history of our efforts to address the issue of housing special populations is appropriate.

A.   *The Consent Judgment and Early Efforts to Address Special Populations*

As noted, from the earliest days of this case, the issue of special populations was front and center. And from those earliest days the City and the Sheriff were at odds as to how to most appropriately address this issue. In 2013, it was revealed that the new jail then under construction[3] was not designed to house special populations, which apparently came as a surprise to the parties (and the Court) because there was an ordinance in place at the time that required the new jail to house <u>all</u> populations. (*See e.g.*, rec. doc. 439). Upon being so apprised – seven and a half years ago – the Court addressed the issue:

> The parties agree that a plan is necessary to address the issue that the new OPP facility, as presently under construction, will not be able to house all inmates in a manner that complies with the Consent Judgment. The Plaintiff Class and the United States reiterated their serious concerns that the resolution of this issue is necessary before the August 5 [2013] hearing, which all parties agree must not be continued. The Court shares these concerns.
>
> The Plaintiff Class and the United States volunteered to provide assistance, including the assistance of experts, in formulating such a plan. While the Court is aware that any such plan may require input from multiple sources, any delays in creating such a plan will, presumably, only add to the costs of implementing the Consent Judgment. Although the parties were unable to decide on a deadline by which the Sheriff and the City will

---

[3] It was called "Phase II" at the time. It is now known as the Orleans Justice Center or "OJC."

commit to a plan, they expressed confidence that they can agree
upon such a deadline in the near future.

(Rec. doc. 481).

In late July 2013, the Sheriff shared with the parties and the Court design drawings that attempted to "retrofit" the then-extant design of the new jail to include housing for special populations.  (Rec. doc. 515).  After those drawings were submitted and in advance of what the parties and the Court anticipated would be a hearing to determine a path forward on this important issue, Deputy Mayor Andy Kopplin, in an interview with Naomi Martin of nola.com, explained the City's view as to retrofitting the then-under-construction jail:

> At this point in the process, our view is to finish the (housing) building, then build something else.  Rather than redesign it and change it, let's build smarter.   We don't want to delay construction of the building. It's not efficient to retrofit something. . . . Our view is the best path forward is to finish the building and build an appropriate mental-health facility that's scaled to the needs that we have.

(Rec. doc. 1380-2). [4]

Soon thereafter, with a hearing looming on the issue, the City acted on that sentiment, filing a memorandum on behalf of <u>all</u> the parties and agreeing with the other parties to forego the idea of a retrofit and finish OJC "without requiring it to house all classifications of inmates" and to permit the Templeman V facility to remain open to temporarily house special needs prisoners "<u>until a Phase 3 facility can be opened to house special populations</u>." (Rec. doc. 545) (emphasis added).  This statement of the City's intention to build Phase III was filed August 20, 2013, more than seven years ago.  It was the first time agreed to build Phase III and so informed the Court.

---

[4] The referenced article can be found on the web at  https://www.nola.com/crime/2013/08/despite claims of being broke.html.

In the following year, many options were discussed, for long- and short-term housing of special-population inmates.  (*See, e.g.*, rec. doc. 722).  While the discussions, negotiations, and disagreements lingered on a long-term solution, there was consensus that a short-term solution was needed while the parties and the Court worked out and built a longer-term solution.

Among the short-term options considered were renovating Templeman V and/or the Temporary Detention Center ("TDC") for temporary use until a more permanent solution could be found.  These two options at one time or another were favored by the City.  (*Id.*).  The Sheriff advocated for a plan to house inmates out of parish at Elayn Hunt Correctional Center ("Hunt").  (*Id.*).

On June 27, 2014, Judge Africk ordered the Sheriff to submit a plan proposing a short-term remedy for housing male and female inmates with acute and sub-acute mental issues.  (Rec. doc. 690).  The Sheriff thereafter submitted his formal proposal to house inmates at Hunt.  (Rec. doc. 691).  The City objected to that plan as "cost-prohibitive" (Rec. doc. 722).

After a lengthy hearing on the matter, the Court ruled.  Noting that "[t]he conditions experienced by inmates with mental health issues have long been at the forefront of the case," Judge Africk adopted the Sheriff's plan for housing special-needs population at Hunt.  (Rec. doc. 738).  In his minute entry announcing that decision, Judge Africk made the following observation regarding the position taken by the City on the matter:

> At the evidentiary hearing, however, the City's arguments included rhetoric more befitting a press conference than a judicial proceeding.  Counsel for the City of New Orleans compared the proposed costs associated with the treatment of mentally ill inmates, including providing a secure and safe environment, to "the cost of staying at a suite at the Windsor Court."  Such arguments by the City trivialize the plight of vulnerable inmates in dire need of mental health care.  Comparing the cost of a hotel room with the

cost of providing severely mentally ill inmates with constitutionally mandated mental health treatment in a secure correctional environment is misguided.

(*Id.*).

In part, the Court accepted the Sheriff's plan to use Hunt because "the City failed to present any specific plan regarding the use of Templeman V prior to the hearing, or even any evidence supporting such a plan at the hearing .... " (*Id.*).

With the problem of temporary housing solved, the Court turned to finding a long-term solution. Even before his ruling accepting the Sheriff's proposal to house inmates at Hunt, Judge Africk had on June 25, 2014 ordered the City and Sheriff to submit plans for long-term care of special populations by August 4, 2014. (Rec. doc. 689). These plans would be considered by the Mental Health Working Group ("MHWG") Judge Africk had appointed and, if necessary, by him. (*Id.*).

This was Judge Africk's first direct order to address the long-term housing of special populations. Unfortunately, more would become necessary.

In response, the City, contradicting the position it had taken only a year earlier, suggested retrofitting OJC, which by then was complete. (Rec. doc. 722). The Sheriff suggested a Phase III facility to be built within the jail's secure perimeter. (Rec. doc. 723). The Sheriff submitted to the Court a plan for construction of a Phase III facility with between 300 and 700 additional beds. (*Id.*).

These competing proposals were referred to the MHWG. The composition and charge of that working group was aptly described by its chair, Dr. Raymond Patterson, in his subsequent report to the Court:

In the Court's creation of the MHWG on May 5, 2014 pursuant to *Jones, et.al. vs. Gusman*, we were charged with assisting the Orleans Parish Sheriff's Office and the City in attaining

> compliance with the Consent Judgment of October 21, 2013. The appointed members included three representatives of the OPSO, namely Blake Acuri, Esq., Chief Michael Tidwell (Jail Administrator), and Dr. William Lowe (Psychiatrist).  Dr. Lowe has not participated in the MHWG deliberations, has left his employment with OPSO and has not been replaced with another nominee by the OPSO.   The MHWG also includes three appointees nominated by the city, namely Charlotte Parent (Director of Health), Judge Calvin Johnson (retired), and Dr. Kathryn Smith (Medical Director of Metropolitan Human Services District).
>
> Three additional members of the MHWG include Robert Greifinger, M.D. (Medical Monitor), John Thompson, M.D. (Chairman of the Tulane Department of Psychiatry), and Raymond Patterson, M.D. (Mental Health Monitor) as Chair of the MHWG.
>
> (Rec. doc. 750).

After its thorough review of the competing proposals for long-term care of the jail's special populations, the MHWG made the following unanimous recommendation to Judge Africk:

> The MHWG received and reviewed the submissions.  The MHWG met on August 20, 2014, chaired by Dr. Patterson and attended by Chief Michael Tidwell, Blake Acuri, Esq., Kathryn Smith, M.D., and Judge Calvin Johnson.  Based on the information before the MHWG at that time, it was the unanimous opinion of the attendees that the OPSO's plans for construction of Phase III was the more appropriate and responsive plan to address the long term needs of inmates with mental illness held in the Orleans Parish jail.
> . . . .
> Based on our review of the plans submitted by the City and the OPSO as well as consideration of the City's response to the OPSO plan, the OPSO response to the City's plan, and plaintiffs' counsel, and our own intensive discussions, the MHWG is of the unanimous opinion and recommends to the Court that the OPSO long term plan for inmate mental health services is the better option.
>
> (<i>Id.</i>).[5]

---

[5]  Germane to certain issues raised by the parties in connection with the present motion, Dr. Patterson also observed that the MHWG had questions about the City's involvement in its work, as well as the availability of FEMA funds for construction of a Phase III facility:

Following the entry of this memorandum in the record, nothing of substance was accomplished toward addressing the special populations problem for over a year. At that point, at Judge Africk's request, I began more intensive efforts to bring the parties together to solve this problem. (Rec. doc. 936). On October 22, 2015, I ordered the City and the Sheriff to submit to me confidential memoranda "identifying the various outstanding issues that are ripe for amicable resolution and proposals for so resolving those issues," including the housing of special populations. (*Id.*). These memoranda were received by the Court on October 30, 2015.[6]

The Sheriff's plan tracked the one he had earlier submitted to the MHWG for its consideration – a Phase III facility ranging from 300-700 additional beds. (Rec. doc. 1106 at 4). The City submitted its "Jail Plan," which consisted of Scenario A and Scenario B. (Rec.

---

At the August meeting the MHWG questioned whether there may be additional information/data that had not been provided by the City or the OPSO, and were concerned that there was "no City representative" present. As the Chair, I disagreed with the point of view regarding no City representation, given that both the City and the OPSO were directed by the Court to nominate three members of their choosing and each nominated their respective representatives who were subsequently appointed by the Court. As Chair, I agreed to pursue the answers to the group's questions regarding additional information from the City or OPSO as well as a specific request that both the City and the OPSO provide to the MHWG the amount of FEMA funds that are available to the City and OPSO for the work envisioned by the two plans. I met with the Mayor and his staff on August 20, 2014.

Subsequent to the August 20th meeting of the MHWG, OPSO reported that the amount of FEMA dollars available to the City and OPSO is $112 million. However, despite my having made that same request directly to Mayor Landrieu at the meeting on August 20, 2014, at the time of the writing of this report the City has not provided written data to the MHWG as to the amount of FEMA dollars available for the proposed work. Director Charlotte Parent stated she has been advised that FEMA funds of $112 million were not dedicated entirely for the Phase III construction, as 75% was to be dedicated to other public safety projects and 25% to the jail. Blake Acuri reported that the distribution of FEMA funds was not yet decided.

[6] Because they were considered confidential at the time, the memoranda were not placed in the record. With the passage of time and because the dispute was later resolved, there is no longer any need to protect these memoranda from disclosure, so I have ordered them placed in the record. (Rec. doc. 1380).

doc. 1368 at 20-21).  Scenario A would "retrofit the fourth floor of the new Phase II facility to create 160 beds dedicated to inmates with medical and mental health needs" while Scenario B called for "a new Phase III facility dedicated to housing 88 inmates with mental health needs."  (Rec. doc. 1380-1, *see also* rec. doc. 1368 at 45-46).  Notably, even back in October 2015, the City knew that the Phase III option "would result in $5 million to $10 million more in operating expenses over Scenario A."  (*Id.*).

After these plans were submitted to me, but before the Court and the parties acted on them, the Plaintiffs and Department of Justice ("DOJ") filed a "Motion for an Order to Show Cause Why Defendant Sheriff Marlin N. Gusman Should Not be Held in Contempt and for Appointment of a Receiver to Implement the Consent Judgment."  (Rec. doc. 1009).  The City later joined in that motion.  (Rec. doc. 1018).  The Court's and parties' attention then turned to resolving that motion.

A hearing on that motion began May 25, 2016.  (Rec. doc. 1059).  Also beginning May 25, 2016 and continuing over the following four weeks, I oversaw negotiations and discussions between the parties aimed at resolving the issues raised in the receivership motion.  (Rec. doc. 1086).  Those negotiations would culminate in a case-changing agreement.

### B.   *The Stipulated Order for Appointment of Independent Jail Compliance Director*

On June 21, 2016, the parties presented to Judge Africk for his approval a "Stipulated Agreement for Appointment of Independent Jail Compliance Director."  (Rec. doc. 1082).  The Court approved the agreement and it was entered into the record as the "Stipulated Order for Appointment of Independent Jail Compliance Director" (the "Stipulated Order").  (*Id.*).  The Stipulated Order was the product of a month's worth of constant negotiation involving

the Court and the parties and presented a detailed and comprehensive plan for setting the jail on a path for compliance with the Consent Judgment.  It created the Office of the Compliance Director, who, after being chosen by the parties and approved by the Court, would temporarily assume the duties and authority of the Sheriff as to all aspects of the jail's operations.  (*Id.*).

Relevant to the present motion, the Stipulated Order directed at paragraph D.22 that:

> Within 60 days of [the Compliance Director's] appointment, the City, the Sheriff, and the Compliance Director shall develop and finalize a plan for (1) appropriate housing for prisoners with mental health issues and medical needs, (2) addressing the housing needs of youthful offenders and (3) addressing the current conditions of the "Docks" facility, consistent with the terms of the Consent Judgment.
>
> (*Id.*).

Also notable in the context of this motion, this paragraph of the Stipulated Order memorialized the Sheriff's agreement to abandon his claim to certain FEMA funds associated with Katrina-based damages to the Templeman II facility in exchange for the City's commitment to dedicate those funds to the three-part plan set forth above:

> The City of New Orleans shall maintain final authority and approval over capital expenditures associated with that plan, including use of Templeman II FEMA funding exclusively for implementation of the plan.  The City and the Compliance Director shall consult with the Monitors and the Plaintiffs to ensure that the proposed resolutions meet the standards required by the Consent Judgment.
>
> (*Id.*)[7]

---

[7]  Former City Attorney, Rebecca Dietz, confirmed that the City understood this provision was "intended to resolve the issue of the Templeman II funding, which had been a dispute between the City and the Sheriff for a long time.  It was intended to resolve it such that the FEMA funding belonged to the City and we would use it to implement the plan." (Rec doc. 1368).

13

Following his appointment as Compliance Director, Gary Maynard ("Maynard") did, in fact, submit his plan for housing of special populations and the docks facility on January 4, 2017.  (Rec. doc. 1106).  This plan, denominated the "Supplemental Compliance Action Plan" ("SCAP"), set forth in great detail the various options considered by Maynard, the stakeholders and constituencies with whom he met while working to arrive at a decision, the information and data he reviewed, and the details of his ultimate decision.  (*Id.*).  For instance, Maynard explained that he had attended "numerous meetings and discussions with advocacy groups, community groups, OPSO employees, Correct Care Solutions (CCS), architects, City administration, City Council Members, the Federal Monitors, the Federal Emergency Management Agency (FEMA), and citizens of New Orleans." (*Id.*).  He described the options for housing special populations that he considered as "wide-ranging and included a Phase III Facility with approximately 380 beds, a smaller Phase III Facility with approximately 119 beds, retrofitting the fourth floor of OJC Facility, or not moving forward with any new facilities." (*Id.*).

Ultimately, Maynard recommended an 89-bed Phase III facility "to address the acute and sub-acute mental health needs of the Jail." (*Id.*).  He noted this was a "significantly reduced scope from what was originally proposed in 2014 by Sheriff Gusman and his team," which had been a 388-bed facility.  (*Id.*).  It also represented a reduced scope from what the City had proposed as its "Scenario B" option, which called for a Phase III facility with approximately 120 beds.  (Rec. doc. 1368 at 20).

In addition to the housing of inmates with acute and sub-acute mental health needs, the SCAP also called for the inclusion of a 12-16 bed infirmary, along with expanded

attorney- and family-visitation capacity, programming and counseling space, and a laundry. (Rec. doc. 1106).

All of the parties, including the City, supported the Compliance Director's plan. Indeed, the City had been quite involved working with Director Maynard to draft the actual document in advance of its submission to the Court (Rec. doc. 1336-45 to 1336-51). Additionally, Maynard testified that, before finalizing the SCAP, he met and discussed his proposal with Mayor Landrieu, Dietz, and Councilpersons Jason Williams and Susan Guidry. (Rec. doc. 1368 at 58).  Dietz confirmed at the hearing that, before he actually submitted the plan to the Court, Maynard met with Mayor Landrieu and her, after which the mayor accepted Maynard's Phase III recommendation.  (*Id.* at 22).[8]

Once the SCAP was submitted, the parties, including the City, began the design/programming phase of the Phase III project.  On June 8, 2017, at an in-court status conference, Dietz, as City Attorney, updated the Court on the progress being made toward construction of Phase III:

> Finally, the construction of the inmate mental and medical health facility and laundry.  The RFP for design professionals is being finalized this week.  The City will make sure that the monitors have an opportunity to review that RFP before it goes out to the public.
> Once the design is completed, construction can begin depending on the project delivery method, which, as your Honor knows, is a little dependent on FEMA; although we are not holding anything back because of FEMA.  We're not waiting on them. We're moving forward.  <u>This project should be completed within 24 to 40 months</u>.
>
> (Rec.    doc.    1127)
> (emphasis added).

---

[8]  Indeed, the record evidence shows that a City employee, Eric Melancon, actually drafted the final version of the SCAP and emailed it to Maynard for his review, to which Maynard replied, "Eric, this is good."  (Rec. doc. 1336-45).

This was the second time the City committed to the Court that it was moving forward with construction of an 89-bed Phase III facility and, at the outer limit of the timeline suggested by Dietz, Phase III would have been completed by October 2020.

The City's expressed commitment to construct Phase III didn't end with that statement to the Court.  In seeking a four-year extension of the agreement with the State Department of Corrections ("DOC") to temporarily house inmates with mental-health needs at Hunt, Mayor Landrieu, along with the Sheriff, wrote to DOC Secretary LeBlanc, stating:

> upon recommendation from the appointed Independent Jail Compliance Director and agreement by Sheriff Gusman and the City of New Orleans, the City has begun preparing for construction of a jail facility on the current OPSO campus for the purpose of housing mental health and medical needs inmates. The City is currently procuring a design professional and a construction manager for the project. It is our understanding at this time that the Department of Corrections would be willing to grant another extension of the CEA, allowing OPSO to use the Hunt Facility until completion of the new jail facility.  Although we expect completion of the entire facility to be completed in three (3) years, we would request a four-year extension of the CEA to cover any unexpected delays in the project.
>
> (Rec. doc. 1336-52)

Following submission of the SCAP and the City's commitment to implement Maynard's plan to build Phase III, the project inched ahead.  On May 18, 2017, the New Orleans City Council voted to forward the 89-bed Phase III Plan set forth in the SCAP to the City Planning Commission for a conditional use permit.  At that hearing, Deputy Mayor Ryan Berni and City Attorney Dietz spoke in support of the Phase III plan.[9]  While the Court was not entirely satisfied with the pace of progress, it did believe that the City was acting in good

---

[9]  The Court has taken judicial notice of the May 18, 2017 meeting, which can be found on the web at cityofno.granicus.com/MediaPlayer.php?view_id=40&clip_id=2641&meta_id=372638.

faith and that the Phase III project would be completed by some time in 2020, based on the City's repeated statements of that commitment.

Then, on November 18, 2017, the City of New Orleans elected a new mayor, a development that would eventually change the course of the litigation and bring us to where we are today.

### C.   *The Cantrell Administration Stops Work and Tries to Change the Narrative*

Mayor Cantrell was elected on November 18, 2017 but, owing to a quirk in the electoral calendar, she was not sworn in as mayor until May 7, 2018.  In the almost six-month period in between those dates, Judge Africk and I met on numerous occasions with the Mayor-elect and her team to discuss Phase III and impress upon them the importance of timely completing that project.  The Mayor-elect continued to commit to the Court that the project would be completed as promised.[10]

On October 22, 2018, a few months after Mayor Cantrell was sworn in, DOC Secretary LeBlanc informed the Compliance Director and the Sheriff that, as of October 15, 2019, the DOC would no longer be able to house Orleans Parish inmates with mental-health needs at the Hunt facility, due to the State's long-term plan to use that space to house state offenders with mental-health needs.  (Rec. doc. 1213-3).  The Court and the parties therefore had one year to figure out how to house this population temporarily as we awaited the promised completion of Phase III.

---

[10]  Over the course of this litigation, the Court, in its managerial role over the Consent Judgment, has routinely met with the parties and their representatives without a court reporter present.  As the assigned Magistrate Judge, my role particularly has been meeting, not only off the record, but *ex parte*, with the parties, their counsel and other interested persons and entities representing a plethora of interests to identify and try to solve the myriad problems we face in this case.  (*See, e.g.*, rec. doc. 1086).  While the referenced meetings were not on the record, the administration's statements and conduct in its early days were entirely consistent with this expressed commitment in said meetings to see this project through, as I will explain below.

Judge Africk ordered the parties to a status conference to decide how to proceed in light of the anticipated loss of Hunt. (Rec. doc. 1215). That conference was scheduled for January 25, 2019. (Rec. doc. 1221). Before the conference took place, on December 13, 2018, Vince Smith, the Director of Capital Projects for the City ("Smith"), confirmed <u>yet again</u> to then-Compliance Director Darnley Hodge the City's commitment to build an 89-bed Phase III facility at an estimated cost of $36 million. (Rec. doc. 1336-55).[11]

The status conference went forward as scheduled. The focus of the conference was addressing the short-term problem of housing inmates with mental-health issues due to the impending loss of Hunt for that purpose. However, we also discussed the long-term issues, with the Court directing the City to press forward with the Phase III plans set forth in the SCAP, which had been submitted two years earlier. The Mayor's team informed the Court at that conference – for the first time – that they were interested in exploring "alternatives" to Phase III and asked that the Court allow them an opportunity to further explore such alternatives. In response, the Court ordered

> that the City shall direct the architect chosen to design the permanent facility described in the Supplemental Compliance Action Plan, filed into the record on January 4, 2017 (the "Phase III facility"), to begin the programming phase of the Phase III facility as soon as possible and to update the Court on the progress of those efforts at the next scheduled status conference.
>
> (Rec. doc. 1221).

The City timely responded to this Order on February 25, 2019. In that response, the City revealed that

---

[11] Smith attached the SCAP to his letter, explaining that "[i]n support of [the SCAP] the City has appropriated $58.337 million in the Criminal Justice and Public Safety roll up towards the renovation of the Docks ($5.252 million), YSC 28-bed addition ($11 million) and OJC Medical Services Building ($36,048 million)." (*Id.*). These were all post-Katrina FEMA funds. (*Id.*).

on January 12, 2019, the City met with Director Hodge and the Sheriff, and presented three options, including both temporary and permanent solutions for medical services housing within the City's current budget. These options included:

> 1.) Renovations to all TDC buildings phased to accommodate the transfer of male inmates from Hunt, the permanent, 89-bed male and female medical inmate housing, a new visitation center and laundry, and the pedestrian bridge connection to this new building and the kitchen/warehouse building;

> 2.) Renovations to three TDC buildings for the permanent 89-bed male and female medical inmate housing, a new visitation center and laundry, and the pedestrian bridge connection to this new building and the kitchen/warehouse building; and

> 3.) Renovations to the 4th floor of OJC for the permanent 89-bed male and female medical inmate housing, a new visitation center and laundry and the pedestrian bridge connection to this new building and the kitchen/warehouse building.

> (Rec. doc. 1222).

The City further advised the Court that "on January 23, 2019, the City was informed by counsel for OPSO that OPSO rejected all of the above options." (*Id.*).[12] Apparently based on that "rejection," the City told the Court in its February 25 response:

> With the requested renovations to TDC, the City's OPSO capital investment will total $63.4 million (including the OPP Docks Renovation, $5.3 million; Youth Study Center 28-bed addition, $17 million; and OJC Medical Services Phase III Building, $36.1 million)
>
> 　　　　　. . . .
>
> The City, Hill, Hebert and CCS / Wellpath, the OPSO medical services provider, are all <u>actively working</u> with Director Hodge, Sheriff Gusman and the monitors <u>to program, design, and construct a Phase III project</u> that meets the requirements of the Consent Decree, and does so in a cost-effective manner.

---

[12]   Importantly, City's proposal of alternatives to the Compliance Director and Sheriff and their collective rejection of those alternatives all happened <u>before</u> the January 25, 2019 status conference.

(*Id.*)(emphasis added).

Perhaps owing to what was a promising recent working history with the City and its ongoing commitment that we were working together in good faith, the Court (and presumably) the parties failed to fully appreciate the coy message embedded in this statement.[13]

It is important here to recall that the only "Phase III project" that anyone involved in the case believed was underway was the 89-bed project submitted by the Compliance Director in the SCAP and accepted, embraced, and advocated for by the City – through two administrations.

Following the City's submission and based upon its stated intentions to renovate TDC for temporary housing and to design and build the Phase III project, the Court ordered as follows:

> IT IS FURTHER ORDERED that, beginning on April 18, 2019 and continuing every thirty (30) calendar days thereafter, the City shall timely submit a written statement to this Court advising it of the progress of the TDC renovation as well as any change in the projected date set forth in the City's response to the Court's January 25, 2019 order.  The written statement shall also advise the Court of the City's progress toward construction of Phase III.
> (Rec. doc. 1227).[14]

Also notable for present purposes, the Court made a specific finding pursuant to the PLRA that:

> the orders herein extend no further than necessary to correct violations of the federal rights of the plaintiff class.  The Court further specifically finds that such relief is narrowly drawn,

---

[13]  In hindsight, the Cantrell Administration's use of the verbiage to "construct a Phase III project that meets the requirements of the Consent Decree, and does so in a cost-effective manner" should have been a red flag, for it seems now they were beginning to hedge their bets.

[14]  This is the language the City now points to in claiming that the Court ordered it to build a jail in violation of the Prison Litigation Reform Act ("PLRA").  This argument is addressed in more detail below.

> extends no further than necessary to correct the violations of
> federal rights, and is the least intrusive means necessary to
> correct such violations. The Court has given substantial weight
> to any adverse impact on public safety or the operation of a
> criminal justice system caused by the relief ordered herein.
>
> (*Id.*).

Following issuance of this order, the City, the other parties, and the monitors continued their collaboration in the design and programming of Phase III and, as ordered by the Court, the City submitted 30-day status reports to keep the Court informed as to that progress. Here is a sample of those updates:

> The current projected finish date for the Phase III facility is June
> 2022. The City will update the Court and the parties of any
> changes to the projected dates submitted herein."
>
> (Rec. doc. 1231, Apr. 18, 2019)

> The current projected start of construction is October, 2020 and
> the projected completion date for Phase III is June, 2022.
>
> (Rec. doc. 1238, June 18, 2019)

> Significant progress continues to occur in moving both projects
> forward.
>
> (Rec. doc. 1244, Aug. 14, 2019)

> We are currently in the Design Development ("DD") Phase of
> Phase III and the estimated projected completion date remains
> June 2022.
>
> (Rec. doc. 1253, Nov. 19, 2019)

> The City has issued a Notice to Proceed to Grace Hebert Curtis
> Architects to begin the final stage of design . . . . The projected
> completion date for Phase III is Summer 2022.
>
> (Rec. doc. 1261, Feb. 21, 2020)

> The architect, Grace/Hebert Architects, is currently engaged in
> the Construction Document ("CD") phase of Phase III. The
> projected project completion is summer 2022."
>
> (Rec. doc. 1268, Apr. 17, 2020).

In its final status report before the filing of the present motion, on May 31, 2020, the City stated "[a]s Ordered by the Court, Phase III design work remains ongoing, and design information and documents were previously shared with all parties." (Rec. doc. 1276). The City then proceeded to make veiled arguments suggesting reasons for abandoning Phase III, by mentioning the financial impacts of the COVID-19 pandemic and a decline in jail population. (*Id.*). What the City did not do was ask the Court for any type of relief whatsoever regarding its years-long commitment to build that facility. Rather, as we were to soon learn, the City had decided that the better course would be to take matters into its own hands, act unilaterally, and not inform the Court of that decision.

On June 5, 2020 – five days after it affirmatively advised the Court for the fourteenth time that Phase III was progressing and on schedule to be completed in Summer 2022 – the Cantrell Administration ordered the architect and project manager to stop work entirely, without advising the Court, the monitors, or the other parties. (Rec. doc. 1280). I learned of this development from the Sheriff's Office the next day and Judge Africk and I conducted a status conference with counsel to address the situation on June 10, 2020. (*Id.*).

At that conference, the City Attorney confirmed that the City had, indeed, stopped work and had done so unilaterally without informing anyone else in the case. When asked by the Court, she indicated the City had not planned on informing the Court of this decision until the next 30-day status report at the end of June 2020. The Court found this most unsatisfactory.

Following the status conference, but before a minute order issued from the Court, the City Attorney filed an "Updated" status report, in an apparent effort to get in front of what promised to be a critical minute entry, based upon the criticisms heaped upon the City by

the Court at the status conference.  That updated status report hardly improved the City's standing in the matter.

The City's updated status report opened with the tone-deaf observation that the City's compliance with prior Court orders regarding TDC and Phase III had been "to the City's overall detriment."  (Rec. doc. 1279).  It then went on to make the questionable claim that "the City has now been required to request that the architect suspend Phase III construction design work," admitting on the record a fact it had previously sought to conceal.  (*Id.*).  And, in citing to Judge Africk's order that design work continue pending the resolution of the City's to-be-filed motion for relief, the City accused the Court (in bold-faced type, no less) of wasting taxpayers' dollars:

> **To the extent the Court is further ordering that Construction Design work continue on a facility where adjustments and decisions will need to be made going forward consistent with the current facts, this will be a waste of taxpayer dollars, financially benefitting only the architect**, which should be avoided.
>
> (*Id.*)(emphasis in original)

To be kind, this was all quite unhelpful, which was eventually pointed out by Judge Africk in his Minute Order.  Addressing the City's contention that complying with Court Orders in this case was to the City's "overall detriment," Judge Africk observed,

> such an inappropriate choice of words by the City Attorney in the updated status report warrants a change of perspective by the City.  Operating a constitutional jail and incarcerating fellow citizens in a constitutional manner can never be to the City's detriment.  To the contrary, it is to the City's benefit, and the City must understand that.
>
> (Rec. doc. 1280).

And as to the suggestion that the Court was ordering the City to "waste" taxpayer money, he replied:

> Since the filing of the complaint in this case, the Court has worked diligently with the Sheriff, the City, the DOJ, the plaintiffs, and the monitors to guard against financial waste and to use taxpayer dollars in a respectful way.  Many hours have been spent focusing on the Sheriff's annual budgets so that the City was able to evaluate those budget requests in an informed and meaningful way.
>
> The City's position that a design change is now needed may ultimately be correct.  However, that is not for the City, alone, to decide.  There are other parties to this litigation who must be heard.  So the City need not and should not admonish this Court in bold type about the Court's responsibility to the taxpayers.  The City would be better served, and its arguments would be better received, if the City would respectfully listen and not holler.

(*Id.*)

Shortly after the issuance of this Minute Order, the City filed the present Motion for Relief from Court Orders of January 25, 2019 (Rec. Doc. 1221) and March 18, 2019 (Rec. Doc. 1227).  (Rec. doc. 1281).  It is evident from that filing that the hoped-for "change in perspective" referenced by Judge Africk has not occurred.


## II.    The Present Motion:  The City Asks Permission to Do Nothing, Indefinitely.

From its conduct in this case since the change of administrations in 2018, it's become clear, to our great disappointment, that the City has determined to embark on a calculated plan to publicly diminish the importance of its responsibility to care for our special population of inmates, in favor of other priorities.  That public appeal – to be absolved of responsibility for solving the special-populations jail problem in favor of some amorphous, larger-scale, "public safety"-based shift in fiscal priorities – resonates with some in the community.  That's the City's aim, no doubt.  And it's to be expected when one engages in a full-on political campaign with no opposition in kind.

24

But this is not a political campaign and it is not a political question.  And to the extent the City places its hopes on the possibility that political or community pressure will influence this Court's decisions on this matter, the City and its attorneys have profoundly miscalculated.  This matter will be decided on the merits, which means the facts and the law and the binding agreements between the parties.  And nothing else.

The City's motion and the pleadings, exhibits, and testimony offered in support of it reveal a fundamental misunderstanding of those merits – of the genesis of this lawsuit, the meaning and effect of the Consent Judgment and the Stipulated Order and, indeed, the City's own constitutional obligations to the most vulnerable inmates in its custody.  Beyond that simple misunderstanding, the City now seeks to void the progress earned by the hard work of dozens of serious people over thousands of hours since 2012 when this case was filed.

This is a recent development.  Until sometime in 2019, through a great deal of effort by many, including the former City administration, this case was firmly headed in the right direction, at long last.  The present motion seeks to undo that progress, whether the City actually appreciates it or not.

In this motion, the City asks the Court's permission to abandon its years-long commitment to permanently address the serious problem of housing inmates with special needs in the jail – those in need of acute and sub-acute mental-health and medical treatment. It asks to be allowed to do nothing, indefinitely.  In service of this effort, the City has concocted a haphazard collection of unconvincing arguments, some of which appear suddenly overnight only to be later abandoned, others of which change from day to day. None of them have merit.  Here are the reasons why.

The City's motion is (or was) fairly straightforward.  It is brought pursuant to Rule 60 of the Federal Rules of Civil Procedure, asking for relief from two Court orders, issued on January 25, 2019 (rec. doc. 1221) and March 18, 2019 (rec. doc. 1227).  The substance of both of these orders have been discussed above.

The City moved for relief from the aforementioned orders because "a significant change in circumstances has occurred [pursuant to Rule 60], which makes the construction of Phase III unsustainable."  (Rec. doc. 1281-1 at 4).  This change in circumstances was summarized by the City in its request for relief:

> Because there has been a significant change in the factual conditions which makes the continued programming, design, and construction of Phase III unsustainable.  First, the Orleans Justice Center ("OJC") currently provides medical and mental healthcare that is above the minimal constitutional standard; second, the unexpected COVID-19 pandemic will cause a significant budgetary shortfall for the City; third, the decrease in the inmate population makes the programming, design, and construction of a new Phase III jail facility unnecessary.  Finally, as a result, the City requests that this Honorable Court grant the City's Motion and modify the Court's Orders by indefinitely suspending the programming, design, and construction of a new Phase III jail facility.

> (Rec. doc. 1281 at 1).

The City gives <u>three reasons only</u> to implicate Rule 60:  (1) the level of care provided to special-needs inmates at OJC today exceeds the constitutional minimum (and is presumably fully compliant with the Consent Judgment); (2) the COVID-19 pandemic has caused a budgetary shortfall that makes building and operating Phase III infeasible; and (3) an unexpected decline in inmate population makes Phase III unnecessary.

These are the <u>only</u> arguments advanced by the City in its motion.

The parties and the Compliance Director filed opposition memoranda, each of which argued against the City's request to stop work on Phase III and each of which understandably

took aim only at the arguments advanced by the City.   (Rec. docs. 1301 (Compliance Director), 1304 (Plaintiffs and DOJ), and 1305 (Sheriff)).   Wanting to give the City the final word on its own motion and the opportunity to address the parties' various opposition memoranda, I issued an order providing that:

> No later than August 12, 2020, the City shall file a memorandum in reply to these three opposition memoranda. Motions for leave to file the reply memorandum and/or to exceed the page limit imposed by the local rules need not be filed, as leave to do both is granted by this Order. No sur-reply memoranda shall be filed.
> (Rec. doc. 1309).

No good deed goes unpunished, they say.   That certainly turned out to be the case here.

Apparently seizing on the fact that it wasn't required to seek leave to file a reply brief and that I would not allow sur-reply briefing, the City filed a 31-page reply brief, attaching 13 new exhibits[15] and making an entirely new, allegedly dispositive argument for the first time.  Right out of the gate, the City exclaimed in bold-faced type:

> **The Court's March 18, 2019 Order violates the Prison Litigation Reform Act ("PLRA") because the PLRA prohibits the Court from Ordering the construction of prisons.**
> (Rec. doc. 1312).

This pronouncement, and the argument that followed, was surprising for a number of reasons.  First and foremost was that it had not been made in the City's motion, and as we should all know, an argument made for the first time in a reply brief is, in this circuit,

---

[15]  These exhibits included a tranche of correspondence previously sent to Judge Africk and me from various State Legislators representing the New Orleans area.  (Rec. doc. 1312-1).  This correspondence was no doubt precipitated by the City and/or its attorneys, as were the hundreds of emails received by the Court from various citizens and advocates.  (Rec. doc. 1381-1).  The City made the legislators' correspondence part of the record as an exhibit to its reply brief and repeatedly urged me to make the 900-plus emails we received part of the record during the hearing I conducted on the City's motion.   This again reveals a fundamental misunderstanding by the City over what this case is – and is not – about.

waived.[16]   More curious is the obvious fact that, over the many years the City had been promising to construct Phase III – even when it didn't want to – it never raised this seemingly straightforward argument that, if correct, would have saved the City a great deal of time, money, and angst over those years.

In any event, faced with this entirely new argument, the Court wasn't going to deprive the other parties the opportunity to address it, no matter that I had previously ordered there would be no sur-reply memoranda accepted for filing.  Thus, I issued the following order:

> In its reply brief, the City raised an argument that it had not previously raised –that the PLRA prohibits the Court from ordering the City to build a jail.  While the Court earlier indicated that it would not entertain sur-reply briefs, it did not anticipate at that time that the City would make a new, allegedly dispositive, argument for the first time in its reply brief. Accordingly, any party that wishes to address that argument only may do so in a sur-reply brief filed no later than Wednesday, August 26, 2020.
>
> (Rec. doc. 1313).

The Plaintiffs, Compliance Director, and DOJ filed sur-reply memoranda.  (Rec. docs. 1327, 1328, 1329).  The Sheriff did not.

The Court conducted a hearing on the motion that spanned eight days, during which the City called 13 witnesses, the Compliance Director called five, the Sheriff called two, and the Plaintiffs and DOJ collectively called four (all of whom are members of the Court-appointed monitoring team).  (Rec. docs. 1350, 1351, 1352, 1353, 1354, 1357, 1358, and 1359).

---

[16]  *See, e.g., Hamstein Cumberland Music Group v. Williams*, 532 Fed.Appx. 538, 543 n.4 (5th Cir. 2013) (citing *Medina Cnty. Envtl. Action Ass'n v. Surface Transp. Bd.*, 602 F.3d 687, 702 (5th Cir. 2010)); *see also Alaniz v. Zamora–Quezada*, 591 F.3d 761, 777 (5th Cir. 2009) (citing *Peteet v. Dow Chem. Co.*, 868 F.2d 1428, 1437 (5th Cir. 1989)).

Following the hearing, I issued an order allowing the parties each to file 10-page closing memoranda, which they each did.  (Rec. docs. 1360-64).  With record now complete, I turn to the merits of the City's motion, such as they are.

    *A.*   *The City's PLRA Argument Is Waived and Is Otherwise Without Merit Because the Court Did Not Order the City to "Build a Jail."*

I will address the City's arguments slightly out of order, because the PLRA-based argument it advanced for the first time in its reply brief <u>would</u> be potentially dispositive if (1) it was not waived and (2) it otherwise had merit.

As threshold matter, it is undisputed that the City failed to raise this argument in its motion, doing so for the first time in its reply brief.  The general rule in the Fifth Circuit and this District is that arguments raised for the first time in a reply brief are waived.  *See, e.g.*, *Hamstein Cumberland Music Group v. Williams*, 532 Fed.Appx. 538, 543 n.4 (5th Cir. 2013) (citing *Medina Cnty. Envtl. Action Ass'n v. Surface Transp. Bd.*, 602 F.3d 687, 702 (5th Cir. 2010)); *United States v. Jones*, No. 13-cv-205, 2016 WL 1383656 at *7 n.110 (E.D. La. Apr. 7, 2016) (Morgan, J.); *see also Winward Grp., LLC v. Reva Solutions, Inc.*, No. 17-cv-5748, 2017 WL 6388510 at *3 n.11 (E.D. La. Dec. 13, 2017) (Africk, J.) ("Nor must the Court consider Reva's argument concerning contract modification, as '[a]rguments raised for the first time in a reply brief are generally waived.'") (citing *Jones v. Cain*, 600 F .3d 527, 541 (5th Cir. 2010)); *Iteld, Bernstein & Assocs., LLC v. Hanover Ins. Grp.*, No. 06-cv-3418, 2009 WL 2496552 at *4 (E.D. La. Aug. 12, 2009) (Vance, J.) ("[A]rguments raised for the first time in a Reply brief are waived.") (citing *United States v. Jackson*, 426 F.3d 301, 304 n.2 (5th. Cir. 2005)); *Lightfoot v. Hartford Fire Ins. Co.*, No. 07-cv-4833, 2011 WL 13208962 at *2 (E.D. La. Mar. 14, 2011) (Zainey, J.) ("[A]rguments raised for the first time in a reply brief are waived." (citing *Jackson*, 426 F. 3d at 304 n.2)).

Indeed, not so long ago, the City itself was on the receiving end of one such ruling.  *See Ganheart v. Brown*, No. 17-43, 2017 WL 3991182, at *3 n.18 (E.D. La. Sept. 11, 2017) (Africk, J.) ("However, the City does not raise this issue in its memorandum in support of its motion to dismiss .... The argument is therefore waived.").

The City hasn't even tried to explain why it failed to include this argument in its motion or why it waited months, if not years, to raise it at all.  Accordingly, the Court need not consider the argument at all.

Even it was not waived, the argument lacks merit for a number of reasons, which are at least worth mentioning here briefly.

First and foremost, the Court has <u>never</u> ordered the City to build a jail.  The City's attorneys seem fixated nonetheless on pressing that alternative reality in mantra-like fashion.  Its insistence that the Court's March 18, 2020 Order is an order for "construction of a prison[]" must be intended solely for public consumption, because the Court has repeatedly explained to the City's attorneys how and why they are wrong, including on multiple occasions during the very first day of the hearing:

> So, to be clear, and this will address some of the questions that Mr. Rosenberg was asking earlier, the City has not ordered -- the Court has not ordered the City to build a jail.  The Court has ordered the City to solve a problem, and the City has chosen on multiple occasions to submit this solution [Phase III] to the Court in response to that.
>
> . . . .
>
> THE COURT: Mr. Green, and I know I'm interrupting Ms. LeBeouf, but I keep hearing this reference to the court ordering the City to build a jail and that's not what happened; and I want to make sure the record is clear on that.
>
> I have a quote as well, and I don't know if you've seen this document, but it's in the record.  It's document 1222, and it was

30

the document that was submitted by the City in response to Judge Africk's order that the City submit both a temporary plan and a permanent plan. In that document, the City says "the City, Hill, the project manager, Hebert, and CCS/Wellpath, the OPSO medical services provider, are all actively working with Director Hodge, Sheriff Gusman, and the monitors to program, design, and construct a Phase III project that meets the requirements of the consent decree and does so in a cost-effective manner." That is the city's representation to the court in February of 2019.

(Rec. doc. 1364 at 200, 239-40).

To be clear, in the Stipulated Order signed by the parties, including the City Attorney on behalf of the City, the parties agreed that the Compliance Director would submit a plan for housing inmates with mental-health and medical needs as part of his Supplemental Compliance Action Plan. (Rec. doc. 1082). The City worked closely with the Compliance Director to fashion that Plan,[17] which ultimately called for the construction of an 89-bed Phase III facility. (Rec. doc. 1106). The City thereafter accepted that plan and committed to it, not only to the parties but to the Court – on multiple occasions. (*See, e.g.,* rec. doc 1127). It did this voluntarily and as part of a binding agreement with the other parties to the litigation. It did not do so because it was ordered to.

Notably, as it regards compliance with the PLRA, the parties included the following language in the Stipulated Order:

### H. Compliance with the Prison Litigation Reform Act (PLRA)

The Court further finds that:

1. OPSO is in non-compliance with Consent Judgment Sections IV.A.1-8, 10-11, IV.B.5, IV.D.1-4, and IV.G, which were entered as an Order of this Court on June 6, 2013;

---

[17] Dietz testified that she, Mayor Landrieu, and the Compliance Director met to discuss the Plan before it was submitted to the Court and that the Mayor accepted the Director's plan as "the most reasonable and feasible" alternative. (Rec. doc. 1368 at 22).

2. As a result, more specific remedial relief is necessary, as set forth below; and

3. Based on a robust case record including over 80 status conferences and the evidence presented in these proceedings, the Court finds that the additional relief set fourth above complies in all respects with the provisions of 18 U.S.C. § 3626(a). The relief is narrowly drawn, extends no further than necessary to correct violations of federal rights affected by the Consent Judgment, is the least intrusive means necessary to correct these violations, and will not have an adverse impact on public safety or the operation of the criminal justice system.

(*Id.*).

Former City Attorney Dietz testified at the hearing that the inclusion of this language was not a *pro forma* exercise and that the precise language was specifically negotiated by the parties before it was included in the Stipulated Order.  (Rec. doc. 1368 at 46-47).

The City continues to make the point that the Stipulated Order did not require the City to build Phase III.  In the City's most recent filing, it states "[n]owhere in the Stipulated Order is there even a mention of the proposed Phase III facility—much less a contractual obligation for the City to construct another jail facility that would ultimately house 65 or fewer inmates." (Rec. doc. 1377).  This argument intentionally misconstrues the language and effect of the Stipulated Order.  Of course there's no mention of Phase III in that Order – the whole idea was for the Compliance Director, who hadn't even been named yet, to weigh various options (including Phase III and retrofit) and submit a proposed plan to the Court in the future.

The City is absolutely wrong that the Stipulated Order does not embody its contractual obligation to build Phase III[18] – once the Compliance Director chose Phase III as the solution

---

[18]  The City concedes in its reply memorandum that "the Stipulated Order 'is a contract and its interpretation is governed by the basic rules of contract construction."  (Rec. doc. 1312 at 14).  This is partially true.  It is a contract between the parties, but that contract also contains the following language, bargained for by the parties:  "Issues regarding the interpretation or implementation of this agreement shall be referred to the

to the special-needs problem implicated in section D.22, the City was, in fact, contractually obligated to construct that facility. This is reflected in the plain language of the Order, was confirmed by former City Attorney Rebecca Dietz at the hearing, and is reinforced by the City's more than four-year long acquiescence in and acceptance of the Phase III plan submitted by the Compliance Director, not to mention its repeated assurances to the Court that it was in the process of designing and building that facility.

To seriously suggest the City did not bind itself to implement whatever plan the Compliance Director submitted – after all this time and after this administration repeatedly assured the Court and the parties it was doing exactly that – is offensive. The Court does not kindly view this administration's cavalier attempt to rewrite the important history of this case because it has become politically or financially expedient.

The simple truth is that, four and a half years after the fact, the City doesn't like the deal that it made. It doesn't like the result of the very process that it bargained for, helped develop, and thereafter fully embraced in open court as the most reasonable and feasible alternative for addressing the issue of housing special-needs inmates. The problem for the City is not that the Court issued some illegal order to "construct a prison" in violation of the PLRA; the problem is that the City entered into a binding contract with the other parties in the case to allow the Compliance Director to develop a plan and that once that plan was submitted the City fully accepted it for over four years, even extending into the current administration. The orders the City now claims violated federal statutory law did no such thing – they simply ordered the City to effectuate a plan it had voluntarily and contractually

---

United States Magistrate Judge assigned to the case for resolution." (Rec. doc. 1082 at 4). That is largely what this proceeding and this report and recommendation are about.

bound itself to undertake.[19]  The City's revisionist argument falters for that reason alone, yet there is another fatal flaw in the argument.

The *Plata v. Schwarzenegger* case in California has taken its place as a leading case on any number of issues in prison/jail consent decree litigation.  In that case, as in this one, a dispute arose over the funding authority's responsibility to fund construction projects included in a remedial plan submitted by a receiver.[20]  There are some pretty stark similarities between a motion in that case and the present motion in this one.

In *Plata*, the court issued an order requiring the State of California ("California") to transfer $250 million to the receiver "in furtherance of the receiver's work to remedy the undisputed and ongoing constitutional inadequacies in the delivery of medical care in California's prisons." *Id.* at *1.  The receiver in that case, like the Compliance Director here, had submitted a "remedial" plan for the medical care of that state's prisoners.  *Id.*  And, as here, the funding authority had agreed to that plan, before changing course and opposing it:

> As part of his remedial plan, the Receiver proposed construction projects that would both upgrade clinical space at existing prisons and result in entirely new healthcare facilities. The Court approved these projects with Defendants' consent.
>
> . . . .
>
> Until Defendants' opposition papers to the Receiver's contempt motion, Defendants never objected to any of the Receiver's facilities programs, his other remedial plans, or his authority to undertake any of these projects.

---

[19]  Notably, the City itself acknowledges the Stipulated Order as a binding contract and attempts to apply various theories of contract interpretation to it, albeit in a different context.  (Rec. doc. 1213 at 14).  To be sure, that Order is a binding contract, but it is more.  When it was signed by Judge Africk the "agreement" became an "order."  And it's an order that has never been appealed.

[20]  Of course the Compliance Director is not a "receiver" in this case but he does occupy a similar status, as both are court-appointed officials tasked with moving the respective facilities into constitutional compliance.  In *Plata*, the funding authority is the State of California whereas here it is the City.  *See Plata v. Schwarzenegger*, 2008 WL 4847080 (N.D. Cal.).

(*Id.*).

This "buyer's remorse" theme sounds familiar, to be sure.

Part of the State's argument in *Plata* tracked the City's argument here – that the PLRA prohibited the Court from ordering the construction of a prison. *Id.* The *Plata* Court met that argument as a matter of fact, head-on and decisively: "This argument fails on its face because, as discussed above, the State has consented to the Receiver's facilities program in this case." *Id.* at *7.

Also true here.

The *Plata* Court continued, though, undertaking a helpful plain-language analysis of the PLRA language at issue in that case and in this one.

> The statute provides only that "[n]othing in this section shall be construed" to authorize courts to order construction of prisons. The plain-language interpretation of this language is that the PLRA does not, in and of itself, authorize federal courts to order prison construction, but that the PLRA does not repeal the courts' equitable powers to remedy the violation of constitutional rights. Had Congress intended to bar courts from ordering prison construction under any circumstances, it would have done so explicitly.
>
> (*Id.*).

The remainder of the text of the PLRA bears out this analysis. The provision of the statute relied upon by the City in this case states simply that "[n]othing in this section shall be construed" to authorize courts to order construction of prisons. The City extrapolates this one sentence to reach the conclusion that this Court has overreached. It is wrong.

The plain language of this statutory provision simply says that the PLRA does not, in and of itself, <u>authorize</u> federal courts to order prison construction; it does not say that federal courts are <u>prohibited</u> from doing so or that the PLRA somehow repealed the courts' equitable powers to remedy the violation of constitutional rights. "Had Congress intended to bar

35

courts from ordering prison construction under any circumstances, it would have done so explicitly." *Id.* at *7.

The City might suggest the *Plata* Court and this one are wrong.  But, as pointed out by Plaintiffs, in the context of this PLRA argument, "courts, constitutional scholars, and United States attorneys general agree that courts should strictly interpret statutes purporting to curtail remedies for constitutional violations."[21]

So, even if the argument wasn't waived (which it was) and even if the City had not fatally undermined its argument by repeatedly agreeing to build Phase III over the years, its argument that the Court is statutorily prohibited from ordering the construction of a Phase III facility is wrong as a simple matter of statutory interpretation.

Even if not waived, the argument therefore fails.  So now we turn to the actual merits of the City's motion.

### B.   *The City's Alleged "Changed Circumstances"*

The Court turns now to the arguments originally made in the City's motion.  The City cites Rule 60 in seeking to be relieved from two Court orders that it claims required it to build a jail.  It argues that "there has been a significant change in the factual conditions which makes the continued programming, design, and construction of Phase III unsustainable." (Rec. doc. 1281-1 at 1).  Specifically, it argues that

---

[21] (Rec. doc. 1327 at 5) ("[W]here constitutional rights are at stake and where Congress leaves the federal courts with authority to grant only plainly inadequate relief, it has set itself against the Constitution."  Lawrence Gene Sager, *Constitutional Limitations on Congress' Authority to Regulate the Jurisdiction of the Federal Courts*, 95 Harv. L. Rev. 17, 88 (1981); *see also Katzenbach v. Morgan*, 384 U.S. 641, 651 (1966); *Oregon v. Mitchell*, 400 U.S. 112, 249 (1970) (accord); *North Carolina v. Swann*, 402 U.S. 43, 45-46 (1971) (holding that when a remedy is required to eliminate a constitutional violation, the remedy cannot be statutorily eliminated); Letter from Attorney General of the United States to Chairman of the Judiciary Committee, May 6, 1982 (The court must retain "adequate legal or equitable powers to remedy whatever constitutional violation may be found to exist in a given case.").

> <u>First</u>, the Orleans Justice Center ("OJC") currently provides medical and mental healthcare that is above the minimal constitutional standard; <u>second</u>, the unexpected COVID-19 pandemic will cause a significant budgetary shortfall for the City; <u>third</u>, the decrease in the inmate population makes the programming, design, and construction of a new Phase III jail facility unnecessary.
>
> (*Id.*).

I will address these arguments in order.

### 1. "The Orleans Justice Center ("OJC") currently provides medical and mental healthcare that is above the minimal constitutional standard."

Of the various arguments made by the City in support of its motion, this one is the most plainly disconnected from reality, a reality that necessarily includes the fact that what matters in this case is whether inmate care meets the standards, not only of the Constitution, but of the Consent Judgment. It is the Consent Judgment that establishes the acceptable level of care in this case, not <u>just</u> the Constitution. And it is abundantly clear that OJC is a place where compliant care cannot be provided to special-needs inmates.

For starters, it's worth mentioning that the City's own conduct is inconsistent with the idea that OJC does now and can in the future provide adequate medical and mental-health care to inmates in need of that care. If that were truly the case, the City would not have <u>agreed</u> to spend over $6 million of its own funds to build facilities at TDC for housing special-needs inmates <u>temporarily</u>. (Rec. doc. 1365 at 248-50). Similarly, if the City truly believed adequate care was being provided today at OJC, it would not have devoted time and taxpayer dollars to having experts fashion supposed alternatives to Phase III, including the "retrofit" idea, and having them present those alternatives to the Court in the recent two-week hearing on its motion.

These are not the acts of an entity that honestly thinks the status quo is acceptable.

In any event, it is clear to the Court that adequate care is not currently being provided in OJC. One need look only at the statements and testimony of the medical and mental-health monitors to understand that the City's argument to the contrary is untenable.

As an initial matter, here is a sample of the monitors' observations over the course of five years' worth of Compliance Reports regarding the need for a Phase III facility to address the inadequate level of care provided special-needs inmates at OJC:

> In the status conference of August 6, 2015 with Judge Africk, the [mental health] Monitor expressed his concerns that no action had taken place regarding the MHWG's recommendation that the Phase III building was the best available option and that the construction of Phase III should begin with all deliberate speed.
> (Rec. doc. 881 at 70)( Sept. 9, 2015).

> The defendants and the City must move forward as expeditiously as possible to construct the appropriate housing for inmates on the mental health caseload, and the physical plant to adequately provide medical care (*e.g.* examination rooms, triage rooms, office and storage space, and an infirmary). Each day this physical plant is not in existence constitutes on-going harm to inmates.
> (Rec. doc. 1101 at 59)(Oct. 25, 2016).

> The Compliance Director provided a required report to the Court and the community regarding the critical need to build a Phase III for at risk populations. Moving forward expeditiously is critical to achieving a Constitutional jail. . . . [T]here must be an urgent push to get the project moving forward.
> (Rec. doc. 1120 at 10)(May 1, 2017).

> There are no special needs beds (*e.g.* infirmary) at OJC and no specific plans to provide this much-needed space, except for the vague promise of a Phase III building.
> (Rec. doc. 1188 at 104)(Aug. 29, 2018).

> The Monitors are hopeful that the City will make the design and building of this additional facility a priority as it is critical to the provision of mental and medical health services.
> (Rec. doc. 1226 at 12)(Mar 18, 2019).

38

> Despite improvement in the areas of medical and mental health care, the Medical and Mental Health Monitors report challenges remain in the provision of basic [care], staffing, and recordkeeping, as well as the need for improved collaboration with custody/security staffing. . . . The long-term solution is the design and construction of Phase III, a specialized building which contain[s] an infirmary and housing for inmates with acute mental health issues.
>
> (Rec. doc. 1259 at 8)(Jan. 22, 2020).

Not surprisingly, at the hearing on this motion, Drs. Patterson and Greifinger, the mental-health and medical monitors respectively, testified consistent with these observations, explaining in detail why Phase III was still a critical need.

Throughout his testimony, Dr. Patterson identified numerous structural deficiencies that interfere with adequate mental-health treatment at OJC and how the Phase III will address those deficiencies. He testified that OJC has never had appropriate housing for the acute, sub-acute, and step-down populations and that they are forced to be housed in standard 60-bed pods. (*See generally* rec. doc. 1369 at 134-226). As a result, people who have made statements about self-harm or attempted self-harm have been housed in non-suicide-resistant cells. These housing decisions require intensive staffing and supervision to keep inmates safe and that cannot occur in OJC, with its poor sight lines and inability to readily observe inmates housed on the mezzanine level. (*Id.*). And speaking of mezzanines, Dr. Patterson described countless incidents of harm arising from the presence of these structures throughout OJC. (*Id.* at 147).[22]

---

[22] Dr. Patterson testified:

> But the mezzanines, we have had over time -- I probably can't count the number of times where there's been an incident of a detainee running up to the mezzanine, threatening to jump off, actually jumping off, threatening to hang himself, actually hanging, or, in other ways, increasing their risk of harm; and this is for inmates, detainees, I'm sorry, who at the time were on suicide watch. At the time were on suicide precautions. They weren't on population. They were on the, quote, mental health unit and able to do that.

The shortcomings in mental-health care go beyond issues of physical harm.  Dr. Patterson explained how OJC lacks sufficient space for individual and group programming activities, which are not only critical elements of mental-health treatment but are also underlined(required) to be provided by the Consent Judgment.  (*Id.*).  He testified that there are hundreds of inmates who should be receiving such services at OJC but are not.  (*Id.*).

The same can be said for medical services, according to Dr. Greifinger.  He stated that only 39% of the Consent Judgment provisions for which he is responsible are in substantial compliance and that a common problem he sees at OJC is that inmates returning from the emergency room or in-patient care at local hospitals are placed directly into general population because there is no infirmary at OJC.  (*See generally* rec. doc. 1369).  This results in inmates requiring follow-up medical care being denied that care.

Dr. Greifinger also testified that he continues to believe that "construction and occupation of Phase III are critical to the provision of mental and medical health services in accordance with the consent judgment."  (*Id.* at 266).

On the medical-care side, a major point of contention in this proceeding and at the hearing is the question whether OJC requires an infirmary to provide care consistent with its obligations under the Consent Judgment and Constitution.  The City claims that it does not and hired an outside consultant, Dr. Ronald Shansky, to try to make that point to the Court.  His testimony had the opposite effect.

At the hearing, Dr. Shansky explained what he had been "tasked with" in connection with the present motion, "I was asked by Dr. Austin, Jim Austin,[23] are there circumstances under which, for medical problems, you could conceive of them providing constitutional

---

[23] Dr. Austin is another outside consultant retained by the City to testify in this matter.

care; and I spelled out under number 21, A through F, the conditions under which I could conceive of them providing constitutionally respectful care." (Rec. doc. 1366 at 135-36). Dr. Shansky's reference to "A through F" was to a declaration he authored for the City which the City filed into the record as an exhibit to its motion. (Rec. doc. 1281-7). The relevant language is as follows:

> 21. For the OJC, an alternative to the Phase III infirmary unit would be sufficient if it meets the following conditions;
>
> > a. A secure and dedicated ward located in an easily accessible local hospital;
> >
> > b. There must be a legal agreement between the City and the local hospital in terms of dedicated use of the ward for OJC patients who would otherwise be detained in the OJC;
> >
> > c. The secure ward must have 10-12 beds within it and be properly staffed with security staff;
> >
> > d. The OJC Medical Director must have admitting privileges to the secure ward for which she/he must make direct admissions to the ward;
> >
> > e. The OJC Medical Director must make the rounds at least three times per week on the secure ward to ensure adequate care is being provided; and
> >
> > f. There must be an arrangement that other hospitals in Orleans Parish will accept patients whom adequate medical care would not be available within the OJC or the secure ward at the local hospital.
>
> 22. If these conditions are met, Orleans Parish, in my opinion, will have provided a constitutionally adequate alternative to the proposed infirmary that would be part of the Phase III facility

and would meet the medical care requirements of the Consent
Decree.

(Rec. doc. 1281-7 at 4).

To this list of conditions, Dr. Shansky in his testimony added two more
"requirements":  (1) that in addition to the OJC medical director having admitting privileges
at a local hospital, the medical director should also have discharge privileges and (2) that the
local hospital with which OJC has an agreement should be within walking distance of the jail.
(Rec. doc. 1366 at 137).

Somewhat unbelievably, there is <u>no</u> evidence in this record to suggest that even <u>one</u>
of these conditions is currently met at OJC; in fact I believe it is undisputed that not a single
one of Dr. Shansky's conditions have been met (although Dr. Shansky was apparently
misinformed and led to believe otherwise).  (*Id.* at 153-57)).

Recall Dr. Shansky's own words in his declaration:  "<u>If</u> these conditions are met,
Orleans Parish, in my opinion, will have provided a constitutionally adequate alternative to
the proposed infirmary that would be part of the Phase III facility and would meet the
medical care requirements of the Consent Decree."  (Rec. doc. 1281-7 at 4)(emphasis added).
The question now becomes, what is the impact of a finding that <u>none</u> of these conditions
precedent are satisfied?

One might easily assume that, in the absence of any of these conditions being met, the
City will <u>not</u> "have provided a constitutionally adequate alternative to the proposed
infirmary that would be part of the Phase III facility" and that medical care provided at a jail
without an infirmary would <u>not</u> "meet the medical care requirements of the Consent Decree."
(*See id.*).  This is the conclusion I reach after listening to the testimony and reviewing this
record.  That conclusion is bolstered by Dr. Shansky's later testimony.

Dr. Shansky testified that "smaller" jails can do without infirmaries because "they have less hospitalizations and they can afford to not have an infirmary, medium or mid-sized jails are usually associated with infirmaries." (Rec. doc. 1366 at 164). But he clearly testified that OJC is not a "smaller jail," because "mid-sized" jails," (normally associated with infirmaries) are jails with "above five hundred" in population." (*Id.* at 167). As of November 23, 2020, there were 984 inmates in Orleans Parish custody, far more than the 500-inmate threshold described by Dr. Shansky. (Rec. doc. 1381).

In sum, according to the declaration and testimony of the City's own expert, the conditions necessary for the jail "to meet the medical care requirements of the Consent Decree" without an infirmary do not exist; any suggestion by the City that such that such care is <u>currently</u> being provided at OJC is not only unsupported but is wholly contradicted by its own expert. And the City has still not presented an option that includes an infirmary.

In the face of all this overwhelming evidence, including the Monitors' statements over years' worth of Compliance Reports that a Phase III facility is "critical" to meeting the requirements of the Consent Judgement, the City, in its motion, makes the outlandish representation that

> OPSO inmates are receiving adequate mental health and medical services as provided by Wellpath and Tulane – two highly qualified and competent service providers. The OJC currently has existing facilities to fully implement Section IV (B) which governs the mental health care of inmates, and Section IV (C) which governs the medical care of inmates.
> (Rec. doc. 1281-1 at 18).

This argument is literally at odds with all of the evidence in the record and is therefore rejected.

### 2.  "The Decrease in the Inmate Population Makes the Programming, Design, and Construction of a New Phase III Jail Facility Unnecessary."

The City argues next that a drastic decline in population at OJC "makes the programming, design, and construction of a new Phase III jail facility unnecessary." (Rec doc. 1281-1 at 1). It claims that a steady decrease in the inmate population amounts to "a significant change in circumstances," meriting relief under Rule 60. The City is quite wrong about this.

During the COVID-19 shutdown in the City of New Orleans in mid-2020, the population in the jail did, in fact, decrease. The evidence and testimony presented in this proceeding makes it clear that decline was attributable to a number of idiosyncratic circumstances, almost all of which have since vanished. Arrests were down during the shutdown and many non-violent inmates were released on bond due to the extraordinary efforts of the Sheriff and the Judges and Magistrate Commissioners in Criminal District Court, who actively sought to decrease the Jail's population <u>because</u> of the risks presented by COVID-19 in a jail setting. Since the City filed its motion, predictably, the population has crept back to where previous estimates by the City's own expert suggested it would be in 2020.

What matters to the Court for purposes of this motion is whether there has been a dramatic, <u>unexpected</u> decrease in the OJC population such that Rule 60 is implicated. To be sure, to the extent the population in OJC has decreased since the City signed the Stipulated Order and the Compliance Director submitted the SCAP calling for construction of Phase III, such a reduction is neither dramatic nor unexpected. To suggest otherwise, as the City does here, is to rewrite history.

44

When he submitted the SCAP providing for the Phase III facility, former Director Maynard expressly relied on the population estimates of the City's now-expert, Dr. Austin. (Rec. doc. 1106 at 4-6).   More recently, in a December 14, 2018 letter to the current Compliance Director, the City's Director of Capital Projects, Vince Smith, stated clearly that

> The supplemental compliance action plan submitted to the courts in January, 2017 and signed by Sheriff Gusman and Gary Maynard (Compliance Director at that time) notes the Compliance Director's recommendation to construct an acute and sub-acute mental health needs facility with a bed count of 89 total with 77 beds for males and 12 beds for females.   The document notes this bed count as being based on population projections provided by Jim Austin (JFA Institute) which show downward trends in the population from 2014 to 2018 (See attachment #1).   Recent JFA Institute forecast continue to project a downward population trend that could reach 980 inmates by 2020.
>
> (Rec.    doc.    1336-55) (emphasis added).

Based on these estimates, the City committed to build a Phase III facility with 89 mental-health beds at a cost of over $36 million.   This was two years ago.

On November 23, 2020, during the most recent status conference I held with the parties, the Sheriff's counsel informed us that there were 984 inmates in OJC custody – a number exactly aligned with Austin's and Smith's estimate for 2020.   (Rec. docs. 1381, 1336-55).[24]   The evidence establishes that any decline in population to date at OJC has been fully expected and therefore does not amount to "changed circumstances" under Rule 60.[25]

---

[24]  On the morning this Report and Recommendations was filed in the record, OPSO filed an update notifying the Court that, as of December 7, 2020, the jail's population had increased to 1,003 inmates.  (Rec. doc. 1384).

[25]  Even Dr. Austin himself agreed with this at the hearing:

Q. The notion that the jail population of OJC would be coming down was not new with the COVID crisis, was it?
A. No.

(Rec. doc. 1366 at 282).

This argument and the facts underlying it do not implicate or satisfy the requirements of Rule 60.

### 3. "The Unexpected COVID-19 Pandemic Will Cause a Significant Budgetary Shortfall for the City."

The deleterious effect on the City's finances of the COVID-19 pandemic are inarguably unexpected and significant. The question for the Court in the context of this motion, however, is whether this unexpected development, standing alone, is sufficient to convince the Court to indefinitely absolve the City of its prior commitment to remedy the inadequate care being provided to special-needs inmates. For the following reasons, it is not.

#### a. There Are Adequate FEMA Funds Available to Build Phase III

The City's arguments regarding the financial difficulties associated with building and operating Phase III can be roughly divided into two parts: the cost to construct Phase III and the cost to operate it once it is built. I will address the construction costs first.

In its motion, the City makes the definitive statement that the Phase III project, "is already projected to cost $51M, which is $15M over budget, and will require the commitment not only of additional bond funds, but also a substantial operating budget. Accommodating this budget increase would require the City to sell new bonds to finance construction during a time of economic uncertainty and the recent default bond rating downgrade." (Rec. doc. 1281-1 at 15). This statement is not true.

It is true that Phase III is projected to cost $51 million to build and that the City allocated only $36 million toward its construction. It is not true that the City has to sell new bonds or borrow money to make up that difference.

46

Lanitra Hasan ("Hasan"), the Federal Grants Manager for the City, testified at the hearing.  Hasan confirmed that the City pooled post-Katrina FEMA funds into a "criminal justice program" fund pursuant to certain federal regulations and that those pooled funds included funds that FEMA had previously allocated to Templeman I and II facilities of the OPSO's pre-Katrina campus. (Rec. doc. 1365).

By way of background, when a FEMA applicant, such as the City, determines that the public interest would not be best served by restoring a damaged facility or its function after a federal disaster, the applicant may request approval of any alternate project from FEMA. *See* 44 CFR § 206.203(d)(2).  Funds contributed for alternate projects may be used to repair or expand other selected public facilities, to construct new facilities, or to fund hazard mitigation measures.  *See* 44 CFR § 206.203(d)(2)(iv).

Hasan confirmed that sometime in 2011 or 2012, the City took advantage of these provisions:

> I think back in 2011, 2012, [the City] may have identified a series of projects that it determined it was not going to move forward with.  It presented the list of those projects to FEMA and FEMA made a determination to accept that those projects would not move forward.
>
> The City provided for a list of approximately 33 projects, not including project management costs, and identified those projects as recipient projects for criminal justice and public safety.
>
> (Rec. doc. 1365 at 149).

Michael Gaffney ("Gaffney"), an attorney who has represented OPSO in obtaining post-Katrina FEMA funding and who testified for the Compliance Director at the hearing as an expert in FEMA funding, including application policies and procedures, confirmed Hasan's testimony.  (Rec. doc. 1369 at 63).  Prior to the hearing, Gaffney issued multiple public

records requests to the Governor's Office of Homeland Security and Emergency Preparedness ("GOHSEP") regarding various FEMA project worksheets involving OPSO and the City.  (Rec. doc. 1301-1).  From the documents received pursuant to those requests, he learned that the the combined FEMA funding attributable to the Templeman I and Templeman II buildings[26] was $115,620,949.00.  Of that amount, Gaffney calculated that $70,482,530.51 was attributable to Templeman II.[27]  (*Id.*).

Ultimately, the City directed the funds from more than 75 different projects into a "Combined Criminal Justice Alternate Projects'' pool for a total of $144 million in funding.  (*Id.*).  Of that $144 million pool, $106 million came from the Templeman I and II funds, with the estimated $70 million in Templeman II funds comprising the single largest contribution.  (*Id.*).

Among the 33 projects Hasan described as receiving funds as part of the Combined Criminal Justice Alternate Projects pool were Gallier Hall renovations ($1.5 million),[28] police vehicles ($8 million), and Municipal Traffic Court ($4.1 million).  (*Id.*).

This reallocation of funds from OPSO-specific projects to the alternate-projects pool likely explains the years-long dispute between the Sheriff and the City over "ownership" and control of the Templeman II funds.  Because OPSO had purchased the land and built Templeman II with its own bond funds, it argued for years that it should have control over those funds.  (*Id.*).

---

[26]  Before Katrina, the Templeman I and II buildings contained OPSO's facilities to address the medical and mental needs of inmates at the jail.

[27]  This estimated allocation will become important later.  Hasan disagreed with Gaffney's allocation but could offer no alternative allocation of funds as between Templeman I and II.  (Rec. doc. 1365 at 158-61).

[28]  In all the pleadings and testimony associated with the City's motion, it has never even attempted to explain how renovations to Gallier Hall could remotely be considered a "Criminal Justice Alternate Project" or, more importantly, how they could be prioritized above the medical and mental-health needs of inmates in Orleans Parish custody.

Ultimately, as confirmed by former City Attorney Dietz and others at the hearing, the

OPSO and City settled that dispute as part of their agreement to the Stipulated Order, which

contains the following crucial language:

> Within 60 days of appointment, the City, the Sheriff, and the
> Compliance Director shall develop and <u>finalize a plan</u> for ( 1)
> appropriate housing for prisoners with mental health issues and
> medical needs, (2) addressing the housing needs of youthful
> offenders and (3) addressing the current conditions of the
> "Docks" facility, consistent with the terms of the Consent
> Judgment.   The City of New Orleans shall maintain final
> authority and approval over capital expenditures associated
> with that plan, <u>including use of Templeman II FEMA funding</u>
> <u>exclusively for implementation of the plan.</u>
>
> (Rec. doc. 1082)(emphasis added)

In her testimony, Dietz very clearly confirmed the City's understanding of the intent

of the parties in agreeing to this language:

> Q. And so my question is, there seems to be a process to bring
> final resolution to these issues and I was asking you what was
> the process for final resolution as you understood it.
>
> A. I understood it that the compliance director after we -- Well,
> after we interviewed him, and the sheriff recommended
> appointment, that the compliance director would work with the
> City and the sheriff and also consult with the monitors and the
> plaintiffs on the appropriate housing for mental health and
> medical needs inmates, the appropriate resolution for youthful
> offenders, and an appropriate resolution for the dock facilities.
>
> The compliance director and the sheriff would then submit a
> plan to the court, but that the City would still maintain
> essentially, not just the responsibilities, but also the authority
> over the funding to be used to implement those solutions.
>
> Again, this was intended to resolve the issue of the Templeman
> II funding, which had been a dispute between the City and the
> sheriff for a long time.  <u>It was intended to resolve it such that the</u>
> <u>FEMA funding belonged to the City and we would use it to</u>
> <u>implement the plan</u>.

Q. The sheriff was contending that his office, the OPSO, should own the Templeman II FEMA funding or control it, rather?

A. That's my understanding of the sheriff's office's position at the time, yes.

Q. <u>And this was intended to resolve that issue by having the sheriff give up that argument in return for this stipulation that that funding would be used for these three purposes, correct?</u>

A. <u>Correct.</u> That's my understanding and, you'll note in paragraph 23, that OPSO was required to dismiss any lawsuits related to the Templeman II funding.

Q. And didn't, in fact, the OPSO do so?

A. Eventually.

(Rec. doc. 1368 at 17-18)(emphasis added).

In the present motion, the City reads the quoted language of the Stipulated Order as giving it free reign to spend the Templeman II funds any way it wants and ignores the language that binds it to use those funds "exclusively for implementation of the plan."  It ignores, not only the plain language of the Stipulated Order (which it concedes is a binding agreement),[29] but also ignores the testimony of the former City Attorney who negotiated and drafted the agreement as to what the parties – particularly the City – intended when they signed that agreement.

The City states in its reply memorandum:

While it is correct that a Stipulated Order "is a contract and its interpretation is governed by the basic rules of contract construction," as with any contract, the understanding of the agreement begins within its "four corners."  When a contract is expressed in unambiguous language, its terms will be given its plain meaning, and should be enforced as written.

(Rec. doc. 1312 at 14).

---

[29]  Rec. doc. 1312.

It then goes on to argue that the statement "[t]he City...shall maintain final authority and approval over capital expenditures associated with the plan, including use of Templeman II FEMA funding exclusively for implementation of the plan," <u>unambiguously</u> establishes that "that the City fully retained authority and discretion over how funding obligated by FEMA would be appropriated for housing." (*Id.* at 15).

That is very clearly and unambiguously <u>not</u> what that language says.

Assigning to this language its "plain-meaning," as the City insists I should, it is clear that, pursuant to the Stipulated Order, the City now maintains authority and approval over capital expenditures associated with the plan set forth in the Compliance Director's SCAP <u>generally</u>, but that as to <u>FEMA Templeman II funds</u>, specifically (which are a mere subset of total available funds), it is constrained to use <u>those</u> funds "exclusively for implementation of the plan." This is the only way to read this provision that doesn't lead to an absurd result or make the "exclusivity" language superfluous.[30]

Underlining the Court's interpretation of this language, Rebecca Dietz, the City representative responsible for negotiating, drafting and signing the agreement confirmed this as the proper interpretation in her sworn testimony at the hearing. (Rec. doc. 1368 at 17-18).

So where does this all leave us with regard to the City's claim that it will have to borrow money to build Phase III? Even Hasan testified that there remains at least $81 million in FEMA funds available to the City for criminal justice and public safety projects. (Rec. doc. 1365 at 151-52). She further confirmed, under direct questioning by me at the hearing, that

---

[30] It is also worth noting that reading the provision the way the City suggests would mean that the Sheriff bargained away his claim for the Templeman II funds for nothing in return, which would be an absurd result, indeed.

funds moved by the City from Templeman I and II to other "Criminal Justice Alternate Projects" could be reallocated to Phase III.  (*Id.* at 165-67).  The only "caveat," she explained, was that "if we reallocate funding from other projects that we will not be able to move forward with other projects."  (*Id.*).

The truth is that reallocating FEMA funds back to Phase III won't mean other projects can't go forward, they just might not go forward with FEMA funds previously associated with Templeman II.  In other words, this is all just an exercise in balancing priorities, not, as the City suggests, a zero-sum game in which the City will be forced to borrow money to pay for construction of a Phase III facility it is contractually obligated to build.  Indeed, it contracted to use Templeman II FEMA funds "exclusively for implementation of the plan" submitted by the Compliance Director in the SCAP.  Gaffney estimates those funds are valued at roughly $70 million and that, after renovation of the Youth Studies Center and the Docks (the other two elements of the "plan"), some $47.9 million remains for Phase III, just from Templeman II funds.  (Rec. doc. 1301-1 at 4-5).[31]

In sum, then, the record evidence and testimony clearly establishes that, not only is there ample FEMA funding available to construct Phase III, the City is contractually bound to spend that money for that project.  (Rec. doc. 1082).  The City's argument on this front is without merit.

> b.   *The City's "Operational Costs" Argument Is a Red Herring*

The City's next argument is focused on what it estimates will be a projected $9 million-plus per year increase in operational costs that it says will come along with the

---

[31]  And if the City is worried about the $3.1 million shortfall there, maybe it should have though about that before using money from the Criminal Justice Alternative Projects pool to pay for renovations to Gallier Hall. (Rec doc. 1301-1 at 7-8).

completion and operation of Phase III.  On its face this argument would seem to call for the closest attention of all the City's arguments.  Having now given it that attention, I still find the City has failed to make its case, for the following reasons.

The City's argument, that <u>changed circumstances</u> render the operational costs of Phase III untenable, is unconvincing.  Recall that the City has agreed to build (and thereby pay to operate) Phase III since January 2017 at the very latest.  (Rec. doc. 1106).  The Cantrell Administration confirmed that commitment in this record as recently as April of this year: "[t]he architect, Grace/Hebert Architects, is currently engaged in the Construction Document ("CD") phase of Phase III.  The projected project completion is summer 2022."  (Rec. doc. 1268).  The City has always known that facility would be designed and built to accommodate 89 mental-health beds plus an infirmary.[32]  And since signing the Stipulated Order, the City has never objected or raised concerns about the costs of operating that facility, until COVID-19 presented that opportunity.

Here's why the City's recently conjured falls flat.  It agreed – during the current administration – to renovate TDC to temporarily house special-needs inmates until Phase III was completed.  (Rec. doc. 1222).  The TDC renovation, which is now complete, can accommodate up to 69 beds, fewer than the Phase III facility will accommodate.  (*Id.*).  The City, even in these motion papers, has touted to the Court that it "delivered" this temporary TDC project as promised, apparently forgetting that this project comes along with its own additional operating costs – an additional 102 security staff above and beyond those currently required in OJC.  (Rec. doc. 1369 at 48).  This is an increase in operational costs to

---

[32] And it has known since at least 2015 that Phase III would require $5-10 million in additional operating costs annually.  (Rec. doc. 1380-1 at 6).

which the City has <u>never objected</u>.  The current staffing plan for Phase III – the one the City says will cost an additional $9 million to fund – calls for 109 security staff, an increase over the un-objected-to TDC staff of six deputies.  (*Id.* at 48-49).[33]

Common sense (along with some testimony) tells us that, once Phase III is online and the TDC inmates can be moved to that permanent facility from TDC's temporary accommodations, the security staff from TDC will simply move to Phase III.  (*Id.* at 49).

For reasons that escape me entirely, the City has ignored this rather gaping logical hole in its operational-costs argument.  The Court's task is not to compare the operational costs of OJC as it was in June 2020 to what the City projects it will cost to operate OJC plus a Phase III facility three years from now, the task is to compare what the operational costs of OJC plus Phase III will be versus the ongoing costs to operate OJC <u>and</u> TDC as it serves as as temporary housing for special populations for the next three or so years.

These TDC costs are being realized right now, without any objection from the City – indeed the temporary accommodations at TDC were the City's idea to solve the loss of Hunt as a temporary solution to housing special populations.  It's just disingenuous to suggest that these costs are manageable now at TDC but won't be manageable three years from now just because they'll be accruing in a building the City doesn't want to build.

Which brings us to the issue of timing.  The City cites <u>current</u> budget shortfalls as a reason to halt work on Phase III because it might not be able to afford the increased cost of

---

[33]   The $9 million figure comes from Dr. Austin's report.  (Rec. doc. 1281-2).  Sean Bruno, the Chief Administrative Officer of the OPSO, testified that Dr. Austin substantially over-estimated the annual salaries of captains ($100,000 versus $72,000), lieutenants ($85,000 versus $75,000) and sergeants ($75,000 versus $$51,000).  (Rec. doc. 1368 at 92-93). No one has done the math but it would appear that Dr. Austin's $9 million estimate should be markedly lower based just on his over-estimating these salary figures.  Dr. Austin's estimate also does not account for approximately $1.2 million in annual savings from no longer housing inmates at Hunt. (*Id.* at 94).

operating that facility when it eventually opens.  But that facility, by all measures, is a good three years away from being occupied, assuming work continues apace in that direction.  The City's Chief Administrative Officer, Gilbert Montano, testified at the hearing that the City anticipated financial recovery from the effects of COVID-19 in 3.75 years from April 2020. (Rec. doc. 1365 at 48; *see also* rec. doc. 1337-7).  We all hope that is a conservative estimate, but one way or another, that is the estimate the City presented at the hearing and in the record.  (Rec. doc. 1337-7).

Suffice to say, this evidence and testimony, superimposed over the City's conduct vis-à-vis the renovation of TDC and the attendant increase in operational costs associated with using that facility, convinces the Court that the City cannot avoid its obligations to construct the Phase III facility because of a speculative budgetary shortfall three years from now.

Finally, the, I must make this observation.  The City has complained throughout this motion practice and at the hearing that "if the City is mandated to proceed with building a new jail building, this will subtract resources from public safety for all of Orleans Parish.  This will subtract resources from what is minimally available for mental health services to those who are not in jail."  (Rec. doc. 1376 at 10-11).  For those of us who have been involved in this case for years, that is a familiar – and repeatedly rejected – argument.

One of the City's objections to the entry of the Consent Judgment itself was that "that the proposed consent judgment requires a 'diversion of funds' that will adversely affect public safety and the welfare of the <u>citizens of New Orleans who are not inmates at OPP</u>." (Rec. doc. 465 at 75-76).  That this argument was rejected by Judge Africk seven and a half years ago has not impeded the City from repeating it today.

Notably, in support of the City's objection to the Consent Judgment back in 2013, former First Deputy Mayor, Andy Kopplin, testified that "that either significant layoffs and furloughs or a drastic reduction in the number of police officers and fire department employees available to respond to public emergencies would be necessary if the City was forced to spend" the funds required to implement the Consent Judgment. (*Id.* at 76). This certainly sounds familiar. Rejecting that argument in 2013, Judge Africk expressly found

> "[i]t is well established that inadequate funding will not excuse the perpetuation of unconstitutional conditions of confinement, nor will an allegedly contrary duty at state law." *Smith v. Sullivan*, 611 F.2d 1039, 1043-44 (5th Cir. 1980) (internal citations omitted). "That it may be inconvenient or more expensive for the [local government] to run its prison in a constitutional fashion is neither a defense to this action or a ground for modification of the judgment rendered in this case." *Gates v. Collier*, 501 F.2d 1291, 1322 (5th Cir. 1974).
>
> (*Id.* at 79).

This was sound reasoning in 2013 and it remains sound today.

For the reasons explained above, the Court finds that the City's argument that it should be relieved of its obligation to design and construct Phase III because of financial difficulties caused by the COVID-19 pandemic does not implicate Rule 60 and otherwise is without merit.

### C.   Addressing the City's Remaining Arguments and Efforts

### 1.  Dr. Austin's Supposed Alternatives to Phase III

As I mentioned earlier, when the City initially filed its motion, the <u>only</u> relief it sought was entry of an order that it be allowed to indefinitely cease work on Phase III – it did not suggest any alternatives to that project. (*See generally* rec. doc. 1281). Indeed, as discussed above, the City originally took the position that adequate care was currently being provided

to special-needs inmates at OJC, which is one of the reasons I assume it asked the Court to allow it to step back from efforts to improve that care with no alternative plan.

Upon receipt and review of that motion and the parties' respective response memoranda, I was admittedly confounded by the idea that the City would ask for such relief without suggesting <u>any</u> specific alternatives to Phase III, so I issued an order requiring the City to file a reply memorandum that addressed, among other things, the following questions:

- What specific, durable solution, if any, for the appropriate housing for prisoners with mental health issues and medical needs is the City suggesting it be permitted to pursue in lieu of the promised construction of the Special Needs Facility?

- To the extent the City proposes any specific, durable solution(s) as described above, has FEMA been consulted on its position on such solution(s) since February 25, 2019 and, if so, what was that agency's response?

(Rec. doc. 1309).

The City then filed a reply memorandum (rec. doc. 1312) that greatly expanded (or at least attempted to greatly expand) the scope of the motion before the Court.[34]  Included in this reply was a presentation of three separate alternatives to Phase III, each of which was said to have been developed by its expert, Dr. Austin.  (*Id.*).

While the Court has decided that relief is not merited under Rule 60 and will so recommend to Judge Africk, because significant effort and time was devoted by the parties and the Court to addressing these alternatives at the hearing, it makes sense to address them on the merits, such as they are.

Here is how the City presented its three alternatives in its reply memorandum:

---

[34]  The City's attempt to introduce for the first time in its reply memorandum the argument that the Court's March 18, 2019 Order violated the PLRA was addressed in detail earlier.

> The City maintains there are options other than Phase III available to address the Plaintiffs' concerns and ensure that OJC's populations are receiving medical and mental health care services consistent with the Consent Judgment and in conformity with national standards. The first option retains TDC as a long-term facility for acute and sub-acute female prisoners and renovating OJC pod 2 to accommodate the sub-acute males. The second option renovates TDC buildings 3 and 4 to accommodate the 33 OJC sub-acute males in OJC Pod A. An additional option includes renovating OJC pods 2A, 2C, and 2D and subsequently closing TDC once those renovations are complete.
>
> (Rec. doc. 1312).[35]

Fortunately, I need not belabor the lack of merit of the first two alternatives because Dr. Austin readily conceded at the hearing that both of those options were "not viable." (Rec. doc. 1366 at 258-59). After testifying that he had been asked by the City to present three options he believed were "viable" alternatives to Phase III, Dr. Austin was only asked about and only testified about the third such option – the so-called retrofit of the second floor of OJC. (*See* rec. doc. 1366 at 174). When asked on cross examination why he limited his direct testimony to the retrofit option and didn't discuss either alternative that involves the use of TDC as a permanent solution, Dr. Austin delivered this bombshell:

> I don't think they're viable. I think -- I just heard today, by the way, about the hurricane issues. That's another issue. I only had so much time and [retrofit] is the option I think is most viable that will work the best and be least intrusive.
>
> (*Id.* at 259).[36]

---

[35] The City cited Dr. Austin's report, "Alternatives to the Phase 3 Facility Program," in support of these alternatives. One version of that report is found at record document 1312-4. Interestingly, there is a subsequent version of the same report that the City later filed that differs from this one in some material respects. (Rec. doc. 1337-1).

[36] TDC routinely requires evacuation during hurricane season. It actually had to be evacuated <u>during</u> the hearing on this motion, owing to the approach of a late-season hurricane.

Leaving no doubt, in response to a direct query from me, Dr. Austin stated clearly that "I'm only proposing option three. That's all I'm proposing." (*Id.*). Option three is the retrofit of the second floor of OJC.

After the avalanche of pleadings and exhibits and declarations and reports unleashed on the Court by the City and the parties, all of which I actually read in preparation for the hearing, it was disconcerting to say the least to hear the primary proponent of these three supposedly viable alternatives openly and categorically disavow two of the three. Worse still, Dr. Austin testified that he had arrived at this conclusion by September 10, 2020, when he presented his "options" to the New Orleans City Council's Criminal Justice Committee at the behest of the Cantrell Administration. (*Id.* at 258-59). On cross examination, he explained that he only discussed the retrofit option before that committee because he had already determined already that his other two options were not "viable." (*Id.*). This begs the question (to me at least) why the Court and the parties had to wait until Dr. Austin testified on October 7, 2020 to learn that he had abandoned his first two, TDC-related, alternatives.

I will choose to attribute no bad faith to the City and its representatives for this oversight and will chalk it up simply as a product of the haphazard approach they have taken to this entire problem since the day they unilaterally decided to stop complying with their previous commitments and court orders regarding Phase III. The ad hoc and ill-considered nature of the City's conduct is perfectly encapsulated in Dr. Austin's hastily cobbled set of options, which is really just one option when the smoke clears. So let's look at that one option.

As discussed earlier, for years the Landrieu Administration advocated off and on for the retrofit of the fourth floor of OJC as an alternative to a Phase III facility. This was, of

course, before that administration affirmatively bound the City in the Stipulated Order to construct that same Phase III facility following years of tumult, negotiations and, eventually, compromise.  As noted above, the Cantrell Administration then re-committed to that course.

After filing the present motion seeking permission to simply stop work on Phase III, the City, for the first time on August 12, 2020 in its reply memorandum, suggested (through Dr. Austin) that retrofitting the second floor of OJC might be a viable alternative to constructing the Phase III facility.

To be kind, this suggestion is not fully thought-out.  Indeed, the whole concept seems to morph from day to day, owing no doubt to the completely improvised nature of the City's approach to this entire enterprise.  In any event, this suggested "retrofit" is not a viable option in any way, shape, or form.  Here are some of the reasons.

- Initially, the concept of a retrofit of OJC was considered and rejected multiple times by multiple persons and entities in favor of the very Phase III option now being designed.  The Compliance Director rejected it and then, when given opportunity to consider it yet again, the Cantrell Administration did the same in favor of Phase III – there are reasons for this.

- The current retrofit "plan" suggested by Dr. Austin was thrown together in 22 days (and it shows).  Dr. Austin wasn't asked to put the plan together until July 1, 2020 (after the City stopped work on Phase III) and he submitted the first version of his plan on July 23, 2020.  (Rec. docs. 1366 at 271-72; 1312-4).  As noted,

Dr. Austin thereafter quickly decided two of his three options in that plan are not "viable." (Rec. doc. 1366 at 259).

- The population at OJC as of November 23, 2020 was just under 1,000 inmates, a substantial <u>increase</u> in inmates since the City filed its motion in June 2020. Dr. Austin's assumptions about a substantially declining population allowing for retrofit of an entire floor of OJC are unfounded.

- The retrofit plan would require the permanent relocation from OJC of <u>all</u> youthful offenders, which does not appear possible or likely, as the judges of the Criminal District Court have sole discretion over housing decisions on youthful offenders. (*Id.* at 58).

- Even if none of these problems existed, the retrofit does not include an infirmary, which even the City's own expert, Dr. Shansky, agrees is not compliant with the Consent Judgment. OJC requires an infirmary.

- According to the mental-health monitor, Dr. Patterson, there is insufficient programming space in the retrofit plan to comply with the Consent Judgment.

- Dr. Austin and the City have sought no input on the plan from the monitors, who, with full knowledge of a retrofit option, have repeatedly stated that Phase III is "critical" to compliance.

- There has been no input on the plan from Wellpath, the Tulane doctors, or the Sheriff, who is legally charged with operating the jail.

- There has been no consideration whether OPSO – which owns the facility – would consent to a retrofit.  (Rec. doc. 1369 at 91).

- The City failed to demonstrate that a retrofit of OJC would not put the OPSO at risk of up to $75 million of FEMA's "at cost" reimbursement for OJC, given that the OJC project itself has not been closed and that the proposed retrofit will not meet FEMA's "design," "function," and "capacity" requirements for "at cost" reimbursement, assuming OJC is retrofitted.[37]

---

[37] Mr. Gaffney, the FEMA expert and attorney who assisted OPSO with its post-Katrina FEMA claims, explained why this was a concern:

> Every item that was in the building that was damaged was identified because the function had to be the same in the replacement facility.  So we went through each and every item and made sure that the building that was being designed by Grace Hebert was similar in every single manner with the damaged facility.  What that enabled us to obtain for the sheriff was at-cost funding.
>
> Okay.  FEMA -- if you back up a little bit, FEMA is not an insurance company. FEMA does not come in and say here's a check, this is how much you lost. They don't do that.  They look at the design, the function, and the capacity. They will replace those items.  Design, function, and capacity. They will adjust those under applicable codes and standards and that's what you get, and they will pay that cost no matter what it is.
>
> It's an at-cost facility as long as you meet those 3 parameters.  We did that to make sure we had an at-cost facility for the sheriff.  If you go back and change those similarities and it's not what we had previously existing, then what happens is it becomes an improved project or an alternate project.
>
> Okay. If it becomes an improved project or an alternate project because it is no longer similar to what you had before, the funding is capped.  The funding is capped at what you had before, which is about 70 million less than what we ended up getting as an at-cost facility.
>
> (Rec. doc. 1369 at 92-93).

He went on to note that OJC was built with a 1438-bed capacity because that is the precisely number of beds that were in the Katrina-damaged facilities it replaced.  (*Id.*).  Reducing the bed capacity by 200 (which the retrofit would do) would make OJC non-compliant with FEMA's at-cost capacity requirement according to Gaffney.  (*Id.*).  There was no countervailing testimony.

In sum, for all the reasons explained above, the Court is wholly unconvinced that the City's oft-rejected suggestion of a retrofit of OJC as a viable alternative to Phase III is an alternative at all.

### 2. The City's Misguided Efforts to Turn This into a Political Issue Will Not Bear Fruit in this Court.[38]

I mentioned earlier that the City included as an exhibit to its reply memorandum a tranche of correspondence from various State legislators addressed to Judge Africk and me urging us to relieve the City of its agreed-to obligation to construct Phases III.  (Rec. doc. 1312-1).  This correspondence was in addition to the over 900 emails Judge Africk and I received before the hearing from members of the community urging the same.  (Rec. doc. 1376 at 66-68).

It has become rather clear that this is all part of a campaign by the City to create the impression that public opinion overwhelmingly favors its position and thus, perhaps, influence the Court to decide this issue for something other than the right reasons.  This campaign began very soon after the City unilaterally decided to stop work on Phase III.

The City stopped work on June 5, 2020.  (Rec. doc. 1280 at 2).  On June 10, 2020 the Court held a status conference to address that ill-advised decision.  (*Id.*).  Judge Africk thereafter issued an Order reflecting the Court's distress at those circumstances and ordering the City to restart work on Phase III.  (*Id.*).

---

[38]  While these arguments to move consideration of the present issue into the public-opinion/political arena have no bearing at all on the merits of the motion, they have featured prominently enough in the City's efforts that I feel compelled to briefly address them.

A few days after that Order was issued, predictably, a news article describing these developments appeared on "nola.com."[39]  Then this appeared:



---

[39] *See New Orleans stops work on jail expansion plan, calling it a 'waste of taxpayer dollars,"* available on the web at https://www.nola.com/news/courts/article_5d33d510-af43-11ea-904d-1ba83c44180b.html.

[40]  Available on the web at https://twitter.com/mayorcantrell/status/1272670134294007808.

Citing the aforementioned article, Mayor Cantrell announced that the City was "changing the paradigm" and "investing in people not jails."  One supposes this was not welcome news to the families of the 800 or so inmates who happened to be <u>in</u> the jail at the time (particularly those with medical and mental-health issues) and it was probably just a bad idea from the start.  But then so was the Mayor's focusing attention on the article's suggestion that the City's decision to stop work without informing the Court was "setting up a face-off between City Hall officials and a federal judge."

Judge Africk and I didn't know it at the time but this was the first sign that our e-mail in-boxes were about to blow up.

Throughout the City's subsequent pleadings in the matter, it continued to lean heavily on the emails and correspondence sent to the Court by local and state politicians and members of the community as a fundamental reason that the Court should allow it to stop work on Phase III.  (*See, e.g.*, rec. doc. 1312 at 3).[41]  Unfortunately, this approach continued into the hearing and even beyond.

Indeed, the very first words spoken by the City Attorney in her closing statement to the Court at the hearing closed the circle with the Mayor's earlier tweet.  After the better part of two weeks of testimony, the City Attorney began:  "The City of New Orleans must invest in people and not new jail buildings."  (Rec. doc. 1376 at 4).

From the Twittersphere to the courtroom.  How disappointing.

---

[41] "Many elected officials accountable to their constituents regarding services provided by Orleans Parish have specifically expressed concern and opposition to a new Phase III jail building. The concerns of officials elected to serve the people of Orleans Parish, and the needs of all Orleans Parish residents, including those who are not in jail, should not be ignored."

But it continued:

> MS. LeBEOUF:  Without being duplicate, your Honor, I believe that those leaders in Orleans Parish elected to serve have made their position clear, and that is that every level of government by those elected within the City of New Orleans by Orleans Parish residents, from the mayor –
>
> THE COURT: <u>This is not a political question</u>.
>
> MS. LeBEOUF:  <u>It is not a political question</u>, but these proceedings -- over the course of these proceedings the record is clear in that the Court -- neither the Court nor the parties are asking to usurp the authority of the elected officials for Orleans Parish, and so I raised that –
>
> THE COURT:  That's where you're coming from.  That's why I got 900 e-mails in my inbox.
>
> MS. LeBEOUF:  Well, your Honor, I would ask that those e-mails be made a part of the record, <u>because the community has made very clear their desire not to build a new jail building</u>.  So the community has asked not to build a new jail building, the mayor and the City Council have asked not to build a new jail building, and state representatives have asked not to build a new jail building . . .
>
> (<em>Id.</em>)(emphasis added).

The City Attorney in one breath acknowledged that the issue before the Court is not a political question but then immediately proceeded to make it one.  And in doing so, she completely ignored the fact that the Sheriff is <u>also</u> an elected City official who has been working on these issues for years, clearly understands their importance, and has made <u>his</u> position in favor of Phase III known to the Court and the public for years.

This is a particularly disappointing strategy knowing what we now know – that the City itself had been working behind the scenes to encourage these "community stakeholders"

to deluge the Court with correspondence sympathetic to the City's position.  (Rec. doc. 1382-1).[42]

It's not altogether clear on what basis the City Attorney has decided to stake the City's position on the idea that 900 persons sending emails and a few letters to the Court establishes that the entire "community" has definitively spoken on this issue.  Certainly, there is a cohort in the community that harbors a sincere belief that we should not proceed with Phase III.  The Court respects those voices, but to suggest that a small, vocal portion of the population represents the <u>whole </u>community in a city this size is just more unhelpful, overreaching rhetoric from the City.

The City's political asides have not subsided, even since the hearing.   In mid-November, well after the hearing and while this motion was under consideration by the Court, I was made aware of correspondence that Mayor Cantrell had sent to a well-known real estate developer/jail advocate in New Orleans, Pres Kabacoff, seeking his "support of the City's Motion for Relief from Court Orders to build a new jail building in Orleans Parish." (Rec. doc. 1379).   Concerned about another wave of correspondence and emails from community members and advocates after this motion was submitted, I addressed that letter (along with some other issues) at a status conference on November 23, 2020, with the City

---

[42]  At a status conference on November 23, 2020, the City Attorney was adamant that the City had not asked members of the community to correspond with the Court.  (Rec. doc. 1381).  Hearing this, counsel for Plaintiffs' spoke up, stating that "Tenisha Stevens, who is one of the witnesses for the City in this matter, in fact did contact community members and community groups and other political leaders specifically providing template letters and requesting that those be sent to the Court."  (*Id.*).  The City Attorney, claiming no knowledge of any such solicitation, promised to "reach out" to Stevens and "confirm" that the City had not solicited community outreach to the Court.  The City has been silent since then, but on December 4, 2020, the Sheriff filed into the record a copy of correspondence – on City letterhead – from Commissioner Stevens to "Community Stakeholders" doing exactly that which the City Attorney assured the Court Commissioner Stevens did not do, *i.e.*, urging the letter's recipients to correspond with Judge Africk in favor of the City's position and going so far as to provide Judge Africk's court address.  (Rec. doc. 1382-1).

Attorney.  (Rec. doc. 1379).  I asked whether that correspondence presaged another round of emails and/or correspondence to the Court from the "community" advocating in favor of the City's position; I was told by the City Attorney that it did not.  (*Id.*).

One thing that continued to concern the Court, however, particularly after the colloquy I had with the City Attorney at the close of the hearing, was Mayor Cantrell's question to Mr. Kabacoff in that correspondence:

> What would it tell the nation about the values of New Orleanians if we sat idly by while the Federal Court ordered our City to build a new jail facility, that would cost nearly $50 million to build and approximately $8M to $10M annually to operate, to serve inmates that do not exist?
>
> (Rec. doc. 1379-1).

This statement is a window into the current administration's misimpression about its obligations to address the constitutional care of special-needs inmates.

This administration's sloganeering has sought to convince the public that the best course is to "invest in people, not jails."  That expression, of course, ignores our obligation to care for people who are <u>in</u> jail.  Now we're confronted with the sentiment, from the Mayor herself, that the very people this case and motion are about "do not exist."

But they do.

At one point, people like Michael Perdomo, William Goetzee, Cleveland Tumblin, and 15-year-old Jaquin Thomas existed in the jail.  That was before they each committed suicide there.

If the human cost of our failure to protect these most vulnerable in our custody doesn't resonate with the City, then perhaps the millions of taxpayer dollars paid out in wrongful death lawsuits in these and other cases will.

These are harsh observations, to be sure.  I take no pleasure in making them.  But the Court is trying to come to terms with a litigant in the City that is contorting itself to avoid established obligations that it bargained for and, in attempting to avoid those obligations, is making reckless statements that pit the rights and interests of incarcerated people against those of us who think and hope that the jail will never factor into our lives.  The stratagem is shortsighted and wrong.

In any event, let it be clear that the Court does not respond to public shaming or political pressure.  And if the administration is spoiling for a fight with the federal court, as it appears it may be, they won't get it because we don't fight.  That's not how this process works and it's really time for the City and its attorneys to understand and accept this fact.

Having said all that, I think it's important to note here that we are not insensitive to the valid and compelling arguments advanced by elected officials, members of the community, and advocacy organizations like the Vera Institute that jails are singularly unsuited as a first option for housing and treating mentally ill people and that the City of New Orleans lacks the treatment infrastructure to properly care for those in the community who suffer from mental illness.  We also agree there will always be someone in jail that ought not or need not be there.  Unfortunately, those problems cannot be addressed in the context of this motion or even this case – for us to try to do so would be to ignore the plight of citizens with medical needs and mental illness who are actually in the jail now (and those who will be one day).  To allow ourselves to become distracted by the political/policy arguments advanced by the City would be an abdication of our obligation to those citizens; it is something we cannot do.

III.     **Conclusion**

The City of New Orleans has gone from an unwilling participant in this enterprise to a productive collaborating partner to, yet again, an unwilling participant.  So be it.  The Court cannot not let shifting winds move us off course, not after all this time and all the progress we have all made.  For all the reasons set forth above, I recommend to Judge Africk that the City's motion be denied.

In June 2016, over four years ago, Judge Africk remarked from the bench in approving the Stipulated Order submitted by the City and the other parties to this case:

> Why should we expend the effort and taxpayer money to solve these problems which still face the jail?  Why should we even care?  I suggest that there are several answers to that question, many of which I've just stated.   While we ponder those questions, think not only of the inmates, but the staff who put their well-being and lives on the line on a daily basis.  Think of the significant public safety consequences that flow from the release of an inmate who has been forced to survive under extremely challenging conditions or an inmate whose mental health issue has not been properly addressed.  Think of the fact that one of your loved ones could one day be one of those inmates in need of medical healthcare, mental healthcare and a safe and secure environment.  Are you not entitled to expect that he or she would receive the needed treatment in a safe and secure environment designed to provide the same?
>
> (Rec. doc. 1084).

We have allowed this problem to fester for far too long.  Responsibility lies with us all – the parties and the Court.  While we have engaged in endless debate and hand-wringing, inmates in the care of the Sheriff have suffered needlessly.  That simply cannot continue.

At long last, we must end the debate and begin the work.  The families of those who are in the jail now, who will be there one day, and who have suffered or died there in the past have every right to expect more of us as a result of this litigation, and we cannot disappoint them.

## RECOMMENDATION

For all of the foregoing reasons, it is **RECOMMENDED** that the City's Motion for Relief from Court Orders of January 25, 2019 (Rec. Doc. 1221) and March 18, 2019 (Rec. Doc. 1227) be **DENIED**.  A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. 28 U.S.C. § 636(b)(1); *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[43]

New Orleans, Louisiana, this 7th day of  December, 2020.

MICHAEL B. NORTH
UNITED STATES MAGISTRATE JUDGE

---

[43]  *Douglass* referenced the previously applicable 10-day period for the filing of objections.  Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to 14 days.