**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **LASHAWN JONES, ET AL.** | **CIVIL ACTION NO. 12-859** |
| **VERSUS** | **SECTION I, DIVISION 5** |
| **MARLIN GUSMAN, ET AL.** | **JUDGE LANCE M. AFRICK** |
| | **MAGISTRATE JUDGE NORTH** |

**CITY OF NEW ORLEANS' OBJECTIONS TO
REPORT ISSUED ON DECEMBER 7, 2020**

**MAY IT PLEASE THE COURT:**

On December 7, 2020, Magistrate Judge North issued a Report and Recommendation (the "Report").[1] The City of New Orleans (the "City") respectfully objects to the factual statements and legal contentions stated in the Report, as detailed below, consistent with 28 U.S.C. § 636(b).

There are factual errors and mischaracterizations in the Recommendation issued by the Magistrate Judge. The mischaracterizations and errors are evident from the Report's introductory paragraphs, which fail to address the pertinent legal issues raised by the City. While the City of New Orleans agrees that the City and others have an obligation to the 65 acute and sub-acute inmates, the City shares the Court's frustration that many aspects of that care is seemingly still in question after so much effort and investment by the City and other parties. The Magistrate Judge's criticism of the City and the Administration are unjustified. While the Mayor of this City has expressed her concern with the care of our OPSO inmates who are incarcerated, she is also keenly aware of how an expansion of the jail can negatively impact our Black and Brown communities, which is contrary to criminal justice reform efforts in the City and throughout the country, and

---

[1] Rec. Doc. 1385.

contrary to positively shifting attitudes regarding criminal justice reform.  When jails are expanded unnecessarily, as is the case here, and Cities overinvest in incarceration, as is the case here, it is well known that Black and Brown communities are disproportionately ravaged in a way that has not been mentioned or acknowledged in the Report.  There are approximately five hundred (500) empty beds at OPSO, which the taxpayers of Orleans Parish will be required to pay for, whether or not someone is jailed.  Through its Motion for Relief, the City was seeking to ensure the responsible and appropriate use of taxpayer dollars for public safety, the need to maintain the functioning of an equitable criminal justice system, as well as address the health needs of the 65 acute and sub-acute inmates that a Phase III new jail building would house.  The City has met its role in this case, as the guarantor of adequate funding for staff and the provision of physical facilities.  The City agrees with the Magistrate Judge that resolution of the City's Motion is about the provision of appropriate care of those with acute and sub-acute medical and mental health needs.  The Sheriff and OPSO, as well as the City-funded Court-Appointed Compliance Directors (in place from 2016-2020), have always been responsible for jail operations, which includes providing sufficiently trained correctional staff for the delivery of medical and mental health services as appropriate.

The Magistrate Judge's misguided frustration, as well as apparent antipathy toward the City, stems from what appears to be a misplaced understanding of the City's roles and obligations. The City was not an original defendant.  Plaintiffs did not allege it to be in violation of any inmate's rights.  It is neither responsible for the jail's operations nor the training and retention of staff required to render appropriate medical and mental health services to OPSO inmates. The City has met its obligations in providing adequate funding for the care and housing of acute and sub-acute inmates.  In fact, the evidence was undisputed in demonstrating that funding for OPSO, including

the City's investment in medical and mental health services, is amongst the very best in the Country for comparable jail facilities.

Support is merited, instead of attacks, based on the City's efforts to reasonably ensure that the enormous investment of taxpayer dollars is being used appropriately.  The proposed retrofit was designed to address flaws in the Sheriff's inadequate design and construction of the OJC.

The City has the right and obligation to determine how to meet its funding obligation, especially when it comes to building or not building an additional jail building.  Indeed, the recognition of the City's autonomy and area of control has been previously acknowledged by this Court and the parties, specifically recognizing deference to the City's and other local officials' right to make decisions that impact taxpayers as well as directly affect the public safety of the residents of the City of New Orleans.  Contrary to the statements in the Report, the City had no obligation to present a specific plan for a retrofit to the Court before asking for relief from its commitment to plan for Phase III as a possible second jail facility based on a change in circumstances.  That was erroneous and thus the subject of one of many objections by the City to the Report.  The City had no obligation to ask for relief from the referenced two Court Orders, given that those Orders impermissibly obligated the City to move forward with the construction of a Phase III new jail building; concomitantly, those Orders of this Court in January and March 2019[2] wrongly prevented other less intrusive and more narrowly drawn options and blocked other options to be developed as the City decided, particularly given the wording of the Stipulated Order.[3]

---

[2] Rec. Docs. 1221 & 1227.
[3] Rec. Doc. 1082.

Contrary to the erroneous comments in the Report, neither the Stipulated Order nor the Supplemental Compliance Plan[4] obligated the City to construct a new jail building described as Phase III. The wording is explicit in the Stipulated Order signed by the City, which reads "appropriate housing." Moreover, it is undisputed that the referenced documents specifically permitted the City to exercise control over the capital expenditures, which is exactly what the City requested, where the Magistrate Judge recommended a denial. As part of its objections to the Report, the City should not be restricted to having the myopic approach of building a new jail, to accommodate approximately 65 inmates (and possibly fewer) while disregarding the welfare of all the residents of the City, which principles are significantly implicated by the City's Motion for Relief and are inherent in the Prison Litigation Reform Act (the "PLRA") – and where a less intrusive alternative exists. Stated simply, the City's Motion recognizes the constitutional rights and needs of OPSO inmates, and all people residing in Orleans Parish.

The City aggressively developed a method for augmenting its efforts to ensure it funds adequate physical space and care for acute and sub-acute inmates. The City's reasoned proposal is embedded in Alternative 3 in the City's submission prepared by Dr. James Austin and Allen Patrick as a more logical and efficacious alternative to building a new jail facility for a small percentage of inmates in OJC and less than one-tenth of one percent of the population of New Orleans, all to compensate for the structural deficiencies at OJC created by the Sheriff's building design failures.[5] The City has committed to be held accountable for defined processes and timelines to ensure adequate facilities are provided within the current jail (OJC). But the City needs the Court's assistance to achieve the goal of accomplishing expedited mental and medical

[4] Rec. Doc. 1106.
[5] Rec.Doc. 1337-1.

health services by providing the 65 or fewer acute and sub-acute inmates with required services in a retrofit two years earlier (or even sooner) through the retrofit plan submitted by the City.

The  Report apparently blames the City for the Sheriff's resistance to a retrofit when it is only the Court that has the power to command or direct such a solution that would more quickly benefit the  acute and sub-acute inmates.  For these reasons (among other objections listed below) the City objects to the Report and recommendation for denial of the City's Motion for Relief.

The City agrees with Magistrate Judge North's concerns as to the necessary legal and moral focus, namely, care for the acute and sub-acute inmates.  This is precisely why the City's approach is superior to building a new jail building.  The City objects to the Report because it has essentially affirmed the prior Court Orders for erecting Phase III, which is an inferior approach for the medical and mental healthcare of this class of inmates.  The City's proposal for a retrofit, developed by Dr. Austin and a long-time and knowledgeable correctional architect, Allen Patrick, over a period of months (not weeks, as implied by Judge North), rapidly achieves additional physical facilities years before Phase III would do so, especially in view of the potential future obstacles to Phase III not mentioned in the Report.  As such, the City objects to effectively being forced to choose one approach—a far more intrusive one—over another, contrary to the dictates of the PLRA."

Part and parcel of the City's Objections to the Report is that the Report never considered or mentioned the requisite need for evaluation by the City Planning Commission, consideration and approval required by the New Orleans City Council consistent with the Home Rule Charter, FEMA review and the regulatory requirement for extensive public comment, as well as potential voter disapproval of bond funding and the Section 106 Process to permit essential public comment, particularly given the numerous objections by a number of residents in the City.  In the end, Phase III will not advance us towards compliance with the Consent Judgment; only new approaches,

such as offered by the City of New Orleans with the support of this Court, as to the Sheriff's provision of care, can accomplish that needed goal.

It is well recognized that buildings do not provide care for people; only people provide those essential services.  The City's retrofit approach would complement the OJC's physical facilities in numerous ways.  It will enhance OPSO's ability to provide care consistent with both the Constitution and the Consent Judgment.  It will provide that supplemental healthcare for the 65 acute and sub-acute inmates years sooner than would constructing another new jail, which is estimated to take at least three years.  The retrofit proposal would consolidate healthcare services in one area of OJC, namely, the second floor of OJC.  The retrofit proposal also would provide adequate common space and access for individual consultations with mental health providers, and, particularly given the strained financial condition of the City of New Orleans caused by the pandemic, the retrofit will preserve resources for care and housing within the jail and within the community.  Lastly, the retrofit would allow for the increase of correctional staff and mental health staff currently assigned to the OJC, which the Monitors have repeatedly recognized as a major and ongoing deficiency at OJC that hinders security and undercuts providing the type of expected health care warranted by the Constitution and the Consent Judgment.  The City objects to the Report's glaring omission of these basic considerations.

The City implores the Court not to seek to justify the end result of a desired new jail building which will expand the jail's campus and capacity, but instead to hold the City, as well as OPSO, accountable for implementing an approach that achieves the goals of the Consent Judgment and the Constitution efficiently and promptly, and considering the needs of OPSO inmates, and all New Orleans residents including those residents who need medical and mental health services and are not incarcerated.

The City further objects to the Report because it far exceeds the scope of the subject hearing.  The parameters of the hearing on the City's Motion for Relief were regarding care for those inmates who would be housed in a proposed Phase III new jail building, approximately 65 persons with acute and sub-acute mental health and medical health needs.  Nonetheless, the Magistrate Judge, *sans* notice, expanded the hearing and considered testimony, as reflected in the Report, to include the entire general population of inmates at OJC, well beyond what a Phase III new jail building or retrofit  was ever intended to address.  This is another objection by the City to the Report founded upon the absence of fair notice and due process.

Correspondingly, the crux of issues identified during the hearing, such as a need for a laundry or an infirmary, are obligations of the OPSO that go beyond the needs of the 65 acute and sub-acute inmates at issue.  The City's conditional use permit for OJC was premised on an Ordinance that conditioned construction and occupancy of the current jail on it being designed and built to accommodate all inmates and then modified to exclude seriously acute mentally ill inmates.[6]  OPSO did not provide a facility that accommodated all inmates excepting those individuals with serious mental conditions, as was required.  These failures by OPSO should have been considered in the Report.  The omission of OPSO's failures which have created the issue before the Court, including the absence of an infirmary, as well as the absence of a laundry and purportedly suitable meeting areas, aside from the oversized 60-person pods in OJC, are ignored and surprisingly never mentioned in the Report at all.  And for these reasons the Report is objectionable.

The City further objects to the Report because it states that the City committed to build Phase III.  That is another factual error.  The City agreed to provide appropriate housing for

---

[6] *See* City Ordinance No. 24,282, ¶ 7(a).

inmates, and that is the plain language in the Stipulated Order signed by the City.[7]   Equally important and objectionable is the fact that the Report refers to the May 2017 City Council meeting and statements by then City Attorney Rebecca Dietz.   Yet, there was no mention of the fact that the former City Attorney during the May 2017 City Council Meeting threatened the members of the New Orleans City Council that they could be held in contempt of Court if they did not approve a Phase III new jail building.   Subject to this duress, the City Council voted to have the City Planning Commission make a recommendation on whether a zoning variance should be allowed. The former City Attorney's suggestion of contempt inherently acknowledged that the Court was ordering the City to build a Phase III new jail building.

The Report similarly omits that neither the former City Attorney nor even the former Mayor himself had the authority to issue a conditional use permit for the construction of a new jail facility as documented in the City's Home Rule Charter.   Therefore, it was yet another error, and the City objects to the reliance upon the statements made by the former City Attorney or a former representative of the Mayor's Office, Ryan Berni, during the May 2017 Council hearing without the complete set of facts and their departure from the required process in the Home Rule Charter.

First, as this Court is aware, the City is a mayor-council form of government with clearly defined powers and duties.   While the Mayor may recommend a course of action, the Council is required to adopt, reject, or amend that course of action, particularly when it comes to the construction of buildings and zoning.   This position was expressed by former Councilwoman Susan Guidry[8] and former City Attorney Rebecca Dietz during their testimony.[9]

---

[7] Rec. Doc. 1106.
[8] *See* Testimony of Susan Guidry, Transcript of the Motion for Relief, Vol. I, p. 171.
[9] *See* Testimony of Rebecca Dietz, Transcript of the Motion for Relief, Vol. IV, p. 36.

To fully appreciate why the subject Orders comprise orders to build a jail, the Court must review the evidence and testimony in its totality.

On June 21, 2016, the Stipulated Order was executed, which required the City, the Sheriff, and Compliance Director to develop and finalize a plan for (1) the appropriate housing for prisoners with mental health issues and medical needs.[10]

This plan, the Supplemental Compliance Action Plan (the "Plan"), recommended constructing an 89-bed facility for acute and sub-acute inmates.[11]  This recommendation was based on an average daily population ("ADP") of 1,300-1,500 inmates.[12]  Compliance Director Maynard conceded in the Plan that a retrofit of the fourth floor of OJC would be functional.[13]  And his concerns regarding the treatment of acute and sub-acute inmates expressed in the Plan no longer exist.[14]  The Plan vested the City with authority over construction, which allowed the City discretion to conclude a retrofit was more practical, and this decision-making authority is underscored by the considerable change in circumstances in the reduced jail population compounded by the worldwide pandemic.

On or around May 18, 2017, the Landrieu Administration presented a motion to the Council requesting a zoning variance regarding the TDC and "to instruct the [Commission] to . . . have a public meeting and to study whether it would be appropriate to provide a conditional use to allow a jail building to be built[.]"[15]  At that hearing, then-City Attorney Rebecca Dietz represented to the Council that the Landrieu Administration considered the Phase III facility reasonable and

---

[10] Rec. Doc. 1082 at 14 para. 22.
[11] Rec. Doc. 1106.
[12] *Id.* at 5.
[13] *Id.* at 7.
[14] *See* Testimony of Dr. Jeffery Rouse, Transcript of the Motion for Relief, Vol. IV, III, pp. 149, 152, 156.
[15] *See* Testimony of Susan Guidry, Transcript of the Motion for Relief, Vol. I, pp. 170-171.

feasible.[16]  But even at that time, Ms. Dietz understood that she needed Council approval to move forward with Phase III.[17]  Such requisite approval never occurred.

Councilwoman Guidry expressed concerns about building a new facility. Instead, she proposed an alternate "Phase III" project—along with then-councilwoman LaToya Cantrell— which would retrofit the fourth floor of the OJC to house inmates with acute and sub-acute needs.[18] Councilwoman Guidry stated that Phase III, as Maynard proposed, was an acceptable preliminary plan, but the alternative to  Phase III project should be carefully considered.[19]

After some deliberation where Ms. Dietz indicated Judge Africk might hold the City in contempt,[20] the City adopted the motion which required the City Planning Commission to conduct a public hearing to "consider establishing a conditional use permit . . . to permit the construction of a new 89 bed facility" for acute and sub-acute inmates.[21]  However, the motion also required the Commission to study the decommissioning of 89 beds in Phase II "and the repurposing of that bed space when considering the commissioning of the 89 beds in Phase III[.]"[22]  To date, the City Planning Commission has not met to discuss the directives contained in the May 18, 2017 motion, and thus the needed recommendations from the City Planning Commission has yet to be issued.

Without the City Planning Commission's review and Council's approval, the Phase III facility cannot go forward. In addition to the Magistrate Judge's erroneous belief that the City reached a court approved  agreement to build Phase III (which agreement, even if had existed,

---

[16] City Council Meeting (May 18, 2017), *available at*, Regular City Council - May 18th, 2017 (granicus.com).
[17] Testimony of Rebecca Dietz, Transcript of the Motion for Relief, Vol. IV, p. 36.
[18] City Council Meeting (May 18, 2017), *available at*, Regular City Council - May 18th, 2017 (granicus.com). *See also* Testimony of Susan Guidry, Transcript of the Motion for Relief, Vol. I, p. 171-172.
[19] City Council Meeting (May 18, 2017), *available at*, Regular City Council - May 18th, 2017 (granicus.com).
[20] Testimony of Rebecca Dietz, Transcript of the Motion for Relief, Vol. IV, p. 29.
[21] Rec. Doc. 1338-1.
[22] *Id*.

would be violative of the PLRA), any Order relying upon the mistaken chronology of the May 2017 Council hearing is likewise tantamount to an impermissible Order to build a jail.

It is clear that the transcript of the May 18, 2017 council meeting plainly reveals that the Council only voted to have the Commission study the viability of Phase III, which requires the Commission's review and recommendations and public input before the Council can vote on approval.  Furthermore, the Report personally attacks and wrongly questions the motives of the Mayor in seeking to ensure adequate care for OPSO inmates, while simultaneously seeking to ensure that the interest of Orleans Parish residents is also protected.  Yet, Magistrate Judge North, recognizing he reviewed the transcript of the May 2017 City Council hearing, had to simultaneously acknowledge that then-Councilmember Cantrell (now Mayor Cantrell) objected to Phase III in 2017, three years ago—and she has not changed her preference to avoid building a new jail.  This hole in the chronology as recited in the Report is both unfair to the Mayor and further discounts an already questionable, and misplaced, reliance on what occurred at a 2017 Council meeting when Councilmembers were notified by an attorney that they could be subject to a finding of contempt if Phase III was not endorsed; as a result, even more bases for the City's objections exist.  The City objects to this partial recitation of an inaccurate recitation of what transpired before the City Council.

Regardless of any perceived prior commitment to work toward planning Phase III, the City has the right, if not the obligation, to adjust course  in a manner that will achieve the same Consent Judgment goals as would building a new Phase III jail building and would do so more quickly and efficiently.  The ill-logic of the Magistrate Judge's position is that whether the jail population is 800 or 2,000, the City must build exactly 89 mental health beds and 14 infirmary beds at a cost of $500,000 per bed.  The denial of the City's Motion is effectively an Order to build a Jail, which

is, in fact, prohibited by the PLRA under the present circumstances.  The statutory deviation in the Report is one more reason that the City objects to the Magistrate Judge's erroneous decision to depart from the plain statutory language of the PLRA and the very purpose of the PLRA as expressed by Congress.[23]  Due to its legal error, the City objects to the notion that there was a waiver of its rights under the PLRA.[24]

Although the Magistrate Judge is correct that it is the general practice to refuse to consider arguments raised for the first time in a reply brief, "a district court may rely on arguments and evidence presented for the first time in a reply brief as long as the court gives the nonmovant an adequate opportunity to respond."[25]  In this case, this Magistrate Judge gave the nonmovants notable time to respond to the City's argument under the PLRA well before the issuance of the final Report.[26]  As such, the City contends that this argument has not been waived, neither could it be.

Indeed, the City provided a history of its objections to attempted circumvention of the PLRA as well as the City's repeated requests that the Court adhere to the statutory language of the PLRA.[27]  Of equal import is the Magistrate Judge provided all parties opposing the City's Motion an opportunity to address the City's PLRA argument, of which each party took advantage.  Under the circumstances of the City's and Plaintiffs' alluding to the PLRA as far back as seven years ago, coupled with the Court's periodic recitation of PLRA restrictions, it was legal error for the Magistrate Judge to opine the City had somehow waived the governing statutory provisions.[28]

---

[23] *See* 18 USC § 3626.

[24] It must also be noted that Plaintiffs have consistently argued that the PLRA barred the Court from ordering the construction of a jail (that is, until the City filed its Motion for Relief).

[25] *Vais Arms, Inc. v. Vais,* 383 F.3d 287, 292 (5th Cir. 2004). *See also Thompson v. Dallas City Attorney's Office*, 913 F.3d 464, 472 (5th Cir. 2019).

[26] Rec. Doc. 1320.

[27] Rec. Doc. 1338.

[28] Rec. Doc. 928. *See also* Rec. Doc. 1338.

Moreover, the Report's reference to the single unpublished California district court opinion of the restrictions in the PLRA in *Plata* twelve years ago does not offer legal support to avoid the straightforward statutory language of the PLRA as the Report apparently suggests. [29]  *Plata* involved an entirely different set of factual issues that are not present here.  The allocation of the $250 million referenced in *Plata* went through the legislative process. [30]  It was approved by the California Assembly "for capital outlay to renovate, improve, or expand infrastructure capacity at existing prison facilities and may be used for . . . architectural programming, engineering assessments, schematic design, preliminary plans, working drawings, and construction." [31]  Thus, the plans referenced in *Plata* were approved by the legislature, which has yet to occur here. [32]

And the City specifically objects to the tortured reading in the Report regarding the Congressional prohibition of judicial orders forcing a municipality or City to construct a new jail. Such a conclusion is the antithesis of Congressional intent as well as Congressional language, and for these reasons, among others, the City objects to the erroneous interpretation and failed application of the PLRA by the Magistrate Judge.  Correspondingly, this Court's prior conclusory statement that the conditions precedent under the PLRA had been met is not valid many years later.  First, the City recognizes and, for this reason, objects to the Report because there must be specific findings for the current moment under the PLRA as well as this Court's *de novo* review of the testimony and the proper application of the PLRA adhering to all of the statutory wording and limitations.  Stated another way, the PLRA requires the least intrusive means and the most narrowly drawn response for the perceived need for some relief if federal rights have been proven

---

[29] Rec. Doc. 1385 at 34-36.
[30] *Plata v. Schwarzenegger*, 2008 WL 4847080 at *5 (N.D. Cal.).
[31] *Id.* (internal quotations omitted).
[32] *Cf. Reece v. Gragg*, 650 F. Supp. 1297, 1306 (D. Kan. 1986). *See also Padgett v. Stein*, 406 F. Supp. 287, 303 (M.D. Pa. 1975) ("this court lacks the power to order public funds expended to build a prison"); *Jones v. Wittenberg*, 330 F. Supp. 707, 712 (N.D. Ohio 1971) (holding that the court has no power to require the public to fund new jails).

to have been violated. these statutory mandates are part of the Congressional verbiage in the PLRA, which is not discretionary at whim in the PLRA.  Notably, and as part of the City's objections, the Report does not support the position that Phase III is the least intrusive and most narrowly drawn means for ensuring provision of adequate healthcare facilities for the special needs inmates, and, conversely, the retrofit alternative proposed by the City offers the least intrusive, most efficient, and most effective means of providing precisely that healthcare to this small group of acute and sub-acute inmates at OJC.

Even assuming the City had committed to building Phase III and further assuming that the PLRA does not bar an order to enforce such a commitment (which the PLRA plainly proscribes) that order must be narrowly drawn, extend no further than necessary, and be the least intrusive means to address a violation of federal rights.[33]  Pre-PLRA prison litigation reform cases bear this out.  The Fifth Circuit recognized in *Ruiz v. Estelle*[34] that the "respect for the state's role and the allocation of functions in our federal system, as well as comity toward the state, the relief ordered by federal courts, must be consistent with the policy of minimal intrusion into the affairs of state prison administration[.]"[35]  In a case like this, where more conservative measures are available, those options should be explored. "Conservative treatment is essential because it is more readily administered, less costly to the state, and not irreversible . . . [i]f these measures later prove ineffective, more stringent ones should be considered."[36]

Considering the preceding factors, the circumstances that must be proved to justify an order to build a new facility must be so extreme that there is no other option.  For example, in *Inmates*

---

[33] 18 USC § 3626(a)(1).
[34] 679 F.2d 1115 (5th Cir. 1982).
[35] *Id.* at 1145 (internal quotations omitted).
[36] *Id.*

*of the Allegheny County Jail v. Wecht*,[37] the court was asked to determine whether the inmates in the Allegheny County Jail were housed in constitutionally adequate conditions.[38] The court recited the conditions these inmates faced. A 102-year-old structure with mattresses suspended from chains; inoperable cells; an unsafe heating plant that regularly broke down during the winter; a master lock system that did not work correctly; and a lack of smoke detectors and sprinkler system.[39] Due to a lack of space in a building constructed in 1887 (two years after the Civil War), "the quality of the physical and mental health care provided inmates" had deteriorated.[40] In addition, the court recognized the lack of nursing staff and psychiatric services.[41]

While acknowledging its limited role, the court recognized in this case that "[t]he problem with the [j]ail is that it is a fortress-like stone structure to which additional floor space cannot be added. Those same physical inadequacies prevent the [c]ounty from remodeling it to meet constitutional standards, while at the same time accommodating current and future population demands."[42]

The circumstances that led the district court in *Allegheny* to order the county to submit "a plan for construction of a new facility, or alternative housing" are not present here. The OJC is new construction and has been in operation for only approximately five years. The assumptions made by former Compliance Director Maynard are currently inaccurate. By ordinance, the Council has now limited the ADP to 1,250, which includes acute and sub-acute populations. Simply put, the more conservative approach—retrofitting the second floor of the current facility— is more appropriate and comports with the criteria established by Congress in the PLRA.

---

[37] 699 F. Supp. 1137 (W.D. Pa. 1988), *vacated on other grounds*, 493 U.S. 948 (1989).
[38] *Id*.
[39] *Id*.
[40] *Id.* at 1141.
[41] *Id*.
[42] *Id*. at 1147.

Moreover, the City has demonstrated more than adequate cause for relief under FRCP Rule 60.[43]  When considering relief from an order in institutional reform litigation, the Court must consider "[f]ederalism concerns" because the decree, or order enforcing the decree, may have the effect of "dictating state and local budget priorities."[44]  And orders that limit the ability of state or local officials "to respond to priorities and concerns of their constituents" constrain their ability "to fulfill their duties as democratically-elected officials."[45]

That is why motions requesting relief in institutional reform litigation under Rule 60 require a "flexible approach."[46]  The City contends this flexible approach was given no consideration in the Court's Report.

The Report offered from the Magistrate Judge is both legally and factually error laden; it is objectionable due to these errors and the Magistrate Judge's error in rejecting the City's well-founded Rule 60 Motion for Relief.  This is especially so given the City's commitment to complete a retrofit that will achieve the very Phase III goals for the acute and sub-acute inmates and satisfy the City's obligations in a timelier fashion where timely care is preferable to delayed care. Otherwise, as part of the City's objections, the Report, as it now reads, represents an exemplary and improper case of personal attacks and judicial activism in pursuit of a new jail building, in the face of good faith efforts by a local jurisdiction faced with unanticipated challenges and its elected leaders working to resolve age-old issues created by the action or inaction of others historically, to achieve a fiscally sound and expeditious resolution to the concerns raised, as vested within the province of local officials.

---

[43] *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367 (1992).
[44] *Horne v. Flores*, 557 U.S. 433, 448 (2009).
[45] *Id*. at 449.
[46] *Id*.

The Report also rests upon additional factual and legal error.  Among the many factual errors to which the City objects is the Magistrate Judge's denigration of the City's position that the City of New Orleans and its Administration are serious and committed to making the retrofit occur in short order.  The City has interacted with FEMA in an effort to advance the retrofit, and as Dr. James Austin testified, months of planning with the City's correctional architect and correctional consultant occurred prior to the hearing that is the subject of the City's Motion for Relief began.[47]  More specifically, the City objects to the Report's intimation that the City's retrofit plan was "late arriving" and appeared to be a "slapdash" plan.  Besides these ill-founded pejorative terms contained in the Report, the Magistrate Judge's mistaken comments simply underscore a misguided and incorrect characterization of the City's efforts for a retrofit alternative.  Conversely, the Magistrate Judge noted numerous efforts by the City to advance retrofit plans.  Particularly, the City objects to the Report's unwarranted criticism of the City's efforts to develop a reasoned alternative to a Phase III new jail building because it glides past the months of preparation and analysis undertaken by both the correctional architect, Allen Patrick, and the City's consultant for correctional affairs, Dr. James Austin.  By no means was the retrofit alternative an overnight proposal as the Magistrate Judge intimates, and the testimony by both Dr. Austin and Allen Patrick evidence their months of planning based on their vast experience and expertise.[48]

Allen Patrick also testified that the proposed Option 3 retrofit of OJC would be a better and more effective alternative to constructing a new Phase III building.  He noted the construction costs of a retrofit would be far more cost-effective than building a new facility. The facility could provide the necessary amenities to continue care of the inmates in a constitutional manner that was

---

[47] *See* Testimony of Dr. James Austin, Transcript of Motion for Relief, Vol. II, pp. 171-232.
[48] *See* Testimony of Dr. James Austin, Transcript of the Motion for Relief, Vol. II, pp. 171-232; Testimony of Allen Patrick, Transcript of the Motion for Relief, Vol. III, pp. 93-120.

compliant with the Consent Judgment.  Mr. Patrick noted that the retrofit would include suicide prevention cells and adequate space for counseling and interviews.[49]

The Option 3 retrofit addresses the concerns of Director Hodge from the earlier proposed 4th-floor modification in that the retrofit keeps the medical and mental health activities from being separated.[50]  Medical and mental health services are consolidated on the same level as clinic space and space for administration.  The mezzanine level concerns in terms of self-harm have been addressed by installing a floor to ceiling barrier that will prevent an inmate from jumping from the level or attempting self-harm.  According to Mr. Patrick, the Elayn Hunt facility where acute inmates were previously held and deemed acceptable also has a mezzanine with a barrier that has successfully prevented inmates from self-harm.[51]  Dr. Rouse also testified that he would not have a problem with the mezzanine level as long as the retrofit had a barrier to prevent self-harm by the inmates.[52]

Moreover, Dr. Austin testified that the Option 3 retrofit was the most viable because all clinics and services and protective custody were centrally located under that option. The retrofit solves the problem of lack of custodial staff to escort the inmates to their treatment sessions, which has hindered compliance with the Consent Judgment's mental health provisions.  Dr. Austin believed that the psychiatric staff necessary for compliance is already present at OJC.[53]

Complementing the City's studied and carefully considered retrofit alternative is the fact that the City is engaging an independent psychiatrist, Dr. Daphne Glindmeyer who was initially retained by the Department of Justice to investigate the level of mental health care at the Orleans

---

[49] *See* Testimony of Allen Patrick, Transcript of the Motion for Relief, Vol. III, p. 99.
[50] *Id.* at p. 103.
[51] *Id*. at p. 96.
[52] *See* Testimony of Dr. Jeffrey Rouse, Transcript of the Motion for Relief, Vol. III, p. 163.
[53] *See* Testimony of Dr. James Austin, Transcript of the Motion for Relief, Vol. II, p. 240.

Parish Prison prior to the signing of the Consent Judgment.  Dr. Glindmeyer's mission is to independently audit and evaluate the services provided by Wellpath's doctors and professionals as well as the mental healthcare provided by Dr. Jeffrey Rouse and the Tulane medical staff.

It is noteworthy that there was no testimony questioning the completeness and immediate provision of mental healthcare services by the Tulane University Medical Staff.  Even the monitors did not critique Dr. Rouse and the team of Tulane physicians.  And notably, Dr. Rouse testified the acute and sub-acute inmates were currently receiving above-standard mental health care.  He likewise testified that he and his colleagues would continue to provide adequate forensic care to the acute and sub-acute inmates regardless of the facility they were housed.[54]  In other words, a Phase III facility is not required to meet the requirements of the Consent Judgment nor is it the least intrusive.

Similarly, Dr. Carin Kottraba also testified that adequate mental health care was being offered to the acute and sub-acute inmates.[55]  Yet oddly, neither Dr. Rouse's nor Dr. Kottraba's testimony is noted anywhere in the Magistrate Judge's Report.  These existing mental healthcare services now being offered by both Wellpath and Tulane belie the need for a separate complex for approximately 65 inmates.  Consequently, this constitutes another basis for the City to object to the factually erroneous Report, particularly given the numerous omissions of testimony favoring the City's Motion.

In addition, the City objects to the Report's suggestion that the City can be criticized for not having a plan as to how to gain the Sheriff's cooperation, given the plain fact that it is the Court, and only the Court, that has always had the authority and ability to have the OPSO cooperate with an alternative to an oversized and unneeded new jail facility.

---

[54] Testimony of Dr. Jeffrey Rouse, Transcript of the Motion for Relief, Vol. III, p. 163.
[55] *See* Testimony of Dr. Carin Kottraba, Transcript of the Motion for Relief, Vol. III, pp. 52-55.

Upon *de novo* review, it is clear that the City's Motion for Relief pursuant to FRCP Rule 60 is clearly justified and supported.  There have been numerous changes in circumstances since 2017, which changes alone support granting the City's Motion.  These pervasive changes should not have been discounted or ignored in the Report, and it was plain error to do so.  Aside from the unjustified departure from the PLRA, the change of circumstances experienced by the City from 2017 until now include a massive reduction in jail population, the availability and appropriateness of a more narrow and less intrusive alternative to constructing a new jail complex by using the City's proposed retrofit proposal, not to say the least of which is the over-arching effects of the pandemic that the City nor any of the parties could presage in 2017.  The Report wrongly, and as part of the City's objection, gives short shrift to these considerations, and, instead, appears to seek to justify the Court's desired end result, which is the construction of a Phase III new jail building, a facility that is not necessary for the standard of care to be met for the approximately 65 or fewer acute and sub-acute inmates at issue in accordance with the statutory confines of the PLRA.

In addition to the objections articulated in the above narrative, the City submits additional objections as chronicled below:

1) The City objects to the fact that the Compliance Director Darnley Hodge was permitted to participate as a party litigant on the City's Motion for Relief using separate private law firm counsel throughout briefing, the hearing and post-hearing briefing.  This injection of the Compliance Director as a *de facto* litigant, over the multiple objections of the City, particularly when the District Court granted in part the OPSO motion to terminate the Compliance Director in its Order of August 5, 2020, constituted both legal and factual error.[56]  If the Compliance Director wished to participate as a litigant,

---

[56] Rec. Doc. 1311.

he could have sought recognition as an intervenor in this litigation matter. The appointment of the Compliance Director did not, in any way, convert him into being a litigant and this objection is further supported by the fact that the Sheriff, who ostensibly was replaced by the Compliance Director for jail operations, also participated as a party litigant with separate legal counsel. This irregular addition of the Compliance Director led to the fact that the parties opposing the City's Motion were able to question, and did question, the City's witnesses as well as their own witnesses through the assistance of four separate sets of attorneys as well as permitted four sets of attorneys to file separate briefs against the City. Giving a consultant who is appointed by, and reports directly to the Federal Court, the status of a litigant essentially permits the Court to rewrite the Federal Rules of Procedure absent any legal basis.

2) The City objects to the suggestion in the Report that the City deprived inmates of their liberty; to the contrary, these individuals deprived themselves of total liberty as a result of being arrested for criminal conduct following a determination of probable cause.[57] As Dr. Austin testified the vast majority of the 65 acute and sub-acute population at issue are inmates charged with violent crimes, and the vast majority of them will be sentenced to state prisons.[58] Nonetheless, the City provides adequate funds for facilities and care consistent with the Consent Judgment.

3) The City objects to the suggestion that the problems empowered "prior Sheriffs" to preside over a jail complex that mocked fundamental constitutional protections owed to the City's inmates.[59] Indeed, as this Court knows and as the record establishes,

---

[57] Rec. Doc. 1385 at 1.
[58] *See* Testimony of Dr. James Austin, Transcript of the Motion for Relief, Vol. II, p. 185.
[59] Rec. Doc. 1385 at 1.

Plaintiffs and DOJ requested that a Receiver be appointed for the Sheriff in 2016, but as a result of a compromise an independent Compliance Director was appointed to avoid the appointment of a Receiver.  This mistaken chronology goes to the very heart of the failure to focus on the obligations of the OPSO and the now terminated Compliance Directors and is part of the City's Objections to the Report.

4) The City objects to the characterization of a group of "under-informed newcomers,"[60] which represents more factual error.  As to this commentary in the Report, quite to the contrary, the group of concerned citizens who continue to express their opposition to Phase III consist of individuals who were involved in the consideration of the construction of OJC as well as consideration of Phase III with hands-on and active involvement, some of which pre-dates the interaction by the Magistrate Judge.  These individuals have been very involved, contrary to the notation in the Report, in the assessment of a need for a new jail complex.  All agree that providing adequate housing and health care consistent with the Constitution and the Consent Judgment is necessary. It is an erroneous slight to the City, its Administration, and concerned citizens to suggest that they are somehow in favor of embarking on a course to "nowhere" when that is not the case at all.  In fact, nothing is further from the truth – yet another incorrect statement in the Report.

5) The City objects to the statement in the Report that the City is primarily responsible for a perceived failure of housing and treating the 65 acute and sub-acute inmates that are currently housed at OJC and TDC facilities.  The testimony presented at the hearing together with supporting exhibits proved just the opposite.  As established during the

---

[60] *Id.* at 3.

hearing, but seemingly also ignored, a nationally known corrections health care provider is providing medical and mental health services to the special-needs inmates at a cost of millions of dollars each year. If criticism should be directed at anyone or any entity for questionable operations, such criticisms should be directed to OPSO and the now terminated Court-Appointed Compliance Directors for their failure to adequately train and staff OJC, to allow for the appropriate delivery of services. In addition to the Monitors' reports of inadequate correctional staff, the testimony during the hearing also confirmed that the shortage of correctional staff adversely impacts health care at OJC; another permanent jail facility as proposed in the Report will logically heighten staffing shortages, which is also ignored in the Court's recommendations.

6) Besides the acerbic comments in the Report, the City objects to the assertion that there were "crass calculations" about community "support" (original quotations). The fact that the court received a large number of communications and expressions from residents in New Orleans opposing Phase III is simply an inaccurate and wrong reason, on many levels, to cavalierly dismiss the exercise of the First Amendment rights of these taxpaying citizens.

7) The City objects to the factual statement in the Report that is dismissive of many residents who simply oppose the construction of a Phase III new jail building. An inordinate number of community-conscious citizens submitted their views to the Court, which should be normal in any matter affecting the entire City and, indeed, would be required under Section 106 for a FEMA application. It was error to jettison the

constitutional rights of individuals expressing their opposition to a Phase III new jail building.

8) The City objects to the Report's statement that the City is indefinitely ignoring the needs of inmates. The facts establish just the opposite. The City of New Orleans spends more per inmate in housing and care than any other parish; the City spends more than $70,000 per inmate compared to a small fraction of that amount in the adjacent Parish of Jefferson. If Phase III is allowed, the City will be required to spend nearly double that amount per inmate housed in Phase III. Such an amount would likely be the highest per inmate in the United States. The current amount expended by the City of New Orleans not only shows its attention to the housing and care of inmates, but it counters the notion in the Report that the City is somehow ignoring the needs of inmates. The City increased the OPSO's budget by more than 140% even though the jail population decreased by more than 1,200 inmates during the past few years.[61] And the City recently renovated the Temporary Detention Center (TDC) at a cost of more than $6M; yet TDC was not immediately occupied following delivery of the building likely due to the lack of correctional staff – which has consistently been an issue for OPSO, including under the leadership of two now terminated purported expert Compliance Directors. Pointedly, after five (5) years of operation of the new jail (OJC), including approximately four (4) years under the leadership of the now terminated Court-Appointed Compliance Directors, OPSO has never demonstrated an ability to hire, train and retain needed correctional staff as the monitors uniformly and repeatedly assert in their reports to the Court—which the Court seemingly also ignores.[62] In

---

[61] *See* Rec. Doc. 1281 at 16.
[62] *See* Rec. Doc. 1303 (Monitors' Report No. 12).

further support of this objection to the Report, the City notes that it supported the
building of OJC but unfortunately physical deficiencies were created which should
have been addressed by the Sheriff when OJC was built.  It is only the design failures
by OPSO with respect to OJC which are causing the Court and parties to brush by the
creation of a Phase III new jail building with no regard for the residents of Orleans
Parish.  As the Report noted, there was an Ordinance in place that required this new
jail (OJC) to house all populations.[63]  It is the omission of the infirmary by OPSO in
OJC that suggests the absence of an infirmary was another failure by OPSO in building
construction, if in fact an infirmary is required.  Now, the OPSO and others wish to
foist the prior omission or failure by OPSO upon the City's shoulders.  That is error.
Acute and sub-acute inmates continue to be treated at UMC as needed, as no inmate is
turned away or denied treatment.

9) The City objects to the Report's inherent conclusion that jail is a means of securing
healthcare.  That concept is at odds with national correctional practices as well as the
City's efforts to reduce jail population but provide proper care in the appropriate
facility.  An individual should not have to be incarcerated to receive healthcare in the
City.  This objection, as well as the preceding objections by the City, represents the
City's position that people should not have to be jailed to receive adequate healthcare.
Nonetheless, the Report repeatedly seems to suggest otherwise and for this reason is
factually in error.

10) The City objects to the statements in the Report that appear to singularly cast
responsibility upon the City and conclude that the City has not addressed its

---

[63] Rec. Doc. 439.

constitutional responsibilities to the limited 65 acute and sub-acute inmates who would be housed in a Phase III new jail building. These statements are mistaken and form another objection by the City. The City has provided and continues to pay for above adequate healthcare for this group of inmates who have a need for mental and medical health care. These health services for what has been denominated as the 65 acute and sub-acute inmates who would be housed in a purported Phase III meet the standard of care besides satisfying the constitutional criteria as well as the provisions in the Consent Judgment. As noted earlier, the existing high level of healthcare provided to these 65 acute and sub-acute inmates was confirmed in testimony both by Wellpath's Dr. Kattraba[64] and a leading psychiatrist, Dr. Jeffrey Rouse, from Tulane University Hospital.[65]

11) Once again, the Report wrongly shifts the sole responsibility of adequate healthcare to the City when, in fact, that obligation belongs to OPSO and adequate staffing and operations is required. Noticeably absent from the Report is the fact that the monitoring of inmates is the responsibility of OPSO. There is no dispute that OPSO lacks correctional staff at OJC (but not because of inadequate funding), and for this reason the City objects to the construction of another jail facility which will only exacerbate OPSO' s well known staffing challenges. The retrofit proposed by the City has much greater potential of curing any purported staffing deficiencies. Similarly, there is no mention in the Report that some correctional staff chose not to adhere to their assigned duties, which created deficiencies that are the responsibility of OPSO, and previously

---

[64] *See* Testimony of Dr. Carin Kottraba, Transcript of the Motion for Relief, Vol. III, at pp. 52-55.
[65] *See* Testimony of Dr. Jeffery Rouse, Transcript of the Motion for Relief, Vol. III, at pp. 140-156.

the now terminated Compliance Director, to cure.  The City objects to the factual omission of these critical facts.

12) It is not only single error, but it is perverse that the Report only identifies the City as being responsible for any alleged deficiencies in the health, housing, and care of inmates.  Notably, the very reason why a Motion[66] for a Receiver to replace the Sheriff as well as a Motion[67] for Contempt were filed was OPSO's purported failure in satisfying the terms of the Consent Judgment.  Notably, it was asserted by the Court and parties that the Court-Appointed Compliance Director, who was subsequently placed in charge of the jail, did less than the Sheriff to move the jail into compliance and was a complete failure in this role.  It is factually mistaken to now cast blame upon the City, when the City funded the Court-Appointed Compliance Director position from 2016-2020, and the Court-Appointed Compliance Director has been responsible for jail operations for the last four (4) years.  The facts dating back to 2016 through the present, contrary to the Report, disclosed the failings and responsibilities of OPSO and the now terminated Court-Appointed Compliance Directors – not the City.

13) The City objects to the Report which concludes that the PLRA can be glossed over and wrongly shortchanges the public's safety and welfare of un-incarcerated individuals.  The City's constant focus on the health and safety of individuals not incarcerated is buttressed by Congress in the Prison Litigation Reform Act.  It is not rhetoric as the Report incorrectly denotes; that is yet another factual error that is the purpose of the City's objections to the Report.  Fundamental care for the homeless individuals in the City, the residents in need of public safety and emergency medical services are criteria

---

[66] Rec. Doc. 1009.
[67] Rec. Doc. 1010.

that are embedded in the PLRA.  The City has not disregarded the relatively limited number of inmates at issue for a Phase III new jail building (approximately 65), by simultaneously considering the welfare of 99.9%+ of its citizens who have not been charged with a crime –particularly where there is an alternative that will allow the City to better and more narrowly meet the needs of all, including the OPSO inmates at issue.  To ignore the alternative available is factually and legally erroneous.

14) The City objects to the reading of the Stipulated Order[68] for the Appointment of a Jail Compliance Director, as well as the Supplemental Compliance Action Plan as offered in the Report.[69]  The language in these documents is plain; none of the plain language in either the Stipulated Order or the Supplemental Compliance Action Plan requires the building of Phase III.  It was error for the Magistrate Judge to read into these documents language that does not exist.  In contrast to the erroneous reading of the Stipulated Order, it provides for appropriate housing for prisoners with mental health issues and medical needs; that is exactly what the City's proposal for a retrofit of the second floor of OJC would accomplish.  Correspondingly, the Report recognizes that the Stipulated Order provides the City with final authority and approval over capital expenditures associated with any plan for housing; yet, in another error, the Magistrate Judge seemingly excised that authority and enforced court orders requiring capital expenditures for the building of Phase III.[70]

15) The City objects to the statements in the Report that intimate that the City agreed to construct Phase III.  That statement is contrary to the Stipulated Order and erroneously

---

[68] Rec. Doc. 1082.
[69] Rec. Doc. 1106.
[70] Rec. Doc. 1385 at 13.

would deprive the City of the very discretion that the Stipulated Order recites.[71]  While

the Report recognizes the May 18, 2017, City Council meeting at which a vote among

the City Council members resulted in a potential Phase III Plan would be submitted to

the City Planning Commission for consideration of a conditional use permit, there is

no mention in the Report that the conditional use permit was *never* issued nor did the

Civil Planning Commission ever issue a recommendation as to zoning for Phase III.

For this reason, the City objects to the Report. Likewise, the Report omits the former

City Attorney's warning to the Members of the City Council on May 18, 2017, that

they would  be held in contempt of court if they did not approve a Phase III new jail

building; this admonition by the former City Attorney indicates she believed a court

order to construct Phase III was extant.  Putting aside the potential for contempt against

the members of the Council, and its inherent duress, it was known by the former City

Attorney and by former Deputy Mayor Berni on May 18, 2017, that the City Charter

required the City Planning Commission to consider and make a recommendation

regarding a conditional use permit as an initial step in assessing the appropriateness of

Phase III.  The City also notes the factual error that a plan was never submitted to the

City Planning Commission after May 18, 2017; as the video of that Council meeting

reveals, the Council simply asked the CPC to review a possible Phase III.  Notably, no

plan was ever presented to the CPC.  As further support of this objection, the Report

makes no mention of the fact that both then Councilmember LaToya Cantrell (who is

now the Mayor of the City) and former Councilmember Susan Guidry commented

during that May 18, 2017, City Council hearing that the former City Attorney was

---

[71] *Id*. at 14.

unable to promise something on the Council's behalf because she failed to consult the Council body before making any commitment neither did she have the authority to do so under the City's Home Rule Charter.   The Report makes no mention of these requirements in city governance and this omission represents another error in the Report's discussion of this Council session as some form of support for denial of the City's Motion for Relief.   It is not.

16) The City objects to the abjectly subjective statement that the election of Mayor LaToya Cantrell changed the course of the litigation.[72]  As of the Council meeting on May 18, 2017, it was apparent that Mayor Cantrell (then a council member) opposed the construction of Phase III.   Equally as important, the members of the prior City Administration under the former Mayor Landrieu opposed the construction of Phase III, and, as the recent City Council Resolution issued just two months ago clearly reads, the members of the current City Council, without a dissent, opposed the construction of Phase III and supported the effort for a retrofit.[73]

17) The City also objects to the contents of footnote 10 in the Report.   Almost all the referenced meetings were not on the record as the Magistrate Judge acknowledged in footnote 10 of the Report. Nonetheless, he subjectively states that it was the Administration's statements and conduct which were consistent with a perceived form of commitment to build Phase III.[74]   Such an observation would strangely make the Magistrate Judge a fact witness and/or litigant and this notation is error.

---

[72] *Id.* at 17.
[73] *See* Rec. Doc. 1337-12.
[74] Rec. Doc. 1385 at 18.

18) In the Report, it is stated that the Mayor's "team" informed the Court during the January 25, 2019, conference that they were interested in exploring "alternatives" to Phase III for the "first time." That statement is factually incorrect, and the City objects to it. The concept of the retrofit had been discussed for several years, and, in fact, it was identified with particularity during the May 2017 City Council hearing. Even the contents of the Report recognize the prior discussions and alternatives to Phase III. Nevertheless, the Court issued an Order directing the architect to begin the programming phase of the Phase III facility as soon as possible.[75] Based upon the PLRA, the City believes that this Order and the subsequent Order are legally defective.

19) The City objects to the characterization that the City conveyed a "coy" message embedded in "its statements to the Court."[76] That is an inappropriate characterization without any facts and certainly is not supported by any of the testimony. The January 2019 Order for the construction of Phase III was supplemented by an Order in March 2019 compelling the same construction of Phase III.[77] The City submits these Orders are not valid to the extent planning and/or construction of Phase III has been directed. And even if the Report attempts to invoke an agreement the City supposedly reached (which did not occur) in an effort to circumvent the strictures of the PLRA, this Court's Orders dating as far back as 2016 make any such agreement invalid due to non-compliance with the PLRA.

20) Apparently attempting to satisfy the requirements of the PLRA, the Report alludes to a general statement reciting in conclusory terms the language of the PLRA. The City

---

[75] Rec. Doc. 1221.
[76] Rec. Doc. 1385 at 20.
[77] Rec. Doc. 1227.

objects to this effort to comply with the PLRA because the conclusory language is deficient and dated. While the contents of the Report recognize that the City never waived (nor could it waive) its rights and the statutory directives in the PLRA, the catchall language in the Court's March 2019 Order[78] is legally insufficient. And while the Report lists a series of communications regarding efforts to satisfy the Court's Orders for completion of Phase III, it is beyond peradventure that no one expected the scope and depth of financial damage that soon would be caused by the pandemic. Nor would anybody understand how quickly the City would be able to reduce its jail population, thus freeing up more than enough space for a retrofit. No one had the prescience to realize the duration of the pandemic (which still has not ended) nor could the attendant impact upon public safety, and the criminal justice system be envisioned at the beginning of the pandemic. It is these very reasons, among others established in the City's Motion for Relief, that support the Rule 60 Motion by the City.

21) The City objects to the characterization that the City decided to take matters into its own hands and act unilaterally.[79]  As explained to the Court, the accelerated pace of the financial crisis and the accompanying need to respond to the needs of residents of New Orleans in response to a global pandemic caused the City to take action with the expectation of reporting what it was doing in response to a global pandemic through the next status conference report in June 2020. Significantly, the City never sought to conceal facts from the Court and objects to such a comment as factually erroneous in the Report. And responding to another misreading of the City's Statement to the Court, the City does not take the position and never has taken the position that all Court Orders

---

[78] *Id.*
[79] Rec. Doc. 1385 at 22.

are detrimental; indeed the City supported Court Orders that led to the operation of a constitutional jail in compliance with the Consent Judgment, and the City complied with Orders increasing the Sheriff's revenue by more than two and a half fold, while the inmate population decreased by half, to provide better care and housing for inmates. However, the City did state that the Court's January 2019 and March 2019 Orders as well as directives to proceed with the construction of Phase III would result in overall detriment to the City.  This distinction is important to avoid a mistaken and incorrect perception about the City's priorities and actions.

22) The contents of the Report wrongly chastise members of the community for exercising their First Amendment rights and expressing their personal views about waste and needless spending, especially because they know as taxpayers, not OPSO, they will shoulder these inordinate costs for decades to come.  For these reasons, the City lodges its objection to this section of the Report as legally erroneous.

23) The City has never embarked on a plan to publicly diminish the importance of its responsibility for the care of the 65 acute and sub-acute inmates who would be housed in a Phase III new jail building in favor of other priorities.[80]  This statement in the Report is inaccurate, lacks any testimonial or documentary support, and consequently supports another objection by the City to contents of the Report.  Ironically it is OPSO that has the primary responsibility for the care and housing of inmates at OJC.  Yet another error engrained and associated with the error of excluding OPSO, and the now terminated Compliance Directors (who were responsible for jail operations from 2016-2020), from any responsibility for jail operations, inmate care and staffing is the

---

[80] *See* Rec. Doc. 1385 at 24.

fundamental factual error that a new building can solve the problems of the acute and sub-acute population.  That was the exact mantra of OPSO when it sought construction of the new OJC jail building.  Yet, based on the Court's position, it is apparent that a new jail building alone is not the solution for concerns raised regarding any alleged deficiencies in the jail.  Rather it is the nature and extent of services that are provided to these individuals.  For these reasons, the City's proposed retrofit is a better way to meet the City's obligations under the Consent Judgment.

24) The City objects to the contents of the Report suggesting that the City and OPSO have been involved in a political campaign against each other.[81]   To the extent the City has made an effort to share information about Phase III and whether a Phase III new jail building is the least intrusive and most narrow means of addressing constitutional concerns as set forth in the PLRA, the City is acting consistent with its accountability to the residents of Orleans Parish.  This Court has stated on several occasions that it is the decision of local officials, who are responsible to taxpayers in the City, to decide the best approach for the expenditure of the City's limited capital.  With this Court's prefatory statements deferring to local elected officials, it is these very elected officials who have expressed opposition to Phase III.  The Sheriff notably is the sole elected official advocating for the construction of another jail building to further expand the jail—as has been the case over the life of this litigation.

25) The City has never asked to be excused from constitutional care as well as health needs consistent with the Consent Judgment.  For this reason, the City strongly objects to the unfounded and erroneous statements in the Report that the City has asked to be allowed

---

[81] *Id.* at 24-25.

to do nothing indefinitely.[82]  To the contrary, the Court should not ignore the major improvements in jail facilities and inmate care that transpired over the course of this lawsuit as the result of the City's notable and significant contributions. A request to do "nothing" is factually incorrect as displayed throughout the record.  What the City and current Administration does ask of the Court, however, is not to be made the scapegoat for the past failures of many.  This includes major structural omissions at OJC coupled with the shortage of correctional staff (and at times the inattentiveness of correctional staff) operating under the leadership of the Court's now terminated multiple Compliance Directors. This also includes alleged failures by a prior Administration which purportedly created delays resulting in unanticipated changed circumstances which not surprisingly occur with time.  This insinuation in the Report is squarely negated by the City's commitment to undertake a retrofit that would be more efficient and could be accomplished more expeditiously to the benefit of the special-needs population.

26) As occurred during the hearing, the City's statutory argument based upon PLRA was wrongly and incorrectly described as an entirely new argument.  The City again objects to this characterization.[83]  The PLRA has been the subject of briefing by the City since at least 2015.  The City submitted a detailed chronology of repeated instances over the past five years when the City addressed the PLRA.[84]  And equally objectionable is the conclusion in the Report that the City somehow waived its statutory rights under the PLRA, which it cannot do.  Such a waiver did not occur, and this comment is legal

---

[82] Rec. Doc. 1385 at 25-26.
[83] *See, e.g.,* Rec. Doc. 1338.
[84] *Id.*

error.  Besides being raised on a number of occasions by the City, the Magistrate Judge essentially provided the City with the opportunity to augment its initial Motion for Relief if a formal supplement necessary.  The Magistrate Judge then allowed the other four parties to file objections to the Court's consideration of the PLRA.  Yet even this Court and the Magistrate Judge have recognized the application of the PLRA in prior Orders.  To the extent those prior Orders and the City's earlier briefs did not make it clear, the City included the PLRA as part of its reply brief, and sur-replies were then filed by the four opposing parties.  It is error for the Report to consider the City's reliance upon the PLRA as having been waived.  Even if the City could affirmatively waive application of a federal statute that Congress considered to be important, there was no indication that the City deliberately, or tacitly, waived the PLRA confines.  Nor was there any indication during the 10-day hearing that the PLRA issues would be brushed aside, which only compounds the errors in the Report.

27) The City objects to the conclusion in the Report that the City failed to raise the PLRA argument in its Motion.  The import of the PLRA and the need to abide by PLRA was raised in this litigation to the Court on multiple occasions by the City, and even by the Plaintiffs – and was never waived by the City.  Indeed, the Report contains a number of occasions during which this Court cited the PLRA as an apparent threshold legal issue.  The few cases cited in the Report that a waiver of the PLRA restrictions occurred are inapposite, particularly given the fulsome briefing and the overriding import of the PLRA as the Fifth Circuit has noted.

28) The City objects to the conclusion in the Report that the Court never ordered the City to build the jail.[85]  Aside from its January 2019 and March 2019 Orders to the City directing the construction of a jail to be known as Phase III, the former City Attorney did not simply imagine that the Court would hold the Council Members in contempt if they did not comply with the Court's requirement for a Phase III new jail building. That threat of contempt is seen and heard during the May 18, 2017, Council hearing. And denial of the City's pending Motion for Relief under FRCP Rule 60 effectively orders the City to build a jail.  The City firmly objects to the mistaken attempts in the Report to circumvent the need to adhere to the language of the PLRA.

29) The Report also alludes to the recital of portions of the PLRA as part of the Stipulated Order.[86]  Even if the conclusory language in the Stipulated Order suffices to satisfy the PLRA, the statutory language in the PLRA was included in an Order that was issued in 2017.  A determination that the factors in the PLRA have been satisfied nearly four years ago does not satisfy the need to satisfy the exacting terms of the PLRA in 2020. A new determination for each item in the Consent Judgment and detailed findings for each component that the Court believes could support Phase III must be made now rather than relying upon dated recitations.  Those needed detailed findings are not in the Report,   In short, the reference to former City Attorney Dietz's statements at the 2017 hearing only culminating in Phase III and the retrofit alternative being forwarded to the City Planning Commission has no legal import upon the pending Motion by the City.

---

[85] Rec. Doc. 1385 at 30.
[86] Rec. Doc. 1368 at 46-47.

30) The Stipulated Agreement did not serve as the City's approval of Phase III – nor could it. The City maintained final authority over the approval of capital expenditures associated with the plan not yet refined in the Stipulated Order. Moreover, the City objects to the factual belief that the Stipulated Order required Phase III construction. Read plainly, the Stipulated Order only requires "appropriate housing." That is exactly what the City's alternative of the retrofit would achieve as testimony from Allen Patrick, the correctional architect, and Dr. James Austin, an expert witness in correctional housing, corroborated.

31) The City objects to the suggestion that it embraced Phase III as the most reasonable and feasible alternative for addressing the issues of housing 65 acute and sub-acute inmates.[87] From as early as 2017 (if not before), elected officials in the City advocated for a more measured approach. But putting aside the long history of the fact that Phase III is not the most reasonable alternative for housing approximately 65 acute and sub-acute inmates , it is certainly neither reasonable nor feasible  at this  time. Nor could Phase III be couched as the least intrusive response nor one that would not burden the City's taxpayers or public safety, as the statutory criteria in the PLRA require. Given the unrefuted testimony by both Allen Patrick and Dr. Austin, the retrofit provides more than appropriate housing and healthcare for the 65 acute and sub-acute inmates. Most importantly, the retrofit alternative provides the least intrusive and most narrowly drawn alternative to addressing constitutional concerns as well as the Consent Judgment, with recognition for public safety, the criminal justice system, and avoidance of an undue burden upon taxpayers.

---

[87] Rec. Doc. 1385 at 31 n.17.

32) The City objects to the Report when it concludes that the OJC currently does not provide medical and mental healthcare that is above the minimal Constitutional standards.   It is noteworthy that the OPSO seemingly agrees that the OJC provides medical and mental healthcare that are above the minimal constitutional standards as made clear by the OPSO's Motion to terminate the compliance director and the Consent Judgment.   In addition to providing expert testimony that healthcare needs of the special population inmates are being fully satisfied, the City has  embarked upon an independent audit to be conducted by a psychiatrist previously retained by the Department of Justice to further ensure that healthcare services are appropriate, meet constitutional standards, and comply with the Consent Judgment.   As observed by the monitors, deficiencies in providing healthcare services to the special needs population, can be attributed to OPSO and the now terminated Court Appointed Compliance Directors who were responsible for jail operations from 2016 through the soon to released monitors' report, and the lack of adequate correctional staff.[88]   While the City asserts that adequate medical and mental healthcare are being provided to the 65 acute and sub-acute inmates that Phase III would house, the Report oddly seems to chastise the City for  its attempt to improve these healthcare services through improved and more efficient staffing.   The City retained correctional experts to develop alternatives to Phase III, including the retrofit concept, to improve the nature and timing of healthcare to these inmates.   It is difficult to discern how the City can be harshly criticized in its attempt to improve the quality of healthcare services through a proposed retrofit and through an independent audit of existing healthcare services.   Even if

---

[88] *See* Rec. Doc. 1303 (Monitors' Report No. 12).

adequate healthcare is not currently being provided in OJC (which the experts who testified for the City disputed strongly), the proposed retrofit that can be accomplished within approximately one year and would be adjacent to the other healthcare services on the second floor of OJC is undoubtedly preferable to the unknown future of Phase III after needed public hearings before FEMA and a construction period of approximately three years.  The City objects to the lack of recognition of the numerous advantages to the retrofit alternative as errors and objects to the City's efforts as factually incorrect.

33) The Report references medical services that appear directed to the general population of OJC.[89]  These statements regarding medical services, including inmates returning from an emergency room at University Medical Center, go far beyond the scope of the Motion for Relief filed by the City as to the limited issues that were before the Magistrate Judge during the hearing.  Consequently, the City objects to this unnoticed expansion of the issues in the City's Motion for Relief and the ensuing hearing.  This type of extraneous commentary is objectionable and an error as a violation of fair notice and due process.

34) The City objects to the statement in the Report that the City's position is at odds with all of the evidence in the record.[90] Quite to the contrary, which is why this statement is factually in error.  Both representatives of from Wellpath, including Dr. Kottraba with twenty years of experience in corrections mental health services, as well as an esteemed psychiatrist from Tulane University Medical Center testified that OJC has existing facilities that fully satisfy the need to provide constitutional care as well as comport

---

[89] Rec. Doc. 1385 at 31.
[90] *Id*.

with the terms of the Consent Judgment.  Rouse testimony, Vol. III at pp. 155.  Indeed, this Court, as well as the now terminated  Court Appointed Compliance Director, recently concluded that all terms of the Consent Judgment are in compliance though a portion of the terms of the Consent Judgment are in partial compliance rather than substantial compliance.  The monitors have noted that the healthcare for this discrete group of inmates continues to improve in quality.  The City believes that its proposal of a retrofit in lieu of building a new jail makes sense, complies with federal law unlike Phase III, and is a better alternative for the special needs inmates, particularly given the legal errors that riddle the Report.   Putting aside the disparaging adjectives unfortunately used in the Report, the testimony by medical professionals established that these inmates are receiving adequate care if not above adequate care at OJC.  It is simply factual error to state that the City's position is at odds with all of the evidence in view of the uncontradicted testimony of the Wellpath doctors as well as Dr. Rouse.

35) The City objects to the erroneous conclusion in the Report that a steady decrease in inmate population does not amount to a significant change in circumstances justifying Rule 60 relief.  As recently as several years ago, even the monitors did not believe that the jail population could be reduced below 1,000; the monitors and other observers were wrong.  The jail population is now below 1,000.  It will continue to decrease once the Criminal District Court can fully resume and the Department of Corrections inmates can be transferred as has occurred in the past, which would result in an even greater decrease in jail population.[91]  As an aside, it was further error for the Magistrate Judge to consider a report he received on the day his Report was issued.  Neither that

---

[91] See Rec. Doc. 916.

document nor the contents of that document were presented during the hearing.  Even though the population was a few inmates over a 1,000 (putting aside that the Report exaggerates the number of OJC inmates), and has since returned to the 900's, the City was not afforded the expected reasonable opportunity to respond to this footnote observation in the Report.

36) The fact is that no one believed there would be a decrease of more than 1,000 inmates at OJC, which decrease should provide better correctional staff ratio to inmates and the ability of those correctional staff members to monitor the acute and sub-acute inmate population.  The decrease of the OPSO jail population is not singularly attributed to COVID-19 as the Report erroneously recites.  Instead, the credit belongs to the City for undertaking and continuing to undertake affirmative initiatives that reduce the number of individuals arrested, expedite the number of individuals released either on nominal bond or without bond, and have augmented pre-trial services, all of which has resulted in a first-time jail population below four digits.  Though the Magistrate Judge apparently believed that the decrease in jail population was expected, such an observation is factually erroneous and appears to be a part of revisionist history.  While Dr. Austin forecasted a jail population that could reach 980 inmates by 2020, that projection formed his best estimate in 2018, which was not embraced by the monitors and other parties to the litigation.  The fact that the jail population is now below 1,000 inmates constitutes, without question, changed circumstances under Rule 60, which changed circumstances are only augmented by the overwhelming financial and public safety circumstances resulting from the pandemic.

37) The City also objects to statements in the Report that FEMA funds are available for the construction of Phase III.[92]  First, the comment in the Report  ignores the absolute need for a conditional use permit (which has never been secured), the opposition by the members of the City Council and the Mayor against construction of another jail facility, and the regulatory need for a Section 106 hearing permitting members of the public to voice their position regarding Phase III which, as Ramsey Green testified, is a requisite before FEMA makes a decision whether to approve authorization of an application for a capital expenditure.[93]

38) The City also objects to the conclusion in the Report that the City's operational costs are not a concrete and meaningful consideration.  As the City's testimony established, if Phase III is constructed, it will require between eight to nine million dollars per year for the indefinite future; assuming the building has a lifespan of 30 years, that would require the City to pay at least $270M from limited and greatly reduced taxpayer funds.  The City objects to the conclusion in the Report that the correctional staff at TDC can simply be transferred to a Phase III building.  As the monitors have recognized and even the OPSO has acknowledged, there are currently inadequate numbers of correctional staff at OJC and TDC.  But more glaring of an error by the Magistrate Judge is the fact that if a retrofit alternative is accepted in lieu of a new building, there would be no need for additional correctional staff other than what may be needed at OJC to respond to the perennial shortages of correctional staff at OJC.  The Report also committed factual error by concluding that it merely needed to examine the operational costs for the special population for the next three or so years.  It is error,

---

[92] Rec. Doc. 1385 at 46.
[93] *See* Testimony of Ramsey Green, Transcript of the Motion for Relief, Vol. VII, at p. 70.

and part of the City's objections that the Report accepts the short-sighted comparison for the next three years, even though the operational costs for the City and its taxpayers undoubtedly will last for decades if Phase III is authorized.  That is part and parcel of the errors committed in the Report which is the failure to compare the projected costs of Phase III that will last considerably more than three years with the virtual zero operational costs for the retrofit proposed as an alternative.

39) The Report is also objectionable because it seeks to criticize the City for its mandated concern for individuals who are not incarcerated, general public safety, and criminal justice reform efforts.  Yet, once again, the Report ignores the Congressional factors in the PLRA.  The City has not suggested that it should be excused from assisting with the preservation of constitutional conditions of confinement.  While it is recognized that this Court in 2013 commented that a lack of funds will not permit unconstitutional conditions to exist, given the City's tremendous investment in the jail to date, and undisputed testimony demonstrating that OPSO's funding is superior to the funding of comparable jail facilities throughout the Country, it is clear that a lack of adequate funding is not the issue here.  Rather, the improved conditions provided for OPSO inmates over the past seven years, including the construction of a new jail known as OJC and a sizable increase in financial commitments to the OPSO should be considered.  The Report simply refutes reasonable reliance upon the Court's statement relating to the conditions of the jail seven years ago.  Further supporting these objections are the significant layoffs and furloughs of police officers and fire department employees available to respond to public emergencies.  These are the very

factors identified in the PLRA and it was error for the Magistrate Judge to brush these statutory elements aside as irrelevant and of no concern.[94]

40) The City also objects to statements in the Report that Dr. Austin "hastily cobbled a set of options" to Phase III.  That is simply not the case and for this reason such a statement is factually erroneous.  Dr. Austin and Allen Patrick worked on proposed retrofit over many years.   As their testimony confirms, Dr. Austin and Mr. Patrick established three alternatives to Phase III to determine if OPSO would agree to any alternative Phase III or was adamant that a new jail complex had to be built.  In refining the City's alternatives to Phase III during the several months before the hearing, Dr. Austin and Mr. Patrick concluded that the retrofit was the most efficient, most timely, and best suited alternative to Phase III.[95]  As the Report itself states, the retrofit of the fourth floor of OJC as an alternative to the Phase III facility was considered years ago.  However, both Mr. Patrick and Dr. Austin's testimony during the hearing explained that the retrofit alternative on the second floor of OJC would be easier to accomplish, would not impede security issues in OJC, and would be a needed and appropriate complement to the medical and healthcare facilities already on the second floor of OJC.

41) The City objects to the statement in the Report that there will be a substantial increase in inmates since the City filed its Motion for Relief in June 2020.  The Report suggests that Dr. Austin's assumptions about a substantially declining population are unfounded, even though just pages earlier the Magistrate Judge stated that Dr. Austin's forecast for declining jail population should have been accepted as concrete.  Dr. Austin's

---

[94] Rec. Doc. 1385 at 52-54.
[95] *Id*. at 58.

assumptions about a declining jail population continue to remain accurate, particularly once the barrier of COVID-19 is overcome in the near future and a large number of inmates can be transferred to the Department of Corrections where they should be housed and in recognition of the City's efforts through the Mac Arthur Foundation grants to develop additional ways to reduce the jail population.

42) The City also objects to the statement in the Report that the retrofit plan would require the relocation of all youthful offenders which, according to the Report, does not appear possible or likely. That statement is factually incorrect and the documents in the record show the error of this statement. At the time of the hearing, there was only one youthful offender occupying a 60-person pod at OJC. As the City reported to the Court, all youthful offenders have since been removed from OJC and are now at the Juvenile Justice Intervention Center, formerly known as the Youth Study Center.[96] The Court's failure to acknowledge this fact is error.

43) The Report states that the retrofit cannot be implemented because the Sheriff may not consent to a retrofit. This statement is not entirely accurate. If the Court determines that the retrofit alternative is the least intrusive and most narrowly drawn means of addressing the needs of this relatively small population of inmates and is the most compatible with the PLRA, the Court can direct the retrofit unlike the statutory prohibition curtailing a court from ordering the construction of a new jail.

44) The City also objects to the repeated statements in the Report that the City somehow embarked upon a campaign to create public opinion favoring its position. That is simply incorrect. This Court should also recognize that public officials should make

---

[96] Rec. Doc. 1378.

decisions regarding the construction of new jails and expenditure of capital funds.  In a democratic environment, there is simply nothing wrong with the City or its elected officials informing members of the public about the consequences of creating a new jail which the City knows to be unnecessary, inefficient, adding to the creation of more taxes, and contrary to criminal justice reform efforts.  In drafting the Report, the Magistrate Judge was certainly at liberty to ignore public opinion and public reaction opposing the construction of Phase III – which is what occurred.  Yet, what was also presented to the Magistrate Judge and this Court, consistent with this Court's prior statements, were the views of the Mayor, members of the City Council, and state legislators as to the preference for retrofit as a suitable alternative to Phase III.  Similarly, members of the public, who are taxpayers, have their constitutional right and freedom to express their views to the Court.  Indeed, the public will similarly welcome the opportunity to express their views to FEMA during the Section 106 hearing process.

45) In prior court orders as well as in a number of court statements, deference was afforded to the elected city officials to make decisions impacting both the welfare of its residents and the expenditure of taxpayer dollars.  This courtesy was certainly afforded to the prior Administration.  It is reasonable to expect the Mayor and other elected officials to be mindful of the needs of Orleans Parish residents, and limited resources available for residents, whether incarcerated or not.  If a new jail building is not necessary (and Phase III is not), the Mayor, along with state legislators and council members, may appropriately express that view.  Personal attacks in response to efforts to fulfill obligations to the public in good faith are most unwarranted.   Any extraneous

statements and personal attacks should have no legitimate place in this litigation matter, and no bearing upon the determination in the Report.

46) The City objects to the suggestion that it failed to protect individuals who are incarcerated within the City of New Orleans. And it is rank speculation and thus factually outside the record for the Report to comment that millions of taxpayer dollars would be paid out in wrongful death lawsuits.[97] Pointedly, the alternative of a retrofit prepared by Allen Patrick and Dr. Austin established through their testimony that a retrofit would eliminate wrongful deaths at OJC. It was simply error to intimate otherwise. As Dr. Austin and Mr. Patrick testified, the proposal of a retrofit would include a protective barrier on the mezzanine which would prevent inmates from attempting self-harm. That approach, as Dr. Austin testified, worked successfully at Elayn Hunt. That approach, similarly, worked for the Court's lead monitor, Margo Frasier, while Sheriff in Austin, Texas. The Report also fails to mention that prior wrongful deaths at OJC often were previously attributed to lack of correctional staff or the failure of correctional staff to fulfill their assigned duties and/or an alleged building design flaw. In addition, the Report mentions the poor sight lines and apparent inability to observe inmates at OJC, but inexplicably chose not to address the fact that these very issues were addressed by Allen Patrick and Dr. Austin in the retrofit alternative, with the creation of positive sight lines and no impediment for correctional staff to observe inmates. Those pivotal omissions constituted error.

47) The Magistrate Judge ordered the City and OPSO to submit confidential memoranda for the purpose of trying to achieve settlement of disputes in 2015; these confidential

---

[97] *Id*. at 68.

settlement memoranda were submitted as of October 30, 2015.  It was error for the Magistrate Judge to improperly file into the record *sua sponte* confidential settlement submissions.  Confidential position papers, whether submitted to a Magistrate Judge, or a private mediator, especially where confidential per Court Order, are not appropriately filed into the record of a litigation proceeding without consent.  The proffered justification for release of these confidential settlement documents, without even so much as notification to the City prior to adding to the record in 2020, was the "passage of time."  Yet the passage of time did not remove the confidential nature of the previously submitted  settlement position paper simply because the Court chose to release them for improper reference in his Report, absent notice to the City and any opportunity to respond regarding whether the release of confidential settlement documents could ever be appropriately warranted under FRE Rule 408.

Respectfully the numerous legal and factual errors in the Report should not withstand judicial scrutiny.  Upon consideration of these many infirmities, this Court should decline to accept the Reports.  Instead, adhering to governing legal principles, statutory law and recognition  of vast improvements in facilities and funding for OPSO inmates, and with an alternative which will allow for the standard of care to be met, without the construction of a new jail building to  expand the jail's capacity, it is time for the City of New Orleans to move far away from being the incarceration capital of the nation.  The City's retrofit alternative to Phase III accomplishes that goal, will best serve the special needs inmates, and will more quickly move the OPSO forward to curing any alleged remaining gaps in meeting Consent Judgment requirements.

Respectfully submitted,

*/s/ Sunni J. LeBeouf*

**SUNNI J. LeBEOUF (LSBA #28633)**
CITY ATTORNEY
Email:  sunni.lebeouf@nola.gov
**DONESIA D. TURNER (LSBA #23338)**
Email:  donesia.turner@nola.gov
Sr. Chief Deputy City Attorney
**CHURITA H. HANSELL (LSBA #25694)**
Chief Deputy City Attorney
Email:  chhansell@nola.gov
1300 PERDIDO STREET
CITY HALL - ROOM 5E03
NEW ORLEANS, LOUISIANA 70112
TELEPHONE:  (504) 658-9800
FACSIMILE:   (504) 658-9868

– and –

*/s/ Harry Rosenberg*

**HARRY ROSENBERG (LSBA #11465)**
**PHELPS DUNBAR LLP**
365 CANAL STREET, SUITE 2000
NEW ORLEANS, LOUISIANA 70130
TELEPHONE:  (504) 566-1311
FACSIMILE:   (504) 568-9130
Email:  Harry.Rosenberg@Phelps.com

***Counsel for the City of New Orleans***

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on December 21, 2020, a copy of the foregoing was filed with the Clerk of Court by using the court's CM/ECF system, which will send a notice of electronic filing to all participating counsel of record.

*/s/ Sunni J. LeBeouf*

**SUNNI J. LeBEOUF**