UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| LASHAWN JONES, ET AL, Plaintiffs; and UNITED STATES OF AMERICA Plaintiffs in Intervention | ) ) ) ) ) ) | |
| v. | ) ) | Civil Action No. 2:12-cv-00859 Section I, Division 5 |
| MARLIN N. GUSMAN, ET AL, Defendants | ) ) ) ) | Judge Lance M. Africk Magistrate Judge Michael B. North |
| MARLIN N. GUSMAN, Third-Party Plaintiff | ) ) ) ) | |
| v. | ) ) | |
| THE CITY OF NEW ORLEANS, Third-Party Defendant | ) ) ) | |

**PLAINTIFF CLASS RESPONSE TO CITY'S OBJECTIONS TO MAGISTRATE'S REPORT AND RECOMMENDATION**

The Plaintiff Class asserts that the factual findings and legal conclusions of the Magistrate's Report and Recommendation[1] are well-supported by the extensive record in this case, including the voluminous briefing and evidence presented in relation to the City's instant motion.[2] In response to the City's Objections,[3] the Plaintiff Class adopts and incorporates its prior filings on

---

[1] ECF No. 1385.
[2] ECF No. 1281.
[3] ECF No. 1389.

the City's motion,[4] as well as the testimony elicited and evidence entered at the associated hearing,[5] and further responds below.

Despite their incredible breadth, the City's Objections frequently stray from material relevant to the City's Motion and lack the specificity required of objections to a magistrate's report and recommendation.[6] On June 29, 2020, the City filed a Motion for Relief From Court Orders of January 25, 2019 and March 18, 2019 Regarding Phase III Jail Facility.[7] The relief requested by the City is described as, and limited to, this Court's modification of "its Orders by indefinitely suspending the programming, design and construction of a new Phase III jail facility."[8] The City has not sought modification of the terms of the Stipulated Order for Appointment of Independent Jail Compliance Director.[9] The City has not requested to retrofit the existing Orleans Justice Center

---

[4] ECF No. 1304 (The United States' and Plaintiff Class' Response to City's Motion for Relief from Court Orders of January 25, 2019 and March 18, 2019 Regarding Phase III Jail Facility); ECF No. 1327 (Plaintiff Class' Sur-Reply Regarding City's Motion for Relief from Court's Orders); ECF No. 1362 (Plaintiff Class' Post-Hearing Memorandum).

[5] See also ECF No. 1306 (The United States' and Plaintiffs' Unopposed Motion to Admit Certain Exhibits Under Seal); ECF No. 1330 (Joint Witness List); ECF No. 1334 (Plaintiffs' Notice of Additional Exhibits); ECF No. 1335 (Plaintiffs' Unopposed Motion to Admit Exhibits Under Seal); ECF No. 1349 (Plaintiffs' Order of Witnesses).

[6] Pursuant to 28 U.S.C. § 636(b)(1)(C), "any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." The Texas Federal District Courts of the Fifth Circuit provide the following directive as to the specificity of an objection: "To be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference, or refers to, the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error." See, e.g., Moore v. Saul, 4:19-CV-00195-O-BP, 2020 WL 1302324, at *1 (N.D. Tex. Mar. 19, 2020) (citing Douglass v. United Services Automobile Ass'n, 79 F.3d 1415, 1417 (5th Cir. 1996), superseded by statute on other grounds, and 28 U.S.C. § 636(b)(1)).

[7] ECF No. 1281.

[8] Id. As discussed below, the only conclusion that can be drawn from the plain language of the City's prayer for relief, ECF No. 1281 at 1, is that it "asks permission to do nothing, indefinitely." ECF No. 1385 at 24. The City has not sought to amend or modify its requested relief since its June 2020 filing.

[9] ECF No. 1082, settling the Plaintiff Class' and the Plaintiff in Intervention United States' motion for appointment of a receiver and for contempt, providing that "the City, the Sheriff, and the Compliance Director shall develop and finalize a plan for (1) appropriate housing for prisoners with mental health issues and medical needs," and settling the dispute between the City and the Sheriff over control of Templeman II FEMA funding to be used "exclusively for

("OJC").[10] The only relief the City seeks in the Motion before this Court is relief from the Court's 2019 Orders enforcing the terms of the settlement agreement contained in the Stipulated Order.

Citing generally to Fed. R. Civ. P. 60(b),[11] the City advanced three bases for its requested relief, arguing each as a "significant change in factual conditions": 1) the current adequacy of medical and mental health care in the Orleans jail facilities; 2) the financial constraint experienced by the City due to the COVID-19 pandemic; and 3) a decrease in the jail population.[12]

Given the significant repetition and the irrelevance of large portions of the City's Objections, rather than responding to each of the forty-seven (47) enumerated Objections, the Plaintiff Class will identify four categories of objections, and will point to record evidence that supports the Magistrate's findings with regard to each of the four categories. The first three categories of objections are relevant to the bases relied on in the City's Motion: objections related to population decrease, objections related to the adequacy of mental health and medical care at the jail, and objections related to funding. The fourth, largest category contains objections that are irrelevant to the City's Motion.

---

implementation of the plan." Id. at 14.

[10] The word "retrofit" does not appear in the City's Motion, ECF No. 1281, and the one mention in the City's associated Memorandum, ECF No. 1281-1 at 12, relates solely to modifications to the Temporary Detention Center. Rather, the City's Memorandum concludes that "OPSO inmates are receiving adequate mental health and medical services as provided by Wellpath and Tulane," and further that the "OJC currently has existing facilities to fully implement Section IV (B) which governs the mental health care of inmates, and Section IV (C) which governs the medical care of inmates." Id. at 18. The Report and Recommendation appears to acknowledge that the "alternatives" raised by the City for the first time in its Reply are outside the scope of the City's Rule 60 Motion. ECF No. 1385 at 57.

[11] ECF No. 128-1 at 3-4. While the City has cited to caselaw regarding the modification of consent decrees in support of its Motion, see, e.g., ECF No.1281-1 at 4, the Plaintiff Class notes that such jurisprudence is inapplicable here. The City has not moved to modify the Consent Judgment, nor even to modify the Stipulated Order. Despite its reliance on Rule 60(b), the 2019 Orders from which the City seeks relief are not "final judgments" but rather efforts to enforce the agreement of the parties contained in the Stipulated Order.

[12] ECF No. 1281-1 at 1.

3

**I.      Response to Objections Related to Population Decrease as a "Significant Change in Factual Conditions"**

Objections 2, 20, 35, 36, and 41 insist that the Report and Recommendation did not properly assess the reduction of average daily population of the jail. Although jail population has decreased, the current population of approximately 1000 detainees[13] does not represent a changed factual condition. The record evidence and testimony at the hearing demonstrated that the Compliance Director was well-aware of the population projections and specifically took these projections into account in late 2016 when the plan for the appropriate housing of prisoners with mental health and medical needs was formulated and finalized.[14] Further, multiple witnesses testified that the population reduction which has occurred has not translated into a decline in the population in need of mental health care in the jail.[15] Additionally, as the record reflects and as the parties, the monitoring team, and the Court have long-recognized, the structural problems of the OJC that imped the provision of care compliant with the Consent Judgment include the large pod sizes, the lack of suitable sight lines, access to dangerous mezzanine levels, the inadequacy of programming space, and the lack of space for infirmary-level medical care.[16] None of these deficiencies, nor the constitutional rights violations they engender, are alleviated by the realization of a foreseen decrease in the population.[17]

Further, the City's reliance on "approximately five hundred (500) empty beds"[18] ignores

---

[13] ECF No. 1382.
[14] ECF No. 1366, Tr. 10/7/2020, 54:1-55:6; ECF No. 1304 at 22. See also ECF No. 1106, Supplemental Compliance Action Plan, at 4-6, discussing consideration of reduction in jail population from 2014 to 2016 and the projections for the future population (at least through 2019) as provided by Dr. James Austin from the JFA Institute, one of the witnesses called by the City at the hearing on its Motion.
[15] ECF No. 1366, Tr. 10/7/2020, 79:14-80:3; ECF No. 1367, Tr. 10/8/2020, 166:23-167:6.
[16] See ECF No. 1106 at 9; ECF No. 1304 at 3, 5-8, 21-23; ECF No. 1367, Tr. 10/8/2020, 162:12-163:2, 165:4-166:8.
[17] ECF No. 1304 at 21-22 (cataloguing Reports of Independent Monitors finding non-compliance caused, in part, by lack of adequate space).
[18] ECF No. 1389 at 2.

fundamental classification considerations and the provision of specialized housing necessary to keep all detainees safe. As an initial matter, compliance with established classification principles – i.e. the need to separate detainees by security levels, PREA risk assessments, and special populations – reduces the number of useable beds in a jail dramatically. This reality is all the more acute in OJC, where all tiers were constructed as 60-bed pods that reduce flexibility in housing configurations. As Dr. Hardyman testified, proper classification practice requires that everyone, including those on specialized acute or sub-acute mental health units, be housed according to their custody status.[19]

Additionally, the decrease in the Orleans jail population does not translate into housing space that is safe and appropriate for prisoners in need of acute, sub-acute, and step-down treatment.[20] Dr. Patterson testified about the therapeutic importance of providing people held on mental health units with out-of-cell time for interaction and socialization.[21] With the 60-bed pod structure of the OJC, achieving the necessary classification separations while also providing this therapeutic interaction is not possible, even with the current population of the jail.[22]

Lastly, Objection 42 appears to ignore the current and applicable legal structures in Louisiana which bear on the holding of youth in OJC. While there may be no youth housed in OJC today,[23] Louisiana law still allows for youth to be held in the adult jail facility, and places the

---

[19] ECF No. 1375, Tr. 10/14/2020, 6:18-7:4.
[20] ECF No. 1375, Tr. 10/15/2020, 23:8-24:5; ECF No. Tr. 10/13/2020, 150:21-152:17.
[21] ECF No. 1375, Tr. 10/13/2020, 150:21-151:25.
[22] Dr. Rouse specifically testified about the utility of the sub-pods included in the Phase III design for maintaining necessary security separations while providing safe housing and appropriate treatment for prisoners with mental health needs. ECF No. 1367, Tr. 10/8/2020, 165:24-166:8.
[23] There were six youth housed at OJC during the course of the hearing on the City's Motion in October 2020. ECF No. 1366, Tr. 10/7/20, 201:7-16.

authority for such decisions outside the control of either the City administration or the Sheriff.[24] Thus, whether or not youth are currently in OJC has no bearing on whether an entire tier may again be necessary to house a child in compliance with the Prison Rape Elimination Act's (PREA) sight and sound separation requirements.[25]

### II. Response to Objections Related to Adequacy of Medical and Mental Health Care as a "Significant Change in Factual Conditions"

Objections 9, 10, 13, 25, 33, and 34 suggest that relief from the 2019 Orders is appropriate because current medical and mental health care at the Orleans jail facilities is adequate. But the record evidence shows that care is not in compliance with the Consent Judgment nor constitutionally adequate.

In its Objections, the City repeatedly relies on misrepresentations of Dr. Rouse's testimony to claim that medical and mental health care at OJC is adequate. As Dr. Rouse himself testified, he believes the Sheriff's Office to be in compliance with "the subset of the subset of the consent decree guidelines that are controlled by psychiatry; such as appropriateness of medication, seeing psychiatrists in a timely manner, etc."[26] But as Dr. Rouse's testimony recognizes, there is mental health care required by the Consent Judgment and the Constitution that Tulane psychiatry is not tasked with providing, including but not limited to the provision of therapy and counseling by mental health professionals.[27] As a result, even if Tulane psychiatrists are providing adequate care, numerous other provisions of the Consent Judgment are outside of their control.[28]

---

[24] ECF No. 1365, Tr. 10/6/2020, 293:9-19; ECF No. 1369, Tr. 10/13/2020, 39:3-16; ECF No. 1369, Tr. 10/14/2020, 39:9-12.
[25] ECF No. 1374, Tr. 10/14/2020, 38:14-39:12.
[26] ECF No. 1367, Tr. 10/8/2020, 152:19-22.
[27] ECF No. 1367, Tr. 10/8/2020, 175:2-7.
[28] ECF No 1367, Tr. 10/8/2020, 14-21.

6

Further, the City's Objections to an "expansion" of the hearing[29] as a result of witness testimony regarding the provision of medical and mental health care to general population detainees demonstrates the City's failure to understand that the appropriate provision of the care required by the Consent Judgment extends beyond those needing specialized housing on acute and sub-acute units. Everyone imprisoned in the City's jail must receive access to clinically-appropriate group and individual mental health and medical services in private and secure settings.[30] These services are not being provided.[31] Dr. Patterson testified that Wellpath is not meeting the mental health programming requirements, specifically noting that Wellpath's reliance on non-confidential, cell-front sessions does not meet the requirements for individual or group therapy.[32] And as Dr. Greifinger testified, the lack of treatment space for acute medical patients has negatively impacted compliance with the Consent Judgment.[33]

While multiple sources contribute to these persistent failures to provide compliant and constitutional care,[34] the structural deficiencies of the OJC are a long-acknowledged and significant contributing factor.[35] Dr. Patterson testified at length regarding the risks as well as the

---

[29] See, e.g., ECF No. 1389 at 40, Objection 33.
[30] ECF No. 1369, Tr. 10/13/2020, 152:18-153:7, 154:12-17.
[31] ECF No. 1304 at 11-21; ECF No. 1303, Report of Independent Monitors No. 12 at 61; ECF No. 1369, Tr. 10/13/2020, 152:18-153:7, 154:12-17.
[32] ECF No. 1369, Tr. 10/13/2020, 152:18-153:7, 154:12-17,163:20-165:4.
[33] ECF No. 1369, Tr. 10/13/2020, 233:10-24. Further, Dr. Shansky, the City's own expert witness, testified that jails the size of Orleans usually have infirmaries to provide care. ECF No. 1366, Tr. 10/7/2020, 164:1-8, 167:5-19. He further testified that multiple conditions, including ready access to a designated secure ward and admitting privileges, were necessary in order for a mid-sized jail to be constitutionally-adequate without an infirmary. ECF No. 1281-7 at 3-4; ECF No. 1366, Tr. 10/7/2020, 137:1-21. The City offered no evidence that any of Dr. Shansky's articulated conditions are being met.
[34] Objections 11, 12, and 23 are not specific objections requiring review by the Court. The City filed a Motion asking to stop all efforts to correct the structural deficiencies of the OJC that contribute to ongoing non-compliance and constitutional rights violations. The failures of performance of Wellpath and the Sheriff's Office ("OPSO"), while certainly contributing factors to the ongoing violations, are not the question before this Court on the City's Motion.
[35] ECF No. 1303, Report of Independent Monitors No. 12 at 9, noting the importance of Phase III to long-term compliance.

actual harm that has befallen people in the jail as the result of these structural deficiencies.[36] And indeed, the City acknowledges "major structural omissions at OJC" in its Objection 25.[37]

Objections 9 and 13 are not strictly relevant to the City's Motion, but the Plaintiff Class must confront the City's perpetuation of the dangerous and false dichotomy that providing adequate care to people in jail stands in the way of providing access to health care for the City's non-imprisoned residents. Nothing in this litigation, let alone the Report and Recommendation, impedes the City's ability or obligation to provide and expand community-based mental health care to the people of New Orleans. The City's own witness, Will Snowden of the Vera Institute of Justice, testified that he "definitely agreed" that New Orleans lacks crisis receiving services, has limited availability of substance abuse treatment services, has delays in access to outpatient mental health services, and has few residential treatment options.[38] Mr. Snowden further testified that investing in community-based care would be a strategy to reduce the number of people with mental health needs in the jail.[39] And yet still, although significant funds have been expended by the City on renovations to Gallier Hall, on increased surveillance cameras, and on new police vehicles, Mr.

---

[36] ECF No. 1369, Tr. 10/13/2020, 144:1-150:24.

[37] ECF No. 1389 at 35. The City's reliance on the purported adequacy of current medical and mental health care in support of the relief it's requesting ("indefinite suspension" of work on appropriate housing) is difficult to reconcile with the City's belated advancement of "alternatives" (first discussed in its Reply) and belated discussion of an auditor to assess Wellpath's performance (first discussed in its Objections to the Report and Recommendation). If, as the City has argued, the care provided to its prisoners is not only adequate but excessive, warranting the suspension of all further work to provide appropriate housing, why would a retrofit or an audit of healthcare performance be needed? These conflicting arguments suggest that even the City understands both that health care delivery is not in fact adequate and that the current physical space is a contributing factor. And, as a factual correction to the City's Objections, Daphne Glindmeyer was retained by the Plaintiff Class, not the Department of Justice, prior to the entry of the Consent Judgment in this case, and testified for the Plaintiff Class at the fairness hearing. The City has not proffered any evidence of its relationship with Dr. Glindmeyer, nor any evidence from Dr. Glindmeyer herself. Plaintiff Class would object to any effort to do so both on the procedural grounds that presentation of new evidence after the Magistrate has issued the Report and Recommendation is improper and in light of the potential conflicts raised.

[38] ECF No. 1366, Tr. 10/7/2020, 35:1-14.

[39] ECF No. 1366, Tr. 10/7/2020, 35:23-36:6.

Snowden confirmed that the City has not committed any funding to remedy this severe dearth of community-based mental health treatment.[40] While the people of Orleans wait for investment in community-based mental health care, the reality is that people with mental health needs are still being taken to and kept in jail.[41] This case is only about the constitutional obligations to provide safe housing and adequate and appropriate healthcare to those people who have been imprisoned in the City's jail. The provision of adequate healthcare to the Plaintiff Class members does not in any way implicate or erode the City's responsibility to provide adequate healthcare to its residents outside the jail.

### III.     Response to Objections Related to the COVID-19 Pandemic as a "Significant Change in Factual Conditions"

As the Plaintiff Class has maintained throughout these proceedings on the City's Motion, Objections related to funding[42] do not support the request for relief. Cost is not and cannot be a defense to the perpetuation of unconstitutional conditions.[43]

### IV.     Response to Objections That Are Irrelevant to the Request for Relief

The bulk of the City's Objections are either (1) not properly formulated as they fail to state with specificity what part of the Report is being challenged and/or on what basis, or (2) wholly irrelevant to the matter before the Court.[44]

---

[40] ECF No. 1366, Tr. 10/7/2020, 34:12-36:24; ECF No. 1366, Tr. 10/7/2020, 36:2-6.
[41] ECF No. 1366, Tr. 10/7/2020, 34:20-22.
[42] ECF No. 1389, Objections 8, 37, 38, and 39.
[43] ECF No. 465 at 79; ECF No. 1304 at 23-24.
[44] The Objections regarding various characterizations of evidence or events outside the record, including Objections 3, 4, 5, 16, 17, 19, 21, and 24, appear to be included more for the sake of performance than in any effort to articulate either legal or factual error in the Report and Recommendation. The Plaintiff Class does not have any response other than to assert that these Objections are irrelevant to the Motion before the Court. Objection 40 (to the Report's characterizations of the proposed retrofit) are not proper objections for this same reason but also as they are irrelevant to the relief moved for by the City.

      a. <u>Response to Objections Regarding the Plain Language of the Stipulated Order[45] and the PLRA[46]</u>

The Objections regarding the plain language of the Stipulated Order, as well as regarding the history of the City's prior statements and actions in advancement of the construction of the Phase III facility, are not germane to the requested relief from the 2019 Orders. But to the extent the Court's review will include consideration of these Objections, the Plaintiff Class contends that the City's representations are simply at odds with the facts and evidence in the record.

As discussed at length in briefing on this Motion, as well as in record statements and testimony by the parties who confected the terms of the Stipulated Order, ¶ D. 22 resolved the ongoing stalemate as to how to provide appropriate mental health and medical care, and settled the associated dispute over FEMA funds between the Sheriff and the City.[47] Ms. Dietz testified that she had authority to negotiate and sign the agreement as the City Attorney for the City of New Orleans.[48] She further testified, that as the City representative, she understood the agreement provided for the Compliance Director to develop and finalize a plan with the City and the Sheriff, in consultation with the Monitors and Plaintiffs, for appropriate housing for people with medical and mental health needs.[49] Finally, she testified that she understood the Supplemental Compliance

---

[45] ECF No. 1389, Objections 14, 15, 18, 28, 30, and 31.
[46] ECF No. 1389, Objections 13, 18, 20, 26, 27, 28, 29, and 31.
[47] ECF No. 1304 at 6-8; ECF No. 1368, Tr. 10/9/2020, 15:14-18:23.
[48] ECF No. 1368, Tr. 10/9/2020, 14:1-3. This representative authority should also be considered in the context of the City's injection of new arguments as to the city planning approval process in its Objections. Such arguments are procedurally improper at this stage and are waived. Similarly, this authority of the City Attorney undercuts Objections 6, 7, 22, 44, and 45 regarding contact with the Court by members of the public. These Objections are not germane to the relief requested in the City's Motion and the bases on which the City has sought that relief. The City and its citizenry have been represented throughout this litigation by the City Attorney, including during the prior mayoral administration. The Report and Recommendation notes the consideration of correspondence from various members of the public that were directed to the Court at the solicitation of the City. ECF No. 1382-1. What further weight or import these correspondences have in this litigation beyond consideration by the Court is unclear.
[49] ECF No. 1368, Tr. 10/9/2020, 7:14-18:8.

Action Plan of January 2017 to be the plan developed as a result of the process agreed to in the Stipulated Order, and that the City accepted it as such.[50]

Notwithstanding the City's continued attempts to re-write this history, the evidence is plain that the Stipulated Order committed the City to the plan resulting from the process outlined at ¶ D.22 of the Stipulated Order, making the City's discussion of the PLRA irrelevant.[51] The Magistrate correctly recommends that the City's failure to raise the PLRA in its original Motion constitutes waiver. Nevertheless, the Magistrate engaged in a thorough sixteen-page analysis of the City's PLRA discussion to find that, even if the PLRA argument had not been waived, it nonetheless does not support the City's Motion.[52]

As the Plaintiff Class previously briefed, the PLRA does not apply to the City's Motion as the 2019 Orders from which the City seeks relief are mere enforcements of the City's agreement with OPSO, the Plaintiff Class, and the United States, as embodied in ¶ D.22 of the Stipulated Order.[53] But even if these Orders could be construed as ones for jail construction, implicating the PLRA, the Plaintiff Class' consistent position remains that where a constitutional rights violation must be cured by jail construction, the PLRA does not prohibit such relief.[54]

---

[50] ECF No. 1368, Tr. 10/9/2020, 22:19 – 23:9. Also of note, the Stipulated Order includes three paragraphs outlining the agreement's compliance with the PLRA. ECF No. 1082 at 16. And as former City Attorney Dietz testified, the parties engaged in specific discussion related to inclusion of this language regarding compliance with the PRLA. ECF No. 1368, Tr. 10/9/2020, 46:19-47:6. The City's Objections to the contrary are belied by this record evidence.

[51] The suggestion that the PLRA confers un-waivable "statutory rights" on the City of New Orleans, ECF. No. 1389 at 35, is not based in either the text of the statute or any jurisprudence that the Plaintiff Class can identify. Nothing in the PLRA speaks to or allows for the unilateral withdraw from a settlement agreement, as requested by the City.

[52] ECF No. 1385 at 20-36.

[53] ECF No. 1327 at 2-4.

[54] ECF No. 1327 at 4-7. The City misstates Plaintiffs' position that the PLRA bars a court from ever ordering the construction of a new jail building. ECF No. 1389 at 12 n.24. Plaintiff Class assumes, although the City does not cite to any prior filings or record statements, that the City is referring to Plaintiffs' Joint Memorandum in Opposition to Defendant Gusman's Motion for Declaratory Judgment and Contempt. ECF No. 930. Plaintiffs' position in that brief is the same as its position now: the PLRA does not prohibit new jail construction, but requires a stipulation or finding that the relief complies with the PLRA's need-narrowness-intrusiveness test. ECF No. 930 at 4-5. At the time of

As detailed above, the structural deficiencies that resulted in ongoing non-compliance with the Consent Judgment and constitutional violations at the time of the Stipulated Order have not been resolved. Compliant and constitutional care is still not being provided to people with medical and mental health needs. The reports of this Court's monitoring team, this Court's orders, and the Magistrate's Report and Recommendation have confirmed time and time again that these rights violations persist.

  b. <u>Response to Objections Regarding Relief the City Has Not Requested</u>[55]

In its entirety, the City's prayer for relief on this Motion seeks only modification of this Court's 2019 Orders "by indefinitely suspending the programming, design and construction of a new Phase III jail facility.". The City has not moved to modify any other orders, and has not moved to modify the relief requested in the present Motion, including as may relate to any retrofit of the OJC. Further, the City's suggestion that the Court – in resolution of the current Motion – could simply order the Sheriff to retrofit OPSO's jail facility[56] conveniently ignores the fact that OPSO and the City (not to mention the Plaintiff Class and the United States)[57] engaged in negotiation and compromise, each giving up something of value or interest, in agreement to be bound by the plan for appropriate housing developed by the Compliance Director, the City, and the Sheriff.

Where the parties and this Court have been occupied for almost 6 months in resolution of

---

Plaintiffs' 2015 filing, there was no such stipulation or finding. There is such a stipulation now. <u>See</u> ECF. No. 1082 at 16, Stipulated Order, Section H, stipulating to compliance with the PLRA. The ongoing harm to people held in the jail, in part as a result of its physical deficiencies, led to Plaintiffs' motion seeking appointment of a receiver, formed the basis for the Stipulated Order's PLRA language, and was recognized by the Court in entry of the Order. <u>See also</u> ECF No. 1327 n.18, Plaintiff Class' Sur-Reply to City's Motion.

[55] ECF No. 1389, Objections 25, 40, 43, and 46.
[56] ECF No. 1389, Objection 43.
[57] Further, ¶ D.22. of the Stipulated Order also provides that "the City and the Compliance Director shall consult with the Monitors and the Plaintiffs to ensure that the proposed resolutions meet the standards required by the Consent Judgment."

12

the City's Motion – brought almost 4 years after entry of the Supplemental Compliance Action Plan – to relieve itself of this pledge, the Plaintiff Class respectfully suggests that the City's Objections related to its plan to retrofit the OJC, such as it stands,[58] carry little weight.

## V.     Conclusion

For the foregoing reasons, the City's Objections do not specify any errors in the Magistrate's factual findings or legal conclusions requiring modification or rejection by the Court. The Plaintiff Class urges the Court to adopt the Report and Recommendation.

Respectfully submitted,

**FOR THE PLAINTIFF CLASS:**

 */s/ Emily Washington*
EMILY WASHINGTON, LSBN 34143
ELIZABETH CUMMING, LSBN 31685
Roderick & Solange MacArthur Justice Center
4400 S. Carrollton Avenue
New Orleans, LA 70119
(504) 620-2259 (ph)
emily.washington@macarthurjustice.org

Date:  January 8, 2021

---

[58] As the City's Motion does not request any relief related to a retrofit of the OJC, the Plaintiff Class will not provide an exhaustive catalogue of the record evidence that supports the Magistrate Judge's finding that the retrofit plan, "to be kind," is "not fully thought-out." See, e.g., ECF No. 1385 at 56-63, Report and Recommendation, discussing "the so-called retrofit of the second floor of OJC," and concluding the "suggested 'retrofit' is not a viable option in any way, shape, or form." But Plaintiff Class briefly points to some of the record evidence and testimony in hearing on the City's Motion. For example, witnesses testified as to the paucity of detail and failure to consider classification and programming needs, or how to supply suitable and sufficient sub-dayrooms, group space, lines of sight, and observation. See, e.g., ECF No. 1366, Tr. 10/7/2020, 260:9-262:15 (Dr. Austin's testimony that he had not assessed the programming needed and did not consider classification separations in programming space); ECF No. 1375, Tr. 10/15/2020, 37:11-18 (Monitor Frasier's testimony cataloging deficiencies in the retrofit plan); ECF No. 1369, Tr. 10/13/2020, 156:4-14 (Dr. Patterson's testimony regarding the need to consider classification in group programming); ECF No. 1367, Tr. 10/8/2020, 163:10-164:5 (Dr. Rouse's testimony reflecting on the careful consideration that would be needed, but had not yet been supplied, to remedy the mezzanine levels and the unaddressed need for improved lines of sight).