# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| _____ | § | |
| LASHAWN JONES, *et al.*, and | § | |
| THE UNITED STATES OF AMERICA, | § | |
| | § | Civil Action No. 2:12-cv-00859 |
| PLAINTIFFS | § | Section I, Division 5 |
| | § | Judge Lance M. Africk |
| | § | Magistrate Judge Michael B. North |
| MARLIN GUSMAN, Sheriff, | § | |
| | § | |
| | § | |
| DEFENDANT. | § | |
| _____ | § | |

## Report No. 13 of the Independent Monitors
## February 8, 2021

Margo L. Frasier, J.D., C.P.O., Lead Monitor
Robert B. Greifinger, M.D. Medical Monitor
Patricia L. Hardyman, Ph.D., Classification Monitor
Raymond F. Patterson, M.D., D.F.A.P.A., Mental Health Monitor
Shane J. Poole, M.S., C.JM., Environmental Fire Life Safety Monitor
Diane Skipworth, M.C.J., R.D.N., L.D., R.S., C.C.H.P., C.L.L.M., Food Safety Monitor





***Compliance Report #13***
***LASHAWN JONES, et al., and the United States of America v.***
***Marlin Gusman, Sheriff***

Table of Contents

**Page**

| | | |
|---|---|---|
| I. | Introduction | 4 |
| | A. Summary of Compliance | 5 |
| | B. Opportunities for Progress | 7 |
| | C. Review Process of Monitors' Compliance Report #13 | 14 |
| | D. Communication with Stakeholders | 15 |
| | E. Recommendations | 15 |
| II. | Substantive Provisions | |
| | A. Protection from Harm | 17 |
| | A.1. Use of Force Policies and Procedures | 20 |
| | A.2. Use of Force Training | 21 |
| | A.3. Use of Force Reporting | 23 |
| | A.4. Early Intervention System | 27 |
| | A.5. Safety and Supervision | 28 |
| | A.6. Security Staffing | 34 |
| | A.7. Incidents and Referrals | 35 |
| | A.8. Investigations | 38 |
| | A.9. Pretrial Placement in Alternative Settings | 40 |
| | A.10. Custodial Placement | 40 |
| | A.11. Prisoner Grievance Process | 59 |
| | A.12. Sexual Abuse | 63 |
| | A.13. Access to Information | 64 |
| | B. Mental Health Care | 64 |
| | C. Medical Care | 88 |
| | D. Sanitation and Environmental Conditions | 90 |
| | E. Fire and Life Safety | 105 |
| | F. Language Assistance | 109 |
| | G. Youthful Prisoners | 110 |
| | H. The New Jail Facility | 111 |
| | I. Compliance and Quality Improvement | 112 |
| | J. Reporting Requirements and Right of Access | 113 |
| III. | Status of Stipulated Orders – February 11, 2015 and April 22, 2015 | 114 |



**Page**

**Tables**

Table 1 – Summary of Compliance – All Compliance Reports                    7
Table 2 – Status of Compliance – Stipulated Agreements                      7
Table 3 – Summary of Incidents CY 2019-CY 2020                              18
Table 4 – CY 2018-CY 2020 All OJC Reported Incidents by Type by Month       19
Table 5 – CY 2018-CY 2020 OJC Reported Incidents                           31

**Figures**

Figure 1 – Distribution of Inmates by Race by OPSO Facility                 45
Figure 2 – Rates and Completion Time of Initial Custody Assessments         47
Figure 3 – Percent Overrides for Housing Purposes – January 2019 –
               March 2020                                                   49
Figure 4 – Initial Classification Override Rates by Gender in January 2019 –
               September 2020                                               50
Figure 5 – Number of Attachments Input by Classification Staff –
               October 2019 - September 2020                                52
Figure 6 – Attachment Reason by Month – April - September 2020              52
Figure 7 – Rate of the Disciplinary Infractions for the OPSO ADP            57
Figure 8 – ADP versus Number Disciplinary Hearings: October 2019 –
               September 2020                                               58
Figure 9 – Most Serious Disciplinary Infraction/Report with Finding of Guilty:
               Oct 2019 – Sept 2020                                         58

**Appendices**

Appendix A - Summary Compliance Findings by Section Compliance
Reports 1 – 13                                                              110



**Compliance Report # 13**
**Introduction:**

This is Compliance Report #13 submitted by the Independent Monitors providing assessment of the Orleans Parish Sheriff's Office's (OPSO) compliance with the Consent Judgment of June 6, 2013. Report #13 reflects the status of OPSO's compliance as of September 30, 2020. This Report is based on incidents, documents, and compliance-related activities between April 1, 2020 and September 30, 2020. Due to health safety concerns because of COVID, three of the Monitors conducted the monitoring visit onsite while the medical, mental health, and classification portions were conducted virtually. Having some of the Monitors onsite allowed for observations to be shared with the Monitors conducting their visit virtually. This report is based on the observations and review of OPSO documents by the Monitors during the onsite and virtual site visits.

Throughout the time the Monitors have been involved in enforcement of the Consent Judgment, the site visits have played an integral role. During the site visits and the site visits by the Lead Monitor in between, the Monitors have endeavored to provide guidance to OPSO as to how to remedy the unsafe and unconstitutional conditions which existed when we began monitoring in late 2013. During this monitoring period, health concerns related to COVID limited the ability of the Monitors to be onsite. The May 2020 site visit was conducted virtually. Due to COVID only one visit onsite before the tour was possible; the Lead Monitor visited in August 2020.

The Monitors have consistently urged OPSO to put in place the necessary processes and procedures to not only obtain compliance, but to sustain compliance. Such processes and procedures would allow OPSO to provide adequate proof of compliance and assess compliance with the Consent Judgment and its own policies and procedures and address shortcomings without intervention of the Monitors. The Monitors have provided guidance as to how to go about the various review functions and establish an inspection unit that would operate independently of those whose performance would be assessed, but only minimal progress has been made. For instance, OPSO does not have an electronic way of recording security checks in the housing unit. In an effort to simplify the process, OPSO developed a paper form on which to record security checks. While this provides an easier way for a supervisor to see during a unit inspection if the deputy has recorded that the security checks are being performed timely, it is insufficient proof that the security checks actually occurred



and requires watching hours of video to verify. With the departure of the Independent Compliance Director (ICD), a comprehensive audit and inspection unit is even more important to finishing up the work to be done on compliance and sustaining compliance. Equally important is adopting a culture where accountability is embraced as opposed to a culture where there is a reluctance to address the deficiencies and, in some instances, undermine the efforts of those whose job it is to provide information.

During the monitoring period, the OPSO's jail system was under the leadership of Darnley R. Hodge, Sr., who was appointed by the Court on January 29, 2018, as the ICD on an interim basis and was appointed to the position permanently on October 12, 2018. On August 5, 2020, the Court terminated the appointment of the ICD at a date to be mutually agreed upon by the Sheriff and ICD later. November 27, 2020 was the date agreed upon by Sheriff Gusman and Director Hodge. Given that it was clear that the role of the ICD was coming to an end, Director Hodge, and Sheriff Gusman collaborated more in the operation of the jail. Sheriff Gusman resumed complete control of the operation of the jail on November 27, 2020. Byron LeCounte joined the OPSO administrative staff as the Chief of Corrections in February 2019 and continues in that role.

In summary, the Monitors find that safety, medical and mental health care, and environment conditions of inmates held in both the Orleans Justice Center (OJC) and the Temporary Detention Center (TDC) has made little improvement since Compliance Report #12 provided to the Court on July 26, 2020. In some areas, compliance has backslid. Ratings improved on eleven (11) provisions but regressed on nineteen (19) provisions. While some of the regression is due to the strain put on the system by COVID, much is due to a failure to follow the policies and procedures that have been put in place. The specific initiatives are addressed in this report.

**A.      Summary of Compliance**

The requirements of the Consent Judgment represent correctional practice recognized as required for the operation of a Constitutional jail system. While there is some flexibility for how OPSO addresses the mandates, achieving substantial compliance with the Consent Judgment, and Stipulated Agreements are necessary to bring OPSO and its correctional facilities into adherence with Constitutional requirements. The Consent Judgment contains 174 separately rated provisions. While they are separately rated, they are often intertwined. For example, effective implementation of a policy requires not only the



drafting of a suitable policy, but appropriate training on the policy and enforcement of the policy. Enforcement of the policy is contingent on assessing whether the policy is being followed which requires supervision, analysis of incidents and data, and objective confirmation of compliance. A meaningful annual review of the adequacy of the policy does not just mean to determine whether the wording of the policy should be changed, but also includes determining adherence to the policy and whether the objectives of the policy are being met, which again requires objective data collection and analysis and development of corrective action plans.

Based on the current assessment, OPSO has regressed from Report #12 and now has four provisions which are in non-compliance. Substantial compliance has been achieved for 64% of the provisions. Thirty-four percent (34%) of the provisions are in partial compliance. Two percent of the provision are in non-compliance.

Overtime, OPSO has made material progress as indicated by the movement of non-compliance to partial compliance to substantial compliance for some provisions. At different times during the duration of the Consent Judgment, there has been regression in the progress towards compliance. One of those periods was shortly after OPSO transitioned into the new jail. That was due to the failure to implement a transition plan which allowed for hiring and extensive training of staff on the direct supervision model and a phasing in of the movement into the OJC. As will be addressed in individual areas, OPSO has shown regression from the progress reflected in Compliance Reports #10-12 in some provisions due to failure to consistently follow and enforce policies and procedures.

During the virtual site visit for Compliance Report #12, Chief LeCounte relayed recent efforts to rely on in-depth analyses of data, including grievance data and use of force data to determine policy adherence and develop action plans to address shortcomings and make decisions. While there appears to be improvement in this area, lacking is a systematic approach to making decisions and implementing and enforcing them. The same deficiencies continued to be noted time and time again.

Under the leadership of Director Hodge and Chief LeCounte, OPSO has spent the last year and a half examining its strategies to obtain and sustain compliance and determining the structural and organizational changes necessary to achieve compliance. It is past time for implementation of those strategies. The first step to addressing these deficiencies is for the



organization, as a whole, to embrace the need for improvement.

**Table 1 – Summary of Compliance – All Compliance Reports[1]**

| Compliance Report/Date | Substantial Compliance | Partial Compliance | Non-Compliance | NA/ Other | Total |
|---|---|---|---|---|---|
| #1 – December 2013 | 0 | 10 | 85 | 76 | 171 |
| #2 – July 2014 | 2 | 22 | 149 | 1 | 174 |
| #3 – January 2015 | 2 | 60 | 110 | 2 | 174 |
| #4 – August 2015 | 12 | 114 | 43 | 4 | 173 |
| #5 – February 2016 | 10 | 96 | 63 | 4 | 173 |
| #6 – September 2016 | 20 | 98 | 53 | 2 | 173 |
| #7 – March 2017 | 17 | 99 | 55 | 2 | 173 |
| #8 – November 2017 | 23 | 104 | 44 | 2 | 173 |
| #9 – June 2018 | 26 | 99 | 46 | 2 | 173 |
| #10 – January 2019 | 65 | 98 | 8 | 2 | 173 |
| #11 – September 2019 | 103 | 66 | 5 | 0 | 174 |
| #12 – May 2020 | 118 | 56 | 0 | 0 | 174 |
| #13-- November 2020 | 111 | 59 | 4 | 0 | 174 |

The status of compliance (February 11, 2015 and April 22, 2015) is as follows:

**Table 2 – Status of Compliance with 2015 Stipulated Agreements**

| Compliance Report/Date | Substantial Compliance | Partial Compliance | Non-Compliance | NA | Total |
|---|---|---|---|---|---|
| August 2015 | 21 | 12 | 1 | 0 | 34 |
| February 2016 | 21 | 12 | 1 | 1 | 34 |
| September 2016 | 26 | 7 | 1 | 0 | 34 |
| March 2017 | 28 | 4 | 1 | 1 | 34 |
| November 2017 | 21 | 11 | 1 | 1 | 34 |
| June 2018 | 23 | 8 | 2 | 1 | 34 |
| January 2019 | 28 | 5 | 0 | 1 | 34 |
| September 2019 | 28 | 5 | 0 | 1 | 34 |
| May 2020 | 28 | 5 | 0 | 1 | 34 |
| November 2020 | 32 | 2 | 0 | 0 | 34 |

**B.      Opportunities for Continued Progress**

The Monitors summarize below the areas identified in preparation of this report regarding OPSO's current level of compliance with the Consent Judgment.

**1.      Foundational Work** - The essential, core work required to achieve compliance includes:



- <u>Policies and Procedures</u> – OPSO has completed the essential policies and procedures. The Policy Manager has continued to review policies and perform updates. It was noted during the virtual site visit in advance of Report #12 that some of the policies do not match current practice. One in particular is the Use of Force Reporting policy. OPSO advised that it was scheduled for review and would be updated. The failure of policies to match current practice was again noted during site visit in advance of Report #13. Essential is the continued development, approval, and implementation of lessons plans that correspond with each of the policies. OPSO's policy governing its written directive system has significantly improved the policy/ procedure process. This process allows for organizational components to develop specific operational practices for review by OPSO administration. Adherence to the policies, procedures, and training is essential. OPSO has yet to develop a reliable process for objective consistent auditing of adherence and consistent enforcement of policies.

- <u>Inadequate staffing</u> – OPSO has continued to hire staff but has not been able to gain ground on vacancies due to the number of terminations and resignations. During calendar year, CY 2020, OPSO lost significant ground. Inadequate staff in the housing areas of the facilities (OJC and TDC) and the timely completion of use of force investigations continues to hamper OPSO's ability to consistently comply with the Consent Judgment. OPSO continues to use employee overtime to address the staff shortages. Even with substantial overtime, frequently, there are housing units and control rooms with no assigned staffing. Further, almost daily, assigned staff leave housing units and control pods unattended for meal breaks and other duties. Recent promotions have helped to address the staffing deficiencies at the supervisory level. While a pay scale which provides for improvement in compensation with the goal of increased retention of staff and assistance in the recruitment efforts has been developed, a plan to secure the necessary funding and implement the pay scale has not been advanced. OPSO is strongly encouraged to review its deployment of staff. It is apparent that staff is not being deployed to the areas where the need is most critical, staffing the housing units.



- <u>Training</u> – Employee training for security staff, both pre-service and in-service, has become more in line with OPSO policies and procedures. Foundational work, such as preparation of lesson plans to provide for a consistent instruction content, instruction by qualified individuals, and demonstration and documentation of students' knowledge gained, needs to continue. Providing a policy without training is not effective implementation. Once effective training has been provided, auditing of staff adherence to policies is essential. When non-adherence to policy is discovered on a consistent basis, training should be reviewed to determine whether revised and improved training would be beneficial. Given the lack of enforcement of policy by supervisors, additional training of supervisors in this area would be beneficial.

- <u>Supervision</u> – Safe operation of OPSO's facilities requires an adequate number of sufficiently trained first line and mid-management supervisors. A promotional process for sergeants and lieutenants was developed and implemented. The unit managers were reclassified as captains instead of lieutenants. This process has resulted in a significant reduction in vacancies at supervisory positions. OPSO is encouraged to finalize its organizational chart. Also lacking is a uniform and consistent process for evaluations of staff, particularly supervisory staff. Director Hodge implemented the unit management approach and provided training and mentoring for the managers. While there are benefits to a unit management system, the unit management system has blurred the lines of responsibility and accountability. Many times, during the site visit when asked about an apparent problem or lapse in security, the response from the supervisor was that they were not responsible for that area. It also appears that unit supervisors fail to properly train and supervise staff and enforce policies and are seldom held accountable for their failure.

2. **Medical and Mental Health Care** – Several provisions in the areas of mental health have regressed. The Medical and Mental Health Monitors report challenges remain in the provision of basic care, staffing, and recordkeeping, as well as the need for improved collaboration with custody/security staffing. Security staff were found to be responsible for "suicide watch" during the site visit, but the deputies routinely



stated that they did not understand what their duties were to perform suicide watches. Resources from Tulane University continue to be particularly helpful in providing mental health care, but Tulane University is not responsible for many aspects of mental health care required by the Consent Judgment. An important part of the long-term solution to the lack of compliance with the Consent Judgment in the areas of medical and mental health is the design and construction of Phase III, a specialized building which will contain an infirmary and housing for inmates with acute mental health issues. However, the City did extensively renovate portions of TDC as a stop gap measure. OPSO has yet to fully occupy TDC and should do so immediately.

3.  **Inmate Safety and Protection from Harm** - Providing a safe and secure jail continues to be a challenge.

    - <u>Unit Management</u>—The Unit Management approach is being used in the supervision of the OPSO housing units. Each floor of the OJC, IPC, and TDC have been designated as a "unit". The purpose of this strategy is to enhance accountability for both staff and the inmates by allowing the staff to get to know the inmates. The effectiveness of the Unit Management approach has been greatly hampered by the lack of development of inmate management plans for problematic inmates. It also has blurred the lines of responsibility and accountability as indicated above.

    - <u>Violence</u> – There were still significant incidents of violence occurring within the facilities during the monitoring period– including inmate on inmate assaults and assaults on staff. Especially concerning is that inmates continue to fashion weapons from items found in the jail. The items (such as the light supports in the utility closets) would be unavailable to them if the staff were following policies regarding supervision and limiting access. Disorder and non-compliance to the institutional rules cause staff to use force to gain control and compliance. There is inadequate use of de-escalation techniques before resorting to force. Seldom are mental health staff involved when de-escalation is attempted even though a large percentage of the inmates involved in a use of force are on the mental health caseload. There has been a decrease in substance abuse overdoses, but a large amount of prescription



medication and illicit drugs continues to be found during shakedowns. Three inmates died while in custody during the monitoring period: one by suicide and one involving the use of illicit drugs.

- <u>Inmate Classification</u> – The inmate classification processes require continued attention to ensure housing decisions and placements are consistent with OPSO policies and objective classification principles. Credible auditing needs to focus on identifying issues and correcting placements. Of concern this monitoring period is the signing of waivers of inmates known to be enemies of each other and resulting decision to house them together.

- <u>Inmate grievances</u> – As of Report #11, the ratings of the subdivisions in the grievance provision were individually given. The separate ratings allowed the areas in which deficiency existed to be highlighted. While timeliness and adequacy of responses is still not in substantial compliance, improvement continues. The trend data from the grievance system is now being used to identify problems to be addressed.

- <u>Incident Reporting</u> –The accurate timely reporting of incidents has been a constant area of concern. There remain serious incidents for which no report or no timely report is prepared by OPSO staff, including incidents involving the serious injury of inmates. There continue to be reports which are incomplete and do not provide the necessary information for the reader to determine what occurred and why it occurred. It is particularly concerning that incomplete and sometime inarticulate reports have been reviewed by and approved by a supervisor. While the development of a corrective action plan to address was discussed which includes training and remedial action including discipline during the last monitoring tour, it has not been implemented.

- <u>Jail Management System</u> **–** An integral part of the jail's operational improvement is tied to an effective jail management system. Such capacity provides on-demand, routine, and periodic data to inform critical leadership and management decisions. Such an information system has not been implemented. After OPSO cancelled the contract with the provider who was to



supply a new JMS due to the inability to interface with the Orleans Parish court system, the City of New Orleans was to purchase a JMS which will interface with the Orleans Parish court system and the OPSO information systems. Despite passage of significant time, there is no definite timeline for that process. In the meantime, OPSO has modified its current system to provide more of the required JMS functions. One of the crucial areas lacking is a way to electronically verify that security checks are taking place in a timely fashion.

4. **Sanitation and Environment Conditions** – Challenges remain regarding the public health and inmate/staff safety risks. During the site visit, inmates and staff were often seen not wearing their masks or wearing the masks in an improper manner. The COVID-19 pandemic has presented additional challenges for the extremely dedicated sanitation staff. The inability to fill support positions identified in OPSO's staffing analysis negatively impacts the ability of OPSO to sustain compliance with the requirements of the Consent Judgment and align with accepted correctional practice. Sanitation and cleanliness of the cells and housing areas are not solely the responsibility of the sanitation staff. The unit managers and pod deputies have the first responsibility for ensuring inmates keep their cells and dayroom areas clean and uncluttered. During the monitoring tour, when sanitation concerns were called to the attention of pod deputies and supervisors, they often tried to explain them away by stating they have told the inmate to correct the issue. If true, follow through is clearly lacking.

5. **Youthful Inmates** – The Monitors acknowledge and commend the educational program established in OJC. Provision of age-appropriate mental health services has improved with the addition of the Tulane University resources. Due to lack of adequate housing options, a female youthful inmate(s) must be housed alone in TDC; often by herself. This creates a double quandary; the young woman faces isolation and the OPSO staffing challenges are intensified. Recent efforts have been made to relocate all youthful inmates from the OJC to the Youth Study Center. While this is a welcome change, currently, one youthful offender is enough to tie up an entire housing unit. It is strongly suggested that the design of the Phase III facility address this issue.

6. **Inmate Sexual Safety** – OPSO underwent its required audit of compliance with the

Prison Rape Elimination Act of 2003 (PREA) and passed in September 2019. Since that time, the sergeant who was assigned as the PREA Coordinator was moved from that assigned and reassigned to a housing area. The position has not been filled. Continued internal collaboration among OPSO security, classification, and the medical/mental health provider is needed for the assessments of inmates' potential for sexual victimization and aggression. The necessity of separation of inmates testing positive for COVID-19 has resulted in the need for additional attention to inmates' PREA designation. Change in leadership of the supervisor over PREA investigations continues to be a concern.

7. **Compliance, Quality Reporting, and Quality Improvement** – An essential element of inmate safety is OPSO's timely review of all serious incidents as well as of non-violent incidents to determine if there are trends and/or patterns. This ensures assessment of root causes and then the development, implementation, and tracking of action plans to address the issues. This activity focuses on resolving problems. OPSO has made efforts to undertake this function but would benefit from a more robust effort. Especially concerning are systemic issues, which if remain unaddressed, will continue to create risks to institutional safety and security. While progress is noted, the Monitors encourage OPSO to dedicate more time and knowledgeable resources to quality improvement. Impediments include the lack of staff with the skills and/or time to devote to the task. Establishment of an Inspection/Accreditation Unit is suggested.

8. **Stipulated Agreements 2015** – OPSO should review its on-going compliance with the two Stipulated Agreements from 2015.

9. **Construction Projects** –

   - The Docks – Construction of the renovations on the Docks has been completed. Due to COVID-19, almost all of the court dockets have either been discontinued or are conducted virtually. The Docks have not been used yet for court holding. OPSO is encouraged to review its operational plans in light of the likely need to separate COVID-19 positive inmates when court dockets resume. The Monitors continue to encourage OPSO to have a robust training plan for the operation of the Docks and to not take possession until all systems are in proper working order.



- TDC Mental Health – The renovation of two TDC housing areas (total of four units) has been completed. While the male inmates with acute mental illness were moved from Hunt into one of the housing units, during the monitoring period, the other inmates remained in OJC. OPSO has now made progress in relocating some the sub-acute male inmates and all sub-acute and acute female inmates to TDC. One unit remains unused except for COVID quarantine of female inmates. There is no requirement that this unit only be used for female inmates. OPSO is encouraged to staff the unit so that it can be used to house inmates who are currently on suicide watch in various housing areas of OJC. While TDC is not a suitable solution to meeting the requirements of the Consent Judgment as to medical and mental health services in the long run, it is a necessary interim step given no satisfactory housing for acute inmates in OJC. The operation of TDC Mental Health has revealed the necessity of single person cells for acute inmates which should be considered in the design of Phase III. It is important to note that TDC does nothing to address the lack of an infirmary and medical housing in OJC and lack of programming space.

- Phase III – This project has progressed to the phase of drawing construction documents. The Monitors continue to urge the City to seek input on decisions from the various stakeholders and the Monitors. In early June 2020, it came to light that the City of New Orleans unilaterally stopped work on the project. The Monitors and other stakeholders were unaware of the stoppage as the City had not adhered to the agreement for quarterly executive committee meetings with all stakeholders. The construction and occupation of Phase III are critical to the provision of mental and medical health services in accordance with the Consent Judgment.

**C.**     **Review Process of Monitors' Compliance Report #13**

A draft of this report was provided to OPSO, Counsel for the Plaintiff Class, and the Department of Justice (DOJ) on December 8, 2020. Comments were provided by OPSO, Counsel for the Plaintiff Class, Wellpath (OPSO's medical contractor) and DOJ on December 22, 2020. The parties exchanged their comments and were afforded the opportunity to provide further comment and information to the Monitors on January11, 2021. The Monitors considered the comments of the parties in finalizing Report #13.



**D.**     **Communication with Stakeholders**

The Monitors are committed to providing as much information as possible regarding the status of OPSO's efforts to comply with all orders of the Court. The www.nolajailmonitors.org website came on-line in September 2014. Joining all other reports, the finalized version of Compliance Report #13 will be posted on that site.

**E.**     **Recommendations**

Over the years, the Monitors have provided multiple recommendations and suggestions to OPSO to achieve and maintain compliance with the Consent Judgment. The purpose of the recommendations continues to be to assist OPSO in achieving and maintaining compliance. While much progress has been accomplished, many of the recommendations made in the past have not been implemented. Only "new" recommendations and suggestions are included within the body of this report. While the Consent Judgment may not require, in all situations, that OPSO follow the recommendations and suggestions of the Monitors, refusal to change is unlikely to result in compliance.

**F.**     **Conclusions and Path Forward**

OPSO has been operating under the provisions of the Consent Judgment since June 2013; monitoring began in Fall 2013. During the past two years, under the leadership of Director Hodge, significant improvements were acknowledged by the Monitors. The hiring of Byron LeCounte as Chief of Corrections in February 2019 has been beneficial to the vital work which remains to comply with the provisions of the Consent Judgment. His additional expertise and experience allowed Director Hodge to focus on the Consent Judgment. The ICD position has now been eliminated. It is now the sole responsibility of Sheriff Gusman to bring OPSO into compliance with the Consent Judgment.

Concerning is that the same issues continue to arise and are not being thoroughly resolved. Serious incidents and harm to inmates continue to occur. OPSO has made efforts to identify and address sources of contraband but the Monitors frequently encountered inmates smoking in the facility and weapons have been found which had been fashioned from materials within the jail such as the light supports in the utility closets. Illicit drugs and prescription drugs that were not prescribed to the deceased were noted to be found in the autopsy of an inmate who died in custody during the monitoring period. Dangerous medication is frequently found during cell shakedowns suggesting that the medication



distribution process is seriously flawed.

There has been some improvement in OPSO's data collection which should allow for better problem solving with a goal of a sustainable reduction in inmate-on-inmate assaults, inmate-on-staff assaults, uses of force, contraband, and property damage. However, corrective action plans seldom are developed through analysis of the data and root cause reviews. When they are developed, follow through on implementation is severely lacking, especially at the Unit Manager level.

The Monitors remain committed to the Court and the parties to collaborate on solutions that will result in significant improvement towards compliance with the provisions of the Consent Judgment and achievement of constitutional conditions.

**The Monitors again thank and acknowledge the leadership, guidance, and support of The Honorable Lance M. Africk and The Honorable Michael B. North.**



**II. A.    Protection from Harm**

**Introduction**

 This section of the Consent Judgment addresses core correctional functions including the use of force (policies, training, and reporting), identification of staff involved in uses of force through an early intervention system, safety and supervision of inmates, staffing, incidents and referrals, investigations, pre-trial placement of inmates in the facility, classification, the inmate grievance process, sexual safety of inmates, and inmates' access to information.

 The Consent Judgment requires that OPSO operate the facility to assure inmates are "reasonably safe and secure." Based on objective review of data, the facility has shown improvement in inmate and staff safety, but significant incidents that result in serious injury to inmates and staff continue to occur. Overly concerning is that inmates continue to fashion weapons out of items in the jail. This would not be occurring it the facility was properly staff and the staff were properly supervising the inmates.

 Reaching and sustaining compliance with provisions of the Consent Judgment, particularly this section, relies on the collection, analysis, and corrective action planning using accurate and reliable data. The Monitors encourage OPSO to continue efforts to build its capacity to collect and analyze relevant accurate data, draw supportable conclusions to inform decisions throughout the organization, develop corrective action plans, implement corrective action plans, and hold staff accountable for non-adherence to corrective action plans and policies. It is discouraging that OPSO often takes the position that it is not required to analyze the data it is required to collect under the Consent Judgment or to develop a corrective action plan based on the analysis. As OPSO's capacity to collect, analyze, plan, and implement is enhanced, the ability to achieve and maintain compliance will be strengthened. Without an enhancement in capacity and dedication to making and implementing informed decisions, OPSO is unlikely to achieve and maintain compliance and likely to regress.

 The Monitors reported in Compliance Report #9 about OPSO's efforts to be much more transparent in the reporting of incidents. A lieutenant assigned to the administrative section reviews the daily medical logs for inmates taken to the clinic for treatment subsequent to an altercation or a use of force as well as the transport logs of inmates routed to the hospital with trauma-related injuries and cross checks them against reported incidents. The lieutenant also compares the Watch Commander's Log (which lists significant



events and incidents occurring during the shift) and the incident reports to detect missing reports. Comparison of the medical logs to the incidents calls into question whether all of the inmates who are being seen by medical are being logged. What is not verified is whether an inmate received medical attention as indicated in a particular report. Examination of the walk-in logs often reveals that inmates who allegedly received medical attention are not on the log. Whether this is due to an error in record keeping on the part of Wellpath or because the inmate did not actually receive medical treatment as claimed is unknown at this time. Another issue is the lack of reporting of inmates transported to the hospital for medical emergencies. A continuing issue is the lack of meaningful consequences for supervisors and deputies who fail to comply with the reporting policies resulting in late, incomplete, or missing incident reports.

The Monitors reviewed all reported incidents for CY 2020. The following charts compare the totals for the calendar years (CY) 2018-2020. It should be noted that there was a significant decrease in the number of incidents for May, September, and October 2020 which may be the result of reporting errors as opposed to an actual decline in reportable incidents.

**Table 3 - All OJC Reported Incidents for CY 2018-CY 2020**

### 2018-2020 Report Categories Comparison



| | Inmate/ Inmate Assault | Inmate Staff Altercation | Use of Force | PREA | Death | Attempt Suicide/ Ideation | Internal Escape | Criminal Damage | Inmate Injury/ Inmate Medical (AKA slip/falls/ overdoses) | Contraband | Staff Arrest | Staff Misconduct/ Suspension | Other |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2018 | 442 | 64 | 260 | 47 | 2 | 78 | 48 | 69 | 262 | 106 | 3 | 0 | 15 |
| 2019 | 440 | 117 | 358 | 42 | 0 | 82 | 6 | 47 | 145 | 302 | 0 | 0 | 6 |
| 2020 | 309 | 139 | 372 | 35 | 3 | 21 | 1 | 64 | 64 | 351 | 0 | 0 | 1 |

The number of inmate-staff altercations, use of force, and contraband in CY 2020 exceeded both CY 2018 and CY 2019. This is despite the inmate population having decreased significantly. The number of reported inmate on inmate assaults has declined, but it should be noted that there is an increase of the use of weapons in the assaults resulting in serious injuries. It should also be noted that not only has the inmate population has declined greatly during the monitoring period, but that the movement of inmates in the units was greatly curtailed due to COVID safety protocols.

**Table 4 –All OJC Reported Incidents by Type by Month CY 2018-CY 2020**



| | Jan | Feb | March | April | May | June | July | August | September | October | November | December | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2018 | 92 | 96 | 112 | 121 | 124 | 144 | 116 | 132 | 112 | 113 | 105 | 129 | 1396 |
| 2019 | 123 | 93 | 105 | 112 | 127 | 148 | 131 | 163 | 107 | 153 | 160 | 123 | 1545 |
| 2020 | 118 | 129 | 110 | 125 | 95 | 150 | 111 | 105 | 77 | 92 | 123 | 125 | 1360 |



**Assessment Methodology**

Dates of visits:

- August 17-19, 2020
- November 9-12, 2020

Materials reviewed:

- Materials reviewed include the Consent Judgment, OPSO policies and procedures, use of force reports, incident reports, and investigations conducted by Investigative Services Bureau-Internal Affairs Division (ISB-IAD), investigations conducted by ISB-Criminal Division (ISB-Criminal), investigations conducted by ISB-Inmate Division, training materials, shakedown logs, and post logs.

Interviews:

- Interviews included command staff, jail supervisors, commander of ISB, commander of IAD-Administrative, chief of investigations, chief of corrections, director of training, and various supervisors of units within ISB. Inmates were interviewed by the three Monitors onsite for the visit.

**IV.A.1. Use of Force Policies and Procedures**

*A. 1.a. OPSO shall develop, implement, and maintain comprehensive policies and procedures (in accordance with generally accepted correctional standards) relating to the use of force with particular emphasis regarding permissible and impermissible uses of force.*
*A. 1.b. OPSO shall develop and implement a single, uniform reporting system under a Use of Force Reporting policy. OPSO reportable force shall be divided into two levels, as further specified in policy: Level 1 uses of force will include all serious uses of force (i.e., the use of force leads to injuries that are extensive, serious or visible in nature, including black eyes, lacerations, injuries to the mouth or head, multiple bruises, injuries to the genitals, etc.), injuries requiring hospitalization, staff misconduct, and occasions when use of force reports are inconsistent, conflicting, or otherwise suspicious. Level 2 uses of force will include all escort or control holds used to overcome resistance that are not covered by the definition of Level 1 uses of force.*
*A. 1.c. OPSO shall assess, annually, all data collected regarding uses of force and make any necessary changes to use of force policies or procedures to ensure that unnecessary or excessive use of force is not used in OPP. The review and recommendations will be documented and provided to the Monitor, DOJ, and SPLC.*

Findings:

A. 1. a.  Substantial Compliance

A. 1. b.  Substantial Compliance

A. 1. c.  Partial Compliance

Observations:

The current OPSO use of force policy was effective as of May 2016. It was last reviewed in May 2020. OPSO has conducted the 2019 annual review of available use of force



data and the policy. OPSO analysis of the data has improved, but it is concerning that the same issues such as poorly written reports, backlog in the number of use of force incidents to be reviewed (there are cases dating back to 2018), high level of use of force on specialty pods (particularly the discipline pod and the mental health pod), and the failure to faithfully report uses of force continue, but no recommendations were documented and provided to the Monitors and DOJ and counsel for the Plaintiffs. Identifying the problem is just the first step in addressing the reoccurring issues. Examination of the use of force reports by the Monitors revealed that often the use of force is precipitated by a failure to follow policy such as not restraining the inmate prior to movement or allowing an inmate out of his/her cell with another inmate(s) from whom he/she is to be kept separate. Incident reports most often demonstrate a lack of de-escalation efforts as required by the Consent Judgment. Seldom is mental health staff called upon to assist in de-escalation although a majority of the inmates upon whom force is used are on the mental health caseload. In order to warrant a rating of substantial compliance in A.1.c., OPSO needed to address the issues; not just identify them. Until that is done, the compliance rating will remain at Partial Compliance. Concerns regarding timeliness of submission of use of force report and reviews are addressed in those sections.

### IV. A. 2. Use of Force Training

*A. 2. a. OPSO shall ensure that all correctional officers are knowledgeable of and have the knowledge, skills, and abilities to comply with use of force policies and procedures. At a minimum, OPSO shall provide correctional officers with pre-service and annual in-service training in use of force, defensive tactics, and use of force policies and procedures. The training will include the following:*
> *(1) instruction on what constitutes excessive force;*
> *(2) de-escalation tactics; and*
> *(3) management of prisoners with mental illness to limit the need for using force.*

*A. 2. b. OPSO shall ensure that officers are aware of any change to policies and practices throughout their employment with OPP. At a minimum, OPSO shall provide pre-service and annual in-service use of force training that prohibits:*
> *(1) use of force as a response to verbal insults or prisoner threats where there is no immediate threat to the safety or security of the institution, prisoners, staff, or visitors;*
> *(2) use of force as a response to prisoners' failure to follow instructions where there is no immediate threat to the safety or security of the institution, prisoners, staff, or visitors;*
> *(3) use of force against a prisoner after the prisoner has ceased to offer resistance and is under control;*
> *(4) use of force as punishment or retaliation; and*
> *(5) use of force involving kicking, striking, hitting, or punching a non-combative prisoner.*

*A. 2. c. OPSO shall randomly test five percent of the correctional officer staff on an annual basis to determine their knowledge of the use of force policies and procedures. The testing instrument and policies shall be approved by the Monitor. The results of these assessments shall be evaluated to determine the need for changes in training practices. The review and conclusions will be documented and provided to the Monitor*

Findings:



A. 2. a.  Substantial Compliance

A. 2. b.  Substantial Compliance

A. 2. c.  Substantial Compliance

Observations:

The Monitor reviewed the training materials and documentation and the supplemental documentation submitted by training staff for the rating period. The Monitor was able to randomly review staff training files maintained by the training staff. The proof provided by the Academy staff regarding the annual training on use of force demonstrate that the 8-hour use of force in-service training class was offered to all staff who come into direct contact with inmates. Over 95% of the OJC and 100% of the TDC staff received the required annual training. This is a commendable accomplishment by the Academy staff and is a direct reflection of their willingness to adjust their schedules to facilitate training and of the leadership of Chief LeCounte as he has made training a priority. Concerning is that two of the individuals who were listed as remaining delinquent are unit managers who have been involved in numerous uses of force including questionable uses of force.

The Monitor has, in the past, observed the Academy staff maintained detailed, comprehensive, and very well-maintained files. In response to our request for documentation, the Academy staff provided succinct and thorough reports as to who had and who had not completed the required use of force training.

The Monitor's review of the use of force training materials noted that the lesson plan, PowerPoint presentation, and testing materials substantively cover the requisite information in A. 2. c. 1-5. The proof of training documentation indicates that the OPSO staff received the required training on policies and practices by the Academy staff. However, a thorough review of the CY 2020 use of force reports reveals the need for additional training which emphasize de-escalation and provide deputies with additional tools when dealing with inmates with mental health issues and inmates who routinely exhibited behavioral problems. Given some very problematic incidents in which staff observed inappropriate uses of force and did not stop or report the same, it is strongly suggested that the duty to intervene and report be emphasized.

The Monitor reviewed training documentation provided by training staff specific to the 5 percent annual testing requirement for this section. The testing for 2020 has not yet been conducted. Training staff intends to test 15 percent of the staff. The test for 2020 has



not yet been submitted for the annual approval of the testing instrument by the Monitor. The analysis focused on simplifying the test rather than determining whether training required revision to address any deficiencies in knowledge of policies. The Academy staff has demonstrated proficiency in analyzing data. When drafting the next annual test, it is recommended that the Academy staff coordinate with the Force Investigation Team (FIT) regarding adherence to the use of force policy to include those portions in the test instrument.

### IV. A. 3. Use of Force Reporting

*A.3 a. Failure to report a use of force incident by any staff member engaging in the use of force or witnessing the use of force shall be grounds for discipline, up to and including termination.*
*A.3.b. OPSO shall ensure that sufficient information is collected on uses of force to assess whether staff members complied with policy; whether corrective action is necessary including training or discipline; the effectiveness of training and policies; and whether the conditions in OPP comply with this Agreement. At a minimum, OPSO will ensure that officers using or observing a Level 1 use of force shall complete a use of force report that will:*

    *(1)    include the names of all staff, prisoner(s), or other visual or oral witness(es);*
    *(2)    contain an accurate and specific account of the events leading to the use of force;*
    *(3)    describe the level of resistance and the type and level of force used, consistent with OPP use of force; policy and procedure, as well as the precise actions taken by OPSO staff in response to the incident;*
    *(4)    describe the weapon or instrument(s) of restraint, if any, and the manner of such use be accompanied by a prisoner disciplinary report, if it exists, pertaining to the events or prisoner activity that prompted the use of force incident;*
    *(5)    describe the nature and extent of injuries sustained by anyone involved in the incident;*
    *(6)    contain the date and time when medical attention, if any, was requested and actually provided;*
    *(7)    describe any attempts the staff took to de-escalate prior to the use of force;*
    *(8)    include an individual written account of the use of force from every staff member who witnessed the use of force;*
    *(9)    include photographs taken promptly, but no later than two hours after a use of force incident, of all injuries sustained, or as evidence that no injuries were sustained, by prisoners and staff involved in the use of force incident;*
    *(10)    document whether the use of force was digitally or otherwise recorded. If the use of force is not digitally or otherwise recorded, the reporting officer and/or watch commander will provide an explanation as to why it was not recorded; and*
    *(11)    include a statement about the incident from the prisoner(s) against whom force was used.*
*A.3.c. All officers using a Level 2 use of force shall complete a use of force report that will:*

    *(1)    include the names of staff, prisoner(s), or other visual or oral witness(es);*
    *(2)    contain an accurate and specific account of the events leading to the use of force;*
    *(3)    describe the level of resistance and the type and level of force used, consistent with OPP use of force policy and procedure, as well as the precise actions taken by OPSO staff in response to the incident;*
    *(4)    describe the weapon or instrument(s) of restraint, if any, and the manner of such use;*
    *(5)    be accompanied by a prisoner disciplinary report, if it exists, pertaining to the events or prisoner activity that prompted the use of force incident;*
    *(6)    describe the nature and extent of injuries sustained by anyone involved in the incident;*
    *(7)    contain the date and time when medical attention, if any, was requested and actually provided; and*
    *(8)    describe any attempts the staff took to de-escalate prior to the use of force.*
*A.3.d. OPSO shall require correctional officers to notify the watch commander as soon as practical of any use of force incident or allegation of use of force. When notified, the watch commander will respond to the*



*scene of all Level 1 uses of force. When arriving on the scene, the watch commander shall:*

- *(1)    ensure the safety of everyone involved in or proximate to the incident;*
- *(2)    determine if any prisoner or correctional officer is injured and ensure that necessary medical care is provided;*
- *(3)    ensure that personnel and witnesses are identified, separated, and advised that communications with other witnesses or correctional officers regarding the incident are prohibited;*
- *(4)    ensure that witness and subject statements are taken from both staff and prisoner(s) outside of the presence of other prisoners and staff;*
- *(5)    ensure that the supervisor's use of force report is forwarded to IAD for investigation if, upon the supervisor's review, a violation of law or policy is suspected. The determination of what type of investigation is needed will be based on the degree of the force used consistent with the terms of this Agreement;*
- *(6)    If the watch commander is not involved in the use of force incident, the watch commander shall review all submitted use of force reports within 36 hours of the end of the incident, and shall specify his findings as to completeness and procedural errors. If the watch commander believes that the use of force may have been unnecessary or excessive, he shall immediately contact IAD for investigation consideration and shall notify the warden or assistant warden; and*
- *(7)    All Level 1 use of force reports, whether or not the force is believed by any party to be unnecessary or excessive, shall be sent to IAD for review. IAD shall develop and submit to the Monitor within 90 days of the Effective Date clear criteria to identify use of force incidents that warrant a full investigation, including injuries that are extensive or serious, visible in nature (including black eyes, injuries to the mouth, injuries to the genitals, etc.), injuries requiring hospitalization, staff misconduct (including inappropriate relationships*

    *with prisoners), and occasions when use of force reports are inconsistent, conflicting, or otherwise suspicious.*

*A.3 e. Ensure that a first-line supervisor is present during all pre-planned uses of force, such as cell extractions.*

*A.3.f. Within 36 hours, exclusive of weekends and holidays, of receiving the report and review from the shift commander, in order to determine the appropriateness of the force used and whether policy was followed, the Warden or Assistant Warden shall review all use of force reports and supervisory reviews including:*

- *(1)    the incident report associated with the use of force;*
- *(2)    any medical documentation of injuries and any further medical care;*
- *(3)    the prisoner disciplinary report associated with the use of force; and*
- *(4)    the Warden or Assistant Warden shall complete a written report or written statement of specific findings and determinations of the appropriateness of force.*

*A.3.g. Provide the Monitor a periodic report detailing use of force by staff. These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. Each report will include the following information:*

- *(1)    a brief summary of all uses of force, by type;*
- *(2)    date that force was used;*
- *(3)    identity of staff members involved in using force;*
- *(4)    identity of prisoners against whom force was used;*
- *(5)    a brief summary of all uses of force resulting in injuries;*
- *(6)    number of planned and unplanned uses of force;*
- *(7)    a summary of all in-custody deaths related to use of force, including the identity of the decedent and the circumstances of the death; and*
- *(8)    a listing of serious injuries requiring hospitalization.*

*A.3.h. OPSO shall conduct, annually, a review of the use of force reporting system to ensure that it has been effective in reducing unnecessary or excessive uses of force. OPSO will document its review and conclusions and provide them to the Monitor, SPLC, and DOJ.*

<u>Findings:</u>



A. 3. a.  Partial Compliance

A. 3. b.  Partial Compliance

A. 3. c.  Substantial Compliance

A. 3. d.  Partial Compliance

A. 3. e.  Substantial Compliance

A. 3. f.  Partial Compliance

A. 3.g.  Substantial Compliance

A. 3. h.  Partial Compliance

<u>Observations</u>:

 As to provision A. 3. a., the use of force policy requires all uses of force to be reported timely and completely and sets out the potential discipline if the policy is not followed. Review of documentation revealed that there continues to be cases in which supervisors failed to report force within a month of the incident and only did so as a result of being instructed to file a report. There were many other untimely reports, but the period was less than a month. While one month far exceeds the time period allowed by the Consent Judgment, it is used to distinguish between a situation of untimeliness as opposed to failure to report. No documentation of discipline was administered in any of these cases, not even as much as written reprimand or verbal counseling.  The only documentation provided was the counseling of one deputy. It is important to note that the same supervisors who failed to file reports on the uses of force during the last monitoring period failed to do so again. Once again, one of the supervisors is the same supervisor mentioned in Compliance Report #11 who failed to report a deputy's attempt to assault an inmate that required the deputy to be restrained to protect the inmate. Having a policy which states that failure to report a use of force shall be grounds for discipline, but not enforcing it continues to result in Partial Compliance. A memorandum was provided that additional individuals are being considered for discipline. If and when enforcement of the policy is demonstrated, the rating will be reviewed. OPSO continues to argue that having a policy with the required learning is sufficient for substantial compliance. Refusal by OPSO to recognize that practice must mirror policy is an impediment to improvement and compliance.

 Provisions A. 3. b. remains in partial compliance due to the significant number of incomplete/inadequate use of force reports. The use of force policy includes the provisions required by the Consent Judgment, but adherence is inconsistent. The Monitor provided a



checklist of the report requirements to assist supervisors in ensuring reports included all necessary items. A review of those checklists and accompanying reports indicates that the required information was frequently missing from the use of force reports such as what led up to the incident, details of actions taken during the use of force, and resolution of the incident. Seldom do reports include an articulation of any de-escalation tactics, description of injuries sustained, and when medical attention was provided. As with the failure to timely report all uses of force, deputies and supervisors are not consistently held accountable for failure to include required information. Provision A. 3. c. requires less information as it is a lesser level of force. Improvement warrants a Substantial Compliance rating.

The unit managers and watch commanders still are not consistently compliant with the requirements of the Consent Judgment (IV. A. 3. d.) as to their specific duties and the time requirement for performance of these duties under the policies. This has been noted in multiple reports. The Consent Judgment requires submission of the packet to the Assistant Warden within 36 hours not three (3) days. OPSO's insistence on this interpretation began about three reporting periods ago and is inconsistent with the plain language of the Consent Judgment and how the provision was applied for over five years. It is an example of seeking to change the rules as opposed to striving to comply. Timeliness of the submission of the packets continues to be severely lacks. Although improvement has been shown, adherence to the information required to be included is often missing from the original packet which requires it to be sent back to the supervisors for correction. Some improvement has been made in the quality of the packets sent to FIT, but errors occur every week. Communication between FIT and OJC leadership appears to have improved but the issues have not been sufficiently addressed.

A. 3. e. continues to be in substantial compliance due to the presence of a supervisor for planned uses of force. One of the reasons for this provision is to allow for de-escalation to be attempted before the force is carried out. OPSO supervisors are inconsistent in utilizing de-escalation techniques.

It appears that the Major assigned as the Unit Management Commander is fulfilling the role of the Assistant Warden or Warden which was vacant for over a year. Policy should be revised to reflect this change. The reviews, required under IV. A. 3. f., are being conducted by this major. However, analysis indicates that the reviews required by this provision were conducted timely less than 50% of the time, but this is an improvement. This provision



remains in partial compliance. FIT issues a quarterly report which contains all the information required by IV. A. 3. g. Thus, this section is in substantial compliance. The annual review of use of force incidents as required by IV. A. 3. h. was provided to the Monitors and all parties. It should be noted that the review is based on incomplete data due to the backlog of cases to be reviewed by FIT. While the review contained a much-improved analysis and confirmed the issues pointed out above, there was no corrective action plan to remedy the systemic issues which continue to exist. In order to warrant a rating of substantial compliance OPSO needed to address the issues; not just identify them. This is yet another example of OPSO simply checking boxes as opposed to addressing problems. Therefore, the compliance rating remains at partial compliance.

### IV. A. 4. Early Intervention System ("EIS")

*A.4.a. OPSO shall develop, within 120 days of the Effective Date, a computerized relational database ("EIS") that will document and track staff members who are involved in use of force incidents and any complaints related to the inappropriate or excessive use of force, in order to alert OPSO management to any potential problematic policies or supervision lapses or need for retraining or discipline. The Chief of Operations Deputy, supervisors, and investigative staff shall have access to this information and shall review on a regular basis, but not less than quarterly, system reports to evaluate individual staff, supervisor, and housing area activity. OPSO will use the EIS as a tool for correcting inappropriate staff behavior before it escalates to more serious misconduct.*

*A.4.b. Within 120 days of the Effective Date, OPSO senior management shall use EIS information to improve quality management practices, identify patterns and trends, and take necessary corrective action both on an individual and systemic level. IAD will manage and administer EIS systems. The Special Operations Division ("SOD") will have access to the EIS. IAD will conduct quarterly audits of the EIS to ensure that analysis and intervention is taken according to the process described below. Command staff shall review the data collected by the EIS on at least a quarterly basis to identify potential patterns or trends resulting in harm to prisoners. The Use of Force Review Board will periodically review information collected regarding uses of force in order to identify the need for corrective action, including changes to training protocols and policy or retraining or disciplining individual staff or staff members. Through comparison of the operation of this system to changes in the conditions in OPP, OPSO will assess whether the mechanism is effective at addressing the requirements of this Agreement.*

*A.4.c. OPSO shall provide, within 180 days of the implementation date of its EIS, to SPLC, DOJ, and the Monitor, a list of all staff members identified through the EIS and corrective action taken.*

*A.4.d. The EIS protocol shall include the following components: data storage, data retrieval, reporting, data analysis, pattern identification, supervisory assessment, supervisory intervention, documentation, and audit.*

*A.4.e. On an annual basis, OPSO shall review the EIS to ensure that it has been effective in identifying concerns regarding policy, training, or the need for discipline. This assessment will be based in part on the number and severity of harm and injury identified through data collected pursuant to this Agreement. OPSO will document its review and conclusions and provide them to the Monitor, who shall forward this document to DOJ and SPLC.*

Findings:

A. 4. a.  Substantial Compliance

A. 4. b.  Substantial Compliance

A. 4. c.  Substantial Compliance



A. 4. d.  Substantial Compliance

A. 4. e.  Substantial Compliance

Observations:

Due to unreliability of the electronic EIS has been unreliable, OPSO abandoned the original system and fashioned an alternative version within the AS400. A FIT staff member manually monitors the database to alert FIT staff as to the need to review any uses of force by a staff member.

OPSO has improved its documentation to the Monitors as to the names of the staff members who are flagged for uses of force, if a review is conducted, and any retraining received, if required. Continued questionable and inappropriate uses of force by the same staff members and with the same inmates calls into question whether the EIS is being utilized to improve management quality practices, identify patterns and trends, and take necessary corrective action as required by A. 4. b.

The Use of Force Review Board met regularly and evaluated the 2019 data as required for substantial compliance with IV. A .4. e. The inadequacies of the review are addressed in other sections. It should be noted that the review was based on inadequate data due to the backlog in FIT.

While the EIS would ideally be part of the jail management system, as one does not yet exist, the efforts made by OPSO to craft an alternative EIS warrant a rating of substantial compliance on all provisions.

## IV. A. 5. Safety and Supervision

*A.5.a. Maintain security policies, procedures, and practices to provide a reasonably safe and secure environment for prisoners and staff in accordance with this Agreement.*
*A.5.b. Maintain policies, procedures, and practices to ensure the adequate supervision of prisoner work areas and trustees.*
*A.5.c. Maintain policies and procedures regarding care for and housing of protective custody prisoners and prisoners requesting protection from harm.*
*A.5.d. Continue to ensure that correctional officers conduct appropriate rounds at least once during every 30- minute period, at irregular times, inside each general population housing unit and at least once during every 15-minute period of special management prisoners, or more often if necessary. All security rounds shall be documented on forms or logs that do not contain pre-printed rounding times. In the alternative, OPSO may provide direct supervision of prisoners by posting a correctional officer inside the day room area of a housing unit to conduct surveillance.*
*A.5.e. Staff shall provide direct supervision in housing units that are designed for this type of supervision. Video surveillance may be used to supplement, but must not be used to replace, rounds by correctional officers.*
*A.5.f. Increase the use of overhead video surveillance and recording cameras to provide adequate coverage throughout the common areas of the Jail, including the Intake Processing Center, all divisions' intake areas, mental health units, special management units, prisoner housing units, and in the divisions' common areas.*
*A.5.g. Continue to ensure that correctional officers, who are transferred from one division to another, are*



*required to attend training on division-specific post orders before working on the unit.*
*A.5.h. Continue to ensure that correctional officers assigned to special management units, which include youth tiers, mental health tiers, disciplinary segregation, and protective custody, receive eight hours of specialized training regarding such units on prisoner safety and security on at least an annual basis.*
*A.5.i. Continue to ensure that supervisors conduct daily rounds on each shift in the prisoner housing units and document the results of their rounds.*
*A.5.j. Continue to ensure that staff conduct daily inspections of cells and common areas of the housing units to protect prisoners from unreasonable harm or unreasonable risk of harm.*
*A.5.k. Continue to ensure that staff conduct random monthly shakedowns of cells and common areas so that prisoners do not possess or have access to dangerous contraband.*
*A.5.l. Provide the Monitor a periodic report of safety and supervision at the Facility. These periodic reports shall be provided to the monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. Each report will provide the following information:*

      *(1)    a listing of special management prisoners, their housing assignments, the basis for them being placed in the specialized housing unit, and the date placed in the unit; and*
      *(2)    a listing of all contraband, including weapons seized, the type of contraband, date of seizure, location, and shift of seizure.*

<u>Findings:</u>

A. 5. a.  Partial Compliance

A. 5. b.  Substantial Compliance

A. 5. c.  Substantial Compliance

A. 5. d.  Partial Compliance

A. 5. e.  Partial Compliance

A. 5. f.  Substantial Compliance

A. 5. g.  Substantial Compliance

A. 5. h.  Substantial Compliance

A. 5. i.  Partial Compliance

A. 5. j.  Partial Compliance

A. 5. k.  Partial Compliance

A. 5. l.  Partial Compliance

<u>Observations:</u>

      OPSO has worked hard to finalize policies, procedures, and post orders. The implementation of those policies, procedures, and practices and the adequate supervision of inmate working areas results in substantial compliance as to A. 5. b. and c. The level of violence, an average of 25 inmate on inmate assaults/altercations per month and 11 assaults on staff per month despite the reduction in inmate population, are indicative that OPSO has not substantially complied with the requirement that the facility be reasonably safe for staff and inmates. It is concerning that OPSO began, unbeknownst to the Monitors, the practice of allowing inmates to sign waivers regarding known enemies and housing them together.



After this practice and OPSO refusal to provide the necessary documentation to allow the Monitors to assess the results of this ill-advised practice was pointed out in the draft of this report, the Chief of Corrections ordered the practice ceased until it was properly vetted as required by the Consent Judgment. The challenges of developing credible training lesson plans, recruiting staff, training staff, remediating staff who do not have the required level of proficiency, and supervising employees to hold them accountable for not following policy remains.

OPSO made significant progress under the leadership of the ICD and his initiation of unit management to assist in the daily supervision of housing units and increase accountability. However, review of the CY 2020 significant incidents indicates that the failure of staff to follow policy consistently continues to be a serious impediment to effective supervision of the inmates. Staff continue to leave inmates unsupervised and allow them to have access to materials by which to fashion weapons. Many of the inmate-on-inmate assaults occur because staff allow inmates out of their cells who are to be kept separate from each other. There are inmates who repeatedly do not follow the rules of OJC including assaulting other inmates, assaulting staff, destroying property, and/or threatening self-harm. One way of dealing with those inmates is developing individual inmate management plans which Director Hodge indicated he instructed the Unit Managers to develop. Such plans, if done routinely and consistently followed by all staff, would likely reduce the level of violence in the facility. To date, there is no indication that it is being done on a consistent basis; if at all.

_____



## Table 5 CY 2018-CY 2020 OJC Reported Incidents

| 2018 | Inmate/Inmate Assault | Inmate Staff Altercation | Use of Force | PREA | Death | Attempt Suicide/Ideation | Internal Escape | Criminal Damage | Inmate Injury/Inmate Medical (AKA slip/falls/overdoses) | Contraband | Staff Arrest | Staff Misconduct/Suspension | Other | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| January | 38 | 7 | 13 | 2 | 0 | 6 | 2 | 3 | 9 | 9 | 0 | 0 | 3 | 92 |
| February | 28 | 6 | 10 | 4 | 0 | 14 | 2 | 10 | 5 | 15 | 2 | 0 | 0 | 96 |
| March | 37 | 7 | 21 | 5 | 0 | 4 | 3 | 13 | 5 | 5 | 0 | 0 | 1 | 112 |
| April | 39 | 9 | 22 | 4 | 0 | 4 | 3 | 12 | 22 | 5 | 0 | 0 | 1 | 121 |
| May | 52 | 0 | 24 | 5 | 1 | 0 | 5 | 8 | 19 | 10 | 0 | 0 | 0 | 124 |
| June | 46 | 7 | 26 | 5 | 0 | 6 | 7 | 3 | 32 | 9 | 1 | 0 | 2 | 144 |
| July | 30 | 4 | 20 | 4 | 0 | 9 | 3 | 3 | 30 | 13 | 0 | 0 | 0 | 116 |
| Aug | 39 | 3 | 27 | 3 | 0 | 13 | 2 | 6 | 30 | 6 | 0 | 0 | 3 | 132 |
| Sept | 33 | 6 | 14 | 2 | 0 | 7 | 5 | 4 | 35 | 6 | 0 | 0 | 0 | 112 |
| Oct | 32 | 9 | 28 | 5 | 0 | 3 | 0 | 2 | 26 | 7 | 0 | 0 | 1 | 113 |
| Nov | 31 | 6 | 21 | 5 | 0 | 5 | 8 | 3 | 18 | 7 | 0 | 0 | 1 | 105 |
| Dec | 37 | 0 | 34 | 3 | 1 | 7 | 8 | 4 | 18 | 14 | 0 | 0 | 3 | 129 |
| Total | 442 | 64 | 260 | 47 | 2 | 78 | 48 | 69 | 262 | 106 | 3 | 0 | 15 | 1396 |

| 2019 | Inmate/Inmate Assault | Inmate Staff Altercation | Use of Force | PREA | Death | Attempt Suicide/Ideation | Internal Escape | Criminal Damage | Inmate Injury/Inmate Medical (AKA slip/falls/overdoses) | Contraband | Staff Arrest | Staff Misconduct/Suspension | Other | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| January | 40 | 1 | 27 | 2 | 0 | 15 | 3 | 7 | 14 | 14 | 0 | 0 | 0 | 123 |
| February | 26 | 7 | 29 | 2 | 0 | 13 | 1 | 0 | 4 | 11 | 0 | 0 | 0 | 93 |
| March | 25 | 4 | 26 | 1 | 0 | 6 | 1 | 2 | 16 | 21 | 0 | 0 | 3 | 105 |
| April | 28 | 7 | 26 | 1 | 0 | 3 | 0 | 3 | 15 | 27 | 0 | 0 | 2 | 112 |
| May | 36 | 11 | 22 | 6 | 0 | 13 | 0 | 2 | 11 | 25 | 0 | 0 | 1 | 127 |
| June | 55 | 9 | 26 | 4 | 0 | 13 | 0 | 2 | 16 | 23 | 0 | 0 | 0 | 148 |
| July | 50 | 15 | 31 | 5 | 0 | 6 | 0 | 3 | 8 | 13 | 0 | 0 | 0 | 131 |
| Aug | 32 | 17 | 37 | 6 | 0 | 7 | 1 | 8 | 20 | 35 | 0 | 0 | 0 | 163 |
| Sept | 32 | 4 | 31 | 3 | 0 | 2 | 0 | 1 | 10 | 24 | 0 | 0 | 0 | 107 |
| Oct | 38 | 15 | 37 | 4 | 0 | 1 | 0 | 7 | 18 | 33 | 0 | 0 | 0 | 153 |
| Nov | 55 | 12 | 33 | 7 | 0 | 0 | 0 | 6 | 5 | 42 | 0 | 0 | 0 | 160 |
| Dec | 23 | 15 | 33 | 1 | 0 | 3 | 0 | 6 | 8 | 34 | 0 | 0 | 0 | 123 |
| Total | 440 | 117 | 358 | 42 | 0 | 82 | 6 | 47 | 145 | 302 | 0 | 0 | 0 | 1545 |

| 2020 | Inmate/Inmate Assault | Inmate Staff Altercation | Use of Force | PREA | Death | Attempt Suicide/Ideation | Internal Escape | Criminal Damage | Inmate Injury/Inmate Medical (AKA slip/falls/..) | Contraband | Staff Arrest | Staff Misconduct/Suspension | Other | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| January | 31 | 8 | 29 | 4 | 0 | 3 | 0 | 1 | 7 | 35 | 0 | 0 | 0 | 118 |
| February | 35 | 12 | 33 | 2 | 0 | 0 | 0 | 3 | 13 | 29 | 0 | 0 | 1 | 129 |
| March | 24 | 9 | 31 | 1 | 0 | 1 | 0 | 3 | 6 | 35 | 0 | 0 | 0 | 110 |
| April | 25 | 19 | 45 | 7 | 0 | 0 | 0 | 4 | 1 | 24 | 0 | 0 | 0 | 125 |
| May | 24 | 11 | 37 | 1 | 0 | 1 | 0 | 6 | 3 | 12 | 0 | 0 | 0 | 95 |
| June | 28 | 13 | 22 | 4 | 2 | 1 | 0 | 5 | 12 | 63 | 0 | 0 | 0 | 150 |
| July | 22 | 9 | 21 | 1 | 0 | 2 | 0 | 4 | 5 | 47 | 0 | 0 | 0 | 111 |
| Aug | 22 | 8 | 22 | 2 | 1 | 4 | 0 | 11 | 4 | 31 | 0 | 0 | 0 | 105 |
| Sept | 16 | 12 | 24 | 2 | 0 | 0 | 0 | 8 | 4 | 9 | 0 | 0 | 0 | 77 |
| Oct | 24 | 10 | 35 | 2 | 0 | 1 | 0 | 3 | 3 | 14 | 0 | 0 | 0 | 92 |
| Nov | 14 | 9 | 24 | 2 | 0 | 1 | 0 | 5 | 3 | 17 | 0 | 0 | 0 | 75 |
| Dec | | | | | | | | | | | | | | 0 |
| Total | 265 | 120 | 323 | 28 | 3 | 16 | 1 | 53 | 61 | 316 | 0 | 0 | 1 | 1187 |

OPSO still does not consistently conduct and document security rounds (30 minutes or 15 minutes depending on the unit) nor perform direct supervision surveillance consistent with the requirements of the Consent Judgment or OPSO policy.

Direct supervision requires surveillance of all of the inmates and cannot be properly performed by sitting behind a desk or in the control module. It requires walking around the unit, looking into the individual cells, and actively engaging with the inmates. Use of designated mandatory assignments has improved the consistency of staffing within those units, but for other units staffing was routinely inadequate or inconsistent throughout the shift. Review of incident reports revealed that units were often unstaffed, including mandatory posts. If staff are not present, it impossible to make the required rounds. The staff is now writing their rounds on paper forms in addition to entry into the log. No proof of compliance has been provided. OPSO remains in partial compliance with IV. A. 5. d.

Due to unreliability of the TourWatch system, OPSO reverted to paper logs and now



to a separate form on which rounds are to be recorded. While the current OPSO policy requires supervisors, up to the level of Watch Commander, to review the paper logs and forms to ensure rounds are being conducted, OPSO has not audited compliance with this policy. OPSO continues to take the position that it is not required to audit compliance. Such a position missed the point. OPSO has written policies but has not put in the place a system to measure whether the policies are being followed and to provide proof of compliance or address deficiencies. There was documentation of counseling of sergeants and lieutenants provided for not completing the review and/or approving the security round form despite it clearly showing the security rounds had not been completed. A review of the paper logs and forms during the monitoring tour revealed that timely rounds were often not performed. OPSO should consider a reliable system that would allow for rounds, by both deputies and supervisors, to be recorded electronically. Not only would it allow for supervisors to quickly determine whether rounds were being conducted timely, it would allow for OPSO to prove compliance and address non-adherence.

All twenty-four (24) of the housing units in OJC are designed for direct supervision. At the time of the drafting of the Consent Judgment the design of OJC was known. The Consent Judgment requires that staff shall provide direct supervision in housing units that are designed for this type of supervision. Thus, continual presence of a deputy in each housing unit at OJC and TDC is mandatory under the Consent Judgment. OPSO, during the last several reports, has taken the position that OPSO gets to determine which housing posts are mandatory and routinely does not assign mandatory staff to each housing unit between 50% to 75% of the time. In addition, deputies are frequently absent from even the housing units designated by OPSO as mandatory. Often, especially on 2nd squad, one deputy is assigned to two housing units. OPSO's recent interpretation of the Consent Judgment is inconsistent with the plain wording of the Consent Judgment and the manner in which it has been applied by the Monitors since its inception. It is impossible to conduct direct supervision if not present in the housing unit. Thus, IV. A. 5. e. remains in partial compliance.

Regarding overhead video surveillance and recording cameras for OJC (A.5.f.), significant repairs were made to the recording system. There are still times when a nonfunctional camera is discovered when a supervisor or an investigator tries to retrieve the videos. OPSO needs to continue to audit the system by having a supervisor test the various cameras on a monthly basis and preparing a report for the Chief of Security. IV. A. 5. f.



continues to be in substantial compliance. A problem with supervisors not pulling video as required by the Use of Force policy was noted.

Documentation was provided that staff transferred from other divisions to work in the OJC received the required training; thus, IV. A. 5. g. is in substantial compliance. Proof of training for the specialized units was provided; IV. A. 5. h. is now in substantial compliance. Given the high level of incidents in the specialized units, it is recommended that the training be reviewed, and deficiencies addressed.

Documentation is lacking that supervisors consistently conduct daily rounds during this compliance period; thus, IV. A. 5. i. continues to be in partial compliance. Supervisors are not required to sign off on the round sheet completed by the pod deputy, but this does not provide proof that the supervisor conducted daily rounds. The daily inspections of housing units as required by VI. A. 5. j. has improved but are still only in partial compliance. With the introduction of unit management, unit managers and deputies were required to conduct daily inspections. However, by OPSO's own admission, the inspections have not been conducted daily. The daily inspection required by the Consent Judgment is not the same as the observations made on rounds. Chief LeCounte has recently implemented a procedure which should correct this issue. It is concerning that neither the inspections by the deputies or the supervisors resulted in the discovery of the destruction of items that are part of the jail to fashion weapons. It is essential that the inspections be thorough and that corrective actions are taken to address the inspection findings.

Monthly shakedowns were not conducted in substantial compliance with VI. A. 5.k. The data provided indicates that shakedowns were not conducted in substantial compliance during five of the six months during the monitoring period. The number of incident report concerning contraband increased significantly in 2020. An analysis of the reports reflects that it is likely due to the increase in contraband in the facility as opposed to being a result of more frequent and effective contraband shakedowns. The review of contraband reports clearly indicates reoccurring issues. There continues to be a serious issue of inmates hoarding medication. Reports demonstrate that inmates are fashioning weapons out of items in the jail which are then used to assault other inmates. Reports and the site visit reveal that inmates are smuggling in marijuana and hallucinogens to smoke. Some of these items come through the mail, but there is a significant issue of staff smuggling in contraband. This indicates the need to analyze the data and develop a corrective action plan to reduce, if not



stop, the hoarding of medication, the fashioning of weapons, and the flow of contraband into the facility.

The proof tendered regarding shakedowns indicates that the performance of shakedowns has fallen below substantial compliance. Given the amount of contraband encountered during the site visit by the Monitors, this is particularly concerning. A. 5. k. is now in Partial Compliance. The documentation provided for A. 5. l. does not cover the entire monitoring period nor include all of the required information. Thus, A. 5. l. is in Partial Compliance.

## IV. A. 6. Security Staffing

*A.6.a. OPSO shall ensure that correctional staffing and supervision is sufficient to adequately supervise prisoners, fulfill the terms of this Agreement, and allow for the safe operation of the Facility, consistent with constitutional standards.*

> *(1) OPSO shall achieve adequate correctional officer staffing in the following manner: Within 90 days of the Effective Date, develop a staffing plan that will identify all posts and positions, the adequate number and qualification of staff to cover each post and position, adequate shift relief, and coverage for vacations. The staffing plan will ensure that there is adequate coverage inside each housing and specialized housing areas and to accompany prisoners for court, visits and legal visits, and other operations of OPP and to comply with all provisions of this Agreement. OPSO will provide its plan to the Monitor, SPLC, and DOJ for approval. The Monitor, SPLC, or DOJ will have 60 days to raise any objections and recommend revisions to the staffing plan.*
>
> *(2) Within 120 days before the opening of any new facility, submit a staffing plan consistent with subsection (1) above.*
>
> *(3) Within 90 days after completion of the staffing study, OPSO shall recruit and hire a full-time professional corrections administrator to analyze and review OPP operations. The professional corrections administrator shall report directly to the Sheriff and shall have responsibilities to be determined by the Sheriff. The professional corrections administrator shall have at least the following qualifications: (a) a bachelor's degree in criminal justice or other closely related field; (b) five years of experience in supervising a large correctional facility; and (c) knowledge of and experience in applying modern correctional standards, maintained through regular participation in corrections-related conferences or other continuing education.*
>
> *(4) Provide the Monitor a periodic report on staffing levels at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. Each report will include the following information:*
>> *i. a listing of each post and position needed;*
>> *ii. the number of hours needed for each post and position; a listing of staff hired and positions filled;*
>> *iii. a listing of staff working overtime and the amount of overtime worked by each staff member;*
>> *iv. a listing of supervisors working overtime; and*
>> *v. a listing of and types of critical incidents reported*

*A.6.b. Review the periodic report to determine whether staffing is adequate to meet the requirements of this Agreement. OPSO shall make recommendations regarding staffing based on this review. The review and recommendations will be documented and provided to the Monitor.*

Findings:

A. 6. a.  Partial Compliance



A. 6. b.  Partial Compliance

An overall rating of A. 6. was provided in the previous reports. This was inconsistent with the other introductory paragraphs and has now been discontinued.

Observations:

The level of staffing is insufficient to adequately supervise inmates and allow for the safe operation of the facility. There has been insufficient security staff for over the past few monitoring periods, but it has now risen to the level where the extensive use of overtime is not enough to overcome the vacancies in security staff. OPSO's staffing reports document that mandatory posts are not filled on a consistent basis. Numerous incident reports and investigations that reveal posts were not constantly staffed which resulted in increased violence. Efforts have been attempted to reassign some staff from areas that had excess staff but have not addressed the problem. Lacking is a coordinated effort on the utilization of overtime and redeployment of staff to ensure the mandatory posts are covered on a consistent basis. During the monitoring tour, deputies indicated they were working overtime not because they had been assigned or authorized, but because they needed the money. The deployment of staff is sufficiently inconsistent and insufficient to result in A. 6. a. (1) and IV. A. 6. a. (2) being in partial compliance. Provision IV. 6. a. (3) is in substantial compliance with the hiring of Byron LeCounte as the Chief of Corrections as of February 19, 2019. Paragraph IV. 6. a. (4) is in substantial compliance, as monthly reports are produced to document hiring and termination of employees. The Stipulated Agreement also provides for bi-monthly reports regarding hiring. Paragraph 7.a. of the Stipulated Agreement of February 11, 2015 requires monthly reporting. Given the importance of the actual implementation of an approved staffing plan, A. 6. a. is in partial compliance.

OPSO is in partial compliance with A. 6. b. as OPSO has not provided a periodic review of the staffing plan. Discussion during the monitoring tour indicated that a plan exists, but it has not been finalized or submitted to the Monitors. A staffing plan which is based on staffing levels which do not exist is insufficient

## IV. A. 7. Incidents and Referrals

*A.7.a.   OPSO shall develop and implement policies that ensure that Facility watch commanders have knowledge of reportable incidents in OPP to take action in a timely manner to prevent harm to prisoners or take other corrective action. At a minimum, OPSO shall do the following:*
*A.7.b.   Continue to ensure that Facility watch commanders document all reportable incidents by the end of their shift, but no later than 24 hours after the incident, including prisoner fights, rule violations, prisoner injuries, suicide attempts, cell extractions, medical emergencies, found contraband, vandalism,*



*escapes and escape attempts, and fires.*

*A.7.c.   Continue to ensure that Facility watch commanders report all suicides and deaths no later than one hour after the incident, to a supervisor, IAD, the Special Operations Division, and medical and mental health staff.*

*A.7.d.   Provide formal pre-service and annual in-service training on proper incident reporting policies and procedures.*

*A.7.e.   Implement a policy providing that it is a disciplinary infraction for staff to fail to report any reportable incident that occurred on his or her shift. Failure to formally report any observed prisoner injury may result in staff discipline, up to and including termination.*

*A.7.f.   Maintain a system to track all reportable incidents that, at a minimum, includes the following information:*

      *(1)      tracking number;*
      *(2)      the prisoner(s) name;*
      *(3)      housing classification and location;*
      *(4)      date and time;*
      *(5)      type of incident;*
      *(6)      injuries to staff or prisoner;*
      *(7)      medical care;*
      *(8)      primary and secondary staff involved;*
      *(9)      reviewing supervisor;*
      *(10)     external reviews and results;*
      *(11)     corrective action taken; and*
      *(12)     administrative sign-off.*

*A.7.g.   Ensure that incident reports and prisoner grievances are screened for allegations of staff misconduct, and, if the incident or allegation meets established criteria in accordance with this Agreement, it is referred for investigation.*

*A.7.h.   Provide the Monitor a periodic data report of incidents at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement.*

*A.7.i. The report will include the following information:*

      *(1)      a brief summary of all reportable incidents, by type and date;*
      *(2)      a description of all suicides and in-custody deaths, including the date, name of prisoner, and housing unit;*
      *(3)      number of prisoner grievances screened for allegations of misconduct; and*
      *(4)      number of grievances referred to IAD or SOD for investigation.*

*A.7.j.   Conduct internal reviews of the periodic reports to determine whether the incident reporting system is ensuring that the constitutional rights of prisoners are respected. Review the quarterly report to determine whether the incident reporting system is meeting the requirements of this Agreement. OPSO shall make recommendations regarding the reporting system or other necessary changes in policy or staffing based on this review. The review and recommendations will be documented and provided to the Monitor.*

<u>Findings:</u>

A. 7. a.  Substantial Compliance

A. 7. b.  Partial Compliance

A. 7. c.  Substantial Compliance

A. 7. d.  Substantial Compliance

A. 7. e.  Partial Compliance

A. 7. f.  Substantial Compliance

A. 7. g.  Substantial Compliance

A. 7. h.  Substantial Compliance



A. 7. i.  Substantial Compliance

A. 7. j.  Substantial Compliance

<u>Observations</u>:

OPSO has long had a policy on incidents and referrals that sets out the process for documenting and referring incidents. What has been lacking is a sufficient process to ensure all reportable incidents are being documented and that all incident reports are complete, prompt, and accurate. OPSO has backslid in its timeliness of the reporting of incidents. OPSO was warned in Report #12 that a failure to continue improvement in the timely reporting of incident might result in a finding of partial compliance. As the opposite of improvement was shown, IV. A. 7. b. is now back in partial compliance. Review of the incident reports indicates that between 25-50% of the incident s are not timely reported.

One of the methods for determining whether incidents are reported is to review "routes" of inmates with serious medical or trauma injuries to the hospital emergency and the OPSO clinic walk-in logs. The lieutenant who was assigned these duties has been reassigned to another position but is continuing to perform this function. This function used to be performed by the Monitors. OPSO has implemented a process where a lieutenant performs this function and follow up on missing reports. This is an example of OPSO incorporating processes which allow OPSO to audit its compliance.

What continues to be lacking is holding the supervisors and security staff accountable for the late reports. No documentation was provided of accountability in the form of counseling or discipline was presented. Having a policy on paper, but not enforcing it in practice is insufficient for substantial compliance. Therefore, IV. A. 7. e. is in partial compliance.

During this reporting period, there were three deaths, and serious attempts at suicide and they were reported within an hour to the proper persons: thus IV. A. 7. c. is in substantial compliance. Annual training was provided on incident reporting, and documentation indicates that staff were required to attend; IV. A. 7. d. is in substantial compliance. OPSO has transitioned to the AS 400 system to track the information required in IV. A. 7. f.  and is now in substantial compliance. While OPSO makes little use of the information, that failure is reflected elsewhere. In substantial compliance with A. 7. g., incidents, and grievances are reviewed for misconduct and referred for investigation where appropriate. The Monitors were provided a semi- annual report of incidents, that now, with



the supplementation by the daily/weekly reports, which contains all of the required information and, thus, IV. A. 7. h. and i. are in substantial compliance. OPSO performed an assessment of whether the reporting system is meeting the requirements of the Consent Judgment and is given substantial compliance for IV. A. 7. j. as OPSO is now addressing the lack of timeliness. However, to maintain substantial compliance, future assessments of the reporting system will need to be more robust and refined.

## IV. A. 8. Investigations

*A.8.a. Maintain implementation of comprehensive policies, procedures, and practices for the timely and thorough investigation of alleged staff misconduct, sexual assaults, and physical assaults of prisoners resulting in serious injury, in accordance with this Agreement. Investigations shall:*

 *(1) be conducted by persons who do not have conflicts of interest that bear on the partiality of the investigation;*

 *(2) include timely, thorough, and documented interviews of all relevant staff and prisoners who were involved in or who witnessed the incident in question, to the extent practicable; and*

 *(3) include all supporting evidence, including logs, witness and participant statements, references to policies and procedures relevant to the incident, physical evidence, and video or audio recordings.*

*A.8.b. Continue to provide SOD and IAD staff with pre-service and annual in-service training on appropriate investigation policies and procedures, the investigation tracking process, investigatory interviewing techniques, and confidentiality requirements.*

*A.8.c. Ensure that any investigative report indicating possible criminal behavior will be referred to IAD/SOD and then referred to the Orleans Parish District Attorney's Office, if appropriate.*

*A.8.d. Provide the Monitor a periodic report of investigations conducted at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement.*

*A.8.e. The report will include the following information:*

 *(4) a brief summary of all completed investigations, by type and date;*

 *(5) a listing of investigations referred for administrative investigation;*

 *(6) a listing of all investigations referred to an appropriate law enforcement agency and the name of the agency; and*

 *(7) a listing of all staff suspended, terminated, arrested, or reassigned because of misconduct or violations of policy and procedures. This list must also contain the specific misconduct and/or violation.*

*A.8.f. OPSO shall review the periodic report to determine whether the investigation system is meeting the requirements of this Agreement and make recommendations regarding the investigation system or other necessary changes in policy based on this review. The review and recommendations will be documented and provided to the Monitor.*

Findings:

A. 8. a. Substantial Compliance

A. 8. b.  Substantial Compliance

A. 8. c.  Substantial Compliance

A. 8. d.  Substantial Compliance

A. 8. e.  Substantial Compliance

A. 8. f.  Substantial Compliance



<u>Observations</u>:

      The Investigative Services Division (ISB) is responsible for: the Criminal Investigation Division (investigates possible criminal activity by inmates), Internal Affairs Division-Criminal (investigates possible criminal activity by staff), the FIT (investigates use of force by staff), the Internal Affairs Division-Administrative (investigates possible violation of policies by staff), and the Intelligence Unit (provides information and intelligence regarding activities that have taken place or may take place in the jail or support activities).

      While there is evidence of substantial compliance provided for IV. A. 8. a., the timeliness of investigations involving in custody deaths and use of force threatens the rating. The three most experienced investigators resigned in 2020 and the lack of experience of those replacing them is evident in the quality of the death investigations. The FIT supervisor has recently been terminated and a supervisor who is not familiar with FIT has been assigned to replace him. It is strongly encouraged that these individuals receive extensive additional training. Improvements in all other areas from hiring, training, supervision, and adequate staffing will enhance the safety of staff and inmates and, ultimately, decrease the workload of ISB.

      The Monitor acknowledges that investigating incidents of inmate-on-inmate assaults, sexual assaults, staff on inmate assaults, etc. with a goal of seeking indictments is appropriate; but the overall goal is to create a safe jail. In a jail setting, investigations play a critical role in protecting inmates from inappropriate or illegal staff actions, protecting inmates from each other, and correcting policy, practice, supervision, and training. Continued emphasis is needed on the goal of investigations to prevent future incidents through analysis of the policy, procedures, training, supervision, and physical plant contributors to the incident. This function cannot and should not be performed by ISB alone. This level of assessment requires input from individuals who have a high level of experience in jail/corrections work. In short, it requires collaboration between ISB and OJC which continues to be wanting. While collaboration has improved, there is still insufficient follow through by the OJC staff. For instance, ISB discovered that the source of dangerous contraband being used to shatter windows originated in the utility closets on the housing units. Inmates were literally taking the jail apart to fashion weapons. The failure of staff to keep the utility closets locked and to supervise inmates when allowed access to the utility closets is an issue which has been raised by the Monitors since the occupation of OJC. In fact,



during this monitoring tour, utility closets were discovered to be unsecured.

Supervision of sexual assault investigations was added to the duties of the FIT supervisor when the Lieutenant who was responsible for IAD-Criminal investigations resigned earlier this year. The quality of the investigations will continue to be monitored.

ISB has not demonstrated training related to the investigative skills has been provided during 2020. As the deadline for providing the information has not yet passed, IV. A. 8. b. will remain in substantial compliance. It is encouraged that appropriate skill specific training be provided.

Investigations which reveal potential criminal activity are referred to the Orleans Parish District Attorney's Office in substantial compliance with A. 8. c. ISB provides reports in substantial compliance with IV. A. 8. d. and e. ISB reviewed the investigation system to determine whether the investigation system complies with the requirements of the Consent Judgment and forwarded any recommendations to the Monitors in substantial compliance with IV. A. 8. f.

### IV. A. 9. Pretrial Placement in Alternative Settings

*A.9.a. OPSO shall maintain its role of providing space and security to facilitate interviews conducted pursuant to the City's pretrial release program, which is intended to ensure placement in the least restrictive appropriate placement consistent with public safety.*
*A.9.b. OPSO shall create a system to ensure that it does not unlawfully confine prisoners whose sole detainer is by Immigration and Customs Enforcement ("ICE"), where the detainer has expired.*

Findings:

A. 9. a.  Substantial Compliance

A. 9. b.  Substantial Compliance

Observations:

OPSO provided a memorandum noting that the pretrial program is managed by the Criminal District Court, and that space is provided. OPSO also provided a memorandum that ICE detainers are only accepted for a specified list of offenses.  OPSO has not detained any individuals under an ICE detainer during the monitoring period.

### IV. A. 10. Custodial Placement within OPP

Introduction:

OPSO has designed, validated, and implemented an objective classification system to assess and house each OPSO inmate according to his/her risks posed to institutional safety and security. The automated classification system was rolled out in the Jail Management



System (JMS) on January 15, 2015.[1] The OPSO staffing plan set the classification unit staff FTEs at 18. As of November 12, 2020, the Classification Unit staffing was 13 -- 12 civilian classification specialists and a classification manager.  However, two of the classification specialists were on medical leave. Thus, the active roster included only 11 classification specialists and the classification manager.  During this compliance period, two (2) classification specialists resigned. An individual slated for the classification unit is currently enrolled in the OPSO Training Academy. However, given the relatively low average daily population (ADP) during this compliance period, low activity of the courts, and reduced admissions during this compliance period, staffing for the classification unit appears to be adequate. This reduced staffing level will be re-evaluated as these factors change.  No formal training was provided to the OPSO classification staff during this compliance period.

An automated housing assignment process (HUAP) identifies housing options for inmates according to their custody level, gender, special population status, PREA designations, enemies, and associates. The classification specialist selects from the potential housing locations to match the inmates by age, crime/criminal history, custody level, and PREA designations. Special population tags identify inmates for suicide observation versus suicide watch, medical housing/isolation, academic education, or special diets.

Throughout this compliance period, the OPSO revised its housing matrix on multiple occasions. Updates reflected fluctuations in the demand for specialized intake housing units (IPC Non-Symptomatic Roll-Ins), isolation pods for individuals exposed to COVID-19, other special populations (medical, mental health, disciplinary, administrative segregation, and protective custody), and of course, the general population.  OJC pods 1A – 1E were designated as COVID-19 non-symptomatic intake housing for men; 3-F served as the intake housing for non-symptomatic women. OJC 1-F and TDC B3-E served as quarantine housing for individuals positive for COVID-19. The OPSO Housing Matrix was expanded to include the new mental health units within TDC -- TMH B2 A & B.

Population fluctuations and isolation related to COVID-19 requirements created additional demands on the Classification Unit for housing transfers within a seemingly ever-changing housing matrix.  An extra layer of complexity to the housing process was added to

---

[1] Hardyman, Patricia L. (2015). "Design and Validation of an Objective Classification System for the Orleans Parish Sheriff's Office: Final Report." Hagerstown, MD: Criminal Justice Institute, Inc.



separate individuals by admission date, custody level, and PREA designation within a cell. Individuals of all custody levels, PREA designations, and special population tags (medical, mental health, administrative segregation, disciplinary, and protective custody) are housed in the IPC Roll-In and isolation units.  The ISI is not used for either the general population or special management units.[2] OPSO attempts to maintain separations within the mixed custody and COVID-19 populations units by the cell assignments.

In August 2020, OPSO resumed housing audits to verify individuals were in their assigned cells and beds.[3]  OPSO provided a brief description of the audit process that requires the classification supervisors to conduct random housing audits. Provided were the standardized monthly classification statistical reports documenting the classification processes and OPSO populations.

Assessment Methodology:

This compliance review focused primarily on documents provided by OPSO and a virtual meeting with OPSO staff. These documents included monthly statistical reports, housing audits packets, and monitoring logs. Throughout the compliance period, we examined ad hoc classification reports regarding custody reviews, arrests/releases, housing assignments, and inmate disciplinary/incidents.   Thus, compliance was assessed using multiple data sources and methods; however, sorely missed were the on-site observations of the custody assessment, housing, and audit processes as a means of reviewing compliance. This compliance report focuses primarily on the April – September 2020 data. For some analyses, considered were the trends over a twelve-month (12) period to detect variations due to seasonal variations and COVID-19 related procedures.

Summary:

OPSO is in substantial compliance each paragraph of the Consent Judgment related to Custodial Placement within OPP (IV. A.10), except sections f and h. OPSO resumed the internal housing audits and these audits were indeed better over those previously conducted. However, the audits did not appear to comply with the housing audit process

---

[2] The ISI (Inmate Separation Instrument) is an automated JMS report that identifies appropriate out-of-cell separations within the mixed custody and special populations units. As a pod deputy may not be aware or have access to the multiple factors requiring separation of individuals within a pod, failure to use the ISI creates risks to the inmates' and staff safety and security.
[3] As of January 2020, OPSO suspended the housing audits. Its' intent was to revamp the process and restart audits by March of 2020; however, the COVID-19 pandemic delayed moving forward on this initiative.



provided by OPSO nor were all the housing units audited monthly. Also missing were the required follow-up audits to verify corrective actions to address housing assignment violations. Section 10.h was regressed to Partial Compliance as multiple policy changes were implemented without review or notification.  Attempts to learn about the new/revised processes were met with resistance and redacted documents.   During the upcoming compliance period, to maintain its compliance rating for section 10.e. OPSO will need to address training requirements for any new classification specialist and provide in-service training to address consistencies among the housing audits and repeated errors noted in the audits of the custody assessments.

<u>Findings:</u>

A. 10. a.  Substantial Compliance

A. 10. b.  Substantial Compliance

A. 10. c.  Substantial Compliance

A. 10. d.  Substantial Compliance

A. 10. e.  Substantial Compliance

A. 10. f.  Partial Compliance

A. 10. g.  Substantial Compliance

A. 10. h.  Partial Compliance

***IV.A.10. a. OPP shall implement an objective and validated classification system that assigns prisoners to housing units by security levels, among other valid factors, in order to protect prisoners from unreasonable risk of harm. The System shall include consideration of a prisoner's security needs, the severity of the current charge, types of prior commitments, suicide risk, history of escape attempts, history of violence, gang affiliations, and special needs, including mental illness, gender identity, age, and education requirements. OPSO shall anticipate periods of unusual intake volume and schedule sufficient classification staff to classify prisoners within 24 hours of booking and perform prisoner reclassifications, assist eligible DOC prisoners with re-entry assistance (release preparation), among other duties.***

<u>Finding:</u>

Substantial Compliance

<u>Observations:</u>

As of November 12, 2020, the Classification Unit roster lists 13 individuals -- a classification manager and 12 civilian classification specialists.[4] However, two classification specialists were on medical leave. Thus, the active roster included only 11 classification

---

[4] As per the OPSO 2018 staffing analysis plan, the Classification Unit includes 18 "civilianized" positions. The Classification Unit Manager reports to the Captain of the Intake Processing Center (IPC) Hodge, Darnley (October 1, 2018). "Updated Coverage Plans for the OPSO (Civil Division excluded)." Orleans Parish Sheriff's Office, Independent Compliance Director. pp. 12.



specialists and the classification manager.  During this compliance period, two (2) classification specialists resigned.   For two of the four platoons, the shift supervisors complete the custody reviews in addition to his/her responsibilities for supervising the classification specialists, processing housing transfers, and conducting housing audits.

The classification shift leaders and specialists work overtime to complete the initial classification, reclassification, vulnerability assessments, and housing assignments.  During April - September 2020, the Classification Unit logged 2,912 hours of overtime.[5]  These compute to an average of 485.0 hours per month; the classification line staff worked an average of 43.6 hours of overtime/month.  (In contrast, during this compliance period, non-Classification Unit staff logged an average of 20.86 hours.)   At least in part, the extra hours served by the classification staff were due to the COVID-19 Pandemic. Their workload increased as inmates' housing assignments were modified to maintain appropriate separations.

During this compliance reporting period, there was no formal classification training. On resumption of the housing audits, the classification manager reviewed the housing audit process with the auditors. As needed, the classification manager offered remedial instruction to address errors noted on the custody assessment audits.

***IV.A.10.b. Prohibit classifications based solely on race, color, national origin, or ethnicity.***

Finding:

Substantial Compliance

Observations:

The custody assessments consider objective risk factors validated for the OPSO males and female inmates. The inmate's race is not one of the objective risk factors. Classification specialists consider the inmate's custody level, vulnerability designation, age, and charges when selecting from the beds identified by the JMS.  To track this element of the Consent Judgment, OPSO created a monthly statistical report to track classifications by race and housing location. Analyses of these reports by the Monitor suggested that the OJC housing assignments were not by race. With a few exceptions, the number of black and white inmates within each OJC housing unit was generally consistent with the overall racial distributions among the OPSO inmate population. However, the percentage of white inmates assigned to

---

[5] OPSO Excel spreadsheet entitled, "Overtime by Month – January – September 2020.



TDC exceeds their proportions within the total inmate population. As shown in Figure 1, in May 2020, 91.3 percent of the OPSO inmates were Black; however, only 66.7 percent of the TDC inmates were Black. (See Figure 1.) The percentages of Blacks housed in TDC increased in June – September.  By September 2020, the TDC housing discrepancy had dropped to only 4 percent.  However, this rate appeared to be due at least in part to those housed in the new TDC mental health units (TMH).  Before opening the TMH units, there was a +10 percent discrepancy between the percentage of Blacks housed in TDC versus the overall OPSO population. Tracking these rates separately for the TDC worker versus TMH units will be essential.  Questions remain about the worker selection/ assignment process. As these disparities have continued from the previous reporting periods, recommended is a review of the worker selection/ assignment process to identify and address any inherent bias.



Figure 1: Distribution of Inmates by Race by OPSO Facilities – January – September 2020

***IV.A.10.c Ensure that the classification staff has sufficient access to current information regarding cell availability in each division.***

Finding:

Substantial Compliance

Observations:

OPSO automated housing assignment process (HUAP) considers the inmate's custody level, gender, special population status, PREA designations, enemies, and associates versus OJC beds available, to recommend an appropriate bed for the inmate. The new COVID-19 intake housing protocols also require matching cellmates by their dates of admission. Housing tags identify inmates on suicide observation versus suicide watch, alcohol/drug detoxification protocol, gang affiliation, school participation, and special diets. The HUAP



provides the classification specialists a list of potential beds for each inmate.

The JMS daily population report lists the units, cells, and beds offline for maintenance or staffing, as recorded in the AS400. The virtual tour protocol precluded a full review of the veracity of the closed cell counts within the data population reports.   It was assumed that the classification specialists continue to manually compare the posted lists of cells/beds offline with the bed assignments generated by the HUAP.

Classification specialists have maintained a list of daily bed assignments to avoid duplications due to delays between the housing assignments and physical transfer of the inmate to the designated housing unit. Thus, as required by the Consent Judgment, the classification specialists appear to have access to current information regarding bed availability throughout the OJC.  The virtual tour also precluded full exploration of the impacts of the COVID-19 isolation protocols on the housing assignment processes.  The COVID-19 isolation protocol of 14 days quarantine within an IPC Intake housing unit requires the classification specialists to match cellmates by date of admission, custody level, PREA designation, special housing tags, enemies, and the like.

The JMS housing availability logic should be updated to consider the COVID-19 isolation protocols. Further, adding the new TMH beds to the electronic housing inventory will facilitate the proper placement of individuals with acute and sub-acute mental health needs as well as track their movements within and across admissions to OJC.

***IV. A. 10. d. Continue to update the classification system to include information on each prisoner's history at OPSO.***

<u>Finding:</u>

Substantial Compliance

<u>Observations:</u>

As shown in Figure 2, the monthly custodial reports provided by OPSO indicated a significant decrease in the lag-time between booking and the initial classification. Further, the percentage of inmates for whom initial custody and housing assessments were completed increased by nearly eight percent (7.5%). In particular:

- Percent Initial Custody Assessments: During this compliance period, the Classification Unit completed initial custody assessments for 89.1 percent of the inmates booked into OJC.  This rate was a 10 percent improvement over the rate (79.3 percent) observed for the previous compliance period.



- **Percent Within 8 Hours:** As of September 2020, initial custody assessments were completed within the first eight hours of booking for 62.6 percent of the OPSO inmates.  For this compliance period, the percentage of initial classifications completed within the first eight hours of booking fluctuated between 62.6 and 84.8 percent; the average rate across the six months was 77.7 percent.  Likewise, the percentage of cases completed between 8.01 and 24 hours vacillated between 12.1 and 20.2 percent; the average was 11.4 percent. Thus, only one in ten inmates remained in the booking area for more than eight hours before assigned to a bed. This was a considerable improvement over the rate of three in ten inmates who remained in the booking area for more than eight hours observed for the previous compliance period.

- **Percent Greater Than 24 Hours:** As of September 2020, 1.7 percent of the inmates remained in the OJC intake book area for more than 24 hours. This rate continued the trend observed from January to March of 2020.  The April data appear to represent an anomaly; otherwise hopefully, this trends observed for 2020 will continue.



Figure 2: Rates and Completion Time of 2020 Initial Custody Assessments

These data suggested that the percentage of inmates for whom an initial classification was completed has remained stable. Yet, the lag time between booking and classification/ housing continues to fluctuate. As the system adjusts to the COVID-19 pandemic pressures, the lag time between booking and housing will probably continue to vacillate.  Minimizing the length of time spent in the IPC helps prevent the potential spread of COVID-19 among



staff and inmates within the IPC booking area.

Under the COVID-19 Pandemic, the OPSO Housing Matrix has been adjusted on multiple occasions to ensure appropriate separations for observation, quarantine, and the like.  These special pods create concerns about the additional risks from the assignment of Low, Medium, and High custody inmates with different PREA designations to the same housing unit.  OPSO command and classification staff initially reported using the automated ISI (Inmate Separation Instrument) to maintain out-of-cell separations within these multi-custody/special population units.  However, the virtual tour -- observations and security staff reports -- indicated that inmate(s) are allowed out of the cell for 30 minutes at a time. An inmate is out alone unless he/she has a cellmate, in which case both are out of the cell simultaneously. The deputies do not consult the separations reports or the ISI to determine out-of-cell separations. This out-of-cell schedule does not give inmates adequate time to shower, wash personal clothing, make telephone calls, exercise, and the like. It is a violation of the OPSO policy of at least one (1) hour/day out-of-cell. Further, given the number of occupied cells and various other demands on the daily pod schedule, if more than 16 to 18 cells and various other demands on the daily pod schedule, if more than 16 to 18 cells within the pod are occupied, there is insufficient time for all inmates to receive their daily out-of-cell time.[6]

Regardless, the sub-standard practice of mixed custody/vulnerability using units prompted by the Pandemic should be reviewed and discontinued as soon as possible. In the interim, refresher ISI training for seasoned staff, and introductory training for new line staff, is critical for increasing the length and frequency of out-of-cell time while maintaining necessary COVID-19 restrictions. Note, the ISI can be easily tweaked to control for data of admission and COVID-19 isolation status.

We noted the dangers of overriding the inmate custody levels for housing purposes in previous compliance reports. As shown in Figure 3, during this compliance period – April - September 2020, 15 percent of the custody overrides were for housing purposes. This is undoubtedly an improvement over the rate of 84.9% observed for January 2019, but the practice continues.[7]

---

[6] Within the general population pods, the current "social distancing" practice was reported as only ten inmates allow out of their cells at a time.
[7] On the other hand, the reason or rationale was not documented to 43.4 percent of the overrides. Thus, the full extent of the practice of custody overrides were for housing purposes is unknown.





Figure 3: Percent Overrides for Housing Purposes – January 2019 - March 2020

As shown in Figure 4, the April – September 2020 classification reports indicated the initial custody assessments included a discretionary override for 1.6 percent of the men and .7% of the women. These are very low rates, well below the generally recommended rates of 5 to 15 percent.[8]  Before implementing COVID-19 housing protocols, classification specialists were careful to "match" inmates by age, current offense, and final custody level for the housing assignments, particularly for the "low" custody inmates.  As the IPC-intake housing protocols only require matching inmates to the cell-level, staff have greater flexibility for housing. Further, during the early waves of the COVID-19 Pandemic, the OJC average daily population (ADP) dropped dramatically. (See Figure 8.) Thus, classification staff had more bed/cells available and greater flexibility for matching individuals within a cell.   Monitoring the discretionary overrides for housing purposes remains essential as the Pandemic wanes, and the OJC ADP increases.

---

[8] Austin, James and Patricia L. Hardyman. 2004. *Objective Prison Classification: A Guide For Correctional Agencies.* Washington, D.C.: National Institute of Corrections.





Figure 4: Initial Classification Override Rates by Gender in January 2019 – September 2020

A different type of housing override was discovered via the compliance visit virtual meeting.  The Classification Unit initiated the use of an "Inmate Refusal of Enemies" form to "facilitate" the housing of general population inmates.  At least in part, the intent was to address inmate requests to transfer from one pod to another.   To eliminate pod or cell separations between inmates noted in the JMS as "enemies," the inmates must sign forms indicating the listed inmates "are not my enemies." Both inmates must sign forms in addition to the classification supervisor, disciplinary supervisor, and unit manager.   When this process was implemented for the general population inmates was unclear, but it appears to have been late summer.  Unavailable were formal OPSO policies or procedures for the use of this form, the tracking of "refused enemies," and the storage of the records.   Written policies and formal training for the "Inmate Refusal of Enemies" form are essential to ensure inmate safety, protection of rights, and documentation of OPSO policy and procedures. Discontinuance of the practice is highly recommended until written policies are approved, adequate staff training provided, and means for systematic tracking and documentation are implemented to prevent circumvention of the objective classification and housing systems and harm to the inmates and staff. [9]

The Classification Monitor List (List) is an ad hoc report that identifies inmates for whom a custody review is due. Custody re-assessment reasons include a regular 60/90-day re-assessment or because of some change or event within their jail records, i.e., change in

---

[9] OPSO indicated that use of "Inmate Refusal of Enemies" form was a trial strategy initiated in September.  As of December 2020, after a 6-week trial period, OPSO elected to discontinue the use of the form.



their charge(s), bail amount, disciplinary history, detainer lodged/lifted, or sentence. The number of inmates on the list fluctuates as inmates return from court, move through the booking process, and the like. A classification specialist or supervisor is tasked with completing the custody reviews on each shift. The average number of pending custody assessments per the Classification Monitor list was 11.98. The cases were split between those awaiting an initial classification (4.92) and those awaiting a custody re-assessment (7.07). The average number of pending custody assessments during the previous compliance period was 18.4. Thus, wait-times for initial and reclassification processes continued to decrease during this compliance period.

Following Compliance Report #8, OPSO took steps to work with Wellpath to rebuild the linkages between the medical/mental health records and JMS. These data are essential for scoring seven of the PREA victimization and predation risk factors. Also, medical and mental health information is critical for the inmates' housing assignments. The linkage between the electronic medical records (ERMA) and the JMS for the intake data is complete. Wellpath/OPSO has not verified the accuracy of the data as uploaded to the JMS.

As shown in Figures 5 and 6, classification staff have continued to create attachments to record criminal history data into the JMS for inmates with non-Orleans Parish felony convictions. Figure 5 illustrates ~285 attachments were created per month between October 2019 and September 2020. The exceptions were April and May of 2020; during these months, the number of attachments dropped to only 99 in April and 216 in May. However, the number of attachments climbed to pre-COVID-19 levels for the remainder of this Compliance Period. For April – September 2020, the classification staff input on average 251.8 attachments/ month. If the April data are excluded from the calculations, an average of 282.4 attachments was input each month. As shown in Figure 5, on average, 97.1 percent of the attachments updated the inmate's criminal history.





Figure 5: Number of Attachments Input by Classification Staff -- October 2019 - September 2020



Figure 6: Attachment Reason by Month – April – September 2020

*IV.A.10.e. Continue competency-based training and access to all supervisors on the full capabilities of the OPSO classification and prisoner tracking system.*

<u>Finding:</u>

Substantial Compliance

<u>Observations:</u>

The most recent objective classification training was mid-December 2019. The training topics were the principles of objective classification and instruction on OPSO custody, predation, and vulnerability assessments, and the housing assignment process. As no classification specialists joined the Unit during this compliance period, the introductory training was not required.

There was no OPSO in-service training classification training for the specialists during this compliance period. In response to questions during the virtual tour, the classification



manager orally reported some instruction on the internal housing audit process and remedial instruction on special population housing tags.   However, no documentation of even such specialized or corrective action instruction was provided.  Quality consistent in-service and introductory training for new staff is vital to ensure reliable and accurate custody assessments, housing assignments, and audits. While the System is highly automated, the JMS automation should not replace the staff's understanding of the objective classification principles, scoring rules for the custody and PREA risk factors, or housing standards.

***IV.A.10.f. Conduct internal and external review and validation of the classification and prisoner tracking system on at least an annual basis.***

Finding:

Partial Compliance

Observations:

OPSO population reports with the number of inmates by location were received daily by the Monitor. Custodial statistical reports for April - September 2020 regarding the number of custody assessments by type, gender, and population were also available. These reports track the timeliness of the initial custody assessments, the custody distributions; the cases due for a custody assessment; the prevalence of special populations; as well as the rates and types of disciplinary infractions. OPSO conducts housing and internal audits. Housing Audits – Checking the Veracity of the Inmate Housing Assignments:

As of July 28, 2020, OPSO resumed audits of the inmate housing assignments.  For this compliance report, reviewed were a random sample of the audit score sheets, rosters, and corrective action reports.  The audit score sheets had undoubtedly improved from previous audits. Further, corrective action forms were completed for each audit.  Observation of a housing audit for this compliance report indicated the auditor verified the cell and bed assignments for each inmate as required by the OPSO audit procedures.

On the other hand, the written description of the restarted OPSO audit process was unclear. A review of a random sample of the housing audits suggested that staff did not always adhere to the written procedures.  The primary concerns included 1) not all OJC and TDC housing units were audited monthly, and 2) pods with housing errors were not re-



audited.[10]  For example, audits of pods 4A, D, E, and F conducted on September 5, 2020, identified 16 to 33 inmates who were not in their assigned beds. These audits were not re-audited until November 23, 2020.  Thus, the pods were not re-audited as per the OPSO audit process.

OPSO classification staff create a "Housing Audit Corrective Action" report for each audit to summarize the auditor's findings. While these summaries are helpful, most neither indicated the specific "corrective" actions required, tracked their resolution, nor documented the date and results of any follow-up audit. It is important to emphasize that housing audits are a means of ensuring the classification system's integrity.  Merely filling out a custody assessment form and assigning an inmate to a bed does not fulfill a validated classification system's requirements.  OPSO must ensure that all inmates are in the assigned cells and bunks according to their risks and needs. Otherwise, classification becomes just another form. The importance of housing audits cannot be over-stated. While most of the audit sheets indicated all inmates were in their assigned cells and beds, there were notable exceptions.  As previously noted, audits of pods 4A, D, E, and F conducted September 5, 2020, identified 16 to 33 inmates who were not in their assigned beds.  Among the 28 randomly selected audits, 7 (25%) noted inmates not in their assigned beds/cells. Note, these seven audits did <u>not</u> include the notations that inmates were sleeping on the floor rather than his/her assigned bunk. Security staff does not consistently enforce the housing assignments specified on the housing transfer sheets.

Internal Audits – Checking the Accuracy of the Custody and PREA Assessments

As part of the ongoing classification and housing processes, the classification shift supervisor reviews the JMS reports to identify placement errors and ISI separation conflicts. Supervisors/team leaders indicated that they immediately corrected all errors. Thus, the housing separation errors detected by the JMS were resolved quickly. Total reliance on automated housing violation reports to detect housing and custody assessment errors is insufficient to ensure institutional safety and security.

Reviewed were the April - September 2020 internal audit logs. The audit logs include two types of audits: Random (custody assessments selected by the JMS for review) and

---

[10] As per the description of the CLASSIFICATION HOUSING AUDIT PROCESS" provided by Jackson-Price, Rhonda (OPSO Classification Manager) on 11/20/2020, "*A follow-up housing audit will take place to make sure the security infractions or operational infractions have been corrected on another random day within the same month.*"



Discovered (custody assessments with errors observed by a classification specialist or supervisor).  No errors were reported for the 39 randomly selected assessments. The low error rate among random audits[11] is surprising.   There were 30 custody assessments with "discovered errors." These errors included missing special population tags, housing errors (Low and High Custody inmates housed together), missing medical tags, and missing criminal history attachments.  No errors were reported for the 39 randomly selected assessments. The low error rate among random audits[12] is surprising as there was an almost equal number of "discovered errors."   There were 30 custody assessments with "discovered errors" included missing special population tags, housing errors (Housing Low and High Custody inmates together), missed medical tags, and missing criminal history attachments. Some log entries noted multiple staff replicated the "error."  The classification manager or supervisor reviews the errors with the staff member. As necessary, additional instruction was provided. These audits log suggest the need for in-service training on special population and isolation tags as well as housing assignments for low custody inmates and potential predators.

<u>Revalidation of the Classification System – Assessing the Validity of the System:</u>

Lovins and Latessa submitted their report on the validation of the OPSO classification system on April 30, 2018.[13] This validation study served as documentation of compliance with the Consent Judgment requirement for "external review and validation of the classification and prisoner tracking system on at least an annual basis*."* Although statistical validation of an objective classification system is generally recommended every three to five years,[14] continuous monitoring and process evaluation are essential for ensuring the system's integrity for the OPSO <u>current</u> inmate population.  OPSO is currently soliciting proposals for revalidation of the classification system. This revalidation is anticipated to be completed in 2021.

*IV.A.10.g. Provide the Monitor a periodic report on classification at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date and every six months, thereafter, until termination of this Agreement. Each report will include the following information:*
   *(1)  number of prisoner-on-prisoner assaults;*
   *(2)  number of assaults against prisoners with mental illness;*

---

[11] A total of 10,424 custody assessments were completed between April 1 and September 30, 2020.

[12] A total of 10,424 custody assessments were completed between April 1 and September 30, 2020.

[13] Lovins, Brian K. and Edward Latessa (April 30, 2018). "Revalidation of the Orleans Parish Classification System." Cincinnati, Ohio: University of Cincinnati Corrections Institute.

[14] Austin, James and Hardyman, Patricia L. (2004) "Objective Prison Classification: A Guide for Correctional Agencies." Washington, D.C.: National Institute of Corrections. pp.iv.



*(3)   number of prisoners who report having gang affiliations;*
*(4)   most serious offense leading to incarceration;*
*(5)   number of prisoners classified in each security level;*
*(6)   number of prisoners placed in protective custody; and*

*(7)   number of misconduct complaints.*

<u>Finding:</u>

Substantial compliance

<u>Observations:</u>

Reviewed were the monthly custodial, discipline, and inmate statistical reports for April - September 2020. OPSO has developed reports to track the statistics as required under section IV.A.10.g.  The only exception is the rates of victimization of inmates on the mental health caseload. As noted earlier, these data are dependent upon timely caseload information from the mental health provider.  Wellpath and OPSO are working together to align the JMS and electronic medical data to generate timely and accurate victimization counts. The Consent Judgment specifically requires victimization rates for inmates on the mental health caseload. It appears that the Wellpath electronic medical records are now linked to the AS400.  However, pending is the data validation process to ensure timely and accurate updates of the inmate's medical and mental health caseload status.  The monthly classification special population reports include counts for the medical and mental health caseloads but missing are the victimization counts among individuals on the mental health caseload. OPSO and Wellpath must complete this process to maintain substantial compliance with this section.

Updated data as to the inmates with gang affiliations were input to the JMS throughout the compliance period. OPSO and the Orleans District Attorney (DA) have created an ongoing process for notifying the OPSO of offenders identified as members of a "gang." Thus, these data are available to track the prevalence of inmates per "gang" among OPSO populations as well as by their location (i.e., tier, side, and bed).  The NOPD has created a new task force to address violent crime within New Orleans.  This task force's work may impact the characteristics of the OPSO population and provide new opportunities for building information-sharing bridges to consistently identify individuals with gang affiliations, not just those with a gang-related offense(s).

Figures 7 and 8 provide the OPSO monthly disciplinary data as recorded in the JMS. The rate of disciplinary reports has fluctuated over the last twelve months – October 2019 – September 2020. (To account for short-term variations, seasonal trends, and the population



shifts due to the Pandemic 12 months of disciplinary data are provided.) As shown in Figure 7, the rate of disciplinary reports per inmate increased by about 10 percent between October 2019 – April 2020.  As of April 2020, the rate of disciplinary reports for the OPSO detainees was 41.0 percent, i.e., 4 in 10 inmates received a disciplinary report. The rate increased to 44.3 percent for June 2020 but dropped back to 41.3 percent in September. Thus, as shown in Figure 8, although in March, the OPSO ADP dropped significantly, the rate of disciplinary reports remained steady at about 41 percent.

Figure 8 also illustrates the rates of predatory (e.g., assaults or battery) and aggressive behaviors (e.g., fights or threats) based on the OPSO ADP. These rates have remained virtually unchanged over the last 12 months despite the drop in the OPSO population and strict out-of-cell separations due to the COVID-19 Pandemic.  In April 2020, the rate of predatory infractions among OPSO inmates was 8.6 percent – nearly 1 in 10 inmates was involved in institutional violence.



Figure 7: Rate of Disciplinary Infractions for the OPSO ADP – Oct 2019 - April 2020.





Figure 8: OPSO ADP versus Number Disciplinary Hearings: October 2019 – September 2020

Figure 9 provides a breakdown of the most severe guilty infraction/disciplinary report between October 2019 and September 2020. During May – July 2020, each of the types of infractions -- predatory (assaults or battery), aggressive (fights and threats), management problems (e.g., disobey a direct order) decreased, except for the number of Management Problems in June. However, the predatory infractions rose again in August and September. While the actual number of violence incidents (i.e., predatory and aggressive infractions) decreased during this compliance period, as was shown in Figure 7, the rate of violence based on the OPSO ADP was steady at about 9 percent.



Figure 9 Most Serious Disciplinary Infraction/Report with Finding of Guilty: Oct 2019 – Sept 2020

***IV.A.10.h. OPSO shall review the periodic data report and make recommendations regarding proper placement consistent with this Agreement or other necessary changes in policy based on this review. The review and recommendations will be documented and provided to the Monitor.***

Finding:



Partial Compliance

Observations:

The Monitor receives the daily "Active Inmates by Location" reports and has access to the ad hoc Classification Monitor list and various classification statistical reports. During this compliance period, provided were multiple updates to the OPSO Housing Matrix. Chief LeCounte has maintained open communications.  However, independent analyses of the statistical reports or the housing audits were minimal. We learned of OPSO's "restart" of the housing audits in late July/early August through discussions during the virtual compliance meetings.

Further, we learned that the Classification Unit initiated the use of an "Inmate Refusal of Enemies" form to "facilitate" the housing of general population inmates.  When this process was implemented for the general population inmates was unclear.  Also unavailable were formal OPSO policies or procedures for the use of this form.  Requests for a sample of completed forms as well as OPSO policies regarding the use of the form, the tracking of "refused enemies," and the storage of these forms were resisted.   Addressed was the Monitor's suggestion for adding the signature dates to the form, but not those for deleting the inmate's waiver of OPSO's liability for "any type of altercation." Procedures for the use of this form for general population inmates and the special populations (i.e., individuals on protective custody and administrative segregation) remain unclear. As previously noted, written policies and formal training regarding the use of the "Inmate Refusal of Enemies" form, as well as the housing audits, are essential to ensure inmate safety, protection of rights, and documentation of OPSO policy and procedures. As previously noted, written policies, documentation, and formal training regarding the use of the "Inmate Refusal of Enemies" form, as well as the housing audits, are essential to ensure inmate safety, protection of rights, and documentation of OPSO policy and procedures.

## IV. A. 11.    Prisoner Grievance Process

*A. 11.a. OPSO shall ensure that prisoners have a mechanism to express their grievances, resolve disputes, and ensure that concerns regarding their constitutional rights are addressed. OPSO shall, at a minimum, do the following:*

> *(1) Continue to maintain policies and procedures to ensure that prisoners have access to an adequate grievance process and to ensure that grievances may be reported and filed confidentially, without requiring the intervention of a correctional officer. The policies and procedures should be applicable and standardized across all the Facility divisions.*
> *(2) Ensure that each grievance receives appropriate follow-up, including providing a timely written response and tracking implementation of resolutions.*
> *(3) Ensure that grievance forms are available on all units and are available in Spanish and*



*Vietnamese and that there is adequate opportunity for illiterate prisoners and prisoners who have physical or cognitive disabilities or language barriers to access the grievance system.*

(4) *Separate the process of "requests to staff" from the grievance process and prioritize grievances that raise issues regarding prisoner safety or health.*

(5) *Ensure that prisoner grievances are screened for allegations of staff misconduct and, if an incident or allegation warrants per this Agreement, that it is referred for investigation.*

(6) *A member of the management staff shall review the grievance tracking system quarterly to identify areas of concerns. These reviews and any recommendations will be documented and provided to the Monitor.*

Findings:

A. 11. a. (1)  Substantial Compliance

A. 11. a. (2)  Partial Compliance

A. 11. a. (3)  Substantial Compliance

A. 11. a. (4)  Substantial Compliance

A. 11. a. (5)  Substantial Compliance

A. 11. a. (6)  Substantial Compliance

Until the September 2019 report, one rating was given for the entire section for the Prisoner Grievance Process. In order to highlight which provisions are in substantial compliance versus those which fall short, the decision was made to rate each provision separately.

This review covers April 2020 through September 2020. For this review, the Monitor interviewed the Grievance Lieutenant, security staff and inmates while inspecting the housing units. Reports and data submitted by OPSO covering the rating period was also reviewed.

As reported by the OPSO Grievance staff, a monthly average of 190 grievances and 1905 inmate requests were received for the current rating period. This represents a 31% *decrease* in the monthly grievance average over the previous 6-month period. It is the monitor's opinion that this drop can be largely attributed to the significant drop in the average daily inmate population due to the COVID pandemic. OPSO grievance reports did show a spike in the number of grievances for the month of May 2020, but, again, the tightening of COVID restrictions throughout the jail during this time likely prompted this and centered largely around commissary, maintenance, food service and programs. All four categories dropped notably in the month of June and remained relatively stable through the rest of the reporting period.

Inmates have access to the grievance process via electronic kiosks located in the



housing units throughout OJC and TDC and through a traditional paper grievance system. A review of the OPSO "Kiosk Maintenance Log" showed that kiosks had to be "rebooted" approximately 175 times during the rating period with some individual kiosks being rebooted 2 to 3 times in a 7-day period. There were at least two instances where the entire system in the OJC had to be rebooted. In previous reports, it was noted that several kiosks were non-repairable. The Monitor observed that some replacements have been installed, however it is the monitor's opinion that the kiosk system remains relatively unreliable in terms of operational availability. The Grievance Lieutenant reported that every housing unit is visited 7 days per week with a "walk by" of every cell to collect paper grievances to ensure that problems with the kiosks do not interfere with an inmate's ability to submit grievances. The Monitor observed locked grievance receptacles in every housing unit, however at least two inmates complained of not being able to get blank grievance forms from security staff in a timely manner. Unit Managers are urged to remind line security staff of the importance of making grievance forms available upon request by the inmate(s). It is the Monitor's opinion that this manual work-around is acceptable under the language of the Consent Judgment requiring the inmates have access to a meaningful and confidential grievance process. OPSO staff report that a replacement system is still being pursued but the status has been relatively unchanged for almost three years. Given that inmates have reported difficulty in accessing the paper grievance forms and writing utensils and the delay that results from not being able to submit the grievance and medical requests electronically, the securing of a replacement system should be given priority.

For this compliance review, the Monitor specifically reviewed weekly and monthly audit documentation (statistics, actual grievance documentation, and response timeliness) and trend reports compiled by the Grievance staff covering the period April through September 2020.

As noted previously, the Grievance Weekly Response Audit reports continue to reflect a diligent effort by Grievance staff to review and notify responsible staff when responses are insufficient or incomplete. The audits reflect a positive trend in terms of quality of responses. The relative number of "no response" or "non-specific" responses continues to decline across the board largely due to the feedback given respondents by Grievance staff. The Grievance Lieutenant also stated that increased support from management has had a positive impact as well.



In terms of quantitative analysis, the Monitor specifically reviewed the number of "overdue" grievance responses (>10 days) as a percentage of the total number of grievances assigned in a given month. Based on data provided by Grievance staff, the monthly average of overdue responses declined from 44% (Nov19 thru Mar20) to 25% (Apr20 thru Aug20), a marked improvement. The Monitor believes this change to be a result of Grievance staff improving the level and frequency of feedback to staff responsible for answering grievances as well as OPSO leadership holding supervisors accountable for not responding to grievances timely.

In order to refine the analysis and focus improvement efforts, Grievance staff increased the frequency of the "overdue" grievance response reports from monthly to weekly as of May 2020 and separated OPSO staff responses from those of the medical contractor (Wellpath) as of September 2020. While insufficient to form an opinion at this point, it appears that the first three weeks of data reflect a weekly average of 36% overdue responses for OPSO staff and 14% for medical grievance responses despite the number of medical grievances being 2 to 4 times the number received by OPSO staff on a monthly basis. Grievance staff should continue their efforts in this area.

Grievance staff continues to do an excellent job tracking grievances and requests and reporting as to the timeliness and quality of the responses to address the inmates' issues.

The Monitor again reviewed documentation regarding the use and tracking of paper grievance forms made available to all units with non-functioning kiosks. The documentation reflects all paper grievances gathered which are then entered into the electronic system by Grievance staff for routine routing and tracking. Documentation consistently reflects that Grievance staff continue to maintain a by-name/housing listing of all OPSO inmates identified as needing Grievance staff assistance to access the grievance system due to either a language barrier or illiteracy. The logs reviewed by the Monitor for the second and third quarters show the list of disadvantaged inmates continues to be actively managed by Grievance staff.

Grievance staff provided detailed documentation as to their separate handling of the April 2020 through September 2020 inmate requests, grievances, and complaints related to inmate safety or health.

Review of the documentation demonstrated that all inmate submissions are reviewed by Grievance staff, categorized into requests and grievances, and forwarded to the



appropriate staff for response with statistical information kept on all categories. Both requests and grievances are further sorted by type. Specific grievances related to inmate safety, medical issues, PREA, etc., continue to be documented to reflect the date received, inmate information, type of grievance, time of notification made to the appropriate staff member, and the staff member making the notification.

The Monitor reviewed detailed documentation provided by Grievance staff for the rating period regarding the screening of grievances for staff misconduct. The documentation demonstrated that all inmate submissions are reviewed by Grievance staff and those regarding staff misconduct are separately documented for appropriate referral to the administrative level for follow-up. Grievance staff processed a total of 90 such staff misconduct related grievances during this rating period versus 147 grievances for July through December 2019.

Grievance staff also separately document grievances that require specific referral to IAD, ISB, PREA, or FIT staff for review and investigation. Detailed information along with the date assigned and disposition is maintained as well as email transmission receipts.

The Monitor reviewed the CY 2020 second and fourth quarter executive analysis of the grievance reports. Specific discussion by executive staff regarding the grievance documentation and reports was noted. No specific changes to the grievance process recommended however changes to the data analysis methodology and follow-up actions were discussed and recommended.

## IV. A. 12.  Sexual Abuse

***A.12. OPSO will develop and implement policies, protocols, trainings, and audits, consistent with the requirements of the Prison Rape Elimination Act of 2003, 42 U.S.C. § 15601, et seq., and its implementation of regulations, including but not limited to, preventing, detecting, reporting, investigating, and collecting sexual abuse data, including prisoner-on-prisoner and staff-on-prisoner sexual abuse, sexual harassment, and sexual touching.***

Finding:

A. 12. Substantial Compliance

Observations:

OPSO successfully completed its PREA audit in 2019. The PREA Coordinator has since been reassigned to a housing area and the position has not been filled. Supervision of the investigation of PREA complaints has been added to the duties of the FIT supervisor due to the departure of the lieutenant who previously oversaw them. Substantial compliance is not guaranteed by successfully completing a PREA audit once every three years. While this



provision is being rated in substantial compliance, stricter adherence to the requirements of the provision are necessary to maintain this rating.

### IV. A. 13.        Access to Information

*A.13. OPSO will ensure that all newly admitted prisoners receive information, through an inmate handbook and, at the discretion of the Jail, an orientation video, regarding the following topics: understanding Facility disciplinary process and rules and regulations; reporting misconduct; reporting sexual abuse or assault; accessing medical and mental health care; emergency procedures; and sending and receiving mail; understanding the visitation process; and accessing the grievance process.*

Finding:

A.    13. Substantial Compliance

Observations:

Materials were provided indicating the requirements of this paragraph have been met.

### IV. B. Mental Health Care

Introduction:

As with past reports, the Monitors rate the compliance levels based on the documents requested and reviewed, observations, discussions during visits, (including this recent virtual visit) review of medical records (107 for this visit), and any additional information provided by the parties.

The Monitors note very little improvement in performance in many areas of the Consent Judgment since Compliance Tour #11 and 12 and regression in some areas. The addition of the Tulane Department of Psychiatry staff and leadership remains an invaluable asset in providing required and consistent psychiatric services for inmates at OJC. There is continuing positive progress with Tulane's interface with Wellpath, however the provision of adequate and timely mental health and medical care and services has declined, as has compliance with suicide prevention training, management, and monitoring.

Wellpath continues to have difficulty with counting, for example, calculating the mental health caseload consistently and counting the number of patients with acute and chronic disease who need and receive counseling, and tracking discharge medications. The average daily population (ADP) for OJC including TDC was reported as 941 detainees, with 704 (73%) on the mental health caseload and 503 (53%) prescribed psychotropic medications.  Practitioner productivity remains an open question.

Several paragraphs remain where necessary improvements are required by the



Consent Judgment to provide the full range and quality of medical care and mental health/counseling services for inmates incarcerated in OJC and the newly renovated TDC. These concerns are deeply impacted by the lack of progress in developing the required services and programs recommended in 2014, including permanent acute care and step-down programing and services for mental health and acute medical services. There continue to be no acute care mental health services for women, except via emergency transfer to hospital emergency departments, and limited mental health acute, stepdown and outpatient programmatic activities.

General recommendations are to: continue leadership initiatives and direction by OPSO and Wellpath; continue correctional security staffing to consistently provide adequate and ongoing dedicated support for mental health and medical services; continue to develop full services and continuity of services for both male and female prisoners including all levels of care, staffing and space; and continue to evaluate and pursue full services for mentally ill prisoners, including medication management, and acute, residential, and outpatient care.

The Monitors are concerned that the budgetary cuts in staffing will exacerbate the current serious problems with recruitment and retention of nursing staff at all levels, particularly when it has been so difficult to provide timely services with current staff.  The suicide watch staffing ratios of 1:5 or more are insufficient to provide safe risk mitigation for suicide prevention.  Further, the use of deputies who are untrained in suicide watch compounds the danger.

The Monitors are also concerned about the inability of patients on 2A and 3C to receive the full range of timely and appropriate mental health care care including individual and group therapy and counseling in privacy, as opposed to cell side through the food port, which was in place prior to the initiation of COVID-19 restrictions, and eliminating group therapies and limiting individual contacts for essentially all units since those restrictions have been in place.

The Monitors have very serious concerns regarding suicide training, observations, monitoring and documentation.  Wellpath has exceeded their standard ratios of one clinical suicide watcher (Certified Nursing Assts., or Mental Health Technicians) to five inmates on staggered every fifteen-minute suicide precautions. This ratio is very high and difficult for staff to maintain consistency. Inmates requiring Direct Observation require 1:1 observation full time. Wellpath staff are working double shifts/overtime as suicide watchers, however



have not been able to demonstrate keeping up with the needs and OPSO deputies have been providing up to 30% of all watches, without adequate training specifically for duties and responsibilities as suicide prevention observers and monitors. Deputies have been attempting to include suicide monitoring in their more frequent welfare checks, often for prisoners housed in non-suicide resistant cells. These modifications are extremely problematic, potentially increasing risk of harm, and do not meet Consent Judgment requirements.

OPSO and Wellpath have been following health department guidance on mitigation and containment of transmission of COVID-19.  The Monitors have not been asked for technical assistance in this area.

Specific findings and recommendations regarding medical and mental health services are provided below. For those paragraphs that have previously demonstrated Substantial Compliance the Monitors recommend, encourage, and support the diligent and consistent efforts by OPSO and the medical and mental health providers to continue to demonstrate Substantial Compliance.

## B.  Mental Health Care

***B. OPSO shall ensure constitutionally adequate intake, assessment, treatment, and monitoring of prisoners' mental health needs, including but not limited to, protecting the safety of and giving priority access to prisoners at risk for self-injurious behavior or suicide. OPSO shall assess, on an annual or more frequent basis, whether the mental health services at OPP comply with the Constitution. In order to provide mental health services to prisoners, OPSO, at a minimum, shall:***

<u>Findings:</u>

B. 1. a.  Partial Compliance

B. 1. b.  Substantial Compliance

B. 1. c.  Substantial Compliance

B. 1. d.  Partial Compliance

B. 1. e.  Partial Compliance

B. 1. f.  Partial Compliance

B. 1. g.  Partial Compliance

B. 1. h.  Substantial Compliance

B. 1. i.  Partial Compliance

B. 1. j.  Partial Compliance

B. 1. k.  Partial Compliance

B. 1. l.  Partial Compliance



***B.1.a. Develop and maintain comprehensive policies and procedures for appropriate screening and assessment of prisoners with mental illness. These policies should include definitions of emergent, urgent, and routine mental health needs, as well as timeframes for the provision of services for each category of mental health needs.***

<u>Finding:</u>

Partial Compliance

<u>Suggestion:</u>

Wellpath has different timeframes for timeliness of responses. Previously recommended to review and revise policies and procedures. Wellpath has procedures that conflict with Consent Judgment requirements; corrective actions began during site visit.

***B.1.b. Develop and implement an appropriate screening instrument that identifies mental health needs, and ensures timely access to a mental health professional when presenting symptoms require such care. The screening instrument should include the factors described in Appendix B. The screening instrument will be validated by a qualified professional approved by the Monitor within 180 days of the Effective Date and every 12 months thereafter, if necessary.***

<u>Finding:</u>

Substantial Compliance

***B.1.c. Ensure that all prisoners are screened by Qualified Medical Staff upon arrival to OPP, but no later than within eight hours, to identify a prisoner's risk for suicide or self-injurious behavior. No prisoner shall be held in isolation prior to an evaluation by medical staff.***

<u>Finding:</u>

Substantial Compliance

***B.1.d. Implement a triage policy that utilizes the screening and assessment procedures to ensure that prisoners with emergent and urgent mental health needs are prioritized for services.***

<u>Finding:</u>

Partial Compliance

<u>Suggestion:</u>

Wellpath and OPSO to review and revise SOP's for Psychiatric Referrals, suicide watches in IPC and suicide prevention training to comply with the Consent Judgment.

***B.1.e. Develop and implement protocols, commensurate with the level of risk of suicide or self-harm, to ensure that prisoners are protected from identified risks for suicide or self-injurious behavior. The protocols shall also require that a Qualified Mental Health Professional perform a mental health assessment, based on the prisoner's risk.***

<u>Finding:</u>

Partial Compliance

<u>Suggestion:</u>

Deputies have been assigned duties for suicide watches since the last site visit and have been documenting suicide watches in logs rather than required observation forms.



Provide documentation of training, protocols, and observation results. Monitor and report use of physical restraints for inmates on suicide watches in IPC.

***B.1.f. For prisoners with emergent or urgent mental health needs, search the prisoner and monitor with constant supervision until the prisoner is transferred to a Qualified Mental Health Professional for assessment.***

Finding:

Partial Compliance

Suggestion:

Provide documentation of searches and constant supervision by security until mental health staff arrives and conducts assessment for all emergent and urgent referrals. Include protocols/procedures for searching inmates as soon as safely possible and prior to placement on any form of suicide precautions, watch or Direct Observation, and documentation requirements.

***B.1.g. Ensure that a Qualified Mental Health Professional conducts appropriate mental health assessments within the following periods from the initial screen or other identification of need:***
> ***(1) 14 days, or sooner, if medically necessary, for prisoners with routine mental health needs***
> ***(2) 48 hours, or sooner, if medically necessary, for prisoners with urgent mental health needs; and***
> ***(3) immediately, but no later than two hours, for prisoners with emergent mental health needs.***

Finding:

Partial Compliance

Suggestion:

Continue to provide documentation that inmates in population (after IPC) consistently receive appropriate and complete assessments within the required timeframes. Review and revise Wellpath SOP advising QMHP referrals to psychiatrists on weekends, with OPSO approval, and report results.

***B.1.h. Ensure that a Qualified Mental Health Professional performs a mental health assessment no later than the next working day following any adverse triggering event (i.e., any suicide attempt, any suicide ideation, or any aggression to self, resulting in serious injury).***

Finding:

Substantial Compliance

***B.1.i. Ensure that a Qualified Mental Health Professional, as part of the prisoner's interdisciplinary treatment team, maintains a risk profile for each prisoner on the mental health case load based on the Assessment Factors identified in Appendix B, and develops and implements a treatment plan to minimize the risk of harm to each of these prisoners.***

Finding:

Partial Compliance

Suggestion:



Provide documentation of timeliness of treatment plans for all inmates on the mental health caseload at all levels of care including risk profiles. Include focus on inmates in stepdown and outpatient programs. Expand reviews to include deficiencies in content, diagnoses, planned services, etc. for inmates at all levels of care.

***B.1.j. Ensure adequate and timely treatment for prisoners, whose assessments reveal mental illness and/or suicidal ideation, including timely and appropriate referrals for specialty care and visits with Qualified Mental Health Professionals, as clinically appropriate.***

<u>Finding:</u>

Partial Compliance

<u>Suggestion:</u>

Continue to provide documentation of scheduled and completed adequate and timely treatment for all caseload inmates including rounds and psychosocial handout materials, individual and group therapies and/or counseling, and referrals for specialty services for male and female inmates. This should include prisoners at TDC/TMH, all suicide watches at OJC in all locations including IPC, acute care services for male and female inmates, step down units, and outpatients in population and all restricted housing units. The need for necessary and full range of mental health and counseling services for all specified inmates remains. The future utilization of TDC and Phase III were unclear at the time of this review and report.

***B.1.k. Ensure crisis services are available to manage psychiatric emergencies. Such services include licensed in-patient psychiatric care, when clinically appropriate.***

<u>Finding:</u>

Partial Compliance

<u>Suggestion:</u>

OPSO does not have access to any licensed inpatient services for male and female inmates. Provide documentation that all psychiatric emergencies are sent to an emergency department and any crisis is adequately resolved. Provide documentation that all inmates have access to licensed inpatient psychiatric care, when clinically appropriate.

***B.1.l. On an annual basis, assess the process for screening prisoners for mental health needs to determine whether prisoners are being appropriately identified for care. Based on this assessment, OPSO shall recommend changes to the screening system. The assessment and recommendations will be documented and provided to the Monitor.***

<u>Finding:</u>

Substantial Compliance

<u>Suggestion:</u>

The report of annual assessment and recommendations of the process for screening



prisoners for mental health needs to determine whether prisoners are being appropriately identified for care has been provided. The report does not include information and analyses of the use of restraint shackles during suicide watch in IPC and timeliness of transfer to suicide resistant cells.

Findings:

B. 2. a.  Partial Compliance

B. 2. b.  Partial Compliance

B. 2. c.  Partial Compliance

B. 2. d. Partial Compliance

B. 2. e.  Substantial Compliance

B. 2. f.   Partial Compliance

B. 2. g.  Substantial Compliance

B. 2. h.  Partial Compliance

***B.2.a. Review, revise, and supplement its existing policies in order to implement a policy for the delivery of mental health services that includes a continuum of services, provides for necessary and appropriate mental health staff, includes a treatment plan for prisoners with serious mental illness, and collects data and contains mechanisms sufficient to measure whether care is being provided in a manner consistent with the Constitution.***

Finding:

Partial Compliance

Suggestion:

Wellpath and OPSO have completed the majority of necessary policies including the use of restraints policies. During this review, the monitors received inconsistent and conflicting reports regarding the use of suicide watches conducted in IPC by custody and/or nursing staff while the inmate was shackled to a chair in the open area of the IPC. This information ranged from never observed for one chair to the availability of three chairs for men and two chairs for women with shackles for "suicide watch." Suggested are the revision and completion of policies/procedures regarding continuum of services for inmates on suicide watch in IPC.  The need for the continuum of mental health services for female inmates and counseling services for specific groups identified in this Consent Judgment remains. Protocols are needed for confidential individual and group therapies for prisoners on - all units, as well as specific descriptions of the modified services provided during the COVID pandemic.

***B.2.b. Ensure that treatment plans adequately address prisoners' serious mental health needs and that the treatment plans contain interventions specifically tailored to the prisoner's diagnoses and problems.***



Finding:

Partial Compliance

Suggestion:

     Continue progress on documentation in treatment plans at OJC. Provide documentation of individualized treatment plans for men, women, and youthful offenders at all levels of care, including acute care and suicide watches.

***B.2.c. Provide group or individual therapy services by an appropriately licensed provider where necessary for prisoners with mental health needs.***

Finding:

Partial Compliance

Suggestion:

     This provision is dangerously close to noncompliance. Quite clearly, actual group therapies have been suspended for months and individual therapies/contacts have largely been non-confidential cell-front contacts for limited time periods. The efforts to provide contacts and limited services during the pandemic are understood but remain insufficient and problematic. Continue to provide documentation of data and analysis of numbers and percentages of inmates at all levels of care in need of individual and/or group therapies and counseling as well as the numbers and percentages of individual and group services offered and received/completed for prisoners in need. Continue to provide numbers of inmates who received counseling for sexual abuse and for those inmates who received counseling for alcohol and drug abuse.  Continue to provide data on Disruption of Services forms and provide analysis of that data and corrective action plans, including staffing and space needs, as necessary.

***B.2.d. Ensure that mental health evaluations that are done as part of the disciplinary process include recommendations based on the prisoner's mental health status.***

Finding:

Partial Compliance

Suggestion:

     This process has begun during the last 6 months of the monitoring period. Data provided indicates 5 of 494 mental health evaluations resulted in placement on mental health unit. These numbers are reportedly based on screenings or in-hearing observations rather than pre-hearing assessments relative to charges. The data needs analysis to assess impact of mental health evaluations on disciplinary sanctions. Wellpath needs to provide policy approved by OPSO regarding mental health participation in the disciplinary process, as well as necessary training for



OPSO and Wellpath staff.

***B.2.e. Ensure that prisoners receive psychotropic medications in a timely manner and that prisoners have proper diagnoses and/or indications for each psychotropic medication they receive.***

Finding:

Substantial Compliance

Suggestion:

Continue exceptionally good improvement demonstrated with the addition of Tulane psychiatric providers. Continue to provide documentation and analysis of data that inmates receive psychotropic medications in a timely manner and that inmates have proper diagnosis and/or indications for each psychotropic medication they receive, including particular emphasis on juveniles.

***B.2.f. Ensure that psychotropic medications are administered in a clinically appropriate manner as to prevent misuse, overdose, theft, or violence related to the medication.***

Finding:

Partial Compliance

Suggestion:

Medication diversion and/ or contraband continues to be problematic. Reports of prescribed and nonprescribed medications, as well as concerns regarding watch-take procedures require further analysis and corrective actions.

***B.2.g. Ensure that prescriptions for psychotropic medications are reviewed by a Qualified Mental Health Professional on a regular, timely basis and prisoners are properly monitored.***

Finding:

Substantial Compliance

Suggestion:

Continue to provide documentation of data collection and analysis of psychotropic medication prescriptions.

***B.2.h. Ensure that standards are established for the frequency of review and associated charting of psychotropic medication monitoring, including monitoring for metabolic effects of second generation psychotropic medications.***

Finding:

Partial Compliance

Suggestion:

Monitoring for metabolic effects of second- generation psychotropic medications has declined for this monitoring period. Timeliness of laboratory services and associated inmate refusals have become problematic.



Findings:

B. 3. a.  Partial Compliance

B. 3. b.  Partial Compliance

**B.3.a. OPSO shall develop and implement policies and procedures for prisoner counseling in the areas of general mental health/therapy, sexual-abuse counseling, and alcohol and drug counseling. This should, at a minimum, include some provision for individual services.**

Finding:

Partial Compliance

Suggestion:

Provide documentation of implementation of policies and procedures and modifications or changes in programmatic and other service activities since the COVID pandemic specifically for inmate counseling in the areas of general mental health/therapy, sexual abuse counseling, and alcohol and drug counseling, including some provisions for individual services. Continue to track disruptions of services and percentages of inmates identified as in need compared to those who receive services.

**B.3.b. Within 180 days of the Effective Date, and quarterly thereafter, report all prisoner counseling services to the Monitor, which should include:**
> **(1)      the number of prisoners who report having participated in general mental health/therapy counseling at OPP;**
> **(2)      the number of prisoners who report having participated in alcohol and drug counseling services at OPP;**
> **(3)      the number of prisoners who report having participated in sexual-abuse counseling at OPP; and**
> **(4)      the number of cases with an appropriately licensed practitioner and related one-to-one counseling at OPP.**

Finding:

Partial Compliance

Suggestion:

This provision is dangerously close to noncompliance. Provide accurate and complete data and analysis for the numbers and percentages for inmates with needs for these specific services and numbers and percentages of inmates who receive these services in the actual format, including in-cell and out-of-cell services. Compliance has been compromised by the pandemic impact, staffing deficiencies and lack of adequate space.

Findings:

B. 4. a.  Non-Compliance

B. 4. b.  Substantial Compliance

B. 4. c.  Substantial Compliance



B. 4. d.  Non-Compliance

B. 4. e.  Substantial Compliance

B. 4. f.  Substantial Compliance

B. 4. g.  Substantial Compliance

**B.4.a. OPSO shall ensure that all staff who supervise prisoners have the adequate knowledge, skill, and ability to address the needs of prisoners at risk for suicide. Within 180 days of the Effective Date, OPSO shall review and revise its current suicide prevention training curriculum to include the following topics:**
> **(1) suicide prevention policies and procedures (as revised consistent with this Agreement);**
> **(2) analysis of facility environments and why they may contribute to suicidal behavior;**
> **(3) potential predisposing factors to suicide;**
> **(4) high-risk suicide periods;**
> **(5) warning signs and symptoms of suicidal behavior;**
> **(6) case studies of recent suicides and serious suicide attempts;**
> **(7) mock demonstrations regarding the proper response to a suicide attempt;**
> **(8) differentiating suicidal and self-injurious behavior; and**
> **(9) the proper use of emergency equipment.**

Finding:

Non-Compliance

Suggestion:

Since the previous visit, Wellpath staff who supervise inmates have been tasked with supervising more than three (recommended) as well as more than five (Wellpath practice) inmates on suicide watch, frequent overtime/double shifts, and/or while performing Direct Observation (requires 1:1 staff to prisoner ratio). Because of staffing shortages, OPSO deputies have provided up to 30% of suicide watches and have had no documented additional and specific training regarding conducting suicide watches or documentation requirements to demonstrate the adequate knowledge, skill, and ability to address the needs of inmates at risk for suicide. Inmates on suicide precautions or watch continue to obtain contraband that can be used to harm themselves. The failures to provide adequate, appropriate, well trained, and supervised suicide prevention and management services is extremely serious.

**B.4.b. Ensure that all correctional, medical, and mental health staff are trained on the suicide screening instrument and the medical intake tool.**

Finding:

Substantial Compliance

Suggestion:

Continue to provide documentation that multi-disciplinary in-service training has been completed annually for all current correctional, medical, and mental health staff to include training on updated policies, procedures, and techniques.

**B.4.c. Ensure that multi-disciplinary in-service training is completed annually by all correctional, medical, and**



*mental health staff, to include training on updated policies, procedures, and techniques. The training will be reviewed and approved by the Monitor.*

Finding:

Substantial Compliance

Suggestion:

Continue to provide documentation that multidisciplinary in-service training has been completed annually for all current correctional, medical, and mental health staff, to include training on updated policies, procedures, and techniques. OPSO/Wellpath need to provide documentation regarding training for staff on the use of therapeutic restraints. Note: This training was completed prior to the COVID pandemic and the changes in responsibilities for deputies. Updated training should include training on additional duties and responsibilities.

*B.4.d. Ensure that staff are trained in observing prisoners on suicide watch and step-down unit status.*

Finding:

Non-Compliance

Suggestion:

Documentation that current custody staff are trained, specifically, in observing inmates on suicide watch and step-down status was not provided despite repeated requests by the Monitors. Deputies are conducting up to 30% of "suicide watches" as part of their every fifteen-minute welfare checks on various units in OJC and documentation is done in logbooks and not Observation forms. Onsite Monitors observed CNA's inattentive to the inmates on watch. Inmates on suicide watch continue to obtain contraband that can be used to harm themselves. These are practices inconsistent with the Consent Judgment and are potentially highly dangerous.

*B.4.e. Ensure that all staff that have contact with prisoners are certified in cardiopulmonary resuscitation ("CPR").*

Finding:

Substantial Compliance

Suggestion:

Continue to provide documentation that all current staff, (including OPSO and Wellpath) are certified in CPR.

*B.4.f. Ensure that an emergency response bag, which includes a first aid kit and emergency rescue tool, is in close proximity to all housing units. All staff that has contact with prisoners shall know the location of this emergency response bag and be trained to use its contents.*



Finding:

Substantial Compliance

Note: The Monitors observed one bag was missing a cutdown tool. Most of the bags were unlocked and staff was unable to report on how to have bag contents checked and then locked.

**B.4.g. Randomly test five percent of relevant staff on an annual basis to determine their knowledge of suicide prevention policies. The testing instrument and policies shall be approved by the Monitor. The results of these assessments shall be evaluated to determine the need for changes in training practices. The review and conclusions will be documented and provided to the Monitor.**

Finding:

Substantial Compliance

Note: Documentation of testing of 5% of current relevant staff to determine their knowledge of suicide prevention policies was provided to have occurred in March, 2020 with a passing rate of 81%. Please provide the evaluation of the results, review, and conclusions of testing after COVID changes to determine the need for changes in training practices.

Findings:

B. 5. a.  Partial Compliance

B. 5. b.  Non-Compliance

B. 5. c.  Partial Compliance

B. 5. d.  Substantial Compliance

B. 5. e.  Non-Compliance

B. 5. f.  Partial Compliance

B. 5. g.  Partial Compliance

B. 5. h.  Substantial Compliance

B. 5. i.  Substantial Compliance

B. 5. j.  Substantial Compliance

B. 5. k.  Partial Compliance

**B.5.a. OPSO shall implement a policy to ensure that prisoners at risk of self-harm are identified, protected, and treated in a manner consistent with the Constitution.**

Finding:

Partial Compliance

Suggestion:

OPSO and Wellpath continue to reference policies are in place. Provide documentation of implementation of policies for utilization of suicide resistant cells and nonresistant cells (with



direct observation), and treatment services provided to inmates at risk for self-harm. Inmates on suicide watch are housed on various units, including IPC reportedly in shackles and continue to be placed in non-suicide resistant cells without direct observation. Clinical staff suicide observers are carrying high patient loads and working extra shifts. Deputies are providing suicide watches with minimal to no documented training in conducting watches and reportedly varying degrees of understanding of their responsibilities.  Contraband and misuse of supplies (blankets, pens, clothing, chemicals, and medications) have been obtained by inmates while on suicide watch or detox protocols. Treatment services are very limited and inadequate for inmates on suicide watch because of staffing and space needs.

***B.5.b. Ensure that suicide prevention procedures include provisions for constant direct supervision of current suicidal prisoners and close supervision of special needs prisoners with lower levels of risk (at a minimum, 15 minute checks). Correctional officers shall document their checks in a format that does not have pre- printed times.***

Finding:

Non-Compliance

Suggestion:

Since the last site visit changes in the suicide prevention program include comments in IV.B.5a. In addition, deputies have been documenting their checks in logbooks and not in compliance with timeliness or content requirements.  Please provide documentation of training, specific suicide watch procedures in IPC, and documentation of all suicide precautions, watches and direct observations.

***B.5.c. Ensure that prisoners on suicide watch are immediately searched and monitored with constant direct supervision until a Qualified Mental Health Professional conducts a suicide risk assessment, determines the degree of risk, and specifies the appropriate degree of supervision.***

Finding:

Partial Compliance

Suggestion:

Provide documentation that demonstrates that inmates are immediately searched and monitored with constant direct supervision until a QMHP conducts a suicide risk assessment, determines the degree of risk, and specifies the appropriate degree of supervision. This paragraph requires collaboration and documentation by OPSO deputies and Wellpath QMHP's. As per discussion during the visit, specify procedure for search as soon as safely necessary and requirements search of prisoner and cell to be placed in is completed prior to placement in cell for suicide watch.

***B.5.d. Ensure that all prisoners discharged from suicide precautions receive a follow-up assessment***



*within three to eight working days after discharge, as clinically appropriate, in accordance with a treatment plan developed by a Qualified Mental Health Care Professional. Upon discharge, the Qualified Mental Health Care Professional shall conduct a documented in-person assessment regarding the clinically appropriate follow-up intervals.*

Finding:

Substantial Compliance

Suggestion:

Wellpath staff report denial of access to inmates for follow-up during lockdowns. This should not occur; immediate corrective action is recommended. Provide documentation of follow-up appointments as required by policy.

*B.5.e. Implement a step-down program providing clinically appropriate transition for prisoners discharged from suicide precautions.*

Finding:

Partial Compliance

Suggestion:

Before the COVID pandemic efforts, placements for male inmates in a true step-down/residential unit and program continued, however the programming was not yet sufficient because of inadequate staffing and space to provide services. Similar services and housing did not exist for female inmates. Since COVID restrictions, group therapies and counseling have been suspended and replaced with clinical staff providing handouts for in-cell reading/activities by inmates. Individual therapies and counseling have been largely diminished. Recommend continued vigilance in developing these programs as safety concerns allow.

*B.5.f. Develop and implement policies and procedures for suicide precautions that set forth the conditions of the watch, incorporating a requirement of an individualized clinical determination of allowable clothing, property, and utensils. These conditions shall be altered only on the written instruction of a Qualified Mental Health Professional, except under emergency circumstances or when security considerations require.*

Finding:

Partial Compliance

Suggestion:

Policy is in place. Provide documentation of implementation of policy regarding individualized determinations of the conditions of watch for male and female inmates at OJC (especially for suicide watches/direct observation in non-resistant cells), and at TMC. Provide policy, procedure, and documentation regarding suicide watch in IPC.

*B.5.g. Ensure that cells designated by OPSO for housing suicidal prisoners are retrofitted to render them*



*suicide-resistant (e.g., eliminating bed frames/holes, sprinkler heads, water faucet lips, and unshielded lighting or electrical sockets).*

Finding:

Partial Compliance

Suggestion:

OPSO reports 13 suicide resistant cells for OJC. It is unclear at the time of this report how many usable and staffed suicide resistant cells have been available at TDC for males (reportedly none for females).  When non-suicidal resistant overflow cells are utilized, it has been strongly recommended and agreed the inmates in those cells be placed on direct constant observation to best provide for their safety. Please see IV.B.5f.

*B.5.h. Ensure that every suicide or serious suicide attempt is investigated by appropriate mental health and correctional staff, and that the results of the investigation are provided to the Sheriff and the Monitor.*

Finding:

Partial Compliance

Suggestion:

During discussions two cases were identified that should have been appropriate for morbidity reviews. Continue to expand Morbidity and Mortality reviews, these reviews should be structured to conduct clinical investigation, including aggregation of data, self-critical analysis and corrective action plans regarding individual inmate deaths, or intended death but also systemic concerns. The addition of the CQI Workgroup appears to have been helpful but needs to focus more on clinical as well as security systems issues and self-critical analysis.

*B.5.i. Direct observation orders for inmates placed on suicide watch shall be individualized by the ordering clinician based upon the clinical needs of each inmate, and shall not be more restrictive than is deemed necessary by the ordering clinician to ensure the safety and well being of the inmate.*

Finding:

Substantial Compliance

Suggestion:

The issue of suicide watch in IPC and use of a shackle to chair (between 1 and 5 chairs) was discussed during the visit with various descriptions. Please provide policy, procedure, and documentation of utilization in IPC since March 2020 to assist in determination of use as clinical restraint.  The case in question was placed on suicide watch/direct observation in the IPC on September 10, 2020, after threatening officers.  He was shackled to a chair for 5½ hours in IPC at deputy request.  This case should have a morbidity review to determine whether suicide watch was indeed appropriate and to



determine alternative possible approaches to this inmate.

***B.5.j. Provide the Monitor a periodic report on suicide and self-harm at the Facility. These periodic reports shall be provided to the monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. The report will include the following:***
> ***(1) all suicides;***
> ***(2) all serious suicide or self-harm attempts; and***
> ***(3) all uses of restraints to respond to or prevent a suicide attempt.***

<u>Finding:</u>

Substantial Compliance

<u>Suggestion:</u>

OPSO and Wellpath provide periodic reports on suicides, suicide attempts and self-harm. Wellpath has indicated their intent to clarify and determine status of attempts as serious or not. There has been one reported completed suicide for 2020 to date. There has been no reported use of restraints for this monitoring period, however the use of shackles for inmates on suicide watch in IPC is under review.

***B.5.k. Assess the periodic report to determine whether prisoners are being appropriately identified for risk of self-harm, protected, and treated. Based on this assessment, OPSO shall document recommended changes to policies and procedures and provide these to the Monitor.***

<u>Finding:</u>

Partial Compliance

<u>Suggestion:</u>

Provide an assessment of the periodic reports required in B.5.j., above, particularly with regard to adequacy of treatment for prisoners with multiple suicide or self-harm attempts and IPC.

<u>Findings:</u>

B. 6. a.  Partial Compliance

B. 6. b.  Substantial Compliance

B. 6. c.  Substantial Compliance

B. 6. d.  Partial Compliance

B. 6. e.  Substantial Compliance

B. 6. f.  Substantial Compliance

B. 6. g.  Substantial Compliance

***B.6.a. OPSO shall prevent the unnecessary or excessive use of physical or chemical restraints on prisoners with mental illness.***

<u>Finding:</u>

Partial Compliance



Suggestion:

Wellpath has begun to provide documentation/information regarding use of de-escalation techniques at OJC. OPSO needs to report all uses of physical and chemical restraint. OPSO and Wellpath to clarify use of restraints and suicide watch in IPC.

***B.6.b. Maintain comprehensive policies and procedures for the use of restraints for prisoners with mental illness consistent with the Constitution.***

Finding:

Substantial Compliance

Note: Provisions B.6.b., B.6.c., B.6.e, B.6.f., and B.6.g. will remain in Substantial Compliance pending resolution of practice of use of restraints for suicidal inmates in IPC.

***B.6.c. Ensure that approval by a Qualified Medical or Mental Health Professional is received and documented prior to the use of restraints on prisoners living with mental illness or requiring suicide precautions.***

Finding:

Substantial Compliance

See B.6.b.

***B.6.d. Ensure that restrained prisoners with mental illnesses are monitored at least every 15 minutes by Custody Staff to assess their physical condition.***

Finding:

Partial Compliance

Suggestion:

Deputies performing suicide watches must document their staggered every fifteen-minute checks on the appropriate Observation forms. This includes deputies in any location, including IPC.

***B.6.e. Ensure that Qualified Medical or Mental Health Staff document the use of restraints, including the basis for and duration of the use of restraints and the performance and results of welfare checks on restrained prisoners.***

Finding:

Substantial Compliance

See B.6.b.

***B.6.f. Provide the Monitor a periodic report of restraint use at the Facility. These periodic reports shall be provided to the monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. Each report shall include:***

***(1)A list of prisoners whom were restrained;***

***(2)A list of any self-injurious behavior observed or discovered while restrained; and***

***(3)A list of any prisoners whom were placed in restraints on three or more occasions in a thirty (30) day period or whom were kept in restraints for a period exceeding twenty-four (24) hours.***



<u>Finding:</u>

Substantial Compliance

See B.6.b.

***B.6.g. Assess the periodic report to determine whether restraints are being used appropriately on prisoners with mental illness. Based on this assessment, OPSO shall document recommended changes to policies and procedures and provide these to the Monitor.***

<u>Finding:</u>

Substantial Compliance

See B.6.b.

<u>Findings:</u>

B. 7. a.  Substantial Compliance

B. 7. b.  Substantial Compliance

B. 7. c.  Partial Compliance

B. 7. d.  Partial Compliance

***7.a. OPSO shall ensure that all staff who supervise prisoners have the knowledge, skills, and abilities to identify and respond to detoxifying prisoners. Within 180 days of the Effective Date, OPSO shall institute an annual in-service detoxification training program for Qualified Medical and Mental Health Staff and for correctional staff. The detoxification training program shall include:***
- ***(1) annual staff training on alcohol and drug abuse withdrawal;***
- ***(2) training of Qualified Medical and Mental Health Staff on treatment of alcohol and drug abuse conducted by the Chief Medical Officer or his or her delegate;***
- ***(3) oversight of the training of correctional staff, including booking and housing unit officers, on the policies and procedures of the detoxification unit, by the Chief Medical Officer or his or her delegate;***
- ***(4) training on drug and alcohol withdrawal by Qualified Medical and Mental Health Staff;***
- ***(5) training of Qualified Medical and Mental Health Staff in providing prisoners with timely access to a Qualified Mental Health Professional, including psychiatrists, as clinically appropriate; and***
- ***(6) training of Qualified Medical and Mental Health Staff on the use and treatment of withdrawals, where medically appropriate.***

<u>Finding:</u>

Substantial compliance

Qualified Medical and Mental Health Staff are trained regarding care for patients who have orders for monitoring and treatment of withdrawal. Some of custody staff are trained. As of July 2020, training has been documents and appears to be successful.

***7.b. Provide medical screenings to determine the degree of risk for potentially life-threatening withdrawal from alcohol, benzodiazepines, and other substances, in accordance with Appendix B.***

<u>Finding:</u>

Substantial Compliance

Incoming inmates are screened for withdrawal, in accordance with Appendix B.



Wellpath quarterly performance measurement demonstrates sustained compliance. Monitors find Wellpath measurement reliable.

***7.c. Ensure that the nursing staff complete assessments of prisoners in detoxification on an individualized schedule, ordered by a Qualified Medical or Mental Health Professional, as clinically appropriate, to include observations and vital signs, including blood pressure.***

<u>Finding:</u>

Partial Compliance

Wellpath quarterly performance measurement and the Monitor's reliability audits demonstrate that nursing care for patients on the detox protocol has not improved. There are significant lags to first dose of vital medication and between 20% and 35% missed nursing assessments.

<u>Suggestion:</u>

Enforce timely assessments for patients who are on the detox protocol. Complete a process map of the events that take place from the order for detox medication and the patient's receipt of the first dose, to identify factors that contribute to delay. Develop process improvement plans to improve timelines of the first dose of medication.

***7.d. Annually, conduct a review of whether the detoxification training program has been effective in identifying concerns regarding policy, training, or the proper identification of and response to detoxifying prisoners. OPSO will document this review and provide its conclusions to the Monitor.***

<u>Finding:</u>

Partial Compliance

An annual review was conducted for 2019, but that review lacks any evaluation or discussion of the effectiveness of training (increase in post-test scores, number needing training, etc.).

<u>Suggestion:</u>

Report on the program effectiveness to the monitors for the calendar year 2020.

<u>Findings:</u>

B. 8. a.  Partial Compliance

B. 8. b.  Substantial Compliance

***8.a. OPSO shall ensure that medical and mental health staffing is sufficient to provide adequate care for prisoners' serious medical and mental health needs, fulfill constitutional mandates and the terms of this Agreement, and allow for the adequate operation of the Facility, consistent with constitutional***

<u>Finding:</u>

Partial Compliance

Medical and mental health staffing is insufficient for most care functions at the



current time. There have been systemic delays in access to acute nursing care, chronic medical care, health assessments, detox assessments, laboratory testing and nursing assessments.  The suicide watch staffing ratio of one watcher for five or more patients is insufficient and dangerous.  The use of deputies for suicide watch is likewise dangerous, as they are currently not trained on what to look for.  Further, there is no documentation in the medical record that these patients at risk of suicide have been watched.

Suggestion:

Fund and authorize MH staff for special programs, as per Wellpath proposal.  Fund and train a sufficient number of suicide watchers to reduce the risk of unnecessary death from suicide.

***8.b. Within 90 days of the Effective Date, OPSO shall conduct a comprehensive staffing plan and/or analysis to determine the medical and mental health staffing levels necessary to provide adequate care for prisoners' mental health needs and to carry out the requirements of this Agreement. Upon completion of the staffing plan and/or analysis, OPSO shall provide its findings to the Monitor, SPLC, and DOJ for review. The Monitor, SPLC, and DOJ will have 60 days to raise any objections and recommend revisions to the staffing plan.***

Finding:

Substantial Compliance

Findings:

B. 9. a.  Partial Compliance

B. 9. b.  Partial Compliance

B. 9. c.  Partial Compliance

B. 9. d.  Partial Compliance

B. 9. e.  Partial Compliance

B. 9. f.  Partial Compliance

***B.9.a. OPSO shall develop, implement, and maintain a system to ensure that trends and incidents involving avoidable suicides and self-injurious behavior are identified and corrected in a timely manner. Within 90 days of the Effective Date, OPSO shall develop and implement a risk management system that identifies levels of risk for suicide and self-injurious behavior and requires intervention at the individual and system levels to prevent or minimize harm to prisoners, based on the triggers and thresholds set forth in Appendix B.***

Finding:

Partial Compliance

Suggestion:

Analysis of trends and incidents involving avoidable suicides and self-injurious behaviors to determine required interventions at the individual and system levels to prevent or minimize harm to inmates requires further development, particularly with regard to prisoners who have repeated suicidal or self-harming behaviors and the need for revisions



in their treatment plans and treatment activities. Incidents of inmates identified as at increased risk continue to obtain access to contraband and/or are not adequately supervised and gain access to mezzanines. Systems analysis should be helpful in identifying consistent protocols to minimize these events.

***B.9.b. The risk management system shall include the following processes to supplement the mental health screening and assessment processes: incident reporting, data collection, and data aggregation to capture sufficient information to formulate a reliable risk assessment at the individual and system levels; identification of at-risk prisoners in need of clinical treatment or assessment by the Interdisciplinary Team or the Mental Health Committee; and development and implementation of interventions that minimize and prevent harm in response to identified patterns and trends.***

Finding:

Partial Compliance

Suggestion:

Provide documentation of analysis of risk management system processes including the listed criteria, with more attention to data aggregation and analysis, and development and implementation of interventions that minimize and prevent harm in response to identified patterns and trends. The risk assessments at the individual-level by the Interdisciplinary Treatment Team and at the system- level by the Mental Health Committee and QI Work Group should include analysis of current practices such as the need for out-of-cell treatment services for inmates on the mental health caseload in segregated housing, and mental health staff participation the disciplinary process. Since the last visit, OPSO has committed to assist mental health with the provision of out of cell individual and group therapies (when resumed).  Further development of the interface of mental health with the disciplinary process, development of Behavioral Management plans for individuals and a possible unit, and identification of at-risk individuals and implementation of interventions for those with longer term incarcerations is anticipated.

***B.9.c. OPSO shall develop and implement an Interdisciplinary Team, which utilizes intake screening, health assessment, and triggering event information for formulating treatment plans. The Interdisciplinary Team shall:***
***(1) include the Medical and Nursing directors, one or more members of the psychiatry staff, counseling staff, social services staff, and security staff, and other members as clinical circumstances dictate;***
***(2) conduct interdisciplinary treatment rounds, on a weekly basis, during which targeted patients are reviewed based upon screening and assessment factors, as well as triggering events; and***
***(3) provide individualized treatment plans based, in part, on screening and assessment factors, to all mental health patients seen by various providers.***

Finding:

Partial Compliance



Suggestion:

Provide adequate documentation of completion of mental health Interdisciplinary Treatment Team meetings and rounds, and provision of adequate and timely individualized treatment plans to all mental health patients seen by various providers at OJC and TDC.

*B.9.d. OPSO shall develop and implement a Mental Health Review Committee that will, on a monthly basis, review mental health statistics including, but not limited to, risk management triggers and trends at both the individual and system levels. The Mental Health Review Committee shall:*

> *(1)      include the Medical and Nursing Director, one or more members of the psychiatry staff and social services staff, the Health Services Administrator, the Warden of the facility housing the Acute Psychiatric Unit, and the Risk Manager.*
> *(2)      identify at-risk patients in need of mental health case management who may require intervention from and referral to the Interdisciplinary Team, the OPSO administration, or other providers.*
> *(3)      conduct department-wide analyses and validation of both the mental health and self-harm screening and assessment processes and tools, review the quality of screenings and assessments and the timeliness and appropriateness of care provided, and make recommendations on changes and corrective actions;*
> *(4)      analyze individual and aggregate mental health data and identify trends and triggers that indicate risk of harm;*
> *(5)      review data on mental health appointments, including the number of appointments and wait times before care is received; and*
> *(6)      review policies, training, and staffing and recommend changes, supplemental training, or corrective actions.*

Finding:

Partial Compliance

Suggestion:

Provide documentation of Mental Health Review Committee meetings addressing all of the listed elements, including analysis of the data collected.  See IV.B.9a and b., as well as provisions on suicide prevention, training, observation/management and documentation.

*B.9.e. OPSO shall develop and implement a Quality Improvement and Morbidity and Mortality Review Committee that will review, on at least a quarterly basis, risk management triggers and trends and quality improvement reports in order to improve care on a Jail-wide basis.*

> *(1)   The Quality Improvement Committee shall include the Medical Director, the Director of Psychiatry, the Chief Deputy, the Risk Manager, and the Director of Training.*
> *(2)   The Quality Improvement Committee shall review and analyze activities and conclusions of the Mental Health Review Committee and pursue Jail-wide corrective actions. The Quality Improvement Committee shall:*
>> *i.      monitor all risk management activities of the facilities through the review of risk data, identification of individual and systemic trends, and recommendation and monitored implementation of investigation or corrective action; and*
>> *ii.     generate reports of risk data analyzed and corrective actions taken.*

Finding:

Partial Compliance

The medical and psychiatric staff report improvements in access to on-site care. Quality management activities have identified significant opportunities for improvement,



including acute and chronic care, medication management, nursing care, mental health referrals, treatment plans, and monitoring for metabolic effects and toxicity of medication. The fact that WellPath is identifying these obstacles to a reasonable level of care is an enormous improvement.  Further, there is some documentation of analysis of these data and corrective action, both improvements, though the documentation could be improved.  The corrective action plans should be more robust and they should be tracked in a coherent manner over time.

There are other problems apparent to the Monitors and to Plaintiff attorneys that have yet to be recognized by WellPath and OPSO, including significant numbers of patients "falling through the cracks" when appropriate care had been intended but never realized.

The Monitors selected 30 recent medical and mental health grievances for review. The great majority of answers were unresponsive, with statements like "I will get back to you," and no indication that this promise was fulfilled.  The quality management program has been neglecting analysis of grievances for the seven years of the Monitors tenure, notwithstanding the fact that the grievances point directly to the disorganization of the appointment system and medication management.  These problems have persisted for the duration of the consent judgment.

Suggestions:

Incorporate performance data, analysis, and trending into QI Committee minutes. Analyze grievance data and incorporate it into the quality management process.  Improve analysis and corrective action plans generally, with more specificity for root cause analysis, process design, and effective improvement strategies. Continue to improve reliability of clinical performance measurement. Ensure that the Chief Deputy (or equivalent) and Director of Training participate in meetings, with documentation. Continue to collect and report reliable data on visit disruptions due to the unavailability of custody staff for escort and/or transportation and develop interventions, with accountabilities and timelines, in collaboration with custody staff. Improve responsiveness of answers to grievances. Utilize clinical performance data for management purposes.  Continue to improve reliability of clinical performance monitoring.  Secure corporate assistance with evaluation methodology.

***B.9.f. OPSO shall review mortality and morbidity reports quarterly to determine whether the risk management system is ensuring compliance with the terms of this Agreement. OPSO shall make recommendations regarding the risk management system or other necessary changes in policy based on this review. The review and recommendations will be documented and provided to the Monitor.***



Finding:

Partial Compliance

The mortality and morbidity reviews remain perfunctory and they lack self-critical analysis. Clinical analyses are incomplete. Psychiatrists are more recently involved in morbidity reviews for patients with suicide attempts, though there were two recent suicide attempts with no morbidity review.  This was described as an "oversight."  The Monitors note that for patients attempting self-harm, morbidity reviews are insincere and defensive, without self-critical analysis.  These reviews are remarkably complacent. Corrective action plans are not well-documented and there is no annual review of findings.

Suggestion:

Develop a process to assure transparency and self-critical analysis for morbidity reviews.  Enhance analysis and problem identification in morbidity and mortality reviews. Improve corrective action plans generally, with specificity for root cause analysis, process design, and effective improvement strategies. Evaluate and report on the effectiveness of the mortality and morbidity review process.  Secure corporate assistance on evaluation methodology.

**C.      Medical Care**

*C. OPSO shall ensure constitutionally adequate treatment of prisoners' medical needs. OPSO shall prevent unnecessary risks to prisoners and ensure proper medication administration practices. OPSO shall assess on an annual or more frequent basis whether the medical services at OPP comply with the Constitution. At a minimum, OPSO shall:*

*1. Quality Managing of Medication Administration:*

*a. Within 120 days of the Effective Date, ensure that medical and mental health staff are trained on proper medication administration practices, including appropriately labeling containers and contemporaneously recording medication administration;*

*b. Ensure that physicians provide a systematic review of the use of medication to ensure that each prisoner's prescribed regimen continues to be appropriate and effective for his or her condition;*

*c. Maintain medication administration protocols that provide adequate direction on how to take medications, describe the names of the medications, how frequently to take medications, and identify how prisoners taking such medications are monitored; an*

*d. Maintain medication administration protocols that prevent misuse, overdose, theft, or violence related to medication.*

Findings:

C.1. a.  Substantial Compliance

C. 1. b.  Partial Compliance

C. 1. c.  Substantial Compliance

C. 1. d.  Substantial Compliance

Substantial lags to laboratory testing, chronic care visits and medication continue



through the period ending October.  Staff report, anecdotally that there are no longer any backlogs, yet grievances and reports from Plaintiffs' attorneys bely that statement. The lags to laboratory testing and to chronic care visits lead to lags to medication.

There are persistent and significant lags to first dose of medication prescribed for detoxification.

Suggestions:

Continue to improve performance on conformance to chronic disease protocols for medical and psychiatric conditions. Reduce lags to and lapses in medication.

**2.a. Provide the Monitor a periodic report on health care at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. Each report will include:**
> **(1) number of prisoners transferred to the emergency room for medical treatment related to medication errors;**
> **(2) number of prisoners taken to the infirmary for non-emergency treatment related to medication errors;**
> **(3) number of prisoners prescribed psychotropic medications;**
> **(4) number of prisoners prescribed "keep on person" medications; and**
> **(5) occurrences of medication variances.**

**2.b. Review the periodic health care delivery reports to determine whether the medication administration protocols and requirements of this Agreement are followed. OPSO shall make recommendations regarding the medication administration process, or other necessary changes in policy, based on this review. The review and recommendations will be documented and provided to the Monitor.**

Findings:

C. 2. a.  Substantial Compliance

C. 2. b.  Partial Compliance

Periodic reports have been sporadic. There is no indication that Wellpath has used data to improve timely access to care or medication.  There are no reports on medication contraband, with analysis of data and corrective action plans.

Suggestion:

C. 2. a. Provide reports every six months.

Suggestion:

C. 2. b. Review reports, once written, and make recommendations. Recommendations should be reviewed at committee meetings to assure multidisciplinary input. Report on medication contraband and efforts to reduce diversion of prescribed medication.

**3.a. OPSO shall notify Qualified Medical or Mental Health staff regarding the release of prisoners with serious medical and/or mental health needs from OPSO custody, as soon as such information is available.**
**3.b. When Qualified Medical or Mental Health staff are notified of the release of prisoners with serious medical and/or mental health needs from OPSO custody, OPSO shall provide these prisoners with at least a seven-day supply of appropriate prescription medication, unless a different amount is necessary and medically appropriate to serve as a bridge until prisoners can reasonably arrange for continuity of care in the community.**
**3.c. For all other prisoners with serious medical and/or mental health needs who are released from OPSO custody without advance notice, OPSO shall provide the prisoner a prescription for his or her medications,**



*printed instructions regarding prescription medications, and resources indicating where prescriptions may be filled in the community.*
*3.d. For prisoners who are being transferred to another facility, OPSO shall prepare and send with a transferring prisoner, a transition summary detailing major health problems and listing current medications and dosages, as well as medication history while at the Facility. OPSO shall also supply sufficient medication for the period of transit for prisoners who are being transferred to another correctional facility or other institution, in the amount required by the receiving agency.*

<u>Findings:</u>

C. 3. a.  Substantial Compliance

C. 3. b.  Substantial Compliance

C. 3. c.  Substantial Compliance

C. 3. d.  Substantial compliance

The proportion of patients with serious needs reached continues to increase. Once identified, the patients are receiving either a supply or a prescription that can be filled at no cost; medication pickup rates are reportedly improved at 47%. Transfer of information and medication appears to be working well.

<u>Suggestion:</u>

C. 3. a. Improve notifications.

<u>Suggestions:</u>

C. 3. b. Build on recent progress to increase numbers. Continue to counsel patients face-to-face.

**IV.    D. 1. Sanitation and Environmental Conditions**

<u>Findings:</u>

D.1. a.  Partial Compliance

D. 1. b.  Substantial Compliance

D. 1. c.  Substantial Compliance

D. 1. d.  Partial Compliance

D. 1. e.  Substantial Compliance

D. 1. f.  Substantial Compliance

D. 1. g.  Substantial Compliance

D. 1. h.  Substantial Compliance

*IV. D. 1. a. OPSO shall provide oversight and supervision of routine cleaning of housing units, showers, and medical areas. Such oversight and supervision will include meaningful inspection processes and documentation, as well as establish routine cleaning requirements for toilets, showers, and housing units to be documented at least once a week but to occur more frequently.*

<u>Finding:</u>



Partial Compliance

Observations:

The Monitor physically inspected every occupied housing unit in the OJC and TDC facilities with the exception of the COVID positive quarantine unit. Given the circumstances due to COVID and the procedural modifications made as a result of social distancing requirements, the Monitor observed the overall level of cleanliness in the housing units to be generally acceptable with some exceptions noted below.  The Monitor also interviewed the OPSO Sanitarian and Environmental Officer as well as inmates and staff during the inspection itself. The Sanitarian noted that no state inspections had been performed in May 2020 as typically scheduled due to the pandemic. OPSO was advised that the state would notify them when inspections were to resume.

OPSO was unable to provide cleaning schedule and inspection documentation included with previous inspections with the explanation that staffing and resource constraints during the COVID crisis prevented the recording and collection of this information. Specifically, the Sanitarian noted that the shower cleaning responsibilities normally performed by Sanitation staff had been turned over to Security staff to manage due to a lack of inmate workers available under COVID restrictions. The Sanitarian also reported that the section's staffing levels had remained good during the reporting period with only occasional diversion of evening Sanitation staff to other security functions.

During the virtual tour, inmate showers were specifically viewed by the Monitor. The majority of the showers appeared to be generally clean and free of trash, soap residue and drain flies. Some residual condensation was noted in at least three showers, but staff noted that each had been in use just prior to the Monitor's visit to that unit.

OPSO continues to provide substantial documentation of monthly housing unit inspections by the Environmental Officer. While the Monitor observed a generally acceptable level of cleanliness in the units viewed during the virtual tour, the monthly environmental inspection reports continue to note clutter and cleanliness issues primarily in individual cells, but also some common areas. Typical inspection notations included dirty floors/walls, lavatories, and trash/excess clutter. The documentation continues to show a reduction in the frequency of obstructed cell vents however the Monitor noted at least three housing units where at least half of the air supply vents were obstructed. These were in Unit C and on the 1st and 2nd floor.



The Environmental Inspection reports also reflected that the inspector found the unit mop/chemical closets to be secured in a majority of instances. The Monitor, however, found two doors unsecured and unsupervised by security staff. The door leading into the attorney visitation/mop closet area in 2E had actually been "tied" open by inmates inserting the video monitor handset into the door handle. There were no deputies on either 2E or 2F pod. The Monitor noted the chemical dispenser to be broken, spray bottles missing and the closet to be in disarray. This was the case in several housing units indicating a lack of supervision and security awareness on the part of the pod deputies. Sanitation staff advised that the destruction of the chemical dispensers was an increasing problem and that replacements had been difficult to obtain.

The Monitor also noted several lighting fixtures in the mop closets had been removed and was advised that inmates had been tampering with the lights by removing the mounting "rods" (all-thread) that secured the lights to the ceilings. The inmates would conceal the damage by tying the light fixture back to the ceiling with strips of material—the Monitor noted at least two fixtures still held in place in this manner. The inmates would then use the 10" to 20" rods to smash and damage cell door windows (approximately 15 to 20 windows). This has been a relatively new occurrence and poses a significant safety and security risk. This is a direct result of the pod deputies' failure to secure the mop closets when not in use and their failure to monitor the inmates when they are allowed access to the closets. The Monitor noted some clutter issues during the inspection, primarily in units with individual cells—this is also noted in the Environmental and Life-Safety inspection reports. This has been noted with every inspection and continues to be a challenge primarily for the lockdown inmate populations.

The documentation confirmed the inability of the Sanitarian and Environmental Officer to maintain consistent, regular cleaning schedules due to the COVID pandemic restrictions.

Grievances regarding sanitation issues were minimal (3) during the rating period. Inmate reports via grievance of inadequate or missing cleaning supplies were consistently low however this was an issue noted in the notes of several "town hall" meetings conducted by the Sanitarian in the housing units. Inmates, particularly in restricted or lock-down dorms reported verbally there was a lack of cleaning chemicals and a lack of access to cleaning chemicals purportedly due to COVID restrictions. The Monitor reviewed the Sanitation staff's



chemical refill documentation for the housing units on the 1st, 2nd, and 3rd floors (housing units with 1-2 person cells)—specifically the E23 disinfectant. The documentation reflected a significant drop in the replenishment of this cleaning chemical during the pandemic. Some of this drop may be attributed to the initial drop in population, but it is the Monitor's opinion that the COVID restriction procedures have substantially impaired the inmates' ability to clean and disinfect common areas as well as their cells. Inmates complained to the Monitor that they are unable to clean, wash clothing, shower and make phone calls during their one to two hours out of their cells daily. Several complained on not being able to get out of their cells at all on some days. Pod deputies were asked how the inmates were allowed out of their cells. They stated that only the day shift was responsible for allowing inmates their dayroom time. One deputy stated that, depending on the number of inmates in the unit, she could not allow all of them out during her shift. She stated she would start with those still lacking time out the next day. She stated she could not verify whether these inmates would get time out if she were not present the next day. It is recommended that the Unit Managers adopt a uniform procedure for allowing inmates dayroom time to insure all receive at least one hour per day in lockdown units and as much as possible in general population housing taking into account social distancing requirements.

Directly related to sanitation in the inmate housing units and the control of infectious disease within the jail is the Monitor's observations of the OPSO COVID-19 policy/procedures related to social distancing within the units and the sanitation of common areas.

While the OPSO COVID-19 policy does not specifically address social distancing, the Monitor again observed several housing pods with one/two person cells being managed so as to promote social distancing. The procedure consisted of allowing only a fraction of the inmates access to the dayroom at any given time for a two-hour period on a rotational basis. The Monitor did not observe a significant number of inmates in the dayrooms conversing with inmates locked in their cells or passing items as with the previous inspection. However, inmates were observed to be using furniture, fixtures, and equipment (e.g., phone handsets and video screens) without any efforts at sanitation between uses. Inmates were observed congregating in several dayrooms without wearing their issued face masks. Inmates in open dormitories also failed to wear masks consistently, particularly while in their bunks. In Pod 2E, the pod with no deputy present, five inmates were found by the Monitor congregating in



a single cell on the upper tier apparently smoking some sort of contraband. OPSO is encouraged to review the actual management of these activities by line staff to ensure the greatest possible benefit is realized from their efforts to control the spread of COVID-19 within the jail.

The Monitor found two instances where two types of chemicals and latex paint were stored in two chemical storage rooms and were not on approved chemical list and/or had no corresponding Safety Data Sheet. The Sanitarian corrected the issues immediately.

As previously noted, regular provision of clean inmate clothing and bedding and appropriate inventory of these supplies are essential to sanitation, infection control and disease prevention. The Sanitarian reported that she was able to maintain an adequate supply of inmate clothing for issue and exchange. As with the previous inspection, the increased frequency of clothing exchange for inmates in COVID-19 affected pods continues. The Sanitarian noted no issue with the laundry vendor's performance. Inmates continue to launder their personal items (e.g. underwear, shorts) in the washing machines and dryers located in each housing unit when allowed. COVID restrictions in the housing units, particularly lockdown and quarantine pods do not allow inmates enough time to launder personal items in the provided washers and dryers. The Monitor was advised that management is considering a new procedure where inmate workers will be assigned to wash inmates' personal items for them overnight in the quarantine pods. The Monitor recommends that management consider the same procedure for inmates in disciplinary lockdown and segregation. The Monitor further recommends that any inmate workers assigned this task receive proper instruction on the safe handling of the clothing and be issued the proper personal protective equipment.

The Monitor observed the majority of the clothes dryers located in OJC's inmate housing units were generally serviceable although several had effectively non-functional exhaust lines typically found in the open dormitories. The lines were crushed against the wall, torn, or disconnected. One washer/dryer set in one of the dormitories had been removed by Maintenance staff and not replaced. Inmates continue to tamper with and/or used to heat water-filled latex gloves stuffed into the lint traps or placed under a towel draped over the dryer exhaust port to heat water. The tampering was readily apparent to the Monitor and should have been to the pod officer. One washer electrical outlet had been shorted out by inmates attempting to create a "stinger" device and the damage was extensive



enough to destroy the outlet and trip the circuit back to the circuit breaker in the electrical room. The Maintenance Section noted that the contractor hired to repair the washers and driers as issues arise has been very helpful. As noted previously, this increased attention was more apparent in the pods where the laundry area is secured. The accumulation of lint behind and above the driers as well as on the surface of return-air grills was noted to be less prevalent than during previous inspections.

During the inspection, the Monitor noted via video that the accumulation of inmates' personal items (paperwork, commissary purchases, and other approved items) was at acceptable levels in most areas. As noted previously, the most problematic areas continue to be the high-security units.

***IV. D. 1. b. Continue the preventive maintenance plan to respond to routine and emergency maintenance needs, including ensuring that showers, toilets, and sink units are adequately installed and maintained. Work orders will be submitted within 48 hours of identified deficiencies, or within 24 hours in the case of emergency maintenance needs.***

Finding:

Substantial Compliance

Observations:

The Monitor reviewed the Sanitation and Environmental Conditions report, the OPSO Preventive Maintenance Plan, the Preventive Maintenance Schedule Summary report, and a Preventive Maintenance work orders status report as well as inmate grievances related to maintenance issues. The Monitor also interviewed the Maintenance Director. The documentation reflected an on-going preventive maintenance program for major building systems and components consistent with OPSO policy and the Consent Judgment. Deferred preventive maintenance did not appear to have risen due to the COVID pandemic and the Maintenance Director confirmed his staff had not been substantially impacted the section's ability to address both preventive maintenance and calls for service beyond the impacts noted in Report #12.

 Individual inmate interviews conducted during the walk-thru in each housing unit revealed no significant complaints by inmates regarding water, electric or HVAC services in individual cells that were not addressed in a timely fashion. The Monitor did note several issues with water pressure at the restroom sinks in open dormitory pods and with water fountains in at least two pods. As with the previous inspection, there was no marked increase/decrease in the number of grievances received on a monthly basis also indicating



that routine issues with basic plumbing, mechanical or electrical services in inmate cells or dayrooms are typically remedied within 48 to 72 hours and that work orders are being submitted in a timely manner as required by the Consent Judgment ("Work orders will be submitted within 48 hours of identified deficiencies, or within 24 hours in the case of emergency maintenance needs").

Of particular note, inmates reported to the Monitor that security staff routinely failed to answer intercom calls made by the inmates "even when the deputy is in the pod". It was the Monitor's understanding that the pod control room operator would answer intercom calls when the pod deputy is unavailable to do so even when present in the pod. Upon investigation, the Monitor learned that the pod control room cannot answer intercom calls when the pod deputy is logged into the pod control station. The underlying issue seems to be a number of missing or broken microphone/speaker modules at the pod deputy desks. The inmates stated that grievances had been filed about the issue. It is unclear if security staff have reported all intercom system issues to Maintenance. Grievance staff stated they will be copying Maintenance on such grievances to ensure Maintenance is aware of any such reports by inmates.

***IV. D. 1. c. Maintain adequate ventilation throughout OPSO facilities to ensure that prisoners receive adequate air flow and reasonable levels of heating and cooling. Maintenance staff shall review and assess compliance with this requirement, as necessary, but no less than twice annually.***

Finding:

Substantial Compliance

Observations:

Adequate air flow is maintained in the facilities but continues to be impeded in a few inmate cells when inmates block the air vents. As noted above, the Monitor noted at least three housing units where the inmates in at least half of the cells in the pod had partially or completely covered over the supply vent in their cell. This impedes the HVAC's proper functioning and potentially impacts the system's ability to provide the required 15 air exchanges per hour in cells with a toilet. This is an inmate supervision issue and must be addressed by security staff. The Monitor noted that the majority of housing dayrooms and cells to be at a relatively reasonable levels of heating and cooling so this section's rating remains in Substantial Compliance.

As noted in the two previous reports, test and balance reports for the Kitchen/Warehouse (2014), OJC (2017) and TDC (2012) were the latest available to the



Monitor.

Prior to the September 2019 report, this section had been interpreted as requiring comprehensive "test and balance" assessments on a semi-annual basis. Such assessments are very expensive and typically performed only during the commissioning of new or replacement HVAC systems. As with the previous two inspections, the Monitor met with the Maintenance Director specifically to discuss the status and capabilities of the OJC Building Automation System that controls the heating and cooling throughout all occupied areas in OJC. The Maintenance Director provided screenshots of all mechanical, electrical and plumbing systems controlled by the BAS demonstrating the real-time monitoring of the systems for the Monitor's review as well as their operating status at the time the screenshots were taken. A report of the system's warning and alarm functions was also generated which reflected no major equipment or systems issues at the time the report was generated.

The system can automatically compensate for changes in climate and heat load as well as increased or decreased demand for air flow, mechanical breakdowns typically require physical repair by Maintenance staff. The Maintenance Director was again able to provide documentation reflecting work orders generated for the repair/replacement of mechanical system components restoring the system to normal operation. It is the Monitor's opinion that the OJC Building Automation System, as currently operated, meets the intent of the Consent Judgment with regard to this section.

***IV. D. 1. d. Ensure adequate lighting in all prisoner housing units and prompt replacement and repair of malfunctioning lighting fixtures in living areas within five days unless the item must be specially ordered.***

<u>Finding:</u>

Partial Compliance

<u>Observations:</u>

The Monitor observed sufficient lighting being provided in housing units and individual cells of both OJC and TDC. Maintenance staff continue to maintain a supply of replacement bulbs, transformers, or ballasts to repair malfunctioning lighting. However, during this inspection the Monitor noted several light fixtures in the pod mop closets to have been removed due to inmate tampering and at least two fixtures still in place held up by cloth strips (also due to inmate tampering). This presents a safety and security hazard to both inmates and staff and is a direct result of pod deputies failing to secure the mop closets



and provide direct supervision of the inmates when they are allowed access to the closets. The Monitor observed no outstanding electrical work orders beyond routine bulb replacement and the issue noted above.

***IV. D. 1. e. Ensure adequate pest control throughout the housing units, including routine pest control spraying on at least a quarterly basis and additional spraying as needed.***

Finding:

Substantial Compliance

Observations:

A review of the documentation submitted found sufficient evidence of a pest control program that meets the intent of the Consent Judgment. OPSO continues to maintain a pest control contract with a state licensed company for monthly service of all housing areas and bi-weekly service for the Kitchen/Warehouse. Inmate grievances related to pest control were reviewed and found to have been addressed in a timely manner. The Monitor observed no "drain fly" issues anywhere in the facility.

Environmental, Sanitation and Life-Safety staff performing inspections and responding to pest control grievances continue to initiate work orders for pest control and to document how, when. and where infestations are identified and remedied.

***IV. D. 1.f. Ensure that any prisoner or staff assigned to clean a biohazardous area is properly trained in universal precautions, outfitted with protective materials, and properly supervised.***

Finding:

Partial Compliance

Observations:

As noted in previous inspections, Policy 1101.07, "Bio-hazardous Spill Cleaning Procedures" [Revised 1/18/2018] Section VIII. A. 1 has been revised to allow properly trained and equipped inmates and deputies to clean-up bio-hazardous spills. Training materials were devised by the Sanitarian. No inmates were trained during the rating period according to the Sanitarian as no inmates have been assigned to the section during the COVID pandemic. The Monitor also reviewed training curricula and documentation indicating that during 2020, all pre-service staff received training in bio-hazardous cleanup procedures as part of their initial training in each new-hire class in 2020. Documentation reflected that the in-service training for this requirement had been postponed due to the pandemic. No training had occurred as of the date of the inspection.

As of November 2018, the Sanitation and/or Environmental Officer is required to be



notified of such incidents each business day to enable them to replace any bio-hazardous clean up protective materials used and inspect the area to ensure it was properly cleaned and sanitized. The Sanitarian reported that three such incidents reports were received during the rating period covered by this inspection and that she responded to two additional incidents personally and replaced those kits. The Monitor personally inspected the emergency response kits in each pod control room and found one kit to be missing. The Sanitarian immediately replaced the biohazard clean up kit. Security staff's failure to make this notification made it impossible for the Sanitarian to properly inspect the affected area in a timely manner as required by policy. The Monitor strongly urges the supervisory chain address this deficiency given the potential health and safety impact.

***IV. D. 1. g. Ensure the use of cleaning chemicals that sufficiently destroy the pathogens and organisms in biohazard spills.***

Findings:

Substantial Compliance

Observations:

The Monitor was able to make direct observation of the chemicals on-hand and available to staff were sufficient to destroy the pathogens and organisms in bio-hazardous spills common in a jail environment to include the COVID-19 virus. The Sanitarian stated that an additional chemical had been added and was the primary disinfectant being given to inmates and staff in the pods to disinfect common areas and cells. Chemical inventory records indicate this product was added in August 2020. Based upon this statement and observations made during previous inspections, the Monitor is continuing to rate this section as being in substantial compliance.

Additionally, the chemical storage inventory documentation submitted demonstrated availability of a consistent supply of the required chemicals being maintained by the designated staff.

***IV. D. 1. h. Maintain an infection control plan that addresses contact, blood borne, and airborne hazards and infections. The plan shall include provisions for the identification, treatment, and control of Methicillin-Resistant Staphylococcus Aureus ("MRSA") at the Facility.***

Findings:

Substantial compliance

Observations:

As with the previous inspection, the Monitor reviewed the OPSO infection control



policy 1201.11 as well as the WellPath Infection Control Program document (rev. 8/30/18) submitted by OPSO. All requisite areas required by the Consent Judgement were addressed, to include MRSA, and included by OPSO for the Monitor's review and found sufficient.

The Monitor was unable to directly observe the handling and sanitation of inmate mattresses in OJC or TDC. No violations were observed during the inspection at either facility. OPSO has previously provided for annual review of the policy and standard operating procedures for the handling of inmate mattresses to include staff and/or inmate sanitation training program that includes mattress cleaning, and chemical use and control. This procedure is specifically required by the Infection Control Plan.

**IV. D. 2. Environmental Control**

Findings:

D. 2. a.  Substantial Compliance

D. 2. b.  Substantial Compliance

***IV. D. 2. a. OPSO shall ensure that broken or missing electrical panels are repaired within 30 days of identified deficiencies, unless the item needs to be specially ordered.***

Findings:

Substantial Compliance

Observations:

OPSO Policies 601.02 "Reporting and Addressing Maintenance Needs" and Policy 601.03 "Preventive Maintenance" [August 15, 2016] and are implemented. Major electrical panels at OJC and TDC are located in secure maintenance spaces inaccessible to inmates.

***IV. D. 2. b. Develop and implement a system for maintenance and timely repair of electrical panels, devices, and exposed electrical wires.***

Findings:

Substantial Compliance

Observations:

The Monitor noted new issues related to exposed/damaged wiring/cabling during the tour. While investigating the extent of damage caused to an electrical circuit by inmate tampering with an outlet in a housing unit, the Monitor observed that the circuit breaker in the electrical room had been tripped. The outlet had not been repaired/replaced and was not safe to be re-energized nor was a "lock-out/tag-out" device placed on the circuit breaker to prevent accidental resetting of the breaker. It did not appear that Maintenance staff had been made aware of the damage through the work order system by security staff as should



have occurred. The Maintenance Director advised that a "lock-out/tag-out" system and procedure would be investigated and implemented.

The Monitor considers this to be sufficient to support a continued finding of Substantial Compliance.

**IV. D. 3. Food Service**

This report summarizes the findings for the Food Service provisions of the Consent Judgment based on the Monitor's document reviews and tour conducted November 9-12, 2020.  The Monitor inspected the Orleans Justice Center (OJC) Kitchen/Warehouse; observed meal service activities; and spoke with OPSO supervisors and deputies, Summit contracted food service employees, and inmates.

Since the last tour on May 18-22, 2020, OPSO has maintained compliance with the Food Service provisions resulting in sections IV. D. 3. a, IV. D. 3. b., and IV. D. 3. c. of the Consent Judgment remaining in substantial compliance.

Findings:

D. 3. a. Substantial Compliance

D. 3. b. Substantial Compliance

D. 3. c. Substantial Compliance

***IV. D. 3. a. OPSO shall ensure that food service staff, including prisoner staff, continues to receive in-service annual training in the areas of food safety, safe food handling procedures, and proper hygiene, to reduce the risk of food contamination and food-borne illnesses.***

Findings:

Substantial Compliance

Observations:

OPSO and Summit continue to provide documentation of ongoing annual in-service food safety training for staff, including inmate workers, and therefore D. 3. a. remains in Substantial Compliance for the period of April 2020 through September 2020.

***IV. D. 3. b. Ensure that dishes and utensils, food preparation and storage areas, and vehicles and containers used to transport food are appropriately cleaned and sanitized on a daily basis.***

Findings:

Substantial Compliance

Observations:

OPSO and Summit food service management staff have continued to maintain significant improvements in cleaning and sanitization and D. 3. b. remains in Substantial



Compliance for the period of April through September 2020. Although the COVID-19 pandemic has significantly limited the number of inmate workers that are available to work in the kitchen, OPSO has assigned additional deputies to work in the kitchen alongside Summit staff to ensure that the daily kitchen functions are completed, including cleaning tasks. The Monitor observed the kitchen to be clean.

OPSO uses a logbook to document that the truck used to transport the meals from the kitchen to the jail is swept, washed, rinsed, and sanitized after delivering the breakfast, lunch, and dinner meals. However, when the logbook was reviewed on November 11, 2020, it was found that the last entry was for the breakfast meal on November 8, 2020. The OPSO kitchen supervisors stated that the truck is cleaned and sanitized after every meal. However, because a failure to make entries in the logbook does not necessarily mean that the truck was not cleaned and the interior of the box truck's cargo space was found to be clean and odor-free while observing the process of loading the food carts on the truck at the kitchen and offloading the food carts at the OJC dock, this finding will not negatively impact this compliance rating. The Consent Judgment requires that OPSO ensure that the vehicles used to transport food are appropriately cleaned and sanitized on a daily basis, and a logbook is an effective tool to facilitate compliance with ensuring that vehicles are cleaned and sanitized, while also providing documentation that it was done. However, failing to make entries in a logbook is not only a poor practice, but it also makes it an unreliable record.

- OPSO kitchen supervisors should hold their truck drivers responsible for completing documentation and logs related to ensuring that the vehicles used to transport food are cleaned and sanitized on a daily basis, in a consistent and timely manner.

***IV. D. 3. c. Check and record on a daily basis the temperatures in the refrigerators, coolers, walk-in refrigerators, the dishwasher water, and all other kitchen equipment with a temperature monitor, to ensure proper maintenance of food service equipment.***

<u>Findings:</u>

Substantial Compliance

<u>Observations:</u>

The Consent Judgment requires that OPSO "Check and record on a daily basis the temperatures in the refrigerators, coolers, walk-in refrigerators, the dishwasher water, and all other kitchen equipment with a temperature monitor, to ensure proper maintenance of food service equipment." Temperatures are used as a means of confirming the working



condition of kitchen equipment by measuring with a properly calibrated thermometer or temperature measuring device and documenting the operating temperature to ensure that it complies with the temperatures specified in the Louisiana Food Code. The Monitor reviewed temperature documentation and tested random food temperatures during the tour. The dishwasher and refrigeration/cooler temperature logs were reviewed and found to be compliant with the following exception. A refrigerator on casters was observed at TDC that held approximately six unlabeled, undated meal trays. The digital temperature gauge on the refrigerator read 33°F, which is an appropriate temperature. However, there was not a temperature log or record for the refrigerator as required by D. 3. c. stating, "Check and record on a daily basis the temperatures in the refrigerators." The refrigerator was observed to be dirty with an accumulation of food debris and crumbs in the bottom of the unit. The Monitor's concern is not that the meals found in the refrigerator were going to be served to inmates, rather that all refrigerators that are used to hold or store food or meal trays are maintained in accordance with the Consent Judgment.

- The refrigerator at TDC should be kept clean and free of food debris as required by D. 3. b. of the Consent Judgement stating that food storage areas are appropriately cleaned and sanitized on a daily basis.
- OPSO supervisors should ensure that the temperature of the refrigerator at TDC is checked and recorded on a daily basis with a temperature monitor, to ensure the proper maintenance of foodservice equipment. as required by D. 3. C. of the Consent Judgment.

On November 9, 2020, the lunch meal service was observed at OJC. Per the established OPSO policy and procedure, the food temperature on random meal trays was measured. The food on the regular/general diet trays was measured at appropriate temperatures. However, the temperatures of the medical diet trays were found to be below the OPSO established acceptable temperature threshold. The kitchen managers immediately and appropriately instructed the kitchen to remake all of the medical diet trays. Although replacing all of the medical diets caused a significant delay in the lunch meal and undoubtedly caused difficulties for the jail, it helped ensure that the food was not only palatable, but that it was safe. OPSO and Summit kitchen management immediately began investigating the cause of the temperature problem and working together to implement improvements to the preparation of medical diets to help prevent future occurrences.



Therefore, the Monitor views this as a success, rather than a failure, as it is an indicator that OPSO has implemented an effective and functional policy and procedure and that the OPSO and Summit food service managers continue to cultivate sound operational decision-making skills. Therefore, this finding will not adversely affect the compliance rating and D. 3. c. remains in Substantial Compliance for the period of April through September 2020. OPSO and Summit should continue to strive to maintain all temperatures within the established limits and document temperature problems along with corrective actions. However, to remain in Substantial Compliance, temperatures below the OPSO and Summit established limits and below those specified in the Louisiana Food Code must remain the exception, occurring as outliers.

### IV. D. 4. Sanitation and Environmental Conditions Reporting

Findings:

D.4. a. Substantial Compliance

D.4. b. Substantial Compliance

***D. 4. a. Provide the Monitor a periodic report on sanitation and environmental conditions in the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. The report will include***
    ***(1) number and type of violations reported by health and sanitation inspectors;***
    ***(2) number and type of violations of state standards;***
    ***(3) number of prisoner grievances filed regarding the environmental conditions at the Facility;***
    ***(4) number of inoperative plumbing fixtures, light fixtures, HVAC systems, fire protection systems, and security systems that have not been repaired within 30 days of discovery;***
    ***(5) number of prisoner-occupied areas with significant vandalism, broken furnishings, or excessive clutter;***
    ***(6) occurrences of insects and rodents in the housing units and dining halls; and***
    ***(7) occurrences of poor air circulation in housing units.***

Findings:

Substantial Compliance

Observations:

The January-June 2020 Sanitation and Environmental report was made available to the Monitor prior to the November 2020 inspection tour. The report contained the requisite information spelled out by the Consent Judgement as well as supporting documentation.

***IV. D. 4. b. Review the periodic sanitation and environmental conditions reports to determine whether the prisoner grievances and violations reported by health, sanitation, or state inspectors are addressed, ensuring that the requirements of this Agreement are met. OPSO shall make recommendations regarding the sanitation and environmental conditions, or other necessary changes in policy, based on this review. The review and recommendations will be documented and provided to the Monitor.***

Findings:

Substantial Compliance



Observations:

The Consent Judgment requires a review of the periodic sanitation and environmental conditions reports to ensure issues are addressed along with making recommendations regarding sanitation and environmental conditions and policy changes based upon the review. Such reviews are to be documented and provided to the Monitor. The Monitor reviewed the supporting documentation provided by OPSO and determined that it was sufficient to satisfy the requirements of the Consent Judgment. OPSO provided documentation of the required review and basic analysis of prisoner grievances and inspection violations noted regarding sanitation and environmental conditions during the rating period.

**IV. E. 1. Fire and Life Safety**

Findings:

E.1. a.  Substantial Compliance

E. 1. b.  Substantial Compliance

E. 1. c.  Substantial Compliance

E. 1. d.  Substantial Compliance

E. 1. e.  Substantial Compliance

***IV. E. 1. a. Ensure that necessary fire and life safety equipment is properly maintained and inspected at least quarterly. These inspections must be documented.***

Finding:

Substantial Compliance

Observations:

The Monitor was able to conduct a tour of the OJC, TDC, and the Kitchen/Warehouse facilities during the November 2020 with the Facility Life Safety Officer. The Monitor observed no major issues with the fire and life safety equipment. One fire extinguisher in the IPC area was found lacking a current inspection. The Fire Alarm Control Panel in OJC indicated a trouble fault related to a recreation yard door in one of the pods. The doors are integral to the smoke evacuation system. The remaining recreation yard door in the pod remains functional. The problem is being addressed by Life Safety and Maintenance staff and has been identified as a wiring issue. Options to repair the issue were being considered at the time of the inspection. The Monitor advised the Maintenance Director of a potential electrical code issue with control and high voltage wiring being contained within the same



conduit running to this door and potentially to others.  The Maintenance Director agreed to follow up on the issue. The panel had previously been "Green Tagged" during the latest contractor and Fire Marshall inspections. The FACP in TDC Building 4 that indicated a backflow preventer "trouble" alarm during the previous inspection had been cleared. The Monitor also reviewed all monthly and quarterly inspection documentation as well as outside inspection documentation noting no significant issues and that requisite work orders had been generated when warranted.

Life Safety staff continue to use the "Facility Dude" work order system to maintain the schedule of required inspections. The system notifies the Fire Safety Officer when an inspection is due. OPSO continues to maintain contracts with licensed vendors to complete annual inspections of all fire and life safety equipment. OPSO provided copies of quarterly inspections conducted by the Fire Safety Officer for Kitchen/Warehouse, OJC, and TDC for the second and third quarter of 2020. This documentation, supported by observations during the compliance tour, indicates that OPSO ensures that necessary fire and life safety equipment is properly maintained and inspected at required intervals. These inspections are conducted by a qualified fire safety officer or a qualified contractor, as required by the Consent Judgment.

***IV. E. 1. b. Ensure that a qualified fire safety officer conducts a monthly inspection of the facilities for compliance with fire and life safety standards (e.g., fire escapes, sprinkler heads, smoke detectors, etc.).***

<u>Finding:</u>

Substantial Compliance

<u>Observations</u>:

The Monitor was provided with the monthly inspection documents for the Kitchen /Warehouse, OJC, and TDC facilities performed during the current inspection period. The reports are thorough and complete with all noted discrepancies listed with the associated work order number.

***IV. E. 1. c. Ensure that comprehensive fire drills are conducted every six months. OPSO shall document these drills, including start and stop times and the number and location of prisoners who were moved as part of the drills.***

<u>Finding:</u>

Substantial Compliance

<u>Observations</u>:

The Consent Judgment requires comprehensive fire drills every six months. OPSO



provided documentation for fire drills for all facilities and shifts conducted during the current rating period. Only "Level 1" drills were conducted (no inmate evacuation) due to COVID 19 restrictions. Documentation reviewed by the Monitor noted in excess of 90% of available OJC and TDC (by squad) had participated in at least one drill during the rating period. In addition to the detailed drill reports, the documentation lists, by name, any delinquent staff with the listing provided to senior management for the coordination of make-up training. Pre-service training was provided to all participants in classes held during the rating period.

***IV. E. 1. d. Provide competency-based training to staff on proper fire and emergency practices and procedures at least annually.***

Finding:

Substantial Compliance

Observations:

OPSO has developed the requisite policy, training course syllabus/outline and written directives. OPSO training staff provided documentation noting that the required competency-based training on fire and emergency practices had been delayed until December 2020 due to the pandemic crisis. This section remains in Substantial Compliance pending the results of training in December.

***IV. E. 1. e. Within 120 days of the Effective Date, ensure that emergency keys are appropriately marked and identifiable by touch and consistently stored in a quickly accessible location, and that staff are adequately trained in use of the emergency keys.***

Finding:

Substantial Compliance

Observations:

Inspection reports note the routine verification of the keys and the Fire Safety Officer documents the periodic testing of the keys to verify they are operational. The Fire Safety Officer trains staff on the use of the location and use of the keys during the fire and life safety training curriculum provided to all staff at the training academy.

**IV. E. 2. Fire and Life Safety Reporting**

Findings:

E. 2. a.  Substantial Compliance

E. 2. b.  Substantial Compliance

***IV. E. 2. a. (1) – (3) Provide the Monitor a periodic report on fire and life safety conditions at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date and every***



*six months thereafter until termination of this Agreement. Each report shall include:*
> *(1) number and type of violations reported by fire and life safety inspectors;*
> *(2) fire code violations during annual fire compliance tours; and*
> *(3) occurrences of hazardous clutter in housing units that could lead to a fire.*

Finding:

 Substantial Compliance

Observations:

The 2020 Fire and Life Safety Conditions reports generated during the rating period were made available to the Monitor prior to the November 2020inspection. The reports contained the requisite information spelled out by the Consent Judgment as well as supporting documentation.

*IV. E. 2. b. Review the periodic fire and life safety reports to determine whether the violations reported by fire and life safety inspectors are addressed, ensuring the requirements of this Agreement are being met. OPSO shall make recommendations regarding the fire and life safety conditions, or other necessary changes in policy, based on this review. The review and recommendations will be documented and provided to the Monitor.*

Finding:

 Substantial Compliance

 Observations:

The Consent Judgment requires a review of the periodic fire and life safety reports to ensure issues are addressed along with making recommendations regarding the fire and life safety conditions and policy changes based upon the review. Such reviews are to be documented and provided to the Monitor.

The Monitor reviewed the supporting documentation provided by OPSO and determined that it was sufficient to satisfy the requirements of the Consent Judgment. OPSO provided documentation of the required review and basic analysis of fire and life safety conditions as well as any necessary changes in policy or procedure.

Meeting minutes from the previous review indicated the OPSO Life Safety Officer communicated the information in IV. E. 2. a. (1) – (3), however, the Monitor noted a change in OPSO counting rules for reporting the number of violations relative to Item#3 above in Report #12 and addressed during the monthly Fire and Life/Safety inspections. Prior to this submission, each violation was counted each month if observed and reported cumulatively. The change in reporting resulted in a single violation being counted only once regardless of the number of times the violation was observed during subsequent inspections. This resulted in a precipitous, and somewhat misleading, drop in the number of violations



reported in the Semi-Annual Report. The Monitor discussed the change with OPSO and recommended alternative methods of reporting that may reflect a clearer picture of the actual conditions over time. As the information was still available in the monthly inspection reports and reviewable by the Monitor, the Monitor believes a continued finding of Substantial Compliance is justified.

### IV. F. Language Assistance

*F.1.a. OPP shall ensure effective communication with and provide timely and meaningful access to services at OPP to all prisoners at OPP, regardless of their national origin or limited ability to speak, read, write, or understand English. To achieve this outcome, OPP shall:*

> *(1)   Develop and implement a comprehensive language assistance plan and policy that complies, at a minimum, with Title VI of the Civil Rights Act of 1964, as amended, (42 U.S.C. § 2000d et seq.) and other applicable law;*
>
> *(2)   Ensure that all OPP personnel take reasonable steps to provide timely, meaningful language assistance services to Limited English Proficient ("LEP") prisoners;*
>
> *(3)   At intake and classification, identify and assess demographic data, specifically including the number of LEP individuals at OPP on a monthly basis, and the language(s) they speak;*
>
> *(4)   Use collected demographic information to develop and implement hiring goals for bilingual staff that meet the needs of the current monthly average population of LEP prisoners;*
>
> *(5)   Regularly assess the proficiency and qualifications of bilingual staff to become an OPP Authorized Interpreter ("OPPAI");*
>
> *(6)   Create and maintain an OPPAI list and provide that list to the classification and intake staff; and*
>
> *(7)   Ensure that while at OPP, LEP prisoners are not asked to sign or initial documents in English without the benefit of a written translation from an OPPAI.*

*F.2.a. OPP shall develop and implement written policies, procedures and protocols for documenting, processing, and tracking of individuals held for up to 48 hours for the U.S. Department of Homeland Security ("DHS");*

*F.2.b Policies, procedures, and protocols for processing 48-hour holds for DHS will:*

> *(1)   Clearly delineate when a 48-hour hold is deemed to begin and end;*
>
> *(2)   Ensure that, if necessary, an OPPAI communicates verbally with the OPP prisoner about when the 48-hour period begins and is expected to end;*
>
> *(3)   Provide a mechanism for the prisoner's family member and attorney to be informed of the 48-hour hold time period, using, as needed, an OPPAI or telephonic interpretation service;*
>
> *(4)   Create an automated tracking method, not reliant on human memory or paper documentation, to trigger notification to DHS and to ensure that the 48-hour time period is not exceeded.*
>
> *(5)   Ensure that telephone services have recorded instructions in English and Spanish;*
>
> *(6)   Ensure that signs providing instructions to OPP prisoners or their families are translated into Spanish and posted;*
>
> *(7)   Provide Spanish translations of vital documents that are subject to dissemination to OPP prisoners or their family members. Such vital documents include, but are not limited to:*
>> *i.     grievance forms;*
>> *ii.    sick call forms;*
>> *iii.   OPP inmate handbooks;*
>> *iv.    Prisoner Notifications (e.g., rule violations, transfers, and grievance responses) and*
>> *v.     "Request for Services" forms.*
>
> *(8)   Ensure that Spanish-speaking LEP prisoners obtain the Spanish language translations of forms provided by DHS; and*
>
> *(9)   Provide its language assistance plan and related policies to all staff within 180 days of the Effective Date of this Agreement.*

*F.3.a. Within 180 days of the Effective Date, OPP shall provide at least eight hours of LEP training to all corrections and medical and mental health staff who may regularly interact with LEP prisoners.*

> *(1)   LEP training to OPP staff shall include:*
>> *i.     OPP's LEP plan and policies, and the requirements of Title VI and this Agreement;*



*ii.  how to access OPP-authorized, telephonic and in-person OPPAIs; and*

*iii.  basic commands and statements in Spanish for OPP staff.*

*(2) OPP shall translate the language assistance plan and policy into Spanish, and other languages as appropriate, and post the English and translated versions in a public area of the OPP facilities, as well as online.*

*(3) OPP shall make its language assistance plan available to the public.*

*F.4.*

*(1)  OPP shall ensure that adequate bilingual staff are posted in housing units where DHS detainees and other LEP prisoners may be housed.*

*(2)  OPP shall ensure that an appropriate number of bilingual staff are available to translate or interpret for prisoners and other OPP staff. The appropriate number of bilingual staff will be determined based on a staffing assessment by OPP.*

<u>Findings:</u>

F.1. a. Substantial Compliance

F. 2. a.  Substantial Compliance

F. 2. b.  Substantial Compliance

F. 3. a. Partial Compliance

F. 4. Substantial Compliance

<u>Observations</u>:

The Language Assistance Plan required by this paragraph has now been prepared and finalized.

While OPSO asserts that DHS and ICE inmates are not detained, OPSO has developed a policy which was submitted to the Monitors which brings provisions F. 2. a. and b. into substantial compliance.

OPSO provided documentation regarding the use of the language line. OPSO has provided documentation regarding the number of bilingual staff and the manner in which the needs of language assistance are provided bringing provisions of F. 4. into substantial compliance. The Consent Judgment specifically requires at least eight hours of LEP training to all corrections and mental health staff who may regularly interact with LEP inmates. Provision IV. F. 3. a. is determined in partial compliance as the training is not provided. Training of security and medical staff assigned to the IPC should be sufficient.

## IV. G.  Youthful Prisoners

*IV. G. Consistent with the Prison Rape Elimination Act of 2003, 42 U.S.C. § 15601, et seq., and its implementation of regulations, a youthful prisoner shall not be placed in a housing unit in which the youthful prisoner will have sight, sound, or physical contact with any adult prisoner through use of a shared dayroom or other common space, shower area, or sleeping quarters. In areas outside of housing units, OPSO shall either: maintain sight and sound separation between youthful prisoners and adult prisoners, or provide direct staff supervision when youthful prisoners and adult prisoners have sight, sound, or physical contact. OPP shall ensure that youthful prisoners in protective custody status shall have no contact with, or access to or from, non- protective custody prisoners. OPP will develop policies for the provision of developmentally appropriate mental health and programming services.*



Finding:

Substantial Compliance

Observations:

OPSO has provided documentation that its separation of youthful inmates from adult inmates was found in compliance during its recent PREA audit. Youthful female inmates are now housed in TDC. Tulane is providing developmentally appropriate mental health services to youthful inmates. Travis School continues to provide educational and programming services. The requirement for developmentally appropriate mental health and programming services is separate and apart from PREA.

### VI. A – D. The New Jail Facility and Related Issues

#### A.  New Jail

*The Parties anticipate that Defendant will build a new jail facility or facilities that will replace or supplement the current facility located at 2800 Gravier Street, New Orleans, Louisiana. This Agreement shall apply to any new jail facility.*

Finding:

VI. A. Substantial Compliance.

#### B.  Design and Design Document

*Defendant shall obtain the services of a qualified professional to evaluate, design, plan, oversee, and implement the construction of any new facility. At each major stage of the facility construction, Defendant shall provide the Monitor with copies of design documents.*

Finding:

VI B. Substantial Compliance

Observations:

These provisions apply to the construction of any new facility. Phase III is such a facility. Timely access to design documents has not been provided to the Monitors by the City for Phase III. If this continues, this rating is in jeopardy of being lowered.

#### C.  Staffing

*Defendant shall consult with a qualified corrections expert as to the required services and staffing levels needed for any replacement facility. OPSO shall complete a staffing study to ensure that any new facility is adequately staffed to provide prisoners with reasonable safety.*

Finding:

VI.C. Substantial Compliance

Observations:

The Consent Judgment requires that the Defendant **shall** consult with a qualified corrections expert as to the required services and staffing levels needed for any replacement



facility. The Monitors are concerned that will await planning for Phase III to ascertain future compliance. For now, the paragraph is in substantial compliance.

### D. Compliance with Code and Standards

*Defendant will ensure that the new jail facility will be built in accordance with: (1) the American Correctional Association's standards in effect at the time of construction; (2) the American with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101-12213, including changes made by the ADA Amendments of 2008 (P.L. 110-325) and 47 U.S.C. §§ 225-661, and the regulations there under; and (3) all applicable fire codes and regulations.*

Finding:

Monitors not qualified to evaluate.

Observations:

The Monitors do not have the knowledge or expertise to evaluate compliance with this paragraph. OPSO asserts that it is in compliance with this provision, without offering documentation.

## VII. Compliance and Quality Improvement

## VII. A. Policies, Procedures, Protocols, Training Curriculum and Practices

*Within 120 days of the Effective Date, OPSO shall revise and/or develop its policies, procedures, protocols, training curricula, and practices to ensure that they are consistent with, incorporate, address, and implement all provisions of this Agreement. OPSO shall revise and/or develop, as necessary, other written documents, such as screening tools, logs, handbooks, manuals, and forms, to effectuate the provisions of this Agreement. OPSO shall send pertinent newly drafted and revised policies and procedures to the Monitor as they are promulgated. The Monitor will provide comments on the policies to OPSO, SPLC, and DOJ within 30 days.*

*OPSO, SPLC, and DOJ may provide comments on the Monitor's comments within 15 days. At that point, the Monitor will consider the Parties' comments, mediate any disputes, and approve the policies with any changes within 30 days. If either party disagrees with the Monitor, they may bring the dispute to the Court. OPSO shall provide initial and in-service training to all Facility staff with respect to newly implemented or revised policies and procedures. OPSO shall document employee review and training in new or revised policies and procedures.*

Finding:

VII. A. Substantial Compliance

Observations:

OPSO has now completed the development of the required policies. There are still procedures and lesson plans which must be completed to remain in substantial compliance.

## VII. (H). B. Written Quality Improvement Policies and Procedures

*Within 180 days of the Effective Date, Defendant shall develop and implement written quality improvement policies and procedures adequate to identify serious deficiencies in protection from harm, prisoner suicide prevention, detoxification, mental health care, environmental health, and fire and life safety in order to assess and ensure compliance with the terms of this Agreement on an ongoing basis. Within 90 days after identifying serious deficiencies, OPSO shall develop and implement policies and procedures to address problems that are uncovered during the course of quality improvement activities.*



*These policies and procedures shall include the development and implementation of corrective action plans, as necessary, within 30 days of each biannual review.*

Finding:

VII. B. Partial compliance

Observations:

OPSO has provided documentation that it is now developing plans to identify serious deficiencies, and to address problems that are uncovered during the course of quality improvement activities to warrant a finding of partial compliance. These plans need to contain specific performance measures, timelines, and persons responsible. They also need to be implemented with appropriate development of corrective action to be taken and the auditing of adherence to the action plan.

### VII. (I). C. Full-Time Compliance Coordinator

*The Parties agree that OPSO will hire and retain, or reassign a current OPSO employee for the duration of this Agreement, to serve as a full-time OPSO Compliance Coordinator. The Compliance Coordinator will serve as a liaison between the Parties and the Monitor and will assist with OPSO's compliance with this Agreement. At a minimum, the Compliance Coordinator will: coordinate OPSO's compliance and implementation activities; facilitate the provision of data, documents, materials, and access to OPSO's personnel to the Monitor, SPLC, DOJ, and the public, as needed; ensure that all documents and records are maintained as provided in this Agreement; and assist in assigning compliance tasks to OPSO personnel, as directed by the Sheriff or his or her designee. The Compliance Coordinator will take primary responsibility for collecting information the Monitor requires to carry out the duties assigned to the Monitor.*

Finding:

Substantial Compliance.

### VII. (J.) D. Self-Assessment

*On a bi-annual basis, OPSO will provide the public with a self-assessment in which areas of significant improvement or areas still undergoing improvement are presented either through use of the OPSO website or through issuance of a public statement or report.*

Finding:

Substantial Compliance

Observations:

During the monitoring period, no town hall meetings were held. The holding of those meeting and posting the PowerPoint presentations at those meetings brought OPSO into substantial compliance. OPSO will remain in substantial compliance due to the posting of the self-assessment although it appears to present a distorted view of areas needing improvement.

### VIII. Reporting Requirements and Right of Access

### VIII. A. Periodic Compliance Reporting



*OPSO shall submit periodic compliance reports to the Monitor. These periodic reports shall be provided to the Monitor within four months from the date of a definitive judgment on funding; and every six months thereafter until termination of this Agreement. Each compliance report shall describe the actions Defendant has taken during the reporting period to implement this Agreement and shall make specific reference to the Agreement provisions being implemented. The report shall also summarize audits and continuous improvement and quality assurance activities, and contain findings and recommendations that would be used to track and trend data compiled at the Facility. The report shall also capture data that is tracked and monitored under the reporting provisions of the following provisions: Use of Force; Suicide Prevention; Health Care Delivered; Sanitation and Environmental Conditions; and Fire and Life Safety.*

Finding:

Substantial Compliance

Observations:

The reports provided by OPSO are now sufficient to address the requirements of this provision.

## VIII. B.  (Notification of) Death of Any Prisoner

*OPSO shall, within 24 hours, notify the Monitor upon the death of any prisoner. The Monitor shall forward any such notifications to SPLC and DOJ upon receipt. OPSO shall forward to the Monitor incident reports and medical and/or mental health reports related to deaths, autopsies, and/or death summaries of prisoners, as well as all final SOD and IAD reports that involve prisoners. The Monitor shall forward any such reports to SPLC and DOJ upon receipt.*

Finding:

Substantial Compliance

## VIII. C. Records

*Defendant shall maintain sufficient records to document that the requirements of this Agreement are being properly implemented and shall make such records available to the Monitor within seven days of request for inspection and copying. In addition, Defendant shall maintain and provide, upon request, all records or other documents to verify that they have taken the actions described in their compliance reports (e.g., census summaries, policies, procedures, protocols, training materials, investigations, incident reports, tier logs, or use of force reports).*

Finding:

Substantial Compliance

Observations:

OPSO now generally provides responses with seven days of a request by the Monitors. The monthly reports provided to the Monitors greatly decreases the need for document requests. After the site visit, OPSO refused to provide the Monitors with unredacted copies of the enemy refusal forms. But for the Chief of Corrections intervening and providing the requested records, this rating would have been lowered.

## III.  Stipulated Orders

OPSO and the Plaintiffs/DOJ negotiated two agreements after Compliance Report #3.



The language of the Stipulated Orders was linked directly to the Consent Judgment and represented priority areas for inmate safety. Some of them required a one-time action such the posting of a memorandum or providing of training by a specific date. Some of the provisions of the Stipulated Order of February 11, 2015 contain on-going obligations that are in addition to the Consent Judgment or clarify the obligations under the Consent Judgment.

The three provisions of the April 22, 2015 are in substantial compliance and contained provisions that were to be accomplished by specific dates during April 2015. As those dates have passed, the Monitors no longer monitor those provisions. Two of the provisions in the Stipulated Order of February 11, 2015 require additional attention. The provisions of the Stipulated Order of February 11, 2015, which require ongoing compliance are 1. a-c. 5. b., 6. a., and 7. a. and b. The provisions that are not in substantial compliance are addressed below.

***1. c. Within 24 hours of the occurrence of any of the following incident, OPSO shall notify the Monitor via email:***
- ***Death of an inmate/arrestee while held in custody (or housed in a hospital to which the inmate has been committed for care and retain in the custody of OPSO; or whose injury occurred while in custody and was subsequently released from custody);***
- ***An inmate's/arrestee's suicide, suicide attempt, aborted suicide attempt, suicidal intent, and/or deliberate suicide self-harm gesture as defined by the American Psychiatric Association;***
- ***An inmate's allegation of sexual abuse, sexual assault, sexual harassment, or voyeurism whether the incident is between or among inmates, or between or among inmates and a staff/contractor or volunteer;***
- ***An inmate's report, or a report by a staff/contractor or volunteer, of any inmate/inmate allegation of assault; or other inmate allegation of felonies occurring to them while in custody;***
- ***An Inmate's report by a staff/contractor or volunteer, of any allegation of excessive force by an employee, volunteer or contractor;***
- ***Suspension or arrest of any OPSO employee, volunteer, or contractor for alleged criminal activities while on-duty and/or in a facility under the control of OPSO; and***
- ***Any recovery of significant contraband, specifically weapons.***

Finding:

Partial Compliance

Observations:

OPSO complies with the first two bullet points, but it is usually verbally as opposed to by email as required. OPSO is not in compliance with the reporting of the other incidents and items with 24 hour by email. At best, the Monitor learns of some of the items through incident reports, review of investigation and newspaper reports. OPSO should put in place a system to comply with this provision.

***6. a. By February 15, 2015, in order that the housing for youthful offenders is continually staffed by a deputy, OPSO will assure that a deputy is working on every shift, on every day on the unit housing youthful offenders. This deputy may not be assigned to other tiers or other responsibilities, and shall be periodically relieved by***



***another deputy and/or supervisor. The evidence of compliance with this document will be the staffing assignments each day, each shift for the facility in which youthful offenders are held, and samples of the log books from that unit.***

Finding:

Partial Compliance

Observations

There are times that the housing units for youthful offenders is not staffed continuously. The housing unit is usually made a mandatory post in the staffing assignments, but the deputy leaves without having been relieved by another deputy or supervisor.



Appendix A: Summary of Compliance Findings by Compliance Section Reports 1 - 13

| | Report # 1 2/13/14 | Report # 2 8/26/14 | Report # 3 2/25/15 | Report # 4 9/9/15 | Report # 5 3/17/16 | Report # 6 10/25/16 | Report # 7 5/1/17 | Report # 8 1/12/18 | Report # 9 8/25/18 | Report # 10 3/18/19 | Report #11 9/19/19 | Report #12 3/6/20 | Report#13 11/16/20 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **IV.A. 1. Use of Force Policies and Procedures/Margo Frasier** | | | | | | | | | | | | | |
| IV. A. 1.a. | ND | NC | NC | PC | NC | PC | PC | PC | PC | SC | SC | SC | SC |
| IV. A. 1.b. | ND | NC | NC | PC | NC | PC | PC | PC | SC | SC | SC | SC | SC |
| IV. A. 1.c. | ND | NC | NC | PC | NC | NC | PC | PC | PC | SC | SC | PC | PC |
| **IV.A.2. Use of Force Training/Margo Frasier and Shane Poole** | | | | | | | | | | | | | |
| IV. A. 2. a. | ND | NC | NC | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC |
| IV. A. 2. b. | ND | NC | NC | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC |
| IV. A. 2. c. | ND | NC | NC | NC | NC | NC | NC | NC | PC | PC | SC | SC | SC |
| **IV.A.3. Use of Force Reporting/Margo Frasier** | | | | | | | | | | | | | |
| IV. A.3 a. | ND | NC | NC | NC | NC | NC | PC | PC | PC | PC | SC | PC | PC |
| IV. A.3 b. | ND | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC |
| IV. A.3 c. | ND | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC |
| IV. A.3 d. | ND | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC |
| IV. A.3 e. | ND | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC |
| IV. A.3 f. | ND | NC | NC | PC | PC | NC | PC | PC | PC | PC | PC | PC | PC |
| IV. A.3 g. | ND | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC |
| IV. A.3 h. | ND | NC | NC | NC | NC | NC | NC | NC | PC | SC | SC | PC | PC |
| **IV.A.4. Early Intervention System ("EIS") /Margo Frasier and Shane Poole** | | | | | | | | | | | | | |
| IV.A.4.a. | ND | NC | NC | PC | PC | PC | NC | NC | PC | PC | SC | SC | SC |
| IV.A.4.b. | ND | NC | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC | SC |
| IV.A.4.c. | ND | NC | NC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC |
| IV.A.4.d. | ND | NC | NC | NC | NC | PC | PC | NC | NC | SC | SC | SC | SC |
| IV.A.4.e. | ND | ND | ND | ND | NC | NC | NC | NC | NC | SC | SC | SC | SC |
| **IV.A.5. Safety and Supervision/Margo Frasier** | | | | | | | | | | | | | |
| IV.A.5.a. | ND | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC |
| IV.A.5.b. | ND | NC | NC | NC | NC | NC | NC | NC | PC | PC | SC | SC | SC |
| IV.A.5.c. | ND | NC | NC | NC | NC | NC | NC | PC | PC | SC | SC | SC | SC |
| IV.A.5.d. | NC | NC | PC | PC | NC | NC | NC | NC | PC | PC | PC | PC | PC |
| IV.A.5.e. | ND | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC |
| IV.A.5.f. | ND | NC | NC | PC | SC | SC | NC | PC | PC | PC | PC | SC | PC |
| IV.A.5.g. | ND | NC | ND | PC | PC | NC | NC | NC | NC | PC | SC | SC | SC |
| IV.A.5.h. | ND | NC | NC | NC | NC | NC | NC | NC | PC | PC | SC | SC | SC |
| IV.A.5.i. | ND | NC | NC | PC | PC | PC | SC | PC | PC | PC | PC | PC | |
| IV.A.5.j. | ND | NC | PC | PC | NC | NC | NC | NC | PC | PC | PC | PC | PC |
| IV.A.5.k. | ND | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | PC |
| IV.A.5.l. | ND | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | PC |
| **IV.A.6. Security Staffing/Margo Frasier** | | | | | | | | | | | | | |
| IV.A.6.a. | ND | PC | PC | SC | SC | PC | PC | PC | PC | SC | SC | SC | PC |
| IV.A.6.b. | ND | NC | PC | PC | NC | PC | PC | PC | PC | SC | SC | SC | PC |
| **IV.A.7 Incidents and Referrals/Margo Frasier** | | | | | | | | | | | | | |
| IV.A.7.a. | ND | NC | NC | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC |
| IV.A.7.b. | ND | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | SC | PC |
| IV.A.7.c. | ND | NC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC |



Appendix A: Summary of Compliance Findings by Compliance Section Reports 1 - 13

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IV.A.7.d. | ND | NC | NC | NC | NC | NC | NC | PC | PC | PC | SC | SC | SC |
| IV.A.7.e. | ND | NC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | PC |
| IV.A.7.f. | ND | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | SC | Sc |
| IV.A.7.g. | ND | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC |
| IV.A.7.h. | ND | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC |
| IV.A.7.i. | ND | NC | NC | PC | NC | NC | NC | NC | NC | PC | SC | SC | SC |
| IV.A.7.j. | ND | NC | NC | NC | NC | NC | NC | NC | NC | NC | SC | SC | SC |
| **IV.A.8. Investigations/Margo Frasier** | | | | | | | | | | | | | |
| IV.A.8.a. | ND | NC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.8.b. | ND | NC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.8.c. | ND | NC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.8.d. | ND | NC | NC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.8.e. | ND | NC | NC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC |
| IV.A.8.f. | ND | NC | NC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC |
| **IV.A.9. Pretrial Placement in Alternative Settings/Margo Frasier** | | | | | | | | | | | | | |
| IV.A.9.a. | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.9.b. | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| **IV.A.10. Custodial Placement within OPP/Patricia Hardyman** | | | | | | | | | | | | | |
| IV.A.10.a. | NC | PC | SC | SC | SC | PC | PC | PC | PC | SC | SC | SC | SC |
| IV.A.10.b. | NC | NC | NC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.10.c. | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC |
| IV.A.10.d. | NC | NC | PC | PC | PC | PC | PC | NC | PC | SC | PC | PC | SC |
| IV.A.10.e. | NC | NC | PC | SC | PC | PC | SC | PC | PC | PC | PC | PC | SC |
| IV.A.10.f. | NC | NC | NC | NC | NC | PC | PC | PC | NC | SC | PC | PC | PC |
| IV.A.10.g. | NC | NC | NC | NC | NC | PC | PC | PC | PC | SC | SC | SC | SC |
| IV.A.10.h. | ND | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | PC |
| **IV..A.11. Prisoner Grievance Process/Margo Frasier and Shane Poole** | | | | | | | | | | | | | |
| IV.A.11.a | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | | | |
| IV.A.11.a.(1) | | | | | | | | | | | SC | SC | SC |
| IV.A.11.a.(2) | | | | | | | | | | | PC | PC | PC |
| IV.A.11.a.(3) | | | | | | | | | | | SC | SC | SC |
| IV.A.11.a.(4) | | | | | | | | | | | SC | SC | SC |
| IV.A.11.a.(5) | | | | | | | | | | | SC | SC | SC |
| IV.A.11.a.(6) | | | | | | | | | | | PC | PC | SC |
| **IV.A.12. Sexual Abuse/Margo Frasier** | | | | | | | | | | | | | |
| IV.A.12. | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC |
| **IV.A.13. Access to Information/Margo Frasier** | | | | | | | | | | | | | |
| IV.A.13. | PC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC |
| **IV. B. Mental Health Care** | | | | | | | | | | | | | |
| **IV.B.1. Screening and Assessment/Raymond Patterson** | | | | | | | | | | | | | |
| IV.B.1.a. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | PC |
| IV.B.1.b. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC |
| IV.B.1.c. | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC |
| IV.B.1.d. | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | PC |
| IV.B.1.e. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | PC |
| IV.B.1.f. | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC |
| IV.B.1.g. | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC |
| IV.B.1.h. | NC | NC | NC | NC | NC | NC | NC | NC | PC | SC | SC | SC | SC |



Appendix A: Summary of Compliance Findings by Compliance Section Reports 1 - 13

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IV.B.1.i. | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC |
| IV.B.1.j. | NC | NC | PC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC |
| IV.B.1.k. | NC | NC | NC | PC | NC | NC | NC | NC | NC | NC | PC | PC | PC |
| IV.B.1.l. | NC | NC | NC | NC | NC | NC | NC | NC | NC | SC | SC | SC | PC |
| **B. 2. Treatment/Raymond Patterson** | | | | | | | | | | | | | |
| IV.B.2.a. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.2.b. | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC |
| IV.B.2.c. | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC |
| IV.B.2.d. | NC | NC | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC |
| IV.B.2.e. | NC | NC | NC | PC | PC | PC | NC | NC | NC | PC | SC | SC | SC |
| IV.B.2.f. | NC | NC | NC | PC | PC | PC | NC | PC | PC | PC | SC | PC | PC |
| IV.B.2.g. | NC | NC | NC | PC | PC | PC | NC | PC | PC | SC | SC | SC | SC |
| IV.B.2.h. | NC | NC | NC | PC | PC | PC | PC | PC | NC | PC | SC | SC | PC |
| **IV.B.3. Counseling/Raymond Patterson** | | | | | | | | | | | | | |
| IV.B.3.a. | NC | NC | NC | PC | NC | NC | NC | PC | PC | PC | PC | PC | PC |
| IV.B.3.b. | NC | NC | NC | NC | PC | NC | NC | PC | PC | PC | PC | PC | PC |
| **IV.B.4. Suicide Prevention Training Program/Raymond Patterson** | | | | | | | | | | | | | |
| IV.B.4.a. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | NC |
| IV.B.4.b. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC |
| IV.B.4.c. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC |
| IV.B.4.d. | NC | NC | NC | PC | NC | NC | NC | NC | NC | PC | PC | PC | NC |
| IV.B.4.e. | NC | NC | NC | PC | NA | PC | PC | PC | PC | PC | PC | SC | SC |
| IV.B.4.f. | NC | NC | NC | NC | PC | NC | NC | NC | SC | SC | SC | SC | SC |
| IV.B.4.g. | NC | NC | NC | SC | PC | NC | NC | NC | NC | PC | NC | PC | SC |
| **IV.B.5. Suicide Precautions/Raymond Patterson** | | | | | | | | | | | | | |
| IV.B.5.a. | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC |
| IV.B.5.b. | NC | NC | NC | NC | NC | NC | NC | PC | PC | SC | PC | PC | NC |
| IV.B.5.c. | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC |
| IV.B.5.d. | NC | NC | NC | NC | NC | NC | NC | PC | PC | SC | SC | SC | SC |
| IV.B.5.e. | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | NC |
| IV.B.5.f. | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | SC | SC | PC |
| IV.B.5.g. | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC |
| IV.B.5.h. | NC | NC | NC | NC | NC | NC | NC | PC | NC | PC | PC | SC | SC |
| IV.B.5.i. | NC | NC | NC | NC | NC | NC | NC | PC | PC | SC | SC | SC | SC |
| IV.B.5.j. | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | SC | SC |
| IV.B.5.k. | NC | NC | NC | NC | NC | NC | NC | PC | NC | PC | PC | PC | PC |
| **IV.B.6. Use of Restraints/Raymond Patterson** | | | | | | | | | | | | | |
| IV.B.6.a. | PC | NC | PC | PC | PC | PC | PC | PC | NC | PC | PC | PC | PC |
| IV.B.6.b. | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC |
| IV.B.6.c. | ND | NC | PC | PC | PC | PC | PC | PC | NC | PC | NC | SC | SC |
| IV.B.6.d. | ND | NC | PC | PC | PC | PC | PC | PC | NC | PC | SC | SC | PC |
| IV.B.6.e. | NC | NC | PC | PC | PC | PC | PC | PC | NC | PC | NC | SC | SC |
| IV.B.6.f. | NC | NC | PC | PC | PC | PC | PC | PC | NC | PC | SC | SC | SC |
| IV.B.6.g. | NC | NC | PC | PC | PC | PC | PC | PC | NC | PC | NC | SC | SC |
| **IV.B.7. Detoxification and Training/Robert Greifinger** | | | | | | | | | | | | | |
| IV.B.7.a. | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC |
| IV.B.7.b. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC |
| IV.B.7.c. | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |



Appendix A: Summary of Compliance Findings by Compliance Section Reports 1 - 13

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IV.B.7.d. | NC | NC | PC | PC | PC | PC | PC | PC | PC | NC | PC | PC | PC |
| IV.B.8. Medical and Mental Health Staffing/Robert Greifinger | | | | | | | | | | | | | |
| IV.B.8.a. | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.8.b. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC |
| IV.B.9. Risk Management/Robert Greifinger | | | | | | | | | | | | | |
| IV.B.9.a. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.9.b. | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.9.c. | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.9.d. | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC |
| IV.B.9.e. | NC | NC | NC | NC | PC | PC | PC | PC | NC | PC | PC | PC | PC |
| IV.B.9.f. | NC | NC | NC | NC | PC | PC | PC | PC | NC | NC | PC | PC | PC |
| IV.C. Medical Care See SA 2/11/15 13. | | | | | | | | | | | | | |
| IV. C. Quality Management of Medication Administration | | | | | | | | | | | | | |
| IV.C.1.a. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC |
| IV.C.1.b. | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.C.1.c. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC |
| IV.C.1.d. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC |
| IV.C.2. Health Care Delivered/Robert Greifinger | | | | | | | | | | | | | |
| IV.C.2.a. | NC | NC | NC | PC | PC | PC | PC | PC | PC | NC | PC | PC | SC |
| IV.C.2.b. | NC | NC | NC | PC | PC | PC | PC | PC | PC | NC | PC | PC | PC |
| IV.C.3. Release and Transfer/Robert Greifinger | | | | | | | | | | | | | |
| IV.C.3.a. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | SC |
| IV.C.3.b. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | SC |
| IV.C.3.c. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | SC |
| IV.C.3.d. | NC | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC |
| IV.D. Sanitation and Environmental Conditions/Shane Poole | | | | | | | | | | | | | |
| IV.D. 1.a. | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC |
| IV. D. 1.b. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC |
| IV. D. 1.c. | NC | NC | PC | PC | NC | NC | PC | SC | PC | SC | SC | SC | SC |
| IV. D. 1.d. | NC | NC | NC | NC | SC | SC | SC | SC | SC | SC | SC | SC | PC |
| IV. D. 1.e. | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC |
| IV. D. 1.f. | NC | NC | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC | SC |
| IV. D. 1.g. | NC | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC |
| IV. D. 1.h. | NC | NC | NC | PC | NC | NC | NC | NC | NC | PC | PC | PC | SC |
| IV. D. 2. Environmental Control/Shane Poole | | | | | | | | | | | | | |
| IV. D. 2.a. | NC | NC | PC | PC | PC | SC | SC | SC | PC | SC | SC | SC | SC |
| IV. D. 2.b. | NC | NC | NC | NC | NC | NC | SC | PC | SC | SC | SC | SC | SC |
| IV. D. 3. Food Service/Diane Skipworth | | | | | | | | | | | | | |
| IV. D. 3.a. | NC | NC | NC | PC | PC | PC | NC | PC | PC | SC | SC | SC | SC |
| IV. D. 3.b. | NC | NC | NC | PC | PC | PC | NC | NC | NC | NC | PC | SC | SC |
| IV. D. 3.c. | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC |
| IV. D. 4. Sanitation and Environmental Conditions Reporting/Shane Poole | | | | | | | | | | | | | |
| IV. D. 4.a. 1-7 | NC | NC | PC | PC | PC | PC | PC | NC | SC | SC | SC | SC | SC |
| IV. D. 4.b. | NC | NC | NC | NC | PC | PC | NC | NC | PC | PC | SC | SC | SC |
| IV.E. Fire and Life Safety/Shane Poole | | | | | | | | | | | | | |
| IV. E. 1. Fire and Life Safety | | | | | | | | | | | | | |
| IV. E. 1.a. | NC | PC | PC | PC | PC | PC | PC | SC | PC | PC | PC | PC | SC |

Orleans Parish
JAIL MONITORS

Appendix A: Summary of Compliance Findings by Compliance Section Reports 1 - 13

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IV. E. 1.b. | NC | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC |
| IV. E. 1.c. | PC | PC | PC | PC | NC | PC | SC | PC | SC | SC | SC | SC | SC |
| IV. E. 1.d. | NC | NC | NC | NC | NC | NC | PC | SC | PC | SC | SC | SC | SC |
| IV. E. 1.e. | ND | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC |
| **IV. E. 2. Fire and Life Safety Reporting** | | | | | | | | | | | | | |
| IV. E. 2.a.1-3 | ND | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC |
| IV. E. 2.b. | ND | NC | NC | PC | NC | NC | NC | PC | PC | SC | SC | SC | SC |
| **IV.F. Language Assistance** | | | | | | | | | | | | | |
| **IV.F.1. Timely and Meaningful Access to Services/Margo Frasier** | | | | | | | | | | | | | |
| IV.F.1.a. | ND | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC |
| **IV.F.2. Language Assistance Policies and Procedures/Margo Frasier** | | | | | | | | | | | | | |
| IV.F.2.a. | ND | PC | PC | PC | Not App | Not App | Not App | Not App | Not App | Not App | SC | SC | SC |
| IV.F.2.b. | ND | PC | PC | PC | Not App | Not App | Not App | Not App | Not App | Not App | SC | SC | SC |
| **IV.F.3. Language Assistance Training/Margo Frasier** | | | | | | | | | | | | | |
| IV.F.3.a. | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| **IV.F.4. Bilingual Staff/Margo Frasier** | | | | | | | | | | | | | |
| IV.F.4. | NC | PC | PC | PC | PC | NC | NC | NC | NC | PC | SC | SC | SC |
| **IV.G. Youthful Prisoners/Margo Frasier** | | | | | | | | | | | | | |
| IV.G. | NC | NC | NC | PC | PC | PC | NC | NC | PC | PC | PC | PC | PC |
| **VI. The New Jail Facility/Margo Frasier** | | | | | | | | | | | | | |
| VI. A. | ND | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| VI. B. | NC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| VI. C. | ND | PC | SC | SC | PC | PC | PC | PC | SC | SC | SC | SC | SC |
| VI. D. | Monitors Not Qualified to Evaluate | | | | | | | | | | | | |
| **VII. Compliance and Quality Improvement/Margo Frasier** | | | | | | | | | | | | | |
| VII. A. | ND | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC |
| VI. B. (H.) | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC |
| VI. C. (I.) | NC | NC | SC | SC | NC | SC | SC | NC | PC | SC | SC | SC | SC |
| VI. D. (J.) | ND | NC | NC | PC | PC | PC | PC | NC | NC | NC | SC | SC | SC |
| **VIII. Reporting Requirements and Right of Access/Margo Frasier** | | | | | | | | | | | | | |
| VIII.A. | ND | PC | PC | PC | PC | PC | PC | NC | NC | PC | SC | SC | SC |
| VIII.B. | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| VIII.C. | PC | PC | PC | SC | SC | SC | NC | NC | PC | PC | SC | SC | SC |

**Legend:**
**ND - Not scheduled for review**
**NC - Non-compliance**
**PC - Partial Compliance**
**SC - Substantial Compliance**
**NA - Not Applicable**

