UNITED STATE DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| LASHAWN JONES, ET AL. | CIVIL ACTION NO. 12-859 |
| VERSUS | SECTION I, DIVISION 5 |
| MARLIN GUSMAN, ET AL. | JUDGE LANCE M. AFRICK<br>MAGISTRATE JUDGE NORTH |

### MEMORANDUM IN SUPPORT OF MOTION FOR STAY

Pursuant to Rule 62 of the Federal Rules of Civil Procedure, Third-Party Defendant, the City of New Orleans (the "City"), respectfully moves for an order staying this Court's January 25, 2021 Order & Reasons (the "Order"),[1] denying the City's Motion for Relief from Court Orders of January 25, 2019 (Rec. Doc. 1221) and March 18, 2019 (Rec. Doc. 1227) regarding Phase III Jail Facility (the "Motion for Relief").[2] Because the City is likely to succeed on the merits of its appeal and will be irreparably injured absent a stay, which will not substantially injure the other parties to this proceeding, and because the public's interest is best served by first resolving the merits of the City's appeal, the City respectfully submits this Court should stay the execution of its Order, pending the resolution of the City's appeal thereof.[3]

### I.   BACKGROUND

The Court is familiar with the facts of this case. On June 6, 2013, the Court approved a Consent Judgment (the "Consent Judgment") requiring Sheriff Marlin Gusman to implement systemic and durable reforms remedying the pervasive and longstanding problems at the Orleans

---

[1] Rec. Doc. 1396.
[2] Rec. Doc. 1281.
[3] Rec. Doc. 1399.

1

PD.31094981.2

Parish Prison ("OPP").[4] Although not a signatory to the Consent Judgment, the City is a party to this litigation and is thereby bound by the Court's directives. One element of the Consent Judgment requires the Orleans Parish Sheriff's Office (the "OPSO") and Sheriff Gusman to provide inmates with acute and subacute medical needs with constitutionally adequate care.[5] To that end, in August 2014, the Court approved the use of Elayn Hunt Correctional Center ("Hunt") as a short-term housing solution for these inmates.[6]

In January 2019, the Court was made aware of the fact that, effective October 15, 2019, Hunt would no longer house Orleans Justice Center ("OJC") inmates with significant mental health issues.[7] Accordingly, on January 25, 2019, the Court ordered the City to "begin the programming phase of the Phase III facility as soon as possible."[8] On March 18, 2019, the Court ordered the City to "continue the programming of Phase III," and to "work collaboratively to design and build a facility that provides for the constitutional treatment of the special populations . . . without undue delay, expense or waste."[9]

---

[4] Rec. Doc. 466. OPP has since been replaced with a newly built facility, the Orleans Justice Center ("OJC").

[5] *See* Rec. Doc. 466 at 24.

[6] *See, e.g.*, Rec. Docs. 722, 1221. Thereafter, on September 21, 2015, Sheriff Gusman filed a motion with the Court, moving for a declaratory judgment requiring the City to build the Phase III facility and to hold the City in contempt for its failure to do so previously. On November 24, 2015, this Court denied the Sheriff's motion in all respects. Rec. Doc. 948; *see also Jones v. Gusman*, No. 12-859, 2015 WL 7458605, at *3 (E.D. La. Nov. 24, 2015).

[7] Rec. Doc. 1221.

[8] *Id.* The Court further ordered the City to submit a proposal regarding a new short-term solution to housing prisoners previously at Hunt, which the City timely submitted on February 25, 2019. *See* Rec. Doc. 1227. On March 18, 2019, the Court ordered the City to "immediately initiate the planning, design, procurement, and renovation of the temporary accommodations described in its Short-Term Plan," namely renovations to the already-existing Temporary Detention Center, which was constructed as a stopgap measure following Hurricane Katrina. Rec. Doc. 1227. The Short-Term Plan has since been completed; however, the Temporary Detention Center has not been fully utilized, apparently due to the lack of OPSO staff.

[9] Rec. Doc. 1227.

On March 23, 2020, Louisiana Governor John Bel Edwards issued a state-wide stay-at-home order in light of the COVID-19 pandemic.[10] As a result of the pandemic, among other extraordinary factors, on June 29, 2020, the City filed a Motion for Relief, praying that the Court, "indefinitely suspend[] the programming, design, and construction of a new Phase III jail facility."[11] In support of its Motion for Relief, and consistent with Federal Rule of Civil Procedure 60, the City presented the following compelling reasons warranting relief: (1) the newly-constructed OJC facility currently provides medical and mental healthcare that is at or above the minimal constitutional standard, according to both the OPSO and expert witnesses in healthcare; (2) the COVID-19 pandemic has caused an unforeseen and sizeable budgetary shortfall, the effects of which the City and its residents must bear for years to come; (3) the decline in prison population has rendered the programming, design, and construction of a new Phase III jail facility unnecessary;[12] and (4) Congress, in enacting the Prison Litigation Reform Act (the "PLRA"), limited the Court's ability to grant the prospective relief recited in its January 25, 2019 and March 18, 2019 orders; namely, the construction of a new jail and the inordinate burden such construction would place upon the City's taxpayers for the benefit of approximately sixty-five inmates.[13] Significant motion practice followed,[14] culminating in a hearing before Magistrate Judge North,[15] along with additional post-hearing briefing.[16]

---

[10] *See* Proclamation No. 33 JBE 2020, *Additional Measures for COVID-19 Stay at Home*, https://gov.louisiana.gov/order.

[11] Rec. Doc. 1281-1 at 1.

[12] *Id.*

[13] Rec. Doc. 1312.

[14] *See, e.g.*, Rec. Docs. 1301, 1304, 1305, 1312, 1327, 1328, 1329.

[15] *See* Rec. Docs. 1287 (referring the Motion for Relief to Magistrate Judge Michael North for hearing); 1350–54, 1357–59 (Minute Entries for 10/6–9/2020, 10/13–15/2020, 10/19/2020 Proceedings).

[16] *See* Rec. Docs. 1360–64.

3

On December 7, 2020, Magistrate Judge North issued his Report & Recommendation ("R&R"), recommending that this Court deny the City's Motion for Relief.[17]  On December 21, 2020, the City filed its objections to the Magistrate Judge's R&R.[18]  Three replies thereto were filed.[19]  On January 25, 2021, this Court adopted Judge North's R&R as its own, denying the City's Motion for Relief.[20]  The City filed a timely notice of appeal on February 2, 2021.[21]  The City now moves this Court to stay the execution of its Order, along with its prior orders directing the City to "begin the programming phase of the Phase III facility"[22] "without undue delay, expense or waste,"[23] pending the outcome of appellate review.[24]

## II.    LAW & ARGUMENT

The filing of a notice of appeal does not automatically stay the enforcement of the judgment being appealed.[25]  Rather, after a federal district court enters a judgment, Rule 8(a)(1)(A) of the Federal Rules of Appellate Procedure requires the appealing party to first move the district court to stay the enforcement of its order pending appeal.  Only after such a motion is denied may the appealing party seek a stay from the Fifth Circuit.[26]

In this circuit, courts undergo a four-part test in determining whether it should stay relief pending appeal: "'(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3)

---

[17] Rec. Doc. 1385.
[18] Rec. Doc. 1389.
[19] Rec. Docs.1392–94.
[20] Rec. Doc. 1396.
[21] Rec. Doc. 1399.
[22] Rec. Doc. 1221.
[23] Rec. Doc. 1227.
[24] Rec. Doc. 1399.
[25] *See* Fed. R. Civ. P. 62(c) ("Unless the court orders otherwise, . . . an interlocutory or final judgment in an action for an injunction . . . [is] not stayed after being entered, even if an appeal is taken.").
[26] *See* Fed. R. Civ. P. 8(a)(1)(2).

4


whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.'"[27] "The first two factors are the most critical."[28] All four factors are met in this case, thereby warranting a stay of the execution of this Court's orders, as well as the underlying orders from which the City seeks relief.

### A. The City Has a Strong Likelihood of Success on the Merits

The City respectfully submits that it has a strong likelihood of success on the merits of its appeal, in light of the U.S. Supreme Court's holdings in *Rufo v. Inmates of Suffolk County* and *Horne v. Flores*,[29] and because the PLRA restricts a court's ability to order the construction of any new facility, particularly when an order to build a new jail affects both public safety and the criminal justice system, while also foisting a heavy burden on the already strained shoulders of the City's taxpayers.

> a. Under the "flexible" approach established by the U.S. Supreme Court in Rufo, this Court should have granted the City's Rule 60 Motion based on the significant changes in circumstances this case presents

In its Motion for Relief, the City argued that applying the Court's orders to build the Phase III facility prospectively were both statutorily impermissible and no longer equitable,[30] requiring the Court to employ a "flexible approach" in determining whether and to what extent its previously-issued orders should be modified. Under the flexible standard articulated in *Rufo*, a party seeking modification of an institutional reform consent decree bears the burden of establishing that a significant change in facts or law warrants revision of the decree and that the

---

[27] *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987); *see also Nken v. Holder*, 556 U.S. 418, 426 (2009); *Moore v. Tangipahoa Parish Sch. Bd.*, No. 12-31218, 2013 WL 141791, at *2 (5th Cir. Jan. 14, 2013) (quoting *Hilton*, 481 U.S. at 776); *United States v. Baylor Univ. Med. Ctr.*, 711 F.2d 38, 39 (5th Cir. 1983).
[28] *Valentine v. Collier*, 956 F.3d 797, 801 (5th Cir. 2020).
[29] 502 U.S. 367 (1992); 557 U.S. 433 (2009).
[30] *See* Fed. R. Civ. P. 60(b)(5).

proposed modification is suitably tailored to the changed circumstances.  In this case, the City has met this burden.

The City respectfully submits the record demonstrates significant changes in circumstances requiring the modification of the Court's prior orders directing the City to build the Phase III facility.  Namely, the City submits that, on appeal, it will demonstrate that:  (1) the OJC currently provides medical and mental healthcare that is at or above the minimal constitutional standard; (2) the COVID-19 pandemic has caused an unforeseen fiscal and social impact upon the City with seemingly no end in sight; and (3) the marked decline in both the general prison population, and the inmates with acute and subacute mental health needs in particular, has rendered the programming, design, and construction of a new Phase III jail facility unnecessary and unjustified, particularly in light of the OPSO's apparent inability to retain an adequate number of correctional officers for OJC, much less having the ability to hire and retain more than 100 additional correctional officers for the proposed Phase III facility.

During the hearing on the City's Motion for Relief, among other evidence, the City offered testimony from multiple medical doctors and healthcare providers who testified that the sixty-five inmates with acute and subacute mental health needs housed in the OJC are presently being provided with constitutionally adequate health care.  The City also presented evidence demonstrating that the jail population is now below 1,000 inmates.  That number has decreased and is projected to only continue to decline once the Criminal District Court can fully resume its judicial functions and the Department of Corrections inmates can be transferred, as has occurred in the past.[31]  The fact that the jail population is now below 1,000 inmates and that the inmates

---

[31] *See* Rec. Doc. 916.

with acute and subacute mental health needs are now receiving constitutionally adequate care unquestionably constitutes a significant change in circumstances sufficient for modification of this Court's prior orders pursuant to Rule 60. These changed circumstances, which could not be presaged, are only augmented by the overwhelming public safety, housing, and fundamental care issues resulting from the pandemic and further undermine any basis for the construction of the Phase III facility, particularly when a more narrow and less intrusive alternative that completely addresses the healthcare needs of inmates with acute and sub-acute mental health issues is available.[32]

The City's proposed modification is also suitably tailored to these changed circumstances that simply cannot be overlooked. Pursuant to the above-mentioned factors, the City requested that it be permitted to retrofit the second floor of OJC instead of building the Phase III facility, for which the City had not (and has not) obtained approval, as the City's Home Rule Charter requires, given that a retrofit is less intrusive, would enhance healthcare for acute inmates in one-third of the time it would take to construct a new jail, and the retrofit alternative does not require a zoning variance that must be evaluated by the City Planning Commission and approved by the City Council. To that end, Dr. James Austin, an expert in conducting justice and corrections research at the JFA Institute, and Mr. Allen Patrick, an experienced correctional facilities architect, worked for several years on the proposed retrofit. As their testimony confirms, Dr. Austin and Mr. Patrick established three alternatives to the Phase III facility. In refining the City's alternatives to Phase III during the several months before the hearing, Dr. Austin and Mr. Patrick concluded that the

---

[32] Moreover, in addition to the over 50 million dollars construction of the Phase III facility is projected to cost, if Phase III is constructed, it will require between eight to nine million dollars per year for the indefinite future. Thus, assuming the building has a 30-year lifespan, its operation would require the City to pay at least $270,000,000.00 from limited and greatly reduced taxpayer funds.

retrofit was the most efficient, most timely, and best suited alternative to Phase III.[33] Thus, under the flexible approach *Rufo* requires, the City presented a viable alternative that would both meet the needs of the City's inmates with acute and subacute mental health needs, while also acknowledging the significant change in circumstances resulting from years of work towards complying with the Consent Judgement.

Despite these three significant changes in circumstances, and the evidence presented at the hearing before Magistrate Judge North demonstrating that a retrofit of the existing, newly-constructed facility is the least intrusive and most narrow approach to addressing the needs of the City's inmates with acute and subacute mental health issues and would do so at a considerably lower cost to the taxpayers, this Court instead rejected each of the City's well-founded objections to proceeding with the construction of the Phase III facility.

> b. *The PLRA restricts this Court's ability to order the construction of a new jail facility*

In addition to the significant changes in circumstances, as detailed above, which render the construction of the Phase III facility unnecessary, the PLRA prohibits a court from ordering the construction of a new facility.[34] Importantly, the Fifth Circuit reviews a district court's

---

[33] Rec. Doc. 1385 at 58.

[34] 18 U.S.C. § 3626(a)(1)(C) ("Nothing in this section shall be construed to authorize the courts, in exercising their remedial powers, to order the construction of prisons."); *compare* Rec. Doc. 1221 at 3 ("IT IS FURTHER *ORDERED* that the City shall direct the architect chosen to design the permanent facility described in the Supplemental Compliance Action Plan, filed into the record on January 4, 2017 (the "Phase III facility"), to begin the programming phase of the Phase III facility as soon as possible and to update the Court on the progress of those efforts at the next scheduled status conference." (emphasis added), *with* Rec. Doc. 1227 at 2–3 ("IT IS FURTHER *ORDERED* that the parties are to work collaboratively to design and build a facility that provides for the constitutional treatment of the special populations discussed herein without undue delay, expense or waste.") (emphasis added), *with Ruiz v. Estelle*, 161 F.3d 814, 822, 824–25 (5th Cir. 1998), *abrogated on other grounds by Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645 (2017) (noting that the order issuing the consent decree was styled as an "*Order* Approving Proposed Judgment," and concluding that, as such, its contents may not order what the PLRA specifically prohibits (emphasis added)).

interpretation of the PLRA *de novo*.[35]  The City acknowledges the Court's belief that the City's arguments regarding the PLRA have been waived.  However, a district court may consider arguments and evidence raised for the first time in a reply brief without abusing its discretion "so long as it gives 'the non-movant an adequate opportunity to respond prior to a ruling.'"[36]  Thus, when "there exists no palpable injustice if the opposing party is given a chance to respond, as would be the situation if [a court were to grant the opposing party] leave to file [a] surreply" the issue is properly before the court for consideration.[37]

In this case, the City raised the issue of whether the PLRA restricts the Court's authority to order the construction of a new jail as early as 2013.[38]  And, with respect to the City's Motion for Relief, the PLRA issue was raised before the Magistrate Judge,[39] who ultimately permitted all four non-moving parties to address the application of the PLRA in sur-replies,[40] which were filed prior

---

[35] *Ruiz*, 161 F.3d at 819 ("We review the district court's interpretation of the PLRA *de novo*." (citing *Spacek v. Maritime Assn.*, 134 F.3d 283, 288 (5th Cir. 1998))).

[36] *Thompson v. Dall. City Att'ys Office*, 913 F.3d 464, 471 (5th Cir. 2019) (quoting *Vais Arms, Inc. v. Vais*, 383 F.3d 287, 292 (5th Cir. 2004)).

[37] *Blanchard & Co., Inc. v. Heritage Cap. Corp.*, No. 97-690, 1997 WL 757909, at *1 (N.D. Tex. Dec. 1, 1997); *Scott v. R.J. Reynolds Tobacco Co*, No. 99-3091, 2001 WL 797992, at *6 (E.D. La. July 12, 2001) (considering an argument raised for the first time in reply); *see also Murillo v. Coryell Cnty. Tradesmen, LLC*, No. 15-3641, 2017 WL 1155166, at *3–4 (E.D. La. Mar. 28, 2017) (considering argument raised for the first time in moving party's reply, despite non-moving party not filing a sur-reply, because non-moving party had had the opportunity to respond, but did not). Indeed, this Court (and the Magistrate Judge) did briefly address the PLRA issue, notwithstanding both courts' finding of waiver.

[38] *Jones v. Gusman*, 296 F.R.D. 416, 458–49 (E.D. La. 2013) (approving the consent judgment) ("The City's proposed finding of law that '[t]he Court may not approve a proposed consent decree that results in the raising of taxes' is disingenuous. The City cites 18 U.S.C. § 3626(a)(1)(C), but that statute provides: 'Nothing in this section shall be construed to authorize the courts, in exercising their remedial powers, to order the construction of prisons or the raising of taxes.' *The Court has no intention of ordering the City, the Sheriff, or any other political entity, for that matter, to raise taxes or to construct yet another facility*. To the extent our elected political leaders intend to house inmates at OPP facilities, however, these facilities must meet constitutional and statutory minimum requirements." (emphasis added)); Rec. Doc. 930, at 4 ("[T]he Prison Litigation Reform Act ('PLRA') places barriers on the Court's authority to enter any such order. The PLRA imposes a number of restrictions on the prospective relief a court can order in any civil action involving 'prison conditions.' All relief must be narrowly drawn, extend no further than necessary, and be the least intrusive means necessary to correct a violation of federal rights." (internal citations omitted)).

[39] *See* Rec. Doc. 1312 (noting the PLRA had been raised throughout this litigation).

[40] Rec. Doc. 1332.

to the hearing of the City's Motion for Relief.[41] Thus, not only were all non-moving parties given the opportunity to respond to the argument, thereby alleviating any arguable prejudice to them, the parties were *again* given the opportunity to fully brief the issue to this Court.[42] Finally, refusing to consider whether the PLRA curbs the Court's ability to order the construction of the Phase III facility would result in a manifest injustice to the City and the citizens to whom it is responsible.[43] Accordingly, because a manifest injustice will result should the Court refuse to consider the issue and because the non-moving parties would not have been unduly prejudiced by the Court's consideration thereof, the City respectfully submits the issue was properly before the Court, which should have exercised its discretion to proceed to the merits of the City's PLRA defense.

And the PLRA does indeed restrict the Court from ordering the construction of the Phase III facility in this case. Even assuming the City "agreed" to build the Phase III facility, which is denied, the Fifth Circuit squarely addressed the issue of whether a court may enforce an agreement when the object of that agreement is unlawful under the PLRA in *Ruiz v. Estelle*, holding that "the PLRA *does expressly* restrict the prospective relief which may be afforded by a consent decree to the same extent and in the same manner as it restricts the prospective relief which may be afforded by a judgment entered pursuant to adversarial litigation without agreement."[44] "[T]he PLRA does expressly reflect Congress' concern to limit judicial enforcement of obligations that arise out of the agreement of the parties embodied in a consent decree."[45] The PLRA also authorizes the preclusion and termination of existing prospective relief that does not comply with [the PLRA's directive that]" "any

---

[41] Rec. Docs. 1350–54, 1357–59 (Minute Entries for 10/6–9/2020, 10/13–15/2020, 10/19/2020 Proceedings).
[42] Rec. Docs.1392–94.
[43] *Dean v. Chrysler Corp.*, 38 F.3d 568, at *3 (5th Cir. 1994).
[44] *Ruiz*, 161 F.3d at 824–25 (emphasis in original).
[45] *Id.*

prospective relief [be] . . . 'narrowly drawn, extend[] no further than necessary to correct the violation of the Federal right, and is the least restrictive means necessary.'"[46]  In this case, building the Phase III facility undoubtedly extends further than necessary to correct the violation of the Federal right, and plainly is not the least restrictive means to address the needs of the inmates at issue here.  Thus, as a matter of law, the PLRA prevents a court from compelling the construction of a new facility, even assuming the construction thereof was previously agreed to.[47]

In this case, the record shows a significant change in circumstances.  And, when analyzed pursuant to the "flexible approach" articulated in *Rufo*, these significant changes in circumstances warrant the modification of this Court's January 25 2019[48] and March 18, 2019[49] Orders directing the City to construct the Phase III facility.  Moreover, in addition to these significant changes in circumstances, the PLRA prohibits a court from ordering a governmental entity, such as the City, to build a new facility, even if that order was entered pursuant to a consent judgment or some other perceived acquiescence.[50]  As a result, the City has a substantial likelihood of succeeding on appeal, and the first prong of the analysis is met.

---

[46] *Id.* at 817 (quoting 18 U.S.C. § 3626(a)(1) and § 3626(b)(2)); *see also Brown v. Plata*, 563 U.S. 493, 564 (2011) (affirming a prisoner release order) (Scalia, J., dissenting) ("The PLRA is . . . best understood as an attempt to constrain the discretion of courts issuing structural injunctions—not as a mandate for their use. . . . [S]tructural injunctions . . . raise grave separation-of-powers concerns and veer significantly from the historical role and institutional capability of courts. It is appropriate to construe the PLRA so as to constrain courts from entering injunctive relief that would exceed that role and capability."); *Plyler v. Moore*, 100 F.3d 365, 369 (4th Cir. 1996) ("The PLRA also provides an avenue for states to end their obligations under consent decrees providing for greater prospective relief than that required by federal law.").

[47] Moreover, although the R&R recognizes the May 18, 2017, City Council meeting at which a vote among the City Council members resulted in the *potential* for a Phase III Plan to be submitted to the City Planning Commission for consideration of a conditional use permit, there is no mention in the R&R or the Court's adaptation thereof that the conditional use permit was in fact *never* issued, nor did the Civil Planning Commission ever issue a recommendation as to zoning for Phase III.  Thus, compelling the City to construct the Phase III facility also violates the City's Home Rule Charter, which requires a zoning variance prior to moving forward with such construction.

[48] Rec. Doc. 1221.

[49] Rec. Doc. 1227.

[50] *Ruiz*, 161 F.3d 824–25.

### B. The City Will be Irreparably Injured Absent a Stay

The second factor is also met here. In this case, the Court's order, if enforced, will have serious and irreparable consequences for the City. The Fifth Circuit has defined irreparable harm to mean "harm for which there is no adequate remedy at law."[51] In this case, should the City be required to comply with this Court's orders to continue with the programming, design, and construction of the Phase III facility and those orders are reversed by the Fifth Circuit, the City will be irreparably injured and unable to recoup the considerable time and expense necessary to comply with those orders.

The Fifth Circuit has already addressed the propriety of granting a stay pending the appeal of a district court's order requiring the remodeling of a jail's facilities. Specifically, in *Ruiz v. Estelle*,[52] the Fifth Circuit held that requiring a governmental entity to: "go through the effort and expense of furnishing the district court with a plan for [establishing] community correction facilities,"[53] and submit plans providing for "the architectural modification and retrofitting of existing units"[54] would cause the State irreparable harm if enforced.[55] As a result, the Fifth Circuit granted the State's motion to stay, pending the outcome of its appeal of the district court's injunction, which required significant structural and managerial changes to the State's prison

---

[51] *Monumental Task Committee, Inc. v. Foxx*, 157 F. Supp. 3d 573, 582 (E.D. La. 2016) (citing *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)).

[52] *Ruiz v. Estelle*, 650 F.2d 555, 559 (5th Cir. 1981) (noting that, "Construction of future prison units and modification of present units are required by the [district] court's order").

[53] *Id.* at 573.

[54] *Id.*

[55] *Id.*; *see also id.* at 573–74 ("Insofar as the injunction requires [the State] to construct units that house no more than 500 inmates or that may be divided into sub-units housing no more than 500 inmates, we stay that part of the order for reasons similar to those set forth above. . . . Irreparable injury will be sustained by [the State] because, absent a stay, it will be required either to suspend all new construction or to construct only units that comply with the size limitations mandated by the injunction.").

system.[56] The same logic applies here. In the absence of a stay, the City will be compelled to expend considerable taxpayer funds and community resources complying with the Court's orders, including planning and constructing a multi-million-dollar facility for which it has not received approval. Indeed, this Court's orders to build a new facility go even further than the district court's order in *Ruiz,* in that the court in *Ruiz* ordered the state to simply remodel an existing building. Here, this Court's orders require the City to construct an entire new facility, in addition to the new OJC facility already built at considerable expense. As a result, the second prong of this Court's analysis is also met.

### C. Other Interested Parties Will Not be Substantially Injured If a Stay Issues

When considering whether the interested parties will be substantially injured if a stay issues, the court's "decision is limited to determining irreparable harm not in denying the plaintiffs' requested relief outright but in temporarily staying the injunction pending a full appeal."[57] In this case, the *undisputed* evidence demonstrates that funding for the OPSO, including the City's investment in medical and mental health services, is amongst the very best in the Country for comparable jail facilities. Indeed, in the past several years, the City has increased the OPSO's budget by more than 140%, even though the jail population has decreased by more than 1,200 inmates during this same time period.[58] Moreover, a nationally recognized corrections health care provider is currently providing medical and mental health services to the special-needs inmates at

---

[56] *See id.* at 573. *Ruiz* was issued prior to the establishment of the PLRA. Nevertheless, in *Ruiz*, in granting the State's motion to stay, the Fifth Circuit explained, "Although a district court's remedial authority to correct unconstitutional conditions in prisons is broad, we do not believe that the court had the power to alter the managerial structure and size of existing TDC units . . . . *The size and managerial organization of a state prison system would appear to be matters that are best left to a state's legislature* and to those charged with the responsibility for running the prison system." *Id.* at 573 (internal citations omitted) (emphasis added).

[57] *Tex. Democratic Party v. Abbott*, 961 F.3d 389, 412 (5th Cir. 2020).

[58] *See* Rec. Doc. 1281 at 16.

13

a cost of millions of dollars each year. Importantly, inmates with acute and sub-acute mental health needs continue to be treated at University Medical Center, as needed, as no inmate is turned away or denied treatment, which supplements daily the top-quality treatment provided by an array of Tulane psychiatrists and physicians. This arrangement has been in place for years and will be maintained pending appeal.

The existing high-level of healthcare for the sixty-five acute and sub-acute inmates who would be housed in the Phase III facility (should this Court's orders to construct a new jail complex be affirmed on appeal) was confirmed in testimony from both Wellpath's Dr. Carin Kottraba and Tulane University Hospital's preeminent psychiatrist, Dr. Jeffrey Rouse.[59] Given the high level of care the inmates with acute and subacute mental health needs are presently receiving, without the need of the Phase III facility, inmates with acute and subacute mental health needs will not be substantially injured if a stay issues, and the third prong of the Court's analysis is also met.

**D. The Public Interest Lies in Favor of Granting a Stay**

Finally, the public's interest falls squarely in favor of first determining whether the PLRA renders this Court's prior orders directing the City to build the Phase III facility unenforceable before the City devotes unrecoverable time, funds, and resources towards its planning and construction. Importantly, "Because the State is the appealing party, its interest and [aforementioned] harm merge with that of the public."[60] And, like the issue presented to the Fifth Circuit in *Ruiz*, "the public interest is best served in this case by maintaining the status quo . . .

---

[59] *See* Testimony of Dr. Carin Kottraba, Transcript of the Motion for Relief, Vol. III, at pp. 52–5; Testimony of Dr. Jeffery Rouse, Transcript of the Motion for Relief, Vol. III, at pp. 140–56. It is also noteworthy that the OPSO seemingly agrees that the OJC provides medical and mental healthcare that are above the minimal constitutional standards, as made clear by the OPSO's Motion to terminate the compliance director and the Consent Judgment. *See* Rec. Docs. 1274 (Motion to Terminate), 1311 (Order Granting Motion to Terminate).

[60] *Veasey v. Abbott*, 870 F.3d 387, 391 (5th Cir. 2017) (per curiam).

until the merits are decided on appeal," because "[i]f the State prevails on appeal, the public is best served by not placing on the State the personnel and monetary burdens of implementing" the Court's orders directing the City to construct the multi-million dollar Phase III facility.[61]

### III.     CONCLUSION

The City seeks a stay to resolve whether the district court erred in its application of Rule 60(b) to the City's Motion for Relief, in light of the United States Supreme Court's directive that courts employ a "flexible approach" when addressing compliance with Consent Judgments in Institutional Reform Litigation,[62] and the PLRA's express prohibition on ordering the construction of new facilities. Based on the foregoing, the City respectfully submits it is likely to succeed on the merits of its appeal. The City further submits it will be irreparably injured absent a stay, and that a stay will not substantially injure the other parties to this proceeding. Finally, the City avers the public's interest is best served by first determining conclusively whether this Court may require the construction of the Phase III jail facility before expending further taxpayer dollars on the programming, design, and construction thereof.[63] Consequently, a stay until the conclusion of any appeals taken in this action will also "secure the just, speedy, and inexpensive determination" of this action pursuant to Rule 1 of the Federal Rules of Civil Procedure. Accordingly, the City requests that its Motion for Stay be granted.

---

[61] *Ruiz*, 650 F.2d at 569; *see also id.* at 572 ("Finally, we conclude that the public interest is best served by leaving the details of reducing overcrowding in TDC to Texas prison officials. It is sufficient that the district court has ordered the overcrowding to be eliminated.").

[62] *See Rufo*, 502 U.S. at 367; *Horne*, 557 U.S. at 433.

[63] Rec. Doc. 1281-1 at 1.

Respectfully submitted,

**BY:** /s/Sunni J. LeBeouf
**SUNNI J. LeBEOUF** (Bar #28633)
CITY ATTORNEY
Email: Sunni.LeBeouf@nola.gov
**DONESIA D. TURNER** (Bar #23338)
Email: Donesia.Turner@nola.gov
**CHURITA H. HANSELL** (Bar #25694)
Email: chhansell@nola.gov
**DARREN P. TYUS** (Bar #30772)
Email: darren.tyus@nola.gov
1300 PERDIDO STREET
CITY HALL – ROOM 5E03
NEW ORLEANS, LOUISIANA 70112
TELEPHONE: (504) 658-9800
FACSIMILE: (504) 658-9868

/s/ Harry Rosenberg
**HARRY ROSENBERG** (#11465)
**STEPHANIE POUCHER** (#37263)
**PHELPS DUNBAR LLP**
365 CANAL STREET, SUITE 2000
NEW ORLEANS, LA 70130
TELEPHONE: 504-566-1311
FACSIMILE: 504-568-9130
Email: Harry.Rosenberg@Phelps.com
Stephanie.Poucher@Phelps.com
*COUNSEL FOR:*
*THE CITY OF NEW ORLEANS*

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing was filed on this 19th day of February, 2021, with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to all participating counsel of record.

/s/ Sunni J. LeBeouf

16

PD.31094981.2