UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| LASHAWN JONES, ET AL, Plaintiffs; and UNITED STATES OF AMERICA Plaintiffs in Intervention<br><br>v.<br><br>MARLIN N. GUSMAN, ET AL, Defendants<br><br>MARLIN N. GUSMAN, Third-Party Plaintiff<br><br>v.<br><br>THE CITY OF NEW ORLEANS, Third-Party Defendant | Civil Action No. 2:12-cv-00859<br>Section I, Division 5<br>Judge Lance M. Africk<br>Magistrate Judge Michael B. North |

**PLAINTIFF CLASS' SUR-REPLY IN RESPONSE TO
CITY'S REPLY IN SUPPORT OF MOTION FOR STAY**

The Plaintiff Class respectfully files this Sur-Reply in response to the City of New Orleans' Reply in Support of Motion for Stay.[1]

    I.    <u>Introduction</u>

The City's Reply raises new arguments that were not contained in its Motion for Stay.[2] This continues "a frustrating recent pattern of practice in this case,"[3] despite prior admonition by

---

[1] ECF No. 1431. The Plaintiff Class adopts and incorporates its prior Response to the City's Motion. ECF No. 1426.
[2] ECF No. 1430.
[3] Id.

this Court[4] and the clear jurisprudence of this Circuit as to waiver.[5] On the basis of this jurisprudence, the Plaintiff Class respectfully requests that this Court find all new arguments raised by the City in its Reply to be waived. To the extent this Court considers the City's new arguments on their merits, these arguments should be rejected and the Motion for Stay denied.

In responding to the City's Reply, the Plaintiff Class begins from three important and coordinated premises, all supported by the record of this case: (1) this Court did not order the construction of the Phase III facility – the City of New Orleans committed itself to the 2016 Stipulated Order[6] and to the January 2017 Supplemental Compliance Action Plan,[7] as provided for by ¶ D.22 of that Order; (2) the Prison Litigation Reform Act (PLRA), and specifically 18 U.S.C. § 3626(a)(1)(c), is not implicated where a party contractual consented to an agreed-upon

---

[4] ECF No. 1320 ("In its reply brief [in support of its Motion for Relief from Court Orders], the City raised an argument that it had not previously raised – that the PLRA prohibits the Court from ordering the City to build a jail. While the Court earlier indicated that it would not entertain sur-reply briefs, it did not anticipate at that time that the City would make a new, allegedly dispositive[] argument for the first time in its reply brief."); ECF No. 1385 (Report and Recommendation) at 27-30; ECF No. 1396 (Order and Reasons) at 4 ("the Court finds that new arguments first raised by the City in its reply brief, as well as those not initially made before the U.S. Magistrate Judge, are deemed waived. Notwithstanding the waivers, the U.S. Magistrate Judge's alternative disposition on the merits of these untimely arguments is affirmed.").

[5] See, e.g., Bolton v. United States, 946 F.3d 256, 262 (5th Cir. 2019) ("[a]rguments raised for the first time in a reply brief are waived"); Jones v. Cannizzaro, 2021 WL 218040, at *5, n.22 (E.D. La. Jan. 21, 2021) ("Defendant's arguments that this opinion is not relevant were not raised until its reply brief. 'Arguments raised for the first time in a reply brief are generally waived.' Jones v. Cain, 600 F.3d 527, 541 (5th Cir. 2010)."). See also ECF No. 1385 (Report and Recommendation) at 27 ("Apparently seizing on the fact that it wasn't required to seek leave to file a reply brief and that I would not allow sur-reply briefing, the City filed a 31-page reply brief, attaching 13 new exhibits and making an entirely new, allegedly dispositive argument for the first time. Right out of the gate, the City exclaimed in bold-faced type: The Court's March 18, 2019 Order violates the Prisoner Litigation Reform Act ("PLRA") because the PLRA prohibits the Court from Ordering the construction of prisons. This pronouncement, and the argument that followed, was surprising for a number of reasons. First and foremost was that it had not been made in the City's motion, and as we should all know, an argument made for the first time in a reply brief is, in this circuit, waived," citing Hamstein Cumberland Music Group v. Williams, 532 Fed.Appx. 538, 543 n.4 (5th Cir. 2013) (citing Medina Cnty. Envtl. Action Ass'n v. Surface Transp. Bd., 602 F.3d 687, 702 (5th Cir. 2010)) and Alaniz v. Zamora–Quezada, 591 F.3d 761, 777 (5th Cir. 2009) (citing Peteet v. Dow Chem. Co., 868 F.2d 1428, 1437 (5th Cir. 1989)) (internal citations and formatting omitted)).

[6] ECF No. 1082 at 14-15, 20.

[7] ECF No. 1106.

remedy, including the construction of a jail facility;[8] and (3) the City of New Orleans has not sought, pursuant to the PLRA or otherwise, to modify or terminate the Consent Judgment entered by this Court in 2013, rendering inapplicable much of the statutory, procedural, and case authority on which the City attempts to rely.

    II.    <u>The City has never moved this Court pursuant to 18 U.S.C. § 3626(b). Any reliance on the automatic stay provision of 18 U.S.C. § 3626(e) is inapplicable.</u>

In Reply in Support of its Motion for Stay, the City – for the first time ever – purports that the automatic stay provision of 18 U.S.C. § 3626(e) was triggered by the City's filing of its Motion for Relief from Court Orders, commencing on December 26, 2020 (180 days after this filing) and lasting until January 25, 2021 when this Court entered its Order and Reasons denying the City's Motion. The entirety of this assertion is inapposite because the City's original Motion for Relief did not move for relief under this statute (the PLRA);[9] to the contrary the City's filing specifically cited Fed. R. Civ. P. 60 as the vehicle for the relief it sought.[10] Further, even if this automatic stay provision had been in play, the alleged stay is not in effect now; it did not have any procedural effect when it ostensibly was in effect; and it has no bearing on any of the factors related to a stay

---

[8] <u>See, e.g.</u>, <u>Plata v. Schwarzenegger</u>, No. C01-1351 THE, 2008 WL 4847080, at *5 (N.D. Cal. Nov. 7, 2008) (rejecting defendants' argument that the PLRA barred the court from ordering correctional facility construction, even after defendants had previously agreed to that remedy: defendants "both consented to the Receiver's plans and allocated funding that can be used to further those plans").

[9] 18 U.S.C. § 3926(e) applies only to "motion[s] to modify or terminate prospective relief made under subsection (b)" of the statute. The City has never filed a motion for relief under subsection (b) of the PLRA.

[10] <u>See</u> ECF No. 1281-1 at 1, 3-4. On June 29, 2020, the City filed its Motion for Relief from Court Orders, praying that the Court "indefinitely suspend[] the programming, design and construction of a new Phase III jail facility." ECF No. 1281 at 1. The City did not cite to 18 U.S.C. § 3626(e) or the PLRA a single time in its original motion. Even when the City attempted to raise the PLRA in its reply brief on the Motion for Relief, the waived (and also denied) argument was based on 18 U.S.C. § 3626(a)(1)(C) with no mention of the provisions of 18 U.S.C. § 3626(e). The stay provisions of 18 U.S.C. § 3626(e) were not applicable to the City's Motion because the Orders from which the City sought relief were not prospective relief orders contemplated by the statute. <u>See supra</u> at 2-3 for three premises underpinning this Sur-Reply. Further, the City's argument in their Motion for Relief quoted the full text of Rule 60(b) of the Federal Rules of Civil Procedure, related to "Grounds for Relief from a Final Judgment, Order, or Proceeding."

3

pending appeal.

Throughout the month of December 2020, the City represented to the Court that work was proceeding on the Phase III facility and made no mention of an automatic stay. On December 14, 2020, twelve days before the City's alleged stay, the Magistrate held a status conference at which, among other things, the Court requested the City to provide confirmation that work was ongoing on the construction of the Phase III facility.[11] The City Attorney made no mention of any stay, but rather committed to determine the status of work from the City's director of capital projects and to file a letter outlining the progress.[12] On December 21, 2020, five days before the alleged stay took effect, the City filed a status update regarding the Phase III facility.[13] According to a City memorandum filed as an exhibit to that update, "the City is taking immediate steps to further engage the Architect in the completion of design work."[14] Again, the City made no mention of a stay. On December 22, 2020, four days before the alleged stay, the City filed fifty (50) pages of objections to the Magistrate's Report and Recommendations.[15] The City never raised the allegedly impending stay. The reason the City never raised the automatic stay is because there was never a stay in effect.

But even if 18 U.S.C. § 3626(e) was somehow at issue, and even if there had been an automatic stay in effect, the City fails to explain how or why this alleged stay goes to any of the elements of a stay during the pendency of an appeal.[16] The automatic stay provisions of 18 U.S.C.

---

[11] ECF No. 1387.
[12] Id.
[13] ECF No. 1388.
[14] ECF No. 1388-1.
[15] ECF No. 1389.
[16] The City's original brief on appeal was due yesterday, April 21, 2021, but no ECF confirmation had been provided to counsel for the parties before the deadline elapsed. Today, the City filed a motion for leave to file its brief out of time, citing an error in the processing of its electronic filing. The Fifth Circuit has yet to rule on this motion.

§ 3626(e) are only narrowly applicable in the time period before a court issues a final ruling on a motion "made under subsection (b)" of the statute. The City cites to Miller v. French[17] perhaps to suggest that the Supreme Court interpreted 18 U.S.C. § 3626 (e) to represent a broad impingement on the equitable powers of courts.[18] But the Miller Court is clear that such a broad reading of the statute would be impermissible: "we should not construe a statute to displace courts' traditional equitable authority absent the clearest command, or an inescapable inference to the contrary . . . [.]"[19] Accordingly, the Miller Court is explicit in the narrowness of its holding: "[t]he PLRA does not deprive courts of their adjudicatory role, but merely provides a new legal standard for relief and encourages courts to apply that standard promptly."[20] Miller is clear that, even if the stay provisions of 18 U.S.C. § 3626 (e) were at issue in this case, such a stay only operates prior to the entry of the court's findings, and has no bearing on the merits of a motion for stay pending appeal.

Thus, given the procedural and factual history of litigation of the City's Motions for Relief from Court Orders and for Stay, the City's reliance on 18 U.S.C. § 3626(e) is utterly inapposite, verging on frivolous.

---

[17] Miller v. French, 530 U.S. 327, 120 S. Ct. 2246, 147 L. Ed. 2d 326 (2000).
[18] ECF No. 1431 at 8.
[19] Miller v. French, 530 U.S. at 340 (2000) (internal quotations omitted.)
[20] Miller v. French, 530 U.S. at 350 (2000).

> III. <u>A municipal charter cannot contravene an agreement of parties, including the municipality, to settle an enforcement action for ongoing violations of a consent judgment. Relatedly, a municipal charter does not supersede the orders of a Federal Court to progress such an agreement.</u>

The City argues that "building the Phase III facility requires approvals mandated by the City's Home Rule Charter, which the City has not obtained,"[21] appearing to suggest that the City's own inaction relative to a zoning variance to be evaluated by the City Planning Commission and approved by the City Council somehow relieves the City of its negotiated and agreed-upon obligations under the Stipulated Order and the Supplemental Compliance Action Plan, not to mention its statutory requirement to fund a good and sufficient jail.[22] Unsurprisingly, the City cites no authority for the proposition that its City Council is "empowered by City Charter to invalidate this Court's orders and its own contractual obligations by refusing to approve a zoning variance."[23] The Plaintiff Class will briefly discuss the robust jurisprudential support for the contrary position below.[24]

The breadth of remedial power available to Federal courts to correct constitutional violations, and to enter and enforce consent agreements, is well-established.[25] In the Eastern

---

[21] ECF No. 1431 at 12. <u>See also</u> ECF No. 1410-1 at 7, 11 n.47 (City's Memorandum in Support of Motion for Stay).
[22] "It is a principle of fundamental justice that if a promisor is himself the cause of the failure of performance, . . . , he cannot take advantage of the failure." <u>Lozano v. Metropolitan Transit Authority of Harris County, No. H-14-1297, 2016 WL 3906295, at *8 (S.D. Tex. Jul. 19, 2016)</u>, quoting In re Deepwater Horizon, 786 F.3d 344, 361 (5th Cir. 2015). As further detailed in the Plaintiff Class' Response to the City's Motion for Stay, ECF No. 1426 at 2-7, the City committed to the Stipulated Order (and its ¶ D.22) in 2016, after which the Supplemental Compliance Action Plan was filed in January 2017 as to the construction of the Phase III facility. On May 18, 2017, the New Orleans City Council voted 5 to 1 in favor of passing the motion to present the Phase III plan to the City Planning Commission. And since that time, the City has moved forward with contracting, resource expenditure, and extensive development of the Phase III facility.
[23] ECF No. 1430 at 1.
[24] The United States Constitution (Article VI, Clause 2) itself provides clear direction: "This Constitution, and the Laws of the United States . . . , shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."
[25] <u>See, e.g.</u> <u>U.S. v. Alcoa, Inc.</u>, 533 F.3d 278, 286 (5th Cir. 2008) (finding that "consent decrees are more than contracts," "[t]hey are also enforceable judicial orders," instructing "that district courts have the power and ordinarily

6

District of Louisiana, fair housing litigation brought against St. Bernard Parish is instructive. In December 2008, the Greater New Orleans Fair Housing Action Center (GNO) and an intervenor-plaintiff filed a motion to enforce, alleging that an ordinance passed by the St. Bernard Parish Council in September 2008 violated a previously-entered consent order.[26] The ordinance at issue had placed a moratorium on the construction of multi-family housing, and the plaintiffs contended this action was racially discriminatory and had been taken in violation of the Fair Housing Act and the consent order. Following an evidentiary hearing, the court concluded that the ordinance had a disparate racial impact on African-Americans, and also found that the Parish's and the Council's intent in enacting the moratorium had been discriminatory. In granting the plaintiffs' enforcement motion, the court ordered "that the Defendants St. Bernard Parish and St. Bernard Parish Council shall rescind Ordinance SBPC # 905-09-98, its moratorium on all housing developments with five or more units," and that defendants be immediately enjoined from enforcing the ordinance until it was rescinded.[27]

Months later, the plaintiffs once again moved for enforcement of the consent order, alleging that the defendants' conduct since the March 2009 order constituted a further violation of the consent order: in April 2009, the Parish Planning Commission had denied the plaintiffs' application to re-subdivide, thereby enacting the same discriminatory practice as the now-

---

must hold parties to the terms of a consent decree," and further noting that district courts "have wide discretion to enforce decrees and to implement remedies for decree violations"). See also Swann v. Charlotte-Mecklenburg Bd. of Ed., 401 U.S. 1, 15 (1971) ("Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies."); Milliken v. Bradley, 433 U.S. 267, 282 (1977) ("where, as here, a constitutional violation has been found, the remedy does not 'exceed' the violation if the remedy is tailored to cure the 'condition that offends the Constitution.'").

[26] A consent order entered in February 2008 had "settled plaintiffs' allegations that defendants violated the Fair Housing Act of 1968 . . . in enacting several housing ordinances. Greater New Orleans Fair Housing Action Center v. St. Bernard Parish, 641 F.Supp.2d 563, 565 (E.D. La. Mar. 25, 2009).

[27] Id. at 578.

rescinded moratorium.[28] Further, the plaintiffs alleged that the Parish Council and the Planning Commission had injected improper concerns into otherwise routine re-subdivision requests. Following another evidentiary hearing, the court granted the plaintiffs' motions for enforcement and contempt, finding that (1) the defendants' conduct, by subverting the re-subdivision process, had a discriminatory effect on African-Americans and therefore violated the Fair Housing Act and the terms of the 2008 Consent Order,[29] and (2) the objections raised by the Planning Commission and the Parish Council (to the re-subdivision application) were irrelevant and pretextual.[30] The court ordered that the re-subdivision applications be placed on the agenda for the next calendar Planning Commission hearing.[31]

Thus, as illustrated by these remedial measures of the Greater New Orleans Fair Housing Action Center litigation, it is clearly within the purview of Federal courts to direct local political subdivisions to take specific action related to legislative and zoning decisions where such action is necessary to enforce compliance with previously-entered consent agreements. Such remedial orders may even include rescinding of a Parish Council ordinance and scheduling of zoning applications for consideration by a Parish Planning Commission.

Greater New Orleans Fair Housing Action Center emerges from decades of jurisprudence as to remedying violations of Federal constitutional and statutory rights to be free of racial discrimination in the provision of housing.[32] One needs only look to Village of Arlington Heights

---

[28] Greater New Orleans Fair Housing Action Center v. St. Bernard Parish, 648 F.Supp.2d 805 (E.D. La. Aug. 17, 2009).
[29] Id. at 821.
[30] Id.
[31] Id.
[32] While the body of case law surrounding the remediation of racial discrimination in housing is especially applicable to the zoning argument advanced by the City, one could also look to the history of Federal court action to address constitutional violations and breaches of corrective orders in the context of school desegregation, which also impacts

et al. v. Metropolitan Housing Development Corporation et al.,[33] its subsequent procedural history, and its progeny to locate plentiful support for the role Federal courts must play in the remediation of rights violations, including through orders directing the action of local political subdivisions responsible for the perpetuation of such violations.

In 1971 the Metropolitan Housing Development Corporation (MHDC) had applied to the Village of Arlington Heights, Illinois, for rezoning of a parcel of land from single-family to multiple-family, intending to build low- and moderate-income housing. The Village denied the rezoning request, and MHDC, along with other plaintiffs, sued the Village, alleging that the denial was racially discriminatory and violated the Fourteenth Amendment as well as the Fair Housing Act of 1968.[34] Following remand from the United States Supreme Court, the Court of Appeals held that "the Village of Arlington Heights ha[d] a statutory obligation under the Fair Housing Act . . . to refrain from the perpetuation of zoning policies that effectively foreclosed construction of low-cost housing within its boundaries,"[35] and further remanded the case for the district court to determine whether there was land within the municipality that was properly zoned and suitable for subsidized housing. If not, the Village's refusal to rezone the development site would violate the Fair Housing Act and the plaintiffs would be entitled to the affirmative relief they sought – the

---

local functions such as those of boards of education. See, e.g., Dayton Bd. of Ed. V. Brinkman, 433 U.S. 406, 419-20 (1977) (recognizing the power of federal courts "to restructure the operation of local and state government entities" on the basis of a constitutional violation); U.S. v. Lawrence County School Dist., 799 F.2d 1031, 1043 (5th Cir. 1986) (holding "the remedial power of a federal court that adopts a desegregation plan is not thereafter limited to enforcement of the details of the original plan," and if "it becomes evident that an integrated school system cannot be achieved simply by directing adherence to the original plan, the court may consider remedial measures that are designed to restore the victims of segregation to the position they would have occupied absent both the original discriminatory conduct and the aggravation of it by school authorities' failure to comply with corrective orders").
[33] 429 U.S. 252 (1977).
[34] Id. at 254.
[35] Metro. Hous. Dev. Corp. v. Village of Arlington Heights, 469 F. Supp. 836, 842–43 (N.D. Ill. 1979), aff'd, 616 F.2d 1006 (7th Cir. 1980), citing Metro. Hous. Dev Corp. v. Village of Arlington Heights, 558 F.2d 1283 (7th Cir. 1977).

rezoning of the site to permit construction.

While recognizing that "local authorities have the primary responsibility for dealing with local matters," the district court found that "if local authorities fail in their affirmative obligations under federal law, judicial authority may be invoked."[36] The court concluded that, its power having been properly invoked in the case, it could order "site-specific affirmative relief, based on the statutory violation alleged in the complaint."[37] In entering its consent decree, the district court specifically ordered, among other remedies, that the Village of Arlington Heights (1) adopt an ordinance annexing properties described in the order, and (2) adopt amendments to its zoning and related ordinances to reclassify the properties. The amendments and changes to the zoning ordinance, other ordinances, and the zoning documents were to be accomplished "without further notice or hearing or proceeding."[38] "In this decision, the court attempted to the best of its abilities to use its broad and flexible equity powers to fashion a result that would do justice to all concerned."[39]

Lastly, review of the district court's actions in Spallone v. United States[40] further elucidate the broad powers of the Federal bench to direct a party's compliance with previously-entered consent agreements. In this suit brought against the city of Yonkers and its Community Development Agency for intentionally enhancing racial segregation in housing, the district court concluded that the defendants had violated the Fair Housing Act and the Fourteenth Amendment,

---

[36] Id. at 852-53, citing Milliken v. Bradley, 433 U.S. 267, 280-81 (1977).
[37] Id. at 853.
[38] Id. at 870.
[39] Id. at 869.
[40] 493 U.S. 265 (1990).

and entered a remedial decree enjoining the defendants from promoting racial residential segregation and requiring affirmative steps be taken by the city to disperse public housing.[41] After the appellate court upheld the district court's judgment, the parties consented to an agreement that set forth actions the city would take to implement the affirmative portions of the court's remedial decree. Such actions included the adoption of legislation directing zoning changes.[42] When "the city continued to delay action toward implementing the long-term plan," the district court entered an order requiring the city to enact the legislative package described in the earlier consent agreement, and further outlined daily fines that would be leveraged in the event of contempt.[43] Despite these directives, the city council voted to defeat the agreed-upon legislative package, and the district court held both the city as well as the individual councilmembers in contempt. On certiorari, the United States Supreme Court concluded that the district court "should have proceeded with such contempt sanctions first against the city alone in order to secure compliance with the remedial order."[44]

Thus, Federal courts possess broad and flexible remedial powers to address constitutional and statutory violations, to enter consent agreements, and to progress such agreements when inaction or breach occurs, including through measures that impact or direct local parish and/or municipal functions.

---

[41] Id. at 268-69.
[42] Id. at 270.
[43] Id. at 271.
[44] Id. at 280.

IV. <u>In arguing its likelihood of success on the merits of its appeal, the City's Reply again misstates the factual record of this case and misconstrues the case law of this Circuit.</u>

The Plaintiff Class cannot leave the City's new misrepresentations of fact and law unanswered,[45] and will briefly address those included in the Reply:

- The City misapplies and misrepresents[46] the holding in <u>Ruiz v. Estelle</u>.[47] As an initial matter, the procedural posture in <u>Ruiz</u> is entirely distinct from the procedural posture in this matter. <u>Ruiz</u> was an appeal of a motion for stay pending the appellate review of the District Court's injunction to remedy conditions in the Texas Department of Corrections.[48] Despite a belated argument to the contrary,[49] there is no pending appeal on any injunction in the instant case.[50] Setting aside the procedural gulf that distinguishes <u>Ruiz</u> from the instant case, the City ignores the context of the quoted language that clearly contemplates the necessity of construction and the importance of the stay to facilitate and speed construction to remedy the causes of constitutional rights violations.[51]

---

[45] The Plaintiff Class continues to rely on its previous briefing regarding the inapplicability of 18 U.S.C. § 3626(a)(1)(C) to the Stipulated Order, and the clear applicability of <u>Plata v. Schwarzenegger</u>, No. C01-1351 THE, 2008 WL 4847080, at *5 (N.D. Cal. Nov. 7, 2008), to the City's extraordinary position that they are not bound by a negotiated consent agreement. <u>See</u> ECF No. 1327; ECF No. 1393 at 10–12.
[46] ECF No. 1431 at 13–14.
[47] 650 F. 2d 555 (5th Cir. 1981).
[48] <u>Id</u>. at 558-9.
[49] ECF No. 1431 at 6-7.
[50] <u>See supra</u> at 2; ECF No. 1426 at 2-12.
[51] "With the need being so urgent for new facilities to alleviate inmate overcrowding, it is in the interest of all parties and the public that the location requirements of the district court's order be stayed." <u>Ruiz,</u> 650 F. 2d at 574. <u>See also</u> ECF No. 1426 at 18-19, discussion of <u>Ruiz</u> in Plaintiff Class' Response. Additionally, as a practical matter, the City's chosen language from <u>Ruiz</u> – on its face – militates in favor of the Phase III facility in its emphasis on the importance of allowing entities responsible for running the facility to determine size and managerial structure of the facility. The Compliance Director was tasked with operating the jail and developing the plan for the management of special populations through the Stipulated Order. ECF No. 1082. The plan, size, and managerial structure developed by the Compliance Director, in direct consultation with the City and the Sheriff's Office, was the Phase III facility. ECF No.

- The City misrepresents the testimony of William Snowden regarding the population of people with mental health needs in the jail.[52] William Snowden is not a medical doctor nor a healthcare provider, and he does not work in the Orleans jail; as such, he is not able to offer credible testimony or evidence as to the number of people in the jail with acute and subacute mental health needs. In fact, the City's representation of a significant decline is directly contrary to another of the City's witnesses, Dr. Rouse, the lead psychiatrist at the jail. Dr. Rouse testified that the proportion of people in the jail with serious mental illness has in fact increased.[53]

- The testimony offered by Dr. Kottraba does not establish a "high level" of health care delivered to people at the jail.[54] Dr. Kottraba has been to the Orleans jail one time.[55] As an executive for the company holding the contract to provide medical services at the jail, she is simply not in a position to provide credible testimony as to the state of medical and mental health care, particularly when that testimony is at odds with the findings of this Court's Independent Monitors.[56]

- The City's suggestion that Tulane psychiatrists performing suicide watch

---

1109.

[52] ECF No. 1431 at 11.

[53] According to the testimony of Dr. Rouse, "we're at 477 patients taking psychiatric medications, which is greater than it was before COVID." ECF No. 1367, Tr. 10/8/2020, 166:23-167:6; see also ECF No. 1393 at 4–6, Plaintiff Class' Response to City's Objections, for further discussion of the flaws in the City's argument that population reduction represents a changed circumstance.

[54] ECF No. 1431 at 11, 15.

[55] ECF No. 1367, Tr. 10/8/2020, 73:9-12.

[56] See Report No. 12 of the Independent Monitors, ECF No. 1303 at 64-66; Report No. 13 of the Independent Monitors, ECF No. 1404 at 9-10, 14; Trans. 3/8/21 at 25:4-26:6. Dr. Kottraba's testimony on the National Commission on Correctional Healthcare (NCCHC) is irrelevant. The NCCHC is not the arbiter of compliance with the Consent Judgment, nor is it an arbiter of constitutionally-sufficient care. See ECF No. 1362 at 5, Plaintiff Class' Post-Hearing Brief, for further discussion.

- assessments[57] mitigates the problem of untrained deputies conducting, or failing to conduct, suicide precautions in structurally dangerous settings only serves to demonstrate the City's misconception of what is necessary to keep the people it holds in its jail safe from self-harm.[58]

- The City's suggestion that the current state of somatic healthcare at the jail is adequately met by University Medical Center[59] flies in the face of testimony and evidence submitted by the City's own expert, Dr. Shansky. Dr. Shansky specifically testified to the importance of Orleans jail medical providers[60] having admitting and discharge privileges, as well as access to a secure ward dedicated exclusively to patients form the Orleans jail.[61] The arrangement the City describes in its Reply does not comply with the Consent Judgement and continues to present a risk of harm to anyone with serious medical needs in the jail.

- The City's argument based on COVID-19 reductions in revenue[62] continues to completely ignore the independent, unaffected FEMA funding for construction of the Phase III facility.

Despite these continued misrepresentations of fact and law, the City remains unable to

---

[57] ECF No. 1431 at 15.
[58] See ECF No. 1393 at 6, Plaintiff Class' Response to City's Objections, for full discussion of Dr. Rouse's testimony on the extremely limited aspects of the Consent Judgment provisions for which Tulane Psychiatry has responsibility. See also ECF No. 1426 at 20, Plaintiff Class' Response to City's Motion for Stay, for full discussion of the insufficiency of suicide prevention measures at the jail described by the Independent Monitors.
[59] ECF No. 1431 at 15-16.
[60] The City references Tulane physicians. The Plaintiff Class is unsure what the City means by this reference, but notes that Tulane is only contracted to provide psychiatrists, not somatic physicians.
[61] See ECF No. 1366, Tr. 10/7/2020, 164:1-8, 167:5-19; ECF No. 1281-7 at 3-4; ECF No. 1366, Tr. 10/7/2020, 137:1-21. See also ECF No. 1393 at 7, Plaintiff Class' Response to City's Objections, for further discussion of how somatic care is not provided at OJC.
[62] ECF No. 1431 at 11.

establish likely success on the merits of its appeal.

V.      Conclusion

As detailed above, and in the Plaintiff Class' Response to the City's Motion, the City is not entitled – procedurally or substantively – to a "stay" of this Court's Order and Reasons pending appeal. The Plaintiff Class respectfully requests that the Court deem waived all new arguments raised by the City in its Reply. Further, the Plaintiff Class respectfully request that the City's Motion for Stay be denied.

**FOR THE PLAINTIFF CLASS:**

 */s/ Elizabeth Cumming*
EMILY WASHINGTON, La. Bar No. 34143
ELIZABETH CUMMING, La. Bar No. 31685
Roderick & Solange MacArthur Justice Center
4400 S. Carrollton Avenue
New Orleans, LA 70119
(504) 620-2259
elizabeth.cumming@macarthurjustice.org

Date:  April 21, 2021

15