# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| _____ | § |
| LASHAWN JONES, *et al.*, and | § |
| THE UNITED STATES OF AMERICA, | § |
| | § Civil Action No. 2:12-cv-00859 |
| PLAINTIFFS | § Section I, Division 5 |
| | § Judge Lance M. Africk |
| | § Magistrate Judge Michael B. North |
| MARLIN GUSMAN, Sheriff, | § |
| | § |
| | § |
| DEFENDANT. | § |
| _____ | § |

---

## Report No. 14 of the Independent Monitors
## October 5, 2021

---

Margo L. Frasier, J.D., C.P.O., Lead Monitor
Robert B. Greifinger, M.D. Medical Monitor
Patricia L. Hardyman, Ph.D., Classification Monitor
Raymond F. Patterson, M.D., D.F.A.P.A., Mental Health Monitor
Shane J. Poole, M.S., C.JM., Environmental Fire Life Safety Monitor
Diane Skipworth, M.C.J., R.D.N., L.D., R.S., C.C.H.P., C.L.L.M., Food Safety Monitor



***Compliance Report #14***
***LASHAWN JONES, et al., and the United States of America v.***
***Marlin Gusman, Sheriff***

Table of Contents

|  |  | **Page** |
|---|---|---|
| I. | Introduction | 4 |
|  | A. Summary of Compliance | 6 |
|  | B. Opportunities for Progress | 8 |
|  | C. Review Process of Monitors' Compliance Report #14 | 15 |
|  | D. Communication with Stakeholders | 15 |
|  | E. Recommendations | 15 |
| II. | Substantive Provisions | |
|  | A. Protection from Harm | 17 |
|  | A.1. Use of Force Policies and Procedures | 20 |
|  | A.2. Use of Force Training | 21 |
|  | A.3. Use of Force Reporting | 23 |
|  | A.4. Early Intervention System | 27 |
|  | A.5. Safety and Supervision | 28 |
|  | A.6. Security Staffing | 33 |
|  | A.7. Incidents and Referrals | 35 |
|  | A.8. Investigations | 37 |
|  | A.9. Pretrial Placement in Alternative Settings | 39 |
|  | A.10. Custodial Placement | 40 |
|  | A.11. Prisoner Grievance Process | 59 |
|  | A.12. Sexual Abuse | 63 |
|  | A.13. Access to Information | 63 |
|  | B. Mental Health Care | 64 |
|  | C. Medical Care | 89 |
|  | D. Sanitation and Environmental Conditions | 92 |
|  | E. Fire and Life Safety | 103 |
|  | F. Language Assistance | 107 |
|  | G. Youthful Prisoners | 108 |
|  | H. The New Jail Facility | 110 |
|  | I. Compliance and Quality Improvement | 111 |
|  | J. Reporting Requirements and Right of Access | 112 |
| III. | Status of Stipulated Orders – February 11, 2015, and April 22, 2015 | 112 |



**Page**

**Tables**
Table 1 – Summary of Compliance – All Compliance Reports          7
Table 2 – Status of Compliance – Stipulated Agreements          8
Table 3 – Summary of Incidents CY 2019-CY 2021          18
Table 4 – CY 2018-CY 2021 All OJC Reported Incidents by Type by Month          19
Table 5 – CY 2018-CY 2021 OJC Reported Incidents          30

**Figures**
Figure 1 – Distribution of Inmates by Race by OPSO Facility          46
Figure 2 – Rates and Completion Time of Initial Custody Assessments          48
Figure 3 – Percent Overrides for Housing Purposes – October 2020 –
          May 2021          49
Figure 4 – Initial Classification Override Rates by Gender in October 2020 –
          May 2021          50
Figure 5 – Number of Attachments Input by Classification Staff –
          October 2020-May 2021          52
Figure 6 – Attachment Reason by Month – October 2020-May 2021          52
Figure 7 – Rate of the Disciplinary Infractions for the OPSO ADP          57
Figure 8 – ADP versus Number Disciplinary Hearings: October 2020 –
          May 2021          57
Figure 9 – Most Serious Disciplinary Infraction/Report with Finding of Guilty:
          October 2020-May 2021          58

**Appendices**
Appendix A - Summary Compliance Findings by Section Compliance
Reports 1 – 14          115



**Compliance Report # 14**

**Introduction:**

This is Compliance Report #14 submitted by the Independent Monitors providing assessment of the Orleans Parish Sheriff's Office's (OPSO) compliance with the Consent Judgment of June 6, 2013. Report #14 reflects the status of OPSO's compliance as of March 31, 2021. This Report is based on incidents, documents, and compliance-related activities between October 1, 2020, and March 31, 2021. Due to health safety concerns because of COVID, three of the Monitors conducted the monitoring visit onsite while the medical, mental health, and classification portions were conducted virtually. In addition, the Classification Monitor conducted an abbreviated onsite monitoring visit in June 2021. Having some of the Monitors onsite allowed for observations to be shared with the Monitors conducting their visit virtually. This report is based on the observations and review of OPSO documents by the Monitors during the onsite and virtual site visits.

Throughout the time the Monitors have been involved in enforcement of the Consent Judgment, the site visits have played an integral role. During the site visits and the site visits by the Lead Monitor in between, the Monitors have endeavored to provide guidance to OPSO as to how to remedy the unsafe and unconstitutional conditions which existed when we began monitoring in late 2013. During this monitoring period, health concerns related to COVID limited the ability of the Monitors to be onsite. Due to COVID, only one visit onsite between tours was possible; the Lead Monitor visited in April 2021. The Monitors were in frequent contact with OPSO via other methods such as emails, telephone calls, and virtual meetings.

The Monitors have consistently urged OPSO to put in place the necessary processes and procedures to not only obtain compliance, but to sustain compliance. Such processes and procedures would allow OPSO to provide adequate proof of compliance, assess compliance with the Consent Judgment and its own policies and procedures, and address shortcomings without intervention of the Monitors. The Monitors have provided guidance as to how to go about the various review functions and establish a compliance unit that would operate independently of those whose performance would be assessed. OPSO has put in place a process where unit managers and section heads are required to gather, and report selected statistical data to the leadership at the weekly unit managers meeting. This is a step in the right direction. Analysis of the data and accountability for shortcomings in the analysis



of the data needs to occur. OPSO has begun to take steps towards the formation of a compliance unit, but it is not operational.

A fully staffed compliance unit, which includes inspection and auditing duties, would allow for OPSO to recognize deficiencies, and address them. For instance, OPSO does not have an electronic way of recording security checks in the housing unit. In an effort to simplify the process, OPSO developed a paper form on which to record security checks. While this provides an easier way for a supervisor to spot check during a unit inspection if the deputy has recorded that the security checks are being performed timely, it is insufficient proof that the security checks actually occurred and requires watching hours of video to verify. Due to the lack of electronic recording of the security checks, it is extremely difficult to efficiently analyze the data and spot trends. OPSO has indicated that with the formation of the compliance unit that OPSO has now started to audit log sheets with video footage and plans to have an audit report for the next compliance period. At the unit managers' meeting, one of the statistics reported was the number of security checks which occurred, but it was unclear what constituted a security check and how the timeliness and thoroughness were measured. During the onsite monitoring visit, Monitors viewed the documentation for security checks of the units. It should be noted that the documentation was often missing or incomplete. When questioned, deputies usually were able to describe what an acceptable security check would look like. However, the deputies admitted that they did not perform all of the tasks for a proper security check each time a security check was recorded as having taken place. Usually, an adequate security check was only performed when a physical count of the inmates took place; at most, twice a twelve-hour shift. A comprehensive compliance unit which includes audits and inspections is important to finishing up the work to be done on compliance and sustaining compliance. Equally important is adopting a culture where accountability is embraced as opposed to a culture where there is a reluctance to address the deficiencies and, in some instances, undermine the efforts of those whose job it is to provide information.

During the monitoring period, the OPSO's jail system was under the leadership of Sheriff Gusman. Byron LeCounte continues to be the Chief of Corrections. He has been in that role since February 2019. The Assistant Chief of Corrections' position remains vacant.

In summary, the Monitors find that food service and environment conditions of inmates held in both the Orleans Justice Center (OJC) and the Temporary Detention Center



(TDC) has made improvement since Compliance Report #13 provided to the Court on February 8, 2021. There has not been progress in the safety, classification, medical and mental health care areas. Overall, ratings improved on four (4) provisions but regressed on eighteen (18) provisions. While some of the regression is due to the strain put on the system by COVID, much is due to a failure to follow the policies and procedures that have been put in place. The specific initiatives are addressed in this report.

## A.    Summary of Compliance

The requirements of the Consent Judgment represent correctional practice recognized as required for the operation of a Constitutional jail system. While there is some flexibility for how OPSO addresses the mandates, achieving substantial compliance with the Consent Judgment, and Stipulated Agreements are necessary to bring OPSO and its correctional facilities into adherence with Constitutional requirements. The Consent Judgment contains 174 separately rated provisions. While they are separately rated, they are often intertwined. For example, effective implementation of a policy requires not only the drafting of a suitable policy, but appropriate training on the policy and enforcement of the policy. Enforcement of the policy is contingent on assessing whether the policy is being followed which requires supervision, analysis of incidents and data, and objective confirmation of compliance. A meaningful annual review of the adequacy of the policy does not just mean to determine whether the wording of the policy should be changed, but also includes determining adherence to the policy and whether the objectives of the policy are being met, which again requires objective data collection and analysis and development of corrective action plans.

Based on the current assessment, OPSO has regressed from Report #13 and now has seven provisions which are in non-compliance. Six of those ratings are in the medical and mental health areas with the remaining one attributable to not providing annual training on fire and emergency practices. Substantial compliance has been achieved for 58% of the provisions. Thirty-nine percent (39%) of the provisions are in partial compliance. Four (4%) percent of the provisions are in non-compliance.

Over time, OPSO has made material progress as indicated by the movement of non-compliance to partial compliance to substantial compliance for almost two-thirds of the provisions. At different times during the duration of the Consent Judgment, there has been



regression in the progress towards compliance. As will be addressed in individual areas, OPSO has shown regression from the progress reflected in Compliance Reports #10-13 in some provisions due to failure to consistently follow and enforce policies and procedures and to provide required annual training.

During the onsite visit for Compliance Report #14, Chief LeCounte and Major Griffin provided an update on their continuing efforts to utilize analyses of data, including grievance data and use of force data to determine policy adherence and develop action plans to address shortcomings and make decisions. They continued to be hampered in their efforts by the lack of data and meaningful analysis. Needed is reliable data which is analyzed in an impartial manner and the development of a systematic approach to making decisions and implementing and enforcing them. Until that occurs, the same deficiencies are likely to be continued to be noted time and time again.

Sheriff Gusman and Chief LeCounte, OPSO continue to examine strategies to obtain and sustain compliance and determine the structural and organizational changes necessary to achieve compliance. Towards the end of the monitoring period, they put in place a weekly meeting of managers to review performance measures; similar to a CompStat meeting. This is a very positive step towards implementation of the strategies that should result in progress.

**Table 1 – Summary of Compliance – All Compliance Reports[1]**

| Compliance Report/Date | Substantial Compliance | Partial Compliance | Non-Compliance | NA/Other | Total |
|---|---|---|---|---|---|
| #1 – December 2013 | 0 | 10 | 85 | 76 | 171 |
| #2 – July 2014 | 2 | 22 | 149 | 1 | 174 |
| #3 – January 2015 | 2 | 60 | 110 | 2 | 174 |
| #4 – August 2015 | 12 | 114 | 43 | 4 | 173 |
| #5 – February 2016 | 10 | 96 | 63 | 4 | 173 |
| #6 – September 2016 | 20 | 98 | 53 | 2 | 173 |
| #7 – March 2017 | 17 | 99 | 55 | 2 | 173 |
| #8 – November 2017 | 23 | 104 | 44 | 2 | 173 |
| #9 – June 2018 | 26 | 99 | 46 | 2 | 173 |
| #10 – January 2019 | 65 | 98 | 8 | 2 | 173 |
| #11 – September 2019 | 103 | 66 | 5 | 0 | 174 |
| #12 – May 2020 | 118 | 56 | 0 | 0 | 174 |
| #13-- November 2020 | 111 | 59 | 4 | 0 | 174 |
| #14—May 2021 | 100 | 67 | 7 | 0 | 174 |



The status of compliance (February 11, 2015 and April 22, 2015) is as follows:

**Table 2 – Status of Compliance with 2015 Stipulated Agreements**

| Compliance Report/Date | Substantial Compliance | Partial Compliance | Non-Compliance | NA | Total |
|---|---|---|---|---|---|
| August 2015 | 21 | 12 | 1 | 0 | 34 |
| February 2016 | 21 | 12 | 1 | 1 | 34 |
| September 2016 | 26 | 7 | 1 | 0 | 34 |
| March 2017 | 28 | 4 | 1 | 1 | 34 |
| November 2017 | 21 | 11 | 1 | 1 | 34 |
| June 2018 | 23 | 8 | 2 | 1 | 34 |
| January 2019 | 28 | 5 | 0 | 1 | 34 |
| September 2019 | 28 | 5 | 0 | 1 | 34 |
| May 2020 | 28 | 5 | 0 | 1 | 34 |
| November 2020 | 32 | 2 | 0 | 0 | 34 |
| May 2021 | 32 | 2 | 0 | 0 | 34 |

**B.     Opportunities for Continued Progress**

The Monitors summarize below the areas identified in preparation of this report regarding OPSO's current level of compliance with the Consent Judgment.

**1.     Foundational Work** - The essential, core work required to achieve compliance includes:

- Policies and Procedures – OPSO has completed the essential policies and procedures. The Policy Manager has continued to review policies and perform updates. Essential is the continued development, approval, and implementation of lessons plans that correspond with each of the policies. OPSO's policy governing its written directive system has significantly improved the policy/ procedure process. This process allows for organizational components to develop specific operational practices for review by OPSO administration. Adherence to the policies, procedures, and training is essential. OPSO has yet to develop a reliable process for objective consistent auditing of adherence and consistent enforcement of policies.

- Inadequate staffing – OPSO has continued to hire staff but has not been able to gain ground on vacancies due to the number of terminations and resignations. During calendar year CY 2020 and the first quarter of CY 2021, OPSO lost



significant ground. Inadequate staff in the housing areas of the facilities (OJC and TDC) and the timely completion of use of force investigations continues to hamper OPSO's ability to consistently comply with the Consent Judgment. OPSO continues to use employee overtime to address the staff shortages. Even with substantial overtime, frequently, there are housing units and control rooms with no assigned staffing. Further, almost daily, assigned staff leave housing units and control pods unattended for meal breaks and other duties. While a pay scale which provides for improvement in compensation with the goal of increased retention of staff and assistance in the recruitment efforts has been developed, a plan to secure the necessary funding and implement the pay scale has not been advanced. OPSO is strongly encouraged to review its deployment of staff. It is apparent that staff is not being deployed to the areas where the need is most critical, staffing the housing units.

- <u>Training</u> – Employee training for security staff, both pre-service and in-service, has become more in line with OPSO policies and procedures. OPSO has reinstated the practice of assigning new deputies a training officer during the first three weeks of assignment to OJC (field training program). The sergeant supervising the program also meets with the new deputies and provides them mentoring and guidance. Follow up should be done to see the affect that this program has on turnover. The program, if allowed to be fully implemented, is likely to result in a reduction of turnover and a reduction in rule violation by new deputies. OPSO did not provide its annual training in CY 2020 or during the monitoring period. While COVID was offered as the reason, lack of staff appears to be equally responsible for the failure. This failure resulted in downgrading of the ratings in several provisions related to training.

- <u>Supervision</u> – Safe operation of OPSO's facilities requires an adequate number of sufficiently trained first line and mid-management supervisors and clear lines of authority and responsibility. When Independent Compliance Director Hodge was in charge of operations, he implemented the unit management approach and provided training and mentoring for the managers. While there are benefits to a unit management system, the unit management system has blurred the lines of responsibility and accountability. This is particularly

apparent when there are no unit managers on duty and the supervision of the jail is the responsibility of the watch commanders. Given that the unit managers are seldom present at the facility after 4:00 p.m. or weekends, the authority of the watch commanders to assign and supervise the staff is crucial to the safe operation of the OJC.

2.   **Medical and Mental Health Care** – Several provisions in the areas of mental health have regressed. The Medical and Mental Health Monitors report challenges remain in the provision of basic care, staffing, and recordkeeping, as well as the need for improved collaboration with custody/security staffing. Security staff were found to be responsible for "suicide watch" during the site visit, but the deputies routinely stated that they did not understand what their duties were to perform suicide watches. Resources from Tulane University continue to be particularly helpful in providing mental health care, but Tulane University is not responsible for many aspects of mental health care required by the Consent Judgment. An important part of the long-term solution to the lack of compliance with the Consent Judgment in the areas of medical and mental health is the design and construction of Phase III, a specialized building which will contain an infirmary and housing for inmates with acute mental health issues. However, the City did extensively renovate portions of TDC (now referred as TMH or Temporary Mental Health) as a stop gap measure. OPSO is utilizing all of the TMH units, but not to their full capacity.

3.   **Inmate Safety and Protection from Harm** - Providing a safe and secure jail continues to be a challenge.

- <u>Unit Management</u>—The Unit Management approach is being used in the supervision of the OPSO housing units. Each floor of the OJC, the IPC, and the TDC/TMH have been designated as a "unit". The purpose of this strategy is to enhance accountability for both staff and the inmates by allowing the staff to get to know the inmates. The effectiveness of the Unit Management approach has been greatly hampered by the lack of development of management plans for problematic inmates. It also has blurred the lines of responsibility and accountability as indicated above.

- <u>Violence</u> – There were still significant incidents of violence occurring within the facilities during the monitoring period– including inmate on inmate



assaults and assaults on staff. Especially concerning is that inmates continue to fashion weapons from items found in the jail. The items (such as the light supports in the utility closets and the cabinets at the front of the day room) would be unavailable to them if the staff were following policies regarding supervision and limiting access. The lack of effective random shakedowns has resulted in the continued presence of weapons and other contraband in the housing units. Disorder and non-compliance to the institutional rules cause staff to use force to gain control and compliance. There is inadequate use of de-escalation techniques before resorting to force. Seldom are mental health staff involved when de-escalation is attempted even though a large percentage of the inmates involved in a use of force are on the mental health caseload. The number of overdoses linked to illicit drugs and prescription medication continues to be high. No inmates died while in custody during the monitoring period, but an inmate did die in custody in June 2021.

- <u>Inmate Classification</u> – The inmate classification processes require continued attention to ensure housing decisions and placements are consistent with OPSO policies and objective classification principles. Credible auditing needs to focus on identifying issues and correcting placements. There were numerous incidents of supervisors reassigning or requesting reassignment of inmates under the guise of the inmate being an enemy of someone else on the housing unit when it appears that the real reason was the desire to provide relief from dealing with a difficult inmate. The process of designating and de-designating inmates as those to be kept separate continues to be refined.

- <u>Inmate grievances</u> – As of Report #11, the ratings of the subdivisions in the grievance provision were individually given. The separate ratings allowed the areas in which deficiency existed to be highlighted. While timeliness and adequacy of responses is still not in substantial compliance, improvement continues. The trend data from the grievance system is now being used to identify problems to be addressed.

- <u>Incident Reporting</u> –The accurate timely reporting of incidents has been a constant area of concern. There remain serious incidents for which no report or no timely report is prepared by OPSO staff, including incidents involving the



serious injury of inmates and drug overdoses. There continue to be reports which are incomplete and do not provide the necessary information for the reader to determine what occurred and why it occurred. It is particularly concerning that incomplete and sometime inarticulate reports have been reviewed by and approved by a supervisor. OPSO has begun implementation of a corrective action plan to address timeliness and thoroughness of reports which includes training and remedial action including discipline.

- <u>Jail Management System</u> – An integral part of the jail's operational improvement is tied to an effective jail management system. Such capacity provides on-demand, routine, and periodic data to inform critical leadership and management decisions. Such an information system has not been implemented. After OPSO cancelled the contract with the provider who was to supply a new JMS, due to the inability to interface with the Orleans Parish court system, the City of New Orleans was to purchase a JMS which will interface with the Orleans Parish court system and the OPSO information systems. Despite passage of several years, there is no definite timeline for that process. In the meantime, OPSO has modified its current system to provide more of the required JMS functions. One of the crucial areas lacking is a way to electronically verify that security checks are taking place in a timely fashion.

4.  **Sanitation and Environment Conditions** – Challenges remain regarding the public health and inmate/staff safety risks. During the site visit, inmates and staff were often seen not wearing their masks or wearing the masks in an improper manner. The COVID-19 pandemic has presented additional challenges for the extremely dedicated sanitation staff. The inability to fill support positions identified in OPSO's staffing analysis negatively impacts the ability of OPSO to sustain compliance with the requirements of the Consent Judgment and align with accepted correctional practice. Sanitation and cleanliness of the cells and housing areas are not solely the responsibility of the sanitation staff. The unit managers and pod deputies have the first responsibility for ensuring inmates keep their cells and dayroom areas clean and uncluttered. During the monitoring tour, when sanitation concerns were called to the attention of pod deputies and supervisors, they often tried to explain them away by stating they have told the inmate to correct the issue. If true, follow through is clearly



lacking.

5.   **Youthful Inmates** – The Monitors acknowledge and commend the educational
program established in OJC. Provision of age-appropriate mental health services has
improved with the addition of the Tulane University resources. A renewed effort is
being made to house youthful offenders in the Juvenile Justice Intervention Center
(JJIC). While this is a welcome change, currently, one youthful offender is enough to
tie up an entire housing unit. It is strongly suggested that the design of the Phase III
facility address this issue.

6.   **Inmate Sexual Safety** – OPSO underwent its required audit of compliance with the
Prison Rape Elimination Act of 2003 (PREA) and passed in September 2019. Since
that time, the sergeant who was assigned as the PREA Coordinator was moved from
that assignment and reassigned to a housing area. The position has not been filled.
Continued internal collaboration among OPSO security, classification, and the
medical/mental health provider is needed for the assessments of inmates' potential
for sexual victimization and aggression. The necessity of separation of inmates testing
positive for COVID-19 has resulted in the need for additional attention to inmates'
PREA designation. Lack of leadership over PREA continues to be a concern. OPSO
cannot rely on an audit that is over two years old to demonstrate compliance with
PREA.

7.   **Compliance, Quality Reporting, and Quality Improvement** – An essential element
of inmate safety is OPSO's timely review of all serious incidents as well as of non-
violent incidents to determine if there are trends and/or patterns. This ensures
assessment of root causes and then the development, implementation, and tracking of
action plans to address the issues. This activity focuses on resolving problems. OPSO
has made efforts to undertake this function but would benefit from a more robust
effort. Especially concerning are systemic issues, which if they remain unaddressed,
will continue to create risks to institutional safety and security. While progress is
noted, the Monitors encourage OPSO to dedicate more time and knowledgeable
resources to quality improvement. Impediments include the lack of staff with the
skills and/or time to devote to the task. While OPSO has reported the establishment
of an Inspection/Accreditation Unit, there have been no meaningful progress.

8.   **Stipulated Agreements 2015** – OPSO should review its on-going compliance with

the two Stipulated Agreements from 2015. Several provisions remain in partial compliance, without any progress towards substantial compliance.

9.  **Construction Projects** –

- The Docks – Construction of the renovations on the Docks has been completed. Due to COVID-19, almost all of the court dockets have either been discontinued or are conducted virtually. The Docks have not been used yet for court holding, but the courts are starting to reopen. OPSO is encouraged to review its operational plans in light of the likely need to separate COVID-19 positive inmates when court dockets resume. The Monitors continue to encourage OPSO to have a robust training plan for the operation of the Docks and to not take possession until all systems are in proper working order.

- TDC Mental Health (TMH)– The renovation of two TDC housing areas (total of four units) has been completed. Initially, the male inmates with acute mental illness were moved from Hunt into one of the housing units. During the monitoring period, OPSO made progress in relocating some the sub-acute male inmates and all sub-acute and acute female inmates to TMH. However, the majority of sub-acute male inmates and some sub-acute female inmates remain in the OJC despite available beds in the TMH. All units are now operational. OPSO is encouraged to house inmates who are currently on suicide watch in various housing areas of OJC in TMH when possible. While TMH is not a suitable solution to meeting the requirements of the Consent Judgment as to medical and mental health services in the long run, it is a necessary interim step given no satisfactory housing for acute inmates in OJC. The operation of TMH has reaffirmed the necessity of single person cells for acute inmates which should be considered in the design of Phase III. It is important to note that TMH does nothing to address the lack of an infirmary and medical housing in OJC and lack of programming space.

- Phase III – This project has reached 75% completion of the drawing of construction documents. Monthly meetings of the Executive Committee have been held and have allowed input on decisions from the various stakeholders and the Monitors. The construction and occupation of Phase III are critical to



the provision of mental and medical health services in accordance with the Consent Judgment.

**C.**     <u>**Review Process of Monitors' Compliance Report #14**</u>

A draft of this report was provided to OPSO, Counsel for the Plaintiff Class, and the Department of Justice (DOJ) on July 12, 2021. Comments were provided Counsel for the Plaintiff Class and DOJ on August 4, 2021. OPSO objected by on letter on August 2, 2021, to the manner in which the medical and mental health compliance tour was conducted (virtually as opposed to in person). OPSO finally provided comments on its behalf and the behalf of Wellpath (OPSO's medical contractor) on September 10, 2021. The Monitors considered the comments of the parties in finalizing Report #14.

**D.**     <u>**Communication with Stakeholders**</u>

The Monitors are committed to providing as much information as possible regarding the status of OPSO's efforts to comply with all orders of the Court. The [www.nolajailmonitors.org](http://www.nolajailmonitors.org) website came on-line in September 2021 but is no longer available. The Lead Monitor is exploring alternatives to posting Compliance Report #14.

**E.**     <u>**Recommendations**</u>

Over the years, the Monitors have provided multiple recommendations and suggestions to OPSO to achieve and maintain compliance with the Consent Judgment. The purpose of the recommendations continues to be to assist OPSO in achieving and maintaining compliance. While much progress has been accomplished, many of the recommendations made in the past have not been implemented. Only "new" recommendations and suggestions are included within the body of this report. While the Consent Judgment may not require, in all situations, that OPSO follow the recommendations and suggestions of the Monitors, refusal to implement the recommendation or a suitable alternative is unlikely to result in compliance.

**F.**     <u>**Conclusions and Path Forward**</u>

OPSO has been operating under the provisions of the Consent Judgment since June 2013; monitoring began in Fall 2013. During the leadership of Director Hodge, significant improvements were acknowledged by the Monitors. The hiring of Byron LeCounte as Chief of Corrections in February 2019 has been beneficial to the vital work which remains to comply with the provisions of the Consent Judgment. His additional expertise and experience



allowed Director Hodge to focus on the Consent Judgment. Sheriff Gusman has resumed the role of bringing OPSO into compliance with the Consent Judgment. Sheriff Gusman appears to embrace the opportunity to continue moving compliance forward and has made progress by holding weekly CompStat meetings.

It continues to be concerning that the same deficiencies pointed out in previous reports by the Monitors continue to exist and are not being thoroughly resolved. Serious incidents and harm to inmates continue to occur. OPSO has made efforts to identify and address sources of contraband, but the Monitors encountered inmates smoking in the facility and weapons have been found which had been fashioned from materials within the jail such as the light supports in the utility closets and the cabinets in the dayrooms. Dangerous medication is frequently found during cell shakedowns suggesting that the medication distribution process continues to be seriously flawed.

There has been improvement in OPSO's data collection which should allow for better problem solving with a goal of a sustainable reduction in inmate-on-inmate assaults, inmate-on-staff assaults, uses of force, contraband, and property damage. However, corrective action plans would benefit from thorough analysis of the data and root cause reviews. When they are developed, follow through on implementation is often lacking.

The Monitors remain committed to the Court and the parties to collaborate on solutions that will result in significant improvement towards compliance with the provisions of the Consent Judgment and achievement of constitutional conditions.

**The Monitors again thank and acknowledge the leadership, guidance, and support of The Honorable Lance M. Africk and The Honorable Michael B. North.**



**II. A.    Protection from Harm**

**Introduction**

This section of the Consent Judgment addresses core correctional functions including the use of force (policies, training, and reporting), identification of staff involved in uses of force through an early intervention system, safety and supervision of inmates, staffing, incidents and referrals, investigations, pre-trial placement of inmates in the facility, classification, the inmate grievance process, sexual safety of inmates, and inmates' access to information.

The Consent Judgment requires that OPSO operate the facility to assure inmates are "reasonably safe and secure." Based on objective review of data, the facility has shown improvement in inmate and staff safety over the life of the Consent Judgment, but significant incidents that result in serious injury to inmates and staff continue to occur. Overly concerning is that inmates continue to fashion weapons out of items in the jail. This would not be occurring it the facility was properly staffed, and the staff were properly supervising the inmates.

Reaching and sustaining compliance with provisions of the Consent Judgment, particularly this section, relies on the collection, analysis, and corrective action planning using accurate and reliable data. The Monitors encourage OPSO to continue efforts to build its capacity to collect and analyze relevant accurate data, draw supportable conclusions to inform decisions throughout the organization, develop corrective action plans, implement corrective action plans, and hold staff accountable for non-adherence to corrective action plans and policies. As OPSO's capacity to collect, analyze, plan, and implement is enhanced, the ability to achieve and maintain compliance will be strengthened. Without an enhancement in capacity and dedication to making and implementing informed decisions, OPSO is unlikely to achieve and maintain compliance and likely to regress.

The lieutenant assigned to coordinating the reporting of incidents to the Monitors and parties has been reassigned to another position. When she was originally assigned the coordination, she held the rank of sergeant. Her promotion to lieutenant necessitated her reassignment outside of the administrative section. She has continued to have the responsibility to report the incidents and reviews the daily medical logs for inmates taken to the clinic for treatment subsequent to an altercation or a use of force as well as the transport logs of inmates routed to the hospital with trauma-related injuries and cross checks them



against reported incidents. The lieutenant also compares the Watch Commander's Log (which lists significant events and incidents occurring during the shift) and the incident reports to detect missing reports. Comparison of the medical logs to the incidents calls into question whether all of the inmates who are being seen by medical are being logged. What is not verified is whether an inmate received medical attention as indicated in a particular report. Examination of the walk-in logs often reveals that inmates who allegedly received medical attention are not on the log. Whether this is due to an error in record keeping on the part of Wellpath or because the inmate did not actually receive medical treatment as claimed is unknown at this time. Another issue is the lack of reporting of inmates transported to the hospital for medical emergencies. A continuing issue is the lack of meaningful consequences for supervisors and deputies who fail to comply with the reporting policies resulting in late, incomplete, or missing incident reports.

The Monitors reviewed all reported incidents for CY 2020 and the first five months of CY 2021. The following charts compare the totals for the calendar years (CY) 2018-2021. It should be noted that there was a significant decrease in the number of incidents for May, September, and October 2020 which may be the result of reporting errors as opposed to an actual decline in reportable incidents.

**Table 3 - All OJC Reported Incidents for CY 2018-May 2021**



| | Inmate/ Inmate Assault | Inmate Staff Altercation | Use of Force | PREA | Death | Attempt Suicide/ Ideation | Internal Escape | Criminal Damage | Inmate Injury/ Inmate Medical (AKA slip/falls/ overdoses) | Contraband | Staff Arrest | Staff Misconduct/ Suspension | Other |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2018 | 442 | 64 | 260 | 47 | 2 | 78 | 48 | 69 | 262 | 106 | 3 | 0 | 15 |
| 2019 | 440 | 117 | 358 | 42 | 0 | 82 | 6 | 47 | 145 | 302 | 0 | 0 | 6 |
| 2020 | 309 | 139 | 372 | 35 | 3 | 21 | 1 | 64 | 64 | 351 | 0 | 0 | 1 |
| 2021 | 144 | 58 | 126 | 9 | 0 | 2 | 1 | 15 | 17 | 138 | 0 | 0 | 0 |

The number of inmate-staff altercations, use of force, and contraband in CY 2020 exceeded both CY 2018 and CY 2019. This is despite the inmate population having decreased significantly. The number of reported inmate on inmate assaults has declined, but it should be noted that there is an increase of the use of weapons in the assaults resulting in serious injuries. It should also be noted that not only has the inmate population has declined greatly during the monitoring period, but that the movement of inmates in the units was greatly curtailed due to COVID safety protocols.

**Table 4 –All OJC Reported Incidents by Type by Month CY 2018-May 2021**




| | Jan | Feb | March | April | May | June | July | August | September | October | November | December | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2018 | 92 | 96 | 112 | 121 | 124 | 144 | 116 | 132 | 112 | 113 | 105 | 129 | 1396 |
| 2019 | 123 | 93 | 105 | 112 | 127 | 148 | 131 | 163 | 107 | 153 | 160 | 123 | 1545 |
| 2020 | 118 | 129 | 110 | 125 | 95 | 150 | 111 | 105 | 77 | 92 | 123 | 125 | 1360 |
| 2021 | 129 | 95 | 84 | 116 | 86 | | | | | | | | 510 |

**Assessment Methodology**

Dates of visits:

- April 19-20, 2021



- May 17-20, 2021
- June 7-8, 2021

Materials reviewed:

- Materials reviewed include the Consent Judgment, OPSO policies and procedures, use of force reports, incident reports, and investigations conducted by Investigative Services Bureau-Internal Affairs Division (ISB-IAD), investigations conducted by ISB-Criminal Division (ISB-Criminal), investigations conducted by ISB-Inmate Division, training materials, shakedown logs, and post logs.

Interviews:

- Interviews included the Sheriff, command staff, jail supervisors, commander of ISB, commander of IAD-Administrative, chief of investigations, chief of corrections, director of training, and various supervisors of units within ISB. Inmates were interviewed by the three Monitors onsite for the visit.

### IV.A.1. Use of Force Policies and Procedures

*A. 1.a. OPSO shall develop, implement, and maintain comprehensive policies and procedures (in accordance with generally accepted correctional standards) relating to the use of force with particular emphasis regarding permissible and impermissible uses of force.*

*A. 1.b. OPSO shall develop and implement a single, uniform reporting system under a Use of Force Reporting policy. OPSO reportable force shall be divided into two levels, as further specified in policy: Level 1 uses of force will include all serious uses of force (i.e., the use of force leads to injuries that are extensive, serious or visible in nature, including black eyes, lacerations, injuries to the mouth or head, multiple bruises, injuries to the genitals, etc.), injuries requiring hospitalization, staff misconduct, and occasions when use of force reports are inconsistent, conflicting, or otherwise suspicious. Level 2 uses of force will include all escort or control holds used to overcome resistance that are not covered by the definition of Level 1 uses of force.*

*A. 1.c. OPSO shall assess, annually, all data collected regarding uses of force and make any necessary changes to use of force policies or procedures to ensure that unnecessary or excessive use of force is not used in OPP. The review and recommendations will be documented and provided to the Monitor, DOJ, and SPLC.*

Findings:

A. 1. a.  Partial Compliance

A. 1. b.  Substantial Compliance

A. 1. c.  Partial Compliance

Observations:

The current OPSO use of force policy was effective as of May 2016. It was last reviewed in May 2020. A violation of the use of force policy was identified in that the Use of Force Review Board did not meet for five of the six months of the reporting period. The failure of the Use of Force Review Board to meet is extremely serious as it is the entity which



refers the majority of the cases to the Internal Affairs Division for investigation and discipline, if appropriate. OPSO has conducted the 2020 annual review of available use of force data and the policy. OPSO analysis of the data has improved, and plans have been put in place to address the issues which continue to occur such as poorly written reports, failure to properly classify uses of force as Level One or Level Two, backlog in the number of use of force incidents to be reviewed (there are cases dating back to 2018), and the lack of timely filed reports. While there was recognition of the high number of uses of force on specialty pods (particularly the disciplinary pod and the mental health pod), there were no recommendations documented and provided to the Monitors and DOJ and counsel for the Plaintiffs. Identifying the problem is just the first step in addressing the reoccurring issues. A review of uses of force found to be inappropriate was performed, but there were not recommendations as a result. As has been pointed out to the Force Investigation Team and Chief of Investigations in the past, the Consent Judgment requires not only assessment and reduction of inappropriate uses of force, but also unnecessary uses of force. In addition, the process would benefit from examining a larger number of the use of force incidents. Examination of the use of force reports by the Monitors revealed that often the use of force is precipitated by a failure to follow policy such as not restraining the inmate prior to movement or allowing an inmate out of his/her cell with another inmate(s) from whom he/she is to be kept separate. Incident reports most often demonstrate a lack of de-escalation efforts as required by the Consent Judgment. Seldom is mental health staff called upon to assist in de-escalation although a majority of the inmates upon whom force is used are on the mental health caseload. In order to warrant a rating of substantial compliance in A.1.c., OPSO needed to address the issues; not just identify them. Until that is done, the compliance rating will remain at Partial Compliance. Concerns regarding timeliness of submission of use of force report and reviews are addressed in those sections.

## IV. A. 2. Use of Force Training

*A. 2. a. OPSO shall ensure that all correctional officers are knowledgeable of and have the knowledge, skills, and abilities to comply with use of force policies and procedures. At a minimum, OPSO shall provide correctional officers with pre-service and annual in-service training in use of force, defensive tactics, and use of force policies and procedures. The training will include the following:*
  *(1) instruction on what constitutes excessive force;*
  *(2) de-escalation tactics; and*
  *(3) management of prisoners with mental illness to limit the need for using force.*
*A. 2. b. OPSO shall ensure that officers are aware of any change to policies and practices throughout their employment with OPP. At a minimum, OPSO shall provide pre-service and annual in-service use of force training that prohibits:*



*(1) use of force as a response to verbal insults or prisoner threats where there is no immediate threat to the safety or security of the institution, prisoners, staff, or visitors;*
*(2) use of force as a response to prisoners' failure to follow instructions where there is no immediate threat to the safety or security of the institution, prisoners, staff, or visitors;*
*(3) use of force against a prisoner after the prisoner has ceased to offer resistance and is under control;*
*(4) use of force as punishment or retaliation; and*
*(5) use of force involving kicking, striking, hitting, or punching a non-combative prisoner.*
***A. 2. c. OPSO shall randomly test five percent of the correctional officer staff on an annual basis to determine their knowledge of the use of force policies and procedures. The testing instrument and policies shall be approved by the Monitor. The results of these assessments shall be evaluated to determine the need for changes in training practices. The review and conclusions will be documented and provided to the Monitor***

<u>Findings:</u>

A. 2. a.  Partial Compliance

A. 2. b.  Partial Compliance

A. 2. c.  Partial Compliance

<u>Observations:</u>

The Monitor reviewed the training materials and documentation and the supplemental documentation submitted by training staff for the rating period. The Director of Training advised that, due to COVID-19 impacts, the annual in-service Use of Force, Defensive Tactics, and Use of Force policy and procedure training requirements for CY 2020 were not met.  The Training Director provided a schedule for 2021 noting that the majority of tenured staff will have the required in-service training by the end of the third quarter, 2021. The monitor reviewed training documentation verifying that Use of Force training was provided as required during all pre-service classes.

The Monitor's review of the use of force training materials noted that the lesson plan, PowerPoint presentation, and testing materials substantively cover the requisite information in A. 2. c. 1-5. The proof of training documentation indicates that the pre-service OPSO staff received the required training on policies and practices by the Academy staff. As noted in A. 2. a., the in-service training requirements for CY 2020 were not met. Additionally, a thorough review of the CY 2020 use of force reports reveals the need for additional training which emphasizes de-escalation and provide deputies with additional tools when dealing with inmates with mental health issues and inmates who routinely exhibited behavioral problems. Given some very problematic incidents in which staff observed inappropriate uses of force and did not stop or report the same, it is strongly suggested that the duty to intervene and report be emphasized.



The Monitor reviewed training documentation provided by training staff specific to the 5 percent annual testing requirement for this section. The testing for 2020 was not completed. Training staff intends to test 15 percent of the staff in June 2021. The test for 2021 was approved by Monitor Frasier April 21, 2021.

The Monitor has, in the past, observed that the Academy staff has maintained detailed, comprehensive, and very well-maintained files. In response to our request for documentation, the Academy staff provided succinct and thorough reports as to who had and who had not completed the required use of force training.

## IV. A. 3. Use of Force Reporting

*A.3 a. Failure to report a use of force incident by any staff member engaging in the use of force or witnessing the use of force shall be grounds for discipline, up to and including termination.*
*A.3.b. OPSO shall ensure that sufficient information is collected on uses of force to assess whether staff members complied with policy; whether corrective action is necessary including training or discipline; the effectiveness of training and policies; and whether the conditions in OPP comply with this Agreement. At a minimum, OPSO will ensure that officers using or observing a Level 1 use of force shall complete a use of force report that will:*

    *(1)    include the names of all staff, prisoner(s), or other visual or oral witness(es);*
    *(2)    contain an accurate and specific account of the events leading to the use of force;*
    *(3)    describe the level of resistance and the type and level of force used, consistent with OPP use of force; policy and procedure, as well as the precise actions taken by OPSO staff in response to the incident;*
    *(4)    describe the weapon or instrument(s) of restraint, if any, and the manner of such use be accompanied by a prisoner disciplinary report, if it exists, pertaining to the events or prisoner activity that prompted the use of force incident;*
    *(5)    describe the nature and extent of injuries sustained by anyone involved in the incident;*
    *(6)    contain the date and time when medical attention, if any, was requested and actually provided;*
    *(7)    describe any attempts the staff took to de-escalate prior to the use of force;*
    *(8)    include an individual written account of the use of force from every staff member who witnessed the use of force;*
    *(9)    include photographs taken promptly, but no later than two hours after a use of force incident, of all injuries sustained, or as evidence that no injuries were sustained, by prisoners and staff involved in the use of force incident;*
    *(10)    document whether the use of force was digitally or otherwise recorded. If the use of force is not digitally or otherwise recorded, the reporting officer and/or watch commander will provide an explanation as to why it was not recorded; and*
    *(11)    include a statement about the incident from the prisoner(s) against whom force was used.*
*A.3.c. All officers using a Level 2 use of force shall complete a use of force report that will:*
    *(1)    include the names of staff, prisoner(s), or other visual or oral witness(es);*
    *(2)    contain an accurate and specific account of the events leading to the use of force;*
    *(3)    describe the level of resistance and the type and level of force used, consistent with OPP use of force policy and procedure, as well as the precise actions taken by OPSO staff in response to the incident;*
    *(4)    describe the weapon or instrument(s) of restraint, if any, and the manner of such use;*
    *(5)    be accompanied by a prisoner disciplinary report, if it exists, pertaining to the events or prisoner activity that prompted the use of force incident;*
    *(6)    describe the nature and extent of injuries sustained by anyone involved in the incident;*
    *(7)    contain the date and time when medical attention, if any, was requested and actually provided; and*
    *(8)    describe any attempts the staff took to de-escalate prior to the use of force.*



*A.3.d. OPSO shall require correctional officers to notify the watch commander as soon as practical of any use of force incident or allegation of use of force. When notified, the watch commander will respond to the scene of all Level 1 uses of force. When arriving on the scene, the watch commander shall:*

    *(1)    ensure the safety of everyone involved in or proximate to the incident;*

    *(2)    determine if any prisoner or correctional officer is injured and ensure that necessary medical care is provided;*

    *(3)    ensure that personnel and witnesses are identified, separated, and advised that communications with other witnesses or correctional officers regarding the incident are prohibited;*

    *(4)    ensure that witness and subject statements are taken from both staff and prisoner(s) outside of the presence of other prisoners and staff;*

    *(5)    ensure that the supervisor's use of force report is forwarded to IAD for investigation if, upon the supervisor's review, a violation of law or policy is suspected. The determination of what type of investigation is needed will be based on the degree of the force used consistent with the terms of this Agreement;*

    *(6)    If the watch commander is not involved in the use of force incident, the watch commander shall review all submitted use of force reports within 36 hours of the end of the incident, and shall specify his findings as to completeness and procedural errors. If the watch commander believes that the use of force may have been unnecessary or excessive, he shall immediately contact IAD for investigation consideration and shall notify the warden or assistant warden; and*

    *(7)    All Level 1 use of force reports, whether or not the force is believed by any party to be unnecessary or excessive, shall be sent to IAD for review. IAD shall develop and submit to the Monitor within 90 days of the Effective Date clear criteria to identify use of force incidents that warrant a full investigation, including injuries that are extensive or serious, visible in nature (including black eyes, injuries to the mouth, injuries to the genitals, etc.), injuries requiring hospitalization, staff misconduct (including inappropriate relationships*

        *with prisoners), and occasions when use of force reports are inconsistent, conflicting, or otherwise suspicious.*

*A.3 e. Ensure that a first-line supervisor is present during all pre-planned uses of force, such as cell extractions.*

*A.3.f. Within 36 hours, exclusive of weekends and holidays, of receiving the report and review from the shift commander, in order to determine the appropriateness of the force used and whether policy was followed, the Warden or Assistant Warden shall review all use of force reports and supervisory reviews including:*

    *(1)    the incident report associated with the use of force;*

    *(2)    any medical documentation of injuries and any further medical care;*

    *(3)    the prisoner disciplinary report associated with the use of force; and*

    *(4)    the Warden or Assistant Warden shall complete a written report or written statement of specific findings and determinations of the appropriateness of force.*

*A.3.g. Provide the Monitor a periodic report detailing use of force by staff. These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. Each report will include the following information:*

    *(1)    a brief summary of all uses of force, by type;*

    *(2)    date that force was used;*

    *(3)    identity of staff members involved in using force;*

    *(4)    identity of prisoners against whom force was used;*

    *(5)    a brief summary of all uses of force resulting in injuries;*

    *(6)    number of planned and unplanned uses of force;*

    *(7)    a summary of all in-custody deaths related to use of force, including the identity of the decedent and the circumstances of the death; and*

    *(8)    a listing of serious injuries requiring hospitalization.*

*A.3.h. OPSO shall conduct, annually, a review of the use of force reporting system to ensure that it has been effective in reducing unnecessary or excessive uses of force. OPSO will document its review and conclusions and provide them to the Monitor, SPLC, and DOJ.*



Findings:

A. 3. a.  Substantial Compliance

A. 3. b.  Substantial Compliance

A. 3. c.  Substantial Compliance

A. 3. d.  Partial Compliance

A. 3. e.  Substantial Compliance

A. 3. f.  Partial Compliance

A. 3.g.  Substantial Compliance

A. 3. h.  Partial Compliance

Observations:

As to provision A. 3. a., the use of force policy requires all uses of force to be reported timely and completely and sets out the potential discipline if the policy is not followed. Review of documentation revealed that there continues to be cases in which supervisors failed to timely report force and some that only do so when instructed to write a report. Documentation of corrective action has improved greatly. There is much improved communication between FIT and the Major of Security. With the beginning of enforcement of the policy which states that failure to report a use of force shall be grounds for discipline, the rating has improved to substantial compliance.

Provisions A. 3. b. is now in substantial compliance due to the reduction in the number of incomplete/inadequate use of force reports. The use of force policy includes the provisions required by the Consent Judgment, but lack of adherence still occurs. The Monitor provided a checklist of the report requirements to assist supervisors in ensuring reports included all necessary items. A review of those checklists and accompanying reports indicates that the required information still found to be missing from the use of force reports such as what led up to the incident, details of actions taken during the use of force, and resolution of the incident. Seldom do reports include an articulation of any de-escalation tactics, description of injuries sustained, and when medical attention was provided. Now, deputies and supervisors are beginning to be held accountable for failure to include required information. Provision A. 3. c. requires less information as it is a lesser level of force and remains in substantial compliance.

The unit managers and watch commanders still are not consistently compliant with the requirements of the Consent Judgment (IV. A. 3. d.) as to their specific duties and the



time requirement for performance of these duties under the policies. This has been noted in multiple reports. The Consent Judgment requires submission of the packet to the Assistant Warden within 36 hours not three (3) days. OPSO appears to have abandoned its ill-advised insistence on this interpretation that began about three reporting periods ago and is inconsistent with the plain language of the Consent Judgment and how the provision was applied for over five years. However, OPSO is now taking the position that use of force packets for Level Two do not have a time limit. This is inconsistent with the interpretation for the eight years OPSO has operated under the Consent Judgment. It should be noted that, while OPSO continues to be in partial compliance, a major step towards improvement was shown. OPSO is now gathering the proper data, analyzing the data, and acting upon it. Credit for this improvement belongs to Major Griffin and the communication that is occurring between Sgt. Newman of FIT and him.

A. 3. e. continues to be in substantial compliance due to the presence of a supervisor for planned uses of force. One of the reasons for this provision is to allow for de-escalation to be attempted before the force is carried out. OPSO supervisors are inconsistent in utilizing de-escalation techniques.

It appears that the Major of Security is fulfilling the role of the Assistant Warden or Warden. Policy should be revised to reflect this change. The reviews, required under IV. A. 3. f., are being conducted by this major. Analysis indicates that the reviews required by this provision were conducted timely for the months of February and March which is a great improvement. If this trend continues, this provision is likely to come into substantial compliance. For now, this provision remains in partial compliance. FIT issues a quarterly report which contains all the information required by IV. A. 3. g. Thus, this section is in substantial compliance. The annual review of use of force incidents as required by IV. A. 3. h. was provided to the Monitors and all parties. It should be noted that the review is based on incomplete data due to the backlog of cases to be reviewed by FIT. Also, as the Use of Force Review Board did not meet for the last two months of CY2020, that information was not available. While the review contained a much-improved analysis and confirmed the issues pointed out above, the corrective action plan to remedy the systemic issues only addressed a few of the issues. In order to warrant a rating of substantial compliance OPSO needed to address the issues; particularly the most serious issues such as the frequent use of force on the mental health housing units and lack of de-escalation were not addressed. Therefore, the



compliance rating remains at partial compliance.

## IV. A. 4. Early Intervention System ("EIS")

*A.4.a. OPSO shall develop, within 120 days of the Effective Date, a computerized relational database ("EIS") that will document and track staff members who are involved in use of force incidents and any complaints related to the inappropriate or excessive use of force, in order to alert OPSO management to any potential problematic policies or supervision lapses or need for retraining or discipline. The Chief of Operations Deputy, supervisors, and investigative staff shall have access to this information and shall review on a regular basis, but not less than quarterly, system reports to evaluate individual staff, supervisor, and housing area activity. OPSO will use the EIS as a tool for correcting inappropriate staff behavior before it escalates to more serious misconduct.*

*A.4.b. Within 120 days of the Effective Date, OPSO senior management shall use EIS information to improve quality management practices, identify patterns and trends, and take necessary corrective action both on an individual and systemic level. IAD will manage and administer EIS systems. The Special Operations Division ("SOD") will have access to the EIS. IAD will conduct quarterly audits of the EIS to ensure that analysis and intervention is taken according to the process described below. Command staff shall review the data collected by the EIS on at least a quarterly basis to identify potential patterns or trends resulting in harm to prisoners. The Use of Force Review Board will periodically review information collected regarding uses of force in order to identify the need for corrective action, including changes to training protocols and policy or retraining or disciplining individual staff or staff members. Through comparison of the operation of this system to changes in the conditions in OPP, OPSO will assess whether the mechanism is effective at addressing the requirements of this Agreement.*

*A.4.c. OPSO shall provide, within 180 days of the implementation date of its EIS, to SPLC, DOJ, and the Monitor, a list of all staff members identified through the EIS and corrective action taken.*

*A.4.d. The EIS protocol shall include the following components: data storage, data retrieval, reporting, data analysis, pattern identification, supervisory assessment, supervisory intervention, documentation, and audit.*

*A.4.e. On an annual basis, OPSO shall review the EIS to ensure that it has been effective in identifying concerns regarding policy, training, or the need for discipline. This assessment will be based in part on the number and severity of harm and injury identified through data collected pursuant to this Agreement. OPSO will document its review and conclusions and provide them to the Monitor, who shall forward this document to DOJ and SPLC.*

Findings:

A. 4. a.  Substantial Compliance

A. 4. b.  Partial Compliance

A. 4. c.  Substantial Compliance

A. 4. d.  Substantial Compliance

A. 4. e.  Substantial Compliance

Observations:

Due to unreliability of the electronic EIS, OPSO abandoned the original system and fashioned an alternative version within the AS400. A FIT staff member manually monitors the database to alert FIT staff as to the need to review any uses of force by a staff member.

OPSO has improved its documentation to the Monitors as to the names of the staff members who are flagged for uses of force. However, no review of staff alerted under the EIS was documented or provided. As the Use of Force Review Board had been tasked with the



review and did not meet four of the six months of the monitoring period, it appears that the review was not conducted. The only document provided was a case-by-case review by the Use of Force Review Board, not a review as to the staff that alerted the EIS. Continued questionable and inappropriate uses of force by the same staff members and with the same inmates calls into question whether the EIS is being utilized to improve management quality practices, identify patterns and trends, and take necessary corrective action as required by A. 4. b. This provision is in partial compliance.

The Use of Force Review Board did not meet four of the six months of the monitoring period to evaluate the EIS data. A meeting was held for the annual review of the EIS. The review recommended that staff who have alerted the EIS be informed of the alert. It is unclear whether those conducting the review noticed that EIS referrals and actions were not documented or simply did not note that failure. However, the review is the annual one based on the entire CY2020 and therefore IV. A .4. e. remains in substantial compliance. It should be noted that the review was based on inadequate data due to the backlog in FIT.

## IV. A. 5. Safety and Supervision

*A.5.a. Maintain security policies, procedures, and practices to provide a reasonably safe and secure environment for prisoners and staff in accordance with this Agreement.*
*A.5.b. Maintain policies, procedures, and practices to ensure the adequate supervision of prisoner work areas and trustees.*
*A.5.c. Maintain policies and procedures regarding care for and housing of protective custody prisoners and prisoners requesting protection from harm.*
*A.5.d. Continue to ensure that correctional officers conduct appropriate rounds at least once during every 30- minute period, at irregular times, inside each general population housing unit and at least once during every 15-minute period of special management prisoners, or more often if necessary. All security rounds shall be documented on forms or logs that do not contain pre-printed rounding times. In the alternative, OPSO may provide direct supervision of prisoners by posting a correctional officer inside the day room area of a housing unit to conduct surveillance.*
*A.5.e. Staff shall provide direct supervision in housing units that are designed for this type of supervision. Video surveillance may be used to supplement, but must not be used to replace, rounds by correctional officers.*
*A.5.f. Increase the use of overhead video surveillance and recording cameras to provide adequate coverage throughout the common areas of the Jail, including the Intake Processing Center, all divisions' intake areas, mental health units, special management units, prisoner housing units, and in the divisions' common areas.*
*A.5.g. Continue to ensure that correctional officers, who are transferred from one division to another, are required to attend training on division-specific post orders before working on the unit.*
*A.5.h. Continue to ensure that correctional officers assigned to special management units, which include youth tiers, mental health tiers, disciplinary segregation, and protective custody, receive eight hours of specialized training regarding such units on prisoner safety and security on at least an annual basis.*
*A.5.i. Continue to ensure that supervisors conduct daily rounds on each shift in the prisoner housing units and document the results of their rounds.*
*A.5.j. Continue to ensure that staff conduct daily inspections of cells and common areas of the housing units to protect prisoners from unreasonable harm or unreasonable risk of harm.*
*A.5.k. Continue to ensure that staff conduct random monthly shakedowns of cells and common areas so that prisoners do not possess or have access to dangerous contraband.*
*A.5.l. Provide the Monitor a periodic report of safety and supervision at the Facility. These periodic reports*



***shall be provided to the monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. Each report will provide the following information:***

      (1)      ***a listing of special management prisoners, their housing assignments, the basis for them being placed in the specialized housing unit, and the date placed in the unit; and***

      (2)      ***a listing of all contraband, including weapons seized, the type of contraband, date of seizure, location, and shift of seizure.***

<u>Findings:</u>

A. 5. a.  Partial Compliance

A. 5. b.  Substantial Compliance

A. 5. c.  Substantial Compliance

A. 5. d.  Partial Compliance

A. 5. e.  Partial Compliance

A. 5. f.  Substantial Compliance

A. 5. g.  Substantial Compliance

A. 5. h.  Partial Compliance

A. 5. i.  Partial Compliance

A. 5. j.  Partial Compliance

A. 5. k.  Partial Compliance

A. 5. l.  Partial Compliance

<u>Observations:</u>

OPSO has worked hard to finalize policies, procedures, and post orders. The implementation of those policies, procedures, and practices and the adequate supervision of inmate working areas results in substantial compliance as to A. 5. b. and c. The level of violence, an average of 28 inmate on inmate assaults/altercations per month and 13 assaults on staff per month despite the reduction in inmate population, are indicative that OPSO has not substantially complied with the requirement that the facility be reasonably safe for staff and inmates. These both reflect an increase over the previous monitoring period. While the Monitors are well aware that violent incidents occur in jail facilities, the level currently reflects partial compliance with the obligation to provide a reasonably safe and secure environment as to A.5.a.

Review of the significant incidents during the monitoring period, indicates that the failure of staff to follow policy consistently continues to be a serious impediment to effective supervision of the inmates. Staff continue to leave inmates unsupervised and allow them to have access to materials by which to fashion weapons. Many of the inmate-on-inmate



assaults occur because staff allow inmates out of their cells who are to be kept separate from each other and/or leave inmates out of their cells unsupervised. There are inmates who repeatedly do not follow the rules of OJC including assaulting other inmates, assaulting staff, destroying property, and/or threatening self-harm. OPSO has chosen to house many of those inmates in a close security unit. It would be beneficial to develop individual inmate management plans for these inmates which would include specific security measures to be used when these inmates are allowed out of their cells. Such plans, if done routinely and consistently followed by all staff, would likely reduce the level of violence in the facility. To date, there is no indication that it is being done on a consistent basis; if at all.

### Table 5 CY 2018-May 2021 OJC Reported Incidents

| 2018 | Inmate/ Inmate Assault | Inmate Staff Altercation | Use of Force | PREA | Death | Attempt Suicide/ Ideation | Internal Escape | Criminal Damage | Inmate Injury/ Inmate Medical (AKA slip/falls/ overdoses) | Contraband | Staff Arrest | Staff Misconduct/ Suspension | Other | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| January | 38 | 7 | 13 | 2 | 0 | 6 | 2 | 3 | 9 | 9 | 0 | 0 | 3 | 92 |
| February | 28 | 6 | 10 | 4 | 0 | 14 | 2 | 10 | 5 | 15 | 2 | 0 | 0 | 96 |
| March | 37 | 7 | 21 | 5 | 0 | 4 | 3 | 11 | 18 | 5 | 0 | 0 | 1 | 112 |
| April | 39 | 9 | 22 | 4 | 0 | 4 | 3 | 12 | 22 | 5 | 0 | 0 | 1 | 121 |
| May | 52 | 0 | 24 | 5 | 1 | 0 | 5 | 8 | 19 | 10 | 0 | 0 | 0 | 124 |
| June | 46 | 7 | 26 | 5 | 0 | 6 | 7 | 3 | 32 | 9 | 1 | 0 | 2 | 144 |
| July | 30 | 4 | 20 | 4 | 0 | 9 | 3 | 3 | 30 | 13 | 0 | 0 | 0 | 116 |
| Aug | 39 | 3 | 27 | 3 | 0 | 13 | 2 | 6 | 30 | 6 | 0 | 0 | 3 | 132 |
| Sept | 33 | 6 | 14 | 2 | 0 | 7 | 5 | 4 | 35 | 6 | 0 | 0 | 0 | 112 |
| Oct | 32 | 9 | 28 | 5 | 0 | 3 | 0 | 2 | 26 | 7 | 0 | 0 | 1 | 113 |
| Nov | 31 | 6 | 21 | 5 | 0 | 5 | 8 | 3 | 18 | 7 | 0 | 0 | 1 | 105 |
| Dec | 37 | 0 | 34 | 3 | 1 | 7 | 8 | 4 | 18 | 14 | 0 | 0 | 0 | 129 |
| **Total** | 442 | 64 | 260 | 47 | 2 | 78 | 48 | 60 | 262 | 106 | 3 | 0 | 15 | 1396 |

| 2019 | Inmate/ Inmate Assault | Inmate Staff Altercation | Use of Force | PREA | Death | Attempt Suicide/ Ideation | Internal Escape | Criminal Damage | Inmate Injury/ Inmate Medical (AKA slip/falls/ overdoses) | Contraband | Staff Arrest | Staff Misconduct/ Suspension | Other | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| January | 40 | 1 | 27 | 2 | 0 | 15 | 3 | 7 | 14 | 14 | 0 | 0 | 0 | 123 |
| February | 26 | 7 | 29 | 2 | 0 | 13 | 1 | 0 | 4 | 11 | 0 | 0 | 0 | 93 |
| March | 25 | 4 | 26 | 1 | 0 | 6 | 1 | 2 | 16 | 21 | 0 | 0 | 3 | 105 |
| April | 28 | 7 | 26 | 1 | 0 | 3 | 0 | 3 | 15 | 27 | 0 | 0 | 2 | 112 |
| May | 36 | 11 | 22 | 6 | 0 | 13 | 0 | 2 | 11 | 25 | 0 | 0 | 1 | 127 |
| June | 55 | 9 | 26 | 4 | 0 | 13 | 0 | 2 | 16 | 23 | 0 | 0 | 0 | 148 |
| July | 50 | 15 | 31 | 5 | 0 | 6 | 0 | 3 | 8 | 13 | 0 | 0 | 0 | 131 |
| Aug | 32 | 17 | 37 | 6 | 0 | 7 | 1 | 8 | 20 | 35 | 0 | 0 | 0 | 163 |
| Sept | 32 | 4 | 31 | 3 | 0 | 2 | 0 | 3 | 10 | 24 | 0 | 0 | 0 | 107 |
| Oct | 38 | 15 | 37 | 4 | 0 | 1 | 0 | 7 | 18 | 33 | 0 | 0 | 0 | 153 |
| Nov | 55 | 12 | 33 | 7 | 0 | 0 | 0 | 5 | 5 | 42 | 0 | 0 | 0 | 160 |
| Dec | 23 | 15 | 33 | 1 | 0 | 3 | 0 | 6 | 8 | 34 | 0 | 0 | 0 | 123 |
| **Total** | 440 | 117 | 358 | 42 | 0 | 82 | 6 | 47 | 145 | 302 | 0 | 0 | 6 | 1545 |

| 2020 | Inmate/ Inmate Assault | Inmate Staff Altercation | Use of Force | PREA | Death | Attempt Suicide/ Ideation | Internal Escape | Criminal Damage | Inmate Injury/ Inmate Medical (AKA slip/falls/ overdoses) | Contraband | Staff Arrest | Staff Misconduct/ Suspension | Other | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| January | 8 | 8 | 29 | 4 | 0 | 3 | 0 | 1 | 7 | 35 | 0 | 0 | 0 | 118 |
| February | 35 | 12 | 33 | 2 | 0 | 0 | 0 | 13 | 29 | 0 | 0 | 0 | 1 | 129 |
| March | 24 | 9 | 31 | 1 | 0 | 1 | 0 | 6 | 35 | 0 | 0 | 0 | 0 | 110 |
| April | 25 | 19 | 45 | 7 | 0 | 0 | 0 | 4 | 24 | 0 | 0 | 0 | 0 | 125 |
| May | 24 | 11 | 37 | 1 | 0 | 1 | 0 | 6 | 3 | 12 | 0 | 0 | 0 | 95 |
| June | 28 | 13 | 22 | 4 | 2 | 1 | 0 | 5 | 12 | 63 | 0 | 0 | 0 | 150 |
| July | 22 | 9 | 21 | 1 | 0 | 2 | 0 | 4 | 5 | 47 | 0 | 0 | 0 | 111 |
| Aug | 22 | 8 | 22 | 2 | 1 | 4 | 0 | 11 | 4 | 31 | 0 | 0 | 0 | 105 |
| Sept | 16 | 12 | 24 | 2 | 0 | 2 | 0 | 8 | 4 | 9 | 0 | 0 | 0 | 77 |
| Oct | 24 | 10 | 35 | 2 | 0 | 3 | 0 | 3 | 14 | 0 | 0 | 0 | 0 | 92 |
| Nov | 28 | 10 | 33 | 5 | 0 | 2 | 0 | 9 | 5 | 31 | 0 | 0 | 0 | 123 |
| Dec | 30 | 18 | 40 | 4 | 0 | 0 | 0 | 4 | 4 | 25 | 0 | 0 | 0 | 125 |
| **Total** | 309 | 139 | 372 | 35 | 3 | 21 | 1 | 64 | 64 | 351 | 0 | 0 | 1 | 1360 |

| 2021 | Inmate/ Inmate Assault | Inmate Staff Altercation | Use of Force | PREA | Death | Attempt Suicide/ Ideation | Internal Escape | Criminal Damage | Inmate Injury/ Inmate Medical (AKA slip/falls/ overdoses) | Contraband | Staff Arrest | Staff Misconduct/ Suspension | Other | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| January | 32 | 20 | 38 | 1 | 0 | 0 | 0 | 3 | 3 | 32 | 0 | 0 | 0 | 129 |
| February | 30 | 14 | 27 | 2 | 0 | 1 | 0 | 2 | 5 | 14 | 0 | 0 | 0 | 95 |
| March | 24 | 7 | 16 | 4 | 0 | 0 | 0 | 5 | 4 | 24 | 0 | 0 | 0 | 84 |
| April | 27 | 10 | 24 | 2 | 0 | 1 | 1 | 2 | 4 | 45 | 0 | 0 | 0 | 116 |
| May | 31 | 7 | 21 | 0 | 0 | 0 | 0 | 3 | 1 | 23 | 0 | 0 | 0 | 86 |
| June | | | | | | | | | | | | | | 0 |
| July | | | | | | | | | | | | | | 0 |
| Aug | | | | | | | | | | | | | | 0 |
| Sept | | | | | | | | | | | | | | 0 |
| Oct | | | | | | | | | | | | | | 0 |
| Nov | | | | | | | | | | | | | | 0 |
| Dec | | | | | | | | | | | | | | 0 |
| **Total** | 144 | 58 | 126 | 9 | 0 | 2 | 1 | 15 | 17 | 138 | 0 | 0 | 0 | 510 |

OPSO still does not consistently conduct and document security rounds (30 minutes or 15 minutes depending on the unit) nor perform direct supervision surveillance consistent



with the requirements of the Consent Judgment or OPSO policy.

Direct supervision requires surveillance of all of the inmates and cannot be properly performed by sitting behind a desk or in the control module. It requires walking around the unit, looking into the individual cells, and actively engaging with the inmates. Use of designated mandatory assignments has improved the consistency of staffing within those units, but for other units staffing was routinely inadequate or inconsistent throughout the shift. Review of incident reports revealed that units were often unstaffed, including mandatory posts. If staff are not present, it impossible to make the required rounds. The staff is now writing their rounds on paper forms in addition to entry into the log. While this provides an easier way for a supervisor to see during a unit inspection if the deputy has recorded that the security checks are being performed timely, it is insufficient proof that the security checks actually occurred and requires watching hours of video to verify. OPSO has indicated that with the formation of the compliance unit that OPSO has now started to audit log sheets with video footage and plans to have an audit report for the next compliance period. At the unit managers' meeting, one of the statistics reported was the number of security checks which occurred. The percentage reported on some units appeared to be higher than what a review of the incident reports would reflect. During the onsite monitoring visit, Monitors viewed the documentation for security checks of the units. When questioned, deputies usually were able to describe what an acceptable security check would look like. However, the deputies admitted that they did not perform all of the tasks for a proper security check each time a security check was recorded as having taken place. Usually, an adequate security check was only performed when a physical count of the inmates took place; at most, twice a twelve-hour shift. The rest of the "checks" were no more than looking about the housing unit without leaving the deputy station. Sufficient proof of compliance has not been provided. OPSO remains in partial compliance with IV. A. 5. d.

A review of the paper logs and forms during the monitoring tour revealed that timely rounds were often not performed and are not accurate. OPSO should consider a reliable system that would allow for rounds, by both deputies and supervisors, to be recorded electronically. Not only would it allow for supervisors to quickly determine whether rounds were being conducted timely, it would allow for OPSO to prove compliance and address non-adherence.

All twenty-four (24) of the housing units in OJC are designed for direct supervision. At



the time of the drafting of the Consent Judgment the design of OJC was known. The Consent Judgment requires that staff shall provide direct supervision in housing units that are designed for this type of supervision. Thus, continual presence of a deputy in each housing unit at OJC and TDC is mandatory under the Consent Judgment. OPSO, during the last several reports, has taken the position that OPSO gets to determine which housing posts are mandatory and routinely does not assign mandatory staff to each housing unit between 50% to 75% of the time. In addition, deputies are frequently absent from even the housing units designated by OPSO as mandatory. Often, especially on 2nd squad, one deputy is assigned to two housing units. OPSO's recent interpretation of the Consent Judgment is inconsistent with the plain wording of the Consent Judgment and the manner in which it has been applied by the Monitors since its inception. It is impossible to conduct direct supervision if not present in the housing unit. Thus, IV. A. 5. e. remains in partial compliance.

Regarding overhead video surveillance and recording cameras for OJC (A.5.f.), significant repairs were made to the recording system. There are still times when a nonfunctional camera is discovered when a supervisor or an investigator tries to retrieve the videos. OPSO needs to continue to audit the system by having a supervisor test the various cameras on a monthly basis and preparing a report for the Chief of Security. IV. A. 5. f. continues to be in substantial compliance. Supervisors have improved on pulling video as required by the Use of Force policy.

No staff was transferred between divisions during the monitoring period; thus, IV. A. 5. g. is in substantial compliance. No proof of training for the specialized units was provided. However, training was provided for the deputies assigned to the Temporary Mental Health Facility (TMH) before they were transferred; IV. A. 5. h. is now in partial compliance. Given the high level of incidents in the specialized units, it is recommended that the training be reviewed, and deficiencies addressed.

Documentation is lacking that supervisors consistently conduct daily rounds during this compliance period; thus, IV. A. 5. i. continues to be in partial compliance. Supervisors are required to sign off on the round sheet completed by the pod deputy, but this does not provide proof that the supervisor conducted daily rounds. The daily inspections of housing units as required by VI. A. 5. j. has improved but are still only in partial compliance. The daily inspections have improved, but it is concerning that neither the inspections by the deputies or the supervisors resulted in the discovery of the destruction of items that are part of the



COMPLIANCE REPORT #14                                          32

jail to fashion weapons. It is essential that the inspections be thorough and that corrective actions are taken to address the inspection findings. This provision remains in partial compliance.

Monthly shakedowns were not conducted in substantial compliance with VI. A. 5.k. The data provided indicates that shakedowns were not conducted in substantial compliance during five of the six months during the monitoring period. There continues to be significant incidents involving contraband including the manufacturing and use of weapons fashioned from the jail itself. The review of contraband reports clearly indicates reoccurring issues. There continues to be a serious issue of inmates hoarding medication. Reports demonstrate that inmates are fashioning weapons out of items in the jail which are then used to assault other inmates. Reports and the site visit reveal that inmates are smuggling in marijuana and hallucinogens to smoke. Some of these items come through the mail, but there is a significant issue of staff smuggling in contraband. This indicates the need to analyze the data and develop a corrective action plan to reduce, if not stop, the hoarding of medication, the fashioning of weapons, and the flow of contraband into the facility.

The documentation provided for A. 5. l. does not cover the entire monitoring period nor include all of the required information. Thus, A. 5. l. remains in Partial Compliance.

## IV. A. 6. Security Staffing

*A.6.a. OPSO shall ensure that correctional staffing and supervision is sufficient to adequately supervise prisoners, fulfill the terms of this Agreement, and allow for the safe operation of the Facility, consistent with constitutional standards.*

     *(1)    OPSO shall achieve adequate correctional officer staffing in the following manner: Within 90 days of the Effective Date, develop a staffing plan that will identify all posts and positions, the adequate number and qualification of staff to cover each post and position, adequate shift relief, and coverage for vacations. The staffing plan will ensure that there is adequate coverage inside each housing and specialized housing areas and to accompany prisoners for court, visits and legal visits, and other operations of OPP and to comply with all provisions of this Agreement. OPSO will provide its plan to the Monitor, SPLC, and DOJ for approval. The Monitor, SPLC, or DOJ will have 60 days to raise any objections and recommend revisions to the staffing plan.*

     *(2)    Within 120 days before the opening of any new facility, submit a staffing plan consistent with subsection (1) above.*

     *(3)    Within 90 days after completion of the staffing study, OPSO shall recruit and hire a full-time professional corrections administrator to analyze and review OPP operations. The professional corrections administrator shall report directly to the Sheriff and shall have responsibilities to be determined by the Sheriff. The professional corrections administrator shall have at least the following qualifications: (a) a bachelor's degree in criminal justice or other closely related field; (b) five years of experience in supervising a large correctional facility; and (c) knowledge of and experience in applying modern correctional standards, maintained through regular participation in corrections-related conferences or other continuing education.*

     *(4)    Provide the Monitor a periodic report on staffing levels at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date; and*



*every six months thereafter until termination of this Agreement. Each report will include the following information:*

    i.   *a listing of each post and position needed;*
    ii.   *the number of hours needed for each post and position; a listing of staff hired and positions filled;*
    iii.   *a listing of staff working overtime and the amount of overtime worked by each staff member;*
    iv.   *a listing of supervisors working overtime; and*
    v.   *a listing of and types of critical incidents reported*

*A.6.b. Review the periodic report to determine whether staffing is adequate to meet the requirements of this Agreement. OPSO shall make recommendations regarding staffing based on this review. The review and recommendations will be documented and provided to the Monitor.*

Findings:

A. 6. a.  Partial Compliance

A. 6. b.  Partial Compliance

An overall rating of A. 6. was provided in the previous reports. This was inconsistent with the other introductory paragraphs and has now been discontinued.

Observations:

The level of staffing is insufficient to adequately supervise inmates and allow for the safe operation of the facility. There has been insufficient security staff for over the past few monitoring periods, but it has now risen to the level where the extensive use of overtime is not enough to overcome the vacancies in security staff. OPSO's staffing reports document that mandatory posts are not filled on a consistent basis. Numerous incident reports and investigations reveal posts were not constantly staffed which resulted in increased violence. Efforts have been attempted to reassign some staff from areas that had excess staff but have not fully addressed the problem. Lacking is a coordinated effort on the utilization of overtime and redeployment of staff to ensure the mandatory posts are covered on a consistent basis. The deployment of staff is sufficiently inconsistent and insufficient to result in A. 6. a. (1) and IV. A. 6. a. (2) being in partial compliance. Provision IV. 6. a. (3) is in substantial compliance with the hiring of Byron LeCounte as the Chief of Corrections as of February 19, 2019. Paragraph IV. 6. a. (4) is in substantial compliance, as monthly reports are produced to document hiring and termination of employees. The Stipulated Agreement also provides for bi-monthly reports regarding hiring. Paragraph 7.a. of the Stipulated Agreement of February 11, 2015, requires monthly reporting. Given the importance of the actual implementation of an approved staffing plan, A. 6. a. is in partial compliance. The last approved staffing plan was in September 2019.

OPSO is in partial compliance with A. 6. b. as OPSO has not provided a periodic review



of the staffing plan. Discussion during the monitoring tour indicated that a plan exists, but it has not been finalized or submitted to the Monitors. A staffing plan which is based on staffing levels which do not exist is insufficient.

## IV. A. 7. Incidents and Referrals

*A.7.a.   OPSO shall develop and implement policies that ensure that Facility watch commanders have knowledge of reportable incidents in OPP to take action in a timely manner to prevent harm to prisoners or take other corrective action. At a minimum, OPSO shall do the following:*

*A.7.b.   Continue to ensure that Facility watch commanders document all reportable incidents by the end of their shift, but no later than 24 hours after the incident, including prisoner fights, rule violations, prisoner injuries, suicide attempts, cell extractions, medical emergencies, found contraband, vandalism, escapes and escape attempts, and fires.*

*A.7.c.   Continue to ensure that Facility watch commanders report all suicides and deaths no later than one hour after the incident, to a supervisor, IAD, the Special Operations Division, and medical and mental health staff.*

*A.7.d.   Provide formal pre-service and annual in-service training on proper incident reporting policies and procedures.*

*A.7.e.  Implement a policy providing that it is a disciplinary infraction for staff to fail to report any reportable incident that occurred on his or her shift. Failure to formally report any observed prisoner injury may result in staff discipline, up to and including termination.*

*A.7.f.  Maintain a system to track all reportable incidents that, at a minimum, includes the following information:*

      *(1)       tracking number;*
      *(2)       the prisoner(s) name;*
      *(3)       housing classification and location;*
      *(4)       date and time;*
      *(5)       type of incident;*
      *(6)       injuries to staff or prisoner;*
      *(7)       medical care;*
      *(8)       primary and secondary staff involved;*
      *(9)       reviewing supervisor;*
      *(10)     external reviews and results;*
      *(11)     corrective action taken; and*
      *(12)     administrative sign-off.*

*A.7.g.  Ensure that incident reports and prisoner grievances are screened for allegations of staff misconduct, and, if the incident or allegation meets established criteria in accordance with this Agreement, it is referred for investigation.*

*A.7.h.   Provide the Monitor a periodic data report of incidents at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement.*

*A.7.i. The report will include the following information:*

      *(1)       a brief summary of all reportable incidents, by type and date;*
      *(2)       a description of all suicides and in-custody deaths, including the date, name of prisoner, and housing unit;*
      *(3)       number of prisoner grievances screened for allegations of misconduct; and*
      *(4)       number of grievances referred to IAD or SOD for investigation.*

*A.7.j.   Conduct internal reviews of the periodic reports to determine whether the incident reporting system is ensuring that the constitutional rights of prisoners are respected. Review the quarterly report to determine whether the incident reporting system is meeting the requirements of this Agreement. OPSO shall make recommendations regarding the reporting system or other necessary changes in policy or staffing based on this review. The review and recommendations will be documented and provided to the Monitor.*

Findings:



A. 7. a.  Substantial Compliance

A. 7. b.  Partial Compliance

A. 7. c.  Substantial Compliance

A. 7. d.  Substantial Compliance

A. 7. e.  Substantial Compliance

A. 7. f.  Substantial Compliance

A. 7. g.  Substantial Compliance

A. 7. h.  Substantial Compliance

A. 7. i.  Substantial Compliance

A. 7. j.  Substantial Compliance

<u>Observations</u>:

OPSO has long had a policy on incidents and referrals that sets out the process for documenting and referring incidents. What has been lacking is a sufficient process to ensure all reportable incidents are being documented and that all incident reports are complete, prompt, and accurate. OPSO backslid in its timeliness of the reporting of incidents in Report #13 to partial compliance. A concentrated effort by the command staff has resulted in improvement by the watch commanders as far as the timeliness of the incidents for which a report is prepared. However, review of the routes of inmates and medical clinic walk-in log indicates that a significant number of incidents are not resulting in an incident report.

OPSO implemented a process where an OPSO staff member reviewed the "routes" of inmates with serious medical or trauma injuries to the hospital emergency and the OPSO clinic walk-in logs and compared them to the reports received. This function used to be performed by the Monitors. This is an example of OPSO incorporating processes which allow OPSO to audit its compliance. The lieutenant who was performing this process has been assigned significant other duties but has continued to be tasked with completing the review and notifying the Monitors and counsel of incidents. The accuracy and timeliness of the review and follow-up have suffered with the lieutenant's transfer. Someone else needs to be trained to take over the duties of review and notification of the Monitors and counsel. IV. A. 7. b. remains in partial compliance.

OPSO is doing a much better job of holding supervisors and security staff accountable for the late reports. Documentation was provided of accountability in the form of counseling was presented. As OPSO has begun to enforce the policy regarding discipline for not timely



filing reports, IV. A. 7. e. is in substantial compliance. What will be important is to track whether the counseling was effective in improving the timeliness of incident reports.

During this reporting period, there were no deaths, and serious attempts at suicide and they were reported within an hour to the proper persons: thus IV. A. 7. c. is in substantial compliance. Annual training was provided on incident reporting, and documentation indicates that staff were required to attend; IV. A. 7. d. is in substantial compliance. OPSO has transitioned to the AS 400 system to track the information required in IV. A. 7. f. and in substantial compliance. OPSO is doing a better job analyzing the data. The next step is utilizing the analysis to make required changes in policy and procedure. In substantial compliance with A. 7. g., incidents, and grievances are reviewed for misconduct and referred for investigation where appropriate. The Monitors were provided a semi-annual report of incidents, that now, with the supplementation by the daily/weekly reports, which contains all of the required information and, thus, IV. A. 7. h. and i. are in substantial compliance. OPSO performed an assessment of whether the reporting system is meeting the requirements of the Consent Judgment and is given substantial compliance for IV. A. 7. j. as OPSO is now addressing the lack of timeliness.

## IV.   A. 8.  Investigations

*A.8.a. Maintain implementation of comprehensive policies, procedures, and practices for the timely and thorough investigation of alleged staff misconduct, sexual assaults, and physical assaults of prisoners resulting in serious injury, in accordance with this Agreement. Investigations shall:*

    *(1)    be conducted by persons who do not have conflicts of interest that bear on the partiality of the investigation;*

    *(2)    include timely, thorough, and documented interviews of all relevant staff and prisoners who were involved in or who witnessed the incident in question, to the extent practicable; and*

    *(3)    include all supporting evidence, including logs, witness and participant statements, references to policies and procedures relevant to the incident, physical evidence, and video or audio recordings.*

*A.8.b. Continue to provide SOD and IAD staff with pre-service and annual in-service training on appropriate investigation policies and procedures, the investigation tracking process, investigatory interviewing techniques, and confidentiality requirements.*

*A.8.c. Ensure that any investigative report indicating possible criminal behavior will be referred to IAD/SOD and then referred to the Orleans Parish District Attorney's Office, if appropriate.*

*A.8.d. Provide the Monitor a periodic report of investigations conducted at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement.*

*A.8.e. The report will include the following information:*

    *(4)    a brief summary of all completed investigations, by type and date;*

    *(5)    a listing of investigations referred for administrative investigation;*

    *(6)    a listing of all investigations referred to an appropriate law enforcement agency and the name of the agency; and*

    *(7)    a listing of all staff suspended, terminated, arrested, or reassigned because of misconduct or violations of policy and procedures. This list must also contain the*



*specific misconduct and/or violation.*

*A.8.f. OPSO shall review the periodic report to determine whether the investigation system is meeting the requirements of this Agreement and make recommendations regarding the investigation system or other necessary changes in policy based on this review. The review and recommendations will be documented and provided to the Monitor.*

Findings:

A. 8. a. Substantial Compliance

A. 8. b.  Substantial Compliance

A. 8. c.  Substantial Compliance

A. 8. d.  Substantial Compliance

A. 8. e.  Substantial Compliance

A. 8. f.  Substantial Compliance

Observations:

The Investigative Services Division (ISB) is responsible for: the Criminal Investigation Division (investigates possible criminal activity by inmates), Internal Affairs Division-Criminal (investigates possible criminal activity by staff), the FIT (investigates use of force by staff), the Internal Affairs Division-Administrative (investigates possible violation of policies by staff), and the Intelligence Unit (provides information and intelligence regarding activities that have taken place or may take place in the jail or support activities).

While there is evidence of substantial compliance provided for IV. A. 8. a., the timeliness of investigations involving in custody deaths and use of force threatens the rating despite some improvement. The three most experienced investigators resigned in 2020 and the lack of experience of those replacing them was evident in the quality of the death investigations initially done by the new investigators. The supervisor assigned to take over the duties of FIT supervisor has done a good job at assuming the duties and has worked with the Major of Security to bring an increased level of accountability to supervisors for properly completing the FIT packets. The investigators assigned to criminal investigations, including in custody death investigations have received additional training. Improvements in all other areas from hiring, training, supervision, and adequate staffing will enhance the safety of staff and inmates and, ultimately, decrease the workload of ISB.

The Monitor acknowledges that investigating incidents of inmate-on-inmate assaults, sexual assaults, staff on inmate assaults, etc. with a goal of seeking indictments is appropriate; but the overall goal is to create a safe jail. In a jail setting, investigations play a



critical role in protecting inmates from inappropriate or illegal staff actions, protecting inmates from each other, and correcting policy, practice, supervision, and training. Continued emphasis is needed on the goal of investigations to prevent future incidents through analysis of the policy, procedures, training, supervision, and physical plant contributors to the incident. This function cannot and should not be performed by ISB alone. This level of assessment requires input from individuals who have a high level of experience in jail/corrections work. In short, it requires collaboration between ISB and OJC which has improved. While collaboration has improved, there is still insufficient follow through by the OJC staff. For instance, ISB discovered that the source of dangerous contraband being used to shatter windows originated in the utility closets on the housing units. The cabinets near the deputy's station were found to be the source of materials to make homemade knives or "shanks". Inmates literally are taking the jail apart to fashion weapons. The failure of staff to keep the utility closets and cabinets locked and to supervise inmates when allowed access to the utility closets and cabinets is the root cause of the problem. While utility closets were found to be secured during this monitoring tour, many of the cabinets were found to be unsecured.

Supervision of sexual assault investigations was added to the duties of the FIT supervisor when the Lieutenant who was responsible for IAD-Criminal investigations resigned earlier this year. The quality of the investigations will continue to be monitored.

ISB has demonstrated training related to the investigative skills provided during 2020. IV. A. 8. b. remains in substantial compliance.

Investigations which reveal potential criminal activity are referred to the Orleans Parish District Attorney's Office in substantial compliance with A. 8. c. The Monitors are concerned about the apparent refusal of the new district attorney to follow through with filing cases related to indecent exposure by inmates towards staff. ISB provides reports in substantial compliance with IV. A. 8. d. and e. ISB reviewed the investigation system to determine whether the investigation system complies with the requirements of the Consent Judgment and forwarded any recommendations to the Monitors in substantial compliance with IV. A. 8. f.

### IV. A. 9. Pretrial Placement in Alternative Settings

*A.9.a. OPSO shall maintain its role of providing space and security to facilitate interviews conducted pursuant to the City's pretrial release program, which is intended to ensure placement in the least restrictive appropriate placement consistent with public safety.*



*A.9.b. OPSO shall create a system to ensure that it does not unlawfully confine prisoners whose sole detainer is by Immigration and Customs Enforcement ("ICE"), where the detainer has expired.*

Findings:

A. 9. a.  Substantial Compliance

A. 9. b.  Substantial Compliance

Observations:

OPSO provided a memorandum noting that the pretrial program is managed by the Criminal District Court, and that space is provided. OPSO also provided a memorandum that ICE detainers are only accepted for a specified list of offenses.  OPSO has not detained any individuals under an ICE detainer during the monitoring period.

## IV. A. 10. Custodial Placement within OPP

Introduction:

OPSO has designed, validated, and implemented an objective classification system to assess and house each OPSO inmate according to his/her risks posed to institutional safety and security. The automated classification system was rolled out in the Jail Management System (JMS) on January 15, 2015.[1] The 2021 OPSO staffing plan reduced the classification unit staffing from 18.68 to 14 FTEs. [2] As of March 31, 2021, the Classification Unit staffing was 13 -- eight civilian classification specialists, four supervisors, and a classification manager.  One of the classification specialists is on medical disability. Thus, the active roster included only 11 classification specialists and the classification manager.  During this compliance period, one (1) classification specialist resigned; one was hired. Given the relatively low average daily population (ADP), low activity of the courts, and reduced admissions during this compliance period, staffing for the classification unit appears to be adequate. This reduced staffing level will be re-evaluated as these factors change. Classification-related training during this compliance period included annual training for all staff and instruction for the new classification specialist.

An automated housing assignment process (HUAP) identifies housing options for inmates according to their custody level, gender, special population status, PREA designations, enemies, and associates.  The classification specialists assign all individuals to one of the IPC ROLL INS on

---

[1]  Hardyman, Patricia L. (2015). "Design and Validation of an Objective Classification System for the Orleans Parish Sheriff's Office: Final Report." Hagerstown, MD: Criminal Justice Institute, Inc.

[2]  Gusman, Marlin N. (March 16, 2021) "Coverage Plan 2021." Orleans Parish, LA: Office of the Sheriff. pp. 11.



the first floor at initial classification.  The "IPC ROLL IN" pods house inmates of all custody levels, PREA designations, and special population tags. Thus, the housing assignments are cell-level separations by date of intake. Enemies and associates are assigned to separate pods.  At reclassification and for the transfers from the "IPC ROLL IN" to the general population pods, the classification supervisors select from the potential housing locations to match the inmates by age, crime/criminal history, custody level, and PREA designations. Special population tags identify inmates for suicide observation versus suicide watch, medical housing/isolation, academic education, or special diets.

Throughout this compliance period, the OPSO revised its housing matrix on multiple occasions. These changes reflected fluctuations in demand for specialized intake housing units (IPC Non-Symptomatic Roll-Ins), isolation pods for individuals exposed to COVID-19, other special populations (medical, mental health, disciplinary, administrative segregation, and protective custody), and of course, the general population.  The OPSO Housing Matrix was expanded to include the new mental health units within TDC -- TMH B1 and B2 A-B.

Population fluctuations and isolation related to COVID-19 requirements created additional demands on the Classification Unit for housing transfers within a seemingly ever-changing housing matrix.  The pandemic added another layer of complexity to the housing process to separate individuals by admission date, custody level, and PREA designation <u>within a cell</u>. As previously noted, individuals of all custody levels, PREA designations, and special population tags (medical, mental health, administrative segregation, disciplinary, and protective custody) are housed in the IPC Roll-In and isolation units.  Security staff does not use the ISI for either the general population or special management units.[3]  The schedules for the out-of-cell separations within either the general population or the mixed custody and COVID-19 populations units were not available.

OPSO continued the housing audits to verify individuals were in their assigned cells and beds.[4]  OPSO provided a brief description of the audit process that requires the classification supervisors to conduct random housing audits. However, during an onsite

___

[3] The ISI (Inmate Separation Instrument) is an automated JMS report to identify appropriate out-of-cell separations within the mixed custody and special populations units. As a pod deputy may not be aware or have access to the multiple factors requiring separation of individuals within a pod, failure to use the ISI creates risks to the inmates' and staff safety and security.
[4] The COVID-19 quarantine and isolation pods were not audited. Further audit procedures for the TDC and TMH pods have not been developed.



workgroup meeting, the classification supervisors described his/her audit schedule and scoring rules. The standardized monthly classification statistical reports documented the current classification processes and OPSO populations.

Assessment Methodology:

Compliance was assessed through multiple data sources and activities – a review of the OPSO and JMS statistical reports, a virtual meeting with OPSO staff, and a site visit conducted June 7 – 8th. The OPSO documents included monthly statistical reports, housing audit reports, training materials, and monitoring logs. The JMS reports include ad hoc daily reclassification, population, and placement error reports. The onsite activities included: observation of the initial classification, reclassification, housing, housing audit process, a walk-through of the enemy review process, a tour of the TMH housing units, attendance at the OPSO weekly CompStat meeting, and a training/work session with the classification supervisors regarding the housing audits. This compliance review focused primarily on the October 1, 2020 – March 31, 2021, data, and activities. Some analyses considered trends over a twelve to fifteen-month (12-15) period to detect variations due to seasonal variations and COVID-19 related procedures.

Summary:

OPSO is in substantial compliance with the Custodial Placement sections of the Consent Judgment (IV. A.10), except sections e and f. OPSO internal housing audits improved somewhat. However, the audit scoring, tracking, and reporting were inconsistent and, at times, unintelligible. During the onsite visit, the auditors provided verbal explanations of their audit schedules and processes, as well as their steps for following up on audits that required corrective actions to address pod and cell-level placement errors. However, there is still no systematic process for tracking and storing the audits. The written audit process should accurately reflect the auditors' activities as outlined during the onsite work session. While sections e and f are in Partial Compliance for this review period, it is anticipated that OPSO will achieve Substantial Compliance if there is full implementation of the changes to housing audit and enemy refusal processes discussed during our onsite meetings. Annual classification training was provided on March 30th and 31st, 2021. However, assessment for section 10.e. was difficult. While OPSO provided the required annual training for those who were not new employees, the training for the new classification specialist was little more than on-the-job instruction that focused primarily on the housing assignment process. There



was no documentation of her training process. Further, no in-service training or instruction was provided during this compliance period despite the inadequacies/inconsistencies of the housing audit reports.

The onsite visit highlighted two key points that simple ratings of the custodial placement sections do not address. The first observation was not new but still very troubling. While OPSO has developed and "implemented" an objective classification system, 15 of the 30 OJC/TDC pods house inmates of all custody, vulnerability, predation, and special population status. The problem begins with the failure to differentiate the intake roll-in pods by custody level, PREA status, or special population status. As a result, an inmate is assigned to any available cell with little regard to the critical housing criteria. (The exceptions are the COVID-19 protocols require separation of inmates by intake date, lower bunk assignments for medical need(s), and suicide resistance/ observation cells, as needed.) This disregard for classification status has been extended to the TMH units. The treatment teams assign patients to the Units according to their mental health needs with little regard for custody or PREA status. (Known enemies live in separate pods.) Housing assignments, activities, and out-of-cell time are according to the individual's program/treatment level. So again, classification becomes irrelevant. The risks associated with "ALL CUSTODY ALL STATUS" for the housing matrix are compounded by the inadequate security staffing and ad hoc schedules for the out-of-cell time across all pods -- intake, special population, and general population.

The second observation was the security staff's blatant failure to maintain/enforce the housing assignments by the Classification Unit. Security staff moved inmates from one cell to another without consulting or even reporting the moves to the Classification Unit. Pod deputies disregard the transfer sheets for inmates arriving to the pod. Watching the flurry of emails and telephone calls between the Classification Unit, Central Control, and pods suggested that classification was perceived as a clerical unit for recording bed assignments in the JMS or generating the transfer requests rather than the driver of the System. Further, the housing audit reports revealed numerous incidents in which inmates were not sleeping in the assigned cells or bunks. (Of even more significant concern, inmates were in the wrong pods.) While the value and role of the classification system may vary by pod, shift, or rank, the overall effect is the same. Classification staff spends too much time checking and re-checking emails, responding to telephone calls, generating transfer



requests, entering moves into the JMS, auditing the pods, and making rounds just to ensure the inmates live in the appropriate pods, cells, and beds which the classification system is supposed to address in the first place.  It appeared that the classification system had become a housing game rather than an objective risk assessment process.  This point was highlighted by the first comments by an initial classification specialist when asked about her training, "I assign the inmates to a bed."

Findings:

A. 10. a.  Substantial Compliance

A. 10. b.  Substantial Compliance

A. 10. c.  Substantial Compliance

A. 10. d.  Substantial Compliance

A. 10. e.  Partial Compliance

A. 10. f.  Partial Compliance

A. 10. g.  Substantial Compliance

A. 10. h.  Substantial Compliance

***IV.A.10. a. OPP shall implement an objective and validated classification system that assigns prisoners to housing units by security levels, among other valid factors, in order to protect prisoners from unreasonable risk of harm. The System shall include consideration of a prisoner's security needs, the severity of the current charge, types of prior commitments, suicide risk, history of escape attempts, history of violence, gang affiliations, and special needs, including mental illness, gender identity, age, and education requirements. OPSO shall anticipate periods of unusual intake volume and schedule sufficient classification staff to classify prisoners within 24 hours of booking and perform prisoner reclassifications, assist eligible DOC prisoners with re-entry assistance (release preparation), among other duties.***

Finding:

Substantial Compliance

Observations:

As of March 31, 2021, the Classification Unit staffing was 13 -- eight civilian classification specialists, four supervisors, and a classification manager.  One of the classification specialists was on medical disability. Thus, the active roster included only 11 classification specialists and the classification manager.  During this compliance period, one (1) classification specialist resigned, and one was hired.  For two of the four platoons, the shift supervisors complete the custody reviews in addition to his/her responsibilities for supervising the classification specialists, processing housing transfers, conducting housing audits, and making classification rounds of the pods.



The classification shift leaders and specialists work overtime to complete the initial classification, reclassification, vulnerability assessments, and housing assignments.  During October 2020 - March 2020, the Classification Unit logged 3,058.12 hours of overtime.[5]  The classification line staff worked an average of 44.63 hours of overtime/month.  (In contrast, non-Classification Unit staff logged an average of 20.93 hours/person during this compliance period.)   At least in part, the classification staff spent the extra hours modifying housing assignments to address COVID-19-related quarantine and isolations and multiple adjustments to the housing matrix.

As previously noted, inmates are assigned to OJC/TMH housing units with little consideration the critical objective custody, vulnerability, predation, and special population housing criteria. Inmates, for example, are assigned to any available cell within the intake, medical, mental health, education, protective custody, and disciplinary pods. Further, security staff do not maintain/enforce the housing assignments made by the Classification Unit. Thus, failure to re-establish the objective classification system to direction and enforce all housing assignments will result in a downgrade of the compliance rating for this section.

***IV.A.10.b. Prohibit classifications based solely on race, color, national origin, or ethnicity.***
Finding:
Substantial Compliance
Observations:

The custody assessments consider objective risk factors validated for the OPSO male and female inmates. The inmate's race is not one of the objective risk factors. Classification specialists consider the inmate's custody level, vulnerability designation, age, and charges from the beds identified by the JMS when transferring an inmate from an IPC Rollin pod and at reclassification.  To track this element of the Consent Judgment, OPSO created a monthly statistical report to track classifications by race and housing location. Analyses of these reports by the Monitor suggested that the OJC housing assignments were not by race. With a few exceptions, the number of black and white inmates within each OJC housing unit was generally consistent with the overall racial distributions among the OPSO inmate population. However, the percentage of white inmates assigned to TDC DOC worker units exceeds their

---

[5] OPSO Excel spreadsheets entitled, "Overtime by Month – October - December 2020" and "2021 HR Report – January – March 2021."



proportions within the total inmate population. During this compliance period, 83.3 percent of the OPSO male inmates were Black; 14.9 percent were white.  However, only 67.25 percent of the TDC DOC inmates were Black. (See Figure 1.)  Figure 1 also illustrates the racial distributions with the OPSO worker and mental health units. These data suggest race was not a factor for these housing assignments.  Thus, the disparate housing assignments appear to be generated by the DOC rather than the OPSO worker/mental assignment process. As we move out of the pandemic, it will be essential to track these rates and patterns.



Figure 1: Distribution of Inmates by Race by TDC and TMH Housing Units – October 2020 – March 2021.

***IV.A.10.c Ensure that the classification staff has sufficient access to current information regarding cell availability in each division.***

Finding:

Substantial Compliance

Observations:

OPSO automated housing assignment process (HUAP) considers the inmate's custody level, gender, special population status, PREA designations, enemies, and associates versus OJC beds available, to recommend an appropriate bed for the inmate. The new COVID-19 intake housing protocols also require matching cellmates by their dates of admission. Housing tags identify inmates on suicide observation versus suicide watch, alcohol/drug detoxification protocol, gang affiliation, school participation, and special diets.

The JMS daily population report lists the units, cells, and beds off-line for maintenance or staffing, as recorded in the AS400.  The cells/pods off-line, as listed in the AS400, appeared to be an accurate record.  The classification supervisors noted the cells that required



maintenance as part of their weekly audits and rounds; the problems were entered into the AS400 by the classification manager.

Classification specialists maintain a list of daily bed assignments to avoid duplications due to delays between the inmate's housing assignment and physical transfer of the designated pod/cell.  Gone were the lists, memos, and notes of broken cells.  Thus, as required by the Consent Judgment, the classification specialists appear to have access to current information regarding bed availability throughout the OJC.

OPSO should update the JMS housing availability logic to consider the COVID-19 isolation protocols, i.e., intake date. Further, adding the new TMH beds to the electronic housing inventory will facilitate the proper placement of individuals with acute and sub-acute mental health needs and track their movements within and across admissions to OJC.

***IV. A. 10. d. Continue to update the classification system to include information on each prisoner's history at OPSO.***

Finding:

Substantial Compliance

Observations:

As shown in Figure 2, the monthly custodial reports provided by OPSO indicated:

- **Percent Initial Custody Assessments**: During this compliance period, the Classification Unit completed initial custody assessments for 89.0 percent of the inmates booked into OJC.  This rate was on par with the percentage of 89.1 observed for the previous compliance period.

- **Percent Within 8 Hours:** As of March 2021, initial custody assessments were completed within the first eight hours of booking for 81.4 percent of the OPSO inmates.  For this compliance period, the percentage of initial classifications completed within the first eight hours of booking fluctuated between 65.0 and 86.4 percent; the average rate across the six months was 79.7 percent.  On the other hand, the percentage of cases completed between 8.01 and 24 hours fluctuated between 3.9 and 17.0 percent; the average was 8.4 percent. Thus, less than one in ten inmates remained in the booking area for more than eight hours before assignment to a bed. This rate was on par with the pace of one in ten observed for the previous compliance period – March – September 2020.



- **Percent Greater Than 24 Hours:** In March 2020, none (0.0) percent of the inmates remained in the OJC intake booking area for more than 24 hours. This rate continued the trend observed for the previous compliance period.



Figure 2: Rates and Completion Time for Initial Custody Assessments Completed during October 2020 – March 2021

These data suggested that the percentage of inmates for whom an initial classification was completed and the lag time between booking and classification/housing have stabilized. As the COVID-19 pandemic eases or the OJC bookings increase, it will be vital to monitor the process and the initial classification staffing patterns to ensure these excellent rates are maintained.

As previously noted, the OPSO Housing Matrix was revised on multiple occasions to ensure appropriate separations for COVID-19 treatment, quarantine, and isolation, as well as to incorporate the new TMH housing units.  These unique pods create significant risks associated with assignment of Low, Medium, and High custody inmates with different PREA designations and special needs to the same housing unit.  OPSO command and classification staff initially reported using the automated ISI (Inmate Separation Instrument) to maintain out-of-cell separations within these multi-custody/special population units.  However, the virtual tours -- observations and security staff reports -- indicated the basic schedule allows inmates to be out of their cells in groups of 10.  The deputies do not consult the separations reports or the ISI to determine out-of-cell separations. Unfortunately, the "pressures of the day" disrupt the basic pod schedule. As a result, security staff expands the evening groups to ensure all receive some out-of-cell time. As previously noted, inadequate OJC staffing compound this scenario. The problem is not limited to the intake or special population pods.



As observed during a housing audit for this review, the deputy and sergeant were absent from the pod. Yet approximately 20 of the 46 high-custody inmates were out of their cells. Regardless of the staffing patterns and pod schedules, the sub-standard practice of mixed custody/vulnerability units should be reviewed and discontinued as soon as possible. The Classification Unit should designate the custody and PREA parameters for each of the IPC Roll-in pods. (Note, the ISI programming can be easily tweaked to consider admission and COVID-19 isolation status.) Further, refresher ISI training and enforcement of housing assignments among security staff are critical for maintaining inmate separations and thus, institutional safety and security.

We noted the dangers of overriding the inmate custody levels for housing purposes in previous compliance reports. As shown in Figure 3, during this compliance period – October 2020 – March 2021, 17.5 percent of the custody overides were for housing purposes. This is undoubtedly an improvement over the rate of 84.9 percent observed for January 2019, but the practice continues.[6]  It is unclear why this practice continues given the decline in the ADP within OJC and the number of "All Custody ALL PREA" pods.



Figure 3: Percent Overrides for Housing Purposes - October 2020 – March 2021

The January 2020 – March 2021 classification reports indicated a discretionary override was applied for only 1.4 percent of the initial custody assessments. These are very low rates, well below the generally recommended rates of 5 to 15 percent.[7]  Before

---

[6] On the other hand, the reason or rationale was not documented for 31.3 percent of the overrides. Thus, the full extent of the practice of custody overrides for housing purposes is unknown.
[7] Austin, James and Patricia L. Hardyman. 2004. *Objective Prison Classification: A Guide For Correctional Agencies.* Washington, D.C.: National Institute of Corrections.



implementing COVID-19 housing protocols, classification specialists were careful to "match" inmates by age, current offense, and final custody level for the housing assignments, particularly for the "low" custody inmates.  The staff has greater flexibility within the IPC-intake housing pods where cellmates are matched by custody, PREA status, and intake date.  Further, during the early waves of the COVID-19 pandemic, the OJC ADP dropped dramatically and has remained low. (See Figure 8.) Thus, classification staff had more beds/cells available and greater flexibility for both pod and cell assignments.  Monitoring the discretionary overrides for housing purposes remains essential as the pandemic wanes and the OJC ADP increases.



Figure 4: Initial Classification Override Rates in January 2020 – March 2021

A different type of housing override was discovered during the previous compliance review.  The classification manager used an "Inmate Refusal of Enemies" process to "facilitate" the housing of general population inmates.  At least in part, the intent was to address inmate requests to transfer from one pod to another. In response to questions from the monitors and plaintiff attorneys, the inmate refusal process was suspended in December 2020[8] but re-started in April despite absence of a policy review and sign-off by the Monitors or plaintiff attorneys.

As part of the onsite activities for this compliance review, the classification manager outlined her current "enemy refusal" process. We then outlined steps to strengthen and document the process and created an "enemy refusal" checklist.  The next steps are to

---

[8] OPSO indicated that use of "Inmate Refusal of Enemies" form was a trial strategy initiated in September.  As of December 2020, after a 6-week trial period, OPSO elected to discontinue the use of the form, but then continued an "enemy refusal" without use of the form .



finalize the checklist, revise the draft enemy refusal policy (draft SOP 7020), and train staff as per the approved policy. In the interim, the current process should remain suspended.

The Classification Monitor List (List) is an ad hoc report to identify inmates for whom a custody review is due. Custody re-assessment reasons include a regular 60/90-day re-assessment or a status change or event within their jail records, i.e., amended charge(s) or bail amount, disciplinary incident, detainer lodged/lifted, or a new sentence. The number of inmates on the list fluctuates as inmates return from court, move through the booking process, and the like.  On each shift, a classification specialist or supervisor completes the pending custody reviews.  The average number of pending custody assessments per the Classification Monitor list was 10.1; 4.2 were awaiting an initial classification and 5.9 awaiting a custody re-assessment.  The average number of pending custody assessments during the previous compliance period was 11.98. Thus, wait times for the initial and reclassification processes continued to decrease during this compliance period.

Following Compliance Report #8, OPSO took steps to work with Wellpath to rebuild the linkages between the medical/mental health records and JMS. These data are essential for scoring seven of the PREA victimization and predation risk factors.  Also, medical and mental health information is critical for the inmates' housing assignments. The linkage between the electronic medical records (ERMA) and the JMS for the intake data is complete. Wellpath/OPSO has not verified the accuracy of the data as uploaded to the JMS.  Wellpath has provided the treatment/ service codes for defining the active mental health caseload. However, a count of "two" victims during this compliance period is questionable given that 37.5 percent of the women and 35.3 percent of men were on the mental health caseload as per the classification monthly statistical reports.

As shown in Figures 5 and 6, classification staff continued to create attachments to record criminal history data into the JMS for inmates with non-Orleans Parish felony convictions.  Figure 5 illustrates that the classification staff created ~266.5 attachments per month between October 2020 and March 2021.  The number of attachments decreased during the first three months of 2021, but this appears to parallel the recent drop in OJC bookings. As shown in Figure 5, on average, 99 percent of the attachments updated the inmate's criminal history.





Figure 5: Number of Attachments Input by Classification Staff – October 2020 – March 2021



Figure 6: Attachment Reason by Month – October 2020 – March 2021

**IV.A.10.e. Continue competency-based training and access to all supervisors on the full capabilities of the OPSO classification and prisoner tracking system.**

Finding:

Partial Compliance

Observations:

The required annual classification training was March 30 - 31, 2021. All specialists and supervisors attended one of the two sessions.  The training topics centered on the housing process, matrix, and terminology. The training for the new classification specialist was primarily on-the-job. She received an OPSO classification handbook, but her tutoring focused on the bed assignment process. Her "training" did not appear to follow the "initial



classification curriculum" submitted for approval in October 2019.  No written documentation of her training was available.

All specialists fly through the assessment screens, clicking on "Yes" according to JMS assessments of the custody and PREA risk factors.  There appears to be little understanding or concern for the underlying data or factors; it seems as if their "goal" is to get to the housing decision screens. (The exception is the criminal history factor; here, they check each individual's NCIC rap sheet and enter the required out-of-parish convictions.)

There was no OPSO in-service classification training for the specialists or supervisors. Despite the continuation of incomplete and inconsistent audit reports, no remedial training was documented. Quality in-service and introductory training for new staff is vital to ensure reliable and accurate custody assessments, housing assignments, and audits. While the System is highly automated, the JMS automation should not replace the staff's understanding of the objective classification principles, scoring rules for the custody and PREA risk factors, or housing standards.

***IV.A.10.f. Conduct internal and external review and validation of the classification and prisoner tracking system on at least an annual basis.***

Finding:

Partial Compliance

Observations:

OPSO population reports with the number of inmates by location were received daily by the Monitor.  Monthly custodial statistical reports for October 2020 – March 2021 regarding the number of custody assessments by type, gender, and population were also available. These reports track the timeliness of the initial custody assessments, the custody distributions; the cases due for a custody assessment; the prevalence of special populations; as well as the rates and types of disciplinary infractions. OPSO conducts housing and internal audits.

**Housing Audits – Checking the Veracity of the Inmate Housing Assignments:**

OPSO classification supervisors routinely audited the inmate housing assignments during this compliance period.  For this compliance report, we reviewed a random sample of the audit score sheets, rosters, and corrective action reports.  Although there is certainly room for improvement, the completed audit score sheets and corrective action reports were better than those from previous compliance reviews. Observation of housing audits



indicated the auditors verify each inmate's cell and bed assignments as required by the OPSO audit procedures.

On the other hand, the written description of the audit process was unclear. A review of a random sample of the housing audits suggested that staff did not always adhere to the written procedures. The most frustrating point was the lack of consistency among the auditors for recording and reporting their findings.  Reviewing the audit documents required learning each auditor's individual scoring/notation style.

The auditors create a "Housing Audit Corrective Action" report for each audit to summarize the findings. While these summaries are helpful, most neither indicated the specific "corrective" actions required, tracked their resolution, nor documented the date and results of any follow-up audit. It is important to emphasize that housing audits are a means of ensuring the classification system's integrity.  Merely filling out a custody assessment form and assigning an inmate to a bed does not fulfill the requirements of a validated classification system.  OPSO must ensure that all inmates are in the assigned cells and bunks according to their risks and needs. Otherwise, classification becomes just another form.

The importance of housing audits cannot be over-stated. Most of the audits indicated all inmates were in their assigned pods and cells. There were notable exceptions indicating the security staff does not consistently enforce or adhere to the housing assignments specified on the housing transfer sheets.

**Internal Audits – Checking the Accuracy of the Custody and PREA Assessments**

As part of the ongoing classification and housing processes, the classification shift supervisor reviews the JMS reports to identify placement errors and ISI separation conflicts. However, random reviews of the JMS location report uncovered an average of four to five PREA separation or placement errors per review. Unfortunately, this report is useless for the 15 pods that accept "All Custody All PREA."  The supervisors/team leaders indicated that they immediately corrected all errors. However, reliance on the automated housing violation reports to detect housing and custody assessment errors is insufficient to ensure institutional safety and security.

The October 2020 – March 2021 internal audit logs indicated zero errors. The audit logs include two types of audits: Random (custody assessments selected by the JMS for review) and Discovered (custody assessments with errors observed by a classification specialist or supervisor).  No errors were recorded for the 66 randomly selected custody



assessments. Zero (0) "discovered errors" were also reported. The intent of these audits is to uncover missing special population tags (isolation, medical, mental health, suicide, etc.), housing errors (Low and High Custody inmates housed together), missing override reasons, and missing criminal history attachments.  These low error rates are good news, except the noted random checks of the inmate by location report by the monitor suggest there were undetected or undocumented errors.

Revalidation of the Classification System – Assessing the Validity of the System:

Lovins and Latessa submitted their report on the validation of the OPSO classification system on April 30, 2018.[9] This validation study served as documentation of compliance with the Consent Judgment requirement for "external review and validation of the classification and prisoner tracking system on at least an annual basis." Although statistical validation of an objective classification system is generally recommended every three to five years,[10] continuous monitoring and process evaluation are essential for ensuring the system's integrity for the OPSO <u>current</u> inmate population. Revalidation of the system is due in 2021 to keep to the previous agreement for a statistical validation every three years.  The draft OPSO audit process calls for revalidation of the classification system every five years. Neither the monitors nor the plaintiff attorneys were notified of this proposed schedule change.

***IV.A.10.g. Provide the Monitor a periodic report on classification at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date and every six months, thereafter, until termination of this Agreement. Each report will include the following information:***

> *(1) number of prisoner-on-prisoner assaults;*
> *(2) number of assaults against prisoners with mental illness;*
> *(3) number of prisoners who report having gang affiliations;*
> *(4) most serious offense leading to incarceration;*
> *(5) number of prisoners classified in each security level;*
> *(6) number of prisoners placed in protective custody; and*
> *(7) number of misconduct complaints.*

Finding:

Substantial compliance

Observations:

---

[9] Lovins, Brian K. and Edward Latessa (April 30, 2018). "Revalidation of the Orleans Parish Classification System." Cincinnati, Ohio: University of Cincinnati Corrections Institute.
[10] Austin, James and Hardyman, Patricia L. (2004) "Objective Prison Classification: A Guide for Correctional Agencies." Washington, D.C.: National Institute of Corrections. pp. iv.



Reviewed were the monthly custodial, discipline, and inmate statistical reports for April - September 2020. OPSO has developed reports to track the statistics as required under section IV.A.10.g.  The only exception is the rates of victimization of inmates on the mental health caseload. As noted earlier, these data are dependent upon timely caseload information from the mental health provider.  Wellpath and OPSO are working together to align the JMS and electronic medical data to generate timely and accurate victimization counts. The Consent Judgment requires victimization rates for inmates on the mental health caseload. The Wellpath electronic records for tracking victimization of individuals on the mental health caseload are uploaded to the AS400.  However, pending is the data validation process to ensure timely and accurate updates of the inmate's medical and mental health caseload status.  The monthly classification special population reports include counts for the medical and mental health caseloads, but the victimization counts among individuals on the mental health caseload are unreliable. OPSO and Wellpath must complete this process to maintain substantial compliance with this section by January 2022.

Updated data as to the inmates with gang affiliations were inputted to the JMS throughout the compliance period. OPSO and the Orleans District Attorney (DA) have created an ongoing process for notifying the OPSO of offenders identified as members of a "gang." Thus, these data are available to track the prevalence of inmates per "gang" among OPSO populations as well as by their location (i.e., tier, side, and bed).

Figures 7 and 8 provide the OPSO monthly disciplinary data as recorded in the JMS. The rate of disciplinary reports has fluctuated over the last fifteen months – January 2020 – March 2021. (To account for short-term variations, seasonal trends, and the population shifts due to the pandemic, 15 months of disciplinary data are provided.) As shown in Figure 7, the rate of disciplinary reports per inmate decreased by 10 percent between October 2020 – March 2021.  As of October 2020, the rate of disciplinary reports among the OPSO detainees was 40.6 percent, i.e., 4 in 10 inmates received a disciplinary report. By March 2021, the rate was 29.8 percent. Of particular importance was the low rates of predatory and aggressive infractions – Predatory infractions decreased from 8.0 to 2.7 percent, while Aggressive infractions increased slightly from 2.6 to 3.1 percent. As shown in Figure 8, as the OPSO ADP has continued to decline, the number of disciplinary reports/month dropped from 385 in October 2020 to 275 by March 2021.





Figure 7: Rate of Disciplinary Infractions for the OPSO ADP – January 2020 - March 2021



Figure 8: OPSO ADP vs. Number of Disciplinary Reports: January 2020 – March 2021

Figure 9 illustrates the breakdown of the types of disciplinary infractions during this compliance period. (These data reflect the most severe infraction of which the inmate was found guilty/report.) While the actual number of predatory (e.g., assaults or battery) and aggressive behaviors (e.g., fights or threats) has stabilized, the numbers of management problem behaviors (disobeying a direct order, misuse of medication, possession of narcotics/illicit substance, etc.) fluctuated significantly.  For example, during the last three months of 2020, there were nearly 200 management problem infractions per month. But, by the end of March 2021, there were only 149 disciplinary reports for management problems.





Figure 9 Most Serious Disciplinary Infraction/Report with Finding of Guilty: Oct 2020 – March 2021

***IV.A.10.h. OPSO shall review the periodic data report and make recommendations regarding proper placement consistent with this Agreement or other necessary changes in policy based on this review. The review and recommendations will be documented and provided to the Monitor.***

Finding:

Substantial Compliance

Observations:

The Monitor receives the daily "Active Inmates by Location" reports and has access to the ad hoc Classification Monitor list and various classification statistical reports. During this compliance period, provided were multiple updates to the OPSO Housing Matrix. Chief LeCounte has maintained open communications.  It is our understanding that the classification manager reports the housing problems at the weekly CompStat meetings. However, building better communication among the line staff, front line supervisory, and classification supervisors is critical to eliminate the unreported and ad hoc housing changes by security staff and enforce the housing assignments as per transfer orders. Reports/requests from OPSO were timely.

During this upcoming compliance period, it is anticipated that a revamped enemy refusal process will be implemented. Continuation of an enemy refusal process without review and approval of the written policy by all parties and documentation of training for classification staff as to the approved policy will result in a downgrade of this section. Further, the classification manager is updating the audit steps to better documentation and tracking of the audits. It is anticipated that in-service training on the revised audit process for the classification supervisors will occur by the end of July 2021.



#### IV. A. 11.  Prisoner Grievance Process

*A. 11.a. OPSO shall ensure that prisoners have a mechanism to express their grievances, resolve disputes, and ensure that concerns regarding their constitutional rights are addressed. OPSO shall, at a minimum, do the following:*

> *(1) Continue to maintain policies and procedures to ensure that prisoners have access to an adequate grievance process and to ensure that grievances may be reported and filed confidentially, without requiring the intervention of a correctional officer. The policies and procedures should be applicable and standardized across all the Facility divisions.*
> *(2) Ensure that each grievance receives appropriate follow-up, including providing a timely written response and tracking implementation of resolutions.*
> *(3) Ensure that grievance forms are available on all units and are available in Spanish and Vietnamese and that there is adequate opportunity for illiterate prisoners and prisoners who have physical or cognitive disabilities or language barriers to access the grievance system.*
> *(4) Separate the process of "requests to staff" from the grievance process and prioritize grievances that raise issues regarding prisoner safety or health.*
> *(5) Ensure that prisoner grievances are screened for allegations of staff misconduct and, if an incident or allegation warrants per this Agreement, that it is referred for investigation.*
> *(6) A member of the management staff shall review the grievance tracking system quarterly to identify areas of concerns. These reviews and any recommendations will be documented and provided to the Monitor.*

Findings:

A. 11. a. (1)  Substantial Compliance

A. 11. a. (2)  Partial Compliance

A. 11. a. (3)  Substantial Compliance

A. 11. a. (4)  Substantial Compliance

A. 11. a. (5)  Substantial Compliance

A. 11. a. (6)  Substantial Compliance

Until the September 2019 report, one rating was given for the entire section for the Prisoner Grievance Process. In order to highlight which provisions are in substantial compliance versus those which fall short, the decision was made to rate each provision separately.

This review covered October 2020 through March 2021. For this review, the Monitor interviewed the Grievance Lieutenant, security staff and inmates while inspecting the housing units. Reports and data submitted by OPSO covering the rating period were also reviewed.

Review of the documentation demonstrated that all inmate submissions are reviewed by Grievance staff, categorized into requests and grievances, and forwarded to the appropriate staff for response with statistical information kept on all categories. Both requests and grievances are further sorted by type. Specific grievances related to inmate



safety, medical issues, PREA, etc., continue to be documented to reflect the date received, inmate information, type of grievance, time of notification made to the appropriate staff member, and the staff member making the notification.

Grievance staff provided detailed documentation as to their separate handling of the October 2020 through March 2021 inmate requests, grievances, and complaints related to inmate safety or health.

As reported by the OPSO Grievance staff, a monthly average of 143 grievances down from 162 grievances and an average of 2277 inmate requests were received for the current rating period. This represents a 12% *decrease* in the monthly grievance average over the previous 6-month period. While the reduced Average Daily Population due to the pandemic is still a factor in the lower average number for this rating period when compared to that prior to March 2020, it is significant to note that the number of grievances submitted decreased while under relatively the same pandemic conditions of the previous rating period. This is a positive indication of operational changes and conditions within the jail in the Monitor's opinion.  OPSO grievance reports reflected a high of 185 grievances submitted in October 2020 and a low monthly total of 90 for February 2021. The Monitor noted in the previous report increases in grievances related to commissary, maintenance, facility, sanitation, and food service issues, likely due to COVID-19 restrictions. All five categories showed to be trending downward throughout this rating period. The monthly average of medical grievances dropped 25% (32 > 24) from the previous rating period as well. Commissary grievances however, increased over 50%. This may be attributable to the on-going issues with kiosks (7 permanently out of order with 4 additional off-line on the date of the inspection) requiring inmates to order through the automated phone system. Other contributing issues are likely the pandemic restrictions as well as commissary staff working remotely.

Inmates have access to the grievance process via electronic kiosks located in the housing units throughout OJC and TDC and through a traditional paper grievance system. "Rebooting", as noted in the previous inspection, continues to be a problem. The Monitor observed that little progress has been made by the kiosk system vendor in replacing the broken kiosks. It remains the Monitor's opinion that the kiosk system remains relatively unreliable in terms of operational availability. The Grievance Lieutenant reported that every housing unit continues to be visited seven days per week with a "walk by" of every cell to



collect paper grievances to ensure that problems with the kiosks do not interfere with an inmate's ability to submit grievances. The Monitor reviewed documentation tracking paper grievances and noted that all such grievances are entered into the electronic system by Grievance staff upon receipt. Paper responses are provided to inmates in units that do not have a functioning kiosk. The Monitor observed locked grievance receptacles in every housing unit, however the Monitor again received verbal complaints from inmates of not being able to get blank grievance forms from security staff in a timely manner.

Unit Managers are again urged to remind line security staff of the importance of making grievance forms available upon request by the inmate(s). It is the Monitor's opinion that this manual work-around is acceptable under the language of the Consent Judgment requiring the inmates have access to a meaningful and confidential grievance process. The OPSO staff report that a replacement system is still being pursued but the status has been relatively unchanged for over three years. Given that inmates have reported difficulty in accessing the paper grievance forms and writing utensils and the delay that results from not being able to submit the grievance and medical requests electronically, the Monitor again emphasizes the securing of a replacement system should be given priority.

For this compliance review, the Monitor specifically reviewed weekly and monthly audit documentation (statistics, actual grievance documentation, and response timeliness) and trend reports compiled by the Grievance staff covering the period October 2020 through March 2021.

As noted previously, the Grievance Weekly Response Audit reports continue to reflect a diligent effort by Grievance staff to review and notify responsible staff when responses are insufficient or incomplete. The audits generally reflect a positive trend in terms of quality of responses. The Weekly and Monthly Grievance Reports showed no grievances that failed to get a response, however the average (monthly) number categories/staff members noted to have responded beyond the requisite 10 days rose by almost 50% from the first half of the rating period to the second. The Grievance Lieutenant stated she had recently noted the issue and that the likely cause was key personnel being unavailable due to various pandemic-related issues. The Grievance Lieutenant stated she had implemented a change whereby additional staff members in all areas were simultaneously assigned grievances to ensure a timely response to the inmate(s).  The Grievance Lieutenant also stated that support from management continued to be positive.



In terms of quantitative analysis, the Monitor reviewed the grievance audit documentation supplied by Grievance staff. Grievance staff randomly audit approximately 10% of the grievances received in a given month for issues such as proper assignment, response time, and appropriate response given. An average of 8% of the number of grievances audited were misassigned; 11% were overdue; and 9% did not have an appropriate response. The results of these audits are reported to OPSO management. The Monitor recommends that OPSO management continue to utilize these reports to individually identify and correct these deficiencies with staff.

As noted previously, Grievance staff increased the frequency of the "overdue" grievance response reports from monthly to weekly as of May 2020 and separated OPSO staff responses from those of the medical contractor (Wellpath) as of September 2020. This is the first full rating period with weekly data separating OPSO staff responses from that of Wellpath. Of the total grievances assigned on a weekly basis, OPSO staff showed an average of 39% (142 of 385) to be 10 days or more past due. Wellpath, despite averaging 12% more grievances, week to week, than OPSO staff, showed an average of 21% (86 of 432) to be 10 days or more past due. Individual interviews with several inmates who approached the Monitor with regard to grievances reflected excessive response times, non-substantive answers/no answers, and in the case of OPSO staff, a form of "passing the buck" if the inmate had transferred from one floor of the jail to another while the grievance was pending. Grievance staff should continue their efforts in this area.

Grievance staff continues to do an excellent job tracking grievances and requests and reporting as to the timeliness and quality of the responses to address the inmates' issues.

Documentation consistently reflects that Grievance staff continue to maintain a by-name/housing listing of all OPSO inmates identified as needing Grievance staff assistance to access the grievance system due to either a language barrier or illiteracy. The logs reviewed by the Monitor showed the list of disadvantaged inmates continues to be actively managed by Grievance staff.

The Monitor reviewed detailed documentation provided by Grievance staff for the rating period regarding the screening of grievances for staff misconduct. The documentation demonstrated that all inmate submissions are reviewed by Grievance staff and those regarding staff misconduct are separately documented for appropriate referral to the administrative level for follow-up. Grievance staff processed a total of 39 such staff



misconduct related grievances during this rating period versus 90 total for April through September 2020 and 147 grievances for July through December 2019. The Monitor notes this to be a positive trend.

Grievance staff also separately document grievances that require specific referral to IAD, ISB, PREA, or FIT staff for review and investigation. Detailed information along with the date assigned and disposition is maintained as well as email transmission receipts.

The Monitor reviewed the 2020 4th quarter and 2021 1st quarter data analysis of the grievance reports. Specific discussion by executive staff regarding the grievance documentation and reporting was noted. No specific changes to the grievance process were recommended; however, changes to the data analysis methodology and follow-up actions were discussed and recommended.

## IV. A. 12.  Sexual Abuse

*A.12. OPSO will develop and implement policies, protocols, trainings, and audits, consistent with the requirements of the Prison Rape Elimination Act of 2003, 42 U.S.C. § 15601, et seq., and its implementation of regulations, including but not limited to, preventing, detecting, reporting, investigating, and collecting sexual abuse data, including prisoner-on-prisoner and staff-on-prisoner sexual abuse, sexual harassment, and sexual touching.*

Finding:

A. 12. Partial Compliance

Observations:

OPSO successfully completed its PREA audit in 2019. The PREA Coordinator was reassigned to a housing area and the position has not been filled in almost a year. The duties of the PREA Coordinator have not been absorbed by anyone else. Supervision of the investigation of PREA complaints was added to the duties of the FIT supervisor due to the departure of the lieutenant who previously oversaw them. He has received additional PREA training. Substantial compliance is not guaranteed by successfully completing a PREA audit once every three years. The only documentation provided for this monitoring period was the policies. No proof as to implementing the requirements of PREA was provided. The Monitor is aware of PREA investigations taking place due to her review of those documents under a different section.

## IV. A. 13.      Access to Information

*A.13. OPSO will ensure that all newly admitted prisoners receive information, through an inmate handbook and, at the discretion of the Jail, an orientation video, regarding the following topics: understanding Facility disciplinary process and rules and regulations; reporting misconduct; reporting sexual abuse or assault; accessing medical and mental health care; emergency procedures; and sending and receiving mail; understanding the visitation process; and accessing the grievance process.*



Finding:

A.    13. Substantial Compliance

Observations:

      Materials were provided indicating the requirements of this paragraph have been met.

**IV. B. Mental Health Care**

Introduction:

      As with past reports, the Monitors rate the compliance levels based on the documents requested and reviewed, observations, discussions during visits, (including this recent virtual visit) review of medical records (141 for this visit), and any additional information provided by the parties.

      The Monitors note very little improvement in performance in many areas of the Consent Judgment since Compliance Tour #11 and regression in some areas. The addition of the Tulane Department of Psychiatry staff and leadership remains an invaluable asset in providing required and consistent psychiatric services for inmates at OJC. There is continuing positive progress with Tulane's interface with Wellpath, however the provision of adequate and timely mental health and medical care and services has declined, as has compliance with suicide prevention training, management, and monitoring.

      Wellpath continues to have difficulty with counting, for example, calculating the mental health caseload consistently and counting the number of patients with acute and chronic disease who need and receive counseling, and tracking discharge medications. Wellpath and OPSO reported Substantial Compliance in all but four of the mental health and medical provisions without necessary documentation and during the COVID pandemic which limited treatment services and treatment planning.  The average daily population (ADP) for OJC including TMH was reported as 799 detainees, with 420 (53%) prescribed psychotropic medications.  Practitioner productivity remains an open question.

      Several paragraphs remain where necessary improvements are required by the Consent Judgment to provide the full range and quality of medical care and mental health/counseling services for inmates incarcerated in OJC and the newly renovated TDC. These concerns are deeply impacted by the lack of progress in developing the required services and programs recommended in 2014, including permanent acute care and step-down programing and services for mental health and acute medical services. There continue

to be no acute care mental health services for women, except via emergency transfer to hospital emergency departments, and limited mental health acute, stepdown and outpatient programmatic activities.

General recommendations are to: continue leadership initiatives and direction by OPSO and Wellpath; continue correctional security staffing to consistently provide adequate and ongoing dedicated support for mental health and medical services; continue to develop full services and continuity of services for both male and female prisoners including all levels of care, staffing and space; and continue to evaluate and pursue full services for mentally ill prisoners, including medication management, and acute, residential, and outpatient care.

The Monitors are concerned that the budgetary cuts in staffing will exacerbate the current serious problems with recruitment and retention of nursing staff at all levels, particularly when it has been so difficult to provide timely services with current staff.  The suicide watch staffing ratios of 1:5 or more are insufficient to provide safe risk mitigation for suicide prevention.  Further, the use of deputies who are untrained in suicide watch compounds the danger.

The Monitors are also concerned about the inability of patients on 2A and 3C to receive the full range of timely and appropriate mental health care including individual and group therapy and counseling in private, as opposed to cell side through the food port, which was in place prior to the initiation of COVID-19 restrictions, and eliminating group therapies and limiting individual contacts for essentially all units since those restrictions have been in place.

The Monitors have very serious concerns regarding suicide training, observations, monitoring and documentation.  Wellpath has exceeded their standard ratios to now have one clinical suicide watcher (Certified Nursing Assts., or Mental Health Technicians) to five inmates on staggered every fifteen-minute suicide precautions. This ratio is very high and difficult for staff to maintain consistency. Inmates requiring Direct Observation require 1:1 observation full time. Wellpath staff are working double shifts/overtime as suicide watchers, however, have not been able to demonstrate keeping up with the needs and OPSO deputies have been providing up to 30% of all watches, without adequate training specifically for duties and responsibilities as suicide prevention observers and monitors. Deputies have been attempting to include suicide monitoring in their more frequent welfare checks, often for inmates housed in non-suicide resistant cells. These modifications are extremely



COMPLIANCE REPORT #14                                              65

problematic, potentially increasing risk of harm, and do not meet Consent Judgment requirements.

OPSO and Wellpath have been following health department guidance on mitigation and containment of transmission of COVID-19.  The Monitors have not been asked for technical assistance in this area.

Specific findings and recommendations regarding medical and mental health services are provided below. For those paragraphs that have previously demonstrated Substantial Compliance the Monitors recommend, encourage, and support the diligent and consistent efforts by OPSO and the medical and mental health providers to continue to demonstrate Substantial Compliance.

### B.  Mental Health Care

*B. OPSO shall ensure constitutionally adequate intake, assessment, treatment, and monitoring of prisoners' mental health needs, including but not limited to, protecting the safety of and giving priority access to prisoners at risk for self-injurious behavior or suicide. OPSO shall assess, on an annual or more frequent basis, whether the mental health services at OPP comply with the Constitution. In order to provide mental health services to prisoners, OPSO, at a minimum, shall:*

Findings:

B. 1. a.  Partial Compliance

B. 1. b.  Partial Compliance

B. 1. c.  Partial Compliance

B. 1. d.  Partial Compliance

B. 1. e.  Partial Compliance

B. 1. f.  Partial Compliance

B. 1. g.  Partial Compliance

B. 1. h.  Substantial Compliance

B. 1. i.  Partial Compliance

B. 1. j.  Partial Compliance

B. 1. k.  Partial Compliance

B. 1. l.  Partial Compliance

*B.1.a. Develop and maintain comprehensive policies and procedures for appropriate screening and assessment of prisoners with mental illness. These policies should include definitions of emergent, urgent, and routine mental health needs, as well as timeframes for the provision of services for each category of mental health needs.*

Finding:

Partial Compliance



Suggestion:

Wellpath revised the screening forms after the monitoring period and implementation has not begun. Wellpath and OPSO should develop and implement policies on de-escalation, as discussed during the visit.

***B.1.b. Develop and implement an appropriate screening instrument that identifies mental health needs, and ensures timely access to a mental health professional when presenting symptoms require such care. The screening instrument should include the factors described in Appendix B. The screening instrument will be validated by a qualified professional approved by the Monitor within 180 days of the Effective Date and every 12 months thereafter, if necessary.***

Finding:

Partial Compliance

***B.1.c. Ensure that all prisoners are screened by Qualified Medical Staff upon arrival to OPP, but no later than within eight hours, to identify a prisoner's risk for suicide or self-injurious behavior. No prisoner shall be held in isolation prior to an evaluation by medical staff.***

Finding:

Partial Compliance

***B.1.d. Implement a triage policy that utilizes the screening and assessment procedures to ensure that prisoners with emergent and urgent mental health needs are prioritized for services.***

Finding:

Partial Compliance

Suggestion:

Wellpath and OPSO to implement revised screening policies for referrals for Special Needs prisoners identified as in need of counseling. CQI study of this provision.

***B.1.e. Develop and implement protocols, commensurate with the level of risk of suicide or self-harm, to ensure that prisoners are protected from identified risks for suicide or self-injurious behavior. The protocols shall also require that a Qualified Mental Health Professional perform a mental health assessment, based on the prisoner's risk.***

Finding:

Partial Compliance

Suggestion:

Deputies have been assigned duties for suicide watches since the last site visit and have been documenting suicide watches in logs rather than required observation forms. Documentation of training, and protocols was provided that began at the end of this monitoring period. Continue to monitor and report use of physical restraints for inmates on suicide watches in IPC and documentation by deputies.

***B.1.f. For prisoners with emergent or urgent mental health needs, search the prisoner and monitor with constant supervision until the prisoner is transferred to a Qualified Mental Health Professional for assessment.***



Finding:

Partial Compliance

Suggestion:

Provide documentation of searches and constant supervision by security until mental health staff arrives and conducts assessment for all emergent and urgent referrals. Include protocols/procedures for searching inmates as soon as safely possible and prior to placement on any form of suicide precautions, watch or Direct Observation, and documentation requirements. Documentation provided reported 26% of searches in January and 40% in March were documented for inmates placed on suicide precautions or watch.

**B.1.g. Ensure that a Qualified Mental Health Professional conducts appropriate mental health assessments within the following periods from the initial screen or other identification of need:**
 **(1) 14 days, or sooner, if medically necessary, for prisoners with routine mental health needs**
 **(2) 48 hours, or sooner, if medically necessary, for prisoners with urgent mental health needs; and**
 **(3) immediately, but no later than two hours, for prisoners with emergent mental health needs.**

Finding:

Partial Compliance

Suggestion:

Policy has changed requiring revised timeframes for completion of referrals and contacts with psychiatrists on weekends. Conduct CQI study to ensure implementation. Continue to provide documentation that inmates in population (after IPC) consistently receive appropriate and complete assessments within the required timeframes, including consultations with psychiatrists during on-call hours. Review and revise Wellpath SOP advising QMHP referrals to psychiatrists on weekends, with OPSO approval, and report results.

**B.1.h. Ensure that a Qualified Mental Health Professional performs a mental health assessment no later than the next working day following any adverse triggering event (i.e., any suicide attempt, any suicide ideation, or any aggression to self, resulting in serious injury).**

Finding:

Substantial Compliance

**B.1.i. Ensure that a Qualified Mental Health Professional, as part of the prisoner's interdisciplinary treatment team, maintains a risk profile for each prisoner on the mental health case load based on the Assessment Factors identified in Appendix B, and develops and implements a treatment plan to minimize the risk of harm to each of these prisoners.**

Finding:

Partial Compliance

Suggestion:



Provide documentation of timeliness of treatment plans for all inmates, including interventions to minimize risk of harm, for the mental health caseload at all levels of care including risk profiles. Include focus on inmates in stepdown and outpatient programs. Expand reviews to include deficiencies in content, diagnoses, planned services, etc. for inmates at all levels of care.

***B.1.j. Ensure adequate and timely treatment for prisoners, whose assessments reveal mental illness and/or suicidal ideation, including timely and appropriate referrals for specialty care and visits with Qualified Mental Health Professionals, as clinically appropriate.***

Finding:

Partial Compliance

Suggestion:

Continue to provide documentation of scheduled and completed adequate and timely treatment for all caseload inmates including rounds and psychosocial handout materials, individual and group therapies and/or counseling, and referrals for specialty services for male and female inmates. This should include prisoners at TDC/TMH, all suicide watches at OJC in all locations including IPC, acute care services for male and female inmates, step down units, and outpatients in population and all restricted housing units. Documentation provided for this monitoring period indicates no group therapies were provided until the latter three months, and then to a very limited number of prisoners in TMH, 2A and the fourth floor. Very limited out of cell and confidential individual counseling was also not provided. Instead, Wellpath reported giving handouts with varying degrees of education required to understand as "group" or "individual" counseling or therapy, rather than in-cell activity. This reporting is highly problematic and disingenuous. The need for necessary and full range of mental health and counseling services for all specified inmates remains.

***B.1.k. Ensure crisis services are available to manage psychiatric emergencies. Such services include licensed in-patient psychiatric care, when clinically appropriate.***

Finding:

Partial Compliance

Suggestion:

OPSO does not have access to any licensed inpatient services for male and female inmates. Provide documentation that all psychiatric emergencies are sent to an emergency department and any crisis is adequately resolved. Provide documentation that all inmates have access to licensed inpatient psychiatric care, when clinically appropriate. The



utilization of TMH and external emergency departments are the current available resources.

***B.1.l. On an annual basis, assess the process for screening prisoners for mental health needs to determine whether prisoners are being appropriately identified for care. Based on this assessment, OPSO shall recommend changes to the screening system. The assessment and recommendations will be documented and provided to the Monitor.***

Finding:

Substantial Compliance

Suggestion:

The report of annual assessment and recommendations of the process for screening prisoners for mental health needs to determine whether inmates are being appropriately identified for care has been provided.

Findings:

B. 2. a.  Partial Compliance

B. 2. b.  Partial Compliance

B. 2. c.  Partial Compliance

B. 2. d. Partial Compliance

B. 2. e.  Substantial Compliance

B. 2. f.   Partial Compliance

B. 2. g.  Substantial Compliance

B. 2. h.  Partial Compliance

***B.2.a. Review, revise, and supplement its existing policies in order to implement a policy for the delivery of mental health services that includes a continuum of services, provides for necessary and appropriate mental health staff, includes a treatment plan for prisoners with serious mental illness, and collects data and contains mechanisms sufficient to measure whether care is being provided in a manner consistent with the Constitution.***

Finding:

Partial Compliance

Suggestion:

Wellpath and OPSO have completed the majority of necessary policies including the use of restraints policies. There is the need for de-escalation policies that include OJC and TMH, as well as programmatic descriptions including the frequency and types of specific, individualized interventions by staff in multidisciplinary treatment team meetings that includes the prisoner. The concerns generated by conflicting information regarding restraints in IPC has been resolved and corrected. Measures for the "denominators" of those inmates in need of counseling services have been formulated but not yet implemented.



***B.2.b. Ensure that treatment plans adequately address prisoners' serious mental health needs and that the treatment plans contain interventions specifically tailored to the prisoner's diagnoses and problems.***

Finding:

Partial Compliance

Suggestion:

Continue progress on documentation in treatment plans at OJC. Provide documentation of individualized treatment plans for men, women, and youthful offenders at all levels of care, including acute care and suicide watches. Treatment plans are not consistently developed by multidisciplinary teams nor consistently include the prisoner in the team meetings

***B.2.c. Provide group or individual therapy services by an appropriately licensed provider where necessary for prisoners with mental health needs.***

Finding:

Partial Compliance

Suggestion:

This provision is dangerously close to noncompliance. Quite clearly, actual group therapies have been suspended for months and individual therapies/contacts have largely been non-confidential cell-front contacts for limited time periods. The resumption of group therapies since January has been severely limited and insufficient to serve the inmates in need.  The efforts to provide contacts and limited services during the pandemic are understood but remain insufficient and problematic. Continue to provide documentation of data and analysis of numbers and percentages of inmates at all levels of care in need of individual and/or group therapies and counseling as well as the numbers and percentages of individual and group services offered and received/completed for inmates in need. Continue to provide numbers of inmates who received counseling for sexual abuse and for those inmates who received counseling for alcohol and drug abuse.  Continue to provide data on Disruption of Services forms and provide analysis of that data and corrective action plans, including staffing and space needs, as necessary.

***B.2.d. Ensure that mental health evaluations that are done as part of the disciplinary process include recommendations based on the prisoner's mental health status.***

Finding:

Partial Compliance

Suggestion:

This process has begun during the previous monitoring period. Data provided indicates 7 of 157 "patients assessed" resulted in placement on a mental health unit. These numbers are



reportedly based on screenings or in-hearing observations rather than pre-hearing assessments relative to charges. The data needs analysis to assess impact of mental health evaluations on disciplinary sanctions. Wellpath still needs to provide policy approved by OPSO regarding mental health participation in the disciplinary process, as well as necessary training for OPSO and Wellpath staff.

***B.2.e. Ensure that prisoners receive psychotropic medications in a timely manner and that prisoners have proper diagnoses and/or indications for each psychotropic medication they receive.***

<u>Finding:</u>

Substantial Compliance

<u>Suggestion:</u>

Continue exceptionally good improvement demonstrated with the addition of Tulane psychiatric providers. Continue to provide documentation and analysis of data that inmates receive psychotropic medications in a timely manner and that inmates have proper diagnosis and/or indications for each psychotropic medication they receive, including particular emphasis on juveniles.

***B.2.f. Ensure that psychotropic medications are administered in a clinically appropriate manner as to prevent misuse, overdose, theft, or violence related to the medication.***

<u>Finding:</u>

Partial Compliance

<u>Suggestion:</u>

As previously reported, medication diversion and/ or contraband continues to be problematic. Reports of prescribed and nonprescribed medications, as well as concerns regarding watch-take procedures require further analysis and corrective actions.

***B.2.g. Ensure that prescriptions for psychotropic medications are reviewed by a Qualified Mental Health Professional on a regular, timely basis and prisoners are properly monitored.***

<u>Finding:</u>

Substantial Compliance

<u>Suggestion:</u>

Continue to provide documentation of data collection and analysis of psychotropic medication prescriptions.

***B.2.h. Ensure that standards are established for the frequency of review and associated charting of psychotropic medication monitoring, including monitoring for metabolic effects of second generation psychotropic medications.***

<u>Finding:</u>

Partial Compliance



Suggestion:

Monitoring for metabolic effects of second- generation psychotropic medications has declined for this monitoring period. Timeliness of laboratory services and associated inmate refusals have become problematic. Wellpath to establish policy/protocols for psychiatric content and frequency of supervisory review, as discussed during visit.

Findings:

B. 3. a.  Non-Compliance

B. 3. b.  Non-Compliance

***B.3.a. OPSO shall develop and implement policies and procedures for prisoner counseling in the areas of general mental health/therapy, sexual-abuse counseling, and alcohol and drug counseling. This should, at a minimum, include some provision for individual services.***

Finding:

Non-Compliance

Suggestion:

From the previous site visit, the request was made to provide documentation of implementation of policies and procedures and modifications or changes in programmatic and other service activities since the COVID pandemic specifically for inmate counseling in the areas of general mental health/therapy, sexual abuse counseling, and alcohol and drug counseling, including some provisions for individual services. Reports indicate very few prisoners in OJC received group or individual counseling during the pandemic, but instead received handouts to read in their cells. In addition, those few who did receive counseling were in non-confidential spaces, including cell side. For example, in January 2021, 175 individual patients received group counseling when the only unit conducting groups was TMH with an average daily census of less than 50. Four prisoners were reported to have received either substance abuse counseling, sexual abuse counseling or domestic violence counseling during January 2021.   Continue to track disruptions of services and percentages of inmates identified as in need compared to those who receive services.

***B.3.b. Within 180 days of the Effective Date, and quarterly thereafter, report all prisoner counseling services to the Monitor, which should include:***
> ***(1)      the number of prisoners who report having participated in general mental health/therapy counseling at OPP;***
> ***(2)      the number of prisoners who report having participated in alcohol and drug counseling services at OPP;***
> ***(3)      the number of prisoners who report having participated in sexual-abuse counseling at OPP; and***
> ***(4)      the number of cases with an appropriately licensed practitioner and related one-to-one counseling at OPP.***



Finding:

Non-Compliance

Suggestion:

This provision is now in non-compliance.  During the previous visit, the Monitors requested accurate and complete data and analysis for the numbers and percentages for inmates with needs for these specific services and numbers and percentages of inmates who receive these services in the actual format, including in-cell and out-of-cell services. The discussions during this visit and the numbers reported were for "individual patients that attended therapy" and included numbers for January thru March which appear inflated for individual and group counseling that consisted of handouts given to patients for in cell reading. During those three months, a total of forty-one patients received "counseling" for substance abuse, sexual abuse, or domestic violence. No denominators to assess the actual numbers of inmates in need of these services was provided for the monitoring period despite prior and continued requests by the Monitors. Compliance has been compromised by the pandemic impact, staffing deficiencies and lack of adequate space.

Findings:

B. 4. a.  Non-Compliance

B. 4. b.  Substantial Compliance

B. 4. c.  Substantial Compliance

B. 4. d.  Non-Compliance

B. 4. e.  Substantial Compliance

B. 4. f.  Substantial Compliance

B. 4. g.  Substantial Compliance

*B.4.a. OPSO shall ensure that all staff who supervise prisoners have the adequate knowledge, skill, and ability to address the needs of prisoners at risk for suicide. Within 180 days of the Effective Date, OPSO shall review and revise its current suicide prevention training curriculum to include the following topics:*
*(1) suicide prevention policies and procedures (as revised consistent with this Agreement);*
*(2) analysis of facility environments and why they may contribute to suicidal behavior;*
*(3) potential predisposing factors to suicide;*
*(4) high-risk suicide periods;*
*(5) warning signs and symptoms of suicidal behavior;*
*(6) case studies of recent suicides and serious suicide attempts;*
*(7) mock demonstrations regarding the proper response to a suicide attempt;*
*(8) differentiating suicidal and self-injurious behavior; and*
*(9) the proper use of emergency equipment.*

Finding:

Non-Compliance



<u>Suggestion:</u>

      For the past two monitoring periods, Wellpath staff who supervise inmates have been tasked with supervising more than three (recommended) as well as more than five (Wellpath practice) inmates on suicide watch, although the frequency of overtime/double shifts has decreased, in part because of the utilization of deputies. However, the use of Direct Observation (requires 1:1 staff to inmate ratio) has been minimal. OPSO has increased the number of suicide resistant cells to 19, located on various units. Because of staffing shortages, OPSO deputies have provided up to 30% of suicide watches. The deputies began receiving adequate training on the requirements of them for suicide watches and documentation at the end of this monitoring period. Assessment of the effectiveness of the training requires further analysis, as episodes of inadequate monitoring continues. Inmates on suicide precautions or watch continue to obtain contraband that can be used to harm themselves. The failures to provide adequate, appropriate, well trained, and supervised suicide prevention and management services is extremely serious.

***B.4.b. Ensure that all correctional, medical, and mental health staff are trained on the suicide screening instrument and the medical intake tool.***

<u>Finding:</u>

Substantial Compliance

<u>Suggestion:</u>

      Continue to provide documentation that multi-disciplinary in-service training has been completed annually for all current correctional, medical, and mental health staff to include training on updated policies, procedures, and techniques.

***B.4.c. Ensure that multi-disciplinary in-service training is completed annually by all correctional, medical, and mental health staff, to include training on updated policies, procedures, and techniques. The training will be reviewed and approved by the Monitor.***

<u>Finding:</u>

Partial Compliance

<u>Suggestion:</u>

      Continue to provide documentation that multidisciplinary in-service training has been completed annually for all current correctional, medical, and mental health staff, to include training on updated policies, procedures, and techniques. OPSO/Wellpath need to provide documentation regarding training for staff on the use of therapeutic restraints. Note: This training was completed prior to the COVID pandemic and the changes in responsibilities for deputies. Updated training should include training on additional duties and responsibilities.



***B.4.d. Ensure that staff are trained in observing prisoners on suicide watch and step-down unit status.***

Finding:

Non-Compliance

Suggestion:

Documentation that current custody staff are trained, specifically, in observing inmates on suicide watch and step-down status was not provided despite repeated requests by the Monitors. Deputies are conducting up to 30% of "suicide watches" as part of their every fifteen-minute welfare checks on various units in OJC and documentation is done in logbooks and not Observation forms. Deputies continued to have varying understanding of the requirements for monitoring inmates while in their cells or out of cell for recreation while on watch. Inmates on suicide watch continue to obtain contraband that can be used to harm themselves. These are practices inconsistent with the Consent Judgment and are potentially highly dangerous.

***B.4.e. Ensure that all staff that have contact with prisoners are certified in cardiopulmonary resuscitation ("CPR").***

Finding:

Substantial Compliance

Suggestion:

Continue to provide documentation that all current staff, (including OPSO and Wellpath) are certified in CPR.

***B.4.f. Ensure that an emergency response bag, which includes a first aid kit and emergency rescue tool, is in close proximity to all housing units. All staff that has contact with prisoners shall know the location of this emergency response bag and be trained to use its contents.***

Finding:

Substantial Compliance

***B.4.g. Randomly test five percent of relevant staff on an annual basis to determine their knowledge of suicide prevention policies. The testing instrument and policies shall be approved by the Monitor. The results of these assessments shall be evaluated to determine the need for changes in training practices. The review and conclusions will be documented and provided to the Monitor.***

Finding:

Substantial Compliance

Note: Documentation of testing of 5% of current relevant staff to determine their knowledge of suicide prevention policies is scheduled for June 2021. Please provide the evaluation of the results, review, and conclusions of testing after COVID changes to determine the need for changes in training practices.



Findings:

B. 5. a.  Partial Compliance

B. 5. b.  Non-Compliance

B. 5. c.  Partial Compliance

B. 5. d.  Substantial Compliance

B. 5. e.  Non-Compliance

B. 5. f.  Partial Compliance

B. 5. g.  Partial Compliance

B. 5. h.  Partial Compliance

B. 5. i.  Substantial Compliance

B. 5. j.  Substantial Compliance

B. 5. k.  Partial Compliance

***B.5.a. OPSO shall implement a policy to ensure that prisoners at risk of self-harm are identified, protected, and treated in a manner consistent with the Constitution.***

Finding:

Partial Compliance

Suggestion:

OPSO and Wellpath continue to reference policies are in place. Provide documentation of implementation of policies for utilization of suicide resistant cells and nonresistant cells (with direct observation), and treatment services provided to inmates at risk for self-harm. Inmates on suicide watch are housed on various units and continue to be placed in non-suicide resistant cells without direct observation. OPSO has increased the number of suicide resistant cells. Clinical staff suicide observers are carrying high patient loads and working extra shifts. Deputies are providing suicide watches with minimal to no documented training in conducting watches and reportedly varying degrees of understanding of their responsibilities.  Contraband and misuse of supplies (blankets, pens, clothing, chemicals, and medications) have been obtained by inmates while on suicide watch or detox protocols. Treatment services are very limited and inadequate for inmates on suicide watch because of staffing and space needs.

***B.5.b. Ensure that suicide prevention procedures include provisions for constant direct supervision of current suicidal prisoners and close supervision of special needs prisoners with lower levels of risk (at a minimum, 15 minute checks). Correctional officers shall document their checks in a format that does not have pre- printed times.***

Finding:

Non-Compliance



<u>Suggestion:</u>

Changes in the suicide prevention program have been notable since the pandemic and restrictions. See comments in IV.B.5a. and other sections of this report. In addition, deputies have been documenting their checks in logbooks and not in compliance with timeliness or content requirements.  Documentation of training that began at the end of this 6-month monitoring period has been provided. Documentation of specific suicide watch procedures in IPC, and documentation of all suicide precautions, watches and direct observations would be helpful as a CQI of this provision and implementation.

***B.5.c. Ensure that prisoners on suicide watch are immediately searched and monitored with constant direct supervision until a Qualified Mental Health Professional conducts a suicide risk assessment, determines the degree of risk, and specifies the appropriate degree of supervision.***

<u>Finding:</u>

Partial Compliance

<u>Suggestion:</u>

Provide documentation that demonstrates that inmates are immediately searched and monitored with constant direct supervision until a QMHP conducts a suicide risk assessment, determines the degree of risk, and specifies the appropriate degree of supervision. This paragraph requires collaboration and documentation by OPSO deputies and Wellpath QMHP's. As per discussion during the visit, specify procedure for search as soon as safely necessary and requires the search of inmate and cell to be completed prior to placement in cell for suicide watch. Documentation provided indicates 26% of inmates in January and 40% of inmates in March were searched as required. These are inmates determined to possibly be at increased risk of self-harm.

***B.5.d. Ensure that all prisoners discharged from suicide precautions receive a follow-up assessment within three to eight working days after discharge, as clinically appropriate, in accordance with a treatment plan developed by a Qualified Mental Health Care Professional. Upon discharge, the Qualified Mental Health Care Professional shall conduct a documented in-person assessment regarding the clinically appropriate follow-up intervals.***

<u>Finding:</u>

Substantial Compliance

<u>Suggestion:</u>

Wellpath staff report improvement in access to inmates for follow-up during lockdowns. Denial of access should not occur and corrective action is recommended to ensure sound confidentiality. Provide documentation of follow-up appointments as required by policy.



***B.5.e. Implement a step-down program providing clinically appropriate transition for prisoners discharged from suicide precautions.***

Finding:

Non-Compliance

Suggestion:

Before the COVID pandemic efforts, placements for male inmates in a true step-down/residential unit and program continued, however the programming was not yet sufficient because of inadequate staffing and space to provide services. Similar services and housing did not exist for female inmates. Since COVID restrictions, group therapies and counseling have been suspended and replaced with clinical staff providing handouts for in-cell reading/activities by inmates. Individual therapies and counseling have been eliminated or largely diminished. Recommend continued vigilance in developing these programs as safety concerns allow.

***B.5.f. Develop and implement policies and procedures for suicide precautions that set forth the conditions of the watch, incorporating a requirement of an individualized clinical determination of allowable clothing, property, and utensils. These conditions shall be altered only on the written instruction of a Qualified Mental Health Professional, except under emergency circumstances or when security considerations require.***

Finding:

Partial Compliance

Suggestion:

Policy is in place. Provide documentation of implementation of policy regarding individualized determinations of the conditions of watch for male and female inmates at OJC (especially for suicide watches/direct observation in non-resistant cells), and at TMH. Provide policy, procedure, and documentation regarding suicide watch in IPC.

***B.5.g. Ensure that cells designated by OPSO for housing suicidal prisoners are retrofitted to render them suicide-resistant (e.g., eliminating bed frames/holes, sprinkler heads, water faucet lips, and unshielded lighting or electrical sockets).***

Finding:

Partial Compliance

Suggestion:

OPSO reports 19 suicide resistant cells for OJC. When non-suicidal resistant overflow cells are utilized, it has been strongly recommended and agreed the inmates in those cells be placed on direct constant observation to best provide for their safety. Please see IV.B.5f. Please review and address suicide resistance fixtures in the women's bathroom/shower area



in TMH.

**B.5.h. Ensure that every suicide or serious suicide attempt is investigated by appropriate mental health and correctional staff, and that the results of the investigation are provided to the Sheriff and the Monitor.**

Finding:

Partial Compliance

Suggestion:

Continue to expand Morbidity and Mortality reviews. These reviews should be structured to conduct clinical investigation, including aggregation of data, self-critical analysis and corrective action plans regarding individual inmate serious injuries or inattention to medical, mental health or dental needs, deaths, or intended death and systemic concerns. The addition of the CQI Workgroup appears to have been helpful but needs to focus more on clinical as well as security systems issues and self-critical analysis.

**B.5.i. Direct observation orders for inmates placed on suicide watch shall be individualized by the ordering clinician based upon the clinical needs of each inmate, and shall not be more restrictive than is deemed necessary by the ordering clinician to ensure the safety and well being of the inmate.**

Finding:

Substantial Compliance

Suggestion:

The issue of suicide watch in IPC and use of a shackle to restrain inmates to a chair has been resolved.

**B.5.j. Provide the Monitor a periodic report on suicide and self-harm at the Facility. These periodic reports shall be provided to the monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. The report will include the following:**
**(1) all suicides;**
**(2) all serious suicide or self-harm attempts; and**
**(3) all uses of restraints to respond to or prevent a suicide attempt.**

Finding:

Substantial Compliance

Suggestion:

OPSO and Wellpath provide periodic reports on suicides, suicide attempts and self-harm. Wellpath has indicated their intent to clarify and determine status of attempts as serious or not. There has been one reported completed suicide for 2020, and none in 2021.There has been no reported use of restraints for this monitoring period.

**B.5.k. Assess the periodic report to determine whether prisoners are being appropriately identified for risk of self-harm, protected, and treated. Based on this assessment, OPSO shall document recommended changes to policies and procedures and provide these to the Monitor.**

Finding:



Partial Compliance

Suggestion:

The OPSO assessment of the periodic reports required in B.5.j., above, has been completed and needs to have an assessment of protection and treatment of inmates, in addition to the numbers identified in each category. The adequacy of protection and monitoring (searches, suicide watch, access to contraband), and adequacy of treatment planning and interventions require analysis of systemic issues.

Findings:

B. 6. a.  Partial Compliance

B. 6. b.  Substantial Compliance

B. 6. c.  Substantial Compliance

B. 6. d.  Partial Compliance

B. 6. e.  Substantial Compliance

B. 6. f.  Substantial Compliance

B. 6. g.  Substantial Compliance

**B.6.a. OPSO shall prevent the unnecessary or excessive use of physical or chemical restraints on prisoners with mental illness.**

Finding:

Partial Compliance

Suggestion:

Wellpath has begun to provide documentation/information regarding use of de-escalation techniques at OJC. Policies are needed regarding de-escalation prior to planned uses of force. OPSO needs to report all uses of physical and chemical restraint.

**B.6.b. Maintain comprehensive policies and procedures for the use of restraints for prisoners with mental illness consistent with the Constitution.**

Finding:

Substantial Compliance

**B.6.c. Ensure that approval by a Qualified Medical or Mental Health Professional is received and documented prior to the use of restraints on prisoners living with mental illness or requiring suicide precautions.**

Finding:

Substantial Compliance

**B.6.d. Ensure that restrained prisoners with mental illnesses are monitored at least every 15 minutes by Custody Staff to assess their physical condition.**

Finding:



Substantial Compliance

***B.6.e. Ensure that Qualified Medical or Mental Health Staff document the use of restraints, including the basis for and duration of the use of restraints and the performance and results of welfare checks on restrained prisoners.***

Finding:

Substantial Compliance

***B.6.f. Provide the Monitor a periodic report of restraint use at the Facility. These periodic reports shall be provided to the monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. Each report shall include:***

> ***(1)A list of prisoners whom were restrained;***
>
> ***(2)A list of any self-injurious behavior observed or discovered while restrained; and***
>
> ***(3)A list of any prisoners whom were placed in restraints on three or more occasions in a thirty (30) day period or whom were kept in restraints for a period exceeding twenty-four (24) hours.***

Finding:

Substantial Compliance

***B.6.g. Assess the periodic report to determine whether restraints are being used appropriately on prisoners with mental illness. Based on this assessment, OPSO shall document recommended changes to policies and procedures and provide these to the Monitor.***

Finding:

Substantial Compliance

Findings:

B. 7. a.  Partial Compliance

B. 7. b.  Substantial Compliance

B. 7. c.  Partial Compliance

B. 7. d.  Substantial Compliance

***7.a. OPSO shall ensure that all staff who supervise prisoners have the knowledge, skills, and abilities to identify and respond to detoxifying prisoners. Within 180 days of the Effective Date, OPSO shall institute an annual in-service detoxification training program for Qualified Medical and Mental Health Staff and for correctional staff. The detoxification training program shall include:***
> ***(1)  annual staff training on alcohol and drug abuse withdrawal;***
> ***(2)  training of Qualified Medical and Mental Health Staff on treatment of alcohol and drug abuse conducted by the Chief Medical Officer or his or her delegate;***
> ***(3)  oversight of the training of correctional staff, including booking and housing unit officers, on the policies and procedures of the detoxification unit, by the Chief Medical Officer or his or her delegate;***
> ***(4)  training on drug and alcohol withdrawal by Qualified Medical and Mental Health Staff;***
> ***(5)  training of Qualified Medical and Mental Health Staff in providing prisoners with timely access to a Qualified Mental Health Professional, including psychiatrists, as clinically appropriate; and***
> ***(6)  training of Qualified Medical and Mental Health Staff on the use and treatment of withdrawals, where medically appropriate.***

Finding:

Partial compliance



Qualified Medical and Mental Health Staff are trained regarding care for patients who have orders for monitoring and treatment of withdrawal.

Medical staff in the IPC, however, are not referring patients with alcohol and/or substance abuse to mental health staff for evaluation for treatment.  Very few patients with these conditions are identified.  For the month of January 2021, for example, only 192 incoming patients were queried, of whom 104 screened positive for alcohol and 73 for drug use.

Suggestion:  Implement the planned revision of the intake screening document to improve identification of patients who might benefit from MH evaluation and treatment.  Reinforce policy, training, and supervision to refer patients who abuse alcohol and other substances to mental health for evaluation for treatment.

**7.b. Provide medical screenings to determine the degree of risk for potentially life-threatening withdrawal from alcohol, benzodiazepines, and other substances, in accordance with Appendix B.**

Finding:

Substantial Compliance

Incoming inmates are screened for withdrawal, in accordance with Appendix B. Wellpath quarterly performance measurement demonstrates sustained compliance. Monitors find Wellpath measurement reliable.

**7.c. Ensure that the nursing staff complete assessments of prisoners in detoxification on an individualized schedule, ordered by a Qualified Medical or Mental Health Professional, as clinically appropriate, to include observations and vital signs, including blood pressure.**

Finding:

Partial Compliance

Wellpath quarterly performance measurement and the Monitor's reliability audits demonstrate that nursing care for patients on the detox protocol has improved overall. For example, all patients are assessed before initiating the detox protocol and patients are more often receiving timely and complete subsequent assessments. This process is monitored daily by the clinical managers and confirmed through the CQI process. However, there are significant lags to first dose of vital medication.  In December 2020, none of the patients reviewed by Wellpath received their first dose timely.  By April 2021, only 60% received a timely first dose.  Nursing assessments are better documented.

Suggestion: Continue to enforce timely and complete assessments for patients who are on the detox protocol.  Complete a process map of the events that take place from the order for



detox medication and the patient's receipt of the first dose, to identify factors that contribute to delay. Develop process improvement plans to improve timelines of the first dose of medication.

***7.d. Annually, conduct a review of whether the detoxification training program has been effective in identifying concerns regarding policy, training, or the proper identification of and response to detoxifying prisoners. OPSO will document this review and provide its conclusions to the Monitor.***

Finding:

Substantial Compliance

An annual review was conducted for 2020, including a discussion of the effectiveness of training (increase in post-test scores, number needing training, etc.).  The evaluation identified the poor timeliness of medication.

Findings:

B. 8. a.  Partial Compliance

B. 8. b.  Substantial Compliance

***8.a. OPSO shall ensure that medical and mental health staffing is sufficient to provide adequate care for prisoners' serious medical and mental health needs, fulfill constitutional mandates and the terms of this Agreement, and allow for the adequate operation of the Facility, consistent with constitutional***

Finding:

Partial Compliance

Medical and mental health staffing is insufficient for most care functions at the current time. There have been systemic delays in access to acute nursing care, health assessments, detox assessments, laboratory testing and nursing assessments.  The suicide watch staffing ratio of one watcher for five or more patients is insufficient and dangerous. WellPath anticipates training deputies who perform suicide watch, including requirements for documentation.  There is no documentation in the medical record that these patients at risk of suicide have been watched.

Suggestion: Fund and authorize MH staff for special programs, as per Wellpath proposal.  Fund and train a sufficient number of suicide watchers to reduce the risk of unnecessary death from suicide.

***8.b. Within 90 days of the Effective Date, OPSO shall conduct a comprehensive staffing plan and/or analysis to determine the medical and mental health staffing levels necessary to provide adequate care for prisoners' mental health needs and to carry out the requirements of this Agreement. Upon completion of the staffing plan and/or analysis, OPSO shall provide its findings to the Monitor, SPLC, and DOJ for review. The Monitor, SPLC, and DOJ will have 60 days to raise any objections and recommend revisions to the staffing plan.***

Finding:



Substantial Compliance

Findings:

B. 9. a.  Partial Compliance

B. 9. b.  Partial Compliance

B. 9. c.  Partial Compliance

B. 9. d.  Partial Compliance

B. 9. e.  Partial Compliance

B. 9. f.  Partial Compliance

*B.9.a. OPSO shall develop, implement, and maintain a system to ensure that trends and incidents involving avoidable suicides and self-injurious behavior are identified and corrected in a timely manner. Within 90 days of the Effective Date, OPSO shall develop and implement a risk management system that identifies levels of risk for suicide and self-injurious behavior and requires intervention at the individual and system levels to prevent or minimize harm to prisoners, based on the triggers and thresholds set forth in Appendix B.*

Finding:

Partial Compliance

Suggestion: Analysis of trends and incidents involving avoidable suicides and self-injurious behaviors to determine required interventions at the individual and system levels to prevent or minimize harm to inmates requires further development, particularly with regard to inmates who have repeated suicidal or self-harming behaviors and the need for revisions in their treatment plans and treatment activities. Incidents of inmates identified as at increased risk continue to obtain access to contraband and/or are not adequately supervised and gain access to mezzanines. Systems analysis should be helpful in identifying consistent protocols to minimize these events.

*B.9.b. The risk management system shall include the following processes to supplement the mental health screening and assessment processes: incident reporting, data collection, and data aggregation to capture sufficient information to formulate a reliable risk assessment at the individual and system levels; identification of at-risk prisoners in need of clinical treatment or assessment by the Interdisciplinary Team or the Mental Health Committee; and development and implementation of interventions that minimize and prevent harm in response to identified patterns and trends.*

Finding:

Partial Compliance

Suggestion: Provide documentation of analysis of risk management system processes including the listed criteria, with more attention to data aggregation and analysis, and development and implementation of interventions that minimize and prevent harm in response to identified patterns and trends. The risk assessments at the individual-level by the Interdisciplinary Treatment Team and at the system-level by the Mental Health



Committee and QI Work Group should include analysis of current practices such as the need for out-of-cell treatment services for inmates on the mental health caseload in segregated housing, and mental health staff participation in the disciplinary process. Wellpath reports knowledge of High Security Containment apparatus that may be helpful for treatment services. The current process for mental health participation in the disciplinary process is during the hearing rather than assessing the inmate before the hearing and generating written recommendations to the Hearing Officer. Since the last visit, OPSO has committed to assist mental health with the provision of out of cell individual and group therapies (as they are resumed).  Further development of the interface of mental health with the disciplinary process, development of Behavioral Management plans for individuals and a possible unit, and identification of at-risk individuals and implementation of interventions for those with longer term incarcerations is anticipated.

*B.9.c. OPSO shall develop and implement an Interdisciplinary Team, which utilizes intake screening, health assessment, and triggering event information for formulating treatment plans. The Interdisciplinary Team shall:*
- *(1)  include the Medical and Nursing directors, one or more members of the psychiatry staff, counseling staff, social services staff, and security staff, and other members as clinical circumstances dictate;*
- *(2)  conduct interdisciplinary treatment rounds, on a weekly basis, during which targeted patients are reviewed based upon screening and assessment factors, as well as triggering events; and*
- *(3)  provide individualized treatment plans based, in part, on screening and assessment factors, to all mental health patients seen by various providers.*

<u>Finding:</u>

Partial Compliance

<u>Suggestion:</u> Provide adequate documentation of completion of mental health Interdisciplinary Treatment Team meetings and rounds, and provision of adequate and timely individualized treatment plans to all mental health patients seen by various providers at OJC and TMH.

*B.9.d. OPSO shall develop and implement a Mental Health Review Committee that will, on a monthly basis, review mental health statistics including, but not limited to, risk management triggers and trends at both the individual and system levels. The Mental Health Review Committee shall:*
- *(1)  include the Medical and Nursing Director, one or more members of the psychiatry staff and social services staff, the Health Services Administrator, the Warden of the facility housing the Acute Psychiatric Unit, and the Risk Manager.*
- *(2)  identify at-risk patients in need of mental health case management who may require intervention from and referral to the Interdisciplinary Team, the OPSO administration, or other providers.*
- *(3)  conduct department-wide analyses and validation of both the mental health and self-harm screening and assessment processes and tools, review the quality of screenings and assessments and the timeliness and appropriateness of care provided, and make recommendations on changes and corrective actions;*
- *(4)  analyze individual and aggregate mental health data and identify trends and triggers*



*that indicate risk of harm;*
*(5)      review data on mental health appointments, including the number of appointments and wait times before care is received; and*
*(6)      review policies, training, and staffing and recommend changes, supplemental training, or corrective actions.*

Finding:

Partial Compliance

Suggestion: Provide documentation of Mental Health Review Committee meetings addressing all of the listed elements, including analysis of the data collected.  See IV.B.9a and b., as well as provisions on suicide prevention, training, observation/management, and documentation.

***B.9.e. OPSO shall develop and implement a Quality Improvement and Morbidity and Mortality Review Committee that will review, on at least a quarterly basis, risk management triggers and trends and quality improvement reports in order to improve care on a Jail-wide basis.***
*(1)   **The Quality Improvement Committee shall include the Medical Director, the Director of Psychiatry, the Chief Deputy, the Risk Manager, and the Director of Training.***
*(2)   **The Quality Improvement Committee shall review and analyze activities and conclusions of the Mental Health Review Committee and pursue Jail-wide corrective actions. The Quality Improvement Committee shall:***
    *i.   **monitor all risk management activities of the facilities through the review of risk data, identification of individual and systemic trends, and recommendation and monitored implementation of investigation or corrective action; and***
    *ii.   **generate reports of risk data analyzed and corrective actions taken.***

Finding:

Partial Compliance

Quality management activities have been curtailed through the deployment of the quality management nurse for other duties.  Some quality management activities have been effective in identifying problems and designing corrective action.  These include dental care disruptions and suicide watch.  However, quality management activities have identified significant opportunities for improvement with no identified corrective action.  These include medication refusal, AIMS testing, mental health treatment plans, asthma care, and laboratory measurements for diabetes and seizure disorder.  The fact that Wellpath is identifying these obstacles to a reasonable level of care is an enormous improvement.  Further, there is some documentation of analysis of these data and corrective action, both improvements, though the documentation could be improved.  The corrective action plans should be more robust, and they should be tracked in a coherent manner over time.

There are other problems apparent to the Monitors and to Plaintiff attorneys that have yet to be recognized by Wellpath and OPSO, including significant numbers of patients



"falling through the cracks" when appropriate care had been intended but never realized.

The Monitors selected 26 recent medical and mental health grievances for review. Fifty percent of answers were unresponsive. The quality management program continues to neglect analysis of grievances for the eight years of the Monitors tenure, notwithstanding the fact that the grievances point directly to the disorganization of the appointment system and medication management. These problems have persisted for the duration of the consent judgment.

Suggestions:

Incorporate performance data, analysis, and trending into QI Committee minutes. Analyze grievance data and incorporate it into the quality management process. Improve analysis and corrective action plans generally, with more specificity for root cause analysis, process design, and effective improvement strategies. Continue to improve reliability of clinical performance measurement. Ensure that the Chief Deputy (or equivalent) and Director of Training participate in meetings, with documentation. Continue to collect and report reliable data on visit disruptions due to the unavailability of custody staff for escort and/or transportation and develop interventions, with accountabilities and timelines, in collaboration with custody staff. Improve responsiveness of answers to grievances. Utilize clinical performance data for management purposes. Continue to improve reliability of clinical performance monitoring. Secure corporate assistance with evaluation methodology.

***B.9.f. OPSO shall review mortality and morbidity reports quarterly to determine whether the risk management system is ensuring compliance with the terms of this Agreement. OPSO shall make recommendations regarding the risk management system or other necessary changes in policy based on this review. The review and recommendations will be documented and provided to the Monitor.***

Finding:

Partial Compliance

We discussed the seven morbidity reviews done between October 2020 and March 2021. The mortality and morbidity reviews remain perfunctory and lack self-critical analysis. Clinical analyses are incomplete, for example among the seven, only one suggested that the suicide attempt might have been prevented had there been a behavior management program at OJC. Otherwise, there was no discussion as to how mental health intervention might have prevented the risky medication ingestions in six of the seven incidents. These reviews are remarkably complacent. Corrective action plans are not well-documented and there is no annual review of findings. No recommendations are made in the periodic



reviews.

Suggestion: Develop a process to assure transparency and self-critical analysis for morbidity reviews. Enhance analysis and problem identification in morbidity and mortality reviews. Improve corrective action plans generally, with specificity for root cause analysis, process design, and effective improvement strategies. Evaluate and report on the effectiveness of the mortality and morbidity review process. Secure corporate assistance on evaluation methodology.

## C.      Medical Care

*C. OPSO shall ensure constitutionally adequate treatment of prisoners' medical needs. OPSO shall prevent unnecessary risks to prisoners and ensure proper medication administration practices. OPSO shall assess on an annual or more frequent basis whether the medical services at OPP comply with the Constitution. At a minimum, OPSO shall:*
*1. Quality Managing of Medication Administration:*
>    *a. Within 120 days of the Effective Date, ensure that medical and mental health staff are trained on proper medication administration practices, including appropriately labeling containers and contemporaneously recording medication administration;*
>    *b. Ensure that physicians provide a systematic review of the use of medication to ensure that each prisoner's prescribed regimen continues to be appropriate and effective for his or her condition;*
>    *c. Maintain medication administration protocols that provide adequate direction on how to take medications, describe the names of the medications, how frequently to take medications, and identify how prisoners taking such medications are monitored; an*
>    *d. Maintain medication administration protocols that prevent misuse, overdose, theft, or violence related to medication.*

Findings:

C.1. a.  Substantial Compliance

C. 1. b.  Partial Compliance

C. 1. c.  Partial Compliance

C. 1. d.  Partial Compliance

Substantial lags to laboratory testing, acute care visits and medication continue through the period ending March 2021. Performance is poor on measurement of A1c hemoglobin in diabetics, antiseizure medication levels, and trough lithium levels; this leads to lags in dose adjustments for life-critical medications. Staff report, anecdotally that there are few backlogs, yet grievances and reports from Plaintiffs' attorneys bely that statement. The lags to laboratory testing and to acute care visits lead to lags to medication. Poor nursing judgment has persisted; this leads to delayed evaluation by the physician and nurse practitioners and prescription of medication and other necessary treatment. Vacancies and reliance on temporary nurses no doubt contribute to weakness in the quality of nursing judgment and care.



There are persistent and significant lags to first dose of medication prescribed for detoxification.

There are lapses in medication administration leading to hoarding and/or diversion. This is documented on contraband logs and ingestions in suicide attempts.

The self-congratulatory annual reports for 2019 and 2020 consistently skirt problems that have been identified in the clinical performance monitoring program, for example the problem with dental escorts, failures to ensure health assessments, persistent laboratory failures, etc.

Suggestions: Continue to improve performance on conformance to chronic disease protocols for medical and psychiatric conditions. Reduce lags to and lapses in medication. Work with custody staff to improve medication administration safety.  Carefully recruit and select a DON with the talent and experience to lead nursing staff as well as collaborate with the rest of the Wellpath team at OJC. Analyze the current nursing allocation to determine if changes to the numbers and mix of skills of personnel need to be made to improve performance. We also suggested that Wellpath review the Nursing Pathway for shortness of breath and consider revisions to include possible cardiovascular conditions.

***C.2.a. Provide the Monitor a periodic report on health care at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. Each report will include:***
> ***(1) number of prisoners transferred to the emergency room for medical treatment related to medication errors;***
> ***(2) number of prisoners taken to the infirmary for non-emergency treatment related to medication errors;***
> ***(3) number of prisoners prescribed psychotropic medications;***
> ***(4) number of prisoners prescribed "keep on person" medications; and***
> ***(5) occurrences of medication variances.***

***C.2.b. Review the periodic health care delivery reports to determine whether the medication administration protocols and requirements of this Agreement are followed. OPSO shall make recommendations regarding the medication administration process, or other necessary changes in policy, based on this review. The review and recommendations will be documented and provided to the Monitor.***

Findings:

C. 2. a.  Substantial Compliance

C. 2. b.  Partial Compliance

Periodic reports are written, but there is no indication that Wellpath has used data to improve timely access to care or medication.  Wellpath reported to the Monitors that health assessments are now up-to-date and that they are fully compliant.  However, Wellpath's own performance monitoring belies that assertion.   In January, timeliness was only 10%, in February it was 100 %. However, in March it fell back to 10 % and in April it is reported at



100%, again. Clearly, Wellpath been unable to demonstrate sustainability on this measure. Failure to perform health assessments poses a risk that medical problems will not be identified, thereby delaying prescription of vital medications.  As discussed above, lapses in medication administration protocols lead to hoarding, diversion, and suicidal ingestions. Lags to medication for withdrawal from alcohol and benzodiazepines poses a lethal risk to patients.

Suggestion: C. 2. b. During the site review we discussed several actions which are being taken to improve safety and proposed consideration of signage about the expectation to remain at the cart until medication is ingested and use of other forms of medication (liquid, depot injection etc.) targeting hoarding and to reduce the workload volume. Develop detailed corrective action plans and act on them.  Periodically evaluate progress and refocus the CAPs when performance is not improving.

*3.a. OPSO shall notify Qualified Medical or Mental Health staff regarding the release of prisoners with serious medical and/or mental health needs from OPSO custody, as soon as such information is available.*
*3.b. When Qualified Medical or Mental Health staff are notified of the release of prisoners with serious medical and/or mental health needs from OPSO custody, OPSO shall provide these prisoners with at least a seven-day supply of appropriate prescription medication, unless a different amount is necessary and medically appropriate to serve as a bridge until prisoners can reasonably arrange for continuity of care in the community.*
*3.c. For all other prisoners with serious medical and/or mental health needs who are released from OPSO custody without advance notice, OPSO shall provide the prisoner a prescription for his or her medications, printed instructions regarding prescription medications, and resources indicating where prescriptions may be filled in the community.*
*3.d. For prisoners who are being transferred to another facility, OPSO shall prepare and send with a transferring prisoner, a transition summary detailing major health problems and listing current medications and dosages, as well as medication history while at the Facility. OPSO shall also supply sufficient medication for the period of transit for prisoners who are being transferred to another correctional facility or other institution, in the amount required by the receiving agency.*

Findings:

C. 3. a.  Substantial Compliance

C. 3. b.  Substantial Compliance

C. 3. c.  Substantial Compliance

C. 3. d.  Substantial compliance

The proportion of patients with serious needs reached continues to increase. Once identified, the patients are receiving either a supply or a prescription that can be filled at no cost; medication pickup rates are reportedly improved. Transfer of information and medication appears to be working well.

Suggestion:

C. 3. a. Improve notifications.



<u>Suggestions:</u>

      C. 3. b. Build on recent progress to increase numbers. Continue to counsel patients face-to-face.

**IV.     D. 1. Sanitation and Environmental Conditions**

<u>Findings:</u>

D.1. a.  Partial Compliance

D. 1. b.  Substantial Compliance

D. 1. c.  Substantial Compliance

D. 1. d.  Partial Compliance

D. 1. e.  Substantial Compliance

D. 1. f.  Partial Compliance

D. 1. g.  Substantial Compliance

D. 1. h.  Substantial Compliance

***IV. D. 1. a. OPSO shall provide oversight and supervision of routine cleaning of housing units, showers, and medical areas. Such oversight and supervision will include meaningful inspection processes and documentation, as well as establish routine cleaning requirements for toilets, showers, and housing units to be documented at least once a week but to occur more frequently.***

<u>Finding:</u>

Partial Compliance

<u>Observations:</u>

      The Monitor physically inspected every occupied housing unit in the OJC and TDC/TMH facilities. The Monitor observed the overall level of cleanliness in the housing units to be generally acceptable with some exceptions noted below.  The Monitor also interviewed the OPSO Sanitarian and Environmental Officer as well as inmates and staff during the inspection itself. The Sanitarian noted that no state inspections had been performed in the previous twelve months due to the pandemic. OPSO was advised that the state would notify them when inspections were to resume.

      OPSO was unable to provide cleaning schedule documentation. The Sanitarian advised that due to the lack of inmate workers, responsibility for routine cleaning of pod areas had been turned over to security staff as noted in the previous inspection. The environmental inspection reports consistently noted cleanliness issues with pod shower areas, communal sink and toilet areas in open dorms, and issues with the storage and security of cleaning supplies kept in the pod areas. The Sanitarian also reported that the



section's staffing levels had decreased during the reporting period and vacancies persisted.

During the tour, inmate showers were specifically viewed by the Monitor. The majority of the showers appeared to be generally clean and free of trash, soap residue and drain flies. Some residual condensation was noted in several showers that had recently been in use.

OPSO continues to provide substantial documentation of monthly housing unit inspections by the Environmental Office as noted above. The documentation continues to show a reduction in the frequency of obstructed cell vents however the Monitor noted at least three housing units with approximately 25% of the cells having obstructed air supply vents. These were primarily in male lockdown units.

The Environmental Inspection reports also reflected that the inspector found the unit mop/chemical closets to be unsecured in some instances. The Monitor found no doors unsecured during the inspection. Several inspection reports did note damaged chemical dispensers in the secure closets indicating that inmates had unsupervised access at some point. Sanitation staff advised that the repair and replacement of the chemical dispensers was a repetitious problem.

During the previous inspection, the Monitor noted several lighting fixtures in the mop closets had been removed and had been advised that inmates had been tampering with the lights by removing the mounting "rods" (all-thread) that secured the lights to the ceilings. The majority of the light fixtures had been replaced as of the May 2021 inspection. Some lights still need to be replaced. The Monitor noted some clutter issues during the inspection, primarily in units with individual cells—this is noted in the Life-Safety inspection reports as well. This has been noted with every inspection and continues to be a challenge primarily for the lockdown inmate populations.

The documentation confirmed the inability of the Sanitarian and Environmental Officer to maintain consistent, regular cleaning schedules due to the COVID pandemic restrictions and staffing challenges.

Grievances regarding sanitation issues were minimal during the rating period. Inmate reports via grievance of inadequate or missing cleaning supplies were consistently low however this was an issue noted in the notes of several "town hall" meetings conducted by the Sanitarian in the housing units. The Monitor spoke with several inmates in various units who complained about cleaning supplies being made routinely available, particularly in



dormitories. When asked about cleaning schedules, the inmates stated there was no set schedule. Pod deputies could not identify a standard schedule either, however the Unit Manager present stated that there was an established schedule…apparently the line staff and inmates were not made aware of the schedule. The Monitor observed that inmates in the dormitory pods were keeping mop buckets and mops in the shower rooms. When asked, the inmates stated that was the only way they could insure they would have access to the equipment. The Monitor noted fewer verbal inmate complaints to the Monitor about not being able to clean, wash clothing, shower and make phone calls during their time out of their cells. The Monitor also observed larger numbers of inmates in dayrooms compared to the previous inspection indicating an easing of the COVID restrictions as more inmates have become vaccinated.

The Monitor found the chemical inventories and material safety sheets to be in order in each area inspected.

As previously noted, regular provision of clean inmate clothing and bedding and appropriate inventory of these supplies are essential to sanitation, infection control and disease prevention. The Sanitarian reported that she was able to maintain an adequate supply of inmate clothing for issue and exchange and that the laundry vendor's performance had improved since the last inspection. The Monitor observed fewer instances of hording issued clothing items and blankets although there were a few examples. One trend noted however, was several inmates fashioning "hoodies" out of altered clothing items. Material fashioned into hoods was actually sewn onto the collars of issued t-shirts with pockets added. The inmates wore these altered items freely and in plain view of staff.

The Monitor noted that new washers and/or dryers had been installed in the dormitory pods. Inmates continue to launder their personal items (e.g., underwear, shorts) in the washing machines and dryers located in each housing unit when allowed. Security staff had implemented a new procedure where inmate workers are assigned to wash inmates' personal items for them overnight in certain lockdown pods. The Monitor recommends that management consider expanding the practice to all lockdown pods. The Monitor reiterates that any inmate workers assigned this task receive proper instruction on the safe handling of the clothing and be issued the proper personal protective equipment.

The Monitor observed the majority of the clothes dryers located in OJC's inmate housing units were generally serviceable although some had effectively non-functional



exhaust lines typically found in the open dormitories—the fewest observed by the Monitor since joining the inspection team.

The Monitor noted that the accumulation of inmates' personal items (paperwork, commissary purchases, and other approved items) was at acceptable levels in most areas. As noted previously, the most problematic areas continue to be the high-security units.

***IV. D. 1. b. Continue the preventive maintenance plan to respond to routine and emergency maintenance needs, including ensuring that showers, toilets, and sink units are adequately installed and maintained. Work orders will be submitted within 48 hours of identified deficiencies, or within 24 hours in the case of emergency maintenance needs.***

Finding:

Substantial Compliance

Observations:

As with previous inspections, the Monitor reviewed the Sanitation and Environmental Conditions report, the OPSO Preventive Maintenance Plan, the Preventive Maintenance Schedule Summary report, and a Preventive Maintenance work orders status report as well as inmate grievances related to maintenance issues. The Monitor also interviewed the Maintenance Director. The documentation reflected an on-going preventive maintenance program for major building systems and components consistent with OPSO policy and the Consent Judgment. Preventive maintenance did not appear to have suffered due to COVID issues and the Maintenance Director confirmed his staff had not been substantially impacted as far as responding to calls for service.

Individual inmate interviews conducted during the walk-thru in each housing unit revealed no significant complaints by inmates regarding water, electric or HVAC services in individual cells that were not addressed in a timely fashion. The Monitor did note several issues with water pressure at the restroom sinks in open dormitory pods and with water fountains in at least two pods. The Monitor did note that one housing unit had an issue throughout with the HVAC system. Fans had been brought in to supplement the air circulation and the issue was corrected by the time the Monitor visited the unit.

As with the previous inspection, there was no marked increase/decrease in the number of grievances received on a monthly basis also indicating that routine issues with basic plumbing, mechanical or electrical services in inmate cells or dayrooms are typically remedied within 48 to 72 hours and that work orders are being submitted in a timely manner as required by the Consent Judgment ("Work orders will be submitted within 48



hours of identified deficiencies, or within 24 hours in the case of emergency maintenance needs").

The issue regarding the inmate intercoms noted in the previous report remains a concern for the Monitor. Inmates noted that intercom calls from the cells were not consistently answered in a timely fashion or at all in some cases. The Monitor noted that intercom equipment at the pod desks and in some of the pod control areas appeared to be missing or broken. The Monitor recommends that Maintenance staff make a comprehensive survey of working/non-working intercom equipment in every housing unit to facilitate repair of the system throughout the facility.

***IV. D. 1. c. Maintain adequate ventilation throughout OPSO facilities to ensure that prisoners receive adequate air flow and reasonable levels of heating and cooling. Maintenance staff shall review and assess compliance with this requirement, as necessary, but no less than twice annually.***

Finding:

Substantial Compliance

Observations:

As noted in previous inspections, adequate air flow is maintained in the facilities but continues to be impeded in a few inmate cells when inmates block the air vents.  The Monitor noted that overall, the number of cells with blocked supply registers had decreased from the previous visit with no housing unit having more than half of the cells observed to be obstructed. However, this remains an inmate supervision issue and must continue to be addressed by security staff consistently. The Monitor noted that the majority of housing dayrooms and cells to be at relatively reasonable levels of heating and cooling, so this section's rating remains in Substantial Compliance.

The following, regarding test and balance reports, is restated from previous reports. As noted in the two previous reports, test, and balance reports for the Kitchen/Warehouse (2014), OJC (2017) and TDC (2012) were the latest available to the Monitor.

Prior to the September 2019 report, this section had been interpreted as requiring comprehensive "test and balance" assessments on a semi-annual basis. Such assessments are very expensive and typically performed only during the commissioning of new or replacement HVAC systems. As with the previous two inspections, the Monitor met with the Maintenance Director specifically to discuss the status and capabilities of the OJC Building Automation System that controls the heating and cooling throughout all occupied areas in OJC. The Maintenance Director provided screenshots of all mechanical, electrical, and



plumbing systems controlled by the BAS demonstrating the real-time monitoring of the systems for the Monitor's review as well as their operating status at the time the screenshots were taken. A report of the system's warning and alarm functions was also generated which reflected no major equipment or systems issues at the time the report was generated. The Monitor inspected the BAS system and noted no alarms or alerts present on the system. The Maintenance Director was again able to provide documentation reflecting work orders generated for the repair/replacement of mechanical system components restoring the system to normal operation. It is the Monitor's opinion that the OJC Building Automation System, as currently operated, meets the intent of the Consent Judgment with regard to this section.

***IV. D. 1. d. Ensure adequate lighting in all prisoner housing units and prompt replacement and repair of malfunctioning lighting fixtures in living areas within five days unless the item must be specially ordered.***

Finding:

Partial Compliance

Observations:

The Monitor observed sufficient lighting being provided in housing units and individual cells of both OJC and TDC. Maintenance staff continue to maintain a supply of replacement bulbs, transformers, or ballasts to repair malfunctioning lighting. However, during the previous inspection the Monitor noted several light fixtures in the pod mop closets that had been removed due to inmate tampering. The replacement of the light fixtures had not been completed in the requisite time frame as of the date of this inspection. The Monitor observed no outstanding electrical work orders beyond routine bulb replacement and the issue noted above.

***IV. D. 1. e. Ensure adequate pest control throughout the housing units, including routine pest control spraying on at least a quarterly basis and additional spraying as needed.***

Finding:

Substantial Compliance

Observations:

A review of the documentation submitted found sufficient evidence of a pest control program that meets the intent of the Consent Judgment. OPSO continues to maintain a pest control contract with a state licensed company for monthly service of all housing areas and bi-weekly service for the Kitchen/Warehouse. Inmate grievances related to pest control were reviewed and found to have been addressed in a timely manner. The Monitor observed



no "drain fly" issues anywhere in the facility except under two transition floor strips in two of the dormitory pods.

Environmental, Sanitation and Life-Safety staff performing inspections and responding to pest control grievances continue to initiate work orders for pest control and to document how, when, and where infestations are identified and remedied.

***IV. D. 1.f. Ensure that any prisoner or staff assigned to clean a biohazardous area is properly trained in universal precautions, outfitted with protective materials, and properly supervised.***

Finding:

Partial Compliance

Observations:

As noted in previous inspections, Policy 1101.07, "Bio-hazardous Spill Cleaning Procedures" [Revised 1/18/2018] Section VIII. A. 1 has been revised to allow properly trained and equipped inmates and deputies to clean-up bio-hazardous spills. Training materials were devised by the Sanitarian. The Sanitarian documented training for three inmates were trained during the rating period and noted there was a shortage of available inmate workers. The Monitor also reviewed training curricula and documentation indicating that during 2020, all pre-service staff received training in bio-hazardous cleanup procedures as part of their initial training in each new-hire class in 2020. Documentation reflected that the in-service training for this requirement had been postponed due to the pandemic. No required in-service training was performed in 2020.

As of November 2018, the Sanitation and/or Environmental Officer is required to be notified of such incidents each business day to enable them to replace any bio-hazardous clean up protective materials used and inspect the area to ensure it was properly cleaned and sanitized. The Sanitarian reported that five such incidents occurred. The Sanitarian was not notified of these incidents so no inspection or verification of who performed the cleanup was performed by the Sanitarian. The Monitor personally inspected the emergency response kits in each pod control room and found all to be properly sealed.

***IV. D. 1. g. Ensure the use of cleaning chemicals that sufficiently destroy the pathogens and organisms in biohazard spills.***

Findings:

Substantial Compliance

Observations:

The Monitor was able to make direct observation that the chemicals on-hand and



available to staff were sufficient to destroy the pathogens and organisms in bio-hazardous spills common in a jail environment to include the COVID-19 virus. The Monitor is continuing to rate this section as being in substantial compliance.

Additionally, the chemical storage inventory documentation submitted demonstrated availability of a consistent supply of the required chemicals being maintained by the designated staff.

***IV. D. 1. h. Maintain an infection control plan that addresses contact, blood borne, and airborne hazards and infections. The plan shall include provisions for the identification, treatment, and control of Methicillin-Resistant Staphylococcus Aureus ("MRSA") at the Facility.***

Findings:

Substantial compliance

Observations:

As with the previous inspection, the Monitor reviewed the OPSO infection control policy 1201.11 as well as the Wellpath Infection Control Program document (rev. 8/30/18) submitted by OPSO. All requisite areas required by the Consent Judgement were addressed, to include MRSA, and included by OPSO for the Monitor's review and found sufficient.

As noted in Report #13, the Monitor was unable to directly observe the handling and sanitation of inmate mattresses in OJC or TDC. No violations were observed during the inspection at either facility. OPSO has previously provided for annual review of the policy and standard operating procedures for the handling of inmate mattresses to include staff and/or inmate sanitation training program that includes mattress cleaning, and chemical use and control. This procedure is specifically required by the Infection Control Plan.

## IV. D. 2. Environmental Control

Findings:

D. 2. a.  Substantial Compliance

D. 2. b.  Substantial Compliance

***IV. D. 2. a. OPSO shall ensure that broken or missing electrical panels are repaired within 30 days of identified deficiencies, unless the item needs to be specially ordered.***

Findings:

Substantial Compliance

Observations:

OPSO Policies 601.02 "Reporting and Addressing Maintenance Needs" and Policy 601.03 "Preventive Maintenance" [August 15, 2016] are implemented. Major electrical



panels at OJC and TMH are located in secure maintenance spaces inaccessible to inmates.

***IV. D. 2. b. Develop and implement a system for maintenance and timely repair of electrical panels, devices, and exposed electrical wires.***

Findings:

Substantial Compliance

Observations:

      The Monitor noted no new issues related to exposed/damaged wiring/cabling during the tour.  The Monitor did happen upon a housing unit where the odor of burning material was noticeably present upon entering the unit. The Unit Manager located an inmate's cell and confiscated a still-burning "wick" made of paper towels. A survey of the wall outlets in the unit revealed one with charring on the faceplate. These outlets are typically de-energized according to the Life-Safety specialist. In this case, the outlets were all found to be energized. The breaker was turned off and the circuit de-energized.

      The Monitor considers this to be sufficient to support a continued finding of Substantial Compliance.

**IV. D. 3. Food Service**

      This report summarizes the findings for the Food Service provisions of the Consent Judgment based on the Monitor's document reviews and tour conducted May 17-20, 2021. The Monitor inspected the Orleans Justice Center (OJC) Kitchen/Warehouse; observed meal service activities; and spoke with OPSO supervisors and deputies, Summit contracted food service employees, and inmates.

      Since the last tour on November 9-12, 2020, OPSO has maintained compliance with the Food Service provisions resulting in sections IV. D. 3. a, IV. D. 3. b., and IV. D. 3. c. of the Consent Judgment remaining in substantial compliance.

Findings:

D. 3. a. Substantial Compliance

D. 3. b. Substantial Compliance

D. 3. c. Substantial Compliance

***IV. D. 3. a. OPSO shall ensure that food service staff, including prisoner staff, continues to receive in-service annual training in the areas of food safety, safe food handling procedures, and proper hygiene, to reduce the risk of food contamination and food-borne illnesses.***

Findings:

Substantial Compliance



<u>Observations:</u>

OPSO and Summit continue to provide documentation of ongoing annual in-service food safety training for staff, including inmate workers, and therefore D. 3. a. remains in Substantial Compliance for the period of October 2020 through March 2021.

***IV. D. 3. b. Ensure that dishes and utensils, food preparation and storage areas, and vehicles and containers used to transport food are appropriately cleaned and sanitized on a daily basis.***

<u>Findings:</u>

Substantial Compliance

<u>Observations:</u>

OPSO and Summit food service management staff have maintained the significant improvements in cleaning and sanitization and the Monitor observed the kitchen to be clean; therefore, D. 3. b. remains in Substantial Compliance for the period of October 2020 through March 2021.

The exteriors of the Igloo style beverage coolers used to dispense water and ice in several of the housing units were found to be dirty, which can lead to contamination of the spout and/or the water or ice contained within the cooler. Although this finding was not of a systemic or critical nature to substantiate a change in the compliance rating, immediate corrective action is needed:

- OPSO should ensure that the Igloo style water coolers are thoroughly and appropriately cleaned and sanitized on a daily basis as required by D. 3. b.

Additionally, in housing unit 3A, the inmates reported that the sink across from the officer's desk and near the microwave had not functioned properly since October 2020, a jail supervisor confirmed that it had been broken for a considerable length of time and that a work order had been submitted. The inmates used a bar of soap to operate the sink and a plastic (trash) bag served as a funnel to fill the Igloo style beverage cooler with water from the sink, which is unhygienic. These sinks should be available to serve as a sanitary sink, during meal service periods. Because this was the only sink of this type that was found to be in disrepair, it will not change the compliance rating for D. 3. b. the period of October 2020 through March 2021. However, future problems related to cleaning and sanitization may result in changes to the compliance rating.

- OPSO should ensure that the sink in housing unit 3A is immediately repaired. The sink should be available for use during meal service periods



and is being used to service the Igloo style water coolers; therefore, the sink must be in good working order, including so that dishes and utensils can be cleaned and sanitized in compliance with D. 3. b. Furthermore, OPSO must ensure that the Igloo style beverage coolers are filled using a sanitary method that complies with the state food code.

***IV. D. 3. c. Check and record on a daily basis the temperatures in the refrigerators, coolers, walk-in refrigerators, the dishwasher water, and all other kitchen equipment with a temperature monitor, to ensure proper maintenance of food service equipment.***

<u>Findings:</u>

Substantial Compliance

<u>Observations:</u>

The Consent Judgment requires that OPSO "Check and record on a daily basis the temperatures in the refrigerators, coolers, walk-in refrigerators, the dishwasher water, and all other kitchen equipment with a temperature monitor, to ensure proper maintenance of food service equipment." The Monitor reviewed the records provided by OPSO and Summit and found that the documented temperatures were within the applicable ranges. During the tour, the Monitor observed and measured food temperatures and found them to be compliant with the state food code.  Additionally, the Monitor randomly asked numerous inmates about meal/food temperatures, and they all responded affirmatively, with only a few stating that they recalled a time or two that the food was not hot.  The Monitor observed that all of the coolers and freezers throughout the kitchen as well as the refrigerator at TMH were at the proper temperatures. Therefore, IV. D. 3. c. remains in Substantial Compliance for the period of October 2020 through March 2021.

## IV. D. 4. Sanitation and Environmental Conditions Reporting

<u>Findings:</u>

D.4. a. Substantial Compliance

D.4. b. Substantial Compliance

***D. 4. a. Provide the Monitor a periodic report on sanitation and environmental conditions in the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. The report will include***
     ***(1) number and type of violations reported by health and sanitation inspectors;***
     ***(2) number and type of violations of state standards;***
     ***(3) number of prisoner grievances filed regarding the environmental conditions at the Facility;***
     ***(4) number of inoperative plumbing fixtures, light fixtures, HVAC systems, fire protection systems, and security systems that have not been repaired within 30 days of discovery;***
     ***(5) number of prisoner-occupied areas with significant vandalism, broken furnishings, or excessive clutter;***



*(6) occurrences of insects and rodents in the housing units and dining halls; and*
*(7) occurrences of poor air circulation in housing units.*

Findings:

Substantial Compliance

Observations:

The July-December 2021 Sanitation and Environmental report was made available to the Monitor prior to the March 2021 inspection tour. The report contained the requisite information spelled out by the Consent Judgement as well as supporting documentation.

***IV. D. 4. b. Review the periodic sanitation and environmental conditions reports to determine whether the prisoner grievances and violations reported by health, sanitation, or state inspectors are addressed, ensuring that the requirements of this Agreement are met. OPSO shall make recommendations regarding the sanitation and environmental conditions, or other necessary changes in policy, based on this review. The review and recommendations will be documented and provided to the Monitor.***

Findings:

Substantial Compliance

Observations:

The Consent Judgment requires a review of the periodic sanitation and environmental conditions reports to ensure issues are addressed along with making recommendations regarding sanitation and environmental conditions and policy changes based upon the review. Such reviews are to be documented and provided to the Monitor. The Monitor reviewed the supporting documentation provided by OPSO and determined that it was sufficient to satisfy the requirements of the Consent Judgment. OPSO provided documentation of the required review and basic analysis of prisoner grievances and inspection violations noted regarding sanitation and environmental conditions during the rating period.

**IV. E. 1. Fire and Life Safety**

Findings:

E.1. a.  Substantial Compliance

E. 1. b.  Substantial Compliance

E. 1. c.  Substantial Compliance

E. 1. d.  Non-Compliance

E. 1. e.  Substantial Compliance

***IV. E. 1. a. Ensure that necessary fire and life safety equipment is properly maintained and inspected at least quarterly. These inspections must be documented.***

Finding:



Substantial Compliance

Observations:

The Monitor was able to conduct a tour of the OJC, TDC/TMH, and the Kitchen/Warehouse facilities during the May 2021 inspection with the Facility Life Safety Officer. The Monitor observed no major issues with the fire and life safety equipment. One fire extinguisher in the Central Plant area was found lacking a current inspection. The Fire Alarm Control Panels in the areas inspected were found to be properly inspected and free of trouble alarms. The issue with a recreation yard door in an OJC pod noted during the previous inspection had been corrected. The Monitor also reviewed all monthly and quarterly inspection documentation as well as outside inspection documentation noting no significant issues and that requisite work orders had been generated when warranted.

Life Safety staff continue to use the "Facility Dude" work order system to maintain the schedule of required inspections. The system notifies the Fire Safety Officer when an inspection is due. OPSO continues to maintain contracts with licensed vendors to complete annual inspections of all fire and life safety equipment. OPSO provided copies of quarterly inspections conducted by the Fire Safety Officer for Kitchen/Warehouse, OJC, and TDC/TMH for the 2020 fourth quarter and first quarter of 2021. This documentation, supported by observations during the compliance tour, indicates that OPSO ensures that necessary fire and life safety equipment is properly maintained and inspected at required intervals. These inspections are conducted by a qualified fire safety officer or a qualified contractor, as required by the Consent Judgment.

***IV. E. 1. b. Ensure that a qualified fire safety officer conducts a monthly inspection of the facilities for compliance with fire and life safety standards (e.g., fire escapes, sprinkler heads, smoke detectors, etc.).***

Finding:

Substantial Compliance

Observations:

The Monitor was provided with the monthly inspection documents for the Kitchen /Warehouse, OJC, and TDC/TMH facilities performed during the current inspection period. The reports are thorough and complete with all noted discrepancies listed with the associated work order number.

***IV. E. 1. c. Ensure that comprehensive fire drills are conducted every six months. OPSO shall document these drills, including start and stop times and the number and location of prisoners who were moved as part of the drills.***



Finding:

Substantial Compliance

Observations:

The Consent Judgment requires comprehensive fire drills every six months. OPSO provided documentation for fire drills for all facilities and shifts conducted during the current rating period. Only "Level 1" drills were conducted (no inmate evacuation) due to COVID 19 restrictions. Documentation reviewed by the Monitor noted in excess of 90% of available OJC and TDC (by squad) had participated in at least one drill during the rating period (most were conducted in December 2020). In addition to the detailed drill reports, the documentation lists, by name, any delinquent staff with the listing provided to senior management for the coordination of make-up training. Pre-service training was provided to all participants in classes held during the rating period.

***IV. E. 1. d. Provide competency-based training to staff on proper fire and emergency practices and procedures at least annually.***

Finding:

Non-Compliance

Observations:

OPSO has developed the requisite policy, training course syllabus/outline and written directives. OPSO training staff provided documentation noting that the required competency-based training on fire and emergency practices had been delayed until December 2020 due to the pandemic crisis. This section was allowed to remain in Substantial Compliance pending the results of training in December. The training did not occur due to COVID related issues, and therefore, is now in non-compliance.

***IV. E. 1. e. Within 120 days of the Effective Date, ensure that emergency keys are appropriately marked and identifiable by touch and consistently stored in a quickly accessible location, and that staff are adequately trained in use of the emergency keys.***

Finding:

Substantial Compliance

Observations:

Inspection reports note the routine verification of the keys and the Fire Safety Officer documents the periodic testing of the keys to verify they are operational. The Fire Safety Officer trains staff on the use of the location and use of the keys during the fire and life safety training curriculum provided to all staff at the training academy.



**IV. E. 2. Fire and Life Safety Reporting**

<u>Findings:</u>

E. 2. a.  Substantial Compliance

E. 2. b.  Substantial Compliance

***IV. E. 2. a. (1) – (3) Provide the Monitor a periodic report on fire and life safety conditions at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date and every six months thereafter until termination of this Agreement. Each report shall include:***
    ***(1) number and type of violations reported by fire and life safety inspectors;***
    ***(2) fire code violations during annual fire compliance tours; and***
    ***(3) occurrences of hazardous clutter in housing units that could lead to a fire.***

<u>Finding:</u>

Substantial Compliance

<u>Observations:</u>

The 2020-2021 Fire and Life Safety Conditions reports generated during the rating period were made available to the Monitor prior to the May 2021 inspection. The reports contained the requisite information spelled out by the Consent Judgment as well as supporting documentation.

***IV. E. 2. b. Review the periodic fire and life safety reports to determine whether the violations reported by fire and life safety inspectors are addressed, ensuring the requirements of this Agreement are being met. OPSO shall make recommendations regarding the fire and life safety conditions, or other necessary changes in policy, based on this review. The review and recommendations will be documented and provided to the Monitor.***

<u>Finding:</u>

Substantial Compliance

<u>Observations:</u>

The Consent Judgment requires a review of the periodic fire and life safety reports to ensure issues are addressed along with making recommendations regarding the fire and life safety conditions and policy changes based upon the review. Such reviews are to be documented and provided to the Monitor.

The Monitor reviewed the supporting documentation provided by OPSO and determined that it was sufficient to satisfy the requirements of the Consent Judgment. OPSO provided documentation of the required review and basic analysis of fire and life safety conditions as well as any necessary changes in policy or procedure.

Previously, the Monitor addressed a change in the method of reporting used by OPSO. This has since been revised by OPSO staff and the Monitor believes a continued finding of Substantial Compliance is justified.



## IV. F. Language Assistance

*F.1.a. OPP shall ensure effective communication with and provide timely and meaningful access to services at OPP to all prisoners at OPP, regardless of their national origin or limited ability to speak, read, write, or understand English. To achieve this outcome, OPP shall:*

    *(1) Develop and implement a comprehensive language assistance plan and policy that complies, at a minimum, with Title VI of the Civil Rights Act of 1964, as amended, (42 U.S.C. § 2000d et seq.) and other applicable law;*

    *(2) Ensure that all OPP personnel take reasonable steps to provide timely, meaningful language assistance services to Limited English Proficient ("LEP") prisoners;*

    *(3) At intake and classification, identify and assess demographic data, specifically including the number of LEP individuals at OPP on a monthly basis, and the language(s) they speak;*

    *(4) Use collected demographic information to develop and implement hiring goals for bilingual staff that meet the needs of the current monthly average population of LEP prisoners;*

    *(5) Regularly assess the proficiency and qualifications of bilingual staff to become an OPP Authorized Interpreter ("OPPAI");*

    *(6) Create and maintain an OPPAI list and provide that list to the classification and intake staff; and*

    *(7) Ensure that while at OPP, LEP prisoners are not asked to sign or initial documents in English without the benefit of a written translation from an OPPAI.*

*F.2.a. OPP shall develop and implement written policies, procedures and protocols for documenting, processing, and tracking of individuals held for up to 48 hours for the U.S. Department of Homeland Security ("DHS");*

*F.2.b Policies, procedures, and protocols for processing 48-hour holds for DHS will:*

    *(1) Clearly delineate when a 48-hour hold is deemed to begin and end;*

    *(2) Ensure that, if necessary, an OPPAI communicates verbally with the OPP prisoner about when the 48-hour period begins and is expected to end;*

    *(3) Provide a mechanism for the prisoner's family member and attorney to be informed of the 48-hour hold time period, using, as needed, an OPPAI or telephonic interpretation service;*

    *(4) Create an automated tracking method, not reliant on human memory or paper documentation, to trigger notification to DHS and to ensure that the 48-hour time period is not exceeded.*

    *(5) Ensure that telephone services have recorded instructions in English and Spanish;*

    *(6) Ensure that signs providing instructions to OPP prisoners or their families are translated into Spanish and posted;*

    *(7) Provide Spanish translations of vital documents that are subject to dissemination to OPP prisoners or their family members. Such vital documents include, but are not limited to:*

        *i.  grievance forms;*

        *ii.  sick call forms;*

        *iii.  OPP inmate handbooks;*

        *iv.  Prisoner Notifications (e.g., rule violations, transfers, and grievance responses) and*

        *v.  "Request for Services" forms.*

    *(8) Ensure that Spanish-speaking LEP prisoners obtain the Spanish language translations of forms provided by DHS; and*

    *(9) Provide its language assistance plan and related policies to all staff within 180 days of the Effective Date of this Agreement.*

*F.3.a. Within 180 days of the Effective Date, OPP shall provide at least eight hours of LEP training to all corrections and medical and mental health staff who may regularly interact with LEP prisoners.*

    *(1) LEP training to OPP staff shall include:*

        *i.  OPP's LEP plan and policies, and the requirements of Title VI and this Agreement;*

        *ii.  how to access OPP-authorized, telephonic and in-person OPPAIs; and*

        *iii.  basic commands and statements in Spanish for OPP staff.*

    *(2) OPP shall translate the language assistance plan and policy into Spanish, and other languages as appropriate, and post the English and translated versions in a public area of the OPP facilities, as well as online.*

    *(3) OPP shall make its language assistance plan available to the public.*

*F.4.*

    *(1) OPP shall ensure that adequate bilingual staff are posted in housing units where DHS detainees and other LEP prisoners may be housed.*



> **(2)** *OPP shall ensure that an appropriate number of bilingual staff are available to translate or interpret for prisoners and other OPP staff. The appropriate number of bilingual staff will be determined based on a staffing assessment by OPP.*

<u>Findings:</u>

F.1. a. Substantial Compliance

F. 2. a.  Substantial Compliance

F. 2. b.  Substantial Compliance

F. 3. a. Partial Compliance

F. 4. Substantial Compliance

<u>Observations</u>:

The Language Assistance Plan required by this paragraph has been prepared and finalized.

While OPSO asserts that DHS and ICE inmates are not detained, OPSO has developed a policy which was submitted to the Monitors which has provisions F. 2. a. and b. into substantial compliance.

OPSO provided documentation regarding the use of the language line. OPSO has provided documentation regarding the number of bilingual staff and the manner in which the needs of language assistance are provided bringing provisions of F. 4. into substantial compliance. The Consent Judgment specifically requires at least eight hours of LEP training to all corrections and mental health staff who may regularly interact with LEP inmates. Provision IV. F. 3. a. is determined in partial compliance as eight hours of  training is not provided. Training of security and medical staff assigned to the IPC should be sufficient.

## IV. G.  Youthful Prisoners

*IV. G. Consistent with the Prison Rape Elimination Act of 2003, 42 U.S.C. § 15601, et seq., and its implementation of regulations, a youthful prisoner shall not be placed in a housing unit in which the youthful prisoner will have sight, sound, or physical contact with any adult prisoner through use of a shared dayroom or other common space, shower area, or sleeping quarters. In areas outside of housing units, OPSO shall either: maintain sight and sound separation between youthful prisoners and adult prisoners, or provide direct staff supervision when youthful prisoners and adult prisoners have sight, sound, or physical contact. OPP shall ensure that youthful prisoners in protective custody status shall have no contact with, or access to or from, non- protective custody prisoners. OPP will develop policies for the provision of developmentally appropriate mental health and programming services.*

<u>Finding:</u>

Substantial Compliance

<u>Observations</u>:

OPSO has provided documentation that its separation of youthful inmates from adult inmates was found in compliance during its recent PREA audit.  A concerted effort has been



made to house all youthful inmates at the juvenile detention facility. When housed at OJC, Tulane is providing developmentally appropriate mental health services to youthful inmates. Travis School continues to provide educational and programming services. The requirement for developmentally appropriate mental health and programming services is separate and apart from PREA.

### VI. A – D. The New Jail Facility and Related Issues

#### A.  New Jail

***The Parties anticipate that Defendant will build a new jail facility or facilities that will replace or supplement the current facility located at 2800 Gravier Street, New Orleans, Louisiana. This Agreement shall apply to any new jail facility.***

<u>Finding:</u>

VI. A. Substantial Compliance.

#### B.  Design and Design Document

***Defendant shall obtain the services of a qualified professional to evaluate, design, plan, oversee, and implement the construction of any new facility. At each major stage of the facility construction, Defendant shall provide the Monitor with copies of design documents.***

<u>Finding:</u>

VI B. Substantial Compliance

<u>Observations</u>:

These provisions apply to the construction of any new facility. Phase III is such a facility. As the City is the entity overseeing the construction of Phase III, OPSO must coordinate with the City to provide copies of design document at each major stage. The City has been providing much more timely access to design documents and information regarding Phase III.

#### C.  Staffing

***Defendant shall consult with a qualified corrections expert as to the required services and staffing levels needed for any replacement facility. OPSO shall complete a staffing study to ensure that any new facility is adequately staffed to provide prisoners with reasonable safety.***

<u>Finding:</u>

VI.C. Substantial Compliance

<u>Observations</u>:

The Consent Judgment requires that the Defendant **shall** consult with a qualified corrections expert as to the required services and staffing levels needed for any replacement facility. The Monitors are concerned whether this will occur with Phase III staffing, but, for now, the paragraph is in substantial compliance.



### D. Compliance with Code and Standards

*Defendant will ensure that the new jail facility will be built in accordance with: (1) the American Correctional Association's standards in effect at the time of construction; (2) the American with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101-12213, including changes made by the ADA Amendments of 2008 (P.L. 110-325) and 47 U.S.C. §§ 225-661, and the regulations there under; and (3) all applicable fire codes and regulations.*

Finding:

Monitors not qualified to evaluate.

Observations:

The Monitors do not have the knowledge or expertise to evaluate compliance with this paragraph. OPSO asserts that it is in compliance with this provision, without offering documentation. Documentation from the architect would be sufficient.

### VII. Compliance and Quality Improvement

### VII. A. Policies, Procedures, Protocols, Training Curriculum and Practices

*Within 120 days of the Effective Date, OPSO shall revise and/or develop its policies, procedures, protocols, training curricula, and practices to ensure that they are consistent with, incorporate, address, and implement all provisions of this Agreement. OPSO shall revise and/or develop, as necessary, other written documents, such as screening tools, logs, handbooks, manuals, and forms, to effectuate the provisions of this Agreement. OPSO shall send pertinent newly drafted and revised policies and procedures to the Monitor as they are promulgated. The Monitor will provide comments on the policies to OPSO, SPLC, and DOJ within 30 days.*

*OPSO, SPLC, and DOJ may provide comments on the Monitor's comments within 15 days. At that point, the Monitor will consider the Parties' comments, mediate any disputes, and approve the policies with any changes within 30 days. If either party disagrees with the Monitor, they may bring the dispute to the Court. OPSO shall provide initial and in-service training to all Facility staff with respect to newly implemented or revised policies and procedures. OPSO shall document employee review and training in new or revised policies and procedures.*

Finding:

VII. A. Substantial Compliance

Observations:

OPSO has now completed the development of the required policies. OPSO is making progress in the development of procedures and lesson plans.

### VII. (H). B.  Written Quality Improvement Policies and Procedures

*Within 180 days of the Effective Date, Defendant shall develop and implement written quality improvement policies and procedures adequate to identify serious deficiencies in protection from harm, prisoner suicide prevention, detoxification, mental health care, environmental health, and fire and life safety in order to assess and ensure compliance with the terms of this Agreement on an ongoing basis. Within 90 days after identifying serious deficiencies, OPSO shall develop and implement policies and procedures to address problems that are uncovered during the course of quality improvement activities. These policies and procedures shall include the development and implementation of corrective action plans, as necessary, within 30 days of each biannual review.*

Finding:



VII. B. Partial compliance

Observations:

     OPSO has provided documentation that it is now developing plans to identify serious deficiencies, and to address problems that are uncovered during the course of quality improvement activities to warrant a finding of partial compliance. These plans need to contain specific performance measures, timelines, and persons responsible. They also need to be implemented with appropriate development of corrective action to be taken and the auditing of adherence to the action plan.

### VII. (I). C. Full-Time Compliance Coordinator

*The Parties agree that OPSO will hire and retain, or reassign a current OPSO employee for the duration of this Agreement, to serve as a full-time OPSO Compliance Coordinator. The Compliance Coordinator will serve as a liaison between the Parties and the Monitor and will assist with OPSO's compliance with this Agreement. At a minimum, the Compliance Coordinator will: coordinate OPSO's compliance and implementation activities; facilitate the provision of data, documents, materials, and access to OPSO's personnel to the Monitor, SPLC, DOJ, and the public, as needed; ensure that all documents and records are maintained as provided in this Agreement; and assist in assigning compliance tasks to OPSO personnel, as directed by the Sheriff or his or her designee. The Compliance Coordinator will take primary responsibility for collecting information the Monitor requires to carry out the duties assigned to the Monitor.*

Finding:

Substantial Compliance

Observations:

The Compliance Coordinator resigned in July 2021. While some of her duties were reassigned to other staff members, this is insufficient both as to the requirement of the Consent Judgment and the performance of the duties required.

### VII. (J.) D. Self-Assessment

*On a bi-annual basis, OPSO will provide the public with a self-assessment in which areas of significant improvement or areas still undergoing improvement are presented either through use of the OPSO website or through issuance of a public statement or report.*

Finding:

Substantial Compliance

Observations:

     During the monitoring period, no town hall meetings were held. The holding of those meetings and posting the PowerPoint presentations at those meetings brought OPSO into substantial compliance. OPSO will remain in substantial compliance due to the posting of the self-assessment although it appears to present a distorted view of areas needing improvement. It is acceptable as long as the current Compliance Report is also posted on the website in the same area.



## VIII. Reporting Requirements and Right of Access

## VIII. A. Periodic Compliance Reporting

***OPSO shall submit periodic compliance reports to the Monitor. These periodic reports shall be provided to the Monitor within four months from the date of a definitive judgment on funding; and every six months thereafter until termination of this Agreement. Each compliance report shall describe the actions Defendant has taken during the reporting period to implement this Agreement and shall make specific reference to the Agreement provisions being implemented. The report shall also summarize audits and continuous improvement and quality assurance activities, and contain findings and recommendations that would be used to track and trend data compiled at the Facility. The report shall also capture data that is tracked and monitored under the reporting provisions of the following provisions: Use of Force; Suicide Prevention; Health Care Delivered; Sanitation and Environmental Conditions; and Fire and Life Safety.***

Finding:

Substantial Compliance

Observations:

The reports provided by OPSO are now sufficient to address the requirements of this provision.

## VIII. B.  (Notification of) Death of Any Prisoner

***OPSO shall, within 24 hours, notify the Monitor upon the death of any prisoner. The Monitor shall forward any such notifications to SPLC and DOJ upon receipt. OPSO shall forward to the Monitor incident reports and medical and/or mental health reports related to deaths, autopsies, and/or death summaries of prisoners, as well as all final SOD and IAD reports that involve prisoners. The Monitor shall forward any such reports to SPLC and DOJ upon receipt.***

Finding:

Substantial Compliance

## VIII. C. Records

***Defendant shall maintain sufficient records to document that the requirements of this Agreement are being properly implemented and shall make such records available to the Monitor within seven days of request for inspection and copying. In addition, Defendant shall maintain and provide, upon request, all records or other documents to verify that they have taken the actions described in their compliance reports (e.g., census summaries, policies, procedures, protocols, training materials, investigations, incident reports, tier logs, or use of force reports).***

Finding:

Substantial Compliance

Observations:

OPSO now generally provides responses with seven days of a request by the Monitors. There have been several times when the incidents notifications are not reported within seven days. The monthly reports provided to the Monitors greatly decreases the need for document requests.

## III.  Stipulated Orders



OPSO and the Plaintiffs/DOJ negotiated two agreements after Compliance Report #3. The language of the Stipulated Orders was linked directly to the Consent Judgment and represented priority areas for inmate safety. Some of them required a one-time action such the posting of a memorandum or providing of training by a specific date. Some of the provisions of the Stipulated Order of February 11, 2015, contain on-going obligations that are in addition to the Consent Judgment or clarify the obligations under the Consent Judgment.

The three provisions of the April 22, 2015 are in substantial compliance and contained provisions that were to be accomplished by specific dates during April 2015. As those dates have passed, the Monitors no longer monitor those provisions. Two of the provisions in the Stipulated Order of February 11, 2015, require additional attention. The provisions of the Stipulated Order of February 11, 2015, which require ongoing compliance are 1. a-c. 5. b., 6. a., and 7. a. and b. The provisions that are not in substantial compliance are addressed below.

***1. c. Within 24 hours of the occurrence of any of the following incident, OPSO shall notify the Monitor via email:***
- ***Death of an inmate/arrestee while held in custody (or housed in a hospital to which the inmate has been committed for care and retain in the custody of OPSO; or whose injury occurred while in custody and was subsequently released from custody);***
- ***An inmate's/arrestee's suicide, suicide attempt, aborted suicide attempt, suicidal intent, and/or deliberate suicide self-harm gesture as defined by the American Psychiatric Association;***
- ***An inmate's allegation of sexual abuse, sexual assault, sexual harassment, or voyeurism whether the incident is between or among inmates, or between or among inmates and a staff/contractor or volunteer;***
- ***An inmate's report, or a report by a staff/contractor or volunteer, of any inmate/inmate allegation of assault; or other inmate allegation of felonies occurring to them while in custody;***
- ***An Inmate's report of a report by a staff/contractor or volunteer, of any allegation of excessive force by an employee, volunteer or contractor;***
- ***Suspension or arrest of any OPSO employee, volunteer, or contractor for alleged criminal activities while on-duty and/or in a facility under the control of OPSO; and***
- ***Any recovery of significant contraband, specifically weapons.***

Finding:

Partial Compliance

Observations:

OPSO complies with the first bullet points, but it is usually verbally as opposed to by email as required. OPSO is not in compliance with the reporting of the other incidents, including suicides and suicide attempts, and items with 24 hour by email. At best, the Monitor learns of some of the items through incident reports, review of investigations and newspaper reports. OPSO should put in place a system to comply with this provision.



*6. a. By February 15, 2015, in order that the housing for youthful offenders is continually staffed by a deputy, OPSO will assure that a deputy is working on every shift, on every day on the unit housing youthful offenders. This deputy may not be assigned to other tiers or other responsibilities, and shall be periodically relieved by another deputy and/or supervisor. The evidence of compliance with this document will be the staffing assignments each day, each shift for the facility in which youthful offenders are held, and samples of the log books from that unit.*

<u>Finding</u>:

Partial Compliance

<u>Observations</u>

There are times that the housing units for youthful offenders are not staffed continuously. The housing unit is usually made a mandatory post in the staffing assignments, but the deputy leaves without having been relieved by another deputy or supervisor.



Appendix A: Summary of Compliance Findings by Compliance Section Reports 1 - 14

| | Report # 1 2/13/14 | Report # 2 8/26/14 | Report # 3 2/25/15 | Report # 4 9/9/15 | Report # 5 3/17/16 | Report # 6 10/25/16 | Report # 7 5/1/17 | Report # 8 1/12/18 | Report # 9 8/25/18 | Report # 10 3/18/19 | Report # 11 9/19/19 | Report # 12 3/6/20 | Report # 13 11/16/20 | Report # 14 5/17/21 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **IV.A. 1. Use of Force Policies and Procedures/Margo Frasier** | | | | | | | | | | | | | | |
| IV. A. 1.a. | ND | NC | NC | PC | NC | PC | PC | PC | PC | SC | SC | SC | SC | PC |
| IV. A. 1.b. | ND | NC | NC | PC | NC | PC | PC | PC | SC | SC | SC | SC | SC | SC |
| IV. A. 1.c. | ND | NC | NC | PC | NC | NC | PC | PC | PC | SC | SC | PC | PC | PC |
| **IV.A.2. Use of Force Training/Margo Frasier and Shane Poole** | | | | | | | | | | | | | | |
| IV. A. 2. a. | ND | NC | NC | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC | PC |
| IV. A. 2. b. | ND | NC | NC | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC | PC |
| IV. A. 2. c. | ND | NC | NC | NC | NC | NC | NC | NC | PC | PC | SC | SC | SC | PC |
| **IV.A.3. Use of Force Reporting/Margo Frasier** | | | | | | | | | | | | | | |
| IV. A.3 a. | ND | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | PC | PC | SC |
| IV. A.3 b. | ND | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC |
| IV. A.3 c. | ND | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC |
| IV. A.3 d. | ND | NC | NC | PC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV. A.3 e. | ND | NC | NC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC |
| IV. A.3 f. | ND | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV. A.3 g. | ND | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC |
| IV. A.3 h. | ND | NC | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC | PC | SC |
| **IV.A.4. Early Intervention System ("EIS") /Margo Frasier and Shane Poole** | | | | | | | | | | | | | | |
| IV.A.4.a. | ND | NC | NC | PC | PC | PC | NC | NC | PC | PC | SC | SC | SC | SC |
| IV.A.4.b. | ND | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | PC |
| IV.A.4.c. | ND | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC |
| IV.A.4.d. | NC | NC | NC | NC | NC | PC | PC | NC | PC | PC | SC | SC | SC | SC |
| IV.A.4.e. | ND | ND | ND | ND | NC | NC | NC | NC | NC | SC | SC | SC | SC | SC |
| **IV.A.5. Safety and Supervision/Margo Frasier** | | | | | | | | | | | | | | |
| IV.A.5.a. | ND | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC |
| IV.A.5.b. | ND | NC | NC | NC | NC | NC | NC | NC | PC | PC | SC | SC | SC | SC |
| IV.A.5.c. | ND | NC | NC | NC | NC | NC | NC | PC | PC | SC | SC | SC | SC | SC |
| IV.A.5.d. | NC | NC | PC | PC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC |
| IV.A.5.e. | ND | NC | NC | NC | PC | NC | NC | NC | NC | PC | PC | PC | PC | PC |
| IV.A.5.f. | ND | NC | NC | PC | PC | SC | SC | PC | PC | PC | PC | PC | PC | PC |
| IV.A.5.g. | ND | NC | ND | NC | PC | PC | NC | NC | NC | PC | SC | SC | SC | SC |
| IV.A.5.h. | ND | NC | NC | NC | NC | NC | NC | NC | PC | PC | SC | SC | PC | PC |
| IV.A.5.i. | ND | NC | NC | PC | PC | PC | PC | PC | SC | PC | PC | PC | PC | PC |
| IV.A.5.j. | ND | NC | PC | PC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC |
| IV.A.5.k. | ND | NC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | PC | PC |
| IV.A.5.l. | ND | NC | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC | PC | PC |
| **IV.A.6. Security Staffing/Margo Frasier** | | | | | | | | | | | | | | |
| IV.A.6.a. | ND | PC | PC | SC | SC | PC | PC | PC | SC | SC | SC | SC | PC | PC |
| IV.A.6.b. | ND | NC | PC | PC | NC | PC | PC | PC | PC | SC | SC | SC | PC | PC |
| **IV.A.7 Incidents and Referrals/Margo Frasier** | | | | | | | | | | | | | | |
| IV.A.7.a. | ND | NC | NC | NC | NC | PC | PC | PC | PC | SC | SC | SC | SC | SC |
| IV.A.7.b. | ND | NC | NC | PC | NC | PC | PC | PC | PC | PC | SC | SC | PC | SC |
| IV.A.7.c. | ND | NC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC |



Appendix A: Summary of Compliance Findings by Compliance Section Reports 1 - 14

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IV.A.7.d. | ND | NC | NC | NC | NC | NC | NC | PC | PC | PC | SC | SC | SC | SC |
| IV.A.7.e. | ND | NC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | PC | SC |
| IV.A.7.f. | ND | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC |
| IV.A.7.g. | ND | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC |
| IV.A.7.h. | ND | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC |
| IV.A.7.i. | ND | NC | NC | PC | NC | NC | NC | NC | NC | PC | SC | SC | SC | SC |
| IV.A.7.j. | ND | NC | NC | NC | NC | NC | NC | NC | NC | SC | SC | SC | SC | SC |
| **IV.A.8. Investigations/Margo Frasier** | | | | | | | | | | | | | | |
| IV.A.8.a. | ND | NC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.8.b. | ND | NC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.8.c. | ND | NC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.8.d. | ND | NC | NC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.8.e. | ND | NC | NC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.8.f. | ND | NC | NC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC |
| **IV.A.9. Pretrial Placement in Alternative Settings/Margo Frasier** | | | | | | | | | | | | | | |
| IV.A.9.a. | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.9.b. | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| **IV.A.10. Custodial Placement within OPP/Patricia Hardyman** | | | | | | | | | | | | | | |
| IV.A.10.a. | NC | PC | SC | SC | SC | PC | PC | PC | PC | SC | SC | SC | SC | SC |
| IV.A.10.b. | NC | NC | NC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.10.c. | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.10.d. | NC | NC | PC | PC | PC | PC | NC | PC | SC | PC | PC | SC | SC | SC |
| IV.A.10.e. | NC | NC | PC | SC | PC | PC | SC | PC | PC | PC | PC | PC | SC | PC |
| IV.A.10.f. | NC | NC | NC | NC | NC | PC | PC | PC | NC | SC | PC | PC | PC | PC |
| IV.A.10.g. | NC | NC | NC | NC | NC | PC | PC | SC | PC | SC | SC | SC | SC | SC |
| IV.A.10.h. | ND | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC | PC | SC |
| **IV..A.11. Prisoner Grievance Process/Margo Frasier and Shane Poole** | | | | | | | | | | | | | | |
| IV.A.11.a | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | | | | |
| IV.A.11.a.(1) | | | | | | | | | | | SC | SC | SC | SC |
| IV.A.11.a.(2) | | | | | | | | | | | PC | PC | PC | PC |
| IV.A.11.a.(3) | | | | | | | | | | | SC | SC | SC | SC |
| IV.A.11.a.(4) | | | | | | | | | | | SC | SC | SC | SC |
| IV.A.11.a.(5) | | | | | | | | | | | SC | SC | SC | SC |
| IV.A.11.a.(6) | | | | | | | | | | | PC | PC | SC | SC |
| **IV.A.12. Sexual Abuse/Margo Frasier** | | | | | | | | | | | | | | |
| IV.A.12. | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | PC |
| **IV.A.13. Access to Information/Margo Frasier** | | | | | | | | | | | | | | |
| IV.A.13. | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC |
| **IV. B. Mental Health Care** | | | | | | | | | | | | | | |
| **IV.B.1. Screening and Assessment/Raymond Patterson** | | | | | | | | | | | | | | |
| IV.B.1.a. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | PC | PC |
| IV.B.1.b. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | PC |
| IV.B.1.c. | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | PC |
| IV.B.1.d. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | PC | PC |
| IV.B.1.e. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | PC | PC |
| IV.B.1.f. | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC |
| IV.B.1.g. | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC |
| IV.B.1.h. | NC | NC | NC | NC | NC | NC | NC | NC | PC | SC | SC | SC | SC | SC |



Appendix A: Summary of Compliance Findings by Compliance Section Reports 1 - 14

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IV.B.1.i. | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC |
| IV.B.1.j. | NC | NC | NC | PC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC |
| IV.B.1.k. | NC | NC | NC | PC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC |
| IV.B.1.l. | NC | NC | NC | NC | NC | NC | NC | NC | NC | SC | SC | SC | PC | PC |
| **B. 2. Treatment/Raymond Patterson** | | | | | | | | | | | | | | |
| IV.B.2.a. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.2.b. | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC |
| IV.B.2.c. | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC |
| IV.B.2.d. | NC | NC | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC |
| IV.B.2.e. | NC | NC | NC | PC | PC | PC | NC | NC | NC | PC | SC | SC | SC | SC |
| IV.B.2.f. | NC | NC | NC | PC | PC | PC | NC | PC | PC | PC | SC | PC | PC | PC |
| IV.B.2.g. | NC | NC | NC | PC | PC | PC | NC | PC | PC | SC | SC | SC | SC | SC |
| IV.B.2.h. | NC | NC | NC | PC | PC | PC | PC | PC | NC | PC | SC | SC | PC | PC |
| **IV.B.3. Counseling/Raymond Patterson** | | | | | | | | | | | | | | |
| IV.B.3.a. | NC | NC | NC | PC | NC | NC | NC | PC | PC | PC | PC | PC | PC | NC |
| IV.B.3.b. | NC | NC | NC | NC | PC | NC | NC | PC | PC | PC | PC | PC | PC | NC |
| **IV.B.4. Suicide Prevention Training Program/Raymond Patterson** | | | | | | | | | | | | | | |
| IV.B.4.a. | NC | NC | NC | PC | PC | PC | PC | PC | NC | PC | PC | PC | NC | NC |
| IV.B.4.b. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC |
| IV.B.4.c. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC |
| IV.B.4.d. | NC | NC | NC | PC | NC | NC | NC | NC | NC | PC | PC | PC | NC | NC |
| IV.B.4.e. | NC | NC | NC | PC | NA | PC | PC | PC | PC | PC | PC | SC | SC | SC |
| IV.B.4.f. | NC | NC | NC | NC | PC | PC | NC | NC | SC | SC | SC | SC | SC | SC |
| IV.B.4.g. | NC | NC | NC | SC | PC | NC | NC | NC | NC | PC | NC | PC | SC | SC |
| **IV.B.5. Suicide Precautions/Raymond Patterson** | | | | | | | | | | | | | | |
| IV.B.5.a. | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.5.b. | NC | NC | NC | NC | NC | NC | NC | PC | PC | SC | PC | PC | NC | NC |
| IV.B.5.c. | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.5.d. | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | SC | SC | SC | SC |
| IV.B.5.e. | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | NC | NC |
| IV.B.5.f. | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | SC | SC | PC | PC |
| IV.B.5.g. | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC |
| IV.B.5.h. | NC | NC | NC | NC | NC | NC | NC | PC | NC | PC | PC | SC | SC | PC |
| IV.B.5.i. | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | SC | SC | SC | SC |
| IV.B.5.j. | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | SC | SC | SC |
| IV.B.5.k. | NC | NC | NC | NC | NC | NC | NC | PC | NC | PC | PC | PC | PC | PC |
| **IV.B.6. Use of Restraints/Raymond Patterson** | | | | | | | | | | | | | | |
| IV.B.6.a. | PC | NC | PC | PC | PC | PC | PC | PC | NC | PC | PC | PC | PC | PC |
| IV.B.6.b. | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC |
| IV.B.6.c. | ND | NC | PC | PC | PC | PC | PC | PC | NC | NC | SC | SC | SC | SC |
| IV.B.6.d. | ND | NC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | PC | PC |
| IV.B.6.e. | NC | NC | PC | PC | PC | PC | PC | PC | NC | NC | SC | SC | SC | SC |
| IV.B.6.f. | NC | NC | PC | PC | PC | PC | PC | PC | NC | PC | SC | SC | SC | SC |
| IV.B.6.g. | NC | NC | PC | PC | PC | PC | PC | PC | NC | PC | NC | SC | SC | SC |
| **IV.B.7. Detoxification and Training/Robert Greifinger** | | | | | | | | | | | | | | |
| IV.B.7.a. | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC |
| IV.B.7.b. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC |
| IV.B.7.c. | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |



Appendix A: Summary of Compliance Findings by Compliance Section Reports 1 - 14

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IV.B.7.d. | NC | NC | PC | PC | PC | PC | PC | PC | PC | NC | PC | PC | PC | SC |
| **IV.B.8. Medical and Mental Health Staffing/Robert Greifinger** | | | | | | | | | | | | | | |
| IV.B.8.a. | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.8.b. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC |
| **IV.B.9. Risk Management/Robert Greifinger** | | | | | | | | | | | | | | |
| IV.B.9.a. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.9.b. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.9.c. | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.9.d. | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC |
| IV.B.9.e. | NC | NC | NC | NC | PC | PC | PC | PC | NC | PC | PC | PC | PC | PC |
| IV.B.9.f. | NC | NC | NC | NC | PC | PC | PC | PC | NC | NC | PC | PC | PC | PC |
| **IV.C. Medical Care See SA 2/11/15 13.** | | | | | | | | | | | | | | |
| **IV. C. Quality Management of Medication Administration** | | | | | | | | | | | | | | |
| IV.C.1.a. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC |
| IV.C.1.b. | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.C.1.c. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | PC |
| IV.C.1.d. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | PC |
| **IV.C.2. Health Care Delivered/Robert Greifinger** | | | | | | | | | | | | | | |
| IV.C.2.a. | NC | NC | NC | PC | PC | PC | PC | PC | PC | NC | PC | PC | SC | SC |
| IV.C.2.b. | NC | NC | NC | PC | PC | PC | PC | PC | PC | NC | PC | PC | PC | PC |
| **IV.C.3. Release and Transfer/Robert Greifinger** | | | | | | | | | | | | | | |
| IV.C.3.a. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC |
| IV.C.3.b. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC |
| IV.C.3.c. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC |
| IV.C.3.d. | NC | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC |
| **IV.D. Sanitation and Environmental Conditions/Shane Poole** | | | | | | | | | | | | | | |
| IV.D. 1.a. | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC |
| IV. D. 1.b. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC |
| IV. D. 1.c. | NC | NC | PC | PC | NC | NC | NC | SC | PC | SC | SC | SC | SC | SC |
| IV. D. 1.d. | NC | NC | NC | NC | SC | SC | SC | SC | SC | SC | SC | SC | PC | PC |
| IV. D. 1.e. | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC |
| IV. D. 1.f. | NC | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | PC |
| IV. D. 1.g. | NC | NC | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC |
| IV. D. 1.h. | NC | NC | NC | PC | NC | PC | NC | NC | NC | PC | PC | PC | SC | SC |
| **IV. D. 2. Environmental Control/Shane Poole** | | | | | | | | | | | | | | |
| IV. D. 2.a. | NC | NC | PC | PC | PC | SC | SC | SC | PC | SC | SC | SC | SC | SC |
| IV. D. 2.b. | NC | NC | NC | NC | NC | SC | PC | SC | SC | SC | SC | SC | SC | SC |
| **IV. D. 3. Food Service/Diane Skipworth** | | | | | | | | | | | | | | |
| IV. D. 3.a. | NC | NC | NC | PC | PC | PC | NC | PC | PC | SC | SC | SC | SC | SC |
| IV. D. 3.b. | NC | NC | NC | PC | PC | NC | NC | NC | NC | NC | PC | SC | SC | SC |
| IV. D. 3.c. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC |
| **IV. D. 4. Sanitation and Environmental Conditions Reporting/Shane Poole** | | | | | | | | | | | | | | |
| IV. D. 4.a. 1-7 | NC | NC | PC | PC | PC | PC | PC | PC | NC | SC | SC | SC | SC | SC |
| IV. D. 4.b. | NC | NC | NC | NC | PC | NC | NC | NC | PC | SC | SC | SC | SC | SC |
| **IV.E. Fire and Life Safety/Shane Poole** | | | | | | | | | | | | | | |
| **IV. E. 1. Fire and Life Safety** | | | | | | | | | | | | | | |
| IV. E. 1.a. | NC | PC | PC | PC | PC | PC | PC | SC | PC | PC | PC | PC | SC | SC |



Appendix A: Summary of Compliance Findings by Compliance Section Reports 1 - 14

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IV. E. 1.b. | NC | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC |
| IV. E. 1.c. | PC | PC | PC | PC | NC | PC | PC | SC | SC | SC | SC | SC | SC | SC |
| IV. E. 1.d. | NC | NC | NC | NC | NC | NC | PC | SC | PC | SC | SC | SC | SC | NC |
| IV. E. 1.e. | ND | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC |
| IV. E. 2. Fire and Life Safety Reporting | | | | | | | | | | | | | | |
| IV. E. 2.a.1-3 | ND | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC |
| IV. E. 2.b. | ND | NC | NC | PC | NC | NC | NC | PC | PC | SC | SC | SC | SC | SC |
| IV.F. Language Assistance | | | | | | | | | | | | | | |
| IV.F.1. Timely and Meaningful Access to Services/Margo Frasier | | | | | | | | | | | | | | |
| IV.F.1.a. | ND | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC |
| IV.F.2. Language Assistance Policies and Procedures/Margo Frasier | | | | | | | | | | | | | | |
| IV.F.2.a. | ND | PC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC |
| IV.F.2.b. | ND | PC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC |
| IV.F.3. Language Assistance Training/Margo Frasier | | | | | | | | | | | | | | |
| IV.F.3.a. | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.F.4. Bilingual Staff/Margo Frasier | | | | | | | | | | | | | | |
| IV.F.4. | NC | PC | PC | PC | PC | NC | NC | NC | NC | PC | SC | SC | SC | SC |
| IV.G. Youthful Prisoners/Margo Frasier | | | | | | | | | | | | | | |
| IV.G. | NC | NC | NC | PC | PC | PC | NC | NC | PC | PC | PC | SC | SC | SC |
| VI. The New Jail Facility/Margo Frasier | | | | | | | | | | | | | | |
| VI. A. | ND | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| VI. B. | NC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| VI. C. | ND | PC | SC | SC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC |
| VI. D. | Monitors Not Qualified to Evaluate | | | | | | | | | | | | | |
| VII. Compliance and Quality Improvement/Margo Frasier | | | | | | | | | | | | | | |
| VII. A. | ND | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC |
| VI. B. (H.) | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC |
| VI. C. (I.) | NC | NC | SC | SC | NC | SC | SC | NC | PC | SC | SC | SC | SC | SC |
| VI. D. (J.) | ND | NC | NC | PC | PC | PC | PC | NC | NC | NC | SC | SC | SC | SC |
| VIII. Reporting Requirements and Right of Access/Margo Frasier | | | | | | | | | | | | | | |
| VIII.A. | ND | PC | NC | PC | PC | PC | PC | NC | NC | PC | SC | SC | SC | SC |
| VIII.B. | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| VIII.C. | PC | PC | PC | SC | SC | SC | NC | NC | PC | PC | SC | SC | SC | SC |

**Legend:**
**ND - Not scheduled for review NC - Non-compliance**
**PC - Partial Compliance**
**SC - Substantial Compliance NA - Not Applicable**


Orleans Parish JAIL MONITORS