UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| LASHAWN JONES, ET AL. | CIVIL ACTION NO. 12-859 |
| VERSUS | SECTION I, DIVISION 5 |
| MARLIN GUSMAN, ET AL. | JUDGE LANCE M. AFRICK<br>MAGISTRATE JUDGE NORTH |

### CITY OF NEW ORLEANS' RESPONSE TO
### REPORT NO. 14 OF THE INDEPENDENT MONITORS, R.DOC. 1476

**MAY IT PLEASE THE COURT:**

Although the Court Appointed Monitors furnished all other parties to this lawsuit with their draft report in August, 2021, the City's request for a copy of the draft report from the "independent" monitors was denied by the monitors. The City first received a copy of the independent monitors' report on October 5, 2021. The City respectfully requests the Court to advise the Monitors to provide their draft reports to the City of New Orleans at the same time the draft report is provided to the other Orleans Parish Sheriff's Office (OPSO) consent judgment litigants. While the City recognizes that it is not a party to the Consent Judgment, the City incurs all monitor related cost and the majority of the operations budget for the Orleans Justice Center (OJC). Moreover, the City was brought into the above captioned Consent Judgment litigation as a third-party Defendant by OPSO, is thus a party to this consent decree litigation matter and is required to participate in all litigation proceedings accordingly.

Within the past two fiscal years, the City and OPSO have been charged $1,009,216 by the Court appointed monitors, for which payment is always expected, and with no monitor oversight. In addition, during the last two fiscal years, the City paid OPSO the sum of $102,419,972, and has also separately paid Wellpath, the OPSO Medical and Mental Healthcare provider, an additional

$10,793,559 for services provided during the same timeframe. In view of the City's financial obligations to both the Monitors and the OPSO, as well as the City's status as a litigation party in the Consent Judgment litigation, the City requests that it receive the Monitors' draft report and the Monitors' final report simultaneously with the other OPSO Consent Judgment litigants. Fairness warrants this result.

Although the City has only been afforded an abbreviated period of time to review the Monitors' Report No. 14, the City believes that it will be helpful for the Court and the other litigants to receive some of the City's observations regarding the Monitors' Report No. 14, R.Doc. 1476.

The Monitors' Report No. 14, R.Doc. 1476, expressed views regarding medical services and mental healthcare at OJC. The other issues described in Report No. 14 primarily relate to the general operations of the OJC and the corresponding undertakings by OPSO under the Consent Judgment.

With respect to medical services, Report No. 14 appears to indicate that there is substantial compliance with all but very few of the medical provisions in the Consent Judgment. Regarding medical care for inmates, no example of any patients/inmates not being provided with adequate medical care are provided in Report No. 14. In fact, the Monitors agree that OPSO is in substantial compliance with all but a small number of medical provisions in the Consent Judgment. Therefore, the City submits this response to address concerns observed in reviewing the monitor's report in the following areas: staffing deficiencies, suicide watch, monitor visits, juveniles and lack of audit methodology/data to support the monitors' conclusory observations.

In addition, the City respectfully invites the Court to review Wellpath's separate response and supporting exhibits with regard to the Monitors' Report No. 14. Wellpath's submission and exhibits are appended to the City's response and marked as Exhibit A and incorporated herein.

**Staffing Deficiencies**

An unequivocal overarching issue which has impaired medical and mental health services, as well as other operations at the Orleans Justice Center ("OJC"), continues to be the lack of an adequate correctional staff. It cannot be emphasized enough that the level of staffing, as the Monitors have stated in each of their Reports, is at the core of the problems being experienced by OJC and some of the Monitors' concerns. As the Monitors expressed in Report No. 14, R.Doc. 1476: "The level of staffing is insufficient to adequately supervise inmates and allow for the safe operation of the facility. …. discussion during the monitoring tour indicated that a plan exists, but it has not been finalized or submitted to the Monitors. A staffing plan which is based on staffing levels which do not exist is insufficient." (Pages 34-35 in the Report). OPSO is unable to adequately staff OJC as the Monitors repeatedly have expressed over many years, predating the COVID-19 global pandemic, and therefore it is inconceivable that the OPSO will ever have sufficient staff to safely operate the OJC, much less another major facility based on all reasonably available information.

As the Monitors have repeatedly noted in their Reports to the Court, OJC has not been able to hire or retain necessary correctional staff. This staffing deficiency has not been cured at OJC during the past 8 years. Notably, all four Court Ordered newly renovated units in the Temporary Detention Center ("TDC" or "THC") are not being used due to lack of security staff. Nonetheless, the Monitors indicate that Phase III is appropriate even though it is clear that the proposed new facilities will continue to lack adequate correctional staff. This continuing and recurring staffing

deficiency underlies virtually every issue in the Monitors' Report No. 14, but pointedly underscores the inappropriateness of another jail facility that similarly would be understaffed. In Monitors' Report No. 14, the Monitors have commented at least sixteen (16) times that the OPSO staff is inadequate and prevents proper services for the inmates consistent with the Consent Judgment (*See* pages 8, 9, 12, 13, 34, 35, 43, 48, 65, 74, 77, 79, 88, 93, 109 and 114 of Report No. 14). Until adequate staff can be employed and retained at OJC, the legitimacy of constructing another jail facility (known as the Phase III new jail building) can reasonably be questioned given this acute shortage of correctional staff. Equally significant is the fact that the proposed design for Phase III will potentially not permit sufficient single celling for inmates with acute challenges, while even the Monitors indicate that single cells are needed for these acute inmates. In contrast, the retrofit proposed by the City offers more single cells (45 single cells in the retrofit as opposed to 19 single cells in proposed Phase III). This concern has been raised several times during Executive Committee Meetings. With respect to the Monitors, a number of deficiencies and inconsistencies appear in Report No. 14. For example, Dr. Patterson appears to be complaining primarily about lack of counseling services and inadequate suicide watches. Importantly, Wellpath has provided counseling services to those inmates in need of counseling. Although there was criticism that some of the counseling occurred outside of the cells, those occurrences occurred primarily during the apex of the COVID-19 global pandemic, which likely explains the reason why a number of the Monitors declined to participate in on-site visits at OJC. Nevertheless, the inmates received counseling in a relatively private setting and, more privacy is now being permitted for counseling sessions as the result of the limited control of COVID-19.

**Suicide Watch**

In Monitors' Report No. 14, there is also an expression of concern about inadequate suicide watches. Wellpath personnel, Tulane professionals, complemented by OPSO deputies, have successfully engaged in suicide watches. While any suicide is one too many, in the one instance where a suicide did occur in the past several years, there was nothing in the record to support that policies were not followed in this one instance. As noted earlier, the cell door contacts for treatment sessions has been greatly diminished and is rarely used now except when there are serious security issues or health consequences for the inmate and the treating healthcare provider. In short, Wellpath has been compliant in the delivery of counseling services. The Court is respectfully invited to the detailed Audit prepared by Dr. Daphne Glindmeyer and Dr. Jim Austin which is attached as Exhibit B to this submission and incorporated by reference.[1]

**Monitors' Visits**

Notably, on-site visits were not completed by Dr. Patterson and several other Monitors, notwithstanding OPSO's specific request for in-person monitor visits. As Report No. 14 states, "the medical, mental health and classification portions were conducted virtually" (pg. 4 of the Report). The City, like the OPSO, respectfully submits that Dr. Patterson should have made a personal on-site tour for Report No. 14 instead of virtual participation. As a result, many of Dr. Patterson's observations are general in nature, are not documented, and squarely contradict the specific findings by Dr. Glindmeyer and Dr. Austin (these detailed comments are appended to this submission). It is difficult, if not impossible, for Dr. Patterson to opine about compliance ratings unless he has made on-site visits or structured virtual visits to conduct observations of jail operations and conduct formal interviews with both staff and inmates. The OPSO has expressed

---

[1] In collaboration with OPSO, the City has issued a Request for Proposals (RFPs) for OPSO medical and mental healthcare services which is currently open.

their agreement with this requisite for on-site visits.  Until Dr. Patterson and the other Monitors are able to conduct on-site visits, the Monitors' Reports on these issues should be suspended or deferred.  Notably, Wellpath personnel, Tulane physicians, and OPSO are able to make daily visits to the jail, though Dr. Patterson and Dr. Greifinger chose not to do so.  That, of course, is their prerogative, but it directly impacts the quality and completeness of their views.

In a like vein, Report No. 14 states that the Monitors were in "frequent contact" with inmates and staff, but fails to specify how many contacts were made and by whom.  For example, there is no documentation of how many times the Monitors accessed the available Wellpath data base to sample treatment case plans and associated treatment contacts made by both Wellpath healthcare providers and Tulane physicians.  Secondly, the Monitors now criticize OPSO for the absence of a Compliance Unit.  Yet, there is no requirement for a Compliance Unit in the Consent Judgment.  Although the Monitors indicated that they have provided guidance to OPSO for a Compliance Unit, there is nothing in Report No. 14 to indicate what would constitute such a unit, the number of staff, functions, and a suggested budget.  Nevertheless, the Monitors acknowledge that OPSO has "begun to take steps toward the formation of a Compliance Unit, but it is not operational" (pg. 5 of the Report).

In Report No. 14, the Monitors make statements of findings that lack specifics.  It appears that just a portion of the Monitors made in-person visits to OJC.  Nonetheless, Report No. 14 recites that the security staff were found to be responsible for "suicide watch" during the site visit, but the deputies routinely stated they did not understand what their duties were to perform suicide watches (pg. 10 of the Report).

**Juvenile Inmates**

The Monitors also raised the issues of youthful inmates. However, virtually all, with perhaps the exception of one youthful inmate, are housed in the Juvenile Justice Intervention Center. The initiative to move youthful inmates from OJC to the Juvenile Justice Intervention Center was advocated for by the City, and with the City's assistance, it was essentially accomplished. Nevertheless, the Monitors' comment that one youthful inmate *could* "tie up an entire housing unit." This issue would not be addressed by the proposed Phase III facility, as even the Monitors acknowledge (pg. 13 of the Report).

The City recognizes that the Monitors have made a number of general statements, such as medication not being distributed properly. Yet, once again, these general comments lack specifics and are directly addressed by Wellpath in its response (See Exhibit A to this submission). The expression by the Monitors that medication is found during cell shakedowns "suggesting that the medication distribution process is flawed" lacks details, needed specificity, and is countered by Wellpath's detailed submission. It is virtually impossible for the City or OPSO to reasonably respond to these conclusory comments. Equally important, the Court should be provided with the specifics of these types of statements rather than just "suggestions" as the Monitors have offered in their latest Report.

Although the Monitors repeatedly observed that the jail population continues to be reduced, the reduction of the jail population seemingly has still not resulted in adequate security staff for the total operations of OJC, much less opening and attempting to operate another jail building. Concomitantly, the jail population should continue to decline given the reactivation of the Judges at Orleans Parish Criminal District Court, which will permit the processing of trials or guilty pleas and the inevitable and required transfer of inmates to the Department of Corrections or results that they be released from incarceration.

**Lack of Methodology/Data**

Respectfully, Dr. Patterson has never detailed how he offers his so-called compliance ratings. In particular, he did not appear to have used standard auditing methods when representative samples of the mental health case load are selected and audited to determine: "1) the adequacy of the case plan, and 2) the offering of appropriate healthcare services." Although there is a cryptic reference to 141 medical records, there is no specificity as to whether the inmates for these medical records are on the case load, how they were selected, or any additional information provided by the parties (pg. 64 of the Report). While the Monitors commend the work of the Tulane physicians and the Wellpath healthcare providers, they inexplicably question whether there is any progress with Tulane's interface with Wellpath. They also comment that the prisoner is not involved in team meetings between team meetings between Wellpath and Tulane. Aside from the logistical and health challenges (which could be insurmountable) to involve the prisoner in team meetings with healthcare providers, there is nothing in the Consent Judgment requiring this interaction. Furthermore, it is not apparent that the Wellpath data has been accessed to confirm, if possible, this supposition.

Correspondingly, the Report states that there were numerous incidents of supervisors reassigning or requesting reassignment of inmates under the guise of an inmate being an enemy of someone else in a housing unit, when it appears that the real reason was the desire to provide relief from dealing with a difficult inmate (pg. 11 of the Report). Absent from the Report is the data to support the Monitors' claims of "numerous incidents" or the basis of how these incidents were detected or measured by the Monitors, except general references to a series of various documents without offering any specificity. There is no reference to accessing the Wellpath data system that contains critical information on case plans and delivery of healthcare services. Likewise, while

PD.35857711.1

there is a reference that inmates were "interviewed," there is no indication of how many inmates were interviewed, how they were selected for the interviews, what questions were asked, the responses from the inmates, and the findings of the interviews. As Report No. 14 issued by the Monitors reflects, all but very few of the medical provisions are in substantial compliance. The City respectfully invites the Court's attention to Sections C.2.a (substantial compliance), C.3.b (substantial compliance), C.3.d (substantial compliance), and C.2.b (partial compliance).

## CONCLUSION

Without question, the City respects the time and resources the Court has devoted to the improvement of the jail facility in Orleans Parish. The City is providing this submission so that the Court understands the concerns of the City and the deficiencies that the City believes exist in the latest Monitors' Report. This is another reason that the City believes it should be included in the receipt of draft reports from the Monitors and have the ability to provide comments to those draft reports before they are finalized. In addition, many of these issues, including the design concerns relating to the proposed Phase III facility and the attendant staff shortages, could be addressed collaboratively by the parties. The City has offered to mediate the issue of a Phase III new jail building as well as any other concerns expressed by the litigants. Regrettably, a meeting among all the parties or a more structured mediation with a neutral mediator has not yet come to fruition. The City would welcome the Court to encourage the parties to proceed with this approach in the belief that the City as well as the other parties could make progress for the inmates, the residents of the City of New Orleans, and the mission of this Court as well as the Monitors.

    Respectfully submitted,

    BY: */s/ Harry Rosenberg*
        **SUNNI J. LeBEOUF** (Bar #28633)
        CITY ATTORNEY

Email: Sunni.LeBeouf@nola.gov
**DONESIA D. TURNER** (Bar #23338)
Email: Donesia.Turner@nola.gov
**CHURITA H. HANSELL** (Bar #25694)
Email: Chhansell@nola.gov
1300 PERDIDO STREET
CITY HALL – ROOM 5E03
NEW ORLEANS, LOUISIANA 70112
TELEPHONE: (504) 658-9800
FACSIMILE: (504) 658-9868

**HARRY ROSENBERG** (#11465)
**STEPHANIE POUCHER** (#37263)
**PHELPS DUNBAR LLP**
365 CANAL STREET, SUITE 2000
NEW ORLEANS, LA 70130
TELEPHONE:  504-566-1311
FACSIMILE:  504-568-9130
Email: Harry.Rosenberg@Phelps.com
Stephanie.Poucher@Phelps.com

*COUNSEL FOR:*
*THE CITY OF NEW ORLEANS*

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing was filed on this 29th day of October 2021, with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to all participating counsel of record and the Court, and a copy was sent to the Lead Monitor for distribution to the other Monitors.

　　　　　　　　　　　　　　　　　　　*/s/ Harry Rosenberg*
　　　　　　　　　　　　　　　　　　　_____