**Torey M. Rayford**

| | |
|---|---|
| **From:** | Vincent A. Smith |
| **Sent:** | Wednesday, November 24, 2021 11:08 AM |
| **To:** | LaNitrah B. Hasan |
| **Cc:** | Sousa, John |
| **Subject:** | OJC MEDICAL SERVICES BUIILDING - PLANING COMMISSION FINAL REPORT | FEMA 106 INFORMATION |
| **Attachments:** | OJCMedicalServicesBuildingPhIII_CityPlanningCommission_FinalReport_102121.zip |

LaNitrah;

Please see the attached final report from the City Planning Commission for the OJC Medical Services Building to send to Jeremy and Tiffany for our meeting on Monday.  This report includes the following information;

1.) Report Summary and Staff Conditional Use Recommendations - Pg. 24
2.) Planning Commission Motion re: Conditional Use Recommendations - Pg. 37
3.) NPP Mailing List - Pg. 57
4.) Notification Letter for the public meeting schedule - Pg. 72
5.) Office of Neighborhood Engagement Brochure Sent to their public database - Pg. 78
6.) Power Point Presentation used at the public meetings - Pg. 81
7.) NPP Summary Report for 5/20 and 6/17 public meetings - Pg. 97
8.) Q&A Transcript from 5/20 public meeting - Pg. 99
9.) Q&A Transcript from 5/20 public meeting (chat box) - Pg. 113
10.) Q&A Transcript from 6/18 public meeting - Pg. 131

Thanks.

CAPITAL PROJECTS ADMINISTRATION
Vincent A. Smith
Director
(504)658-8670
viasmith@nola.gov

Exhibit

**B**
**(Part 1)**

**Torey M. Rayford**

| | |
|---|---|
| **From:** | Vincent A. Smith |
| **Sent:** | Wednesday, November 24, 2021 11:08 AM |
| **To:** | LaNitrah B. Hasan |
| **Cc:** | Sousa, John |
| **Subject:** | OJC MEDICAL SERVICES BUIILDING - PLANING COMMISSION FINAL REPORT \| FEMA 106 INFORMATION |
| **Attachments:** | OJCMedicalServicesBuildingPhIII_CityPlanningCommission_FinalReport_102121.zip |

LaNitrah;

Please see the attached final report from the City Planning Commission for the OJC Medical Services Building to send to Jeremy and Tiffany for our meeting on Monday.  This report includes the following information;

1.)  Report Summary and Staff Conditional Use Recommendations - Pg. 24
2.)  Planning Commission Motion re: Conditional Use Recommendations - Pg. 37
3.)  NPP Mailing List - Pg. 57
4.)  Notification Letter for the public meeting schedule - Pg. 72
5.)  Office of Neighborhood Engagement Brochure Sent to their public database - Pg. 78
6.)  Power Point Presentation used at the public meetings - Pg. 81
7.)  NPP Summary Report for 5/20 and 6/17 public meetings - Pg. 97
8.)  Q&A Transcript from 5/20 public meeting - Pg. 99
9.)  Q&A Transcript from 5/20 public meeting (chat box) - Pg. 113
10.) Q&A Transcript from 6/18 public meeting - Pg. 131

Thanks.

CAPITAL PROJECTS ADMINISTRATION
Vincent A. Smith
Director
(504)658-8670
viasmith@nola.gov

CITY PLANNING COMMISSION

# CITY OF NEW ORLEANS

LATOYA CANTRELL
MAYOR

ROBERT D. RIVERS
EXECUTIVE DIRECTOR

LARRY W. MASSEY, JR.
INTERIM DEPUTY DIRECTOR

**City Planning Commission Staff Report**

**Executive Summary**

**Zoning Docket 071/21**

**Applicant:**    City of New Orleans

**Request:**    Request for an amendment to Ordinance No. 28,300 MCS (Zoning Docket 105/19), establishing a conditional use to permit a prison and related uses in an LI Light Industrial District, to permit the expansion of the prison to include the construction of a medical and mental health services facility.

**Location:**    The municipal addresses are 2750-3200 Perdido Street and 819-821 South Broad Street.

**Summary of Proposal:**

Zoning Docket 071/21 considers an amendment to Ordinance No. 28,300 MCS (Zoning Docket 105/19), which amended Ordinance No. 24,282 MCS (Zoning Docket 030/10) authorizing the conditional use of a prison and related uses (Orleans Justice Center), to permit an expansion to include the construction of a medical and mental health services facility on the former Templeman I and II site, which is bounded by Perdido Street, the former S. Dupre Street right-of-way, Interstate 10, and the former S. Gayoso Street right-of-way. Known as Phase III, this new two-story 80,500 square feet facility would contain 89 beds for inmates with acute and sub-acute mental health conditions. The proposal also includes laundry, a centralized visitation area for attorney and family visits with a public entry point, housing support with counseling rooms and mental health staff work areas, a nurse and security station, and additional space including an infirmary, clinic, phlebotomy, dental services, and administration. The proposed building will connect via an elevated walkway to the existing OJC structures on either side. The application projects an estimated cost of $51 million with construction finalized around August 2023.

Staff recognizes the legitimate concerns surrounding the merits of this application—including incarceration of individuals with mental health conditions, the $51 million price tag (only $39 million of which would be covered by FEMA funds), and what is allowable under the federal consent decree.

That said, the City Planning Commission's role is narrowly focused on assessing a proposed development's impact in terms of the type of activity they generate; when, where, and how this activity occurs; vehicular traffic and parking impacts; noise impacts; environmental impacts; and aesthetic impacts. This allows for a determination of whether there are meaningful land use impacts and whether there are building or site design changes or operational restrictions that can imposed to mitigate those impacts in order to make the development appropriate for the intended location. From a land use perspective, the addition of a Phase III facility to provide housing and ancillary services for inmates with acute and sub-acute mental health conditions would not result in significant new impacts or an intensification of the current use. Indeed, the current proposal aligns with the 2019 request, which specifically requested accommodations for 89 inmates with acute and sub-acute mental health conditions. With this in mind, staff believes that the request meets the approval standards of **Article 4, Section 4.3.F** and must recommend approval.

This application constitutes the first of two competing proposals for housing and services for inmates with acute and sub-acute mental health conditions. The other proposal, Zoning Docket 099/21, was introduced by Council Motion M-21-276 and considers the adaptive reuse (retrofit) of the Orleans Justice Center's Phase 2 building or other existing resources for the housing of male and female inmates classified with acute and sub-acute mental health conditions. That proposal will be considered at a subsequent City Planning Commission meeting. Ultimately, City Council must consider how each proposal aligns with its policy agenda.

**Master Plan:**

The proposal is consistent with the Master Plan.

**Recommendation:**

The staff recommends **APPROVAL** of Zoning Docket 071/21, subject to one (1) waiver and thirty-one (31) provisos.

**Reasons for Recommendation:**

1. Expansion of a previously approved prison use, within the existing site boundaries, to house a limited number of inmates with acute and sub-acute mental health does not constitute a significant change to the conditional use already in place, which authorized the temporary use of Buildings 1 and 2 of the Temporary Detention Center ("TDC") for the same purpose.

2. While there are legitimate concerns surrounding the criminalization and incarceration of individuals with mental health conditions, the financial burden of a new facility, and the consent decree, these are outside the scope of the City Planning Commission's purview. The scope of this review is limited to the land use considerations and, based on an evaluation of those considerations, the staff finds that the application meets the approval standards of **Article 4, Section 4.3.F.**

**City Planning Commission Meeting**
**Tuesday, October 12, 2021**

**CPC Deadline:** 10/23/2021
**CC Deadline:** 60 days from receipt
**Council District:** B - Banks

## STAFF REPORT

**Zoning Docket 071/21**

**To:** City Planning Commission

**From:** Robert Rivers, Executive Director
Stephen Kroll, Planning Administrator

**Prepared by:** Emily Ramírez Hernández

**Date:** October 13, 2021

## I.        GENERAL INFORMATION

**Applicant:**     City of New Orleans

**Request:**        Request for an amendment to Ordinance No. 28,300 MCS (Zoning Docket 105/19), establishing a conditional use to permit a prison and related uses in an LI Light Industrial District, to permit the expansion of the prison to include the construction of a medical and mental health services facility.

**Location:**       The petitioned property is located on Square 600-A (formerly Square 600), all lots (excluding Lots 28 through 31), Square 615, all lots, Square 624, all lots, Square 624-A, all lots, Square 666, all lots, and Square 675, all lots, all of which are now subdivided into Square 600-A, Lots 1 and 2, in the First Municipal District, bounded by Interstate Highway 10, South Broad Street, Perdido Street, and South Jefferson Davis Parkway. The municipal addresses are 2750-3200 Perdido Street and 819-821 South Broad Street.

**Description:**   Zoning Docket 071/21 considers an amendment to Ordinance No. 28,300 MCS (Zoning Docket 105/19), which amended Ordinance No. 24,282 MCS (Zoning Docket 030/10) authorizing the conditional use of a prison and related uses (Orleans Justice Center), to permit an expansion to include the construction of a medical and mental health services facility on the former Templeman I and II site, which is bounded by Perdido Street, the former S. Dupre Street right-of-way, Interstate 10, and the former S. Gayoso Street right-of-way. Known as Phase III, this new two-story 80,500 square feet facility would contain 89 beds for inmates with acute and sub-acute mental health conditions. The proposal also includes laundry, a centralized visitation area for attorney and family visits with a public entry point, housing support with counseling rooms and mental health staff work areas, a nurse and security station, and additional space including an infirmary, clinic, phlebotomy, dental services, and administration. The proposed building will connect via an elevated walkway to the existing OJC structures on either side. The application projects an estimated cost of $51 million with construction finalized

around August 2023.

This application constitutes the first of two competing proposals for housing and services for inmates with acute and sub-acute mental health conditions. The other proposal, Zoning Docket 099/21, was introduced by Council Motion M-21-276 and considers the adaptive reuse (retrofit) of the Orleans Justice Center's Phase 2 building or other existing resources for the housing of male and female inmates classified with acute and sub-acute mental health conditions. That proposal will be considered at a subsequent City Planning Commission meeting. Ultimately, City Council must consider how each proposal aligns with its policy agenda.

**Why is City Planning Commission Action required?**

In accordance with **Article 16, Section 16.2 (Table 16-1)**, a prison, and related uses, is a conditional use in the LI Light Industrial District. The subject site has an active entitlement authorized under Ordinance No. 28,300 MCS (which amended Ordinance No. 24,282 MCS). Further, proviso 5 requires an amendment to the conditional use, with City Council approval, for the Phase III (Templeman 1 and II) facility.[1] Lastly, the application includes a variance request. Pursuant to **Article 4, Section 4.3.E**, City Council is authorized to grant variances associated with conditional uses. The City Planning Commission is required to make a recommendation on all conditional use proposals prior to City Council action, in accordance with **Article 4, Section 4.3.D.3.**

## II.   ANALYSIS

**A.   What is the zoning of the surrounding areas? What is the existing land use? And how are the surrounding areas used?**

### *Surrounding Zoning*

The petitioned site is located within a small, L-shaped LI Light Industrial District bounded by Interstate Highway 10, S. Jefferson Davis Parkway, Perdido Street, S. Dupre Street, Tulane Avenue, and S. Broad Street. It operates as the Orleans Justice Center, the replacement for the local jail known as Orleans Parish Prison which saw severe damage following Hurricane Katrina's flooding. The uses in the surrounding area within the LI District are generally institutional in nature and include the Orleans Parish Sheriff's Office, the former Orleans Parish Prison site, the New Orleans Police Department, Criminal District Court, the District Attorney's Office, and other associated buildings.

The LI District is surrounded by MU-1 Medium Intensity Mixed-Use and MU-2 High Intensity Mixed-Use Districts and a small OS-N Neighborhood Open Space District. These surrounding districts are heavily mixed-use, serving nearby residential uses as well as the courts and jail. Uses include low-density residential, large-scale multi-family residential, U-Haul, restaurants, retail, a salon, a school, bail bond establishments, and financial institutions. BIP Business-Industrial Park and C-3 Heavy Commercial Districts are located

---

[1] Proviso 5 states: "In order for the applicant to add additional properties and to add the Templeman I and II facility, the applicant shall be required to amend this Conditional Use ordinance through the City Planning Commission, with Council approval, in accordance with the full Conditional Use process."

across the Interstate Highway 10 from the subject site and contain a print shop, a tool rental and sales facility for contractors, a staging area for airport shuttles, and Bridge House's thrift shop.

**Figure 1: Zoning Map of Subject Site & Surrounding Area**



**B.      What is the zoning and land use history of the site?**

    *Zoning:*    1929 – "J" Industrial District
                     1953 – "L" Light Industrial District
                     1970 – HI Heavy Industrial
                     2015 (prior to 8/12/2015) – HI Heavy Industrial

    *Land Use:*    1929 – Industries and Warehouses
                     1949 – Mix of Heavy Industry and Light Industry
                     1999 – Industrial/Vacant Industrial and Institutional/Public and Semi-Public[2]

**C.      What was approved under Conditional Use Ordinance No. 28,300 MCS Zoning Docket 105/19? What was approved under Conditional Use Ordinance No. 24,282 MCS Zoning Docket 030/10? What waivers and provisos were attached approvals? Have there been any amendments to the original conditional use?**

---

[2] The 1999 Land Use Plan presented a generalized indication of land uses, and was not lot-specific.

The subject site has a long history of zoning entitlements. While the former Orleans Parish Prison was subject to a number of conditional uses and amendments over the years, these were rescinded in conjunction with Ordinance No. 24,282 in 2011.

### Conditional Use Ordinance No. 24,282 MCS Zoning Docket 030/10

The project approved under Conditional Use Ordinance No. 24,282 MCS (Zoning Docket 030/10) involved the comprehensive rebuilding and redevelopment of the Orleans Parish Prison facilities damaged in the 2005 flooding. City Council approved the request for the new Orleans Justice Center, subject to one (1) waiver and twenty-two (22) provisos.[3] The redevelopment comprised the following:

- **Phase I** involved rebuilding of a kitchen warehouse and campus central plant facility on the square between South Salcedo and South Gayoso Streets. Overall, the building was to have a gross area of 163,885 square feet. This phase has been completed.

- **Phase II**, on the block between South Dupre and South White Streets, replaced the Templeman III & IV inmate housing facility, which suffered extensive flood damage from Hurricane Katrina and had been demolished. The building integrates many critical prison functions into one building, including an intake processing facility, administrative offices, a public lobby and visitation center, and has 1,438 beds. This facility received its certificate of occupancy in 2015 and is fully operational.

- The proposed **Phase III** (the former Templeman I and II buildings) is on the block between South Gayoso and South Dupre Streets. Phase III, as contemplated under the original conditional use, would include a permanent eighty-nine (89) bed facility to house male and female inmates with acute and sub-acute mental health conditions, as well as an infirmary, a family visitation facility, an inmate-attorney visitation center, a laundry, and a pedestrian sky bridge.[4]

- **Temporary Detention Center**. The originally approved conditional use required that the "TDC," modular units with 400 beds, be removed and/or closed when Phase II was complete. As noted, Phase II received its certificate of occupancy in 2015, and the TDC continues to operate. This was amended under the current ordinance.

As noted, at that time plans for the former Templeman I and II building site were only tentative. According to the staff report for Zoning Docket 030/10:

> *The third phase, for which plans are tentative, is to rebuild a second inmate housing facility tower known as Templeman I & II replacement, located on the square between South Dupre Street and South Gayoso Street. The building is nearly identical to the Templeman III & IV housing tower – with a height of 100'8", a cruciform floor plan, and exterior surfaces skinned the same. Unlike Templeman*

---

[3] See Ordinance No. 24,282 MCS for waiver and provisos. These were later amended under Ordinance No. 28,300 MCS.

[4] This is the site of the current request.

*III & IV however, this building will solely be used for inmate housing, – so its bed capacity will be greater, although its bulk will be smaller, with a gross area of 311,013 square feet.*

*At the time of this application, no architect's plans have been submitted for Templeman I & II. City Planning Commission can only accept this building as part of the conditional use permit when funding and plans are ready, therefore an amendment to this conditional use will be required when the applicant is prepared to proceed with construction of this phase.*

- *The applicant shall be required to amend this Conditional Use permit for the petitioned site when plans for the construction of the proposed Templeman I & II facility are ready, by submitting floor and site plans to City Planning for review, as a precondition for building permit issuance.[5]*

### Conditional Use Ordinance No. 28,300 MCS Zoning Docket 105/19

Most recently, the original conditional use authorization was amended under Ordinance No. 28,300 MCS (Zoning Docket 105/19). Proviso 7 of the original ordinance was amended while proviso 20 was deleted. The amendment authorized the following:

- Temporary use of Buildings 1 and 2 of the Temporary Detention Center ("TDC") to accommodate male and female inmates suffering from acute and sub-acute mental disorders until the opening of a permanent facility and/or unit at which point the entire TDC will be removed and/or closed.
- Temporary use of Building 3 and Building 4 of the Temporary Detention Center ("TDC") to house only two (2) distinct classes of inmates, namely 1) those inmates participating in any work-release program, where they are released from the OJC secured complex into the general public during the day and return to the OJC Complex overnight; and 2) those inmates that are serving as trustees in the Orleans Justice Center kitchen where they have access to items which may be used as weapons.
- References to Phase III have been removed to allow more leeway for an alternative plan for inmates with acute and sub-acute mental health conditions ("permanent facility and/or unit").
- Caps the maximum allowable number of *inmates* across the facility (vs. beds) at 1,250 inmates.

The amendment included one waiver (granted under Ordinance No. 24,282) and 21 provisos:

### <u>WAIVER:</u>

1. The applicant shall be granted a waiver of Article 15, Section 15.2.1. *Off-Street Parking Regulations for All Districts, Except the CBD Districts and the Vieux Carré Districts* of the Comprehensive Zoning Ordinance, which requires the

---

[5] The staff recommended proviso was slightly modified in the final ordinance.

provision of two hundred six (206) off-street parking spaces, to permit the provision of zero (0) off-street parking spaces, subject to the requirements indicated in the related condition (see proviso 22) pertaining to the future provision of off-street parking on the site.

## PROVISOS:

1.  The applicant shall resubdivide the petitioned lots into one lot of record.

2.  The applicant shall submit revised site plans demonstrating that no permanent structure encroaches upon the Poydras Street right-of-way.

3.  The surface parking lot shall be enclosed with perimeter fencing – such as a low masonry chain wall with half metal picket fence above – in order to create a street edge along Perdido Street and the curvilinear South Broad Street/Poydras Service Drive.

4.  The applicant shall alter the sallyport window openings at street-level on Perdido Street so that they are larger and more transparent, as long as security is not compromised.

5.  In order for the applicant to add additional properties and to add the Templeman I and II facility, the applicant shall be required to amend this Conditional Use ordinance through the City Planning Commission, with Council approval, in accordance with the full Conditional Use process.

6.  The applicant shall secure a long-term lease of servitude for existing improvements made upon the Poydras Street right-of-way, including but not limited to the 12-foot concrete security wall between South White and South Lopez Streets, and the paved storage yard area between South Rendon Street and South Jefferson Davis Parkway.

7.  The developer shall include a note on amended site plans stating that all temporary inmate housing, including the 400 bed modular units known as the Temporary Detention Center ("TDC"), will be removed and/or closed upon the opening of a permanent facility and/or unit for the housing of male and female inmates classified with acute and sub-acute mental health conditions:

    a.  The developer shall ensure that at no time shall the aggregate inmate population of the Orleans Justice Center complex, including without limitation, those held in Phase II, the TDC, and in the permanent facility or unit for the housing of male and female inmates classified with acute and sub-acute mental health conditions exceed 1,250 inmates, and that all inmates (male, female, and juvenile) except those classified with acute and sub-acute mental health conditions, those participating in the work-release program and those actively working on the kitchen staff, shall be detained in Phase II of the OJC, which shall continue to provide a variety of programming aimed at reducing

recidivism including but not limited to medical care, educational services, including GED preparation, vocational and job training.

b.  The developer shall demolish or decommission and not detain any inmates in any of the following existing Orleans Parish Prison facilities, unless other appropriate action is taken by the Mayor and/or City Council that is consistent with their authority:

  i.  House of Dentition;
  ii.  The Community Correctional Center;
  iii.  Conchetta;
  iv.  Broad Street;
  v.  South White Street;
  vi.  Templeman V; and
  vii.  The original Temporary Housing Units (Tents).

The original Orleans Parish Prison connected to the Criminal Courts building (OPP) shall only be used as a daily holding facility to transfer inmates to and from court while awaiting a trial or hearing.

c.  Building 1 and Building 2 of the 400-bed modular Temporary Detention Center ("TDC") shall be renovated in accordance with the submitted plans to temporarily accommodate male and female inmates classified with acute and sub-acute mental health conditions. Building 1 and Building 2 shall be permitted to continue to accommodate these inmates until the opening of a permanent facility and/or unit for the housing of male and female inmates classified with acute and sub-acute mental health conditions. Once the inmates housed in Buildings 1 and 2 of the TDC have been transferred to the permanent facility and/or unit for the housing of male and female inmates classified with acute and sub-acute mental health conditions. Developer shall demolish or decommission Buildings 1 and 2 of the TDC and they shall not be used to house any inmates with OJC.

d.  Developer shall be permitted to use Building 3 and Building 4 of the Temporary Detention Center ("TDC") to house only two (2) distinct classes of inmates, namely:

  i.  Those inmates participating in any work-release program, where they are released from the OJC secured complex into the general public during the day and return to the OJC Complex overnight.
  ii.  Those inmates that are serving as trustees in the Orleans Justice Center kitchen where they have access to items which may be used as weapons.

At no time shall the total number of inmates housed in Building 3 and Building 4 exceed one hundred and fifty (150) (a maximum of one hundred twenty (120) for work release and a maximum of thirty (30) for kitchen detail), and at all times the total aggregate number of inmates housed in Buildings 3 and 4 shall

count toward the 1,250 maximum inmate population count established in subsection (a) hereof.

8. The applicant shall remove all obstructions to automotive and pedestrian traffic, and restore the public right-of-way on Perdido and South White Streets prior to receiving a certificate of use and occupancy for the new Templeman III & IV facility from the Department of Safety and Permits. This proviso may be amended upon written recommendation by the Mayor after meeting with stakeholders and experts.

9. The applicant shall submit a phasing plan showing that, upon demolition of South White Street women's housing facility and relocation of the tilapia farm, Ring Road shall be extended to a secure gate on Poydras Avenue under the South Broad Street viaduct.

10. The applicant shall secure approval of revised site plans by the Fire Marshall and abide by applicable fire code.

11. The applicant shall submit detailed landscape plans prepared by a licensed Louisiana landscape architect indicating the items listed below. The landscape plan shall be subject to final approval by City Planning Commission staff and by the Department of Parks and Parkways for any proposed planting within a public right-of-way.

   a. Landscaping improvements within the proposed parking lot, on islands, medians and along perimeter ground not improved with asphalt paving.

   b. Shade-plantings along the Perdido Street side of the Intake and Processing Center sallyport, between the building and the sidewalk as space permits, providing a planting bed of not less than two (2) feet.

   c. The genus, species, size, location, quantity and irrigation of all proposed plant materials within both the common areas and the street rights-of-way within the site, with applicable remarks and details.

   d. There shall be aesthetic tree plantings subject to the approval of the Department of Parks and Parkways along Tulane Avenue, Broad Street and South Jefferson Davis Parkway.

12. The applicant shall submit a revised site plan showing additional green space of a sizable concentration within the Correctional Complex that can be used as an outdoor recreation area for inmates, to the extent possible.

13. The applicant shall either modify the location of dumpster berths or provide visual screening as part of the site design so that the Trash Dock at the rear of the Kitchen/Warehouse/Plant will not be visible from the public right-of-way.

14. The applicant shall provide to the City Planning Commission a litter abatement

program letter, inclusive of the stated location of litter storage, the type and quantity of trash receptacles, the frequency of litter pickup by the Department of Sanitation or a contracted trash removal company, and the clearing of all litter from the sidewalks and street rights-of-way. The name and phone number of the owner/operator of the development shall be included in this letter to be kept on file in case of any violation.

15. The applicant shall submit a detailed signage plan indicating:

   a. The location, text and dimension of all signs posted around the perimeter of the petitioned site or which are visible to the public.

   b. Which signs will be illuminated and specifications for said signs.

16. The applicant shall submit a lighting plan for the petitioned site for review and approval by the staff of the City Planning Commission and the Department of Public Works.

17. All proposed curb cuts shall require the approval of the Department of Public Works. All curbs and sidewalks along the Perdido Street frontage shall be replaced and any existing and unused curb cuts along either street frontage shall be restored. Approval of plans for such reconstruction shall be secured from the Department of Public Works.

18. The Sheriff's department shall restrict loading dock activity at night, so that no truck deliveries or trash collection occurs between the hours of 10:00 p.m. and 6:00 a.m.

19. The applicant shall secure the approval of the Department of Public Works for the following:

   a. the location and construction of all proposed curb cuts and the restoration of any existing curb cuts that are not to be utilized as part of the development;

   b. the replacement or restoration of all sidewalks adjacent to and across a street from the site as deemed necessary;

   c. the installation of vertical curbs along all street frontages adjacent to the site;

   d. the installation of all subsurface drainage for the proposed development; and

   e. a traffic impact analysis for the proposed development, including any mitigation measures deemed necessary should significant adverse impact to the transportation system be determined by the Department of Public Works to be likely to occur as a result of the proposed development.

20. The applicant shall work with the Sewerage and Water Board as necessary for the retention or relocation of any sewer or water lines affected by the proposed development.

21. The Mayor may provide a written recommendation to the City Council after convening meetings with stakeholders and experts.

***Other Amendment Proposals***

*Motion M-14-28*

In 2014, City Council issued Motion M-14-28 for an amendment to permit the use of the 400-bed temporary inmate housing unit until completion of the construction of the anticipated Phase 3 building or until there is a determination that the Phase 3 building is not needed to accommodate the inmate population.6 Specifically, the amendment proposed by Motion M-14-28 would have resulted in changes to proviso 7 (c) which relates to the use of temporary detention facilities. Originally, these buildings were to be decommissioned no later than eighteen (18) months from the date of issuance of a certificate of use and occupancy for the new Templeman III & IV facility. The proposed amendment would have allowed greater flexibility in determining the "end date" for the use of these 400-bed, four modular Temporary Detention Center buildings constructed on the far western tip of the site. Though the City Planning Commission recommended approval of Zoning Docket 032/14 at the April 8, 2014 meeting, City Council deferred the request past deadline, rendering it effectively denied.

*Motion M-17-261*

In 2017, City Council produced Motion No. M-17-261, directing the City Planning Commission "to conduct a public hearing to consider an amendment to Ordinance No. 24,282 (ZD 30/10), establishing a conditional use to permit a prison and unrelated uses in a HI Heavy Industrial District… to permit the construction of a new 89 bed facility that is limited to housing inmates needing medical treatment or inmates with mental health needs; amend the proviso requiring the decommissioning or demolition of temporary housing facilities, the 400-bed modular units referenced therein, to permit retention of temporary housing that can be activated to house work-release inmates, and any overflow needs that may arise from insufficient space at Orleans Justice Center (OJC), consistent with the housing plan presented by the Compliance Director, and to establish parameters ensuring appropriate temporary use and incremental discontinuance once OJC regains sufficient space, but to require the demolition or decommissioning of the temporary housing facilities within **two years** from adoption of the ordinance effectuating this amendment (necessitating an additional amendment to the Conditional Use Ordinance to retain any temporary housing beyond the two year period)." Ultimately, the City Planning Commission staff could not move forward with this request because the applicant did not submit plans in order to complete the application and proceed with docketing.

---

6 An earlier Motion M-13-444 for an Amendment to Conditional Use Ordinance No. 24,282 MCS was considered under ZD 07/14. That Motion was withdrawn by the Council and replaced with M-14-28.

*Motion M-21-276 (Zoning Docket 099/21)*

The City Planning Commission will consider a competing proposal for the adaptive reuse of the Orleans Parish Justice Center's Phase 2 building or other existing resources for the housing of male and female inmates classified with acute and sub-acute mental health conditions, and for components related to a medical clinic, infirmary, laundry, administration, and visitation area. This request will come before the Commission at a subsequent meeting.

**D.   What changes are proposed?**

The applicant is requesting an amendment to Ordinance No. 28,300 MCS (Zoning Docket 105/19), establishing a conditional use to permit a prison and related uses in an LI Light Industrial District, to permit the expansion of the prison to include the construction of a medical and mental health services facility on a portion of Lots 1 and 2, Square 600-A. Known as Phase III, this proposal was only tentative during review under the original zoning docket (ZD030/10). The proposal includes construction of a new two-story building with approximately 80,500 square feet.

**E.   How do the proposed amendments impact building and site design?**

*Existing Conditions*

**Figure 2: Aerial of Proposed Phase III Site**



*Site Conditions*

The Orleans Justice Center is located on Square 600-A on Lots 1 and 2 and measures approximately 654,000 square feet (15 acres) in total area. The site is generally bounded by Poydras Street, South Broad Street, Perdido Street, and South Jefferson Davis Parkway. Lot 1 constitutes the majority of the OJC complex (617,477 square feet), while Lot 2 (36,547 square feet) is significantly smaller. Despite the existence of two lots of record, the land functions as a single development site.

The Phase III facility would be situated on the portion of land bounded by Perdido Street, the former S. Dupre Street right-of-way, Interstate 10, and the former S. Gayoso Street right-of-way, a portion of both Lots 1 and 2. The 97,178 square foot area largely consists of green space and is vacant except for an overhead walkway and security fences/walls and gates. This was the former site of the Templeman I and II buildings.

**Proposed Conditions**

*Site Conditions*

### Figure 3: Proposed Phase III Site Plan



As described previously, the proposed Phase III facility structure would sit on a portion of both Lots 1 and 2. Should this request receive approval, the staff recommends the following proviso to eliminate any issues with the building code:

- Prior to the issuance of a Certificate of Occupancy by the Department of Safety and Permits, the applicant shall consolidate the lots associated with the site into a single lot of record through the City Planning Commission. The approved subdivision shall be recorded with the Office of Conveyances.

The proposed building will be connected to the existing OJC structures on either side by an elevated walkway. The submitted information indicates that Phase III will serve as housing for inmates with acute and sub-acute mental health conditions. The two-story 80,500 square feet facility would contain 89 beds: a 12-bed female housing unit and a 39-bed male housing unit on the first floor and a 38-bed male housing unit on the second floor. While the submitted floor plans are not fully detailed for security purposes, the applicant has noted there will be 62 cells.[7] The proposal also includes laundry, a centralized visitation area for attorney and family visits with a public entry point, housing support with counseling rooms and mental health staff work areas, a nurse and security station, and additional space including an infirmary, clinic, phlebotomy, dental services, and administration. According to the application package, the applicant projects an estimated cost of $51 million with construction finalized around August 2023.

*Base Zoning District Standards*

Bulk & Yard Regulations

The subject site is located in an LI Light Industrial District. As such, the bulk and yard requirements of the LI District can be found in **Article 16, Section 16.3.A.1 (Table 16-2) – Bulk & Yard Regulations** of the Comprehensive Zoning Ordinance.

Table 1: Bulk Regulations (Proposed Conditions)

| Bulk Regulations | Requirement | Proposed | Waiver Necessary? |
|---|---|---|---|
| *Minimum Lot Area* | 5,000 ft² | 654,000 ft² | No |
| *Maximum Building Height* | 75 ft | 58 ft, 8 in | No |
| *Minimum Permeable Open Space* | 20% of lot area | TBD | No |

The submitted site plan for the Phase III building indicates that it will meet the bulk and yard requirements of the district with the exception of permeable open space, which the applicant has not provided. If approved, staff recommends the following proviso to ensure compliance:

- The plans submitted to the City Planning Commission for final approval shall

---

[7] Per the September 30 email from Stephanie Norris, Grace Hebert Curtis Architects: "We have 56 cells with beds plus 6 cells that are either 'Padded' or 'Calming' cells for use by the population in the 56 cells."

indicate at least 20% permeable open space. Permeable open space shall conform to the requirements of **Article 16, Section 16.3.A.1 (Table 16-2)** of the Comprehensive Zoning Ordinance, subject to the review and approval of the City Planning Commission staff.

**Table 2. Yard Regulations (Proposed Conditions)[8]**

| Minimum Yard Requirements | Requirement | Proposed | Waiver Necessary? |
|---|---|---|---|
| *Front Yard (Norman C. Francis)* | N/A - existing | N/A - existing | No |
| *Corner Side Yard (Perdido)* | 10 ft | 55 ft, 3 in | No |
| *Front Side Yard (Broad Street ramp)* | N/A - existing | N/A - existing | No |
| *Corner Side Yard (Poydras)* | 10 ft | 11 ft, 6 in | No |

*Parking and Loading*

The required and proposed parking and loading facilities are detailed in Section G of this report, below.

*Landscaping*

The applicant has submitted a landscape plan as part of the application package. However, to ensure full compliance in the event of approval, staff recommends the following proviso:

■ The Phase III plans submitted to the City Planning Commission for final approval shall include a landscaping plan that complies with **Article 23, Section 23.3.B** of the Comprehensive Zoning Ordinance. The landscape plan shall be prepared by a licensed Louisiana landscape architect. This landscape plan shall indicate the following:

    a. the genus, species, size, location, quantity, and irrigation of all existing and proposed plant materials within both the common areas and the street rights of-way within the site, with applicable remarks and details;

    b. compliance with all applicable landscape regulations in **Article 23** and elsewhere in the Comprehensive Zoning Ordinance including parking lot landscaping in **Article 23, Section 23.7** and buffer yard landscaping in **Article 23, Section 23.8;** and

    c. building foundation planting.

*Lighting*

As this is a new structure, it must comply with the exterior lighting requirements of **Article 21, Section 21.5.** Thus, staff recommends the following proviso:

---

[8] The Department of Safety & Permits has confirmed that the development site maintains two front yards on the Norman C. Francis Parkway (formerly Jefferson Davis Parkway) and the Broad Street ramp frontages of the site, one interior side yard on the Interstate 10 side of the site, and one corner side yard on the Perdido Street side of the site.

> ▪ The plans submitted to the City Planning Commission for final approval shall indicate the type, locations, and height of any exterior lighting. Any proposed exterior lighting shall comply with the standards of **Article 21, Section 21.5** of the Comprehensive Zoning Ordinance.

*Signage*

The submitted architectural elevations show a self-illuminating Orleans Parish Sheriff's Office letters on the building's north elevation. However, to ensure compliance, staff recommends the following proviso for any signage proposed for the Phase III structure:

> ▪ The plans submitted to the City Planning Commission for final approval shall indicate the type, location, size, and materials of all signage. All signage shall conform to the requirements of **Article 24** of the Comprehensive Zoning Ordinance, subject to the review and approval of the City Planning Commission staff.

*Screening*

The submitted Phase III site plan indicates the presence of dumpsters that would be screened from the public right-of-way by building walls as well as the security wall around the perimeter of the site. However, to ensure compliance, staff recommends the following proviso for any signage proposed for the Phase III structure:

> ▪ In accordance with **Article 23, Section 23.13.A** of the Comprehensive Zoning Ordinance, the plans submitted to the City Planning Commission for final approval shall indicate the location of the trash receptacle which shall be within an enclosed structure or screened by a seven foot (7') opaque fence with latching gates. At no time, excepting trash collection days, shall trash be stored as to be visible from the public rights-of-way.

*Right-of-Way Improvements*

While the existing ordinances include a number of provisos associated with the public right-of-way, the current proposal does not indicate any further modifications. However, to ensure compliance, staff recommends the following proviso for any signage proposed for the Phase III structure:

> ▪ The developer shall secure the approval of the Department of Public Works for any improvements to the adjacent public right-of-way, including sidewalks, curbing, and curb cuts, and any other modifications to the surrounding public rights-of-way. When submitting plans to the City Planning Commission for final approval, the developer shall provide documentation of all required approvals by the Department of Public Works.

*Use Standards*

**Article 20** does not contain any use standards for jails.

F. **Have there been any recent zoning changes or conditional uses or planned developments in the immediate area? If so, do these changes indicate any particular pattern or trend?**

In the past five years, there has been one request for zoning action (including zoning changes, conditional uses, and planned developments) within the survey area (approximately 1,800 feet of the subject site):

**Zoning Docket 105/19** was a request for an amendment to a conditional use to modify certain provisos for a property in an LI Light Industrial District. The municipal address is 2800 Perdido Street (formerly 819-821 South Broad Street and 2750-3200 Perdido Street). The City Planning Commission recommended denial of the request, and the City Council granted modified approval. *This site is part of the Orleans Justice Center complex.*

While a competing proposal (Zoning Docket 099/21) is currently under review at the staff level, the City Planning Commission has not yet acted on it. No other zoning requests within a five (5) block radius are relevant to the subject request.

G. **What impact will the proposed conditional use have on the transportation system, if any? What are the off-street parking and off-street loading requirements? Can they be provided on site? If not, is a waiver required?**

*Traffic*

As noted in the staff report for Zoning Docket 030/10, "[t]he petitioned site is bounded on its downriver side by Perdido Street, which is a minor street with one lane of travel in each direction and on-street parking on both sides of the street. Its upriver side is bounded by the Poydras Street right-of-way, which is unpaved.   A railroad track used by Amtrak is adjacent to the right-of-way, and Interstate 10 is located beyond the railroad track. The site extends from South Broad Street on its river side to South Jefferson Davis Parkway on its lake side. South Broad Street is a major street with two lanes of travel in each direction. Adjacent to the site, the South Broad Street viaduct crosses the Amtrak railroad line and Interstate 10. A curvilinear on-ramp merges with the elevated viaduct from the end of Poydras Street, parallel to which is a road traveling directly adjacent to the site and connecting Perdido Street to the downriver bound lanes of South Broad Street. South Jefferson Davis Parkway is also a major street with two lanes of travel in each direction and ramps into an elevated viaduct adjacent to the site, similar to South Broad Street.

The former street rights-of-way traversing the site have been revoked and are occupied by buildings and enclosed by walls. Additionally, a portion of Perdido Street between Jane Alley and South Dupre, and a portion of South White Street between Perdido and Gravier Streets have been enclosed by fencing by the applicant and are closed to public access. This was done to provide a secure perimeter between the temporary inmate processing center across Perdido Street from the petitioned site and the inmate housing facilities within the petitioned site.

Properties fronting on Perdido Street adjacent to the site are occupied by a mixture of residential, commercial, industrial and public uses, as are the minor streets connecting

Perdido Street to Tulane Avenue, which is a major street located two blocks downriver from the site. Due to the large size of the proposed development, a traffic impact analysis was ordered by the applicant, prepared by a consultant and submitted to the City for its review. The conclusion reached by the consultant for the applicant is copied below for reference:

> 'The results of this analysis indicate that the signalized intersections that provide access to the OPCSO facilities and other planned and proposed developments in the study area can accommodate future traffic demand. This conclusion is based upon sufficient excess capacity that is exhibited under current traffic demand and future traffic operations. (p. 24)'"[9]

ZD030/10's approval hinged upon the Department of Public Works' approval of a traffic impact analysis:

> 19. The applicant shall secure the approval of the Department of Public Works for the following:
>
>> […]
>
>> e. a traffic impact analysis for the proposed development, including any mitigation measures deemed necessary should significant adverse impact to the transportation system be determined by the Department of Public Works to be likely to occur as a result of the proposed development.

Staff believes that, because the Orleans Justice Center was contemplated as a whole under the original zoning docket, that any further impacts to traffic would be minimal. Additionally, at the time of the original staff report in 2010, the Orleans Parish Sheriff's Office had provided a long-term goal to house 4,500 inmates in a facility with 5,000 beds; plans submitted to staff at that time indicated 5,832 beds. However, in the intervening years, the prison population has further reduced due to various reforms. The site is now restricted to no more than 1,250 inmates under Ordinance No. 28,300 MCS. Due to this significant reduction in operational scale, staff does not foresee any notable traffic impact.

*Parking*

The Orleans Justice Center was required to provide 206 off-street parking spaces based on a determination by the Department of Safety & Permits during the course of review for Zoning Docket 030/10, which determined that required parking for prisons is to be calculated by applying the "office or office building" use category to the square footage of administration and central services buildings. All other uses on the site (cell blocks, kitchen/warehouse building, etc.) are accessory to the prison and incidental thereto, and no parking is thus required for those structures. Ultimately, the request was granted a waiver of the off-street parking requirement under the former Comprehensive Zoning Ordinance:

---

[9] Excerpt from traffic impact section of ZD030/10 staff report.

**WAIVER:**

1.  The applicant shall be granted a waiver of Article 15, Section 15.2.1. *Off-Street Parking Regulations for All Districts, Except the CBD Districts and the Vieux Carré Districts* of the Comprehensive Zoning Ordinance, which requires the provision of two hundred six (206) off-street parking spaces, to permit the provision of zero (0) off-street parking spaces, subject to the requirements indicated in the related condition (see proviso 20) pertaining to the future provision of off-street parking on the site.[10]

The proposed amendment would increase the number of cells beyond what was originally approved in Zoning Docket 030/10. Under **Article 22, Section 22.4.A (Table 22-1)** of the current Comprehensive Zoning Ordinance, a prison is required to provide one (1) off-parking space per 20 cells. According to the applicant's agent, there will be 62 cells. Based on this number, three (3) off-street parking spaces are required. To ensure compliance, staff recommends the following proviso:

- The plans submitted to the City Planning Commission for final approval shall indicate the presence of a minimum of one (1) off-street vehicle parking space per 20 cells, as set forth in **Article 22, Section 22.4.A (Table 22-1)** of the Comprehensive Zoning Ordinance. The number of required parking spaces shall be calculated based only upon the number of additional cells approved under Zoning Docket 071/21. The location and design of vehicle parking spaces shall comply with the requirements as set forth in **Article 22, Section 22.8** of the Comprehensive Zoning Ordinance.

*Bicycle Parking*

In addition, bicycle parking was not required under Zoning Docket 030/10. However, as the applicant is increasing the number of cells above what was previously approved, bicycle parking spaces are now required at the rate of one (1) per 40 cells, 50 percent of which are long-term, for the number of cells that exceed the previously approved amounts.

In order to assure that the applicant will provide the required bicycle parking spaces triggered by the addition of cells beyond the number previously approved under Zoning Docket 30/10, staff recommends the following proviso:

- The plans submitted to the City Planning Commission for final approval shall indicate the installation of at least one (1) bicycle parking space per 40 cells, 50% of which are long-term bicycle spaces, as set forth in **Article 22, Section 22.4.A (Table 22-1)** and **Article 22, Section 22.6** of the Comprehensive Zoning Ordinance. The number of required bicycle parking spaces shall be calculated based only upon the number of additional cells approved under Zoning Docket 071/21. The design of bicycle parking spaces shall comply with the requirements as set forth in **Article 22, Section 22.9** of the Comprehensive Zoning Ordinance. When submitting plans to the City Planning Commission for final approval, the developer shall provide documentation of all required approvals by the

---

[10] Proviso 20 was deleted under Ordinance 28,300.

Department of Public Works for any bicycle spaces located in the public right-of-way.

### *Loading*

The subject use was required and proposed two (2) loading spaces under the former Comprehensive Zoning Ordinance. **Article 22, Section 22.7 (Table 22-3)** requires that each additional full 50,000 square feet of gross floor area over 200,000 square feet triggers one (1) additional loading space. At 80,500 square feet, Phase III triggers one (1) additional loading space. To ensure compliance, staff recommends the following proviso:

- The plans submitted to the City Planning Commission for final approval shall indicate the presence of a minimum of one (1) additional loading space, as set forth in **Article 22, Section 22.7 (Table 22-3)** of the Comprehensive Zoning Ordinance. The number of required loading spaces shall be calculated based only upon Zoning Docket 071/21. The design of loading spaces shall comply with the requirements as set forth in **Article 22, Section 22.10** of the Comprehensive Zoning Ordinance.

**H.   What effects/impacts would the proposed conditional use have on adjacent properties?**

This amendment will not have any significant land use impacts on adjacent properties. The conditional use process contemplates land use impacts such as traffic, noise, and other operational characteristics. This amendment will not change the existing approved land use in a meaningful way and ultimately is not an intensification of the previous approval.

The criminalization and incarceration of individuals with acute and sub-acute mental health conditions—and the lack of alternative support systems resulting from significant failures in how the U.S. health care system addresses mental illness—as well as financial concerns and the requirements of the federal consent decree are not zoning issues and are beyond the scope of what the City Planning Commission staff has the legal authority to consider.

**I.   What are the comments from other agencies/departments/committees?**

*Design Advisory Committee*

The Design Advisory Committee is tasked with advising on design. Minutes from its June 3, 2020 meeting are below:

> **Consideration: Design Review 088/20** – Request by the City of New Orleans to construct a new medical services building. (EH)
>
> The applicant's agent provided an overview of the Orleans Justice Center's new Medical Services Building. Constructed between two existing OJC buildings and visible from Interstate-10 and Perdido Street, it would house two (2) male housing units, two (2) female housing units, laundry, administration, a clinic, infirmary, and

visitation area. It would have limited access to the public. No parking is planned, and the exterior finishes would mimic the two adjacent buildings.

The Committee expressed no comments or concerns relative to the design of the building.

The **Historic District Landmarks Commission** representative made a motion to **approve** the proposal. The **City Planning Commission** representative **seconded** the motion, which was **unanimously approved**.

J.     **Compliance with approval standards**

The City Planning Commission recommendation and the City Council decision on applications for a conditional use shall, on the basis of all information submitted, evaluate the impact of the conditional use on and the compatibility of the use with surrounding properties and neighborhoods to ensure the appropriateness of the use at a particular location. The Commission and Council are required to specifically consider the extent to which the proposed use meets the approval standards contained in **Article 4, Section 4.3.F Approval Standards** of the Comprehensive Zoning Ordinance. In this section, the staff evaluates the application using those standards.

**The proposed use at the specified location is consistent with the policies embodied in the adopted Master Plan.**

This standard is met. The Home Rule Charter of the City of New Orleans requires all land use actions to be consistent with the Master Plan. A land use action is consistent with the Plan for the 21st Century, commonly known as the Master Plan, if it furthers, or at least does not interfere with, the goals, policies, and is compatible with the proposed future uses, densities, and intensities designated in the Land Use Element of the Plan. "Chapter 13: Land Use Plan" of the Master Plan designates on the Future Land Use Map (FLUM) of the petitioned site as "Institutional." The goal, range of uses, and development character for that designation are copied below.

**INSTITUTIONAL**

**Goal:** Preserve and enhance existing large-scale institutions such as health care, education (colleges and universities), detention centers and other facilities.

**Range of Uses:** Hospitals, colleges, universities, military and public detention facilities with large campus-like facilities. Smaller-scale, local houses of worship, public and private schools, police and fire stations, emergency and community centers are included in residential, commercial and mixed-use areas, as they are essential components of neighborhood life. Transit and transportation facilities, agricultural, and stormwater management uses are allowed.

**Development Character:** Large-scale, coordinated campus development with appropriate transitions to surrounding uses and neighborhoods. Incorporate risk reduction and adaptation strategies in the built environment.

The Orleans Justice Center, a jail with a campus-like facility, is consistent with the institutional Future Land Use designation of the subject site.

**The proposed use is consistent with the general purpose and intent of the applicable zoning district regulations.**
This standard is met. While this use was originally reviewed under the former Comprehensive Zoning Ordinance for the HI Heavy Industrial District, the site's current zoning—LI Light Industrial District—contemplates a number of institutional uses, including prisons (as a conditional use). Based on this and the original staff report for Zoning Docket 030/10, the use is consistent with the general purpose and intent of the applicable zoning district regulations for both the former zoning district and the current zoning district.

**The proposed use meets all standards specifically applicable to the use as set forth in Article 20 and all environmental performance standards of Section 21.3.**

This standard is either not applicable or can be met. As noted previously, there are no use standards specific to prisons. In addition, the proposal can meet all environmental performance standards listed in **Article 21, Section 21.3**, which would be addressed (and mitigated) through the normal permitting process.

**The proposed use is compatible with and preserves the character and integrity of adjacent development and neighborhoods and, as required by the particular circumstances, includes improvements or modifications either on-site or within the public right-of-way to mitigate development-related adverse impacts.**

This standard is met. As the proposal remains consistent with the current use of the site, the addition of the Phase III building does not detract from the overall use's compatibility with the surrounding area. Further, if approved with the staff-recommended provisos, any development-related impacts can be mitigated.

**Any variance of zoning standards meets the approval standards of Section 4.6.F.**

This is not applicable. The applicant is not requesting any variances.[11]

**The proposed use is not materially detrimental to the public health, safety, and welfare, or results in material damage or prejudice to other property in the vicinity.**

This standard is met. This approvable standard—assessing the health, safety, and welfare impacts of developments reviewed through the conditional use process—is intended to assess the externalized *land use* impacts of a particular development on surrounding properties. This assessment of land use impacts relates to the historical function of zoning as mechanism for separating incompatible land uses. It considers a proposed development's impact in terms of the type of activity they generate; when, where, and how this activity occurs; vehicular traffic and parking impacts; noise impacts; environmental

---

[11] While the application package notes a variance request for front yard setback, the Department of Safety & Permits determined in an October 1 email that the subject frontage was considered a corner side and, therefore, did not trigger a variance.

impacts; and aesthetic impacts. This allows for a determination of whether there are meaningful land use impacts and whether there are building or site design changes or operational restrictions that can imposed to mitigate those impacts in order to make the development appropriate for the intended location.

From a land use perspective, the addition of a Phase III facility to provide housing and ancillary services for inmates with acute and sub-acute mental health conditions would not result in significant new impacts. Indeed, as the current proposal aligns with the 2019 request, which specifically requested accommodations for 89 inmates with acute and sub-acute mental health conditions, staff believes that no further detriment to the public health, safety, and welfare would occur from authorizing construction of a new building for the same purpose.

The staff certainly recognizes the concerns of many in the community about the negative impacts of incarcerating mentally ill people on the individuals themselves and the community at large, as well as the projected financial costs associated with Phase III. However, these human and societal impacts are beyond the scope of what the staff is tasked with evaluating.

## III.   SUMMARY

Zoning Docket 071/21 considers an amendment to Ordinance No. 28,300 MCS (Zoning Docket 105/19), which amended Ordinance No. 24,282 MCS (Zoning Docket 030/10) authorizing the conditional use of a prison and related uses (Orleans Justice Center), to permit an expansion to include the construction of a medical and mental health services facility on the former Templeman I and II site, which is bounded by Perdido Street, the former S. Dupre Street right-of-way, Interstate 10, and the former S. Gayoso Street right-of-way. Known as Phase III, this new two-story 80,500 square feet facility would contain 89 beds for inmates with acute and sub-acute mental health conditions. The proposal also includes laundry, a centralized visitation area for attorney and family visits with a public entry point, housing support with counseling rooms and mental health staff work areas, a nurse and security station, and additional space including an infirmary, clinic, phlebotomy, dental services, and administration. The proposed building will connect via an elevated walkway to the existing OJC structures on either side. The application projects an estimated cost of $51 million with construction finalized around August 2023.

Staff recognizes the legitimate concerns surrounding the merits of this application—including incarceration of individuals with mental health conditions, the $51 million price tag (only $39 million of which would be covered by FEMA funds), and what is allowable under the federal consent decree.

That said, the City Planning Commission's role is narrowly focused on assessing a proposed development's impact in terms of the type of activity they generate; when, where, and how this activity occurs; vehicular traffic and parking impacts; noise impacts; environmental impacts; and aesthetic impacts. This allows for a determination of whether there are meaningful land use impacts and whether there are building or site design changes or operational restrictions that can imposed to mitigate those impacts in order to make the development appropriate for the intended location. From a land use perspective, the

addition of a Phase III facility to provide housing and ancillary services for inmates with acute and sub-acute mental health conditions would not result in significant new impacts or an intensification of the current use. Indeed, the current proposal aligns with the 2019 request, which specifically requested accommodations for 89 inmates with acute and sub-acute mental health conditions. With this in mind, staff believes that the request meets the approval standards of **Article 4, Section 4.3.F** and must recommend approval.

This application constitutes the first of two competing proposals for housing and services for inmates with acute and sub-acute mental health conditions. The other proposal, Zoning Docket 099/21, was introduced by Council Motion M-21-276 and considers the adaptive reuse (retrofit) of the Orleans Justice Center's Phase 2 building or other existing resources for the housing of male and female inmates classified with acute and sub-acute mental health conditions. That proposal will be considered at a subsequent City Planning Commission meeting. Ultimately, City Council must consider how each proposal aligns with its policy agenda.

## IV.  PRELIMINARY STAFF RECOMMENDATION

The staff recommends **APPROVAL** of Zoning Docket 071/21, a request for an amendment to Ordinance No. 28,300 MCS (Zoning Docket 105/19) subject to one (1) waiver and thirty-one (31) provisos. Proposed new language is shown in <u>underlined</u> text:

### WAIVER:

1.  The applicant shall be granted a waiver of Article 15, Section 15.2.1. *Off-Street Parking Regulations for All Districts, Except the CBD Districts and the Vieux Carré Districts* of the Comprehensive Zoning Ordinance, which requires the provision of two hundred six (206) off-street parking spaces, to permit the provision of zero (0) off-street parking spaces, subject to the requirements indicated in the related condition (see proviso 22) pertaining to the future provision of off-street parking on the site.

### PROVISOS:

1.  The applicant shall resubdivide the petitioned lots into one lot of record.

2.  The applicant shall submit revised site plans demonstrating that no permanent structure encroaches upon the Poydras Street right-of-way.
3.  The surface parking lot shall be enclosed with perimeter fencing – such as a low masonry chain wall with half metal picket fence above – in order to create a street edge along Perdido Street and the curvilinear South Broad Street/Poydras Service Drive.

4.  The applicant shall alter the sallyport window openings at street-level on Perdido Street so that they are larger and more transparent, as long as security is not compromised.

5.  In order for the applicant to add additional properties and to add the Templeman I and II facility, the applicant shall be required to amend this Conditional Use ordinance through the City Planning Commission, with Council approval, in accordance with the full Conditional Use process.

6.  The applicant shall secure a long-term lease of servitude for existing improvements made upon the Poydras Street right-of-way, including but not limited to the 12-foot concrete security wall between South White and South Lopez Streets, and the paved storage yard area between South Rendon Street and South Jefferson Davis Parkway.

7.  The developer shall include a note on amended site plans stating that all temporary inmate housing, including the 400 bed modular units known as the Temporary Detention Center ("TDC"), will be removed and/or closed upon the opening of a permanent facility and/or unit for the housing of male and female inmates classified with acute and sub-acute mental health conditions:

    a.  The developer shall ensure that at no time shall the aggregate inmate population of the Orleans Justice Center complex, including without limitation, those held in Phase II, the TDC, and in the permanent facility or unit for the housing of male and female inmates classified with acute and sub-acute mental health conditions exceed 1,250 inmates, and that all inmates (male, female, and juvenile) except those classified with acute and sub-acute mental health conditions, those participating in the work-release program and those actively working on the kitchen staff, shall be detained in Phase II of the OJC, which shall continue to provide a variety of programming aimed at reducing recidivism including but not limited to medical care, educational services, including GED preparation, vocational and job training.

    b.  The developer shall demolish or decommission and not detain any inmates in any of the following existing Orleans Parish Prison facilities, unless other appropriate action is taken by the Mayor and/or City Council that is consistent with their authority:

        i.    House of Dentition;
        ii.   The Community Correctional Center;
        iii.  Conchetta;
        iv.   Broad Street;
        v.    South White Street;
        vi.   Templeman V; and
        vii.  The original Temporary Housing Units (Tents).

        The original Orleans Parish Prison connected to the Criminal Courts building (OPP) shall only be used as a daily holding facility to transfer inmates to and from court while awaiting a trial or hearing.

    c.  Building 1 and Building 2 of the 400-bed modular Temporary Detention Center ("TDC") shall be renovated in accordance with the submitted plans to

temporarily accommodate male and female inmates classified with acute and sub-acute mental health conditions. Building 1 and Building 2 shall be permitted to continue to accommodate these inmates until the opening of a permanent facility and/or unit for the housing of male and female inmates classified with acute and sub-acute mental health conditions. Once the inmates housed in Buildings 1 and 2 of the TDC have been transferred to the permanent facility and/or unit for the housing of male and female inmates classified with acute and sub-acute mental health conditions. Developer shall demolish or decommission Buildings 1 and 2 of the TDC and they shall not be used to house any inmates with OJC.

    d.  Developer shall be permitted to use Building 3 and Building 4 of the Temporary Detention Center ("TDC") to house only two (2) distinct classes of inmates, namely:

        i.  Those inmates participating in any work-release program, where they are released from the OJC secured complex into the general public during the day and return to the OJC Complex overnight.

       ii.  Those inmates that are serving as trustees in the Orleans Justice Center kitchen where they have access to items which may be used as weapons.

At no time shall the total number of inmates housed in Building 3 and Building 4 exceed one hundred and fifty (150) (a maximum of one hundred twenty (120) for work release and a maximum of thirty (30) for kitchen detail), and at all times the total aggregate number of inmates housed in Buildings 3 and 4 shall count toward the 1,250 maximum inmate population count established in subsection (a) hereof.

8.  The applicant shall remove all obstructions to automotive and pedestrian traffic, and restore the public right-of-way on Perdido and South White Streets prior to receiving a certificate of use and occupancy for the new Templeman III & IV facility from the Department of Safety and Permits. This proviso may be amended upon written recommendation by the Mayor after meeting with stakeholders and experts.

9.  The applicant shall submit a phasing plan showing that, upon demolition of South White Street women's housing facility and relocation of the tilapia farm, Ring Road shall be extended to a secure gate on Poydras Avenue under the South Broad Street viaduct.

10.  The applicant shall secure approval of revised site plans by the Fire Marshall and abide by applicable fire code.

11.  The applicant shall submit detailed landscape plans prepared by a licensed Louisiana landscape architect indicating the items listed below. The landscape plan shall be subject to final approval by City Planning Commission staff and by the Department of Parks and Parkways for any proposed planting within a public right-of-way.

    a.  Landscaping improvements within the proposed parking lot, on islands, medians and along perimeter ground not improved with asphalt paving.

    b.  Shade-plantings along the Perdido Street side of the Intake and Processing Center sallyport, between the building and the sidewalk as space permits, providing a planting bed of not less than two (2) feet.

    c.  The genus, species, size, location, quantity and irrigation of all proposed plant materials within both the common areas and the street rights-of-way within the site, with applicable remarks and details.

    d.  There shall be aesthetic tree plantings subject to the approval of the Department of Parks and Parkways along Tulane Avenue, Broad Street and South Jefferson Davis Parkway.

12. The applicant shall submit a revised site plan showing additional green space of a sizable concentration within the Correctional Complex that can be used as an outdoor recreation area for inmates, to the extent possible.

13. The applicant shall either modify the location of dumpster berths or provide visual screening as part of the site design so that the Trash Dock at the rear of the Kitchen/Warehouse/Plant will not be visible from the public right-of-way.

14. The applicant shall provide to the City Planning Commission a litter abatement program letter, inclusive of the stated location of litter storage, the type and quantity of trash receptacles, the frequency of litter pickup by the Department of Sanitation or a contracted trash removal company, and the clearing of all litter from the sidewalks and street rights-of-way. The name and phone number of the owner/operator of the development shall be included in this letter to be kept on file in case of any violation.

15. The applicant shall submit a detailed signage plan indicating:

    a.  The location, text and dimension of all signs posted around the perimeter of the petitioned site or which are visible to the public.

    b.  Which signs will be illuminated and specifications for said signs.

16. The applicant shall submit a lighting plan for the petitioned site for review and approval by the staff of the City Planning Commission and the Department of Public Works.

17. All proposed curb cuts shall require the approval of the Department of Public Works. All curbs and sidewalks along the Perdido Street frontage shall be replaced and any existing and unused curb cuts along either street frontage shall be restored.  Approval of plans for such reconstruction shall be secured from the Department of Public Works.

18. The Sheriff's department shall restrict loading dock activity at night, so that no truck deliveries or trash collection occurs between the hours of 10:00 p.m. and 6:00 a.m.

19. The applicant shall secure the approval of the Department of Public Works for the following:

    a.  the location and construction of all proposed curb cuts and the restoration of any existing curb cuts that are not to be utilized as part of the development;

    b.  the replacement or restoration of all sidewalks adjacent to and across a street from the site as deemed necessary;

    c.  the installation of vertical curbs along all street frontages adjacent to the site;

    d.  the installation of all subsurface drainage for the proposed development; and

    e.  a traffic impact analysis for the proposed development, including any mitigation measures deemed necessary should significant adverse impact to the transportation system be determined by the Department of Public Works to be likely to occur as a result of the proposed development.

20. The applicant shall work with the Sewerage and Water Board as necessary for the retention or relocation of any sewer or water lines affected by the proposed development.

21. The Mayor may provide a written recommendation to the City Council after convening meetings with stakeholders and experts.

**<u>PROVISOS (PHASE III ONLY):</u>**

22. <u>Prior to the issuance of a Certificate of Occupancy by the Department of Safety and Permits, the applicant shall consolidate the lots associated with the site into a single lot of record through the City Planning Commission. The approved subdivision shall be recorded with the Office of Conveyances.</u>

23. <u>The plans submitted to the City Planning Commission for final approval shall indicate at least 20% permeable open space. Permeable open space shall conform to the requirements of **Article 16, Section 16.3.A.1 (Table 16-2)** of the Comprehensive Zoning Ordinance, subject to the review and approval of the City Planning Commission staff.</u>

24. <u>The Phase III plans submitted to the City Planning Commission for final approval shall include a landscaping plan that complies with **Article 23, Section 23.3.B** of the Comprehensive Zoning Ordinance. The landscape plan shall be prepared by a</u>

licensed Louisiana landscape architect. This landscape plan shall indicate the following:

   a.   the genus, species, size, location, quantity, and irrigation of all existing and proposed plant materials within both the common areas and the street rights of-way within the site, with applicable remarks and details;

   b.   compliance with all applicable landscape regulations in **Article 23** and elsewhere in the Comprehensive Zoning Ordinance including parking lot landscaping in **Article 23, Section 23.7** and buffer yard landscaping in **Article 23, Section 23.8**; and

   c.   building foundation planting.

25. The plans submitted to the City Planning Commission for final approval shall indicate the type, locations, and height of any exterior lighting. Any proposed exterior lighting shall comply with the standards of **Article 21, Section 21.5** of the Comprehensive Zoning Ordinance.

26. The plans submitted to the City Planning Commission for final approval shall indicate the type, location, size, and materials of all signage. All signage shall conform to the requirements of **Article 24** of the Comprehensive Zoning Ordinance, subject to the review and approval of the City Planning Commission staff.

27. In accordance with **Article 23, Section 23.13.A** of the Comprehensive Zoning Ordinance, the plans submitted to the City Planning Commission for final approval shall indicate the location of the trash receptacle which shall be within an enclosed structure or screened by a seven foot (7') opaque fence with latching gates. At no time, excepting trash collection days, shall trash be stored as to be visible from the public rights-of-way.

28. The developer shall secure the approval of the Department of Public Works for any improvements to the adjacent public right-of-way, including sidewalks, curbing, and curb cuts, and any other modifications to the surrounding public rights-of-way. When submitting plans to the City Planning Commission for final approval, the developer shall provide documentation of all required approvals by the Department of Public Works.

29. The plans submitted to the City Planning Commission for final approval shall indicate the presence of a minimum of one (1) off-street vehicle parking space per 20 cells, as set forth in **Article 22, Section 22.4.A (Table 22-1)** of the Comprehensive Zoning Ordinance. The number of required parking spaces shall be calculated based only upon the number of additional cells approved under Zoning Docket 071/21. The location and design of vehicle parking spaces shall comply with the requirements as set forth in **Article 22, Section 22.8** of the Comprehensive Zoning Ordinance.

30. The plans submitted to the City Planning Commission for final approval shall indicate the installation of at least one (1) bicycle parking space per 40 cells, 50%

of which are long-term bicycle spaces, as set forth in **Article 22, Section 22.4.A (Table 22-1)** and **Article 22, Section 22.6** of the Comprehensive Zoning Ordinance. The number of required bicycle parking spaces shall be calculated based only upon the number of additional cells approved under Zoning Docket 071/21. The design of bicycle parking spaces shall comply with the requirements as set forth in **Article 22, Section 22.9** of the Comprehensive Zoning Ordinance. When submitting plans to the City Planning Commission for final approval, the developer shall provide documentation of all required approvals by the Department of Public Works for any bicycle spaces located in the public right-of-way.

31. The plans submitted to the City Planning Commission for final approval shall indicate the presence of a minimum of one (1) additional loading space, as set forth in **Article 22, Section 22.7 (Table 22-3)** of the Comprehensive Zoning Ordinance. The number of required loading spaces shall be calculated based only upon Zoning Docket 071/21. The design of loading spaces shall comply with the requirements as set forth in **Article 22, Section 22.10** of the Comprehensive Zoning Ordinance.

## V.   REASONS FOR RECOMMENDATION

1. Expansion of a previously approved prison use, within the existing site boundaries, to house a limited number of inmates with acute and sub-acute mental health does not constitute a significant change to the conditional use already in place, which authorized the temporary use of Buildings 1 and 2 of the Temporary Detention Center ("TDC") for the same purpose.

2. While there are legitimate concerns surrounding the criminalization and incarceration of individuals with mental health conditions, the financial burden of a new facility, and the consent decree, these are outside the scope of the City Planning Commission's purview. The scope of this review is limited to the land use considerations and, based on an evaluation of those considerations, the staff finds that the application meets the approval standards of **Article 4, Section 4.3.F.**

## VI.   ADDENDUM

### Compliance with approval standards

The City Planning Commission recommendation and the City Council decision on applications for a conditional use shall, on the basis of all information submitted, evaluate the impact of the conditional use on and the compatibility of the use with surrounding properties and neighborhoods to ensure the appropriateness of the use at a particular location. The Commission and Council are required to specifically consider the extent to which the proposed use meets the approval standards contained in **Article 4, Section 4.3.F Approval Standards** of the Comprehensive Zoning Ordinance. In this section, the staff evaluates the application using those standards.

**Any variance of zoning standards meets the approval standards of Section 4.6.F.**

This standard is not met. The requested variances do not meet the approval standards of **Article 4, Section 4.6.F.**

Following release of the staff report on October 5, the applicant notified staff that a variance of permeable open space would be needed. Per **Article 16, Section 16.3.A.1 (Table 16-2)**, 20% permeable open space is required. The applicant is proposing 17.3% and requesting a waiver of 2.7%:

> **Request:** This request is for a variance from the provisions of Article 16, Section 16.3.A.1 (Table 16-2) of the Comprehensive Zoning Ordinance to permit the expansion of a prison resulting in insufficient permeable open space.
>
> **Requested Waiver:**
> **Article 16, Section 16.3.A.1 (Table 16-2) – Permeable Open Space**
> Permitted: 20%            Proposed: 17.3%            Waiver: 2.3%

The purpose of the variance procedure is to afford an applicant relief from the requirements of the letter of this Ordinance when unnecessary hardship or practical difficulty exists. Pursuant to **Article 4, Section 4.3.E**, City Council may authorize a variance only when the evidence presented supports a finding that each case indicates all of the following:

1. **Do special conditions and circumstances exist which are peculiar to the land, structure, or building involved which are not applicable to other lands, structures, or buildings in the same zoning district?**

    This standard is **not** met.

    The former Comprehensive Zoning Ordinance did not set a permeable open space requirement for the subject site. Additionally, as part of the original approval, the Ordinance required subdivision of the entire site into a single lot of record.12 The applicant argues that these are special conditions peculiar to the site.

    Staff disagrees with this. This is not uncommon or a special condition unique to this site. Additionally, while the permeable open space requirement was not in place until August 2015, the site, as currently developed, is well within compliance with the requirement (approximately 32% permeable open space).

2. **Will the literal interpretation of the provisions of the ordinance deprive the applicant of rights commonly enjoyed by other properties in the same district?**

    This standard is **not** met.

    The current CZO, and with it the permeable open space requirement for the subject site, took effect on August 12, 2015. Since that time, no other similarly situated

---

12 According to permit data, the site was resubdivided following approval of Zoning Docket 030/10; however, instead of one lot, it was resubdivided into two lots of record under Subdivision Docket 079/11.

properties received variances from the permeable open space requirement.13·14 While instances of insufficient permeable open space for similarly situated properties may exist, these are most likely legal nonconforming conditions established under the former regulations. That said, based on the fact that no other sites have requested/received similar variances, the applicant would not be denied commonly enjoyed rights.

3.    **Do any special conditions and circumstances result from the actions of the applicant or any other person who may have (or had) an interest in the property?**

      This standard is **not** met.

      There are no special circumstances specific to the property that preclude the applicant from developing the property with a Phase III facility that provides the required open space on-site.  As undeveloped land, there are no apparent site constraints that preclude the applicant from developing the Phase III facility with the required open space.  As there are no special circumstances at all, there are no special circumstances that arise from the actions of the applicant or others with an interest in the property. The applicant could redevelop the site to reduce impervious surface, possibly.

4.    **Will the granting of the variance confer on the applicant any special privilege which is denied by this ordinance to other lands, structures, or buildings in the same district or similarly situated?**

      This standard is **not** met.
      Should the variance be granted, the applicant would receive special privilege because no other similarly situated sites have received variances of this requirement, as noted under standard 2.

5.    **Will the variance(s), if granted, alter the essential character of the locality?**

      This standard is **not** met.

      The Orleans Justice Center is already established on the larger development site and, further, is enclosed by a security wall. As the site is generally obscured from public view, the visual impacts of insufficient permeable open space on the essential character of the area, if any, will be limited.

      However, impervious surfaces can contribute to severe negative repercussions. Allowing developments that fail to meet the minimum permeable open space requirement (in other words, allowing excessive impervious surface) runs contrary to the intent of the Comprehensive Zoning Ordinance and *Plan for the 21st Century* and would most certainly fundamentally alter the character of a neighborhood

---

13 According to permit data for variance cases and conditional use cases.
14 Staff considers similarly situated properties as those non-residential uses in LI Light Industrial Districts.

through broader destructive impacts (e.g., runoff, flooding, subsidence, property damage, increase in the heat island effect, etc.).

6. **Will strict adherence to the property regulations result in a demonstrable hardship upon the owner, as distinguished from mere inconvenience?**

This standard is **not** met.

According to the architect, strict adherence would require an approximately 20% reduction of the proposed building area. Staff does not believe that this rises to the level of a hardship as there may be a way to attain similar operational capacity using existing square footage in other OJC buildings or through replacement of existing impervious paving with permeable paving systems or grass.

The Orleans Parish Sheriff's Office has indicated that square footage is important.15 Particularly during COVID, they have been able to more safety spread out inmates into all available housing units, something achieved, at least in part, due to a reduced inmate population. However, staff does not believe this is a demonstrable hardship. In general, it could apply to any number of uses, including hospitals, schools, restaurants, etc. Allowing for reduction of permeable open space citing scenarios outside the norm has negative land use ramifications long-term, as discussed previously.

7. **Is the purpose of the variance based exclusively upon a desire to serve the convenience or profit of the property owner, or other interested party(s)?**

This standard is met.
No. The request hinges upon a number of factors including requirements under the federal consent decree and operational considerations. For example, as noted above, the Orleans Parish Sheriff's Office has been able to more safety separate inmates during the pandemic due to the current square footage and reduced inmate population.

8. **Will the variance be detrimental to the public welfare, or injurious to other property or improvements in the neighborhood in which the property is located?**

This standard is **not** met.

If approved, the variance would be detrimental and injurious. As alluded to previously, impervious surfaces do not allow for stormwater infiltration and groundwater recharge. Stormwater runoff from impervious surfaces picks up pollutants such as trash, dirt, oil, pesticides, fertilizers, and metals, and directs them into the municipal stormwater system, which is eventually discharged into natural water bodies, such as Lake Pontchartrain. New Orleans relies on natural water bodies for fishing and recreation, so allowing pollution into these water bodies has

---

15 Per the Neighborhood Participation Program documents on page 52 of the application package.

a negative impact on health and quality of life. The City relies on pumps to convey stormwater which lowers groundwater levels and causes land to subside. Subsidence can lead to infrastructure failure of streets, underground pipes and utilities, and buildings which could lead to both damage to property and risk to human life from flooding as well as cost the City billions of dollars to repair.

9.   **Will the variance impair the adequate supply of light and air to adjacent property, substantially increase traffic congestion in the public street, increase the danger of fire, or endanger the public safety?**

This standard is **not** met.

For the reasons expounded upon under standard 8, approval of this variance would endanger the public safety, particularly due to side effects like infrastructure failure that could lead to flooding.

Based on this report, the staff believes that the requested variance of **Article 16, Section 16.3.A.1 (Table 16-2)** fails to meet 8 of the 9 criteria of the Standards for Variances of **Article 4, Section 4.6.F** of the Comprehensive Zoning Ordinance, in that:

- There are no special circumstances which are peculiar to the land,
- Literal interpretation of the ordinance will not deprive the applicant of rights commonly enjoyed by other properties in the district,
- The special circumstances were caused by the applicant,
- Granting the variance will confer on the applicant a special privilege,
- Granting the variance will alter the essential character of the locality,
- The property regulations will not result in a demonstrable hardship,
- The variance will be detrimental to public welfare, and
- The variance impair the adequate supply of light and air to adjacent property, substantially increase traffic congestion in the public street, increase the danger of fire, or endanger the public safety.

Therefore, the staff recommends **DENIAL** of the requested variance.

**Preliminary Staff Recommendation (Amended)**

In light of the above variance analysis, as well as a clarification on the site's ownership, staff recommends **APPROVAL** of Zoning Docket 071/21, a request for an amendment to Ordinance No. 28,300 MCS (Zoning Docket 105/19) subject to one (1) waiver and thirty-one (31) provisos, as noted above, with modifications to provisos 22 and 23. Proposed new language is shown in **bold underlined** text while proposed deletions are shown in ~~strikethrough~~ text:

22. Prior to the issuance of a Certificate of Occupancy by the Department of Safety and Permits, the applicant shall consolidate the lots associated with the site into a single lot of record through the City Planning Commission. The approved subdivision shall be recorded with the Office of Conveyances. **Alternatively, the applicant may elect to not combine the lots. Should the existing lots remain, the applicant shall secure any needed waivers**

**from the Board of Building Standards and Appeals to address any building code issues that may arise from the proposal.**

23. ~~The plans submitted to the City Planning Commission for final approval shall indicate at least 20% permeable open space. Permeable open space shall conform to the requirements of Article 16, Section 16.3.A.1 (Table 16-2) of the Comprehensive Zoning Ordinance, subject to the review and approval of the City Planning Commission staff.~~

23. **The plans submitted to the City Planning Commission for approval shall indicate compliance with the relevant yard, bulk, and open space requirements contained in Article 16, Section 16.3.A.1 (Table 16-2) of the Comprehensive Zoning Ordinance. This shall be achieved by modifying the plans to demonstrate compliance or obtaining variances of the requirements.**

## VII.   CITY PLANNING COMMISSION MEETING (OCTOBER 12, 2021)

The Assistant Planning Administrator requested a suspension of the rules to accept into the record an addendum to the staff report and the applicant's letter addressing a permeable open space variance request.

Commissioner Stewart made a motion to suspend the rules, which was seconded by Commissioner Mobley and adopted.

**MOTION:**

BE IT MOVED BY THE CITY PLANNING COMMISSION THAT THE RULES HAVE BEEN **SUSPENDED** TO ACCEPT INTO THE RECORD ITEMS RECEIVED PAST DEADLINE.

YEAS:          Alexander, Brown, Flick, Lunn, Mobley, Steeg, Stewart, Witry

NAYS:          None

ABSENT:     Wedberg

The Assistant Planning Administrator presented the staff recommendation of approval, noting the denial of the requested variance for permeable open space and modifications to recommended provisos 22 and 23. The applicant's agent, Stephanie Norris, spoke in support of the request. A number of public comments were submitted in opposition of this item. Comments were read into the record according to the adopted hearing rules for public comment.

Commissioner Lunn made a motion for denial, which was seconded by Commissioner Mobley and adopted.

**MOTION:**

BE IT MOVED BY THE CITY PLANNING COMMISSION THAT ZONING DOCKET 071/21 IS HEREBY RECOMMENDED FOR **DENIAL**. BE IT FURTHER MOVED THAT THE EXECUTIVE DIRECTOR IS HEREBY AUTHORIZED TO NOTIFY THE CITY COUNCIL OF SAID ACTION.

YEAS:        Flick, Lunn, Mobley

NAYS:        Alexander, Brown, Steeg, Stewart, Wedberg

ABSENT:      Witry

Motion **FAILS** due to lack of majority.

Commissioner Brown made a motion for approval, accepting the amended staff recommendation, which was seconded by Commissioner Stewart.

**MOTION:**

BE IT MOVED BY THE CITY PLANNING COMMISSION THAT ZONING DOCKET 071/21 IS HEREBY RECOMMENDED FOR **APPROVAL**, SUBJECT TO ONE (1) WAIVER AND 31 PROVISOS. BE IT FURTHER MOVED THAT THE EXECUTIVE DIRECTOR IS HEREBY AUTHORIZED TO NOTIFY THE CITY COUNCIL OF SAID ACTION.

*Waiver:*

1. The applicant shall be granted a waiver of Article 15, Section 15.2.1. *Off-Street Parking Regulations for All Districts, Except the CBD Districts and the Vieux Carré Districts* of the Comprehensive Zoning Ordinance, which requires the provision of two hundred six (206) off-street parking spaces, to permit the provision of zero (0) off-street parking spaces, subject to the requirements indicated in the related condition (see proviso 22) pertaining to the future provision of off-street parking on the site.

*Provisos:*

1. The applicant shall resubdivide the petitioned lots into one lot of record.

2. The applicant shall submit revised site plans demonstrating that no permanent structure encroaches upon the Poydras Street right-of-way.

3. The surface parking lot shall be enclosed with perimeter fencing – such as a low masonry chain wall with half metal picket fence above – in order to create a street edge along Perdido Street and the curvilinear South Broad Street/Poydras Service Drive.

4. The applicant shall alter the sallyport window openings at street-level on Perdido Street so that they are larger and more transparent, as long as security is not compromised.

5. In order for the applicant to add additional properties and to add the Templeman I and II facility, the applicant shall be required to amend this Conditional Use ordinance through the City Planning Commission, with Council approval, in accordance with the full Conditional Use process.

6. The applicant shall secure a long-term lease of servitude for existing improvements made upon the Poydras Street right-of-way, including but not limited to the 12-foot concrete security wall between South White and South Lopez Streets, and the paved storage yard area between South Rendon Street and South Jefferson Davis Parkway.

7. The developer shall include a note on amended site plans stating that all temporary inmate housing, including the 400 bed modular units known as the Temporary Detention Center ("TDC"), will be removed and/or closed upon the opening of a permanent facility and/or unit for the housing of male and female inmates classified with acute and sub-acute mental health conditions:

   a. The developer shall ensure that at no time shall the aggregate inmate population of the Orleans Justice Center complex, including without limitation, those held in Phase II, the TDC, and in the permanent facility or unit for the housing of male and female inmates classified with acute and sub-acute mental health conditions exceed 1,250 inmates, and that all inmates (male, female, and juvenile) except those classified with acute and sub-acute mental health conditions, those participating in the work-release program and those actively working on the kitchen staff, shall be detained in Phase II of the OJC, which shall continue to provide a variety of programming aimed at reducing recidivism including but not limited to medical care, educational services, including GED preparation, vocational and job training.

   b. The developer shall demolish or decommission and not detain any inmates in any of the following existing Orleans Parish Prison facilities, unless other appropriate action is taken by the Mayor and/or City Council that is consistent with their authority:

      i.    House of Dentition;
      ii.   The Community Correctional Center;
      iii.  Conchetta;
      iv.   Broad Street;
      v.    South White Street;
      vi.   Templeman V; and
      vii.  The original Temporary Housing Units (Tents).

The original Orleans Parish Prison connected to the Criminal Courts building (OPP) shall only be used as a daily holding facility to transfer inmates to and from court while awaiting a trial or hearing.

c.  Building 1 and Building 2 of the 400-bed modular Temporary Detention Center ("TDC") shall be renovated in accordance with the submitted plans to temporarily accommodate male and female inmates classified with acute and sub-acute mental health conditions. Building 1 and Building 2 shall be permitted to continue to accommodate these inmates until the opening of a permanent facility and/or unit for the housing of male and female inmates classified with acute and sub-acute mental health conditions. Once the inmates housed in Buildings 1 and 2 of the TDC have been transferred to the permanent facility and/or unit for the housing of male and female inmates classified with acute and sub-acute mental health conditions. Developer shall demolish or decommission Buildings 1 and 2 of the TDC and they shall not be used to house any inmates with OJC.

d.  Developer shall be permitted to use Building 3 and Building 4 of the Temporary Detention Center ("TDC") to house only two (2) distinct classes of inmates, namely:

  i.  Those inmates participating in any work-release program, where they are released from the OJC secured complex into the general public during the day and return to the OJC Complex overnight.
  ii.  Those inmates that are serving as trustees in the Orleans Justice Center kitchen where they have access to items which may be used as weapons.

At no time shall the total number of inmates housed in Building 3 and Building 4 exceed one hundred and fifty (150) (a maximum of one hundred twenty (120) for work release and a maximum of thirty (30) for kitchen detail), and at all times the total aggregate number of inmates housed in Buildings 3 and 4 shall count toward the 1,250 maximum inmate population count established in subsection (a) hereof.

8.  The applicant shall remove all obstructions to automotive and pedestrian traffic, and restore the public right-of-way on Perdido and South White Streets prior to receiving a certificate of use and occupancy for the new Templeman III & IV facility from the Department of Safety and Permits. This proviso may be amended upon written recommendation by the Mayor after meeting with stakeholders and experts.

9.  The applicant shall submit a phasing plan showing that, upon demolition of South White Street women's housing facility and relocation of the tilapia farm, Ring Road shall be extended to a secure gate on Poydras Avenue under the South Broad Street viaduct.

10. The applicant shall secure approval of revised site plans by the Fire Marshall and abide by applicable fire code.

11. The applicant shall submit detailed landscape plans prepared by a licensed Louisiana landscape architect indicating the items listed below. The landscape plan shall be subject to final approval by City Planning Commission staff and by the Department of Parks and Parkways for any proposed planting within a public right-of-way.

    a. Landscaping improvements within the proposed parking lot, on islands, medians and along perimeter ground not improved with asphalt paving.

    b. Shade-plantings along the Perdido Street side of the Intake and Processing Center sallyport, between the building and the sidewalk as space permits, providing a planting bed of not less than two (2) feet.

    c. The genus, species, size, location, quantity and irrigation of all proposed plant materials within both the common areas and the street rights-of-way within the site, with applicable remarks and details.

    d. There shall be aesthetic tree plantings subject to the approval of the Department of Parks and Parkways along Tulane Avenue, Broad Street and South Jefferson Davis Parkway.

12. The applicant shall submit a revised site plan showing additional green space of a sizable concentration within the Correctional Complex that can be used as an outdoor recreation area for inmates, to the extent possible.

13. The applicant shall either modify the location of dumpster berths or provide visual screening as part of the site design so that the Trash Dock at the rear of the Kitchen/Warehouse/Plant will not be visible from the public right-of-way.

14. The applicant shall provide to the City Planning Commission a litter abatement program letter, inclusive of the stated location of litter storage, the type and quantity of trash receptacles, the frequency of litter pickup by the Department of Sanitation or a contracted trash removal company, and the clearing of all litter from the sidewalks and street rights-of-way. The name and phone number of the owner/operator of the development shall be included in this letter to be kept on file in case of any violation.

15. The applicant shall submit a detailed signage plan indicating:

    a. The location, text and dimension of all signs posted around the perimeter of the petitioned site or which are visible to the public.

    b. Which signs will be illuminated and specifications for said signs.

16. The applicant shall submit a lighting plan for the petitioned site for review and approval by the staff of the City Planning Commission and the Department of Public Works.

17. All proposed curb cuts shall require the approval of the Department of Public Works. All curbs and sidewalks along the Perdido Street frontage shall be replaced and any existing and unused curb cuts along either street frontage shall be restored. Approval of plans for such reconstruction shall be secured from the Department of Public Works.

18. The Sheriff's department shall restrict loading dock activity at night, so that no truck deliveries or trash collection occurs between the hours of 10:00 p.m. and 6:00 a.m.

19. The applicant shall secure the approval of the Department of Public Works for the following:

    a. the location and construction of all proposed curb cuts and the restoration of any existing curb cuts that are not to be utilized as part of the development;

    b. the replacement or restoration of all sidewalks adjacent to and across a street from the site as deemed necessary;

    c. the installation of vertical curbs along all street frontages adjacent to the site;

    d. the installation of all subsurface drainage for the proposed development; and

    e. a traffic impact analysis for the proposed development, including any mitigation measures deemed necessary should significant adverse impact to the transportation system be determined by the Department of Public Works to be likely to occur as a result of the proposed development.

20. The applicant shall work with the Sewerage and Water Board as necessary for the retention or relocation of any sewer or water lines affected by the proposed development.

21. The Mayor may provide a written recommendation to the City Council after convening meetings with stakeholders and experts.

*Provisos (Phase III Only):*

22. Prior to the issuance of a Certificate of Occupancy by the Department of Safety and Permits, the applicant shall consolidate the lots associated with the site into a single lot of record through the City Planning Commission. The approved subdivision shall be recorded with the Office of Conveyances. Alternatively, the applicant may elect to not combine the lots. Should the existing lots remain, the applicant shall secure any needed waivers from the Board of Building Standards and Appeals to address any building code issues that may arise from the proposal.

23. The plans submitted to the City Planning Commission for approval shall indicate

compliance with the relevant yard, bulk, and open space requirements contained in **Article 16, Section 16.3.A.1 (Table 16-2)** of the Comprehensive Zoning Ordinance. This shall be achieved by modifying the plans to demonstrate compliance or obtaining variances of the requirements.

24. The Phase III plans submitted to the City Planning Commission for final approval shall include a landscaping plan that complies with **Article 23, Section 23.3.B** of the Comprehensive Zoning Ordinance. The landscape plan shall be prepared by a licensed Louisiana landscape architect. This landscape plan shall indicate the following:

   a. the genus, species, size, location, quantity, and irrigation of all existing and proposed plant materials within both the common areas and the street rights-of-way within the site, with applicable remarks and details;
   b. compliance with all applicable landscape regulations in **Article 23** and elsewhere in the Comprehensive Zoning Ordinance including parking lot landscaping in **Article 23, Section 23.7** and buffer yard landscaping in **Article 23, Section 23.8**; and
   c. building foundation planting.

25. The plans submitted to the City Planning Commission for final approval shall indicate the type, locations, and height of any exterior lighting. Any proposed exterior lighting shall comply with the standards of **Article 21, Section 21.5** of the Comprehensive Zoning Ordinance.

26. The plans submitted to the City Planning Commission for final approval shall indicate the type, location, size, and materials of all signage. All signage shall conform to the requirements of **Article 24** of the Comprehensive Zoning Ordinance, subject to the review and approval of the City Planning Commission staff.

27. In accordance with **Article 23, Section 23.13.A** of the Comprehensive Zoning Ordinance, the plans submitted to the City Planning Commission for final approval shall indicate the location of the trash receptacle which shall be within an enclosed structure or screened by a seven foot (7') opaque fence with latching gates. At no time, excepting trash collection days, shall trash be stored as to be visible from the public rights-of-way.

28. The developer shall secure the approval of the Department of Public Works for any improvements to the adjacent public right-of-way, including sidewalks, curbing, and curb cuts, and any other modifications to the surrounding public rights-of-way. When submitting plans to the City Planning Commission for final approval, the developer shall provide documentation of all required approvals by the Department of Public Works.

29. The plans submitted to the City Planning Commission for final approval shall indicate the presence of a minimum of one (1) off-street vehicle parking space per 20 cells, as set forth in **Article 22, Section 22.4.A (Table 22-1)** of the Comprehensive Zoning Ordinance. The number of required parking spaces shall be

calculated based only upon the number of additional cells approved under Zoning Docket 071/21. The location and design of vehicle parking spaces shall comply with the requirements as set forth in **Article 22, Section 22.8** of the Comprehensive Zoning Ordinance.

30. The plans submitted to the City Planning Commission for final approval shall indicate the installation of at least one (1) bicycle parking space per 40 cells, 50% of which are long-term bicycle spaces, as set forth in **Article 22, Section 22.4.A (Table 22-1) and Article 22, Section 22.6** of the Comprehensive Zoning Ordinance. The number of required bicycle parking spaces shall be calculated based only upon the number of additional cells approved under Zoning Docket 071/21. The design of bicycle parking spaces shall comply with the requirements as set forth in **Article 22, Section 22.9** of the Comprehensive Zoning Ordinance. When submitting plans to the City Planning Commission for final approval, the developer shall provide documentation of all required approvals by the Department of Public Works for any bicycle spaces located in the public right-of-way.

31. The plans submitted to the City Planning Commission for final approval shall indicate the presence of a minimum of one (1) additional loading space, as set forth in **Article 22, Section 22.7 (Table 22-3)** of the Comprehensive Zoning Ordinance. The number of required loading spaces shall be calculated based only upon Zoning Docket 071/21. The design of loading spaces shall comply with the requirements as set forth in **Article 22, Section 22.10** of the Comprehensive Zoning Ordinance.

YEAS:         Alexander, Brown, Steeg, Stewart

NAYS:         Flick, Lunn, Mobley, Wedberg

ABSENT:       Witry

Motion **FAILS** due to lack of majority.

No other motions were made. The request moves forward to City Council with **NO RECOMMENDATION**

## VIII.   REASONS FOR THE LACK OF RECOMMENDATION

1. Those Commissioners who voted to support the application seemingly did so because the policy decision should be reserved for lawmakers and because the City is under a court order and denial of the request would take off the table our good faith effort to present alternatives to the court.

2. Those Commissioners who voted to deny the application seemingly did so because it would be detrimental to the public safety and welfare, run contrary to the purpose of the Comprehensive Zoning, negatively impact quality of life, and advance the notion that the city has the capacity to incarcerate more inmates.



City of New Orleans Property Viewer

Orleans Justice Center
2800 Perdido Street

Displayed information is a product of the City of New Orleans Enterprise GIS Database. The City of New Orleans does not assume any liability for damage arising from errors, omissions, or use of this information as it is intended for the display of relative positions and locations only. Legend contents are dependent on the type of information added to the web application and may not be fully represented. This preliminary version map document is distributed solely for purposes of peer review.



Page 45 of 187

Case 2:12-cv-00859-LMA-MBN   Document 1498-2   Filed 03/25/22   Page 48 of 114





FIRST DISTRICT
SQUARE 624
NEW ORLEANS, LA

VICINITY MAP
(N.T.S.)

GRAPHIC SCALE

Boundary & Topographic Survey of a GJC Medical
Services Building made for Grace Hebert Curtis
Architects
New Orleans, La. December 19, 2019

SQUARE 624

PERDIDO STREET

S. GAYOSO ST.



NOT FOR CONSTRUCTION

OJC MEDICAL SERVICES BUILDING

City of New Orleans
New Orleans, Louisiana

AS101A.

ARCHITECTURAL SITE
PLAN FOR LEVEL

PERMEABLE OPEN SPACE

| GREEN SPACE | 45,000 SF |
| PLANTING | 3215 SF |
| PERVIOUS CONCRETE PAVING | 1900 SF |

TOTAL SITE AREA INCLUDING BUILDING FOOTPRINT: 87,178 SF

SITE PLAN KEYNOTES

| Number | Note |
| 1 | CONCRETE STAIR |
| 2 | EXISTING SEWER MH |
| 3 | EXISTING SEWER AC/GREASE DRAIN |
| 4 | EXISTING CHAIN LINK FENCE |
| 5 | EXISTING CONCRETE SIDEWALK |
| 6 | EXISTING CONCRETE SIDEWALK |
| 7 | EXISTING CONCRETE SIDEWALK |
| 8 | EXISTING CONCRETE RIGHT OF WAY |
| 9 | EXISTING CONCRETE PERIMETER WALL |
| 10 | EXISTING HOLD DOWN |
| 11 | EXISTING METAL CANOPY |
| 12 | NEW PERIMETER WALL CONCRETE COLUMN |
| 13 | NEW PERIMETER WALL |
| 14 | NEW PERIMETER FENCE |
| 15 | NEW METAL ENTRANCE WALL |
| 16 | EDGE OF SITE DEVELOPMENT |

PERDIDO ST.

S. GAYOSO ST.

ENTRY PLAZA

DUMPSTERS

1   ARCHITECTURAL SITE PLAN



NOT FOR CONSTRUCTION

OJC MEDICAL SERVICES BUILDING

City of New Orleans
New Orleans, Louisiana

BUILDING ELEVATIONS

A201

1  NORTH ELEVATION

2  EAST ELEVATION



1 SOUTH ELEVATION

2 WEST ELEVATION

OJC MEDICAL SERVICES BUILDING

BUILDING ELEVATIONS

A202

City of New Orleans
New Orleans, Louisiana

NOT FOR
CONSTRUCTION



ZD071/21



SITE PHOTO FROM KITCHEN/WAREHOUSE/CENTRAL PLANT BUILDING

PHOTO TOWARDS PHASE II FROM PERDIDO & S. GAYOSO STREETS

ZD071/21

PHOTO OF PHASE II FROM PERDIDO STREET

ZD071/21

PHOTO OF KITCHEN/WAREHOUSE/CENTRAL PLANT BUILDING FROM PERDIDO STREET

ZD071/21

ZD071/21

| Name | Mailing Address | Mailing City | Mailing St | Mailing Zip | Generated |
|---|---|---|---|---|---|
| Xavier University of Louisiana | 1 Drexel Dr | New Orleans | LA | 70125 | |
| City Of New Orleans | 1300 Perdido St | New Orleans | LA | 70112 | |
| The City Of New Orleans | 1300 Perdido St Room 5W1 | New Orleans | LA | 70112 | |
| Loomis Armored US LLC C/O E&Y Property Tax | PO Box 52307 | Atlanta | GA | 30355-0307 | |
| Current Resident | 2600 Poydras St | New Orleans | LA | 70119 | |
| Enforcement District-Orleans Parish Law | 2614 Tulane AV | New Orleans | LA | 70119 | |
| Loomis Armored US LLC | C/O E&Y Property Tax PO B | Atlanta | GA | 30355-0307 | |
| Current Resident | 2638 Poydras St | New Orleans | LA | 70119 | |
| Current Resident | 2648 Poydras St | New Orleans | LA | 70119 | |
| Neville Crossing LLC | 10210 N Central Expwy Uni | Dallas | TX | 75231 | |
| Current Resident | 2651 Poydras St | New Orleans | LA | 70119 | |
| Loomis Armored Us LLC | 16225 Park Ten Place | Houston | TX | 77084 | |
| Current Resident | 2654 Poydras St | New Orleans | LA | 70119 | |
| Current Resident | 2700 Gravier St | New Orleans | LA | 70119 | |
| Current Resident | 2700 Tulane Ave | New Orleans | LA | 70119 | |
| Current Resident | 2701 Gravier St | New Orleans | LA | 70119 | |
| Ducotewaynec | C/O Tchoupitoulas Partners | New Orleans | LA | 70130 | |
| Current Resident | 2726 Perdido St | New Orleans | LA | 70119 | |
| Ducotewaynec | C/O Tchoupitoulas Partners | New Orleans | LA | 70119 | |
| Current Resident | 2728 Perdido St | New Orleans | LA | 70119 | |
| Current Resident | 2733 Gravier St | New Orleans | LA | 70119 | |
| Current Resident | 2735 Gravier St | New Orleans | LA | 70119 | |
| Current Resident | 2735 Perdido St | New Orleans | LA | 70119 | |
| Wayne Ducote | C/O Tchoupitoulas Partners | New Orleans | LA | 70130 | |
| Current Resident | 2742 Perdido St | New Orleans | LA | 70119 | |
| Current Resident | 2761 Gravier St | New Orleans | LA | 70119 | |
| Current Resident | 2800 Gravier St | New Orleans | LA | 70119 | |
| Enforcement - Orleans Parish Law | 2614 Tulane AV | New Orleans | LA | 70119 | |
| Current Resident | 2800 Perdido St | New Orleans | LA | 70119 | |
| Current Resident | 2801 Perdido St | New Orleans | LA | 70119 | |

| | | | |
|---|---|---|---|
| Current Resident | 2809 Gravier St | New Orleans | LA | 70119 |
| Current Resident | 2813 Gravier St | New Orleans | LA | 70119 |
| Current Resident | 2819 Gravier St | New Orleans | LA | 70119 |
| Current Resident | 2825 Gravier St | New Orleans | LA | 70119 |
| Current Resident | 2826 Gravier St | New Orleans | LA | 70119 |
| Current Resident | 2829 Gravier St | New Orleans | LA | 70119 |
| Current Resident | 2833 Gravier St | New Orleans | LA | 70119 |
| Current Resident | 2833 Perdido St | New Orleans | LA | 70119 |
| Current Resident | 2900 Perdido St | New Orleans | LA | 70119 |
| Parish Criminal Sheriff Orleans | 2800 Gravier St | New Orleans | LA | 70119 |
| Current Resident | 2901 Perdido St | New Orleans | LA | 70119 |
| Michael P Villavaso | 34514 Hwy 433 | Slidell | LA | 70460-3802 |
| Current Resident | 2902 Gravier St | New Orleans | LA | 70119 |
| Current Resident | 2903 Perdido St | New Orleans | LA | 70119 |
| Ethel L Johnson | ET Al 1922 Timber Creek D | Missouri City | TX | 77459 |
| Current Resident | 2904 Gravier St | New Orleans | LA | 70119 |
| Current Resident | 2908 Gravier St | New Orleans | LA | 70119 |
| Reine Drop Rentals LLC | 618 Highlands Dr | Slidell | LA | 70458 |
| Current Resident | 2912 Gravier St | New Orleans | LA | 70119 |
| Brad D Mortensen | 2913 Gravier St | New Orleans | LA | 70119 |
| Armani Investments LLC | 4929 Utica St | Metairie | LA | 70006 |
| Current Resident | 2914 Gravier St | New Orleans | LA | 70119 |
| Consulting,Llc B-3 | 540 S Broad St Ste C | New Orleans | LA | 70119 |
| Current Resident | 2915 Perdido St | New Orleans | LA | 70119 |
| Nikolaos E Pantazis | 4900 Lake Vista Dr | Metairie | LA | 70006 |
| Current Resident | 2916 Gravier St | New Orleans | LA | 70119 |
| B-3 Consulting LLC | 540 S Broad St Ste C | New Orleans | LA | 70119 |
| Current Resident | 2917 Perdido St | New Orleans | LA | 70119 |
| Current Resident | 2918 Gravier St | New Orleans | LA | 70119 |
| Baronne Quarters LLC | 601 Baronne St Ste C-1 | New Orleans | LA | 70113 |
| Current Resident | 2919 Gravier St | New Orleans | LA | 70119 |

ZD07l/21

| | | | | |
|---|---|---|---|---|
| Current Resident | 2919 Gravier St Apt 101 | New Orleans | LA | 70119 |
| Current Resident | 2919 Gravier St Apt 201 | New Orleans | LA | 70119 |
| Current Resident | 2919 Gravier St Apt 202 | New Orleans | LA | 70119 |
| Current Resident | 2919 Perdido St | New Orleans | LA | 70119 |
| Steppin Stone Properties Inc | 3030 Boyce Dr | Marietta | GA | 30066 |
| Current Resident | 2920 Gravier St | New Orleans | LA | 70119 |
| Current Resident | 2922 Gravier St | New Orleans | LA | 70119 |
| Current Resident | 2923 Perdido St | New Orleans | LA | 70119 |
| Delores Foster | 2926 Gravier Street | New Orleans | LA | 70119 |
| Current Resident | 2926 Gravier St | New Orleans | LA | 70119 |
| Current Resident | 2926 Perdido St | New Orleans | LA | 70119 |
| Current Resident | 2927 Perdido St | New Orleans | LA | 70119 |
| Gravier Street Investments LLC | 3308 Prytania St Unit 12 | New Orleans | LA | 70115 |
| Current Resident | 2928 Gravier St | New Orleans | LA | 70119 |
| Current Resident | 2932 Gravier St | New Orleans | LA | 70119 |
| Current Resident | 2936 Gravier St | New Orleans | LA | 70119 |
| Current Resident | 3000 Perdido St | New Orleans | LA | 70119 |
| The Crescent Club New Orleans I LLC | C/O The Domain Companie | New York | NY | 10007 |
| Current Resident | 3000 Tulane Ave | New Orleans | LA | 70119 |
| Current Resident | 3000 Tulane Ave Apt 201 | New Orleans | LA | 70119 |
| Current Resident | 3000 Tulane Ave Apt 203 | New Orleans | LA | 70119 |
| Current Resident | 3000 Tulane Ave Apt 204 | New Orleans | LA | 70119 |
| Current Resident | 3000 Tulane Ave Apt 206 | New Orleans | LA | 70119 |
| Current Resident | 3000 Tulane Ave Apt 207 | New Orleans | LA | 70119 |
| Current Resident | 3000 Tulane Ave Apt 208 | New Orleans | LA | 70119 |
| Current Resident | 3000 Tulane Ave Apt 210 | New Orleans | LA | 70119 |
| Current Resident | 3000 Tulane Ave Apt 218 | New Orleans | LA | 70119 |
| Current Resident | 3000 Tulane Ave Apt 219 | New Orleans | LA | 70119 |
| Current Resident | 3000 Tulane Ave Apt 220 | New Orleans | LA | 70119 |
| Current Resident | 3000 Tulane Ave Apt 222 | New Orleans | LA | 70119 |
| Current Resident | 3000 Tulane Ave Apt 223 | New Orleans | LA | 70119 |

ZD071/21

| | | | | |
|---|---|---|---|---|
| Current Resident | 3000 Tulane Ave Apt 224 | New Orleans | LA | 70119 |
| Current Resident | 3000 Tulane Ave Apt 225 | New Orleans | LA | 70119 |
| Current Resident | 3000 Tulane Ave Apt 226 | New Orleans | LA | 70119 |
| Current Resident | 3000 Tulane Ave Apt 227 | New Orleans | LA | 70119 |
| Current Resident | 3000 Tulane Ave Apt 228 | New Orleans | LA | 70119 |
| Current Resident | 3000 Tulane Ave Apt 229 | New Orleans | LA | 70119 |
| Current Resident | 3000 Tulane Ave Apt 230 | New Orleans | LA | 70119 |
| Current Resident | 3000 Tulane Ave Apt 231 | New Orleans | LA | 70119 |
| Current Resident | 3000 Tulane Ave Apt 232 | New Orleans | LA | 70119 |
| Current Resident | 3000 Tulane Ave Apt 234 | New Orleans | LA | 70119 |
| Current Resident | 3000 Tulane Ave Apt 236 | New Orleans | LA | 70119 |
| Current Resident | 3000 Tulane Ave Apt 237 | New Orleans | LA | 70119 |
| Current Resident | 3000 Tulane Ave Apt 238 | New Orleans | LA | 70119 |
| Current Resident | 3000 Tulane Ave Apt 239 | New Orleans | LA | 70119 |
| Current Resident | 3000 Tulane Ave Apt 246 | New Orleans | LA | 70119 |
| Current Resident | 3000 Tulane Ave Apt 247 | New Orleans | LA | 70119 |
| Current Resident | 3000 Tulane Ave Apt 248 | New Orleans | LA | 70119 |
| Current Resident | 3000 Tulane Ave Apt 253 | New Orleans | LA | 70119 |
| Current Resident | 3000 Tulane Ave Apt 500 | New Orleans | LA | 70119 |
| Current Resident | 3000 Tulane Ave Apt 509 | New Orleans | LA | 70119 |
| Current Resident | 3000 Tulane Ave Apt 517 | New Orleans | LA | 70119 |
| Current Resident | 3000 Tulane Ave Apt 534 | New Orleans | LA | 70119 |
| Current Resident | 3000 Tulane Ave Apt 554 | New Orleans | LA | 70119 |
| Current Resident | 3000 Tulane Ave Apt 555 | New Orleans | LA | 70119 |
| Current Resident | 3000 Tulane Ave Apt 556 | New Orleans | LA | 70119 |
| Current Resident | 3000 Tulane Ave Apt 557 | New Orleans | LA | 70119 |
| Current Resident | 3000 Tulane Ave Apt 559 | New Orleans | LA | 70119 |
| Current Resident | 3000 Tulane Ave Apt 560 | New Orleans | LA | 70119 |
| Current Resident | 3000 Tulane Ave Fire Pump | New Orleans | LA | 70119 |
| Current Resident | 3000 Tulane Ave HM1 | New Orleans | LA | 70119 |
| Current Resident | 3000 Tulane Ave HM2 | New Orleans | LA | 70119 |

ZD071/21

| Name | Address | City | State | Zip |
|---|---|---|---|---|
| Current Resident | 3001 Perdido St | New Orleans | LA | 70119 |
| Current Resident | 3007 Perdido St | New Orleans | LA | 70119 |
| Current Resident | 3009 Perdido St | New Orleans | LA | 70119 |
| Morris Kirschman & Co LLC | 2621 Cleveland AV | New Orleans | LA | 70119 |
| Current Resident | 3016 Gravier St | New Orleans | LA | 70119 |
| Jimmie Ree Day | 3018 Gravier St | New Orleans | LA | 70119 |
| Terrell S II Caffery | 7012 Sevenoaks AV | Baton Rouge | LA | 70806 |
| Current Resident | 3019 Perdido St | New Orleans | LA | 70119 |
| Lydia D Roberts | 3020 Gravier St | New Orleans | LA | 70119 |
| Alexander J Dupuy | 4708 Rebecca BL | Kenner | LA | 70065 |
| Current Resident | 3021 Perdido St | New Orleans | LA | 70119 |
| Alexander Dupuy | 4708 Rebecca BL | Kenner | LA | 70065 |
| Current Resident | 3023 Perdido St | New Orleans | LA | 70119 |
| Louis F Varnado | 3306 Trafalgar St | New Orleans | LA | 70119 |
| Current Resident | 3024 Gravier St | New Orleans | LA | 70119 |
| Jo Ann Jones | 7608 Vanderkloot Ave | New Orleans | LA | 70127 |
| Current Resident | 3025 Gravier St | New Orleans | LA | 70119 |
| Current Resident | 3027 Perdido St | New Orleans | LA | 70119 |
| Anna M Earles | C/O City of New Orleans 2C | Cincinnati | OH | 45231 |
| Current Resident | 3029 Perdido St | New Orleans | LA | 70119 |
| Gss Investments LLC | 2117 Veterans Blvd Unit 41 | Metairie | LA | 70002-6321 |
| Current Resident | 3100 Gravier St | New Orleans | LA | 70119 |
| Current Resident | 3100 Gravier St Apt A | New Orleans | LA | 70119 |
| Current Resident | 3100 Gravier St Apt B | New Orleans | LA | 70119 |
| Current Resident | 3100 Gravier St Apt C | New Orleans | LA | 70119 |
| Current Resident | 3100 Gravier St Apt D | New Orleans | LA | 70119 |
| Current Resident | 3100 Perdido St | New Orleans | LA | 70119 |
| James Smith | 2029 Sere Street | New Orleans | LA | 70122 |
| Current Resident | 3101 Perdido St | New Orleans | LA | 70119 |
| Kike H Dilbert | 3103 Gravier St | New Orleans | LA | 70119 |
| Charlie Hampton | 1319 Newton Street | New Orleans | LA | 70114 |

| Name | Address | City | State | Zip |
|---|---|---|---|---|
| Current Resident | 3104 Gravier St | New Orleans | LA | 70119 |
| Frank Jr Johnson | 1164 Sandalwood Dr | Harvey | LA | 70058 |
| Current Resident | 3106 Gravier St | New Orleans | LA | 70119 |
| Tyrell P Brandvold | 3107 Gravier St | New Orleans | LA | 70119-7226 |
| Current Resident | 3108 Gravier St | New Orleans | LA | 70119 |
| Robert Davenport | 3109 Gravier St | New Orleans | LA | 70119 |
| Current Resident | 3111 Gravier St | New Orleans | LA | 70119 |
| James Smith | 2029 Sere Street | New Orleans | LA | 70114 |
| Current Resident | 3111 Perdido St | New Orleans | LA | 70119 |
| Clifton Guice | Joseph Guice C/O Mscrober | New Orleans | LA | 70117 |
| Current Resident | 3113 Perdido St | New Orleans | LA | 70119 |
| New Orleans Redevelopment Authority | 1409 Oretha Castle Haley E | New Orleans | LA | 70113 |
| Current Resident | 3114 Gravier St | New Orleans | LA | 70119 |
| Katherine Whitney Stone | 3115 Gravier St | New Orleans | LA | 70119-7226 |
| Fredrick J Prevost | 3116 Gravier Street | New Orleans | LA | 70119-7227 |
| Current Resident | 3116 Gravier St | New Orleans | LA | 70119 |
| Alan W Bailey | 3436 Magazine St #301 | New Orleans | LA | 70115 |
| Current Resident | 3117 Gravier St | New Orleans | LA | 70119 |
| Reuther LLC | 1410 Calhoun St | New Orleans | LA | 70118 |
| Current Resident | 3117 Perdido St | New Orleans | LA | 70119 |
| Albert Leonard | 4116 General Ogden Street | New Orleans | LA | 70118 |
| Current Resident | 3118 Gravier St | New Orleans | LA | 70119 |
| Current Resident | 3119 Gravier St | New Orleans | LA | 70119 |
| Current Resident | 3120 Gravier St | New Orleans | LA | 70119 |
| Authority Of New Orleans Housing | 4100 Touro St | New Orleans | LA | 70122 |
| Current Resident | 3121 Gravier St | New Orleans | LA | 70119 |
| Current Resident | 3121 Perdido St | New Orleans | LA | 70119 |
| Current Resident | 3122 Gravier St | New Orleans | LA | 70119 |
| Current Resident | 3123 Gravier St | New Orleans | LA | 70119 |
| Current Resident | 3124 Gravier St | New Orleans | LA | 70119 |
| Gravier Village LLC | 910 Brooklyn AV | Brooklyn | NY | 11203 |

| | | | | |
|---|---|---|---|---|
| Current Resident | 3125 Gravier St | New Orleans | LA | 70119 |
| Current Resident | 3127 Perdido St | New Orleans | LA | 70119 |
| Current Resident | 3200 Gravier St | New Orleans | LA | 70119 |
| Current Resident | 3200 Perdido St | New Orleans | LA | 70119 |
| Michael Woods | 5626 Bellaire Dr | New Orleans | LA | 70124 |
| Current Resident | 3201 Gravier St | New Orleans | LA | 70119 |
| Current Resident | 3203 Gravier St | New Orleans | LA | 70119 |
| Michael Woods | 5626 Bellaire Dr | New Orleans | LA | 70115 |
| Current Resident | 3205 Gravier St | New Orleans | LA | 70119 |
| Current Resident | 3205 Perdido St | New Orleans | LA | 70119 |
| Current Resident | 3207 Gravier St | New Orleans | LA | 70119 |
| Ellis Emery | 3208 Gravier Street | New Orleans | LA | 70119 |
| Current Resident | 3208 Gravier St | New Orleans | LA | 70119 |
| Michael Wood | 5626 Bellaire Drive | New Orleans | LA | 70124 |
| Current Resident | 3209 Gravier St A | New Orleans | LA | 70119 |
| Current Resident | 3209 Gravier St B | New Orleans | LA | 70119 |
| Current Resident | 3209 Perdido St | New Orleans | LA | 70119 |
| Janette Watson Coco | Etals- Arthur A Watson (Us | New Orleans | LA | 70119 |
| Current Resident | 3210 Gravier St | New Orleans | LA | 70119 |
| Brandon's Bee Removal Service LLC | 6134 Belldirie Dr | New Orleans | LA | 70124 |
| Current Resident | 3211 Gravier St | New Orleans | LA | 70119 |
| Hamilton Milton Jr | 3212 Gravier St | New Orleans | LA | 70119-7229 |
| Law Enforcement District-Orleans Parish of Orleans State of Louisiana | 2800 Tulane Ave | New Orleans | LA | 70119 |
| Current Resident | 3215 Perdido St | New Orleans | LA | 70119 |
| Vernon N Lumar | 3217 Gravier St | New Orleans | LA | 70119 |
| Current Resident | 3218 Gravier St | New Orleans | LA | 70119 |
| Current Resident | 3219 Gravier St | New Orleans | LA | 70119 |
| Current Resident | 3219 Perdido St | New Orleans | LA | 70119 |
| Current Resident | 3220 Gravier St | New Orleans | LA | 70119 |
| Current Resident | 3222 Gravier St | New Orleans | LA | 70119 |
| John Jr Brown | 8721 Nelson St | New Orleans | LA | 70118 |

ZD071/21

| Name | Address | City | State | Zip | |
|---|---|---|---|---|---|
| Current Resident | 3223 Gravier St | New Orleans | LA | 70119 | |
| Current Resident | 3224 Gravier St | New Orleans | LA | 70119 | |
| Leroy Jr Hargrove | 3225 Gravier St | New Orleans | LA | 70130 | |
| Current Resident | 3225 Perdido St | New Orleans | LA | 70119 | |
| Current Resident | 3226 Gravier St | New Orleans | LA | 70119 | |
| Current Resident | 3228 Gravier St | New Orleans | LA | 70119 | |
| Current Resident | 3229 Perdido St | New Orleans | LA | 70119 | |
| Quman LLC | 834 N Robertson St #B | New Orleans | LA | 70116 | |
| Current Resident | 3231 Perdido St | New Orleans | LA | 70119 | |
| Ball Gerald | Etals C/O Jose I Fernandez Kenner | | LA | 70065 | |
| Current Resident | 3232 Gravier St | New Orleans | LA | 70119 | |
| Current Resident | 3233 Perdido St | New Orleans | LA | 70119 | |
| Current Resident | 3234 Gravier St | New Orleans | LA | 70119 | |
| Current Resident | 3236 Gravier St | New Orleans | LA | 70119 | |
| Current Resident | 3238 Gravier St | New Orleans | LA | 70119 | |
| Current Resident | 3240 Gravier St | New Orleans | LA | 70119 | |
| Central Bell South | 820 Poydras St | New Orleans | LA | 70112- | 0 |
| Current Resident | 3300 Gravier St | New Orleans | LA | 70119 | |
| South Communications Bell | Prop Tax Dept PO Box 720: Bedminster | | NJ | 07921 | |
| Gravi Train LLC | C/O Ben Jacobson 2318 Oc New Orleans | | LA | 70115 | |
| Current Resident | 3301 Gravier St | New Orleans | LA | 70119 | |
| Leonard J Powell | ET Al 3315 Gravier Street | New Orleans | LA | 70119 | |
| Current Resident | 3305 Gravier St | New Orleans | LA | 70119 | |
| Raul Jackson | 3315 Gravier St | New Orleans | LA | 70119 | |
| Current Resident | 3311 Gravier St | New Orleans | LA | 70119 | |
| Raul M Jackson | 3315 Gravier Street | New Orleans | LA | 70119 | |
| Current Resident | 3315 Gravier St | New Orleans | LA | 70119 | |
| Law Enforcement District Of The Parish Of Orleans | 2614 Tulane Ave | New Orleans | LA | 70119 | |
| Current Resident | 3319 Gravier St | New Orleans | LA | 70119 | |
| Gravi Train LLC | C/O Ben Jacobson 2318 Oc New Orleans | | LA | 70115 | |
| Current Resident | 3323 Gravier St | New Orleans | LA | 70119 | |

| Name | Address | City | State | Zip |
|---|---|---|---|---|
| Current Resident | 3327 Gravier St | New Orleans | LA | 70119 |
| Current Resident | 3331 Gravier St | New Orleans | LA | 70119 |
| Barry Donahue | 1225 Bonnabel Dr | Metairie | LA | 70005 |
| Current Resident | 3333 Gravier St | New Orleans | LA | 70119 |
| Goodwill Industries of Southeastern La | 3400 Tulane Ave Suite 100 | New Orleans | LA | 70119 |
| Current Resident | 3400 Tulane Ave | New Orleans | LA | 70119 |
| 3800 Howard Investors LLC | 3330 N Causeway Blvd Suit | Metairie | LA | 70002 |
| Current Resident | 3800 Howard Ave | New Orleans | LA | 70125 |
| Industrial Development Board | 1340 Poydras Street, Suite | New Orleans | LA | 70112 |
| Pontchartrain Housing Corp I | 3900 Howard Ave | New Orleans | LA | 70125 |
| 3914 Howard Avenue LLC | 4436 St Ann St | New Orleans | LA | 70119 |
| Current Resident | 3914 Howard Ave | New Orleans | LA | 70125 |
| 3920 Howard Ave Partners LLC | 917 Franklin Ste 550 | Houston | TX | 77002 |
| Current Resident | 3920 Howard Ave | New Orleans | LA | 70125 |
| Aja Properties LLC | 4100 Howard Ave | New Orleans | LA | 70125 |
| Precisioninc Beerman | Attn; Pres Marc A Beerman | New Orleans | LA | 70125-1327 |
| Current Resident | 4200 Howard Ave | New Orleans | LA | 70125 |
| Precisionmachine Beerman | Works Inc 4206 Howard Av | New Orleans | LA | 70125 |
| Current Resident | 4206 Howard Ave | New Orleans | LA | 70125 |
| And Smithenterprises, Reuther | L L C 4220 Howard Ave | New Orleans | LA | 70125 |
| Current Resident | 4214 Howard Ave | New Orleans | LA | 70125 |
| Reuther and Smith Enterprises LLC | 4220 Howard Ave | New Orleans | LA | 70125 |
| Wld Properties Iv LLC | 7110 N Freeway | Houston | TX | 77076 |
| Current Resident | 4300 Howard Ave | New Orleans | LA | 70125 |
| Htj Interests LLC | 33 Farnham Pl | Metairie | LA | 70005 |
| Current Resident | 600 S Broad St | New Orleans | LA | 70119 |
| Current Resident | 600 S White St | New Orleans | LA | 70119 |
| Current Resident | 629 S Gayoso St | New Orleans | LA | 70119 |
| Current Resident | 641 S White St | New Orleans | LA | 70119 |
| Current Resident | 642 S Lopez St | New Orleans | LA | 70119 |
| Current Resident | 642 S Lopez St Apt A | New Orleans | LA | 70119 |

| Name | Address | City | State | ZIP |
|---|---|---|---|---|
| Current Resident | 642 S Lopez St Apt B | New Orleans | LA | 70119 |
| Current Resident | 645 S Broad St | New Orleans | LA | 70119 |
| Jared S Lilly | Etal 648 S Gayoso St | New Orleans | LA | 70119 |
| Current Resident | 648 S Gayoso St | New Orleans | LA | 70119 |
| Current Resident | 648 S Lopez St | New Orleans | LA | 70119 |
| M & J S-2 LLC | Etal PO Box 810066 | Boca Raton | FL | 33481 |
| Current Resident | 648 S Rendon St | New Orleans | LA | 70119 |
| Louise C Thomas | 24 Tennyson Place | New Orleans | LA | 70131 |
| Current Resident | 649 S Gayoso St | New Orleans | LA | 70119 |
| Current Resident | 650 S Rendon St | New Orleans | LA | 70119 |
| George E Keelen | 5807 W Louis Prima Dr | New Orleans | LA | 70128 |
| Current Resident | 652 S Gayoso St | New Orleans | LA | 70119 |
| Current Resident | 652 S Rendon St | New Orleans | LA | 70119 |
| Current Resident | 654 S Gayoso St | New Orleans | LA | 70119 |
| Current Resident | 654 S Rendon St | New Orleans | LA | 70119 |
| Elizabeth A Zepherin | 655 South Gayoso Street | New Orleans | LA | 70119 |
| Current Resident | 655 S Gayoso St | New Orleans | LA | 70119 |
| Binoy George | 10102 Forest Spring Ln | Pearland | TX | 77584 |
| Current Resident | 663 S Dupre St | New Orleans | LA | 70119 |
| Katie Marie Guice | 2751 Gladiolus St | New Orleans | LA | 70122 |
| Current Resident | 669 S Dupre St | New Orleans | LA | 70119 |
| Alcide N Clayton | Jessie Novell Clayton 451 B Brick | | NJ | 08723 |
| Current Resident | 700 S Salcedo St | New Orleans | LA | 70119 |
| Current Resident | 701 S Gayoso St | New Orleans | LA | 70119 |
| Current Resident | 705 S Gayoso St | New Orleans | LA | 70119 |
| Coy Meldalynn A Mc | 707 SO Dupre Street | New Orleans | LA | 70119 |
| Current Resident | 707 S Dupre St | New Orleans | LA | 70119 |
| Current Resident | 707 S Gayoso St | New Orleans | LA | 70119 |
| Rosella R Gray | 708 SO Salcedo Street | New Orleans | LA | 70119 |
| Current Resident | 708 S Salcedo St | New Orleans | LA | 70119 |
| William A Crawford | 2900 Paris Ave | New Orleans | LA | 70119 |

ZD071/21

| Name | Address | City | State | Zip |
|---|---|---|---|---|
| Current Resident | 709 S Gayoso St | New Orleans | LA | 70119 |
| Current Resident | 710 S Salcedo St | New Orleans | LA | 70119 |
| Carolyn W Mosley | 1812 South 70th Street | Fort Smith | AR | 72903 |
| Current Resident | 711 S Dupre St | New Orleans | LA | 70119 |
| Iba Development LLC | 2117 Veterans Memorial Bl | Metairie | LA | 70002 |
| Current Resident | 712 S Salcedo St | New Orleans | LA | 70119 |
| William A Crawford | 2900 Paris AV | New Orleans | LA | 70119 |
| Current Resident | 713 S Gayoso St | New Orleans | LA | 70119 |
| Ssg Investments LLC | 2117 Veterans Blvd Unit 41 | Metairie | LA | 70002-6321 |
| Current Resident | 713 S Salcedo St | New Orleans | LA | 70119 |
| Kenneth M Tamm | 909 S Broad St | New Orleans | LA | 70125 |
| Current Resident | 714 S Gayoso St | New Orleans | LA | 70119 |
| Current Resident | 714 S Salcedo St | New Orleans | LA | 70119 |
| Current Resident | 715 S Broad St | New Orleans | LA | 70119 |
| Marvin L Calahan | 715 S Dupre St | New Orleans | LA | 70119 |
| Current Resident | 715 S Gayoso St | New Orleans | LA | 70119 |
| Current Resident | 715 S Salcedo St | New Orleans | LA | 70119 |
| Current Resident | 716 S Gayoso St | New Orleans | LA | 70119 |
| Current Resident | 716 S Lopez St | New Orleans | LA | 70119 |
| Current Resident | 716 S Rendon St | New Orleans | LA | 70119 |
| Dupuy Alexander J Jr | Etal 4708 Rebecca BL | Kenner | LA | 70065 |
| Current Resident | 716 S Salcedo St | New Orleans | LA | 70119 |
| Current Resident | 717 S Gayoso St | New Orleans | LA | 70119 |
| Current Resident | 717 S White St | New Orleans | LA | 70119 |
| Current Resident | 718 S Gayoso St | New Orleans | LA | 70119 |
| Lester R Simmons | 15 Maurepas Lane | Kenner | LA | 70065 |
| Current Resident | 718 S Salcedo St | New Orleans | LA | 70119 |
| Mary D Thomas | 719 S Dupre | New Orleans | LA | 70119 |
| Current Resident | 719 S Dupre St | New Orleans | LA | 70119 |
| Valrie Perkins | 719 S Salcedo St | New Orleans | LA | 70119 |
| Current Resident | 720 S Gayoso St | New Orleans | LA | 70119 |

| Name | Address | City | State | Zip |
|---|---|---|---|---|
| Morris Kirschman & Co LLC | 2621 Cleveland Ave | New Orleans | LA | 70119 |
| Current Resident | 720 S Lopez St | New Orleans | LA | 70119 |
| Current Resident | 720 S Salcedo St | New Orleans | LA | 70119 |
| Current Resident | 721 S Gayoso St | New Orleans | LA | 70119 |
| Current Resident | 721 S Lopez St | New Orleans | LA | 70119 |
| De Krol Edward Van | 721 S Salcedo St | New Orleans | LA | 70119 |
| Current Resident | 722 S Gayoso St | New Orleans | LA | 70119 |
| Alexander J Jr Dupuy | 4708 Rebecca BL | Kenner | LA | 70065 |
| Current Resident | 722 S Lopez St | New Orleans | LA | 70119 |
| Joseph S Jr Geeck | Etal 290 Audubon BL | New Orleans | LA | 70125 |
| Current Resident | 722 S Salcedo St | New Orleans | LA | 70119 |
| Owen Fanguy Trust NO 1 | C/O Timothy J Fanguy 320 Houma | New Orleans | LA | 70363 |
| Current Resident | 723 S Dupre St | New Orleans | LA | 70119 |
| New City Properties LLC | PO Box 504 | Gretna | LA | 70054 |
| Current Resident | 723 S Gayoso St | New Orleans | LA | 70119 |
| Current Resident | 723 S Lopez St | New Orleans | LA | 70119 |
| Current Resident | 723 S Salcedo St | New Orleans | LA | 70119 |
| Current Resident | 724 S Gayoso St | New Orleans | LA | 70119 |
| Current Resident | 724 S Lopez St | New Orleans | LA | 70119 |
| Amy J Hargrove | ET Al 725-B S Gayoso St | New Orleans | LA | 70119 |
| Current Resident | 725 S Gayoso St | New Orleans | LA | 70119 |
| Current Resident | 726 S Dupre St | New Orleans | LA | 70119 |
| 726 S Gayoso LLC | 814 St Roch Ave | New Orleans | LA | 70117 |
| Current Resident | 726 S Gayoso St | New Orleans | LA | 70119 |
| Gulf Coast Marine Surveying Inc | P O Box 30492 | New Orleans | LA | 70190 |
| Current Resident | 726 S Lopez St | New Orleans | LA | 70119 |
| Alvin Clayton | 726 SO Salcedo Street | New Orleans | LA | 70119 |
| Current Resident | 726 S Salcedo St | New Orleans | LA | 70119 |
| Current Resident | 727 S Broad St | New Orleans | LA | 70119 |
| Current Resident | 727 S Dupre St | New Orleans | LA | 70119 |
| Tizona R Watts | 11649 N Adams Ct | New Orleans | LA | 70128-3133 |

| | | | |
|---|---|---|---|
| Current Resident | 727 S Gayoso St | New Orleans | LA | 70119 |
| Deutsche Bank National Trust Company | C/O Atty Daniel A Reed 855 Baton Rouge | LA | 70809 |
| Current Resident | 727 S Salcedo St | New Orleans | LA | 70119 |
| Current Resident | 728 S Gayoso St | New Orleans | LA | 70119 |
| Current Resident | 728 S Lopez St | New Orleans | LA | 70119 |
| Current Resident | 728 S Salcedo St | New Orleans | LA | 70119 |
| Naomi E Morris | 729 S Salcedo St | New Orleans | LA | 70119 |
| Strain Rizpah Armstead | 730 S Rendon St | New Orleans | LA | 70119-0 |
| GNP Properties LLC | 2023 Fern St | New Orleans | LA | 70118 |
| Current Resident | 730 S Salcedo St | New Orleans | LA | 70119 |
| Barbara Rush | 731 S Dupre St | New Orleans | LA | 70119 |
| John Conrad Emerson | 732 S Gayoso St | New Orleans | LA | 70119 |
| Barbara Grosse | Etals 732 S Lopez St | New Orleans | LA | 70119 |
| Current Resident | 732 S Lopez St | New Orleans | LA | 70119 |
| Current Resident | 732 S Rendon St | New Orleans | LA | 70119 |
| Current Resident | 732 S Salcedo St | New Orleans | LA | 70119 |
| Current Resident | 733 S Lopez St | New Orleans | LA | 70119 |
| Evelyn L Jones | 734 S Gayoso St | New Orleans | LA | 70119 |
| Current Resident | 734 S Rendon St | New Orleans | LA | 70119 |
| Current Resident | 735 S Dupre St | New Orleans | LA | 70119 |
| Mary A Billington | 735 SO Gayoso Street | New Orleans | LA | 70119 |
| Current Resident | 735 S Gayoso St | New Orleans | LA | 70119 |
| Dupuy Alexander J Jr | 4707 Rebecca Blvd | Kenner | LA | 70065 |
| Current Resident | 735 S Salcedo St | New Orleans | LA | 70119 |
| 736 S Lopez LLC | 608 Surrey St | Lafayette | LA | 70501 |
| Current Resident | 736 S Lopez St | New Orleans | LA | 70119 |
| Milton L Hudson | Etals 738 S Rendon St | New Orleans | LA | 70119 |
| Current Resident | 736 S Rendon St | New Orleans | LA | 70119 |
| Apollo Executive & Co LLC | 736 S Salcedo St | New Orleans | LA | 70119 |
| Orleans Parish Criminal Sheriff's Office | 2800 Gravier St | New Orleans | LA | 70119 |
| Current Resident | 737 S Dupre St | New Orleans | LA | 70119 |

ZD071/21

| Name | Address | City | State | Zip |
|---|---|---|---|---|
| James L Jr Saunders | 737 S Gayoso St | New Orleans | LA | 70119 |
| Current Resident | 738 S Lopez St | New Orleans | LA | 70119 |
| Current Resident | 738 S Rendon St | New Orleans | LA | 70119 |
| Current Resident | 738 S Salcedo St | New Orleans | LA | 70119 |
| Current Resident | 739 S Dupre St | New Orleans | LA | 70119 |
| Cecile Scorza | 739 S Gayoso St | New Orleans | LA | 70119 |
| Olga B Platt | ET Als C/O City of New Orle | Washington | DC | 20019 |
| Current Resident | 739 S Salcedo St | New Orleans | LA | 70119 |
| Orleans District Redevelopment | 4902 S Claiborne Ave | New Orleans | LA | 70125 |
| Current Resident | 740 S Lopez St | New Orleans | LA | 70119 |
| Nellie J Smith | C/O Hound Investment Gro | New Orleans | LA | 70126 |
| Current Resident | 740 S Rendon St | New Orleans | LA | 70119 |
| Current Resident | 741 S Lopez St | New Orleans | LA | 70119 |
| Current Resident | 741 S Salcedo St | New Orleans | LA | 70119 |
| Robin Lynn Parker | Etals PO Box 330413 | Fort Worth | TX | 76163 |
| Current Resident | 742 S Gayoso St | New Orleans | LA | 70119 |
| Current Resident | 742 S Rendon St | New Orleans | LA | 70119 |
| Priscilla Edwards | 1600 S Gayoso St | New Orleans | LA | 70125 |
| Current Resident | 744 S Gayoso St | New Orleans | LA | 70119 |
| Orleans District Redevelopment Corporati | 4902 S Claiborne AV | New Orleans | LA | 70125 |
| Current Resident | 744 S Lopez St | New Orleans | LA | 70119 |
| Current Resident | 744 S Rendon St | New Orleans | LA | 70119 |
| Priscilla R Edwards | 1600 S Gayoso St | New Orleans | LA | 70125 |
| Current Resident | 746 S Gayoso St | New Orleans | LA | 70119 |
| Current Resident | 746 S Lopez St | New Orleans | LA | 70119 |
| Current Resident | 746 S Norman C Francis Pr | New Orleans | LA | 70119 |
| Current Resident | 746 S Rendon St | New Orleans | LA | 70119 |
| Elaine R Wilcox | 748 S Gayoso Street | New Orleans | LA | 70119 |
| Current Resident | 748 S Gayoso St | New Orleans | LA | 70119 |
| Current Resident | 748 S Lopez St | New Orleans | LA | 70119 |
| Current Resident | 748 S Rendon St | New Orleans | LA | 70119 |

ZD071/21

| | | | | |
|---|---|---|---|---|
| Current Resident | 750 S Dupre St | New Orleans | LA | 70119 |
| Ella T Charles | ET Als 750 S Gayoso St | New Orleans | LA | 70119-7203 |
| Current Resident | 750 S Gayoso St | New Orleans | LA | 70119 |
| Current Resident | 750 S Lopez St | New Orleans | LA | 70119 |
| 750 Jeff Davis LLC | 643 Magazine St Ste 201 | New Orleans | LA | 70130 |
| Current Resident | 750 S Norman C Francis Pr | New Orleans | LA | 70119 |
| Current Resident | 750 S Rendon St | New Orleans | LA | 70119 |
| Current Resident | 755 S Norman C Francis Pr | New Orleans | LA | 70119 |
| Tulane Partners, Lp Pelican | 1300 Perdido St 5Th Floor | New Orleans | LA | 70112 |
| Current Resident | 765 S White St | New Orleans | LA | 70119 |
| Hartel Enterprises LLC | PO Box 444 | Waveland | MS | 39576 |
| Current Resident | 780 S Norman C Francis Pr | New Orleans | LA | 70119 |
| South Central Bell Tele Co | C/O F Izard Ass't Controller | Birmingham | AL | 35201 |
| Current Resident | 800 S Norman C Francis Pr | New Orleans | LA | 70125 |
| Current Resident | 801 S Norman C Francis Pr | New Orleans | LA | 70125 |
| Current Resident | 819 S Broad St | New Orleans | LA | 70119 |
| Current Resident | 821 S Broad St | New Orleans | LA | 70119 |
| Administrators of The Tulane Educ Fund | 800 East Commerce Rd Ste Harahan | | LA | 70123 |
| Current Resident | 900 S Norman C Francis Pr | New Orleans | LA | 70125 |
| Current Resident | 903 S White St | New Orleans | LA | 70125 |
| Comeaux Building LLC | 415 Veterans Blvd | Metairie | LA | 70005 |
| Current Resident | 906 S White St | New Orleans | LA | 70125 |
| 915 South White LLC | 2212 Brighton Place | Harvey | LA | 70058 |
| Current Resident | 915 S White St | New Orleans | LA | 70125 |
| Nofh Inc | 921 South Dupre Street | New Orleans | LA | 70125 |
| Current Resident | 921 S Dupre St | New Orleans | LA | 70125 |
| Current Resident | 950 S Rendon St | New Orleans | LA | 70125 |



GRACE HEBERT CURTIS

**April 30, 2021**


Dear Neighbor:

As an agent for the City of New Orleans, we are contacting you regarding the proposed construction of the Orleans Justice Center Medical Services Building.  The site for this project is located at 2900 Perdido Street, bounded by the Pontchartrain Expressway and in the section between S. Dupre and S. Gayoso Streets. The proposed building is a new 2-story, 80,500 square foot facility housing male and female acute mental health housing units, medical clinic, infirmary, laundry, administration, and visitation components. Construction is anticipated to begin January 2022 and be completed in August 2023.


Per the requirements of Sections 4.3G and 16.2 of the Comprehensive Zoning Ordinance, we are applying for an amendment to an existing conditional use ordinance. This would authorize the expansion of the prison (Orleans Justice Center) in an LI Light Industrial District.


Additionally, we are applying for a variance to exceed the set back of 20 feet that is required by Section 16.3.A.2 of the zoning ordinance. Due to existing conditions on the site, the proposed building is set back at least 55 feet from the front property line to avoid piping lines supplying the existing adjacent buildings.


As a nearby neighbor or stakeholder in the neighborhood, we are inviting you to join the upcoming community meeting to learn more about what we are proposing and offer your questions, comments, and concerns. Our application has to be heard by the City Planning Commission and the City Council, and we are required to do this before we submit our application. Due to the current COVID-19 emergency, we are unable to set up an in-person Neighborhood Participation meeting but will post an informational presentation online at www.youtube.com/gracehebertcurtisarchitects that will be available from **Friday, April 30 – Thursday, June 17, 2021** where you can learn more about the project. We will host a virtual presentation on **Thursday, May 20** and **Thursday, June 17, 2021**. The presentations will begin at **6:00 pm**.  We invite you to join the meeting and share your comments and concerns by using the link or call-in information below.


**Join from the meeting link:**

https://nolagov.webex.com/nolagov/j.php?MTID=me647e60e6f9314b67b0827b4302a6cb9

**Join by meeting number:**

Meeting number (access code): 187 330 2930
Meeting password: 1234

**Join by phone**
+1-415-655-0001 US Toll

**Join from a video system or application**
Dial 1873302930@nolagov.webex.com
You can also dial 173.243.2.68 and enter your meeting number.

**Join using Microsoft Lync or Microsoft Skype for Business**
Dial 1873302930.nolagov@lync.webex.com

All correspondence received will be included in the conditional use application.

This letter is being delivered through U.S. Mail. If you would like to receive updates, if there are any changes to the plans, and/or if you would like the meeting invitation sent via email please reach out to us at OJCMedicalServices2900@gmail.com.

Sincerely,

Grace Hebert Curtis Architects



**ARCHITECTURAL SITE PLAN**

GRACE HEBERT CURTIS ARCHITECTS, APAC
OJC MEDICAL SERVICES BUILDING | SITE PLAN



**Stephanie Norris**

| | |
|---|---|
| **From:** | Stephanie Norris |
| **Sent:** | Friday, April 30, 2021 9:15 AM |
| **To:** | president@mcno.org |
| **Subject:** | FW: Orleans Justice Center Medical Services Building - NPP Meeting Invitation |
| **Attachments:** | NPP Letter Notice.pdf; Site Plan.pdf |

Mid-City Neighborhood Organization,

Please find the attached invitation to the Neighborhood Participation meeting for the Orleans Justice Center Medical Services Building.  The Site Plan for the project is included.
The first meeting will be held on May 20th at 6:00 pm.

Regards,

**Stephanie Norris** AIA
**Architect**

Grace Hebert Curtis Architects, APAC
**Office**: 504.522.2050
650 Poydras Street, Suite 1110
New Orleans, LA 70130
**ghc-arch.com**

**Stephanie Norris**

| | |
|---|---|
| **From:** | Stephanie Norris |
| **Sent:** | Friday, April 30, 2021 9:25 AM |
| **To:** | Jay.H.Banks@nola.gov |
| **Subject:** | Orleans Justice Center Medical Services Building - NPP Meeting Invitation |
| **Attachments:** | NPP Letter Notice.pdf; Site Plan.pdf |

Councilman Banks,

Please find the attached invitation to the Neighborhood Participation meeting for the Orleans Justice Center Medical
Services Building.  The Site Plan for the project is included.
The first meeting will be held on May 20th at 6:00 pm.

Regards,

**Stephanie Norris** AIA
**Architect**

Grace Hebert Curtis Architects, APAC
**Office**: 504.522.2050
650 Poydras Street, Suite 1110
New Orleans, LA 70130
**ghc-arch.com**

**Stephanie Norris**

| | |
|---|---|
| **From:** | Stephanie Norris |
| **Sent:** | Friday, April 30, 2021 9:28 AM |
| **To:** | Stephen K. Kroll |
| **Subject:** | Orleans Justice Center Medical Services Building - NPP Meeting Invitation |
| **Attachments:** | NPP Letter Notice.pdf; Site Plan.pdf |

Mr. Kroll,

Please find the attached invitation to the Neighborhood Participation meeting for the Orleans Justice Center Medical Services Building.  The Site Plan for the project is included.
The first meeting will be held on May 20th at 6:00 pm.

Regards,

**Stephanie Norris** AIA
**Architect**

**Grace Hebert Curtis Architects, APAC**
**Office**: 504.522.2050
650 Poydras Street, Suite 1110
New Orleans, LA 70130
**ghc-arch.com**

**Stephanie Norris**

| | |
|---|---|
| **From:** | Talva  Burnette <Talva.Burnette@nola.gov> |
| **Sent:** | Wednesday, May 19, 2021 9:02 AM |
| **To:** | Talva  Burnette |
| **Subject:** | Orleans Justice Center Medical Services Building Phase III Public Meeting |

Please Join us.

Orleans Justice Center Medical Services Building Community Meeting

Please Join the City of New Orleans and Join representatives from the City and Grace Hebert Curtis Architects To discuss the proposed construction.

Location: WebEx

When: Thursday, May 20th at 6 PM

**Join from the meeting link**
https://nolagov.webex.com/nolagov/j.php?MTID=me647e60e6f9314b67b0827b4302a6cb9

Or

Dial-in number: (415) 655-0001

Access code: 187 330 2930

Password: 1234

To access via WebEx, please RSVP at:

nola.gov/neoevents

Questions:

talva.burnette@nola.gov

(504) 281-9890



**Best Regards,**

**Talva Burnette**
Neighborhood Liaison District B

**Mayor's Neighborhood Engagement Office**
**City of New Orleans**
1300 Perdido Street Suite 8E15 New Orleans
Louisiana 70112
talva.burnette@nola.gov I 504.658.7808 (desk) I 504.658.4969 (fax) I 504.281.9890 (mobile)
http://www.nola.gov/neighborhood-engagement

*For information about COVID-19, please visit ready.nola.gov.*









Perdido Street Entrance

Orleans Justice Center Medical Services Building

2900 Perdido Street, between S Dupre and S Gayoso

ZD07121

# Orleans Justice Center Medical Services Building

## AGENDA

**Welcome**
Talva Burnette
*Neighborhood Engagement*

**Chronology**
Vincent Smith
*Capital Projects Administration - Director*

**Building Design**
Gerald Hebert
*Grace Hebert Curtis Architects*

**Project Schedule & Cost**
John Sousa
*Hill International, Inc. — Project Manager for City of New Orleans*

**Online Tools**
Stephanie Norris
*Grace Hebert Curtis Architects*

**Questions & Answers**

**Closing Comments**
Talva Burnette
*Neighborhood Engagement*

---

## Question & Answer
Page 9 of 187
### Participants

- Talva Burnette
  *Neighborhood Engagement*

- Vincent Smith
  *Capital Projects Administration*

- Gerald Hebert
  Stephanie Norris
  *Grace Hebert Curtis Architects*

- John Sousa
  *Hill International, Inc.*

- Sean Bruno
  *Orleans Parish Sheriff's Office*

- William Kissel
  *Wellpath Medical and
  Behavioral Healthcare provider*

# Orleans Justice Center Medical Services Building Chronology

ZD07/1/21

- **September, 2011** – OPSO breaks ground on the new, 433,000 sq. ft., 1,438 bed, Orleans Justice Center that includes Inmate Housing, Intake Processing Center and Administrative Building.

- **April, 2012** – A class action lawsuit was filed by the Southern Poverty Law Center (SPLC) against Orleans Parish Prison to protect inmates from "abusive and unconstitutional conditions of confinement".

- **June, 2013** - A Consent Judgement was entered among and between the Plaintiff class; Department of Justice; and the Orleans Parish Sheriff.   The purpose of the agreement was to address alleged constitutional violations in the treatment of inmates at Orleans Parish Prison.  Through the provisions of this agreement, the parties would seek to ensure that the conditions in the Orleans Parish Prison (OPP) protect the constitutional rights of prisoners confined at OPP.

# Orleans Justice Center Medical Services Building Chronology

- **December, 2014** – OPSO moves acute mental/medical male inmates to Elayn Hunt Correctional Facility in St. Gabriel, La. The housing unit at Hunt could accommodate up to 33 male acute mental/medical inmates.

- **November, 2015** – OPSO opens the new 1,438-bed Orleans Justice Center Facility Inmate Housing, Intake Processing Center and Administrative Building.

- **June, 2016** - The Orleans Parish Sheriff's Office (OPSO), Department of Justice and Plaintiffs signed a Stipulated Order creating the position of Independent Jail Compliance Director. The Compliance Director assumed authority to operate the Orleans Justice Center (OJC) and all jail facilities.

  - The Stipulated Order required the Compliance Director to make recommendations to the Court on three mayor topics: The youthful inmate population currently housed at OJC, the "Docks" holding area for the inmate population going to and from Criminal District Court, and a decision on a long-term solution for the inmate population affected by acute and sub-acute mental health and medical needs.

# Orleans Justice Center Medical Services Building Chronology

ZD071/21

- **January, 2017** - The Compliance Director submitted the supplemental compliance action plan with recommendations for the acute and sub-acute mental health and medical service needs.  The Medical Services Building referred as Phase III facility would include: a housing capacity of 89 security beds and 14 infirmary beds (total of 103 beds), it would accommodate only Male and Female inmates with acute and sub-acute mental disorders.  The design would also provide space for laundry service, family and attorney visitation, an infirmary, medical clinic to provide services currently provided at OJC Phase II, and administrative space for medical and mental health staff.

- **January, 2018** – The City breaks ground on new, 28-bed Juvenile Justice Center Addition.

- **March, 2018** - The City hires Hill International and Grace Hebert Curtis Architects to provide Project Management and Architectural Services for the design and construction of a new 89-bed male and female mental and medical services building on the OJC campus.

- **September, 2018** – City issues NTP for the renovation of the OPP 3rd floor "Docks".

# Orleans Justice Center Medical Services Building Chronology

2D01/21

- **November, 2019** – City completes construction of the new, 28- bed, Juvenile Justice Center Addition.

- **February, 2020** – City completes renovations of the OPP 3rd floor "Docks".

- **March, 2020** – COVID-19

- **June, 2020** – City asks Federal Judge to modify Phase III Plan to renovate the 2nd floor of the existing OJC Inmate Facility to accommodate the medical services scope of work.

- **August, 2020** – The City completes the renovation of TDC buildings #1 and #2.

- **September, 2020** – OPSO moves inmates from Elayn Hunt into TDC.

- **January, 2021** – Federal Judge directs the City to move forward with the current Phase III design.

- **February, 2021** – Capital Projects/GHC Architect begin engagements with City Planning to begin Conditional Use/NPP process.

- **March, 2021** - Capital Projects/GHC begin engagements with FEMA/EHP to begin the EHP 106 process.

**Orleans Justice Center Medical Services Building**

2900 Perdido Street, between S Dupre and S Gayoso

ZD07/21





## Architectural Site Plan

We are applying for an amendment to an existing conditional use ordinance

- This would authorize the expansion of the prison in an LI Light Industrial District

We are also applying for a variance to exceed the set back of 20 feet required by Section 16.3.A.2 of the zoning ordinance

- Due to the existing utility pipes that go from the building on the lake side of the property to the jail on the river side, we can not build up to the 20' setback

Orleans Justice Center Medical Services Building
Site Plan

OJC MEDICAL SERVICES BUILDING

EXISTING HOUSING BUILDING

EXISTING KITCHEN/ WAREHOUSE

PERDIDO ST.

S. GAYOSO ST.

INTERSTATE 10

PROPERTY LINE

UTILITY BRIDGE & PIPES

EXIST. UTILITY BRIDGE & PIPES

ENTRY PLAZA

## First Floor Plan

Page 29 of 187

Housing that serves acute mental health inmates

- 2-story 80,500 SF facility
- 106,000 SF site

Three areas:

- 12 bed female housing unit on the 1st floor
- 39 bed male housing unit on the 1st floor
- 38 bed male housing unit on the 2nd floor

Access to outdoor fresh air and exercise space from the common Dayroom space

# Orleans Justice Center Medical Services Building
## First Floor

ZD071/21



## Second Floor Plan

Nurse and security station
- Located in the center of each dayroom
- Allows for observation of the entire housing area

Joint male/female housing support
- Counseling rooms
- Mental health staff work areas

Centralized visitation
- Attorney and family visits
- Public entry point

Additional Spaces:
- Infirmary
- Clinic with 6 exam rooms
- Phlebotomy
- Dental services
- Administration areas



# Orleans Justice Center Medical Services Building
## Second Floor



ZD071/21

PROPERTY LINE

PERDIDO ST.

UTILITY BRIDGE & PIPES

EXIST. UTILITY BRIDGE & PIPES

INFIRMARY

CLINIC

MED / MENTAL HEALTH/ADMIN

HOUSING SUPPORT

MALE ACUTE MENTAL HEALTH

EXISTING HOUSING BUILDING

EXISTING KITCHEN WAREHOUSE

INTERSTATE 10

Interior View of Male Housing Unit

Orleans Justice Center Medical Services Building

ZD071/21

Page 92 of 187

# Orleans Justice Center Medical Services Building
## Project Schedule/Project Costs

ZD07/12/

- Complete Design    – September, 2021

- Start Construction – January, 2022

- Finish Construction – August, 2023

Estimated Project Costs

**$51 million**

Orleans Justice Center Medical Services Building

ZD071/21

## CITY OF NEW ORLEANS ONLINE TOOLS

### CITY PLANNING COMMISSION WEBSITE

nola.gov/cpc

The City Planning Commission website hosts a number of important documents and tools. CPC meeting agendas, videos, and staff reports can be viewed on the website as well as regulatory and planning documents such as the Comprehensive Zoning Ordinance and the Master Plan.

### COMPREHENSIVE ZONING ORDINANCE

czo.nola.gov

The entire text of the Comprehensive Zoning Ordinance can be viewed on this website.

### NOTICEME

noticeme.nola.gov/

NoticeMe is a personalized notification tool that emails citizens to inform them of opportunities for public input on proposed land use changes. This system that offers a way for interested parties to stay informed for land use proposals in an individually selected area. Once registered, the email address will receive notices of when a public hearing is scheduled and when a report is ready. You will also be notified of the action of the City Planning Commission or Board of Zoning Adjustments.

### ONE STOP APP

http://onestopapp.nola.gov/search.aspx

The One Stop App pulls up-to-date information directly from the City's official record. This tool is used by homeowners, businesses, licensed professionals, developers, contactors, and other interested citizens to:

- Find information about a permit, license, planning project, or violation in progress.
- Initiate an application for many types of permits and licenses without coming to City Hall.
- Pay with credit cards for permits and licenses online.
- Research what has been permitted, licensed, or cited at a particular location or during a user defined time frame.

### PROPERTY VIEWER

property.nola.gov

The Property Viewer provides zoning and land use information for all properties within the City of New Orleans. The Property Viewer displays "layers" of information that includes the Master Plan Future Land Use Map, zoning districts, and the locations of site-specific zoning actions approved by ordinance which includes Conditional Uses, Exceptional Uses, and Planned Development Districts. Links are provided that can take the viewer to the applicable section of the Comprehensive Zoning Ordinance and Assessor records.

---

## Additional Online Tools

Page 4 of 47

### City Planning Commission

- Nola.gov/cpc

### Comprehensive Zoning Ordinance

- Czo.nola.gov

### NoticeMe

- Noticeme.nola.gov

### One Stop

- Onestopapp.nola.gov

### Property Viewer

- Property.nola.gov



ZD071/21

# Orleans Justice Center Medical Services Building

## Q & A

During this presentation you may text questions or comments to

# 504-384-8055

or

enter questions or comments in the WebEx Chat box



Chat



Page 95 of 187

Orleans Justice Center Medical Services Building

ZD071/21

Direct any additional questions or comments to

OJCMedicalServices2900@gmail.com



**Perdido Street Entrance**

Orleans Justice Center Medical Services Building

2900 Perdido Street, between S Dupre and S Gayoso



# NPP SUMMARY REPORT

**Date of Report:** June 18, 2021

**Project Name:** Orleans Justice Center – Medical Services Building

**Overview**: This report provides results of the implementation of the Project Neighborhood Participation Program and the NEPA public involvement requirements for the Orleans Justice Center Medical Services Building located at 2900 Perdido Street, bounded by Interstate 10 and between the extensions of S. Dupre Street and S. Gayoso Street.  The applicant intends to file an application to allow for the conditional use approval for a prison in an L1 Light Industrial District.  This report provides a summary of contacts with citizens, neighbors, public agencies, and interested parties.  Opportunities have been provided to learn about and comment on the proposed plans and actions.  Comments and questions from emails, contents of the virtual presentation chatbox and a pdf of the video presentation are attached.

**Contacts:**       Email:  OJCMedicalServices2900@gmail.com

Mayor's Neighborhood Engagement Office
City of New Orleans
1300 Perdido Street Suite 8E15 New Orleans
Louisiana 70112
talva.burnette@nola.gov I 504.658.7808 (desk) I 504.658.4969 (fax) I 504.281.9890 (mobile)
http://www.nola.gov/neighborhood-engagement

**Virtual Neighborhood Meetings:**  The following dates of all virtual meetings where citizens were invited to discuss the applicant's proposal [comments and other feedback are included].
1.   May 20, 2021 – via Webex, 6:00 pm – 7:30pm
There were 44 participants in the virtual meeting, 23 people submitted questions or comments via email and 12 people entered questions or comments in the Chatbox.  Of the 12 participating in the Chatbox, 4 had submitted questions via email.  Additionally, one person called to request a pdf copy of the presentation.
2.   June 17, 2021 – via Webex, 6:00 pm – 7:30pm
There were 19 participants in the virtual meeting, there were no questions or comments via email and 2 people entered questions or comments in the Chatbox.

**Results:**
There were 461 persons/addresses invited to the community meetings.  Of those 142 were returned, stamped "return to sender, no such number".
1.   Summary of concerns:



   a. Most of the questions and observation dealt with the concern that persons with mental health challenges should not be treated within the carceral system.
   b. Concerns were expressed regarding the cost of the project and the retrofitting of the Phase II (existing) facility.
2. How concerns and observations were addressed:
   a. While it was agreed that there was not a desire to see the criminalization of the mentally ill, it was noted that many who are incarcerated have mental health issues. These persons may need and deserve evaluation, care and treatment.
   b. Regarding the retrofit of the Phase II (existing facility), while there are several aspects that make the retrofit problematic, the most significant obstacle was lack of approval from the federal monitors appointed to oversee the court-mandated reform agreement. One concern for the monitors were the mezzanines in the existing housing units;  they consider this element hazardous for acute patients.
3. Attached are questions, observations and responses gathered from the emails to ojcmedicalservices2900@gmail.com and the chatbox feature that was utilized during the video presentations.



# QUESTIONS & OBSERVATIONS

**Topic:**          Orleans Justice Center – Medical Services Building

**Host:**           Talva Burnette, Neighborhood Liaison District B
                    Mayor's Neighborhood Engagement Office
                    City of New Orleans

**Location:**       Webex

**Date:**           May 20, 2021, 6:00-7:30 pm


## Q&A TRANSCRIPT

The following is a transcription of the conversation during the Question & Answer session.

<u>HOST</u>:  Now, we want to go ahead and move into the questions and answers.  If you put your question in the chatbox, whether you direct it to specifically to myself or someone.  They will see it, I will see it.  I think someone asked that question.  You can put your question in the chatbox and we will attempt to address them all tonight.  Additionally, it you have called in, the number that you can send a text to ask your question is 504-608-8306.  That number, again, is 504-608-8306.  You can use that to send a text if you came in via calling in.  Additionally, I wanted to give out the email address, one more time, for additional questions and comments.  That is <u>ojcmedicalservices2900@gmail.com</u>.  So, the text line is available, feel free to use it. Again, that email address is <u>ojcmedicalservices2900@gmail.com</u>.  So, you have multiple ways to submit questions, concerns, observations and comments.  Either of those will be available to you.  Please do use those to share your questions with us.
Right now, I'm going to go back and have a look through our chatbox, here, and see if there are any question we can address now.

<u>CPA</u>:  Talva, this is Vince, did you get the questions that came in earlier?

<u>HOST</u>:  I did, and I asked John if he would like to read through them.  If that's what he wants, we can certainly do that.  We have quite a bit of time left.

<u>CPA</u>:  Let's go ahead and start with those.  If you could let John read those.  I think, John, as project manager, just from his seat, I think he would be the best first shot at directing a question to one of the team members.  And, of course, if another team member could answer it better, they can certainly and respectfully jump in.  But, just to maintain some type of order, if you could let John start with those questions, that could help you to cue up as your looking through the chat.  I think that might help us to be more efficient.

<u>HOST</u>:  John, feel free to go ahead and read those questions as you like.



<u>HILL</u>: Earlier today we received a few questions and, then, later in the day received a lot of them.  We're probably going to have to address the earlier ones; the same order that they came in.  **Sade Dumas**, you had a question:

> **Aren't there currently design problems with the Phase III design, such as double bed cells, which are not recommended for acute and sub-acute patients and can be dangerous? What other issues currently exist with the design, and how is Grace Hebert addressing them?**

<u>HILL</u>: Wellpath, I'm going to let you address that, about the double cells, double beds.

<u>WELLPATH-KISSEL</u>: This is Bill Kissel, from Wellpath.  Thank you for having us, first of all.  I'm going to let Dr. Rouse, who is our chief psychologist and our partner from Tulane, answer the question of the acute patients and what type of bed that patient would need.  Then, we can answer the sub-acute, too.  Doctor, do you want to talk to the housing requirements or best practices for the acute patients?

<u>WELLPATH-ROUSE</u>: Yes, I'd be happy to.  Thanks, Bill.  Just like in a acute psychiatric hospital, there are some rooms that are single occupancy but the majority of which are double occupancy.  That is reflected in the design of this special needs facility.  And, it is always a clinical determination as to whether or not a patient can have a roommate.  So, for now, it is in the existing facility, it is very common for persons to be too acutely mentally ill to have a roommate, for various reasons.  As that person takes their medication, their brain starts to get better, they may be able to tolerate having a roommate.  But, at all phases of that, that is a clinical determination that is made by the mental health professionals and the psychiatrists in conjunction with information that we can get from security.  So, there is no blanket prescription that a group of patients needs to be single celled nor a group of patients would always be double celled.  That is always a flexible dynamic but clinically driven decision that tries to balance – that does balance – the safety needs of each patient.

<u>HILL</u>: Thank you, Doctor.  Let me just go on right to question 2.  It comes from **Lexi Peterson**.  Her question is:

> **Doesn't the research show that it is more sufficient and more secure to have all detainees being housed in one building?**

<u>HILL</u>: We would probably like to have OPSO address that

<u>OPSO</u>: This is Blake Arcuri, general counsel for the Sheriff's office.  As has been discussed in some of the hearings and several of the meetings, this building is going to be functionally operated as one building.  It's not a building that we have to go outside to reach.  It is connected by a hallway, a corridor, it's about 25 or 30' long.  It's almost an identical walk from the central core to the current medical clinic as it will be to this building.  So, it will functionally be one building.

<u>HILL</u>: Thank you, Arcuri.  Question number 3 comes from **Jenna Grant**.  Her question is an architectural one so it will probably go to Grace Hebert.  She questions:

> **Isn't it true that each floor of the Phase II building includes an outdoor exercise space, as is contemplated for Phase III?**



HILL:  Jerry, you want to answer that.

GHC:  Yes, each of the housing units has an outdoor exercise yard adjacent to them for easy access for the offenders to be able to get to them.

HILL:  Yes, Phase II has them, Phase III will have them as well.

GHC:  Correct.

HILL:  Question number 4 is comes from the **CAG** group that's the **Challenge Community Advisory Group**.  They wrote a very long observation but their question is this:

> **Isn't it correct that the jail population has continued to decrease due to strategies to which the city has committed over the past 12 years with the objective of losing our title as the most over-incarcerating city in the country? Given the continuing decrease in the jail population and the hundreds of unused beds in Phase II, why would the city waste $51 million to build more beds?**

HILL:  Arcuri, do you want to handle that one?

OPSO:  Yes, sure.  So, I guess the issue here is the bed count in OJC, or any building, is not important to us.  What's important to us is footprint.  Covid 19 has shown that more than ever.  We have been pushed to the max in our ability to spread out the inmates in a way we never thought we would have to.  Right now, today, with the population, whatever it is, 774, we're utilizing every housing unit.  We've had trouble trying to fit all the inmates safely in OJC throughout Covid.  No Jail that was ever constructed ever thought that, on top of existing classification levels, such as predator, non-predator, high-, medium- and low-security and all the special populations, that they would have to add quarantine, suspected Covid, Covid positive, stepping down off of Covid. So, the idea that there is all this unused space in OJC is just a myth.  The housing units are all being utilized. That's a large reason why we were successful with the way we handled Covid.  If we had taken an entire floor and retrofitted it, prior to Covid, we would never had been able house the inmates safely like we did throughout this process.

HILL:  Question number 5 comes from **Natalie Sharp** and her question is:

> **If we presently have a clinic in the Phase II building, why are we paying to build, staff and supply another one?**

HILL:  Wellpath, would you care to answer that?

WELLPATH-KISSEL:  Sure, this is Bill Kissel, again.  I think we will probably tag team on this on this answer.  Nina Howard our HSA, who is also an RN will probably jump with some answers along with Dr. Blake and Dr. Rouse.
We obviously have challenges with patients who need a higher level of sematic care.  We do not have true infirmary beds, now, for sematic care.  We also are challenged, often, with patients who need specialized housing for psychiatric reasons.  We're challenged to have enough suicide-resistant cells for



patients when they are in crisis.  And, we're also challenged, at times, to have adequate space to provide proactive programming for our mental health population so we can help them with their recovery while they are with us.  There is just not enough space.  So, those are some of the reasons we feel in support of this initiative.
I'm going to let Nina Howard and both Dr. Blake and Dr. Rouse jump in if I miss something.  So, Nina

<u>WELLPATH-HOWARD</u>:  I'm Nina Howard.  I'm the HSA for Wellpath.  While our Clinic is going to be centralized in the Phase III, what's really important is what he said about the Infirmary.  We have to be able to take care of patients at all levels, not transport them to the hospital unnecessarily.  On the nursing side, there is not going to be any difference, just like Blake (OPSO) said, as far as the space-to-walk ratio will be the exact same from all units to the new housing area.  The Infirmary is definitely needed.  Dr. Blake, do you have anything to add?  Dr. Rouse?

<u>WELLPATH-ROUSE</u>:  I'm a psychiatrist, but I am a medical doctor, although my work is not necessarily in the Infirmary, we work alongside of the sematic medical providers every day. There are many difficulties with the existing Clinic space; particularly, that you can only have, for security reasons, one type of inmate in that facility at a time.  For example, it becomes difficult if you have a regular Clinic day in which the females are there in the Clinic, yet, at the same time, there's a need for males to enter the Clinic.  In the current space, it is exquisitely difficult to keep security and keep everyone safe in that kind of setting.
Also, in the current existing Infirmary space, it's not really set up in a way that can house and hold patients who may need to stay and sleep in the Infirmary for days at a time.  Unfortunately, many of those persons, their care couldn't happen where they are.  Although that's not exactly where I work, I can see numbers of issues with the current Infirmary that are cured by the new Infirmary.  For example, in the old jail complex, in old OPP, there was an Infirmary on the first floor. That was a spot where patients could stay for days, even receive dialysis in that facility.  That cannot happen in the current footprint of the Infirmary which was, as far as I know, was never designed to be an infirmary space in the first place.  It was designed to be a programming space and potentially even a schooling space.  So, it's been sort of retrofitted.  It does a good job, most of the time.  But there are many limitations which, in my medical opinion, are cured by a new Infirmary space.

<u>WELLPATH-KISSEL</u>:  Dr. Rouse, I just want to add, to support what you're saying, we've been challenged with patients who need hospital beds and getting them in the existing space.  Patients with extreme challenges with their activities of daily living.  A true infirmary bed that will be designed for those resources will be a great thing and we'll be able to keep patients out of the hospital and keep deputies out of hospital posts inside the facility which will help the Sheriff and his staff.  I'm sure, Blake, you would agree with that.

<u>WELLPATH-HOWARD</u>:  Yes, I'd also want to add, Bill; we have had patients that have ended up for weeks at the hospital just because they needed round-the-clock antibiotics.  This would be rendered completely unnecessary if we had our Infirmary space in place.  It would save money and it's safer for the patients.

<u>HILL</u>:  Thank you, that was question number 5.  Question number 6 is mostly an observation from **Leslie Molson**.  She had 3 basic observations.  One concerning incarceration of people, the second one had to do with the City of New Orleans cannot afford to build a new one and the third item basically talking



about retrofitting Phase II instead of building Phase III.  All of these observations will be addressed, by the way.  We're trying to address questions that people have right now.

Question number 7 comes from **Stanford Rosenthal**.  His question was – it's going to be for Blake, by the way, for OPSO to address – the question is:

> **Given that the sheriff has not been able to adequately staff the Phase II building or TDC, and that adequately staffing jails is a national problem, how do you envision the sheriff being able to hire the over 100 new staff that will be required to operate Phase III?**

HILL:  Blake?

OPSO:  First off, I think this 100 number that's thrown around is a mischaracterization. I think it was included, I'll be honest, in a city document that did not operate with the assumption that once this building opens, TDC closes.  We believe that the staffing required for this building's security staff is going to be very similar, if not identical, to the staffing required to operate TDC right now.  So, those staff will be swinging back over into this new building.  To be sure of this, we recently engaged an expert, I think they are on this call now just listening and observing, to confirm that we have projected the right amount of staff, both security and medical.  We've had challenges hiring deputies, as has everyone; Covid has impacted that.  We were unable to train as much as we wanted to during Covid.  But, we're now opening back up.  We have an academy class running right now.  Like the NOPD, like other agencies around the area, like restaurants and everywhere else, we're going to continue to make a push to hire and believe we will be in a position to staff the facility.

HILL:  I have a few more here to read that are mostly, like I said, are mostly all observations.  Again, all of these questions are going to be - we're going to probably address them in the next couple of weeks.  We have an **Aidan Morse**, she had an observation, I haven't even read them all but, some of them are quite long, by the way.  Once again, questioning why we're building the new facility versus using or retrofitting the existing.  **Kendra Davis** also had an observation and she mentions:

> **We need real mental health care, not cages. We need compassionate community members who care about one another, not prisons.**

HILL:  Basically, we can have Wellpath address and Dr. Rouse, you can probably help here, it's not that we are putting people in cages but we're trying to get them treatment and that's what this is all about.  Wellpath, do you care to address that?

WELLPATH-KISSEL:  Dr. Rouse, can I just take a quick swipe and then we'll send to you?  I think this facility is going to allow, if a patient is incarcerated, it's going to allow us the resources to include group and programming space, appropriate cell space, whether it be single or double, or appropriate safe cells for those in a self-injurious crises.  It is going to help us start the recovery for that patient during his or her incarceration.  Start programming, start mental health treatments, groups on life skills and job readiness and other life skill opportunities.  Then we can do a very warm and tight hand-off to community resources and community providers.  We know so many of our patients are going to be returning to the community.  Very few end up going to Louisiana DLC.  This is giving us an opportunity to really assist patients jump-start their recovery.  I'll pass to Dr. Rouse at that point.



<u>WELLPATH-ROUSE</u>:  I've been involved In public mental health in this city for nearly 20 years, at this point.  Working inside the Orleans Justice Center has shown me a new side of things that even I had not seen before.  And it all comes down to this simple fact:  at OJC, the Sheriff does not determine who the police arrest and bring to him.  At OJC, the Sheriff doesn't determine when people leave; that's the judges.  So, there's a space and that's where our fellow citizens are.  So, to me, the question is what can be done for them while they are here.  And, that's what drives us every day to do what we do.  I will be the first to admit I do not want to see the criminalization of the mentally ill.  But, the bottom line is that sometimes people get arrested.  That doesn't change whether or not they need care or deserve evaluation and deserve treatment.  So, that is what we try to do on the inside.  The medical staff and the Sheriff's staff don't control the front door and don't control the exit for the most part.

<u>HILL</u>:  Dr. Rouse, this is John, do you care to expand, a little bit, when people talk about mental health they think it's just one group of people.  The mental health group, how many groups are we talking about?

<u>WELLPATH-ROUSE</u>:  As of last week, we had 420 people taking psychiatric medications in the jail.  That encompasses a population that is taking everything from low-dose anti-depressants, because they are having persistent mood problems after an extended period of substance abuse, all the way to persons taking anti-psychotic and anti-epileptic medication because they are floridly psychotic.  We have an entire range of mental health populations which you could consider some to be more akin to outpatient care, such as persons who would be going to Central City Mental Health Clinic or Chartres Pontchartrain Mental Health Clinic.  We've also got people in jail who are at much higher levels of need.  It's a broad swath of the mental health population but we're pretty much seeing it all.

<u>HILL</u>:  Again, I ask you to clarify that because a lot of people don't realize there is drug abuse, sexual abuse, murderers and all of those fall into this category.  And, it's your job, working with Wellpath and treating, and working with the Sheriff and the City to separate all these groups.  Thank you, the next one comes from **Bob Murell**.  Again, it's mostly an observation and he's got several.  One of them has to do with why are we building a psychiatric care facility.  I think, Dr. Rouse, you've already addressed some of those, you've clarified some of that.  One of his last observations was that – Blake, you may want to add a little bit to this – but he talks about:

> **Phase III only benefits the sheriff and the OPSO – doesn't benefit the deputies, not the medical staff, and certainly not the incarcerated people that need psychiatric care.**

<u>HILL</u>:  It's hard to follow that but those are his concerns.

<u>OPSO</u>:  I don't know how to address that.  Like you said, it's an observation.  I think it kind of speaks for itself; that's his opinion.

<u>HILL</u>:  A lot of these questions are really observations or personal opinions.  Since 6:00 we've done quite a few of those.  We will try to address every one of those, one way or another.  The next one comes from **Lian Lucansky**, he's a resident there:

> **I firmly oppose the construction of a Phase II (Hill:  It should be Phase III) psychiatric facility because out prisons and jails should not be in charge of people's mental health.**



<u>HILL</u>: I think we've already addressed, Dr. Rouse and Wellpath have addressed, why we're doing this and it's not just one group of people, it encompasses many groups of people. It goes on:

> **I believe this money instead should be supporting mental health services run by the city in partnership with community members directly impacted by incarceration and mental health. Increased mental health services will invest in our community's wellbeing and prevent incarceration for mental illness in the future.**

<u>HILL</u>: Again, it's an observation. All of these will be addressed. I don't know how many more of these observations we can read. But, it's mostly pretty much the same, over and over, and we got a lot of these at the last minute and haven't had a chance to review them all. Talva, I'll be glad to hand this thing back to you.

<u>HOST</u>: Absolutely, and thank you so much for that, John. I do see that we do have a couple in the chatbox. Some of them are rather long, so I will see if I can work through them. Just so that everyone knows, the entire contents of the chatbox will be sent over to the respective people so that they can address those questions and comments, going forward.

<u>CPA:</u> We have, part of the requirement and obligation, I know for the 106, and I'm sure for the NPP, as well, is to create a meeting summary that documents the conversations. We will be creating a meeting summary and all comments, questions, with responses, will be in that summary and be available to the public. We are going to answer every question.

<u>HILL</u>: I just see one, I think that we've probably addressed most of this, but I think it comes from **Janet Hays**. Dr. Rouse, you can probably help with this one because most of these deal with mental health issues. She says:

> **How will the jail accommodate people with serious mental illnesses who lack insight they are sick and will not voluntarily seek or accept treatment?**

<u>WELLPATH-ROUSE</u>: Hey, Janet, how you? So, the concept of lack of insight, is a medical term-anosognosia, is a problem that has been seen in psychiatry since psychiatry existed. The cruel irony, in many ways, of mental illness is that many times the part of the brain, that is causing the mental illness symptoms, is the same part of the brain that's necessary for knowing that you have a problem. And, that's an unfortunate fact that cuts across psychiatric diagnosis; like schizophrenia, schizoaffetive disorder, bipolar 1, and, of course dementias and others like it. But, nevertheless, like I said before, we don't control who comes in the front door or we don't control when they leave. So, it's our ethical obligation to do the best we can while they're there. So, we do a couple of things. Number one, there is no other place in the entire city, except perhaps the University hospital emergency room, where you can see a psychiatrist quicker; it doesn't exist. Go to Central City, go to Chartres Pontchartrain, sign up to see a psychiatrist and they're going to tell you weeks, if not months. That's not how it is in OJC. You're talking that day, or just a day or two later, if a non-acute problem. That's how it works. So, we have a triage system that identifies the most severely and persistently mentally ill when they show up and they're the ones that get our first attention. So, we see them quickly, is my point. The second point is, we do everything we can to house those persons in the safest environment possible. So, that often,



what that means is we'll be getting a call and the psychiatrists will be using the limited power we have to make housing determinations. You don't want me determining who's in which gang and who can't live together because of previous convictions. I've got no idea, that's not my skill set. But, I am permitted, by the Sheriff, to determine if a person needs to go to a room by themselves or a room on the sub-acute psychiatric floor or a room on the acute psychiatric floor. So, we have that power to make that determination - where's the safest area for that patient. And then finally, we do not force medications in the jail. It does not happen, under no circumstances. State law prevents it and we don't do it. So, what that practically means, for the most severe, one's whose insight affects not just their understanding of their illness but also affects their understanding of their legal situation, those persons leave the jail and go to a state forensic hospital in Jackson, Louisiana, just north of Baton Rouge. Honestly, it's kind of a win every time we see one of our acute patients make it up on that wait list and get up to Jackson because we know that's an even safer environment – an even more hospital-like environment than we can provide at OJC. That's a bit rambling but, Janet, I hope that answers your question.

HILL: Actually, Dr. Rouse, this next question is for you and for Blake because it ties into exactly what you talked about. It's from **Janet Hays**

> **I agree we need a phase 3 special needs facility but it should be a hospital under the jurisdiction of psychiatrists, not a jail under the jurisdiction of un/under trained deputies.**

HILL: What's the difference in this and sending them to a hospital?

OPSO: I guess I'll answer first, from a security perspective. The issue that we have is, we have no access to the secured unit at the University Medical Center. It's almost always taken up by the most serious state inmates who cannot stay at the infirmaries that are located around the state. So, every time we send an inmate to the hospital, the inmate stays in an ordinary room on an ordinary floor. We have to assign two deputies, 24 hours a day, 7 days a week, until the inmate is released. This has sometimes spanned months. At one time, we had to move an inmate who was incapacitated for over a year because he was shot, while shooting someone else. He stayed in a nursing home that was costing the taxpayers a thousand dollars per day. So, as the City's expert testified at the hearing, a city and jail, of this size, need an infirmary. We're going to get inmates that come in that have committed crimes, that are incapacitated and/or are seriously mentally ill and the judges are not going to release them because of what they've done. We need to have a solution to be able to safely and adequately house these people and, hopefully, release them better, if they are going to be released on the streets, than when they came in.

WELLPATH-ROUSE: The only other thing I would add to Blake's statement is, let's reiterate, we're happy every time a person who needs Jackson goes to Jackson. We love it, it's great. But, we don't control when they leave and when they get to Jackson, and what Jackson's wait list looks like. So, in my opinion, people want to see a quicker and more robust pipeline to that state forensic hospital. I'm all for it, I'm your biggest advocate. But, that's a question for the Governor and how Office of Mental Health allocates that funds.

HOST: It looks like I do see a couple or more questions. The first one I see, I think, is from **Susan Guidry**.



**Does the Phase III design still have acute and sub-acute inmates in double bunk beds? Isn't that against best practices and doesn't it create the possibility of inmate on inmate harm? Are there other issues that haven't been solved?**

<u>HILL</u>:  Okay, Dr. Rouse, he's sort of touched on that before with one of the earlier questions that dealt with having double bunks.  So, Dr Rouse, would you care to clarify that one more time, please.

<u>WELLPATH-ROUSE</u>:  I'd be happy to – Hello, Susan, I hope you are doing well.  First off, there are no bunk beds in the proposed special needs facility.  From a medical treatment standpoint, I don't like bunk beds, they're too high up off the floor and obvious bad things can happen.  However, that being said, like an acute psychiatric hospital, like DePaul hospital, River Oaks hospital, or Ochsner or UMC, you've got some rooms that are singles and some rooms that are doubles.  That doesn't necessarily mean that any person that's in a double room has to have a roommate.  That's always a clinical determination.  That's what we do now and what we will continue to do in the special needs facility.  The last thing we want to do is put a roommate in a room where he and his cellmate are going to be dangerous to each other; that's the last thing we want to do.  But, sometimes, it's useful, from a social standpoint, from a treatment standpoint, from a brain standpoint, for a person to have a cellmate; a person to talk to, somebody to interact with.  But, those decisions are clinical decisions that are made based upon the individuals.  We're not going to be forcing people to live together who shouldn't live together.  And, we're not going to be isolating people who are okay and could have a roommate.  It's an individual call, at all time, just like it is in a psychiatric hospital.

<u>HOST</u>:  I, too, see a lot of comments.  A lot of the questions were about reading questions out load; which you've already done, and comments, as well.  I do see one in here, Isn't it correct, about – I do think someone already mentioned this – about having to make the adjustments because of Covid but we can go ahead and reiterate it.

**Isn't it correct that Phase II has over 600 empty beds at this time, and that this creates sufficient space to renovate Phase II to adequately house the acute and sub-acute mental health inmates without building a new building to house them?**

<u>OPSO</u>:  I'll just say it, again.  No, it does not.  It does have 600 empty beds.  They're spread out over 24 housing units and all 24 housing units are occupied.  We've paid tremendous attention to quarantining everybody when they come in for the first 14 days, testing them before they come to the general population.  We do routine mass testing - we need to be able move individuals that test positive onto housing units and keep them there until they successfully complete the quarantine and they can be moved off.  So, no, like I said, if the retrofit plan had have happened, we absolutely would not have been remotely as successful as we were with Covid or we probably would have had to move 200 inmates out of parish.  We needed every available, separate space in OJC to be able to accommodate Covid.  This is something we don't know if can happen again in the future.  We do not have the intention of operating OJC loaded to the gills.  The fact that a housing unit can hold 60 inmates does not mean that that's the most comfortable environment for 60 people.  If I can have open space, and allow them to move around comfortably, that's what I want.  We do not look forward to saying, man, we hope we can get an inmate in every bed.  That's just not how it works.  Things are safer, calmer, smoother, easier for our deputies to manage whenever there are fewer people per housing unit.



<u>HOST</u>: Thank you, very much.  I have one, you've addressed a portion of it already, regarding the double beds.  The second portion of the question was:

> A<span>re there other issues with the current design – beyond the assumption of the double beds –</span> **and what is Grace Hebert addressing any of these outlying issues.**

<u>HILL</u>: I'm not sure what the question is.

<u>HOST</u>:  Are there any additional issues that you foresee with the design and is Grace Hebert addressing them?

<u>HILL</u>:  Jerry, are you still around?

<u>GHC</u>:  Yeah, I'm here.  I think we have vetted the design with not only staff of Wellpath, and the mental health staff, and the Sheriff's office and, obviously, the monitors have been somewhat involved in it.  So, it's been vetted pretty thoroughly and kind of decided upon and that was the design at the end of the day.  Currently, there are some minor changes that are being addressed inside the building but really are minor stuff; things that came up to make things a little bit better.

<u>HOST</u>:  I see there is a question regarding the number of beds.  I'm going to go back to slide number 9.  I think there you explain about the female housing.  The question is how many of the beds are double cells and single cells.  You've explained.

<u>GHC</u>:  Sorry, I'll have to answer that in an email to verify to make sure I get the right counts in.  It depends on the female acute and the male acute units.  But, we can send that out.  This is the total bed count and I'd be glad to share the number of double and single beds, once I add them up.

<u>HILL</u>:  Talva, I've noticed a lot of the questions continue to be about the single cells and double cells and single cells and, I think, Blake and Dr. Rouse sort of answered all these questions.  The key, we have a total 89 beds and the building was designed with maximum flexibility.  I think Dr. Rouse was touching base on that.  It's not that they're going to put two acute mental health inmates in one cell with two beds.  He will be making that determination.  Acute will probably be in single cells.

<u>GHC</u>:  John, I've got the numbers.  I think Stephanie actually, put them in the chat room.  There a 50 male cells:  19 are single, 31 are double; for female, there are 8 cells: with 4 single and 4 double.

<u>HILL</u>:  Again, the whole facility was designed with flexibility.

<u>HOST</u>:  Thank you, so much.  I am still kind of working through our chatbox to see, to find, questions I haven't already been addressed so far.  So, hang on just a second as I kind of look through here.

<u>HILL</u>:  Blake, let me read this one to Blake.  It is from **Lexi PB**:

> **As a clarification to my question,  this would essentially, Phase III would essentially, be expanding jail capacity to house more folks, under the title of being a mental health specific,**



**though it is connected to the jail, and is functioning as a jail.  Can you address her question about essentially expanding the jail and housing more people?**

OPSO:  We do not see this as a jail expansion. Yes, it has 89 beds in it.  It's intended to be operated as you would if it were a hospital.  The goal, as I think Dr. Rouse could say is, the people who have acute mental illness, we hope, after being treated here, could step down to Level 2 and Level 3.  If they do okay on Level 3, they can be moved into general population.  That's the goal.  Everybody acknowledges that some of those people never make it out of the acute facility.  They have to stay there because of severity of their illnesses.  No, we do not see it as an expansion, as I've said, we do not need and expansion.  We have plenty of beds available. The fact that beds exist means that people are going to be loaded into them seems to be proven wrong right now.  Because, we have this many beds available and they're not being filled.  As I said, we need footprint to be able to spread people out.  This is the additional part of the footprint we need which is to take the most seriously mentally ill and get them treated.  Some will stay in there, yes.  We hope that many will step down.  Right now, we have many inmates that do get treated and step down.  An example I often give people, many assume that - can we talk about these that are seriously mentally ill - we're talking about people who are insane, or who committed a crime because of the mental illness.  We have inmates that come in with no mental illness and deteriorate while they're here; suddenly, sometimes.  Some people find out that a witness showed up in court that they didn't think was there and they're now facing the realistic possibility of life in prison.  Some people, after they hear the jury come back guilty, had no mental illness, suddenly become suicidal.  There are people who have family members that they hear pass away, on the street.  They can't be with them and they know that they've missed that opportunity and they deteriorate. Those are the kind of inmates that, you can't just say, well just let them out because this happened.  They have to have a place to get stabilized.  Those are the people we are targeting to get stabilized, then step back down and get back in the general population.  To answer the question, no, we do not see this as an expansion, we see it as providing us with the tools we need to help people get better and, hopefully, if they are going to be released, be released better than they came.

HOST:  Thank you – This is a staffing question.

**What is the staffing required to operate the 600 bed facility at ELMHS?**

OPSO:  I have no idea.  I don't even know how many beds that has.  They are referring to the Eastern Louisiana Mental Health System, so I don't know how many beds it has or how many staff they have, at all.

WELLPATH-ROUSE:  I can answer part of that if you wish, Blake.  I believe that Jackson has somewhere close to 700 psychiatric beds and it is on the footprint of the hospital, the same footprint that it used to be in the 50's and the late 1800s, etc., where they had over 5000 patients at a time.  In terms of how many people work there, again, I don't work for the office of mental health.  I don't know these numbers.  It is my observation, on the times I've been up there, there are more cars throughout that lot, throughout those series of lots for staff, than you have at the Sheriff's office parking lot, for sure.  But it is the biggest psychiatric hospital in the state and we're the second.  That's just the facts.

HILL:  Here's another one, **David Brazil**, he has several questions but here's one of the more common;



**Many of us believe that meaningful treatment is NOT POSSIBLE in a jail.**

Again, it all goes back to what Dr. Rouse was saying, and what Blake was saying, many people don't show symptoms when they're outside and when they're arrested and brought in, it may turn in to a whole different person. Dr. Rouse, do you care to answer this, about the difference between treating them in a jail versus a hospital?

<u>WELLPATH-ROUSE</u>:  No one that is rational or sane would proffer that treating mental illness in a jail is the optimal place to treat mental illness. It's not the Betty Ford Clinic, it's not a high-end psychiatric facility outside Boston, it's just not and it can't be because it's a different world. The remaining question is, what do we do with the persons whose brains have trouble when they're incarcerated? Do we offer them treatment? Of course, we do. Should we offer them counseling? Of course, we should. Is it as good as you would get at a private facility and who knows where? Of course not. It's not set up for that. I can't reasonably state that when I have a board-certified child, adult, and forensic psychiatrist, whose meeting with a patient, that that's not meaningful treatment. When I have people who have decades of experience - in treating mental illness at the VA hospital, in Jackson, on the streets of New Orleans, at Charity Hospital, etc. – that when they're meeting with that patient and talking to them, trying to understand their symptoms, trying to understand where they are coming from, prescribing medication and working with counselors – I can't state that that's not meaningful. No – is it optimal? Of course not. Is it better than nothing? You bet it is. And, is it better than you're going to get in Jefferson Parish, or St. Bernard or St. Tammany? You're damn right it is.

<u>HOST</u>:  **Susan** has a question that touches on the point you were just making:

    **If inmates are now getting seen quickly for psychiatric care, why do we need a new building?**
    **Is that a misunderstanding?**

<u>WELLPATH-KISSEL</u>:  Dr. Rouse, I can answer that. I think the building is going to allow enhanced programming. We're challenged because of limited space for groups, which we know is best practice for our patients. We know that we're challenged with having ample safe housing space for those who are in a self-injurious crisis. So, this will enhance our ability to provide the best quality care we can while 100they're with us. We are proud of the level of care we are providing, now. This will enhance the treatment that we can provide our patients.

<u>OPSO</u>:  I'll just note that Susan Guidry is the reason why this facility is being built. She's the one that passed the ordinance that excluded acute mental health from OJC. She offered no alternative or no location where the acute mentally ill would be housed. We've asked her, repeatedly over the years – we asked her at the hearing, last July – and it's always at a hospital that she can't identify. When that language is included in the ordinance, it's obvious that acute mental illness had to be treated somewhere and now we are going to provide the solution.

<u>HOST</u>:  A lot of people were making mention of; can you read through all of the emails that you have received? It looks like there are an additional 22. Unfortunately, we do have a limited amount of time and we are coming towards that end. So, being able to address and read out each and every one of the questions, at this time, may not be possible. However, we will be having, as Vince Smith mentioned, a meeting Summary. The chatbox and all the information will be readily available. But, unfortunately, the



ability to read through each and every question is not possible.  At the moment, we're down to about 3 minutes left.  I am still looking through the chatbox for questions rather than comments.  Your comments are, certainly, important and we are maintaining them.  I'm just trying to find – and, most of the remaining questions are about questions.  Again, we will be addressing those questions.  We don't have the amount of time to read through and answer each and every question.  Hang on one second.  This sounds like a relatively - a question that is different from what we've had.  This is from **Janet Hays**:

> **The problem is, once people leave the psychiatric facility, they go back to the correction system.  How many deputies are trained to recognize symptoms of SMI to get them into treatment before a crisis?**

<u>WELLPATH-KISSEL</u>:  All deputies, right Blake, receive intensive mental health training.

<u>OPSO</u>:  Yes, we do training with Wellpath at our academy.  We have several deputies that have been trained in crisis intervention training, CIT.  We do our best to help them spot the signs is somebody's suicidal or just, maybe, not right.  We have a large contingent of mental health staff that we can quickly get a mental health staff member over if a deputy recognizes something and, hopefully, work on the problem.

<u>HILL</u>:  Talva, would you be allowed to - Susan, - see if she can speak.

<u>HOST</u>:  I can unmute her.  We do want to, again.  Be conscious of the time; we're at 7:29.  Ms. Guidry, I will unmute you.

<u>SUSAN GUIDRY</u>:  Thank you, I appreciate that, since Blake just made an incredibly inaccurate statement.  In 2010, 2011, I was one of 23 members of a working group to try to determine how many jail beds there should be in the jail.  This is when the Sheriff was proposing a jail of, I don't know, I think something over 3000.  We had just come into office.  The 23 people included judges, from all the different courts.  It included the Sheriff, it included the DA, the public defender, the Mayor's office.  I was one of 23 people in the room.  We decided the language; that, acutely mentally ill people should not be in a jail.  They should be in a hospital.  The language was stated that the jail should be built to fit every type of prisoner, every type of prisoner except for acutely mentally ill because we thought they should be in the jail.  We all voted on that.  That's so not honest of you, Blake.  Anyway, bottom line is, the Sheriff then went ahead and built the jail as a general population jail, just the way he planned because he planned on having more buildings.  So, he built the jail against our – the City Council voted that ordinance in – and he built it against the law.  It should be able to house everybody else but the acute.

<u>OPSO</u>:  Does it not hold everybody else?  Is there any population that's not being held in it right now?

<u>SUSAN GUIDRY</u>:  That's not the point, Blake.  It wasn't designed to fit, adequately, every kind of prisoner.

<u>OPSO</u>:  I'll ask you again, Susan, does it hold every kind of prisoner except the acutely mentally ill that you excluded from it with the ordinance?  Does it?  It does.



**SUSAN GUIDRY:**  The whole reason you're saying you need a Phase III is because the Phase II is not adequate.   Would you say it is not adequate [crosstalk]

**OPSO:**  It's because the acute [crosstalk] it's because the acute mental ill need a place to live.

**SUSAN GUIDRY:**  The bottom line, Blake, it's a gen pop building.  It's a gen pop building with 60 bed pods, every one of them, 60 bed pods.  No distinction made for male/female, kids, acute, sub-acute — none of those distinctions made.

**OPSO:**  That's because acute weren't supposed to be in this building per your ordinance.

**SUSAN GUIDRY:**  I'm sorry Blake, you blamed this on me.

**OPSO:**  And, I still do.

**SUSAN GUIDRY:**  That is totally inaccurate and your boss was in the room when we created the language.

**CPA:**  Councilwoman and Blake, look we appreciate your comments and you guys expressing your opinions.

**SUSAN GUIDRY:**  Thank you

**CPA:**  Talva, can you take

**HILL:**  Yes, I think we can wrap it up.

**HOST:**  Yes, again, I want to thank you all for your comments and your positionings on this construction. I thank you, Ms. Susan, for adding in your comments, as well.  We thank you very much for your time. As I mention, again, all this information will be made public to you. You are welcome to email me if you do not have access to get the video.  I'm happy to send it over to you so that you have all the information that you need. Thank, again, you for your time.  Have a wonderful night. Good night, all.