

# QUESTIONS & ANSWERS

**Topic:**    Orleans Justice Center – Medical Services Building

**Host:**    Talva Burnette, Neighborhood Liaison District B
Mayor's Neighborhood Engagement Office
City of New Orleans

**Location:**    Webex

**Date:**    May 20, 2021, 6:00-7:30 pm

<div style="border:1px solid">

Exhibit

**B**
(Part 2)

</div>

## CHATBOX

During the presentation, a 'chatbox' was available for entering questions and observations.  Some answers were provided in the chatbox.  The items below include

**Questions from the Webex Chatbox:**
Responses answered in the chatbox, during the video, are in green.
Responses in blue were discussed in the video.
Responses post-presentation are in red.

1.  **Sade Dumas: QUESTION** - Will questions sent via email before the meeting be answered during the meeting too?
    REPLY:  An attempt was made to address the questions sent via email.  Of the 9 questions, 7 were addressed.

2.  **Sade Dumas: QUESTION** - Is this being recorded?
    **Talva Burnette (Host):  Yes, this meeting is being recorded.**

3.  **Chloe Dewberry: QUESTION** - In addition to having this meeting recorded (still need confirmation on if it will be shared with the public), will the slides being presented also be accessible to the public?
    REPLY:  See Talva's response to Number 4.

4.  **Sade Dumas: QUESTION** - Will the recording be shared with the public? Also, are you all answering all questions submitted via email during the meeting too?
    **Talva Burnette (Sade Dumas, privately):  We will be sharing the link in various ways after the meeting and you can request it from me directly after the meeting at talva.burnette@nola.gov. The questions sent via email will be answered via email after the meeting. [Sade notes she seems to have been accidentally messaged privately and reposts Talva's response].**



**Talva Burnette (to everyone):  This presentation is being recorded and will be shared in various locations and you can request a copy from me directly as well at talva.burnette@nola.gov**

REPLY:  Talva's response was at 6:11 pm.  The Q&A session began about 30 minutes into the video.  The presenters did address some of the questions and observations in the email.  It was stressed, throughout the meeting, that responses would be directed to all questions and observations and these would be made available.

5. **Susan Guidry**: QUESTION - Isn't it correct that the mayor (as shown in the litigation) and the city council (as shown in numerous Resolutions) do not believe that the Phase III building is needed? Who is in favor of this huge expenditure of taxpayer money and why?

REPLY:  Yes, the mayor and the City Council have expressed belief that the Phase III building is not needed.  However, U.S. District Judge Lance Africk and U.S. Magistrate Judge Michael North, who oversee the court-mandated reform agreement, requires the city provide adequate facilities.  The federal monitors appointed to oversee the consent decree found the retrofit of Phase II did not meet these requirements.  In part, the monitors found retrofitting the existing housing unit(s) problematic as the housing units have mezzanines which they considered hazardous for acute patients.

However, the City is appealing the case to the U.S. 5th Circuit Court of Appeals.

6. **Janet Hays**: QUESTION – How will the jail accommodate people with serious mental illnesses who lack insight they are sick and will not voluntarily seek or accept treatment? This is common in 50% of people with Sz and 40%of people with BPD.

**WELLPATH-ROUSE:  Hey, Janet, how you?  So, the concept of lack of insight, is a medical term- anosognosia, is a problem that has been seen in psychiatry since psychiatry existed.  The cruel irony, in many ways, of mental illness is that many times the part of the brain, that is causing the mental illness symptoms, is the same part of the brain that's necessary for knowing that you have a problem.  And, that's an unfortunate fact that cuts across psychiatric diagnosis; like schizophrenia, schizoaffective disorder, bipolar 1, and, of course dementias and others like it.  But, nevertheless, like I said before, we don't control who comes in the front door or we don't control when they leave.  So, it's our ethical obligation to do the best we can while they're there.  So, we do a couple of things.  Number one, there is no other place in the entire city, except perhaps the University hospital emergency room, where you can see a psychiatrist quicker; it doesn't exist.  Go to Central City, go to Chartres Pontchartrain, sign up to see a psychiatrist and they're going to tell you weeks, if not months.  That's not how it is in OJC. You're talking that day, or just a day or two later, if a non-acute problem.  That's how it works.  So, we have a triage system that identifies the most severely and persistently mentally ill when they show up and they're the ones that get our first attention.  So, we see them quickly, is my point.  The second point is, we do everything we can to house those persons in the safest environment possible. So, that often, what that means is we'll be getting a call and the psychiatrists will be using the limited power we have to make housing determinations. You don't want me determining who's in which gang and who can't live together because of previous convictions.  I've got no idea, that's not my skill set.  But I am permitted, by the Sheriff, to determine if a person needs to go to a room by**



themselves or a room on the sub-acute psychiatric floor or a room on the acute psychiatric floor.  So, we have that power to make that determination - where's the safest area for that patient. And then finally, we do not force medications in the jail.  It does not happen, under no circumstances.  State law prevents it and we don't do it.  So, what that practically means, for the most severe, one's whose insight affects not just their understanding of their illness but also affects their understanding of their legal situation, those persons leave the jail and go to a state forensic hospital in Jackson, Louisiana, just north of Baton Rouge.  Honestly, it's kind of a win every time we see one of our acute patients make it up on that wait list and get up to Jackson because we know that's an even safer environment – an even more hospital-like environment than we can provide at OJC.  That's a bit rambling but, Janet, I hope that answers your question.

7. **Chloe Dewberry:** QUESTION - Will all responses to questions that are being asked in this chatbox be sent to everyone on this chat, or are those being responded to privately?
REPLY:  Yes – the responses to questions in the chatbox will be made available to all.  The contents of the chatbox will be sent to those who emailed.  Others may request a copy of the by emailing their contact information to ojcmedicalservices2900@gmail.com.  The responses will also be available through  the City's Neighborhood Engagement site: http://www.nola.gov/neighborhood-engagement.

8. **Susan Guidry:** QUESTION - Does the Phase III design still have acute and sub-acute inmates in double bunk beds? Isn't that against best practices and doesn't it create the possibility of inmate on inmate harm? Are there other issues that haven't been solved?
WELLPATH-ROUSE:  I'd be happy to – Hello, Susan, I hope you are doing well.  First off, there are no bunk beds in the proposed special needs facility.  From a medical treatment standpoint, I don't like bunk beds, they're too high up off the floor and obvious bad things can happen.  However, that being said, like an acute psychiatric hospital, like DePaul hospital, River Oaks hospital, or Ochsner or UMC, you've got some rooms that are singles and some rooms that are doubles.  That doesn't necessarily mean that any person that's in a double room has to have a roommate.  That's always a clinical determination.  That's what we do now and what we will continue to do in the special needs facility.  The last thing we want to do is put a roommate in a room where he and his cellmate are going to be dangerous to each other; that's the last thing we want to do.  But, sometimes, it's useful, from a social standpoint, from a treatment standpoint, from a brain standpoint, for a person to have a cellmate; a person to talk to, somebody to interact with.  But those decisions are clinical decisions that are made based upon the individuals.  We're not going to be forcing people to live together who shouldn't live together.  And, we're not going to be isolating people who are okay and could have a roommate.  It's an individual call, at all time, just like it is in a psychiatric hospital.

9. **Alysia Savoy:** QUESTION - Why is money being spent to create a jail extension for mental health instead of creating a mental health se(r)vices center outside of the prison system? If individuals are more in need of health care, are we not creating prisoners out of people who are more specifically in need of support? Does this not overburden the N.O. overstretched prison system?



Is it possible to open this conversation and budget to cooperating with public health and social services bodies?

REPLY: This question was tangentially addressed in the presentation and discussion. Please refer to the response in Number 5.

10. **Michael Cahoon: QUESTION** – Isn't it correct that Phase II has over 600 empty beds at this time, and that this creates sufficient space to renovate Phase II to adequately house the acute and sub-acute mental health inmates without building a new building to house them?

> **OPSO: I'll just say it, again. No, it does not. It does have 600 empty beds. They're spread out over 24 housing units and all 24 housing units are occupied. We've paid tremendous attention to quarantining everybody when they come in for the first 14 days, testing them before they come to the general population. We do routine mass testing - we need to be able move individuals that test positive onto housing units and keep them there until they successfully complete the quarantine and they can be moved off. So, no, like I said, if the retrofit plan had have happened, we absolutely would not have been remotely as successful as we were with Covid or we probably would have had to move 200 inmates out of parish. We needed every available, separate space in OJC to be able to accommodate Covid. This is something we don't know if can happen again in the future. We do not have the intention of operating OJC loaded to the gills. The fact that a housing unit can hold 60 inmates does not mean that that's the most comfortable environment for 60 people. If I can have open space, and allow them to move around comfortably, that's what I want. We do not look forward to saying, man, we hope we can get an inmate in every bed. That's just not how it works. Things are safer, calmer, smoother, easier for our deputies to manage whenever there are fewer people per housing unit.**

11. **Sade Dumas: QUESTION** - Aren't there currently design problems with the Phase III design, such as double bed cells, which are not recommended for acute and sub-acute patients and can be dangerous? What other issues currently exist with the design, and how is Grace Hebert addressing them?

> **WELLPATH-ROUSE: Yes, I'd be happy to. Thanks, Bill. Just like in a acute psychiatric hospital, there are some rooms that are single occupancy but the majority of which are double occupancy. That is reflected in the design of this special needs facility. And, it is always a clinical determination as to whether or not a patient can have a roommate. So, for now, it is in the existing facility, it is very common for persons to be too acutely mentally ill to have a roommate, for various reasons. As that person takes their medication, their brain starts to get better, they may be able to tolerate having a roommate. But, at all phases of that, that is a clinical determination that is made by the mental health professionals and the psychiatrists in conjunction with information that we can get from security. So, there is no blanket prescription that a group of patients needs to be single celled nor a group of patients would always be double celled. That is always a flexible dynamic but clinically driven decision that tries to balance – that does balance – the safety needs of each patient.**

12. **David Brazil: QUESTION** - I understand that the Phase II retrofit plan includes construction of 6 additional individual interview/counseling rooms on the pods renovated for the acute and sub-



acute inmates. If this is correct, given the existing interview/counseling rooms in the Phase II building, wouldn't that satisfy the needs of the acute and sub-acute inmates?
REPLY:  As to your question regarding interview/counseling rooms in the retrofit plan, this was not addressed in the discussion.  Currently, OPSO and Wellpath are working with a criminal justice consulting firm to develop staffing and operational plans.  The staffing and operational plans will assist in determining the adequacy of the number of interview/counseling rooms provided in Phase III.  This is to assist in providing the required verification to the monitors.
(Duplicated in email questions).

13. <u>Chloe Dewberry:</u> QUESTION - Do you know approximately how many community questions you received over email?
   **Stephanie Norris (GHC):  We received 22 emails to the ojcmedicalservices2900@gmail.com account.**

14. <u>Susan Guidry:</u> QUESTION – How many of the beds are double cell vs. single cell?
   **Stephanie Norris (GHC):  Regarding double vs. single cell: there are 50 male cells, 19 are single 31 are double.  For female, there are 8 cells with 4 single and 4 double.**
   <u>Correction:</u>  There are 48 male cells with beds; 19 are single and 29 are double.

15. <u>Janet Hays:</u> QUESTION – Wouldn't building a phase 3 (or phase 2) jail institutionalize the criminalization of SMI? Why do we treat misdemeanors and serious crimes differently if the cause is an illness that calls for medical treatment and a continuum of coordinated psych care?
   Wellpath Response:  Wellpath agrees that the best setting for treatment of persons with a SMI is in a community setting, but as long as patients with an SMI are housed at OPSO, we want to ensure all resources are available  to care got our patients in a way that will assist with their recovery.

16. <u>Lexi Peterson-Burge:</u> QUESTION – This would essentially be expanding jail capacity to house more folks, under the title of being a mental health specific, though it is connected to the jail, and is functioning as a jail?
   <u>OPSO:</u>  We do not see this as a jail expansion. Yes, it has 89 beds in it.  It's intended to be operated as you would if it were a hospital.  The goal, as I think Dr. Rouse could say is, the people who have acute mental illness, we hope, after being treated here, could step down to Level 2 and Level 3.  If they do okay on Level 3, they can be moved into general population.  That's the goal.  Everybody acknowledges that some of those people never make it out of the acute facility.  They have to stay there because of severity of their illnesses.  No, we do not see it as an expansion, as I've said, we do not need an expansion.  We have plenty of beds available. The fact that beds exist means that people are going to be loaded into them seems to be proven wrong right now.  Because, we have this many beds available and they're not being filled.  As I said, we need footprint to be able to spread people out.  This is the additional part of the footprint we need which is to take the most seriously mentally ill and get them treated.  Some will stay in there, yes.  We hope that many will step down.  Right now, we have many inmates that do get treated and step down.  An example I often give people, many assume that - can we talk about these that are seriously mentally ill - we're talking about people who are insane, or who committed a crime because of the



mental illness.  We have inmates that come in with no mental illness and deteriorate while they're here; suddenly, sometimes.  Some people find out that a witness showed up in court that they didn't think was there and they're now facing the realistic possibility of life in prison.  Some people, after they hear the jury come back guilty, had no mental illness, suddenly become suicidal.  There are people who have family members that they hear pass away, on the street.  They can't be with them and they know that they've missed that opportunity and they deteriorate. Those are the kind of inmates that, you can't just say, well just let them out because this happened. They have to have a place to get stabilized.  Those are the people we are targeting to get stabilized, then step back down and get back in the general population.  To answer the question, no, we do not see this as an expansion, we see it as providing us with the tools we need to help people get better and, hopefully, if they are going to be released, be released better than they came.

17. <u>Janet Hays</u>: **QUESTION** – Medical services for all correctional facilities around the state get treatment at UMC. If they are so sick they need to be infirmed, do they really need to be in jail? REPLY:  see OPSO comments in Question 16.

18. <u>Susan Guidry</u>: **QUESTION** – Why is transporting a few blocks to a new UMC as the infirmary a problem?

> **Blake Arcuri (OPSO):  The state facilities you're referencing have infirmaries.  The OPSO has never had access to the secure unit at UMC.  Any inmate who goes to UMC is housed in a regular hospital bed and requires two deputies, 24/7, until the individual can be incarcerated.  This process has spanned months at times.   The City's own expert agreed that an infirmary is needed in a city and facility of this size.**

19. <u>Janet Hays</u>: **QUESTION** – What is the staffing required to operate the 600 bed facility at ELMHS?

> <u>WELLPATH-ROUSE</u>:  I can answer part of that if you wish, Blake.  I believe that Jackson has somewhere close to 700 psychiatric beds and it on the footprint of the hospital, the same footprint that it used to be in the 50's and the late 1800s, etc., where they had over 5000 patients at a time.  In terms of how many people work there, again, I don't work for the office of mental health.  I don't know these numbers.  It is my observation, on the times I've been up there, there are more cars throughout that lot, throughout those series of lots for staff, than you have at the Sheriff's office parking lot, for sure.  But it is the biggest psychiatric hospital in the state and we're the second.  That's just the facts.

20. <u>Sade Dumas</u>: **QUESTION** - Also, Mr. Kissel testified in federal court that Wellpath is providing adequate mental and medical care in OJC.  How does a new, big building change that?

> <u>WELLPATH-KISSEL</u>:  I think this facility is going to allow, if a patient is incarcerated, it's going to allow us the resources to include group and programming space, appropriate cell space, whether it be single or double, or appropriate safe cells for those in a self-injurious crises.  It is going to help us start the recovery for that patient during his or her incarceration.  Start programming, start mental health treatments, groups on life skills and job readiness and other life skill opportunities.  Then we can do a very warm and tight hand-off to community resources and community providers.  We know so



many of our patients are going to be returning to the community. Very few end up going to Louisiana DLC. This is giving us an opportunity to really assist patients jump-start their recovery. I'll pass to Dr. Rouse at that point.
WELLPATH-ROUSE: I've been involved In public mental health in this city for nearly 20 years, at this point. Working inside the Orleans Justice Center has shown me a new side of things that even I had not seen before. And it all comes down to this simple fact: at OJC, the Sheriff does not determine who the police arrest and bring to him. At OJC, the Sheriff doesn't determine when people leave; that's the judges. So, there's a space and that's where our fellow citizens are. So, to me, the question is what can be done for them while they are here. And, that's what drives us every day to do what we do. I will be the first to admit I do not want to see the criminalization of the mentally ill. But the bottom line is that sometimes people get arrested. That doesn't change whether or not they need care or deserve evaluation and deserve treatment. So, that is what we try to do on the inside. The medical staff and the Sheriff's staff don't control the front door and don't control the exit for the most part.
Kissel Response: The addition of the new building will enhance the resources available for programing as well as improve staffing efficiency, and patient safety through increasing the number of patient safe cells.

21. **Susan Guidry: QUESTION** – The 420 people taking any kind of psychiatric meds are not the acute or sub-acutes that would be housed in Phase III, correct? Isn't it correct that there are less than 55 acute and sub-acute who would be housed in the Phase III jail?
    **Blake Arcuri (OPSO): Yes.** They'll be housed there because you specifically excluded the acute mental population from your ordinance and, despite it being the City's obligation, provided no solution or housing location for those with acute mental illness who are charged and under a detention order.

22. **Sade Duman: QUESTION** – Were those all of the questions emailed?
    **Stephanie Norris (GHC):** We received 22 emails to the ojcmedicalservices2900@gmail.com account.

23. **Ruby Corbyn-Ross: QUESTION** - How can we obtain a copy of that summary?
    Stephanie Norris (GHC): [This question was in response to a comment during the video presentation that a summary would be prepared and available to the public.]
    The copy of the responses to questions and observations from the **ojcmedicalservices2900@gmail.com** address and the chatbox, available during the video presentation, will be emailed to those who provided emails through the **ojcmedicalservices2900@gmail.com** address. Additionally, the copy of the responses will be available through the City's Neighborhood Engagement site: **http://www.nola.gov/neighborhood-engagement**.

24. **Susan Guidry: QUESTION** – If inmates now getting seen quickly for psychiatric care, why need new building?
    **Blake Arcuri (OPSO):** Because if they aren't released, they need to be monitored and provided with appropriate treatment and counseling.

25. <u>Janet Hays</u>: QUESTION – Blake, is Jackson not a secured facility?

> Blake Arcuri (OPSO):  Jackson/FFF is secured.  We have no access to Jackson. We can't send an inmate to Jackson.  That happens via a Court order and we suffer long wait lists.

26. <u>Lexi Peterson-Burge</u>: QUESTION - There are a few questions in this chat that were clarification questions from the very few answers that were heard from the emailed questions. These questions do not have anything to do with beds. Just to name that?

> Stephanie Norris (GHC):  Of the 22 emails, 9 were questions; of the remaining, most were expressing opposition to the Phase III facility.

27. <u>Sade Dumas</u>: QUESTION - I'm bothered by the fact that moderators are skipping over certain questions. Can we hear questions and comments in the order they were submitted?
REPLY:  Seven of the 9 questions from the emails were discussed.  The moderators did skip over certain observations in order to address specific questions due to time concerns.

28. <u>Janet Hays</u>: QUESTION – Problem is that once a patient leaves the psychiatrist they go back to the corrections system. How many deputies are trained to recognize symptoms of SMI to get them into treatment before crisis?

> <u>OPSO</u>:  Yes, we do training with Wellpath at our academy.  We have several deputies that have been trained in crisis intervention training, CIT.  We do our best to help them spot the signs is somebody's suicidal or just, maybe, not right.  We have a large contingent of mental health staff that we can quickly get a mental health staff member over if a deputy recognizes something and, hopefully, work on the problem.

29. <u>Sade Dumas</u>: QUESTION - Can you post all questions and comments from emails and the chat when the meeting is over?
REPLY:  All questions and comments from emails and the chatbox will be made available.  See Question 23.

30. <u>Janet Hays</u>: QUESTION - So why don't we have a hospital if we needed a hospital and why discriminate between acute and sub-acute? Same people at different times on the timeline.
Wellpath Response:  Wellpath agrees that timely access to an external psychiatric hospital would be the best option for our patients in a psychiatric crisis.  That issue is beyond our control. Additionally we want to ensure patients have access to the level of resources they need at any given time to ensure their needs can be met, to include housing, programing, and access to mental health professionals.

## EMAILS

**Emails to <u>ojcmedicalservices2900@gmail.com</u>**

Prior to the meeting, an email address was provided for input.  Twenty-two (22) emails were received. Of those, 9 were questions.  The remaining expressed opposition to the construction of the facility. Seven of the 9 questions were addressed in the discussion.  Several of the observations were discussed



but many were not addressed or completely addressed.   As several participants requested post of all email questions and comments, they are included herein.

Text in blue indicates responses during the Webex meeting.  Text in red indicates responses to questions that were not, or not completely, addressed.

1. **Sade Dumas** (Orleans Parish Prison Reform Coalition, Executive Director): I am submitting this as a question before tomorrow's NPP meeting about the Phase 3 jail facility, which I oppose.
   **QUESTION** - Aren't there currently design problems with the Phase III design, such as double bed cells, which are not recommended for acute and sub-acute patients and can be dangerous? What other issues currently exist with the design, and how is Grace Hebert addressing them?
   REPLY:  As to your question about design problems, such as double beds, response was included in the discussion.

   > **WELLPATH-ROUSE:  Just like in a acute psychiatric hospital, there are some rooms that are single occupancy but the majority of which are double occupancy.  That is reflected in the design of this special needs facility. And, it is always a clinical determination as to whether, or not, a patient can have a roommate.  So, for now, it is in the existing facility, it is very common for persons to be too acutely mentally ill to have a roommate, for various reasons, and as that person takes their medication, their brain starts to get better, and they may be able to tolerate having a roommate.  But at all phases of that, that is a clinical determination that is made by the mental health professional and the psychiatrists in conjunction with information that we can get from security.  So, there is no blanket prescription that a group of patients needs to be single celled nor a group of patients would always be double celled.  That is always a flexible dynamic but clinically driven decision that tries to balance – that does balance – the safety needs of each patient.**

   REPLY:  As to your question about other issues with the design and how Grace Hebert is addressing them, GHC's Jerry Hebert responded:

   > **I think we have vetted the design with not only staff of Wellpath, and the mental health staff, and the Sheriff's office and, obviously, the monitors have been somewhat involved in it.  So, it's been vetted pretty thoroughly and kind of decided upon and that was the design at the end of the day.  Currently, there are some minor changes that are being addressed inside the building but really are minor stuff; things that came up to make things a little bit better.**

2. **Lexi Peterson-Burge**: **QUESTION** - Doesn't the research show that it is more sufficient and more secure to have all detainees being housed in one building?
   REPLY:  As to your question on housing all detainees in one building, response was included in the discussion.

   > **OPSO:  As has been discussed in some of the hearings and several of the meetings, this building is going to be functionally operated as one building.  It's not a building that we have to go outside to reach.  It is connected by a hallway or corridor that's about 25 or 30' long.  It's almost an identical walk from the central core to the current medical clinic as it will be to this building. So, it will functionally be one building.**

3. **Jenna Grant**: **QUESTION** - Isn't it true that each floor of the Phase II building includes an outdoor exercise space, as is contemplated for Phase III?



**REPLY:**  As to your question regarding outdoor exercise space on each floor of Phase II, response was included in the discussion.

> **GHC:**  Each of the housing units has an outdoor exercise yard adjacent to them for easy access for the offenders to be able to get to them.
> **HILL:**  Yes, Phase II has them, Phase III will have them as well.
> **GHC:**  Correct.

4. **New Orleans Safety & Justice Challenge Community Advisory Group (CAG):**  I am writing today on behalf of the Safety and Justice Challenge Community Advisory Group (CAG) to oppose the Phase III expansion of the New Orleans jail. We are a group of volunteers whose mission is to support the implementation of the Safety and Justice Challenge by holding public agencies accountable to the SJC plan to safely reduce the jail population and increase equity within the criminal system. Our members hold three positions on the Jail Population Management Subcommittee.  On behalf of the CAG, I would like to submit the following question to be considered during the NPP meeting this evening:

**QUESTION** – Isn't it correct that the jail population has continued to decrease due to strategies to which the city has committed over the past 12 years with the objective of losing our title as the most over-incarcerating city in the country? Given the continuing decrease in the jail population and the hundreds of unused beds in Phase II, why would the city waste $51 million to build more beds?

**REPLY:**  As to your question pointing out decreasing jail population, response was included in the discussion.

> **OPSO:**  So, I guess the issue here is the bed count in OJC, or any building, is not important to us.  What's important to us is footprint.  Covid 19 has shown that more than ever.  We have been pushed to the max in our ability to spread out the inmates in a way we never thought we would have to.  Right now, today, with the population, whatever it is, 774, we're utilizing every housing unit.  We've had trouble trying to fit all the inmates safely in OJC throughout Covid.  No Jail that was ever constructed ever thought that, on top of existing classification levels, such as predator, non-predator, high-, medium- and low-security and all the special populations, that they would have to add quarantine, suspected Covid, Covid positive, stepping down off of Covid. So, the idea that there is all this unused space in OJC is just a myth.  The housing units are all being utilized. That's a large reason why we were successful with the way we handled Covid.  If we had taken an entire floor and retrofitted it, prior to Covid, we would never had been able house the inmates safely like we did throughout this process.

Thank you for your time. The expansion of the Orleans jail will have a devastating impact on community members facing mental health challenges, who would be better served seeking help and treatment from sources outside of the carceral system. We urge you to consider community voices like ours when making such impactful decisions about our city's jail.

**REPLY:**  As to your comment that persons with mental health challenges would be better served seeking help outside the carceral system, this topic was alluded to when addressing a similar observation.  Please see response to Number 15.



5.  **Natalie Sharp**: **QUESTION** - If we presently have a clinic in the Phase II building, why are we paying to build, staff and supply another one?
    REPLY:  As to your question regarding inclusion of a Clinic in the Phase III facility when one exists in the Phase II facility, response was included in the discussion.  Phase III includes both a Clinic and Infirmary.

    **WELLPATH-KISSEL**:  We obviously have challenges with patients who need a higher level of sematic care.  We do not have true infirmary beds, now, for sematic care.  We also are challenged, often, with patients who need specialized housing for psychiatric reasons.  We're challenged to have enough suicide-resistant cells for patients when they are in crisis.  And, we're also challenged, at times, to have adequate space to provide proactive programming for our mental health population so we can help them with their recovery while they are with us.  There is just not enough space.  So, those are some of the reasons we feel in support of this initiative.

    **WELLPATH-HOWARD**:  While our Clinic is going to be centralized in the Phase III, what's really important is what was said about the Infirmary.  We have to be able to take care of patients at all levels, not transport them to the hospital unnecessarily.  So, on the nursing side, there is not going to be any difference, just like Blake (OPSO) said, as far as the space-to-walk ratio will be the exact same from all units to the new housing area.  The Infirmary is definitely needed.

    **WELLPATH-ROUSE**:  As a psychiatrist, but as a medical doctor, although my work is not necessarily in the Infirmary, we work alongside of the sematic medical providers every day. There are many difficulties with the existing Clinic space; particularly, that you can only have, for security reasons, one type of inmate in that facility at a time.  For example, it becomes difficult if you have a regular Clinic day in which the females are there in the Clinic, yet, at the same time, there's a need for males to enter the Clinic.  In the current space, it is exquisitely difficult to keep security and keep everyone safe in that kind of setting.  Also, in the current existing Infirmary space, it's not really set up in a way that can house and hold patients who may need to stay and sleep in the Infirmary for days at a time.  Unfortunately, many of those persons, their care couldn't happen where they are.  Although that's not exactly where I work, I can see numbers of issues with the current Infirmary that are cured by the new Infirmary.  For example, in the old jail complex, in old OPP, there was an Infirmary on the first floor. That was a spot where patients could stay for days, even receive dialysis in that facility.  That could not happen in the current footprint of the Infirmary which was, as far as I know, wasn't designed to be an infirmary space in the first place.  It was designed to be a programming space and potentially even a schooling space.  So, it's been sort of retrofitted.  It does a good job, most of the time.  But there are many limitations which, in my medical opinion, are cured by a new Infirmary space.

    **WELLPATH-KISSEL**:  We've been challenged with patients who need hospital beds and getting them in the existing space.  Patients with extreme challenges with their activities of daily living.  A true infirmary bed that will be designed for those resources will be a great thing and we'll be able to keep patients out of the hospital, keep deputies out of hospital posted inside the facility which will help the Sheriff and his staff.

    **WELLPATH-HOWARD**:  We have had patients that have ended up for weeks at the hospital just because they needed round-the-clock antibiotics.  This would be



rendered completely unnecessary if we had our Infirmary space in place.  It would save money and be safer for the patients.

6. <u>Leslie Molson</u>: OBSERVATIONS - **Firstly**, we need to stop incarcerating people with serious mental illnesses. A new jail building specifically for the mentally ill will only ensure that more mentally ill people are in the jail. If it's built, it will be filled. Orleans Parish Sheriff's Office deputies are not trained to deal with people suffering these illnesses, and jail is not an appropriate place for them.

REPLY: While your observations were not specifically addressed, the aspect of filling beds in the new facility was addressed in response to a similar question.  From the discussion:

<u>OPSO</u>:  We have plenty of beds available. The fact that beds exist means that people are going to be loaded into them seems to be proven wrong right now.

REPLY: As to your observation that deputies are not trained to deal with people suffering mental illnesses, this was touched on in the discussion in a response to another question.

<u>OPSO</u>:  Yes, we do training with Wellpath at our academy.  We have several deputies that have been trained in crisis intervention training, CIT.  We do our best to help them spot the signs is somebody's suicidal or just, maybe, not right.  We have a large contingent of mental health staff that we can quickly get a mental health staff member over if a deputy recognizes something and, hopefully, work on the problem.

**Second** - Moreover, the City of New Orleans cannot afford to build this Phase III facility. Are we really going to spend $50 million upfront and $8-10 million every year to operate additional jail space, while facing a projected $135 million loss in sales tax revenue? And if we have that money to spend, wouldn't it be more prudent to spend it on community-based services and resources, so that people who are sick aren't finding themselves in jail?

REPLY: While this observation was not specifically addressed, the topic of needing mental health services in jail was part of the discussion.  Responses included:

<u>OPSO</u>:  An example I often give people, many assume that - can we talk about these that are seriously mentally ill - we're talking about people who are insane, or who committed a crime because of the mental illness.  We have inmates that come in with no mental illness and deteriorate while they're here; suddenly, sometimes.  Some people find out that a witness showed up in court that they didn't think was there and they're now facing the realistic possibility of life in prison.  Some people, after they hear the jury come back guilty, had no mental illness, suddenly become suicidal. There are people who have family members that they hear pass away, on the street. They can't be with them and they know that they've missed that opportunity and they deteriorate. Those are the kind of inmates that, you can't just say, well just let them out because this happened.  They have to have a place to get stabilized.   Those are the people we are targeting to get stabilized, then step back down and get back in the general population.  To answer the question, no, we do not see this as an expansion, we see it as providing us with the tools we need to help people get better and, hopefully, if they are going to be released, be released better than they came.

<u>WELLPATH-ROUSE</u>:  The remaining question is, what do we do with the persons whose brains have trouble when they're incarcerated?  Do we offer them treatment?  Of course, we do.  Should we offer them counseling?  Of course, we should.  Is it as good as you would get at a private facility and who knows where?  Of course not.  It's not set up for that.



**Third** - Finally, I urge you to support a retrofit of the existing jail building to comply with the federal judge's demands. Sheriff Gusman oversaw the construction of a poorly designed jail building, knowing that he could, and would, argue for expansion. But since then, the jail's population has decreased by almost 50%, so why do we need a larger jail?

REPLY:  See responses to Question 5, 10 and 16 in the Chatbox response portion and the comments below.

> **WELLPATH-KISSEL:  I think the building is going to allow enhanced programming. We're challenged because of limited space for groups, which we know is best practice for our patients.  We know that we're challenged with having ample safe housing space for those who are in a self-injurious crisis.  So, this will enhance our ability to provide the best quality care we can while they're with us.  We are proud of the level of care we are providing, now.  This will enhance the treatment that we can provide our patients.**

7. <u>Stanford Rosenthal</u>:  **QUESTION** - Given that the sheriff has not been able to adequately staff the Phase II building or TDC, and that adequately staffing jails is a national problem, how do you envision the sheriff being able to hire the over 100 new staff that will be required to operate Phase III?

REPLY:  As to your question regarding staffing, a response was included in the discussion.

> **OPSO:  First off, I think this 100 number that's thrown around is a mischaracterization. I think it was included in a city document that did not operate with the assumption that once this building opens, TDC closes.  We believe that the staffing required for this building's - security staff – is going to be very similar, if not identical, to the staffing required to operate TDC right now.  So, those staff will be swinging back over into this new building.  To be sure of this, we recently engaged an expert, I think they are on this call right now just listening and observing, to confirm we have projected the right amount of staff, both security and medical.  But we've had challenges hiring deputies, as has everyone; Covid has impacted that.  We were unable to train as much as we wanted to during Covid.  But we're now opening back up.  We have an academy class running right now.  Like the NOPD, like other agencies around the area, like restaurants and everywhere else, we're going to continue to make a push to hire and believe we will be in a position to staff the facility.**

8. <u>Emily Rhodes</u>:  **QUESTION** - I am a resident of District C. I firmly oppose the construction of a Phase III psychiatric facility because we do not need another jail facility in New Orleans. Given that we presently use UMC for medical needs beyond those that can be served in the Phase II Clinic, why would we pay to build, staff and supply an infirmary inside of the jail?

REPLY:  As to your question about the need for an infirmary inside of the jail, related responses to the questions, were included in the discussion.

> **OPSO:  I guess I'll answer first, from a security perspective.  The issue that we have is, we have no access to the secured unit at the University Medical Center.  It's almost always taken up by the most serious state inmates who cannot stay at the infirmaries that are located around the state.  So, every time we send an inmate to the hospital, the inmate stays in an ordinary room on an ordinary floor.  We have to assign two deputies, 24 hours a day, 7 days a week, until the inmate is released.  This has sometimes spanned months.  At one time, we had to move an inmate who was**



incapacitated for over a year because he was shot, while shooting someone else.  He stayed in a nursing home that was costing the taxpayers a thousand dollars per day. So, as the City's expert testified at the hearing, a city and jail, of this size, need an infirmary. We're going to get inmates that come in that have committed crimes, that are incapacitated and/or are seriously mentally ill and the judges are not going to release them because of what they've done.  We need to have a solution to be able to safely and adequately house these people and, hopefully, release them better, if they are going to be released on the streets, than when they came in.

**WELLPATH-HOWARD:  We have had patients that have ended up for weeks at the hospital just because they needed round-the-clock antibiotics.  This would be rendered completely unnecessary if we had our Infirmary space in place.  It would save money and be safer for the patients.**

An alternative plan to retrofit the existing jail building, which would save the city an estimated $184 million in construction, maintenance, and staffing costs over 35 years and offer a constitutional solution for those with mental illness within one year, has been widely endorsed by advocates. The retrofit plan construction costs would total approximately $10 million, with no increase in future operating costs. This plan would also permit the City to use brick and mortar restricted FEMA funds to build a community wellness center to care for people with serious mental illness outside of the carceral system.

Thank you for your consideration.

REPLY:  As to your observations regarding the plan to retrofit the existing jail building, this was not specifically addressed in the discussion.  However, aspects related to the retrofit were noted during the chronology portion of the presentation.  Those included the Compliance Director's supplemental compliance action plan containing recommendations for the acute and sub-acute mental health and medical service needs.  The recommendations included a housing capacity of 89 security beds and 14 infirmary beds, accommodations for only Male and Female inmates with acute and sub-acute mental disorders, laundry service, family and attorney visitation, an infirmary, medical clinic and administrative space for medical and mental health staff.  The retrofit of Phase II did not meet the monitors' approval.  In part, the monitors found retrofitting existing housing unit(s) problematic as the housing units have mezzanines which they considered hazardous for acute patients.

9. **David Brazil:  QUESTION** - I understand that the Phase II retrofit plan includes construction of 6 additional individual interview/counseling rooms on the pods renovated for the acute and sub-acute inmates. If this is correct, given the existing interview/counseling rooms in the Phase II building, wouldn't that satisfy the needs of the acute and sub-acute inmates?  I also wish it to be a matter of record that I oppose the proposal.

REPLY:  As to your question regarding interview/counseling rooms in the retrofit plan, this was not addressed in the discussion.  Currently, OPSO and Wellpath are working with a criminal justice consulting firm to develop staffing and operational plans.  The staffing and operational plans will assist in determining the adequacy of the number of interview/counseling rooms provided in Phase III.  This is to assist in providing the required verification to the monitors.



10. **Rachael Wingate:  OBSERVATIONS** - I am a resident of Broadmoor, New Orleans.  I firmly oppose the construction of a Phase III psychiatric facility because people with mental illness need medical help, not handcuffs. They need community care, not prison cells.
Cities across the country are changing how they treat mental illness – as a matter of access to healthcare, not a crime problem. We must follow their lead and invest in New Orleans' non-carceral infrastructure, and allocate the proper funding to education, housing, and community wellness.
Angela Davis said: "Prisons do not disappear social problems, they disappear human beings." Putting people with psychiatric problems into prison is NOT JUSTICE. It is inhumane.
REPLY:  As to your question regarding treating mental illness in the carceral setting, this was addressed in the discussion.  Please refer to responses in Number 13.

11. **Rachel Wallace:  OBSERVATIONS** - I am a resident of Orleans Parish. I firmly oppose the construction of a Phase III psychiatric facility for various reasons. Firstly, because people with serious mental illness are over criminalized throughout the country, particularly in New Orleans. The National Alliance on Mental Illness says: "Once in jail, many individuals [with mental illness] don't receive the treatment they need and end up getting worse, not better." Secondly, the money spent to build this facility could be used much better to provide mental health help and support for people BEFORE they are incarcerated and to provide more beneficial care for those currently incarcerated.
REPLY:  As to your question regarding treating mental illness in the carceral setting, this was addressed in the discussion.  Please refer to responses in Number 13.

12. **Aidan Morse**: **OBSERVATIONS** - I am a resident of District A. I firmly oppose the construction of a Phase III psychiatric facility because:
- People with serious mental illness are over criminalized throughout the country, particularly in New Orleans.
- New Orleans can't afford to build a Phase III jail facility.
- An alternative plan to retrofit the existing jail building, which would save the city an estimated $184 million in construction, maintenance, and staffing costs over 35 years and offer a constitutional solution for those with mental illness within one year, has been widely endorsed by advocates.
- Following previous demands from New Orleans residents and business leaders, mental health experts, and city officials, the City of New Orleans suspended the programming, design and construction of a new Phase III jail facility and filed to request a modification of prior court orders in early 2020.
REPLY:  As to your observations on the plan to retrofit the existing jail building, please refer to response to Number 8.

13. **Kendra Davis**: **OBSERVATIONS** - We need real mental health care, not cages. We need compassionate community members who care for one another, not prisons. New Orleans does NOT WANT more jail beds! Please tune in and listen to us! Stop constructing phase 3 of the jail.
REPLY:  As to your comment regarding compassionate treatment, this was addressed in the discussion.
**WELLPATH-KISSEL:  I think this facility is going to allow, if a patient is incarcerated, it's going to allow us the resources to include group and programming space, appropriate cell space,**



whether it be single or double, or appropriate safe cells for those in a self-injurious crises.  It is going to help us start the recovery for that patient during his or her incarceration.  Start programming, start mental health treatments, groups on life skills and job readiness and other life skill opportunities.  Then we can do a very warm and tight hand-off to community resources and community providers.  We know so many of our patients are going to be returning to the community.  Very few end up going to Louisiana DLC.  This is giving us an opportunity to really assist patients jump-start their recovery.  I'll pass to Dr. Rouse at that point.

WELLPATH-ROUSE:  I've been involved In public mental health in this city for nearly 20 years, at this point.  Working inside the Orleans Justice Center has shown me a new side of things that even I had not seen before.  And it all comes down to this simple fact:  at OJC, the Sheriff does not determine who the police arrest and bring to him.  At OJC, the Sheriff doesn't determine when people leave; that's the judges.  So, there's a space and that's where our fellow citizens are.  So, to me, the question is what can be done for them while they are here.  And, that's what drives us every day to do what we do.  I will be the first to admit I do not want to see the criminalization of the mentally ill.  But the bottom line is that sometimes people get arrested.  That doesn't change whether or not they need care or deserve evaluation and deserve treatment.  So, that is what we try to do on the inside.  The medical staff and the Sheriff's staff don't control the front door and don't control the exit for the most part.

14. **Bob Murrell**: **OBSERVATIONS** - Hello, my name is Bob Murrell, and I'm a resident of District A in New Orleans. I oppose the construction of the Phase III psychiatric jail, and I hope you do too. In a time where our city continues to struggle to get tax dollars dedicated to helping citizens, the Phase III expansion does little to help our citizens in need. The retrofit plan that was approved by Council and the mayor more than adequately addresses the population that would need psychiatric care at a significantly less amount of money. Further, the expanded jail would not be adequately staffed with the current number of employees in the sheriff's department.
A Phase III only benefits the sheriff and those that stand to profit from its construction - not the deputies, not the medical staff, and certainly not the incarcerated people that need psychiatric care.
REPLY:  As to your question regarding the adequacy of the retrofit plan, this was not specifically addressed in the discussion.  However, aspects related to the retrofit were addressed during the chronology portion of the presentation.  Please refer to the reply in Number 8.

15. **Lian Lucansky**:  **OBSERVATIONS** - I'm a resident of District A. I firmly oppose the construction of a Phase II psychiatric facility because out prisons and jails should not be in charge of people's mental health treatment. Research shows that people with mental illnesses are disproportionately incarcerated, and the construction of this facility will be contributing to the problem, not creating a solution. I believe this money instead should be supporting mental health services run by the city in partnership with community members directly impacted by incarceration and mental health. Increased mental health services will invest in our community's wellbeing and prevent incarceration for mental illness in the future.
REPLY:  As to your observation regarding treating mental illness in the carceral setting, this was addressed in the discussion.  Please refer to additional responses in Number 13.



To your observation regarding investing in treatment of mental illness outside the carceral setting, the topic was alluded to in the discussion.

**WELLPATH-ROUSE:  So, in my opinion, people want to see a quicker and more robust pipeline to that state forensic hospital.  I'm all for it, I'm your biggest advocate.  But that's a question for the Governor and how Office of Mental Health allocates their funds.**

16. <u>**Lucy Blumberg**</u>: **OBSERVATIONS** - People with mental health issues NEED safe and good treatment. They do not need to be incarcerated, and we do not need to add more beds to the jail. Please do not expand the jail.
    REPLY:  As to your observation regarding treating mental illness in the carceral setting, this was addressed in the discussion.  Please refer to responses in Numbers 13.

17. <u>**Zoe Johnson**</u>:  **QUESTION** - If all inmates were accommodated in the Phase II building, wouldn't that negate the need to hire more staff?
    REPLY:  As to your question regarding staffing, please refer to the reply in Number 7.

18. <u>**Celeste Cahn**</u>: **OBSERVATIONS** - I firmly oppose the construction of a New phase III jail facility because I believe that money would be put to better use elsewhere, we should have a better mental health service on the front end because jails must stop being our way of dealing with mental health crisis, it is unfair to the people who get imprisoned because of that, it is unfair to their communities and it is unfair to the officers who then must care for those people when they are not equipped to do so and don't have what is truly necessary in either training or tools. New Orleans cannot afford this facility that will simply continue the trend of over-criminalizing people with mental illness.  I hope you will consider the alternative plans and invest more of this money into actual mental health care for the citizens of New Orleans.
    REPLY:  As to your observation regarding allocation of funds, this topic was alluded to in the discussion.  Please refer to the response in Number 15.
    As to your observation regarding officers training and the jails tools, please refer to the response in Number 6.

19. <u>**Jenna Losh**</u>: **OBSERVATIONS** - I live off Broad not too far from the jail complex. I am totally opposed to any expansion of the New Orleans jail, and I am totally opposed to supposed "treatment" of mental illness in the jail.
    There's no need to build this additional building to be in compliance with the constitutional requirements for care - a retrofit would meet that standard. It would be expensive and waste money we could give to communities to treat mental illness in a loving and non-punitive way. It further solidifies the hold of prisons and punishment as a way of creating safety, which research and experience show us is the opposite of reality.
    I want our money and attention to go towards creating real safety, towards addressing the root issues of poverty, white supremacy, etc., etc.
    REPLY:  As to your observation regarding treating mental illness in the carceral setting, this was addressed in the discussion.  Please refer to responses in Number 13.
    As to your question regarding the adequacy of the retrofit plan, this was not specifically addressed in the discussion.  However, aspects related to the retrofit were addressed during the chronology portion of the presentation.  Please refer to the reply in Number 8.



20. <u>**John Burkhart**</u>: **QUESTION** - Didn't Mr. Kissel testify under oath in federal court that Wellpath is providing adequate mental and medical care to the inmate population? With this, why is a Phase 3 building needed?

On a further note, I cannot believe - this many years later - we are still having to fight the same old battles because some people refuse to accept that a Super-Size Jail is an absolutely, terrible idea for this city. Today would be a great day to start!

REPLY:  As to your question regarding treating mental illness in the carceral setting, this was addressed in the discussion.  Please refer to responses in Number 13.

As to your question regarding the need for the Phase III building, this was addressed in the discussion.  Please refer to responses to the Third part of Numbers 6.

21. <u>**Carolyn Mayes**</u>:  **OBSERVATIONS** - I am a resident of District 1. As a registered nurse who regularly cares for people who are incarcerated, I firmly oppose the construction of a Phase III psychiatric facility. Individuals with mental illness are over criminalized in our community already-- community safety and the health needs of people with mental illness are better served by resources and treatment outside of the carceral system. Thank you for your consideration.

REPLY:  As to your question regarding treating mental illness in the carceral setting, this was addressed in the discussion.  Please refer to responses in Numbers 13.

22. <u>**Ruby Corbyn-Ross**</u>:  **OBSERVATIONS** - I am a resident of Orleans Parish. I firmly oppose the construction of a new Phase III psychiatric facility because it is neither needed nor a good use of limited City funds. At a time when New Orleans is struggling from an estimated loss of $137 million in sales revenue, the last thing we need is a costly construction project of a new jail building when there are better alternatives. Rather than spending $84 million to build an unneeded new facility which would take three years, I urge you to retrofit the existing jail building for $10 million for a constitutional solution within one year. Furthermore, those with serious mental illness are already over-criminalized, especially in New Orleans. People in need of help are often cycled through the criminal legal system instead of being provided adequate care. Rather than making a new jail with more beds for incarcerating those suffering from mental illnesses, I urge you to support a non-carceral mental health crisis intervention center to get the residents the help they really need.  Thank you for your consideration

REPLY:  As to your question regarding treating mental illness in the carceral setting, this was addressed in the discussion.  Please refer to responses in Numbers 13.

As to your question regarding the adequacy of the retrofit plan, this was not specifically addressed in the discussion.  However, aspects related to the retrofit were addressed during the chronology portion of the presentation.  Please refer to the reply in Number 8.



# QUESTIONS & OBSERVATIONS

**Topic:**       Orleans Justice Center – Medical Services Building

**Host:**        Talva Burnette, Neighborhood Liaison District B
Mayor's Neighborhood Engagement Office
City of New Orleans

**Location:**    Webex

**Date:**        June 17, 2021

## Q&A TRANSCRIPT

The following is a transcription of the conversation during the Question & Answer session.

<u>HOST</u>:  Again, we want to thank you for your time and for joining us for this information session tonight regarding the Orleans Justice Center.  If you do have questions, we do want to implore you to submit those questions to the chatbox.  We're happy to address them tonight.  Additionally, I am going to actually give you a separate number from what you see on the slide.  I've also put it in the chatbox.  And, that number is 504-608-8306.  You can use it to share any questions with us you may have, as well as the chatbox.  We certainly will give you a few minutes to work on any questions you may have.  Thank you again for your time.

<u>CPA</u>:  Thanks Talva, this last slide indicates if there are any questions or comments that you didn't get in for this presentation, you can send them in to <u>OJCMedicalServices2900@gmail.com</u>.  Talva, does the office of Neighborhood Engagement have a email address, or how can the people send questions or comments to Neighborhood Engagement?  Talva?

<u>HOST</u>:  Just one moment – Thank you so much for your patience there.  I will also be putting my information in the chatbox at the end of the meeting.  You can always contact Neighborhood Engagement, as a whole for, questions.  My phone line is 504-658-7808; again, that's 504-658-7808.  We will be having to take your questions and direct them to the appropriate location they belong.  Also, our website has additional information on it; that is <u>nola.gov/neighborhood-engagement/</u>.
I do see one question here, and let's see, it is from Roland Washington:  Is there a micro-view illustration of the personal sleeping space for detainees?  John?  John, you're muted.

<u>HILL</u>:  There we go, hey. can I see that question again?  Because I can't see it here on the screen.

<u>HOST</u>:  It's in the chatbox.

<u>HILL</u>:  I see it now.  Is there more of a micro-view illustration of the personal sleeping… that's the only rendering that we currently have so that's it right now. That's the only one we have.

ZD071/21



CPA:  Well, and, also John, because of security purposes we are illustrating the layout in a more general format.

HILL:  Right.

HOST:  If you do have any additional questions, again, we certainly invite you to submit them to the chatbox so that we can address them this evening.  If not, we'll certainly be happy to address them in the future.  As Vince mentioned, you can always email additional questions or concerns regarding this project to OJCMedicalServices2900@gmail.com, thank you.

CPA:  Talva, this is Vince again.  I want to ask the architect: What's the date of the Planning Commission hearing?

GHC:   Vince, this is Stephanie, if you can hear me, August 24th is the one we're trying to get signed up for.

CPA:  OK, great, thank you.  Just wanted the public to be aware that that Planning Commission hearing is August 24th and that would be one more opportunity for the community to come and voice their opinions about the project.  Thank you.

HOST:  Just to confirm Vince, that is the, that marks the third public opportunity to ask questions regarding this project.

CPA:  That's correct.
OK, Talva, do we have any more questions, any more comments from the community?

HOST:  At this time, we do not.  I have also checked the text line to confirm there are no questions there, as well.

CPA:  OK, do we want to make one last call, one last opportunity before we adjourn the meeting?

HOST:  Absolutely, we are perfectly happy to give another 5 minutes, if you like.
Hello, Jenna, yes – this meeting is currently being recorded.  You said you had some connectivity issues. So, absolutely, yes.

CPA:  Where can they pull down that recording, Talva?

HOST:   Most immediately you can email myself for a copy of the recording. Ultimately it will be posted on the neighborhood engagement website. Again that's at nola.gov/neighborhood-engagement/.  It is also currently in the chatbox.

CPA:  Thanks, Talva.  Also, a record of this, a written record of the meeting, will be developed and posted as well.  If anyone wants any information on the first meeting that was held, the meeting record and recording of that meeting is posted on the neighborhood engagement website as well. That's right, Talva?



<u>HOST</u>:   Correct, it's currently there now.

<u>CPA</u>:   OK, we're extending a couple of more minutes to make sure we give people an opportunity to dial in.

<u>HOST</u>:   Again, I want to thank everybody for their time.  And, I want to thank our speakers for sharing this information with us tonight. Again, if you have any questions or concerns or you would like a copy of this presentation, do feel free to email myself, as well.  My name is Talva - spelled T, like Tom, A-L-V, like Victor, -A.  Last name Burnett – B-U-R-N-E-T-T-E at nola.gov.  Again, that's Talva.Burnette@nola.gov.  As well as, you can email OJCMedicalServices2900@gmail.com and we'll be assured to answer any questions and send over a copy of this presentation at your request.

Thank you, again, for your time.  I do hope you have a safe and positive evening and weekend.  If you haven't gotten vaccinated, please do get vaccinated.  And, because this building is in District B, I want to invite you to come to our community office hours Monday, Tuesday, Wednesdays from 10:30 until 5:00. Please make an appointment at our neighborhood engagement website or give a call at either of the emails and I'll be sure to handle any questions or concerns you might have.

Have a wonderful evening.  Thank you for your time and look forward to seeing you.

ZD071/21

Page 134 of 187



**CITY OF NEW ORLEANS**
# ONE STOP
### PERMITS & LICENSES

Building/Construction
Related Permit



| Received by | RB |
|---|---|
| Sign Provided ○ | Date 6/22/21 |
| Tracking Number | 21-0791 |

# LAND-USE REQUEST APPLICATION

**Covid-19 Submittal Protocol: Please submit complete applications via email to CPCinfo@nola.gov. Applicants without the ability to submit via email should contact (504) 658-7100 to make alternative arrangements. Incomplete applications will <u>not</u> be accepted and will be returned to the applicant.**

Type of application: ○ Text Amendment   ○ Zoning Change   ◉ Conditional Use/Planned Development

Address of Property for which this
application is being filed.    2900 Perdido Street New Orleans 70119

## APPLICANT INFORMATION

Applicant Identity:   ○ Property Owner   ◉ Agent

Applicant Name  Gerald D Hebert

Applicant Address  501 Government Street, Suite 200

City  Baton Rouge              State  Louisiana              Zip  70802

Applicant Contact Number  225-338-5569          Email  jhebert@ghc-arch.com

## PROPERTY OWNER INFORMATION        SAME AS ABOVE ☐

Property Owner Name   City of New Orleans, Vincent A. Smith - Director Capital Projects Administration

Property Owner Address  1300 Perdido Street, Suite 6E15

City  New Orleans              State  Louisiana              Zip  70112

Property Owner Contact Number  504-669-0179          Email  viasmith@nola.gov

## SPECIFIC ZONING REQUEST

Conditional use approval for construction of Medical and Mental Health Services Facility (prison) for LI zoning district and variance to exceed the set back of 20 feet required by Section 16.3.A.2.

## PROPERTY LOCATION

Square Number(s)  624A                     Lot Number(s)  2

Bounding Streets  I-10        S. Dupre Street              S. Gayoso Street

Zoning  L1 Light Industrial District                Municipal District  1

Tax Bill Number  104106926           Planning District  4

## DESCRIPTION OF PROJECT (Attachments are acceptable)

Two-story medical and mental health services facility on the secure site of the Orleans Parish Criminal Sheriff's Campus. The building will also contain a mechanical mezzanine, roof penthouse and bridge connections, on the second floor, to the existing Inmate Processing Center and the Kitchen Warehouse buildings.

ZD071/21

Page 135 of 187



Building/Construction
Related Permit 

| Received by |
| --- |
| Sign Provided ○ Date |
| Tracking Number |

## LAND-USE REQUEST APPLICATION

### ACKNOWLEDGMENTS

I (we) hereby affirm that ownership and property information presented on this application is current and accurate and, further, that the undersigned meet the requirements of Article 16 of the Comprehensive Zoning Ordinance to submit this application. I (we) acknowledge that inaccurate or incomplete ownership, improper authorization, or property identification will make this application and resulting actions null and void. I (we) the undersigned owner and authorized agent of the area of land described above, hereby submit for your approval the above stated request.

Owner Signature _____      Date 6/9/21

Agent Signature _____      Date 6/9/21

If ownership is joint, each owner must be listed. If ownership is a partnership, the Partnership Agreement must be included. If owner-ship is a corporation, Articles of Incorporation (full document filed with the Secretary of State) and a Board Resultion authorizing an individual or agent to sign on its behalf must be included. If ownership is a LLC, Articles of Organization (full document filed with the Secretary of State) and legal documentation authorizing an individual or agent to sign on its behalf must be included. If necessary, submit proof of ownership documents, such as copies of the recorded act of sale, act of exchange, act of donation, cash sale or deed.

STATE OF LOUISIANA, PARISH OF ORLEANS

Before me, the undersigned authority, personally appeared the person(s) whose signature are affixed above, all of the full age of the majority, who declared under oath to me, Notary, that they are the owners or authorized agents of the property described above, and that their signatures were executed freely and voluntarily and that they are duly qualified to sign.

Sworn to and subscribed before me this ___9th___ day of ___June___, 2021

My Commission expires ___For Life___

**DONALD LANCE CARDWELL**
**NOTARY PUBLIC**
LA BAR NO. 34476, NOTARY NO. 133589
Parish of Orleans, State of Louisiana
My Commission is Issued for Life

# CITY PLANNING COMMISSION
# DESIGN ADVISORY COMMITTEE
# MINUTES – June 03, 2020

**Committee Members Present:**
Wheeler Manouchehri (CPC)           Stephen Kroll (CPC)
Louis Haywood (DPW)                 Lindsay Glatz (Art Council of N.O.)
Eleanor Burke (HDLC)

**Attendees Present:**
Joseph Colon  (CPC)  Travis Martin (CPC)   Amos Wright (CPC)   Emily Hernandez (CPC)
Rachael Berg (CPC)   Joanna Farley (CPC)

Victoria Yee   Michael Grote        Tighe Kirkland        Andrea Bowman       Damien Job
Lisa Pagano    Emily Bullock        Jonathan House        Jerry Hebert

**CPC ITEMS:**

1. **Consideration**: Minutes from 05/20/20

   CPC made a motion for approval which was seconded by HDLC and approved unanimously.

2. **Consideration**: Minutes for Item 6 & Item 8 from the 05/06/20 DAC meeting

   HDLC made a motion for approval which was seconded by CPC and approved unanimously.

3. **Consideration: Zoning Docket 066/19 (Site Plan Review Only)-** Request by the LTFC-Alembic, LLC to renovate an existing structure with more than 100 feet of street frontage in an HU-MU Historic Urban Mixed-Use District, an HUC Historic Urban Corridor Use Restriction Overlay District, and an EC Enhancement Corridor Design Overlay District. (RB)

   HDLC asked if the applicant was intending to replace the windows or restore them. The applicant responded they will be restoring the windows. No further questions were asked, and there were no public comments; HDLC made a motion to approve the request which was seconded by CPC and unanimously adopted.

4. **Reconsideration**: **Design Review 077/20** – Request by Miles Granderson to construction a pre-engineered metal building for use as a Mardi Gras den on a site with over 100 feet of frontage within the CT Corridor Transformation Overlay District. (TM)

   The Committee reviewed the updates that the applicant made to the plans regarding facades, sidewalk improvements and street trees. These updates were found to have

addressed the majority of the DAC's comments from the previous meeting, although the representative from DPW pointed out that the sidewalk still needs to be shifted towards the property line along South Roman Street. Parks and Parkways motioned for approval of the application, subject to the applicant addressing the comments from DPW and CPC review. This motion was seconded by DPW and approved.

5. **Consideration**: **Design Review 084/20** – Request by Victoria Yee to renovate an existing structure with over 40k sq ft in floor area. (JF)

HDLC recommended that the whole wall be painted the same color instead of what appears to be two colors in the rendering to remove the horizontal stripe that appears at the top. The applicant noted that this would be the same beige stucco throughout the wall and would not be a different color.

DPW noted that the catch basin would need to be converted to a drop-in catch basin with the reconstructed parking lot.   The DPW representative also asked for the driveway on Dickens drive to be reduced if it is not to be used for buses.

There was a motion for approval by HDLC, subject to compliance with the recommendations by DAC. This was seconded by the Arts Council and unanimously approved.

6. **Consideration**: **Design Review 085/20** – Request by Lisa Pagano for an addition to an existing structure over 40k sq ft in floor area. (AW)

No comments were received from the DAC. A motion to approve was made by HDLC and seconded by the Arts Council. The motion to approve passed with unanimity.

7. **Consideration**: **Design Review 088/20** – Request by the City of New Orleans to construct a new medical services building. (EH)

The applicant's agent provided an overview of the Orleans Justice Center's new Medical Services Building. Constructed between two existing OJC buildings and visible from Interstate-10 and Perdido Street, it would house two (2) male housing units, two (2) female housing units, laundry, administration, a clinic, infirmary, and visitation area. It would have limited access to the public. No parking is planned, and the exterior finishes would mimic the two adjacent buildings.

The Committee expressed no comments or concerns relative to the design of the building.

The **Historic District Landmarks Commission** representative made a motion to **approve** the proposal. The **City Planning Commission** representative **seconded** the motion, which was **unanimously approved**.



RETIRED



RETIRED



RETIRED

City of New Orleans
New Orleans, Louisiana

OJC MEDICAL SERVICES BUILDING

BUILDING ELEVATIONS

A202

NOT FOR
CONSTRUCTION

1  SOUTH ELEVATION

2  WEST ELEVATION



ORDINANCE

CITY OF NEW ORLEANS
CITY HALL:  December 19, 2019
CALENDAR NO. 32,884
**NO. 28300 MAYOR COUNCIL SERIES**
BY:   COUNCILMEMBER BANKS

AN ORDINANCE to amend Ordinance No. 24,282 MCS (Zoning Docket 30/10), which granted
a conditional use to permit a prison and related uses, to now amend certain provisos in order to:
permit the temporary use of Buildings 1 and 2 of the Orleans Justice Center's Temporary Detention
Center to house inmates suffering acute and sub-acute mental disorders until the more permanent
Phase III facility (currently in planning) is complete; and to allow for the limited housing of two
(2) special classifications of inmates in Buildings 3 and 4 of the Temporary Detention Center until
such time that the population of the Orleans Justice Center is reduced where the same may be
housed in segregation within Phase II of the Orleans Justice Center – with the subject property
being located in an LI Light Industrial District, on Square 600-A (formerly Square 600), all lots
(excluding Lots 28 through 31), Square 615, all lots, Square 624, all lots, Square 624-A, all lots,
Square 666, all lots, and Square 675, all lots, in the First Municipal District, bounded by Interstate
Highway 10, South Broad Street, Perdido Street, and South Jefferson Davis Parkway (Municipal
Address: 2800 Perdido Street (formerly 819-821 South Broad Street and 2750-3200 Perdido
Street); and otherwise to provide with respect thereto.

**WHEREAS,** Zoning Docket Number 105/19 was initiated by Honorable Marlin N.
Gusman, Sheriff, Orleans Parish and referred to the City Planning Commission; and

**WHEREAS,** the City Planning Commission held a public hearing on this zoning petition
and recommended denial of the amendment in its report to the City Council dated October 14,
2019, presented in Zoning Docket 105/19;

**WHEREAS,** the recommendation of the City Planning Commission was overruled and the
changes were deemed to be advisable and necessary and in the best interest of the City and were
granted modified approval subject to the proviso amendments recommended by CPC staff, with
additional modifications to proviso 7, as stated in Motion Number M-19-512 of the Council of
the City of New Orleans on December 5, 2019.

**SECTION 1. THE COUNCIL OF THE CITY OF NEW ORLEANS HEREBY ORDAINS,**
That Ordinance No. 24,282 MCS (Zoning Docket 30/10), which granted a conditional use to
permit a prison and related uses, to now amend certain provisos in order to: permit the temporary
use of Buildings 1 and 2 of the Orleans Justice Center's Temporary Detention Center to house
inmates suffering acute and sub-acute mental disorders until the more permanent Phase III
facility (currently in planning) is complete; and to allow for the limited housing of two (2)
special classifications of inmates in Buildings 3 and 4 of the Temporary Detention Center until
such time that the population of the Orleans Justice Center is reduced where the same may be
housed in segregation within Phase II of the Orleans Justice Center – with the subject property

being located in an LI Light Industrial District, on Square 600-A (formerly Square 600), all lots (excluding Lots 28 through 31), Square 615, all lots, Square 624, all lots, Square 624-A, all lots, Square 666, all lots, and Square 675, all lots, in the First Municipal District, bounded by Interstate Highway 10, South Broad Street, Perdido Street, and South Jefferson Davis Parkway (Municipal Address: 2800 Perdido Street (formerly 819-821 South Broad Street and 2750-3200 Perdido Street); is hereby amended, subject to the proviso amendments recommended by the CPC staff, with additional modifications to proviso 7, as specifically set forth herein:

## PROVISOS:

No person shall use any of the properties described herein or permit another to use any of those properties described herein for the use authorized by this ordinance, unless the following requirements are met and continue to be met:

\*\*\*

7.  The developer shall include a note on amended site plans stating that all temporary inmate housing, including the 400 bed modular units known as the Temporary Detention Center ("TDC"), will be removed and/or closed upon the opening of a permanent facility and/or unit for the housing of male and female inmates classified with acute and sub-acute mental health conditions:

a.   The developer shall ensure that at no time shall the aggregate inmate population of the Orleans Justice Center complex, including without limitation, those held in Phase II, the TDC, and in the permanent facility or unit for the housing of male and female inmates classified with acute and sub-acute mental health conditions exceed 1,250 inmates, and that all inmates (male, female, and juvenile) except those classified with acute and sub-acute mental health conditions, those participating in the work-release program and those actively working on the kitchen staff, shall be detained in Phase II of the OJC, which shall continue to provide a variety of programming aimed at reducing recidivism including but not limited to medical care, educational services, including GED preparation, vocational and job training.

b.  The developer shall demolish or decommission and not detain any inmates in any of the following existing Orleans Parish Prison facilities, unless other appropriate action is taken by the Mayor and/or City Council that is consistent with their authority:

i. House of Dentition;
ii. The Community Correctional Center;
iii. Conchetta;
iv. Broad Street;
v. South White Street;
vi. Templeman V; and
vii. The original Temporary Housing Units (Tents).

The original Orleans Parish Prison connected to the Criminal Courts building (OPP) shall only be used as a daily holding facility to transfer inmates to and from court while awaiting a trial or hearing.

c.  Building 1 and Building 2 of the 400-bed modular Temporary Detention Center ("TDC") shall be renovated in accordance with the submitted plans to temporarily accommodate male and female inmates classified with acute and sub-acute mental health conditions. Building 1 and Building 2 shall be permitted to continue to accommodate these inmates until the opening of a permanent facility and/or unit for the housing of male and female inmates classified with acute and sub-acute mental health conditions. Once the inmates housed in Buildings 1 and 2 of the TDC have been transferred to the permanent facility and/or unit for the housing of male and female inmates classified with acute and sub-acute mental health conditions. Developer shall demolish or decommission Buildings 1 and 2 of the TDC and they shall not be used to house any inmates with OJC.

d.  Developer shall be permitted to use Building 3 and Building 4 of the Temporary Detention Center ("TDC") to house only two (2) distinct classes of inmates, namely:

i.  Those inmates participating in any work-release program, where they are released from the OJC secured complex into the general public during the day and return to the OJC Complex overnight.

ii.  Those inmates that are serving as trustees in the Orleans Justice Center kitchen where they have access to items which may be used as weapons.
At no time shall the total number of inmates housed in Building 3 and Building 4 exceed one hundred and fifty (150) (a maximum of one hundred twenty (120) for work release and a maximum of thirty (30) for kitchen detail), and at all times the total aggregate number of inmates housed in Buildings 3 and 4 shall count toward the 1,250 maximum inmate population count established in subsection (a) hereof.

***

20.  The developer shall work with the Sewerage and Water Board as necessary for the retention or relocation of any sewer or water lines affected by the proposed development.

21.  The Mayor may provide a written recommendation to the City Council after convening meetings with stakeholders and experts

**SECTION 2.** Whoever does anything prohibited by this Ordinance or fails to do anything required to be done by this Ordinance shall be guilty of a misdemeanor and upon conviction shall be subject to a fine or to imprisonment or both, such fine and/or imprisonment set by Section 1-13 of the Code of the City of New Orleans, or shall alternatively be subject to whatever civil liabilities, penalties or remedies the law may prescribe.  Conviction shall be the cause for the immediate cancellation of the Use and Occupancy permit of the premises.

**SECTION 3.** This ordinance shall have the legal force and effect of authorizing this conditional use only after all the provisos listed in Section 1 of this Ordinance which impose a one-time obligation have been completely fulfilled and complied with, and only after all the provisos listed in Section 1, which impose a continuing or on-going obligation shall have begun to be fulfilled, as evidenced by the Planning Commission's approval of a final site plan, on or before

one year from the date of adoption of this ordinance, (which shall be incorporated into this ordinance by reference) and its subsequent recordation, and no use or occupancy certificates or permits (other than the building permits needed to fulfill the provisos) shall be issued until all the provisos which impose a one-time obligation have been completely fulfilled and complied with, and only after all the provisos listed in Section 1 which impose a continuing or ongoing obligation shall have begun to be fulfilled, as evidenced by the Planning Commission's approval of a final site plan (which shall be incorporated into this ordinance by referenced) and its subsequent recordation.  If the development or construction of the conditional use authorized herein is not commenced within three (3) years from the date this ordinance becomes law, as contemplated by Section 3-113 of the Home Rule Charter of the City of New Orleans, the provisions of this Ordinance shall be null and void with no legal force or binding effect.

ADOPTED BY THE COUNCIL OF THE CITY OF NEW ORLEANS JANUARY 16, 2020
HELENA MORENO
PRESIDENT OF THE COUNCIL

DELIVERED TO THE MAYOR ON JANUARY 17, 2020

APPROVED:  JANUARY 17, 2020
LATOYA CANTRELL
MAYOR

RETURNED BY THE MAYOR ON JANUARY 21, 2020 AT 10:00AM

LORA W. JOHNSON
CLERK OF COUNCIL

ROLL CALL VOTE:
YEAS:  Banks, Brossett, Giarrusso, Gisleson Palmer, Moreno, Nguyen, Williams - 7
NAYS:  0
ABSENT:  0
RECUSED:  0

FEB 28 2011 PM 4:22

ORDINANCE

(AS AMENDED)

CITY OF NEW ORLEANS

CITY HALL: January 6, 2011

CALENDAR NO. 28,291

NO.   24282 MAYOR COUNCIL SERIES

BY:   COUNCILMEMBER HEAD (BY REQUEST)

**AN ORDINANCE** to provide for the establishment of a conditional use to permit a prison and related uses in an HI Heavy Industrial District, on Square 600, all Lots (excluding Lots 28 through 31), Square 615, all lots, Square 624, all lots, Square 624-A, all lots, Square 666, all lots, and Square 675, all lots, in the First Municipal District, bounded by Interstate Highway 10, South Broad Street, Perdido Street, and South Jefferson Davis Parkway; and the rescission of Conditional Use Ordinances 10,428 M.C.S., 14,505 M.C.S., 14,648 M.C.S., 14,762 M.C.S., 17,274 M.C.S., and 20,101 M.C.S. (Multiple Municipal Addresses); and otherwise to provide with respect thereto.

WHEREAS, **Zoning Docket Number 30/10** was initiated by City of New Orleans, Criminal Sheriff of Parish of Orleans and Law Enforcement District of the Parish of Orleans and referred to the City Planning Commission; and

**WHEREAS,** the City Planning Commission held a public hearing on this zoning petition and recommended approval, in its report to the City Council dated April 29, 2010 of the conditional use and the rescission of Conditional Use Ordinances 10,428 M.C.S., 14,505 M.C.S., 14,648 M.C.S., 14,762 M.C.S., 17,274 M.C.S., and 20,101 M.C.S. presented in **Zoning Docket Number 30/10;** and

**WHEREAS,** the recommendation of the City Planning Commission was upheld and the changes were deemed necessary and in the best interest of the City of New Orleans and were granted approval, subject to subject to one (1) waiver and twenty-four (24) provisos, in Motion Number M-10-295 of the Council of the City of New Orleans on July 1, 2010; and

**WHEREAS,** the Criminal Justice Working Group, established by Executive Order 10-06, has recommended taking the following preliminary actions in an ongoing process to determine the appropriate size of the entire Orleans Parish jail facility.

SECTION 1. THE COUNCIL OF THE CITY OF NEW ORLEANS HEREBY ORDAINS that conditional use Ordinance Numbers 10,428 M.C.S., 14,505 M.C.S., 14,648 M.C.S., 14,762 M.C.S., 17,274 M.C.S., and 20,101 M.C.S. are hereby rescinded.

SECTION 2. THE COUNCIL OF THE CITY OF NEW ORLEANS HEREBY ORDAINS that a conditional use to permit a prison and related uses in an HI Heavy Industrial District, on Square 600, all Lots (excluding Lots 28 through 31), Square 615, all lots, Square 624, all lots, Square 624-A, all lots, Square 666, all lots, and Square 675, all lots, in the First Municipal District, bounded by Interstate Highway 10, South Broad Street, Perdido Street, and South Jefferson Davis Parkway (Multiple Municipal Addresses); is hereby authorized and approved, subject to the following waiver and provisos, as specifically set forth herein:

**WAIVER:**

1.   The applicant shall be granted a waiver of Article 15, Section 15.2.1. *Off-Street Parking Regulations for All Districts, Except the CBD Districts and the Vieux Carré Districts* of the Comprehensive Zoning Ordinance, which requires the provision of two hundred six (206) off-street parking spaces, to permit the provision of zero (0) off-street parking spaces, subject to the requirements indicated in the related condition (see proviso 20) pertaining to the future provision of off-street parking on the site.

**PROVISOS:**

No person shall use any of the properties described herein or permit another to use any of those properties described herein for the use authorized by this ordinance, unless the following requirements are met and continue to be met:

1.   The applicant shall resubdivide the petitioned lots into one lot of record.

2.   The applicant shall submit revised site plans demonstrating that no permanent structure encroaches upon the Poydras Street right-of-way, absent an agreement from the City.

3.   The surface parking lot shall be enclosed with perimeter fencing – such as a low masonry chain wall with half metal picket fence above – in order to create a street edge along Perdido Street and the curvilinear South Broad Street/Poydras Service Drive.

4.   The applicant shall alter the sallyport window openings at street-level on Perdido Street so that the scale appears larger, as long as security is not compromised.

2

5.     In order for the applicant to add additional properties and to add the Templeman I and II facility, the applicant shall be required to amend this Conditional Use ordinance through the City Planning Commission, with Council approval, in accordance with the full Conditional Use process.

6.     The applicant shall secure a long-term lease of servitude for existing improvements made upon the Poydras Street right-of-way, including but not limited to the 12-foot concrete security wall between South White and South Lopez Streets, and the paved storage yard area between South Rendon Street and South Jefferson Davis Parkway.

7.     The applicant shall include a note on amended site plans stating that all temporary inmate housing, including tent city, but excluding current 400 bed modular units under construction, will be removed and/or closed upon completion of the 1,438 bed facility at the Templeman III & IV site.

    a.     The applicant shall ensure that upon completion, the 1,438 bed facility at the Templeman III & IV site is designed to accomodate any type of prisoner under any jurisdiction. This includes, but is not limited to, state and federal prisoners, inmates that need substance abuse and mental health treatment (except inmates that require acute mental health treatment), female inmates, and prisoners participating in a re-entry program and that the facility is able to provide a variety of programming aimed at reducing recidivism including, but not limited to, medical care, educational services, including GED preparation, vocational and job training.

    b.     The applicant shall decommission or demolish the following Orleans Parish Prison facilities upon completion of the 1,438 bed facility at the Templeman III & IV site, unless other appropriate action is taken by the Mayor and/or City Council that is consistent with their authority – House of Detention, Community Correctional Center, Conchetta, Broad Street, South White Street, Templeman V, and the original Temporary Housing Units (Tents). Orleans Parish Prison (OPP) shall only be used as a holding facility to transfer inmates to and from court.

    c.     The 400-bed modular units currently being constructed shall be decommissioned or demolished no later than eighteen (18) months from the date of issuance of a certificate of use and occupancy for the new Templeman III & IV facility.

8.     The applicant shall remove all obstructions to automotive and pedestrian traffic, and restore the public right-of-way on Perdido and South White Streets prior to receiving a certificate of use and occupancy for the new Templeman III & IV facility from the Department of Safety and Permits. This proviso may be amended upon written recommendation by the Mayor after meeting with stakeholders and experts.

9.   The applicant shall submit a phasing plan for the wall(s) and secure perimeters illustrating materials and assembly. Said wall shall be opaque, twelve (12) feet in height and match the dimensions and style of the existing wall currently installed along the Perdido Street side.

10.  The applicant shall secure approval of revised site plans by the Fire Marshall and abide by applicable fire code.

11.  The applicant shall submit detailed landscape plans prepared by a licensed Louisiana landscape architect indicating the items listed below. The landscape plan shall be subject to final approval by City Planning Commission staff and by the Department of Parks and Parkways for any proposed planting within a public right-of-way.

    a.   Landscaping improvements within the proposed parking lot, on islands, medians and along perimeter ground not improved with asphalt paving.

    b.   Shade-plantings along the Perdido Street side of the Intake and Processing Center sallyport, between the building and the sidewalk as space permits, providing a planting bed of not less than two (2) feet.

    c.   The genus, species, size, location, quantity and irrigation of all proposed plant materials within both the common areas and the street rights-of-way within the site, with applicable remarks and details.

    d.   There shall be aesthetic landscaping, subject to the approval of the Department of Parks and Parkways, along Broad Street between the overpass and the security gate.

12.  The applicant shall submit a revised site plan showing additional green space of a sizable concentration within the Correctional Complex that can be used as an outdoor recreation area for inmates, to the extent possible.

13.  The applicant shall either modify the location of dumpster berths or provide visual screening as part of the site design so that the Trash Dock at the rear of the Kitchen/Warehouse/Plant will not be visible from the public right-of-way.

14.  The applicant shall provide to the City Planning Commission a litter abatement program letter, inclusive of the stated location of litter storage, the type and quantity of trash receptacles, the frequency of litter pickup by the Department of Sanitation or a contracted trash removal company, and the clearing of all litter from the sidewalks and street rights-of-way. The name and phone number of the owner/operator of the development shall be included in this letter to be kept on file in case of any violation.

15.  The applicant shall submit a detailed signage plan indicating:

   a.  The location, text and dimension of all signs posted around the perimeter of the petitioned site or which are visible to the public.

   b.  Which signs will be illuminated and specifications for said signs.

16.  The applicant shall submit a lighting plan for the petitioned site for review and approval by the staff of the City Planning Commission and the Department of Public Works.

17.  All proposed curb cuts shall require the approval of the Department of Public Works. All curbs and sidewalks along the Perdido Street frontage shall be replaced and any existing and unused curb cuts along either street frontage shall be restored.  Approval of plans for such reconstruction shall be secured from the Department of Public Works.

18.  The Sheriff's department shall restrict loading dock activity at night, so that no truck deliveries or trash collection occurs between the hours of 10:00 p.m. and 6:00 a.m.

19.  The applicant shall secure the approval of the Department of Public Works for the following:

   a.  the location and construction of all proposed curb cuts and the restoration of any existing curb cuts that are not to be utilized as part of the development;

   b.  the replacement or restoration of all sidewalks adjacent to and across a street from the site as deemed necessary;

   c.  the installation of vertical curbs along all street frontages adjacent to the site;

   d.  the installation of all subsurface drainage for the proposed development; and

| 135 | | e. | a traffic impact analysis for the proposed development, including any mitigation measures deemed necessary should significant adverse impact to the transportation system be determined by the Department of Public Works to be likely to occur as a result of the proposed development. |

135     e. a traffic impact analysis for the proposed development, including
136       any mitigation measures deemed necessary should significant
137       adverse impact to the transportation system be determined by the
138       Department of Public Works to be likely to occur as a result of the
139       proposed development.

140  20. Upon the issuance of a certificate of use and occupancy by the City of New
141    Orleans for the new Inmate Process Center and Housing Units building, the
142    applicant shall demolish the eight existing tent prison structures within six
143    months, and shall restore the existing off-street parking lot upon which they are
144    located to use as one hundred forty-seven (147) parking spaces.

145  21. The applicant shall work with the Sewerage and Water Board as necessary for the
146    retention or relocation of any sewer or water lines affected by the proposed
147    development.

148  22. The Mayor may provide a written recommendation to the City Council after
149    convening meetings with stakeholders and experts.

150  **SECTION 3.** Whoever does anything prohibited by this Ordinance or fails to do
151 anything required to be done by this Ordinance shall be guilty of a misdemeanor and upon
152 conviction shall be subject to a fine or to imprisonment or both, such fine and/or imprisonment
153 set by Section 1-13 of the 1995 Code of the City of New Orleans, or should alternatively be
154 subject to whatever civil liabilities, penalties or remedies the law may prescribe. Conviction shall
155 be cause for the immediate cancellation of the Use and Occupancy permit of the premises.

1  **SECTION 4.** This ordinance shall have the legal force and effect of authorizing this
2 conditional use only after all the provisos listed in Section 1 of this Ordinance which impose a
3 one-time obligation have been completely fulfilled and complied with, and only after all the
4 provisos listed in Section 1 which impose a continuing or on-going obligation shall have begun
5 to be fulfilled, as evidenced by the Planning Commission's approval of a final site plan, on or
6 before one year from the date of adoption of this ordinance, (which shall be incorporated into
7 this ordinance by reference) and its subsequent recordation, and no use or occupancy certificates
8 or permits (other than the building permits needed to fulfill the provisos) shall be issued until all
9 the provisos which impose a one-time obligation have been completely fulfilled and complied

10   with, and only after all the provisos listed in Section 1  which impose a continuing or ongoing

11   obligation shall have begun to be fulfilled, as evidenced by the Planning Commission's approval

12   of a final site plan (which shall be incorporated into this ordinance by reference) and its

13   subsequent recordation.

ADOPTED BY THE COUNCIL OF THE CITY OF NEW ORLEANS <u>FEBRUARY 3, 2011</u>

<u>JACQUELYN B. CLARKSON</u>
VICE PRESIDENT OF COUNCIL

DELIVERED TO THE MAYOR ON <u>FEBRUARY 4, 2011</u>

APPROVED:
<s>DISAPPROVED</s>:   <u>FEBRUARY 9, 2011</u>

<u>MITCHELL J. LANDRIEU</u>
MAYOR

RETURNED BY THE MAYOR ON <u>FEBRUARY 9, 2011</u> AT <u>3:00 P.M.</u>

<u>PEGGY LEWIS</u>
CLERK OF COUNCIL

ROLL CALL VOTE:

YEAS:   Clarkson, Fielkow, Gisleson Palmer, Guidry, Head, Hedge-Morrell, Johnson – 7

NAYS:   0

ABSENT: 0

*G:\DoCS\KIMBERLI\Amended ord\28291.docx*



THE FOREGOING IS CERTIFIED
TO BE A TRUE AND CORRECT COPY

CLERK OF COUNCIL

**Emily R. Hernandez**

| | |
|---|---|
| **From:** | Stephanie Norris <snorris@ghc-arch.com> |
| **Sent:** | Tuesday, June 22, 2021 9:23 AM |
| **To:** | CPCINFO |
| **Subject:** | OJC - Medical Services Building -  Land Use Application Request |
| **Attachments:** | OJC Land Use Request Application.pdf |

**EMAIL FROM EXTERNAL SENDER: DO NOT click links, or open attachments, if sender is unknown, or the message seems suspicious in any way. DO NOT provide your user ID or password. If you believe that this is a phishing attempt, use the reporting tool in your Outlook to send this message to Security.**

Please find our Land Use Request Application attached.

Regards,

**Stephanie Norris** AIA
**Architect**

Grace Hebert Curtis Architects, APAC
Office: 504.522.2050
650 Poydras Street, Suite 1110
New Orleans, LA 70130
ghc-arch.com

## Emily R. Hernandez

| | |
|---|---|
| **From:** | Stephanie Norris <snorris@ghc-arch.com> |
| **Sent:** | Monday, September 13, 2021 9:37 AM |
| **To:** | Stephen K. Kroll |
| **Cc:** | Emily R. Hernandez |
| **Subject:** | RE: Deferred items for the August 24 CPC meeting - registration and resources for applicants |

---

**EMAIL FROM EXTERNAL SENDER: DO NOT click links, or open attachments, if sender is unknown, or the message seems suspicious in any way. DO NOT provide your user ID or password. If you believe that this is a phishing attempt, use the reporting tool in your Outlook to send this message to Security.**

---

Assumed as much.
Thanks

**Stephanie Norris** AIA
**Architect**

Grace Hebert Curtis Architects, APAC
**Office**: 504.522.2050
650 Poydras Street, Suite 1110
New Orleans, LA 70130
ghc-arch.com

**From:** Stephen K. Kroll <skroll@nola.gov>
**Sent:** Monday, September 13, 2021 9:33 AM
**To:** Stephanie Norris <snorris@ghc-arch.com>
**Cc:** Emily R. Hernandez <erhernandez@nola.gov>
**Subject:** Re: Deferred items for the August 24 CPC meeting - registration and resources for applicants

Hi Stephanie,

No, due to the closure of City facilities following the hurricane, our staff review is not complete.  The item is on the agenda for tomorrow's meeting but we are recommending that the Commission defer action until the 9/28 meeting.

Here's the meeting agenda and a staff report for all items to be deferred.

---

**From:** Stephanie Norris <snorris@ghc-arch.com>
**Sent:** Monday, September 13, 2021 8:58 AM
**To:** Stephen K. Kroll <skroll@nola.gov>
**Cc:** Emily R. Hernandez <erhernandez@nola.gov>
**Subject:** RE: Deferred items for the August 24 CPC meeting - registration and resources for applicants

> **EMAIL FROM EXTERNAL SENDER: DO NOT click links, or open attachments, if sender is unknown, or the message seems suspicious in any way. DO NOT provide your user ID or password. If you believe that this is a phishing attempt, use the reporting tool in your Outlook to send this message to Security.**

Good morning, Stephen & Emily –
Were you able to complete the staff review of 2900 Perdido Street (OJC Medical Services Building), Zoning Docket 115/19, and is the CPC meeting still on for September 14?
Thanks,

**Stephanie Norris** AIA
**Architect**

Grace Hebert Curtis Architects, APAC
**Office**: 504.522.2050
650 Poydras Street, Suite 1110
New Orleans, LA 70130
**ghc-arch.com**

**From:** Stephen K. Kroll <skroll@nola.gov>
**Sent:** Tuesday, August 24, 2021 8:26 AM
**To:** Stephanie Norris <snorris@ghc-arch.com>
**Cc:** Emily R. Hernandez <erhernandez@nola.gov>
**Subject:** Fw: Deferred items for the August 24 CPC meeting - registration and resources for applicants

Hi Stephanie, the matter will be deferred at the CPC afternoon to the 9/14 meeting. I thought I'd sent you the below email so I apologize if I didn't. Emily, copied, is preparing our staff report in advance of the 9/14 meeting. Please let either of us know if you have any questions. It's my recollection that public notice signs have been posted on the property, but if not, they'll need to be as soon as possible.

**From:** Stephen K. Kroll <skroll@nola.gov>
**Sent:** Monday, August 23, 2021 10:52 AM
**To:** Stephen K. Kroll <skroll@nola.gov>
**Subject:** Deferred items for the August 24 CPC meeting - registration and resources for applicants

You are receiving this because you are the designated contact person for an application pending before the New Orleans City Planning Commission.

Please note that because of limited staffing, we have been unable to complete the staff review of your item at this point.  Your application will be deferred from the August 24 City Planning Commission meeting to the September 14 City Planning Commission meeting.  Please see the attached document, which notes the deferral intent.  We apologize for any inconvenience this delay causes.

**Even though your item is to be deferred, you're welcome to attend the August 24.  You're not required to attend. Since the matter will be deferred, you may wish to only attend the next meeting on September 14.**

The meeting will be held at 1:30 pm. This meeting will be hosted via Zoom.

Register for the meeting

If you choose to attend, you must register in advance for the Zoom meeting. <u>PLEASE DO NOT SHARE THIS LINK.</u> We will only be allowing the one designated applicant into the Zoom meeting. If you need to change your designated applicant, please let me know.

https://zoom.us/meeting/register/tJEscuGtpzsuHdwMQQP9LG7wnh03j9G4EaoI

**The link to the agenda and staff reports is here**

http://cityofno.granicus.com/GeneratedAgendaViewer.php?view_id=2&event_id=23231

Order of Business

As the designated applicant, you will be allowed a two minute presentation during the "Presentation of Dockets" portion of the hearing. The host of the meeting will recognize you and then un-mute your microphone so that you can present. If there is opposition during the Public Comment period, you will be allowed a two minute rebuttal following the public comment period. The Board may also ask questions of you during the "Presentation of Dockets" or "Consideration of Dockets" portion of the meeting. The order of business of the hearing will be as follows.

The order of business at the hearing shall be as follows:

a. Call to order and roll call, with recording of members present.
b. Approval of Minutes
c. Reading of the Hearing Rules
d. Presentation of Dockets.
     i. Staff Presentation
     **ii. Applicant Presentation**
     iii. Questions from Members
e. Recess for 30 minutes
f. Consideration of dockets
     i. Public Comment
     **ii. Rebuttal by Applicant**

iii. Questions from Members
iv. Voting
g. Adjournment

Presentation by the Applicant or their representative

Only <u>one</u> representative may speak on behalf of a request and must pre-register with the staff of the City Planning Commission. Other representatives or speakers may sign up to provide comments during the public comment portion of the meeting. The applicant shall be allowed a maximum presentation of two (2) minutes.

**Public Comment.**

For other members of your team that would like to comment, they can submit written comments to our staff that will be read into the record at the hearing. Please note that this form will be activated tomorrow prior to the start of the hearing. Comments may be submitted at the form included on the following page:

https://nola.gov/city-planning/announcements/announcements/august-24,-2021-city-planning-commission-public-hearing/

**System Requirements**

Please download Zoom in advance and ensure your device is compatible with the software. Upon entering the meeting, please be sure to test your audio.

See instructions for testing audio: https://support.zoom.us/hc/en-us/articles/201362283-Testing-computer-or-device-audio

You can also use Zoom with an:

iPhone or iPad: https://apps.apple.com/us/app/zoom-cloud-meetings/id546505307

Android device: https://play.google.com/store/apps/details?id=us.zoom.videomeetings&hl=en_US

Stephen Kroll

Planning Administrator | New Orleans City Planning Commission

Office of Business and External Services
1300 Perdido Street, 7th Floor | New Orleans, LA 70112
(504) 658-7010 (office) | skroll@nola.gov

RESOURCES:
Application forms

Property Viewer(check the zoning of a property)
Comprehensive Zoning Ordinance

One Stop App

---

COVID-19:
In an effort to prevent the spread of COVID-19 to our employees and members of the public, our staff is working remotely and will not have any face to face contact with members of the public. Staff is available from 8am to 5pm to assist the public by phone or email.

**Emily R. Hernandez**

| | |
|---|---|
| **From:** | Stephanie Norris <snorris@ghc-arch.com> |
| **Sent:** | Monday, October 4, 2021 10:19 AM |
| **To:** | Emily R. Hernandez |
| **Subject:** | RE: OJC ZD071-21 Request |
| **Attachments:** | 08.006 A100A - Architectural Site Plan.pdf |

**EMAIL FROM EXTERNAL SENDER: DO NOT click links, or open attachments, if sender is unknown, or the message seems suspicious in any way. DO NOT provide your user ID or password. If you believe that this is a phishing attempt, use the reporting tool in your Outlook to send this message to Security.**

I found it on the Architectural Site Plan used for the Phase II jail.  I tried to find a stamped sheet but was unable.  This was a joint venture project, so Sizler might have issued the set.  It should be in the documents for the permit.
I was also considering pointing out Proviso 6, which involved "existing improvements" of the original ordinance:

6.  The applicant shall secure a long-term lease of servitude for existing improver upon the Poydras Street right-of-way, including but not limited to the 12-foot cor wall between South White and South Lopez Streets, and the paved storage yard a South Rendon Street and South Jefferson Davis Parkway.

**Stephanie Norris** AIA
Architect

Grace Hebert Curtis Architects, APAC
Office: 504.522.2050
650 Poydras Street, Suite 1110
New Orleans, LA 70130
ghc-arch.com

**From:** Emily R. Hernandez <erhernandez@nola.gov>
**Sent:** Monday, October 04, 2021 9:44 AM
**To:** Stephanie Norris <snorris@ghc-arch.com>
**Subject:** RE: OJC ZD071-21 Request

Thanks, Stephanie.

As far as permeable open space, be sure to provide it for the entire site (both Lots 1 and 2) since it's one development site.

For the Phase II I-10 side setback, could you send me where you are finding that dimension? It looks like the documents in our 2010 file measure the building setbacks to the concrete wall rather than the property line.

Thank you!

**Emily Ramírez Hernández** (she/her/hers)
Assistant Planning Administrator | New Orleans City Planning Commission
Office of Business and External Services

ZD071/21

1300 Perdido Street, 7th Floor | New Orleans, LA 70112
(504) 658-7011 (office) | (504) 383-5287 (remote) | erhernandez@nola.gov

**Please be advised that all email correspondence is subject to the state's public records laws.**

**RESOURCES:**
Application forms
Property Viewer (check the zoning of a property)
Comprehensive Zoning Ordinance
One Stop App
Frequently Asked Questions

**COVID-19:**
**In an effort to prevent the spread of COVID-19 to our employees and members of the public, our staff is working remotely and will not have any face to face contact with members of the public. Staff is available from 8am to 5pm to assist the public by phone or email. More information about our remote operations can be found at nola.gov/cpc.**

**From:** Stephanie Norris <snorris@ghc-arch.com>
**Sent:** Monday, October 4, 2021 9:36 AM
**To:** Emily R. Hernandez <erhernandez@nola.gov>
**Subject:** RE: OJC ZD071-21 Request

**EMAIL FROM EXTERNAL SENDER: DO NOT click links, or open attachments, if sender is unknown, or the message seems suspicious in any way. DO NOT provide your user ID or password. If you believe that this is a phishing attempt, use the reporting tool in your Outlook to send this message to Security.**

Hey, Emily –
I'm starting to work on the Lot 1 permeable open space and have been considering language for the interior side yard variance.  And, just noticed that the Phase II OJC Jail is has a 3'-4" setback on the I-10 side.  Was going to use that in our request for variance.  From what you're saying, sounds like we're okay.

**Stephanie Norris** AIA
Architect

Grace Hebert Curtis Architects, APAC
Office: 504.522.2050
650 Poydras Street, Suite 1110
New Orleans, LA 70130
ghc-arch.com

**From:** Emily R. Hernandez <erhernandez@nola.gov>
**Sent:** Monday, October 04, 2021 9:26 AM
**To:** Stephanie Norris <snorris@ghc-arch.com>
**Subject:** RE: OJC ZD071-21 Request

Hi, Stephanie.

Actually, hold that thought on the interior side yard variance. I'm reviewing recorded plans for the interior side yard setbacks on the other existing buildings on the site. If any of their interior side yards is less than or equal to that proposed for this building, then it looks like we can consider that a legal nonconforming setback. If you know that information off-hand, please pass it along.

**Emily Ramírez Hernández** (she/her/hers)

ZD071/21

Page 161 of 187

Assistant Planning Administrator | New Orleans City Planning Commission
Office of Business and External Services
1300 Perdido Street, 7th Floor | New Orleans, LA 70112
(504) 658-7011 (office) | (504) 383-5287 (remote) | erhernandez@nola.gov

**Please be advised that all email correspondence is subject to the state's public records laws.**

**RESOURCES:**
Application forms
Property Viewer (check the zoning of a property)
Comprehensive Zoning Ordinance
One Stop App
Frequently Asked Questions

**COVID-19:**
**In an effort to prevent the spread of COVID-19 to our employees and members of the public, our staff is working remotely and will not have any face to face contact with members of the public. Staff is available from 8am to 5pm to assist the public by phone or email. More information about our remote operations can be found at nola.gov/cpc.**

**From:** Stephanie Norris <snorris@ghc-arch.com>
**Sent:** Friday, October 1, 2021 5:15 PM
**To:** Emily R. Hernandez <erhernandez@nola.gov>
**Subject:** RE: OJC ZD071-21 Request

> **EMAIL FROM EXTERNAL SENDER: DO NOT click links, or open attachments, if sender is unknown, or the message seems suspicious in any way. DO NOT provide your user ID or password. If you believe that this is a phishing attempt, use the reporting tool in your Outlook to send this message to Security.**

The good news is … The bad news is ….
Thanks for the heads up.  We'll have to consider and review our options.  Once we decide our approach, I'll revise the letter.
Hope you can wrap up your day and enjoy the weekend!

**Stephanie Norris** AIA
**Architect**

Grace Hebert Curtis Architects, APAC
**Office**: 504.522.2050
650 Poydras Street, Suite 1110
New Orleans, LA 70130
**ghc-arch.com**

**From:** Emily R. Hernandez <erhernandez@nola.gov>
**Sent:** Friday, October 01, 2021 5:03 PM
**To:** Stephanie Norris <snorris@ghc-arch.com>
**Subject:** RE: OJC ZD071-21 Request

Thanks, Stephanie. According to Stephen Kroll, the Assessor's website is incorrect, and both lots are (at least now) under common ownership.

Also, by way of a heads up, the Department of Safety & Permits just a few minutes ago provided me with an interpretation of yards based on the entire site, and it turns out that the request won't need the front yard waiver after all as that is considered a corner side yard. However, the LI District requires a 15 ft. interior side yard setback. The interior side yard for the site is along the I-10 side. With 11'-6" provided, a variance (or plan revision) is necessary. I think

we can use parts of your letter if you choose the variance route; however, this may be more difficult to obtain since you could shave off 3'-6" of the building to become compliant. Please let me know how you all feel about that.

Thanks again (and I'm sorry you had to draft that letter in light of this interpretation)!

**Emily Ramírez Hernández** (she/her/hers)
Assistant Planning Administrator | New Orleans City Planning Commission
Office of Business and External Services
1300 Perdido Street, 7th Floor | New Orleans, LA 70112
(504) 658-7011 (office) | (504) 383-5287 (remote) | erhernandez@nola.gov

**Please be advised that all email correspondence is subject to the state's public records laws.**

RESOURCES:
Application forms
Property Viewer (check the zoning of a property)
Comprehensive Zoning Ordinance
One Stop App
Frequently Asked Questions

**COVID-19:**
**In an effort to prevent the spread of COVID-19 to our employees and members of the public, our staff is working remotely and will not have any face to face contact with members of the public. Staff is available from 8am to 5pm to assist the public by phone or email. More information about our remote operations can be found at nola.gov/cpc.**

**From:** Stephanie Norris <snorris@ghc-arch.com>
**Sent:** Friday, October 1, 2021 4:57 PM
**To:** Emily R. Hernandez <erhernandez@nola.gov>
**Subject:** RE: OJC ZD071-21 Request

---

**EMAIL FROM EXTERNAL SENDER: DO NOT click links, or open attachments, if sender is unknown, or the message seems suspicious in any way. DO NOT provide your user ID or password. If you believe that this is a phishing attempt, use the reporting tool in your Outlook to send this message to Security.**

---

Thanks, Emily –
I think I'm starting to get it.  Yes, looks like the City still owns Lot 2 and the Sheriff's Offices owns Lot 1.
I'll start trying to determine the permeable open space for the area.

**Stephanie Norris** AIA
**Architect**

Grace Hebert Curtis Architects, APAC
Office: 504.522.2050
650 Poydras Street, Suite 1110
New Orleans, LA 70130
ghc-arch.com

**From:** Emily R. Hernandez <erhernandez@nola.gov>
**Sent:** Friday, October 01, 2021 4:51 PM
**To:** Stephanie Norris <snorris@ghc-arch.com>
**Subject:** RE: OJC ZD071-21 Request

Thank you, Stephanie.

1. Correct. The original conditional use required a resubdivision of the petitioned lots into one lot of record. However, the recorded subdivision consolidated into one huge Lot 1 and a smaller Lot 2. I'm looking at our final closeout of the original conditional use, and it references this subdivision that created two lots. I think perhaps there was an ownership issue back then, but in any case it was sufficient to meet that proviso and close the original conditional use. I also attached the recorded declaration of title change noting the creation of Square 600-A with Lots 1 and 2.



2. As far as Property Viewer, the square layer is incorrect (though the description that pops up on the left hand side describes the square correctly as 600-A. What I am requesting is, yes, the percentage of permeable open space for the entire site bounded by Normal C. Francis, Perdido, Broad Street ramp, and I-10. The survey shown above (and attached) shows a total site area of 654,024 square feet so we need the permeable open space percentage of that site.

Let me know if that doesn't answer your questions. Thank you!

**Emily Ramírez Hernández** (she/her/hers)
Assistant Planning Administrator | New Orleans City Planning Commission
Office of Business and External Services
1300 Perdido Street, 7th Floor | New Orleans, LA 70112
(504) 658-7011 (office) | (504) 383-5287 (remote) | erhernandez@nola.gov

Please be advised that all email correspondence is subject to the state's public records laws.

RESOURCES:
Application forms
Property Viewer (check the zoning of a property)
Comprehensive Zoning Ordinance
One Stop App
Frequently Asked Questions

COVID-19:
In an effort to prevent the spread of COVID-19 to our employees and members of the public, our staff is working remotely and will not have any face to face contact with members of the public. Staff is available from 8am to 5pm to assist the public by phone or email. More information about our remote operations can be found at nola.gov/cpc.

**From:** Stephanie Norris <snorris@ghc-arch.com>
**Sent:** Friday, October 1, 2021 4:33 PM

ZD071/21

**To:** Emily R. Hernandez <erhernandez@nola.gov>
**Subject:** RE: OJC ZD071-21 Request

**EMAIL FROM EXTERNAL SENDER: DO NOT click links, or open attachments, if sender is unknown, or the message seems suspicious in any way. DO NOT provide your user ID or password. If you believe that this is a phishing attempt, use the reporting tool in your Outlook to send this message to Security.**

I was just getting ready to send the letter addressing the Approval Standards – please find attached.

Regarding your comments below, could you please clarify.
As to No. 1, I'm getting my Lots and Squares a bit muddled.  The original Conditional Use required the petitioned lots to be resubdivided into one lot of record.  (See Proviso 1 – Ordinance attached.)  I would think this would have had to have happened.
In No. 2, are you asking for the percentage of the entire Square 600-A, from (now) Norman C Francis Parkway to Broad St., as shown on your 2011 Recorded Subdivision?  Or, would it be the Lot 1 and 2 as shown on the City of New Orleans Property Viewer map within the 624A?  Also, would the Property Viewer map be wrong.  [I don't think I have immediate access to information for either and won't be able to provide a quick response.]



**Stephanie Norris** AIA
Architect

Grace Hebert Curtis Architects, APAC
Office: 504.522.2050
650 Poydras Street, Suite 1110
New Orleans, LA 70130
ghc-arch.com

**From:** Emily R. Hernandez <erhernandez@nola.gov>
**Sent:** Friday, October 01, 2021 3:48 PM
**To:** Stephanie Norris <snorris@ghc-arch.com>
**Subject:** RE: OJC ZD071-21 Request

Thank you, Stephanie. I appreciate your quick responses to my questions as they arise. I have two more:

1. I'm comparing the survey we have on file (from the 2011 subdivision required for the original conditional use) with the 2019 one submitted, and there are some discrepancies. Both are attached. I don't see a record of a later subdivision, and our zoning map doesn't show one either. Specifically, our records indicate the square as 600-A (vs. 624A) containing two lots, 1 and 2. It also appears that the proposed building will encroach across property lines—so partially located on Lot 1 and most of Lot 2—rather than just on Lot 2.

2. As the project appears to encroach onto Lot 1 as well, we will need to consider this one development site and ultimately require a subdivision into one lot should this be approved. That said, permeable open space would be calculated based on the full site. Could you please provide that percentage?

Much appreciated!

**Emily Ramírez Hernández** (she/her/hers)
Assistant Planning Administrator | New Orleans City Planning Commission
Office of Business and External Services
1300 Perdido Street, 7th Floor | New Orleans, LA 70112
(504) 658-7011 (office) | (504) 383-5287 (remote) | erhernandez@nola.gov

Please be advised that all email correspondence is subject to the state's public records laws.

RESOURCES:
Application forms
Property Viewer (check the zoning of a property)
Comprehensive Zoning Ordinance
One Stop App
Frequently Asked Questions

COVID-19:
In an effort to prevent the spread of COVID-19 to our employees and members of the public, our staff is working remotely and will not have any face to face contact with members of the public. Staff is available from 8am to 5pm to assist the public by phone or email. More information about our remote operations can be found at nola.gov/cpc.

**From:** Stephanie Norris <snorris@ghc-arch.com>
**Sent:** Thursday, September 30, 2021 5:04 PM
**To:** Emily R. Hernandez <erhernandez@nola.gov>
**Subject:** RE: OJC ZD071-21 Request

EMAIL FROM EXTERNAL SENDER: DO NOT click links, or open attachments, if sender is unknown, or the message seems suspicious in any way. DO NOT provide your user ID or password. If you believe that this is a phishing attempt, use the reporting tool in your Outlook to send this message to Security.

Hey, Emily –
Regarding cells:  I believe the total would be counted as 62 cells.  (We have 56 cells with beds plus 6 cells that are either 'Padded' or 'Calming' cells for use by the population in the 56 cells.)  I don't believe anything else would qualify as a cell.
Regarding Loading spaces:  We don't have an actual Loading Dock but we do have an area for dumpsters and an ambulance arrival/pick-up spot.



**Stephanie Norris** AIA
Architect

Grace Hebert Curtis Architects, APAC
Office: 504.522.2050
650 Poydras Street, Suite 1110
New Orleans, LA 70130
ghc-arch.com

**From:** Emily R. Hernandez <erhernandez@nola.gov>
**Sent:** Thursday, September 30, 2021 4:13 PM
**To:** Stephanie Norris <snorris@ghc-arch.com>
**Subject:** RE: OJC ZD071-21 Request

Thanks, Stephanie. I will stay tuned for the letter. Two quick questions:

☐ How many cells are proposed for this facility? The parking requirement is one space per 20 cells so I am working to determine compliance as the floor plans provided for the NPP don't show this level of detail.
☐ Are there any proposed loading spaces for this site?

**Emily Ramírez Hernández** (she/her/hers)
Assistant Planning Administrator | New Orleans City Planning Commission
Office of Business and External Services
1300 Perdido Street, 7th Floor | New Orleans, LA 70112
(504) 658-7011 (office) | (504) 383-5287 (remote) | erhernandez@nola.gov

**Please be advised that all email correspondence is subject to the state's public records laws.**

**RESOURCES:**
Application forms
Property Viewer (check the zoning of a property)
Comprehensive Zoning Ordinance
One Stop App
Frequently Asked Questions

**COVID-19:**
**In an effort to prevent the spread of COVID-19 to our employees and members of the public, our staff is working remotely and will not have any face to face contact with members of the public. Staff is available from 8am to 5pm to assist the public by phone or email. More information about our remote operations can be found at nola.gov/cpc.**

**From:** Stephanie Norris <snorris@ghc-arch.com>
**Sent:** Wednesday, September 29, 2021 1:53 PM
**To:** Emily R. Hernandez <erhernandez@nola.gov>
**Subject:** RE: OJC ZD071-21 Request

**EMAIL FROM EXTERNAL SENDER: DO NOT click links, or open attachments, if sender is unknown, or the message seems suspicious in any way. DO NOT provide your user ID or password. If you believe that this is a phishing attempt, use the reporting tool in your Outlook to send this message to Security.**

Good afternoon, Emily –
Please find the attached drawings revised per comments below.
I was able to find an old survey with the Templeman 2 Building that was demolished before the current new Jail was constructed.  I added a few dimensions.  The Site Plan and the Elevations have been revised.
Hopefully, this will provide the information needed to allow you to complete your report.  I intend to submit the recommended letter and will try and get that to you Friday (a project deadline looms).
Thank you for your help.

**Stephanie Norris** AIA
**Architect**

Grace Hebert Curtis Architects, APAC
**Office**: 504.522.2050
650 Poydras Street, Suite 1110
New Orleans, LA 70130
**ghc-arch.com**

**From:** Emily R. Hernandez <erhernandez@nola.gov>
**Sent:** Tuesday, September 28, 2021 6:03 PM
**To:** Stephanie Norris <snorris@ghc-arch.com>
**Subject:** OJC ZD071-21 Request

Good evening, Stephanie.

I am working on the staff report for Phase III (ZD071-21) and have a few questions/requests:

☐   What was the front setback of the prior structure? Could you share a survey or other document verifying this?
☐   Please revise the site plan to include:
    ○   Proposed front yard setback (narrowest dimension from the front lot line to the principal structure building wall). Note we need the exact dimension. I see the NPP invitation references 55 feet ("set back at least 55 feet…") so if you could indicate the dimension on the site plan that would be great.
    ○   Proposed side yard setbacks to lot lines

ZD071/21                                                                    Page 168 of 187

- o Proposed rear setback to lot line
- o Permeable open space (location and total)
- ☐ Please revise the architectural elevations to indicate building height
- ☐ I recommend you submit a letter addressing the nine approval standards for the variance request:
  http://czo.nola.gov/Article-4#4-6-F

Please submit this information as soon as possible so I can complete my report. Apologies about the quick turnaround time. Thank you!

**Emily Ramírez Hernández** (she/her/hers)
Assistant Planning Administrator | New Orleans City Planning Commission
Office of Business and External Services
1300 Perdido Street, 7th Floor | New Orleans, LA 70112
(504) 658-7011 (office) | (504) 383-5287 (remote) | erhernandez@nola.gov

**Please be advised that all email correspondence is subject to the state's public records laws.**

**RESOURCES:**
Application forms
Property Viewer (check the zoning of a property)
Comprehensive Zoning Ordinance
One Stop App
Frequently Asked Questions

**COVID-19:**
**In an effort to prevent the spread of COVID-19 to our employees and members of the public, our staff is working remotely and will not have any face to face contact with members of the public. Staff is available from 8am to 5pm to assist the public by phone or email. More information about our remote operations can be found at nola.gov/cpc.**



FIRST DISTRICT
SQUARE 624
NEW ORLEANS, LA

VICINITY MAP
(N.T.S.)

GRAPHIC SCALE

Boundary & Topographic Survey of a OJC Medical
Services Building made for Grace Hebert Curtis
Architects

New Orleans, La. December 19, 2019



GRACE HEBERT CURTIS

October 1, 2021

City Planning Commission
1300 Perdido St., Ste. #7
New Orleans, LA  70112

RE:     OJC Medical Services Building
        City of New Orleans
        2900 Perdido Street
        New Orleans, Louisiana
        Conditional Use & Variance Request

Dear City Planning Commission,

As an agent for the City of New Orleans, we are applying for an amendment to an existing
conditional use ordinance and a setback variance for the construction of the OJC Medical
Services Building.  The proposed building is a 2-story, 80,500 square foot facility housing
male and female acute mental health housing units and includes a medical clinic, infirmary,
laundry, administration and visitation components.

The site location is in a LI, Light Industrial District.  In 2011, an ordinance for a conditional
use permit was required and approved for the construction of the Inmate Process Center and
Housing Units building.  A Proviso in that ordinance requires an amendment for any addition
of future properties.

We are also seeking a variance from the provisions of Article 16, Section 16.3.A.2 requiring a
front yard setback not to exceed twenty (20) feet.

We believe the owner's request for the conditional use and variance meets with all parts of
the Article 4, Section 4.6.F Approval Standards.

1.  *Special conditions and circumstances exist that are peculiar to the land or structure
    involved and are not generally applicable to other lands or structure in the same
    zoning district.*
    a.  The building location would be in the existing, security-walled area between
        the Inmate Process Center and Housing Units building and the Kitchen-
        Warehouse-Central Plant building that services the IPC.
    b.  The building would improve the Perdido Street facade by opening a section
        of the security wall and creating a plaza entrance to the facility.
2.  *Literal interpretation of the provision of this ordinance would deprive the applicant of
    rights commonly enjoyed by other properties in the same district under the terms of
    this Ordinance.*
    a.  As this would be part of the existing prison complex, these rights have been
        previously granted.
3.  *The special conditions and circumstances do not result from the action of the
    applicant or any other person who may have had an interest in the property.*
    a.  Any conditions and circumstances are inherent to the existing property. The
        setback variance request is a result of utility pipes that run from the Kitchen-

Warehouse-Central Plant to the IPC building.  The location of the utility pipes requires the building setback in excess of twenty (20) feet.

4.  *Granting the variance request will not confer on the applicant any special privilege which is denied by this Ordinance to other lands or structures in the same district or similarly situated area.*
    a.  Granting the requests will not confer any special privilege denied by this Ordinance to other lands or structures. This is a uniquely situated area.
5.  *The variance, if granted, will not alter the essential character of the locality.*
    a.  Contained within the existing complex, the proposed building will not alter the existing character of the locality.
6.  *Strict adherence to the regulations by the property would result in a demonstrable hardship upon the owner, as distinguished from mere inconvenience.*
    a.  The location of the existing utility pipes is the basis for the setback variance request.  The utility pipes are essential infrastructure serving the existing IPC facility.
7.  *The request for the variance is not based primarily upon a desire to serve the convenience or profit of the property owner or other interested party(s).*
    a.  The request for the variance is based on the existing conditions.
8.  *The granting of the variance will not be detrimental to the public welfare or injurious to other property or improvements in the neighborhood on which the property is located.*
    a.  The granting of the variance will not be detrimental to the public welfare or injurious to other property or improvements in the neighborhood.  As mentioned, the changes to the Perdido Street entrance improves the interface with the neighborhood and the public.
9.  *The property variance will not impair an adequate supply of light and air to adjacent property, substantially increase the congestion in the public street, increase the danger of fire, or endanger the public safety.*
    a.  The new facility would not impair the adequate supply of light and air to adjacent property, substantially increase congestion in the public street, nor increase the danger of fire or endangerment to public safety.

Respectfully submitted,

Stephanie Norris, AIA
snorris@ghc-arch.com
Grace Hebert Curtis Architects, APAC

ORDINANCE
(AS AMENDED)
CITY OF NEW ORLEANS
CITY HALL:  January 6, 2011
CALENDAR NO. 28,291
NO. 24282 MAYOR COUNCIL SERIES
BY:  COUNCILMEMBER HEAD (BY REQUEST)
AN ORDINANCE to provide for the establishment of a conditional use to permit a prison and
related uses in an HI Heavy Industrial District, on Square 600, all Lots (excluding Lots 28
through 31), Square 615, all lots, Square 624, all lots, Square 624-A, all lots, Square 666, all lots,
and Square 675, all lots, in the First Municipal District, bounded by Interstate Highway 10,
South Broad Street, Perdido Street, and South Jefferson Davis Parkway; and the rescission of
Conditional Use Ordinances 10,428 M.C.S., 14,505 M.C.S., 14,648 M.C.S., 14,762 M.C.S.,
17,274 M.C.S., and 20,101 M.C.S. (Multiple Municipal Addresses); and otherwise to provide
with respect thereto.
WHEREAS, Zoning Docket Number 30/10 was initiated by City of New Orleans, Criminal
Sheriff of Parish of Orleans and Law Enforcement District of the Parish of Orleans and referred
to the City Planning Commission; and
WHEREAS, the City Planning Commission held a public hearing on this zoning petition and
recommended approval, in its report to the City Council dated April 29, 2010 of the conditional
use and the rescission of Conditional Use Ordinances 10,428 M.C.S., 14,505 M.C.S., 14,648
M.C.S., 14,762 M.C.S., 17,274 M.C.S., and 20,101 M.C.S. presented in Zoning Docket Number
30/10; and
WHEREAS, the recommendation of the City Planning Commission was upheld and the changes
were deemed necessary and in the best interest of the City of New Orleans and were granted
approval, subject to subject to one (1) waiver and twenty-four (24) provisos, in Motion Number
M-10-295 of the Council of the City of New Orleans on July 1, 2010; and
WHEREAS, the Criminal Justice Working Group, established by Executive Order 10-06, has
recommended taking the following preliminary actions in an ongoing process to determine the
appropriate size of the entire Orleans Parish jail facility.

SECTION 1. THE COUNCIL OF THE CITY OF NEW ORLEANS HEREBY ORDAINS that conditional use Ordinance Numbers 10,428 M.C.S., 14,505 M.C.S., 14,648 M.C.S., 14,762 M.C.S., 17,274 M.C.S., and 20,101 M.C.S. are hereby rescinded.

SECTION 2. THE COUNCIL OF THE CITY OF NEW ORLEANS HEREBY ORDAINS that a conditional use to permit a prison and related uses in an HI Heavy Industrial District, on Square 600, all Lots (excluding Lots 28 through 31), Square 615, all lots, Square 624, all lots, Square 624-A, all lots, Square 666, all lots, and Square 675, all lots, in the First Municipal District, bounded by Interstate Highway 10, South Broad Street, Perdido Street, and South Jefferson Davis Parkway (Multiple Municipal Addresses); is hereby authorized and approved, subject to the following waiver and provisos, as specifically set forth herein:

WAIVER:

1.  The applicant shall be granted a waiver of Article 15, Section 15.2.1. Off-Street Parking Regulations for All Districts, Except the CBD Districts and the Vieux Carré Districts of the Comprehensive Zoning Ordinance, which requires the provision of two hundred six (206) off-street parking spaces, to permit the provision of zero (0) off-street parking spaces, subject to the requirements indicated in the related condition (see proviso 20) pertaining to the future provision of off-street parking on the site.

PROVISOS:

No person shall use any of the properties described herein or permit another to use any of those properties described herein for the use authorized by this ordinance, unless the following requirements are met and continue to be met:

1.  The applicant shall resubdivide the petitioned lots into one lot of record.

2.  The applicant shall submit revised site plans demonstrating that no permanent structure encroaches upon the Poydras Street right-of-way, absent an agreement from the City.

3.  The surface parking lot shall be enclosed with perimeter fencing – such as a low masonry chain wall with half metal picket fence above – in order to create a street edge along Perdido Street and the curvilinear South Broad Street/Poydras Service Drive.

4.  The applicant shall alter the sallyport window openings at street-level on Perdido Street so that the scale appears larger, as long as security is not compromised.

5.  In order for the applicant to add additional properties and to add the Templeman I and II facility, the applicant shall be required to amend this Conditional Use ordinance through the City Planning Commission, with Council approval, in accordance with the full Conditional Use process.

6.  The applicant shall secure a long-term lease of servitude for existing improvements made upon the Poydras Street right-of-way, including but not limited to the 12-foot concrete security wall between South White and South Lopez Streets, and the paved storage yard area between South Rendon Street and South Jefferson Davis Parkway.

7.  The applicant shall include a note on amended site plans stating that all temporary inmate housing, including tent city, but excluding current 400 bed modular units under construction, will be removed and/or closed upon completion of the 1,438 bed facility at the Templeman III & IV site.

a.  The applicant shall ensure that upon completion, the 1,438 bed facility at the Templeman III & IV site is designed to accomodate any type of prisoner under any jurisdiction. This includes, but is not limited to, state and federal prisoners, inmates that need substance abuse and mental health treatment (except inmates that require acute mental health treatment), female inmates, and

prisoners participating in a re-entry program and that the facility is able to provide a variety of programming aimed at reducing recidivism including, but not limited to, medical care, educational services, including GED preparation, vocational and job training.

b.  The applicant shall decommission or demolish the following Orleans Parish Prison facilities upon completion of the 1,438 bed facility at the Templeman III & IV site, unless other appropriate action is taken by the Mayor and/or City Council that is consistent with their authority – House of Detention, Community Correctional Center, Conchetta, Broad Street, South White Street, Templeman V, and the original Temporary Housing Units (Tents). Orleans Parish Prison (OPP) shall only be used as a holding facility to transfer inmates to and from court.

c.  The 400-bed modular units currently being constructed shall be decommissioned or demolished no later than eighteen (18) months from the date of issuance of a certificate of use and occupancy for the new Templeman III & IV facility.

8.  The applicant shall remove all obstructions to automotive and pedestrian traffic, and restore the public right-of-way on Perdido and South White Streets prior to receiving a certificate of use and occupancy for the new Templeman III & IV facility from the Department of Safety and Permits. This proviso may be amended upon written recommendation by the Mayor after meeting with stakeholders and experts.

9.  The applicant shall submit a phasing plan for the wall(s) and secure perimeters illustrating materials and assembly. Said wall shall be opaque, twelve (12) feet in height and match the dimensions and style of the existing wall currently installed along the Perdido Street side.

10.  The applicant shall secure approval of revised site plans by the Fire Marshall and abide by applicable fire code.

11.  The applicant shall submit detailed landscape plans prepared by a licensed Louisiana landscape architect indicating the items listed below. The landscape plan shall be subject to final approval by City Planning Commission staff and by the Department of Parks and Parkways for any proposed planting within a public right-of-way.

a.  Landscaping improvements within the proposed parking lot, on islands, medians and along perimeter ground not improved with asphalt paving.

b.  Shade-plantings along the Perdido Street side of the Intake and Processing Center sallyport, between the building and the sidewalk as space permits, providing a planting bed of not less than two (2) feet.

c.  The genus, species, size, location, quantity and irrigation of all proposed plant materials within both the common areas and the street rights-of-way within the site, with applicable remarks and details.

d.  There shall be aesthetic landscaping, subject to the approval of the Department of Parks and Parkways, along Broad Street between the overpass and the security gate.

12.  The applicant shall submit a revised site plan showing additional green space of a sizable concentration within the Correctional Complex that can be used as an outdoor recreation area for inmates, to the extent possible.

13.  The applicant shall either modify the location of dumpster berths or provide visual screening as part of the site design so that the Trash Dock at the rear of the Kitchen/Warehouse/Plant will not be visible from the public right-of-way.

14.  The applicant shall provide to the City Planning Commission a litter abatement program letter, inclusive of the stated location of litter storage, the type and quantity of trash receptacles, the frequency of litter pickup by the Department of Sanitation or a contracted trash removal company, and the clearing of all litter from the sidewalks and street rights-of-way. The name and

phone number of the owner/operator of the development shall be included in this letter to be kept on file in case of any violation.

15.  The applicant shall submit a detailed signage plan indicating:

a.  The location, text and dimension of all signs posted around the perimeter of the petitioned site or which are visible to the public.

b.  Which signs will be illuminated and specifications for said signs.

16.  The applicant shall submit a lighting plan for the petitioned site for review and approval by the staff of the City Planning Commission and the Department of Public Works.

17.  All proposed curb cuts shall require the approval of the Department of Public   Works.  All curbs and sidewalks along the Perdido Street frontage shall be replaced and any existing and unused curb cuts along either street frontage shall be restored.  Approval of plans for such reconstruction shall be secured from the Department of Public Works.

18.  The Sheriff's department shall restrict loading dock activity at night, so that no truck deliveries or trash collection occurs between the hours of 10:00 p.m. and 6:00 a.m.

19.  The applicant shall secure the approval of the Department of Public Works for the following:

a.  the location and construction of all proposed curb cuts and the restoration of any existing curb cuts that are not to be utilized as part of the development;

b.  the replacement or restoration of all sidewalks adjacent to and across a street from the site as deemed necessary;

c.  the installation of vertical curbs along all street frontages adjacent to the site;

d.  the installation of all subsurface drainage for the proposed development; and

e.  a traffic impact analysis for the proposed development, including any mitigation measures deemed necessary should significant adverse impact to the transportation system be determined by the Department of Public Works to be likely to occur as a result of the proposed development.

20.  Upon the issuance of a certificate of use and occupancy by the City of New Orleans for the new Inmate Process Center and Housing Units building, the applicant shall demolish the eight existing tent prison structures within six months, and shall restore the existing off-street parking lot upon which they are located to use as one hundred forty-seven (147) parking spaces.

21.  The applicant shall work with the Sewerage and Water Board as necessary for the retention or relocation of any sewer or water lines affected by the proposed     development.

22.  The Mayor may provide a written recommendation to the City Council after convening meetings with stakeholders and experts.

SECTION 3.  Whoever does anything prohibited by this Ordinance or fails to do anything required to be done by this Ordinance shall be guilty of a misdemeanor and upon conviction shall be subject to a fine or to imprisonment or both, such fine and/or imprisonment set by Section 1-13 of the 1995 Code of the City of New Orleans, or should alternatively be subject to whatever civil liabilities, penalties or remedies the law may prescribe. Conviction shall be cause for the immediate cancellation of the Use and Occupancy permit of the premises.

SECTION 4. This ordinance shall have the legal force and effect of authorizing this conditional use only after all the provisos listed in Section 1 of this Ordinance which impose a one-time obligation have been completely fulfilled and complied with, and only after all the provisos listed in Section 1 which impose a continuing or on-going obligation shall have begun to be fulfilled, as evidenced by the Planning Commission's approval of a final site plan, on or before one year from the date of adoption of this ordinance, (which shall be incorporated into this ordinance by reference) and its subsequent recordation, and no use or occupancy certificates or

permits (other than the building permits needed to fulfill the provisos) shall be issued until all the provisos which impose a one-time obligation have been completely fulfilled and complied with, and only after all the provisos listed in Section 1  which impose a continuing or ongoing obligation shall have begun to be fulfilled, as evidenced by the Planning Commission's approval of a final site plan (which shall be incorporated into this ordinance by reference) and its subsequent recordation.

ADOPTED BY THE COUNCIL OF THE CITY OF NEW ORLEANS FEBRUARY 3, 2011
JACQUELYN B. CLARKSON
VICE PRESIDENT OF COUNCIL
DELIVERED TO THE MAYOR ON FEBRUARY 4, 2011
APPROVED:  FEBRUARY 9, 2011
MITCHELL J. LANDRIEU
MAYOR
RETURNED BY THE MAYOR ON FEBRUARY 9, 2011 AT 3:00 P.M.
PEGGY LEWIS
CLERK OF COUNCIL
ROLL CALL VOTE:
YEAS:  Clarkson, Fielkow, Gisleson Palmer, Guidry, Head, Hedge-Morrell, Johnson – 7
NAYS:  0
ABSENT:  0

## Emily R. Hernandez

| | |
|---|---|
| **From:** | Emily R. Hernandez |
| **Sent:** | Friday, October 1, 2021 4:25 PM |
| **To:** | Nicholas J. Kindel |
| **Subject:** | RE: Orleans Justice Center Front Yard Question |

Thanks, Nick. It does. And that tells me that their proposed 55ish ft. corner side yard meets the minimum 10 ft. requirement for that district so no waiver is necessary.

Thanks again for your quick response. Enjoy your weekend!

**Emily Ramírez Hernández** (she/her/hers)
Assistant Planning Administrator | New Orleans City Planning Commission
Office of Business and External Services
1300 Perdido Street, 7th Floor | New Orleans, LA 70112
(504) 658-7011 (office) | (504) 383-5287 (remote) | erhernandez@nola.gov

**Please be advised that all email correspondence is subject to the state's public records laws.**

**RESOURCES:**
Application forms
Property Viewer (check the zoning of a property)
Comprehensive Zoning Ordinance
One Stop App
Frequently Asked Questions

**COVID-19:**
**In an effort to prevent the spread of COVID-19 to our employees and members of the public, our staff is working remotely and will not have any face to face contact with members of the public. Staff is available from 8am to 5pm to assist the public by phone or email. More information about our remote operations can be found at nola.gov/cpc.**

**From:** Nicholas J. Kindel <njkindel@nola.gov>
**Sent:** Friday, October 1, 2021 4:22 PM
**To:** Emily R. Hernandez <erhernandez@nola.gov>
**Subject:** RE: Orleans Justice Center Front Yard Question

Yes, you have the setbacks correct. (I think that we said that we would not treat ROWs like highway as front or corner side yards, so then I-10 would be an interior side yard.)

I cannot remember how the yards were defined in the old Ordinance, so they might have been all front yard back then. Since this is a new CZO, I think that it is fine that the yards have changed from 2010 to now.

Does that answer your question? If not, I can give you a call. Thanks

nick

Nick Kindel
Zoning Administrator
Department of Safety and Permits
Office of Business and External Services | City of New Orleans
1300 Perdido Street | 7th Floor | New Orleans, LA 70112

ZD071/21                                                                                                    Page 179 of 187

(504) 658-7200 Office | (504) 658-7125 Zoning | (504) 915-6489 Cell | njkindel@nola.gov

Find your property's zoning on the Property Viewer: https://property.nola.gov/
Look up the Comprehensive Zoning Ordinance at https://czo.nola.gov/home/
Apply for or check the status of a permit or license at https://onestopapp.nola.gov/

Please note that email communications are subject to Louisiana Public Records Law in accordance with La RS 44:1, et seq.

**From:** Emily R. Hernandez <erhernandez@nola.gov>
**Sent:** Friday, October 1, 2021 4:08 PM
**To:** Nicholas J. Kindel <njkindel@nola.gov>
**Subject:** Orleans Justice Center Front Yard Question

Hi, Nick.

I'm going to give you a call after sending this email (sorry—I know it's Friday afternoon). I am working on my staff report for the Orleans Justice Center CU amendment, and they are requesting a variance for front yard setback. However, the recorded survey we have on file (and what's indicated in Property Viewer) makes me think they won't need this variance because that side of the site might be a corner side yard. The site is zoned LI by the way: http://czo.nola.gov/Article-16#16-3-A-1

The attached 2011 Recorded Subdivision shows Square 600-A, which is comprised of Lots 1 and 2. The proposed development would be located on a portion of both Lots 1 and 2 (so we could recommend—and I guess you all would require—a subdivision into one lot). The proposed site plan for this facility is included in the second attachment on page 2.

That said, to me it seems that the front yards of the entire OJC site would be considered Jefferson Davis (or Norman C. Francis these days) and the Broad Street ramp frontages, per the survey. Perdido would be a corner side yard, and the Poydras/I-10 side would be an interior side. However, the original staff report from 2010 describes all frontages as front yards. Could you let me know how you would look at this as well as whether the front yard variance request is moot?

Thank you!

**Emily Ramírez Hernández** (she/her/hers)
Assistant Planning Administrator | New Orleans City Planning Commission
Office of Business and External Services
1300 Perdido Street, 7th Floor | New Orleans, LA 70112
(504) 658-7011 (office) | (504) 383-5287 (remote) | erhernandez@nola.gov

**Please be advised that all email correspondence is subject to the state's public records laws.**

RESOURCES:
Application forms
Property Viewer (check the zoning of a property)
Comprehensive Zoning Ordinance
One Stop App
Frequently Asked Questions

**COVID-19:**
**In an effort to prevent the spread of COVID-19 to our employees and members of the public, our staff is working remotely and will not have any face to face contact with members of the public. Staff is available from 8am to 5pm to assist the public by phone or email. More information about our remote operations can be found at nola.gov/cpc.**

| | |
|---|---|
| **From:** | Stephanie Norris <snorris@ghc-arch.com> |
| **Sent:** | Wednesday, October 6, 2021 6:20 PM |
| **To:** | Emily R. Hernandez |
| **Subject:** | RE: October 12 CPC Meeting: ZD071/21 Staff Report [ACTION REQUIRED] |
| **Attachments:** | Letter_LandUseApp_2021.10.06.pdf |

**EMAIL FROM EXTERNAL SENDER: DO NOT click links, or open attachments, if sender is unknown, or the message seems suspicious in any way. DO NOT provide your user ID or password. If you believe that this is a phishing attempt, use the reporting tool in your Outlook to send this message to Security.**

Emily –
Thank you for the explanation on the separate lots.
I've attached a letter addressing the request for variance.
Also, please note that I will act as the authorized representative:

> Stephanie Norris
> snorris@ghc-arch.com
> O:  504.522.2050

I am out of the office Thursday-Monday.  I will be traveling on both those days but will check email at some point during that time.  During that time, please don't hesitate to call my cell phone:
504.251.8079
Thank you for your help,

**Stephanie Norris** AIA
Architect

Grace Hebert Curtis Architects, APAC
Office: 504.522.2050
650 Poydras Street, Suite 1110
New Orleans, LA 70130
ghc-arch.com

**From:** Emily R. Hernandez <erhernandez@nola.gov>
**Sent:** Wednesday, October 06, 2021 4:36 PM
**To:** Stephanie Norris <snorris@ghc-arch.com>
**Subject:** RE: October 12 CPC Meeting: ZD071/21 Staff Report [ACTION REQUIRED]

Hi, Stephanie.

1. Both of these are still accurate according to our records. Stephen has indeed noted that they are under common ownership by the City; but they are also two separate lots.
2. As far as the permeable open space issue, the best course of action is for you to write a letter addressing the approval standards for variances as they relate to the permeable open space issue and present that (or at least the gist of that) during the meeting. Please include the full site area, the proposed permeable open space square footage, and the percentage so we know the exact % of waiver you are requesting. You can email me the letter when it is ready so we can

include it in the transmittal to City Council following Tuesday's meeting. I will prepare an oral presentation with a recommendation on this for Tuesday.

**Emily Ramírez Hernández** (she/her/hers)
Assistant Planning Administrator | New Orleans City Planning Commission
Office of Business and External Services
1300 Perdido Street, 7th Floor | New Orleans, LA 70112
(504) 658-7011 (office) | (504) 383-5287 (remote) | erhernandez@nola.gov

Please be advised that all email correspondence is subject to the state's public records laws.

RESOURCES:
Application forms
Property Viewer (check the zoning of a property)
Comprehensive Zoning Ordinance
One Stop App
Frequently Asked Questions

COVID-19:
In an effort to prevent the spread of COVID-19 to our employees and members of the public, our staff is working remotely and will not have any face to face contact with members of the public. Staff is available from 8am to 5pm to assist the public by phone or email. More information about our remote operations can be found at nola.gov/cpc.

**From:** Stephanie Norris <snorris@ghc-arch.com>
**Sent:** Wednesday, October 6, 2021 3:39 PM
**To:** Emily R. Hernandez <erhernandez@nola.gov>
**Subject:** RE: October 12 CPC Meeting: ZD071/21 Staff Report [ACTION REQUIRED]

> EMAIL FROM EXTERNAL SENDER: DO NOT click links, or open attachments, if sender is unknown, or the message seems suspicious in any way. DO NOT provide your user ID or password. If you believe that this is a phishing attempt, use the reporting tool in your Outlook to send this message to Security.

Emily –
I have reviewed the Staff Report and have a few questions:

1. It is noted, under Proposed Conditions / Site Conditions that the Phase III facility would sit on a portion of Lots 1 and 2.  You mentioned on Friday that, according to Stephen Kroll, the Assessor's website is incorrect, and both lots are (at least now) under common ownership.  Is that no longer the case?

2. It looks like we will have a problem achieving 20% permeable open space for the entire lot.  Do we need to amend to seek a variance?

Thanks,

**Stephanie Norris** AIA
**Architect**

Grace Hebert Curtis Architects, APAC

**Office**: 504.522.2050
650 Poydras Street, Suite 1110
New Orleans, LA 70130
ghc-arch.com

**From:** Emily R. Hernandez <erhernandez@nola.gov>
**Sent:** Wednesday, October 06, 2021 10:31 AM
**To:** Vincent A. Smith <viasmith@nola.gov>; Stephanie Norris <snorris@ghc-arch.com>
**Subject:** October 12 CPC Meeting: ZD071/21 Staff Report [ACTION REQUIRED]

Good morning,

I hope this email finds you well. We are moving forward with a *virtual* City Planning Commission meeting on Tuesday, October 12 at 1:30 pm. **Please do *not* come to City Hall.**

Please review the staff report before Monday's hearing, and feel free to contact me if you have any questions about the recommendation. The staff report can be found at the following link: http://cityofno.granicus.com/GeneratedAgendaViewer.php?view_id=2&event_id=23243

Your application is ZD071/21. It is the second item on Tuesday's agenda (following approval of the minutes).

> **Meeting details are below:**
>
> **Date:** Tuesday, October 12
> **Time:** 1:30 pm
> **Location:** Zoom (designated representative only)
> **Link to live stream:**
> - Granicus: http://cityofno.granicus.com/ViewPublisher.php?view_id=2
> - Youtube: https://www.youtube.com/channel/UCoE99Rj_b4gJiO3KnZjctjg/featured

Additionally, please note the below logistics, including one (1) action item:

☐ **Incoming Zoom link**
   o Please designate one authorized representative who should be prepared to present the request to the Commission and respond to questions during the meeting as needed. **Please reply with the representative's full name, email address, and phone number no later than 12:00 pm Friday, October 8.** Other representatives or members of the public will have the opportunity to provide written comment during the meeting through an online form, but we would like to have one designated individual for the purposes of the meeting.
   o This representative speaker should be on the lookout for an email with the Zoom link approximately 24 hours prior to the meeting.
      ▪ Note that the link **should not be shared** with anyone else. It is reserved for Commissioners, staff, and one representative speaker per item. Unauthorized users will not be permitted access to the Zoom meeting and should instead watch via the livestream:

http://cityofno.granicus.com/ViewPublisher.php?view_id=2 or
https://www.youtube.com/channel/UCoE99Rj_b4gJiO3KnZjctjg/featured

☐ **Digital speaker card**
  ○ The Commission will not be accepting *spoken* public comments during the meeting. Instead, comments should be submitted using the digital speaker card form. You may wish to share this with others on your team who would like to provide comments during the public comment portion of the meeting. The designated representative should not fill out a digital speaker card since they will be allowed to speak on their item during the Presentation of Dockets.
    ▪ Digital speaker cards will be accepted from the start of the meeting until the close of the 30-minute recess. The link will be posted here: https://nola.gov/city-planning/announcements/

Please let me know if you have any questions, and I will stay tuned for confirmation of the designated representative.

**Emily Ramírez Hernández** (she/her/hers)
Assistant Planning Administrator | New Orleans City Planning Commission
Office of Business and External Services
1300 Perdido Street, 7th Floor | New Orleans, LA 70112
(504) 658-7011 (office) | (504) 383-5287 (remote) | erhernandez@nola.gov

Please be advised that all email correspondence is subject to the state's public records laws.

RESOURCES:
Application forms
Property Viewer (check the zoning of a property)
Comprehensive Zoning Ordinance
One Stop App
Frequently Asked Questions

COVID-19:
In an effort to prevent the spread of COVID-19 to our employees and members of the public, our staff is working remotely and will not have any face to face contact with members of the public. Staff is available from 8am to 5pm to assist the public by phone or email. More information about our remote operations can be found at nola.gov/cpc.



GRACE HEBERT CURTIS

October 6, 2021

City Planning Commission
1300 Perdido St., Ste. #7
New Orleans, LA  70112

RE:    OJC Medical Services Building
       City of New Orleans
       2900 Perdido Street
       New Orleans, Louisiana
       Conditional Use & Variance Request

Dear City Planning Commission,

As an agent for the City of New Orleans, we are applying for an amendment to an existing conditional use ordinance and a permeable open space variance for the construction of the OJC Medical Services Building.  The proposed building is a 2-story, 80,500 square foot facility housing male and female acute mental health housing units and includes a medical clinic, infirmary, laundry, administration and visitation components.

The site location is in a LI, Light Industrial District.  In 2011, an ordinance for a conditional use permit was required and approved for the construction of the Inmate Process Center and Housing Units building.  A Proviso in that ordinance requires an amendment for any addition of future properties.

We are also seeking a variance from the provisions of Article 16, Table 16-2: Bulk & Yard Regulations for the Minimum Permeable Open Space.

We believe the owner's request for the conditional use and variance meets with all parts of the Article 4, Section 4.6.F Approval Standards.

1.  *Special conditions and circumstances exist that are peculiar to the land or structure involved and are not generally applicable to other lands or structure in the same zoning district.*
    a.  The projects approved under the previous Conditional Use Ordinance required re-subdividing the petitioned lots into one lot of record.  Per the prior Comprehensive Zoning Ordinance, the New Orleans Justice Center buildings, zoned as HI Heavy Industrial, did not require a percentage of permeable open space.  The total site area is now 654,024 square feet.  Current zoning for the LI Light Industrial District requires 20% permeable open space or 130,805 square feet.  Based on the proposed building, a permeable open space of 113,573 sf, or 17.3%, is achieved for the entire lot.
2.  *Literal interpretation of the provision of this ordinance would deprive the applicant of rights commonly enjoyed by other properties in the same district under the terms of this Ordinance.*
    a.  As the change in zoning occurred after many of the buildings were constructed, this request is unique.

3.  *The special conditions and circumstances do not result from the action of the applicant or any other person who may have had an interest in the property.*
    a.  Any conditions and circumstances are inherent to the existing property.
4.  *Granting the variance request will not confer on the applicant any special privilege which is denied by this Ordinance to other lands or structures in the same district or similarly situated area.*
    a.  Granting the requests will not confer any special privilege denied by this Ordinance to other lands or structures. This is a uniquely situated area.
5.  *The variance, if granted, will not alter the essential character of the locality.*
    a.  The proposed variance will not alter the existing character of the locality.
6.  *Strict adherence to the regulations by the property would result in a demonstrable hardship upon the owner, as distinguished from mere inconvenience.*
    a.  The OJC Medical Services Building achieves over 50% permeable open space on its site. Strict adherence would require an approximate 20% reduction of building area to rectify the condition of the full site.
7.  *The request for the variance is not based primarily upon a desire to serve the convenience or profit of the property owner or other interested party(s).*
    a.  The request for the variance is based on the existing conditions.
8.  *The granting of the variance will not be detrimental to the public welfare or injurious to other property or improvements in the neighborhood on which the property is located.*
    a.  The granting of the variance will not be detrimental to the public welfare or injurious to other property or improvements in the neighborhood.
9.  *The property variance will not impair an adequate supply of light and air to adjacent property, substantially increase the congestion in the public street, increase the danger of fire, or endanger the public safety.*
    a.  Not applicable.

Respectfully submitted,

Stephanie Norris, AIA
snorris@ghc-arch.com
Grace Hebert Curtis Architects,

| From: | Stephanie Norris <snorris@ghc-arch.com> |
|---|---|
| Sent: | Wednesday, October 27, 2021 10:14 AM |
| To: | Emily R. Hernandez |
| Subject: | FW: OJC Medical Services Building |

**EMAIL FROM EXTERNAL SENDER: DO NOT click links, or open attachments, if sender is unknown, or the message seems suspicious in any way. DO NOT provide your user ID or password. If you believe that this is a phishing attempt, use the reporting tool in your Outlook to send this message to Security.**

Good morning, Emily –

As the Commission advanced the OJC project to the City Council with 'No Recommendation', I was hoping you could provide clarification on any steps required by us before the project goes before the Council.

I assume the Staff Report recommendations would be included and we would need to address the provisos.  To address the permeable open space requirement, we would note the proposed demolition, per the standing conditional use requirements, as a method of achieving this requirement.
Regarding, the requirement for a Loading Space, I believe that does exist in the area shown below.  It is greater than 12'x35' with a vertical clearance of 14' minimum.



## 22.10.A LOCATION

All off-street loading spaces shall be located on the same lot as the use served. No off-street loading spaces may space is permitted in a front yard.

### Table 2. Yard Regulations (Proposed Conditions)[8]

| Minimum Yard Requirements | Requirement | Proposed | Wa... Ne... |
|---|---|---|---|
| *Front Yard (Norman C. Francis)* | N/A - existing | N/A - existing | No... |
| *Corner Side Yard (Perdido)* | 10 ft | 55 ft, 3 in | No... |
| *Front Side Yard (Broad Street ramp)* | N/A - existing | N/A - existing | No... |
| *Corner Side Yard (Poydras)* | 10 ft | 11 ft, 6 in | No... |

Footnote 8 cites:

[8] The Department of Safety & Permits has confirmed that the development site maintair
Norman C. Francis Parkway (formerly Jefferson Davis Parkway) and the Broad Street ramp
interior side yard on the Interstate 10 side of the site, and one corner side yard on the Perdic

If the two front yards are Norman C. Francis and Broad, can we use this area as a Loading Space?

Thank you for your assistance.

**Stephanie Norris** AIA
Architect

Grace Hebert Curtis Architects, APAC
Office: 504.522.2050
650 Poydras Street, Suite 1110
New Orleans, LA 70130
ghc-arch.com