# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| LASHAWN JONES, *et al.*, and | § |
| THE UNITED STATES OF AMERICA, | § |
| | § Civil Action No. 2:12-cv-00859 |
| PLAINTIFFS | § Section I, Division 5 |
| | § Judge Lance M. Africk |
| | § Magistrate Judge Michael B. North |
| MARLIN GUSMAN, Sheriff, | § |
| | § |
| | § |
| DEFENDANT. | § |
| | § |

## Report No. 15 of the Independent Monitors
### July 18, 2022

Margo L. Frasier, J.D., C.P.O., Lead Monitor
Robert B. Greifinger, M.D. Medical Monitor
Patricia L. Hardyman, Ph.D., Classification Monitor
Raymond F. Patterson, M.D., D.F.A.P.A., Mental Health Monitor
Shane J. Poole, M.S., C.JM., Environmental Fire Life Safety Monitor
Diane Skipworth, M.C.J., R.D.N., L.D., R.S., C.C.H.P., C.L.L.M., Food Safety Monitor



*Compliance Report #15*
*LASHAWN JONES, et al., and the United States of America v.*
*Marlin Gusman, Sheriff*

Table of Contents

|  |  | Page |
|---|---|---|
| I. | Introduction | 4 |
|  | A. Summary of Compliance | 6 |
|  | B. Opportunities for Progress | 8 |
|  | C. Review Process of Monitors' Compliance Report #14 | 15 |
|  | D. Communication with Stakeholders | 15 |
|  | E. Recommendations | 15 |
| II. | Substantive Provisions |  |
|  | A. Protection from Harm | 18 |
|  | A.1. Use of Force Policies and Procedures | 21 |
|  | A.2. Use of Force Training | 21 |
|  | A.3. Use of Force Reporting | 24 |
|  | A.4. Early Intervention System | 28 |
|  | A.5. Safety and Supervision | 29 |
|  | A.6. Security Staffing | 35 |
|  | A.7. Incidents and Referrals | 36 |
|  | A.8. Investigations | 39 |
|  | A.9. Pretrial Placement in Alternative Settings | 41 |
|  | A.10. Custodial Placement | 41 |
|  | A.11. Prisoner Grievance Process | 63 |
|  | A.12. Sexual Abuse | 69 |
|  | A.13. Access to Information | 70 |
|  | B. Mental Health Care | 70 |
|  | C. Medical Care | 96 |
|  | D. Sanitation and Environmental Conditions | 98 |
|  | E. Fire and Life Safety | 110 |
|  | F. Language Assistance | 113 |
|  | G. Youthful Prisoners | 115 |
|  | H. The New Jail Facility | 115 |
|  | I. Compliance and Quality Improvement | 116 |
|  | J. Reporting Requirements and Right of Access | 118 |
| III. | Status of Stipulated Orders – February 11, 2015, and |  |
|  | April 22, 2015 | 119 |



**Page**

**Tables**
Table 1 – Summary of Compliance – All Compliance Reports       7
Table 2 – Status of Compliance – Stipulated Agreements       8
Table 3 – Summary of Incidents CY 2019-CY 2021       19
Table 4 – CY 2018-CY 2021 All OJC Reported Incidents by Type by Month       20
Table 5 – CY 2018-CY 2021 OJC Reported Incidents       31

**Figures**
Figure 1 – Percentage of White Male Inmates Assigned to OJC, TDC, and TMH
             Housing Units—January 2021-September 2021       47
Figure 2 – Percentage of White Female Inmates Assigned to OJC, TDC, and
             TMH Housing Units—January 2021-September 2021       48
Figure 3 – Rates and Completion Time of Initial Custody Assessments       50
Figure 4 – Percent Overrides for Housing Purposes – October 2020 –
             September 2021       52
Figure 5 – Discretionary Override Rates by Gender in April 2021 –
             September 2021       53
Figure 6 – Time Required to Complete the Initial Custody Assessments
             April 2021-- September 2021       54
Figure 7 – Number of Attachments Input by Classification Staff
             October 2020-September 2021       55
Figure 8 – Attachment Reason by Month—October 2020-September 2021       56
Figure 9 -- Rate of the Disciplinary Infractions for the OPSO ADP       61
Figure 10 –OPSO ADP vs. Number Disciplinary Hearings: October 2020 –
             September 2021       61
Figure 11 –Most Serious Disciplinary Infraction/Report with Finding of
             Guilty: October 2020-September 2021       61

**Appendices**
Appendix A - Summary Compliance Findings by Section Compliance
Reports 1 – 14       115



**Compliance Report # 15**
**Introduction:**

This is Compliance Report #15 submitted by the Independent Monitors providing assessment of the Orleans Parish Sheriff's Office's (OPSO) compliance with the Consent Judgment of June 6, 2013. Report #15 reflects the status of OPSO's compliance as of September 30, 2021. This Report is based on incidents, documents, and compliance-related activities between April 1, 2021, and September 30, 2021. Due to health safety concerns because of COVID, the medical and mental health portions were conducted virtually. Having some of the Monitors onsite allowed for observations to be shared with the Monitors conducting their visit virtually. This report is based on the observations and review of OPSO documents by the Monitors during the onsite and virtual site visits.

Throughout the time the Monitors have been involved in enforcement of the Consent Judgment, the site visits have played an integral role. During the site visits and the site visits by the Lead Monitor in between, the Monitors have endeavored to provide guidance to OPSO as to how to remedy the unsafe and unconstitutional conditions which existed when we began monitoring in late 2013. During this monitoring period, health concerns related to COVID limited the ability of the Monitors to be onsite. Due to COVID, only two visits onsite during the monitoring period were possible; the Lead Monitor visited in April 2021 and a compliance tour occurred in May 2021. The Monitors were in frequent contact with OPSO via other methods such as emails, telephone calls, and virtual meetings.

The Monitors have consistently urged OPSO to put in place the necessary processes and procedures to not only obtain compliance, but to sustain compliance. Such processes and procedures would allow OPSO to provide adequate proof of compliance, assess compliance with the Consent Judgment and its own policies and procedures, and address shortcomings without intervention of the Monitors. The Monitors have provided guidance as to how to go about the various review functions and establish a compliance unit that would operate independently of those whose performance would be assessed. OPSO has put in place a process where unit managers and section heads are required to gather, and report selected statistical data to the leadership at the weekly unit managers meeting. This is a step in the right direction. Analysis and validation of the data and accountability for shortcomings in the analysis of the data needs to occur. OPSO has begun to take steps towards the formation of a compliance unit, but, as was the case in the previous monitoring period, it



remains not operational.

A fully staffed compliance unit, which includes inspection and auditing duties, would allow for OPSO to recognize deficiencies, and address them. For instance, OPSO continues to not have an electronic way of recording security checks in the housing unit. In an effort to simplify the process, OPSO developed a paper form on which to record security checks. While this provides an easier way for a supervisor to spot check during a unit inspection if the deputy has recorded that the security checks are being performed timely, it is insufficient proof that an appropriate security check actually occurred and requires watching hours of video to verify. Due to the lack of electronic recording of the security checks, it is extremely difficult to efficiently analyze the data and spot trends. OPSO has indicated that with the formation of the compliance unit that OPSO has now started to audit log sheets with video footage and plans to have an audit report for the next compliance period. At the unit managers' meeting, one of the statistics reported was the number of security checks which occurred, but it was unclear what constituted a security check and how the timeliness and thoroughness were measured. During the onsite monitoring visit, Monitors viewed the documentation for security checks of the units. It should be noted that the documentation was often missing or incomplete. When questioned, as was done during the previous tour, deputies usually were able to describe what an acceptable security check would look like. However, the deputies admitted that they did not perform all of the tasks for a proper security check each time a security check was recorded as having taken place. Usually, an adequate security check was only performed when a physical count of the inmates took place; at most, twice a twelve-hour shift. A comprehensive compliance unit which includes audits and inspections is important to finishing up the work to be done on compliance and sustaining compliance. Equally important is adopting a culture where accountability is embraced as opposed to a culture where there is a reluctance to address the deficiencies and, in some instances, undermine the efforts of those whose job it is to provide information.

During the monitoring period, the OPSO's jail system was under the leadership of Sheriff Gusman. Byron LeCounte served as the Chief of Corrections. He had been in that role since February 2019 but left the position in December 2021. The Assistant Chief of Corrections position has been vacant for several monitoring periods. The Assistant Chief of Corrections position is not required by the Consent Judgment, but OPSO is required to have



someone with the stated requirements fulfill the duties currently assigned to the Chief of Corrections.

In summary, the Monitors find that food service and environment conditions of inmates held in both the Orleans Justice Center (OJC) and the Temporary Detention Center (TDC) has made improvement since Compliance Report #14 provided to the Court on October 5, 2021. There has not been significant progress, and, in some cases, regression, in safety or classification. There is significant improvement in the areas of medical and mental health care. Overall, ratings improved in fifteen (15) provisions and regressed on eleven (11) provisions. While some of the regression is due to the strain put on the system by COVID and shortage of staff, much is due to a failure to follow the policies and procedures that have been put in place. The specific initiatives are addressed in this report.

**A.      Summary of Compliance**

The requirements of the Consent Judgment represent correctional practice recognized as required for the operation of a Constitutional jail system. While there is some flexibility for how OPSO addresses the mandates, achieving substantial compliance with the Consent Judgment, and Stipulated Agreements are necessary to bring OPSO and its correctional facilities into adherence with Constitutional requirements. The Consent Judgment contains 174 separately rated provisions. While they are separately rated, they are often intertwined. For example, effective implementation of a policy requires not only the drafting of a suitable policy, but appropriate training on the policy and enforcement of the policy. Enforcement of the policy is contingent on assessing whether the policy is being followed which requires supervision, analysis of incidents and data, and objective confirmation of compliance. A meaningful annual review of the adequacy of the policy does not just mean to determine whether the wording of the policy should be changed, but also includes determining adherence to the policy and whether the objectives of the policy are being met, which again requires objective data collection and analysis and development of corrective action plans.

Based on the current assessment, OPSO has improved from Report #14. There are no provisions which are in non-compliance. Substantial compliance has been achieved for 56% of the provisions. Forty-four (44%) of the provisions are in partial compliance.

Over time, OPSO has made material progress as indicated by the movement of non-



compliance to partial compliance to substantial compliance for over half of the provisions. At different times during the duration of the Consent Judgment, including in some areas in thie report, there has been regression in the progress towards compliance. As will be addressed in individual areas, OPSO has shown regression from the progress reflected in Compliance Reports #10-15 in some provisions due to failure to consistently follow and enforce policies and procedures and to provide required annual training.

During the onsite visit for Compliance Report #15, Chief LeCounte and Major Griffin provided an update on their continuing efforts to utilize analyses of data, including grievance data and use of force data to determine policy adherence and develop action plans to address shortcomings and make decisions. They continued to be hampered in their efforts by the lack of data and meaningful analysis. Needed is reliable data which is analyzed in an impartial manner and the development of a systematic approach to making decisions and implementing and enforcing them. Until that occurs, the same deficiencies are likely to be continued to be noted time and time again.

Sheriff Gusman and Chief LeCounte put in place a weekly meeting of managers to review performance measures; similar to a CompStat meeting. This is a very positive step towards implementation of the strategies that should result in progress, but it has shown to be ineffective as there have not been any performance measures put in place or corrective action plans on how to meet the performance measures.

### Table 1 – Summary of Compliance – All Compliance Reports[1]

| Compliance Report/Date | Substantial Compliance | Partial Compliance | Non-Compliance | NA/ Other | Total |
|---|---|---|---|---|---|
| #1 – December 2013 | 0 | 10 | 85 | 76 | 171 |
| #2 – July 2014 | 2 | 22 | 149 | 1 | 174 |
| #3 – January 2015 | 2 | 60 | 110 | 2 | 174 |
| #4 – August 2015 | 12 | 114 | 43 | 4 | 173 |
| #5 – February 2016 | 10 | 96 | 63 | 4 | 173 |
| #6 – September 2016 | 20 | 98 | 53 | 2 | 173 |
| #7 – March 2017 | 17 | 99 | 55 | 2 | 173 |
| #8 – November 2017 | 23 | 104 | 44 | 2 | 173 |
| #9 – June 2018 | 26 | 99 | 46 | 2 | 173 |
| #10 – January 2019 | 65 | 98 | 8 | 2 | 173 |
| #11 – September 2019 | 103 | 66 | 5 | 0 | 174 |
| #12 – May 2020 | 118 | 56 | 0 | 0 | 174 |
| #13-- November 2020 | 111 | 59 | 4 | 0 | 174 |



| #14—May 2021 | 100 | 67 | 7 | 0 | 174 |
| #15—November 2021 | 97 | 77 | 0 | 0 | 174 |

The status of compliance (February 11, 2015 and April 22, 2015) is as follows:

**Table 2 – Status of Compliance with 2015 Stipulated Agreements**

| Compliance Report/Date | Substantial Compliance | Partial Compliance | Non-Compliance | NA | Total |
|---|---|---|---|---|---|
| August 2015 | 21 | 12 | 1 | 0 | 34 |
| February 2016 | 21 | 12 | 1 | 1 | 34 |
| September 2016 | 26 | 7 | 1 | 0 | 34 |
| March 2017 | 28 | 4 | 1 | 1 | 34 |
| November 2017 | 21 | 11 | 1 | 1 | 34 |
| June 2018 | 23 | 8 | 2 | 1 | 34 |
| January 2019 | 28 | 5 | 0 | 1 | 34 |
| September 2019 | 28 | 5 | 0 | 1 | 34 |
| May 2020 | 28 | 5 | 0 | 1 | 34 |
| November 2020 | 32 | 2 | 0 | 0 | 34 |
| May 2021 | 32 | 2 | 0 | 0 | 34 |
| November 2021 | 32 | 2 | 0 | 0 | 34 |

**B.    Opportunities for Continued Progress**

The Monitors summarize below the areas identified in preparation of this report regarding OPSO's current level of compliance with the Consent Judgment.

**1.    Foundational Work** - The essential, core work required to achieve compliance includes:

- Policies and Procedures – OPSO has completed the essential policies and procedures. The Policy Manager has continued to review policies and perform updates. Essential is the continued development, approval, and implementation of lessons plans that correspond with each of the policies. OPSO's policy governing its written directive system has significantly improved the policy/ procedure process. This process allows for organizational components to develop specific operational practices for review by OPSO administration. Adherence to the policies, procedures, and training is essential. OPSO has yet to develop a reliable process for objective consistent auditing of adherence and consistent enforcement of policies.

- Inadequate staffing – OPSO has continued to hire staff but has not been able to

gain ground on vacancies due to the number of terminations and resignations. During CY 2021, OPSO lost significant ground in that it hired 97 new staff members and lost 177 staff members through resignation, termination, and retirement. Inadequate staff in the housing areas of the facilities (OJC and TDC) and the timely completion of use of force investigations continues to hamper OPSO's ability to consistently comply with the Consent Judgment. OPSO continues to use employee overtime to address the staff shortages. Even with substantial overtime, frequently, there are housing units and control rooms with no assigned staffing. Further, almost daily, assigned staff leave housing units and control pods unattended for meal breaks and other duties. While a pay scale which provides for improvement in compensation with the goal of increased retention of staff and assistance in the recruitment efforts has been developed, there has not been a request by OPSO for the necessary funding to implement the pay scale. OPSO is strongly encouraged to review its deployment of staff. It is apparent that staff is not being deployed to the areas where the need is most critical, staffing the housing units. While redeployment of staff is unlikely to fully address the staffing shortage, it would be helpful in addressing the most critical needs. For instance, there is a severe lack of supervisors on the evening/night shift due to the majority of the supervisors working on the day shift.

- <u>Training</u> – Employee training for security staff, both pre-service and in-service, has become more in line with OPSO policies and procedures. OPSO has reinstated the practice of assigning new deputies a training officer during the first three weeks of assignment to OJC (field training program). The sergeant supervising the program also meets with the new deputies and provides them mentoring and guidance. Follow up should be done to see the affect that this program has on turnover. The program, if allowed to be fully implemented, is likely to result in a reduction of turnover and a reduction in rule violation by new deputies. OPSO did its annual training in CY 2021, but 17% of the staff did not attend.

- <u>Supervision</u> – Safe operation of OPSO's facilities requires an adequate number of sufficiently trained first line and mid-management supervisors and clear



lines of authority and responsibility. When Independent Compliance Director Hodge was in charge of operations, he implemented the unit management approach and provided training and mentoring for the managers. While there are benefits to a unit management system, the unit management system has blurred the lines of responsibility and accountability. This is particularly apparent when there are no unit managers on duty and the supervision of the jail is the responsibility of the watch commanders. Given that the unit managers are seldom present at the facility after 4:00 p.m. or weekends, the authority of the watch commanders to assign and supervise the staff is crucial to the safe operation of the OJC.

2.    **Medical and Mental Health Care** – The Medical and Mental Health Monitors report challenges remain in the provision of basic care, staffing, and recordkeeping, as well as the need for improved collaboration with custody/security staffing, but there has been improvement and none of the provisions are in non-compliance. Security staff were found to be responsible for performance of some of the "suicide watches" during the site visit, but the deputies routinely stated that they did not understand what their duties were to perform and document suicide watches. When deputies did document the performance of a suicide watch, it was not done in the same manner as the mental health technicians which made reporting of data inconsistent. Resources from Tulane University continue to be particularly helpful in providing psychiatric mental health care, but Tulane University is not responsible for many aspects of mental health care required by the Consent Judgment. An important part of the long-term solution to the lack of compliance with the Consent Judgment in the areas of medical and mental health is the design and construction of Phase III, a specialized building which will contain an infirmary and housing for inmates with acute mental health issues. However, the City did extensively renovate portions of TDC (now referred as TMH or Temporary Mental Health) as a stop gap measure. OPSO does not utilize all of the TMH units due to a lack of security staffing. Inmates with acute mental health issues continue to be housed in OJC which is inadequate for the housing of these inmates.

3.    **Inmate Safety and Protection from Harm** - Providing a safe and secure jail continues to be a challenge.



- <u>Unit Management</u>—The Unit Management approach is being used in the supervision of the OPSO housing units. Each floor of the OJC, the IPC, and the TDC/TMH have been designated as a "unit". The purpose of this strategy is to enhance accountability for both staff and the inmates by allowing the staff to get to know the inmates. The effectiveness of the Unit Management approach has been greatly hampered by the lack of development of management plans for problematic inmates. It also has blurred the lines of responsibility and accountability as indicated above.

- <u>Violence</u> – There were still significant incidents of violence occurring within the facilities during the monitoring period– including inmate on inmate assaults and assaults on staff. Especially concerning is that inmates continue to fashion weapons from items found in the jail. The items (such as the light supports in the utility closets and the cabinets at the front of the day room) would be unavailable to them if the staff were following policies regarding supervision and limiting access. Also concerning is the refusal of the OPSO to take timely action to secure, or, better yet, remove the cabinets despite this issue being raised at the monthly meetings with OPSO practically every month during the monitoring period. Another concern is the lack of effective random shakedowns has resulted in the continued presence of weapons and other contraband in the housing units. Disorder and non-compliance to the institutional rules cause staff to use force to gain control and compliance. There is inadequate use of de-escalation techniques before resorting to force, including repeated examples of using OC spray without adequate de-escalation and/or in retaliation against inmates. Seldom are mental health staff involved when de-escalation is attempted even though a large percentage of the inmates involved in a use of force are on the mental health caseload. The number of overdoses linked to illicit drugs and prescription medication continues to be high. One inmate died while in custody during the CY 2021.

- <u>Inmate Classification</u> – The inmate classification processes require continued attention to ensure housing decisions and placements are consistent with OPSO policies and objective classification principles. Credible auditing needs to focus on identifying issues and correcting placements. During the tour, the



COMPLIANCE REPORT #15                                                                 11

housing audits were found to be wholly inadequate. It was discovered that no housing audits had been performed on one of the floors and the classification manager was unaware of the failure of staff assigned to her to complete audits over a six-month period as she had not followed policy by reviewing the audits and taking necessary corrective action. There is no analysis done when inmates are involved in an altercation to determine whether they should have been kept separate.

- <u>Inmate grievances</u> – As of Report #11, the ratings of the subdivisions in the grievance provision were individually given. The separate ratings allowed the areas in which deficiency existed to be highlighted. While timeliness and adequacy of responses is still not in substantial compliance, improvement continues. The trend data from the grievance system is now available to assist in identifying problems to be addressed, but there was a lack of follow through by the administration.

- <u>Incident Reporting</u> –The accurate timely reporting of incidents has been a constant area of concern. There remain serious incidents for which no report or no timely report is prepared by OPSO staff, including incidents involving the serious injury of inmates and drug overdoses. There continue to be reports which are incomplete and do not provide the necessary information for the reader to determine what occurred and why it occurred. It is particularly concerning that incomplete and sometime inarticulate reports have been reviewed by and approved by a supervisor. OPSO begun implementation of a corrective action plan to address timeliness and thoroughness of reports which includes training and remedial action including discipline, but it has not adequately addressed the issue. Part of the problem is the lack of resources dedicated to the gathering and auditing of reports.

- <u>Jail Management System</u> – An integral part of the jail's operational improvement is tied to an effective jail management system. Such capacity provides on-demand, routine, and periodic data to inform critical leadership and management decisions. Such an information system has not been implemented. After OPSO cancelled the contract with the provider who was to



supply a new JMS, due to the inability to interface with the Orleans Parish court system, the City of New Orleans was to purchase a JMS which will interface with the Orleans Parish court system and the OPSO information systems. Despite passage of several years, there is no definite timeline for that process. In the meantime, OPSO has modified its current system to provide more of the required JMS functions. One of the crucial areas lacking is a way to electronically verify that security checks are taking place in a timely fashion.

4.    **Sanitation and Environment Conditions** – Challenges remain regarding the public health and inmate/staff safety risks. During the site visit, inmates and staff were often seen not wearing their masks or wearing the masks in an improper manner. The COVID-19 pandemic has presented additional challenges for the extremely dedicated sanitation staff. The inability to fill support positions identified in OPSO's staffing analysis negatively impacts the ability of OPSO to sustain compliance with the requirements of the Consent Judgment and align with accepted correctional practice. Sanitation and cleanliness of the cells and housing areas are not solely the responsibility of the sanitation staff. The unit managers and pod deputies have the first responsibility for ensuring inmates keep their cells and dayroom areas clean and uncluttered. As with past tours, during the monitoring tour, when sanitation concerns were called to the attention of pod deputies and supervisors, they often tried to explain them away by stating they have told the inmate to correct the issue. If true, follow through is clearly lacking.

5.    **Youthful Inmates** – No youthful offenders were held in OJC during the monitoring period. The Monitors applaud the effort being made to house youthful offenders in the Juvenile Justice Intervention Center (JJIC). It should be noted that housing one youthful offender is enough to tie up an entire housing unit.

6.    **Inmate Sexual Safety** – OPSO underwent its required audit of compliance with the Prison Rape Elimination Act of 2003 (PREA) and passed in September 2019. Since that time, the sergeant who was assigned as the PREA Coordinator was moved from that assignment and reassigned to a housing area. The position has not been filled in over a year. Continued internal collaboration among OPSO security, classification, and the medical/mental health provider is needed for the assessments of inmates' potential for sexual victimization and aggression. The necessity of separation of



inmates testing positive for COVID-19 has resulted in the need for additional attention to inmates' PREA designation. Lack of leadership over PREA continues to be a concern. OPSO cannot rely on an audit that is nearly three years old to demonstrate compliance with PREA.

7.   **Compliance, Quality Reporting, and Quality Improvement** – An essential element of inmate safety is OPSO's timely review of all serious incidents as well as of non-violent incidents to determine if there are trends and/or patterns. This ensures assessment of root causes and then the development, implementation, and tracking of action plans to address the issues. This activity focuses on resolving problems. OPSO has made efforts to undertake this function but would benefit from a more robust effort. Especially concerning are systemic issues, which if they remain unaddressed, will continue to create risks to institutional safety and security. While progress is noted, the Monitors encourage OPSO to dedicate more time and knowledgeable resources to quality improvement. Impediments include the lack of staff with the skills and/or time to devote to the task. While OPSO has reported the establishment of an Inspection/Accreditation Unit, there have been no meaningful progress.

8.   **Stipulated Agreements 2015** – OPSO should review its on-going compliance with the two Stipulated Agreements from 2015. Several provisions remain in partial compliance, without any progress towards substantial compliance.

9.   **Construction Projects** –

  - The Docks – Construction of the renovations on the Docks has been completed. Due to COVID-19, court dockets have been reduced. The Docks have not been used yet for court holding, but the Docks are used as a way to access the courts.

  - TDC Mental Health (TMH)– The renovation of two TDC housing areas (total of four units) has been completed. Initially, the male inmates with acute mental illness were moved from Hunt into one of the housing units. During the monitoring period, OPSO housed acute male inmates, acute female inmates, and some sub-acute female inmates in TMH. However, only three of the four units were operational during the monitoring period. Some acute inmates remain in OJC due a lack of staff to operate all four of the TMH units and all



sub-acute male inmates remain in OJC. OPSO is encouraged to house inmates who are currently on suicide watch in various housing areas of OJC in TMH when possible. While TMH is not a suitable solution to meeting the requirements of the Consent Judgment as to medical and mental health services in the long run, it is a necessary interim step given no satisfactory housing for acute inmates in OJC. The operation of TMH has reaffirmed the necessity of single person cells for acute inmates which should be considered in the capacity of Phase III. It is important to note that TMH does nothing to address the lack of an infirmary and medical housing in OJC and lack of programming space. Even with the construction of Phase III, there will be a need for safe and suitable housing for sub-acute inmates.

- Phase III – This project has reached 95% completion of the drawing of construction documents. Monthly meetings of the Executive Committee have been held and have allowed input on decisions from the various stakeholders and the Monitors. The construction and occupation of Phase III are critical to the provision of mental and medical health services in accordance with the Consent Judgment.

C. **Review Process of Monitors' Compliance Report #15**

A draft of this report was provided to OPSO, Counsel for the Plaintiff Class, and the Department of Justice (DOJ) on May 31, 2022. Comments were provided Counsel for the Plaintiff Class and DOJ on June 24, 2022. OPSO provided comments on its behalf and informed the Monitors that Wellpath (OPSO's medical contractor) chose not to make comments on June 24, 2022. The Monitors considered the comments of the parties in finalizing Report #15.

D. **Communication with Stakeholders**

The Monitors are committed to providing as much information as possible regarding the status of OPSO's efforts to comply with all orders of the Court. The OPSO has, thus far, not honored the request of the Monitors to provide a link to the current reports on the OPSO website.

E. **Recommendations**

Over the years, the Monitors have provided multiple recommendations and suggestions to OPSO to achieve and maintain compliance with the Consent Judgment. The

purpose of the recommendations continues to be to assist OPSO in achieving and maintaining compliance. While much progress has been accomplished, many of the recommendations made in the past have not been implemented. Only "new" recommendations and suggestions are included within the body of this report. While the Consent Judgment may not require, in all situations, that OPSO follow the recommendations and suggestions of the Monitors, refusal to implement the recommendation or a suitable alternative is unlikely to result in compliance.

**F.**     **Conclusions and Path Forward**

OPSO has been operating under the provisions of the Consent Judgment since June 2013; monitoring began in Fall 2013. During the leadership of Director Hodge, significant improvements were acknowledged by the Monitors. The hiring of Byron LeCounte as Chief of Corrections in February 2019 has been beneficial to the vital work which remains to comply with the provisions of the Consent Judgment. His additional expertise and experience allowed Director Hodge to focus on the Consent Judgment. Sheriff Gusman has resumed the role of full responsibility for bringing OPSO into compliance with the Consent Judgment. Sheriff Gusman was defeated in the election held in December 2021 which seemed to lessen his desire to make progress in obtaining compliance.

It continues to be concerning that the same deficiencies pointed out in previous reports by the Monitors continue to exist and are not being thoroughly resolved. Serious incidents and harm to inmates continue to occur. OPSO has made some efforts to identify and address sources of contraband, but the Monitors encountered inmates smoking in the facility and weapons have frequently been found which had been fashioned from materials within the jail such as the light supports in the utility closets and the cabinets in the dayrooms. Dangerous medication is frequently found during cell shakedowns suggesting that the medication distribution process continues to be flawed.

There has been improvement in OPSO's data collection which should allow for better problem solving with a goal of a sustainable reduction in inmate-on-inmate assaults, inmate-on-staff assaults, uses of force, contraband, and property damage. However, corrective action plans would benefit from thorough analysis of the data and root cause reviews. When they are developed, follow through on implementation is often lacking.

The Monitors remain committed to the Court and the parties to collaborate on



solutions that will result in significant improvement towards compliance with the provisions
of the Consent Judgment and achievement of constitutional conditions.

**The Monitors again thank and acknowledge the leadership, guidance, and support of
The Honorable Lance M. Africk and The Honorable Michael B. North.**

**Lead Monitor Frasier would like to acknowledge and thank Dr. Robert Greifinger and
Dr. Raymond Patterson for their service as monitors. Their expertise and assistance
have been crucial to the improvement seen in the provision of medical and mental
health services in the Orleans Parish jail system. This is their final report.**



**II. A.    Protection from Harm**

**Introduction**

 This section of the Consent Judgment addresses core correctional functions including the use of force (policies, training, and reporting), identification of staff involved in uses of force through an early intervention system, safety and supervision of inmates, staffing, incidents and referrals, investigations, pre-trial placement of inmates in the facility, classification, the inmate grievance process, sexual safety of inmates, and inmates' access to information.

 The Consent Judgment requires that OPSO operate the facility to assure inmates are "reasonably safe and secure." Based on objective review of data, the facility has shown improvement in inmate and staff safety over the life of the Consent Judgment, but significant incidents that result in serious injury to inmates and staff continue to occur. Overly concerning is that inmates continue to fashion weapons out of items in the jail. This would not be occurring if the facility was properly staffed, and the staff were properly supervising the inmates. Also concerning is the lack of a sense of urgency to address the issue of dangerous contraband even when the source of contraband has been determined.

 Reaching and sustaining compliance with provisions of the Consent Judgment, particularly this section, relies on the collection, analysis, and corrective action planning using accurate and reliable data. The Monitors encourage OPSO to continue efforts to build its capacity to collect and analyze relevant accurate data, draw supportable conclusions to inform decisions throughout the organization, develop corrective action plans, implement corrective action plans, and hold staff accountable for non-adherence to corrective action plans and policies. As OPSO's capacity to collect, analyze, plan, and implement is enhanced, the ability to achieve and maintain compliance will be strengthened. Without an enhancement in capacity and dedication to making and implementing informed decisions, OPSO is unlikely to achieve and maintain compliance and likely to regress.

 The reporting of incidents to the Monitors and parties has been sporadic and less complete since the reassignment of the person who was responsible was assigned to another position. OPSO has not consistently had someone report the incidents and review the daily medical logs for inmates taken to the clinic for treatment subsequent to an altercation or a use of force as well as the transport logs of inmates routed to the hospital with trauma-related injuries to cross check them against reported incidents. A continuing issue is the lack



of meaningful consequences for supervisors and deputies who fail to comply with the reporting policies resulting in late, incomplete, or missing incident reports.

The Monitors reviewed all reported incidents for CY 2021 in preparation of this report. The following charts compare the totals for the calendar years (CY) 2018-2021. Unfortunately, given that the system for reporting incidents has proven to be unreliable, it is impossible to tell if a particular decline is the result of reporting errors as opposed to an actual decline in a type of reportable incidents.

**Table 3 - All OJC Reported Incidents for CY 2018-CY 2021**



| | Inmate/ Inmate Assault | Inmate Staff Altercation | Use of Force | PREA | Death | Attempt Suicide/ Ideation | Internal Escape | Criminal Damage | Inmate Injury/ Inmate Medical (AKA slip/falls/ overdoses) | Contraband | Staff Arrest | Staff Misconduct/ Suspension | Other |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2018 | 442 | 64 | 260 | 47 | 2 | 78 | 48 | 69 | 262 | 106 | 3 | 0 | 15 |
| 2019 | 440 | 117 | 358 | 42 | 0 | 82 | 6 | 47 | 145 | 302 | 0 | 0 | 6 |
| 2020 | 309 | 139 | 372 | 35 | 3 | 21 | 1 | 64 | 64 | 351 | 0 | 0 | 1 |
| 2021 | 293 | 124 | 311 | 17 | 1 | 20 | 1 | 42 | 43 | 350 | 0 | 0 | 0 |

The number of inmate-staff altercations, use of force, and contraband in CY 2020 exceeded both CY 2018 and CY 2019. This was despite the inmate population having decreased significantly. In CY 2021, the number of reported inmate on inmate assaults, inmate/staff



altercations, and uses of force has declined, but it should be noted that there is still an alarming use of weapons in the assaults resulting in serious injuries. The reported number of contraband incidents was essentially the same in CY 2020 and CY 2021, demonstrating that a high amount of contraband, including pills which can be used to overdose and weapons, continues to be present in the facility.

### Table 4 –All OJC Reported Incidents by Type by Month CY 2018-CY 2021

|      | Jan | Feb | March | April | May | June | July | August | September | October | November | December | Total |
|------|-----|-----|-------|-------|-----|------|------|--------|-----------|---------|----------|----------|-------|
| 2018 | 92  | 96  | 112   | 121   | 124 | 144  | 116  | 132    | 112       | 113     | 105      | 129      | 1396  |
| 2019 | 123 | 93  | 105   | 112   | 127 | 148  | 131  | 163    | 107       | 153     | 160      | 123      | 1545  |
| 2020 | 118 | 129 | 110   | 125   | 95  | 150  | 111  | 105    | 77        | 92      | 123      | 125      | 1360  |
| 2021 | 129 | 95  | 84    | 116   | 86  | 113  | 102  | 75     | 87        | 123     | 108      | 84       | 1202  |

## Assessment Methodology

Dates of visits:

- April 19-20, 2021
- May 17-20, 2021
- November 15-18, 2021

Materials reviewed:



- Materials reviewed include the Consent Judgment, OPSO policies and procedures, use of force reports, incident reports, and investigations conducted by Investigative Services Bureau-Internal Affairs Division (ISB-IAD), investigations conducted by ISB-Criminal Division (ISB-Criminal), investigations conducted by ISB-Inmate Division, training materials, shakedown logs, and post logs.

Interviews:

- Interviews included the Sheriff, command staff, jail supervisors, commander of ISB, commander of IAD-Administrative, chief of investigations, chief of corrections, director of training, and various supervisors of units within ISB. Inmates were interviewed by the Monitors onsite for the visit. The Monitors also attended security-related meetings.

### IV.A.1. Use of Force Policies and Procedures

*A. 1.a. OPSO shall develop, implement, and maintain comprehensive policies and procedures (in accordance with generally accepted correctional standards) relating to the use of force with particular emphasis regarding permissible and impermissible uses of force.*

*A. 1.b. OPSO shall develop and implement a single, uniform reporting system under a Use of Force Reporting policy. OPSO reportable force shall be divided into two levels, as further specified in policy: Level 1 uses of force will include all serious uses of force (i.e., the use of force leads to injuries that are extensive, serious or visible in nature, including black eyes, lacerations, injuries to the mouth or head, multiple bruises, injuries to the genitals, etc.), injuries requiring hospitalization, staff misconduct, and occasions when use of force reports are inconsistent, conflicting, or otherwise suspicious. Level 2 uses of force will include all escort or control holds used to overcome resistance that are not covered by the definition of Level 1 uses of force.*

*A. 1.c. OPSO shall assess, annually, all data collected regarding uses of force and make any necessary changes to use of force policies or procedures to ensure that unnecessary or excessive use of force is not used in OPP. The review and recommendations will be documented and provided to the Monitor, DOJ, and SPLC.*

Findings:

A. 1. a.  Partial Compliance

A. 1. b.  Substantial Compliance

A. 1. c.  Partial Compliance

Observations:

The current OPSO use of force policy was effective as of May 2016. It was last reviewed in May 2020. No documentation was provided that the Use of Force Review Board met during the reporting period. The failure of the Use of Force Review Board to meet is extremely serious as it is the entity which refers the majority of the cases to the Internal Affairs Division for investigation and discipline, if appropriate. OPSO has conducted the 2020 annual review of available use of force data and the policy. The 2021 annual review will be



part of Report #16. OPSO analysis of the data has improved, and plans have been put in place to address the issues which continue to occur such as poorly written reports, failure to properly classify uses of force as Level One or Level Two, backlog in the number of use of force incidents to be reviewed (there are cases dating back to 2018), and the lack of timely filed reports. While there was recognition of the high number of uses of force on specialty pods (particularly the disciplinary pod and the mental health pod), there were no recommendations documented and provided to the Monitors and DOJ and counsel for the Plaintiffs. Identifying the problem is just the first step in addressing the reoccurring issues. A review of uses of force found to be inappropriate was performed, but there were not recommendations as a result. As has been pointed out to the Force Investigation Team and Chief of Investigations in the past, the Consent Judgment requires not only assessment and reduction of inappropriate uses of force, but also unnecessary uses of force. This is not occurring. In addition, the process would benefit from examining a larger number of the use of force incidents. Examination of the use of force reports by the Monitors revealed that often the use of force is precipitated by a failure to follow policy such as not restraining the inmate prior to movement or allowing an inmate out of his/her cell with another inmate(s) from whom he/she is to be kept separate or failing to secure the food port in the cell door. Incident reports most often demonstrate a lack of de-escalation efforts as required by the Consent Judgment; particularly before using OC spray. Seldom is mental health staff called upon to assist in de-escalation although a majority of the inmates upon whom force is used are on the mental health caseload. In order to warrant a rating of substantial compliance in A.1.c., OPSO needed to address the issues; not just identify them. Until that is done, the compliance rating will remain at Partial Compliance. Concerns regarding timeliness of submission of use of force report and reviews are addressed in those sections.

### IV. A. 2. Use of Force Training

*A. 2. a. OPSO shall ensure that all correctional officers are knowledgeable of and have the knowledge, skills, and abilities to comply with use of force policies and procedures. At a minimum, OPSO shall provide correctional officers with pre-service and annual in-service training in use of force, defensive tactics, and use of force policies and procedures. The training will include the following:*
      *(1) instruction on what constitutes excessive force;*
      *(2) de-escalation tactics; and*
      *(3) management of prisoners with mental illness to limit the need for using force.*
*A. 2. b. OPSO shall ensure that officers are aware of any change to policies and practices throughout their employment with OPP. At a minimum, OPSO shall provide pre-service and annual in-service use of force training that prohibits:*
      *(1) use of force as a response to verbal insults or prisoner threats where there is no immediate threat to the safety or security of the institution, prisoners, staff, or visitors;*



*(2) use of force as a response to prisoners' failure to follow instructions where there is no immediate threat to the safety or security of the institution, prisoners, staff, or visitors;*
*(3) use of force against a prisoner after the prisoner has ceased to offer resistance and is under control;*
*(4) use of force as punishment or retaliation; and*
*(5) use of force involving kicking, striking, hitting, or punching a non-combative prisoner.*
*A. 2. c. OPSO shall randomly test five percent of the correctional officer staff on an annual basis to determine their knowledge of the use of force policies and procedures. The testing instrument and policies shall be approved by the Monitor. The results of these assessments shall be evaluated to determine the need for changes in training practices. The review and conclusions will be documented and provided to the Monitor*

Findings:

A. 2. a.  Partial Compliance

A. 2. b.  Partial Compliance

A. 2. c.  Partial Compliance

Observations:

The Monitor reviewed the training materials and documentation and the supplemental documentation submitted by training staff for the rating period and interviewed the Training Sergeant, Instructor and Support Staff present on the day of the inspection. Training advised that the annual in-service Use of Force, Defensive Tactics, and Use of Force policy and procedure training requirements for CY 2021 were conducted in April 2021. Documentation reflected 42 staff members received the training mandated by Section A.2.a. (89.5%), and 49 staff members received the training mandated by Section A.2.b. (90%). Make up training is scheduled for November 2021. As the requirements in these two sections are annual and based on the calendar year, a final finding for 2021 compliance will be noted in the March 2022 inspection.

The monitor reviewed training documentation verifying that Use of Force training was provided as required during all pre-service classes.

The Monitor's review of the use of force training materials noted that the lesson plan, PowerPoint presentation, and testing materials substantively cover the requisite information in A. 2. c. 1-5. The proof of training documentation indicates that the pre-service OPSO staff received the required training on policies and practices by the Academy staff. As noted in A. 2. a., the effort towards meeting the in-service training requirements for CY 2021 are on-going with make-up training to occur in November 2021. Additionally, a thorough review of the CY 2020 use of force reports reveals the need for additional training which emphasizes de-escalation and provide deputies with additional tools when dealing with



inmates with mental health issues and inmates who routinely exhibited behavioral problems. Given some very problematic incidents in which staff observed inappropriate uses of force and did not stop or report the same, it is strongly suggested that the duty to intervene and report be emphasized.

The Monitor reviewed training documentation provided by training staff specific to the 5 percent annual testing requirement for this section. Testing documentation for 2021 showed it to have occurred in April 2021. Training staff continue to pursue a goal of 15% testing, exceeding that of the consent judgement language. During April 2021, the test was administered to approximately 50 individual deputies and approximately 27 supervisory staff members. The test for 2021 was approved by Monitor Frasier April 21, 2021.

The Monitor has, in the past, observed that the Academy staff has maintained detailed, comprehensive, and very well-maintained files. In response to our request for documentation, the Academy staff provided succinct and thorough reports as to who had and who had not completed the required use of force training.

As a cautionary note, Training staff conveyed that training operations had been substantially disrupted during the 2021 hurricane season and subsequent evacuation of the jail population out of New Orleans. Compounding the problem is the somewhat cumbersome training enrollment process currently utilized by Training staff. The Monitor made several recommendations as to policy, procedure, and scheduling software for Training staff to review with the goal of making scheduling more efficient for Training and Security staff alike.

## IV. A. 3. Use of Force Reporting

*A.3 a. Failure to report a use of force incident by any staff member engaging in the use of force or witnessing the use of force shall be grounds for discipline, up to and including termination.*
*A.3.b. OPSO shall ensure that sufficient information is collected on uses of force to assess whether staff members complied with policy; whether corrective action is necessary including training or discipline; the effectiveness of training and policies; and whether the conditions in OPP comply with this Agreement. At a minimum, OPSO will ensure that officers using or observing a Level 1 use of force shall complete a use of force report that will:*

    *(1)    include the names of all staff, prisoner(s), or other visual or oral witness(es);*
    *(2)    contain an accurate and specific account of the events leading to the use of force;*
    *(3)    describe the level of resistance and the type and level of force used, consistent with OPP use of force; policy and procedure, as well as the precise actions taken by OPSO staff in response to the incident;*
    *(4)    describe the weapon or instrument(s) of restraint, if any, and the manner of such use be accompanied by a prisoner disciplinary report, if it exists, pertaining to the events or prisoner activity that prompted the use of force incident;*
    *(5)    describe the nature and extent of injuries sustained by anyone involved in the incident;*
    *(6)    contain the date and time when medical attention, if any, was requested and actually provided;*



*(7)    describe any attempts the staff took to de-escalate prior to the use of force;*

*(8)    include an individual written account of the use of force from every staff member who witnessed the use of force;*

*(9)    include photographs taken promptly, but no later than two hours after a use of force incident, of all injuries sustained, or as evidence that no injuries were sustained, by prisoners and staff involved in the use of force incident;*

*(10)   document whether the use of force was digitally or otherwise recorded. If the use of force is not digitally or otherwise recorded, the reporting officer and/or watch commander will provide an explanation as to why it was not recorded; and*

*(11)   include a statement about the incident from the prisoner(s) against whom force was used.*

*A.3.c. All officers using a Level 2 use of force shall complete a use of force report that will:*

*(1)    include the names of staff, prisoner(s), or other visual or oral witness(es);*

*(2)    contain an accurate and specific account of the events leading to the use of force;*

*(3)    describe the level of resistance and the type and level of force used, consistent with OPP use of force policy and procedure, as well as the precise actions taken by OPSO staff in response to the incident;*

*(4)    describe the weapon or instrument(s) of restraint, if any, and the manner of such use;*

*(5)    be accompanied by a prisoner disciplinary report, if it exists, pertaining to the events or prisoner activity that prompted the use of force incident;*

*(6)    describe the nature and extent of injuries sustained by anyone involved in the incident;*

*(7)    contain the date and time when medical attention, if any, was requested and actually provided; and*

*(8)    describe any attempts the staff took to de-escalate prior to the use of force.*

*A.3.d. OPSO shall require correctional officers to notify the watch commander as soon as practical of any use of force incident or allegation of use of force. When notified, the watch commander will respond to the scene of all Level 1 uses of force. When arriving on the scene, the watch commander shall:*

*(1)    ensure the safety of everyone involved in or proximate to the incident;*

*(2)    determine if any prisoner or correctional officer is injured and ensure that necessary medical care is provided;*

*(3)    ensure that personnel and witnesses are identified, separated, and advised that communications with other witnesses or correctional officers regarding the incident are prohibited;*

*(4)    ensure that witness and subject statements are taken from both staff and prisoner(s) outside of the presence of other prisoners and staff;*

*(5)    ensure that the supervisor's use of force report is forwarded to IAD for investigation if, upon the supervisor's review, a violation of law or policy is suspected. The determination of what type of investigation is needed will be based on the degree of the force used consistent with the terms of this Agreement;*

*(6)    If the watch commander is not involved in the use of force incident, the watch commander shall review all submitted use of force reports within 36 hours of the end of the incident, and shall specify his findings as to completeness and procedural errors. If the watch commander believes that the use of force may have been unnecessary or excessive, he shall immediately contact IAD for investigation consideration and shall notify the warden or assistant warden; and*

*(7)    All Level 1 use of force reports, whether or not the force is believed by any party to be unnecessary or excessive, shall be sent to IAD for review. IAD shall develop and submit to the Monitor within 90 days of the Effective Date clear criteria to identify use of force incidents that warrant a full investigation, including injuries that are extensive or serious, visible in nature (including black eyes, injuries to the mouth, injuries to the genitals, etc.), injuries requiring hospitalization, staff misconduct (including inappropriate relationships*

*with prisoners), and occasions when use of force reports are inconsistent, conflicting, or otherwise suspicious.*

*A.3 e. Ensure that a first-line supervisor is present during all pre-planned uses of force, such as cell extractions.*

*A.3.f. Within 36 hours, exclusive of weekends and holidays, of receiving the report and review from the shift commander, in order to determine the appropriateness of the force used and whether policy was*



*followed, the Warden or Assistant Warden shall review all use of force reports and supervisory reviews including:*

      *(1)    the incident report associated with the use of force;*
      *(2)    any medical documentation of injuries and any further medical care;*
      *(3)    the prisoner disciplinary report associated with the use of force; and*
      *(4)    the Warden or Assistant Warden shall complete a written report or written statement of specific findings and determinations of the appropriateness of force.*

*A.3.g. Provide the Monitor a periodic report detailing use of force by staff. These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. Each report will include the following information:*

      *(1)    a brief summary of all uses of force, by type;*
      *(2)    date that force was used;*
      *(3)    identity of staff members involved in using force;*
      *(4)    identity of prisoners against whom force was used;*
      *(5)    a brief summary of all uses of force resulting in injuries;*
      *(6)    number of planned and unplanned uses of force;*
      *(7)    a summary of all in-custody deaths related to use of force, including the identity of the decedent and the circumstances of the death; and*
      *(8)    a listing of serious injuries requiring hospitalization.*

*A.3.h. OPSO shall conduct, annually, a review of the use of force reporting system to ensure that it has been effective in reducing unnecessary or excessive uses of force. OPSO will document its review and conclusions and provide them to the Monitor, SPLC, and DOJ.*

Findings:

A. 3. a.  Substantial Compliance

A. 3. b.  Substantial Compliance

A. 3. c.  Substantial Compliance

A. 3. d.  Partial Compliance

A. 3. e.  Substantial Compliance

A. 3. f.  Partial Compliance

A. 3.g.  Substantial Compliance

A. 3. h.  Partial Compliance

Observations:

     As to provision A. 3. a., the use of force policy requires all uses of force to be reported timely and completely and sets out the potential discipline if the policy is not followed. Review of documentation revealed that there continues to be cases in which supervisors failed to timely report force and some that only do so when instructed to write a report. Documentation of corrective action has improved greatly. There continues to be good communication between FIT and the Major of Security. With the beginning of enforcement of the policy which states that failure to report a use of force shall be grounds for discipline, the rating continues to be in substantial compliance.

     Provision A. 3. b. continues in substantial compliance due to the reduction in the



number of incomplete/inadequate use of force reports. The use of force policy includes the provisions required by the Consent Judgment, but lack of adherence still occurs. The Monitor provided a checklist of the report requirements to assist supervisors in ensuring reports included all necessary items. A review of those checklists and accompanying reports indicates that the required information still found to be missing from the use of force reports such as what led up to the incident, details of actions taken during the use of force, and resolution of the incident. Seldom do reports include an articulation of any de-escalation tactics, description of injuries sustained, and when medical attention was provided. Now, deputies and supervisors are beginning to be held accountable for failure to include required information. Provision A. 3. c. requires less information as it is a lesser level of force and remains in substantial compliance.

The unit managers and watch commanders still are not consistently compliant with the requirements of the Consent Judgment (IV. A. 3. d.) as to their specific duties and the time requirement for performance of these duties under the policies. This has been noted in multiple reports. The Consent Judgment requires submission of the packet to the Assistant Warden within 36 hours not three (3) days. It should be noted that, while OPSO continues to be in partial compliance, a major step towards improvement was shown. OPSO is now gathering the proper data, analyzing the data, and acting upon it. Credit for this improvement belongs to Major Griffin and the communication that is occurring between Sgt. Newman of FIT and him.

A. 3. e. continues to be in substantial compliance due to the presence of a supervisor for planned uses of force. One of the reasons for this provision is to allow for de-escalation to be attempted before the force is carried out. OPSO supervisors are inconsistent in utilizing de-escalation techniques.

It appears that the Major of Security is fulfilling the role of the Assistant Warden or Warden. Policy should be revised to reflect this change. The reviews, required under IV. A. 3. f., are being conducted by this major. Data and analysis provided indicates that the reviews required by this provision were conducted timely. OPSO has not provided sufficient documentation that the 36-hour time limit is being met so the provision remains in partial compliance. FIT issues a quarterly report which contains all the information required by IV. A. 3. g. Thus, this section is in substantial compliance. The annual review of use of force incidents as required by IV. A. 3. h. was provided to the Monitors and all parties. It should be



noted that the review is based on incomplete data due to several years backlog of cases to be reviewed by FIT. Also, no documentation of the meeting of the Use of Force Review Board during the reporting period was provided. While the review contained an improved analysis and confirmed the issues pointed out above, the corrective action plan to remedy the systemic issues only addressed a few of the issues. In order to warrant a rating of substantial compliance OPSO needed to address all of the issues; particularly the most serious issues such as the frequent use of force on the mental health housing units and lack of de-escalation that were not addressed. Therefore, the compliance rating remains at partial compliance.

## IV. A. 4. Early Intervention System ("EIS")

*A.4.a. OPSO shall develop, within 120 days of the Effective Date, a computerized relational database ("EIS") that will document and track staff members who are involved in use of force incidents and any complaints related to the inappropriate or excessive use of force, in order to alert OPSO management to any potential problematic policies or supervision lapses or need for retraining or discipline. The Chief of Operations Deputy, supervisors, and investigative staff shall have access to this information and shall review on a regular basis, but not less than quarterly, system reports to evaluate individual staff, supervisor, and housing area activity. OPSO will use the EIS as a tool for correcting inappropriate staff behavior before it escalates to more serious misconduct.*

*A.4.b. Within 120 days of the Effective Date, OPSO senior management shall use EIS information to improve quality management practices, identify patterns and trends, and take necessary corrective action both on an individual and systemic level. IAD will manage and administer EIS systems. The Special Operations Division ("SOD") will have access to the EIS. IAD will conduct quarterly audits of the EIS to ensure that analysis and intervention is taken according to the process described below. Command staff shall review the data collected by the EIS on at least a quarterly basis to identify potential patterns or trends resulting in harm to prisoners. The Use of Force Review Board will periodically review information collected regarding uses of force in order to identify the need for corrective action, including changes to training protocols and policy or retraining or disciplining individual staff or staff members. Through comparison of the operation of this system to changes in the conditions in OPP, OPSO will assess whether the mechanism is effective at addressing the requirements of this Agreement.*

*A.4.c. OPSO shall provide, within 180 days of the implementation date of its EIS, to SPLC, DOJ, and the Monitor, a list of all staff members identified through the EIS and corrective action taken.*

*A.4.d. The EIS protocol shall include the following components: data storage, data retrieval, reporting, data analysis, pattern identification, supervisory assessment, supervisory intervention, documentation, and audit.*

*A.4.e. On an annual basis, OPSO shall review the EIS to ensure that it has been effective in identifying concerns regarding policy, training, or the need for discipline. This assessment will be based in part on the number and severity of harm and injury identified through data collected pursuant to this Agreement. OPSO will document its review and conclusions and provide them to the Monitor, who shall forward this document to DOJ and SPLC.*

Findings:

A. 4. a.  Partial Compliance

A. 4. b.  Partial Compliance

A. 4. c.  Partial Compliance

A. 4. d.  Substantial Compliance

A. 4. e.  Substantial Compliance



Observations:

Due to unreliability of the electronic EIS, OPSO abandoned the original system and fashioned an alternative version within the AS400. A FIT staff member manually monitors the database to alert FIT staff as to the need to review any uses of force by a staff member.

OPSO has provided its documentation to the Monitors as to the names of the staff members who are flagged for uses of force. However, no review of staff alerted under the EIS was documented or provided. As the Use of Force Review Board had been tasked with the review and no documentation of it having met was provided. Thus, A. 4. a. and A. 4. c. are in partial compliance. Continued questionable and inappropriate uses of force by the same staff members and with the same inmates calls into question whether the EIS is being utilized to improve management quality practices, identify patterns and trends, and take necessary corrective action as required by A. 4. b. This provision is in partial compliance.

No proof of the Use of Force Review Board meeting during the monitoring period to evaluate the EIS data was provided. A meeting was held for the annual review of the EIS based on CY 2020 data. The review recommended that staff who have alerted the EIS be informed of the alert. It is unclear whether those conducting the review noticed that EIS referrals and actions were not documented or simply did not note that failure. However, the review is the annual one based on the entire CY2020 and therefore IV. A .4. e. remains in substantial compliance. It should be noted that the review was based on inadequate data due to the backlog in FIT.

## IV. A. 5. Safety and Supervision

*A.5.a. Maintain security policies, procedures, and practices to provide a reasonably safe and secure environment for prisoners and staff in accordance with this Agreement.*
*A.5.b. Maintain policies, procedures, and practices to ensure the adequate supervision of prisoner work areas and trustees.*
*A.5.c. Maintain policies and procedures regarding care for and housing of protective custody prisoners and prisoners requesting protection from harm.*
*A.5.d. Continue to ensure that correctional officers conduct appropriate rounds at least once during every 30- minute period, at irregular times, inside each general population housing unit and at least once during every 15-minute period of special management prisoners, or more often if necessary. All security rounds shall be documented on forms or logs that do not contain pre-printed rounding times. In the alternative, OPSO may provide direct supervision of prisoners by posting a correctional officer inside the day room area of a housing unit to conduct surveillance.*
*A.5.e. Staff shall provide direct supervision in housing units that are designed for this type of supervision. Video surveillance may be used to supplement, but must not be used to replace, rounds by correctional officers.*
*A.5.f. Increase the use of overhead video surveillance and recording cameras to provide adequate coverage throughout the common areas of the Jail, including the Intake Processing Center, all divisions' intake areas, mental health units, special management units, prisoner housing units, and in the divisions' common areas.*



*A.5.g. Continue to ensure that correctional officers, who are transferred from one division to another, are required to attend training on division-specific post orders before working on the unit.*

*A.5.h. Continue to ensure that correctional officers assigned to special management units, which include youth tiers, mental health tiers, disciplinary segregation, and protective custody, receive eight hours of specialized training regarding such units on prisoner safety and security on at least an annual basis.*

*A.5.i. Continue to ensure that supervisors conduct daily rounds on each shift in the prisoner housing units and document the results of their rounds.*

*A.5.j. Continue to ensure that staff conduct daily inspections of cells and common areas of the housing units to protect prisoners from unreasonable harm or unreasonable risk of harm.*

*A.5.k. Continue to ensure that staff conduct random monthly shakedowns of cells and common areas so that prisoners do not possess or have access to dangerous contraband.*

*A.5.l. Provide the Monitor a periodic report of safety and supervision at the Facility. These periodic reports shall be provided to the monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. Each report will provide the following information:*

    *(1)    a listing of special management prisoners, their housing assignments, the basis for them being placed in the specialized housing unit, and the date placed in the unit; and*

    *(2)    a listing of all contraband, including weapons seized, the type of contraband, date of seizure, location, and shift of seizure.*

Findings:

A. 5. a.  Partial Compliance

A. 5. b.  Substantial Compliance

A. 5. c.  Substantial Compliance

A. 5. d.  Partial Compliance

A. 5. e.  Partial Compliance

A. 5. f.  Substantial Compliance

A. 5. g.  Substantial Compliance

A. 5. h.  Partial Compliance

A. 5. i.  Partial Compliance

A. 5. j.  Partial Compliance

A. 5. k.  Partial Compliance

A. 5. l.  Partial Compliance

Observations:

OPSO has worked hard to finalize policies, procedures, and post orders. The implementation of those policies, procedures, and practices and the adequate supervision of inmate working areas results in substantial compliance as to A. 5. b. and c. The level of violence, an average of 24 inmate on inmate assaults/altercations per month and 10 assaults on staff per month despite the reduction in inmate population, are indicative that OPSO has not substantially complied with the requirement that the facility be reasonably safe for staff and inmates. These both reflect a decrease over the previous monitoring period, but suspect



given the systematic underreporting of reportable incidents. Even at the lower number, they are still at an unacceptable level. While the Monitors are well aware that violent incidents occur in jail facilities, the level currently reflects partial compliance with the obligation to provide a reasonably safe and secure environment as to A.5.a.

Review of the significant incidents during the monitoring period indicates that the failure of staff to follow policy consistently continues to be a serious impediment to effective supervision of the inmates. Staff continue to leave inmates unsupervised and allow them to have access to materials by which to fashion weapons. Many of the inmate-on-inmate assaults occur because staff allow inmates out of their cells who are to be kept separate from each other and/or leave inmates out of their cells unsupervised. There are inmates who repeatedly do not follow the rules of OJC including assaulting other inmates, assaulting staff, destroying property, and/or threatening self-harm. OPSO has chosen to house many of those inmates in a close security unit. It would be beneficial to develop individual inmate management plans for these inmates which would include specific security measures to be used when these inmates are allowed out of their cells. Such plans, if done routinely and consistently followed by all staff, would likely reduce the level of violence in the facility. To date, there is no indication that it is being done on a consistent basis; if at all.

**Table 5 CY 2018-CY 2021 OJC Reported Incidents**

| 2018 | Inmate/Inmate Assault | Inmate Staff Altercation | Use of Force | PREA | Death | Attempt Suicide/Ideation | Internal Escape | Criminal Damage | Inmate Injury/Inmate Medical (AKA slip/falls/overdoses) | Contraband | Staff Arrest | Staff Misconduct/Suspension | Other | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| January | 38 | 7 | 13 | 2 | 0 | 6 | 2 | 3 | 9 | 9 | 0 | 0 | 3 | 92 |
| February | 28 | 6 | 10 | 4 | 0 | 14 | 2 | 10 | 5 | 15 | 2 | 0 | 0 | 96 |
| March | 37 | 7 | 21 | 5 | 0 | 4 | 3 | 11 | 18 | 5 | 0 | 0 | 1 | 112 |
| April | 39 | 9 | 22 | 4 | 0 | 4 | 3 | 12 | 22 | 5 | 0 | 0 | 1 | 121 |
| May | 52 | 0 | 24 | 5 | 1 | 0 | 5 | 8 | 19 | 10 | 0 | 0 | 0 | 124 |
| June | 46 | 7 | 26 | 5 | 0 | 6 | 7 | 3 | 32 | 9 | 1 | 0 | 2 | 144 |
| July | 30 | 4 | 20 | 4 | 0 | 9 | 3 | 3 | 30 | 13 | 0 | 0 | 0 | 116 |
| Aug | 39 | 3 | 27 | 3 | 0 | 13 | 2 | 6 | 30 | 6 | 0 | 0 | 3 | 132 |
| Sept | 33 | 6 | 14 | 2 | 0 | 7 | 5 | 4 | 35 | 6 | 0 | 0 | 0 | 118 |
| Oct | 32 | 9 | 28 | 5 | 0 | 3 | 0 | 2 | 26 | 7 | 0 | 0 | 1 | 113 |
| Nov | 31 | 6 | 21 | 5 | 0 | 5 | 8 | 3 | 18 | 7 | 0 | 0 | 1 | 105 |
| Dec | 37 | 0 | 34 | 3 | 1 | 7 | 8 | 4 | 18 | 14 | 0 | 0 | 3 | 129 |
| Total | 442 | 64 | 260 | 47 | 2 | 78 | 48 | 60 | 262 | 106 | 3 | 0 | 15 | 1396 |

| 2019 | Inmate/Inmate Assault | Inmate Staff Altercation | Use of Force | PREA | Death | Attempt Suicide/Ideation | Internal Escape | Criminal Damage | Inmate Injury/Inmate Medical (AKA slip/falls/overdoses) | Contraband | Staff Arrest | Staff Misconduct/Suspension | Other | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| January | 40 | 1 | 27 | 2 | 0 | 15 | 3 | 7 | 14 | 14 | 0 | 0 | 0 | 123 |
| February | 26 | 7 | 29 | 2 | 0 | 13 | 1 | 0 | 4 | 11 | 0 | 0 | 0 | 93 |
| March | 25 | 4 | 26 | 1 | 0 | 6 | 1 | 2 | 16 | 21 | 0 | 0 | 3 | 105 |
| April | 28 | 7 | 26 | 1 | 0 | 3 | 0 | 3 | 15 | 27 | 0 | 0 | 2 | 112 |
| May | 36 | 11 | 22 | 6 | 0 | 13 | 0 | 2 | 11 | 25 | 0 | 0 | 1 | 127 |
| June | 55 | 9 | 26 | 4 | 0 | 13 | 0 | 2 | 16 | 23 | 0 | 0 | 0 | 148 |
| July | 50 | 15 | 31 | 5 | 0 | 6 | 0 | 3 | 8 | 13 | 0 | 0 | 0 | 131 |
| Aug | 32 | 17 | 37 | 6 | 0 | 7 | 1 | 8 | 20 | 35 | 0 | 0 | 0 | 163 |
| Sept | 32 | 4 | 31 | 3 | 0 | 2 | 0 | 1 | 10 | 24 | 0 | 0 | 0 | 107 |
| Oct | 38 | 15 | 37 | 4 | 0 | 1 | 0 | 7 | 18 | 33 | 0 | 0 | 0 | 158 |
| Nov | 55 | 12 | 33 | 7 | 0 | 0 | 0 | 6 | 5 | 42 | 0 | 0 | 0 | 160 |
| Dec | 23 | 15 | 33 | 1 | 0 | 3 | 0 | 6 | 8 | 34 | 0 | 0 | 0 | 123 |
| Total | 440 | 117 | 358 | 42 | 0 | 82 | 6 | 47 | 145 | 302 | 0 | 0 | 6 | 1545 |



| 2020 | Inmate/ Inmate Assault | Inmate Staff Altercation | Use of Force | PREA | Death | Attempt Suicide/ Ideation | Internal Escape | Criminal Damage | Inmate Injury/ Inmate Medical (AKA slip/falls) | Contraband | Staff Arrest | Staff Misconduct/ Suspension | Other | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| January | 31 | 8 | 29 | 4 | 0 | 3 | 0 | 1 | 7 | 35 | 0 | 0 | 0 | 118 |
| February | 35 | 12 | 33 | 2 | 0 | 0 | 0 | 3 | 13 | 29 | 0 | 0 | 1 | 129 |
| March | 24 | 9 | 31 | 1 | 0 | 1 | 0 | 3 | 6 | 35 | 0 | 0 | 0 | 110 |
| April | 25 | 19 | 45 | 7 | 0 | 0 | 0 | 2 | 1 | 24 | 0 | 0 | 0 | 125 |
| May | 24 | 11 | 37 | 1 | 0 | 1 | 0 | 0 | 6 | 3 | 12 | 0 | 0 | 95 |
| June | 28 | 13 | 22 | 4 | 2 | 1 | 0 | 5 | 12 | 63 | 0 | 0 | 0 | 150 |
| July | 22 | 9 | 21 | 1 | 0 | 2 | 0 | 4 | 5 | 47 | 0 | 0 | 0 | 111 |
| Aug | 22 | 8 | 22 | 2 | 1 | 4 | 0 | 11 | 4 | 31 | 0 | 0 | 0 | 105 |
| Sept | 16 | 12 | 24 | 2 | 0 | 2 | 0 | 8 | 4 | 9 | 0 | 0 | 0 | 77 |
| Oct | 24 | 10 | 35 | 2 | 0 | 1 | 0 | 3 | 3 | 14 | 0 | 0 | 0 | 92 |
| Nov | 28 | 10 | 33 | 5 | 0 | 2 | 0 | 9 | 5 | 31 | 0 | 0 | 0 | 123 |
| Dec | 30 | 18 | 40 | 4 | 0 | 4 | 0 | 7 | 1 | 21 | 0 | 0 | 0 | 125 |
| Total | 309 | 139 | 372 | 35 | 3 | 21 | 1 | 64 | 64 | 351 | 0 | 0 | 1 | 1360 |

| 2021 | Inmate/ Inmate Assault | Inmate Staff Altercation | Use of Force | PREA | Death | Attempt Suicide/ Ideation | Internal Escape | Criminal Damage | Inmate Injury/ Inmate Medical (AKA slip/falls/ overdoses) | Contraband | Staff Arrest | Staff Misconduct/ Suspension | Other | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| January | 32 | 20 | 38 | 1 | 0 | 0 | 0 | 3 | 3 | 32 | 0 | 0 | 0 | 129 |
| February | 30 | 14 | 27 | 2 | 0 | 1 | 0 | 2 | 5 | 14 | 0 | 0 | 0 | 95 |
| March | 24 | 7 | 16 | 4 | 0 | 0 | 0 | 5 | 4 | 24 | 0 | 0 | 0 | 84 |
| April | 27 | 10 | 24 | 2 | 0 | 1 | 1 | 2 | 4 | 45 | 0 | 0 | 0 | 116 |
| May | 31 | 7 | 21 | 0 | 0 | 0 | 0 | 3 | 1 | 23 | 0 | 0 | 0 | 86 |
| June | 25 | 15 | 34 | 0 | 1 | 0 | 0 | 4 | 4 | 30 | 0 | 0 | 0 | 113 |
| July | 22 | 10 | 22 | 0 | 0 | 6 | 0 | 8 | 3 | 31 | 0 | 0 | 0 | 102 |
| Aug | 19 | 7 | 18 | 0 | 0 | 5 | 0 | 2 | 4 | 20 | 0 | 0 | 0 | 75 |
| Sept | 18 | 6 | 28 | 3 | 0 | 1 | 0 | 1 | 7 | 23 | 0 | 0 | 0 | 87 |
| Oct | 22 | 8 | 31 | 0 | 0 | 1 | 0 | 6 | 3 | 52 | 0 | 0 | 0 | 123 |
| Nov | 21 | 11 | 27 | 2 | 0 | 4 | 0 | 4 | 3 | 38 | 0 | 0 | 0 | 108 |
| Dec | 22 | 9 | 25 | 3 | 0 | 1 | 0 | 2 | 2 | 18 | 0 | 0 | 0 | 84 |
| Total | 293 | 124 | 311 | 17 | 1 | 20 | 1 | 42 | 43 | 350 | 0 | 0 | 0 | 1202 |

OPSO still does not consistently conduct and document security rounds (30 minutes or 15 minutes depending on the unit) nor perform direct supervision surveillance consistent with the requirements of the Consent Judgment or OPSO policy.

Direct supervision requires surveillance of all of the inmates and cannot be properly performed by sitting behind a desk or in the control module. It requires walking around the unit, looking into the individual cells, and actively engaging with the inmates. Staffing was routinely inadequate or inconsistent throughout the shift. Review of incident reports revealed that units were often unstaffed, including mandatory posts. If staff are not present, it is impossible to make the required rounds. The staff writes their rounds on paper forms in addition to entry into the log. While this provides an easier way for a supervisor to see during a unit inspection if the deputy has recorded that the security checks are being performed timely, it is insufficient proof that the security checks actually occurred and requires watching hours of video to verify. Review of video footage after an incident often reveals that security checks are not being conducted even if recorded in the logbook. OPSO has indicated that with the beginning of the formation of the compliance unit that OPSO has now started to audit log sheets with video footage and plans to have an audit report for the next compliance period. It appears that the audits are being conducted, if at all, by the unit managers. At the unit managers' meeting, one of the statistics reported was the number of security checks which occurred. The percentage reported on some units appeared to be higher than what a review of the incident reports would reflect. During the onsite monitoring visit, Monitors viewed the documentation for security checks of the units. When



questioned, as during the previous tour, deputies usually were able to describe what an acceptable security check would look like. However, the deputies admitted that they did not perform all of the tasks for a proper security check each time a security check was recorded as having taken place. Usually, an adequate security check was only performed when a physical count of the inmates took place; at most, twice a twelve-hour shift. The rest of the "checks" were no more than looking about the housing unit without leaving the deputy station. Sufficient proof of compliance has not been provided. OPSO remains in partial compliance with IV. A. 5. d.

A review of the paper logs and forms during the monitoring tour revealed that timely rounds were often not performed and are not accurate. OPSO should consider a reliable system that would allow for rounds, by both deputies and supervisors, to be recorded electronically. Not only would it allow for supervisors to quickly determine whether rounds were being conducted timely, it would allow for OPSO to prove compliance and address non-adherence.

All twenty-four (24) of the housing units in OJC are designed for direct supervision. At the time of the drafting of the Consent Judgment the design of OJC was known. The Consent Judgment requires that staff shall provide direct supervision in housing units that are designed for this type of supervision. Thus, continual presence of a deputy in each housing unit at OJC and TDC is mandatory under the Consent Judgment. OPSO, during the last several reports, has taken the position that OPSO gets to determine which housing posts are mandatory and routinely does not assign mandatory staff to each housing unit. In addition, deputies are frequently absent from even the housing units designated by OPSO as mandatory. More often than not, one deputy is assigned to two or more housing units. OPSO's interpretation of the Consent Judgment is inconsistent with the plain wording of the Consent Judgment and the manner in which it has been applied by the Monitors since its inception. It is impossible to conduct direct supervision if a deputy is not present in the housing unit. The harm that results from not having a deputy in each pod, especially when inmates are out, is evident by the repeated serious incidents occurring when there is no deputy on the unit. Thus, IV. A. 5. e. remains in partial compliance.

Regarding overhead video surveillance and recording cameras for OJC (A. 5. f.), significant repairs were made to the recording system. There are still times when a nonfunctional camera is discovered when a supervisor or an investigator tries to retrieve the



videos. OPSO needs to continue to audit the system by having a supervisor test the various cameras on a monthly basis and preparing a report for the Chief of Security. IV. A. 5. f. continues to be in substantial compliance. Supervisors have improved on pulling video as required by the Use of Force policy.

No staff was transferred between divisions during the monitoring period; thus, IV. A. 5. g. is in substantial compliance. Proof for deputies assigned to some of the specialized units was provided. However, no proof of training provided for the deputies assigned to the Temporary Mental Health Facility (TMH) before they were transferred was provided; IV. A. 5. h. is in partial compliance. Given the high level of incidents in the specialized units, it is recommended that the training be reviewed, and deficiencies addressed.

Documentation is lacking that supervisors consistently conduct daily rounds during this compliance period; thus, IV. A. 5. i. continues to be in partial compliance. Supervisors are required to sign off on the round sheet completed by the pod deputy, but this does not provide proof that the supervisor conducted daily rounds. The daily inspections of housing units as required by VI. A. 5. j. has improved but are still only in partial compliance. It is concerning that neither the inspections by the deputies or the supervisors resulted in the discovery of the destruction of items that are part of the jail to fashion weapons. It is essential that the inspections be thorough and that corrective actions are taken to address the inspection findings. This provision remains in partial compliance.

Monthly shakedowns were not conducted in substantial compliance with VI. A. 5. k. The data provided indicates that shakedowns were not conducted in substantial compliance during five of the six months during the monitoring period. There continues to be significant incidents involving contraband including the manufacturing and use of weapons fashioned from the jail itself. The review of contraband reports clearly indicates reoccurring issues. There continues to be a serious issue of inmates hoarding medication. Reports demonstrate that inmates are fashioning weapons out of items in the jail which are then used to assault other inmates. Reports and the site visit reveal that inmates are smuggling in marijuana and hallucinogens to smoke. Some of these items come through the mail, but there is a significant issue of staff smuggling in contraband. This indicates the need to analyze the data and develop a corrective action plan to reduce, if not stop, the hoarding of medication, the fashioning of weapons, and the flow of contraband into the facility.

The documentation provided for A. 5. l. does not cover the entire monitoring period

nor include all of the required information. Thus, A. 5. l. remains in Partial Compliance.

## IV. A. 6. Security Staffing

*A.6.a. OPSO shall ensure that correctional staffing and supervision is sufficient to adequately supervise prisoners, fulfill the terms of this Agreement, and allow for the safe operation of the Facility, consistent with constitutional standards.*

> *(1)    OPSO shall achieve adequate correctional officer staffing in the following manner: Within 90 days of the Effective Date, develop a staffing plan that will identify all posts and positions, the adequate number and qualification of staff to cover each post and position, adequate shift relief, and coverage for vacations. The staffing plan will ensure that there is adequate coverage inside each housing and specialized housing areas and to accompany prisoners for court, visits and legal visits, and other operations of OPP and to comply with all provisions of this Agreement. OPSO will provide its plan to the Monitor, SPLC, and DOJ for approval. The Monitor, SPLC, or DOJ will have 60 days to raise any objections and recommend revisions to the staffing plan.*
>
> *(2)    Within 120 days before the opening of any new facility, submit a staffing plan consistent with subsection (1) above.*
>
> *(3)    Within 90 days after completion of the staffing study, OPSO shall recruit and hire a full-time professional corrections administrator to analyze and review OPP operations. The professional corrections administrator shall report directly to the Sheriff and shall have responsibilities to be determined by the Sheriff. The professional corrections administrator shall have at least the following qualifications: (a) a bachelor's degree in criminal justice or other closely related field; (b) five years of experience in supervising a large correctional facility; and (c) knowledge of and experience in applying modern correctional standards, maintained through regular participation in corrections-related conferences or other continuing education.*
>
> *(4)    Provide the Monitor a periodic report on staffing levels at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. Each report will include the following information:*
>> *i.    a listing of each post and position needed;*
>> *ii.   the number of hours needed for each post and position; a listing of staff hired and positions filled;*
>> *iii.  a listing of staff working overtime and the amount of overtime worked by each staff member;*
>> *iv.   a listing of supervisors working overtime; and*
>> *v.    a listing of and types of critical incidents reported*

*A.6.b. Review the periodic report to determine whether staffing is adequate to meet the requirements of this Agreement. OPSO shall make recommendations regarding staffing based on this review. The review and recommendations will be documented and provided to the Monitor.*

Findings:

A. 6. a.  Partial Compliance

A. 6. b.  Partial Compliance

An overall rating of A. 6. was provided in the previous reports. This was inconsistent with the other introductory paragraphs and has now been discontinued.

Observations:

The level of staffing is insufficient to adequately supervise inmates and allow for the safe operation of the facility. There has been insufficient security staff for over the past few monitoring periods, and it continues to be at a level where the extensive use of overtime is



not enough to overcome the vacancies in security staff. OPSO's staffing reports document that mandatory posts are not filled on a consistent basis. Numerous incident reports and investigations reveal posts were not constantly staffed which resulted in increased violence. Efforts have been attempted to reassign some staff from areas that had excess staff but have not fully addressed the problem. Lacking is a coordinated effort on the utilization of overtime and redeployment of staff to ensure the mandatory posts are covered on a consistent basis. The deployment of staff is sufficiently inconsistent and insufficient to result in A. 6. a. (1) and IV. A. 6. a. (2) being in partial compliance. Provision IV. 6. a. (3) is in substantial compliance with the hiring of Byron LeCounte as the Chief of Corrections as of February 19, 2019. However, Chief LeCounte left the position at the end of 2021. Paragraph IV. 6. a. (4) is in substantial compliance, as monthly reports are produced to document hiring and termination of employees. The Stipulated Agreement also provides for bi-monthly reports regarding hiring. Paragraph 7.a. of the Stipulated Agreement of February 11, 2015, requires monthly reporting. Given the importance of the actual implementation of an approved staffing plan, A. 6. a. is in partial compliance. The last approved staffing plan was in September 2019.

OPSO is in partial compliance with A. 6. b. as OPSO has not provided a periodic review of the staffing plan. Discussion during the monitoring tour indicated that a plan exists, but it has not been finalized or submitted to the Monitors. A staffing plan which is based on staffing levels which do not exist is insufficient.

## IV. A. 7. Incidents and Referrals

*A.7.a.   OPSO shall develop and implement policies that ensure that Facility watch commanders have knowledge of reportable incidents in OPP to take action in a timely manner to prevent harm to prisoners or take other corrective action. At a minimum, OPSO shall do the following:*

*A.7.b.   Continue to ensure that Facility watch commanders document all reportable incidents by the end of their shift, but no later than 24 hours after the incident, including prisoner fights, rule violations, prisoner injuries, suicide attempts, cell extractions, medical emergencies, found contraband, vandalism, escapes and escape attempts, and fires.*

*A.7.c.   Continue to ensure that Facility watch commanders report all suicides and deaths no later than one hour after the incident, to a supervisor, IAD, the Special Operations Division, and medical and mental health staff.*

*A.7.d.   Provide formal pre-service and annual in-service training on proper incident reporting policies and procedures.*

*A.7.e.   Implement a policy providing that it is a disciplinary infraction for staff to fail to report any reportable incident that occurred on his or her shift. Failure to formally report any observed prisoner injury may result in staff discipline, up to and including termination.*

*A.7.f.   Maintain a system to track all reportable incidents that, at a minimum, includes the following information:*

  *(1)      tracking number;*
  *(2)      the prisoner(s) name;*



(3)     *housing classification and location;*
(4)     *date and time;*
(5)     *type of incident;*
(6)     *injuries to staff or prisoner;*
(7)     *medical care;*
(8)     *primary and secondary staff involved;*
(9)     *reviewing supervisor;*
(10)    *external reviews and results;*
(11)    *corrective action taken; and*
(12)    *administrative sign-off.*

***A.7.g. Ensure that incident reports and prisoner grievances are screened for allegations of staff misconduct, and, if the incident or allegation meets established criteria in accordance with this Agreement, it is referred for investigation.***

***A.7.h.   Provide the Monitor a periodic data report of incidents at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement.***

***A.7.i. The report will include the following information:***

(1)     *a brief summary of all reportable incidents, by type and date;*
(2)     *a description of all suicides and in-custody deaths, including the date, name of prisoner, and housing unit;*
(3)     *number of prisoner grievances screened for allegations of misconduct; and*
(4)     *number of grievances referred to IAD or SOD for investigation.*

***A.7.j.   Conduct internal reviews of the periodic reports to determine whether the incident reporting system is ensuring that the constitutional rights of prisoners are respected. Review the quarterly report to determine whether the incident reporting system is meeting the requirements of this Agreement. OPSO shall make recommendations regarding the reporting system or other necessary changes in policy or staffing based on this review. The review and recommendations will be documented and provided to the Monitor.***

Findings:

A. 7. a.  Substantial Compliance

A. 7. b.  Partial Compliance

A. 7. c.  Substantial Compliance

A. 7. d.  Partial Compliance

A. 7. e.  Substantial Compliance

A. 7. f.  Substantial Compliance

A. 7. g.  Substantial Compliance

A. 7. h.  Substantial Compliance

A. 7. i.  Substantial Compliance

A. 7. j.  Substantial Compliance

Observations:

OPSO has long had a policy on incidents and referrals that sets out the process for documenting and referring incidents. What has been lacking is a sufficient process to ensure all reportable incidents are being documented and that all incident reports are complete, prompt, and accurate. A concentrated effort by the command staff has resulted in



improvement by the watch commanders as far as the timeliness of the incidents for which a report is prepared. However, review of the routes of inmates and medical clinic walk-in log indicates that a significant number of incidents are not resulting in an incident report.

OPSO implemented a process where an OPSO staff member reviewed the "routes" of inmates with serious medical or trauma injuries to the hospital emergency and the OPSO clinic walk-in logs and compared them to the reports received. This function used to be performed by the Monitors. This is an example of OPSO incorporating processes which allow OPSO to audit its compliance. The lieutenant who was performing this process has been assigned significant other duties but has continued to be tasked with completing the review and notifying the Monitors and counsel of incidents. The accuracy and timeliness of the review and follow-up have suffered with the lieutenant's transfer. Someone else needs to be trained to take over the duties of review and notification of the Monitors and counsel. IV. A. 7. b. remains in partial compliance.

OPSO is doing a much better job of holding supervisors and security staff accountable for the late reports. Documentation was provided of accountability in the form of counseling. As OPSO has begun to enforce the policy regarding discipline for not timely filing reports, IV. A. 7. e. is in substantial compliance. What will be important is to track whether the counseling was effective in improving the timeliness of incident reports.

During this reporting period, there one death and several attempts at suicide and they were reported within an hour to the proper persons: thus IV. A. 7. c. is in substantial compliance. Annual training was provided on incident reporting, but documentation indicates that 17% of staff did not attend; IV. A. 7. d. is now in partial compliance. OPSO has transitioned to the AS 400 system to track the information required in IV. A. 7. f.  and is in substantial compliance. OPSO is doing a better job analyzing the data. The next step is utilizing the analysis to make required changes in policy and procedure. OPSO is in substantial compliance with A. 7. g.; incidents, and grievances are reviewed for misconduct and referred for investigation where appropriate. The Monitors were provided a semi-annual report of incidents, that now, with the supplementation by the daily/weekly reports, which contains all of the required information and, thus, IV. A. 7. h. and i. are in substantial compliance. OPSO performed an assessment of whether the reporting system is meeting the requirements of the Consent Judgment and is given substantial compliance for IV. A. 7. j. as OPSO is now addressing the lack of timeliness.



## IV.  A. 8.  Investigations

*A.8.a. Maintain implementation of comprehensive policies, procedures, and practices for the timely and thorough investigation of alleged staff misconduct, sexual assaults, and physical assaults of prisoners resulting in serious injury, in accordance with this Agreement. Investigations shall:*

    *(1)    be conducted by persons who do not have conflicts of interest that bear on the partiality of the investigation;*

    *(2)    include timely, thorough, and documented interviews of all relevant staff and prisoners who were involved in or who witnessed the incident in question, to the extent practicable; and*

    *(3)    include all supporting evidence, including logs, witness and participant statements, references to policies and procedures relevant to the incident, physical evidence, and video or audio recordings.*

*A.8.b. Continue to provide SOD and IAD staff with pre-service and annual in-service training on appropriate investigation policies and procedures, the investigation tracking process, investigatory interviewing techniques, and confidentiality requirements.*

*A.8.c. Ensure that any investigative report indicating possible criminal behavior will be referred to IAD/SOD and then referred to the Orleans Parish District Attorney's Office, if appropriate.*

*A.8.d. Provide the Monitor a periodic report of investigations conducted at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement.*

*A.8.e. The report will include the following information:*

    *(4)    a brief summary of all completed investigations, by type and date;*

    *(5)    a listing of investigations referred for administrative investigation;*

    *(6)    a listing of all investigations referred to an appropriate law enforcement agency and the name of the agency; and*

    *(7)    a listing of all staff suspended, terminated, arrested, or reassigned because of misconduct or violations of policy and procedures. This list must also contain the specific misconduct and/or violation.*

*A.8.f. OPSO shall review the periodic report to determine whether the investigation system is meeting the requirements of this Agreement and make recommendations regarding the investigation system or other necessary changes in policy based on this review. The review and recommendations will be documented and provided to the Monitor.*

<u>Findings:</u>

A. 8. a. Substantial Compliance

A. 8. b.  Substantial Compliance

A. 8. c.  Substantial Compliance

A. 8. d.  Substantial Compliance

A. 8. e.  Substantial Compliance

A. 8. f.  Substantial Compliance

<u>Observations</u>:

      The Investigative Services Division (ISB) is responsible for: the Criminal Investigation Division (investigates possible criminal activity by inmates), Internal Affairs Division-Criminal (investigates possible criminal activity by staff), the FIT (investigates use of force by staff), the Internal Affairs Division-Administrative (investigates possible violation of policies by staff), and the Intelligence Unit (provides information and intelligence regarding



activities that have taken place or may take place in the jail or support activities).

While there is evidence of substantial compliance provided for IV. A. 8. a., the timeliness of investigations involving in custody deaths and use of force threatens the rating despite some improvement. The three most experienced investigators resigned in 2020 and the lack of experience of those replacing them was evident in the quality of the death investigations initially done by the new investigators. The supervisor assigned to take over the duties of FIT supervisor has done a good job at assuming the duties and has worked with the Major of Security to bring an increased level of accountability to supervisors for properly completing the FIT packets. The investigators assigned to criminal investigations, including in custody death investigations have received additional training. Improvements in all other areas from hiring, training, supervision, and adequate staffing will enhance the safety of staff and inmates and, ultimately, decrease the workload of ISB.

The Monitor acknowledges that investigating incidents of inmate-on-inmate assaults, sexual assaults, staff on inmate assaults, etc. with a goal of seeking indictments is appropriate; but the overall goal is to create a safe jail. In a jail setting, investigations play a critical role in protecting inmates from inappropriate or illegal staff actions, protecting inmates from each other, and correcting policy, practice, supervision, and training. Continued emphasis is needed on the goal of investigations to prevent future incidents through analysis of the policy, procedures, training, supervision, and physical plant contributors to the incident. This function cannot and should not be performed by ISB alone. This level of assessment requires input from individuals who have a high level of experience in jail/corrections work. In short, it requires collaboration between ISB and OJC which has improved. While collaboration has improved, there is still insufficient follow through by the OJC staff. For instance, ISB discovered that the source of dangerous contraband being used to shatter windows originated in the utility closets on the housing units. The cabinets near the deputy's station were found to be the source of materials to make homemade knives or "shanks". Inmates literally are continuing to take the jail apart to fashion weapons. The failure of staff to keep the utility closets and cabinets locked throughout the monitoring period, and to refuse to remove the cabinets when made aware of the problem and to supervise inmates when allowed access to the utility closets and cabinets is the root cause of the problem. What would make the most sense would be to remove the cabinets as they serve no useful purpose. The best alternative to removal would be secure the cabinets. While



most of the utility closets were found to be secured during this monitoring tour, many of the cabinets were found to be unsecure and it is only a matter of time until inmates bypass the locks placed on the cabinets.

Supervision of sexual assault investigations was added to the duties of the FIT supervisor when the Lieutenant who was responsible for IAD-Criminal investigations resigned earlier this year. The quality of the investigations will continue to be monitored.

ISB has demonstrated training related to the investigative skills provided during 2021. IV. A. 8. b. remains in substantial compliance.

Investigations which reveal potential criminal activity are referred to the Orleans Parish District Attorney's Office in substantial compliance with A. 8. c. The Monitors remain concerned about the frequent refusal by the district attorney to follow through with filing cases related to indecent exposure by inmates towards staff. ISB provides reports in substantial compliance with IV. A. 8. d. and e. ISB reviewed the investigation system to determine whether the investigation system complies with the requirements of the Consent Judgment and forwarded any recommendations to the Monitors in substantial compliance with IV. A. 8. f.

### IV. A. 9. Pretrial Placement in Alternative Settings

*A.9.a. OPSO shall maintain its role of providing space and security to facilitate interviews conducted pursuant to the City's pretrial release program, which is intended to ensure placement in the least restrictive appropriate placement consistent with public safety.*
*A.9.b. OPSO shall create a system to ensure that it does not unlawfully confine prisoners whose sole detainer is by Immigration and Customs Enforcement ("ICE"), where the detainer has expired.*

Findings:

A. 9. a.  Substantial Compliance

A. 9. b.  Substantial Compliance

Observations:

OPSO provided a memorandum noting that the pretrial program is managed by the Criminal District Court, and that space is provided. OPSO also provided a memorandum that ICE detainers are only accepted for a specified list of offenses.  OPSO has not detained any individuals under an ICE detainer during the monitoring period.

### IV. A. 10. Custodial Placement within OPP

Introduction:

OPSO designed, validated, and implemented an objective classification system to assess and house OPSO inmates according to their risks posed to institutional safety and



security. The automated classification system was rolled out in the Jail Management System (JMS) on January 15, 2015.[1] The 2021 OPSO staffing plan reduced the classification unit staffing from 18.68 to 14 FTEs.[2] As of September 30, 2021, the Classification Unit staffing was 11 -- seven civilian classification specialists, four supervisors, and a classification manager.  During this compliance period, one (1) classification specialist resigned. No one was hired. Given the relatively low average daily population (ADP), low activity of the courts, and reduced admissions during this compliance period, staffing for the classification unit appears to be adequate. We will re-evaluate the reduced staffing level as these factors change.  However, the number of overtime hours logged by classification staff was double that of OPSO non-classification staff. There was no classification-related training during this compliance period.[3]

An automated housing assignment process (HUAP) identifies housing options for inmates according to their custody level, gender, special population status, PREA designations, enemies, and associates.  At initial classification, the classification specialists assign most male admittees to one of the first floor IPC ROLL IN pods. (Special population tags identify individuals for suicide observation versus suicide watch, medical housing/isolation, academic education, or special diets.) (As needed, men with acute mental health or medical needs go directly to 2A or 4B, respectively.  At intake, the women are housed on 3F.)  During this Compliance Period, the "IPC ROLL IN" pods housed all custody levels, PREA designations, and various special population tags. These housing assignments were cell-level separations by date of intake.  Enemies and associates were assigned to separate pods.

When transferring inmates from the IPC ROLL IN pods or following a custody or housing review, the classification specialists match the inmates by custody level, PREA designations, age, and crime/criminal history.

The OPSO revised its housing matrix on multiple occasions throughout this Compliance Period. These changes reflected fluctuations in demand for specialized intake housing units (IPC Non-Symptomatic Roll-Ins), isolation pods for individuals exposed to COVID-19, other special populations (medical, mental health, disciplinary, administrative segregation, and protective custody), and of course, the general population.

---

[1] Hardyman, Patricia L. (2015). "Design and Validation of an Objective Classification System for the Orleans Parish Sheriff's Office: Final Report." Hagerstown, MD: Criminal Justice Institute, Inc.
[2] Gusman, Marlin N. (March 16, 2021) "Coverage Plan 2021." Orleans Parish, LA: Office of the Sheriff. pp. 11
[3] The mandatory annual classification training was March 30 - 31, 2021.



Population fluctuations and isolation related to COVID-19 Pandemic requirements continued to create demands on the Classification Unit for housing transfers within a seemingly ever-changing housing matrix.  The Pandemic added another layer of complexity to the housing process to separate individuals by admission date, custody level, and PREA designation <u>within a cell</u>. As previously noted, the IPC Roll-In and isolation pods housed individuals of all custody levels, PREA designations, and special population tags (medical, mental health, administrative segregation, disciplinary, and protective custody).  Security staff does not use the ISI for the general population or special management pods.[4]  Schedules for the out-of-cell separations are pod-specific. Further, descriptions of the pod-level out-of-cell separations varied according to the staff member asked.  These inconsistencies were especially troubling for the IPC Roll-in and special population pods that house individuals of all custody and PREA designations.

Housing audits to verify individuals were in their assigned cells and beds were sporadic, and, for some units, non-existent.[5]  As previously reported, the classification supervisors described their respective audit schedules and scoring rules during an onsite workgroup meeting in June 2021. The goal of the June workgroup meeting was to standardize the audit scoring process and reports to ensure consistency across the auditors and to provide clarity for the audit reports for readers.  However, the "agreed" upon score sheet and instructions were not codified and distributed to the auditors. No in-service audit training was provided. Thus, the audit score sheets and reports continued to vary by the auditor and pod.

 Assessment Methodology:

Compliance was assessed through multiple data sources and activities – a review of the OPSO and JMS statistical reports, onsite meetings with OPSO staff, and a site visit conducted November 15 – 17, 2021. The OPSO documents included monthly statistical reports, housing audit reports, and monitoring logs. The JMS reports include ad hoc daily reclassification, population, and placement error reports.  Onsite activities included: observation of the initial classification, reclassification, housing, and housing audit processes, review of data and JMS screens for documenting inmate enemies and associates, and

---

[4] The ISI (Inmate Separation Instrument) is an automated JMS report to identify appropriate out-of-cell separations for the mixed custody and special populations units. As a pod deputy may not be aware or have access to the multiple factors requiring separation of individuals within a pod, failure to use the ISI threatens everyone's safety and institutional security.
[5] The COVID-19 quarantine, TDC, and TMH pods were not audited.



meetings with OPSO staff, including but not limited to classification, security supervisors (re out-of-cell schedules), facility administrators, and WellPath. This compliance review focused primarily on the April 1, 2021 – September 30, 2021, data and activities. Some analyses considered trends over a twelve to fifteen-month (12-15) period to detect variations due to seasonal variations and COVID-19 related procedures.

Summary:

OPSO is in substantial compliance with four of the eight Custodial Placement sections of the Consent Judgment (IV. A.10). Sections a, e, f, and g are rated as Partial Compliance. Notable was the regression from Substantial to Partial Compliance for Sections a (full implementation of an objective classification system) and g (*review and recommendations will be documented and provided to the Monitor*).  Section f (internal and external review and validation of the System) was anticipated to progress to Substantial Compliance. OPSO's performance stalled, and in some respects, regressed.  Hence, the rating for Section f is very close to Noncompliance.   Assessment for section 10.e. (competency-based training) was knotty.  OPSO provided the required annual training in March 2021. However, no in-service training or instruction was provided to address the inadequacies/ inconsistencies of the housing audit reports.  Also troubling was the classification specialists' ignorance of the scoring rules for the custody and PREA risk factors and disciplinary-related attachments.

Findings:

A. 10. a.  Partial Compliance

A. 10. b.  Substantial Compliance

A. 10. c.  Substantial Compliance

A. 10. d.  Substantial Compliance

A. 10. e.  Partial Compliance

A. 10. f.  Partial Compliance

A. 10. g.  Substantial Compliance

A. 10. h.  Partial Compliance

***IV.A.10. a. OPP shall implement an objective and validated classification system that assigns prisoners to housing units by security levels, among other valid factors, in order to protect prisoners from unreasonable risk of harm. The System shall include consideration of a prisoner's security needs, the severity of the current charge, types of prior commitments, suicide risk, history of escape attempts, history of violence, gang affiliations, and special needs, including mental illness, gender identity, age, and education requirements. OPSO shall anticipate periods of unusual intake volume and schedule sufficient classification staff to classify prisoners within 24 hours of booking and perform prisoner reclassifications, assist eligible DOC prisoners with re-entry assistance (release preparation), among other duties.***



Finding:

Partial Compliance

Observations:

As of September 30, 2021, the Classification Unit staffing was 12 -- seven civilian classification specialists, four supervisors, and a classification manager.  During this compliance period, one (1) classification specialist resigned. No one was hired. The shift supervisors are responsible for supervising the classification specialists, processing housing transfers, completing custody reviews, conducting housing audits, addressing classification-related grievances, and making rounds of the pods. The classification specialists complete the initial custody and predation/ vulnerability (PREA) assessments, conduct custody and PREA risk reviews, and identify appropriate housing as per the individual's assessed custody, PREA status, and special needs and assign and then assign the individuals to an appropriate pod and cell. Custody reviews and housing re-assignments are new responsibilities for the classification specialists.   Previously, classification supervisors completed the custody re-assessments and housing updates.

The classification staff continued to log significant overtime during this compliance period. Between April 1st and September 30th of 2021, the Classification Unit logged 2,788.57 hours of overtime.[6]  During this compliance period, each classification specialist worked an average of 40.2 hours/month overtime; the classification supervisors logged 47.51 hours/month overtime.  (In contrast, non-Classification Unit staff logged, per person, an average of 26.23 hours/month during this compliance period.)   At least in part, the classification staff spent the extra hours modifying housing assignments to address COVID-19-related quarantine and isolations and multiple adjustments to the housing matrix. However, the continued high levels of overtime raise questions about the adequacy of the staffing of the Classification Unit.

The onsite visit highlighted the fact that the OPSO had not addressed two key concerns noted in the previous compliance reports.  First, 20 of 32 OJC/TDC pods house individuals of all custody, vulnerability, predation, and special population status.  The problem began with the failure to differentiate the intake roll-in pods by custody level, PREA

---

[6] OPSO Excel spreadsheets entitled "Overtime by Month – April - September 2021" and "2021 HR Report – January – September 2021."



status, or special population status and was continued for the TMH and female units. Within these units, individuals are assigned to any available cell with little regard to the objective housing criteria. (The exceptions are the COVID-19 protocols require separations by intake date, lower bunk assignments for medical need(s), and suicide resistance/observation cells, as needed.)  Within the TMH units. the treatment teams assign patients cells according to their mental health needs with little regard for custody or PREA status. (Known enemies live in separate pods.) Housing assignments, activities, and out-of-cell time are according to the individual's program/treatment level.  So again, classification becomes irrelevant. Inadequate security staffing and ad hoc schedules for the out-of-cell activities compound the risks associated with "ALL CUSTODY ALL STATUS" pods.

  The second concern was the blatant failure by security staff to maintain/ enforce the housing assignments specified by the Classification Unit.  During the onsite housing audits, multiple individuals were not living in their assigned cells or sleeping in their allotted bunks. These observations parallel the findings recorded on the housing audit reports indicating individuals were not living in their given cell and or bunk. The disappointing conclusion was that the classification system had become a housing game rather than an objective risk assessment process.  Thus, the compliance rating for Section 10 a was downgraded from Substantial to Partial Compliance as OPSO has failed to maintain the integrity of its objective classification system.

***IV.A.10.b. Prohibit classifications based solely on race, color, national origin, or ethnicity.***
<u>Finding:</u>
Substantial Compliance
<u>Observations:</u>

  The custody assessments consider objective risk factors validated for the OPSO male and female inmates. The individual's race is not one of the objective risk factors. Classification specialists consider the individual's custody level, vulnerability designation, age, and charges to select a cell and bed from those the JMS automated housing program identifies as appropriate housing for the individual. To track this element of the Consent Judgment, OPSO created a monthly statistical report to record the race and gender of individuals per housing location.



The "Housing By Race" reports suggested that race was not a factor for the OJC housing assignments. With a few exceptions, the number of Black and White inmates within each OJC housing unit was generally consistent with the overall racial distributions among the OPSO inmate population. However, the percentages of White inmates assigned to the TDC DOC worker unit and the female TMH unit exceed the proportions of white inmates within the total inmate population for each month of the compliance period. As shown in Figure 1, on average, 13.3 percent of the OPSO male population identified as White. However, on average, 25.9 percent of the men assigned to the TDC DOC worker unit were White. On the other hand, only 6.8 percent of the men assigned to a TMH unit were White. In contrast, among the women, an opposite trend was observed. As shown in Figure 2, on average, 21.3 percent of the OPSO female population identified as White. However, on average, 37.7 percent of the women assigned to the TMH unit were White.

While these data suggest race was not a housing factor within OJC, the data does create concerns re disparate housing assignments generated by the DOC worker program criteria and the mental health assignment process among the women.



Figure 1: Percentage of White Male Inmates Assigned to OJC, TDC & TMH Housing Units – January – September 2021.





Figure 2: Percentage of White Female Inmates Assigned to OJC & TMH Housing Units – January – September 2021.

***IV.A.10.c Ensure that the classification staff has sufficient access to current information regarding cell availability in each division.***

Finding:

Substantial Compliance

Observations:

      OPSO automated housing assignment process (HUAP) considers the inmate's custody level, gender, special population status, PREA designations, enemies, and associates versus OJC beds available, to recommend an appropriate bed. The COVID-19 intake housing protocols also require matching cellmates by their admission dates.  Housing tags identify inmates on suicide observation versus suicide watch, alcohol/drug detoxification protocol, gang affiliation, school participation, and special diets.

      The JMS daily population report lists the units, cells, and beds off-line for maintenance or staffing, as recorded in the AS400.  The cells/pods off-line, as listed in the AS400, appeared to be an accurate record.  The classification supervisors noted the cells that required maintenance as part of their weekly audits and rounds; the problems were entered into the AS400 by the classification manager.

      Classification specialists maintain a list of daily bed assignments to avoid duplications due to delays between the inmate's housing assignment and physical transfer of the designated pod/cell. The lists, memos, and notes of broken cells and maintenance issues were removed from the walls of the classification work areas in preparation for the Compliance Reviews.  However, these <u>manual</u> lists and notes continue to direct and inform the housing



COMPLIANCE REPORT #15                                        48

assignments.  Again, OPSO is urged to ensure all information regarding cell or bunk availability is promptly updated with the JMS.

OPSO should update the JMS housing availability logic to consider the COVID-19 isolation protocols, i.e., intake date.  A quick conversation with the JMS programmers confirmed that the housing and ISI programs could be easily modified to consider the intake date for the Roll-In Pods.  Further, the ISI could be adjusted to consider mezzanine vs. lower-level cells within the special population units.

Overall, the classification specialists have access to automated and manual information regarding current bed availability throughout OJC, TDC, and TMH.

***IV. A. 10. d. Continue to update the classification system to include information on each prisoner's history at OPSO.***

Finding:

Substantial Compliance

Observations:

As shown in Figure 3, the monthly custodial reports provided by OPSO indicated:

- **Percent Initial Custody Assessments**: During this Compliance Period, the Classification Unit completed initial custody assessments for 90.4 percent of the inmates booked into OJC.  Excellent!  This rate is a slight improvement over the rate observed (89%) for the previous Compliance Period.

- **Percent Within 8 Hours:** During this Compliance Period, the percentage of initial classifications completed within the first eight hours of booking fluctuated between 76.4 and 85.5 percent; the average rate across the six months was 82.8 percent.  On the other hand, the percentage of cases completed between 8.01 and 24 hours fluctuated between 5.5 and 12.7 percent; the average was 7.4 percent. Thus, less than one in ten inmates remained in the booking area for more than eight hours before assignment to a bed. This rate was on par with the pace of one in ten observed for the previous compliance period – September 2020 - March 2021.

- **Percent Greater Than 24 Hours:** Very few -- only .4 percent -- of the inmates remained in the OJC intake booking area for more than 24 hours. This rate continued the trend observed for the previous compliance period.





*Figure 3: Rates and Completion Time for Initial Custody Assessments Completed October 2020 – September 2021*

These data suggested that the percentage of inmates for whom an initial classification is completed and the lag time between booking and classification/housing have stabilized. As the COVID-19 Pandemic eases or the OJC bookings increase, close monitoring of the classification staffing patterns is vital to ensure these excellent rates are maintained.

As previously noted in this report, as well as previous compliance reports, the OPSO Housing Matrix was revised on multiple occasions to ensure appropriate separations for COVID-19 treatment, quarantine, and isolation and to address shifts within the inmate population.  These "ALL CUSTODY - ALL STATUS" pods create significant risks as Low, Medium, and High custody inmates with different PREA designations and special needs live in the same housing unit.

OPSO command and security staff initially reported using the automated ISI (Inmate Separation Instrument) to maintain out-of-cell separations within these multi-custody/ special population units.  However, the virtual tours -- observations and security staff reports -- indicated the out-of-cell schedules are based on location. Five to six consecutive cells are open at one time. For example, group 1 might include lower-level cells 15 – 19; group 2 would then include lower-level cells 10 - 14.  Deputies do not consult the separations reports or the ISI to determine out-of-cell separations. Security staff reported exchanging information regarding intra-pod conflicts and tensions between the shifts. All agreed shift debriefs, and intelligence-sharing are essential for identifying and maintaining inmate separations. However, these exchanges were not systematically documented in the



pod logbook or current roster.  Unfortunately, the "pressures of the day" frequently disrupt the basic pod schedule. As a result, security staff expands the size of the evening groups to ensure all receive out-of-cell time. As previously noted, inadequate OJC staffing continues to compound this scenario.

The problem is not limited to the intake and special population pods. As observed during a housing audit for this review, most of the 49 high-custody inmates were out of their cells. (The deputy reported that "today's" schedule was for the top vs. bottom levels of the pods to be out of their cells together. However, the audit revealed a mix of the mezzanine and lower-level cells were open.)   Regardless of the staffing patterns, pod mission, and schedules, the sub-standard practice of mixed custody/vulnerable inmates should be reviewed and discontinued as soon as possible. A straightforward option is to list the custody level and key separation tags on the housing rosters. (As previously observed, the ISI programming can be easily tweaked to consider admission date and COVID-19 isolation status.) Further, refresher ISI training and enforcement of housing assignments among security staff are critical for maintaining inmate separations and, thus, institutional safety and security.

Previous compliance reports have delineated the dangers of overriding the inmate custody levels for housing purposes. As shown in Figure 4, custody overrides for housing increased slightly during this compliance period: October 2020 – March 2021 = 18.2 percent versus April – September 2021 = 20.4 percent.  (The most common reasons cited were PREA-related: Known/Potential Predator = 31.6% of overrides and Potential Victim = 23.7%. Unfortunately, staff did not provide a rationale for 20.3 percent of the overrides.)  It is unclear why overrides for housing purposes continue given the decline in the ADP and the number of "All Custody ALL PREA" pods.





Figure 4: Percent Overrides for Housing Purposes - October 2020 – March 2021

The April - September 2021 classification stock population reports indicated the scored custody level was overridden for less than 3 percent of the inmates (2.7%).  (See Figure 5.) These are very low rates, well below the recommended rates of 5 to 15 percent.[7] However, within this small group of inmates, approximately 20 percent are housing-related overrides. Further, one could argue that the "Potential Victim" overrides are modifications for bed/cell assignments as all Minimum Custody, Potential Victims are overridden to Medium Custody.  Under the COVID-19 Pandemic, the OJC ADP dropped dramatically and has remained low. (See Figure 9.) Thus, classification staff had greater flexibility for pod and cell assignments as more beds/cells were available.  Monitoring the discretionary overrides for housing will remain essential as the Pandemic wanes, and the OJC ADP increases.

---

[7] Austin, James and Patricia L. Hardyman. 2004. *Objective Prison Classification: A Guide For Correctional Agencies.* Washington, D.C.: National Institute of Corrections.





Figure 5: Discretionary Override Rates by Gender: April - September 2021

A different type of housing override was discovered as part of the review for Compliance Report #14. The classification manager used an "Inmate Refusal of Enemies" process to "facilitate" the housing of general population inmates.  At least in part, she intended to address inmate requests to transfer from one pod to another. In response to questions from the Monitors and Plaintiff attorneys, OPSO suspended the inmate refusal process in December 2020.[8]  "Enemy Refusals" re-started in April despite the absence of a policy review and sign-off by the Monitors and Plaintiff attorneys.

During the June 2021 onsite visit for Compliance Report #14, the classification manager outlined her current "enemy refusal" process. The process was documented, and a draft "enemy refusal" checklist was created and circulated back to OPSO.  The next tasks were to finalize the checklist, revise the draft enemy refusal policy (draft SOP 7020), and train staff as per the approved policy. In the interim, the enemy refusal process was supposed to remain suspended.

Since June 2021, "Inmate Separation Review" procedures, as well as the draft checklist, were incorporated into OPSO Inmate Classification Procedures, 7020 (Review date 1/2021). The Procedures (7020) require "The Classification Manager conducts a quarterly audit of the "Separation Reviews" to ensure the process works and makes recommendations for adjustments as needed. . . "The Classification Manager reported the enemy separation

---

[8] OPSO indicated that the "Inmate Refusal of Enemies" form was a trial strategy initiated in September 2020.  As of December 2020, after a 6-week trial period, OPSO discontinued the questionable form but continued the "enemy refusal" process without the form.



review process was suspended in June (2021) because the draft checklist was too long. Quarterly audits of the separations completed before "suspending the process" were not available. A review of the enemy/associate data logged into the JMS, recent emails (i.e., dated November 3, 2021), and custody assessment comments indicate the enemy separations/ refusals process continues despite the lack of documentation of the separation reviews and despite the OPSO representation that enemy refusal process was discontinued.

The Classification Monitor List (List) is an ad hoc report to identify inmates for whom a custody review is due. Custody re-assessment reasons include a regular 60/90-day re-assessment or a status change or event within their jail records, i.e., amended charge(s) or bail amount, disciplinary incident, detainer lodged/lifted, or a new sentence. The number of inmates on the list fluctuates as inmates return from court, move through the booking process, and the like.  A classification specialist or supervisor completes the pending custody reviews on each shift.  The average number of pending custody assessments per the Classification Monitor list was 12.5; 4.9 were awaiting an initial classification, and 7.5 were awaiting a custody re-assessment.  The average number of pending custody assessments during the previous compliance period was 10.1. Thus, wait times for the initial and reclassification processes increased slightly during this compliance period.

A second set of data from the JMS tracked the actual time when a case hit the Classification Monitor list and when the classification specialist completed the assessment. As shown in Figure 6, these data indicated, on average, that a little over eight hours were required to complete the initial custody assessments (8.77 hours); the custody updates were completed in about 5.5 hours (5.47 hours).





Figure 6: Time Required to Complete the Custody Assessments -- April - September 2021

Following Compliance Report #8, OPSO took steps to work with Wellpath to rebuild the linkages between the medical/mental health records and JMS. These data are essential for scoring seven of the PREA victimization and predation risk factors.  Also, medical and mental health information is critical for the inmates' housing assignments. The linkage between the electronic medical records (ERMA) and the JMS is complete.  WellPath medical and mental health service and treatment data are now routinely uploaded to the JMS.  These data will certainly expedite and enhance OPSO's ability to identify and track the victimization of individuals on the mental health caseload. However, the final steps for defining the active mental health caseload remain.

As shown in Figures 7 and 8, classification staff continued to create attachments to record criminal history data into the JMS for inmates with non-Orleans Parish felony convictions.  Figure 7 illustrates that the classification staff created ~222.5 attachments per month between April 1st and September 30th, 2021.  The number of attachments fluctuated through the period, but this appears to parallel the recent drop in OJC bookings. As shown in Figure 8, nearly all (99.9%) of the attachments updated the inmate's criminal history. As previously observed, the classification specialists' ignorance of the process and the need for disciplinary-related attachments were troubling. Hence, no disciplinary history attachments were input by the classification specialists.





Figure 7: Number of Attachments Input by Classification Staff – October 2020 – September 2021



Figure 8: Attachment Reason by Month – October 2020 – September 2021

***IV.A.10.e. Continue competency-based training and access to all supervisors on the full capabilities of the OPSO classification and prisoner tracking system.***

Finding:

Partial Compliance

Observations:

The required annual classification training was March 30 - 31, 2021. All specialists and supervisors attended one of the two sessions.  Thus, OPSO met the mandatory training requirement for 2021.

Observation of the custody assessment process revealed that the specialists fly through the assessment screens, clicking on "Yes" according to JMS assessments of the custody and PREA risk factors.  There appears to be little understanding or concern for the underlying data or factors; it seems as if their "goal" is to get to the housing decision screens. (The exception is the criminal history factor.  They check each individual's NCIC rap sheet and enter the required out-of-parish convictions.)

There was no OPSO in-service classification training for the specialists or supervisors. Despite the incomplete and inconsistent audit reports, no remedial training was provided. Clearly, in-service training on when and how to input disciplinary-related attachment is needed.



Quality in-service and introductory training for new staff is vital to ensure reliable and accurate custody assessments, housing assignments, and audits. While the System is highly automated, the JMS automation should not replace the staff's understanding of the objective classification principles, scoring rules for the custody and PREA risk factors, or housing standards.

***IV.A.10.f. Conduct internal and external review and validation of the classification and prisoner tracking system on at least an annual basis.***

Finding:

Partial Compliance

Observations:

OPSO population reports with the number of inmates by location were received daily by the Monitor.  Monthly custodial statistical reports for April 2021 – September 2021 regarding the number of custody assessments by type, gender, and population were also available. These reports track the timeliness of the initial custody assessments, the custody distributions; the cases due for a custody assessment; the prevalence of special populations; as well as the rates and types of disciplinary infractions. OPSO conducts housing and internal audits.

**Housing Audits – Checking the Veracity of the Inmate Housing Assignments:**

Audits of the inmate housing assignments were sporadic during this compliance period.  For example, across the four auditors:

Auditor A – No audits during August or September.

Auditor B – Weekly audits each month.

Auditor C - No audits submitted for May - September.[9]

Auditor D - No audits during August or September.

Due to Hurricane Ida, few housing audits were conducted during August as most inmates and many staff were relocated to a DOC facility.

Overall, the most troubling observations were that the classification manager did not track the reports submitted to ensure all pods were audited throughout the compliance period, nor did she provide training on the revised score sheet and notations.  Following the June workgroup meeting, the audit score sheet was revised. But the scoring and notation

---

[9] The Classification Manager could not locate May – September audits completed by Auditor C. However, as part of the June site visit, audits by this staff member were observed.  Reports for observed audits were provided to the Monitor while onsite.



instructions were not delineated. Hence, even after the June workgroup meeting, the inconsistencies and auditor-specific markings on the audit score sheets, rosters, and corrective action reports continued.

The auditors create a "Housing Audit Corrective Action" report for each audit to summarize the findings. While these summaries are helpful, many were not dated, and the suggested "corrective" actions were not tracked.

We reviewed 146 audit score sheets, rosters, and corrective action reports for this compliance report. The sample was stratified by audit month and auditor to ensure audits by all staff were reviewed.  Observation of housing audits while onsite indicated the auditors verify each inmate's cell and bed assignments as required by the OPSO audit procedures. Twenty-four 24 of the 146 audit reports (16.4%) indicated that staff did not audit the pod because no security staff was on the pod.  The audit reports indicated that most inmates were in their assigned cells. Incorrect cell/bed assignments were recorded on 29 of the 122 completed audits (23.8%). (Audits of the dorms tracked if the inmates were sleeping in their assigned beds.) The reports/score sheets from the celled/pods simply indicated that the inmates were sleeping in their cells.

It is important to emphasize that housing audits are a means of ensuring the classification system's integrity.  Merely filling out a custody assessment form and assigning an inmate to a bed does not fulfill the requirements of a validated classification system.

**Internal Audits – Checking the Accuracy of the Custody and PREA Assessments**

The April 2021 – September 2021 internal audit logs indicated 60 custody assessments were audited.  The audit logs include two types of audits: Random (custody assessments selected by the JMS for review) and Discovered (custody assessments with errors observed by a classification specialist or supervisor).  No errors were recorded for the 56 randomly selected custody assessments. Four (4) "discovered errors" were also reported. The purpose of the internal audits is to uncover errors -- missing or incorrect special population tags (isolation, medical, mental health, suicide, etc.), housing errors (Low and High Custody inmates housed together), unclear/incomplete override reasons, and missing criminal history attachments.  These low error rates are good news. However, random checks of the inmate by location report by the Monitor revealed undetected/unaddressed errors. These observations suggest a need to retool the internal audit process.

**Revalidation of the Classification System – Assessing the Validity of the System:**



Lovins and Latessa submitted their report on the validation of the OPSO classification system on April 30, 2018.[10] This validation study served as documentation of compliance with the Consent Judgment requirement for "external review and validation of the classification and prisoner tracking system on at least an annual basis." Statistical validation of an objective classification system is generally recommended every three to five years.[11] Revalidation of the System is due in 2021 as per a previous agreement for a statistical validation every three years. OPSO has contracted with Dr. Garth Davies, Associate Professor in the School of Criminology at Simon Fraser University, to revalidate the classification system.  His report is due in the late fall of 2022.

*IV.A.10.g. Provide the Monitor a periodic report on classification at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date and every six months, thereafter, until termination of this Agreement. Each report will include the following information:*

> *(1) number of prisoner-on-prisoner assaults;*
> *(2) number of assaults against prisoners with mental illness;*
> *(3) number of prisoners who report having gang affiliations;*
> *(4) most serious offense leading to incarceration;*
> *(5) number of prisoners classified in each security level;*
> *(6) number of prisoners placed in protective custody; and*
> *(7) number of misconduct complaints.*

Finding:

Substantial compliance

Observations:

Reviewed were the monthly custodial, discipline, and inmate population statistical reports for April - September 2021. OPSO has developed reports to track the statistics as required under section IV.A.10.g.  The only exception is the rates of victimization of inmates on the mental health caseload. As noted earlier, Wellpath and OPSO are working together to align the JMS and electronic medical record data to generate timely and accurate victimization counts. The Consent Judgment requires victimization rates for inmates on the mental health caseload.  The Wellpath electronic records for individuals who received medical or mental health services are uploaded continually to the AS400.  However, the programming within the JMS for identifying and tracking individuals on the mental health caseload is still pending feedback from WellPath.  The monthly classification special population reports include counts for the medical and mental health caseloads, but the

---

[10] Lovins, Brian K. and Edward Latessa (April 30, 2018). "Revalidation of the Orleans Parish Classification System." Cincinnati, Ohio: University of Cincinnati Corrections Institute.

[11] Hardyman, Patricia L. and James Austin (2021) "Objective Prison Classification: A Guide for Correctional Agencies." 2nd Edition.  Washington, D.C.: National Institute of Corrections. p. 17.



victimization counts among individuals on the mental health caseload are unreliable. OPSO and WellPath must complete this process to maintain substantial compliance with this Section by January 2022.

OPSO staff input inmate gang affiliation data in the JMS throughout the Compliance period. OPSO and the Orleans District Attorney (DA) have an ongoing process for notifying the OPSO of individuals identified as members of a "gang." Thus, these data are available to track the prevalence of inmates per "gang" among OPSO populations as well as by their location (i.e., tier, side, and bed). The initial classification questionnaire includes a question as to the individual's membership or affiliation with a "gang." To date, the classification staff did not record this information in the JMS or even forward the information to the ISB-Inmate Division investigation/validation. The questionnaires were merely filed with the other intake documents. As of the onsite visit, the classification specialists were instructed to forward any gang affiliations reported during the initial classification process to the Classification Manager. We also learned that security staff supervisors interview each new inmate assigned to a pod to identify his "beefs with others on the pod" and involvement with local cliques/gangs. Documentation of these interviews and any subsequent communication with the classification unit to record required separations were unavailable.

Figures 9 and 10 provide the OPSO monthly disciplinary data as recorded in the JMS. The rate of disciplinary reports has fluctuated over the last twelve months – October 2020 – September 2021. (To account for short-term variations, seasonal trends, and the population shifts due to the Pandemic, 12 months of disciplinary data are provided.) As shown in Figure 9, the rate of disciplinary reports per inmate decreased by 12 percent (12.4) between April and September 2021. As of April 2021, the rate of disciplinary reports among the OPSO detainees was 35.2 percent, i.e., 1 in 3 inmates received a disciplinary report. By September 2021, the rate was 22.2 percent -- one in five inmates. Of particular importance was the low rates of predatory and aggressive infractions – Predatory infractions decreased from 4.7 to 3.8 percent, while Aggressive infractions decreased slightly from 3.3 to 1.5 percent. As shown in Figure 10, the OPSO ADP increased from a low of 793 in April to 904 by September 2021. The number of disciplinary reports per month increased from 254 in April to 384 by September 2021.





Figure 9: Rate of Disciplinary Infractions for the OPSO ADP – October 2020 - September 2021



Figure 10: OPSO ADP vs. Number of Disciplinary Reports: October 2020 – September 2021

Figure 11 illustrates the breakdown of the types of disciplinary infractions during this Compliance Period. (These data reflect the most severe infraction of which the inmate was found guilty per report.) While the actual number of predatory (e.g., assaults or battery) and aggressive behaviors (e.g., fights or threats) stabilized, the numbers of management problem behaviors (disobeying a direct order, misuse of medication, possession of illicit substance, etc.) decreased significantly. For example, during April 2021, there were 158 management problem infractions. But, by the end of September 2021, there were only 88 disciplinary reports for management problems.





Figure 11: Most Serious Disciplinary Infraction/Report with Finding of Guilty: October 2020 – September 2021

***IV.A.10.h. OPSO shall review the periodic data report and make recommendations regarding proper placement consistent with this Agreement or other necessary changes in policy based on this review. The review and recommendations will be documented and provided to the Monitor.***

Finding:

Partial Compliance

Observations:

The Monitor receives the daily "Active Inmates by Location" reports and has access to the ad hoc Classification Monitor lists and various classification statistical reports. During this Compliance Period, there were multiple updates to the OPSO Housing Matrix not provided to the Monitors or Plaintiffs despite assurances we would receive timely copies of any revised matrices.

We anticipated that OPSO would revamp the enemy refusal process during this Compliance Period. However, it appeared that process did not change. In fact, it continued despite assurances to the Monitors that the practice had been suspended. Further, the enemy reviews completed during this period did not comply with the OPSO draft policy. Thus, the continuation of an enemy refusal process without review and approval of the written policy by all parties and the absence of training for classification staff responsible for these reviews are the primary reasons for downgrading the compliance rating of this Section. All parties were ready and willing to work with OPSO to develop and implement a feasible process for reviewing and updating inmate enemies.



Chief LeCounte and the new Compliance Bureau staff have reopened efforts to address the remaining items required to achieve and maintain full compliance with all Custodial Placement Sections of the Consent Judgment.  Optimism for compliance remains.

## IV. A. 11.        Prisoner Grievance Process

*A. 11.a. OPSO shall ensure that prisoners have a mechanism to express their grievances, resolve disputes, and ensure that concerns regarding their constitutional rights are addressed. OPSO shall, at a minimum, do the following:*

*(1) Continue to maintain policies and procedures to ensure that prisoners have access to an adequate grievance process and to ensure that grievances may be reported and filed confidentially, without requiring the intervention of a correctional officer. The policies and procedures should be applicable and standardized across all the Facility divisions.*

*(2) Ensure that each grievance receives appropriate follow-up, including providing a timely written response and tracking implementation of resolutions.*

*(3) Ensure that grievance forms are available on all units and are available in Spanish and Vietnamese and that there is adequate opportunity for illiterate prisoners and prisoners who have physical or cognitive disabilities or language barriers to access the grievance system.*

*(4) Separate the process of "requests to staff" from the grievance process and prioritize grievances that raise issues regarding prisoner safety or health.*

*(5) Ensure that prisoner grievances are screened for allegations of staff misconduct and, if an incident or allegation warrants per this Agreement, that it is referred for investigation.*

*(6) A member of the management staff shall review the grievance tracking system quarterly to identify areas of concerns. These reviews and any recommendations will be documented and provided to the Monitor.*

Findings:

A. 11. a. (1)  Substantial Compliance

A. 11. a. (2)  Partial Compliance

A. 11. a. (3)  Substantial Compliance

A. 11. a. (4)  Substantial Compliance

A. 11. a. (5)  Substantial Compliance

A. 11. a. (6)  Substantial Compliance

Until the September 2019 report, one rating was given for the entire section for the Prisoner Grievance Process. In order to highlight which provisions are in substantial compliance versus those which fall short, the decision was made to rate each provision separately.

This review covered April 2021 through September 2021. For this review, the Monitor interviewed the Grievance Lieutenant, and security staff and inmates while inspecting the housing units. Reports and data submitted by OPSO covering the rating period were also reviewed. Three inmates who had requested to speak with a Monitor were also interviewed regarding their specific grievances.



As noted during the previous inspection, a review of the documentation demonstrated that all inmate submissions continue to be reviewed by Grievance staff, categorized into requests and grievances, and forwarded to the appropriate staff for response. Statistical information was provided on all categories. Both requests and grievances continue to be sorted by type. Specific grievances related to inmate safety, medical issues, PREA, etc., are documented to reflect the date received, inmate information, type of grievance, time of notification made to the appropriate staff member, and the staff member making the notification. For the analysis, the Monitor created three charts and added simple trendline overlays to each grievance category listed.

Grievance staff once again provided detailed documentation as to their separate handling of the April 2021 through September 2021 inmate requests, grievances, and complaints related to inmate safety or health.

As reported by the OPSO Grievance staff, the monthly average of 85 grievances during this rating period was a decrease from the 143 monthly average during the previous period, a marked decline of 41%. An average of 1889 inmate requests were received each month for the current rating period, down from 2277 for the previous period, or a 17% decrease. How the data trends will be tracked to determine whether the decrease is the result of fewer grievances or the resolving of grievances timelier or the result of lack of access to the grievance process.

While the reduced Average Daily Population since the beginning of the pandemic is still a factor in the lower average number for this rating period when compared to that prior to March 2020, it is significant to note that the number of grievances submitted has continued to decrease while jail operations are still being impacted by COVID control measures. This continues to be a positive indication of operational changes and conditions within the jail in the Monitor's opinion.

OPSO grievance reports reflected a high of 92 grievances submitted in August 2021 and a low monthly total of 75 for May 2021. The Monitor noted in the previous report increases in grievances related to commissary, maintenance, facility, sanitation, and food service issues, likely due to COVID-19 restrictions. All five categories showed to be trending downward throughout this rating period with the exception of Sanitation, due to a small spike in grievances for the single month of July. Medical grievances continued to trend downward while the number of mental health grievances stayed relatively flat. Commissary



and inmate funds grievances also show a downward trend for the rating period and the calendar year.

Grievances related to inmate-on-inmate physical violence and claims of life-threatening conditions showed a downward trend while inmate on inmate PREA grievances remained at one or zero throughout the rating period and calendar year. Grievances related to use of force by staff, PREA incidents by staff, and staff misconduct all trended upward largely due to grievances received in August/September. The Monitor spoke to several inmates who stated they had filed grievances related to treatment received during the hurricane evacuation. It is the Monitor's understanding that investigations into the allegations were still on-going at the time of the inspection. Grievances related to Commissary and Inmate Funds also showed a marked decline across the rating period while most other categories remained relatively flat. (See the three figures below.)











Orleans Parish JAIL MONITORS

Timeliness of responses appears to have improved somewhat based on changes made by the Grievance Lieutenant after the previous inspection to recognize the impact of COVID on Sheriff's Office staff members. Up until that time, grievances were distributed to specific persons in various sections regardless of whether that person was available to answer the grievance in a timely fashion. Grievance staff now take this into account when assigning grievances for response. The impact of the change appears to be positive based upon the weekly grievance audits however, the Monitor expects more evidence will be available during the next inspection. Timeliness of responses to grievance appeals continues to be an issue and was discussed by the Monitor directly with the responsible staff. The Grievance Lieutenant did make special note of the improved effort being made by the housing lieutenants in answering grievances assigned to them in a timely and substantive manner. The Grievance Section continues to randomly audit approximately 10% of the grievances received with regular reports generated for management review.

As noted during the last several inspections, inmates have access to the grievance process via electronic kiosks located in the housing units throughout OJC and TDC and through a traditional paper grievance system utilized as a "back-up" system due to the number of non-functioning kiosks. As of the date of the inspection, there were 10 housing pods completely without a functioning kiosk and three other pods that required the kiosks to be reset 4 to 5 times per day.  The Monitor observed that the problem with the current kiosk system continues to worsen, and it remains the Monitor's opinion that the kiosk system remains relatively unreliable in terms of operational availability for the majority of the inmates. The Grievance Lieutenant reported that every housing unit continues to be visited seven days per week with a "walk by" of every cell to collect paper grievances to ensure that problems with the kiosks do not interfere with an inmate's ability to submit grievances.

The Monitor again reviewed the paper grievances tracking documentation and noted that all such grievances continue to be entered into the electronic system by Grievance staff upon receipt. Paper responses are provided to inmates in units that do not have a functioning kiosk. The Monitor observed locked grievance receptacles in every housing unit with the exception of Pod 3A, however the Monitor again received verbal complaints from inmates of not being able to get blank grievance forms from security staff in a timely manner—the impetus for the Grievance staff's twice-daily rounds.

Unit Managers are again urged to remind line security staff of the importance of



making grievance forms available upon request by the inmate(s). It is the Monitor's opinion that this manual work-around is acceptable under the language of the Consent Judgment requiring the inmates have access to a meaningful and confidential grievance process. The OPSO staff still report that a replacement system is still being pursued but the status has been relatively unchanged for over three years. Given that inmates have reported difficulty in accessing the paper grievance forms and writing utensils and the delay that results from not being able to submit the grievance and medical requests electronically, the Monitor again emphasizes the securing of a replacement system should be given priority.

During the Monitor's interview with the Grievance Lieutenant, she noted that the number of authorized staff in the section had been reduced by management. Given the time and staff intensive nature of the manual work-around grievance system, the Monitor recommends that OPSO consider reinstating the positions until such time as a fully operational electronic grievance system is acquired and installed.

As reflected in the weekly overdue grievance reports generated by Grievance staff, late responses to inmate grievances continue to be an issue. As reflected in previous Monitor inspection reports, the information shows the majority of past due responses overall rest with OPSO staff and a lesser share with Wellpath staff despite Wellpath frequently receiving the largest percentage of the total grievances submitted.

During the Monitor's tour through the housing pods, the Monitor spoke with several individual inmates. While there were few verbal complaints about the grievance process, there were still some instances reported regarding a lack of substantive responses and timeliness. Two inmates requested to speak with the Monitor privately and made statements indicating that certain staff had "coached" or otherwise advised the inmates not to speak freely with the Monitors during the inspection. It is the Monitor's observation and opinion that the inmates may have been coached in such a manner by staff.

Two inmates also complained regarding OPSO's policy of providing copies of only the latest 30 days of grievance paperwork when requested by the inmates. Any earlier paperwork must be requested through the inmate's attorney policy. This policy creates an issue for inmates who are not represented by an attorney, typically those in a post-conviction status and awaiting transfer to state prison. The Monitor discussed the issue with the Grievance Lieutenant and recommended a change in the policy to address this situation, the Grievance Lieutenant agreed to recommend the policy change to executive staff.



Grievance staff continues to do an excellent job tracking grievances and requests and reporting as to the timeliness and quality of the responses to address the inmates' issues. Documentation continues to reflect that Grievance staff maintain a by-name/housing listing of all OPSO inmates identified as needing Grievance staff assistance to access the grievance system due to either a language barrier or illiteracy.

The Monitor reviewed detailed documentation provided by Grievance staff for the rating period regarding the screening of grievances for staff misconduct. The documentation demonstrated that all inmate submissions are reviewed by Grievance staff and those regarding staff misconduct are separately documented for appropriate referral to the administrative level for follow-up. Grievance staff processed a total of 77 such staff misconduct related grievances during this rating period—almost double that of the previous rating period (39) and reversing the downward trend noted in the previous report. There were 6 and 18 grievances referred to IAD and ISB, respectively, for investigation during the rating period.

Grievance staff continue to separately document grievances that require specific referral to IAD, ISB, PREA, or FIT staff for review and investigation. Detailed information along with the date assigned and disposition is maintained as well as email transmission receipts.

The Monitor reviewed the 2021 Second and Third quarter data analysis of the grievance reports presented by Grievance staff for executive review. Specific discussion by executive staff regarding the grievance documentation and reporting was noted. No specific changes to the grievance process were recommended.

## IV. A. 12.  Sexual Abuse

*A.12. OPSO will develop and implement policies, protocols, trainings, and audits, consistent with the requirements of the Prison Rape Elimination Act of 2003, 42 U.S.C. § 15601, et seq., and its implementation of regulations, including but not limited to, preventing, detecting, reporting, investigating, and collecting sexual abuse data, including prisoner-on-prisoner and staff-on-prisoner sexual abuse, sexual harassment, and sexual touching.*

Finding:

A. 12. Partial Compliance

Observations:

OPSO successfully completed its PREA audit in 2019. The PREA Coordinator was reassigned to a housing area and the position has not been filled in over a year. The duties of the PREA Coordinator have not been absorbed by anyone else. Supervision of the



investigation of PREA complaints was added to the duties of the FIT supervisor due to the departure of the lieutenant who previously oversaw them. He has received additional PREA training. Substantial compliance is not guaranteed by successfully completing a PREA audit once every three years. The only documentation provided for this monitoring period was the policies. No proof as to implementing the requirements of PREA was provided. The Monitor is aware of PREA investigations taking place due to her review of those documents under a different section.

### IV. A. 13.        Access to Information

*A.13. OPSO will ensure that all newly admitted prisoners receive information, through an inmate handbook and, at the discretion of the Jail, an orientation video, regarding the following topics: understanding Facility disciplinary process and rules and regulations; reporting misconduct; reporting sexual abuse or assault; accessing medical and mental health care; emergency procedures; and sending and receiving mail; understanding the visitation process; and accessing the grievance process.*

Finding:

A.   13. Substantial Compliance

Observations:

Materials were provided indicating the requirements of this paragraph have been met.

### IV. B. Mental Health Care

Introduction:

As with past reports, the Monitors rate the compliance levels based on the documents requested and reviewed, observations, discussions during visits, (including this recent virtual visit) review of medical records (172 for this visit), and any additional information provided by the parties.

The Monitors note that there has been improvement in performance in many areas of the Consent Judgment since Compliance Tour #14. The addition of the Tulane Department of Psychiatry staff and leadership remains an invaluable asset in providing required and consistent psychiatric services for inmates at OJC. There is continuing positive progress with Tulane's interface with Wellpath, however the provision of adequate and timely mental health and medical care and services has been problematic, as has compliance with suicide prevention training, management, and monitoring.

Wellpath continues to have difficulty with counting, for example, calculating the mental health caseload consistently and counting the number of patients with acute and



chronic disease who need and receive counseling, however for the first time has identified waiting lists for prisoners to receive group and/or individual counseling. The average daily population (ADP) for OJC including TMH was reported as 799 detainees, with 420 (53%) prescribed psychotropic medications.  Practitioner productivity remains an open question.

Several paragraphs remain where necessary improvements are required by the Consent Judgment to provide the full range and quality of medical care and mental health/counseling services for inmates incarcerated in OJC and the newly renovated TDC. These concerns are deeply impacted by the lack of progress in developing the required services and programs recommended in 2014, including permanent acute care and step-down programing and services for mental health and acute medical services. There continue to be no acute care mental health services for women, except via emergency transfer to hospital emergency departments, and limited mental health acute, stepdown and outpatient programmatic activities.

General recommendations are to: continue leadership initiatives and direction by OPSO and Wellpath including completion and implementation of policies and procedures regarding de-escalation, disciplinary input from mental health, and levels of observations for suicide prevention and management continue necessary increases and training for correctional security staffing to consistently provide adequate and ongoing dedicated support for mental health and medical services; continue to develop full services and continuity of services for both male and female prisoners including all levels of care, staffing and space; and continue to evaluate and pursue full services for mentally ill prisoners, including medication management and multidisciplinary treatment team planning, and acute, residential, and outpatient care.

The Monitors are concerned that the budgetary cuts in staffing will exacerbate the current serious problems with recruitment and retention of nursing staff at all levels, particularly when it has been so difficult to provide timely services with current staff.  The suicide watch staffing ratios of 1:5 or more are insufficient to provide safe risk mitigation for suicide prevention.  Further, the use of deputies who are untrained in suicide watch compounds the danger.

The Monitors are also concerned about the inability of patients on 2A and 3D to receive the full range of timely and appropriate mental health care including individual and group therapy and counseling in private, as opposed to cell side through the food port, which



was in place prior to the initiation of COVID-19 restrictions and eliminating group therapies and limiting individual contacts for essentially all units since those restrictions have been in place.  As the restrictions have been relieved, group and individual contacts have increased. However, assuring sound privacy remains problematic.

The Monitors have very serious concerns regarding suicide training, observations, monitoring, and documentation.  Record reviews and discussions with staff indicate mental health clinicians have been under-estimating the level of necessary observation as q15 minute checks rather than Direct Observation (1 to 1) in some cases.  Wellpath has exceeded their standard ratios to now have one clinical suicide watcher (Certified Nursing Assts., or Mental Health Technicians) to five inmates on staggered every fifteen-minute suicide precautions. This ratio is very high and difficult for staff to maintain consistency. Inmates requiring Direct Observation require 1:1 observation full time. Wellpath staff are working double shifts/overtime as suicide watchers, however, have not been able to demonstrate keeping up with the needs and OPSO deputies have been providing up to 34% of all watches, with limited training and supervision specifically for duties and responsibilities as suicide prevention observers and monitors. These modifications are extremely problematic, potentially increasing risk of harm, and do not meet Consent Judgment requirements.

OPSO and Wellpath have been following health department guidance on mitigation and containment of transmission of COVID-19.  The Monitors have not been asked for technical assistance in this area.

Specific findings and recommendations regarding medical and mental health services are provided below. For those paragraphs that have previously demonstrated Substantial Compliance the Monitors recommend, encourage, and support the diligent and consistent efforts by OPSO and the medical and mental health providers to continue to demonstrate Substantial Compliance.

## B.  Mental Health Care

***B. OPSO shall ensure constitutionally adequate intake, assessment, treatment, and monitoring of prisoners' mental health needs, including but not limited to, protecting the safety of and giving priority access to prisoners at risk for self-injurious behavior or suicide. OPSO shall assess, on an annual or more frequent basis, whether the mental health services at OPP comply with the Constitution. In order to provide mental health services to prisoners, OPSO, at a minimum, shall:***

<u>Findings:</u>

B. 1. a.   Substantial Compliance

B. 1. b.   Substantial Compliance



B. 1. c.  Substantial Compliance

B. 1. d.  Substantial Compliance

B. 1. e. Partial Compliance

B. 1. f.  Partial Compliance

B. 1. g.   Substantial Compliance

B. 1. h.  Substantial Compliance

B. 1. i.  Partial Compliance

B. 1. j.  Partial Compliance

B. 1. k.  Partial Compliance

B. 1. l.  Partial Compliance

***B.1.a. Develop and maintain comprehensive policies and procedures for appropriate screening and assessment of prisoners with mental illness. These policies should include definitions of emergent, urgent, and routine mental health needs, as well as timeframes for the provision of services for each category of mental health needs.***

Finding:  Wellpath has revised the screening forms and implementation has begun. Wellpath and OPSO have developed an SOP on de-escalation and referrals for counseling, as discussed during the visit.

Substantial Compliance

***B.1.b. Develop and implement an appropriate screening instrument that identifies mental health needs, and ensures timely access to a mental health professional when presenting symptoms require such care. The screening instrument should include the factors described in Appendix B. The screening instrument will be validated by a qualified professional approved by the Monitor within 180 days of the Effective Date and every 12 months thereafter, if necessary.***

Finding: See B.1.a

Substantial Compliance

***B.1.c. Ensure that all prisoners are screened by Qualified Medical Staff upon arrival to OPP, but no later than within eight hours, to identify a prisoner's risk for suicide or self-injurious behavior. No prisoner shall be held in isolation prior to an evaluation by medical staff.***

Finding: See B.1.a

Substantial Compliance

***B.1.d. Implement a triage policy that utilizes the screening and assessment procedures to ensure that prisoners with emergent and urgent mental health needs are prioritized for services.***

Finding:  See B.1.a

Substantial Compliance

Suggestion:

Wellpath and OPSO to implement revised screening policies and recently developed



SOP for referrals for Special Needs prisoners identified as in need of counseling. CQI study of this provision.

***B.1.e. Develop and implement protocols, commensurate with the level of risk of suicide or self-harm, to ensure that prisoners are protected from identified risks for suicide or self-injurious behavior. The protocols shall also require that a Qualified Mental Health Professional perform a mental health assessment, based on the prisoner's risk.***

<u>Finding:</u>  Deputies have been assigned duties for up to 34% of suicide watches; documenting suicide watches on the required observation forms has been problematic. Documentation of training, and protocols was provided that began at the end of the previous monitoring period.

Partial Compliance

<u>Suggestion:</u>

Continue to monitor and report use of physical restraints for inmates on suicide watches in IPC and TMH, and documentation of de-escalation procedures by Wellpath and deputies.

***B.1.f. For prisoners with emergent or urgent mental health needs, search the prisoner and monitor with constant supervision until the prisoner is transferred to a Qualified Mental Health Professional for assessment.***

<u>Finding:</u>

Partial Compliance

<u>Suggestion:</u>

Provide documentation of searches and constant supervision by security until mental health staff arrives and conducts assessment for all emergent and urgent referrals. Include protocols/procedures for searching inmates as soon as safely possible and prior to placement on any form of suicide precautions, watch or Direct Observation, and documentation requirements. .

***B.1.g. Ensure that a Qualified Mental Health Professional conducts appropriate mental health assessments within the following periods from the initial screen or other identification of need:***
***(1) 14 days, or sooner, if medically necessary, for prisoners with routine mental health needs***
***(2) 48 hours, or sooner, if medically necessary, for prisoners with urgent mental health needs; and***
***(3) immediately, but no later than two hours, for prisoners with emergent mental health needs.***

<u>Finding:</u> Policy has changed requiring revised timeframes for completion of referrals and contacts with psychiatrists on weekends.

 Substantial Compliance

<u>Suggestion:</u>



Conduct CQI study to ensure implementation. Continue to provide documentation that inmates in population (after IPC) consistently receive appropriate and complete assessments within the required timeframes, including consultations with psychiatrists during on-call hours. An SOP was discussed during visit to improve documentation of on-call responses.

**B.1.h. Ensure that a Qualified Mental Health Professional performs a mental health assessment no later than the next working day following any adverse triggering event (i.e., any suicide attempt, any suicide ideation, or any aggression to self, resulting in serious injury).**

Finding:

Substantial Compliance

**B.1.i. Ensure that a Qualified Mental Health Professional, as part of the prisoner's interdisciplinary treatment team, maintains a risk profile for each prisoner on the mental health case load based on the Assessment Factors identified in Appendix B, and develops and implements a treatment plan to minimize the risk of harm to each of these prisoners.**

Finding:

Partial Compliance

Suggestion:

Provide documentation of timeliness of treatment plans for all inmates and multi-disciplinary participation by staff, including interventions to minimize risk of harm, for the mental health caseload at all levels of care including risk profiles. Include focus on inmates in stepdown and outpatient programs. Expand reviews to include deficiencies in content, diagnoses, planned services, etc. for inmates at all levels of care.

**B.1.j. Ensure adequate and timely treatment for prisoners, whose assessments reveal mental illness and/or suicidal ideation, including timely and appropriate referrals for specialty care and visits with Qualified Mental Health Professionals, as clinically appropriate.**

Finding:

Partial Compliance

Suggestion:

Continue to provide documentation of scheduled and completed adequate and timely treatment for all caseload inmates including rounds and psychosocial handout materials, individual and group therapies and/or counseling, and referrals for specialty services for male and female inmates. This should include prisoners at TDC/TMH, all suicide watches at OJC in all locations including IPC, acute care services for male and female inmates, step down units, and outpatients in population and all restricted housing units. Documentation provided for this monitoring period indicates increases in group therapies were provided to a very limited number of prisoners in TMH, 2A and the fourth floor. Necessary out of cell and



confidential individual counseling was also not provided.  Wellpath reported backlogs of 37% on waiting lists for 90 days or more for group" or "individual" counseling or therapy. This reporting is helpful and demonstrates the need for necessary and full range of mental health and counseling services for all specified inmates remains.

***B.1.k. Ensure crisis services are available to manage psychiatric emergencies. Such services include licensed in-patient psychiatric care, when clinically appropriate.***

Finding:

Partial Compliance

Suggestion:

OPSO does not have access to any licensed inpatient services for male and female inmates. Provide documentation that all psychiatric emergencies are sent to an emergency department and any crisis is adequately resolved. Provide documentation that all inmates have access to licensed inpatient psychiatric care, when clinically appropriate. The utilization of TMH and external emergency departments are the current available resources.

***B.1.l. On an annual basis, assess the process for screening prisoners for mental health needs to determine whether prisoners are being appropriately identified for care. Based on this assessment, OPSO shall recommend changes to the screening system. The assessment and recommendations will be documented and provided to the Monitor.***

Finding: The report of annual assessment and recommendations of the process for screening prisoners for mental health needs to determine whether inmates are being appropriately identified for care has been provided. The next assessment should include SOP revisions.

Substantial Compliance

Suggestion:

The next assessment should include SOP revisions.

Findings:

B. 2. a.  Partial Compliance

B. 2. b.  Partial Compliance

B. 2. c.  Partial Compliance

B. 2. d. Partial Compliance

B. 2. e.  Substantial Compliance

B. 2. f.   Partial Compliance

B. 2. g.  Substantial Compliance

B. 2. h.  Partial Compliance

***B.2.a. Review, revise, and supplement its existing policies in order to implement a policy for the delivery of***



*mental health services that includes a continuum of services, provides for necessary and appropriate mental health staff, includes a treatment plan for prisoners with serious mental illness, and collects data and contains mechanisms sufficient to measure whether care is being provided in a manner consistent with the Constitution.*

Finding:

Partial Compliance

Suggestion:

Wellpath and OPSO have completed the majority of necessary policies including the use of restraints policies. There is the need for de-escalation policies that include OJC and TMH.  OPSO recently provided a draft revised Use of Force policy, and Wellpath provided a lesson plan and SOP for de-escalation. Both need implementation.

Programmatic descriptions are being developed, including the frequency and types of specific, individualized interventions by staff in multidisciplinary treatment team meetings that includes the prisoner and psychiatrists. The concerns generated by conflicting information regarding restraints in IPC has been addressed. Measures for the "denominators" of those inmates in need of counseling services have been formulated but not yet fully implemented.

**B.2.b. Ensure that treatment plans adequately address prisoners' serious mental health needs and that the treatment plans contain interventions specifically tailored to the prisoner's diagnoses and problems.**

Finding:

Partial Compliance

Suggestion:

Continue progress on documentation in treatment plans at OJC. Provide documentation of individualized treatment plans for men, women, and youthful offenders at all levels of care, including acute care and suicide watches. Treatment plans are not consistently developed by multidisciplinary teams nor consistently include the prisoner in the team meetings, although prisoner inclusion is improving.

**B.2.c. Provide group or individual therapy services by an appropriately licensed provider where necessary for prisoners with mental health needs.**

Finding:

Partial Compliance

Suggestion:

This provision has improved.  Actual group therapies have been re-started, and individual therapies/contacts have largely been non-confidential cell-front contacts for limited time periods. The



resumption of group therapies since January has been severely limited and insufficient to serve the inmates in need.  The efforts to provide contacts and limited services during the pandemic are understood but remain insufficient and problematic. Continue to provide documentation of data and analysis of numbers and percentages of inmates at all levels of care in need of individual and/or group therapies and counseling as well as the numbers and percentages of individual and group services offered and received/completed for inmates in need. Thirty seven percent of prisoners referred for individual or group counseling had not received them for 90 days or more; should revise measure to 30 days for jail populations.

Continue to provide numbers of inmates who received counseling for sexual abuse and for those inmates who received counseling for alcohol and drug abuse.  Continue to provide data on Disruption of Services forms and provide analysis of that data and corrective action plans, including staffing and space needs, as necessary.

***B.2.d. Ensure that mental health evaluations that are done as part of the disciplinary process include recommendations based on the prisoner's mental health status.***

Finding:

Partial Compliance

Suggestion:

This process has begun during the 13th monitoring period.  The current process is based on screenings or in-hearing observations rather than pre-hearing assessments relative to charges. The data needs analysis to assess impact of mental health evaluations on disciplinary sanctions. Wellpath still needs to provide policy approved by OPSO regarding mental health assessments as participation in the disciplinary process, as well as necessary training for OPSO and Wellpath staff.

***B.2.e. Ensure that prisoners receive psychotropic medications in a timely manner and that prisoners have proper diagnoses and/or indications for each psychotropic medication they receive.***

Finding:

Substantial Compliance

Suggestion:

Continue good improvement demonstrated with the addition of Tulane psychiatric providers. Continue to provide documentation and analysis of data that inmates receive psychotropic medications in a timely manner and that inmates have proper diagnosis and/or indications for each psychotropic medication they receive, including particular emphasis on juveniles.



***B.2.f. Ensure that psychotropic medications are administered in a clinically appropriate manner as to prevent misuse, overdose, theft, or violence related to the medication.***

Finding:

Partial Compliance

Suggestion:

As previously reported, medication diversion and/ or contraband continues to be problematic. Reports of prescribed and nonprescribed medications, as well as concerns regarding watch-take procedures and suicide watches require further analysis and corrective actions.

***B.2.g. Ensure that prescriptions for psychotropic medications are reviewed by a Qualified Mental Health Professional on a regular, timely basis and prisoners are properly monitored.***

Finding:

Substantial Compliance

Suggestion:

Continue to provide documentation of data collection and analysis of psychotropic medication prescriptions.

***B.2.h. Ensure that standards are established for the frequency of review and associated charting of psychotropic medication monitoring, including monitoring for metabolic effects of second generation psychotropic medications.***

Finding:

Partial Compliance

Suggestion:

Monitoring for metabolic effects of second- generation psychotropic medications and mood stabilizers has remained problematic for this monitoring period. Timeliness of laboratory services and associated inmate refusals remain problematic. Wellpath to establish policy/protocols for psychiatric content and frequency of supervisory review, as discussed during visits.

Findings:

B. 3. a.   Partial Compliance

B. 3. b.  Partial Compliance

***B.3.a. OPSO shall develop and implement policies and procedures for prisoner counseling in the areas of general mental health/therapy, sexual-abuse counseling, and alcohol and drug counseling. This should, at a minimum, include some provision for individual services.***

Finding: From the previous site visits, the request was made to provide documentation of implementation of policies and procedures and modifications or changes in programmatic and other service activities since the COVID pandemic, specifically for inmate counseling in



the areas of general mental health/therapy, sexual abuse counseling, and alcohol and drug counseling, including some provisions for individual services. Reports indicate increasing numbers of prisoners in OJC received group or individual counseling as the pandemic improved, but space has been limited. For example, in January 2021, 175 individual patients received group counseling when the only unit conducting groups was TMH, with an average daily census of less than 50.  Four inmates were reported to have received either substance abuse counseling, sexual abuse counseling or domestic violence counseling during January 2021.  In addition, those few who did receive counseling were in non-confidential spaces, including cell side.   The waiting list/backlog for services was 37% not receiving services for 90 days or more.  The improvements are noted, but they are far less than needed.

Partial Compliance

Suggestion:

      Continue to track disruptions of services and percentages of inmates identified as in need compared to those who receive services. Implementation of the new SOP for referrals from IPC should be helpful.

***B.3.b. Within 180 days of the Effective Date, and quarterly thereafter, report all prisoner counseling services to the Monitor, which should include:***
> ***(1)    the number of prisoners who report having participated in general mental health/therapy counseling at OPP;***
> ***(2)    the number of prisoners who report having participated in alcohol and drug counseling services at OPP;***
> ***(3)    the number of prisoners who report having participated in sexual-abuse counseling at OPP; and***
> ***(4)    the number of cases with an appropriately licensed practitioner and related one-to-one counseling at OPP.***

Finding: During several previous visits, the Monitors requested accurate and complete data and analysis for the numbers and percentages for inmates with needs for these specific services and numbers and percentages of inmates who receive these services in the actual format, including in-cell and out-of-cell services. The discussions during this visit indicated increased numbers.  No denominators to assess the actual numbers of inmates in need of these services was provided for the monitoring period despite prior and continued requests by the Monitors; however, backlogs/waiting lists are steps in the right direction.  Compliance has been compromised by the pandemic impact, staffing deficiencies and lack of adequate space.

Partial Compliance



<u>Suggestion:</u> Improve accuracy of data and analysis for use in corrective action and trending of data over time.

B. 4. a.   Partial Compliance

B. 4. b.  Substantial Compliance

B. 4. c.  Partial Compliance

B. 4. d.   Partial Compliance

B. 4. e.  Substantial Compliance

B. 4. f.   Partial Compliance

B. 4. g.  Substantial Compliance

*B.4.a. OPSO shall ensure that all staff who supervise prisoners have the adequate knowledge, skill, and ability to address the needs of prisoners at risk for suicide. Within 180 days of the Effective Date, OPSO shall review and revise its current suicide prevention training curriculum to include the following topics:*
*(1) suicide prevention policies and procedures (as revised consistent with this Agreement);*
*(2) analysis of facility environments and why they may contribute to suicidal behavior;*
*(3) potential predisposing factors to suicide;*
*(4) high-risk suicide periods;*
*(5) warning signs and symptoms of suicidal behavior;*
*(6) case studies of recent suicides and serious suicide attempts;*
*(7) mock demonstrations regarding the proper response to a suicide attempt;*
*(8) differentiating suicidal and self-injurious behavior; and*
*(9) the proper use of emergency equipment.*

<u>Finding:</u>

Partial Compliance

<u>Suggestion:</u>

For the past several monitoring periods, Wellpath staff who supervise inmates have been tasked with supervising more than three (recommended) as well as more than five (Wellpath practice) inmates on suicide watch, although the frequency of overtime/double shifts has decreased, in part because of the utilization of deputies. However, the use of Direct Observation (requires 1:1 staff to inmate ratio) has been minimal.  Indeed, reviews of individual cases indicated a significant number of clinician assessments placed prisoners on staggered q15 minute checks when Direct Observation was appropriate.  Because of staffing allocations, OPSO deputies have provided up to 34% of all suicide watches. The deputies began receiving adequate training on the requirements of them for suicide watches and documentation at the end of the previous monitoring period. Assessment of the effectiveness of the training requires further analysis, as episodes of inadequate monitoring continues. Inmates on suicide precautions or watch continue to obtain contraband that can be used to harm themselves. Adequate, appropriate, well trained, and supervised suicide prevention and management services is absolutely necessary.



***B.4.b. Ensure that all correctional, medical, and mental health staff are trained on the suicide screening instrument and the medical intake tool.***

Finding:

Substantial Compliance

Suggestion:

Continue to provide documentation that multi-disciplinary in-service training has been completed annually for all current correctional, medical, and mental health staff to include training on updated policies, procedures, and techniques.

***B.4.c. Ensure that multi-disciplinary in-service training is completed annually by all correctional, medical, and mental health staff, to include training on updated policies, procedures, and techniques. The training will be reviewed and approved by the Monitor.***

Finding:

Partial Compliance

Suggestion:

Continue to provide documentation that multidisciplinary in-service training has been completed annually for all current correctional, medical, and mental health staff, to include training on updated policies, procedures, and techniques.  As discussed during the visit, training needs to address deficiencies regarding communication and documentation regarding de-escalation, disciplinary process, searches and conditions around suicide prevention and management

Updated training should include training on additional duties and responsibilities for all staff.

***B.4.d. Ensure that staff are trained in observing prisoners on suicide watch and step-down unit status.***

Finding:

Partial Compliance

Documentation that current custody staff are trained, specifically, in observing inmates on suicide watch and step-down status was provided after requests by the Monitors. Deputies are conducting up to 34% of "suicide watches" however documentation is inconsistent and Observation forms are not consistently completed. Staff continued to have varying understanding of the requirements for monitoring inmates while in their cells or out of cell for recreation while on watch. Inmates on suicide watch continue to obtain contraband that can be used to harm themselves. The training component has improved and requires further improvement in the areas identified and discussed during the visit.

Suggestion:

Assure that staff are trained appropriately.



***B.4.e. Ensure that all staff that have contact with prisoners are certified in cardiopulmonary resuscitation ("CPR").***

<u>Finding:</u>

Substantial Compliance

<u>Suggestion:</u>

Continue to provide documentation that all current staff, (including OPSO and Wellpath) are certified in CPR.

***B.4.f. Ensure that an emergency response bag, which includes a first aid kit and emergency rescue tool, is in close proximity to all housing units. All staff that has contact with prisoners shall know the location of this emergency response bag and be trained to use its contents.***

<u>Finding:</u> During visit emergency response bags were found to be incomplete, including missing cut-down in TMH.

Partial Compliance

***B.4.g. Randomly test five percent of relevant staff on an annual basis to determine their knowledge of suicide prevention policies. The testing instrument and policies shall be approved by the Monitor. The results of these assessments shall be evaluated to determine the need for changes in training practices. The review and conclusions will be documented and provided to the Monitor.***

<u>Finding:</u>

Substantial Compliance

<u>Findings:</u>

B. 5. a.  Partial Compliance

B. 5. b.  Partial Compliance

B. 5. c.  Partial Compliance

B. 5. d.  Substantial Compliance

B. 5. e.   Partial Compliance

B. 5. f.  Partial Compliance

B. 5. g.  Partial Compliance

B. 5. h.  Partial Compliance

B. 5. i.   Partial Compliance

B. 5. j.  Substantial Compliance

B. 5. k.  Partial Compliance

***B.5.a. OPSO shall implement a policy to ensure that prisoners at risk of self-harm are identified, protected, and treated in a manner consistent with the Constitution.***

<u>Finding:</u>  OPSO and Wellpath continue to reference policies that are in place. New SOP's on Use of Force/de-escalation, referrals, and IPC watches, and program statements for women on step-down status require implementation and analyses for effectiveness. According to classification



information and documentation reviewed, prisoners on suicide precautions received only one hour of out of cell time and non-confidential cell front interviews, both of which require corrective actions.

Partial Compliance

Suggestion:

Provide documentation of implementation of policies for utilization of suicide resistant cells and nonresistant cells (with direct observation), and treatment services provided to inmates at risk for self-harm. Clinical staff suicide observers are carrying high patient loads and working extra shifts. Deputies are providing 34% of suicide watches. Contraband and misuse of supplies (blankets, pens, clothing, chemicals, and medications) have been obtained by inmates while on suicide watch or detox protocols. Treatment services are very limited and inadequate for inmates on suicide watch because of staffing and space needs. All prisoners housed on the mental health units and confined to single cells, including those who are at risk of self-harm, should have significant out-of-cell time, counseling, and therapy, as medically indicated.

***B.5.b. Ensure that suicide prevention procedures include provisions for constant direct supervision of current suicidal prisoners and close supervision of special needs prisoners with lower levels of risk (at a minimum, 15 minute checks). Correctional officers shall document their checks in a format that does not have pre-printed times.***

Finding: Changes in the suicide prevention program have been notable since the pandemic and restrictions. See comments in IV.B.5a. and other sections of this report. Documentation of training that began at the end of the previous monitoring period has been provided. Review of implementation of procedures by QMHP's indicated assignments of staggered suicide watches when Direct Observations were appropriate.

Partial Compliance

Suggestion:

Documentation of specific suicide watch procedures in IPC, and documentation of all suicide precautions, watches and direct observations would be helpful as a CQI of this provision and implementation.

***B.5.c. Ensure that prisoners on suicide watch are immediately searched and monitored with constant direct supervision until a Qualified Mental Health Professional conducts a suicide risk assessment, determines the degree of risk, and specifies the appropriate degree of supervision.***

Finding:

Partial Compliance

Suggestion:

Provide documentation that demonstrates that inmates are immediately searched and



monitored with constant direct supervision until a QMHP conducts a suicide risk assessment, determines the degree of risk, and specifies the appropriate degree of supervision. This paragraph requires collaboration and documentation by OPSO deputies and Wellpath QMHP's. As per discussion during the visit, specify procedure for search as soon as safely necessary and requires the search of inmate and cell to be completed prior to placement in cell for suicide watch. The new IPC SOP was discussed and is at variance with this provision (calls for staggered q15 minute watches rather than Direct Observation). Also utilizing a scanner for prisoners suspected of hiding metal contraband on their persons was discussed as possible SOP. See B.5.b.

***B.5.d. Ensure that all prisoners discharged from suicide precautions receive a follow-up assessment within three to eight working days after discharge, as clinically appropriate, in accordance with a treatment plan developed by a Qualified Mental Health Care Professional. Upon discharge, the Qualified Mental Health Care Professional shall conduct a documented in-person assessment regarding the clinically appropriate follow-up intervals.***

Finding:

Substantial Compliance

Suggestion:

Wellpath staff report improvement in access to inmates for follow-up during lockdowns. Denial of access should not occur, and corrective action is recommended to ensure sound confidentiality. Continue to provide documentation of follow-up appointments as required by policy.

***B.5.e. Implement a step-down program providing clinically appropriate transition for prisoners discharged from suicide precautions.***

Finding: For more than ½ of this monitoring period the male step-down unit has resumed limited programs; a program plan has been submitted for female prisoners, as there is no dedicated female step-down unit because of space limitations.  Before the COVID pandemic efforts, placements for male inmates in a true step-down/residential unit and program continued, however the programming was not yet sufficient because of inadequate staffing and space to provide services.  Group and  individual therapies and counseling have resumed, although confidentiality remains problematic.

Partial Compliance

Suggestion:

Recommend continued vigilance in developing these programs as safety concerns allow.

***B.5.f. Develop and implement policies and procedures for suicide precautions that set forth the conditions of the watch, incorporating a requirement of an individualized clinical determination of allowable***



*clothing, property, and utensils. These conditions shall be altered only on the written instruction of a Qualified Mental Health Professional, except under emergency circumstances or when security considerations require.*

Finding:

Partial Compliance

Suggestion:

See B.5.b and B.5.c. Policies are in place or being revised and new SOP's have begun. Provide documentation of implementation of policies and SOP's regarding individualized determinations of the conditions of watch for male and female inmates at OJC (especially for suicide watches/direct observation in non-resistant cells), and at TMH. Provide policy, procedure, and documentation regarding suicide watch in IPC.

*B.5.g. Ensure that cells designated by OPSO for housing suicidal prisoners are retrofitted to render them suicide-resistant (e.g., eliminating bed frames/holes, sprinkler heads, water faucet lips, and unshielded lighting or electrical sockets).*

Finding:

Partial Compliance

Suggestion:

OPSO reports 19 suicide resistant cells for OJC. When non-suicidal resistant overflow cells are utilized, it has been strongly recommended and agreed the inmates in those cells be placed on direct constant observation to best provide for their safety. Please see IV.B.5f. Please review and address non-suicide resistance fixtures in the women's bathroom/shower area in TMH, which was previously suggested but remains.  Also, the security panel on TMH 2A was reported as working during the visit such that 2A could be utilized for this population.

*B.5.h. Ensure that every suicide or serious suicide attempt is investigated by appropriate mental health and correctional staff, and that the results of the investigation are provided to the Sheriff and the Monitor.*

Finding:

Partial Compliance

Suggestion:

As previously suggested, continue to expand Morbidity and Mortality reviews. These reviews should be structured to conduct clinical investigation, including aggregation of data, self-critical analysis and corrective action plans regarding individual inmate serious injuries or inattention to medical, mental health or dental needs, deaths, or intended death and systemic concerns. The addition of the CQI Workgroup appears to have been helpful but needs to focus more on clinical as well as security systems issues and self-critical analysis.



*B.5.i. Direct observation orders for inmates placed on suicide watch shall be individualized by the ordering clinician based upon the clinical needs of each inmate, and shall not be more restrictive than is deemed necessary by the ordering clinician to ensure the safety and well being of the inmate.*

Finding: The issue of suicide watch in IPC is problematic; the SOP requires staggered watch by deputies prior to mental health assessment.   Further, based on record reviews with staff during the visit, a significant number of inmates were placed on staggered watches instead of appropriate Direct Observations.

Partial Compliance

Suggestion:

Require appropriate watches.

*B.5.j. Provide the Monitor a periodic report on suicide and self-harm at the Facility. These periodic reports shall be provided to the monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. The report will include the following:*
*(1) all suicides;*
*(2) all serious suicide or self-harm attempts; and*
*(3) all uses of restraints to respond to or prevent a suicide attempt.*

Finding:

Substantial Compliance

Suggestion:

OPSO and Wellpath provide periodic reports on suicides, suicide attempts and self-harm. Wellpath has indicated their intent to clarify and determine status of attempts as serious or not. There has been one reported completed suicide for 2020, and none in 2021.There has been no reported use of restraints for this monitoring period.

*B.5.k. Assess the periodic report to determine whether prisoners are being appropriately identified for risk of self-harm, protected, and treated. Based on this assessment, OPSO shall document recommended changes to policies and procedures and provide these to the Monitor.*

Finding:

Partial Compliance

Suggestion:

The OPSO assessment of the periodic reports required in B.5.j., above, has been completed and needs to have an assessment of protection and treatment of inmates, in addition to the numbers identified in each category.  The adequacy of protection and monitoring (searches, suicide watch, access to contraband), and adequacy of treatment planning and interventions require analysis of systemic issues. See B.5.b and B.5.i.

Findings:

B. 6. a.  Partial Compliance



B. 6. b.  Substantial Compliance

B. 6. c.  Substantial Compliance

B. 6. d.  Substantial Compliance

B. 6. e.  Substantial Compliance

B. 6. f.  Substantial Compliance

B. 6. g.  Substantial Compliance

***B.6.a. OPSO shall prevent the unnecessary or excessive use of physical or chemical restraints on prisoners with mental illness.***

Finding:  Wellpath has begun to provide documentation/information regarding use of de-escalation techniques at OJC.

Partial Compliance

Suggestion:

Policies are needed regarding de-escalation prior to planned uses of force. OPSO is in the process of revising the Use of Force policy and SOP on de-escalation for staff. OPSO needs to report all uses of physical and chemical restraint.

***B.6.b. Maintain comprehensive policies and procedures for the use of restraints for prisoners with mental illness consistent with the Constitution.***

Finding:

Substantial Compliance

***B.6.c. Ensure that approval by a Qualified Medical or Mental Health Professional is received and documented prior to the use of restraints on prisoners living with mental illness or requiring suicide precautions.***

Finding:

Substantial Compliance

***B.6.d. Ensure that restrained prisoners with mental illnesses are monitored at least every 15 minutes by Custody Staff to assess their physical condition.***

Finding:

Substantial Compliance

***B.6.e. Ensure that Qualified Medical or Mental Health Staff document the use of restraints, including the basis for and duration of the use of restraints and the performance and results of welfare checks on restrained prisoners.***

Finding:

Substantial Compliance

***B.6.f. Provide the Monitor a periodic report of restraint use at the Facility. These periodic reports shall be provided to the monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. Each report shall include:***

   ***(1)A list of prisoners whom were restrained;***



*(2)A list of any self-injurious behavior observed or discovered while restrained; and*

*(3)A list of any prisoners whom were placed in restraints on three or more occasions in a thirty (30) day period or whom were kept in restraints for a period exceeding twenty-four (24) hours.*

Finding:

Substantial Compliance

*B.6.g. Assess the periodic report to determine whether restraints are being used appropriately on prisoners with mental illness. Based on this assessment, OPSO shall document recommended changes to policies and procedures and provide these to the Monitor.*

Finding:

Substantial Compliance

Findings:

B. 7. a.  Partial Compliance

B. 7. b.  Substantial Compliance

B. 7. c.  Partial Compliance

B. 7. d.  Substantial Compliance

*7.a. OPSO shall ensure that all staff who supervise prisoners have the knowledge, skills, and abilities to identify and respond to detoxifying prisoners. Within 180 days of the Effective Date, OPSO shall institute an annual in-service detoxification training program for Qualified Medical and Mental Health Staff and for correctional staff. The detoxification training program shall include:*
  *(1)  annual staff training on alcohol and drug abuse withdrawal;*
  *(2)  training of Qualified Medical and Mental Health Staff on treatment of alcohol and drug abuse conducted by the Chief Medical Officer or his or her delegate;*
  *(3)  oversight of the training of correctional staff, including booking and housing unit officers, on the policies and procedures of the detoxification unit, by the Chief Medical Officer or his or her delegate;*
  *(4)  training on drug and alcohol withdrawal by Qualified Medical and Mental Health Staff;*
  *(5)  training of Qualified Medical and Mental Health Staff in providing prisoners with timely access to a Qualified Mental Health Professional, including psychiatrists, as clinically appropriate; and*
  *(6)  training of Qualified Medical and Mental Health Staff on the use and treatment of withdrawals, where medically appropriate.*

Finding:

Partial compliance

Qualified Medical and Mental Health Staff are trained regarding care for patients who have orders for monitoring and treatment of withdrawal.

Medical staff in the IPC, however, are not referring patients with alcohol and/or substance abuse to mental health staff for evaluation for treatment.  Very few patients with these conditions are identified.

Suggestion:

Reinforce policy, training, and supervision to refer patients who abuse alcohol and other



substances to mental health for evaluation for treatment.

***7.b. Provide medical screenings to determine the degree of risk for potentially life-threatening withdrawal from alcohol, benzodiazepines, and other substances, in accordance with Appendix B.***

Finding:

Substantial Compliance

Incoming inmates are screened for withdrawal, in accordance with Appendix B. Wellpath quarterly performance measurement demonstrates sustained compliance. Monitors find Wellpath measurement reliable.

***7.c. Ensure that the nursing staff complete assessments of prisoners in detoxification on an individualized schedule, ordered by a Qualified Medical or Mental Health Professional, as clinically appropriate, to include observations and vital signs, including blood pressure.***

Finding:

Partial Compliance

The last report noted that Wellpath quarterly performance measurement and the Monitor's reliability audits demonstrate that nursing care for patients on the detox protocol has improved overall.  That continues to be the case.  Lags to first dose of vital medication needed during detoxification from alcohol have not yet reached 60%.  This is an improvement since December 2020, when none of the patients reviewed by Wellpath received their first dose timely, but is wholly insufficient.  Nursing assessments are better documented and have exceeded the 90 % threshold the last three audits in 2021 (February, April, and September). Assessments for symptoms of withdrawal from opiates however have been less than 90% through September 2021. There does not appear to be a particular time of day in which assessments are missed.

Suggestion:

The last report suggested a process map be completed of the events that take place from the order for detox medication and the patient's receipt of the first dose, to identify factors that contribute to delay. Develop process improvement plans to improve timelines of the first dose of medication. Given that performance on this measure has not improved significantly this suggestion remains.  Examine the reasons that contribute to the success in achieving performance measures for alcohol detox assessments and apply these to improve timely and complete assessments of patients who are on opiate detox protocols.

***7.d. Annually, conduct a review of whether the detoxification training program has been effective in identifying concerns regarding policy, training, or the proper identification of and response to detoxifying prisoners. OPSO will document this review and provide its conclusions to the Monitor.***



Finding:

Substantial Compliance

An annual review was conducted for 2020, including a discussion of the effectiveness of training (increase in post-test scores, number needing training, etc.).  The evaluation identified the poor timeliness of medication.

Findings:

B. 8. a.  Partial Compliance

B. 8. b.  Substantial Compliance

***8.a. OPSO shall ensure that medical and mental health staffing is sufficient to provide adequate care for prisoners' serious medical and mental health needs, fulfill constitutional mandates and the terms of this Agreement, and allow for the adequate operation of the Facility, consistent with constitutional***

Finding:

Partial Compliance

Medical and mental health staffing was insufficient for most care functions during most of the period May through September 2021.  Recently, many positions that were vacant have been filled with permanent employees.  This is really encouraging.  Until recently, there have been systemic delays in access to acute nursing care, health assessments, detox assessments, laboratory testing and nursing assessments.  Health assessments are current at this time but were significantly backlogged during the measuring period. The suicide watch staffing ratio of one watcher for five or more patients is insufficient and dangerous.  Deputies have been performing about one-third of the suicide watches, especially on the special needs units, but not limited to those units.  There is scant documentation in the medical record that these patients at risk of suicide have been watched.

Suggestion:

Fund and authorize MH staff for special programs, as per Wellpath proposal.  Fund and train enough suicide watchers to reduce the risk of unnecessary death from suicide.

***8.b. Within 90 days of the Effective Date, OPSO shall conduct a comprehensive staffing plan and/or analysis to determine the medical and mental health staffing levels necessary to provide adequate care for prisoners' mental health needs and to carry out the requirements of this Agreement. Upon completion of the staffing plan and/or analysis, OPSO shall provide its findings to the Monitor, SPLC, and DOJ for review. The Monitor, SPLC, and DOJ will have 60 days to raise any objections and recommend revisions to the staffing plan.***

Finding:

Substantial Compliance

Findings:



B. 9. a.  Partial Compliance

B. 9. b.  Partial Compliance

B. 9. c.  Partial Compliance

B. 9. d.  Partial Compliance

B. 9. e.  Partial Compliance

B. 9. f.  Partial Compliance

***B.9.a. OPSO shall develop, implement, and maintain a system to ensure that trends and incidents involving avoidable suicides and self-injurious behavior are identified and corrected in a timely manner. Within 90 days of the Effective Date, OPSO shall develop and implement a risk management system that identifies levels of risk for suicide and self-injurious behavior and requires intervention at the individual and system levels to prevent or minimize harm to prisoners, based on the triggers and thresholds set forth in Appendix B.***

Finding:

Partial Compliance

Suggestion: Analysis of trends and incidents involving avoidable suicides and self-injurious behaviors to determine required interventions at the individual and system levels to prevent or minimize harm to inmates requires further development, particularly regarding inmates who have repeated suicidal or self-harming behaviors and the need for revisions in their treatment plans and treatment activities. Incidents of inmates identified as at increased risk continue to obtain access to contraband and/or are not adequately supervised and gain access to mezzanines. Further morbidity reviews and other treatment reviews indicate a significant number of inmates are placed on staggered suicide watches instead of appropriate direct observations.  Some systemic actions, i.e., replacing worn suicide smocks and blankets is noted.  Systems analysis should be helpful in identifying consistent protocols to minimize these events.

***B.9.b. The risk management system shall include the following processes to supplement the mental health screening and assessment processes: incident reporting, data collection, and data aggregation to capture sufficient information to formulate a reliable risk assessment at the individual and system levels; identification of at-risk prisoners in need of clinical treatment or assessment by the Interdisciplinary Team or the Mental Health Committee; and development and implementation of interventions that minimize and prevent harm in response to identified patterns and trends.***

Finding:

Partial Compliance

Suggestion:

Provide documentation of analysis of risk management system processes including the listed criteria, with more attention to data aggregation and analysis, and development and implementation of interventions that minimize and prevent harm in response to identified



patterns and trends. The risk assessments at the individual-level by the Interdisciplinary Treatment Team and at the system-level by the Mental Health Committee and QI Work Group should include analysis of current practices such as the need for out-of-cell treatment services for inmates on the mental health caseload in segregated housing, and mental health staff participation in the disciplinary process. Wellpath reports knowledge of High Security Containment apparatus that may be helpful for treatment services. The current process for mental health participation in the disciplinary process is during the hearing rather than assessing the inmate before the hearing and generating written recommendations to the Hearing Officer. Since the last visit, OPSO has committed to assist mental health with the provision of out of cell individual and group therapies (as they are resumed). Further development of the interface of mental health with the disciplinary process, development of Behavioral Management plans for individuals and a possible unit, and identification of at-risk individuals and implementation of interventions for those with longer term incarcerations is anticipated.

***B.9.c. OPSO shall develop and implement an Interdisciplinary Team, which utilizes intake screening, health assessment, and triggering event information for formulating treatment plans. The Interdisciplinary Team shall:***

    *(1)   include the Medical and Nursing directors, one or more members of the psychiatry staff, counseling staff, social services staff, and security staff, and other members as clinical circumstances dictate;*

    *(2)   conduct interdisciplinary treatment rounds, on a weekly basis, during which targeted patients are reviewed based upon screening and assessment factors, as well as triggering events; and*

    *(3)   provide individualized treatment plans based, in part, on screening and assessment factors, to all mental health patients seen by various providers.*

<u>Finding:</u>

Partial Compliance

<u>Suggestion:</u>

Provide adequate documentation of completion of mental health Interdisciplinary Treatment Team meetings and rounds, and provision of adequate and timely individualized treatment plans to all mental health patients seen by various providers at OJC and TMH.

***B.9.d. OPSO shall develop and implement a Mental Health Review Committee that will, on a monthly basis, review mental health statistics including, but not limited to, risk management triggers and trends at both the individual and system levels. The Mental Health Review Committee shall:***

    *(1)   include the Medical and Nursing Director, one or more members of the psychiatry staff and social services staff, the Health Services Administrator, the Warden of the facility housing the Acute Psychiatric Unit, and the Risk Manager.*

    *(2)   identify at-risk patients in need of mental health case management who may require intervention from and referral to the Interdisciplinary Team, the OPSO administration, or other providers.*

    *(3)   conduct department-wide analyses and validation of both the mental health and self-*



*harm screening and assessment processes and tools, review the quality of screenings and assessments and the timeliness and appropriateness of care provided, and make recommendations on changes and corrective actions;*
*(4)      analyze individual and aggregate mental health data and identify trends and triggers that indicate risk of harm;*
*(5)      review data on mental health appointments, including the number of appointments and wait times before care is received; and*
*(6)      review policies, training, and staffing and recommend changes, supplemental training, or corrective actions.*

Finding:

Partial Compliance

Suggestion:

Provide documentation of Mental Health Review Committee meetings addressing all of the listed elements, including analysis of the data collected.  See IV.B.9a and b., as well as provisions on suicide prevention, training, observation/management, and documentation. The MAC meetings should address and track systemic concerns.  See B.9.e and B.9.f.

*B.9.e. OPSO shall develop and implement a Quality Improvement and Morbidity and Mortality Review Committee that will review, on at least a quarterly basis, risk management triggers and trends and quality improvement reports in order to improve care on a Jail-wide basis.*
*(1)    The Quality Improvement Committee shall include the Medical Director, the Director of Psychiatry, the Chief Deputy, the Risk Manager, and the Director of Training.*
*(2)    The Quality Improvement Committee shall review and analyze activities and conclusions of the Mental Health Review Committee and pursue Jail-wide corrective actions. The Quality Improvement Committee shall:*
*   i.    monitor all risk management activities of the facilities through the review of risk data, identification of individual and systemic trends, and recommendation and monitored implementation of investigation or corrective action; and*
*   ii.   generate reports of risk data analyzed and corrective actions taken.*

Finding:

Partial Compliance

Quality management activities have been curtailed through the deployment of the quality management nurse for other duties.  Some quality management activities have been effective in identifying problems and designing corrective action.  These include dental care disruptions and suicide watch, neither of which have been adequately addressed.  However, quality management activities have identified significant opportunities for improvement with no identified corrective action.  These include medication refusal, AIMS testing, asthma care, and laboratory measurements for diabetes.  The fact that Wellpath is identifying these obstacles to a reasonable level of care is an enormous improvement.  Further, there is some documentation of analysis of these data and corrective action, both improvements, though the documentation could be improved.  The corrective action plans should be more robust,



and they should be tracked in a coherent manner over time.

Wellpath provided an analysis of grievances received over the year ending September 30, 2021.  Healthcare grievances are 60% the rate of the previous year. The analysis concentrated on the three most frequent categories of grievance which were medication issues, conduct of healthcare staff and requests, rather than complaints, for service. All three areas trended down the last twelve months; however, in August, grievances about medication spiked, so these were each examined, and improvements identified and implemented.

The Monitors reviewed the grievance log as well as thirteen grievance responses in September. The nature of complaints on the log in September are less serious although no less valid than those reviewed during the last tour. For example, grievances this time concern preferences for the type of medication prescribed (wanting Protonix rather than Pepcid) compared to an example from the last visit of an entire tier not receiving medication because there was no deputy to escort. The quality of the responses to grievances has also improved with ten of the thirteen considered adequate responses.

<u>Suggestions</u>:

Incorporate performance data, analysis, and trending into QI Committee minutes. Continue to analyze grievance data and incorporate it into the quality management process. The responsiveness of answers to grievances and whether the suggested resolution actually took place should be monitored as part of the grievance analysis. Improve analysis and corrective action plans generally, with more specificity for root cause analysis, process mapping and design, and effective improvement strategies. Continue to improve reliability of clinical performance measurement in the areas discussed during this tour. Ensure that the Chief Deputy (or equivalent) and Director of Training participate in meetings, with documentation. Continue to collect and report reliable data on visit disruptions due to the unavailability of custody staff for escort and/or transportation and develop interventions, with accountabilities and timelines, in collaboration with custody staff. Utilize clinical performance data for management purposes.  Continue to improve reliability of clinical performance monitoring.  Secure corporate assistance with evaluation methodology.

***B.9.f. OPSO shall review mortality and morbidity reports quarterly to determine whether the risk management system is ensuring compliance with the terms of this Agreement. OPSO shall make recommendations regarding the risk management system or other necessary changes in policy based on this review. The review and recommendations will be documented and provided to the Monitor.***



Finding:

Partial Compliance

We discussed the nine morbidity and one mortality reviews done between April and September 2021.  The mortality and morbidity reviews remain perfunctory and lack self-critical analysis. Clinical analyses are incomplete, for example among them, only one suggested that the suicide attempt might have been prevented had there been a behavior management program at OJC. Otherwise, there was no discussion as to how mental health intervention might have prevented the risky medication ingestions in six of the seven incidents. These reviews are remarkably complacent. Corrective action plans are not well-documented and there is no annual review of findings.  No recommendations are made in the periodic reviews. In addition, in a significant number of cases, prisoners were placed at a lower level of observation (q15' checks) instead of the appropriate Direct Observations. Suggestion: Develop a process to assure transparency and self-critical analysis for morbidity reviews.  Enhance analysis and problem identification in morbidity and mortality reviews. Improve corrective action plans generally, with specificity for root cause analysis, process design, and effective improvement strategies. Evaluate and report on the effectiveness of the mortality and morbidity review process.  Secure corporate assistance on evaluation methodology.

## C.    Medical Care

*C. OPSO shall ensure constitutionally adequate treatment of prisoners' medical needs. OPSO shall prevent unnecessary risks to prisoners and ensure proper medication administration practices. OPSO shall assess on an annual or more frequent basis whether the medical services at OPP comply with the Constitution. At a minimum, OPSO shall:*
*1. Quality Managing of Medication Administration:*
   *a. Within 120 days of the Effective Date, ensure that medical and mental health staff are trained on proper medication administration practices, including appropriately labeling containers and contemporaneously recording medication administration;*
   *b. Ensure that physicians provide a systematic review of the use of medication to ensure that each prisoner's prescribed regimen continues to be appropriate and effective for his or her condition;*
   *c. Maintain medication administration protocols that provide adequate direction on how to take medications, describe the names of the medications, how frequently to take medications, and identify how prisoners taking such medications are monitored; an*
   *d. Maintain medication administration protocols that prevent misuse, overdose, theft, or violence related to medication.*

Findings:

C.1. a.  Substantial Compliance

C. 1. b.  Substantial Compliance

C. 1. c. Substantial Compliance



C. 1. d.  Partial Compliance

Substantial lags to laboratory testing, acute care visits and medication continue through the period ending September 2021.  Performance is poor on measurement of A1c hemoglobin in diabetics, antiseizure medication levels, and trough lithium levels; this leads to lags in dose adjustments for life-critical medications.  Staff report, anecdotally that there are few backlogs, yet grievances and reports from Plaintiffs' attorneys bely that statement. The lags to laboratory testing and to acute care visits lead to lags to medication.  Poor nursing judgment has persisted; this leads to delayed evaluation by the physician and nurse practitioners and prescription of medication and other necessary treatment. Vacancies and reliance on temporary nurses no doubt contributed to weakness in the quality of nursing judgment and care.

There are persistent and significant lags to first dose of medication prescribed for detoxification, though the monitors note great improvement in this life-saving measure.  In Report #14 we noted that only 10% of patients received their first dose timely.  This visit the rate improved to 50-60%.

The number of confiscated contraband medication has decreased consistently. Custody staff have continued shakedowns and cell searches.

The self-congratulatory annual reports for 2019 and 2020 consistently skirt problems that have been identified in the clinical performance monitoring program, for example the problem with dental escorts, failures to ensure health assessments, persistent laboratory failures, etc.

<u>Suggestions:</u> Continue to improve performance on conformance to chronic disease protocols for medical and psychiatric conditions. Reduce lags to and lapses in medication. Work with custody staff to improve medication administration safety.  Analyze the current nursing allocation to determine if changes to the numbers and mix of skills of personnel need to be made to improve performance.

*C.2.a. Provide the Monitor a periodic report on health care at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. Each report will include:*
*(1) number of prisoners transferred to the emergency room for medical treatment related to medication errors;*
*(2) number of prisoners taken to the infirmary for non-emergency treatment related to medication errors;*
*(3) number of prisoners prescribed psychotropic medications;*
*(4) number of prisoners prescribed "keep on person" medications; and*
*(5) occurrences of medication variances.*



*C.2.b. Review the periodic health care delivery reports to determine whether the medication administration protocols and requirements of this Agreement are followed. OPSO shall make recommendations regarding the medication administration process, or other necessary changes in policy, based on this review. The review and recommendations will be documented and provided to the Monitor.*

Findings:

C. 2. a.  Substantial Compliance

C. 2. b.  Partial Compliance

Periodic reports are written, but there is no indication that Wellpath has used data to improve timely access to care or medication.  Wellpath reported to the Monitors that health assessments are now up-to-date and that they are fully compliant.

*3.a. OPSO shall notify Qualified Medical or Mental Health staff regarding the release of prisoners with serious medical and/or mental health needs from OPSO custody, as soon as such information is available.*
*3.b. When Qualified Medical or Mental Health staff are notified of the release of prisoners with serious medical and/or mental health needs from OPSO custody, OPSO shall provide these prisoners with at least a seven-day supply of appropriate prescription medication, unless a different amount is necessary and medically appropriate to serve as a bridge until prisoners can reasonably arrange for continuity of care in the community.*
*3.c. For all other prisoners with serious medical and/or mental health needs who are released from OPSO custody without advance notice, OPSO shall provide the prisoner a prescription for his or her medications, printed instructions regarding prescription medications, and resources indicating where prescriptions may be filled in the community.*
*3.d. For prisoners who are being transferred to another facility, OPSO shall prepare and send with a transferring prisoner, a transition summary detailing major health problems and listing current medications and dosages, as well as medication history while at the Facility. OPSO shall also supply sufficient medication for the period of transit for prisoners who are being transferred to another correctional facility or other institution, in the amount required by the receiving agency.*

Findings:

C. 3. a.  Substantial Compliance

C. 3. b.  Substantial Compliance

C. 3. c.  Substantial Compliance

C. 3. d.  Substantial compliance

The proportion of patients with serious needs reached continues to increase. Once identified, the patients are receiving either a supply or a prescription that can be filled at no cost; medication pickup rates are reportedly improved. Transfer of information and medication appears to be working well.

## IV.    D. 1. Sanitation and Environmental Conditions

Findings:

D.1. a.  Partial Compliance

D. 1. b.  Substantial Compliance

D. 1. c.  Substantial Compliance



D. 1. d.  Partial Compliance

D. 1. e.  Substantial Compliance

D. 1. f.  Partial Compliance

D. 1. g.  Substantial Compliance

D. 1. h.  Substantial Compliance

***IV. D. 1. a. OPSO shall provide oversight and supervision of routine cleaning of housing units, showers, and medical areas. Such oversight and supervision will include meaningful inspection processes and documentation, as well as establish routine cleaning requirements for toilets, showers, and housing units to be documented at least once a week but to occur more frequently.***

Finding:

Partial Compliance

Observations:

The Monitor physically inspected every occupied housing unit in the OJC and TDC/TMH facilities. The Monitor observed the overall level of cleanliness in the housing units to be generally acceptable with the exception of the janitor closets in several OJC housing pods.  The Monitor also interviewed the OPSO Sanitarian and Environmental Officer as well as inmates and staff during the inspection itself. The Sanitarian reported that a state inspection had occurred during the rating period. A review of the inspection results indicated minor maintenance issues were noted by the inspector and repaired before the conclusion of the inspection process.

OPSO did not provide cleaning schedule documentation as required. The Sanitarian advised that due to the lack of inmate workers, responsibility for routine cleaning of pod areas continues to rest with security staff as noted in the previous inspection. The twice-monthly environmental inspection reports noted cleanliness issues, though somewhat improved, with pod shower areas, communal sink and toilet areas in open dorms, and issues with the storage and security of cleaning supplies kept in the pod areas continues to be a problem in some pods. The Sanitarian also reported that the section's staffing levels remained at 6 on days and 4 on nights, but that the "borrowing" of sanitation deputies for other duties has decreased during the reporting period.

During the tour, inmate showers were specifically viewed by the Monitor. As with the previous tour, the majority of the showers appeared to be generally clean and free of trash, soap residue and drain flies. Some residual condensation was noted in several showers that had recently been in use.



OPSO continues to provide substantial documentation of monthly housing unit inspections by the Environmental Officer as noted above. The documentation continues to show a reduction in the frequency of obstructed cell vents. On the day of the inspection, the Monitor found no housing units having more than 25% of the cells with obstructed air supply vents. These were primarily in male lockdown units.

The Environmental Inspection reports also noted that the inspector found the unit mop/chemical closets to be unsecured in some instances and damage to chemical dispensers in the closets continues to occur indicating the inmates continue to have some unsupervised access to the closets. The Monitor found no doors unsecured during the inspection. Sanitation staff advised that the repair and replacement of the chemical dispensers is a chronic issue.

During the previous two inspections, the Monitor noted several lighting fixtures in the mop closets had been removed and had been advised that inmates had been tampering with the lights by removing the mounting "rods" (all-thread) that secured the lights to the ceilings. The majority of the light fixtures had been replaced as of the May 2021 inspection. The Monitor found light in Pod 3B's janitor closet had been tampered with and was held up with makeshift strapping. The Monitor noted clutter issues in most housing pods, typically involving the improper storage of inmate property in cells and dormitories. The Life-Safety inspection reports during the rating period noted similar issues.

The documentation reflected the Sanitarian and Environmental staff's efforts at maintaining consistent, regular cleaning schedules under the COVID pandemic restrictions and staffing challenges has improved significantly since the last inspection.

Grievances regarding sanitation issues were minimal during the rating period. Inmate reports via grievance of inadequate or missing cleaning supplies were consistently low however this was an issue noted in the notes of several "town hall" meetings conducted by the Sanitarian in the housing units and noted in the previous inspection. The Monitor received few verbal complaints from the inmates during the walk-thru regarding chemical availability and chemical inventory/inspection documentation reflected routine resupply of chemicals was occurring.  The material safety sheets appear to be in order in each area inspected.

As previously noted, regular provision of clean inmate clothing and bedding and appropriate inventory of these supplies are essential to sanitation, infection control and



disease prevention. The Sanitarian reported that she was able to maintain an adequate supply of inmate clothing for issue and exchange and that the laundry vendor's performance was acceptable. The Monitor observed fewer instances of hording issued clothing items and blankets during this inspection although, again, there were a few examples. The altered clothing (homemade "hoodies") observed during the last inspection was less prevalent during this inspection.

The Monitor noted that the washers and dryers appeared to be in working condition throughout the facility at the time of the inspection. Several dryer vent hoses were observed to be damaged and one completely missing. The Monitor received no verbal complaints from inmates regarding their ability to wash personal items. Security staff stated that the previously implemented procedure for washing lockdown inmates' personal items was continuing and appears to have addressed the problem. The Monitor again reiterates that any inmate workers assigned this task receive proper instruction on the safe handling of the clothing and be issued the proper personal protective equipment.

***IV. D. 1. b. Continue the preventive maintenance plan to respond to routine and emergency maintenance needs, including ensuring that showers, toilets, and sink units are adequately installed and maintained. Work orders will be submitted within 48 hours of identified deficiencies, or within 24 hours in the case of emergency maintenance needs.***

Finding:

Substantial Compliance

Observations:

As with previous inspections, the Monitor reviewed the Sanitation and Environmental Conditions report, the OPSO Preventive Maintenance Plan, the Preventive Maintenance Schedule Summary report, and a Preventive Maintenance work orders status report as well as inmate grievances related to maintenance issues. The Monitor also interviewed the Maintenance Director. The documentation reflected an on-going preventive maintenance program for major building systems and components consistent with OPSO policy and the Consent Judgment. Preventive maintenance appears to be fairly consistent despite staffing issues reported by the Maintenance Director.

Individual inmate interviews conducted during the walk-thru in each housing unit revealed no significant complaints by inmates regarding water, electric or HVAC services in individual cells that were not addressed in a timely fashion. Water pressure issues at the restroom sinks in open dormitory pods in the OJC noted during the previous inspection



were noticeably improved.

As with the previous inspection, there was no marked increase/decrease in the number of grievances received on a monthly basis also indicating that routine issues with basic plumbing, mechanical or electrical services in inmate cells or dayrooms are typically remedied within 48 to 72 hours and that work orders are being submitted in a timely manner as required by the Consent Judgment ("Work orders will be submitted within 48 hours of identified deficiencies, or within 24 hours in the case of emergency maintenance needs").

During the previous inspection, the Monitor noted issues with intercom equipment and inmate complaints about unanswered intercom calls from cells. During this visit, the Monitor did receive a few inmate complaints, however, upon randomly testing the intercom call button in several cells and pods, the intercom calls were answered by the pod control staff member with each attempt. Based on the consistent complaints, the Monitor continues to recommend that Maintenance staff make a comprehensive survey of working/non-working intercom equipment in every housing unit to facilitate repair of the system throughout the facility. Additionally, security staff supervision should continue to emphasize the importance of the prompt response to emergency intercom calls by pod deputies and pod control staff.

***IV. D. 1. c. Maintain adequate ventilation throughout OPSO facilities to ensure that prisoners receive adequate air flow and reasonable levels of heating and cooling. Maintenance staff shall review and assess compliance with this requirement, as necessary, but no less than twice annually.***

Finding:

Substantial Compliance

Observations:

As noted in previous inspections, adequate air flow is maintained in the facilities but continues to be impeded in a few inmate cells when inmates block the air vents.  The Monitor noted that overall, the number of cells with blocked supply registers was significantly less than noted during the previous visit with no housing unit having more than 25% of the cells observed to be obstructed. However, this remains an inmate supervision issue and must continue to be addressed by security staff consistently. The Monitor noted that the majority of housing dayrooms and cells to be at relatively reasonable levels of heating and cooling, so this section's rating remains in Substantial Compliance.

The following, regarding test and balance reports, is restated from previous reports.



As noted in the two previous reports, test, and balance reports for the Kitchen/Warehouse (2014), OJC (2017) and TDC (2012) were the latest available to the Monitor.

Prior to the September 2019 report, this section had been interpreted as requiring comprehensive "test and balance" assessments on a semi-annual basis. Such assessments are very expensive and typically performed only during the commissioning of new or replacement HVAC systems. As with the previous two inspections, the Monitor met with the Maintenance Director specifically to discuss the status and capabilities of the OJC Building Automation System that controls the heating and cooling throughout all occupied areas in OJC. Discussions with the Maintenance Director following this inspection regarding the BAS HVAC control systems in particular resulted in an improved approach to documenting the performance (and maintenance repair response) of the HVAC system for review by the Monitor going forward. Graphic temperature reports for specified date ranges and housing pods will be included with the documentation going forward. The Monitor reviewed live data of the system's warning and alarm functions which reflected no major equipment or systems issues that had not been addressed. The Monitor inspected the BAS system and noted no alarms or alerts present on the system. The Maintenance Director was again able to provide documentation reflecting work orders generated for the repair/replacement of mechanical system components restoring the system to normal operation. It is the Monitor's opinion that the OJC Building Automation System, as currently operated, meets the intent of the Consent Judgment regarding this section.

**IV. D. 1. d. Ensure adequate lighting in all prisoner housing units and prompt replacement and repair of malfunctioning lighting fixtures in living areas within five days unless the item must be specially ordered.**

Finding:

Partial Compliance

Observations:

The Monitor observed sufficient lighting being provided in housing units and individual cells of both OJC and TDC. Maintenance staff continue to maintain a supply of replacement bulbs, transformers, or ballasts to repair malfunctioning lighting. However, as previously noted by the Monitor, the vandalized light fixture in at least one of the pod mop closets had yet to be replaced. The replacement of the light fixtures had not been completed in the requisite time frame as of the date of this inspection. The Monitor observed no outstanding electrical work orders beyond routine bulb replacement and the issue noted



above. This section remains in partial compliance due to failure of the reporting and replacement requirements.

***IV. D. 1. e. Ensure adequate pest control throughout the housing units, including routine pest control spraying on at least a quarterly basis and additional spraying as needed.***

<u>Finding:</u>

Substantial Compliance

<u>Observations:</u>

A review of the documentation submitted found sufficient evidence of a pest control program that meets the intent of the Consent Judgment. OPSO continues to maintain a pest control contract with a state licensed company for monthly service of all housing areas and bi-weekly service for the Kitchen/Warehouse. Inmate grievances related to pest control were reviewed and found to have been addressed in a timely manner. The Monitor observed no "drain fly" issues anywhere in the facility.

Environmental, Sanitation and Life-Safety staff performing inspections and responding to pest control grievances continue to initiate work orders for pest control and to document how, when, and where infestations are identified and remedied. The pest control contractor documentation reflected no infestations were found during routine inspections.

***IV. D. 1.f. Ensure that any prisoner or staff assigned to clean a biohazardous area is properly trained in universal precautions, outfitted with protective materials, and properly supervised.***

<u>Finding:</u>

Partial Compliance

<u>Observations:</u>

As noted in previous inspections, Policy 1101.07, "Bio-hazardous Spill Cleaning Procedures" [Revised 1/18/2018] Section VIII. A. 1 has been revised to allow properly trained and equipped inmates and deputies to clean-up bio-hazardous spills. Training materials were devised by the Sanitarian. The Sanitarian documented training for several inmates trained during the rating period and noted there was a shortage of available inmate workers. The Monitor also reviewed training curricula and documentation indicating that during 2021, all pre-service staff received training in bio-hazardous cleanup procedures as part of their initial training in each new-hire class in 2021 up to the date of this inspection. Documentation reflected that the in-service training for this requirement had been delayed somewhat as OPSO continues to recover from pandemic related issues. Required pre-service



and in-service training took place during the rating period. As this section is an annual requirement, the final rating for 2021 will occur with the October 2021-March 2022 inspection period.

As of November 2018, the Sanitation and/or Environmental Officer is required to be notified of such incidents each business day to enable them to replace any bio-hazardous clean up protective materials used and inspect the area to ensure it was properly cleaned and sanitized. The Sanitarian reported that the required notification process has improved and that she checks the AS-400 reporting system daily, Monday through Friday, as a backup procedure. The Sanitarian stated that she received notification of one incident during the rating period. The Monitor personally inspected the emergency response kits in each pod control room and found all to be properly sealed with the exception of the TDC/TMH facility. The Monitor found several emergency response bags unsealed and incomplete. The Sanitarian briefed the facility captain on the requirements and remedied the issue during the inspection. This section remains in partial compliance based upon these observations and will be re-checked during the next inspection.

***IV. D. 1. g. Ensure the use of cleaning chemicals that sufficiently destroy the pathogens and organisms in biohazard spills.***

Findings:

Substantial Compliance

Observations:

The Monitor was able to make direct observation that the chemicals on-hand and available to staff were sufficient to destroy the pathogens and organisms in bio-hazardous spills common in a jail environment to include the COVID-19 virus. The Monitor is continuing to rate this section as being in substantial compliance.

Additionally, the chemical storage inventory documentation submitted demonstrated availability of a consistent supply of the required chemicals being maintained by the designated staff.

***IV. D. 1. h. Maintain an infection control plan that addresses contact, blood borne, and airborne hazards and infections. The plan shall include provisions for the identification, treatment, and control of Methicillin-Resistant Staphylococcus Aureus ("MRSA") at the Facility.***

Findings:

Substantial compliance

Observations:



As with the previous inspection, the Monitor reviewed the OPSO infection control policy 1201.11 as well as the Wellpath Infection Control Program document (rev. 8/30/18) submitted by OPSO. All requisite areas required by the Consent Judgement were addressed, to include MRSA, and included by OPSO for the Monitor's review and found sufficient.

The Monitor observed no violations with regard to the handling and sanitation of inmate mattresses in OJC or TDC. OPSO has previously provided for annual review of the policy and standard operating procedures for the handling of inmate mattresses to include staff and/or inmate sanitation training program that includes mattress cleaning, and chemical use and control. This procedure is specifically required by the Infection Control Plan.

**IV. D. 2. Environmental Control**

Findings:

D. 2. a.  Substantial Compliance

D. 2. b.  Substantial Compliance

***IV. D. 2. a. OPSO shall ensure that broken or missing electrical panels are repaired within 30 days of identified deficiencies, unless the item needs to be specially ordered.***

Findings:

Substantial Compliance

Observations:

OPSO Policies 601.02 "Reporting and Addressing Maintenance Needs" and Policy 601.03 "Preventive Maintenance" [August 15, 2016] are implemented. Major electrical panels at OJC and TMH are located in secure maintenance spaces inaccessible to inmates.

During the inspection, the Monitor observed two electrical rooms that had unauthorized miscellaneous items stored in the rooms and obstructing access to the electrical panels. The Maintenance Director and Unit Managers were made aware of the code violations which were remedied on the spot.

***IV. D. 2. b. Develop and implement a system for maintenance and timely repair of electrical panels, devices, and exposed electrical wires.***

Findings:

Substantial Compliance

Observations:

The Monitor noted no new issues related to exposed/damaged wiring/cabling during the tour.  The Monitor did happen upon a housing unit where the odor of burning material



was noticeably present in one cell. The Unit Manager was advised and addressed the situation on the spot. No issues with energized circuits accessible to inmates were observed.

The Monitor considers this to be sufficient to support a continued finding of Substantial Compliance.

### IV. D. 3. Food Service

This report summarizes the findings for the Food Service provisions of the Consent Judgment based on the Monitor's document reviews and tour conducted November 15-16, 2021.  The Monitor inspected the Orleans Justice Center (OJC) Kitchen/Warehouse; observed meal service activities; and spoke with OPSO supervisors and deputies, Summit contracted food service employees, and inmates.

Since the last tour on May 17-20, 2021, OPSO has maintained compliance with sections IV. D. 3. a, IV. D. 3. b., and IV. D. 3. c. of the Consent Judgment, resulting in Food Service remaining in substantial compliance.

Findings:

D. 3. a. Substantial Compliance

D. 3. b. Substantial Compliance

D. 3. c. Substantial Compliance

*IV. D. 3. a. OPSO shall ensure that food service staff, including prisoner staff, continues to receive in-service annual training in the areas of food safety, safe food handling procedures, and proper hygiene, to reduce the risk of food contamination and food-borne illnesses.*

Findings:

Substantial Compliance

Observations:

OPSO and Summit provide documentation of ongoing annual in-service food safety training for staff, including inmate workers, and therefore D. 3. a. remains in Substantial Compliance for the period of April 2021 through September 2021.  Inmate kitchen workers receive orientation training, including watching a video and a written quiz on the topics of food safety, personal safety, sanitation, and chemical supplies, prior to starting work in the kitchen.  Summit provides monthly training for food service staff and training topics for the compliance period included cooking, holding, cooling, and reheating temperatures; and chemical safety.

*IV. D. 3. b. Ensure that dishes and utensils, food preparation and storage areas, and vehicles and containers used to transport food are appropriately cleaned and sanitized on a daily basis.*



Findings:

Substantial Compliance

Observations:

The Monitor observed the kitchen to be clean.  OPSO and Summit food service management staff have continued to maintain the significant improvements in cleaning and sanitization and therefore, D. 3. b. remains in Substantial Compliance for the period of April 2021 through September 2021.

However, the floor in the area of the kitchen where the large cooking kettles are located, also known as the "cook pit" is in disrepair.  The floor is severely cracked and pieces are missing, which makes it extremely difficult to properly clean, as food debris lodge in the cracks and crevices.  OPSO is aware of the problem, and it is cited in their internal Sanitarian inspection reports.  They have implemented additional cleaning steps including power washing the floor in the area; however, caution must be taken so that the power washing does not cause damage.  OPSO reports that they have contacted contractors for renovation quotes and that the process will be extensive and intrusive to the food service operation.

- I recommend that OPSO begin the process for floor renovations in the kitchen "cook pit" because the floor around the kettles is in poor condition and will only continue to deteriorate.  The floor in the "cook pit" cooking area must be properly maintained, so that it is easily cleanable in order to facilitate compliance with IV. D. 3. b. requiring that food preparation areas are appropriately cleaned on a daily basis.

***IV. D. 3. c. Check and record on a daily basis the temperatures in the refrigerators, coolers, walk-in refrigerators, the dishwasher water, and all other kitchen equipment with a temperature monitor, to ensure proper maintenance of food service equipment.***

Findings:

Substantial Compliance

Observations:

The Consent Judgment requires that OPSO "Check and record on a daily basis the temperatures in the refrigerators, coolers, walk-in refrigerators, the dishwasher water, and all other kitchen equipment with a temperature monitor, to ensure proper maintenance of food service equipment." The Monitor reviewed numerous food service records provided by OPSO and Summit for the compliance period and found that the documented temperatures were within the applicable ranges. During the tour, the Monitor observed and measured food



temperatures and found them to be code compliant.  The Monitor measured and observed that all of the coolers and freezers throughout the kitchen were at the proper temperatures. The refrigerator at TMH was also at the proper temperature.  The monitor observed the dishwasher in operation and found that the dishwasher was properly dispensing chemicals and that the machine temperatures were code compliant.  Therefore, IV. D. 3. c. remains in Substantial Compliance for the period of April 2021 through September 2021.

### IV. D. 4. Sanitation and Environmental Conditions Reporting

Findings:

D.4. a. Substantial Compliance

D.4. b. Substantial Compliance

*D. 4. a. Provide the Monitor a periodic report on sanitation and environmental conditions in the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. The report will include*
*(1) number and type of violations reported by health and sanitation inspectors;*
*(2) number and type of violations of state standards;*
*(3) number of prisoner grievances filed regarding the environmental conditions at the Facility;*
*(4) number of inoperative plumbing fixtures, light fixtures, HVAC systems, fire protection systems, and security systems that have not been repaired within 30 days of discovery;*
*(5) number of prisoner-occupied areas with significant vandalism, broken furnishings, or excessive clutter;*
*(6) occurrences of insects and rodents in the housing units and dining halls; and*
*(7) occurrences of poor air circulation in housing units.*

Findings:

Substantial Compliance

Observations:

The January-June 2021 Sanitation and Environmental report was made available to the Monitor prior to the November 2021 inspection tour. The report contained the requisite information spelled out by the Consent Judgement as well as supporting documentation.

*IV. D. 4. b. Review the periodic sanitation and environmental conditions reports to determine whether the prisoner grievances and violations reported by health, sanitation, or state inspectors are addressed, ensuring that the requirements of this Agreement are met. OPSO shall make recommendations regarding the sanitation and environmental conditions, or other necessary changes in policy, based on this review. The review and recommendations will be documented and provided to the Monitor.*

Findings:

Substantial Compliance

Observations:

The Consent Judgment requires a review of the periodic sanitation and environmental conditions reports to ensure issues are addressed along with making recommendations regarding sanitation and environmental conditions and policy changes



based upon the review. Such reviews are to be documented and provided to the Monitor. The Monitor reviewed the supporting documentation provided by OPSO and determined that it was sufficient to satisfy the requirements of the Consent Judgment. OPSO provided documentation of the required review and basic analysis of prisoner grievances and inspection violations noted regarding sanitation and environmental conditions during the rating period.

### IV. E. 1. Fire and Life Safety

<u>Findings:</u>

E.1. a.  Substantial Compliance

E. 1. b.  Substantial Compliance

E. 1. c.  Substantial Compliance

E. 1. d.  Partial Compliance

E. 1. e.  Substantial Compliance

***IV. E. 1. a. Ensure that necessary fire and life safety equipment is properly maintained and inspected at least quarterly. These inspections must be documented.***

<u>Finding:</u>

Substantial Compliance

<u>Observations</u>:

The Monitor was able to conduct a tour of the OJC, TDC/TMH, and the Kitchen/Warehouse facilities during the November 2021 inspection with the Facility Life Safety Officer. The Monitor observed no major issues with the fire and life safety equipment. All fire extinguishers were found to be current on required inspections. The Fire Alarm Control Panels in the areas inspected were found to be properly inspected and free of trouble alarms. Facility monthly inspections reflected a persistent ground fault issue on the 4th floor of the OJC, a minor issue, that was referred to the system contractor for repair. The Monitor also reviewed all monthly and quarterly inspection documentation as well as outside inspection documentation noting no significant issues and that requisite work orders had been generated when warranted.

Life Safety staff continue to use the "Facility Dude" work order system to maintain the schedule of required inspections. The system notifies the Fire Safety Officer when an inspection is due. OPSO continues to maintain contracts with licensed vendors to complete annual inspections of all fire and life safety equipment. OPSO provided copies of quarterly



inspections conducted by the Fire Safety Officer for Kitchen/Warehouse, OJC, and TDC/TMH for the second and third quarters for 2021. A copy of the most recent fire marshal inspection was also provided and reviewed. This documentation, supported by observations during the compliance tour, indicates that OPSO ensures that necessary fire and life safety equipment is properly maintained and inspected at required intervals.

***IV. E. 1. b. Ensure that a qualified fire safety officer conducts a monthly inspection of the facilities for compliance with fire and life safety standards (e.g., fire escapes, sprinkler heads, smoke detectors, etc.).***

Finding:

Substantial Compliance

Observations:

The Monitor was provided with the monthly inspection documents for the Kitchen /Warehouse, OJC, and TDC/TMH facilities performed during the current inspection period. The reports are thorough and complete with all noted discrepancies listed with the associated work order number. These inspections are conducted by a qualified fire safety officer or a qualified contractor, as required by the Consent Judgment.

***IV. E. 1. c. Ensure that comprehensive fire drills are conducted every six months. OPSO shall document these drills, including start and stop times and the number and location of prisoners who were moved as part of the drills.***

Finding:

Substantial Compliance

Observations:

The Consent Judgment requires comprehensive fire drills every six months. OPSO provided documentation for nine (9) fire drills for all facilities and shifts conducted during the current rating period. Only "Level 1" drills were conducted (no inmate evacuation) due to COVID 19 restrictions. Documentation reviewed by the Monitor noted in excess of 90% of available OJC and TDC (by squad) had participated in at least one drill during the rating period. In addition to the detailed drill reports, the documentation lists, by name, any delinquent staff with the listing provided to senior management for the coordination of make-up training. Pre-service training was provided to all participants in classes held during the rating period.

***IV. E. 1. d. Provide competency-based training to staff on proper fire and emergency practices and procedures at least annually.***

Finding:

Partial-Compliance



Observations:

OPSO has developed the requisite policy, training course syllabus/outline and written directives necessary for this section. OPSO training staff provided documentation noting that approximately 83% of the mandated staff had completed the required competency-based training on fire and emergency practices by August 4, 2021. 58 staff members were noted as still needing the annually mandated training. Chief Lampard and the Training Academy anticipate that full compliance will be achieved by the end of 2021. The final rating for 2021 will be noted in the March 2022 inspection.

*IV. E. 1. e. Within 120 days of the Effective Date, ensure that emergency keys are appropriately marked and identifiable by touch and consistently stored in a quickly accessible location, and that staff are adequately trained in use of the emergency keys.*

Finding:

Substantial Compliance

Observations:

Inspection reports note the routine verification of the keys and the Fire Safety Officer documents the periodic testing of the keys to verify they are operational. The Fire Safety Officer trains staff on the location and use of the keys during the fire and life safety training curriculum provided to all staff at the training academy.

**IV. E. 2. Fire and Life Safety Reporting**

Findings:

E. 2. a.  Substantial Compliance

E. 2. b.  Substantial Compliance

*IV. E. 2. a. (1) – (3) Provide the Monitor a periodic report on fire and life safety conditions at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date and every six months thereafter until termination of this Agreement. Each report shall include:*
*(1) number and type of violations reported by fire and life safety inspectors;*
*(2) fire code violations during annual fire compliance tours; and*
*(3) occurrences of hazardous clutter in housing units that could lead to a fire.*

Finding:

Substantial Compliance

Observations:

The 2021 Fire and Life Safety Conditions reports generated during the rating period were made available to the Monitor prior to the November 2021 inspection. The reports contained the requisite information spelled out by the Consent Judgment as well as supporting documentation and a continued finding of Substantial Compliance is justified in



the Monitor's opinion.

*IV. E. 2. b. Review the periodic fire and life safety reports to determine whether the violations reported by fire and life safety inspectors are addressed, ensuring the requirements of this Agreement are being met. OPSO shall make recommendations regarding the fire and life safety conditions, or other necessary changes in policy, based on this review. The review and recommendations will be documented and provided to the Monitor.*

Finding:

 Substantial Compliance

 Observations:

The Consent Judgment requires a review of the periodic fire and life safety reports to ensure issues are addressed along with making recommendations regarding the fire and life safety conditions and policy changes based upon the review. Such reviews are to be documented and provided to the Monitor.

The Monitor reviewed the supporting documentation provided by OPSO and determined that it was sufficient to satisfy the requirements of the Consent Judgment. OPSO provided documentation of the required review and basic analysis of fire and life safety conditions as well as any necessary changes in policy or procedure. The Monitor believes a continued finding of Substantial Compliance is justified.

## IV. F. Language Assistance

*F.1.a. OPP shall ensure effective communication with and provide timely and meaningful access to services at OPP to all prisoners at OPP, regardless of their national origin or limited ability to speak, read, write, or understand English. To achieve this outcome, OPP shall:*

*(1)   Develop and implement a comprehensive language assistance plan and policy that complies, at a minimum, with Title VI of the Civil Rights Act of 1964, as amended, (42 U.S.C. § 2000d et seq.) and other applicable law;*

*(2)   Ensure that all OPP personnel take reasonable steps to provide timely, meaningful language assistance services to Limited English Proficient ("LEP") prisoners;*

*(3)   At intake and classification, identify and assess demographic data, specifically including the number of LEP individuals at OPP on a monthly basis, and the language(s) they speak;*

*(4)   Use collected demographic information to develop and implement hiring goals for bilingual staff that meet the needs of the current monthly average population of LEP prisoners;*

*(5)   Regularly assess the proficiency and qualifications of bilingual staff to become an OPP Authorized Interpreter ("OPPAI");*

*(6)   Create and maintain an OPPAI list and provide that list to the classification and intake staff; and*

*(7)   Ensure that while at OPP, LEP prisoners are not asked to sign or initial documents in English without the benefit of a written translation from an OPPAI.*

*F.2.a. OPP shall develop and implement written policies, procedures and protocols for documenting, processing, and tracking of individuals held for up to 48 hours for the U.S. Department of Homeland Security ("DHS");*

*F.2.b Policies, procedures, and protocols for processing 48-hour holds for DHS will:*

*(1)   Clearly delineate when a 48-hour hold is deemed to begin and end;*

*(2)   Ensure that, if necessary, an OPPAI communicates verbally with the OPP prisoner about when the 48-hour period begins and is expected to end;*

*(3)   Provide a mechanism for the prisoner's family member and attorney to be informed of the 48-hour hold time period, using, as needed, an OPPAI or telephonic interpretation service;*



*(4) Create an automated tracking method, not reliant on human memory or paper documentation, to trigger notification to DHS and to ensure that the 48-hour time period is not exceeded.*

*(5) Ensure that telephone services have recorded instructions in English and Spanish;*

*(6) Ensure that signs providing instructions to OPP prisoners or their families are translated into Spanish and posted;*

*(7) Provide Spanish translations of vital documents that are subject to dissemination to OPP prisoners or their family members. Such vital documents include, but are not limited to:*

    *i.    grievance forms;*

    *ii.    sick call forms;*

    *iii.    OPP inmate handbooks;*

    *iv.    Prisoner Notifications (e.g., rule violations, transfers, and grievance responses) and*

    *v.    "Request for Services" forms.*

*(8) Ensure that Spanish-speaking LEP prisoners obtain the Spanish language translations of forms provided by DHS; and*

*(9) Provide its language assistance plan and related policies to all staff within 180 days of the Effective Date of this Agreement.*

*F.3.a. Within 180 days of the Effective Date, OPP shall provide at least eight hours of LEP training to all corrections and medical and mental health staff who may regularly interact with LEP prisoners.*

*(1) LEP training to OPP staff shall include:*

    *i.    OPP's LEP plan and policies, and the requirements of Title VI and this Agreement;*

    *ii.    how to access OPP-authorized, telephonic and in-person OPPAIs; and*

    *iii.    basic commands and statements in Spanish for OPP staff.*

*(2) OPP shall translate the language assistance plan and policy into Spanish, and other languages as appropriate, and post the English and translated versions in a public area of the OPP facilities, as well as online.*

*(3) OPP shall make its language assistance plan available to the public.*

*F.4.*

*(1) OPP shall ensure that adequate bilingual staff are posted in housing units where DHS detainees and other LEP prisoners may be housed.*

*(2) OPP shall ensure that an appropriate number of bilingual staff are available to translate or interpret for prisoners and other OPP staff. The appropriate number of bilingual staff will be determined based on a staffing assessment by OPP.*

<u>Findings:</u>

F.1. a. Substantial Compliance

F. 2. a.  Substantial Compliance

F. 2. b.  Substantial Compliance

F. 3. a. Partial Compliance

F. 4. Substantial Compliance

<u>Observations</u>:

    The Language Assistance Plan required by this paragraph has been prepared and finalized. F. 1. a. remains in substantial compliance.

    OPSO asserts that DHS and ICE inmates are not detained. OPSO developed a policy which was submitted to the Monitors which has provisions F. 2. a. and b. into substantial compliance.

    OPSO provided documentation regarding the use of the language line. OPSO has provided documentation regarding the number of bilingual staff and the manner in which



the needs of language assistance are provided bringing provisions of F. 4. into substantial compliance. The Consent Judgment specifically requires at least eight hours of LEP training to all corrections and mental health staff who may regularly interact with LEP inmates. Provision IV. F. 3. a. is determined in partial compliance as eight hours of training is not provided. Training of security and medical staff assigned to the IPC should be sufficient.

### IV. G.  Youthful Prisoners

*IV. G. Consistent with the Prison Rape Elimination Act of 2003, 42 U.S.C. § 15601, et seq., and its implementation of regulations, a youthful prisoner shall not be placed in a housing unit in which the youthful prisoner will have sight, sound, or physical contact with any adult prisoner through use of a shared dayroom or other common space, shower area, or sleeping quarters. In areas outside of housing units, OPSO shall either: maintain sight and sound separation between youthful prisoners and adult prisoners, or provide direct staff supervision when youthful prisoners and adult prisoners have sight, sound, or physical contact. OPP shall ensure that youthful prisoners in protective custody status shall have no contact with, or access to or from, non- protective custody prisoners. OPP will develop policies for the provision of developmentally appropriate mental health and programming services.*

Finding:

Substantial Compliance

Observations:

OPSO has provided documentation that its separation of youthful inmates from adult inmates was found in compliance during its recent PREA audit.  A concerted effort has been made to house all youthful inmates at the juvenile detention facility. When housed at OJC, Tulane is providing developmentally appropriate mental health services to youthful inmates. Travis School continues to provide educational and programming services. The requirement for developmentally appropriate mental health and programming services is separate and apart from PREA.

### VI. A – D. The New Jail Facility and Related Issues

### A.  New Jail

*The Parties anticipate that Defendant will build a new jail facility or facilities that will replace or supplement the current facility located at 2800 Gravier Street, New Orleans, Louisiana. This Agreement shall apply to any new jail facility.*

Finding:

VI. A. Substantial Compliance.

### B.  Design and Design Document

*Defendant shall obtain the services of a qualified professional to evaluate, design, plan, oversee, and implement the construction of any new facility. At each major stage of the facility construction, Defendant shall provide the Monitor with copies of design documents.*

Finding:

VI. B. Substantial Compliance



Observations:

These provisions apply to the construction of any new facility. Phase III is such a facility. As the City is the entity overseeing the construction of Phase III, OPSO must coordinate with the City to provide copies of design document at each major stage. The City has been providing timely access to design documents and information regarding Phase III.

### C. Staffing

*Defendant shall consult with a qualified corrections expert as to the required services and staffing levels needed for any replacement facility. OPSO shall complete a staffing study to ensure that any new facility is adequately staffed to provide prisoners with reasonable safety.*

Finding:

VI.C. Substantial Compliance

Observations:

The Consent Judgment requires that the Defendant **shall** consult with a qualified corrections expert as to the required services and staffing levels needed for any replacement facility. The Monitors are concerned whether this will occur with Phase III staffing, but, for now, the paragraph is in substantial compliance.

### D. Compliance with Code and Standards

*Defendant will ensure that the new jail facility will be built in accordance with: (1) the American Correctional Association's standards in effect at the time of construction; (2) the American with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101-12213, including changes made by the ADA Amendments of 2008 (P.L. 110-325) and 47 U.S.C. §§ 225-661, and the regulations there under; and (3) all applicable fire codes and regulations.*

Finding:

Monitors not qualified to evaluate.

Observations:

The Monitors do not have the knowledge or expertise to evaluate compliance with this paragraph. OPSO asserts that it is in compliance with this provision, without offering documentation. Documentation from the architect would be sufficient.

## VII. Compliance and Quality Improvement

## VII. A. Policies, Procedures, Protocols, Training Curriculum and Practices

*Within 120 days of the Effective Date, OPSO shall revise and/or develop its policies, procedures, protocols, training curricula, and practices to ensure that they are consistent with, incorporate, address, and implement all provisions of this Agreement. OPSO shall revise and/or develop, as necessary, other written documents, such as screening tools, logs, handbooks, manuals, and forms, to effectuate the provisions of this Agreement. OPSO shall send pertinent newly drafted and revised policies and procedures to the Monitor as they are promulgated. The Monitor will provide comments on the policies to OPSO, SPLC, and DOJ within 30 days.*



*OPSO, SPLC, and DOJ may provide comments on the Monitor's comments within 15 days. At that point, the Monitor will consider the Parties' comments, mediate any disputes, and approve the policies with any changes within 30 days. If either party disagrees with the Monitor, they may bring the dispute to the Court. OPSO shall provide initial and in-service training to all Facility staff with respect to newly implemented or revised policies and procedures. OPSO shall document employee review and training in new or revised policies and procedures.*

Finding:

VII. A. Substantial Compliance

Observations:

OPSO has now completed the development of the required policies. OPSO is making progress in the development of procedures and lesson plans.

## VII. (H). B.  Written Quality Improvement Policies and Procedures

*Within 180 days of the Effective Date, Defendant shall develop and implement written quality improvement policies and procedures adequate to identify serious deficiencies in protection from harm, prisoner suicide prevention, detoxification, mental health care, environmental health, and fire and life safety in order to assess and ensure compliance with the terms of this Agreement on an ongoing basis. Within 90 days after identifying serious deficiencies, OPSO shall develop and implement policies and procedures to address problems that are uncovered during the course of quality improvement activities. These policies and procedures shall include the development and implementation of corrective action plans, as necessary, within 30 days of each biannual review.*

Finding:

VII. B. Partial compliance

Observations:

OPSO has provided documentation that it is now developing plans to identify serious deficiencies, and to address problems that are uncovered during the course of quality improvement activities to warrant a finding of partial compliance. These plans need to contain specific performance measures, timelines, and persons responsible. They also need to be implemented with appropriate development of corrective action to be taken and the auditing of adherence to the action plan.

## VII. (I). C. Full-Time Compliance Coordinator

*The Parties agree that OPSO will hire and retain, or reassign a current OPSO employee for the duration of this Agreement, to serve as a full-time OPSO Compliance Coordinator. The Compliance Coordinator will serve as a liaison between the Parties and the Monitor and will assist with OPSO's compliance with this Agreement. At a minimum, the Compliance Coordinator will: coordinate OPSO's compliance and implementation activities; facilitate the provision of data, documents, materials, and access to OPSO's personnel to the Monitor, SPLC, DOJ, and the public, as needed; ensure that all documents and records are maintained as provided in this Agreement; and assist in assigning compliance tasks to OPSO personnel, as directed by the Sheriff or his or her designee. The Compliance Coordinator will take primary responsibility for collecting information the Monitor requires to carry out the duties assigned to the Monitor.*

Finding:

Partial Compliance



Observations:

The Compliance Coordinator resigned in July 2021. While some of her duties were reassigned to other staff members, this is insufficient both as to the requirement of the Consent Judgment and the performance of the duties required. No one has been designated as the Compliance Director during the monitoring period.

### VII. (J.) D. Self-Assessment

*On a bi-annual basis, OPSO will provide the public with a self-assessment in which areas of significant improvement or areas still undergoing improvement are presented either through use of the OPSO website or through issuance of a public statement or report.*

Finding:

Partial Compliance

Observations:

During the monitoring period, no town hall meetings were held. The holding of those meetings and posting the PowerPoint presentations at those meetings brought OPSO into substantial compliance.

### VIII. Reporting Requirements and Right of Access

### VIII. A. Periodic Compliance Reporting

*OPSO shall submit periodic compliance reports to the Monitor. These periodic reports shall be provided to the Monitor within four months from the date of a definitive judgment on funding; and every six months thereafter until termination of this Agreement. Each compliance report shall describe the actions Defendant has taken during the reporting period to implement this Agreement and shall make specific reference to the Agreement provisions being implemented. The report shall also summarize audits and continuous improvement and quality assurance activities, and contain findings and recommendations that would be used to track and trend data compiled at the Facility. The report shall also capture data that is tracked and monitored under the reporting provisions of the following provisions: Use of Force; Suicide Prevention; Health Care Delivered; Sanitation and Environmental Conditions; and Fire and Life Safety.*

Finding:

Substantial Compliance

Observations:

The reports provided by OPSO are now sufficient to address the requirements of this provision.

### VIII. B.  (Notification of) Death of Any Prisoner

*OPSO shall, within 24 hours, notify the Monitor upon the death of any prisoner. The Monitor shall forward any such notifications to SPLC and DOJ upon receipt. OPSO shall forward to the Monitor incident reports and medical and/or mental health reports related to deaths, autopsies, and/or death summaries of prisoners, as well as all final SOD and IAD reports that involve prisoners. The Monitor shall forward any such reports to SPLC and DOJ upon receipt.*

Finding:



Substantial Compliance

## VIII. C. Records

***Defendant shall maintain sufficient records to document that the requirements of this Agreement are being properly implemented and shall make such records available to the Monitor within seven days of request for inspection and copying. In addition, Defendant shall maintain and provide, upon request, all records or other documents to verify that they have taken the actions described in their compliance reports (e.g., census summaries, policies, procedures, protocols, training materials, investigations, incident reports, tier logs, or use of force reports).***

Finding:

Partial Compliance

Observations:

During this compliance period, OPSO often did not provide the incident notifications within seven days. The monthly reports provided to the Monitors greatly decreases the need for document requests.

## III.  Stipulated Orders

OPSO and the Plaintiffs/DOJ negotiated two agreements after Compliance Report #3. The language of the Stipulated Orders was linked directly to the Consent Judgment and represented priority areas for inmate safety. Some of them required a one-time action such the posting of a memorandum or providing of training by a specific date. Some of the provisions of the Stipulated Order of February 11, 2015, contain on-going obligations that are in addition to the Consent Judgment or clarify the obligations under the Consent Judgment.

The three provisions of the April 22, 2015 Stipulated Order are in substantial compliance and contained provisions that were to be accomplished by specific dates during April 2015. As those dates have passed, the Monitors no longer monitor those provisions. Two of the provisions in the Stipulated Order of February 11, 2015, require additional attention. The provisions of the Stipulated Order of February 11, 2015, which require ongoing compliance are 1. a-c. 5. b., 6. a., and 7. a. and b. The provisions that are not in substantial compliance are addressed below.

***1. c. Within 24 hours of the occurrence of any of the following incident, OPSO shall notify the Monitor via email:***
- ***Death of an inmate/arrestee while held in custody (or housed in a hospital to which the inmate has been committed for care and retain in the custody of OPSO; or whose injury occurred while in custody and was subsequently released from custody);***
- ***An inmate's/arrestee's suicide, suicide attempt, aborted suicide attempt, suicidal intent, and/or deliberate suicide self-harm gesture as defined by the American Psychiatric Association;***
- ***An inmate's allegation of sexual abuse, sexual assault, sexual harassment, or voyeurism whether***



*the incident is between or among inmates, or between or among inmates and a staff/contractor or volunteer;*

- *An inmate's report, or a report by a staff/contractor or volunteer, of any inmate/inmate allegation of assault; or other inmate allegation of felonies occurring to them while in custody;*
- *An Inmate's report of a report by a staff/contractor or volunteer, of any allegation of excessive force by an employee, volunteer or contractor;*
- *Suspension or arrest of any OPSO employee, volunteer, or contractor for alleged criminal activities while on-duty and/or in a facility under the control of OPSO; and*
- *Any recovery of significant contraband, specifically weapons.*

Finding:

Partial Compliance

Observations:

OPSO complies with the first bullet points, but it is usually verbally as opposed to by email as required. OPSO is not in compliance with the reporting of the other incidents, including suicides and suicide attempts, and items with 24 hour by email. At best, the Monitor learns of some of the items through incident reports, review of investigations and newspaper reports. OPSO should put in place a system to comply with this provision.

*6. a. By February 15, 2015, in order that the housing for youthful offenders is continually staffed by a deputy, OPSO will assure that a deputy is working on every shift, on every day on the unit housing youthful offenders. This deputy may not be assigned to other tiers or other responsibilities, and shall be periodically relieved by another deputy and/or supervisor. The evidence of compliance with this document will be the staffing assignments each day, each shift for the facility in which youthful offenders are held, and samples of the log books from that unit.*

Finding:

Substantial Compliance

Observations

No youthful offenders were housed in OJC during the monitoring period. Therefore, there was not a period where housing units for youthful offenders needed to be staffed continuously.



Appendix A: Summary of Compliance Findings by Compliance Section Reports 1 - 15

| | Report # 1 2/13/14 | Report # 2 8/26/14 | Report # 3 2/25/15 | Report # 4 9/9/15 | Report # 5 3/17/16 | Report # 6 10/25/16 | Report # 7 5/1/17 | Report # 8 1/12/18 | Report # 9 8/25/18 | Report # 10 3/18/19 | Report # 11 9/19/19 | Report # 12 3/6/20 | Report # 13 11/16/20 | Report # 14 5/17/21 | Report # 15 11/15/21 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **IV.A. 1. Use of Force Policies and Procedures/Margo Frasier** | | | | | | | | | | | | | | | |
| IV. A. 1.a. | ND | NC | NC | PC | NC | PC | PC | PC | PC | SC | SC | SC | SC | PC | PC |
| IV. A. 1.b. | ND | NC | NC | PC | NC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC |
| IV. A. 1.c. | ND | NC | NC | PC | NC | NC | PC | PC | SC | SC | SC | PC | PC | PC | PC |
| **IV.A.2. Use of Force Training/Margo Frasier and Shane Poole** | | | | | | | | | | | | | | | |
| IV. A. 2. a. | ND | NC | NC | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC | PC | PC |
| IV. A. 2. b. | ND | NC | NC | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC | PC | PC |
| IV. A. 2. c. | ND | NC | NC | NC | NC | NC | NC | NC | PC | PC | SC | SC | SC | PC | PC |
| **IV.A.3. Use of Force Reporting/Margo Frasier** | | | | | | | | | | | | | | | |
| IV. A.3 a. | ND | NC | NC | PC | NC | PC | PC | PC | PC | PC | SC | PC | PC | SC | SC |
| IV. A.3 b. | ND | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC |
| IV. A.3 c. | ND | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC |
| IV. A.3 d. | ND | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV. A.3 e. | ND | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC |
| IV. A.3 f. | ND | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV. A.3 g. | ND | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC |
| IV. A.3 h. | ND | NC | NC | NC | NC | NC | NC | NC | PC | SC | SC | PC | PC | PC | PC |
| **IV.A.4. Early Intervention System ("EIS") /Margo Frasier and Shane Poole** | | | | | | | | | | | | | | | |
| IV.A.4.a. | ND | NC | NC | PC | PC | PC | NC | NC | PC | PC | SC | SC | SC | SC | PC |
| IV.A.4.b. | ND | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | PC | PC |
| IV.A.4.c. | ND | NC | NC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | PC |
| IV.A.4.d. | ND | NC | NC | NC | NC | PC | PC | NC | NC | PC | SC | SC | SC | SC | SC |
| IV.A.4.e. | ND | ND | ND | ND | NC | NC | NC | NC | PC | SC | SC | SC | SC | SC | SC |
| **IV.A.5. Safety and Supervision/Margo Frasier** | | | | | | | | | | | | | | | |
| IV.A.5.a. | ND | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC |
| IV.A.5.b. | ND | NC | NC | NC | NC | NC | NC | NC | NC | PC | SC | SC | SC | SC | SC |
| IV.A.5.c. | ND | NC | NC | NC | NC | NC | PC | PC | PC | PC | SC | SC | SC | SC | SC |
| IV.A.5.d. | NC | NC | PC | PC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.A.5.e. | ND | NC | NC | PC | PC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC |
| IV.A.5.f. | ND | NC | NC | PC | PC | SC | SC | PC | PC | PC | SC | SC | SC | SC | SC |
| IV.A.5.g. | ND | NC | ND | PC | NC | NC | NC | NC | NC | PC | SC | SC | SC | SC | SC |
| IV.A.5.h. | ND | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | SC | SC | PC | PC |

Appendix A: Summary of Compliance Findings by Compliance Section Reports 1 - 15

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IV.A.5.i. | ND | NC | NC | PC | PC | PC | PC | PC | SC | PC | PC | PC | PC | PC | PC |
| IV.A.5.j. | ND | NC | PC | PC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC |
| IV.A.5.k. | ND | NC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | PC | PC | PC |
| IV.A.5.l. | ND | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | PC | PC | PC |
| **IV.A.6. Security Staffing/Margo Frasier** | | | | | | | | | | | | | | | |
| IV.A.6.a. | ND | PC | PC | PC | SC | SC | PC | PC | PC | SC | SC | SC | PC | PC | PC |
| IV.A.6.b. | ND | NC | PC | PC | NC | PC | PC | PC | PC | SC | SC | SC | PC | PC | PC |
| **IV.A.7 Incidents and Referrals/Margo Frasier** | | | | | | | | | | | | | | | |
| IV.A.7.a. | ND | NC | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC |
| IV.A.7.b. | ND | NC | NC | PC | NC | PC | PC | PC | PC | PC | PC | SC | PC | PC | PC |
| IV.A.7.c. | ND | NC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.7.d. | ND | NC | NC | NC | NC | NC | NC | PC | PC | SC | SC | SC | SC | SC | SC |
| IV.A.7.e. | ND | NC | PC | PC | PC | PC | PC | PC | PC | PC | SC | PC | SC | SC | SC |
| IV.A.7.f. | ND | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC |
| IV.A.7.g. | ND | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC |
| IV.A.7.h. | ND | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC |
| IV.A.7.i. | ND | NC | NC | PC | NC | NC | NC | NC | PC | SC | SC | SC | SC | SC | SC |
| IV.A.7.j. | ND | NC | NC | NC | NC | NC | NC | NC | NC | SC | SC | SC | SC | SC | SC |
| **IV.A.8. Investigations/Margo Frasier** | | | | | | | | | | | | | | | |
| IV.A.8.a. | ND | NC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.8.b. | ND | NC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.8.c. | ND | NC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.8.d. | ND | NC | NC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.8.e. | ND | NC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.8.f. | ND | NC | NC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC |
| **IV.A.9. Pretrial Placement in Alternative Settings/Margo Frasier** | | | | | | | | | | | | | | | |
| IV.A.9.a. | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.9.b. | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| **IV.A.10. Custodial Placement within OPP/Patricia Hardyman** | | | | | | | | | | | | | | | |
| IV.A.10.a. | NC | PC | SC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | PC |
| IV.A.10.b. | NC | NC | NC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.10.c. | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.10.d. | NC | NC | PC | PC | PC | PC | NC | PC | SC | SC | SC | PC | SC | SC | SC |
| IV.A.10.e. | NC | NC | PC | SC | PC | PC | SC | PC | PC | PC | PC | PC | SC | PC | PC |
| IV.A.10.f. | NC | NC | NC | NC | NC | PC | PC | PC | NC | SC | PC | PC | PC | PC | PC |
| IV.A.10.g. | NC | NC | NC | NC | NC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC |
| IV.A.10.h. | ND | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | PC | SC | PC |

Appendix A: Summary of Compliance Findings by Compliance Section Reports 1 - 15

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **IV..A.11. Prisoner Grievance Process/Margo Frasier and Shane Poole** | | | | | | | | | | | | | | | |
| IV.A.11.a | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | | | | | |
| IV.A.11.a.(1) | | | | | | | | | | | SC | SC | SC | SC | SC |
| IV.A.11.a.(2) | | | | | | | | | | | PC | PC | PC | PC | PC |
| IV.A.11.a.(3) | | | | | | | | | | | SC | SC | SC | SC | SC |
| IV.A.11.a.(4) | | | | | | | | | | | SC | SC | SC | SC | SC |
| IV.A.11.a.(5) | | | | | | | | | | | SC | SC | SC | SC | SC |
| IV.A.11.a.(6) | | | | | | | | | | | PC | PC | SC | SC | SC |
| **IV.A.12. Sexual Abuse/Margo Frasier** | | | | | | | | | | | | | | | |
| IV.A.12. | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | PC | PC |
| **IV.A.13. Access to Information/Margo Frasier** | | | | | | | | | | | | | | | |
| IV.A.13. | PC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC |
| **IV. B. Mental Health Care** | | | | | | | | | | | | | | | |
| **IV.B.1. Screening and Assessment/Raymond Patterson** | | | | | | | | | | | | | | | |
| IV.B.1.a. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | PC | PC | SC |
| IV.B.1.b. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | PC | SC |
| IV.B.1.c. | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | PC | SC |
| IV.B.1.d. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | PC | PC | SC |
| IV.B.1.e. | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | PC | PC | PC |
| IV.B.1.f. | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC |
| IV.B.1.g. | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | SC |
| IV.B.1.h. | NC | NC | NC | NC | NC | NC | NC | PC | SC | SC | SC | SC | SC | SC | SC |
| IV.B.1.i. | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.1.j. | NC | NC | NC | PC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC |
| IV.B.1.k. | NC | NC | NC | PC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC |
| IV.B.1.l. | NC | NC | NC | NC | NC | NC | NC | NC | NC | SC | SC | SC | PC | PC | PC |
| **B. 2. Treatment/Raymond Patterson** | | | | | | | | | | | | | | | |
| IV.B.2.a. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.2.b. | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC |
| IV.B.2.c. | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC |
| IV.B.2.d. | NC | NC | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC |
| IV.B.2.e. | NC | NC | NC | PC | PC | PC | PC | NC | NC | PC | SC | SC | SC | SC | SC |
| IV.B.2.f. | NC | NC | NC | PC | PC | PC | NC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.2.g. | NC | NC | NC | PC | PC | PC | NC | PC | PC | SC | SC | SC | SC | SC | SC |
| IV.B.2.h. | NC | NC | NC | PC | PC | PC | PC | PC | NC | PC | SC | SC | PC | PC | PC |
| **IV.B.3. Counseling/Raymond Patterson** | | | | | | | | | | | | | | | |
| IV.B.3.a. | NC | NC | NC | NC | PC | NC | NC | PC | PC | PC | PC | PC | PC | NC | PC |

Appendix A: Summary of Compliance Findings by Compliance Section Reports 1 - 15

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IV.B.3.b. | NC | NC | NC | NC | PC | NC | NC | PC | PC | PC | PC | PC | PC | NC | PC |
| **IV.B.4. Suicide Prevention Training Program/Raymond Patterson** | | | | | | | | | | | | | | | |
| IV.B.4.a. | NC | NC | NC | PC | PC | PC | PC | PC | NC | PC | PC | PC | NC | NC | PC |
| IV.B.4.b. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | PC |
| IV.B.4.c. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | PC |
| IV.B.4.d. | NC | NC | NC | PC | NC | NC | NC | NC | NC | PC | PC | PC | NC | NC | PC |
| IV.B.4.e. | NC | NC | NC | PC | NA | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC |
| IV.B.4.f. | NC | NC | NC | NC | PC | NC | NC | NC | SC | SC | SC | SC | SC | PC | SC |
| IV.B.4.g. | NC | NC | NC | SC | PC | NC | NC | NC | NC | PC | NC | PC | SC | SC | SC |
| **IV.B.5. Suicide Precautions/Raymond Patterson** | | | | | | | | | | | | | | | |
| IV.B.5.a. | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.5.b. | NC | NC | NC | NC | NC | NC | NC | PC | PC | SC | PC | PC | NC | NC | PC |
| IV.B.5.c. | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.5.d. | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | SC | SC | SC | SC | SC |
| IV.B.5.e. | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | SC | NC | NC | PC | PC |
| IV.B.5.f. | NC | NC | NC | NC | NC | NC | NC | NC | PC | SC | SC | PC | PC | PC | PC |
| IV.B.5.g. | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.5.h. | NC | NC | NC | NC | NC | NC | NC | PC | NC | PC | PC | SC | SC | PC | PC |
| IV.B.5.i. | NC | NC | NC | NC | NC | NC | NC | PC | PC | SC | SC | SC | SC | SC | PC |
| IV.B.5.j. | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | SC | SC | SC | SC | SC |
| IV.B.5.k. | NC | NC | NC | NC | NC | NC | NC | PC | NC | PC | PC | PC | PC | PC | PC |
| **IV.B.6. Use of Restraints/Raymond Patterson** | | | | | | | | | | | | | | | |
| IV.B.6.a. | PC | NC | PC | PC | PC | PC | PC | PC | NC | PC | PC | PC | PC | PC | PC |
| IV.B.6.b. | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC |
| IV.B.6.c. | ND | NC | PC | PC | PC | PC | PC | PC | NC | PC | NC | SC | SC | SC | SC |
| IV.B.6.d. | ND | NC | PC | PC | PC | PC | PC | PC | NC | PC | SC | SC | PC | PC | SC |
| IV.B.6.e. | NC | NC | PC | PC | PC | PC | PC | PC | NC | PC | NC | SC | SC | SC | SC |
| IV.B.6.f. | NC | NC | PC | PC | PC | PC | PC | PC | NC | PC | SC | SC | SC | SC | SC |
| IV.B.6.g. | NC | NC | PC | PC | PC | PC | PC | PC | NC | PC | NC | SC | SC | SC | SC |
| **IV.B.7. Detoxification and Training/Robert Greifinger** | | | | | | | | | | | | | | | |
| IV.B.7.a. | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | PC | PC | PC |
| IV.B.7.b. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC |
| IV.B.7.c. | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.7.d. | NC | NC | PC | PC | PC | PC | PC | PC | PC | NC | PC | PC | PC | SC | SC |
| **IV.B.8. Medical and Mental Health Staffing/Robert Greifinger** | | | | | | | | | | | | | | | |
| IV.B.8.a. | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |

Appendix A: Summary of Compliance Findings by Compliance Section Reports 1 - 15

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IV.B.8.b. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC |
| **IV.B.9. Risk Management/Robert Greifinger** | | | | | | | | | | | | | | | |
| IV.B.9.a. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.9.b. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.9.c. | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.9.d. | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC |
| IV.B.9.e. | NC | NC | NC | NC | PC | PC | PC | PC | NC | PC | PC | PC | PC | PC | PC |
| IV.B.9.f. | NC | NC | NC | NC | PC | PC | PC | PC | NC | NC | PC | PC | PC | PC | PC |
| **IV.C. Medical Care See SA 2/11/15 13.** | | | | | | | | | | | | | | | |
| **IV. C. Quality Management of Medication Administration** | | | | | | | | | | | | | | | |
| IV.C.1.a. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC |
| IV.C.1.b. | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | SC |
| IV.C.1.c. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | PC | SC |
| IV.C.1.d. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | PC | PC |
| **IV.C.2. Health Care Delivered/Robert Greifinger** | | | | | | | | | | | | | | | |
| IV.C.2.a. | NC | NC | NC | PC | PC | PC | PC | PC | NC | PC | PC | SC | SC | SC | SC |
| IV.C.2.b. | NC | NC | NC | PC | PC | PC | PC | PC | NC | PC | PC | PC | PC | PC | PC |
| **IV.C.3. Release and Transfer/Robert Greifinger** | | | | | | | | | | | | | | | |
| IV.C.3.a. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC |
| IV.C.3.b. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC |
| IV.C.3.c. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC |
| IV.C.3.d. | NC | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC |
| **IV.D. Sanitation and Environmental Conditions/Shane Poole** | | | | | | | | | | | | | | | |
| IV. D. 1.a. | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC |
| IV. D. 1.b. | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC |
| IV. D. 1.c. | NC | NC | PC | PC | NC | NC | NC | PC | SC | SC | SC | SC | SC | SC | SC |
| IV. D. 1.d. | NC | NC | NC | NC | SC | SC | SC | SC | SC | SC | SC | SC | PC | PC | PC |
| IV. D. 1.e. | NC | PC | PC | PC | PC | PC | SC | PC | SC | SC | SC | SC | SC | SC | SC |
| IV. D. 1.f. | NC | NC | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC | PC | PC | PC |
| IV. D. 1.g. | NC | NC | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC |
| IV. D. 1.h. | NC | NC | NC | PC | NC | PC | NC | NC | NC | PC | PC | PC | SC | SC | SC |
| **IV. D. 2. Environmental Control/Shane Poole** | | | | | | | | | | | | | | | |
| IV. D. 2.a. | NC | NC | PC | PC | PC | SC | SC | SC | PC | SC | SC | SC | SC | SC | SC |
| IV. D. 2.b. | NC | NC | NC | NC | NC | SC | PC | SC | SC | SC | SC | SC | SC | SC | SC |
| **IV. D. 3. Food Service/Diane Skipworth** | | | | | | | | | | | | | | | |
| IV. D. 3.a. | NC | NC | NC | PC | PC | PC | NC | PC | PC | PC | SC | SC | SC | SC | SC |

Appendix A: Summary of Compliance Findings by Compliance Section Reports 1 - 15

| Requirement | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IV. D. 3.b. | NC | NC | NC | PC | PC | PC | NC | NC | NC | NC | PC | SC | SC | SC | SC |
| IV. D. 3.c. | NC | NC | NC | PC | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC | SC |
| IV. D. 4. Sanitation and Environmental Conditions Reporting/Shane Poole | | | | | | | | | | | | | | | |
| IV. D. 4.a. 1-7 | NC | NC | PC | PC | PC | PC | PC | PC | NC | SC | SC | SC | SC | SC | SC |
| IV. D. 4.b. | NC | NC | NC | PC | PC | NC | NC | PC | PC | SC | SC | SC | SC | SC | SC |
| IV.E. Fire and Life Safety/Shane Poole | | | | | | | | | | | | | | | |
| IV. E. 1. Fire and Life Safety | | | | | | | | | | | | | | | |
| IV. E. 1.a. | NC | PC | PC | PC | PC | PC | PC | SC | PC | PC | PC | SC | SC | SC | SC |
| IV. E. 1.b. | NC | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC |
| IV. E. 1.c. | PC | PC | PC | PC | NC | PC | PC | SC | PC | SC | SC | SC | SC | SC | SC |
| IV. E. 1.d. | NC | NC | NC | NC | NC | NC | PC | SC | PC | SC | SC | SC | SC | NC | PC |
| IV. E. 1.e. | ND | NC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV. E. 2. Fire and Life Safety Reporting | | | | | | | | | | | | | | | |
| IV. E. 2.a.1-3 | ND | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC |
| IV. E. 2.b. | ND | NC | NC | PC | NC | NC | NC | PC | PC | SC | SC | SC | SC | SC | SC |
| IV.F. Language Assistance | | | | | | | | | | | | | | | |
| IV.F.1. Timely and Meaningful Access to Services/Margo Frasier | | | | | | | | | | | | | | | |
| IV.F.1.a. | ND | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC |
| IV.F.2. Language Assistance Policies and Procedures/Margo Frasier | | | | | | | | | | | | | | | |
| IV.F.2.a. | ND | PC | PC | | PC | PC | PC | | PC | PC | SC | SC | SC | SC | SC |
| IV.F.2.b. | ND | PC | PC | | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC |
| IV.F.3. Language Assistance Training/Margo Frasier | | | | | | | | | | | | | | | |
| IV.F.3.a. | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.F.4. Bilingual Staff/Margo Frasier | | | | | | | | | | | | | | | |
| IV.F.4. | NC | PC | PC | PC | PC | NC | NC | NC | NC | PC | SC | SC | SC | SC | SC |
| IV.G. Youthful Prisoners/Margo Frasier | | | | | | | | | | | | | | | |
| IV.G. | NC | NC | NC | PC | PC | PC | NC | NC | PC | PC | PC | SC | SC | SC | SC |
| VI. The New Jail Facility/Margo Frasier | | | | | | | | | | | | | | | |
| VI. A. | ND | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| VI. B. | NC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| VI. C. | ND | PC | SC | SC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC |
| VI. D. | Monitors Not Qualified to Evaluate | | | | | | | | | | | | | | |
| VII. Compliance and Quality Improvement/Margo Frasier | | | | | | | | | | | | | | | |

Appendix A: Summary of Compliance Findings by Compliance Section Reports 1 - 15

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| VII. A. | ND | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC |
| VI. B. (H.) | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| VI. C. (I.) | NC | NC | SC | SC | NC | SC | SC | NC | PC | SC | SC | SC | SC | SC | PC |
| VI. D. (J.) | ND | NC | NC | PC | PC | PC | PC | NC | NC | NC | SC | SC | SC | SC | SC |
| **VIII. Reporting Requirements and Right of Access/Margo Frasier** | | | | | | | | | | | | | | | |
| VIII.A. | ND | PC | NC | PC | PC | PC | PC | NC | NC | PC | SC | SC | SC | SC | SC |
| VIII.B. | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| VIII.C. | PC | PC | PC | SC | SC | SC | NC | NC | PC | PC | SC | SC | SC | SC | PC |
| **Legend:**<br>**ND - Not scheduled for review NC - Non-compliance**<br>**PC - Partial Compliance**<br>**SC - Substantial Compliance NA - Not Applicable** | | | | | | | | | | | | | | | |