# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| _____ | § |
| LASHAWN JONES, *et al.*, and | § |
| THE UNITED STATES OF AMERICA, | § |
| | § Civil Action No. 2:12-cv-00859 |
| PLAINTIFFS | § Section I, Division 5 |
| | § Judge Lance M. Africk |
| | § Magistrate Judge Michael B. North |
| MARLIN GUSMAN, Sheriff, | § |
| | § |
| | § |
| DEFENDANT. | § |
| _____ | § |

---

## Report No. 16 of the Independent Monitors
## April 3, 2023

---

Margo L. Frasier, J.D., C.P.O., Lead Monitor
Susi Vassallo, M.D., Medical Monitor
Patricia L. Hardyman, Ph.D., Classification Monitor
Nicole Johnson, M.D., Mental Health Monitor
Shane J. Poole, M.S., C.JM., Environmental Fire Life Safety Monitor
Diane Skipworth, M.C.J., R.D.N., L.D., R.S., C.C.H.P., C.L.L.M., Food Safety Monitor



***Compliance Report #16***
***LASHAWN JONES, et al., and the United States of America v.***
***Marlin Gusman, Sheriff***

Table of Contents

|  |  | **Page** |
|---|---|---|
| I. | Introduction | 4 |
|  | A. Summary of Compliance | 6 |
|  | B. Opportunities for Progress | 8 |
|  | C. Review Process of Monitors' Compliance Report #16 | 17 |
|  | D. Communication with Stakeholders | 17 |
|  | E. Recommendations | 17 |
| II. | Substantive Provisions |  |
|  | A. Protection from Harm | 19 |
|  | A.1. Use of Force Policies and Procedures | 22 |
|  | A.2. Use of Force Training | 24 |
|  | A.3. Use of Force Reporting | 26 |
|  | A.4. Early Intervention System | 29 |
|  | A.5. Safety and Supervision | 31 |
|  | A.6. Security Staffing | 37 |
|  | A.7. Incidents and Referrals | 40 |
|  | A.8. Investigations | 42 |
|  | A.9. Pretrial Placement in Alternative Settings | 44 |
|  | A.10. Custodial Placement | 45 |
|  | A.11. Prisoner Grievance Process | 67 |
|  | A.12. Sexual Abuse | 73 |
|  | A.13. Access to Information | 74 |
|  | B. Mental Health Care | 74 |
|  | C. Medical Care | 99 |
|  | D. Sanitation and Environmental Conditions | 113 |
|  | E. Fire and Life Safety | 124 |
|  | F. Language Assistance | 128 |
|  | G. Youthful Prisoners | 130 |
|  | H. The New Jail Facility | 130 |
|  | I. Compliance and Quality Improvement | 132 |
|  | J. Reporting Requirements and Right of Access | 133 |
| III. | Status of Stipulated Orders – February 11, 2015, and April 22, 2015 | 134 |



**Page**

**Tables**

Table 1 – Summary of Compliance – All Compliance Reports          7
Table 2 – Status of Compliance – Stipulated Agreements          8
Table 3 – Summary of Incidents CY 2019-June CY 2022          20
Table 4 – CY 2018-June CY 2022 All OJC Reported Incidents by Month          21
Table 5 – CY 2018-June CY 2022 OJC Reported Incidents          33
Table 6-- Housing Audits by Units—October 2021-March 2022          66

**Figures**

Figure 1 – Percentage of White Male Inmates Assigned to OJC, TDC, and TMH Housing Units—January 2021-March 2022          51
Figure 2 – Percentage of White Female Inmates Assigned to OJC, TDC, and TMH Housing Units—January 2021-March 2022          51
Figure 3 – Rates and Completion Time of Initial Custody Assessments October 2021-March 2022          54
Figure 4 – Percent Overrides for Housing Purposes – October 2021 – March 2022          56
Figure 5 – Discretionary Override Rates by Gender in October 2021 – March 2022          57
Figure 6 – Number of Attachments Input by Classification Staff October 2021-March 2022          59
Figure 7 – Attachment Reason by Month—October 2021-March 2022          60
Figure 8 -- Rate of the Disciplinary Infractions for the OPSO ADP          65
Figure 9 – OPSO ADP vs. Number Disciplinary Hearings: October 2021 – March 2022          65
Figure 10–Most Serious Disciplinary Infraction/Report with Finding of Guilty: October 2021-March 2022          66

**Charts**

Chart 1—Facility Food Service, Medical, Mental Health, and Miscellaneous Grievances          70
Chart 2-- Inmate/Inmate Physical Violence and PREA, Staff Misconduct and PREA, Life-Threatening, and Use of Force Grievances          70
Chart 3-- Commissary, Programs, Inmate Funds, Property, Grievance Appeals, Legal and Law Library Grievances          71
Chart 4—Monthly Grievances, Request and Inmate Population Comparison  71

**Appendices**

Appendix A - Summary Compliance Findings by Section Compliance Reports 1 – 14          136



**Compliance Report # 16**
**Introduction:**

This is Compliance Report #16 submitted by the Independent Monitors providing assessment of the Orleans Parish Sheriff's Office's (OPSO) compliance with the Consent Judgment of June 6, 2013. Compliance Report #16 reflects the status of OPSO's compliance as of March 31, 2022. This report is based on incidents, documents, and compliance-related activities between October 1, 2021, and March 31, 2022. All of the Monitors were on-site for a monitoring tour June 27-30, 2022. This report is based on the observations and review of OPSO documents by the Monitors during the on-site visits and the monitoring period.

Throughout the time the Monitors have been involved in enforcement of the Consent Judgment, the on-site visits have played an integral role. During the on-site visits and the on-site visits by the Lead Monitor in between the monitoring tours, the Monitors have endeavored to provide guidance to OPSO as to how to remedy the unsafe and unconstitutional conditions which existed when we began monitoring in late 2013, and which continue to exist. In addition to the on-site visit of all of the Monitors June 27-30, 2022, the Lead Monitor visited October 2-3, 2021, November 15-18, 2021, December 20, 2021, March 15-16, 2022, April 7, 2022, April 19-21, 2022, and May 17-18, 2022. Additionally, the Monitors were in frequent contact with OPSO via other methods such as emails, telephone calls, and virtual meetings.

It should be noted that a new Orleans Parish Sheriff was elected in December 2022. Sheriff Susan Hutson took over as Orleans Parish Sheriff less than two months before the on-site visit. While Sheriff Hutson was still in the process of transitioning at the time of the monitoring tour, she set the tone of cooperation and collaboration with the Monitors. The period covered by Compliance Report #16 occurred during the time Sheriff Marlin Gusman was in charge.

The Monitors have consistently urged OPSO to put in place the necessary processes and procedures to not only obtain compliance, but to sustain compliance. Such processes and procedures would allow OPSO to provide adequate proof of compliance, independently assess compliance with the Consent Judgment and its own policies and procedures, and address shortcomings without intervention of the Monitors. The Monitors have provided guidance as to how to go about the various review functions and establish a



compliance unit that would operate independently of those whose performance would be assessed. While OPSO during this reporting period had a process where unit managers and section heads were required to gather, and report data to the leadership at unit managers meetings, there was very little verification or analysis of the data and no identification of problematic areas and/or corrective action planning. While there has been talk about the formation of a compliance unit over the past several years, it did not become operational during the monitoring period. Sheriff Hutson has taken steps to form a compliance unit which include naming the initial staff assigned to form the compliance unit.

A fully staffed compliance unit, which includes inspection and auditing duties, would allow OPSO to recognize deficiencies, and address them. For instance, OPSO continues to not have an electronic way of recording when and if security checks take place in the housing units. Since there is not an electronic record of checks, deputies write the checks in their logbooks. In an effort to make review of checks simpler by supervisors, OPSO developed a paper form on which to record security checks. While this provides an easier way for a supervisor to determine during a unit inspection if the deputy has recorded that the security checks are being performed timely, it is insufficient proof that an appropriate security check actually occurred and when it occurred. To appropriately verify the accuracy of the times recorded and the method used, hours of video would have to be watched. Prior monitoring visits have revealed the continued deficiencies in the documentation and auditing of the security checks. For instance, in the past and during this on-site visit, deputies were inconsistent in describing what an acceptable security check would look like. Furthermore, the deputies admitted that they did not perform all of the tasks for a proper security check each time a security check was recorded as having taken place. Generally, an adequate security check was performed when a physical count of the inmates took place; twice a day. A comprehensive compliance unit which includes audits and inspections is important to the work to be done on gaining and sustaining compliance. Equally important is adopting a culture where accountability is embraced as opposed to a culture where there is a reluctance to address the deficiencies and, in some instances, undermining the efforts of those whose job it is to provide information. Recent steps towards a compliance unit taken by Sheriff Hutson are significant progress.

During the monitoring period, the OPSO's jail system was under the leadership of Sheriff Gusman. Byron LeCounte served as the Chief of Corrections for the first half of the



monitoring period. Chief LeCounte had been in that role since February 2019 but left the position in December 2021. The OPSO is required to employ a professional corrections administrator who meets the requirements outlined in the Consent Judgment. During the first half of the monitoring period, the person assigned to fulfill those duties held the title of Chief of Corrections. No one held that title or performed those duties for the second half of the monitoring period once Chief LeCounte resigned.

In summary, the Monitors find that food service and environment conditions of inmates held in both the Orleans Justice Center (OJC) and the Temporary Detention Center (TDC) maintained the improvement noted in Compliance Report #15 provided to the Court on July 18, 2022. There has not been progress, and, in some cases, there has been regression; particularly, in safety and classification. Overall, ratings improved in five (5) provisions and regressed on seventeen (17) provisions. There are now five (5) provisions in non-compliance. The lack of progression and, in some cases, regression is due to a failure to follow the policies and procedures that have been put in place. It has been exasperated by the lack of staff, but many of the provisions are not reliant on security staffing. The specific areas are addressed in this report.

A.      **Summary of Compliance**

The requirements of the Consent Judgment represent correctional practice recognized as required for the operation of a Constitutional jail system. While there is some flexibility in addressing the mandates, achieving substantial compliance with the Consent Judgment, and Stipulated Agreements are necessary to bring OPSO and its correctional facilities into adherence with Constitutional requirements. The Consent Judgment contains 174 separately rated provisions. While they are separately rated, they are often intertwined. For example, effective implementation of a policy requires not only the drafting of a suitable policy, but appropriate training on the policy and enforcement of the policy. Enforcement of the policy is contingent on assessing whether the policy is being followed which requires supervision, analysis of incidents and data, and objective confirmation of compliance. A meaningful annual review of the adequacy of the policy does not just mean determining whether the wording of the policy should be changed, but also includes evaluating adherence to the policy and whether the objectives of the policy are being met; which requires objective data collection and analysis and development of corrective action plans. While appropriate policies have been developed, the objective data

collection, analysis and development of corrective action plans have been lacking or non-existent thus far. The Monitors are hopeful that will change with the establishment of a compliance unit under Sheriff Hutson.

Based on the current assessment, OPSO has regressed from Report #15. There are now five (5) provisions which are in non-compliance; as opposed to Report #15 when there were two (2). Substantial compliance has been achieved for fifty-two percent (52%) of the provisions. Forty-five percent (45%) of the provisions are in partial compliance. Three percent (3%) of the provisions are in non-compliance.

Over time, OPSO has made material progress as indicated by the movement of non-compliance to partial compliance to substantial compliance for over half of the provisions. At different times during the duration of the Consent Judgment, including in some areas in this report, there has been regression in the progress towards compliance. As will be addressed in individual areas, OPSO has shown regression from the progress reflected in Compliance Reports #10-15 in some provisions due to failure to consistently follow and enforce policies and procedures and to provide required annual training.

During the onsite visit for Compliance Report #16, it was apparent that the efforts made by Chief LeCounte to utilize analyses of data, including grievance data and use of force data to determine policy adherence and develop action plans to address shortcomings and make decisions had been mostly abandoned with his departure. For those efforts to be renewed and furthered, reliable data which is analyzed in an impartial manner and the development of a systematic approach to making decisions and implementing and enforcing them must occur. Until that occurs, the same deficiencies are likely to continue to be noted time and time again.

Sheriff Gusman and Chief LeCounte put in place a weekly meeting of managers to review performance measures; similar to a CompStat meeting. While initially viewed as a positive step towards implementation of the strategies that should result in progress, it has shown to be ineffective as there have not been any performance measures put in place or corrective action plans on how to meet the performance measures.

**Table 1 – Summary of Compliance – All Compliance Reports[1]**

| Compliance Report/Date | Substantial Compliance | Partial Compliance | Non-Compliance | NA/Other | Total |
|---|---|---|---|---|---|
| #1 – December 2013 | 0 | 10 | 85 | 76 | 171 |



| | | | | | |
|---|---|---|---|---|---|
| #2 – July 2014 | 2 | 22 | 149 | 1 | 174 |
| #3 – January 2015 | 2 | 60 | 110 | 2 | 174 |
| #4 – August 2015 | 12 | 114 | 43 | 4 | 173 |
| #5 – February 2016 | 10 | 96 | 63 | 4 | 173 |
| #6 – September 2016 | 20 | 98 | 53 | 2 | 173 |
| #7 – March 2017 | 17 | 99 | 55 | 2 | 173 |
| #8 – November 2017 | 23 | 104 | 44 | 2 | 173 |
| #9 – June 2018 | 26 | 99 | 46 | 2 | 173 |
| #10 – January 2019 | 65 | 98 | 8 | 2 | 173 |
| #11 – September 2019 | 103 | 66 | 5 | 0 | 174 |
| #12 – May 2020 | 118 | 56 | 0 | 0 | 174 |
| #13-- November 2020 | 111 | 59 | 4 | 0 | 174 |
| #14—May 2021 | 100 | 67 | 7 | 0 | 174 |
| #15—November 2021 | 97 | 77 | 0 | 0 | 174 |
| #16—May 2022 | 95 | 77 | 2 | 0 | 174 |

The status of compliance (February 11, 2015 and April 22, 2015) is as follows:

### Table 2 – Status of Compliance with 2015 Stipulated Agreements

| Compliance Report/Date | Substantial Compliance | Partial Compliance | Non-Compliance | NA | Total |
|---|---|---|---|---|---|
| August 2015 | 21 | 12 | 1 | 0 | 34 |
| February 2016 | 21 | 12 | 1 | 1 | 34 |
| September 2016 | 26 | 7 | 1 | 0 | 34 |
| March 2017 | 28 | 4 | 1 | 1 | 34 |
| November 2017 | 21 | 11 | 1 | 1 | 34 |
| June 2018 | 23 | 8 | 2 | 1 | 34 |
| January 2019 | 28 | 5 | 0 | 1 | 34 |
| September 2019 | 28 | 5 | 0 | 1 | 34 |
| May 2020 | 28 | 5 | 0 | 1 | 34 |
| November 2020 | 32 | 2 | 0 | 0 | 34 |
| May 2021 | 32 | 2 | 0 | 0 | 34 |
| November 2021 | 32 | 2 | 0 | 0 | 34 |
| May 2022 | 32 | 2 | 0 | 0 | 34 |

**B.     Opportunities for ContinuedProgress**

The Monitors summarize below the areas identified in preparation of this report regarding OPSO's current level of compliance with the Consent Judgment.

**1.     Foundational Work** - The essential, core work required to achieve compliance includes:



- <u>Policies and Procedures</u> – OPSO has completed the essential policies and procedures. The Policy Manager has continued to review policies and perform updates. Essential is the continued development, approval, and implementation of lessons plans that correspond with each of the policies. OPSO's policy governing its written directive system has significantly improved the policy/ procedure process. This process allows for organizational components to develop specific operational practices for review by OPSO administration. Unfortunately, there is often a delay between when policies are submitted for review, and they are returned with any suggested changes. Adherence to the policies, procedures, and training is essential. OPSO has yet to develop a reliable process for objective consistent auditing of adherence and consistent enforcement of policies.

- <u>Inadequate staffing</u> – OPSO has continued to hire staff but has not been able to gain ground on vacancies due to the number of terminations and resignations. During CY 2021, OPSO lost significant ground in that it hired 97 new staff members and lost 177 staff members through resignation, termination, and retirement. Through March 2022, OPSO hired 23 new staff members and lost 45 staff members through resignation, termination, and retirement. Inadequate staff in the housing areas of the facilities (OJC and TMH) and the timely completion of use of force investigations continues to hamper OPSO's ability to consistently comply with the Consent Judgment. OPSO continues to use employee overtime to address the staff shortages. Even with substantial overtime, frequently, there are housing units and control rooms with no assigned staffing. Further, almost daily, assigned staff leave housing units and control pods unattended for meal breaks and other duties. While a pay scale which provides for improvement in compensation with the goal of increased retention of staff and assistance in the recruitment efforts has been discussed, there was not a request by OPSO during the Sheriff Gusman administration for the necessary funding to implement the pay scale. A request for money to raise salaries has been requested by Sheriff Hutson in



the 2023 budget. OPSO is strongly encouraged to review its deployment of staff. It is apparent that staff are not being deployed to the areas where the need is most critical, staffing the housing units. While redeployment of staff is unlikely to fully address the staffing shortage, it would be helpful in addressing the most critical needs. During the monitoring period, there was a severe lack of supervisors on the evening/night shift due to the majority of the supervisors working on the day shift. Sheriff Hutson has made redeployment of staff, including adequate supervision on the evening/night shift a priority.

- <u>Training</u> – Employee training for security staff, both pre-service and in-service, has made progress over time, but has taken a step back with the lack of staff. In 2021, OPSO reinstated the practice of assigning new deputies to a training officer during the first three weeks of assignment to OJC (field training program), but enforcement and follow through has been sporadic and occurred even less often in the first quarter of 2022. The sergeant supervising the program also has the duty of running the school program which has hampered her efforts to meet with the new deputies and provide them mentoring and guidance. A field training program needs to be fully implemented with follow up as to the affect the program has on turnover. The program, if allowed to be fully implemented, is likely to result in a reduction of turnover and a reduction in rule violation by new deputies. OPSO did its annual training in CY 2021 with 99% attending.

- <u>Supervision</u> – Safe operation of OPSO's facilities requires an adequate number of sufficiently trained first line and mid-management supervisors and clear lines of authority and responsibility. When Independent Compliance Director Hodge was in charge of operations, he implemented the unit management approach and provided training and mentoring for the managers. While there are benefits to a unit management system, the unit management system has blurred the lines of responsibility and accountability. This is particularly apparent when there are no unit managers on duty and the supervision of the jail is the responsibility of the watch commanders. Given that the unit managers are seldom present at the



facility after 4:00 p.m. or weekends, the authority of the watch commanders to assign and supervise the staff is crucial to the safe operation of the OJC. During the monitoring period, there often was not anyone higher than the rank of sergeant on duty in the evening and overnight hours and on the weekends.

2. **Medical and Mental Health Care** – The Medical and Mental Health Monitors report challenges remain in the provision of basic care, staffing, and recordkeeping, as well as the need for improved collaboration with custody/security staffing. Security staff were found to be responsible for the performance of some of the "suicide watches" during the on-site visit. While there was some improvement in the deputies' knowledge of their duties to perform and document suicide watches, inconsistency with how suicide watches were performed and documented by the mental health technicians was still noted; resulting in inconsistency of the reporting of data. Resources from Tulane University continue to be particularly helpful in providing psychiatric mental health care, but the psychiatrists have had difficulty accessing their clients due to the shortage of security staff. In addition, Tulane University is not responsible for many aspects of mental health care required by the Consent Judgment. An important part of the long-term solution to the lack of compliance with the Consent Judgment in the areas of medical and mental health is the design and construction of Phase III, a specialized building which will contain an infirmary and housing for inmates with acute mental health issues. The City extensively renovated portions of TDC (now referred as TMH or Temporary Mental Health) as a stop gap measure. OPSO does not utilize all of the TMH units due to a lack of security staffing. Inmates with acute mental health issues continue to be housed in OJC which is inadequate for the housing of these inmates. The lack of security staff continues to hamper the efforts of the medical and mental health staff to perform their duties.

3. **Inmate Safety and Protection from Harm** - Providing a safe and secure jail continues to be a challenge.

- <u>Unit Management</u>—The Unit Management approach is being used in the supervision of the OPSO housing units. Each floor of the OJC, the IPC, and the TDC/TMH have been designated as a "unit". The purpose of this strategy is



to enhance accountability for both staff and the inmates by allowing the staff to get to know the inmates. The effectiveness of the Unit Management approach has been greatly hampered by the lack of development of management plans for problematic inmates. It also has blurred the lines of responsibility and accountability as indicated above.

- <u>Violence</u> – There were still significant incidents of violence occurring within the facilities during the monitoring period; including inmate-on-inmate assaults and assaults on staff. Most often, the inmate-on-inmate assaults occurred when there was no deputy stationed in the housing unit. Especially concerning is that inmates continue to fashion weapons from items found in the jail. As one source of contraband (such as the light supports in the utility closets and the cabinets at the front of the day room) is identified and eliminated, the inmates then discover a new source of material from which to fashion weapons. For example, inmates have begun to pry off the metal sheeting around the sinks in the janitor closets. In reality, few, if any, of the sources of contraband would be available to the inmates if the staff followed policies regarding supervision and limiting access to materials. Also concerning was the refusal of OPSO to take timely action to secure, or, better yet, remove the cabinets despite this issue being raised at the monthly meetings with OPSO practically every month during the monitoring period. This issue was addressed outside of the monitoring period by Sheriff Hutson's staff within two months of taking over the OJC. Another concern is the lack of effective random shakedowns resulting in the continued presence of weapons, pills, and other contraband in the housing units. Disorder and non-compliance with the institutional rules cause staff to use force to gain control and compliance. There is inadequate use of de-escalation techniques before resorting to force, including repeated examples of using OC spray without adequate de-escalation and/or in retaliation against inmates. Seldom are mental health staff involved when de-escalation is attempted even though a large percentage of the inmates involved in uses of force are on the mental health caseload. The number of overdoses linked to illicit drugs and prescription medication continues to be high. One inmate died



while in custody during the CY 2021. Two inmates died in June 2022 (one as a result of an inmate-on-inmate altercation and the other by means of suicide from leaping off the mezzanine).

- <u>Inmate Classification</u> – The inmate classification process requires continued attention to ensure housing decisions and placements are consistent with OPSO policies and objective classification principles. Credible auditing needs to focus on identifying issues and correcting placements. Once again, during the tour, the housing audits were found to be wholly inadequate. This is particularly disturbing since the inadequacies of the housing audits and the apparent unawareness of the classification manager of the failure of staff assigned to her to complete audits over a six-month period had been a point of emphasis during the last tour and was supposed to be part of a corrective action plan. During this monitoring period, it is clear that the classification manager had not followed policy by reviewing the audits and taking necessary corrective action. There is no analysis done when inmates are involved in an altercation to determine whether they should have been kept separate.

- <u>Inmate grievances</u> – As of Report #11, the ratings of the subdivisions in the grievance provision were individually given. The separate ratings allowed the areas in which deficiency existed to be highlighted. Timeliness and adequacy of responses is still not in substantial compliance. The trend data from the grievance system is now available to assist in identifying problems to be addressed, but there was a lack of follow through by the administration under Sheriff Gusman.

- <u>Incident Reporting</u> –The accurate timely reporting of incidents has been a constant area of concern. There remain serious incidents for which no report or no timely report is prepared by OPSO staff, including incidents involving the serious injury of inmates and drug overdoses. There continue to be reports which are incomplete and do not provide the necessary information for the reader to determine what occurred and why it occurred. It is particularly concerning that incomplete and sometime inarticulate reports have been reviewed by and approved by a supervisor. OPSO began



implementation of a corrective action plan over a year ago to address timeliness and thoroughness of reports which includes training and remedial action including discipline, but it has not adequately addressed the issue. Part of the problem is the lack of resources dedicated to the gathering and auditing of reports. In October 2022, changes were made to the way reports were distributed to the Monitors and parties which has improved the timeliness of provision of completed reports, but the timeliness of the completion of reports and quality of reports still need to be addressed. The change has also highlighted that there are incidents which should have been reported to the monitors and the parties which were not reported.

- Jail Management System **–** An integral part of the jail's operational improvement is tied to an effective jail management system. Such capacity provides on-demand, routine, and periodic data to inform critical leadership and management decisions. Such an information system has not been implemented. After OPSO cancelled the contract with the provider who was to supply a new JMS, due to the inability to interface with the Orleans Parish court system, the City of New Orleans was to purchase a JMS which will interface with the Orleans Parish court system and the OPSO information systems. Despite the passage of several years, there is no definite timeline for that process. In the meantime, OPSO has modified its current system to provide more of the required JMS functions. One of the crucial areas lacking is a way to electronically verify that security checks are taking place in a timely fashion. With the change in administration, there appears to be a much-needed emphasis on improving the functioning of the OPSO information systems.

4. **Sanitation and Environment Conditions** – Challenges remain regarding the public health and inmate/staff safety risks. During the on-site visit, inmates were often seen not wearing their masks or wearing the masks in an improper manner. The COVID-19 pandemic has presented additional challenges for the extremely dedicated sanitation staff. The inability to fill support positions identified in OPSO's staffing analysis negatively impacts the ability of OPSO to sustain compliance with the requirements of the Consent Judgment and align with accepted correctional

practice. Sanitation and cleanliness of the cells and housing areas are not solely the responsibility of the sanitation staff. The unit managers and pod deputies have the first responsibility for ensuring inmates keep their cells and dayroom areas clean and uncluttered. As with past tours, during the monitoring tour, when sanitation concerns were called to the attention of pod deputies and supervisors, they often tried to explain them away by stating they had told the inmate to correct the issue. If true, follow through is clearly lacking.

5. **Youthful Inmates** – No youthful offenders were held in OJC during the monitoring period. The Monitors applaud the effort being made to house youthful offenders in the Juvenile Justice Intervention Center (JJIC). It should be noted that housing one youthful offender is enough to tie up an entire housing unit.

6. **Inmate Sexual Safety** – OPSO underwent its required audit of compliance with the Prison Rape Elimination Act of 2003 (PREA) and passed in September 2019. Since that time, the sergeant who was assigned as the PREA Coordinator was moved from that assignment and reassigned to a housing area. One of the PREA managers has been acting in the role of the PREA Coordinator, in addition to her duties, for years. One person overseeing PREA efforts may be sufficient, but the organizational chart should be updated to indicate that decision. Continued internal collaboration among OPSO security, classification, and the medical/mental health provider is needed for the assessments of inmates' potential vulnerability to sexual assault. Due to the overuse of intake units to house inmates, inmates of various PREA designations continued to be housed together without an appropriate plan to keep them separate during time out of cell. OPSO cannot rely on an audit that is three years old to demonstrate compliance with PREA. The new administration is exploring having an updated PREA audit conducted in the near future.

7. **Compliance, Quality Reporting, and Quality Improvement** – An essential element of inmate safety is OPSO's timely review of all serious incidents as well as of non-violent incidents to determine if there are trends and/or patterns. This ensures assessment of root causes and the development, implementation, and tracking of action plans to address the causes. This activity focuses on resolving problems. OPSO has talked about undertaking this function, but during this monitoring period really made little effort to do so. Especially concerning are



systemic issues, which if they remain unaddressed, will continue to create risks to institutional safety and security. The Monitors encourage the new administration at OPSO to dedicate more time and knowledgeable resources to quality improvement. Impediments in the past include the lack of staff with the skills and/or time to devote to the task and failure to hold staff accountable for failure to follow corrective action plans.

8. **Stipulated Agreements 2015** – OPSO should review its on-going compliance with the two Stipulated Agreements from 2015. Several provisions remain in partial compliance, without any progress towards substantial compliance.

9. **Construction Projects** –

- The Docks – Construction of the renovations on the Docks has been completed. Due to COVID-19, court dockets were reduced. With the reopening of the courts, the Docks are once again being used for court holding in addition to court access.

- TDC Mental Health (TMH)– Two housing units in the Temporary Detention Center (TDC) (total of four units) were renovated to provide for housing inmates with acute mental illness pending the construction of Phase III. After completion, the male inmates with acute mental illness were moved from Hunt into one of the housing units. During the monitoring period, OPSO housed acute male inmates and acute female inmates in TMH. However, only three of the four units were operational during the monitoring period. Some acute inmates remain in OJC due to the decision not to assign sufficient staff to operate all four of the TMH units.  All sub-acute inmates remain in OJC. OPSO is encouraged to find a way to staff the fourth unit at TMH to address the backlog of acute inmates currently housed at OJC.  While TMH is not a suitable long-term solution to meet the requirements of the Consent Judgment as to medical and mental health services, it is a necessary interim step on mental health services given no satisfactory housing for acute inmates in OJC. The operation of TMH has reaffirmed the necessity of single person cells for the majority of acute inmates which should be factored in the operational capacity of Phase III. It is important to note that TMH does



nothing to address the lack of infirmary and medical housing in OJC and lack of programming space. Even with the construction of Phase III, there will be a need for safe and suitable housing for sub-acute inmates.

- Phase III –Monthly meetings of the Executive Committee have been held and have allowed input on decisions from the various stakeholders and the Monitors. The construction and occupation of Phase III are critical to the provision of mental and medical health services in accordance with the Consent Judgment. Court intervention has been required to keep the project moving forward.

C.    **Review Process of Monitors' Compliance Report #16**

A draft of this report was provided to OPSO, Counsel for the Plaintiff Class, and the Department of Justice (DOJ) on November 15, 2022. Comments were provided by Counsel for the Plaintiff Class and DOJ on December 2, 2022. OPSO chose not to make comments as Sheriff Hutson was not in charge during the monitoring period. The Monitors considered the comments of the parties in finalizing Report #16.

D.    **Communication with Stakeholders**

The Monitors are committed to providing as much information as possible regarding the status of OPSO's efforts to comply with all orders of the Court. During the monitoring period, OPSO did not honor the request of the Monitors to provide a link to the current reports on the OPSO website.

E.    **Recommendations**

Over the years, the Monitors have provided multiple recommendations and suggestions to OPSO to achieve and maintain compliance with the Consent Judgment. The purpose of the recommendations continues to be to assist OPSO in achieving and maintaining compliance. While much progress has been accomplished, many of the recommendations made in the past have not been implemented. Only "new" recommendations and suggestions are included within the body of this report. While the Consent Judgment may not require, in all situations, that OPSO follow the recommendations and suggestions of the Monitors, refusal to implement the recommendation or a suitable alternative is unlikely to result in compliance.

F.    **Conclusions and Path Forward**



OPSO has been operating under the provisions of the Consent Judgment since June 2013; monitoring began in Fall 2013. During the leadership of Director Hodge, significant improvements were acknowledged by the Monitors. The hiring of Byron LeCounte as Chief of Corrections in February 2019 was beneficial as his additional expertise and experience allowed Director Hodge to focus on the Consent Judgment. Sheriff Gusman resumed the role of full responsibility for bringing OPSO into compliance with the Consent Judgment in August 2020. Sheriff Gusman was defeated in the election held in December 2021 which seemed to lessen his desire to make progress in obtaining compliance during the remainder of his tenure. Chief LeCounte resigned from the OPSO in December 2021 which created a significant leadership vacuum. Sheriff Hutson was sworn in as Sheriff in May 2022.

It continues to be concerning that the same deficiencies pointed out in previous reports by the Monitors continued to exist and were not resolved. Serious incidents and harm to inmates continue to occur. OPSO has made some efforts to identify and address sources of contraband, but the Monitors encountered inmates smoking, including marijuana and synthetic marijuana, in the facility and weapons have frequently been fashioned from materials within the OJC. Dangerous medication is frequently found during cell shakedowns suggesting that the medication distribution process continues to be flawed.

What improvement there had been made in OPSO's data collection prior to this monitoring period appeared to have been mostly abandoned. Data collection and analysis is key to problem solving with a goal of a sustainable reduction in inmate-on-inmate assaults, inmate-on-staff assaults, uses of force, contraband, and property damage. Development of corrective action plans based on thorough analysis of the data and root cause reviews are crucial to improvement. Follow-through on implementation is essential. The Monitors are hopeful that improvement will take place with the emphasis placed on data collection and analysis by OPSO under Sheriff Hutson.

The Monitors remain committed to the Court and the parties to collaborate on solutions that will result in significant improvement towards compliance with the provisions of the Consent Judgment and future achievement of constitutional conditions.

**The Monitors again thank and acknowledge the leadership, guidance, and support**



**of The Honorable Lance M. Africk and The Honorable Michael B. North.**

## I. A.    Protection from Harm

**Introduction**

This section of the Consent Judgment addresses core correctional functions including the use of force (policies, training, and reporting), identification of staff involved in uses of force through an early intervention system, safety and supervision of inmates, staffing, incidents and referrals, investigations, pre-trial placement of inmates in the facility, classification, the inmate grievance process, sexual safety of inmates, and inmates' access to information.

The Consent Judgment requires that OPSO operate the facility to assure inmates are "reasonably safe and secure." Based on objective review of data, the facility has shown improvement in inmate and staff safety over the life of the Consent Judgment, but significant incidents that result in serious injury to inmates and staff continue to occur. Concerning is that inmates continue to fashion weapons out of items available in the jail. Inmate on inmate assaults often happen with no staff present to prevent the incident from occurring or to intervene to stop the incident. These are often incidents which result in injuries severe enough to require hospitalization. This would not have occurred if the facility was properly staffed, and the staff were properly supervising the inmates. Also concerning is the lack of a sense of urgency to address the issue of dangerous contraband even when the source of contraband has been determined.

Reaching and sustaining compliance with provisions of the Consent Judgment, particularly this section, relies on the collection, analysis, and corrective action planning using accurate and reliable data. The Monitors encourage OPSO to continue efforts to build its capacity to collect and analyze relevant accurate data, draw supportable conclusions to inform decisions throughout the organization, develop corrective action plans, implement corrective action plans, and hold staff accountable for non-adherence to corrective action plans and policies. As OPSO's capacity to collect, analyze, plan, and implement is enhanced, the ability to achieve and maintain compliance will be strengthened. Without an enhancement in capacity and dedication to making and implementing informed decisions,



OPSO is unlikely to achieve and maintain compliance and likely to regress.

The reporting of incidents to the Monitors and parties has been sporadic during the monitoring period. There were periods of weeks no reports were submitted as the responsible OPSO was not at work and no one else was assigned the duty. OPSO has not consistently had someone review the daily medical logs for inmates taken to the clinic for treatment subsequent to an altercation or a use of force as well as the transport logs of inmates routed to the hospital with trauma-related injuries to cross check them against reported incidents. A continuing issue is the lack of meaningful consequences for supervisors and deputies who fail to comply with the reporting policies resulting in late, incomplete, or missing incident reports.

The Monitors reviewed all reported incidents for the monitoring period in preparation of this report. The following charts compare the totals for the calendar years (CY) 2018-2021 and the first seven months of CY 2022. Unfortunately, given that the system for reporting incidents has proven to be unreliable, it is impossible to tell if a particular decline is the result of reporting errors as opposed to an actual decline in a type of reportable incident. It is suspected that it is not the result of an actual decline incidents, but, instead, the result of not reporting incidents and/or not forwarding the incident reports to the Monitors.

**Table 3 - All OJC Reported Incidents for CY 2018-July 2022**





| | Inmate/Inmate Assault | Inmate Staff Altercation | Use of Force | PREA | Death | Attempt Suicide/Ideation | Internal Escape | Criminal Damage | Inmate Injury/Inmate Medical (AKA slip/falls/overdoses) | Contraband | Staff Arrest/Misconduct/Suspension | Other |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2018 | 442 | 64 | 260 | 47 | 2 | 78 | 48 | 69 | 262 | 106 | 3 | 15 |
| 2019 | 440 | 117 | 358 | 42 | 0 | 82 | 6 | 47 | 145 | 302 | 0 | 6 |
| 2020 | 309 | 139 | 372 | 35 | 3 | 21 | 1 | 64 | 64 | 351 | 0 | 1 |
| 2021 | 293 | 124 | 311 | 17 | 1 | 20 | 1 | 42 | 43 | 350 | 0 | 0 |
| 2022 | 183 | 29 | 127 | 17 | 2 | 20 | 2 | 23 | 19 | 95 | 0 | 1 |

The number of inmate-staff altercations, use of force, and contraband in CY 2020 exceeded both CY 2018 and CY 2019. This was despite the inmate population having decreased significantly. In CY 2021, the number of reported inmate on inmate assaults, inmate/staff altercations, and uses of force declined slightly, but it should be noted that there is still an alarming use of weapons in assaults resulting in serious injuries. The rate of inmate-on-inmate assaults in CY 2022 is on track to exceed CY 2020 and CY 2021.

**Table 4 –All OJC Reported Incidents by Type by Month CY 2018-July 2022**





| | Jan | Feb | March | April | May | June | July | August | September | October | November | December | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2018** | 92 | 96 | 112 | 121 | 124 | 144 | 116 | 132 | 112 | 113 | 105 | 129 | **1396** |
| **2019** | 123 | 93 | 105 | 112 | 117 | 129 | 113 | 152 | 94 | 137 | 144 | 113 | **1432** |
| **2020** | 107 | 113 | 98 | 109 | 84 | 144 | 98 | 106 | 67 | 75 | 109 | 110 | **1220** |
| **2021** | 125 | 80 | 78 | 109 | 77 | 97 | 91 | 70 | 78 | 113 | 89 | 72 | **1079** |
| **2022** | 77 | 88 | 66 | 50 | 55 | 66 | 66 | 0 | 0 | 0 | 0 | 0 | **468** |

## Assessment Methodology

Dates of visits:

- October 2-3, 2021 (Lead Monitor only)
- November 15-18, 2021 (Lead Monitor only)
- December 20, 2021 (Lead Monitor only)
- March 15-16, 2022 (Lead Monitor only)
- April 7, 2022 (Lead Monitor only)
- April 19-21, 2022 (Lead Monitor only)
- May 17-18, 2022 (Lead Monitor only)
- June 27-30, 2022 (All Monitors)

Materials reviewed:

- Materials reviewed include the Consent Judgment, OPSO policies and procedures, use of force reports, incident reports, and investigations conducted by Investigative Services Bureau-Internal Affairs Division (ISB-IAD), investigations conducted by ISB-Criminal Division (ISB-Criminal), investigations conducted by ISB-Inmate Division, training materials, shakedown logs, and post logs.

Interviews:

- Interviews included the Sheriff, command staff, jail supervisors, commander of ISB, commander of IAD-Administrative, chief of investigations, chief of corrections (now referred to as warden), classification manager and staff, director of training, and various supervisors of units within ISB. Inmates were interviewed by the Monitors onsite for the visit. The Monitors also attended security-related meetings.

## IV. A. 1. Use of Force Policies and Procedures

*A. 1. a. OPSO shall develop, implement, and maintain comprehensive policies and procedures (in accordance with generally accepted correctional standards) relating to the use of force with particular emphasis regarding permissible and impermissible uses of force.*

*A. 1. b. OPSO shall develop and implement a single, uniform reporting system under a Use of Force Reporting policy. OPSO reportable force shall be divided into two levels, as further specified in policy: Level 1 uses of force will include all serious uses of force (i.e., the use of force leads to injuries that are extensive, serious or visible in nature, including black eyes, lacerations, injuries to the mouth or head, multiple bruises, injuries to the genitals, etc.), injuries requiring hospitalization, staff misconduct, and*



*occasions when use of force reports are inconsistent, conflicting, or otherwise suspicious. Level 2 uses of force will include all escort or control holds used to overcome resistance that are not covered by the definition of Level 1 uses of force.*
*A. 1. c. OPSO shall assess, annually, all data collected regarding uses of force and make any necessary changes to use of force policies or procedures to ensure that unnecessary or excessive use of force is not used in OPP. The review and recommendations will be documented and provided to the Monitor, DOJ, and SPLC.*

Findings:

A. 1. a.  Partial Compliance

A. 1. b.  Substantial Compliance

A. 1. c.  Non-Compliance

Observations:

The current OPSO use of force policy was effective as of May 2016. It was last reviewed in December 2021. While there is a policy, the failure to fully adhere to the policy results in A.1.a. remaining in Partial Compliance. One of the most frequent violations of policy has to do with the failure to attempt de-escalation before using force. There are also numerous examples of force being used as retaliation for an inmate's actions that do not warrant the use of force; i.e., pepper spray for verbally refusing to comply with an order or for having thrown a substance on the staff. The reporting system does comply with the requirements of A.1.b., which remains in Substantial Compliance. The only documentation regarding an annual review of the data collected regarding uses of force is a memo (misdated May 10, 2021, instead of May 10, 2022) stating that the Use of Force Review Board has not met since January 2022. It is the group charged with completion of the annual review. No proof was provided that the Use of Force Review Board actually met at all during the reporting period. The failure of the Use of Force Review Board to meet is extremely serious as it is the entity which refers the majority of the cases to the Internal Affairs Division for investigation and discipline, if appropriate. No annual review of the use of force data and the policy was conducted for 2021 as required by A.1.c. Problems regarding OPSO analysis of the data, poorly written reports, failure to properly classify uses of force as Level One or Level Two, backlog in the number of use of force incidents to be reviewed, and the lack of timely filed reports continue. Uses of force on specialty pods (particularly the disciplinary pod and the mental health pod) continue to be high, but there have been no recommendations documented and provided to the Monitors and DOJ and counsel for the Plaintiffs to address the problem. As has been pointed out in the past, the



Consent Judgment requires not only assessment and reduction of inappropriate uses of force, but also unnecessary uses of force. This is not occurring. Examination of the use of force reports by the Monitors revealed that often the use of force is precipitated by a failure to follow policy such as not restraining the inmate prior to movement or allowing an inmate out of his/her cell with another inmate(s) from whom he/she is to be kept separate or failing to secure the food port in the cell door. Incident reports most often demonstrate a lack of de-escalation efforts as required by the Consent Judgment; particularly before using OC spray. Seldom are mental health staff called upon to assist in de-escalation although a majority of the inmates upon whom force is used are on the mental health caseload. With the failure of OPSO to conduct the annual review of the 2021 uses of force, A.1.c., is now in Non-Compliance. Concerns regarding timeliness of submission of use of force reports and reviews are addressed in those sections.

### IV. A. 2. Use of Force Training

*A. 2. a. OPSO shall ensure that all correctional officers are knowledgeable of and have the knowledge, skills, and abilities to comply with use of force policies and procedures. At a minimum, OPSO shall provide correctional officers with pre-service and annual in-service training in use of force, defensive tactics, and use of force policies and procedures. The training will include the following:*

*(1) instruction on what constitutes excessive force;*
*(2) de-escalation tactics; and*
*(3) management of prisoners with mental illness to limit the need for using force.*

*A. 2. b. OPSO shall ensure that officers are aware of any change to policies and practices throughout their employment with OPP. At a minimum, OPSO shall provide pre-service and annual in-service use of force training that prohibits:*

*(1) use of force as a response to verbal insults or prisoner threats where there is no immediate threat to the safety or security of the institution, prisoners, staff, or visitors;*
*(2) use of force as a response to prisoners' failure to follow instructions where there is no immediate threat to the safety or security of the institution, prisoners, staff, or visitors;*
*(3) use of force against a prisoner after the prisoner has ceased to offer resistance and is under control;*
*(4) use of force as punishment or retaliation; and*
*(5) use of force involving kicking, striking, hitting, or punching a non-combative prisoner.*

*A. 2. c. OPSO shall randomly test five percent of the correctional officer staff on an annual basis to determine their knowledge of the use of force policies and procedures. The testing instrument and policies shall be approved by the Monitor. The results of these assessments shall be evaluated to determine the need for changes in training practices. The review and conclusions will be documented and provided to the Monitor.*

<u>Findings:</u>

A. 2. a.  Substantial Compliance

A. 2. b.  Substantial Compliance

A. 2. c.  Substantial Compliance

<u>Observations:</u>

The Monitor reviewed the training materials testing documentation and the



supplemental documentation submitted by training staff for the rating period and interviewed the Training Major, Sergeant, and Instructor present on the day of the inspection. Training staff advised that the annual in-service Use of Force, Defensive Tactics, and Use of Force policy and procedure training requirements for CY 2021 were conducted in April 2021 with makeup training conducted in November 2021. A completion rate of just over 96% overall was achieved. Documentation reflected 335 staff members who received the training mandated by Section A.2.a. and Section A.2.b. The Monitor considers the 96% completion rate to substantially meet the requirement for this section for CY2021 (included by this rating period).

The Monitor reviewed training documentation verifying that Use of Force training was provided as required during all pre-service classes.

The Monitor's review of the use of force training materials noted that the lesson plan, PowerPoint presentation, and testing materials substantively cover the requisite information in A. 2. b. 1-5. The proof of training documentation indicates that the pre-service OPSO staff received the required training on policies and practices from the Academy staff.

Additionally, a thorough review of the CY 2021 use of force reports reveals the need for additional training which emphasizes de-escalation and provide deputies with additional tools when dealing with inmates with mental health issues and inmates who routinely exhibited behavioral problems. Given some very problematic incidents in which staff observed inappropriate uses of force and did not stop or report the same, it is strongly suggested that the duty to intervene and report be emphasized. As any security staff member may have to deal with an inmate with mental health issues, it is recommended that mental health training be made mandatory for all security staff; not just those daily assigned to the mental health units.

The Monitor reviewed training documentation provided by training staff specific to the 5 percent annual testing requirement for A.2.c. Testing documentation for 2021 showed it to have occurred primarily in April 2021. Training staff continue to pursue a goal of 15% testing, exceeding that of the consent judgement language. The test was administered to approximately 43 individual deputies and approximately 15 supervisory staff members. The actual testing percentage achieved was approximately 16.5%. The test for 2021 was approved by Monitor Frasier April 21, 2021.



The Monitor has, in the past, observed that the Academy staff has maintained detailed, comprehensive, and very well-maintained files. In response to our request for documentation, the Academy staff provided succinct and thorough reports as to who had and who had not completed the required use of force training.

## IV. A. 3. Use of Force Reporting

*A. 3. a. Failure to report a use of force incident by any staff member engaging in the use of force or witnessing the use of force shall be grounds for discipline, up to and including termination.*

*A. 3. b. OPSO shall ensure that sufficient information is collected on uses of force to assess whether staff members complied with policy; whether corrective action is necessary including training or discipline; the effectiveness of training and policies; and whether the conditions in OPP comply with this Agreement. At a minimum, OPSO will ensure that officers using or observing a Level 1 use of force shall complete a use of force report that will:*

- *(1)    include the names of all staff, prisoner(s), or other visual or oral witness(es);*
- *(2)    contain an accurate and specific account of the events leading to the use of force;*
- *(3)    describe the level of resistance and the type and level of force used, consistent with OPP use of force; policy and procedure, as well as the precise actions taken by OPSO staff in response to the incident;*
- *(4)    describe the weapon or instrument(s) of restraint, if any, and the manner of such use be accompanied by a prisoner disciplinary report, if it exists, pertaining to the events or prisoner activity that prompted the use of force incident;*
- *(5)    describe the nature and extent of injuries sustained by anyone involved in the incident;*
- *(6)    contain the date and time when medical attention, if any, was requested and actually provided;*
- *(7)    describe any attempts the staff took to de-escalate prior to the use of force;*
- *(8)    include an individual written account of the use of force from every staff member who witnessed the use of force;*
- *(9)    include photographs taken promptly, but no later than two hours after a use of force incident, of all injuries sustained, or as evidence that no injuries were sustained, by prisoners and staff involved in the use of force incident;*
- *(10)   document whether the use of force was digitally or otherwise recorded. If the use of force is not digitally or otherwise recorded, the reporting officer and/or watch commander will provide an explanation as to why it was not recorded; and*
- *(11)   include a statement about the incident from the prisoner(s) against whom force was used.*

*A. 3. c. All officers using a Level 2 use of force shall complete a use of force report that will:*

- *(1)    include the names of staff, prisoner(s), or other visual or oral witness(es);*
- *(2)    contain an accurate and specific account of the events leading to the use of force;*
- *(3)    describe the level of resistance and the type and level of force used, consistent with OPP use of force policy and procedure, as well as the precise actions taken by OPSO staff in response to the incident;*
- *(4)    describe the weapon or instrument(s) of restraint, if any, and the manner of such use;*
- *(5)    be accompanied by a prisoner disciplinary report, if it exists, pertaining to the events or prisoner activity that prompted the use of force incident;*
- *(6)    describe the nature and extent of injuries sustained by anyone involved in the incident;*
- *(7)    contain the date and time when medical attention, if any, was requested and actually provided; and*
- *(8)    describe any attempts the staff took to de-escalate prior to the use of force.*

*A. 3. d. OPSO shall require correctional officers to notify the watch commander as soon as practical of any use of force incident or allegation of use of force. When notified, the watch commander will respond to the scene of all Level 1 uses of force. When arriving on the scene, the watch commander shall:*

- *(1)    ensure the safety of everyone involved in or proximate to the incident;*
- *(2)    determine if any prisoner or correctional officer is injured and ensure that necessary medical care is provided;*



*(3)*    *ensure that personnel and witnesses are identified, separated, and advised that communications with other witnesses or correctional officers regarding the incident are prohibited;*

*(4)*    *ensure that witness and subject statements are taken from both staff and prisoner(s) outside of the presence of other prisoners and staff;*

*(5)*    *ensure that the supervisor's use of force report is forwarded to IAD for investigation if, upon the supervisor's review, a violation of law or policy is suspected. The determination of what type of investigation is needed will be based on the degree of the force used consistent with the terms of this Agreement;*

*(6)*    *If the watch commander is not involved in the use of force incident, the watch commander shall review all submitted use of force reports within 36 hours of the end of the incident, and shall specify his findings as to completeness and procedural errors. If the watch commander believes that the use of force may have been unnecessary or excessive, he shall immediately contact IAD for investigation consideration and shall notify the warden or assistant warden; and*

*(7)*    *All Level 1 use of force reports, whether or not the force is believed by any party to be unnecessary or excessive, shall be sent to IAD for review. IAD shall develop and submit to the Monitor within 90 days of the Effective Date clear criteria to identify use of force incidents that warrant a full investigation, including injuries that are extensive or serious, visible in nature (including black eyes, injuries to the mouth, injuries to the genitals, etc.), injuries requiring hospitalization, staff misconduct (including inappropriate relationships*

                    *with prisoners), and occasions when use of force reports are inconsistent, conflicting, or otherwise suspicious.*

*A. 3. e. Ensure that a first-line supervisor is present during all pre-planned uses of force, such as cell extractions.*

*A. 3. f. Within 36 hours, exclusive of weekends and holidays, of receiving the report and review from the shift commander, in order to determine the appropriateness of the force used and whether policy was followed, the Warden or Assistant Warden shall review all use of force reports and supervisory reviews including:*

*(1)*    *the incident report associated with the use of force;*

*(2)*    *any medical documentation of injuries and any further medical care;*

*(3)*    *the prisoner disciplinary report associated with the use of force; and*

*(4)*    *the Warden or Assistant Warden shall complete a written report or written statement of specific findings and determinations of the appropriateness of force.*

*A. 3. g. Provide the Monitor a periodic report detailing use of force by staff. These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. Each report will include the following information:*

*(1)*    *a brief summary of all uses of force, by type;*

*(2)*    *date that force was used;*

*(3)*    *identity of staff members involved in using force;*

*(4)*    *identity of prisoners against whom force was used;*

*(5)*    *a brief summary of all uses of force resulting in injuries;*

*(6)*    *number of planned and unplanned uses of force;*

*(7)*    *a summary of all in-custody deaths related to use of force, including the identity of the decedent and the circumstances of the death; and*

*(8)*    *a listing of serious injuries requiring hospitalization.*

*A. 3. h. OPSO shall conduct, annually, a review of the use of force reporting system to ensure that it has been effective in reducing unnecessary or excessive uses of force. OPSO will document its review and conclusions and provide them to the Monitor, SPLC, and DOJ.*

<u>Findings:</u>

A. 3. a.  Substantial Compliance

A. 3. b.  Partial Compliance

A. 3. c.  Partial Compliance



A. 3. d.  Partial Compliance

A. 3. e.  Partial Compliance

A. 3. f.  Partial Compliance

A. 3. g.  Substantial Compliance

A. 3. h.  Partial Compliance

Observations:

As to provision A. 3. a., the use of force policy requires all uses of force to be reported timely and completely and sets out the potential discipline if the policy is not followed. A review of documentation revealed that there were four cases of discipline for failure to timely report a use of force or file the required statements. Due to enforcement of the policy which states that failure to report a use of force shall be grounds for discipline, the rating continues to be in substantial compliance.

Provision A. 3. b. is in Partial Compliance due to the number of use of force reports that are incomplete or inadequate. The use of force policy includes the provisions required by the Consent Judgment, but lack of adherence still occurs. The Monitor provided a checklist of the report requirements to assist supervisors in ensuring reports included all necessary items. A review of those checklists and accompanying reports indicates that the required information still found to be missing from the use of force reports such as what led up to the incident, details of actions taken during the use of force, and resolution of the incident. Seldom do reports include an articulation of any de-escalation tactics, a description of injuries sustained, and when medical attention was provided. Now, deputies and supervisors are beginning to be held accountable for failure to include required information. Provision A. 3. c. requires less information as it is a lesser level of force, but the deficiencies are the same as those noted for A. 3. b. and thus it is in Partial Compliance.

The unit managers and watch commanders still are not consistently compliant with the requirements of the Consent Judgment (IV. A. 3. d.) as to their specific duties and the time requirement for performance of these duties under the policies. This has been noted in multiple reports. The Consent Judgment requires submission of the packet to the Assistant Warden within 36 hours not three (3) days. It should be noted that, while OPSO continues to be in partial compliance, improvement did occur. OPSO provided an analysis, but it was for the data during the reporting period for Report #15. A similar analysis and a resulting corrective action plan need to be performed for the last quarter of 2021 and



2022.

A. 3. e. requires the presence of a supervisor for planned uses of force. One of the reasons for this provision is to allow for de-escalation to be attempted before force is carried out. OPSO supervisors seldom utilize de-escalation techniques. Given the repeated failure of supervisors to utilize de-escalation techniques, this provision's rating has been downgraded to partial compliance.

The Major of Security (also called the Unit Manager Commander) fulfills the role of the Assistant Warden. The policy should be revised to reflect this change. The reviews, required under IV. A. 3. f., are being conducted by this major. Data and analysis provided indicate that the reviews required by this provision were conducted in a timely manner five of the six months, but it consisted of a memo providing the time required with no proof as to how these times were arrived at by OPSO. Without sufficient documentation that the 36-hour time limit is being met, the provision remains in partial compliance. FIT issues a quarterly report which contains all the information required by IV. A. 3. g. Thus, this section is in substantial compliance. The annual review of use of force incidents as required by IV. A. 3. h. was provided to the Monitors and all parties. It should be noted that the review is based on complete data as the backlog of cases has been eliminated by FIT. The review contained an improved analysis and confirmed the issues pointed out above, there needs to be a corrective action plan to remedy the systemic issues. In order to warrant a rating of substantial compliance OPSO needed to address all of the issues; particularly the most serious issues such as the frequent use of force on the mental health housing units and lack of de-escalation that were not addressed. Also not addressed is how frequently uses of force would not be needed if policy was followed. Therefore, the compliance rating remains at partial compliance.

### IV. A. 4. Early Intervention System ("EIS")

*A. 4. a. OPSO shall develop, within 120 days of the Effective Date, a computerized relational database ("EIS") that will document and track staff members who are involved in use of force incidents and any complaints related to the inappropriate or excessive use of force, in order to alert OPSO management to any potential problematic policies or supervision lapses or need for retraining or discipline. The Chief of Operations Deputy, supervisors, and investigative staff shall have access to this information and shall review on a regular basis, but not less than quarterly, system reports to evaluate individual staff, supervisor, and housing area activity. OPSO will use the EIS as a tool for correcting inappropriate staff behavior before it escalates to more serious misconduct.*
*A. 4. b. Within 120 days of the Effective Date, OPSO senior management shall use EIS information to improve quality management practices, identify patterns and trends, and take necessary corrective action both on an individual and systemic level. IAD will manage and administer EIS systems. The Special Operations Division ("SOD") will have access to the EIS. IAD will conduct quarterly audits of the*



*EIS to ensure that analysis and intervention is taken according to the process described below. Command staff shall review the data collected by the EIS on at least a quarterly basis to identify potential patterns or trends resulting in harm to prisoners. The Use of Force Review Board will periodically review information collected regarding uses of force in order to identify the need for corrective action, including changes to training protocols and policy or retraining or disciplining individual staff or staff members. Through comparison of the operation of this system to changes in the conditions in OPP, OPSO will assess whether the mechanism is effective at addressing the requirements of this Agreement.*

*A. 4. c. OPSO shall provide, within 180 days of the implementation date of its EIS, to SPLC, DOJ, and the Monitor, a list of all staff members identified through the EIS and corrective action taken.*

*A. 4. d. The EIS protocol shall include the following components: data storage, data retrieval, reporting, data analysis, pattern identification, supervisory assessment, supervisory intervention, documentation, and audit.*

*A. 4. e. On an annual basis, OPSO shall review the EIS to ensure that it has been effective in identifying concerns regarding policy, training, or the need for discipline. This assessment will be based in part on the number and severity of harm and injury identified through data collected pursuant to this Agreement. OPSO will document its review and conclusions and provide them to the Monitor, who shall forward this document to DOJ and SPLC.*

Findings:

A. 4. a.  Partial Compliance

A. 4. b.  Partial Compliance

A. 4. c.  Partial Compliance

A. 4. d.  Substantial Compliance

A. 4. e.  Partial Compliance

Observations:

Due to unreliability of the electronic EIS, OPSO abandoned the original system and fashioned an alternative version within the AS400. A FIT staff member manually monitors the database to alert FIT staff as to the need to review any uses of force by a staff member.

OPSO has provided its documentation to the Monitors as to the names of the staff members who are flagged for use of force. However, no review of staff alerted under the EIS was documented or provided. As no documentation of review by the Use of Force Review Board was provided and it was acknowledged that the Use of Force Review did not meet in the first quarter of 2022, A. 4. a., A. 4. b, and A. 4. c. are in partial compliance. Continued questionable and inappropriate uses of force by the same staff members and with the same inmates calls into question whether the EIS is being utilized to improve management quality practices, identify patterns and trends, and take necessary corrective action as required. Section A.4.d. is in substantial compliance as the EIS protocol contain the required elements.

No proof of the Use of Force Review Board meeting during the monitoring period to



evaluate the EIS data was provided. A meeting was held for the annual review of the EIS based on CY 2021 data. The review recommended that staff who have alerted the EIS continue to be informed of the alert. It is unclear whether those conducting the review noticed that EIS referrals and actions were not documented or simply did not note that failure. This is a significant shortcoming. The review should consist of more than noting that the EIS was triggered. It involves assessing the effectiveness of the EIS which was not performed. Therefore, IV. A .4. e. is in partial compliance.

## IV. A. 5. Safety and Supervision

*A. 5. a. Maintain security policies, procedures, and practices to provide a reasonably safe and secure environment for prisoners and staff in accordance with this Agreement.*
*A. 5. b. Maintain policies, procedures, and practices to ensure the adequate supervision of prisoner work areas and trustees.*
*A. 5. c. Maintain policies and procedures regarding care for and housing of protective custody prisoners and prisoners requesting protection from harm.*
*A. 5. d. Continue to ensure that correctional officers conduct appropriate rounds at least once during every 30- minute period, at irregular times, inside each general population housing unit and at least once during every 15-minute period of special management prisoners, or more often if necessary. All security rounds shall be documented on forms or logs that do not contain pre-printed rounding times. In the alternative, OPSO may provide direct supervision of prisoners by posting a correctional officer inside the day room area of a housing unit to conduct surveillance.*
*A. 5. e. Staff shall provide direct supervision in housing units that are designed for this type of supervision. Video surveillance may be used to supplement, but must not be used to replace, rounds by correctional officers.*
*A. 5. f. Increase the use of overhead video surveillance and recording cameras to provide adequate coverage throughout the common areas of the Jail, including the Intake Processing Center, all divisions' intake areas, mental health units, special management units, prisoner housing units, and in the divisions' common areas.*
*A. 5. g. Continue to ensure that correctional officers, who are transferred from one division to another, are required to attend training on division-specific post orders before working on the unit.*
*A. 5. h. Continue to ensure that correctional officers assigned to special management units, which include youth tiers, mental health tiers, disciplinary segregation, and protective custody, receive eight hours of specialized training regarding such units on prisoner safety and security on at least an annual basis.*
*A. 5. i. Continue to ensure that supervisors conduct daily rounds on each shift in the prisoner housing units and document the results of their rounds.*
*A. 5. j. Continue to ensure that staff conduct daily inspections of cells and common areas of the housing units to protect prisoners from unreasonable harm or unreasonable risk of harm.*
*A. 5. k. Continue to ensure that staff conduct random monthly shakedowns of cells and common areas so that prisoners do not possess or have access to dangerous contraband.*
*A. 5. l. Provide the Monitor a periodic report of safety and supervision at the Facility. These periodic reports shall be provided to the monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. Each report will provide the following information:*
      *(1)    a listing of special management prisoners, their housing assignments, the basis for them being placed in the specialized housing unit, and the date placed in the unit; and*
      *(2)    a listing of all contraband, including weapons seized, the type of contraband, date of seizure, location, and shift of seizure.*

Findings:

A. 5. a.  Partial Compliance



A. 5. b.  Substantial Compliance

A. 5. c.  Partial Compliance

A. 5. d.  Partial Compliance

A. 5. e.  Partial Compliance

A. 5. f.   Substantial Compliance

A. 5. g.  Substantial Compliance

A. 5. h.  Partial Compliance

A. 5. i.   Partial Compliance

A. 5. j.   Partial Compliance

A. 5. k.  Partial Compliance

A. 5. l.   Partial Compliance

Observations:

OPSO has worked hard to finalize policies, procedures, and post orders. The implementation of those policies, procedures, and practices and the adequate supervision of inmate working areas results in substantial compliance as to A. 5. b. The level of violence, an average of 22 reported inmate on inmate assaults/altercations per month are indicative that OPSO has not substantially complied with the requirement that the facility be reasonably safe for staff and inmates. This is a decrease over the previous monitoring period but suspect given the systematic underreporting of reportable incidents and the number of inmate-on-inmate assaults that are likely undetected due to the lack of staff in the housing areas. Even at the lower number, they are still at an unacceptable level. While the Monitors are well aware that violent incidents occur in jail facilities, the level currently reflects partial compliance with the obligation to provide a reasonably safe and secure environment as to A. 5. a. and A. 5. c.

Review of the significant incidents during the monitoring period indicates that the failure of staff to follow policy consistently continues to be a serious impediment to effective supervision of the inmates. Staff continue to leave inmates unsupervised for hours and allow them to have access to materials by which to fashion weapons. Many of the inmate-on-inmate assaults occur because staff allow inmates out of their cells and leave them unsupervised. There are inmates who repeatedly do not follow the rules of OJC including assaulting other inmates, assaulting staff, destroying property, smoking contraband and/or threatening self-harm. OPSO chose to house many of those inmates in a



high-security unit. It is of concern that the practice of limiting the movement of high-security inmates was eliminated after the monitoring period. It would be beneficial to develop individual inmate management plans for these inmates which would include specific security measures to be used when these inmates are allowed out of their cells. Such plans, if carried out routinely and consistently followed by all staff, would likely reduce the level of violence in the facility. To date, there is no indication that it is being done on a consistent basis; if at all.

## Table 5 CY 2018-July 2022 OJC Reported Incidents

| 2018 | Use of Force | Inmate Misconduct FLD/FFD | Inmate/ Inmate Assault | Inmate Staff Altercation | PREA | Death | Attempt Suicide/ Ideation | Internal Escape | Criminal Damage | Inmate Injury/ Inmate Medical (AKA slip/falls/ overdoses) | Contraband | Staff Misconduct-Suspension/ Arrest | Other | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| January | 13 | 0 | 38 | 7 | 2 | 0 | 6 | 2 | 3 | 9 | 9 | 0 | 3 | 92 |
| February | 10 | 0 | 28 | 6 | 4 | 0 | 14 | 2 | 10 | 5 | 15 | 2 | 0 | 96 |
| March | 21 | 0 | 37 | 7 | 5 | 0 | 4 | 3 | 11 | 18 | 5 | 0 | 1 | 112 |
| April | 22 | 0 | 39 | 9 | 4 | 0 | 4 | 3 | 12 | 22 | 5 | 0 | 1 | 121 |
| May | 24 | 0 | 52 | 0 | 5 | 1 | 0 | 5 | 8 | 19 | 10 | 0 | 0 | 124 |
| June | 26 | 0 | 46 | 7 | 5 | 0 | 6 | 7 | 3 | 32 | 9 | 1 | 2 | 144 |
| July | 20 | 0 | 30 | 4 | 4 | 0 | 9 | 3 | 3 | 30 | 13 | 0 | 0 | 116 |
| Aug | 27 | 0 | 39 | 3 | 3 | 0 | 13 | 2 | 6 | 30 | 6 | 0 | 3 | 132 |
| Sept | 14 | 0 | 33 | 6 | 2 | 0 | 7 | 5 | 4 | 35 | 6 | 0 | 0 | 112 |
| Oct | 28 | 0 | 32 | 9 | 5 | 0 | 3 | 0 | 2 | 26 | 7 | 0 | 1 | 113 |
| Nov | 21 | 0 | 31 | 6 | 5 | 0 | 5 | 8 | 3 | 18 | 7 | 0 | 1 | 105 |
| Dec | 34 | 0 | 37 | 0 | 3 | 1 | 7 | 8 | 4 | 18 | 14 | 0 | 3 | 129 |
| Total | 260 | 0 | 442 | 64 | 47 | 2 | 78 | 48 | 69 | 262 | 106 | 3 | 15 | 1396 |

| 2019 | Use of Force | Inmate Misconduct FLD/FFD | Inmate/ Inmate Assault | Inmate Staff Altercation | PREA | Death | Attempt Suicide/ Ideation | Internal Escape | Criminal Damage | Inmate Injury/ Inmate Medical (AKA slip/falls/ overdoses) | Contraband | Staff Misconduct-Suspension/ Arrest | Other | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| January | 27 | 0 | 40 | 1 | 2 | 0 | 15 | 3 | 7 | 14 | 14 | 0 | 0 | 123 |
| February | 29 | 0 | 26 | 7 | 2 | 0 | 13 | 1 | 0 | 4 | 11 | 0 | 0 | 93 |
| March | 26 | 0 | 25 | 4 | 1 | 0 | 6 | 1 | 2 | 16 | 21 | 0 | 3 | 105 |
| April | 26 | 0 | 28 | 7 | 1 | 0 | 3 | 0 | 3 | 15 | 27 | 0 | 2 | 112 |
| May* | 22 | 12 | 36 | 11 | 6 | 0 | 13 | 0 | 2 | 11 | 25 | 0 | 1 | 117 |
| June | 26 | 7 | 55 | 9 | 4 | 0 | 13 | 0 | 2 | 16 | 23 | 0 | 0 | 129 |
| July | 31 | 13 | 50 | 15 | 5 | 0 | 6 | 0 | 3 | 8 | 13 | 0 | 0 | 113 |
| Aug | 37 | 26 | 32 | 17 | 6 | 0 | 7 | 1 | 8 | 20 | 35 | 0 | 0 | 152 |
| Sept | 31 | 18 | 32 | 4 | 3 | 0 | 2 | 0 | 1 | 10 | 24 | 0 | 0 | 94 |
| Oct | 37 | 21 | 38 | 15 | 4 | 0 | 1 | 0 | 7 | 18 | 33 | 0 | 0 | 137 |
| Nov | 33 | 17 | 55 | 12 | 7 | 0 | 0 | 0 | 6 | 5 | 42 | 0 | 0 | 144 |
| Dec | 33 | 23 | 23 | 15 | 1 | 0 | 3 | 0 | 6 | 8 | 34 | 0 | 0 | 113 |



| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total** | 358 | 137 | 440 | 117 | 42 | 0 | 82 | 6 | 47 | 145 | 302 | 0 | 6 | 1432 |

| 2020 | Use of Force | Inmate Misconduct FLD/FFD | Inmate/ Inmate Assault | Inmate Staff Altercation | PREA | Death | Attempt Suicide/ Ideation | Internal Escape | Criminal Damage | Inmate Injury/ Inmate Medical (AKA slip/falls/ overdoses) | Contraband | Staff Misconduct-Suspension/ Arrest | Other | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| January | 29 | 18 | 31 | 8 | 4 | 0 | 3 | 0 | 1 | 7 | 35 | 0 | 0 | **107** |
| February | 33 | 17 | 35 | 12 | 2 | 0 | 0 | 1 | 3 | 13 | 29 | 0 | 1 | **113** |
| March | 31 | 19 | 24 | 9 | 1 | 0 | 0 | 0 | 3 | 6 | 35 | 0 | 0 | **98** |
| April | 45 | 29 | 25 | 19 | 7 | 0 | 0 | 0 | 4 | 1 | 24 | 0 | 0 | **109** |
| May | 37 | 26 | 24 | 11 | 1 | 0 | 1 | 0 | 6 | 3 | 12 | 0 | 0 | **84** |
| June | 22 | 16 | 28 | 13 | 4 | 2 | 1 | 0 | 5 | 12 | 63 | 0 | 0 | **144** |
| July | 21 | 8 | 22 | 9 | 1 | 0 | 2 | 0 | 4 | 5 | 47 | 0 | 0 | **98** |
| Aug | 22 | 23 | 22 | 8 | 2 | 1 | 4 | 0 | 11 | 4 | 31 | 0 | 0 | **106** |
| Sept | 24 | 14 | 16 | 12 | 2 | 0 | 2 | 0 | 8 | 4 | 9 | 0 | 0 | **67** |
| Oct | 35 | 18 | 24 | 10 | 2 | 0 | 1 | 0 | 3 | 3 | 14 | 0 | 0 | **75** |
| Nov | 33 | 19 | 28 | 10 | 5 | 0 | 0 | 0 | 9 | 5 | 31 | 0 | 0 | **109** |
| Dec | 40 | 25 | 30 | 18 | 4 | 0 | 4 | 0 | 7 | 1 | 21 | 0 | 0 | **110** |
| Total | **372** | **232** | **309** | **139** | **35** | **3** | **21** | **1** | **64** | **64** | **351** | **0** | **1** | **1220** |

| 2021 | Use of Force | Inmate Misconduct FLD/FFD | Inmate/ Inmate Assault | Inmate Staff Altercation | PREA | Death | Attempt Suicide/ Ideation | Internal Escape | Criminal Damage | Inmate Injury/ Inmate Medical (AKA slip/falls/ overdoses) | Contraband | Staff Misconduct-Suspension/ Arrest | Other | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| January | 38 | 34 | 32 | 20 | 1 | 0 | 0 | 0 | 3 | 3 | 32 | 0 | 0 | 125 |
| February | 27 | 12 | 30 | 14 | 2 | 0 | 1 | 0 | 2 | 5 | 14 | 0 | 0 | 80 |
| March | 16 | 10 | 24 | 7 | 4 | 0 | 0 | 0 | 5 | 4 | 24 | 0 | 0 | 78 |
| April | 24 | 17 | 27 | 10 | 2 | 0 | 1 | 1 | 2 | 4 | 45 | 0 | 0 | 109 |
| May | 21 | 12 | 31 | 7 | 0 | 0 | 0 | 0 | 3 | 1 | 23 | 0 | 0 | 77 |
| June | 34 | 18 | 25 | 15 | 0 | 1 | 0 | 0 | 4 | 4 | 30 | 0 | 0 | 97 |
| July | 22 | 11 | 22 | 10 | 0 | 0 | 6 | 0 | 8 | 3 | 31 | 0 | 0 | 91 |
| Aug | 18 | 13 | 19 | 7 | 0 | 0 | 5 | 0 | 2 | 4 | 20 | 0 | 0 | 70 |
| Sept | 28 | 19 | 18 | 6 | 3 | 0 | 1 | 0 | 1 | 7 | 23 | 0 | 0 | 78 |
| Oct | 31 | 21 | 22 | 8 | 0 | 0 | 1 | 0 | 6 | 3 | 52 | 0 | 0 | 113 |
| Nov | 27 | 12 | 21 | 7 | 2 | 0 | 4 | 0 | 4 | 1 | 38 | 0 | 0 | 89 |
| Dec | 25 | 11 | 22 | 12 | 3 | 0 | 1 | 0 | 2 | 4 | 17 | 0 | 0 | 72 |
| Total | 311 | 190 | 293 | 124 | 17 | 1 | 20 | 1 | 42 | 43 | 350 | 0 | 0 | 1079 |

| 2022 | Use of Force | Inmate Misconduct FLD/FFD | Inmate/ Inmate Assault | Inmate Staff Altercation | PREA | Death | Attempt Suicide/ Ideation | Internal Escape | Criminal Damage | Inmate Injury/ Inmate Medical (AKA slip/falls/ overdoses) | Contraband | Staff Misconduct-Suspension/ Arrest | Other | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| January | 22 | 12 | 22 | 5 | 1 | 0 | 0 | 0 | 4 | 4 | 29 | 0 | 0 | 77 |
| February | 26 | 21 | 18 | 10 | 3 | 0 | 1 | 0 | 4 | 0 | 31 | 0 | 0 | 88 |
| March | 15 | 8 | 24 | 1 | 2 | 0 | 0 | 0 | 4 | 3 | 20 | 0 | 0 | 66 |
| April | 12 | 6 | 28 | 3 | 1 | 0 | 6 | 0 | 4 | 1 | 1 | 0 | 0 | 50 |
| May | 15 | 10 | 24 | 3 | 5 | 0 | 3 | 0 | 4 | 2 | 4 | 0 | 0 | 55 |
| June | 22 | 15 | 31 | 2 | 2 | 2 | 5 | 1 | 2 | 2 | 4 | 0 | 0 | 66 |


Orleans Parish JAIL MONITORS

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| July | 15 | 6 | 36 | 5 | 3 | 0 | 1 | 1 | 1 | 7 | 6 | 0 | 1 | 67 |
| Aug | | | | | | | | | | | | | | 0 |
| Sept | | | | | | | | | | | | | | 0 |
| Oct | | | | | | | | | | | | | | 0 |
| Nov | | | | | | | | | | | | | | 0 |
| Dec | | | | | | | | | | | | | | 0 |
| Total | 127 | 78 | 183 | 29 | 17 | 2 | 20 | 2 | 23 | 19 | 95 | 0 | 1 | 469 |

OPSO does not timely conduct and document security rounds (30 minutes or 15 minutes depending on the unit) nor perform direct supervision surveillance consistent with the requirements of the Consent Judgment or OPSO policy.

Direct supervision requires surveillance of all of the inmates and cannot be properly performed by sitting behind a desk or in the control module. It requires walking around the unit, looking into the individual cells, and actively engaging with the inmates. Staffing in the housing units was observed to be inadequate throughout the OJC during the monitoring tour. During this tour, the Monitors witnessed the most unsupervised units in recent memory. A review of the log of security checks reveals TMH was the one area which appeared to have sufficient staff and consistently conducted security rounds. Review of incident reports revealed that units were often unstaffed, including mandatory posts. If staff are not present, it is impossible to make the required rounds. The staff write their rounds on paper forms in addition to entry into the log. While this provides an easier way for a supervisor to see during a unit inspection if the deputy has recorded that the security checks are being performed timely, it is insufficient proof that the security checks actually occurred and requires watching hours of video to verify. Review of video footage after an incident often reveals that security checks are not being conducted and/or adequately conducted even if recorded in the logbook. OPSO indicated that with the beginning of the formation of the compliance unit that OPSO has now started to audit log sheets with video footage and plans to have an audit report for the next compliance period. It appears that the audits are being conducted, if at all, by the unit managers. At the unit managers' meeting, one of the statistics reported was the number of security checks which occurred. The percentage reported on some units appeared to be higher than what a review of the incident reports would reflect. It also should be noted that staff often report multiple security rounds when it is really two or more staff members conducting a security round at the same time. A simple review of the documentation provided indicates that there are



often gaps of two or more hours in between security rounds. During the onsite monitoring visit, Monitors viewed the documentation for security checks of the units in addition to the documentation provided beforehand. When questioned, as during the previous tour, deputies usually were able to describe what an acceptable security check would look like. However, the deputies admitted that they did not perform all of the tasks for a proper security check each time a security check was recorded as having taken place. Usually, an adequate security check was only performed when a physical count of the inmates took place; at most, twice in a twelve-hour shift. The rest of the "checks" were no more than looking about the housing unit without leaving the deputy station, or, even more troubling, the control station which is located outside of the housing unit. This is also obvious by staff recording that a security round was conducted within two minutes. It is physically impossible to walk a housing unit in two minutes, much less perform an adequate check of the inmates. OPSO remains in partial compliance with IV. A. 5. d.

A review of the paper logs and forms during the monitoring tour revealed that timely rounds were often not performed and are not accurate. OPSO should consider a reliable system that would allow for rounds, by both deputies and supervisors, to be recorded electronically. Not only would it allow for supervisors to quickly determine whether rounds were being conducted in a timely manner, it would allow for OPSO to prove compliance and address non-adherence.

All twenty-four (24) of the housing units in OJC are designed for direct supervision. At the time of the drafting of the Consent Judgment the design of OJC was known. The Consent Judgment requires that staff provide direct supervision in housing units that are designed for this type of supervision. Thus, continual presence of a deputy in each housing unit at OJC and TMH is mandatory under the Consent Judgment. OPSO, during the last several reports, has taken the position that OPSO gets to determine which housing posts are mandatory and routinely does not assign mandatory staff to each housing unit. In addition, deputies are frequently absent from even the housing units designated by OPSO as mandatory. More often than not, one deputy is assigned to two or more housing units. OPSO's recent interpretation of the Consent Judgment is inconsistent with the plain wording of the Consent Judgment and the manner in which it has been applied by the Monitors since its inception. It is impossible to conduct direct supervision if a deputy is not present in the housing unit. The harm that results from not having a deputy in each



pod, especially when inmates are out, is evident by the repeated serious incidents occurring when there is no deputy on the unit, including those resulting serious injury and/or necessitating hospital routes. Thus, IV. A. 5. e. remains in partial compliance.

Regarding overhead video surveillance and recording cameras for OJC (A. 5. f.), there is a significant investment in cameras. There are times when a nonfunctional camera is discovered when a supervisor or an investigator tries to retrieve the videos, but it is rare. OPSO needs to continue to audit the system by having a supervisor test the various cameras on a monthly basis and prepare a report for the Chief of Security. IV. A. 5. f. continues to be in substantial compliance. Supervisors have improved on pulling video as required by the Use of Force policy.

No staff was transferred between divisions during the monitoring period; thus, IV. A. 5. g. is in substantial compliance. Given the necessity of utilizing staff from other areas of OPSO to supervise inmates in the OJC, OPSO is encouraged to provide training even if there is not an actual transfer from one division to another. Proof that recruits received training on specialized housing during pre-service was provided. However, no proof of the required annual eight (8) hours of training for the deputies assigned to specialized units was provided; IV. A. 5. h. is in partial compliance. Given the high level of incidents in the specialized units, it is recommended that the training be reviewed, and deficiencies addressed. OPSO is close to being in non-compliance with this provision.

Documentation indicates that supervisors do not consistently conduct daily rounds; thus, IV. A. 5. i. continues to be in partial compliance. Supervisors are required to sign off on the round sheet completed by the pod deputy, but this does not provide proof that the supervisor conducted daily rounds. The daily inspections of housing units as required by VI. A. 5. j. has improved but are still only in partial compliance. It is concerning that neither the inspections by the deputies nor the supervisors resulted in the discovery of the destruction of items that are part of the jail to fashion weapons. It is essential that the inspections be thorough and that corrective actions are taken to address the inspection findings. This provision remains in partial compliance.

Monthly shakedowns were not conducted in substantial compliance with VI. A. 5. k. The data provided indicates that shakedowns were not conducted in substantial compliance during six of the six months during the monitoring period. There continues to be significant incidents involving contraband including the manufacturing and use of



weapons fashioned from the jail itself. The review of contraband reports clearly indicates reoccurring issues. There continues to be a serious issue of inmates hoarding medication. Reports demonstrate that inmates are fashioning weapons out of items in the jail which are then used to assault other inmates. Reports and the site visit reveal that inmates are smuggling in marijuana and hallucinogens to smoke. Some of these items come through the mail, but there is a significant issue of staff smuggling in contraband. This indicates the need to analyze the data and develop a corrective action plan to reduce, if not stop, the hoarding of medication, the fashioning of weapons, and the flow of contraband into the facility. OPSO is close to non-compliance with this provision.

The documentation provided for A. 5. l. does not include all of the required information. Thus, A. 5. l. remains in Partial Compliance.

### IV. A. 6. Security Staffing

*A. 6. a. OPSO shall ensure that correctional staffing and supervision is sufficient to adequately supervise prisoners, fulfill the terms of this Agreement, and allow for the safe operation of the Facility, consistent with constitutional standards.*

  *(1) OPSO shall achieve adequate correctional officer staffing in the following manner: Within 90 days of the Effective Date, develop a staffing plan that will identify all posts and positions, the adequate number and qualification of staff to cover each post and position, adequate shift relief, and coverage for vacations. The staffing plan will ensure that there is adequate coverage inside each housing and specialized housing areas and to accompany prisoners for court, visits and legal visits, and other operations of OPP and to comply with all provisions of this Agreement. OPSO will provide its plan to the Monitor, SPLC, and DOJ for approval. The Monitor, SPLC, or DOJ will have 60 days to raise any objections and recommend revisions to the staffing plan.*

  *(2) Within 120 days before the opening of any new facility, submit a staffing plan consistent with subsection (1) above.*

  *(3) Within 90 days after completion of the staffing study, OPSO shall recruit and hire a full-time professional corrections administrator to analyze and review OPP operations. The professional corrections administrator shall report directly to the Sheriff and shall have responsibilities to be determined by the Sheriff. The professional corrections administrator shall have at least the following qualifications: (a) a bachelor's degree in criminal justice or other closely related field; (b) five years of experience in supervising a large correctional facility; and (c) knowledge of and experience in applying modern correctional standards, maintained through regular participation in corrections-related conferences or other continuing education.*

  *(4) Provide the Monitor a periodic report on staffing levels at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. Each report will include the following information:*

    *i. a listing of each post and position needed;*

    *ii. the number of hours needed for each post and position; a listing of staff hired and positions filled;*

    *iii. a listing of staff working overtime and the amount of overtime worked by each staff member;*

    *iv. a listing of supervisors working overtime; and*

    *v. a listing of and types of critical incidents reported*



***A. 6. b. Review the periodic report to determine whether staffing is adequate to meet the requirements of this Agreement. OPSO shall make recommendations regarding staffing based on this review. The review and recommendations will be documented and provided to the Monitor.***

Findings:

A. 6. a.  Non-Compliance

A. 6. b.  Non-Compliance

An overall rating of A. 6. was provided in the previous reports. This was inconsistent with the other introductory paragraphs and has now been discontinued.

Observations:

The level of staffing is extremely insufficient to adequately supervise inmates and allow for the safe operation of the facility. There have been insufficient security staff over the past few monitoring periods, and it continues to be at a level where the extensive use of overtime is not enough to overcome the vacancies in security staff. OPSO's staffing reports document that mandatory posts are not filled on a consistent basis. Numerous incident reports and investigations reveal posts were not constantly staffed, which resulted in increased violence. Efforts have been made to reassign some staff from areas that had excess staff but have not fully addressed the problem. Lacking is a coordinated effort on the utilization of overtime and redeployment of staff to ensure the mandatory posts are covered on a consistent basis. The deployment of staff is sufficiently inconsistent and insufficient to result in A. 6. a. (1) and IV. A. 6. a. (2) being in non-compliance. Provision IV. 6. a. (3) was in substantial compliance with the hiring of Byron LeCounte as the Chief of Corrections as of February 19, 2019. However, Chief LeCounte left the position at the end of 2021. Thus, IV. 6. a. (3) became in non-compliance in January 2022. Paragraph IV. 6. a. (4) is in substantial compliance, as monthly reports are produced to document hiring and termination of employees. The Stipulated Agreement also provides for bi-monthly reports regarding hiring. Paragraph 7.a. of the Stipulated Agreement of February 11, 2015, requires monthly reporting. Given the importance of the actual implementation of an approved staffing plan, A. 6. a. is now in non-compliance. The last approved staffing plan was in September 2019.

OPSO is in now in non-compliance with A. 6. b. as OPSO has not provided a periodic review of the staffing plan. Discussion during the monitoring tour indicated that a plan exists, but it has not been finalized or submitted to the Monitors. An antiquated staffing plan which is based on staffing levels which do not exist is insufficient.



## IV. A. 7. Incidents and Referrals

*A.7.a.   OPSO shall develop and implement policies that ensure that Facility watch commanders have knowledge of reportable incidents in OPP to take action in a timely manner to prevent harm to prisoners or take other corrective action. At a minimum, OPSO shall do the following:*

*A.7.b.   Continue to ensure that Facility watch commanders document all reportable incidents by the end of their shift, but no later than 24 hours after the incident, including prisoner fights, rule violations, prisoner injuries, suicide attempts, cell extractions, medical emergencies, found contraband, vandalism, escapes and escape attempts, and fires.*

*A.7.c.   Continue to ensure that Facility watch commanders report all suicides and deaths no later than one hour after the incident, to a supervisor, IAD, the Special Operations Division, and medical and mental health staff.*

*A.7.d.   Provide formal pre-service and annual in-service training on proper incident reporting policies and procedures.*

*A.7.e.   Implement a policy providing that it is a disciplinary infraction for staff to fail to report any reportable incident that occurred on his or her shift. Failure to formally report any observed prisoner injury may result in staff discipline, up to and including termination.*

*A.7.f.   Maintain a system to track all reportable incidents that, at a minimum, includes the following information:*

  *(1)  tracking number;*
  *(2)  the prisoner(s) name;*
  *(3)  housing classification and location;*
  *(4)  date and time;*
  *(5)  type of incident;*
  *(6)  injuries to staff or prisoner;*
  *(7)  medical care;*
  *(8)  primary and secondary staff involved;*
  *(9)  reviewing supervisor;*
  *(10)  external reviews and results;*
  *(11)  corrective action taken; and*
  *(12)  administrative sign-off.*

*A.7.g.   Ensure that incident reports and prisoner grievances are screened for allegations of staff misconduct, and, if the incident or allegation meets established criteria in accordance with this Agreement, it is referred for investigation.*

*A.7.h.   Provide the Monitor a periodic data report of incidents at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement.*

*A.7.i. The report will include the following information:*

  *(1)  a brief summary of all reportable incidents, by type and date;*
  *(2)  a description of all suicides and in-custody deaths, including the date, name of prisoner, and housing unit;*
  *(3)  number of prisoner grievances screened for allegations of misconduct; and*
  *(4)  number of grievances referred to IAD or SOD for investigation.*

*A.7.j.   Conduct internal reviews of the periodic reports to determine whether the incident reporting system is ensuring that the constitutional rights of prisoners are respected. Review the quarterly report to determine whether the incident reporting system is meeting the requirements of this Agreement. OPSO shall make recommendations regarding the reporting system or other necessary changes in policy or staffing based on this review. The review and recommendations will be documented and provided to the Monitor.*

<u>Findings:</u>

A. 7. a.  Substantial Compliance

A. 7. b.  Partial Compliance

A. 7. c.  Substantial Compliance



A. 7. d.  Partial Compliance

A. 7. e.  Substantial Compliance

A. 7. f.  Substantial Compliance

A. 7. g.  Substantial Compliance

A. 7. h.  Substantial Compliance

A. 7. i.  Substantial Compliance

A. 7. j.  Substantial Compliance

<u>Observations</u>:

OPSO has long had a policy on incidents and referrals that sets out the process for documenting and referring incidents. What has been lacking is a sufficient process to ensure all reportable incidents are being documented and that all incident reports are complete, prompt, and accurate. A concentrated effort by the command staff has resulted in improvement by the watch commanders as far as the timeliness of the incidents for which a report is prepared. Watch commanders are required to be notified of any incident occurring and document the incident in their shift log which results in substantial compliance of A.7.a. However, review of the routes of inmates and medical clinic walk-in logs indicates that a number of incidents are not resulting in an incident report.

OPSO implemented a process where an OPSO staff member reviewed the "routes" of inmates with serious medical or trauma injuries to the hospital emergency room and the OPSO clinic walk-in logs and compared them to the reports received. The quality of this review has been inadequate for the last two monitoring periods. Someone needs to be trained to take over the duties of review and notification of the Monitors and counsel. IV. A. 7. b. remains in partial compliance.

OPSO is doing a much better job of holding supervisors and security staff accountable for the late reports. Documentation was provided of accountability in the form of counseling. As OPSO has begun to enforce the policy regarding discipline for not timely filing reports, IV. A. 7. e. is in substantial compliance. What will be important is to track whether the counseling was effective in improving the timeliness of incident reports.

During this reporting period, several attempts at suicide were reported within an hour to the proper persons: thus IV. A. 7. c. is in substantial compliance. While preservice training on report writing was provided, no documentation of annual training on report writing was presented; IV. A. 7. d. is in partial compliance. OPSO has transitioned to the AS



400 system to track the information required in IV. A. 7. f. and is in substantial compliance. OPSO is doing a better job analyzing the data. The next step is utilizing the analysis to make required changes in policy and procedure. OPSO is in substantial compliance with A. 7. g.; incidents, and grievances are reviewed for misconduct and referred for investigation where appropriate. The Monitors were provided a semi-annual report of incidents, that now, with the supplementation by the daily/weekly reports, contains all of the required information and, thus, IV. A. 7. h. and i. are in substantial compliance. OPSO performed an assessment of whether the reporting system is meeting the requirements of the Consent Judgment and is given substantial compliance for IV. A. 7. j. as OPSO is now addressing the lack of timeliness.

## IV.   A. 8. Investigations

***A. 8. a. Maintain implementation of comprehensive policies, procedures, and practices for the timely and thorough investigation of alleged staff misconduct, sexual assaults, and physical assaults of prisoners resulting in serious injury, in accordance with this Agreement. Investigations shall:***

> ***(1)      be conducted by persons who do not have conflicts of interest that bear on the partiality of the investigation;***
> ***(2)      include timely, thorough, and documented interviews of all relevant staff and prisoners who were involved in or who witnessed the incident in question, to the extent practicable; and***
> ***(3)      include all supporting evidence, including logs, witness and participant statements, references to policies and procedures relevant to the incident, physical evidence, and video or audio recordings.***

***A. 8. b. Continue to provide SOD and IAD staff with pre-service and annual in-service training on appropriate investigation policies and procedures, the investigation tracking process, investigatory interviewing techniques, and confidentiality requirements.***

***A. 8. c. Ensure that any investigative report indicating possible criminal behavior will be referred to IAD/SOD and then referred to the Orleans Parish District Attorney's Office, if appropriate.***

***A. 8. d. Provide the Monitor a periodic report of investigations conducted at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement.***

***A. 8. e. The report will include the following information:***

> ***(4)      a brief summary of all completed investigations, by type and date;***
> ***(5)      a listing of investigations referred for administrative investigation;***
> ***(6)      a listing of all investigations referred to an appropriate law enforcement agency and the name of the agency; and***
> ***(7)      a listing of all staff suspended, terminated, arrested, or reassigned because of misconduct or violations of policy and procedures. This list must also contain the specific misconduct and/or violation.***

***A. 8. f. OPSO shall review the periodic report to determine whether the investigation system is meeting the requirements of this Agreement and make recommendations regarding the investigation system or other necessary changes in policy based on this review. The review and recommendations will be documented and provided to the Monitor.***

Findings:

A. 8. a.  Partial Compliance

A. 8. b.  Substantial Compliance



A. 8. c.  Substantial Compliance

A. 8. d.  Substantial Compliance

A. 8. e.  Substantial Compliance

A. 8. f.   Substantial Compliance

<u>Observations</u>:

The Investigative Services Division (ISB) is responsible for: the Criminal Investigation Division (investigates possible criminal activity by inmates), Internal Affairs Division-Criminal (investigates possible criminal activity by staff), the FIT (investigates use of force by staff), the Internal Affairs Division-Administrative (investigates possible violation of policies by staff), and the Intelligence Unit (provides information and intelligence regarding activities that have taken place or may take place in the jail or support activities).

While there is evidence of substantial compliance provided for IV. A. 8. a., the timeliness of investigations has reached a point where the rating on this provisions has been downgraded to partial compliance. Since the resignation of the major and lieutenant in 2020, the other supervisors have been required to take on additional duties. The supervisor assigned to take over the duties of FIT supervisor has done a good job at assuming the duties and eliminated the backlog in use of force investigations. The investigators assigned to criminal investigations, including in custody death investigations have received additional training and one of the more experienced investigators from IAD-Administrative has been assigned to assist them. Improvements in all other areas from hiring, training, supervision, and adequate staffing will enhance the safety of staff and inmates and, ultimately, decrease the workload of ISB.

The Monitor acknowledges that investigating incidents of inmate-on-inmate assaults, sexual assaults, staff on inmate assaults, etc. with a goal of seeking indictments is appropriate; but the overall goal is to create a safe jail. In a jail setting, investigations play a critical role in protecting inmates from inappropriate or illegal staff actions, protecting inmates from each other, and ensuring policy is followed. Continued emphasis is needed on the goal of investigations to prevent future incidents through analysis of the policy, procedures, training, supervision, and physical plant contributors to the incident. This function cannot and should not be performed by ISB alone. This level of assessment requires input from individuals who have a high level of experience in jail/corrections



work. In short, it requires collaboration between ISB and OJC. While collaboration has improved, there is often defensiveness on the part of OJC staff when issues are pointed out by ISB or others. For instance, ISB discovered that the source of dangerous contraband being used to shatter windows originated in the utility closets on the housing units. The cabinets near the deputy's station were found to be the source of materials to make homemade knives or "shanks". Inmates literally are continuing to take the jail apart to fashion weapons. The failure of staff to keep the utility closets and cabinets locked throughout the monitoring period, and to refuse to remove the cabinets when made aware of the problem and to supervise inmates when allowed access to the utility closets and cabinets is the root cause of the problem. What would make the most sense would be to remove the cabinets as they serve no useful purpose. The best alternative to removal would be to secure the cabinets. While most of the utility closets were found to be secured during this monitoring tour, many of the cabinets were found to be unsecure and it is only a matter of time until inmates bypass the locks placed on the cabinets. It should be noted that the cabinets were removed by the new administration.

ISB has demonstrated training related to the investigative skills provided during 2021. IV. A. 8. b. remains in substantial compliance.

Investigations which reveal potential criminal activity are referred to the Orleans Parish District Attorney's Office in substantial compliance with A. 8. c. The Monitors remain concerned about the frequent refusal by the district attorney to follow through with filing cases related to indecent exposure by inmates towards staff. There were a couple of cases in which the previous administration made the decision not to refer the case to the district attorney for filing of criminal cases which were questionable. The Monitors are comfortable that referral will not be an issue with the new administration but will continue to scrutinize. ISB provides reports in substantial compliance with IV. A. 8. d. and e. ISB reviewed the investigation system to determine whether the investigation system complies with the requirements of the Consent Judgment and forwarded any recommendations to the Monitors in substantial compliance with IV. A. 8. f.

### IV. A. 9. Pretrial Placement in Alternative Settings

*A. 9. a. OPSO shall maintain its role of providing space and security to facilitate interviews conducted pursuant to the City's pretrial release program, which is intended to ensure placement in the least restrictive appropriate placement consistent with public safety.*
*A. 9. b. OPSO shall create a system to ensure that it does not unlawfully confine prisoners whose sole detainer is by Immigration and Customs Enforcement ("ICE"), where the detainer has expired.*



Findings:

A. 9. a.  Substantial Compliance

A. 9. b.  Substantial Compliance

Observations:

OPSO provided a memorandum noting that the pretrial program is managed by the Criminal District Court, and that space is provided. OPSO also provided a memorandum that ICE detainers are only accepted for a specified list of offenses.  OPSO has not detained any individuals under an ICE detainer during the monitoring period. Both of these memos are dated August 27, 2020. Updated memos need to be provided in the future as the signatory is no longer with OPSO.

## IV. A. 10. Custodial Placement within OPP

Introduction:

OPSO designed, validated, and implemented an objective classification system to assess and house OPSO inmates according to their threats to institutional safety and security. The automated classification system was rolled out in the Jail Management System (JMS) on January 15, 2015.[1] The 2021 OPSO coverage plan reduced the classification unit staffing from 18.68 to 14 FTEs.[2]

As of June 30, 2022, the Classification Unit staffing was 6 -- one civilian classification specialist, four supervisors, and a classification manager.  During this compliance period, five (5) classification specialists resigned; one (1) was on maternity leave. No one was hired.[3] Although the average daily population (ADP) remains below the pre-COVID counts, due to the extra length of time required for the initial and reclassification assessments, the Classification Unit staffing appears inadequate.  Despite the decrease in the Classification staff from 11 to 6, the number of overtime hours they logged decreased during this Compliance Period. Yet, it was still nearly twice that of OPSO non-classification staff.

An automated housing assignment process (HUAP) identifies housing options for inmates according to their custody level, gender, special population status, PREA

---

[1] Hardyman, Patricia L. (2015). "Design and Validation of an Objective Classification System for the Orleans Parish Sheriff's Office: Final Report." Hagerstown, MD: Criminal Justice Institute, Inc.

[2] Gusman, Marlin N. (March 16, 2021). "Coverage Plan 2021." Orleans Parish, LA: Office of the Sheriff. pp. 11

[3] The Sheriff's Office posted a hiring announcement for the Classification Specialist position. (Onsite tour - As of June 27, 2022).



designations, enemies, and associates.  Most male admittees are assigned one of the first floor IPC ROLL IN pods at initial classification. (Special population tags identify individuals for suicide observation versus suicide watch, medical housing/ isolation, academic education, or special diets.) (As needed, men with acute mental health or medical needs go directly to 2A or 4B, respectively.  At intake, most women are housed on 3F.)  The OPSO housing matrix rolled out on December 2, 2021, differentiated the "IPC ROLL IN" pods by custody level, PREA designations, and various special population tags.

Further, the intake housing assignments required cell-level separations by date of intake.  Enemies and associates were assigned to separate pods.  However, the "ALL" custody and PREA designations continue in the special population units – Mental Health, Protective Custody, Disciplinary/Segregation, Medical, etc.

When transferring inmates from the IPC ROLL IN or special population pods to a general population pod, the classification staff matches inmates by custody level, PREA designations, age, and crime/criminal history.

The OPSO revised its housing matrix on multiple occasions throughout this Compliance Period. These changes reflected fluctuations in demand for specialized intake housing units (IPC Non-Symptomatic Roll-Ins), isolation pods for individuals exposed to COVID-19, other special populations (medical, mental health, disciplinary, administrative segregation, and protective custody), and of course, the general population.

Population fluctuations and isolation related to COVID-19 Pandemic requirements continued to create demands on the Classification Unit for housing transfers within an ever-changing housing matrix.  The Pandemic added another layer of complexity to the housing process by separating individuals by admission date, custody level, and PREA designation within a cell. As previously noted, IPC Roll-In pods house inmates by custody levels, PREA designations, and special population tags (medical, mental health, administrative segregation, disciplinary, and protective custody).  However, security staff does not use the ISI to schedule out-of-cell activities for the general population or special management pods.[4]  Schedules have been "standardized" to allow inmates by bottom tier versus mezzanine.

---

[4] The ISI (Inmate Separation Instrument) is an automated JMS report to identify appropriate out-of-cell separations for the mixed custody and special populations units. As a pod deputy may not be aware or have access to the multiple factors requiring separation of individuals within a pod, failure to use the ISI threatens everyone's safety and institutional security.



The classification supervisors conducted housing audits to verify individuals were in their assigned cells and beds. Further, the housing audit protocol was expanded in January 2022 to include the TMH and TDC units.  However, the auditors frequently canceled due to the absence of pod security staff or COVID quarantine.  As previously reported, the classification supervisors described their respective audit schedules and scoring rules during an onsite workgroup meeting in June 2021. The audit sheets and reports showed marked improvement over the previous compliance period.  For example, a couple of the supervisors documented the "recheck" of the pods to verify errors noted were corrected and maintained.  The "error score" seemed to vary by the auditor, even for the same pod. For example, if auditor X checked the Tier 1 pods, the error rates were very low.  However, if auditor Z checked the Tier 1 pods, the error rates were higher. Unfortunately, the Classification Correction Action Plan task to organize and upload the audit reports to the shared drive did not occur.  The audit reports had to be scanned and uploaded at the last minute during the onsite tour. OPSO provided an in-service classification training session on March 14, 2022.  The topics included loading documents to the shared drive and the new enemy refusal process.

Assessment Methodology:

Compliance was assessed through multiple data sources and activities – a review of the OPSO and JMS statistical reports, onsite meetings with OPSO staff, and a site visit conducted June 28 – 30, 2022. The OPSO documents included monthly statistical reports, housing audit reports, and monitoring logs.  Analyzed were custody override, attachment, and enemy refusal data downloaded from the AS400.  The statistical reports tracked daily reclassifications, daily populations, placement errors, the stock population, and monthly custody trends.  Onsite activities included: observation of the initial classification, reclassification, and housing processes, and examination of the inmate enemy, associates, segregation, and protective custody reviews. The Monitor met with OPSO classification, facility administration, and compliance unit staff, as well as WellPath personnel. This review focused primarily on the data and activities from October 1, 2021 – March 31, 2022. Some analyses considered trends over a twelve to fifteen-month (12-15) period to detect variations due to seasonal variations and COVID-19-related procedures.



Summary:

OPSO is in substantial compliance with four of the eight Custodial Placement sections of the Consent Judgment (IV. A.10). Sections a, d, and f are rated as Partial Compliance.  Section e is rated as Non-Compliance. Notable was the regression from Substantial to Partial Compliance for Section d (*continue to update the classification system*).  We had anticipated Section f (internal and external review and validation of the classification system) to progress to Substantial Compliance, but it did not. OPSO's performance stalled, and in some respects, regressed.  Hence, the rating for Section f is very close to Noncompliance.   Assessment for section 10.e. (competency-based training) was knotty.  OPSO provided the in-service training in March 2022, but the training was not competency-based or related to the classification specialists' job responsibilities.

Findings:

A. 10. a.  Partial Compliance

A. 10. b.  Substantial Compliance

A. 10. c.  Substantial Compliance

A. 10. d.  Partial Compliance

A. 10. e.  Non-Compliance

A. 10. f.  Partial Compliance

A. 10. g.  Partial Compliance

A. 10. h.  Substantial Compliance

*IV. A. 10. a. OPP shall implement an objective and validated classification system that assigns prisoners to housing units by security levels, among other valid factors, in order to protect prisoners from unreasonable risk of harm. The System shall include consideration of a prisoner's security needs, the severity of the current charge, types of prior commitments, suicide risk, history of escape attempts, history of violence, gang affiliations, and special needs, including mental illness, gender identity, age, and education requirements. OPSO shall anticipate periods of unusual intake volume and schedule sufficient classification staff to classify prisoners within 24 hours of booking and perform prisoner reclassifications, assist eligible DOC prisoners with re-entry assistance (release preparation), among other duties.*

Finding:

Partial Compliance

Observations:

As of March 30, 2022, the Classification Unit staffing was 7 -- two civilian classification specialists, four supervisors, and a classification manager. One specialist is on maternity leave. Thus, only six (6) are available for the 24/7 shifts. During this



compliance period, one (1) classification specialist resigned. No one was hired. The shift supervisors are responsible for supervising the classification specialists, processing housing transfers, completing custody reviews, conducting housing audits, addressing classification-related grievances, and making rounds on the housing units. The classification specialists complete the custody and predation/vulnerability (PREA) assessments and assign appropriate pod and cell housing accordingly.  To keep up with the workload, custody reviews and housing re-assignments were shifted to the classification specialists.   Previously, classification supervisors completed the custody re-assessments and housing updates.

The number of overtime hours logged by the classification staff decreased from an average of 47.51 to 39.56 hours/month/staff member during this compliance period. Between October 1, 2021, and March 31, 2022, the Classification Unit logged 2,531.83 hours of overtime.[5]  During this Compliance Period, each classification specialist worked an average of 37.28 hours/month overtime; the classification supervisors logged 43.36 hours overtime/month.  (In contrast, non-Classification Unit staff logged an average of 22.19 hours/person/ month during this Compliance Period.)   At least in part, the classification staff spent the extra hours modifying housing assignments to address COVID-19-related quarantine, isolations, and multiple adjustments to the housing matrix. However, the continued high levels of overtime raise questions about the adequacy of the Classification Unit staffing.

During this compliance period, OPSO addressed one of the critical concerns noted in the previous compliance reports.  First, as indicated in Compliance Report #15,  20 of 32 OJC/TDC pods house individuals of all custody, vulnerability, predation, and special population status.  In December 2021, OPSO revised its housing matrix to differentiate the male intake roll-in pods by custody level, PREA status, and special population status.  The special population -- Mental Health, Medical, Education, Disciplinary/Segregation, TMH, and all female units – allow for all custody levels and PREA statuses. (COVID-19 protocols require cell-level separations by custody level and intake date; medical and mental health considerations include lower bunk requirements and suicide resistance/observation

---

[5] OPSO Excel spreadsheets entitled "Overtime by Month – October – December 2021," Overtime by Month – January – March 2022 and the 2021 and 2022 HR Report Hire and Separations Reports.  The classification work schedule builds in eight hours of overtime/month.  However, the same scheduling formula impacts other OPSO staff.



cells.)  As of March 30, 2022, 16 of the 31 OJC/TDC/TMH pods house individuals of all custody, vulnerability, predation, and special population status.

Within the TMH units, the treatment teams assign inmates to cells according to their mental health needs with little regard for custody or PREA status. (Known enemies live in separate pods.) Housing assignments, activities, and out-of-cell time are according to the individual's program/treatment level.  So again, classification becomes irrelevant. Inadequate security staffing and ad hoc schedules for the out-of-cell activities compound the risks associated with "ALL CUSTODY ALL STATUS" pods.

The second concern was the blatant failure by security staff to maintain/ enforce the housing assignments specified by the Classification Unit.  The housing audits from this compliance period indicated multiple inmates were not living in their assigned cells or sleeping in their allotted bunks.  Thus, at best, it appears that some, but not all, security and treatment staff adhere to and enforce the housing assignments specified by the Classification Unit.  While OPSO has taken significant steps to ensure the integrity of the Classification Unit and housing assignments, over half of the OPSO pods remain as "ALL CUSTODY ALL STATUS." Thus, the compliance rating for Section 10.a will remain as Partial Compliance as OPSO has failed to maintain the integrity of its objective classification system.

***IV. A. 10. b. Prohibit classifications based solely on race, color, national origin, or ethnicity.***

Finding:

Substantial Compliance

Observations:

The custody assessments consider objective risk factors validated for the OPSO male and female inmates. The individual's race is not one of the objective risk factors. Classification specialists consider the individual's custody level, vulnerability designation, age, and charges to select a cell and bed from those the JMS automated housing program identifies as appropriate housing for the individual. To track this element of the Consent Judgment, OPSO created a monthly statistical report to record the race and gender of individuals per housing location.

The "Housing By Race" reports suggested that race was not a factor for the OJC housing assignments. With a few exceptions, the number of black and white inmates within each OJC housing unit was consistent with the overall racial distributions among



the OPSO inmate population. However, the percentages of males assigned to the TDC DOC worker unit, and the females assigned to the TMH unit exceed the proportions of white inmates within the total inmate population for each month of the compliance period. As shown in Figure 1, on average, 13.1 percent of the OPSO male population identified as white. However, 30.7 percent of the men assigned to the TDC DOC worker unit were white, while only 6.8 percent of the men assigned to a TMH unit were white.

In contrast, among the women, an opposite trend was observed. As shown in Figure 2, on average, 21.3 percent of the OPSO female population identified as White. However, on average, 37.7 percent of the women assigned to the TMH unit were White.



Figure 1: Percentage of White Male Inmates Assigned to OJC, TDC & TMH Housing Units – January 2021 – March 2022.





Figure 2: Percentage of White Female Inmates Assigned to OJC & TMH Housing Units – January 2021 – March 2022.

While these data suggest race was not a housing factor within OJC, the data create concerns regarding disparate housing assignments generated by the Louisiana DOC worker program criteria and the mental health assignments for the women. The TDC worker unit houses inmates approved by the Louisiana DOC for participation in its local work release program. OPSO provides housing for the worker but does not approve or set the program criteria. Thus, any housing bias within this TDC unit, results from the Louisiana DOC selection criteria not OPSO classification or housing processes. Further, overrepresentation of minority women assigned to THM maybe a function of the small number of women assigned to TMH and/or the prevalence and severity of mental health needs in the community among minority women which goes unaddressed until incarcerated.

***IV. A. 10. c. Ensure that the classification staff has sufficient access to current information regarding cell availability in each division.***

Finding:

Substantial Compliance

Observations:

OPSO automated housing assignment process (HUAP) considers the inmate's custody level, gender, special population status, PREA designations, enemies, and associates versus OJC beds available to recommend an appropriate bed. The COVID-19 intake housing protocols also require matching cellmates by their admission dates. Housing tags identify inmates on suicide observation versus suicide watch, medical, mental health, alcohol/drug detoxification protocol, gang affiliation, special diets, and school participation.

The OPSO daily population report lists the units, cells, and beds off-line for maintenance or staffing, as recorded in the AS400. The cells/pods off-line, as listed in the AS400, appeared to be an accurate record. The classification supervisors noted the cells that required maintenance as part of their weekly audits and rounds. The classification manager enters the damaged cells into the AS400.

Classification specialists track all bed assignments to avoid housing errors or duplications due to delays between the inmate's housing assignment and the physical transfer of the individual to the designated pod/cell. These <u>manual</u> lists and notes direct



and inform the housing assignments.  Again, we urge OPSO to promptly update all cell or bunk availability information in the JMS.

OPSO should update the JMS housing availability logic to consider the COVID-19 isolation protocols, i.e., intake date.  A quick conversation with the JMS programmers confirmed that the housing and ISI programs could be easily modified to consider the intake date for the Roll-In Pods.  Further, the ISI could be adjusted to consider mezzanine vs. lower-level cells within the special population units.

Overall, the classification staff can access automated and manual information regarding current bed availability throughout OJC, TDC, and TMH.

*IV. A. 10. d. Continue to update the classification system to include information on each prisoner's history at OPSO.*

Finding:

Partial Compliance

Observations:

As shown in Figure 3, the monthly custodial reports provided by OPSO indicated:

- **Percent Initial Custody Assessments**: During this Compliance Period, the Classification Unit completed initial custody assessments for 91.2 percent of the inmates booked into OJC.  Excellent!  This rate is a slight improvement over the rate of 90.6% observed for the previous Compliance Period.

- **Percent Within 8 Hours:** During this Compliance Period, the percentage of initial classifications completed within the first eight hours of booking fluctuated between 90.2 and 85.5 percent; the average rate across the six months was 85.7 percent.  On the other hand, the percentage of cases completed between 8.01 and 24 hours fluctuated between 1.1 and 11.2 percent; the average was 4.7 percent. Thus, less than one in twenty inmates remained in the booking area for more than eight hours before assignment to a bed. This rate is an improvement from the pace of one in ten observed for the previous compliance period: April – September 2021. This is particularly notable as OPSO revised its housing matrix in December 2022 to differentiate the male intake roll-in pods by custody level. Thus, it appears that the changes to the housing matrix did not slow the custody assessment or housing processes despite an increase in the ADP during this compliance period.



COMPLIANCE REPORT #16                                    53

- **Percent Greater Than 24 Hours:** Very few -- only .8 percent -- of the inmates remained in the OJC intake booking area for more than 24 hours. This rate continued the trend observed for the previous compliance period.



*Figure 3: Rates and Completion Time for Initial Custody Assessments Completed October 2021 – March 2022*

These data suggested that the rate inmates initially classified and the lag time between booking and classification/ housing have stabilized. As the COVID-19 Pandemic eases or the OJC bookings increase, close monitoring of the classification staffing patterns is vital to ensure these excellent rates are maintained.

As noted in this report and previous compliance reports, the OPSO Housing Matrix was revised multiple times to ensure appropriate separations for COVID-19 treatment, quarantine, and isolation and to address shifts within the inmate population.  The "ALL CUSTODY - ALL STATUS" housing units create significant risks as Low, Medium, and High custody inmates with different PREA designations and special needs live in the same housing unit.

During this compliance period, observations and security staff reports indicated that most housing units' out-of-cell schedules were by tier (bottom vs. mezzanine) and cell number. Seven to ten consecutive cells are open at one time. For example, group 1 might include lower-level cells 5 – 11; group 2 would consist of lower-level cells 12 - 19. Deputies do not consult the separations reports or the ISI to determine out-of-cell separations. Security staff reported exchanging information regarding intra-pod conflicts and tensions. All agreed that shift-debriefs and intelligence-sharing are essential for



identifying and maintaining inmate separations. These exchanges were not systematically documented in the pod logbooks or roster, incident or disciplinary reports, or shared with the Classification Unit. This ad hoc process depends on individual relationships and trust. While interpersonal cooperation and trust are essential, consistency and documentation are also vital for building and maintaining a system to ensure inmate safety. Unfortunately, the "pressures of the day" frequently disrupt the basic pod schedule. As a result, the security staff expands the size of the evening groups to ensure all receive out-of-cell time. As previously noted, inadequate OJC staffing compounds this scenario.

Regardless of the staffing patterns, pod mission, and schedules, the sub-standard practice of mixed custody/vulnerable inmates during out-of-cell activities should be discontinued as soon as possible. A straightforward option is to list the custody level and key separation tags on the housing rosters. (As previously observed, the ISI programming can be easily tweaked to include admission date and COVID-19 isolation status. However, using the ISI will require retraining all security staff and their access to the AS400.) Further, enforcement of housing assignments among security staff is critical for maintaining inmate separations and, thus, institutional safety and security.

Previous compliance reports have delineated the dangers of overriding the inmate custody levels for housing purposes. As shown in Figure 4, custody overrides for housing increased during this compliance period: October 2021 – March 2022 = 30.7 percent versus April – September 2021 = 20.4 percent.  (The other common override reasons cited were PREA-related: Known/Potential Predator and Potential Victim). Unfortunately, staff did not provide a rationale for 24.8 percent of the overrides.





Figure 4: Percent Overrides for Housing Purposes - October 2020 – March 2022

The October 2021 – March 2022 classification stock population reports indicated that staff overrode the scored custody level for less than 3 percent of the male inmates (2.6%) and 0.0% of the women.  (See Figure 5.) These are very low rates; they are well below the recommended rates of 5 to 15 percent.[6]  However, within this small group of inmates, approximately 30 percent are housing-related overrides. Further, one could argue that the automatic overrides of "Potential Victim/ Potential Predators" from Minimum to Medium are just another type of housing override.  Under the COVID-19 Pandemic, the OJC ADP dropped dramatically and has remained low. (See Figure 9.)  Thus, as more beds and cells were available, classification staff had greater flexibility for pod and cell assignments.  Monitoring the discretionary overrides for housing will remain essential as the pandemic wanes, or the OJC ADP increases.

---

[6] Austin, James and Patricia L. Hardyman. 2004. *Objective Prison Classification: A Guide For Correctional Agencies.* Washington, D.C.: National Institute of Corrections.





Figure 5: Discretionary Override Rates by Gender: April 2021 – March 2022

As part of the review for Compliance Report #14, we observed housing overrides for "inmate refusal of enemies" to facilitate the housing of general population inmates. Staff dismissed inmate-to-inmate conflicts to resolve inmate requests to transfer from one pod to another. In response to the Monitors and Plaintiff attorneys' questions, OPSO suspended the inmate refusal process in December 2020.[7]  "Enemy Refusals" re-started in April 2021.

Following Compliance Report #15, the OPSO revised its Inmate Classification Procedures (#7020) to include rules for resolving an "Inmate Refusal of Enemy." The Procedures (#7020) require detailed documentation of the reviews and quarterly audits to ensure the separation review process works as intended and to make recommendations for adjustments as needed. The Classification Manager updated the "Separation Review Checklist" (3-10-2022) to record the "enemy refusal" evaluations.[8]   OPSO developed screens and reports in the AS400 to document and track the separation reviews as per the Inmate Classification Procedures (#7020). Training on the new procedures, screens, and checklist was provided to the classification staff in March 2022.

With the rollout of the AS400 enemy review screens, the classification staff can only delete the enemy and associate separations listed for an inmate via the automated screens. The new screens provide for uploading the completed checklists to the server to document

---

[7] OPSO indicated that the "Inmate Refusal of Enemies" form was a trial strategy initiated in September 2020. As of December 2020, after a 6-week trial period, OPSO discontinued the questionable form but continued the "enemy refusal" process without the form.

[8] The Classification Unit staff indicated that the earlier versions of the checklist were "too long."



the required interviews and data checks. The AS400 enemy review data indicated that since October of 2021, the classification staff conducted six separation reviews. However, the required separation review checklists were NOT completed. Staff continued to rely on telephone calls from security staff indicating there was "no problem between the inmates." The documentation of the required interviews of the inmates, unit management, and mental health staff was unavailable.

Further, classification staff did not complete the quarterly audits of the separations as per OPSO policy. Thus, OPSO has not fully implemented its enemy separation procedures delineated in Procedures (#7020). Instead, the Unit continues to "resolve" inmate-inmate enemies sans full investigation and documentation.

The Classification Monitor List (List) is an ad hoc report identifying inmates for whom a custody review is due. Custody re-assessment reasons include a regular 60/90-day re-assessment or a status change or event within their jail records, i.e., amended charge(s) or bail amount, disciplinary incident, detainer lodged/lifted, or a new sentence. The number of inmates on the list fluctuates as inmates return from court, move through the booking process, and the like. The goal is for the classification specialist or supervisor to complete all pending custody reviews during their shift. The average number of pending custody assessments per the Classification Monitor list was 10.1; 4.2 were awaiting an initial classification, and 5.9 were awaiting a custody re-assessment. The average number of pending custody assessments during the previous compliance period was 12.5. Thus, wait times for the initial and reclassification processes decreased slightly during this compliance period. These statistics parallel the data provided in Figure 3 regarding the wait times between booking an initial classification.

Following Compliance Report #8, OPSO took steps to work with WellPath to rebuild the linkages between the medical/mental health records and JMS. These data are essential for scoring seven of the PREA victimization and predation risk factors. Medical and mental health information is critical for the inmates' housing assignments. The linkage between the electronic medical records (ERMA) and the JMS is complete. WellPath medical and mental health service and treatment data are now routinely (every five to eight minutes) uploaded to the JMS. Unfortunately, contrary to expectations, these data have not enabled OPSO to identify and track the victimization of individuals on the mental health caseload. Efforts to resolve the data questions continued with meetings with the



OPSO programmer, WellPath staff, and the Monitor.  The OPSO statistical reports for October – March 2022 still do not provide victimization data for individuals on the mental health caseload.

Figures 6 and 7 show that the number of attachments to record criminal history data regarding non-Orleans Parish felony convictions dropped dramatically during this compliance period.  Figure 6 illustrates that the classification staff created only 108.67 attachments per month between October 1, 2021, and March 31, 2022.  This statistic is misleading as only one attachment was created in January; 63 and 71 were created in December and February, respectively. As shown in Figure 7, the drop was not related to a decrease in the number of initial custody assessments completed.



Figure 6: Number of Attachments Input by Classification Staff – October 2020 – March 2022

As shown in Figure 7, the percentage of initial custody assessments for which an attachment was created dropped to only .2% for January 2022. In December and February, the classification specialists created attachments for 11.6% and 13.9% of the initial custody assessments.  In March, the attachment rate increased to 25.3% of the initial custody assessments. However, these rates are well below those observed for the previous compliance periods:  October – March 2021 = 46.8%, and April – September 2021 = 37.5%. Inquiries during the onsite tour revealed that the NCIC system was updated in December 2021. Staff reported that the system was unavailable/ unreliable from December through February.   The NCIC access problem helps to explain the drop in attachments. However, when the NCIC system was down, one would have anticipated that staff would have noted



the custody assessments with "missing" NCIC reports and then checked NCIC once the system was again available.  What is unclear is why the Classification Manager was unaware of the significant drop in attachments until we examined the data for this compliance review.  It appears that the data required to complete the custody assessments and housing assignments are not routinely monitored.



Figure 7: Percentage of Initial Custody Assessments for which an Attachment was created during October 2020 – March 2022

***IV. A. 10. e. Continue competency-based training and access to all supervisors on the full capabilities of the OPSO classification and prisoner tracking system.***

Finding:

Non-Compliance

Observations:

An in-service classification training was held on March 14, 2022.  All specialists and supervisors attended.  This in-service training did not meet the OPSO mandatory competency-based training requirement for 2022 as there was no pre- and post-training testing.  Further, as previously noted, the training topic was the new "enemy separation review" procedures and screens.  As per OPSO policy, the classification manager and supervisors are responsible for the "enemy separation reviews." Thus, the training provided was unrelated to the classification specialists' responsibilities and did not suffice as the mandatory annual training.

Quality in-service and introductory training for new staff is vital to ensure reliable and accurate custody assessments, housing assignments, and audits. While the System is highly automated, the JMS automation should not replace the staff's understanding of the



objective classification principles, scoring rules for the custody and PREA risk factors, or housing standards.

***IV. A. 10. f. Conduct internal and external review and validation of the classification and prisoner tracking system on at least an annual basis.***

Finding:

Partial Compliance

Observations:

OPSO population reports with the number of inmates by location were received daily by the Monitor.  Monthly custodial statistical reports for October 2021 – March 2022 regarding the number of custody assessments by type, gender, and population were available. These reports track the timeliness of the initial custody assessments, the custody distributions, the cases due for a custody assessment, the prevalence of special populations, and the rates and types of disciplinary infractions. OPSO conducts housing and internal audits.

**Housing Audits – Checking the Veracity of the Inmate Housing Assignments:**

As shown in Table 6, staff conducted monthly audits for most of the OPSO housing units during this compliance period. There were notable exceptions:

- TDC and TMH units were not audited in October – December,
- OJC Tier 2 pods were not audited in January or March, and
- OJC Tier 1 pods were not audited in February.

Some audits were not conducted due to COVID-quarantine, lockdown, or absence of security staff.

| Table 6: Housing Audits by Unit for October 2021 – March 2022 | | | | | | | |
|---|---|---|---|---|---|---|---|
| Tier | Pod | Oct-21 | Nov-21 | Dec-21 | Jan-22 | Feb-22 | Mar-22 |
| 1 | A | Pod empty | | X | X | Quarantine, | X |
| | B | No deputy | X | X | X | Quarantine, X | X |
| | C | X | | X | X | Quarantine, X | X |
| | D | X | | X | X | Quarantine | X |
| | E | No deputy | X | X | X | Quarantine, X | X |
| | F | No deputy | X | X | X | Quarantine, X | X |
| 2 | A | X | X | X | Lockdown | X | |
| | B | X | X | X | Lockdown | X | |
| | C | X | X | X | Lockdown | X | |
| | D | X | X | X | Lockdown | X | |
| | E | X | X | X | Lockdown | X | |
| | F | X | X | X | Lockdown | X | |
| 3 | A | | X | X | X | X | X |
| | B | | Lockdown | X | X | X | X |



|   |   |   |   |   |   |   |   |
|---|---|---|---|---|---|---|---|
|   | C | X | X | X | X | X | X |
|   | D | X | X | X | X | X | X |
|   | E | X | X | X | X | X | X |
|   | F | X | X | X | X | X | X |
| 4 | A | X | X | X | X | X | X |
|   | B | X | X | X | X | X | X |
|   | C | X | X | X | X | X | X |
|   | D | X | X | X | X | X | X |
|   | E | X | X | X | X | X | X |
|   | F | X | X | X | X | X | X |
| TDC |   |   |   | X | X |   | X |
| TMH |   |   |   | X | X | X | X |
| X = 1+ Audit completed. | | | | | | | |

The rush to locate, sort, scan, and upload the audit reports during the onsite visit suggested all audits are not routinely reviewed or tracked to ensure at least monthly checks throughout the compliance period. On the other hand, consistency across the audit score sheets, rosters, and corrective action reports improved. Some of the corrective action reports noted that "errors" observed in a previous report were addressed.

We reviewed 260 audit score sheets, rosters, and corrective action reports for this compliance report. No housing audits were observed because insufficient classification or security staff were available to complete the audits. It is important to emphasize that housing audits are a means of ensuring the classification system's integrity. Merely filling out a custody assessment form and assigning an inmate to a bed does not fulfill the requirements of a validated classification system.

**Internal Audits – Checking the Accuracy of the Custody and PREA Assessments**

The October 2021 – March 2022 internal audit logs indicated the classification manager assessed the accuracy of 54 custody assessments. Each audit was recorded as "No current errors detected." A quick recheck of the January custody assessments revealed missing NCIC attachments. This suggested that the NCIC reports were not checked as part of the original custody assessment nor as part of the random audits. This indicates a need to retool the internal audit process and implement procedures to check NCIC rap sheets when that system is down.



**Revalidation of the Classification System – Assessing the Validity of the System:**

Lovins and Latessa submitted their report on the validation of the OPSO classification system on April 30, 2018.[9] This validation study served as documentation of compliance with the Consent Judgment requirement for "external review and validation of the classification and prisoner tracking system on at least an annual basis." Statistical validation of an objective classification system is generally recommended every three to five years.[10] Revalidation of the System was due in 2021 per a previous agreement for a statistical validation every three years.  OPSO twice initiated but failed to complete a contract to revalidate the classification system.  The previous administration had plenty of time to contract for the revalidation between October 2021 and May 2022. Yet, the revalidation of the classification system was lost in the transition process.  The new administration was unaware of the pending revalidation.

*A. 10. g. Provide the Monitor a periodic report on classification at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date and every six months, thereafter, until termination of this Agreement. Each report will include the following information:*

> *(1) number of prisoner-on-prisoner assaults;*
> *(2) number of assaults against prisoners with mental illness;*
> *(3) number of prisoners who report having gang affiliations;*
> *(4) most serious offense leading to incarceration;*
> *(5) number of prisoners classified in each security level;*
> *(6) number of prisoners placed in protective custody; and*
> *(7) number of misconduct complaints.*

Finding:

Partial Compliance

Observations:

Reviewed were the monthly custodial, discipline, and inmate population statistical reports for October 2021 – March 2022. OPSO has developed reports to track the statistics as required under section IV.A.10.g.  The only exception is the rate of victimization of inmates on the mental health caseload.  Despite the Consent Judgment requirement for victimization rates among inmates on the mental health caseload, the WellPath-OPSO efforts to align the disciplinary and mental health caseload data to generate timely and accurate victimization counts continue to lag or get lost in the scurry of the day.  The

---

[9] Lovins, Brian K. and Edward Latessa (April 30, 2018). "Revalidation of the Orleans Parish Classification System." Cincinnati, Ohio: University of Cincinnati Corrections Institute.
[10] Hardyman, Patricia L. and James Austin (2021) "Objective Prison Classification: A Guide for Correctional Agencies." 2nd Edition.  Washington, D.C.: National Institute of Corrections. p. 17.



WellPath electronic records for individuals who received medical or mental health services are uploaded continually to the AS400.  However, the programming tracking victimization among the mental health caseload does not generate accurate or reliable counts.  As this issue has been pending for numerous reports, we indicated in our most compliance report that OPSO and WellPath must complete this process to maintain substantial compliance with this Section by January 2022. As of July 2022, this issue has not been resolved.  Therefore, this provision is now in partial compliance.

OPSO staff continue to input inmate gang affiliation data in the JMS. OPSO and the Orleans District Attorney (DA) have an ongoing process for notifying the OPSO of individuals identified as members of a "gang." As of May 19, 2022, only six active inmates were identified as "gang" members or associates.  Reports are available to identify their locations within OJC (i.e., tier, side, and bed).  OPSO has always maintained there are few formal gangs within New Orleans.  Nonetheless, six is a rather low number.

The initial classification questionnaire includes a question as to the individual's membership or affiliation with a "gang." Staff indicated that inmates rarely reveal their affiliations.  However, if the classification interview identifies any "gang affiliations," the information should be forwarded to the OPSO investigation bureau for verification. During the previous compliance review site visits, we learned that security staff supervisors interview each new inmate assigned to a pod to identify "conflicts with others on the pod" or involvement with local cliques/gangs.  Documentation of these interviews and subsequent communication with the classification unit to record required separations were unavailable.

Figures 8 and 9 provide the OPSO monthly disciplinary data recorded in the JMS. The rate of disciplinary reports has fluctuated over the last twelve months – October 2020 – September 2021. (To account for short-term variations, seasonal trends, and the population shifts due to the Pandemic, we reviewed 15 months of disciplinary data.) As shown in Figure 8, the rate of disciplinary reports per inmate increased from 31.8% to 38.3% between October 2021 and March 2022.  The OPSO DR rate for February 2022 jumped to 50.4% but fell back to 38.8% for March 2022.   The average rate of disciplinary reports among the OPSO inmates was 31.1%, i.e., 1 in 3 received a disciplinary report.  Of particular importance was a slight uptick in the rate of predatory infractions during this compliance period – the rate of predatory infractions increased from 3.5 to 3.8%.  The rate



of aggressive infractions remained at ~2.9%. Overall, misconduct data revealed increased disruption/misconduct among OPSO inmates. However, the rates of violence as indicated by the predatory and aggressive infractions have not changed significantly.



Figure 8: Rate of Disciplinary Infractions for the OPSO ADP – October 2020 – March 2022

As shown in Figure 9, the OPSO ADP increased from a low of 793 in April to 922 by March 2022. However, the number of disciplinary reports per month decreased from 279 in April 2021 to 260 in March 2022. This data suggests that since April of 2021, the number of disciplinary reports written does not correlate significantly with the OPSO ADP.



Figure 9: OPSO ADP vs. Number of Disciplinary Reports: October 2020 – March 2022

Figure 10 illustrates the breakdown of the disciplinary infractions by type during



this Compliance Period. (These data reflect the most severe infraction of which the inmate was found guilty per report.) While the actual number of predatory (e.g., assaults or battery) and aggressive behaviors (e.g., fights or threats) stabilized during August – December 2021, the numbers of management problem behaviors (disobeying a direct order, misuse of medication, possession of illicit substance, etc.) decreased significantly. For example, during April 2021, there were 238 management problem infractions. But, by January 2022, only 83 disciplinary reports were written for management problems.



Figure 10: Most Serious Disciplinary Infraction/Report with Finding of Guilty: April 2021 – March 2022

***IV. A. 10. h. OPSO shall review the periodic data report and make recommendations regarding proper placement consistent with this Agreement or other necessary changes in policy based on this review. The review and recommendations will be documented and provided to the Monitor.***

<u>Finding:</u>

Substantial Compliance

<u>Observations:</u>

The Monitor receives the daily "Active Inmates by Location" reports and has access to the ad hoc Classification Monitor lists and various classification statistical reports. During this Compliance Period, there were multiple updates to the OPSO Housing Matrix; the Matrices were provided upon request.

We anticipated that OPSO would revamp the daily enemy refusal process per its revised classification procedures and checklist (dated 3-10-2022). However, it appeared that the process did not change. The enemy reviews completed during this period did not comply with the OPSO policy. Classification staff continued to rely on telephone calls from



security rather than conduct the required interviews, data checks, etc. Further, the classification revalidation project languished despite previous OPSO assurances. (With whom OPSO contracts for the revalidation is irrelevant, our concern is that the validation is already 12 months behind schedule.)

### IV. A. 11.        Prisoner Grievance Process

*A. 11. a. OPSO shall ensure that prisoners have a mechanism to express their grievances, resolve disputes, and ensure that concerns regarding their constitutional rights are addressed. OPSO shall, at a minimum, do the following:*

> *(1) Continue to maintain policies and procedures to ensure that prisoners have access to an adequate grievance process and to ensure that grievances may be reported and filed confidentially, without requiring the intervention of a correctional officer. The policies and procedures should be applicable and standardized across all the Facility divisions.*
>
> *(2) Ensure that each grievance receives appropriate follow-up, including providing a timely written response and tracking implementation of resolutions.*
>
> *(3) Ensure that grievance forms are available on all units and are available in Spanish and Vietnamese and that there is adequate opportunity for illiterate prisoners and prisoners who have physical or cognitive disabilities or language barriers to access the grievance system.*
>
> *(4) Separate the process of "requests to staff" from the grievance process and prioritize grievances that raise issues regarding prisoner safety or health.*
>
> *(5) Ensure that prisoner grievances are screened for allegations of staff misconduct and, if an incident or allegation warrants per this Agreement, that it is referred for investigation.*
>
> *(6) A member of the management staff shall review the grievance tracking system quarterly to identify areas of concerns. These reviews and any recommendations will be documented and provided to the Monitor.*

Findings:

A. 11. a. (1)  Substantial Compliance

A. 11. a. (2)  Partial Compliance

A. 11. a. (3)  Substantial Compliance

A. 11. a. (4)  Substantial Compliance

A. 11. a. (5)  Substantial Compliance

A. 11. a. (6)  Substantial Compliance

Until the September 2019 report, one rating was given for the entire section for the Prisoner Grievance Process. In order to highlight which provisions are in substantial compliance versus those which fall short, the decision was made to rate each provision separately.

This review covered October 2021 through March 2022. For this review, the Monitor interviewed the Grievance Lieutenant, and security staff and inmates while inspecting the housing units. Reports and data submitted by OPSO covering the rating period were also reviewed.



As noted during the previous inspection, a review of the documentation demonstrated that all inmate submissions continue to be reviewed by Grievance staff, categorized into requests and grievances, and forwarded to the appropriate staff for response. Statistical information was provided on all categories. Both requests and grievances continue to be sorted by type. Specific grievances related to inmate safety, medical issues, PREA, etc., are documented to reflect the date received, inmate information, type of grievance, time of notification made to the appropriate staff member, and the staff member making the notification. For the analysis, the Monitor created three charts and added simple trendline overlays to each grievance category listed. A fourth chart was added to graphically represent the number of grievances overall relative to the inmate population to give an indication as to whether the number of grievances received in a given period substantially correlated with the total inmate population.

Grievance staff once again provided detailed documentation as to their separate handling of the October 2021 through March 2022 inmate requests, grievances, and complaints related to inmate safety or health. (Three months from the previous rating period were added to the charts below to reflect any changes from the previous rating period.)

As reported by the OPSO Grievance staff, the monthly average of 85 grievances during the previous rating period ***increased to 146—a 72% increase overall during the current rating period.*** Inmate Medical grievances are trending slightly upward and, while relatively small in number, grievances related to Inmate-on-Inmate violence and "Life Threatening" grievances also were on the rise during the rating period, reversing the trend from the previous rating period.

Accounting for the most significant portion of the increase was the category of "OJC Facility Grievable Miscellaneous" which are assigned to the Unit Managers and Major of Security for resolution. This is a catch-all category for grievances that do not fit the other categories listed. The increased average for the last four months of the rating period (75) was a 150% increase versus an average of 30 for the previous 11 months. It should be noted as well that staff responsible for answering grievances in this category failed to meet the timeliness requirement in all but one month of the rating period. Overall timeliness of responses as well as substantive responses remain as issues based upon the OPSO grievance audit information. While changes to the grievance monitoring, assignment



and reporting processes by the Grievance Lieutenant have had a positive impact (as noted in Report #15), the Monitor recommends OPSO focus specific attention in this area as failure to do so may result in the lowering of the rating in this area.

The monthly average of inmate requests received declined from 1889 during the previous rating period to 1649 for the current rating period, continuing the downward trend by another 13% indicating staff are handling routine issues more efficiently. It may also be indicative of an issue with inmates being able to file grievances due to non-working kiosks and lack of paper grievance forms. Additionally, Grievance staff responded to an additional 746 miscellaneous inmate requests per month, on average, expediting the response process.

As noted in the previous report, the Average Daily Population since the beginning of the pandemic has seen a general decline but is still a factor in the lower average number for this rating period when compared to that prior to March 2020. Additional analysis of data provided by OPSO allowed the Monitor to determine whether the number of grievances and requests relative to the overall inmate population was consistent or not. Chart Number 4 in this section graphically reflects the monthly averages for population, requests, and grievances. It is the Monitor's opinion that the rise and fall of the grievances and requests substantially mirror that of the total inmate population as would generally be expected. This is a positive indication of operational changes and conditions within the jail in the Monitor's opinion.

The Grievance Section continues to randomly audit approximately 10% of the grievances received with regular reports generated for management review.



**Chart 1**



**Chart 2**





**Chart 3**



**Chart 4**



(The color gray represents the overall population; orange represents inmate requests; and blue represents inmate grievances.)

     As noted during the last several inspections, inmates have access to the grievance



process via electronic kiosks located in the housing units throughout OJC and TDC and through a traditional paper grievance system utilized as a "back-up" system due to the number of non-functioning kiosks. As of the date of the inspection, there were only 8 of 24 kiosks reported as functional in OJC. Similar issues were noted in TDC/TMH. As noted in report #15, the Monitor observed that the problem with the current kiosk system continues to worsen, and it remains the Monitor's opinion that the kiosk system remains unreliable in terms of operational availability for the majority of the inmates. The Monitor recommends that the new OPSO administration address either the repair or replacement of the current system as soon as possible, and ensure adequate staff are assigned to the Grievance section to handle the additional workload generated by the paper system.

The Grievance Lieutenant reported that every housing unit continues to be visited seven days per week with a "walk by" of every cell to collect paper grievances to ensure that problems with the kiosks do not interfere with an inmate's ability to submit grievances. However, there were inmates who expressed concern that paper grievances lead to retaliation.

The Monitor again reviewed the paper grievances tracking documentation and noted that all such grievances continue to be entered into the electronic system by Grievance staff upon receipt. Paper responses are provided to inmates in units that do not have a functioning kiosk. The Monitor recommends Maintenance staff address the security of the grievance receptacles. At least two were found to be easily manipulated and opened by inmates simply by inserting their fingers into the slot on top of the receptacle. This jeopardizes the confidentiality of the grievance system.

As with the previous report, Unit Managers are again urged to remind line security staff of the importance of making grievance forms available upon request by the inmate(s). It is the Monitor's opinion that this manual work-around is acceptable under the language of the Consent Judgment requiring the inmates have access to a meaningful and confidential grievance process but is problematic.

During the Monitor's tour through the housing pods, the Monitor spoke with several individual inmates. While there were few verbal complaints about the grievance process, there were still some instances reported regarding access to paper grievances, a lack of substantive responses and response timeliness. No inmates complained of staff "coaching" inmates with regard to speaking with the Monitors as was noted during the



previous inspection.

No complaints regarding access to grievance histories/paperwork were received by the Monitor indicating that the policy issue noted in Report #15 had been addressed by the Administration and Grievance Lieutenant.

Grievance staff continue to do an excellent job tracking grievances and requests and reporting as to the timeliness and quality of the responses to address the inmates' issues. Documentation continues to reflect that Grievance staff maintain a by-name/housing listing of all OPSO inmates identified as needing Grievance staff assistance to access the grievance system due to either a language barrier or illiteracy.

The Monitor reviewed detailed documentation provided by Grievance staff for the rating period regarding the screening of grievances for staff misconduct. The documentation demonstrated that all inmate submissions are reviewed by Grievance staff and those regarding staff misconduct are separately documented for appropriate referral to the administrative level for follow-up. Grievance staff processed a total of 100 such staff misconduct related grievances during this rating period, up from 77 in the previous rating period and the 39 noted in Report #14. This demonstrates a significant trend and may be reflective of staff shortages, turnover and training issues noted elsewhere in the report.

Grievance staff continue to separately document grievances that require specific referral to IAD, ISB, PREA, or FIT staff for review and investigation. Detailed information along with the date assigned and disposition is maintained as well as email transmission receipts. Grievances referred to IAD more than doubled from 6 to 14, and grievances referred to ISB increased more than 30% from 18 to 25 for the rating period.

The Monitor reviewed the 2021 Fourth and 2022 First quarter data analysis of the grievance reports presented by Grievance staff for executive review. Specific discussion by executive staff regarding the grievance documentation and reporting was noted. The meeting minutes noted that Dr. Astrid has implemented weekly meetings with staff and inmate representatives on the topic. The Monitor views this as a positive action by the new administration.

### IV. A. 12.  Sexual Abuse

*A. 12. OPSO will develop and implement policies, protocols, trainings, and audits, consistent with the requirements of the Prison Rape Elimination Act of 2003, 42 U.S.C. § 15601, et seq., and its implementation of regulations, including but not limited to, preventing, detecting, reporting, investigating, and collecting sexual abuse data, including prisoner-on-prisoner and staff-on-prisoner*



*sexual abuse, sexual harassment, and sexual touching.*

Finding:

A. 12. Partial Compliance

Observations:

OPSO successfully completed its PREA audit in 2019. The PREA Coordinator was reassigned to a housing area and the position has not been filled for years. The duties of the PREA Coordinator have been absorbed by the PREA manager, but she is now tasked with performing the duties of three positions. PREA does not require more than a PREA Coordinator, but the organizational chart should be revised to reflect the change. Supervision of the investigation of PREA complaints was added to the duties of the FIT supervisor. He has received additional PREA training. Substantial compliance is not guaranteed by successfully completing a PREA audit once every three years. The only documentation provided for this monitoring period was the policies. No proof as to implementing the requirements of PREA was provided. The Monitor is aware of PREA investigations taking place due to her review of those documents under a different section.

## IV. A. 13.    Access to Information

*A. 13. OPSO will ensure that all newly admitted prisoners receive information, through an inmate handbook and, at the discretion of the Jail, an orientation video, regarding the following topics: understanding Facility disciplinary process and rules and regulations; reporting misconduct; reporting sexual abuse or assault; accessing medical and mental health care; emergency procedures; and sending and receiving mail; understanding the visitation process; and accessing the grievance process.*

Finding:

A. 13.   Substantial Compliance

Observations:

Materials were provided indicating the requirements of this paragraph have been met.

## IV. B. Mental Health Care

*B. OPSO shall ensure constitutionally adequate intake, assessment, treatment, and monitoring of prisoners' mental health needs, including but not limited to, protecting the safety of and giving priority access to prisoners at risk for self-injurious behavior or suicide. OPSO shall assess, on an annual basis or more frequent basis, whether the mental health services at OPP comply with the Constitution. In order to provide mental health services to prisoners, OPSP, at a minimum shall:*

Findings:

B. 1. a. Substantial Compliance

B. 1. b. Substantial Compliance



B. 1. c.  Substantial Compliance

B. 1. d. Substantial Compliance

B. 1. e. Partial Compliance

B. 1. f.  Partial Compliance

B. 1. g. Substantial Compliance

B. 1. h. Substantial Compliance

B. 1. i.  Partial Compliance

B. 1. j.  Partial Compliance

B. 1. k. Partial Compliance

B. 1. l.  Partial Compliance

***B. 1. a. Develop and maintain comprehensive policies and procedures for appropriate screening and assessment of prisoners with mental illness. These policies should include definitions of emergent, urgent, and routine mental health needs, as well as timeframes for the provision of services for each category of mental health needs.***

Finding:

Substantial Compliance

  This was found in substantial compliance by the prior monitor and there was no evidence Wellpath does not continue to utilize proper screening and assessment forms. They are being implemented without issue.

***B. 1. b. Develop and implement an appropriate screening instrument that identifies mental health needs, and ensures timely access to a mental health professional when presenting symptoms require such care. The screening instrument should include the factors described in Appendix B. The screening instrument will be validated by a qualified professional approved by the Monitor within 180 days of the Effective Date and every 12 months thereafter, if necessary.***

Finding: See B. 1. a.

Substantial Compliance

***B. 1. c. Ensure that all prisoners are screened by Qualified Medical Staff upon arrival at OPP, but no later than within eight hours, to identify a prisoner's risk for suicide or self-injurious behavior. No prisoner shall be held in isolation prior to an evaluation by medical staff.***

Finding: See B. 1. a.

Substantial Compliance

Suggestion:

  While Wellpath is in substantial compliance with this provision, there was a discussion/recommendation to have a mental health professional assigned to the intake area (IPC) to help ensure inmates are seen by a mental health professional and needs are



not missed or overlooked by non-behaviorally trained staff.

***B. 1. d. Implement a triage policy that utilizes the screening and assessment procedures to ensure that prisoners with emergent and urgent mental health needs are prioritized for services.***

<u>Finding:</u> See B. 1. a. and B. 1. c. Suggestion

Substantial Compliance

<u>Suggestion:</u>

CQI project for this provision to ensure SOP for referrals for Special Needs inmates in need of counseling are adequately addressed.

***B. 1. e. Develop and implement protocols, commensurate with the level of risk of suicide or self-harm, to ensure that prisoners are protected from identified risks for suicide or self-injurious behavior. The protocols shall also require that a Qualified Mental Health Professional perform a mental health assessment, based on prisoner's risk.***

<u>Finding:</u>

Partial Compliance

There continues to be challenges with deputies documenting suicide watch on the required observation forms. While the use of these forms would make the suicide watch process more uniform, it would also allow for more accurate communication between deputies and mental health staff. While improved, Deputies have been assigned duties for 12% of suicide watches in June 2022, 10% of suicide watches in May 2022, 15% of suicide watches in April 2022, 9% of suicide watches in March 2022, 14% of suicide watches in February 2022, and 9% of suicide watches in January 2022. These numbers do not include miscellaneous watches which are not conducted by Wellpath staff.

<u>Suggestion:</u>

Continue to monitor and report use of the correct observation for suicide watch by deputies. Ensure there is no use of physical restraints for inmates on suicide watch in IPC or TMH and document any instance where this occurs. Document de-escalation procedures by Wellpath and deputies.

***B. 1. f. For prisoners with emergent or urgent mental health needs, search the prisoner and monitor with constant supervision until the prisoner is transferred to a Qualified Mental Health Professional for assessment.***

<u>Finding:</u>

Partial Compliance

<u>Suggestion:</u>

There continue to be challenges providing adequate documentation of searches and



constant supervision, on proper documentation, by deputies prior to the arrival of mental health staff when an assessment for all emergent and urgent needs are determined. Provide written documentation of all protocols and procedures for searching inmates as soon as safely possible, along with attempts at having mental health staff available to try and limit the need for de-escalation interventions. This should all be completed prior to placement on any form of suicide precautions, watch or Direct Observation.

***B. 1. g. Ensure that a Qualified Mental Health Professional conducts appropriate mental health assessments within the following periods from the initial screen or other identification of need:***
   ***1)       14 days, or sooner, if medically necessary, for prisoners with routine mental health needs;***
   ***2)       48 hours, or sooner, if medically necessary, for prisoners with urgent mental health needs;***
              ***And***
   ***3)        immediately, but no later than two hours, for prisoners with emergent mental health needs.***

Finding:

Substantial Compliance

Suggestion:

 Continue to conduct CQI audits to ensure implementation and timeliness of referral responses. A Qualified Mental Health Professional assigned to IPC will help ensure inmates at intake receive appropriate assessments and timely referrals, including referrals to psychiatrists during on-call hours.

***B. 1. h. Ensure a Qualified Mental Health Professional preforms a mental health assessment no later than the next working day following any adverse triggering event (i.e., any suicide attempt, any suicide ideation, or any aggression to self, resulting in serious injury).***

Finding:

Substantial Compliance

***B. 1. i. Ensure that a Qualified Mental Health Professional, as part if the prisoner's interdisciplinary treatment team, maintains a risk profile for each prisoner on the mental health case load based on the Assessment Factors identified in Appendix B, and develops and implements a treatment plan to minimize the risk of harm to each of these prisoners.***

Finding:

Partial Compliance

Suggestion:

 During this site visit, the lack of completed treatment plans, especially in the general population, was discussed. This is due in part to the lack of resources, a dedicated psychiatrist and mental health professional, for the general population. In order to achieve



substantial compliance, there will need to be interdisciplinary treatment plans conducted in the general population with a risk profile for each inmate on the mental health case load. A commitment to providing an adequate staffing rubric to complete these tasks will be essential. It does not appear that stretching the current resources will be sufficient to complete this task. These treatment plans must include interventions to minimize risk of harm for inmates throughout the system, including stepdown and outpatient level of care. This risk profile should also include deficits in planned services and content, which could be due to lack of available staff, and remedies to correct the deficits.

***B. 1. j. Ensure adequate and timely treatment for prisoners, whose assessments reveal mental illness and/or suicidal ideation, including timely and appropriate referrals for specialty care and visits with Qualified Mental Health Professionals, as clinically appropriate.***

<u>Finding:</u>

Partial Compliance

<u>Suggestion:</u>

There is a need for a full range of mental health and counseling services at OJC and TMH/TDC. These services include group therapy sessions, individual counseling sessions and a confidential area to conduct these interventions. There is a lack of dedicated confidential areas to conduct mental health interventions. All inmates, including those in IPC and outpatient level of care, need appropriate, therapeutically developed treatment for their mental illness. Mental health interventions cannot be properly administered without the assistance of deputies providing security and transport for inmates. Wellpath and OPSO must work together in order for this provision to be in substantial compliance. Cell side visits are not considered therapeutically appropriate or adequate treatment for the vast majority of inmates on the mental health case load. Continue to provide documentation, including barriers, to scheduled and completed adequate and timely treatment for all individuals on the mental health case load including rounds, individual and group therapies and/or counseling, referrals to specialty services for all male and female inmates, and materials which are used to provide education.

***B. 1. k. Ensure crisis services are available to manage psychiatric emergencies. Such services include licensed in-patient psychiatric care, when clinically appropriate.***

<u>Finding:</u>

Partial Compliance



Suggestion:

OPSO continues to lack access to licensed in-patient services for male and female inmates. While attempts have been made to secure a licensed in-patient facility to care for these inmates, OPSO has been unsuccessful in this endeavor. Wellpath is encouraged to continue to provide documentation that all psychiatric emergencies are sent to an emergency department and any crisis is adequately resolved. Currently, the utilization of TMH and external emergency departments are the resources which must be used.

***B.1.l. On an annual basis, assess the process for screening prisoners for mental health needs to determine whether prisoners are being appropriately identified for care. Based on this assessment, OPSO shall recommend changes to the screening system. The assessment and recommendations will be documented and provided to the monitor.***

Finding:

Substantial Compliance

Suggestion:

SOP revisions will be reviewed at the next visit to ensure OPSO remains in substantial compliance. The suggestion to add a Qualified Mental Health Professional to IPC would help ensure inmates are being appropriately identified for care.

Findings:

B. 2. a. Partial Compliance

B. 2. b. Partial Compliance

B. 2. c. Partial Compliance

B. 2. d. Partial Compliance

B. 2. e. Substantial Compliance

B. 2. f.  Partial Compliance

B. 2. g. Substantial Compliance

B. 2. h. Partial Compliance

***B. 2. a. Review, revise, and supplement existing policies in order to implement a policy for the delivery of mental health services that includes a continuum of services, provides necessary and appropriate mental health staff, includes a treatment plan for prisoners with serious mental illness, and collects data and contains mechanisms sufficient to measure whether care is being provided in a manner consistent with the Constitution.***

Finding:

Partial Compliance

Suggestion:

While the vast majority of necessary policies have been completed, there continues



to be a need for consistent and appropriate implementation of these policies, especially de-escalation interventions. There is a need to collect data regarding the universe of inmates requiring mental health services and how many are receiving therapeutically, individualized care. This will include documenting wait lists and service needs along with barriers to the provision of treatment. There will also need to be an interdisciplinary treatment team in the outpatient level of care to determine and implement appropriate levels of treatment.

***B. 2. b. Ensure that treatment plans adequately address prisoners' serious mental health needs and that the treatment plans contain interventions specifically tailored to the prisoner's diagnoses and problems.***

<u>Finding:</u>

Partial Compliance

<u>Suggestion:</u>

Continue to work towards providing interdisciplinary treatment plans to all individuals on the mental health case load throughout the facility. Treatment plans are needed for all male, female, and youthful offenders at all levels of care, including acute care, suicide watches and outpatient level of care. These treatment plans need to be developed by a multidisciplinary team, including the prisoner.

***B. 2. c. Provide group or individual therapy services by an appropriately licensed provider where necessary for prisoners with mental health needs.***

<u>Finding:</u>

Partial Compliance

<u>Suggestion:</u>

Group therapies have been conducted in TMH since January 2021. There is a struggle to consistently conduct groups in OJC, which was interrupted by COVID. There is also limited, dedicated group space for Wellpath to conduct groups. There is limited access to confidential space to conduct individual therapy sessions. Cell front visits are not considered therapeutically appropriate treatment for inmates with mental health needs. There may be a need to determine what the needs for the mental health population are, i.e., what services need to be offered, and focus resources until sufficiently able to provide the level of service needed throughout the facility, as a stop gap measure. Continue to provide documentation of data and analysis of numbers and percentages of inmates at all levels of care in need of individual and/or group therapies and counseling as well as the numbers



and percentages of individual and group services offered and received/completed for inmates in need. Provide documentation of attempted individual and group services and reasons for the services not being completed along with wait lists for services, including Disruption of Service forms and corrective action plans to address the issues.

Continue to provide data on the number of inmates who received counseling for sexual abuse, alcohol and drug abuse.

***B. 2. d. Ensure that mental health evaluations that are done as part of the disciplinary process include recommendations based on the prisoner's mental health status.***

Finding:

Partial Compliance

Suggestion:

While this process began in the 13th monitoring period, mental health staff are included in in-hearing observations and screenings rather than consulted to provide a pre-hearing assessment relative to charges. There is also a lack of consistency in ensuring mental health staff are consulted prior to the inmate being moved into disciplinary housing. While Wellpath is working on a policy for mental health assessments as a part of the disciplinary process, OPSO has not signed off on nor has there been consistent implementation of this policy. Training would be required to ensure both parties, Wellpath and OPSO, are working in tandem to ensure inmates do not deteriorate when in disciplinary housing and mental health needs are adequately assessed and addressed.

***B. 2. e. Ensure that prisoners receive psychotropic medications in a timely manner and that prisoners have proper diagnoses and/or indications for each psychotropic medication they receive.***

Finding:

Substantial Compliance

Suggestion:

Continue the partnership with Tulane psychiatric providers as this has made dramatic improvements in the system. Continue to provide documentation and analysis of data to ensure inmates are receiving psychotropic medications in a timely manner, especially upon admission to the facility. If there are delays in an inmate receiving medication, document and create a correction action plan to address the deficiency. Ensure medications are being used to treat the diagnosis on record or there is clear justification in the record for the off-label use of a psychotropic medication.



***B. 2. f. Ensure that psychotropic medications are administered in a clinically appropriate manner as to prevent misuse, overdose, theft, or violence related to medication.***

Finding:

Partial Compliance

Suggestion:

There continues to be challenges with proper observation of medication administration on the units. The lack of consistent mouth checks during pill pass may result in misuse, overdose, theft, and violence related to medication. This provision requires the cooperation of OPSO and Wellpath to ensure policies and procedures are enforced. Corrective action plans may be required to ensure the safety of inmates who are prescribed psychotropic medication, the safety of the pod, and the safety of the staff/deputies assigned to the unit. Further analysis may be needed to analyze the finding of contraband, prescribed and nonprescribed medication, and what corrective plan to put in place to minimize the risks.

***B. 2. g. Ensure that prescriptions for psychotropic medication are reviewed by a Qualified Mental Health Professional on a regular, timely basis and prisoners are properly monitored.***

Finding:

Substantial Compliance

Suggestion:

Continue to provide documentation of data collection and analysis of psychotropic medication prescriptions, including the timeliness between when the prescription is written, and the first dose received by the inmate. There also needs to be documentation if there is a disruption in providing psychotropic medications along with the source of the disruption.

***B. 2. h. Ensure that standards are established for the frequency of review and associated charting of psychotropic medication monitoring, including monitoring for metabolic effects of second-generation psychotropic medications.***

Finding:

Partial Compliance

Suggestion:

With the addition of a laboratory technician, monitoring for metabolic effects of second-generation psychotropic medications has improved. The challenge remains with the prescribing provider being informed of a refusal by the inmate. If the provider is not



informed, the inmate risks not having the labs drawn in a timely manner because the provider was unaware of the need to re-order the labs. Wellpath needs to create and implement a policy enforcing communication to the necessary clinician regarding laboratory refusals/services and put a system in place to ensure timely follow-up.

Findings:

B. 3. a. Partial Compliance

B. 3. b. Partial Compliance

***B. 3. a. OPSO shall develop and implement policies and procedures for prisoner counseling in the areas of general mental health/therapy, sexual-abuse counseling, and alcohol and drug counseling. This should, at a minimum, include some provision for individual services.***

Finding:

Partial Compliance

While there have been more group and individual therapy sessions available in TMH, there continues to be a challenge in providing group and/or individual therapeutic sessions in the general population. There continues to be challenges surrounding dedicated, confidential space to conduct therapeutic interventions, with many interventions occurring at cell side. The exact numbers of inmates who had received services or who were on a waitlist for services was not discussed but will be closely evaluated at the next site visit.

Suggestion:

Continue to track the availability of group and/or individual sessions completed along with the number of inmates in need of services. Continue to track disruptions in service. As stated earlier, assigning a Qualified Mental Health Professional to IPC would help with accurate tracking of referrals and need for service at OJC and TMH.

***B. 3. b. Within 180 days of the Effective Date, and quarterly thereafter, report all prisoner counseling services to the Monitor, which should include:***
***1)     the number of prisoners who report having participated in general mental health/therapy counseling at OPP;***
***2)     the number of prisoners who report having participated in alcohol and drug counseling services at OPP;***
***3)     the number of prisoners who report having participated in sexual-abuse counseling at OPP; and***
***4)     the number of cases with an appropriately licensed practitioner and related one-on-one counseling at OPP.***

Finding:

Partial Compliance



At this site visit, the request to look at the absolute number of inmates in need of these services was requested. This number is not collected, at this time, rather the number of participants in services is collected. In order to determine the need for service and types of services needed, Wellpath needs to know the universe of inmates in need of these services.  A Qualified Mental Health Professional assigned at IPC would assist in determining the absolute numbers of individuals in need of these services and help determine whether the current offerings are sufficient to provide these therapeutic interventions. These numbers could then be analyzed to determine where clinicians may be needed to conduct interventions. Keeping track of wait lists and backlogs helps determine the needs throughout the facility. There are factors at play which continue to preclude achieving substantial compliance with this provision including lack of dedicated, confidential space to conduct these sessions, staffing deficiencies and the pandemic's impact. Just keeping track of those who attend these therapeutic sessions is not sufficient.

Suggestion:

Collect and analyze data concerning the universe of inmates in need of these services and create corrective action plans to address the deficits which may be present at OJC and TMH.

Findings:

B. 4. a.  Partial Compliance

B. 4. b.  Substantial Compliance

B. 4. c.  Substantial Compliance

B. 4. d.  Partial Compliance

B. 4. e.  Substantial Compliance

B. 4. f.  Partial Compliance

B. 4. g.  Substantial Compliance

**B. 4. a. OPSO shall ensure that all staff who supervise prisoners have the adequate knowledge, skill, and ability to address the needs of prisoners at risk for suicide. Within 180 days of the Effective Date, OPSO shall review and revise its current suicide prevention training curriculum to include the following topics:**

    **1)**       **suicide prevention policies and procedures (as revised consistent with this Agreement);**
    **2)**       **analysis of facility environments and why they may contribute to suicidal behavior;**
    **3)**       **potential predisposing factors to suicide;**
    **4)**       **high-risk suicide periods;**
    **5)**       **warning signs and symptoms of suicidal behavior;**
    **6)**       **case studies of recent suicides and serious suicide attempts;**
    **7)**       **differentiating suicidal and self-injurious behavior; and**
    **8)**       **the proper use of emergency equipment.**



Finding:

Partial Compliance

A new curriculum has been created to address this provision. Deputies have yet to consistently utilize the Observation/Restraint Checklist and Worksheet which the MHTs use for suicide watch. It was observed that MHTs were not accurately documenting staggered q15 minute checks on the Observation/Restraint Checklist and Worksheet. The MHTs were doing exactly 15-minute checks, not staggered – for example, one MHT had done a check at 10:57am with the next check at 11:12am. The MHT stated they were asked to do a check at 11:09am, when I was present on the pod, yet wrote 11:12am on the Observation/Restraint Checklist and Worksheet. The checks should be staggered within the 15-minute period rather than every 15 minutes. Deputies are still responsible for approximately 11% of suicide watches in a given month since January 2022.

Suggestion:

Continue training both deputies and MHTs on the importance of staggered 15-minute checks. There continue to be reports of inmates having access to contraband resulting in self-harm behaviors. Analysis of the effectiveness of training is paramount to determine whether inadequate monitoring continues to occur. The upper tier assignments of inmates in OJC need careful scrutiny as there is a risk of self-harm behavior as there are no barriers in place to prevent jumping or hanging from the upper tier. Ensure recommendations from clinicians for level of observation is appropriate for the presenting situation. Peer reviews and supervisory checks may be necessary to ensure proper documentation of suicide watch and observations.

**B. 4. b. Ensure that all correctional, medical, and mental health staff are trained on the suicide screening instrument and the medical intake tool.**

Finding:

Substantial Compliance

Suggestion:

Continue to provide documentation that multi-disciplinary in-service training has been completed annually for all current correctional, medical, and mental health staff to include training on updated policies, procedures, and techniques. All incoming staff should be trained in the suicide screening instrument and medical intake tool during onboarding



orientation.

***B. 4. c. Ensure that multi-disciplinary in-service training is completed annually by correctional, medical, and mental health staff, to include training on updated policies, procedures, and techniques. The training will be reviewed and approved by the Monitor.***

Finding:

Substantial Compliance

Suggestion:

Continue to provide documentation that multi-disciplinary in-service training has been completed annually for all current correctional, medical, and mental health staff, to include training on updated policies, procedures, and techniques. Training will be needed to address deficiencies in communication, especially between OPSO and Wellpath clinicians, and documentation regarding de-escalation procedures, disciplinary process, and searches. Training should clearly delineate responsibilities of various staff member involvement, including during medication pass. Supervisory spot checks may be needed to ensure training is adequate and adhered to during various processes around OJC and TMH.

***B. 4. d. Ensure that all staff are trained in observing prisoners on suicide watch and step-down units status.***

Finding:

Partial Compliance

During the site visit, we discussed the use of the approved Observation/Restraint Checklist and Worksheet not being consistently adhered to by deputies assigned to suicide watch. It was also observed that the MHTs were not accurately completing the document for observation. Deputies have been assigned approximately 11% of suicide watches monthly since January 2022.

Suggestion:

Further training and supervisory observation may be necessary to ensure accurate completion of these documents and a correction action plan to help ensure deputies are completing the correct document.

***B. 4. e. Ensure that all staff that have contact with prisoners are certified in cardiopulmonary resuscitation ("CPR").***

Finding:

Substantial Compliance



<u>Suggestion:</u>

Continue to provide documentation that all current staff, including OPSO and Wellpath, are certified in CPR. At the next site visit, will review the process in place to ensure all staff are appropriately scheduled for CPR so there is no lapse in certification.

***B. 4. f. Ensure that an emergency response bag, which includes a first aid kit and emergency rescue tool, is in close proximity to all housing units. All staff that has contact with prisoners shall know the location of this emergency response bag and be trained to use its contents.***

<u>Finding:</u>

Partial Compliance

During this site visit, the emergency bags were present near the housing units checked. The challenge was the sharpness of the tool and use by the assigned staff member to the control room. The staff member was unable to adequately use the tool to cut a cloth.

<u>Suggestion:</u>

Ensure the cut down tools are adequately sharpened, and staff is trained in the proper use of the tool.

***B. 4. g. Randomly test five percent of relevant staff on an annual basis to determine their knowledge of suicide prevention policies. The testing instrument and policies shall be approved by the Monitor. The results of these assessments shall be evaluated to determine the need for changes in training practices. The review and conclusions will be documented and provided to the Monitor.***

<u>Finding:</u>

Substantial Compliance

The testing instrument was reviewed and one question which seemed to present an issue for a number of the testers was discussed.

<u>Suggestion:</u>

Consider revision of the question.

<u>Findings:</u>

B. 5. a. Partial Compliance

B. 5. b. Partial Compliance

B. 5. c. Partial Compliance

B. 5. d. Substantial Compliance

B. 5. e. Partial Compliance

B. 5. f.  Partial Compliance

B. 5. g. Partial Compliance

B. 5. h. Partial Compliance



B. 5. i.  Partial Compliance

B. 5. j.  Substantial Compliance

B. 5. k. Partial Compliance

***B. 5. a. OPSO shall implement a policy to ensure that prisoners at risk of self-harm are identified, protected, and treated in a manner consistent with the Constitution.***

Finding:

Partial Compliance

While various policies are in place to ensure inmates at risk of self-harm are identified, protected, and treated in a manner consistent with the Constitution, there remains the challenge of consistent implementation. Issues surrounding de-escalation, searches, and referrals remain. The prior Monitor identified limited out of cell time and non-confidential cell front interviews being conducted for inmates on suicide watch. While not completely investigated during this site visit, it is noted the new psychologist has insisted on having a confidential space to conduct suicide watch assessments.

Suggestion:

Monitor whether the psychologist has consistent access to a confidential space to conduct these assessment and document reasons this has not been implemented. Document consistent out of cell time for inmates on suicide watch and create a corrective action if there is not adequate time out of cell. Individuals on suicide watch need intensive treatment interventions including out of cell time, counseling, and therapy, as medically indicated. Document treatment interventions of inmates on suicide watch and any barriers present in not providing appropriate treatment. Document any inmate on suicide watch or in detox protocols who is found with contraband or misuse of supplies.

***B. 5. b. Ensure that suicide prevention procedures include provisions for constant direct supervision of current suicidal prisoners and close supervision of special needs prisoners with lower levels of risk, at a minimum, 15 minutes check. Correctional officers shall document their checks in a format that does not have pre-printed times.***

Finding:

Partial Compliance

Deputies are not using the prescribed Observation/Restraint Checklist and Worksheet consistently. QMHPs/MHTs are not accurately completing the document.

Suggestion:

See comments in B.4.d. Submit documentation for suicide watches in IPC.



***B. 5. c. Ensure that prisoners on suicide watch are immediately searched and monitored with consistent direct supervision until a Qualified Mental Health Care Professional conducts a suicide risk assessment, determines the degree of risk, and specifies the appropriate degree of supervision.***

Finding:

Partial Compliance

The challenge remains with immediate and adequate searches of inmates who are placed on suicide watch.

Suggestion:

Provide documentation that inmates are immediately searched or as soon as safely necessary, with a mental health clinician present when feasible, and monitored with constant direct observation, documented on the Observation/Restraint Checklist and Worksheet, until a QMHP conducts a suicide risk assessment, determine the degree of risk, and specifies the appropriate degree of supervision. Written procedures for searches should be a part of training so each staff member is clear of their responsibilities. Cells should be searched prior to placement of an inmate on suicide watch and documented. Collaboration and proactive communication are necessary between OPSO deputies and Wellpath staff, particularly QMHPs, to meet the requirements of this provision.

***B. 5. d. Ensure that prisoners discharged from suicide precautions receive a follow-up assessment within three to eight working days after discharge, as clinically appropriate, in accordance with a treatment plan developed by a Qualified Mental Health Care Professional. Upon discharge, the Qualified Mental Health Care Professional shall conduct a documented in-person assessment regarding the clinically appropriate follow-up intervals.***

Finding:

Substantial Compliance

Suggestion:

Continue to document if there are access issues to inmates during lockdown procedures at OJC. Document any barrier to having a confidential space to complete these post-suicide watch assessments. Continue to monitor and document follow-up appointments and ensure they are conducted as policy dictates.

***B. 5. e. Implement a step-down program providing clinically appropriate transitions for prisoners discharged from suicide precautions.***

Finding:

Partial Compliance

While there remains no official location for a female step-down unit, there has been identification of a housing unit where a female step-down unit may be placed – 3D. Overall,



confidentiality and adequate space still remains a challenge in providing necessary treatment and follow-up for this population.

Suggestion:

Continued vigilance in creating a space for a female step-down unit. Continued attention to securing confidential spaces to provide adequate treatment and interventions for inmates.

***B. 5. f. Develop and implement policies and procedures for suicide precautions that set forth the conditions of the watch, incorporating a requirement of an individualized clinical determination of allowable clothing, property, and utensils. These conditions shall be altered only on the written instruction of a Qualified Mental Health Care Professional, except under emergency circumstances or when security considerations require.***

Finding:

Partial Compliance

There continues to be questions surrounding whether all inmates are properly searched prior to being placed on suicide watch.

Suggestion:

Document all searches, including whether it occurs prior to or after being placed on suicide watch. Provide documentation of implementation of policies concerning searches of inmates being placed on suicide watch. Provide documentation of individualized determinations of the conditions for watch for male and female inmates at OJC and at TMH. This should include all inmates who are in non-suicide resistant cells and are therefore on direct observation. Provide policy, procedure, and documentation about suicide watches in IPC.

***B. 5. g. Ensure that cells designated by OPSO for housing suicidal prisoners are retrofitted to render them suicide-resistant (e.g., eliminating bed frames/holes, sprinkler heads, water faucet lips, and unshielded lighting or electrical sockets).***

Finding:

Partial Compliance

There are inmates still being housed in non-suicide resistant cells. There were updates and recommended removal of non-suicide resistance fixtures in TMH.

Suggestion:

Continue direct observation of individuals who are housed in non-suicide resistant cells while on suicide watch to best provide for their safety.



***B. 5. h. Ensure that every suicide or serious suicide attempt is investigated by appropriate mental health and correctional staff, and that the results of the investigation are provided to the Sheriff, and the Monitor.***

<u>Finding:</u>

Partial Compliance

<u>Suggestion:</u>

The addition of a psychologist conducting a psychological autopsy on all suicides and serious suicide attempts will help identify not only the security deficits but the clinical deficiencies which may have been present prior to and during the time of the incident. Provide the psychological autopsy and all self-critical analyses which have been conducted for each case. These analyses should include any medical, mental health or other concerns which were not appropriately addressed while the inmate was in the care and treatment of OJC or TMH.

***B. 5. i. Direct observation orders for inmates placed on suicide watch shall be individualized by the ordering clinician based upon the clinical needs of each inmate and shall not be more restrictive than is deemed necessary by the ordering clinician to ensure the safety and well-being of the inmate.***

<u>Finding:</u>

Partial Compliance

<u>Suggestion:</u>

While documentation of suicide watches was not reviewed during this site visit, the prior Monitor was concerned about suicide watches in IPC. There was also concern regarding whether inmates in IPC, who are on suicide watch, should be on staggered 15-minute watches or Direct Observation. Inmates in IPC, who are placed on suicide watch and have yet to be assessed by an QMHP, should be on Direct Observation. This will be further investigated at the next site visit.

***B. 5. j. Provide the Monitor with periodic report on suicide and self-harm at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. The report will include the following:***
   1) ***all suicides;***
   2) ***all serious suicide or self-harm attempts; and***
   3) ***all uses of restraints to respond to or prevent a suicide attempt.***

<u>Finding:</u>

Substantial Compliance

<u>Suggestion:</u>

Continue to provide this report every six months. There was one suicide prior to the site visit in 2022.



***B. 5. k. Assess the periodic report to determine whether prisoners are being appropriately identified for risk of self-harm, protected, and treated. Based on this assessment, OPSO shall document recommended changes to policies and procedures and provide these to the Monitor.***

Finding:

Partial Compliance

There remain challenges in documenting changes to policies and procedures based on analysis of risk at the Facility. There remain issues with adequate searches with inmates having access to contraband. There is also the question of why Direct Observation is not the standard in IPC when an inmate is placed on suicide watch prior to being seen by mental health.

Suggestion:

Provide updated procedures to the Monitor to address outstanding issues with implementation of ensuring risk challenges are adequately addressed. This provision will also require adequate treatment plan creation to ensure all individuals who engage with the inmate are providing a united care front for the inmate.

Findings:

B. 6. a. Partial Compliance

B. 6. b. Substantial Compliance

B. 6. c. Substantial Compliance

B. 6. d. Substantial Compliance

B. 6. e. Substantial Compliance

B. 6. f.  Substantial Compliance

B. 6. g. Substantial Compliance

***B. 6. a. OPSO shall prevent the unnecessary or excessive use of physical or chemical restraints on prisoners with mental illness.***

Finding:

Partial Compliance

OPSO is not consistently and proactively contacting mental health prior to the use of force or needing to implement de-escalation in the Facility.

Suggestion:

Provide documentation of policies in use for planned de-escalation and use of force. Provide documentation to support consistent implementation of the policy and procedures in place to ensure mental health is contacted prior to the use of force, when reasonably



safe. OPSO needs to generate a report for the Monitor documenting all uses of physical and chemical restraints throughout the Facility along with attempts to contact mental health and whether the restraint was planned. Create and submit to the Monitor documentation to determine how many instances of use-of-force incidents occurred over the year prior to the next site visit where mental health was not contacted prior to exercising the use-of-force.

***B. 6. b. Maintain comprehensive policies and procedures for the use of restraints for prisoners with mental illness consistent with the Constitution.***

Finding:

Substantial Compliance

***B. 6. c. Ensure that approval by a Qualified Medical or Mental Health Professional is received and documented prior to the use of restraints on prisoners living with mental illness or requiring suicide precautions.***

Finding:

Substantial Compliance

***B. 6. d. Ensure that restrained prisoners with mental illness are monitored at least every 15 minutes by Custody Staff to assess their physical condition.***

Finding:

Substantial Compliance

***B. 6. e. Ensure that Qualified Medical or Mental Health Staff document the use of restraints, including the basis for and duration of the use of restraints and the performance and results of welfare checks on restrained prisoners.***
Finding:

Substantial Compliance

***B. 6. f. Provide the Monitor a periodic report of restraint use at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. Each report shall include:***
    ***1)    A list of prisoners whom were restrained;***
    ***2)    A list of any self-injurious behavior observed or discovered while restrained; and***
    ***3)    A list of any prisoners whom were placed in restraints on three or more occasions in a thirty (30) day period or whom were kept in restraints for a period exceeding twenty-four (24) hours.***

Finding:

Substantial Compliance

***B. 6. g. Assess the periodic report to determine whether restraints are being used appropriately on prisoners with mental illness. Based on this assessment, OPSO shall document recommended changes to policies and procedures and provide these to the Monitor.***



Finding:

Substantial Compliance

Findings:

B. 7. a. Partial Compliance

B. 7. b. Substantial Compliance

B. 7. c. Partial Compliance

B. 7. d. Substantial Compliance

*B. 7. a. OPSO shall ensure that all staff who supervise prisoners have the knowledge, skills, and abilities to identify and respond to detoxifying prisoners. Within 180 days of the Effective Date, OPSO shall institute an annual in-service detoxification training program for Qualified Medical and Mental Health Staff and for correctional staff. The detoxification training program shall include:*

*1)        annual staff training on alcohol and drug abuse withdrawal;*

*2)        training of Qualified Medical and Mental Health Staff on treatment of alcohol and drug abuse conducted by the Chief Medical Officer or his or her delegate;*

*3)        oversight of the training of correctional staff, including booking and housing unit officers, on the policies and procedures of the detoxification unit, by the Chief Medical Officer or his or her delegate;*

*4)        training on drug and alcohol withdrawal by Qualified Medical and Mental Health Staff;*

*5)        training of Qualified Medical and Mental Health Staff in providing prisoners with timely access to a Qualified Mental Health Professional, including psychiatrists, as clinically appropriate; and*

*6)        training of Qualified Medical and Mental Health Staff on the use and treatment of withdrawals, where medically appropriate.*

Finding:

Partial Compliance

Suggestion:

Assign a mental health clinician to IPC to help identify the universe of patients in need of mental health services – both behavioral health and substance abuse. Reinforce training and supervision to ensure all who make referrals for mental health services are aware of what is expected.

*B. 7. b. Provide medical screenings to determine the degree of risk for potentially life-threatening withdrawal from alcohol, benzodiazepines, and other substances, in accordance with Appendix B.*

Finding:

Substantial Compliance

*B. 7. c. Ensure that the nursing staff complete assessments of prisoners in detoxification on an individualized schedule, ordered by a Qualified Medical or Mental Health Professional, as clinically appropriate, to include observations and vital signs, including blood pressure.*

Finding:

Partial Compliance

*B. 7. d. Annually, conduct a review of whether the detoxification training program has been effective in*



*identifying concerns regarding policy, training, or the proper identification of and response to detoxifying prisoners. OPSO will document this review and provide its conclusions to the Monitor.*

Finding:

Substantial Compliance

Findings:

B. 8. a.  Partial Compliance

B. 8. b.  Substantial Compliance

**B. 8. a. OPSO shall ensure that medical and mental health staffing is sufficient to provide adequate care for prisoners' serious medical and mental health needs, fulfill constitutional mandates and the terms of this Agreement, and allow for the adequate operation of the Facility, consistent with constitutional mandates.**

Findings:

Partial Compliance

There continues to be challenges in securing and retaining adequate numbers of staff, including medical and mental health staff, to provide adequate care for inmates' serious medical and mental health needs. For example, there are insufficient staff to create and complete a multi-disciplinary treatment plan in the outpatient setting where all members of the treatment plan are physically present with the inmate.

Suggestion:

There needs to be adequate funding set aside to hire staff and ensure there is adequate, constitutionally mandated treatment throughout the entire facility. This includes a dedicated psychiatrist for the outpatient (OJC) treatment program who would be available for much needed treatment planning. This includes a recommendation for a dedicated QMHP in IPC to ensure referrals are identified and addressed in a timely manner. This includes having adequate staff to conduct safety/suicide watches, especially while non-suicide resistant cells are still in use. OPSO and Wellpath should consider hiring a psychiatric nurse who could help with proper identification of mental health grievance needs, especially when they are related to medication, and can help with follow up for laboratory refusals, which are vital to adequate treatment from the inmates.

**B. 8. b. Within 90 days of the Effective Date, OPSO shall conduct a comprehensive staffing plan and/or analysis to determine the medical and mental health staffing levels necessary to provide adequate care for prisoners' mental health needs and carry out the requirements of this Agreement. Upon completion of the staffing plan and/or analysis, OPSO shall provide its findings to the Monitor, SPLC, and DOJ for review. The Monitor, SPLC, and DOJ will have 60 days to raise any objections and recommend revisions to the staffing plan.**



Finding:

Substantial Compliance

Findings:

B. 9. a. Partial Compliance

B. 9. b. Partial Compliance

B. 9. c. Partial Compliance

B. 9. d. Partial Compliance

B. 9. e. Partial Compliance

B. 9. f. Partial Compliance

***B. 9. a. OPSO shall develop, implement, and maintain a system to ensure that trends and incidents involving avoidable suicides and self-injurious behavior are identified and corrected in a timely manner. Within 90 days of the Effective Date, OPSO shall develop and implement a risk management system that identifies levels of risk for suicide and self-injurious behavior and requires intervention at the individual and system levels to prevent or minimize harm to prisoners, based on the triggers and thresholds set forth in Appendix B.***

Finding:

Partial Compliance

There continues to be use of non-suicide resistant cells at OJC. There also continues to be staggered suicide watches in IPC rather than direct observation, as there are no suicide resistant cells in IPC.

Suggestion:

Continue analyzing the trends and incidents involving avoidable suicides and self-injurious behaviors to determine required interventions at the individual and system levels to prevent or minimize harm to inmates, especially inmates with repeated suicidal or self-harming behaviors. Consider ensuring any inmate who is not in a suicide resistant cell, especially in IPC, are under Direct Observation and Observation Worksheets are accurately completed.

***B. 9. b. The risk management system shall include the following processes to supplement the mental health screening and assessment processes: incident reporting, data collection, and data aggregation to capture sufficient information to formulate a reliable risk assessment at the individual and system levels; identification of at-risk prisoners in need of clinical treatment or assessment by the Interdisciplinary Team or the Mental Health Committee; and development and implementation of interventions that minimize and prevent harm in response to identified patterns and trends.***

Finding:

Partial Compliance

There is no functional Interdisciplinary Team operating consistently in general



COMPLIANCE REPORT #16                                                    96

population to address formulating a reliable risk assessment. There is limited to no mental health involvement prior to the implementation of the disciplinary process. Segregation is known as a risk factor which negatively interferes with inmates with mental health challenges. Further analysis is needed to ensure processes are in place to address individual and systemic risk levels, especially surrounding risks involved with segregation.

Suggestion:

Analyze and provide documentation of risk management system processes, including listed criteria, which minimize and prevent harm in response to identified patterns and trends. This examination should include the need for functioning interdisciplinary treatment teams throughout OJC who are focused on treatment strategies to minimize risk including adequate out-of-cell time and participation in the disciplinary process at the outset where a written recommendation can be completed and used to determine appropriate action. A dedicated unit for female stepdown will also contribute to minimizing risk factors and improve transition outcomes addressing risk management issues throughout the system.

*B. 9. c. OPSO shall develop and implement an Interdisciplinary Team, which utilizes intake screening, health assessment, and triggering event information for formulating treatment plans. The Interdisciplinary Team shall:*

*1.    include the Medical and Nursing directors, one or more members of the psychiatry staff, counseling staff, social services staff, and security staff, and other members as clinical circumstances dictate;*

*2.    conduct interdisciplinary treatment rounds, on a weekly basis, during which targeted patients are reviewed based upon screening and assessment factors, as well as triggering events; and*

*3.    provide individualized treatment plans based, in part, on screening and assessment factors, to all mental health patients seen by various providers.*

Finding:

Partial Compliance

As discussed at this site visit, there are no consistent, functional multidisciplinary teams operating in person at OJC, due to staffing deficits. The treatment plans were not specifically examined during this site visit and will be during the next site visit.

Suggestion:

Provide a variety of treatment plans, from both OJC, TMH and step-down units, for review of their individualization from various providers. Provide adequate documentation of completion of mental health Interdisciplinary Treatment Team meetings and rounds on both OJC and TMH.



*B. 9. d. OPSO shall develop and implement a Mental Health Review Committee that will, on a monthly basis, review mental health statistics including, but not limited to, risk management triggers and trends at both the individual and system levels. The Mental Health Review Committee shall:*

*1.      include Medical and Nursing Director, one or more members of the psychiatry staff and social services staff, the Health Services Administrator, the Warden of the Facility housing the Acute Psychiatric Unit, and the Risk Manage;.*

*2.      identify at-risk patients in need of mental health case management who may require intervention from and referral to the Interdisciplinary Team, the OPSO administration, or other providers;*

*3.      conduct department-wide analyses and validation of both the mental health and self-harm screening and assessment processes and tools, review the quality of screenings and assessments and the timeliness and appropriateness of care provided, and make recommendations on changes and corrective actions;*

*4.      analyze individual and aggregate mental health data and identify trends and triggers that indicate risk of harm;*

*5.      review data on mental health appointments, including the number of appointments and wait times before care is received;*

*6.      review policies, training, and staffing and recommend changes, supplemental training, or corrective actions.*

<u>Finding:</u>

Partial Compliance

Until there is a functioning Interdisciplinary Treatment Team assigned to OJC, there will be limitations in being able to adequately address at-risk patients in need of mental health case management who may need referral from the Mental Health Review Committee.

<u>Suggestion:</u>

Create and implement an Interdisciplinary Treatment Team for OJC. Provide documentation of Mental Health Review Committee meetings addressing all listed elements, including analysis of all data collected. This data should address and track systemic concerns as well.

*B. 9. e. OPSO shall develop and implement a Quality Improvement and Morbidity and Mortality Review Committee that will review, on at least a quarterly basis, risk management triggers and trends and quality improvement reports in order to improve care on a Jail-wide basis.*

*1.      The Quality Improvement Committee shall include the Medical Director, the Director of Psychiatry, the Chief Deputy, the Risk Manager, and the Director of Training.*

*2.      The Quality Improvement Committee shall review and analyze activities and conclusions of the Mental Health Review Committee and pursue Jail-wide corrective actions. The Quality Improvement Committee shall:*

*a.      monitor all risk management activities of the facilities through the review of risk data, identification of investigation or corrective action; and*

*b.      generate reports of risk data analyzed and corrective actions taken.*

<u>Finding:</u>

Partial Compliance



Suggestion:

Provide documentation of grievance logs for the next site visit to help determine types of grievances being submitted, Healthcare versus environment versus other categories. Provide documentation to support implementation of corrective action plans for areas which have been identified for improvement like medication refusal, AIMS testing, timely access to laboratory services after inmate refusal, and chronic medical care access. Provide documentation of attendance and addressed topics for the quarterly meetings over the past year, up to the next site visit. Demonstrate how collected and analyzed data is being used to effect positive change throughout the system.

***B. 9. f. OPSO shall review mortality and morbidity reports quarterly to determine whether the risk management system is ensuring compliance with the terms of this Agreement. OPSO shall make recommendations regarding the risk management system or other necessary changes in policy based on this review. The review and recommendations will be documented and provided to the Monitor.***

Finding:

Partial Compliance

Suggestion:

Awaiting psychological autopsy of most recent suicide to determine whether there are self-critical aspects to a suicide investigation, both clinical and security, which would help determine needed changes to the risk management system. Provide the most recent report from OPSO to determine whether there is compliance with the terms of this Agreement. Requesting information on what changes have been recommended over the year, prior to the most recent site visit, in regard to the risk management system from OPSO. Provide corrective actions plans which have been created and implemented over the year, prior to the most recent site visit, to help determine whether changes are being made and impacting the risk management system at OJC.

**C.    Medical Care**

Methodology:

Record reviews for October 2021 through March 2022.

Medical record reviews

Grievance reviews

Medical record review and testing of clinical performance measurement.

Compliance analysis report reviews.



<u>Observation:</u>[11]

Communication between medical and custody staff needs to improve so that there is a checklist and process,[12] a strategy or procedure, to get things done that need to be done. A checklist would list the vital activities of the night and day that need completion for example, if lockdown interrupted the collection of sick call requests, the checklist would activate a process for the morning team.  The checklist idea resulted in almost a perfect record in aviation and in the specialty of anesthesiology. It is a tool for improvement of communication and systems.

Patients transferred to the emergency department represent patients with serious medical needs. Currently, it is uncommon for providers to make a contemporaneous entry into the medical record describing the circumstances that lead to transfer to the emergency department.  Every patient transferred to the emergency department should have a timely provider note in the medical record. This note should describe the circumstances that lead to transfer. The transfer note is not a substitute.  Every transfer to the emergency department should be reviewed by the physician. For morbidity mortality and Improvement (MMI), also called continuous quality improvement (CQI), the care should be discussed. Improvement initiatives should be firmly delineated.

The lack of privacy for sick call is unacceptable. Sick call should not be a public event. Currently, sick call is in front of personnel coming and going and in front of other inmates as they peer through the doors.

Lockdowns may be necessary for a housing unit but there must be a contingency plan to get an individual to an appointment, or to get practitioner or lab technician to the patient. An electronic list of the appointments should be visible to custody. This was recently instituted at Louisiana State Penitentiary, so custody knows who is expected to be where and when.

Prolonged malfunction of the electronic Tiger system contributes to inefficiency and incomplete communication with patients.  The broken electronic system severely impairs the sick call request system.

Medication administration still does not meet compliance. This may have in part to do with training.  Training needs to be improved. Some case examples would engage the

---

[11] In this report Provider indicates a Nurse Practitioner or Physician
[12] The Checklist Manifesto, How to Get things Right. by Atul Gawande



learner. The Monitor witness "refused" being recorded when the patient was at the hospital, and when the patient does not come to the medication cart, even when the patient is sleeping through the shout out. Medications are sometimes "in transit" and not on the medication carts.

Providers need to see the patients at all times of day.  Providers are not timely examining and documenting physical exams and medical decision making. There is a great deal of reliance on the LPNs and LVNs as demonstrated in the examples. Providers are practicing too often by telephone based on lesser trained individuals' reports. There is insufficient involvement in the clinical care of the patients by the nurse practitioners.

The system of care is unwieldy resulting in inefficient use of time. The clinic must be opened to the patients. The patients need to be brought to the clinic. At this time, providers sit at computers in their offices, take notes on the patients, go to the housing units to see the patients, come back to the office and document in the office computer from notes and memory; this is inefficient. The medical records are incomplete.  Providers must have the patients 'chart open during an encounter. The Monitor noticed that patients with more than one medical problem such as diabetes and hypertension and hepatitis, do not have their problems addressed cohesively.

The structure of the electronic health record needs to tell a cohesive story of the patients care. The work between providers is unevenly distributed. This must be addressed by the physician and the regional medical director.

<u>Sick call:</u>

Custody staff are inconsistently available to facilitate patients' access to medical care.[1314] The controlling document in this case is the Consent Judgment. The NCCHC description regarding unreasonable barriers to inmates' access to health service to avoided describes succinctly the barriers to care at OPSO. Medical staff attribute problems delivering medical care to staffing shortages or to custody operational short comings. For

---

[13]

 I haven't recieve my meds is going on 12:00am the next day and no one has come to do med pass. We have no one in the booth no deputy on duty or a captain on the 4th floor. We need our Meds No one is there - Paper Request Response: Good morning, sir. According to your medication record, you received your medication that night. I apologize if there was a delay, but as you are aware, medical must have security with them to administer care on the pods.

[14] NCCHC Standard J_A_01 access to care. Discussion Unreasonable barriers to inmates: access to health services is to be avoided and include "having an understaffed, underfunded, or poorly organized system with the result that it is not able to provide appropriate and timely access to care,



example, "delayed booking times "are listed as one a disruption not within Wellpath's control.[15] However, medical care is Wellpath's responsibility regardless of delays in booking. As long as medical care is not reaching the patients, the rating here will be partial or non-compliance regardless of the responsible party.

Paper health service requests (sick call) are inconsistently gathered from the housing units or received within 24 hours. Chart reviews confirmed that this is a recurrent problem.  On our site visit, the unit had been on lockdown and the overnight medical staff was unable to access the tier to pick up the paper requests from the boxes. Urgent sick call notes are not signed dated and timed. In March 2022, only 50% of the weekend urgent care sick call requests had the encounter note signed, dated, and timed. [16] The electronic request system, known as the "Tiger" system, has many broken computer consoles making paper sick call system vital.   The paper-based system requires that a patient request a paper form.  On the morning of the site visit, neither custody nor the medication administration nurse had the form. While we waited, a form was brought to the patient. One of the patients did not have a working pen. She was told to request one.

There is lack of privacy for sick call. During our site visit, the Monitor observed sick call for females being conducted in the passageway where other inmates were looking through the windows and people passed in and out of the housing unit. No meaningful physical examination can be conducted with a patient standing outside of the security booth. This does not meet the standard for privacy of care. [17]

Lockdowns result in patients not attending medical appointments. Lab technicians are not allowed access to patients to obtain ordered lab tests. Health care requests are not gathered and triaged timely due to lockdowns.

Example 1: "You received your medication that night. I apologize if there was a delay, but as you are aware, medical must have security with them to administer care on the pods."

Example 2: "There was documentation that wound care was not completed due to a security issue, Remember, medical cannot perform duties if facility is on lockdown. Medical will do everything in our power to complete your wound care. "

Example 3:

---

[15] December 12, 2021, site specific CIWA Time study
[16] CQI graphs March 2022 Urgent care sick call-weekend shifts
[17] NCCHC J-A-07 No conversations concerning a patient's health status, diagnosis or treatment should be conducted in areas where they can be overheard by other inmates, staff, or visitors.



> *Multiple attempts to perform wound care today.  09:13 AM (no deputy), 09:25 AM (In court), and 2:23 PM (No deputy) available.*

## Medication Administration:

Consistent medication administration is essential. More effort must be made to have patients come to the medication cart. To receive medications during medication administration on the tiers.  On the monitor site visit, the Monitor suggested the medication nurse shout for the patients a second time; four more patients came to receive their medications.

Mouth checks during medication administration were inconsistently performed. Patients were surprised by mouth checks indicating it was unexpected. By Wellpath policy [18] it is the Qualified Health Professional who should be doing mouth checks. One patient took the medication in his mouth and spit it out in the trash. Another person left the pill in the cup. Hoarding is problematic and some patients require emergency transfer due to intoxication with medication prescribed to them or to others. Confiscated medications illustrate the importance of diligence with regards to medication administration. [19]

## Medical Records:

When walking to the housing units to see patients, nurses and practitioners do not have the patient's medical record.  The practitioners review the medical record while in their offices in front of the computer, make notes, go to see the patients away from the medical clinic, make more notes regarding the encounter, go back to their offices, and enter notes into the desktop computer. Questions that arise during a clinical encounter cannot be addressed by looking into the medical record contemporaneously.[20]

Progress notes in ERMA, the electronic medical record (EMR) are arranged such that medical personnel must navigate excessively to paint the picture of the history and the state of the patient's health. Going in and out of medical record encounter dates results is cumbersome. It is time consuming and does not allow for a seamless review of the medical progress note, comparisons of lab values and progression of illness. [21]

Medical records reflected notes that focused on the problem of the day and did not

---

[18] HCD-100_D-02 Medication Services Reference 55436
[19] Confiscated Meds Q4 2021
[20] NCCHC J-A-08 Health records specifically address this issue in the discussion. Having health record available for each patient encounter enhances continuity of care, facilitates early and correct diagnosis.
[21] NCCHC J—A-08 Health Records. Users should be able to retrieve data by diagnosis.



address other problems on the Problem List. For example, the Monitor found in the review of charts that if diabetes was being addressed and the patient had elevated liver enzymes, the liver problem was unaddressed. The care is fragmented, and medical problems are not addressed.

ERMA medical records do not contain sufficient medical documentation of care rendered at UMC. As providers at OPSO have access to EPIC of UMC, I would expect to see a real summary of what happened at the hospital. EPIC records from UMC are inconsistently scanned into the medical record. Patients are transferred to UMC emergency, and no provider notes address the condition of the patient at the time of transfer.

Clinic Space:

The clinical space is an excellent space to see patients. Patients should be seen in the clinic for medical appointments. At the time of our visit, except for dental appointments, patients were not being brought to the clinic to see the practitioners in their clinical offices.  The offices are medical exam rooms. These rooms offer the medical record on the desktop computer, greater privacy, and a professional environment. COVID is not a reason to continue to see patients on the housing units. Lack of custody staff to bring the patients to the providers is an unacceptable excuse.[22]

Formulary:

Commonly prescribed medications should be available on site. Inmates entering the facility on verifiable prescription medication continue to receive the mediation in a timely fashion. The formulary should have the direct acting anticoagulants. Patients who present on these drugs need to receive them. The Monitor addressed the problem of no Direct Acting Anticoagulants with medical leadership in August 2022 and has been assured that this problem has been rectified.

Chronic care:

The Monitor appreciates the work done on the "tool kit" parameters that the previous monitor put forth. This has resulted in performance improvements in areas of medical care addressed by the "tool kit". Hemoglobin A1C is not consistently monitored, and this is a recognized area for improvement.  The Monitor is most concerned about insulin dependent diabetes care. Insulin dependent diabetic patients must receive their

---

[22] NCCHC J-D-06 When required for security purposes, custody administration ensures that personnel are available to escort patients from housing to clinic areas for their scheduled appointments.



insulin timely. To the extent that there is success with timely treatment of alcohol or opiate dependent patients, the Monitor would like to see this type of attention for the administration of insulin and the glucose measurements. The mealtimes and the before meals insulin administration leave diabetics without coverage from the late afternoon to the next morning. This must be addressed.

Acute Care:

Patients admitted as inpatients to UMC hospital represent patients with serious medical needs. Therefore, focus on these patients and the circumstances that preceded hospitalization is warranted. The Monitor found care insufficient and delayed before the transfer of patients to the hospital. There is insufficient involvement with providers in medical care. There is poor medical record keeping around the time of transfer. Providers did not see these patients timely at the time of deterioration. [J]

The Monitor has included examples from emergency department admissions. However, there were other chart reviews by the Monitor that demonstrated insufficient medical care preceding the transfer to the emergency department. The Monitor expects to see Morbidity, mortality, and improvement or CQI reviews for these patients and corrective action.

Example 1 Patient K.M.:  In the below example, the patient was evaluated by a licensed vocational nurse (LVN) on December 14, 2021.  The patient was not seen by a provider for two more days. There were telephone orders from the Nurse Practitioner without an in-person examination. This patient should have seen a provider on December 14th. The patient was complaining of abdominal pain and had vomited breakfast. The nurse practitioner/ vocational nurse called the nurse practitioner. The nurse practitioner should have evaluated the patient. She did not. No doctor evaluated the patient either. Orders and wellness checks were ordered. No wellness checks were performed. He was sent to the emergency department on December 17th. The provider wrote a late entry note on December 18th. The patient spent six days in the hospital for pancreatitis caused by gallstones. [23]

---

[J] NCCHC J-D-07 Emergency Service and Response Plans

[23] Clinical Course in Jail: Notes



Example 2 Patient C.M.:  This is another example of insufficient provider involvement in the case and insufficient medical documentation. This patient was admitted for four days in October and again in November.  The diagnosis was gastrointestinal bleeding and sepsis. Before emergency transfer, vital signs were not performed, and a provider did not write a note. No provider notes were filed timely at transfer.  Inadequate care was evident preceding the second hospitalization. On November 1 the patient had no vital signs obtained and recorded. Wellness checks were ordered but there is no evidence of wellness checks in the medical records. The patient went into acute kidney insufficiency. [24]

---

*Added 12/14/2021 04:45 PMLPN/LVN*
*Patient brought to Medical via wheelchair for C/O vomiting with abdominal pain. Patient states he has been vomiting all day, since after breakfast this morning. Patient indicates pain to be in epigastric region. Abdomen soft, with active bowel sounds heard. Patient is fidgety, going from squirming around in wheelchair to pacing floor around wheelchair. NP\*\*\*\*\* notified, and order given for Meclizine 12.5mg BID PRN X 2 days; IBU 400mg 90minutes after Meclizine; Welfare check Q12 hrs. X 1 day and a KUB on Thursday. States he feels like he needs to have a bowel movement. Escorted to dorm, but when he returned, he stated he was unable to have a bowel movement. Patient states he didn't eat much of his breakfast this morning, also says it may be from the hookup they ate last night. He is asking for something to make him have a bowel movement. Called and informed Dr.\*\*\*\*\* of his request. Order given to give IBU 400mg 1 PO now and MOM 30cc PO now.*
*Added 12/14/2021 11:49 PM RN*
*Medical called to 4D at approx. 9:15 pm, when medical arrived on tier pt. was laying on the ground with a blanket under his head. The pt. was able to get up on his own and get in the wheelchair to be taken to the 2nd floor main clinic. Pt states he did not hit his head but can't remember how he ended up the floor. Pt states he was feeling nauseous and hasn't been able to eat or drink anything without vomiting and he hasn't had a bowel movement in a few days. Pt was given Gatorade, Meclizine and waited in the clinic for 30 min. Pt tolerated both*

[24] First Hospitalization
Labs collected on September 29, 2021, and received September 29, 2021, at 12 am. Date and time of report October 1, 2021. Never acknowledged by a provider
October 1, 2021, seen in clinic by provider: Patient looked okay, but no vital signs recorded.
Sick call October 3, 2021, received October 3, 2021*: "patient states he has been vomiting".*
October 4, 2021, LVN note.  *"Seen by provider"* However, there are no provider notes
October 4- 8 hospitalized
Next provider note is October 12, 2021, as a post hospital admission return. patient admitted to the hospital from October 4, 2021, to October 8, 2021*. Assessment" GI bleed and sepsis resolved. Hospital records reviewed".*
Second hospitalization
November 1, 2021, not eating and drinking for 2 days no vital signs recorded.
Medical record plan*: "For 72 hours do every 4 hours wellness checks full set of vital signs. Please. Have deputy assist in hygiene care. RTC next Friday"*



Example 3 Patient R.S.:  This is an example of a delay to care and insufficient involvement of providers and poor medical record keeping.  This mentally ill patient lay naked in urine and had not consumed food or water for 48 hours. No provider examined the patient or wrote a medical note. The patient was hospitalized and had a perforated ulcer and surgery. [25]

Example 4 Patient M.D.:  In this example, ordered medications and ordered follow-up were not provided. This patient was admitted to the hospital for four days, from January 13-17, 2022. Upon return from the hospital, the patient did not receive the valproate (Depakote) as ordered. This is despite the patient having had a stroke code called for hemiplegic migraine. This is a serious diagnosis and deserves ordered medications and ordered neurologic follow up. No one month follow up appointment with UMC neurology as ordered by UMC. [26]

---

There was no evidence in the medical record of this plan occurring.
Labs collected on November 3, 2021, and reported November 4th, 2021, are critically increased and abnormal.  BUN is now 34 and creatinine is 3.24.
November 4th 10:48pm: LVN note is" *patient states that last time he urinated 3 days ago patient refused out get out of bed.*  No vital signs recorded
November 5th 3:30am. No vital signs recorded.  *"Patient would not move or take cup of water refused to let nurse take vital signs. Refused blood sugar check."*
Admitted to the hospital on November 11,2021
Patient sent to the hospital. No notes concerning this.
Next note is November 17, 2021, return from hospital.

[25] Clinical course in jail: Notes
*12/28/12 @ 2000: Pat was lying on the floor most of the night. He was naked and just lying on supine position on the mattress on the floor. Resp even and unlabored. His skin looks so dry. He just makes mumbling sounds. Refused medication. Unsteady gait. Safety measure in place. Will continue to monitor.*
                    *___RN*
*Patient observed lying naked, prone in urine, refusing to follow verbal commands from nursing or security, notified Medical Director (Dr.***) and LPC (***) of declining mental/physical health of patient.  Patient refuses to take prescribed medication, blood glucose checks, and per security report, patient hasn't consumed food or water within last 48 hours.  Order initiated to route patient to UMC for further evaluation/treatment, notified Captain **, security escort secured, and patient transported via custody car.*

[26]
*Jan 18, 2022, progress note provider return from hospital note*
*Sepsis due to gastroenteritis, stroke activated on Jan 14 for headache with right blurred vision and right hemiplegia. Ct negative*



<u>Example 5 Patient A. L.:</u>  This is an example of insufficient provider involvement with a patient in pain and no medical documentation by a provider. The patient complained that his gunshot wound had severe pain and a drain. The drain in place in the patient's body was leaking green stinky fluid. The registered nurse contacted a provider and antibiotics were initiated and an appointment with a provider was made. No provider examined the patient that day. There is no documentation around the time of transfer and no evidence a provider examined the patient. The patient was sent to UMC emergency department on October 26th. The diagnosis was intraabdominal abscess. [27]

<u>Example 6 Patient A.B.:</u>  This example demonstrates inadequate medical care with a delay in transferring to the hospital. This patient had a history of bleeding ulcer with a recent hospitalization requiring the administration of blood and a procedure to stop the bleeding. Nevertheless, though this history was known, the patient was not seen by a provider when he filed a sick call request on October 22 in which he reported bleeding from the stomach, blood in the stool and throwing up blood. He was scheduled with a nurse for wellness checks.

This demonstrates dangerous health care as the patient became hypotensive with tachycardia (a fast heart rate) before being transferred to UMC emergency department. He arrived in hemorrhagic shock. [28]

---

[27] Admitted to UMC on October 26th, 2021
Per Excel sheet for pancreatic duct leak
Clinical Course in Jail: Notes
October 23, 2021, RN good note
October 24, 2021, sick call request 4pm through Tiger system: "*my gunshot wound has severe pain, and my lung bag is leaking green stinky fluid:*"
October 24, 2021, 10:56pm; Response from RN
You have been ordered metronidazole and scheduled to see the provider
EMAR indicates metronidazole administered timely
October 26th, 2021, transfer note to UMC emergency department by custody care
October 25, 2021, Progress note provider 4pm
S: 38-year-old male seen on tier for follow up UMC hospitalization
November 3, 2021, back to the hospital
November 3, 2021, UMC notes
Diagnosis intrabdominal abscess

[28] Admitted to the hospital on October 24, 2021, Sunday
October 20, 2021P, 7:29am. Progress Note by RN "Patient seen in clinic for complaint of not feeling well. Found in cell with wet clothing. VSS" States **he has a history of bleeding ulcer in which he was in the hospital recently and received 7 pints of blood.**



Example 7 patient IB:  This is an example of insufficient provider examination and involvement in a patient with a serious medical condition. It is another example of a patient not receiving ordered medication timely. The patient arrived in the jail on Feb 16, 2022. She had just been released from an outside hospital. She had spent Feb 13-15th in that outside hospital with a serious complication of diabetes known as DKA, or diabetic ketoacidosis. No long-acting insulin was ordered when she arrived at the OJC. She became unable to tolerate fluids and unable to ambulate. This patient was critically ill on Feb. 16th but was not transported to the hospital timely. The patient had chest pain and diabetes and waited in the clinic. She could not take fluids and was ordered hydrated. There is no record that the patient was given intravenous fluids. No record by a provider around the time of the illness on February 16th was found. The Monitor did not see a Morbidity or CQI report concerning this case. She could have died. She was sent to the hospital. Upon return from the hospital, again she did not receive insulin timely. The chest pain she had experienced for which she was waiting in the clinic was diagnosed as blood clots in both lungs. (Bilateral pulmonary emboli) This is a life-threatening condition for which she did not receive ordered anticoagulation (apixaban) upon return to OJC. [29]

---

**October 22, 11:38am; Health service request**
**"Bleeding from stomach, blood in stool throwing up blood. No further documentation**
**October 23, 2021, 10:23am: Health services Request #2 Now there is a triage urgent: weak**
**unsteady gait. Immediate intervention needed "yes" Put on wellness checks**
**Scheduled with nurse:**

October 23, 2021, ER referred to hospital by Dr. Blake.  Blood pressure 90/68 pulse 127

October 24, 2021, hospital notes
HPI: History of gastric ulcers July 2021 treated with clips and epi found to be secondary to H pylori.
Vital signs on arrival: triage blood pressure 93/67. Pulse 122

Hospital findings; Acute upper Gastrointestinal bleeding

[29] Medical record:
　　　　NP*** give SS coverage, scheduled coverage, dip urine, and hydrate pt.  Inmate
　　　　received a total of 13 units, 3 unites NovoLog aspart, 10 units Regular.  Urine was
　　　　collected at this point.  Urine was dipped at 1630, **+**3 ketones and +4 glucose
　　　　present in urine.  2nd floor medical was also called by deputy*** stating inmate is
　　　　now unable to ambulate and c/o chest pain.  Inmate was escorted to 2nd floor
　　　　medical by Deputy *** EKG obtained, sinus tach, and CBG was rechecked at 495 of a
　　　　reading.  (Same NP called again) was called and a voicemail message was left



*C. OPSO shall ensure constitutionally adequate treatment of prisoners' medical needs. OPSO shall prevent unnecessary risks to prisoners and ensure proper medication administration practices. OPSO shall assess on an annual or more frequent basis whether the medical services at OPP comply with the Constitution. At a minimum, OPSO shall:*

*1. Quality Managing of Medication Administration:*

> *a. Within 120 days of the Effective Date, ensure that medical and mental health staff are trained on proper medication administration practices, including appropriately labeling containers and contemporaneously recording medication administration;*
>
> *b. Ensure that physicians provide a systematic review of the use of medication to ensure that each prisoner's prescribed regimen continues to be appropriate and effective for his or her condition;*
>
> *c. Maintain medication administration protocols that provide adequate direction on how to take medications, describe the names of the medications, how frequently to take medications, and identify how prisoners taking such medications are monitored; an*
>
> *d. Maintain medication administration protocols that prevent misuse, overdose, theft, or violence related to medication.*

<u>Findings:</u>

C.1. a.   Substantial Compliance

C. 1. b.  Partial Compliance

C. 1. c.  Substantial Compliance

C. 1. d.  Partial Compliance

Medication administration protocol and practice is not resulting in preventing misuse and overdose.

*C.2.a. Provide the Monitor a periodic report on health care at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. Each report will include:*

> *(1) number of prisoners transferred to the emergency room for medical treatment related to medication errors;*
>
> *(2) number of prisoners taken to the infirmary for non-emergency treatment related to medication errors;*
>
> *(3) number of prisoners prescribed psychotropic medications;*
>
> *(4) number of prisoners prescribed "keep on person" medications; and*
>
> *(5) occurrences of medication variances.*

*C.2.b. Review the periodic health care delivery reports to determine whether the medication administration protocols and requirements of this Agreement are followed. OPSO shall make recommendations regarding the medication administration process, or other necessary changes in policy, based on this review. The review and recommendations will be documented and provided to the Monitor.*

---

informing of such. (Another NP) was also called and informed of such, per (this NP) call Dr. *** for orders to root out.  Dr. *** was called and informed of such, per Dr. ***route out by EMS, administer 6 units, c/o chest pain.  Awaiting EMS



Findings:

C. 2. a.  Partial Compliance

C. 2. b.  Partial Compliance

C. 2. a.   Partial Compliance

There is no report and the medical records do not contain adequate notes to ascertain medical treatment related to medication errors or medication variances. The is no report describing the patients taken to the infirmary for nonemergency treatment related to medication errors.

C. 2. b.  Partial Compliance

Administration of first dose medication on the CIWA protocol is delayed. Eliminating barriers not within Wellpath's control does not make 67% an acceptable percentage for patients in need of medical treatment. In 2/10, the delay was due to only one nurse. In 3/10 the delay was due to delayed booking. When it takes 20 hours to book a person, that person's medical conditions must still be addressed. Alcohol withdrawal is a potentially life-threatening condition, unlike opiate withdrawal. Wellpath must have a policy and procedure to address the medical treatment of inmates with delayed booking. This is true of concern for patients dependent on insulin too.  The delays in booking could result in delay to the administration of insulin.[30]

Providers are not being advised of patients missing medication.  From the CQI "Notification of prescribing clinician of poor adherence to medication orders, including psychotropic and non-psychotropic medication on three consecutive days or four or more doses in a week" measurement was somewhere between 40-60% in March 2022. [31]

*3.a. OPSO shall notify Qualified Medical or Mental Health staff regarding the release of prisoners with serious medical and/or mental health needs from OPSO custody, as soon as such information is available.*
*3.b. When Qualified Medical or Mental Health staff are notified of the release of prisoners with serious medical and/or mental health needs from OPSO custody, OPSO shall provide these prisoners with at least a seven-day supply of appropriate prescription medication, unless a different amount is necessary and medically appropriate to serve as a bridge until prisoners can reasonably arrange for continuity of care in the community.*
*3.c. For all other prisoners with serious medical and/or mental health needs who are released from OPSO custody without advance notice, OPSO shall provide the prisoner a prescription for his or her medications, printed instructions regarding prescription medications, and resources indicating where prescriptions may be filled in the community.*
*3.d. For prisoners who are being transferred to another facility, OPSO shall prepare and send with a*

---

[30] CIWA time study November and December 2021
[31] Medication refusal January through March 2022.



*transferring prisoner, a transition summary detailing major health problems and listing current medications and dosages, as well as medication history while at the Facility. OPSO shall also supply sufficient medication for the period of transit for prisoners who are being transferred to another correctional facility or other institution, in the amount required by the receiving agency.*

Findings:

C. 3. a.  Substantial Compliance

C. 3. b.  Substantial Compliance

C. 3. c.  Substantial Compliance

C. 3. d.  Substantial compliance

Transfers to the emergency department should have more up to date information concerning the history of present illness and past medical history.

Recommendations:

1.   All emergency department transfers for medical illness should have a CQI analysis of care and documented physician review. CQI analysis reports include areas of positive success and trends and areas of opportunity.  The corrective action should be monitored for its efficacy.  As an example, the CQI analysis for chronic care hypertension identified corrective action and intervention. The Monitor did not see a measurement of the success of the corrective action and intervention. [32] Monitoring after the implementation of improvement strategies is necessary.[33] Outcome and improvement study is initiated and documented. [34]

a.   The Electronic Health Record needs software improvements and updates. Wellpath should meet with the ERMA software engineers and build out improvements. These include an "In basket" that forces review of lab results and note completion. Alerts for certain labs due come into the provider in basket. Systems should be built into the electronic medical record such that medication levels and acknowledgement are flagged, and they must be acknowledged before proceeding.  The electronic medical record should prompt the provider to sign, date, and time the sick call note. This measure is at 50% currently. [35]

2.   Upgrading scores in CQI reports due to barriers not within Wellpath's control is unacceptable and counterproductive to the goal of improving patient care and meeting

---

[32] Quarterly report Q2 2022
[33] NCCHC Standard J-A. -06. 5.e. Continuous quality improvement program.
[34] NCCHC Standard J-A-06
[35] 2022 CQI graphs sick call weekend shift March 2022



substantial compliance. Wellpath's responsibility is the provision of medical care to the patients. The Monitor recommends formulating a policy and procedure to address and eliminate this barrier. A policy is needed to address the "only one nurse "and "prolonged booking process". [36] [37]

3.   CQI analysis should include the patient's time of writing/submitting the sick call to the time of receiving the paper sick call. Make fixing the computerized sick call system a priority.

4.   Morbidity and mortality improvement (MMI) review be conducted on every patient sent to the emergency department and admitted. This will identify areas of improvement in patient care. [38]

5.   Site level approval for medications and referrals for outside visits are critical to the timely continuity of care. The physician on site should be able to order care that is necessary without the delay of outside approval. From the site visit, the Monitor knows that the practitioners have developed workarounds to necessary care for patients. It should never be necessary to work around to get timely and necessary care for a patient.

## IV.    D. 1. Sanitation and Environmental Conditions

Findings:

D.1. a.   Partial Compliance

D. 1. b.  Substantial Compliance

D. 1. c.   Substantial Compliance

D. 1. d.  Non-Compliance

D. 1. e.  Substantial Compliance

D. 1. f.   Partial Compliance

D. 1. g.  Substantial Compliance

D. 1. h.  Substantial Compliance

***IV. D. 1. a. OPSO shall provide oversight and supervision of routine cleaning of housing units, showers, and medical areas. Such oversight and supervision will include meaningful inspection processes and documentation, as well as establish routine cleaning requirements for toilets, showers, and housing units to be documented at least once a week but to occur more frequently.***

---

[36] CQI November 10, 2021: Purpose: To track the process effects on the CIWA protocol
[37] CQI December 12, 2021:
[38] ER routes November -December 2021
October and November CM admitted twice, sepsis, renal failure esophagitis
December: K.M.: Pancreatitis not provider assessment for two days. Lethargic mentally unstable admitted and found to have perforated ulcer.
.



<u>Finding:</u>

Partial Compliance

<u>Observations:</u>

The Monitor physically inspected every occupied housing unit in the OJC and TDC/TMH facilities. The Monitor observed the overall level of cleanliness in the housing units to be generally acceptable with the exception of the janitor closets in several OJC housing pods.  The Monitor was advised that a new procedure consolidating all cleaning supplies outside of the units had been implemented. The Monitor recommends any necessary repairs and cleanup in the janitor closets be accomplished prior to closing the closets to regular use. Maintenance and/or Life/Safety should still inspect the closets routinely to ensure continued serviceability, particularly lighting, water service and drains. The Monitor also interviewed the OPSO Sanitarian and Environmental Officer as well as inmates and staff during the inspection itself.

OPSO did not provide a cleaning schedule and weekly inspection documentation as required. The Sanitarian advised that due to the lack of inmate workers, responsibility for routine cleaning of pod areas continues to rest with security staff as noted in the previous two inspections. The twice-monthly environmental inspection reports were not available for review. The cleanliness in the open dorms was acceptable.

During the tour, inmate showers were specifically viewed by the Monitor. As with the previous tour, the majority of the showers appeared to be generally clean and free of trash, soap residue and drain flies. Some residual condensation was noted in several showers that had recently been in use.

On the day of the inspection, the Monitor found one housing unit having more than 50% of the cells (lockdown unit) with obstructed air supply vents. None of the unit janitor closets were found unsecure. Several maintenance and cleanliness issues were noted in some of the closets. OPSO staff advised that all cleaning chemicals and supplies had been consolidated outside the housing units, obviating the need for chemical dispensers and inmate access to the closets. Inspecting staff should be diligent in performing unit cleanliness inspections going forward to ensure the success of the new procedure.

During the previous three inspections, the Monitor noted several lighting fixtures in the mop closets had been removed and had been advised that inmates had been tampering with the lights by removing the mounting "rods" (all-thread) that secured the



lights to the ceilings. The majority of the light fixtures had been replaced as of the May 2021 inspection, however, at least two remain "tied" to the ceiling posing a safety issue and an obvious maintenance deficiency. The Monitor noted clutter issues in most housing pods, typically involving the improper storage of inmate property in cells and dormitories. The Life-Safety inspection reports during the rating period noted similar issues.

The documentation reflected the Sanitarian and Environmental staff's efforts at maintaining consistent, regular cleaning schedules for circulation areas under the COVID pandemic restrictions and staffing challenges has improved significantly since the last inspection. The issue with the floor condition in the dental office noted during the last inspection was remedied.

Grievances regarding sanitation issues were minimal during the rating period. Inmate reports via grievance of inadequate or missing cleaning supplies were consistently low however this was an issue noted in the notes of a few of the "town hall" meetings conducted by the Sanitarian in the housing units. The Monitor received few verbal complaints from the inmates during the walk-thru regarding chemical availability and chemical inventory/inspection documentation reflected routine resupply of chemicals was occurring.  The material safety sheets were in order in each area inspected.

As previously noted, regular provision of clean inmate clothing and bedding and appropriate inventory of these supplies are essential to sanitation, infection control and disease prevention. The Sanitarian reported that she was able to maintain an adequate supply of inmate clothing for issue and exchange and that the laundry vendor's performance was acceptable. The Monitor observed fewer instances of hording issued clothing items and blankets during this inspection although, again, there were a few examples. The altered clothing (homemade "hoodies") observed during the last inspection was less prevalent during this inspection but still persists.

The Monitor noted that the washers and dryers appeared to be in working condition throughout the facility at the time of the inspection although at least one unit had both the washer and dryer removed for an extended period of time according to inmates. Several inmates complained to the Monitor about inoperable equipment and a lack of access to the washers/dryers. The Monitor noted few damaged or missing dryer vent hoses.

*IV. D. 1. b. Continue the preventive maintenance plan to respond to routine and emergency*



*maintenance needs, including ensuring that showers, toilets, and sink units are adequately installed and maintained. Work orders will be submitted within 48 hours of identified deficiencies, or within 24 hours in the case of emergency maintenance needs.*

Finding:

Substantial Compliance

Observations:

As with previous inspections, the Monitor reviewed the Sanitation and Environmental Conditions report, the OPSO Preventive Maintenance Plan, the Preventive Maintenance Schedule Summary report, and a Preventive Maintenance work orders status report as well as inmate grievances related to maintenance issues. The Monitor also interviewed the Maintenance Director. The documentation reflected an on-going preventive maintenance program for major building systems and components consistent with OPSO policy and the Consent Judgment. Preventive maintenance appears to be fairly consistent despite staffing issues reported by the Maintenance Director.

Individual inmate interviews conducted during the walk-thru in each housing unit revealed no significant complaints by inmates regarding water, electric or HVAC services in individual cells that were not addressed in a timely fashion. Water pressure issues at the restroom sinks in open dormitory pods in the OJC noted during the previous inspection continue to improve.

As with the previous inspection, there was no marked increase/decrease in the number of grievances received on a monthly basis also indicating that routine issues with basic plumbing, mechanical or electrical services in inmate cells or dayrooms are typically remedied within 48 to 72 hours and that work orders are being submitted in a timely manner as required by the Consent Judgment ("Work orders will be submitted within 48 hours of identified deficiencies, or within 24 hours in the case of emergency maintenance needs").

During the previous inspection, the Monitor noted issues with intercom equipment remains. The Monitor continues to recommend that Maintenance staff make a comprehensive survey of working/non-working intercom equipment in every housing unit to facilitate repair of the system throughout the facility. Additionally, security staff supervision should continue to emphasize the importance of the prompt response to emergency intercom calls by pod deputies and pod control staff.

*IV. D. 1. c. Maintain adequate ventilation throughout OPSO facilities to ensure that prisoners receive*



*adequate air flow and reasonable levels of heating and cooling. Maintenance staff shall review and assess compliance with this requirement, as necessary, but no less than twice annually.*

Finding:

Substantial Compliance

Observations:

As noted in previous inspections, adequate air flow is maintained in the facilities but continues to be impeded in a few inmate cells when inmates block the air vents. The Monitor noted that overall, the number of cells with blocked supply registers was significantly less than noted during the previous visit with only one housing unit having more than 50% of the cells observed to be obstructed. However, as consistently noted by the Monitor, this remains an inmate supervision issue and must continue to be addressed by security staff consistently. The Monitor noted that the majority of housing dayrooms and cells to be at relatively reasonable levels of heating and cooling, so this section's rating remains in Substantial Compliance.

The following, regarding test and balance reports, is restated from previous reports. As noted in the two previous reports, test, and balance reports for the Kitchen/Warehouse (2014), OJC (2017) and TDC (2012) were the latest available to the Monitor.

Prior to the September 2019 report, this section had been interpreted as requiring comprehensive "test and balance" assessments on a semi-annual basis. Such assessments are very expensive and typically performed only during the commissioning of new or replacement HVAC systems. As with the previous two inspections, the Monitor met with the Maintenance Director specifically to discuss the status and capabilities of the OJC Building Automation System that controls the heating and cooling throughout all occupied areas in OJC. Discussions with the Maintenance Director following the November 2021 inspection regarding the BAS HVAC control systems in particular resulted in an improved approach to documenting the performance (and maintenance repair response) of the HVAC system. The graphic temperature reports for specified date ranges and housing pods requested by the Monitor were not included with the inspection documentation as provided. During the changeover in administration, the Maintenance Director was replaced, and the new Director had not been trained in the retrieval of the required reports. The Monitor anticipates this will be remedied, along with any necessary software



upgrades to the BAS system, by the next inspection.

The Monitor reviewed live data of the system's warning and alarm functions which reflected no major equipment or systems issues that had not been addressed. The Monitor inspected the BAS system and noted no alarms or alerts present on the system.

It is the Monitor's opinion that the OJC Building Automation System and the new BAS system supporting the TMH units, as currently operated, meets the intent of the Consent Judgment regarding this section. The requested supporting documentation will be necessary to support the finding of substantial compliance for future inspections.

***IV. D. 1. d. Ensure adequate lighting in all prisoner housing units and prompt replacement and repair of malfunctioning lighting fixtures in living areas within five days unless the item must be specially ordered.***

Finding:

Non-Compliance

Observations:

The Monitor observed sufficient lighting being provided in housing units and individual cells of both OJC and TDC. Maintenance staff continue to maintain a supply of replacement bulbs, transformers, or ballasts to repair malfunctioning lighting. However, as previously noted by the Monitor, the vandalized light fixtures in at least two of the pod mop closets had yet to be replaced. The replacement of the light fixtures had not been completed in the requisite time frame as of the date of this inspection. The Monitor observed no outstanding electrical work orders beyond routine bulb replacement and the issue noted above. This section has been moved to non-compliance due to failure of the reporting/replacement and adequate lighting requirements.

***IV. D. 1. e. Ensure adequate pest control throughout the housing units, including routine pest control spraying on at least a quarterly basis and additional spraying as needed.***

Finding:

Substantial Compliance

Observations:

A review of the documentation submitted found sufficient evidence of a pest control program that meets the intent of the Consent Judgment. OPSO continues to maintain a pest control contract with a state licensed company for monthly service of all housing areas and bi-weekly service for the Kitchen/Warehouse. Inmate grievances related to pest control were reviewed and found to have been addressed in a timely manner. The Monitor observed no "drain fly" issues anywhere in the facility.



Environmental, Sanitation and Life-Safety staff performing inspections and responding to pest control grievances continue to initiate work orders for pest control and to document how, when, and where infestations are identified and remedied. The pest control contractor documentation reflected no infestations were found during routine inspections.

***IV. D. 1.f. Ensure that any prisoner or staff assigned to clean a biohazardous area is properly trained in universal precautions, outfitted with protective materials, and properly supervised.***

Finding:

Partial Compliance

Observations:

As noted in previous inspections, Policy 1101.07, "Bio-hazardous Spill Cleaning Procedures" [Revised 1/18/2018] Section VIII. A. 1 has been revised to allow properly trained and equipped inmates and deputies to clean up bio-hazardous spills. Training materials were devised by the Sanitarian. The Sanitarian advised that no inmate training was conducted during the rating period due to a shortage of available inmate workers.

The Monitor also reviewed training curricula and documentation indicating that during 2021, all pre-service staff received training in bio-hazardous cleanup procedures as part of their initial training in each new-hire class in 2021 up to the date of this inspection. Documentation reflected that the in-service training for this requirement had been delayed somewhat as OPSO continues to recover from pandemic and hurricane related issues, but the training was ongoing.

As of November 2018, the Sanitation and/or Environmental Officer is required to be notified of such incidents each business day to enable them to replace any bio-hazardous clean up protective materials used and inspect the area to ensure it was properly cleaned and sanitized. The Monitor was provided with several reports indicating that proper notification had been made to the Sanitarian and that required cleanup/inspection procedures had been followed.  The Monitor inspected all emergency response bags and found them complete on the day of the inspection.

***IV. D. 1. g. Ensure the use of cleaning chemicals that sufficiently destroy the pathogens and organisms in biohazard spills.***

Findings:

Substantial Compliance

Observations:



The Monitor was able to make direct observation that the chemicals on-hand and available to staff were sufficient to destroy the pathogens and organisms in bio-hazardous spills common in a jail environment to include the COVID-19 virus. The Monitor is continuing to rate this section as being in substantial compliance.

Additionally, the chemical storage inventory documentation submitted demonstrated availability of a consistent supply of the required chemicals being maintained by the designated staff.

***IV. D. 1. h. Maintain an infection control plan that addresses contact, blood borne, and airborne hazards and infections. The plan shall include provisions for the identification, treatment, and control of Methicillin-Resistant Staphylococcus Aureus ("MRSA") at the Facility.***

Findings:

Substantial compliance

Observations:

As with the previous inspection, the Monitor reviewed the OPSO infection control policy 1201.11 as well as the Wellpath Infection Control Program document (rev. 8/30/18) submitted by OPSO. No changes were noted, and all requisite areas required by the Consent Judgement were addressed, to include MRSA, and included by OPSO for the Monitor's review and found sufficient.

The Monitor observed no violations with regard to the handling and sanitation of inmate mattresses in OJC or TDC. OPSO has previously provided for annual review of the policy and standard operating procedures for the handling of inmate mattresses to include staff and/or inmate sanitation training program that includes mattress cleaning, and chemical use and control. This procedure is specifically required by the Infection Control Plan.

**IV. D. 2. Environmental Control**

Findings:

D. 2. a.  Substantial Compliance

D. 2. b.  Substantial Compliance

***IV. D. 2. a. OPSO shall ensure that broken or missing electrical panels are repaired within 30 days of identified deficiencies, unless the item needs to be specially ordered.***

Findings:

Substantial Compliance

Observations:



OPSO Policies 601.02 "Reporting and Addressing Maintenance Needs" and Policy 601.03 "Preventive Maintenance" [August 15, 2016] are implemented. Major electrical panels at OJC and TMH are located in secure maintenance spaces inaccessible to inmates.

During the inspection, the Monitor observed two electrical rooms that had unauthorized miscellaneous items stored in the rooms and obstructing access to the electrical panels. The Maintenance Director and Unit Managers were made aware of the code violations which were remedied on the spot.

***IV. D. 2. b. Develop and implement a system for maintenance and timely repair of electrical panels, devices, and exposed electrical wires.***

Findings:

Substantial Compliance

Observations:

The Monitor noted one damaged floor receptacle in the Kitchen bakery area and noted to be an electrical hazard to workers. The issue was noted and submitted for repair by Chief Lampard.

The Monitor considers this to be sufficient to support a continued finding of Substantial Compliance.

## IV. D. 3. Food Service

This report summarizes the findings for the Food Service provisions of the Consent Judgment based on the Monitor's document reviews and tour conducted June 27-30, 2022. The Monitor inspected the Orleans Justice Center (OJC) Kitchen/Warehouse; observed meal service activities; and spoke with OPSO supervisors and deputies, Summit contracted food service employees, and inmates.

Since the last tour on November 15-16, 2021, OPSO has maintained compliance with sections IV. D. 3. a, IV. D. 3. b., and IV. D. 3. c. of the Consent Judgment, resulting in Food Service remaining in substantial compliance.

Findings:

D. 3. a. Substantial Compliance

D. 3. b. Substantial Compliance

D. 3. c. Substantial Compliance

***IV. D. 3. a. OPSO shall ensure that food service staff, including prisoner staff, continues to receive in-service annual training in the areas of food safety, safe food handling procedures, and proper hygiene, to reduce the risk of food contamination and food-borne illnesses.***



Findings:

Substantial Compliance

Observations:

Summit continues to provide documented monthly training for food service staff. Food safety related training for the compliance period included lessons on handwashing, proper glove use, illness reporting, cleaning, and sanitizing. Although there are fewer inmates working in the kitchen due to COVID, they still receive orientation training, including watching a video on the topics of food safety, personal safety, sanitation, and chemical supplies, followed by a written quiz, prior to starting work in the kitchen. Therefore, D. 3. a. remains in Substantial Compliance for the period of October 2021 through March 2022.

***IV. D. 3. b. Ensure that dishes and utensils, food preparation and storage areas, and vehicles and containers used to transport food are appropriately cleaned and sanitized on a daily basis.***

Findings:

Substantial Compliance

Observations:

The Monitor observed the kitchen to be clean. OPSO and Summit food service management staff have maintained the improvements in cleanliness; therefore, D. 3. b. remains in Substantial Compliance for the period of October 2021 through March 2022.

The floor in the area of the kitchen where the large cooking kettles are located, also known as the "cook pit" remains an ongoing concern because it is severely cracked and pieces are missing, which makes it extremely difficult to properly clean. OPSO is aware of the problem, and it is cited in the internal inspection reports. Although OPSO has implemented enhanced cleaning procedures in the area, and report that they are still in the process of obtaining vendor/contractor work proposals and cost quotes, the condition of the floor continues to deteriorate.

- Strongly recommend that OPSO move forward with the process for the floor renovations in the kitchen "cook pit" because the floor around the kettles is in poor condition and will only continue to deteriorate.  The floor in the "cook pit" cooking area must be properly maintained, so that it is easily cleanable in order to facilitate compliance with IV. D. 3. b. requiring that food preparation areas are appropriately cleaned on a daily basis.



*IV. D. 3. c. Check and record on a daily basis the temperatures in the refrigerators, coolers, walk-in refrigerators, the dishwasher water, and all other kitchen equipment with a temperature monitor, to ensure proper maintenance of food service equipment.*

Findings:

Substantial Compliance

Observations:

The Consent Judgment requires that OPSO "Check and record on a daily basis the temperatures in the refrigerators, coolers, walk-in refrigerators, the dishwasher water, and all other kitchen equipment with a temperature monitor, to ensure proper maintenance of food service equipment." The Monitor reviewed the numerous food service records provided by OPSO and Summit for the compliance period and found that the documented temperatures were within the appropriate ranges. During the tour, the Monitor observed that the food temperatures, cooler and freezer temperatures, the refrigerator at TMH and the dishwasher machine temperatures were code compliant. Therefore, IV. D. 3. c. remains in Substantial Compliance for the period of October 2021 through March 2022.

Although the food temperatures were found to be in compliance with applicable standards, during observation of the June 28, 2022, dinner meal, inmates reported that the corn chips on their trays were stale, and upon inspection they were not crunchy or fresh. The meal trays had been prepared the previous day, placed in carts, and stored in refrigeration. Thus, although the corn chips were safe to eat, they were not necessarily appetizing. Therefore, it is recommended that OPSO and Summit review their practices to ensure that cold meals are fresh and palatable upon being served.

### IV. D. 4. Sanitation and Environmental Conditions Reporting

Findings:

D.4. a. Substantial Compliance

D.4. b. Substantial Compliance

*D. 4. a. Provide the Monitor a periodic report on sanitation and environmental conditions in the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. The report will include*
*(1) number and type of violations reported by health and sanitation inspectors;*
*(2) number and type of violations of state standards;*
*(3) number of prisoner grievances filed regarding the environmental conditions at the Facility;*
*(4) number of inoperative plumbing fixtures, light fixtures, HVAC systems, fire protection systems, and security systems that have not been repaired within 30 days of discovery;*
*(5) number of prisoner-occupied areas with significant vandalism, broken furnishings, or excessive clutter;*



*(6) occurrences of insects and rodents in the housing units and dining halls; and*
*(7) occurrences of poor air circulation in housing units.*

Findings:

Substantial Compliance

Observations:

The October 2021 through March 2022 Sanitation and Environmental reports as supporting documentation were not available to the Monitor prior to the inspection tour. The biannual summary reports contained the requisite information spelled out by the Consent Judgement for this section. The State Department of Health performed an inspection on October 21, 2021, noting several issues. The DHH reinspection conducted on November 8, 2021, noted all deficiencies had been corrected. The Monitor reviewed documentation covering items 3 through 6 and found no significant issues.

**IV. D. 4. b. Review the periodic sanitation and environmental conditions reports to determine whether the prisoner grievances and violations reported by health, sanitation, or state inspectors are addressed, ensuring that the requirements of this Agreement are met. OPSO shall make recommendations regarding the sanitation and environmental conditions, or other necessary changes in policy, based on this review. The review and recommendations will be documented and provided to the Monitor.**

Findings:

Substantial Compliance

Observations:

The Consent Judgment requires a review of the periodic sanitation and environmental conditions reports to ensure issues are addressed along with making recommendations regarding sanitation and environmental conditions and policy changes based upon the review. Such reviews are to be documented and provided to the Monitor. The Monitor reviewed the supporting documentation provided by OPSO and determined that it was sufficient to satisfy the requirements of the Consent Judgment. OPSO provided documentation of the required review and basic analysis of inmate grievances and inspection violations noted regarding sanitation and environmental conditions during the rating period.

**IV. E. 1. Fire and Life Safety**

Findings:

E.1. a.   Substantial Compliance

E. 1. b.  Substantial Compliance

E. 1. c.   Substantial Compliance



E. 1. d.  Substantial Compliance

E. 1. e.  Substantial Compliance

***IV. E. 1. a. Ensure that necessary fire and life safety equipment is properly maintained and inspected at least quarterly. These inspections must be documented.***

<u>Finding:</u>

Substantial Compliance

<u>Observations</u>:

The Monitor was able to conduct a tour of the OJC, TDC/TMH, and the Kitchen/Warehouse facilities during the June 2022 inspection with the Facility Life Safety Officer. The Monitor observed no major issues with the fire and life safety equipment. All fire extinguishers were found to be current on required inspections with one exception that was corrected. The Fire Alarm Control Panels in the areas inspected were found to be properly inspected and free of trouble alarms with the exception of one remote panel in TDC. A repair/contract work order was already in place.

The Monitor also reviewed all monthly and quarterly inspection documentation as well as outside inspection documentation noting no significant issues, that requisite work orders had been generated when warranted, and that all major systems were operational/"green tagged". Of note, the inspection documentation reflected few, if any, trash issues throughout the inmate housing areas. The reports did note, however, a significant issue with excess inmate property being improperly stored in a substantial number of housing units. Staff should consider potential solutions to reduce the amount of clutter and potential fire-load the material presents.

As noted in the previous inspection, Life Safety staff continue to use the "Facility Dude" work order system to maintain the schedule of required inspections. The system notifies the Fire Safety Officer when an inspection is due. OPSO continues to maintain contracts with licensed vendors to complete annual inspections of all fire and life safety equipment. OPSO provided copies of quarterly inspections conducted by the Fire Safety Officer for Kitchen/Warehouse, OJC, and TDC/TMH for the fourth quarter for 2021 and first quarter for 2022. A copy of the most recent fire marshal inspection was also provided and reviewed. This documentation, supported by observations during the compliance tour, indicates that OPSO ensures that necessary fire and life safety equipment is properly maintained and inspected at required intervals.



***IV. E. 1. b. Ensure that a qualified fire safety officer conducts a monthly inspection of the facilities for compliance with fire and life safety standards (e.g., fire escapes, sprinkler heads, smoke detectors, etc.).***

Finding:

Substantial Compliance

Observations:

The Monitor was provided with the monthly inspection documents for the Kitchen /Warehouse, OJC, and TDC/TMH facilities performed during the current inspection period. The reports are thorough and complete with all noted discrepancies listed with the associated work order number. These inspections are conducted by a qualified fire safety officer or a qualified contractor, as required by the Consent Judgment.

***IV. E. 1. c. Ensure that comprehensive fire drills are conducted every six months. OPSO shall document these drills, including start and stop times and the number and location of prisoners who were moved as part of the drills.***

Finding:

Substantial Compliance

Observations:

The Consent Judgment requires comprehensive fire drills every six months. OPSO provided documentation for fourteen (14) fire drills for all facilities and shifts conducted during the current rating period. Only "Level 1" drills were conducted (no inmate evacuation) due to COVID restrictions. Five (5) drills were conducted in OJC, six (6) drills were conducted in TDC/TMH, and three (3) were conducted in the Kitchen/Warehouse. Documentation reviewed by the Monitor noted in excess of 90% of available OJC and TDC (by squad) staff had participated in at least one drill during the rating period. In addition to the detailed drill reports, the documentation lists, by name, any delinquent staff with the listing provided to senior management for the coordination of make-up training. Pre-service training was provided to all participants in classes held during the rating period.

***IV. E. 1. d. Provide competency-based training to staff on proper fire and emergency practices and procedures at least annually.***

Finding:

Substantial Compliance

Observations:

OPSO has developed the requisite policy, training course syllabus/outline and written directives necessary for this section. OPSO training staff provided documentation



noting that approximately 95% of the mandated staff had completed the required competency-based training on fire and emergency practices by December 31,2021. Eighteen staff members of the required 349, were noted as still needing the annually mandated training.  The Monitor considers the 95% success rate for in-service Life/Safety training to meet the requirement of the Consent Judgement. Although not covered in the language above, the success rate for pre-service Life/Safety training was 100%.

*IV. E. 1. e. Within 120 days of the Effective Date, ensure that emergency keys are appropriately marked and identifiable by touch and consistently stored in a quickly accessible location, and that staff are adequately trained in use of the emergency keys.*

Finding:

Substantial Compliance

Observations:

Inspection reports note the routine verification of the keys and the Fire Safety Officer documents the periodic testing of the keys to verify they are operational. The Fire Safety Officer trains staff on the location and use of the keys during the fire and life safety training curriculum provided to all staff at the training academy.

**IV. E. 2. Fire and Life Safety Reporting**

Findings:

E. 2. a.  Partial Compliance

E. 2. b.  Substantial Compliance

*IV. E. 2. a. (1) – (3) Provide the Monitor a periodic report on fire and life safety conditions at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date and every six months thereafter until termination of this Agreement. Each report shall include:*
*(1) number and type of violations reported by fire and life safety inspectors;*
*(2) fire code violations during annual fire compliance tours; and*
*(3) occurrences of hazardous clutter in housing units that could lead to a fire.*

Finding:

Partial Compliance

Observations:

The semiannual report referenced in IV.E.2.a. was not provided for the period 7/1/21-12/31/21. The semiannual report referenced in IV.E.2.a. was provided for the period 1/1/22-6/30/22 and covered the latter 3 months of the rating period. The 2021-2022 Fire and Life Safety Conditions reports generated during the rating period were made available to the Monitor prior to the June 2022 inspection. The reports contained the supporting information for the semiannual reports spelled out by the Consent Judgment. In



light of the supporting documentation, the Monitor finds this section to be in Partial Compliance.

*IV. E. 2. b. Review the periodic fire and life safety reports to determine whether the violations reported by fire and life safety inspectors are addressed, ensuring the requirements of this Agreement are being met. OPSO shall make recommendations regarding the fire and life safety conditions, or other necessary changes in policy, based on this review. The review and recommendations will be documented and provided to the Monitor.*

<u>Finding:</u>

Substantial Compliance

<u>Observations</u>:

The Consent Judgment requires a review of the periodic fire and life safety reports to ensure issues are addressed along with making recommendations regarding the fire and life safety conditions and policy changes based upon the review. Such reviews are to be documented and provided to the Monitor.

The Monitor reviewed the supporting documentation provided by OPSO and determined that it was sufficient to satisfy the requirements of the Consent Judgment. OPSO provided documentation of the required review and basic analysis of fire and life safety conditions as well as any necessary changes in policy or procedure. The Monitor believes a continued finding of Substantial Compliance is justified.

## IV. F. Language Assistance

*F.1.a. OPP shall ensure effective communication with and provide timely and meaningful access to services at OPP to all prisoners at OPP, regardless of their national origin or limited ability to speak, read, write, or understand English. To achieve this outcome, OPP shall:*

    *(1)    Develop and implement a comprehensive language assistance plan and policy that complies, at a minimum, with Title VI of the Civil Rights Act of 1964, as amended, (42 U.S.C. § 2000d et seq.) and other applicable law;*

    *(2)    Ensure that all OPP personnel take reasonable steps to provide timely, meaningful language assistance services to Limited English Proficient ("LEP") prisoners;*

    *(3)    At intake and classification, identify and assess demographic data, specifically including the number of LEP individuals at OPP on a monthly basis, and the language(s) they speak;*

    *(4)    Use collected demographic information to develop and implement hiring goals for bilingual staff that meet the needs of the current monthly average population of LEP prisoners;*

    *(5)    Regularly assess the proficiency and qualifications of bilingual staff to become an OPP Authorized Interpreter ("OPPAI");*

    *(6)    Create and maintain an OPPAI list and provide that list to the classification and intake staff; and*

    *(7)    Ensure that while at OPP, LEP prisoners are not asked to sign or initial documents in English without the benefit of a written translation from an OPPAI.*

*F.2.a. OPP shall develop and implement written policies, procedures and protocols for documenting, processing, and tracking of individuals held for up to 48 hours for the U.S. Department of Homeland Security ("DHS");*

*F.2.b Policies, procedures, and protocols for processing 48-hour holds for DHS will:*

    *(1)    Clearly delineate when a 48-hour hold is deemed to begin and end;*

    *(2)    Ensure that, if necessary, an OPPAI communicates verbally with the OPP prisoner about when the 48-hour period begins and is expected to end;*



*(3)     Provide a mechanism for the prisoner's family member and attorney to be informed of the 48-hour hold time period, using, as needed, an OPPAI or telephonic interpretation service;*

*(4)     Create an automated tracking method, not reliant on human memory or paper documentation, to trigger notification to DHS and to ensure that the 48-hour time period is not exceeded.*

*(5)     Ensure that telephone services have recorded instructions in English and Spanish;*

*(6)     Ensure that signs providing instructions to OPP prisoners or their families are translated into Spanish and posted;*

*(7)     Provide Spanish translations of vital documents that are subject to dissemination to OPP prisoners or their family members. Such vital documents include, but are not limited to:*

*i.      grievance forms;*
*ii.     sick call forms;*
*iii.    OPP inmate handbooks;*
*iv.     Prisoner Notifications (e.g., rule violations, transfers, and grievance responses) and*
*v.      "Request for Services" forms.*

*(8)     Ensure that Spanish-speaking LEP prisoners obtain the Spanish language translations of forms provided by DHS; and*

*(9)     Provide its language assistance plan and related policies to all staff within 180 days of the Effective Date of this Agreement.*

*F.3.a. Within 180 days of the Effective Date, OPP shall provide at least eight hours of LEP training to all corrections and medical and mental health staff who may regularly interact with LEP prisoners.*

*(1)  LEP training to OPP staff shall include:*
*i.      OPP's LEP plan and policies, and the requirements of Title VI and this Agreement;*
*ii.     how to access OPP-authorized, telephonic and in-person OPPAIs; and*
*iii.    basic commands and statements in Spanish for OPP staff.*

*(2)  OPP shall translate the language assistance plan and policy into Spanish, and other languages as appropriate, and post the English and translated versions in a public area of the OPP facilities, as well as online.*

*(3)  OPP shall make its language assistance plan available to the public.*

*F.4.*

*(1)     OPP shall ensure that adequate bilingual staff are posted in housing units where DHS detainees and other LEP prisoners may be housed.*

*(2)     OPP shall ensure that an appropriate number of bilingual staff are available to translate or interpret for prisoners and other OPP staff. The appropriate number of bilingual staff will be determined based on a staffing assessment by OPP.*

<u>Findings:</u>

F.1. a.  Substantial Compliance

F. 2. a. Substantial Compliance

F. 2. b. Substantial Compliance

F. 3. a. Partial Compliance

F. 4.    Substantial Compliance

<u>Observations</u>:

The Language Assistance Plan required by this paragraph has been prepared and finalized. F. 1. a. remains in substantial compliance.

OPSO asserts that DHS and ICE inmates are not detained. OPSO developed a policy which was submitted to the Monitors which has provisions F. 2. a. and b. into substantial compliance.



OPSO provided documentation regarding the use of the language line. OPSO has provided documentation regarding the number of bilingual staff and the manner in which the needs of language assistance are provided bringing provisions of F. 4. into substantial compliance. The Consent Judgment specifically requires at least eight hours of LEP training for all deputies and mental health staff who may regularly interact with LEP inmates. Provision IV. F. 3. a. is determined in partial compliance as eight hours of training is not provided. Training of security and medical staff assigned to the IPC should be sufficient.

## IV. G.  Youthful Prisoners

*IV. G. Consistent with the Prison Rape Elimination Act of 2003, 42 U.S.C. § 15601, et seq., and its implementation of regulations, a youthful prisoner shall not be placed in a housing unit in which the youthful prisoner will have sight, sound, or physical contact with any adult prisoner through use of a shared dayroom or other common space, shower area, or sleeping quarters. In areas outside of housing units, OPSO shall either: maintain sight and sound separation between youthful prisoners and adult prisoners, or provide direct staff supervision when youthful prisoners and adult prisoners have sight, sound, or physical contact. OPP shall ensure that youthful prisoners in protective custody status shall have no contact with, or access to or from, non- protective custody prisoners. OPP will develop policies for the provision of developmentally appropriate mental health and programming services.*

Finding:

Substantial Compliance

Observations:

OPSO has provided documentation that its separation of youthful inmates from adult inmates was found in compliance during its recent PREA audit.  A concerted effort has been made to house all youthful inmates at the juvenile detention facility. When housed at OJC, Tulane provides developmentally appropriate mental health services to youthful inmates. Travis School continues to provide educational and programming services. The requirement for developmentally appropriate mental health and programming services is separate and apart from PREA.

## VI. A – D. The New Jail Facility and Related Issues

### A.  New Jail

*The Parties anticipate that Defendant will build a new jail facility or facilities that will replace or supplement the current facility located at 2800 Gravier Street, New Orleans, Louisiana. This Agreement shall apply to any new jail facility.*

Finding:

VI. A. Substantial Compliance.

### B.  Design and Design Document

*Defendant shall obtain the services of a qualified professional to evaluate, design, plan, oversee, and*



*implement the construction of any new facility. At each major stage of the facility construction, Defendant shall provide the Monitor with copies of design documents.*

Finding:

VI. B. Substantial Compliance

Observations:

These provisions apply to the construction of any new facility. Phase III is such a facility. As the City is the entity overseeing the construction of Phase III, OPSO must coordinate with the City to provide copies of design document at each major stage. The City has been providing timely access to design documents and information regarding Phase III.

### C.  Staffing

*Defendant shall consult with a qualified corrections expert as to the required services and staffing levels needed for any replacement facility. OPSO shall complete a staffing study to ensure that any new facility is adequately staffed to provide prisoners with reasonable safety.*

Finding:

VI.C. Partial Compliance

Observations:

The Consent Judgment requires that the Defendant **shall** consult with a qualified corrections expert as to the required services and staffing levels needed for any replacement facility. The staffing plan for OJC developed in 2019 is now longer sufficient due to the lack of staff for deployment to the positions. The Monitors are concerned whether this will occur with Phase III staffing. The paragraph is in partial compliance.

### D.  Compliance with Code and Standards

*Defendant will ensure that the new jail facility will be built in accordance with: (1) the American Correctional Association's standards in effect at the time of construction; (2) the American with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101-12213, including changes made by the ADA Amendments of 2008 (P.L. 110-325) and 47 U.S.C. §§ 225-661, and the regulations there under; and (3) all applicable fire codes and regulations.*

Finding:

Monitors not qualified to evaluate.

Observations:

The Monitors do not have the knowledge or expertise to evaluate compliance with this paragraph. OPSO asserts that it is in compliance with this provision, without offering documentation. Documentation from the architect would be sufficient.



## VII. Compliance and Quality Improvement

## VII. A. Policies, Procedures, Protocols, Training Curriculum and Practices

*Within 120 days of the Effective Date, OPSO shall revise and/or develop its policies, procedures, protocols, training curricula, and practices to ensure that they are consistent with, incorporate, address, and implement all provisions of this Agreement. OPSO shall revise and/or develop, as necessary, other written documents, such as screening tools, logs, handbooks, manuals, and forms, to effectuate the provisions of this Agreement. OPSO shall send pertinent newly drafted and revised policies and procedures to the Monitor as they are promulgated. The Monitor will provide comments on the policies to OPSO, SPLC, and DOJ within 30 days.*

*OPSO, SPLC, and DOJ may provide comments on the Monitor's comments within 15 days. At that point, the Monitor will consider the Parties' comments, mediate any disputes, and approve the policies with any changes within 30 days. If either party disagrees with the Monitor, they may bring the dispute to the Court. OPSO shall provide initial and in-service training to all Facility staff with respect to newly implemented or revised policies and procedures. OPSO shall document employee review and training in new or revised policies and procedures.*

Finding:

VII. A. Partial Compliance

Observations:

OPSO has now completed the development of the required policies. OPSO's efforts in the development of procedures and lesson plans resulted in this paragraph being downgraded to partial compliance. OPSO should continue to seek the input of the Monitors and Parties of any revisions of the policies required by the Consent Judgment. OPSO is reminded that it may not unilaterally change those policies.

## VII. (H). B.  Written Quality Improvement Policies and Procedures

*Within 180 days of the Effective Date, Defendant shall develop and implement written quality improvement policies and procedures adequate to identify serious deficiencies in protection from harm, prisoner suicide prevention, detoxification, mental health care, environmental health, and fire and life safety in order to assess and ensure compliance with the terms of this Agreement on an ongoing basis. Within 90 days after identifying serious deficiencies, OPSO shall develop and implement policies and procedures to address problems that are uncovered during the course of quality improvement activities. These policies and procedures shall include the development and implementation of corrective action plans, as necessary, within 30 days of each biannual review.*

Finding:

VII. B. Partial compliance

Observations:

OPSO has provided documentation that it is now developing plans to identify serious deficiencies, and to address problems that are uncovered during the course of quality improvement activities to warrant a finding of partial compliance. These plans need to contain specific performance measures, timelines, and persons responsible. They also need to be implemented with appropriate development of corrective action to be taken



and the auditing of adherence to the action plan.

## VII. (I). C. Full-Time Compliance Coordinator

*The Parties agree that OPSO will hire and retain, or reassign a current OPSO employee for the duration of this Agreement, to serve as a full-time OPSO Compliance Coordinator. The Compliance Coordinator will serve as a liaison between the Parties and the Monitor and will assist with OPSO's compliance with this Agreement. At a minimum, the Compliance Coordinator will: coordinate OPSO's compliance and implementation activities; facilitate the provision of data, documents, materials, and access to OPSO's personnel to the Monitor, SPLC, DOJ, and the public, as needed; ensure that all documents and records are maintained as provided in this Agreement; and assist in assigning compliance tasks to OPSO personnel, as directed by the Sheriff or his or her designee. The Compliance Coordinator will take primary responsibility for collecting information the Monitor requires to carry out the duties assigned to the Monitor.*

Finding:

Partial Compliance

Observations:

The Compliance Coordinator resigned in July 2021. While some of her duties were reassigned to other staff members, this is insufficient both as to the requirement of the Consent Judgment and the performance of the duties required. No one has been designated as the Compliance Director during the monitoring period, but a captain was designated to perform the functions.

## VII. (J.) D. Self-Assessment

*On a bi-annual basis, OPSO will provide the public with a self-assessment in which areas of significant improvement or areas still undergoing improvement are presented either through use of the OPSO website or through issuance of a public statement or report.*

Finding:

Partial Compliance

Observations:

During the monitoring period, no town hall meetings were held. The holding of those meetings previously and posting the PowerPoint presentations at those meetings had brought OPSO into substantial compliance.

## VIII. Reporting Requirements and Right of Access

## VIII. A. Periodic Compliance Reporting

*OPSO shall submit periodic compliance reports to the Monitor. These periodic reports shall be provided to the Monitor within four months from the date of a definitive judgment on funding; and every six months thereafter until termination of this Agreement. Each compliance report shall describe the actions Defendant has taken during the reporting period to implement this Agreement and shall make specific reference to the Agreement provisions being implemented. The report shall also summarize audits and continuous improvement and quality assurance activities, and contain findings and recommendations that would be used to track and trend data compiled at the Facility. The report shall also capture data that is tracked and monitored under the reporting provisions of the following provisions: Use of Force; Suicide Prevention; Health Care Delivered; Sanitation and Environmental Conditions; and Fire and Life Safety.*



Finding:

Partial Compliance

Observations:

    As noted in the individual section, several of the required reports have not been submitted during this monitoring period.

### VIII. B.  (Notification of) Death of Any Prisoner

*OPSO shall, within 24 hours, notify the Monitor upon the death of any prisoner. The Monitor shall forward any such notifications to SPLC and DOJ upon receipt. OPSO shall forward to the Monitor incident reports and medical and/or mental health reports related to deaths, autopsies, and/or death summaries of prisoners, as well as all final SOD and IAD reports that involve prisoners. The Monitor shall forward any such reports to SPLC and DOJ upon receipt.*

Finding:

Substantial Compliance

### VIII. C. Records

*Defendant shall maintain sufficient records to document that the requirements of this Agreement are being properly implemented and shall make such records available to the Monitor within seven days of request for inspection and copying. In addition, Defendant shall maintain and provide, upon request, all records or other documents to verify that they have taken the actions described in their compliance reports (e.g., census summaries, policies, procedures, protocols, training materials, investigations, incident reports, tier logs, or use of force reports).*

Finding:

Partial Compliance

Observations:

    During this compliance period, OPSO often did not provide incident notifications within seven days. The monthly reports provided to the Monitors greatly decreases the need for document requests.

### III.  Stipulated Orders

    OPSO and the Plaintiffs/DOJ negotiated two agreements after Compliance Report #3. The language of the Stipulated Orders was linked directly to the Consent Judgment and represented priority areas for inmate safety. Some of them required a one-time action such the posting of a memorandum or providing of training by a specific date. Some of the provisions of the Stipulated Order of February 11, 2015, contain on-going obligations that are in addition to the Consent Judgment or clarify the obligations under the Consent Judgment.

    The three provisions of the April 22, 2015, Stipulated Order are in substantial compliance and contained provisions that were to be accomplished by specific dates



during April 2015. As those dates have passed, the Monitors no longer monitor those provisions. Two of the provisions in the Stipulated Order of February 11, 2015, require additional attention. The provisions of the Stipulated Order of February 11, 2015, which require ongoing compliance are 1. a-c. 5. b., 6. a., and 7. a. and b. The provisions that are not in substantial compliance are addressed below.

*1. c. Within 24 hours of the occurrence of any of the following incident, OPSO shall notify the Monitor via email:*

- *Death of an inmate/arrestee while held in custody (or housed in a hospital to which the inmate has been committed for care and retain in the custody of OPSO; or whose injury occurred while in custody and was subsequently released from custody);*
- *An inmate's/arrestee's suicide, suicide attempt, aborted suicide attempt, suicidal intent, and/or deliberate suicide self-harm gesture as defined by the American Psychiatric Association;*
- *An inmate's allegation of sexual abuse, sexual assault, sexual harassment, or voyeurism whether the incident is between or among inmates, or between or among inmates and a staff/contractor or volunteer;*
- *An inmate's report, or a report by a staff/contractor or volunteer, of any inmate/inmate allegation of assault; or other inmate allegation of felonies occurring to them while in custody;*
- *An Inmate's report of a report by a staff/contractor or volunteer, of any allegation of excessive force by an employee, volunteer or contractor;*
- *Suspension or arrest of any OPSO employee, volunteer, or contractor for alleged criminal activities while on-duty and/or in a facility under the control of OPSO; and*
- *Any recovery of significant contraband, specifically weapons.*

Finding:

Partial Compliance

Observations:

OPSO has not sufficiently complied with the requirements of this provision. At best, the Monitor learns of some of the items through incident reports, review of investigations and newspaper reports. OPSO should put in place a system to comply with this provision.

*6. a. By February 15, 2015, in order that the housing for youthful offenders is continually staffed by a deputy, OPSO will assure that a deputy is working on every shift, on every day on the unit housing youthful offenders. This deputy may not be assigned to other tiers or other responsibilities, and shall be periodically relieved by another deputy and/or supervisor. The evidence of compliance with this document will be the staffing assignments each day, each shift for the facility in which youthful offenders are held, and samples of the log books from that unit.*

Finding:

Substantial Compliance

Observations

No youthful offenders were housed in OJC during the monitoring period. Therefore, there was not a period where housing units for youthful offenders needed to be staffed continuously.



Appendix A: Summary of Compliance Findings by Compliance Section Reports 1 - 15

| | Report # 1 2/13/14 | Report # 2 8/26/14 | Report # 3 2/25/15 | Report # 4 9/9/15 | Report # 5 3/17/16 | Report # 6 10/25/16 | Report # 7 5/1/17 | Report # 8 1/12/18 | Report # 9 8/25/18 | Report # 10 3/18/19 | Report #11 9/19/19 | Report #12 3/6/20 | Report#13 11/16/20 | Report #14 5/17/21 | Report #15 11/15/21 | Report #16 06/26/22 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **IV.A. 1. Use of Force Policies and Procedures/Margo Frasier** | | | | | | | | | | | | | | | | |
| IV. A. 1.a. | ND | NC | NC | PC | NC | PC | PC | PC | PC | SC | SC | SC | SC | PC | PC | PC |
| IV. A. 1.b. | ND | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV. A. 1.c. | ND | NC | NC | PC | NC | NC | PC | PC | SC | SC | SC | PC | PC | PC | PC | NC |
| **IV.A.2. Use of Force Training/Margo Frasier and Shane Poole** | | | | | | | | | | | | | | | | |
| IV. A. 2. a. | ND | NC | NC | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC | PC | PC | SC |
| IV. A. 2. b. | ND | NC | NC | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC | PC | PC | SC |
| IV. A. 2. c. | ND | NC | NC | NC | NC | NC | NC | NC | PC | PC | SC | SC | SC | PC | SC | SC |
| **IV.A.3. Use of Force Reporting/Margo Frasier** | | | | | | | | | | | | | | | | |
| IV. A.3 a. | ND | NC | NC | PC | NC | PC | PC | PC | PC | PC | SC | PC | PC | SC | SC | SC |
| IV. A.3 b. | ND | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | PC |
| IV. A.3 c. | ND | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC | SC | PC |
| IV. A.3 d. | ND | NC | NC | PC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV. A.3 e. | ND | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | PC |
| IV. A.3 f. | ND | NC | NC | PC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV. A.3 g. | ND | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV. A.3 h. | ND | NC | NC | NC | NC | NC | NC | NC | NC | PC | SC | SC | PC | PC | PC | PC |
| **IV.A.4. Early Intervention System ("EIS") /Margo Frasier and Shane Poole** | | | | | | | | | | | | | | | | |
| IV.A.4.a. | ND | NC | NC | PC | PC | PC | NC | NC | NC | PC | SC | SC | SC | PC | PC | PC |
| IV.A.4.b. | ND | NC | NC | NC | NC | PC | PC | PC | PC | SC | SC | SC | SC | PC | PC | PC |
| IV.A.4.c. | ND | NC | NC | NC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | PC | PC |
| IV.A.4.d. | ND | NC | NC | NC | NC | PC | PC | NC | NC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.4.e. | ND | ND | ND | ND | NC | NC | NC | NC | NC | SC | SC | SC | SC | SC | SC | PC |
| **IV.A.5. Safety and Supervision/Margo Frasier** | | | | | | | | | | | | | | | | |
| IV.A.5.a. | ND | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC |
| IV.A.5.b. | ND | NC | NC | NC | NC | NC | NC | NC | NC | PC | SC | SC | SC | SC | SC | PC |
| IV.A.5.c. | ND | NC | NC | NC | NC | NC | NC | PC | PC | SC | SC | SC | SC | SC | SC | PC |
| IV.A.5.d. | NC | NC | PC | PC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.A.5.e. | ND | NC | NC | PC | PC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC |
| IV.A.5.f. | ND | NC | NC | PC | PC | SC | SC | PC | PC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.5.g. | ND | NC | ND | PC | NC | NC | NC | NC | NC | PC | SC | SC | SC | SC | SC | SC |

Appendix A: Summary of Compliance Findings by Compliance Section Reports 1 - 15

| | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IV.A.5.h. | ND | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | SC | SC | PC | PC | PC |
| IV.A.5.i. | ND | NC | NC | PC | PC | PC | PC | PC | SC | PC | PC | PC | PC | PC | PC | PC |
| IV.A.5.j. | ND | NC | PC | PC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.A.5.k. | ND | NC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | PC | PC | PC | PC |
| IV.A.5.l. | ND | NC | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC | PC | PC | PC | PC |
| **IV.A.6. Security Staffing/Margo Frasier** | | | | | | | | | | | | | | | | |
| IV.A.6.a. | ND | PC | PC | PC | SC | SC | PC | PC | PC | SC | SC | SC | PC | PC | PC | NC |
| IV.A.6.b. | ND | PC | PC | PC | NC | PC | PC | PC | PC | SC | SC | SC | PC | PC | PC | NC |
| **IV.A.7 Incidents and Referrals/Margo Frasier** | | | | | | | | | | | | | | | | |
| IV.A.7.a. | ND | NC | NC | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC |
| IV.A.7.b. | ND | NC | NC | NC | NC | PC | PC | PC | PC | PC | SC | SC | PC | PC | PC | PC |
| IV.A.7.c. | ND | NC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.7.d. | ND | NC | NC | NC | NC | NC | NC | PC | PC | PC | SC | SC | SC | SC | SC | SC |
| IV.A.7.e. | ND | NC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | PC | SC | SC |
| IV.A.7.f. | ND | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC |
| IV.A.7.g. | ND | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC |
| IV.A.7.h. | ND | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC |
| IV.A.7.i. | ND | NC | NC | PC | NC | NC | NC | NC | NC | PC | SC | SC | SC | SC | SC | SC |
| IV.A.7.j. | ND | NC | NC | NC | NC | NC | NC | NC | NC | SC | SC | SC | SC | SC | SC | SC |
| **IV.A.8. Investigations/Margo Frasier** | | | | | | | | | | | | | | | | |
| IV.A.8.a. | ND | NC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | PC |
| IV.A.8.b. | ND | NC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.8.c. | ND | NC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.8.d. | ND | NC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.8.e. | ND | NC | NC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.8.f. | ND | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC |
| **IV.A.9. Pretrial Placement in Alternative Settings/Margo Frasier** | | | | | | | | | | | | | | | | |
| IV.A.9.a. | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.9.b. | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| **IV.A.10. Custodial Placement within OPP/Patricia Hardyman** | | | | | | | | | | | | | | | | |
| IV.A.10.a. | NC | PC | SC | SC | SC | SC | PC | PC | PC | PC | SC | SC | SC | SC | PC | PC |
| IV.A.10.b. | NC | NC | NC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.10.c. | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.10.d. | NC | NC | PC | PC | PC | PC | PC | NC | PC | SC | PC | PC | SC | SC | SC | PC |
| IV.A.10.e. | NC | NC | PC | SC | PC | PC | SC | PC | PC | PC | PC | SC | PC | PC | PC | NC |
| IV.A.10.f. | NC | NC | NC | NC | NC | PC | PC | PC | NC | SC | PC | PC | PC | PC | PC | PC |
| IV.A.10.g. | NC | NC | NC | NC | NC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | PC |

Appendix A: Summary of Compliance Findings by Compliance Section Reports 1 - 15

| | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IV.A.10.h. | ND | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | PC | SC | PC | SC |
| **IV..A.11. Prisoner Grievance Process/Margo Frasier and Shane Poole** | | | | | | | | | | | | | | | | |
| IV.A.11.a | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | | | | | | |
| IV.A.11.a.(1) | | | | | | | | | | | SC | SC | SC | SC | SC | SC |
| IV.A.11.a.(2) | | | | | | | | | | | PC | PC | PC | PC | PC | PC |
| IV.A.11.a.(3) | | | | | | | | | | | SC | SC | SC | SC | SC | SC |
| IV.A.11.a.(4) | | | | | | | | | | | SC | SC | SC | SC | SC | SC |
| IV.A.11.a.(5) | | | | | | | | | | | SC | SC | SC | SC | SC | SC |
| IV.A.11.a.(6) | | | | | | | | | | | PC | PC | SC | SC | SC | SC |
| **IV.A.12. Sexual Abuse/Margo Frasier** | | | | | | | | | | | | | | | | |
| IV.A.12. | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | PC | PC | PC |
| **IV.A.13. Access to Information/Margo Frasier** | | | | | | | | | | | | | | | | |
| IV.A.13. | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | PC | SC | SC |
| **IV. B. Mental Health Care** | | | | | | | | | | | | | | | | |
| **IV.B.1. Screening and Assessment/Nicole Johnson** | | | | | | | | | | | | | | | | |
| IV.B.1.a. | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | PC | PC | SC | SC |
| IV.B.1.b. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | PC | SC | SC |
| IV.B.1.c. | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | PC | SC | SC |
| IV.B.1.d. | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC | PC | PC | SC | SC | SC |
| IV.B.1.e. | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC | PC | PC | PC | PC | PC | PC |
| IV.B.1.f. | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.1.g. | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC |
| IV.B.1.h. | NC | NC | NC | NC | NC | NC | NC | NC | PC | SC | SC | SC | SC | SC | SC | SC |
| IV.B.1.i. | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.1.j. | NC | NC | NC | PC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.1.k. | NC | NC | NC | PC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC |
| IV.B.1.l. | NC | NC | NC | NC | NC | NC | NC | NC | NC | SC | SC | SC | PC | PC | PC | PC |
| **B. 2. Treatment/Nicole Johnson** | | | | | | | | | | | | | | | | |
| IV.B.2.a. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.2.b. | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.2.c. | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.2.d. | NC | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC |
| IV.B.2.e. | NC | NC | NC | PC | PC | PC | PC | NC | NC | PC | SC | SC | SC | SC | SC | SC |
| IV.B.2.f. | NC | NC | NC | PC | PC | PC | NC | PC | PC | SC | PC | PC | PC | PC | PC | PC |
| IV.B.2.g. | NC | NC | NC | PC | PC | NC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.B.2.h. | NC | NC | NC | PC | PC | PC | PC | PC | NC | PC | SC | SC | PC | PC | PC | PC |
| **IV.B.3. Counseling/Nicole Johnson** | | | | | | | | | | | | | | | | |

Appendix A: Summary of Compliance Findings by Compliance Section Reports 1 - 15

| Section | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IV.B.3.a. | NC | NC | NC | NC | PC | NC | NC | PC | PC | PC | PC | PC | PC | NC | PC |
| IV.B.3.b. | NC | NC | NC | NC | PC | NC | NC | PC | PC | PC | PC | PC | PC | NC | PC |
| **IV.B.4. Suicide Prevention Training Program/Nicole Johnson** | | | | | | | | | | | | | | | |
| IV.B.4.a. | NC | NC | NC | PC | PC | PC | PC | NC | PC | PC | NC | PC | PC | NC | PC |
| IV.B.4.b. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | PC |
| IV.B.4.c. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC |
| IV.B.4.d. | NC | NC | NC | PC | NC | NC | NC | NC | NC | PC | PC | PC | NC | NC | PC |
| IV.B.4.e. | NC | NC | NC | PC | NA | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC |
| IV.B.4.f. | NC | NC | NC | NC | PC | PC | NC | NC | SC | SC | SC | SC | SC | SC | PC |
| IV.B.4.g. | NC | NC | NC | SC | PC | NC | NC | NC | NC | PC | NC | PC | SC | SC | SC |
| **IV.B.5. Suicide Precautions/Nicole Johnson** | | | | | | | | | | | | | | | |
| IV.B.5.a. | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.5.b. | NC | NC | NC | NC | NC | NC | NC | PC | PC | SC | PC | PC | NC | NC | PC |
| IV.B.5.c. | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | NC | PC | PC |
| IV.B.5.d. | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | SC | SC | SC | SC | SC |
| IV.B.5.e. | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | NC | NC | PC | PC |
| IV.B.5.f. | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | SC | SC | PC | PC | PC |
| IV.B.5.g. | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC |
| IV.B.5.h. | NC | NC | NC | NC | NC | NC | NC | PC | NC | PC | PC | SC | SC | PC | PC |
| IV.B.5.i. | NC | NC | NC | NC | NC | NC | NC | PC | PC | SC | SC | SC | SC | SC | PC |
| IV.B.5.j. | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | SC | SC | SC | SC | SC |
| IV.B.5.k. | NC | NC | NC | NC | NC | NC | NC | PC | NC | PC | PC | PC | PC | PC | PC |
| **IV.B.6. Use of Restraints/Nicole Johnson** | | | | | | | | | | | | | | | |
| IV.B.6.a. | PC | NC | PC | PC | PC | PC | PC | PC | NC | PC | PC | PC | PC | NC | PC |
| IV.B.6.b. | NC | NC | PC | PC | PC | PC | PC | PC | NC | PC | SC | SC | SC | SC | SC |
| IV.B.6.c. | ND | NC | PC | PC | PC | PC | PC | PC | NC | NC | SC | SC | PC | SC | SC |
| IV.B.6.d. | ND | NC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | PC | SC | SC |
| IV.B.6.e. | NC | NC | PC | PC | PC | PC | PC | PC | NC | PC | NC | SC | SC | SC | SC |
| IV.B.6.f. | NC | NC | PC | PC | PC | PC | PC | PC | NC | PC | SC | SC | SC | SC | SC |
| IV.B.6.g. | NC | NC | PC | PC | PC | PC | PC | PC | NC | PC | NC | SC | SC | SC | SC |
| **IV.B.7. Detoxification and Training/Nicole Johnson/Susi Vassallo** | | | | | | | | | | | | | | | |
| IV.B.7.a. | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | PC | PC | PC |
| IV.B.7.b. | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC |
| IV.B.7.c. | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.7.d. | NC | NC | PC | PC | PC | PC | PC | PC | PC | NC | PC | PC | PC | SC | SC |
| **IV.B.8. Medical and Mental Health Staffing/Nicole Johnson/Susi Vassallo** | | | | | | | | | | | | | | | |
| IV.B.8.a. | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |

Appendix A: Summary of Compliance Findings by Compliance Section Reports 1 - 15

| Section | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IV.B.8.b. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC |
| **IV.B.9. Risk Management/Nicole Johnson/Susi Vassallo** | | | | | | | | | | | | | | | | |
| IV.B.9.a. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.9.b. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.9.c. | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.9.d. | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.9.e. | NC | NC | NC | NC | PC | PC | PC | PC | NC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.9.f. | NC | NC | NC | NC | PC | PC | PC | PC | NC | NC | PC | PC | PC | PC | PC | PC |
| **IV.C. Medical Care** **See SA 2/11/15 13.** | | | | | | | | | | | | | | | | |
| **IV. C. Quality Management of Medication Administration/Susi Vassallo** | | | | | | | | | | | | | | | | |
| IV.C.1.a. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC |
| IV.C.1.b. | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | SC | PC |
| IV.C.1.c. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | PC | SC | SC |
| IV.C.1.d. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | PC | PC | PC |
| **IV.C.2. Health Care Delivered/Susi Vassallo** | | | | | | | | | | | | | | | | |
| IV.C.2.a. | NC | NC | NC | PC | PC | PC | PC | PC | PC | NC | PC | PC | SC | SC | SC | PC |
| IV.C.2.b. | NC | NC | NC | PC | PC | PC | PC | PC | PC | NC | PC | PC | PC | PC | PC | PC |
| **IV.C.3. Release and Transfer/Susi Vassallo** | | | | | | | | | | | | | | | | |
| IV.C.3.a. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC |
| IV.C.3.b. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC |
| IV.C.3.c. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC |
| IV.C.3.d. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC |
| **IV.D. Sanitation and Environmental Conditions/Shane Poole** | | | | | | | | | | | | | | | | |
| IV.D. 1.a. | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC |
| IV. D. 1.b. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC |
| IV. D. 1.c. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC |
| IV. D. 1.d. | NC | NC | NC | NC | SC | SC | SC | SC | SC | SC | SC | SC | PC | PC | PC | NC |
| IV. D. 1.e. | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV. D. 1.f. | NC | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC | PC | PC | PC | PC |
| IV. D. 1.g. | NC | NC | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC |
| IV. D. 1.h. | NC | NC | NC | PC | NC | PC | NC | NC | NC | PC | PC | PC | SC | SC | SC | SC |
| **IV. D. 2. Environmental Control/Shane Poole** | | | | | | | | | | | | | | | | |
| IV. D. 2.a. | NC | NC | PC | PC | PC | SC | SC | SC | PC | SC | SC | SC | SC | SC | SC | SC |
| IV. D. 2.b. | NC | NC | NC | NC | NC | PC | SC | SC | PC | SC | SC | SC | SC | SC | SC | SC |
| **IV. D. 3. Food Service/Diane Skipworth** | | | | | | | | | | | | | | | | |
| IV. D. 3.a. | PC | PC | PC | PC | PC | PC | NC | PC | PC | | SC | SC | SC | SC | | SC |

Appendix A: Summary of Compliance Findings by Compliance Section Reports 1 - 15

| Section | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IV. D. 3.b. | NC | NC | NC | PC | PC | PC | NC | NC | NC | NC | PC | SC | SC | SC | SC |
| IV. D. 3.c. | NC | NC | NC | PC | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC | SC |
| IV. D. 4. Sanitation and Environmental Conditions Reporting/Shane Poole | | | | | | | | | | | | | | | |
| IV. D. 4.a. 1-7 | NC | NC | PC | PC | PC | PC | PC | PC | NC | SC | SC | SC | SC | SC | SC |
| IV. D. 4.b. | NC | NC | NC | NC | PC | NC | NC | PC | PC | SC | SC | SC | SC | SC | SC |
| IV.E. Fire and Life Safety/Shane Poole | | | | | | | | | | | | | | | |
| IV. E. 1. Fire and Life Safety | | | | | | | | | | | | | | | |
| IV. E. 1.a. | NC | PC | PC | PC | PC | PC | SC | PC | PC | PC | PC | SC | SC | SC | SC |
| IV. E. 1.b. | NC | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC |
| IV. E. 1.c. | PC | PC | PC | PC | NC | PC | PC | SC | PC | SC | SC | SC | SC | SC | SC |
| IV. E. 1.d. | NC | NC | NC | NC | NC | NC | PC | SC | SC | SC | SC | SC | NC | PC | SC |
| IV. E. 1.e. | ND | NC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV. E. 2. Fire and Life Safety Reporting | | | | | | | | | | | | | | | |
| IV. E. 2.a.1-3 | ND | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | PC |
| IV. E. 2.b. | ND | NC | NC | PC | NC | NC | NC | PC | PC | SC | SC | SC | SC | SC | SC |
| IV.F. Language Assistance | | | | | | | | | | | | | | | |
| IV.F.1. Timely and Meaningful Access to Services/Margo Frasier | | | | | | | | | | | | | | | |
| IV.F.1.a. | ND | PC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC |
| IV.F.2. Language Assistance Policies and Procedures/Margo Frasier | | | | | | | | | | | | | | | |
| IV.F.2.a. | ND | PC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC |
| IV.F.2.b. | ND | PC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC |
| IV.F.3. Language Assistance Training/Margo Frasier | | | | | | | | | | | | | | | |
| IV.F.3.a. | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.F.4. Bilingual Staff/Margo Frasier | | | | | | | | | | | | | | | |
| IV.F.4. | NC | PC | PC | PC | PC | NC | NC | NC | NC | PC | SC | SC | SC | SC | SC |
| IV.G. Youthful Prisoners/Margo Frasier | | | | | | | | | | | | | | | |
| IV.G. | NC | NC | NC | PC | PC | PC | NC | NC | PC | PC | PC | SC | SC | SC | SC |
| VI. The New Jail Facility/Margo Frasier | | | | | | | | | | | | | | | |
| VI. A. | ND | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| VI. B. | NC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| VI. C. | ND | PC | SC | SC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | PC |
| VI. D. | Monitors Not Qualified to Evaluate | | | | | | | | | | | | | | |
| VII. Compliance and Quality Improvement/Margo Frasier | | | | | | | | | | | | | | | |

Appendix A: Summary of Compliance Findings by Compliance Section Reports 1 - 15

| | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| VII. A. | ND | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | PC |
| VI. B. (H.) | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| VI. C. (I.) | NC | NC | SC | SC | NC | SC | SC | NC | PC | SC | SC | SC | SC | SC | PC | PC |
| VI. D. (J.) | ND | NC | NC | PC | PC | PC | PC | NC | NC | NC | SC | SC | SC | SC | SC | PC |
| VIII. Reporting Requirements and Right of Access/Margo Frasier | | | | | | | | | | | | | | | | |
| VIII.A. | ND | PC | NC | PC | PC | PC | PC | NC | NC | PC | SC | SC | SC | SC | SC | SC |
| VIII.B. | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| VIII.C. | PC | PC | PC | SC | SC | SC | NC | NC | PC | PC | SC | SC | SC | SC | PC | PC |
| **Legend:**<br>**ND - Not scheduled for review NC - Non-compliance**<br>**PC - Partial Compliance**<br>**SC - Substantial Compliance NA - Not Applicable** | | | | | | | | | | | | | | | | |