


# SUSAN HUTSON
## *Sheriff*

### OFFICE OF THE SHERIFF
*Parish of Orleans • State of Louisiana*

June 21, 2023

The Honorable Lance M. Africk
US District Court, Eastern District of Louisiana
500 Poydras Street Room C405
New Orleans, LA 70130

| | |
|---|---|
| UNITED STATES DISTRICT COURT<br>EASTERN DISTRICT OF LOUISIANA | CIVIL ACTION NO: 12-859 |
| | SECTION I, DIVISION 5 |
| LASHAWN JONES, ET AL.<br>VERSUS<br>MARLIN GUSMAN, ET AL. | JUDGE LANCE AFRICK<br>MAGISTRATE JUDGE NORTH |

RE:    Phase III Cooperative Endeavor Agreement

To the Honorable Judge Lance Africk:

Please accept this letter as a clarification of my position regarding the "Phase III" project. It is important to clarify some public misstatements about my position, in the interest of efficient administration and discharge of my duties as Sheriff of Orleans Parish.  I hope that this communication sets the stage for an inclusive and robust conversation about the expansion of mental health treatment, both inside the Orleans Justice Center ("OJC") and also within the City of New Orleans.  Public safety for the entire City rests upon the Court's docket.  The laws of the United States of America, the State of Louisiana, local laws, and rules and regulations support my responsibility as Orleans Parish Sheriff to champion solutions that I see as better and also identify those I see as not ideal in improving conditions for OJC residents.

My official position regarding the expansion of mental health treatment inside the OJC is that Phase III is not the best solution and that other options more beneficial to current and future jail residents and the citizens of the City of New Orleans have not been meaningfully explored during my tenure as Orleans Parish Sheriff.  This position is not mine alone.  Two Mayors, four terms of City Council members, the District Attorney, the Public Defender and the community have opposed building Phase III.  Their opposition has been public and well documented.   I think it

The Honorable Judge Lance Africk
June 21, 2023
Page 2 of 6

important to note for the record that diverse groups of public officials believe and have believed that this plan is not the best means of achieving constitutional compliance.

The Phase III facility's primary purpose is to house the acute (presently about 20) and sub-acute (presently about 30) mentally ill inmates. There would be 90 beds in 56 cells, if Phase III were built as planned. The building would also house a 13-bed infirmary, expanded clinic, administrative/medical personnel offices, visitation rooms, and a laundry. Phase III is expected to take three to four years to build after construction begins.

The estimated cost to tax payers of building Phase III has almost tripled since it was originally proposed. The architect's initial estimate was $40 million. The City put the project out to bid twice-- the second time because only one bid was received the first time. The project bids were well over budget both times. The second round again brought only one bidder – the same bidder as the first – and an even higher bid of $88,757,000. With soft costs and fees estimated at 30%, the ultimate price tag is likely to be $115 million. This cost equates to $2+ million per actual cell. It should be noted that the Orleans Parish Sheriff's Office is still engaged in litigation with the current bidder over the building of Phases I and II and espouses major reservations about the safety of the design of Phase II-OJC.

Funding this building project will require the City to appropriate $76 million in capital funds for construction. On August 4, 2022, through Ord. No. 29,131, the City Council re-appropriated $26.7 million that was taken from capital funds set aside for other public safety projects, libraries and parks. On February 16, 2023, the Council appropriated $38.7 million in "FEMA Katrina" funds for construction of Phase III. Another $49.6 million of the City's capital projects will have to be re-appropriated to cover the construction costs under the new bid. Several years ago, it was estimated that the new building would cost $8 million a year to operate. That estimate now exceeds $10 million according to several sources. Presumably, this money would come from the City's general fund.

The proposed Phase III facility has numerous flaws that undercut its effectiveness as a means of complying with specific provisions of the consent decree.  There is a total of 56 cells with 90 beds. Only 22 of the 56 cells are designed as single-bed cells. Because most acute and sub-acute patients cannot safely be double celled, 56 beds should be considered as the true capacity of Phase III.  With a peaking factor of 15%, the total capacity of Phase III is 47 patients.

The cell layout in Phase III for the acutely mentally ill patients is an outdated and rarely used panopticon design that is inhumane and dangerous, according to mental health experts. This design places the cells in a circle with all facing a security station in the middle.  The Phase III design includes all glass cell fronts, so the patients are on view 24/7.  Such a lack of privacy among

 

Orleans Parish Sheriff's Office
2800 Perdido Street • New Orleans LA 70119

severely mentally ill jail patients undoubtedly will cause further psychological damage and will encourage unhealthy activity and communication among patients.

The majority of residents on the mental health caseload (between 400 and 450) will continue to be housed in OJC, which currently has no individual counseling rooms and only two available multi-purpose rooms. Approximately 75% of the mental health caseload requires individual counseling sessions. All parties have recognized that OJC will require renovation (despite the addition of Phase III) to provide adequate counseling rooms. No plan for this renovation has been created and no money has been appropriated for it. In contrast, I have not waited, and we have completed minimal modifications to include more suicide prevention cells and plan to remodel the interlock areas to include counseling rooms in some interlock areas.

All people who need infirmary level medical care are presently sent to University Medical Center (UMC), about 1-3 on any given day. Phase III will provide 13 infirmary beds that will be mostly unused based on average historical demand. Moreover, Phase III contains group counseling rooms and visitation rooms that outnumber the patients who will be housed there. Many of the above deficiencies cannot be seriously debated.

I appreciate that over the prior 6 years all parties have participated vigorously in attempting to find a solution to the challenge of treating our most ill jail residents. During this extended debate many viable alternatives have been offered. During my tenure as the duly elected Sheriff of Orleans Parish, I have been unable to engage meaningfully with any of the stakeholders regarding feasible solutions to expand mental health services within OJC. Instead, the Phase III project has dominated the discussion, notwithstanding the long list of flaws in the proposed building.

One prior recommendation was a full build out at the Temporary Detention Center ("TDC"). Two buildings of the (TDC), which consists of four buildings with two pods each, were renovated at a cost of $7 Million to house the acutely mentally ill. The TMH (Temporary Mental Health) facility has been successful, considering the limited scope for which it was originally purposed.

At present, a total of 1,709 beds are available: 1,438 in OJC; 59 in TMH; and 212 in TDC Buildings 3 and 4. The acute male patients (~20) are in TMH, and the sub-acute male patients (~30) are in OJC Pod 2A. A small number of acute and sub-acute women reside in OJC. There is much unused or underused space in OJC in addition to approximately 400 unused beds.

A reasonable Compliance Plan would involve renovating the two un-renovated TDC buildings (Buildings 1 and 2) to house the sub-acute patients, and would add an infirmary and counseling and visitation rooms within OJC. We note that we are already working to move all acute residents to TMH at the request of the Court and the Court's monitors. Further utilizing all the space at




TDC is a less expensive and quicker option. The additional remodeling of TDC, TMH and OJC is estimated to cost $14 million for the buildout ($8.2 million for renovation of the TMH extension and $5.6 million for renovation of OJC.) It is estimated to take one to 1 ½ years to fully build out. To be clear, this proposal is not a reiteration of the failed "retrofit" discussions of past administrations but rather a fresh look at a different option based on current realities.

Such an approach would provide numerous improvements over what is presently proposed. For instance, all cells for the acute and sub-acute patients would be single bed cells. The acute and sub-acute patients would not be placed in inhumanely designed cells that put them on display 24/7. The cells in TMH are humane and secure. These would be replicated for the extended TMH for the sub-acute patients. Existing cells in each pod of OJC would be converted to individual counseling rooms for the 400+ mental health caseload, which would create significant savings because security would not be required to transport these patients out of their pods for counseling. Existing larger spaces that are underused or could easily be converted to group counseling rooms at little to no cost have been identified, a number of which are within pods.

The clinic inside OJC could be right-sized and is located adjacent to a large unused space that could be made into a properly sized and outfitted infirmary. Laundry could continue to be outsourced. Alternatively, the kitchen and warehouse building (Phase I), which was grossly overbuilt, could be renovated to include a laundry. The staffing shortage would not be exacerbated, as the existing staff oversee the sub-acute patients on OJC Pod 2A which would be moved to the extended TMH. The building costs would be reduced from $115 million to approximately $14 million and the project could be completed two to three years earlier.

The unused $84 million re-appropriation from the City Council would create an opportunity for the City of New Orleans to fund a more comprehensive system of care for individuals with trauma, mental health diagnoses, and substance use disorder with these capital funds. This less costly and more expeditious proposal (along with several others) should be more fully vetted and considered. There are other options that I would welcome the opportunity to discuss more fully with the Court and all stakeholders. The Court's power, authority, influence, and leadership could help usher in a new era of mental health care and public safety that would resound for decades to come.

    As previously stated, the Phase III project has a proposed price of approximately $115 million. A large majority of this money is being taken from other projects that were previously planned, including public safety projects, community centers, libraries, etc. Considering the larger consequences of building the Phase III facility it is important that all due diligence and transparency remain intact. Moreover, this $115 Million project has been fast tracked without



Orleans Parish Sheriff's Office
2800 Perdido Street • New Orleans LA 70119



proper adherence to our laws and desired principles of transparency and good government practices.

For instance, recently the City Council created Rule 57 and the related City Code section, seemingly as an added protective measure to further transparency in contracting within City government. The City Council suspended Rule 57 in pushing forward resolutions and ordinances to build the Phase III facility.   City Code section 70-10 now requires, among other things, that most contracts with an initial term of more than one year be signed by the President of the City Council. City Council Rule 57 states that when the Council President is asked to sign a contract pursuant to City Code section 70-10, the request must be in writing and placed on the Consent Agenda of a Council meeting. (The purpose of this requirement is to give initial public notice of matters of serious public interest. The request must thereafter be sent along with the requisite documentary support through the appropriate Council committee (for public hearing) and receive a majority vote of the committee. Only then can the request go before the Council for approval, and this is done by a "by request" motion bearing the names of all committee members who voted in favor of it.  The ordinance itself was on the Consent Agenda for the June 8 meeting (item 74j). It was not submitted as a formal communication requesting the signature of the Council President per Rule 57.   It was not sent to the appropriate Council committee for public hearing. Because it was not voted on at a committee meeting, it is sponsored only by one Council member.   It is not being brought to the Council on its June 22 Regular Agenda as a "by request" motion, but as an ordinance. If it were brought as a "by request" motion, the motion would be voted on at the June 22 meeting, and an ordinance would then be prepared and placed on the Consent Agenda to be voted on at the next City Council meeting. The very purpose of these newly created rules would be thwarted by suspending Rule 57.

Moreover, City Council Rule 17 states that the City Council rules can be temporarily suspended. This must be done by a two-thirds vote of the Council, and the Council President must state the purpose for which the rules are suspended.   Such a rule exists so the public will have notice and a chance to weigh in.   The public needs an explanation of why the rule the Council just created for increased transparency in government contracting is being suspended—particularly considering the size and scope of the Phase III project. The Phase III project has been accelerated in ways that are counterproductive to good government.

In summary, I am confident that my role as Sheriff of Orleans Parish gives me the authority to challenge proposals that I think are not in the best interest of the residents of OJC, present and future.  Further, to acquiesce in—or even worse, to sign off on—this project would be a dereliction of my duty as Sheriff for many of the reasons I have outlined.  I am hopeful that the Court will help to lead a robust conversation with stakeholders interested in expanding mental




health services for the jail and our entire community in ways that serve jail residents and New Orleanians and in hopes of making us all safer.

In Partnership,

Susan Hutson
Orleans Parish Sheriff

**RESPECTFULLY SUBMITTED,**

/s/ John S. Williams
**John S. Williams (LSBA No. 32270)**
Williamsjo@opso.us
2800 Perdido Street
New Orleans, LA 70119
(504) 822-8000 office
(504) 202-9454 facsimile

**CERTIFICATE OF SERVICE**
**I HEREBY CERTIFY** that on June 21, 2023, a copy of the foregoing was served contemporaneously, upon all counsel of record in this proceeding via the court's CM/ECF system.

/s/ John S. Williams

cc:   Mayor Latoya Cantrell (via email)
      All City Councilmembers (via email)
      Plaintiffs Class (via email)
      Department of Justice (via email)




Orleans Parish Sheriff's Office
2800 Perdido Street • New Orleans LA 70119