# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| _____ | § |
| LASHAWN JONES, *et al.*, and | § |
| THE UNITED STATES OF AMERICA, | § |
| | § Civil Action No. 2:12-cv-00859 |
| PLAINTIFFS | § Section I, Division 5 |
| | § Judge Lance M. Africk |
| | § Magistrate Judge Michael B. North |
| SUSAN HUTSON, Sheriff, | § |
| | § |
| | § |
| DEFENDANT. | § |
| _____ | § |

## Report No. 17 of the Independent Monitors
## July 3, 2023

Margo L. Frasier, J.D., C.P.O., Lead Monitor
Susi Vassallo, M.D., Medical Monitor
Patricia L. Hardyman, Ph.D., Classification Monitor
Nicole Johnson, M.D., Mental Health Monitor
Shane J. Poole, M.S., C.JM., Environmental Fire Life Safety Monitor
Diane Skipworth, M.C.J., R.D.N., L.D., R.S., C.C.H.P., C.L.L.M., Food Safety Monitor



### Compliance Report #17
### LASHAWN JONES, et al., and the United States of America v. Susan Hutson, Sheriff

Table of Contents

|  |  | Page |
|---|---|---|
| I. | Introduction | 4 |
| | A. Summary of Compliance | 6 |
| | B. Opportunities for Progress | 8 |
| | C. Review Process of Monitors' Compliance Report #16 | 17 |
| | D. Communication with Stakeholders | 18 |
| | E. Recommendations | 18 |
| II. | Substantive Provisions | |
| | A. Protection from Harm | 20 |
| | A.1. Use of Force Policies and Procedures | 23 |
| | A.2. Use of Force Training | 25 |
| | A.3. Use of Force Reporting | 27 |
| | A.4. Early Intervention System | 31 |
| | A.5. Safety and Supervision | 32 |
| | A.6. Security Staffing | 39 |
| | A.7. Incidents and Referrals | 41 |
| | A.8. Investigations | 43 |
| | A.9. Pretrial Placement in Alternative Settings | 46 |
| | A.10. Custodial Placement | 46 |
| | A.11. Prisoner Grievance Process | 70 |
| | A.12. Sexual Abuse | 78 |
| | A.13. Access to Information | 78 |
| | B. Mental Health Care | 79 |
| | C. Medical Care | 105 |
| | D. Sanitation and Environmental Conditions | 117 |
| | E. Fire and Life Safety | 131 |
| | F. Language Assistance | 135 |
| | G. Youthful Prisoners | 137 |
| | H. The New Jail Facility | 137 |
| | I. Compliance and Quality Improvement | 138 |
| | J. Reporting Requirements and Right of Access | 140 |
| III. | Status of Stipulated Orders – February 11, 2015, and April 22, 2015 | 141 |



**Page**

**Tables**

Table 1 – Summary of Compliance – All Compliance Reports                    7
Table 2 – Status of Compliance – Stipulated Agreements                      8
Table 3 – Summary of Incidents CY 2019-CY 2022                             21
Table 4 – CY 2018-CY 2022 All OJC Reported Incidents by Month              22
Table 5 – CY 2018-CY 2022 OJC Reported Incidents                          35
Table 6-- Housing Audits by Units—October 2021-September 2022             68

**Figures**

Figure 1 – Percentage of White Male Inmates Assigned to OJC, TDC, and TMH
          Housing Units—October 2021-September 2022                          54
Figure 2 – Percentage of White Female Inmates Assigned to OJC, TDC, and
          TMH Housing Units—October 2021-September 2022                     54
Figure 3 – Rates and Completion Time of Initial Custody Assessments
          Completed October 2021-September 2022                             56
Figure 4 – Percent Overrides for Housing Purposes – October 2021 –
          September 2022                                                    58
Figure 5 – Mandatory and Discretionary Override Rates by Gender
          October 2021 – September 2022                                    59
Figure 6 – Pending Custody Assessments April 2021-September 2022           61
Figure 7 – Victimization of Inmates on the Mental Health Caseload April
          2022-March 2022                                                  62
Figure 8 – Number of Attachments input by Classification Staff
          —October 2021-September 2022                                      63
Figure 9 – Percentage of Initial Custody Assessments April 2022-Sept. 2022  64
Figure 10–Rate of Disciplinary Infractions for the OPSO ADP: October 2022
          -September 2022                                                   68
Figure 11—OPSO ADP vs. Number of Disciplinary                             68
Figure 12—Most Serious Disciplinary Infraction/Report with Finding of
          Guilty                                                           69

**Charts**

Chart 1—Facility Food Service, Medical, Mental Health, and Miscellaneous
          Grievances                                                       70
Chart 2-- Inmate/Inmate Physical Violence and PREA, Staff Misconduct and
          PREA, Life-Threatening, and Use of Force Grievances               73
Chart 3-- Commissary, Programs, Inmate Funds, Property, Grievance
          Appeals, Legal and Law Library Grievances                         74
Chart 4—Monthly Grievances, Request and Inmate Population Comparison       75

**Appendices**

Appendix A - Summary Compliance Findings by Section Compliance
Reports 1 – 14                                                            143



**Compliance Report # 17**
**Introduction:**

This is Compliance Report #17 submitted by the Independent Monitors providing assessment of the Orleans Parish Sheriff's Office's (OPSO) compliance with the Consent Judgment of June 6, 2013. Compliance Report #17 reflects the status of OPSO's compliance as of September 30, 2022. This report is based on incidents, documents, and compliance-related activities between April 1, 2022, and September 30, 2022. All of the Monitors were on-site for a monitoring tour December 5-8, 2022. This report is based on the observations and review of OPSO documents by the Monitors during the on-site visits and the monitoring period.

Throughout the time the Monitors have been involved in enforcement of the Consent Judgment, the on-site visits have played an integral role. During the on-site visits and the on-site visits by the Lead Monitor and various other monitors in between the monitoring tours, the Monitors have endeavored to provide guidance to OPSO as to how to remedy the unsafe and unconstitutional conditions which existed when we began monitoring in late 2013, and which continue to exist. In addition to the on-site visit of all of the Monitors December 5-8, 2022, the Lead Monitor visited June 18-20, 2022, July 8-10, 2022, July 15-18, 2022, August 15-17, 2022, September 19-21, 2022, October 12-13, 2022, October 18-20, 2022, and December 19-22, 2022. Monitor Shane Poole accompanied the Lead Monitor during the visits on August 15-17, 2022, September 19-21, 2022, and October 18-20, 2022. Additionally, all of the Monitors were in frequent contact with OPSO via other methods such as emails, telephone calls, and virtual meetings.

It should be noted that a new New Orleans Parish Sheriff was elected in December 2021. Sheriff Susan Hutson took over as Orleans Parish Sheriff in May 2022. The period covered by Compliance Report #17 occurred during the last month Sheriff Marlin Gusman was in office and the first five months of Sheriff Hutson being in office.

The Monitors have consistently urged OPSO to put in place the necessary processes and procedures to not only obtain compliance, but to sustain compliance. Such processes and procedures would allow OPSO to provide adequate proof of compliance, independently assess compliance with the Consent Judgment and its own policies and procedures, and address shortcomings without intervention of the Monitors. The Monitors have provided guidance as to how to go about the various review functions and establish a



compliance unit that would operate independently of those whose performance would be assessed. While there had been talk about the formation of a compliance unit over the past several years under Sheriff Gusman, it did not become operational until Sheriff Hutson took office. During the monitoring period, Sheriff Hutson took steps to form a compliance unit which included naming the initial staff assigned to form the Compliance and Accountability Bureau (CAB).

The establishment of the CAB is a monumental step in the right direction. A fully staffed compliance unit, which includes inspection and auditing duties, will allow OPSO to recognize deficiencies, and address them. For instance, OPSO continues to not have an electronic way of recording when and if security checks take place in the housing units. Since there is not an electronic record of checks, deputies write the checks in their logbooks. In an effort to make review of checks simpler by supervisors, OPSO developed a paper form on which to record security checks. While this provides an easier way for a supervisor to determine during a unit inspection if the deputy has recorded that the security checks are being performed timely, it is insufficient proof that an appropriate security check actually occurred and when it occurred. To appropriately verify the accuracy of the times recorded and the method used, hours of video would have to be watched. Prior monitoring visits have revealed the continued deficiencies in the documentation and auditing of the security checks. For instance, in the past and during this on-site visit, deputies were inconsistent in describing what an acceptable security check would look like. Furthermore, the deputies admitted that they did not perform all of the tasks for a proper security check each time a security check was recorded as having taken place. Generally, an adequate security check was only performed, if at all, when a physical count of the inmates took place; twice a day. The CAB is important to the work to be done on gaining and sustaining compliance. Equally important is adopting a culture where accountability is embraced as opposed to a culture where there is a reluctance to address the deficiencies and, in some instances, undermining the efforts of those whose job it is to provide information.

For the first two months of the monitoring period, OPSO was without a Chief of Corrections. Byron LeCounte had served as the Chief of Corrections but left the position in December 2021. The OPSO is required to employ a professional corrections administrator who meets the requirements outlined in the Consent Judgment. For the last four months of



the monitoring period, that position was held by Dr. Astrid Birgden.

In summary, the Monitors find that food service for inmates held in both the Orleans Justice Center (OJC) and the Temporary Detention Center (TDC) maintained the maintained substantial compliance noted in Compliance Report #16 provided to the Court on July 18, 2022. In other areas of the Consent Judgement, there has not been progress, and in some cases, there has been regression; particularly, in safety and classification. Overall, ratings improved in three (3) provisions and regressed on twenty-two (22) provisions. There are now seventeen (17) provisions in non-compliance. The lack of progression and, in some cases, regression is due to a failure to follow the policies and procedures that have been put in place. It has been exasperated by the lack of staff, but many of the provisions are not reliant on security staffing. The specific areas are addressed in this report.

### A.    Summary of Compliance

The requirements of the Consent Judgment represent correctional practice recognized as required for the operation of a Constitutional jail system. While there is some flexibility in addressing the mandates, achieving substantial compliance with the Consent Judgment, and Stipulated Agreements are necessary to bring OPSO and its correctional facilities into adherence with Constitutional requirements. The Consent Judgment contains 174 separately rated provisions. While they are separately rated, they are often intertwined. For example, effective implementation of a policy requires not only the drafting of a suitable policy, but appropriate training on the policy and enforcement of the policy. Enforcement of the policy is contingent on assessing whether the policy is being followed which requires supervision, analysis of incidents and data, and objective confirmation of compliance. A meaningful annual review of the adequacy of the policy does not just mean determining whether the wording of the policy should be changed, but also includes evaluating adherence to the policy and whether the objectives of the policy are being met; which requires objective data collection and analysis and development of corrective action plans. While appropriate policies have been developed, the objective data collection, analysis and development of corrective action plans have been lacking or non-existent thus far. The Monitors are hopeful that will change with the establishment of the CAB under Sheriff Hutson.



Based on the current assessment, OPSO has regressed from Report #16. There are now seventeen (17) provisions which are in non-compliance; as opposed to Report #15 when there were five (5). Substantial compliance has been achieved for forty-six (46%) of the provisions. Forty-four percent (44%) of the provisions are in partial compliance. Ten percent (10%) of the provisions are in non-compliance.

Over time, OPSO has made material progress as indicated by the movement of non-compliance to partial compliance to substantial compliance for over half of the provisions. At different times during the duration of the Consent Judgment, including in some areas in this report, there has been regression in the progress towards compliance. As will be addressed in individual areas, OPSO has shown regression from the progress reflected in Compliance Reports #10-16 in some provisions due to failure to consistently follow and enforce policies and procedures and to provide meaningful training.

During the onsite visit for Compliance Report #17, it was apparent that the efforts made by Chief LeCounte to utilize analyses of data, including grievance data and use of force data to determine policy adherence and develop action plans to address shortcomings and make decisions that had been mostly abandoned with his departure by the previous administration, were being revived. However, for those efforts to be successful, reliable data which is analyzed in an impartial manner and the development of a systematic approach to making decisions and implementing and enforcing them must occur. The establishment of the CAB is a definite move in the right direction, but the concept of accountability and a systematic approach must become part of the OPSO culture. Otherwise, the same deficiencies are likely to continue to be noted time and time again.

**Table 1 – Summary of Compliance – All Compliance Reports[1]**

| Compliance Report/Date | Substantial Compliance | Partial Compliance | Non-Compliance | NA/ Other | Total |
|---|---|---|---|---|---|
| #1 – December 2013 | 0 | 10 | 85 | 76 | 171 |
| #2 – July 2014 | 2 | 22 | 149 | 1 | 174 |
| #3 – January 2015 | 2 | 60 | 110 | 2 | 174 |
| #4 – August 2015 | 12 | 114 | 43 | 4 | 173 |
| #5 – February 2016 | 10 | 96 | 63 | 4 | 173 |
| #6 – September 2016 | 20 | 98 | 53 | 2 | 173 |
| #7 – March 2017 | 17 | 99 | 55 | 2 | 173 |
| #8 – November 2017 | 23 | 104 | 44 | 2 | 173 |



| #9 – June 2018 | 26 | 99 | 46 | 2 | 173 |
| #10 – January 2019 | 65 | 98 | 8 | 2 | 173 |
| #11 – September 2019 | 103 | 66 | 5 | 0 | 174 |
| #12 – May 2020 | 118 | 56 | 0 | 0 | 174 |
| #13-- November 2020 | 111 | 59 | 4 | 0 | 174 |
| #14—May 2021 | 100 | 67 | 7 | 0 | 174 |
| #15—November 2021 | 97 | 77 | 0 | 0 | 174 |
| #16—May 2022 | 95 | 72 | 5 | 0 | 174 |
| #17—December 2022 | 80 | 77 | 17 | 0 | 174 |

The status of compliance (February 11, 2015, and April 22, 2015) is as follows:

**Table 2 – Status of Compliance with 2015 Stipulated Agreements**

| Compliance Report/Date | Substantial Compliance | Partial Compliance | Non-Compliance | NA | Total |
|---|---|---|---|---|---|
| August 2015 | 21 | 12 | 1 | 0 | 34 |
| February 2016 | 21 | 12 | 1 | 1 | 34 |
| September 2016 | 26 | 7 | 1 | 0 | 34 |
| March 2017 | 28 | 4 | 1 | 1 | 34 |
| November 2017 | 21 | 11 | 1 | 1 | 34 |
| June 2018 | 23 | 8 | 2 | 1 | 34 |
| January 2019 | 28 | 5 | 0 | 1 | 34 |
| September 2019 | 28 | 5 | 0 | 1 | 34 |
| May 2020 | 28 | 5 | 0 | 1 | 34 |
| November 2020 | 32 | 2 | 0 | 0 | 34 |
| May 2021 | 32 | 2 | 0 | 0 | 34 |
| November 2021 | 32 | 2 | 0 | 0 | 34 |
| May 2022 | 32 | 2 | 0 | 0 | 34 |
| December 2022 | 32 | 2 | 0 | 0 | 34 |

**B.    Opportunities for Continued Progress**

The Monitors summarize below the areas identified in preparation of this report regarding OPSO's current level of compliance with the Consent Judgment.

**1.    Foundational Work** - The essential, core work required to achieve compliance includes:

- Policies and Procedures – OPSO has completed the essential policies and procedures. The Policy Manager has continued to coordinate the review of policies and make the necessary updates. When the need for new policies is identified, the Policy Manager initiates a draft and circulates them to the



appropriate staff. The review process seems to take an extraordinary length of time. Often draft policies remain in draft form for many months without finalization. Essential is the continued development, approval, and implementation of lessons plans and training that correspond with each of the policies. OPSO's policy governing its written directive system has significantly improved the policy/procedure process. This process allows for organizational components to develop specific operational practices for review by OPSO administration. Unfortunately, there is often a delay between when policies are submitted for review, and when they are returned with any suggested changes. Adherence to the policies, procedures, and training is essential. While the implementation of the CAB will be helpful through its objective auditing of policy adherence, the consistent enforcement of policies is a role which must be performed by the supervisors at all levels. Too often the failure to follow policy is blamed on the lack of staff or training. Neither is an acceptable excuse.

- <u>Inadequate staffing</u> – OPSO has continued to hire staff but has not been able to gain ground on vacancies due to the number of terminations and resignations. During CY 2021, OPSO lost significant ground in that it hired 97 new staff members and lost 177 staff members through resignation, termination, and retirement. During CY 2021, OPSO hired 136 new staff members and lost 185 staff members through resignation, termination, and retirement. Over the past two calendar years, the number of staff has decreased by 129. Inadequate staff in the housing areas of the facilities (OJC and TMH) and the timely and thorough completion of use of force investigations continues to hamper OPSO's ability to consistently comply with the Consent Judgment. OPSO has not mandated overtime to address the staff shortages. Other units within the OPSO have been tasked with assisting, but, more often than not, there are housing units and control rooms with no assigned staffing. Staff are often tasked with manning two housing units and the control room despite the Consent Judgment requiring one deputy/recruit on each unit for direct supervision. Further, almost daily, assigned staff leave housing units and control pods unattended for meal



COMPLIANCE REPORT #17

breaks and other duties. Sheriff Hutson raised the salaries for recruits and deputies as a result of the budget request submitted in the 2023 budget. OPSO is strongly encouraged to review its deployment of staff. It is apparent that staff are not being deployed to the areas where the need is most critical, staffing the housing units. While redeployment of staff is unlikely to fully address the staffing shortage, it would be helpful in addressing the most critical needs. During the monitoring period, there was a severe lack of supervisors on the evening/night shift due to the majority of the supervisors working on the day shift. Sheriff Hutson has made redeployment of staff, including adequate supervision on the evening/night shift a priority.

- Training – Employee training for security staff, both pre-service and in-service, has made progress over time, but has taken a step back with the lack of staff. In 2021, OPSO reinstated the practice of assigning new deputies to a training officer during the first three weeks of assignment to OJC (field training program), but enforcement and follow through has been sporadic and occurred infrequently during the monitoring period. The sergeant supervising the program also has the duty of running the school program which has hampered her efforts to meet with the new deputies and provide them mentoring and guidance. A field training program needs to be fully implemented with follow up as to the effect the program has on turnover. The program, if allowed to be fully implemented, is likely to result in a reduction of turnover and a reduction in rule violation by new deputies. OPSO did its annual training in CY 2021 with 99% attending. CY 2022 will be included in the next monitoring report.

- Supervision – Safe operation of OPSO's facilities requires an adequate number of sufficiently trained first line and mid-management supervisors and clear lines of authority and responsibility. When Independent Compliance Director Hodge was in charge of operations, he implemented the unit management approach and provided training and mentoring for the managers. While there are benefits to a unit management system, the unit management system has blurred the lines of responsibility and accountability. This is particularly apparent when there are no unit



COMPLIANCE REPORT #17                                    10

managers on duty and the supervision of the jail is the responsibility of the watch commanders. Given that the unit managers were seldom present at the facility after 4:00 p.m. or weekends, the authority of the watch commanders to assign and supervise the staff is crucial to the safe operation of the OJC. During the monitoring period, there often was not anyone higher than the rank of sergeant on duty in the evening and overnight hours and on the weekends. This issue appears to have been addressed after the monitoring period by deploying the captains and lieutenants to cover the shifts on a 24/7 basis. However, it was met with great resistance from those that did not want to give up having weekends off or working only the day shift.

2.    **Medical and Mental Health Care** – The Medical and Mental Health Monitors report challenges remain in the provision of basic care, staffing, and recordkeeping, as well as the continued need for improved collaboration with custody/security staffing. Security staff continued to be responsible for the performance of some of the "suicide watches" during the on-site visit. While there was some improvement in the deputies' knowledge of their duties to perform and document suicide watches, inconsistency with how suicide watches were performed and documented were still noted, resulting in inconsistency of the reporting of data. Resources from Tulane University continue to be particularly helpful in providing psychiatric mental health care, but the psychiatrists have had difficulty during the monitoring period accessing their clients due to the shortage of security staff. In addition, Tulane University is not responsible for many aspects of mental health care required by the Consent Judgment. An important part of the long-term solution to the lack of compliance with the Consent Judgment in the areas of medical and mental health is the design and construction of Phase III, a specialized building which will contain an infirmary and housing for inmates with acute mental health issues. The City extensively renovated portions of TDC (now referred as TMH or Temporary Mental Health) as a stop gap measure. OPSO does not utilize all of the TMH units due to a lack of security staffing. Inmates with acute mental health issues continue to be housed in OJC which is inadequate for the housing of these inmates. The inadequacy of the facilities within OJC to house inmates with mental health



issues and the lack of training on the part of the security staff are reflected in the high number of uses of force on the mental health units.

3. **Inmate Safety and Protection from Harm** - Providing a safe and secure jail continues to be a challenge.

- Unit Management—The Unit Management approach was being used in the supervision of the OPSO housing units during the monitoring period. Each floor of the OJC, the IPC, and the TDC/TMH have been designated as a "unit". The purpose of this strategy is to enhance accountability for both staff and the inmates by allowing the staff to get to know the inmates. The effectiveness of the Unit Management approach has been greatly hampered by the lack of development of management plans for problematic inmates. It also has blurred the lines of responsibility and accountability as indicated above. It has been proven not to be effective. At the time of the writing of this report, the Unit Management approach has been abandoned by the new administration. The Monitors feel this was the right decision as the captains and lieutenants are better utilized supervising OJC 24/7.

- Violence – There were significant incidents of violence occurring within the facilities during the monitoring period; including inmate-on-inmate assaults and assaults on staff. Most often, the inmate-on-inmate assaults occurred when there was no deputy stationed in the housing unit. Especially concerning is that inmates continue to fashion weapons from items found in the jail. As one source of contraband (such as the light supports in the utility closets and the cabinets at the front of the day room) is identified and eliminated, the inmates then discover a new source of material from which to fashion weapons. For example, inmates have begun to pry off the metal sheeting around the sinks in the janitor closets and used the brooms the facility provided as weapons. In reality, few, if any, of the sources of contraband would be available to the inmates if the staff followed policies regarding supervision and limiting access to materials. The long-standing problem of the cabinets in the dayrooms being used as a resource for contraband was addressed by Sheriff Hutson's staff within two months of taking over the OJC. Another concern is the lack of effective random



shakedowns resulting in the continued presence of weapons, pills, and other contraband in the housing units. Disorder and non-compliance with the institutional rules cause staff to use force to gain control and compliance. Often the force is more than is necessary. There is inadequate use of de-escalation techniques before resorting to force, including repeated examples of using OC spray without adequate de-escalation and/or in retaliation against inmates. Seldom are mental health staff involved when de-escalation is appropriate even though a large percentage of the inmates involved in uses of force are on the mental health caseload. The number of overdoses linked to illicit drugs and prescription medication continues to be high. Two inmates died in June 2022 (one as a result of an inmate-on-inmate altercation and the other by means of suicide from leaping off the mezzanine).

- <u>Inmate Classification</u> – The inmate classification process, which regressed during this monitoring period, requires continued attention to ensure housing decisions and placements are consistent with OPSO policies and objective classification principles. Credible auditing needs to focus on identifying issues and correcting placements. Once again, during the tour, the housing audits were found to be wholly inadequate. While the classification manager claimed the audits had been performed, it turned out not to be true. This is in spite of it having been a repeated point of emphasis over several monitoring tours and was supposed to be part of a corrective action plan. There is no analysis done when inmates are involved in an altercation to determine whether they should have been kept separate. After the monitoring period, the classification manager was reassigned. Only recently, a new classification manager has been selected and appears to be following classification policy.

- <u>Inmate grievances</u> – As of Report #11, the ratings of the subdivisions in the grievance provision were individually given. The separate ratings allowed the areas in which deficiency existed to be highlighted. Timeliness and adequacy of responses are still not in substantial compliance. The trend data from the grievance system is now available to assist in identifying problems



to be addressed, but there was a lack of follow through by the administration under Sheriff Gusman. More emphasis was found on identifying problems during this monitoring period. The key will be addressing the issues identified.

- <u>Incident Reporting</u> –The accurate, timely reporting of incidents has been a constant area of concern. There remain serious incidents for which no report or no timely report is prepared by OPSO staff, including incidents involving the serious injury of inmates and drug overdoses. Reports are often incomplete and do not provide the necessary information for the reader to determine what occurred and why it occurred. It is particularly concerning that incomplete and sometime inarticulate reports have been reviewed by and approved by a supervisor. OPSO began implementation of a corrective action plan over a year ago to address timeliness and thoroughness of reports which includes training and remedial action including discipline, but it has not adequately addressed the issue. Part of the problem is the lack of resources dedicated to the gathering and auditing of reports. A change was made after the monitoring period to automatically provide reports electronically each day to the Monitors and parties which has improved the timeliness of provision of completed reports, but the timeliness of the completion of reports and quality of reports still need to be addressed. The change has also highlighted that there are incidents which should have been reported to the Monitors and the parties which were not.

- <u>Jail Management System</u> **–** An integral part of the jail's operational improvement is tied to an effective jail management system. Such capacity provides on-demand, routine, and periodic data to inform critical leadership and management decisions. Such an information system has not been implemented. After OPSO cancelled the contract with the provider who was to supply a new JMS, due to the inability to interface with the Orleans Parish court system, the City of New Orleans was to purchase a JMS which will interface with the Orleans Parish court system and the OPSO information systems. Despite the passage of several years, there is no definite timeline for that process. In the meantime, OPSO has modified its current system to



COMPLIANCE REPORT #17                                              14

provide more of the required JMS functions. One of the crucial areas lacking is a way to electronically verify that security checks are taking place in a timely fashion. There is limited ability to generate reports regarding violence occurring in the OJC. With the change in administration, there appears to be a much-needed emphasis on improving the functioning of the OPSO information systems. However, no funding has been provided to purchase the necessary system.

4.  **Sanitation and Environment Conditions** – Challenges remain regarding the public health and inmate/staff safety risks. Although there have been a few outbreaks of COVID during the monitoring period, COVID has mainly been held in check by quarantining and testing both inmates and staff. There was an outbreak shortly after the monitoring tour. The inability to fill support positions identified in OPSO's staffing analysis negatively impacts the ability of OPSO to sustain compliance with the requirements of the Consent Judgment and align with accepted correctional practice. Sanitation and cleanliness of the cells and housing areas are not solely the responsibility of the sanitation staff. The supervisors and pod deputies have the first responsibility for ensuring inmates keep their cells and dayroom areas clean and uncluttered. The level of cleanliness of cells and housing areas was worse during the site visits conducted during this monitoring period than previous tours since OJC has been occupied. As with past tours, during the monitoring tour, when sanitation concerns were called to the attention of pod deputies and supervisors, they often tried to explain them away by stating they had told the inmate to correct the issue. If true, follow through is clearly lacking.

5.  **Youthful Inmates** – No youthful offenders were held in OJC during the monitoring period. The Monitors applaud the effort being made to house youthful offenders in the Juvenile Justice Intervention Center (JJIC). It should be noted that housing one youthful offender is enough to tie up an entire housing unit.

6.  **Inmate Sexual Safety** – OPSO underwent its required audit of compliance with the Prison Rape Elimination Act of 2003 (PREA) and passed in September 2019. Since that time, the sergeant who was assigned as the PREA Coordinator was moved from that assignment and reassigned to a housing area. One of the PREA managers has been acting in the role of the PREA Coordinator, in addition to her duties, for years.



One person overseeing PREA efforts may be sufficient, but the organizational chart should be updated to indicate that decision. Continued internal collaboration among OPSO security, classification, and the medical/mental health provider is needed for the assessments of inmates' potential vulnerability to sexual assault. Due to the long time that inmates are housed in intake units, inmates of various PREA designations continued to be housed together without an appropriate plan to keep them separate during time out of cell. Commingling of inmates of various PREA designations occurs on half of the housing units. OPSO cannot rely on an audit that is three years old to demonstrate compliance with PREA. The new administration is exploring having an updated PREA audit conducted in the near future.

7. **Compliance, Quality Reporting, and Quality Improvement** – An essential element of inmate safety is OPSO's timely review of all serious incidents as well as of non-violent incidents to determine if there are trends and/or patterns. This ensures assessment of root causes and the development, implementation, and tracking of action plans to address the causes. This activity focuses on resolving problems. OPSO has begun to undertake this function, but there does not seem to have been much progress in addressing the systemic issues, which if they remain unaddressed, will continue to create risks to institutional safety and security. The new administration at OPSO has dedicated more time and knowledgeable resources to quality improvement. One of the main impediments in the past has been the failure to hold staff accountable for failure to follow corrective action plans.

8. **Stipulated Agreements 2015** – The section on the Stipulated Agreements of 2015 has been expanded to aid OPSO in reviewing its on-going compliance with the two Stipulated Agreements from 2015. Two provisions remain in partial compliance, without any progress towards substantial compliance.

9. **Construction Projects** –
   - The Docks – Construction of the renovations on the Docks has been completed.  With the reopening of the courts, the Docks are once again being used for court holding in addition to court access.



- TDC Mental Health (TMH)– Two housing units in the Temporary Detention Center (TDC) (total of four housing areas) were renovated to provide for housing inmates with acute mental illness pending the construction of Phase III. After TMH's completion, the male inmates with acute mental illness were moved from Hunt into one of the housing units. During the monitoring period, OPSO housed acute male inmates and acute female inmates in TMH. However, as in previous monitoring periods, only three of the four housing areas were operational during the monitoring period. Some acute inmates remain in OJC due to the decision not to assign sufficient staff to operate all four of the TMH housing areas.  All sub-acute inmates remain in OJC. OPSO is again encouraged to find a way to staff the fourth housing area at TMH to address the backlog of acute inmates currently housed at OJC.  While TMH is not a suitable long-term solution to meet the requirements of the Consent Judgment as to medical and mental health services, it is a necessary interim step on mental health services given no satisfactory housing for acute inmates in OJC. The operation of TMH has reaffirmed the necessity of single person cells for the majority of acute inmates which should be factored in the operational capacity of Phase III. It is important to note that TMH does nothing to address the lack of infirmary and medical housing in OJC and lack of programming space. Even with the construction of Phase III, there will be a need for safe and suitable housing for sub-acute inmates.

- Phase III –Monthly meetings of the Executive Committee have been held and have provided information to the parties and the Monitors. The construction and occupation of Phase III are critical to the provision of mental and medical health services in accordance with the Consent Judgment. Court intervention has been required to keep the project moving forward.

C.  **Review Process of Monitors' Compliance Report #17**

A draft of this report was provided to OPSO, Counsel for the Plaintiff Class, and the Department of Justice (DOJ) on May 9, 2023.  Comments were provided by Counsel for the Plaintiff Class and DOJ on June 1, 2023. OPSO chose not to make comments. Wellpath did provide some untimely comments directly to the Lead Monitor. The Monitors considered the comments of the parties in finalizing Report #17.



D.     **Communication with Stakeholders**

        The Monitors are committed to providing as much information as possible regarding the status of OPSO's efforts to comply with all orders of the Court. During the monitoring period, OPSO did not honor the request of the Monitors to provide a link to the current reports on the OPSO website.

E.     **Recommendations**

        Over the years, the Monitors have provided multiple recommendations and suggestions to OPSO to assist in achieving and maintaining compliance with the Consent Judgment. The purpose of the recommendations continues to be to assist OPSO in achieving and maintaining compliance; not to change the requirements of the Consent Judgment. There are recommendations and suggestions included within the body of this report.

F.     **Conclusions and Path Forward**

        OPSO has been operating under the provisions of the Consent Judgment since June 2013; monitoring began in Fall 2013. During the previous leadership of Director Hodge, significant improvements were acknowledged by the Monitors. The hiring of Byron LeCounte as Chief of Corrections in February 2019 was beneficial as his additional expertise and experience allowed Director Hodge to focus on the Consent Judgment. Sheriff Gusman resumed the role of full responsibility for bringing OPSO into compliance with the Consent Judgment in August 2020. Sheriff Gusman was defeated in the election held in December 2021 which seemed to lessen his desire to make progress in obtaining compliance during the remainder of his tenure. Chief LeCounte resigned from the OPSO in December 2021 which created a significant leadership vacuum. Sheriff Hutson was sworn in as Sheriff in May 2022. Sheriff Hutson has embraced the challenge of complying with the Consent Judgment and has established a good working relationship with the monitoring team.

        However, it continues to be concerning that the same deficiencies pointed out in previous reports by the Monitors continued to exist and are not resolved. Serious incidents and harm to inmates continue to occur. OPSO has made some efforts to identify and address sources of contraband, but the Monitors encountered inmates smoking, including marijuana and synthetic marijuana, in the facility and weapons have frequently



been fashioned from materials within the OJC. Dangerous medication is frequently found during cell shakedowns; the medication distribution process continues to be flawed.

There appears to be a new emphasis on OPSO's data collection. Data collection and analysis is key to problem solving with a goal of a sustainable reduction in inmate-on-inmate assaults, inmate-on-staff assaults, uses of force, contraband, and property damage. Development of corrective action plans based on thorough analysis of the data and root cause reviews are crucial to improvement. Follow-through on implementation is essential. The Monitors are hopeful that improvement will take place with the emphasis placed on data collection and analysis by OPSO under Sheriff Hutson.

The Monitors remain committed to the Court and the parties to collaborate on solutions that will result in significant improvement towards compliance with the provisions of the Consent Judgment and future achievement of constitutional conditions.

**The Monitors again thank and acknowledge the leadership, guidance, and support of The Honorable Lance M. Africk and The Honorable Michael B. North.**



**I. A.    Protection from Harm**

**Introduction**

This section of the Consent Judgment addresses core correctional functions including the use of force (policies, training, and reporting), identification of staff involved in uses of force through an early intervention system, safety and supervision of inmates, staffing, incidents and referrals, investigations, pre-trial placement of inmates in the facility, classification, the inmate grievance process, safety of inmates from sexual assault, and inmates' access to information.

The Consent Judgment requires that OPSO operate the facility to assure inmates are "reasonably safe and secure." Based on objective review of data, the facility has shown improvement in inmate and staff safety over the life of the Consent Judgment, but significant incidents that result in serious injury to inmates and staff continue to occur which confirmed that the facility is not reasonably safe and secure. Concerning is that inmates continue to fashion weapons out of items available in the jail including brooms provided by the jail. Inmate on inmate assaults often happen with no staff present to prevent the incident from occurring or to intervene to stop the incident. These are often incidents and uses of force which result in injuries severe enough to require hospitalization. This would not have occurred if the facility was properly staffed, and the staff were properly supervising the inmates and conducting themselves in accordance with policy. Also concerning is the lack of a sense of urgency to address the issue of dangerous contraband even when the source of contraband has been determined.

Reaching and sustaining compliance with provisions of the Consent Judgment, particularly this section, relies on the collection, analysis, and corrective action planning using accurate and reliable data. The Monitors encourage OPSO to continue efforts to build its capacity to collect and analyze relevant accurate data, draw supportable conclusions to inform decisions throughout the organization, develop corrective action plans, implement corrective action plans, and hold staff accountable for non-adherence to corrective action plans and policies. As OPSO's capacity to collect, analyze, plan, and implement is enhanced, the ability to achieve and maintain compliance will be strengthened. Without an enhancement in capacity and dedication to making and implementing informed decisions, OPSO is unlikely to achieve and maintain compliance and likely to regress.

The reporting of incidents to the Monitors and parties has been sporadic during the



monitoring period. OPSO has not consistently had someone review the daily medical logs for inmates taken to the clinic for treatment subsequent to an altercation or a use of force, as well as the transport logs of inmates routed to the hospital with trauma-related injuries to cross check them against reported incidents. A continuing issue is the lack of meaningful consequences for supervisors and deputies who fail to comply with the reporting policies resulting in late, incomplete, or missing incident reports. Even something as simple as the checking of a box as to whether there was a deputy on the housing unit when the incident occurred is often found to be inaccurate.

The Monitors reviewed all reported incidents for the monitoring period in preparation of this report. The following charts compare the totals for the calendar years (CY) 2018-2022. Given that the system for reporting incidents has proven to be unreliable, in the past, it was unclear whether a particular decline was the result of reporting errors as opposed to an actual decline in a type of reportable incident. For the last three months of CY 2022, the Monitors received the reports automatically which supported the proposition that previous declines were more likely the result of not reporting incidents and/or not forwarding the incident reports to the Monitors.

**Table 3 - All OJC Reported Incidents for CY 2018-CY 2022**





| | Inmate/ Inmate Assault | Inmate Staff Altercation | Use of Force | PREA | Death | Attempt Suicide/ Ideation | Internal Escape | Criminal Damage | Inmate Injury/ Inmate Medical (AKA slip/falls/ overdoses) | Contraband | Staff Arrest/Misconduct/ Suspension | Other |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2018** | 442 | 64 | 260 | 47 | 2 | 78 | 48 | 69 | 262 | 106 | 3 | 15 |
| **2019** | 440 | 117 | 358 | 42 | 0 | 82 | 6 | 47 | 145 | 302 | 0 | 6 |
| **2020** | 309 | 139 | 372 | 35 | 3 | 21 | 1 | 64 | 64 | 351 | 0 | 1 |
| **2021** | 293 | 124 | 311 | 17 | 1 | 20 | 1 | 42 | 43 | 350 | 0 | 0 |
| **2022** | 351 | 71 | 229 | 36 | 2 | 45 | 6 | 39 | 35 | 248 | 0 | 10 |

In CY 2021, the number of reported inmate on inmate assaults, inmate/staff altercations, and uses of force declined slightly, but it should be noted that there is still an alarming use of weapons in assaults resulting in serious injuries. The rate of inmate-on-inmate assaults in CY 2022 increased by 20% over CY 2021.

**Table 4 –All OJC Reported Incidents by Type by Month CY 2018-CY 2022**





| | Jan | Feb | March | April | May | June | July | August | September | October | November | December | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2018** | 92 | 96 | 112 | 121 | 124 | 144 | 116 | 132 | 112 | 113 | 105 | 129 | **1396** |
| **2019** | 123 | 93 | 105 | 112 | 117 | 129 | 113 | 152 | 94 | 137 | 144 | 113 | **1432** |
| **2020** | 107 | 113 | 98 | 109 | 84 | 144 | 98 | 106 | 67 | 75 | 109 | 110 | **1220** |
| **2021** | 125 | 80 | 78 | 109 | 77 | 97 | 91 | 70 | 78 | 113 | 89 | 72 | **1079** |
| **2022** | 77 | 88 | 66 | 50 | 55 | 66 | 67 | 51 | 93 | 137 | 115 | 119 | **984** |

**Assessment Methodology**

Dates of visits:

- June 18-20, 2022 (Lead Monitor only)

- July 8-10, 2022 (Lead Monitor only)

- July 15-18, 2022 (Lead Monitor only)

- August 15-17 (Lead Monitor and Monitor Poole)

- September 17-21, 2022 (Lead Monitor and Monitor Poole)

- October 12-13, 2022 (Lead Monitor and Monitor Poole)

- December 5-8, 2022 (All Monitors)

- December 19-22, 2022 (Lead Monitor only)

Materials reviewed:

- Materials reviewed include the Consent Judgment, OPSO policies and procedures, use of force reports, incident reports, and investigations conducted by Investigative Services Bureau-Internal Affairs Division (ISB-IAD), investigations conducted by ISB-Criminal Division (ISB-Criminal), investigations conducted by ISB-Inmate Division, training materials, shakedown logs, OPSO self-assessment, Wellpath self-assessment, and post logs.

Interviews:

- Interviews included the Sheriff, command staff, jail supervisors, commander of ISB, commander of IAD-Administrative, chief of corrections (now referred to as warden), classification manager and staff, director of training, Wellpath staff, and various supervisors of units within ISB. Inmates were interviewed by the Monitors onsite for the visit. The Monitors also attended security-related meetings.

## IV. A. 1. Use of Force Policies and Procedures

*A. 1. a. OPSO shall develop, implement, and maintain comprehensive policies and procedures (in accordance with generally accepted correctional standards) relating to the use of force with particular emphasis regarding permissible and impermissible uses of force.*
*A. 1. b. OPSO shall develop and implement a single, uniform reporting system under a Use of Force*



*Reporting policy. OPSO reportable force shall be divided into two levels, as further specified in policy: Level 1 uses of force will include all serious uses of force (i.e., the use of force leads to injuries that are extensive, serious or visible in nature, including black eyes, lacerations, injuries to the mouth or head, multiple bruises, injuries to the genitals, etc.), injuries requiring hospitalization, staff misconduct, and occasions when use of force reports are inconsistent, conflicting, or otherwise suspicious. Level 2 uses of force will include all escort or control holds used to overcome resistance that are not covered by the definition of Level 1 uses of force.*

*A. 1. c. OPSO shall assess, annually, all data collected regarding uses of force and make any necessary changes to use of force policies or procedures to ensure that unnecessary or excessive use of force is not used in OPP. The review and recommendations will be documented and provided to the Monitor, DOJ, and SPLC.*

Findings:

A. 1. a.  Partial Compliance

A. 1. b.  Substantial Compliance

A. 1. c.  Non-Compliance

Observations:

The current OPSO use of force policy was effective as of May 2016. It was last reviewed in December 2021. OPSO reports that it has begun its annual review of the UOF policy, but that it has yet to be reviewed and approved by the administration. While there is a policy, the failure to fully adhere to the policy results in A.1.a. remaining in Partial Compliance. One of the most frequent violations of policy has to do with the failure to attempt de-escalation, including the utilization of mental health staff, before using force. There are also numerous examples of force being used as retaliation for an inmate's actions that do not warrant the use of force; i.e., pepper spray for verbally refusing to comply with an order or for having thrown a substance on the staff.

The reporting system does comply with the requirements of A.1.b., which remains in Substantial Compliance.

The Use of Force Review Board did not meet between January 2022 and June 2022. When the Board did begin to meet, it was faced with a large backlog which resulted in reviewing cases over a year old. It is the group charged with completion of the annual review. An analysis of the number of uses of force was performed by the CAB and submitted in April 2022. The analysis was limited to looking at the number of uses of force by housing unit reported in CY 2021 as compared to CY 2020. There was no analysis as to compliance with the use of force policy such as timeliness and proper use of de-escalation. The analysis reported that there had been a marked decrease in the use of force on both the 2nd and 4th floors, which does not appear to be accurate. Unfortunately, those are the



two floors for which reporting on the uses of force has been found by the Monitors to be the most lacking. The CAB is encouraged to confirm the validity of the data before conducting the analysis and to expand the analysis to all aspects of the use of force policy. No annual review of the use of force data and the policy was conducted for CY2021 as required by A.1.c. Problems regarding OPSO analysis of the data, poorly written reports, failure to properly classify uses of force as Level One or Level Two, backlog in the number of use of force incidents to be reviewed, and the lack of timely filed reports continue. Uses of force on specialty pods (particularly the disciplinary pod and the mental health pod) continue to be high, but there have been no recommendations documented and provided to the Monitors and DOJ and counsel for the Plaintiffs to address the problem. As has been pointed out in the past, the Consent Judgment requires not only assessment and reduction of inappropriate uses of force, but also unnecessary uses of force. This is not occurring. Examination of the use of force reports by the Monitors revealed that often the use of force is precipitated by a failure to follow policy such as not restraining the inmate prior to movement or allowing an inmate out of his/her cell with another inmate(s) from whom he/she is to be kept separate or failing to secure the food port in the cell door. Incident reports most often demonstrate a lack of de-escalation efforts as required by the Consent Judgment; particularly before using OC spray. Seldom are mental health staff called upon to assist in de-escalation although a majority of the inmates upon whom force is used are on the mental health caseload. With the continued failure by OPSO to conduct the annual review of the 2021 uses of force, A.1.c., remains in Non-Compliance. Concerns regarding timeliness of submission of use of force reports and reviews are addressed in those sections.

### IV. A. 2. Use of Force Training

*A. 2. a. OPSO shall ensure that all correctional officers are knowledgeable of and have the knowledge, skills, and abilities to comply with use of force policies and procedures. At a minimum, OPSO shall provide correctional officers with pre-service and annual in-service training in use of force, defensive tactics, and use of force policies and procedures. The training will include the following:*
      *(1) instruction on what constitutes excessive force;*
      *(2) de-escalation tactics; and*
      *(3) management of prisoners with mental illness to limit the need for using force.*
*A. 2. b. OPSO shall ensure that officers are aware of any change to policies and practices throughout their employment with OPP. At a minimum, OPSO shall provide pre-service and annual in-service use of force training that prohibits:*
      *(1) use of force as a response to verbal insults or prisoner threats where there is no immediate threat to the safety or security of the institution, prisoners, staff, or visitors;*
      *(2) use of force as a response to prisoners' failure to follow instructions where there is no immediate threat to the safety or security of the institution, prisoners, staff, or visitors;*



*(3) use of force against a prisoner after the prisoner has ceased to offer resistance and is under control;*
*(4) use of force as punishment or retaliation; and*
*(5) use of force involving kicking, striking, hitting, or punching a non-combative prisoner.*
*A. 2. c. OPSO shall randomly test five percent of the correctional officer staff on an annual basis to determine their knowledge of the use of force policies and procedures. The testing instrument and policies shall be approved by the Monitor. The results of these assessments shall be evaluated to determine the need for changes in training practices. The review and conclusions will be documented and provided to the Monitor.*

Findings:

A. 2. a.  Substantial Compliance

A. 2. b.  Substantial Compliance

A. 2. c.  Substantial Compliance

Observations:

The Monitor reviewed the training materials testing documentation and the supplemental documentation submitted by training staff for the rating period and interviewed the Training Lieutenant present on the day of the inspection. Training staff advised that the annual in-service Use of Force, Defensive Tactics, and Use of Force policy and procedure training requirements for CY 2021 were conducted in April 2021 with makeup training conducted in November 2021. A completion rate of just over 96% overall was achieved. Documentation reflected 335 staff members who received the training mandated by Section A.2.a. and Section A.2.b. The Monitor considers the 96% completion rate to substantially meet the requirement for this section for CY2021 (included by this rating period). CY 2022 will be included in the next monitoring period.

The Monitor's review of the use of force training materials noted that the lesson plan, PowerPoint presentation, and testing materials substantively cover the requisite information in A. 2. b. 1-5. The proof of training documentation indicates that the pre-service OPSO staff received the required training on policies and practices from the Academy staff. CY 2022 training will be included in the next monitoring period. OPSO may move to a rating of Partial Compliance given the number of uses of force which violate the use of force policy; calling into question the effectiveness of the training.

A thorough review of the use of force reports during the monitoring period reveals the need for additional training which emphasizes de-escalation and provide deputies with additional tools when dealing with inmates with mental health issues and inmates who routinely exhibited behavioral problems. Given some very problematic incidents in



which staff observed inappropriate uses of force and did not stop or report the same, it is strongly suggested that the duty to intervene and report be emphasized. As any security staff member may have to deal with an inmate with mental health issues, it is recommended that mental health training be made mandatory for all security staff; not just those daily assigned to the mental health units.

The Monitor reviewed training documentation provided by training staff specific to the 5 percent annual testing requirement for A.2.c. Testing documentation for 2021 showed it to have occurred primarily in April 2021. Training staff continue to pursue a goal of 15% testing, exceeding that of the consent judgement language. The test was administered to approximately 43 individual deputies and approximately 15 supervisory staff members. The actual testing percentage achieved was approximately 16.5%. The test for 2021 was approved by Monitor Frasier on April 21, 2021. The test for CY 2022 has yet to be submitted for approval which calls into question whether this rating will be maintained in the next report.

The Monitor has, in the past, observed that the Academy staff has maintained detailed, comprehensive, and very well-maintained files. In response to our request for documentation, the Academy staff provided succinct and thorough reports as to who had and who had not completed the required use of force training.

## IV. A. 3. Use of Force Reporting

*A. 3. a. Failure to report a use of force incident by any staff member engaging in the use of force or witnessing the use of force shall be grounds for discipline, up to and including termination.*
*A. 3. b. OPSO shall ensure that sufficient information is collected on uses of force to assess whether staff members complied with policy; whether corrective action is necessary including training or discipline; the effectiveness of training and policies; and whether the conditions in OPP comply with this Agreement. At a minimum, OPSO will ensure that officers using or observing a Level 1 use of force shall complete a use of force report that will:*

    *(1)    include the names of all staff, prisoner(s), or other visual or oral witness(es);*
    *(2)    contain an accurate and specific account of the events leading to the use of force;*
    *(3)    describe the level of resistance and the type and level of force used, consistent with OPP use of force; policy and procedure, as well as the precise actions taken by OPSO staff in response to the incident;*
    *(4)    describe the weapon or instrument(s) of restraint, if any, and the manner of such use be accompanied by a prisoner disciplinary report, if it exists, pertaining to the events or prisoner activity that prompted the use of force incident;*
    *(5)    describe the nature and extent of injuries sustained by anyone involved in the incident;*
    *(6)    contain the date and time when medical attention, if any, was requested and actually provided;*
    *(7)    describe any attempts the staff took to de-escalate prior to the use of force;*
    *(8)    include an individual written account of the use of force from every staff member who witnessed the use of force;*
    *(9)    include photographs taken promptly, but no later than two hours after a use of force incident, of all injuries sustained, or as evidence that no injuries were sustained, by*



*prisoners and staff involved in the use of force incident;*

(10) *document whether the use of force was digitally or otherwise recorded. If the use of force is not digitally or otherwise recorded, the reporting officer and/or watch commander will provide an explanation as to why it was not recorded; and*

(11) *include a statement about the incident from the prisoner(s) against whom force was used.*

**A. 3. c. All officers using a Level 2 use of force shall complete a use of force report that will:**

(1) *include the names of staff, prisoner(s), or other visual or oral witness(es);*

(2) *contain an accurate and specific account of the events leading to the use of force;*

(3) *describe the level of resistance and the type and level of force used, consistent with OPP use of force policy and procedure, as well as the precise actions taken by OPSO staff in response to the incident;*

(4) *describe the weapon or instrument(s) of restraint, if any, and the manner of such use;*

(5) *be accompanied by a prisoner disciplinary report, if it exists, pertaining to the events or prisoner activity that prompted the use of force incident;*

(6) *describe the nature and extent of injuries sustained by anyone involved in the incident;*

(7) *contain the date and time when medical attention, if any, was requested and actually provided; and*

(8) *describe any attempts the staff took to de-escalate prior to the use of force.*

**A. 3. d. OPSO shall require correctional officers to notify the watch commander as soon as practical of any use of force incident or allegation of use of force. When notified, the watch commander will respond to the scene of all Level 1 uses of force. When arriving on the scene, the watch commander shall:**

(1) *ensure the safety of everyone involved in or proximate to the incident;*

(2) *determine if any prisoner or correctional officer is injured and ensure that necessary medical care is provided;*

(3) *ensure that personnel and witnesses are identified, separated, and advised that communications with other witnesses or correctional officers regarding the incident are prohibited;*

(4) *ensure that witness and subject statements are taken from both staff and prisoner(s) outside of the presence of other prisoners and staff;*

(5) *ensure that the supervisor's use of force report is forwarded to IAD for investigation if, upon the supervisor's review, a violation of law or policy is suspected. The determination of what type of investigation is needed will be based on the degree of the force used consistent with the terms of this Agreement;*

(6) *If the watch commander is not involved in the use of force incident, the watch commander shall review all submitted use of force reports within 36 hours of the end of the incident, and shall specify his findings as to completeness and procedural errors. If the watch commander believes that the use of force may have been unnecessary or excessive, he shall immediately contact IAD for investigation consideration and shall notify the warden or assistant warden; and*

(7) *All Level 1 use of force reports, whether or not the force is believed by any party to be unnecessary or excessive, shall be sent to IAD for review. IAD shall develop and submit to the Monitor within 90 days of the Effective Date clear criteria to identify use of force incidents that warrant a full investigation, including injuries that are extensive or serious, visible in nature (including black eyes, injuries to the mouth, injuries to the genitals, etc.), injuries requiring hospitalization, staff misconduct (including inappropriate relationships*

*with prisoners), and occasions when use of force reports are inconsistent, conflicting, or otherwise suspicious.*

**A. 3. e. Ensure that a first-line supervisor is present during all pre-planned uses of force, such as cell extractions.**

**A. 3. f. Within 36 hours, exclusive of weekends and holidays, of receiving the report and review from the shift commander, in order to determine the appropriateness of the force used and whether policy was followed, the Warden or Assistant Warden shall review all use of force reports and supervisory reviews including:**

(1) *the incident report associated with the use of force;*

(2) *any medical documentation of injuries and any further medical care;*



    *(3)      the prisoner disciplinary report associated with the use of force; and*

    *(4)      the Warden or Assistant Warden shall complete a written report or written statement of specific findings and determinations of the appropriateness of force.*

*A. 3. g. Provide the Monitor a periodic report detailing use of force by staff. These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. Each report will include the following information:*

    *(1)      a brief summary of all uses of force, by type;*

    *(2)      date that force was used;*

    *(3)      identity of staff members involved in using force;*

    *(4)      identity of prisoners against whom force was used;*

    *(5)      a brief summary of all uses of force resulting in injuries;*

    *(6)      number of planned and unplanned uses of force;*

    *(7)      a summary of all in-custody deaths related to use of force, including the identity of the decedent and the circumstances of the death; and*

    *(8)      a listing of serious injuries requiring hospitalization.*

*A. 3. h. OPSO shall conduct, annually, a review of the use of force reporting system to ensure that it has been effective in reducing unnecessary or excessive uses of force. OPSO will document its review and conclusions and provide them to the Monitor, SPLC, and DOJ.*

<u>Findings:</u>

A. 3. a.  Partial Compliance

A. 3. b.  Partial Compliance

A. 3. c.  Partial Compliance

A. 3. d.  Partial Compliance

A. 3. e.  Partial Compliance

A. 3. f.  Partial Compliance

A. 3. g.  Partial Compliance

A. 3. h.  Partial Compliance

<u>Observations:</u>

As to provision A. 3. a., the use of force policy requires all uses of force to be reported timely and completely and sets out the potential discipline if the policy is not followed. No documentation of discipline for failure to timely report a use of force or file the required statements was provided, despite the failure to report several uses of force. Thus, the rating is now in Partial Compliance.

Provision A. 3. b. is in Partial Compliance due to the number of use of force reports that are incomplete or inadequate. The use of force policy includes the provisions required by the Consent Judgment, but lack of adherence still occurs. The Monitor provided a checklist of the report requirements to assist supervisors in ensuring reports included all necessary items. A review of those checklists and accompanying reports indicates that the required information is still found to be missing from the use of force reports such as what



led up to the incident, details of actions taken during the use of force, and resolution of the incident. Seldom do reports include an articulation of any de-escalation tactics, a description of injuries sustained, and when medical attention was provided. No proof was provided that deputies and supervisors are being held accountable for failure to include required information. Provision A. 3. c. requires less information as it is a lesser level of force, but the deficiencies are the same as those noted for A. 3. b. and thus it is in Partial Compliance.

The unit managers and watch commanders still are not consistently compliant with the requirements of the Consent Judgment (IV. A. 3. d.) as to their specific duties and the time requirement for performance of these duties under the policies. This has been noted in multiple reports. The Consent Judgment requires submission of the packet to the Assistant Warden within 36 hours not three (3) days. It should be noted that, while OPSO continues to be in partial compliance, improvement did occur.

A. 3. e. requires the presence of a supervisor for planned uses of force. One of the reasons for this provision is to allow for de-escalation to be attempted before force is carried out. OPSO supervisors seldom utilize de-escalation techniques. Several uses of force which were planned uses of force did not result in a supervisor being present. For instance, deputies used OC spray on inmates secured in their cells who posed no threat. Given the repeated failure of supervisors to utilize de-escalation techniques, this provision's rating has been downgraded to Partial Compliance.

The Major of Security (also called the Unit Manager Commander) fulfilled the role of the Assistant Warden during the monitoring period. OPSO has indicated that the position of Assistant Warden or Assistant Chief of Corrections has been posted and will be filled. The use of force policy should reflect which position will conduct the review, required under IV. A. 3. f. During the monitoring period, they were conducted by this major. The Monitor was able to locate documentation that the average time for the review was 36:50 in April 2022, 30:11 in May 2022, and 32:48 in June 2022. No documentation was found as to the months of July-September 2022. A mean average was provided for April through September 2022, but it is unclear how this average was generated given the missing monthly data. It is not possible to determine how often the 36-hour requirement was not met. This provision remains in Partial Compliance.

OPSO relies on the quarterly report issued by FIT for documentation as to



compliance with IV. A. 3. g. The FIT quarterly reports did not contain all of the required information for compliance with IV. A. 3. g. (3), (5), (6), and (7), and (8). Thus, this section is in Partial Compliance.

The annual review of use of force incidents for CY 2021as required by IV. A. 3. h. was provided to the Monitors and all parties in March 2022. It should be noted that the review is based on complete data as the backlog of cases has been eliminated by FIT. The review contained an improved analysis and confirmed the issues pointed out above, but there needs to be a corrective action plan to remedy the systemic issues. In order to warrant a rating of substantial compliance, OPSO needed to address all of the issues; particularly the most serious issues such as the frequent use of force on the mental health housing units and lack of de-escalation that were not addressed. Also not addressed is how frequent uses of force would not be needed if policy was followed. Therefore, the compliance rating remains at partial compliance.

## IV. A. 4. Early Intervention System ("EIS")

*A. 4. a. OPSO shall develop, within 120 days of the Effective Date, a computerized relational database ("EIS") that will document and track staff members who are involved in use of force incidents and any complaints related to the inappropriate or excessive use of force, in order to alert OPSO management to any potential problematic policies or supervision lapses or need for retraining or discipline. The Chief of Operations Deputy, supervisors, and investigative staff shall have access to this information and shall review on a regular basis, but not less than quarterly, system reports to evaluate individual staff, supervisor, and housing area activity. OPSO will use the EIS as a tool for correcting inappropriate staff behavior before it escalates to more serious misconduct.*

*A. 4. b. Within 120 days of the Effective Date, OPSO senior management shall use EIS information to improve quality management practices, identify patterns and trends, and take necessary corrective action both on an individual and systemic level. IAD will manage and administer EIS systems. The Special Operations Division ("SOD") will have access to the EIS. IAD will conduct quarterly audits of the EIS to ensure that analysis and intervention is taken according to the process described below. Command staff shall review the data collected by the EIS on at least a quarterly basis to identify potential patterns or trends resulting in harm to prisoners. The Use of Force Review Board will periodically review information collected regarding uses of force in order to identify the need for corrective action, including changes to training protocols and policy or retraining or disciplining individual staff or staff members. Through comparison of the operation of this system to changes in the conditions in OPP, OPSO will assess whether the mechanism is effective at addressing the requirements of this Agreement.*

*A. 4. c. OPSO shall provide, within 180 days of the implementation date of its EIS, to SPLC, DOJ, and the Monitor, a list of all staff members identified through the EIS and corrective action taken.*

*A. 4. d. The EIS protocol shall include the following components: data storage, data retrieval, reporting, data analysis, pattern identification, supervisory assessment, supervisory intervention, documentation, and audit.*

*A. 4. e. On an annual basis, OPSO shall review the EIS to ensure that it has been effective in identifying concerns regarding policy, training, or the need for discipline. This assessment will be based in part on the number and severity of harm and injury identified through data collected pursuant to this Agreement. OPSO will document its review and conclusions and provide them to the Monitor, who shall forward this document to DOJ and SPLC.*

Findings:



A. 4. a.  Partial Compliance

A. 4. b.  Partial Compliance

A. 4. c.  Partial Compliance

A. 4. d.  Partial Compliance

A. 4. e.  Partial Compliance

Observations:

       Due to unreliability of the electronic EIS, OPSO abandoned the original system and fashioned an alternative version within the AS400. A FIT staff member manually monitors the database to alert FIT staff as to the need to review any uses of force by a staff member.

       OPSO has provided its documentation to the Monitors as to the names of the staff members who are flagged for use of force. However, no review of staff alerted under the EIS was documented or provided. OPSO acknowledges that the reviews did not occur. Having alerts with no follow up negates the value of gathering the data. As no documentation of review by the Use of Force Review Board as to EIS alerts was provided and it was acknowledged that the Use of Force Review did not meet between January and June of 2022, A. 4. a., A. 4. b, and A. 4. c. remain in partial compliance. Continued questionable and inappropriate uses of force by the same staff members and with the same inmates calls into question whether the EIS is being utilized to improve management quality practices, identify patterns and trends, and take necessary corrective action as required. Section A.4.d. is now in partial compliance as the EIS protocol lists the required elements, but there is no supervisory assessment nor intervention.

       No proof of the Use of Force Review Board meeting during the monitoring period to evaluate the EIS data was provided. A meeting was held for the annual review of the EIS based on CY 2021 data. The review recommended that staff who have alerted the EIS continue to be informed of the alert. It is unclear whether those conducting the review noticed that EIS referrals and actions were not documented or simply did not note that failure. This is a significant shortcoming. The review should consist of more than noting that the EIS was triggered. It involves assessing the effectiveness of the EIS which was not performed. Therefore, IV. A .4. e. is in partial compliance.

## IV. A. 5. Safety and Supervision

***A. 5. a. Maintain security policies, procedures, and practices to provide a reasonably safe and secure environment for prisoners and staff in accordance with this Agreement.***
***A. 5. b. Maintain policies, procedures, and practices to ensure the adequate supervision of prisoner***





Orleans Parish
JAIL MONITORS

*work areas and trustees.*

*A. 5. c. Maintain policies and procedures regarding care for and housing of protective custody prisoners and prisoners requesting protection from harm.*

*A. 5. d. Continue to ensure that correctional officers conduct appropriate rounds at least once during every 30- minute period, at irregular times, inside each general population housing unit and at least once during every 15-minute period of special management prisoners, or more often if necessary. All security rounds shall be documented on forms or logs that do not contain pre-printed rounding times. In the alternative, OPSO may provide direct supervision of prisoners by posting a correctional officer inside the day room area of a housing unit to conduct surveillance.*

*A. 5. e. Staff shall provide direct supervision in housing units that are designed for this type of supervision. Video surveillance may be used to supplement, but must not be used to replace, rounds by correctional officers.*

*A. 5. f. Increase the use of overhead video surveillance and recording cameras to provide adequate coverage throughout the common areas of the Jail, including the Intake Processing Center, all divisions' intake areas, mental health units, special management units, prisoner housing units, and in the divisions' common areas.*

*A. 5. g. Continue to ensure that correctional officers, who are transferred from one division to another, are required to attend training on division-specific post orders before working on the unit.*

*A. 5. h. Continue to ensure that correctional officers assigned to special management units, which include youth tiers, mental health tiers, disciplinary segregation, and protective custody, receive eight hours of specialized training regarding such units on prisoner safety and security on at least an annual basis.*

*A. 5. i. Continue to ensure that supervisors conduct daily rounds on each shift in the prisoner housing units and document the results of their rounds.*

*A. 5. j. Continue to ensure that staff conduct daily inspections of cells and common areas of the housing units to protect prisoners from unreasonable harm or unreasonable risk of harm.*

*A. 5. k. Continue to ensure that staff conduct random monthly shakedowns of cells and common areas so that prisoners do not possess or have access to dangerous contraband.*

*A. 5. l. Provide the Monitor a periodic report of safety and supervision at the Facility. These periodic reports shall be provided to the monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. Each report will provide the following information:*

      *(1)    a listing of special management prisoners, their housing assignments, the basis for them being placed in the specialized housing unit, and the date placed in the unit; and*

      *(2)    a listing of all contraband, including weapons seized, the type of contraband, date of seizure, location, and shift of seizure.*

<u>Findings:</u>

A. 5. a.  Partial Compliance

A. 5. b.  Substantial Compliance

A. 5. c.  Partial Compliance

A. 5. d.  Non-Compliance

A. 5. e.  Partial Compliance

A. 5. f.   Substantial Compliance

A. 5. g.  Substantial Compliance

A. 5. h.  Partial Compliance

A. 5. i.   Partial Compliance

A. 5. j.   Partial Compliance

A. 5. k.  Non-Compliance



A. 5. l.   Partial Compliance

<u>Observations:</u>

OPSO has worked hard to finalize policies, procedures, and post orders. OPSO takes the position that all that is required is that OPSO "maintain" policies, procedures, and practices. Having words written on paper without implementation of those policies, procedures, and practices is insufficient for compliance. Policies and procedures must be adhered to and followed for them to be maintained and compliance achieved. Practices, even if not included in policies and procedures, must adhere to the standard also. There is adequate supervision of inmate working areas to result in partial compliance as to A. 5. b. The level of violence, an average of 29 (up from 22 for the previous reporting period) reported inmate on inmate assaults/altercations per month are indicative that OPSO has not substantially complied with the requirement that the facility be reasonably safe for staff and inmates. The number reported is suspect given the systematic underreporting of reportable incidents and the number of inmate-on-inmate assaults that are likely undetected due to the lack of staff in the housing areas. While the Monitors are well aware that violent incidents occur in jail facilities, the level currently reflects partial compliance with the obligation to provide a reasonably safe and secure environment as to A. 5. a. and A. 5. c.

Review of the significant incidents during the monitoring period indicates that the failure of staff to follow policy consistently continues to be a serious impediment to effective supervision of the inmates. Staff continue to leave inmates unsupervised for hours and allow them to have access to materials by which to fashion weapons. Many of the inmate-on-inmate assaults occur because staff allow inmates out of their cells and leave them unsupervised. There are inmates who repeatedly do not follow the rules of OJC including assaulting other inmates, assaulting staff, destroying property, smoking contraband and/or threatening self-harm. OPSO used to house many of those inmates in a high security unit but chose to abandon this practice during the monitoring period. It is of concern that the practice of limiting the movement of high-security inmates and the practice of placing them in specialty housing was eliminated. It would be beneficial to develop individual inmate management plans for these inmates which would include specific security measures to be used when these inmates are allowed out of their cells. Such plans, if carried out routinely and consistently followed by all staff, would likely



reduce the level of violence in the facility. To date, there is no indication that it is being done on a consistent basis; if at all.

### Table 5 CY 2018-CY 2022 OJC Reported Incidents

| 2018 | Use of Force | Inmate Misconduct FLD/FFD | Inmate/ Inmate Assault | Inmate Staff Assault | PREA | Death | Attempt Suicide/ Ideation | Internal Escape | Criminal Damage | Medical (AKA slip/falls/ injury) | Contraband | Staff Misconduct-Suspension/ Arrest | Other | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| January | 13 | 0 | 38 | 7 | 2 | 0 | 6 | 2 | 3 | 9 | 9 | 0 | 3 | 92 |
| February | 10 | 0 | 28 | 6 | 4 | 0 | 14 | 2 | 10 | 5 | 15 | 2 | 0 | 96 |
| March | 21 | 0 | 37 | 7 | 5 | 0 | 4 | 3 | 11 | 18 | 5 | 0 | 1 | 112 |
| April | 22 | 0 | 39 | 9 | 4 | 0 | 4 | 3 | 12 | 22 | 5 | 0 | 1 | 121 |
| May | 24 | 0 | 52 | 0 | 5 | 1 | 0 | 5 | 8 | 19 | 10 | 0 | 0 | 124 |
| June | 26 | 0 | 46 | 7 | 5 | 0 | 6 | 7 | 3 | 32 | 9 | 1 | 2 | 144 |
| July | 20 | 0 | 30 | 4 | 4 | 0 | 9 | 3 | 3 | 30 | 13 | 0 | 0 | 116 |
| Aug | 27 | 0 | 39 | 3 | 3 | 0 | 13 | 2 | 6 | 30 | 6 | 0 | 3 | 132 |
| Sept | 14 | 0 | 33 | 6 | 2 | 0 | 7 | 5 | 4 | 35 | 6 | 0 | 0 | 112 |
| Oct | 28 | 0 | 32 | 9 | 5 | 0 | 3 | 0 | 2 | 26 | 7 | 0 | 1 | 113 |
| Nov | 21 | 0 | 31 | 6 | 5 | 0 | 5 | 8 | 3 | 18 | 7 | 0 | 1 | 105 |
| Dec | 34 | 0 | 37 | 0 | 3 | 1 | 7 | 8 | 4 | 18 | 14 | 0 | 3 | 129 |
| Total | 260 | 0 | 442 | 64 | 47 | 2 | 78 | 48 | 69 | 262 | 106 | 3 | 15 | 1396 |

| 2019 | Use of Force | Inmate Misconduct FLD/FFD | Inmate/ Inmate Assault | Inmate Staff Assault | PREA | Death | Attempt Suicide/ Ideation | Internal Escape | Criminal Damage | Medical (AKA slip/falls/ injury) | Contraband | Staff Misconduct-Suspension/ Arrest | Other | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| January | 27 | 0 | 40 | 1 | 2 | 0 | 15 | 3 | 7 | 14 | 14 | 0 | 0 | 123 |
| February | 29 | 0 | 26 | 7 | 2 | 0 | 13 | 1 | 0 | 4 | 11 | 0 | 0 | 93 |
| March | 26 | 0 | 25 | 4 | 1 | 0 | 6 | 1 | 2 | 16 | 21 | 0 | 3 | 105 |
| April | 26 | 0 | 28 | 7 | 1 | 0 | 3 | 0 | 3 | 15 | 27 | 0 | 2 | 112 |
| May* | 22 | 12 | 36 | 11 | 6 | 0 | 13 | 0 | 2 | 11 | 25 | 0 | 1 | 117 |
| June | 26 | 7 | 55 | 9 | 4 | 0 | 13 | 0 | 2 | 16 | 23 | 0 | 0 | 129 |
| July | 31 | 13 | 50 | 15 | 5 | 0 | 6 | 0 | 3 | 8 | 13 | 0 | 0 | 113 |
| Aug | 37 | 26 | 32 | 17 | 6 | 0 | 7 | 1 | 8 | 20 | 35 | 0 | 0 | 152 |
| Sept | 31 | 18 | 32 | 4 | 3 | 0 | 2 | 0 | 1 | 10 | 24 | 0 | 0 | 94 |
| Oct | 37 | 21 | 38 | 15 | 4 | 0 | 1 | 0 | 7 | 18 | 33 | 0 | 0 | 137 |
| Nov | 33 | 17 | 55 | 12 | 7 | 0 | 0 | 0 | 6 | 5 | 42 | 0 | 0 | 144 |
| Dec | 33 | 23 | 23 | 15 | 1 | 0 | 3 | 0 | 6 | 8 | 34 | 0 | 0 | 113 |
| Total | 358 | 137 | 440 | 117 | 42 | 0 | 82 | 6 | 47 | 145 | 302 | 0 | 6 | 1432 |

| 2020 | Use of Force | Inmate Misconduct FLD/FFD | Inmate/ Inmate Assault | Inmate Staff Assault | PREA | Death | Attempt Suicide/ Ideation | Internal Escape | Criminal Damage | Medical (AKA slip/falls/ injury) | Contraband | Staff Misconduct-Suspension/ Arrest | Other | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| January | 29 | 18 | 31 | 8 | 4 | 0 | 3 | 0 | 1 | 7 | 35 | 0 | 0 | 107 |
| February | 33 | 17 | 35 | 12 | 2 | 0 | 0 | 1 | 3 | 13 | 29 | 0 | 1 | 113 |
| March | 31 | 19 | 24 | 9 | 1 | 0 | 1 | 0 | 3 | 6 | 35 | 0 | 0 | 98 |
| April | 45 | 29 | 25 | 19 | 7 | 0 | 0 | 0 | 4 | 1 | 24 | 0 | 0 | 109 |
| May | 37 | 26 | 24 | 11 | 1 | 0 | 1 | 0 | 6 | 3 | 12 | 0 | 0 | 84 |
| June | 22 | 16 | 28 | 13 | 4 | 2 | 1 | 0 | 5 | 12 | 63 | 0 | 0 | 144 |
| July | 21 | 8 | 22 | 9 | 1 | 0 | 2 | 0 | 4 | 5 | 47 | 0 | 0 | 98 |
| Aug | 22 | 23 | 22 | 8 | 2 | 1 | 4 | 0 | 11 | 4 | 31 | 0 | 0 | 106 |
| Sept | 24 | 14 | 16 | 12 | 2 | 0 | 2 | 0 | 8 | 4 | 9 | 0 | 0 | 67 |
| Oct | 35 | 18 | 24 | 10 | 2 | 0 | 1 | 0 | 3 | 3 | 14 | 0 | 0 | 75 |
| Nov | 33 | 19 | 28 | 10 | 5 | 0 | 2 | 0 | 9 | 5 | 31 | 0 | 0 | 109 |
| Dec | 40 | 25 | 30 | 18 | 4 | 0 | 4 | 0 | 7 | 1 | 21 | 0 | 0 | 110 |
| Total | 372 | 232 | 309 | 139 | 35 | 3 | 21 | 1 | 64 | 64 | 351 | 0 | 1 | 1220 |

| 2021 | Use of Force | Inmate Misconduct FLD/FFD | Inmate/ Inmate Assault | Inmate Staff Assault | PREA | Death | Attempt Suicide/ Ideation | Internal Escape | Criminal Damage | Medical (AKA slip/falls/ injury) | Contraband | Staff Misconduct-Suspension/ Arrest | Other | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|



| | Use of Force | Inmate Misconduct FLD/FFD | Inmate/Inmate Assault | Inmate Staff Assault | PREA | Death | Attempt Suicide/Ideation | Internal Escape | Criminal Damage | Medical (AKA slip/falls/injury) | Contraband | Staff Misconduct-Suspension/Arrest | Other | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| January | 38 | 34 | 32 | 20 | 1 | 0 | 0 | 0 | 3 | 3 | 32 | 0 | 0 | 125 |
| February | 27 | 12 | 30 | 14 | 2 | 0 | 1 | 0 | 2 | 5 | 14 | 0 | 0 | 80 |
| March | 16 | 10 | 24 | 7 | 4 | 0 | 0 | 0 | 5 | 4 | 24 | 0 | 0 | 78 |
| April | 24 | 17 | 27 | 10 | 2 | 0 | 1 | 1 | 2 | 4 | 45 | 0 | 0 | 109 |
| May | 21 | 12 | 31 | 7 | 0 | 0 | 0 | 0 | 3 | 1 | 23 | 0 | 0 | 77 |
| June | 34 | 18 | 25 | 15 | 0 | 1 | 0 | 0 | 4 | 4 | 30 | 0 | 0 | 97 |
| July | 22 | 11 | 22 | 10 | 0 | 0 | 6 | 0 | 8 | 3 | 31 | 0 | 0 | 91 |
| Aug | 18 | 13 | 19 | 7 | 0 | 0 | 5 | 0 | 2 | 4 | 20 | 0 | 0 | 70 |
| Sept | 28 | 19 | 18 | 6 | 3 | 0 | 1 | 0 | 1 | 7 | 23 | 0 | 0 | 78 |
| Oct | 31 | 21 | 22 | 8 | 0 | 0 | 1 | 0 | 6 | 3 | 52 | 0 | 0 | 113 |
| Nov | 27 | 12 | 21 | 7 | 2 | 0 | 4 | 0 | 4 | 1 | 38 | 0 | 0 | 89 |
| Dec | 25 | 11 | 22 | 12 | 3 | 0 | 1 | 0 | 2 | 4 | 17 | 0 | 0 | 72 |
| Total | 311 | 190 | 293 | 124 | 17 | 1 | 20 | 1 | 42 | 43 | 350 | 0 | 0 | 1079 |

| 2022 | Use of Force | Inmate Misconduct FLD/FFD | Inmate/ Inmate Assault | Inmate Staff Assault | PREA | Death | Attempt Suicide/ Ideation | Internal Escape | Criminal Damage | Medical (AKA slip/falls/ injury) | Contraband | Staff Misconduct-Suspension/ Arrest | Other | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| January | 22 | 12 | 22 | 5 | 1 | 0 | 0 | 0 | 4 | 4 | 29 | | 0 | 77 |
| February | 26 | 21 | 18 | 10 | 3 | 0 | 1 | 0 | 4 | 0 | 31 | | 0 | 88 |
| March | 15 | 8 | 24 | 1 | 2 | 0 | 4 | 0 | 4 | 3 | 20 | | 0 | 66 |
| April | 12 | 6 | 28 | 3 | 1 | 0 | 6 | 0 | 4 | 1 | 1 | | 0 | 50 |
| May | 15 | 10 | 24 | 3 | 5 | 0 | 3 | 0 | 4 | 2 | 4 | | 0 | 55 |
| June | 22 | 15 | 31 | 2 | 2 | 2 | 5 | 1 | 2 | 2 | 4 | | 0 | 66 |
| July | 15 | 6 | 36 | 5 | 3 | 0 | 1 | 1 | 1 | 7 | 6 | | 1 | 67 |
| Aug | 15 | 12 | 24 | 1 | 0 | 0 | 1 | 0 | 3 | 2 | 8 | | 0 | 51 |
| Sept | 27 | 18 | 30 | 7 | 5 | 0 | 3 | 0 | 6 | 3 | 20 | | 1 | 93 |
| Oct | 23 | 16 | 55 | 8 | 9 | 0 | 2 | 0 | 2 | 7 | 37 | | 1 | 137 |
| Nov | 13 | 6 | 26 | 11 | 4 | 0 | 10 | 1 | 3 | 3 | 45 | | 6 | 115 |
| Dec | 24 | 11 | 33 | 15 | 1 | 0 | 9 | 3 | 2 | 1 | 43 | | 1 | 119 |
| Total | 229 | 141 | 351 | 71 | 36 | 2 | 45 | 6 | 39 | 35 | 248 | 0 | 10 | 984 |

OPSO continues to not timely conduct and document security rounds (30 minutes or 15 minutes depending on the unit) nor perform direct supervision surveillance consistent with the requirements of the Consent Judgment or OPSO policy.

Direct supervision requires surveillance of all of the inmates and cannot be properly performed by sitting behind a desk or in the control module. It requires walking around the unit, looking into the individual cells, and actively engaging with the inmates. Staffing in the housing units was observed to be inadequate throughout the OJC during the monitoring tour. During this and the previous monitoring tour, the Monitors witnessed the most unsupervised units in recent memory. The frequency of unsupervised units during this monitoring tour was even worse than the previous monitoring tour. A review of the log of security checks reveals TMH was the one area which appeared to have sufficient staff and consistently conducted security rounds. Review of incident reports revealed that units were often unstaffed, including many mandatory posts. If staff are not present, it is impossible to make the required rounds. The staff write their rounds on paper forms in addition to entry into the log. While this provides an easier way for a supervisor to see during a unit inspection if the deputy has recorded that the security checks are being



performed timely, it is insufficient proof that the security checks actually occurred and requires watching hours of video to verify. Review of video footage after an incident often reveals that security checks are not being conducted and/or adequately conducted even if recorded in the logbook. OPSO indicated that with the beginning of the formation of the compliance unit that OPSO has now started to audit log sheets with video footage and plans to have an audit report for the next compliance period. A simple review of the documentation provided indicates that there are often gaps of two or more hours in between security rounds. During the onsite monitoring visit, Monitors reviewed the logbooks. Deputies were questioned and often found to be incapable of describing what an acceptable security check would look like. At most, in the majority of the units, an adequate security check was only performed when a physical count of the inmates took place; at most, twice in a twelve-hour shift. The rest of the "checks" were no more than looking about the housing unit without leaving the deputy station, or, even more troubling, the control station which is located outside of the housing unit. Given the digression in performing security checks and lack of staff assigned to direct supervision, OPSO is now in noncompliance with IV. A. 5. d.

A review of the paper logs and forms during the monitoring tour revealed that timely rounds were often not performed and are not accurate. OPSO should consider a reliable system that would allow for rounds, by both deputies and supervisors, to be recorded electronically. Not only would it allow for supervisors to quickly determine whether rounds were being conducted in a timely manner, it would allow for OPSO to prove compliance and address non-adherence.

All twenty-four (24) of the housing units in OJC are designed for direct supervision. At the time of the drafting of the Consent Judgment the design of OJC was known. The Consent Judgment requires that staff provide direct supervision in housing units that are designed for this type of supervision. Thus, continual presence of a deputy in each housing unit at OJC and TMH is mandatory under the Consent Judgment. OPSO has taken the position that OPSO gets to determine which housing posts are mandatory and routinely does not assign mandatory staff to each housing unit. In addition, deputies are frequently absent from even the housing units designated by OPSO as mandatory. More often than not, one deputy is assigned to two or more housing units. The harm that results from not having a deputy in each pod, especially when inmates are out, is evident by the repeated



serious incidents occurring when there is no deputy on the unit, including those resulting serious injury and/or necessitating hospital routes. Thus, IV. A. 5. e. remains in partial compliance.

Regarding overhead video surveillance and recording cameras for OJC (A. 5. f.), there is a significant investment in cameras. There are times when a nonfunctional camera is discovered when a supervisor or an investigator tries to retrieve the videos, but it is rare. OPSO needs to continue to audit the system by having a supervisor test the various cameras on a monthly basis and prepare a report for the Chief of Security. IV. A. 5. f. continues to be in substantial compliance. Supervisors have improved on pulling video as required by the Use of Force policy. Deputies are now issued body worn cameras which is helpful as the body worn cameras provide audio in addition to video.

Four staff members were transferred between divisions during the monitoring period and received on-the-job training; thus, IV. A. 5. g. is in substantial compliance. Given the necessity of utilizing staff from other areas of OPSO to supervise inmates in the OJC, OPSO is encouraged to provide training even if there is not an actual transfer from one division to another. Proof that recruits received training on specialized housing during pre-service was provided. However, no proof of the required annual eight (8) hours of training for the deputies assigned to specialized units was provided; IV. A. 5. h. is in partial compliance. Given the high level of incidents in the specialized units, it is recommended that the training be reviewed, and deficiencies addressed. OPSO is close to being in non-compliance with this provision.

Documentation indicates that supervisors do not consistently conduct daily rounds; thus, IV. A. 5. i. continues to be in partial compliance. Supervisors are required to sign off on the round sheet completed by the pod deputy, but this does not provide proof that the supervisor conducted daily rounds. The daily inspections of housing units as required by VI. A. 5. j. is still only in partial compliance as they are not consistently performed and do not cover all areas. It is concerning that neither the inspections by the deputies nor the supervisors resulted in the discovery of the destruction of items that are part of the jail to fashion weapons. It is essential that the inspections be thorough and that corrective actions are taken to address the inspection findings.

Monthly shakedowns were not conducted in compliance with VI. A. 5. k. In fact, the number of shakedowns declined during this monitoring period. On average, 34% of the



units were shaken down. The high average was 52% and the low average was 27%. The data provided indicates that shakedowns were not conducted even in partial compliance during six of the six months during the monitoring period. There continues to be significant incidents involving contraband including the manufacturing and use of weapons fashioned from the jail itself. The review of contraband reports clearly indicates reoccurring issues. The number of drug overdoses occurring is a direct reflection of the failure to prevent introduction of illicit drugs into the facility and the failure to perform timely and appropriate searches to remove the illicit drugs. There continues to be a serious issue of inmates hoarding medication. Reports demonstrate that inmates are fashioning weapons out of items in the jail which are then used to assault other inmates. Reports and the site visit reveal that inmates are smuggling in marijuana and hallucinogens to smoke. Some of these items come through the mail, but there is a significant issue of staff smuggling in contraband and the failure to detect narcotics being brought in by inmates being arrested. This indicates the need to analyze the data and develop a corrective action plan to reduce, if not stop, the hoarding of medication, the fashioning of weapons, and the flow of contraband into the facility. OPSO is in non-compliance with this provision.

The documentation provided for A. 5. l. includes the classification date, but not all of the required information. Thus, A. 5. l. remains in Partial Compliance.

### IV. A. 6. Security Staffing

*A. 6. a. OPSO shall ensure that correctional staffing and supervision is sufficient to adequately supervise prisoners, fulfill the terms of this Agreement, and allow for the safe operation of the Facility, consistent with constitutional standards.*

    *(1)    OPSO shall achieve adequate correctional officer staffing in the following manner: Within 90 days of the Effective Date, develop a staffing plan that will identify all posts and positions, the adequate number and qualification of staff to cover each post and position, adequate shift relief, and coverage for vacations. The staffing plan will ensure that there is adequate coverage inside each housing and specialized housing areas and to accompany prisoners for court, visits and legal visits, and other operations of OPP and to comply with all provisions of this Agreement. OPSO will provide its plan to the Monitor, SPLC, and DOJ for approval. The Monitor, SPLC, or DOJ will have 60 days to raise any objections and recommend revisions to the staffing plan.*

    *(2)    Within 120 days before the opening of any new facility, submit a staffing plan consistent with subsection (1) above.*

    *(3)    Within 90 days after completion of the staffing study, OPSO shall recruit and hire a full-time professional corrections administrator to analyze and review OPP operations. The professional corrections administrator shall report directly to the Sheriff and shall have responsibilities to be determined by the Sheriff. The professional corrections administrator shall have at least the following qualifications: (a) a bachelor's degree in criminal justice or other closely related field;*



*(b) five years of experience in supervising a large correctional facility; and (c) knowledge of and experience in applying modern correctional standards, maintained through regular participation in corrections-related conferences or other continuing education.*

*(4)    Provide the Monitor a periodic report on staffing levels at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. Each report will include the following information:*

    *i.    a listing of each post and position needed;*

    *ii.    the number of hours needed for each post and position; a listing of staff hired and positions filled;*

    *iii.    a listing of staff working overtime and the amount of overtime worked by each staff member;*

    *iv.    a listing of supervisors working overtime; and*

    *v.    a listing of and types of critical incidents reported*

*A. 6. b. Review the periodic report to determine whether staffing is adequate to meet the requirements of this Agreement. OPSO shall make recommendations regarding staffing based on this review. The review and recommendations will be documented and provided to the Monitor.*

<u>Findings:</u>

A. 6. a.  Non-Compliance

A. 6. b.  Non-Compliance

An overall rating of A. 6. was provided in the previous reports. This was inconsistent with the other introductory paragraphs and has now been discontinued.

<u>Observations:</u>

The level of staffing is extremely insufficient to adequately supervise inmates and allow for the safe operation of the facility. There have been insufficient security staff over the past few monitoring periods, and it has worsened to a level where OPSO struggles to staff the facility and cover basic functions. OPSO's staffing reports document that most mandatory posts are not filled on a consistent basis. Numerous incident reports and investigations reveal posts were not constantly staffed, which resulted in increased violence. Efforts have been made to reassign some staff from areas that had excess staff but have not fully addressed the problem. Lacking is a coordinated effort on the utilization of overtime and redeployment of staff to ensure the mandatory posts are covered on a consistent basis. The deployment of staff is sufficiently inconsistent and insufficient to result in IV. A. 6. a. (1) and IV. A. 6. a. (2) being in non-compliance. Provision IV. A. 6. a. (3) is now in partial compliance with the hiring of the new Chief of Corrections in June 2022. Proof that she meets the criteria contained in the Consent Judgment will be required before the provision will be rated substantial compliance. Paragraph IV. A. 6. a. (4) is in substantial compliance, as monthly reports are produced to document hiring and



termination of employees. The Stipulated Agreement also provides for bi-monthly reports regarding hiring. Paragraph 7.a. of the Stipulated Agreement of February 11, 2015, requires monthly reporting. Given the importance of the actual implementation of an approved staffing plan, A. 6. a. remains in non-compliance. The last approved staffing plan was in September 2019 and was based on a much different staffing level.

OPSO continues to be in non-compliance with A. 6. b. as OPSO has not provided a periodic review of the staffing plan. Discussion during the monitoring tour indicated that a plan is being prepared, but it has not been finalized or submitted to the Monitors. An antiquated staffing plan which is based on staffing levels which do not exist is insufficient.

## IV. A. 7. Incidents and Referrals

*A.7.a.  OPSO shall develop and implement policies that ensure that Facility watch commanders have knowledge of reportable incidents in OPP to take action in a timely manner to prevent harm to prisoners or take other corrective action. At a minimum, OPSO shall do the following:*

*A.7.b.  Continue to ensure that Facility watch commanders document all reportable incidents by the end of their shift, but no later than 24 hours after the incident, including prisoner fights, rule violations, prisoner injuries, suicide attempts, cell extractions, medical emergencies, found contraband, vandalism, escapes and escape attempts, and fires.*

*A.7.c.  Continue to ensure that Facility watch commanders report all suicides and deaths no later than one hour after the incident, to a supervisor, IAD, the Special Operations Division, and medical and mental health staff.*

*A.7.d.  Provide formal pre-service and annual in-service training on proper incident reporting policies and procedures.*

*A.7.e.  Implement a policy providing that it is a disciplinary infraction for staff to fail to report any reportable incident that occurred on his or her shift. Failure to formally report any observed prisoner injury may result in staff discipline, up to and including termination.*

*A.7.f.  Maintain a system to track all reportable incidents that, at a minimum, includes the following information:*

    *(1)    tracking number;*
    *(2)    the prisoner(s) name;*
    *(3)    housing classification and location;*
    *(4)    date and time;*
    *(5)    type of incident;*
    *(6)    injuries to staff or prisoner;*
    *(7)    medical care;*
    *(8)    primary and secondary staff involved;*
    *(9)    reviewing supervisor;*
    *(10)    external reviews and results;*
    *(11)    corrective action taken; and*
    *(12)    administrative sign-off.*

*A.7.g.  Ensure that incident reports and prisoner grievances are screened for allegations of staff misconduct, and, if the incident or allegation meets established criteria in accordance with this Agreement, it is referred for investigation.*

*A.7.h.  Provide the Monitor a periodic data report of incidents at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement.*

*A.7.i. The report will include the following information:*

    *(1)    a brief summary of all reportable incidents, by type and date;*
    *(2)    a description of all suicides and in-custody deaths, including the date, name of prisoner, and housing unit;*



*(3)    number of prisoner grievances screened for allegations of misconduct; and*

*(4)    number of grievances referred to IAD or SOD for investigation.*

***A.7.j.    Conduct internal reviews of the periodic reports to determine whether the incident reporting system is ensuring that the constitutional rights of prisoners are respected. Review the quarterly report to determine whether the incident reporting system is meeting the requirements of this Agreement. OPSO shall make recommendations regarding the reporting system or other necessary changes in policy or staffing based on this review. The review and recommendations will be documented and provided to the Monitor.***

<u>Findings:</u>

A. 7. a.  Substantial Compliance

A. 7. b.  Partial Compliance

A. 7. c.  Substantial Compliance

A. 7. d.  Substantial Compliance

A. 7. e.  Partial Compliance

A. 7. f.  Substantial Compliance

A. 7. g.  Substantial Compliance

A. 7. h.  Substantial Compliance

A. 7. i.  Substantial Compliance

A. 7. j.  Substantial Compliance

<u>Observations:</u>

OPSO has long had a policy on incidents and referrals that sets out the process for documenting and referring incidents. What has been lacking is a sufficient process to ensure all reportable incidents are being documented and that all incident reports are complete, prompt, and accurate. Watch commanders are required to be notified of any incident occurring and document the incident in their shift log which results in substantial compliance of A.7.a. However, review of the routes of inmates and medical clinic walk-in logs indicates that a number of incidents are not resulting in an incident report. Continued non-reporting of incidents when compared to other documentation is likely to result in a finding of partial compliance.

OPSO implemented a process where an OPSO staff member reviewed the "routes" of inmates with serious medical or trauma injuries to the hospital emergency room and the OPSO clinic walk-in logs and compared them to the reports received. The quality of this review has been inadequate for the last three monitoring periods. Someone needs to be trained to take over the duties of review and notification of the Monitors and counsel. IV. A. 7. b. remains in partial compliance.



During this reporting period, several attempts at suicide were reported within an hour to the proper persons: thus IV. A. 7. c. is in substantial compliance. Documentation on preservice training and annual training on report writing was provided; IV. A. 7. d. is now in substantial compliance.

OPSO still does not hold supervisors and security staff accountable for the late reports. The only documentation regarding accountability provided was a single write-up of a captain for instructing a staff member not to write a use of force report. OPSO's own documentation indicates that reports are often not timely filed. Failure to hold staff accountable results in IV. A. 7. e. being in partial compliance. Also important is to track whether the counseling was effective in improving the timeliness of incident reports.

OPSO has transitioned to the AS 400 system to track the information required in IV. A. 7. f.  and is in substantial compliance. OPSO is doing a better job analyzing the data, but the analysis is still inadequate and often does not result in measures which would correct the problem being identified. The next step is utilizing the analysis to make required changes in policy and procedure. OPSO remains in substantial compliance with A. 7. g.; incidents, and grievances are reviewed for misconduct and referred for investigation where appropriate, but the lack of completeness of reports puts this rating at risk. The Monitors were provided a semi-annual report of incidents, that now, with the supplementation by the daily/weekly reports, contains all of the required information and, thus, IV. A. 7. h. and i. are in substantial compliance. OPSO performed an assessment of whether the reporting system is meeting the requirements of the Consent Judgment and is given substantial compliance for IV. A. 7. j. as OPSO is now addressing the lack of timeliness.

## IV.   A. 8.  Investigations

*A. 8. a. Maintain implementation of comprehensive policies, procedures, and practices for the timely and thorough investigation of alleged staff misconduct, sexual assaults, and physical assaults of prisoners resulting in serious injury, in accordance with this Agreement. Investigations shall:*

    *(1)    be conducted by persons who do not have conflicts of interest that bear on the partiality of the investigation;*

    *(2)    include timely, thorough, and documented interviews of all relevant staff and prisoners who were involved in or who witnessed the incident in question, to the extent practicable; and*

    *(3)    include all supporting evidence, including logs, witness and participant statements, references to policies and procedures relevant to the incident, physical evidence, and video or audio recordings.*

*A. 8. b. Continue to provide SOD and IAD staff with pre-service and annual in-service training on appropriate investigation policies and procedures, the investigation tracking process, investigatory interviewing techniques, and confidentiality requirements.*



*A. 8. c. Ensure that any investigative report indicating possible criminal behavior will be referred to IAD/SOD and then referred to the Orleans Parish District Attorney's Office, if appropriate.*
*A. 8. d. Provide the Monitor a periodic report of investigations conducted at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement.*
*A. 8. e. The report will include the following information:*

      *(4)     a brief summary of all completed investigations, by type and date;*
      *(5)     a listing of investigations referred for administrative investigation;*
      *(6)     a listing of all investigations referred to an appropriate law enforcement agency and the name of the agency; and*
      *(7)     a listing of all staff suspended, terminated, arrested, or reassigned because of misconduct or violations of policy and procedures. This list must also contain the specific misconduct and/or violation.*

*A. 8. f. OPSO shall review the periodic report to determine whether the investigation system is meeting the requirements of this Agreement and make recommendations regarding the investigation system or other necessary changes in policy based on this review. The review and recommendations will be documented and provided to the Monitor.*

<u>Findings:</u>

A. 8. a.  Partial Compliance

A. 8. b.  Substantial Compliance

A. 8. c.  Partial Compliance

A. 8. d.  Substantial Compliance

A. 8. e.  Substantial Compliance

A. 8. f.  Substantial Compliance

<u>Observations:</u>

      The Investigative Services Division (ISB) is responsible for: the Criminal Investigation Division (investigates possible criminal activity by inmates), Internal Affairs Division-Criminal (investigates possible criminal activity by staff), the FIT (investigates use of force by staff), the Internal Affairs Division-Administrative (investigates possible violation of policies by staff), and the Intelligence Unit (provides information and intelligence regarding activities that have taken place or may take place in the jail or support activities).

      The timeliness and the quality of the investigations produced by ISB declined during the monitoring period. This particularly applies to investigations by FIT. They are often finalized without having interviewed any witnesses and relying on short self-serving statements by the involved deputy. Thus, IV. A. 8. a., remains in partial compliance. The major and lieutenant resigned in 2020 and lower ranking supervisors have been required to take on additional duties. The supervisor assigned to take over the duties of FIT supervisor initially did a good job at assuming the duties and eliminated the backlog in use



of force investigations. However, he is now required to oversee the investigators assigned to criminal investigations, including in custody death investigations. While they received additional training, the quality of the investigations is lacking. It is recommended that an experienced supervisor of investigations be hired to head ISB.

The Monitor acknowledges that investigating incidents of inmate-on-inmate assaults, sexual assaults, staff on inmate assaults, etc. with a goal of seeking indictments is appropriate; but the overall goal is to create a safe jail. In a jail setting, investigations play a critical role in protecting inmates from inappropriate or illegal staff actions, protecting inmates from each other, and ensuring policy is followed. Continued emphasis is needed on the goal of investigations to prevent future incidents through analysis of the policy, procedures, training, supervision, and physical plant contributors to the incident. This function cannot and should not be performed by ISB alone. Also troubling is how seldom ISB recognizes the other factors which contributed to an incident such as failure to follow policy and/or includes them in the investigation reports. This level of assessment requires input from individuals who have a high level of experience in jail/corrections work. In short, it requires collaboration between ISB and OJC. While collaboration was improving for a while, during this monitoring period, it was noted that the level of defensiveness on the part of OJC staff when issues are pointed out by ISB or others was even greater than before. OJC staff were instructed not to ask ISB for assistance which sometimes resulted in evidence not being gathered appropriately and shakedowns for weapons and drugs being conducted.

ISB has demonstrated training related to the investigative skills provided during 2022. IV. A. 8. b. remains in substantial compliance.

Investigations which reveal possible criminal activity by staff were not always referred to the Orleans Parish District Attorney's Office. It appears that ISB made the decision based on a belief that if ISB did not feel the case was worthy of prosecution, it should not be referred. The standard is referral for possible criminal activity, not whether the case should be prosecuted. Thus, A. 8. c. is now in partial compliance. The Monitors remain concerned about the frequent refusal by the district attorney to follow through with filing cases related to indecent exposure by inmates towards staff. ISB provides reports in substantial compliance with IV. A. 8. d. and e. ISB reviewed the investigation system to determine whether the investigation system complies with the requirements of



the Consent Judgment and forwarded any recommendations to the Monitors in substantial compliance with IV. A. 8. f. The quality of those recommendations may result in a lowering of the rating.

### IV. A. 9. Pretrial Placement in Alternative Settings

***A. 9. a. OPSO shall maintain its role of providing space and security to facilitate interviews conducted pursuant to the City's pretrial release program, which is intended to ensure placement in the least restrictive appropriate placement consistent with public safety.***
***A. 9. b. OPSO shall create a system to ensure that it does not unlawfully confine prisoners whose sole detainer is by Immigration and Customs Enforcement ("ICE"), where the detainer has expired.***

Findings:

A. 9. a.  Substantial Compliance

A. 9. b.  Substantial Compliance

Observations:

OPSO provided a memorandum noting that the pretrial program is managed by the Criminal District Court, and that space is provided. OPSO also provided a memorandum that ICE detainers are only accepted for a specified list of offenses.  OPSO has not detained any individuals under an ICE detainer during the monitoring period. Both of these memos are dated July 25, 2022. Updated memos need to be provided in the future as the signatory is no longer with OPSO.

### IV. A. 10. Custodial Placement within OPP

Introduction:

OPSO designed, validated, and implemented an objective classification system to assess and house OPSO inmates according to their threats to institutional safety and security. The automated classification system was rolled out in the Jail Management System (JMS) on January 15, 2015.[1] The 2022 OPSO staffing plan reduced the classification unit staffing from 18.68 to 14 FTEs.[2]

As of December 5, 2022, the Classification Unit staffing was 3 -- two civilian classification specialists and one shift supervisor.  (One classification specialist was out on medical leave.)  A captain was assigned to serve as a liaison between the Classification Unit and OPSO operations. However, he has not received any custody assessment or housing

---

[1] Hardyman, Patricia L. (2015). "Design and Validation of an Objective Classification System for the Orleans Parish Sheriff's Office: Final Report." Hagerstown, MD: Criminal Justice Institute, Inc.
[2] Gusman, Marlin N. (March 16, 2021). "Coverage Plan 2021." Orleans Parish, LA: Office of the Sheriff. pp. 11. The 2022-23 staffing planning is pending.



assignment training. Hence, he cannot assist with the classification supervisor and specialists' duties. During this compliance period, two (2) classification specialists and three (3) classification shift supervisors resigned. As of December 2nd, the classification manager transferred to the Transportation Unit. Thus, she no longer assisted the line staff with the custody/housing assessments or supervised the Unit.

Hiring staff for the Classification Unit posed challenges. Three individuals had been "hired" for the Classification Unit – two opted for deputy rather than civilian positions, and one was assigned to another OJC division. One individual who resigned from the Classification Unit re-applied for a Classification Unit position. Still, as of the December site visit, she had not been assigned to a shift or provided the logins/passwords to the OPSO jail management or Louisiana criminal record systems.

In short, the Classification Unit staffing was inadequate. For example, for two of the three days of the onsite Compliance review, no (0) classification staff were available to complete the custody assessments or housing assignments. Further, the classification specialist assigned to the day shift on the third day of the site visit was not trained to complete custody reassessments or housing re-locations. Thus, no staff was available for these essential classification tasks. Night-shift workers were called upon to come in early to reduce the backlog in the booking area.

An automated housing assignment process (HUAP) identifies housing options for inmates according to their custody level, gender, special population status, PREA designations, enemies, and associates. Most male admittees are assigned one of the first-floor IPC ROLL IN pods at initial classification.[3] (Special population tags identify individuals for suicide observation versus suicide watch, medical housing/ isolation, academic education, or special diets.) (As needed, men with acute mental health or medical needs go directly to 2A or 4B, respectively. At intake, most women are housed on 3F.) While technically not an issue for this compliance review period of April - September 2022, the re-assignment of the classification manager to the Transportation Unit created challenges for the housing process. For example, neither the captain liaison nor the remaining classification supervisor was aware of or trained as to the classification manager's duties to update the OPSO housing matrix, track maintenance issues within the

---

[3] When transferring inmates from the IPC ROLL IN or special population pods to a general population pod, the classification staff matches individuals by custody level, PREA designations, age, and crime/criminal history.



housing units, or maintain the automated housing unit within the jail management system.[4]

OPSO designed its housing process to assign enemies and associates to separate pods.  This is critical for preventing institutional violence and disruption. What appears to be lacking is communication, cooperation, and trust between the Classification Unit and security staff to share information regarding neighborhood cliques, enemies/associates, and other housing separation requirements.  The "ALL" custody and PREA designations continue in the special population units – Mental Health, Protective Custody, Disciplinary/ Segregation, Medical, etc.  Closing pods to reduce staffing requirements will exacerbate the challenge of maintaining adequate separations of detainees by custody level, enemies/associates, PREA vulnerabilities/predation, and special needs. It is important not to negate the classification system and jeopardize out-of-cell time in the struggle to reduce staffing requirements. These tradeoffs may only create more violence and disruption in the long term.

The OPSO revised its housing matrix on multiple occasions throughout this Compliance Period. These changes reflected fluctuations in demand for specialized intake housing units (IPC Non-Symptomatic Roll-Ins), isolation pods for individuals exposed to COVID-19, other special populations (medical, mental health, disciplinary, administrative segregation, and protective custody), and of course, the general population.

Population fluctuations and isolation related to COVID-19 continued to create demands on the Classification Unit. However, housing individuals within the Roll-In Pods by the admission date is no longer required.  Individuals are assigned to a cell by custody level, PREA designations, age, and crime/criminal history.  Additional medical, mental health, administrative segregation, disciplinary, and protective custody restrictions may impact bed assignment or separations.  Security staff does not use the ISI to schedule out-of-cell activities for the general population or special management pods.[5] Standardized schedules by bottom row vs. mezzanine for out-of-cell time are adequate for the general

---

[4] The day-shift classification supervisors have taken on the role of updating the OPSO housing matrix. However, as of February, they have not received training for updating the housing matrix in jail management system.
[5] The ISI (Inmate Separation Instrument) is an automated JMS report to identify appropriate out-of-cell separations for the mixed custody and special populations units. As a pod deputy may not be aware or have access to the multiple factors requiring the separation of individuals within a pod, failure to use the ISI threatens everyone's safety and institutional security.



population pods but pose serious risks within the numerous OJC special population pods. As previously noted, as the OPSO considers closing/combining pods to reduce staffing requirements, maintaining adequate separations of inmates by custody level, enemies/associates, PREA vulnerabilities/predation, and special needs remain critical.

OPSO did not provide documentation of any audits to verify the integrity of the classification system for this Compliance Review period.  The Classification manager reported that the shift supervisor audited a few housing units during "April or May." However, neither paper nor electronic copies of these audits were available. The housing audits were discontinued due to the classification and security staffing shortages. Captain Lewis undertook housing audits in December.  But, without training on the audit process and instrument, these audits were of limited utility. Further, they did not address the absence of audits during the last nine months. In addition, the Classification Manger did not audit the accuracy of the custody assessments during this Compliance Review period.  There was no explanation for the missing internal audits.

Assessment Methodology:

Compliance was assessed through multiple data sources and activities – review of the OPSO and JMS statistical reports, onsite meetings with OPSO staff, and a site visit conducted December 5 – 7, 2022. The OPSO documents included monthly statistical reports.  Analyzed were custody assessment, override, attachment, and enemy refusal data downloaded from the AS400.  The statistical reports tracked daily reclassifications, daily populations, placement errors, pending custody reviews, the stock population, and monthly custody trends. Onsite activities included: observation of the initial classification, reclassification, and housing processes.  The Monitor met with OPSO classification, facility administration, and compliance unit staff, as well as briefly with WellPath personnel.  As noted above, OPSP did not provide documentation of any audits of the housing assignments or custody assessments for this Compliance Review Period. Further, there was no documentation of systematic reviews of inmate enemy/associates or segregation and protective custody status.

This review focused primarily on the data and Classification Unit activities between April 1, 2022 – September 30, 2022.  Some analyses considered trends over a twelve to fifteen-month (12-15) period to detect variations due to seasonal variations and COVID-19-related procedures. In addition, comments as to the current status of the classification



unit -- staffing, lack of leadership, training for new/rehires and new responsibilities, and the integrity of the classification – are provided to guide OPSO toward Compliance.

Summary:

OPSO is substantially compliant with one of the eight Custodial Placement sections of the Consent Judgment (IV. A.10). Section c is rated as Partial Compliance.  Notable was the regression of Sections a, d, e, f, g, and h to Noncompliance.  The rating for Section b (*Prohibit classifications based solely on race, color, national origin, or ethnicity*) did not change.

Findings:

A. 10. a.  Noncompliance

A. 10. b.  Substantial Compliance

A. 10. c.  Partial Compliance

A. 10. d.  Noncompliance

A. 10. e.  Noncompliance

A. 10. f.   Noncompliance

A. 10. g.  Noncompliance

A. 10. h.  Noncompliance

***IV.A.10. a. OPP shall implement an objective and validated classification system that assigns prisoners to housing units by security levels, among other valid factors, in order to protect prisoners from unreasonable risk of harm. The System shall include consideration of a prisoner's security needs, the severity of the current charge, types of prior commitments, suicide risk, history of escape attempts, history of violence, gang affiliations, and special needs, including mental illness, gender identity, age, and education requirements. OPSO shall anticipate periods of unusual intake volume and schedule sufficient classification staff to classify prisoners within 24 hours of booking and perform prisoner reclassifications, assist eligible DOC prisoners with re-entry assistance (release preparation), among other duties.***

Finding:

Noncompliance

Observations:

As of September 30, 2022, the Classification Unit staffing was five -- three civilian classification specialists, one shift supervisor, and a classification manager.  As of the onsite review, one specialist was on medical leave, and the classification manager had transferred to another unit. Thus, only three (3) are available for the 24/7 shifts. Despite significant HR activities, no one was hired and assigned to a shift. The shift supervisors oversee the classification specialists, process housing transfers, complete custody reviews, conduct housing audits, address classification-related grievances, and make rounds to the



pods. The classification specialists complete the custody and predation/vulnerability (PREA) assessments and assign appropriate pod and cell housing accordingly. Due to the absence of a classification manager and only one classification supervisor, there was little to no attention to the housing audits, the accuracy of the custody assessments, training, the integrity of the housing matrix, the bed assignment program within the jail management system, or protective custody and segregation reviews.[6]

In short, the Classification Unit staffing was inadequate. As noted above, classification staff were not available to complete the custody assessments or housing assignments for two of the three-day shifts of the onsite Compliance review. Further, the classification specialist assigned to the day shift on the third day of the site visit had not been trained to complete custody reassessments or housing re-locations. While the re-assignment of the classification manager and the medical leave of the classification specialist may have created a dire situation for that week, a staff of three is inadequate to ensure 24/7 coverage of the system. Further, the vacancy of the classification manager and three of the four shift supervisor positions leaves the Unit absent of leadership while struggling to keep up with the daily workload of custody assessments, housing assignments, and audits.

As anticipated from the drop in the number of classification staff from six to three, the overtime hours logged by the classification staff increased from an average of 39.56 to 63.07 hours/month/staff member during this compliance period. Between April 1 and Sept 30, 2022, the Classification Unit logged 2,207.67 hours of overtime.[7]  During this compliance period, each classification specialist worked overtime an average of 78.63 hours/month; the classification supervisors logged 48.39 hours of overtime/month.  (In contrast, non-Classification Unit staff logged an average of 23.84 hours/person/month during this Compliance Period.) While it is unclear if the high levels of overtime contributed to the unit stress and resignations, obviously, there are not sufficient staff to cover each shift without relying on overtime.

---

[6]  In December, two of the shift supervisors were rehired. This created some stability of the Classification Unit, but adequate coverage of the shifts as well as attention to audits, staff training, and system oversight remain of great concern.

[7]  OPSO Excel spreadsheets entitled Overtime by Month – January –September 2022 and the 2022 HR Report Hire and Separations Reports.  The classification work schedule builds in eight hours of overtime/month. However, the same scheduling formula impacts other OPSO staff.



During Compliance Period #16, OPSO partially addressed one of the critical concerns noted in the previous compliance reports. The housing matrix was revised to differentiate the male intake roll-in pods by custody level, PREA status, and special population status. But the special population pods -- Mental Health, Medical, Education, Disciplinary/Segregation, TMH, and all female units – allow for all custody levels and PREA statuses. As per the OPSO Housing Matrix provided during the onsite review (dated 11-16-2022), 15 of the 30 OJC/TDC/TMH pods house individuals of all custody, vulnerability, predation, and special population status.

The TMH treatment teams assign patients cells according to their mental health needs with little regard for custody or PREA status. (Known enemies live in separate pods.) Housing assignments, activities, and out-of-cell time are according to the individual's program/treatment level. So again, classification is compromised.   Inadequate security staffing and ad hoc schedules for the out-of-cell activities compound the risks associated with "ALL CUSTODY ALL STATUS" pods.

A second concern was the blatant failure of the security staff to maintain/enforce the housing assignments specified by the Classification Unit.  Although there was substantial concern among classification staff and facility administrators that inmates were not living in their assigned cells or sleeping in their allotted bunks, housing audits were not conducted.  An onsite meeting with OJC captains and unit managers revealed strong distrust and frustration with the Classification Unit. The security staff expressed concerns that their knowledge of conflicts among inmates was ignored or not given full consideration for the housing assignments. They lamented that the classification staff was sometimes slow to address concerns and re-assign inmates.  This tension between security and classification has been ever-present since the implementation of the objective classification system. However, the minimal OPSO staffing has fueled the tensions between the classification and security staff. As a follow-up to this meeting, a draft protocol for prioritizing and identifying "emergency moves" and communication among the units was drafted and circulated to the facility administrators. To date, no action.

The new classification manager must work closely with other OJC units to facilitate information sharing and build trust. As the OPSO rebuilds the Classification Unit and restarts the reclassification process, the Classification Unit should consider strategies for utilizing the security staff's knowledge of local cliques, checking in with the inmates during



their rounds or audits, and addressing inmate grievances.  Clear expectations for the Classification Unit to respond to security requests for inmate housing re-locations would be a simple first step.

***IV.A.10.b. Prohibit classifications based solely on race, color, national origin, or ethnicity.***
<u>Finding:</u>

Substantial Compliance

<u>Observations:</u>

The custody assessments consider objective risk factors validated for the OPSO male and female inmates. The individual's race is not one of the objective risk factors. Classification specialists consider the individual's custody level, vulnerability designation, age, and charges to select a cell and bed from those the JMS automated housing program identifies as appropriate housing for the individual. To track this element of the Consent Judgment, OPSO created a monthly statistical report to record the race and gender of individuals per housing location.

The OPSO "Housing By Race" reports suggested that race was not a factor for the OJC housing assignments. With a few exceptions, the number of black and white inmates within each OJC housing unit was consistent with the overall racial distributions among the OPSO inmate population. However, the percentages of white males assigned to the TDC DOC worker and TMH units differed from the proportions of white inmates within the total male inmate population. As shown in Figure 1, between October 2021 and September 2022, only 12.4 percent of the OPSO male population identified as white. However, 29.2 percent of the men assigned to the TDC DOC worker unit were white. On the other hand, only 5.6 percent of the men assigned to a TMH unit were white.





Figure 1: Percentage of White Males Assigned to OJC, TDC & TMH Housing Units – Oct 2021 – Sept 2022.

In contrast, the percentages of white women assigned to the OJC versus TMH did not differ significantly during this compliance period. As shown in Figure 2, on average, 20.1 percent of the OPSO female population identified as white. On average, 23.4 percent of the women assigned to the TMH unit identified as white.



Figure 2: Percentage of White Female Inmates Assigned to OJC & TMH Housing Units – October 2021 – September 2022.

While these data suggest race was not a housing factor within OJC, the data create concerns regarding disparate housing assignments generated by the DOC worker program criteria.

***IV.A.10.c Ensure that the classification staff has sufficient access to current information regarding cell availability in each division.***



Finding:

Partial Compliance

Observations:

OPSO automated housing assignment process (HUAP) considers the inmate's custody level, gender, special population status, PREA designations, enemies, and associates versus OJC beds available to recommend an appropriate bed. Housing tags identify inmates on suicide observation versus suicide watch, medical, mental health, alcohol/drug detoxification protocol, gang affiliation, special diets, and school participation.

The OPSO daily population report lists the units, cells, and beds offline for maintenance or staffing, as recorded in the AS400.  The reliability of the AS400 data for cells/pods offline within the housing module was unavailable.  As the classification supervisors did not conduct housing audits or weekly rounds, they did not have the opportunity to identify cells requiring maintenance.  Classification relied on maintenance reports from security and maintenance staff. The walls of the classification specialist work area displayed the usual collage of messages and notes of damaged and closed cells. The classification specialists could not speak to the accuracy and timeliness of the notes.

Classification specialists track all bed assignments to avoid housing errors or duplications due to delays between the inmate's housing assignment and the physical transfer of the individual to the designated pod/cell. These manual lists and notes direct the housing assignments.  Absent a classification manager, the classification supervisor(s) will need to quickly assume responsibility and training for updating all cell or bunk availability information in the JMS to ensure the accuracy of the bed assignments. Overall, during the compliance review period – April - September 2022 – the classification staff had access to automated and manual information regarding current bed availability throughout OJC, TDC, and TMH.  Its reliability, however, was questionable given the classification staffing, particularly after the Manager's departure.

***IV. A. 10. d. Continue to update the classification system to include information on each prisoner's history at OPSO.***

Finding:

Noncompliance



Observations:

As shown in Figure 3, the monthly custodial reports provided by OPSO indicated:

- **Percent Initial Custody Assessments**: During this Compliance Period, the Classification Unit completed initial custody assessments for 90.6 percent of the inmates booked into OJC. This rate is a slight regression from the rate of 91.2% observed for the previous Compliance Period.

- **Percent Within 8 Hours:** During this Compliance Period, the percentage of initial classifications completed within the first eight hours of booking fluctuated between 85.7 and 76.4 percent; the average rate across the six months was 83.3 percent. However, during the last three months of the period -- July – September -- only 81.7 percent of the initial custody assessment were completed within the first eight hours of booking. Thus, nearly 20 percent of the detainees remained in the booking area for more than eight hours before assignment to a bed. The percentage of cases completed between 8.01 and 24 hours fluctuated between 4.7 and 12.7 percent; the average was 6.9 percent.

- **Percent Greater Than 24 Hours:** Very few -- only .4 percent -- of the inmates remained in the OJC intake booking area for more than 24 hours. This rate continued the trend observed for the previous compliance period.



*Figure 3: Rates and Completion Time for Initial Custody Assessments Completed October 2021 – September 2022*

These data suggested that while the percentage of inmates initially classified remains at about 90 percent, the lag time between booking and classification/housing



increased.  When asked about the increase in time from booking to housing, staff attributed the delays to staffing rather than the differentiation of the male Roll In pods by custody level.  When observing the initial classification and housing process, the classification specialist was stymied by the lack of lower bunks available within the Roll In pods.  When asked about reclassifying or transferring inmates who had cleared their detoxification process and/or COVID restrictions from the Roll-In to general population pods, the response was, "I don't know how to do that. I only classify and house inmates from the booking area." This comment suggested that the delays between booking and housing were due to inadequate staff training as well as staffing shortages.

As noted in this report and previous compliance reports, the OPSO Housing Matrix was revised multiple times to ensure appropriate separations for COVID-19 treatment, quarantine, and isolation and to address shifts within the inmate population.  The "ALL CUSTODY - ALL STATUS" pods continue to pose significant risks as Low, Medium, and High custody inmates with different PREA designations and special needs live in the same housing units.   During this compliance period, administrative and security staff reports indicated that most pods' out-of-cell schedules were by tier (bottom vs. mezzanine) and cell number within the special population pods. Security staff reported exchanging information regarding intra-pod conflicts and tensions. All agreed that shift-debriefs and intelligence sharing are essential for identifying and maintaining inmate separations. However, this knowledge is not routinely exchanged with the classification unit except as ad hoc requests for housing transfers.  A simple statement "Inmate XXX can't live on this pod" neither provides the classification staff with sufficient information to place that individual properly nor informs the assignments of other individuals. Thus, the transfer process is repeated, and the workload for the limited classification and escort staff is multiplied.

Regardless of the staffing patterns, pod mission, and schedules, the sub-standard practice of mixing custody/vulnerable inmates during out-of-cell activities should be discontinued as soon as possible. A straightforward option is to list the custody level and key separation tags on the housing rosters. (As previously observed, the ISI programming can be easily tweaked to include the admission date and COVID-19 isolation status. However, using the ISI will require retraining all security staff and their access to the



AS400.) Further, enforcement of housing assignments among security staff is critical for maintaining inmate separations and, thus, institutional safety and security.

Previous compliance reports have delineated the dangers of overriding the scored custody levels for housing purposes. As shown in Figure 4, during this compliance period – April - September 2022 – just over a third of the overrides (37.6%) were for housing purposes. The other frequently cited override reasons were PREA-related: Known/Potential Predator and Potential Victim). Staff did not provide the rationale for 21.8 percent of the overrides.



Figure 4: Percent Overrides for Housing Purposes - October 2021 – September 2022

The April - September 2022 classification stock population reports indicate that staff overrode the scored custody level for 2.8% percent of the men and 1.7% of the women. (See Figure 5.) These are very low rates; they are well below the recommended rates of 5 to 15 percent.[8] However, within this small group of inmates, approximately 30 percent are housing-related overrides. Further, one could argue that the automatic overrides of "Potential Victim/Potential Predators" from Minimum to Medium are just another type of housing override. Under the COVID-19 Pandemic, the OJC ADP had decreased significantly. However, by the Summer of 2022 -- July – September -- the ADP increased to over 1,000. (See Figure 9.) This population increase, along with the pods closed for repairs and staffing shortages, created housing challenges. Continued tracking

---

[8] Austin, James and Patricia L. Hardyman. 2004. *Objective Prison Classification: A Guide For Correctional Agencies.* Washington, D.C.: National Institute of Corrections.



of the discretionary overrides for housing purposes remains essential as the Pandemic wanes, and the ADP increases.

On the other hand, the percentage of custody assessments impacted by a mandatory override (OPSO policy restrictions) remains high. OSPO should revisit these restrictions as part of the revalidation of the classification system. However, in the interim, OPSO should consider eliminating the mandatory restrictors at reclassification that require medium custody for an inmate with a felony detainer or open felony charge. This change would base the custody level on the individual's behaviors rather than legal status.



Figure 5: Mandatory and Discretionary Override Rates by Gender: October 2021 – September 2022

As part of the review for Compliance Report #14, we observed housing overrides for "inmate refusal of enemies" to facilitate the housing of general population inmates. Staff dismissed inmate-to-inmate conflicts to resolve inmate requests to transfer from one pod to another. In response to the Monitors' and Plaintiff attorneys' questions, OPSO suspended the inmate refusal process in December 2020.[9] "Enemy Refusals" restarted in April 2021 and have continued. During this Compliance Period, the classification staff removed 22 inmate separations within the JMS.

Following Compliance Report #15, the OPSO revised its Inmate Classification Procedures (#7020) to include rules for resolving an "Inmate Refusal of Enemy." These

---

[9] OPSO indicated that the "Inmate Refusal of Enemies" form was a trial strategy initiated in September 2020. As of December 2020, after a 6-week trial period, OPSO discontinued the questionable form but continued the "enemy refusal" process without the form.



Procedures require detailed documentation of the reviews and quarterly audits to ensure the separation review process works as intended and to make recommendations for adjustments as needed. The Classification Manager updated the "Separation Review Checklist" (3-10-2022) to record the "enemy refusal" evaluations. [10]   OPSO developed screens and reports in the AS400 to document and track the separation reviews as per the Inmate Classification Procedures (#7020). Training on the new procedures, screens, and checklist was provided to the classification staff in March 2022.

The automated screens within the AS400 were created to prevent the removal of enemy and associate separations without adequate review and documentation.  The new screens provide for uploading the completed checklists to the server to document the required interviews and data checks.  While the jump in the number of enemy separations from 6 to 22 during this compliance period was quite troubling, of even greater concern was the failure to complete and upload the required separation review checklists.  Staff continued to rely on telephone calls and emails from security staff indicating there was "no problem between the inmates." Documentation of the required interviews of the inmates, unit management, and mental health staff and reviews of the inmate's disciplinary history was unavailable. The "emails" documenting the security staff's recommendations for rehousing the inmates were also not provided.

Further, staff did not complete the quarterly audits of the separations as per OPSO policy. Thus, OPSO has not fully implemented its enemy separation procedures delineated in Procedures (7020). Instead, the Unit continues to "resolve" inmate-inmate enemies sans full investigation and documentation.

The Classification Monitor List (List) is an ad hoc report identifying inmates for whom a custody review is due. Custody reassessment reasons include a regular 60/90-day reassessment or a status change or event within their jail records, i.e., amended charge(s) or bail amount, disciplinary incident, detainer lodged/lifted, or a new sentence. The number of inmates on the list fluctuates as inmates return from court, move through the booking process, and the like.  The goal is for the classification specialist or supervisor to complete all pending custody reviews during their shift.  During the previous Compliance Review period, the average number of pending custody assessments per the Classification

---

[10] The Classification Unit staff indicated that the earlier versions of the checklist were "too long."

Monitor list was 10.1; 4.2 were awaiting an initial classification, and 5.9 were awaiting a custody reassessment. However, during this review period, the number of pending assessments doubled. On average, 27.6 assessments were pending; 4.7 inmates were awaiting an initial classification, and 22.96 were awaiting a custody reassessment. As shown in Figure 6, while the number of pending initial custody assessments remained low, beginning in July, the number of pending custody reassessments increased sharply. By the end of the period, there were 100 pending custody reassessments. Thus, the classification unit did not "*Continue to update the classification system to include information on each prisoner's history at OPSO.*" Custody assessments are not static. Instead, they must be updated throughout the incarceration to reflect changes in the individual's legal status, charges, institutional behavior, etc.



Figure 6: Pending Custody Assessments - April - September 2022

Following Compliance Report #8, OPSO worked with Wellpath to rebuild the linkages between the medical/mental health records and JMS. These data are essential for scoring seven of the PREA victimization and predation risk factors. Medical and mental health information is critical for the inmates' housing assignments. Wellpath medical and mental health service and treatment data are routinely (every five to eight minutes) uploaded to the JMS. It appears that the ERMA -AS400 linkages are finally yielding some data on the victimization of individuals on the mental health caseload. As shown in Figure 7, OPSO disciplinary reports indicated that individuals on the mental health caseload were victims of a battery or assault during April, July, August, and September. These data



suggest that during April, 1 of the 11 inmates assaulted was on the mental health caseload. During August, 4 of the 20 inmates assaulted were on the mental health caseload.



Figure 7: Victimization of Inmates on the Mental Health Caseload - April - September 2022

Figure 8 provides the number of attachments input by the classification staff to record criminal history data between April 2021 and September 2022. Figure 8 illustrates that the classification staff created, on average, 180 attachments per month between April 1 and September 30, 2022.  While this rate is substantially more than the mere 69/month input during the first three months of 2022, the number is still significantly less than the average of 222.5 attachments/month for April 2021 - September 2022.  A decrease in the number of initial custody assessments completed did not explain this drop.   As shown in Figure 9, attachments were input for 30.4% of the initial custody assessments. The current rate is still less than the rate of 37.2% input for April – September of 2021.





Figure 8: Number of Attachments Input by Classification Staff – October 2020 – March 2022

Staff reported that the national record (NCIC) system is frequently unavailable. The NCIC access problem helps to explain the drop in attachments. The onsite observation of the initial custody assessments revealed that not all classification specialists had the necessary login/password to access the NCIC system. Further, the process did not require checking the booking folder for a rap sheet or recording the folder numbers for assessments with missing rap sheets to facilitate rechecking the records when the NCIC was available.  Thus, it appears that the criminal history data required to score four of the custody factors, three of the vulnerability factors, and four of the predation was compromised by the failure to 1) ensure all staff had access to the NCIC criminal history system; 2) train staff to check the booking folders for the rap sheet; 3) track and follow-up assessments with missing rap sheets; and 4) audit the accuracy of the custody and PREA assessments.





Figure 9: Percentage of Initial Custody Assessments for which an Attachment was created between April 2021 and September 2022

***IV.A.10.e. Continue competency-based training and access to all supervisors on the full capabilities of the OPSO classification and prisoner tracking system.***

Finding:

Noncompliance

Observations:

An in-service classification training was held on March 14, 2022. All specialists and supervisors attended. This in-service training did not meet the OPSO mandatory competency-based training requirement for 2022 because no pre- and post-training testing was conducted. No training was provided during this compliance period.

***IV.A.10.f. Conduct internal and external review and validation of the classification and prisoner tracking system on at least an annual basis.***

Finding:

Noncompliance

Observations:

Daily population reports indicating the number of inmates by location – OJC, TDC, TMH, and out-of-parish– are received daily. Monthly custodial statistical reports for April - September 2022 regarding the number of custody assessments by type, gender, and population were available. These reports track the timeliness of the initial custody assessments, the custody distributions, the cases due for a custody assessment, the prevalence of special populations, and the rates and types of disciplinary infractions.



**Housing Audits – Checking the Veracity of the Inmate Housing Assignments**

During previous compliance review periods, the Classification Unit supervisors audited the housing units to ensure inmates were housed as per the classification transfer orders.  There was no documentation of any housing audits completed between April and September.  Although the classification manager indicated some housing audits were conducted during April and May, the reports, rosters, and corrective action plans from these audits were not provided despite repeated requests.

**Internal Audits – Checking the Accuracy of the Custody and PREA Assessments**

The classification manager is responsible for assessing the accuracy of a random sample of at least ten custody/PREA assessments each month. There was no documentation of any internal audits completed between April and September.  Although the classification manager indicated audits were conducted during April and May, no internal audit logs were provided despite repeated requests. In Compliance Report #16, we recommended retooling the internal audit process to include checking the NCIC rap sheets.  However, we did not anticipate that the Manager would terminate the internal audit process.

**Revalidation of the Classification System – Assessing the Validity of the System**

Lovins and Latessa submitted their report on the validation of the OPSO classification system on April 30, 2018.[11] This validation study served as documentation of Compliance with the Consent Judgment requirement for "external review and validation of the classification and prisoner tracking system on at least an annual basis." Statistical validation of an objective classification system must be completed every three to five years to ensure the integrity of the classification system and that the risk factors and custody scales are still appropriate for the current inmate population.[12] Revalidation of the System was due in 2021 per a previous agreement for statistical validation every three years.  OPSO still has not contracted to revalidate the classification system.  The new administration had plenty of time to contract for the revalidation since May 2022. When asked about revalidation, the delays were attributed to the City's budget process.  Again, the classification system's revalidation was not prioritized.

[11] Lovins, Brian K. and Edward Latessa (April 30, 2018). "Revalidation of the Orleans Parish Classification System." Cincinnati, Ohio: University of Cincinnati Corrections Institute.

[12] Hardyman, Patricia L. and James Austin (2021) "Objective Prison Classification: A Guide for Correctional Agencies." 2nd Edition.  Washington, D.C.: National Institute of Corrections. p. 17.



*A.10.g. Provide the Monitor a periodic report on classification at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date and every six months, thereafter, until termination of this Agreement. Each report will include the following information:*

    *(1)  number of prisoner-on-prisoner assaults;*
    *(2)  number of assaults against prisoners with mental illness;*
    *(3)  number of prisoners who report having gang affiliations;*
    *(4)  most serious offense leading to incarceration;*
    *(5)  number of prisoners classified in each security level;*
    *(6)  number of prisoners placed in protective custody; and*
    *(7)  number of misconduct complaints.*

<u>Finding:</u>

Noncompliance

<u>Observations:</u>

Reviewed were the monthly custodial, discipline, and inmate population statistical reports for April - September 2022. OPSO has developed reports to track the statistics as required under section IV.A.10.g. As previously noted, this was the first compliance review period, for which data as to the rate of victimization of inmates on the mental health caseload was available. The data suggests relatively few individuals on the mental health caseload are victims of assault or battery. This is good news! It will be vital to continue to track these data to ensure their accuracy.

OPSO and the Orleans District Attorney (DA) have an ongoing process for notifying the OPSO of individuals identified as members of a "gang." For this Compliance Review, OPSO reported only six active inmates were identified as "gang" members or associates. However, the gang statistics reported for the OSPO 2022 semi-annual report did not match those provided for this Compliance Review. For example, the semi-annual report indicated five (5) gang members in May and six (6) in June. The data provided for this Compliance Review showed four gang members in May and June. While the differences between these reported counts are minor, what was troubling was that the Classification Manager was unaware of the discrepancy between the two reports. Further, we observed similar differences between the two reports regarding the number of prisoners in protective custody.

The initial classification questionnaire includes a question as to the individual's membership or affiliation with a "gang." Staff indicated that inmates rarely reveal their affiliations. However, if the classification interview identifies any "gang affiliations," the information should be forwarded to the OPSO investigation bureau for verification.



During the previous and current site visits, security staff stressed the importance of their interviews with each new inmate to identify "conflicts with others on the pod" or involvement with local cliques/gangs.  Security staff relies on these interviews to determine if the individual "can live" in the pod and make recommendations to the classification staff to transfer an inmate to another pod.  Unfortunately, documentation of these interviews and subsequent communication (via telephone or email) with the classification unit to record required separations were unavailable.  Often the classification staff is notified AFTER the transfer rather than consulted to determine the best location of the individuals given their custody level, PREA designation, enemies, associates, or medical and mental health service requirements.

Figures 10 and 11 provide the OPSO monthly disciplinary data recorded in the JMS. The rate of disciplinary reports has fluctuated over the last twelve months – October 2021 – September 2022. (To account for short-term variations, seasonal trends, and the population shifts due to the Pandemic, we reviewed 12 months of disciplinary data.) As shown in Figure 10, these data suggest that the rate of disciplinary reports within the OJC population decreased significantly during this Compliance Review Period.  For example, the October 2021 – April 2022 disciplinary rate was 24.3%; for the current review period, the rate was 12.6%.  This decrease is misleading. Figure 10 shows no disciplinary disposition data were available in the JMS for May 2022.  OPSO explained that the disciplinary hearings were held in April and May, but the dispositions were not input into the JMS.  During April, for example, 242 disciplinary reports were written; as of November 2022, 108 reports (44.6%) remain as "Hearing not held = No Action Taken." During May, 309 disciplinary reports were written; as of November, all (100.0%) remain in the JMS as "Hearing not held = No Action Taken." Even though OPSO held the disciplinary hearings for these incidents, the failure to input the dispositions into the JMS means that the institutional behavior data essential to score three of the custody risk factors and five of the PREA risk are missing. Thus, the assessments for the individuals with missing disciplinary dispositions for April and/or May will underestimate the risks posed by these individuals.





Figure 10 Rate of Disciplinary Infractions for the OPSO ADP – October 2021 – September 2022

Figures 10 and 11 suggest downward trends in the rates of disciplinary infractions/inmate and the findings of guilt/infractions.  As shown in Figure 11, during the last 12 months, the OPSO ADP has gradually increased from 885 in October to 1049 by September 2022.  However, the number of disciplinary reports per month decreased from 275 in October 2021 to 202 in September 2022. A decrease in institutional misconduct is good news. However, to ensure the veracity of these trends, continued tracking of the number of disciplinary reports written, the number of disciplinary hearings held, and the number of reports/hearings "open/unheard" is essential.



Figure 11: OPSO ADP vs. Number of Disciplinary Reports: October 2021 – September 2022

Figure 12 illustrates the breakdown of the disciplinary infractions by type during



this Compliance Period. (These data reflect the most severe infraction of which the inmate was found guilty per report.) During this Compliance Period, the numbers of recorded predatory (e.g., assaults or battery) and aggressive behaviors (e.g., fights or threats) ranged between 30 and 57 predatory infractions and 28 and 73 aggressive infractions per month. For the five months for which data were available, the average numbers of predatory and aggressive infractions were 42.2 and 47.8/month, respectively. While these numbers are down significantly from those observed for April – June of 2021, the data suggest an average of three assaults/fights per day.



Figure 12: Most Serious Disciplinary Infraction/Report with Finding of Guilty: April 2021 – Sept 2022

As observed during the previous compliance period, the numbers of management problems and disruptive infractions suggest a continued decrease in the disorder within the facilities (OJC, TDC, and TMH). The average number of management problem-related violations[13] during this Compliance Period was 51.4/per month. Disruptive behavior was the most severe infraction for only 11 disciplinary reports per month.

***IV.A.10.h. OPSO shall review the periodic data report and make recommendations regarding proper placement consistent with this Agreement or other necessary changes in policy based on this review. The review and recommendations will be documented and provided to the Monitor.***

<u>Finding:</u>

Noncompliance

---

[13] Management problem infractions include contraband, destruction of Parish property, tampering with security devices, obedience to staff orders. Disruptive behaviors include interference with staff duties, gambling, tattooing, etc.



Observations:

The Monitor receives the daily "Active Inmates by Location" reports and has access to the ad hoc Classification Monitor lists and various classification statistical reports. During this Compliance Period, there were multiple updates to the OPSO Housing Matrix; the Matrices were provided only upon request.

Section G is rated as non-compliant for several reasons. First, several documents requested for the Compliance Review were never provided despite repeated requests and extended due dates.  Some of the missing documents and data files were provided only after multiple requests.  Second, as previously noted, the monthly statistical reports were contradictory and had to be rerun.  Third, the Classification Unit staff were not available for the onsite meetings.  During the onsite visit, for example, the Classification Manager was only available for one 2-hour session.  Observation of the classification processes was limited because the classification specialists and shift supervisors were not available to conduct custody assessments, housing transfers, or housing audits. Fourth, documentation of the required protective custody and administrative segregation reviews was unavailable because the multi-disciplinary analyses, as required by OPSO policy # 801.39, were not conducted during this Compliance Review Period. Fifth, OPSO continued to disregard its written policy regarding removing inmate enemies/ separations. Telephone calls or emails from security staff are insufficient for the investigation and review of the authenticity of the inmates' separation requirements.  Unfortunately, even the "emails" from the security staff requesting the removal of an enemy/separation could not be produced. A final point of concern was that the classification revalidation project languished despite previous OPSO assurances. With whom OPSO contracts for the revalidation is irrelevant; our concern is that the validation is already 24 months behind schedule.

## IV. A. 11.    Prisoner Grievance Process

*A. 11. a. OPSO shall ensure that prisoners have a mechanism to express their grievances, resolve disputes, and ensure that concerns regarding their constitutional rights are addressed. OPSO shall, at a minimum, do the following:*

> *(1) Continue to maintain policies and procedures to ensure that prisoners have access to an adequate grievance process and to ensure that grievances may be reported and filed confidentially, without requiring the intervention of a correctional officer. The policies and procedures should be applicable and standardized across all the Facility divisions.*
> *(2) Ensure that each grievance receives appropriate follow-up, including providing a timely written response and tracking implementation of resolutions.*
> *(3) Ensure that grievance forms are available on all units and are available in Spanish and*



*Vietnamese and that there is adequate opportunity for illiterate prisoners and prisoners who have physical or cognitive disabilities or language barriers to access the grievance system.*

*(4) Separate the process of "requests to staff" from the grievance process and prioritize grievances that raise issues regarding prisoner safety or health.*

*(5) Ensure that prisoner grievances are screened for allegations of staff misconduct and, if an incident or allegation warrants per this Agreement, that it is referred for investigation.*

*(6) A member of the management staff shall review the grievance tracking system quarterly to identify areas of concerns. These reviews and any recommendations will be documented and provided to the Monitor.*

<u>Findings:</u>

A. 11. a. (1)  Partial Compliance

A. 11. a. (2)  Non-Compliance

A. 11. a. (3)  Substantial Compliance

A. 11. a. (4)  Substantial Compliance

A. 11. a. (5)  Substantial Compliance

A. 11. a. (6)  Partial Compliance

Until the September 2019 report, one rating was given for the entire section for the Prisoner Grievance Process. In order to highlight which provisions are in substantial compliance versus those which fall short, the decision was made to rate each provision separately.

This review covered April 2022 through September 2022. For this review, the Monitor interviewed the Grievance Lieutenant, and security staff and inmates while inspecting the housing units. Reports and data submitted by OPSO covering the rating period were also reviewed.

As noted during the previous inspection, a review of the documentation demonstrated that all inmate submissions continue to be reviewed by Grievance staff, categorized into requests and grievances, and forwarded to the appropriate staff for response. Statistical information was provided on all categories. Both requests and grievances continue to be sorted by type. Specific grievances related to inmate safety, medical issues, PREA, etc., are documented to reflect the date received, inmate information, type of grievance, time of notification made to the appropriate staff member, and the staff member making the notification. For the analysis, the Monitor created three charts and added simple linear trendline overlays to each grievance category listed. A fourth chart was added to graphically represent the number of grievances overall relative



to the inmate population.

Grievance staff once again provided detailed documentation as to their separate handling of the April 2022 through September 2022 inmate requests, grievances, and complaints related to inmate safety or health. (Three months from the previous rating period were added to the charts below to reflect any changes from the previous rating period.)

As reported by the OPSO Grievance staff, the monthly average of 85 grievances for the Report #15 rating period to 146 for Report #16 and 182 for this rating period-- a 25% increase from Report 16 to Report 17 and a 114% increase overall. Of note is the lower increase reported from Report 16 to 17 versus that from Report 15 to 16 (76%). The rate of increase declined by some 50+ percentage points and the decline coincidently began about the time the current administration came into office. The Monitor will continue to observe the grievance trends reported by OPSO.

Chart 1 reflects trends that are generally stable or declining relative to the same six categories shown in Report #16 to include Medical (slight increase) and Mental Health (stable) grievances. "OJC Facility Grievable Miscellaneous" accounted for the most significant number of grievances in this section. The rising trend during the previous rating period has been substantially reversed since the beginning of 2022. Grievances in this category were assigned to the Unit Managers and Major of Security for resolution. This is a catch-all category for grievances that do not fit the other categories listed.

**Chart 1**





Chart 2 is somewhat of a mixed bag in terms of general trends for the various categories, particularly as they relate to the trends noted in Report #17. The Monitor cautions drawing any particular conclusions from the displayed trends and attributes any swings to the relatively small number of grievances in a given month for every category (less than 10 total).

**Chart 2**



Chart 3 represents several categories, primarily inmate services and property/fund accounts. The chart reflects increases in grievances related to commissary, law library services and inmate property with the remaining categories either stable or declining. Again, the Monitor cautions against drawing any conclusions as to long-term trends due to the relatively small number of grievances in each category overall (less than 12).



**Chart 3**



Chart 4 reflects the monthly Grievance and Request totals for the Report 16 and Report 17 rating periods along with simple linear trend lines to give the reader a visual depiction of the trends for both, relative to the average daily inmate population (July thru September 2022 not included). Requests outnumber grievances significantly as expected but reflect a pronounced upward trend. Grievances are relatively stable across the period covered, showing only a slight increase.



**Chart 4**



The Monitor also reviewed the "Overdue Grievance Reports" for the rating period. The reports are created weekly for supervisory review and tracking. For the purposes of the report, the Monitor only included the data from the fourth week of each month. Chart 5 reflects the data for each category: "Green"(2-4 days overdue), "Yellow" (5-9 days overdue) and "Red"(10+ days overdue), which represents overdue responses to inmates. While the monthly numbers fluctuate significantly, the linear trendlines show concerning upward trends in both the Yellow and Red categories. The Monitor finds section IV. A.11. a. 2. to be in Non-Compliance based on the increasing number of delinquent responses. The Monitor recommends an executive level review and root-cause analysis of the problem to determine an appropriate course of action.



**Chart 5**



| | APR | MAY | JUN | JUL | AUG | SEP | | |
|---|---|---|---|---|---|---|---|---|
| Green (2-4 dys) | 87 | 41 | 164 | 67 | 100 | 89 | | |
| Yellow (5-9 dys) | 25 | 37 | 102 | 87 | 93 | 91 | | |
| Red (Overdue >=10 dys) | 16 | 24 | 103 | 160 | 186 | 106 | | |

As noted during the last several inspections, inmates have access to the grievance process via the few workable electronic kiosks located in the housing units throughout OJC and TDC and more commonly through a traditional paper grievance system utilized as a "back-up" system due to the large number of non-functioning kiosks. As of the last day of the reporting period, OPSO Grievance staff noted there were 18 kiosks in permanent non-working order and 8 remaining kiosks in OJC/TDC/TMH that were working but required 10 to 15 manual "reboot" operations in a given month to keep them operational for inmate use. The problem with the kiosks and the kiosk contractor is chronic and it remains the Monitor's opinion that the kiosk system remains unreliable in terms of operational availability for the majority of the inmates. The Monitor was advised that the new OPSO administration was considering replacement of the current system. The Monitor recommends this action as soon as possible, and consider additional staff be assigned to the Grievance section to handle the additional workload generated by the paper system.

The Grievance Lieutenant reported that every housing unit continues to be visited seven days per week with a "walk by" of every cell to collect paper grievances to ensure that problems with the kiosks do not interfere with an inmate's ability to submit grievances. However, there continued to be inmates who expressed concern that paper



grievances would get lost and lead to retaliation and were frequently unavailable to them upon request from security staff.

The Monitor again reviewed the paper grievances tracking documentation and noted that all such grievances continue to be entered into the electronic system by Grievance staff upon receipt. Paper responses are provided to inmates in units that do not have a functioning kiosk. The Monitor recommends Maintenance staff address the security of the grievance receptacles. As noted in Report 16, at least two were found to be easily manipulated and opened by inmates simply by inserting their fingers into the slot on top of the receptacle. This jeopardizes the confidentiality of the paper grievance system.

As with the previous report, Unit Managers are again urged to remind line security staff of the importance of making grievance forms available upon request by the inmate(s). It is the Monitor's opinion that with secure receptacles and security staff supporting the policy and effort in this regard, the manual work-around is acceptable under the language of the Consent Judgment requiring the inmates have access to a meaningful and confidential grievance process. Given the chronic issues it is problematic and has resulted in the downgrading of Section IV. A. 11. a. (1) to Partial Compliance.

Grievance staff continue to do an excellent job tracking grievances and requests and reporting as to the timeliness and quality of the responses to address the inmates' issues. Documentation continues to reflect that Grievance staff maintain a by name and housing a listing of all OPSO inmates identified as needing Grievance staff assistance to access the grievance system due to either a language barrier or illiteracy. The Monitor received no information or verbal complaints from inmates in this regard.

The Monitor reviewed detailed documentation provided by Grievance staff for the rating period regarding the screening of grievances for staff misconduct. The documentation demonstrated that all inmate submissions are reviewed by Grievance staff and those regarding staff misconduct are separately documented for appropriate referral to the administrative level for follow-up. Grievance staff processed a total of 92 such staff misconduct related grievances during this rating period, down from 100 for the previous rating period and the 77 noted in Report #15. While the decrease is encouraging, the Monitor will make specific note as to whether the downward trend continues.  Of note, the Grievance staff keep track of disposition information provided to the inmate on a spreadsheet titled "Warden – disposition". A review of the disposition notes in this report



revealed a significant number of non-substantive responses (i.e. "We will look into the matter.") with no true final disposition information. The Monitor recommends an executive review of this issue and develop any necessary policy, procedure or training necessary to ensure such grievances are addressed and the inmate notified appropriately.

Grievance staff continue to separately document grievances that require specific referral to IAD, ISB, PREA, or FIT staff for review and investigation. Detailed information along with the date assigned and disposition is maintained as well as email transmission receipts. Grievances referred to IAD decreased from 14 to 11, and grievances referred to ISB decreased slightly from 25 to 23 for the rating period.

The Monitor reviewed the 2022 Second and Third quarters data analysis of the grievance reports presented by Grievance staff for executive review. No documentation regarding any specific discussion by executive staff of the grievance documentation and reporting was noted. Without such documentation, the rating for IV. A. 11. a.(6) has been reduced to Partial Compliance.

### IV. A. 12.  Sexual Abuse

***A. 12. OPSO will develop and implement policies, protocols, trainings, and audits, consistent with the requirements of the Prison Rape Elimination Act of 2003, 42 U.S.C. § 15601, et seq., and its implementation of regulations, including but not limited to, preventing, detecting, reporting, investigating, and collecting sexual abuse data, including prisoner-on-prisoner and staff-on-prisoner sexual abuse, sexual harassment, and sexual touching.***

<u>Finding:</u>

A. 12. Partial Compliance

<u>Observations</u>:

OPSO successfully completed its PREA audit in 2019. The PREA manager has now been designated as the PREA Coordinator was reassigned to a housing area and the position has not been filled for years. Supervision of the investigation of PREA complaints was added to the duties of the FIT supervisor. While a listing of the PREA investigations for April 2022 was provided, no documentation was provided for the other five months of the monitoring period. In addition, there was no finding listed for the investigations provided. Substantial compliance is not guaranteed by successfully completing a PREA audit once every three years. The only documentation provided for this monitoring period was the policies and one month out of six investigations with no indication of outcome. No proof as to implementing the requirements of PREA was provided. OPSO claims that the



required training was provided, but no proof was offered.

## IV. A. 13.    Access to Information

*A. 13. OPSO will ensure that all newly admitted prisoners receive information, through an inmate handbook and, at the discretion of the Jail, an orientation video, regarding the following topics: understanding Facility disciplinary process and rules and regulations; reporting misconduct; reporting sexual abuse or assault; accessing medical and mental health care; emergency procedures; and sending and receiving mail; understanding the visitation process; and accessing the grievance process.*

Finding:

A. 13.   Partial Compliance

Observations:

No materials were provided indicating the requirements of this paragraph have been met. The Monitors observed handbooks in some housing units, but many inmates stated they did not have access to a handbook. Previously, the inmate handbook was available on the kiosk. However, very few of those kiosks are in working order.

## IV. B. Mental Health Care

*B. OPSO shall ensure constitutionally adequate intake, assessment, treatment, and monitoring of prisoners' mental health needs, including but not limited to, protecting the safety of and giving priority access to prisoners at risk for self-injurious behavior or suicide. OPSO shall assess, on an annual basis or more frequent basis, whether the mental health services at OPP comply with the Constitution. In order to provide mental health services to prisoners, OPSP, at a minimum shall:*

Findings:

B. 1. a. Substantial Compliance

B. 1. b. Substantial Compliance

B. 1. c. Substantial Compliance

B. 1. d. Substantial Compliance

B. 1. e. Partial Compliance

B. 1. f.  Partial Compliance

B. 1. g. Substantial Compliance

B. 1. h. Substantial Compliance

B. 1. i.  Partial Compliance

B. 1. j.  Partial Compliance

B. 1. k. Partial Compliance

B. 1. l.  Substantial Compliance

*B.1.a. Develop and maintain comprehensive policies and procedures for appropriate screening and assessment of prisoners with mental illness. These policies should include definitions of emergent,*



*urgent, and routine mental health needs, as well as timeframes for the provision of services for each category of mental health needs.*

Finding: This was found in substantial compliance by the prior monitor and there was no evidence Wellpath does not continue to utilize proper screening and assessment forms. This must be closely monitored as staffing challenges become more prominent.

Substantial Compliance

***B.1.b. Develop and implement an appropriate screening instrument that identifies mental health needs, and ensures timely access to a mental health professional when presenting symptoms require such care. The screening instrument should include the factors described in Appendix B. The screening instrument will be validated by a qualified professional approved by the Monitor within 180 days of the Effective Date and every 12 months thereafter, if necessary.***

<u>Finding:</u> See B.1.a.

Substantial Compliance

***B.1.c. Ensure that all prisoners are screened by Qualified Medical Staff upon arrival at OPP, but no later than within eight hours, to identify a prisoner's risk for suicide or self-injurious behavior. No prisoner shall be held in isolation prior to an evaluation by medical staff.***

<u>Finding:</u> See B.1.a.

Substantial Compliance

<u>Suggestion:</u> While Wellpath is in substantial compliance with this provision, the recommendation to have a mental health professional assigned to the intake area (IPC) to help ensure inmates are seen by a mental health professional and needs are not missed or overlooked by non-behaviorally trained staff remains.

***B.1.d. Implement a triage policy that utilizes the screening and assessment procedures to ensure that prisoners with emergent and urgent mental health needs are prioritized for services.***

<u>Finding:</u> See B.1.a. and B.1.c. Suggestion

Substantial Compliance

<u>Suggestion:</u> CQI project for this provision to ensure SOP for referrals for Special Needs inmates in need of counseling are adequately addressed. The goal should be 100% compliance with the timeframes outlined in the policy for inmatesto be seen for emergent and urgent needs. Any deviance from the timeframe requires clear and timely documentation.

***B.1.e. Develop and implement protocols, commensurate with the level of risk of suicide or self-harm, to ensure that prisoners are protected from identified risks for suicide or self-injurious behavior. The protocols shall also require that a Qualified Mental Health Professional perform a mental health assessment, based on prisoner's risk.***

<u>Finding:</u>

There continues to be challenges with deputies documenting suicide watch on the



COMPLIANCE REPORT #17                                        80

required observation forms. While the use of these forms would make the suicide watch process more uniform, it would also allow for more accurate communication between deputies and mental health staff. While improved, deputies have been assigned duties for 1.4% of suicide watches in July 2022, 17% of suicide watches in August 2022, 6% of suicide watches in September 2022, 24% of suicide watches in August 2022, and 15% of suicide watches in November 2022. These numbers do not include miscellaneous watches which are not conducted by Wellpath staff. There were also reports of contraband findings, homemade knives, and batteries to name a couple, on inmates at risk for suicide which were confiscated by staff. There remains a lack of implementation of protocols to protect prisoners from self-harm. The Monitor witnessed QMHPs not conducting watches as outlined in policy and not following protocol for watches. This is lack of implementation of required protocols to help protect prisoners from self-harm. Finally, at the MAC meeting for December 2022 findings, it was reported that 30% of the mental health population being placed on suicide watch are not being appropriately searched.

Partial Compliance

<u>Suggestion:</u> Continue to monitor and report use of the correct observation for suicide watch by deputies. Ensure there is no use of physical restraints for inmates on suicide watch in IPC or TMH and document any instance where this occurs. Document de-escalation procedures by Wellpath and deputies. Adequate cell searches and body searches are necessary to protect prisoners from risk of self-injurious behavior. The Monitor recommends more frequent spot checks of QMHPs who are conducting watches and implementing corrective actions as deemed necessary. ***Please note you will see this recommendation throughout this report*** – The Monitor also recommends a member of the Wellpath administrative team have direct access to the video monitoring system of the facility in order to conduct these checks and others necessary to comply with the expectations of many of the provisions.

***B.1.f. For prisoners with emergent or urgent mental health needs, search the prisoner and monitor with constant supervision until the prisoner is transferred to a Qualified Mental Health Professional for assessment.***

<u>Finding:</u> There continue to be reports of inmates in possession of contraband, like a homemade knife, when they are at risk of suicide. The MAC meeting which reported on findings from December 2022 showed 30% of mental health patients are not properly



searched for contraband prior to being placed on suicide watch. While this is an improvement, there is more room to improve.

Partial Compliance

Suggestion: There continue to be challenges providing adequate documentation of searches and constant supervision, on proper documentation, by deputies prior to the arrival of mental health staff when an assessment for all emergent and urgent needs are determined. Provide written documentation of all protocols and procedures for searching inmates as soon as safely possible, along with attempts at having mental health staff available to try and limit the need for de-escalation interventions. This should all be completed prior to placement on any form of suicide precautions, watch or direct observation. As stated above, reports of contraband findings on inmates are unacceptable in trying to ensure risk of self-harming behavior is minimized.

***B.1.g. Ensure that a Qualified Mental Health Professional conducts appropriate mental health assessments within the following periods from the initial screen or other identification of need:***
> ***1)        14 days, or sooner, if medically necessary, for prisoners with routine mental health needs;***
> ***2)        48 hours, or sooner, if medically necessary, for prisoners with urgent mental health needs;***
>
> ***And***
> ***3)         immediately, but no later than two hours, for prisoners with emergent mental health needs.***

Finding:

Substantial Compliance

Suggestion: Continue to conduct CQI audits to ensure implementation and timeliness of referral responses. A Qualified Mental Health Professional assigned to IPC will help ensure inmates at intake receive appropriate assessments and timely referrals, including referrals to psychiatrists during on-call hours. This needs to be closely monitored if staffing challenges become more prominent. There were instances within the CQI report where the timeframes were missed. This trend cannot continue to remain in substantial compliance.

***B.1.h. Ensure a Qualified Mental Health Professional preforms a mental health assessment no later than the next working day following any adverse triggering event (i.e., any suicide attempt, any suicide ideation, or any aggression to self, resulting in serious injury).***

Finding:

Substantial Compliance

***B.1.i. Ensure that a Qualified Mental Health Professional, as part of the prisoner's interdisciplinary treatment team, maintains a risk profile for each prisoner on the mental health case load based on the Assessment Factors identified in Appendix B, and develops and implements a treatment plan to minimize the risk of harm to each of these prisoners.***



Finding:

There remain challenges in completing clinically adequate treatment plans outside of TMH. Since the plans are not being completed, there is no implementation.

Partial Compliance

Suggestion: The same issues which presented a barrier to compliance from the previous site visit remain. There continues to be a lack of resources, a dedicated psychiatrist and mental health professional, for the general population. As stated in Report #16, in order to achieve substantial compliance, there will need to be interdisciplinary treatment plans conducted in general population with a risk profile for each inmate on the mental health case load. A commitment to providing an adequate staffing rubric to complete these tasks will be essential. It does not appear that stretching the current resources will be sufficient to complete this task. These treatment plans must include interventions to minimize risk of harm for inmates throughout the system, including stepdown and outpatient level of care. This risk profile should also include deficits in planned services and content, which could be due to lack of available staff, and remedies to correct the deficits.

***B.1.j. Ensure adequate and timely treatment for prisoners, whose assessments reveal mental illness and/or suicidal ideation, including timely and appropriate referrals for specialty care and visits with Qualified Mental Health Professionals, as clinically appropriate.***

Finding: While there are a variety of services offered at TMH, this level of treatment is not as robust at OJC. During the site visit, it was revealed that inmates on the waitlist for TMH were seen weekly by a mental health clinician, unless located in 2A. If the mental health clinician has determined an inmate is in need of TMH level treatment, weekly visits to someone who is acutely in need of treatment is not sufficient. Additionally, there still remains challenges with having confidential designated areas to conduct adequate mental health treatment.

Partial Compliance

Suggestion: There continues to be a need for a full range of mental health and counseling services at OJC and TMH/TDC. These services include group therapy sessions, individual counseling sessions and a confidential area to conduct these interventions. Wellpath and OPSO must work together in order to provide an adequate and therapeutic system of mental health services. The inmates are unable to attend therapeutic sessions without



adequate clinical staff to conduct sessions and correctional staff to transport and provide security for both staff and prisoner. The Monitor will reiterates that cell side visits do not constitute therapeutically appropriate or clinically adequate mental health services and will not result in substantial compliance. The Monitors recommends continued documentation of barriers to providing timely and adequate mental health treatment for all individuals captured on the mental health caseload. Issues cannot be rectified without knowledge of the problem. While staffing remains a barrier in many of the provisions and will not be corrected quickly, the Monitor recommends doing good work with the available resources in the most problematic areas. This will demonstrate what is possible once resources are available to provide this level of treatment throughout the entire facility.

***B.1.k. Ensure crisis services are available to manage psychiatric emergencies. Such services include licensed in-patient psychiatric care, when clinically appropriate.***

<u>Finding:</u> There are no designated in-patient licensed facilities identified to provide treatment for the OPSO population.

Partial Compliance

<u>Suggestion:</u> OPSO continues to lack access to licensed in-patient services for male and female inmates. While attempts have been made to secure a licensed in-patient facility to care for these inmates, OPSO has been unsuccessful in this endeavor. Wellpath is encouraged to continue to provide documentation that all psychiatric emergencies are sent to an emergency department and any crisis is adequately resolved. Currently, the utilization of TMH and external emergency departments are the resources which must be used. Rewording this provision so all parties can agree is recommended.

***B.1.l. On an annual basis, assess the process for screening prisoners for mental health needs to determine whether prisoners are being appropriately identified for care. Based on this assessment, OPSO shall recommend changes to the screening system. The assessment and recommendations will be documented and provided to the monitor.***

<u>Finding:</u>

Substantial Compliance

<u>Suggestion:</u> SOP revisions will be reviewed at the next visit to ensure OPSO remains in substantial compliance. The suggestion to add a Qualified Mental Health Professional to IPC would help ensure inmates are being appropriately identified for care.



Findings:

B.2.a    Partial Compliance

B.2.b.    Partial Compliance

B.2.c.    Partial Compliance

B.2.d.    Partial Compliance

B.2.e.    Substantial Compliance

B.2.f.    Partial Compliance

B.2.g.    Substantial Compliance

B.2.h.    Partial Compliance

***B.2.a. Review, revise, and supplement existing policies in order to implement a policy for the delivery of mental health services that includes a continuum of services, provides necessary and appropriate mental health staff, includes a treatment plan for prisoners with serious mental illness, and collects data and contains mechanisms sufficient to measure whether care is being provided in a manner consistent with the Constitution.***

Finding: Inmates on the waitlist for TMH are seen weekly by a QMHP. For someone who is in acute need of 24-hour mental health services, a weekly visit is insufficient. There needs to be a system in place to provide a continuum of treatment for all individuals at the jail, including adequate treatment for outpatient and someone who is awaiting transfer to TMH.  Implementation of policy to ensure the delivery of mental health services across the entire facility continues to be hampered by staffing deficits. The lack of treatment teams and treatment plans at OJC require continued attention.

Partial Compliance

Suggestion: Both Wellpath and OPSO must commit to consistent and appropriate implementation of policies in order to ensure an adequate delivery of mental health services, including de-escalation interventions. This will include documenting wait lists and service needs along with barriers to the provision of treatment. This will include documenting how long an inmate awaits transfer to TMH and what therapeutic and clinically adequate services are provided during that time. There continues to be a need for interdisciplinary treatment teams in the outpatient level of care which will help determine and implement appropriate levels of treatment.

***B.2.b. Ensure that treatment plans adequately address prisoners' serious mental health needs and that the treatment plans contain interventions specifically tailored to the prisoner's diagnoses and problems.***

Finding: Inmates, outside of TMH, do not have comprehensive treatment plans created by a multi-disciplinary treatment team. The treatment plans created in TMH are adequate in



providing a framework for treatment and are specifically tailored to the needs of the patient.

Partial Compliance

<u>Suggestion:</u> Continue to work towards providing interdisciplinary treatment plans to all individuals on the mental health case load throughout the facility. Treatment plans are needed for all male, female and youthful offenders at all levels of care, including acute care, suicide watches and outpatient level of care. These treatment plans need to be developed by a multidisciplinary team, including the prisoner.

***B.2.c. Provide group or individual therapy services by an appropriately licensed provider where necessary for prisoners with mental health needs.***

<u>Finding:</u> There remain challenges with providing group and individual therapy services outside of TMH.

Partial Compliance

<u>Suggestion:</u> This provision will remain a challenge to move into substantial compliance without adequate staff, for Wellpath and OPSO, along with adequate confidential space to conduct these sessions. While there is commitment to increasing staff numbers from both Wellpath and OPSO, this provision cannot be in substantial compliance without adequate staff to conduct group and individual therapy services. In addition, there needs to be a commitment to identifying and developing, if necessary, confidential, dedicated space sufficient to support the delivery of mental health services for the inmates. As stated earlier, cell front visits are not considered therapeutically appropriate treatment for prisoners with mental health needs. Continue to follow the service needs for the population and the numbers of individuals accessing the available services. Please note how many individuals are unable to access the provided service due to barriers like adequate space, staffing challenges (including Disruption of Service forms) and are on a waitlist. Document the corrective action plans which will be implemented to address these issues. Continue to provide data on number of inmates who received counseling for sexual abuse, alcohol and drug abuse.

***B.2.d. Ensure that mental health evaluations that are done as part of the disciplinary process include recommendations based on the prisoner's mental health status.***

<u>Finding:</u> There remains challenges with mental health consistently being made aware and being able to conduct assessments of prisoners prior to placement in segregation.



Partial Compliance

Suggestion: While this process began in the 13th monitoring period, mental health staff are included in in-hearing observations and screenings rather than consulted to provide a pre-hearing assessment relative to charges. There is also a lack of consistency in ensuring mental health staff are consulted prior to the inmate being moved into disciplinary housing. While Wellpath is working on a policy for mental health assessments as a part of the disciplinary process, OPSO has not signed off on nor has there been consistent implementation of this policy. Training would be required to ensure both parties, Wellpath and OPSO, are working in tandem to ensure inmates do not deteriorate while in disciplinary housing and mental health needs are adequately assessed and addressed.

***B.2.e. Ensure that prisoners receive psychotropic medications in a timely manner and that prisoners have proper diagnoses and/or indications for each psychotropic medication they receive.***

Finding:

Substantial Compliance

Suggestion: Continue the partnership with Tulane psychiatric providers as this has made dramatic improvements in the system. Continue to provide documentation and analysis of data to ensure inmates are receiving psychotropic medications in a timely manner, especially upon admission to the facility. If there are delays in an inmate receiving medication, document and create a correction action plan to address the deficiency. Ensure medications are being used to treat the diagnosis on record or there is clear justification in the record for the off-label use of a psychotropic medication.

***B.2.f. Ensure that psychotropic medications are administered in a clinically appropriate manner as to prevent misuse, overdose, theft, or violence related to medication.***

Finding: During the Monitor's observation of pill pass and review of videos of medication administration, adherence to policy in order to ensure medications are administered in a clinically appropriate manner was not consistently done. Absent mouth checks and lack of proper observation of patients can lead to misuse, overdose, theft, and violence related to medications.

Partial Compliance

Suggestion: There continues to be challenges with proper observation of medication administration on the units. The lack of consistent mouth checks during pill pass may



result in misuse, overdose, theft, and violence related to medication. This provision requires the **cooperation along with adequate staffing** of OPSO and Wellpath to ensure policies and procedures are enforced. Corrective action plans may be required to ensure the safety of inmates who are prescribed psychotropic medication, the safety of the pod, and the safety of the staff/deputies assigned to the pod. Further analysis may be needed to analyze the finding of contraband, prescribed and nonprescribed medication, and what corrective plan to put in place to minimize the risks.

***B.2.g. Ensure that prescriptions for psychotropic medication are reviewed by a Qualified Mental Health Professional on a regular, timely basis and prisoners are properly monitored.***

Finding:

Substantial Compliance

Suggestion: Continue to provide documentation of data collection and analysis of psychotropic medication prescriptions, including the timeliness between when the prescription is written, and the first dose received by the inmate. There also needs to be documentation if there is a disruption in providing psychotropic medications along with the source of the disruption.

***B.2.h. Ensure that standards are established for the frequency of review and associated charting of psychotropic medication monitoring, including monitoring for metabolic effects of second-generation psychotropic medications.***

Finding:

Partial Compliance

Suggestion: With the addition of a laboratory technician, monitoring for metabolic effects of second-generation psychotropic medications has improved. The challenge remains with the prescribing provider being informed of a refusal by the inmate. If the provider is not informed, the inmate risks not having the labs drawn in a timely manner because the provider was unaware of the need to re-order the labs. Wellpath needs to create and implement a policy enforcing communication to the necessary clinician regarding laboratory refusals/services and put a system in place to ensure timely follow-up. Submit documentation to demonstrate standards have been set and implemented to ensure the frequency and charting are done as outlined in the SOP.

Findings:

B.3.a.   Partial Compliance



B.3.b.  Substantial Compliance

*B.3.a. OPSO shall develop and implement policies and procedures for prisoner counseling in the areas of general mental health/therapy, sexual-abuse counseling, and alcohol and drug counseling. This should, at a minimum, include some provision for individual services.*

<u>Finding:</u> While there have been more group and individual therapy sessions available in TMH, there continues to be a challenge in providing group and/or individual therapeutic sessions in general population. There continues to be challenges surrounding dedicated, confidential space to conduct therapeutic interventions, with many interventions occurring at cell side. The exact numbers of inmates who had received services or who were on a waitlist for services was not discussed but will be closely evaluated at the next site visit. The logbooks maintained by OPSO are not consistently completed and therefore there is limited, if not one-sided, information as to what is occurring, in terms of treatment, on the various pods.

Partial Compliance

<u>Suggestion:</u> Continue to track the availability of group and/or individual sessions completed along with the number of inmates in need of services. Continue to track disruptions in service. As stated earlier, assigning a Qualified Mental Health Professional to IPC would help with accurate tracking of referrals and need for service at OJC and TMH. Ensure the logbooks maintained by OPSO are accurate and completed as dictated by policy.

*B.3.b. Within 180 days of the Effective Date, and quarterly thereafter, report all prisoner counseling services to the Monitor, which should include:*
*1)        the number of prisoners who report having participated in general mental health/therapy counseling at OPP;*
*2)        the number of prisoners who report having participated in alcohol and drug counseling services at OPP;*
*3)        the number of prisoners who report having participated in sexual-abuse counseling at OPP; and*
*4)        the number of cases with an appropriately licensed practitioner and related one-on-one counseling at OPP.*

<u>Finding:</u>

Substantial Compliance

<u>Suggestion:</u> Continue to collect and analyze data concerning inmates in need of these services and create corrective action plans to address the deficits which may be present at OJC and TMH.



Findings:

B.4.a     Partial Compliance

B.4.b.   Substantial Compliance

B.4.c.   Substantial Compliance

B.4.d.   Partial Compliance

B.4.e.   Substantial Compliance

B.4.f.   Partial Compliance

B.4.g.   Substantial Compliance

*B.4.a. OPSO shall ensure that all staff who supervise prisoners have the adequate knowledge, skill, and ability to address the needs of prisoners at risk for suicide. Within 180 days of the Effective Date, OPSO shall review and revise its current suicide prevention training curriculum to include the following topics: 1) suicide prevention policies and procedures (as revised consistent with this Agreement); 2) analysis of facility environments and why they may contribute to suicidal behavior; 3) potential predisposing factors to suicide; 4) high-risk suicide periods; 5) warning signs and symptoms of suicidal behavior; 6) case studies of recent suicides and serious suicide attempts; 7) differentiating suicidal and self-injurious behavior; and 8) the proper use of emergency equipment.*

Finding: The Monitor is still finding that deputies have yet to consistently utilize the Observation/Restraint Checklist and Worksheet which the MHTs use for suicide watch. It was observed again that MHTs were not accurately documenting staggered q15 minute checks on the Observation/Restraint Checklist and Worksheet. Videos were watched where there was some misrepresentation captured – writing that a check was done although the MHT did not go to the cell or went to talk with the deputy for longer than the 15-minute grace period. The Monitor reiterates the checks should be staggered within the 15-minute period rather than every 15 minutes. Deputies are still responsible for approximately 13% of suicide watches in a given month, since July 2022.

Partial Compliance

Suggestion: Continue training both deputies and MHTs on the importance of staggered 15-minute checks. Enforce proper searches of cells and persons who are at risk for self-harm as there continues to be reports of inmates having access to contraband. Provide video access to an administrator for Wellpath so MHTs can be observed/watched for compliance without their knowledge, as when someone is watched they tend to do what they are supposed to do. Upper tier assignments of inmates in OJC need careful scrutiny as there is a risk of self-harm behavior as there are no barriers in place to prevent jumping or



hanging from the second tier. Ensure recommendations from clinicians for level of observation is appropriate for the presenting situation. Supervisory spot checks along with video surveillance may be necessary to ensure proper implementation and documentation of suicide watch and observations.

***B.4.b. Ensure that all correctional, medical, and mental health staff are trained on the suicide screening instrument and the medical intake tool.***

<u>Finding:</u>

Substantial Compliance

<u>Suggestion:</u> Continue to provide documentation that multi-disciplinary in-service training has been completed annually for all current correctional, medical, and mental health staff to include training on updated policies, procedures, and techniques. All incoming staff should be trained on the suicide screening instrument and medical intake tool during onboarding orientation.

***B.4.c. Ensure that multi-disciplinary in-service training is completed annually by correctional, medical, and mental health staff, to include training on updated policies, procedures, and techniques. The training will be reviewed and approved by the Monitor.***

<u>Finding:</u>

Substantial Compliance

<u>Suggestion:</u> Continue to provide documentation that multi-disciplinary in-service training has been completed annually for all current correctional, medical, and mental health staff, to include training on updated policies, procedures, and techniques. Training will need to address deficiencies in communication, especially between OPSO and Wellpath clinicians, and documentation regarding de-escalation procedures, disciplinary process, and searches. Training should clearly delineate responsibilities of various staff member involvement, including during medication pass. Supervisory spot checks may be needed to ensure training is adequate and adhered to during various processes around OJC and TMH.

***B.4.d. Ensure that all staff are trained in observing prisoners on suicide watch and step-down units status.***

<u>Finding:</u> It was brought to the Monitor's attention again that the use of the approved Observation/Restraint Checklist and Worksheet is not being consistently adhered to by deputies assigned to suicide watch. It was also observed in person and via video that the MHTs were not accurately completing the document for observation. Deputies have been



assigned approximately 13% of all suicide watches monthly since July 2022.

Partial Compliance

<u>Suggestion:</u> Further training and supervisory observation, in person and via video access by a Wellpath administrator, will be necessary to ensure accurate completion of these documents and a correction action plan to help ensure deputies are completing the correct document and MHTs are accurately and truthfully completing the watch documents.

***B.4.e. Ensure that all staff that have contact with prisoners are certified in cardiopulmonary resuscitation ("CPR").***

<u>Finding:</u>

Substantial Compliance

<u>Suggestion:</u> Continue to provide documentation that all current staff, including OPSO and Wellpath, are certified in CPR. At the next site visit, will review the process in place to ensure all staff are appropriately scheduled for CPR so there is no lapse in certification. Will also review attendance sheets for demonstration of timely certification.

***B.4.f. Ensure that an emergency response bag, which includes a first aid kit and emergency rescue tool, is in close proximity to all housing units. All staff that has contact with prisoners shall know the location of this emergency response bag and be trained to use its contents.***

<u>Finding:</u> During this site visit, the emergency bags were present near the housing units checked. This is an improvement from other site visits where the bags were absent.

Substantial Compliance

<u>Suggestion:</u> Ensure the cut down tools are adequately sharpened, and staff are trained in the proper use of the tool throughout the facility. Ensure that staff are available in the control room in order to access the cut down tool, if necessary.

***B.4.g. Randomly test five percent of relevant staff on an annual basis to determine their knowledge of suicide prevention policies. The testing instrument and policies shall be approved by the Monitor. The results of these assessments shall be evaluated to determine the need for changes in training practices. The review and conclusions will be documented and provided to the Monitor.***

<u>Finding:</u> The testing instrument was reviewed and one question which seemed to present an issue for a number of the testers was discussed.

Substantial Compliance

<u>Suggestion:</u> Consider revision of the question.

<u>Findings:</u>

B.5.a.   Partial Compliance



COMPLIANCE REPORT #17                        92

B.5.b.   Partial Compliance

B.5.c.   Partial Compliance

B.5.d.   Substantial Compliance

B.5.e.   Partial Compliance

B.5.f.   Partial Compliance

B.5.g.   Partial Compliance

B.5.h.   Partial Compliance

B.5.i.   Partial Compliance

B.5.j.   Substantial Compliance

B.5.k.   Partial Compliance

***B.5.a. OPSO shall implement a policy to ensure that prisoners at risk of self-harm are identified, protected, and treated in a manner consistent with the Constitution.***

Finding: While various policies are in place to ensure inmates at risk of self-harm are identified, protected, and treated in a manner consistent with the Constitution, there remains the challenge of consistent implementation. Issues surrounding de-escalation, searches, and referrals remain. There has been some improvement in having a confidential space for interviews of inmates on suicide watch by the psychologist but staffing deficits has forced some cell side visits, which is unacceptable. Out of cell time remains limited for inmates at risk for self-harm.

Partial Compliance

Suggestion: Ensure staffing is sufficient to allow the psychologist or person designated to monitor inmates on suicide watch have access to a confidential space to conduct assessments. Continue to document any barriers to having access to confidential space. Document consistent out of cell time for inmates on suicide watch and create a corrective action if there is not adequate time out of cell. Individuals on suicide watch need intensive treatment interventions including out of cell time, counseling, and therapy, as medically indicated. Document treatment interventions of inmates on suicide watch and any barriers present in not providing appropriate treatment. Document any inmate on suicide watch or in detox protocols who is found with contraband or misuse of supplies. OPSO and Wellpath staff may want to consider TMH waitlist patients as risks for self-harm in order to provide more appropriate, timely and direct care while awaiting transfer.

***B.5.b. Ensure that suicide prevention procedures include provisions for constant direct supervision of***



*current suicidal prisoners and close supervision of special needs prisoners with lower levels of risk, at a minimum, 15 minutes check. Correctional officers shall document their checks in a format that does not have pre-printed times.*

<u>Finding:</u> Deputies are not using the prescribed Observation/Restraint Checklist and Worksheet consistently. QMHPs/MHTs are not accurately completing the document. While the document does not have pre-printed times, they are either not being used or being filled out improperly.

Partial Compliance

<u>Suggestion:</u> See comments in B.4.d. Submit documentation for suicide watches in IPC.

***B.5.c. Ensure that prisoners on suicide watch are immediately searched and monitored with consistent direct supervision until a Qualified Mental Health Care Professional conducts a suicide risk assessment, determines the degree of risk, and specifies the appropriate degree of supervision.***

<u>Finding:</u> The challenge remains with immediate and adequate searches of inmates who are placed on suicide watch. The finding of contraband on prisoners at risk for self-harm is concerning and reflects challenges continue to exist with proper searches.

Partial Compliance

<u>Suggestion:</u> Provide documentation that inmates are immediately searched or as soon as safely necessary, with a mental health clinician present when feasible, and monitored with constant direct observation, documented on the Observation/Restraint Checklist and Worksheet, until a QMHP conducts a suicide risk assessment, determine the degree of risk, and specifies the appropriate degree of supervision. Written procedures for searches should be a part of training so each staff member is clear of their responsibilities. Cells should be searched prior to placement of an inmate on suicide watch and documented. Collaboration and proactive communication are necessary between OPSO deputies and Wellpath staff, particularly QMHPs, to meet the requirements of this provision. As of December 2022, 33% of mental health patients placed on suicide watch are not being appropriately searched.

***B.5.d. Ensure that prisoners discharged from suicide precautions receive a follow-up assessment within three to eight working days after discharge, as clinically appropriate, in accordance with a treatment plan developed by a Qualified Mental Health Care Professional. Upon discharge, the Qualified Mental Health Care Professional shall conduct a documented in-person assessment regarding the clinically appropriate follow-up intervals.***

<u>Finding:</u>

Substantial Compliance



<u>Suggestion:</u> Continue to document if there are access issues to inmates during lockdown procedures at OJC. Document any barrier to having a confidential space to complete these post-suicide watch assessments. Continue to monitor and document follow-up appointments and ensure they are conducted as policy dictates.

***B.5.e. Implement a step-down program providing clinically appropriate transitions for prisoners discharged from suicide precautions.***

<u>Finding:</u> Simply having a step-down program is insufficient for substantial compliance without providing clinically appropriate treatment. Without dedicated confidential space to conduct this sensitive treatment, the treatment is not considered clinically appropriate.

Partial Compliance

<u>Suggestion:</u> Continued vigilance in creating a space for a female step-down unit and adequate space for step-down programs or identifying a consistent confidential space to provide clinically appropriate treatment is necessary.  The confidential space must be accessible for treatment consistently, which will require adequate staffing from OPSO and Wellpath to ensure this provision is met. Show this dedicated space, scheduling of treatment, use of the space and attendance in the step-down program at the next site visit. Confidentiality is key to clinically appropriate treatment.

***B.5.f. Develop and implement policies and procedures for suicide precautions that set forth the conditions of the watch, incorporating a requirement of an individualized clinical determination of allowable clothing, property, and utensils. These conditions shall be altered only on the written instruction of a Qualified Mental Health Care Professional, except under emergency circumstances or when security considerations require.***

<u>Finding:</u> There continues to be questions surrounding whether all inmates are properly searched prior to being placed on suicide watch.

Partial Compliance

<u>Suggestion:</u> Document all searches, including whether it occurs prior to or after being placed on suicide watch. Provide documentation of implementation of policies concerning searches of inmates being placed on suicide watch. Provide documentation of individualized determinations of the conditions for watch for male and female inmates at OJC and at TMH. This should include all inmates who are in non-suicide resistant cells and are therefore on direct observation. Provide policy, procedure, and documentation about suicide watches in IPC. Once the documents are provided, implementation must also be monitored closely.



***B.5.g. Ensure that cells designated by OPSO for housing suicidal prisoners are retrofitted to render them suicide-resistant (e.g., eliminating bed frames/holes, sprinkler heads, water faucet lips, and unshielded lighting or electrical sockets).***

<u>Finding:</u> There are still inmates at risk for self-harm being housed in non-suicide resistant cells.

Partial Compliance

<u>Suggestion:</u> Continue direct observation of individuals who are housed in non-suicide resistant cells while on suicide watch to best provide for their safety. Installation of suicide resistant fixtures, like toilets, for the cells will help move this provision into substantial compliance. This will also help with the burden of constant observation on a depleted staff.

***B.5.h. Ensure that every suicide or serious suicide attempt is investigated by appropriate mental health and correctional staff, and that the results of the investigation are provided to the Sheriff, and the Monitor.***

<u>Finding:</u>

Partial Compliance

<u>Suggestion:</u> There appear to be limited findings requiring corrective actions for suicide and serious suicide attempts. There is no expectation that there will never be a suicide or suicide attempt in the correctional facility, but when they occur there requires more intentional and self-critical analysis of the event with corrective action which will lead to jail-wide systemic changes. Psychological autopsies should help in identifying systemic deficits which will help inform systemic changes throughout the system. While it appears these events are currently investigated and discussed at meetings, there are still some concerns as to the overall results and how they are being used for changes. Provide the self-critical analyses to the Sheriff and Monitor which demonstrate a thorough understanding and investigation of these critical events.

***B.5.i. Direct observation orders for inmates placed on suicide watch shall be individualized by the ordering clinician based upon the clinical needs of each inmate and shall not be more restrictive than is deemed necessary by the ordering clinician to ensure the safety and well-being of the inmate.***

<u>Finding:</u> The Monitor watched videos of suicide watches in IPC and there remains concern regarding observation of inmates.

Partial Compliance

<u>Suggestion:</u> The Monitor continue to recommend that inmates in IPC, who are placed on suicide watch and have yet to be assessed by an QMHP, should be on direct observation.



Submit suicide watch audits with the location of the watch embedded in the report.

***B.5.j. Provide the Monitor with periodic report on suicide and self-harm at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. The report will include the following:***
***1) all suicides;***
***2)all serious suicide or self-harm attempts; and***
***3) all uses of restraints to respond to or prevent a suicide attempt.***

Finding:

Substantial Compliance

Suggestion: Continue to provide this report every six months. There was one suicide prior to the site visit in 2022.

***B.5.k. Assess the periodic report to determine whether prisoners are being appropriately identified for risk of self-harm, protected, and treated. Based on this assessment, OPSO shall document recommended changes to policies and procedures and provide these to the Monitor.***

Finding: There remain challenges in documenting changes to policies and procedures based on analysis of risk at the Facility. There remain issues with adequate searches with inmates having access to contraband. There is also the question of why direct observation is not the standard in IPC when an inmate is placed on suicide watch prior to being seen by mental health.

Partial Compliance

Suggestion: Provide updated procedures to the Monitor to address outstanding issues with implementation of ensuring risk challenges are adequately addressed. This provision will also require adequate treatment plan creation to ensure all individuals who engage with the inmate are adequately knowledgeable about the needs of the patient.

Findings:

B.6.a.   Partial Compliance

B.6.b.   Substantial Compliance

B.6.c.   Substantial Compliance

B.6.d.   Substantial Compliance

B.6.e.   Substantial Compliance

B.6.f.   Substantial Compliance

B.6.g.   Substantial Compliance

***B.6.a. OPSO shall prevent the unnecessary or excessive use of physical or chemical restraints on prisoners with mental illness.***



<u>Finding:</u> OPSO is not consistently and proactively contacting mental health prior to the use of force or needing to implement de-escalation in the Facility.

Partial Compliance

<u>Suggestion:</u> Provide documentation of policies in use for planned de-escalation and use of force. Provide documentation to support consistent implementation of the policy and procedures in place to ensure mental health is contacted prior to the use of force, when reasonably safe. OPSO needs to generate a report for the Monitor documenting all uses of physical and chemical restraints throughout the Facility along with attempts to contact mental health and whether the restraint was planned. Create and submit to the Monitor documentation to determine how many instances of use-of-force incidents occurred over the year prior to the next site visit where mental health was not contacted prior to exercising the use-of-force.

***B.6.b. Maintain comprehensive policies and procedures for the use of restraints for prisoners with mental illness consistent with the Constitution.***

<u>Finding:</u>

Substantial Compliance

***B.6.c. Ensure that approval by a Qualified Medical or Mental Health Professional is received and documented prior to the use of restraints on prisoners living with mental illness or requiring suicide precautions.***

<u>Finding:</u>

Substantial Compliance

***B.6.d. Ensure that restrained prisoners with mental illness are monitored at least every 15 minutes by Custody Staff to assess their physical condition.***

<u>Finding:</u>

Substantial Compliance

***B.6.e. Ensure that Qualified Medical or Mental Health Staff document the use of restraints, including the basis for and duration of the use of restraints and the performance and results of welfare checks on restrained prisoners.***

<u>Finding:</u>

Substantial Compliance

***B.6.f. Provide the Monitor a periodic report of restraint use at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. Each report shall include:***
 ***1) A list of prisoners whom were restrained;***



*2)        A list of any self-injurious behavior observed or discovered while restrained; and*
*3)        A list of any prisoners whom were placed in restraints on three or more occasions in a thirty (30) day period or whom were kept in restraints for a period exceeding twenty-four (24) hours.*

Finding:

Substantial Compliance

***B.6.g. Assess the periodic report to determine whether restraints are being used appropriately on prisoners with mental illness. Based on this assessment, OPSO shall document recommended changes to policies and procedures and provide these to the Monitor.***
Finding:

Substantial Compliance

Findings:

B.7.a.  Partial Compliance

B.7.b.  Substantial Compliance

B.7.c.  Non-Compliance

B.7.d.  Non-Compliance

***B.7.a. OPSO shall ensure that all staff who supervise prisoners have the knowledge, skills, and abilities to identify and respond to detoxifying prisoners. Within 180 days of the Effective Date, OPSO shall institute an annual in-service detoxification training program for Qualified Medical and Mental Health Staff and for correctional staff. The detoxification training program shall include:***
*1)        annual staff training on alcohol and drug abuse withdrawal;*
*2)        training of Qualified Medical and Mental Health Staff on treatment of alcohol and drug abuse conducted by the Chief Medical Officer or his or her delegate;*
*3)        oversight of the training of correctional staff, including booking and housing unit officers, on the policies and procedures of the detoxification unit, by the Chief Medical Officer or his or her delegate;*
*4)        training on drug and alcohol withdrawal by Qualified Medical and Mental Health Staff;*
*5)        training of Qualified Medical and Mental Health Staff in providing prisoners with timely access to a Qualified Mental Health Professional, including psychiatrists, as clinically appropriate; and*
*6)        training of Qualified Medical and Mental Health Staff on the use and treatment of withdrawals, where medically appropriate.*

Finding:

Partial Compliance

Suggestion: There is no evidence that the staff have been properly trained to identify and respond to detoxifying patients. There has been no sign in sheets submitted to demonstrate all Qualified Medical and Mental Health staff, including the Nurse Practitioner, have attended and successfully demonstrated competence in this area. How is the retention of information measured? If, as shown in the CQI report, the referrals to mental health services are low, then how can timely access to care be provided? Where is the evidence that B.7.a.5 is being conducted with all staff including psychiatrists. What is



the use and treatment of withdrawals? There should be training on opiate intoxication, opiate withdrawal, piloerection, tearing, yawning and GI upset. There should be training on sedative hypnotic withdrawal and the differential diagnoses for tachycardia, fever, altered mental status and delirium tremens.  If there is not improvement in this area prior to the next site visit after the release of this report, this provision risks returning to noncompliance.

***B.7.b. Provide medical screenings to determine the degree of risk for potentially life-threatening withdrawal from alcohol, benzodiazepines, and other substances, in accordance with Appendix B.***
<u>Finding:</u>

Substantial Compliance

<u>Suggestion:</u> Submit these medical screenings to the Monitors for review and to determine whether this provision remains in substantial compliance.

***B.7.c. Ensure that the nursing staff complete assessments of prisoners in detoxification on an individualized schedule, ordered by a Qualified Medical or Mental Health Professional, as clinically appropriate, to include observations and vital signs, including blood pressure.***
<u>Finding:</u> Upon review of records, vital signs, although they may have been done, were not consistently recorded in the records.

Non-compliance

<u>Suggestion:</u> Submit the documentation to demonstrate that nursing staff are consistently completing assessments of inmates in detoxification on an individual schedule to include vital signs and observations.

***B.7.d. Annually, conduct a review of whether the detoxification training program has been effective in identifying concerns regarding policy, training, or the proper identification of and response to detoxifying prisoners. OPSO will document this review and provide its conclusions to the Monitor.***
<u>Finding:</u>

Non-compliance

<u>Suggestion:</u> Submit documentation to support an annual review of the detoxification program and its effectiveness in identifying concerns regarding policy, training, or the proper identification of and response to detoxifying prisoners. Please ensure OPSO have signed off on this review and contributes to the conclusions reached regarding this provision prior to submission to the Monitor. This review should include analysis and self-critical findings regarding this program.

<u>Findings:</u>

B.8.a.    Partial Compliance

B.8.b.    Substantial Compliance



***B.8.a. OPSO shall ensure that medical and mental health staffing is sufficient to provide adequate care for prisoners' serious medical and mental health needs, fulfill constitutional mandates and the terms of this Agreement, and allow for the adequate operation of the Facility, consistent with constitutional mandates.***

Findings: There continue to be challenges in securing and retaining adequate numbers of staff, including medical and mental health staff, to provide adequate care for inmates' serious medical and mental health needs. For example, there are insufficient staff to create and complete a multi-disciplinary treatment plan in the outpatient setting where all members of the treatment plan are physically present with the inmate.

Partial Compliance

Suggestion: There needs to be adequate funding set aside to hire staff and ensure there is adequate, constitutionally mandated treatment throughout the entire facility. This includes a dedicated psychiatrist for the outpatient (OJC) treatment program who would be available for much needed treatment planning. This includes having adequate staff to conduct safety/suicide watches, especially while non-suicide resistant cells are still in use. OPSO and Wellpath should consider hiring a psychiatric nurse who could help with proper identification of mental health grievance needs, especially when they are related to medication, and can help with follow up for laboratory refusals, which are vital to adequate treatment from the inmates and lastly help ensure timely and accurate referrals from IPC.

***B.8.b. Within 90 days of the Effective Date, OPSO shall conduct a comprehensive staffing plan and/or analysis to determine the medical and mental health staffing levels necessary to provide adequate care for prisoners' mental health needs and carry out the requirements of this Agreement. Upon completion of the staffing plan and/or analysis, OPSO shall provide its findings to the Monitor, SPLC, and DOJ for review. The Monitor, SPLC, and DOJ will have 60 days to raise any objections and recommend revisions to the staffing plan.***

Finding:

Substantial Compliance

Findings:

B.9.a.   Partial Compliance

B.9.b.   Partial Compliance

B.9.c.   Partial Compliance

B.9.d.   Partial Compliance

B.9.e.   Partial Compliance

B.9.f.   Partial Compliance

***B.9.a. OPSO shall develop, implement, and maintain a system to ensure that trends and incidents involving avoidable suicides and self-injurious behavior are identified and corrected in a timely***



*manner. Within 90 days of the Effective Date, OPSO shall develop and implement a risk management system that identifies levels of risk for suicide and self-injurious behavior and requires intervention at the individual and system levels to prevent or minimize harm to prisoners, based on the triggers and thresholds set forth in Appendix B.*

<u>Finding:</u>

There continues to be use of non-suicide resistant cells at the Facility for inmates at high risk of self-harm. There also continues to be staggered suicide watches in IPC rather than direct observation. The Monitor observed an inmate on video, on suicide watch, wandering around IPC without supervision.

Partial Compliance

<u>Suggestion:</u> Continue analyzing the trends and incidents involving avoidable suicides and self-injurious behaviors to determine required interventions at the individual and system levels to prevent or minimize harm to inmates, especially inmates with repeated suicidal or self-harming behaviors. Consider ensuring any inmate who is not in a suicide resistant cell, especially in IPC, are under Direct Observation and Observation Worksheets are accurately completed. Installation of suicide resistant toilets will move the facility forward in having adequate suicide resistant cells to address the needs of the population.

*B.9.b. The risk management system shall include the following processes to supplement the mental health screening and assessment processes: incident reporting, data collection, and data aggregation to capture sufficient information to formulate a reliable risk assessment at the individual and system levels; identification of at-risk prisoners in need of clinical treatment or assessment by the Interdisciplinary Team or the Mental Health Committee; and development and implementation of interventions that minimize and prevent harm in response to identified patterns and trends.*

<u>Finding:</u> There is no functional Interdisciplinary Team operating consistently in general population to address formulating a reliable risk assessment. There is limited to no mental health involvement prior to the implementation of the disciplinary process. Segregation is known as a risk factor which negatively interferes with inmates with mental health challenges. Further analysis is needed to ensure processes are in place to address individual and systemic risk levels, especially surrounding risks involved with segregation.

Partial Compliance

<u>Suggestion:</u> Analyze and provide documentation of risk management system processes, including listed criteria, which minimize and prevent harm in response to identified patterns and trends. This examination should include the need for functioning interdisciplinary treatment teams throughout the Facility who are focused on treatment strategies to minimize risk including adequate out-of-cell time and participation in the



disciplinary process at the outset where a written recommendation can be completed and used to determine appropriate action. A dedicated unit for female stepdown will also contribute to minimizing risk factors and improve transition outcomes addressing risk management issues throughout the system.

***B.9.c. OPSO shall develop and implement an Interdisciplinary Team, which utilizes intake screening, health assessment, and triggering event information for formulating treatment plans. The Interdisciplinary Team shall:***
 ***1. include the Medical and Nursing directors, one or more members of the psychiatry staff, counseling staff, social services staff, and security staff, and other members as clinical circumstances dictate;***
 ***2. conduct interdisciplinary treatment rounds, on a weekly basis, during which targeted patients are reviewed based upon screening and assessment factors, as well as triggering events; and***
 ***3. provide individualized treatment plans based, in part, on screening and assessment factors, to all mental health patients seen by various providers.***

<u>Finding:</u>

As discussed at this site visit, there are no consistent, functional multidisciplinary teams operating in person at OJC, due to staffing deficits. The treatment plans generated from TMH are adequate to address the needs of the patient.

Partial Compliance

<u>Suggestion:</u> Continue to generate and complete treatment plans in TMH. Provide samples for review at the site visit. Create a plan/template for how treatment plans will be conducted and completed with a multidisciplinary team in all areas outside of TMH. Ensure there is ongoing training for the adequate completion of the treatment plan including individualization of the plan with measurable goals, objectives, and interventions. Continue to work on the staffing plans and staffing needs in order to have multidisciplinary treatment team meetings throughout the facility.

***B.9.d. OPSO shall develop and implement a Mental Health Review Committee that will, on a monthly basis, review mental health statistics including, but not limited to, risk management triggers and trends at both the individual and system levels. The Mental Health Review Committee shall:***
***1. include Medical and Nursing Director, one or more members of the psychiatry staff and social services staff, the Health Services Administrator, the Warden of the Facility housing the Acute Psychiatric Unit, and the Risk Manage;***
***2.identify at-risk patients in need of mental health case management who may require intervention from and referral to the Interdisciplinary Team, the OPSO administration, or other providers;***
***3.conduct department-wide analyses and validation of both the mental health and self-harm screening and assessment processes and tools, review the quality of screenings and assessments and the timeliness and appropriateness of care provided, and make recommendations on changes and corrective actions;***
***4.analyze individual and aggregate mental health data and identify trends and triggers that indicate risk of harm;***
***5.review data on mental health appointments, including the number of appointments and wait times before care is received;***



*6.review policies, training, and staffing and recommend changes, supplemental training, or corrective actions.*

<u>Finding:</u> Until there is a functioning Interdisciplinary Treatment Team assigned to OJC, there will be limitations in being able to adequately address at-risk patients in need of mental health case management who may need referral from the Mental Health Review Committee.

Partial Compliance

<u>Suggestion:</u> Create and implement an Interdisciplinary Treatment Team for OJC. Provide documentation of Mental Health Review Committee meetings addressing all listed elements, including analysis of all data collected. This data should address and track systemic concerns as well.

*B.9.e. OPSO shall develop and implement a Quality Improvement and Morbidity and Mortality Review Committee that will review, on at least a quarterly basis, risk management triggers and trends and quality improvement reports in order to improve care on a Jail-wide basis.*
*1.The Quality Improvement Committee shall include the Medical Director, the Director of Psychiatry, the Chief Deputy, the Risk Manager, and the Director of Training.*
*2.The Quality Improvement Committee shall review and analyze activities and conclusions of the Mental Health Review Committee and pursue Jail-wide corrective actions. The Quality Improvement Committee shall:*
*a. monitor all risk management activities of the facilities through the review of risk data, identification of investigation or corrective action; and*
*b. generate reports of risk data analyzed and corrective actions taken.*

<u>Finding:</u>

Partial Compliance

<u>Suggestion:</u> It is not enough to create a Quality Improvement and Morbidity and Mortality Review Committee. Jail-wide corrective actions plans must be in place and a collaborative effort between OPSO and Wellpath needs to be pursued in order for all risk management activities to be properly monitored. COLLABORATION is a key component of this provision as it focuses on jail-wide CAPs. Provide documentation to support implementation of collaborative corrective action plans for areas which have been identified for improvement like medication refusal, AIMS testing, timely access to laboratory services after inmate refusal, the grievance process and chronic medical care access. Provide documentation of attendance and addressed topics for the quarterly meetings along with proposed action items which will be pursued on a collaborative basis. Demonstrate how collected and analyzed data is being used to effect positive change throughout the system.

*B.9.f. OPSO shall review mortality and morbidity reports quarterly to determine whether the risk management system is ensuring compliance with the terms of this Agreement. OSPO shall make*



*recommendations regarding the risk management system or other necessary changes in policy based on this review. The review and recommendations will be documented and provided to the Monitor.*

<u>Finding:</u>

Partial Compliance

<u>Suggestion:</u> Provide OPSO recommendations regarding the risk management system. This recommendation should be reviewed by Wellpath and there should be a collaborative effort in correcting identified areas of concern. Submit all information to demonstrate changes which have been made to address identified risk management issues throughout the jail facility. Provide the most recent report from OPSO to determine whether there is compliance with the terms of this Agreement. Provide corrective actions plans which have been created and implemented over the year along with effectiveness of the proposed changes. If there are gaps or effectiveness is determined to be minimal, submit updated CAPs to address this. If there is no submission of an OPSO report at the next site visit, this provision is at risk of being scored as in non-compliance.

## C.      Medical Care

## Materials reviewed.

Grievances

Compliance reports

Medical Records

SharePoint Documents

## Overview:

This is the 17th report on medical care and to that end past reports have recommended more measurement of quality of care. There is a tool kit of continuous quality improvement measurements, semiannual reports, and other reports. These reports reflect many hours of painstaking work.  There is a willingness to provide good care to these patients.by the medical personnel in the trenches. Some medical records reflect the cynicism of the provider.  Despite the progress that has been achieved, harm regularly reaches the patients. The most important sentence in the consent decree is OPSO shall ensure constitutionally adequate treatment of inmates' medical needs. This will require financial commitment to hire more providers and to have providers 24 hours a day, seven days a week.  One physician is too few for such a complicated and large patient population. There simply must be more supervision of medical practice, less reliance on licensed



nurses for managing patients and an understanding excellence is appreciated and expected.

**Findings**

1. Since the last review period there have been efforts to improve the communication between the Custody and the Medical staff. This includes the "Medication Administration Committee" a collaborative meeting between OPSO and Wellpath. . There is a Consent Judgment compliance group now to interface between OPSO and Wellpath. There is a stand-alone medical mortality and morbidity (M and M) review for focus on medical cases. Hopefully, the frequent interruptions of medical care due to too few custody staff will improve.

2. There is insufficient in person, face to face, provider care. There is excessive dependence on nurses, primarily licensed vocation and practical nurses (LVN/LPN) for daily monitoring of the patients.  If a provider evaluates a patient, it is often not timely. Providers do not assess the patients timely upon the patients return from the UMC hospital.  Providers give verbal and telephone orders to nurses without evaluating the patient. Providers' documentation is incomplete. The course of events leading to the transfer to the emergency department at UMC is not in the medical records. [14] [15] An incomplete medical record makes the history of the present illness unknowable. Notes by a provider should be entered into the medical record before transfer and after return to the jail from the UMC.[16] Fourthly, these above inadequacies are worse on the weekends. [17] [18] [19]  The point of the medical record is that anyone can pick it up and understand the patient's history, medical problems, laboratory data, trends over time and the care administered.

---

[14] Patient 26 suffered a head injury from trauma. No provider notes The one note is not signed. Lack of documentation is a deviation from the standard of care.

[15] Patient 28 has no description in the notes of seizure like activity except the transfer and the UMC notes. A provider should document the history of the illness in the medical record.

[16][16] Patient 21 has no notes by a provider explaining the circumstances of the patients change in condition and no timely note upon return from the UMC.

[17] Patient 19 was not assessed by a provider in spite of serious symptoms, The patient went to the UMC and returned on a Sunday. The patient was not assessed by a provider timely upon return from UMC.

[18][18] Patient 18 was not evaluated by a provider all weekend as he continued to decompensate from new onset congestive heart failure.

[19] Patient 24 jumped from the second floor and had a head injury. Only LVNs were present at the trauma, as per the scribe notes. No provider was in house.



3.  There are numerous harms due to insufficient provider[20] involvement in the care of the patients and over reliance on nursing for patient care. One patient complaining of five days of chest pain and abdominal pain, was not evaluated by a provider during these five days. The LVN/LPNs were the ones to evaluate this patient for 5 days. The LVN diagnosed this patient with chest pain "due to hyperventilation". Diagnosis is not in the scope of practice of a LVN /LPN. Without assessing this patient with the serious complaint of chest pain, the provider gave orders over the telephone for meclizine, Maalox and Tylenol. [21]

In another example, one patient was sent to the hospital for multiple stab wounds and vomiting blood. Upon return to jail on a Friday at 1:15pm, the patient's pulse was 128. The rapid pulse was not addressed by the nurse and the stab to the flank was not noted in the nurse's exam. After the weekend, a provider evaluated the patient and commented on the presence of the stab to the flank. A patient returning from the UMC with tachycardia and multiple stab wounds should have a provider evaluation upon arrival at the jail. [22]

In the next example, on the day of admission to the jail, the patient was started on the opiate withdrawal protocol. The patient worsened with vomiting and nausea. The patient was not evaluated by a provider. A registered nurse gave an order to the LPN to administer the controlled substance lorazepam (Ativan). Nurses should not order controlled substances. And to do so without assessing the patient makes it dangerous. The medication record does not include the Ativan. The hospital notes indicated that the patient received the Ativan. Inexplicably the patient was administered Narcan. Narcan is used to reverse opiate intoxication [23]  The patient was on the opiate withdrawal protocol and had the signs and symptoms of opiate withdrawal. As the patient became sicker, he was taken to the body scanner two times looking for drugs in his body. This is cruel and medically irrelevant at the jail.

---

[20] Medical "providers" are Nurse practitioners and one medical physician. Mental health providers are not referenced in this medical section of the report.

[21] Patient 18 received no provider care and required being put on a ventilator at the hospital. This is an blatant example of inadequate care and resultant harm.

[22] Patient 17 had multiple stab wounds and vomited blood. Upon return from the hospital the patient did not get evaluated by a provider in spite of abnormal vital signs . The flank stab wound was not noted the registered nurse.

[23] Patient 52 cared for by a LPN, orders for narcotics by RN, out of scope of  practice.



The patient arrived in the hospital critically ill, with the lab value for acids in the blood very> (high lactic acid 7.2) kidney abnormalities, and a dangerous electrocardiogram (EKG) abnormality. The lack of provider assessment, the culture of LPN/LVN bearing the burden of care is harmful to the wellbeing of the patients. The previous report illustrated the harms of inadequate involvement of providers and over reliance on nurses. This report again emphasizes this critical and inexcusable deficiency.

4. The electronic medical record is difficult and time consuming to navigate. Like one provider said, "it is not provider friendly". It is not patient friendly either as when a practitioner or provider cannot follow the care, the patient suffers. This electronic medical record is like an Easter Egg hunt. Providers hunt for information and spend a lot of time doing so. At the end of the hunt, not all the eggs are found. But these eggs are records, treatments, and results of testing that when left undiscovered, can adversely affect the patient's health. For example, the medical records from UMC could be under "miscellaneous" or under "CM", care management. The Provider Note after the return of the patient from UMC could be under "Progress notes: Provider", or could be under the "Chronic Care" tab. The tab "Hospital / Emergency" usually contains "scribe notes"; the contemporaneous description of emergency calls for medical assistance. [24][25]. Navigating the medical record to construct a coherent record of care is difficult and time consuming.[26] Late entries are common.[27] UMC uses an electronic health record trade name EPIC. This is the same electronic health record as at UMC. OPSO / Wellpath should use it and link it to UMC. There is a specialty called Information Technology and every medical system needs a strong information technology team to assure the quality of care. This is a powerful electronic health record that allows anyone with access to quickly see the information and timeline of that information. The Wellpath

---

[24] Patient 48 has a return form offsite progress note under hospital/ emergency. There should be consistency not based on if the patient was admitted to the hospital or sent home after emergency department evaluation. . One should be able to open one tab and see the hospital notes.
[25] Patient 45 had the medical records under "CM" not "miscellaneous". The patient's heart failure was not addressed in the provider note. It may be because she did not find the note that described the heart failure.
[26] Patient 47 has the notes from June 2022 placed under June 2021.
[27] Patient 37 had entry placed on October 19,2022 for July 26, 2022



electronic record is poor, and it contributes to the problems with the care of patients.

5. Patients' problem-lists are frequently incomplete and inaccurate.[28] [29] [30] [31][32] [33] [34] [35] The problem list is important as it auto populates into the "Health Assessments" and is a reference at intake screening if the patient has previously been in the jail. The problem list can alert the initial screeners to the patient's risk factors and medical problems.[36] When a patient has gone to the hospital to consult with a specialist, upon the return of the patient to the jail, there ought to be a note by a provider describing the results of the testing, the treatment rendered, and the plan of care. Upon return from the UMC, the medical records from the hospital must be put into the jail records. The discharge summary from UMC is insufficient for providers in the jail to understand the course of the patients care at the hospital. [37]

6. From the site visit and from grievance review, inmate patients are not timely informed of their diagnostic test results. Analysis of the continuous quality improvement (CQI) studies show this is a recognized deficit.

7. Patients are started on treatment with benzodiazepines without signs of alcohol withdrawal as measured by the Clinical Institute Withdrawal Assessment (CIWA ). Though the CIWA score is zero, patients are kept on benzodiazepines for five days. When a patient is started on a controlled mind-altering medication, a provider should do a face-to-face evaluation within 24 hours. The provider needs to

---

[28] Patient 2 has hepatitis C and abnormal liver tests not listed in the problem list.
[29]  Patient 4 delivered baby at the hospital and had a tubal ligation. There was no notation that she had a tubal ligation.
[30] Patient 7 has diabetes, and it is not on the problem list.
[31] Patient 20 has no updates on the problem list since Feb 2022. The list does not include the gunshot wound to the chest, the thoracotomy; does not confirm the  mandible fracture, or the  infection as a result of mandible wires,
[32] Patient 17 arrives in jail with a history of a remote gunshot wound to left thigh. Although noted on intake, it is not on the problem list.
[33] Patient 22 was sent to UMC for a hip infection. There is no further record of what happened.
[34] Patient 45 returned from intensive care with heart failure and ejection fraction 25% never mentioned in jail notes.
[35] Patient 42 had hepatitis C and it had been treated. Hepatitis C was not on the problem list.
[36] Patient 29 This is a well-kept problem list that populated into the Health Assessment
[37] Patient 5 was found in the jail unresponsive. The notes from the hospital were not in the chart; only the discharge summary. The discharge summary does not have the details of what happened in the hospital.



document the vital signs at the time of the examination and write a note in the medical record.

8. Sick call complaints are to be gathered and screened within 24 hours of the date received regardless of the day of the week. This happens inconsistently. The patients are not reliably evaluated within 24 hours for serious symptoms. One patient submitted his first sick call on November 2, 2022. The sick call was received on November 5th at 11:46pm.[38] The triage was "routine". and the patient had a nursing documentation tool completed for gastroenteritis on November 3, 2022. The record review shows inconsistency in the dates. What is clear is that the patient was not evaluated by someone with the training to make a diagnosis and went directly from jail to the emergency department and into the Intensive Care Unit (ICU) at UMC.

9. The initiative to have inmates provided with medication upon release is successful. Of the approximately 130 patients released on medication in the months of October and November 2022, the vast majority of those who wanted medications obtained them.

10. Medication variances include the finding of medications hoarded in cells[39], overdoses, "In transit" medications[40][41] diversion, misuse [42]and delays to administration of medications not on formulary.[43] Sometimes patients go to court and do not get medications. Patients going to court should get their morning medications before court. Patients sometimes do not get medications due to lockdowns.[44] Medications are charted as refused when the patient sleeps through medication administration or when a patient is in the hospital.[45]

---

[38] Patient 67 had 5 days of vomiting and on the 5th day was sent to the UMC and immediately admitted to the intensive care unit. The patient during that week was never evaluated by a provider.
[39] Patient 27 meds found around his cell of Ibuprofen not taken July 25, 2022, "cups of ibu".
[40] Patient 13/14 medications were 'in transit' and awaiting pharmacy repeatedly. These included Seroquel and Gabapentin.
[41] Patient 21 has psychiatric medications awaiting pharmacy on May 31.
[42] Patient 50 selling her Seroquel. Note of September 7 "walking off with medicine."
[43] Patient 7 did not receive the recommended medicine empagliflozin for congestive heart failure and diabetes. Cost and pill count were listed in the chart as reasons. The patient was instead continued metformin.
[44] Patient 17. June 10th, 2022 "unable to give this patient his clindamycin HCL due to dorm locked down.
[45] Patient 59 The patient was on a ventilator in the hospital on October 23 when medications were "Refused"



11. The new focus of medication assisted therapy for the treatment of opiate use disorder is a positive development. Currently the number of patients categorized as having opioid withdrawal is low. The questionnaire is to be improved to accurately capture the patients with opioid use disorder (OUD).

12. Hepatitis C is a curable infectious disease. All patients with Hepatitis C should be treated.[46] One patient told the Monitor on the site visit that he was not being treated for his diagnosis of hepatitis C.[47] Chart review confirmed this inmate was released with untreated Hepatitis C. Untreated hepatitis C may lead to liver failure and cancer of the liver and spreads in the community.

13. Patients with sickle cell disease must have the pain relief recommended by the hematologist. In some cases, opiates will be necessary.[48]

14. Patients are not always receiving recommended follow-up specialty care. [49][50]

15. Pregnant patients are high risk as the fetus is the second patient. Opiate withdrawal in a pregnant patient needs treatment. This patient was in opiate withdrawal on May 25. On May 26th she was sent to the emergency department at UMC and was administered Buprenorphine. This patient came to jail on Buprenorphine, and it should have been continued. There is a process in place for obtaining emergency medication and it should be utilized. The patient and fetus were in withdrawal for over 24 hours. [51]

16. Medical care is frequently not completed due to lock downs and insufficient custody staff. [52][53]

17.  There are an alarming number of overdoses.

OPSO shall ensure constitutionally adequate treatment of inmates' medical needs.

Included below are examples of patients who received care which fell below that standard.

---

[46]Patient 36 did not receive treatment for hepatitis C and abnormal liver tests.

[47] Patient 36

[48] Patient 9 went to UM C with a pain crisis. At UMC, Care management, and hematology recommended opiates. Because this patient had a seizure disorder, the recommendation against Tramadol was based on that Tramadol can cause seizures or predispose to seizures. The patient received Tramadol for the three days after discharge.

[49] Patient 9, with sickle cell disease did not receive the recommended Hematology Specialty care as recommended.

[50] Patient 22 with a stab and pneumothorax never went back to the trauma clinic as ordered.

[51] Patient 11 pregnant 6 months, on buprenorphine, sent to ER for buprenorphine.

[52] Patient 27 "July 18, 2022 'patient was not seen during clinic due to no deputy on the pod.

[53] Patient 51 August 5,2022 two days after multiple stabs and emergency room. Nurse Practitioner charts "Attempt times 2 to see patient. No deputy on pod".



Please refer to the above patients for examples illustrating specific areas of concern. Patient 1 did not receive wound care consistently due to no custody staff available to escort the nurse. The patient had Hepatitis C that was not addressed. It was not listed on his problem list.

Patient 2 was never seen by a provider and no provider notes are in the chart. The patient was sent to the emergency department for an asthma attack. The only reference to a provider in the medical record is the note that the provider instructed the LPN that if the patient did not know the name of the rescue inhaler, then the patient did not need it.

Patient 37 arrived in jail on July 20, 2022. He has diabetes, hypertension, kidneys insufficiency and alcohol use disorder. On July 21, the patient was not taken to the clinic because there was no deputy on the pod.  He was not seen by a provider. He did not get laboratory testing. He was started on a controlled substance, benzodiazepine for alcohol withdrawal.  He started having nausea and vomiting. Because the notes in the medical record are late entries, it is necessary to look at the medication administration records and orders to try to glean what happened. Licensed vocational nurses assessed the patient. The LVN called the provider who, without seeing the patient, ordered medications to treat symptoms. Due to late notes, it is hard to tell the timing of what happened. This went on from 11:50pm on from the last hour of an unknown time (late note added on July 29, 2022) until the afternoon of July 26 at 4pm. At that time, emergency medical services were activated, and the patient went to the University Medical Center. The transfer note had "alcohol intoxication" as the cause of transfer. There was no evidence for alcohol intoxication, and it was not diagnosed at the hospital. On arrival at the emergency department at UMC, the patient was admitted to the Intensive Care Unit (ICU) . The patient was admitted on July 26 and discharged on July 29, 2022. Upon discharge the patient had "gastrointestinal bleeding" added to his problem list although it was not diagnosed during his hospitalization. [54]

Patient 59 was complaining of shortness of breath on Tuesday October 18, 2022, at 12:10pm. An LVN/LPN assessed the patient. No provider assessed the patient. The next day the patient was not seen by health care personnel.  On the morning of October 20, 2022, the patient was in respiratory distress.  The oxygen saturation was 73%. Two hours

---

[54] Patient 37 notes late addendums. Disorganized medical record.



and 45 minutes later, EMS was activated.[55] The patient went to the UMC emergency department, was admitted to the ICU and placed on a ventilator. He was discharged from the hospital on November 18 and released from jail at the same time.

Patient 67 This is another example of a patient who did not see a provider for his complaints of serious symptoms and the patient went from the jail where he received no care to the intensive care unit at UMC. This patient placed a health services request on November 2, 2022, at 9am. It was received on November 5, 2022, at 11:46pm. The triage was "routine" and see "NDP". The "PNP" the Professional Nursing Documentation tool noted the patient's complaints as trapped food in chest, burning in his stomach and whatever he eats comes up. The patient was dizzy at times and the problem had been going on for 3-4 days. The patient was noted to be lethargic. The pulse was fast at 115 beats per minutes. Although the form has written on it that a provider is to be contacted if the heart rate is above 110, no provider is contacted.  Nothing was done. There is no signature on the form. However, when the Monitor went to the orders tab in to see if anything did occur, the Monitor saw see a note for antacid medicine need by the LPN/ LVN on November 3 at 6:11pm.  The patient placed a second sick call on November 2,2022. This time the patient wrote "I really need to see a doctor ASAP. I haven't eaten in "5" days. I feel lightheaded. I keep throwing up and no matter what I do, I can't keep nothing down Please help me and my chest hurts" The time this health services request was completed is not documented. Nothing other than the patient's complaint is on this health service request. However, upon going into the other tabs on the chart, there is a Professional Nursing Documentation tool on November 5, 2022. The nurse has written "dizzy, stomach pain times 3 days, dry lips, vomiting times 3 days. The vital signs are obtained and the pulse I 114. The patient is lethargic, and the abdomen is nontender. This note is signed RN. (registered nurse). There is no documented plan, no provider was informed.

Then there is a note on November 6, 2022. It is a "Direct Admit" Referral request. The notes say the patient has been vomiting for 5-6 days. The patient arrived in the Emergency Department at UMC and was admitted to the Intensive Care unit for diabetic keto acidosis. He was started on insulin and discharged to jail three days later. To see the course of what happened at the hospital it is necessary to go to the tab called "CM" or care management

---

[55] Patient 59 Patient went from jail to the intensive care unit. No provider assessed patient from October 18-October 20, 2022.



where there is a complete note from Of note, the patient had been evaluated in August 29, 2022 and laboratory testing was ordered for 80 days later.

*C. OPSO shall ensure constitutionally adequate treatment of prisoners' medical needs. OPSO shall prevent unnecessary risks to prisoners and ensure proper medication administration practices. OPSO shall assess on an annual or more frequent basis whether the medical services at OPP comply with the Constitution. At a minimum, OPSO shall:*
*1. Quality Managing of Medication Administration:*
*a. Within 120 days of the Effective Date, ensure that medical and mental health staff are trained on proper medication administration practices, including appropriately labeling containers and contemporaneously recording medication administration;*
*b. Ensure that physicians provide a systematic review of the use of medication to ensure that each prisoner's prescribed regimen continues to be appropriate and effective for his or her condition;*
*c. Maintain medication administration protocols that provide adequate direction on how to take medications, describe the names of the medications, how frequently to take medications, and identify how prisoners taking such medications are monitored; an*
*d. Maintain medication administration protocols that prevent misuse, overdose, theft, or violence related to medication.*

C. 1. a. Partial compliance. Training on medication administration is insufficient. "In transit" is documented for patient who do not receive medications because they are away from the housing unit. In transit is meant for the medication, not the patient. "Refusal" is documented even when a patient does not hear that pill call and even when the patient is in the hospital. There are medication errors, such as when the pharmacy sends the wrong instructions with medication cards. These errors are addressed with the pharmacy. There were about 79 medications confiscated but unidentified. In July there were 51 Buspar confiscated, and 18 Remeron. Sickle cell patients prescribed opiates by the hospital do not receive the prescribed opiates. A patient with a seizure disorder was given a medication that lowers the seizure threshold. Making it more likely he will have a seizure. [56]These are serious medication variances.

C. 1. b. Substantial compliance.

C. 1. c. Substantial compliance

C. 1. d. Partial Compliance. Overdose, hoarding, overdoses and diverting are common.

*C.2.a. Provide the Monitor a periodic report on health care at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. Each report will include:*
*(1) number of prisoners transferred to the emergency room for medical treatment related to medication errors;*
*(2) number of prisoners taken to the infirmary for non-emergency treatment related to medication errors;*

---

[56] Patient 9 did not receive opiates for pain control but received tramadol, a medication that lowers the seizure threshold making it more likely that a seizure will occur.



*(3) number of prisoners prescribed psychotropic medications;*
*(4) number of prisoners prescribed "keep on person" medications; and*
*(5) occurrences of medication variances.*
*C.2.b. Review the periodic health care delivery reports to determine whether the medication administration protocols and requirements of this Agreement are followed. OPSO shall make recommendations regarding the medication administration process, or other necessary changes in policy, based on this review. The review and recommendations will be documented and provided to the Monitor.*

C. 2. a. (1) Substantial compliance

The Semi Annual Report -2nd Half 2022 January 2023 says "there is no infirmary and therefore no patients were taken to the infirmary." The Monitor disagrees. Everything happens in the medical clinic that happens in an infirmary. The Medical Clinic functions as an infirmary; although it is inadequately equipped as an infirmary. Patients are observed, sometimes for days, diagnoses and decisions about disposition are made in this medical clinic. It serves as an infirmary.   Because the medical clinic serves as an infirmary, the clinical presentation, treatment provided, the outcome of the observation period and the disposition of the patient should be reported. Therefore, to satisfy the consent decree there must be a report on patients taken to the clinic and observed, treated, transferred, or released back to their housing.  The number of patients taken to the infirmary should be reported to comply with this section of the consent decree.  Patients who overdose on medications are taken to the medical clinic for evaluation and observation.  For example, Patient 3 was monitored in the clinic, during which time he deteriorated. Patient 9 was given intravenous fluids for pain in the clinic. Another patient had a seizure in the inmate intake center at 315am. He was taken to the medical clinic where he was observed; had a third seizure and a fourth seizure at 350 a.m. A Provider was called and said to send the patient to the emergency department. EMS arrived at 450 a.m. and the patient had a fifth seizure that EMS treated. In this situation a patient with status epilepticus was observed in the medical clinic.

C. 2. a. (3) Substantial compliance

C. 2. a.(4) Substantial compliance

C. 2. a. (5) Partial compliance.



The semiannual report 2nd half 2022 said there were four instances of medication variances during the reporting period However, there were more than four medication variances. In the future, these variances should be described. Medication variances are self-reported and under reported. A medication variance is if a patient needs a medication and does not receive it. Patient 11 was pregnant and put on the opioid withdrawal protocol. She was in withdrawal on May 25 with classic symptoms described in the chart, including yawning and a pulse of 90. This was on May 25, 2022. On May 26th at 4:36pm the patient "remains in court unable to assess". This is a medication variance that is dangerous to the fetus.

Medication administration is affected by lockdowns and shortage of custody staff to escort nurses. A medication variance is when a patient does not receive a specialist recommended medication because it is too expensive. A medication variance is if the medication is not administered because it is not on the formulary. For example, patient 7 did not receive empagliflozin, an important medication to treat congestive heart failure and diabetes, due to "pill burden and cost". In one case one inmate had a box of suboxone. This is a medication variance. Another patient had a bottle of pills in her cell and overdosed. These are medication variances.

C.2.b Substantial compliance

*3.a. OPSO shall notify Qualified Medical or Mental Health staff regarding the release of prisoners with serious medical and/or mental health needs from OPSO custody, as soon as such information is available.*

*3.b. When Qualified Medical or Mental Health staff are notified of the release of prisoners with serious medical and/or mental health needs from OPSO custody, OPSO shall provide these prisoners with at least a seven-day supply of appropriate prescription medication, unless a different amount is necessary and medically appropriate to serve as a bridge until prisoners can reasonably arrange for continuity of care in the community.*

*3.c. For all other prisoners with serious medical and/or mental health needs who are released from OPSO custody without advance notice, OPSO shall provide the prisoner a prescription for his or her medications, printed instructions regarding prescription medications, and resources indicating where prescriptions may be filled in the community.*

*3.d. For prisoners who are being transferred to another facility, OPSO shall prepare and send with a transferring prisoner, a transition summary detailing major health problems and listing current medications and dosages, as well as medication history while at the Facility. OPSO shall also supply sufficient medication for the period of transit for prisoners who are being transferred to another correctional facility or other institution, in the amount required by the receiving agency.*

C. 3. a Substantial compliance

C. 3. b. Substantial compliance

C. 3. c. Substantial compliance



C. 3. d. Substantial compliance

## IV.     D. 1. Sanitation and Environmental Conditions

Findings:

D.1. a.   Non-Compliance

D. 1. b.  Substantial Compliance

D. 1. c.   Non-Compliance

D. 1. d.  Non-Compliance

D. 1. e.  Substantial Compliance

D. 1. f.   Partial Compliance

D. 1. g.  Substantial Compliance

D. 1. h.  Substantial Compliance

***IV. D. 1. a. OPSO shall provide oversight and supervision of routine cleaning of housing units, showers, and medical areas. Such oversight and supervision will include meaningful inspection processes and documentation, as well as establish routine cleaning requirements for toilets, showers, and housing units to be documented at least once a week but to occur more frequently.***

Finding:

Non-Compliance

Observations:

The Monitor physically inspected every occupied housing unit in the OJC and TDC/TMH facilities. The Monitor observed the overall level of cleanliness and sanitation in the TDC housing units to be generally acceptable. The cleanliness and sanitation of the TMH housing units was very good, including the appearance of the individual cells and janitor closets. There were two closets in TDC units that had cleaning equipment improperly stored which was corrected. There was no sign of insect infestation (ants) as had been observed in the past. A sanitation/maintenance issue was noted in and around janitor closet E206. There was an apparent water leak in this area as evidenced by water and green mold at the base of the unit dividing wall with the next housing area. Also, the Monitor observed the shower floors in one of the TDC units to have severely peeling paint. In this condition, the floor cannot be properly cleaned and sanitized. The issues were pointed out to Security staff for submission of work orders.

The Monitor observed the digital and/or analog temperature displays in the janitor closets were reading 130+ degrees with 140-degree setpoints for the leaving water temperatures. This is too high for showering and handwashing and could cause scalding.



The Sanitarian advised that the local health department inspector required the 140-degree setpoint for the mop sinks in the closets. The Maintenance Director later advised that a secondary mixing valve outside the janitor closet moderated the water temperatures below 120 degrees for the inmates use. These were inaccessible to the Monitor at the time of the inspection but will be reviewed during the next inspection. A physical check of the shower and sink water temperatures did not indicate excessively hot water was being provided to inmates.

Regarding OJC, the OPSO practice of consolidating all cleaning supplies outside of the units has continued since the last inspection and inmate access to the unit janitor closets remains restricted according to staff. The Monitor still found several janitor closets to be dirty and disorderly. The closets are still in limited use as they remain the water source and storage location for mop buckets, mops, brooms, etc. Recommended repairs of damaged metal flashing and shelving from previous inspections has not been accomplished and remain a potential material source for contraband. Sanitation, Maintenance, and Life/Safety should still inspect the closets routinely to ensure continued serviceability, particularly lighting, water service and drains. The Monitor also interviewed the OPSO Sanitarian and Environmental Officer as well as inmates and staff during the inspection itself.

As with previous inspections, OPSO did not provide a cleaning schedule and weekly inspection documentation as required. The Sanitarian advised that due to the lack of inmate workers, responsibility for routine cleaning of pod areas continues to rest with security staff as noted in the previous three inspections. The Monitor reviewed the monthly environmental inspection reports and found them to routinely include the majority of the sanitation issues noted by the Monitor on the date of the inspection indicating the sanitation issues in the housing units are persistent. The cleanliness in the open dorms was generally acceptable with some exceptions (excess trash, etc.).

During the tour, inmate showers were specifically viewed by the Monitor. The OPSO Sanitarian provided a memo regarding the cleaning of the inmate showers which noted:

> For the requested reporting period, each unit manager has devised a listing of inmates that are located on each pod as the designated shower cleaning crew. Showers are cleaned on a daily basis during the night shift and are left open to dry



*out. Also sanitation continues to assist with supplying the cleaning chemicals and supplies needed to effectively clean and sanitize the showers.*

The Monitor observed that the cleanliness and sanitation in many housing units had declined substantially since the last inspection, particularly in the shower areas. Unit 3C was the worst example. An accumulation of trash was noted in several individual cells in various units and several dayrooms and recreation yards as well. While the Monitor considers that showers and communal restroom areas are used throughout the day, it was obvious that the regular cleaning of these areas, and several showers in particular, was not being accomplished according to the OPSO statement above nor with any frequency that would indicate adherence to any cleaning schedule. Again, no cleaning schedules were posted nor provided to the Monitor as documentation, nor was there any documentation of routine daily cleanliness inspections by security staff.

Based on the above, the Monitor has downgraded the rating for this section to Non-Compliance.

During previous inspections, the Monitor found at least one housing unit having more than 50% of the cells (lockdown unit) with obstructed air supply vents. While blocked supply registers present a code violation as it relates to ventilation and the number of required air exchanges per hour in rooms with toilets, the correctional environment presents unique challenges in maintaining this aspect of compliance. The Monitor observed significantly fewer individual cell supply registers to be covered or obstructed by the cell occupants than during previous inspections and wishes to acknowledge the efforts of OPSO security staff in this regard. The Monitor noted that several dayroom return air registers needed cleaning, particularly in the dorm-style units. The registers collect dust and lint and, if left unchecked, can promote the growth of mold.

None of the unit janitor closets were found unsecure. As noted above, several maintenance and cleanliness issues were noted in some of the closets. Over the past two years, the Monitor noted several lighting fixtures in the mop closets that had been vandalized by inmates and not repaired. The Monitor noted one remaining light fixture in the 3D janitor closet that was still held up with cloth strips and presents a safety/security hazard. (This will be reflected in the Maintenance section rating for repair of electrical fixtures.)

The Monitor noted clutter issues in most housing pods, typically involving the



improper storage of inmate property in cells and dormitories. The Life-Safety inspection reports during the rating period noted similar issues.

The documentation and interviews reflected the Sanitarian and Environmental staff's efforts at maintaining consistent and regular cleaning schedules for circulation areas however, some lingering effects of the COVID pandemic restrictions persist with fluctuating positivity rates among staff and inmates, and overall staff vacancies, that affect the ability of the staff available to perform regular cleaning tasks, laundry exchange, etc. (The Sanitarian reports that sanitation staff are still redirected at times to other security-related tasks.)

The number of grievances regarding sanitation issues was consistently low during the rating period (4 laundry issues and 3 for cleaning supplies). Inmate reports via grievance of inadequate or missing cleaning supplies were few in number, however this was an issue noted in the notes at least once in random units on each of the monthly "town hall" meetings conducted by the Sanitarian in the housing units. The Sanitarian also noted that the Facility's supply of replacement mops was depleted during the entire month of August due to being backordered from the supplier. (During an interim visit, the Monitor strongly suggested finding another source and the supply was restored in September.) The Monitor received few verbal complaints from the inmates during the walk-thru regarding chemical availability and chemical inventory/inspection documentation reflected routine resupply of chemicals was occurring. The material safety sheets were in order in each area inspected.

As previously noted, regular provision of clean inmate clothing and bedding and appropriate inventory of these supplies are essential to sanitation, infection control and disease prevention. The Sanitarian reported that she was only able to maintain a minimally adequate supply of inmate clothing for issue and exchange primarily due to limited shelf-stock levels and the laundry vendor's staffing issues that sometimes delayed the return of items. While hoarding issued clothing items and blankets continues to be a problem, the Monitor observed relatively few instances during this inspection. The instances of altered clothing (homemade "hoodies") observed during the previous inspections appeared to be declining but still persists. Based on an inmate's comment and some grievance documentation, the Monitor inquired about the frequency of the exchange of blankets and linens. The Sanitarian advised that both were on a monthly exchange



schedule. While acceptable for blankets, the Monitor recommends a weekly exchange for linens to support good hygiene and sanitation.

The Monitor noted that the washers and dryers appeared to be in working condition in most of the units at the time of the inspection although at least one unit had (4E) the dryer removed for an extended period of time according to inmates and as evidenced by towels and personal clothing hanging on every handrailing in the unit to dry. Several inmates complained to the Monitor about inoperable equipment and a lack of access to the washers/dryers. The Monitor noted personal clothing and towels hanging on dayroom railings in several housing units indicating that either the clothes dryer was not working, or the inmates were resorting to handwashing items due to lack of access to the machines. The Monitor noted a few damaged or missing dryer vent hoses.

***IV. D. 1. b. Continue the preventive maintenance plan to respond to routine and emergency maintenance needs, including ensuring that showers, toilets, and sink units are adequately installed and maintained. Work orders will be submitted within 48 hours of identified deficiencies, or within 24 hours in the case of emergency maintenance needs.***

<u>Finding:</u>

Substantial Compliance

<u>Observations:</u>

As with previous inspections, the Monitor reviewed the Sanitation and Environmental Conditions report, the OPSO Preventive Maintenance Plan, the Preventive Maintenance Schedule Summary report, and a Preventive Maintenance work orders status report as well as inmate grievances related to maintenance issues. The Monitor also interviewed the Maintenance Director. The documentation reflected an on-going preventive maintenance program for major building systems and components consistent with OPSO policy and the Consent Judgment. Preventive maintenance appears to be fairly consistent despite the continued staffing issues reported by the Maintenance Director.

Individual inmate interviews conducted during the walk-thru in each housing unit revealed no significant complaints by inmates regarding water, electric or HVAC services in individual cells that were not addressed in a timely fashion. Water pressure issues at the restroom sinks in open dormitory pods in the OJC noted during the previous inspection continue to improve.

As with the previous inspection, there was no marked increase/decrease in the number of grievances received on a monthly basis also indicating that routine issues with



basic plumbing, mechanical or electrical services in inmate cells or dayrooms are typically remedied within 48 to 72 hours and that work orders are being submitted in a timely manner as required by the Consent Judgment ("Work orders will be submitted within 48 hours of identified deficiencies, or within 24 hours in the case of emergency maintenance needs").

The Monitor observed an increase in the number of broken cell door windows throughout OJC to include a door glass in the Intake Processing Center. While OJC staff were aware of the vandalism, the Monitor makes this note to emphasize the need for timely replacement of the broken glass to eliminate the safety and security risk.

***IV. D. 1. c. Maintain adequate ventilation throughout OPSO facilities to ensure that prisoners receive adequate air flow and reasonable levels of heating and cooling. Maintenance staff shall review and assess compliance with this requirement, as necessary, but no less than twice annually.***

Finding:

Non-Compliance

Observations:

As noted in previous inspections, adequate air flow is maintained in the facilities but continues to be impeded in a few inmate cells when inmates block the air vents.  The Monitor noted that overall, the number of cells with blocked supply registers was significantly less than noted during the previous visit with no housing unit having more than 50% of the cells observed to be obstructed. Compliance in this area remains an inmate supervision issue and must continue to be addressed by security staff consistently. The Monitor noted that the majority of housing dayrooms and cells to be at relatively reasonable levels of heating and cooling. Based on inmate complaints of "hot cells" and "no air" in at least two housing units with cells, the Monitor investigated and found at least two areas with minimal or no air flow in a section of inmate cells controlled by a single Variable Air Volume (VAV) box.

The following, regarding test and balance reports, is restated from previous reports. As noted in the two previous reports, test, and balance reports for the Kitchen/Warehouse (2014), OJC (2017) and TDC (2012) were the latest available to the Monitor.

Prior to the September 2019 report, this section had been interpreted as requiring comprehensive "test and balance" assessments on a semi-annual basis. Such assessments are very expensive and typically performed only during the commissioning of new or



replacement HVAC systems. The Monitor has consistently requested OPSO provide reports from the Building Automation System (BAS) covering the inspection period which would reflect the actual air temperatures in the units and cells on a continuous basis. The BAS controls the heating and cooling throughout all occupied areas in OJC, and the reports would be used to verify the system's performance as well as the maintenance response to routine and emergency situations requiring service or replacement of the HVAC components. The previous Maintenance Director failed consistently to provide the requested information. Tour #17 was the second inspection under the new Administration and the documentation was still not provided. The Monitor is anticipating the requested documentation will be available for Tour #18 based upon follow-up action recently taken by OPSO. However, for this rating period, the rating is reduced to Non-Compliance.

The Monitor reviewed live data of the system's warning and alarm functions which reflected no major equipment or systems issues that had not been addressed at that moment. The Monitor inspected the BAS system and noted no alarms or alerts present on the system. Given the Monitor's observation of at least two cell areas with little or no air circulation in the OJC area, it is recommended that the Maintenance Director implement a routine audit/inspection of the housing areas for such occurrences and compare the findings with the BAS reports to ensure the system is working as expected.

It is the Monitor's opinion that the OJC Building Automation System and the new BAS system supporting the TMH units, as currently operated, meets the intent of the Consent Judgment regarding this section. The requested supporting documentation will be necessary to support gain a finding of substantial compliance.

***IV. D. 1. d. Ensure adequate lighting in all prisoner housing units and prompt replacement and repair of malfunctioning lighting fixtures in living areas within five days unless the item must be specially ordered.***

<u>Finding:</u>

Non-Compliance

<u>Observations:</u>

The Monitor observed sufficient lighting being provided in housing units and the majority of individual cells of both OJC and TDC. Maintenance staff continue to maintain a supply of replacement bulbs, transformers, or ballasts to repair malfunctioning lighting. However, as previously noted by the Monitor, one vandalized light fixture in one of the pod



mop closets has yet to be replaced after two years. The replacement of the light fixtures had not been completed in the requisite time frame as of the date of this inspection. The Monitor observed no outstanding electrical work orders beyond routine bulb replacement and the issue noted above. This section remains in non-compliance due to failure to repair/replace the light fixture.

***IV. D. 1. e. Ensure adequate pest control throughout the housing units, including routine pest control spraying on at least a quarterly basis and additional spraying as needed.***

Finding:

Substantial Compliance

Observations:

A review of the documentation submitted found sufficient evidence of a pest control program that meets the intent of the Consent Judgment. OPSO continues to maintain a pest control contract with a state licensed company for monthly service of all housing areas and bi-weekly service for the Kitchen/Warehouse. Inmate grievances related to pest control were reviewed and found to have been addressed in a timely manner. The Monitor observed minimal "drain fly" issues in two of the inmate housing units and the Environmental Officer was notified to service the areas noted.

Environmental, Sanitation and Life-Safety staff performing inspections and responding to pest control grievances continue to initiate work orders for pest control and to document how, when, and where infestations are identified and remedied. The pest control contractor documentation reflected no infestations were found during routine inspections. Documentation in D.4.a. (Semi-annual reporting) reflects self-reported pest control issues and issues noted in the local health department report that were all followed up on by OPSO as required by the Consent Judgment language.

***IV. D. 1.f. Ensure that any prisoner or staff assigned to clean a biohazardous area is properly trained in universal precautions, outfitted with protective materials, and properly supervised.***

Finding:

Partial Compliance

Observations:

As noted in previous inspections, Policy 1101.07, "Bio-hazardous Spill Cleaning Procedures" [Revised 1/18/2018] Section VIII. A. 1 has been revised to allow properly trained and equipped inmates and deputies to clean up bio-hazardous spills. Training materials were devised by the Sanitarian. No documentation was provided to indicate any



inmate training had occurred during the rating period.

The Monitor also reviewed training curricula and documentation indicating that during 2022, all pre-service staff received training in bio-hazardous cleanup procedures as part of their initial training in each new-hire class in 2022 up to the date of this inspection. Documentation reflected that the in-service training for this requirement was accomplished in July 2022.

As of November 2018, the Sanitation and/or Environmental Officer is required to be notified of such incidents each business day to enable them to replace any bio-hazardous clean up protective materials used and inspect the area to ensure it was properly cleaned and sanitized. The Monitor was provided with several reports indicating that proper notification had been made to the Sanitarian and that required cleanup/inspection procedures had been followed. However, the proper notification was inconsistent where inmates were used to clean the affected areas, or it was mentioned in the reports that PPE was provided to the inmate and/or used by the staff member. Further, there was no indication or documentation that the inmate(s) performing the cleanup had received the requisite training and no class rosters for inmate training was provided with the documentation. The Monitor recommends that the Sanitarian document the inmate(s) training on the follow-up inspection reports. This section remains in partial compliance for this reason.

The Monitor inspected all emergency response bags and found issues with two bags (missing seals, extra cut-down knife). The discrepancies were reported and corrected.

***IV. D. 1. g. Ensure the use of cleaning chemicals that sufficiently destroy the pathogens and organisms in biohazard spills.***

Findings:

Substantial Compliance

Observations:

The Monitor was able to make direct observation that the chemicals on-hand and available to staff were sufficient to destroy the pathogens and organisms in bio-hazardous spills common in a jail environment to include the COVID-19 virus. The Monitor is continuing to rate this section as being in substantial compliance.

Additionally, the chemical storage inventory documentation submitted



demonstrated availability of a consistent supply of the required chemicals being maintained by the designated staff.

***IV. D. 1. h. Maintain an infection control plan that addresses contact, blood borne, and airborne hazards and infections. The plan shall include provisions for the identification, treatment, and control of Methicillin-Resistant Staphylococcus Aureus ("MRSA") at the Facility.***

Findings:

Substantial compliance

Observations:

As with the previous inspection, the Monitor reviewed the OPSO infection control policy 1201.11 as well as the Wellpath Infection Control Program document (rev. 8/30/18) submitted by OPSO. No changes were noted, and all requisite areas required by the Consent Judgement were addressed, to include MRSA, and included by OPSO for the Monitor's review and found sufficient.

The Monitor observed no violations with regard to the handling and sanitation of inmate mattresses in OJC or TDC. OPSO has previously provided for annual review of the policy and standard operating procedures for the handling of inmate mattresses to include staff and/or inmate sanitation training program that includes mattress cleaning, and chemical use and control. This procedure is specifically required by the Infection Control Plan.

## IV. D. 2. Environmental Control

Findings:

D. 2. a.  Substantial Compliance

D. 2. b.  Partial Compliance

***IV. D. 2. a. OPSO shall ensure that broken or missing electrical panels are repaired within 30 days of identified deficiencies, unless the item needs to be specially ordered.***

Findings:

Substantial Compliance

Observations:

OPSO Policies 601.02 "Reporting and Addressing Maintenance Needs" and Policy 601.03 "Preventive Maintenance" [August 15, 2016] are implemented. Major electrical panels at OJC and TMH are located in secure maintenance spaces inaccessible to inmates.

During the inspection, the Monitor noted no specific issues in electrical rooms accessible by security staff.



***IV. D. 2. b. Develop and implement a system for maintenance and timely repair of electrical panels, devices, and exposed electrical wires.***

<u>Findings:</u>

Partial Compliance

<u>Observations:</u>

During the previous inspection, the Monitor noted a damaged floor receptacle in the Kitchen bakery area noted in the previous inspection that had been repaired.

Also, during previous inspections, the Monitor noted chronic issues with the inmate intercom equipment. This was noted in previous reports under Section IV.D.1.b. (with no apparent action from OPSO Maintenance), however the Monitor has determined that this issue is more appropriately covered in this section that requires the implementation of "a system for maintenance and timely repair of electrical panels, devices, and exposed electrical wires".

During the inspection, the Monitor randomly asked inmates to activate their cell intercoms to elicit a response from security staff. There were at least two instances with no response despite staff being present to answer the call indicating the field device (intercom) may be inoperable. Additionally, several inmates complained that intercom calls are not typically answered by staff. The Monitor has observed that, if the inmate is locked in a cell, the inmate must either call out to the pod deputy (if present) or request another inmate who may be out of their cell to alert the pod control staff member if an issue or emergency arises.

The intercom system is tied into the security electronics system. Pod deputies are able to answer intercom calls from inmates via a microphone/speaker on the pod desk (connected to the pod computer) *if* the equipment is present. If the pod deputy is logged out of the system, the intercom call is transferred to the pod control desk. The Monitor observed that the pod computer/intercom equipment is missing from at least half of the housing pods. This presents a safety issue even if the deputy is present in the pod. (i.e., an inmate experiencing a medical emergency or assault is unable to call out but can press the intercom button for help).

The Monitor continues to recommend that Maintenance staff make a comprehensive survey of working/non-working intercom equipment in every housing unit to facilitate repair of the system throughout the facility and add random intercom



testing in every unit to the routine inspection process. Additionally, security staff supervisors should continue to emphasize the importance of the prompt response to emergency intercom calls by pod deputies and pod control staff.

Due to the chronic issue with the inmate intercom field devices and control equipment devices, the Monitor is placing this section in partial compliance and recommends OPSO develop a comprehensive near-term plan to repair the system.

**IV. D. 3. Food Service**

This report summarizes the findings for the Food Service provisions of the Consent Judgment based on the Monitor's document reviews and tour conducted December 5-7, 2022. The Monitor inspected the Orleans Justice Center (OJC) Kitchen/Warehouse; observed meal service activities; and spoke with OPSO supervisors and deputies, Summit contracted food service employees, and inmates.

Since the last tour on June 27-30, 2022, OPSO has maintained compliance with sections IV. D. 3. a, IV. D. 3. b., and IV. D. 3. c. of the Consent Judgment, resulting in Food Service remaining in substantial compliance.

Findings:

D. 3. a. Substantial Compliance

D. 3. b. Substantial Compliance

D. 3. c. Substantial Compliance

***IV. D. 3. a. OPSO shall ensure that food service staff, including prisoner staff, continues to receive in-service annual training in the areas of food safety, safe food handling procedures, and proper hygiene, to reduce the risk of food contamination and food-borne illnesses.***

Findings:

Substantial Compliance

Observations:

Summit provided documented training for food service staff. The in-service training for the compliance period included lessons on safe food storage, chemical safety, and food allergens. Documentation of the orientation training, including watching a video on the topics of food safety, personal safety, sanitation, and chemical supplies, followed by a written quiz, that is required for inmate workers prior to starting work in the kitchen was provided for the compliance period. Therefore, D. 3. a. remains in Substantial Compliance for the period of April 2022 through September 2022.

***IV. D. 3. b. Ensure that dishes and utensils, food preparation and storage areas, and vehicles and***



*containers used to transport food are appropriately cleaned and sanitized on a daily basis.*

Findings:

Substantial Compliance

Observations:

For the compliance period of April 2022 through September 2022, the Monitor observed the kitchen to be clean; therefore, D. 3. b. remains in Substantial Compliance.

However, the floor in the area of the kitchen known as the "cook pit", where the large cooking kettles are located remains an ongoing concern because it is severely cracked and pieces are missing, which makes it extremely difficult to properly clean. OPSO continues to cite the damaged floor in their internal inspection reports. Food service staff use enhanced cleaning procedures. The condition of the floor continues to deteriorate.

- The Monitor continues to strongly recommend that OPSO renovate the floor in the "cook pit" area of the kitchen because the floor around the kettles is in poor condition and continues to deteriorate.  The floor in the "cook pit" area must be properly maintained, so that it is easily cleanable in order to facilitate compliance with IV. D. 3. b. requiring that food preparation areas are appropriately cleaned on a daily basis.

***IV. D. 3. c. Check and record on a daily basis the temperatures in the refrigerators, coolers, walk-in refrigerators, the dishwasher water, and all other kitchen equipment with a temperature monitor, to ensure proper maintenance of food service equipment.***

Findings:

Substantial Compliance

Observations:

The Consent Judgment requires that OPSO "Check and record on a daily basis the temperatures in the refrigerators, coolers, walk-in refrigerators, the dishwasher water, and all other kitchen equipment with a temperature monitor, to ensure proper maintenance of food service equipment." The food service records for the compliance period provided by OPSO and Summit were reviewed by the Monitor and the documented temperatures were found to be within the appropriate ranges. During the tour, the Monitor observed that the food temperatures, cooler and freezer temperatures, the refrigerator at TMH, and the dishwasher machine temperatures were code compliant. Therefore, IV. D. 3. c. remains in Substantial Compliance for the period of April 2022 through September 2022.



During the kitchen inspection on December 5, 2022, it was observed that the dishwasher had an error code for the final rinse temperature. Upon inquiry, it was found that the factory authorized technician had just worked on the machine and was still present in the facility with one of the engineers and they were called back to the kitchen. The dishwasher technician determined that the machine needed a new sensor and probe, and parts were ordered. OPSO implemented the use of FDA food code compliant single use dishwasher temperature adhesive labels. The labels are applied directly to an item, washed in the dishwasher, and the label changes color when it reaches the appropriate temperature, thereby ensuring that the dishwasher is operating at the correct final rinse temperature. The use of the labels complies with IV. D. 3.

### IV. D. 4. Sanitation and Environmental Conditions Reporting

Findings:

D.4. a. Substantial Compliance

D.4. b. Partial Compliance

***D. 4. a. Provide the Monitor a periodic report on sanitation and environmental conditions in the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. The report will include***
> ***(1) number and type of violations reported by health and sanitation inspectors;***
> ***(2) number and type of violations of state standards;***
> ***(3) number of prisoner grievances filed regarding the environmental conditions at the Facility;***
> ***(4) number of inoperative plumbing fixtures, light fixtures, HVAC systems, fire protection systems, and security systems that have not been repaired within 30 days of discovery;***
> ***(5) number of prisoner-occupied areas with significant vandalism, broken furnishings, or excessive clutter;***
> ***(6) occurrences of insects and rodents in the housing units and dining halls; and***
> ***(7) occurrences of poor air circulation in housing units.***

Findings:

Substantial Compliance

Observations:

The April 2022 through September 2022 Sanitation and Environmental reports as supporting documentation were available to the Monitor prior to the inspection tour. The biannual summary reports contained the requisite information spelled out by the Consent Judgement for this section. The State Department of Health performed an annual inspection on October 26, 2022, and fell outside the reporting period for Tour #17. The report noted several issues which were corrected or scheduled for correction by OPSO staff. The DHH reinspection conducted on November 11, 2022, noted the majority of the



deficiencies noted had been corrected. Again, this inspection falls outside the rating period for this report. The Monitor reviewed documentation covering items 3 through 6 and found no significant issues.

***IV. D. 4. b. Review the periodic sanitation and environmental conditions reports to determine whether the prisoner grievances and violations reported by health, sanitation, or state inspectors are addressed, ensuring that the requirements of this Agreement are met. OPSO shall make recommendations regarding the sanitation and environmental conditions, or other necessary changes in policy, based on this review. The review and recommendations will be documented and provided to the Monitor.***

Findings:

Partial Compliance

Observations:

The Consent Judgment requires a review of the periodic sanitation and environmental conditions reports to ensure issues are addressed along with making recommendations regarding sanitation and environmental conditions and policy changes based upon the review. Such reviews are to be documented and provided to the Monitor. The Monitor reviewed the supporting documentation provided by OPSO and determined that it was sufficient to satisfy the requirements of the Consent Judgment for this rating period. However, OPSO failed to provide any documentation reflecting that a review of the Sanitation/Maintenance documentation was conducted and policy recommendations made (if any). This places this section in partial compliance.

**IV. E. 1. Fire and Life Safety**

Findings:

E.1. a.  Substantial Compliance

E. 1. b.  Substantial Compliance

E. 1. c.  Substantial Compliance

E. 1. d.  Substantial Compliance

E. 1. e.  Substantial Compliance

***IV. E. 1. a. Ensure that necessary fire and life safety equipment is properly maintained and inspected at least quarterly. These inspections must be documented.***

Finding:

Substantial Compliance

Observations:

The Monitor was able to conduct a tour of the OJC, TDC/TMH, and the Kitchen/Warehouse facilities during the December 2022 inspection with the Facility Life



Safety Officer. The Monitor observed no major issues with the fire and life safety equipment. All fire extinguishers were found to be current on required inspections with one exception that was corrected. The Fire Alarm Control Panels in the areas inspected were found to be properly inspected and free of trouble alarms with the exception of a filter replacement notification on one remote panel in TDC/TMH. The Life/Safety Officer was already aware of the issue and a work order was in process.

The Monitor also reviewed all monthly and quarterly inspection documentation as well as outside inspection documentation noting no significant issues, that requisite work orders had been generated when warranted, and that all major systems were operational/"green tagged". Of note, the inspection documentation reflected increasing trash issues throughout the inmate housing areas. The reports continued to note significant issues with excess inmate property being improperly stored in a substantial number of housing units. As previously noted, Staff should consider potential solutions to reduce the amount of clutter and potential fire-load the material presents.

As noted in the previous inspection, the Life Safety Officer continues to use the "Facility Dude" work order system to maintain the schedule of required inspections. The system notifies the Fire Safety Officer when an inspection is due. OPSO continues to maintain contracts with licensed vendors to complete annual inspections of all fire and life safety equipment. OPSO provided copies of quarterly inspections conducted by the Fire Safety Officer for Kitchen/Warehouse, OJC, and TDC/TMH for the second and third quarter for 2022. A copy of the most recent fire marshal inspection was also provided and reviewed (August 2021). The latest copy of the Annual fire detection system inspection available for review was dated December 2021. The inspections are performed on a calendar year basis and neither was out of date at the time of the inspection. This documentation, supported by observations during the compliance tour, indicates that OPSO ensures that necessary fire and life safety equipment is properly maintained and inspected at required intervals.

***IV. E. 1. b. Ensure that a qualified fire safety officer conducts a monthly inspection of the facilities for compliance with fire and life safety standards (e.g., fire escapes, sprinkler heads, smoke detectors, etc.).***

Finding:

Substantial Compliance



Observations:

      The Monitor was provided with the monthly inspection documents for the Kitchen /Warehouse, OJC, and TDC/TMH facilities performed during the current inspection period. The reports are thorough and complete with all noted discrepancies listed with the associated work order number. These inspections are conducted by a qualified fire safety officer or a qualified contractor, as required by the Consent Judgment.

***IV. E. 1. c. Ensure that comprehensive fire drills are conducted every six months. OPSO shall document these drills, including start and stop times and the number and location of prisoners who were moved as part of the drills.***

Finding:

Substantial Compliance

Observations:

      The Consent Judgment requires comprehensive fire drills every six months. OPSO provided documentation for nine (9) fire drills for all facilities and shifts conducted during the current rating period. Only "Level 1" drills were conducted (no inmate evacuation) due to COVID restrictions. Three (3) drills were conducted in OJC, five (5) drills were conducted in TDC/TMH, and one (1) drill was conducted in the Kitchen/Warehouse during the rating period. Documentation reviewed by the Monitor noted more than 90% of available OJC and TDC (by squad) staff had participated in at least one drill during the rating period. In addition to the detailed drill reports, the documentation lists, by name, any delinquent staff with the listing provided to senior management for the coordination of make-up training. Pre-service training was provided to all participants in classes held during the rating period.

***IV. E. 1. d. Provide competency-based training to staff on proper fire and emergency practices and procedures at least annually.***

Finding:

Substantial Compliance

Observations:

      OPSO has developed the requisite policy, training course syllabus/outline and written directives necessary for this section. OPSO training staff provided documentation noting that approximately 95% of the mandated staff had completed the required competency-based training on fire and emergency practices in September 2022. (The Training Academy provides make-up opportunities through the remainder of the calendar



year to increase the completion rate.) The Monitor considers the 95% success rate for in-service Life/Safety training to meet the requirement of the Consent Judgement. Although not covered in the language above, the success rate for pre-service Life/Safety training continues to be 100%.

**IV. E. 1. e. Within 120 days of the Effective Date, ensure that emergency keys are appropriately marked and identifiable by touch and consistently stored in a quickly accessible location, and that staff are adequately trained in use of the emergency keys.**

Finding:

Substantial Compliance

Observations:

Inspection reports note the routine verification of the keys and the Fire Safety Officer documents the periodic testing of the keys to verify they are operational. The Fire Safety Officer trains staff on the location and use of the keys during the fire and life safety training curriculum provided to all staff at the training academy.

## IV. E. 2. Fire and Life Safety Reporting

Findings:

E. 2. a.  Substantial Compliance

E. 2. b.  Partial Compliance

**IV. E. 2. a. (1) – (3) Provide the Monitor a periodic report on fire and life safety conditions at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date and every six months thereafter until termination of this Agreement. Each report shall include:**
    **(1) number and type of violations reported by fire and life safety inspectors;**
    **(2) fire code violations during annual fire compliance tours; and**
    **(3) occurrences of hazardous clutter in housing units that could lead to a fire.**

Finding:

Substantial Compliance

Observations:

The semiannual reports referenced in IV.E.2.a. are conducted by OPSO on a semi-annual basis (Jan through June and July through December). The Monitor was provided with the report covering 1/1/22 through 6/30/22 noting the requisite information and covered the first three months of the rating period. The 2022 Fire and Life Safety Conditions and inspections reports generated during the rating period were made available to the Monitor prior to the December 2022 inspection. The reports contained the supporting information for the semiannual reports spelled out by the Consent Judgment. In light of the supporting documentation, the Monitor finds this section to be in substantial compliance.



*IV. E. 2. b. Review the periodic fire and life safety reports to determine whether the violations reported by fire and life safety inspectors are addressed, ensuring the requirements of this Agreement are being met. OPSO shall make recommendations regarding the fire and life safety conditions, or other necessary changes in policy, based on this review. The review and recommendations will be documented and provided to the Monitor.*

<u>Finding:</u>

Partial Compliance

<u>Observations</u>:

The Consent Judgment requires a review of the periodic fire and life safety reports to ensure issues are addressed along with making recommendations regarding the fire and life safety conditions and policy changes based upon the review. Such reviews are to be documented and provided to the Monitor.

The Monitor reviewed the supporting documentation provided by OPSO and determined that it was sufficient to satisfy the requirements of the first half of this requirement. OPSO failed to provide any documentation reflecting that a review of the Life/Safety documentation was conducted and policy recommendations made (if any). This places this section in partial compliance.

## IV. F. Language Assistance

*F.1.a. OPP shall ensure effective communication with and provide timely and meaningful access to services at OPP to all prisoners at OPP, regardless of their national origin or limited ability to speak, read, write, or understand English. To achieve this outcome, OPP shall:*

    *(1)    Develop and implement a comprehensive language assistance plan and policy that complies, at a minimum, with Title VI of the Civil Rights Act of 1964, as amended, (42 U.S.C. § 2000d et seq.) and other applicable law;*

    *(2)    Ensure that all OPP personnel take reasonable steps to provide timely, meaningful language assistance services to Limited English Proficient ("LEP") prisoners;*

    *(3)    At intake and classification, identify and assess demographic data, specifically including the number of LEP individuals at OPP on a monthly basis, and the language(s) they speak;*

    *(4)    Use collected demographic information to develop and implement hiring goals for bilingual staff that meet the needs of the current monthly average population of LEP prisoners;*

    *(5)    Regularly assess the proficiency and qualifications of bilingual staff to become an OPP Authorized Interpreter ("OPPAI");*

    *(6)    Create and maintain an OPPAI list and provide that list to the classification and intake staff; and*

    *(7)    Ensure that while at OPP, LEP prisoners are not asked to sign or initial documents in English without the benefit of a written translation from an OPPAI.*

*F.2.a. OPP shall develop and implement written policies, procedures and protocols for documenting, processing, and tracking of individuals held for up to 48 hours for the U.S. Department of Homeland Security ("DHS");*

*F.2.b Policies, procedures, and protocols for processing 48-hour holds for DHS will:*

    *(1)    Clearly delineate when a 48-hour hold is deemed to begin and end;*

    *(2)    Ensure that, if necessary, an OPPAI communicates verbally with the OPP prisoner about when the 48-hour period begins and is expected to end;*

    *(3)    Provide a mechanism for the prisoner's family member and attorney to be informed of the*



*48-hour hold time period, using, as needed, an OPPAI or telephonic interpretation service;*

(4) *Create an automated tracking method, not reliant on human memory or paper documentation, to trigger notification to DHS and to ensure that the 48-hour time period is not exceeded.*

(5) *Ensure that telephone services have recorded instructions in English and Spanish;*

(6) *Ensure that signs providing instructions to OPP prisoners or their families are translated into Spanish and posted;*

(7) *Provide Spanish translations of vital documents that are subject to dissemination to OPP prisoners or their family members. Such vital documents include, but are not limited to:*

 i. *grievance forms;*

 ii. *sick call forms;*

 iii. *OPP inmate handbooks;*

 iv. *Prisoner Notifications (e.g., rule violations, transfers, and grievance responses) and*

 v. *"Request for Services" forms.*

(8) *Ensure that Spanish-speaking LEP prisoners obtain the Spanish language translations of forms provided by DHS; and*

(9) *Provide its language assistance plan and related policies to all staff within 180 days of the Effective Date of this Agreement.*

**F.3.a. Within 180 days of the Effective Date, OPP shall provide at least eight hours of LEP training to all corrections and medical and mental health staff who may regularly interact with LEP prisoners.**

 (1) *LEP training to OPP staff shall include:*

  i. *OPP's LEP plan and policies, and the requirements of Title VI and this Agreement;*

  ii. *how to access OPP-authorized, telephonic and in-person OPPAIs; and*

  iii. *basic commands and statements in Spanish for OPP staff.*

 (2) *OPP shall translate the language assistance plan and policy into Spanish, and other languages as appropriate, and post the English and translated versions in a public area of the OPP facilities, as well as online.*

 (3) *OPP shall make its language assistance plan available to the public.*

**F.4.**

 (1) *OPP shall ensure that adequate bilingual staff are posted in housing units where DHS detainees and other LEP prisoners may be housed.*

 (2) *OPP shall ensure that an appropriate number of bilingual staff are available to translate or interpret for prisoners and other OPP staff. The appropriate number of bilingual staff will be determined based on a staffing assessment by OPP.*

<u>Findings:</u>

F.1. a.  Substantial Compliance

F. 2. a. Substantial Compliance

F. 2. b. Substantial Compliance

F. 3. a. Partial Compliance

F. 4.    Substantial Compliance

<u>Observations</u>:

  The Language Assistance Plan required by this paragraph has been prepared and finalized. F. 1. a. remains in substantial compliance.

  OPSO asserts that DHS and ICE inmates are not detained. OPSO developed a policy which was submitted to the Monitors which has provisions F. 2. a. and b. into substantial compliance.

  OPSO provided documentation regarding the use of the language line. OPSO has



provided documentation regarding the number of bilingual staff and the manner in which the needs of language assistance are provided bringing provisions of F. 4. into substantial compliance. The Consent Judgment specifically requires at least eight hours of LEP training for all deputies and mental health staff who may regularly interact with LEP inmates. Provision IV. F. 3. a. is determined in partial compliance as only four hours of training as opposed to the eight hours of training is provided. Training of security and medical staff assigned to the IPC should be sufficient.

### IV. G.  Youthful Prisoners

*IV. G. Consistent with the Prison Rape Elimination Act of 2003, 42 U.S.C. § 15601, et seq., and its implementation of regulations, a youthful prisoner shall not be placed in a housing unit in which the youthful prisoner will have sight, sound, or physical contact with any adult prisoner through use of a shared dayroom or other common space, shower area, or sleeping quarters. In areas outside of housing units, OPSO shall either: maintain sight and sound separation between youthful prisoners and adult prisoners, or provide direct staff supervision when youthful prisoners and adult prisoners have sight, sound, or physical contact. OPP shall ensure that youthful prisoners in protective custody status shall have no contact with, or access to or from, non- protective custody prisoners. OPP will develop policies for the provision of developmentally appropriate mental health and programming services.*

Finding:

Substantial Compliance

Observations:

OPSO has provided documentation that its separation of youthful inmates from adult inmates was found in compliance during its recent PREA audit.  A concerted effort has been made to house all youthful inmates at the juvenile detention facility. When housed at OJC, Tulane provides developmentally appropriate mental health services to youthful inmates. Travis School continues to provide educational and programming services. The requirement for developmentally appropriate mental health and programming services is separate and apart from PREA.

### VI. A – D. The New Jail Facility and Related Issues

### A.  New Jail

*The Parties anticipate that Defendant will build a new jail facility or facilities that will replace or supplement the current facility located at 2800 Gravier Street, New Orleans, Louisiana. This Agreement shall apply to any new jail facility.*

Finding:

VI. A. Substantial Compliance.

### B.  Design and Design Document

*Defendant shall obtain the services of a qualified professional to evaluate, design, plan, oversee, and implement the construction of any new facility. At each major stage of the facility construction, Defendant shall provide the Monitor with copies of design documents.*



Finding:

VI. B. Substantial Compliance

Observations:

These provisions apply to the construction of any new facility. Phase III is such a facility. As the City is the entity overseeing the construction of Phase III, OPSO must coordinate with the City to provide copies of design document at each major stage. The City has been providing timely access to design documents and information regarding Phase III.

### C. Staffing

***Defendant shall consult with a qualified corrections expert as to the required services and staffing levels needed for any replacement facility. OPSO shall complete a staffing study to ensure that any new facility is adequately staffed to provide prisoners with reasonable safety.***

Finding:

VI.C. Partial Compliance

Observations:

The Consent Judgment requires that the Defendant **shall** consult with a qualified corrections expert as to the required services and staffing levels needed for any replacement facility. The staffing plan for OJC developed in 2019 is now longer sufficient due to the lack of staff for deployment to the positions. The Monitors are concerned whether this will occur with Phase III staffing. The paragraph is in partial compliance.

### D. Compliance with Code and Standards

***Defendant will ensure that the new jail facility will be built in accordance with: (1) the American Correctional Association's standards in effect at the time of construction; (2) the American with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101-12213, including changes made by the ADA Amendments of 2008 (P.L. 110-325) and 47 U.S.C. §§ 225-661, and the regulations there under; and (3) all applicable fire codes and regulations.***

Finding:

Monitors not qualified to evaluate.

Observations:

The Monitors do not have the knowledge or expertise to evaluate compliance with this paragraph. OPSO asserts that it is in compliance with this provision, without offering documentation. Documentation from the architect would be sufficient.

## VII. Compliance and Quality Improvement

## VII. A. Policies, Procedures, Protocols, Training Curriculum and Practices

***Within 120 days of the Effective Date, OPSO shall revise and/or develop its policies, procedures,***



*protocols, training curricula, and practices to ensure that they are consistent with, incorporate, address, and implement all provisions of this Agreement. OPSO shall revise and/or develop, as necessary, other written documents, such as screening tools, logs, handbooks, manuals, and forms, to effectuate the provisions of this Agreement. OPSO shall send pertinent newly drafted and revised policies and procedures to the Monitor as they are promulgated. The Monitor will provide comments on the policies to OPSO, SPLC, and DOJ within 30 days.*

*OPSO, SPLC, and DOJ may provide comments on the Monitor's comments within 15 days. At that point, the Monitor will consider the Parties' comments, mediate any disputes, and approve the policies with any changes within 30 days. If either party disagrees with the Monitor, they may bring the dispute to the Court. OPSO shall provide initial and in-service training to all Facility staff with respect to newly implemented or revised policies and procedures. OPSO shall document employee review and training in new or revised policies and procedures.*

Finding:

VII. A. Partial Compliance

Observations:

      OPSO has now completed the development of the required policies. OPSO's efforts in the development of procedures and lesson plans resulted in this paragraph continuing to be in partial compliance. OPSO should continue to seek the input of the Monitors and Parties of any revisions of the policies required by the Consent Judgment. OPSO is reminded that it may not unilaterally change those policies.

## VII. (H). B.  Written Quality Improvement Policies and Procedures

*Within 180 days of the Effective Date, Defendant shall develop and implement written quality improvement policies and procedures adequate to identify serious deficiencies in protection from harm, prisoner suicide prevention, detoxification, mental health care, environmental health, and fire and life safety in order to assess and ensure compliance with the terms of this Agreement on an ongoing basis. Within 90 days after identifying serious deficiencies, OPSO shall develop and implement policies and procedures to address problems that are uncovered during the course of quality improvement activities. These policies and procedures shall include the development and implementation of corrective action plans, as necessary, within 30 days of each biannual review.*

Finding:

VII. B. Partial compliance

Observations:

      OPSO has provided documentation that it is now developing plans to identify serious deficiencies, and to address problems that are uncovered during the course of quality improvement activities to warrant a finding of partial compliance. These plans need to contain specific performance measures, timelines, and persons responsible. They also need to be implemented with appropriate development of corrective action to be taken and the auditing of adherence to the action plan.

## VII. (I). C. Full-Time Compliance Coordinator

*The Parties agree that OPSO will hire and retain, or reassign a current OPSO employee for the duration*



*of this Agreement, to serve as a full-time OPSO Compliance Coordinator. The Compliance Coordinator will serve as a liaison between the Parties and the Monitor and will assist with OPSO's compliance with this Agreement. At a minimum, the Compliance Coordinator will: coordinate OPSO's compliance and implementation activities; facilitate the provision of data, documents, materials, and access to OPSO's personnel to the Monitor, SPLC, DOJ, and the public, as needed; ensure that all documents and records are maintained as provided in this Agreement; and assist in assigning compliance tasks to OPSO personnel, as directed by the Sheriff or his or her designee. The Compliance Coordinator will take primary responsibility for collecting information the Monitor requires to carry out the duties assigned to the Monitor.*

Finding:

Substantial Compliance

Observations:

Captain Nicole Harris has been designated the Compliance Coordinator.

### VII. (J.) D. Self-Assessment

*On a bi-annual basis, OPSO will provide the public with a self-assessment in which areas of significant improvement or areas still undergoing improvement are presented either through use of the OPSO website or through issuance of a public statement or report.*

Finding:

Partial Compliance

Observations:

During the monitoring period, no town hall meetings were held. The holding of those meetings previously and posting the PowerPoint presentations at those meetings had brought OPSO into substantial compliance. A community meeting was held in October 2022 and will be reflected in the next report.

### VIII. Reporting Requirements and Right of Access

### VIII. A. Periodic Compliance Reporting

*OPSO shall submit periodic compliance reports to the Monitor. These periodic reports shall be provided to the Monitor within four months from the date of a definitive judgment on funding; and every six months thereafter until termination of this Agreement. Each compliance report shall describe the actions Defendant has taken during the reporting period to implement this Agreement and shall make specific reference to the Agreement provisions being implemented. The report shall also summarize audits and continuous improvement and quality assurance activities, and contain findings and recommendations that would be used to track and trend data compiled at the Facility. The report shall also capture data that is tracked and monitored under the reporting provisions of the following provisions: Use of Force; Suicide Prevention; Health Care Delivered; Sanitation and Environmental Conditions; and Fire and Life Safety.*

Finding:

Partial Compliance

Observations:

As noted in the individual section, several of the required reports have not been submitted during this monitoring period.



## VIII. B.  (Notification of) Death of Any Prisoner

***OPSO shall, within 24 hours, notify the Monitor upon the death of any prisoner. The Monitor shall forward any such notifications to SPLC and DOJ upon receipt. OPSO shall forward to the Monitor incident reports and medical and/or mental health reports related to deaths, autopsies, and/or death summaries of prisoners, as well as all final SOD and IAD reports that involve prisoners. The Monitor shall forward any such reports to SPLC and DOJ upon receipt.***

Finding:

Substantial Compliance

## VIII. C. Records

***Defendant shall maintain sufficient records to document that the requirements of this Agreement are being properly implemented and shall make such records available to the Monitor within seven days of request for inspection and copying. In addition, Defendant shall maintain and provide, upon request, all records or other documents to verify that they have taken the actions described in their compliance reports (e.g., census summaries, policies, procedures, protocols, training materials, investigations, incident reports, tier logs, or use of force reports).***

Finding:

Partial Compliance

Observations:

During this compliance period, OPSO often did not provide incident notifications and investigations requested within seven days. The monthly reports provided to the Monitors greatly decreases the need for document requests.

## III.  Stipulated Orders

OPSO and the Plaintiffs/DOJ negotiated two agreements after Compliance Report #3. The language of the Stipulated Orders was linked directly to the Consent Judgment and represented priority areas for inmate safety. Some of them required a one-time action such the posting of a memorandum or providing of training by a specific date. Some of the provisions of the Stipulated Order of February 11, 2015, contain on-going obligations that are in addition to the Consent Judgment or clarify the obligations under the Consent Judgment.

The three provisions of the April 22, 2015, Stipulated Order are in substantial compliance and contained provisions that were to be accomplished by specific dates during April 2015. As those dates have passed, the Monitors no longer monitor those provisions. Two of the provisions in the Stipulated Order of February 11, 2015, require additional attention. The provisions of the Stipulated Order of February 11, 2015, which require ongoing compliance are 1. c. and 5. b. The provisions that are not in substantial compliance are addressed below.



*1. c. Within 24 hours of the occurrence of any of the following incident, OPSO shall notify the Monitor via email:*

- *Death of an inmate/arrestee while held in custody (or housed in a hospital to which the inmate has been committed for care and retain in the custody of OPSO; or whose injury occurred while in custody and was subsequently released from custody);*
- *An inmate's/arrestee's suicide, suicide attempt, aborted suicide attempt, suicidal intent, and/or deliberate suicide self-harm gesture as defined by the American Psychiatric Association;*
- *An inmate's allegation of sexual abuse, sexual assault, sexual harassment, or voyeurism whether the incident is between or among inmates, or between or among inmates and a staff/contractor or volunteer;*
- *An inmate's report, or a report by a staff/contractor or volunteer, of any inmate/inmate allegation of assault; or other inmate allegation of felonies occurring to them while in custody;*
- *An Inmate's report of a report by a staff/contractor or volunteer, of any allegation of excessive force by an employee, volunteer or contractor;*
- *Suspension or arrest of any OPSO employee, volunteer, or contractor for alleged criminal activities while on-duty and/or in a facility under the control of OPSO; and*
- *Any recovery of significant contraband, specifically weapons.*

Finding:

Partial Compliance

Observations:

OPSO has not sufficiently complied with the requirements of this provision. At best, the Monitor learns of some of the items through incident reports, review of investigations and newspaper reports. OPSO should put in place a system to comply with this provision.

*5. b. Commending March 1, 2015, OPSO will make available to Monitors, at the Monitors' request, the quarterly reviews conducted by ISB and the command staff regarding the operation of the EIS system, including supporting documentation reviewed, as delineated by Section IV. A. 4. b., c., d., and of the Consent Judgment.*

Finding:

Partial Compliance

Observations:

The documentation provided is not sufficient. The EIS alerts have not been reviewed.



Appendix A: Summary of Compliance Findings by Compliance Section Reports 1 - 15

| | Report # 1 2/13/14 | Report # 2 8/26/14 | Report # 3 2/25/15 | Report # 4 9/9/15 | Report # 5 3/17/16 | Report # 6 10/25/16 | Report # 7 5/1/17 | Report # 8 1/12/18 | Report # 9 8/25/18 | Report # 10 3/18/19 | Report # 11 9/19/19 | Report # 12 3/6/20 | Report #13 11/16/20 | Report # 14 5/17/21 | Report # 15 11/15/21 | Report # 16 06/26/22 | Report # 17 12/08/22 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **IV.A. 1. Use of Force Policies and Procedures/Margo Frasier** | | | | | | | | | | | | | | | | | |
| IV. A. 1.a. | ND | NC | NC | PC | NC | PC | PC | PC | PC | SC | SC | SC | SC | PC | PC | PC | PC |
| IV. A. 1.b. | ND | NC | NC | PC | NC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | PC | PC |
| IV. A. 1.c. | ND | NC | NC | PC | NC | NC | PC | PC | SC | SC | SC | PC | PC | PC | PC | NC | NC |
| **IV.A.2. Use of Force Training/Margo Frasier and Shane Poole** | | | | | | | | | | | | | | | | | |
| IV. A. 2. a. | ND | NC | NC | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC | PC | PC | SC | SC |
| IV. A. 2. b. | ND | NC | NC | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC | PC | PC | SC | SC |
| IV. A. 2. c. | ND | NC | NC | NC | NC | NC | NC | NC | PC | PC | SC | SC | SC | PC | PC | SC | SC |
| **IV.A.3. Use of Force Reporting/Margo Frasier** | | | | | | | | | | | | | | | | | |
| IV. A.3 a. | ND | NC | NC | PC | NC | PC | PC | PC | PC | PC | SC | PC | PC | SC | SC | SC | PC |
| IV. A.3 b. | ND | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC | PC | SC | PC |
| IV. A.3 c. | ND | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC | PC | SC | PC |
| IV. A.3 d. | ND | NC | NC | PC | NC | NC | PC | PC | PC | PC | SC | SC | SC | SC | PC | SC | PC |
| IV. A.3 e. | ND | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | PC | PC |
| IV. A.3 f. | ND | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV. A.3 g. | ND | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | PC |
| IV. A.3 h. | ND | NC | NC | NC | NC | NC | NC | NC | PC | SC | SC | PC | PC | PC | PC | PC | PC |
| **IV.A.4. Early Intervention System ("EIS") /Margo Frasier and Shane Poole** | | | | | | | | | | | | | | | | | |
| IV.A.4.a. | ND | NC | NC | PC | PC | PC | NC | NC | PC | PC | SC | SC | SC | PC | PC | PC | PC |
| IV.A.4.b. | ND | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | PC | SC | PC | PC |
| IV.A.4.c. | ND | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | PC | SC | PC | PC |
| IV.A.4.d. | ND | NC | NC | PC | NC | PC | PC | NC | NC | PC | SC | SC | SC | SC | SC | SC | PC |
| IV.A.4.e. | ND | NC | ND | ND | NC | NC | NC | NC | PC | SC | SC | SC | SC | SC | SC | PC | PC |
| **IV.A.5. Safety and Supervision/Margo Frasier** | | | | | | | | | | | | | | | | | |
| IV.A.5.a. | ND | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.A.5.b. | ND | NC | NC | NC | NC | NC | NC | NC | NC | PC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.5.c. | ND | NC | NC | NC | NC | NC | PC | PC | PC | PC | SC | SC | SC | PC | SC | PC | PC |
| IV.A.5.d. | NC | NC | PC | PC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | NC |
| IV.A.5.e. | ND | NC | NC | PC | PC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.A.5.f. | ND | NC | NC | PC | PC | SC | SC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.5.g. | ND | NC | ND | PC | NC | NC | PC | NC | NC | PC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.5.h. | ND | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | SC | PC | PC | PC | PC | PC |

Appendix A: Summary of Compliance Findings by Compliance Section Reports 1 - 15

| | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IV.A.5.i. | ND | NC | NC | PC | PC | PC | PC | PC | SC | PC | PC | PC | PC | PC | PC | PC |
| IV.A.5.j. | ND | NC | PC | PC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.A.5.k. | ND | NC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | PC | PC | PC | NC |
| IV.A.5.l. | ND | NC | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC | PC | PC | PC | PC |
| **IV.A.6. Security Staffing/Margo Frasier** | | | | | | | | | | | | | | | | |
| IV.A.6.a. | ND | PC | PC | PC | SC | SC | PC | PC | PC | SC | SC | SC | PC | PC | NC | NC |
| IV.A.6.b. | ND | NC | PC | PC | NC | PC | PC | PC | PC | SC | SC | SC | PC | PC | NC | NC |
| **IV.A.7 Incidents and Referrals/Margo Frasier** | | | | | | | | | | | | | | | | |
| IV.A.7.a. | ND | NC | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC |
| IV.A.7.b. | ND | NC | NC | PC | NC | PC | PC | PC | PC | PC | PC | SC | PC | PC | PC | PC |
| IV.A.7.c. | ND | NC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.7.d. | ND | NC | NC | PC | NC | NC | NC | PC | PC | PC | SC | SC | SC | SC | SC | SC |
| IV.A.7.e. | ND | NC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | PC |
| IV.A.7.f. | ND | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC |
| IV.A.7.g. | ND | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.7.h. | ND | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC |
| IV.A.7.i. | ND | NC | NC | PC | NC | NC | NC | NC | NC | PC | SC | SC | SC | SC | SC | SC |
| IV.A.7.j. | ND | NC | NC | NC | NC | NC | NC | NC | NC | SC | SC | SC | SC | SC | SC | SC |
| **IV.A.8. Investigations/Margo Frasier** | | | | | | | | | | | | | | | | |
| IV.A.8.a. | ND | NC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | PC | PC |
| IV.A.8.b. | ND | NC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.8.c. | ND | NC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | PC |
| IV.A.8.d. | ND | NC | NC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.8.e. | ND | NC | NC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.8.f. | ND | NC | NC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| **IV.A.9. Pretrial Placement in Alternative Settings/Margo Frasier** | | | | | | | | | | | | | | | | |
| IV.A.9.a. | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.9.b. | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| **IV.A.10. Custodial Placement within OPP/Patricia Hardyman** | | | | | | | | | | | | | | | | |
| IV.A.10.a. | NC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | PC | PC | PC | NC |
| IV.A.10.b. | NC | NC | NC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.10.c. | NC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | PC |
| IV.A.10.d. | NC | NC | PC | PC | PC | PC | PC | NC | SC | PC | SC | SC | SC | SC | SC | NC |
| IV.A.10.e. | NC | NC | PC | SC | PC | PC | SC | PC | PC | PC | PC | PC | SC | PC | NC | NC |
| IV.A.10.f. | NC | NC | NC | NC | NC | PC | PC | PC | NC | SC | PC | PC | PC | PC | PC | NC |
| IV.A.10.g. | NC | NC | NC | NC | NC | PC | PC | PC | PC | SC | SC | SC | SC | SC | PC | NC |
| IV.A.10.h. | ND | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | PC | SC | PC | SC | NC |

Appendix A: Summary of Compliance Findings by Compliance Section Reports 1 - 15

| | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **IV..A.11. Prisoner Grievance Process/Margo Frasier and Shane Poole** | | | | | | | | | | | | | | | | | |
| IV.A.11.a | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | | | | | | | |
| IV.A.11.a.(1) | | | | | | | | | | | SC | SC | SC | SC | SC | SC | PC |
| IV.A.11.a.(2) | | | | | | | | | | | PC | PC | PC | PC | PC | PC | NC |
| IV.A.11.a.(3) | | | | | | | | | | | SC | SC | SC | SC | SC | SC | SC |
| IV.A.11.a.(4) | | | | | | | | | | | SC | SC | SC | SC | SC | SC | SC |
| IV.A.11.a.(5) | | | | | | | | | | | SC | SC | SC | SC | SC | SC | SC |
| IV.A.11.a.(6) | | | | | | | | | | | PC | PC | SC | SC | SC | SC | SC |
| **IV.A.12. Sexual Abuse/Margo Frasier** | | | | | | | | | | | | | | | | | |
| IV.A.12. | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | PC | PC | PC | PC |
| **IV.A.13. Access to Information/Margo Frasier** | | | | | | | | | | | | | | | | | |
| IV.A.13. | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | PC |
| **IV. B. Mental Health Care** | | | | | | | | | | | | | | | | | |
| **IV.B.1. Screening and Assessment/Nicole Johnson** | | | | | | | | | | | | | | | | | |
| IV.B.1.a. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | PC | PC | SC | SC | SC |
| IV.B.1.b. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | PC | SC | SC | SC | SC |
| IV.B.1.c. | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | PC | SC | SC | SC |
| IV.B.1.d. | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | PC | SC | SC | SC | SC |
| IV.B.1.e. | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | PC | PC | PC | PC | PC |
| IV.B.1.f. | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.1.g. | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC |
| IV.B.1.h. | NC | NC | NC | NC | NC | NC | NC | NC | PC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.B.1.i. | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.1.j. | NC | NC | NC | PC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.1.k. | NC | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.1.l. | NC | NC | NC | NC | NC | NC | NC | NC | NC | SC | SC | SC | PC | PC | PC | PC | SC |
| **B. 2. Treatment/Nicole Johnson** | | | | | | | | | | | | | | | | | |
| IV.B.2.a. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.2.b. | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.2.c. | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.2.d. | NC | NC | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC |
| IV.B.2.e. | NC | NC | NC | PC | PC | PC | PC | NC | NC | PC | SC | SC | SC | SC | SC | SC | SC |
| IV.B.2.f. | NC | NC | NC | PC | PC | PC | NC | PC | PC | PC | SC | PC | PC | PC | PC | PC | PC |
| IV.B.2.g. | NC | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.B.2.h. | NC | NC | NC | PC | PC | PC | PC | PC | NC | PC | SC | SC | PC | PC | PC | PC | PC |
| **IV.B.3. Counseling/Nicole Johnson** | | | | | | | | | | | | | | | | | |
| IV.B.3.a. | NC | NC | NC | NC | PC | NC | NC | PC | PC | PC | PC | PC | NC | PC | PC | PC | PC |

Appendix A: Summary of Compliance Findings by Compliance Section Reports 1 - 15

| | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IV.B.3.b. | NC | NC | NC | NC | PC | NC | NC | PC | PC | PC | PC | PC | PC | NC | PC | PC | SC |
| **IV.B.4. Suicide Prevention Training Program/Nicole Johnson** | | | | | | | | | | | | | | | | | |
| IV.B.4.a. | NC | NC | NC | PC | PC | PC | PC | PC | NC | PC | PC | PC | NC | NC | PC | PC | PC |
| IV.B.4.b. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | PC | PC | SC |
| IV.B.4.c. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | PC | SC | SC |
| IV.B.4.d. | NC | NC | NC | PC | NC | NC | PC | NC | NC | PC | PC | PC | NC | NC | PC | PC | PC |
| IV.B.4.e. | NC | NC | NC | PC | NA | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC |
| IV.B.4.f. | NC | NC | NC | NC | PC | PC | NC | NC | NC | SC | SC | SC | SC | SC | PC | PC | SC |
| IV.B.4.g. | NC | NC | NC | SC | PC | NC | NC | NC | NC | PC | NC | PC | SC | SC | SC | SC | SC |
| **IV.B.5. Suicide Precautions/Nicole Johnson** | | | | | | | | | | | | | | | | | |
| IV.B.5.a. | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.5.b. | NC | NC | NC | NC | NC | NC | NC | PC | SC | PC | PC | NC | PC | PC | PC | PC | PC |
| IV.B.5.c. | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.5.d. | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | SC | SC | SC | SC | SC | SC | SC |
| IV.B.5.e. | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | NC | NC | PC | PC | PC |
| IV.B.5.f. | NC | NC | NC | NC | NC | NC | NC | NC | PC | SC | SC | PC | PC | PC | PC | PC | PC |
| IV.B.5.g. | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.5.h. | NC | NC | NC | NC | NC | NC | NC | PC | NC | PC | SC | SC | PC | PC | PC | PC | PC |
| IV.B.5.i. | NC | NC | NC | NC | NC | NC | NC | PC | PC | SC | SC | SC | SC | SC | PC | PC | PC |
| IV.B.5.j. | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | SC | SC | SC | SC | SC | SC | SC |
| IV.B.5.k. | NC | NC | NC | NC | NC | NC | NC | PC | NC | PC | PC | PC | PC | PC | PC | PC | PC |
| **IV.B.6. Use of Restraints/Nicole Johnson** | | | | | | | | | | | | | | | | | |
| IV.B.6.a. | PC | NC | PC | PC | PC | PC | PC | PC | NC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.6.b. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.B.6.c. | ND | NC | PC | PC | PC | PC | PC | NC | PC | NC | SC | SC | SC | SC | SC | SC | SC |
| IV.B.6.d. | ND | NC | PC | PC | PC | PC | PC | NC | PC | SC | SC | SC | PC | PC | SC | SC | SC |
| IV.B.6.e. | NC | NC | PC | PC | PC | PC | PC | PC | NC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.B.6.f. | NC | NC | PC | PC | PC | PC | PC | PC | NC | PC | SC | SC | SC | SC | SC | SC | SC |
| IV.B.6.g. | NC | NC | PC | PC | PC | PC | PC | PC | NC | PC | SC | SC | SC | SC | SC | SC | SC |
| **IV.B.7. Detoxification and Training/Nicole Johnson/Susi Vassallo** | | | | | | | | | | | | | | | | | |
| IV.B.7.a. | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | PC | PC | PC | PC | PC |
| IV.B.7.b. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.B.7.c. | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | NC |
| IV.B.7.d. | NC | NC | PC | PC | PC | PC | PC | PC | PC | NC | PC | PC | PC | SC | SC | SC | NC |
| **IV.B.8. Medical and Mental Health Staffing/Nicole Johnson/Susi Vassallo** | | | | | | | | | | | | | | | | | |
| IV.B.8.a. | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | PC | PC | PC | PC | PC |
| IV.B.8.b. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC |

Appendix A: Summary of Compliance Findings by Compliance Section Reports 1 - 15

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **IV.B.9. Risk Management/Nicole Johnson/Susi Vassallo** | | | | | | | | | | | | | | | | | |
| IV.B.9.a. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.9.b. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.9.c. | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.9.d. | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.9.e. | NC | NC | NC | NC | PC | PC | PC | PC | NC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.9.f. | NC | NC | NC | NC | PC | PC | PC | PC | NC | NC | PC | PC | PC | PC | PC | PC | PC |
| **IV.C. Medical Care** **See SA 2/11/15 13.** | | | | | | | | | | | | | | | | | |
| **IV. C. Quality Management of Medication Administration/Susi Vassallo** | | | | | | | | | | | | | | | | | |
| IV.C.1.a. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.C.1.b. | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | SC | PC | SC |
| IV.C.1.c. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | PC | SC | SC | SC |
| IV.C.1.d. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | PC | PC | PC | PC |
| **IV.C.2. Health Care Delivered/Susi Vassallo** | | | | | | | | | | | | | | | | | |
| IV.C.2.a. | NC | NC | NC | PC | PC | PC | PC | PC | NC | PC | PC | SC | SC | SC | PC | PC | PC |
| IV.C.2.b. | NC | NC | NC | PC | PC | PC | PC | PC | NC | PC | PC | PC | PC | PC | PC | PC | PC |
| **IV.C.3. Release and Transfer/Susi Vassallo** | | | | | | | | | | | | | | | | | |
| IV.C.3.a. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC |
| IV.C.3.b. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC |
| IV.C.3.c. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC |
| IV.C.3.d. | NC | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC |
| **IV.D. Sanitation and Environmental Conditions/Shane Poole** | | | | | | | | | | | | | | | | | |
| IV. D. 1.a. | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | NC |
| IV. D. 1.b. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV. D. 1.c. | NC | NC | PC | PC | NC | NC | PC | SC | PC | PC | SC | SC | SC | SC | PC | SC | NC |
| IV. D. 1.d. | NC | NC | NC | NC | SC | SC | SC | SC | SC | SC | SC | SC | PC | PC | PC | NC | NC |
| IV. D. 1.e. | NC | PC | NC | PC | PC | PC | SC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV. D. 1.f. | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC | PC | PC | PC | PC | PC |
| IV. D. 1.g. | NC | NC | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV. D. 1.h. | NC | NC | NC | PC | PC | PC | NC | NC | NC | PC | PC | PC | SC | SC | SC | SC | SC |
| **IV. D. 2. Environmental Control/Shane Poole** | | | | | | | | | | | | | | | | | |
| IV. D. 2.a. | NC | NC | PC | PC | SC | SC | SC | SC | PC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV. D. 2.b. | NC | NC | NC | NC | NC | SC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | PC |
| **IV. D. 3. Food Service/Diane Skipworth** | | | | | | | | | | | | | | | | | |
| IV. D. 3.a. | NC | NC | NC | PC | PC | PC | NC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV. D. 3.b. | NC | NC | NC | PC | PC | PC | NC | NC | NC | NC | PC | SC | SC | SC | SC | SC | SC |

Appendix A: Summary of Compliance Findings by Compliance Section Reports 1 - 15

| | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IV. D. 3.c. | NC | NC | NC | PC | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC |
| IV. D. 4. Sanitation and Environmental Conditions Reporting/Shane Poole | | | | | | | | | | | | | | | | | |
| IV. D. 4.a. 1-7 | NC | NC | PC | PC | PC | PC | PC | PC | NC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV. D. 4.b. | NC | NC | NC | NC | PC | NC | NC | PC | PC | SC | SC | SC | SC | SC | SC | SC | PC |
| IV.E. Fire and Life Safety/Shane Poole | | | | | | | | | | | | | | | | | |
| IV. E. 1. Fire and Life Safety | | | | | | | | | | | | | | | | | |
| IV. E. 1.a. | NC | PC | PC | PC | PC | PC | SC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC |
| IV. E. 1.b. | NC | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV. E. 1.c. | PC | PC | PC | PC | NC | PC | PC | SC | PC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV. E. 1.d. | NC | NC | NC | NC | NC | NC | PC | SC | PC | SC | SC | SC | SC | NC | PC | SC | SC |
| IV. E. 1.e. | ND | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV. E. 2. Fire and Life Safety Reporting | | | | | | | | | | | | | | | | | |
| IV. E. 2.a.1-3 | ND | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | PC | PC |
| IV. E. 2.b. | ND | NC | NC | PC | NC | NC | NC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.F. Language Assistance | | | | | | | | | | | | | | | | | |
| IV.F.1. Timely and Meaningful Access to Services/Margo Frasier | | | | | | | | | | | | | | | | | |
| IV.F.1.a. | ND | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC |
| IV.F.2. Language Assistance Policies and Procedures/Margo Frasier | | | | | | | | | | | | | | | | | |
| IV.F.2.a. | ND | PC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC |
| IV.F.2.b. | ND | PC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC |
| IV.F.3. Language Assistance Training/Margo Frasier | | | | | | | | | | | | | | | | | |
| IV.F.3.a. | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.F.4. Bilingual Staff/Margo Frasier | | | | | | | | | | | | | | | | | |
| IV.F.4. | NC | PC | PC | PC | PC | NC | NC | NC | NC | PC | SC | SC | SC | SC | SC | SC | SC |
| IV.G. Youthful Prisoners/Margo Frasier | | | | | | | | | | | | | | | | | |
| IV.G. | NC | NC | NC | PC | PC | PC | NC | NC | PC | PC | PC | SC | SC | SC | SC | SC | SC |
| VI. The New Jail Facility/Margo Frasier | | | | | | | | | | | | | | | | | |
| VI. A. | ND | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| VI. B. | NC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| VI. C. | ND | PC | SC | SC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | PC | PC |
| VI. D. | Monitors Not Qualified to Evaluate | | | | | | | | | | | | | | | | |
| VII. Compliance and Quality Improvement/Margo Frasier | | | | | | | | | | | | | | | | | |
| VII. A. | ND | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | PC | SC |

Appendix A: Summary of Compliance Findings by Compliance Section Reports 1 - 15

| | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| VI. B. (H.) | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| VI. C. (I.) | NC | NC | SC | SC | NC | SC | SC | NC | PC | SC | SC | SC | SC | SC | PC | PC | PC |
| VI. D. (J.) | ND | NC | NC | PC | PC | PC | PC | NC | NC | NC | SC | SC | SC | SC | PC | PC | PC |
| VIII. Reporting Requirements and Right of Access/Margo Frasier | | | | | | | | | | | | | | | | | |
| VIII.A. | ND | PC | NC | PC | PC | PC | PC | NC | NC | PC | SC | SC | SC | SC | SC | SC | SC |
| VIII.B. | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| VIII.C. | PC | PC | PC | SC | SC | SC | NC | NC | PC | PC | SC | SC | SC | SC | PC | PC | PC |

**Legend:**
**ND - Not scheduled for review NC - Non-compliance**
**PC - Partial Compliance**
**SC - Substantial Compliance NA - Not Applicable**