UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| _____ ) | |
| LASHAWN JONES, ET AL, ) | |
| Plaintiffs; and ) | |
| UNITED STATES OF AMERICA ) | |
| Plaintiffs in Intervention ) | |
| ) | |
| v. ) | Civil Action No. 2:12-cv-00859 |
| ) | Section I, Division 5 |
| SUSAN HUTSON, ET AL, ) | Judge Lance M. Africk |
| Defendants ) | Magistrate Judge Michael B. North |
| _____ ) | |
| ) | |
| SUSAN HUTSON, ) | |
| Third-Party Plaintiff ) | |
| ) | |
| v. ) | |
| ) | |
| THE CITY OF NEW ORLEANS, ) | |
| Third-Party Defendant ) | |
| _____ ) | |

## PLAINTIFF CLASS' OPPOSITION TO OPSO'S MOTION TO TERMINATE ALL ORDERS REGARDING THE CONSTRUCTION OF THE PHASE III JAIL

The Plaintiff Class opposes the Orleans Parish Sheriff's effort to re-animate the exhaustively litigated and fully settled matter of the construction of the Phase III facility.

OPSO's request will be very familiar to this Court, as it is just the latest iteration of yet another ask to do nothing, indefinitely, to provide constitutional medical and mental health care to the people detained in the Orleans jail. While the following words were authored by this Court in recommendation of denial of the City of New Orleans 2020 motion for relief, they remain – unfortunately – applicable over two years later:

> For far too many years, the real needs of the people in jail in New Orleans have been ignored by the City and the Sheriff, largely as a consequence of a scorched-earth, politically driven fight between these two parties and their lawyers about

money, politics, power, and control. We – the parties, their lawyers and the Court – have worked very hard to transcend those battles and, at long last, we believed for good reason we had succeeded. Then along came a group of under-informed newcomers . . . who now want to rewrite a history they weren't a part of and ask us to jettison a well-developed, agreed-to plan in favor of embarking on a course to nowhere.[1]

This Court declined the City's invitation in 2020. The Plaintiff Class urges this Court to reject OPSO's invitation as well.

The OPSO filing appears to present several (often contradictory) categories of argument,[2] including that:

1. the construction of the Phase III facility arises from private settlement agreement(s), as defined by the Prison Litigation Reform Act (PLRA);[3]

2. Sheriff Hutson is not bound by any such private settlement agreements;[4]

3. all orders related to the construction of the Phase III facility violate the PLRA;[5] and

4. the PLRA somehow requires modification of consent decrees when the successor official disagrees with its terms.[6]

---

[1] ECF No. 1385 at 3-4.

[2] The filing's numerous inconsistencies leave open questions of precisely what authority OPSO relies on to bring its request for relief as well as what precise relief is even being requested.

[3] ECF No. 1617-2 at 8-14.

[4] ECF No. 1617-2 at 14-17.

[5] ECF No. 1617-2 at 1. In this opposition, the Plaintiff Class only engages the merits of OPSO's argument that all orders related to the construction of the Phase III facility are private settlement agreements (as that term of art is defined by the PLRA), rendering this Court powerless to enforce them. While OPSO's filing flirts with the issue of whether a court can order construction of a detention facility under the PLRA, this argument is jettisoned as inconsistent with OPSO's argument as to private settlement agreements. This opposition does not address the merits of this abandoned topic, particularly as it is precluded by prior litigation in this case, as discussed infra at 3-5.

[6] ECF No. 1617-2 at 16. The Plaintiff Class is unsure if OPSO is actually seeking modification as there is no citation anywhere in its pleading to Federal Rule of Civil Procedure 60, and it does not address any of the statutory or jurisprudential factors governing modification. However, the pleading does cite Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367 (1992), a pre-PLRA case in which modification of a jail consent decree was sought pursuant to Rule 60. ECF No. 1617-2 at 3, 16. Here, OPSO appears to suggest modification of something (what exactly remains unclear), solely on the basis of Sheriff Hutson's personal disagreement with previous actions taken in this litigation. OPSO's citation to Frew ex rel. Frew v. Hawkins, 540 U.S. 431 (2004), similarly provides no support for modification. ECF No. 1617-2 at 2-3, 16 n.5. In that matter, officials sought modification of a state Medicaid consent decree on

As much of OPSO's motion is substantially similar to many of the arguments the City put forth in its failed 2020 motion for relief,[7] the Plaintiff Class adopts and incorporates its prior filings on the City's motion,[8] as well as the testimony elicited and evidence entered at the associated hearing,[9] and further responds below.

## I. OPSO is precluded from seeking re-adjudication of issues related to the PLRA, the reviewability of the 2019 Orders, or the modification of relief that have already been decided by this Court and the Fifth Circuit.

OPSO's assertions related to the PLRA and relief modification are repetitions of the slew of shifting arguments the City put forth in extensive briefing related to its failed 2020 Motion for Relief from Court Orders of January 25, 2019 and March 18, 2019 Regarding Phase III Jail Facility.[10] To the extent the Court wishes to engage the merits of OPSO's arguments, the Plaintiff Class adopts and incorporates its prior filings related to the PLRA and the proper standards and procedure for Rule 60 modification.[11]

But the Court need not reach the merits of OPSO's motion on these points as OPSO is

---

Eleventh Amendment grounds.

[7] ECF No. 1281.

[8] ECF No. 1304 (The United States' and Plaintiff Class' Response to City's Motion for Relief from Court Orders of January 25, 2019 and March 18, 2019 Regarding Phase III Jail Facility); ECF No. 1327 (Plaintiff Class' Sur-Reply Regarding City's Motion for Relief from Court's Orders); ECF No. 1362 (Plaintiff Class' Post-Hearing Memorandum); ECF No. 1393 (Plaintiff Class' Response to City's Objections to Report and Recommendation); ECF No. 1426 (Plaintiff Class' Response to City's Motion for Stay); ECF No. 1439 (Plaintiff Class' Sur-Reply in Response to City's Reply in Support of Motion for Stay); ECF No. 1457 (Plaintiff Class' Response to City's Objection to Report and Recommendation to Deny City's Motion for Stay). See also Brief of Plaintiffs-Appellees, No. 21-30072, Anderson v. City of New Orleans (5th Cir.), July 23, 2021.

[9] See also ECF No. 1306 (The United States' and Plaintiffs' Unopposed Motion to Admit Certain Exhibits Under Seal); ECF No. 1330 (Joint Witness List); ECF No. 1334 (Plaintiffs' Notice of Additional Exhibits); ECF No. 1335 (Plaintiffs' Unopposed Motion to Admit Exhibits Under Seal); ECF No. 1349 (Plaintiffs' Order of Witnesses).

[10] ECF No. 1281 (City's Motion for Relief from Court Orders of January 25, 2019 and March 18, 2019 Regarding Phase III Jail Facility); ECF No. 1312 (City's Reply Memo in Support of Motion for Relief); ECF No. 1363 (Post-Hearing Brief of City of New Orleans); ECF No. 1389 (City of New Orleans' Objections to Report and Recommendation); ECF No. 1410 (City's Motion to Stay); ECF No. 1431 (City's Reply in Support of Motion to Stay); ECF No. 1451 (City's Objection to Report and Recommendation).

[11] See, supra, n.8.

precluded from raising these previously litigated and decided issues under both law of the case doctrine and direct estoppel. The Fifth Circuit has long recognized the doctrine of law of the case, which "generally prevents reexamination of issues of law or fact decided on appeal 'either by the district court on remand or by the appellate court itself on a subsequent appeal.'"[12] Additionally, "[i]t is well established that an appellate court decision establishes "the law of the case" which must be followed in all subsequent proceedings in the same case in the trial court or on a later appeal in the appellate court . . . ."[13]

Here, the Fifth Circuit's ruling affirming the District Court's denial of the City's motion, particularly that the January 2019 and March 2019 orders are not subject to review and that the PLRA does not present a changed circumstance, represents the law of the case and precludes litigants from re-opening or revisiting these issues.[14]

OPSO is similarly precluded from raising these challenges under the PLRA and to the 2019 enforcement orders under the direct estoppel doctrine which prevents re-litigation of issues of fact or law in a successive action between parties on the same claim.[15] This doctrine applies in post-judgment proceedings.[16] Thus direct estoppel applies where an issue of fact or law has been

---

[12] Bigford v. Taylor, 896 F.2d 972, 974 (5th Cir.1990) (quoting Todd Shipyards Corp. v. Auto Transp., S.A., 763 F.2d 745, 750 (5th Cir.1985)). See also Morrow v. Dillard, 580 F.2d 1284, 1290 (5th Cir.1978); Bigford v. Taylor, 896 F.2d at 974. Additionally, this Court has ruled on precisely the PLRA argument OPSO sets out at ECF No. 1617-2 at 11-12. The Plaintiff Class points to and incorporates its prior briefing responding to the City's similar arguments. See, supra, n.8.

[13] Williams v. Riley, 392 Fed.Appx. 237, 240 (5th Cir. 2010). See also Morrow v. Dillard, 580 F.2d 1284, 1290 (5th Cir. 1978); Bigford v. Taylor, 896 F.2d at 974.

[14] Anderson v. City of New Orleans, 38 F.4th 472 (5th Cir. June 30, 2022), rehearing denied.

[15] Rest 2d Judg § 27. Collateral estoppel, by contrast, precludes relitigating the same issue of fact or law in a new claim.

[16] 18 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 4447 (3d ed.) ("Application of issue preclusion to questions actually litigated and decided in post-judgment proceedings is as appropriate as in any other setting."); id. § 4418 ("Perhaps more importantly, issue preclusion may well be appropriate when a party fails to appeal a traditional final judgment and then becomes embroiled in post-judgment proceedings . . . . It may be even more important to establish issue preclusion in cases that require continuing supervision of an injunction, perhaps for years after the final judgment. Institutional reform litigation frequently involves such protracted proceedings.").

actually litigated and decided previously by the court. In this sense, direct estoppel and law-of-the-case doctrine perform similar functions in ensuring consistency and avoiding duplicative judgments. As detailed further below, this Court has repeatedly and carefully considered the PLRA arguments raised yet again by OPSO, as well as challenges to the 2019 Orders implicitly raised by OPSO. This Court has found them wanting. OPSO is precluded from raising these arguments again.

## II. The procedural history of this case demonstrates that none of the orders related to the Phase III facility are private settlement agreements.

OPSO's attempt to recast judicially entered and enforceable orders associated with the Phase III facility as private settlement agreements to which Sheriff Hutson is not bound is a grotesque pastiche of the City's failed motion and is similarly unhinged from the history of this case. Under the jurisprudential and statutory architecture OPSO sets out in its motion, Federal civil actions challenging unconstitutional conditions of confinement may be resolved by "two mutually exclusive types" of settlement – consent decrees or private settlement agreement – with the critical distinction being "whether the Federal court asserts authority to enforce the agreement."[17] And while OPSO acknowledges that this Federal civil action was resolved by entry of a consent decree in 2013,[18] it then ignores this reality and argues that there is a private settlement agreement (or multiple) in play in this litigation, which OPSO may now be seeking to terminate, modify, or challenge with its motion. While OPSO's murky pleading frustrates this response, the procedural history set out below demonstrates that every single order in this case relating to the Phase III

---

[17] ECF No. 1617-2 at 9, 12-13 (citing <u>Row v. Jones</u>, 483 F. 3d 791, 796-97 (11th Cir. 2007)).

[18] ECF No, 1617-2 at 3. <u>See also</u> ECF No. 466 at 43, Consent Judgment entered on June 6, 2013, providing for the Court's retention of "jurisdiction over the implementation of this Agreement," as well as the ability of the Plaintiff Class and the Department of Justice to "initiate contempt or enforcement proceedings against Defendant for an alleged failure to fulfill an obligation under Section IV through X of this Agreement in Court."

facility is enforceable by the Court or is itself an enforcement order, and thus cannot be considered a private settlement agreement under the PLRA.

## A. **The Consent Judgment is judicially enforceable and not a private settlement agreement.**

The Plaintiff Class filed this action against Orleans Parish Sheriff Marlin Gusman in his official capacity in April 2012, challenging the unconstitutional conditions of confinement that each person in the jail suffers.[19] In September 2012, the Court granted the United States' Motion to Intervene.[20] Sheriff Gusman brought the City into the action as a Third-Party Defendant, alleging that the City had failed to honor its obligations to provide adequate funding for a constitutional jail.[21] The Sheriff and the Plaintiffs filed a Consent Judgment as a proposed settlement to the action in December 2012.[22] After a four-day fairness hearing, the Court entered the judicially enforceable Consent Judgment in June 2013.[23]

In May 2013, after the fairness hearing but prior to final entry of the Consent Judgment, Plaintiffs filed a motion raising concerns about the proposed designs for construction of the Orleans Justice Center (OJC).[24] Specifically, the design plans did not comply with the City Council's January 2011 ordinance requiring the building to be equipped to house any type of prisoner, including people in need of mental health and/or substance abuse treatment, as well as to provide adequate and appropriate space for a variety of programming.[25] Plaintiffs noted that, because OJC would include only 60-bed units, it would not be possible to house people with mental

---

[19] ECF No. 1.
[20] ECF No. 69.
[21] ECF No. 76.
[22] ECF No. 101-3.
[23] ECF No. 465.
[24] ECF No. 439.
[25] Id.

illness safely in accordance with accepted classification principles; that there was no space to provide mental health or medical services; and that there was not adequate space for suicide watch.[26] The Plaintiffs asked: "what happens to the special populations when the new jail becomes operational and the Sheriff is forced by ordinance to close all other buildings? How is this facility going to come into compliance with the proposed Consent Judgment if it does not even have a facility in which it can house its current populations?"[27]

In light of these concerns, the Court ordered briefing and hearings to assess various plans relative to the Consent Judgment's medical and mental health requirements.[28] In June 2014, the Court directed the Sheriff and the City to appoint members to a Mental Health Working Group to propose solutions to compliance-related issues with the Consent Judgment's mental health provisions and to assess submissions by OPSO and the City regarding the provision of long-term mental health services for OPSO prisoners.[29] The Mental Health Working Group included representatives appointed by OPSO and the City with expertise in corrections, mental health, and the associated legal issues, as well as the Medical Monitor, Dr. Robert Greifinger, and Dr. John Thompson, Chairman of the Tulane Department of Psychiatry. Mental Health Monitor Dr. Raymond Patterson chaired the Working Group.[30]

In August 2014, the Court issued an order and findings related to planning and funding

---

[26] Id. at 4-6.
[27] Id. at 9.
[28] ECF No. 597; ECF No. 641. See also ECF No. 1385 at 6-9, Report and Recommendation to Deny City's Motion for Relief, discussing "early efforts to address special populations," including the City's declaration in 2013 that "the best path forward is to finish the building and build an appropriate mental-health facility that's scaled to the needs that we have," and discussing the August 2013 memorandum filed on behalf of all parties foregoing a retrofit of OJC and agreeing to a future "Phase 3 facility" "to house special populations."
[29] ECF No. 668; ECF No. 750 at 1.
[30] ECF No. 712.

obligations of what had become known as the "short-term solution" for housing of men and women with acute and sub-acute mental health care needs.[31] Under the plan, men with acute mental illness would be held at and receive treatment at a unit of Elayn Hunt Correctional Center (Hunt), pursuant to a contract with the Louisiana Department of Public Safety and Corrections. Women with acute and sub-acute mental health needs would receive treatment at the Temporary Detention Center (TDC), after modifications to that unit's physical space.[32]

In September 2014, after review and consideration of proposals for how to provide housing and mental health care in the long term, the Mental Health Working Group unanimously recommended the adoption of the Sheriff's plan which included construction of a Phase III facility with a base bed capacity of 380 total beds and space for medical and mental health care services.[33] Voting in favor of the Phase III proposal, the City's representative to the Mental Health Working Group noted that it was "clinically and humanely inappropriate not to act."[34] Years later, in May 2017, at a City Council vote on the Phase III facility, then City Council member (now Orleans Parish District Attorney) Jason Williams said: "I believe this facility is not just our moral obligation, it is our commitment to a consent decree that we're under and we are duty bound to make sure the people that are in custody now have fair, adequate and humane treatment."[35]

Despite the Working Group's recommendation, there was functionally no movement towards implementing a long-term solution over the next year and a half. The Court continued to

---

[31] ECF No. 738 at 30.
[32] ECF No. 738.
[33] ECF No. 750 at 4; ECF No. 723-1.
[34] ECF No. 750 at 4.
[35] ECF No. 1385 at 16 n.9, taking judicial notice of the May 18, 2017 City Council meeting; Transcript at 17:1-10, June 28, 2023, status conference on Sheriff's remark.

encourage the City and the Sheriff to reach resolution.[36]

In September 2015, the new OJC facility was completed and occupied, yet serious deficiencies continued to cause harm to prisoners with mental illness and those who were suicidal. The Fifth Monitors' Report documented the impact of the opening of OJC on people with mental illness:

> This significant change in the housing of inmates, that is – opening the new jail, transfer of inmates out-of-parish and closing the TDC – resonates in primarily negative ways, and may continue to do so into the foreseeable future. While the opening of the OJC should have been a positive impetus to reform, this milestone was overshadowed and diminished for the following reasons: . . . absences of appropriate in-custody treatment for inmates with acute mental illness, the lack of services and programs for acute and sub-acute care, and absence of step-down/residential mental health housing.[37]

In 2016, men and women with mental health care needs were moved from TDC to the massive 60-bed OJC units consisting of cells that are identical to every other unit in OJC.[38] The Fifth Monitors' Report specifically noted the "designation of Unit 2A as a 'mental health' unit is absolutely unacceptable as the unit does not have the space, configuration or milieu that is necessary and required for an acute/sub-acute or step-down/residential mental health unit."[39] Further, "the current realignment in the OJC does not allow for any psychotherapeutic out-of-cell activities for men or women other than the day room and four off-unit multipurpose rooms. These spaces are inadequate for provision of necessary mental health services . . . ."[40] Today, an

---

[36] See, e.g., ECF No. 941 (ordering the City and the Sheriff to arrive at agreement as to how to house acutely mentally ill prisoners on or prior to December 11, 2015).
[37] ECF No. 996 at 6.
[38] Id. at 79, 81, and 86. Hunt remained in use as an acute mental health unit for men.
[39] Id. at 82.
[40] Id. at 79.

inadequate "mental health" unit remains in OJC 2A, with the same physical space limitations to necessary mental health services described in the Monitors' reports.

**B.**  **The Stipulated Order is an enforcement order and judicially enforceable.**

In April 2016, Plaintiffs sought to enforce the Consent Judgment by moving for an order to show cause why the Sheriff should not be held in contempt and to place the jail into receivership.[41] Plaintiffs argued that, over two years after entry of the Consent Judgment, "the Sheriff remains dangerously non-compliant with numerous substantive provisions that immediately impact the safety and health of men, women and youth in the Orleans Parish jail system . . . , and is not making adequate progress towards compliance."[42] Plaintiffs detailed OPSO's litany of failures to provide safe housing and treatment to individuals with serious mental illness or who were suicidal.[43] And Plaintiffs highlighted the contribution of the long-standing structural problems with the jail's physical space to these failures. Specifically, Plaintiffs cited to the Monitors' reports regarding the lack of adequate mental health step-down or residential mental health units, the lack of spaces for mental health services, and the lack of suicide-resistant cells.[44]

Plaintiffs' motion to enforce the Consent Judgment was ultimately resolved by a judicially enforceable settlement between the Sheriff, the Plaintiffs, and the City, which was approved and entered by the Court as the Stipulated Order for Appointment of Independent Compliance Director ("Stipulated Order") in June 2016.[45]

Precisely because OJC's structural deficiencies inhibiting the provision of constitutional

---

[41] ECF No. 1009.
[42] Id. at 1. See also ECF No. 1009-1 at 10-11, outlining the powers retained by district court judges to enforce consent decrees entered in their cases.
[43] Id. at 16-18.
[44] Id. at 20.
[45] ECF No. 1082.

mental health care and safe housing remained unresolved, the Stipulated Order provided that, within 60 days of appointment, the City, the Sheriff, and the Compliance Director would develop and finalize a plan for the appropriate housing of prisoners with mental health issues and medical needs.[46] Further, as former City Attorney Rebecca Dietz testified, the parties engaged in specific discussion related to inclusion of language regarding compliance with the PRLA.[47] The Stipulated Order includes three paragraphs outlining the agreement's compliance with the PLRA, based on the ongoing harm to people in the jail resulting, in part, from its physical deficiencies. The Court recognized the agreement's compliance with the PLRA when it entered the Stipulated Order:

> Based on a robust case record including over 80 status conferences and the evidence presented in these proceedings, the Court finds that the additional relief set forth above complies in all respects with the provisions of 18 U.S.C. § 3626(a). The relief is narrowly drawn, extends no further than necessary to correct violations of federal rights affected by the Consent Judgment, is the least intrusive means necessary to correct these violations, and will not have an adverse impact on public safety or the operation of the criminal justice system.[48]

After holding public meetings and reviewing plans proposed by the Sheriff and the City, Compliance Director Gary Maynard filed a Supplemental Compliance Action Plan on January 4, 2017, outlining the long-term plan for appropriate housing of prisoners with mental health and medical needs.[49] In developing the plan, Director Maynard considered the recommendations of the Mental Health Working Group in 2014, the Special Populations Working Group in 2015, and the City-funded 2016 JFA Institute review of jail population trends which predicted a reduction in

---

[46] ECF No. 1082 at 14, ¶ 22.
[47] Transcript at 46:16-47:17, Motion for Relief, October 9, 2020, testimony of former City Attorney Rebecca Dietz regarding discussion and adoption of PLRA compliance language by all parties to the Stipulated Order.
[48] ECF No. 1082 at 16.
[49] ECF No. 1106. The Plan was signed by the Sheriff and the Independent Compliance Director. Id. at 13.

the jail population below 1400 by 2019.[50] Director Maynard also received input from community groups, OPSO employees, the jail's medical and mental health care provider, architects, the City and City Council members, FEMA, and the citizens of New Orleans.[51] Ultimately Director Maynard recommended the building of a Phase III facility, with bed capacity significantly reduced from the Sheriff's proposed 380 beds to 89 beds for men and women with acute and sub-acute mental health care needs.[52] Critically, Director Maynard concluded that "[s]pace for individual and group mental health counseling will also be part of the design of the Phase III facility for both male and female inmates."[53]

Director Maynard also recommended that the construction of Phase III address the medical services needs of the jail to provide an infirmary and clinic, including negative pressure rooms and space to care for 10-16 patients with infirmary level care.[54] And finally, Director Maynard recommended administrative space be provided directly adjacent to the proposed mental health housing units for use by the jail medical and mental health care providers.

C. **The January 2019 and March 2019 Orders enforce compliance with the Stipulated Order and the Supplemental Compliance Plan and are themselves judicially enforceable.**

Over the next two years, the City and the Sheriff failed to implement Director Maynard's recommendation for the Phase III facility. In January 2019, the Louisiana Department of Public Safety and Corrections advised that the Hunt unit would no longer be available as the "short-term"

---

[50] ECF No. 1106 at 3-6. Jim Austin's consulting group, the JFA Institute, is a non-profit organization that works in partnership with local government agencies to evaluate criminal justice practices.
[51] ECF No. 1106 at 3-5, 7.
[52] Id. at 9.
[53] Id.
[54] Id.

housing solution for Orleans Parish male prisoners with acute mental health needs, starting in October 2019.[55]

In light of the impending loss of the Hunt unit, the Court scheduled a status conference on January 25, 2019, to discuss "pressing matters related to the medical and acute and subacute mental health needs" of prisoners in OPSO custody.[56] The Court noted that the situation facing these prisoners was "dire," and further remarked that "[d]espite repeated assurances from the City, little progress has been made" on plans for housing and treating male and female prisoners with significant mental health issues.[57] "During the conference, the Court . . . emphasized the importance of a permanent solution designed to provide constitutionally mandated mental health treatment for all OJC prisoners."[58] The Court ordered the City, in collaboration with the current Independent Jail Compliance Director, Darnley R. Hodge, Sr., to develop a short-term solution for mental health housing, and further ordered the City to "direct the architect chosen to design the permanent facility described in the Supplemental Compliance Action Plan . . . to begin the programming phase of the Phase III facility as soon as possible . . . ."[59] This January 2019 Order is judicial enforcement of a negotiated agreement, entered and plainly enforceable by the Court.[60]

In response, the City advised that it was "actively working" with the Compliance Director, the Sheriff, and the monitors, as well as with the medical services provider and the City's selected architecture firm, "to program, design, and construct a Phase III project that meets the requirements

---

[55] ECF No. 1213-1 at 4-5; ECF No. 1221 at 2.
[56] ECF No. 1221 at 1.
[57] Id. at 2.
[58] Id.
[59] Id. at 3.
[60] As noted, supra, at n.14, the Fifth Circuit has already determined that the District Court's 2019 enforcement orders are not subject to appellate review, thus any attempt to challenge these orders has long been foreclosed by law of the case doctrine.

of the Consent Decree."[61] On March 18, 2019, the Court ordered commencement of the proposed

TDC renovations and continuance of the programming phase of Phase III.[62] The Order also

required the parties to work collaboratively on the Phase III design to create "a facility that

provides for the constitutional treatment of the special populations discussed herein without undue

delay, expense or waste."[63] Like the January 2019 Order, the March 2019 Order is a judicial

enforcement of a settled motion, entered and plainly enforceable by the Court.[64]

Over the next year, planning for Phase III slowly progressed until June 2020, when the City

unilaterally suspended work on Phase III without notice to the Court or the parties, in contravention

of the Court's prior orders.[65] After prompting from the Court, the City filed its motion asking the

Court to "indefinitely suspend[] the programming, design, and construction of a new Phase III

facility," without offering any resolution to the continued lack of adequate housing and space to

provide mental health services in OPSO facilities.[66]

After extensive briefing, a multi-day evidentiary hearing, and briefing on a motion to stay,

this Court thoroughly considered and rejected the City's motion to do nothing indefinitely.[67] The

Fifth Circuit affirmed the ruling of this Court, and denied the City's petition for rehearing without

any judge even asking to poll the court.[68] As the City Council recently wrote, "the Council has

---

[61] ECF No. 1221 at 4.
[62] ECF No. 1227.
[63] Id. at 2-3.
[64] See, supra, n.14 and n.60.
[65] ECF No. 1285 at 1.
[66] ECF No. 1281-1 at 1.
[67] ECF No. 1385; ECF No. 1396; ECF No. 1450; ECF No. 1463. In its reply in support of its motion for relief, the City belatedly raised the PLRA, arguing that the Court was prohibited from ordering the construction of a detention facility. ECF No. 1312. The Plaintiff Class addressed this argument in its sur-reply. ECF No. 1327. In deciding the City's motion, the Report and Recommendation found the City's PLRA argument to have been waived, but also determined it to be without merit. ECF No. 1385 at 27-36. The Court adopted the Report and Recommendation in full.
[68] The City's re-raised its PLRA argument on appeal to the Fifth Circuit. In its ruling affirming the District Court's denial of the City's motion for relief, the Fifth Circuit reviewed the District Court's findings at to the PLRA for abuse

recognized and continues to recognize the supremacy of the United States Constitution over City laws as well as the legally binding final judgments of the magistrate, district and appellate courts regarding Phase III. After its losses in the courts, the City of New Orleans has embraced the Council's sentiments. Any reasonable and responsible actor understands the fight is over."[69]

In the time since its losses, the City has moved forward with planning for construction of the Phase III facility, as reflected in monthly status reports filed with the Court and monthly meetings of an executive group relative to the facility. At least since her inauguration in May 2022 as Sheriff of Orleans Parish, Susan Hutson, her enrolled counsel in this case, and several members of her OPSO staff have been invitees to these monthly executive group discussions of the Phase III facility.[70]

OPSO fails to explain how any of the orders related to the completion of the Phase III facility are not enforceable by this Court or enforcement orders themselves. Intentionally or not, OPSO misconstrues this Court's statements about the negotiated nature of the Consent Judgment, Stipulated Order, and the resulting Supplemental Compliance Plan, and ignores the fact that all of these (not to mention the 2019 Orders) were all orders enforcing the Consent Judgment that are in and of themselves enforceable by this Court. As OPSO's own citations to the jurisprudence establish, the fact that the parties negotiated any of these orders is entirely irrelevant to the question of whether they are judicially enforceable. OPSO has failed to point to a single private settlement

---

of discretion under Rule 60(b)(5) and found the City's claim a failure. <u>Anderson v. City of New Orleans</u>, 38 F.4th 472, 478-79 (5th Cir. June 30, 2022), rehearing denied.

[69] ECF No. 1620 at 1.

[70] Representatives from the Plaintiff Class also attend these monthly meetings. Phase III architects are present at these meetings, along with representatives from Wellpath, representatives from the City, and (for a period of time) Jim Austin and Allen Patrick, the City's consulting architect. For over a year, the current OPSO administration has had repeated and ample opportunity to discuss the Phase III facility with the parties to this litigation and other stakeholders, but has never done so until OPSO's remark to the Court on June 21, 2023. ECF No. 1615.

agreement in play.

### III. OPSO is bound by this litigation's orders as to the Phase III facility.

The Sheriff cannot simply ignore orders binding her Office. Whatever her personal opinion, as the Defendant, sued in official capacity, Sheriff Hutson is bound by orders previously issued by this court and admissions made by her Office in this litigation.  For nearly half a century, the United State's Supreme Court, the Fifth Circuit, and its District Courts have recognized that when defendants are named in their official capacity, the claim is against the entity: "the distinction between official-capacity suits and personal-capacity suits is more than 'a mere pleading device.' . . . State officers sued . . . in their official capacity are not 'persons' for purposes of the suit because they assume the identity of the government that employs them."[71] So while an action may not be styled as against the Orleans Parish Sheriff's Office, an action styled against the Orleans Parish Sheriff is functionally against the entity.[72] Thus, in actions against defendants in their official capacity, individual office holders may come and go, but the defendant never changes because the office, not the person occupying it, is the party.

In 1961, the advisory committee amended Federal Rule of Civil Procedure 25(d) to reflect this truism. Under this amendment, the successor to a public office is automatically substituted in "any action brought in form against a named officer, but intrinsically against the government or

---

[71] Hafer v. Melo, 502 U.S. 21, 27 (1991) (quoting Kentucky v. Graham, 473 U.S. 159, 167 n.4 (1985)). See, e.g., Turner v. Houma Mun. Fire & Police Civ. Serv. Bd., 229 F.3d 478, 484 (5th Cir. 2000) (articulating that the "performance of official duties creates two potential liabilities, individual-capacity liability for the person and official-capacity liability for the municipality."); New Orleans Towing Ass'n v. Foster, 248 F.3d 1143 (5th Cir. 2001) (recognizing official capacity liability for the entity.)

[72] Id. See, e.g., Jenkins v. Jefferson Par. Sheriff's Off., 402 So. 2d 669, 671 (La. 1981) (reversing Jenkins v. Jefferson Par. Sheriff's Office, 385 So. 2d 578, 579 (La. App. 4 Cir. 1980) and holding that certain state tort liability in official capacity runs with the office, not the individual holding the office).

the office or the incumbent thereof whoever he may be from time to time during the action."[73]
This amendment was designed to move away from the abatement doctrine and its attendant
practice of requiring a party to show a substantial need for continuing litigation to substitute a
successor public officer because the requirement "can rarely serve any useful purpose and fosters
a burdensome formality."[74] This amendment was a direct response to long standing criticism by
the Supreme Court and members of the academy because this "burdensome formality" frequently
resulted in a waste of judicial and litigant resources.[75]

Under Rule 25(d), this substitution is "merely a procedural device for substituting a
successor for a past officeholder as a party, is distinct from and does not affect any substantive
issues which may be involved in the action."[76] In other words, an automatic substitution of the
person occupying the defendant's seat for the moment does not open settled questions for re-
litigation because the person who happens to be inhabiting the office has a different opinion or is
beholden to different interests.

An examination of the operation of Fed. R. Civ Pro. 25 (c) is instructive on this point. Even
where the party in litigation has actually changed, such as in the case of a transfer or assignment
of rights contemplated by Rule 25(c), the Fifth Circuit and other Circuits have long held that

---

[73] Fed. R. Civ. P. 25, 1961 Advisory Committee Note.
[74] Id.
[75] "Even if there is some reason to preserve the doctrine of sovereign immunity by employing the fiction that suit must
be brought against the government officer, it is absurd to carry this concept to such lengths that both litigants, at a late
stage of a protracted litigation, can be forced to undergo the expense and difficulties of starting the suit again merely
because a new nominal defendant has not been substituted in time." Remedies Against the United States and Its
Officials, 70 Harv. L. Rev. 827, 933 (1957). See, e.g., Irwin v. Wright, 258 U.S. 219, 224, 42 S. Ct. 293, 295, 66 L.
Ed. 573 (1922) (observing "an important litigation may be begun and carried through to this court after much effort
and expense, only to end in dismissal because in the necessary time consumed in reaching here, state officials, parties
to the action, have retired from office.").
[76] Fed. R. Civ. Pro. 26, 1961 Advisory Committee Note.

substituted parties "must stand in [the] shoes [of predecessor litigant] with respect to all phases of the litigation. The fact that [predecessor's] litigation may have impaired or adversely affected the rights of [current party] under the assignment would not justify our disturbing all prior orders and decrees entered in this controversy and unfavorable to [current party] which were binding on [predecessor] . . . when made."[77] This logic holds all the more here, where the functional defendant, the Orleans Parish Sheriff's Office, has not actually changed. Sheriff Hutson has stepped into the shoes of the Defendant Sheriff, in official capacity, and in doing so she has bound herself to this Court's orders binding her Office.[78]

> ### IV. OPSO is estopped from asserting positions contrary to those it made and adopted in response to the City's motion for relief.

As established above, the defendant in this litigation did not change in May 2022 when Sheriff Hutson was inaugurated. She should therefore be estopped from taking positions diametrically opposed to those taken by OPSO related to the Phase III facility. As this Court has observed: "When a district court is called upon to manage litigation involving a political entity [like the Sheriff], it must be able to take that entity, acting through legally designated representatives at its word."[79] Here, OPSO's word has been clear both on the record and off. As detailed further below, in the course of the litigation on the City's motion from 2020 to 2022,

---

[77] <u>Deauville Assoc. v. Murrell</u>, 180 F.2d 275, 277 (5th Cir.1950); <u>see also</u> <u>In re Bernal</u>, 207 F.3d 595, 599 (9th Cir. 2000).

[78] In this context, OPSO's citations to state law regarding successor sheriff's obligations to honor private contracts are inapposite. First, because there is no private contract at issue, as discussed above. And secondly, because this argument flies in the face of over a half century of jurisprudence that demands continuity in litigation to avoid the waste and delay associated with perpetual re-litigation of settled questions. OPSO fails to offer a scintilla of support for its radical suggestion that when a successor defendant disagrees with her predecessor's position on settled legal questions, she is somehow not bound by the Court's rulings. OPSO's citation to <u>Rufo</u> is more baffling than elucidating, as OPSO does not cite to Rule 60 anywhere as a basis for its motion, offers no analysis to suggest why modification would be appropriate, and in the next breath says that there is no consent judgment to modify. ECF No. 1617-2 at 16.

[79] ECF No. 1385 at 4.

OPSO made myriad admissions regarding the validity of the agreement to build the Phase III facility, the enforceability of that agreement by this Court, and its binding commitment to abide by these judicially enforceable settlements.[80]

## A. Judicial Estoppel

Under the judicial estoppel doctrine, parties should not benefit from taking a position on an issue contrary to or inconsistent with a position they have previously taken with the Court, so as to protect the integrity of the judicial process.[81] The Fifth Circuit provides the following guidance on when a court should invoke this doctrine: "(1) the party against whom judicial estoppel is sought has asserted a legal position which is plainly inconsistent with a prior position; (2) a court accepted the prior position; and (3) the party did not act inadvertently."[82]

This doctrine has been applied numerous times to positions staked out in consent decrees, and the Supreme Court's most recent treatment of the topic was in just such a context. In New Hampshire v. Maine, the Supreme Court held that the state of New Hampshire was estopped from challenging the precise location of its border with Maine, a question that the parties had previously resolved in a 1977 consent decree. The Court noted that there was no hard-and-fast standard for judicial estoppel,[83] but emphasized that the following factors would "typically inform the decision" to apply the doctrine: (1) the party takes a position that is clearly inconsistent with an

---

[80] See, e.g., ECF No. 1305 at 4; ECF No. 1364 at 1; ECF No. 1360 at 8; ECF No. 1385 at 66.

[81] New Hampshire v. Maine, 532 U.S. 742, 749 (2001) (""[W]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him.") (quoting Davis v. Wakelee, 156 U.S. 680c 689 (1895)).

[82] U.S. ex rel. Long v. GSDMIdea City, L.L.C., 798 F.3d 265, 271-72 (5th Cir. 2015).

[83] 532 U.S. at 751 ("[W]e do not establish inflexible prerequisites or an exhaustive formula for determining the applicability of judicial estoppel."); see also Republic of Ecuador v. Connor, 708 F.3d 651, 654 (5th Cir. 2013) ("Because judicial estoppel is an equitable doctrine, courts must apply it flexibly to achieve substantial justice.").

earlier position; (2) whether the party succeeded in persuading the court of its earlier position, such that if they succeeded in their new position it would appear as though the court had been misled; and (3) the inconsistent position would either provide an unfair advantage to the party asserting it or impose an unfair detriment on an opposing party.[84]

Similarly, in <u>Ergo Science, Inc. v. Martin</u>,[85] the Fifth Circuit held that counsel's statement at a pretrial hearing disclaiming any interest in disputed funds deposited with the court estopped that party from later asserting an interest in those funds. The court recognized the "laudable policy goals" of judicial estoppel: "the doctrine prevents internal inconsistence, precludes litigants from 'playing fast and loose' with the courts, and prohibits parties from deliberately changing positions based upon the exigencies of the moment."[86]

In light of <u>New Hampshire v. Maine</u>, <u>Ergo Science</u>, and subsequent Fifth Circuit precedent, the Sheriff should be estopped from now seeking to terminate orders that it has previously urged the Court to enforce. In opposing the City's Rule 60(b) motion for relief, OPSO cited relinquishing its claim to FEMA funds in exchange for the City's agreement to build Phase III: "This Court must uphold the City's binding commitment to use the Templeman II FEMA funding for the construction of the Special Needs Facility."[87] Furthermore, OPSO adopted, by reference, all of the Independent Compliance Director's arguments against the City's 60(b) motion, including those

---

[84] <u>Id</u>.

[85] 73 F.3d 595 (5th Cir. 1996).

[86] <u>Id</u>. at 598. The court further noted that multiple equitable doctrines could be applied. "Whether this reliance is labeled as 'waiver,' 'judicial estoppel,' or 'renunciation' is immaterial. What is clear is that the district court, as a matter of federal procedure, is entitled to rely on statements made by counsel in open court." <u>Id</u>. at 600.

[87] ECF No. 1305 at 2-4. <u>See also</u> ECF No. 1385 at 48-51, Report and Recommendation to deny the City's motion discussing agreement in Stipulated Order that the Sheriff relinquish any claims to ownership of the Templeman II funds in exchange for the City's commitment to use those funds to implement the Supplemental Compliance Action Plan.

opposing the City's PLRA arguments.[88] As relevant to the pending motion, these arguments by the Independent Compliance Director were adopted by OPSO:

- "The Court has never ordered the City to build a jail, but it does have the authority to enforce the City's agreement with the parties to build Phase III."[89]

- "Nothing in the PLRA limits a Court's authority to enforce its own orders or to require a party to fulfill its contractual agreements and promises."[90]

- "Neither of the Court's orders violate any provisions of the PLRA."[91]

- "the City is estopped from adopting contrary positions with respect to the construction of Phase III (especially as regards the PLRA and land use arguments) after representing to the Court and the parties to this longstanding litigation . . . that it had ever intention of going forward with the construction of same."[92]

- "The Special Needs Facility is the only durable, long-term solution to the problem of inmates with medical and mental health needs."[93]

The position taken by OPSO in its pending motion is unquestionably inconsistent from their past position, satisfying the first suggested inquiry for judicial estoppel. As to the second consideration, the court's reliance on the prior position, it is abundantly clear that the Court relied upon OPSO's stated positions, not only as to the validity of its agreement with the City over the

---

[88] ECF No. 1364 at 1. ("Sheriff Gusman hereby adopts and incorporates the arguments and authorities set forth in the Post-Hearing Brief of the Independent Jail Compliance Director Darnley R. Hodge, Sr.")

[89] ECF No. 1360 at 8. OPSO also adopted this following assertion: "In fact, the City agreed in the Stipulated Order to an express provision that the Stipulated Order complies with the PLRA. This language was not "boilerplate" but rather included input and consideration from all parties, including the City." Id.

[90] Id. at 9, citing Plata v. Schwarzenegger, No. C01-1351, 2008 WL 4847080, at *7 (N.D. Cal. Nov. 7, 2008).

[91] Id., citing Harris v. City of Philadelphia, No. 82-1847, 2000 WL 1978, at *17 (E.D. Pa. Dec. 23, 1999).

[92] Id. at 10.

[93] Id.

Templeman II funds, its performance, and its judicial enforceability,[94] but also as to the lack of merit of the City's PLRA contentions.[95]

The most important equitable factor the Court should consider is the potential harm to the Plaintiff Class engendered by this change in position. The Plaintiff Class is comprised of all individuals who are now or will be imprisoned by the Orleans Parish Sheriff. Every day of delay in completing the Phase III facility is another day in which the health, safety, and wellbeing of the members of the Plaintiff Class is unnecessarily at risk. Every hour the parties are distracted by frivolous motions on long-settled commitments related to the Phase III facility is an hour not spent on the critical work of bringing an unconstitutional jail into compliance. As the Court is well aware, these are questions of life and death.

### B.  Laches

Lastly, the equitable doctrine of laches prevents parties from seeking equitable relief if "they have improperly rested on their claims and the [opposing party] would be prejudiced as a result of the delay."[96] The elements for this equitable defense are:  "(1) delay in asserting a right or claim; (2) that the delay was inexcusable; (3) that undue prejudice resulted from the delay."[97] Over one year has passed since Sheriff Hutson took office, and nearly a year has passed since the Fifth Circuit affirmed the District Court's denial of the City's motion and issued its mandate. The Sheriff and multiple representatives from her office have been invited to participate in planning

---

[94] See, e.g., ECF No. 1385 at 66 ("[The City Attorney] completely ignored the fact that the Sheriff is also an elected City official who has been working on these issues for years, clearly understands their importance, and has made his position in favor of Phase III known to the Court and the public for years.")

[95] ECF No. 1385 at 33-36.

[96] FDIC v. Niblo, 821 F. Supp. 441, 450-51 (N.D. Tex. 1993).

[97] Armco, Inc. v. Armco Burglar Alarm Co., 693 F.2d 1155, 1161 (5th Cir. 1982).

meetings related to the Phase III facility for over a year. And the Sheriff has represented to the Court that she would not obstruct building the Phase III facility.[98] For OPSO to wait until this moment, when construction is scheduled to begin imminently, to raise this nebulous challenge to the Phase III facility is inexcusable.

The undue prejudice prong is also fulfilled here in that, if the Sheriff were to succeed on the motion, the Plaintiff Class would be again left to bear significant delays in receiving the adequate medical and mental health care they have been fighting for a decade to receive.

## V.   Conclusion

Sheriff Hutson's motion is a frivolous and dangerous distraction wrapped in the self-righteous cloak of community interest. But Sheriff Hutson forgets, "it is pointless to talk of the interest of the community, without understanding what the interest of the individual is,"[99] specifically the 1103 individuals detained in the Orleans jail as of July 10, 2023. Four men, Philip Soublet, Chad Neyland, Christopher Johnson, and Terry Carter, have died in the Sheriff's custody since she assumed office – two in just the last two months from suspected drug overdoses. OPSO admitted in open court last month that it is not in control of the jail, and the consequences are fatal.[100] The jail population has ballooned under Sheriff Hutson's watch, meaning ever growing numbers of people are exposed to OPSO's inhumane, ineffective, and chaotic jail operation. Despite the crisis posed by the jail's current conditions, Sheriff Hutson has decided to distract her Office and the parties from the real work of reducing the deadly risk of harm to members of the Plaintiff Class, by grandstanding and pandering to her political base with a motion that is not based

---

[98] The Court observed: "I think that we have had in discussion with me and the Sheriff and others that she wasn't going to obstruct the process." Transcript at 20:18-20, June 28, 2023 status conference on Sheriff's remark.
[99] Jeremy Bentham, Introduction to the Principles of Morals and Legislation (3rd Ed. 1823).
[100] Transcript at 24:14-17, June 28, 2023, status conference on Sheriff's remark.

in any valid legal position on the exhaustively litigated and now foreclosed matter of whether the

Phase III facility will be constructed. For the foregoing reasons, the Plaintiff Class respectfully

and urgently requests that Sheriff Hutson's motion be denied with utmost expediency.

Respectfully submitted,

**FOR THE PLAINTIFF CLASS:**

*s/ Elizabeth Cumming*
EMILY WASHINGTON, LSBN 34143
ELIZABETH CUMMING, LSBN 31685
Roderick & Solange MacArthur Justice Center
4400 S. Carrollton Avenue
New Orleans, LA 70119
(504) 620-2259 (ph)
emily.washington@macarthurjustice.org
elizabeth.cumming@macarthurjustice.org

Date:  July 10, 2023

24