# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| _____ | |
| LASHAWN JONES, *et al.*, and | § |
| THE UNITED STATES OF AMERICA, | § |
| | § Civil Action No. 2:12-cv-00859 |
| PLAINTIFFS | § Section I, Division 5 |
| | § Judge Lance M. Africk |
| | § Magistrate Judge Michael B. North |
| SUSAN HUTSON, Sheriff, | § |
| | § |
| | § |
| DEFENDANT. | § |
| _____ | § |

---

## Report No. 18 of the Independent Monitors
## October 6, 2023

---

Margo L. Frasier, J.D., C.P.O., Lead Monitor
Susi Vassallo, M.D., Medical Monitor
Patricia L. Hardyman, Ph.D., Classification Monitor
Nicole Johnson, M.D., Mental Health Monitor
Shane J. Poole, M.S., C.JM., Environmental Fire Life Safety Monitor
Diane Skipworth, M.C.J., R.D.N., L.D., R.S., C.C.H.P., C.L.L.M., Food Safety Monitor



***Compliance Report #18***
***LASHAWN JONES, et al., and the United States of America v.***
***Susan Hutson, Sheriff***

Table of Contents

|  |  | **Page** |
|---|---|---|
| I. | Introduction | 4 |
|  | A. Summary of Compliance | 6 |
|  | B. Opportunities for Progress | 9 |
|  | C. Review Process of Monitors' Compliance Report #18 | 20 |
|  | D. Communication with Stakeholders | 20 |
|  | E. Recommendations | 21 |
|  | F. Conclusions and Path Forward | 21 |
| II. | Substantive Provisions |  |
|  | A. Protection from Harm | 23 |
|  | A.1. Use of Force Policies and Procedures | 27 |
|  | A.2. Use of Force Training | 29 |
|  | A.3. Use of Force Reporting | 32 |
|  | A.4. Early Intervention System | 36 |
|  | A.5. Safety and Supervision | 38 |
|  | A.6. Security Staffing | 47 |
|  | A.7. Incidents and Referrals | 49 |
|  | A.8. Investigations | 52 |
|  | A.9. Pretrial Placement in Alternative Settings | 54 |
|  | A.10. Custodial Placement | 55 |
|  | A.11. Prisoner Grievance Process | 80 |
|  | A.12. Sexual Abuse | 87 |
|  | A.13. Access to Information | 88 |
|  | B. Mental Health Care | 88 |
|  | C. Medical Care | 120 |
|  | D. Sanitation and Environmental Conditions | 125 |
|  | E. Fire and Life Safety | 143 |
|  | F. Language Assistance | 147 |
|  | G. Youthful Prisoners | 149 |
|  | H. The New Jail Facility | 150 |
|  | I. Compliance and Quality Improvement | 151 |
|  | J. Reporting Requirements and Right of Access | 152 |
| III. | Status of Stipulated Orders – February 11, 2015, and April 22, 2015 | 153 |



**Page**

**Tables**
Table 1 – Summary of Compliance – All Compliance Reports                          7
Table 2 – Status of Compliance – Stipulated Agreements                           8
Table 3 – Summary of Incidents CY 20189-July 2023                               24
Table 4 – CY 2018-July 2023 All OJC Reported Incidents by Month                 26
Table 5 – CY 2018-CY 2022 OJC Reported Incidents                                39

**Figures**
Figure 1 – Percentage of White Male Inmates Assigned to OJC, TDC, and TMH
          Housing Units—October 2021-March 2023                                63
Figure 2 – Percentage of White Female Inmates Assigned to OJC, TDC, and
          TMH Housing Units—October 2021-March 2023                            63
Figure 3 – Rates and Completion Time of Initial Custody Assessments
          Completed April 2022-March 2023                                      65
Figure 4 – Percent Overrides for Housing Purposes – October 2021 –
          March 2023                                                           67
Figure 5 – Mandatory and Discretionary Override Rates by Gender
          October 2021 – March 2023                                            68
Figure 6 – Pending Custody Assessments April 2021-March 2023                    70
Figure 7 – Victimization of Inmates on the Mental Health Caseload April
          2022-March 2023                                                      71
Figure 8 – Number of Attachments input by Classification Staff
          —April 2021-March 2023                                               72
Figure 9 – Percentage of Initial Custody Assessments April 2021-March 2023      73
Figure 10–Rate of Disciplinary Infractions for the OPSO ADP: October 2021
          -March 2023                                                          77
Figure 11—OPSO ADP vs. Number of Disciplinary October 2021-March 2023          78
Figure 12—Most Serious Disciplinary Infraction/Report with Finding of
          Guilty: April 2021-March 2023                                        78

**Charts**
Chart 1—Facility, Food Service, Medical, Mental Health, and Miscellaneous
        Grievances                                                             82
Chart 2-- Inmate/Inmate Physical Violence and PREA, Staff Misconduct and
        PREA, Life-Threatening, and Use of Force Grievances                    83
Chart 3-- Commissary, Programs, Inmate Funds, Property, Grievance
        Appeals, Legal and Law Library Grievances                              83
Chart 4—Monthly Grievances, Request and Inmate Population Comparison            84
Chart 5—Overdue Grievance Reports by Month                                     85

**Appendices**
Appendix A - Summary Compliance Findings by Section Compliance
Reports 1 – 18                                                                 155



**Compliance Report # 18**
**Introduction:**

This is Compliance Report #18 submitted by the Independent Monitors providing assessment of the Orleans Parish Sheriff's Office's (OPSO) compliance with the Consent Judgment of June 6, 2023. Compliance Report #18 reflects the status of OPSO's compliance as of March 31, 2023. This report is based on incidents, documents, and compliance-related activities between October 1, 2022, and March 31, 2023. All of the Monitors were on-site for a monitoring tour July 10-13, 2023. This report is based on the observations and review of OPSO documents by the Monitors during the on-site visits and the monitoring period.

Throughout the time the Monitors have been involved in enforcement of the Consent Judgment, the on-site visits have played an integral role. During the on-site visits and the on-site visits by the Lead Monitor and various other monitors in between the monitoring tours, the Monitors have endeavored to provide guidance to OPSO as to how to remedy the unsafe and unconstitutional conditions which existed when we began monitoring in late 2013, and which continue to exist. In addition to the on-site visit of all of the Monitors July 10-13, 2023, all monitors were on site December 5-8, 2022. The Lead Monitor also visited September 19-21, 2022, October 18-20, 2022, December 19-22, 2022, April 17-20, 2023, May 15-18, 2023, June 19-22, 2023, and August 15-17, 2023. Monitor Shane Poole accompanied the Lead Monitor during the visit on October 18-20, 2022, and April 17-20, 2023.  Monitor Dr. Susi Vassallo accompanied the Lead Monitor during the visit on April 17-20, 2023. Monitor Dr. Patricia Hardyman provided classification training on site March 20-21, 2023. Monitor Dr. Nicole Johnson additionally visited May14-15, 2023. Additionally, all of the Monitors were in frequent contact with OPSO via other methods such as emails, telephone calls, and virtual meetings.

Sheriff Susan Hutson was sworn in as Orleans Parish Sheriff in May 2022. The period covered by Compliance Report #18 is the first monitoring period for which Sheriff Hutson was sheriff the entire time.

The Monitors have consistently urged OPSO to put in place the necessary processes and procedures to not only obtain compliance, but to sustain compliance. Such processes and procedures would allow OPSO to provide adequate proof of compliance, independently assess compliance with the Consent Judgment and its own policies and procedures, and



address shortcomings without intervention of the Monitors. The Monitors have provided guidance as to how to go about the various review functions and establish a compliance unit that would operate independently of those whose performance would be assessed. While there had been talk about the formation of a compliance unit over the past several years under Sheriff Gusman, it did not become operational until Sheriff Hutson took office. The Compliance and Accountability Bureau (CAB) was in existence for the monitoring period; although in its infancy.

The establishment of the CAB is a monumental step in the right direction. A fully staffed compliance unit, which would include inspection and auditing duties, will allow OPSO to recognize deficiencies, and address them. For instance, OPSO continues to not have an electronic way of recording when and if security checks take place in the housing units. Since there is not an electronic record of checks, deputies write the checks in their logbooks. In an effort to make review of checks simpler by supervisors, OPSO developed a paper form on which to record security checks. While this provides an easier way for a supervisor to determine during a unit inspection if the deputy has recorded that the security checks are being performed timely, it proved to be insufficient proof that an appropriate security check actually occurred and when it occurred. To appropriately verify the accuracy of the times recorded and the method used, hours of video would have to be watched. Prior monitoring visits have revealed the continued deficiencies in the documentation and auditing of the security checks. For instance, in the past and during this on-site visit, deputies were inconsistent in describing what an acceptable security check would look like. Furthermore, the deputies admitted that they did not perform all of the tasks for a proper security check each time a security check was recorded as having taken place. Generally, an adequate security check was only performed, if at all, when a physical count of the inmates took place; twice a day. The CAB is important to the work to be done on gaining and sustaining compliance. Equally important is adopting a culture where accountability is embraced as opposed to a culture where there is a reluctance to address the deficiencies and, in some instances, undermining the efforts of those whose job it is to objectively review data and accurately assess compliance status.

The OPSO is required to employ a professional corrections administrator who meets the requirements outlined in the Consent Judgment. For the monitoring period, that position



was held by Dr. Astrid Birgden, but no documentation has been provided that her experience complies with the requirements under the applicable provision of the Consent Judgment.

In summary, the Monitors find that food service for inmates held in both the Orleans Justice Center (OJC) and the Temporary Detention Center (TDC) fell out of the substantial compliance it had maintained for three years due to a serious issue with the coolers used to maintain the food at safe temperatures. In other areas of the Consent Judgment, progress has been sporadic. In some areas, there has been progress, and in some cases, there has been regression. Overall, ratings improved in eleven (11) provisions and regressed in fourteen (14) provisions. The number of provisions in non-compliance reduced from seventeen (17) provisions to twelve (12) provisions. The lack of significant progression and, in some cases, regression is due to a failure to follow the policies and procedures that have been put in place. It has been exasperated by the lack of staff, but many of the provisions are not reliant on security staffing. The specific areas are addressed in this report.

A.      **Summary of Compliance**

The requirements of the Consent Judgment represent correctional practice recognized as required for the operation of a Constitutional jail system. While there is some flexibility in addressing the mandates, achieving substantial compliance with the Consent Judgment, and Stipulated Agreements are necessary to bring OPSO and its correctional facilities into adherence with Constitutional requirements. The Consent Judgment contains 174 separately rated provisions. While they are separately rated, they are often intertwined. For example, effective implementation of a policy requires not only the drafting of a suitable policy, but appropriate training on the policy and enforcement of the policy. Enforcement of the policy is contingent on assessing whether the policy is being followed which requires supervision, analysis of incidents and data, and objective confirmation of compliance. A meaningful annual review of the adequacy of the policy does not just mean determining whether the wording of the policy should be changed, but also includes evaluating adherence to the policy and whether the objectives of the policy are being met; which requires objective data collection and analysis and development of corrective action plans. While appropriate policies have been developed, the objective data collection, analysis and development of corrective action plans have been lacking or non-existent thus far. The Monitors are hopeful that will change with the establishment of the CAB under Sheriff



Hutson.

Based on the current assessment, OPSO has regressed slightly from Report #17. There has been progress in reducing the number of provisions in non-compliance as there are now twelve (12) provisions in non-compliance as opposed to the seventeen (17) provisions which are in non-compliance in Report #17; however, in Report #16, there were five (5). Substantial compliance has been achieved for seventy-six (76) of the provisions (43.7%). Eighty-six (86) of the provisions are in partial compliance (49.4 %). Twelve (12) of the provisions are in non-compliance (6.9%).

Over time, OPSO made material progress as indicated by the movement of non-compliance to partial compliance to substantial compliance for over half of the provisions. At different times during the duration of the Consent Judgment, including in some areas in this report, there has been regression in the progress towards compliance. As will be addressed in individual areas, OPSO has shown regression from the progress in some provisions due to failure to consistently follow and enforce policies and procedures and to provide meaningful training.

During the onsite visit for Compliance Report #18, it was apparent that there is an effort being made to utilize analyses of data, including grievance data and use of force data to determine policy adherence and develop action plans to address shortcomings and make decisions. Unfortunately, there still has not been an objective analysis of data concerning institutional violence or at least no development of a systematic approach to making decisions and implementing and enforcing them to reduce institutional violence. For instance, review of incident reports and disciplinary reports clearly indicate that much of the violence is perpetrated by an identifiable group of inmates. However, other than the short time they might be placed on the disciplinary unit, nothing has been done to separate them from the general population. The establishment of the CAB is a definite move in the right direction, but the concept of accountability and a systematic approach must become part of the OPSO culture. Otherwise, the same deficiencies are likely to continue to be noted time and time again.

**Table 1 – Summary of Compliance – All Compliance Reports[1]**

| Compliance Report/Date | Substantial Compliance | Partial Compliance | Non-Compliance | NA/ Other | Total |
|---|---|---|---|---|---|



| | | | | | |
|---|---|---|---|---|---|
| #1 – December 2013 | 0 | 10 | 85 | 76 | 171 |
| #2 – July 2014 | 2 | 22 | 149 | 1 | 174 |
| #3 – January 2015 | 2 | 60 | 110 | 2 | 174 |
| #4 – August 2015 | 12 | 114 | 43 | 4 | 173 |
| #5 – February 2016 | 10 | 96 | 63 | 4 | 173 |
| #6 – September 2016 | 20 | 98 | 53 | 2 | 173 |
| #7 – March 2017 | 17 | 99 | 55 | 2 | 173 |
| #8 – November 2017 | 23 | 104 | 44 | 2 | 173 |
| #9 – June 2018 | 26 | 99 | 46 | 2 | 173 |
| #10 – January 2019 | 65 | 98 | 8 | 2 | 173 |
| #11 – September 2019 | 103 | 66 | 5 | 0 | 174 |
| #12 – May 2020 | 118 | 56 | 0 | 0 | 174 |
| #13-- November 2020 | 111 | 59 | 4 | 0 | 174 |
| #14—May 2021 | 100 | 67 | 7 | 0 | 174 |
| #15—November 2021 | 97 | 77 | 0 | 0 | 174 |
| #16—May 2022 | 95 | 72 | 5 | 0 | 174 |
| #17—December 2022 | 80 | 77 | 17 | 0 | 174 |
| #18—July 2023 | 76 | 86 | 12 | 0 | 174 |

The status of compliance (February 11, 2015, and April 22, 2015) is as follows:

**Table 2 – Status of Compliance with 2015 Stipulated Agreements**

| Compliance Report/Date | Substantial Compliance | Partial Compliance | Non-Compliance | NA | Total |
|---|---|---|---|---|---|
| August 2015 | 21 | 12 | 1 | 0 | 34 |
| February 2016 | 21 | 12 | 1 | 1 | 34 |
| September 2016 | 26 | 7 | 1 | 0 | 34 |
| March 2017 | 28 | 4 | 1 | 1 | 34 |
| November 2017 | 21 | 11 | 1 | 1 | 34 |
| June 2018 | 23 | 8 | 2 | 1 | 34 |
| January 2019 | 28 | 5 | 0 | 1 | 34 |
| September 2019 | 28 | 5 | 0 | 1 | 34 |
| May 2020 | 28 | 5 | 0 | 1 | 34 |
| November 2020 | 32 | 2 | 0 | 0 | 34 |
| May 2021 | 32 | 2 | 0 | 0 | 34 |
| November 2021 | 32 | 2 | 0 | 0 | 34 |
| May 2022 | 32 | 2 | 0 | 0 | 34 |
| December 2022 | 32 | 2 | 0 | 0 | 34 |
| July 2023 | 32 | 2 | 0 | 0 | 34 |



**B.**     **Opportunities for Continued Progress**

The Monitors summarize below the areas identified in preparation of this report regarding OPSO's current level of compliance with the Consent Judgment.

**1.**     **Foundational Work** - The essential, core work required to achieve compliance includes:

- <u>Policies and Procedures</u> – OPSO has completed the essential policies and procedures. The Policy Manager has continued to coordinate the review of policies and make the necessary updates. When the need for new policies is identified, the Policy Manager initiates a draft and circulates them to the appropriate staff. The review process, however, seems to take an extraordinary length of time. Often draft policies remain in draft form for many months without finalization. The current Policy Manager was appointed as the Deputy Chief of Jail Operations after the compliance period. The Policy Manager position has not yet been filled. Essential is the continued development, approval, and implementation of lessons plans and training that correspond with each of the policies. OPSO's policy governing its written directive system has significantly improved the policy/procedure process. This process allows for organizational components to develop specific operational practices for review by OPSO administration. Unfortunately, there is often a delay between when policies are submitted for review, and when they are returned with any suggested changes. Adherence to the policies, procedures, and training is essential. While the implementation of the CAB will be helpful through its objective auditing of policy adherence, the consistent enforcement of policies is a role which must be performed by the supervisors at all levels. Too often the failure to follow policy is blamed on the lack of staff or training. Neither is an acceptable excuse. Whether it is lack of supervision, lack of staff, or inadequate training, the result of failure to follow policy is often harm to staff and/or inmates and must be addressed.

- <u>Inadequate staffing</u> – OPSO has continued to hire staff but has not been able to gain sufficient ground on vacancies due to the number of terminations and resignations. During CY 2021, OPSO lost significant ground in that it hired



97 new staff members and lost 177 staff members through resignation, termination, and retirement. During CY 2022, OPSO hired 136 new staff members and lost 185 staff members through resignation, termination, and retirement. During the first six months of 2023, OPSO hired 156 new staff members and lost 69 staff members through resignation, termination, and retirement. Over the past two and half calendar years, the number of staff has decreased by 42. It should be noted that since May 2022 when Sheriff Hutson took office, as of July 2023 there has been a gain of 69 staff members as 269 new staff members were hired, and 198 staff members were lost to resignation, termination, and retirement. Inadequate staff in the housing areas of the facilities (OJC and TMH) and the timely and thorough completion of use of force investigations continues to hamper OPSO's ability to consistently comply with the Consent Judgment. OPSO did not mandate overtime during the compliance period. Since that time, there has been discussion about mandating overtime and developing the necessary policy and procedures. Deputies are often reluctant to work overtime in OJC as they can make more per hour working off duty security details than they can working overtime in OJC. OPSO should consider prioritizing staffing the OJC over allowing deputies to work details. The requirement that units within the OPSO outside of OJC assist in staffing OJC has been formalized through the Emergency Staffing and Augmentation Plan (ESAP). The ESAP has resulted in the provision of deputies from outside OJC to assist in critical area such as escorts for the mental health and medical staff. There has not been sufficient participation by outside units to supplement security in housing units to any meaningful degree. More often than not, there are housing units and control rooms with no assigned staffing. Staff are often tasked with manning two housing units and the control room despite the Consent Judgment requiring one deputy/recruit physically on each unit for direct supervision. Further, almost daily, assigned staff leave housing units and control pods unattended for meal breaks and other duties. Sheriff Hutson raised the salaries for recruits and deputies as a result of the budget request submitted in the 2023 budget. OPSO has made valiant efforts at hiring



new recruits to work in OJC. Unfortunately, OJC has not seen a corresponding increase in staff as almost an equal number of staff have been transferred out of OJC. This is concerning to the Monitors for two reasons: (1) it lessens the level of experience within OJC and (2) a higher percentage of male staff were transferred than female staff which exacerbated the disparate ratio of male staff to female staff within the OJC.  OPSO is strongly encouraged to review its deployment of staff. It is apparent that staff are not being deployed to the areas where the need is most critical, staffing the housing units. While redeployment of staff is unlikely to fully address the staffing shortage, it would be helpful in addressing the most critical needs. During the monitoring period, senior staff members (lieutenants and captains were redeployed to the evening/night shift due to the majority of the supervisors previously working on the day shift. Sheriff Hutson has made redeployment of staff, including adequate supervision on the evening/night shift a priority. There is currently a severe shortage of sergeants on all of the shifts. While there are plans to have a promotional board for sergeants in the near future, it is suggested that the shortage be addressed by the appointment of provisional sergeants. While not ideal, it would address the immediate need and allow the administration to evaluate the performance of the provisional sergeants.

- <u>Training</u> – Employee training for security staff, both pre-service and in-service, has made progress over time, but has taken a step back with the lack of staff. In 2021, OPSO reinstated the practice of assigning new deputies to a training officer during the first three weeks of assignment to OJC (field training program), but enforcement and follow through has been sporadic and occurred infrequently during the monitoring period. The sergeant supervising the program also has the duty of running the school program which has hampered her efforts to meet with the new deputies and provide them mentoring and guidance. A field training program needs to be fully implemented with follow up as to the effect the program has on turnover. The program, if allowed to be fully implemented, is likely to result in a reduction of turnover and a reduction in rule violation by new recruits. OPSO did its annual



training in CY 2022 with 100% attending. An issue with the quality of training was discovered during the monitoring period. Most of the recruits trained during 2023 did not receive the practical portion of CPR or shotgun training. In addition, as discussed in the use of force training section, many of the recruits have not received adequate defensive tactics training.

- <u>Supervision</u> – Safe operation of OPSO's facilities requires an adequate number of sufficiently trained first line and mid-management supervisors and clear lines of authority and responsibility. When Independent Compliance Director Hodge was in charge of operations, he implemented the unit management approach and provided training and mentoring for the managers. While there are benefits to a unit management system, the unit management system blurred the lines of responsibility and accountability. This is particularly apparent when there are no unit managers on duty and the supervision of the jail was the responsibility of the watch commanders. Given that the unit managers were seldom present at the facility after 4:00 p.m. or weekends, the authority of the watch commanders to assign and supervise the staff was crucial to the safe operation of the OJC. During the monitoring period, there often was not anyone higher than the rank of sergeant on duty in the evening and overnight hours and on the weekends. This issue appears to have been addressed by deploying the captains and lieutenants to cover the shifts on a 24/7 basis. However, the movement of captains and lieutenants to cover the shifts on a 27/7 basis was met with great resistance from those that did not want to give up having weekends off or working only the day shift. It appears that several of the lieutenants and captains have still not embraced their new role.

2.  **Medical and Mental Health Care** – The Medical and Mental Health Monitors report challenges remain in the provision of basic care, staffing, and recordkeeping, as well as the continued need for improved collaboration with custody/security staffing. Security staff continued to be responsible for the performance of some of the "suicide watches" during the on-site visit. While there was some improvement in the deputies' knowledge of their duties to perform and document suicide watches, inconsistency



with how suicide watches were performed and documented were still noted, resulting in inconsistency of the reporting of data. Resources from Tulane University continue to be particularly helpful in providing psychiatric mental health care, but the psychiatrists have had difficulty during the monitoring period accessing their clients due to the shortage of security staff. The implementation of the ESAP appears to have aided greatly in addressing the problem. The design of the interview rooms and concerns of the Tulane University for their safety has resulted in having to assign one deputy to escort each psychiatrist. Tulane University is not responsible for many aspects of mental health care required by the Consent Judgment. An important part of the long-term solution to the lack of compliance with the Consent Judgment in the areas of medical and mental health is the design and construction of Phase III, a specialized building which will contain an infirmary and housing for inmates with acute mental health issues. For instance, having security staff escort each psychiatrist or other mental health to interview inmates is addressed in the design of Phase III as the psychiatrists and other mental health staff will be able to interview inmates in an environment which is much safer for both staff and inmates.  The City extensively renovated portions of TDC (now referred as TMH or Temporary Mental Health) as a stop gap measure. OPSO finally began to utilize all of the TMH after the monitoring period. During the monitoring period, one of the TMH units not being used due to a lack of security staffing resulting in a backlog of inmates with acute mental health issues continuing to be housed in OJC which is inadequate for the housing of these inmates. Even with TMH, the facilities within OJC to house inmates with mental health issues are inadequate and create security and safety issues for both staff and inmates. The inadequacy of the OJC facility and the lack of training on the part of the security staff are reflected in the high number of uses of force, attempted suicides, and assaults on staff and inmates on the mental health units.

3.    **Inmate Safety and Protection from Harm** - Providing a safe and secure jail continues to be a challenge.

- <u>Unit Management</u>—The Unit Management approach was being used in the supervision of the OPSO housing units during most of the monitoring period. Each floor of the OJC, the IPC, and the TDC/TMH was designated as a "unit".



The purpose of this strategy is to enhance accountability for both staff and the inmates by allowing the staff to get to know the inmates. The effectiveness of the Unit Management approach has been greatly hampered by the lack of development of management plans for problematic inmates. It also has blurred the lines of responsibility and accountability as indicated above. It has been proven not to be effective. During the monitoring period, the Unit Management approach was abandoned by the new administration. The Monitors feel this was the right decision as the captains and lieutenants are better utilized supervising OJC 24/7.

- <u>Violence and Contraband</u> – There were significant incidents of violence occurring within the facilities during the monitoring period; including inmate-on-inmate assaults and assaults on staff. The level of violence in the facility continued to escalate during this monitoring period. The inmates appear to be emboldened in their refusal to follow the rules and obey the orders of the security staff. Very concerning is that both staff and inmates relayed to the Monitors that there are inmates who are acting as "tank bosses" and are extorting other inmates and requiring payment for protection. Even more concerning is that the majority of these inmates are known to staff and many of them are being designated as "tier reps" by the OJC leadership which is viewed as further empowering these inmates. Most often, the inmate-on-inmate assaults occurred when there was no deputy stationed in the housing unit. Especially concerning is that inmates continue to fashion weapons from items found in the jail and continue to find new sources from which to make weapons due to the lack of security staff on the units. As sources of contraband (such as the light supports in the utility closets and the cabinets at the front of the day room) were identified and appears to have been eliminated, the inmates then discover a new source of material from which to fashion weapons. For example, inmates pry off the metal sheeting around the sinks in the janitor closets and windows to fashion weapons. The brooms and mops the facility provided are used as weapons as inmates are not supervised when performing cleaning with the exception of the Sanitation Supervisor. In reality,



few, if any, of the sources of contraband would be available to the inmates if the staff followed policies regarding supervision and limiting access to materials. Another concern is the lack of effective random shakedowns resulting in the continued presence of weapons, pills, narcotics, and other contraband in the housing units. Inmates are often observed smoking illegal substances and lighting wicks from dryers and electrical outlets. Disorder and non-compliance with the institutional rules cause staff to use force to gain control and compliance. Often the force used is more than is necessary. There is inadequate use of de-escalation techniques before resorting to force, including repeated examples of using OC spray without adequate de-escalation and/or in retaliation against inmates. Seldom are mental health staff involved in de-escalation even though a large percentage of the inmates involved in uses of force are on the mental health caseload. The number of overdoses linked to illicit drugs and prescription medication continues to be high. Two inmates died in June 2023 as a result of apparent drug overdoses. Another inmate died in July 2023 after a lengthy stay in the hospital.

- <u>Inmate Classification</u> – The inmate classification process, which had regressed during the last several monitoring periods showed improvement with the replacement of the Classification Manager in December 2022. There needs to be continued attention to ensure housing decisions and placements are consistent with OPSO policies and objective classification principles. There continued to the acquiescence to inmates or security staff where inmates are moved to housing where other members of their allies and/or gang members reside or in order for staff avoid having to supervise a problematic inmate. A policy exists regarding the steps to be taken before inmates who are on the keep separate list would be cleared to be housed together or removed from protective custody, but it is not being followed and has been undermined by the Sheriff's Adjutant approving removal from the keep separate list without adherence to the policy. During the preparation of this report, an inmate from removed from protective custody status and placed on a housing unit with an inmate who had been on his enemy list but removed by staff. The inmate was



brutally attacked that very day by the known enemy and others, and sustained life threatening stab wounds. Credible auditing needs to focus on identifying issues and correcting placements. During the tour, the housing audits were found to be much improved after the replacement of the Classification Manager. There is no analysis done when inmates are involved in an altercation to determine whether they should have been kept separate or if they manipulated the system to gain access to the housing unit in which the altercation occurred.

- <u>Inmate grievances</u> – As of Report #11, the ratings of the subdivisions in the grievance provision were individually given. The separate ratings allowed the areas in which deficiency existed to be highlighted. Timeliness and adequacy of responses are still not acceptable. The trend data from the grievance system is now available to assist in identifying problems to be addressed, but there has not been adequate follow-through on addressing the issues identified. The absence of working kiosks by which to file grievances continues to compromise the confidentiality of the grievance system. The issues with compliance with the Consent Judgment related to grievances is the result of follow up by the persons charged with responding to the grievances, not the Grievance Staff.

- <u>Incident Reporting</u> –The accurate, timely reporting of incidents continues to be a constant area of concern. There remain serious incidents for which no report or no timely report is prepared by OPSO staff, including incidents involving the serious injury of inmates and drug overdoses. Reports are often incomplete and do not provide the necessary information for the reader to determine what occurred and why it occurred. It is particularly concerning that incomplete and sometime inarticulate reports have been reviewed by and approved by a supervisor. OPSO began implementation of a corrective action plan over a year ago to address timeliness and thoroughness of reports which includes training and remedial action including discipline, but it has been not implemented so as to adequately address the issue. Part of the problem is the lack of resources dedicated to the gathering and auditing of reports. The



Monitors and parties receive reports electronically which has improved the timeliness of provision of completed reports, but the timeliness of the completion of reports and quality of reports still need to be addressed. The change has also highlighted that there are numerous incidents which should have been reported to the Monitors in the daily summary which were not. Part of the problem may be the incorrect categorization of reports when written. Not only does it present an issue for the Monitors, but it also makes the gathering of accurate data on incidents more difficult.

- <u>Jail Management System</u> – An integral part of the jail's operational improvement is tied to an effective jail management system. Such capacity provides on-demand, routine, and periodic data to inform critical leadership and management decisions. Such an information system has not been implemented. After OPSO cancelled the contract with the provider who was to supply a new JMS, due to the inability to interface with the Orleans Parish court system, the City of New Orleans was to purchase a JMS which will interface with the Orleans Parish court system and the OPSO information systems. Despite the passage of several years, there is no definite timeline for that process. In the meantime, OPSO has modified its current system to provide more of the required JMS functions. One of the crucial areas lacking is a way to electronically verify that security checks are taking place in a timely fashion. There is limited ability to generate reports regarding violence occurring in the OJC. With the change in administration, there appears to be a much-needed emphasis on improving the functioning of the OPSO information systems. However, funding for the project is not in the budget approved by the City Council.

4.    **Sanitation and Environment Conditions** – Challenges remain regarding the public health and inmate/staff safety risks. Although there have been a few outbreaks of COVID during the monitoring period, COVID has mainly been held in check by quarantining and testing both inmates and staff. The inability to fill support positions identified in OPSO's staffing analysis negatively impacts the ability of OPSO to sustain compliance with the requirements of the Consent Judgment and align with accepted



correctional practice. Sanitation and cleanliness of the cells and housing areas are not solely the responsibility of the sanitation staff. The supervisors and pod deputies have the first responsibility for ensuring inmates keep their cells and dayroom areas clean and uncluttered. The level of cleanliness of cells and housing areas was worse during the site visit conducted during this monitoring period than previous tours since OJC has been occupied. As with past tours, during the monitoring tour, when sanitation concerns were called to the attention of pod deputies and supervisors, they often appeared not to be concerned.

5. **Youthful Inmates** – Five youthful offenders were held in OJC during the monitoring period. Four of them were transferred to the Juvenile Justice Intervention Center (JJIC) before being placed in housing. One, a 15-year-old female was held for 12 days before she was transferred to JJIC. This is extremely concerning as even if they are not placed in housing, they are held within the sight and sound of adults inmates while in the Inmate Processing Center (IPC). OPSO reported that the female juvenile had lied about her age, but there was also a report that her true age was learned while she was still in IPC, and still she was not separated from adult inmates. While the Monitors applaud the effort being made to house youthful offenders in the JJJC, juveniles should not be accepted into the facility. Better coordination with arresting agencies is required. It should be noted that housing one youthful offender is enough to tie up an entire housing unit.

6. **Inmate Sexual Safety** – OPSO underwent its required audit of compliance with the Prison Rape Elimination Act of 2003 (PREA) and passed in September 2019. Since that time, the sergeant who was assigned as the PREA Coordinator was moved from that assignment and reassigned to a housing area. One of the PREA managers has been named the PREA Coordinator. Continued internal collaboration among OPSO security, classification, and the medical/mental health provider is needed for the assessments of inmates' potential vulnerability to sexual assault. Due to the long time that inmates are housed in intake units, inmates of various PREA designations continued to be housed together without an appropriate plan to keep them separate during time out of cell. Commingling of inmates of various PREA designations occurs on half of the housing units. OPSO cannot rely on an audit that is three years old to



demonstrate compliance with PREA. The new administration is exploring having an updated PREA audit conducted in the near future.

7.   **Compliance, Quality Reporting, and Quality Improvement** – An essential element of inmate safety is OPSO's timely review of all serious incidents as well as of non-violent incidents to determine if there are trends and/or patterns. This ensures assessment of root causes and the development, implementation, and tracking of corrective action plans to address the causes. This activity focuses on resolving problems. OPSO has begun to undertake this function, but there does not seem to have been much progress in addressing the systemic issues, which if they remain unaddressed, will continue to create risks to institutional safety and security. The new administration at OPSO has dedicated more time and knowledgeable resources to quality improvement. However, it is disappointing that the corrective action plans which were supposedly being developed when the Monitors toured in December 2022 had still not been completed when the Monitors toured in July 2023. One of the main impediments in the past has been the failure to hold staff accountable for failure to follow corrective action plans.

8.   **Stipulated Agreements 2015** – The section on the Stipulated Agreements of 2015 has been expanded to aid OPSO in reviewing its on-going compliance with the two Stipulated Agreements from 2015. Two provisions remain in partial compliance, without any progress towards substantial compliance.

9.   **Construction Projects** –

- The Docks – Construction of the renovations on the Docks has been completed. With the reopening of the courts, the Docks are once again being used for court holding in addition to court access.

- TDC Mental Health (TMH)– Two housing units in the Temporary Detention Center (TDC) (total of four housing areas) were renovated to provide for housing inmates with acute mental illness pending the construction of Phase III. After TMH's completion, the male inmates with acute mental illness were moved from Hunt into one of the housing units. During the monitoring period, OPSO housed acute male inmates and acute female inmates in TMH. However, as in previous monitoring periods, only three of the four housing areas were



operational during the monitoring period. Some acute inmates remained in OJC due to the decision not to assign sufficient staff to operate all four of the TMH housing areas.  All sub-acute inmates remain in OJC. After the monitoring period, in late April 2023, OPSO finally opened and staffed the fourth housing area at TMH to address the backlog of acute male inmates currently housed at OJC.  While TMH is not a suitable long-term solution to meet the requirements of the Consent Judgment as to medical and mental health services, it is a necessary interim step on mental health services given no satisfactory housing for acute inmates in OJC. The operation of TMH has reaffirmed the necessity of single person cells for the majority of acute inmates in the initial stages of treatment which should be factored in the operational capacity of Phase III. Housing sub-acute inmates in two person cells in Phase III will often be acceptable. It is important to note that TMH does nothing to address the lack of infirmary and medical housing in OJC and lack of programming space. Even with the construction of Phase III, there will be a need for safe and suitable housing for any sub-acute inmates which remain in OJC.

- Phase III –Monthly meetings of the Executive Committee have been held and have provided information to the parties and the Monitors. The construction and occupation of Phase III are critical to the provision of mental and medical health services in accordance with the Consent Judgment. Regular court intervention has been required to keep the project moving forward.

**C.**    **Review Process of Monitors' Compliance Report #18**

A draft of this report was provided to OPSO, Counsel for the Plaintiff Class, and the Department of Justice (DOJ) on August 28, 2023.  Comments were provided by Counsel on September 13, 2023. Wellpath provided comments through OPSO. The Monitors considered the comments of the parties in finalizing Report #18.

**D.**    **Communication with Stakeholders**

The Monitors are committed to providing as much information as possible regarding the status of OPSO's efforts to comply with all orders of the Court. During the monitoring period, OPSO did not honor the request of the Monitors to provide a link to the current reports on the OPSO website. Report #16 and some prior reports are now available on the



OPSO website.

**E.**     **Recommendations**

Over the years, the Monitors have provided multiple recommendations and suggestions to OPSO to assist in achieving and maintaining compliance with the Consent Judgment. The purpose of the recommendations continues to be to assist OPSO in achieving and maintaining compliance; not to change the requirements of the Consent Judgment. There are recommendations and suggestions included within the body of this report.

**F.**     **Conclusions and Path Forward**

OPSO has been operating under the provisions of the Consent Judgment since June 2013; monitoring began in Fall 2013. During the previous leadership of Director Hodge, significant improvements were acknowledged by the Monitors. Sheriff Gusman resumed the role of full responsibility for bringing OPSO into compliance with the Consent Judgment in August 2020. Sheriff Gusman was defeated in the election held in December 2021 which seemed to lessen his desire to make progress in obtaining compliance during the remainder of his tenure. Chief LeCounte resigned from the OPSO in December 2021 which created a significant leadership vacuum. Sheriff Hutson was sworn in as Sheriff in May 2022. Sheriff Hutson has embraced the challenge of complying with the Consent Judgment and has established a good working relationship with the monitoring team.

However, it continues to be concerning that the same deficiencies pointed out in previous reports by the Monitors continued to exist and are not resolved. Serious incidents and harm to inmates continue to occur. OPSO has made some efforts to identify and address sources of contraband, but the Monitors encountered inmates smoking, including marijuana and synthetic marijuana, in the facility and weapons have frequently been fashioned from materials within the OJC. Dangerous medication is frequently found during cell shakedowns; the medication distribution process continues to be flawed. Narcotics frequently are discovered in the facility and two inmates died of fentanyl overdoses in June 2023.

There appears to be a new emphasis on OPSO's data collection. Data collection and analysis is key to problem solving with a goal of a sustainable reduction in inmate-on-inmate assaults, inmate-on-staff assaults, uses of force, contraband, and property damage. Development of corrective action plans based on thorough analysis of the data and root cause reviews are crucial to improvement. Follow-through on implementation is essential.



The Monitors are hopeful that improvement will take place with the emphasis placed on data collection and analysis by OPSO under Sheriff Hutson.

  The Monitors remain committed to the Court and the parties to collaborate on solutions that will result in significant improvement towards compliance with the provisions of the Consent Judgment and future achievement of constitutional conditions.

**The Monitors again thank and acknowledge the leadership, guidance, and support of The Honorable Lance M. Africk and The Honorable Michael B. North.**



## I. A.   Protection from Harm

**Introduction**

This section of the Consent Judgment addresses core correctional functions including the use of force (policies, training, and reporting), identification of staff involved in uses of force through an early intervention system, safety and supervision of inmates, staffing, incidents and referrals, investigations, pre-trial placement of inmates in the facility, classification, the inmate grievance process, safety of inmates from sexual assault, and inmates' access to information.

The Consent Judgment requires that OPSO operate the facility to assure inmates are "reasonably safe and secure." Based on objective review of data, the facility has shown improvement in inmate and staff safety over the life of the Consent Judgment, but significant incidents that result in serious injury to inmates and staff continue to occur which confirmed that the facility is not reasonably safe and secure. Concerning is that inmates continue to fashion weapons out of items available in the jail including brooms provided by the jail. Inmate on inmate assaults often happen with no staff present to prevent the incident from occurring or to intervene to stop the incident. These are often incidents and uses of force which result in injuries severe enough to require hospitalization. This would not have occurred if the facility was properly staffed, and the staff were properly supervising the inmates and conducting themselves in accordance with policy. Also concerning is the lack of action to securely house inmates who are easily identified as being frequently involved in violence, contraband, and disruption of the facility.

Reaching and sustaining compliance with provisions of the Consent Judgment, particularly this section, relies on the collection, analysis, and corrective action planning using accurate and reliable data. The Monitors encourage OPSO to continue efforts to build its capacity to collect and analyze relevant accurate data, draw supportable conclusions to inform decisions throughout the organization, develop corrective action plans, implement corrective action plans, and hold staff accountable for non-adherence to corrective action plans and policies. As OPSO's capacity to collect, analyze, plan, and implement is enhanced, the ability to achieve and maintain compliance will be strengthened. Without an enhancement in capacity and dedication to making and implementing informed decisions, OPSO is unlikely to achieve and maintain compliance.



The reporting of incidents to the Monitors and parties has been sporadic during the monitoring period. OPSO has not consistently had someone review the daily medical logs for inmates taken to the clinic for treatment subsequent to an altercation or a use of force, as well as the transport logs of inmates routed to the hospital with trauma-related injuries to cross check them against reported incidents. A continuing issue is the lack of meaningful consequences for supervisors and deputies who fail to comply with the reporting policies resulting in late, incomplete, or missing incident reports. Even something as simple as the checking of a box as to whether there was a deputy on the housing unit when the incident occurred or whether a use of force occurred are often found to be inaccurate.

The Monitors reviewed all reported incidents for the monitoring period in preparation of this report. The following charts compare the totals for the calendar years (CY) 2018-June 2023. Given that the system for reporting incidents has proven to be unreliable, in the past, it was unclear whether a particular decline was the result of reporting errors as opposed to an actual decline in a type of reportable incident. Since October 2022, the Monitors received the reports automatically which supported the proposition that previous declines were more likely the result of not reporting incidents and/or not forwarding the incident reports to the Monitors.

**Table 3 - All OJC Reported Incidents for CY 2018-July 2023**

Table 3 - All OJC Reported Incidents for CY2018 - July 2023



| | Inmate/ Inmate Assault | Inmate Staff Altercation | Use of Force | PREA | Death | Attempt Suicide/ Ideation | Internal Escape | Criminal Damage | Inmate Injury/ Inmate Medical (AKA slip/falls/injury) | Contraband | Staff Misconduct Arrest/ Suspension | Other |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2018** | 442 | 64 | 260 | 47 | 2 | 78 | 48 | 69 | 262 | 106 | 3 | 15 |
| **2019** | 440 | 117 | 358 | 42 | 0 | 82 | 6 | 47 | 145 | 302 | 0 | 6 |
| **2020** | 309 | 139 | 372 | 35 | 3 | 21 | 1 | 64 | 64 | 351 | 0 | 1 |
| **2021** | 293 | 124 | 311 | 17 | 1 | 20 | 1 | 42 | 43 | 350 | 0 | 0 |
| **2022** | 351 | 71 | 229 | 36 | 2 | 45 | 6 | 39 | 35 | 248 | 0 | 10 |
| **2023** | 256 | 58 | 132 | 13 | 3 | 15 | 30 | 24 | 82 | 283 | 0 | 11 |

In CY 2021, the number of reported inmate on inmate assaults, inmate/staff altercations, and uses of force declined slightly, but it should be noted that there was still an alarming use of weapons in assaults resulting in serious injuries. The rate of inmate-on-inmate assaults in CY 2022 increased by 20% over CY 2021. The rate of inmate-on-inmate assaults in CY 2023 is set to increase by another 30% over CY 2022. It this rate continues; the number of inmate-on-inmate assaults will reach a high since this data has been included in the Monitors' Report. Based on the number of contraband incidents thus far in CY 2023, it appears the number of contraband incident will reach the highest number since CY 2028. Many of the inmate injuries or slip and falls are suspected to, in actuality, the result of an inmate-on-inmate assault that was not observed by staff and that inmates were afraid to report. The staff misconduct number reported is not accurate as it reflects what is reported; not what occurred.



**Table 4 –All OJC Reported Incidents by Type by Month CY 2018-July 2023**



| | Jan | Feb | March | April | May | June | July | August | September | October | November | December | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2018** | 92 | 96 | 112 | 121 | 124 | 144 | 116 | 132 | 112 | 113 | 105 | 129 | **1396** |
| **2019** | 123 | 93 | 105 | 112 | 117 | 129 | 113 | 152 | 94 | 137 | 144 | 113 | **1432** |
| **2020** | 107 | 113 | 98 | 109 | 84 | 144 | 98 | 106 | 67 | 75 | 109 | 110 | **1220** |
| **2021** | 125 | 80 | 78 | 109 | 77 | 97 | 91 | 70 | 78 | 113 | 89 | 72 | **1079** |
| **2022** | 77 | 88 | 66 | 50 | 55 | 66 | 67 | 51 | 93 | 137 | 115 | 119 | **984** |
| **2023** | 189 | 125 | 140 | 142 | 164 | 231 | 216 | | | | | | **1207** |

**Assessment Methodology**

Dates of visits:

- September 19-21, 2022 (Lead Monitor only)
- October 18-20, 2022 (Lead Monitor and Monitor Poole)
- December 5-8, 2022 (All Monitors)
- December 19-22, 2022 (Lead Monitor only)
- March 20-21, 2023 (Monitor Dr. Hardyman only)
- April 17-20, 2023 (Lead Monitor, Monitor Poole, and Monitor Dr. Vassallo)
- May 14-18, 2023 (Lead Monitor and Monitor Dr. Johnson for May 14-15, 2023)



- June 19-22, 2023 (Lead Monitor only)
- July 10-13, 2023 (All Monitors)
- August 15-17. 2023 (Lead Monitor only)

Materials reviewed:
- Materials reviewed include the Consent Judgment, OPSO policies and procedures, use of force reports, incident reports, and investigations conducted by Investigative Services Bureau-Internal Affairs Division (ISB-IAD), investigations conducted by ISB-Criminal Division (ISB-Criminal), investigations conducted by ISB-Inmate Division, training materials, shakedown logs, OPSO self-assessment, Wellpath self-assessment, and post logs.

Interviews:
- Interviews included the Sheriff, command staff, jail supervisors, chief of corrections (now referred to as warden), deputy chief of jail operations, classification manager and staff, director of training, Wellpath staff, and various supervisors of units within ISB. Inmates were interviewed by the Monitors onsite for the visit. The Monitors also attended security-related meetings.

### IV. A. 1. Use of Force Policies and Procedures

*A. 1. a. OPSO shall develop, implement, and maintain comprehensive policies and procedures (in accordance with generally accepted correctional standards) relating to the use of force with particular emphasis regarding permissible and impermissible uses of force.*
*A. 1. b. OPSO shall develop and implement a single, uniform reporting system under a Use of Force Reporting policy. OPSO reportable force shall be divided into two levels, as further specified in policy: Level 1 uses of force will include all serious uses of force (i.e., the use of force leads to injuries that are extensive, serious or visible in nature, including black eyes, lacerations, injuries to the mouth or head, multiple bruises, injuries to the genitals, etc.), injuries requiring hospitalization, staff misconduct, and occasions when use of force reports are inconsistent, conflicting, or otherwise suspicious. Level 2 uses of force will include all escort or control holds used to overcome resistance that are not covered by the definition of Level 1 uses of force.*
*A. 1. c. OPSO shall assess, annually, all data collected regarding uses of force and make any necessary changes to use of force policies or procedures to ensure that unnecessary or excessive use of force is not used in OPP. The review and recommendations will be documented and provided to the Monitor, DOJ, and SPLC.*

Findings:

A. 1. a.  Partial Compliance

A. 1. b.  Substantial Compliance

A. 1. c.  Non-Compliance

Observations:

The current OPSO use of force policy was effective as of May 2016. It was last



reviewed in December 2021. OPSO provided the FIT report that was to be reviewed in March 2023 during its annual review of the UOF policy in the 2022 Annual Report. However, proof of the meeting being held, and any recommendations was not provided. It appears it may have been held belatedly in August 2023. While there is a policy, the failure to fully adhere to the policy results in A.1.a. remaining in Partial Compliance. One of the most frequent violations of policy has to do with the failure to attempt de-escalation, including the utilization of mental health staff, before using force. There are also numerous examples of force being used as retaliation for an inmate's actions that do not warrant the use of force; i.e., pepper spray for verbally refusing to comply with an order or for having thrown a substance on the staff.

The reporting system does comply with the requirements of A.1.b., which remains in Substantial Compliance. There continues to be misclassification of uses of force between Level 1 and Level 2 uses of force. To be clear, the Monitors consider the use of OC spray, pepper ball guns, and any other intermediate weapon to be a Level 1 use of force. Level 2 is reserved for escort and control holds.

The Use of Force Review Board (UOFRB) did not meet between January 2022 and June 2022. When the Board did begin to meet, it was faced with a large backlog which resulted in reviewing cases over a year old. It is the group charged with completion of the annual review. The UOFRB met during the compliance period with the exception of February 2023. However, all of the uses of force reviewed were several months old which has resulted in many troubling uses of force by current staff not being reviewed and referred for investigation in a timely manner. As a result, problematic staff often have continued contact with inmates. For example, on the first day of the July 2023, a staff member used OC spray on a handcuffed and restrained inmate less than a week after this same staff members deployed multiple rounds from a pepper ball rifle at an inmate who was on the outside of the mezzanine level. This same staff member had been identified by the early warning system, but no action had been taken by the UOFRB.

An analysis of the number of uses of force was performed by the CAB and submitted in January 2023. The analysis found that only 20% of the cases sampled had been reviewed by the UOFRB and confirmed that reports are not being authored in a timely manner and that first line supervisors are late on their review the majority of the time. The analysis



found that reports are being reviewed by the Major of Security in a timely fashion 82% of the time. However, this did not consider that since the reports often not authored in a timely manner nor reviewed by the first line supervisor in a timely manner, the cumulative time frame allowed for reports to be reviewed and finalized is almost always exceeded. While it is understandable that all issues cannot be included in one audit, it would be helpful to have an analysis as to compliance with the use of force policy such as being reasonable and necessary, and regarding proper use of de-escalation. The CAB is encouraged to confirm the validity of the data before conducting the analysis and to expand the analysis to all aspects of the use of force policy. The annual review of the use of force data and the policy was conducted for CY2022 as required by A.1.c. was not conducted until August 7, 2023, outside of the compliance period, and did not include all of the items required. Problems regarding OPSO analysis of the data, poorly written reports, failure to properly classify uses of force as Level One or Level Two, backlog in the number of use of force incidents to be reviewed, and the lack of timely filed reports continue. Uses of force on specialty pods (particularly the disciplinary pod and the mental health pod) continue to be high, but there have been no recommendations documented and provided to the Monitors and DOJ and counsel for the Plaintiffs to address the problem. As has been pointed out in the past, the Consent Judgment requires not only assessment and reduction of inappropriate uses of force, but also unnecessary uses of force. This is not occurring. Examination of the use of force reports by the Monitors revealed that often the use of force is precipitated by a failure to follow policy such as not restraining the inmate prior to movement or allowing an inmate out of his/her cell with another inmate(s) from whom he/she is to be kept separate or failing to secure the food port in the cell door. Incident reports most often demonstrate a lack of de-escalation efforts as required by the Consent Judgment; particularly before using OC spray. Seldom are mental health staff called upon to assist in de-escalation although a majority of the inmates upon whom force is used are on the mental health caseload. With the continued failure by OPSO to conduct the annual review of the 2021 uses of force, A.1.c., remains in Non-Compliance. Concerns regarding timeliness of submission of use of force reports and reviews are addressed in those sections.

## IV. A. 2. Use of Force Training

***A. 2. a. OPSO shall ensure that all correctional officers are knowledgeable of and have the knowledge, skills, and abilities to comply with use of force policies and procedures. At a minimum, OPSO shall provide***



*correctional officers with pre-service and annual in-service training in use of force, defensive tactics, and use of force policies and procedures. The training will include the following:*
    *(1) instruction on what constitutes excessive force;*
    *(2) de-escalation tactics; and*
    *(3) management of prisoners with mental illness to limit the need for using force.*
*A. 2. b. OPSO shall ensure that officers are aware of any change to policies and practices throughout their employment with OPP. At a minimum, OPSO shall provide pre-service and annual in-service use of force training that prohibits:*
    *(1) use of force as a response to verbal insults or prisoner threats where there is no immediate threat to the safety or security of the institution, prisoners, staff, or visitors;*
    *(2) use of force as a response to prisoners' failure to follow instructions where there is no immediate threat to the safety or security of the institution, prisoners, staff, or visitors;*
    *(3) use of force against a prisoner after the prisoner has ceased to offer resistance and is under control;*
    *(4) use of force as punishment or retaliation; and*
    *(5) use of force involving kicking, striking, hitting, or punching a non-combative prisoner.*
*A. 2. c. OPSO shall randomly test five percent of the correctional officer staff on an annual basis to determine their knowledge of the use of force policies and procedures. The testing instrument and policies shall be approved by the Monitor. The results of these assessments shall be evaluated to determine the need for changes in training practices. The review and conclusions will be documented and provided to the Monitor.*

Findings:

A. 2. a.  Partial Compliance

A. 2. b.  Substantial Compliance

A. 2. c.  Substantial Compliance

Observations:

The Monitor reviewed the training materials, testing documentation, and the supplemental documentation submitted by training staff for the rating period and interviewed the Training Lieutenant present on the day of the inspection. Training staff advised that the annual in-service Use of Force and Use of Force policy and procedure training requirements for CY 2022 were conducted in March 2022 with makeup training conducted in October 2022. As noted in Report 17, OPSO achieved a 96% completion rate for this training requirement. Documentation reflected that OPSO achieved a remarkable completion rate of 100% attendance for the UOF training requirement in A. 2. a. and A. 2. b. for CY2023. The Monitor considers the 100% completion rate to substantially meet the requirement for this section for A. 2. a. and A. 2. b. for CY2022 (included by this rating period) with the exception of the defensive tactics requirement in A. 2. a. CY 2023 will be included in the next monitoring period.

As noted in the previous report, concerns regarding the number of uses of force which violate the use of force policy called into question the effectiveness of the training. The



Monitor's review of the use of force training materials noted that the lesson plan, PowerPoint presentation, and testing materials substantively cover the requisite Use of Force information in A. 2. a. and A. 2. b. 1-5. and the term "Defensive Tactics" is used several times in the Use of Force Lesson Plan. However, due to an OPSO training policy oversight, the Defensive Tactics program was not fully presented in either of the Pre-Service or In-Service classes in CY2022. The Monitor interviewed the Director of Training and determined that the entirety of the Defensive Tactics program (Monadnock Defensive Tactics System (MDTS)) has, as of the date of the inspection, only been provided to POST Level 1 and Level 2 certified deputies as part of the annual "Officer Survival" training. This creates a gap in training for the POST Level 3 "Recruits" in both the Pre-Service and In-Service Defensive Tactics training. Specifically, the opportunity for training in blocking, active defensive skills, and weapons retention is not provided to Recruits until they achieve the POST Level 2 certification. As of the date of the inspection, over 50 individual OPSO Level 3 Recruits had qualified for In-Service level training without receiving the defensive tactics training required by the Consent Judgment. It is the Monitor's opinion that this oversight has contributed significantly to the on-going issues OPSO is experiencing with staff performance in use of force incidents. This has resulted in the downgrading of the rating of A. 2. a. to Partial Compliance.

The Monitor strongly recommends that the current Use of Force training being provided to both Pre-Service and In-Service staff be immediately expanded to include the full MDTS curriculum. The Monitor further recommends that OPSO develop a remedial Defensive Tactics class to cover the deferred portion of the MDTS curriculum and schedule this training in CY2023 for all current Level 3 Recruits.

A thorough review of the use of force reports during the monitoring period reveals the need for additional training which emphasizes de-escalation and provide deputies with additional tools when dealing with inmates with mental health issues and inmates who routinely exhibited behavioral problems. Given some very problematic incidents in which staff observed inappropriate uses of force and did not stop or report the same, it is strongly suggested that the duty to intervene and report be emphasized. As any security staff member may have to deal with an inmate with mental health issues, it is recommended that mental health training be made mandatory for all security staff; not just those daily assigned to the



mental health units, particularly given the majority of the inmates in OJC are on the mental health caseload.

The Monitor reviewed training documentation provided by training staff specific to the 5 percent annual testing requirement for A. 2. c. Testing documentation for 2022 showed it to have occurred primarily in March 2022. Training staff continue to pursue a goal of 15% testing, exceeding that of the consent judgement language. OPSO documentation showed a pass rate of 83.7%. The test given in 2022 was originally approved by Monitor Frasier on April 21, 2021.

The Monitor has, in the past, observed that the Academy staff has maintained detailed, comprehensive, and very well-maintained files. A recent internal investigation has called into question the accuracy of those files. In response to our request for documentation, the Academy staff provided succinct and thorough reports as to who had and who had not completed the required use of force training. The question is what was included in those trainings.

## IV. A. 3. Use of Force Reporting

*A. 3. a. Failure to report a use of force incident by any staff member engaging in the use of force or witnessing the use of force shall be grounds for discipline, up to and including termination.*

*A. 3. b. OPSO shall ensure that sufficient information is collected on uses of force to assess whether staff members complied with policy; whether corrective action is necessary including training or discipline; the effectiveness of training and policies; and whether the conditions in OPP comply with this Agreement. At a minimum, OPSO will ensure that officers using or observing a Level 1 use of force shall complete a use of force report that will:*

*(1)    include the names of all staff, prisoner(s), or other visual or oral witness(es);*
*(2)    contain an accurate and specific account of the events leading to the use of force;*
*(3)    describe the level of resistance and the type and level of force used, consistent with OPP use of force; policy and procedure, as well as the precise actions taken by OPSO staff in response to the incident;*
*(4)    describe the weapon or instrument(s) of restraint, if any, and the manner of such use be accompanied by a prisoner disciplinary report, if it exists, pertaining to the events or prisoner activity that prompted the use of force incident;*
*(5)    describe the nature and extent of injuries sustained by anyone involved in the incident;*
*(6)    contain the date and time when medical attention, if any, was requested and actually provided;*
*(7)    describe any attempts the staff took to de-escalate prior to the use of force;*
*(8)    include an individual written account of the use of force from every staff member who witnessed the use of force;*
*(9)    include photographs taken promptly, but no later than two hours after a use of force incident, of all injuries sustained, or as evidence that no injuries were sustained, by prisoners and staff involved in the use of force incident;*
*(10)   document whether the use of force was digitally or otherwise recorded. If the use of force is not digitally or otherwise recorded, the reporting officer and/or watch commander will provide an explanation as to why it was not recorded; and*
*(11)   include a statement about the incident from the prisoner(s) against whom force was used.*

*A. 3. c. All officers using a Level 2 use of force shall complete a use of force report that will:*



(1)     include the names of staff, prisoner(s), or other visual or oral witness(es);
(2)     contain an accurate and specific account of the events leading to the use of force;
(3)     describe the level of resistance and the type and level of force used, consistent with OPP use of force policy and procedure, as well as the precise actions taken by OPSO staff in response to the incident;
(4)     describe the weapon or instrument(s) of restraint, if any, and the manner of such use;
(5)     be accompanied by a prisoner disciplinary report, if it exists, pertaining to the events or prisoner activity that prompted the use of force incident;
(6)     describe the nature and extent of injuries sustained by anyone involved in the incident;
(7)     contain the date and time when medical attention, if any, was requested and actually provided; and
(8)     describe any attempts the staff took to de-escalate prior to the use of force.

A. 3. d. OPSO shall require correctional officers to notify the watch commander as soon as practical of any use of force incident or allegation of use of force. When notified, the watch commander will respond to the scene of all Level 1 uses of force. When arriving on the scene, the watch commander shall:

(1)     ensure the safety of everyone involved in or proximate to the incident;
(2)     determine if any prisoner or correctional officer is injured and ensure that necessary medical care is provided;
(3)     ensure that personnel and witnesses are identified, separated, and advised that communications with other witnesses or correctional officers regarding the incident are prohibited;
(4)     ensure that witness and subject statements are taken from both staff and prisoner(s) outside of the presence of other prisoners and staff;
(5)     ensure that the supervisor's use of force report is forwarded to IAD for investigation if, upon the supervisor's review, a violation of law or policy is suspected. The determination of what type of investigation is needed will be based on the degree of the force used consistent with the terms of this Agreement;
(6)     If the watch commander is not involved in the use of force incident, the watch commander shall review all submitted use of force reports within 36 hours of the end of the incident, and shall specify his findings as to completeness and procedural errors. If the watch commander believes that the use of force may have been unnecessary or excessive, he shall immediately contact IAD for investigation consideration and shall notify the warden or assistant warden; and
(7)     All Level 1 use of force reports, whether or not the force is believed by any party to be unnecessary or excessive, shall be sent to IAD for review. IAD shall develop and submit to the Monitor within 90 days of the Effective Date clear criteria to identify use of force incidents that warrant a full investigation, including injuries that are extensive or serious, visible in nature (including black eyes, injuries to the mouth, injuries to the genitals, etc.), injuries requiring hospitalization, staff misconduct (including inappropriate relationships

with prisoners), and occasions when use of force reports are inconsistent, conflicting, or otherwise suspicious.

A. 3. e. Ensure that a first-line supervisor is present during all pre-planned uses of force, such as cell extractions.

A. 3. f. Within 36 hours, exclusive of weekends and holidays, of receiving the report and review from the shift commander, in order to determine the appropriateness of the force used and whether policy was followed, the Warden or Assistant Warden shall review all use of force reports and supervisory reviews including:

(1)     the incident report associated with the use of force;
(2)     any medical documentation of injuries and any further medical care;
(3)     the prisoner disciplinary report associated with the use of force; and
(4)     the Warden or Assistant Warden shall complete a written report or written statement of specific findings and determinations of the appropriateness of force.

A. 3. g. Provide the Monitor a periodic report detailing use of force by staff. These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. Each report will include the following information:



*(1)      a brief summary of all uses of force, by type;*
*(2)      date that force was used;*
*(3)      identity of staff members involved in using force;*
*(4)      identity of prisoners against whom force was used;*
*(5)      a brief summary of all uses of force resulting in injuries;*
*(6)      number of planned and unplanned uses of force;*
*(7)      a summary of all in-custody deaths related to use of force, including the identity of the decedent and the circumstances of the death; and*
*(8)      a listing of serious injuries requiring hospitalization.*

*A. 3. h. OPSO shall conduct, annually, a review of the use of force reporting system to ensure that it has been effective in reducing unnecessary or excessive uses of force. OPSO will document its review and conclusions and provide them to the Monitor, SPLC, and DOJ.*

Findings:

A. 3. a.  Partial Compliance

A. 3. b.  Partial Compliance

A. 3. c.  Partial Compliance

A. 3. d.  Partial Compliance

A. 3. e.  Partial Compliance

A. 3. f.  Partial Compliance

A. 3. g.  Partial Compliance

A. 3. h.  Partial Compliance

Observations:

As to provision A. 3. a., the use of force policy requires all uses of force to be reported timely and completely and sets out the potential discipline if the policy is not followed. There were nine (9) disciplinary memorandums submitted as documentation of discipline for failure to report a use of force. Five (5) of those were for failing to activate a body worn camera during a use of force. One was for failure to file the required statement. Three (3) were for not reporting the use of force. There was no documentation of actual discipline being administered. In addition, there were many more incidents of use of force not being reported. Thus, the rating continues to be in Partial Compliance.

Provision A. 3. b. is in Partial Compliance due to the number of use of force reports that are incomplete or inadequate. The use of force policy includes the provisions required by the Consent Judgment, but lack of adherence still occurs. The Monitor provided a checklist of the report requirements to assist supervisors in ensuring reports included all necessary items. A review of those checklists and accompanying reports indicates that the required information is still found to be missing from the use of force reports such as what



led up to the incident, details of actions taken during the use of force, and resolution of the incident. Seldom do reports include an articulation of any de-escalation tactics, a description of injuries sustained, and when medical attention was provided. No proof was provided that deputies and supervisors are being held accountable for failure to include required information. Provision A. 3. c. requires less information as it is a lesser level of force, but the deficiencies are the same as those noted for A. 3. b. and thus it is in Partial Compliance.

The unit managers and watch commanders still are not consistently compliant with the requirements of the Consent Judgment (IV. A. 3. d.) as to their specific duties and the time requirement for performance of these duties under the policies. This has been noted in multiple reports. The Consent Judgment requires submission of the packet to the Assistant Warden within 36 hours not three (3) days or three (3) 12-hour shifts. OPSO's audit of timeliness confirmed that it takes, on average, one and half times as long for submission as policy allows.

A. 3. e. requires the presence of a supervisor for planned uses of force. One of the reasons for this provision is to allow for de-escalation to be attempted before force is carried out. OPSO supervisors seldom utilize de-escalation techniques. Several uses of force which were planned uses of force did not result in a supervisor being present. For instance, deputies used OC spray on inmates secured in their cells who posed no threat. Given the repeated failure of supervisors to utilize de-escalation techniques, this provision's rating remains in Partial Compliance.

The Major of Security fulfilled the role of the Assistant Warden or Deputy Chief of Jail Operations during the monitoring period. OPSO has filled the position of Deputy Chief of Jail Operations after the monitoring period. The use of force policy should reflect which position will conduct the review, required under IV. A. 3. f. During the monitoring period, they were conducted by this major. The Monitor was able to locate documentation that the average time for the review was within thirty-six (36) hours 82% of the time. It is unclear how this average was generated as many reports are sent back to the first line supervisor for incompleteness.  This provision remains in Partial Compliance.

OPSO relies on the quarterly report issued by FIT for documentation as to compliance with IV. A. 3. g. The FIT quarterly reports did not contain all of the required information for compliance with IV. A. 3. g. (3), (4), (5), (6), and (7), and (8). Two memorandums were



provided which provided the information required for IV. A. 3. g. (7) and (8). Thus, this section continues to be in Partial Compliance.

The annual review of use of force incidents for CY 2022 was not conducted until August 7, 2023, and did not include all of the items required by IV. A. 3. h. The documentation produced in March 2023 claimed to support compliance was a memorandum by FIT as to the data and recommendations it was going to present to leadership. It should be noted that it is unclear if the review is based on complete data as there was a backlog in the investigation of cases which occurred in CY 2022. The review contained an improved analysis and confirmed the issues pointed out above, but there needs to be a corrective action plan to remedy the systemic issues. In order to warrant a rating of substantial compliance, OPSO needed to address all of the issues; particularly the most serious issues such as the frequent use of force on the mental health housing units and lack of de-escalation that were not addressed. Also not addressed are how frequent uses of force would not be needed if policy was followed. Therefore, the compliance rating remains at partial compliance.

### IV. A. 4. Early Intervention System ("EIS")

*A. 4. a. OPSO shall develop, within 120 days of the Effective Date, a computerized relational database ("EIS") that will document and track staff members who are involved in use of force incidents and any complaints related to the inappropriate or excessive use of force, in order to alert OPSO management to any potential problematic policies or supervision lapses or need for retraining or discipline. The Chief of Operations Deputy, supervisors, and investigative staff shall have access to this information and shall review on a regular basis, but not less than quarterly, system reports to evaluate individual staff, supervisor, and housing area activity. OPSO will use the EIS as a tool for correcting inappropriate staff behavior before it escalates to more serious misconduct.*

*A. 4. b. Within 120 days of the Effective Date, OPSO senior management shall use EIS information to improve quality management practices, identify patterns and trends, and take necessary corrective action both on an individual and systemic level. IAD will manage and administer EIS systems. The Special Operations Division ("SOD") will have access to the EIS. IAD will conduct quarterly audits of the EIS to ensure that analysis and intervention is taken according to the process described below. Command staff shall review the data collected by the EIS on at least a quarterly basis to identify potential patterns or trends resulting in harm to prisoners. The Use of Force Review Board will periodically review information collected regarding uses of force in order to identify the need for corrective action, including changes to training protocols and policy or retraining or disciplining individual staff or staff members. Through comparison of the operation of this system to changes in the conditions in OPP, OPSO will assess whether the mechanism is effective at addressing the requirements of this Agreement.*

*A. 4. c. OPSO shall provide, within 180 days of the implementation date of its EIS, to SPLC, DOJ, and the Monitor, a list of all staff members identified through the EIS and corrective action taken.*

*A. 4. d. The EIS protocol shall include the following components: data storage, data retrieval, reporting, data analysis, pattern identification, supervisory assessment, supervisory intervention, documentation, and audit.*

*A. 4. e. On an annual basis, OPSO shall review the EIS to ensure that it has been effective in identifying concerns regarding policy, training, or the need for discipline. This assessment will be based in part on the number and severity of harm and injury identified through data collected pursuant to this Agreement.*



*OPSO will document its review and conclusions and provide them to the Monitor, who shall forward this document to DOJ and SPLC.*

<u>Findings:</u>

A. 4. a.  Partial Compliance

A. 4. b.  Partial Compliance

A. 4. c.  Partial Compliance

A. 4. d.  Partial Compliance

A. 4. e.  Partial Compliance

<u>Observations:</u>

Due to unreliability of the electronic EIS, OPSO abandoned the original system and fashioned an alternative version within the AS400. A FIT staff member manually monitors the database to alert FIT staff as to the need to review any uses of force by a staff member.

OPSO has provided its documentation to the Monitors as to the names of the staff members who are flagged for use of force. However, no review of staff alerted under the EIS was documented or provided. OPSO acknowledges that the reviews did not occur. Having alerts with no follow up negates the value of gathering the data. As no documentation of review by the UFRB as to EIS alerts was provided and it was acknowledged that the UFRB did not review the EIS alerts. A. 4. a., A. 4. b, and A. 4. c. remain in partial compliance. Continued questionable and inappropriate uses of force by the same staff members and with the same inmates calls into question whether the EIS is being utilized to improve management quality practices, identify patterns and trends, and take necessary corrective action as required. Section A.4.d. is in partial compliance as the EIS protocol lists the required elements, but there is no supervisory assessment nor intervention.

No proof of the UFRB evaluating the EIS data was provided. The annual review of use of force incidents and EIS for CY 2022 was not conducted until August 7, 2023, and did not include all of the items required by IV. A. 4. e. The documentation produced in March 2023 claimed to support compliance was a memorandum by FIT as to the data and recommendations it was going to present to leadership. It is unclear whether those conducting the review noticed that EIS referrals and actions were not documented or simply did not note that failure. This is a significant shortcoming. The review should consist of more than noting that the EIS was triggered. It involves assessing the effectiveness of the EIS which was not performed. Therefore, IV. A .4. e. is in partial compliance.



## IV. A. 5. Safety and Supervision

*A. 5. a. Maintain security policies, procedures, and practices to provide a reasonably safe and secure environment for prisoners and staff in accordance with this Agreement.*

*A. 5. b. Maintain policies, procedures, and practices to ensure the adequate supervision of prisoner work areas and trustees.*

*A. 5. c. Maintain policies and procedures regarding care for and housing of protective custody prisoners and prisoners requesting protection from harm.*

*A. 5. d. Continue to ensure that correctional officers conduct appropriate rounds at least once during every 30- minute period, at irregular times, inside each general population housing unit and at least once during every 15-minute period of special management prisoners, or more often if necessary. All security rounds shall be documented on forms or logs that do not contain pre-printed rounding times. In the alternative, OPSO may provide direct supervision of prisoners by posting a correctional officer inside the day room area of a housing unit to conduct surveillance.*

*A. 5. e. Staff shall provide direct supervision in housing units that are designed for this type of supervision. Video surveillance may be used to supplement, but must not be used to replace, rounds by correctional officers.*

*A. 5. f. Increase the use of overhead video surveillance and recording cameras to provide adequate coverage throughout the common areas of the Jail, including the Intake Processing Center, all divisions' intake areas, mental health units, special management units, prisoner housing units, and in the divisions' common areas.*

*A. 5. g. Continue to ensure that correctional officers, who are transferred from one division to another, are required to attend training on division-specific post orders before working on the unit.*

*A. 5. h. Continue to ensure that correctional officers assigned to special management units, which include youth tiers, mental health tiers, disciplinary segregation, and protective custody, receive eight hours of specialized training regarding such units on prisoner safety and security on at least an annual basis.*

*A. 5. i. Continue to ensure that supervisors conduct daily rounds on each shift in the prisoner housing units and document the results of their rounds.*

*A. 5. j. Continue to ensure that staff conduct daily inspections of cells and common areas of the housing units to protect prisoners from unreasonable harm or unreasonable risk of harm.*

*A. 5. k. Continue to ensure that staff conduct random monthly shakedowns of cells and common areas so that prisoners do not possess or have access to dangerous contraband.*

*A. 5. l. Provide the Monitor a periodic report of safety and supervision at the Facility. These periodic reports shall be provided to the monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. Each report will provide the following information:*

> *(1)    a listing of special management prisoners, their housing assignments, the basis for them being placed in the specialized housing unit, and the date placed in the unit; and*
>
> *(2)    a listing of all contraband, including weapons seized, the type of contraband, date of seizure, location, and shift of seizure.*

Findings:

A. 5. a.  Partial Compliance

A. 5. b.  Substantial Compliance

A. 5. c.  Partial Compliance

A. 5. d.  Non-Compliance

A. 5. e.  Partial Compliance

A. 5. f.  Substantial Compliance

A. 5. g.  Substantial Compliance

A. 5. h.  Partial Compliance



A. 5. i.   Partial Compliance

A. 5. j.   Partial Compliance

A. 5. k.  Non-Compliance

A. 5. l.   Partial Compliance

<u>Observations:</u>

OPSO has worked hard to finalize policies, procedures, and post orders. OPSO takes the position that all that is required is that OPSO "maintain" policies, procedures, and practices. Having words written on paper without implementation of those policies, procedures, and practices is insufficient for compliance, as demonstrated by the previous discussion of OPSO staff failing to follow established use of force policies and procedures. Policies and procedures must be adhered to and followed for them to be maintained and compliance achieved. Practices, even if not included in policies and procedures, must adhere to the standard also. There is adequate supervision of inmate working areas to result in partial compliance as to A. 5. b. The level of violence continues to rise. There was a monthly average of 24 reported inmate-on-inmate assaults/altercations in CY 2021. That number rose to 27 in CY 2022 and is averaging 37 thus far in CY 2023. This is indicative that OPSO has not substantially complied with the requirement that the facility be reasonably safe for staff and inmates, and that the facility is becoming less safe. The number reported, even while higher than previous calendar years, is suspect given the systematic underreporting of reportable incidents and the number of inmate-on-inmate assaults that are likely undetected due to the lack of staff in the housing areas. While the Monitors are well aware that violent incidents occur in jail facilities, the level currently reflects partial compliance with the obligation to provide a reasonably safe and secure environment as to A. 5. a. and A. 5. c.

Review of the significant incidents during the monitoring period indicates that the failure of staff to follow policy consistently continues to be a serious impediment to effective supervision of the inmates. Staff continue to leave inmates unsupervised for hours and allow them to have access to materials by which to fashion weapons. Many of the inmate-on-inmate assaults occur because staff allow inmates out of their cells and leave them unsupervised. There are inmates who repeatedly do not follow the rules of OJC including assaulting other inmates, assaulting staff, destroying property, smoking contraband and/or threatening self-harm. OPSO used to house many of those inmates in a high security unit but



chose to abandon this practice shortly after Sheriff Hutson took office. To make matters worse, many of these high-risk inmates were housed in dormitories during the monitoring period. It is of concern that the practice of limiting the movement of high-security inmates and the practice of placing them in specialty housing was eliminated. The Monitors strongly urge OPSO to reestablish a high security unit. While it would be beneficial to develop individual inmate management plans for these inmates, those plans should include specific security measures to be used when these inmates are allowed out of their cells. Such plans, if carried out routinely and consistently followed by all staff, would likely reduce the level of violence in the facility. To date, there is no indication that it is being done on a consistent basis; if at all.

### Table 5 CY 2018-CY 2023 OJC Reported Incidents

| 2018 | Use of Force | Inmate Misconduct | Inmate/ Inmate Assault | Inmate Staff Altercation | PREA | Death | Att., Suicide/ Ideation | Internal Escape | Criminal Damage | Medical (AKA slip/ falls/ injury) | Contraband | Staff Misconduct- Suspension/ Arrest | Other | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| January | 13 | 0 | 38 | 7 | 2 | 0 | 6 | 2 | 3 | 9 | 9 | 0 | 3 | 92 |
| February | 10 | 0 | 28 | 6 | 4 | 0 | 14 | 2 | 10 | 5 | 15 | 2 | 0 | 96 |
| March | 21 | 0 | 37 | 7 | 5 | 0 | 4 | 3 | 11 | 18 | 5 | 0 | 1 | 112 |
| April | 22 | 0 | 39 | 9 | 4 | 0 | 4 | 3 | 12 | 22 | 5 | 0 | 1 | 121 |
| May | 24 | 0 | 52 | 0 | 5 | 1 | 0 | 5 | 8 | 19 | 10 | 0 | 0 | 124 |
| June | 26 | 0 | 46 | 7 | 5 | 0 | 6 | 7 | 3 | 32 | 9 | 1 | 2 | 144 |
| July | 20 | 0 | 30 | 4 | 4 | 0 | 9 | 3 | 3 | 30 | 13 | 0 | 0 | 116 |
| Aug | 27 | 0 | 39 | 3 | 3 | 0 | 13 | 2 | 6 | 30 | 6 | 0 | 3 | 132 |
| Sept | 14 | 0 | 33 | 6 | 2 | 0 | 7 | 5 | 4 | 35 | 6 | 0 | 0 | 112 |
| Oct | 28 | 0 | 32 | 9 | 5 | 0 | 3 | 0 | 2 | 26 | 7 | 0 | 1 | 113 |
| Nov | 21 | 0 | 31 | 6 | 5 | 0 | 5 | 8 | 3 | 18 | 7 | 0 | 1 | 105 |
| Dec | 34 | 0 | 37 | 0 | 3 | 1 | 7 | 8 | 4 | 18 | 14 | 0 | 3 | 129 |



| Total | 260 | 0 | 442 | 64 | 47 | 2 | 78 | 48 | 69 | 262 | 106 | 3 | 15 | 1396 |

| 2019 | Use of Force | Inmate Misconduct FLD/FFD | Inmate/ Inmate Assault | Inmate Staff Assault | PREA | Death | Attempt Suicide/ Ideation | Internal Escape | Criminal Damage | Medical (AKA slip/falls/ injury) | Contraband | Staff Misconduct- Suspension/ Arrest | Other | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| January | 27 | 0 | 40 | 1 | 2 | 0 | 15 | 3 | 7 | 14 | 14 | 0 | 0 | 123 |
| February | 29 | 0 | 26 | 7 | 2 | 0 | 13 | 1 | 0 | 4 | 11 | 0 | 0 | 93 |
| March | 26 | 0 | 25 | 4 | 1 | 0 | 6 | 1 | 2 | 16 | 21 | 0 | 3 | 105 |
| April | 26 | 0 | 28 | 7 | 1 | 0 | 3 | 0 | 3 | 15 | 27 | 0 | 2 | 112 |
| May* | 22 | 12 | 36 | 11 | 6 | 0 | 13 | 0 | 2 | 11 | 25 | 0 | 1 | 117 |
| June | 26 | 7 | 55 | 9 | 4 | 0 | 13 | 0 | 2 | 16 | 23 | 0 | 0 | 129 |
| July | 31 | 13 | 50 | 15 | 5 | 0 | 6 | 0 | 3 | 8 | 13 | 0 | 0 | 113 |
| Aug | 37 | 26 | 32 | 17 | 6 | 0 | 7 | 1 | 8 | 20 | 35 | 0 | 0 | 152 |
| Sept | 31 | 18 | 32 | 4 | 3 | 0 | 2 | 0 | 1 | 10 | 24 | 0 | 0 | 94 |
| Oct | 37 | 21 | 38 | 15 | 4 | 0 | 1 | 0 | 7 | 18 | 33 | 0 | 0 | 137 |
| Nov | 33 | 17 | 55 | 15 | 7 | 0 | 0 | 0 | 6 | 5 | 42 | 0 | 0 | 144 |
| Dec | 33 | 23 | 23 | 15 | 1 | 0 | 3 | 0 | 6 | 8 | 34 | 0 | 0 | 113 |
| Total | 358 | 137 | 440 | 117 | 42 | 0 | 82 | 6 | 47 | 145 | 302 | 0 | 6 | 1432 |

| 2020 | Use of Force | Inmate Misconduct FLD/FFD | Inmate/ Inmate Assault | Inmate Staff Assault | PREA | Death | Attempt Suicide/ Ideation | Internal Escape | Criminal Damage | Medical (AKA slip/falls/ injury) | Contraband | Staff Misconduct- Suspension/ Arrest | Other | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| January | 29 | 18 | 31 | 8 | 4 | 0 | 3 | 0 | 1 | 7 | 35 | 0 | 0 | 107 |
| February | 33 | 17 | 35 | 12 | 2 | 0 | 0 | 1 | 3 | 13 | 29 | 0 | 1 | 113 |



| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **March** | 31 | 19 | 24 | 9 | 1 | 0 | 1 | 0 | 3 | 6 | 35 | 0 | 0 | **98** |
| **April** | 45 | 29 | 25 | 19 | 7 | 0 | 0 | 0 | 4 | 1 | 24 | 0 | 0 | **109** |
| **May** | 37 | 26 | 24 | 11 | 1 | 0 | 1 | 0 | 6 | 3 | 12 | 0 | 0 | **84** |
| **June** | 22 | 16 | 28 | 13 | 4 | 2 | 1 | 0 | 5 | 12 | 63 | 0 | 0 | **144** |
| **July** | 21 | 8 | 22 | 9 | 1 | 0 | 2 | 0 | 4 | 5 | 47 | 0 | 0 | **98** |
| **Aug** | 22 | 23 | 22 | 8 | 2 | 1 | 4 | 0 | 11 | 4 | 31 | 0 | 0 | **106** |
| **Sept** | 24 | 14 | 16 | 12 | 2 | 0 | 2 | 0 | 8 | 4 | 9 | 0 | 0 | **67** |
| **Oct** | 35 | 18 | 24 | 10 | 2 | 0 | 1 | 0 | 3 | 3 | 14 | 0 | 0 | **75** |
| **Nov** | 33 | 19 | 28 | 10 | 5 | 0 | 2 | 0 | 9 | 5 | 31 | 0 | 0 | **109** |
| **Dec** | 40 | 25 | 30 | 18 | 4 | 0 | 4 | 0 | 7 | 1 | 21 | 0 | 0 | **110** |
| **Total** | 372 | 232 | 309 | 139 | 35 | 3 | 21 | 1 | 64 | 64 | 351 | 0 | 1 | **1220** |

| 2021 | Use of Force | Inmate Misconduct FLD/FFD | Inmate/Inmate Assault | Inmate Staff Assault | PREA | Death | Attempt Suicide/ Ideation | Internal Escape | Criminal Damage | Medical (AKA slip/falls/ injury) | Contraband | Staff Misconduct-Suspension/ Arrest | Other | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **January** | 38 | 34 | 32 | 20 | 1 | 0 | 0 | 0 | 3 | 3 | 32 | 0 | 0 | 125 |
| **February** | 27 | 12 | 30 | 14 | 2 | 0 | 1 | 0 | 2 | 5 | 14 | 0 | 0 | 80 |
| **March** | 16 | 10 | 24 | 7 | 4 | 0 | 0 | 0 | 5 | 4 | 24 | 0 | 0 | 78 |
| **April** | 24 | 17 | 27 | 10 | 2 | 0 | 1 | 1 | 2 | 4 | 45 | 0 | 0 | 109 |
| **May** | 21 | 12 | 31 | 7 | 0 | 0 | 0 | 0 | 3 | 1 | 23 | 0 | 0 | 77 |
| **June** | 34 | 18 | 25 | 15 | 0 | 1 | 0 | 0 | 4 | 4 | 30 | 0 | 0 | 97 |
| **July** | 22 | 11 | 22 | 10 | 0 | 0 | 6 | 0 | 8 | 3 | 31 | 0 | 0 | 91 |
| **Aug** | 18 | 13 | 19 | 7 | 0 | 0 | 5 | 0 | 2 | 4 | 20 | 0 | 0 | 70 |
| **Sept** | 28 | 19 | 18 | 6 | 3 | 0 | 1 | 0 | 1 | 7 | 23 | 0 | 0 | 78 |



| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Oct** | 31 | 21 | 22 | 8 | 0 | 0 | 1 | 0 | 6 | 3 | 52 | 0 | 0 | 113 |
| **Nov** | 27 | 12 | 21 | 7 | 2 | 0 | 4 | 0 | 4 | 1 | 38 | 0 | 0 | 89 |
| **Dec** | 25 | 11 | 22 | 12 | 3 | 0 | 1 | 0 | 2 | 4 | 17 | 0 | 0 | 72 |
| **Total** | 311 | 190 | 293 | 124 | 17 | 1 | 20 | 1 | 42 | 43 | 350 | 0 | 0 | 1079 |

| 2022 | Use of Force | Inmate Misconduct FLD/FFD | Inmate/ Inmate Assault | Inmate Staff Assault | PREA | Death | Attempt Suicide/ Ideation | Internal Escape | Criminal Damage | Medical (AKA slip/falls/ injury) | Contraband | Staff Misconduct- Suspension/ Arrest | Other | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **January** | 22 | 12 | 22 | 5 | 1 | 0 | 0 | 0 | 4 | 4 | 29 | 0 | 0 | 77 |
| **February** | 26 | 21 | 18 | 10 | 3 | 0 | 1 | 0 | 4 | 0 | 31 | 0 | 0 | 88 |
| **March** | 15 | 8 | 24 | 1 | 2 | 0 | 4 | 0 | 4 | 3 | 20 | 0 | 0 | 66 |
| **April** | 12 | 6 | 28 | 3 | 1 | 0 | 6 | 0 | 4 | 1 | 1 | 0 | 0 | 50 |
| **May** | 15 | 10 | 24 | 3 | 5 | 0 | 3 | 0 | 4 | 2 | 4 | 0 | 0 | 55 |
| **June** | 22 | 15 | 31 | 2 | 2 | 2 | 5 | 1 | 2 | 2 | 4 | 0 | 0 | 66 |
| **July** | 15 | 6 | 36 | 5 | 3 | 0 | 1 | 1 | 1 | 7 | 6 | 0 | 1 | 67 |
| **Aug** | 15 | 12 | 24 | 1 | 0 | 0 | 1 | 0 | 3 | 2 | 8 | 0 | 0 | 51 |
| **Sept** | 27 | 18 | 30 | 7 | 5 | 0 | 3 | 0 | 6 | 3 | 20 | 0 | 1 | 93 |
| **Oct** | 23 | 16 | 55 | 8 | 9 | 0 | 2 | 0 | 2 | 7 | 37 | 0 | 1 | 137 |
| **Nov** | 13 | 6 | 26 | 11 | 4 | 0 | 10 | 1 | 3 | 3 | 45 | 0 | 6 | 115 |
| **Dec** | 24 | 11 | 33 | 15 | 1 | 0 | 9 | 3 | 2 | 1 | 43 | 0 | 1 | 119 |
| **Total** | 229 | 141 | 351 | 71 | 36 | 2 | 45 | 6 | 39 | 35 | 248 | 0 | 10 | 984 |



| 2023 | Use of Force | Inmate Misconduct FLD/FFD | Inmate/Inmate Assault | Inmate Staff Assault | PREA | Death | Attempt Suicide/Ideation | Internal Escape | Criminal Damage | Medical (AKA slip/falls/injury) | Contraband | Staff Misconduct-Suspension/Arrest | Other | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| January | 24 | 17 | 34 | 9 | 2 | 0 | 5 | 2 | 6 | 15 | 75 | 0 | 0 | 189 |
| February | 19 | 14 | 30 | 4 | 4 | 0 | 1 | 4 | 4 | 15 | 28 | 0 | 2 | 125 |
| March | 14 | 7 | 46 | 9 | 2 | 0 | 5 | 8 | 1 | 7 | 40 | 0 | 1 | 140 |
| April | 18 | 12 | 42 | 9 | 2 | 0 | 2 | 3 | 5 | 6 | 39 | 0 | 4 | 142 |
| May | 21 | 12 | 43 | 11 | 2 | 0 | 1 | 5 | 1 | 15 | 52 | 0 | 1 | 164 |
| June | 36 | 23 | 62 | 16 | 1 | 2 | 1 | 8 | 7 | 25 | 49 | 0 | 3 | 231 |
| July | 32 | 20 | 66 | 18 | 5 | 1 | 4 | 4 | 8 | 20 | 35 | 0 | 4 | 216 |
| Aug | | | | | | | | | | | | | | 0 |
| Sept | | | | | | | | | | | | | | 0 |
| Oct | | | | | | | | | | | | | | 0 |
| Nov | | | | | | | | | | | | | | 0 |
| Dec | | | | | | | | | | | | | | 0 |
| Total | 164 | 105 | 323 | 76 | 18 | 0 | 19 | 34 | 32 | 103 | 318 | 0 | 15 | |

OPSO continues to not timely conduct and document security rounds (30 minutes or 15 minutes depending on the unit) nor perform direct supervision surveillance consistent with the requirements of the Consent Judgment or OPSO policy.

Direct supervision requires surveillance of all of the inmates and cannot be properly performed by sitting behind a desk or in the control module. It requires walking around the unit, looking into the individual cells, and actively engaging with the inmates. Staffing in the housing units was observed to be inadequate throughout the OJC during the monitoring tour. Over the last three monitoring tours, the Monitors witnessed the most unsupervised units in recent memory. The frequency of unsupervised units during this monitoring tour was even worse than the previous monitoring tour. A review of the log of security checks reveals TMH



was the one area which appeared to have sufficient staff and consistently conducted security rounds. Review of incident reports revealed that units were often unstaffed, including many mandatory posts. If staff are not present, it is impossible to make the required rounds. The staff write their rounds on paper forms in addition to entry into the log. While this provides an easier way for a supervisor to see during a unit inspection if the deputy has recorded that the security checks are being performed timely, it is insufficient proof that the security checks actually occurred and requires watching hours of video to verify. Review of video footage after an incident often reveals that security checks are not being conducted and/or inadequately conducted even if recorded in the logbook. OPSO indicated that with the beginning of the formation of the compliance unit that OPSO has now started to audit log sheets with video footage and plans to have an audit report for the next compliance period. A simple review of the documentation provided indicates that there are often gaps of two or more hours in between security rounds. During the onsite monitoring visit, Monitors reviewed the logbooks. Deputies were once again questioned and often found to be incapable of describing what an acceptable security check would be like. At most, in the majority of the units, an adequate security check was only performed when a physical count of the inmates took place; at most, twice in a twelve-hour shift. The rest of the "checks" were no more than looking about the housing unit without leaving the deputy station, or, even more troubling, the control station which is located outside of the housing unit. Given the level of failure to perform security checks and lack of staff assigned to direct supervision, OPSO continues to be in noncompliance with IV. A. 5. d.

A review of the paper logs and forms during the monitoring tour revealed that timely rounds were often not performed and are not accurate. OPSO should consider a reliable system that would allow for rounds, by both deputies and supervisors, to be recorded electronically. Not only would it allow for supervisors to quickly determine whether rounds were being conducted in a timely manner, it would allow for OPSO to prove compliance and address non-adherence.

All twenty-four (24) of the housing units in OJC are designed for direct supervision. At the time of the drafting of the Consent Judgment the design of OJC was known. The Consent Judgment requires that staff provide direct supervision in housing units that are designed for this type of supervision. Thus, continual presence of a deputy in each housing unit at OJC



and TMH is mandatory under the Consent Judgment. OPSO has taken the position that OPSO gets to determine which housing posts are mandatory and routinely does not assign mandatory staff to each housing unit. In addition, deputies are frequently absent from even the housing units designated by OPSO as mandatory. More often than not, one deputy is assigned to two or more housing units. The harm that results from not having a deputy in each pod, especially when inmates are out, is evident by the repeated serious incidents occurring when there is no deputy on the unit, including those resulting serious injury and/or necessitating hospital routes. Thus, IV. A. 5. e. remains in partial compliance.

Regarding overhead video surveillance and recording cameras for OJC (A. 5. f.), there has been a significant investment in cameras. There are times when a nonfunctional camera is discovered when a supervisor or an investigator tries to retrieve the videos, but it is rare. OPSO needs to continue to audit the system by having a supervisor test the various cameras on a monthly basis and prepare a report for the Deputy Chief of Jail Operations. IV. A. 5. f. continues to be in substantial compliance. Supervisors have improved on pulling video as required by the Use of Force policy. Deputies are now issued body worn cameras which is helpful as the body worn cameras provide audio in addition to video.

Four staff members were transferred between divisions during the monitoring period and received on-the-job training; thus, IV. A. 5. g. is in substantial compliance. Given the necessity of utilizing staff from other areas of OPSO to supervise inmates in the OJC, OPSO is encouraged to provide training even if there is not an actual transfer from one division to another. Proof that recruits received training on specialized housing during pre-service was provided. However, no proof of the required annual eight (8) hours of training for the deputies assigned to specialized units was provided; IV. A. 5. h. is in partial compliance. Given the high level of incidents in the specialized units, it is recommended that the training be reviewed, and deficiencies addressed. OPSO continues to be close to being in non-compliance with this provision.

Documentation indicates that supervisors do not consistently conduct daily rounds; thus, IV. A. 5. i. continues to be in partial compliance. Supervisors are required to sign off on the round sheet completed by the pod deputy, but this does not provide proof that the supervisor conducted daily rounds. The daily inspections of housing units as required by VI. A. 5. j. is still only in partial compliance as they are not consistently performed and do not



cover all areas. It is concerning that neither the inspections by the deputies nor the supervisors resulted in the discovery of the destruction of items that are part of the jail to fashion weapons. It is essential that the inspections be thorough and that corrective actions are taken to address the inspection findings.

Monthly shakedowns were not conducted in compliance with VI. A. 5. k. The number of shakedowns increased during this monitoring period, but, on average, only 39% of the required monthly shakedowns of units took place. The high average was 80% and the low average was 0%. The data provided indicates that shakedowns were not conducted even in partial compliance during six of the six months during the monitoring period. There continues to be significant incidents involving contraband including the manufacturing and use of weapons fashioned from the jail itself. The review of contraband reports clearly indicates reoccurring issues. The number of drug overdoses occurring is a direct reflection of the failure to prevent introduction of illicit drugs into the facility and the failure to perform timely and appropriate searches to remove the illicit drugs. There continues to be a serious issue of inmates hoarding medication. Reports demonstrate that inmates are fashioning weapons out of items in the jail which are then used to assault other inmates. Reports and the site visit reveal that inmates are smuggling in marijuana and hallucinogens to smoke. Some of these items come through the mail, but there is a significant issue of staff smuggling in contraband and the failure to detect narcotics being brought in by inmates being arrested. The failure to search inmates thoroughly and properly upon returning from court also constitutes a source of illegal drugs. This indicates the need to analyze the data and develop a corrective action plan to reduce, if not stop, the hoarding of medication, the fashioning of weapons, and the flow of contraband into the facility. OPSO is in non-compliance with this provision. Failure to conduct shakedowns on a proactive basis is directly related to the violence in the facility.

The documentation provided for A. 5. l. includes a listing of contraband, but no classification data. Thus, A. 5. l. remains in Partial Compliance.

### IV. A. 6. Security Staffing

*A. 6. a. OPSO shall ensure that correctional staffing and supervision is sufficient to adequately supervise prisoners, fulfill the terms of this Agreement, and allow for the safe operation of the Facility, consistent with constitutional standards.*

        *(1)      OPSO shall achieve adequate correctional officer staffing in the following manner: Within 90 days of the Effective Date, develop a staffing plan that will identify all posts and positions, the adequate number and qualification of staff to cover each post and*



*position, adequate shift relief, and coverage for vacations. The staffing plan will ensure that there is adequate coverage inside each housing and specialized housing areas and to accompany prisoners for court, visits and legal visits, and other operations of OPP and to comply with all provisions of this Agreement. OPSO will provide its plan to the Monitor, SPLC, and DOJ for approval. The Monitor, SPLC, or DOJ will have 60 days to raise any objections and recommend revisions to the staffing plan.*

*(2) Within 120 days before the opening of any new facility, submit a staffing plan consistent with subsection (1) above.*

*(3) Within 90 days after completion of the staffing study, OPSO shall recruit and hire a full-time professional corrections administrator to analyze and review OPP operations. The professional corrections administrator shall report directly to the Sheriff and shall have responsibilities to be determined by the Sheriff. The professional corrections administrator shall have at least the following qualifications: (a) a bachelor's degree in criminal justice or other closely related field; (b) five years of experience in supervising a large correctional facility; and (c) knowledge of and experience in applying modern correctional standards, maintained through regular participation in corrections-related conferences or other continuing education.*

*(4) Provide the Monitor a periodic report on staffing levels at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. Each report will include the following information:*

    *i. a listing of each post and position needed;*

    *ii. the number of hours needed for each post and position; a listing of staff hired and positions filled;*

    *iii. a listing of staff working overtime and the amount of overtime worked by each staff member;*

    *iv. a listing of supervisors working overtime; and*

    *v. a listing of and types of critical incidents reported*

*A. 6. b. Review the periodic report to determine whether staffing is adequate to meet the requirements of this Agreement. OPSO shall make recommendations regarding staffing based on this review. The review and recommendations will be documented and provided to the Monitor.*

<u>Findings:</u>

A. 6. a.  Non-Compliance

A. 6. b.  Non-Compliance

An overall rating of A. 6. was provided in the previous reports. This was inconsistent with the other introductory paragraphs and has now been discontinued.

<u>Observations:</u>

The level of staffing is extremely insufficient to adequately supervise inmates and allow for the safe operation of the facility. There have been insufficient security staff over the past few monitoring periods, and it has worsened to a level where OPSO struggles to staff the facility and cover basic functions. OPSO's staffing reports document that most mandatory posts are not filled on a consistent basis. Numerous incident reports and investigations reveal posts were not constantly staffed, which resulted in increased violence. OPSO has now put in place the Emergency Staffing and Augmentation Plan (ESAP) which has resulted in escorts being provided to the Tulane psychiatrists and some of the medicals runs. The ESAP



has not been shown to provide any increased coverage of the housing units as many of the individuals, especially the reserves, have been resistant to working in the housing units. Some of them do not have the required certification to supervise inmates. There is still a lack of a coordinated effort on the utilization of overtime and redeployment of staff to ensure the mandatory posts are covered on a consistent basis. The deployment of staff is sufficiently inconsistent and insufficient to result in IV. A. 6. a. (1) and IV. A. 6. a. (2) continuing to be in non-compliance. While the position of Warden/Chief of Corrections was filled in June 2022, no proof that her background, education, and experience fulfill the requirements of provision IV. A. 6. a. (3) was provided; in particular that she has five years of experience supervising a large correctional facility. Thus, it remains in partial compliance. Paragraph IV. A. 6. a. (4) is in substantial compliance, as monthly reports are produced to document hiring and termination of employees. The Stipulated Agreement also provides for bi-monthly reports regarding hiring. Paragraph 7.a. of the Stipulated Agreement of February 11, 2015, requires monthly reporting. Given the importance of the actual implementation of an approved staffing plan, A. 6. a. remains in non-compliance. The last approved staffing plan was in September 2019 and was based on a much different staffing level.

OPSO continues to be in non-compliance with A. 6. b. as OPSO has not provided a periodic review of the staffing plan. Discussion during the monitoring tour indicated that a plan is being prepared, but it has not been finalized or submitted to the Monitors, the Plaintiff Class, or DOJ. An antiquated staffing plan which is based on staffing levels which do not exist is insufficient.

## IV. A. 7. Incidents and Referrals

*A.7.a.   OPSO shall develop and implement policies that ensure that Facility watch commanders have knowledge of reportable incidents in OPP to take action in a timely manner to prevent harm to prisoners or take other corrective action. At a minimum, OPSO shall do the following:*

*A.7.b.   Continue to ensure that Facility watch commanders document all reportable incidents by the end of their shift, but no later than 24 hours after the incident, including prisoner fights, rule violations, prisoner injuries, suicide attempts, cell extractions, medical emergencies, found contraband, vandalism, escapes and escape attempts, and fires.*

*A.7.c.   Continue to ensure that Facility watch commanders report all suicides and deaths no later than one hour after the incident, to a supervisor, IAD, the Special Operations Division, and medical and mental health staff.*

*A.7.d.   Provide formal pre-service and annual in-service training on proper incident reporting policies and procedures.*

*A.7.e.   Implement a policy providing that it is a disciplinary infraction for staff to fail to report any reportable incident that occurred on his or her shift. Failure to formally report any observed prisoner injury may result in staff discipline, up to and including termination.*

*A.7.f.   Maintain a system to track all reportable incidents that, at a minimum, includes the following*



*information:*
        *(1)      tracking number;*
        *(2)      the prisoner(s) name;*
        *(3)      housing classification and location;*
        *(4)      date and time;*
        *(5)      type of incident;*
        *(6)      injuries to staff or prisoner;*
        *(7)      medical care;*
        *(8)      primary and secondary staff involved;*
        *(9)      reviewing supervisor;*
        *(10)    external reviews and results;*
        *(11)     corrective action taken; and*
        *(12)    administrative sign-off.*

***A.7.g.** Ensure that incident reports and prisoner grievances are screened for allegations of staff misconduct, and, if the incident or allegation meets established criteria in accordance with this Agreement, it is referred for investigation.*

***A.7.h.** Provide the Monitor a periodic data report of incidents at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement.*

***A.7.i.** The report will include the following information:*
        *(1)      a brief summary of all reportable incidents, by type and date;*
        *(2)      a description of all suicides and in-custody deaths, including the date, name of prisoner, and housing unit;*
        *(3)      number of prisoner grievances screened for allegations of misconduct; and*
        *(4)      number of grievances referred to IAD or SOD for investigation.*

***A.7.j.** Conduct internal reviews of the periodic reports to determine whether the incident reporting system is ensuring that the constitutional rights of prisoners are respected. Review the quarterly report to determine whether the incident reporting system is meeting the requirements of this Agreement. OPSO shall make recommendations regarding the reporting system or other necessary changes in policy or staffing based on this review. The review and recommendations will be documented and provided to the Monitor.*

Findings:

A. 7. a.  Substantial Compliance

A. 7. b.  Partial Compliance

A. 7. c.  Substantial Compliance

A. 7. d.  Substantial Compliance

A. 7. e.  Partial Compliance

A. 7. f.  Substantial Compliance

A. 7. g.  Substantial Compliance

A. 7. h.  Substantial Compliance

A. 7. i.  Substantial Compliance

A. 7. j.  Substantial Compliance

Observations:

      OPSO has long had a policy on incidents and referrals that sets out the process for documenting and referring incidents. What has been lacking is a sufficient process to ensure



all reportable incidents are being documented and that all incident reports are complete, prompt, and accurate. Watch commanders are required to be notified of any incident occurring and document the incident in their shift log which results in substantial compliance of A.7.a. However, review of the routes of inmates and medical clinic walk-in logs indicates that a number of incidents are not resulting in an incident report. Enough improvement has resulted in a continued finding of substantial compliance, but a corrective action plan to maintain substantial compliance is warranted.

OPSO implemented a process where an OPSO staff member reviewed the "routes" of inmates with serious medical or trauma injuries to the hospital emergency room and the OPSO clinic walk-in logs and compared them to the reports received. The sergeant assigned has improved the quality of this review, but the lack of follow through on items found to be unreported results in IV. A. 7. b. remaining in partial compliance.

During this reporting period, several attempts at suicide were reported within an hour to the proper persons: thus IV. A. 7. c. is in substantial compliance. Documentation on preservice training and annual training on report writing was provided; IV. A. 7. d. is in substantial compliance.

OPSO still does not hold supervisors and security staff accountable for the late reports. No documentation regarding accountability was provided. OPSO's own documentation indicates that reports are often not timely filed. Failure to hold staff accountable results in IV. A. 7. e. being in partial compliance. This provision is close to being in non-compliance.

OPSO has transitioned to the AS 400 system to track the information required in IV. A. 7. f.  and is in substantial compliance. OPSO is doing a better job analyzing the data, but the analysis is still inadequate and often does not result in measures which would correct the problem being identified. The next step is utilizing the analysis to make required changes in policy and procedure. OPSO remains in substantial compliance with A. 7. g.; incidents, and grievances are reviewed for misconduct and referred for investigation where appropriate, but the lack of completeness of reports puts this rating at risk. The Monitors were provided a semi-annual report of incidents, that now, with the supplementation by the daily/weekly reports, contains all of the required information and, thus, IV. A. 7. h. and i. are in substantial compliance. OPSO performed an assessment of whether the reporting system is meeting the



requirements of the Consent Judgment and is given substantial compliance for IV. A. 7. j. as OPSO is now addressing the lack of timeliness.

## IV.   A. 8.  Investigations

*A. 8. a. Maintain implementation of comprehensive policies, procedures, and practices for the timely and thorough investigation of alleged staff misconduct, sexual assaults, and physical assaults of prisoners resulting in serious injury, in accordance with this Agreement. Investigations shall:*

    *(1)    be conducted by persons who do not have conflicts of interest that bear on the partiality of the investigation;*

    *(2)    include timely, thorough, and documented interviews of all relevant staff and prisoners who were involved in or who witnessed the incident in question, to the extent practicable; and*

    *(3)    include all supporting evidence, including logs, witness and participant statements, references to policies and procedures relevant to the incident, physical evidence, and video or audio recordings.*

*A. 8. b. Continue to provide SOD and IAD staff with pre-service and annual in-service training on appropriate investigation policies and procedures, the investigation tracking process, investigatory interviewing techniques, and confidentiality requirements.*

*A. 8. c. Ensure that any investigative report indicating possible criminal behavior will be referred to IAD/SOD and then referred to the Orleans Parish District Attorney's Office, if appropriate.*

*A. 8. d. Provide the Monitor a periodic report of investigations conducted at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement.*

*A. 8. e. The report will include the following information:*

    *(4)    a brief summary of all completed investigations, by type and date;*

    *(5)    a listing of investigations referred for administrative investigation;*

    *(6)    a listing of all investigations referred to an appropriate law enforcement agency and the name of the agency; and*

    *(7)    a listing of all staff suspended, terminated, arrested, or reassigned because of misconduct or violations of policy and procedures. This list must also contain the specific misconduct and/or violation.*

*A. 8. f. OPSO shall review the periodic report to determine whether the investigation system is meeting the requirements of this Agreement and make recommendations regarding the investigation system or other necessary changes in policy based on this review. The review and recommendations will be documented and provided to the Monitor.*

Findings:

A. 8. a.  Partial Compliance

A. 8. b.  Substantial Compliance

A. 8. c.  Partial Compliance

A. 8. d.  Substantial Compliance

A. 8. e.  Substantial Compliance

A. 8. f.   Substantial Compliance

Observations:

      The Investigative Services Division (ISB) is responsible for: the Criminal Investigation Division (investigates possible criminal activity by inmates), Internal Affairs Division-



Criminal (investigates possible criminal activity by staff), the FIT (investigates use of force by staff), the Internal Affairs Division-Administrative (investigates possible violation of policies by staff), and the Intelligence Unit (provides information and intelligence regarding activities that have taken place or may take place in the jail or support activities).

The timeliness and the quality of the investigations produced by ISB has declined over the past two monitoring periods. This particularly applies to investigations by FIT. They are often finalized without having interviewed any witnesses and relying on short self-serving statements by the involved deputy. Thus, IV. A. 8. a., remains in partial compliance. The major and lieutenant resigned in 2020 and lower ranking supervisors have been required to take on additional duties. The supervisor assigned to take over the duties of FIT supervisor initially did a good job at assuming the duties and eliminated the backlog in use of force investigations. However, he is now required to oversee the investigators assigned to criminal investigations. Supervision of in custody death investigations has been moved to IA-Administrative. While they receive additional training, the quality of the investigations is lacking. It is recommended that an experienced supervisor of investigations be hired to head ISB. OPSO filled that position in late September with an individual who has the appropriate credentials including being a highly experienced investigator.

The Monitor acknowledges that investigating incidents of inmate-on-inmate assaults, sexual assaults, staff on inmate assaults, etc. with a goal of seeking indictments is appropriate. Inmates should be held accountable when they commit criminal acts while in the jail facility. The same holds true for staff who commit criminal acts whether it be the smuggling of contraband or assault on inmates. The overall goal is to create a safe jail. In a jail setting, investigations play a critical role in protecting inmates from inappropriate and/or illegal staff actions, protecting inmates from each other, protecting staff from inappropriate and/or illegal inmate actions, and ensuring policy is followed. Continued emphasis is needed on the goal of investigations to prevent future incidents through analysis of the policy, procedures, training, supervision, and physical plant contributors to the incident. This function cannot and should not be performed by ISB alone. Also troubling is how seldom ISB recognizes the other factors which contributed to an incident such as failure to follow policy and/or includes them in the investigation reports. It should be noted that when ISB had included other factors in the investigation report, they have often received



pushback from the leadership in OJC and been accused of overstepping their role. There must be collaboration between ISB and OJC. While collaboration was improving for a while, during this monitoring period, it was noted that the level of defensiveness on the part of OJC staff when issues are pointed out by ISB, or others continued to be high. OJC staff were instructed not to ask ISB for assistance which sometimes resulted in evidence not being gathered appropriately and shakedowns for weapons and drugs being conducted. With the appointment of the Deputy Chief of Jail Operations after the monitoring period, there appears to be a renewed effort at collaboration between OJC and ISB.

ISB has demonstrated training related to the investigative skills provided during 2022. IV. A. 8. b. remains in substantial compliance.

Investigations which reveal possible criminal activity by staff were not always referred to the Orleans Parish District Attorney's Office. It appears that ISB made the decision based on a belief that if ISB did not feel the case was worthy of prosecution, it should not be referred. The standard is referral for possible criminal activity, not whether the case should be prosecuted. Thus, A. 8. c. is in partial compliance. The Monitors remain concerned about the frequent refusal by the district attorney to follow through with filing cases related to indecent exposure by inmates towards staff and assaults on staff due to the throwing of urine and feces by inmates on staff. ISB provides reports in substantial compliance with IV. A. 8. d. and e. ISB reviewed the investigation system to determine whether the investigation system complies with the requirements of the Consent Judgment and forwarded any recommendations to the Monitors in substantial compliance with IV. A. 8. f. The quality of those recommendations has room for improvement and, unless implemented, may result in a lowering of the rating.

## IV. A. 9. Pretrial Placement in Alternative Settings

*A. 9. a. OPSO shall maintain its role of providing space and security to facilitate interviews conducted pursuant to the City's pretrial release program, which is intended to ensure placement in the least restrictive appropriate placement consistent with public safety.*
*A. 9. b. OPSO shall create a system to ensure that it does not unlawfully confine prisoners whose sole detainer is by Immigration and Customs Enforcement ("ICE"), where the detainer has expired.*

Findings:

A. 9. a.  Substantial Compliance

A. 9. b.  Substantial Compliance

Observations:



OPSO provided a memorandum noting that the pretrial program is managed by the Criminal District Court, and that space is provided. OPSO also provided a memorandum that ICE detainers are only accepted for a specified list of offenses.  OPSO has not detained any individuals under an ICE detainer during the monitoring period. The memos are dated March 31, 2023, and signed by the Chief of Staff.

## IV. A. 10. Custodial Placement within OPP

Introduction:

OPSO designed, validated, and implemented an objective classification system to assess and house OPSO inmates according to their threats to institutional safety and security. The automated classification system was implemented on January 15, 2015.[1] The 2022 OPSO pending staffing plan reduced the classification unit staffing from 18.68 to 14 FTEs.[2]

As of March 31, 2023, the Classification Unit staffing was 11 -- seven classification specialists and four shift supervisors.[3] The captain, who served as a liaison between the Classification Unit and OPSO operations, was reassigned to OPSO security. Given the lack of knowledge of classification principles by the captain, his reassignment does not appear to be detrimental. As of December 2, 2023, the former Classification Manager transferred to the Transportation Unit. An acting classification manager as of February 24, 2023. In March 2023, he was named the Classification Manager.

Staffing the Classification Unit has posed challenges, but not to the extent faced by the security or medical/mental health divisions. Nine individuals were hired for the Classification Unit; one resigned before completing the Academy. Three individuals had previously worked in the OPSO Classification Unit; thus, their training and integration into the schedule were expedited.

Thus, during this Compliance Period, OPSO made giant steps toward full staffing of the Classification Unit. In contrast to the previous Compliance Period, when the Classification Unit included only three individuals, and most shifts were not staffed, as of

---

[1] Hardyman, Patricia L. (2015). "Design and Validation of an Objective Classification System for the Orleans Parish Sheriff's Office: Final Report." Hagerstown, MD: Criminal Justice Institute, Inc.
[2] Gusman, Marlin N. (March 16, 2021). "Coverage Plan 2021." Orleans Parish, LA: Office of the Sheriff. pp. 11.  The 2022-23 staffing plan is still pending.
[3] During the Fall of 2022, OPSO created the option for the classification staff to become deputy recruits. Two individuals opted to remain civilian classification specialists, the remaining nine are "recruits." For the purposes of this report, the classification line staff are referred to as "Classification Officers" and the shift supervisors are referred to as "Shift Supervisors."



March 31, 2023, each of the four classification platoons included at least two members. Unfortunately, only four members of the Classification Unit have been cleared for NCIC / Louisiana criminal record systems. Thus, most cannot correctly complete the custody and PREA assessments. The Classification Manager serves as Manager for the Unit and a shift supervisor. OPSO has posted openings for "Classification Specialists" to fill the two remaining positions.

An automated housing assignment process (HUAP) identifies housing options for inmates according to their custody level, gender, special population status, PREA designations, enemies, and associates. Most male admittees are assigned one of the first-floor IPC ROLL IN pods at initial classification.[4] (Special population tags identify individuals for suicide observation versus suicide watch, medical housing/ isolation, academic education, or special diets.) (As needed, men with acute mental health or medical needs go directly to 2A or 4B, respectively. At intake, most women are housed on 3F.)

The OPSO automated housing process assigns enemies and associates to separate pods. This is critical for preventing institutional violence and disruption. While the tension between the Classification Unit and security staff appears to have diminished with the hiring of the new classification manager, security staff and ISB seem reluctant to share information with the classification unit regarding neighborhood cliques/gang involvement, enemies/associates, and other housing separation requirements.

The "ALL" custody and PREA designations continue in the special population units – Mental Health, Protective Custody, Education, Disciplinary/Segregation, Medical, etc. It is important not to negate the classification system and jeopardize out-of-cell time in the struggle to reduce staffing requirements. These tradeoffs may only create more violence and disruption in the long term.  In contrast to previous compliance periods, OPSO has operated pods with less than five inmates. This approach certainly avoids the problems of mixing custody and PREA designations. However, it is relatively inefficient for security staffing purposes. Sometimes, individuals are housed alone in pods without supervision/monitoring.

During this Compliance Period, the Classification Manager or day shift supervisor sent a daily housing matrix to reflect the current OJC, TMH, and TDC populations. The

---

[4] When transferring inmates from the IPC ROLL IN or special population pods to a general population pod, the classification staff matches individuals by custody level, PREA designations, age, and crime/criminal history.



matrices reflected fluctuations in the OPSO population. Isolations for COVID have dropped significantly. The OPSO Special Population Report for October 1, 2022-March 31, 2023, lists only 14 individuals as COVID-19 positive.

Under Compliance Director Hodge, two pods were designated housing units for new arrivals (Roll-In Pods). During the COVID-19 pandemic, these units quarantined newly admitted inmates to slow/prevent the spread of the disease throughout the facility.[5]  The number of Roll-In Pods has grown from two to six, i.e., OJC Tier 1 Pods, A – F.  (For women, Pod 3-F serves as the Roll-in Pod.)   The availability of six Roll-In pods makes initial housing assignments relatively easy, as the staff needs only look at the individual's custody level, PREA designations, and medical requirements (e.g., disability, detox, isolation, etc.). However, maintaining six Roll-In pods restricts the housing options for the general population at reclassification. Individuals often spend months in the Roll-In Pods waiting for a general population bed. Thus, the benefits and mission of the Roll-in Pods have been negated.

As of January 2023, the Classification Unit resumed housing audits to verify the integrity of the housing assignments designed by the Classification staff.   For the first time in five years, documentation of the housing audits was very well-organized and available before our arrival for the Compliance Review.  While some audit reports were incomplete/unclear, housing audits were conducted for January, February, and March 2023.  Further, the Classification Manager tracked and reviewed the audits per the written OPSO housing audit process.

Assessment Methodology:

Compliance was assessed through multiple data sources and activities – review of the OPSO and JMS statistical reports, onsite meetings with OPSO staff, and a site visit conducted July 10 – 13, 2023. The OPSO documents included monthly statistical reports. Analyzed were custody assessment, override, attachment, and enemy refusal data downloaded from the AS400. The statistical reports tracked pending custody assessments, daily population counts, placement errors, the stock population, and monthly custody trends. Onsite activities included:

- Observation of the initial classification, reclassification, and housing processes;

---

[5] Individuals are assigned to a Roll-In cell by custody level, PREA designations, age, and crime/criminal history. COVID-19 restrictions required further separations by date of admission.



- Meetings with OPSO classification, facility administration, and compliance unit staff;
- Review of body-camera videos of staff interviews to resolve inmate enemy/associate separations; and
- Examination of the protective custody placement and status reviews.

This review focused primarily on the data and Classification Unit activities between October 1, 2022 – March 31, 2023. Some analyses considered trends over twelve to fifteen months (12-15) to detect variations due to seasonal variations and COVID-19-related procedures. In addition, comments as to the status of the classification unit -- staffing, lack of leadership, training for new/rehires and new responsibilities, and the integrity of the classification – are provided to guide OPSO toward Compliance.

Summary:

OPSO complies substantially with four of the eight Custodial Placement sections of the Consent Judgment (Sections b, e, g, and h). Sections a and c are rated as Partial Compliance. OPSO is noncompliant with sections d and f.  While OPSO did not move to Substantial Compliance for all sections of the Consent Judgment during this review period, significant progress was observed for each section. (Section b [*Prohibit classifications based solely on race, color, national origin, or ethnicity*] remained in Substantial Compliance)*.* The Classification staff are commended for their efforts and achievements regarding Custodial Placement. Perhaps most important is the "can and will do" attitude exhibited by the Classification and Compliance Unit staff.

Findings:

A. 10. a.  Partial Compliance

A. 10. b.  Substantial Compliance

A. 10. c.  Partial Compliance

A. 10. d.  Noncompliance

A. 10. e.  Substantial Compliance

A. 10. f.   Noncompliance Compliance

A. 10. g.  Substantial Compliance

A. 10. h.  Substantial Compliance

***IV.A.10. a. OPP shall implement an objective and validated classification system that assigns prisoners to housing units by security levels, among other valid factors, in order to protect prisoners from***



*unreasonable risk of harm. The System shall include consideration of a prisoner's security needs, the severity of the current charge, types of prior commitments, suicide risk, history of escape attempts, history of violence, gang affiliations, and special needs, including mental illness, gender identity, age, and education requirements. OPSO shall anticipate periods of unusual intake volume and schedule sufficient classification staff to classify prisoners within 24 hours of booking and perform prisoner reclassifications, assist eligible DOC prisoners with re-entry assistance (release preparation), among other duties.*

Finding:

Partial Compliance

Observations:

Compliance with Section IV.A.10. a. moved from Non to Partial Compliance during this review period. While there was a substantial improvement, the rating is Partial Compliance for three reasons:

- **Staffing:**  As of March 31, 2023, the Classification Unit staffing was 11 -- seven classification specialists and four shift supervisors. A shift supervisor and classification specialist were available for each shift. As of July 2023, two classification specialist positions are posted on the OPSO website. The shift supervisors oversee the classification specialists, process housing transfers, complete custody reviews, conduct housing audits, address classification-related grievances, and make rounds to the pods. The classification specialists complete the custody and predation/vulnerability (PREA) assessments and assign appropriate pod and cell housing accordingly. Although the new Classification Manager had no opportunity to learn his roles and responsibilities from his predecessor, he has learned quickly. And he is open to tackling the new tasks associated with housing audits, protective custody/administrative segregation reviews, review of enemy/associates, and the accuracy of the custody assessments, training, and staff supervision.

  The primary Classification Unit staffing concern was that only four of the 11 specialists had been cleared for the NCIC / Louisiana criminal record systems. Although they have been on the job for six or more months, most cannot fully complete the custody and PREA assessments. On two of the four platoons, no one has an NCIC clearance. Further, the day shift classification specialists do not conduct custody reassessments or housing re-locations. These tasks fall to the



shift supervisor.  When the shift supervisor or Classification Manager attends to other duties, the custody reassessments and housing changes languish.

During October – December 2022, while the Classification Unit was rebuilt from three to 11 specialists one would have anticipated a high number of overtime hours logged by the classification staff. During October – December 2022, the average number of overtime hours/month/staff member was 59.2 hours. However, the average number of overtime hours/month/ staff member during this Compliance Period ranged from a high of 62.1 hours in March to a low of 41.7 hours in February. Thus, the number of overtime hours logged was not linked directly to staffing. The Classification Unit logged 1,948.65 hours of overtime.[6]  During this Compliance Period, the classification officers worked overtime an average of 50.65 hours/month while the shift supervisors worked an average of 68.24 hours of overtime/month (In contrast, non-Classification Unit staff logged an average of 27.43 hours/person/month during this Compliance Period.) Thus, the overtime rates were not linked directly to coverage for each shift; but rather a combination of staffing level, the scheduling process, and special projects.

- *Housing Matrix:* The classification system is compromised in the OPSO special population pods -- Mental Health, Medical, Education, TMH, TDC, Disciplinary/Segregation, and female units. The matrix allows for all custody levels and PREA statuses in these pods. Per the March 30, 2023, Housing Matrix, 14 of the 31 OJC/TDC/TMH pods housed individuals of all custody, vulnerability, predation, and special population status.  As needed, two TDC pods --- B3-E (men) and B3-W (women) -- housed COVID-19-positive residents. However, what is perplexing is the continued mixing of all custody levels on two pods dedicated to Travis High School (THS) students. While the idea of a pod for low-custody THS students has some merit, OPSO scatters most THS students throughout OJC. Thus, why are two pods with all custody levels reserved for THS students?

---

[6] OPSO Excel spreadsheets entitled Overtime by Month and HR Report Hire and Separations Reports for 2022 and 2023.  The classification work schedule builds in eight hours of overtime/month.  However, the same scheduling formula impacts other OPSO staff.



The TMH treatment teams assign patients to cells according to their mental health needs with little regard for their custody or PREA status. (Known enemies live in separate pods.) Housing assignments, activities, and out-of-cell time are scheduled according to the individual's program/ treatment level. So again, classification is compromised.

Given the size and configuration of the OJC and TDC/TMH, we recognize that pods with multiple custody levels and PREA designations are unavoidable. However, OPSO appears to favor "ALL CUSTODY ALL STATUS" pods despite inadequate security staffing and out-of-cell schedules activities that allow for mixing high-risk inmates. This is further exasperated by placing high-risk inmates in dormitories.

- **Classification staff control of housing assignments**. The January – March housing audits indicated that, for the most part, inmates were in the cell and bunk assigned by the classification staff. Two audit reports indicated that inmates were sleeping on the wrong dormitory beds, but otherwise, "no errors" were reported. This is good. Further, in contrast to previous site visits, the classification staff and facility administrators expressed fewer concerns that inmates were not living in their assigned cells or sleeping in their allotted bunks. There was also less tension between the Classification and Security staff. However, observation of the classification staff suggested that the security staff directed the housing assignments through repeated calls to specify the pod and cell to which an inmate should be assigned. This is not acceptable and likely to result in inmates manipulating their housing assignment which results in gang behavior including assaults of other inmates.

The new Classification Manager must work closely with other OJC Divisions to facilitate information sharing and build trust. As the OPSO rebuilds the Classification Unit, the Classification Unit should consider strategies for utilizing the security staff's knowledge of local cliques, checking in with the inmates during their rounds or audits, and addressing inmate grievances.

*IV.A.10.b. Prohibit classifications based solely on race, color, national origin, or ethnicity.*
<u>Finding:</u>



Substantial Compliance

Observations:

      The custody assessments consider objective risk factors validated for the OPSO male and female inmates. The individual's race is not one of the objective risk factors. Classification specialists consider the individual's custody level, vulnerability designation, age, and charges to select a cell and bed from those the JMS automated housing program identifies as appropriate housing for the individual. To track this element of the Consent Judgment, OPSO created a monthly statistical report to record the race and gender of individuals per housing location.

      The OPSO "Housing By Race" reports suggested that race was not a factor in OJC housing assignments. With a few exceptions, the number of black and white inmates within each OJC housing unit was consistent with the overall racial distributions among the OPSO inmate population. As shown in Figure 1, the percentage of white males assigned to the TDC DOC worker dropped during this Compliance Period – 33.3% during October 2022 versus 16.7% during March 2023. The proportion of white inmates within the total male inmate population has been relatively constant -- between October 2021 – March 2023, only 12.3 percent of the OPSO male population identified as white.



Figure 1: Percentage of White Males Assigned to OJC, TDC & TMH Housing Units – Oct 2021 – Mar 2023.

      In contrast to the previous Compliance Periods, during this Compliance period, the percentages of white women assigned to the OJC versus TMH did not differ significantly. As shown in Figure 2, on average, 18.6% of the OPSO female population identified as white. On



average, while the rate varies, 22.0% of the women assigned to the TMH unit identified as white. The overall trend among the OPSO female population is a decrease in the percentage of women identified as white, yet the number of white women assigned to TMH has increased.



Figure 2: Percentage of White Female Inmates Assigned to OJC & TMH Housing Units – October 2021 – March 2023.

***IV.A.10.c Ensure that the classification staff has sufficient access to current information regarding cell availability in each division.***

Finding:

Partial Compliance

Observations:

OPSO automated housing assignment process (HUAP) considers the inmate's custody level, gender, special population status, PREA designations, enemies, and associates versus OJC beds available to recommend an appropriate bed. Housing tags identify inmates on suicide observation versus suicide watch, medical, mental health, alcohol/drug detoxification protocol, gang affiliation, special diets, and school participation.

The OPSO daily population report lists the units, cells, and beds offline for maintenance or staffing, as recorded in the AS400. The reliability of the AS400 data for cells/pods offline within the housing module was unavailable. Classification staff rely on maintenance reports from security and maintenance staff. The classification specialists' work area walls displayed the usual collage of messages and notes of damaged and closed cells. The classification



specialists could not speak to the accuracy or timeliness of the notices. Notable was the date of the posted housing matrix -- April 2023. Thus, although the OPSO housing matrix is updated daily, the current matrix is not posted in the classification specialists' work area.

Classification specialists track all bed assignments to avoid housing errors or duplications due to delays between the inmate's housing assignment and the physical transfer of the individual to the designated pod/cell. These <u>manual</u> lists and notes direct the housing assignments. Overall, during this compliance review period, the classification staff had access to automated and manual information regarding current bed availability throughout OJC, TDC, and TMH.

***IV. A. 10. d. Continue to update the classification system to include information on each prisoner's history at OPSO.***

<u>Finding:</u>

Noncompliance

<u>Observations:</u>

As shown in Figure 3, the monthly custodial reports provided by OPSO indicated:

- **Percent Initial Custody Assessments**: During this Compliance Period, the Classification Unit completed initial custody assessments for 91.4% of the inmates booked into OJC.  This rate is equivalent to that observed for the previous Compliance Period (91.3%). However, during the latter half of this Compliance Period (January - March 2023), staff completed custody assessments for 93% of the inmates booked into OJC.

- **Percent Within 8 Hours:** During this Compliance Period, the percentage of initial classifications completed within the first eight hours of booking increased from a low of 71.7% in October to 91.7% during March 2023. Thus, by the end of the Compliance Period, less than 10 percent of the detainees remained in the booking area for more than eight hours before assignment to a bed.





*Figure 3: Rates and Completion Time for Initial Custody Assessments Completed April 2022 – March 2023*

- **Percent Greater Than 24 Hours:** Very few -- only .5 percent -- of the inmates were not classified within 24 hours of booking. The rate improved slightly during the latter half of the period (January - March 2023) to .1%. This rate matches the rates observed before the Fall of 2022 when the classification staffing level fell to three persons.

These data suggested that although the percentage of inmates initially classified remains at about 91%, there are still concerns about the lag time between booking, classification, and housing. When asked about the time from booking to housing, staff attributed the delays to security/escort and medical staffing rather than the custody assessment process. When observing the initial classification and housing process, the classification specialists were stymied by delayed medical clearances or the availability of lower bunks available within the Roll-In pods. When asked about reclassifying or transferring inmates who had cleared their detoxification process or COVID-19 restrictions from the Roll-In to general population pods, the classification specialist responded, "I don't know how to do that. I only classify and house inmates from the booking area." This comment suggested that the delays between booking and housing were due to inadequate classification staff training as well as staffing shortages.  A review of the length of stay within the Roll-In Pods indicated that the delays were due to limited space within the general population, non-Roll-In pods.



As noted for this and previous compliance reports, the OPSO Housing Matrix was revised multiple times to ensure appropriate separations for COVID-19 treatment, quarantine, and isolation and to address shifts within the inmate population. The "ALL CUSTODY - ALL STATUS" pods continue to pose significant risks as Low, Medium, and High custody inmates with different PREA designations and special needs live in the same housing units; including dormitories.  During this Compliance Period, administrative and security staff reports indicated that for most of the general population pods, all inmates are out of their cells together. Within the special population pods, groups or clusters of cells are let out together.  However, the rationale for scheduling or clustering cells for joint out-of-cell times was unclear.  Security staff reported exchanging information regarding intra-pod conflicts and tensions. All agreed that shift debriefs, and intelligence sharing are essential for identifying and maintaining inmate separations. However, this knowledge is not routinely exchanged with the Classification Unit except as ad hoc requests for housing transfers. The simple statement, "ZZZZ XXX can't live on this pod." does not provide the classification staff with sufficient information to place the individual in a different housing unit. Thus, the transfer process is repeated again and again, multiplying the workload for the limited classification and escort staff.

Regardless of the staffing patterns, pod mission, and schedules, the sub-standard practice of mixing custody/vulnerable inmates during out-of-cell activities should be discontinued as soon as possible. A straightforward option is to list the custody level and key separation tags on the housing rosters. Further, adherence to the housing assignments by the Classification Unit is critical for maintaining inmate separations and, thus, institutional safety and security.

Previous compliance reports have delineated the dangers of overriding the scored custody levels for housing purposes. As shown in Figure 4, during this Compliance Period -- October 2022 – March 2023 -- 20.3% of custody overrides were for housing purposes. Further, one could argue that the automatic overrides of "Potential Victim/Potential Predators" from Minimum to Medium are another type of housing override. During December 2022, for example, 23.0% of the overrides were PREA-related. During March, 63.8% of the overrides were PREA-related.  Staff did not provide the rationale for 26.5 percent of the overrides.





Figure 4: Percent Overrides for Housing Purposes - October 2021 – March 2023

The October 2022 - March 2023 classification stock population reports indicate that staff overrode the scored custody level for 2.7% percent of the men and 1.2% of the women. (See Figure 5.) These rates are well below the recommended rate of 5 to 15 percent.[7]  Within this small group of inmates, approximately ∼a third are housing-related overrides. Under the COVID-19 Pandemic, the OJC ADP had decreased significantly. However, by the Summer of 2022 -- July – September -- the ADP increased to over 1,000. (See Figure 9.)  This population increase, along with the pods closed for repairs and staffing shortages, created housing challenges. Continued tracking of the discretionary overrides for housing purposes remains essential as the Pandemic wanes and the ADP increases.

On the other hand, the percentage of custody assessments impacted by a mandatory override (OPSO policy restrictions) remains high. OSPO should revisit these restrictions as part of the revalidation of the classification system. However, in the interim, OPSO should consider eliminating the mandatory restrictors at reclassification that require medium custody for all open felony detainers or open felony charges. This change would base the custody level on the individual's behaviors rather than legal status.

---

[7] Austin, James and Patricia L. Hardyman. 2004. *Objective Prison Classification: A Guide For Correctional Agencies.* Washington, D.C.: National Institute of Corrections.





Figure 5: Mandatory and Discretionary Override Rates by Gender: October 2021 – March 2023

As part of the Compliance Report #14 review, we observed housing overrides for "inmate refusal of enemies" to facilitate the housing of general population inmates. Staff dismissed inmate-to-inmate conflicts to expedite transfer requests from one pod to another. In response to the Monitors' and Plaintiff attorneys' questions, OPSO revised its Inmate Classification Procedures (#7020) to include rules for resolving an "Inmate Refusal of Enemy." These Procedures require detailed documentation of the reviews and quarterly audits to ensure the separation review process works as intended and to make recommendations for adjustments as needed. The Classification Manager updated the "Separation Review Checklist" (3-10-2022) to record the "enemy refusal" evaluations.[8] OPSO developed screens and reports in the AS400 to document and track the separation reviews as per the Inmate Classification Procedures (#7020). In March 2022, the classification staff were instructed on the new procedures, screens, and interview form.

OPSO staff created automated screens within the AS400 to track and document enemy and associate separations reviews.  Despite the efforts to develop a systematic process to review and verify inmate enemy and associate separations, OPSO continues to disregard its' policies and documentation standards.  During this Compliance Period, 11 enemy separations were recorded in the AS 400. While this number is significantly less than the 22 recorded during the previous Review Period, the reviews did not meet the OPSO Inmate Classification Procedures standards for assessing the separations' validity and

---

[8] The Classification Unit staff indicated that the earlier versions of the checklist were "too long."



documentation. For example, a separation checklist was not completed for any of the removals. Instead, the Sheriff's Adjutant took it upon himself to record the inmate interviews via a body camera. These interviews were quite troubling for several reasons:

- The purpose of the "interview" was not explained -- The inmates had no idea why they were being questioned about another inmate.
- The interviews were not private -- Some occurred at the cell front and/or with other inmate(s) present.
- The interviewer did not attempt to learn the source or validity of the conflict between the inmates. Most of the interviews were garbled and lasted less than one minute.
- Classification staff did not check, as per OPSO policy, the disciplinary history of the "enemies" to ensure that there were no predatory or aggressive incidents between the two individuals within the last 36 months.

Further, it was unclear who or what initiated the separation reviews – the inmates, grievances, security staff, or ??  Other blatant policy violations included failure to seek input from mental health and security staff, failure to review the inmates' disciplinary and institutional histories, and failure to privately interview both inmates named in the separation. The Classification staff received an email indicating the inmates were not enemies, and the separations should be removed from their profiles. The "videos" of the interviews were provided to the Classification Manager following the Monitor and Plaintiff's request to see the videos. The Classification Manager has resumed control of the separation review process. The idea of recording the interviews has merit. However, a one-minute video by someone untrained in classification does not displace all the other elements of the policy.

The Classification Monitor List (List) is an ad hoc report identifying inmates for whom a custody review is due. Custody reassessment reasons include a regular 60/90-day reassessment or a status change or event within their jail records, i.e., amended charge(s) or bail amount, disciplinary incident, detainer lodged/lifted, or a new sentence. The number of inmates on the list fluctuates as inmates return from court, move through the booking process, and the like. The goal is for the classification specialist or supervisor to complete all pending custody reviews during their shift. During the previous Compliance Review period, the average number of pending custody assessments per the Classification Monitor list was



62.3 – 4.3 were awaiting an initial classification, and 58.0 were awaiting a custody reassessment. These numbers indicated a sharp increase over those from the previous Compliance Period -- total, 27.6; initial type, 4.7; and custody reassessment, 23.0.  As shown in Figure 6, the number of pending custody reassessments increased sharply in the Fall of 2022. By the end of December, more than 300 custody reassessments were pending. However, under the new Classification Manager and increased staffing, the number of pending assessments has dropped to that comparable to the Spring of 2022.



Figure 6: Pending Custody Assessments - April 1, 2022 – March 31, 2023

Following Compliance Report #8, OPSO worked with Wellpath to rebuild the linkages between the medical/mental health records and JMS. These data are essential for scoring seven PREA victimization and predation risk factors. Medical and mental health information is critical for the inmates' housing assignments. Wellpath medical and mental health treatment data are routinely (every five to eight minutes) uploaded to the JMS. It appears that the ERMA-AS400 linkages are finally yielding some data on the victimization of individuals on the mental health caseload. As shown in Figure 7, OPSO disciplinary reports indicated that nine (9) individuals on the mental health caseload were victims of an assault or battery during this Compliance Period. Only nine incidents appear low, given the number of inmate-on-inmate battery/assaults and the Wellpath mental health caseload. Nevertheless, it is important to remember that this number only reflects incidents of OPSO disciplinary Code 101 (battery) and Code 102 (assault), of which the perpetrator was found guilty.





Figure 7: Victimization of Inmates on the Mental Health Caseload - April 2022 – March 2023

Figure 8 provides the number of attachments to record criminal history data input by the classification staff between April 2021 and March 2023. The classification staff completed fewer than ten attachments/month between November 2022 and March 2023. It appears that classification specialists ceased to routinely review the criminal rap sheets and input attachments to record non-Orleans Parish criminal convictions. When asked about the low number of attachments, OPSO observed that most classification staff do not have NCIC logins/passwords that would allow them to check for non-Orleans Parish convictions. Further, observation of the initial custody assessments revealed that the Intake and Process Center (IPC) staff had stopped including the NCIC rap sheets in the intake/booking folders provided to the classification staff. Without direct access to NCIC and the absence of the hardcopy of the rap sheets, the classification specialists simply skipped the critical step of reviewing criminal rap sheets for the initial custody assessments.





Figure 8: Number of Attachments Input by Classification Staff – April 2021 – March 2023

Thus, it appears that the criminal history data required to score four of the custody factors, three of the vulnerability factors, and four of the predation were compromised by the failure to 1) ensure all staff had access to the NCIC criminal history system; 2) check the booking folders for the rap sheet; 3) track and follow-up assessments with missing rap sheets; and 4) audit the accuracy of the custody and PREA assessments. The stopgap process of putting the criminal rap sheets in the booking folders was resurrected during a quick conversation with the IPC Major. However, what is still quite troubling is that the criminal history rap sheets were not reviewed for most of the custody assessments completed between January – July of 2023. Also, disconcerting was the failure to identify and address the problem; instead, staff allowed it to languish for months, lamenting that the NCIC certification process is "slow."





Figure 9: Percentage of Initial Custody Assessments for which an Attachment was created between April 2021 and March 2023

In sum, although the Classification Manager has addressed the backlog of custody assessments and maintained, actually reduced, the time between booking and the initial custody assessment, this section is rated as "Noncompliance" due to the failure to review the criminal history rap sheets and address the risks posed by the enemy separation reviews.

***IV.A.10.e. Continue competency-based training and access to all supervisors on the full capabilities of the OPSO classification and prisoner tracking system.***

Finding:

Substantial Compliance

Observations:

A six-hour objective classification training was held on March 20 and 21, 2023. Topics included the principles of objective classification, OPSO custody and PREA risk scoring, criminal history reviews and attachments, custody overrides, and housing decisions. All the classification specialists, supervisors, and members of the OPSO Compliance Unit attended. The training curriculum included pre- and post-training competency-based testing. In addition to the March training, the Classification Manager has provided remedial instruction, as needed, to address custody assessment and housing errors.

***IV.A.10.f. Conduct internal and external review and validation of the classification and prisoner tracking system on at least an annual basis.***



COMPLIANCE REPORT # 18                                                  73

Finding:

Noncompliance

Observations:

Compliance for this section focused on three types of audits: Housing (checking the veracity of the inmate housing assignments; internal (checking the accuracy of the custody, PREA, and housing designations by the classification staff), and statistical validation of the OPSO objective classification system. During this Compliance Period, OPSO audited the housing assignments for January - March 2023 but not October – December 2022. Neither the internal audits nor statistical validation of the system was completed.  Therefore, Section f is rated as Noncompliant.

**Housing Audits – Checking the Veracity of the Inmate Housing Assignments**

As of January 2023, the Classification Unit supervisors resumed audits of the housing units to ensure inmates were housed as per the classification transfer orders. For the first time, the Compliance/Classification staff organized and posted the housing audit reports on the shared drive prior to the onsite review. These audit reports indicated that inmates were housed in the cells and beds as per the transfer order prepared by the Classification Unit. The only exceptions were inmates sleeping in the wrong dormitory bunks in 4A and E, and then two inmates had switched bunks within a cell on 3C. The errors were addressed immediately. While there were some inconsistencies in the documentation of the audits via the reports, housing rosters, and corrective action plans, for the most part, the audits were acceptable. The most common question was whether the auditors checked the cell and bed assignments.

**Internal Audits – Checking the Accuracy of the Custody and PREA Assessments**

The Classification Manager is responsible for assessing the accuracy of a random sample of at least ten custody/PREA assessments each month. No internal audits were routinely completed during this Compliance Period. Given the number of new classification specialists and supervisors, one might anticipate a few housing errors. As noted, the Classification Manager provided remedial instruction to address these custody assessment and housing errors. The Classification Manager restarted the internal audit process with a review of custody assessments completed in June and July 2023 to identify and input missing criminal history rap sheets.



**Revalidation of the Classification System – Assessing the Validity of the System**

Lovins and Latessa submitted their report on the validation of the OPSO classification system on April 30, 2018.[9] This validation study documented the requirement for "external review and validation of the classification and prisoner tracking system on at least an annual basis" for 2014 – 2017. Statistical validation of an objective classification system must be completed every three to five years to ensure the integrity of the classification system and that the risk factors and custody scales are still appropriate for the current inmate population.[10] Revalidation of the System was due in 2021 per a previous agreement for statistical validation every three years. OPSO still has not contracted to revalidate the classification system, despite remaining in noncompliance for this provision for failure to do so from Report #17 and despite Report #16 making the new administration aware of the revalidation requirement. For Compliance Review #18, the OPSO provided a short memo indicating, "A request to quote for a revalidation is currently being developed." This statement suggests that a request for proposals has not been completed nor budgeted. Again, the classification system's revalidation was not prioritized.

*A.10.g. Provide the Monitor a periodic report on classification at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date and every six months, thereafter, until termination of this Agreement. Each report will include the following information:*

    *(1) number of prisoner-on-prisoner assaults;*
    *(2) number of assaults against prisoners with mental illness;*
    *(3) number of prisoners who report having gang affiliations;*
    *(4) most serious offense leading to incarceration;*
    *(5) number of prisoners classified in each security level;*
    *(6) number of prisoners placed in protective custody; and*
    *(7) number of misconduct complaints.*

Finding:

Substantial Compliance

Observations:

Daily population reports are received daily, indicating the number of inmates by location – OJC, TDC, TMH, and out-of-parish. In addition, as required under Section g, monthly custodial statistical reports for October 2022 - March 2023 regarding the custody

---

[9] Lovins, Brian K. and Edward Latessa (April 30, 2018). "Revalidation of the Orleans Parish Classification System." Cincinnati, Ohio: University of Cincinnati Corrections Institute.
[10] Hardyman, Patricia L. and James Austin (2021) "Objective Prison Classification: A Guide for Correctional Agencies." 2nd Edition.  Washington, D.C.: National Institute of Corrections. p. 17.



assessments by type, gender, population, gang afflation, discipline, housing, current offense, etc., were promptly provided prior to the onsite review. These reports track the timeliness of the initial custody assessments, the custody distributions, cases due for a custody assessment, the prevalence of special populations, and the rates and types of disciplinary infractions. Data as to the number of "*assaults against prisoners with mental illness"* suggest relatively few individuals on the mental health caseload are victims of assault or battery. This is good news! It will be vital to continue to track these data to ensure their accuracy.

For this Compliance Review, OPSO reported only two active inmates as "gang" members or associates. The initial classification interview includes a question about the individual's "gang" membership or affiliation. Staff indicated that inmates rarely reveal their alliances. In the past, the Classification Unit has relied primarily on information from the District Attorney's Office to identify gang-related inmates. The IPC Major indicated that OPSO no longer received information regarding gang affiliations or prosecutions from the District Attorney and recommended checking with the OPSO ISB Unit. This conversation was interesting, although circular. The ISB agent indicated that they track "gang" behaviors within OJC but quickly pointed out that Orleans Parish "gangs" were better described as dynamic neighborhood/ward-based cliques. The ISB agent reported that they exchanged information with the NOPD. Yet, he was reluctant to share these data with the Classification Unit because, again, Orleans Parish "gangs" are dynamic neighborhood/ward-based cliques.

On the other hand, OJC security staff interview inmates regarding "ward/ neighborhood-based cliques" and who can live with whom. In sum, it appears that ISB collects and shares information with NOPD, and security staff requests housing assignments based on neighborhood associations. Yet, neither ISB nor security staff share intelligence with the Classification Unit or input the information into the AS400. Thus, the classification staff makes multiple housing transfers in response to emails indicating "this individual cannot live on this pod." In addition, the statistical reports regarding active "gang" members generated by the AS400 are inaccurate. To maintain Substantial Compliance with Section g, OPSO must create a systematic process for collecting information on active "gang/cliques," sharing this intelligence across its various divisions, <u>and</u> inputting these data into a standardized report available to the Compliance Unit.



Figures 10 and 11 provide the OPSO monthly disciplinary data recorded in the JMS. The rate of disciplinary reports has fluctuated over the last 15 months – October 2021 – March 2023. (To account for short-term variations and seasonal trends, we reviewed 15 months of disciplinary data.) As shown in Figure 10, these data suggest that while the rate of disciplinary reports has OJC population fluctuated. In October 2021, nearly a third (31.1%) of the ADP was written-up for a disciplinary infraction. By October 2022, the rate had dropped to 25%. During this Compliance Review Period, on average, 22.4% of the inmates received a disciplinary infraction each month. It appears that OPSO has rectified the problem of the missing disciplinary data observed for May 2022.



Figure 10: Rate of Disciplinary Infractions for the OPSO ADP – October 2021 – March 2023

Figure 11 suggests a downward trend in the rates of disciplinary infractions/ inmate and the findings of guilt/infractions. As shown in Figure 11, during the last 15 months, the OPSO ADP has gradually increased from 885 in October 2021 to 1,038 by March 2023. However, the number of disciplinary reports per month decreased from 275 in October 2021 to 256 in March 2023. If accurate, a decrease in institutional misconduct would be good news. However, it appears that the decrease in the number of disciplinary reports was due to OPSO's failure to supervise the housing units and enforce the disciplinary code or due to an actual improvement in the order and safety of the facility as the review of actual incident reports shows there has been an increase in institutional misconduct; particularly assaults. To ensure the accuracy of these trends, continued tracking of the number of disciplinary reports written, the number of disciplinary hearings held, and the number of reports/hearings "open/unheard" is essential.





Figure 11: OPSO ADP vs. Number of Disciplinary Reports: October 2021 - March 2023

Figure 12 illustrates the breakdown of the disciplinary infractions by type during this Compliance Period. (These data reflect the most severe violation of which the inmate was found guilty per report.) During this Compliance Period, the numbers of recorded predatory (e.g., assaults or battery) ranged between 18 (February) and 59 (March), and aggressive infractions ranged between 69 (January) and 32 (November) infractions per month. For this 6-month period, the average numbers of predatory and aggressive infractions were 39.8 and 50.3/month, respectively. This computes to an average of three assaults/fights per day (39.8 + 50.3 = 90.1/30 = 3/day).



Figure 12: Most Serious Disciplinary Infraction/Report with Finding of Guilty: April 2021 – March 2023



As observed during the previous Compliance Period, management problems and disruptive infractions continue to decrease. Given the comments by staff, this made be more reflective of staff not writing reports for minor offenses than an actual decrease. Thus, as shown in Figure 11, the number of disciplinary reports per ADP has decreased, but the level of violence, as indicated by assaults and fights within the facilities (OJC, TDC, and TMH), has risen.

***IV.A.10.h. OPSO shall review the periodic data report and make recommendations regarding proper placement consistent with this Agreement or other necessary changes in policy based on this review. The review and recommendations will be documented and provided to the Monitor.***

Finding:

Substantial Compliance

Observations:

The Monitor receives the daily "Active Inmates by Location reports and has access to the ad hoc Classification Monitor lists and various classification statistical reports. During this Compliance Period, there were multiple updates to the OPSO Housing Matrix. As of January 2023, the Classification staff provided the matrices daily.

Section h is rated as Substantial Compliance to reflect the status of the section since January of 2023 with the appointment of the new Classification Manager and his work with the Monitors and the Compliance Unit. The problems noted in Compliance Report #17 -- failure to provide requested documents for the Compliance Review, contradictory and incomplete data, lack of availability, and lack of openness of OPSO (in particular Classification Unit staff) for the onsite review, and the absence/organization of the protective custody and administrative segregation reviews – have been addressed. For example, for the first time since the implementation of the monitoring process, the documentation of protective custody and administrative segregation hearings were available for review. While the PC hearings/documentation pose some concerns as to the rationale for the PC placements and criteria for exit, OPSO was open to our comments and recommendations.

As previously noted, assurances and communication regarding addressing the enemies/separations reviews and commitment to revalidation of the objective classification system remain. These concerns were raised under Sections d and f, respectively.



### IV. A. 11.        Prisoner Grievance Process

*A. 11. a. OPSO shall ensure that prisoners have a mechanism to express their grievances, resolve disputes, and ensure that concerns regarding their constitutional rights are addressed. OPSO shall, at a minimum, do the following:*

> *(1) Continue to maintain policies and procedures to ensure that prisoners have access to an adequate grievance process and to ensure that grievances may be reported and filed confidentially, without requiring the intervention of a correctional officer. The policies and procedures should be applicable and standardized across all the Facility divisions.*
> *(2) Ensure that each grievance receives appropriate follow-up, including providing a timely written response and tracking implementation of resolutions.*
> *(3) Ensure that grievance forms are available on all units and are available in Spanish and Vietnamese and that there is adequate opportunity for illiterate prisoners and prisoners who have physical or cognitive disabilities or language barriers to access the grievance system.*
> *(4) Separate the process of "requests to staff" from the grievance process and prioritize grievances that raise issues regarding prisoner safety or health.*
> *(5) Ensure that prisoner grievances are screened for allegations of staff misconduct and, if an incident or allegation warrants per this Agreement, that it is referred for investigation.*
> *(6) A member of the management staff shall review the grievance tracking system quarterly to identify areas of concerns. These reviews and any recommendations will be documented and provided to the Monitor.*

<u>Findings:</u>

A. 11. a. (1)  Partial Compliance

A. 11. a. (2)  Non-Compliance

A. 11. a. (3)  Substantial Compliance

A. 11. a. (4)  Substantial Compliance

A. 11. a. (5)  Substantial Compliance

A. 11. a. (6)  Partial Compliance

Until the September 2019 report, one rating was given for the entire section for the Prisoner Grievance Process. In order to highlight which provisions are in substantial compliance versus those which fall short, the decision was made to rate each provision separately.

This review covered October 2022 through March 2023. For this review, the Monitor interviewed the Grievance Lieutenant, and security staff and inmates while inspecting the housing units. Reports and data submitted by OPSO covering the rating period were also reviewed.

As noted during the previous inspection, a review of the documentation demonstrated that all inmate submissions continue to be reviewed by Grievance staff, categorized into requests and grievances, and forwarded to the appropriate staff for



response. Statistical information was provided on all categories. Both requests and grievances continue to be sorted by type. Specific grievances related to inmate safety, medical issues, PREA, etc., are documented to reflect the date received, inmate information, type of grievance, time of notification made to the appropriate staff member, and the staff member making the notification. For the analysis, the Monitor created three charts and added simple linear trendline overlays to each grievance category listed. A fourth chart was added to graphically represent the number of grievances overall relative to the inmate population.

Grievance staff once again provided detailed documentation as to their separate handling of the October 2022 through March 2023 inmate requests, grievances, and complaints related to inmate safety or health.

As reported by the OPSO Grievance staff, the monthly average of 182 grievances for the Report #17 rating period to 131 for Report #18 reflects a substantial decrease overall grievance numbers and is considered by the Monitor to be a positive development if it a reflection of a reduction of grievances as opposed to being reflective of the difficulty of filing grievances due to the nonworking kiosks. The Monitor will continue to observe the grievance trends reported by OPSO.

Chart 1 reflects trends that are generally stable or declining relative to the same six categories shown in Report #17 to include Medical (slight increase) and Mental Health (stable) grievances. "OJC Facility Grievable Miscellaneous" accounted for the most significant number of grievances in this section. The rising trend during the previous rating period has been substantially reversed since the beginning of 2022. Grievances in this category were assigned to the Unit Managers and Major of Security for resolution. This is a catch-all category for grievances that do not fit the other categories listed.



**Chart 1**



Chart 2 is somewhat of a mixed bag in terms of general trends for the various categories, particularly as they relate to the trends noted in Report #17. The Monitor cautions drawing any particular conclusions from the displayed trends and attributes any swings to the relatively small number of grievances in a given month for every category (less than 10 total). The exception is the "Life Threatening" category which more than doubled from September 2022 to October 2022 and December 2022 to January 2023. While the increases could be attributed to a single inmate writing multiple grievances, the Monitor recommends Grievance staff focus additional attention on such month-to-month occurrences.



Chart 2



Chart 3 represents several categories, primarily inmate services and property/fund accounts. The chart reflects increases in grievances related to law library services and inmate property with the remaining categories either stable or declining. Again, the Monitor cautions against drawing any conclusions as to long-term trends due to the relatively small number of grievances in each category overall (less than 12).

Chart 3





Chart 4 reflects the monthly Grievance and Request totals for CY2021 through the current rating period along with simple linear trend lines to give the reader a visual depiction of the trends for both, relative to the average daily inmate population. Requests outnumber grievances significantly as expected. The Monitor shortened the observed period from the previous report to give a more contemporary view of the trends depicted. Doing so reflects a declining trend in the number of requests and a relatively flat trendline for grievances despite the increasing inmate population. Again, a positive development in the Monitor's opinion.

**Chart 4**



The Monitor also reviewed the "Overdue Grievance Reports" for the rating period. The reports are created weekly for supervisory review and tracking. For the purposes of the report, the Monitor only included the data from the first week of each month. Chart 5 reflects the data for each category: "Green" (2-4 days overdue), "Yellow" (5-9 days overdue) and "Red"(10+ days overdue), which represents overdue responses to inmates. While the monthly numbers fluctuate significantly, the linear trendlines show a significant upward trend in the Red category. The rise in the Yellow category previously noted is now on a downward trend due in large part to the increasing number in the Red category. The Monitor finds section IV. A. 11. a. 2. to be in Non-Compliance based on the increasing number



of delinquent responses. The Monitor recommends an executive level review and root-cause analysis of the problem to determine an appropriate course of action. It should be noted that the issue is not with the Grievance Unit. The issue lies the staff would are assigned to respond to the grievances and do not do so timely.

**Chart 5**



OVERDUE GRIEVANCE REPORTS BY MONTH

| | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC | JAN | FEB | MAR | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Series1 | 87 | 41 | 164 | 67 | 100 | 89 | 153 | 181 | 98 | 167 | 132 | 106 | | |
| Series2 | 25 | 37 | 102 | 87 | 93 | 91 | 107 | 123 | 113 | 116 | 77 | 109 | | |
| Series3 | 16 | 24 | 103 | 160 | 186 | 106 | 148 | 363 | 641 | 872 | 1013 | 1355 | | |

As noted during the last several inspections, inmates have access to the grievance process via the few workable electronic kiosks located in the housing units throughout OJC and TDC and more commonly through a traditional paper grievance system utilized as a "back-up" system due to the large number of non-functioning kiosks. As of the last day of the reporting period, OPSO Grievance staff noted there were 18 kiosks in permanent non-working order and 8 remaining kiosks in OJC/TDC/TMH that were working but required 10 to 15 manual "reboot" operations in a given month to keep them operational for inmate use. The problem with the kiosks and the kiosk contractor is chronic and it remains the Monitor's opinion that the kiosk system remains unreliable in terms of operational availability for the majority of the inmates. The Monitor was advised that the OPSO administration was still considering replacement of the current system. The Monitor recommends this action as soon as possible, and consider additional staff be assigned to the Grievance section to handle the additional workload generated by the paper system.

The Grievance Lieutenant reported that every housing unit continues to be visited



seven days per week with a "walk by" of every cell to collect paper grievances to ensure that problems with the kiosks do not interfere with an inmate's ability to submit grievances. However, there continued to be inmates who expressed concern that paper grievances would get lost and lead to retaliation and were frequently unavailable to them upon request from security staff.

The Monitor again reviewed the paper grievances tracking documentation and noted that all such grievances continue to be entered into the electronic system by Grievance staff upon receipt. Paper responses are provided to inmates in units that do not have a functioning kiosk. The Monitor recommends Maintenance staff address the security of the grievance receptacles. As noted in Report #16 and #17, several receptacles were found to be easily manipulated and opened by inmates simply by inserting their fingers into the slot on top of the receptacle or were missing locks entirely. This jeopardizes the confidentiality of the paper grievance system.

As with the previous reports, OPSO leadership is again urged to remind line security staff of the importance of making grievance forms available upon request by the inmates. It is the Monitor's opinion that with secure receptacles and security staff supporting the policy and effort in this regard, the manual work-around is acceptable under the language of the Consent Judgment requiring the inmates have access to a meaningful and confidential grievance process. Given the chronic issues it is problematic and has resulted in Section IV. A. 11. a. (1) continuing to be in Partial Compliance.

Grievance staff continue to do an excellent job tracking grievances and requests and reporting as to the timeliness and quality of the responses to address the inmates' issues. Documentation continues to reflect that Grievance staff maintain by name and housing a listing of all OPSO inmates identified as needing Grievance staff assistance to access the grievance system due to either a language barrier or illiteracy. The Monitor received no information or verbal complaints from inmates in this regard.

The Monitor reviewed detailed documentation provided by Grievance staff for the rating period regarding the screening of grievances for staff misconduct. The documentation demonstrated that all inmate submissions are reviewed by Grievance staff and those regarding staff misconduct are separately documented for appropriate referral to the administrative level for follow-up. Grievance staff processed a total of 22 such staff



misconduct related grievances during this rating period, down from 92 for the previous rating period and the 100 noted in Report #16. While the decrease is encouraging, the Monitor will make specific note as to whether the downward trend continues. Grievances regarding staff misconduct are particularly susceptible to interception by staff accused of misconduct due to the reliance on paper grievances. Of note, the Grievance staff continue to keep track of disposition information provided to the inmate on a spreadsheet titled "Warden – disposition". A review of the disposition notes in this report shows a significant number of non-substantive responses (i.e., "We will look into the matter.") with no true final disposition information other than to a majority of grievances being "Returned to Grievance Coordinator" with the notation "mediation". Referral of a grievance to a non-existent mediation process is not an acceptable response. The Monitor continues to recommend an executive review of this issue and develop any necessary policy, procedure or training necessary to ensure such grievances are addressed and the inmate is notified appropriately.

Grievance staff continue to separately document grievances that require specific referral to IAD, ISB, PREA, or FIT staff for review and investigation. Detailed information along with the date assigned and disposition is maintained as well as email transmission receipts. Grievances referred to IAD remained steady at 11 versus the previous rating period, however grievances referred to ISB increased substantially from 23 to 37 for the current rating period.

The Monitor reviewed the 2022 Second and Third quarters data analysis of the grievance reports presented by Grievance staff for executive review. No documentation regarding any specific discussion by executive staff of the grievance documentation and reporting was noted. Without such documentation, the rating for IV. A. 11. a. (6) continues to be Partial Compliance.

## IV. A. 12.  Sexual Abuse

***A. 12. OPSO will develop and implement policies, protocols, trainings, and audits, consistent with the requirements of the Prison Rape Elimination Act of 2003, 42 U.S.C. § 15601, et seq., and its implementation of regulations, including but not limited to, preventing, detecting, reporting, investigating, and collecting sexual abuse data, including prisoner-on-prisoner and staff-on-prisoner sexual abuse, sexual harassment, and sexual touching.***

Finding:

A. 12. Partial Compliance

Observations:



OPSO successfully completed its PREA audit in 2019. Passing a PREA audit that is now four years old is not considered as conclusory evidence of compliance. Proof of training and policies were provided, but the review of the policies has not been completed due to inaction by OPSO leadership. Documentation regarding PREA investigations was provided. No proof as to implementing the other requirements of PREA including education of inmates was provided. This provision remains in partial compliance, but significant progress has been made due to the efforts of the PREA Coordinator.

### IV. A. 13.        Access to Information

***A. 13. OPSO will ensure that all newly admitted prisoners receive information, through an inmate handbook and, at the discretion of the Jail, an orientation video, regarding the following topics: understanding Facility disciplinary process and rules and regulations; reporting misconduct; reporting sexual abuse or assault; accessing medical and mental health care; emergency procedures; and sending and receiving mail; understanding the visitation process; and accessing the grievance process.***

Finding:

A.13.   Non-Compliance

 Observations:

No materials were provided indicating the requirements of this paragraph have been met other than a memo stating each inmate was provided with a handbook upon reception into the facility. That was found not to be accurate. In the past, the Monitors observed a few handbooks in the housing units, but they were not observed this compliance period and many inmates stated they did not have access to a handbook. Previously, the inmate handbook was available on the kiosk. However, very few of those kiosks are in working order. This provision is now in Non-Compliance.

### IV. B. Mental Health Care

***B. OPSO shall ensure constitutionally adequate intake, assessment, treatment, and monitoring of prisoners' mental health needs, including but not limited to, protecting the safety of and giving priority access to prisoners at risk for self-injurious behavior or suicide. OPSO shall assess, on an annual basis or more frequent basis, whether the mental health services at OPP comply with the Constitution. In order to provide mental health services to prisoners, OPSP, at a minimum shall:***

Findings:

B. 1. a. Substantial Compliance

B. 1. b. Substantial Compliance

B. 1. c. Substantial Compliance



B. 1. d. Substantial Compliance

B. 1. e. Partial Compliance

B. 1. f.  Partial Compliance

B. 1. g. Substantial Compliance

B. 1. h. Partial Compliance

B. 1. i.  Partial Compliance

B. 1. j.  Partial Compliance

B. 1. k. Partial Compliance

B. 1. l.  Substantial Compliance

***B.1.a. Develop and maintain comprehensive policies and procedures for appropriate screening and assessment of prisoners with mental illness. These policies should include definitions of emergent, urgent, and routine mental health needs, as well as timeframes for the provision of services for each category of mental health needs.***
Finding:

Substantial Compliance

This was found in substantial compliance by the prior monitor. While Wellpath continues to utilize the screening and assessment forms for intakes, there needs to be attention given to ensure appropriate referrals are made from intake. Inmate WC voiced suicidal ideation at intake yet was recommended for general population and there was no mental health referral at intake, which was seen. He was eventually placed on suicide watch within two weeks of admission. These lapses in appropriate referrals will be monitored and if they become more of a pattern, this provision's rating could be affected.

***B.1.b. Develop and implement an appropriate screening instrument that identifies mental health needs, and ensures timely access to a mental health professional when presenting symptoms require such care. The screening instrument should include the factors described in Appendix B. The screening instrument will be validated by a qualified professional approved by the Monitor within 180 days of the Effective Date and every 12 months thereafter, if necessary.***
<u>Finding:</u> See B.1.a.

Substantial Compliance

***B.1.c. Ensure that all prisoners are screened by Qualified Medical Staff upon arrival at OPP, but no later than within eight hours, to identify a prisoner's risk for suicide or self-injurious behavior. No prisoner shall be held in isolation prior to an evaluation by medical staff.***
<u>Finding:</u> See B.1.a.

Substantial Compliance

<u>Suggestion:</u> While Wellpath remains in substantial compliance with this provision, there needs to be continued attention and training done to ensure there is an adequate response to the information received at intake to ensure harm is mitigated. If risks are not mitigated,



the result does not constitute constitutionally adequate care.

***B.1.d. Implement a triage policy that utilizes the screening and assessment procedures to ensure that prisoners with emergent and urgent mental health needs are prioritized for services.***

<u>Finding:</u> See B.1.a. and B.1.c. Suggestion

Substantial Compliance

<u>Suggestion:</u> CQI project for this provision to ensure SOP for referrals for Special Needs inmates in need of counseling are adequately addressed. The goal should be 100% compliance with the timeframes outlined in the policy for inmates to be seen for emergent and urgent needs. Any deviance from the timeframe requires clear and timely documentation. Recommendation to ensure that triage from intake is adequate – look at a random sample of routine referrals from triage for each month during the next review period and see how many have had an incident or need for a more urgent/emergent intervention within the 14 days while they are awaiting a mental health evaluation. This will help establish whether the intake clinicians are adequately assessing mental health needs.

***B.1.e. Develop and implement protocols, commensurate with the level of risk of suicide or self-harm, to ensure that prisoners are protected from identified risks for suicide or self-injurious behavior. The protocols shall also require that a Qualified Mental Health Professional perform a mental health assessment, based on prisoner's risk.***

<u>Finding:</u>

Partial Compliance

For this provision, it is imperative that protocols are implemented with the level of risk of suicide or self-harm for the inmate's protection. It is not sufficient to have developed the protocols without the intentional implementation of them in everyday practice. There continues to be challenges with documentation for suicide watch at OJC. First, the deputies are not documenting suicide watch on the required observation forms, especially in the IPC. Use of the required observation form not only aids in communication between custody staff and mental health, but it also ensures the level of risk is being properly addressed. Ten (10) inmate records (2516878, 2511722, 2518901, 2519140, 2519336, 2519641, 2518997, 2502947, 2517879, 2521566) were reviewed who were assigned to OJC security for suicide watch during the reporting period and not one had an observation/restraint checklist and worksheet completed. While the deputies are trained in completing the document, there appears to be some reservation in attending to this task. Second, the QMHPs assigned to



suicide watch are not accurately reporting their check in times on the observation/restraint checklist and worksheet. While observing in person in December 2022 and via video during the period in review, there were QMHPs who documented times on the worksheet where they did not see the patient. In review of various worksheets, there were visits which occurred outside of the 15-minute period, i.e., someone was seen after 20 minutes. Adequate searches by deputies are vital in ensuring inmates are protected from suicide and self-harm. This is not being done at a level commensurate with the level of risk. In October 2022, only 55% of patients were searched during a Code White. This number improved to 70% in November 2022, December 2022, and January 2023. Only 50% in February and 61% in March 2023 were searched during a Code White.

Suggestion: Continue to monitor and encourage use of the correct observation form for suicide watch by deputies. The Mental Health Monitor expects consistency in suicide watches which will include all observers utilizing the same documentation for watches. Ensure there is no use of physical restraints for inmates on suicide watch in IPC or TMH and document any instance where this occurs. Document de-escalation procedures by Wellpath and deputies and challenges with implementation. Adequate cell searches and body searches are necessary to protect inmates from the risk of self-injurious behavior. The Monitor recommends more frequent spot checks of QMHPs who are conducting watches and enforcing corrective actions as deemed necessary. ***Please note you will see this recommendation throughout this report*** – The Monitor also recommends a member of the Wellpath administrative team have direct access to the video monitoring system of the facility in order to conduct these checks and others necessary to comply with the expectations of many of the provisions.

***B.1.f. For prisoners with emergent or urgent mental health needs, search the prisoner and monitor with constant supervision until the prisoner is transferred to a Qualified Mental Health Professional for assessment.***

Fi

Finding:

Partial Compliance

See B.1.e. There are fluctuations in the percentage of adequate searches of inmates with emergent or urgent mental health needs. As stated in B.1.e. - October 2022, only 55% of patients were searched during a Code White. In November 2022, December 2022, and January 2023, 70% of inmates were searched. Only 50% in February and 61% in March



2023 of inmates were searched. Substantial compliance requires that at least close to 100% of inmates are searched who present with an emergent or urgent mental health need to help mitigate risk.

<u>Suggestion:</u> There continue to be challenges providing adequate documentation of searches and constant supervision, on proper documentation, by deputies prior to the arrival of mental health staff when an assessment for all emergent and urgent needs are determined. Provide written documentation of all protocols and procedures for searching inmates as soon as safely possible, along with attempts at having mental health staff available to try and limit the need for de-escalation interventions. This should all be completed prior to placement on any form of suicide precautions, watch or direct observation. Contraband left on an inmate because an adequate search was delayed, or inadequate search was conducted are unacceptable and not constitutionally adequate care in trying to ensure risk of self-harming behavior is minimized.

***B.1.g. Ensure that a Qualified Mental Health Professional conducts appropriate mental health assessments within the following periods from the initial screen or other identification of need:***
          ***1)      14 days, or sooner, if medically necessary, for prisoners with routine mental health needs;***
          ***2)      48 hours, or sooner, if medically necessary, for prisoners with urgent mental health needs;***
                    ***And***
          ***3)      immediately, but no later than two hours, for prisoners with emergent mental health needs.***

<u>Finding:</u>

Substantial Compliance

<u>Suggestion:</u> Continue to conduct CQI audits to ensure implementation and timeliness of referral responses. A Qualified Mental Health Professional assigned to IPC will help ensure inmates at intake receive appropriate assessments and timely referrals, including referrals to psychiatrists during on-call hours. This needs to be closely monitored if staffing challenges become more prominent. There were instances within the CQI report where the timeframes were missed. This trend cannot continue to remain in substantial compliance.

***B.1.h. Ensure a Qualified Mental Health Professional preforms a mental health assessment no later than the next working day following any adverse triggering event (i.e., any suicide attempt, any suicide ideation, or any aggression to self, resulting in serious injury).***

<u>Finding:</u>

Partial Compliance

This is being downgraded to Partial Compliance due to mental health not being consistently



and timely notified of use of force incidents throughout OJC. The use of force is considered a triggering event by the Monitor and therefore mental health is required to be notified in order to perform a mental health assessment. While QMHPs have been compliant in performing an assessment when notified, since they are not consistently notified of use of forces, they are not performing assessments. In addition, when an inmate comes to the medical clinic after a use of force, the medical attendant should be alerting mental health in order for an assessment to be conducted.

<u>Suggestion:</u> Create a Code for use of force, i.e., Code Purple, in order to alert mental health and medical regarding the incident. This will help with timely interventions by the medical and mental health staff at OJC. Reeducate deputies regarding the importance of alerting mental health staff regarding all triggering events, in advance as much as feasible, so proper assessments and assistance can be provided.

***B.1.i. Ensure that a Qualified Mental Health Professional, as part of the prisoner's interdisciplinary treatment team, maintains a risk profile for each prisoner on the mental health case load based on the Assessment Factors identified in Appendix B, and develops and implements a treatment plan to minimize the risk of harm to each of these prisoners.***

<u>Finding:</u>

Partial Compliance

There remain challenges in completing clinically adequate, interdisciplinary treatment plans outside of TMH. Treatment plans direct treatment and keeps the involved clinicians and supporting staff abreast of interventions and objectives for each patient. The aim is to provide person-centered, coordinated, high-quality care to patients. Some of the lack of progress with this provision comes from different interpretations of the provision and some from a lack of adequate staffing to perform this duty. All inmates on the mental health caseload require a risk profile based on the Assessment Factors in Appendix B, to include an acknowledgement that the factors were considered and may not apply to that individual AND an interdisciplinary treatment plan. While every inmate on the case load may not require a monthly treatment plan, an adequate treatment planning schedule needs to be created and implemented to ensure all inmates on the case load have a treatment plan. Some may require, based on clinical judgment, a plan every sixty days while others may have a plan every 90 days. Wellpath, in consultation with OPSO, should determine what is needed, in terms of additional psychiatrists' hours, in order to conduct multidisciplinary treatment



plans in OJC for the required inmates.

Suggestion: A clinical analysis of treatment needs will be needed to inform an adequate and appropriate treatment planning schedule for OJC. Securing an adequate number of additional FTEs for psychiatrists is crucial for compliance with this provision. Ensuring interdisciplinary treatment plans are created and followed for the general population patients with a risk profile for each inmate on the mental health case load will be necessary for substantial compliance. As stated before, these treatment plans must include interventions to minimize risk of harm for inmates throughout the system, including stepdown and outpatient level of care along with the acknowledgement that risks were assessed and may not be relevant for the patient. This risk profile should also include deficits in planned services and content, which could be due to lack of available staff, and remedies to correct the deficits.

***B.1.j. Ensure adequate and timely treatment for prisoners, whose assessments reveal mental illness and/or suicidal ideation, including timely and appropriate referrals for specialty care and visits with Qualified Mental Health Professionals, as clinically appropriate.***

Finding:

Partial Compliance

Since the last site visit, daily visit by a QMHP was implemented for individuals awaiting transfer to TMH. At first, weekends were not covered, but this has since been remedied. While the provision does not direct the need for special areas to conduct mental health work, the provision calls for adequate treatment for inmates with mental illness. Adequate mental health treatment is not conducted cell side nor in a dayroom where an inmate may be reluctant to discuss private, intimate issues with a clinician. The lack of confidentiality and a space that promotes confidentiality leads to a lack of validity that the information received is adequate to provide the necessary treatment. Due to the consistent lack of deputies on each pod, many QMHP interventions, which would provide timely treatment, are not conducted. Many groups sessions are held sporadically, and individual sessions are conducted cell side, neither of which is adequate treatment for someone with a mental illness. One of the advantages of the Phase III design is that it provides confidential spaces for conducting interviews of inmates in a manner which is safe for both the QMHP and inmate.

Suggestion: There continues to be a need for a full range of mental health and consistent



individual and group counseling services at OJC and TMH/TDC. Adequate treatment includes providing an environment where confidentiality is secured so the inmate can share valid information to inform necessary treatment. Wellpath and OPSO must collaborate and plan TOGETHER in order to provide an adequate and therapeutic system of mental health services. The inmates are unable to attend therapeutic sessions without adequate clinical staff to conduct sessions and correctional staff to transport and provide security for both staff and inmate. The Monitor reiterates that cell side visits do not constitute therapeutically appropriate or clinically adequate mental health services and will not result in substantial compliance. The Monitors recommends continued documentation of barriers to providing timely and adequate mental health treatment for all individuals captured on the mental health caseload. Issues cannot be rectified without knowledge of the problem. Consistent and reliable access to care is necessary for substantial compliance.

***B.1.k. Ensure crisis services are available to manage psychiatric emergencies. Such services include licensed in-patient psychiatric care, when clinically appropriate.***

Finding:

Partial Compliance

There are no designated in-patient licensed facilities identified to provide treatment for the OPSO population.

Suggestion: OPSO continues to lack access to licensed in-patient psychiatric services for male and female inmates, beyond simple emergency room treatment. Wellpath is encouraged to continue to provide documentation that all psychiatric emergencies are sent to an emergency department and any crisis is adequately resolved, which will keep this provision in partial compliance. Currently, the utilization of TMH and external emergency departments are the resources which must be used.

***B.1.l. On an annual basis, assess the process for screening prisoners for mental health needs to determine whether prisoners are being appropriately identified for care. Based on this assessment, OPSO shall recommend changes to the screening system. The assessment and recommendations will be documented and provided to the monitor.***

Finding:

Substantial Compliance

Suggestion: This provision risks being rated as partial compliance in future auditing periods without OPSO contributing recommendations regarding the screening system, even if the



recommendation is simply that the system in place is sufficient. Screenings require an adequate clinical response and if there are inmates who are not being adequately screened and identified for care, from the perspective of OPSO, this needs to be addressed.

Findings:

B.2.a    Partial Compliance

B.2.b.   Partial Compliance

B.2.c.   Partial Compliance

B.2.d.   Partial Compliance

B.2.e.   Substantial Compliance

B.2.f.   Partial Compliance

B.2.g.   Substantial Compliance

B.2.h.   Partial Compliance

***B.2.a. Review, revise, and supplement existing policies in order to implement a policy for the delivery of mental health services that includes a continuum of services, provides necessary and appropriate mental health staff, includes a treatment plan for prisoners with serious mental illness, and collects data and contains mechanisms sufficient to measure whether care is being provided in a manner consistent with the Constitution.***

Finding

Partial Compliance

Inmates on the waitlist for TMH are now to be seen daily by a QMHP. There needs to be a system in place to provide a continuum of treatment for all individuals on the behavioral health caseload at the jail, including a treatment plan for inmates with serious mental illness which directs care. Serious mental illness is defined as mental, behavioral, or emotion disorder of mood, thought, or anxiety that significantly impairs judgment, behavior, capacity to recognize reality, or ability to cope with the ordinary demands of life. Those disorders include, but are not limited to, Schizophrenia Spectrum Disorders, other psychotics disorders, bipolar related disorder, major depressive disorders, and post-traumatic stress disorders. Implementation of policy to ensure the delivery of mental health services across the entire facility continues to be hampered by staffing deficits, from both Wellpath and OPSO. The lack of treatment teams and treatment plans at OJC require continued attention. Without adequate staff, there will be no consistent treatment.

Suggestion: Both Wellpath and OPSO must commit to consistent and appropriate implementation of policies in order to ensure an adequate delivery of mental health services,



including de-escalation interventions. This will include documenting wait lists and service needs along with barriers to the provision of treatment, including missing group sessions and conducting suicide watches from the control room adjacent to the housing units. This will include documenting how long an inmate awaits transfer to TMH and what therapeutic and clinically adequate services are provided during that time. There continues to be a need for interdisciplinary treatment teams in the outpatient level of care which will help determine and implement appropriate levels of treatment. Wellpath should produce for the monitor the total number of inmates with any of the diagnoses listed above, whether in TMH, 2A, 2B, or general population along with their corresponding multidisciplinary treatment plan.

***B.2.b. Ensure that treatment plans adequately address prisoners' serious mental health needs and that the treatment plans contain interventions specifically tailored to the prisoner's diagnoses and problems.***

Finding:

Partial Compliance

Inmates, outside of those housed in TMH, do not have comprehensive treatment plans created by a multi-disciplinary treatment team. The treatment plans created in TMH are adequate in providing a framework for treatment and are specifically tailored to the needs of the patient.

Suggestion: Continue to work towards providing interdisciplinary treatment plans to all individuals on the mental health case load throughout the facility. Treatment plans are needed for all male, female, and youthful inmates at all levels of care, including acute care, suicide watches and outpatient level of care. These treatment plans need to be developed by a multidisciplinary team, including the prisoner, as much as possible.

***B.2.c. Provide group or individual therapy services by an appropriately licensed provider where necessary for prisoners with mental health needs.***

Finding:

Partial Compliance

There remain challenges with providing group and individual therapy services outside of TMH. Some of this is due to lack of adequate deputies to secure pods therefore the mental health provider has to cancel an intervention. Until there are confidential locations to conduct interventions, the validity of inmate responses is in question which in turn



questions whether appropriate, clinically therapeutic programming is being offered. One cannot offer what they do not know is needed.

Suggestion: This provision will remain a challenge to move into substantial compliance without adequate staff for Wellpath and OPSO, along with adequate confidential environment to conduct these sessions. Confidentiality will help validate the responses of the inmate which will in turn inform what individual and group sessions are needed for the population. While there is commitment to increasing staff numbers from both Wellpath and OPSO, this provision cannot be in substantial compliance without adequate staff to conduct group and individual therapy services. If individual and group sessions cannot be held consistently, this provision will not move to substantial compliance. Please note how many individuals are unable to access the provided service due to barriers like adequate space, staffing challenges (including Disruption of Service forms) and are on a waitlist. Document the corrective action plans which will be implemented to address these issues. Continue to provide data on the number of inmates who received counseling for sexual abuse, alcohol, and drug abuse.

***B.2.d. Ensure that mental health evaluations that are done as part of the disciplinary process include recommendations based on the prisoner's mental health status.***

Finding:

Partial Compliance

There remain challenges with mental health consistently being made aware and being able to conduct assessments of prisoners prior to placement in segregation.

Suggestion: It is imperative that mental health staff are contacted prior to any inmate, especially on the mental health caseload, being moved into disciplinary housing. While Wellpath is working on a policy for mental health assessments as a part of the disciplinary process, OPSO has not signed off on nor has there been consistent implementation of this policy. Training would be required to ensure both parties, Wellpath and OPSO, are working in tandem to ensure inmates do not deteriorate while inThere disciplinary housing and mental health needs are adequately assessed and addressed.

***B.2.e. Ensure that prisoners receive psychotropic medications in a timely manner and that prisoners have proper diagnoses and/or indications for each psychotropic medication they receive.***

Finding:



Substantial Compliance

Suggestion: Continue the partnership with Tulane psychiatric providers as this has made dramatic improvements in the system. Continue to provide documentation and analysis of data to ensure inmates are receiving psychotropic medications in a timely manner, especially upon admission to the facility. If there are delays in an inmate receiving medication, document and create a corrective action plan to address the deficiency. Ensure medications are being used to treat the diagnosis on record or there is clear justification in the record for the off-label use of a psychotropic medication.

***B.2.f. Ensure that psychotropic medications are administered in a clinically appropriate manner as to prevent misuse, overdose, theft, or violence related to medication.***

Finding:

Partial Compliance

Medication variances have not been properly documented as there was some confusion to as to what constitutes a medication variance. Medication variances help ensure there is clinically appropriate administration of medication and allows staff to make corrections when needed. There were only four (4) medication variances documented for this review period. Discussed with leadership what the monitor would consider a medication variance – late administration of medication (nurses have one hour before and one hour after the set time for the medication to be given for administration to be timely), missed dose of medication, if a medication is ordered and not received by the patient within 24 hours of the order, the use of numerous smaller dose(s) of pills to equal the prescribed amount when the prescribed amount is available in one pill (olanzapine 20mg is prescribed and rather than give olanzapine 20mg tablet, which is available, two 10mg tablets are given). Medication pass was not observed during this visit and will be revisited at the next site visit in December.

Suggestion: Implement monitoring of medication variances at OJC and TMH and accurately report findings. Wellpath and OPSO need to work cooperatively to ensure medication passes are aligned with policy and procedures in order to prevent misuse, overdose, theft, and violence related to medication. Further analysis may be needed to analyze the finding of contraband, prescribed and nonprescribed medication, and what corrective plan to put in place to minimize the risks.



***B.2.g. Ensure that prescriptions for psychotropic medication are reviewed by a Qualified Mental Health Professional on a regular, timely basis and prisoners are properly monitored.***

Finding:

Substantial Compliance

Suggestion: Continue to provide documentation of data collection and analysis of psychotropic medication prescriptions, including the timeliness between when the prescription is written, and the first dose received by the inmate. There also needs to be documentation if there is a disruption in providing psychotropic medications along with the source of the disruption. Refusals of medications also require proper clinical assessment which is part of adequate monitoring of inmates.

***B.2.h. Ensure that standards are established for the frequency of review and associated charting of psychotropic medication monitoring, including monitoring for metabolic effects of second-generation psychotropic medications.***

Finding:

Partial Compliance

Suggestion: With the addition of a laboratory technician, monitoring for metabolic effects of second-generation psychotropic medications has improved. There remains the lack of a consistent procedure for alerting the provider when an inmate refuses labs or if labs are not drawn for some reason. For example, inmate 2507048 had an order for lab work written in January 2023, yet the labs were not drawn in a timely manner. The provider was not made aware. As stated in the monitor's previous report, if the provider is not informed, the inmate risks not having the labs drawn in a timely manner because the provider was unaware of the need to re-order the labs. Wellpath needs to create and implement a policy enforcing communication to the necessary clinician regarding laboratory refusals/services and put a system in place to ensure timely follow-up. Submit documentation to demonstrate standards have been set and implemented to ensure the frequency and charting are done as outlined in the SOP.

Findings:

B.3.a.   Partial Compliance

B.3.b.   Substantial Compliance

***B.3.a. OPSO shall develop and implement policies and procedures for prisoner counseling in the areas of general mental health/therapy, sexual-abuse counseling, and alcohol and drug counseling. This should, at a minimum, include some provision for individual services.***



Finding:

Partial Compliance

Due to staffing challenges, groups and individual sessions have been conducted inconsistently throughout the reporting period. While the provision does not require a confidential space be provided for treatment, adequate treatment requires confidentiality in order for there to be valid responses from inmates to inform necessary treatment. Cell side interventions are not adequate mental health treatment. The logbooks maintained by OPSO continue to be inadequately completed and therefore do not provide a true reflection of the daily activities occurring on the housing units. Development of the policies and procedures is not sufficient for substantial compliance without implementation which would include consistent availability of therapeutic services.

Suggestion: Continue to track the availability of group and/or individual sessions completed along with the number of inmates in need of services. Continue to track disruptions in service. The creation of dedicated space where confidential therapeutic engagement can occur would be ideal in moving this provision towards substantial compliance. Ensure the logbooks maintained by OPSO are accurate and completed as dictated by policy.

**B.3.b. Within 180 days of the Effective Date, and quarterly thereafter, report all prisoner counseling services to the Monitor, which should include:**
   **1)      the number of prisoners who report having participated in general mental health/therapy counseling at OPP;**
   **2)      the number of prisoners who report having participated in alcohol and drug counseling services at OPP;**
   **3)      the number of prisoners who report having participated in sexual-abuse counseling at OPP; and**
   **4)      the number of cases with an appropriately licensed practitioner and related one-on-one counseling at OPP.**

Finding:

Substantial Compliance

Suggestion: Continue to collect and analyze data concerning inmates in need of these services and create corrective action plans to address the deficits which may be present at OJC and TMH. As stated earlier, due to a lack of confidential engagements, the validity of responses from inmates is questionable and therefore the monitor is unsure whether the offered services are indeed adequate for the population.

Findings:

B.4.a    Partial Compliance



B.4.b.   Substantial Compliance

B.4.c.   Substantial Compliance

B.4.d.   Partial Compliance

B.4.e.   Partial Compliance

B.4.f.   Partial Compliance

B.4.g.   Substantial Compliance

*B.4.a. OPSO shall ensure that all staff who supervise prisoners have the adequate knowledge, skill, and ability to address the needs of prisoners at risk for suicide. Within 180 days of the Effective Date, OPSO shall review and revise its current suicide prevention training curriculum to include the following topics:*
*1) suicide prevention policies and procedures (as revised consistent with this Agreement);*
*2) analysis of facility environments and why they may contribute to suicidal behavior;*
*3) potential predisposing factors to suicide;*
*4) high-risk suicide periods;*
*5) warning signs and symptoms of suicidal behavior;*
*6) case studies of recent suicides and serious suicide attempts;*
*7) differentiating suicidal and self-injurious behavior; and*
*8) the proper use of emergency equipment.*

Finding:

Partial Compliance

The Monitor is still finding that deputies have yet to consistently utilize the Observation/Restraint Checklist and Worksheet which the MHTs use for suicide watch. It was observed again that MHTs were not accurately documenting staggered 15-minute checks on the Observation/Restraint Checklist and Worksheet. Videos were watched where there was some misrepresentation captured – writing that a check was done although the MHT did not go to the cell or checked on an individual outside of the 15-minute grace period. The Monitor reiterates the checks should be staggered within the 15-minute period rather than every 15 minutes. Deputies need to be encouraged to utilize the proper documents while conducting watches.

Suggestion: Continue training both deputies and MHTs on the importance of staggered 15-minute checks. Enforce proper searches of cells and persons who are at risk for self-harm as there continues to be reports of inmates having access to contraband. There should be extremely limited upper tier assignments of inmates in OJC as there is a risk of self-harm behavior as there are no barriers in place to prevent jumping or hanging from the second tier. Ensure recommendations from clinicians for level of observation is appropriate for the presenting situation. Supervisory spot checks along with video surveillance may be necessary to ensure proper implementation and documentation of suicide watch and



observations.

**B.4.b. Ensure that all correctional, medical, and mental health staff are trained on the suicide screening instrument and the medical intake tool.**

Finding:

Substantial Compliance

Suggestion: Continue to provide documentation that multi-disciplinary in-service training has been completed annually for all current correctional, medical, and mental health staff to include training on updated policies, procedures, and techniques. All incoming staff should be trained on the suicide screening instrument and medical intake tool during onboarding orientation.

**B.4.c. Ensure that multi-disciplinary in-service training is completed annually by correctional, medical, and mental health staff, to include training on updated policies, procedures, and techniques. The training will be reviewed and approved by the Monitor.**

Finding:

Substantial Compliance

Suggestion: Continue to provide documentation that multi-disciplinary in-service training has been completed annually for all current correctional, medical, and mental health staff, to include training on updated policies, procedures, and techniques. Training will need to address deficiencies in communication, especially between OPSO and Wellpath clinicians, and documentation regarding de-escalation procedures, disciplinary process, and searches. Training should clearly delineate responsibilities of various staff member involvement, including during medication pass. Supervisory spot checks may be needed to ensure training is adequate and adhered to during various processes around OJC and TMH.

**B.4.d. Ensure that all staff are trained in observing prisoners on suicide watch and step-down units status.**

Finding:

Partial Compliance

See B.1.e. There continues to be resistance from deputies in using the approved Observation/Restraint Checklist and Worksheet when assigned to suicide watch. It was also observed in person and via video that the MHTs were not accurately completing the document for observation. In addition, there were watches being performed from the control room adjacent to the housing unit, as documented on the worksheet, which is not



clinically appropriate. Although outside of this reporting period, the monitor observed, during this site visit, the MHTs having to prioritize who they were going to watch. On July 10, 2023, due to insufficient staff to conduct watches on 2A, the MHTs watched the direct observation in 2A in lieu of watching the 15-minute watches during their tour of duty. While this was documented as happening for about 90 minutes, there were five (5) individuals (2512739, 2516200, 2523423, 2418035, 2521100) who were not being monitored, which is outside the prescribed time for ensuring the safety of the inmates on watch.

Suggestion: Continued training and supervisory observation, in person and via video access by a Wellpath administrator, will be necessary to ensure accurate completion of these documents and a correction action plan to help ensure deputies are completing the correct document and MHTs are accurately and truthfully completing the watch documents. While the monitor applauds the efforts of the Wellpath administration to ensure compliance with suicide watches, to include having the MHTs sign a document of do's and don'ts on watch and having supervisory staff conduct spot checks daily, consideration of incentives for proper suicide watches or shorter shifts for watching specific prisoners (more rotation) may need to be implemented.

***B.4.e. Ensure that all staff that have contact with prisoners are certified in cardiopulmonary resuscitation ("CPR").***

Finding:

Partial Compliance

The Monitor's review of documentation provided by OPSO indicated that the CPR training provided to the most recent Pre-Service class (Mar-Apr 2023) was incomplete as there was no practical skills demonstration, practice or evaluation conducted as required by the lesson plan and certifying authority. 100% of all eligible Pre-Service staff were shown to have attended this class. 83% of all eligible In-Service staff attended the training.

Suggestion: Continue to provide documentation that all current staff, including OPSO and Wellpath, are certified in CPR. At the next site visit, will review the process in place to ensure all staff are appropriately scheduled for CPR so there is no lapse in certification. The Monitor will also review attendance sheets for demonstration of timely certification.

***B.4.f. Ensure that an emergency response bag, which includes a first aid kit and emergency rescue tool, is in close proximity to all housing units. All staff that has contact with prisoners shall know the location of this emergency response bag and be trained to use its contents.***



Finding:

Substantial Compliance

The emergency response bags continue to be present in close proximity to all housing units.

Suggestion: Ensure the cut down tools are adequately sharpened, and staff are trained in the proper use of the tool throughout the facility. Ensure that staff are available in the control room in order to access the cut down tool, if necessary.

**B.4.g. Randomly test five percent of relevant staff on an annual basis to determine their knowledge of suicide prevention policies. The testing instrument and policies shall be approved by the Monitor. The results of these assessments shall be evaluated to determine the need for changes in training practices. The review and conclusions will be documented and provided to the Monitor.**

Finding:

Substantial Compliance

Suggestion: Consider including questions about the required use of the Observation/Restraint Checklist & Worksheet.

Findings:

B.5.a.   Partial Compliance

B.5.b.   Partial Compliance

B.5.c.   Partial Compliance

B.5.d.   Substantial Compliance

B.5.e.   Partial Compliance

B.5.f.   Partial Compliance

B.5.g.   Partial Compliance

B.5.h.   Partial Compliance

B.5.i.   Partial Compliance

B.5.j.   Substantial Compliance

B.5.k.   Partial Compliance

**B.5.a. OPSO shall implement a policy to ensure that prisoners at risk of self-harm are identified, protected, and treated in a manner consistent with the Constitution.**

Finding:

Partial Compliance

While various policies are in place to ensure inmates at risk of self-harm are identified, protected, and treated in a manner consistent with the Constitution, there remains the



challenge of consistent implementation. Issues surrounding de-escalation, searches, and referrals remain. Without proper searches, inmates remain at risk of self-harm. Without proper medication administration, including adequate mouth checks, inmates remain at risk for self-harm. Without mental health being consulted prior to a use of force, inmates are at risk for self-harm. Without adequate staffing, inmates on suicide watch are not being adequately watched or protected therefore increasing the risk of self-harm.

Suggestion: Ensure staffing is sufficient to allow prescribed suicide watches to be conducted as necessary – all direct observations should be monitored directly, and staff should not have to choose whom to watch. Continue to offer a confidential space for the clinician designated to monitor inmates on suicide watch to conduct assessments. Continue to document any barriers to having access to confidential space. Ensure inmates are searched to prevent self-harm when placed on suicide watch. Implement medication administration policies, to include adequate mouth checks, to help prevent access of the inmate to medication to self-harm. Document consistent out of cell time for inmates on suicide watch and create a corrective action if there is not adequate time out of cell. Individuals on suicide watch need intensive treatment interventions including out of cell time, counseling, and therapy, as medically indicated. Document treatment interventions of inmates on suicide watch and any barriers present in not providing appropriate treatment. Document any inmate on suicide watch or in detox protocols who is found with contraband or misuse of supplies.

***B.5.b. Ensure that suicide prevention procedures include provisions for constant direct supervision of current suicidal prisoners and close supervision of special needs prisoners with lower levels of risk, at a minimum, 15 minutes check. Correctional officers shall document their checks in a format that does not have pre-printed times.***

Finding:

Partial Compliance

Deputies are not using the prescribed Observation/Restraint Checklist and Worksheet consistently. QMHPs/MHTs are not accurately completing the document. While the document does not have pre-printed times, they are either not being used or being filled out improperly. As stated above, and outside of the current reporting period, the monitor observed in July 2023, on 2A, MHTs having to choose who to watch, prioritizing the direct observations while allowing the 15-minute watches to go unobserved for 90 minutes.



Suggestion: See comments in B.4.d. Submit documentation for suicide watches in IPC.

**B.5.c. Ensure that prisoners on suicide watch are immediately searched and monitored with consistent direct supervision until a Qualified Mental Health Care Professional conducts a suicide risk assessment, determines the degree of risk, and specifies the appropriate degree of supervision.**

Finding:

Partial Compliance

There continue to be challenges with immediate and adequate searches of inmates who are placed on suicide watch. In October 2022, only 55% of patients were searched during a Code White. In November 2022, December 2022, and January 2023, 70% of prisoners were searched. Only 50% in February and 61% in March 2023 of inmates were searched. Substantial compliance requires that 100% of inmates are searched. Appropriate monitoring includes the use and proper/accurate completion of the approved documentation to conduct watches – Observation/Restraint Checklist & Worksheet.

Suggestion: Inmates need to be immediately searched or as soon as safely possible 100% of the time. Ideally, but not required, a mental health professional should be present for searches to help with de-escalation and provide a therapeutic environment. Deputies conducting direct observation need to be documenting their watches on the Observation/Restraint Checklist and Worksheet, until a QMHP conducts a suicide risk assessment, determine the degree of risk, and specifies the appropriate degree of supervision. Written procedures for searches should be a part of training so each staff member is clear of their responsibilities. Cells should be searched prior to placement of an inmate on suicide watch and documented. Collaboration and proactive communication are necessary between OPSO deputies and Wellpath staff, particularly QMHPs, to meet the requirements of this provision.

**B.5.d. Ensure that prisoners discharged from suicide precautions receive a follow-up assessment within three to eight working days after discharge, as clinically appropriate, in accordance with a treatment plan developed by a Qualified Mental Health Care Professional. Upon discharge, the Qualified Mental Health Care Professional shall conduct a documented in-person assessment regarding the clinically appropriate follow-up intervals.**

Finding:

Substantial Compliance

While the assessments are being done within the 3-8 working days, there is concern regarding where they are being conducted which contributes to the clinical appropriateness



of treatment.

Suggestion: While this provision has been in substantial compliance, there is a risk of change if adequate follow-up assessments are not conducted for someone discharged from suicide risk. Suicide ideation/attempt can be emotional and the need for follow-up is necessary. Just as suicide assessments are conducted in a confidential space, suicide follow-up assessments require the same degree of care. A cell side visit for suicide follow up is not adequate or clinically appropriate treatment. Continue to document if there are access issues to inmates. Document any barrier to having a confidential space to complete these post-suicide watch assessments. Continue to monitor and document follow-up appointments and ensure they are conducted as policy dictates.

***B.5.e. Implement a step-down program providing clinically appropriate transitions for prisoners discharged from suicide precautions.***

Finding:

Partial Compliance

Simply having a document which outlines a step-down program is insufficient for substantial compliance without implementing a clinically appropriate, consistently run program. In review of the step-down program handout, it is proposed to occur on 2B for males and 3E for females. It includes individual and group counseling services, recreational and music therapy, medication education and addresses discharge resources. During this current site visit, which is outside of the review period and the prior visit in December 2022, there was no deputy assigned to the unit on the days of the Monitor's visit and therefore there could not be any programming conducted on the unit. Consistent implementation is just as important as having the program. While the program is described as providing an individualized care approach to meet the needs of the patients who may require assistance transitioning from intensive acute treatment to general population, there appears to be general treatment offered, when a deputy is available, in a groups setting rather than individualized treatment or focused groups based on the needs of the population. As stated earlier, while the provision does not dictate there be a confidential space dedicated to the step-down program, confidentiality is key in providing adequate clinical care for this population.

Suggestion: Consistent implementation of the step-down program is necessary. The



introduction of medication education (which is number 6 on the list of offerings for this program), even in a group setting, is imperative for this population. Ensure the multi-disciplinary treatment plans include individualized treatment for inmates which is reflected in the programming being offered in the step-down program. The progress notes should reflect the treatment being given in the program in line with the prescribed interventions in the treatment plan. Continue to document interruptions in service for this unit and any barriers in consistent programming.

***B.5.f. Develop and implement policies and procedures for suicide precautions that set forth the conditions of the watch, incorporating a requirement of an individualized clinical determination of allowable clothing, property, and utensils. These conditions shall be altered only on the written instruction of a Qualified Mental Health Care Professional, except under emergency circumstances or when security considerations require.***

<u>Finding:</u>

Partial Compliance

One hundred percent (100%) of inmates are not searched properly prior to being placed on suicide watch. In fact, the highest percentage was 70%. This provision calls for individualized determination of allowable property. It appears the system is an all or none mentality as to what an individual can have on suicide watch. The restrictions need to be clinically driven and properly documented to address the presented risk.

<u>Suggestion:</u> Document all searches, including whether it occurs prior to or after being placed on suicide watch. Provide documentation of individualized determinations of the conditions for watch for male and female inmates at OJC and at TMH. This should include all inmates who are in non-suicide resistant cells and are therefore on direct observation. Provide policy, procedure, and documentation about suicide watches in IPC. Once the documents are provided, implementation must also be monitored closely.

***B.5.g. Ensure that cells designated by OPSO for housing suicidal prisoners are retrofitted to render them suicide-resistant (e.g., eliminating bed frames/holes, sprinkler heads, water faucet lips, and unshielded lighting or electrical sockets).***

<u>Finding:</u>

Partial Compliance

All the designated cells by OPSO have been retrofitted to render them suicide-resistant (9 cells on 2A, 2 cells on 3C, 2 cells on 2C, 2 cells on 3E). The toilets have been installed and the cells have been updated. There are still inmates at risk for self-harm being housed in non-suicide resistant cells.



<u>Suggestion:</u> Continue direct observation of individuals who are housed in non-suicide resistant cells while on suicide watch to best provide for their safety. Consider retrofitting all the cells on the first floor in 2A into suicide-resistant cells. There needs to be priority given to placing screening around the mezzanine and stairwells in 2A to prevent inmates from jumping. Inmates on suicide watch should not be allowed up on the mezzanine level.

***B.5.h. Ensure that every suicide or serious suicide attempt is investigated by appropriate mental health and correctional staff, and that the results of the investigation are provided to the Sheriff, and the Monitor.***

<u>Finding:</u>

Partial Compliance

Suicide and suicide attempts are investigated in silos and there appears to be limitation in what information is shared. There needs to be more collaboration between OPSO and Wellpath in investigations and a communal response to making systemic changes.

<u>Suggestion:</u> There needs to be intentional collaboration and systemic changes produced from investigations by OPSO and Wellpath concerning suicides and serious suicide attempts at the facility. To reiterate, there is no expectation that there will never be a suicide or suicide attempt in the correctional facility, but when they occur, they require more intentional and self-critical analysis of the event by both OPSO and Wellpath. Psychological autopsies should help in identifying systemic deficits which will help inform systemic changes throughout the system. Simply discussing these events at a meeting is not sufficient without real analysis and productive change being the product, including enforcing current policies like alerting mental health to help with de-escalation. Provide a COLLABORATIVE self-critical analysis to the Sheriff and Monitor which demonstrates a thorough understanding and investigation of these critical events.

***B.5.i. Direct observation orders for inmates placed on suicide watch shall be individualized by the ordering clinician based upon the clinical needs of each inmate and shall not be more restrictive than is deemed necessary by the ordering clinician to ensure the safety and well-being of the inmate.***

<u>Finding:</u>

Partial Compliance

The lack of staff at OJC limits the ability of staff to provide direct observation for inmates.

<u>Suggestion:</u> The Monitor continues to recommend that inmates in IPC, who are placed on suicide watch and have yet to be assessed by an QMHP, should be on direct observation.



Continue to submit suicide watch audits with the location of the watch embedded in the report.

***B.5.j. Provide the Monitor with periodic report on suicide and self-harm at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. The report will include the following:***
***1) all suicides;***
***2) all serious suicide or self-harm attempts; and***
***3) all uses of restraints to respond to or prevent a suicide attempt.***

<u>Finding:</u>

Substantial Compliance

<u>Suggestion:</u> Continue to provide this report every six months. If there is a discrepancy in the numbers collected by OPSO versus Wellpath, include the reason for the differences in the report.

***B.5.k. Assess the periodic report to determine whether prisoners are being appropriately identified for risk of self-harm, protected, and treated. Based on this assessment, OPSO shall document recommended changes to policies and procedures and provide these to the Monitor.***

<u>Finding:</u>

Partial Compliance

There remain challenges in documenting changes to policies and procedures based on analysis of risk at the Facility. There remain issues with adequate searches of inmates having access to contraband with no changes being offered to rectify the problem.

<u>Suggestion:</u> Provide updated procedures to the Monitor to address outstanding issues with implementation of ensuring risk challenges are adequately addressed. This provision will also require adequate treatment plan creation, as this would address risk of self-harm and the protective measures in place, to ensure all individuals who engage with the inmate are adequately knowledgeable about the needs of the patient.

<u>Findings:</u>

B.6.a.   Partial Compliance

B.6.b.   Substantial Compliance

B.6.c.   Substantial Compliance

B.6.d.   Substantial Compliance

B.6.e.   Substantial Compliance

B.6.f.   Substantial Compliance

B.6.g.   Substantial Compliance



***B.6.a. OPSO shall prevent the unnecessary or excessive use of physical or chemical restraints on prisoners with mental illness.***

Finding:

Partial Compliance

OPSO is not consistently and proactively contacting mental health prior to the use of force or needing to implement de-escalation in the Facility.

Suggestion: Provide documentation of policies in use for planned de-escalation and use of force. Provide documentation to support consistent implementation of the policy and procedures in place to ensure mental health is contacted prior to the use of force, when reasonably safe. OPSO needs to generate a report for the Monitor documenting all uses of physical and chemical restraints throughout the Facility along with attempts to contact mental health and whether the restraint was planned. Create and submit to the Monitor documentation to determine how many instances of use-of-force incidents occurred over the year prior to the next site visit where mental health was not contacted prior to exercising the use-of-force.

***B.6.b. Maintain comprehensive policies and procedures for the use of restraints for prisoners with mental illness consistent with the Constitution.***

Finding:

Substantial Compliance

***B.6.c. Ensure that approval by a Qualified Medical or Mental Health Professional is received and documented prior to the use of restraints on prisoners living with mental illness or requiring suicide precautions.***

Finding:

Substantial Compliance

***B.6.d. Ensure that restrained prisoners with mental illness are monitored at least every 15 minutes by Custody Staff to assess their physical condition.***

Finding:

Substantial Compliance

***B.6.e. Ensure that Qualified Medical or Mental Health Staff document the use of restraints, including the basis for and duration of the use of restraints and the performance and results of welfare checks on restrained prisoners.***

Finding:



Substantial Compliance

***B.6.f. Provide the Monitor a periodic report of restraint use at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. Each report shall include:***

    ***1)    A list of prisoners whom were restrained;***

    ***2)    A list of any self-injurious behavior observed or discovered while restrained; and***

    ***3)    A list of any prisoners whom were placed in restraints on three or more occasions in a thirty (30) day period or whom were kept in restraints for a period exceeding twenty-four (24) hours.***

<u>Finding:</u>

Substantial Compliance

***B.6.g. Assess the periodic report to determine whether restraints are being used appropriately on prisoners with mental illness. Based on this assessment, OPSO shall document recommended changes to policies and procedures and provide these to the Monitor.***

<u>Finding:</u>

Substantial Compliance

<u>Findings:</u>

B.7.a.  Partial Compliance

B.7.b.  Substantial Compliance

B.7.c.  Non-Compliance

B.7.d.  Partial Compliance

***B.7.a. OPSO shall ensure that all staff who supervise prisoners have the knowledge, skills, and abilities to identify and respond to detoxifying prisoners. Within 180 days of the Effective Date, OPSO shall institute an annual in-service detoxification training program for Qualified Medical and Mental Health Staff and for correctional staff. The detoxification training program shall include:***

    ***1)    annual staff training on alcohol and drug abuse withdrawal.***

    ***2)    training of Qualified Medical and Mental Health Staff on treatment of alcohol and drug abuse conducted by the Chief Medical Officer or his or her delegate.***

    ***3)    oversight of the training of correctional staff, including booking and housing unit officers, on the policies and procedures of the detoxification unit, by the Chief Medical Officer or his or her delegate.***

    ***4)    training on drug and alcohol withdrawal by Qualified Medical and Mental Health Staff.***

    ***5)    training of Qualified Medical and Mental Health Staff in providing prisoners with timely access to a Qualified Mental Health Professional, including psychiatrists, as clinically appropriate; and***

    ***6)    training of Qualified Medical and Mental Health Staff on the use and treatment of withdrawals, where medically appropriate.***

<u>Finding:</u>

Partial Compliance

From review of the documents on Box under B.7.A., the date of this training and the names, positions and date of training are not included. There needs to be inclusion of the name of the trainee, the date of the training, the position of the trainee and the training materials for



that training to allow for a determination that the provision has been substantially met. The Detox Refresher Training Document by Wellpath should demonstrate again who attended, should show the training materials.

The Wellpath Correctional Staff Training Evaluation Detoxification and withdrawal report of November 28,2022, highlights the fact that deputies do not understand it is their duty to do mouth checks.

7.a.1 and 7.a.2 and 7.a.4 The training materials need improvement to ensure that all staff who supervise prisoners have the knowledge, skills, and abilities to identify and respond to detoxifying prisoners.  To make the training meaningful, it is recommended that the training be divided as follows. 1. There should be a section on alcohol intoxication. Included in this training with be a discussion of the differential diagnosis of alcohol intoxication 2. Alcohol withdrawal and the differential diagnosis; in other words, other considerations that could appear like alcohol withdrawal 3. Opioid toxidrome.   A toxidrome is the constellation of signs that result from opioid intoxication. The cardinal signs of opioid intoxication. During this training naloxone will be covered. 4. Withdrawal from opioids.

7.a.3.Training of correctional staff on policies and procedures of the detoxification units.

7.a. 5. Training on when and how to provide inmates with timely access to a mental health professional.

7.a.6. This training is provided, but proof of the training is problematic. Also pointed out above are the deficiencies in the training.

***B.7.b. Provide medical screenings to determine the degree of risk for potentially life-threatening withdrawal from alcohol, benzodiazepines, and other substances, in accordance with Appendix B.***
<u>Finding:</u>

Substantial Compliance

<u>Suggestion:</u> Submit these medical screenings to the Monitors for review and to determine whether this provision remains in substantial compliance.

***B.7.c. Ensure that the nursing staff complete assessments of prisoners in detoxification on an individualized schedule, ordered by a Qualified Medical or Mental Health Professional, as clinically appropriate, to include observations and vital signs, including blood pressure.***
<u>Finding:</u> Vital signs were not consistently recorded in the medical records.

Non-compliance

<u>Suggestion:</u> Submit the documentation to demonstrate that nursing staff are consistently completing assessments of inmates in detoxification on an individual schedule to include



vital signs and observations.

***B.7.d. Annually, conduct a review of whether the detoxification training program has been effective in identifying concerns regarding policy, training, or the proper identification of and response to detoxifying prisoners. OPSO will document this review and provide its conclusions to the Monitor.***
Finding:

Partial compliance

B.7.d is asking if the training program is effective. This review was made available to the monitors this year and there is an analysis of the questions missed on the posttest review. The result of the testing seems to demonstrate that the teaching and testing need improvement. This analysis, conducted yearly, with new and improved training and testing, should yield better results by the next monitor period.

The Policy and Procedure Title: HCD-100_F-04 Medically Supervised withdrawal and treatment program, the involvement of the provider and the administration of benzodiazepines to patients with a CIWA score of zero, needs updating.

Findings:

B.8.a.   Partial Compliance

B.8.b.   Substantial Compliance

***B.8.a. OPSO shall ensure that medical and mental health staffing is sufficient to provide adequate care for prisoners' serious medical and mental health needs, fulfill constitutional mandates and the terms of this Agreement, and allow for the adequate operation of the Facility, consistent with constitutional mandates.***
Findings:

Partial Compliance

There continue to be challenges in securing and retaining adequate numbers of staff, including medical and mental health staff, to provide adequate care for inmates' serious medical and mental health needs. For example, there are insufficient staff to create and complete a multi-disciplinary treatment plan in the outpatient setting where all members of the treatment plan are physically present with the inmate. The hiring of the psychiatric nurse has helped improve and ensure adequate care is being provided for inmates, especially in the area of medication refusals.

Suggestion: There needs to be adequate funding set aside to hire staff and ensure there is adequate, constitutionally mandated treatment throughout the entire facility. This includes dedicated psychiatrist(s) for the outpatient (OJC) treatment program who would be available for much needed treatment planning. This includes having adequate staff to conduct safety/suicide watches, especially while non-suicide resistant cells are still in use.



Consider adding additional psychiatric nurses to assist with covering all psychotropic medication refusals, grievances, sick calls and follow up for laboratory services.

***B.8.b. Within 90 days of the Effective Date, OPSO shall conduct a comprehensive staffing plan and/or analysis to determine the medical and mental health staffing levels necessary to provide adequate care for prisoners' mental health needs and carry out the requirements of this Agreement. Upon completion of the staffing plan and/or analysis, OPSO shall provide its findings to the Monitor, SPLC, and DOJ for review. The Monitor, SPLC, and DOJ will have 60 days to raise any objections and recommend revisions to the staffing plan.***

Finding:

Substantial Compliance

This finding could change without OSPO submitting an updated comprehensive staffing plan/analysis as the population changes and new needs are identified.

Findings:

B.9.a.   Partial Compliance

B.9.b.   Partial Compliance

B.9.c.   Partial Compliance

B.9.d.   Partial Compliance

B.9.e.   Partial Compliance

B.9.f.   Partial Compliance

***B.9.a. OPSO shall develop, implement, and maintain a system to ensure that trends and incidents involving avoidable suicides and self-injurious behavior are identified and corrected in a timely manner. Within 90 days of the Effective Date, OPSO shall develop and implement a risk management system that identifies levels of risk for suicide and self-injurious behavior and requires intervention at the individual and system levels to prevent or minimize harm to prisoners, based on the triggers and thresholds set forth in Appendix B.***

Finding:

Partial Compliance

There continues to be use of non-suicide resistant cells at the Facility for inmates at high risk of self-harm. There continues to be deviation from the policy when the document prescribed for suicide watch is not utilized. There has been no documented collaboration with Wellpath by OPSO to implement and maintain a system to ensure trends and incidents involving avoidable suicides and self-injurious behavior are identified and corrected in a timely manner.

Suggestion: Continue analyzing the trends and incidents involving avoidable suicides and self-injurious behaviors to determine required interventions at the individual and system levels to prevent or minimize harm to inmates, especially inmates with repeated suicidal or self-harming behaviors. Consider ensuring any inmate who is not in a suicide resistant cell,



especially in IPC, are under Direct Observation and Observation Worksheets are accurately completed. Document and demonstrate the collaborative efforts between OPSO and Wellpath to maintain a safe system.

***B.9.b. The risk management system shall include the following processes to supplement the mental health screening and assessment processes: incident reporting, data collection, and data aggregation to capture sufficient information to formulate a reliable risk assessment at the individual and system levels; identification of at-risk prisoners in need of clinical treatment or assessment by the Interdisciplinary Team or the Mental Health Committee; and development and implementation of interventions that minimize and prevent harm in response to identified patterns and trends.***

Finding:

Partial Compliance

Without collaboration between OPSO and Wellpath, there can be no adequate risk management system in place for the facility. Both parties are necessary to submit and capture data which is analyzed in order to formulate a risk assessment to minimize harm. Simply having a meeting where one side offers information is not collaboration. These meetings should be where information is shared after collaborating and having a joint mission moving forward. There continues to be no functional Interdisciplinary Team operating consistently in general population to address formulating a reliable risk assessment. There is limited to no mental health involvement prior to the implementation of the disciplinary process. Segregation is known as a risk factor which negatively interferes with inmates with mental health challenges. Further analysis is needed to ensure processes are in place to address individual and systemic risk levels, especially surrounding risks involved with segregation.

Suggestion: Analyze and provide collaborative documentation of risk management system processes, including listed criteria, which minimize and prevent harm in response to identified patterns and trends. This examination should include the need for functioning interdisciplinary treatment teams throughout the Facility who are focused on treatment strategies to minimize risk including adequate out-of-cell time and participation in the disciplinary process at the outset where a written recommendation can be completed and used to determine appropriate action. All parties have a part to play in decreasing risks and there should be intentional efforts to ensure that collaboration is happening and not just having one side sharing information at a monthly meeting.



*B.9.c. OPSO shall develop and implement an Interdisciplinary Team, which utilizes intake screening, health assessment, and triggering event information for formulating treatment plans. The Interdisciplinary Team shall:*
*1.      include the Medical and Nursing directors, one or more members of the psychiatry staff, counseling staff, social services staff, and security staff, and other members as clinical circumstances dictate;*
*2.      conduct interdisciplinary treatment rounds, on a weekly basis, during which targeted patients are reviewed based upon screening and assessment factors, as well as triggering events; and*
*3.      provide individualized treatment plans based, in part, on screening and assessment factors, to all mental health patients seen by various providers.*

Finding:

Partial Compliance

As discussed at this site visit, there are no consistent, functional multidisciplinary teams operating in person at OJC, due to staffing deficits and misunderstanding of which inmates require this. It was made clear at the most recent site visit that the expectation is all inmates on the behavioral health caseload have a multidisciplinary treatment plan. The treatment plans generated from TMH are adequate to address the needs of the patient.

Suggestion: Continue to generate and complete treatment plans in TMH. There was a request for the Monitor to conduct/facilitate a treatment planning session. The details of this will need to be worked out and may need to include the training department. Create a plan/template for how treatment plans will be conducted and completed, including time frame, with a multidisciplinary team in all areas outside of TMH. Continue to work on the staffing plans and staffing needs in order to have multidisciplinary treatment team meetings throughout the facility.

*B.9.d. OPSO shall develop and implement a Mental Health Review Committee that will, on a monthly basis, review mental health statistics including, but not limited to, risk management triggers and trends at both the individual and system levels. The Mental Health Review Committee shall:*
*1. include Medical and Nursing Director, one or more members of the psychiatry staff and social services staff, the Health Services Administrator, the Warden of the Facility housing the Acute Psychiatric Unit, and the Risk Manage;*
*2.identify at-risk patients in need of mental health case management who may require intervention from and referral to the Interdisciplinary Team, the OPSO administration, or other providers;*
*3.conduct department-wide analyses and validation of both the mental health and self-harm screening and assessment processes and tools, review the quality of screenings and assessments and the timeliness and appropriateness of care provided, and make recommendations on changes and corrective actions;*
*4.analyze individual and aggregate mental health data and identify trends and triggers that indicate risk of harm;*
*5.review data on mental health appointments, including the number of appointments and wait times before care is received;*
*6.review policies, training, and staffing and recommend changes, supplemental training, or corrective actions.*



Finding:

Partial Compliance

Until there is a functioning Interdisciplinary Treatment Team assigned to OJC, there will be limitations in being able to adequately address at-risk patients in need of mental health case management who may need referral from the Mental Health Review Committee. There also needs to be more collaboration between OPSO and Wellpath for this provision to move into substantial compliance. The bulk of the work cannot be done by one party and presented to the other party but there both parties need to be working together from the outset to help minimize risk and review the delivery of services by the system.

Suggestion: Create and implement an Interdisciplinary Treatment Team for OJC. Provide documentation of Mental Health Review Committee meetings, where COLLABORATION is taking place in both organizing and documenting findings, addressing all listed elements, including analysis of all data collected. This data should address and track systemic concerns as well.

***B.9.e. OPSO shall develop and implement a Quality Improvement and Morbidity and Mortality Review Committee that will review, on at least a quarterly basis, risk management triggers and trends and quality improvement reports in order to improve care on a Jail-wide basis.***
***1.The Quality Improvement Committee shall include the Medical Director, the Director of Psychiatry, the Chief Deputy, the Risk Manager, and the Director of Training.***
***2.The Quality Improvement Committee shall review and analyze activities and conclusions of the Mental Health Review Committee and pursue Jail-wide corrective actions. The Quality Improvement Committee shall:***
***a. monitor all risk management activities of the facilities through the review of risk data, identification of investigation or corrective action; and***
***b. generate reports of risk data analyzed and corrective actions taken.***

Finding:

Partial Compliance

This provision again requires collaboration between OPSO and Wellpath to achieve substantial compliance. While the creation of the MAC meeting is a step in the right direction, a requirement is implementation of a quality improvement process where risk management triggers and trends are reviewed throughout the entire system and both parties work together to improve care at the facility. The monitor is looking for OPSO input into joint meetings and a work product that shows how both parties are working together to establish a safer facility.

Suggestion: Jail-wide corrective actions plans must be in place and a collaborative effort between OPSO and Wellpath needs to be pursued in order for all risk management activities to be properly monitored. COLLABORATION is a key component of this provision as it focuses on



jail-wide CAPs. Provide documentation to support implementation of collaborative corrective action plans for areas which have been identified for improvement like alerting mental health to planned use of force, access to care challenges, medication refusal, timely access to laboratory services after inmate refusal, the grievance process and chronic medical care access. Provide documentation of attendance and addressed topics for the quarterly meetings along with proposed action items which will be pursued on a COLLABORATIVE basis. Demonstrate how collected and analyzed data is being used to effect positive change throughout the system.

***B.9.f. OPSO shall review mortality and morbidity reports quarterly to determine whether the risk management system is ensuring compliance with the terms of this Agreement. OSPO shall make recommendations regarding the risk management system or other necessary changes in policy based on this review. The review and recommendations will be documented and provided to the Monitor.***

Finding:

Partial Compliance

The monitor has not received any report from OPSO addressing the risk management system or making recommendations for necessary changes. This provision is at risk of moving into Non-Compliance without a more intentional effort by OSPO to provide the required information to the monitor. A joint analysis will be accepted with clear OPSO contributions.

Suggestion: Provide OPSO recommendations regarding the risk management system. This recommendation should be reviewed by Wellpath and there should be a collaborative effort in correcting identified areas of concern. Submit all information to demonstrate changes which have been made to address identified risk management issues throughout the jail facility. Provide the most recent report from OPSO to determine whether there is compliance with the terms of this Agreement. Provide corrective actions plans which have been created and implemented over the year along with effectiveness of the proposed changes. If there are gaps or effectiveness is determined to be minimal, submit updated CAPs to address this. One more chance is being given but if there is no submission of a report with clear OPSO contribution and collaboration by the next site visit in December 2023, this provision is at risk of being scored as non-compliant.

## C.    Medical Care

**Materials reviewed.**



Grievances

Compliance reports

Medical Records

SharePoint Documents

**Overview:**

This is the 18th report on medical care.  Criticism from Report #17 concerning the overreliance on nurses, dependence on verbal orders in place of face-to-face evaluations of patients by practitioners, and lack of escalation of clinical care to a physician which leads to missed diagnosis and deterioration of patients' medical conditions remains. Telemedicine consultation with a physician is available to all health care staff day and night and is underutilized.

**Findings:**

Improvements

There is an additional nurse dedicated to training and to improving the training materials. This is critical to bettering the quality of medical care.

There is a continuous quality improvement study to assure that providers write complete medical records upon sending a patient to the hospital and upon return from the hospital. These records are improving.

The on-site physician may now order specialty care and certain medications without secondary review by the Wellpath corporate office. This should prevent delays in specialty consultation and the timely administration of off formulary medications.

Criticisms

1.      Medical grievances are not responded to timely and are not documented in the medical record. The OJC contract with Wellpath states that "detainees concerned about health care services will receive a response within three days and no later than seven days after receipt.  Written responses are to be based on principles of adequate medical care. Wellpath will respond in the Tiger system as well as a face-to-face response." [11]  The Tiger system for electronic grievances is still not operational for the majority of the pods.  As a result, handwritten health service requests are entered by staff into the Tiger system, and this is one reason for the delay in responsiveness to grievances. The site visit demonstrates

---

[11] HCD_100 A-10 Grievance Process for Health Care Complaints. Well path Orleans Justice Center Louisiana Policies and Procedures.



that paper health service requests and writing implements are not consistently available on the medication cart nor with the deputies.

2.      One physician is not enough for a jail with this number of detainees.   As a result, there is insufficient oversite of medical care by a physician and there is insufficient oversight of the nurse practitioners' practice of medicine.  The telemedicine service provides emergency medicine physician consultation. There are many missed opportunities to involve the physician available by telemedicine.   For example, patient CC had a series of seizures.  The registered nurses diagnosed that a patient was not experiencing seizures because he could walk and talk after the seizure. A physician should have been consulted. After several days, the in-house physician was consulted, and the patient was sent to the emergency department for his seizures.

Examples:

Patient BC had pus coming from a previous craniotomy site. He had hardware in place at the site of the craniotomy.  The nurse practitioner failed to recognize the meaning of pus coming from a previous craniotomy site with hardware in place. She ordered wound care and culture and antibiotics.  A week passed and no provider examined the patient again.   The patient had an emergency response for more blood and pus coming from the surgical site. The telemedicine physician was consulted, and the patient was sent to the emergency department. The patient had a subdural empyema (pus collection on the brain) and osteomyelitis (bone infection) of the skull.

Patient RM came into OJC talking. One day he stopped being able to speak and he could only make sounds. The nurse practitioner should have consulted with a physician since the sudden inability to speak is a symptom of a stroke. Instead, she recommended a psychiatry appointment for the patient. The patient's stroke went unrecognized leaving the patient with permanent neurological damage.

Patient SB was started on Bactrim, an antibiotic, without being evaluated by a provider. The patient was started on an antibiotic without documentation of why and without a provider visit.

1.      Laboratory results are not available to health care practitioners because of the poor interface between the laboratory service provider and the medical record. In modern medicine, access to prompt laboratory results is important to patient care. Wellpath has to



dedicate a staff member to a process that should be automated. Patient SB had a critically abnormal lab result unrecognized for three days because of this outmoded system. Upon receiving this three-day old result, the patient was sent to the emergency department where she required a blood transfusion. Patients do not get medical care because custody does not bring them to the providers for medical care and if the medical provider comes to the tier to see the patient the provider may still not see the patient. The patient SB, in the above case, was not brought to the provider. Despite going to the hospital with a low hemoglobin and receiving a blood transfusion, on the first clinic visit after this hospitalization nurse practitioner wrote "Patient not seen no deputy available reschedule." Patients with serious medical problems are unable to receive medical care due to lack of security personnel. Patient JF was not brought to the dentist multiple times. Then he got admitted to the hospital for four days for a mouth infection. Subsequently, he missed more dental appointments as he was not brought to the dental clinic.

*C. OPSO shall ensure constitutionally adequate treatment of prisoners' medical needs. OPSO shall prevent unnecessary risks to prisoners and ensure proper medication administration practices. OPSO shall assess on an annual or more frequent basis whether the medical services at OPP comply with the Constitution. At a minimum, OPSO shall:*
*1. Quality Managing of Medication Administration:*
> *a. Within 120 days of the Effective Date, ensure that medical and mental health staff are trained on proper medication administration practices, including appropriately labeling containers and contemporaneously recording medication administration.*
> *b. Ensure that physicians provide a systematic review of the use of medication to ensure that each prisoner's prescribed regimen continues to be appropriate and effective for his or her condition.*
> *c. Maintain medication administration protocols that provide adequate direction on how to take medications, describe the names of the medications, how frequently to take medications, and identify how prisoners taking such medications are monitored; an*
> *d. Maintain medication administration protocols that prevent misuse, overdose, theft, or violence related to medication.*

C. 1. a. Partial compliance

C. 1. b. Substantial compliance

C. 1. c. Substantial compliance

C. 1. d. Partial Compliance

C. 1. a.

<u>Finding:</u>

Partial compliance

Training in medication administration is insufficient. "Refusal" is documented even when a patient does not hear the announcement that medication call is taking place. There were instances of



refusal being noted when the patient was in the hospital. With respect to refusal documentations for patients on the CIWA protocol, a note describing the patient is needed. Medical staff should wake the patient up and make sure he is talking and alive and well. Understanding that the patient has a right to refuse vital signs does not mean that nothing should be documented regarding the patient's condition. Four days of refusal without any notation that the patient is alive and well is insufficient documentation.

Medication administration continues to be a problem area. Using the month of October 2022 as an example, medications were administered 83% of the time. For 595 times, the medication administration record was documented as "out of unit."  If the patient is at court, the patient should receive his medication before court or after court. Medication administration was documented as refused 9776 times in the month of October. Patients have a right to refuse, but when patients are administered their medications at 1:30 a.m. or 4:00 a.m. because of difficulty with staffing and security problems, it results in poor medical care. A set time for medication administration is needed and security should be coordinated for this time. On the site visit, medication pass occurred at 11:00 p.m. due to a lock down. As for patient AR, she was getting her med pass at 12:53 a.m. Morning and evening medication pass should be scheduled about 8:00 a.m. and 8:00 p.m.

Finding:

C. 1. b. Substantial compliance

Finding:

C. 1. c. Substantial compliance

Finding:

Partial compliance

Overdoses, hoarding of medication, and diversion of medication are common.

*C.2.a. Provide the Monitor a periodic report on health care at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. Each report will include:*
> *(1) number of prisoners transferred to the emergency room for medical treatment related to medication errors.*
> *(2) number of prisoners taken to the infirmary for non-emergency treatment related to medication errors.*
> *(3) number of prisoners prescribed psychotropic medications.*
> *(4) number of prisoners prescribed "keep on person" medications; and*
> *(5) occurrences of medication variances.*
*C.2.b. Review the periodic health care delivery reports to determine whether the medication administration protocols and requirements of this Agreement are followed. OPSO shall make*



*recommendations regarding the medication administration process, or other necessary changes in policy, based on this review. The review and recommendations will be documented and provided to the Monitor.*

C. 2. a.

Finding:

Partial compliance

While a report has been provided which includes the information required, the validity of it is suspect due to the way medication variances are recorded. The quality improvement team has identified a need for improved documentation of medication variances. Additional training has been initiated.

C.2.b.

Finding:

Substantial compliance

*3.a. OPSO shall notify Qualified Medical or Mental Health staff regarding the release of prisoners with serious medical and/or mental health needs from OPSO custody, as soon as such information is available.*
*3.b. When Qualified Medical or Mental Health staff are notified of the release of prisoners with serious medical and/or mental health needs from OPSO custody, OPSO shall provide these prisoners with at least a seven-day supply of appropriate prescription medication, unless a different amount is necessary and medically appropriate to serve as a bridge until prisoners can reasonably arrange for continuity of care in the community.*
*3.c. For all other prisoners with serious medical and/or mental health needs who are released from OPSO custody without advance notice, OPSO shall provide the prisoner a prescription for his or her medications, printed instructions regarding prescription medications, and resources indicating where prescriptions may be filled in the community.*
*3.d. For prisoners who are being transferred to another facility, OPSO shall prepare and send with a transferring prisoner, a transition summary detailing major health problems and listing current medications and dosages, as well as medication history while at the Facility. OPSO shall also supply sufficient medication for the period of transit for prisoners who are being transferred to another correctional facility or other institution, in the amount required by the receiving agency.*

Findings:

C. 3. a Substantial compliance

C. 3. b. Substantial compliance

C. 3. c. Substantial compliance

C. 3. d. Substantial compliance

## IV.      D. 1. Sanitation and Environmental Conditions

Findings:

D.1. a.   Non-Compliance

D. 1. b.  Partial Compliance



D. 1. c.  Non-Compliance

D. 1. d.  Substantial Compliance

D. 1. e.  Partial Compliance

D. 1. f.  Partial Compliance

D. 1. g.  Substantial Compliance

D. 1. h.  Partial Compliance

***IV. D. 1. a. OPSO shall provide oversight and supervision of routine cleaning of housing units, showers, and medical areas. Such oversight and supervision will include meaningful inspection processes and documentation, as well as establish routine cleaning requirements for toilets, showers, and housing units to be documented at least once a week but to occur more frequently.***

<u>Finding:</u>

Non-Compliance

<u>Observations:</u>

The Monitor physically inspected every occupied housing unit in the OJC and TDC/TMH facilities. The Monitor observed the overall level of cleanliness and sanitation in the TDC housing units to be generally acceptable. The cleanliness and sanitation of the TMH housing units was again found to be very good, including the appearance of the individual cells and janitor closets.  Cleaning equipment was properly stored.

There were signs of insect infestation (ants and drain flies), primarily dead insects on pest control glue boards.  The sanitation/maintenance issue was noted during the previous inspection in and around janitor closet E205 was still present. Water continues to leak in this area as evidenced by water and green mold at the base of the unit dividing wall with the next housing area. A check of the pipe chase behind the stand-alone cells in Pod 2A revealed a significant sewer line leak at the cell's toilet. The leak was emptying into a nearby floor drain, and while not readily apparent outside the pipe chase, it still posed a significant health hazard. Security staff notified Maintenance immediately to remedy the problem. Also, the Monitor observed no change to the shower floors in one of the TDC units where the severely peeling paint has not been repaired. In this condition, the floor cannot be properly cleaned and sanitized. The issues were pointed out to Security staff for follow-up with Maintenance.

The Monitor notes that all previous issues regarding the hot water set points for the TDC/TMH housing units were resolved during the Monitor's interim visit. Maintenance staff were able to demonstrate the separate mixing valve and temperature control systems for both the mop sink and inmate showers/sinks to the Monitor's satisfaction and that the



systems were working properly. All water temps were observed to be within prescribed limits during this inspection tour.

The overall cleanliness in the OJC open dorms as well as pods with individual cells had declined since the last inspection with the Monitor noting an increase in the amount of trash, debris, dirty floors, spilled food/milk, etc. and showers in particular. The Monitor recommends OPSO urgently devise a new strategy to address these deficiencies starting with holding security staff accountable for adherence to the pod cleaning schedules.

The OPSO practice of consolidating all cleaning supplies outside of the units has continued since the last inspection and inmate access to the unit janitor closets remains restricted according to staff. While the Monitor observed fewer spray bottles and other cleaning equipment in the individual cells, issues with Security staff maintaining accountability for the supplies continue. As with the previous inspection the Monitor found several janitor closets to be dirty and disorderly with dirty mop water in the mop buckets though none were found unsecure. The closets are still in limited use as they remain the water source and storage location for mop buckets, mops, brooms, etc. Recommended repairs of damaged metal flashing and shelving from previous inspections have been accomplished. Sanitation, Maintenance, and Life/Safety should still inspect the closets routinely to ensure continued serviceability, particularly lighting, water service and drains. The Monitor also interviewed the OPSO Sanitarian and Environmental Officer as well as inmates and staff during the inspection itself.

As with previous inspections, OPSO did not provide a cleaning schedule and weekly inspection documentation as required. The Assistant Warden stated that a schedule had been developed but it was apparent through inmate interviews and comments that staff were not following a particular schedule from day to day. The Sanitarian advised that due to the lack of inmate workers, responsibility for routine cleaning of pod areas continues to rest with security staff as noted in the previous four inspections. The Monitor reviewed the monthly environmental inspection reports and found them to routinely include the majority of the sanitation issues noted by the Monitor on the date of the inspection indicating the sanitation issues in the housing units are persistent.

During the tour, inmate showers were specifically viewed by the Monitor and found to be in far worse shape in terms of cleanliness than during the previous inspection. As



included in the previous report, the OPSO Sanitarian provided a memo regarding the cleaning of the inmate showers which noted:

> *For the requested reporting period, each unit manager has devised a listing of inmates that are located on each pod as the designated shower cleaning crew. Showers are cleaned on a daily basis during the night shift and are left open to dry out. Also sanitation continues to assist with supplying the cleaning chemicals and supplies needed to effectively clean and sanitize the showers.*

The Monitor observed that the cleanliness and sanitation in many housing units had continued to decline since the last inspection. Unit 3C was again the worst example with several others close behind. An accumulation of trash was noted in several individual cells in various units and several dayrooms and recreation yards as well.

Based on the above, the Monitor continues the Non-Compliance rating and expects significant improvement prior to the next inspection tour.

During previous inspections, the Monitor found at least three housing units having more than 50% of the cells with obstructed air supply vents. As noted previously, blocked supply registers present a code violation as it relates to ventilation and the number of required air exchanges per hour in rooms with toilets, the correctional environment presents unique challenges in maintaining this aspect of compliance. The Monitor observed a significantly greater number of individual cell supply registers to be covered or obstructed by the cell occupants than during the previous inspection. The Monitor noted that several dayroom return air registers still needed cleaning, particularly in the dorm-style units. The registers collect dust and lint and, if left unchecked, can promote the growth of mold.

The Monitor noted clutter issues in most housing pods, typically involving the improper storage of inmate property in cells and dormitories. The Life-Safety inspection reports during the rating period noted similar issues. The inmates' use of contraband in their cells was readily apparent in most of the OJC housing pods. The possession of altered items or utilizing items in ways other than their intended use should be considered by security staff to be contraband and confiscated. Several cells were observed to have lights covered, home-made clotheslines strung across the cells, extra blankets used as carpeting on the cell floors, and numerous altered clothing items, to name a few of the issues.

The documentation and interviews reflected the Sanitarian and Environmental staff's



efforts at maintaining consistent and regular cleaning schedules for circulation areas however, these sections report that staff continue to be assigned to security tasks on a daily basis making the accomplishment of required cleaning duties a challenge.

The number of grievances regarding sanitation issues, while relatively low during the rating period, has been increasing steadily over the last 15 months. Inmate reports via grievance of inadequate or missing cleaning supplies were few in number, however this was an issue noted in the notes at least once in random units on each of the "town hall" meetings conducted by the Warden in the housing units. The Monitor also heard repeated complaints from the inmates during the tour. The Sanitarian also noted that the Facility's supply of replacement mops was depleted prior to the inspection tour due to being backordered from the supplier. This is the second time within 12 months that mops, essential equipment for sanitation and cleanliness in the units, have been unavailable. The Monitor strongly recommends a review of the purchasing and acquisition procedures that apparently do not allow for alternate sources of supply for essential items. The material safety sheets were in order in each area inspected.

As previously noted, regular provision of clean inmate clothing and bedding and appropriate inventory of these supplies are essential to sanitation, infection control and disease prevention. The Sanitarian again reported that she was only able to maintain a minimally adequate supply of inmate clothing for issue and exchange primarily due to limited shelf-stock levels and the laundry vendor's staffing issues that sometimes delayed the return of items. Women's uniforms were noted to be in particularly short supply, and the Monitor was advised the uniforms were "backordered" The Monitor was further advised that if the women inmates were not washing their own uniforms, a regular exchange could not be provided.

The Monitor noted the hoarding and altering of issued clothing items and blankets has increased markedly since the last inspection. The instances of altered clothing (homemade "hoodies", sewn on designs, and clothing used for other than it's intended purpose) observed is of particular concern as it destroys the clothing item and precludes reissuance to another inmate thus decreasing stock levels prematurely. The security staff's apparent indifference to this issue concerns the Monitor.

Based on an inmate comments and some grievance documentation, the Monitor again



inquired about the frequency of the exchange of blankets and linens. The Sanitarian advised that both were on a monthly exchange schedule. While acceptable for blankets, the Monitor again recommends a weekly exchange for linens to support good hygiene and sanitation. To put it simply, the outsourcing of laundry is not an acceptable alternative to an in-house laundry.

The Monitor noted that the washers and dryers appeared to be in working condition in several of the pods at the time of the inspection although several units were non-functioning or had been removed from service. The issue was readily apparent to the Monitor as several pods without functioning dryers had inmate clothing hung to dry on most every handrail throughout the pods. Missing or non-functioning washers were obvious as the inmates had taken to washing their laundry in mop buckets that were left in the pod by security staff. The Monitor considers both practices to be unsanitary. at least one unit had (4E) the dryer removed for an extended period of time according to inmates and as evidenced by towels and personal clothing hanging on every handrailing in the unit to dry. Several inmates complained to the Monitor about inoperable equipment and a lack of access to the washers/dryers. The Monitor noted personal clothing and towels hanging on dayroom railings in several housing units indicating that either the clothes dryer was not working, or the inmates were resorting to handwashing items due to lack of access to the machines. The Monitor noted a few damaged or missing dryer vent hoses.

***IV. D. 1. b. Continue the preventive maintenance plan to respond to routine and emergency maintenance needs, including ensuring that showers, toilets, and sink units are adequately installed and maintained. Work orders will be submitted within 48 hours of identified deficiencies, or within 24 hours in the case of emergency maintenance needs.***

Finding:

Partial Compliance

Observations:

As with previous inspections, the Monitor reviewed the Sanitation and Environmental Conditions report, the OPSO Preventive Maintenance Plan, the Preventive Maintenance Schedule Summary report, and a Preventive Maintenance work orders status report as well as inmate grievances related to maintenance issues. The Monitor also interviewed the Maintenance Director. The documentation reflected an on-going preventive maintenance program for major building systems and components consistent with OPSO policy and the Consent Judgment. Preventive maintenance continues to be a challenge per



the Maintenance Director with continued staffing issues being the root cause.

Through the Monitor's personal observations and individual inmate interviews conducted during the walk-thru in each housing unit, the Monitor observed a substantial increase in the number of issues identified regarding water, electric or HVAC services in individual cells that were not addressed in a timely fashion. The issues primarily involved water pressure issues at the restroom sinks in open dormitory pods and in individual cells throughout OJC and TDC/TMH. The Maintenance Director again noted staffing issues as the root cause of the increase in the number of plumbing issues.

Unlike the previous inspection, there was a marked increase in the number of grievances received for the month of March 2023. A review of the previous 15 months' records also indicated an increasing trend in the number of maintenance grievances indicating that the timeliness and level of service for routine issues with basic plumbing, mechanical or electrical services in inmate cells or dayrooms has deteriorated.



While work orders being submitted in a timely manner is required by the Consent Judgment ("Work orders will be submitted within 48 hours of identified deficiencies, or within 24 hours in the case of emergency maintenance needs"), the timely follow-on repair actions are essential.

The Monitor observed a continued increase in the number of broken cell door windows throughout OJC to include a door glass in the Intake Processing Center. While OJC staff were aware of the vandalism, the Monitor makes this note to emphasize the need for timely replacement of the broken glass to eliminate the safety and security risk.

*IV. D. 1. c. Maintain adequate ventilation throughout OPSO facilities to ensure that prisoners receive adequate air flow and reasonable levels of heating and cooling. Maintenance staff shall review and assess compliance with this requirement, as necessary, but no less than twice annually.*

Finding:



Non-Compliance

Observations:

      As noted in previous inspections, adequate air flow is maintained in the facilities but continues to be impeded in inmate cells when inmates block the air vents.  The Monitor noted that overall, the number of cells with blocked supply registers was significantly greater than noted during the previous visit with at least two OJC housing units having more than 50% of the cells observed to be obstructed. Compliance in this area remains an inmate supervision issue and must continue to be addressed by security staff consistently. The Monitor noted that the majority of housing dayrooms and cells to be at relatively reasonable levels of heating and cooling. Based on inmate complaints of "hot cells" and "no air" in at least four housing units with cells, the Monitor investigated and found at least one areas with minimal or no air flow in a section of inmate cells controlled by a single Variable Air Volume (VAV) box. The OPSO staff member present was advised to submit a work order for the area.

      The following, regarding test and balance reports, is restated from previous reports. As noted in the two previous reports, test, and balance reports for the Kitchen/Warehouse (2014), OJC (2017) and TDC (2012) were the latest available to the Monitor.

      Prior to the September 2019 report, this section had been interpreted as requiring comprehensive "test and balance" assessments on a semi-annual basis. Such assessments are very expensive and typically performed only during the commissioning of new or replacement HVAC systems. The Monitor has consistently requested OPSO provide reports from the Building Automation System (BAS) covering the inspection period which would reflect the actual air temperatures in the units and cells on a continuous basis. The BAS controls the heating and cooling throughout all occupied areas in OJC, and the reports would be used to verify the system's performance as well as the maintenance response to routine and emergency situations requiring service or replacement of the HVAC components. The previous Maintenance Director failed consistently to provide the requested information. Tour #18 was the third inspection under the new Administration that the documentation was still not provided. The Monitor is anticipating the requested documentation will be available for Tour #19 based upon follow-up action recently taken by OPSO (contracted system training for staff). However, for this rating period, the rating remains in Non-Compliance.



The Monitor reviewed live data of the system's warning and alarm functions which reflected no major equipment or systems issues that had not been addressed at that moment. The Monitor inspected the BAS system and noted no alarms or alerts present on the system. Given the Monitor's observation of at least two cell areas with little or no air circulation in the OJC area, it is recommended that the Maintenance Director implement a routine audit/inspection of the housing areas for such occurrences and compare the findings with the BAS reports to ensure the system is working as expected. Additionally, the Monitor recommends the Maintenance Director establish a "system status review" protocol requiring the responsible on-duty staff member to review the live HVAC equipment monitor status throughout the facility at least once per day to facilitate the identification and repair of any issues noted.

It is the Monitor's opinion that the OJC Building Automation System and the new BAS system supporting the TMH units, as currently operated, meets the intent of the Consent Judgment regarding this section. The requested supporting documentation will be necessary to support gain a finding of substantial compliance.

***IV. D. 1. d. Ensure adequate lighting in all prisoner housing units and prompt replacement and repair of malfunctioning lighting fixtures in living areas within five days unless the item must be specially ordered.***

Finding:

Substantial Compliance

Observations:

The Monitor observed sufficient lighting being provided in housing units and the majority of individual cells of both OJC and TDC. Maintenance staff continue to maintain a supply of replacement bulbs, transformers, or ballasts to repair malfunctioning lighting. The one remaining vandalized light fixture in one of the pod mop closets had been repaired. The Monitor observed no outstanding electrical work orders beyond routine bulb replacement and the issue noted above. This section returns to substantial compliance with the replacement of the light fixture.

***IV. D. 1. e. Ensure adequate pest control throughout the housing units, including routine pest control spraying on at least a quarterly basis and additional spraying as needed.***

Finding:

Partial Compliance

Observations:

A review of the documentation submitted found sufficient evidence of a pest control



program that meets the intent of the Consent Judgment. OPSO continues to maintain a pest control contract with a state licensed company for monthly service of all housing areas and bi-weekly service for the Kitchen/Warehouse. Inmate grievances related to pest control were reviewed and found to have been addressed in a timely manner. The Monitor observed several "drain fly" issues in housing units both at OJC and TDC and in the booking holding cells. The Monitor advised staff present to notify the Environmental Officer for remediation.

Environmental, Sanitation and Life-Safety staff performing inspections and responding to pest control grievances continue to initiate work orders for pest control and to document how, when, and where infestations are identified and remedied. The pest control contractor documentation showed no major infestations were found during routine inspections. However, the inspection reports noted numerous issues with debris in housing units and maintenance areas throughout OJC and TDC as well as the exterior and cleanliness of dumpsters and trash receptacles. During the inspection, the Monitor noted significant signs of insects (ants, drain flies) and lizards in TDC 4E/W and 3E/W (pest accumulation on glue boards). The Monitor noted significant clutter and debris (open and scattered food, trash, etc.) in multiple OJC housing units and cells. The majority of the issues relate directly to the level of cleanliness throughout the housing units and adjacent spaces which the Monitor deemed to be insufficient during the inspection. The Monitor expects that OPSO can substantially reduce the issues noted by the pest control contractor by increasing the frequency and effectiveness of the cleaning of these areas.

***IV. D. 1.f. Ensure that any prisoner or staff assigned to clean a biohazardous area is properly trained in universal precautions, outfitted with protective materials, and properly supervised.***

Finding:

Partial Compliance

Observations:

As noted in previous inspections, Policy 1101.07, "Bio-hazardous Spill Cleaning Procedures" [Revised 1/18/2018] Section VIII. A. 1 has been revised to allow properly trained and equipped inmates and deputies to clean up bio-hazardous spills. Training materials were devised by the Sanitarian. Documentation was provided to indicate six (6) inmates received the requisite training in September 2022 and another five (5) inmates received the training after January 1, 2023, during the rating period.

The Monitor also reviewed training curricula and documentation indicating that



during 2022, all pre-service staff received training in bio-hazardous cleanup procedures as part of their initial training in each new-hire class in 2022 up to the date of this inspection. Documentation reflected that the in-service training for this requirement was accomplished in July 2022.

As of November 2018, the Sanitation and/or Environmental Officer is required to be notified of such incidents each business day to enable them to replace any bio-hazardous clean up protective materials used and inspect the area to ensure it was properly cleaned and sanitized. The Monitor was provided with several reports indicating that several bio-hazard incidents requiring cleanup had occurred, however the report narratives frequently failed to identify if, how, or by whom any remediation of the spill was accomplished. The Sanitarian has previously advised that her practice is to routinely review all reports mentioning such incidents to ensure proper follow-up is conducted. and that required cleanup/inspection procedures had been followed. This section remains in partial compliance for this reason.

The Monitor inspected all emergency response bags and found all bags to be properly sealed and containing one cut-down knife as required.

***IV. D. 1. g. Ensure the use of cleaning chemicals that sufficiently destroy the pathogens and organisms in biohazard spills.***

Findings:

Substantial Compliance

Observations:

The Monitor was able to make direct observation that the chemicals on-hand and available to staff were sufficient to destroy the pathogens and organisms in bio-hazardous spills common in a jail environment to include the COVID-19 virus. The Monitor is continuing to rate this section as being in substantial compliance.

Additionally, the chemical storage inventory documentation submitted demonstrated availability of a consistent supply of the required chemicals being maintained by the designated staff.

***IV. D. 1. h. Maintain an infection control plan that addresses contact, blood borne, and airborne hazards and infections. The plan shall include provisions for the identification, treatment, and control of Methicillin-Resistant Staphylococcus Aureus ("MRSA") at the Facility.***

Findings:

Partial compliance



Observations:

As with the previous inspection, the Monitor reviewed the OPSO infection control policy 1201.11 as well as the Wellpath Infection Control Program document (rev. 8/30/18) submitted by OPSO. No changes were noted, and all requisite areas required by the Consent Judgement were addressed, to include MRSA, and included by OPSO for the Monitor's review and found sufficient.

The Monitor observed one instance whereby OPSO staff failed to recognize and remediate a blood/bodily fluid spill in accordance with the established policy. (The Monitor noted a 2- to 3-inch square area of floor tile near the stairs in Unit 3D that had a dried blood stain that appeared to have been present for several days without remediation. An inmate stated that the blood spill occurred during an incident where staff were involved.) The Monitor recommends additional reminders in show-up trainings in addition to the Pre-Service/In-Service training in this area to call staff's attention to the importance of following the policies and procedures on blood borne pathogen remediation.

The Monitor observed no violations with regard to the handling and sanitation of inmate mattresses in OJC or TDC. OPSO has previously provided for annual review of the policy and standard operating procedures for the handling of inmate mattresses to include staff and/or inmate sanitation training program that includes mattress cleaning, and chemical use and control. This procedure is specifically required by the Infection Control Plan.

**IV. D. 2. Environmental Control**

Findings:

D. 2. a.  Substantial Compliance

D. 2. b.  Partial Compliance

***IV. D. 2. a. OPSO shall ensure that broken or missing electrical panels are repaired within 30 days of identified deficiencies, unless the item needs to be specially ordered.***

Findings:

Substantial Compliance

Observations:

OPSO Policies 601.02 "Reporting and Addressing Maintenance Needs" and Policy 601.03 "Preventive Maintenance" [August 15, 2016] are implemented. Major electrical panels at OJC and TMH are located in secure maintenance spaces inaccessible to inmates.



During the inspection, the Monitor noted no specific issues in electrical rooms accessible by security staff.

***IV. D. 2. b. Develop and implement a system for maintenance and timely repair of electrical panels, devices, and exposed electrical wires.***

Findings:

Partial Compliance

Observations:

During the previous inspection, the Monitor noted a damaged floor receptacle in the Kitchen bakery area noted in the previous inspection that had been repaired.

Also, during previous inspections, the Monitor noted chronic issues with the inmate intercom equipment. This was noted in previous reports under Section IV.D.1.b. (with no apparent action from OPSO Maintenance), however the Monitor has determined that this issue is more appropriately covered in this section that requires the implementation of "a system for maintenance and timely repair of electrical panels, devices, and exposed electrical wires".

As with the previous inspection, the Monitor randomly asked inmates to activate their cell intercoms or did so himself to elicit a response from security staff.  There were at least four instances with no response despite staff being present to answer the call indicating the field device (intercom) may be inoperable. The Monitor again heard complaints from  several inmates that intercom calls are not typically answered by staff. The Monitor has observed that, if the inmate is locked in a cell, the inmate must either call out to the pod deputy (if present) or request another inmate who may be out of their cell to alert the pod control staff member if an issue or emergency arises.

As noted in the previous inspection, the OJC intercom system is tied into the security electronics system. Pod deputies are able to answer intercom calls from inmates via a microphone/speaker on the pod desk (connected to the pod computer) *if* the equipment is present. If the pod deputy is logged out of the system, the intercom call is transferred to the pod control desk. The Monitor observed that the pod computer/intercom equipment is missing from at least half of the housing pods. This presents a safety issue even if the deputy is present in the pod. (i.e., an inmate experiencing a medical emergency or assault is unable to call out but can press the intercom button for help). The inmate intercoms in the



Temporary Mental Health (TMH) facility are similarly non-working at the officer control stations, and while the Sallyport Control officer is able to observe and hear inmate intercom calls on the intercom system, there is no microphone present to allow two-way communication with the inmate. As a practice, the Sallyport Control officer is not required to monitor inmate intercom calls. The Monitor recommends TMH supervisory staff review the procedure and require the Sallyport Control officer to notify the respective TMH pod deputy any time a call is observed on the control screen.

The Monitor continues to recommend that Maintenance staff make a comprehensive survey of working/non-working intercom equipment in every housing unit to facilitate repair of the system throughout the facility and add random intercom testing in every unit to the routine inspection process. Additionally, security staff supervisors should continue to emphasize the importance of the prompt response to emergency intercom calls by pod deputies and pod control staff.

Due to the chronic issue with the inmate intercom field devices and control equipment devices, the Monitor is placing this section in partial compliance and recommends OPSO develop a comprehensive near-term plan to repair the system.

**IV. D. 3. Food Service**

This report summarizes the findings for the Food Service provisions of the Consent Judgment based on the Monitor's document reviews and tour conducted July 10-13, 2023. The Monitor inspected the Orleans Justice Center (OJC) Kitchen/Warehouse; observed meal service activities; and spoke with OPSO supervisors and deputies, Summit contracted food service employees, and inmates.

Since the last tour on December 5-7, 2022, sections IV. D. 3. a. and IV. D. 3. b. of the Consent Judgment remained in Substantial Compliance.  However, section IV. D. 3. c., dropped to Partial Compliance.

Findings:

D. 3. a. Substantial Compliance

D. 3. b. Substantial Compliance

D. 3. c. Partial Compliance

*IV. D. 3. a. OPSO shall ensure that food service staff, including prisoner staff, continues to receive in-service annual training in the areas of food safety, safe food handling procedures, and proper hygiene, to reduce the risk of food contamination and food-borne illnesses.*



Findings:

Substantial Compliance

Observations:

D. 3. a. remains in Substantial Compliance for the period of October 2022 through March 2023 based on the documentation provided by Summit. The in-service training for employees included lessons on food allergens, safe food temperatures, and cleaning and sanitizing. Documentation was provided stating that there were no new inmate workers in the kitchen during the compliance period and therefore no training for inmate kitchen workers was conducted.

***IV. D. 3. b. Ensure that dishes and utensils, food preparation and storage areas, and vehicles and containers used to transport food are appropriately cleaned and sanitized on a daily basis.***

Findings:

Substantial Compliance

Observations:

For the compliance period of October 2022 through March 2023, the Monitor reviewed the provided documents including the Summit cleaning logs, daily chemical usage logs, chemical sanitizer concentration logs, and the kitchen vehicle inspection forms. The Monitor inspected the kitchen and observed it to be clean on July 10, 2023, and July 13, 2023. Therefore, D. 3. b. remains in Substantial Compliance.

The floor in the area of the kitchen where the large cooking kettles are located, known as the "cook pit", had been an ongoing concern because it was in poor condition which made it difficult to clean. The floor was renovated on July 17-19, 2023, after the Monitor's last inspection. Photographs were provided and the new epoxy flooring appears to be easily cleanable facilitating compliance with section IV. D. 3. b. of the Consent Judgement requiring that food preparation areas are appropriately cleaned on a daily basis.

***IV. D. 3. c. Check and record on a daily basis the temperatures in the refrigerators, coolers, walk-in refrigerators, the dishwasher water, and all other kitchen equipment with a temperature monitor, to ensure proper maintenance of food service equipment.***

Findings:

Partial Compliance

Observations:

The Consent Judgment requires that OPSO "Check and record on a daily basis the temperatures in the refrigerators, coolers, walk-in refrigerators, the dishwasher water, and



all other kitchen equipment with a temperature monitor, to ensure proper maintenance of food service equipment." The food service records for the compliance period provided by OPSO and Summit were reviewed by the Monitor. The documented refrigeration temperatures were found to be within the regulatory guidelines for the months of October 2022 through February 2023. However, starting on March 22, 2023, problems with high refrigeration temperature[12] readings were documented for coolers #239 (55°F), 241 (51°F), and 242 (52°F). The March 23, 2023, cooler temperature log states that the temperatures were out of range for Coolers #239 (53°F), 241 (50°F), and 242 (51°F) and a work order was submitted. The logs indicate that the refrigeration temperatures continued to fluctuate and the March 27, 2023, log states that Cooler #242 was turned off, the problem was reported, and that it needed freon. The March 28, 2023, log states that Cooler #242 was turned off and empty, and that it had been reported.

During the tour, the Monitor was advised that there were significant problems with the refrigeration that had been ongoing for the last few months. The Monitor observed that most of the coolers and freezers were turned off and empty. The kitchen was utilizing Cooler #224, which is adequately sized to meet the needs of the food service department and the temperatures measured during the Monitor's July 10, 2023, inspection of the kitchen complied with regulatory requirements. However, during the Monitor's July 13, 2023, kitchen inspection, the temperature of the foods stored in Cooler #224 were found to be well above the safe maximum temperature for the cold storage of food.[13] The wall thermometer in Cooler #224 indicated that it was 38°F inside the cooler; however, the air temperature felt much warmer, and it was actually 50°F. No one at OPSO was aware of the actual food temperatures, nor was anyone properly monitoring the cooler and refrigeration temperatures as required by section IV. D. 3. c. of the Consent Judgment. OPSO's Chief Engineer reported that a problem had occurred with the refrigeration system and when refrigerant was added another problem ensued resulting in oil from the compressors

---

[12] The Louisiana Administrative Code does not designate a set-point for refrigerator/cooler temperatures, rather it states, "Food stored for cold holding and service shall be held at a temperature of 41°F (5°C) or below." Therefore, refrigeration must be set at a temperature that can maintain the foods stored therein at 41°F (5°C) or below. https://www.doa.la.gov/media/j3hnpfdy/51.pdf

[13] Sliced apples= 49°F; sliced ham = 52°F; steamed rice = 50°F; liquid eggs = 50°F; and milk = 49-50°F.

contaminating the rest of the system, and that the current problems were caused by the oil which still needed to be filtered out of the system. The Chief Engineer also reported that a lack of proper preventive maintenance had led to these problems.

Unsafe refrigeration temperatures were first documented on March 22, 2023, near the end of the rating period, and on July 13, 2023, the refrigeration system was still not functioning properly; therefore, OPSO has failed to ensure the proper maintenance of the food service equipment, specifically the coolers and walk-in refrigerators, resulting in a reduction to Partial Compliance for section IV. D. 3. c. for the rating period of October 2022 through March 2023. However, if the refrigeration is not immediately repaired and operating in accordance with regulatory requirements, section IV. D. 3. c. of the Consent Judgement will further drop to a rating of Noncompliance for the next rating period.

OPSO will need to achieve and maintain the following to reestablish a rating of Substantial Compliance for IV. D. 3. c.:

- Complete all refrigeration repairs in a timely manner and restore all refrigeration to proper operational capacity that complies with applicable regulatory codes, including Louisiana, Title 51, Public Health, Sanitary Code, Ch. 13, Section 1309, stating, "Food stored for cold holding and service shall be held at a temperature of 41°F (5°C) or below."

- Calibrate and/or replace the current wall/built-in thermometers in the coolers, walk-in refrigerators, and freezers to ensure that they are accurate to the requirements as set forth in the applicable regulatory code, including Louisiana, Title 51, Public Health, Sanitary Code, Ch. 13, Section 1321, stating, "the ambient air temperature of all equipment or a simulated product temperature in all equipment used to hold potentially hazardous food on a device scaled in Fahrenheit accurate to a plus or minus 3°F or Celsius accurate to a plus or minus 1.5°C."

- Purchase and install thermometers that are easy to see and easy to read in all refrigerators, coolers, and walk-ins and train and instruct employees to frequently check the temperatures and ensure that they are operating within the proper and safe temperature range.

- Develop and implement a policy and procedure to check and record the



internal temperature of potentially hazardous refrigerated/cold foods that are held cold for service on the meal/tray preparation line to ensure compliance with applicable regulatory codes, including Louisiana, Title 51, Public Health, Sanitary Code, Ch. 13, Section 1309, stating, "Food stored for cold holding and service shall be held at a temperature of 41°F (5°C) or below."

- Develop and implement a preventive maintenance plan that will ensure proper maintenance of the refrigeration system.
- Provide training to all OPSO and Summit food service staff on proper temperatures, including refrigeration and cold food holding temperatures.
- Provide training to OPSO facilities staff and engineers that are assigned to the Kitchen/Warehouse on basic food safety principles, including refrigeration temperatures.

## IV. D. 4. Sanitation and Environmental Conditions Reporting

Findings:

D.4. a. Substantial Compliance

D.4. b. Partial Compliance

***D. 4. a. Provide the Monitor a periodic report on sanitation and environmental conditions in the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. The report will include***
> ***(1) number and type of violations reported by health and sanitation inspectors;***
> ***(2) number and type of violations of state standards;***
> ***(3) number of prisoner grievances filed regarding the environmental conditions at the Facility;***
> ***(4) number of inoperative plumbing fixtures, light fixtures, HVAC systems, fire protection systems, and security systems that have not been repaired within 30 days of discovery;***
> ***(5) number of prisoner-occupied areas with significant vandalism, broken furnishings, or excessive clutter;***
> ***(6) occurrences of insects and rodents in the housing units and dining halls; and***
> ***(7) occurrences of poor air circulation in housing units.***

Findings:

Substantial Compliance

Observations:

The October 2022 through March 2023 Sanitation and Environmental reports as supporting documentation were available to the Monitor prior to the inspection tour. The biannual summary reports contained the requisite information spelled out by the Consent Judgement for this section. The State Department of Health performed an annual inspection on October 26, 2022, and fell within the reporting period for Report #18. The report noted



several issues which were corrected or scheduled for correction by OPSO staff. The DHH reinspection conducted on November 11, 2022, noted the majority of the deficiencies noted had been corrected. Again, this inspection falls outside the rating period for this report. The Monitor reviewed documentation covering items 3 through 6 and found no significant issues.

***IV. D. 4. b. Review the periodic sanitation and environmental conditions reports to determine whether the prisoner grievances and violations reported by health, sanitation, or state inspectors are addressed, ensuring that the requirements of this Agreement are met. OPSO shall make recommendations regarding the sanitation and environmental conditions, or other necessary changes in policy, based on this review. The review and recommendations will be documented and provided to the Monitor.***

Findings:

Partial Compliance

Observations:

The Consent Judgment requires a review of the periodic sanitation and environmental conditions reports to ensure issues are addressed along with making recommendations regarding sanitation and environmental conditions and policy changes based upon the review. Such reviews are to be documented and provided to the Monitor. The Monitor reviewed the supporting documentation provided by OPSO and determined that it was sufficient to satisfy the requirements of the Consent Judgment for this rating period. However, OPSO again failed to provide any documentation reflecting that a review of the Sanitation/Maintenance documentation was conducted, and policy recommendations made (if any). This places this section in partial compliance.

**IV. E. 1. Fire and Life Safety**

Findings:

E.1. a.   Substantial Compliance

E. 1. b.  Substantial Compliance

E. 1. c.   Substantial Compliance

E. 1. d.  Substantial Compliance

E. 1. e.  Substantial Compliance

***IV. E. 1. a. Ensure that necessary fire and life safety equipment is properly maintained and inspected at least quarterly. These inspections must be documented.***

Finding:

Substantial Compliance

Observations:



The Monitor was able to conduct a tour of the OJC, TDC/TMH, and the Kitchen/Warehouse facilities during the July 2023 inspection with the Facility Life Safety Officer. The Monitor observed no major issues with the fire and life safety equipment. All fire extinguishers were found to be current on required inspections. The Fire Alarm Control Panels in the areas inspected were found to be properly inspected and free of trouble alarms with the exception of an unspecified trouble alarm on one remote panel in TDC/TMH. The Life/Safety Officer was already aware of the issue and a work order was in process.

The Monitor also reviewed all monthly and quarterly inspection documentation as well as outside inspection documentation noting no significant issues with the documentation, that requisite work orders had been generated when warranted, and that all major systems were operational/"green tagged". Of note, the inspection documentation again reflected increasing trash issues throughout the inmate housing areas. The reports continued to note significant issues with excess inmate property being improperly stored in a substantial number of housing units. As previously noted, Staff should consider potential solutions to reduce the amount of clutter and potential fire-load the material presents.

As noted in the previous inspection, the Life Safety Officer continues to use the "Facility Dude" work order system to maintain the schedule of required inspections. The system notifies the Fire Safety Officer when an inspection is due. OPSO continues to maintain contracts with licensed vendors to complete annual inspections of all fire and life safety equipment. OPSO provided copies of quarterly inspections conducted by the Fire Safety Officer for Kitchen/Warehouse, OJC, and TDC/TMH for the 2022 fourth quarter and 2023 first quarter. The latest copy of the Annual fire detection system and extinguisher inspection available for review was dated January 2023. The inspections are performed on a calendar year basis, and neither was out of date at the time of the inspection. This documentation, supported by observations during the compliance tour, indicates that OPSO ensures that necessary fire and life safety equipment is properly maintained and inspected at required intervals.

***IV. E. 1. b. Ensure that a qualified fire safety officer conducts a monthly inspection of the facilities for compliance with fire and life safety standards (e.g., fire escapes, sprinkler heads, smoke detectors, etc.).***

Finding:

Substantial Compliance

Observations:



The Monitor was provided with the monthly inspection documents for the Kitchen /Warehouse, OJC, and TDC/TMH facilities performed during the current inspection period. The reports are thorough and complete with all noted discrepancies listed with the associated work order number. The findings were summarized in a memorandum covering the rating period. Clutter in cells is the greatest contributor to the fire load in the pod housing units that can be effectively mitigated. These inspections are conducted by a qualified fire safety officer or a qualified contractor, as required by the Consent Judgment.

*IV. E. 1. c. Ensure that comprehensive fire drills are conducted every six months. OPSO shall document these drills, including start and stop times and the number and location of prisoners who were moved as part of the drills.*

Finding:

Substantial Compliance

Observations:

The Consent Judgment requires comprehensive fire drills every six months. OPSO provided documentation for nine (9) fire drills for all facilities and shifts conducted during the current rating period (fourth quarter, 2022). Only "Level 1" drills were conducted (no inmate evacuation) due to COVID restrictions. Four drills were conducted in both OJC and TDC/TMH, and one (1) drill was conducted in the Kitchen/Warehouse during the rating period. Documentation reviewed by the Monitor noted more than 90% of available OJC and TDC (by squad) staff had participated in at least one drill during the rating period. In addition to the detailed drill reports, the documentation lists, by name, any delinquent staff with the listing provided to senior management for the coordination of make-up training. Pre-service training was provided to all participants in classes held during the rating period.

*IV. E. 1. d. Provide competency-based training to staff on proper fire and emergency practices and procedures at least annually.*

Finding:

Substantial Compliance

Observations:

OPSO has developed the requisite policy, training course syllabus/outline and written directives necessary for this section. OPSO training staff provided documentation noting that approximately 95% of the mandated staff had completed the required competency-based training on fire and emergency practices in September 2022. (The Training Academy provides make-up opportunities through the remainder of the calendar



year to increase the completion rate.) The Monitor considers the 95% success rate for in-service Life/Safety training to meet the requirement of the Consent Judgement. Although not covered in the language above, the success rate for pre-service Life/Safety training continues to be 100%.

*IV. E. 1. e. Within 120 days of the Effective Date, ensure that emergency keys are appropriately marked and identifiable by touch and consistently stored in a quickly accessible location, and that staff are adequately trained in use of the emergency keys.*

Finding:

Substantial Compliance

Observations:

Inspection reports note the routine verification of the keys and the Fire Safety Officer documents the periodic testing of the keys to verify they are operational. The Fire Safety Officer trains staff on the location and use of the keys during the fire and life safety training curriculum provided to all staff at the training academy. Of concern to the Monitor is the practice of some OJC security staff obtaining the emergency keys for non-emergency use rendering them unavailable as intended. In addition to them not being available in an emergency, it constitutes a major security issue. The Monitor discussed potential options for eliminating this issue.

## IV. E. 2. Fire and Life Safety Reporting

Findings:

E. 2. a.  Substantial Compliance

E. 2. b.  Partial Compliance

*IV. E. 2. a. (1) – (3) Provide the Monitor a periodic report on fire and life safety conditions at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date and every six months thereafter until termination of this Agreement. Each report shall include:*
*(1) number and type of violations reported by fire and life safety inspectors;*
*(2) fire code violations during annual fire compliance tours; and*
*(3) occurrences of hazardous clutter in housing units that could lead to a fire.*

Finding:

Substantial Compliance

Observations:

The semiannual reports referenced in IV. E. 2. a. are conducted by OPSO on a semi-annual basis (Jan through June and July through December). The Monitor was provided with the report covering 7/1/22 through 12/31/22 noting the requisite information and covering the first three months of the rating period. The 2022 Fire and Life Safety Conditions and



inspections reports generated during the rating period were made available to the Monitor prior to the July 2023 inspection. The reports contained the supporting information for the semiannual reports spelled out by the Consent Judgment. In light of the supporting documentation, the Monitor finds this section to be in substantial compliance.

*IV. E. 2. b. Review the periodic fire and life safety reports to determine whether the violations reported by fire and life safety inspectors are addressed, ensuring the requirements of this Agreement are being met. OPSO shall make recommendations regarding the fire and life safety conditions, or other necessary changes in policy, based on this review. The review and recommendations will be documented and provided to the Monitor.*

<u>Finding:</u>

Partial Compliance

<u>Observations</u>:

The Consent Judgment requires a review of the periodic fire and life safety reports to ensure issues are addressed along with making recommendations regarding the fire and life safety conditions and policy changes based upon the review. Such reviews are to be documented and provided to the Monitor.

The Monitor reviewed the supporting documentation provided by OPSO and determined that it was sufficient to satisfy the requirements of the first half of this requirement. OPSO failed to provide any documentation reflecting that a review of the Life/Safety documentation was conducted, and policy recommendations made (if any). This places this section in partial compliance.

## IV. F. Language Assistance

*F.1.a. OPP shall ensure effective communication with and provide timely and meaningful access to services at OPP to all prisoners at OPP, regardless of their national origin or limited ability to speak, read, write, or understand English. To achieve this outcome, OPP shall:*

 *(1) Develop and implement a comprehensive language assistance plan and policy that complies, at a minimum, with Title VI of the Civil Rights Act of 1964, as amended, (42 U.S.C. § 2000d et seq.) and other applicable law;*

 *(2) Ensure that all OPP personnel take reasonable steps to provide timely, meaningful language assistance services to Limited English Proficient ("LEP") prisoners;*

 *(3) At intake and classification, identify and assess demographic data, specifically including the number of LEP individuals at OPP on a monthly basis, and the language(s) they speak;*

 *(4) Use collected demographic information to develop and implement hiring goals for bilingual staff that meet the needs of the current monthly average population of LEP prisoners;*

 *(5) Regularly assess the proficiency and qualifications of bilingual staff to become an OPP Authorized Interpreter ("OPPAI");*

 *(6) Create and maintain an OPPAI list and provide that list to the classification and intake staff; and*

 *(7) Ensure that while at OPP, LEP prisoners are not asked to sign or initial documents in English without the benefit of a written translation from an OPPAI.*



*F.2.a. OPP shall develop and implement written policies, procedures and protocols for documenting, processing, and tracking of individuals held for up to 48 hours for the U.S. Department of Homeland Security ("DHS");*
*F.2.b Policies, procedures, and protocols for processing 48-hour holds for DHS will:*

    *(1)    Clearly delineate when a 48-hour hold is deemed to begin and end;*
    *(2)    Ensure that, if necessary, an OPPAI communicates verbally with the OPP prisoner about when the 48-hour period begins and is expected to end;*
    *(3)    Provide a mechanism for the prisoner's family member and attorney to be informed of the 48-hour hold time period, using, as needed, an OPPAI or telephonic interpretation service;*
    *(4)    Create an automated tracking method, not reliant on human memory or paper documentation, to trigger notification to DHS and to ensure that the 48-hour time period is not exceeded.*
    *(5)    Ensure that telephone services have recorded instructions in English and Spanish;*
    *(6)    Ensure that signs providing instructions to OPP prisoners or their families are translated into Spanish and posted;*
    *(7)    Provide Spanish translations of vital documents that are subject to dissemination to OPP prisoners or their family members. Such vital documents include, but are not limited to:*
        *i.    grievance forms;*
        *ii.    sick call forms;*
        *iii.    OPP inmate handbooks;*
        *iv.    Prisoner Notifications (e.g., rule violations, transfers, and grievance responses) and*
        *v.    "Request for Services" forms.*
    *(8)    Ensure that Spanish-speaking LEP prisoners obtain the Spanish language translations of forms provided by DHS; and*
    *(9)    Provide its language assistance plan and related policies to all staff within 180 days of the Effective Date of this Agreement.*

*F.3.a. Within 180 days of the Effective Date, OPP shall provide at least eight hours of LEP training to all corrections and medical and mental health staff who may regularly interact with LEP prisoners.*

    *(1)  LEP training to OPP staff shall include:*
        *i.    OPP's LEP plan and policies, and the requirements of Title VI and this Agreement;*
        *ii.    how to access OPP-authorized, telephonic and in-person OPPAIs; and*
        *iii.    basic commands and statements in Spanish for OPP staff.*
    *(2)  OPP shall translate the language assistance plan and policy into Spanish, and other languages as appropriate, and post the English and translated versions in a public area of the OPP facilities, as well as online.*
    *(3)  OPP shall make its language assistance plan available to the public.*

*F.4.*

    *(1)    OPP shall ensure that adequate bilingual staff are posted in housing units where DHS detainees and other LEP prisoners may be housed.*
    *(2)    OPP shall ensure that an appropriate number of bilingual staff are available to translate or interpret for prisoners and other OPP staff. The appropriate number of bilingual staff will be determined based on a staffing assessment by OPP.*

<u>Findings:</u>

F.1. a.  Substantial Compliance

F. 2. a. Substantial Compliance

F. 2. b. Substantial Compliance

F. 3. a. Partial Compliance

F. 4.    Substantial Compliance

<u>Observations</u>:

      The Language Assistance Plan required by this paragraph has been prepared and finalized. F. 1. a. remains in substantial compliance.



OPSO asserts that DHS and ICE inmates are not detained. OPSO developed a policy which was submitted to the Monitors which has provisions F. 2. a. and b. into substantial compliance.

OPSO provided documentation regarding the use of the language line. OPSO has provided documentation regarding the number of bilingual staff and the manner in which the needs of language assistance are provided bringing provisions of F. 4. into substantial compliance. The Consent Judgment specifically requires at least eight hours of LEP training for all deputies and mental health staff who may regularly interact with LEP inmates. Provision IV. F. 3. a. is determined in partial compliance as only four hours of training as opposed to the eight hours of training is provided. Training of security and medical staff assigned to the IPC should be sufficient.

### IV. G.  Youthful Prisoners

*IV. G. Consistent with the Prison Rape Elimination Act of 2003, 42 U.S.C. § 15601, et seq., and its implementation of regulations, a youthful prisoner shall not be placed in a housing unit in which the youthful prisoner will have sight, sound, or physical contact with any adult prisoner through use of a shared dayroom or other common space, shower area, or sleeping quarters. In areas outside of housing units, OPSO shall either: maintain sight and sound separation between youthful prisoners and adult prisoners, or provide direct staff supervision when youthful prisoners and adult prisoners have sight, sound, or physical contact. OPP shall ensure that youthful prisoners in protective custody status shall have no contact with, or access to or from, non- protective custody prisoners. OPP will develop policies for the provision of developmentally appropriate mental health and programming services.*

<u>Finding:</u>

Partial Compliance

<u>Observations</u>:

OPSO has provided documentation that its separation of youthful inmates from adult inmates was found in compliance during its recent PREA audit in housing units.  A concerted effort has been made to house all youthful inmates at the juvenile detention facility. When housed at OJC, Tulane provides developmentally appropriate mental health services to youthful inmates. Travis School continues to provide educational and programming services. The requirement for developmentally appropriate mental health and programming services is separate and apart from PREA. However, during the monitoring period, there were youthful inmates who were booked into OJC, and no proof has been provided that they were kept separate from adult inmates or directly supervised by staff. Thus, this provision is now in partial compliance.



## VI. A – D. The New Jail Facility and Related Issues

### A.  New Jail

*The Parties anticipate that Defendant will build a new jail facility or facilities that will replace or supplement the current facility located at 2800 Gravier Street, New Orleans, Louisiana. This Agreement shall apply to any new jail facility.*

<u>Finding:</u>

VI. A. Substantial Compliance.

### B.  Design and Design Document

*Defendant shall obtain the services of a qualified professional to evaluate, design, plan, oversee, and implement the construction of any new facility. At each major stage of the facility construction, Defendant shall provide the Monitor with copies of design documents.*

<u>Finding:</u>

VI. B. Substantial Compliance

<u>Observations</u>:

These provisions apply to the construction of any new facility. Phase III is such a facility. As the City is the entity overseeing the construction of Phase III, OPSO must coordinate with the City to provide copies of design document at each major stage. The City has been providing access to design documents and information regarding Phase III, but assistance from the Court has often been necessary to facilitate access.

### C.  Staffing

*Defendant shall consult with a qualified corrections expert as to the required services and staffing levels needed for any replacement facility. OPSO shall complete a staffing study to ensure that any new facility is adequately staffed to provide prisoners with reasonable safety.*

<u>Finding:</u>

VI.C. Partial Compliance

<u>Observations</u>:

The Consent Judgment requires that the Defendant **shall** consult with a qualified corrections expert as to the required services and staffing levels needed for any replacement facility. The staffing plan for OJC developed in 2019 is now longer sufficient due to the lack of staff for deployment to the positions. The Monitors are concerned whether this will occur with Phase III staffing. The paragraph is in partial compliance.

### D.  Compliance with Code and Standards

*Defendant will ensure that the new jail facility will be built in accordance with: (1) the American Correctional Association's standards in effect at the time of construction; (2) the American with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101-12213, including changes made by the ADA Amendments of 2008 (P.L. 110-325) and 47 U.S.C. §§ 225-661, and the regulations there under; and (3) all*



*applicable fire codes and regulations.*

Finding:

Monitors not qualified to evaluate.

Observations:

The Monitors do not have the knowledge or expertise to evaluate compliance with this paragraph. OPSO asserts that it is in compliance with this provision, without offering documentation. Documentation from the architect would be sufficient.

**VII. Compliance and Quality Improvement**

**VII. A. Policies, Procedures, Protocols, Training Curriculum and Practices**

*Within 120 days of the Effective Date, OPSO shall revise and/or develop its policies, procedures, protocols, training curricula, and practices to ensure that they are consistent with, incorporate, address, and implement all provisions of this Agreement. OPSO shall revise and/or develop, as necessary, other written documents, such as screening tools, logs, handbooks, manuals, and forms, to effectuate the provisions of this Agreement. OPSO shall send pertinent newly drafted and revised policies and procedures to the Monitor as they are promulgated. The Monitor will provide comments on the policies to OPSO, SPLC, and DOJ within 30 days.*

*OPSO, SPLC, and DOJ may provide comments on the Monitor's comments within 15 days. At that point, the Monitor will consider the Parties' comments, mediate any disputes, and approve the policies with any changes within 30 days. If either party disagrees with the Monitor, they may bring the dispute to the Court. OPSO shall provide initial and in-service training to all Facility staff with respect to newly implemented or revised policies and procedures. OPSO shall document employee review and training in new or revised policies and procedures.*

Finding:

VII. A. Partial Compliance

Observations:

OPSO has now completed the development of the required policies. OPSO's efforts in the development of procedures and lesson plans resulted in this paragraph continuing to be in partial compliance. OPSO should continue to seek the input of the Monitors and Parties of any revisions of the policies required by the Consent Judgment. OPSO is reminded that it may not unilaterally change those policies.

**VII. (H). B.  Written Quality Improvement Policies and Procedures**

*Within 180 days of the Effective Date, Defendant shall develop and implement written quality improvement policies and procedures adequate to identify serious deficiencies in protection from harm, prisoner suicide prevention, detoxification, mental health care, environmental health, and fire and life safety in order to assess and ensure compliance with the terms of this Agreement on an ongoing basis. Within 90 days after identifying serious deficiencies, OPSO shall develop and implement policies and procedures to address problems that are uncovered during the course of quality improvement activities. These policies and procedures shall include the development and implementation of corrective action plans, as necessary, within 30 days of each biannual review.*

Finding:



VII. B. Partial compliance

Observations:

OPSO has provided documentation that it is now developing plans to identify serious deficiencies, and to address problems that are uncovered during the course of quality improvement activities to warrant a finding of partial compliance. If any have been completed, they have not been shared with the Monitors. These plans need to contain specific performance measures, timelines, and persons responsible. They also need to be implemented with appropriate development of corrective action to be taken and the auditing of adherence to the action plan.

### VII. (I). C. Full-Time Compliance Coordinator

*The Parties agree that OPSO will hire and retain, or reassign a current OPSO employee for the duration of this Agreement, to serve as a full-time OPSO Compliance Coordinator. The Compliance Coordinator will serve as a liaison between the Parties and the Monitor and will assist with OPSO's compliance with this Agreement. At a minimum, the Compliance Coordinator will: coordinate OPSO's compliance and implementation activities; facilitate the provision of data, documents, materials, and access to OPSO's personnel to the Monitor, SPLC, DOJ, and the public, as needed; ensure that all documents and records are maintained as provided in this Agreement; and assist in assigning compliance tasks to OPSO personnel, as directed by the Sheriff or his or her designee. The Compliance Coordinator will take primary responsibility for collecting information the Monitor requires to carry out the duties assigned to the Monitor.*

Finding:

Substantial Compliance

Observations:

Captain Nicole Harris has been designated the Compliance Coordinator.

### VII. (J.) D. Self-Assessment

*On a bi-annual basis, OPSO will provide the public with a self-assessment in which areas of significant improvement or areas still undergoing improvement are presented either through use of the OPSO website or through issuance of a public statement or report.*

Finding:

Substantial Compliance

Observations:

A community meeting was held in October 2022. This provision is now in substantial compliance.

### VIII. Reporting Requirements and Right of Access

### VIII. A. Periodic Compliance Reporting

*OPSO shall submit periodic compliance reports to the Monitor. These periodic reports shall be provided to the Monitor within four months from the date of a definitive judgment on funding; and every six months thereafter until termination of this Agreement. Each compliance report shall describe the actions*



*Defendant has taken during the reporting period to implement this Agreement and shall make specific reference to the Agreement provisions being implemented. The report shall also summarize audits and continuous improvement and quality assurance activities, and contain findings and recommendations that would be used to track and trend data compiled at the Facility. The report shall also capture data that is tracked and monitored under the reporting provisions of the following provisions: Use of Force; Suicide Prevention; Health Care Delivered; Sanitation and Environmental Conditions; and Fire and Life Safety.*

Finding:

Partial Compliance

Observations:

    As noted in the individual section, several of the required reports have not been submitted during this monitoring period.

**VIII. B.  (Notification of) Death of Any Prisoner**

*OPSO shall, within 24 hours, notify the Monitor upon the death of any prisoner. The Monitor shall forward any such notifications to SPLC and DOJ upon receipt. OPSO shall forward to the Monitor incident reports and medical and/or mental health reports related to deaths, autopsies, and/or death summaries of prisoners, as well as all final SOD and IAD reports that involve prisoners. The Monitor shall forward any such reports to SPLC and DOJ upon receipt.*

Finding:

Substantial Compliance

**VIII. C. Records**

*Defendant shall maintain sufficient records to document that the requirements of this Agreement are being properly implemented and shall make such records available to the Monitor within seven days of request for inspection and copying. In addition, Defendant shall maintain and provide, upon request, all records or other documents to verify that they have taken the actions described in their compliance reports (e.g., census summaries, policies, procedures, protocols, training materials, investigations, incident reports, tier logs, or use of force reports).*

Finding:

Partial Compliance

Observations:

    During this compliance period, OPSO often did not provide incident notifications and investigations requested within seven days. This provision remains in partial compliance.

**III.  Stipulated Orders**

    OPSO and the Plaintiffs/DOJ negotiated two agreements after Compliance Report #3. The language of the Stipulated Orders was linked directly to the Consent Judgment and represented priority areas for inmate safety. Some of them required a one-time action such as the posting of a memorandum or providing of training by a specific date. Some of the provisions of the Stipulated Order of February 11, 2015, contain on-going obligations that



are in addition to the Consent Judgment or clarify the obligations under the Consent Judgment.

The three provisions of the April 22, 2015, Stipulated Order are in substantial compliance and contained provisions that were to be accomplished by specific dates during April 2015. As those dates have passed, the Monitors no longer monitor those provisions. Two of the provisions in the Stipulated Order of February 11, 2015, require additional attention. The provisions of the Stipulated Order of February 11, 2015, which require ongoing compliance are 1. c. and 5. b. The provisions that are not in substantial compliance are addressed below.

*1. c. Within 24 hours of the occurrence of any of the following incident, OPSO shall notify the Monitor via email:*

- *Death of an inmate/arrestee while held in custody (or housed in a hospital to which the inmate has been committed for care and retain in the custody of OPSO; or whose injury occurred while in custody and was subsequently released from custody);*
- *An inmate's/arrestee's suicide, suicide attempt, aborted suicide attempt, suicidal intent, and/or deliberate suicide self-harm gesture as defined by the American Psychiatric Association;*
- *An inmate's allegation of sexual abuse, sexual assault, sexual harassment, or voyeurism whether the incident is between or among inmates, or between or among inmates and a staff/contractor or volunteer;*
- *An inmate's report, or a report by a staff/contractor or volunteer, of any inmate/inmate allegation of assault; or other inmate allegation of felonies occurring to them while in custody;*
- *An Inmate's report of a report by a staff/contractor or volunteer, of any allegation of excessive force by an employee, volunteer or contractor;*
- *Suspension or arrest of any OPSO employee, volunteer, or contractor for alleged criminal activities while on-duty and/or in a facility under the control of OPSO; and*
- *Any recovery of significant contraband, specifically weapons.*

Finding:

Partial Compliance

Observations:

OPSO has not sufficiently complied with the requirements of this provision. At best, the Monitor learns of some of the items through incident reports, review of investigations and newspaper reports. OPSO should put in place a system to comply with this provision.

*5. b. Commending March 1, 2015, OPSO will make available to Monitors, at the Monitors' request, the quarterly reviews conducted by ISB and the command staff regarding the operation of the EIS system, including supporting documentation reviewed, as delineated by Section IV. A. 4. b., c., d., and of the Consent Judgment.*

Finding:

Partial Compliance

Observations:

The documentation provided is not sufficient. The EIS alerts have not been reviewed.



| | Report # 1 2/13/14 | Report # 2 8/26/14 | Report # 3 2/25/15 | Report # 4 9/9/15 | Report # 5 3/17/16 | Report # 6 10/25/16 | Report # 7 5/1/17 | Report # 8 1/12/18 | Report # 9 8/25/18 | Report # 10 3/18/19 | Report # 11 9/19/19 | Report # 12 3/6/20 | Report # 13 11/16/20 | Report # 14 5/17/21 | Report # 15 11/15/21 | Report # 16 06/26/22 | Report # 17 12/08/22 | Report # 18 07/13/20 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **IV.A. 1. Use of Force Policies and Procedures/Margo Frasier** | | | | | | | | | | | | | | | | | | |
| IV. A. 1.a. | ND | NC | NC | PC | NC | PC | PC | PC | PC | SC | SC | SC | SC | PC | PC | PC | PC | PC |
| IV. A. 1.b. | ND | NC | NC | NC | NC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV. A. 1.c. | ND | NC | NC | PC | NC | NC | PC | PC | PC | SC | SC | PC | PC | PC | PC | NC | NC | NC |
| **IV.A.2. Use of Force Training/Margo Frasier and Shane Poole** | | | | | | | | | | | | | | | | | | |
| IV. A. 2. a. | ND | NC | NC | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC | PC | PC | SC | SC | PC |
| IV. A. 2. b. | ND | NC | NC | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC | PC | PC | SC | SC | SC |
| IV. A. 2. c. | ND | NC | NC | NC | NC | NC | NC | NC | PC | PC | SC | SC | SC | PC | PC | SC | SC | SC |
| **IV.A.3. Use of Force Reporting/Margo Frasier** | | | | | | | | | | | | | | | | | | |
| IV. A.3 a. | ND | NC | NC | PC | NC | PC | PC | PC | PC | SC | PC | PC | SC | SC | SC | PC | PC | PC |
| IV. A.3 b. | ND | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC | PC | PC | PC | PC |
| IV. A.3 c. | ND | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC | PC | PC | PC | PC |
| IV. A.3 d. | ND | NC | NC | PC | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC | PC | PC | PC | PC |
| IV. A.3 e. | ND | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | PC | PC | PC |
| IV. A.3 f. | ND | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV. A.3 g. | ND | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | PC | PC |
| IV. A.3 h. | ND | NC | NC | NC | NC | NC | NC | NC | PC | SC | SC | PC | PC | PC | PC | PC | PC | PC |
| **IV.A.4. Early Intervention System ("EIS")/Margo Frasier and Shane Poole** | | | | | | | | | | | | | | | | | | |
| IV.A.4.a. | ND | NC | NC | PC | PC | PC | NC | NC | PC | PC | SC | SC | SC | PC | PC | PC | PC | PC |
| IV.A.4.b. | ND | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | PC | PC | PC | PC |
| IV.A.4.c. | ND | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | PC | PC | PC | PC |
| IV.A.4.d. | ND | NC | NC | NC | NC | PC | PC | PC | NC | PC | SC | SC | SC | SC | SC | SC | PC | PC |
| IV.A.4.e. | NC | ND | ND | NC | NC | NC | NC | NC | NC | SC | SC | SC | SC | SC | PC | PC | PC | PC |
| **IV.A.5. Safety and Supervision/Margo Frasier** | | | | | | | | | | | | | | | | | | |
| IV.A.5.a. | ND | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.A.5.b. | ND | NC | NC | NC | NC | NC | NC | NC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.5.c. | ND | NC | NC | NC | NC | NC | NC | PC | PC | SC | SC | SC | SC | SC | PC | PC | PC | PC |
| IV.A.5.d. | NC | NC | PC | PC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | NC | NC |
| IV.A.5.e. | ND | NC | NC | PC | PC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.A.5.f. | ND | NC | NC | PC | PC | SC | SC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.5.g. | ND | NC | ND | PC | PC | NC | NC | NC | NC | PC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.5.h. | ND | NC | NC | NC | NC | NC | NC | NC | PC | PC | SC | SC | PC | PC | PC | PC | PC | PC |

| | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IV.A.5.i. | ND | NC | NC | PC | PC | PC | PC | PC | SC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.A.5.j. | ND | NC | PC | PC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.A.5.k. | ND | NC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | PC | PC | PC | NC | NC |
| IV.A.5.l. | ND | NC | NC | PC | PC | PC | PC | PC | PC | SC | PC | PC | PC | PC | PC | PC | PC |
| *IV.A.6. Security Staffing/Margo Frasier* | | | | | | | | | | | | | | | | | |
| IV.A.6.a. | ND | PC | PC | SC | SC | PC | PC | PC | SC | SC | SC | PC | PC | PC | NC | NC | NC |
| IV.A.6.b. | ND | NC | PC | PC | NC | PC | PC | PC | PC | SC | SC | SC | PC | PC | NC | NC | NC |
| *IV.A.7 Incidents and Referrals/Margo Frasier* | | | | | | | | | | | | | | | | | |
| IV.A.7.a. | ND | NC | NC | NC | NC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.7.b. | ND | NC | NC | PC | NC | PC | PC | PC | PC | PC | PC | SC | PC | PC | PC | PC | PC |
| IV.A.7.c. | ND | NC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.7.d. | ND | NC | NC | NC | NC | NC | NC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.7.e. | ND | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | PC | SC | SC | SC | PC | PC |
| IV.A.7.f. | ND | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC |
| IV.A.7.g. | ND | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.7.h. | ND | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.7.i. | ND | NC | NC | PC | NC | NC | NC | NC | NC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.7.j. | ND | NC | NC | NC | NC | NC | NC | NC | NC | SC | SC | SC | SC | SC | SC | SC | SC |
| *IV.A.8. Investigations/Margo Frasier* | | | | | | | | | | | | | | | | | |
| IV.A.8.a. | ND | NC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | PC | PC | PC |
| IV.A.8.b. | ND | NC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.8.c. | ND | NC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | PC | PC |
| IV.A.8.d. | ND | NC | NC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.8.e. | ND | NC | NC | PC | PC | PC | PC | SC SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.8.f. | ND | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| *IV.A.9. Pretrial Placement in Alternative Settings/Margo Frasier* | | | | | | | | | | | | | | | | | |
| IV.A.9.a. | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.9.b. | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| *IV.A.10. Custodial Placement within OPP/Patricia Hardyman* | | | | | | | | | | | | | | | | | |
| IV.A.10.a. | NC | PC | SC | SC | SC | SC | PC | PC | PC | PC | SC | SC | SC | SC | PC | NC | PC |
| IV.A.10.b. | NC | NC | NC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.10.c. | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | PC | PC |
| IV.A.10.d. | NC | NC | PC | PC | PC | PC | NC | PC | SC | PC | PC | SC | SC | SC | PC | NC | NC |
| IV.A.10.e. | NC | NC | PC | PC | PC | PC | SC | PC | PC | PC | PC | SC | PC | PC | NC | NC | SC |
| IV.A.10.f. | NC | NC | NC | PC | NC | NC | PC | PC | NC | SC | PC | PC | PC | PC | PC | NC | NC |
| IV.A.10.g. | NC | NC | NC | NC | NC | PC | PC | PC | PC | SC | SC | SC | SC | SC | PC | NC | SC |

| | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IV.A.10.h. | ND | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | PC | SC | PC | SC | NC | SC |
| *IV..A.11. Prisoner Grievance Process/Margo Frasier and Shane Poole* | | | | | | | | | | | | | | | | | | |
| IV.A.11.a | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | | | | | | | | |
| IV.A.11.a.(1) | | | | | | | | | | | SC | SC | SC | SC | SC | SC | PC | PC |
| IV.A.11.a.(2) | | | | | | | | | | | PC | PC | PC | PC | PC | PC | NC | NC |
| IV.A.11.a.(3) | | | | | | | | | | | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.11.a.(4) | | | | | | | | | | | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.11.a.(5) | | | | | | | | | | | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.11.a.(6) | | | | | | | | | | | PC | PC | SC | SC | SC | SC | SC | PC |
| *IV.A.12. Sexual Abuse/Margo Frasier* | | | | | | | | | | | | | | | | | | |
| IV.A.12. | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | PC | PC | PC | PC | PC |
| *IV.A.13. Access to Information/Margo Frasier* | | | | | | | | | | | | | | | | | | |
| IV.A.13. | PC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | PC | NC |
| *IV. B. Mental Health Care* | | | | | | | | | | | | | | | | | | |
| *IV.B.1. Screening and Assessment/Nicole Johnson* | | | | | | | | | | | | | | | | | | |
| IV.B.1.a. | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | PC | PC | SC | SC | SC |
| IV.B.1.b. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | PC | SC | SC | SC | SC |
| IV.B.1.c. | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | PC | SC | SC | SC | SC |
| IV.B.1.d. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | PC | PC | SC | SC | SC |
| IV.B.1.e. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | PC | PC | PC | PC | PC | PC |
| IV.B.1.f. | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.1.g. | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC |
| IV.B.1.h. | NC | NC | NC | NC | NC | NC | NC | NC | PC | SC | SC | SC | SC | SC | SC | SC | SC | PC |
| IV.B.1.i. | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.1.j. | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.1.k. | NC | NC | NC | NC | PC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.1.l. | NC | NC | NC | NC | NC | NC | NC | NC | NC | SC | SC | SC | PC | PC | PC | PC | SC | SC |
| *B. 2. Treatment/Nicole Johnson* | | | | | | | | | | | | | | | | | | |
| IV.B.2.a. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.2.b. | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.2.c. | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.2.d. | NC | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.2.e. | NC | NC | NC | PC | PC | PC | PC | NC | NC | PC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.B.2.f. | NC | NC | NC | PC | PC | PC | NC | PC | PC | PC | SC | SC | PC | PC | PC | PC | PC | PC |
| IV.B.2.g. | NC | NC | NC | PC | PC | PC | NC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.B.2.h. | NC | NC | NC | PC | PC | PC | PC | PC | NC | PC | SC | SC | PC | PC | PC | PC | PC | PC |
| *IV.B.3. Counseling/Nicole Johnson* | | | | | | | | | | | | | | | | | | |

| | C1 | C2 | C3 | C4 | C5 | C6 | C7 | C8 | C9 | C10 | C11 | C12 | C13 | C14 | C15 | C16 | C17 | C18 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IV.B.3.a. | NC | NC | NC | NC | PC | NC | NC | PC | PC | PC | PC | PC | PC | NC | PC | PC | PC | PC |
| IV.B.3.b. | NC | NC | NC | NC | PC | NC | NC | PC | PC | PC | PC | PC | PC | NC | PC | PC | SC | SC |
| **IV.B.4. Suicide Prevention Training Program/Nicole Johnson** | | | | | | | | | | | | | | | | | | |
| IV.B.4.a. | NC | NC | NC | PC | PC | PC | PC | NC | PC | PC | PC | NC | NC | PC | PC | PC | PC | PC |
| IV.B.4.b. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | PC | PC | PC | SC |
| IV.B.4.c. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | PC | SC | SC | SC |
| IV.B.4.d. | NC | NC | NC | PC | NC | NC | NC | NC | NC | PC | PC | PC | NC | NC | PC | PC | PC | PC |
| IV.B.4.e. | NC | NC | NC | PC | NA | PC | PC | PC | PC | PC | SC | SC | SC | SC | PC | PC | PC | SC |
| IV.B.4.f. | NC | NC | NC | NC | PC | PC | NC | PC | SC | SC | SC | SC | SC | SC | PC | PC | PC | PC |
| IV.B.4.g. | NC | NC | NC | SC | PC | NC | NC | NC | NC | PC | NC | PC | SC | SC | SC | SC | SC | SC |
| **IV.B.5. Suicide Precautions/Nicole Johnson** | | | | | | | | | | | | | | | | | | |
| IV.B.5.a. | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.5.b. | NC | NC | NC | NC | NC | NC | NC | PC | PC | SC | PC | PC | NC | NC | PC | PC | PC | PC |
| IV.B.5.c. | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.5.d. | NC | NC | NC | NC | NC | NC | NC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.B.5.e. | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | NC | NC | PC | PC | PC | PC | PC |
| IV.B.5.f. | NC | NC | NC | NC | NC | NC | NC | PC | SC | SC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.5.g. | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.5.h. | NC | NC | NC | NC | NC | NC | NC | PC | NC | PC | PC | SC | SC | PC | PC | PC | PC | PC |
| IV.B.5.i. | NC | NC | NC | NC | NC | NC | NC | PC | SC | SC | SC | SC | SC | PC | PC | PC | PC | PC |
| IV.B.5.j. | NC | NC | NC | NC | NC | NC | NC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.B.5.k. | NC | NC | NC | NC | NC | NC | NC | PC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| **IV.B.6. Use of Restraints/Nicole Johnson** | | | | | | | | | | | | | | | | | | |
| IV.B.6.a. | PC | NC | PC | PC | PC | PC | PC | PC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.6.b. | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.B.6.c. | ND | NC | PC | PC | PC | PC | PC | PC | NC | PC | NC | SC | SC | SC | SC | SC | SC | SC |
| IV.B.6.d. | ND | NC | PC | PC | PC | PC | PC | PC | NC | PC | SC | SC | PC | SC | SC | SC | SC | SC |
| IV.B.6.e. | NC | NC | PC | PC | PC | PC | PC | PC | NC | PC | NC | SC | SC | SC | SC | SC | SC | SC |
| IV.B.6.f. | NC | NC | PC | PC | PC | PC | PC | PC | NC | PC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.B.6.g. | NC | NC | PC | PC | PC | PC | PC | PC | NC | PC | NC | SC | SC | SC | SC | SC | SC | SC |
| **IV.B.7. Detoxification and Training/Nicole Johnson/Susi Vassallo** | | | | | | | | | | | | | | | | | | |
| IV.B.7.a. | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | PC | PC | PC | PC | PC | PC |
| IV.B.7.b. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.B.7.c. | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | NC | NC |
| IV.B.7.d. | NC | NC | PC | PC | PC | PC | PC | PC | PC | NC | PC | PC | PC | SC | SC | SC | NC | PC |
| **IV.B.8. Medical and Mental Health Staffing/Nicole Johnson/Susi Vassallo** | | | | | | | | | | | | | | | | | | |
| IV.B.8.a. | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | |

| | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IV.B.8.b. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.B.9. Risk Management/Nicole Johnson/Susi Vassallo | | | | | | | | | | | | | | | | | | |
| IV.B.9.a. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.9.b. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.9.c. | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.9.d. | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.9.e. | NC | NC | NC | NC | PC | PC | PC | PC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.9.f. | NC | NC | NC | NC | PC | PC | PC | PC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.C. Medical Care<br>See SA 2/11/15 13. | | | | | | | | | | | | | | | | | | |
| IV. C. Quality Management of Medication Administration/Susi Vassallo | | | | | | | | | | | | | | | | | | |
| IV.C.1.a. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | PC |
| IV.C.1.b. | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | SC | PC | PC | SC |
| IV.C.1.c. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | PC | SC | SC | SC | SC |
| IV.C.1.d. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | PC | PC | PC | PC | PC |
| IV.C.2. Health Care Delivered/Susi Vassallo | | | | | | | | | | | | | | | | | | |
| IV.C.2.a. | NC | NC | NC | PC | PC | PC | PC | PC | PC | NC | PC | PC | SC | SC | SC | PC | PC | PC |
| IV.C.2.b. | NC | NC | NC | PC | PC | PC | PC | PC | PC | NC | PC | PC | PC | PC | PC | PC | PC | SC |
| IV.C.3. Release and Transfer/Susi Vassallo | | | | | | | | | | | | | | | | | | |
| IV.C.3.a. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC |
| IV.C.3.b. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC |
| IV.C.3.c. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC |
| IV.C.3.d. | NC | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.D. Sanitation and Environmental Conditions/Shane Poole | | | | | | | | | | | | | | | | | | |
| IV. D. 1.a. | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | NC | NC |
| IV. D. 1.b. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | PC |
| IV. D. 1.c. | NC | NC | PC | PC | PC | PC | PC | SC | PC | SC | SC | SC | SC | SC | SC | SC | NC | NC |
| IV. D. 1.d. | NC | NC | NC | NC | SC | SC | SC | SC | SC | SC | SC | SC | PC | PC | PC | NC | NC | SC |
| IV. D. 1.e. | NC | PC | PC | PC | PC | PC | SC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | PC |
| IV. D. 1.f. | NC | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC | PC | PC | PC | PC | PC | PC |
| IV. D. 1.g. | NC | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV. D. 1.h. | NC | NC | NC | PC | NC | PC | NC | NC | NC | PC | PC | PC | SC | SC | SC | SC | SC | PC |
| IV. D. 2. Environmental Control/Shane Poole | | | | | | | | | | | | | | | | | | |
| IV. D. 2.a. | NC | NC | NC | PC | PC | SC | SC | SC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV. D. 2.b. | NC | NC | NC | NC | NC | SC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | PC | PC |
| IV. D. 3. Food Service/Diane Skipworth | | | | | | | | | | | | | | | | | | |
| IV. D. 3.a. | NC | NC | NC | PC | PC | PC | NC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC |

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *IV. D. 3.b.* | NC | NC | NC | PC | PC | PC | NC | NC | NC | NC | PC | SC | SC | SC | SC | SC | SC | SC |
| *IV. D. 3.c.* | NC | NC | NC | PC | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | PC |
| *IV. D. 4. Sanitation and Environmental Conditions Reporting/Shane Poole* | | | | | | | | | | | | | | | | | | |
| *IV. D. 4.a.* | NC | NC | PC | PC | PC | PC | PC | PC | NC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| *IV. D. 4.b.* | NC | NC | NC | NC | PC | NC | NC | PC | PC | SC | SC | SC | SC | SC | SC | SC | PC | PC |
| *IV.E. Fire and Life Safety/Shane Poole* | | | | | | | | | | | | | | | | | | |
| *IV. E. 1. Fire and Life Safety* | | | | | | | | | | | | | | | | | | |
| *IV. E. 1.a.* | NC | NC | PC | PC | PC | PC | PC | SC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC |
| *IV. E. 1.b.* | NC | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| *IV. E. 1.c.* | PC | PC | PC | PC | NC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| *IV. E. 1.d.* | NC | NC | NC | NC | NC | NC | PC | SC | PC | SC | SC | SC | SC | NC | PC | SC | SC | SC |
| *IV. E. 1.e.* | ND | NC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| *IV. E. 2. Fire and Life Safety Reporting* | | | | | | | | | | | | | | | | | | |
| *IV. E. 2.a.1-3* | ND | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | PC | PC | SC |
| *IV. E. 2.b.* | ND | NC | NC | PC | NC | NC | NC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | PC |
| *IV.F. Language Assistance* | | | | | | | | | | | | | | | | | | |
| *SCIV.F.1. Timely and Meaningful Access to Services/Margo Frasier* | | | | | | | | | | | | | | | | | | |
| *IV.F.1.a.* | ND | PC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC |
| *IV.F.2. Language Assistance Policies and Procedures/Margo Frasier* | | | | | | | | | | | | | | | | | | |
| *IV.F.2.a.* | ND | PC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC |
| *IV.F.2.b.* | ND | PC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC |
| *IV.F.3. Language Assistance Training/Margo Frasier* | | | | | | | | | | | | | | | | | | |
| *IV.F.3.a.* | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| *IV.F.4. Bilingual Staff/Margo Frasier* | | | | | | | | | | | | | | | | | | |
| *IV.F.4.* | NC | PC | PC | PC | PC | NC | NC | NC | NC | PC | SC | SC | SC | SC | SC | SC | SC | SC |
| *IV.G. Youthful Prisoners/Margo Frasier* | | | | | | | | | | | | | | | | | | |
| *IV.G.* | NC | NC | NC | PC | PC | PC | NC | NC | PC | PC | PC | SC | SC | SC | SC | SC | SC | PC |
| *VI. The New Jail Facility/Margo Frasier* | | | | | | | | | | | | | | | | | | |
| *VI. A.* | ND | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| *VI. B.* | NC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| *VI. C.* | ND | PC | SC | SC | SC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | PC | PC | SC |
| *VI. D.* | Monitors Not Qualified to Evaluate | | | | | | | | | | | | | | | | | |
| *VII. Compliance and Quality Improvement/Margo Frasier* | | | | | | | | | | | | | | | | | | |

| | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *VII. A.* | ND | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | PC | SC | PC |
| *VI. B. (H.)* | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| *VI. C. (I.)* | NC | NC | SC | SC | NC | SC | SC | NC | PC | SC | SC | SC | SC | SC | PC | PC | PC | SC |
| *VI. D. (J.)* | ND | NC | NC | PC | PC | PC | PC | NC | NC | NC | SC | SC | SC | SC | SC | PC | PC | PC |
| *VIII. Reporting Requirements and Right of Access/Margo Frasier* | | | | | | | | | | | | | | | | | | |
| *VIII.A.* | ND | PC | NC | PC | PC | PC | PC | NC | NC | PC | SC | SC | SC | SC | SC | SC | SC | PC |
| *VIII.B.* | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| *VIII.C.* | PC | PC | PC | SC | SC | SC | NC | NC | PC | PC | SC | SC | SC | SC | PC | PC | PC | PC |
| *Legend:* *ND - Not scheduled for review* *NC - Non-compliance* *PC - Partial Compliance* *SC - Substantial Compliance* *NA - Not Applicable* | | | | | | | | | | | | | | | | | | |

