# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| LASHAWN JONES, *et al.*, and | § |
| THE UNITED STATES OF AMERICA, | § |
| | § Civil Action No. 2:12-cv-00859 |
| PLAINTIFFS | § Section I, Division 5 |
| | § Judge Lance M. Africk |
| | § Magistrate Judge Michael B. North |
| SUSAN HUTSON, Sheriff, | § |
| | § |
| | § |
| DEFENDANT. | § |
| | § |

## Report No. 19 of the Independent Monitors
### April 10, 2024

Margo L. Frasier, J.D., C.P.O., Lead Monitor
Susi Vassallo, M.D., Medical Monitor
Patricia L. Hardyman, Ph.D., Classification Monitor
Nicole Johnson, M.D., Mental Health Monitor
Shane J. Poole, M.S., C.JM., Environmental Fire Life Safety Monitor
Diane Skipworth, M.C.J., R.D.N., L.D., R.S., C.C.H.P., C.L.L.M., Food Safety Monitor



***Compliance Report #19***
***LASHAWN JONES, et al., and the United States of America v.***
***Susan Hutson, Sheriff***

Table of Contents

|  |  | **Page** |
|---|---|---|
| I. | Introduction | 4 |
|  | A. Summary of Compliance | 6 |
|  | B. Opportunities for Progress | 9 |
|  | C. Review Process of Monitors' Compliance Report #18 | 20 |
|  | D. Communication with Stakeholders | 20 |
|  | E. Recommendations | 20 |
|  | F. Conclusions and Path Forward | 21 |
| II. | Substantive Provisions |  |
|  | A. Protection from Harm | 23 |
|  | A.1. Use of Force Policies and Procedures | 27 |
|  | A.2. Use of Force Training | 29 |
|  | A.3. Use of Force Reporting | 31 |
|  | A.4.  Early Intervention System | 35 |
|  | A.5. Safety and Supervision | 37 |
|  | A.6. Security Staffing | 45 |
|  | A.7. Incidents and Referrals | 47 |
|  | A.8. Investigations | 49 |
|  | A.9. Pretrial Placement in Alternative Settings | 51 |
|  | A.10. Custodial Placement | 52 |
|  | A.11. Prisoner Grievance Process | 79 |
|  | A.12. Sexual Abuse | 87 |
|  | A.13. Access to Information | 87 |
|  | B. Mental Health Care | 88 |
|  | C. Medical Care | 127 |
|  | D. Sanitation and Environmental Conditions | 134 |
|  | E. Fire and Life Safety | 157 |
|  | F. Language Assistance | 158 |
|  | G. Youthful Prisoners | 160 |
|  | H. The New Jail Facility | 160 |
|  | I. Compliance and Quality Improvement | 161 |
|  | J. Reporting Requirements and Right of Access | 163 |
| III. | Status of Stipulated Orders – February 11, 2015, and April 22, 2015 | 164 |



Page

**Tables**

Table 1 – Summary of Compliance – All Compliance Reports ............ 8

Table 2 – Status of Compliance – Stipulated Agreements ............ 8

Table 3 – Summary of Incidents CY 2018-CY 2023 ............ 24

Table 4 – CY 2018-CY 2023 All OJC Reported Incidents by Month ............ 26

Table 5 – CY 2018-CY 2023 OJC Reported Incidents ............ 39

**Figures**

Figure 1 – Percentage of White Male Inmates Assigned to OJC, TDC, and TMH Housing Units—April 2022-September 2023 ............ 60

Figure 2 – Percentage of White Female Inmates Assigned to OJC, TDC, and TMH Housing Units—April 2022-September 2023 ............ 60

Figure 3 – Rates and Completion Time of Initial Custody Assessments Completed July 2022-September 2023 ............ 63

Figure 4 – Percent Overrides for Housing Purposes – July 2022-Sept 2023 ............ 65

Figure 5 – Mandatory and Discretionary due to PREA Status—April 2022-September 2023 ............ 65

Figure 6 – Mandatory and Discretionary Override Rates by Gender January 2023-September 2023 ............ 66

Figure 7 – Pending Custody Assessments January 2023-September 2023 ............ 69

Figure 8 – Victimization of Inmates on the Mental Health Caseload April 2022-September 2023 ............ 70

Figure 9 – Number of Attachments input by Classification Staff —April 2021-September 2023 ............ 70

Figure 10 – Percentage of Initial Custody Assessments April 2021-Sept 2022 ............ 71

Figure 11–Rate of Disciplinary Infractions for the OPSO ADP: April 2022 -September 2023 ............ 76

Figure 12—OPSO ADP vs. Number of Disciplinary April 2022-Sept 2023 ............ 77

Figure 13—Most Serious Disciplinary Infraction/Report with Finding of Guilty: January 2022-September 2023 ............ 78

**Charts**

Chart 1—Facility, Food Service, Medical, Mental Health, and Miscellaneous Grievances ............ 81

Chart 2-- Inmate/Inmate Physical Violence and PREA, Staff Misconduct and PREA, Life-Threatening, and Use of Force Grievances ............ 82

Chart 3-- Commissary, Programs, Inmate Funds, Property, Grievance Appeals, Legal and Law Library Grievances ............ 83

Chart 4—Monthly Grievances, Request and Inmate Population Comparison ............ 84

Chart 5—Overdue Grievance Reports by Month ............ 84

**Appendices**

Appendix A - Summary Compliance Findings by Section Compliance Reports 1 – 18 ............ 167



**Compliance Report # 19**
**Introduction:**

This is Compliance Report #19 submitted by the Independent Monitors providing assessment of the Orleans Parish Sheriff's Office's (OPSO) compliance with the Consent Judgment of June 6, 2013. Compliance Report #19 reflects the status of OPSO's compliance as of September 30, 2023. This report is based on incidents, documents, and compliance-related activities between April 1, 2023, and September 30, 2023. All of the Monitors, with the exception of the food services monitor Diane Skipworth, were on-site for a monitoring tour December 4-7, 2023. Monitor Skipworth was on-site for a monitoring tour October 18-19, 2023. This report is based on the observations and review of OPSO documents by the Monitors during the on-site visits and during the monitoring period.

Throughout the time the Monitors have been involved in enforcement of the Consent Judgment, the on-site visits have played an integral role. During the on-site visits and the on-site visits by the Lead Monitor and various other monitors in between the monitoring tours, the Monitors have endeavored to provide guidance to OPSO as to how to remedy the unsafe and unconstitutional conditions which existed when we began monitoring in late 2013, and which continue to exist. In addition to the on-site visit of all of the Monitors, the Lead Monitor also visited April 17-20, 2023, May 15-18, 2023, September 19-21, 2023, and October 18-20, 2023. Monitor Shane Poole accompanied the Lead Monitor during the visits on April 17-20, 2023, May 15-17, 2023, August 15-17, 2023, and October 17-19, 2023. Monitor Dr. Susi Vassallo accompanied the Lead Monitor during the visit on April 17-20, 2023. Monitor Dr. Patricia Hardyman and Monitor Dr. Nicole Johnson additionally visited May 15-16, 2023. Additionally, all of the Monitors were in frequent contact with OPSO via other methods such as emails, telephone calls, and virtual meetings.

Sheriff Susan Hutson was sworn in as Orleans Parish Sheriff in May 2022. Compliance Report #19 is the second monitoring period for which Sheriff Hutson was sheriff the entire time.

The Monitors have consistently urged OPSO to put in place the necessary processes and procedures to not only obtain compliance, but to sustain compliance. Such processes and procedures would allow OPSO to provide adequate proof of compliance, independently assess compliance with the Consent Judgment and its own policies and procedures, and



address shortcomings without intervention of the Monitors. The Monitors have provided guidance as to how to go about the various review functions and establish a compliance unit that would operate independently of those whose performance would be assessed. While there had been talk about the formation of a compliance unit over the past several years, it did not become operational until Sheriff Hutson took office. The Compliance and Accountability Bureau (CAB) has been in existence for the past two monitoring periods but is still not adequately staffed and lacks a strategic plan for governing its tasks, goals, and processes.

The establishment of the CAB is a monumental step in the right direction. A fully staffed compliance unit with a fully developed strategic plan will allow OPSO to recognize deficiencies and address them. For instance, OPSO continues to not have an electronic way of recording when and if security checks take place in the housing units. Since there is not an electronic record of security checks, deputies write the checks in their logbooks. Often, supervisors, who are also required to make security checks and inspections, do not record their security checks in any manner. In an effort to make review of security checks simpler, OPSO developed a paper form on which to record security checks. While this provides an easier way for a supervisor to determine during a unit inspection if the deputy has recorded that the security checks are being performed timely, it proved to be insufficient proof that an appropriate security check actually occurred and when it occurred. To appropriately verify the accuracy of the times recorded and the method used, hours of video would have to be watched. The monitoring visits continue to find systemic deficiencies in the documentation and auditing of the security checks. For instance, during on-site visits, deputies were inconsistent in describing how an acceptable security check would be performed. Furthermore, the deputies admitted that they did not perform all of the tasks for a proper security check each time a security check was recorded as having taken place. Generally, an adequate security check was only performed, if at all, when a physical count of the inmates took place; twice a day. Supervisors often claim they perform inspections, but the appearance of the housing areas and the lack of documentation calls those claims into doubt. The CAB is important to the work to be done on gaining and sustaining compliance. Equally important is adopting a culture where accountability is embraced as opposed to a culture where there is a reluctance to address the deficiencies and, in some instances, undermining



the efforts of those whose job it is to objectively review data and accurately assess compliance status.

In other areas of the Consent Judgment, progress has been sporadic. In some areas, there has been progress, and in some cases, there has been regression. Overall, ratings improved in eight (8) provisions and regressed in thirteen (13) provisions. OPSO has continued to decline in overall compliance with the Consent Judgment as the number of provisions in substantial compliance the seventh straight monitoring report (Reports 13-19). The decline in substantial compliance corresponds with the return of the control of the OJC to the authority of the Sheriff. The number of provisions in non-compliance has been reduced from twelve (12) provisions to eleven (11) provisions. The lack of significant progression and, in some cases, regression is due to a failure to follow the policies and procedures that have been put in place. It has been exasperated by the lack of staff, but many of the provisions are not reliant on security staffing. The specific areas are addressed in this report.

A.      **Summary of Compliance**

The requirements of the Consent Judgment represent correctional practice recognized as required for the operation of a Constitutional jail system. While there is some flexibility in addressing the mandates, achieving substantial compliance with the Consent Judgment, and Stipulated Agreements are necessary to bring OPSO and its correctional facilities into adherence with Constitutional requirements. The Consent Judgment contains 174 separately rated provisions. While they are separately rated, they are often intertwined. For example, effective implementation of a policy requires not only the drafting of a suitable policy, but appropriate training on the policy and enforcement of the policy. Enforcement of the policy is contingent on assessing whether the policy is being followed which requires supervision, analysis of incidents and data, and objective confirmation of compliance. A meaningful annual review of the adequacy of the policy does not just mean determining whether the wording of the policy should be changed, but also includes evaluating adherence to the policy and whether the objectives of the policy are being met; which requires objective data collection and analysis and development of corrective action plans. While appropriate policies have been developed, the objective data collection, analysis and



development of corrective action plans have been lacking or non-existent thus far. The Monitors are hopeful that will change with the establishment and implementation of the CAB under Sheriff Hutson. However, the CAB has yet to oversee the completion of several corrective actions plans that it represented, during the tour, would be implemented.

Based on the current assessment, OPSO has regressed overall from Report #18 as substantial compliance continued to decline. The goal is substantial compliance with all of the provisions of the Consent Judgment. There has been progress in reducing the number of provisions in non-compliance as there are now eleven (11) provisions in non-compliance (6.3%) as opposed to twelve (12) provisions in Report #18 (6.8%), and seventeen (17) provisions in Report #17; however, in Report #16, there were five (5). Substantial compliance has been achieved for sixty-eight (68) of the provisions (39.1%); down from seventy-seven of the provisions (43.7%). Ninety-five (95) of the provisions are in partial compliance (54.6 %); up from eighty-five (49.4 %).

Under the authority of the Independent Compliance Director, OPSO made material progress as indicated by the movement of non-compliance to partial compliance to substantial compliance for over half of the provisions. At different times during the duration of the Consent Judgment, including in some areas in this report, there has been regression in the progress towards compliance. As will be addressed in individual areas, OPSO has shown regression from the progress in some provisions due to failure to consistently follow and enforce policies and procedures and to provide meaningful training. OPSO has also shown improvement in other provisions.

During the onsite visit for Compliance Report #19, it was apparent that there continues to be an effort being made to utilize analyses of data, including grievance data and use of force data to determine policy adherence and develop action plans to address shortcomings and make decisions. Unfortunately, there still has not been an objective analysis of data concerning institutional violence or at least no development of a systematic approach to making decisions and implementing and enforcing them to reduce institutional violence. For instance, review of incident reports and disciplinary reports continues to clearly indicate that much of the violence is perpetrated by an identifiable group of inmates. However, other than the short time they might be placed on the disciplinary unit, nothing has been done to separate them from the general population. The establishment of the CAB



is a definite move in the right direction, but the concept of accountability and a systematic approach must become part of the OPSO culture and the CAB must be fully staffed with a fully developed strategic plan to be effective. Otherwise, the same deficiencies are likely to continue to be noted time and time again.

**Table 1 – Summary of Compliance – All Compliance Reports[1]**

| Compliance Report/Date | Substantial Compliance | Partial Compliance | Non-Compliance | NA/Other | Total |
|---|---|---|---|---|---|
| #1 – December 2013 | 0 | 10 | 85 | 76 | 171 |
| #2 – July 2014 | 2 | 22 | 149 | 1 | 174 |
| #3 – January 2015 | 2 | 60 | 110 | 2 | 174 |
| #4 – August 2015 | 12 | 114 | 43 | 4 | 173 |
| #5 – February 2016 | 10 | 96 | 63 | 4 | 173 |
| #6 – September 2016 | 20 | 98 | 53 | 2 | 173 |
| #7 – March 2017 | 17 | 99 | 55 | 2 | 173 |
| #8 – November 2017 | 23 | 104 | 44 | 2 | 173 |
| #9 – June 2018 | 26 | 99 | 46 | 2 | 173 |
| #10 – January 2019 | 65 | 98 | 8 | 2 | 173 |
| #11 – September 2019 | 103 | 66 | 5 | 0 | 174 |
| #12 – May 2020 | 118 | 56 | 0 | 0 | 174 |
| #13-- November 2020 | 111 | 59 | 4 | 0 | 174 |
| #14—May 2021 | 100 | 67 | 7 | 0 | 174 |
| #15—November 2021 | 97 | 77 | 0 | 0 | 174 |
| #16—May 2022 | 95 | 72 | 5 | 0 | 174 |
| #17—December 2022 | 80 | 77 | 17 | 0 | 174 |
| #18—July 2023 | 76 | 86 | 12 | 0 | 174 |
| #19—December 2023 | 68 | 95 | 11 | 0 | 174 |

The status of compliance (February 11, 2015, and April 22, 2015) is as follows:

**Table 2 – Status of Compliance with 2015 Stipulated Agreements**

| Compliance Report/Date | Substantial Compliance | Partial Compliance | Non-Compliance | NA | Total |
|---|---|---|---|---|---|
| August 2015 | 21 | 12 | 1 | 0 | 34 |
| February 2016 | 21 | 12 | 1 | 1 | 34 |
| September 2016 | 26 | 7 | 1 | 0 | 34 |
| March 2017 | 28 | 4 | 1 | 1 | 34 |
| November 2017 | 21 | 11 | 1 | 1 | 34 |
| June 2018 | 23 | 8 | 2 | 1 | 34 |



| January 2019 | 28 | 5 | 0 | 1 | 34 |
|---|---|---|---|---|---|
| September 2019 | 28 | 5 | 0 | 1 | 34 |
| May 2020 | 28 | 5 | 0 | 1 | 34 |
| November 2020 | 32 | 2 | 0 | 0 | 34 |
| May 2021 | 32 | 2 | 0 | 0 | 34 |
| November 2021 | 32 | 2 | 0 | 0 | 34 |
| May 2022 | 32 | 2 | 0 | 0 | 34 |
| December 2022 | 32 | 2 | 0 | 0 | 34 |
| July 2023 | 32 | 2 | 0 | 0 | 34 |
| December 2023 | 29 | 5 | 0 | 0 | 34 |

**B.      Opportunities for ContinuedProgress**

The Monitors summarize below the areas identified in preparation of this report regarding OPSO's current level of compliance with the Consent Judgment.

**1.      Foundational Work** - The essential, core work required to achieve compliance includes:

- <u>Policies and Procedures</u> – OPSO completed the essential policies and procedures. The required reviews and necessary updates have fallen behind since the promotion of the Policy Manager to Deputy Chief of Jail Operations in May 2023. The Policy Manager position has still not been filled and no one has been assigned the job duties in the interim. Also essential is the continued development, approval, and implementation of lessons plans and training that correspond with each of the policies. OPSO's policy governing its written directive system has significantly improved the policy/procedure process. This process allows for organizational components to develop specific operational practices for review by OPSO administration. Unfortunately, there is often a delay between when policies are submitted for review, and when they are returned with any suggested changes. For instance, the policy regarding mandatory overtime has been in the approval stage for over six months at the time of this report. Adherence to the policies, procedures, and training is essential. While the full implementation of a fully staffed and functioning CAB will be helpful through its objective auditing of policy adherence, the consistent enforcement of policies is a role which must be performed by the supervisors at all levels. Too often the failure to follow policy



is blamed on the lack of staff or training. Neither is an acceptable excuse. Whether it is lack of supervision, lack of staff, or inadequate training, the result of failure to follow policy is often harm to staff and/or inmates and still is not adequately being addressed.

- <u>Inadequate staffing</u> – OPSO has continued to hire staff and has made progress despite the large number of terminations and resignations. During CY 2021, OPSO lost significant ground in that it hired 97 new staff members and lost 177 staff members through resignation, termination, and retirement. During CY 2022, OPSO hired 136 new staff members and lost 185 staff members through resignation, termination, and retirement. During CY 2023, OPSO hired 265 new staff members and lost 136 staff members through resignation, termination, and retirement. It should be noted that since May 2022 when Sheriff Hutson took office, the growing deficit of CY 2021 and CY 2022 has been overcome. Over the past three calendar years, 498 new staff members were hired, and 498 staff members were lost to resignation, termination, and retirement. These staff members reflect staff across all operations of the OPSO; not solely the jail operation. While staffing assigned to the housing areas of the facilities (OJC and TMH) has increased, it is still inadequate to comply with the Consent Judgment. OPSO did not mandate overtime during the compliance period. Since that time, there has been discussion about mandating overtime and developing the necessary policy and procedures. Deputies are often reluctant to work overtime in OJC as they can make more per hour working off duty security details than they can working overtime in OJC. OPSO should consider prioritizing staffing the OJC over allowing deputies to work details. The requirement that units within the OPSO outside of OJC assist in staffing OJC has been formalized through the Emergency Staffing and Augmentation Plan (ESAP). The ESAP has resulted in the provision of deputies from outside OJC to assist in critical area such as escorts for the mental health and medical staff. There has not been sufficient participation by outside units to supplement security in housing units to any meaningful degree. During the frequent site visits by the monitoring team,



more often than not, there continue to be housing units and control rooms with no staff present. The excuse which is often given is that staff were assigned, but either failed to report or duty or that their presence is unknown. The staff who were present were often tasked with manning two housing units and the control room despite the Consent Judgment requiring one deputy/recruit physically on each unit for direct supervision. Further, almost daily, assigned staff leave housing units and control pods unattended for meal breaks and other duties. Sheriff Hutson raised the salaries for recruits and deputies as a result of the budget request submitted in the 2023 budget. OPSO has made valiant efforts at hiring new recruits to work in OJC. Unfortunately, OJC has not seen a significant increase in staff present on the housing. While OPSO has begun hiring directly for some of the non-OJC assignments (courthouse security, civil), there are still a significant number of staff continuing to tranfer out of OJC. This is concerning to the Monitors for two reasons: (1) it lessens the level of experience within OJC and (2) a higher percentage of male staff were transferred than female staff which exacerbated the disparate ratio of male staff to female staff within the OJC.  OPSO is strongly encouraged to review its deployment of staff. It is apparent that staff are not actually present in the areas where the need is most critical, staffing the housing units. Along with redeployment of staff has to be the accountability of the supervisors to ensure the staff is physically present in the housing units. Sheriff Hutson has made redeployment of staff, including adequate supervision on the evening/night shift a priority. There is currently a severe shortage of sergeants on all of the shifts. While there are plans to have a promotional board for sergeants, it has been suggested that the shortage be addressed by the appointment of provisional sergeants. It is the understanding of the Monitors that the appointment of provisional supervisors has recently occurred. While not ideal, with proper training, it would address the immediate need and allow the administration to evaluate the performance of the provisional sergeants.

- <u>Training</u> – Employee training for security staff, both pre-service and in-service,



has made progress over time, but has taken a step back with the lack of staff. In 2021, OPSO reinstated the practice of assigning new deputies to a training officer during the first three weeks of assignment to OJC (field training program), but enforcement and follow through has been sporadic and occurred infrequently during the monitoring period. The sergeant supervising the program also has the duty of running the school program which has hampered her efforts to meet with the new deputies and provide them mentoring and guidance. A field training program needs to be fully implemented with follow up as to the effect the program has on turnover. The program, if allowed to be fully implemented, is likely to result in a reduction of turnover and a reduction in rule violation by new recruits. OPSO did its annual training in CY 2023, but attendance was only about 72% of the mandated staff. An issue with the quality of training was discovered during the monitoring period for Report #18. Most of the recruits trained during 2023 did not receive the practical portion of CPR or shotgun training. In addition, as discussed in the use of force training section, many of the recruits have not received adequate defensive tactics training. Remedial classes were held during this monitoring period which partially addressed the concern.

- <u>Supervision</u> – Safe operation of OPSO's facilities requires an adequate number of sufficiently trained first line and mid-management supervisors and clear lines of authority and responsibility.  Captains and lieutenants have now been deployed to cover the shifts on a 24/7 basis. However, the movement of captains and lieutenants to cover the shifts on a 24/7 basis was met with great resistance from those that did not want to give up having weekends off or working only the day shift. It appears that several of the lieutenants and captains have still not embraced their new role.

2.    **Medical and Mental Health Care** – The Medical and Mental Health Monitors report challenges remain in the provision of basic care, staffing, and recordkeeping, as well as the continued need for improved collaboration with custody/security staffing. Security staff continued to be responsible for the performance of some of the "suicide watches" during the on-site visit. While there was some improvement in the deputies'



knowledge of their duties to perform and document suicide watches, inconsistency with how suicide watches were performed and documented were still noted, resulting in inconsistency of the reporting of data. An additional issue is that the mental health staff assigned to do suicide watches are required to leave the housing unit when there is no security staff on the housing unit. This means that inmates on suicide watch are frequently left unsupervised. Housing units upon which inmates are on suicide watch (2A and sometimes 3C) are mandatory and should be prioritized when there is a security staff shortage. Resources from Tulane University continue to be particularly helpful in providing psychiatric mental health care, but the psychiatrists have had some difficulty during the monitoring period accessing their clients due to the shortage of security staff; the implementation of the ESAP appears to have aided greatly in addressing the problem. The design of the interview rooms and concerns of Tulane University for their safety has resulted in having to assign one deputy to escort each psychiatrist. Tulane University is not responsible for many aspects of mental health care required by the Consent Judgment. An important part of the long-term solution to the lack of compliance with the Consent Judgment in the areas of medical and mental health is the design and construction of Phase III, a specialized building which will contain an infirmary and housing for inmates with acute mental health issues. For instance, having security staff escort each psychiatrist or other mental health to interview inmates is addressed in the design of Phase III as the psychiatrists and other mental health staff will be able to interview inmates in an environment which is much safer for both staff and inmates.  The City extensively renovated portions of TDC (now referred as TMH or Temporary Mental Health) as a stop gap measure. OPSO finally began to utilize all of the TMH during this monitoring period, but lack of capacity of TMH results in a backlog of inmates with acute mental health issues continuing to be housed in OJC which is inadequate for the housing of these inmates. Even with TMH, the facilities within OJC to house inmates with mental health issues are inadequate and create security and safety issues for both staff and inmates. The inadequacy of the OJC facility and the lack of training on the part of the security staff are reflected in the high number of uses of force, attempted suicides, and assaults on staff and inmates on the mental health units.



3. **Inmate Safety and Protection from Harm** - Providing a safe and secure jail continues to be a challenge.

- <u>Unit Management</u>—The Unit Management approach was abandoned shortly into the monitoring period. Each floor of the OJC, the IPC, and the TDC/TMH was designated as a "unit". The purpose of this strategy is to enhance accountability for both staff and the inmates by allowing the staff to get to know the inmates. The effectiveness of the Unit Management approach has been greatly hampered by the lack of development of management plans for problematic inmates. It also has blurred the lines of responsibility and accountability as indicated above. It was proven not to be effective. The Monitors feel this was the right decision as the captains and lieutenants are better utilized supervising OJC 24/7.

- <u>Violence and Contraband</u> – There were significant incidents of violence occurring within the facilities during the monitoring period; including inmate-on-inmate assaults and assaults on staff. The level of violence in the facility continued to escalate during this monitoring period. The inmates appear to be emboldened in their refusal to follow the rules and obey the orders of the security staff. Very concerning is that both staff and inmates relayed to the Monitors that there are inmates who are acting as "tank bosses" and are extorting other inmates and requiring payment for protection. Even more concerning is that the majority of these inmates are known to staff and many of them are being designated as "tier reps" by the OJC leadership which is viewed as further empowering these inmates. Most often, the inmate-on-inmate assaults occurred when there was no deputy stationed in the housing unit. Especially concerning is that inmates continue to fashion weapons from items found in the jail, have prolonger periods of time to fashion weapons when the housing unit are without security staff, and continue to find new sources from which to make weapons due to the lack of security staff on the units. As sources of contraband (such as the light supports in the utility closets and the cabinets at the front of the day room) were identified and appears to have been eliminated, the inmates then discover a new source of material from



which to fashion weapons. For example, inmates pry off the metal sheeting around the sinks in the janitor closets and windows to fashion weapons. The brooms and mops the facility provided are used as weapons as inmates are not supervised when performing cleaning with the exception of the Sanitation Supervisor. In reality, few, if any, of the sources of contraband would be available to the inmates if the staff followed policies regarding supervision and limiting access to materials. Another concern is the lack of effective random shakedowns resulting in the continued presence of weapons, pills, narcotics, and other contraband in the housing units. Inmates are often observed smoking illegal substances and lighting wicks from dryers and electrical outlets. Inmates continue to start fires on the housing units. Disorder and non-compliance with the institutional rules cause staff to use force to gain control and compliance. Often the force used is more than is necessary. There is inadequate use of de-escalation techniques before resorting to force, including repeated examples of using OC spray without adequate de-escalation and/or in retaliation against inmates. Seldom are mental health staff involved in de-escalation even though a large percentage of the inmates involved in uses of force are on the mental health caseload. The failure of the Force Investigation Team and the Use of Force Review Board to find that these uses of force are in violation with OPSO policy makes them even more concerning. The number of overdoses linked to illicit drugs and prescription medication continues to be high. Two inmates died in June 2023 as a result of apparent drug overdoses. Another inmate died in July 2023 after a lengthy stay in the hospital.

- <u>Inmate Classification</u> – The inmate classification process, which had regressed during the last several monitoring periods, showed some improvement in staffing and documentation. There needs to be continued attention to ensure housing decisions and placements are consistent with OPSO policies and objective classification principles. Acquiescence to inmates or security staff by moving inmates to reside with their allies or accommodating staff to avoid problematic inmate(s) continues unabated. There was no analysis to determine if inmates involved in an altercation should be kept separate or if



they were simply trying to manipulate the system to gain access to the housing unit in which their friends or associates reside. OPSO policy and procedures for reviewing and clearing separations that prevent inmates from being housed together or removed from protective custody are not followed. The Sheriff's Adjutant continues to interject himself into the separation review process, further undermining adherence to the policy and procedures. During the preparation of this report, an inmate was removed from protective custody status and placed on a housing unit with an inmate who was removed from his enemy list. The inmate was brutally attacked that very day by the known enemy and others and sustained life-threatening stab wounds. Credible auditing needs to focus on identifying issues and correcting placements. During this compliance period, for the most part, it appeared that the housing audits were completed. However, videos of the audits suggested the housing audit process was inconsistent and problematic.

- <u>Inmate grievances</u> – As of Report #11, the ratings of the subdivisions in the grievance provision were individually given. The separate ratings allowed the areas in which deficiency existed to be highlighted. Timeliness and adequacy of responses are still not acceptable. The trend data from the grievance system is now available to assist in identifying problems to be addressed, but there has not been adequate follow-through on addressing the issues identified. The absence of working kiosks by which to file grievances continues to compromise the confidentiality of the grievance system; this has been a continuous issues over numerous monitoring report cycles. This issue is highlighted as the work around developed by the Grievance Staff (handing out and picking up paper grievances) has been hampered by the lack of security staff to allow them on the housing units. The issues with failure to comply with the Consent Judgment are related to non-working kiosks on which to file grievances and the lack of follow up by the persons charged with responding to the grievances, not the Grievance Staff.

- <u>Incident Reporting</u> –The accurate, timely reporting of incidents continues to be a constant area of concern. There remain serious incidents for which no



report or no timely report is prepared by OPSO staff, including incidents involving the serious injury of inmates and drug overdoses. Reports are often incomplete and do not provide the necessary information for the reader to determine what occurred and why it occurred. It is particularly concerning that incomplete and sometimes inarticulate reports have been reviewed by and approved by a supervisor. OPSO began implementation of a corrective action plan nearly two years ago to address timeliness and thoroughness of reports which includes training and remedial action including discipline, but it has been not implemented so as to adequately address the issue. The most common excuse is that staff need training, but there has been no effort to provide the training. Part of the problem is the lack of resources dedicated to the gathering and auditing of reports. The Monitors and parties receive reports electronically which has improved the timeliness of provision of completed reports, but the timeliness of the completion of reports and quality of reports still need to be addressed. The change has also highlighted that there are numerous incidents which previously should have been reported to the Monitors in the daily summary which were not. Part of the problem may be the incorrect categorization of reports when written. Not only does it present an issue for the Monitors, but it also makes the gathering of accurate data on incidents more difficult.

- Jail Management System – An integral part of the jail's operational improvement is tied to an effective jail management system. Such capacity provides on-demand, routine, and periodic data to inform critical leadership and management decisions. Such an information system has not been implemented. After OPSO cancelled the contract with the provider who was to supply a new JMS, due to the inability to interface with the Orleans Parish court system, the City of New Orleans was to purchase a JMS which will interface with the Orleans Parish court system and the OPSO information systems. Despite the passage of several years, there has not been a suitable system purchased. During this year's budget process, progress has been made but the system proposed does not have a way to electronically verify that



security checks are taking place in a timely fashion. It still is unclear whether the funding for the project is in the budget approved by the City Council.

4.   **Sanitation and Environment Conditions** – Challenges remain regarding the public health and inmate/staff safety risks. Although there have been a few outbreaks of COVID during the monitoring period, COVID has mainly been held in check by quarantining and testing both inmates and staff. The inability to fill support positions identified in OPSO's staffing analysis negatively impacts the ability of OPSO to sustain compliance with the requirements of the Consent Judgment and align with accepted correctional practice. Sanitation and cleanliness of the cells and housing areas are not solely the responsibility of the sanitation staff. The supervisors and pod deputies have the first responsibility for ensuring inmates keep their cells and dayroom areas clean and uncluttered. The level of cleanliness of cells and housing areas was worse during the site visit conducted during this monitoring period than previous tours since OJC has been occupied. As with past tours, during the monitoring tour, when sanitation concerns were called to the attention of pod deputies and supervisors, they often appeared not to be concerned.

5.   **Youthful Inmates** –There was no indication of juvenile offenders being housed in OJC during the monitoring period. It should be noted that housing one youthful offender is enough to tie up an entire housing unit. Given the recent legislation passed to decrease the age of criminal responsibility to seventeen years of age, housing youthful inmates will likely become the reality again.

6.   **Inmate Sexual Safety** – OPSO underwent its required audit of compliance with the Prison Rape Elimination Act of 2003 (PREA) and passed in September 2019. Since that time, the sergeant who was assigned as the PREA Coordinator was moved from that assignment and reassigned to a housing area. One of the PREA managers has been named the PREA Coordinator. Continued internal collaboration among OPSO security, classification, and the medical/mental health provider is needed for the assessments of inmates' potential vulnerability to sexual assault. Due to the long time that inmates are housed in intake units, inmates of various PREA designations continued to be housed together without an appropriate plan to keep them separate during time out of cell. Commingling of inmates of various PREA designations occurs



on half of the housing units. OPSO cannot rely on an audit that is four years old to demonstrate compliance with PREA. The new administration is still exploring having an updated PREA audit conducted in the near future.

7. **Compliance, Quality Reporting, and Quality Improvement** – An essential element of inmate safety is OPSO's timely review of all serious incidents as well as of non-violent incidents to determine if there are trends and/or patterns. This ensures assessment of root causes and the development, implementation, and tracking of corrective action plans to address the causes. This activity focuses on resolving problems. OPSO has begun to undertake this function, but there does not seem to have been much progress in addressing the systemic issues, which if they remain unaddressed, will continue to create risks to institutional safety and security. The administration at OPSO has dedicated more time and knowledgeable resources to quality improvement. However, it is disappointing that the corrective action plans which were supposedly being developed when the Monitors toured in December 2022 had still not been completed when the Monitors toured in December 2023. One of the main impediments in the past has been the failure to hold staff accountable for failure to follow corrective action plans. Having a designated staff member of sufficient rank oversee the implementation of the corrective action plans is suggested.

8. **Stipulated Agreements 2015** – The section on the Stipulated Agreements of 2015 has been expanded to aid OPSO in reviewing its on-going compliance with the two Stipulated Agreements from 2015. Five provisions are in partial compliance.

9. **Construction Projects** –

   - The Docks – Construction of the renovations on the Docks has been completed. With the reopening of the courts, the Docks are once again being used for court holding in addition to court access.

   - TDC Mental Health (TMH)– Two housing units in the Temporary Detention Center (TDC) (total of four housing areas) were renovated to provide for housing inmates with acute mental illness pending the construction of Phase III. After TMH's completion, the male inmates with acute mental illness were moved from Hunt into one of the housing units. During the monitoring period, OPSO housed acute male inmates and acute female inmates in TMH.  All four of



the housing areas were operational during the monitoring period although several cells are not being used to maintenance issues. Some acute inmates remained in OJC due to lack of capacity in TMH. While TMH is not a suitable long-term solution to meet the requirements of the Consent Judgment as to medical and mental health services, it is a necessary interim step given no satisfactory housing for acute inmates in OJC. The operation of TMH has reaffirmed the necessity of single person cells for the majority of acute inmates in the initial stages of treatment which should be factored in the operational capacity of Phase III. Housing sub-acute inmates in two person cells in Phase III will often be acceptable. It is important to note that TMH does nothing to address the lack of infirmary and medical housing in OJC and lack of programming space. Even with the construction of Phase III, there will be a need for safe and suitable housing for any sub-acute inmates which remain in OJC.

- Phase III –Monthly meetings of the Executive Committee have been held and have provided information to the parties and the Monitors. The construction and occupation of Phase III are critical to the provision of mental and medical health services in accordance with the Consent Judgment. Regular court intervention has been required to keep the project moving forward.

**C.    Review Process of Monitors' Compliance Report #19**

A draft of this report was provided to OPSO, Counsel for the Plaintiff Class, and the Department of Justice (DOJ) on March 5, 2024.  Comments were provided by Counsel on March 20, 2024. Wellpath provided comments through OPSO. The Monitors considered the comments of the parties in finalizing Report #19.

**D.    Communication with Stakeholders**

The Monitors are committed to providing as much information as possible regarding the status of OPSO's efforts to comply with all orders of the Court. During the monitoring period, OPSO did not honor the request of the Monitors to provide a link to the current reports on the OPSO website. The reports that were on the website are no longer available.

**E.    Recommendations**

Over the years, the Monitors have provided multiple recommendations and



suggestions to OPSO to assist in achieving and maintaining compliance with the Consent Judgment. The purpose of the recommendations continues to be to assist OPSO in achieving and maintaining compliance; not to change the requirements of the Consent Judgment. There are recommendations and suggestions included within the body of this report.

**F.**     **Conclusions and Path Forward**

OPSO has been operating under the provisions of the Consent Judgment since June 2013; monitoring began in Fall 2013. During the previous leadership of Director Hodge, significant improvements were acknowledged by the Monitors. Sheriff Gusman resumed the role of full responsibility for bringing OPSO into compliance with the Consent Judgment in August 2020. Sheriff Gusman was defeated in the election held in December 2021 which seemed to lessen his desire to make progress in obtaining compliance during the remainder of his tenure. Chief LeCounte resigned from the OPSO in December 2021 which created a significant leadership vacuum. Sheriff Hutson was sworn in as Sheriff in May 2022. Sheriff Hutson has embraced the challenge of complying with the Consent Judgment and has established a good working relationship with the monitoring team.

However, it continues to be concerning that the same deficiencies pointed out in previous reports by the Monitors continued to exist and are not resolved. This has resulted in the number of provisions being found to be in substantial compliance to steadily decline. When OJC was placed back under the authority of the Sheriff, there were 118 provisions in substantial compliance. As of this report, there are 68 provisions in substantial compliance. Serious incidents and harm to inmates continue to occur. OPSO has made some efforts to identify and address sources of contraband, but the Monitors encountered inmates smoking in the housing units without fear of consequences, including marijuana and narcotics, in the facility and weapons have frequently been fashioned from various materials within the OJC. Dangerous medication is frequently found during cell shakedowns; the medication distribution process continues to be flawed. Narcotics frequently are discovered in the facility and two inmates died of fentanyl overdoses in June 2023.

There appears to be a new emphasis on OPSO's data collection. Data collection and analysis is key to problem solving with a goal of a sustainable reduction in inmate-on-inmate assaults, inmate-on-staff assaults, uses of force, contraband, and property damage. Development of corrective action plans based on thorough analysis of the data and root



cause reviews are crucial to improvement. Follow-through on implementation is essential. The Monitors are hopeful that improvement will take place with the emphasis placed on data collection and analysis by OPSO under Sheriff Hutson.

The Monitors remain committed to the Court and the parties to collaborate on solutions that will result in significant improvement towards compliance with the provisions of the Consent Judgment and future achievement of constitutional conditions.

**The Monitors again thank and acknowledge the leadership, guidance, and support of The Honorable Lance M. Africk and The Honorable Michael B. North.**



## I. A.      Protection from Harm

**Introduction**

This section of the Consent Judgment addresses core correctional functions including the use of force (policies, training, and reporting), identification of staff involved in uses of force through an early intervention system, safety and supervision of inmates, staffing, incidents and referrals, investigations, pre-trial placement of inmates in the facility, classification, the inmate grievance process, safety of inmates from sexual assault, and inmates' access to information.

The Consent Judgment requires that OPSO operate the facility to assure inmates are "reasonably safe and secure." Based on objective review of data, the facility has shown improvement in inmate and staff safety over the life of the Consent Judgment, but significant incidents that result in serious injury to inmates and staff continue to occur which confirmed that the facility is not reasonably safe and secure. Concerning is that inmates continue to fashion weapons out of items available in the jail including brooms and buckets provided by the jail. Inmate on inmate assaults often happen with no staff present to prevent the incident from occurring or to intervene to stop the incident. These are often incidents and uses of force which result in injuries severe enough to require hospitalization. This would not have occurred if the facility was properly staffed, and the staff were properly supervising the inmates and conducting themselves in accordance with policy. Also concerning is the lack of action to securely house inmates who are easily identified as being frequently involved in violence, contraband, and disruption of the facility.

Reaching and sustaining compliance with provisions of the Consent Judgment, particularly this section, relies on the collection, analysis, and corrective action planning using accurate and reliable data. The Monitors encourage OPSO to continue efforts to build its capacity to collect and analyze relevant accurate data, draw supportable conclusions to inform decisions throughout the organization, develop corrective action plans, implement corrective action plans, and hold staff accountable for non-adherence to corrective action plans and policies. As OPSO's capacity to collect, analyze, plan, and implement is enhanced, the ability to achieve and maintain compliance will be strengthened. Without an enhancement in capacity and dedication to making and implementing informed decisions, OPSO is unlikely to achieve and maintain compliance.



The reporting of incidents to the Monitors and parties has been sporadic during the monitoring period. OPSO has had someone review the daily medical logs for inmates taken to the clinic for treatment subsequent to an altercation or a use of force, as well as the transport logs of inmates routed to the hospital with trauma-related injuries to cross check them against reported incidents, the omissions revealed result in late reports. A continuing issue is the lack of meaningful consequences for supervisors and deputies who fail to comply with the reporting policies resulting in late, incomplete, or missing incident reports. Even something as simple as the checking of a box as to whether there was a deputy on the housing unit when the incident occurred or whether a use of force occurred are often found to be inaccurate.

The Monitors reviewed all reported incidents for the monitoring period in preparation of this report. The following charts compare the totals for the calendar years (CY) 2018-CY 2023. Given that the system for reporting incidents has proven to be unreliable, in the past, it was unclear whether a particular decline or increase was the result of reporting errors as opposed to an actual decline in a type of reportable incident. Since October 2022, the Monitors received the reports automatically which supported the proposition that previous declines were more likely the result of not reporting incidents and/or not forwarding the incident reports to the Monitors.

**Table 3 - All OJC Reported Incidents for CY 2018-CY 2023**





| | Inmate/ Inmate Assault | Inmate Staff Altercation | Use of Force | PREA | Death | Attempt Suicide/ Ideation | Internal Escape | Criminal Damage | Inmate Injury/Medical | Contraband | Staff Misconduct Arrest/ Suspension | Other |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2018** | 442 | 64 | 260 | 47 | 2 | 78 | 48 | 69 | 262 | 106 | 3 | 15 |
| **2019** | 440 | 117 | 358 | 42 | 0 | 82 | 6 | 47 | 145 | 302 | 0 | 6 |
| **2020** | 309 | 139 | 372 | 35 | 3 | 21 | 1 | 64 | 64 | 351 | 0 | 1 |
| **2021** | 293 | 124 | 311 | 17 | 1 | 20 | 1 | 42 | 43 | 350 | 0 | 0 |
| **2022** | 351 | 71 | 229 | 36 | 2 | 45 | 6 | 39 | 35 | 248 | 0 | 10 |
| **2023** | 636 | 139 | 316 | 30 | 3 | 34 | 81 | 60 | 178 | 554 | 0 | 41 |

In CY 2021, the number of reported inmate on inmate assaults, inmate/staff altercations, and uses of force declined slightly, but it should be noted that there was still an alarming use of weapons in assaults resulting in serious injuries. The rate of inmate-on-inmate assaults in CY 2022 increased by 20% over CY 2021. The rate of inmate-on-inmate assaults in CY 2023 increased by 45% over CY 2022. The number of inmate-on-inmate assaults reached an all-time high since this data has been included in the Monitors' Report. The number of contraband incidents reached an all-time also; a 123% increase from CY 2022 to CY 2023. Many of the inmate injuries or slip and falls are suspected to, in actuality, be the result of an inmate-on-inmate assault that was not observed by staff and that inmates were afraid to report. The staff misconduct number reported is not accurate as it reflects what is reported; not what occurred.



**Table 4 –All OJC Reported Incidents by Type by Month CY 2018-CY 2023**



| | Jan | Feb | March | April | May | June | July | August | September | October | November | December | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2018** | 92 | 96 | 112 | 121 | 124 | 144 | 116 | 132 | 112 | 113 | 105 | 129 | **1396** |
| **2019** | 123 | 93 | 105 | 112 | 117 | 129 | 113 | 152 | 94 | 137 | 144 | 113 | **1432** |
| **2020** | 107 | 113 | 98 | 109 | 84 | 144 | 98 | 106 | 67 | 75 | 109 | 110 | **1220** |
| **2021** | 125 | 80 | 78 | 109 | 77 | 97 | 91 | 70 | 78 | 113 | 89 | 72 | **1079** |
| **2022** | 77 | 88 | 66 | 50 | 55 | 66 | 67 | 51 | 93 | 137 | 115 | 119 | **984** |
| **2023** | 165 | 106 | 126 | 124 | 143 | 195 | 184 | 174 | 181 | 198 | 196 | 176 | **1968** |

**Assessment Methodology**

Dates of visits:

- April 17-20, 2023 (Lead Monitor, Monitor Poole, and Monitor Vassallo)
- May 15-18, 2023 (Lead Monitor, Monitor Poole, Monitor Johnson, and Monitor Hardyman)
- June 19-22, 2023 (Lead Monitor only)
- July 10-13, 2023 (All Monitors)
- August 15-17. 2023 (Lead Monitor only)
- September 19-21 (Leader Monitor and Monitor Poole)



- October 18-20, 2023 (Lead Monitor, Monitor Poole, and Monitor Skipworth)
- December 4-7, 2023 (All monitors with the exception of Monitor Skipworth)

Materials reviewed:

- Materials reviewed include the Consent Judgment, OPSO policies and procedures, use of force reports, incident reports, and investigations conducted by Investigative Services Bureau-Internal Affairs Division (ISB-IAD), investigations conducted by ISB-Criminal Division (ISB-Criminal), investigations conducted by ISB-Inmate Division, training materials, shakedown logs, OPSO self-assessment, Wellpath self-assessment, and post logs.

Interviews:

- Interviews included the Sheriff, command staff, jail supervisors, chief of corrections (now referred to as warden), deputy chief of jail operations, classification manager and staff, director of training, Wellpath staff, and various supervisors of units within ISB. Inmates were interviewed by the Monitors onsite for the visit. The Monitors also attended security-related meetings.

## IV. A. 1. Use of Force Policies and Procedures

*A. 1. a. OPSO shall develop, implement, and maintain comprehensive policies and procedures (in accordance with generally accepted correctional standards) relating to the use of force with particular emphasis regarding permissible and impermissible uses of force.*

*A. 1. b. OPSO shall develop and implement a single, uniform reporting system under a Use of Force Reporting policy. OPSO reportable force shall be divided into two levels, as further specified in policy: Level 1 uses of force will include all serious uses of force (i.e., the use of force leads to injuries that are extensive, serious or visible in nature, including black eyes, lacerations, injuries to the mouth or head, multiple bruises, injuries to the genitals, etc.), injuries requiring hospitalization, staff misconduct, and occasions when use of force reports are inconsistent, conflicting, or otherwise suspicious. Level 2 uses of force will include all escort or control holds used to overcome resistance that are not covered by the definition of Level 1 uses of force.*

*A. 1. c. OPSO shall assess, annually, all data collected regarding uses of force and make any necessary changes to use of force policies or procedures to ensure that unnecessary or excessive use of force is not used in OPP. The review and recommendations will be documented and provided to the Monitor, DOJ, and SPLC.*

Findings:

A. 1. a.  Partial Compliance

A. 1. b.  Substantial Compliance

A. 1. c.  Partial Compliance

Observations:

The current OPSO use of force policy was effective as of May 2016. It was last reviewed in 2022. OPSO provided the FIT report that was to be reviewed in March 2023



during its annual review of the UOF policy in the 2022 Annual Report. The review was held in August 2023, but no recommendations were made despite there being obvious deficiencies in implementation of the policy. While there is a policy, the failure to fully adhere to the policy results in A.1.a. remaining in Partial Compliance. One of the most frequent violations of policy has to do with the failure to attempt de-escalation, including the utilization of mental health staff, before using force. There are also numerous examples of force being used as retaliation for an inmate's actions that do not warrant the use of force; i.e., pepper spray for verbally refusing to comply with an order or for having thrown a substance on the staff.

The reporting system does comply with the requirements of A.1.b., which remains in Substantial Compliance. There continues to be misclassification of uses of force between Level 1 and Level 2 uses of force, but it has improved. To be clear, the Monitors consider the use of OC spray, pepper ball guns, and any other intermediate weapon to be a Level 1 use of force. Level 2 is reserved for escort and control holds.

The Use of Force Review Board (UOFRB) did meet twice a month during the monitoring period with the exception of June 2023 when it met only once. The UOFRB continued to deal with a large backlog which resulted in reviewing cases close to a year old. It is the group charged with completion of the annual review. However, all of the uses of force reviewed were several months old which has resulted in many troubling uses of force by current staff not being reviewed and referred for investigation in a timely manner. As a result, problematic staff often have continued contact with inmates. For example, on the first day of July 2023, a staff member used OC spray on a handcuffed and restrained inmate less than a week after this same staff members deployed multiple rounds from a pepper ball rifle at an inmate who was on the outside of the mezzanine level. This same staff member had been identified by the early warning system, but no action had been taken by the UOFRB.

The most recent analysis of the number of uses of force was performed by the CAB and submitted in January 2023. No audits by CAB were submitted to the monitors or the parties for monitoring period #19. The analysis submitted in January 2023 found that only 20% of the cases sampled had been reviewed by the UOFRB and confirmed that reports are not being authored in a timely manner and that first line supervisors are late on their review the majority of the time. The analysis found that reports are being reviewed by the Major of



Security in a timely fashion 82% of the time. However, this did not consider that since the reports are often not authored in a timely manner nor reviewed by the first line supervisor in a timely manner, the cumulative time frame allowed for reports to be reviewed and finalized is almost always exceeded. While it is understandable that all issues cannot be included in one audit, it would be helpful to have an analysis as to compliance with the use of force policy such as being reasonable and necessary, and regarding proper use of de-escalation. The CAB is encouraged to confirm the validity of the data before conducting the analysis and to expand the analysis to all aspects of the use of force policy. The annual review of the use of force data and the policy was conducted for CY2022 as required by A.1.c. on  August 7, 2023, but did not include all of the items required. Problems regarding OPSO analysis of the data, poorly written reports, failure to properly classify uses of force as Level One or Level Two, backlog in the number of use of force incidents to be reviewed, and the lack of timely filed reports continue. Uses of force on specialty pods (particularly the disciplinary pod and the mental health pod) continue to be high, but there have been no recommendations documented and provided to the Monitors and DOJ and counsel for the Plaintiffs to address the problem. As has been pointed out in the past, the Consent Judgment requires not only assessment and reduction of inappropriate uses of force, but also unnecessary uses of force. This is not occurring. Examination of the use of force reports by the Monitors revealed that often the use of force is precipitated by a failure to follow policy such as not restraining the inmate prior to movement or allowing an inmate out of his/her cell with another inmate(s) from whom he/she is to be kept separate or failing to secure the food port in the cell door. Incident reports most often demonstrate a lack of de-escalation efforts as required by the Consent Judgment; particularly before using OC spray. Seldom are mental health staff called upon to assist in de-escalation although a majority of the inmates upon whom force is used are on the mental health caseload. With the improvement in the holding of the UOFRB reviews, this section is now in Partial Compliance.

### IV. A. 2. Use of Force Training

*A. 2. a. OPSO shall ensure that all correctional officers are knowledgeable of and have the knowledge, skills, and abilities to comply with use of force policies and procedures. At a minimum, OPSO shall provide correctional officers with pre-service and annual in-service training in use of force, defensive tactics, and use of force policies and procedures. The training will include the following:*
    *(1) instruction on what constitutes excessive force;*
    *(2) de-escalation tactics; and*
    *(3) management of prisoners with mental illness to limit the need for using force.*



*A. 2. b. OPSO shall ensure that officers are aware of any change to policies and practices throughout their employment with OPP. At a minimum, OPSO shall provide pre-service and annual in-service use of force training that prohibits:*

*(1) use of force as a response to verbal insults or prisoner threats where there is no immediate threat to the safety or security of the institution, prisoners, staff, or visitors;*

*(2) use of force as a response to prisoners' failure to follow instructions where there is no immediate threat to the safety or security of the institution, prisoners, staff, or visitors;*

*(3) use of force against a prisoner after the prisoner has ceased to offer resistance and is under control;*

*(4) use of force as punishment or retaliation; and*

*(5) use of force involving kicking, striking, hitting, or punching a non-combative prisoner.*

*A. 2. c. OPSO shall randomly test five percent of the correctional officer staff on an annual basis to determine their knowledge of the use of force policies and procedures. The testing instrument and policies shall be approved by the Monitor. The results of these assessments shall be evaluated to determine the need for changes in training practices. The review and conclusions will be documented and provided to the Monitor.*

Findings:

A. 2. a.  Partial Compliance

A. 2. b.  Partial Compliance

A. 2. c.  Substantial Compliance

Observations:

The Monitor reviewed the training materials, testing documentation, and the supplemental documentation submitted by training staff for the rating period and interviewed the Training Lieutenant present on the day of the inspection. Training staff advised that the annual in-service Use of Force and Use of Force policy and procedure training requirements for CY 2023 were conducted per the published Academy schedule with makeup training conducted in the 4th quarter of 2023. Due to staffing shortages, the Training Lieutenant reported a significant number of staff assigned to inmate supervision in OJC, IPC and TMH/TDC failed to attend the UOF in-service training in CY 2023. The completion rates were as follows: OJC – 71.3%; IPC – 79.5%; TDC – 85%; and Kitchen/Warehouse at 4%. This is a substantial decline from the 100% compliance noted for CY 2022.

During Tour #18, it was determined that the defensive tactics training provided to both pre-service trainees and all deputies classified as "Level 3" was insufficient as presented in terms of the topics and techniques covered. Upon discussion with the Training Academy staff, an expanded defensive tactics course was implemented in August 2023 for all pre-service and in-service classes going forward. The completion rates through the end of CY 2023 were as follows: OJC – 81.2%; IPC – 83.6%; TDC – 85.9%; and Kitchen/Warehouse at



100%. A. 2. a. remains at partial compliance and A. 2. b. is downgraded to partial compliance as a result. OPSO is applauded for quickly developing and administering a remedial Defensive Tactics class to cover the deferred portion of the MDTS curriculum for all current Level 3 Recruits. Unfortunately, over 15% of the staff did not receive remedial training.

A thorough review of the use of force reports during the monitoring period reveals the need for additional training which emphasizes de-escalation and provide deputies with additional tools when dealing with inmates with mental health issues and inmates who routinely exhibited behavioral problems. Given some very problematic incidents in which staff observed inappropriate uses of force and did not stop or report the same, it is strongly suggested that the duty to intervene and report be emphasized. As any security staff member may have to deal with an inmate with mental health issues, it is recommended that mental health training be made mandatory for all security staff; not just those daily assigned to the mental health units, particularly given the majority of the inmates in OJC are on the mental health caseload.

The Monitor reviewed training documentation provided by training staff specific to the 5 percent annual testing requirement for A. 2. c. Testing documentation for 2023 showed it to have occurred from June 2023 to November 2023. Training staff continue to pursue a goal of 15% testing, exceeding that of the consent judgment language. OPSO documentation showed a pass rate of 92%, a substantial improvement over the 83.7% reported for CY 2022. The test given in 2023 was originally approved by Monitor Frasier on April 21, 2021. The test needs to be reviewed, revised, and approved before the next report.

The Monitor has, in the past, observed that the Academy staff has maintained detailed, comprehensive, and very well-maintained files. A recent internal investigation has called into question the accuracy of those files. In response to our request for documentation, the Academy staff provided succinct and thorough reports as to who had and who had not completed the required use of force training. The question is what was included in those trainings.

### IV. A. 3. Use of Force Reporting

*A. 3. a. Failure to report a use of force incident by any staff member engaging in the use of force or witnessing the use of force shall be grounds for discipline, up to and including termination.*
*A. 3. b. OPSO shall ensure that sufficient information is collected on uses of force to assess whether staff members complied with policy; whether corrective action is necessary including training or discipline; the effectiveness of training and policies; and whether the conditions in OPP comply with this Agreement. At a minimum, OPSO will ensure that officers using or observing a Level 1 use of force shall complete a use of*



*force report that will:*

    *(1)    include the names of all staff, prisoner(s), or other visual or oral witness(es);*

    *(2)    contain an accurate and specific account of the events leading to the use of force;*

    *(3)    describe the level of resistance and the type and level of force used, consistent with OPP use of force; policy and procedure, as well as the precise actions taken by OPSO staff in response to the incident;*

    *(4)    describe the weapon or instrument(s) of restraint, if any, and the manner of such use be accompanied by a prisoner disciplinary report, if it exists, pertaining to the events or prisoner activity that prompted the use of force incident;*

    *(5)    describe the nature and extent of injuries sustained by anyone involved in the incident;*

    *(6)    contain the date and time when medical attention, if any, was requested and actually provided;*

    *(7)    describe any attempts the staff took to de-escalate prior to the use of force;*

    *(8)    include an individual written account of the use of force from every staff member who witnessed the use of force;*

    *(9)    include photographs taken promptly, but no later than two hours after a use of force incident, of all injuries sustained, or as evidence that no injuries were sustained, by prisoners and staff involved in the use of force incident;*

    *(10)    document whether the use of force was digitally or otherwise recorded. If the use of force is not digitally or otherwise recorded, the reporting officer and/or watch commander will provide an explanation as to why it was not recorded; and*

    *(11)    include a statement about the incident from the prisoner(s) against whom force was used.*

*A. 3. c. All officers using a Level 2 use of force shall complete a use of force report that will:*

    *(1)    include the names of staff, prisoner(s), or other visual or oral witness(es);*

    *(2)    contain an accurate and specific account of the events leading to the use of force;*

    *(3)    describe the level of resistance and the type and level of force used, consistent with OPP use of force policy and procedure, as well as the precise actions taken by OPSO staff in response to the incident;*

    *(4)    describe the weapon or instrument(s) of restraint, if any, and the manner of such use;*

    *(5)    be accompanied by a prisoner disciplinary report, if it exists, pertaining to the events or prisoner activity that prompted the use of force incident;*

    *(6)    describe the nature and extent of injuries sustained by anyone involved in the incident;*

    *(7)    contain the date and time when medical attention, if any, was requested and actually provided; and*

    *(8)    describe any attempts the staff took to de-escalate prior to the use of force.*

*A. 3. d. OPSO shall require correctional officers to notify the watch commander as soon as practical of any use of force incident or allegation of use of force. When notified, the watch commander will respond to the scene of all Level 1 uses of force. When arriving on the scene, the watch commander shall:*

    *(1)    ensure the safety of everyone involved in or proximate to the incident;*

    *(2)    determine if any prisoner or correctional officer is injured and ensure that necessary medical care is provided;*

    *(3)    ensure that personnel and witnesses are identified, separated, and advised that communications with other witnesses or correctional officers regarding the incident are prohibited;*

    *(4)    ensure that witness and subject statements are taken from both staff and prisoner(s) outside of the presence of other prisoners and staff;*

    *(5)    ensure that the supervisor's use of force report is forwarded to IAD for investigation if, upon the supervisor's review, a violation of law or policy is suspected. The determination of what type of investigation is needed will be based on the degree of the force used consistent with the terms of this Agreement;*

    *(6)    If the watch commander is not involved in the use of force incident, the watch commander shall review all submitted use of force reports within 36 hours of the end of the incident, and shall specify his findings as to completeness and procedural errors. If the watch commander believes that the use of force may have been unnecessary or excessive, he shall immediately contact IAD for investigation consideration and shall notify the warden or assistant warden; and*



*(7)      All Level 1 use of force reports, whether or not the force is believed by any party to be unnecessary or excessive, shall be sent to IAD for review. IAD shall develop and submit to the Monitor within 90 days of the Effective Date clear criteria to identify use of force incidents that warrant a full investigation, including injuries that are extensive or serious, visible in nature (including black eyes, injuries to the mouth, injuries to the genitals, etc.), injuries requiring hospitalization, staff misconduct (including inappropriate relationships*

*with prisoners), and occasions when use of force reports are inconsistent, conflicting, or otherwise suspicious.*

**A. 3. e. Ensure that a first-line supervisor is present during all pre-planned uses of force, such as cell extractions.**

**A. 3. f. Within 36 hours, exclusive of weekends and holidays, of receiving the report and review from the shift commander, in order to determine the appropriateness of the force used and whether policy was followed, the Warden or Assistant Warden shall review all use of force reports and supervisory reviews including:**

*(1)      the incident report associated with the use of force;*
*(2)      any medical documentation of injuries and any further medical care;*
*(3)      the prisoner disciplinary report associated with the use of force; and*
*(4)      the Warden or Assistant Warden shall complete a written report or written statement of specific findings and determinations of the appropriateness of force.*

**A. 3. g. Provide the Monitor a periodic report detailing use of force by staff. These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. Each report will include the following information:**

*(1)      a brief summary of all uses of force, by type;*
*(2)      date that force was used;*
*(3)      identity of staff members involved in using force;*
*(4)      identity of prisoners against whom force was used;*
*(5)      a brief summary of all uses of force resulting in injuries;*
*(6)      number of planned and unplanned uses of force;*
*(7)      a summary of all in-custody deaths related to use of force, including the identity of the decedent and the circumstances of the death; and*
*(8)      a listing of serious injuries requiring hospitalization.*

**A. 3. h. OPSO shall conduct, annually, a review of the use of force reporting system to ensure that it has been effective in reducing unnecessary or excessive uses of force. OPSO will document its review and conclusions and provide them to the Monitor, SPLC, and DOJ.**

Findings:

A. 3. a.  Partial Compliance

A. 3. b.  Partial Compliance

A. 3. c.  Partial Compliance

A. 3. d.  Partial Compliance

A. 3. e.  Partial Compliance

A. 3. f.  Partial Compliance

A. 3. g.  Partial Compliance

A. 3. h.  Partial Compliance

Observations:

As to provision A. 3. a., the use of force policy requires all uses of force to be reported



timely and completely and sets out the potential discipline if the policy is not followed. There were three (3) disciplinary memorandums submitted as documentation of discipline for failure to report a use of force. Two (2) of those involve the same incident. There was no documentation of actual discipline being administered. In addition, there were many more incidents of use of force not being reported for which OPSO did not provide any documentation of discipline. Thus, the rating continues to be in Partial Compliance.

Provision A. 3. b. is in Partial Compliance due to the number of use of force reports that are incomplete or inadequate. The use of force policy includes the provisions required by the Consent Judgment, but lack of adherence still occurs. The Monitor provided a checklist of the report requirements to assist supervisors in ensuring reports included all necessary items. A review of those checklists and accompanying reports indicates that the required information is still found to be missing from the use of force reports such as what led up to the incident, details of actions taken during the use of force, and resolution of the incident. Seldom do reports include an articulation of any de-escalation tactics, a description of injuries sustained, and when medical attention was provided. No proof was provided that deputies and supervisors are being held accountable for failure to include required information. Provision A. 3. c. requires less information as it is a lesser level of force, but the deficiencies are the same as those noted for A. 3. b. and thus it is in Partial Compliance.

The watch commanders still are not consistently compliant with the requirements of the Consent Judgment (IV. A. 3. d.) as to their specific duties and the time requirement for performance of these duties under the policies. This has been noted in multiple reports. The Consent Judgment requires submission of the packet to the Assistant Warden/Deputy Chief of Corrections within 36 hours not three (3) days or three (3) 12-hour shifts. OPSO's audit of timeliness confirmed that it takes, on average, one and half times as long for submission as policy allows.

A. 3. e. requires the presence of a supervisor for planned uses of force. One of the reasons for this provision is to allow for de-escalation to be attempted before force is carried out. OPSO supervisors seldom utilize de-escalation techniques. A CAP was put in place regarding what was considered to be a planned use of force and there has been improvement in recognition of what constitutes a planned use of force; thirteen this monitoring period. However, given the repeated failure of supervisors to utilize de-



escalation techniques, this provision's rating remains in Partial Compliance.

The Major of Security fulfilled the role of Deputy Chief of Jail Operations during the first two months of the monitoring period. OPSO has filled the position of Deputy Chief of Jail Operations in May 2023. The Major of Security resigned in August 2023. The use of force policy should reflect which position will conduct the review, required under IV. A. 3. f. The Monitor was able to locate documentation that the average time for the review was within thirty-six (36) hours 82% of the time. It is unclear how this average was generated as many reports are sent back to the first line supervisor for incompleteness.  This provision remains in Partial Compliance, but continued failure to produce documentary necessary to evaluate compliance with this provision is likely to result in a finding of non-compliance.

OPSO relies on the quarterly report issued by FIT for documentation as to compliance with IV. A. 3. g. The FIT quarterly reports did not contain all of the required information for compliance with IV. A. 3. g. (3), (4), (5), and (6). Thus, this section continues to be in Partial Compliance.

The annual review of use of force incidents for CY 2022 was conducted August 7, 2023, and did not include all of the items required by IV. A. 3. h. The documentation produced in March 2023 claimed to support compliance was a memorandum by FIT as to the data and recommendations it was going to present to leadership. However, no proof of adoption of the recommendations was provided. In order to warrant a rating of substantial compliance, OPSO needed to address all of the issues; particularly the most serious issues such as the frequent use of force on the mental health housing units and lack of de-escalation that were not addressed. Also not addressed are how frequent uses of force would not be needed if policy was followed. Therefore, the compliance rating remains at partial compliance.

## IV. A. 4. Early Intervention System ("EIS")

*A. 4. a. OPSO shall develop, within 120 days of the Effective Date, a computerized relational database ("EIS") that will document and track staff members who are involved in use of force incidents and any complaints related to the inappropriate or excessive use of force, in order to alert OPSO management to any potential problematic policies or supervision lapses or need for retraining or discipline. The Chief of Operations Deputy, supervisors, and investigative staff shall have access to this information and shall review on a regular basis, but not less than quarterly, system reports to evaluate individual staff, supervisor, and housing area activity. OPSO will use the EIS as a tool for correcting inappropriate staff behavior before it escalates to more serious misconduct.*
*A. 4. b. Within 120 days of the Effective Date, OPSO senior management shall use EIS information to improve quality management practices, identify patterns and trends, and take necessary corrective action both on an individual and systemic level. IAD will manage and administer EIS systems. The Special*



*Operations Division ("SOD") will have access to the EIS. IAD will conduct quarterly audits of the EIS to ensure that analysis and intervention is taken according to the process described below. Command staff shall review the data collected by the EIS on at least a quarterly basis to identify potential patterns or trends resulting in harm to prisoners. The Use of Force Review Board will periodically review information collected regarding uses of force in order to identify the need for corrective action, including changes to training protocols and policy or retraining or disciplining individual staff or staff members. Through comparison of the operation of this system to changes in the conditions in OPP, OPSO will assess whether the mechanism is effective at addressing the requirements of this Agreement.*

*A. 4. c. OPSO shall provide, within 180 days of the implementation date of its EIS, to SPLC, DOJ, and the Monitor, a list of all staff members identified through the EIS and corrective action taken.*

*A. 4. d. The EIS protocol shall include the following components: data storage, data retrieval, reporting, data analysis, pattern identification, supervisory assessment, supervisory intervention, documentation, and audit.*

*A. 4. e. On an annual basis, OPSO shall review the EIS to ensure that it has been effective in identifying concerns regarding policy, training, or the need for discipline. This assessment will be based in part on the number and severity of harm and injury identified through data collected pursuant to this Agreement. OPSO will document its review and conclusions and provide them to the Monitor, who shall forward this document to DOJ and SPLC.*

<u>Findings:</u>

A. 4. a.  Partial Compliance

A. 4. b.  Partial Compliance

A. 4. c.  Partial Compliance

A. 4. d.  Partial Compliance

A. 4. e.  Partial Compliance

<u>Observations</u>:

Due to unreliability of the electronic EIS, OPSO abandoned the original system and fashioned an alternative version within the AS400. A FIT staff member manually monitors the database to alert FIT staff as to the need to review any uses of force by a staff member.

OPSO has provided its documentation to the Monitors as to the names of the staff members who are flagged for use of force. However, no review of staff alerted under the EIS was documented or provided. OPSO acknowledges that the reviews did not occur. Having alerts with no follow up negates the value of gathering the data. As no documentation of review by the UFRB as to EIS alerts was provided and it was acknowledged that the UFRB did not review the EIS alerts; A. 4. a., A. 4. b, and A. 4. c. remain in partial compliance. Continued questionable and inappropriate uses of force by the same staff members and with the same inmates calls into question whether the EIS is being utilized to improve management quality practices, identify patterns and trends, and take necessary corrective action as required. Section A.4.d. is in partial compliance as the EIS protocol lists the required elements, but there is no supervisory assessment nor intervention.



No proof of the UOFRB evaluating the EIS data was provided. The annual review of use of force incidents and EIS for CY 2022 was conducted August 7, 2023, and did not include all of the items required by IV. A. 4. e. The documentation produced in March 2023 claimed to support compliance was a memorandum by FIT as to the data and recommendations it was going to present to leadership. It is unclear whether those conducting the review noticed that EIS referrals and actions were not documented or simply did not note that failure. This is a significant shortcoming. The review should consist of more than noting that the EIS was triggered. It involves assessing the effectiveness of the EIS which was not performed. Therefore, IV. A .4. e. is in partial compliance.

## IV. A. 5. Safety and Supervision

*A. 5. a. Maintain security policies, procedures, and practices to provide a reasonably safe and secure environment for prisoners and staff in accordance with this Agreement.*

*A. 5. b. Maintain policies, procedures, and practices to ensure the adequate supervision of prisoner work areas and trustees.*

*A. 5. c. Maintain policies and procedures regarding care for and housing of protective custody prisoners and prisoners requesting protection from harm.*

*A. 5. d. Continue to ensure that correctional officers conduct appropriate rounds at least once during every 30- minute period, at irregular times, inside each general population housing unit and at least once during every 15-minute period of special management prisoners, or more often if necessary. All security rounds shall be documented on forms or logs that do not contain pre-printed rounding times. In the alternative, OPSO may provide direct supervision of prisoners by posting a correctional officer inside the day room area of a housing unit to conduct surveillance.*

*A. 5. e. Staff shall provide direct supervision in housing units that are designed for this type of supervision. Video surveillance may be used to supplement, but must not be used to replace, rounds by correctional officers.*

*A. 5. f. Increase the use of overhead video surveillance and recording cameras to provide adequate coverage throughout the common areas of the Jail, including the Intake Processing Center, all divisions' intake areas, mental health units, special management units, prisoner housing units, and in the divisions' common areas.*

*A. 5. g. Continue to ensure that correctional officers, who are transferred from one division to another, are required to attend training on division-specific post orders before working on the unit.*

*A. 5. h. Continue to ensure that correctional officers assigned to special management units, which include youth tiers, mental health tiers, disciplinary segregation, and protective custody, receive eight hours of specialized training regarding such units on prisoner safety and security on at least an annual basis.*

*A. 5. i. Continue to ensure that supervisors conduct daily rounds on each shift in the prisoner housing units and document the results of their rounds.*

*A. 5. j. Continue to ensure that staff conduct daily inspections of cells and common areas of the housing units to protect prisoners from unreasonable harm or unreasonable risk of harm.*

*A. 5. k. Continue to ensure that staff conduct random monthly shakedowns of cells and common areas so that prisoners do not possess or have access to dangerous contraband.*

*A. 5. l. Provide the Monitor a periodic report of safety and supervision at the Facility. These periodic reports shall be provided to the monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. Each report will provide the following information:*

> *(1)   a listing of special management prisoners, their housing assignments, the basis for them being placed in the specialized housing unit, and the date placed in the unit; and*
>
> *(2)   a listing of all contraband, including weapons seized, the type of contraband, date of seizure, location, and shift of seizure.*

<u>Findings:</u>



A. 5. a.  Partial Compliance

A. 5. b.  Substantial Compliance

A. 5. c.  Partial Compliance

A. 5. d.  Non-Compliance

A. 5. e.  Partial Compliance

A. 5. f.  Substantial Compliance

A. 5. g.  Partial Compliance

A. 5. h.  Partial Compliance

A. 5. i.  Partial Compliance

A. 5. j.  Partial Compliance

A. 5. k.  Non-Compliance

A. 5. l.  Partial Compliance

<u>Observations:</u>

OPSO has worked hard to finalize policies, procedures, and post orders. OPSO takes the position that all that is required is that OPSO "maintain" policies, procedures, and practices. Having words written on paper without implementation of those policies, procedures, and practices is insufficient for compliance, as demonstrated by the previous discussion of OPSO staff failing to follow established use of force policies and procedures. Policies and procedures must be adhered to and followed for them to be maintained and compliance achieved. Practices, even if not included in policies and procedures, must adhere to the standard also. There is adequate supervision of inmate working areas to result in partial compliance as to A. 5. b. The level of violence continues to rise. There was a monthly average of 24 reported inmate-on-inmate assaults/altercations in CY 2021. That number rose to 27 in CY 2022 and nearly doubled as it rose to 53 in CY 2023. This is indicative that OPSO has not substantially complied with the requirement that the facility be reasonably safe for staff and inmates, and that the facility is becoming less safe. The number reported, even while higher than previous calendar years, is suspect given the systematic underreporting of reportable incidents and the number of inmate-on-inmate assaults that are likely undetected due to the lack of staff in the housing areas. While the Monitors are well aware that violent incidents occur in jail facilities, the level currently reflects partial compliance with the obligation to provide a reasonably safe and secure environment as to A.



5. a. and A. 5. c. OPSO is close to being in Non-Compliance with the provision to maintain a reasonably safe and secure environment.

Review of the significant incidents during the monitoring period indicates that the failure of staff to follow policy consistently continues to be a serious impediment to effective supervision of the inmates. Staff continue to leave inmates unsupervised for hours and allow them to have access to materials by which to fashion weapons. Many of the inmate-on-inmate assaults occur because staff allow inmates out of their cells and leave them unsupervised. There are inmates who repeatedly do not follow the rules of OJC including assaulting other inmates, assaulting staff, destroying property, starting fires, smoking contraband and/or threatening self-harm. OPSO used to house many of those inmates in a high security unit but chose to abandon this practice shortly after Sheriff Hutson took office. To make matters worse, many of these high-risk inmates were housed in dormitories during the monitoring period. It is of concern that the practice of limiting the movement of high-security inmates and the practice of placing them in specialty housing was eliminated. The Monitors strongly urge OPSO to reestablish a high security unit. While it would be beneficial to develop individual inmate management plans for these inmates, those plans should include specific security measures to be used when these inmates are allowed out of their cells. Such plans, if carried out routinely and consistently followed by all staff, would likely reduce the level of violence in the facility. To date, there is no indication that it is being done on a consistent basis; if at all.

### Table 5 CY 2018-CY 2023 OJC Reported Incidents

| 2018 | Use of Force | Inmate Misconduct ELD/EED | Inmate/ Inmate Assault | Inmate Staff Altercation | PREA | Death | Attempt Suicide/ Ideation | Internal Escape | Criminal Damage | Medical (AKA slip/falls/ | Contraband | Staff Misconduct-Suspension/ | Other | Total |
|------|------|------|------|------|------|------|------|------|------|------|------|------|------|------|
| January | 13 | 0 | 38 | 7 | 2 | 0 | 6 | 2 | 3 | 9 | 9 | 0 | 3 | 92 |
| February | 10 | 0 | 28 | 6 | 4 | 0 | 14 | 2 | 10 | 5 | 15 | 2 | 0 | 96 |
| March | 21 | 0 | 37 | 7 | 5 | 0 | 4 | 3 | 11 | 18 | 5 | 0 | 1 | 112 |
| April | 22 | 0 | 39 | 9 | 4 | 0 | 4 | 3 | 12 | 22 | 5 | 0 | 1 | 121 |
| May | 24 | 0 | 52 | 0 | 5 | 1 | 0 | 5 | 8 | 19 | 10 | 0 | 0 | 124 |
| June | 26 | 0 | 46 | 7 | 5 | 0 | 6 | 7 | 3 | 32 | 9 | 1 | 2 | 144 |
| July | 20 | 0 | 30 | 4 | 4 | 0 | 9 | 3 | 3 | 30 | 13 | 0 | 0 | 116 |
| Aug | 27 | 0 | 39 | 3 | 3 | 0 | 13 | 2 | 6 | 30 | 6 | 0 | 3 | 132 |
| Sept | 14 | 0 | 33 | 6 | 2 | 0 | 7 | 5 | 4 | 35 | 6 | 0 | 0 | 112 |



| | Use of Force | Inmate Misconduct ELD/EED | Inmate/ Inmate Assault | Inmate Staff Assault | PREA | Death | Attempt Suicide/ Ideation | Internal Escape | Criminal Damage | Medical (AKA slip/falls/ | Contraband | Staff Misconduct- Suspension/ | Other | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Oct | 28 | 0 | 32 | 9 | 5 | 0 | 3 | 0 | 2 | 26 | 7 | 0 | 1 | 113 |
| Nov | 21 | 0 | 31 | 6 | 5 | 0 | 5 | 8 | 3 | 18 | 7 | 0 | 1 | 105 |
| Dec | 34 | 0 | 37 | 0 | 3 | 1 | 7 | 8 | 4 | 18 | 14 | 0 | 3 | 129 |
| Total | 260 | 0 | 442 | 64 | 47 | 2 | 78 | 48 | 69 | 262 | 106 | 3 | 15 | 1396 |

| 2019 | Use of Force | Inmate Misconduct ELD/EED | Inmate/ Inmate Assault | Inmate Staff Assault | PREA | Death | Attempt Suicide/ Ideation | Internal Escape | Criminal Damage | Medical (AKA slip/falls/ | Contraband | Staff Misconduct- Suspension/ | Other | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| January | 27 | 0 | 40 | 1 | 2 | 0 | 15 | 3 | 7 | 14 | 14 | 0 | 0 | 123 |
| February | 29 | 0 | 26 | 7 | 2 | 0 | 13 | 1 | 0 | 4 | 11 | 0 | 0 | 93 |
| March | 26 | 0 | 25 | 4 | 1 | 0 | 6 | 1 | 2 | 16 | 21 | 0 | 3 | 105 |
| April | 26 | 0 | 28 | 7 | 1 | 0 | 3 | 0 | 3 | 15 | 27 | 0 | 2 | 112 |
| May* | 22 | 12 | 36 | 11 | 6 | 0 | 13 | 0 | 2 | 11 | 25 | 0 | 1 | 117 |
| June | 26 | 7 | 55 | 9 | 4 | 0 | 13 | 0 | 2 | 16 | 23 | 0 | 0 | 129 |
| July | 31 | 13 | 50 | 15 | 5 | 0 | 6 | 0 | 3 | 8 | 13 | 0 | 0 | 113 |
| Aug | 37 | 26 | 32 | 17 | 6 | 0 | 7 | 1 | 8 | 20 | 35 | 0 | 0 | 152 |
| Sept | 31 | 18 | 32 | 4 | 3 | 0 | 2 | 0 | 1 | 10 | 24 | 0 | 0 | 94 |
| Oct | 37 | 21 | 38 | 15 | 4 | 0 | 1 | 0 | 7 | 18 | 33 | 0 | 0 | 137 |
| Nov | 33 | 17 | 55 | 12 | 7 | 0 | 0 | 0 | 6 | 5 | 42 | 0 | 0 | 144 |
| Dec | 33 | 23 | 23 | 15 | 1 | 0 | 3 | 0 | 6 | 8 | 34 | 0 | 0 | 113 |
| Total | 358 | 137 | 440 | 117 | 42 | 0 | 82 | 6 | 47 | 145 | 302 | 0 | 6 | 1432 |

| 2020 | Use of Force | Inmate Misconduct ELD/EED | Inmate/ Inmate Assault | Inmate Staff Assault | PREA | Death | Attempt Suicide/ Ideation | Internal Escape | Criminal Damage | Medical (AKA slip/falls/ | Contraband | Staff Misconduct- Suspension/ | Other | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| January | 29 | 18 | 31 | 8 | 4 | 0 | 3 | 0 | 1 | 7 | 35 | 0 | 0 | 107 |
| February | 33 | 17 | 35 | 12 | 2 | 0 | 0 | 1 | 3 | 13 | 29 | 0 | 1 | 113 |
| March | 31 | 19 | 24 | 9 | 1 | 0 | 1 | 0 | 3 | 6 | 35 | 0 | 0 | 98 |
| April | 45 | 29 | 25 | 19 | 7 | 0 | 0 | 0 | 4 | 1 | 24 | 0 | 0 | 109 |
| May | 37 | 26 | 24 | 11 | 1 | 0 | 1 | 0 | 6 | 3 | 12 | 0 | 0 | 84 |
| June | 22 | 16 | 28 | 13 | 4 | 2 | 1 | 0 | 5 | 12 | 63 | 0 | 0 | 144 |
| July | 21 | 8 | 22 | 9 | 1 | 0 | 2 | 0 | 4 | 5 | 47 | 0 | 0 | 98 |
| Aug | 22 | 23 | 22 | 8 | 2 | 1 | 4 | 0 | 11 | 4 | 31 | 0 | 0 | 106 |
| Sept | 24 | 14 | 16 | 12 | 2 | 0 | 2 | 0 | 8 | 4 | 9 | 0 | 0 | 67 |
| Oct | 35 | 18 | 24 | 10 | 2 | 0 | 1 | 0 | 3 | 3 | 14 | 0 | 0 | 75 |
| Nov | 33 | 19 | 28 | 10 | 5 | 0 | 2 | 0 | 9 | 5 | 31 | 0 | 0 | 109 |
| Dec | 40 | 25 | 30 | 18 | 4 | 0 | 4 | 0 | 7 | 1 | 21 | 0 | 0 | 110 |
| Total | 372 | 232 | 309 | 139 | 35 | 3 | 21 | 1 | 64 | 64 | 351 | 0 | 1 | 1220 |

| 2021 | Use of Force | Inmate Misconduct ELD/EED | Inmate/ Inmate Assault | Inmate Staff Assault | PREA | Death | Attempt Suicide/ Ideation | Internal Escape | Criminal Damage | Medical (AKA slip/falls/ | Contraband | Staff Misconduct- Suspension/ | Other | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| January | 38 | 34 | 32 | 20 | 1 | 0 | 0 | 0 | 3 | 3 | 32 | 0 | 0 | 125 |
| February | 27 | 12 | 30 | 14 | 2 | 0 | 1 | 0 | 2 | 5 | 14 | 0 | 0 | 80 |
| March | 16 | 10 | 24 | 7 | 4 | 0 | 0 | 0 | 5 | 4 | 24 | 0 | 0 | 78 |



| Month | Use of Force | Inmate Misconduct ELD/EED | Inmate/Inmate Assault | Inmate Staff Assault | PREA | Death | Attempt Suicide/Ideation | Internal Escape | Criminal Damage | Medical (AKA slip/falls/ | Contraband | Staff Misconduct-Suspension/ | Other | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| April | 24 | 17 | 27 | 10 | 2 | 0 | 1 | 1 | 2 | 4 | 45 | 0 | 0 | 109 |
| May | 21 | 12 | 31 | 7 | 0 | 0 | 0 | 0 | 3 | 1 | 23 | 0 | 0 | 77 |
| June | 34 | 18 | 25 | 15 | 0 | 1 | 0 | 0 | 4 | 4 | 30 | 0 | 0 | 97 |
| July | 22 | 11 | 22 | 10 | 0 | 0 | 6 | 0 | 8 | 3 | 31 | 0 | 0 | 91 |
| Aug | 18 | 13 | 19 | 7 | 0 | 0 | 5 | 0 | 2 | 4 | 20 | 0 | 0 | 70 |
| Sept | 28 | 19 | 18 | 6 | 3 | 0 | 1 | 0 | 1 | 7 | 23 | 0 | 0 | 78 |
| Oct | 31 | 21 | 22 | 8 | 0 | 0 | 1 | 0 | 6 | 3 | 52 | 0 | 0 | 113 |
| Nov | 27 | 12 | 21 | 7 | 2 | 0 | 4 | 0 | 4 | 1 | 38 | 0 | 0 | 89 |
| Dec | 25 | 11 | 22 | 12 | 3 | 0 | 1 | 0 | 2 | 4 | 17 | 0 | 0 | 72 |
| Total | 311 | 190 | 293 | 124 | 17 | 1 | 20 | 1 | 42 | 43 | 350 | 0 | 0 | 1079 |

| 2022 | Use of Force | Inmate Misconduct ELD/EED | Inmate/Inmate Assault | Inmate Staff Assault | PREA | Death | Attempt Suicide/Ideation | Internal Escape | Criminal Damage | Medical (AKA slip/falls/ | Contraband | Staff Misconduct-Suspension/ | Other | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| January | 22 | 12 | 22 | 5 | 1 | 0 | 0 | 0 | 4 | 4 | 29 | 0 | 0 | 77 |
| February | 26 | 21 | 18 | 10 | 3 | 0 | 1 | 0 | 4 | 0 | 31 | 0 | 0 | 88 |
| March | 15 | 8 | 24 | 1 | 2 | 0 | 4 | 0 | 4 | 3 | 20 | 0 | 0 | 66 |
| April | 12 | 6 | 28 | 3 | 1 | 0 | 6 | 0 | 4 | 1 | 1 | 0 | 0 | 50 |
| May | 15 | 10 | 24 | 3 | 5 | 0 | 3 | 0 | 4 | 2 | 4 | 0 | 0 | 55 |
| June | 22 | 15 | 31 | 2 | 2 | 2 | 5 | 1 | 2 | 2 | 4 | 0 | 0 | 66 |
| July | 15 | 6 | 36 | 5 | 3 | 0 | 1 | 1 | 1 | 7 | 6 | 0 | 1 | 67 |
| Aug | 15 | 12 | 24 | 1 | 0 | 0 | 1 | 0 | 3 | 2 | 8 | 0 | 0 | 51 |
| Sept | 27 | 18 | 30 | 7 | 5 | 0 | 3 | 0 | 6 | 3 | 20 | 0 | 1 | 93 |
| Oct | 23 | 16 | 55 | 8 | 9 | 0 | 2 | 0 | 2 | 7 | 37 | 0 | 1 | 137 |
| Nov | 13 | 6 | 26 | 11 | 4 | 0 | 10 | 1 | 3 | 3 | 45 | 0 | 6 | 115 |
| Dec | 24 | 11 | 33 | 15 | 1 | 0 | 9 | 3 | 2 | 1 | 43 | 0 | 1 | 119 |
| Total | 229 | 141 | 351 | 71 | 36 | 2 | 45 | 6 | 39 | 35 | 248 | 0 | 10 | 984 |

| 2023 | Use of Force | Inmate Misconduct ELD/EED | Inmate/Inmate Assault | Inmate Staff Assault | PREA | Death | Attempt Suicide/Ideation | Internal Escape | Criminal Damage | Medical (AKA slip/falls/ | Contraband | Staff Misconduct-Suspension/ | Other | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| January | 24 | 17 | 34 | 9 | 2 | 0 | 5 | 2 | 6 | 15 | 75 | 0 | 0 | 165 |
| February | 19 | 14 | 30 | 4 | 4 | 0 | 1 | 4 | 4 | 15 | 28 | 0 | 2 | 106 |
| March | 14 | 7 | 46 | 9 | 2 | 0 | 5 | 8 | 1 | 7 | 40 | 0 | 1 | 126 |
| April | 18 | 12 | 42 | 9 | 0 | 0 | 2 | 3 | 5 | 6 | 39 | 0 | 4 | 124 |
| May | 21 | 12 | 43 | 11 | 2 | 0 | 1 | 5 | 1 | 15 | 52 | 0 | 1 | 143 |
| June | 36 | 23 | 62 | 16 | 1 | 0 | 1 | 8 | 7 | 25 | 49 | 0 | 3 | 195 |
| July | 32 | 20 | 66 | 18 | 5 | 0 | 4 | 4 | 8 | 20 | 35 | 0 | 4 | 184 |
| Aug | 27 | 15 | 67 | 14 | 1 | 0 | 7 | 11 | 5 | 12 | 37 | 0 | 5 | 174 |
| Sept | 25 | 19 | 67 | 15 | 1 | 0 | 0 | 4 | 6 | 14 | 53 | 0 | 2 | 181 |
| Oct | 44 | 37 | 64 | 10 | 5 | 0 | 3 | 7 | 7 | 12 | 44 | 0 | 9 | 198 |
| Nov | 31 | 18 | 67 | 13 | 3 | 0 | 1 | 15 | 4 | 23 | 45 | 0 | 7 | 196 |
| Dec | 25 | 21 | 48 | 11 | 2 | 0 | 4 | 10 | 6 | 14 | 57 | 0 | 3 | 176 |
| Total | 316 | 215 | 636 | 139 | 30 | 0 | 34 | 81 | 60 | 178 | 554 | 0 | 41 | 1968 |



OPSO continues to not timely conduct and document security rounds (30 minutes or 15 minutes depending on the unit) nor perform direct supervision surveillance consistent with the requirements of the Consent Judgment or OPSO policy.

Direct supervision requires surveillance of all of the inmates and cannot be properly performed by sitting behind a desk or in the control module. It requires walking around the unit, looking into the individual cells, and actively engaging with the inmates. Staffing in the housing units was observed to be inadequate throughout the OJC during the monitoring tour. Over the last four monitoring tours, the Monitors witnessed the majority of the units being unsupervised. A review of the log of security checks reveals TMH was the one area which appeared to have sufficient staff and consistently conducted security rounds. Review of incident reports revealed that units were often unstaffed, including many mandatory posts. If staff are not present, it is impossible to make the required rounds. The staff write their rounds on paper forms in addition to entry into the log. While this provides an easier way for a supervisor to see during a unit inspection if the deputy has recorded that the security checks are being performed timely, it is insufficient proof that the security checks actually occurred and requires watching hours of video to verify. Review of video footage after an incident often reveals that security checks are not being conducted and/or inadequately conducted even if recorded in the logbook. OPSO indicated that with the beginning of the formation of the compliance unit that OPSO has now started to audit log sheets with video footage and plans to have an audit report for the next compliance period. A simple review of the documentation provided indicates that there are often gaps of two or more hours in between security rounds. During the onsite monitoring visit, Monitors reviewed the logbooks. Deputies were once again questioned and often found to be incapable of describing what an acceptable security check would be like. At most, in the majority of the units, an adequate security check was only performed when a physical count of the inmates took place; at most, twice in a twelve-hour shift. The rest of the "checks" were no more than looking about the housing unit without leaving the deputy station, or, even more troubling, the control station which is located outside of the housing unit. Given the level of failure to perform security checks and lack of staff assigned to direct supervision, OPSO continues to be in noncompliance with IV. A. 5. d.

A review of the paper logs and forms during the monitoring tour revealed that timely



rounds were often not performed and are not accurate. OPSO should consider a reliable system that would allow for rounds, by both deputies and supervisors, to be recorded electronically. Not only would it allow for supervisors to quickly determine whether rounds were being conducted in a timely manner, it would allow for OPSO to prove compliance and address non-adherence.

All twenty-four (24) of the housing units in OJC are designed for direct supervision. At the time of the drafting of the Consent Judgment the design of OJC was known. The Consent Judgment requires that staff provide direct supervision in housing units that are designed for this type of supervision. Thus, continual presence of a deputy in each housing unit at OJC and TMH is mandatory under the Consent Judgment. OPSO has taken the position that OPSO gets to determine which housing posts are mandatory and routinely does not assign mandatory staff to each housing unit. In addition, deputies are frequently absent from even the housing units designated by OPSO as mandatory. More often than not, one deputy is assigned to two or more housing units. The harm that results from not having a deputy in each pod, especially when inmates are out, is evident by the repeated serious incidents occurring when there is no deputy on the unit, including those resulting in serious injury and/or necessitating hospital routes. Thus, IV. A. 5. e. remains in partial compliance but is dangerously close to being found in non-compliance.

Regarding overhead video surveillance and recording cameras for OJC (A. 5. f.), there has been a significant investment in cameras. There are times when a nonfunctional camera is discovered when a supervisor or an investigator tries to retrieve the videos, but it is rare. OPSO needs to continue to audit the system by having a supervisor test the various cameras on a monthly basis and prepare a report for the Deputy Chief of Jail Operations. IV. A. 5. f. continues to be in substantial compliance. Supervisors have improved on pulling video as required by the Use of Force policy. Deputies are now issued body worn cameras which is helpful as the body worn cameras provide audio in addition to video.

One staff member was transferred between divisions during the monitoring period, but no proof of training was provided. Thus, IV. A. 5. g. is in partial compliance. Given the necessity of utilizing staff from other areas of OPSO to supervise inmates in the OJC, OPSO is encouraged to provide training even if there is not an actual transfer from one division to another. Proof that recruits received training on specialized housing during pre-service was



provided. However, no proof of the required annual eight (8) hours of training for the deputies assigned to specialized units was provided; IV. A. 5. h. is in partial compliance. Given the high level of incidents in the specialized units, it is recommended that the training be reviewed, and deficiencies addressed. OPSO continues to be close to being in non-compliance with this provision.

Documentation indicates that supervisors do not consistently conduct daily rounds; thus, IV. A. 5. i. continues to be in partial compliance. Supervisors are required to sign off on the round sheet completed by the pod deputy, but this does not provide proof that the supervisor conducted daily rounds. The daily inspections of housing units as required by VI. A. 5. j. is still only in partial compliance as they are not consistently performed and do not cover all areas. It is concerning that neither the inspections by the deputies nor the supervisors resulted in the discovery of the destruction of items that are part of the jail to fashion weapons. It is essential that the inspections be thorough and that corrective actions are taken to address the inspection findings.

Monthly shakedowns were not conducted in compliance with VI. A. 5. k. The number of shakedowns increased during this monitoring period, but no proof that each of the 24 units were subject to the monthly shakedowns of units was provided. There continues to be significant incidents involving contraband including the manufacturing and use of weapons fashioned from the jail itself. The review of contraband reports clearly indicates reoccurring issues and that the number of contraband incidents is at an all-time high. The number of drug overdoses occurring is a direct reflection of the failure to prevent introduction of illicit drugs into the facility and the failure to perform timely and appropriate searches to remove the illicit drugs. There continues to be a serious issue of inmates hoarding medication. Reports demonstrate that inmates are fashioning weapons out of items in the jail which are then used to assault other inmates. Reports and the site visit reveal that inmates are smuggling in marijuana and narcotics to smoke. Some of these items come through the mail, but there is a significant issue of staff smuggling in contraband and the failure to detect narcotics being brought in by inmates being arrested. The failure to search inmates thoroughly and properly upon returning from court also constitutes a source of illegal drugs. This indicates the need to analyze the data and develop a corrective action plan to reduce, if not stop, the hoarding of medication, the fashioning of weapons, and the flow of contraband



into the facility. OPSO is in non-compliance with this provision. Failure to conduct shakedowns on a proactive basis is directly related to the violence in the facility.

The documentation provided for A. 5. l. includes a categorization of contraband, but no classification data for the required information. Thus, A. 5. l. remains in Partial Compliance.

## IV. A. 6. Security Staffing

*A. 6. a. OPSO shall ensure that correctional staffing and supervision is sufficient to adequately supervise prisoners, fulfill the terms of this Agreement, and allow for the safe operation of the Facility, consistent with constitutional standards.*

*(1)* *OPSO shall achieve adequate correctional officer staffing in the following manner: Within 90 days of the Effective Date, develop a staffing plan that will identify all posts and positions, the adequate number and qualification of staff to cover each post and position, adequate shift relief, and coverage for vacations. The staffing plan will ensure that there is adequate coverage inside each housing and specialized housing areas and to accompany prisoners for court, visits and legal visits, and other operations of OPP and to comply with all provisions of this Agreement. OPSO will provide its plan to the Monitor, SPLC, and DOJ for approval. The Monitor, SPLC, or DOJ will have 60 days to raise any objections and recommend revisions to the staffing plan.*

*(2)* *Within 120 days before the opening of any new facility, submit a staffing plan consistent with subsection (1) above.*

*(3)* *Within 90 days after completion of the staffing study, OPSO shall recruit and hire a full-time professional corrections administrator to analyze and review OPP operations. The professional corrections administrator shall report directly to the Sheriff and shall have responsibilities to be determined by the Sheriff. The professional corrections administrator shall have at least the following qualifications: (a) a bachelor's degree in criminal justice or other closely related field; (b) five years of experience in supervising a large correctional facility; and (c) knowledge of and experience in applying modern correctional standards, maintained through regular participation in corrections-related conferences or other continuing education.*

*(4)* *Provide the Monitor a periodic report on staffing levels at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. Each report will include the following information:*

*i.* *a listing of each post and position needed;*

*ii.* *the number of hours needed for each post and position; a listing of staff hired and positions filled;*

*iii.* *a listing of staff working overtime and the amount of overtime worked by each staff member;*

*iv.* *a listing of supervisors working overtime; and*

*v.* *a listing of and types of critical incidents reported*

*A. 6. b. Review the periodic report to determine whether staffing is adequate to meet the requirements of this Agreement. OPSO shall make recommendations regarding staffing based on this review. The review and recommendations will be documented and provided to the Monitor.*

Findings:

A. 6. a.  Non-Compliance

A. 6. b.  Non-Compliance

An overall rating of A. 6. was provided in the previous reports. This was inconsistent with the other introductory paragraphs and has now been discontinued.



Observations:

The level of staffing is extremely insufficient to adequately supervise inmates and allow for the safe operation of the facility. There have been insufficient security staff over the past few monitoring periods, and it has worsened to a level where OPSO struggles to staff the facility and cover basic functions. OPSO's staffing reports document that most mandatory posts are not filled on a consistent basis. Numerous incident reports and investigations reveal posts were not constantly staffed, which resulted in increased violence. OPSO has now put in place the Emergency Staffing and Augmentation Plan (ESAP) which has resulted in escorts being provided to the Tulane psychiatrists and some of the medicals runs. The ESAP has not been shown to provide any increased coverage of the housing units as many of the individuals, especially the reserves, have been resistant to working in the housing units. Some of them do not have the required certification to supervise inmates. There is still a lack of a coordinated effort on the utilization of overtime and redeployment of staff to ensure the mandatory posts are covered on a consistent basis. The deployment of staff is sufficiently inconsistent and insufficient to result in IV. A. 6. a. (1) and IV. A. 6. a. (2) continuing to be in non-compliance. While the position of Warden/Chief of Corrections was filled in June 2022, no proof was provided that her background, education, and experience fulfill the requirements of provision IV. A. 6. a. (3) of five years of experience supervising a large correctional facility. Thus, it remains in partial compliance. Paragraph IV. A. 6. a. (4) is in substantial compliance, as monthly reports are produced to document hiring and termination of employees. The Stipulated Agreement also provides for bi-monthly reports regarding hiring. Paragraph 7.a. of the Stipulated Agreement of February 11, 2015, requires monthly reporting. Given the importance of the actual implementation of an approved staffing plan, A. 6. a. remains in non-compliance. The last approved staffing plan was in September 2019 and was based on a much different staffing level.

OPSO continues to be in non-compliance with A. 6. b. as OPSO has not provided a periodic review of the staffing plan. Discussion during the monitoring tour indicated that a plan is being prepared, but it has not been finalized or submitted to the Monitors, the Plaintiff Class, or DOJ. An antiquated staffing plan which is based on staffing levels which do not exist, or a staffing plan based on unreliable data is insufficient.



## IV. A. 7. Incidents and Referrals

*A.7.a.   OPSO shall develop and implement policies that ensure that Facility watch commanders have knowledge of reportable incidents in OPP to take action in a timely manner to prevent harm to prisoners or take other corrective action. At a minimum, OPSO shall do the following:*

*A.7.b.   Continue to ensure that Facility watch commanders document all reportable incidents by the end of their shift, but no later than 24 hours after the incident, including prisoner fights, rule violations, prisoner injuries, suicide attempts, cell extractions, medical emergencies, found contraband, vandalism, escapes and escape attempts, and fires.*

*A.7.c.   Continue to ensure that Facility watch commanders report all suicides and deaths no later than one hour after the incident, to a supervisor, IAD, the Special Operations Division, and medical and mental health staff.*

*A.7.d.   Provide formal pre-service and annual in-service training on proper incident reporting policies and procedures.*

*A.7.e.  Implement a policy providing that it is a disciplinary infraction for staff to fail to report any reportable incident that occurred on his or her shift. Failure to formally report any observed prisoner injury may result in staff discipline, up to and including termination.*

*A.7.f.  Maintain a system to track all reportable incidents that, at a minimum, includes the following information:*

    *(1)    tracking number;*
    *(2)    the prisoner(s) name;*
    *(3)    housing classification and location;*
    *(4)    date and time;*
    *(5)    type of incident;*
    *(6)    injuries to staff or prisoner;*
    *(7)    medical care;*
    *(8)    primary and secondary staff involved;*
    *(9)    reviewing supervisor;*
    *(10)    external reviews and results;*
    *(11)    corrective action taken; and*
    *(12)    administrative sign-off.*

*A.7.g.  Ensure that incident reports and prisoner grievances are screened for allegations of staff misconduct, and, if the incident or allegation meets established criteria in accordance with this Agreement, it is referred for investigation.*

*A.7.h.  Provide the Monitor a periodic data report of incidents at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement.*

*A.7.i. The report will include the following information:*

    *(1)    a brief summary of all reportable incidents, by type and date;*
    *(2)    a description of all suicides and in-custody deaths, including the date, name of prisoner, and housing unit;*
    *(3)    number of prisoner grievances screened for allegations of misconduct; and*
    *(4)    number of grievances referred to IAD or SOD for investigation.*

*A.7.j.   Conduct internal reviews of the periodic reports to determine whether the incident reporting system is ensuring that the constitutional rights of prisoners are respected. Review the quarterly report to determine whether the incident reporting system is meeting the requirements of this Agreement. OPSO shall make recommendations regarding the reporting system or other necessary changes in policy or staffing based on this review. The review and recommendations will be documented and provided to the Monitor.*

Findings:

A. 7. a.  Substantial Compliance

A. 7. b.  Partial Compliance

A. 7. c.  Substantial Compliance



A. 7. d.  Substantial Compliance

A. 7. e.  Partial Compliance

A. 7. f.  Substantial Compliance

A. 7. g.  Substantial Compliance

A. 7. h.  Substantial Compliance

A. 7. i.  Substantial Compliance

A. 7. j.  Substantial Compliance

Observations:

OPSO has long had a policy on incidents and referrals that sets out the process for documenting and referring incidents. What has been lacking is a sufficient process to ensure all reportable incidents are being documented and that all incident reports are complete, prompt, and accurate. Watch commanders are required to be notified of any incident occurring and document the incident in their shift log which results in substantial compliance of A.7.a. However, review of the routes of inmates and medical clinic walk-in logs indicates that a number of incidents are not resulting in an incident report. Enough improvement has resulted in a continued finding of substantial compliance, but a corrective action plan to maintain substantial compliance is warranted.

OPSO implemented a process where an OPSO staff member reviewed the "routes" of inmates with serious medical or trauma injuries to the hospital emergency room and the OPSO clinic walk-in logs and compared them to the reports received. The sergeant assigned has improved the quality of this review, but the lack of follow through on items found to be unreported results in IV. A. 7. b. remaining in partial compliance.

During this reporting period, several attempts at suicide were reported within an hour to the proper persons: thus IV. A. 7. c. is in substantial compliance. Documentation on preservice training and annual training on report writing was provided; IV. A. 7. d. is in substantial compliance.

OPSO still does not hold supervisors and security staff accountable for the late reports. No documentation regarding accountability was provided. OPSO's own documentation indicates that reports are often not timely filed. Failure to hold staff accountable results in IV. A. 7. e. being in partial compliance.

OPSO has transitioned to the AS 400 system to track the information required in IV. A.



7. f. and is in substantial compliance. OPSO is doing a better job analyzing the data, but the analysis is still inadequate and often does not result in measures which would correct the problem being identified. The next step is utilizing the analysis to make required changes in policy and procedure. OPSO remains in substantial compliance with A. 7. g.; incidents, and grievances are reviewed for misconduct and referred for investigation where appropriate, but the lack of completeness of reports puts this rating at risk. The Monitors were provided a semi-annual report of incidents, that now, with the supplementation by the daily/weekly reports, contains all of the required information and, thus, IV. A. 7. h. and i. are in substantial compliance. OPSO performed an assessment of whether the reporting system is meeting the requirements of the Consent Judgment and is given substantial compliance for IV. A. 7. j. as OPSO is now addressing the lack of timeliness.

## IV.   A. 8.  Investigations

*A. 8. a. Maintain implementation of comprehensive policies, procedures, and practices for the timely and thorough investigation of alleged staff misconduct, sexual assaults, and physical assaults of prisoners resulting in serious injury, in accordance with this Agreement. Investigations shall:*

> *(1)   be conducted by persons who do not have conflicts of interest that bear on the partiality of the investigation;*
> *(2)   include timely, thorough, and documented interviews of all relevant staff and prisoners who were involved in or who witnessed the incident in question, to the extent practicable; and*
> *(3)   include all supporting evidence, including logs, witness and participant statements, references to policies and procedures relevant to the incident, physical evidence, and video or audio recordings.*

*A. 8. b. Continue to provide SOD and IAD staff with pre-service and annual in-service training on appropriate investigation policies and procedures, the investigation tracking process, investigatory interviewing techniques, and confidentiality requirements.*

*A. 8. c. Ensure that any investigative report indicating possible criminal behavior will be referred to IAD/SOD and then referred to the Orleans Parish District Attorney's Office, if appropriate.*

*A. 8. d. Provide the Monitor a periodic report of investigations conducted at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement.*

*A. 8. e. The report will include the following information:*

> *(4)   a brief summary of all completed investigations, by type and date;*
> *(5)   a listing of investigations referred for administrative investigation;*
> *(6)   a listing of all investigations referred to an appropriate law enforcement agency and the name of the agency; and*
> *(7)   a listing of all staff suspended, terminated, arrested, or reassigned because of misconduct or violations of policy and procedures. This list must also contain the specific misconduct and/or violation.*

*A. 8. f. OPSO shall review the periodic report to determine whether the investigation system is meeting the requirements of this Agreement and make recommendations regarding the investigation system or other necessary changes in policy based on this review. The review and recommendations will be documented and provided to the Monitor.*

Findings:



A. 8. a.  Partial Compliance

A. 8. b.  Substantial Compliance

A. 8. c.  Partial Compliance

A. 8. d.  Substantial Compliance

A. 8. e.  Substantial Compliance

A. 8. f.   Substantial Compliance

Observations:

The Investigative Services Division (ISB) is responsible for: the Criminal Investigation Division (investigates possible criminal activity by inmates), Internal Affairs Division-Criminal (investigates possible criminal activity by staff), the FIT (investigates use of force by staff), the Internal Affairs Division-Administrative (investigates possible violation of policies by staff), and the Intelligence Unit (provides information and intelligence regarding activities that have taken place or may take place in the jail or support activities).

The timeliness and the quality of the investigations produced by ISB has improved during this monitoring period. However, FIT investigations are still often finalized without having interviewed any witnesses and relying on short self-serving statements by the involved deputy. Thus, IV. A. 8. a., remains in partial compliance. The major and lieutenant resigned in 2020 and lower ranking supervisors have been required to take on additional duties. An experienced investigator was hired during the monitoring period to supervise ISB and an immediate improvement in timeliness and quality was apparent.

The Monitor acknowledges that investigating incidents of inmate-on-inmate assaults, sexual assaults, staff on inmate assaults, etc. with a goal of seeking indictments is appropriate. Inmates should be held accountable when they commit criminal acts while in the jail facility. The same holds true for staff who commit criminal acts whether it be the smuggling of contraband or assault on inmates. The overall goal is to create a safe jail. In a jail setting, investigations play a critical role in protecting inmates from inappropriate and/or illegal staff actions, protecting inmates from each other, protecting staff from inappropriate and/or illegal inmate actions, and ensuring policy is followed. Continued emphasis is needed on the goal of investigations to prevent future incidents through analysis of the policy, procedures, training, supervision, and physical plant contributors to the incident. This function cannot and should not be performed by ISB alone. Also troubling is



how seldom ISB recognizes the other factors which contributed to an incident such as failure to follow policy and/or includes them in the investigation reports. It should be noted that when ISB had included other factors in the investigation report, they have often received pushback from the leadership in OJC and been accused of overstepping their role. With the hiring of the new Deputy Chief of Corrections, there appears to be improved collaboration between ISB and OJC.

ISB has demonstrated training related to the investigative skills provided during 2023. IV. A. 8. b. remains in substantial compliance.

Investigations which reveal possible criminal activity by staff were not always referred to the Orleans Parish District Attorney's Office. It appears that ISB made the decision based on a belief that if ISB did not feel the case was worthy of prosecution, it should not be referred. The standard is referral for possible criminal activity, not whether the case should be prosecuted. Thus, A. 8. c. is in partial compliance. The Monitors remain concerned about the frequent refusal by the district attorney to follow through with filing cases related to indecent exposure by inmates towards staff and assaults on staff due to the throwing of urine and feces by inmates on staff. ISB provides reports in substantial compliance with IV. A. 8. d. and e. ISB reviewed the investigation system to determine whether the investigation system complies with the requirements of the Consent Judgment and forwarded any recommendations to the Monitors in substantial compliance with IV. A. 8. f. The quality of those recommendations has room for improvement and, unless implemented, may result in a lowering of the rating.

### IV. A. 9. Pretrial Placement in Alternative Settings

*A. 9. a. OPSO shall maintain its role of providing space and security to facilitate interviews conducted pursuant to the City's pretrial release program, which is intended to ensure placement in the least restrictive appropriate placement consistent with public safety.*
*A. 9. b. OPSO shall create a system to ensure that it does not unlawfully confine prisoners whose sole detainer is by Immigration and Customs Enforcement ("ICE"), where the detainer has expired.*

Findings:

A. 9. a.  Substantial Compliance

A. 9. b.  Substantial Compliance

Observations:

OPSO provided a memorandum noting that the pretrial program is managed by the Criminal District Court, and that space is provided. OPSO also provided a memorandum that



ICE detainers are only accepted for a specified list of offenses.  OPSO has not detained any individuals under an ICE detainer during the monitoring period. The memos are dated March 31, 2023, and signed by the Chief of Staff.

**IV. A. 10. Custodial Placement within OPSO**

Introduction:

OPSO designed and validated an objective classification system to assess and house OPSO inmates according to their threats to institutional safety and security. The automated classification system was implemented on January 15, 2015.[1] The 2022 OPSO pending staffing plan reduced the classification unit staffing from 18.68 to 14 FTEs.[2]

As of September 30, 2023, the Classification Unit staffing was 12 – classification manager, four shift supervisors, and seven classification specialists.[3] One classification specialist position was vacant. However, the position was filled by the December site visit, bringing the total to 13. Each of the four classification platoons includes at least two members.  The classification manager is requesting that the Unit be restructured to create an "assistant classification" manager to handle the day-to-day operational tasks. This change, if approved, would not impact OJC's 24/7 classification coverage.

Eight (8) of the 13 staff have received their NCIC clearance and passwords. NCIC coverage is available on three of the four squads. Thus, staff have access to the criminal history records required to complete the custody and PREA assessments via NCIC website or hardcopy reports within the classification folders.

Thus, most have access to the criminal history records required to complete the custody and PREA assessments.

An automated housing assignment process (HUAP) identifies housing options for inmates according to their custody level, gender, special population status, PREA designations, enemies, and associates. The specialists assign most male admittees to one of

---

[1] Hardyman, Patricia L. (2015). "Design and Validation of an Objective Classification System for the Orleans Parish Sheriff's Office: Final Report." Hagerstown, MD: Criminal Justice Institute, Inc.
[2] Gusman, Marlin N. (March 16, 2021). "Coverage Plan 2021." Orleans Parish, LA: Office of the Sheriff. pp. 11.  The 2022-23 staffing plan is still pending.
[3] During the Fall of 2022, OPSO created the option for the classification staff to become deputy recruits. Two individuals opted to remain civilian classification specialists, the remaining nine are "recruits." For the purposes of this report, the classification line staff are referred to as "Classification Officers" and the shift supervisors are referred to as "Shift Supervisors."



the first-floor IPC Roll-in pods at initial classification.[4] (Special population tags identify individuals for suicide observation versus suicide watch, medical housing/ isolation, academic education, or special diets.) (As needed, men with acute mental health or medical needs go directly to 2A or 4B, respectively. At intake, most women are housed on 3F.)

The OPSO automated housing process assigns enemies and associates to separate pods to prevent institutional violence and disruption. While tension between the Classification Unit and security staff appears to have diminished with the hiring of the new classification manager, security staff and ISB seem reluctant to share information with the classification unit regarding neighborhood cliques, gang involvement, enemies, associates, and other housing separation requirements. Acquiescence to inmates' requests to move to reside with their associates or to accommodate staff's "suggestions" for inmate moves continues unabated. Classification staff routinely accepts the security staff's suggestions and inmate requests with little to no analysis to determine if the inmates are trying to manipulate their housing assignments or if staff are avoiding problematic inmates.

The "ALL" custody and PREA designations continue in the special population units – Mental Health (Acute and Sub-Acute), Protective Custody, Education, Disciplinary/Segregation, Medical, etc.  All pods for housing women are "ALL" custody and PREA designations." It is important not to negate the classification system and jeopardize out-of-cell time in the struggle to reduce OJC staffing requirements. These short-term tradeoffs create more violence and disruption in the long term. With the recent rise in the OPSO population, most of the OJC pods are operating at capacity. The exceptions are OJC 2D (Travis High School), OJC 2B (Mental Health Step Down for Men), and TDC B-4E (Kitchen Workers). As of October 31, 2023, for example,

- OJC 2D - 33 of 49 beds were empty,
- OJC 2B - 39 of 58 beds were empty, and
- TDC B-4E - 49 of 56 were empty.

The failure to identify and assign inmates to these specialized units for kitchen workers, sub-acute mental health services, or the high school suggests a lack of cooperation among the OPSO units and diligent efforts to place inmates in the least restrictive locations

---

[4] When transferring inmates from the IPC Roll-in or special population pods to a general population pod, the classification staff matches individuals by custody level, PREA designations, age, and crime/criminal history.



according to the inmates' risks <u>and needs</u>. Just sending a list for review does not constitute due diligence.

During this Compliance Period, the Classification Manager or day shift supervisor circulated a daily housing matrix to reflect the current OJC, TMH, and TDC populations. The matrices reflected fluctuations in the OPSO population. Isolations for COVID-19 have dropped significantly. The OPSO Special Population Report for April 1, 2023-October 31, 2023, lists only 15 individuals as COVID-19 positive. COVID-19 patients are routinely transferred to TDC to minimize the spread of the virus throughout the facility.

Under Compliance Director Hodge, two pods were designated housing units for new arrivals (Roll-In Pods). The number of Roll-In Pods has grown from two to six -- OJC Tier 1 Pods, A – F.  (For women, Pod 3-F serves as the Roll-in Pod.)   The availability of six Roll-In pods makes initial housing assignments relatively easy, as the staff needs only look at the individual's custody level, PREA designations, and medical requirements (e.g., disability, detox, isolation, etc.). However, maintaining six Roll-In pods restricts the housing options for the general population at reclassification. Many inmates spend months in a Roll-In Pod waiting for a general population bed.  Thus, the benefits and mission of the Roll-in Pods are negated. A meeting was held during the tour between the Monitors, appropriate OPSO staff, and counsel for Plaintiffs and DOJ to explore population management strategies.  The group formulated a multi-faceted plan to:

1)  Convert two of the six Roll-in Pods to general population units to address the backlog within the Roll-in Pods and allow for a Close Security Housing Unit;

2)  Increase the number of kitchen workers to facilitate the movement of minimum custody inmates to TDC B-4E and support the kitchen staff;

3)  Work with LA DOC to expedite the movement of DOC inmates from OPSO to free up much-needed bed space in OJC; and

4)  Consolidate THS students into OJC 2 and/or fill the remaining beds in OJC 2D with general population inmates.

However, as of March 29, 2024, progress on this multi-faceted corrective action plan had stalled. Only one of the Roll-in Pods had been converted to a general population unit, and the OJC 2C remained under-utilized. However, the number of kitchen workers had



increased from approximately to fifteen, and the number of DOC inmates had decreased by about fifty percent.

During this Compliance Period, the Classification Unit conducted housing audits to verify the integrity of the housing assignments designed by the Classification staff. Documentation of the housing audits was well-organized and available before our arrival for the Compliance Review. However, not all housing units were audited each month. Further, some audit reports were incomplete or unclear. Observation of the housing audits and protective custody reviews via the OJC camera system suggested that not all the audits were conducted as reported.

Assessment Methodology:

Compliance was assessed through multiple data sources and activities – review of the OPSO and JMS daily population, classification statistical reports and data files, observation of classification and audit procedures, onsite meetings with OPSO staff, housing matrices, and staffing rosters. A site visit was conducted on December 4 – 7, 2023. The OPSO documents included monthly statistical and protective custody status reports. Analyzed were custody assessment, override, attachment, and enemy refusal data downloaded from the AS400. The statistical reports tracked pending custody assessments, daily population counts, placement errors, the stock population, and monthly custody trends. Onsite activities included:

- Observation of the initial classification, reclassification, and housing processes;
- Meetings with OPSO classification, facility administration, and compliance unit staff;
- Review of body-camera videos of staff interviews to resolve inmate enemy/ associate separations and protective custody status;
- Review of OJC security videos of housing audits; and
- Examination of the protective custody placement, status, and waiver reports.

This review focused primarily on the data and Classification Unit activities between April 1, 2023 – September 30, 2023. Some analyses considered trends over twelve to fifteen months (12-15) to detect variations due to seasonal variations and COVID-19-related procedures. In addition, comments as to the status of the classification unit -- staffing, lack of leadership, training for new/rehires and new responsibilities, and the integrity of the classification system – are provided to guide OPSO toward Compliance.



Summary:

OPSO complies substantially with three of the eight Custodial Placement sections of the Consent Judgment (Sections b, g, and h). Sections a and c are rated as Partial Compliance. OPSO is non-compliant with Sections d, e, and f. The Classification staff are commended for their efforts and progress regarding Custodial Placement. Perhaps most important is the "can and will do" attitude exhibited by the Classification and Compliance Unit staff.

Findings:

A. 10. a.  Partial Compliance

A. 10. b.  Substantial Compliance

A. 10. c.  Partial Compliance

A. 10. d.  Non-Compliance

A. 10. e.  Non-Compliance

A. 10. f.  Non-Compliance

A. 10. g.  Substantial Compliance

A. 10. h.  Substantial Compliance

***IV.A.10. a. OPP shall implement an objective and validated classification system that assigns prisoners to housing units by security levels, among other valid factors, in order to protect prisoners from unreasonable risk of harm. The System shall include consideration of a prisoner's security needs, the severity of the current charge, types of prior commitments, suicide risk, history of escape attempts, history of violence, gang affiliations, and special needs, including mental illness, gender identity, age, and education requirements. OPSO shall anticipate periods of unusual intake volume and schedule sufficient classification staff to classify prisoners within 24 hours of booking and perform prisoner reclassifications, assist eligible DOC prisoners with re-entry assistance (release preparation), among other duties.***

Finding:

Partial Compliance

Observations:

Compliance with Section IV.A.10. a. remained in Partial Compliance during this review period.   Assessment of the Classification Unit staffing during this Compliance period indicated the Unit staffing was 12 – classification manager, four shift supervisors, and seven classification specialists.[5] One classification specialist position was vacant. However, by the December site visit, the remaining position was filled, bringing the Unit staffing total to 13.

---

[5] During the Fall of 2022, OPSO created the option for the classification staff to become deputy recruits. Two individuals opted to remain civilian classification specialists, the remaining nine are "recruits." For the purposes of this report, the classification line staff are referred to as "Classification Officers" and the shift supervisors are referred to as "Shift Supervisors."



Each of the four classification platoons includes a shift supervisor and two classification specialists. Thus, the staffing for the Classification Unit appears sufficient; 13 of the 14 FTEs on the OPSO staffing plan are filled.

The shift supervisors oversee the classification specialists, process housing transfers, complete custody reviews, conduct housing audits, and address classification-related grievances. The classification specialists complete the custody and predation/vulnerability (PREA) assessments and assign inmates to pod and cell housing accordingly. The Classification Manager has assumed responsibility for the Unit. He is tackling the tasks of organizing the housing audits, conducting protective custody/administrative segregation evaluations, reviewing enemy/associates, assessing the accuracy of the custody assessments, as well as training and supervising Unit staff.

Despite full staffing, the number of overtime hours logged by the classification staff remains high. During this Compliance Period, the average number of overtime hours/month/classification staff member was 37. The number of overtime hours/month/staff member ranged from a high of 60.59 hours in September to a low of 16.77 hours in July. The Classification Unit logged a total of 1,850.27 hours of overtime.[6]   During this Compliance Period, the classification specialists worked overtime an average of 39.82 hours/ month while the shift supervisors worked an average of 32.01 hours of overtime/month (In contrast, OPSO non-classification staff logged an average of 26.89 hours/person/month during this Compliance Period.) The overtime rates are not linked directly to shift coverage but rather are a combination of the scheduling process and classification-related special projects.

While the Unit staffing improved substantially, the rating is Partial Compliance for two reasons:

1) **Housing Matrix:** The classification system is compromised in the OPSO special population pods -- Mental Health, Medical, Education, TMH, TDC, Disciplinary/Segregation, and female units. The matrix allows for all custody levels and PREA statuses in these pods. Per the October 31, 2023, Housing Matrix, 12 of the 31 OJC/TDC/TMH pods housed individuals of all custody, vulnerability,

---

[6] OPSO Excel spreadsheets entitled Overtime by Month and HR Report Hire and Separations Reports for 2022 and 2023.  The classification work schedule builds in eight hours of overtime/month.  However, the same scheduling formula impacts other OPSO staff.



predation, and special population status. This count includes two TDC pods --- B3-E (men) and B3-W (women) --- for COVID-19-positive residents.[7]

The TMH treatment teams assign patients to cells according to their mental health needs with little regard for their custody or PREA status. (Known enemies live in separate pods.) Housing assignments, activities, and out-of-cell time are scheduled according to the individual's treatment level. So again, the classification system is compromised.

Given the size and configuration of the OJC and TDC/TMH, we recognize that pods with multiple custody levels and PREA designations are unavoidable. However, OPSO appears to favor "ALL CUSTODY ALL STATUS" pods despite inadequate security staffing and out-of-cell schedules activities that allow for mixing high-risk inmates.

As previously noted, as part of the Compliance Review, we met with OPSO facility and classification administrators to develop a population management strategy to address the multiple custody pods, distribute residents across the pods, and ease the backlog of residents from the "Roll-in Pods" to general population units.   To date, OPSO has completed only one step of the plan – one of the six Roll-in Pods was converted to a general population unit.

2) **Classification staff control of housing assignments**. The housing audits completed during this Compliance Review Period reported that most inmates were in the cell and bunk assigned by the classification staff. However, observation of the classification staff suggested that the security staff directed the housing assignments through repeated calls or emails to specify the pod and cell to which an inmate should be assigned. This is not acceptable and is likely to result in security staff, the Adjutant, and inmates continuing to manipulate housing assignments and facilitating gang/ cliches and inmate-on-inmate violence.

The new Classification Manager must work closely with other OJC Divisions to facilitate information sharing and build trust. As the OPSO rebuilds the Classification Unit, the Classification Unit should consider strategies for utilizing

---

[7] October 1 – November 21st,  B3-W was used as an over-flow general population unit for females.



the security staff's knowledge of local cliques, checking in with the inmates during their rounds or audits, and addressing inmate grievances.

***IV.A.10.b. Prohibit classifications based solely on race, color, national origin, or ethnicity.***

Finding:

Substantial Compliance

Observations:

The custody assessments consider objective risk factors validated for the OPSO male and female inmates. The individual's race is not one of the objective risk factors. Classification specialists consider the individual's custody level, vulnerability designation, age, and charges to select a cell and bed from those the JMS automated housing program identifies as appropriate housing for the individual. To track this element of the Consent Judgment, OPSO created a monthly statistical report to record the race and gender of individuals per housing location.

The OPSO "Housing By Race" reports suggested that race was not a factor in OJC housing assignments. With a few exceptions, the number of black and white inmates within each OJC housing unit was consistent with the overall racial distributions among the OPSO inmate population. On the other hand, the racial distributions across the TDC and TMH units have not always reflected the OPSO population. The percentage of white males assigned to the TDC DOC worker increased during this Compliance Period – 14.3% during April 2023 versus 40.0% by September 2023. (See Figure 1.) Yet, the proportion of white inmates within the total male inmate population has been relatively constant -- between April - September 2023 -- only 11.3 percent of the OPSO male population identified as white. Further, during this Period, the percentage of white men assigned to THM increased from 18.2% in April 2023 to 25.0% by September 2023. However, given that the TDC/TMH population constitutes less than 2% of the total OPSO population, the elevation in the number of white males assigned to TDC/TMH did not significantly impact the distribution of inmates by race across the OJC Pods.





Figure 1: Percentage of White Males Assigned to OJC, TDC & TMH Housing Units – Apr 2022 – Sep 2023.

As shown in Figure 2, between April 2022 and September 2023, on average, 17.0% of the OPSO female population identified as white. In contrast, over the same 18-month Period, 14.2% of the women assigned to the TMH unit identified as white. However, month-to-month, the percentage of white-identified women assigned to TMH varied dramatically. Notably, the portion of the OPSO female population identified as white ranged between 20.3% (July 2022) and 12.6% (December 2022). Overall, the OPSO female population has remained relatively constant at 12.9%.   Thus, multiple factors appear to influence women's assignment to TMH. The direct role of race is unknown.





Figure 2: Percentage of White Female Inmates Assigned to OJC & TMH Housing Units – April 2022 – September 2023.

**IV.A.10.c Ensure that the classification staff has sufficient access to current information regarding cell availability in each division.**

Finding:

Partial Compliance

Observations:

OPSO automated housing assignment process (HUAP) considers the inmate's custody level, gender, special population status, PREA designations, enemies, and associates versus OJC beds available to recommend an appropriate bed. Housing tags identify inmates on suicide observation, suicide watch, medical, mental health, alcohol/drug detoxification protocol, gang affiliation, special diets, and school participation.

The OPSO daily population report lists the units, cells, and beds offline for maintenance or staffing, as recorded in the AS400. The reliability of the AS400 data for cells/pods offline within the housing module was unavailable. Classification staff rely on maintenance reports from security and maintenance staff. The classification specialists' work area walls displayed the usual collage of messages and notes of damaged and closed cells. The classification specialists could not speak to the accuracy or timeliness of the notices. Notable was the posted housing matrix date – July 13, 2023. (The date of the Monitor's last visit.) Thus, although the OPSO housing matrix is updated daily, the current matrix was not posted in the classification specialists' work areas. The housing matrix changes little day-to-day.  Yet, the process for communicating changes to the housing matrix updates was unclear.

Classification specialists track all pending bed assignments to avoid housing errors due to delays between the inmate's housing assignment and the physical transfer of the individual to the designated pod/cell. These manual lists and notes direct the housing assignments. Overall, during this compliance review period, the classification staff had access to automated and manual information regarding current bed availability throughout OJC, TDC, and TMH.

Progress was noted for the staff's clearance on the NCIC / Louisiana criminal record systems. Eight (8) of the 13 staff have received their NCIC clearance and passwords. NCIC coverage is available on three of the four squads. Thus, most have access to the criminal history records required to complete the custody and PREA assessments. Further, IPC staff



continue to include the NCIC rap sheet generated for the intake process in the inmate's classification folder. Thus, classification specialists who do not have access to the NCIC system can review the hard-copy rap sheets.

***IV. A. 10. d. Continue to update the classification system to include information on each prisoner's history at OPSO.***

Finding:

Non-Compliance

Observations:

As shown in Figure 3, the monthly custodial reports provided by OPSO indicated:

- **Percent Initial Custody Assessments**: During this Compliance Period, the Classification Unit completed initial custody assessments for 92.48% of the inmates booked into OJC. This rate is equivalent to that observed for the previous Compliance Period (91.5%). However, during the latter half of this Compliance Period (July-September 2023), staff completed custody assessments for 93% of the inmates booked into OJC. Tracking these data to determine if it is a trend or seasonal fluctuation will be essential.

- **Percent Within 8 Hours:** During this Compliance Period, the percentage of initial classifications completed within the first eight hours of booking dropped by 10% -- from a high of 91.4% in April to 81.3% during September. Thus, by the end of the Compliance Period, about 11 percent of the detainees remained in the booking area for more than eight hours before being assigned to a bed.





*Figure 3: Rates and Completion Time for Initial Custody Assessments Completed July 2022 – September 2023*

- **Percent Greater Than 24 Hours:** Very few -- only .4 percent -- of the inmates were not classified within 24 hours of booking.  The rate increased slightly during August and September 2023 to .7%. This pattern resembles that observed during the late summer and fall of 2022. When asked about the time from booking to housing, staff attributed the delays to the availability of beds within Roll-in Pods rather than the custody assessment process or staffing. (See Figure 11 for the OPSO ADP population April 2022 – September 2023.)

These data suggested that staff completed an initial classification for ~92%  of the inmates.  Further, 94.6% of the initial classifications were completed within eight (8) hours of the inmates' booking into OJC.  However, there are growing concerns about the lag time between booking, classification, and housing. Observation of the initial classification and housing processes revealed that the classification specialists were frequently stymied by medical clearances or the availability of lower bunks on the Roll-In pods. When asked about reclassifying or transferring inmates who had cleared their detoxification process or COVID-19 restrictions from the Roll-In to general population pods, the classification specialist responded, "I don't know how to do that. I only classify and house inmates from the booking area." This comment suggested that the delays between booking and housing were due, at least in part, to inadequate classification staff training. A review of the length of stay within



the Roll-In Pods indicated that the delays were due to limited space within the general population, non-Roll-In pods.

With the dramatic drop in the number of COVID-19 residents, OPSO has relied on TDC B3-E & W for treatment, quarantine, and isolation beds. These units continue the pattern of "ALL CUSTODY - ALL STATUS" pods that pose significant risks as Low, Medium, and High custody inmates with different PREA designations and special needs live in the same housing units, including dormitories. During this Compliance Period, administrative and security staff reports indicated that for most of the general population pods, all inmates are out of their cells together. Within the special population pods, clusters of cells are let out together.[8] However, the rationale for scheduling or clustering cells for joint out-of-cell times was unclear. Security staff reported exchanging information regarding intra-pod conflicts and tensions. All agreed that shift debriefs, and intelligence sharing are essential for identifying and maintaining inmate separations. However, this knowledge is not routinely exchanged with the Classification Unit except as ad hoc requests for housing transfers. The simple statement, "ZZZZ XXX can't live on this pod." does not provide the classification staff with sufficient information to place the individual in a different housing unit. Thus, the transfer process is repeated again and again, multiplying the workload for the limited classification and escort staff.

Regardless of the staffing patterns, pod mission, and schedules, the sub-standard practice of mixing custody/vulnerable inmates during out-of-cell activities should be discontinued as soon as possible. A straightforward option is to list the custody level and key separation tags on the housing rosters. Further, adherence to the housing assignments by the Classification Unit is critical for maintaining inmate separations and, thus, institutional safety and security.

Previous compliance reports have delineated the dangers of overriding the scored custody levels for housing purposes. As shown in Figure 4, during this Compliance Period -- April - September 2023 -- only 8.6% of custody overrides were for housing purposes. This is a welcomed decrease from the rate of 37.6% observed last year  (April - September 2022).

---

[8] The exception is the PC pod (OJC 2C).  Security staff rely on the ISI to identify clusters of cells to let out together.   Unfortunately, the ISI does not consider intra-pod enemy/ associate separations when identifying out-of-cell separations.  OPSO IT staff is currently revising the ISI to ensure that enemies and associates are assigned to different out-of-cell clusters.





Figure 4: Percent Overrides for Housing Purposes – April 2022 – September 2023

On the other hand, one could argue that the automatic overrides of "Potential Victim/Potential Predators" from Minimum to Medium are another type of housing override. The number of cases overridden due to Potential Victim or Potential Predator status appears to be increasing. As shown in Figure 5, during this Compliance Period – April – September 2023 -- 38.3% of the overrides moved individuals from minimum to medium custody due to their "Potential Predator" status.  Another 29.1% were transferred from minimum to medium custody as they scored as both potential predators and potential victims.  Thus, approximately two-thirds of the overrides (67.4%) were driven by the individual's PREA predation and vulnerability scores.





Figure 5: Percent Overrides due to PREA Status – April 2022 – September 2023

   The April 2022-September 2023 classification stock population reports indicate that staff overrode the scored custody level for ~2.0% percent of the men and 1.0 % of the women. (See Figure 6.) These rates are well below the recommended rate of 5 to 15 percent.[9]  Within this small group of inmates, approximately ~a third are housing-related overrides. Continued tracking of the discretionary overrides for housing purposes remains essential as the Pandemic wanes and the ADP increases.

   On the other hand, the percentage of custody assessments impacted by a mandatory override (OPSO policy restrictions) remains high. OSPO should revisit these restrictions as part of the revalidation of the classification system. However, in the interim, OPSO should consider eliminating the mandatory restrictors at reclassification that require medium custody for all open felony detainers or open felony charges. This change would base the custody level on the individual's behaviors rather than legal status.



Figure 6: Mandatory and Discretionary Override Rates by Gender: April 2022 – September 2023

   As part of the Compliance Report #14 review, we observed housing overrides for "inmate refusal of enemies" to facilitate the housing decisions.  Staff dismissed inmate-to-inmate conflicts to expedite transfer requests from one pod to another. In response to the Monitors' and Plaintiff attorneys' questions, OPSO revised its Inmate Classification

[9] Austin, James and Patricia L. Hardyman. 2004. *Objective Prison Classification: A Guide For Correctional Agencies.* Washington, D.C.: National Institute of Corrections.



Procedures (#7020) to include rules for resolving an "Inmate Refusal of Enemy." These Procedures require detailed documentation of the reviews and quarterly audits to ensure the separation review process works as intended and to make recommendations for adjustments as needed. The Classification Manager updated the "Separation Review Checklist" (3-10-2022) to record the "enemy refusal" evaluations.[10]  OPSO developed screens and reports in the AS400 to document and track the separation reviews as per the Inmate Classification Procedures (#7020). In March 2022, the classification staff were instructed on the new procedures, screens, and interview form.

OPSO staff created automated screens within the AS400 to track and document enemy and associate separations reviews. Despite the efforts to develop a systematic process to review and verify inmate enemy and associate separations, OPSO continues to disregard its' policies and documentation standards. During this Compliance Period, 44 enemy separations were recorded in the AS 400. This number is four times the number (11) recorded during the previous Review Period.   None of the reviews met the OPSO Inmate Classification Procedures standards for assessing and documenting the separations' validity. For example, a separation checklist was not completed for any of the 44 removals. Instead, the inmate "interviews" were recorded via a body camera. These interviews were quite troubling for several reasons:

1)  The interviews were not private -- Some occurred at the cell front and/or with other inmate(s) present.

2)  The interviewer did not attempt to learn the source or validity of the conflict between the inmates. Most of the interviews were garbled and lasted less than one minute.

3)  Institutional records and video were not available for all inmates impacted by the "enemy" removals.

4)  Classification staff did not check, as per OPSO policy, the disciplinary history of the "enemies" to ensure that the individuals were not mutual combatants or victims of predatory or aggressive incidents within the last 36 months.

Further, it was unclear who or what initiated the separation reviews – the inmates, grievances, security staff, or another source. Other blatant policy violations included failure

---

[10] The Classification Unit staff indicated that the earlier versions of the checklist were "too long."



to seek input from mental health and security staff, failure to review the inmates' disciplinary and institutional histories, and failure to interview all inmates named in the separation privately. Upon receiving an email, the classification staff simply removed the "enemy" separations from their JMS profiles and moved the inmates to the specified locations. The "videos" were not stored or cataloged for easy retrieval and review. For example, several days were required to locate some of the videos; others were never found. The idea of recording the interviews has merit. However, a one-minute video by someone untrained in classification does not replace all the other elements of the policy.

OPSO has questioned the value of identifying inmates who have engaged in a fight, assault, or disorderly conduct/riot against another inmate or staff member as "enemies" or even associates.[11] Sound correctional practice would argue that while the inmates may not dislike or have a conflict with each other, their documented willingness to join or cooperate to attack another inmate or staff or to disrupt the pod indicates they should not be housed together. Further, the dramatic increase in the number of "enemy removals" suggests that inmates and staff use the process to manipulate housing assignments.

The Classification Monitor List (List) is an ad hoc report identifying inmates for whom a custody review is due. Custody reassessment reasons include a regular 60/90-day reassessment or a status change or event within their jail records, i.e., amended charge(s) or bail amount, disciplinary incident, detainer lodged/lifted, or a new sentence. The number of inmates on the list fluctuates as inmates return from court, move through the booking process, and the like. The goal is for the classification specialist or supervisor to complete all pending custody reviews during his/her shift.

---

[11] Removal of an "associate" is also governed by OPSO Inmate Classification Procedures (#7020).



Figure 7: Pending Custody Assessments – January - September 2023

The number of pending custody assessments vacillates. During 2023, the number of pending initial custody assessments ranged between 0 and 12; the number of pending custody reassessments ranged between 1 and 20. As shown in Figure 7, the average number of pending custody assessments during this Compliance Period was – initial assessments = 4.5 and custody reassessments = 6.5. However, during September, the number of pending assessments increased slightly. This trend was probably driven by the increase in the average daily population and admissions during July – September.

Following Compliance Report #8, OPSO worked with Wellpath to rebuild the linkages between the medical/mental health records and JMS. These data are essential for scoring seven PREA victimization and predation risk factors. Medical and mental health information is critical for the inmates' housing assignments. Wellpath medical and mental health treatment data are routinely uploaded to the JMS (every five to eight minutes). It appears that the ERMA-AS400 linkages are finally yielding some data on the victimization of individuals on the mental health caseload. As shown in Figure 8, OPSO disciplinary reports indicated that 20 individuals on the mental health caseload were victims of an assault or battery during this Compliance Period. Nine (9) assaults occurred in July. Otherwise, the number of assaults on individuals on the mental health caseload is relatively low, given the number of inmate-on-inmate battery/assaults and the Wellpath mental health caseload. It is important to remember that this number only reflects OPSO disciplinary Code 101 (battery) and Code 102 (assault) disciplinary infractions (not reported incidents) of which the



perpetrator was found guilty.



Figure 8: Victimization of Inmates on the Mental Health Caseload - April 2022 – September 2023

Figure 9 provides the number of attachments to record criminal history data input by the classification staff between April 2021 and September 2023. The classification staff completed fewer than ten attachments/month between November 2022 and June 2023. During July - September 2023, 49, 99, and 72 attachments were input, respectively. This uptick in the number of attachments followed the release of Compliance Report #18. However, the rate of attachments per initial custody assessments completed remains far below the rates observed in 2021 and 2022.



Figure 9: Number of Attachments Input by Classification Staff – April 2021 – September 2023



When asked about the continued low number of attachments, OPSO noted the delay in the NCIC clearances.[12] However, as previously mentioned, IPC staff include the NCIC rap sheets in the intake/booking folders provided to the classification staff. Thus, regardless of whether the staff member has an NCIC login, the rap sheets are available. Observation of the initial classification process revealed that the specialists did not always review the rap sheet and were unfamiliar with the JMS screens for inputting attachments.   The classification specialists simply skipped the critical review of criminal rap sheets for the initial custody assessments.

Thus, it appears that the criminal history data required to score four of the custody factors, three of the vulnerability factors, and four of the predation are compromised by the failure to 1) ensure all staff had access to the NCIC criminal history system; 2) check the booking folders for the rap sheet; 3) train on the importance and process for inputting attachments in the JMS; 4) track and follow-up assessments with missing rap sheets; and 5) audit the accuracy of the custody and PREA assessments. Also, disconcerting was the failure to identify and address the problem.  Merely lamenting that the NCIC certification process is "slow" is insufficient.



Figure 10: Percentage of Initial Custody Assessments for which an attachment was created between April 2021 and September 2023

---

[12] Five of the 13 Unit staff members have not been cleared to access the NCIC / Louisiana criminal record systems.   Seventy percent (70%) of the attachments were input by one classification specialist. Three specialists only put in one or two during the six-month period.



The final point of concern for Section d centers on the placement and review of inmates assigned to administrative segregation or protective custody placements. (OPSO does not utilize administrative segregation/restriction housing for the male inmates; however, during this Compliance Period, two females were assigned to administrative segregation.) OPSO continues to disregard its protective custody and administrative segregation policies and documentation standards.

OPSO has created folders on the shared drive to organize and document protective custody (PC) and restrictive housing decisions. For most of the PC inmates, the documentation of the initial placement decisions was missing.  Further, for many, the periodic reports to track the continuation or waive the status were missing or incomplete. To better understand the review process, the Classification Monitor observed OJC videos of the "PC hearings." These interviews were quite troubling for several reasons:

1) The interviews were not private -- Some occurred at the cell front and/or with other inmate(s) present or milling about.

2) Not all members of the multi-disciplinary board met with each individual.

3) The videos did not document the participants, topics discussed, or activities (waiver, behavior modification plan, etc.).

In sum, while the Classification Unit has eliminated the backlog of custody reassessments, this section is rated as "Non-Compliance" due to the continued failure to review the criminal history rap sheets, address the risks posed by the enemy separation reviews, and failure to comply with OPSO protective custody and administrative segregation policies.

***IV.A.10.e. Continue competency-based training and access to all supervisors on the full capabilities of the OPSO classification and prisoner tracking system.***

Finding:

Non-Compliance

Observations:

Two classification specialists joined the Unit during this Compliance Period. Their classification-specific training was limited to a self-directed review of the objective classification PowerPoint developed by the Classification Monitor for the March 2023 training. They received electronic copies of the OPSO classification and PREA handbooks, the "NCIC Step-By-Step," and the "Initial Classification Assessments – Start to Finish"



instructions. The only written documentation of the training was the pre- and post-competency tests for one specialist.  As each classification platoon includes two classification specialists and a supervisor, new specialists are paired with another specialist, and the supervisor is close at hand for questions and guidance. This section is rated non-compliant due to the lack of documentation, competency testing, and the absence of hands-on instruction. Further, during this monitoring period, there was no documentation of remedial training for staff who erred or required instruction on specific topics identified by the internal audit process.

***IV.A.10.f. Conduct internal and external review and validation of the classification and prisoner tracking system on at least an annual basis.***

<u>Finding:</u>

Noncompliance

<u>Observations:</u>

Compliance for this section focused on three types of audits: Housing (checking the veracity of the inmate housing assignments; internal (checking the accuracy of the custody, PREA, and housing designations), and statistical validation of the OPSO objective classification system. During this Compliance Period, housing and internal audits were completed for some, but not all, months. There was no activity on the statistical validation of the system. Therefore, Section f is rated as non-compliant.

**Housing Audits – Checking the Veracity of the Inmate Housing Assignments**

The Classification Unit supervisors conducted monthly housing audits for most, but certainly not all, housing units/month. Missing were audits for April -- OJC Tier 4, TDC/TMH; May -- TDC/TMH; July OJC Tiers 1 and 2; September -- TDC/TMH. Further, the Tier 4 dorms were not audited because the "Majority of bunk numbers have faded. Inmates go to any available bunk." When pressed about re-stenciling the bed numbers, the Classification Unit merely deferred to maintenance. However, the Classification Unit, not the maintenance staff, initially labeled the beds.  Thus, the Classification Unit staff will assume responsibility for relabeling the beds or work closely with the Maintenance staff to complete the project.

The Compliance/Classification staff organized and posted the housing audit reports on the shared drive <u>prior to</u> the onsite review. These audit reports indicated that most inmates were housed in the cells and beds as per the transfer order prepared by the



Classification Unit. Errors noted during the audits were addressed immediately. There were some inconsistencies in the audit reports, e.g., missing housing rosters and corrective action plans. A key question was whether the auditors actually checked the cell and bed assignments. To verify the audit process, housing audits completed by each of the audits were randomly selected and then viewed via the OJC camera system. The video suggested that the audits were not always completed as reported. For example, for two of the audits, the auditor did not enter the pod. The auditor and the pod deputy simply reviewed their housing rosters.

**Internal Audits – Checking the Accuracy of the Custody and PREA Assessments**

The Classification Manager is responsible for assessing the accuracy of a random sample of at least ten custody/PREA assessments each month. The Classification Manager restarted the internal audit process in June. Internal audits were conducted for July – September 2023. Relatively few errors were detected.  However, multiple instances of the same mistake by a couple of the staff members suggested a pattern of sloppy or lazy assessments. No training to assess these behaviors was documented.

**Revalidation of the Classification System – Assessing the Validity of the System**

Lovins and Latessa submitted their validation report on the OPSO classification system on April 30, 2018.[13] This validation study documented the requirement for "external review and validation of the classification and prisoner tracking system on at least an annual basis" for 2014 – 2017. Statistical validation of an objective classification system must be completed every three to five years to ensure the integrity of the classification system and that the risk factors and custody scales are still appropriate for the current inmate population.[14] Revalidation of the System was due in 2021 per a previous agreement for statistical validation every three years. OPSO still has not contracted to revalidate the classification system despite a noncompliance rating for this provision for Reports #16-#18. There was no movement on this element of the Consent Judgement during this Compliance Period. Again, revalidation of the classification system was not prioritized.

---

[13] Lovins, Brian K. and Edward Latessa (April 30, 2018). "Revalidation of the Orleans Parish Classification System." Cincinnati, Ohio: University of Cincinnati Corrections Institute.
[14] Hardyman, Patricia L. and James Austin (2021) "Objective Prison Classification: A Guide for Correctional Agencies." 2nd Edition.  Washington, D.C.: National Institute of Corrections. p. 17.



*A.10.g. Provide the Monitor a periodic report on classification at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date and every six months, thereafter, until termination of this Agreement. Each report will include the following information:*

    *(1) number of prisoner-on-prisoner assaults;*
    *(2) number of assaults against prisoners with mental illness;*
    *(3) number of prisoners who report having gang affiliations;*
    *(4) most serious offense leading to incarceration;*
    *(5) number of prisoners classified in each security level;*
    *(6) number of prisoners placed in protective custody; and*
    *(7) number of misconduct complaints.*

<u>Finding:</u>

Substantial Compliance

<u>Observations:</u>

Daily population reports are received daily, indicating the number of inmates by location – OJC, TDC, TMH, and out-of-parish. In addition, as required under Section g, monthly custodial statistical reports regarding the custody assessments by type, gender, population, gang affiliation, discipline, and housing were provided for the Compliance Review. These reports track the timeliness of the initial custody assessments, the custody distributions, cases due for a custody assessment, the prevalence of special populations, and the rates and types of disciplinary infractions. (Data on the "*most serious offense leading to incarceration" was not provided*.) Disciplinary data as to the number of "*assaults against prisoners with mental illness"* suggest relatively few individuals on the mental health caseload are victims of assault or battery. However, as it is based on disciplinary data as opposed to actual incident report, its accuracy is questionable.

For this Compliance Period, OPSO reported only four active inmates as "gang" members or associates. The initial classification interview includes a question about the individual's "gang" membership or affiliation. Staff indicated that inmates rarely reveal their alliances. In the past, the Classification Unit has relied primarily on information from the District Attorney's Office to identify gang-related inmates. The IPC Major indicated that OPSO no longer received information regarding gang affiliations or prosecutions from the District Attorney and recommended checking with the OPSO ISB Unit. This conversation was interesting, although circular. The ISB agent indicated that they track "gang" behaviors within OJC but quickly pointed out that Orleans Parish "gangs" were better described as dynamic neighborhood/ward-based cliques. The ISB agent reported that they exchanged



information with the NOPD. Yet, he was reluctant to share these data with the Classification Unit because, again, Orleans Parish "gangs" are dynamic neighborhood/ward-based cliques.

On the other hand, OJC security staff interview inmates regarding "ward/ neighborhood-based cliques" and who can live with whom. In sum, it appears that ISB collects and shares information with NOPD, and security staff requests housing assignments based on neighborhood associations. Yet, neither ISB nor security staff share intelligence with the Classification Unit or input the information into the AS400. Thus, the classification staff makes multiple housing transfers in response to emails indicating "this individual cannot live on this pod." To maintain Substantial Compliance with Section g, OPSO must create a systematic process for collecting information on active "gang/cliques," sharing this intelligence across its various divisions, <u>and</u> inputting these data into a standardized report available to the Compliance Unit.

Figures 11 and 12 provide the OPSO monthly disciplinary data recorded in the JMS. To account for short-term variations and seasonal trends, we reviewed 15 months of disciplinary data. As shown in Figure 11, the rate of disciplinary reports has fluctuated over the last 15 months.  However, the average rate/number of inmates written up for an institutional infraction(s) during this Compliance Period was comparable to that observed for the previous Period.  For April – September 2023, on average, 23.1% of the inmates received a disciplinary report; 16.6% were found guilty of an infraction.   During the previous Compliance Period - October 2022 – March 2023, on average, 22.4% of the ADP was written up for a disciplinary infraction; 17.1% were found guilty of an infraction.





Figure 11: Rate of Disciplinary Infractions for the OPSO ADP – April 2022 – September 2023

Figure 12 illustrates the OPSO ADP (Average Daily Population) versus the number of disciplinary reports per month for April 2022 - September 2023. As the ADP increased steadily during the last 15 months, so has the number of disciplinary reports. As shown in Figure 11, during the last 15 months, the OPSO ADP rose by 35.3% -- from 931 in April 2022 to 1,260 by September 2023. It appears that the rate of disciplinary reports per month is increasing faster than the increase in the ADP.  In June 2022, OPSO staff wrote 217 disciplinary reports; in September 2023, 309 reports were written. This represents a 42.4% increase. (As previously noted, the disciplinary data were not input into the JMS for the latter part of April and May 2022. Therefore, the rate was based on the June rather than the April or May disciplinary data.)



Figure 12: OPSO ADP vs. Number of Disciplinary Reports: April 2022 - September 2023

Figure 13 illustrates the breakdown of the disciplinary infractions by type during this Compliance Period. (These data reflect the most severe violation of which the inmate was found guilty per report.) During this Compliance Period, the numbers of recorded predatory (e.g., assaults or battery) ranged between 58 (April and May) and 73 (September), and aggressive infractions ranged between 37 (April) and 88 (August) per month. For this Compliance Period, the average numbers of predatory and aggressive infractions were 63.0 and 59.8/month,



respectively. This computes to an average of four assaults/fights per day (63.0 + 59.8 = 122.8/30 = 4.09/day).



Figure 13: Most Serious Disciplinary Infraction/Report with Finding of Guilty: January 2022 – September 2023

As observed during the previous Compliance Period, management problems and disruptive infractions continue to decrease while predatory and aggressive violations increase.  Thus, Figures 11 and 12 illustrate while the level of facility disruption has decreased, troubling is the dramatic increase in the level of violence, as indicated by assaults and fights within the facilities (OJC, TDC, and TMH).

***IV.A.10.h. OPSO shall review the periodic data report and make recommendations regarding proper placement consistent with this Agreement or other necessary changes in policy based on this review. The review and recommendations will be documented and provided to the Monitor.***

Finding:

Substantial Compliance

Observations:

The Monitor receives the daily "Active Inmates by Location reports and has access to the ad hoc Classification Monitor lists and various classification statistical reports. During this Compliance Period, there were multiple updates to the OPSO Housing Matrix. As of January 2023, the Classification staff provided the matrices daily.   While OPSO has been slow to address concerns regarding the housing matrix and to move forward on the recommended population management strategies, the Classification Manager promptly responds to questions or issues raised throughout the Compliance Period.



There are significant concerns about the quality of the documentation of the staff training, protective custody reviews, and enemy/associate decisions, as well as the commitment to revalidation of the classification system. These concerns were raised under Sections d and f, respectively.

### IV. A. 11.        Prisoner Grievance Process

*A. 11. a. OPSO shall ensure that prisoners have a mechanism to express their grievances, resolve disputes, and ensure that concerns regarding their constitutional rights are addressed. OPSO shall, at a minimum, do the following:*

> *(1) Continue to maintain policies and procedures to ensure that prisoners have access to an adequate grievance process and to ensure that grievances may be reported and filed confidentially, without requiring the intervention of a correctional officer. The policies and procedures should be applicable and standardized across all the Facility divisions.*
> *(2) Ensure that each grievance receives appropriate follow-up, including providing a timely written response and tracking implementation of resolutions.*
> *(3) Ensure that grievance forms are available on all units and are available in Spanish and Vietnamese and that there is adequate opportunity for illiterate prisoners and prisoners who have physical or cognitive disabilities or language barriers to access the grievance system.*
> *(4) Separate the process of "requests to staff" from the grievance process and prioritize grievances that raise issues regarding prisoner safety or health.*
> *(5) Ensure that prisoner grievances are screened for allegations of staff misconduct and, if an incident or allegation warrants per this Agreement, that it is referred for investigation.*
> *(6) A member of the management staff shall review the grievance tracking system quarterly to identify areas of concerns. These reviews and any recommendations will be documented and provided to the Monitor.*

Findings:

A. 11. a. (1)  Partial Compliance

A. 11. a. (2)  Partial Compliance

A. 11. a. (3)  Partial Compliance

A. 11. a. (4)  Substantial Compliance

A. 11. a. (5)  Substantial Compliance

A. 11. a. (6)  Partial Compliance

Until the September 2019 report, one rating was given for the entire section for the Prisoner Grievance Process. In order to highlight which provisions are in substantial compliance versus those which fall short, the decision was made to rate each provision separately.

This review covered April 2023 through September 2023. For this review, the Monitor interviewed the Grievance Lieutenant, and security staff and inmates while inspecting the housing units. Reports and data submitted by OPSO covering the rating period



were also reviewed.

As noted during the previous inspection, a review of the documentation demonstrated that all inmate submissions continue to be reviewed by Grievance staff, categorized into requests and grievances, and forwarded to the appropriate staff for response. Statistical information was provided on all categories. Both requests and grievances continue to be sorted by type. Specific grievances related to inmate safety, medical issues, PREA, etc., are documented to reflect the date received, inmate information, type of grievance, time of notification made to the appropriate staff member, and the staff member making the notification. For the analysis, the Monitor created three charts and added simple linear trendline overlays to each grievance category listed. A fourth chart was added to graphically represent the number of grievances overall relative to the inmate population.

Grievance staff once again provided detailed documentation as to their separate handling of the April 2023 through September 2023 inmate requests, grievances, and complaints related to inmate safety or health.

As reported by the OPSO Grievance staff, the monthly average of 182 grievances for the Report #17 rating period to 131 for Report #18 and 100 for Report #19 reflects a significant downward trend in the overall grievance numbers. It is unclear whether this is a positive development due to the difficulty in filing grievances due to the nonworking kiosks. The Monitor will continue to observe the grievance trends reported by OPSO.

Chart 1 continues to reflect trends in the listed grievance categories beginning January 2022 and covering Reports 17 through 19. The "OJC Facility Grievable Miscellaneous" category, while still carrying the highest monthly totals on average, showed the greatest downward trend drawing essentially even with Medical grievances. Grievances in this category were assigned to the Unit Managers and Major of Security for resolution. This is a catch-all category for grievances that do not fit the other categories listed. This decline may be due to improved response by staff or a refinement in the categorization methods though the Monitor could not identify the root cause with the given data. With the exception of Sanitation, which continues to increase, the remainder of the categories were stable or declining slightly to include Medical, Mental Health and Maintenance grievances despite the increased inmate population noted during this rating period. Grievance staff once



again provided detailed documentation as to their separate handling of the April 2022 through September 2023 inmate requests, grievances, and complaints related to inmate safety or health.

**Chart 1**



With Chart2, the Monitor cautions drawing any particular conclusions from the displayed trends and attributes any swings to the relatively small number of grievances in a given month for each category (less than 10 total). With the exception of the "Life Threatening" category, the trend data reflected stable or slightly declining numbers through the rating period and remained consistent. The "Life Threatening" category's trend line shows to be slightly declining from January 2022 through September 2023. However, during the rating period, the month-to-month numbers more than doubled from April 2023 to August 2023. Due to the low overall number of these grievances, the Monitor recommends OPSO staff review the individual circumstances of each case to determine whether commonalities exist, particularly during shorter periods of increasing grievances, and whether the circumstances can be addressed more effectively.



**Chart 2**



Chart 3 represents several categories, primarily inmate services and property/fund accounts. The extended analysis reflects an overall decrease in grievances related to law library services which had previously been on the rise. Inmate property and commissary grievances continued to increase through the rating period. It is the Monitor's opinion that the substantial rising trend in commissary grievances is directly related to the lack of functioning kiosks forcing inmates to order via a phone ordering system as well as order discrepancies and inmate fund complaints. The Monitor is hopeful OPSO will be able to reverse this trend with the selection of a new inmate commissary contractor, new equipment, and new services. Again, the Monitor cautions against drawing any conclusions as to long-term trends due to the relatively small number of grievances in each category overall (less than 14).



**Chart 3**



The Monitor also reviewed the "Overdue Grievance Reports" for the rating period. The reports are created weekly for supervisory review and tracking. For the purposes of the report, the Monitor only included the data from the first week of each month. Chart 4 reflects the data for each category: "Green" (2-4 days overdue), "Yellow" (5-9 days overdue) and "Red" (10+ days overdue), which represents overdue responses to inmates. In Report #18, the linear trendline showed a significant upward trend in the Red category. Based on the data provided for this rating period, OPSO staff appear to have made a concerted effort to address this issue. The total number of "Red" overdue responses was 1800 in March 2023. OPSO was able to reduce this number some 87% to 227 overdue responses as of the first week of September 2023, a significant accomplishment. Based on this data, the Monitor is raising the assessment from Non-Compliance to Partial Compliance for sections IV.A.11.a. (2). The Monitor commends this effort and expects to see further progress during the next rating period. The Yellow and Green categories remained relatively stable.



Chart 4



OVERDUE GRIEVANCE REPORTS BY MONTH

| | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2-4 Days | 87 | 41 | 164 | 67 | 100 | 89 | 153 | 181 | 98 | 167 | 132 | 106 | 114 | 76 | 65 | 54 | 93 | 118 | | |
| 5-9 Days | 25 | 37 | 102 | 87 | 93 | 91 | 107 | 123 | 113 | 116 | 77 | 109 | 252 | 120 | 118 | 31 | 80 | 81 | | |
| 10+ Days | 16 | 24 | 103 | 160 | 186 | 106 | 148 | 363 | 641 | 872 | 1013 | 1355 | 1803 | 1757 | 965 | 406 | 558 | 227 | | |

As noted during the last several inspections, inmates have access to the grievance process via the few workable electronic kiosks located in the housing units throughout OJC and TDC and more commonly through a traditional paper grievance system utilized as a "back-up" system due to the large number of non-functioning kiosks. As of the last day of the reporting period, OPSO Grievance staff reported that the majority of the kiosks were permanently non-working, essentially making the routine electronic submission of grievances by inmates next to impossible for the majority of the inmates. The Monitor was advised during the inspection that a new commissary vendor was being selected and would be providing new kiosk equipment to resolve the problem.

The Grievance staff again reported that every housing unit continues to be visited seven days per week with a "walk by" of every cell to collect paper grievances to ensure that problems with the kiosks do not interfere with an inmate's ability to submit grievances. The Monitor received fewer complaints regarding the paper grievance process during this inspection than previously.

The Monitor again reviewed the paper grievances tracking documentation and noted that all such grievances continue to be entered into the electronic system by Grievance staff



upon receipt. Paper responses are provided to inmates in units that do not have a functioning kiosk. The Monitor recommends Maintenance staff immediately address the security of the grievance receptacles in the housing units. As noted in previous reports, several receptacles were found to be unsecured, damaged, or missing locks entirely. This jeopardizes the confidentiality of the paper grievance system. Furthermore, while interviewing Grievance staff, the Monitor questioned how civilian Grievance staff retrieved and distributed paper grievances in housing units when no security staff were present. The Monitor was advised that Grievance staff would "skip" that unit(s) until the next round. (Staff visit the units twice daily (morning and afternoon). Given the staffing issues currently faced by OPSO, the Monitor is not confident that certain housing units are not being bypassed entirely on a given day if security staff are unavailable for escort.

As with the previous reports, it remains the Monitor's opinion that with secure receptacles and security staff supporting the policy and effort in this regard, the manual work-around is acceptable under the language of the Consent Judgment requiring the inmates have access to a meaningful and confidential grievance process. However, given the chronic issues with staffing. staff escorts, and grievance receptacles, the rating of Section IV. A. 11. a. (1) to remains in Partial-Compliance. Also, Section IV. A. 11. A. (3). is reduced to Partial-Compliance as the Monitor cannot be reasonably assured that inmates have grievance forms available in English, Spanish, and Vietnamese, and that illiterate or disabled inmates are receiving routine assistance given security staff's inability to provide consistent escorts to Grievance staff.

Grievance staff continue to do an excellent job tracking grievances and requests and reporting as to the timeliness and quality of the responses to address the inmates' issues. Documentation continues to reflect that Grievance staff maintain by name and housing a listing of all OPSO inmates identified as needing Grievance staff assistance to access the grievance system due to either a language barrier or illiteracy. As with the previous inspection, the Monitor received no information or verbal complaints from inmates in this regard.

The Monitor reviewed detailed documentation provided by Grievance staff for the rating period regarding the screening of grievances for staff misconduct. The documentation demonstrated that all inmate submissions are reviewed by Grievance staff and those



regarding staff misconduct are separately documented for appropriate referral to the administrative level for follow-up. Grievance staff processed a total of 25 such staff misconduct related grievances during this rating period, up slightly from 22 for the previous rating period and the 92 noted in Report #17. While the 75% decrease from Report #16 to Report #19 is encouraging, the Monitor recognizes that a certain number of staff misconduct complaints (founded and unfounded) will always present themselves due to the nature of the environment. So, while "zero complaints" is a laudable goal, the Monitor is not assessing the rise or fall of the number itself but the implementation and oversight of the process.

Grievances regarding staff misconduct are particularly susceptible to interception by staff accused of misconduct due to the reliance on paper grievances. Of note, the Grievance staff continue to keep track of disposition information provided to the inmate on a spreadsheet titled "Warden – disposition". A review of the disposition notes in this report shows a reduction in the number of non-substantive responses (i.e., "We will look into the matter.") since the last report and improved explanations as to what staff are actually doing to address the inmate's grievance if founded. The use of "mediation" referrals appears to have stopped as well. The Monitor continues to recommend executive oversight of this process, but the Monitor views the changes as an encouraging response by OPSO in this regard.

Grievance staff continue to separately document grievances that require specific referral to IAD, ISB, PREA, or FIT staff for review and investigation. Detailed information along with the date assigned and disposition is maintained as well as email transmission receipts. Grievances referred to IAD declined to 6 from 11 the previous rating period. Grievances referred to ISB decreased substantially from 37 to 21 for the current rating period.

The rating for IV.A.11.a.(4) remains in substantial compliance. The documentation provided by OPSO Grievance staff indicates that "requests to staff" are routinely separated from true grievances regarding prisoner safety or health and are separately reported and tracked.

The rating for IV.A.11.a.(5) remains in substantial compliance. The documentation provided by OPSO indicates that OPSO Grievance staff routinely screens inmate grievances for allegations of staff misconduct, appropriately reports suspected instances of staff



misconduct and verifies the receipt of the notifications.

The Monitor reviewed the 2023 Second and Third quarters data analysis of the grievance reports presented by Grievance staff for executive review. No documentation regarding any specific discussion by executive staff of the grievance documentation and reporting was noted. Without such documentation, the rating for IV. A. 11. a. (6) continues to be Partial Compliance.

## IV. A. 12.  Sexual Abuse

*A. 12. OPSO will develop and implement policies, protocols, trainings, and audits, consistent with the requirements of the Prison Rape Elimination Act of 2003, 42 U.S.C. § 15601, et seq., and its implementation of regulations, including but not limited to, preventing, detecting, reporting, investigating, and collecting sexual abuse data, including prisoner-on-prisoner and staff-on-prisoner sexual abuse, sexual harassment, and sexual touching.*

Finding:

A. 12. Partial Compliance

Observations:

OPSO successfully completed its PREA audit in 2019. Passing a PREA audit that is now four years old is not considered as conclusory evidence of compliance. Proof of training and policies were provided, but the review of the policies has not been completed due to inaction by OPSO leadership. Documentation regarding PREA investigations was provided. No proof as to implementing the other requirements of PREA including education of inmates was provided. This provision remains in partial compliance, but significant progress has been made due to the efforts of the PREA Coordinator.

## IV. A. 13.      Access to Information

*A. 13. OPSO will ensure that all newly admitted prisoners receive information, through an inmate handbook and, at the discretion of the Jail, an orientation video, regarding the following topics: understanding Facility disciplinary process and rules and regulations; reporting misconduct; reporting sexual abuse or assault; accessing medical and mental health care; emergency procedures; and sending and receiving mail; understanding the visitation process; and accessing the grievance process.*

Finding:

A.13.  Non-Compliance

Observations:

No materials were provided indicating the requirements of this paragraph have been met other than a memo stating each inmate there was an inmate handbook in each housing unit. That was found not to be accurate. In the past, the Monitors observed a few handbooks in the housing units, but they were not observed this compliance period and many inmates



stated they did not have access to a handbook. Previously, the inmate handbook was available on the kiosk. However, very few of those kiosks are in working order. This provision now been found to be in Non-Compliance.

## IV. B. Mental Health Care

***B. OPSO shall ensure constitutionally adequate intake, assessment, treatment, and monitoring of prisoners' mental health needs, including but not limited to, protecting the safety of and giving priority access to prisoners at risk for self-injurious behavior or suicide. OPSO shall assess, on an annual basis or more frequent basis, whether the mental health services at OPP comply with the Constitution. In order to provide mental health services to prisoners, OPSP, at a minimum shall:***

<u>Findings:</u>

B. 1. a. Partial Compliance

B. 1. b. Substantial Compliance

B. 1. c.  Substantial Compliance

B. 1. d. Substantial Compliance

B. 1. e. Partial Compliance

B. 1. f.  Partial Compliance

B. 1. g. Substantial Compliance

B. 1. h. Partial Compliance

B. 1. i.  Partial Compliance

B. 1. j.  Partial Compliance

B. 1. k. Partial Compliance

B. 1. l.  Substantial Compliance

***B.1.a. Develop and maintain comprehensive policies and procedures for appropriate screening and assessment of prisoners with mental illness. These policies should include definitions of emergent, urgent, and routine mental health needs, as well as timeframes for the provision of services for each category of mental health needs.***
Finding:

Partial Compliance

While Wellpath continues to utilize the screening and assessment forms for intakes, there needs to be attention given to ensure appropriate referrals are made from intake. Inmate AT (2522546) experienced delays in receiving psychotropic medication after intake although he reported mental health diagnoses on admission. This demonstrates a procedural issue which needs attention to ensure inmates who need medication receive them in a timelier manner.

***B.1.b. Develop and implement an appropriate screening instrument that identifies mental health needs,***



*and ensures timely access to a mental health professional when presenting symptoms require such care. The screening instrument should include the factors described in Appendix B. The screening instrument will be validated by a qualified professional approved by the Monitor within 180 days of the Effective Date and every 12 months thereafter, if necessary.*

Finding: See B.1.a.

Substantial Compliance

*B.1.c. Ensure that all prisoners are screened by Qualified Medical Staff upon arrival at OPP, but no later than within eight hours, to identify a prisoner's risk for suicide or self-injurious behavior. No prisoner shall be held in isolation prior to an evaluation by medical staff.*

Finding: See B.1.a.

Substantial Compliance

Suggestion: While Wellpath remains in substantial compliance with this provision, there needs to be continued attention and training done to ensure there is an adequate response to the information received at intake to ensure harm is mitigated. If risks are not mitigated, the result does not constitute constitutionally adequate care. There were a number of cases which fell outside the required screening time – April 2023 had 1, May 2023 had 11, June 2023 had 8, July 2023 had 3, August 2023 had 12 and September 2023 had 29. While the percentage of screenings which were completed within 8 hours remains above 95%, which remains above the overall threshold of 90% which is used by this Monitor to rate this provision in substantial compliance, it is imperative to understand what factors are contributing to the extended wait times for these inmates. A suggested study is to look at the smaller percentage of inmates who waited longer than 8 hours, one inmate waited 42.92 hours in May 2023 for an intake, to determine whether there are any factors under the control of Wellpath which could alleviate the extended wait times, even for one inmate.

*B.1.d. Implement a triage policy that utilizes the screening and assessment procedures to ensure that prisoners with emergent and urgent mental health needs are prioritized for services.*

Finding: See B.1.a. and B.1.c. Suggestion

Partial Compliance

Suggestion: As per Wellpath's current policy, inmates are to be seen immediately for an emergent referral, within 24 hours for an urgent referral and within 7 days for a routine referral. CQI analysis of this procedure shows Wellpath is out of compliance for the reporting period in question. Wellpath used more stringent criteria than from Wellpath's previous policy to monitor compliance and the CQI data shows that it was not in substantial compliance with this provision.  In BOX, the documentation hub for all supporting



documents for the period under review, only May was captured and showed 80% compliance for routine referrals, 40% for urgent referrals and 60% compliance for emergent referrals. The goal should be 100% compliance (substantial compliance would be at least 90%) with the timeframes outlined in the policy for inmates to be seen for emergent and urgent and routine needs. Any deviance from the timeframe requires clear and timely documentation. Beginning in July 2023, Wellpath has started using the current policy time frames to address this provision and hopes to return to substantial compliance in the next marking period.   Recommendation to ensure that triage from intake is adequate – look at a random sample of routine referrals from triage for each month during the next review period and see how many have had an incident or need for a more urgent/emergent intervention within the 14 days while they are awaiting a mental health evaluation. This will help establish whether the intake clinicians are adequately assessing mental health needs.

***B.1.e. Develop and implement protocols, commensurate with the level of risk of suicide or self-harm, to ensure that prisoners are protected from identified risks for suicide or self-injurious behavior. The protocols shall also require that a Qualified Mental Health Professional perform a mental health assessment, based on prisoner's risk.***

<u>Finding:</u>

Partial Compliance

For this provision, it is imperative that protocols are implemented with the level of risk of suicide or self-harm for the inmate's protection. It is not sufficient to have developed the protocols without the intentional implementation of them in everyday practice. There continue to be challenges with documentation and actual observation for suicide watch at OJC. First, the deputies are not documenting suicide watch on the required observation forms, especially in the IPC. The observation sheets are blank and/or partially completed by custody staff and therefore calls into question whether inmates are properly observed during this crucial time. Use of the required observation form not only aids in communication between custody staff and mental health, but it also ensures the level of risk is being properly addressed. Four (4) inmate records (2525000, no number on two of the sheets, 2524195) were reviewed who were assigned to OJC security for suicide watch during the reporting period. The documents were not properly completed. While the deputies are trained in completing the document, there appears to be some reservation in attending to this task. Second, the QMHPs assigned to suicide watch are not accurately reporting their



check in times on the observation/restraint checklist and worksheet. The Monitor watched a video for overnight observation on September 21, 2023. All three individuals, MHT/Deputy/CMT assigned to 2A/2B slept in large chunks throughout the night in the bubble. The Monitor reviewed the MHT observation/restraint checklist & worksheet for that time and although sleeping, the MHT documented Q15 minute checks throughout the night. This falsifying of documentation was not an isolated occurrence during the period of review. The Monitor watched at least 4 other shifts during the reporting period and uncovered discrepancies in accurate reporting. It cannot be stressed enough how important this work is in ensuring the safety of the inmates present at OJC. The provider runs the risk of this provision being downgraded to non-compliance, in the next reporting period, if this trend of falsifying documentation continues as this is a grave concern and increases the substantial risk of harm to the patient. It is also expected that custody staff will be educated as to the importance of utilizing the documentation required in policy for suicide watches and for the administration to ensure they are being used.

Adequate searches by deputies and appropriately securing inmates are vital in ensuring inmates are protected from suicide and self-harm. This is not being done at a level commensurate with the level of risk. The following data may be from 2022 rather than 2023. Unfortunately, data from 2023 could not be located. Based on the discussion at the site visit in December 2023, there did not appear to have been any significant improvements in the searches conducted by custody staff in 2023.  In April and May 2023, only 53% of patients were searched during a Code White. In June 2023 and July 2023, the code white log was not accurately completed, there were numerous blank spaces where data was not entered so the picture during these months was not accurate. For the ones completed in July 2023, 56% of patients were searched. In August 2023, 27% of patients were searched and in September 2023, 42% of patients were searched. These numbers were similar for patients being secured to help prevent self-harm. For the month of August 2023, 20% of patients were secured during a code white. In September 2023, 55% of patients were secured. In May 2023, 40% of patients were secured. The other months had large gaps in data entry therefore accurate numbers could not be generated.

<u>Suggestion:</u> Continue to monitor and encourage use of the correct observation form for suicide watch by deputies. The Mental Health Monitor expects consistency in suicide



watches which will include all observers utilizing the same documentation for watches. Ensure there is no use of physical restraints for inmates on suicide watch in IPC or TMH and document any instance where this occurs. Document de-escalation procedures by Wellpath and deputies and challenges with implementation. Adequate cell searches and body searches and properly securing inmates are necessary to protect inmates from the risk of self-injurious behavior. The Monitor recommends more frequent spot checks of QMHPs who are conducting watches and enforcing corrective actions as deemed necessary. ***Please note you will see this recommendation throughout this report*** – The Monitor also recommends a member of the Wellpath administrative team have direct access to the video monitoring system of the facility in order to conduct these checks and others necessary to comply with the expectations of many of the provisions. Finally, consider eight-hour shifts for MHTs rather than twelve hours and/or implementing mandatory periodic movement of individual MHTs throughout the shift to minimize boredom, sleeping and falsification of documentation.

*B.1.f. For prisoners with emergent or urgent mental health needs, search the prisoner and monitor with constant supervision until the prisoner is transferred to a Qualified Mental Health Professional for assessment.*

Finding:

Partial Compliance

See B.1.e. There are fluctuations in the percentage of adequate searches of inmates with emergent or urgent mental health needs. As stated in B.1.e. In April and May 2023, only 53% of patients were searched during a Code White. In June 2023 and July 2023, the code white log was not accurately completed, there were numerous blank spaces where data was not entered so the picture during these months was not accurate. For the ones completed in July 2023, 56% of patients were searched. In August 2023, 27% of patients were adequately searched and in September 2023, 42% of patients were adequately searched. Substantial compliance requires that 100% of inmates are searched who present with an emergent or urgent mental health need to help mitigate risk. When the number falls below 100%, there needs to be documentation outlining the contributing factors and steps to ensure future compliance. While the monitor understands there may be an exception to someone being searched immediately, the expectation is proper documentation justifying the delay.

<u>Suggestion:</u> There continue to be challenges providing adequate documentation of searches



and constant supervision, on proper documentation, by deputies prior to the arrival of mental health staff when an assessment for all emergent and urgent needs are determined. Provide written documentation of all protocols and procedures for searching inmates as soon as safely possible, along with attempts at having mental health staff available to try and limit the need for de-escalation interventions. This should all be completed prior to placement on any form of suicide precautions, watch or direct observation. Contraband left on an inmate because an adequate search was delayed, or inadequate search was conducted are unacceptable and not constitutionally adequate care in trying to ensure risk of self-harming behavior is minimized. As stated above, accurate documentation is necessary that accounts for contributing factors regarding why searches are not performed on 100% of inmates at risk of harm and appropriate steps (corrective active plan) to ensure future compliance. The documentation should also reflect what was done in leu of the immediate search to minimize harm, i.e. an inmate was watched directly until a search could be conducted.

***B.1.g. Ensure that a Qualified Mental Health Professional conducts appropriate mental health assessments within the following periods from the initial screen or other identification of need:***
        ***1)     14 days, or sooner, if medically necessary, for prisoners with routine mental health needs;***
        ***2)     48 hours, or sooner, if medically necessary, for prisoners with urgent mental health needs;***
                 ***And***
        ***3)     immediately, but no later than two hours, for prisoners with emergent mental health needs.***

Finding:

Substantial Compliance

Suggestion: Continue to conduct CQI audits to ensure implementation and timeliness of referral responses. A Qualified Mental Health Professional assigned to IPC will help ensure inmates at intake receive appropriate assessments and timely referrals, including referrals to psychiatrists during on-call hours. Wellpath is currently meeting the compliance threshold of 90% for these referrals. Wellpath also has more stringent time frames than the consent decree which contributes to compliance. Wellpath's policy requires the same criteria for emergent referrals, within 24 hours for urgent referrals and within 7 days for routine referrals. Cell side visits are not considered appropriate mental health assessments. If cell side assessments continue, this will be considered at the next site visit as inappropriate and may result in this provision being downgraded to partial compliance.



***B.1.h. Ensure a Qualified Mental Health Professional preforms a mental health assessment no later than the next working day following any adverse triggering event (i.e., any suicide attempt, any suicide ideation, or any aggression to self, resulting in serious injury).***

Finding:

Partial Compliance

This is in Partial Compliance due to mental health not being consistently and timely notified of use of force incidents throughout OJC. This Monitor considers use of force a triggering event and therefore mental health is required to be notified to perform a mental health assessment. While QMHPs have been compliant in performing an assessment when notified, since they are not consistently notified of use of forces, they are not performing assessments. In addition, when an inmate comes to the medical clinic after a use of force, the medical attendant should be alerting mental health for an assessment to be conducted, demonstrating a need for better internal communication among Wellpath staff.

Suggestion: Create a Code for use of force, i.e., Code Purple, in order to alert mental health and medical regarding the incident. This will help with timely interventions by the medical and mental health staff at OJC. Reeducate deputies regarding the importance of alerting mental health staff regarding all triggering events, in advance as much as feasible, so proper assessments and assistance can be provided. Ensure medical and mental health staff within Wellpath or current mental health provider are communicating and informing each other regarding triggering events as they become aware.

***B.1.i. Ensure that a Qualified Mental Health Professional, as part of the prisoner's interdisciplinary treatment team, maintains a risk profile for each prisoner on the mental health case load based on the Assessment Factors identified in Appendix B, and develops and implements a treatment plan to minimize the risk of harm to each of these prisoners.***

Finding:

Partial Compliance

There remain challenges in completing clinically adequate, interdisciplinary treatment plans outside of TMH. While 2A and 2B and 3E have some treatment planning services, there are limitations in the content of the treatment plans including having measurable goals, interventions, and objectives. There are currently no consistent multidisciplinary treatment planning services occurring in OJC (general population). Treatment plans direct treatment and keep the involved clinicians and supporting staff abreast of interventions and objectives



COMPLIANCE REPORT # 19                    94

for each patient. The aim is to provide person-centered, coordinated, high-quality care to patients. Some of the lack of progress with this provision comes from different interpretations of the provision and some from a lack of adequate staffing to perform this duty. All inmates on the mental health caseload require a risk profile based on the Assessment Factors in Appendix B, to include an acknowledgement that the factors were considered and may not apply to that individual AND an interdisciplinary treatment plan. While every inmate on the case load may not require a monthly treatment plan, an adequate treatment planning schedule needs to be created and implemented to ensure all inmates on the case load have a treatment plan. Some may require, based on clinical judgment, a plan every sixty days while others may have a plan every 90 days. The mental health provider, in consultation with OPSO, should determine what is needed, in terms of additional psychiatrists' hours, in order to conduct multidisciplinary treatment plans in OJC for the required inmates. At this juncture, triggering events do not typically result in any updates to the treatment plan, which it should.

Suggestion: A clinical analysis of treatment needs will be needed to inform an adequate and appropriate treatment planning schedule for OJC. Securing an adequate number of additional FTEs for psychiatrists is crucial for compliance with this provision. Ensuring interdisciplinary treatment plans are created and followed for the general population patients with a risk profile for each inmate on the mental health case load will be necessary for substantial compliance. As stated before, these treatment plans must include interventions to minimize risk of harm for inmates throughout the system, including stepdown and outpatient level of care along with the acknowledgement that risks were assessed and may not be relevant for the patient. This risk profile should also include deficits in planned services and content, which could be due to lack of available staff, and remedies to correct the deficits. A brief treatment planning session was conducted during this site visit to demonstrate the expectations for treatment plans in the future.  Lastly, triggering events should result in an update to the treatment plan which will address interventions and objectives to target recovery from the event.

***B.1.j. Ensure adequate and timely treatment for prisoners, whose assessments reveal mental illness and/or suicidal ideation, including timely and appropriate referrals for specialty care and visits with Qualified Mental Health Professionals, as clinically appropriate.***

Finding:



Partial Compliance

Wellpath continues to conduct daily visits by a QMHP for individuals awaiting transfer to TMH. While the provision does not direct the need for special areas to conduct mental health work, the provision calls for adequate treatment for inmates with mental illness. Adequate mental health treatment is not conducted on the tier, from the module, cell side nor in a dayroom where an inmate may be reluctant to discuss private, intimate issues with a clinician. The lack of confidentiality and a space that promotes confidentiality leads to a lack of validity that the information received is adequate to provide the necessary treatment. Due to the consistent lack of deputies on each pod, many QMHP interventions, which would provide timely treatment, are not conducted. Many group sessions are held sporadically or not at all. Patient 2517271 was enrolled in biweekly treatment groups. Out of the 11 groups he was eligible to attend between April and June 2023, he was not able to attend 6 groups due to lack of deputies). Patient 2517830 was scheduled to attend therapeutic groups every 14 days between June and September 2023 but there is only an attempt to attend one group, but it did not occur due to scheduling conflict. Individual sessions are conducted cell side which is inadequate treatment for someone with a mental illness. One of the advantages of the Phase III design is that it provides confidential spaces for conducting interviews of inmates in a manner which is safe for both the QMHP and inmate.

Suggestion: There continues to be a need for a full range of mental health and consistent individual and group counseling services at OJC and TMH/TDC. Adequate treatment includes providing an environment where confidentiality is secured so the inmate can share valid information to inform necessary treatment. The mental health provider and OPSO must collaborate and plan TOGETHER in order to provide an adequate and therapeutic system of mental health services. The inmates are unable to attend therapeutic sessions without adequate clinical staff to conduct sessions and correctional staff to transport and provide security for both staff and inmate. The Monitor reiterates that cell side visits do not constitute therapeutically appropriate or clinically adequate mental health services and will not result in substantial compliance. The Monitors recommends continued documentation of barriers to providing timely and adequate mental health treatment for all individuals captured on the mental health caseload. Issues cannot be rectified without knowledge of the problem. Consistent and reliable access to care is necessary for substantial compliance.



OPSO may want to consider having community-based volunteer services come in and facilitate groups which would help provide services for inmates.

***B.1.k. Ensure crisis services are available to manage psychiatric emergencies. Such services include licensed in-patient psychiatric care, when clinically appropriate.***

Finding:

Partial Compliance

There are no designated in-patient licensed facilities identified to provide treatment for the OPSO population.

Suggestion: OPSO continues to lack access to licensed in-patient psychiatric services for male and female inmates, beyond simple emergency room treatment. Wellpath is encouraged to continue to provide documentation that all psychiatric emergencies are sent to an emergency department and any crisis is adequately resolved, which will keep this provision in partial compliance. Currently, the utilization of TMH and external emergency departments are the resources which must be used.

***B.1.l. On an annual basis, assess the process for screening prisoners for mental health needs to determine whether prisoners are being appropriately identified for care. Based on this assessment, OPSO shall recommend changes to the screening system. The assessment and recommendations will be documented and provided to the monitor.***

Finding:

Substantial Compliance

Suggestion: This provision risks being rated as partial compliance in IN THE NEXT auditing periods without OPSO contributing recommendations regarding the screening system, even if the recommendation is simply that the system in place is sufficient. Screenings require an adequate clinical response and if there are inmates who are not being adequately screened and identified for care, from the perspective of OPSO, this needs to be addressed.

Findings:

B.2.a   Partial Compliance

B.2.b.   Partial Compliance

B.2.c.   Partial Compliance

B.2.d.   Partial Compliance

B.2.e.   Substantial Compliance

B.2.f.   Partial Compliance



B.2.g.   Substantial Compliance

B.2.h.   Partial Compliance

***B.2.a. Review, revise, and supplement existing policies in order to implement a policy for the delivery of mental health services that includes a continuum of services, provides necessary and appropriate mental health staff, includes a treatment plan for prisoners with serious mental illness, and collects data and contains mechanisms sufficient to measure whether care is being provided in a manner consistent with the Constitution.***

<u>Finding</u>

Partial Compliance

Inmates on the waitlist for TMH are now to be seen daily by a QMHP. There needs to be a system in place to provide a continuum of treatment for all individuals on the behavioral health caseload at the jail, including a treatment plan for inmates with serious mental illness which directs care and consistent therapeutic groups available for all patients on the caseload. Serious mental illness is defined as mental, behavioral, or emotion disorder of mood, thought, or anxiety that significantly impairs judgment, behavior, capacity to recognize reality, or ability to cope with the ordinary demands of life. Those disorders include, but are not limited to, Schizophrenia Spectrum Disorders, other psychotics disorders, bipolar related disorder, major depressive disorders, and post-traumatic stress disorders. Implementation of policy to ensure the delivery of mental health services across the entire facility continues to be hampered by staffing deficits, from both Wellpath and OPSO. The lack of treatment teams and treatment plans at OJC require continued attention. Without adequate staff, there will be no consistent treatment, including scheduled mental health and activity groups for the inmates.

<u>Suggestion:</u> Both Wellpath and OPSO must commit to consistent and appropriate implementation of policies in order to ensure an adequate delivery of mental health services, including de-escalation interventions. This will include documenting wait lists and service needs along with barriers to the provision of treatment, including missing group sessions and conducting suicide watches from the control room adjacent to the housing units. This also includes holding staff accountable for employment requirements – being awake and attentive during suicide watches. This will include documenting how long an inmate awaits transfer to TMH and what therapeutic and clinically adequate services are provided during that time. There continues to be a need for interdisciplinary treatment teams in the outpatient level of care which will help determine and implement appropriate levels of



treatment. Wellpath should produce for the monitor the total number of inmates with any of the diagnoses listed above, whether in TMH, 2A, 2B, or general population along with their corresponding multidisciplinary treatment plan.

**B.2.b. Ensure that treatment plans adequately address prisoners' serious mental health needs and that the treatment plans contain interventions specifically tailored to the prisoner's diagnoses and problems.**

Finding:

Partial Compliance

Inmates, outside of those housed in TMH, some in 2A/2B/3E, do not have comprehensive treatment plans created by a multi-disciplinary treatment team. The treatment plans created in TMH are adequate in providing a framework for treatment and are specifically tailored to the needs of the patient.

Suggestion: Continue to work towards providing interdisciplinary treatment plans to all individuals on the mental health case load throughout the facility. Treatment plans are needed for all male, female, and youthful inmates at all levels of care, including acute care, suicide watches and outpatient level of care. These treatment plans need to be developed by a multidisciplinary team, including the prisoner, as much as possible. A brief treatment planning session was conducted with the staff responsible for supervising the formulation of treatment plans during this site visit.

**B.2.c. Provide group or individual therapy services by an appropriately licensed provider where necessary for prisoners with mental health needs.**

Finding:

Partial Compliance

There remain challenges with consistently providing group and individual therapy services outside of TMH. Some of this is due to lack of adequate deputies to secure pods therefore the mental health provider has to cancel an intervention. Until there are confidential locations to conduct interventions, the validity of inmate responses is in question which in turn questions whether appropriate, clinically therapeutic programming is being offered. One cannot offer what they do not know is needed. Patient 2517271 was enrolled in biweekly treatment groups. Out of the 11 groups he was eligible to attend between April and June 2023, he was not able to attend 6 groups due to lack of deputies. Patient 2517830 was scheduled to attend therapeutic groups every 14 days between June and September 2023



but there was only an attempt to attend one group, but it did not occur due to a scheduling conflict. Patient 2506104 was enrolled in biweekly activity therapy groups and between April to July 2023, he was only able to attend 3 groups with at least two groups not held due to lack of deputy presence. Patient 2496655 was only able to attend 3 out of 8 activity therapy sessions during this period of review primarily due to lack of deputies. Patient 2519343 was enrolled to attend activity therapy groups every 14 days and only attended one group between May and October 2023. It has become too common for patients to be referred for groups which are not being consistently held.

Suggestion: This provision will remain a challenge to move into substantial compliance without adequate staff for Wellpath and OPSO, along with adequate confidential environment to conduct these sessions. Confidentiality will help validate the responses of the inmate which will in turn inform what individual and group sessions are needed for the population. While there is commitment to increasing staff numbers from both Wellpath and OPSO, this provision cannot be in substantial compliance without adequate staff to conduct group and individual therapy services. If individual and group sessions cannot be held consistently, this provision will not move to substantial compliance. Please note how many individuals are unable to access the provided service due to barriers like adequate space, staffing challenges (including Disruption of Service forms) and are on a waitlist. Document the corrective action plans which will be implemented to address these issues. Continue to provide data on the number of inmates who received counseling for sexual abuse, alcohol, and drug abuse. Keep a running list of how many groups are not being held rather than just the attendance of inmates. If you have 10 groups scheduled and only facilitate one group, the data is skewed when you report 92% attendance. Wellpath needs to work on a better reporting system to capture the vast number of groups not being held.

**B.2.d. Ensure that mental health evaluations that are done as part of the disciplinary process include recommendations based on the prisoner's mental health status.**

Finding:

Partial Compliance

There remain challenges with mental health consistently being made aware and being able to conduct assessments of prisoners prior to placement in segregation. This is especially challenging with inmates moving from the general population to restrictive housing.



Suggestion: It is imperative that mental health staff are contacted prior to any inmate, especially on the mental health caseload, being moved into disciplinary housing. While Wellpath is working on a policy for mental health assessments as a part of the disciplinary process, OPSO has not signed off on nor has there been consistent implementation of this policy. Training would be required to ensure both parties, Wellpath and OPSO, are working in tandem to ensure inmates do not deteriorate while in disciplinary housing and mental health needs are adequately assessed and addressed. Collaboration between OPSO and Wellpath is crucial to this provision moving into substantial compliance. Only OPSO can alert mental health to movement of inmates into disciplinary housing and therefore are primarily responsible for this provision remaining in partial compliance. OPSO should consider putting a SOP in place to ensure notification of mental health to every inmate's movement to disciplinary housing. Mental health can then cross reference their caseload and see all their patients prior to movement.

***B.2.e. Ensure that prisoners receive psychotropic medications in a timely manner and that prisoners have proper diagnoses and/or indications for each psychotropic medication they receive.***

Finding:

Substantial Compliance

Suggestion: This provision risks falling into partial compliance due to the lack of medication variances being collected by Wellpath. There is no way to determine whether psychotropic medications are being received in a timely manner without data supporting this finding. While the partnership with Tulane psychiatric providers has made dramatic improvements in the system, the Monitor needs to see data which supports timeliness which would be captured with medication variances. Continue to provide documentation and analysis of data to ensure inmates are receiving psychotropic medications in a timely manner, especially upon admission to the facility. If there are delays in an inmate receiving medication, document and create a corrective action plan to address the deficiency. Ensure medications are being used to treat the diagnosis on record or there is clear justification in the record for the off-label use of a psychotropic medication. The psychiatric nurse has been instrumental in helping to ensure accuracy of diagnoses and indications.

***B.2.f. Ensure that psychotropic medications are administered in a clinically appropriate manner as to prevent misuse, overdose, theft, or violence related to medication.***



<u>Finding:</u>

Partial Compliance

Medication variances are not yet sufficiently captured to help determine whether psychotropic medications are administered in a clinically appropriate manner. Documentation of medication variances help ensure there is clinically appropriate administration of medication and allows staff to make corrections when needed. Variances include late administration of medication (nurses have one hour before and one hour after the set time for the medication to be given for administration to be timely), missed dose of medication, if a medication is ordered and not received by the patient within 24 hours of the order, the use of numerous smaller dose(s) of pills to equal the prescribed amount when the prescribed amount is available in one pill (olanzapine 20mg is prescribed and rather than give olanzapine 20mg tablet, which is available, two 10mg tablets are given). Wellpath spoke with their pharmacy staff who agree with the definitions of medication variances listed above.  Improper searches of inmates by security staff contribute to inmates having contraband including excess medication and medication which may not be prescribed to them.

<u>Suggestion:</u> Implement monitoring of medication variances at OJC and TMH and accurately report findings. Wellpath and OPSO need to work cooperatively to ensure medication passes are aligned with policy and procedures in order to prevent misuse, overdose, theft, and violence related to medication. Proper and thorough searches of cells and persons must be conducted by OPSO to help curb the presence of contraband, including excess prescribed and unprescribed medications. Further analysis may be needed to analyze the finding of contraband, prescribed and nonprescribed medication, and what corrective plan to put in place to minimize the risks.

***B.2.g. Ensure that prescriptions for psychotropic medication are reviewed by a Qualified Mental Health Professional on a regular, timely basis and prisoners are properly monitored.***

<u>Finding:</u>

Substantial Compliance

<u>Suggestion:</u> Continue to provide documentation of data collection and analysis of psychotropic medication prescriptions, including the timeliness between when the



prescription is written, and the first dose is received by the inmate. There also needs to be documentation if there is a disruption in providing psychotropic medications along with the source of the disruption. Refusals of medications also require proper clinical assessment which is part of adequate monitoring of inmates.

***B.2.h. Ensure that standards are established for the frequency of review and associated charting of psychotropic medication monitoring, including monitoring for metabolic effects of second-generation psychotropic medications.***

Finding:

Partial Compliance

Suggestion: With the addition of a laboratory technician who coordinates with the two psychiatric registered nurses, monitoring for metabolic effects of second-generation psychotropic medications has improved. Wellpath has established a system where providers are alerted to lab results and the provider is required to sign off acknowledging the labs have been seen.  While there continues to be some misses (Patient 2520665 did not have an EKG performed when ordered), the system has been much improved since this Monitor first began site visits in 2022. The problem remains with proper monitoring of metabolic syndrome in these patients. In the audit tool from May 2023 titled Antipsychotic Medication: Monitoring for Metabolic Syndrome, 67% of patients did not have a body mass index calculated, recorded, and acknowledged at baseline and during the past three months, 20% of patients did not have a lipid profile as baseline within the past 90 days on the record, 40% of patients did not have a Hemoglobin A1c at baseline and with the past 90 days, 14% did not have vital signs documented in the past 90 days and 20% were not on the mental health caseload. In the same audit tool dated October 9, 2023, which covered cases from within the reporting period, 43% of patients did not have a body mass index calculated, recorded, and acknowledged at baseline and during the past three months, 20% of patients did not have a Hemoglobin A1c at baseline and with the past 90 days and 14% of patients did not have vital signs documented in the past 90 days. Continue to allow the lab technician and psychiatric nurses to provide oversight so this system continues to function well.

Findings:

B.3.a.   Partial Compliance

B.3.b.   Substantial Compliance

***B.3.a. OPSO shall develop and implement policies and procedures for prisoner counseling in the areas of general mental health/therapy, sexual-abuse counseling, and alcohol and drug counseling. This should, at***



*a minimum, include some provision for individual services.*

Finding:

Partial Compliance

Due to staffing challenges, groups and individual sessions continue to be conducted inconsistently throughout the reporting period. While the provision does not require a confidential space be provided for treatment, adequate treatment requires confidentiality in order for there to be valid responses from inmates to inform necessary treatment. Cell side or on the tier interventions are not adequate mental health treatment. The logbooks maintained by OPSO continue to be inadequately completed and therefore do not provide a true reflection of the daily activities occurring on the housing units. Development of the policies and procedures is not sufficient for substantial compliance without implementation which would include consistent availability of therapeutic services.

Suggestion: Continue to track the availability of group and/or individual sessions which can be offered versus completed along with the number of inmates in need of services. Continue to track disruptions in service. The creation of dedicated space where confidential therapeutic engagement can occur would be ideal in moving this provision towards substantial compliance. The Monitor looks forward to this being the case once Phase III is operational. Ensure the logbooks maintained by OPSO are accurate and completed as dictated by policy.

*B.3.b. Within 180 days of the Effective Date, and quarterly thereafter, report all prisoner counseling services to the Monitor, which should include:*
*1)      the number of prisoners who report having participated in general mental health/therapy counseling at OPP;*
*2)      the number of prisoners who report having participated in alcohol and drug counseling services at OPP;*
*3)      the number of prisoners who report having participated in sexual-abuse counseling at OPP; and*
*4)      the number of cases with an appropriately licensed practitioner and related one-on-one counseling at OPP.*

Finding:

Substantial Compliance

Suggestion: Continue to collect and analyze data concerning inmates in need of these services and create corrective action plans to address the deficits which may be present at OJC and TMH. As stated earlier, due to a lack of confidential engagements, the validity of responses from inmates is questionable and therefore the monitor is unsure whether the offered services are indeed adequate for the population.



Findings:

B.4.a    Partial Compliance

B.4.b.   Substantial Compliance

B.4.c.   Substantial Compliance

B.4.d.   Partial Compliance

B.4.e.   Partial Compliance

B.4.f.   Partial Compliance

B.4.g.   Substantial Compliance

***B.4.a. OPSO shall ensure that all staff who supervise prisoners have the adequate knowledge, skill, and ability to address the needs of prisoners at risk for suicide. Within 180 days of the Effective Date, OPSO shall review and revise its current suicide prevention training curriculum to include the following topics:***
***1) suicide prevention policies and procedures (as revised consistent with this Agreement);***
***2) analysis of facility environments and why they may contribute to suicidal behavior;***
***3) potential predisposing factors to suicide;***
***4) high-risk suicide periods;***
***5) warning signs and symptoms of suicidal behavior;***
***6) case studies of recent suicides and serious suicide attempts;***
***7) differentiating suicidal and self-injurious behavior; and***
***8) the proper use of emergency equipment.***

Finding:

Partial Compliance

The Monitor is still finding that deputies have yet to consistently utilize the Observation/Restraint Checklist and Worksheet which the MHTs use for suicide watch. It was observed again that MHTs were not accurately documenting staggered 15-minute checks on the Observation/Restraint Checklist and Worksheet. Videos were watched where an MHT was asleep the majority of the shift yet completed the Observation/Restraint Checklist and Worksheet as if awake the entire shift. Videos were watched where MHTs misrepresented their work – did not perform a check they registered on the Observation/Restraint Checklist and Worksheet.  This remains a very concerning practice and puts the inmate in a situation with preventable risk. The Monitor reiterates the checks should be staggered within the 15-minute period rather than every 15 minutes. Deputies need to be encouraged to utilize the proper documents while conducting watches, although the Monitor was recently informed that Deputies have recently refused to conduct watches on 3C and other areas of OJC. With security staff deficits, it is challenging for the Wellpath staff to get on 3C to conduct proper watches so many watches occur from the module, which is unsafe. Patient 2513388 was monitored from the module in April and May 2023 while on



suicide watch.

Suggestion: Continue training both deputies and MHTs on the importance of staggered 15-minute checks. Enforce proper searches of cells and persons who are at risk for self-harm as there continues to be reports of inmates having access to contraband or there being a lapse between placing someone on watch and being moved to a suicide resistant cell. During this lapse, there is no documentation to support an appropriate watch is being conducted. Patient 2524075 spent 45 minutes on watch prior to Mental Health being made aware and another two and a half hours prior to being moved to an area where he could be properly monitored. There should be extremely limited upper tier assignments of inmates in OJC as there is a risk of self-harm behavior as there are no barriers in place to prevent jumping or hanging from the second tier. Ensure recommendations from clinicians for level of observation is appropriate for the presenting situation. Supervisory spot checks along with video surveillance may be necessary to ensure proper implementation and documentation of suicide watch and observations. OPSO needs to submit their current suicide prevention training curriculum to the Monitor for review.

***B.4.b. Ensure that all correctional, medical, and mental health staff are trained on the suicide screening instrument and the medical intake tool.***

Finding:

Substantial Compliance

Suggestion: Continue to provide documentation that multi-disciplinary in-service training has been completed annually for all current correctional, medical, and mental health staff to include training on updated policies, procedures, and techniques. All incoming staff should be trained on the suicide screening instrument and medical intake tool during onboarding orientation.

***B.4.c. Ensure that multi-disciplinary in-service training is completed annually by correctional, medical, and mental health staff, to include training on updated policies, procedures, and techniques. The training will be reviewed and approved by the Monitor.***

Finding:

Substantial Compliance

Suggestion: Continue to provide documentation that multi-disciplinary in-service training has been completed annually for all current correctional, medical, and mental health staff, to include training on updated policies, procedures, and techniques. Training will need to



address deficiencies in communication, especially between OPSO and Wellpath clinicians, and documentation regarding de-escalation procedures, disciplinary process, and searches. Training should clearly delineate responsibilities of various staff member involvement, including during medication pass. Supervisory spot checks may be needed to ensure training is adequate and adhered to during various processes around OJC and TMH.

***B.4.d. Ensure that all staff are trained in observing prisoners on suicide watch and step-down units status.***

Finding:

Partial Compliance

There continues to be resistance from deputies in using the approved Observation/Restraint Checklist and Worksheet when assigned to suicide watch and now the refusal to conduct suicide watches in OJC. There continues to be concern with MHTs inaccurately completing the Observation/Restraint Checklist and Worksheet, including video observation on September 21 of an MHT asleep the vast majority of the shift but completing the Observation/Restraint Checklist and Worksheet as if she were awake the entire shift. There continue to be watches performed from the control room/module adjacent to the housing unit, as documented on the worksheet, which is not clinically appropriate. On the prior site visit, but during this reporting period, on July 10, 2023, due to insufficient staff to conduct watches on 2A, the MHTs watched the direct observation in 2A in lieu of watching the 15-minute watches during their tour of duty. While this was documented as happening for about 90 minutes, there were five (5) individuals (2512739, 2516200, 2523423, 2418035, 2521100) who were not being monitored, which is outside the prescribed time for ensuring the safety of the inmates on watch. Inmates are found to have contraband while on suicide watch, which is not supported by clinical judgment or policy. Patient 2517762 was placed on direct observation on July 7, 2023, yet on July 9, 2023, he was still in possession of restricted items. Patient 252500 was placed on suicide watch on August 20, 2023, yet over 24 hours later, he remained in possession of restricted items. Patient 2515735 was on watch on September 2, 2023, and in possession of restricted items for at least 24 hours after commencement of the watch.

Suggestion: Continued training and supervisory observation, in person and via video access will be necessary to ensure performance of suicide watches and accurate completion of these documents and a correction action plan to help ensure deputies are completing the



correct document and MHTs are accurately and truthfully completing the watch documents. While the monitor applauds the efforts of the Wellpath administration to ensure compliance with suicide watches, to include having the MHTs sign a document of do's and don'ts on watch and having supervisory staff conduct spot checks daily, consideration of incentives for proper suicide watches or shorter shifts (8 hours) for watching specific prisoners (more rotation) may need to be implemented.

***B.4.e. Ensure that all staff that have contact with prisoners are certified in cardiopulmonary resuscitation ("CPR").***

Finding:

Partial Compliance

The Monitor's review of year-end documentation, which would include the period in review, provided by OPSO indicated that the CPR training provided to staff fell below the compliance threshold in three of the four areas reported. The Monitor uses 90% as the threshold for substantial compliance for training of staff in CPR. In OJC, 82.4% of staff are certified in CPR. In TDC, 72.2% of staff are certified in CPR. In IPC, 85% of staff are properly trained in CPR. In the kitchen and warehouse, 95.8% of staff are properly trained in CPR.

Suggestion: Continue to provide documentation that all current staff, including OPSO and Wellpath, are certified in CPR. The goal is to have at least 90% of all staff at OPSO certified in CPR.

***B.4.f. Ensure that an emergency response bag, which includes a first aid kit and emergency rescue tool, is in close proximity to all housing units. All staff that has contact with prisoners shall know the location of this emergency response bag and be trained to use its contents.***

Finding:

Partial Compliance

There were two emergency response bags found which were sealed yet incomplete. The cut-down tool was missing from the emergency response bags from 2C/D and 3A/B on December 6, 2023. The tools have not been sharpened since the prior site visit in July 2023 therefore would be ineffective in performing their function.

Suggestion: Ensure the cut down tools are adequately sharpened, and staff are trained in the proper use of the tool throughout the facility. Ensure that staff are available in the control room in order to access the cut down tool, if necessary. Ensure every bag has all necessary requirements.



***B.4.g. Randomly test five percent of relevant staff on an annual basis to determine their knowledge of suicide prevention policies. The testing instrument and policies shall be approved by the Monitor. The results of these assessments shall be evaluated to determine the need for changes in training practices. The review and conclusions will be documented and provided to the Monitor.***

<u>Finding:</u>

Substantial Compliance

<u>Suggestion:</u> Consider including questions about the required use of the Observation/Restraint Checklist & Worksheet.

<u>Findings:</u>

B.5.a.   Partial Compliance

B.5.b.   Partial Compliance

B.5.c.   Partial Compliance

B.5.d.   Substantial Compliance

B.5.e.   Partial Compliance

B.5.f.   Partial Compliance

B.5.g.   Substantial Compliance

B.5.h.   Partial Compliance

B.5.i.   Partial Compliance

B.5.j.   Substantial Compliance

B.5.k.   Partial Compliance

***B.5.a. OPSO shall implement a policy to ensure that prisoners at risk of self-harm are identified, protected, and treated in a manner consistent with the Constitution.***

<u>Finding:</u>

Partial Compliance

While various policies are in place to ensure inmates at risk of self-harm are identified, protected, and treated in a manner consistent with the Constitution, there remains the challenge of consistent implementation. Issues surrounding de-escalation, searches, and referrals remain. Without proper searches, inmates remain at risk of self-harm. Without proper medication administration, including adequate mouth checks, inmates remain at risk for self-harm. Without mental health being consulted prior to a use of force, inmates are at risk for harm. Without adequate staffing, inmates on suicide watch are not being adequately watched or protected, therefore increasing the risk of self-harm.



<u>Suggestion:</u> The same issues which were observed in the prior site visit continue to plague OPSO. Ensure staffing is sufficient to allow prescribed suicide watches to be conducted as necessary – all direct observations should be monitored directly, and staff should not have to choose whom to watch or where to watch from, i.e. module. Continue to offer a confidential space for the clinician designated to monitor inmates on suicide watch to conduct assessments. Continue to document any barriers to having access to confidential space. Ensure inmates are searched to prevent self-harm when placed on suicide watch. Implement medication administration policies, to include adequate mouth checks, to help prevent access of the inmate to medication to self-harm. Document consistent out of cell time for inmates on suicide watch and create a corrective action if there is not adequate time out of cell. Individuals on suicide watch need intensive treatment interventions including out of cell time, counseling, and therapy, as medically indicated. Document treatment interventions of inmates on suicide watch and any barriers present in not providing appropriate treatment. Document any inmate on suicide watch or in detox protocols who is found with contraband or misuse of supplies. A CAP must be in place to investigate and correct why contraband is being found on inmates at risk of self-harm. The key will be implementing standing policies to ensure the safety of inmates and staff.

***B.5.b. Ensure that suicide prevention procedures include provisions for constant direct supervision of current suicidal prisoners and close supervision of special needs prisoners with lower levels of risk, at a minimum, 15 minutes check. Correctional officers shall document their checks in a format that does not have pre-printed times.***

<u>Finding:</u>

Partial Compliance

Deputies are not using the prescribed Observation/Restraint Checklist and Worksheet consistently. QMHPs/MHTs are not accurately completing the document. While the document does not have pre-printed times, they are either not being used or being filled out improperly. The Monitor observed, at the prior site visit in July 2023, on 2A, MHTs having to choose who to watch, prioritizing the direct observations while allowing the 15-minute watches to go unobserved for 90 minutes. On this visit, observations were being conducted from modules due to lack of deputy presence on the pods. In addition, observers were sleeping while on duty but completing the observation forms as if awake and attending to the suicidal patient.



Suggestion: See comments in B.4.d. Submit documentation for suicide watches in IPC. Ensure deputies are instructed to properly complete the observation checklist for the times they are responsible for suicide watch.

***B.5.c. Ensure that prisoners on suicide watch are immediately searched and monitored with consistent direct supervision until a Qualified Mental Health Care Professional conducts a suicide risk assessment, determines the degree of risk, and specifies the appropriate degree of supervision.***

Finding:

Partial Compliance

There continue to be challenges with immediate and adequate searches of inmates who are placed on suicide watch. As stated earlier, the following data was submitted by Wellpath to represent 2023 yet it is identical to the data from 2022 so there are questions as to the accuracy of what it captures. Regardless of this fact, during the discussions with Wellpath at the site visit in December 2023, it was emphasized that there has been no significant improvement in searches in 2023.  In April and May 2023, only 53% of patients were searched properly for a Code White. In June 2023 and July 2023, the code white log was not accurately completed, there were numerous blank spaces where data was not entered so the picture during these months was not accurate. For the ones completed in July 2023, 56% of patients were searched. In August 2023, 27% of patients were adequately searched and in September 2023, 42% of patients were adequately searched.  Overall, the search numbers remain well below expected percentages to keep patients safe from self-harm. Appropriate monitoring includes the use and proper/accurate completion of the approved documentation to conduct watches – Observation/Restraint Checklist & Worksheet.

Suggestion: Inmates need to be immediately searched or as soon as safely possible 100% of the time. The threshold for compliance being used is 90%. Ideally, but not required and understandably not always feasible, a mental health professional should be present for searches to help with de-escalation and provide a therapeutic environment. Deputies conducting direct observation need to be documenting their watches on the Observation/Restraint Checklist and Worksheet, until a QMHP conducts a suicide risk assessment, determine the degree of risk, and specifies the appropriate degree of supervision. Written procedures for searches should be a part of training so each staff member is clear of their responsibilities. Cells should be searched prior to placement of an inmate on suicide watch and documented. Collaboration and proactive communication are



necessary between OPSO deputies and mental health staff to meet the requirements of this provision.

**B.5.d. Ensure that prisoners discharged from suicide precautions receive a follow-up assessment within three to eight working days after discharge, as clinically appropriate, in accordance with a treatment plan developed by a Qualified Mental Health Care Professional. Upon discharge, the Qualified Mental Health Care Professional shall conduct a documented in-person assessment regarding the clinically appropriate follow-up intervals.**

Finding:

Substantial Compliance

While many assessments are being done within the 3-8 working days, there are gaps in the screening and assessment which must be addressed. In reviewing the suicide risk screening audit tool for July 2023, the policy for visits following release from suicide watch for high or intermediate risk patients was not followed in 27% of patients. In the September 2023 audit tool for Suicide Risk Screening, 20% of patients were not evaluated daily on watch by a mental health professional and 60% of patients did not have a written treatment plan within 72 hours of placement on watch. There remains concern regarding where they are being conducted which contributes to the clinical appropriateness of treatment. The threshold for compliance is 90%.

Suggestion: While this provision has been in substantial compliance, there were a couple misses during the period in question. 2517762 and 2524012 both missed a 72-hour post-suicide follow -up assessment during the reporting period. there was a miss during the period in question. 2517762 had a missed 72-hour post-suicide follow -up assessment in July. Suicide ideation/attempt can be emotional and the need for follow-up is necessary. Just as suicide assessments are conducted in a confidential space, suicide follow-up assessments require the same degree of care. A cell side visit for suicide follow up is not adequate or clinically appropriate treatment. Continue to document if there are access issues to inmates. Document any barrier to having a confidential space to complete these post-suicide watch assessments. Continue to monitor and document follow-up appointments and ensure they are conducted as policy dictates.

**B.5.e. Implement a step-down program providing clinically appropriate transitions for prisoners discharged from suicide precautions.**



Finding:

Partial Compliance

Simply having a document which outlines a step-down program is insufficient for substantial compliance without implementing a clinically appropriate, consistently run program. In review of the step-down program handout, it is proposed to occur on 2B for males and 3E for females. It includes individual and group counseling services, recreational and music therapy, medication education and addresses discharge resources. In July 2023, during the prior site visit, this Monitor observed no deputy assigned to the unit on the days of the Monitor's visit and therefore there could not be any programming conducted on the unit. During this site visit, review of the programming documentation shows numerous disruptions of service which demonstrates lack of consistency in programming on these units. Consistent implementation is just as important as having the program. 2517964 was located on 2B in May and June 2023. He was scheduled to participate in Behavioral Health Activity therapy. Out of 5 groups he was scheduled to attend between May 1, 2023, and June 5, 2023, he only attended one group and the other 4 groups were not held due to lack of security staff. 12101999 was scheduled to attend Behavioral Health bi-weekly Activity therapy groups. On May 31, 2023, he was unable to attend due to the unit being on lockdown and on June 14, 2023, he was unable to attend due to lack of deputies. While this is only two examples, these situations would affect the entire unit meaning none of the patients would receive therapeutic interventions during these times. While the program is described as providing an individualized care approach to meet the needs of the patients who may require assistance transitioning from intensive acute treatment to general population, there appears to be general treatment offered, when a deputy is available, in a group setting rather than individualized treatment or focused groups based on the needs of the population. As stated earlier, while the provision does not expressly dictate there be a confidential space dedicated to the step-down program, confidentiality is key in providing adequate clinical care for this population.

Suggestion: Consistent implementation of the step-down program is necessary. The introduction of medication education (which is number 6 on the list of offerings for this program), even in a group setting, is imperative for this population. Ensure the multi-disciplinary treatment plans include individualized treatment for inmates which is reflected



in the programming being offered in the step-down program. The progress notes should reflect the treatment being given in the program in line with the prescribed interventions in the treatment plan. Continue to document interruptions in service for this unit and any barriers in consistent programming.

***B.5.f. Develop and implement policies and procedures for suicide precautions that set forth the conditions of the watch, incorporating a requirement of an individualized clinical determination of allowable clothing, property, and utensils. These conditions shall be altered only on the written instruction of a Qualified Mental Health Care Professional, except under emergency circumstances or when security considerations require.***

Finding:

Partial Compliance

One hundred percent (100%) of inmates are not searched properly prior to being placed on suicide watch. The compliance threshold this monitor uses for substantial compliance is 90%. In fact, the highest percentage was 56%. This provision calls for individualized determination of allowable property. It appears the system is an all or none mentality as to what an individual can have on suicide watch. The restrictions need to be clinically driven and properly documented to address the presented risk. Another uncovered issue during this site visit was there is a delay in removing contraband property from cells once brought to the attention of the deputies. 2513388 was placed on suicide watch on April 29, 2023, and on May 1, 2023, the patient was still in regular clothes. 252500 was placed on suicide watch on August 20, 2023, and over 24 hours later on August 21, 2023, he was still in possession of contraband items including a plastic spoon, towel and socks, any one of which could be used for self-harm. 2515735 was placed on watch in September 2023 and there is documentation of contraband in his cell on numerous occasions during this watch.

Suggestion: Document all searches, including whether it occurs prior to or after being placed on suicide watch. Provide documentation of individualized determinations of the conditions for watch for male and female inmates at OJC and at TMH. This should include all inmates who are in non-suicide resistant cells and are therefore on direct observation. Provide policy, procedure, and documentation about suicide watches in IPC. Once the documents are provided, implementation must also be monitored closely. Once restricted property is identified, it should be removed immediately so as to prevent self-harm.

***B.5.g. Ensure that cells designated by OPSO for housing suicidal prisoners are retrofitted to render them suicide-resistant (e.g., eliminating bed frames/holes, sprinkler heads, water faucet lips, and unshielded***



*lighting or electrical sockets).*

Finding:

Substantial Compliance

All the designated cells by OPSO have been retrofitted to render them suicide-resistant (9 cells on 2A, 2 cells on 3C, 2 cells on 2C, 2 cells on 3E). The toilets have been installed and the cells have been updated. There are still inmates at risk for self-harm being housed in non-suicide resistant cells.

Suggestion: Continue direct observation of individuals who are housed in non-suicide resistant cells while on suicide watch to best provide for their safety. Consider retrofitting all the cells on the first floor in 2A into suicide-resistant cells. There needs to be priority given to placing screening around the mezzanine and stairwells in 2A to prevent inmates from jumping. Inmates on suicide watch should not be allowed up on the mezzanine level.

**B.5.h. Ensure that every suicide or serious suicide attempt is investigated by appropriate mental health and correctional staff, and that the results of the investigation are provided to the Sheriff, and the Monitor.**

Finding:

Partial Compliance

Suicide and suicide attempts continue to be investigated in silos and there appears to be limitation in what information is shared. There needs to be more collaboration between OPSO and the mental health provider in investigations and a communal response to making systemic changes.

Suggestion: There needs to be intentional collaboration and systemic changes produced from investigations by OPSO and the mental health provider concerning suicides and serious suicide attempts at the facility. To reiterate, there is no expectation that there will never be a suicide or suicide attempt in the correctional facility, but when they occur, they require more intentional and self-critical analysis of the event by both OPSO and the mental health provider. Psychological autopsies should help in identifying systemic deficits which will help inform systemic changes throughout the system. Simply discussing these events at a meeting is not sufficient without real analysis and productive change being the product, including enforcing current policies like alerting mental health to help with de-escalation. Provide a COLLABORATIVE self-critical analysis to the Sheriff and Monitor which demonstrates a thorough understanding and investigation of these critical events.

**B.5.i. Direct observation orders for inmates placed on suicide watch shall be individualized by the ordering**



COMPLIANCE REPORT # 19                                                                 115

*clinician based upon the clinical needs of each inmate and shall not be more restrictive than is deemed necessary by the ordering clinician to ensure the safety and well-being of the inmate.*

Finding:

Partial Compliance

The lack of staff at OJC limits the ability of staff to provide direct observation for inmates. There was documentation seen where direct observations were conducted from the module due to lack of security presence. This is not direct observation.

Suggestion: The Monitor continues to recommend that inmates in IPC, who are placed on suicide watch and have yet to be assessed by an QMHP, should be on direct observation. Continue to submit suicide watch audits with the location of the watch embedded in the report.

*B.5.j. Provide the Monitor with periodic report on suicide and self-harm at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. The report will include the following:*
*1) all suicides;*
*2) all serious suicide or self-harm attempts; and*
*3) all uses of restraints to respond to or prevent a suicide attempt.*

Finding:

Substantial Compliance

Suggestion: Continue to provide this report every six months. If there is a discrepancy in the numbers collected by OPSO versus Wellpath or the current mental health provider, include the reason for the differences in the report. If the discrepancies continue without explanation, this provision risks being downgraded to partial compliance.

*B.5.k. Assess the periodic report to determine whether prisoners are being appropriately identified for risk of self-harm, protected, and treated. Based on this assessment, OPSO shall document recommended changes to policies and procedures and provide these to the Monitor.*

Finding:

Partial Compliance

There remain challenges in OPSO documenting changes to policies and procedures based on analysis of risk at the Facility. There remain issues with adequate searches of inmates having access to contraband with no changes being offered to rectify the problem. The report needs to address the CAPs which may need to be put in place to better identify and rectify the gaps in the current procedures.

Suggestion: Provide updated procedures to the Monitor to address outstanding issues with



implementation of ensuring risk challenges are adequately addressed. This provision will also require adequate treatment plan creation, as this would address risk of self-harm and the protective measures in place, to ensure all individuals who engage with the inmate are adequately knowledgeable about the needs of the patient.

Findings:

B.6.a.   Partial Compliance

B.6.b.   Substantial Compliance

B.6.c.   Substantial Compliance

B.6.d.   Substantial Compliance

B.6.e.   Substantial Compliance

B.6.f.   Substantial Compliance

B.6.g.   Substantial Compliance

***B.6.a. OPSO shall prevent the unnecessary or excessive use of physical or chemical restraints on prisoners with mental illness.***

Finding:

Partial Compliance

OPSO is not consistently and proactively contacting mental health prior to the use of force or needing to implement de-escalation in the Facility. The use of a taser or chemical spray to, even momentarily, subdue an inmate is considered a form of restraint.

Suggestion: Provide documentation of policies in use for planned de-escalation and use of force. Provide documentation to support consistent implementation of the policy and procedures in place to ensure mental health is contacted prior to the use of force, when reasonably safe. OPSO needs to generate a report for the Monitor documenting all uses of physical and chemical restraints throughout the Facility along with attempts to contact mental health and whether the restraint was planned. Create and submit to the Monitor documentation to determine how many instances of use-of-force incidents occurred over the year prior to the next site visit where mental health was not contacted prior to exercising the use-of-force.

***B.6.b. Maintain comprehensive policies and procedures for the use of restraints for prisoners with mental illness consistent with the Constitution.***

Finding:



Substantial Compliance

**B.6.c. Ensure that approval by a Qualified Medical or Mental Health Professional is received and documented prior to the use of restraints on prisoners living with mental illness or requiring suicide precautions.**

<u>Finding:</u>

Substantial Compliance

**B.6.d. Ensure that restrained prisoners with mental illness are monitored at least every 15 minutes by Custody Staff to assess their physical condition.**

<u>Finding:</u>

Substantial Compliance

**B.6.e. Ensure that Qualified Medical or Mental Health Staff document the use of restraints, including the basis for and duration of the use of restraints and the performance and results of welfare checks on restrained prisoners.**

<u>Finding:</u>

Substantial Compliance

**B.6.f. Provide the Monitor a periodic report of restraint use at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. Each report shall include:**
   1)   **A list of prisoners whom were restrained;**
   2)   **A list of any self-injurious behavior observed or discovered while restrained; and**
   3)   **A list of any prisoners whom were placed in restraints on three or more occasions in a thirty (30) day period or whom were kept in restraints for a period exceeding twenty-four (24) hours.**

<u>Finding:</u>

Substantial Compliance

**B.6.g. Assess the periodic report to determine whether restraints are being used appropriately on prisoners with mental illness. Based on this assessment, OPSO shall document recommended changes to policies and procedures and provide these to the Monitor.**
<u>Finding:</u>

Substantial Compliance

<u>Findings:</u>

B.7.a.   Partial Compliance

B.7.b.   Partial Compliance

B.7.c.   Partial Compliance

B.7.d.   Partial Compliance

**B.7.a. OPSO shall ensure that all staff who supervise prisoners have the knowledge, skills, and abilities to identify and respond to detoxifying prisoners. Within 180 days of the Effective Date, OPSO shall institute an**



*annual in-service detoxification training program for Qualified Medical and Mental Health Staff and for correctional staff. The detoxification training program shall include:*

    *1)    annual staff training on alcohol and drug abuse withdrawal.*

    *2)    training of Qualified Medical and Mental Health Staff on treatment of alcohol and drug abuse conducted by the Chief Medical Officer or his or her delegate.*

    *3)    oversight of the training of correctional staff, including booking and housing unit officers, on the policies and procedures of the detoxification unit, by the Chief Medical Officer or his or her delegate.*

    *4)    training on drug and alcohol withdrawal by Qualified Medical and Mental Health Staff.*

    *5)    training of Qualified Medical and Mental Health Staff in providing prisoners with timely access to a Qualified Mental Health Professional, including psychiatrists, as clinically appropriate; and*

    *6)    training of Qualified Medical and Mental Health Staff on the use and treatment of withdrawals, where medically appropriate.*

<u>Finding:</u>

Partial Compliance

Staff who supervise inmates do not have the knowledge, skills, and abilities to identify and respond to detoxifying inmates.

7.a.1 and 7.a.2 and 7.a.4 The health care providers' training conflates opiate and sedative hypnotic withdrawal. The training is confusing regarding the signs of alcohol intoxication and opiate intoxication. There should be training in the other conditions that could be the cause of the patients' symptoms.  The training must be clear that the signs and symptoms of alcohol intoxication, alcohol withdrawal, opiate intoxication, other intoxication with amphetamine can be the same signs and symptoms as life threatening other disease states.

7.a.3. Supportive documentation of training of all custody and medical staff is incomplete and superficial. The new medical providers should implement meaningful training and document the completeness of training for all staff. The Monitors assert that meaningful training makes a difference to the patients' well-being, access to health care, and completeness of care.

7.a.5. Training on when and how to provide inmates with timely access to a mental health professional. Monitoring demonstrates that medical and mental health staff understand that timely access is clinically appropriate. Despite this training, failure to provide timely access to care occurs.  The consistent implementation of training should be under constant review. Any deviation should be reviewed, and the staff member counseled.

7.a.6. To satisfy the spirit of the Consent Decree, custody, medical and mental health staff should understand the signs of withdrawal and the treatment of withdrawal from both alcohol and from opiates. The training is superficial. Opiate and sedative hypnotic



withdrawal are poorly differentiated, such that staff is not satisfactorily trained to understand withdrawal.

***B.7.b. Provide medical screenings to determine the degree of risk for potentially life-threatening withdrawal from alcohol, benzodiazepines, and other substances, in accordance with Appendix B.***
<u>Finding:</u>

Partial Compliance

Screening suffers from incomplete vital signs and incomplete documentation of the mental state of patients who are refusing the CIWA and COWS assessment and treatment protocols. The deficiencies in training and the inconsistencies in the nursing assessments identified in Provision B.7.b and B.7.c. are evidence of partial and not substantial compliance.

***B.7.c. Ensure that the nursing staff complete assessments of prisoners in detoxification on an individualized schedule, ordered by a Qualified Medical or Mental Health Professional, as clinically appropriate, to include observations and vital signs, including blood pressure.***
<u>Finding:</u> Vital signs were not consistently recorded in the medical records.

Partial compliance

Vital signs and observations of the mental state of patients on the withdrawal protocols are inconsistently documented in the medical records. The documentation of the mental status and the appearance of patients on the detoxification protocols are particularly important for those patients refusing vital signs. The face-to-face interaction of the patient on the detoxification protocol is critical to assure that the patient is stable and alive.

<u>Suggestion:</u> Submit the documentation to demonstrate that nursing staff are consistently completing assessments of inmates in detoxification on an individual schedule to include vital signs and observations.

***B.7.d. Annually, conduct a review of whether the detoxification training program has been effective in identifying concerns regarding policy, training, or the proper identification of and response to detoxifying prisoners. OPSO will document this review and provide its conclusions to the Monitor.***
<u>Finding:</u>

Partial compliance

B.7.d is asking if the training program is effective. The result of the post training testing demonstrates that the training is inadequate. The new medical provider must provide meaningful and medically accurate education to custody personnel and to medical and mental health professionals.

<u>Findings:</u>

B.8.a.   Partial Compliance



B.8.a.   Substantial Compliance

***B.8.a. OPSO shall ensure that medical and mental health staffing is sufficient to provide adequate care for prisoners' serious medical and mental health needs, fulfill constitutional mandates and the terms of this Agreement, and allow for the adequate operation of the Facility, consistent with constitutional mandates.***
Findings:

Partial Compliance

There continue to be challenges in securing and retaining adequate numbers of staff, including medical and mental health staff, to provide adequate care for inmates' serious medical and mental health needs. For example, there are insufficient staff to create and complete a multi-disciplinary treatment plan in the outpatient setting where all members of the treatment team are physically present with the inmate. The hiring of the psychiatric nurse has helped improve and ensure adequate care is being provided for inmates, especially in the area of medication refusals.

Suggestion: There needs to be adequate funding set aside to hire staff and ensure there is adequate, constitutionally mandated treatment throughout the entire facility, including facilitating consistent groups. The mental health provider needs to ensure an adequate ask for necessary staff to conduct all required services throughout OJC/TMH/TDC. This includes dedicated psychiatrist(s) for the outpatient (OJC) treatment program who would be available for much needed treatment planning. This includes having adequate staff to conduct safety/suicide watches, especially while non-suicide resistant cells are still in use. Ensure the MAT program is properly staffed for the number of patients being served.

***B.8.b. Within 90 days of the Effective Date, OPSO shall conduct a comprehensive staffing plan and/or analysis to determine the medical and mental health staffing levels necessary to provide adequate care for prisoners' mental health needs and carry out the requirements of this Agreement. Upon completion of the staffing plan and/or analysis, OPSO shall provide its findings to the Monitor, SPLC, and DOJ for review. The Monitor, SPLC, and DOJ will have 60 days to raise any objections and recommend revisions to the staffing plan.***
Finding:

Substantial Compliance

This finding could change without OSPO submitting an updated comprehensive staffing plan/analysis as the population changes and new needs are identified.

Findings:

B.9.a.   Partial Compliance

B.9.b.   Partial Compliance

B.9.c.   Partial Compliance



B.9.d.   Partial Compliance

B.9.e.   Partial Compliance

B.9.f.   Partial Compliance

***B.9.a. OPSO shall develop, implement, and maintain a system to ensure that trends and incidents involving avoidable suicides and self-injurious behavior are identified and corrected in a timely manner. Within 90 days of the Effective Date, OPSO shall develop and implement a risk management system that identifies levels of risk for suicide and self-injurious behavior and requires intervention at the individual and system levels to prevent or minimize harm to prisoners, based on the triggers and thresholds set forth in Appendix B.***

<u>Finding:</u>

Partial Compliance

There continues to be use of non-suicide resistant cells at OJC for inmates at high risk of self-harm without proper direct observation in place. There continues to be deviation from the policy when the document prescribed for suicide watch is not utilized. There has been no documented collaboration with Wellpath by OPSO to implement and maintain a system to ensure trends and incidents involving avoidable suicides and self-injurious behavior are identified and corrected in a timely manner. Identification of contraband is not immediately addressed which increases the risk of self-harm in the facility. Inadequate searches of inmates present risk factors which increases the risk of self-harm.

<u>Suggestion:</u> Continue analyzing the trends and incidents involving avoidable suicides and self-injurious behaviors to determine required interventions, like CAPs for adequate searches and removal of contraband, at the individual and system levels to prevent or minimize harm to inmates, especially inmates with repeated suicidal or self-harming behaviors. Consider ensuring any inmate who is not in a suicide resistant cell, especially in IPC, are under Direct Observation and Observation Worksheets are accurately completed. Document and demonstrate the collaborative efforts between OPSO and Wellpath to maintain a safe system.

***B.9.b. The risk management system shall include the following processes to supplement the mental health screening and assessment processes: incident reporting, data collection, and data aggregation to capture sufficient information to formulate a reliable risk assessment at the individual and system levels; identification of at-risk prisoners in need of clinical treatment or assessment by the Interdisciplinary Team or the Mental Health Committee; and development and implementation of interventions that minimize and prevent harm in response to identified patterns and trends.***

<u>Finding:</u>

Partial Compliance

Without collaboration between OPSO and Wellpath, there can be no adequate risk



management system in place for the facility. Both parties are necessary to submit and capture data which is analyzed in order to formulate a risk assessment to minimize harm. Simply having a meeting where one side offers information is not collaboration. These meetings should be where information is shared after collaborating and having a joint mission moving forward. There continues to be no functional Interdisciplinary Treatment Team operating consistently in general population to address formulating a reliable risk assessment. There is limited to no mental health involvement prior to the implementation of the disciplinary process. Segregation is known as a risk factor which negatively interferes with inmates with mental health challenges. Further analysis is needed to ensure processes are in place to address individual and systemic risk levels, especially surrounding risks involved with segregation.

<u>Suggestion:</u> Analyze and provide COLLABORATIVE documentation of risk management system processes, including listed criteria, which minimize and prevent harm in response to identified patterns and trends. This examination should include the need for functioning interdisciplinary treatment teams throughout the Facility who are focused on treatment strategies to minimize risk including adequate out-of-cell time and participation in the disciplinary process at the outset where a written recommendation can be completed and used to determine appropriate action. All parties have a part to play in decreasing risks and there should be intentional efforts to ensure that collaboration is happening and not just having one side sharing information at a monthly meeting.

***B.9.c. OPSO shall develop and implement an Interdisciplinary Team, which utilizes intake screening, health assessment, and triggering event information for formulating treatment plans. The Interdisciplinary Team shall:***

***1.      include the Medical and Nursing directors, one or more members of the psychiatry staff, counseling staff, social services staff, and security staff, and other members as clinical circumstances dictate;***

***2.      conduct interdisciplinary treatment rounds, on a weekly basis, during which targeted patients are reviewed based upon screening and assessment factors, as well as triggering events; and***

***3.      provide individualized treatment plans based, in part, on screening and assessment factors, to all mental health patients seen by various providers.***

<u>Finding:</u>

Partial Compliance

As discussed at this site visit, there are no consistent, functional multidisciplinary teams operating in person at OJC, due to staffing deficits and misunderstanding of which inmates require this. At the last site visit, it was made clear that the expectation is all inmates on the



behavioral health caseload have a multidisciplinary treatment plan. The treatment plans generated from TMH are adequate to address the needs of the patient. On the May 2023 audit tool for Mental Health Treatment Planning – OJC 2A: of the 15 cases reviewed, 20% of plans were not updated within the past 30 days; 20% of the plans had less than adequate appropriateness for the individual patient; 20% did not have the diagnosis on the treatment plan and 40% were not on the mental health caseload. On the May 2023 audit tool for Mental Health Treatment Planning – OJC 2B: 80% of patients did not have a multispecialty treatment plan updated within the past 60 days; 20% did not have appropriateness for the individual patient; 20% did not have their diagnosis on the treatment plan and 27% were not on the mental health caseload. On the May 2023 audit tool for Mental Health Treatment Planning – OJC 3E: 47% did not have a multispecialty treatment plan updated within the past 6 months; 20% did not have appropriateness for the individual patient; 20% did not have the diagnosis on the treatment plan. Treatment plans are to include AIMS testing every six months and in reviewing the audit tool from September 2023 titled Abnormal Involuntary Movement, 87% of patients did not have a treatment plan which included AIMS testing every six months and 60% did not include a diagnosis. The same audit tool from June 2023 showed 74% of patients did not have a treatment plan which included AIMS testing every six months and 74% did not include a diagnosis, and 27% of patients were not on the mental health caseload.

<u>Suggestion:</u> Continue to generate and complete treatment plans in TMH. A brief tutorial was presented at the site visit regarding the expectations of the Monitor in terms of adequate treatment plans. Create a plan/template for how treatment plans will be conducted and completed, including time frame, with a multidisciplinary team in all areas outside of TMH. Continue to work on the staffing plans and staffing needs in order to have multidisciplinary treatment team meetings throughout the facility. Follow the prescribed policy and include all that is necessary for a completed treatment plan.

*B.9.d. OPSO shall develop and implement a Mental Health Review Committee that will, on a monthly basis, review mental health statistics including, but not limited to, risk management triggers and trends at both the individual and system levels. The Mental Health Review Committee shall:*
*1. include Medical and Nursing Director, one or more members of the psychiatry staff and social services staff, the Health Services Administrator, the Warden of the Facility housing the Acute Psychiatric Unit, and the Risk Manage;*
*2.identify at-risk patients in need of mental health case management who may require intervention from and referral to the Interdisciplinary Team, the OPSO administration, or other providers;*



*3.conduct department-wide analyses and validation of both the mental health and self-harm screening and assessment processes and tools, review the quality of screenings and assessments and the timeliness and appropriateness of care provided, and make recommendations on changes and corrective actions;*
*4.analyze individual and aggregate mental health data and identify trends and triggers that indicate risk of harm;*
*5.review data on mental health appointments, including the number of appointments and wait times before care is received;*
*6.review policies, training, and staffing and recommend changes, supplemental training, or corrective actions.*

Finding:

Partial Compliance

Until there is a functioning Interdisciplinary Treatment Team assigned to OJC, there will be limitations in being able to adequately address at-risk patients in need of mental health case management who may need referral from the Mental Health Review Committee. There also needs to be more collaboration between OPSO and Wellpath for this provision to move into substantial compliance. The bulk of the work cannot be done by one party and presented to the other party but both parties need to be working together from the outset to help minimize risk and review the delivery of services by the system.

Suggestion: Create and implement an Interdisciplinary Treatment Team for OJC. Ensure treatment plans are done as per policy throughout the entire facility including 2A/2B/3E. Provide documentation of Mental Health Review Committee meetings, where COLLABORATION is taking place in both organizing and documenting findings, addressing all listed elements, including analysis of all data collected. This data should address and track systemic concerns as well.

*B.9.e. OPSO shall develop and implement a Quality Improvement and Morbidity and Mortality Review Committee that will review, on at least a quarterly basis, risk management triggers and trends and quality improvement reports in order to improve care on a Jail-wide basis.*
*1.The Quality Improvement Committee shall include the Medical Director, the Director of Psychiatry, the Chief Deputy, the Risk Manager, and the Director of Training.*
*2.The Quality Improvement Committee shall review and analyze activities and conclusions of the Mental Health Review Committee and pursue Jail-wide corrective actions. The Quality Improvement Committee shall:*
*a. monitor all risk management activities of the facilities through the review of risk data, identification of investigation or corrective action; and*
*b. generate reports of risk data analyzed and corrective actions taken.*

Finding:

Partial Compliance

This provision again requires collaboration between OPSO and Wellpath, or mental health provider, to achieve substantial compliance. While the creation of the MAC meeting is a step in



the right direction, a requirement is implementation of a quality improvement process where risk management triggers and trends are reviewed throughout the entire system and both parties work together to improve care at the facility. The monitor is looking for OPSO input into joint meetings and a work product that shows how both parties are working together to establish a safer facility.

Suggestion: Jail-wide corrective actions plans must be in place and a collaborative effort between OPSO and Wellpath needs to be pursued in order for all risk management activities to be properly monitored. COLLABORATION is a key component of this provision as it focuses on jail-wide CAPs. Provide documentation to support implementation of collaborative corrective action plans for areas which have been identified for improvement like alerting mental health to planned use of force, access to care challenges, medication refusal, timely access to laboratory services after inmate refusal, the grievance process and chronic medical care access. Provide documentation of attendance and addressed topics for the quarterly meetings along with proposed action items which will be pursued on a COLLABORATIVE basis. Demonstrate how collected and analyzed data is being used to effect positive change throughout the system.

***B.9.f. OPSO shall review mortality and morbidity reports quarterly to determine whether the risk management system is ensuring compliance with the terms of this Agreement. OSPO shall make recommendations regarding the risk management system or other necessary changes in policy based on this review. The review and recommendations will be documented and provided to the Monitor.***

Finding:

Non-Compliance

The monitor has not received any report from OPSO addressing the risk management system or making recommendations for necessary changes. Due to the lack of intentional effort by OSPO to provide the required information to the monitor, this provision is being downgraded to non-compliant. The Monitor expects a joint analysis with clear OPSO contributions.

Suggestion: Provide OPSO recommendations regarding the risk management system. This recommendation should be reviewed by Wellpath, or mental health provider, and there should be a collaborative effort in correcting identified areas of concern. Submit all information to demonstrate changes which have been made to address identified risk management issues throughout the jail facility. Provide the most recent report from OPSO to



determine whether there is compliance with the terms of this Agreement. Provide corrective actions plans which have been created and implemented over the year along with effectiveness of the proposed changes. If there are gaps or effectiveness is determined to be minimal, submit updated CAPs to address this.

### C.    Medical Care

*C. OPSO shall ensure constitutionally adequate treatment of prisoners' medical needs. OPSO shall prevent unnecessary risks to prisoners and ensure proper medication administration practices. OPSO shall assess on an annual or more frequent basis whether the medical services at OPP comply with the Constitution. At a minimum, OPSO shall:*

*1. Quality Managing of Medication Administration:*

> *a. Within 120 days of the Effective Date, ensure that medical and mental health staff are trained on proper medication administration practices, including appropriately labeling containers and contemporaneously recording medication administration.*
>
> *b. Ensure that physicians provide a systematic review of the use of medication to ensure that each prisoner's prescribed regimen continues to be appropriate and effective for his or her condition.*
>
> *c. Maintain medication administration protocols that provide adequate direction on how to take medications, describe the names of the medications, how frequently to take medications, and identify how prisoners taking such medications are monitored; an*
>
> *d. Maintain medication administration protocols that prevent misuse, overdose, theft, or violence related to medication.*

C. 1. a. Partial Compliance

C. 1. b. Partial Compliance

C. 1. c. Substantial Compliance

C. 1. d. Partial Compliance

### Overview:

The Monitors recognize that many health care practitioners are working very hard to ensure that patients do not suffer unnecessary risk of serious harm.  Systemic improvements, as recommended in this portion of the report, will facilitate quality health care and support those who currently hold themselves to the highest standards.

### Death

This patient was incarcerated in January 2023.  On intake he reported that he needed Symbicort, an inhaler to treat COPD and asthma. It was never prescribed. This patient was seen on May 2, for his chronic care visit for asthma and the degree of control was "fair". The provider recommended seeing the medication administration record and to continue the medications as ordered for asthma. However, there were no medications ordered for his asthma or his COPD.  He had multiple refusals (over 66) of his blood pressure and psychiatric medications. The patient did not see a provider for the refusals. On May 20, the



patient started complaining of left sided chest pain. He complained of this on May 20, June 9, June 10, June 15, and June 24.  On June 9th the charge nurse was made aware and sent the patient to the "second floor medical clinic". There is no indication in the medical record that he was evaluated when he was walked to the second-floor clinic. On June 16th the patient was evaluated by a registered nurse. She planned to schedule the patient for a provider visit. This never happened. On June 19th the patient had a directed physical exam by a provider. The provider identified the chronic care condition was anemia. She did not address the three sick calls in the previous week for left sided chest pain. She documented that the patient had missed numerous appointments at University Medical Center before his arrival in jail in January, six months earlier.  An outside pharmacy was called, and that pharmacy had no record of prescribing Symbicort to this patient. For this provider, the missed appointments, and the finding that this pharmacy had no record of prescribing Symbicort excused her cynical decision not to provide the prescription for his needed medication.

Peak flow measurements were ordered twice every week. This was not performed.

For six months no medication for asthma or COPD was prescribed. On June 24th the patient complained for the fifth time of chest pain and a nurse diagnosed musculoskeletal pain. On June 28 the patient was critically ill and 911 was called.  When the patient presented on June 28th with extreme respiratory failure the provider documented that the patient was "a poor historian". The University Medical Center physicians found that the patient had a collapsed lung on the left because of complications of severe COPD. He died of respiratory failure from complications of COPD.

<u>Summary of Death</u>

1.There is no morbidity and mortality review of this case of death. Wellpath concluded a mortality review of this patient's death was not indicated. Morbidity and mortality (M and M) reviews must be conducted and must be transparent to the Monitors.  During the Monitors' site visit, health care leadership said that there must be a "pre -call" with the central office that precedes the morbidity and mortality portion of the Monitors' visit. As a result of no "pre-call", there was only one morbidity and mortality report to discuss with the Monitors. This death did not qualify.

No counseling or training was provided to staff concerning this man's death and the multiple opportunities to intervene. Repeated provider incompetence and cynical care goes



uncorrected by the healthcare leadership.

The obfuscation of the morbidity and mortality process, hiding the process and excluding the federal monitors under the guise of legal privilege and patient privacy demonstrates a healthcare company that puts its self-interest above the welfare of the patients. The quarterly review of 2023 describes that morbidity reviews are performed by a multidisciplinary team that includes a designated member of the site, regional and corporate office staff. According to Wellpath, morbidity reviews are patient safety work product (PSWP) and part of the patient safety evaluation system (PSES) and, therefore, are not provided to the Monitors in their entirety. Meaningful analysis by morbidity, mortality, root cause analysis and death reviews result in improvements in health care delivery in the jail. In this jail, it does not happen. Under the corporate guise of patient privilege, the mistakes repeat, and the patients suffer.

OPSO, through Wellpath, is noncompliant with the overarching intent of the consent decree; to provide constitutional care that prevents unnecessary risk of serious harm.

<u>Sick call</u>

The medical sick call standard operating procedure is revised. Prior to the revision of the sick call process, there was no order or consistency, and many sick calls were not answered timely or not answered at all. The tracking protocol, known as the sick call log, provided little or no evidence of the process because of the failure of the nursing staff to complete the log. Also, multiple sick call paper requests are not entered into the patients' charts. The sick call process has not improved. A sick call nurse is needed consistently on both the day and night shift.

At this time, it is the expectation that the nighttime medication pass nurse will handle sick call too.  The med pass nurses are LPNs.  The med pass nurse has a difficult and time-consuming responsibility to sort patients' medication and deliver it to the correct patient. When there is no sick call nurse, the med pass nurse must do both med pass and sick call. Many (48%) of total grievances relate to medication issues. Most of these are related to not getting prescribed medication consistently.

The electronic system (Tiger system) of submitting sick calls or grievances has been inexcusably and incomprehensibly out of service in most of the pods for years now. This limits patients' access to sick call. It delays and complicates responses to grievances. The provision of an electronic communication system for the inmates to express their health care



needs and grievances is needed immediately.

### Custody and health care

Custody does not consistently make patients available to health care personnel.

Patients do not get medical care because custody personnel do not take the patient to the medical provider.  If the medical provider comes to the tier to see the patient, there is frequently no custody escort.  Custody staff shortages contribute to the problem of delay in the care of patients, however, allocation of custody staff to support the health care mission needs improvement.

### Off-site transportation

There is good communication and cooperation to get patients to their off-site appointments. The most common reasons for missed off-site appointments were patient refusals and release from jail. But when security does not get a patient to an off-site appointment, what happens?   This happened seven times in July and seven times in August. These appointments for off-site specialty care are precious. Each failure to transport by custody should be reviewed by OPSO. On the date of the monitors' site visit, two patients were rescheduled due to no transport.

### Telemedicine

The telemedicine consultation service initially was staffed by a physician. Now it is staffed by a nurse practitioner or physician. Telemedicine was utilized 175 times from April to September. 83 patients were sent to the emergency department and 87 were kept on site. Meaningful analysis should include the patient outcomes for those not sent to the emergency department for evaluation.  Telemedicine leads to face-to-face assessments over the telemonitor with an individual with a higher level of training than the available staff in the jail at the time of the consultation. Telemedicine with a provider during the hours there is no provider in the jail is to be encouraged.

### Providers

Currently there is no standard operating procedure or expectation delineating when a provider needs to evaluate a patient in person with an acute medical complaint. As in the past monitor reports, this reliance on LPN/ LVN level nurses and phone in orders by providers has resulted in critical deteriorations in patients 'conditions. Staffing a jail health care system with the least costly level of health care practitioner, without clear instructions to the providers on when they must see the patient in person, is disastrous. A provider issuing repeated verbal orders without a provider



assessment is unacceptable and dangerous for the patient.

Intake screening and health assessments

Chronic conditions are frequently discovered at intake screening. The protocols for chronic conditions found at intake screening are not always followed by the intake nurses. The intake nurse team is transitional and needs constant reeducation and reevaluation.

Health assessments consist of a physical exam and medical history and should be completed within 14 days of booking. Patients with time sensitive conditions such as HIV, insulin dependent diabetes, dialysis and steroid dependent asthma should have a health assessment within 48 hours of arrival in the jail.

There remain multiple patients with health assessments delayed for more than 14 days. Refusals should be signed and documented in the medical record. Appropriate referrals are not consistently made, Chronic care visits are scheduled but do not happen. In one case the patient was ordered for detoxification, but the detoxification protocol was never implemented.

Delays in communication of results to patients and providers

Only about 50% of patients are documented to have been informed of the result of their x-ray evaluation. Laboratory workflow is troubled.  Order, collection, and results received provider notified are not recorded. Laboratory results are not scanned into the medical record in a timely manner. Hopefully, the next medical provider will have an electronic medical record that electronically includes the laboratory results and the date and time the provider acknowledges the results.

Medical Record

The proprietary ERMA medical record of the health care company during the monitoring period is not up to modern electronic medical records standards.  Paper records are scanned into the medical record. Paper refusals do not reach the medical record. Reporting and recognition of medication variances is not computerized.  Sick call requests made on paper are not reliably entered into the medical record. Grievances written on paper go to a person who transcribes the handwritten health care services request into an electronic form. This causes a delay.  Electronic tablets communicating with the medical record is how modern medical records are maintained.

Dental care

Dental care is delayed. These delays can last for many months. There were 131 dental appointments in April and 63% of those were not attended. The poor attendance is a



common problem during all the monitoring periods. Most of these appointments are missed as the patients are not brought to the dental clinic by the custody staff.

Pain results from untreated dental conditions. There is only one deputy bringing patients to dental appointments. As discussed with the dentist and others on the December 2023 site visit, there should be a team of deputies and a supervisor for the clinic. The discussion revealed that the ideal number of deputies would be three, one responsible in the medical clinic, one responsible for the dental clinic and one moving the patients to and from the clinic. Sometimes there is no deputy assigned to the clinic. Despite the emergency staffing plan, meant to alleviate this problem, the patients do not get to the dentist on time. The dentist is willing to work an extra day per week, but he will require a dental assistant. The dentist wants to see eight patients per day. When custody does not bring the patients, the dentist is idle.

C. 1. a.

Finding:

Partial Compliance

Training in medication administration is insufficient. "Refusal" is documented even when a patient does not hear the announcement that a medication call is taking place. There were instances of refusal being noted when the patient was in the hospital. With respect to refusal documentations for patients on the CIWA protocol, a note describing the patient is needed. Medical staff should wake the patient up and make sure he is talking and alive.

C. 1. b.

Finding:

Partial Compliance

There should be provider review after multiple refusals are documented on a patient. Patient 1 had 66 refusals in a short time and no provider counseling. Overdoses and misuse are common. One patient recognized that he was given an anticoagulant in error. The response to his grievance was to counsel him that he was responsible for asking about his medication. This medication error of wrong patient, wrong medication, was never documented in the medication variances. (Patient 1)

C. 1. c.

Finding:



Substantial Compliance

C. 1. d.

<u>Finding:</u>

Partial Compliance

Overdoses, hoarding of medication, and diversion of medication are common.

***C.2.a. Provide the Monitor a periodic report on health care at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. Each report will include:***
> ***(1) number of prisoners transferred to the emergency room for medical treatment related to medication errors.***
> ***(2) number of prisoners taken to the infirmary for non-emergency treatment related to medication errors.***
> ***(3) number of prisoners prescribed psychotropic medications.***
> ***(4) number of prisoners prescribed "keep on person" medications; and***
> ***(5) occurrences of medication variances.***

***C.2.b. Review the periodic health care delivery reports to determine whether the medication administration protocols and requirements of this Agreement are followed. OPSO shall make recommendations regarding the medication administration process, or other necessary changes in policy, based on this review. The review and recommendations will be documented and provided to the Monitor.***

<u>Findings:</u>

C. 2. a.  Partial Compliance

C. 2. b. Partial Compliance

C. 2. a.

<u>Finding:</u>

Partial compliance

It is primarily the reporting of medication variances that causes this section to be partial and not substantial compliance.  Errors involving the "five rights" of medication administration; the right patient, the right drug, the right dose, the right route, and the right time. Although there is a report that includes the information required, the validity of the information is incomplete. The quality improvement team has identified a need for improved documentation of medication variances.

C.2. b.

<u>Finding:</u>

Partial Compliance



Mouth checks are not consistently performed by custody personnel. Custody staff are not timely available to accompany and provide security to medication pass nurses.  Repeated refusals do not reliably result in provider counseling of the patient.

*3.a. OPSO shall notify Qualified Medical or Mental Health staff regarding the release of prisoners with serious medical and/or mental health needs from OPSO custody, as soon as such information is available.*
*3.b. When Qualified Medical or Mental Health staff are notified of the release of prisoners with serious medical and/or mental health needs from OPSO custody, OPSO shall provide these prisoners with at least a seven-day supply of appropriate prescription medication, unless a different amount is necessary and medically appropriate to serve as a bridge until prisoners can reasonably arrange for continuity of care in the community.*
*3.c. For all other prisoners with serious medical and/or mental health needs who are released from OPSO custody without advance notice, OPSO shall provide the prisoner a prescription for his or her medications, printed instructions regarding prescription medications, and resources indicating where prescriptions may be filled in the community.*
*3.d. For prisoners who are being transferred to another facility, OPSO shall prepare and send with a transferring prisoner, a transition summary detailing major health problems and listing current medications and dosages, as well as medication history while at the Facility. OPSO shall also supply sufficient medication for the period of transit for prisoners who are being transferred to another correctional facility or other institution, in the amount required by the receiving agency.*

<u>Findings:</u>

C. 3. a Substantial compliance

C. 3. b. Substantial compliance

C. 3. c. Substantial compliance

C. 3. d. Substantial compliance

## IV.     D. 1. Sanitation and Environmental Conditions

<u>Findings:</u>

D.1. a.  Non-Compliance

D. 1. b.  Partial Compliance

D. 1. c.  Partial Compliance

D. 1. d.  Partial Compliance

D. 1. e.  Partial Compliance

D. 1. f.   Partial Compliance

D. 1. g.  Substantial Compliance

D. 1. h.  Partial Compliance

*IV. D. 1. a. OPSO shall provide oversight and supervision of routine cleaning of housing units, showers, and medical areas. Such oversight and supervision will include meaningful inspection processes and documentation, as well as establish routine cleaning requirements for toilets, showers, and housing units to be documented at least once a week but to occur more frequently.*



<u>Finding:</u>

Non-Compliance

<u>Observations:</u>

The Monitor physically inspected every occupied housing unit in the OJC and TDC/TMH facilities. The Monitor also interviewed the OPSO Sanitarian and Environmental Officer as well as inmates and staff during the inspection. Section D.1.a. remains in non-compliance based on the following observations.

The Monitor observed the overall level of cleanliness and sanitation in the TDC housing units to be generally acceptable with some specific exceptions. The cleanliness and sanitation of the TMH housing units was again found to be very good, including the appearance of the individual cells and janitor closets.  Cleaning equipment was properly stored.

The signs of insect infestation (ants and drain flies) noted during the previous inspection of the TDC housing units were observed to be substantially eliminated as was the sanitation/maintenance issue that was noted previously in and around janitor closet E205. The sewer line leak in Pod 2A has been remedied as well. The condition of the shower floors in the TDC area (peeling paint) was unchanged and the floors cannot be properly cleaned and sanitized. The issues were pointed out to Security and Maintenance staff for follow-up.

While the issues regarding the hot water set points for the TDC/TMH housing units were noted to be substantially resolved during the Monitor's previous inspection, temperature set points in at least one housing unit was off significantly (shower water too hot in 2A and 4W). The Maintenance staff member responsible for the TMH units was unable to demonstrate the separate mixing valve and temperature control systems for both the mop sink and inmate showers/sinks to the Monitor's satisfaction and that the systems were working properly. Aside from Pods 2A and 4W (TDC/TMH) above, all water temps were observed to be within prescribed limits during this inspection tour.

During the walk-through of the OJC facility, the Monitor noted that all circulation areas of the facility to be clean and generally well-kept. The Monitor observed the overall cleanliness in the OJC open dorms as well as pods with individual cells to have declined even further since the last inspection. Issues such as trash, debris, dirty floors, dirty windows, spilled food/milk, hoarded items, etc. and showers in particular, persist. Inmates throughout



the facility complained to the Monitor about the lack of cleaning supplies and minimal time provided by staff in the schedule for the inmates to clean their housing units. The Monitor again recommends OPSO urgently devise a new strategy to address these deficiencies, starting with holding security staff accountable for adherence to the pod cleaning schedules.

The OPSO Sanitarian submitted documentation reflecting staff efforts to clean the inmate showers beginning September 1, 2023, and provided log documentation for cleaning work performed by the newly merged janitorial staff now working under the Sanitarian's supervision. The Sanitarian provided logbook documentation reflecting the staff's efforts in the Intake Processing Center as well as information related to inspections. The Monitor recommends that the logbook process be replaced with simple daily check sheets noting the date, time, area, and cleaning performed as well as a corresponding inspection sign-off area.

The documentation also showed that approximately half of the inmate housing units in OJC had the showers cleaned at least once in September 2023 by Security staff and inmate workers. The Monitor wishes to recognize and encourage these recent efforts, particularly in lockdown units. While this is an improvement, showers should be thoroughly cleaned at least weekly with daily attention to remove debris and sanitize contact surfaces. There was no cleaning schedule or inspection documentation provided as required. Of note, the OPSO Warden provided the Monitor with a detailed correction action plan focused on the sanitation in the housing units. The document was provided on October 18, 2023; however, it did not appear to have been fully implemented as of the date of the on-site tour in December 2023. Should this plan be fully implemented, the Monitor anticipates substantial compliance in this area.

As noted previously, the OPSO practice of consolidating all cleaning supplies outside of the units has continued over the last two inspections and inmate access to the unit janitor closets remains restricted according to staff. The Monitor observed spray bottles and other cleaning equipment in individual cells and in the dormitory housing units. This indicates that Security staff continues to have issues maintaining accountability for the supplies. Documentation of "town hall" meetings conducted periodically by the Sanitarian noted regular complaints as to the availability of cleaning supplies. The Monitor found fewer janitor closets to be dirty and disorderly than during the previous visit. The closets are still in limited use as they remain the water source and storage location for mop buckets, mops,



brooms, etc. The Monitor observed that the recommended repairs of damaged metal flashing and shelving in the janitor closets had been substantially completed.  The Monitor continues to recommend that Sanitation, Maintenance, and Life/Safety staff should still inspect the closets routinely to ensure continued serviceability, particularly lighting, water service and drains.

The Monitor reviewed the monthly environmental inspection reports and found them to routinely include the majority of the sanitation issues noted by the Monitor on the date of the inspection indicating the sanitation issues in the housing units are persistent.

During the tour, inmate showers were specifically viewed by the Monitor and found to be in the same or worse shape in terms of general cleanliness and state of repair (rusted doors, panels, sprinkler escutcheons, etc.) relative to previous inspections.

Based on the above, the Monitor continues the Non-Compliance rating and expects, with the implementation of the new shower cleaning procedure, significant improvement prior to the next inspection tour.

The Monitor observed numerous inmate housing cells with obstructed air supply vents. Blocked supply registers present a code violation as it relates to ventilation and the number of required air exchanges per hour in rooms with toilets, the correctional environment presents unique challenges in maintaining this aspect of compliance. The Monitor observed an average number of individual cell supply registers to be covered or obstructed by the cell occupants during the inspection. The Monitor again noted that several dayroom return air registers still needed cleaning, particularly in the dorm-style units. The registers collect dust and lint and, if left unchecked, can promote the growth of mold.

The Monitor noted clutter issues in most housing pods, typically involving the improper storage of inmate property in cells and dormitories. The Life-Safety inspection reports during the rating period noted similar issues. The inmates' use of contraband in their cells was readily apparent in most of the OJC housing pods. The possession of altered items or utilizing items in ways other than their intended use should be considered by security staff to be contraband and confiscated. As noted in previous inspections, numerous cells were observed to have lights covered, home-made clotheslines strung across the cells, extra blankets used as carpeting on the cell floors, and numerous altered clothing items, to name a few of the issues.



The documentation and interviews again reflected the Sanitarian and Environmental staff's efforts at maintaining consistent and regular cleaning schedules for circulation areas and the merging of janitorial staff into the section has improved the section's overall performance and potentially lessening the impact of staff continuing to be assigned to security tasks on a daily basis.

The number of grievances regarding sanitation issues remained relatively low during the rating period. Inmate reports via grievance of inadequate or missing cleaning supplies were few in number, however this again was an issue noted in the "town hall" meetings conducted and documented by the Sanitarian in the housing units. The Monitor also heard repeated complaints from the inmates during the tour regarding access to cleaning supplies. The Facility's supply of replacement mops had been replenished since the last inspection. The Monitor does have a concern about the number of mops being destroyed, misused, or being hoarded after learning the high annual cost of replacing mops. The Monitor recommends staff review alternative styles of mops/mop heads available for the corrections environment. The Monitor also observed a significant number of mattresses that had been destroyed/altered by inmates attempting to create thicker mattresses. These "modified" mattresses could no longer be sanitized. The mattresses were readily apparent to the Monitor and the criminal mischief was apparently being ignored by Security staff.  The material safety sheets were in order in each area inspected.

As previously noted, regular provision of clean inmate clothing and bedding and appropriate inventory of these supplies are essential to sanitation, infection control and disease prevention. The Sanitarian reported that the regular exchange of inmate uniforms (weekly), sheets (weekly) and blankets (monthly) had returned to the regular schedule and the inventory for these items was sufficient to include the replenished supply of uniforms for the female inmates. This is an improvement since the last inspection. The Monitor did receive a few verbal complaints from inmates about the laundry exchange, typically that it was not on time. Overall, laundry grievances were down for the rating period at an average of about 7 per month.

The Monitor noted the hoarding and altering of issued clothing items and blankets continues to be an issue, There were several instances of altered clothing (homemade "hoodies", sewn on designs, and clothing used for other than its intended purpose) which is



of particular concern as it destroys the clothing item and precludes reissuance to another inmate thus decreasing stock levels prematurely. The security staff's apparent indifference to this issue continues to concern the Monitor.

The Monitor noted that the chronic maintenance issues with washers and dryers have yet to be remedied. Some appeared to be in working condition in several of the pods at the time of the inspection and several units were non-functioning or had been removed from service. The issue was again readily apparent to the Monitor as several pods without functioning dryers had inmate clothing hung to dry on most every handrail throughout the pods. Missing or non-functioning washers were obvious as the inmates are still washing their laundry in mop buckets that were left in the pod by security staff. The Monitor considers both practices to be unsanitary. OPSO staff stated that a laundry service for personal items was imminent and should mitigate this problem. Several inmates complained to the Monitor about inoperable equipment and a lack of access to the washers/dryers due to staff being present infrequently.

***IV. D. 1. b. Continue the preventive maintenance plan to respond to routine and emergency maintenance needs, including ensuring that showers, toilets, and sink units are adequately installed and maintained. Work orders will be submitted within 48 hours of identified deficiencies, or within 24 hours in the case of emergency maintenance needs.***

Finding:

Partial Compliance

Observations:

As with previous inspections, the Monitor reviewed the Sanitation and Environmental Conditions report, the OPSO Preventive Maintenance Plan, the Preventive Maintenance Schedule Summary report, and a Preventive Maintenance work orders status report as well as inmate grievances related to maintenance issues. The Monitor also interviewed and toured the facility with the Maintenance Director. The documentation reflected an on-going preventive maintenance program for major building systems and components consistent with OPSO policy and the Consent Judgment. Preventive maintenance continues to be a challenge.

Through the Monitor's personal observations and individual inmate interviews conducted during the walk-thru in each housing unit, the Monitor again observed a fair number of issues regarding water, electric or HVAC services in individual cells that were not addressed in a timely fashion, possibly due to a lapse in reporting by security staff and/or



Maintenance staffing issues. The issues primarily involved water pressure issues at the restroom sinks in open dormitory pods and in individual cells throughout OJC and TDC/TMH.

In Report #18, the Monitor noted a marked increase in the number of grievances received for the month of March 2023. The current rating period reflected a substantial decline in the number of Maintenance-related grievances and an overall decline in the trendline for Maintenance grievances from January 2022 forward. Miscellaneous grievances also continued its downward trend despite a significant jump in July 2023. Sanitation grievances spiked in May 2023, then showed a significant decline through the rest of the rating period. However, the trend for Sanitation grievances since January 2022 still reflects a slight increase overall.



While work orders being submitted in a timely manner is required by the Consent Judgment ("Work orders will be submitted within 48 hours of identified deficiencies, or within 24 hours in the case of emergency maintenance needs"), the timely follow-on repair actions are essential.

The Monitor observed a significant number of broken cell door windows throughout OJC that need immediate replacement as well as vandalized light switches in pod interview rooms that need to be repaired and "hardened" to prevent further damage. While OJC staff were aware of the vandalism, the Monitor makes this note to emphasize the need for timely replacement of the broken glass and electrical devices to eliminate the safety and security



risk. When asked why replacement takes so long, Maintenance staff often provide the explanation that parts must be ordered. It is suggested that OPSO maintain an inventory of items frequently needed.

With regard to the broken cell door windows, OPSO provided the following response:

> As for the timely changing of the cell door glasses, this is very cumbersome because the cell glasses have to be cut to the correct size. Precut cuts were tried several years ago which resulted is the disposal of thousands of dollars' worth of glass. The plan is to use a more durable plexiglass until the correct glass arrives, which can take up to several weeks.

It is the Monitor's opinion that, given the length of time it is currently taking to replace the broken windows, plexiglass is not an acceptable material for such "temporary" replacements. It has been the Monitor's experience that such a material poses an increased risk to inmates and staff in the event of a fire. Given the frequency of fire events occurring in individual cells and OPSO's inability to identify and eliminate the ignition sources, it is very likely that an inmate(s) confined in a cell or responding staff could be affected by hydrogen cyanide gas produced by burning plexiglass. It is for this reason that plexiglass is typically not used in place of security glass in a correctional environment. Plexiglass also poses a security risk when used in inmate areas. While plexiglass has a high ignition point (800+ degrees), it is easily deformed and melted at much lower temperatures (320-374 degrees Fahrenheit) and is thus more susceptible to vandalism by the inmates. The Monitor recommends OPSO investigate the possible use of a polycarbonate material as a temporary glass replacement. Polycarbonate is inherently flame-resistant, has a UL 94 flammability rating, and is essentially self-extinguishing. At a minimum, the Monitor strongly recommends OPSO vet this plan with the New Orleans Fire Marshal's Office.

***IV. D. 1. c. Maintain adequate ventilation throughout OPSO facilities to ensure that prisoners receive adequate air flow and reasonable levels of heating and cooling. Maintenance staff shall review and assess compliance with this requirement, as necessary, but no less than twice annually.***

<u>Finding:</u>

Partial Compliance

<u>Observations:</u>

As noted in previous tours, adequate air flow is maintained in the facilities but continues to be impeded in inmate cells when inmates block the air vents.  Similar to inspection #18, the Monitor noted the number of cells with blocked supply registers



exceeded 50% in three housing units in OJC. Compliance in this area remains an inmate supervision issue and must continue to be addressed by security staff consistently. The Monitor noted that the majority of housing dayrooms and cells to be at relatively reasonable levels of heating and cooling. Based on inmate complaints of "hot cells" and "no air" in at least four housing units with cells, the Monitor investigated and found at least two areas with minimal or no air flow in a section of inmate cells controlled by a single Variable Air Volume (VAV) box. The Maintenance Supervisor present was advised, and he initiated the repair process.

The following, regarding test and balance reports, is restated from previous reports. As noted in the two previous reports, test, and balance reports for the Kitchen/Warehouse (2014), OJC (2017) and TDC (2012) were the latest available to the Monitor.

Prior to the September 2019 report, this section had been interpreted as requiring comprehensive "test and balance" assessments on a semi-annual basis. Such assessments are very expensive and typically performed only during the commissioning of new or replacement HVAC systems. The Monitor has consistently requested OPSO provide reports from the Building Automation System (BAS) covering the inspection period which would reflect the actual air temperatures in the units and cells on a continuous basis. The BAS controls the heating and cooling throughout all occupied areas in OJC, and the reports would be used to verify the system's performance as well as the maintenance response to routine and emergency situations requiring service or replacement of the HVAC components. The previous Maintenance Director failed consistently to provide the requested information.

With the on-boarding of the new Chief Operating Officer, OPSO was able to coordinate with the BAS contractor and provide reports covering a one-month period from June to July. The reports provided demonstrated the air temperatures for each OJC housing unit noting any temperature swings outside the set parameters. The duration of such swings also indicates whether the issue was promptly addressed and returned to normal. The Monitor anticipates OPSO will now be able to provide the monthly BAS reports for the entire reporting period for Report #20. Based upon this significant development and the Maintenance staff's improving utilization of the BAS' capabilities observed by the Monitor, this section is moved from Non-Compliance to Partial Compliance.

As during previous tours, the Monitor reviewed live data of the system's warning and



alarm functions which reflected no major equipment or systems issues that had not been addressed at that moment. The Monitor inspected the BAS system and noted no alarms or alerts present on the system. During the inspection of the OJC housing units however, the Monitor observed several cells in various units that apparently lacked sufficient air flow. The Maintenance Director made note of these cells for follow-up. The Monitor continues to recommend that the Maintenance Director implement a routine audit/inspection of the housing areas for such occurrences and compare the findings with the BAS reports to ensure the system is working as expected. Additionally, the Monitor continues to recommend the Maintenance Director establish a "system status review" protocol requiring the responsible on-duty staff member to review the live HVAC equipment monitor status throughout the facility at least once per day to facilitate the identification and repair of any issues noted and document/log these reviews for routine recordkeeping as well as staff accountability.

It is the Monitor's opinion that the OJC Building Automation System and the new BAS system supporting the TMH units, as currently operated, meets the intent of the Consent Judgment regarding this section. The requested supporting documentation will be necessary to support a finding of substantial compliance.

***IV. D. 1. d. Ensure adequate lighting in all prisoner housing units and prompt replacement and repair of malfunctioning lighting fixtures in living areas within five days unless the item must be specially ordered.***

Finding:

Partial Compliance

Observations:

The Monitor observed sufficient lighting being provided in housing units and the majority of individual cells of both OJC and TDC. Maintenance staff continue to maintain a supply of replacement bulbs, transformers, or ballasts to repair malfunctioning lighting. Of concern, however, was the "Lighting Work Order" document provided to the Monitor. The Monitor took the average number of days for all "cell light" work order requests and the result exceeded the five days allowed by the Consent Judgment by just over double (10.23). The Monitor recommends the Maintenance Director consider options to prioritize such work to ensure compliance with the Consent Judgment. In light of this, the rating for this section is reduced from Substantial Compliance to Partial Compliance.

***IV. D. 1. e. Ensure adequate pest control throughout the housing units, including routine pest control spraying on at least a quarterly basis and additional spraying as needed.***

Finding:



Partial Compliance

Observations:

A review of the documentation submitted found sufficient evidence of a pest control program that meets the intent of the Consent Judgment. OPSO continues to maintain a pest control contract with a state licensed company for monthly service of all housing areas and bi-weekly service for the Kitchen/Warehouse. Inmate grievances related to pest control were reviewed and found to have been addressed in a timely manner. As with Tour #18, the Monitor observed several "drain fly" issues in housing units both at OJC and TDC and in the booking holding cells. The Monitor advised staff present to notify the Environmental Officer for remediation.

Environmental, Sanitation and Life-Safety staff performing inspections and responding to pest control grievances continue to initiate work orders for pest control and to document how, when, and where infestations are identified and remediated. The pest control contractor documentation showed no major infestations were found during routine inspections. However, the inspection reports continue to note numerous issues with debris in housing units and maintenance areas throughout OJC and TDC which was consistent with the Monitor's observations. During Tour #18, the Monitor noted significant signs of insects (ants, drain flies) and lizards in TDC 4E/W and 3E/W (pest accumulation on glue boards). During Tour #19, the Monitor noted these issues had been remediated. The Monitor noted significant clutter and debris (open and scattered food, trash, etc.) in multiple OJC housing units and cells. The majority of the issues relate directly to the level of cleanliness throughout the housing units and adjacent spaces which the Monitor deemed to be insufficient during the inspection. The exception was in the circulation and administrative areas maintained by the Sanitation staff. Again, the Monitor expects that OPSO can substantially reduce the issues noted by the pest control contractor by increasing the frequency and effectiveness of the cleaning of these areas by the inmates housed therein. Based on the foregoing observations, this section remains in Partial Compliance.

***IV. D. 1.f. Ensure that any prisoner or staff assigned to clean a biohazardous area is properly trained in universal precautions, outfitted with protective materials, and properly supervised.***

Finding:

Partial Compliance

Observations:



As noted in previous inspections, Policy 1101.07, "Bio-hazardous Spill Cleaning Procedures" [Revised 1/18/2018] Section VIII. A. 1 has been revised to allow properly trained and equipped inmates and deputies to clean up bio-hazardous spills. Training materials were devised by the Sanitarian. Documentation was provided to indicate twelve (12) inmates received the requisite training during the rating period.

The Monitor also reviewed training curricula and documentation indicating that during 2023, all pre-service staff received training in bio-hazardous cleanup procedures as part of their initial training in each new-hire class in 2023 up to the date of this inspection. Documentation reflected that the in-service training for this requirement was presented in 2023 although staff participation was less than 95%.

As of November 2018, the Sanitation and/or Environmental Officer is required to be notified of such incidents each business day to enable them to replace any bio-hazardous clean up protective materials used and inspect the area to ensure it was properly cleaned and sanitized. The Monitor was provided with several reports indicating that several bio-hazard incidents requiring cleanup had occurred, however the report narratives frequently failed to identify if, how, or by whom any remediation of the spill was accomplished. The Sanitarian has previously advised that her practice is to routinely review all reports mentioning such incidents to ensure proper follow-up is conducted. and that required cleanup/inspection procedures had been followed. The increase in the number of reports is a positive development, however the Monitor remains concerned that all incidents are not being reported. For example, during the inspection walk-through, an inmate reported that he was required to clean his newly assigned cell that was contaminated with feces from the previous occupant. The inmate reported he was not given the requisite PPE or cleaning supplies, nor was a report generated by security staff for review by the Sanitarian, This section remains in partial compliance for this reason.

***IV. D. 1. g. Ensure the use of cleaning chemicals that sufficiently destroy the pathogens and organisms in biohazard spills.***

Findings:

Substantial Compliance

Observations:

The Monitor was able to make direct observation that the chemicals on-hand and available to staff were sufficient to destroy the pathogens and organisms in bio-hazardous



spills common in a jail environment to include the COVID-19 virus. The Monitor is continuing to rate this section as being in substantial compliance.

Additionally, the chemical storage inventory documentation submitted demonstrated availability of a consistent supply of the required chemicals being maintained by the designated staff.

***IV. D. 1. h. Maintain an infection control plan that addresses contact, blood borne, and airborne hazards and infections. The plan shall include provisions for the identification, treatment, and control of Methicillin-Resistant Staphylococcus Aureus ("MRSA") at the Facility.***

Findings:

Partial compliance

Observations:

As with the previous inspection, the Monitor reviewed the OPSO infection control policy 1201.11 as well as the Wellpath Infection Control Program document (rev. 8/30/18) submitted by OPSO. No changes were noted, and all requisite areas required by the Consent Judgement were addressed, to include MRSA, and included by OPSO for the Monitor's review and found sufficient.

One concern was noted by the Monitor regarding bio-hazard cleanup kits maintained in the control rooms throughout the OJC and TMH/TDC facilities. The Monitor noted "extra" cleanup kits in control rooms and chemical storage rooms. The Monitor recommends that the distribution and replacement of these kits be controlled and inventoried to ensure availability, serviceability, and accountability. With no accountability, staff can utilize "extra" kits without following through with the requisite report(s) to the Sanitarian and thus circumventing the cleanup inspection process.

The Monitor observed numerous violations with regard to the handling and sanitation of inmate mattresses in OJC. The Monitor observed inmates being allowed keep damaged mattresses as "extras" to create thicker sleeping mats and to modify (destroy) mattresses by tearing/removing the outer material and combining the stuffing from several mattresses into one overstuffed mattress using extra sheets or blankets to bind them. Once a mattress is torn or stripped in such a fashion, it cannot be effectively sanitized. OPSO has previously provided for annual review of the policy and standard operating procedures for the handling of inmate mattresses to include staff and/or inmate sanitation training program that includes mattress cleaning, and chemical use and control. This procedure is



specifically required by the Infection Control Plan. Recognizing the foregoing issues, this section remains in Partial Compliance.

**IV. D. 2. Environmental Control**

Findings:

D. 2. a.  Substantial Compliance

D. 2. b.  Partial Compliance

*IV. D. 2. a. OPSO shall ensure that broken or missing electrical panels are repaired within 30 days of identified deficiencies, unless the item needs to be specially ordered.*

Findings:

Substantial Compliance

Observations:

OPSO Policies 601.02 "Reporting and Addressing Maintenance Needs" and Policy 601.03 "Preventive Maintenance" [August 15, 2016] are implemented. Major electrical panels at OJC and TMH are located in secure maintenance spaces inaccessible to inmates.

During the inspection, the Monitor noted minor issues in electrical rooms accessible by security staff (unauthorized items stored in electrical rooms). The issues were corrected on the spot by the Maintenance staff.

*IV. D. 2. b. Develop and implement a system for maintenance and timely repair of electrical panels, devices, and exposed electrical wires.*

Findings:

Partial Compliance

Observations:

During the tour, the Monitor noted several inmate interview rooms in the pod circulation areas that had damaged light switch assemblies. Apparently, inmates had vandalized the switches when left unsupervised in the interview rooms. The Monitor was advised that staff received a directive not to allow inmates to be held in these areas without supervision. The Monitor observed at least two inmates being temporarily held in these rooms while awaiting transfer or movement.

Also, during previous inspections, the Monitor noted chronic issues with the inmate intercom equipment. This was noted in previous reports under Section IV.D.1.b. (with no apparent action from OPSO Maintenance), however the Monitor has determined that this issue is more appropriately covered in this section that requires the implementation of "a



system for maintenance and timely repair of electrical panels, devices, and exposed electrical wires".

As with the previous inspection, the Monitor randomly asked inmates to activate their cell intercoms or did so himself to elicit a response from security staff. The Monitor did not observe any intercoms to be non-functioning during these random checks. Two inmates complained to the Monitor that intercom calls are not typically answered by staff. The Monitor has observed that, if the inmate is locked in a cell, the inmate must either call out to the pod deputy (if present) or request another inmate who may be out of their cell to alert the pod control staff member if an issue or emergency arises.

As noted in the previous inspections, the OJC intercom system is tied into the security electronics system. Pod deputies are able to answer intercom calls from inmates via a microphone/speaker on the pod desk (connected to the pod computer) *if* the equipment is present. If the pod deputy is logged out of the system, the intercom call is transferred to the pod control desk. The Monitor observed that the pod computer/intercom equipment is missing from at least half of the housing pods. This presents a safety issue even if the deputy is present in the pod. (i.e., an inmate experiencing a medical emergency or assault is unable to call out but can press the intercom button for help). The inmate intercoms in the Temporary Mental Health (TMH) facility are similarly non-working at the officer control stations, and while the Sallyport Control officer is able to observe and hear inmate intercom calls on the intercom system, and a microphone has been installed, there continues to be technical as well as staff training issues preventing two-way communication with the inmate in individual TMH cells. Subsequently, the Sallyport Control officer is not required to monitor inmate intercom calls. The Monitor recommends TMH supervisory staff review the procedure and require the Sallyport Control officer to notify the respective TMH pod deputy any time a call is observed on the control screen once the equipment is in working order.

The Monitor continues to recommend that IT staff responsible for the intercom systems make a comprehensive survey of working/non-working intercom equipment in every housing unit to facilitate repair of the system throughout the facility and add random intercom testing in every unit to the routine inspection process. Additionally, security staff supervisors should continue to emphasize the importance of the prompt response to emergency intercom calls by pod deputies and pod control staff.



Due to the chronic issue with the inmate intercom field devices and control equipment devices as well as the damaged switch devices, the Monitor is continuing this section in Partial Compliance and recommends OPSO develop a comprehensive near-term plan to repair and maintain the items.

**IV. D. 3. Food Service**

This report summarizes the findings for the Food Service provisions of the Consent Judgment based on the Monitor's document reviews and tour conducted October 18-19, 2023. The Monitor inspected the Orleans Justice Center (OJC) Kitchen/Warehouse; observed meal service activities; and spoke with OPSO supervisors and deputies, Summit contracted food service employees, and inmates.

Sections IV. D. 3. a. and IV. D. 3. b. of the Consent Judgment remained in Substantial Compliance.  Section IV. D. 3. c., remained in Partial Compliance.

Findings:

D. 3. a. Substantial Compliance

D. 3. b. Substantial Compliance

D. 3. c. Partial Compliance

*IV. D. 3. a. OPSO shall ensure that food service staff, including prisoner staff, continues to receive in-service annual training in the areas of food safety, safe food handling procedures, and proper hygiene, to reduce the risk of food contamination and food-borne illnesses.*

Findings:

Substantial Compliance

Observations:

D. 3. a. remains in Substantial Compliance for the period of April 2023 through September 2023 based on the documentation provided by Summit. The in-service training for employees included lessons on food safety and sanitation logs, general safety guidelines, labeling and date marking foods, and food safety myths and facts. Documentation was provided substantiating that food safety training, including a kitchen orientation quiz, was provided for new inmate kitchen workers, with the exception of August 2023 because there were no new inmate workers in the kitchen that month.

*IV. D. 3. b. Ensure that dishes and utensils, food preparation and storage areas, and vehicles and containers used to transport food are appropriately cleaned and sanitized on a daily basis.*

Findings:



Substantial Compliance

Observations:

For the compliance period of April 2023 through September 2023, the Monitor reviewed the provided documents including the Summit cleaning logs, daily chemical usage logs, chemical sanitizer concentration logs, and the kitchen vehicle inspection forms. The Monitor inspected the kitchen and observed it to be clean on October 18-19, 2023. Therefore, D. 3. b. remains in Substantial Compliance.

The floor in the area of the kitchen where the large cooking kettles are located, known as the "cook pit", had been an ongoing concern because it was deteriorating and in poor condition which made it difficult to clean. The floor was renovated on July 17-19, 2023. The Monitor inspected the newly renovated epoxy flooring and observed that it is easily cleanable facilitating compliance with section IV. D. 3. B. of the Consent Judgment requiring that food preparation areas are appropriately cleaned on a daily basis.

***IV. D. 3. c. Check and record on a daily basis the temperatures in the refrigerators, coolers, walk-in refrigerators, the dishwasher water, and all other kitchen equipment with a temperature monitor, to ensure proper maintenance of food service equipment.***

Findings:

Partial Compliance

Observations:

The Consent Judgment requires that OPSO "Check and record on a daily basis the temperatures in the refrigerators, coolers, walk-in refrigerators, the dishwasher water, and all other kitchen equipment with a temperature monitor, to ensure proper maintenance of food service equipment." During the last compliance review it was found that there were significant problems with the refrigeration that had been ongoing for several months, most of the coolers and freezers were turned off and empty, and no one at OPSO was aware of unsafe food temperatures that did not comply with regulatory requirements[15] as required by section IV. D. 3. c. of the Consent Judgment.

---

[15] The Louisiana Administrative Code does not designate a set-point for refrigerator/cooler temperatures, rather it states, "Food stored for cold holding and service shall be held at a temperature of 41°F (5°C) or below." Therefore, refrigeration must be set at a temperature that can maintain the foods stored therein at 41°F (5°C) or below. https://www.doa.la.gov/media/j3hnpfdy/51.pdf



The food service records for the compliance period provided by OPSO and Summit were reviewed by the Monitor. The daily Cooler Temperature Logs indicate that on April 30, 2023, kitchen staff documented that five of the 15 coolers/freezers were either "out" or not in use. The May logs document that the cooler temperatures continued to fluctuate and the May 15, 2023, log states that Maintenance informed the kitchen that there was a freon leak. The May 28, 2023, log states, "Reported more cooler outages" and lists 12 of the 15 coolers/freezers as being "out." On June 1, 2023, the log states that only the two freezers and one cooler were working and that the "cooler outages reported." July 2023 through September 2023 logs document that the refrigeration problems continued through the end of the reporting period. Therefore, OPSO has failed to ensure the proper maintenance of the food service equipment, specifically the coolers and walk-in refrigerators, resulting in section IV. D. 3. c. remaining in Partial Compliance for the rating period of April 2023 through September 2023.

The daily food production reports only document the temperatures of food items that are served "hot." The temperatures of "cold" foods are not documented on the logs. Breakfast meals are simply recorded as "cold breakfast" and the temperature of potentially hazardous foods such as milk are not documented. However, no documented cases of foodborne illness were reported.

During the tour, the Monitor was advised that the refrigeration was not immediately repaired as had been stated it would be on July 13, 2023. However, additional measures were implemented to help ensure food safety. The food storage was moved to the OJC kitchen cooler, and two refrigerated trailers were leased for the storage of food on the kitchen dock. A refrigeration repair company was hired to make repairs and they were completed on October 8, 2023. The Monitor measured refrigeration temperatures during the kitchen inspections and found them to be within the proper range.

Thermometers were purchased and installed in the refrigerators, coolers, and walk-ins and Summit retrained the kitchen employees to frequently check the temperatures and ensure that they are operating within the proper and safe temperature range as recommended in the previous report.

OPSO will need to achieve and maintain the following to reestablish a rating of Substantial Compliance for IV. D. 3. c.:



- Develop and implement a policy and procedure to check and record the internal temperature of potentially hazardous refrigerated/cold foods that are held cold for service on the meal/tray preparation line to ensure compliance with applicable regulatory codes, including Louisiana, Title 51, Public Health, Sanitary Code, Ch. 13, Section 1309, stating, "Food stored for cold holding and service shall be held at a temperature of 41°F (5°C) or below."
- Develop and implement a preventive maintenance plan that will ensure proper maintenance of the refrigeration system.
- Provide documented training to OPSO facilities staff and engineers that are assigned to the Kitchen/Warehouse on basic food safety principles, including refrigeration temperatures.

## IV. D. 4. Sanitation and Environmental Conditions Reporting

Findings:

D.4. a. Substantial Compliance

D.4. b. Substantial Compliance

***D. 4. a. Provide the Monitor a periodic report on sanitation and environmental conditions in the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. The report will include***
  ***(1) number and type of violations reported by health and sanitation inspectors;***
  ***(2) number and type of violations of state standards;***
  ***(3) number of prisoner grievances filed regarding the environmental conditions at the Facility;***
  ***(4) number of inoperative plumbing fixtures, light fixtures, HVAC systems, fire protection systems, and security systems that have not been repaired within 30 days of discovery;***
  ***(5) number of prisoner-occupied areas with significant vandalism, broken furnishings, or excessive clutter;***
  ***(6) occurrences of insects and rodents in the housing units and dining halls; and***
  ***(7) occurrences of poor air circulation in housing units.***

Findings:

Substantial Compliance

Observations:

The April 2023 through September 2023 Sanitation and Environmental reports as supporting documentation were available to the Monitor prior to the inspection tour. The biannual summary reports contained the requisite information spelled out by the Consent Judgement for this section. The State Department of Health performed a reinspection in April 2023 as a follow-up to their October 26, 2022, inspection. Documentation noted all deficiencies noted in the October 2022 inspection had been corrected. The next annual



Health Department inspection is not scheduled until after the reporting period and will be covered in the next report. The Monitor reviewed documentation covering items 3 through 6 and found no significant issues.

***IV. D. 4. b. Review the periodic sanitation and environmental conditions reports to determine whether the prisoner grievances and violations reported by health, sanitation, or state inspectors are addressed, ensuring that the requirements of this Agreement are met. OPSO shall make recommendations regarding the sanitation and environmental conditions, or other necessary changes in policy, based on this review. The review and recommendations will be documented and provided to the Monitor.***

Findings:

Partial Compliance

Observations:

The Consent Judgment requires a review of the periodic sanitation, and environmental conditions reports to ensure issues are addressed along with making recommendations regarding sanitation and environmental conditions and policy changes based upon the review. Such reviews are to be documented and provided to the Monitor. The Monitor reviewed the supporting documentation of the review conducted in August 2023 and provided by OPSO. The documentation was sufficient to satisfy the requirements of the Consent Judgment for this rating period. This places this section in Substantial Compliance.

## IV. E. 1. Fire and Life Safety

Findings:

E.1. a.  Non-Compliance

E. 1. b.  Substantial Compliance

E. 1. c.  Partial Compliance

E. 1. d.  Partial Compliance

E. 1. e.  Substantial Compliance

***IV. E. 1. a. Ensure that necessary fire and life safety equipment is properly maintained and inspected at least quarterly. These inspections must be documented.***

Finding:

Non-Compliance

Observations:

The Monitor was able to conduct a tour of the OJC, TDC/TMH, and the Kitchen/Warehouse facilities during the December 2023 inspection with the Facility Life Safety Officer and Maintenance Director. The Monitor observed no major issues with the fire



and life safety equipment with an issue with broken sprinkler heads being the exception and noted below. All fire extinguishers observed were found to be current on required inspections. Two control rooms in OJC were found to be missing the issued fire extinguisher. This was reported to the Life Safety Officer for an on-the-spot correction. The Fire Alarm Control Panels in the areas inspected were found to be properly inspected and free of trouble alarms with the exception of an unspecified trouble alarm on one remote panel in TDC Building 3. The Life/Safety Officer was already aware of the issue and a contractor scheduled to repair the issue.

The Monitor also reviewed all monthly and quarterly inspection documentation as well as outside inspection documentation. OPSO provided documentation of the annual contractor fire detection systems for OJC (12/22), TMH/TDC (4/23), and the Kitchen/Warehouse (4/23) which indicated no significant issues along with minor device replacements/programming corrections. There were no significant issues with the documentation, that requisite work orders had been generated when warranted, and that all major systems were operational/ "green tagged". Of note, the inspection documentation again reflected increasing trash issues throughout the inmate housing areas. The reports continued to note significant issues with excess inmate property being improperly stored in a substantial number of housing units. As previously noted, Staff should consider potential solutions to reduce the amount of clutter and potential fire-load the material presents.

During the previous Monitor tour, the Life Safety Officer advised the Monitor of an emerging issue with significantly increased instances of vandalism of sprinkler heads in individual inmate cells. At the time of the tour for this rating period, the Life Safety Officer advised that 22 sprinkler heads in one housing unit (3C) had been damaged and needed to be replaced. The life safety issue that arises with even a single broken sprinkler head in a housing unit is that fire suppression must be disabled for the entire housing unit until the head can be replaced (the sprinkler water supply is cut off). This situation persisted over a period of months in this particular housing unit and placed the facility as well as the inmates in the unit at risk should there be a fire event. As this condition was recognized during this rating period, the rating is reduced to Non-Compliance. The Monitor received notification that all 22 sprinkler heads were replaced, and water service restored as of January 2023. The Monitor recommends that OPSO consider the following policy/procedure changes should



this situation recur.

1. As a best practice and in support of life safety concerns, consider a policy/procedure requiring security staff perform and document 15 minute "fire watch" observation rounds in any unit that has the detection and/or suppression system disabled for any reason until such time the system(s) is restored.
2. Determine if the potential exists for a backup standpipe/fire hose response system in critical areas such as disciplinary, mental health and other lockdown units for fire suppression in the event the unit sprinkler system is out of service. Staff would require additional training in such a system and the equipment be included in monthly inspections.

As noted in the previous inspection, the Life Safety Officer continues to use the "Facility Dude" work order system to maintain the schedule of required inspections. The system notifies the Fire Safety Officer when an inspection is due. OPSO continues to maintain contracts with licensed vendors to complete annual inspections of all fire and life safety equipment. OPSO provided copies of quarterly inspections conducted by the Fire Safety Officer for Kitchen/Warehouse, OJC, and TDC/TMH for the 2023 second and third quarters. This documentation, supported by observations during the compliance tour, indicates that OPSO ensures that necessary fire and life safety equipment is properly maintained and inspected at required intervals, again, with the sprinkler head exception noted.

***IV. E. 1. b. Ensure that a qualified fire safety officer conducts a monthly inspection of the facilities for compliance with fire and life safety standards (e.g., fire escapes, sprinkler heads, smoke detectors, etc.).***

<u>Finding:</u>

Substantial Compliance

<u>Observations</u>:

The Monitor was provided with the monthly inspection documents for the Kitchen /Warehouse, OJC, and TDC/TMH facilities performed during the current compliance period. The reports are thorough and complete with all noted discrepancies listed with the associated work order number where appropriate. The findings were summarized in a memorandum covering the rating period. Clutter in cells and the draping of inmate clothing items and contraband sheets/blankets are the greatest contributors to the fire load in the pod housing units that can be effectively mitigated by security staff. These inspections are conducted by a qualified fire safety officer or a qualified contractor, as required by the

Consent Judgment.

***IV. E. 1. c. Ensure that comprehensive fire drills are conducted every six months. OPSO shall document these drills, including start and stop times and the number and location of prisoners who were moved as part of the drills.***

Finding:

Partial Compliance

Observations:

The Consent Judgment requires comprehensive fire drills every six months. OPSO provided documentation for 6 fire drills conducted in September and October 2023. The documentation did not cover each squad (2 only in OJC and 1 in TDC/TMH). This is not sufficient to meet the requirement for all staff to participate in a fire drill twice a year. The drills conducted prior to these dates occurred in the 4th quarter of 2022. Only "Level 1" drills were conducted (no inmate evacuation) due to COVID restrictions. Pre-service training was provided to all participants in classes held during the rating period. The rating for this section has been reduced to Partial Compliance.

***IV. E. 1. d. Provide competency-based training to staff on proper fire and emergency practices and procedures at least annually.***

Finding:

Partial Compliance

Observations:

OPSO has developed the requisite policy, training course syllabus/outline and written directives necessary for this section. OPSO training staff provided documentation noting life safety training was provided for the pre-service classes during the compliance period, but no documentation was provided for any in-service training that may have been conducted. This section is moved to Partial Compliance based on this lack of documentation. The Monitor considers the 90% success rate for in-service Life/Safety training to meet the requirement of the Consent Judgment. Although not covered in the language above, the success rate for pre-service Life/Safety training continues to be 100%.

***IV. E. 1. e. Within 120 days of the Effective Date, ensure that emergency keys are appropriately marked and identifiable by touch and consistently stored in a quickly accessible location, and that staff are adequately trained in use of the emergency keys.***

Finding:

Substantial Compliance

Observations:



Inspection reports note the routine verification of the keys and the Fire Safety Officer documents the periodic testing of the keys to verify they are operational. The Fire Safety Officer trains staff on the location and use of the keys during the fire and life safety training curriculum provided to all staff at the training academy. In the previous report, the Monitor noted the practice of some OJC security staff obtaining the emergency keys for non-emergency use rendering them unavailable as intended. The Life Safety Officer did not note any ongoing issues in this regard.

**IV. E. 2. Fire and Life Safety Reporting**

<u>Findings:</u>

E. 2. a.  Substantial Compliance

E. 2. b.  Substantial Compliance

*IV. E. 2. a. (1) – (3) Provide the Monitor a periodic report on fire and life safety conditions at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date and every six months thereafter until termination of this Agreement. Each report shall include:*
    *(1) number and type of violations reported by fire and life safety inspectors;*
    *(2) fire code violations during annual fire compliance tours; and*
    *(3) occurrences of hazardous clutter in housing units that could lead to a fire.*

<u>Finding:</u>

Substantial Compliance

<u>Observations:</u>

The semiannual reports, referenced in IV. E. 2. a., are conducted by OPSO on a semi-annual basis (Jauaryn through June and July through December). The Monitor was provided with the report covering 1/1/23 through 7/31/23 noting the requisite information and covering the first three months of the rating period. The 2023 Fire and Life Safety Conditions and inspections reports generated during the rating period were made available to the Monitor prior to the July 2023 inspection. The reports contained the supporting information for the semiannual reports spelled out by the Consent Judgment. In light of the supporting documentation, the Monitor finds this section to be in substantial compliance.

*IV. E. 2. b. Review the periodic fire and life safety reports to determine whether the violations reported by fire and life safety inspectors are addressed, ensuring the requirements of this Agreement are being met. OPSO shall make recommendations regarding the fire and life safety conditions, or other necessary changes in policy, based on this review. The review and recommendations will be documented and provided to the Monitor.*

<u>Finding:</u>

Substantial Compliance

<u>Observations:</u>



The Consent Judgment requires a review of the periodic fire and life safety reports to ensure issues are addressed along with making recommendations regarding the fire and life safety conditions and policy changes based upon the review. Such reviews are to be documented and provided to the Monitor.

The Monitor reviewed the supporting documentation provided by OPSO and determined that it was sufficient to satisfy the requirements of this section. OPSO provided documentation of the senior staff review of the semi-annual report conducted in August 2023 and noted no significant changes in this area. This places this section in Substantial Compliance.

## IV. F. Language Assistance

*F.1.a. OPP shall ensure effective communication with and provide timely and meaningful access to services at OPP to all prisoners at OPP, regardless of their national origin or limited ability to speak, read, write, or understand English. To achieve this outcome, OPP shall:*

    *(1) Develop and implement a comprehensive language assistance plan and policy that complies, at a minimum, with Title VI of the Civil Rights Act of 1964, as amended, (42 U.S.C. § 2000d et seq.) and other applicable law;*

    *(2) Ensure that all OPP personnel take reasonable steps to provide timely, meaningful language assistance services to Limited English Proficient ("LEP") prisoners;*

    *(3) At intake and classification, identify and assess demographic data, specifically including the number of LEP individuals at OPP on a monthly basis, and the language(s) they speak;*

    *(4) Use collected demographic information to develop and implement hiring goals for bilingual staff that meet the needs of the current monthly average population of LEP prisoners;*

    *(5) Regularly assess the proficiency and qualifications of bilingual staff to become an OPP Authorized Interpreter ("OPPAI");*

    *(6) Create and maintain an OPPAI list and provide that list to the classification and intake staff; and*

    *(7) Ensure that while at OPP, LEP prisoners are not asked to sign or initial documents in English without the benefit of a written translation from an OPPAI.*

*F.2.a. OPP shall develop and implement written policies, procedures and protocols for documenting, processing, and tracking of individuals held for up to 48 hours for the U.S. Department of Homeland Security ("DHS");*

*F.2.b Policies, procedures, and protocols for processing 48-hour holds for DHS will:*

    *(1) Clearly delineate when a 48-hour hold is deemed to begin and end;*

    *(2) Ensure that, if necessary, an OPPAI communicates verbally with the OPP prisoner about when the 48-hour period begins and is expected to end;*

    *(3) Provide a mechanism for the prisoner's family member and attorney to be informed of the 48-hour hold time period, using, as needed, an OPPAI or telephonic interpretation service;*

    *(4) Create an automated tracking method, not reliant on human memory or paper documentation, to trigger notification to DHS and to ensure that the 48-hour time period is not exceeded.*

    *(5) Ensure that telephone services have recorded instructions in English and Spanish;*

    *(6) Ensure that signs providing instructions to OPP prisoners or their families are translated into Spanish and posted;*

    *(7) Provide Spanish translations of vital documents that are subject to dissemination to OPP prisoners or their family members. Such vital documents include, but are not limited to:*

        *i. grievance forms;*

        *ii. sick call forms;*

        *iii. OPP inmate handbooks;*

        *iv. Prisoner Notifications (e.g., rule violations, transfers, and grievance responses) and*



     *v. "Request for Services" forms.*
  *(8) Ensure that Spanish-speaking LEP prisoners obtain the Spanish language translations of forms provided by DHS; and*
  *(9) Provide its language assistance plan and related policies to all staff within 180 days of the Effective Date of this Agreement.*
**F.3.a. Within 180 days of the Effective Date, OPP shall provide at least eight hours of LEP training to all corrections and medical and mental health staff who may regularly interact with LEP prisoners.**
  *(1) LEP training to OPP staff shall include:*
    *i. OPP's LEP plan and policies, and the requirements of Title VI and this Agreement;*
    *ii. how to access OPP-authorized, telephonic and in-person OPPAIs; and*
    *iii. basic commands and statements in Spanish for OPP staff.*
  *(2) OPP shall translate the language assistance plan and policy into Spanish, and other languages as appropriate, and post the English and translated versions in a public area of the OPP facilities, as well as online.*
  *(3) OPP shall make its language assistance plan available to the public.*
**F.4.**
  *(1) OPP shall ensure that adequate bilingual staff are posted in housing units where DHS detainees and other LEP prisoners may be housed.*
  *(2) OPP shall ensure that an appropriate number of bilingual staff are available to translate or interpret for prisoners and other OPP staff. The appropriate number of bilingual staff will be determined based on a staffing assessment by OPP.*

Findings:

F.1. a.  Substantial Compliance

F. 2. a. Substantial Compliance

F. 2. b. Substantial Compliance

F. 3. a. Partial Compliance

F. 4.   Substantial Compliance

Observations:

  The Language Assistance Plan required by this paragraph has been prepared and finalized. F. 1. a. remains in substantial compliance.

  OPSO asserts that DHS and ICE inmates are not detained. OPSO developed a policy which was submitted to the Monitors which has provisions F. 2. a. and b. into substantial compliance.

  OPSO provided documentation regarding the use of the language line. OPSO has provided documentation regarding the number of bilingual staff and the manner in which the needs of language assistance are provided bringing provisions of F. 4. into substantial compliance. The Consent Judgment specifically requires at least eight hours of LEP training for all deputies and mental health staff who may regularly interact with LEP inmates. Provision IV. F. 3. a. is determined in partial compliance as only four hours of training as opposed to the eight hours of training is provided. Training of security and medical staff assigned to the IPC should be sufficient.



## IV. G.  Youthful Prisoners

*IV. G. Consistent with the Prison Rape Elimination Act of 2003, 42 U.S.C. § 15601, et seq., and its implementation of regulations, a youthful prisoner shall not be placed in a housing unit in which the youthful prisoner will have sight, sound, or physical contact with any adult prisoner through use of a shared dayroom or other common space, shower area, or sleeping quarters. In areas outside of housing units, OPSO shall either: maintain sight and sound separation between youthful prisoners and adult prisoners, or provide direct staff supervision when youthful prisoners and adult prisoners have sight, sound, or physical contact. OPP shall ensure that youthful prisoners in protective custody status shall have no contact with, or access to or from, non- protective custody prisoners. OPP will develop policies for the provision of developmentally appropriate mental health and programming services.*

Finding:

Substantial Compliance

Observations:

OPSO has provided documentation that its separation of youthful inmates from adult inmates was found in compliance during its recent PREA audit in housing units.  A concerted effort has been made to house all youthful inmates at the juvenile detention facility. When housed at OJC, Tulane provides developmentally appropriate mental health services to youthful inmates. Travis School continues to provide educational and programming services. The requirement for developmentally appropriate mental health and programming services is separate and apart from PREA. There was no indication that any youthful inmates were housed in OJC during the monitoring period. The Monitors are concerned as to how OPSO will manage the housing of youthful inmates with the change in state law lowering the age of criminal responsibility to 17 year of age. This provision is now in substantial compliance.

## VI. A – D. The New Jail Facility and Related Issues

### A.  New Jail

*The Parties anticipate that Defendant will build a new jail facility or facilities that will replace or supplement the current facility located at 2800 Gravier Street, New Orleans, Louisiana. This Agreement shall apply to any new jail facility.*

Finding:

VI. A. Substantial Compliance.

### B.  Design and Design Document

*Defendant shall obtain the services of a qualified professional to evaluate, design, plan, oversee, and implement the construction of any new facility. At each major stage of the facility construction, Defendant shall provide the Monitor with copies of design documents.*

Finding:

VI. B. Substantial Compliance



Observations:

    These provisions apply to the construction of any new facility. Phase III is such a facility. As the City is the entity overseeing the construction of Phase III, OPSO must coordinate with the City to provide copies of design document at each major stage. The City has been providing access to design documents and information regarding Phase III, but assistance from the Court has often been necessary to facilitate access.

### C.  Staffing

*Defendant shall consult with a qualified corrections expert as to the required services and staffing levels needed for any replacement facility. OPSO shall complete a staffing study to ensure that any new facility is adequately staffed to provide prisoners with reasonable safety.*

Finding:

VI.C. Partial Compliance

Observations:

    The Consent Judgment requires that the Defendant **shall** consult with a qualified corrections expert as to the required services and staffing levels needed for any replacement facility. The staffing plan for OJC developed in 2019 is now longer sufficient due to the lack of staff for deployment to the positions. A revised staffing plan has been in the works for over a year. OPSO is encouraged to complete the staffing plan and develop a corrective plan that will allow for its implementation. The paragraph is in partial compliance.

### D.  Compliance with Code and Standards

*Defendant will ensure that the new jail facility will be built in accordance with: (1) the American Correctional Association's standards in effect at the time of construction; (2) the American with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101-12213, including changes made by the ADA Amendments of 2008 (P.L. 110-325) and 47 U.S.C. §§ 225-661, and the regulations there under; and (3) all applicable fire codes and regulations.*

Finding:

Monitors not qualified to evaluate.

Observations:

    The Monitors do not have the knowledge or expertise to evaluate compliance with this paragraph. OPSO asserts that it is in compliance with this provision, without offering documentation. Documentation from the architect would be sufficient.

## VII. Compliance and Quality Improvement

## VII. A. Policies, Procedures, Protocols, Training Curriculum and Practices

*Within 120 days of the Effective Date, OPSO shall revise and/or develop its policies, procedures, protocols, training curricula, and practices to ensure that they are consistent with, incorporate, address, and*



*implement all provisions of this Agreement. OPSO shall revise and/or develop, as necessary, other written documents, such as screening tools, logs, handbooks, manuals, and forms, to effectuate the provisions of this Agreement. OPSO shall send pertinent newly drafted and revised policies and procedures to the Monitor as they are promulgated. The Monitor will provide comments on the policies to OPSO, SPLC, and DOJ within 30 days.*

*OPSO, SPLC, and DOJ may provide comments on the Monitor's comments within 15 days. At that point, the Monitor will consider the Parties' comments, mediate any disputes, and approve the policies with any changes within 30 days. If either party disagrees with the Monitor, they may bring the dispute to the Court. OPSO shall provide initial and in-service training to all Facility staff with respect to newly implemented or revised policies and procedures. OPSO shall document employee review and training in new or revised policies and procedures.*

Finding:

VII. A. Partial Compliance

Observations:

OPSO has now completed the development of the required policies. OPSO's efforts in the development of procedures and lesson plans resulted in this paragraph continuing to be in partial compliance. OPSO should continue to seek the input of the Monitors and Parties on any revisions of the policies required by the Consent Judgment. OPSO is reminded that it may not unilaterally change those policies.

### VII. (H). B.  Written Quality Improvement Policies and Procedures

*Within 180 days of the Effective Date, Defendant shall develop and implement written quality improvement policies and procedures adequate to identify serious deficiencies in protection from harm, prisoner suicide prevention, detoxification, mental health care, environmental health, and fire and life safety in order to assess and ensure compliance with the terms of this Agreement on an ongoing basis. Within 90 days after identifying serious deficiencies, OPSO shall develop and implement policies and procedures to address problems that are uncovered during the course of quality improvement activities. These policies and procedures shall include the development and implementation of corrective action plans, as necessary, within 30 days of each biannual review.*

Finding:

VII. B. Partial compliance

Observations:

OPSO has provided documentation that it is now developing plans to identify serious deficiencies, and to address problems that are uncovered during the course of quality improvement activities to warrant a finding of partial compliance. If any have been completed, they have not been shared with the Monitors. These plans need to contain specific performance measures, timelines, and persons responsible. They also need to be implemented with appropriate development of corrective action to be taken and the auditing of adherence to the action plan.

### VII. (I). C. Full-Time Compliance Coordinator



*The Parties agree that OPSO will hire and retain, or reassign a current OPSO employee for the duration of this Agreement, to serve as a full-time OPSO Compliance Coordinator. The Compliance Coordinator will serve as a liaison between the Parties and the Monitor and will assist with OPSO's compliance with this Agreement. At a minimum, the Compliance Coordinator will: coordinate OPSO's compliance and implementation activities; facilitate the provision of data, documents, materials, and access to OPSO's personnel to the Monitor, SPLC, DOJ, and the public, as needed; ensure that all documents and records are maintained as provided in this Agreement; and assist in assigning compliance tasks to OPSO personnel, as directed by the Sheriff or his or her designee. The Compliance Coordinator will take primary responsibility for collecting information the Monitor requires to carry out the duties assigned to the Monitor.*

Finding:

Substantial Compliance

Observations:

Captain Nicole Harris (recently promoted to Major) has been designated the Compliance

Coordinator.

## VII. (J.) D. Self-Assessment

*On a bi-annual basis, OPSO will provide the public with a self-assessment in which areas of significant improvement or areas still undergoing improvement are presented either through use of the OPSO website or through issuance of a public statement or report.*

Finding:

Substantial Compliance

Observations:

A community meeting was held in April 2023. This provision is in substantial

compliance.

## VIII. Reporting Requirements and Right of Access

## VIII. A. Periodic Compliance Reporting

*OPSO shall submit periodic compliance reports to the Monitor. These periodic reports shall be provided to the Monitor within four months from the date of a definitive judgment on funding; and every six months thereafter until termination of this Agreement. Each compliance report shall describe the actions Defendant has taken during the reporting period to implement this Agreement and shall make specific reference to the Agreement provisions being implemented. The report shall also summarize audits and continuous improvement and quality assurance activities, and contain findings and recommendations that would be used to track and trend data compiled at the Facility. The report shall also capture data that is tracked and monitored under the reporting provisions of the following provisions: Use of Force; Suicide Prevention; Health Care Delivered; Sanitation and Environmental Conditions; and Fire and Life Safety.*

Finding:

Partial Compliance

Observations:

As noted in the individual section, several of the required reports have not been

submitted during this monitoring period.



## VIII. B.  (Notification of) Death of Any Prisoner

*OPSO shall, within 24 hours, notify the Monitor upon the death of any prisoner. The Monitor shall forward any such notifications to SPLC and DOJ upon receipt. OPSO shall forward to the Monitor incident reports and medical and/or mental health reports related to deaths, autopsies, and/or death summaries of prisoners, as well as all final SOD and IAD reports that involve prisoners. The Monitor shall forward any such reports to SPLC and DOJ upon receipt.*

Finding:

Substantial Compliance

## VIII. C. Records

*Defendant shall maintain sufficient records to document that the requirements of this Agreement are being properly implemented and shall make such records available to the Monitor within seven days of request for inspection and copying. In addition, Defendant shall maintain and provide, upon request, all records or other documents to verify that they have taken the actions described in their compliance reports (e.g., census summaries, policies, procedures, protocols, training materials, investigations, incident reports, tier logs, or use of force reports).*

Finding:

Partial Compliance

Observations:

During this compliance period, OPSO often did not provide incident notifications and investigations requested within seven days. This provision remains in partial compliance.

## III.  Stipulated Orders

OPSO and the Plaintiffs/DOJ negotiated two agreements after Compliance Report #3. The language of the Stipulated Orders was linked directly to the Consent Judgment and represented priority areas for inmate safety. Some of them required a one-time action such as the posting of a memorandum or providing of training by a specific date. Some of the provisions of the Stipulated Order of February 11, 2015, contain on-going obligations that are in addition to the Consent Judgment or clarify the obligations under the Consent Judgment.

The three provisions of the April 22, 2015, Stipulated Order are in substantial compliance and contained provisions that were to be accomplished by specific dates during April 2015. As those dates have passed, the Monitors no longer monitor those provisions. The Stipulated Order of February 11, 2015, has provisions which require ongoing compliance.

*1. a. At each of the scheduled Court status conferences, the Sheriff or his designee shall report to the Court regarding OPSO's compliance status with each section (e.g. Section IV.A, IV.B.) of the Consent Judgment. This report shall include a summary of OPSO's progress since the immediate previously scheduled status conference and will include in the reporting OPSO's planned actions in the next 60 days to come into*



*compliance.*

Finding:

Partial Compliance

Observations:

OPSO has not sufficiently complied with the requirements of this provision. This provision envisions outlining planned actions in the form of a report to the Court.

***1. b. OPSO shall comply with the Consent Judgment's requirement for periodic a compliance report as set forth in Consent Judgment Section VIII.A.2. The report shall describe the steps OPSO has taken in furtherance of compliance, and the activities planned during the next reporting period. The first report is due by April 1, 2015, and periodic reports shall be due in accordance with Section VIII.A, and/or on dates mutually agreed to by the parties and the Monitors, and approved by the Court, as necessary.***

Finding:

Partial Compliance

Observations:

OPSO has not sufficiently complied with the requirements of this provision. This provision envisions outlining planned actions in the form of a report to the Monitors every six months.

***1. c. Within 24 hours of the occurrence of any of the following incident, OPSO shall notify the Monitor via email:***

- ***Death of an inmate/arrestee while held in custody (or housed in a hospital to which the inmate has been committed for care and retain in the custody of OPSO; or whose injury occurred while in custody and was subsequently released from custody);***
- ***An inmate's/arrestee's suicide, suicide attempt, aborted suicide attempt, suicidal intent, and/or deliberate suicide self-harm gesture as defined by the American Psychiatric Association;***
- ***An inmate's allegation of sexual abuse, sexual assault, sexual harassment, or voyeurism whether the incident is between or among inmates, or between or among inmates and a staff/contractor or volunteer;***
- ***An inmate's report, or a report by a staff/contractor or volunteer, of any inmate/inmate allegation of assault; or other inmate allegation of felonies occurring to them while in custody;***
- ***An inmate's report of a report by a staff/contractor or volunteer, of any allegation of excessive force by an employee, volunteer or contractor;***
- ***Suspension or arrest of any OPSO employee, volunteer, or contractor for alleged criminal activities while on-duty and/or in a facility under the control of OPSO; and***
- ***Any recovery of significant contraband, specifically weapons.***

Finding:

Partial Compliance

Observations:

OPSO has not sufficiently complied with the requirements of this provision.  At best, the Monitor learns of some of the items through incident reports, review of investigations and newspaper reports. Seldom is the notification within 24 hours. OPSO should put in place



a system to comply with this provision.

**5. b. Commencing March 1, 2015, OPSO will make available to the Monitors, at the Monitors' request, the quarterly reviews conducted by ISB and the command staff regarding the operation of the EIS system, including supporting documentation reviews, as delineated by Section IV A. 4. b., c., d., and e. of the Consent Judgment.**

Finding:

Partial Compliance

Observations:

OPSO has not sufficiently complied with the requirements of this provision.  As noted in the rating and comments in Section IV. A. above, simply providing a list of names with no indication by that the command staff has reviewed the list and determined what action, if any, should be taken is insufficient.

**7. a. OPSO shall provide a monthly report to the Monitors, identifying the number of deputies hired the previous month; the number of deputies who resigned, if known, the reason for resignation, and the date the deputy entered service; and the number of deputies who were terminated, the reason for termination, and the date the deputy entered service. The same report shall be provided for non-sworn (civilian staff). A cumulative annual total will also be included as part of this report.**

Finding:

Substantial Compliance

Observations:

OPSO provides a monthly report that complies with the requirements of this provision.

**7. c. At the scheduled status conferences with the Court, OPSO shall report regarding progress to achieving hiring based on the plan, as well as any modifications and update to the plan.**

Finding:

Partial Compliance

Observations:

OPSO has not sufficiently complied with the requirements of this provision. This provision envisions outlining progress on adherence to the recruitment plan in the form of a report to the Court.



| | Report #1 2/13/14 | Report #2 8/26/14 | Report #3 2/25/15 | Report #4 9/9/15 | Report #5 3/17/16 | Report #6 10/25/16 | Report #7 5/1/17 | Report #8 1/12/18 | Report #9 8/25/18 | Report #10 3/18/19 | Report #11 9/19/19 | Report #12 3/6/20 | Report#13 11/16/20 | Report#14 5/17/21 | Report#15 11/15/21 | Report#16 06/26/22 | Report#17 12/08/22 | Report#18 07/13/23 | Report#19 12/07/23 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **IV. A. 1. Use of Force Policies and Procedures/Margo Frasier** | | | | | | | | | | | | | | | | | | | |
| IV. A. 1.a. | ND | NC | NC | PC | NC | PC | PC | PC | PC | SC | SC | SC | SC | PC | PC | PC | PC | PC | PC |
| IV. A. 1.b. | ND | NC | NC | PC | NC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV. A. 1.c. | ND | NC | NC | PC | NC | PC | PC | PC | PC | SC | SC | PC | PC | PC | PC | NC | NC | NC | PC |
| **IV.A.2. Use of Force Training/Margo Frasier and Shane Poole** | | | | | | | | | | | | | | | | | | | |
| IV. A. 2. a. | ND | NC | NC | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC | PC | PC | SC | SC | PC | PC |
| IV. A. 2. b. | ND | NC | NC | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC | PC | SC | SC | SC | SC | PC |
| IV. A. 2. c. | ND | NC | NC | NC | NC | NC | NC | NC | PC | PC | SC | SC | SC | PC | SC | SC | SC | SC | SC |
| **IV.A.3. Use of Force Reporting/Margo Frasier** | | | | | | | | | | | | | | | | | | | |
| IV. A.3 a. | ND | NC | NC | PC | NC | PC | PC | PC | PC | SC | PC | PC | SC | SC | SC | PC | PC | PC | PC |
| IV. A.3 b. | ND | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV. A.3 c. | ND | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | PC | PC | PC | PC | PC |
| IV. A.3 d. | ND | NC | NC | PC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV. A.3 e. | ND | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | PC | PC | PC | PC |
| IV. A.3 f. | ND | NC | NC | PC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV. A.3 g. | ND | NC | NC | PC | PC | PC | PC | PC | SC | SC | PC | PC | SC | SC | SC | SC | PC | PC | PC |
| IV. A.3 h. | ND | NC | NC | NC | NC | NC | NC | NC | PC | SC | SC | PC | PC | PC | PC | PC | PC | PC | PC |
| **IV.A.4. Early Intervention System ("EIS") /Margo Frasier and Shane Poole** | | | | | | | | | | | | | | | | | | | |
| IV.A.4.a. | ND | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | PC | PC | PC | PC | PC |
| IV.A.4.b. | ND | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | PC | PC | PC | PC | PC | PC |
| IV.A.4.c. | ND | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | PC | PC | PC | PC | PC |
| IV.A.4.d. | ND | NC | NC | NC | NC | PC | PC | PC | NC | PC | SC | SC | SC | SC | SC | SC | PC | PC | PC |
| IV.A.4.e. | ND | ND | ND | ND | NC | PC | NC | NC | NC | SC | SC | SC | SC | SC | SC | PC | PC | PC | PC |
| **IV.A.5. Safety and Supervision/Margo Frasier** | | | | | | | | | | | | | | | | | | | |
| IV.A.5.a. | ND | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | SC | SC | PC | PC | PC | PC | PC | PC |
| IV.A.5.b. | ND | NC | NC | NC | NC | NC | NC | NC | NC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC |

| | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IV.A.5.c. | ND | NC | NC | NC | NC | NC | NC | PC | PC | PC | SC | SC | SC | SC | SC | PC | PC | PC | PC |
| IV.A.5.d. | NC | NC | PC | PC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | NC | NC | NC |
| IV.A.5.e. | ND | NC | NC | PC | PC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.A.5.f. | ND | NC | NC | PC | PC | SC | SC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.5.g. | ND | NC | ND | PC | NC | NC | NC | NC | NC | PC | SC | SC | SC | SC | SC | SC | SC | PC | PC |
| IV.A.5.h. | ND | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | SC | SC | PC | PC | PC | PC | PC | PC |
| IV.A.5.i. | ND | NC | NC | PC | PC | PC | PC | PC | SC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.A.5.j. | ND | NC | PC | PC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.A.5.k. | ND | NC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | PC | PC | PC | PC | NC | NC | NC |
| IV.A.5.l. | ND | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | PC | PC | PC | PC | PC | PC | PC |
| IV.A.6. Security Staffing/Margo Frasier | | | | | | | | | | | | | | | | | | | |
| IV.A.6.a. | ND | PC | PC | PC | SC | SC | PC | PC | PC | SC | SC | PC | PC | PC | PC | NC | NC | NC | NC |
| IV.A.6.b. | ND | NC | PC | PC | NC | PC | PC | PC | PC | SC | SC | SC | PC | PC | PC | NC | NC | NC | NC |
| IV.A.7 Incidents and Referrals/Margo Frasier | | | | | | | | | | | | | | | | | | | |
| IV.A.7.a. | ND | NC | NC | NC | NC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.7.b. | ND | NC | NC | PC | NC | PC | PC | PC | PC | PC | SC | PC | PC | PC | PC | PC | SC | PC | PC |
| IV.A.7.c. | ND | NC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.7.d. | ND | NC | NC | NC | NC | NC | NC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.7.e. | ND | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | PC | SC | SC | SC | PC | PC | PC | PC |
| IV.A.7.f. | ND | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.7.g. | ND | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.7.h. | ND | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.7.i. | ND | NC | NC | PC | NC | NC | NC | NC | NC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.7.j. | ND | NC | NC | NC | NC | NC | NC | NC | NC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.8. Investigations/Margo Frasier | | | | | | | | | | | | | | | | | | | |
| IV.A.8.a. | ND | NC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | PC | PC | PC | PC |
| IV.A.8.b. | ND | NC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.8.c. | ND | NC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | PC | PC | PC | PC |
| IV.A.8.d. | ND | NC | NC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |

| | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IV.A.8.e. | ND | NC | NC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.8.f. | ND | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| *IV.A.9. Pretrial Placement in Alternative Settings/Margo Frasier* | | | | | | | | | | | | | | | | | | | |
| IV.A.9.a. | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | | SC |
| IV.A.9.b. | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| *IV.A.10. Custodial Placement within OPP/Patricia Hardyman* | | | | | | | | | | | | | | | | | | | |
| IV.A.10.a. | NC | PC | SC | SC | SC | SC | PC | PC | PC | PC | SC | SC | SC | SC | PC | PC | NC | PC | PC |
| IV.A.10.b. | NC | NC | NC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.10.c. | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | PC | PC | PC |
| IV.A.10.d. | NC | NC | PC | PC | PC | PC | PC | NC | PC | SC | PC | PC | SC | SC | SC | PC | NC | NC | NC |
| IV.A.10.e. | NC | NC | PC | SC | PC | SC | SC | PC | PC | PC | PC | PC | SC | PC | PC | NC | NC | SC | NC |
| IV.A.10.f. | NC | NC | NC | NC | NC | PC | PC | PC | NC | SC | PC | PC | PC | PC | PC | PC | NC | NC | NC |
| IV.A.10.g. | NC | NC | NC | NC | NC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | PC | NC | SC | SC |
| IV.A.10.h. | ND | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | PC | SC | PC | SC | NC | SC | SC |
| *IV.A.11. Prisoner Grievance Process/Margo Frasier and Shane Poole* | | | | | | | | | | | | | | | | | | | |
| IV.A.11.a | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | | | | | | | | | |
| IV.A.11.a.(1) | | | | | | | | | | | SC | SC | SC | SC | SC | SC | PC | PC | PC |
| IV.A.11.a.(2) | | | | | | | | | | | PC | PC | PC | PC | PC | PC | NC | NC | PC |
| IV.A.11.a.(3) | | | | | | | | | | | SC | SC | SC | SC | SC | SC | SC | SC | PC |
| IV.A.11.a.(4) | | | | | | | | | | | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.11.a.(5) | | | | | | | | | | | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.11.a.(6) | | | | | | | | | | | PC | PC | SC | SC | SC | SC | SC | PC | PC |
| *IV.A.12. Sexual Abuse/Margo Frasier* | | | | | | | | | | | | | | | | | | | |
| IV.A.12. | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | PC | PC | PC | PC | PC | PC |
| *IV.A.13. Access to Information/Margo Frasier* | | | | | | | | | | | | | | | | | | | |
| IV.A.13. | PC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | PC | NC | NC |
| *IV. B. Mental Health Care* | | | | | | | | | | | | | | | | | | | |
| *IV.B.1. Screening and Assessment/Nicole Johnson* | | | | | | | | | | | | | | | | | | | |
| IV.B.1.a. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | PC | PC | SC | SC | SC | SC | PC |
| IV.B.1.b. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | PC | SC | SC | SC | SC | SC | SC |

| | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *IV.B.1.c.* | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | PC | SC | SC | SC | SC | SC |
| *IV.B.1.d.* | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | PC | PC | SC | SC | SC | SC | PC |
| *IV.B.1.e.* | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | PC | PC | PC | PC | PC | PC | PC |
| *IV.B.1.f.* | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| *IV.B.1.g.* | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC |
| *IV.B.1.h.* | NC | NC | NC | NC | NC | NC | NC | NC | PC | SC | SC | SC | SC | SC | SC | SC | SC | PC | PC |
| *IV.B.1.i.* | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| *IV.B.1.j.* | NC | NC | NC | PC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| *IV.B.1.k.* | NC | NC | NC | PC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| *IV.B.1.l.* | NC | NC | NC | NC | NC | NC | NC | NC | NC | SC | SC | SC | PC | PC | PC | PC | SC | SC | SC |
| *B. 2. Treatment/Nicole Johnson* | | | | | | | | | | | | | | | | | | | |
| *IV.B.2.a.* | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| *IV.B.2.b.* | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| *IV.B.2.c.* | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| *IV.B.2.d.* | NC | NC | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC |
| *IV.B.2.e.* | NC | NC | NC | PC | PC | PC | PC | NC | NC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| *IV.B.2.f.* | NC | NC | NC | PC | PC | PC | NC | PC | PC | PC | SC | PC | PC | PC | PC | PC | PC | PC | PC |
| *IV.B.2.g.* | NC | NC | NC | PC | PC | PC | NC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| *IV.B.2.h.* | NC | NC | NC | PC | PC | PC | PC | PC | NC | PC | SC | SC | PC | PC | PC | PC | PC | PC | PC |
| *IV.B.3. Counseling/Nicole Johnson* | | | | | | | | | | | | | | | | | | | |
| *IV.B.3.a.* | NC | NC | NC | NC | PC | NC | NC | PC | PC | PC | PC | PC | PC | NC | PC | PC | PC | PC | PC |
| *IV.B.3.b.* | NC | NC | NC | NC | PC | NC | NC | PC | PC | PC | PC | PC | PC | NC | PC | PC | SC | SC | SC |
| *IV.B.4. Suicide Prevention Training Program/Nicole Johnson* | | | | | | | | | | | | | | | | | | | |
| *IV.B.4.a.* | NC | NC | NC | PC | PC | PC | PC | PC | NC | PC | PC | PC | NC | NC | PC | PC | PC | PC | PC |
| *IV.B.4.b.* | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | PC | PC | PC | SC | SC |
| *IV.B.4.c.* | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | PC | SC | SC | SC | SC |
| *IV.B.4.d.* | NC | NC | NC | PC | NC | NC | NC | NC | NC | PC | PC | PC | NC | NC | PC | PC | PC | PC | PC |
| *IV.B.4.e.* | NC | NC | NC | PC | NA | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | PC | PC |
| *IV.B.4.f.* | NC | NC | NC | NC | PC | PC | NC | NC | SC | SC | SC | SC | SC | SC | PC | PC | PC | PC | PC |
| *IV.B.4.g.* | NC | NC | NC | SC | PC | NC | NC | NC | NC | PC | NC | PC | SC | SC | SC | SC | SC | SC | SC |

| | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **IV.B.5. Suicide Precautions/Nicole Johnson** | | | | | | | | | | | | | | | | | | |
| IV.B.5.a. | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.5.b. | NC | NC | NC | NC | NC | NC | NC | PC | PC | SC | PC | PC | NC | NC | PC | PC | PC | PC |
| IV.B.5.c. | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.5.d. | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.B.5.e. | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | NC | NC | PC | PC | PC | PC | PC |
| IV.B.5.f. | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | SC | SC | PC | PC | PC | PC | PC | PC |
| IV.B.5.g. | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | SC |
| IV.B.5.h. | NC | NC | NC | NC | NC | NC | NC | PC | NC | PC | PC | SC | SC | PC | PC | PC | PC | PC |
| IV.B.5.i. | NC | NC | NC | NC | NC | NC | NC | PC | PC | SC | SC | SC | SC | SC | PC | PC | PC | PC |
| IV.B.5.j. | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC |
| IV.B.5.k. | NC | NC | NC | NC | NC | NC | NC | PC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| **IV.B.6. Use of Restraints/Nicole Johnson** | | | | | | | | | | | | | | | | | | |
| IV.B.6.a. | PC | NC | PC | PC | PC | PC | PC | PC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.6.b. | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.B.6.c. | ND | NC | PC | PC | PC | PC | PC | PC | NC | PC | NC | SC | SC | SC | SC | SC | SC | SC |
| IV.B.6.d. | ND | NC | PC | PC | PC | PC | PC | PC | NC | PC | SC | SC | PC | PC | SC | SC | SC | SC |
| IV.B.6.e. | NC | NC | PC | PC | PC | PC | PC | PC | NC | PC | NC | SC | SC | SC | SC | SC | SC | SC |
| IV.B.6.f. | NC | NC | PC | PC | PC | PC | PC | PC | NC | PC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.B.6.g. | NC | NC | PC | PC | PC | PC | PC | PC | NC | PC | NC | SC | SC | SC | SC | SC | SC | SC |
| **IV.B.7. Detoxification and Training/Nicole Johnson/Susi Vassallo** | | | | | | | | | | | | | | | | | | |
| IV.B.7.a. | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | PC | PC | PC | PC | PC |
| IV.B.7.b. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | PC |
| IV.B.7.c. | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | NC | NC | PC |
| IV.B.7.d. | NC | NC | PC | PC | PC | PC | PC | PC | PC | NC | PC | PC | PC | SC | SC | SC | NC | PC |
| **IV.B.8. Medical and Mental Health Staffing/Nicole Johnson/Susi Vassallo** | | | | | | | | | | | | | | | | | | |
| IV.B.8.a. | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.8.b. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| **IV.B.9. Risk Management/Nicole Johnson/Susi Vassallo** | | | | | | | | | | | | | | | | | | |
| IV.B.9.a. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |

| | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *IV.B.9.b.* | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| *IV.B.9.c.* | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| *IV.B.9.d.* | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| *IV.B.9.e.* | NC | NC | NC | NC | PC | PC | PC | PC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| *IV.B.9.f.* | NC | NC | NC | NC | PC | PC | PC | PC | NC | NC | PC | PC | PC | PC | PC | PC | PC | NC |
| *IV.C. Medical Care* | | | | | | | | | | | | | | | | | | |
| *See SA 2/11/15 13.* | | | | | | | | | | | | | | | | | | |
| *IV. C. Quality Management of Medication Administration/Susi Vassallo* | | | | | | | | | | | | | | | | | | |
| *IV.C.1.a.* | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | PC | PC |
| *IV.C.1.b.* | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | SC | PC | PC | SC | PC |
| *IV.C.1.c.* | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | PC | SC | SC | SC | SC |
| *IV.C.1.d.* | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | PC | PC | PC | PC | PC |
| *IV.C.2. Health Care Delivered/Susi Vassallo* | | | | | | | | | | | | | | | | | | |
| *IV.C.2.a.* | NC | NC | NC | PC | PC | PC | PC | PC | PC | NC | PC | PC | SC | SC | SC | PC | PC | PC |
| *IV.C.2.b.* | NC | NC | NC | PC | PC | PC | PC | PC | PC | NC | PC | PC | PC | PC | PC | PC | SC | PC |
| *IV.C.3. Release and Transfer/Susi Vassallo* | | | | | | | | | | | | | | | | | | |
| *IV.C.3.a.* | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC |
| *IV.C.3.b.* | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC |
| *IV.C.3.c.* | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC |
| *IV.C.3.d.* | NC | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| *IV.D. Sanitation and Environmental Conditions/Shane Poole* | | | | | | | | | | | | | | | | | | |
| *IV.D. 1.a.* | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | NC | NC | NC |
| *IV. D. 1.b.* | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | PC | PC |
| *IV. D. 1.c.* | NC | NC | PC | PC | NC | PC | PC | SC | PC | PC | SC | SC | SC | SC | SC | NC | NC | PC |
| *IV. D. 1.d.* | NC | NC | NC | NC | SC | SC | SC | SC | SC | SC | SC | PC | PC | PC | NC | NC | SC | PC |
| *IV. D. 1.e.* | NC | PC | PC | PC | PC | PC | PC | SC | PC | SC | SC | SC | SC | SC | SC | SC | PC | PC |
| *IV. D. 1.f.* | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | PC | PC | PC | PC |
| *IV. D. 1.g.* | NC | NC | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| *IV. D. 1.h.* | NC | NC | NC | PC | NC | PC | NC | NC | NC | PC | PC | PC | SC | SC | SC | SC | PC | PC |
| *IV. D. 2. Environmental Control/Shane Poole* | | | | | | | | | | | | | | | | | | |

| | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *IV. D. 2.a.* | NC | NC | PC | PC | PC | SC | SC | SC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| *IV. D. 2.b.* | NC | NC | NC | NC | NC | SC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | PC | PC | PC |
| *IV. D. 3. Food Service/Diane Skipworth* | | | | | | | | | | | | | | | | | | | |
| *IV. D. 3.a.* | NC | NC | NC | PC | PC | PC | NC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| *IV. D. 3.b.* | NC | NC | NC | PC | PC | PC | NC | NC | NC | NC | PC | SC | SC | SC | SC | SC | SC | SC | SC |
| *IV. D. 3.c.* | NC | NC | NC | PC | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | PC | PC |
| *IV. D. 4. Sanitation and Environmental Conditions Reporting/Shane Poole* | | | | | | | | | | | | | | | | | | | |
| *IV. D. 4.a.* | NC | NC | PC | PC | PC | PC | PC | PC | NC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| *IV. D. 4.b.* | NC | NC | NC | NC | PC | NC | NC | PC | PC | SC | SC | SC | SC | SC | SC | SC | PC | PC | SC |
| *IV.E. Fire and Life Safety/Shane Poole* | | | | | | | | | | | | | | | | | | | |
| *IV. E. 1. Fire and Life Safety* | | | | | | | | | | | | | | | | | | | |
| *IV. E. 1.a.* | NC | PC | PC | PC | PC | PC | SC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | NC |
| *IV. E. 1.b.* | NC | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| *IV. E. 1.c.* | PC | PC | PC | PC | NC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | PC |
| *IV. E. 1.d.* | NC | NC | NC | NC | NC | NC | PC | SC | PC | SC | SC | SC | SC | NC | PC | SC | SC | SC | PC |
| *IV. E. 1.e.* | ND | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| *IV. E. 2. Fire and Life Safety Reporting* | | | | | | | | | | | | | | | | | | | |
| *IV. E. 2.a.1-3* | ND | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | PC | PC | SC | SC |
| *IV. E. 2.b.* | ND | NC | PC | PC | NC | PC | NC | PC | PC | SC | SC | SC | SC | SC | SC | SC | PC | SC | SC |
| *IV.F. Language Assistance* | | | | | | | | | | | | | | | | | | | |
| *SCIV.F.1. Timely and Meaningful Access to Services/Margo Frasier* | | | | | | | | | | | | | | | | | | | |
| *IV.F.1.a.* | ND | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC |
| *IV.F.2. Language Assistance Policies and Procedures/Margo Frasier* | | | | | | | | | | | | | | | | | | | |
| *IV.F.2.a.* | ND | PC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| *IV.F.2.b.* | ND | PC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| *IV.F.3. Language Assistance Training/Margo Frasier* | | | | | | | | | | | | | | | | | | | |
| *IV.F.3.a.* | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| *IV.F.4. Bilingual Staff/Margo Frasier* | | | | | | | | | | | | | | | | | | | |
| *IV.F.4.* | NC | PC | PC | PC | PC | NC | NC | NC | NC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC |

| | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *IV.G. Youthful Prisoners/Margo Frasier* | | | | | | | | | | | | | | | | | |
| *IV.G.* | NC | NC | NC | PC | PC | PC | NC | NC | PC | PC | PC | SC | SC | SC | SC | SC | PC | SC |
| *VI. The New Jail Facility/Margo Frasier* | | | | | | | | | | | | | | | | | |
| *VI. A.* | ND | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| *VI. B.* | NC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| *VI. C.* | ND | PC | SC | SC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | PC | PC | PC | PC |
| *VI. D.* | Monitors Not Qualified to Evaluate | | | | | | | | | | | | | | | | | |
| *VII. Compliance and Quality Improvement/Margo Frasier* | | | | | | | | | | | | | | | | | |
| *VII. A.* | ND | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | PC | SC | PC |
| *VI. B. (H.)* | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| *VI. C. (I.)* | NC | NC | SC | SC | NC | SC | SC | NC | PC | SC | SC | SC | SC | SC | PC | PC | PC | SC |
| *VI. D. (J.)* | ND | NC | NC | PC | PC | PC | PC | NC | NC | NC | SC | SC | SC | SC | PC | PC | PC | SC |
| *VIII. Reporting Requirements and Right of Access/Margo Frasier* | | | | | | | | | | | | | | | | | |
| *VIII.A.* | ND | PC | NC | PC | PC | PC | PC | NC | NC | PC | SC | SC | SC | SC | SC | SC | SC | PC |
| *VIII.B.* | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| *VIII.C.* | PC | PC | PC | SC | SC | SC | NC | NC | PC | PC | SC | SC | SC | SC | PC | PC | PC | PC |
| *Legend:* | | | | | | | | | | | | | | | | | | |
| *ND - Not scheduled for review* | | | | | | | | | | | | | | | | | | |
| *NC - Non-compliance* | 106 | 51 | 62 | 52 | 53 | 43 | 44 | 8 | 5 | 0 | 4 | 7 | 0 | 5 | 17 | 12 | 11 |
| *PC - Partial Compliance* | 57 | 106 | 96 | 99 | 100 | 105 | 100 | 98 | 66 | 60 | 59 | 67 | 77 | 79 | 77 | 85 | 95 |
| *SC - Substantial Compliance* | 4 | 11 | 10 | 18 | 16 | 21 | 25 | 63 | 103 | 114 | 111 | 100 | 97 | 90 | 80 | 77 | 68 |
| *NA - Not Applicable* | 167 | 168 | 168 | 169 | 169 | 169 | 169 | 169 | 174 | 174 | 174 | 174 | 174 | 174 | 174 | 174 | 174 |

