# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

LASHAWN JONES, *et al.*, and
THE UNITED STATES OF AMERICA,

               PLAINTIFFS

SUSAN HUTSON, Sheriff,

               DEFENDANT.

§
§
§   Civil Action No. 2:12-cv-00859
§   Section I, Division 5
§   Judge Lance M. Africk
§   Magistrate Judge Michael B. North
§
§
§
§
§

---

## Report No. 20 of the Independent Monitors
## October 29, 2024

---

Margo L. Frasier, J.D., C.P.O., Lead Monitor
Susi Vassallo, M.D., Medical Monitor
Patricia L. Hardyman, Ph.D., Classification Monitor
Nicole Johnson, M.D., Mental Health Monitor
Shane J. Poole, M.S., C.JM., Environmental Fire Life Safety Monitor
Diane Skipworth, M.C.J., R.D.N., L.D., R.S., C.C.H.P., C.L.L.M., Food Safety Monitor



***Compliance Report #20***
***LASHAWN JONES, et al., and the United States of America v.***
***Susan Hutson, Sheriff***

Table of Contents

|  |  | **Page** |
|---|---|---|
| I. | Introduction | 4 |
| | A. Summary of Compliance | 7 |
| | B. Opportunities for Progress | 10 |
| | C. Review Process of Monitors' Compliance Report #18 | 22 |
| | D. Communication with Stakeholders | 22 |
| | E. Recommendations | 22 |
| | F. Conclusions and Path Forward | 23 |
| II. | Substantive Provisions | |
| | A. Protection from Harm | 25 |
| | A.1. Use of Force Policies and Procedures | 29 |
| | A.2. Use of Force Training | 32 |
| | A.3. Use of Force Reporting | 34 |
| | A.4. Early Intervention System | 38 |
| | A.5. Safety and Supervision | 40 |
| | A.6. Security Staffing | 49 |
| | A.7. Incidents and Referrals | 51 |
| | A.8. Investigations | 54 |
| | A.9. Pretrial Placement in Alternative Settings | 56 |
| | A.10. Custodial Placement | 57 |
| | A.11. Prisoner Grievance Process | 86 |
| | A.12. Sexual Abuse | 96 |
| | A.13. Access to Information | 96 |
| | B. Mental Health Care | 97 |
| | C. Medical Care | 139 |
| | D. Sanitation and Environmental Conditions | 146 |
| | E. Fire and Life Safety | 168 |
| | F. Language Assistance | 169 |
| | G. Youthful Prisoners | 171 |
| | H. The New Jail Facility | 171 |
| | I. Compliance and Quality Improvement | 172 |
| | J. Reporting Requirements and Right of Access | 174 |
| III. | Status of Stipulated Orders – February 11, 2015, and April 22, 2015 | 175 |



**Page**

**Tables**
Table 1 – Summary of Compliance – All Compliance Reports                    9
Table 2 – Status of Compliance – Stipulated Agreements                      9
Table 3 – Summary of Incidents CY 2018-July 2024                           27
Table 4 – CY 2018-July 2024 All OJC Reported Incidents by Month            28
Table 5 – CY 2018-July 2024 OJC Reported Incidents                         43

**Figures**
Figure 1 – Percentage of White Male Inmates Assigned to OJC, TDC, and TMH
         Housing Units—April 2022-April 2024                              65
Figure 2 – Percentage of White Female Inmates Assigned to OJC, TDC, and
         TMH Housing Units—April 2022-March 2024                          66
Figure 3 – Rates and Completion Time of Initial Custody Assessments
         Completed July 2022-March 2024                                   68
Figure 4 – Number of OPSO Booking Per Month—February 2023-April 2024        71
Figure 5 – Percent Overrides for Housing Purposes—April 2022-March 2023     65
Figure 6 – Mandatory and Discretionary Override Rates by Gender
         April 2022-March 2024                                            66
Figure 7 – Pending Custody Assessments October 2023-March 2024             69
Figure 8 – Victimization of Inmates on the Mental Health Caseload April
         2022-March 2024                                                  70
Figure 9 – Number of Attachments input by Classification Staff
         —April 2021-March 2024                                           70
Figure 10 – Percentage of Initial Custody Assessments April 2021-March 2024  71
Figure 11–Rate of Disciplinary Infractions for the OPSO ADP: January 2023
         -March 2024                                                      76
Figure 12—OPSO ADP vs. Number of Disciplinary January 2023-March 2024       77
Figure 13—Most Serious Disciplinary Infraction/Report with Finding of
         Guilty: June 2022-March 2024                                     78

**Charts**
Chart 1—Facility, Food Service, Medical, Mental Health, and Miscellaneous
         Grievances                                                       81
Chart 2-- Inmate/Inmate Physical Violence and PREA, Staff Misconduct and
         PREA, Life-Threatening, and Use of Force Grievances              82
Chart 3--  Commissary, Programs, Inmate Funds, Property, Grievance
         Appeals, Legal and Law Library Grievances                        83
Chart 4—Overdue Grievance Reports by Month                                 84

**Appendices**
Appendix A - Summary Compliance Findings by Section Compliance
Reports 1 – 18                                                            167



**Compliance Report # 20**
**Introduction:**

This is Compliance Report #20 submitted by the Independent Monitors providing assessment of the Orleans Parish Sheriff's Office's (OPSO) compliance with the Consent Judgment of June 6, 2013. Compliance Report #20 reflects the status of OPSO's compliance as of March 31, 2024. This report is based on incidents, documents, and compliance-related activities between October 1, 2023, and March 31, 2024. Where appropriate, the report reflects the change that occurred between April 1, 2024, and the on-site compliance tour. Due to scheduling conflicts, the on-site compliance tours were split into two sessions. The sub-monitors over food service, life safety, sanitation, classification and correctional practice (Dr. Patricia Hardyman, Diane Skipworth, Shane Poole) were joined by Lead Monitor Frasier for an on-site tour of those areas June 24-27, 2024. The medical and mental health sub-monitors (Dr. Nicole Johnson and Dr. Susi Vassallo) were joined by Lead Monitor Frasier for an on-site tour of the medical and mental health areas July 23-26, 2024. This report is based on the observations and review of OPSO documents by the Monitors during the on-site visits and during the monitoring period.

Throughout the time the Monitors have been involved in enforcement of the Consent Judgment, the on-site visits have played an integral role. During the on-site visits and the on-site visits by the Lead Monitor and various other monitors in between the monitoring tours, the Monitors have endeavored to provide guidance to OPSO as to how to remedy the unsafe and unconstitutional conditions which existed when we began monitoring in late 2013, and which continue to exist. In addition to the on-site compliance tours by the Monitors, the Lead Monitor also visited October 17-19, 2023, December 4-7, 2023, December 16-18, 2023, January 16-18, 2024, February 19-21, 2024, April 16-18, 2024, and May 13-15, 2024. Monitor Shane Poole and Diane Skipworth accompanied the Lead Monitor during the visits on October 17-19, 2023. Monitor Shane Poole accompanied the Lead Monitor during the visits on January 16-18, 2024, February 19-21, 2024, and May 13-15, 2024. Additionally, all of the Monitors were in frequent contact with OPSO via other methods such as emails, telephone calls, and virtual meetings.

Sheriff Susan Hutson was sworn in as Orleans Parish Sheriff in May 2022.



Compliance Report #20 is the third monitoring period for which Sheriff Hutson was sheriff the entire time.

On May 14, 2024, Judge Africk held a hearing on the status of compliance with special emphasis on the findings in Report #19. After hearing testimony from the monitors as to conditions and compliance, the Court ordered OPSO, in consultation with the parties, to file a stipulation regarding a corrective action plan with respect to provisions in non-compliance by June 13, 2024. The Court set deadlines for the filing of stipulations regarding corrective action plans with respect to provisions in partial compliance. The parties also agreed to a Stipulation and Order that was entered by the Court on June 17, 2024. As part of the Stipulation and Order, OPSO is also required to provide a report on its progress with adherence to the corrective action plans each month, to file a report quarterly with the Court, and other obligations.

The requirement that OPSO, in consultation with the parties and monitors, formalize corrective action plans which are intended to ultimately result in substantial compliance with each provision of the Consent Judgment is a monumental step. The Monitors have consistently urged OPSO to put in place the necessary processes and procedures to not only obtain compliance, but to sustain compliance. The Monitors have stressed that such processes and procedures would allow OPSO to take the necessary steps towards compliance, provide adequate proof of compliance, independently assess compliance with the Consent Judgment and its own policies and procedures, and address shortcomings without waiting for the Monitors to point out the shortcomings in the bi-annual reports to the Court. The Monitors have provided guidance as to how to go about the various review functions and establish a compliance unit that would operate independently of those whose performance would be assessed. While there had been talk about the formation of a compliance unit over the lifetime of the Consent Judgment, it did not become operational until Sheriff Hutson took office. The Compliance and Accountability Bureau (CAB) has been in existence for the past three monitoring periods. During this monitoring period, CAB began to add staff and develop a strategic plan for governing its tasks, goals, and processes. The requirements of the Orders issued by Judge Africk necessitated the formalization of the corrective action plans including producing a corrective action plan for every provision not in substantial compliance.



The establishment and development of the CAB is a monumental step in the right direction. A fully staffed compliance unit, trained in conducting audits in a correctional setting, with a fully developed strategic plan will allow OPSO to recognize deficiencies and address them. For instance, OPSO continues to not have an electronic way of recording when and if security checks take place in the housing units. Since there is not an electronic record of security checks, deputies write the checks in their logbooks. Often, supervisors, who are also required to make security checks and inspections, do not record their security checks in any manner. For a while, OPSO utilized a paper form on which to record security checks. While this provided an easier way for a supervisor to determine during a unit inspection if the deputy has recorded that the security checks are being performed timely, it proved to be insufficient proof that an appropriate security check actually occurred and when it occurred. To appropriately verify the accuracy of the times recorded and the method used, hours of video would have to be watched. As far as the corrective action plan, OPSO performed an audit of staff and supervisor security checks for the period of April 14, 2024, through April 20, 2024. The audit, which will be discussed further in the report, found that the day shift actually only performed 15% of the checks indicated on their logs and the night shift actually only performed 7% of the security checks indicated on their logs. This is, unfortunately, consistent with the systemic deficiencies identified by the monitoring team during on-site visits when deputies were inconsistent in describing how an acceptable security check would be performed. Furthermore, the deputies admitted that they did not perform all of the tasks for a proper security check each time a security check was recorded as having taken place. Generally, an adequate security check was only performed, if at all, when a physical count of the inmates took place; twice a day. Supervisors often claim they perform inspections, but the appearance of the housing areas and the lack of documentation calls those claims into doubt. The CAB is important to the work to be done on gaining and sustaining compliance. Equally important is adopting a culture where accountability is embraced as opposed to a culture where there is a reluctance to address the deficiencies and, in some instances, undermining the efforts of those whose job it is to objectively review data and accurately assess compliance status.

In other areas of the Consent Judgment, progress has been sporadic. In some areas,



there has been progress, and in some cases, there has been regression. Overall, ratings improved in thirteen (13) provisions and regressed in seven (7) provisions. Nine (9) provisions were moved to substantial compliance while four (4) provisions regressed from substantial compliance. This stops the decline in overall compliance with the Consent Judgment which had occurred for seven straight monitoring reports (Reports 13-19).  The decline in substantial compliance corresponded with the return of the control of the OJC to the authority of the Sheriff. The number of provisions in non-compliance has been reduced from eleven (11) provisions to nine (9) provisions. It should be noted that three (3) new provisions are in non-compliance while five (5) provisions previously found in non-compliance are now rated to be in partial or substantial compliance. The lack of additional progression and, in some cases, regression is due to a failure to follow the policies and procedures that have been put in place. It has been exasperated by the lack of staff, but many of the provisions are not reliant on security staffing. The specific areas are addressed in this report.

**A.      Summary of Compliance**

The requirements of the Consent Judgment represent correctional practice recognized as required for the operation of a Constitutional jail system. While there is some flexibility in addressing the mandates, achieving substantial compliance with the Consent Judgment, and Stipulated Agreements are necessary to bring OPSO and its correctional facilities into adherence with Constitutional requirements. The Consent Judgment contains 174 separately rated provisions. While they are separately rated, they are often intertwined. For example, effective implementation of a policy requires not only the drafting of a suitable policy, but appropriate training on the policy and enforcement of the policy. Enforcement of the policy is contingent on assessing whether the policy is being followed which requires supervision, analysis of incidents and data, and objective confirmation of compliance. A meaningful annual review of the adequacy of the policy does not just mean determining whether the wording of the policy should be changed, but also includes evaluating adherence to the policy and whether the objectives of the policy are being met; which requires objective data collection and analysis, and the development of and adherence to corrective action plans. While appropriate policies have been developed, the objective data collection, analysis and development of corrective action



plans have been lacking or non-existent thus far. The collection of data is now in its infancy with the establishment and implementation of the CAB under Sheriff Hutson. The CAB has been instrumental in the development of the corrective actions plans now required by court order. The challenge has proven to be the execution of the corrective action plans in a timely and thorough manner.

The goal is substantial compliance with all of the provisions of the Consent Judgment. There has been progress in reducing the number of provisions in non-compliance as there are now nine (9) provisions in non-compliance (5.1%) as opposed to eleven (11) provisions in Report #19 (6.3%), twelve (12) provisions in Report #18 (6.8%), and seventeen (17) provisions in Report #17; however, in Report #16, there were five (5). Substantial compliance has been achieved for seventy-three (73) of the provisions (42.0%). Ninety-two (92) of the provisions are in partial compliance (52.9 %).

Under the authority of the Independent Compliance Director, OPSO made material progress as indicated by the movement of non-compliance to partial compliance to substantial compliance for over half of the provisions. At different times during the duration of the Consent Judgment, including in some areas in this report, there has been regression in the progress towards compliance. As will be addressed in individual areas, OPSO has shown regression from the progress in some provisions due to failure to consistently follow and enforce policies and procedures and to provide meaningful training. OPSO has also shown improvement in other provisions.

During the onsite visit for Compliance Report #20, it was apparent that there continues to be an effort being made to utilize analyses of data, including grievance data and use of force data to determine policy adherence and develop action plans to address shortcomings and make decisions. Unfortunately, there still has not been an objective analysis of data concerning institutional violence or at least no development of a systematic approach to making decisions and implementing and enforcing them to reduce institutional violence. For instance, review of incident reports and disciplinary reports continues to clearly indicate that much of the violence is perpetrated by an identifiable group of inmates. However, other than the short time they might be placed on the disciplinary unit, nothing has been done to separate them from the general population. The effort to reestablish a close custody housing unit with appropriate security measures



has been hampered by the failure of the Classification Unit to timely classify and place inmates in the general population areas resulting in the use of up to four housing units as intake units. The establishment of the CAB is a definite move in the right direction, but the concept of accountability and a systematic approach must become part of the OPSO culture, and the CAB must be fully staffed, fully trained, with a fully developed strategic plan to be effective. Otherwise, the same deficiencies are likely to continue to be noted time and time again.

**Table 1 – Summary of Compliance – All Compliance Reports[1]**

| Compliance Report/Date | Substantial Compliance | Partial Compliance | Non-Compliance | NA/Other | Total |
|---|---|---|---|---|---|
| #1 – December 2013 | 0 | 10 | 85 | 76 | 171 |
| #2 – July 2014 | 2 | 22 | 149 | 1 | 174 |
| #3 – January 2015 | 2 | 60 | 110 | 2 | 174 |
| #4 – August 2015 | 12 | 114 | 43 | 4 | 173 |
| #5 – February 2016 | 10 | 96 | 63 | 4 | 173 |
| #6 – September 2016 | 20 | 98 | 53 | 2 | 173 |
| #7 – March 2017 | 17 | 99 | 55 | 2 | 173 |
| #8 – November 2017 | 23 | 104 | 44 | 2 | 173 |
| #9 – June 2018 | 26 | 99 | 46 | 2 | 173 |
| #10 – January 2019 | 65 | 98 | 8 | 2 | 173 |
| #11 – September 2019 | 103 | 66 | 5 | 0 | 174 |
| #12 – May 2020 | 118 | 56 | 0 | 0 | 174 |
| #13-- November 2020 | 111 | 59 | 4 | 0 | 174 |
| #14—May 2021 | 100 | 67 | 7 | 0 | 174 |
| #15—November 2021 | 97 | 77 | 0 | 0 | 174 |
| #16—May 2022 | 95 | 72 | 5 | 0 | 174 |
| #17—December 2022 | 80 | 77 | 17 | 0 | 174 |
| #18—July 2023 | 76 | 86 | 12 | 0 | 174 |
| #19—December 2023 | 68 | 95 | 11 | 0 | 174 |
| #20—June-July 2024 | 73 | 92 | 9 | 0 | 174 |

The status of compliance (February 11, 2015, and April 22, 2015) is as follows:

**Table 2 – Status of Compliance with 2015 Stipulated Agreements**

| Compliance Report/Date | Substantial Compliance | Partial Compliance | Non-Compliance | NA | Total |
|---|---|---|---|---|---|
| August 2015 | 21 | 12 | 1 | 0 | 34 |
| February 2016 | 21 | 12 | 1 | 1 | 34 |



| | | | | |
|---|---|---|---|---|
| September 2016 | 26 | 7 | 1 | 0 | 34 |
| March 2017 | 28 | 4 | 1 | 1 | 34 |
| November 2017 | 21 | 11 | 1 | 1 | 34 |
| June 2018 | 23 | 8 | 2 | 1 | 34 |
| January 2019 | 28 | 5 | 0 | 1 | 34 |
| September 2019 | 28 | 5 | 0 | 1 | 34 |
| May 2020 | 28 | 5 | 0 | 1 | 34 |
| November 2020 | 32 | 2 | 0 | 0 | 34 |
| May 2021 | 32 | 2 | 0 | 0 | 34 |
| November 2021 | 32 | 2 | 0 | 0 | 34 |
| May 2022 | 32 | 2 | 0 | 0 | 34 |
| December 2022 | 32 | 2 | 0 | 0 | 34 |
| July 2023 | 32 | 2 | 0 | 0 | 34 |
| December 2023 | 29 | 5 | 0 | 0 | 34 |
| June-July 2024 | 29 | 5 | 0 | 0 | 34 |

**B.    Opportunities for Continued Progress**

The Monitors summarize below the areas identified in preparation of this report regarding OPSO's current level of compliance with the Consent Judgment.

**1.    Foundational Work** - The essential, core work required to achieve compliance includes:

- <u>Policies and Procedures</u> – OPSO completed the essential policies and procedures. The required reviews and necessary updates have fallen behind since the promotion of the Policy Manager to Deputy Chief of Jail Operations in May 2023. The Policy Manager position was not filled during the monitoring period, and no one was assigned the job duties in the interim. By the time of the compliance tours, the Policy Manager position had been filled. Also essential is the continued development, approval, and implementation of lessons plans and training that correspond with each of the policies. OPSO's policy governing its written directive system has significantly improved the policy/procedure process. This process allows for organizational components to develop specific operational practices for review by OPSO administration. Unfortunately, there is often a delay between when policies are submitted for review, and when they are returned with any suggested changes. For instance, the policy regarding



mandatory overtime has been in the approval stage for almost a year at the time of this report. Adherence to the policies, procedures, and training is essential. While the full implementation of a fully staffed and functioning CAB will be helpful through its objective auditing of policy adherence, the consistent enforcement of policies is a role which must be performed by the supervisors at all levels. Too often the failure to follow policy is blamed on the lack of staff or training. Neither is an acceptable excuse. Whether it is lack of supervision, lack of staff, or inadequate training, the result of failure to follow policy is often harm to staff and/or inmates and still is not adequately being addressed.

- <u>Inadequate staffing</u> – OPSO has continued to hire staff and has made progress despite the large number of terminations and resignations. During CY 2021, OPSO lost significant ground in that it hired 97 new staff members and lost 177 staff members through resignation, termination, and retirement. During CY 2022, OPSO hired 136 new staff members and lost 185 staff members through resignation, termination, and retirement. During CY 2023, OPSO hired 265 new staff members and lost 136 staff members through resignation, termination, and retirement. During the first six months of 2024, OPSO hired 92 new staff members and lost 58 staff members through resignation, termination, and retirement. These staff members reflect staff across all operations of the OPSO; not solely the jail operation. For instance, during the monitoring period, OPSO hired 71 staff members. Less than half (35) were assigned to security functions in OJC. Of the 41 staff members lost to resignation, termination, and retirement, 33 were assigned to security functions in the OJC. This results in a net gain of only two staff members assigned to security function in the OJC. The staffing assigned to the housing areas of the facilities (OJC and TMH) is extremely inadequate to comply with the Consent Judgment. Given the lack of staff, it is the opinion of the Monitors that significant scheduled overtime of the current staff will be required to staff the housing units at even a minimally acceptable level. OPSO did not mandate overtime during the



compliance period. Since that time, there has been discussion about mandating overtime and developing the necessary policy and procedures. Deputies are often reluctant to work overtime in OJC as they can make more per hour working off duty security details than they can working overtime in OJC. OPSO should prioritize staffing the OJC over allowing deputies to work details. Mandatory overtime of two shifts per pay period (14 days) was implemented in mid-September 2024. The requirement that units within the OPSO outside of OJC assist in staffing OJC has been formalized through the Emergency Staffing and Augmentation Plan (ESAP). The ESAP has resulted in the provision of deputies from outside OJC to assist in critical area such as escorts for the mental health and medical staff. The outside unit that has contributed the most to filling the void is the Investigative Services Bureau. The Reserve Unit has also contributed significant hours. However, there has not been sufficient participation by other outside units to supplement security in housing units to any meaningful degree. During the frequent site visits by the monitoring team, more often than not, there continue to be housing units and control rooms with no staff, including supervisors, present. The excuse is often given that staff were assigned, but either failed to report or duty or that their presence is unknown. The staff who were present were often tasked with manning two housing units and the control room despite the Consent Judgment requiring one deputy/recruit physically on each unit for direct supervision. Further, almost daily, assigned staff leave housing units and control pods unattended for meal breaks and other duties. The Stipulation and Order entered by Judge Africk in June 2024, mandates that the four specialty housing units be staffed 24/7, including breaks. Sheriff Hutson raised the salaries for recruits and deputies as a result of the budget request submitted in the 2023 budget. OPSO has made valiant efforts at hiring new recruits to work in OJC. Retention of those recruits has proven difficult, and OJC has not seen a significant increase in staff present on the housing units. While OPSO has begun hiring directly for some of the non-OJC assignments



(courthouse security, civil), there are still a significant number of staff continuing to transfer out of OJC. This is concerning to the Monitors for two reasons: (1) it lessens the level of experience within OJC and (2) a higher percentage of male staff were transferred than female staff which exacerbated the disparate ratio of male staff to female staff within the OJC. OPSO is strongly encouraged to continue its review of the deployment of staff. It is apparent that staff are not actually present in the areas where the need is most critical, staffing the housing units. Along with redeployment of staff has to be the accountability of the supervisors to ensure the staff is physically present in the housing units. Sheriff Hutson has made redeployment of staff, including adequate supervision on the evening/night shift a priority. To deal with the severe shortage of sergeants on all of the shifts, provisional promotions were made during the monitoring period. Those provisional sergeants received training to assist them in performing their duties.  While there are plans to have a promotional board for sergeants, it has been in the process for over a year. OPSO is encouraged to finalize the promotional process as provisional promotions are often seen as being based on favoritism as opposed to merit.

- <u>Training</u> – Employee training for security staff, both pre-service and in-service, has made progress over time, but it has proven difficult to staff OJC while allowing staff to attend the Academy for their annual training and the training necessary to move from a Recruit to Deputy. In 2021, OPSO reinstated the practice of assigning new deputies to a training officer during the first three weeks of assignment to OJC (field training program), but enforcement and follow through has been sporadic and occurred infrequently during the monitoring period. A field training program needs to be fully implemented with follow up as to the effect the program has on turnover. The program, if allowed to be fully implemented, is likely to result in a reduction of turnover and a reduction in rule violation by new recruits. OPSO did its annual training in CY 2023, but attendance was only about 72% of the mandated staff. An issue with the quality of training was



discovered during the monitoring period for Report #18. Most of the recruits trained during 2023 did not receive the practical portion of CPR or shotgun training. In addition, as discussed in the use of force training section, many of the recruits have not received adequate defensive tactics training. Remedial classes were held during this monitoring period which partially addressed the concern.

- <u>Supervision</u> – Safe operation of OPSO's facilities requires an adequate number of sufficiently trained first line and mid-management supervisors and clear lines of authority and responsibility. Captains and lieutenants have now been deployed to cover the shifts on a continuous basis. The movement of captains and lieutenants to cover the shifts every hour of every day was met with resistance from those that did not want to give up having weekends off or working only the day shift. Several of the lieutenants and captains who did not embrace their new role have been reassigned or resigned.

2. **Medical and Mental Health Care** – After this monitoring period, the contracted provider for medical and mental health services was changed from Wellpath to Wexford. For the entire monitoring period, Wellpath was the provider. The Medical and Mental Health Monitors report challenges remain in the provision of basic care, staffing, and recordkeeping, as well as the continued need for improved collaboration with custody/security staffing. Security staff continued to be responsible for staffing some of the "suicide watches" during the on-site visit. While there was some improvement in the deputies' knowledge of their duties to perform and document suicide watches, inconsistency with how suicide watches were performed and documented were still noted, resulting in inconsistency of the reporting of data. An additional issue is that the mental health staff assigned to do suicide watches are required to leave the housing unit when there is no security staff on the housing unit. This means that inmates on suicide watch are frequently left unsupervised. Housing units upon which inmates are on suicide watch (2A and sometimes 3C) are mandatory and should be prioritized when there is a security staff shortage. The Court addressed this issue by mandating OPSO staff the four



special management housing units (which includes 2A and 3C) including when the assigned deputy takes a break. During the monitoring period, psychiatrists from Tulane University continued to provide psychiatric mental health care. OPSO did a better job of providing deputies so that the psychiatrists could access the inmates. The design of the interview rooms and safety concerns in the OJC has resulted in having to assign one deputy to escort each psychiatrist. Tulane University is not responsible for many aspects of mental health care required by the Consent Judgment. An important part of the long-term solution to the lack of compliance with the Consent Judgment in the areas of medical and mental health is the design and construction of Phase III, a specialized building which will contain an infirmary and housing for inmates with acute mental health issues. For instance, having security staff escort each psychiatrist or other mental health to interview inmates is addressed in the design of Phase III as the psychiatrists and other mental health staff will be able to interview inmates in an environment which is much safer for both staff and inmates.  The City extensively renovated portions of TDC (now referred as TMH or Temporary Mental Health) as a stop gap measure. OPSO finally utilized all of the TMH during this monitoring period, but lack of capacity of TMH results in a backlog of inmates with acute mental health issues continuing to be housed in OJC which is inadequate for the housing of these inmates. Even with TMH, the facilities within OJC to house and to provide individual and group programming for inmates with mental health issues are inadequate and create security and safety issues for both staff and inmates. The inadequacy of the OJC facility and the lack of training on the part of the security staff are reflected in the high number of uses of force, attempted suicides, and assaults on staff and inmates on the mental health units.

3. **Inmate Safety and Protection from Harm** - Providing a safe and secure jail continues to be a challenge.

- <u>Violence and Contraband</u> – There were significant incidents of violence occurring within the facilities during the monitoring period; including inmate-on-inmate assaults and assaults on staff. The level of violence in the facility continued to be at all-time high levels during this monitoring period.



The inmates appear to be emboldened in their refusal to follow the rules and obey the orders of the security staff. Very concerning is that both staff and inmates continue to relay to the Monitors that there are inmates who are acting as "tank bosses" and are extorting other inmates and requiring payment for protection. In order to gain control of this situation, it continues to be recommended by the monitors that OPSO reestablish a housing unit in which these inmates can be housed with adequate security measures, i.e., limited time out of cell, proper restraints when out of cell, and no access to items that can be used as weapons. Most often, the inmate-on-inmate assaults occurred when there was no deputy stationed in the housing unit. Especially concerning is that inmates continue to fashion weapons from items found in the jail, have prolonged periods of time to fashion weapons when the housing unit are without security staff, and continue to find new sources from which to make weapons due to the lack of security staff on the units. As sources of contraband (such as the light supports in the utility closets and the cabinets at the front of the day room) were identified and appeared to have been eliminated, the inmates then discover a new source of material from which to fashion weapons. For example, inmates pry off the metal sheeting around the sinks in the janitor closets and windows to fashion weapons. The brooms and mops, the facility provided for cleaning often end up in the inmates' cells and are used as weapons as inmates are not supervised when performing cleaning with the exception of the Sanitation Supervisor. In reality, few, if any, of the sources of contraband would be available to the inmates if the staff followed policies regarding supervision and limiting access to materials. Another concern is the lack of effective random shakedowns resulting in the continued presence of weapons, pills, narcotics, and other contraband in the housing units. Inmates are often observed smoking illegal substances and lighting wicks from dryers and electrical outlets. Inmates continue to start fires on the housing units. Disorder and non-compliance with the institutional rules cause staff to use force to gain control and compliance.



While the force used may be reasonable in response to the threat, if appropriate security measures were taken in the first place, the force would probably not be necessary. There is inadequate use of de-escalation techniques before resorting to force, including repeated examples of using OC spray without adequate de-escalation and/or in retaliation against inmates. Seldom are mental health staff involved in de-escalation even though a large percentage of the inmates involved in uses of force are on the mental health caseload. The failure of the Force Investigation Team and the Use of Force Review Board to find that these uses of force are in violation with OPSO policy makes them even more concerning. One issue is the lack of consistency of who attended the meetings and the lack of attendance by those in leadership roles at the meeting. This has resulted in the review process being inconsistent and ineffective in correcting deficiencies.

- <u>Inmate Classification</u> – The inmate classification process, which had regressed during the last several monitoring periods, did not show any significant improvement. Since the monitoring period, the classification manager resigned and has now been replaced. As the new Classification Manager has no jail classification experience, managing the Classification Unit and ensuring appropriate housing to achieve compliance with the Consent Judgment will remain a challenge. There needs to be continued attention to ensure housing decisions and placements are consistent with OPSO policies and objective classification principles. Acquiescence to inmates or security staff by moving inmates to reside with their allies or accommodating staff to avoid problematic inmate(s) continues but has lessened. There was no analysis to determine if inmates involved in an altercation should be kept separate or if they were simply trying to manipulate the system to gain access to the housing unit in which their friends or associates reside.  OPSO policy and procedures for reviewing and clearing separations that prevent inmates from being housed together or removed from protective custody are not followed. Credible auditing needs



to focus on identifying issues and correcting placements. During this compliance period, it appeared that while the housing audits were filled out, videos of the audits suggested the housing audit process was inconsistent and problematic.

- <u>Inmate Grievances</u> – As of Report #11, the ratings of the subdivisions in the grievance provision were individually given. The separate ratings allowed the areas in which deficiency existed to be highlighted. Timeliness and adequacy of responses are still not acceptable. The trend data from the grievance system is now available to assist in identifying problems to be addressed, but there has not been adequate follow-through on addressing the issues identified. The absence of working kiosks by which to file grievances continues to compromise the confidentiality of the grievance system; this has been a continuous issue over numerous monitoring report cycles. This issue is highlighted as the work around developed by the Grievance Staff (handing out and picking up paper grievances) has been hampered by the lack of security staff to allow them on the housing units. The issues with failure to comply with the Consent Judgment are related to non-working kiosks on which to file grievances and the lack of follow up by the persons charged with responding to the grievances, not the Grievance Staff.

4.  <u>Incident Reporting</u> –The accurate, timely reporting of incidents continues to be a constant area of concern. There remain serious incidents for which no report or no timely report is prepared by OPSO staff, including incidents involving the serious injury of inmates and drug overdoses. Reports are often incomplete and do not provide the necessary information for the reader to determine what occurred and why it occurred. It is particularly concerning that incomplete and sometimes inarticulate reports have been reviewed by and approved by a supervisor. OPSO began implementation of a corrective action plan nearly two years ago to address timeliness and thoroughness of reports which includes training and remedial action including discipline. While the corrective action plan has resulted in an improvement of timeliness of reports, it still has not adequately addressed the



problem of the thoroughness of the reports. OPSO has provided additional training to supervisors. There still is a lack of resources dedicated to the gathering and auditing of reports. The Monitors and parties receive reports electronically which has improved the timeliness of provision of completed reports, but the timeliness of the completion of reports and quality of reports still need to be addressed. The change has also highlighted that there are numerous incidents which previously should have been reported to the Monitors in the daily summary which were not. Part of the problem seems to be the incorrect categorization of reports when written. Not only does it present an issue for the Monitors, but it also makes the gathering of accurate data on incidents more difficult.

5. **Jail Management System –** An integral part of the jail's operational improvement is tied to an effective jail management system. Such capacity provides on-demand, routine, and periodic data to inform critical leadership and management decisions. Such an information system has not been implemented. Despite the passage of many years, there has not been a suitable system implemented. During this year's budget process, progress has been made but it is still unclear whether the system selection has a way to electronically verify that security checks are taking place in a timely fashion.

6. **Sanitation and Environment Conditions** – Challenges remain regarding the public health and inmate/staff safety risks. Although there have been a few outbreaks of COVID during the monitoring period, COVID has mainly been held in check by quarantining inmates upon entry and when they appear symptomatic. The inability to fill support positions identified in OPSO's staffing analysis negatively impacts the ability of OPSO to sustain compliance with the requirements of the Consent Judgment and align with accepted correctional practice. Sanitation and cleanliness of the cells and housing areas are not solely the responsibility of the sanitation staff. The supervisors and pod deputies have the first responsibility for ensuring inmates keep their cells and dayroom areas clean and uncluttered. The level of cleanliness of cells and housing areas remains unacceptable. As with past tours, during the monitoring tour, when sanitation concerns were called to the attention of pod deputies and supervisors, they often



appeared not to be concerned.

7.  **Youthful Inmates** –Youthful offenders are now being housed in the OJC in part due to a change in Louisiana law, as well as to transfers from the juvenile detention facility. Although the number of male youthful offenders has not exceeded 20, it requires an entire housing unit to be used for these inmates. Each housing unit is designed to hold 60 inmates. Thus, in the male youthful offender unit, over two-thirds of the capacity cannot be utilized. When female youthful offenders are housed, it requires either an entire housing unit in OJC or TMH to be devoted to their housing. In addition, the housing of youthful offenders presents special challenges when it comes to services and mental health care.

8.  **Inmate Sexual Safety** – OPSO underwent its required audit of compliance with the Prison Rape Elimination Act of 2003 (PREA) and passed in September 2019. Continued internal collaboration among OPSO security, classification, and the medical/mental health provider is needed for the assessments of inmates' potential vulnerability to sexual assault. Due to the long time that inmates are housed in intake units, inmates of various PREA designations continued to be housed together without an appropriate plan to keep them separate during time out of cell. Commingling of inmates of various PREA designations occurs on half of the housing units. OPSO cannot rely on an audit that is five years old to demonstrate compliance with PREA. The administration is still exploring having an updated PREA audit conducted in the near future which is unchanged since the last report.

9.  **Compliance, Quality Reporting, and Quality Improvement** – An essential element of inmate safety is OPSO's timely review of all serious incidents as well as of non-violent incidents to determine if there are trends and/or patterns. This ensures assessment of root causes and the development, implementation, and tracking of corrective action plans to address the causes. This activity focuses on resolving problems. OPSO has begun to undertake this function, but there does not seem to have been much progress in addressing the systemic issues, which if they remain unaddressed, will continue to create risks to institutional safety and security. The administration at OPSO has dedicated more time and knowledgeable



resources to quality improvement. The corrective action plans which were supposedly being developed when the Monitors toured in December 2022 had still not been completed when the Monitors toured in December 2023 and June 2024. However, they have been developed since as a result of the Court ordering, in May, the completion of corrective action plans for all provisions not in substantial compliance is now required.  The challenge will be holding the staff accountable for not complying with the corrective action plans including timely completion of tasks. Having a designated staff member of sufficient rank oversee the implementation of the corrective action plans is suggested.

10.    **Stipulated Agreements 2015** – The section on the Stipulated Agreements of 2015 has been expanded to aid OPSO in reviewing its on-going compliance with the two Stipulated Agreements from 2015. Five provisions are in partial compliance. Beginning with the next report, compliance with the Stipulation and Order of June 2024 will be added.

11.    **Construction Projects** –

- TDC Mental Health (TMH)– Two housing units in the Temporary Detention Center (TDC) (total of four housing areas) were renovated to provide for housing inmates with acute mental illness pending the construction of Phase III. After TMH's completion, the male inmates with acute mental illness were moved from Hunt into one of the housing units. During the monitoring period, OPSO housed acute male inmates and acute female inmates in TMH.  All four of the housing areas were operational during the monitoring period although several cells are not being used due to longstanding maintenance issues. Some acute inmates remained in OJC due to lack of capacity in TMH. While TMH is not a suitable long-term solution to meet the requirements of the Consent Judgment as to medical and mental health services, it is a necessary interim step given no satisfactory housing for acute inmates in OJC. The operation of TMH has reaffirmed the necessity of single person cells for the majority of acute inmates in the initial stages of treatment which should be factored in the operational capacity of Phase III. Housing sub-acute inmates in two person cells in



Phase III will often be acceptable. It is important to note that TMH does nothing to address the lack of infirmary and medical housing in OJC and lack of programming space. Even with the construction of Phase III, there will be a need for safe and suitable housing for any sub-acute inmates which remain in OJC. One of the shortcomings of the TDC/TMH buildings is that the inmates have to be evacuated when there is the potential for a hurricane due to its propensity to flood. This occurred in September 2024 when the mental health inmates had to be moved to OJC, and the other inmates were evacuated to the Louisiana Department of Corrections.

- Phase III –Monthly meetings of the Executive Committee have been held and have provided information to the parties and the Monitors. The construction and occupation of Phase III are critical to the provision of mental and medical health services in accordance with the Consent Judgment. Regular court intervention has been required to keep the project moving forward. The project has reached 33.78% completion, based on the status report the City filed with the Court in September 2024.

**C.**     **Review Process of Monitors' Compliance Report #20**

A draft of this report was provided to OPSO, Counsel for the Plaintiff Class, and the Department of Justice (DOJ) on September 27, 2024.  Comments were provided by Counsel on October 14, 2024. Wexford was offered the opportunity to provide comments through OPSO. The Monitors considered the comments of the parties in finalizing Report #20.

**D.**     **Communication with Stakeholders**

The Monitors are committed to providing as much information as possible regarding the status of OPSO's efforts to comply with all orders of the Court. During the monitoring period, OPSO honored the request of the Monitors to provide a link to the current reports on the OPSO website.

**E.**     **Recommendations**

Over the years, the Monitors have provided multiple recommendations and suggestions to OPSO to assist in achieving and maintaining compliance with the Consent Judgment. The purpose of the recommendations continues to be to assist OPSO in



achieving and maintaining compliance; not to change the requirements of the Consent Judgment. There are recommendations and suggestions included within the body of this report.

**F.**      **Conclusions and Path Forward**

OPSO has been operating under the provisions of the Consent Judgment since June 2013; monitoring began in Fall 2013. During the previous leadership of Director Hodge, significant improvements were acknowledged by the Monitors. Sheriff Gusman resumed the role of full responsibility for bringing OPSO into compliance with the Consent Judgment in August 2020. Sheriff Gusman was defeated in the election held in December 2021 which seemed to lessen his desire to make progress in obtaining compliance during the remainder of his tenure. Chief LeCounte resigned from the OPSO in December 2021 which created a significant leadership vacuum. Sheriff Hutson was sworn in as Sheriff in May 2022. Sheriff Hutson has embraced the challenge of complying with the Consent Judgment and has established a good working relationship with the monitoring team.

However, it continues to be concerning that the same deficiencies pointed out in previous reports by the Monitors continued to exist and are not resolved. When OJC was placed back under the authority of the Sheriff, there were 118 provisions in substantial compliance. As of this report, there are only 73 provisions in substantial compliance. Serious incidents and harm to inmates continue to occur. OPSO has made some efforts to identify and address sources of contraband, but the Monitors encountered inmates smoking in the housing units without fear of consequences, including marijuana and narcotics, in the facility and weapons have frequently been fashioned from various materials within the OJC. Dangerous medication is frequently found during cell shakedowns, and it is not properly stored and identified. The medication distribution process was changed after the monitoring period and the new process appears to be a significant improvement. However, narcotics frequently are discovered in the facility and there continue to be inmates overdosing.

There appears to be a new emphasis on OPSO's data collection. Data collection and analysis is key to problem solving with a goal of a sustainable reduction in inmate-on-inmate assaults, inmate-on-staff assaults, uses of force, contraband, and property damage. Development of corrective action plans based on thorough analysis of the data and root



cause reviews are crucial to improvement. Those corrective actions plans are now being developed. The Court's order in June 2024 requires monthly reports on progress to the parties and Monitors and quarterly reports on progress to the Court. Follow-through on implementation is essential. The Monitors are hopeful that improvement will take place with the emphasis placed on data collection and analysis by OPSO under Sheriff Hutson.

The Monitors remain committed to the Court and the parties to collaborate on solutions that will result in significant improvement towards compliance with the provisions of the Consent Judgment and future achievement of constitutional conditions.

**The Monitors again thank and acknowledge the leadership, guidance, and support of The Honorable Lance M. Africk and The Honorable Michael B. North.**



**I. A.    Protection from Harm**

**Introduction**

This section of the Consent Judgment addresses core correctional functions including the use of force (policies, training, and reporting), identification of staff involved in uses of force through an early intervention system, safety and supervision of inmates, staffing, incidents and referrals, investigations, pre-trial placement of inmates in the facility, classification, the inmate grievance process, safety of inmates from sexual assault, and inmates' access to information.

The Consent Judgment requires that OPSO operate the facility to assure inmates are "reasonably safe and secure." Based on objective review of data, the facility has shown improvement in inmate and staff safety over the life of the Consent Judgment, but significant incidents that result in serious injury to inmates and staff continue to occur which confirmed that the facility is not reasonably safe and secure. Concerning is that inmates continue to fashion weapons out of items available in the jail including brooms, mops, and buckets provided by the jail. Inmate on inmate assaults often happen with no staff present to prevent the incident from occurring or to intervene to stop the incident. These are often incidents and uses of force which result in injuries severe enough to require hospitalization. This would not have occurred if the facility was properly staffed, and the staff were properly supervising the inmates and conducting themselves in accordance with policy. Also concerning is the lack of action to securely house inmates who are easily identified as being frequently involved in violence, contraband, and disruption of the facility.

Reaching and sustaining compliance with provisions of the Consent Judgment, particularly this section, relies on the collection, analysis, and corrective action planning using accurate and reliable data. The Monitors encourage OPSO to continue efforts to build its capacity to collect and analyze relevant accurate data, draw supportable conclusions to inform decisions throughout the organization, develop corrective action plans, implement corrective action plans, and hold staff accountable for non-adherence to corrective action plans and policies. As OPSO's capacity to collect, analyze, plan, and implement is enhanced, the ability to achieve and maintain compliance will be strengthened. Without an enhancement in capacity and dedication to making and



implementing informed decisions, OPSO is unlikely to achieve and maintain compliance.

The underreporting of incidents to the Monitors and parties has continued to exist during the monitoring period. In the past, OPSO had someone review the daily medical logs for inmates taken to the clinic for treatment subsequent to an altercation or a use of force, as well as the transport logs of inmates routed to the hospital with trauma-related injuries to cross check them against reported incidents. The review often found omissions. This does not appear to have occurred during the monitoring with regularity due to the person who was assigned to that duty being assigned other additional duties which limited the time available for this valuable task. It should be noted that, since Wexford took over the medical contract, the lists which should be relied upon are not being made available as they were under the previous medical contractor. OPSO has increased its efforts to discipline supervisors and deputies who fail to comply with the reporting policies resulting in late, incomplete, or missing incident reports.

The Lead Monitor reviewed all reported incidents for the monitoring period in preparation of this report. The following charts compare the totals for the calendar years (CY) 2018-July 2024. Given that the system for reporting incidents has proven to be unreliable, in the past, it was unclear whether a particular decline or increase was the result of reporting errors as opposed to an actual decline in a type of reportable incident. Since October 2022, the Monitors received the reports automatically which supported the proposition that previous declines were more likely the result of not reporting incidents and/or not forwarding the incident reports to the Monitors.



**Table 3 - All OJC Reported Incidents for CY 2018-July 2024**



| | Inmate/Inmate Assault | Inmate Staff Altercation | Use of Force | PREA | Death | Attempt Suicide/Ideation | Internal Escape | Criminal Damage | Slip/Falls/Injury | Medical | Contraband | Other |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2018** | 442 | 64 | 260 | 47 | 2 | 78 | 48 | 69 | 262 | NA | 106 | 15 |
| **2019** | 440 | 117 | 358 | 42 | 0 | 82 | 6 | 47 | 145 | NA | 302 | 6 |
| **2020** | 309 | 139 | 372 | 35 | 3 | 21 | 1 | 64 | 64 | NA | 351 | 1 |
| **2021** | 293 | 124 | 311 | 17 | 1 | 20 | 1 | 42 | 43 | NA | 350 | 0 |
| **2022** | 351 | 71 | 229 | 36 | 2 | 45 | 6 | 39 | 35 | NA | 248 | 10 |
| **2023** | 636 | 139 | 316 | 30 | 1 | 34 | 81 | 60 | 178 | NA | 554 | 41 |
| **2024** | 372 | 85 | 197 | 15 | 0 | 30 | 100 | 141 | 102 | 415 | 338 | 26 |

In CY 2021, the number of reported inmate on inmate assaults, inmate/staff altercations, and uses of force declined slightly, but it should be noted that there was still an alarming use of weapons in assaults resulting in serious injuries. The rate of inmate-on-inmate assaults in CY 2022 increased by 20% over CY 2021. The rate of inmate-on-inmate assaults in CY 2023 increased by 45% over CY 2022. The rate of inmate-on-inmate assaults in 2024 (January-July) is on a pace to be similar to the number reported in CY 2023. The number of inmate-on-inmate assaults reached an all-time high in CY 2023 since this data has been included in the Monitors' Report. The number of contraband incidents reached an all-time high in CY 2023 also; a 123% increase from CY 2022 to CY 2023. The number of incidents involving contraband in 2024 (January-July) is on a pace to exceed,



slightly, the number of contraband incidents in CY 2023. This is not unusual given the increased number of cell and unit searches that have taken place. Many of the inmate injuries or slip and falls are suspected to, in actuality, be the result of an inmate-on-inmate assault that was not observed by staff and that inmates were afraid to report. The staff misconduct number reported is not accurate as it reflects what is reported; not what occurred. It has been removed from the chart until reliable numbers are available as it was misleading.

**Table 4 –All OJC Reported Incidents by Type by Month CY 2018-July 2024**



| | Jan | Feb | March | April | May | June | July | August | September | October | November | December | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2018** | 92 | 96 | 112 | 121 | 124 | 144 | 116 | 132 | 112 | 113 | 105 | 129 | **1396** |
| **2019** | 123 | 93 | 105 | 112 | 117 | 129 | 113 | 152 | 94 | 137 | 144 | 113 | **1432** |
| **2020** | 107 | 113 | 98 | 109 | 84 | 144 | 98 | 106 | 67 | 75 | 109 | 110 | **1220** |
| **2021** | 125 | 80 | 78 | 109 | 77 | 97 | 91 | 70 | 78 | 113 | 89 | 72 | **1079** |
| **2022** | 77 | 88 | 66 | 50 | 55 | 66 | 67 | 51 | 93 | 137 | 115 | 119 | **984** |
| **2023** | 165 | 106 | 126 | 124 | 143 | 195 | 184 | 174 | 181 | 198 | 196 | 176 | **1968** |
| **2024** | 286 | 184 | 210 | 224 | 320 | 235 | 291 | 0 | 0 | 0 | 0 | 0 | 1750 |

**Assessment Methodology**

Dates of visits:

- October 17-19, 2023 (Lead Monitor, Monitor Poole, and Monitor Skipworth)
- December 4-7, 2023 (Lead Monitor Frasier)
- December 16-18, 2023 (Lead Monitor Frasier)



- January 16-18, 2024 (Lead Monitor Frasier and Monitor Poole)
- February 19-21, 2024 (Lead Monitor Frasier and Monitor Poole)
- April 16-18, 2024 (Leader Monitor Frasier)
- May 13-15, 2024 (Lead Monitor Frasier and Monitor Poole)
- June 24-27, 2024 (Lead Monitor Frasier, Monitor Skipworth, Monitor Hardyman, and Monitor Poole)
- July 23-26, 2024 (Lead Monitor Frasier, Monitor Johnson, and Monitor Vassallo)

Materials reviewed:

- Materials reviewed include the Consent Judgment, OPSO policies and procedures, use of force reports, incident reports, and investigations conducted by Investigative Services Bureau-Internal Affairs Division (ISB-IAD), investigations conducted by ISB-Criminal Division (ISB-Criminal), investigations conducted by ISB-Inmate Division, training materials, shakedown logs, OPSO self-assessment, Wellpath self-assessment, and post logs.

Interviews:

- Interviews included the Sheriff, Chief of Staff, command staff, jail supervisors, chief of corrections (now referred to as warden), deputy chief of jail operations, classification manager and staff, director of training, Wellpath staff, and various supervisors of units within ISB. Inmates were interviewed by the Monitors onsite for the visit. The Monitors also attended security-related meetings.

## IV. A. 1. Use of Force Policies and Procedures

*A. 1. a. OPSO shall develop, implement, and maintain comprehensive policies and procedures (in accordance with generally accepted correctional standards) relating to the use of force with particular emphasis regarding permissible and impermissible uses of force.*

*A. 1. b. OPSO shall develop and implement a single, uniform reporting system under a Use of Force Reporting policy. OPSO reportable force shall be divided into two levels, as further specified in policy: Level 1 uses of force will include all serious uses of force (i.e., the use of force leads to injuries that are extensive, serious or visible in nature, including black eyes, lacerations, injuries to the mouth or head, multiple bruises, injuries to the genitals, etc.), injuries requiring hospitalization, staff misconduct, and occasions when use of force reports are inconsistent, conflicting, or otherwise suspicious. Level 2 uses of force will include all escort or control holds used to overcome resistance that are not covered by the definition of Level 1 uses of force.*

*A. 1. c. OPSO shall assess, annually, all data collected regarding uses of force and make any necessary changes to use of force policies or procedures to ensure that unnecessary or excessive use of force is not used in OPP. The review and recommendations will be documented and provided to the Monitor, DOJ, and SPLC.*

Findings:

A. 1. a.  Partial Compliance



A. 1. b.  Substantial Compliance

A. 1. c.  Partial Compliance

Observations:

The current OPSO use of force policy was effective as of May 2016. OPSO conducted an annual review of the UOF policy in 2024. Changes were submitted in March 2024, but the changes were found to be unacceptable as the UOF policy no longer complied with the requirements of the Consent Judgment. OPSO, the Monitors, and the parties will meet when OPSO presents a suitable revised policy.  While there is a policy, the failure to fully adhere to the policy results in A.1.a. remaining in Partial Compliance. One of the most frequent violations of policy has to do with the failure to attempt de-escalation, including the utilization of mental health staff, before using force. The Stipulation and Order of June 2024 now specifies that OPSO security is to notify mental health on all non-emergency uses of force before they happen. The purpose is for mental health staff to assist in de-escalating the situation. It is recommended that OPSO include a proper definition for de-escalation when it proposes a revision of the UOF policy and incorporate it into the training of staff. There are numerous examples the situation being escalated, as opposed to de-escalated by staff, in retaliation for an inmate's actions that do not warrant the use of force; i.e., pepper spray for verbally refusing to comply with an order or for having thrown a substance on the staff from a locked cell.

The reporting system does comply with the requirements of A.1.b., which remains in Substantial Compliance. There continues to be misclassification of uses of force between Level 1 and Level 2 uses of force but continues to improve. To be clear, the Monitors consider the use of OC spray, pepper ball guns, and any other intermediate weapon to be a Level 1 use of force. Level 2 is reserved for escort and control holds.

While OPSO reported that the Use of Force Review Board (UOFRB) did meet twice a month during the monitoring period, no minutes for those meetings were provided in the documentation for the tour. The UOFRB has reduced the backlog which resulted in reviewing cases closer to the time they occurred, but it is still several months between the incident and the review. As a result, problematic staff often have continued contact with inmates. Consistency in membership is essential to identifying trends. It was noted that who attends the meetings is not consistent and leadership is lacking. This has resulted in



little analysis of patterns and trends and little corrective action.

The UOFRB is the group charged with completion of the annual review. However, this is not the group that conducted the annual review. Instead, it was conducted by members of the ISB and the CAB.

The most recent analysis of the number of uses of force was performed by the CAB and submitted in January 2023. The audit is performed annually, but no UOF audits by CAB were submitted to the monitors or the parties for the calendar year of 2023. The analysis submitted in January 2023 found that only 20% of the cases sampled had been reviewed by the UOFRB and confirmed that reports are not being authored in a timely manner and that first line supervisors are late on their review the majority of the time. The analysis found that reports are being reviewed by the Major of Security in a timely fashion 82% of the time. However, this did not consider that since the reports are often not authored in a timely manner nor reviewed by the first line supervisor in a timely manner, the cumulative time frame allowed for reports to be reviewed and finalized is almost always exceeded. While it is understandable that all issues cannot be included in one audit, it would be helpful to have an analysis as to compliance with the use of force policy such whether the force being used is reasonable and necessary, and regarding proper use of de-escalation. The CAB is encouraged to confirm the validity of the data before conducting the analysis and to expand the analysis to all aspects of the use of force policy. The annual review of the use of force data and the policy was conducted for CY 2023 as required by A.1.c but did not include all of the items required. Problems regarding OPSO analysis of the data, poorly written reports, backlog in the number of use of force incidents to be reviewed, and the lack of timely filed reports were noted in the review, but no real action items were included to address the shortcomings. Uses of force on specialty pods (particularly the disciplinary pod and the mental health pod) continue to be high, but there have been no recommendations documented and provided to the Monitors and DOJ and counsel for the Plaintiffs to address the problem. As has been pointed out in the past, the Consent Judgment requires not only assessment and reduction of inappropriate uses of force, but also unnecessary uses of force. This is not occurring. Examination of the use of force reports by the Monitors revealed that often the use of force is precipitated by a failure to follow policy such as not restraining the inmate



prior to movement or allowing an inmate out of his/her cell with another inmate(s) from whom he/she is to be kept separate or failing to secure the food port in the cell door. Incident reports most often demonstrate a lack of de-escalation efforts as required by the Consent Judgment; particularly before using OC spray. Seldom are mental health staff called upon to assist in de-escalation although a majority of the inmates upon whom force is used are on the mental health caseload. While there is improvement in the timeliness of holding of the UOFRB reviews, this section remains in Partial Compliance.

## IV. A. 2. Use of Force Training

*A. 2. a. OPSO shall ensure that all correctional officers are knowledgeable of and have the knowledge, skills, and abilities to comply with use of force policies and procedures. At a minimum, OPSO shall provide correctional officers with pre-service and annual in-service training in use of force, defensive tactics, and use of force policies and procedures. The training will include the following:*
*(1) instruction on what constitutes excessive force;*
*(2) de-escalation tactics; and*
*(3) management of prisoners with mental illness to limit the need for using force.*
*A. 2. b. OPSO shall ensure that officers are aware of any change to policies and practices throughout their employment with OPP. At a minimum, OPSO shall provide pre-service and annual in-service use of force training that prohibits:*
*(1) use of force as a response to verbal insults or prisoner threats where there is no immediate threat to the safety or security of the institution, prisoners, staff, or visitors;*
*(2) use of force as a response to prisoners' failure to follow instructions where there is no immediate threat to the safety or security of the institution, prisoners, staff, or visitors;*
*(3) use of force against a prisoner after the prisoner has ceased to offer resistance and is under control;*
*(4) use of force as punishment or retaliation; and*
*(5) use of force involving kicking, striking, hitting, or punching a non-combative prisoner.*
*A. 2. c. OPSO shall randomly test five percent of the correctional officer staff on an annual basis to determine their knowledge of the use of force policies and procedures. The testing instrument and policies shall be approved by the Monitor. The results of these assessments shall be evaluated to determine the need for changes in training practices. The review and conclusions will be documented and provided to the Monitor.*

Findings:

A. 2. a.  Partial Compliance

A. 2. b.  Partial Compliance

A. 2. c.  Substantial Compliance

Observations:

The Monitor reviewed the training materials, testing documentation, and the supplemental documentation submitted by training staff for the rating period and interviewed the Training Lieutenant present on the day of the inspection. It should be noted that the first half of the rating period is the fourth quarter of the calendar year. Training statistics are reported on a calendar basis. As noted in Report #19, Training staff



advised that the annual in-service Use of Force and Use of Force policy and procedure training requirements for CY 2023 were conducted per the published Academy schedule with makeup training conducted in the 4th quarter of 2023. Due to staffing shortages, the Training Lieutenant reported a significant number of staff assigned to inmate supervision in OJC, IPC and TMH/TDC failed to attend the UOF in-service training in CY 2023. The completion rates were as follows: OJC – 71.3%; IPC – 79.5%; TDC – 85%; and Kitchen/Warehouse at 4%. This is a substantial decline from the 100% compliance noted for CY 2022.

During Tour #18, it was determined that the defensive tactics training provided to both pre-service trainees and all deputies classified as "Level 3" was insufficient as presented in terms of the topics and techniques covered. Upon discussion with the Training Academy staff, an expanded defensive tactics course was implemented in August 2023 for all pre-service and in-service classes going forward. The completion rates through the end of CY 2023 were as follows: OJC – 81.2%; IPC – 83.6%; TDC – 85.9%; and Kitchen/Warehouse at 100%. A. 2. a. and A. 2. b. remain in partial compliance. OPSO is applauded for quickly developing and administering a remedial Defensive Tactics class to cover the deferred portion of the MDTS curriculum for all current Level 3 Recruits. Unfortunately, over 15% of the staff did not receive remedial training.

Effective January 2024, OPSO has implemented a new procedure for its annual training requirements under the Consent Judgment. Instead of holding multiple sessions for the same topic over a week-long period, OPSO has incorporated the Consent Judgment training requirements into a new 50-hour long (one week) training class whereby the staff member is required to attend the training on consecutive days. The required courses have also been incorporated into the Level II curriculum. The first consolidated training class was held in March 2024. A review of the attendance records during the inspection in June 2024 showed that less than half of the required staff had attended the consolidated class as of June 2024. OPSO Academy Command Staff stated they anticipate OPSO will meet the training mandates by the end of CY2024. While the Monitors hope that OPSO's optimism is warranted, it will be difficult to accomplish given the staffing shortages at OJC.

A thorough review of the use of force reports during the monitoring period reveals



the need for additional training which emphasizes de-escalation and provide deputies with additional tools when dealing with inmates with mental health issues and inmates who routinely exhibited behavioral problems. Given some very problematic incidents in which staff observed inappropriate uses of force and did not stop or report the same, it is strongly suggested that the duty to intervene and report be emphasized. As any security staff member may have to deal with an inmate with mental health issues, it is recommended that mental health training be made mandatory for all security staff; not just those daily assigned to the mental health units, particularly given the majority of the inmates in OJC are on the mental health caseload.

The Monitor reviewed training documentation provided by training staff specific to the 5 percent annual testing requirement for A. 2. c. Testing documentation for 2023 showed it to have occurred from June 2023 to November 2023. Training staff continue to pursue a goal of 15% testing, exceeding that of the consent judgment language. OPSO documentation showed a pass rate of 92%, a substantial improvement over the 83.7% reported for CY 2022. The test given in 2023 was originally approved by Monitor Frasier on April 21, 2021.

The Monitor has, in the past, observed that the Academy staff has maintained detailed, comprehensive, and very well-maintained files. A recent internal investigation has called into question the accuracy of those files. In response to our request for documentation, the Academy staff provided succinct and thorough reports as to who had and who had not completed the required use of force training. The question is what was included in those trainings. The Monitor continues to review documentation and randomly interview staff regarding the content and quality of the training received throughout the year.

## IV. A. 3. Use of Force Reporting

*A. 3. a. Failure to report a use of force incident by any staff member engaging in the use of force or witnessing the use of force shall be grounds for discipline, up to and including termination.*
*A. 3. b. OPSO shall ensure that sufficient information is collected on uses of force to assess whether staff members complied with policy; whether corrective action is necessary including training or discipline; the effectiveness of training and policies; and whether the conditions in OPP comply with this Agreement. At a minimum, OPSO will ensure that officers using or observing a Level 1 use of force shall complete a use of force report that will:*
> *(1)    include the names of all staff, prisoner(s), or other visual or oral witness(es);*
> *(2)    contain an accurate and specific account of the events leading to the use of force;*
> *(3)    describe the level of resistance and the type and level of force used, consistent with OPP use of force; policy and procedure, as well as the precise actions taken by OPSO staff in*



response to the incident;

*(4)  describe the weapon or instrument(s) of restraint, if any, and the manner of such use be accompanied by a prisoner disciplinary report, if it exists, pertaining to the events or prisoner activity that prompted the use of force incident;*

*(5)  describe the nature and extent of injuries sustained by anyone involved in the incident;*

*(6)  contain the date and time when medical attention, if any, was requested and actually provided;*

*(7)  describe any attempts the staff took to de-escalate prior to the use of force;*

*(8)  include an individual written account of the use of force from every staff member who witnessed the use of force;*

*(9)  include photographs taken promptly, but no later than two hours after a use of force incident, of all injuries sustained, or as evidence that no injuries were sustained, by prisoners and staff involved in the use of force incident;*

*(10)  document whether the use of force was digitally or otherwise recorded. If the use of force is not digitally or otherwise recorded, the reporting officer and/or watch commander will provide an explanation as to why it was not recorded; and*

*(11)  include a statement about the incident from the prisoner(s) against whom force was used.*

*A. 3. c. All officers using a Level 2 use of force shall complete a use of force report that will:*

*(1)  include the names of staff, prisoner(s), or other visual or oral witness(es);*

*(2)  contain an accurate and specific account of the events leading to the use of force;*

*(3)  describe the level of resistance and the type and level of force used, consistent with OPP use of force policy and procedure, as well as the precise actions taken by OPSO staff in response to the incident;*

*(4)  describe the weapon or instrument(s) of restraint, if any, and the manner of such use;*

*(5)  be accompanied by a prisoner disciplinary report, if it exists, pertaining to the events or prisoner activity that prompted the use of force incident;*

*(6)  describe the nature and extent of injuries sustained by anyone involved in the incident;*

*(7)  contain the date and time when medical attention, if any, was requested and actually provided; and*

*(8)  describe any attempts the staff took to de-escalate prior to the use of force.*

*A. 3. d. OPSO shall require correctional officers to notify the watch commander as soon as practical of any use of force incident or allegation of use of force. When notified, the watch commander will respond to the scene of all Level 1 uses of force. When arriving on the scene, the watch commander shall:*

*(1)  ensure the safety of everyone involved in or proximate to the incident;*

*(2)  determine if any prisoner or correctional officer is injured and ensure that necessary medical care is provided;*

*(3)  ensure that personnel and witnesses are identified, separated, and advised that communications with other witnesses or correctional officers regarding the incident are prohibited;*

*(4)  ensure that witness and subject statements are taken from both staff and prisoner(s) outside of the presence of other prisoners and staff;*

*(5)  ensure that the supervisor's use of force report is forwarded to IAD for investigation if, upon the supervisor's review, a violation of law or policy is suspected. The determination of what type of investigation is needed will be based on the degree of the force used consistent with the terms of this Agreement;*

*(6)  If the watch commander is not involved in the use of force incident, the watch commander shall review all submitted use of force reports within 36 hours of the end of the incident, and shall specify his findings as to completeness and procedural errors. If the watch commander believes that the use of force may have been unnecessary or excessive, he shall immediately contact IAD for investigation consideration and shall notify the warden or assistant warden; and*

*(7)  All Level 1 use of force reports, whether or not the force is believed by any party to be unnecessary or excessive, shall be sent to IAD for review. IAD shall develop and submit to the Monitor within 90 days of the Effective Date clear criteria to identify*



*use of force incidents that warrant a full investigation, including injuries that are extensive or serious, visible in nature (including black eyes, injuries to the mouth, injuries to the genitals, etc.), injuries requiring hospitalization, staff misconduct (including inappropriate relationships*

*with prisoners), and occasions when use of force reports are inconsistent, conflicting, or otherwise suspicious.*

*A. 3. e. Ensure that a first-line supervisor is present during all pre-planned uses of force, such as cell extractions.*

*A. 3. f. Within 36 hours, exclusive of weekends and holidays, of receiving the report and review from the shift commander, in order to determine the appropriateness of the force used and whether policy was followed, the Warden or Assistant Warden shall review all use of force reports and supervisory reviews including:*

    *(1)    the incident report associated with the use of force;*
    *(2)    any medical documentation of injuries and any further medical care;*
    *(3)    the prisoner disciplinary report associated with the use of force; and*
    *(4)    the Warden or Assistant Warden shall complete a written report or written statement of specific findings and determinations of the appropriateness of force.*

*A. 3. g. Provide the Monitor a periodic report detailing use of force by staff. These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. Each report will include the following information:*

    *(1)    a brief summary of all uses of force, by type;*
    *(2)    date that force was used;*
    *(3)    identity of staff members involved in using force;*
    *(4)    identity of prisoners against whom force was used;*
    *(5)    a brief summary of all uses of force resulting in injuries;*
    *(6)    number of planned and unplanned uses of force;*
    *(7)    a summary of all in-custody deaths related to use of force, including the identity of the decedent and the circumstances of the death; and*
    *(8)    a listing of serious injuries requiring hospitalization.*

*A. 3. h. OPSO shall conduct, annually, a review of the use of force reporting system to ensure that it has been effective in reducing unnecessary or excessive uses of force. OPSO will document its review and conclusions and provide them to the Monitor, SPLC, and DOJ.*

Findings:

A. 3. a.  Partial Compliance

A. 3. b.  Partial Compliance

A. 3. c.  Partial Compliance

A. 3. d.  Partial Compliance

A. 3. e.  Partial Compliance

A. 3. f.  Partial Compliance

A. 3. g.  Partial Compliance

A. 3. h.  Partial Compliance

Observations:

As to provision A. 3. a., the use of force policy requires all uses of force to be reported timely and completely and sets out the potential discipline if the policy is not followed. There were no disciplinary memorandums submitted as documentation of



discipline for failure to report a use of force even though the Lead Monitor has seen documentation within the documentation provided by IAD. Nearly twenty (20) reports were identified by the Monitors as involving use of force during the compliance period for which there was no use of force report. Thus, the rating continues to be in Partial Compliance.

Provision A. 3. b. is in Partial Compliance due to the number of use of force reports that are incomplete or inadequate. The use of force policy includes the provisions required by the Consent Judgment, but lack of adherence still occurs. The Monitor provided a checklist of the report requirements to assist supervisors in ensuring reports included all necessary items. A review of those checklists and accompanying reports indicates that the required information is still found to be missing from the use of force reports such as what led up to the incident, details of actions taken during the use of force, and resolution of the incident. Seldom do reports include an articulation of any de-escalation tactics, a description of injuries sustained, and when medical attention was provided. No proof was provided that deputies and supervisors are being held accountable for failure to include required information. Provision A. 3. c. requires less information as it is a lesser level of force, but the deficiencies are the same as those noted for A. 3. b. and thus it is in Partial Compliance.

The watch commanders still are not consistently compliant with the requirements of the Consent Judgment (IV. A. 3. d.) as to their specific duties and the time requirement for performance of these duties under the policies. This has been noted in multiple reports. The Consent Judgment requires submission of the packet to the Assistant Warden/Deputy Chief of Corrections within 36 hours not three (3) days or three (3) 12-hour shifts. OPSO's audit of timeliness confirmed that it takes on average one and half times as long for submission as policy allows.

A. 3. e. requires the presence of a supervisor for planned uses of force. One of the main reasons for this provision is to allow for de-escalation to be attempted before force is carried out. A CAP was put in place regarding what was considered to be a planned use of force and there has been improvement in recognition of what constitutes a planned use of force; twelve this monitoring period. OPSO improved and indicated an attempt at de-escalation for seven of them. OPSO is close to substantial compliance with this provision,



but, given the repeated failure of supervisors to utilize de-escalation techniques, this provision's rating remains in Partial Compliance.

The Deputy Chief of Jail Operations conducted the review of the use of force during the monitoring period. There was no documentation provided as to the timeliness of this review. The latest documentation (January 2023) provided was that the average time for the review was within thirty-six (36) hours 82% of the time. In OPSO's comments on the draft report, it contended that the Deputy Warden had approved the UOF reports within 36 hours, 66% of the time. This appears to be a more accurate depiction as the 82% did not include the time lag for sending reports back for correction. This provision remains in Partial Compliance. Documentation should be presented prior to the compliance tour.

OPSO relies on the quarterly report issued by FIT for documentation as to compliance with IV. A. 3. g. While the FIT quarterly report for October-December 2023 was provided, no documentation for January-March 2024 was provided. The information provided did not contain all of the required information for compliance with IV. A. 3. g. (3), (4), (5), and (6). Thus, this section continues to be in Partial Compliance.

The annual review of use of force incidents for CY 2023 was conducted March 15 and 20, 2024 but did not include all of the items required by IV. A. 3. h. In order to warrant a rating of substantial compliance, OPSO needed to address all of the issues; particularly the most serious issues such as the frequent use of force on the mental health housing units and lack of de-escalation that were not addressed. Also not addressed are how frequent uses of force would not be needed if policy was followed. Therefore, the compliance rating remains at partial compliance.

### IV. A. 4. Early Intervention System ("EIS")

*A. 4. a. OPSO shall develop, within 120 days of the Effective Date, a computerized relational database ("EIS") that will document and track staff members who are involved in use of force incidents and any complaints related to the inappropriate or excessive use of force, in order to alert OPSO management to any potential problematic policies or supervision lapses or need for retraining or discipline. The Chief of Operations Deputy, supervisors, and investigative staff shall have access to this information and shall review on a regular basis, but not less than quarterly, system reports to evaluate individual staff, supervisor, and housing area activity. OPSO will use the EIS as a tool for correcting inappropriate staff behavior before it escalates to more serious misconduct.*
*A. 4. b. Within 120 days of the Effective Date, OPSO senior management shall use EIS information to improve quality management practices, identify patterns and trends, and take necessary corrective action both on an individual and systemic level. IAD will manage and administer EIS systems. The Special Operations Division ("SOD") will have access to the EIS. IAD will conduct quarterly audits of the EIS to ensure that analysis and intervention is taken according to the process described below. Command staff shall review the data collected by the EIS on at least a quarterly basis to identify potential patterns or trends resulting in harm to prisoners. The Use of Force Review Board will*



*periodically review information collected regarding uses of force in order to identify the need for corrective action, including changes to training protocols and policy or retraining or disciplining individual staff or staff members. Through comparison of the operation of this system to changes in the conditions in OPP, OPSO will assess whether the mechanism is effective at addressing the requirements of this Agreement.*

*A. 4. c. OPSO shall provide, within 180 days of the implementation date of its EIS, to SPLC, DOJ, and the Monitor, a list of all staff members identified through the EIS and corrective action taken.*

*A. 4. d. The EIS protocol shall include the following components: data storage, data retrieval, reporting, data analysis, pattern identification, supervisory assessment, supervisory intervention, documentation, and audit.*

*A. 4. e. On an annual basis, OPSO shall review the EIS to ensure that it has been effective in identifying concerns regarding policy, training, or the need for discipline. This assessment will be based in part on the number and severity of harm and injury identified through data collected pursuant to this Agreement. OPSO will document its review and conclusions and provide them to the Monitor, who shall forward this document to DOJ and SPLC.*

Findings:

A. 4. a.  Partial Compliance

A. 4. b.  Partial Compliance

A. 4. c.  Partial Compliance

A. 4. d.  Partial Compliance

A. 4. e.  Partial Compliance

Observations:

Due to unreliability of the electronic EIS, OPSO abandoned the original system and fashioned an alternative version within the AS400. A FIT staff member manually monitors the database to alert FIT staff as to the need to review any uses of force by a staff member.

OPSO has provided its documentation to the Monitors as to the names of the staff members who are flagged for use of force. However, no review of staff alerted under the EIS was documented or provided. OPSO acknowledges that the reviews did not occur. Having alerts with no follow up negates the value of gathering the data. As no documentation of review by the UFRB as to EIS alerts was provided and it was acknowledged that the UFRB did not review the EIS alerts consistently; A. 4. a., A. 4. b, and A. 4. c. remain in partial compliance. Continued questionable and inappropriate uses of force by the same staff members and with the same inmates calls into question whether the EIS is being utilized to improve management quality practices, identify patterns and trends, and take necessary corrective action as required. Section A.4.d. is in partial compliance as the EIS protocol lists the required elements, but there is no supervisory assessment nor intervention.

No proof of the UOFRB evaluating the EIS data was provided. The annual review of



use of force incidents and EIS for CY 2023 was conducted March 15 and 20, 2024 and did not include all of the items required by IV. A. 4. e. The review should consist of more than noting that the EIS was triggered. It involves assessing the effectiveness of the EIS which was not performed. Therefore, IV. A .4. e. is in partial compliance.

## IV. A. 5. Safety and Supervision

*A. 5. a. Maintain security policies, procedures, and practices to provide a reasonably safe and secure environment for prisoners and staff in accordance with this Agreement.*
*A. 5. b. Maintain policies, procedures, and practices to ensure the adequate supervision of prisoner work areas and trustees.*
*A. 5. c. Maintain policies and procedures regarding care for and housing of protective custody prisoners and prisoners requesting protection from harm.*
*A. 5. d. Continue to ensure that correctional officers conduct appropriate rounds at least once during every 30- minute period, at irregular times, inside each general population housing unit and at least once during every 15-minute period of special management prisoners, or more often if necessary. All security rounds shall be documented on forms or logs that do not contain pre-printed rounding times. In the alternative, OPSO may provide direct supervision of prisoners by posting a correctional officer inside the day room area of a housing unit to conduct surveillance.*
*A. 5. e. Staff shall provide direct supervision in housing units that are designed for this type of supervision. Video surveillance may be used to supplement, but must not be used to replace, rounds by correctional officers.*
*A. 5. f. Increase the use of overhead video surveillance and recording cameras to provide adequate coverage throughout the common areas of the Jail, including the Intake Processing Center, all divisions' intake areas, mental health units, special management units, prisoner housing units, and in the divisions' common areas.*
*A. 5. g. Continue to ensure that correctional officers, who are transferred from one division to another, are required to attend training on division-specific post orders before working on the unit.*
*A. 5. h. Continue to ensure that correctional officers assigned to special management units, which include youth tiers, mental health tiers, disciplinary segregation, and protective custody, receive eight hours of specialized training regarding such units on prisoner safety and security on at least an annual basis.*
*A. 5. i. Continue to ensure that supervisors conduct daily rounds on each shift in the prisoner housing units and document the results of their rounds.*
*A. 5. j. Continue to ensure that staff conduct daily inspections of cells and common areas of the housing units to protect prisoners from unreasonable harm or unreasonable risk of harm.*
*A. 5. k. Continue to ensure that staff conduct random monthly shakedowns of cells and common areas so that prisoners do not possess or have access to dangerous contraband.*
*A. 5. l. Provide the Monitor a periodic report of safety and supervision at the Facility. These periodic reports shall be provided to the monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. Each report will provide the following information:*
> *(1)    a listing of special management prisoners, their housing assignments, the basis for them being placed in the specialized housing unit, and the date placed in the unit; and*
> *(2)    a listing of all contraband, including weapons seized, the type of contraband, date of seizure, location, and shift of seizure.*

Findings:

A. 5. a.  Partial Compliance

A. 5. b.  Substantial Compliance

A. 5. c.  Partial Compliance



A. 5. d.  Non-Compliance

A. 5. e.  Partial Compliance

A. 5. f.   Substantial Compliance

A. 5. g.  Partial Compliance

A. 5. h.  Partial Compliance

A. 5. i.   Non-Compliance

A. 5. j.   Non-Compliance

A. 5. k.  Partial Compliance

A. 5. l.   Partial Compliance

<u>Observations:</u>

     OPSO has worked hard to finalize policies, procedures, and post orders. Having words written on paper without implementation of those policies, procedures, and practices is insufficient for substantial compliance, as demonstrated by the previous discussion of OPSO staff failing to follow established use of force policies and procedures. Policies and procedures must be adhered to and followed for them to be "maintained", and substantial compliance achieved. Practices, even if not included in policies and procedures, must adhere to the standard also. Thus, A. 5. a. remains in partial compliance. There is adequate supervision of inmate working areas to result in substantial compliance as to A. 5. b. The level of violence continues to be at an unacceptable level. It should be noted that the Lead Monitor actually reads every incident report sent by OPSO. The Lead Monitor often finds that incident reports involving assaults are often not properly categorized by OPSO. Thus, if OPSO is relying on the categorization of incidents for its analysis, the analysis is based on the improper categorization that routinely underreports assaults and altercations. There was a monthly average of 24 reported inmate-on-inmate assaults/altercations in CY 2021. That number rose to 27 in CY 2022 and nearly doubled as it rose to 53 in CY 2023. The monthly average of inmate-on-inmate assaults has continued to be 53 in CY 2024 (January-July). This is indicative that OPSO has not substantially complied with the requirement that the facility be reasonably safe for staff and inmates, and that the facility continues not to be safe. The current number reported, even while higher than previous calendar years, is suspect given the systematic underreporting of reportable incidents and the number of inmate-on-inmate assaults that



are likely undetected due to the lack of staff in the housing areas. While the Monitors are well aware that violent incidents occur in jail facilities, the level currently reflects partial compliance with the obligation to provide a reasonably safe and secure environment as to A. 5. a. and A. 5. c. OPSO's response indicated that their calculation was that 11% of violence occurred in the housing units involving protective custody inmates. It should be noted that protective custody inmates make up less than 11% of the OJC population. Thus, the level of violence on the housing units involving protective custody levels exceeds the OJC population in general. OPSO is currently reviewing how inmates are selected for protective custody housing to lessen the likelihood that violent inmates will manipulate the classification process and gain access to vulnerable inmates. The Monitors will continue to assess whether OPSO moves to being in Non-Compliance with the provision to maintain a reasonably safe and secure environment.

Review of the significant incidents during the monitoring period indicates that the failure of staff to follow policy consistently continues to be a serious impediment to effective supervision of the inmates. Staff continue to leave inmates unsupervised for hours and allow them to have access to materials by which to fashion weapons. Many of the inmate-on-inmate assaults occur because staff allow inmates out of their cells and leave them unsupervised. There are inmates who repeatedly do not follow the rules of OJC including assaulting other inmates, assaulting staff, destroying property, starting fires, smoking, possession of dangerous contraband and/or threatening self-harm. OPSO used to house many of those inmates in a high security unit but chose to abandon this practice shortly after Sheriff Hutson took office. OPSO did move the high-risk inmates that were housed in dormitories into units with cells during the monitoring period. It is of concern that the practice of limiting the movement of high-security inmates and the practice of placing them in specialty housing was eliminated. The Monitors strongly urge OPSO to reestablish a high security unit. While it would be beneficial to develop individual behavioral management plans for these inmates, those plans should include specific security measures to be used when these inmates are allowed out of their cells. Such plans, if carried out routinely and consistently followed by all staff, would likely reduce the level of violence in the facility. While there has been recent discussion about establishing a close custody unit, it has yet to be implemented.



## Table 5 CY 2018-July 2024 OJC Reported Incidents

| 2018 | Use of Force | Inmate Misconduct R/O/SD | Inmate/ Inmate Assault | Inmate Staff Altercation | PREA | Death | Attempt Suicide/ Ideation | Internal Escape | Criminal Damage | Medical (AKA die/fall) | Contraband | Staff Misconduct-Suspension/ | Other | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| January | 13 | 0 | 38 | 7 | 2 | 0 | 6 | 2 | 3 | 9 | 9 | 0 | 3 | 92 |
| February | 10 | 0 | 28 | 6 | 4 | 0 | 14 | 2 | 10 | 5 | 15 | 2 | 0 | 96 |
| March | 21 | 0 | 37 | 7 | 5 | 0 | 4 | 3 | 11 | 18 | 5 | 0 | 1 | 112 |
| April | 22 | 0 | 39 | 9 | 4 | 0 | 4 | 3 | 12 | 22 | 5 | 0 | 1 | 121 |
| May | 24 | 0 | 52 | 0 | 5 | 1 | 0 | 5 | 8 | 19 | 10 | 0 | 0 | 124 |
| June | 26 | 0 | 46 | 7 | 5 | 0 | 6 | 7 | 3 | 32 | 9 | 1 | 2 | 144 |
| July | 20 | 0 | 30 | 4 | 4 | 0 | 9 | 3 | 3 | 30 | 13 | 0 | 0 | 116 |
| Aug | 27 | 0 | 39 | 3 | 3 | 0 | 13 | 2 | 6 | 30 | 6 | 0 | 3 | 132 |
| Sept | 14 | 0 | 33 | 6 | 2 | 0 | 7 | 5 | 4 | 35 | 6 | 0 | 0 | 112 |
| Oct | 28 | 0 | 32 | 9 | 5 | 0 | 3 | 0 | 2 | 26 | 7 | 0 | 1 | 113 |
| Nov | 21 | 0 | 31 | 6 | 5 | 0 | 5 | 8 | 3 | 18 | 7 | 0 | 1 | 105 |
| Dec | 34 | 0 | 37 | 0 | 3 | 1 | 7 | 8 | 4 | 18 | 14 | 0 | 3 | 129 |
| Total | 260 | 0 | 442 | 64 | 47 | 2 | 78 | 48 | 69 | 262 | 106 | 3 | 15 | 1396 |

| 2019 | Use of Force | Inmate Misconduct R/O/SD | Inmate/ Inmate Assault | Inmate Staff Assault | PREA | Death | Attempt Suicide/ Ideation | Internal Escape | Criminal Damage | Medical (AKA die/fall) | Contraband | Staff Misconduct-Suspension/ | Other | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| January | 27 | 0 | 40 | 1 | 2 | 0 | 15 | 3 | 7 | 14 | 14 | 0 | 0 | 123 |
| February | 29 | 0 | 26 | 7 | 2 | 0 | 13 | 1 | 0 | 4 | 11 | 0 | 0 | 93 |
| March | 26 | 0 | 25 | 4 | 1 | 0 | 6 | 1 | 2 | 16 | 21 | 0 | 3 | 105 |
| April | 26 | 0 | 28 | 7 | 1 | 0 | 3 | 0 | 3 | 15 | 27 | 0 | 2 | 112 |
| May* | 22 | 12 | 36 | 11 | 6 | 0 | 13 | 0 | 2 | 11 | 25 | 0 | 1 | 117 |
| June | 26 | 7 | 55 | 9 | 4 | 0 | 13 | 0 | 2 | 16 | 23 | 0 | 0 | 129 |
| July | 31 | 13 | 50 | 15 | 5 | 0 | 6 | 0 | 3 | 8 | 13 | 0 | 0 | 113 |
| Aug | 37 | 26 | 32 | 17 | 6 | 0 | 7 | 1 | 8 | 20 | 35 | 0 | 0 | 152 |
| Sept | 31 | 18 | 32 | 4 | 3 | 0 | 2 | 0 | 1 | 10 | 24 | 0 | 0 | 94 |
| Oct | 37 | 21 | 38 | 15 | 4 | 0 | 1 | 0 | 7 | 18 | 33 | 0 | 0 | 137 |
| Nov | 33 | 17 | 55 | 12 | 7 | 0 | 0 | 0 | 6 | 5 | 42 | 0 | 0 | 144 |
| Dec | 33 | 23 | 23 | 15 | 1 | 0 | 3 | 0 | 6 | 8 | 34 | 0 | 0 | 113 |
| Total | 358 | 137 | 440 | 117 | 42 | 0 | 82 | 6 | 47 | 145 | 302 | 0 | 6 | 1432 |

| 2020 | Use of Force | Inmate Misconduct R/O/SD | Inmate/ Inmate Assault | Inmate Staff Assault | PREA | Death | Attempt Suicide/ Ideation | Internal Escape | Criminal Damage | Medical (AKA die/fall) | Contraband | Staff Misconduct-Suspension/ | Other | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| January | 29 | 18 | 31 | 8 | 4 | 0 | 3 | 0 | 1 | 7 | 35 | 0 | 0 | **107** |
| February | 33 | 17 | 35 | 12 | 2 | 0 | 0 | 1 | 3 | 13 | 29 | 0 | 1 | **113** |
| March | 31 | 19 | 24 | 9 | 1 | 0 | 1 | 0 | 3 | 6 | 35 | 0 | 0 | **98** |


Orleans Parish JAIL MONITORS

| Month | Use of Force | Inmate Misconduct SUS/SO | Inmate/Inmate Assault | Inmate Staff Assault | PREA | Death | Attempt Suicide/Ideation | Internal Escape | Criminal Damage | Medical (AKA die/fall/) | Contraband | Staff Misconduct-Suspension | Other | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| April | 45 | 29 | 25 | 19 | 7 | 0 | 0 | 0 | 4 | 1 | 24 | 0 | 0 | **109** |
| May | 37 | 26 | 24 | 11 | 1 | 0 | 1 | 0 | 6 | 3 | 12 | 0 | 0 | **84** |
| June | 22 | 16 | 28 | 13 | 4 | 2 | 1 | 0 | 5 | 12 | 63 | 0 | 0 | **144** |
| July | 21 | 8 | 22 | 9 | 1 | 0 | 2 | 0 | 4 | 5 | 47 | 0 | 0 | **98** |
| Aug | 22 | 23 | 22 | 8 | 2 | 1 | 4 | 0 | 11 | 4 | 31 | 0 | 0 | **106** |
| Sept | 24 | 14 | 16 | 12 | 2 | 0 | 2 | 0 | 8 | 4 | 9 | 0 | 0 | **67** |
| Oct | 35 | 18 | 24 | 10 | 2 | 0 | 1 | 0 | 3 | 3 | 14 | 0 | 0 | **75** |
| Nov | 33 | 19 | 28 | 10 | 5 | 0 | 2 | 0 | 9 | 5 | 31 | 0 | 0 | **109** |
| Dec | 40 | 25 | 30 | 18 | 4 | 0 | 0 | 0 | 7 | 1 | 21 | 0 | 0 | **110** |
| **Total** | **372** | **232** | **309** | **139** | **35** | **3** | **21** | **1** | **64** | **64** | **351** | **0** | **1** | **1220** |

| 2021 | Use of Force | Inmate Misconduct SUS/SO | Inmate/Inmate Assault | Inmate Staff Assault | PREA | Death | Attempt Suicide/Ideation | Internal Escape | Criminal Damage | Medical (AKA die/fall/) | Contraband | Staff Misconduct-Suspension | Other | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| January | 38 | 34 | 32 | 20 | 1 | 0 | 0 | 0 | 3 | 3 | 32 | 0 | 0 | 125 |
| February | 27 | 12 | 30 | 14 | 2 | 0 | 1 | 0 | 2 | 5 | 14 | 0 | 0 | 80 |
| March | 16 | 10 | 24 | 7 | 4 | 0 | 0 | 0 | 5 | 4 | 24 | 0 | 0 | 78 |
| April | 24 | 17 | 27 | 10 | 2 | 0 | 1 | 1 | 2 | 4 | 45 | 0 | 0 | 109 |
| May | 21 | 12 | 31 | 7 | 0 | 0 | 0 | 0 | 3 | 1 | 23 | 0 | 0 | 77 |
| June | 34 | 18 | 25 | 15 | 0 | 1 | 0 | 0 | 4 | 4 | 30 | 0 | 0 | 97 |
| July | 22 | 11 | 22 | 10 | 0 | 0 | 6 | 0 | 8 | 3 | 31 | 0 | 0 | 91 |
| Aug | 18 | 13 | 19 | 7 | 0 | 0 | 5 | 0 | 2 | 4 | 20 | 0 | 0 | 70 |
| Sept | 28 | 19 | 18 | 6 | 3 | 0 | 1 | 0 | 1 | 7 | 23 | 0 | 0 | 78 |
| Oct | 31 | 21 | 22 | 8 | 0 | 0 | 1 | 0 | 6 | 3 | 52 | 0 | 0 | 113 |
| Nov | 27 | 12 | 21 | 7 | 2 | 0 | 4 | 0 | 4 | 1 | 38 | 0 | 0 | 89 |
| Dec | 25 | 11 | 22 | 12 | 3 | 0 | 1 | 0 | 2 | 4 | 17 | 0 | 0 | 72 |
| Total | 311 | 190 | 293 | 124 | 17 | 1 | 20 | 1 | 42 | 43 | 350 | 0 | 0 | 1079 |

| 2022 | Use of Force | Inmate Misconduct SUS/SO | Inmate/Inmate Assault | Inmate Staff Assault | PREA | Death | Attempt Suicide/Ideation | Internal Escape | Criminal Damage | Medical (AKA die/fall/) | Contraband | Staff Misconduct-Suspension | Other | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| January | 22 | 12 | 22 | 5 | 1 | 0 | 0 | 0 | 4 | 4 | 29 | 0 | 0 | 77 |
| February | 26 | 21 | 18 | 10 | 3 | 0 | 1 | 0 | 4 | 0 | 31 | 0 | 0 | 88 |
| March | 15 | 8 | 24 | 1 | 2 | 0 | 4 | 0 | 4 | 3 | 20 | 0 | 0 | 66 |
| April | 12 | 6 | 28 | 3 | 1 | 0 | 6 | 0 | 4 | 1 | 1 | 0 | 0 | 50 |
| May | 15 | 10 | 24 | 3 | 5 | 0 | 3 | 0 | 4 | 2 | 4 | 0 | 0 | 55 |
| June | 22 | 15 | 31 | 2 | 2 | 2 | 5 | 1 | 2 | 2 | 4 | 0 | 0 | 66 |
| July | 15 | 6 | 36 | 5 | 3 | 0 | 1 | 1 | 1 | 7 | 6 | 0 | 1 | 67 |
| Aug | 15 | 12 | 24 | 1 | 0 | 0 | 1 | 0 | 3 | 2 | 8 | 0 | 0 | 51 |
| Sept | 27 | 18 | 30 | 7 | 5 | 0 | 3 | 0 | 6 | 3 | 20 | 0 | 1 | 93 |
| Oct | 23 | 16 | 55 | 8 | 9 | 0 | 2 | 0 | 2 | 7 | 37 | 0 | 1 | 137 |
| Nov | 13 | 6 | 26 | 11 | 4 | 0 | 10 | 1 | 3 | 3 | 45 | 0 | 6 | 115 |
| Dec | 24 | 11 | 33 | 15 | 1 | 0 | 9 | 3 | 2 | 1 | 43 | 0 | 1 | 119 |
| Total | 229 | 141 | 351 | 71 | 36 | 2 | 45 | 6 | 39 | 35 | 248 | 0 | 10 | 984 |



| 2023 | Use of Force | Inmate Misconduct FLD/FFD | Inmate/ Inmate Assault | Inmate Staff Assault | PREA | Death | Attempt Suicide/ Ideation | Internal Escape | Criminal Damage | Medical (AKA disability/...) | Contraband | Staff Misconduct-Suspension/... | Other | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| January | 24 | 17 | 34 | 9 | 2 | 0 | 5 | 2 | 6 | 15 | 75 | 0 | 0 | 165 |
| February | 19 | 14 | 30 | 4 | 4 | 0 | 1 | 4 | 4 | 15 | 28 | 0 | 2 | 106 |
| March | 14 | 7 | 46 | 9 | 2 | 0 | 5 | 8 | 1 | 7 | 40 | 0 | 1 | 126 |
| April | 18 | 12 | 42 | 9 | 2 | 0 | 2 | 3 | 5 | 6 | 39 | 0 | 4 | 124 |
| May | 21 | 12 | 43 | 11 | 2 | 0 | 1 | 5 | 1 | 15 | 52 | 0 | 1 | 143 |
| June | 36 | 23 | 62 | 16 | 1 | 0 | 1 | 8 | 7 | 25 | 49 | 0 | 3 | 195 |
| July | 32 | 20 | 66 | 18 | 5 | 0 | 4 | 4 | 8 | 20 | 35 | 0 | 4 | 184 |
| Aug | 27 | 15 | 67 | 14 | 1 | 0 | 7 | 11 | 5 | 12 | 37 | 0 | 5 | 174 |
| Sept | 25 | 19 | 67 | 15 | 1 | 0 | 0 | 4 | 6 | 14 | 53 | 0 | 2 | 181 |
| Oct | 44 | 37 | 64 | 10 | 5 | 0 | 3 | 7 | 7 | 12 | 44 | 0 | 9 | 198 |
| Nov | 31 | 18 | 67 | 13 | 3 | 0 | 1 | 15 | 4 | 23 | 45 | 0 | 7 | 196 |
| Dec | 25 | 21 | 48 | 11 | 2 | 0 | 4 | 10 | 6 | 14 | 57 | 0 | 3 | 176 |
| Total | 316 | 215 | 636 | 139 | 30 | 0 | 34 | 81 | 60 | 178 | 554 | 0 | 41 | 1968 |

| 2024 | Use of Force | Inmate Misconduct FLD/FFD | Inmate/ Inmate Assault | Inmate Staff Assault | PREA | Death | Attempt Suicide/ | Internal Escape | Criminal Damage | Slip / Fall / Injury | Contraband | Medical | Other | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Jan | 27 | 23 | 45 | 23 | 2 | 0 | 3 | 14 | 8 | 15 | 64 | 86 | 3 | 286 |
| Feb | 24 | 17 | 35 | 9 | 1 | 0 | 2 | 7 | 21 | 9 | 32 | 46 | 5 | 184 |
| March | 22 | 14 | 39 | 5 | 4 | 0 | 7 | 21 | 16 | 6 | 50 | 43 | 5 | 210 |
| April | 16 | 12 | 44 | 11 | 0 | 0 | 2 | 7 | 19 | 24 | 34 | 70 | 1 | 224 |
| May | 40 | 21 | 70 | 16 | 2 | 0 | 7 | 10 | 30 | 13 | 79 | 68 | 4 | 320 |
| June | 24 | 15 | 72 | 6 | 2 | 0 | 1 | 12 | 18 | 15 | 42 | 49 | 3 | 235 |
| July | 44 | 24 | 67 | 15 | 4 | 0 | 8 | 29 | 29 | 20 | 37 | 53 | 5 | 291 |
| Aug | 0 | 0 | | | | | | | | | | | | 0 |
| Sept | 0 | 0 | | | | | | | | | | | | 0 |
| Oct | 0 | 0 | | | | | | | | | | | | 0 |
| Nov | 0 | 0 | | | | | | | | | | | | 0 |
| Dec | 0 | 0 | | | | | | | | | | | | 0 |
| Total | 197 | 126 | 372 | 85 | 15 | 0 | 30 | 100 | 141 | 102 | 338 | 415 | 26 | 1750 |

OPSO continues to not timely conduct and document security rounds (30 minutes or 15 minutes depending on the unit) nor perform direct supervision surveillance consistent with the requirements of the Consent Judgment or OPSO policy.

Direct supervision requires surveillance of all of the inmates and cannot be properly performed by sitting behind a desk or in the control module. It requires walking around the unit, looking into the individual cells, and actively engaging with the inmates.



Staffing in the housing units was observed to be inadequate throughout the OJC during the monitoring tour. Over the last five monitoring tours, the Monitors witnessed the majority of the units being unsupervised. A review of the log of security checks reveals TMH was the one area which appeared to have sufficient staff and consistently conducted security rounds. Review of incident reports revealed that units were often unstaffed, including many mandatory posts. If staff are not present, it is impossible to make the required rounds. The staff reverted to writing their round solely in the logbooks. This is insufficient proof that the security checks actually occurred and requires watching hours of video to verify. Review of video footage after an incident often reveals that security checks are not being conducted and/or inadequately conducted even if recorded in the logbook. OPSO indicated that with the beginning of the formation of the compliance unit that OPSO has now started to audit log sheets with video footage and plans to have an audit report for the next compliance period. A simple review of the documentation provided indicates that there are often gaps of two or more hours in between security rounds. During the onsite monitoring visit, Monitors reviewed the logbooks. Deputies were once again questioned and often found to be incapable of describing what an acceptable security check would be like. At most, in the majority of the units, an adequate security check was only performed when a physical count of the inmates took place; at most, twice in a twelve-hour shift. The rest of the "checks" were no more than looking about the housing unit without leaving the deputy station, or, even more troubling, the control station which is located outside of the housing unit. OPSO CAB performed an audit of a limited period of security checks for a period in April 2024. While the security checks audited were after the monitoring period, the results are illustrative of what the Monitors have observed and noted in previous reports. The CAB auditors found that while 137 security checks were noted on the pod log, Squads A and B actually only completed 5% of those security checks. Squad C only completed 2.25% of the security checks recorded and Squad D completed 12% of the security checks recorded.  Given the level of failure to perform security checks and lack of staff assigned to direct supervision, OPSO continues to be in noncompliance with IV. A. 5. d. In the Stipulation and Order of June 2024, the Court specifically ordered OPSO to staff four housing units (mental health (2A), youthful offenders (2C), protective custody (2D), and disciplinary (3C)). OPSO's data indicates that



it has made progress on these four specific housing units. However, it should be noted that the progress was outside of this compliance period and only relates to those specific four housing units. OPSO will be rated on the supplemental provisions in the next report.

OPSO should consider a reliable system that would allow for rounds, by both deputies and supervisors, to be recorded electronically. Not only would it allow for supervisors to quickly determine whether rounds were being conducted in a timely manner, it would allow for OPSO to audit compliance and address non-adherence.

All twenty-four (24) of the housing units in OJC are designed for direct supervision. At the time of the drafting of the Consent Judgment the design of OJC was known. The Consent Judgment requires that staff provide direct supervision in housing units that are designed for this type of supervision. Thus, continual presence of a deputy in each housing unit at OJC and TMH is mandatory under the Consent Judgment. OPSO has taken the position that OPSO gets to determine which housing posts are mandatory and routinely does not assign mandatory staff to each housing unit. In addition, deputies are frequently absent from even the housing units designated by OPSO as mandatory. More often than not, one deputy is assigned to two or more housing units. The harm that results from not having a deputy in each pod, especially when inmates are out, is evident by the repeated serious incidents occurring when there is no deputy on the unit, including those resulting in serious injury and/or necessitating hospital routes. Thus, IV. A. 5. e. remains in partial compliance but continues to be dangerously close to being found in non-compliance.

Regarding overhead video surveillance and recording cameras for OJC (A. 5. f.), there has been a significant investment in cameras. There are times when a nonfunctional camera is discovered when a supervisor or an investigator tries to retrieve the videos, but it is rare. OPSO needs to continue to audit the system by having a supervisor test the various cameras on a monthly basis and prepare a report for the Deputy Chief of Jail Operations. IV. A. 5. f. continues to be in substantial compliance. Supervisors have improved on pulling video as required by the Use of Force policy. Deputies are now issued body worn cameras which is helpful as the body worn cameras provide audio in addition to video.

There were no divisional transfers into OJC during the monitoring period. Section



IV. A. 5. g. is in substantial compliance. Given the necessity of utilizing staff from other areas of OPSO to supervise inmates in the OJC, OPSO is encouraged to provide training even if there is not an actual transfer from one division to another. Proof that recruits received training on specialized housing during pre-service was provided. However, no proof of the required annual eight (8) hours of training for all of the deputies assigned to specialized units was provided; IV. A. 5. h. is in partial compliance. Given the high level of incidents in the specialized units, it is recommended that the training be reviewed, and deficiencies addressed. In its response to the draft, OPSO provided data that more than half of the OJC security staff have received the specialized training. That rate of completion (many after the compliance period) does not warrant a finding of Substantial Compliance. The Monitors remain concerned that all of the staff will complete the annual training timely given the rate of vacancies at OJC.

Documentation indicates that supervisors do not consistently conduct daily rounds. The audit performed by OPSO CAB in April 2024 found that the daily security checks by supervisors were actually performed 3.40% of the time on Squad A, 15.00% of the time on Squad B, 4.00% of the time on Squad C, and 1.6% of the time on Squad D. This audit confirms what was suspected by the Monitors. Thus, IV. A. 5. i. is found to be in non-compliance. Supervisors are required to sign off on the round sheet completed by the pod deputy, but this does not provide proof that the supervisor conducted daily rounds. OPSO is encouraged to continue the focus on supervisors' round which has been observed since July 2024.

The daily inspections of housing units as required by VI. A. 5. j. were not performed in a consistent enough manner to warrant a continued rating of partial compliance as they are seldom performed, and the ones that are performed do not cover all areas. Thus, VI. A. 5. j. has been downgraded to non-compliance. Proper inspections by the deputies and the supervisors would likely result in the discovery of the destruction of items that are part of the jail to fashion weapons. It is essential that the inspections be thorough and that corrective actions are taken to address the inspection findings. Since the monitoring period, training was provided on how to properly conduct an inspection. The Monitors are hopeful that improvement will be noticeable during the next compliance period.



Monthly shakedowns to prevent inmates from possessing dangerous contraband are required. Proof was provided for five months of the monitoring period (March 2024 was not provided). For the months that were provided, OPSO documented it conducted 62% of the monthly shakedowns required. Three of the housing units were documented to have been shaken down all five months for which proof was provided. The number of shakedowns increased during this monitoring period, but no proof that each of the 24 units were subject to the monthly shakedowns of units was provided. There continues to be significant incidents involving contraband including the manufacturing and use of weapons fashioned from the jail itself. The review of contraband reports clearly indicates reoccurring issues and that the number of contraband incidents continue to be high. The number of drug overdoses occurring is a direct reflection of the failure to prevent introduction of illicit drugs into the facility and the failure to perform timely and appropriate searches to remove the illicit drugs. There continues to be a serious issue of inmates hoarding medication. Reports demonstrate that inmates are fashioning weapons out of items in the jail which are then used to assault other inmates. Reports and the site visit reveal that inmates are smuggling in marijuana and narcotics to smoke. Some of these items come through the mail, but there is a significant issue of staff smuggling in contraband and the failure to detect narcotics being brought in by inmates following their arrest. The failure to search inmates thoroughly and properly upon returning from court also constitutes a source of illegal drugs. This indicates the need to analyze the data and develop a corrective action plan to reduce, if not stop, the hoarding of medication, the fashioning of weapons, and the flow of contraband into the facility. Failure to conduct shakedowns on a proactive basis is directly related to the violence in the facility. Given the improvement in the percentage of the housing units being shaken down on a monthly basis, A. 5. k. has been moved to partial compliance.

The documentation provided for A. 5. l. includes a categorization of contraband, but no classification data for the required information. Thus, A. 5. l. remains in Partial Compliance.

## IV. A. 6. Security Staffing

*A. 6. a. OPSO shall ensure that correctional staffing and supervision is sufficient to adequately supervise prisoners, fulfill the terms of this Agreement, and allow for the safe operation of the Facility, consistent with constitutional standards.*

*(1)     OPSO shall achieve adequate correctional officer staffing in the following manner:*



> *Within 90 days of the Effective Date, develop a staffing plan that will identify all posts and positions, the adequate number and qualification of staff to cover each post and position, adequate shift relief, and coverage for vacations. The staffing plan will ensure that there is adequate coverage inside each housing and specialized housing areas and to accompany prisoners for court, visits and legal visits, and other operations of OPP and to comply with all provisions of this Agreement. OPSO will provide its plan to the Monitor, SPLC, and DOJ for approval. The Monitor, SPLC, or DOJ will have 60 days to raise any objections and recommend revisions to the staffing plan.*
>
> *(2)   Within 120 days before the opening of any new facility, submit a staffing plan consistent with subsection (1) above.*
>
> *(3)   Within 90 days after completion of the staffing study, OPSO shall recruit and hire a full-time professional corrections administrator to analyze and review OPP operations. The professional corrections administrator shall report directly to the Sheriff and shall have responsibilities to be determined by the Sheriff. The professional corrections administrator shall have at least the following qualifications: (a) a bachelor's degree in criminal justice or other closely related field; (b) five years of experience in supervising a large correctional facility; and (c) knowledge of and experience in applying modern correctional standards, maintained through regular participation in corrections-related conferences or other continuing education.*
>
> *(4)   Provide the Monitor a periodic report on staffing levels at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. Each report will include the following information:*
>
>> *i.   a listing of each post and position needed;*
>> *ii.   the number of hours needed for each post and position; a listing of staff hired and positions filled;*
>> *iii.   a listing of staff working overtime and the amount of overtime worked by each staff member;*
>> *iv.   a listing of supervisors working overtime; and*
>> *v.   a listing of and types of critical incidents reported*
>
> *A. 6. b. Review the periodic report to determine whether staffing is adequate to meet the requirements of this Agreement. OPSO shall make recommendations regarding staffing based on this review. The review and recommendations will be documented and provided to the Monitor.*

Findings:

A. 6. a.  Non-Compliance

A. 6. b.  Partial Compliance

An overall rating of A. 6. was provided in the previous reports. This was inconsistent with the other introductory paragraphs and has now been discontinued.

Observations:

The level of staffing is extremely insufficient to adequately supervise inmates and allow for the safe operation of the facility. There have been insufficient security staff over the past few monitoring periods, and it has worsened to a level where OPSO struggles to staff the facility and cover basic functions. OPSO's staffing reports document that most mandatory posts are not filled on a consistent basis. Numerous incident reports and investigations reveal posts were not constantly staffed, which resulted in increased



violence. OPSO has now put in place the Emergency Staffing and Augmentation Plan (ESAP) which has resulted in escorts being provided to the Tulane psychiatrists and some of the medicals runs. The ESAP has not been shown to provide any increased coverage of the housing units as many of the individuals, especially the reserves, have been resistant to working in the housing units. Some of them do not have the required certification to supervise inmates. There is still a lack of a coordinated effort on the utilization of overtime and redeployment of staff to ensure the mandatory posts are covered on a consistent basis. While OPSO has updated its staffing plan, nearly half of the positions detailed in it are vacant. The deployment of staff is sufficiently inconsistent and insufficient to result in IV. A. 6. a. (1) and IV. A. 6. a. (2) continuing to be in non-compliance. For the monitoring period, there was an Acting Chief of Corrections whose background, education, and experience fulfilled the requirements of provision IV. A. 6. a. (3). Thus, it is in substantial compliance. Paragraph IV. A. 6. a. (4) is in substantial compliance, as monthly reports are produced to document hiring and termination of employees. The Stipulated Agreement also provides for bi-monthly reports regarding hiring. Paragraph 7.a. of the Stipulated Agreement of February 11, 2015, requires monthly reporting. Given the importance of the actual implementation of an approved staffing plan, A. 6. a. remains in non-compliance as the actual implementation of an adequate staffing plan is the most crucial part of this provision. A staffing plan based on nonexistent staff is not enough to warrant partial compliance.

OPSO has now provided a periodic review of the staffing plan. What has not been provided are the recommendations to the Monitor as to how OPSO will enact the staffing plan given that almost half of the positions detailed in the staffing plan are vacant. Section A. 6. b. remains in partial compliance. OPSO has provided some compelling data as to the inadequacy of salaries. The Monitors suggest that this data be reflected in the recommendations and be provided to the Monitors and the New Orleans City Council as it is the funding agency for OPSO. The Monitors also suggest that OPSO consider the mandating of overtime for OPSO staff who are not assigned to OJC at OJC.

## IV. A. 7. Incidents and Referrals

***A.7.a.  OPSO shall develop and implement policies that ensure that Facility watch commanders have knowledge of reportable incidents in OPP to take action in a timely manner to prevent harm to prisoners or take other corrective action. At a minimum, OPSO shall do the following:***



***A.7.b.   Continue to ensure that Facility watch commanders document all reportable incidents by the end of their shift, but no later than 24 hours after the incident, including prisoner fights, rule violations, prisoner injuries, suicide attempts, cell extractions, medical emergencies, found contraband, vandalism, escapes and escape attempts, and fires.***

***A.7.c.   Continue to ensure that Facility watch commanders report all suicides and deaths no later than one hour after the incident, to a supervisor, IAD, the Special Operations Division, and medical and mental health staff.***

***A.7.d.   Provide formal pre-service and annual in-service training on proper incident reporting policies and procedures.***

***A.7.e.   Implement a policy providing that it is a disciplinary infraction for staff to fail to report any reportable incident that occurred on his or her shift. Failure to formally report any observed prisoner injury may result in staff discipline, up to and including termination.***

***A.7.f.   Maintain a system to track all reportable incidents that, at a minimum, includes the following information:***

    ***(1)       tracking number;***
    ***(2)       the prisoner(s) name;***
    ***(3)       housing classification and location;***
    ***(4)       date and time;***
    ***(5)       type of incident;***
    ***(6)       injuries to staff or prisoner;***
    ***(7)       medical care;***
    ***(8)       primary and secondary staff involved;***
    ***(9)       reviewing supervisor;***
    ***(10)      external reviews and results;***
    ***(11)      corrective action taken; and***
    ***(12)      administrative sign-off.***

***A.7.g.   Ensure that incident reports and prisoner grievances are screened for allegations of staff misconduct, and, if the incident or allegation meets established criteria in accordance with this Agreement, it is referred for investigation.***

***A.7.h.   Provide the Monitor a periodic data report of incidents at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement.***

***A.7.i. The report will include the following information:***

    ***(1)       a brief summary of all reportable incidents, by type and date;***
    ***(2)       a description of all suicides and in-custody deaths, including the date, name of prisoner, and housing unit;***
    ***(3)       number of prisoner grievances screened for allegations of misconduct; and***
    ***(4)       number of grievances referred to IAD or SOD for investigation.***

***A.7.j.   Conduct internal reviews of the periodic reports to determine whether the incident reporting system is ensuring that the constitutional rights of prisoners are respected. Review the quarterly report to determine whether the incident reporting system is meeting the requirements of this Agreement. OPSO shall make recommendations regarding the reporting system or other necessary changes in policy or staffing based on this review. The review and recommendations will be documented and provided to the Monitor.***

<u>Findings:</u>

A. 7. a.  Substantial Compliance

A. 7. b.  Partial Compliance

A. 7. c.  Substantial Compliance

A. 7. d.  Substantial Compliance

A. 7. e.  Partial Compliance

A. 7. f.  Substantial Compliance



A. 7. g.  Substantial Compliance

A. 7. h.  Substantial Compliance

A. 7. i.  Substantial Compliance

A. 7. j.  Substantial Compliance

Observations:

OPSO has long had a policy on incidents and referrals that sets out the process for documenting and referring incidents. What has been lacking is a sufficient process to ensure all reportable incidents are being documented and that all incident reports are complete, prompt, and accurate. Watch commanders are required to be notified of any incident occurring and document the incident in their shift log which results in substantial compliance of A.7.a. However, review of the routes of inmates and medical clinic walk-in logs indicates that a number of incidents are not resulting in an incident report. Enough improvement has resulted in a continued finding of substantial compliance, but a corrective action plan to maintain substantial compliance is warranted.

OPSO implemented a process where an OPSO staff member reviewed the "routes" of inmates with serious medical or trauma injuries to the hospital emergency room and the OPSO clinic walk-in logs and compared them to the reports received. The sergeant assigned has improved the quality of this review, but the lack of follow through on items found to be unreported results in IV. A. 7. b. remaining in partial compliance. It is concerning that Wexford, the new medical provider, stopped providing the walk-in logs when it took over. OPSO has indicated that it is working with Wexford to provide the logs in electronic form. Having a process for capturing incidents for which no reports were written is absolutely essential. Failure to capture those incidents will result in this provision being rated in non-compliance if not corrected immediately.

During this reporting period, several attempts at suicide were reported within an hour to the proper persons: thus IV. A. 7. c. is in substantial compliance. Documentation on preservice training and annual training on report writing was provided; IV. A. 7. d. is in substantial compliance.

OPSO still does not hold supervisors and security staff accountable for the late reports. No documentation regarding accountability was provided. OPSO's own documentation indicates that reports are often not timely filed. Failure to hold staff



accountable results in IV. A. 7. e. being in partial compliance.

OPSO has transitioned to the AS 400 system to track the information required in IV. A. 7. f. and is in substantial compliance. OPSO is doing a better job analyzing the data, but the analysis is still inadequate and often does not result in measures which would correct the problem being identified. The next step is utilizing the analysis to make required changes in policy and procedure. OPSO remains in substantial compliance with A. 7. g.; incidents, and grievances are reviewed for misconduct and referred for investigation where appropriate, but the lack of completeness of reports puts this rating at risk. The Monitors were provided a semi-annual report of incidents, that now, with the supplementation by the daily/weekly reports, contains all of the required information and, thus, IV. A. 7. h. and i. are in substantial compliance. OPSO performed an assessment of whether the reporting system is meeting the requirements of the Consent Judgment and is given substantial compliance for IV. A. 7. j. as OPSO is now addressing the lack of timeliness.

## IV. A. 8. Investigations

*A. 8. a. Maintain implementation of comprehensive policies, procedures, and practices for the timely and thorough investigation of alleged staff misconduct, sexual assaults, and physical assaults of prisoners resulting in serious injury, in accordance with this Agreement. Investigations shall:*

> *(1) be conducted by persons who do not have conflicts of interest that bear on the partiality of the investigation;*
> *(2) include timely, thorough, and documented interviews of all relevant staff and prisoners who were involved in or who witnessed the incident in question, to the extent practicable;and*
> *(3) include all supporting evidence, including logs, witness and participant statements, references to policies and procedures relevant to the incident, physical evidence, and video or audio recordings.*

*A. 8. b. Continue to provide SOD and IAD staff with pre-service and annual in-service training on appropriate investigation policies and procedures, the investigation tracking process, investigatory interviewing techniques, and confidentiality requirements.*

*A. 8. c. Ensure that any investigative report indicating possible criminal behavior will be referred to IAD/SOD and then referred to the Orleans Parish District Attorney's Office, if appropriate.*

*A. 8. d. Provide the Monitor a periodic report of investigations conducted at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement.*

*A. 8. e. The report will include the following information:*

> *(4) a brief summary of all completed investigations, by type and date;*
> *(5) a listing of investigations referred for administrative investigation;*
> *(6) a listing of all investigations referred to an appropriate law enforcement agency and the name of the agency; and*
> *(7) a listing of all staff suspended, terminated, arrested, or reassigned because of misconduct or violations of policy and procedures. This list must also contain the specific misconduct and/or violation.*

*A. 8. f. OPSO shall review the periodic report to determine whether the investigation system is meeting the requirements of this Agreement and make recommendations regarding the investigation system*



*or other necessary changes in policy based on this review. The review and recommendations will be documented and provided to the Monitor.*

<u>Findings:</u>

A. 8. a.  Partial Compliance

A. 8. b.  Substantial Compliance

A. 8. c.  Substantial Compliance

A. 8. d.  Substantial Compliance

A. 8. e.  Substantial Compliance

A. 8. f.  Substantial Compliance

<u>Observations</u>:

The Investigative Services Division (ISB) is responsible for: the Criminal Investigation Division (investigates possible criminal activity by inmates), Internal Affairs Division-Criminal (investigates possible criminal activity by staff), the FIT (investigates use of force by staff), the Internal Affairs Division-Administrative (investigates possible violation of policies by staff), and the Intelligence Unit (provides information and intelligence regarding activities that have taken place or may take place in the jail or support activities).

The timeliness and the quality of the investigations produced by ISB has improved during this monitoring period. However, FIT investigations are still often finalized without having interviewed any witnesses and relying on short self-serving statements by the involved deputy. Thus, IV. A. 8. a., remains in partial compliance.

The Monitor acknowledges that investigating incidents of inmate-on-inmate assaults, sexual assaults, staff on inmate assaults, etc. with a goal of seeking indictments is appropriate. Inmates should be held accountable when they commit criminal acts while in the jail facility. The same holds true for staff who commit criminal acts whether it be the smuggling of contraband or assault on inmates. The overall goal is to create a safe jail. In a jail setting, investigations play a critical role in protecting inmates from inappropriate and/or illegal staff actions, protecting inmates from each other, protecting staff from inappropriate and/or illegal inmate actions, and ensuring policy is followed. Continued emphasis is needed on the goal of investigations to prevent future incidents through analysis of the policy, procedures, training, supervision, and physical plant contributors to the incident. This function cannot and should not be performed by ISB alone. Also



troubling is how seldom ISB recognizes the other factors which contributed to an incident such as failure to follow policy and/or includes them in the investigation reports. It should be noted that when ISB previously had included other factors in the investigation report, they have often received pushback from the leadership in OJC and been accused of overstepping their role. There appears to be improved collaboration between ISB and OJC and the opportunity to address the root causes of incidents.

ISB has demonstrated training related to the investigative skills provided during 2023 and 2024. IV. A. 8. b. remains in substantial compliance.

Documentation presented demonstrates that investigations which reveal possible criminal activity by staff were referred to the Orleans Parish District Attorney's Office, if appropriate. Thus, A. 8. c. is in substantial compliance. The Monitors remain concerned about the frequent refusal by the district attorney to follow through with filing cases related to indecent exposure by inmates towards staff and assaults on staff due to the throwing of urine and feces by inmates on staff. ISB provides reports in substantial compliance with IV. A. 8. d. and e. ISB reviewed the investigation system to determine whether the investigation system complies with the requirements of the Consent Judgment and forwarded any recommendations to the Monitors in substantial compliance with IV. A. 8. f. The quality of those recommendations has room for improvement and, unless implemented, may result in a lowering of the rating.

### IV. A. 9. Pretrial Placement in Alternative Settings

*A. 9. a. OPSO shall maintain its role of providing space and security to facilitate interviews conducted pursuant to the City's pretrial release program, which is intended to ensure placement in the least restrictive appropriate placement consistent with public safety.*
*A. 9. b. OPSO shall create a system to ensure that it does not unlawfully confine prisoners whose sole detainer is by Immigration and Customs Enforcement ("ICE"), where the detainer has expired.*

Findings:

A. 9. a.  Substantial Compliance

A. 9. b.  Substantial Compliance

Observations:

OPSO provided a memorandum noting that the pretrial program is managed by the Criminal District Court, and that space is provided. OPSO also provided a memorandum that ICE detainers are only accepted for a specified list of offenses.  OPSO has not detained any individuals under an ICE detainer during the monitoring period. The



memos are dated March 31, 2023, and signed by the Chief of Staff.

**IV. A. 10. Custodial Placement within OPSO**

Introduction:

      OPSO designed and validated an objective classification system to assess and house OPSO inmates according to their threats to institutional safety and security. The automated classification system was implemented on January 15, 2015.[1] The 2024 OPSO draft staffing plan set the classification unit staffing at 21 FTEs.[2]

      As of March 31, 2024, the Classification Unit staffing was 13 – one classification manager, four shift supervisors, and eight classification specialists.[3] `One staff member was expected to be out on medical leave through October 2024. Since the Compliance Review site visit in June 2024, three members of the units have resigned – the classification manager and two classification specialists. Thus, as of August 2024, the Classification Unit had ten members. A new classification manager began in mid-August. This individual has no jail classification-related experience and, thus, will face a steep learning curve and challenges in managing the Unit and achieving compliance with the Consent Judgement.  However, she does have correctional experience.

      Ten (10) of the 13 staff have NCIC clearance and passwords. NCIC coverage is available for each of the four squads. Staff have access to the criminal history records required to complete the custody and PREA assessments via the NCIC website.   The rap sheets were missing from most classification folders reviewed for this Compliance Review. Thus, this backup plan for ensuring staff access to the NCIC criminal records had to be restarted.

      An automated housing assignment process (HUAP) identifies housing options for inmates according to their custody level, gender, special population status, PREA designations, enemies, and associates. After the initial classification assessment, the

---

[1] Hardyman, Patricia L. (2015). "Design and Validation of an Objective Classification System for the Orleans Parish Sheriff's Office: Final Report." Hagerstown, MD: Criminal Justice Institute, Inc.
[2] Mallett, Jay and Hammons, Deborah. (June 17, 2024). "JAIL POST & COVERAGE ANALYSIS – June 17, 2024" Orleans Parish, LA: Office of the Sheriff. page 2 of 12.
[3] During the Fall of 2022, OPSO created the option or the classification staff to become deputy recruits. Two individuals opted to remain civilian classification specialists, the remaining nine are "recruits." For the purposes of this report, the classification line staff are referred to as "Classification Officers" and the shift supervisors are referred to as "Shift Supervisors."



specialists assign most male inmates to one of the Roll-in pods.[4] (Special population tags identify individuals for suicide observation versus suicide watch, medical housing/isolation, academic education, or special diets.) (As needed, men with acute mental health or medical needs go directly to 2A or 4B, respectively.) Following the initial classification, most women are housed on 3F.  In mid-May 2024, due to limited space, OPSO opened TDC B3-East as a "Temporary Overflow Roll-In Pod" for women.

The OPSO automated housing process assigns enemies and associates to separate pods to prevent institutional violence and disruption. While tension between the Classification Unit and security staff appeared to have diminished, security staff and ISB remain reluctant to share information with the Classification Unit regarding neighborhood cliques, gang involvement, enemies, associates, and other housing separation requirements. Acquiescence to inmates' requests to move to reside with their associates or to accommodate staff's "suggestions" for inmate moves continues unabated. Classification staff routinely accepts the security staff's suggestions and inmate requests with little to no analysis to determine if the inmates are trying to manipulate their housing assignments or if staff are avoiding problematic inmates.

The "ALL" custody and PREA designations continue in the special population units – Mental Health (Acute and Sub-Acute), Protective Custody, Education, Disciplinary/Segregation, Medical, etc. All pods for housing women are "ALL" custody and PREA designations." It is important not to negate the classification system and jeopardize out-of-cell time in the struggle to reduce OJC staffing requirements. These short-term tradeoffs create more violence and disruption in the long term. With the recent rise in the OPSO population, most of the OJC pods are operating at capacity. The exceptions were OJC 2D (Travis High School), OJC 2B (Mental Health Step Down for Men), and TDC B-4E (Kitchen Workers). As of March 31, 2024, for example,

- OJC 2D - 38 of 49 beds were empty,
- OJC 2B - 30 of 58 beds were empty, and
- TDC B-4E - 43 of 56 were empty.

---

[4] When transferring inmates from the Roll-in or special population pods to a general population pod, the classification staff matches individuals by custody level, PREA designations, age, and crime/criminal history.



In mid-April 2024, OJC 2-C became the youthful offender pod (i.e., individuals less than or equal to 17 years.) OJC 2D became the Protective Custody Unit. The Travis High School students were moved to general population units according to their custody and separation requirements.   These matrix changes eliminated the under-utilization of OJC 2D for THS students.  However, the youthful offender pod further reduced housing options for adults. (Between April and June 2024, the average daily population of youthful offenders was 12.)  The failure to identify and assign inmates to these specialized units for kitchen workers, sub-acute mental health services, or the high school suggests a lack of cooperation among the OPSO units and diligent efforts to place inmates in the least restrictive locations according to the inmates' risks <u>and needs</u>. Just sending a list to medical for review does not constitute due diligence.

During this Compliance Period, the Classification Manager or day shift supervisor circulated a daily housing matrix to reflect the current OJC, TMH, and TDC populations. The matrices reflected fluctuations in the OPSO population. Isolations for COVID-19 have dropped significantly. The OPSO Special Population Report for October 1, 2023 – March 31, 2024, listed only 14 individuals as COVID-19 positive. COVID-19 patients were transferred to TDC to minimize the spread of the virus throughout the system.

Under Compliance Director Hodge, two pods were designated housing units for new arrivals (Roll-In Pods). The number of Roll-In Pods has grown from two to six -- OJC Tier 1 Pods, A – F.  (For women, Pod 3-F serves as the Roll-in Pod.)  Two OJC Roll-In Pods were converted to general population units during this Compliance Review Period. While these are promising moves, TDC B3-East and West were converted to "overflow roll-in pods." Thus, the actual number of roll-in pods remained unchanged. Using the TDC units as roll-in pods is problematic because of the extra security staffing requirements to supervise the units and transport individuals to and from TDC, limited access to medical and mental health services, and limited ability to separate individuals according to risk and service needs.

 Roll-in pods make initial housing assignments relatively easy, as the staff needs only look at the individual's custody level, PREA designations, and medical requirements (e.g., disability, detox, isolation, etc.). However, maintaining six Roll-In pods restricts the housing options for the general population at reclassification. Many inmates spend



months waiting for a general population bed. Thus, negating the original benefits and mission of the Roll-in Pods. With the continuing rise in the OPSO population, OPSO has explored various population management strategies:

1) Discontinue the use of the TDC units as "Roll-In Pods." Reducing the number of roll-in pods is critical for ensuring adequate space for the general population. However, all roll-in pods should be within the OJC. Unfortunately, it will be necessary to use the TDC housing units as long as the OPSO population remains high. Otherwise, OPSO will need to consider out-of-parish beds or other diversion options.  Regardless, the TDC units should be <u>limited</u> to minimum custody, non-predatory, non-vulnerable individuals.

2) Increase the number of kitchen workers to facilitate the movement of minimum custody inmates to TDC B-4E and support the kitchen staff.

3) Maximize the utilization of the MH beds within TMH and the OJC MH step-down unit.

4) Work with LA DOC to expedite the movement of DOC inmates from OPSO to free up much-needed bed space in OJC.

During this Compliance Period, the Classification Unit conducted housing audits to verify the integrity of the housing assignments designed by the Classification staff. Documentation of the housing audits was well-organized and available before our arrival for the Compliance Review. However, the staff did not audit all housing units each month. Further, some audit reports were incomplete or unclear. Observation of the housing audits and protective custody reviews via the OJC camera system suggested that not all the audits were conducted as reported.

 Assessment Methodology:

Compliance was assessed through multiple data sources and activities – review of the OPSO and JMS daily population, classification statistical reports and data files, observation of classification and audit procedures, onsite meetings with OPSO staff, housing matrices, and staffing rosters. A site visit was conducted on June 24 – 27, 2024. The OPSO documents included monthly statistical and protective custody status reports. Analyzed were custody assessment, override, attachment, and enemy refusal data downloaded from the AS400. The statistical reports tracked pending custody



assessments, daily population counts, placement errors, the stock population, and monthly custody trends. Onsite activities included:

- Observation of the initial classification, reclassification, and housing processes;
- Meetings with OPSO classification, facility administration, and compliance unit staff;
- Review of body-camera videos of staff interviews to resolve inmate enemy/ associate separations and protective custody status;
- Review of OJC security videos of housing audits; and
- Examination of the protective custody placement, status, and waiver reports.

This review focused primarily on the data and Classification Unit activities between October 1, 2023 – March 31, 2024. Some analyses considered trends over twelve to fifteen months (12-15) to detect variations due to seasonal variations. In addition, comments on the status of the classification unit- staffing, lack of leadership, training for new/rehires and new responsibilities, and the integrity of the classification system – are provided to guide OPSO toward compliance.

Summary:

OPSO complies substantially with four of the eight Custodial Placement sections of the Consent Judgment (Sections b, c, g, and h). Sections a and e are rated as Partial Compliance. OPSO is non-compliant with Sections d and f.  We commend the OPSO staff for their efforts and progress. Perhaps most important is the "can and will do" attitude exhibited by the Classification and Compliance Unit staff.

Findings:

A. 10. a.  Partial Compliance

A. 10. b.  Substantial Compliance

A. 10. c.  Substantial Compliance

A. 10. d.  Non-Compliance

A. 10. e.  Partial Compliance

A. 10. f.  Non-Compliance

A. 10. g.  Substantial Compliance

A. 10. h.  Substantial Compliance

*IV.A.10. a. OPP shall implement an objective and validated classification system that assigns prisoners to housing units by security levels, among other valid factors, in order to protect prisoners from*



*unreasonable risk of harm. The system shall include consideration of a prisoner's security needs, the severity of the current charge, types of prior commitments, suicide risk, history of escape attempts, history of violence, gang affiliations, and special needs, including mental illness, gender identity, age, and education requirements. OPSO shall anticipate periods of unusual intake volume and schedule sufficient classification staff to classify prisoners within 24 hours of booking and perform prisoner reclassifications, assist eligible DOC prisoners with re-entry assistance (release preparation), among other duties.*

Finding:

Partial Compliance

Observations:

Compliance with Section IV.A.10. a. remained in Partial Compliance during this review period. During this Compliance period, 13 individuals were assigned to the Unit – a classification manager, four shift supervisors, and eight classification specialists.[5] A classification specialist position was filled in December. However, by the June 2024 site visit, Unit staffing had dropped to 10. Thus, Unit staffing remains unstable.

The shift supervisors oversee the classification specialists, process housing transfers, complete custody reviews, conduct housing audits, and address classification-related grievances. The classification specialists complete the custody and predation/vulnerability (PREA) assessments and assign inmates to pod and cell housing accordingly. The Classification Manager assumed responsibility for the Unit, tackling the tasks of organizing the housing audits, conducting protective custody/ administrative segregation evaluations, reviewing enemy/associates, assessing the accuracy of the custody assessments, and training and supervising Unit staff. The Classification Manager resigned in July 2024. While OPSO has acted quickly to fill this critical position, the Unit must be rebuilt. As previously noted, the new manager has no jail classification-related experience and, thus, will face a steep learning curve and challenges in managing the Unit and achieving compliance with the Consent Judgement. On the other hand, this offers the opportunity to set a new direction for the Unit.

While the Unit was fully staffed during the compliance period, the rating is Partial Compliance for two reasons:

---

[5] During the Fall of 2022, OPSO created the option for the classification staff to become deputy recruits. Two individuals opted to remain civilian classification specialists, the remaining nine are "recruits." For the purposes of this report, the classification line staff are referred to as "Classification Officers" and the shift supervisors are referred to as "Shift Supervisors."



1) **Housing Matrix:** The special population pods (Mental Health, Medical, TMH, TDC, Disciplinary/Segregation, and female units) compromise the classification system. The OPSO matrix allows for all custody levels and PREA statuses in these pods. Per the March 31, 2024, Housing Matrix, 12 of the 31 OJC/TDC/TMH pods housed individuals of all custody, vulnerability, predation, and special population status. This count includes two TDC pods (B3-E (men) and B3-W (women) as Rollin-In overflow or COVID-19-positive residents (as needed).[6]

   The TMH treatment teams assign patients to cells according to their mental health needs with little regard for their custody or PREA status. (Known enemies live in separate pods.) Housing assignments, activities, and out-of-cell time are scheduled according to the individual's treatment level. So again, the classification system is compromised.

   Given the size and configuration of the OJC and TDC/TMH, we recognize that pods with multiple custody levels and PREA designations are unavoidable. However, OPSO appears to favor "ALL CUSTODY ALL STATUS" pods despite inadequate security staffing and out-of-cell schedules activities that allow for mixing high-risk inmates.

   As previously noted, as part of the Compliance Review, we met with OPSO facility and classification administrators to develop a population management strategy to address the multiple custody pods, distribute residents across the pods, and ease the backlog of residents from the "Roll-in Pods" to general population units.   Despite the increased average daily counts, there has been little movement on the population management strategy.

2) **Classification staff control of housing assignments**: The housing audits completed during this Compliance Review Period reported that most inmates were in the cell and bunk assigned by the classification staff. (For a detailed discussion of the housing audit process and findings, see section IV. A. 10. f. of this report.) However, observation of the classification staff suggested that the security staff directed the housing assignments through repeated calls or

---

[6] October 1 – November 21st, B3-W was used as an over-flow general population unit for females.



emails to specify the pod and cell to which an inmate should be assigned. This is not acceptable and is likely to result in security staff, the Adjutant, and inmates continuing to manipulate housing assignments and facilitating gang/ cliches and inmate-on-inmate violence.

The new Classification Manager must work closely with other OJC Divisions to facilitate information sharing and build trust. As the OPSO rebuilds the Classification Unit, the Classification Unit should consider strategies for utilizing the security staff's knowledge of local cliques, checking in with the inmates during their rounds or audits, and addressing inmate grievances.

***IV.A.10.b. Prohibit classifications based solely on race, color, national origin, or ethnicity.***

<u>Finding:</u>

Substantial Compliance

<u>Observations:</u>

The custody assessments consider objective risk factors validated for the OPSO male and female inmates. The individual's race is not one of the objective risk factors. Classification specialists consider the individual's custody level, vulnerability designation, age, and charges to select a cell and bed from those the JMS automated housing program identifies as appropriate housing for the individual. To track this element of the Consent Judgment, OPSO created a monthly statistical report to record the race and gender of individuals per housing location.

The OPSO "Housing By Race" reports suggested that race was not a factor in OJC housing assignments. With a few exceptions, the number of black and white inmates within each OJC housing unit was consistent with the overall racial distributions among the OPSO inmate population. On the other hand, the racial distributions across the TDC and TMH units have not always reflected the OPSO population. (See Figure 1.)  The number of LADOC workers housed in TDC dropped from one/two in the Fall to zero by February. The pod was then repurposed for "Roll-in Overflow" housing.  Yet, the proportion of white inmates within the total male inmate population has been relatively constant -- between October 2023 and March 2024 -- only 11.4% of the OPSO male population identified as white. Further, during this Compliance Period, the percentage of white men assigned to THM decreased from an average of 16.1% to 12.6%. Given that the



TDC/TMH population constitutes less than 2% of the total OPSO population, the elevation in the number of white males assigned to TDC/TMH did not significantly impact the distribution of inmates by race across the OJC Pods.



Figure 1: Percentage of White Males Assigned to OJC, TDC & TMH Housing Units – Apr 2022 – Mar 2024.

As shown in Figure 2, between April 2022 and March 2024, on average, 18.1% of the OPSO female population identified as white. Over the same 24-month period, 17.1 percent of the women assigned to the TMH unit identified as white. However, month-to-month, the percentage of white-identified women assigned to TMH varied dramatically; it ranged from 30.0% (August 2022) to 0.0% (March 2024). Multiple factors appear to influence women's assignment to TMH. The direct role of race is unknown. Notably, the portion of the OPSO female population identified as white ranged between 22.1% (February 2024) and 12.6% (December 2022). Overall, the OPSO female population has remained relatively constant at 13.0%.





Figure 2: Percentage of White Females Assigned to OJC & TMH Housing Units – April 2022 – March 2024

***IV.A.10.c Ensure that the classification staff has sufficient access to current information regarding cell availability in each division.***

Finding:

Substantial Compliance

Observations:

OPSO automated housing assignment process (HUAP) considers the individual's custody level, gender, special population status, PREA designations, enemies, and associates versus available OJC beds to recommend an appropriate bed. Housing tags identify inmates on suicide observation, suicide watch, medical, mental health, alcohol/drug detoxification protocol, gang affiliation, special diets, and school participation.

The OPSO daily population report lists the units, cells, and beds offline for maintenance or staffing, as recorded in the AS400. The reliability of the AS400 data for cells/pods offline within the housing module was unavailable. Classification staff rely on maintenance reports from security and maintenance staff. The classification specialists' work area walls displayed the usual collage of messages and notes of damaged and closed cells. The classification specialists could not speak to the accuracy or timeliness of the notices. The current matrix was posted in the classification specialists' work areas, and staff reported receiving a daily copy of the matrix via email.

Classification specialists track all pending bed assignments to avoid housing errors due to delays between the inmate's housing assignment and the physical transfer of the



individual to the designated pod/cell. These <u>manual</u> lists and notes direct the housing assignments. Overall, during this compliance review period, the classification staff had access to automated and manual information regarding current bed availability throughout OJC, TDC, and TMH.

Progress was noted for the staff's clearance on the NCIC / Louisiana criminal record systems. Ten (10) of the 13 staff have received their NCIC clearance and passwords. NCIC coverage is available on each of the four squads. Thus, most have access to the criminal history records required to complete the custody and PREA assessments. Observation of the initial classification process revealed that the rap sheets were missing from most of the classification folders. Thus, we asked IPC Intake staff to include the NCIC criminal records in ALL classification folders to ensure the classification specialists can review the hard-copy rap sheets.

***IV. A. 10. d. Continue to update the classification system to include information on each prisoner's history at OPSO.***

<u>Finding:</u>

Noncompliance

<u>Observations:</u>

As shown in Figure 3, the monthly custodial reports provided by OPSO indicated:

- **Percent Initial Custody Assessments**: During this Compliance Period, the Classification Unit completed initial custody assessments for 90.9% of the inmates booked into OJC. This rate equals that observed for the previous compliance period (91.8%).

- **Percent Within 8 Hours:** During this Compliance Period, the percentage of initial classifications completed within the first eight hours of booking continued to decline. In September, staff completed 81.3% of the initial classification assessments within eight hours of the booking. By February, the initial classification was completed within eight hours for only 75.9%—however, the rate rebounded to 85.8% in March. The number of February bookings jumped to 824 but dropped back to 717 in March. This fluctuation may be due, at least in part, to the Mardi Gras activities and celebrations during February. For this Compliance Period, about 10 percent of the



detainees remained in the booking area for more than eight hours before being assigned to a bed. A key statistic tracked on the OPSO Areas of Noncompliance Action Plan (dated 6/12/2024 at 9:55 PM) is "Ensure that initial custody assessments are completed within the first 8 hours of booking for at least 95% of residents." Thus, OPSO must focus on the initial classification process to meet the "Noncompliance Action Plan" goals.



*Figure 3: Rates and Completion Time for Initial Custody Assessments Completed April 2022 –March 2024*

- **Percent Greater Than 24 Hours:** Very few -- .8 percent -- of the inmates were not classified within 24 hours of booking. Notable was the January 2024 rate of 2.8 percent. Although an initial classification was completed during the first eight hours for only 74.9% of the February 2024 bookings, most assessments were complete within 24 hours; 6% required 24+ hours. When asked about the time from booking to housing, staff attributed the delays to the availability of beds within the Roll-in Pods rather than the custody assessment process or staffing. (See Figure 4 for the number of monthly OPSO bookings from April 2023 to March 2024.)





*Figure 4: Number of OPSO Bookings Per Month – February 2023 – April 2024*

These data suggested that staff completed an initial classification for ~80% of the bookings during this compliance period. However, 88.9% of the initial classifications assessment and housing decisions were within eight (8) hours of the inmates' booking into OJC. There are growing concerns about the lag time between booking, classification, and housing. The medical clearances and/or the availability of lower bunks on the Roll-In pods slowed the initial classification and housing processes. When asked about reclassifying or transferring inmates who had cleared their detoxification process or COVID-19 restrictions from the Roll-In to general population pods, the classification specialist responded, "I don't know how to do that. I only classify and house inmates from the booking area." This comment suggested that the delays between booking and housing were due, at least in part, to inadequate classification staff training. A review of the length of stay within the Roll-In Pods indicated that the delays were due to limited space within the general population, non-Roll-In pods.

With the dramatic drop in COVID-19 residents and the average daily population increase, OPSO converted TDC B3-E & W to a "Temporary" Roll-in pod. Thus, the pattern of "ALL CUSTODY - ALL STATUS" dormitories that pose significant risks as Low, Medium, and High custody inmates with different PREA designations and special needs live in the same housing units continues. The label of "Temporary" has been dropped. (As of July 28, 2024, TDC B4-W was converted to "Male General Population Overflow.")[7] However, the rationale for scheduling or clustering cells for joint out-of-cell times remains unclear.

---

[7] The exception is the PC pod (OJC 2C). Security staff rely on the ISI to identify clusters of cells to let out together. Unfortunately, the ISI does not consider intra-pod enemy/ associate separations when identifying out-of-cell separations. OPSO IT staff is currently revising the ISI to ensure that enemies and associates are assigned to different out-of-cell clusters.



Security staff reported exchanging information regarding intra-pod conflicts and tensions. All agreed that intelligence sharing is essential for identifying and maintaining inmate separations. However, security and ISB staff do not share intelligence regarding these local "cliques" and conflicts with the Classification Unit, except as ad hoc requests for housing transfers. The simple statement, "ZZZZ XXX can't live on this pod." does not provide the classification staff with sufficient information to place the individual in a different housing unit. Thus, the transfer process is repeated again and again, multiplying the workload for the limited classification and escort staff.

Regardless of the staffing patterns, pod mission, and schedules, the sub-standard practice of mixing custody/vulnerable inmates during out-of-cell activities must be discontinued as soon as possible. A straightforward option is to list the custody level and key separation tags on the housing rosters. Further, adherence to the housing assignments by the Classification Unit is critical for maintaining inmate separations and, thus, institutional safety and security.

**Custody Overrides:**  Previous compliance reports have delineated the dangers of overriding the scored custody levels for housing purposes. As shown in Figure 5, during this Compliance Period -- October 2023 -- March 2024 -- only 1.98% of custody overrides were for housing purposes.  On the other hand, the automatic overrides of "Potential Victim/Potential Predators" from Minimum to Medium are another type of housing override. The number of cases overridden due to Potential Victim or Potential Predator status appears to be increasing. As shown in Figure 5, during this Compliance Period (October 2023 – March 2024), 65.4% of the overrides moved individuals from minimum to medium custody due to their "Potential Predator" or dual status as Potential Predator and Potential Victim.





Figure 5: Percent Overrides for Housing Purposes – April 2023 – March 2024

The April 2022 - March 2024 classification stock population reports indicate that staff overrode the scored custody level for ~2.3% percent of the men and 1.3% of the women. (See Figure 6.) These rates are well below the recommended rate of 5 to 15 percent.[8]  Within this small group of inmates, approximately ~a third are housing-related overrides. Continued tracking of the discretionary overrides for housing purposes remains essential as the ADP increases.

On the other hand, the percentage of custody assessments impacted by a mandatory override (OPSO policy restrictions) remains high. OPSO should revisit these restrictions as part of the revalidation of the classification system. However, in the interim, OPSO should consider eliminating the mandatory restrictors at reclassification that require medium custody for all open felony detainers or open felony charges. This change would base the custody level on the individual's behaviors rather than legal status.

---

[8] Patricia L. Hardyman and Austin, James (2021). *Objective Prison Classification: A Guide For Correctional Agencies. 2nd Edition.* Washington, D.C.: National Institute of Corrections.



Figure 6: Mandatory and Discretionary Override Rates by Gender: April 2022 – March 2024

**Enemy Separation Reviews:** As part of the Compliance Report #14 review, we observed housing overrides for "inmate refusal of enemies" to facilitate housing decisions. Staff dismissed inmate-to-inmate conflicts to expedite transfer requests from one pod to another. In response to the Monitors' and Plaintiff attorneys' questions, OPSO revised its Inmate Classification Procedures (#7020) to include rules for resolving an "Inmate Refusal of Enemy." These Procedures require detailed documentation of the reviews and quarterly audits to ensure the separation review process works as intended and to make recommendations for adjustments as needed. The Classification Manager updated the "Separation Review Checklist" (3-10-2022) to record the "enemy refusal" evaluations.[9] OPSO developed screens and reports in the AS400 to document and track the separation reviews as per the Inmate Classification Procedures (#7020). In March 2022, the classification staff were instructed on the new procedures, screens, and interview form.

OPSO staff created automated screens within the AS400 to track and document reviews of enemy and associate separations. Despite the efforts to develop a systematic process to review and verify inmate enemy and associate separations, OPSO continues to disregard its' policies and documentation standards. During this Compliance Period, 174 enemy separations were recorded in the AS 400. This number is nearly four times the

---

[9] The Classification Unit staff indicated that the checklist were "too long."



number (44) recorded during the previous Review Period.[10] The 174 enemy separation reviews impacted the housing of 75 inmates; the number of enemies removed per individual ranged from one to seven.  None of the reviews met the OPSO Inmate Classification Procedures standards for assessing and documenting the separations' validity. Rather than complete the "separation checklist" as OPSO policy requires, inmate "interviews" were recorded via a body camera. These interviews were quite troubling for several reasons:

1) The interviews were not private -- Some occurred at the cell front or with other inmate(s) present.

2) The interviewer did not attempt to learn the source or validity of the conflict between the inmates. Most of the interviews were garbled and lasted less than one minute.

3) Classification staff did not check, as per OPSO policy, the disciplinary history of the "enemies" to ensure that the individuals were not mutual combatants or victims of predatory or aggressive incidents within the last <u>36 months</u>.

4) Failure to seek input from mental health and security staff.

Who or what initiated the separation reviews – the inmates, grievances, security staff, or another source -- was not always clear. The Enemy Review list documenting the separations removed from the AS 400 between October 1, 2023, and March 31, 2024, lists the sources as Inmate Grievance/Request, 14.3%; Security Staff, 4.0%; and Missing, 81.6%.  Classification staff reported that many of the "enemy reviews" were initiated on completion of the inmates' disciplinary segregation time to facilitate the inmates' move back to the pod where the disciplinary infraction occurred.  Thus, in flagrant violation of OPSO policy and the standard corrections practice, combatants were housed together within months, if not days of the altercation. OPSO has repeatedly questioned the value of identifying mutual combatants who engaged in a fight, assault, or disorderly conduct/riot against another inmate or staff member as "enemies" or even associates.[11]  Sound correctional practice would argue that while the inmates may not dislike or have a conflict with each other, their documented willingness to join or cooperate to attack

---

[10] During the Compliance Review period for Report #18 (October 2022 – March 2024), 11 enemy refusals were recorded. Thus, the number of enemy refusal record has quadrupled in during the last two compliance periods.
[11] Removal of an "associate" is also governed by OPSO Inmate Classification Procedures (#7020).



another inmate or staff or to disrupt the pod indicates they should not be housed together.  Staff routinely removed separation requirements between mutual combatants.

In contrast to the documentation from previous review periods, most inmates impacted by a separation review signed an enemy removal waiver.   The OPSO Compliance Unit has cataloged the video recordings of the inmate interviews. This has improved our review process. However, many of the enemy review packets were incomplete. The video, disciplinary reports, signed waivers, etc., were unavailable for all reviews on the AS 400 Enemy Review list.

Custody Reviews: The Classification Monitor List (List) is an ad hoc report identifying inmates for whom a custody review is due. Custody reassessment reasons include a regular 60/90-day reassessment or a status change or event within their jail records, i.e., amended charge(s) or bail amount, disciplinary incident, detainer lodged/lifted, or a new sentence. The number of inmates on the list fluctuates as inmates return from court, move through the booking process, and the like. Staff are responsible for completing all pending custody reviews during their shift.



**Figure 7: Average Number of Pending Custody Assessments per Month – October 2023 - March 2024**

The number of pending custody assessments vacillates. During this Compliance Period, the number of pending initial custody assessments ranged between 0 and 11; the number of pending custody reassessments ranged between 1 and 31.  Figure 7 provides an average number of monthly initial and custody reviews from October 2023 - March 2024 The overall average number of pending custody assessments during this



Compliance Period was – initial assessments = 3.14 and custody reassessments = 6.14. As shown in Figure 7, the trend lines suggest a decrease in pending initial custody assessments while the number of pending custody reassessments has remained stable (~3).

As part of the transition of health care services from Wellpath to Wexford, OPSO and Wexford information and technology (IT) staff worked together to identify the data elements within the Wexford medical and mental health records required for scoring the PREA assessments and housing assignments and then to build the linkages between the OPSO and Wexford information systems.  We verified the data exchange process as part of the onsite Compliance Review. The medical and mental health data required to score the PREA risk factors and track individuals on the medical and mental caseloads are uploaded to the AS 400 every 15 minutes. Thus, the required data are available for initial and subsequent custody reviews and housing assignments.  This was a significant step as WellPath provided data for the initial assessments, but the electronic data for updating the individual's service needs or caseload counts were unreliable.  In addition to the electronic data exchanges, Wexford has continued to email the inmates' medical and mental health placement requirements to the classification staff.  Thus, the transition from WellPath to Wexford has been smooth with respect to sharing of classification information.  These data are essential for scoring seven PREA victimization and predation risk factors. Medical and mental health information is critical for the inmates' housing assignments.

As shown in Figure 8, OPSO disciplinary reports indicate that only five individuals on the mental health caseload were victims of an assault or battery during this Compliance Period. Given the average number of inmate-on-inmate battery/ assaults (16.2/month) and the OPSPO mental health caseload (80.2 individuals/ month) during this Compliance period, these numbers appear to underreport the victimization of individuals on the mental health caseload. Note that these data reflect Disciplinary Code 101 (battery) and Code 102 (assault) infractions in which the perpetrator was found guilty. A review of the OPSO-reported incidents suggests a much higher rate of inmate-on-inmate assaults. (See Table 3 of this Compliance Report.)





Figure 8: Victimization of Inmates on the Mental Health Caseload - April 2022 – March 2024

Figure 9 provides the number of attachments to record criminal history data input by the classification staff between April 2021 and March 2024. The classification staff completed only nine attachments during November 2023. In December 2023, attachments were input for 106 cases. The number of attachments dropped to 54 in February and then to 31 in March. This variance in the number of attachments suggests that staff is not carefully reading the criminal rap sheets. As shown in Figure 10, the rate of attachments remains far below the 2021-2022 rates.



Figure 9: Number of Attachments Input by Classification Staff – April 2021 – March 2024





Figure 10: Percentage of Initial Custody Assessments for Which an Attachment was Created -- April 2021 – March 2024

IPC staff include the NCIC rap sheets in the intake/booking folders provided to the classification staff. Thus, the rap sheets are available regardless of whether the staff member has an NCIC login. Observation of the initial classification process revealed that the specialists did not always review the rap sheet and were unfamiliar with the JMS screens for inputting attachments.  The classification specialists simply skipped the critical review of criminal rap sheets for the initial custody assessments.

Thus, it appears that the criminal history data required to score four of the custody factors, three of the vulnerability factors, and four of the predation are compromised by the failure to 1) ensure all staff had access to the NCIC criminal history system; 2) check the booking folders for the rap sheet; 3) train on the importance and process for inputting attachments in the JMS; 4) track and follow-up assessments with missing rap sheets; and 5) audit the accuracy of the custody and PREA assessments.[12] Also disconcerting is the failure to identify and address the problem. OPSO has lamented the time required to complete the NCIC certification process. However, even after certification, staff do not routinely review the rap sheets and input out-of-parish criminal convictions.

The final point of concern for Section d centers on the placement and review of inmates assigned to administrative segregation or protective custody placements. (OPSO

---

[12] "Missing" attachments were noted during the audits of the accuracy of the custody assessments.  Unfortunately, the auditor simply added the missing attachment, thus staff were not held accountable or reminded of importance of checking the NCIC rap sheets and inputting attachments as needed.



does not utilize administrative segregation/restriction housing for the male inmates; however, during this Compliance Period, two females were assigned to administrative segregation.) OPSO continues to disregard its protective custody and administrative segregation policies and documentation standards.

OPSO has created folders on the shared drive to organize and document protective custody (PC) and restrictive housing decisions. OPSO added a document indicating the reason (usually the current charge) for the PC placement to each PC file. This was an essential step in the documentation of the initial placement decisions. Unfortunately, the documents did not include the decision date, the PC committee members, or the circumstances of the crime that required PC placement. Further, for many, the periodic reports to track the continuation or termination of the status were missing or incomplete. To better understand the review process, the Classification Monitor observed OJC videos of the "PC hearings." These interviews were quite troubling for several reasons:

1) The interviews were not private -- Some occurred at the cell front or with other inmate(s) present or milling about.

2) The videos did not document the participants, topics discussed, or activities (waiver, behavior modification plan, etc.). Of particular concern was the waiver process. Individuals were asked or allowed to sign waivers without a full investigation of the safety of all inmates impacted by the proposed housing assignment. For examples, in some cases, waivers were obtained after it was communicated to an inmate that waiver was necessary for that inmate to obtain a desired housing assignment.

In sum, this section is rated as "Noncompliance" due to the continued failure to review the criminal history rap sheets, address the risks posed by the enemy separation reviews, and failure to comply with OPSO protective custody and administrative segregation policies. Since the June 2024 compliance tour, Classification Unit staff have completed the required training to obtain NCIC certification and participated in trainings during which the importance of reviewing the criminal history sheets was emphasized. A key question for the compliance tour scheduled for December 2024 will be to determine if these measures have addressed the failure to review the criminal history sheets and document non-Orleans Parish convictions within the classification system. Further OPSO



must address the risks posed the enemy separation reviews and failure to comply with OPSO protective custody and administrative segregation policies. The enemy separation, protective custody, and administrative segregation reviews will be more critical as the OPSO consider implementation of restrictive housing pods to address institutional violence.

***IV.A.10.e. Continue competency-based training and access to all supervisors on the full capabilities of the OPSO classification and prisoner tracking system.***

Finding:

Partial Compliance

Observations:

Annual classification training was held March 21 – 25th.  The training was well-documented. OPSO provided the class sign-in rosters, pre-and post-tests, and the PowerPoint presentation on the training topics and content.  The training was ~ 1.5 hours and included the following topics:

- Purpose, reasons, and schedule of custody assessments,
- Discretionary overrides,
- OPSO housing audit procedures,
- PREA/LGBTI&Q language and terminology,
- Enemy review process,
- Programming of cells/pods within the AS 400,
- NCIC attachments,
- Reclassifications schedule and reasons, and
- Inmate location updates.

These are essential classification topics, particularly the importance and process for NCIC attachments and timely custody assessments.  However, several topics were supervisor responsibilities, e.g., housing audit procedures, programming of cells/pods within the AS 400, and the enemy review process.  Thus, their relevance for the classification specialists is questionable. Given the breadth of topics covered within 1.5 hours, the level of detail of the discussion and instruction are also of concern.

This section is rated as Partial Compliance due to the absence of remedial training for staff who erred or required instruction on specific topics identified by the external or



internal audit process. Given the scope and time/topic, the training appeared to be an in-service rather than an annual training.  In August 2024, objective classification training was provided to all members of the Classification Unit. Additionally, the sub-monitor worked closely with the Classification Unit and the Training Division staff to update the lesson plans and training materials for annual and quarterly training.  Thus, it is anticipated that this provision should be rated as Substantial Compliance for the April – September 2024 compliance review.  However, critical to that rating will be the training provided to the classification specialists and manager who joined the Unit during the last six months.

***IV.A.10.f. Conduct internal and external review and validation of the classification and prisoner tracking system on at least an annual basis.***

<u>Finding:</u>

Non-Compliance

<u>Observations:</u>

Compliance for this section focused on three types of audits: Housing (checking the integrity of the inmate housing assignments; internal (checking the accuracy of the custody, PREA, and housing designations), and statistical validation of the OPSO objective classification system. For this Compliance Period, Section f is rated as non-compliant because:

- Monthly housing and internal audits were conducted for some, but not all, pods.
- Absence of a statistical validation of the classification system. The OPSO has contracted with the University of Cincinnati to revalidate the system.  IT staff provided the required data for the analyses. However, the validation has not been completed.

**Housing Audits – Checking the Veracity of the Inmate Housing Assignments**

The Classification Unit supervisors conducted monthly housing audits for most, but certainly not all, housing units/month. Missing were audits:

November 2023 -- OJC Floors 1 and 2, TDC/TMH; and

December 2023 – OJC Floors 1 – 4.



Further, from October 2023 to January 2024, Floor 4 dorms were not audited because the "Majority of bunk numbers have faded. Inmates go to any available bunk." When pressed about re-stenciling the bed numbers during the December 2023 Compliance Review site visit, the Classification Unit re-numbered the Floor 4 dormitory beds.

The Compliance/Classification staff organized and posted the housing audit reports on the shared drive for the onsite review.  The audit reports indicated that most inmates were housed in cells and beds as per the transfer order prepared by the Classification Unit. Staff immediately addressed any housing errors identified by the audit. There were some inconsistencies in the audit reports, e.g., missing housing rosters and corrective action plans. A key question was whether the auditors visually checked the cell and bed assignments. We selected a random sample of audit reports to verify the audit process and then viewed the audit via the OJC camera system. The video suggested that the audits were not always completed as reported. For example, for two of the audits, the auditor did not enter the pod. The auditor and the pod deputy simply reviewed the housing rosters or met with the inmates in the day room.

**Internal Audits – Checking the Accuracy of the Custody and PREA Assessments**

The Classification Manager is responsible for assessing the accuracy of a random sample of at least ten custody/PREA assessments each month.  The classification manager reviewed a random sample of the custody assessments /month.[13] Multiple instances of the same mistake suggested a pattern of sloppy or lazy assessments. An error was observed in a third (35, 33.7%) of the custody assessments audited.  Of concern was the number of instances where the auditor noted "Missing Attachments." The error description for five of the six February 2024 custody assessments audited was "Did not add attachments." Of the 104 custody assessments audited during this review period, 27.9% had missing attachments. Missing attachments were noted for each staff member; thus, it is a pattern across the Unit rather than a single worker. The auditor added the required attachment rather than addressing the "error" with the staff.  While this "corrects" the custody

---

[13] The internal audits were completed for the January and February custody assessments were completed in March.



assessment, it does not address the global problem of failure to review the criminal rap sheets and add the non-parish convictions into the JMS.

**Revalidation of the Classification System – Assessing the Validity of the System**

The most recent validation of the OPSO classification system was completed in April 2018.[14] This validation study documented the requirement for "external review and validation of the classification and prisoner tracking system on at least an annual basis" for 2014 – 2017. Statistical validation of an objective classification system must be completed every three to five years to ensure the integrity of the classification system and that the risk factors and custody scales are still appropriate for the current inmate population.[15] Revalidation of the System was due in 2021 per a previous agreement for statistical validation every three years. In June 2024, OPSO contracted with the University of Cincinnati to complete a statistical validation. The revalidation of the classification system was completed in September 2024, three months ahead of the deadline set by the District Court.

*A.10.g. Provide the Monitor a periodic report on classification at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date and every six months, thereafter, until termination of this Agreement. Each report will include the following information:*

> *(1) number of prisoner-on-prisoner assaults;*
> *(2) number of assaults against prisoners with mental illness;*
> *(3) number of prisoners who report having gang affiliations;*
> *(4) most serious offense leading to incarceration;*
> *(5) number of prisoners classified in each security level;*
> *(6) number of prisoners placed in protective custody; and*
> *(7) number of misconduct complaints.*

Finding:

Substantial Compliance

Observations:

Daily population reports are received daily, indicating the number of inmates by location – OJC, TDC, TMH, and out-of-parish. In addition, as required under Section g, OPSO provided monthly custodial statistical reports regarding the custody assessments by type, gender, population, gang affiliation, discipline, and housing. These reports track the timeliness of the initial custody assessments, the custody distributions, cases due for a

---

[14] Lovins, Brian K. and Edward Latessa (April 30, 2018). "Revalidation of the Orleans Parish Classification System." Cincinnati, Ohio: University of Cincinnati Corrections Institute.
[15] Hardyman, Patricia L. and James Austin (2021) "Objective Prison Classification: A Guide for Correctional Agencies." 2nd Edition. Washington, D.C.: National Institute of Corrections. p. 17.



custody assessment, the prevalence of special populations, and the rates and types of disciplinary infractions. The numbers of ***"prisoners who report having gang affiliations and the most serious offense leading to incarceration"*** are reported in the OPSO semi-annual statistical reports.

OPSO disciplinary data on the "*assaults against prisoners with mental illness*" suggest relatively few individuals on the mental health caseload are victims of assault or battery. However, the accuracy is questionable as these counts reflect the inmate disciplinary data instead of incident reports. OPSO will need to ensure that the mental health caseload counts provided by Wexford are integrated with the disciplinary data to ensure accurate counts of victimization of individuals on the mental health caseload.

For this Compliance Period, OPSO reported only four active "gang" members or associates. The initial classification interview includes a question about the individual's "gang" membership or affiliation. Staff indicated that inmates rarely reveal their alliances. In the past, the Classification Unit relied primarily on information from the District Attorney's Office to identify gang-related inmates. The IPC Major indicated that OPSO no longer received information regarding gang affiliations or prosecutions from the District Attorney and recommended checking with the OPSO ISB Unit. This conversation was interesting, although circular. The ISB agent indicated that they track "gang" behaviors within OJC but quickly pointed out that Orleans Parish "gangs" were better described as dynamic neighborhood/ward-based cliques. The ISB agent reported that they exchanged information with the NOPD. Yet, he was reluctant to share these data with the Classification Unit because, again, Orleans Parish "gangs" are dynamic neighborhood/ward-based cliques.

On the other hand, OJC security staff routinely interview inmates regarding "ward/neighborhood-based cliques" and who can live with whom. In sum, it appears that ISB collects and shares information with NOPD, and security staff requests housing assignments based on neighborhood associations. Yet, neither ISB nor security staff share intelligence with the Classification Unit or input the information into the AS400. Thus, the classification staff transfers inmates from pod to pod in response to emails indicating, "This individual cannot live on XX pod." To maintain Substantial Compliance with Section g, OPSO must create a systematic process for collecting information on active



"gang/cliques," sharing this intelligence across its various divisions <u>and</u> inputting this data into a standardized report available to the Classification Unit.

Figures 11 and 12 provide the OPSO monthly disciplinary data recorded in the JMS. To account for short-term variations and seasonal trends, we reviewed 15 months of disciplinary data. As shown in Figure 11, disciplinary report rates have fluctuated over the last 15 months. However, during this Compliance Period, 26.8% of the inmates received a disciplinary report, and 19.5% were found guilty of an infraction. During the previous Compliance Period - April – September 2023, on average, 17.7% of the inmates received a disciplinary report; 15.0% were found guilty of an infraction.



Figure 11: Rate of Disciplinary Infractions for the OPSO ADP – January 2023 – March 2024

Figure 12 illustrates the OPSO ADP (Average Daily Population) versus the number of disciplinary reports per month for January 2023 - March 2024. As the ADP increased steadily during the last 15 months, so has the number of disciplinary reports. As shown in Figure 11, between April 2022 and September 2023, the OPSO ADP rose by 35.3%, from 931 to 1,260. It appears that the rate of disciplinary reports per month is increasing faster than the increase in the ADP. In June 2022, OPSO staff wrote 217 disciplinary reports; in September 2023, 309 reports were written. This represents a 42.4% increase.





Figure 12: OPSO ADP vs. Number of Disciplinary Reports: January 2023 - March 2024

Figure 13 illustrates the breakdown of the disciplinary infractions by type during this Compliance Period. (These data reflect the most severe violation of which the inmate was found guilty per report.) During this Compliance Period, the numbers of recorded predatory (e.g., assaults or battery) ranged between 40 (October 2023) and 92 (March 2024), and aggressive infractions ranged between 59 (October) and 102 (December) per month. For this Compliance Period, the average numbers of predatory and aggressive infractions were 56.0 and 79.3/month, respectively. The average number of assaults/fights per day was 4.5 (56.0 + 79.3 = 135.33/30 = 4.51/day).



Figure 13: Most Serious Disciplinary Infraction/Report with Finding of Guilty: June 2022 – March 2024



During this Compliance Period, management problems and disruptive infractions increased, although not nearly as sharply as the predatory and aggressive violations. Thus, Figures 11 and 12 illustrate while the level of facility disruption increased, troubling is the dramatic increase in the level of violence, as indicated by assaults and fights within the facilities (OJC, TDC, and TMH).

***IV.A.10.h. OPSO shall review the periodic data report and make recommendations regarding proper placement consistent with this Agreement or other necessary changes in policy based on this review. The review and recommendations will be documented and provided to the Monitor.***

<u>Finding:</u>

Substantial Compliance

<u>Observations:</u>

The Monitor receives the daily "Active Inmates by Location reports and has access to the ad hoc Classification Monitor lists and various classification statistical reports. During this Compliance Period, there were multiple updates to the OPSO Housing Matrix. As of January 2023, the Classification staff provided the matrices daily.   While OPSO has been slow to address concerns regarding the housing matrix and to move forward on the recommended population management strategies, the Classification Manager promptly responds to questions or issues raised throughout the Compliance Period.

There are significant concerns about the quality of the documentation of the staff training, protective custody reviews, and enemy/associate decisions. These concerns were raised under Sections d and f, respectively.

## IV. A. 11.        Prisoner Grievance Process

***A. 11. a. OPSO shall ensure that prisoners have a mechanism to express their grievances, resolve disputes, and ensure that concerns regarding their constitutional rights are addressed. OPSO shall, at a minimum, do the following:***
   *(1) Continue to maintain policies and procedures to ensure that prisoners have access to an adequate grievance process and to ensure that grievances may be reported and filed confidentially, without requiring the intervention of a correctional officer. The policies and procedures should be applicable and standardized across all the Facility divisions.*
   *(2) Ensure that each grievance receives appropriate follow-up, including providing a timely written response and tracking implementation of resolutions.*
   *(3) Ensure that grievance forms are available on all units and are available in Spanish and Vietnamese and that there is adequate opportunity for illiterate prisoners and prisoners who have physical or cognitive disabilities or language barriers to access the grievance system.*
   *(4) Separate the process of "requests to staff" from the grievance process and prioritize grievances that raise issues regarding prisoner safety or health.*
   *(5) Ensure that prisoner grievances are screened for allegations of staff misconduct and,*



*if an incident or allegation warrants per this Agreement, that it is referred for investigation.*

**(6)** *A member of the management staff shall review the grievance tracking system quarterly to identify areas of concerns. These reviews and any recommendations will be documented and provided to the Monitor.*

<u>Findings:</u>

A. 11. a. (1)  Partial Compliance

A. 11. a. (2)  Partial Compliance

A. 11. a. (3)  Partial Compliance

A. 11. a. (4)  Substantial Compliance

A. 11. a. (5)  Substantial Compliance

A. 11. a. (6)  Partial Compliance

Until the September 2019 report, one rating was given for the entire section for the Prisoner Grievance Process. In order to highlight which provisions are in substantial compliance versus those which fall short, the decision was made to rate each provision separately.

This review covered October 2023 through March 2024. For this review, the Monitor interviewed the Grievance staff, and security staff and inmates while inspecting the housing units. Reports and data submitted by OPSO covering the rating period were also reviewed.

As noted during the previous inspection, a review of the documentation demonstrated that all inmate submissions continue to be reviewed by Grievance staff, categorized into requests and grievances, and forwarded to the appropriate staff for response. Statistical information was provided on all categories. Both requests and grievances continue to be sorted by type. Specific grievances related to inmate safety, medical issues, PREA, etc., are documented to reflect the date received, inmate information, type of grievance, time of notification made to the appropriate staff member, and the staff member making the notification. For the analysis, the Monitor created three charts and added simple linear trendline overlays to each grievance category listed. A fourth chart was added to graphically represent the number of grievances overall relative to the inmate population.

Grievance staff once again provided detailed documentation as to their separate handling of the October 2023 through March 2024 inmate requests, grievances, and



complaints related to inmate safety or health.

As reported by the OPSO Grievance staff, the monthly average of 182 grievances for the Report #17 rating period to 131 for Report #18, 100 for Report #19, and 131 for this rating period reflects a reversal of the downward trend in the overall grievance numbers since Report #17 and returning to the level seen previously with Report #18. This can be attributed largely to an increase in specific categories, namely grievances for this period related to Miscellaneous Facility issues and Maintenance issues. Of note and despite a general upward trend since April 2022, Commissary related grievances dropped significantly during this rating period. Trendlines for the remaining categories still reflect a general decline in the number of grievances if not remaining relatively flat. It remains unclear whether this is a positive development due to the difficulty in filing grievances due to the nonworking kiosks, broken grievance boxes, and issues with the collection of paper grievances. The Monitor will continue to observe the grievance trends reported by OPSO and anticipates changes in the specific numbers and trends with the impending implementation of the new electronic grievance system.

Chart 1 continues to reflect trends in the listed grievance categories beginning April 2022 and covering Reports 17 through 20. The "OJC Facility Grievable Miscellaneous" category, despite showing an overall decline over the 2-year period shown, had a significant increase during the current rating period. This is a catch-all category for grievances that do not fit the other categories listed and are generally addressed by line supervisors assigned to the area. The Monitor recommends OPSO specifically look at the topics of the complaints, specific floors/pods the complaints are originating from, etc., to determine whether there is a root cause for the grievances (i.e. lack of security staff to address problems, insufficient response to complaints, etc.). Maintenance grievances also increased during the rating period while Food Services grievances declined by half.  Of note, the Sanitation trendline now reflects a slight decline in the number of grievances over the 2-year period. Interestingly, this decline does not seem consistent with the sanitation conditions observed in the housing units during the recent inspection nor with inmate comments made to the Monitor which highlighted sanitation issues, lack of supplies, etc. (Sanitation is specifically covered in Section IV.D.1.) Grievance staff once again provided detailed documentation as to their separate handling



of the October 2023 through March 2024 inmate requests, grievances, and complaints related to inmate safety or health.

**Chart 1**



With Chart2, the Monitor continues to caution drawing any particular conclusions from the displayed trends and attributes any swings to the relatively small number of grievances in a given month for each category (less than 10 total). The "Life Threatening" category continues to show slightly declining numbers over the 2-year trendline, however, the monthly number of actual grievances increased from 2 in October 2023 to 5 in February 2024. Grievances for Inmate on Inmate (non-physical) issues also showed a significant jump in February 2024. The Monitor recommends OPSO Grievance and Security staff review these specific instances to determine if there were specific conditions or inmates involved that may warrant further review and action. Again, due to the low overall number of these grievances, the Monitor recommends OPSO staff review the individual circumstances of each case to determine whether commonalities exist, particularly during shorter periods of increasing grievances, and whether the circumstances can be addressed more effectively.



**Chart 2**



Chart 3 represents several categories, primarily inmate services and property/fund accounts. With the inclusion of the Oct 2023 through March 2024 data, the extended analysis reflects an overall decrease in the majority of categories and the only significant increasing trend is that related to Commissary service grievances. However, when focusing on the current rating period only, the number of Commissary grievances decreased by approximately 70% overall (12 to 3.5). Again, the numbers are relatively small, but it appears that OPSO placed some emphasis on improving the quality of the Commissary services despite the absence of a kiosk ordering system. The Monitor looks forward to seeing the downward trend continue and the impact of the impending implementation of the new kiosk ordering system. Inmate Property grievances were near zero for the rating period. Again, the Monitor cautions against drawing any conclusions as to long-term trends due to the relatively small number of grievances in each category overall (less than 14).



**Chart 3**



The Monitor also reviewed the "Overdue Grievance Reports" for the rating period. Over the last four to five rating periods, the Grievance staff have worked diligently to refine the collection, analysis, and presentation of the grievance data. It should be noted that, due to the technical constraints of the existing electronic grievance software, the totals provided have included all issues (requests, complaints, and grievances). Regardless, totals for the monthly "Overdue" were considered by the Monitor to be indicative of OPSO's efforts in addressing inmate issues. The reports are now created weekly for supervisory review, tracking, and follow-up to ensure a timely response. For the purposes of the report, the Monitor only included the data from the first week of each month through December 2023. Chart 4 reflects the data for each category: "Green" (2-4 days overdue), "Yellow" (5-9 days overdue) and "Red" (10+ days overdue), which represents overdue responses to inmates. In Report #18, the linear trendline showed a significant upward trend in the Red category. Based on the data provided for this rating period, OPSO staff appear to have made a concerted effort to address this issue with a general decline in the total number of "Red" overdue responses ranged from 1803 in April 2023 to 228 in December 2023. Again, a significant effort by OPSO staff.

Effective January 2024, OPSO has further refined its data collection, review and analysis efforts by separating requests and complaints from true grievances that may



impact an inmate's constitutional rights. As a significant number of the grievances are focused on mental and mental health care provided by WellPath, these have been further separated from those directed to OPSO staff. Grievance staff will be following this reporting format until the new electronic system is implemented in late 2024/early 2025.

The weekly average number of overdue true grievances for the first 12 weeks of 2024 are as follows:

OPSO – Jan—4.75; Feb—0; Mar—1.5 average per week

WellPath – Jan—1; Feb—7; Mar—1.25 average per week

At least two weeks out of every month showed no overdue grievances for either OPSO or WellPath indicating that the weekly reports are being used to ensure overdue grievances are addressed.

Based on this data, Partial Compliance continues to be appropriate for section IV.A.11.a. (2). The Monitor again commends this effort and expects to see further progress during the next rating period. With this report's focus now solely on actual grievances for the review of timely responses, the Monitor recommends OPSO continue their overall efforts at reducing response times for requests and complaints as well.

**Chart 4**



| | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2-4 Days | 87 | 41 | 164 | 67 | 100 | 89 | 153 | 181 | 98 | 167 | 132 | 106 | 114 | 76 | 65 | 54 | 93 | 118 | 79 | 271 | 60 | | |
| 5-9 Days | 25 | 37 | 102 | 87 | 93 | 91 | 107 | 123 | 113 | 116 | 77 | 109 | 252 | 120 | 118 | 31 | 80 | 81 | 91 | 132 | 95 | | |
| 10+ Days | 16 | 24 | 103 | 160 | 186 | 106 | 148 | 363 | 641 | 872 | 1013 | 1355 | 1803 | 1757 | 965 | 406 | 558 | 227 | 134 | 296 | 228 | | |



As noted during the last several inspections, inmates have access to the grievance process via the few workable electronic kiosks located in the housing units throughout OJC and TDC and more commonly through a traditional paper grievance system utilized as a "back-up" system due to the large number of non-functioning kiosks. As of the last day of the reporting period, OPSO Grievance staff reported that the majority of the kiosks were permanently non-working, essentially making the routine electronic submission of grievances by inmates next to impossible for the majority of the inmates. The Monitor was advised during the inspection that a new commissary vendor has been selected and will be installing a new electronic grievance system with either new kiosks, tablets, or both being provided to inmates. The Monitor recommends OPSO focus on procedures that will ensure inmates in lockdown (disciplinary, psych, etc.) have adequate access to the new system.

The Grievance staff again reported that every housing unit continues to be visited seven days per week with a "walk by" of every cell to collect paper grievances to ensure that problems with the kiosks do not interfere with an inmate's ability to submit grievances. The Monitor received few complaints regarding the paper grievance process during this inspection than previously.

The Monitor reviewed the paper grievances tracking documentation and noted that all such grievances continue to be entered into the electronic system by Grievance staff upon receipt. Paper responses are provided to inmates in units that do not have a functioning kiosk. The inmate then deposits the paper grievance forms in the receptacle in the unit or hands it to Grievance staff on their rounds. During the previous inspection, the Monitor recommended Maintenance staff immediately address the security of the grievance receptacles in the housing units. During this inspection, several receptacles were again found to be unsecured, damaged, or missing entirely from the wall. This jeopardizes the confidentiality of the paper grievance system. Consistent, escorted access for civilian Grievance staff attempting to retrieve grievance forms from housing units continues to be problematic due to Security staffing issues. Grievance staff continue to "skip" unit(s) until the next round when an escort is not available. (Staff visit the units twice daily (morning and afternoon). The Monitor is still of the opinion that certain housing units are being bypassed entirely on a given day if security staff are unavailable



for escort. This opinion is supported by statements of Grievance staff that some units are not accessible due to lack of security staff.

As with the previous reports, it remains the Monitor's opinion that with secure receptacles and security staff supporting the policy and effort in this regard, the manual work-around is acceptable under the language of the Consent Judgment requiring the inmates have access to a meaningful and confidential grievance process if there are secure grievance boxes and the Grievance staff actually hand distribute and pick up grievances at least twice a day. That is not occurring as many grievances boxes were found to be broken, unsecured, or missing despite a specific court order requiring grievance and medical request boxes to be placed in each unit. Given the efforts by the Grievance staff, Section IV. A. 11. a. (1) remains in Partial Compliance.  Section IV. A. 11. A. (3). remains in Partial Compliance as the Monitor cannot be reasonably assured that inmates have grievance forms routinely available from Security staff in English, Spanish, and Vietnamese. Documentation continues to reflect that Grievance staff maintain by name and housing a listing of all OPSO inmates identified as needing Grievance staff assistance to access the grievance system due to either a language barrier or illiteracy. As with the previous inspection, the Monitor received no information or verbal complaints from inmates in this regard.

Grievance staff continue to do an excellent job tracking grievances and requests and reporting as to the timeliness and quality of the responses to address the inmates' issues. While Substantial Compliance does not require perfection, the progress shown in reducing the number of overdue responses does not automatically equate in Substantial Compliance. The Monitor is hopeful that the latest suggested changes to OPSO's reporting methods will result in further progress and an improved rating.

The Monitor reviewed detailed documentation provided by Grievance staff for the rating period regarding the screening of grievances for staff misconduct. The documentation demonstrated that all inmate submissions are reviewed by Grievance staff and those regarding staff misconduct are separately documented for appropriate referral to the administrative level for follow-up. Grievance staff processed a total of 29 such staff misconduct related grievances during this rating period, an increase of 4 grievances over Report #19 of a 16% increase. The Monitor recognizes that a certain number of staff



misconduct complaints (founded and unfounded) will always present themselves due to the nature of the environment. So, while "zero complaints" is a laudable goal, the Monitor is not assessing the rise or fall of the number itself but the implementation and oversight of the process.

Grievances regarding staff misconduct are particularly susceptible to interception by staff accused of misconduct due to the reliance on paper grievances. The Grievance staff practice of making rounds in the housing units mitigates this concern in the Monitor's opinion. Grievance staff had previously included disposition information provided to the inmate on a spreadsheet titled "Warden – disposition", however this document did not appear to be available for review. A review of the disposition notes for grievances assigned to IAD, ISB, PREA, and FIT showed improvement in substantive responses to the inmates. The Monitor continues to recommend executive oversight of this process, but the Monitor continues to view the information as an encouraging response by OPSO in this regard.

Grievance staff continue to separately document grievances that require specific referral to IAD, ISB, PREA, or FIT staff for review and investigation. Detailed information along with the date assigned and disposition is maintained as well as email transmission receipts. Grievances referred to IAD increased slightly from 6 to 9 which was still below the 11 noted in Report #18. Grievances referred to ISB increased by almost 50% from 21 to 33, though again, the total was still below that of the 37 reported in Report #18.

The rating for IV.A.11.a.(4) remains in substantial compliance. The documentation provided by OPSO Grievance staff indicates that "requests to staff" are routinely separated from true grievances regarding prisoner safety or health and are separately reported and tracked.

The rating for IV.A.11.a.(5) remains in substantial compliance. The documentation provided by OPSO indicates that OPSO Grievance staff routinely screens inmate grievances for allegations of staff misconduct, appropriately reports suspected instances of staff misconduct and verifies the receipt of the notifications.

The Monitor reviewed the 2023 Fourth quarter and 2024 First quarter data analysis of the grievance reports presented by Grievance staff for executive review. No documentation regarding any specific discussion by executive staff of the grievance



documentation and reporting was noted. Without such documentation, the rating for IV. A. 11. a. (6) continues to be Partial Compliance. The documentation which OPSO contends supports compliance should be included in the documentation provided for the compliance tour even if it has been previously provided.

### IV. A. 12.  Sexual Abuse

*A. 12. OPSO will develop and implement policies, protocols, trainings, and audits, consistent with the requirements of the Prison Rape Elimination Act of 2003, 42 U.S.C. § 15601, et seq., and its implementation of regulations, including but not limited to, preventing, detecting, reporting, investigating, and collecting sexual abuse data, including prisoner-on-prisoner and staff-on-prisoner sexual abuse, sexual harassment, and sexual touching.*

Finding:

A. 12. Partial Compliance

Observations:

OPSO successfully completed its PREA audit in 2019. Passing a PREA audit that is now five years old is not considered as conclusory evidence of compliance. OPSO has stated that a PREA Audit is scheduled for later in 2024. Proof of training and policies were provided, but the review of the policies has not been completed due to inaction by OPSO leadership. Review began after the monitoring period. Documentation regarding PREA investigations was provided. No proof as to implementing the other requirements of PREA including education of inmates was provided. This provision remains in partial compliance, but significant progress has been made due to the efforts of the PREA Coordinator.

### IV. A. 13.        Access to Information

*A. 13. OPSO will ensure that all newly admitted prisoners receive information, through an inmate handbook and, at the discretion of the Jail, an orientation video, regarding the following topics: understanding Facility disciplinary process and rules and regulations; reporting misconduct; reporting sexual abuse or assault; accessing medical and mental health care; emergency procedures; and sending and receiving mail; understanding the visitation process; and accessing the grievance process.*

Finding:

A.13.  Non-Compliance

Observations:

The proof provided indicated that inmate handbooks were not placed in each housing until after the monitoring period. Inmate handbooks were in the housing units in June 2024, but they were not observed during this compliance period and many inmates



stated they did not have access to a handbook. Previously, the inmate handbook was available on the kiosk. However, very few of those kiosks are in working order. This provision continued to be in Non-Compliance for this monitoring period.

## IV. B. Mental Health Care

*B. OPSO shall ensure constitutionally adequate intake, assessment, treatment, and monitoring of prisoners' mental health needs, including but not limited to, protecting the safety of and giving priority access to prisoners at risk for self-injurious behavior or suicide. OPSO shall assess, on an annual basis or more frequent basis, whether the mental health services at OPP comply with the Constitution. In order to provide mental health services to prisoners, OPSP, at a minimum shall:*

*Note – The submitted policies and procedures reviewed were primarily from Wexford, beginning June 1, 2024. While the review period is October 2023-March 2024, Wellpath did not allow Wexford adequate access to their records for a more thorough review of the period in question. Many of the findings will remain unchanged until adequate time has elapsed to determine how Wexford is addressing concerns to reach substantial compliance. These summaries will be based on CQI and data collection from the period in review and touch on the 6 weeks Wexford has been providing services for OPSO along with specific cases reviewed during the period of review.*

*The Monitors also acknowledge a collaborative response from OSPO and Wexford regarding the provisions, which was an improvement from prior responses to reports.*

Findings:

B. 1. a. Partial Compliance

B. 1. b. Substantial Compliance

B. 1. c. Substantial Compliance

B. 1. d. Substantial Compliance

B. 1. e. Partial Compliance

B. 1. f. Partial Compliance

B. 1. g. Substantial Compliance

B. 1. h. Partial Compliance

B. 1. i. Partial Compliance

B. 1. j. Partial Compliance

B. 1. k. Partial Compliance

B. 1. l. Partial Compliance

*B.1.a. Develop and maintain comprehensive policies and procedures for appropriate screening and assessment of prisoners with mental illness. These policies should include definitions of emergent, urgent, and routine mental health needs, as well as timeframes for the provision of services for each category of mental health needs.*
Finding:

Partial Compliance



Upon review of the submitted documentation, it is primarily focused on the period of time since Wexford Health became the mental health provider for OPSO, June 1, 2024. There is limited documentation to review for the period in question (October 2023 through March 2024). While the screening documents from Wexford appear to capture the necessary information for adequate referrals, there were major transition issues in intake including psychiatric patients not receiving their medication due to intake nurses not calling the provider for bridge orders. This issue appears to have stabilized but will be reviewed at the next site visit.

Maintaining policies and procedures is a key component of this provision. Capturing the adequate information in the screening document is a first step. The procedures must align with the policies and be carried out in a timely fashion. What is expected for substantial compliance for this provision is: clear documentation to support procedures for appropriate screening and assessment is being completed in the timeframes specified by the policy. Delays in screening and inconsistent information documented in the record will continue to keep this provision in partial compliance.

***B.1.b. Develop and implement an appropriate screening instrument that identifies mental health needs, and ensures timely access to a mental health professional when presenting symptoms require such care. The screening instrument should include the factors described in Appendix B. The screening instrument will be validated by a qualified professional approved by the Monitor within 180 days of the Effective Date and every 12 months thereafter, if necessary.***

Finding: See B.1.a.

Substantial Compliance

The instrument used by Wexford identifies mental health needs. Ensuring timely access to a mental health professional appears to be initially occurring from the CQI studies which have been conducted. Of note, the results in the folder reflect Wellpath's intake screening practice prior to the period in question. This provision will be examined more closely at the next site visit and be based on Wexford's screening instrument and practice.

***B.1.c. Ensure that all prisoners are screened by Qualified Medical Staff upon arrival at OPP, but no later than within eight hours, to identify a prisoner's risk for suicide or self-injurious behavior. No prisoner shall be held in isolation prior to an evaluation by medical staff.***

Finding: See B.1.a.

Substantial Compliance

Suggestion: There were two months within the submitted CQI study where compliance fell below the 90% threshold. In February 2024, only 89% of patients were seen within



eight hours by an QMHP. This means 68 individuals waited longer than 8 hours to be seen by an QMHP. In May 2024, 88% of inmates were seen outside of the 8-hour window allotted for an QMHP to see the patient. This means 47 inmates waited longer than 8 hours to be seen. This trend will be monitored with the new provider, Wexford, to determine whether they are able to return to a compliance level above and beyond expectations as the prior provider was able to do. Monitors continue to recommend a study to look at the smaller percentage of inmates who waited longer than 8 hours, to determine whether there are any factors under the control of Wexford which could alleviate the extended wait times, even for one inmate.

***B.1.d. Implement a triage policy that utilizes the screening and assessment procedures to ensure that prisoners with emergent and urgent mental health needs are prioritized for services.***

Finding: See B.1.c. Suggestion

Partial Compliance

Suggestion: For the referrals in question, inmates are to be seen within 2 hours for an emergent referral, within 24 hours for an urgent referral and within 7 days for a routine referral. The submitted CQI documents were from August and September 2023, which is prior to the period in review. Will expect more timely documentation at the next site visit to capture the compliance of Wexford in addressing the needs of prisoners with emergent and urgent mental health needs.

While I appreciate the support for this provision being rated in substantial compliance was placed in the folder on July 9, 2024, it was not timely and therefore it was unable to be fully evaluated for this site visit. Questions could not be properly addressed, giving the lateness of the submission. For substantial compliance, the expectation is all supporting documentation is submitted with adequate time for the document to be reviewed and questions, if any, can be asked and addressed at the next site visit. The document needs to include clear support for prisoners with urgent and emergent needs being prioritized for service and justification for any prisoner who is not. The compliance rate with this provision should be met (90%) in order to be rated and sustained at substantial compliance.

***B.1.e. Develop and implement protocols, commensurate with the level of risk of suicide or self-harm, to ensure that prisoners are protected from identified risks for suicide or self-injurious behavior. The protocols shall also require that a Qualified Mental Health Professional perform a mental health assessment, based on prisoner's risk.***



<u>Finding:</u>

Partial Compliance

For this provision, it is imperative that protocols are implemented with the level of risk of suicide or self-harm for the inmate's protection. It is not sufficient to have developed the protocols without the intentional implementation of them in everyday practice. There continue to be challenges with documentation and actual observation for suicide watch at OJC. First, the deputies are not documenting suicide watch on the required observation forms, especially in the IPC. Video demonstrated there are significant amounts of time where there is no observation being conducted. Whether there are instances when proper observation is being conducted is mute when there is not adequate, and policy supported documentation to demonstrate this. The observation sheets remain partially completed by custody staff and therefore calls into question whether inmates are properly observed during this crucial time. Use of the required observation form not only aids in communication between custody staff and mental health, but it also ensures the level of risk is being properly addressed. Second, the QMHPs assigned to suicide watch continue to not accurately report their check in times on the observation/restraint checklist and worksheet. The Monitor watched videos from January 24, 2024, February 16, 2024, March 25, 2024, June 10, 2024, June 12-14, 2024, June 24-25, 2024, June 29, 2024 and saw many of the same concerning issues which were described in the previous report, falsification of documentation, documenting deputies being unavailable for mental health checks when a deputy was present, MHTs making no additional effort to secure a deputy or taking advantage of deputy rounds to conduct welfare checks, individuals going unwatched for extended period of time and MHTs being absent from their posts.  It cannot be stressed enough how important this work is in ensuring the safety of the inmates present at OJC. At the time of the site visit, Wexford had only been providing services for 6 weeks. At the next site visit, if this situation has not improved, OPSO/Wexford runs the risk of this provision being downgraded to non-compliance. Adequate searches by deputies and appropriately securing inmates are vital in ensuring inmates are protected from suicide and self-harm. This continues to not being done at a level commensurate with the level of risk. Please note there were many cases where there was no documentation regarding securing and searching of prisoners therefore



these numbers could be higher. The following data was taken from the submitted code white spreading in the folder for this provision. The denominators reflect the total number of code whites which were called during the month. In October 2023, 17/25 (68%) of prisoners were not adequately secured while 14/25 (56%) were not properly searched. In November 2023, 9/17 (53%) were not secured while 11/17 (65%) were not searched. In December 2023, 6/24 (25%) were not properly secured while 9/24 (38%) were not searched. In January 2024, 15/21 (71%) were not secured and 14/21 (67%) were not searched. In February 2024, 9/17 (53%) were not secured and 11/17 (65%) were not searched. In March 2024, 11/27 (41%) were not secured and 12/27 (44%) were not searched. Of the code whites called, only a select number after clinical assessment were placed on suicide watch. In January, February and March 2024, there was additional data collected for the prisoners placed on suicide watch and the percentage of those who were searched. In January 2024, 14 of the 21 patients were placed on suicide watch and of the 14, only 4 (29%) were searched. In February 2024, 16 of the 17 prisoners were placed on suicide watch and only 4 (24%) were searched. In March 2024, 20 of the 27 prisoners were placed on suicide watch and only 8 (40%) were searched. It is imperative for the safety of the patient and staff that searches are conducted timely and thoroughly, especially in this population who are at greater risk of self-harm.

<u>Suggestion:</u> Continue to monitor and encourage use of the correct observation form for suicide watch by deputies. The Mental Health Monitor expects consistency in suicide watches which will include all observers utilizing the same documentation for watches. Ensure there is no use of physical restraints for inmates on suicide watch in IPC or TMH and document any instance where this occurs. Document de-escalation procedures by Wexford and deputies and challenges with implementation. Adequate cell searches and body searches and properly securing inmates are necessary to protect inmates from the risk of self-injurious behavior. The Monitor recommends more frequent spot checks of QMHPs who are conducting watches and enforcing corrective actions as deemed necessary. ***Please note you will see this recommendation throughout this report*** – The Monitor also recommends a member of the Wexford administrative team have direct access to the video monitoring system of the facility in order to conduct these checks and



others necessary to comply with the expectations of many of the provisions. Since the current system appears to be plagued with fraudulent behaviors along with lack of accountability and appropriate supervision, consider eight-hour shifts for MHTs rather than twelve hours and/or implementing mandatory periodic movement of individual MHTs throughout the shift to minimize boredom, sleeping and falsification of documentation. These are simply recommendations to consider in trying to improve the current system.

***B.1.f. For prisoners with emergent or urgent mental health needs, search the prisoner and monitor with constant supervision until the prisoner is transferred to a Qualified Mental Health Professional for assessment.***

Finding:

Partial Compliance

See B.1.e. for documented search data. There are fluctuations in the percentage of adequate searches of inmates with emergent or urgent mental health needs. As stated in B.1.e. and after review of the code white spreadsheet which was submitted in the folder during the site visit in July 2024. In October 2023, 14/25 (56%) were not properly searched. In November 2023, 11/17 (65%) were not searched. In December 2023, 9/24 (38%) were not searched. In January 2024, 14/21 (67%) were not searched. In February 2024, 11/17 (65%) were not searched. In March 2024, 12/27 (44%) were not searched. Of the code whites called, only a select number after clinical assessment were placed on suicide watch. Even after an assessment by a QMHP and the prisoner was placed on suicide watch, searches were not consistently conducted. In January, February and March 2024, there was additional data collected for the prisoners placed on suicide watch and the percentage of those which were searched. In January 2024, 14 of the 21 patients were placed on suicide watch and of the 14, only 4 (29%) were searched. In February 2024, 16 of the 17 prisoners were placed on suicide watch and only 4 (24%) were searched. In March 2024, 20 of the 27 prisoners were placed on suicide watch and only 8 (40%) were searched. When the number falls below 100%, there needs to be documentation outlining the contributing factors and steps to ensure future compliance. While the monitor understands there may be an exception to someone being searched immediately, for example the patient is violent and needs stabilization prior to being searched, the expectation is proper documentation justifying the delay.



<u>Suggestion:</u> There continue to be challenges performing and providing adequate documentation of searches and constant supervision, on proper documentation, by deputies prior to the arrival of mental health staff when an assessment for all emergent and urgent needs are determined. Provide written documentation of all protocols and procedures for searching inmates as soon as safely possible, along with attempts at having mental health staff available to try and limit the need for de-escalation interventions. This should all be completed prior to placement on any form of suicide precautions, watch or direct observation. Contraband left on an inmate because an adequate search was delayed, or inadequate search was conducted are unacceptable and not constitutionally adequate care in trying to ensure risk of self-harming behavior is minimized. As stated above, accurate documentation is necessary that accounts for contributing factors regarding why searches are not performed on 100% of inmates at risk of harm and appropriate steps (corrective active plan) to ensure future compliance. The documentation should also reflect what was done in leu of the immediate search to minimize harm, i.e. an inmate was watched directly until a search could be conducted.

***B.1.g. Ensure that a Qualified Mental Health Professional conducts appropriate mental health assessments within the following periods from the initial screen or other identification of need:***

  *1)    14 days, or sooner, if medically necessary, for prisoners with routine mental health needs;*

  *2)    48 hours, or sooner, if medically necessary, for prisoners with urgent mental health needs;*

         *And*

  *3)     immediately, but no later than two hours, for prisoners with emergent mental health needs.*

<u>Finding:</u>

Substantial Compliance

<u>Suggestion:</u> The data submitted to support this provision was taken from August and September 2023, prior to the period in question. This provision will be monitored and CQI data reviewed for the next site visit to ensure OPSO/Wexford remains in substantial compliance. Continue to conduct CQI audits to ensure implementation and timeliness of referral responses. A Qualified Mental Health Professional assigned to IPC will help ensure inmates at intake receive appropriate assessments and timely referrals, including referrals to psychiatrists during on-call hours. Cell side visits are not considered appropriate mental health assessments. As stated in previous reports, if cell side assessments continue, this could result in this provision being downgraded to partial



compliance.

***B.1.h. Ensure a Qualified Mental Health Professional preforms a mental health assessment no later than the next working day following any adverse triggering event (i.e., any suicide attempt, any suicide ideation, or any aggression to self, resulting in serious injury).***

<u>Finding:</u>

Partial Compliance

As of the time of the site visit, the mental health staff had been granted access to incident reports for about a week. There was also an agreement that OPSO will implement a system of notifying the mental health provider (Wexford) by radio for every use of force incident, which will be evaluated by the Monitor at the next site visit. While having access to the incident reports will help in notifying mental health staff of a triggering event, it does not supersede the responsibility of OPSO to alert mental health for each use of force incident by radio with an overall goal of having mental health providers present for every use of force at OJC. This does not negate the importance of communication as soon as possible to the mental health staff of a triggering event. Hopefully this first step will open the gateway of communication between OPSO and Wexford to ensure Wexford is able to perform a mental health assessment within 24 hours or the next working day of a triggering event. This Monitor considers use of force a triggering event and therefore mental health is required to be notified to perform a mental health assessment. I will review at the next site visit if access to the incident reports improves the timeliness and completion of QMHP mental health assessments.

<u>Suggestion:</u> Create a Code for use of force, i.e., Code Purple, in order to alert mental health and medical regarding the incident. This will help with timely interventions by the medical and mental health staff at OJC. Reeducate deputies regarding the importance of alerting mental health staff regarding all triggering events, in advance as much as feasible, so proper assessments and assistance can be provided. Ensure medical and mental health staff within Wexford are communicating and informing each other regarding triggering events as they become aware. Random incident reports and QMHP assessments should be added to the folder to demonstrate compliance each month of the review period.

***B.1.i. Ensure that a Qualified Mental Health Professional, as part of the prisoner's interdisciplinary treatment team, maintains a risk profile for each prisoner on the mental health case load based on the Assessment Factors identified in Appendix B, and develops and implements a treatment plan to***



*minimize the risk of harm to each of these prisoners.*

Finding:

Partial Compliance

There remain challenges in completing clinically adequate, interdisciplinary treatment plans outside of TMH. While 2A and 2B and 3E have some treatment planning services, there are limitations in the content of the treatment plans including having measurable goals, interventions, and objectives. There are currently no consistent multidisciplinary treatment planning services occurring in OJC (general population). Treatment plans direct treatment and keep the involved clinicians and supporting staff abreast of interventions and objectives for each patient. The aim is to provide person-centered, coordinated, high-quality care to patients. All inmates on the mental health caseload require a risk profile based on the Assessment Factors in Appendix B, to include an acknowledgement that the factors were considered and may not apply to that individual AND an interdisciplinary treatment plan. While every inmate on the case load may not require a monthly treatment plan, an adequate treatment planning schedule needs to be created and implemented to ensure all inmates on the case load have a treatment plan. Some may require, based on clinical judgment, a plan every sixty days while others may have a plan every 90 days. The mental health provider, in consultation with OPSO, should determine what is needed, in terms of additional psychiatrists' hours, in order to conduct multidisciplinary treatment plans throughout the entire facility. At this juncture, triggering events do not typically result in any updates to the treatment plan, which it should. The data included for review was only for March 2024. Overall, treatment planning is not only inadequate, but also not done in a timely manner as expected for treatment planning services. If initially completed, treatment plans were rarely, if at all, updated every 30 days on the specialty units.

Suggestion: A clinical analysis of treatment needs will be needed to inform an adequate and appropriate treatment planning schedule for OJC. Ensuring interdisciplinary treatment plans are created and followed for the general population, 2A, 2B and 3E patients with a risk profile for each inmate on the mental health case load will be necessary for substantial compliance. A suggestion is for Wexford to determine the staffing matrix needed to provide treatment plans every 60 days in general population



and secure additional funding to secure that level of staffing, in addition to any staffing needs to ensure timely treatment plans and updates are conducted for specialty units. As stated before, these treatment plans must include interventions to minimize risk of harm for inmates throughout the system, including stepdown and outpatient level of care along with the acknowledgement that risks were assessed and may not be relevant for the patient. This risk profile should also include deficits in planned services and content, which could be due to lack of available staff, and remedies to correct the deficits. Triggering events should result in an update to the treatment plan which will address interventions and objectives to target recovery from the event.

***B.1.j. Ensure adequate and timely treatment for prisoners, whose assessments reveal mental illness and/or suicidal ideation, including timely and appropriate referrals for specialty care and visits with Qualified Mental Health Professionals, as clinically appropriate.***

Finding:

Partial Compliance

OPSO/Wexford continues to conduct daily visits by a QMHP for individuals awaiting transfer to TMH. While the provision does not direct the need for special areas to conduct mental health work, the provision calls for adequate treatment for inmates with mental illness. Adequate mental health treatment is not conducted on the tier, from the module, cell side nor in a dayroom where an inmate may be reluctant to discuss private, intimate issues with a clinician. The lack of confidentiality and a space that promotes confidentiality leads to a lack of validity that the information received is adequate to provide the necessary treatment. Due to the consistent lack of deputies on each pod, many QMHP interventions, which would provide timely treatment, are not conducted. Many group sessions are held sporadically or not at all. There are numerous examples of disruption to service to include group therapy sessions. Patient 2517762 was ordered to have group therapy biweekly; yet, from October through November 2023, he did not attend one session, and the one group note in the chart from 10/12/2023 indicated the group was not held due to lack of deputies. Individual sessions are conducted cell side which is inadequate treatment for someone with a mental illness. One of the advantages of the Phase III design is that it provides confidential spaces for conducting interviews of inmates in a manner which is safe for both the QMHP and inmate. Finally, without a denominator of who is on the caseload and who is in need of services, the listing of



numbers for sessions held and attended is insufficient to capture the true needs of the facility.

Suggestion: There continues to be a need for a full range of mental health and consistent individual and group counseling services at OJC and TMH/TDC. Adequate treatment includes providing an environment where confidentiality is secured so the inmate can share valid information to inform necessary treatment. The mental health provider and OPSO must collaborate and plan TOGETHER in order to provide an adequate and therapeutic system of mental health services. The inmates are unable to attend therapeutic sessions without adequate clinical staff to conduct sessions and correctional staff to transport and provide security for both staff and inmates. The Monitor reiterates that cell side visits do not constitute therapeutically appropriate or clinically adequate mental health services and will not result in substantial compliance. The Monitor recommends continued documentation of barriers to providing timely and adequate mental health treatment for all individuals captured on the mental health caseload. Issues cannot be rectified without knowledge of the problem. Consistent and reliable access to care is necessary for substantial compliance. OPSO may want to consider having community-based volunteer services come in and facilitate groups which would help provide services for inmates.

***B.1.k. Ensure crisis services are available to manage psychiatric emergencies. Such services include licensed in-patient psychiatric care, when clinically appropriate.***

Finding:

Partial Compliance

There are no designated in-patient licensed facilities identified to provide treatment for the OPSO population.

Suggestion: OPSO continues to lack access to licensed in-patient psychiatric services for male and female inmates, beyond simple emergency room treatment. OPSO/Wellpath is encouraged to continue to provide documentation that all psychiatric emergencies are sent to an emergency department and any crisis is adequately resolved, which will keep this provision in partial compliance. Currently, the utilization of TMH and external emergency departments are the resources which must be used.

***B.1.l. On an annual basis, assess the process for screening prisoners for mental health needs to determine whether prisoners are being appropriately identified for care. Based on this assessment,***



*OPSO shall recommend changes to the screening system. The assessment and recommendations will be documented and provided to the monitor.*

Finding:

Partial Compliance

Suggestion: The folder of documents to support compliance for this provision was empty. There was no documentation submitted to keep this provision in substantial compliance. In the last report, this monitor identified a major problem with OPSO not contributing recommendations regarding the screening system, even if the recommendation is simply that the system in place is sufficient. Screenings require an adequate clinical response and if there are inmates who are not being adequately screened and identified for care, from the perspective of OPSO, this needs to be addressed. Provide the necessary documentation to return this provision to substantial compliance which will be reviewed at the next site visit.

Findings:

B.2.a    Partial Compliance

B.2.b.    Partial Compliance

B.2.c.    Partial Compliance

B.2.d.    Partial Compliance

B.2.e.    Partial Compliance

B.2.f.    Partial Compliance

B.2.g.    Substantial Compliance

B.2.h.    Partial Compliance

*B.2.a. Review, revise, and supplement existing policies in order to implement a policy for the delivery of mental health services that includes a continuum of services, provides necessary and appropriate mental health staff, includes a treatment plan for prisoners with serious mental illness, and collects data and contains mechanisms sufficient to measure whether care is being provided in a manner consistent with the Constitution.*

Finding

Partial Compliance

Inmates on the waitlist for TMH are now to be seen daily by a QMHP. There needs to be a system in place to provide a continuum of treatment for all individuals on the behavioral health caseload at the jail, including a treatment plan for inmates with serious mental illness which directs care and consistent therapeutic groups available for all patients on



the caseload. Serious mental illness is defined as mental, behavioral, or emotion disorder of mood, thought, or anxiety that significantly impairs judgment, behavior, capacity to recognize reality, or ability to cope with the ordinary demands of life. Those disorders include, but are not limited to, Schizophrenia Spectrum Disorders, other psychotics disorders, bipolar related disorder, major depressive disorders, and post-traumatic stress disorders. Implementation of policy to ensure the delivery of mental health services across the entire facility continues to be hampered by staffing deficits, from both Wexford and OPSO. The lack of treatment teams and treatment plans at OJC require continued attention. Without adequate staff, there will be no consistent treatment, including scheduled mental health and activity groups for the inmates. The data in the folder to support compliance was from the month of March 2024.

<u>Suggestion:</u> Both Wexford and OPSO must commit to consistent and appropriate implementation of policies in order to ensure an adequate delivery of mental health services, including de-escalation interventions. This will include documenting wait lists and service needs along with barriers to the provision of treatment, including missing group sessions and conducting suicide watches from the control room adjacent to the housing units. This also includes holding staff accountable for employment requirements – being awake and attentive during suicide watches. This will include documenting how long an inmate awaits transfer to TMH and what therapeutic and clinically adequate services are provided during that time. There continues to be a need for interdisciplinary treatment teams in the outpatient level of care which will help determine and implement appropriate levels of treatment. Wexford should produce for the monitor the total number of inmates with any of the diagnoses listed above, whether in TMH, 2A, 2B, or general population along with their corresponding multidisciplinary treatment plan. As stated above, Wexford needs to identify the appropriate staffing levels needed to move into substantial compliance with this provision and satisfy the requirements of the court. A comprehensive plan as to how the staff will be secured is also recommended.

***B.2.b. Ensure that treatment plans adequately address prisoners' serious mental health needs and that the treatment plans contain interventions specifically tailored to the prisoner's diagnoses and problems.***

<u>Finding:</u>

Partial Compliance



It is imperative to know how many patients are being served before Wexford is able to determine the needs of the population. Unfortunately, no one was able to provide the number of inmates on the caseload or the specific needs of the population at the site visit. Inmates, outside of those housed in TMH, some in 2A/2B/3E, do not have comprehensive treatment plans created by a multi-disciplinary treatment team. The treatment plans created in TMH are adequate in providing a framework for treatment and are specifically tailored to the needs of the patient. The data in the folder was from March 2024.

Suggestion: Continue to work towards providing interdisciplinary treatment plans to all individuals on the mental health case load throughout the facility. Treatment plans are needed for all male, female, and youthful inmates at all levels of care, including acute care, suicide watches, TDC and outpatient level of care. These treatment plans need to be developed by a multidisciplinary team, including the prisoner, as much as possible. As stated above, staffing levels need to be assessed, and staff secured to provide the level of expected care and timely treatment for this population.

***B.2.c. Provide group or individual therapy services by an appropriately licensed provider where necessary for prisoners with mental health needs.***

Finding:

Partial Compliance

There remain challenges with consistently providing group and individual therapy services outside of TMH. Some of this is due to lack of adequate deputies to secure pods therefore the mental health provider has to cancel an intervention. Until there are sufficient security staff to provide supervision for groups to take place, and Wexford knows the number of inmates they are serving and the needs of those inmates, it will be difficult to determine the staffing needs of Wexford to move this provision into substantial compliance. Until there are confidential locations to conduct interventions, the validity of inmate responses is in question which in turn questions whether appropriate, clinically therapeutic programming is being offered. One cannot offer what they do not know is needed. Patient 2515677 was recommended for biweekly groups yet between December 2023 and March 2024, there was no documentation that he was able to attend a group. The three submitted notes in March 2024 all indicated that group was not held for lack of security staff and smoking on the unit. It has become too common for



patients to be referred for groups which are not being consistently held.

Suggestion: This provision will remain a challenge to move into substantial compliance without adequate staff for Wexford and OPSO, along with adequate confidential environment to conduct these sessions. Confidentiality will help validate the responses of the inmate which will in turn inform what individual and group sessions are needed for the population. If individual and group sessions cannot be held consistently, this provision will not move to substantial compliance. Please note how many individuals are unable to access the provided service due to barriers like adequate space, staffing challenges (including Disruption of Service forms) and are on a waitlist. Document the corrective action plans which will be implemented to address these issues. Continue to provide data on the number of inmates who received counseling for sexual abuse, alcohol, and drug abuse. Keep a running list of how many groups are not being held rather than just the attendance of inmates. If you have 10 groups scheduled and only facilitate one group, the data is skewed when you report 92% attendance. Wexford needs to work on a better reporting system to capture not just the needs of the population but the vast number of groups not being held.

***B.2.d. Ensure that mental health evaluations that are done as part of the disciplinary process include recommendations based on the prisoner's mental health status.***

Finding:

Partial Compliance

There was no data submitted in this folder to support this provision moving into substantial compliance.

Suggestion: It is imperative that mental health staff are contacted prior to any inmate, especially on the mental health caseload, being moved into disciplinary housing. With recent access to incident reports, the hope is this is the first step in improving communication between Wexford and OPSO. Wexford can begin by using incident reports to ensure they are aware of all mental health inmates who may find themselves in disciplinary housing. Continued collaboration between OPSO and Wexford is crucial to this provision moving into substantial compliance. Only OPSO can alert mental health to movement of inmates into disciplinary housing and therefore are primarily responsible for this provision remaining in partial compliance.



***B.2.e. Ensure that prisoners receive psychotropic medications in a timely manner and that prisoners have proper diagnoses and/or indications for each psychotropic medication they receive.***

Finding:

Partial Compliance

Suggestion: Between January 2024 and May 2024, only 81.6% of psychotropic medications were administered on an average basis. This average fell to 74.4% for non-psychotropic medications. There was also a report that when Wexford first began providing service in June 2024, there was a significant lag in patients receiving their psychotropic medication due to lack of communication from the intake nurse to the provider. At the site visit, this issue had been rectified and the hope is there will be improvement in the process. There continues to be no medication variances captured to demonstrate whether medications are received in a timely manner. The Monitor needs to see data which supports timeliness which would be captured with medication variances. Provide documentation and analysis of data to ensure inmates are receiving psychotropic medications in a timely manner, especially upon admission to the facility. If there are delays in an inmate receiving medication, document and create a corrective action plan to address the deficiency. Ensure medications are being used to treat the diagnosis on record or there is clear justification in the record for the off-label use of a psychotropic medication.

***B.2.f. Ensure that psychotropic medications are administered in a clinically appropriate manner as to prevent misuse, overdose, theft, or violence related to medication.***

Finding:

Partial Compliance

The folder containing data to support compliance with this provision was empty. As stated in the previous provision and in prior reports, medication variances are not yet sufficiently captured to help determine whether psychotropic medications are administered in a clinically appropriate manner. Documentation of medication variances help ensure there is clinically appropriate administration of medication and allows staff to make corrections when needed. Variances include late administration of medication (nurses have one hour before and one hour after the set time for the medication to be given for administration to be timely), missed dose of medication, if a medication is



COMPLIANCE REPORT # 20                                                112

ordered and not received by the patient within 24 hours of the order, the use of numerous smaller dose(s) of pills to equal the prescribed amount when the prescribed amount is available in one pill (olanzapine 20mg is prescribed and rather than give olanzapine 20mg tablet, which is available, two 10mg tablets are given). Improper searches of inmates by security staff and not sending found medications to the correct staff for identification contribute to inmates having contraband including excess medication and medication which may not be prescribed to them.

Suggestion: Implement monitoring of medication variances at OJC and TMH and accurately report findings. Wexford and OPSO need to work cooperatively to ensure medication passes are aligned with policy and procedures in order to prevent misuse, overdose, theft, and violence related to medication. Proper and thorough searches of cells and persons must be conducted by OPSO to help curb the presence of contraband, including excess prescribed and unprescribed medications. Found medications must be sent to the proper personnel for identification to help curb misuse, overdose, theft and violence in the facility. Further analysis may be needed to analyze the finding of contraband, prescribed and nonprescribed medication, and what corrective plan to put in place to minimize the risks.

***B.2.g. Ensure that prescriptions for psychotropic medication are reviewed by a Qualified Mental Health Professional on a regular, timely basis and prisoners are properly monitored.***

Finding:

Substantial Compliance

Suggestion: The collected data was from June and July 2024 rather than the period in review. There appears to be compliance issues with monitoring A1c at baseline and within the past 90 days and monitoring other drug levels as indicated. Continue to provide documentation of data collection and analysis of psychotropic medication prescriptions, including the timeliness between when the prescription is written, and the first dose is received by the inmate. There also needs to be documentation if there is a disruption in providing psychotropic medications along with the source of the disruption. Refusals of medications also require proper clinical assessment which is part of adequate monitoring of inmates. This provision risks falling into partial compliance without proper documentation to support appropriate labs are being drawn and inmates are properly



monitored while on psychotropic medications. This provision risks falling into partial compliance if the concerns mentioned above are not addressed by the next site visit.

***B.2.h. Ensure that standards are established for the frequency of review and associated charting of psychotropic medication monitoring, including monitoring for metabolic effects of second-generation psychotropic medications.***

<u>Finding:</u>

Partial Compliance

<u>Suggestion:</u> Please see summary for B.2.g. This provision will be monitored with the new provider, Wexford, to determine whether there are improvements in the system to move towards substantial compliance. In January and March 2024, only 80% of patients received an adequate baseline workup.

<u>Findings:</u>

B.3.a.   Partial Compliance

B.3.b.   Substantial Compliance

***B.3.a. OPSO shall develop and implement policies and procedures for prisoner counseling in the areas of general mental health/therapy, sexual-abuse counseling, and alcohol and drug counseling. This should, at a minimum, include some provision for individual services.***
<u>Finding:</u>

Partial Compliance

As stated before, without knowing the denominator of who is being served at OPSO and the needs of that population, there is no way to know what services are needed and how may staff are needed to properly conduct those services. Due to staffing challenges, groups and individual sessions continue to be conducted inconsistently throughout the reporting period. While the provision does not require a confidential space be provided for treatment, adequate treatment requires confidentiality in order for there to be valid responses from inmates to inform necessary treatment. Cell side or on the tier interventions are not adequate mental health treatment. Development of the policies and procedures is not sufficient for substantial compliance without implementation which would include consistent availability of therapeutic services.

<u>Suggestion:</u> Determine the caseload and needs of the population at OPSO. Continue to track the availability of group and/or individual sessions which can be offered versus completed along with the number of inmates in need of services. Continue to track disruptions in service. The creation of dedicated space where confidential therapeutic



engagement can occur would be ideal in moving this provision towards substantial compliance. The Monitor looks forward to this being the case once Phase III is operational. Ensure the logbooks maintained by OPSO are accurate and completed as dictated by policy.

***B.3.b. Within 180 days of the Effective Date, and quarterly thereafter, report all prisoner counseling services to the Monitor, which should include:***
***1)   the number of prisoners who report having participated in general mental health/therapy counseling at OPP;***
***2)   the number of prisoners who report having participated in alcohol and drug counseling services at OPP;***
***3)   the number of prisoners who report having participated in sexual-abuse counseling at OPP; and***
***4)   the number of cases with an appropriately licensed practitioner and related one-on-one counseling at OPP.***

Finding:

Substantial Compliance

Suggestion: Determine the denominator and needs of the population at OPSO. This provision risks falling into partial compliance if Wexford is unaware of the number of inmates they are serving or the needs which the inmates have. With over 1,000 inmates at OPSO, many of whom have substance related issues, it is shocking there were only 81 in April 2024 and 62 in May 2024 who participated in substance abuse counseling. Continue to collect and analyze data concerning inmates in need of these services and create corrective action plans to address the deficits which may be present at OJC and TMH. As stated earlier, due to a lack of confidential engagements, the validity of responses from inmates is questionable and therefore the monitor is unsure whether the offered services are indeed adequate for the population. There was no data included for the period in review.

Findings:

B.4.a   Partial Compliance

B.4.b.   Substantial Compliance

B.4.c.   Substantial Compliance

B.4.d.   Partial Compliance

B.4.e.   Partial Compliance

B.4.f.   Substantial Compliance

B.4.g.   Substantial Compliance



*B.4.a. OPSO shall ensure that all staff who supervise prisoners have the adequate knowledge, skill, and ability to address the needs of prisoners at risk for suicide. Within 180 days of the Effective Date, OPSO shall review and revise its current suicide prevention training curriculum to include the following topics:*
*1) suicide prevention policies and procedures (as revised consistent with this Agreement);*
*2) analysis of facility environments and why they may contribute to suicidal behavior;*
*3) potential predisposing factors to suicide;*
*4) high-risk suicide periods;*
*5) warning signs and symptoms of suicidal behavior;*
*6) case studies of recent suicides and serious suicide attempts;*
*7) differentiating suicidal and self-injurious behavior; and*
*8) the proper use of emergency equipment.*

Finding:

Partial Compliance

The Monitor is still finding that deputies have yet to consistently utilize the Observation/Restraint Checklist and Worksheet which the MHTs use for suicide watch. It was observed again that MHTs were not accurately performing or documenting staggered 15-minute checks on the Observation/Restraint Checklist and Worksheet. Videos were watched and the same concerns from the prior reporting period were observed again. There are documented lapses in monitoring. Inmates are to be on constant observation, yet the Observation/Restraint Checklist and Worksheet shows 15-minute checks.  This monitor recommends Wexford keep a running list of all employees of OPSO and document when training is due, when it has been done and reason for pending status. Simply submitting a list of employees who have completed training is not sufficient to determine whether employees are up to date in this training. . Training should also include mock demonstrations regarding the proper response to a suicide attempt.

*B.4.b. Ensure that all correctional, medical, and mental health staff are trained on the suicide screening instrument and the medical intake tool.*

Finding:

Substantial Compliance

Suggestion: Continue to provide documentation that multi-disciplinary in-service training has been completed annually for all current correctional, medical, and mental health staff to include training on updated policies, procedures, and techniques. All incoming staff should be trained on the suicide screening instrument and medical intake tool during onboarding orientation. This monitor recommends Wexford keep a running list of ALL employees of OPSO, including Wexford employees, and document when training is due,



when it has been done and reason for pending status. Simply submitting a list of employees who have completed training is not sufficient to determine whether employees are up to date in this training. This list will be expected in the folder for the next review period.

***B.4.c. Ensure that multi-disciplinary in-service training is completed annually by correctional, medical, and mental health staff, to include training on updated policies, procedures, and techniques. The training will be reviewed and approved by the Monitor.***

Finding:

Substantial Compliance

Suggestion: Continue to provide documentation that multi-disciplinary in-service training has been completed annually for all current correctional, medical, and mental health staff, to include training on updated policies, procedures, and techniques. Training will need to address deficiencies in communication, especially between OPSO and Wexford clinicians, and documentation regarding de-escalation procedures, disciplinary process, and searches. Training should clearly delineate responsibilities of various staff member involvement, including during medication pass. Supervisory spot checks may be needed to ensure training is adequate and adhered to during various processes around OJC and TMH. This monitor recommends Wexford keep a running list of ALL employees of OPSO and document when training is due, when it has been done and reason for pending status. Simply submitting a list of employees who have completed training for a month is not sufficient to determine whether employees are up to date in this training. Part of training needs to include emphasis on communication between Wexford and OSPO along with identifying approved documentation which is to be used throughout the facility.

***B.4.d. Ensure that all staff are trained in observing prisoners on suicide watch and step-down units status.***

Finding:

Partial Compliance

There continues to be resistance from deputies in using the approved Observation/Restraint Checklist and Worksheet when assigned to suicide watch and now the refusal to conduct suicide watches in OJC. There continues to be concern with MHTs



inaccurately completing the Observation/Restraint Checklist and Worksheet, including video observation which were conducted during the most recent site visit. There continue to be watches performed from the control room/module adjacent to the housing unit, as documented on the worksheet, which is not clinically appropriate. The same issues reported in the prior report remain ongoing issues.

Suggestion: Continued training and supervisory observation, in person and via video access will be necessary to ensure performance of suicide watches and accurate completion of these documents. There is a corrective action plan being created to address the issues mentioned in this and previous reports around the issues of safety for inmates on suicide watch. This monitor will be looking for improvements in this system and achievement of benchmarks in the CAP to show movement towards substantial compliance.

**B.4.e. Ensure that all staff that have contact with prisoners are certified in cardiopulmonary resuscitation ("CPR").**

Finding:

Partial Compliance

The data submitted was solely for Wexford employees. The log for OPSO employees was not included in the SharePoint folder.

Suggestion: Continue to provide documentation that all current staff, including OPSO and Wexford, are certified in CPR. The goal is to have at least 90% of all staff at OPSO certified in CPR. As stated earlier, a list of ALL employees who come in contact with inmates should be created and a spreadsheet could help with organization to ensure everyone is up to date in all required trainings. . This information should be housed in one location (SharePoint Folder) and be ready prior to the next site visit.

**B.4.f. Ensure that an emergency response bag, which includes a first aid kit and emergency rescue tool, is in close proximity to all housing units. All staff that has contact with prisoners shall know the location of this emergency response bag and be trained to use its contents.**

Finding:

Substantial Compliance

The cut down tools were sharp and all but one deputy when asked was aware of how to



use the tool. The bags were sealed and easily located by the deputies.

Suggestion: Ensure the cut down tools are maintained and adequately sharpened, and new staff are trained in the proper use of the tool throughout the facility. Training should also include proper technique in breaking the seal on the bag that holds the cutdown tool. Ensure that staff are available in the control room in order to access the cut down tool, if necessary. Ensure every bag has all necessary requirements.

***B.4.g. Randomly test five percent of relevant staff on an annual basis to determine their knowledge of suicide prevention policies. The testing instrument and policies shall be approved by the Monitor. The results of these assessments shall be evaluated to determine the need for changes in training practices. The review and conclusions will be documented and provided to the Monitor.***

Finding:

Substantial Compliance

Suggestion: The data submitted showed 7 employees were tested regarding their knowledge of suicide prevention policies. This number seems very small to represent 5% of relevant staff. For the next review, once this monitor knows the number of relevant staff at OPSO, there should be 5% tested and the scores included in the folder. Consider including questions about the required use of the Observation/Restraint Checklist & Worksheet. There was one individual who scored 71% and two who scored 78% without any documentation in the folder as to how these low scores were addressed.

Findings:

B.5.a.   Partial Compliance

B.5.b.   Partial Compliance

B.5.c.   Partial Compliance

B.5.d.   Partial Compliance

B.5.e.   Partial Compliance

B.5.f.   Partial Compliance

B.5.g.   Substantial Compliance

B.5.h.   Partial Compliance

B.5.i.   Partial Compliance

B.5.j.   Substantial Compliance

B.5.k.   Partial Compliance

***B.5.a. OPSO shall implement a policy to ensure that prisoners at risk of self-harm are identified, protected, and treated in a manner consistent with the Constitution.***



Finding:

Partial Compliance

While various policies are in place to ensure inmates at risk of self-harm are identified, protected, and treated in a manner consistent with the Constitution, there remains the challenge of consistent implementation. Issues surrounding de-escalation, searches, and referrals remain. Without proper searches, inmates remain at risk of self-harm. Without proper medication administration, including adequate mouth checks, inmates remain at risk for self-harm. Without mental health being consulted prior to a use of force, inmates are at risk for harm. Without adequate staffing, consistent performance of duties and adequate supervision of line staff, inmates on suicide watch are not being adequately watched or protected, therefore increasing the risk of self-harm.

Suggestion: The same issues which were observed in the prior site visit continue to plague OPSO. Ensure staffing is sufficient to allow prescribed suicide watches to be conducted as necessary – all direct observations should be monitored directly, and staff should not have to choose whom to watch or where to watch from, i.e. module. Continue to offer a confidential space for the clinician designated to monitor inmates on suicide watch to conduct assessments. Continue to document any barriers to having access to confidential space. Ensure inmates are searched to prevent self-harm when placed on suicide watch. Implement medication administration policies, to include adequate mouth checks, to help prevent access of the inmate to medication to self-harm. Document consistent out of cell time for inmates on suicide watch. The CAP will be reviewed at the next site visit and any benchmarks which have be reached will be included in this report. Individuals on suicide watch need intensive treatment interventions including out of cell time, counseling, and therapy, as medically indicated. Document treatment interventions of inmates on suicide watch and any barriers present in not providing appropriate treatment. Document any inmate on suicide watch or in detox protocols who is found with contraband or misuse of supplies. The key will be implementing standing policies to ensure the safety of inmates and staff. It is also imperative there is timely supervisory review of suicide watches to ensure employees are following existing policies and be held accountable, up to disciplinary procedures, if policies are not adhered to.



***B.5.b. Ensure that suicide prevention procedures include provisions for constant direct supervision of current suicidal prisoners and close supervision of special needs prisoners with lower levels of risk, at a minimum, 15 minutes check. Correctional officers shall document their checks in a format that does not have pre-printed times.***

Finding:

Partial Compliance

Deputies are not using the prescribed Observation/Restraint Checklist and Worksheet consistently and have refused to conduct watches in the facility. QMHPs/MHTs are not accurately completing the document. While the document does not have pre-printed times, they are either not being used or being filled out improperly. On this visit, observations were again being conducted from modules due to lack of deputy presence on the pods. When there was a deputy, the MHTs were not present at times, but filled out documentation as if they were.

Suggestion: See comments in B.4.d. Submit documentation for suicide watches in IPC. Ensure deputies are instructed to properly complete the observation checklist for the times they are responsible for suicide watch. There needs to be consistent supervisory review to ensure employees are adhering to existing policies and disciplinary actions taken if policies are not followed.

***B.5.c. Ensure that prisoners on suicide watch are immediately searched and monitored with consistent direct supervision until a Qualified Mental Health Care Professional conducts a suicide risk assessment, determines the degree of risk, and specifies the appropriate degree of supervision.***

Finding:

Partial Compliance

There continue to be challenges with immediate and adequate searches of inmates who are placed on suicide watch. In October 2023, 14/25 (56%) prisoners were not searched. In November 2023, 11/17 (65%) prisoners were not searched. In December 2023, 9/24 (38%) prisoners were not searched. In January 2024, 14/21 (67%) prisoners were not searched. In February 2024, 11/17 (65%) prisoners were not searched. In March 2024, 12/27 (44%) prisoners were not searched. Of the code whites called, only a select number after clinical assessment were placed on suicide watch. In January, February and March 2024, there was additional data collected for the prisoners placed on suicide watch and the percentage of those which were searched. In January 2024, 14 of the 21 patients



were placed on suicide watch and of the 14, only 4 (29%) were searched. In February 2024, 16 of the 17 prisoners were placed on suicide watch and only 4 (24%) were searched. In March 2024, 20 of the 27 prisoners were placed on suicide watch and only 8 (40%) were searched.

<u>Suggestion:</u> Inmates need to be immediately searched or as soon as safely possible 100% of the time. The threshold for compliance being used is 90%. Ideally, but not required and understandably not always feasible, a mental health professional should be present for searches to help with de-escalation and provide a therapeutic environment. Deputies conducting direct observation need to be documenting their watches on the Observation/Restraint Checklist and Worksheet, until a QMHP conducts a suicide risk assessment, determines the degree of risk, and specifies the appropriate degree of supervision. Written procedures for searches should be a part of training so each staff member is clear of their responsibilities. Cells should be searched prior to placement of an inmate on suicide watch and documented. Once identified by a MHP or MHT, contraband needs immediate removal from the vulnerable inmate to prevent self-harm. Collaboration and proactive communication are necessary between OPSO deputies and mental health staff to meet the requirements of this provision.

***B.5.d. Ensure that prisoners discharged from suicide precautions receive a follow-up assessment within three to eight working days after discharge, as clinically appropriate, in accordance with a treatment plan developed by a Qualified Mental Health Care Professional. Upon discharge, the Qualified Mental Health Care Professional shall conduct a documented in-person assessment regarding the clinically appropriate follow-up intervals.***

<u>Finding:</u>

Partial Compliance

The data submitted had the following data points, which reflects that patients were scheduled to be seen several times, at regular intervals, following discharge from suicide watch:

October 2023: 81% of patients received a follow up visit in 24 hours

75% of patients received a follow up visit in 48 hours

71% of patients received a follow up visit in 72 hours

63% of patients received a follow up visit in 7 days

77% of patients had a documented safety plan

November 2023: 82% of patients has a follow up visit in 24 hours, 48 hours and



72 hours

    65% of patients had a follow up visit in 7 days

    No safety plans were listed as documented

December 2023: 88% of patients received a follow up visit in 24 hours

    91% of patients received a follow up visit in 48 hours and 72 hours

    88% of patients received a follow up visit in 7 days

    91% of patients had a documented safety plan

January 2024: 76% of patients had a follow up visit in 24 hours

    79% of patients had a follow up visit in 48 hours

    76% of patients had a follow up visit in 72 hours

    68% of patients had a follow up visit in in 7 days

    76% of patients had a documented safety plan

February 2024: 86% of patients had a follow up visit in 24 hours

    93% of patients had a follow up visit in 48 hours and 72 hours

    86% of patients had a follow up visit in 7 days

    93% of patients had a documented safety plan

March 2024: 89% of patients had a follow up visit in 24 hours

    76% of patients had a follow up visit in 48 hours

    79% of patients had a follow up visit in 72 hours and at 7 days

    87% of patients had a documented safety plan

The safety plans will be reviewed at the next site visit. The data points were not discussed to determine compliance but based on the submitted numbers, only during the months of December 2023 and February 2024 did the compliance threshold of 90% get achieved for suicide follow up. This will be further reviewed at the next site visit to determine whether OPSO/Wexford is able to return to substantial compliance with this provision.

<u>Suggestion:</u> While this provision has been downgraded to partial compliance, there is still important work being done to ensure adequate follow-up for patients who have been placed on suicide watch. Suicide ideation/attempt can be emotional and the need for follow-up is necessary. Just as suicide assessments are conducted in a confidential space, suicide follow-up assessments require the same degree of care. A cell side visit for suicide follow up is not adequate or clinically appropriate treatment. Continue to document if



there are access issues to inmates. Document any barrier to having a confidential space to complete these post-suicide watch assessments. Continue to monitor and document follow-up appointments and ensure they are conducted as policy dictates.

***B.5.e. Implement a step-down program providing clinically appropriate transitions for prisoners discharged from suicide precautions.***

Finding:

Partial Compliance

Simply having a document which outlines a step-down program is insufficient for substantial compliance without implementing a clinically appropriate, consistently run program. In review of the step-down program handout, it is proposed to occur on 2B for males and 3E for females. It includes individual and group counseling services, recreational and music therapy, medication education and addresses discharge resources. In July 2024, during the site visit, this Monitor again observed no deputy assigned to the unit on the days of the Monitor's visit and therefore there could not be any programming conducted on the unit. During this site visit, review of the programming documentation shows numerous disruptions of service which demonstrates lack of consistency in programming on units. Consistent implementation is just as important as having the program. While the program is described as providing an individualized care approach to meet the needs of the patients who may require assistance transitioning from intensive acute treatment to general population, there appears to be general treatment offered, when a deputy is available, in a group setting rather than individualized treatment or focused groups based on the needs of the population. As stated earlier, while the provision does not expressly dictate there be a confidential space dedicated to the step-down program, confidentiality is key in providing adequate clinical care for this population. It is difficult to provide adequate stepdown programming for women who share a housing unit with other classifications – general population and restrictive housing status.

Suggestion: Consistent implementation of the step-down program is necessary. The introduction of medication education (which is number 6 on the list of offerings for this program), even in a group setting, is imperative for this population. Ensure the multi-disciplinary treatment plans include individualized treatment for inmates which is



reflected in the programming being offered in the step-down program. The progress notes should reflect the treatment being given in the program in line with the prescribed interventions in the treatment plan. Continue to document interruptions in service for this unit and any barriers in consistent programming.

***B.5.f. Develop and implement policies and procedures for suicide precautions that set forth the conditions of the watch, incorporating a requirement of an individualized clinical determination of allowable clothing, property, and utensils. These conditions shall be altered only on the written instruction of a Qualified Mental Health Care Professional, except under emergency circumstances or when security considerations require.***

<u>Finding:</u>

Partial Compliance

One hundred percent (100%) of inmates are not searched properly prior to being placed on suicide watch. The compliance threshold this monitor uses for substantial compliance is 90%. In fact, the highest percentage of searches was 62% of inmates placed on suicide watch in December 2023. This provision calls for individualized determination of allowable property. It appears the system is an all or none mentality as to what an individual can have on suicide watch. The restrictions need to be clinically driven and properly documented to address the presented risk. There continues to be delay in removing contraband property from cells once brought to the attention of the deputies. The Monitor will also review Wexford's policy at the next site visit to ensure staff is meeting expectations.

<u>Suggestion:</u> Document all searches, including whether it occurs prior to or after being placed on suicide watch. Provide documentation of individualized determinations of the conditions for watch for male and female inmates at OJC and at TMH. This should include all inmates who are in non-suicide resistant cells and are therefore on direct observation. Provide policy, procedure, and documentation about suicide watches in IPC. Once the documents are provided, implementation must also be monitored closely and employees held accountable for failing to adhere to existing policy. Once restricted property is identified, it should be removed immediately so as to prevent self-harm. Include Wexford policy in the folder for the next site visit.

***B.5.g. Ensure that cells designated by OPSO for housing suicidal prisoners are retrofitted to render them suicide-resistant (e.g., eliminating bed frames/holes, sprinkler heads, water faucet lips, and unshielded lighting or electrical sockets).***



Finding:

Substantial Compliance

All the designated cells by OPSO have been retrofitted to render them suicide-resistant (9 cells on 2A, 2 cells on 3C, 2 cells on 2C, 2 cells on 3E). The toilets have been installed and the cells have been updated. There are still inmates at risk for self-harm being housed in non-suicide resistant cells.

Suggestion: Continue direct observation of individuals who are housed in non-suicide resistant cells while on suicide watch to best provide for their safety. Consider retrofitting all the cells on the first floor in 2A into suicide-resistant cells. There needs to be priority given to placing screening around the mezzanine and stairwells in 2A to prevent inmates from jumping. Inmates on suicide watch should not be allowed up on the mezzanine level.

***B.5.h. Ensure that every suicide or serious suicide attempt is investigated by appropriate mental health and correctional staff, and that the results of the investigation are provided to the Sheriff, and the Monitor.***

Finding:

Partial Compliance

Suicide and suicide attempts continue to be investigated in silos and there appears to be limitations in what information is shared. There needs to be more collaboration between OPSO and the mental health provider in investigations and a communal response to making systemic changes. There was no data submitted for the period in review. The MAC meeting minutes from June 2024 was included. Will need to review Wexford's compliance and communication with OPSO for the next site visit.

Suggestion: There needs to be intentional collaboration and systemic changes produced from investigations by OPSO and the mental health provider concerning suicides and serious suicide attempts at the facility. To reiterate, there is no expectation that there will never be a suicide or suicide attempt in the correctional facility, but when they occur, they require more intentional and self-critical analysis of the event by both OPSO and the mental health provider (Wexford). Psychological autopsies should help in identifying systemic deficits which will help inform systemic changes throughout the system. Simply discussing these events at a meeting is not sufficient without real analysis and productive change being the product, including enforcing current policies like alerting mental health to help with de-escalation. Provide a COLLABORATIVE self-critical analysis to the Sheriff



and Monitor which demonstrates a thorough understanding and investigation of these critical events.

***B.5.i. Direct observation orders for inmates placed on suicide watch shall be individualized by the ordering clinician based upon the clinical needs of each inmate and shall not be more restrictive than is deemed necessary by the ordering clinician to ensure the safety and well-being of the inmate.***

Finding:

Partial Compliance

The lack of staff at OJC limits the ability of staff to provide direct observation for inmates. There was documentation seen where direct observations were conducted from the module due to lack of security presence. This is not direct observation. There was no data in the folder to support improved compliance with this provision.

Suggestion: The Monitor continues to recommend that inmates in IPC, who are placed on suicide watch and have yet to be assessed by an QMHP, should be on direct observation. Continue to submit suicide watch audits with the location of the watch embedded in the report. Include random direct observation documentation in the folder along with orders for restriction which includes clinical rationale.

***B.5.j. Provide the Monitor with periodic report on suicide and self-harm at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. The report will include the following:***
***1) all suicides;***
***2) all serious suicide or self-harm attempts; and***
***3) all uses of restraints to respond to or prevent a suicide attempt.***

Finding:

Substantial Compliance

Suggestion: There was no report submitted to be reviewed for the review period. Without this report in the next review period, this provision risks being downgraded into downgraded to non-compliance for the next review as the only requirement of this provision is to provide a collaborative report from OPSO and Wexford regarding suicides and attempts at OPSO There should be no discrepancies in the recording of this information between OPSO and Wexford, which emphasizes the need for open and transparent communication. Continue to provide this report every six months. If there is a discrepancy in the numbers collected by OPSO versus Wexford, include the reason for the differences in the report. If the discrepancies continue without explanation, this provision risks being downgraded to partial compliance.



***B.5.k. Assess the periodic report to determine whether prisoners are being appropriately identified for risk of self-harm, protected, and treated. Based on this assessment, OPSO shall document recommended changes to policies and procedures and provide these to the Monitor.***

<u>Finding:</u>

Partial Compliance

There remain challenges in OPSO documenting changes to policies and procedures based on analysis of risk at the Facility. There remain issues with adequate searches of inmates having access to contraband with no changes being offered to rectify the problem. The report needs to address the CAPs which may need to be put in place to better identify and rectify the gaps in the current procedures. The only documentation in the folder was an outline of the proposed groups being offered throughout the facility.

<u>Suggestion:</u> Provide updated procedures to the Monitor to address outstanding issues with implementation of ensuring risk challenges are adequately addressed. This provision will also require adequate treatment plan creation, as this would address risk of self-harm and the protective measures in place, to ensure all individuals who engage with the inmate are adequately knowledgeable about the needs of the patient.

<u>Findings:</u>

B.6.a.   Partial Compliance

B.6.b.   Substantial Compliance

B.6.c.   Substantial Compliance

B.6.d.   Substantial Compliance

B.6.e.   Substantial Compliance

B.6.f.    Substantial Compliance

B.6.g.   Substantial Compliance

***B.6.a. OPSO shall prevent the unnecessary or excessive use of physical or chemical restraints on prisoners with mental illness.***

<u>Finding:</u>

Partial Compliance

OPSO is not consistently and proactively contacting mental health prior to the use of force or needing to implement de-escalation in the Facility. With access to incident reports, Wexford will have more information regarding incidents in the facility and be able to help introduce and recommend strategies to prevent the unnecessary use of physical or



chemical restraints on an inmate. Additionally, OPSO has developed a plan to alert mental health, via radio, of all use of force at OJC. This plan's implementation will be reviewed, and documentation should be provided at the next site visit. The use of a taser or chemical spray to, even momentarily, subdue an inmate is considered a form of restraint. Having access to the incident reports does not negate the need for better communication and seeking assistance from mental health prior to the use of restraints on an inmate by OPSO.

Suggestion: Provide documentation of policies in use for planned de-escalation and use of force. Provide documentation to support consistent implementation of the policy and procedures in place to ensure mental health is contacted prior to the use of force, when reasonably safe. OPSO needs to generate a report for the Monitor documenting all uses of physical and chemical restraints throughout the Facility along with attempts to contact mental health and whether the restraint was planned. This was again requested at the most recent site visit and will be requested again in December 2024, if not produced. Create and submit to the Monitor documentation to determine how many instances of use-of-force incidents occurred over the year prior to the next site visit where mental health was not contacted prior to exercising the use-of-force.

***B.6.b. Maintain comprehensive policies and procedures for the use of restraints for prisoners with mental illness consistent with the Constitution.***

Finding:

Substantial Compliance

***B.6.c. Ensure that approval by a Qualified Medical or Mental Health Professional is received and documented prior to the use of restraints on prisoners living with mental illness or requiring suicide precautions.***

Finding:

Substantial Compliance

***B.6.d. Ensure that restrained prisoners with mental illness are monitored at least every 15 minutes by Custody Staff to assess their physical condition.***

Finding:

Substantial Compliance

***B.6.e. Ensure that Qualified Medical or Mental Health Staff document the use of restraints, including the basis for and duration of the use of restraints and the performance and results of welfare checks on***



*restrained prisoners.*

<u>Finding:</u>

Substantial Compliance

***B.6.f. Provide the Monitor a periodic report of restraint use at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. Each report shall include:***
   ***1)    A list of prisoners whom were restrained;***
   ***2)    A list of any self-injurious behavior observed or discovered while restrained; and***
   ***3)    A list of any prisoners whom were placed in restraints on three or more occasions in a thirty (30) day period or whom were kept in restraints for a period exceeding twenty-four (24) hours.***

<u>Finding:</u>

Substantial Compliance – there was no report in the folder to review. This will need to be

corrected, and a report submitted for the next review period in December 2024.

***B.6.g. Assess the periodic report to determine whether restraints are being used appropriately on prisoners with mental illness. Based on this assessment, OPSO shall document recommended changes to policies and procedures and provide these to the Monitor.***
<u>Finding:</u>

Substantial Compliance

<u>Findings:</u>

B.7.a.   Partial Compliance

B.7.b.   Partial Compliance

B.7.c.   Partial Compliance

B.7.d.   Non-Compliance

***B.7.a. OPSO shall ensure that all staff who supervise prisoners have the knowledge, skills, and abilities to identify and respond to detoxifying prisoners. Within 180 days of the Effective Date, OPSO shall institute an annual in-service detoxification training program for Qualified Medical and Mental Health Staff and for correctional staff. The detoxification training program shall include:***
   ***1)    annual staff training on alcohol and drug abuse withdrawal.***
   ***2)    training of Qualified Medical and Mental Health Staff on treatment of alcohol and drug abuse conducted by the Chief Medical Officer or his or her delegate.***
   ***3)    oversight of the training of correctional staff, including booking and housing unit officers, on the policies and procedures of the detoxification unit, by the Chief Medical Officer or his or her delegate.***
   ***4)    training on drug and alcohol withdrawal by Qualified Medical and Mental Health Staff.***
   ***5)    training of Qualified Medical and Mental Health Staff in providing prisoners with timely access to a Qualified Mental Health Professional, including psychiatrists, as clinically appropriate; and***
   ***6)    training of Qualified Medical and Mental Health Staff on the use and treatment of withdrawals, where medically appropriate.***



Finding:

Partial Compliance

Upon review of the alcohol withdrawal training materials, there are improvements in the training materials. However, further clarity would improve these materials. For example, on page 13, it states that the provider should be contacted when the patient is experiencing withdrawal symptoms while "still intoxicated." One cannot be both intoxicated and withdrawing at the same time. This confusing statement appears again on Slide 35 that "patients experiencing withdrawal symptoms while still intoxicated are at a high risk for severe withdrawal." An elevated alcohol concentration may not mean the individual is "intoxicated" or "drunk". In fact, that individual could have an elevated alcohol level and still be suffering from alcohol withdrawal. In general, this teaching module is improved.

The opioid withdrawal training for correctional officers is an improvement. Because of the critical importance of training in preventing morbidity (illness) and mortality (death), B .7. 1, parts 1, 2,3, 4, 5, 6, will be closely monitored and emphasized in the expectation that such focus will result in better patient care.

Although this monitoring report refers to the time period of October 2023 to March 2024, a period of time where the previous health care company provided services, the improved training materials and the energy of the new head of training is noted and encouraged to bring section B. 7. 1. to substantial compliance.

Teaching materials instruct that a nurse SHOULD NOT give any prescription detox medications without getting a written or verbal order from the provider. The instruction on page 38 that "patients actively seizing because of alcohol withdrawal should be treated immediately with benzodiazepines and should be considered for transfer to a hospital setting." This should be more dogmatic, any patient with an altered mental status thought to be due to alcohol withdrawal must be transferred to the hospital by calling 911 to activate EMS. Adherence to these policies is critical to a safe and effective detoxification program and monitoring will be intensive.

***B.7.b. Provide medical screenings to determine the degree of risk for potentially life-threatening withdrawal from alcohol, benzodiazepines, and other substances, in accordance with Appendix B.***
Finding:

Partial Compliance



The intake medical history and receiving screening form is an improvement. Some patients continued to wait more than 8 hours for the monitoring period from October 2023 to March 2024. Most important is the recognition and correction of any procedures or impediments to the timely screening of patients. If this is overcrowding and the numbers of people requiring screening, more practitioners should be assigned to this area to complete the task. Additionally, the screening should be performed with auditory privacy, an ongoing criticism for many years. This must be remedied as no individual can be expected to divulge private and sensitive information regarding substance use in the current physical setting that does not allow for auditory privacy. Until screening is private, medical screenings will not reliably determine the degree of risk for life threatening withdrawal from opiates or alcohol and therefore this provision cannot be substantially compliant.

***B.7.c. Ensure that the nursing staff complete assessments of prisoners in detoxification on an individualized schedule, ordered by a Qualified Medical or Mental Health Professional, as clinically appropriate, to include observations and vital signs, including blood pressure.***
Finding:

Partial Compliance

Vital signs were not consistently recorded in the medical records. It is the expectation of the monitors that vital signs and observations of the mental state of patients on the withdrawal protocols will be documented in the medical record. The documentation of the mental status and the appearance of patients on the detoxification protocols are particularly important for those patients refusing vital signs. The face-to-face interaction of the patient on the detoxification protocol is critical to assure that the patient is stable and not worsening. Nothing short of this fundamental nursing practice should be acceptable to the nursing leadership or to Wexford. The CIWAS -AR Score Sheet for alcohol and or benzodiazepine withdrawal is submitted to the Sharepoint for review by the Monitors. It is recommended that there be a stamp or number associated with the signature of the nurse and the provider. Ideally, this form should be completed electronically and the identity of the nurse, the time of the exam, should be apparent and searchable.

Suggestion: Submit the documentation to demonstrate that nursing staff are consistently completing assessments of inmates in detoxification on an individual schedule to include vital signs and observations.



***B.7.d. Annually, conduct a review of whether the detoxification training program has been effective in identifying concerns regarding policy, training, or the proper identification of and response to detoxifying prisoners. OPSO will document this review and provide its conclusions to the Monitor.***
<u>Finding:</u>

Non-Compliance

During the monitoring period, the result of the post training testing demonstrated that the training is inadequate. The new medical provider must provide meaningful and medically accurate education to custody personnel and to medical and mental health professionals. At the time of this review, there is no documentation in the Sharepoint under the consent decree provision B.7.d.; therefore, this provision is in non-compliance.

<u>Finding:</u>

Substantial Compliance – see comments on B. 6. f.

<u>Findings:</u>

B. 8. a. Partial Compliance

B .8. b. Partial Compliance

***B.8.a. OPSO shall ensure that medical and mental health staffing is sufficient to provide adequate care for prisoners' serious medical and mental health needs, fulfill constitutional mandates and the terms of this Agreement, and allow for the adequate operation of the Facility, consistent with constitutional mandates.***
<u>Findings:</u>

Partial Compliance

There continue to be challenges in securing and retaining adequate numbers of staff, including medical and mental health staff, to provide adequate care for inmates' serious medical and mental health needs. For example, there are insufficient staff to create and complete a multi-disciplinary treatment plan in the outpatient setting where all members of the treatment team are physically present with the inmate. Until there is a denominator which reflects the caseload of the facility and how many individuals need service, there is no way to determine what would constitute sufficient medical and mental health staff to provide constitutionally adequate care for the inmates.

<u>Suggestion:</u> There needs to be adequate funding set aside to hire staff and ensure there is adequate, constitutionally mandated treatment throughout the entire facility, including facilitating consistent groups. The mental health provider needs to ensure an adequate ask for necessary staff to conduct all required services throughout OJC/TMH/TDC. This includes dedicated psychiatrist(s) for the outpatient (OJC) treatment program who would



COMPLIANCE REPORT # 20                                                      133

be available for much needed treatment planning. This includes having adequate staff to conduct safety/suicide watches, especially while non-suicide resistant cells are still in use.  Ensure the MAT program is properly staffed for the number of patients being served. The first thing to determine is how many patients are on the caseload, the needs and then staffing levels can be addressed.

**B.8.b. Within 90 days of the Effective Date, OPSO shall conduct a comprehensive staffing plan and/or analysis to determine the medical and mental health staffing levels necessary to provide adequate care for prisoners' mental health needs and carry out the requirements of this Agreement. Upon completion of the staffing plan and/or analysis, OPSO shall provide its findings to the Monitor, SPLC, and DOJ for review. The Monitor, SPLC, and DOJ will have 60 days to raise any objections and recommend revisions to the staffing plan.**

Finding:

Partial Compliance

There is no updated comprehensive staffing plan/analysis done to keep this provision in Substantial compliance. Wexford was unsure of the numbers on their caseload. Therefore, it is impossible to know the medical and mental health staffing needs for the facility. The recently created CAPs should help address some of these issues and give clearer direction as to the staffing needs to address the numerous provisions in partial compliance, especially those where staffing plays a contributing factor.

Findings:

B.9.a.   Partial Compliance

B.9.b.   Partial Compliance

B.9.c.   Partial Compliance

B.9.d.   Partial Compliance

B.9.e.   Partial Compliance

B.9.f.   Partial Compliance

**B.9.a. OPSO shall develop, implement, and maintain a system to ensure that trends and incidents involving avoidable suicides and self-injurious behavior are identified and corrected in a timely manner. Within 90 days of the Effective Date, OPSO shall develop and implement a risk management system that identifies levels of risk for suicide and self-injurious behavior and requires intervention at the individual and system levels to prevent or minimize harm to prisoners, based on the triggers and thresholds set forth in Appendix B.**

Finding:

Partial Compliance

There continues to be use of non-suicide resistant cells at OJC for inmates at high risk of self-harm without proper direct observation in place. There continues to be deviation from the policy when the document prescribed for suicide watch is not utilized. There has



been no documented collaboration with Wellpath, in the prior reporting period, by OPSO to implement and maintain a system to ensure trends and incidents involving avoidable suicides and self-injurious behavior are identified and corrected in a timely manner. Identification of contraband is not immediately addressed which increases the risk of self-harm in the facility. Inadequate searches of inmates present risk factors which increases the risk of self-harm. The newly created CAPs should help address the outstanding issues for this provision.

<u>Suggestion:</u> Continue analyzing the trends and incidents involving avoidable suicides and self-injurious behaviors to determine required interventions, like CAPs for adequate searches and removal of contraband, at the individual and system levels to prevent or minimize harm to inmates, especially inmates with repeated suicidal or self-harming behaviors. Ensure that any inmate who is not in a suicide resistant cell, especially in IPC, is under Direct Observation and that Observation Worksheets are accurately completed. Document and demonstrate the collaborative efforts between OPSO and Wexford to maintain a safe system.

***B.9.b. The risk management system shall include the following processes to supplement the mental health screening and assessment processes: incident reporting, data collection, and data aggregation to capture sufficient information to formulate a reliable risk assessment at the individual and system levels; identification of at-risk prisoners in need of clinical treatment or assessment by the Interdisciplinary Team or the Mental Health Committee; and development and implementation of interventions that minimize and prevent harm in response to identified patterns and trends.***

<u>Finding:</u>

Partial Compliance

Without collaboration between OPSO and Wexford, there can be no adequate risk management system in place for the facility. Both parties are necessary to submit and capture data which is analyzed in order to formulate a risk assessment to minimize harm. Simply having a meeting where one side offers information is not collaboration. These meetings should be where information is shared after collaborating and having a joint mission moving forward. There continues to be no functional Interdisciplinary Treatment Team operating consistently in general population to address formulating a reliable risk assessment. There is limited to no mental health involvement prior to the implementation of the disciplinary process. Segregation is known as a risk factor which negatively interferes with inmates with mental health challenges. Further analysis is



needed to ensure processes are in place to address individual and systemic risk levels, especially surrounding risks involved with segregation.

Suggestion: Analyze and provide COLLABORATIVE documentation of risk management system processes, including listed criteria, which minimize and prevent harm in response to identified patterns and trends. This examination should include the need for functioning interdisciplinary treatment teams throughout the Facility who are focused on treatment strategies to minimize risk including adequate out-of-cell time and participation in the disciplinary process at the outset where a written recommendation can be completed and used to determine appropriate action. All parties have a part to play in decreasing risks and there should be intentional efforts to ensure that collaboration is happening and not just having one side sharing information at a monthly meeting. The newly created CAP should assist with improving the continued deficiencies with this provision reaching substantial compliance.

***B.9.c. OPSO shall develop and implement an Interdisciplinary Team, which utilizes intake screening, health assessment, and triggering event information for formulating treatment plans. The Interdisciplinary Team shall:***

  ***1.  include the Medical and Nursing directors, one or more members of the psychiatry staff, counseling staff, social services staff, and security staff, and other members as clinical circumstances dictate;***

  ***2.  conduct interdisciplinary treatment rounds, on a weekly basis, during which targeted patients are reviewed based upon screening and assessment factors, as well as triggering events; and***

  ***3.  provide individualized treatment plans based, in part, on screening and assessment factors, to all mental health patients seen by various providers.***

Finding:

Partial Compliance

There continues to be no consistent, functional multidisciplinary teams operating in person at OJC. It continues to be the expectation that all inmates on the behavioral health caseload have a multidisciplinary treatment plan. The treatment plans generated from TMH are adequate to address the needs of the patient. For March 2024, on 2A, 14/15 (93%) multidisciplinary treatment had NOT been updated within the past 30 days. 11/15 (63%) did not contain sufficient initial clinical evaluation, have appropriateness for the individual patient or have the patient's diagnosis on the treatment plan. On 2b, 7/15 (47%) did not contain sufficient initial clinical evaluation, have appropriateness for the individual patient or have the patient's diagnosis on the treatment plan. As on 2A, 93% (14/15) of the treatment plans on 2B were NOT updated within the past 30 days. On



3E/F, 100% (15/15) of the treatment plans had NOT been updated in the past 30 days. 10/15 (66%) contained insufficient initial clinical evaluation, did not have appropriateness for the individual patient nor have the patient's diagnosis on the treatment plan.

Suggestion: Continue to generate and complete treatment plans in TMH. Create a plan/template for how treatment plans will be conducted and completed, including time frame, with a multidisciplinary team in all areas outside of TMH. Continue to work on the staffing plans and staffing needs in order to have multidisciplinary treatment team meetings throughout the facility. Follow the prescribed policy and include all that is necessary for a completed treatment plan.

*B.9.d. OPSO shall develop and implement a Mental Health Review Committee that will, on a monthly basis, review mental health statistics including, but not limited to, risk management triggers and trends at both the individual and system levels. The Mental Health Review Committee shall:*
*1. include Medical and Nursing Director, one or more members of the psychiatry staff and social services staff, the Health Services Administrator, the Warden of the Facility housing the Acute Psychiatric Unit, and the Risk Manage;*
*2.identify at-risk patients in need of mental health case management who may require intervention from and referral to the Interdisciplinary Team, the OPSO administration, or other providers;*
*3.conduct department-wide analyses and validation of both the mental health and self-harm screening and assessment processes and tools, review the quality of screenings and assessments and the timeliness and appropriateness of care provided, and make recommendations on changes and corrective actions;*
*4.analyze individual and aggregate mental health data and identify trends and triggers that indicate risk of harm;*
*5.review data on mental health appointments, including the number of appointments and wait times before care is received;*
*6.review policies, training, and staffing and recommend changes, supplemental training, or corrective actions.*

Finding:

Partial Compliance

Until there is a functioning Interdisciplinary Treatment Team assigned to OJC, there will be limitations in being able to adequately address at-risk patients in need of mental health case management who may need referral from the Mental Health Review Committee. Until there is timely follow up for treatment plans, based on the clinical schedule, limitations will continue in adequately addressing treatment needs. There also needs to be more collaboration between OPSO and Wexford for this provision to move into substantial compliance. The bulk of the work cannot be done by one party and presented to the other party but both parties need to be working together from the outset to help minimize risk and review the delivery of services by the system.



<u>Suggestion:</u> Create and implement an Interdisciplinary Treatment Team for OJC. Ensure treatment plans are done as per policy throughout the entire facility including 2A/2B/3E. TDC also has individuals in need of mental health treatment and should have treatment plans directing their care. Provide documentation of Mental Health Review Committee meetings, where COLLABORATION is taking place in both organizing and documenting findings, addressing all listed elements, including analysis of all data collected. This data should address and track systemic concerns as well.

*B.9.e. OPSO shall develop and implement a Quality Improvement and Morbidity and Mortality Review Committee that will review, on at least a quarterly basis, risk management triggers and trends and quality improvement reports in order to improve care on a Jail-wide basis.*
*1.The Quality Improvement Committee shall include the Medical Director, the Director of Psychiatry, the Chief Deputy, the Risk Manager, and the Director of Training.*
*2.The Quality Improvement Committee shall review and analyze activities and conclusions of the Mental Health Review Committee and pursue Jail-wide corrective actions. The Quality Improvement Committee shall:*
*a. monitor all risk management activities of the facilities through the review of risk data, identification of investigation or corrective action; and*
*b. generate reports of risk data analyzed and corrective actions taken.*

<u>Finding:</u>

Partial Compliance

This provision again requires collaboration between OPSO and Wexford to achieve substantial compliance. While the creation of the MAC meeting is a step in the right direction, a requirement is implementation of a quality improvement process where risk management triggers and trends are reviewed throughout the entire system and both parties work together to improve care at the facility. The monitor is looking for OPSO input into joint meetings and a work product that shows how both parties are working together to establish a safer facility.

<u>Suggestion:</u> Jail-wide corrective actions plans have been created and the hope is it is foster collaborative efforts between OPSO and Wexford for all risk management activities to be properly monitored. COLLABORATION is a key component of this provision as it focuses on jail-wide CAPs. Provide documentation to support implementation of collaborative corrective action plans for areas which have been identified for improvement like alerting mental health to planned use of force, access to care challenges, medication refusal, timely access to laboratory services after inmate refusal, the grievance process and chronic medical care access. Provide documentation of attendance and addressed topics for the quarterly meetings along with proposed action items which will be pursued on a



COLLABORATIVE basis. Demonstrate how collected and analyzed data is being used to effect positive change throughout the system.

*B.9.f. OPSO shall review mortality and morbidity reports quarterly to determine whether the risk management system is ensuring compliance with the terms of this Agreement. OSPO shall make recommendations regarding the risk management system or other necessary changes in policy based on this review. The review and recommendations will be documented and provided to the Monitor.*

Finding:

Non-Compliance

The monitor has yet to receive any report from OPSO addressing the risk management system or making recommendations for necessary changes. The only thing submitted was a spreadsheet with two names from suicide attempts in January 2024 and February 2024. The jump in January 2024 was from the second tier, yet there have been no recommended changes to address this continued risk. The Monitor expects a joint analysis with clear OPSO contributions at the next site visit regarding mortality and morbidity.

Suggestion: Provide OPSO recommendations regarding the risk management system. This recommendation should be reviewed by Wexford and there should be a collaborative effort in correcting identified areas of concern. Submit all information to demonstrate changes which have been made to address identified risk management issues throughout the jail facility. Provide the most recent report from OPSO to determine whether there is compliance with the terms of this Agreement. Provide corrective actions plans which have been created and implemented over the year along with effectiveness of the proposed changes. If there are gaps or effectiveness is determined to be minimal, submit updated CAPs to address this.

## C.    Medical Care

*C. OPSO shall ensure constitutionally adequate treatment of prisoners' medical needs. OPSO shall prevent unnecessary risks to prisoners and ensure proper medication administration practices. OPSO shall assess on an annual or more frequent basis whether the medical services at OPP comply with the Constitution. At a minimum, OPSO shall:*
*1. Quality Managing of Medication Administration:*
*a. Within 120 days of the Effective Date, ensure that medical and mental health staff are trained on proper medication administration practices, including appropriately labeling containers and contemporaneously recording medication administration.*
*b. Ensure that physicians provide a systematic review of the use of medication to ensure that each prisoner's prescribed regimen continues to be appropriate and effective for his or her condition.*
*c. Maintain medication administration protocols that provide adequate direction on how to take medications, describe the names of the medications, how frequently to take medications,*



*and identify how prisoners taking such medications are monitored; an*
*d. Maintain medication administration protocols that prevent misuse, overdose, theft, or violence related to medication.*

C. 1. a. Partial Compliance

C. 1. b. Partial Compliance

C. 1. c. Substantial Compliance

C. 1. d. Partial Compliance

**Overview:**

I.   Wexford Health Sources began providing services after the period of review covered in this monitor's report (October 2023 to March 2024).  The monitors visited the jail from July 23-26, 2024.  The representatives from the corporate office were helpful during the site visit and there was a spirit of cooperation.

   A.   On the date of our visit, there were 126 nursing sick calls outstanding, 166 provider visits outstanding and 217 patients waiting to see the dentist. This illustrates serious problems with the timeliness of health care for these patients. Approximately 30% of patient grievances concerning health care are due to delays in scheduled provider visits. Another 30% are grieving that they do not get prescribed   treatment such as wound care.

   B.   Not every provider had access to the electronic health record at University Medical Center, the hospital that provides services to the jail. This should be rectified.

   C.   There is no telemedicine service through Wexford. This will be more burdensome and more difficult for the nurse practitioners and the medical director, covering calls from the nurses in the off hours. Without telemedicine, there should be a provider available in the jail 24/7 to provide in person and face to face assessment of patients.

   D.   The previous medical provider, Wellpath, had a proprietary electronic health care record and the medical records of the currently and previously incarcerated will not be available to the current medical provider. Considering the importance of the medical history in the care of patients, this is unfortunate.

   E.   There remains a lack of auditory privacy in intake screening, Upon arrival to the jail, screening questions include, "Have you recently had any drugs or alcohol?



What drugs? And did you swallow any drug or place any drugs in a body cavity".

II.      Mortality and morbidity reports.

The lack of transparency from the previous medical provider regarding mortality and morbidity reporting that allows the monitors to monitor the medical care was a contributing factor to noncompliance or partial compliance in Section C. Medical Care. A corrective action plan addressing this issue has now been filed with the Court. Currently section IV. B. 9. f. of Consent Judgment is in non-compliance. The Monitors look forward to the cooperation of Wexford in providing a thorough and transparent process such that this section of the consent decree can be compliant.

III.     <u>Sick call</u>

The Wexford nursing sick call process requires the med pass nurse to collect sick call requests during med pass. Each of these sick call requests should be reviewed for urgent or emergency complaints.  Each emergent or urgent sick call request must be addressed and reported to the charge nurse immediately. The med pass nurse is to create a sick call task in the electronic medical record. The day shift should make every effort to complete sick calls during their shift. Any sick calls that were not completed during the day shift should be reported to the night charge nurse to be completed during the night shift. Sick call requests will be addressed and closed out within 24. hours of the patient's initial submittal date. Despite this policy, at the time of our site visit, there were over 120 incomplete nurse sick calls.  So far, the new sick call policy has not rectified the problem with nurse sick calls as they are not timely performed.

The med pass nurses are LPNs.  The med pass nurse has a difficult and time-consuming responsibility to sort patients' medication and deliver it to the correct patient.

The electronic system to submit sick calls remained almost entirely out of service during the review period. OPSO has a plan to address the broken system of electronic sick calls and grievances.  Until this is rectified, the medical care will not be in substantial compliance.

IV.      <u>Custody and health care</u>

Patients' needs are not timely evaluated due to custody staff not consistently bringing the patients to the medical clinic. When medical staff goes to the tier, if a custody staff member is available, the patients are more easily made available to the medical personnel. Medical care of patients must be a priority for all custody staff.  For example,



during the monitors' visit in July 2024, patients were not consistently brought from the intake area to the medical providers. The patients were difficult to find in the packed intake area. There was no inmate tracking in the intake area that would guide the custody staff in finding the patients. The monitors and medical staff had difficulty locating particular patients.

<u>V. Off-site transportation</u>

There is good communication and cooperation to get patients to their off-site appointments. The most common reasons for missed off-site appointments were court and release from jail. But when security does not get a patient to an off-site appointment, what happens?   This happened seven times in July 2023 and seven times in August 2023. Each failure to transport by custody should be reviewed by OPSO. On the date of the monitors' site visit, two patients were rescheduled due to no transport. The monitors complement the staff member who oversees this process of specialty care referrals; she is very diligent.

V.    <u>Telemedicine</u>

A significant improvement in health care under the previous provider, Wellpath, was the provision of telemedicine consultation. Telemedicine allows a provider to have a face-to-face interaction with a patient and to answer after hours questions by nurses. A provider is a nurse practitioner or a physician. There is no provider in the jail 24 hours a day. Not having access to a provider is unacceptable.

VI.    <u>Insufficient numbers of providers to meet patient needs</u>

There were over 100 patients waiting to see a provider on the date of our jail visit in July 2024. This is in spite of the emergency action taken to see many patients to catch up. There is only so much one physician can do. The physician is excellent and dedicated. This jail needs more providers. Reliance on LPN/ LVN level nurses and phone orders by providers has resulted in deterioration in patients 'conditions. Given that the healthcare company has changed to Wexford, this will be carefully monitored. Access to providers is needed in this jail 24 hours a day.

VII.    <u>Intake screening and health assessments</u>

Chronic conditions are frequently discovered at intake screening. The protocols for chronic conditions found at intake screening are not consistently followed by the intake nurses. There is no auditory privacy at the intake screening area. Patients cannot be expected to divulge



medical information within earshot of other inmates.

There remain multiple patients with health assessments delayed for more than 14 days.

VIII.    Refusals

During the site visit, we observed a medication pass. When a patient refused medication, there was no effort to address the patient. The med pass nurse just said, "They have a right to refuse". However, the nurse has a duty to address the patient in some form or fashion.  Refusals should be signed and documented in the medical record. Appropriate referrals are not consistently made, Chronic care visits are scheduled but do not happen. In one case the patient was ordered for detoxification, but the detoxification protocol was never implemented.

Delays in communication of results to patients and providers

Only about 50% of patients are documented to have been informed of the result of their x-ray evaluation. Laboratory workflow is troubled.  Order, collection, and results received by the provider notified are not recorded. Laboratory results are not scanned into the medical record in a timely manner. Hopefully, the next medical provider will have an electronic medical record that electronically includes the laboratory results and the date and time the provider acknowledges the results.

IX.    Dental care

Dental care is delayed in some cases for many months. There are currently over 100 dental appointments pending. Pain results from untreated dental conditions. There is only one deputy bringing patients to dental appointments. As discussed with the dentist and others on the December 2023 and again in the July 2024 site visit, there should be a team of deputies making the patients available to the dentist. The discussion revealed that the ideal number of deputies would be three, one responsible in the medical clinic, one responsible for the dental clinic and one moving the patients to and from the clinic. Sometimes there is no deputy assigned to the clinic. Indeed, during our site visit in July 2024, one deputy unexpectedly left the medical clinic for three hours without communication to the medical staff and patient care was delayed.

C. 1. a.

Finding:

Partial Compliance

Training in medication administration is insufficient. "Refusal" is documented even when a



patient does not hear the announcement that a medication call is taking place. There were instances of refusal being noted when the patient was in the hospital. With respect to refusal documentations for patients on the CIWA protocol, a note describing the patient's condition is needed. Medical staff should wake the patient up and make sure he is talking and doing well.

C. 1. b.

Finding:

Partial Compliance

There should be provider review after multiple refusals are documented on a patient. After the compliance period, Wexford made a change to the training to make it a priority to ensure that providers are notified after three refusals. Quality assurance audits should be performed to confirm that the training is being followed.

C. 1. c.

Finding:

Substantial Compliance

C. 1. d.

Finding:

Partial Compliance

Overdoses, hoarding of medication, and diversion of medication are common. Custody staff do not do mouth checks. In fact, watching med pass, custody did not do one mouth check. Nurses doing med pass do not do them either. However, it is a mutual duty.

*C.2.a. Provide the Monitor a periodic report on health care at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. Each report will include:*
> *(1) number of prisoners transferred to the emergency room for medical treatment related to medication errors.*
> *(2) number of prisoners taken to the infirmary for non-emergency treatment related to medication errors.*
> *(3) number of prisoners prescribed psychotropic medications.*
> *(4) number of prisoners prescribed "keep on person" medications; and*
> *(5) occurrences of medication variances.*

*C.2.b. Review the periodic health care delivery reports to determine whether the medication administration protocols and requirements of this Agreement are followed. OPSO shall make recommendations regarding the medication administration process, or other necessary changes in policy, based on this review. The review and recommendations will be documented and provided to the Monitor.*

Findings:

C. 2. a.  Partial Compliance



C. 2. b. Partial Compliance

Finding:

C. 2. a. Partial compliance

It is primarily the reporting of medication variances that causes this section to be partial and not substantial compliance.  Errors involving the "five rights" of medication administration; the right patient, the right drug, the right dose, the right route, and the right time. Although there is a report that includes the information required, the validity of the information is incomplete. The quality improvement team has identified a need for improved documentation of medication variances.

C. 2. b.

Finding:

Partial Compliance

Mouth checks are not consistently performed by custody personnel. As a matter of fact, on the most recent visit, there were no mouth checks. Custody staff are not timely available to accompany and provide security to medication pass nurses.  Repeated refusals do not reliably result in provider counseling of the patient.

***3.a. OPSO shall notify Qualified Medical or Mental Health staff regarding the release of prisoners with serious medical and/or mental health needs from OPSO custody, as soon as such information is available.***
***3.b. When Qualified Medical or Mental Health staff are notified of the release of prisoners with serious medical and/or mental health needs from OPSO custody, OPSO shall provide these prisoners with at least a seven-day supply of appropriate prescription medication, unless a different amount is necessary and medically appropriate to serve as a bridge until prisoners can reasonably arrange for continuity of care in the community.***
***3.c. For all other prisoners with serious medical and/or mental health needs who are released from OPSO custody without advance notice, OPSO shall provide the prisoner a prescription for his or her medications, printed instructions regarding prescription medications, and resources indicating where prescriptions may be filled in the community.***
***3.d. For prisoners who are being transferred to another facility, OPSO shall prepare and send with a transferring prisoner, a transition summary detailing major health problems and listing current medications and dosages, as well as medication history while at the Facility. OPSO shall also supply sufficient medication for the period of transit for prisoners who are being transferred to another correctional facility or other institution, in the amount required by the receiving agency.***

Findings:

C. 3. a. Substantial compliance

C. 3. b. Substantial compliance



C. 3. c. Substantial compliance

C. 3. d. Substantial compliance

## IV.    D. 1. Sanitation and Environmental Conditions

<u>Findings:</u>

D.1. a.   Non-Compliance

D. 1. b.  Partial Compliance

D. 1. c.  Partial Compliance

D. 1. d.  Substantial Compliance

D. 1. e.  Partial Compliance

D. 1. f.   Partial Compliance

D. 1. g.  Substantial Compliance

D. 1. h.  Substantial Compliance

***IV. D. 1. a. OPSO shall provide oversight and supervision of routine cleaning of housing units, showers, and medical areas. Such oversight and supervision will include meaningful inspection processes and documentation, as well as establish routine cleaning requirements for toilets, showers, and housing units to be documented at least once a week but to occur more frequently.***

<u>Finding:</u>

Non-Compliance

<u>Observations:</u>

The Monitor physically inspected every occupied housing unit in the OJC and TDC/TMH facilities. The Monitor also interviewed the OPSO Sanitarian and Environmental Officer as well as inmates and staff during the inspection. Section D.1.a. remains in non-compliance based on the following observations.

The Monitor observed the overall level of cleanliness and sanitation in the TDC housing units to be generally acceptable with some specific exceptions to include showers in TDC and TMH. Otherwise, the cleanliness and sanitation of the TMH housing units was again found to be very good, including the appearance of the individual cells and janitor closets with some minor exceptions.  Cleaning equipment was properly stored.

The signs of insect infestation (ants and drain flies) noted during the previous inspection of the TDC housing units were observed to be substantially less than noted



during Tour #19. However, there was evidence of insects and drain flies on at least two pest control "glue boards". A small number of mature drain flies were observed in several of the shower and mop closet areas. The sanitation/maintenance issue that was noted previously in and around janitor closet E205 (leak) was noted again. OPSO attempted to remedy the TDC inmate shower floors by applying an epoxy paint. The paint was observed to be releasing and pealing up from the concrete in several areas making the affected shower floors all but impossible to clean and sanitize effectively.  A significant water leak from the 4W showers, under/through the shower wall into the pipe chase, was showing signs of promoting mold and mildew growth in the pipe chase and outside the building. The issues were pointed out to Security and Maintenance staff for follow-up.

During the walk-through of the OJC facility, the Monitor noted that all circulation areas of the facility to be clean and generally well-kept to include the medical areas and dentist's office. The Monitor observed the overall cleanliness in the OJC open dorms as well as pods with individual cells to be in the same generally unacceptable state of cleanliness and sanitation as found during the Report #19 inspection. Issues such as trash, debris, dirty floors, dirty windows, soaped windows, spilled food/milk, hoarded items, etc. and showers in particular, persist. Inmates throughout the facility again complained to the Monitor about the lack of cleaning supplies and minimal time provided by staff in the schedule for the inmates to clean their housing units. The Sanitarian provided a sample of a monthly "Sanitation Summary" inspection for March 2024 and noted that such monthly reports would be routinely provided going forward. While laudable as a quality control measure, the Monitor again recommends OPSO urgently devise a new strategy to address these deficiencies, starting with holding security staff accountable for adherence to the (realistic) pod cleaning schedules. The one pod cleaning schedule observed by the Monitor provided 15 minutes for the pod's inmates to clean the entire pod to include their cells—this is unattainable in the Monitor's opinion.

A weekly shower cleaning procedure and schedule has been implemented and is performed by Sanitation staff during overnight hours as long as security escorts are available. While the weekly deep cleaning is a significant improvement, Security staff must still require the pod residents to clean and sanitize the showers and other common areas on a daily basis and to prevent the drain flies that were observed in several areas.



The Monitor recommends that the cleaning logbook process in place for IPC and the medical areas be replaced with simple daily check sheets noting the date, time, area, and cleaning performed as well as a corresponding inspection sign-off area.

The documentation for this section included multiple photos of pod logbooks. However, the Monitor was unable to determine if any instances of the weekly shower cleanings were performed. Any notations regarding general cleanup by pod inmates were sporadic. The Monitor recommends that a separate log and inspection sheet be kept by Sanitation staff documenting the shower cleaning procedure. Security staff should also be documenting their own sanitation inspections daily noting the condition of the pods and cells before and after inmates are allowed to clean their areas. The Monitor again wishes to recognize and encourage OPSO recent implementation of a shower cleaning crew, particularly in lockdown units.

As noted previously, the OPSO practice of consolidating all cleaning supplies outside of the units has continued over the last three inspections and inmate access to the unit janitor closets remains restricted according to staff. The Monitor observed spray bottles and other cleaning equipment in individual cells and in the dormitory housing units. This indicates that Security staff continues to have issues maintaining accountability for the supplies. Previously noted periodic "town hall" meetings between OPSO staff and inmates are expected to resume and may be instructive to OPSO staff as to what policies, processes and procedures (i.e. cleaning schedules and supplies) are working or may need improvement. The Monitor found the majority of the janitor closets to be generally clean and in good order. The closets are still in limited use as they remain the water source and storage location for mop buckets, mops, brooms, etc. The Monitor continues to recommend that Sanitation, Maintenance, and Life/Safety staff should still inspect the closets routinely to ensure continued serviceability, particularly lighting, water service and drains.

The Monitor reviewed the monthly environmental inspection reports and found them to routinely include the majority of the sanitation issues noted by the Monitor on the date of the inspection indicating the sanitation issues in the housing units are persistent.

Based on the above and the observed conditions of the OJC pod cells, shower and



common areas, the Monitor continues the Non-Compliance rating. After the monitoring period, and after the compliance tour, OPSO enacted a much more vigorous program to clean the showers pursuant to the June 2024 court order. If the newly enacted shower cleaning procedure is followed, the Monitor expects significant improvement prior to the next compliance tour and for the progress to be noted in the rating.

The Monitor observed relatively few inmate housing cells with obstructed air supply vents. Blocked supply registers present a code violation as it relates to ventilation and the number of required air exchanges per hour in rooms with toilets, the correctional environment presents unique challenges in maintaining this aspect of compliance. The Monitor, however, observed a significant number of return air grills to have substantial burn/smoke damage resulting from inmates lighting paper "wicks" and then inserting them into the return grills to keep them lit for extended periods. This allows the inmates to keep an ignition source available for smoking contraband materials. The Monitor recommends the cleaning/painting of the grills so that new damage can be readily identified and the disciplinary process applied to the inmate occupant of the cell. This damage also occurs in open dorm units in the upstairs areas.  The Monitor noted that some of the dayroom return air registers had been cleaned…an improvement over the last inspection. The Monitor recommends Maintenance staff perform such cleanings as a part of the preventive maintenance program to inhibit the collection of dust and lint and, and the growth of mold.

The Monitor noted clutter issues in most housing pods, typically involving the improper storage of inmate property in cells with some improvement in the dormitories. The Life-Safety inspection reports during the rating period noted similar issues. The inmates' use of contraband in their cells was readily apparent in most of the OJC housing pods. The possession of altered items or utilizing items in ways other than their intended use should be considered by security staff to be contraband and confiscated. As noted in previous inspections, numerous cells were observed to have lights covered, home-made clotheslines strung across the cells, cloth "ropes" used to manipulate food pass doors, extra blankets used as carpeting on the cell floors, and numerous altered clothing items, to name a few of the issues. A new item of note was torn cloth and plastic bag material being wrapped tightly around the top of the cell doors allowing inmates to affix "curtain"



material to the door and obstructing the view into the cell. This contraband was very obvious to the Monitor and was apparently being ignored by the Security staff present.

The documentation and interviews again reflected the Sanitarian and Environmental staff's efforts at maintaining consistent and regular cleaning schedules for circulation areas and the merging of janitorial staff into the section has improved the section's overall performance.

As noted in the previous report, the number of grievances regarding sanitation issues remained relatively low during the rating period. Inmate reports via grievance of inadequate or missing cleaning supplies were few in number. The Monitor, however, heard repeated complaints from the inmates during the tour regarding access to cleaning supplies. The Monitor noted that the issue with broken mops and altered or destroyed mattresses was significantly improved since the last inspection.

The regular provision of clean inmate clothing and bedding and appropriate inventory of these supplies are essential to sanitation, infection control and disease prevention. The Sanitarian reported that the exchange of inmate uniforms (weekly), sheets (weekly) and blankets (monthly) has continued to adhere to the regular schedule and the inventory for these items was sufficient for scheduled exchanges. The Monitor did not receive any verbal complaints from inmates about the laundry exchange during this tour. Overall, laundry grievances remained low for the rating period at an average of about 7 per month.

While somewhat improved, the Monitor noted the hoarding and altering of issued clothing items and blankets continues to be an issue, There were several instances of altered clothing (homemade "hoodies", sewn on designs, and clothing used for other than its intended purpose) which is of particular concern as it destroys the clothing item and precludes reissuance to another inmate thus decreasing stock levels prematurely. The security staff's apparent indifference to this issue continues to concern the Monitor.

The Monitor noted that the chronic maintenance issues with washers and dryers have essentially been remedied by removing the equipment from all but a few select lockdown units. In place of the washer/dryer equipment, OPSO implemented a laundry bag issuance program whereby the inmates' personal clothing items would be laundered by an OPSO contractor and returned to the inmates. It was obvious that the program had



not been fully implemented as the Monitor observed wet clothing hung to dry in several dayrooms and dorms. The wet clothing was observed to contribute to the significant drain fly issue in at least one dorm as the flies were observed to be attracted to the wet clothing. In place of the washer/dryers, inmates continue to wash their personal items in mop buckets and trash bags utilizing "Tide pods", and regular bar soap without adequately rinsing the items. The Monitor observed at least one inmate with a rash that may be the result of soap residue in his t-shirts. The Monitor recommends the full implementation of the laundry bag program, enforcement of its use, and the deterring of inmates being allowed to do their own laundering.

***IV. D. 1. b. Continue the preventive maintenance plan to respond to routine and emergency maintenance needs, including ensuring that showers, toilets, and sink units are adequately installed and maintained. Work orders will be submitted within 48 hours of identified deficiencies, or within 24 hours in the case of emergency maintenance needs.***

<u>Finding:</u>

Partial Compliance

<u>Observations:</u>

As with previous inspections, the Monitor reviewed the Sanitation and Environmental Conditions report, the OPSO Preventive Maintenance Plan, the Preventive Maintenance Schedule Summary report, and a Preventive Maintenance work orders status report as well as inmate grievances related to maintenance issues. The Monitor also interviewed and toured portions of the facility with the Maintenance Director. The documentation reflected an on-going preventive maintenance program for major building systems and components consistent with OPSO policy and the Consent Judgment. Preventive maintenance continues to be a challenge due to deferred maintenance, staffing and budget constraints. For example, water system equipment (boilers/heaters) necessary for the upcoming Phase III expansion have been left off-line and in disrepair for several years. OPSO is in the process of identifying funding to repair and bring the necessary equipment back on-line.

Through the Monitor's personal observations and individual inmate interviews conducted during the walk-thru in each housing unit, the Monitor again observed a fair number of issues regarding water, electric or HVAC services in individual cells that were not addressed in a timely fashion, possibly due to a lapse in reporting by security staff and/or Maintenance staffing issues. The issues primarily involved water pressure issues



at the restroom sinks in open dormitory pods and in individual cells throughout OJC and TDC/TMH. As the current work order system and building automation system (BAS) are limited in their reporting capabilities, the Monitor was provided with raw work order data for plumbing and HVAC issues in TDC/TMH and OJC for the rating period. While plumbing work orders far outnumbered HVAC issues, it was interesting to note that plumbing issues in both areas were addressed in an average of one day from the time the issue was reported until the work order was closed. HVAC work orders however, averaged more than 60 days which included relatively "simple" requests to adjust a thermostat. This could be indicative of training or procedural deficiencies among the HVAC staff and their using the system incorrectly. The Monitor recommends OPSO Maintenance supervisors give considerable attention to this issue and utilize the work order data to periodically audit other maintenance/trade categories for similar issues.

A review of the Maintenance-related grievances noted an increasing trend in the number of such grievances during the rating period. The Monitor recommends Maintenance staff review the grievances to identify any significant grouping of issues by type and/or location in order to mitigate the upward trend.

While work orders being submitted in a timely manner is required by the Consent Judgment ("Work orders will be submitted within 48 hours of identified deficiencies, or within 24 hours in the case of emergency maintenance needs"), the timely follow-on repair actions are essential.

The Monitor again observed a significant number of broken cell door windows throughout OJC that need immediate replacement. The vandalized light switches in pod interview rooms noted in the previous report had been substantially addressed, however several loose wires, broken outlet covers, and live circuits were found in several OJC housing units posing a significant hazard to the inmates attempting to ignite materials for smoking or other unauthorized purposes. While OJC staff were aware of the vandalism, the Monitor again makes this note to emphasize the need for timely replacement of the broken glass and electrical devices to eliminate the safety and security risk. When asked why replacement takes so long, Maintenance staff often provide the explanation that parts must be ordered. It is suggested that OPSO maintain an inventory of items frequently needed.



With regard to the broken cell door windows, OPSO previously provided the following response:

> As for the timely changing of the cell door glasses, this is very cumbersome because the cell glasses have to be cut to the correct size. Precut cuts were tried several years ago which resulted is the disposal of thousands of dollars' worth of glass. The plan is to use a more durable plexiglass until the correct glass arrives, which can take up to several weeks.

The Monitor has provided guidance on the type of acceptable "temporary" material for the temporary replacement of glass windows while custom-fit glass is ordered however it does not appear that this initiative has been implemented to date given the number of broken windows observed during the tour.

***IV. D. 1. c. Maintain adequate ventilation throughout OPSO facilities to ensure that prisoners receive adequate air flow and reasonable levels of heating and cooling. Maintenance staff shall review and assess compliance with this requirement, as necessary, but no less than twice annually.***

<u>Finding:</u>

Partial Compliance

<u>Observations:</u>

As noted in previous tours, adequate air flow is maintained in the facilities but continues to be impeded in inmate cells when inmates block the air vents.  While the Monitor noted the number of cells with blocked supply registers did not exceed 50% in OJC, the issue is still of concern. Compliance in this area remains an inmate supervision issue and must continue to be addressed by security staff consistently. The Monitor noted that the majority of housing dayrooms and cells to be at relatively reasonable levels of heating and cooling but did find a number of cell clusters with low or no airflow and higher temperatures in various units in OJC as well as overly warm conditions in TDC 4W. The OPSO staff present were advised.

The following, regarding test and balance reports, is restated from previous reports. As noted in the previous reports, test, and balance reports for the Kitchen/Warehouse (2014), OJC (2017) and TDC (2012) were the latest available to the Monitor.

Prior to the September 2019 report, this section had been interpreted as requiring comprehensive "test and balance" assessments on a semi-annual basis. Such assessments are very expensive and typically performed only during the commissioning of new or



replacement HVAC systems. The Monitor has consistently requested OPSO provide reports from the Building Automation System (BAS) covering the inspection period which would reflect the actual air temperatures in the units and cells on a continuous basis. The BAS controls the heating and cooling throughout all occupied areas in OJC, and the reports would be used to verify the system's performance as well as the maintenance response to routine and emergency situations requiring service or replacement of the HVAC components. The previous Maintenance Director failed consistently to provide the requested information.

With the on-boarding of the new Chief Operating Officer, OPSO was able to coordinate with the BAS contractor and has contracted for a system upgrade that will enhance staff's ability to identify, remedy, and report on HVAC and other major systems throughout the facility. The Monitor looks forward to the full implementation of the upgrade and commends OPSO on the initiative. Though somewhat delayed, the Monitor anticipates OPSO will now be able to provide monthly BAS reports for the entire reporting period for Report #21. Based upon this significant development and the Maintenance staff's improving utilization of the BAS' capabilities observed by the Monitor, this section continues to be in Partial Compliance.

As during previous tours, the Monitor reviewed live data of the system's warning and alarm functions which reflected no major equipment or systems issues that had not been addressed at that moment. The Monitor inspected the BAS system and noted no alarms or alerts present on the system. During the inspection of the OJC housing units however, the Monitor observed some issues noted above. The Monitor continues to recommend that the Maintenance Director implement a routine audit/inspection of the housing areas for such occurrences and compare the findings with the BAS and work order reports to ensure the systems are working as expected. Additionally, the Monitor continues to recommend the Maintenance Director establish a "system status review" protocol requiring the responsible on-duty staff member to review the live HVAC equipment monitor status throughout the facility at least once per day to facilitate the identification and repair of any issues noted and document/log these reviews for routine recordkeeping as well as staff accountability.

It is the Monitor's opinion that the OJC Building Automation System and the new



BAS system supporting the TMH units, as currently operated, meets the intent of the Consent Judgment regarding this section. The requested supporting documentation will be necessary to support a finding of substantial compliance.

***IV. D. 1. d. Ensure adequate lighting in all prisoner housing units and prompt replacement and repair of malfunctioning lighting fixtures in living areas within five days unless the item must be specially ordered.***

<u>Finding:</u>

Substantial Compliance

<u>Observations:</u>

The Monitor observed sufficient lighting being provided in housing units and the majority of individual cells of both OJC and TDC. Maintenance staff continue to maintain a supply of replacement bulbs, transformers, or ballasts to repair malfunctioning lighting. As with the previous report, the Monitor reviewed the "Lighting Work Order" document provided to the Monitor. The Monitor took the average number of days for all lighting work order requests and the result was significantly improved at approximately 2.5 days to repair as opposed to the 10 days previously noted. The majority of the work orders were addressed in 1 day or less. The Monitor commends the Maintenance staff on the significant improvement and returns the rating for this section back to Substantial Compliance.

***IV. D. 1. e. Ensure adequate pest control throughout the housing units, including routine pest control spraying on at least a quarterly basis and additional spraying as needed.***

<u>Finding:</u>

Partial Compliance

<u>Observations:</u>

A review of the documentation submitted found sufficient evidence of a pest control program that meets the intent of the Consent Judgment. OPSO continues to maintain a pest control contract with a state licensed company for monthly service of all housing areas and bi-weekly service for the Kitchen/Warehouse as well as on-demand services. Inmate grievances related to pest control were reviewed and found to have been addressed in a timely manner. As with Tours #18 and #19, the Monitor observed several "drain fly" issues in housing units both at OJC and TDC. The Monitor advised staff present to notify the Environmental Officer for remediation.

Environmental, Sanitation and Life-Safety staff performing inspections and



responding to pest control grievances continue to initiate work orders for pest control and to document how, when, and where infestations are identified and remediated. The pest control contractor documentation showed no major infestations were found during routine inspections. However, the inspection reports continue to note numerous issues with debris in housing units throughout OJC and TDC which was consistent with the Monitor's observations. The Monitor noted significant clutter and debris (open and scattered food, trash, etc.) in multiple OJC housing units and cells. The majority of the issues relate directly to the level of cleanliness throughout the housing units and adjacent spaces which the Monitor deemed to be insufficient during the inspection. The exception was in the circulation and administrative areas maintained by the Sanitation staff. Again, the Monitor expects that OPSO can substantially reduce the issues noted by the pest control contractor by increasing the frequency and effectiveness of the cleaning of these areas by the inmates housed therein. While OPSO routinely has a pest control company treat the facility, the issue with the drain flies is chronic and has not been addressed. It is incumbent upon security staff to prevent inmates from doing things that exacerbate the problem such as allowing inmates to keep mop buckets full of dirty water, washing clothing the housing units, and allowing them to drape wet clothing around the housing units which attracts and allow the drain flies to breed and grow. Based on the foregoing observations, this section remains in Partial Compliance.

***IV. D. 1.f. Ensure that any prisoner or staff assigned to clean a biohazardous area is properly trained in universal precautions, outfitted with protective materials, and properly supervised.***

Finding:

Partial Compliance

Observations:

As noted in previous inspections, Policy 1101.07, "Bio-hazardous Spill Cleaning Procedures" [Revised 1/18/2018] Section VIII. A. 1 has been revised to allow properly trained and equipped inmates and deputies to clean up bio-hazardous spills. Training materials were devised by the Sanitarian. Documentation was provided to indicate several inmates received the requisite training during 2023 but prior to the rating period.

The Monitor also reviewed training curricula and documentation indicating that during 2023, all pre-service staff received training in bio-hazardous cleanup procedures as part of their initial training in each new-hire class in 2023 up to the date of this



inspection. Documentation reflected that the in-service training for this requirement was presented in 2023 although staff participation was less than 95%.

As of November 2018, the Sanitation and/or Environmental Officer is required to be notified of such incidents each business day to enable them to replace any bio-hazardous clean up protective materials used and inspect the area to ensure it was properly cleaned and sanitized. For the previous rating period, the Monitor was provided with several reports indicating that several bio-hazard incidents requiring cleanup had occurred, however the report narratives frequently failed to identify if, how, or by whom any remediation of the spill was accomplished. The Sanitarian advised that no bio-hazard reports were submitted to her office during this rating period, therefore there was no evidence to support a change in the current rating. Given the number of incidents in the facility, the lack of any bio-hazard reports is somewhat concerning to the Monitor. The Sanitarian has previously advised that her practice is to routinely review all reports mentioning such incidents to ensure proper follow-up is conducted and that required cleanup/inspection procedures had been followed.

***IV. D. 1. g. Ensure the use of cleaning chemicals that sufficiently destroy the pathogens and organisms in biohazard spills.***

Findings:

Substantial Compliance

Observations:

The Monitor was able to make direct observation that the chemicals on-hand and available to staff were sufficient to destroy the pathogens and organisms in bio-hazardous spills common in a jail environment to include the COVID-19 virus. The Monitor is continuing to rate this section as being in substantial compliance.

Additionally, the chemical storage inventory documentation submitted demonstrated availability of a consistent supply of the required chemicals being maintained by the designated staff.

***IV. D. 1. h. Maintain an infection control plan that addresses contact, blood borne, and airborne hazards and infections. The plan shall include provisions for the identification, treatment, and control of Methicillin-Resistant Staphylococcus Aureus ("MRSA") at the Facility.***

Findings:

Substantial compliance

Observations:



As with the previous inspection, the Monitor reviewed the OPSO infection control policy 1201.11 as well as the Wellpath Infection Control Program document (rev. 8/30/18) submitted by OPSO. No changes were noted, and all requisite areas required by the Consent Judgement were addressed, to include MRSA, and included by OPSO for the Monitor's review and found sufficient.

The Monitor's concern during the previous inspection as to "extra" bio-hazard cleanup kits being maintained in pod control areas was addressed. The Monitor observed only the one kit in the sealed response bag on each pod.

The Monitor's observations of damaged and extra mattresses in cells during the last inspection were substantially addressed by OPSO staff. The number of altered and damaged mattresses observed was significantly less than noted before. OPSO has previously provided for annual review of the policy and standard operating procedures for the handling of inmate mattresses to include staff and/or inmate sanitation training program that includes mattress cleaning, and chemical use and control. This procedure is specifically required by the Infection Control Plan. Recognizing the improvements noted above, this section is deemed to be in Substantial Compliance.

## IV. D. 2. Environmental Control

Findings:

D. 2. a.  Substantial Compliance

D. 2. b.  Partial Compliance

***IV. D. 2. a. OPSO shall ensure that broken or missing electrical panels are repaired within 30 days of identified deficiencies, unless the item needs to be specially ordered.***

Findings:

Substantial Compliance

Observations:

OPSO Policies 601.02 "Reporting and Addressing Maintenance Needs" and Policy 601.03 "Preventive Maintenance" [August 15, 2016] are implemented. Major electrical panels at OJC and TMH are located in secure maintenance spaces inaccessible to inmates.

During the inspection, the Monitor noted minor issues in electrical rooms accessible by security staff (unauthorized items stored in electrical rooms). The issues were corrected on the spot by the Maintenance staff.



***IV. D. 2. b. Develop and implement a system for maintenance and timely repair of electrical panels, devices, and exposed electrical wires.***

Findings:

Partial Compliance

Observations:

During the tour, the Monitor noted several electrical outlet boxes with missing or damaged covers. At least four of these boxes were found to have energized wiring accessible to the inmates and presenting an extreme safety hazard. The vandalized light switch assemblies in the inmate interview rooms noted previously had been substantially repaired.

Also, during previous inspections, the Monitor noted ongoing issues with the inmate intercom equipment. As with the previous inspection, the Monitor randomly asked inmates to activate their cell intercoms or did so himself to elicit a response from security staff.  The Monitor did not observe any intercoms to be non-functioning in OJC during these random checks. The Monitor has observed that, if the inmate is locked in a cell, the inmate must either call out to the pod deputy (if present) or request another inmate who may be out of their cell to alert the pod control staff member if an issue or emergency arises.

While IT staff report they have addressed non-functioning equipment, the Monitor was unable to determine whether randomly tested inmate intercoms failed as a result of inoperative equipment or the lack of staff in control pods to answer the intercoms in OJC. There is no backup system whereby intercom calls from OJC inmate cells can be answered if the control pod is not manned. The intercom system in the TDC/TMH sallyport that provides backup response to TMH inmate intercom calls is still inoperative in that staff cannot speak to the inmate. This has been noted repeatedly. Intercom issues were noted in previous reports under Section IV.D.1.b. (with no apparent action from OPSO Maintenance), however the Monitor has determined that this issue is more appropriately covered in this section that requires the implementation of "a system for maintenance and timely repair of electrical panels, devices, and exposed electrical wires".

As noted in the previous inspections, the OJC intercom system is tied into the security electronics system. Pod deputies are able to answer intercom calls from inmates



via a microphone/speaker on the pod desk (connected to the pod computer) *if* the equipment is present. If the pod deputy is logged out of the system, the intercom call is transferred to the pod control desk. The Monitor observed that the pod computer/intercom equipment is missing from at least half of the housing pods. This presents a safety issue even if the deputy is present in the pod. (i.e., an inmate experiencing a medical emergency or assault is unable to call out but can press the intercom button for help). The inmate intercoms in the Temporary Mental Health (TMH) facility are similarly non-working at the officer control stations, and while the Sallyport Control officer is able to observe and hear inmate intercom calls on the intercom system, and a microphone has been installed, there continues to be technical as well as staff training issues preventing two-way communication with the inmate in individual TMH cells. Subsequently, the Sallyport Control officer is not required to monitor inmate intercom calls. The Monitor recommends TMH supervisory staff review the procedure and require the Sallyport Control officer to notify the respective TMH pod deputy any time a call is observed on the control screen once the equipment is in working order.

The Monitor continues to recommend that IT staff responsible for the intercom systems make a comprehensive survey of working/non-working intercom equipment in every housing unit to facilitate repair of the system throughout the facility and add random intercom testing in every unit to the routine inspection process. Additionally, security staff supervisors should continue to emphasize the importance of the prompt response to emergency intercom calls by pod deputies and pod control staff.

Due to the chronic issue with the inmate intercom field devices and control equipment devices as well as the damaged outlet boxes and energized circuits, OPSO is close to being in Non-Compliance and recommends OPSO develop a comprehensive near-term plan to repair and maintain the items.

**IV. D. 3. Food Service**

This report summarizes the findings for the Food Service provisions of the Consent Judgment based on the Monitor's document reviews and tour conducted June 24-27, 2024. The Monitor inspected the Orleans Justice Center (OJC) Kitchen/Warehouse; observed meal service activities; and spoke with OPSO supervisors and deputies, Summit contracted food service employees, and inmates.



Sections IV. D. 3. a. and IV. D. 3. b. of the Consent Judgment remained in Substantial Compliance.  Section IV. D. 3. c., improved from Partial Compliance to Substantial Compliance.

Findings:

D. 3. a. Substantial Compliance

D. 3. b. Substantial Compliance

D. 3. c. Substantial Compliance

***IV. D. 3. a. OPSO shall ensure that food service staff, including prisoner staff, continues to receive in-service annual training in the areas of food safety, safe food handling procedures, and proper hygiene, to reduce the risk of food contamination and food-borne illnesses.***

Findings:

Substantial Compliance

Observations:

D. 3. a. remains in Substantial Compliance for the period of October 2023 through March 2024 based on the documentation provided by Summit. The in-service training for employees included lessons on food safety and sanitation, chemicals, foodborne illnesses, and food allergens. Documentation was provided substantiating that food safety training, including a kitchen orientation quiz, was provided for new inmate kitchen workers, with the exception of February 2024 because there were no new inmate kitchen workers that month.

***IV. D. 3. b. Ensure that dishes and utensils, food preparation and storage areas, and vehicles and containers used to transport food are appropriately cleaned and sanitized on a daily basis.***

Findings:

Substantial Compliance

Observations:

The Monitor reviewed the documents submitted for the compliance period of October 2023 through March 2024, including the Summit cleaning logs, daily chemical usage logs, chemical sanitizer concentration logs, and the kitchen vehicle inspection forms and no problems were found. The Monitor inspected the kitchen including the kettle area where food is prepared, the bakery, tray preparation area, dishwashing room, dry goods storage, coolers and freezers, and the dock, and found the kitchen to be clean. Therefore, D. 3. b. remains in Substantial Compliance.

***IV. D. 3. c. Check and record on a daily basis the temperatures in the refrigerators, coolers, walk-in***



*refrigerators, the dishwasher water, and all other kitchen equipment with a temperature monitor, to ensure proper maintenance of food service equipment.*

Findings:

Substantial Compliance

Observations:

For the compliance period of October 2023 to March 2024, Section IV. D. 3. C. of the Consent Judgment improved from partial to substantial compliance. During the July 2023 tour and inspections, significant problems with the refrigeration were found and OPSO and Summit were not aware of unsafe food temperatures that failed to comply with regulatory requirements.[16] Therefore, IV. D. 3. c. is included in the Monitor's Report #19 Areas of Partial Compliance Action Plan (CAP) requiring that kitchen staff check and record all refrigerator and freezer temperatures daily and that kitchen supervisors will submit a work order within 24 hours of discovering any refrigerator or freezer that is not within regulatory requirements. The food service records for the compliance period provided by OPSO and Summit include the daily Cooler Temperature Logs.[17] The temperature logs indicate that the refrigeration and freezers were properly functioning, and the temperatures were recorded daily. During the tour, the Monitor measured the temperatures in the coolers and freezers, and they were within the proper range except for Cooler #239 which was at 51°F, well above the temperature standard. However, a contracted refrigeration technician had already been called and was onsite performing repairs and stated that the problem was a refrigerant leak caused by vibration in the system. Cooler #239 is not frequently used and did not pose a food safety risk. The Monitor finds that although Cooler#239 was not at the proper temperature, OPSO handled it appropriately by identifying that the temperature was out of range and took corrective action, demonstrating compliance and improvement. The OJC Kitchen/Warehouse has 15 walk-in coolers and freezers, covering a significant portion of

---

[16] The Louisiana Administrative Code does not designate a set-point for refrigerator/cooler temperatures, rather it states, "Food stored for cold holding and service shall be held at a temperature of 41°F (5°C) or below." Therefore, refrigeration must be set at a temperature that can maintain the foods stored therein at 41°F (5°C) or below. https://www.doa.la.gov/media/j3hnpfdy/51.pdf

[17] The Cooler Temperature Logs are also used to record the freezer temperatures.



the floor space in the large facility. Refrigeration problems should be anticipated, especially as the mechanical system ages, including issues with the condensers, compressors, and refrigerant leaks and it is recommended:

- OPSO develop and implement a preventive maintenance plan for the refrigeration system.

The daily food production logs continue to only document the temperatures of food items that are served "hot." The temperatures of "cold" foods are not documented on the food production logs. Breakfast meals are simply recorded as "cold breakfast" and the temperature of potentially hazardous foods such as milk are not documented. Although no cases of foodborne illness were reported, it is recommended:

- Develop and implement a policy and procedure to check and record the internal temperature of potentially hazardous refrigerated/cold foods that are held cold for service on the meal/tray preparation line to ensure compliance with applicable regulatory codes, including Louisiana, Title 51, Public Health, Sanitary Code, Ch. 13, Section 1309, stating, "Food stored for cold holding and service shall be held at a temperature of 41°F (5°C) or below."

This report summarizes the findings for the Food Service provisions of the Consent Judgment based on the Monitor's document reviews and tour conducted October 18-19, 2023. The Monitor inspected the Orleans Justice Center (OJC) Kitchen/Warehouse; observed meal service activities; and spoke with OPSO supervisors and deputies, Summit contracted food service employees, and inmates.


**IV. D. 4. Sanitation and Environmental Conditions Reporting**

<u>Findings:</u>

D.4. a. Substantial Compliance

D.4. b. Partial Compliance

***D. 4. a. Provide the Monitor a periodic report on sanitation and environmental conditions in the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. The report will include***
  ***(1) number and type of violations reported by health and sanitation inspectors;***
  ***(2) number and type of violations of state standards;***
  ***(3) number of prisoner grievances filed regarding the environmental conditions at the Facility;***



*(4) number of inoperative plumbing fixtures, light fixtures, HVAC systems, fire protection systems, and security systems that have not been repaired within 30 days of discovery;*
*(5) number of prisoner-occupied areas with significant vandalism, broken furnishings, or excessive clutter;*
*(6) occurrences of insects and rodents in the housing units and dining halls; and*
*(7) occurrences of poor air circulation in housing units.*

Findings:

Substantial Compliance

Observations:

The October2023 through March2024 Sanitation and Environmental reports as supporting documentation were available to the Monitor prior to the inspection tour. The biannual summary reports contained the requisite information spelled out by the Consent Judgment for this section. The State Department of Health performed an inspection of the OJC and TDC/TMH facilities on 9/27/23 noting relatively minor deficiencies in each area. Remediation was required by November 8th, 2023, with no reinspection required. The next annual Health Department inspection is not scheduled until after the reporting period and will be covered in the next report. The Monitor reviewed documentation covering items (3) through (6) and found no significant issues.

***IV. D. 4. b. Review the periodic sanitation and environmental conditions reports to determine whether the prisoner grievances and violations reported by health, sanitation, or state inspectors are addressed, ensuring that the requirements of this Agreement are met. OPSO shall make recommendations regarding the sanitation and environmental conditions, or other necessary changes in policy, based on this review. The review and recommendations will be documented and provided to the Monitor.***

Findings:

Partial Compliance

Observations:

The Consent Judgment requires a review of the periodic sanitation, and environmental conditions reports to ensure issues are addressed along with making recommendations regarding sanitation and environmental conditions and policy changes based upon the review. Such reviews are to be documented and provided to the Monitor. The Monitor reviewed the Semi-annual report provided by OPSO as required but found no documentation supporting any review conducted by OPSO command staff. The documentation was insufficient to satisfy the requirements of the Consent Judgment for this rating period. This places this section in Partial Compliance.

**IV. E. 1. Fire and Life Safety**



Findings:

E.1. a.   Substantial Compliance

E. 1. b.  Substantial Compliance

E. 1. c.   Substantial Compliance

E. 1. d.  Partial Compliance

E. 1. e.  Substantial Compliance

***IV. E. 1. a. Ensure that necessary fire and life safety equipment is properly maintained and inspected at least quarterly. These inspections must be documented.***

Finding:

Substantial Compliance

Observations:

      The Monitor was able to conduct a tour of the OJC, TDC/TMH, and the Kitchen/Warehouse facilities during the June 2024 inspection with the Facility Life Safety Officer and Maintenance Director. The Monitor observed no major issues with the fire and life safety equipment and the 20+ sprinkler heads that were observed during the prior inspection were replaced/repaired in January 2024 and a new response procedure, to include 15-minute "Fire Watch" security rounds in affected areas, implemented by the Life Safety Officer to improve response and repair of damaged life-safety equipment or systems. The Monitor was advised that all supervisory staff have been briefed on the new procedure. No further issues of the magnitude previously observed have occurred and the Life Safety Officer advised that the new procedure has been tested and was working well. All fire extinguishers observed were found to be current on required inspections. The Fire Alarm Control Panels in the areas inspected were found to be properly inspected and free of trouble alarms with the exception of a communication issue (outside notification) with a TDC alarm panel. The Life Safety Officer has identified the issue as a broken communication wire and is researching whether the outside notification is required by local code for facilities such as a jail that are manned 24/7.

      The Monitor also reviewed all monthly and quarterly inspection documentation as well as outside inspection documentation. OPSO provided documentation of the annual contractor fire detection systems for OJC (11/23), TMH/TDC (11/23), and the Kitchen/Warehouse (12/23) which indicated no significant issues along with minor device replacements/programming corrections. There were no significant issues with the



documentation, that requisite work orders had been generated when warranted, and that all major systems were operational/ "green tagged". Of note, the inspection documentation again reflected trash issues throughout the OJC inmate housing areas. The reports continued to note significant issues with excess inmate property being improperly stored in a substantial number of housing units. As previously noted, Staff should consider potential solutions to reduce the amount of clutter and potential fire-load the material presents.

As noted in the previous inspection, the Life Safety Officer continues to use the "Facility Dude" work order system to maintain the schedule of required inspections. The system notifies the Fire Safety Officer when an inspection is due. OPSO continues to maintain contracts with licensed vendors to complete annual inspections of all fire and life safety equipment. OPSO provided copies of quarterly inspections conducted by the Fire Safety Officer for Kitchen/Warehouse, OJC, and TDC/TMH for the 2023 fourth quarter and 2024 first quarter. This documentation, supported by observations during the compliance tour, indicates that OPSO ensures that necessary fire and life safety equipment is properly maintained and inspected at required intervals.

***IV. E. 1. b. Ensure that a qualified fire safety officer conducts a monthly inspection of the facilities for compliance with fire and life safety standards (e.g., fire escapes, sprinkler heads, smoke detectors, etc.).***

Finding:

Substantial Compliance

Observations:

The Monitor was provided with the monthly inspection documents for the Kitchen /Warehouse, OJC, and TDC/TMH facilities performed during the current compliance period. The reports are thorough and complete with all noted discrepancies listed with the associated work order number where appropriate. The findings were summarized in a memorandum covering the rating period. Clutter in cells and the draping of inmate clothing items and contraband sheets/blankets continue to be the greatest contributors to the fire load in the pod housing units that can be effectively mitigated by security staff. These inspections are conducted by a qualified fire safety officer or a qualified contractor, as required by the Consent Judgment.

***IV. E. 1. c. Ensure that comprehensive fire drills are conducted every six months. OPSO shall document these drills, including start and stop times and the number and location of prisoners who were moved***



*as part of the drills.*

Finding:

Substantial Compliance

Observations:

The Consent Judgment requires comprehensive fire drills every six months. OPSO provided documentation for 6 fire drills conducted in October and November 2023 covering each of the OJC squads and two of the TDC/TMH squads. An additional two drills were conducted at TDC/OJC in March 2024 during the rating period. This brings the semi-annual requirement in line with the inspection periods and is sufficient to meet the requirement for all staff to participate in a fire drill twice a year going forward. The drills conducted prior to these dates occurred in the 4th quarter of 2022. Only "Level 1" drills were conducted (no inmate evacuation) due to COVID restrictions. The Monitor has recommended to the Life Safety Officer that OPSO return to pre-COVID practices and have at least one quarterly drill consisting of an actual evacuation to better prepare staff for such an event. Pre-service training was provided to all participants in classes held during the rating period. The rating for this section has been returned to Substantial Compliance.

*IV. E. 1. d. Provide competency-based training to staff on proper fire and emergency practices and procedures at least annually.*

Finding:

Partial Compliance

Observations:

OPSO has developed the requisite policy, training course syllabus/outline and written directives necessary for this section. OPSO training staff provided documentation noting life safety training was provided for the pre-service classes during the compliance period, but no documentation was provided for any in-service training that may have been conducted. This section continues to be in Partial Compliance based on this lack of documentation. The Monitor considers the 90% success rate for in-service Life/Safety training to meet the requirement of the Consent Judgment. Although not covered in the language above, the success rate for pre-service Life/Safety training continues to be 100%. With the emphasis on the new annual training, the rating should hopefully improve after the next compliance tour, but, as of, this compliance period, it remains in Partial Compliance.



***IV. E. 1. e. Within 120 days of the Effective Date, ensure that emergency keys are appropriately marked and identifiable by touch and consistently stored in a quickly accessible location, and that staff are adequately trained in use of the emergency keys.***

<u>Finding:</u>

Substantial Compliance

<u>Observations:</u>

Inspection reports note the routine verification of the keys and the Fire Safety Officer documents the periodic testing of the keys to verify they are operational. The Fire Safety Officer trains staff on the location and use of the keys during the fire and life safety training curriculum provided to all staff at the training academy. In the previous report, the Monitor noted the practice of some OJC security staff obtaining the emergency keys for non-emergency use rendering them unavailable as intended. The Life Safety Officer noted some improvement in this area.

## IV. E. 2. Fire and Life Safety Reporting

<u>Findings:</u>

E. 2. a.  Substantial Compliance

E. 2. b.  Partial Compliance

***IV. E. 2. a. (1) – (3) Provide the Monitor a periodic report on fire and life safety conditions at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date and every six months thereafter until termination of this Agreement. Each report shall include:***
***(1) number and type of violations reported by fire and life safety inspectors;***
***(2) fire code violations during annual fire compliance tours; and***
***(3) occurrences of hazardous clutter in housing units that could lead to a fire.***

<u>Finding:</u>

Substantial Compliance

<u>Observations:</u>

The semiannual reports, referenced in IV. E. 2. a., are conducted by OPSO on a semi-annual basis (January through June and July through December). The Monitor was provided with the report covering the rating period and noting the requisite information. The 2023 Fire and Life Safety Conditions and inspections reports generated during the rating period were made available to the Monitor prior to the June 2024 inspection. The reports contained the supporting information for the semiannual reports spelled out by the Consent Judgment. In light of the supporting documentation, the Monitor finds this section to be in substantial compliance.

***IV. E. 2. b. Review the periodic fire and life safety reports to determine whether the violations reported***



*by fire and life safety inspectors are addressed, ensuring the requirements of this Agreement are being met. OPSO shall make recommendations regarding the fire and life safety conditions, or other necessary changes in policy, based on this review. The review and recommendations will be documented and provided to the Monitor.*

<u>Finding</u>:

Partial Compliance

<u>Observations</u>:

The Consent Judgment requires a review of the periodic fire and life safety reports to ensure issues are addressed along with making recommendations regarding the fire and life safety conditions and policy changes based upon the review. Such reviews are to be documented and provided to the Monitor.

The Monitor reviewed the supporting documentation provided by OPSO and determined that it was sufficient to satisfy the requirements of this section, but OPSO provided no documentation of the senior staff review of the semi-annual report as required. This places this section in Partial Compliance.

## IV. F. Language Assistance

*F.1.a. OPP shall ensure effective communication with and provide timely and meaningful access to services at OPP to all prisoners at OPP, regardless of their national origin or limited ability to speak, read, write, or understand English. To achieve this outcome, OPP shall:*

    *(1)    Develop and implement a comprehensive language assistance plan and policy that complies, at a minimum, with Title VI of the Civil Rights Act of 1964, as amended, (42 U.S.C. § 2000d et seq.) and other applicable law;*

    *(2)    Ensure that all OPP personnel take reasonable steps to provide timely, meaningful language assistance services to Limited English Proficient ("LEP") prisoners;*

    *(3)    At intake and classification, identify and assess demographic data, specifically including the number of LEP individuals at OPP on a monthly basis, and the language(s) they speak;*

    *(4)    Use collected demographic information to develop and implement hiring goals for bilingual staff that meet the needs of the current monthly average population of LEP prisoners;*

    *(5)    Regularly assess the proficiency and qualifications of bilingual staff to become an OPP Authorized Interpreter ("OPPAI");*

    *(6)    Create and maintain an OPPAI list and provide that list to the classification and intake staff; and*

    *(7)    Ensure that while at OPP, LEP prisoners are not asked to sign or initial documents in English without the benefit of a written translation from an OPPAI.*

*F.2.a. OPP shall develop and implement written policies, procedures and protocols for documenting, processing, and tracking of individuals held for up to 48 hours for the U.S. Department of Homeland Security ("DHS");*

*F.2.b Policies, procedures, and protocols for processing 48-hour holds for DHS will:*

    *(1)    Clearly delineate when a 48-hour hold is deemed to begin and end;*

    *(2)    Ensure that, if necessary, an OPPAI communicates verbally with the OPP prisoner about when the 48-hour period begins and is expected to end;*

    *(3)    Provide a mechanism for the prisoner's family member and attorney to be informed of the 48-hour hold time period, using, as needed, an OPPAI or telephonic interpretation service;*

    *(4)    Create an automated tracking method, not reliant on human memory or paper documentation, to trigger notification to DHS and to ensure that the 48-hour time period is*



*not exceeded.*
*(5)      Ensure that telephone services have recorded instructions in English and Spanish;*
*(6)      Ensure that signs providing instructions to OPP prisoners or their families are translated into Spanish and posted;*
*(7)      Provide Spanish translations of vital documents that are subject to dissemination to OPP prisoners or their family members. Such vital documents include, but are not limited to:*
   *i.       grievance forms;*
   *ii.      sick call forms;*
   *iii.     OPP inmate handbooks;*
   *iv.      Prisoner Notifications (e.g., rule violations, transfers, and grievance responses) and*
   *v.       "Request for Services" forms.*
*(8)      Ensure that Spanish-speaking LEP prisoners obtain the Spanish language translations of forms provided by DHS; and*
*(9)      Provide its language assistance plan and related policies to all staff within 180 days of the Effective Date of this Agreement.*

*F.3.a. Within 180 days of the Effective Date, OPP shall provide at least eight hours of LEP training to all corrections and medical and mental health staff who may regularly interact with LEP prisoners.*
*(1)  LEP training to OPP staff shall include:*
   *i.       OPP's LEP plan and policies, and the requirements of Title VI and this Agreement;*
   *ii.      how to access OPP-authorized, telephonic and in-person OPPAIs; and*
   *iii.     basic commands and statements in Spanish for OPP staff.*
*(2)  OPP shall translate the language assistance plan and policy into Spanish, and other languages as appropriate, and post the English and translated versions in a public area of the OPP facilities, as well as online.*
*(3)  OPP shall make its language assistance plan available to the public.*

*F.4.*
*(1)      OPP shall ensure that adequate bilingual staff are posted in housing units where DHS detainees and other LEP prisoners may be housed.*
*(2)      OPP shall ensure that an appropriate number of bilingual staff are available to translate or interpret for prisoners and other OPP staff. The appropriate number of bilingual staff will be determined based on a staffing assessment by OPP.*

Findings:

F.1. a.  Substantial Compliance

F. 2. a. Substantial Compliance

F. 2. b. Substantial Compliance

F. 3. a. Partial Compliance

F. 4.    Substantial Compliance

Observations:

The Language Assistance Plan required by this paragraph has been prepared and finalized. F. 1. a. remains in substantial compliance.

OPSO asserts that DHS and ICE inmates are not detained. OPSO developed a policy which was submitted to the Monitors. Provisions F. 2. a. and b. continue to be in substantial compliance.

OPSO provided documentation regarding the use of the language line. OPSO has provided documentation regarding the number of bilingual staff and the manner in which



the needs of language assistance are provided resulting in continuance of substantial compliance for provisions of F. 4. The Consent Judgment specifically requires at least eight hours of LEP training for all deputies and mental health staff who may regularly interact with LEP inmates. Provision IV. F. 3. a. is determined in partial compliance as only four hours of training as opposed to the eight hours of training is provided. Training of security and medical staff assigned to the IPC should be sufficient.

## IV. G.  Youthful Prisoners

*IV. G. Consistent with the Prison Rape Elimination Act of 2003, 42 U.S.C. § 15601, et seq., and its implementation of regulations, a youthful prisoner shall not be placed in a housing unit in which the youthful prisoner will have sight, sound, or physical contact with any adult prisoner through use of a shared dayroom or other common space, shower area, or sleeping quarters. In areas outside of housing units, OPSO shall either: maintain sight and sound separation between youthful prisoners and adult prisoners, or provide direct staff supervision when youthful prisoners and adult prisoners have sight, sound, or physical contact. OPP shall ensure that youthful prisoners in protective custody status shall have no contact with, or access to or from, non- protective custody prisoners. OPP will develop policies for the provision of developmentally appropriate mental health and programming services.*

Finding:

Substantial Compliance

Observations:

OPSO begun housing youthful offenders once again during the monitoring period. While the change in Louisiana law will impact the number in the future, the initial group of youthful inmates were moved from the juvenile facility to OJC under the law that existed at the time. Youthful inmates housed by OPSO are housed separately from adult inmates. When youthful inmates are in contact with adult inmates outside of the housing units, such as attending programs or going to court, they are directly supervised. During the monitoring period, developmentally appropriate mental health services were provided to youthful inmates. Travis School continues to provide educational and programming services. The requirement for developmentally appropriate mental health and programming services is separate and apart from PREA.

Housing youthful offenders places an additional strain on the overcrowded conditions. As of the writing of this report, 16 male youthful offenders were occupying a housing unit designed for 60 inmates and 4 female youthful offenders were occupying one of the mental health units resulting in a backlog of male mental health inmates in the OJC.

## VI. A – D. The New Jail Facility and Related Issues



### A. New Jail

*The Parties anticipate that Defendant will build a new jail facility or facilities that will replace or supplement the current facility located at 2800 Gravier Street, New Orleans, Louisiana. This Agreement shall apply to any new jail facility.*

Finding:

VI. A. Substantial Compliance.

### B. Design and Design Document

*Defendant shall obtain the services of a qualified professional to evaluate, design, plan, oversee, and implement the construction of any new facility. At each major stage of the facility construction, Defendant shall provide the Monitor with copies of design documents.*

Finding:

VI. B. Substantial Compliance

Observations:

These provisions apply to the construction of any new facility. Phase III is such a facility. As the City is the entity overseeing the construction of Phase III, OPSO must coordinate with the City to provide copies of design document at each major stage. The City has been providing access to design documents and information regarding Phase III, but assistance from the Court has often been necessary to facilitate access.

### C. Staffing

*Defendant shall consult with a qualified corrections expert as to the required services and staffing levels needed for any replacement facility. OPSO shall complete a staffing study to ensure that any new facility is adequately staffed to provide prisoners with reasonable safety.*

Finding:

IV. C. Partial Compliance

Observations:

The Consent Judgment requires that the Defendant **shall** consult with a qualified corrections expert as to the required services and staffing levels needed for any replacement facility. A new staffing study was conducted. However, OPSO still lacks the staff for its implementation. The paragraph remains in partial compliance.

### D. Compliance with Code and Standards

*Defendant will ensure that the new jail facility will be built in accordance with: (1) the American Correctional Association's standards in effect at the time of construction; (2) the American with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101-12213, including changes made by the ADA Amendments of 2008 (P.L. 110-325) and 47 U.S.C. §§ 225-661, and the regulations there under; and (3) all applicable fire codes and regulations.*

Finding:



Monitors not qualified to evaluate.

<u>Observations:</u>

The Monitors do not have the knowledge or expertise to evaluate compliance with this paragraph. OPSO asserts that it is in compliance with this provision, without offering documentation. Documentation from the architect would be sufficient.

## VII. Compliance and Quality Improvement

## VII. A. Policies, Procedures, Protocols, Training Curriculum and Practices

*Within 120 days of the Effective Date, OPSO shall revise and/or develop its policies, procedures, protocols, training curricula, and practices to ensure that they are consistent with, incorporate, address, and implement all provisions of this Agreement. OPSO shall revise and/or develop, as necessary, other written documents, such as screening tools, logs, handbooks, manuals, and forms, to effectuate the provisions of this Agreement. OPSO shall send pertinent newly drafted and revised policies and procedures to the Monitor as they are promulgated. The Monitor will provide comments on the policies to OPSO, SPLC, and DOJ within 30 days.*

*OPSO, SPLC, and DOJ may provide comments on the Monitor's comments within 15 days. At that point, the Monitor will consider the Parties' comments, mediate any disputes, and approve the policies with any changes within 30 days. If either party disagrees with the Monitor, they may bring the dispute to the Court. OPSO shall provide initial and in-service training to all Facility staff with respect to newly implemented or revised policies and procedures. OPSO shall document employee review and training in new or revised policies and procedures.*

<u>Finding:</u>

VII. A. Partial Compliance

<u>Observations:</u>

OPSO has now completed the development of the required policies. OPSO's efforts in the development of procedures and lesson plans resulted in this paragraph continuing to be in partial compliance. OPSO should continue to seek the input of the Monitors and Parties on any revisions of the policies required by the Consent Judgment. OPSO is reminded that it may not unilaterally change those policies.

## VII. (H). B.  Written Quality Improvement Policies and Procedures

*Within 180 days of the Effective Date, Defendant shall develop and implement written quality improvement policies and procedures adequate to identify serious deficiencies in protection from harm, prisoner suicide prevention, detoxification, mental health care, environmental health, and fire and life safety in order to assess and ensure compliance with the terms of this Agreement on an ongoing basis.  Within 90 days after identifying serious deficiencies, OPSO shall develop and implement policies and procedures to address problems that are uncovered during the course of quality improvement activities. These policies and procedures shall include the development and implementation of corrective action plans, as necessary, within 30 days of each biannual review.*

<u>Finding:</u>

VII. B. Partial compliance



Observations:

OPSO has provided documentation that it is now developing plans to identify serious deficiencies, and to address problems that are uncovered during the course of quality improvement activities to warrant a finding of partial compliance. If any have been completed, they have not been shared with the Monitors. These plans need to contain specific performance measures, timelines, and persons responsible. They also need to be implemented with appropriate development of corrective action to be taken and the auditing of adherence to the action plan.

### VII. (I). C. Full-Time Compliance Coordinator

*The Parties agree that OPSO will hire and retain, or reassign a current OPSO employee for the duration of this Agreement, to serve as a full-time OPSO Compliance Coordinator. The Compliance Coordinator will serve as a liaison between the Parties and the Monitor and will assist with OPSO's compliance with this Agreement. At a minimum, the Compliance Coordinator will: coordinate OPSO's compliance and implementation activities; facilitate the provision of data, documents, materials, and access to OPSO's personnel to the Monitor, SPLC, DOJ, and the public, as needed; ensure that all documents and records are maintained as provided in this Agreement; and assist in assigning compliance tasks to OPSO personnel, as directed by the Sheriff or his or her designee. The Compliance Coordinator will take primary responsibility for collecting information the Monitor requires to carry out the duties assigned to the Monitor.*

Finding:

Substantial Compliance

Observations:

Major Nicole Harris continues to serve as the full-time Compliance Coordinator.

### VII. (J.) D. Self-Assessment

*On a bi-annual basis, OPSO will provide the public with a self-assessment in which areas of significant improvement or areas still undergoing improvement are presented either through use of the OPSO website or through issuance of a public statement or report.*

Finding:

Substantial Compliance

Observations:

OPSO provides the assessment through its website. This provision is in substantial compliance.

### VIII. Reporting Requirements and Right of Access

### VIII. A. Periodic Compliance Reporting

*OPSO shall submit periodic compliance reports to the Monitor. These periodic reports shall be provided to the Monitor within four months from the date of a definitive judgment on funding; and every six months thereafter until termination of this Agreement. Each compliance report shall describe the actions Defendant has taken during the reporting period to implement this Agreement and shall*



*make specific reference to the Agreement provisions being implemented. The report shall also summarize audits and continuous improvement and quality assurance activities, and contain findings and recommendations that would be used to track and trend data compiled at the Facility. The report shall also capture data that is tracked and monitored under the reporting provisions of the following provisions: Use of Force; Suicide Prevention; Health Care Delivered; Sanitation and Environmental Conditions; and Fire and Life Safety.*

<u>Finding:</u>

Partial Compliance

<u>Observations:</u>

As noted in the individual section, several of the required reports have not been submitted during this monitoring period.

### VIII. B.  (Notification of) Death of Any Prisoner

*OPSO shall, within 24 hours, notify the Monitor upon the death of any prisoner. The Monitor shall forward any such notifications to SPLC and DOJ upon receipt. OPSO shall forward to the Monitor incident reports and medical and/or mental health reports related to deaths, autopsies, and/or death summaries of prisoners, as well as all final SOD and IAD reports that involve prisoners. The Monitor shall forward any such reports to SPLC and DOJ upon receipt.*

<u>Finding:</u>

Substantial Compliance

### VIII. C. Records

*Defendant shall maintain sufficient records to document that the requirements of this Agreement are being properly implemented and shall make such records available to the Monitor within seven days of request for inspection and copying. In addition, Defendant shall maintain and provide, upon request, all records or other documents to verify that they have taken the actions described in their compliance reports (e.g., census summaries, policies, procedures, protocols, training materials, investigations, incident reports, tier logs, or use of force reports).*

<u>Finding:</u>

Partial Compliance

<u>Observations:</u>

During this compliance period, OPSO often did not provide incident notifications and investigations requested within seven days. This provision remains in partial compliance.

### III.  Stipulated Orders

OPSO and the Plaintiffs/DOJ negotiated two agreements after Compliance Report #3. The language of the Stipulated Orders was linked directly to the Consent Judgment and represented priority areas for inmate safety. Some of them required a one-time action such as the posting of a memorandum or providing of training by a specific date. Some of the provisions of the Stipulated Order of February 11, 2015, contain on-going



obligations that are in addition to the Consent Judgment or clarify the obligations under the Consent Judgment.

The three provisions of the April 22, 2015, Stipulated Order are in substantial compliance and contained provisions that were to be accomplished by specific dates during April 2015. As those dates have passed, the Monitors no longer monitor those provisions. The Stipulated Order of February 11, 2015, has provisions which require ongoing compliance. In Report #21, OPSO's compliance with the June 2024 Stipulation and Order will be included.

*1. a. At each of the scheduled Court status conferences, the Sheriff or his designee shall report to the Court regarding OPSO's compliance status with each section (e.g. Section IV.A, IV.B.) of the Consent Judgment. This report shall include a summary of OPSO's progress since the immediate previously scheduled status conference and will include in the reporting OPSO's planned actions in the next 60 days to come into compliance.*

Finding:

Partial Compliance

Observations:

OPSO has not sufficiently complied with the requirements of this provision. This provision envisions outlining planned actions in the form of a report to the Court.

*1. b. OPSO shall comply with the Consent Judgment's requirement for periodic a compliance report as set forth in Consent Judgment Section VIII.A.2. The report shall describe the steps OPSO has taken in furtherance of compliance, and the activities planned during the next reporting period. The first report is due by April 1, 2015, and periodic reports shall be due in accordance with Section VIII.A, and/or on dates mutually agreed to by the parties and the Monitors, and approved by the Court, as necessary.*

Finding:

Partial Compliance

Observations:

OPSO has not sufficiently complied with the requirements of this provision. This provision envisions outlining planned actions in the form of a report to the Monitors every six months.

*1. c. Within 24 hours of the occurrence of any of the following incident, OPSO shall notify the Monitor via email:*
- *Death of an inmate/arrestee while held in custody (or housed in a hospital to which the inmate has been committed for care and retain in the custody of OPSO; or whose injury occurred while in custody and was subsequently released from custody);*
- *An inmate's/arrestee's suicide, suicide attempt, aborted suicide attempt, suicidal intent, and/or deliberate suicide self-harm gesture as defined by the American Psychiatric Association;*
- *An inmate's allegation of sexual abuse, sexual assault, sexual harassment, or voyeurism*



*whether the incident is between or among inmates, or between or among inmates and a staff/contractor or volunteer;*

- *An inmate's report, or a report by a staff/contractor or volunteer, of any inmate/inmate allegation of assault; or other inmate allegation of felonies occurring to them while in custody;*
- *An inmate's report of a report by a staff/contractor or volunteer, of any allegation of excessive force by an employee, volunteer or contractor;*
- *Suspension or arrest of any OPSO employee, volunteer, or contractor for alleged criminal activities while on-duty and/or in a facility under the control of OPSO; and*
- *Any recovery of significant contraband, specifically weapons.*

Finding:

Partial Compliance

Observations:

OPSO has not sufficiently complied with the requirements of this provision. At best, the Monitor learns of some of the items through incident reports, review of investigations and newspaper reports. Seldom is the notification within 24 hours. OPSO should put in place a system to comply with this provision.

*5. b. Commencing March 1, 2015, OPSO will make available to the Monitors, at the Monitors' request, the quarterly reviews conducted by ISB and the command staff regarding the operation of the EIS system, including supporting documentation reviews, as delineated by Section IV A. 4. b., c., d., and e. of the Consent Judgment.*

Finding:

Partial Compliance

Observations:

OPSO has not sufficiently complied with the requirements of this provision. As noted in the rating and comments in Section IV. A. above, simply providing a list of names with no indication that the command staff has reviewed the list and determined what action, if any, should be taken is insufficient.

*7. a. OPSO shall provide a monthly report to the Monitors, identifying the number of deputies hired the previous month; the number of deputies who resigned, if known, the reason for resignation, and the date the deputy entered service; and the number of deputies who were terminated, the reason for termination, and the date the deputy entered service. The same report shall be provided for non-sworn (civilian staff). A cumulative annual total will also be included as part of this report.*

Finding:

Substantial Compliance

Observations:

OPSO provides a monthly report that complies with the requirements of this provision.

*7. c. At the scheduled status conferences with the Court, OPSO shall report regarding progress to achieving hiring based on the plan, as well as any modifications and update to the plan.*



<u>Finding:</u>

Partial Compliance

<u>Observations:</u>

OPSO has not sufficiently complied with the requirements of this provision. This provision envisions outlining progress on adherence to the recruitment plan in the form of a report to the Court.



| 0 | Report # 1 2/13/14 | Report # 2 8/26/14 | Report # 3 2/25/15 | Report # 4 9/9/15 | Report # 5 3/17/16 | Report # 6 10/25/16 | Report # 7 5/1/17 | Report # 8 1/12/18 | Report # 9 8/25/18 | Report # 10 3/18/19 | Report # 11 9/19/19 | Report # 12 3/6/20 | Report #13 11/16/20 | Report # 14 5/17/21 | Report # 15 11/15/21 | Report # 16 06/26/22 | Report #17 12/08/22 | Report #18 07/13/23 | Report #19 12/07/23 | Report #20 06/24/24 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **IV.A. 1. Use of Force Policies and Procedures/Margo Frasier** | | | | | | | | | | | | | | | | | | | | |
| IV. A. 1.a. | ND | NC | NC | PC | NC | PC | PC | PC | PC | SC | SC | SC | SC | PC | PC | PC | PC | PC | PC | PC |
| IV. A. 1.b. | ND | NC | NC | PC | NC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | | SC | SC |
| IV. A. 1.c. | ND | NC | NC | PC | NC | NC | PC | PC | PC | SC | SC | PC | PC | PC | PC | NC | NC | NC | PC | PC |
| **IV.A.2. Use of Force Training/Margo Frasier and Shane Poole** | | | | | | | | | | | | | | | | | | | | |
| IV. A. 2. a. | ND | NC | NC | NC | NC | PC | PC | PC | PC | SC | SC | SC | SC | PC | PC | SC | PC | PC | PC | PC |
| IV. A. 2. b. | ND | NC | NC | NC | NC | PC | PC | PC | PC | SC | SC | SC | SC | PC | PC | SC | SC | PC | PC | PC |
| IV. A. 2. c. | ND | NC | NC | NC | NC | NC | NC | NC | PC | PC | SC | SC | SC | PC | PC | SC | SC | SC | SC | SC |
| **IV.A.3. Use of Force Reporting/Margo Frasier** | | | | | | | | | | | | | | | | | | | | |
| IV. A.3 a. | ND | NC | NC | NC | NC | PC | PC | PC | PC | SC | PC | PC | SC | SC | SC | PC | PC | PC | PC | PC |
| IV. A.3 b. | ND | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC | PC | PC | PC | PC | PC | PC |
| IV. A.3 c. | ND | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC | PC | PC | PC | PC | PC |
| IV. A.3 d. | ND | NC | NC | PC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV. A.3 e. | ND | NC | NC | PC | PC | NC | PC | PC | SC | SC | SC | SC | SC | PC | PC | PC | PC | PC | PC | PC |
| IV. A.3 f. | ND | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV. A.3 g. | ND | NC | NC | NC | PC | NC | PC | PC | SC | SC | SC | SC | SC | SC | SC | PC | PC | PC | PC | PC |
| IV. A.3 h. | ND | NC | NC | NC | NC | NC | NC | NC | PC | SC | SC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| **IV.A.4. Early Intervention System ("EIS") /Margo Frasier and Shane Poole** | | | | | | | | | | | | | | | | | | | | |
| IV.A.4.a. | ND | NC | NC | PC | PC | PC | NC | NC | PC | PC | SC | SC | SC | SC | PC | PC | PC | PC | PC | PC |
| IV.A.4.b. | ND | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | PC | PC | PC | PC | PC | PC | PC |
| IV.A.4.c. | ND | NC | NC | NC | NC | PC | PC | SC | SC | SC | SC | SC | SC | SC | PC | PC | PC | PC | PC | PC |
| IV.A.4.d. | ND | NC | NC | NC | NC | PC | PC | NC | NC | PC | SC | SC | SC | SC | SC | SC | PC | PC | PC | PC |
| IV.A.4.e. | ND | ND | ND | ND | NC | NC | NC | NC | NC | SC | SC | SC | SC | SC | SC | SC | PC | PC | PC | PC |
| **IV.A.5. Safety and Supervision/Margo Frasier** | | | | | | | | | | | | | | | | | | | | |

| | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IV.A.5.a. | ND | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.A.5.b. | ND | NC | NC | NC | NC | NC | NC | NC | NC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.5.c. | ND | NC | NC | NC | NC | NC | NC | PC | PC | PC | SC | SC | SC | SC | SC | PC | PC | PC | PC | PC |
| IV.A.5.d. | NC | NC | PC | PC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | NC | NC | NC | NC |
| IV.A.5.e. | ND | NC | NC | PC | PC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.A.5.f. | ND | NC | NC | PC | PC | SC | SC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.5.g. | ND | NC | ND | PC | NC | NC | NC | NC | NC | PC | SC | SC | SC | SC | SC | SC | SC | PC | PC |
| IV.A.5.h. | ND | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | SC | SC | PC | PC | PC | PC | PC | PC |
| IV.A.5.i. | ND | NC | NC | PC | PC | PC | PC | PC | SC | PC | PC | PC | PC | PC | PC | PC | PC | PC | NC |
| IV.A.5.j. | ND | NC | PC | PC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | NC |
| IV.A.5.k. | ND | NC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | PC | PC | PC | NC | NC | NC | PC |
| IV.A.5.l. | ND | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | PC | PC | PC | PC | PC | PC | PC |
| *IV.A.6. Security Staffing/Margo Frasier* | | | | | | | | | | | | | | | | | | | |
| IV.A.6.a. | ND | PC | PC | PC | SC | SC | PC | PC | PC | SC | SC | SC | PC | PC | | NC | NC | NC | NC |
| IV.A.6.b. | ND | NC | PC | PC | NC | PC | PC | PC | PC | SC | SC | SC | PC | PC | PC | NC | NC | NC | NC |
| *IV.A.7 Incidents and Referrals/Margo Frasier* | | | | | | | | | | | | | | | | | | | |
| IV.A.7.a. | ND | NC | NC | NC | NC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.7.b. | ND | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | SC | PC | PC | PC | PC | PC | PC | PC |
| IV.A.7.c. | ND | NC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.7.d. | ND | NC | NC | NC | NC | NC | NC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.7.e. | ND | NC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | PC | SC | SC | SC | PC | PC | PC |
| IV.A.7.f. | ND | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.7.g. | ND | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.7.h. | ND | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.7.i. | ND | NC | NC | PC | NC | NC | NC | NC | NC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.7.j. | ND | NC | NC | NC | NC | NC | NC | NC | NC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| *IV.A.8. Investigations/Margo Frasier* | | | | | | | | | | | | | | | | | | | |
| IV.A.8.a. | ND | NC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | PC | PC | PC | PC |
| IV.A.8.b. | ND | NC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |

| | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *IV.A.8.c.* | ND | NC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | PC | PC | PC | SC |
| *IV.A.8.d.* | ND | NC | NC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| *IV.A.8.e.* | ND | NC | NC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| *IV.A.8.f.* | ND | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| *IV.A.9. Pretrial Placement in Alternative Settings/Margo Frasier* | | | | | | | | | | | | | | | | | | | | |
| *IV.A.9.a.* | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| *IV.A.9.b.* | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| *IV.A.10. Custodial Placement within OPP/Patricia Hardyman* | | | | | | | | | | | | | | | | | | | | |
| *IV.A.10.a.* | NC | PC | SC | SC | SC | SC | PC | PC | PC | PC | SC | SC | SC | SC | PC | PC | NC | PC | PC | PC |
| *IV.A.10.b.* | NC | NC | NC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| *IV.A.10.c.* | NC | NC | PC | PC | PC | SC | PC | SC | SC | SC | SC | SC | SC | SC | PC | PC | PC | SC | SC | SC |
| *IV.A.10.d.* | NC | NC | PC | PC | PC | SC | PC | NC | PC | SC | PC | PC | SC | SC | PC | SC | PC | NC | NC | NC |
| *IV.A.10.e.* | NC | NC | PC | SC | PC | PC | SC | PC | PC | PC | PC | PC | SC | PC | PC | NC | NC | SC | SC | SC |
| *IV.A.10.f.* | NC | NC | NC | NC | NC | PC | PC | PC | NC | SC | PC | PC | PC | PC | PC | PC | NC | NC | NC | NC |
| *IV.A.10.g.* | NC | NC | NC | NC | NC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | PC | NC | SC | SC | SC |
| *IV.A.10.h.* | ND | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | PC | SC | PC | SC | NC | SC | SC | SC |
| *IV..A.11. Prisoner Grievance Process/Margo Frasier and Shane Poole* | | | | | | | | | | | | | | | | | | | | |
| *IV.A.11.a* | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | | | | | | | | | | |
| *IV.A.11.a.(1)* | | | | | | | | | | | SC | SC | SC | SC | SC | SC | PC | PC | PC | PC |
| *IV.A.11.a.(2)* | | | | | | | | | | | PC | PC | PC | PC | PC | PC | NC | NC | PC | PC |
| *IV.A.11.a.(3)* | | | | | | | | | | | SC | SC | SC | SC | SC | SC | SC | SC | PC | PC |
| *IV.A.11.a.(4)* | | | | | | | | | | | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| *IV.A.11.a.(5)* | | | | | | | | | | | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| *IV.A.11.a.(6)* | | | | | | | | | | | PC | PC | SC | SC | SC | SC | SC | PC | PC | PC |
| *IV.A.12. Sexual Abuse/Margo Frasier* | | | | | | | | | | | | | | | | | | | | |
| *IV.A.12.* | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | PC | PC | PC | PC | PC | PC | PC |
| *IV.A.13. Access to Information/Margo Frasier* | | | | | | | | | | | | | | | | | | | | |
| *IV.A.13.* | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | PC | NC | NC | NC |
| *IV. B. Mental Health Care* | | | | | | | | | | | | | | | | | | | | |
| *IV.B.1. Screening and Assessment/Nicole Johnson* | | | | | | | | | | | | | | | | | | | | |

| | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IV.B.1.a. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | PC | PC | SC | SC | SC | SC | PC | PC |
| IV.B.1.b. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | PC | SC | SC | SC | SC | SC | SC |
| IV.B.1.c. | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | PC | SC | SC | SC | SC | SC | SC |
| IV.B.1.d. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | PC | PC | SC | SC | SC | SC | PC | SC |
| IV.B.1.e. | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.1.f. | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.1.g. | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC |
| IV.B.1.h. | NC | NC | NC | NC | NC | NC | NC | NC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | PC | PC |
| IV.B.1.i. | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.1.j. | NC | NC | NC | PC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.1.k. | NC | NC | NC | PC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.1.l. | NC | NC | NC | NC | NC | NC | NC | NC | NC | SC | SC | SC | PC | PC | PC | PC | SC | SC | SC | SC |
| *B. 2. Treatment/Nicole Johnson* | | | | | | | | | | | | | | | | | | | | |
| IV.B.2.a. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.2.b. | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.2.c. | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.2.d. | NC | NC | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.2.e. | NC | NC | NC | PC | PC | PC | PC | NC | NC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | PC |
| IV.B.2.f. | NC | NC | NC | PC | PC | PC | NC | PC | PC | PC | SC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.2.g. | NC | NC | NC | PC | PC | PC | NC | PC | PC | SC | SC | SC | PC | SC | SC | SC | SC | SC | SC | SC |
| IV.B.2.h. | NC | NC | NC | PC | PC | PC | PC | PC | NC | PC | SC | SC | PC | PC | SC | SC | SC | PC | PC | PC |
| *IV.B.3. Counseling/Nicole Johnson* | | | | | | | | | | | | | | | | | | | | |
| IV.B.3.a. | NC | NC | NC | NC | PC | NC | NC | PC | PC | PC | PC | PC | PC | NC | PC | PC | PC | PC | PC | PC |
| IV.B.3.b. | NC | NC | NC | NC | PC | NC | NC | PC | PC | PC | PC | PC | PC | NC | PC | PC | SC | SC | SC | SC |
| *IV.B.4. Suicide Prevention Training Program/Nicole Johnson* | | | | | | | | | | | | | | | | | | | | |
| IV.B.4.a. | NC | NC | NC | PC | PC | PC | PC | PC | NC | PC | PC | PC | PC | NC | NC | PC | PC | PC | PC | PC |
| IV.B.4.b. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | PC | SC | SC | SC | SC |
| IV.B.4.c. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | PC | SC | SC | SC | SC | SC |
| IV.B.4.d. | NC | NC | NC | PC | NC | NC | NC | NC | NC | PC | PC | PC | NC | NC | PC | PC | PC | PC | PC | PC |
| IV.B.4.e. | NC | NC | NC | PC | NA | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | PC | PC | PC |

| | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IV.B.4.f. | NC | NC | NC | NC | PC | PC | NC | NC | SC | SC | SC | SC | SC | SC | PC | PC | PC | PC | PC | SC |
| IV.B.4.g. | NC | NC | NC | SC | PC | NC | NC | NC | NC | PC | NC | PC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.B.5. Suicide Precautions/Nicole Johnson | | | | | | | | | | | | | | | | | | | | |
| IV.B.5.a. | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.5.b. | NC | NC | NC | NC | NC | NC | NC | PC | PC | SC | PC | PC | NC | NC | PC | PC | PC | PC | PC | PC |
| IV.B.5.c. | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.5.d. | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | PC |
| IV.B.5.e. | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | NC | NC | PC | PC | PC | PC | PC | PC |
| IV.B.5.f. | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | SC | SC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.5.g. | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC |
| IV.B.5.h. | NC | NC | NC | NC | NC | NC | PC | NC | PC | PC | SC | SC | SC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.5.i. | NC | NC | NC | NC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | PC | PC | PC | SC | PC |
| IV.B.5.j. | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.B.5.k. | NC | NC | NC | NC | NC | NC | NC | PC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.6. Use of Restraints/Nicole Johnson | | | | | | | | | | | | | | | | | | | | |
| IV.B.6.a. | PC | NC | PC | PC | PC | PC | PC | PC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.6.b. | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.B.6.c. | ND | NC | PC | PC | PC | PC | PC | PC | NC | PC | NC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.B.6.d. | ND | NC | PC | PC | PC | PC | PC | PC | NC | PC | PC | SC | PC | PC | SC | SC | SC | SC | SC | SC |
| IV.B.6.e. | NC | NC | PC | PC | PC | PC | PC | PC | NC | PC | NC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.B.6.f. | NC | NC | PC | PC | PC | PC | PC | PC | NC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.B.6.g. | NC | NC | PC | PC | PC | PC | PC | PC | NC | PC | NC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.B.7. Detoxification and Training/Nicole Johnson/Susi Vassallo | | | | | | | | | | | | | | | | | | | | |
| IV.B.7.a. | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.7.b. | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | PC | PC |
| IV.B.7.c. | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | NC | NC | PC | PC |
| IV.B.7.d. | NC | NC | PC | PC | PC | PC | PC | NC | PC | PC | PC | PC | SC | SC | SC | SC | NC | PC | PC | NC |
| IV.B.8. Medical and Mental Health Staffing/Nicole Johnson/Susi Vassallo | | | | | | | | | | | | | | | | | | | | |
| IV.B.8.a. | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.8.b. | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | PC |

| | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **IV.B.9. Risk Management/Nicole Johnson/Susi Vassallo** | | | | | | | | | | | | | | | | | | | | |
| IV.B.9.a. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.9.b. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.9.c. | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.9.d. | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.9.e. | NC | NC | NC | NC | PC | PC | PC | PC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.9.f. | NC | NC | NC | NC | PC | PC | PC | PC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | NC | PC |
| **IV.C. Medical Care** | | | | | | | | | | | | | | | | | | | | |
| **See SA 2/11/15 13.** | | | | | | | | | | | | | | | | | | | | |
| **IV. C. Quality Management of Medication Administration/Susi Vassallo** | | | | | | | | | | | | | | | | | | | | |
| IV.C.1.a. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | PC | PC | PC |
| IV.C.1.b. | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | SC | PC | PC | SC | PC | PC | SC | PC | PC | SC |
| IV.C.1.c. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | PC | SC | SC | SC | SC | SC |
| IV.C.1.d. | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | PC | PC | PC | PC | SC | SC | SC |
| **IV.C.2. Health Care Delivered/Susi Vassallo** | | | | | | | | | | | | | | | | | | | | |
| IV.C.2.a. | NC | NC | NC | PC | PC | PC | PC | PC | PC | NC | PC | PC | SC | SC | SC | PC | PC | PC | PC | PC |
| IV.C.2.b. | NC | NC | NC | PC | PC | PC | PC | PC | PC | NC | PC | PC | PC | PC | PC | PC | PC | SC | PC | PC |
| **IV.C.3. Release and Transfer/Susi Vassallo** | | | | | | | | | | | | | | | | | | | | |
| IV.C.3.a. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.C.3.b. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.C.3.c. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.C.3.d. | NC | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| **IV.D. Sanitation and Environmental Conditions/Shane Poole** | | | | | | | | | | | | | | | | | | | | |
| IV.D. 1.a. | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | NC | NC | NC | NC |
| IV. D. 1.b. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | PC | PC | PC |
| IV. D. 1.c. | NC | NC | PC | PC | NC | NC | PC | SC | PC | PC | SC | SC | SC | SC | SC | SC | NC | NC | PC | PC |
| IV. D. 1.d. | NC | NC | NC | NC | SC | SC | SC | SC | SC | SC | SC | SC | SC | PC | PC | SC | NC | NC | SC | PC |
| IV. D. 1.e. | NC | PC | PC | PC | PC | PC | SC | SC | PC | SC | SC | SC | SC | SC | SC | SC | SC | PC | SC | PC |
| IV. D. 1.f. | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC | PC | PC | PC | PC | PC | PC | PC |
| IV. D. 1.g. | NC | NC | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |

| | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *IV. D. 1.h.* | NC | NC | NC | PC | NC | PC | NC | NC | NC | PC | PC | PC | SC | SC | SC | SC | SC | PC | PC | SC |
| *IV. D. 2. Environmental Control/Shane Poole* | | | | | | | | | | | | | | | | | | | | |
| *IV. D. 2.a.* | NC | NC | PC | PC | PC | SC | SC | SC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| *IV. D. 2.b.* | NC | NC | NC | NC | NC | SC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | PC | PC | PC | PC |
| *IV. D. 3. Food Service/Diane Skipworth* | | | | | | | | | | | | | | | | | | | | |
| *IV. D. 3.a.* | NC | NC | NC | PC | PC | PC | NC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| *IV. D. 3.b.* | NC | NC | NC | PC | PC | PC | NC | NC | NC | NC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| *IV. D. 3.c.* | NC | NC | NC | PC | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | PC | PC | SC | SC |
| *IV. D. 4. Sanitation and Environmental Conditions Reporting/Shane Poole* | | | | | | | | | | | | | | | | | | | | |
| *IV. D. 4.a.* | NC | NC | PC | PC | PC | PC | PC | PC | NC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| *IV. D. 4.b.* | NC | NC | NC | NC | PC | NC | NC | PC | PC | SC | SC | SC | SC | SC | SC | SC | PC | PC | SC | SC |
| *IV.E. Fire and Life Safety/Shane Poole* | | | | | | | | | | | | | | | | | | | | |
| *IV. E. 1. Fire and Life Safety* | | | | | | | | | | | | | | | | | | | | |
| *IV. E. 1.a.* | NC | PC | PC | PC | PC | PC | PC | SC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | NC | SC |
| *IV. E. 1.b.* | NC | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| *IV. E. 1.c.* | PC | PC | PC | PC | NC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | PC | SC |
| *IV. E. 1.d.* | NC | NC | NC | NC | NC | NC | PC | SC | SC | SC | SC | SC | NC | PC | SC | SC | SC | SC | PC | PC |
| *IV. E. 1.e.* | ND | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| *IV. E. 2. Fire and Life Safety Reporting* | | | | | | | | | | | | | | | | | | | | |
| *IV. E. 2.a.1-3* | ND | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | PC | PC | SC | SC | SC | SC |
| *IV. E. 2.b.* | ND | NC | NC | PC | NC | NC | NC | PC | PC | SC | SC | SC | SC | SC | SC | SC | PC | SC | SC | SC |
| *IV.F. Language Assistance* | | | | | | | | | | | | | | | | | | | | |
| *SCIV.F.1. Timely and Meaningful Access to Services/Margo Frasier* | | | | | | | | | | | | | | | | | | | | |
| *IV.F.1.a.* | ND | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| *IV.F.2. Language Assistance Policies and Procedures/Margo Frasier* | | | | | | | | | | | | | | | | | | | | |
| *IV.F.2.a.* | ND | PC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| *IV.F.2.b.* | ND | PC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| *IV.F.3. Language Assistance Training/Margo Frasier* | | | | | | | | | | | | | | | | | | | | |
| *IV.F.3.a.* | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **IV.F.4. Bilingual Staff/Margo Frasier** | | | | | | | | | | | | | | | | | | | | |
| IV.F.4. | NC | PC | PC | PC | PC | NC | NC | NC | NC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| **IV.G. Youthful Prisoners/Margo Frasier** | | | | | | | | | | | | | | | | | | | | |
| IV.G. | NC | NC | NC | PC | PC | PC | NC | NC | PC | PC | PC | PC | SC | SC | SC | SC | SC | PC | SC | SC |
| **VI. The New Jail Facility/Margo Frasier** | | | | | | | | | | | | | | | | | | | | |
| VI. A. | ND | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| VI. B. | NC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| VI. C. | ND | PC | SC | SC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | PC | PC | PC | PC | PC |
| VI. D. | Monitors Not Qualified to Evaluate | | | | | | | | | | | | | | | | | | | |
| **VII. Compliance and Quality Improvement/Margo Frasier** | | | | | | | | | | | | | | | | | | | | |
| VII. A. | ND | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | PC | SC | PC | PC | PC |
| VI. B. (H.) | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| VI. C. (I.) | NC | NC | SC | SC | NC | SC | SC | NC | PC | SC | SC | SC | SC | SC | SC | PC | PC | SC | SC | SC |
| VI. D. (J.) | ND | NC | NC | PC | PC | PC | PC | NC | NC | NC | SC | SC | SC | SC | SC | PC | SC | SC | SC | SC |
| **VIII. Reporting Requirements and Right of Access/Margo Frasier** | | | | | | | | | | | | | | | | | | | | |
| VIII.A. | ND | PC | NC | PC | PC | PC | PC | NC | NC | PC | SC | SC | SC | SC | SC | SC | SC | PC | PC | SC |
| VIII.B. | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| VIII.C. | PC | PC | PC | SC | SC | SC | NC | NC | PC | PC | SC | SC | SC | SC | PC | PC | PC | PC | PC | PC |
| **Legend:** | | | | | | | | | | | | | | | | | | | | |
| **ND - Not scheduled for review** | | | | | | | | | | | | | | | | | | | | |
| **NC - Non-compliance** | | 106 | 51 | 62 | 52 | 53 | 43 | 44 | 8 | 5 | 0 | 4 | 7 | 0 | 5 | 17 | 12 | 11 | 9 | |
| **PC - Partial Compliance** | | 57 | 106 | 96 | 99 | 100 | 105 | 100 | 98 | 66 | 60 | 59 | 67 | 77 | 79 | 77 | 85 | 95 | 92 | |
| **SC - Substantial Compliance** | | 4 | 11 | 10 | 18 | 16 | 20 | 25 | 63 | 103 | 114 | 111 | 100 | 97 | 90 | 80 | 77 | 68 | 73 | |
| **TOTAL** | | | | | | | | | | 174 | 174 | 174 | 174 | 174 | 174 | 174 | 174 | 174 | 174 | |

