# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| _____ | § |
| LASHAWN JONES, *et al.*, and | § |
| THE UNITED STATES OF AMERICA, | § |
| | § Civil Action No. 2:12-cv-00859 |
| PLAINTIFFS | § Section I, Division 5 |
| | § Judge Lance M. Africk |
| | § Magistrate Judge Michael B. North |
| SUSAN HUTSON, Sheriff, | § |
| | § |
| | § |
| DEFENDANT. | § |
| _____ | § |

---

### Report No. 21 of the Independent Monitors
### May 27, 2024

---

Margo L. Frasier, J.D., C.P.O., Lead Monitor
Susi Vassallo, M.D., Medical Monitor
Patricia L. Hardyman, Ph.D., Classification Monitor
Nicole Johnson, M.D., Mental Health Monitor
Shane J. Poole, M.S., C.JM., Environmental Fire Life Safety Monitor
Diane Skipworth, M.C.J., R.D.N., L.D., R.S., C.C.H.P., C.L.L.M., Food Safety Monitor



***Compliance Report #21***
***LASHAWN JONES, et al., and the United States of America v.***
***Susan Hutson, Sheriff***

Table of Contents

| | | **Page** |
|---|---|---|
| I. | | |
| II. | Introduction | 4 |
| | A. Summary of Compliance | 7 |
| | B. Opportunities for Progress | 10 |
| | C. Review Process of Monitors' Compliance Report #21 | 23 |
| | D. Communication with Stakeholders | 24 |
| | E. Recommendations | 24 |
| III. | Conclusions and Path Forward | 24 |
| IV. | Substantive Provisions | |
| | A. Protection from Harm | 26 |
| | A.1. Use of Force Policies and Procedures | 30 |
| | A.2. Use of Force Training | 33 |
| | A.3. Use of Force Reporting | 36 |
| | A.4. Early Intervention System | 40 |
| | A.5. Safety and Supervision | 41 |
| | A.6. Security Staffing | 52 |
| | A.7. Incidents and Referrals | 54 |
| | A.8. Investigations | 56 |
| | A.9. Pretrial Placement in Alternative Settings | 59 |
| | A.10. Custodial Placement | 59 |
| | A.11. Prisoner Grievance Process | 87 |
| | A.12. Sexual Abuse | 95 |
| | A.13. Access to Information | 96 |
| | B. Mental Health Care | 96 |
| | C. Medical Care | 140 |
| | D. Sanitation and Environmental Conditions | 147 |
| | E. Fire and Life Safety | 166 |
| | F. Language Assistance | 170 |
| | G. Youthful Prisoners | 172 |
| | H. The New Jail Facility | 173 |
| | I. Compliance and Quality Improvement | 174 |
| | J. Reporting Requirements and Right of Access | 176 |
| V. | Status of Stipulated Orders – February 2015, April 2015, and June 2024 | 177 |



                                                                              **Page**

**Tables**
Table 1 – Summary of Compliance – All Compliance Reports                         9
Table 2 – Status of Compliance – Stipulated Agreements                          10
Table 3 – Summary of Incidents CY 2018-CY 2024                                  28
Table 4 – CY 2018-CY 2024 All OJC Reported Incidents by Month                   29
Table 5 – CY 2018-CY 2024 OJC Reported Incidents                                45

**Figures**
Figure 1 – Percentage of White Male Inmates Assigned to OJC, TDC, and TMH
             Housing Units—April 2022-Sept. 2024                                67
Figure 2 – Percentage of White Female Inmates Assigned to OJC, TDC, and
             TMH Housing Units—April 2022-Sept. 2024                            68
Figure 3 – Rates and Completion Time of Initial Custody Assessments
             Completed Oct. 2022-Sept. 2024                                     70
Figure 4 – Number of OPSO Booking Per Month—February 2023-Dec. 2024             71
Figure 5 – Percent Overrides for Housing Purposes—April 2023-Sept. 2024         73
Figure 6 – Mandatory and Discretionary Override Rates by Gender
             April 2022-Sept. 2024                                              74
Figure 7 – Pending Custody Assessments October 2023-Sept. 2024                  75
Figure 8 – Victimization of Inmates on the Mental Health Caseload April
             2022-Sept. 2024                                                    77
Figure 9 – Number of Attachments input by Classification Staff
             —Oct. 2021-Sept. 2024                                              78
Figure 10 – Percentage of Initial Custody Assessments Oct. 2021-Sept. 2024      78
Figure 11–Rate of Disciplinary Infractions for the OPSO ADP: January 2023
             -Sept. 2024                                                        85
Figure 12—OPSO ADP vs. Number of Disciplinary January 2023-Sept. 2024          86
Figure 13—Most Serious Disciplinary Infraction/Report with Finding of
             Guilty: June 2022-Sept. 2024                                       87

**Charts**
Chart 1—Facility, Food Service, Medical, Mental Health, and Miscellaneous
             Grievances                                                         91
Chart 2-- Inmate/Inmate Physical Violence and PREA, Staff Misconduct and
             PREA, Life-Threatening, and Use of Force Grievances                92
Chart 3-- Commissary, Programs, Inmate Funds, Property, Grievance
             Appeals, Legal and Law Library Grievances                          92
Chart 4—Overdue Grievance Reports by Month                                      93

**Appendices**
Appendix A - Summary Compliance Findings by Section Compliance
Reports 1 – 18                                                                  183



**Compliance Report # 21**
**Introduction:**

This is Compliance Report #21 submitted by the Independent Monitors providing assessment of the Orleans Parish Sheriff's Office's (OPSO) compliance with the Consent Judgment of June 6, 2013. Compliance Report #21 reflects the status of OPSO's compliance as of September 30, 2024. This report is based on incidents, documents, and compliance-related activities between April 1, 2024, and September 30, 2024. Where appropriate, the report reflects the change that occurred between October 1, 2024, and the on-site compliance tour. All of the monitors, with the exception of Dr. Patricia Hardyman (the classification sub-monitor), were present on-site for the compliance tour that occurred December 16-19, 2024. Dr. Hardyman, accompanied by Lead Monitor Frasier, performed her on-site assessment January 13-15, 2025. This report is based on the observations and review of OPSO documents by the Monitors during the on-site visits and during the monitoring period.

Throughout the time the Monitors have been involved in enforcement of the Consent Judgment, the on-site visits have played an integral role. During the on-site visits and the on-site visits by the Lead Monitor and various other monitors in between the monitoring tours, the Monitors have endeavored to provide guidance to OPSO as to how to remedy the unsafe and unconstitutional conditions which existed when we began monitoring in late 2013, and which continue to exist. In addition to the on-site compliance tours by the Monitors, the Lead Monitor also visited April 16-18, 2024, May 13-15, 2024, June 24-27, 2024, August 19-21, 2024, September 16-18, 2024, November 18-20, 2024, January 13-15, 2025, and February 17-19, 2025. Monitor Shane Poole also visited May 13-15, 2024, May 28-30, 2024, June 24-27, 2024, July 31-August 1, 2024, August 19-21, 2024, September 16-18, 2024, November 18-20, 2024, January 13-15, 2025, and February 17-19, 2025.  Additionally, all of the Monitors were in frequent contact with OPSO via other methods such as emails, telephone calls, and virtual meetings.

Sheriff Susan Hutson was sworn in as Orleans Parish Sheriff in May 2022. Compliance Report #21 is the fourth monitoring period for which Sheriff Hutson was sheriff the entire time. During the compliance period, on July 15, 2024, Jeworski Mallett joined OPSO as the Chief of Corrections. He is an experienced correctional administrator



with decades of experience in the Mississippi State Prison system.

On May 14, 2024, Judge Africk held a hearing on the status of compliance with special emphasis on the findings in Report #19. After hearing testimony from the monitors as to conditions and compliance, the Court ordered OPSO, in consultation with the parties, to file a stipulation regarding a corrective action plan (CAP) with respect to provisions in non-compliance by June 13, 2024. The Court also set deadlines for the filing of stipulations regarding corrective action plans with respect to provisions in partial compliance June 24, 2024, August 2, 2024, and September 28, 2024. The parties also agreed to a Stipulation and Order that was entered by the Court on June 17, 2024. As part of the Stipulation and Order, OPSO was also required to provide a report on its progress with adherence to the corrective action plans each month, to file a report quarterly with the Court, and other obligations. OPSO has provided the monthly reports and filed quarterly reports.

The requirement that OPSO, in consultation with the parties and monitors, formalize corrective action plans which are intended to ultimately result in substantial compliance with each provision of the Consent Judgment was a monumental step. The Monitors have consistently urged OPSO to put in place the necessary processes and procedures to not only obtain compliance, but to sustain compliance. The Monitors have stressed that such processes and procedures would allow OPSO to take the necessary steps towards compliance, provide adequate proof of compliance, independently assess compliance with the Consent Judgment and its own policies and procedures, and address shortcomings without waiting for the Monitors to point out the shortcomings in the bi-annual reports to the Court. The Monitors have provided guidance as to how to go about the various review functions and how to establish a compliance unit that would operate independently of those whose performance would be assessed. While there had been talk about the formation of a compliance unit over the lifetime of the Consent Judgment, it did not become operational until Sheriff Hutson took office. The Compliance and Accountability Bureau (CAB) has been in existence for the past four monitoring periods. During this monitoring period, CAB continue to add staff and develop a strategic plan for governing its tasks, goals, and processes. The requirements of the Orders issued by Judge Africk necessitated the formalization of the corrective action plans including producing a



corrective action plan for every provision not in substantial compliance.

The establishment and development of the CAB and the Jail Compliance Team are monumental steps in the right direction. A fully staffed compliance unit, trained in conducting audits in a correctional setting, with a fully developed strategic plan will allow OPSO to recognize deficiencies and address them. For instance, OPSO continues to not have an electronic way of recording when and if security checks take place in the housing units. Since there is not an electronic record of security checks, deputies write the checks in their logbooks. Often, supervisors, who are also required to make security checks and inspections, do not record their security checks in any manner. OPSO also utilizes a paper form on which to record security checks. While this provides an easier way for a supervisor to quickly determine during a unit inspection if the deputy has recorded that the security checks are being performed timely, it is still insufficient proof that an appropriate security check actually occurred and when it occurred. To appropriately verify the accuracy of the times recorded and the method used, the CAB spends hours watching video to determine if and when the security check occurred and whether it was performed correctly. As far as the corrective action plan, OPSO performed a baseline audit of staff and supervisor security checks for the period of April 14, 2024, through April 20, 2024. The audit, which will be discussed further in the report, found that the day shift actually only performed 15% of the checks indicated on their logs and the night shift actually only performed 7% of the security checks indicated on their logs. This is, unfortunately, consistent with the systemic deficiencies identified by the monitoring team during on-site visits when deputies were inconsistent in describing how an acceptable security check would be performed. Furthermore, the deputies admitted that they did not perform all of the tasks for a proper security check each time a security check was recorded as having taken place. Generally, an adequate security check was only performed, if at all, when a physical count of the inmates took place; twice a day. Supervisors often claim they conduct inspections, but the appearance of the housing areas and the lack of documentation calls those claims into doubt. The CAB is important to the work to be done on gaining and sustaining compliance. Equally important is adopting a culture where accountability is embraced as opposed to a culture where there is a reluctance to address the deficiencies and, in some instances, undermining the efforts



of those whose job it is to objectively review data and accurately assess compliance status.

In other areas of the Consent Judgment, progress has been sporadic. In some areas, there has been progress, and in some cases, there has been regression. Overall, ratings improved in twelve (12) provisions and regressed in nine (9) provisions. Seven (7) provisions were moved to substantial compliance while nine (9) provisions regressed from substantial compliance. Unfortunately, returns to the pattern seen in the decline in overall substantial compliance with the Consent Judgment which had occurred for eight (8) straight monitoring reports (Reports 13-20). The decline in substantial compliance corresponded with the return of the control of the OJC to the authority of the Sheriff. The number of provisions in non-compliance has decreased to five (5) provisions. Three of the provisions in non-compliance related to the safety and security of the facility and the staffing of the facility. One non-compliant provision relates to classification. The remaining non-compliant provision relates to mental health care. There was also significant regression from substantial compliance to partial compliance in provisions related to mental health care. The lack of additional progression and, in some cases, regression is due to a failure to follow the policies and procedures that have been put in place. It has been exacerbated by the lack of staff, but many of the provisions are not reliant on security staffing. The specific areas are addressed in this report.

## A.    Summary of Compliance

The requirements of the Consent Judgment represent correctional practice recognized as required for the operation of a Constitutional jail system. While there is some flexibility in addressing the mandates, achieving substantial compliance with the Consent Judgment, and Stipulated Agreements are necessary to bring OPSO and its correctional facilities into adherence with Constitutional requirements. The Consent Judgment contains 174 separately rated provisions. While they are separately rated, they are often intertwined. For example, effective implementation of a policy requires not only the drafting of a suitable policy, but appropriate training on the policy and enforcement of the policy. Enforcement of the policy is contingent on assessing whether the policy is being followed which requires supervision, analysis of incidents and data, and objective confirmation of compliance. A meaningful annual review of the adequacy of the policy



does not just mean determining whether the wording of the policy should be changed but also includes evaluating adherence to the policy and whether the objectives of the policy are being met; which requires objective data collection and analysis, and the development of and adherence to corrective action plans. While appropriate policies have been developed, the objective data collection, and the analysis and development of corrective action plans have been lacking thus far. The collection of data is now in its infancy with the establishment and implementation of the CAB under Sheriff Hutson. The CAB has been instrumental in the development of the corrective actions plans now required by court order. The challenge has proven to be the execution of the corrective action plans in a timely and thorough manner. Thus far, implementation and adherence to the corrective actions plans filed with the Court has not been successful.

The goal is substantial compliance with all of the provisions of the Consent Judgment. There has been improvement in the number of provisions in non-compliance as there are now five (5) provisions in non-compliance (2.9%) as opposed to nine (9) provisions in Report #20 (5.1%), eleven (11) provisions in Report #19 (6.3%), twelve (12) provisions in Report #18 (6.8%), and seventeen (17) provisions in Report #17; however, in Report #16, there were five (5). Substantial compliance was achieved for seventy-two (72) of the provisions (41.4%). Ninety-seven (97) of the provisions are in partial compliance (55.7%).

Under the authority of the Independent Compliance Director, OPSO made material progress as indicated by the movement of non-compliance to partial compliance to substantial compliance for over half of the provisions. At different times during the duration of the Consent Judgment, including in some areas in this report, there has been regression in the progress towards compliance. As will be addressed in individual areas, OPSO has shown regression from the progress in some provisions due to failure to consistently follow and enforce policies and procedures and to provide meaningful training. OPSO has also shown improvement in other provisions.

During the onsite visit for Compliance Report #21, it was apparent that there continues to be an effort being made to utilize data analyses, including institutional violence data and use of force data to determine policy adherence and develop action plans to address shortcomings and make decisions. As the collection of data on



institutional violence improves, the development of a systematic approach to making decisions and implementing and enforcing them to reduce institutional violence is key. For instance, review of incident reports and disciplinary reports continues to clearly indicate that much of the violence is perpetrated by an identifiable group of inmates. OJC leadership has compiled a list of the inmates involved in multiple incidents and have access to the data to allow OPSO to identify inmates involved in institutional violence. However, due to the lack of a close custody housing unit with appropriate security measures to house problematic inmates, other than the short time they might be placed on the disciplinary unit, little has been done to separate them from the general population. There were renewed discussions during the compliance period about reestablishing a close custody housing unit during the monitoring period. One of obstacles was the use of up to four housing units as intake units during the monitoring period, but progress was made, and it appears that the close custody unit will become a reality by the end of June 2025.

The establishment of the CAB is a definite move in the right direction, but the concept of accountability and a systematic approach must become part of the OPSO culture, and the CAB must be fully staffed, fully trained, with a fully developed strategic plan to be effective. Otherwise, the same deficiencies are likely to continue to be noted time and time again.

**Table 1 – Summary of Compliance – All Compliance Reports[1]**

| Compliance Report/Date | Substantial Compliance | Partial Compliance | Non-Compliance | NA/ Other | Total |
|---|---|---|---|---|---|
| #1 – December 2013 | 0 | 10 | 85 | 76 | 171 |
| #2 – July 2014 | 2 | 22 | 149 | 1 | 174 |
| #3 – January 2015 | 2 | 60 | 110 | 2 | 174 |
| #4 – August 2015 | 12 | 114 | 43 | 4 | 173 |
| #5 – February 2016 | 10 | 96 | 63 | 4 | 173 |
| #6 – September 2016 | 20 | 98 | 53 | 2 | 173 |
| #7 – March 2017 | 17 | 99 | 55 | 2 | 173 |
| #8 – November 2017 | 23 | 104 | 44 | 2 | 173 |
| #9 – June 2018 | 26 | 99 | 46 | 2 | 173 |
| #10 – January 2019 | 65 | 98 | 8 | 2 | 173 |
| #11 – September 2019 | 103 | 66 | 5 | 0 | 174 |
| #12 – May 2020 | 118 | 56 | 0 | 0 | 174 |



| #13-- November 2020 | 111 | 59 | 4 | 0 | 174 |
| #14—May 2021 | 100 | 67 | 7 | 0 | 174 |
| #15—November 2021 | 97 | 77 | 0 | 0 | 174 |
| #16—May 2022 | 95 | 72 | 5 | 0 | 174 |
| #17—December 2022 | 80 | 77 | 17 | 0 | 174 |
| #18—July 2023 | 76 | 86 | 12 | 0 | 174 |
| #19—December 2023 | 68 | 95 | 11 | 0 | 174 |
| #20—June-July 2024 | 73 | 92 | 9 | 0 | 174 |
| #21—December 2024 | 72 | 97 | 5 | 0 | 174 |

With the entry of the Stipulated Order in June 2024, seven new supplemental provisions have been added. The status of compliance (February 2015, April 2015, and June 2024) is as follows:

**Table 2 – Status of Compliance with 2015 and 2024 Stipulated Agreements**

| Compliance Report/Date | Substantial Compliance | Partial Compliance | Non-Compliance | NA | Total |
|---|---|---|---|---|---|
| August 2015 | 21 | 12 | 1 | 0 | 34 |
| February 2016 | 21 | 12 | 1 | 1 | 34 |
| September 2016 | 26 | 7 | 1 | 0 | 34 |
| March 2017 | 28 | 4 | 1 | 1 | 34 |
| November 2017 | 21 | 11 | 1 | 1 | 34 |
| June 2018 | 23 | 8 | 2 | 1 | 34 |
| January 2019 | 28 | 5 | 0 | 1 | 34 |
| September 2019 | 28 | 5 | 0 | 1 | 34 |
| May 2020 | 28 | 5 | 0 | 1 | 34 |
| November 2020 | 32 | 2 | 0 | 0 | 34 |
| May 2021 | 32 | 2 | 0 | 0 | 34 |
| November 2021 | 32 | 2 | 0 | 0 | 34 |
| May 2022 | 32 | 2 | 0 | 0 | 34 |
| December 2022 | 32 | 2 | 0 | 0 | 34 |
| July 2023 | 32 | 2 | 0 | 0 | 34 |
| December 2023 | 29 | 5 | 0 | 0 | 34 |
| June-July 2024 | 29 | 5 | 0 | 0 | 34 |
| December 2024 | 30 | 11 | 0 | 0 | 41 |

**B.    Opportunities for Continued Progress**

The Monitors summarize below the areas identified in preparation of this report regarding OPSO's current level of compliance with the Consent Judgment.

**1.    Foundational Work** - The essential, core work required to achieve compliance



includes:

- <u>Policies and Procedures</u> – OPSO completed the essential policies and procedures. The required reviews and necessary updates have fallen behind since the promotion of the Policy Manager to Deputy Chief of Jail Operations in May 2023. The Policy Manager position was filled during the monitoring period, and begun the annual reviews required. Also essential is the continued development, approval, and implementation of lessons plans and training that correspond with each of the policies. OPSO's policy governing its written directive system has significantly improved the policy/procedure process. OPSO, as part of its corrective action plans, has begun to offer training, including roll call training, for areas where it has been found that the execution of policy is lacking. Unfortunately, there has often been a delay between when policies are submitted for review, and when they are returned with any suggested changes. For instance, the policy regarding mandatory overtime has been in the approval stage for over a year at the time of this report. Adherence to the policies, procedures, and training is essential. While the full implementation of a fully staffed and functioning CAB will be helpful through its objective auditing of policy adherence, the consistent enforcement of policies is a role which must be performed by the supervisors at all levels. Too often the failure to follow policy is blamed on the lack of staff or training. Neither is an acceptable excuse. Whether it is lack of supervision, lack of staff, or inadequate training, the result of failure to follow policy is often harmful to staff and/or inmates and still is not adequately being addressed.

- <u>Inadequate staffing</u> – OPSO has continued to hire staff and has made progress despite the large number of terminations and resignations. During CY 2021, OPSO lost significant ground in that it hired 97 new staff members and lost 177 staff members through resignation, termination, and retirement. During CY 2022, OPSO hired 136 new staff members and lost 185 staff members through resignation, termination, and retirement. During CY 2023, OPSO hired 265 new staff members and lost 136 staff



members through resignation, termination, and retirement. During CY 2024, OPSO hired 200 new staff members and lost 141 staff members through resignation, termination, and retirement. These staff members reflect staff across all operations of the OPSO; not solely the jail operation. Of the 200 staff members hired during CY of 2024, approximately two-thirds (134) were assigned to jail operations. This is an improvement over CY 2023 when it was less than half. However, 115 of the 141 staff members who left employment during CY 2024, were assigned to security functions in OJC. Thus, over 80% of the retirements, resignations, and terminations were assigned to security functions in the OJC. This resulted in a net gain of 19 new staff members assigned to jail operations. It should be noted that this does not mean 19 new recruits/deputies as it includes intake clerks and corrections monitoring technicians. The staffing assigned to the housing areas of the facilities (OJC and TMH) is extremely inadequate to comply with the Consent Judgment. Given the lack of staff, it is the opinion of the Monitors that significant amounts of scheduled overtime of the current staff will continue to be required to staff the housing units at even a minimally acceptable level. Mandatory overtime of two shifts per pay period (14 days) was implemented in mid-September 2024. The requirement that units within the OPSO outside of OJC assist in staffing OJC has been formalized through the Emergency Staffing and Augmentation Plan (ESAP). The ESAP has resulted in the provision of deputies from outside OJC to assist in critical area such as escorts for the mental health and medical staff but has not resulted in additional staff working in the housing units; especially on the evening shift and weekends. The outside unit that has contributed the most to filling the void is the Investigative Services Bureau. However, there has not been sufficient participation by other outside units to supplement security in housing units to any meaningful degree. During the frequent site visits by the monitoring team, more often than not, there continue to be housing units for which there is not a staff member present in the housing unit. The staff who were present



were often tasked with manning two housing units and/or the control room despite the Consent Judgment requiring one deputy/recruit physically on each unit for direct supervision. Further, almost daily, assigned staff leave housing units and control pods unattended for meal breaks and other duties. OPSO has been encouraged to require staff to notify their supervisors if they are leaving their post and to require the supervisor to assign a relief staff member during their absence.

The Stipulation and Order entered by Judge Africk in June 2024, mandates that the four specialty housing units be staffed 24/7, including breaks. Despite the mandate, these four specialty housing units remained unstaffed on occasion. The OJC Compliance Monitoring Team, after the compliance period, began conducting audits of the staffing of these units. The audits confirmed that the units were being left unstaffed or that the staff was in the control pod as opposed to being in the housing unit. These audits provide useful information to OJC leadership in making deployment decisions.

Sheriff Hutson raised the salaries for recruits and deputies as a result of the budget request submitted in the 2023 budget, but her request to further raise salaries for recruits and deputies in 2024 was not approved by the City Council. OPSO has made valiant efforts to hire new recruits to work in OJC. Retention of those recruits has proven difficult, and OJC has not seen a significant enough increase in staff to allow all housing units to be properly staffed. While OPSO has begun hiring directly for some of the non-OJC assignments (courthouse security, civil), there are still a significant number of staff continuing to transfer out of OJC or to specialty units with OJC such as the Special Response Team (SRT) and the training academy. This is concerning to the Monitors for two reasons: (1) it lessens the level of experience within OJC and (2) a higher percentage of male staff were transferred than female staff which exacerbated the disparate ratio of male staff to female staff within the OJC.  OPSO is strongly encouraged to continue its review of the deployment of staff. It is apparent that sufficient



staff are not actually present in the areas where the need is most critical, staffing the housing units. Along with redeployment of staff has to be the accountability of the supervisors to ensure the staff is physically present in the housing units. Sheriff Hutson has made the redeployment of staff, including adequate supervision on the evening/night shift, a priority. To deal with the severe shortage of sergeants on all of the shifts, provisional promotions were made during the monitoring period. Those provisional sergeants received training to assist them in performing their duties. While there are plans to have a promotional board, it has been in the process for over a year. After the compliance period, OPSO began the promotional process. OPSO is encouraged to finalize the promotional process as provisional promotions are often seen as being based on favoritism as opposed to merit.

- <u>Training</u> – Employee training for security staff, both pre-service and in-service, has made progress over time, but it has proven difficult to staff OJC while allowing staff to attend the Academy for their annual training and the training necessary to move from a Recruit to Deputy. In 2021, OPSO reinstated the practice of assigning new deputies to a training officer during the first three weeks of assignment to OJC (field training program), but enforcement and follow-through has been sporadic and occurred infrequently during the compliance period. A field training program needs to be fully implemented with follow up as to the impact the program has on turnover. The program, if allowed to be fully implemented, is likely to result in a reduction of turnover and a reduction in rule violation by new recruits. OPSO did its annual training in CY 2023, but attendance was only about 72% of the mandated staff. As discussed in the use of force training section, many of the recruits have not received adequate defensive tactics training.

- <u>Supervision</u> – Safe operation of OPSO's facilities requires an adequate number of sufficiently trained first line and mid-management supervisors and clear lines of authority and responsibility. Captains and lieutenants have now been deployed in an effort to cover the shifts on a continuous



basis. There are still shifts where the numbers of supervisors is not adequate.

2.  **Medical and Mental Health Care** – During this monitoring period, the contracted provider for medical and mental health services was changed from Wellpath to Wexford. ==The area of mental health care showed the most significant decline of all the areas. Wexford did not provide many of the reports and documentation required under the Consent Judgment. This is the second compliance period where Wexford has failed to provide the mandated information. The Medical and Mental Health Monitors report that challenges remain in the provision of basic care, staffing, and recordkeeping, as well as the continued== need for improved collaboration with custody/security staffing. The Monitors continue to be concerned about key leadership positions being unfilled or the frequent absence of the assigned leadership. Security staff continued to be responsible for staffing some of the "suicide watches" during the on-site visit. After the compliance period, an effort was made to reassign inmates on suicide watch to the Temporary Mental Health Facility (TMH) which seemed to reduce the number of inmates on suicide watch in OJC. While there was some improvement in the deputies' knowledge of their duties to perform and document suicide watches, inconsistency with how suicide watches were performed and documented were still noted, resulting in inconsistency of the reporting of data. An additional issue is that the mental health staff assigned to do suicide watches are required to leave the housing unit when there is no security staff on the housing unit. This means that inmates on suicide watch are frequently left unsupervised. Staffing of housing units upon which inmates are on suicide watch (2A and sometimes 3C) is mandatory and should be prioritized when there is a security staff shortage. The Court addressed this issue by mandating OPSO staff the four special management housing units (which includes 2A and 3C) including when the assigned deputy takes a break. However, they are still unstaffed at least 15% of the time. During the monitoring period, psychiatrists from LSU began providing psychiatric mental health care. There have been concerns expressed as to whether the quantity, and, perhaps the quality, of psychiatric care has declined with the new contractor. The design of the interview



rooms and safety concerns in the OJC continues to require the assignment of one deputy to escort each psychiatrist. LSU is not responsible for many aspects of mental health care required by the Consent Judgment. An important part of the long-term solution to the lack of compliance with the Consent Judgment in the areas of medical and mental health is the design and construction of Phase III, a specialized building which will contain an infirmary and housing for inmates with acute mental health issues. For instance, having security staff escort each psychiatrist or other mental health to interview inmates is addressed in the design of Phase III as the psychiatrists and other mental health staff will be able to interview inmates in an environment which is much safer for both staff and inmates and will not require a deputy to be assigned to each mental health professional for security.  The City extensively renovated portions of TDC (now referred to as TMH or Temporary Mental Health) as a stop gap measure. OPSO utilized all of the TMH units during this monitoring period, but the failure to fully utilize the capacity of TMH results in a backlog of inmates with acute mental health issues and the housing of inmates with acute mental health issues and other serious mental health issues continuing to be housed in OJC which is inadequate for the housing of these inmates. Even with TMH, the facilities within OJC to house and to provide individual and group programming for inmates with mental health issues are inadequate and create security and safety issues for both staff and inmates. The inadequacy of the OJC facility and the lack of training on the part of the security staff are reflected in the high number of uses of force, attempted suicides, and assaults on staff and inmates on the mental health units.

3.  **Inmate Safety and Protection from Harm** - Providing a safe and secure jail continues to be a challenge.

   - <u>Violence and Contraband</u> – There were significant incidents of violence occurring within the facilities during the monitoring period; including inmate-on-inmate assaults and assaults on staff. The level of violence in the facility continued to be at all-time high levels during this monitoring period. The inmates appear to be emboldened in their refusal to follow the rules and obey the orders of the security staff. Very concerning is that both staff



and inmates continue to relay to the Monitors that there are inmates who are acting as "tank bosses" and are extorting other inmates and requiring payment for protection or stealing commissary from other inmates. In order to gain control of this situation, it continues to be recommended by the monitors that OPSO reestablish a housing unit in which these inmates can be housed with adequate security measures, i.e., adequate supervision, limited time out of cell, proper restraints when out of cell, and no access to items that can be used as weapons. Most often, the inmate-on-inmate assaults occurred when there was no deputy stationed in the housing unit. Especially concerning is that inmates continue to fashion weapons from items found in the jail during the prolonged periods of time when the housing unit are without supervision. As sources of contraband (such as the light supports in the utility closets and the cabinets at the front of the day room) were identified and appeared to have been eliminated, the inmates then discovered a new source of material from which to fashion weapons. For example, inmates pry off the metal sheeting around the windows to fashion weapons. The brooms and mops, the facility provides for cleaning, often end up in the inmates' cells and are used as weapons as inmates are not supervised when performing cleaning with the exception of the inmate crews utilized to clean the showers. In reality, few, if any, of the sources of contraband would be available to the inmates if the staff followed policies regarding supervision and limiting access to materials. OPSO has increased the number of targeted and random shakedowns resulting in the removal of weapons, pills, narcotics, and other contraband from the housing units. Still, inmates are often observed smoking illegal substances and lighting wicks from dryers and electrical outlets. Inmates continue to start fires on the housing units. Disorder and non-compliance with the institutional rules cause staff to use force to gain control and compliance. While the force used may be reasonable in response to the threat, if appropriate security measures were taken in the first place (such as placing restraints on the inmate before the inmate is allowed to exit the cell, the force used to regain



control would probably not be necessary. There is inadequate use of de-escalation techniques before resorting to force, including examples of using OC spray without adequate de-escalation and/or in retaliation against inmates. Seldom are mental health staff involved in de-escalation even though a large percentage of the inmates involved in the use of force are on the mental health caseload. Concerning is clearly unreasonable or unnecessary uses of force are found to be acceptable when reviewed by OJC leadership and the Force Investigation Team (FIT). to be such during the review at multiple levels at OPSO. The Use of Force Review Board's (UOFRB) role in addressing unreasonable and unnecessary uses of force is limited by the length of time it takes for an incident to be reviewed by the UOFRB. Often the staff involved is no longer employed due to have been terminated for misconduct including improper use of force.

- <u>Inmate Classification</u> – The inmate classification process, which had regressed during the last several monitoring periods, showed improvement this compliance period. The Classification Manager had no prior jail classification experience when she was promoted, but has worked hard to learn the skills needed to ensure appropriate housing to achieve compliance with the Consent Judgment. There needs to be continued attention to ensure housing decisions and placements are consistent with OPSO policies and objective classification principles. Acquiescence to inmates or security staff by moving inmates to reside with their allies or accommodating staff to avoid problematic inmate(s) continues but has lessened. There was no analysis to determine if inmates involved in an altercation should be kept separate or if they were simply trying to manipulate the system to gain access to the housing unit in which their friends or associates reside.  OPSO policy and procedures for reviewing and clearing separations that prevent inmates from being housed together or removed from protective custody are not being closely followed. Credible auditing needs to focus on identifying issues and correcting placements. During this compliance period, it appeared that while the housing audits



were filled out, videos of the audits suggested the housing audit process is still inconsistent and problematic.

- <u>Inmate Grievances</u> – As of Report #11, the ratings of the subdivisions in the grievance provision were individually given. The separate ratings allowed the areas in which deficiency existed to be highlighted. Timeliness and adequacy of responses are still not acceptable. The trend data from the grievance system is now available to assist in identifying problems to be addressed, but there has not been adequate follow-through on addressing the issues identified. The absence of working kiosks by which to file grievances during the monitoring period continued to compromise the confidentiality of the grievance system; this has been a continuous issue over numerous monitoring report cycles. This issue is highlighted as the work around developed by the Grievance Staff (handing out and picking up paper grievances) has been hampered by the lack of security staff to allow them on the housing units. The issues with failure to comply with the Consent Judgment are related to non-working kiosks on which to file grievances and the lack of follow up by the persons charged with responding to the grievances.

4. <u>Incident Reporting</u> –The accurate, timely reporting of incidents has improved but continues to be an area of concern. There remain serious incidents for which no report or no timely report is prepared by OPSO staff, including incidents involving the serious injury of inmates and drug overdoses. Reports are often incomplete and do not provide the necessary information for the reader to determine what occurred and why it occurred. It is particularly concerning that incomplete and sometimes inarticulate reports have been reviewed by and approved by a supervisor. OPSO began implementation of a corrective action plan nearly two years ago to address timeliness and thoroughness of reports which includes training and remedial action including discipline. The corrective action plan has resulted in an improvement of timeliness of reports, and efforts during the end of this compliance period began to address the problem of the thoroughness of the reports. OPSO has provided additional training to supervisors. Additional staff



have recently been added to the Jail Compliance Team which provides additional resources dedicated to the gathering and auditing of reports. The Monitors and parties receive reports electronically, which has improved the timeliness of provision of completed reports, but the timeliness of the completion of reports and quality of reports still need to be addressed. The change has also highlighted that there are numerous incidents which should be reported to the Monitors in the daily summary which are not. A large part of the problem seems to be the incorrect categorization of reports when written. There are numerous reports where the narrative details a use of force, but the categorization does not indicate force was used. Reports will describe an assault by an inmate on another inmate or the assault on a staff member and it will be incorrectly characterized as "other" or "inmate." Not only does the mischaracterization present an issue for the Monitors when reviewing reports, but it also makes the gathering of accurate data and the analysis of data on incidents more difficult for OPSO.

5. **Jail Management System –** An integral part of the jail's operational improvement is tied to an effective jail management system. Such capacity provides on-demand, routine, and periodic data to inform critical leadership and management decisions. Despite the passage of many years, there has not been a suitable system fully implemented. OPSO indicated that the JMS would "go live" in May 2025, but key components, such as integration of the classification system were still lacking at the time of the filing of this. Another key component missing is the need to be able to electronically verify that security checks are taking place in a timely fashion.

6. **Sanitation and Environment Conditions** – Challenges remain regarding the public health and inmate/staff safety risks. Although there have been a few incidents of COVID during the monitoring period, COVID has mainly been held in check by quarantining inmates upon entry and when they appear symptomatic. The use of quarantine of newly admitted inmates has added to the backlog of inmates in the intake units and the inmates awaiting housing in the Inmate Processing Center (IPC). The inability to fill support positions identified in OPSO's staffing analysis negatively impacts the ability of OPSO to sustain compliance with the requirements of the Consent Judgment and align with accepted correctional



practice. OPSO instituted a special team to clean the showers and floors of the housing units in response to the Court's orders in June 2024. However, sanitation and cleanliness of the cells and housing areas are not solely the responsibility of the special cleaning team. The supervisors and unit deputies have the first responsibility for ensuring inmates keep their cells and dayroom areas clean and uncluttered. The level of cleanliness of cells and housing areas remains unacceptable. As with past tours, during the monitoring tour, when sanitation concerns were called to the attention of pod deputies and supervisors, they often appeared not to be concerned.

7.  **Youthful Inmates** –Youthful offenders are housed in the OJC in part due to a change in Louisiana law, as well as to transfers from the juvenile detention facility. Although the number of male youthful offenders has not exceeded 20, it requires an entire housing unit to be used for these inmates. Each housing unit is designed to hold 60 inmates. Thus, in the male youthful offender unit, over two-thirds of the capacity cannot be utilized without violating classification principles. When female youthful offenders are housed, it requires either an entire housing unit in OJC or TMH to be devoted to their housing. In addition, the housing of youthful offenders presents special challenges when it comes to services and mental health care.

8.  **Inmate Sexual Safety** – OPSO underwent its required audit of compliance with the Prison Rape Elimination Act of 2003 (PREA) and passed in September 2019. Continued internal collaboration among OPSO security, classification, and the medical/mental health provider is needed for the assessments of inmates' potential vulnerability to sexual assault. Due to the long time that inmates are housed in the IPC and intake units, inmates of various PREA designations continued to be housed in the same housing unit without an appropriate plan to keep them separate during time out of cell. Commingling of inmates of various PREA designations occurs on a third of the housing units. OPSO cannot rely on an audit that is five years old to demonstrate compliance with PREA. OPSO had a mock PREA Audit conducted in 2024 and is in the process of correcting the deficiencies noted in preparation for the PREA audit in 2025.

9.  **Compliance, Quality Reporting, and Quality Improvement** – An essential



element of inmate safety is OPSO's timely review of all serious incidents as well as of non-violent incidents to determine if there are trends and/or patterns. This ensures assessment of root causes and the development, implementation, and tracking of corrective action plans to address the causes. This activity focuses on resolving problems. OPSO has begun to undertake this function and has begun to identify some of the systemic issues. The next step is determining solutions for the systemic issues and implementing them. Failure to address the systemic issues will continue to create risks to institutional safety and security. The administration at OPSO has dedicated more time and knowledgeable resources to quality improvement. The corrective action plans were finalized as a result of Judge Africk's order, but adherence is lacking. The challenge will be for the OPSO to hold the staff accountable for not complying with the corrective action plans including timely completion of tasks. OPSO has designed a Major in charge or CAB and a Major in charge of the Jail Compliance Unit. Having designated staff members of sufficient rank oversee the implementation of the corrective action plans is commendable, adherence to the CAPs must be a priority of the entire administration.

10. **Stipulated Agreements 2015 and 2024**– The section on the Stipulated Agreements of 2015 has been expanded to aid OPSO in reviewing its on-going compliance with the two Stipulated Agreements from 2015 and the Stipulated Agreement of June 2024 which added seven new provisions. Eleven (six of the seven new provisions) provisions are in partial compliance. Beginning with this report, compliance with the Stipulation and Order of June 2024 has been added.

11. **Construction Projects** –

- TDC Mental Health (TMH)– Two housing units in the Temporary Detention Center (TDC) (total of four housing areas) were renovated to provide for housing inmates with acute mental illness pending the construction of Phase III. After TMH's completion, the male inmates with acute mental illness were moved from Hunt into one of the housing units. During the monitoring period, OPSO housed acute male inmates and acute female inmates in TMH.  All four of the housing areas were operational during the



monitoring period although several cells are not being used due to longstanding maintenance issues or because they were being used to house inmates for non-mental health purposes. OPSO is encouraged to limit the use of TMH to the inmates for which it is designed and utilize the capacity of TMH to its fullest. While TMH is not a suitable long-term solution to meet the requirements of the Consent Judgment as to medical and mental health services, it is a necessary interim step given no satisfactory housing for acute inmates in OJC. The operation of TMH has reaffirmed the necessity of single person cells for the majority of acute inmates in the initial stages of treatment which should be factored in the operational capacity of Phase III. Housing sub-acute inmates in two person cells in Phase III will often be acceptable. It is important to note that TMH does nothing to address the lack of infirmary and medical housing in OJC and lack of programming space. Even with the construction of Phase III, there will be a need for safe and suitable housing for any sub-acute inmates which remain in OJC. One of the shortcomings of the TDC/TMH buildings is that the inmates have to be evacuated when there is the potential for a hurricane due to its propensity to flood. This occurred in September 2024 when the mental health inmates had to be moved to OJC, and the general population inmates were evacuated to the Louisiana Department of Corrections.

- Phase III –Monthly meetings of the Executive Committee have been held and have provided information to the parties and the Monitors. The construction and occupation of Phase III are critical to the provision of mental and medical health services in accordance with the Consent Judgment. Regular court intervention has been required to keep the project moving forward. The project has reached 52% completion, based on the status report the City filed with the Court in March 2025.

**C.    <u>Review Process of Monitors' Compliance Report #21</u>**

A draft of this report was provided to OPSO, Counsel for the Plaintiff Class, and the Department of Justice (DOJ) on April 29, 2025.  Comments were provided by Counsel on May 15, 2025. Wexford was offered the opportunity to provide comments through OPSO.



The Monitors considered the comments of the parties in finalizing Report #21.

**D.**      **Communication with Stakeholders**

     The Monitors are committed to providing as much information as possible regarding the status of OPSO's efforts to comply with all orders of the Court. During the monitoring period, OPSO honored the request of the Monitors to provide a link to the current reports on the OPSO website.

**E.**      **Recommendations**

     Over the years, the Monitors have provided multiple recommendations and suggestions to OPSO to assist in achieving and maintaining compliance with the Consent Judgment. The purpose of the recommendations continues to be to assist OPSO in achieving and maintaining compliance; not to change the requirements of the Consent Judgment. There are recommendations and suggestions included within the body of this report.

**F.**      **Conclusions and Path Forward**

     OPSO has been operating under the provisions of the Consent Judgment since June 2013; monitoring began in Fall 2013. During the previous leadership of Director Hodge, significant improvements were acknowledged by the Monitors. Sheriff Gusman resumed the role of full responsibility for bringing OPSO into compliance with the Consent Judgment in August 2020. Sheriff Gusman was defeated in the election held in December 2021 which seemed to lessen his desire to make progress in obtaining compliance during the remainder of his tenure. Chief LeCounte resigned from the OPSO in December 2021 which created a significant leadership vacuum. Sheriff Hutson was sworn in as Sheriff in May 2022. A suitable replacement for Chief LeCounte was appointed in July 2024 when Chief Mallett joined OPSO. Sheriff Hutson has embraced the challenge of complying with the Consent Judgment and has established a good working relationship with the monitoring team.

     However, it continues to be concerning that the same deficiencies pointed out in previous reports by the Monitors continued to exist and are not resolved. When OJC was placed back under the authority of the Sheriff, there were 118 provisions in substantial compliance. As of this report, there are only 69 provisions in substantial compliance.



Serious incidents and harm to inmates continue to occur. OPSO has made some efforts to identify and address sources of contraband, but the Monitors encountered inmates smoking in the housing units without fear of consequences, including marijuana and narcotics, in the facility and weapons have frequently been fashioned from various materials within the OJC. Dangerous medication is frequently found during cell shakedowns. The medication distribution process was changed after the monitoring period and the new process appears to be a significant improvement in the ability of inmates to hoard medication. However, narcotics frequently are discovered in the facility and there continue to be inmates overdosing.

There continues to be an emphasis on OPSO's data collection. Data collection and analysis is key to problem solving with a goal of a sustainable reduction in inmate-on-inmate assaults, inmate-on-staff assaults, uses of force, contraband, and property damage. Development of corrective action plans has taken place in accordance with the Court's order, but there is limited adherence to them. The Court's order in June 2024 requires monthly reports on progress to the parties and Monitors and quarterly reports on progress to the Court. Follow-through on implementation is essential. The Monitors continue to be hopeful that improvement will take place with the emphasis placed on data collection and analysis by OPSO.

The Monitors remain committed to the Court and the parties to collaborate on solutions that will result in significant improvement towards compliance with the provisions of the Consent Judgment and future achievement of constitutional conditions.

**The Monitors again thank and acknowledge the leadership, guidance, and support of The Honorable Lance M. Africk and The Honorable Michael B. North.**



A.    **Protection from Harm**

**Introduction**

This section of the Consent Judgment addresses core correctional functions including the use of force (policies, training, and reporting), identification of staff involved in uses of force through an early intervention system, safety and supervision of inmates, staffing, incidents and referrals, investigations, pre-trial placement of inmates in the facility, classification, the inmate grievance process, safety of inmates from sexual assault, and inmates' access to information.

The Consent Judgment requires that OPSO operate the facility to assure inmates are "reasonably safe and secure." Based on objective review of data, the facility has shown improvement in inmate and staff safety over the life of the Consent Judgment, but significant incidents that result in serious injury to inmates and staff continue to occur which confirmed that the facility is not reasonably safe and secure. Concerning is that inmates continue to fashion weapons out of items available in the jail including brooms, mops, and buckets provided by the jail and pry metal from around the windows and doors to manufacture knives or shanks. Inmate on inmate assaults often happen with no staff present to prevent the incident from occurring or to intervene to stop the incident. These are often incidents and uses of force which result in injuries severe enough to require hospitalization. This would not have occurred if the facility was properly staffed, and the staff were properly supervising the inmates and conducting themselves in accordance with policy. Also concerning is the lack of action to securely house inmates who are easily identified as being frequently involved in violence, contraband, and disruption of the facility incidents.

Reaching and sustaining compliance with provisions of the Consent Judgment, particularly this section, relies on the collection, analysis, and corrective action planning using accurate and reliable data. The Monitors encourage OPSO to continue efforts to build its capacity to collect and analyze relevant accurate data, draw supportable conclusions to inform decisions throughout the organization, develop corrective action plans, implement corrective action plans, and hold staff accountable for non-adherence to



corrective action plans and policies. As OPSO's capacity to collect, analyze, plan, and implement is enhanced, the ability to achieve and maintain compliance will be strengthened. Without an enhancement in capacity and dedication to making and implementing informed decisions, OPSO is unlikely to achieve and maintain compliance.

The underreporting of incidents to the Monitors and parties has continued to exist during the monitoring period. In the past, OPSO had someone review the daily medical logs for inmates taken to the clinic for treatment subsequent to an altercation or a use of force, as well as the transport logs of inmates routed to the hospital with trauma-related injuries to cross check them against reported incidents. The review often found omissions. The review occurred with more regularity during the monitoring period but still does not occur as frequently as needed due to the person who is assigned to that duty being assigned other additional duties which limited the time available for this valuable task. Wexford, since it took over the medical contract during the monitoring period, has not made the lists that are relied upon available to OPSO, the Monitors, or counsel. Since the monitoring period, Wexford has improved in its provision of the lists. OPSO has increased its efforts to discipline supervisors and deputies who fail to comply with the reporting policies resulting in late, incomplete, or missing incident reports.

The Lead Monitor reviewed all reported incidents for the monitoring period in preparation of this report. The following charts compare the totals for the calendar years CY 2018-CY 2024. Given that the system for reporting incidents has proven to be unreliable, in the past, it was unclear whether a particular decline or increase was the result of reporting errors as opposed to an actual decline in a type of reportable incident. Since October 2022, the Monitors received the reports automatically which supported the proposition that previous declines were more likely the result of not reporting incidents and/or not forwarding the incident reports to the Monitors.



| | Inmate/ Inmate Assault | Inmate Staff Altercation | Use of Force | PREA | Death | Attempt Suicide/ Ideation | Internal Escape | Criminal Damage | Slip/Falls/ Injury | Medical | Contraband | Other |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2018** | 442 | 64 | 260 | 47 | 2 | 78 | 48 | 69 | 262 | NA | 106 | 15 |
| **2019** | 440 | 117 | 358 | 42 | 0 | 82 | 6 | 47 | 145 | NA | 302 | 6 |
| **2020** | 309 | 139 | 372 | 35 | 3 | 21 | 1 | 64 | 64 | NA | 351 | 1 |
| **2021** | 293 | 124 | 311 | 17 | 1 | 20 | 1 | 42 | 43 | NA | 350 | 0 |
| **2022** | 351 | 71 | 229 | 36 | 2 | 45 | 6 | 39 | 35 | NA | 248 | 10 |
| **2023** | 636 | 139 | 316 | 30 | 0 | 34 | 81 | 60 | 178 | NA | 554 | 41 |
| **2024** | 735 | 155 | 409 | 37 | 0 | 57 | 229 | 212 | 175 | 623 | 562 | 34 |

**Table 3 - All OJC Reported Incidents for CY 2018-CY 2024**



In CY 2021, the number of reported inmate on inmate assaults, inmate/staff altercations, and uses of force declined slightly, but it should be noted that there was still an alarming use of weapons in assaults resulting in serious injuries. The rate of inmate-on-inmate assaults in CY 2022 increased by 20% over CY 2021. The rate of inmate-on-inmate assaults in CY 2023 increased by 45% over CY 2022. The rate of inmate-on-inmate assaults in CY 2024 increased 13% over CY 2023. This means there has been a 60%



increase in the number of inmate-on-inmate assaults since the last decrease was noted in CY 2021. The number of contraband incidents reached an all-time high in CY 2023 also; a 123% increase from CY 2022 to CY 2023. The number of incidents involving contraband in CY 2024 essentially remained the same as the number of contraband incidents in CY 2023. This is not unusual given the increased number of cell and unit searches that have taken place. Many of the inmate injuries or slip and falls are suspected to, in actuality, be the result of an inmate-on-inmate assault that was not observed by staff and that inmates were afraid to report. The staff misconduct number reported is not accurate as it reflects what is reported; not what occurred. It has been removed from the chart until reliable numbers are available as it was misleading.

**Table 4 –All OJC Reported Incidents by Type by Month CY 2018-CY 2024**



| | Jan | Feb | March | April | May | June | July | August | September | October | November | December | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2018** | 92 | 96 | 112 | 121 | 124 | 144 | 116 | 132 | 112 | 113 | 105 | 129 | **1396** |
| **2019** | 123 | 93 | 105 | 112 | 117 | 129 | 113 | 152 | 94 | 137 | 144 | 113 | **1432** |
| **2020** | 107 | 113 | 98 | 109 | 84 | 144 | 98 | 106 | 67 | 75 | 109 | 110 | **1220** |
| **2021** | 125 | 80 | 78 | 109 | 77 | 97 | 91 | 70 | 78 | 113 | 89 | 72 | **1079** |
| **2022** | 77 | 88 | 66 | 50 | 55 | 66 | 67 | 51 | 93 | 137 | 115 | 119 | **984** |
| **2023** | 165 | 106 | 126 | 124 | 143 | 195 | 184 | 174 | 181 | 198 | 196 | 176 | **1968** |



| 2024 | 286 | 184 | 210 | 224 | 320 | 235 | 298 | 269 | 305 | 262 | 235 | 214 | 3042 |
|------|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|------|

**Assessment Methodology**

Dates of visits:

- April 16-18, 2024 (Leader Monitor Frasier)

- May 13-15, 2024 (Lead Monitor Frasier and Monitor Poole)

- June 24-27, 2024 (Lead Monitor Frasier, Monitor Skipworth, Monitor Hardyman, and Monitor Poole)

- July 23-26, 2024 (Lead Monitor Frasier, Monitor Johnson, and Monitor Vassallo)

- August 19-21, 2024 (Lead Monitor Frasier and Monitor Poole)

- September16-18, 2024 (Lead Monitor Frasier and Monitor Poole)

- November 18-20, 2024 (Lead Monitor Frasier and Monitor Poole)

- December 16-19, 2024 (Lead Monitor Frasier, Monitor Johnson, Monitor Vassallo, Monitor Skipworth, and Monitor Poole)

- January 13-15, 2024 (Lead Monitor Frasier and Monitor Hardyman)

- February 17-19, 2024 (Lead Monitor Frasier and Monitor Poole)

Materials reviewed:

- Materials reviewed include the Consent Judgment, OPSO policies and procedures, use of force reports, incident reports, and investigations conducted by Investigative Services Bureau-Internal Affairs Division (ISB-IAD), investigations conducted by ISB-Criminal Division (ISB-Criminal), investigations conducted by ISB-Inmate Division, training materials, shakedown logs, OPSO self-assessment, Wellpath self-assessment, and post logs.

Interviews:

- Interviews included the Sheriff, Chief of Staff, command staff, jail supervisors, chief of corrections, deputy chief of jail operations, classification manager and staff, director of training, Wellpath staff, and various supervisors of units within ISB. Inmates were interviewed by the Monitors onsite for the visit. The Monitors also attended security-related meetings.

## IV. A. 1. Use of Force Policies and Procedures

*A. 1. a. OPSO shall develop, implement, and maintain comprehensive policies and procedures (in accordance with generally accepted correctional standards) relating to the use of force with particular emphasis regarding permissible and impermissible uses of force.*
*A. 1. b. OPSO shall develop and implement a single, uniform reporting system under a Use of Force*



*Reporting policy. OPSO reportable force shall be divided into two levels, as further specified in policy: Level 1 uses of force will include all serious uses of force (i.e., the use of force leads to injuries that are extensive, serious or visible in nature, including black eyes, lacerations, injuries to the mouth or head, multiple bruises, injuries to the genitals, etc.), injuries requiring hospitalization, staff misconduct, and occasions when use of force reports are inconsistent, conflicting, or otherwise suspicious. Level 2 uses of force will include all escort or control holds used to overcome resistance that are not covered by the definition of Level 1 uses of force.*

*A. 1. c. OPSO shall assess, annually, all data collected regarding uses of force and make any necessary changes to use of force policies or procedures to ensure that unnecessary or excessive use of force is not used in OPP. The review and recommendations will be documented and provided to the Monitor, DOJ, and SPLC.*

Findings:

A. 1. a.  Partial Compliance

A. 1. b.  Substantial Compliance

A. 1. c.  Partial Compliance

Observations:

The current OPSO use of force policy was effective as of May 2016. OPSO conducted an annual review of the UOF policy in 2024. Changes were submitted in March 2024, but the changes were found to be unacceptable as the UOF policy no longer complied with the requirements of the Consent Judgment. OPSO, the Monitors, and the parties will meet when OPSO presents a suitable revised policy.  While there is a policy, the failure to fully adhere to the policy results in A.1.a. remaining in Partial Compliance. One of the most frequent violations of policy has to do with the failure to attempt de-escalation, including the utilization of mental health staff, before using force. The Stipulation and Order of June 2024 now specifies that OPSO security is to notify mental health staff of all non-spontaneous uses of force before they happen. The purpose is for mental health staff to assist in de-escalating the situation. It is recommended that OPSO include a proper definition for de-escalation when it proposes a revision of the UOF policy and incorporate it into the training of staff. There are numerous examples of the situation being escalated, as opposed to de-escalated by staff, in retaliation for an inmate's actions for disobeying an order or for having thrown a substance on the staff from a locked cell.

The reporting system does comply with the requirements of A.1.b., which remains in Substantial Compliance. There continues to be misclassification of uses of force between Level 1 and Level 2 uses of force but continues to improve. To be clear, the Monitors consider the use of OC spray, pepper ball guns, and any other intermediate weapon to be a Level 1 use of force. Level 2 is reserved for escort and control holds.



While OPSO reported that the Use of Force Review Board (UOFRB) has begun to meet weekly during the monitoring period. A new form was implemented to standardize UOFRB documentation. The UOFRB has reduced the backlog which resulted in reviewing cases closer to the time they occurred, but it is still several months between the incident and the review. As a result, problematic staff often have continued contact with inmates. Consistency in membership is essential to identifying trends. After the monitoring period, the membership of the UOFRB became more stable and there is proper leadership. There still needs to be analysis of patterns and trends and corrective action.

The UOFRB is the group charged with completion of the annual review. However, this is not the group that conducted the annual review. Instead, it was conducted by members of the ISB and the CAB.

The most recent analysis of the number of uses of force was performed by the CAB and submitted in January 2023. The audit is performed annually, but no UOF audits by CAB were submitted to the monitors or the parties to cover the monitoring period. The analysis submitted in January 2023 found that only 20% of the cases sampled had been reviewed by the UOFRB and confirmed that reports are not being authored in a timely manner and that first line supervisors are late on their review the majority of the time. The analysis found that reports are being reviewed by the Major of Security in a timely fashion 82% of the time. However, this did not consider that since the reports are often not authored in a timely manner nor reviewed by the first line supervisor in a timely manner, the cumulative time frame allowed for reports to be reviewed and finalized is almost always exceeded. While it is understandable that all issues cannot be included in one audit, it would be helpful to have an analysis as to compliance with the use of force policy regarding whether the force being used is reasonable and necessary, and regarding proper use of de-escalation. The CAB is encouraged to confirm the validity of the data before conducting the analysis and to expand the analysis to all aspects of the use of force policy. The annual review of the use of force data and the policy was conducted for CY 2023 as required by A.1.c but did not include all of the items required. Problems regarding OPSO analysis of the data, poorly written reports, backlog in the number of use of force incidents to be reviewed, and the lack of timely filed reports were noted in the review, but no real action items were included to address the shortcomings. Uses of force



on specialty pods (particularly the disciplinary pod and the mental health pod) continue to be high, but there have been no recommendations documented and provided to the Monitors and DOJ and counsel for the Plaintiffs to address the problem. As has been pointed out in the past, the Consent Judgment requires not only assessment and reduction of inappropriate uses of force, but also unnecessary uses of force. This is not occurring. Examination of the use of force reports by the Monitors revealed that often the use of force is precipitated by a failure to follow policy such as not restraining the inmate prior to movement or allowing an inmate out of his/her cell with another inmate(s) from whom he/she is to be kept separate or failing to secure the food port in the cell door. Incident reports most often demonstrate a lack of de-escalation efforts as required by the Consent Judgment; particularly before using OC spray. Seldom are mental health staff called upon to assist in de-escalation although a majority of the inmates upon whom force is used are on the mental health caseload. While there is improvement in the timeliness of holding of the UOFRB reviews, this section remains in Partial Compliance.

At the end of the monitoring period (September 2024), OPSO began performing a weekly review of the use of force cases submitted. This report needs to be expanded to include timeliness and completeness along with whether the classification was correct.

## IV. A. 2. Use of Force Training

*A. 2. a. OPSO shall ensure that all correctional officers are knowledgeable of and have the knowledge, skills, and abilities to comply with use of force policies and procedures. At a minimum, OPSO shall provide correctional officers with pre-service and annual in-service training in use of force, defensive tactics, and use of force policies and procedures. The training will include the following:*

> *(1) instruction on what constitutes excessive force;*
> *(2) de-escalation tactics; and*
> *(3) management of prisoners with mental illness to limit the need for using force.*

*A. 2. b. OPSO shall ensure that officers are aware of any change to policies and practices throughout their employment with OPP. At a minimum, OPSO shall provide pre-service and annual in-service use of force training that prohibits:*

> *(1) use of force as a response to verbal insults or prisoner threats where there is no immediate threat to the safety or security of the institution, prisoners, staff, or visitors;*
> *(2) use of force as a response to prisoners' failure to follow instructions where there is no immediate threat to the safety or security of the institution, prisoners, staff, or visitors;*
> *(3) use of force against a prisoner after the prisoner has ceased to offer resistance and is under control;*
> *(4) use of force as punishment or retaliation; and*
> *(5) use of force involving kicking, striking, hitting, or punching a non-combative prisoner.*

*A. 2. c. OPSO shall randomly test five percent of the correctional officer staff on an annual basis to determine their knowledge of the use of force policies and procedures. The testing instrument and policies shall be approved by the Monitor. The results of these assessments shall be evaluated to determine the need for changes in training practices. The review and conclusions will be documented and provided to the Monitor.*



Findings:

A. 2. a.  Partial Compliance

A. 2. b.  Partial Compliance

A. 2. c.  Substantial Compliance

Observations:

The Monitor reviewed the training materials, testing documentation, and the supplemental documentation submitted by training staff for the rating period and interviewed the Training Captain present on the day of the inspection. It should be noted that the rating period covers the second and third quarter of the calendar year. Training statistics are reported on a calendar basis. It should be noted that OPSO elected to change the format for the annual in-service training requirements for CY2024 from offering training on a single topic scheduled for a one-week period with multiple classes throughout the week to offering week-long, 50-hour, in-service training blocks covering all topics required by the Consent Judgment as well as supplemental training topics offered by OPSO in furtherance of POST training requirements. The Academy captain reported issues with attendance during the first quarter but noted the scheduling/attendance of staff for in-service improved significantly as the training year progressed. The Monitor agrees that the new format is a more conducive training experience for both the participants and the training staff as the participants are able to focus solely on learning and retaining the information presented throughout the week. (The Training Academy has also incorporated the training topics required by the Consent Judgment into the POST Level 2 curriculum to minimize the scheduling impact on OPSO security functions.) Training staff advised that policy and procedure training requirements for the annual in-service Use of Force and Use of Force testing, de-escalation, and defensive tactics for CY 2024 were conducted per the published Academy schedule with additional makeup training conducted in the 4th quarter of 2024. Due to staffing shortages, the Training Lieutenant reported for Report #20 a significant number of staff assigned to inmate supervision in OJC, IPC and TMH/TDC failed to attend the UOF in-service training in CY 2023. The completion rates were as follows: OJC – 71.3%; IPC – 79.5%; TDC – 85%; and Kitchen/Warehouse at 4%. All areas showed a substantial decline from the 100% compliance noted for CY 2022. The Monitor anticipates that the final



completion rates for CY2024 will be significantly improved over CY2023 based on the interview with the Training captain and will be presented in Report #22.

During Tour #18, it was determined that the defensive tactics training provided to both pre-service trainees and all deputies classified as "Level 3" was insufficient as presented in terms of the topics and techniques covered. Upon discussion with the Training Academy staff, an expanded defensive tactics course was implemented in August 2023 for all pre-service and in-service classes going forward. OPSO has consistently presented the revised defensive tactics curriculum throughout the CY2024 schedule.

The Monitor has, in the past, observed that the Academy staff has maintained detailed, comprehensive, and up-to-date training files. The Monitor reviewed over 40 individual staff training records using CY2024 UOF training sign-in sheets provided by Training staff in order to select random files for review. Of concern was the condition of the individual files at the time of the inspection. The majority (90%+) had not been updated with a copy of the sign-in roster with the individual staff member's signature as proof of training. Most files were 1 to 3 years out-of-date. As noted above, the original sign-in rosters are maintained by Training staff. The Monitor was shown the master file (3-ring binder) which was to contain the original rosters for the year. Also of concern was the absence of many of the sign-in rosters from the other classes presented during the same week as the UOF class which the given individual should have also attended. Upon discussion with the Training captain and major, the Monitor was advised of a remediation plan to bring all the individual files up to date. The progress will be reviewed by the next inspection tour.

A thorough review of the use of force reports during the monitoring period reveals the need for additional training which emphasizes de-escalation and provide deputies with additional tools when dealing with inmates with mental health issues and inmates who routinely exhibited behavioral problems. Given some very problematic incidents in which staff observed inappropriate uses of force and did not stop or report the same, it is strongly suggested that the duty to intervene and report be emphasized. As any security staff member may have to deal with an inmate with mental health issues, it is recommended that mental health training be made mandatory for all security staff; not just those daily assigned to the mental health units, particularly given the majority of the



inmates in OJC are on the mental health caseload.

The final averages for the 5 percent annual testing requirement for A. 2. c. testing documentation for CY2024 that occurred during the reporting period was unavailable at the time of this writing, however the Monitor reviewed training documentation provided by training staff specific to the Use of Force class pre-training tests and post-training tests. Of the sample reviewed, the staff in each class demonstrated a pre-test passing percentage of 86% to 90%.  Training staff continue to pursue a goal of 15% testing, exceeding that of the consent judgment language. The final completion percentages and 5% testing documentation will be included in Report #22. As a result, the overall ratings for A.2. will be unchanged for this report. The test given in CY24 was originally approved by Monitor Frasier on April 21, 2021. It is recommended that a new test be developed for review and approval.

The Monitor continues to review documentation and randomly interview staff regarding the content and quality of the training received throughout the year.

## IV. A. 3. Use of Force Reporting

*A. 3. a. Failure to report a use of force incident by any staff member engaging in the use of force or witnessing the use of force shall be grounds for discipline, up to and including termination.*

*A. 3. b. OPSO shall ensure that sufficient information is collected on uses of force to assess whether staff members complied with policy; whether corrective action is necessary including training or discipline; the effectiveness of training and policies; and whether the conditions in OPP comply with this Agreement. At a minimum, OPSO will ensure that officers using or observing a Level 1 use of force shall complete a use of force report that will:*

    *(1)    include the names of all staff, prisoner(s), or other visual or oral witness(es);*
    *(2)    contain an accurate and specific account of the events leading to the use of force;*
    *(3)    describe the level of resistance and the type and level of force used, consistent with OPP use of force; policy and procedure, as well as the precise actions taken by OPSO staff in response to the incident;*
    *(4)    describe the weapon or instrument(s) of restraint, if any, and the manner of such use be accompanied by a prisoner disciplinary report, if it exists, pertaining to the events or prisoner activity that prompted the use of force incident;*
    *(5)    describe the nature and extent of injuries sustained by anyone involved in the incident;*
    *(6)    contain the date and time when medical attention, if any, was requested and actually provided;*
    *(7)    describe any attempts the staff took to de-escalate prior to the use of force;*
    *(8)    include an individual written account of the use of force from every staff member who witnessed the use of force;*
    *(9)    include photographs taken promptly, but no later than two hours after a use of force incident, of all injuries sustained, or as evidence that no injuries were sustained, by prisoners and staff involved in the use of force incident;*
    *(10)    document whether the use of force was digitally or otherwise recorded. If the use of force is not digitally or otherwise recorded, the reporting officer and/or watch commander will provide an explanation as to why it was not recorded; and*
    *(11)    include a statement about the incident from the prisoner(s) against whom force was used.*



*A. 3. c. All officers using a Level 2 use of force shall complete a use of force report that will:*

    *(1)    include the names of staff, prisoner(s), or other visual or oral witness(es);*

    *(2)    contain an accurate and specific account of the events leading to the use of force;*

    *(3)    describe the level of resistance and the type and level of force used, consistent with OPP use of force policy and procedure, as well as the precise actions taken by OPSO staff in response to the incident;*

    *(4)    describe the weapon or instrument(s) of restraint, if any, and the manner of such use;*

    *(5)    be accompanied by a prisoner disciplinary report, if it exists, pertaining to the events or prisoner activity that prompted the use of force incident;*

    *(6)    describe the nature and extent of injuries sustained by anyone involved in the incident;*

    *(7)    contain the date and time when medical attention, if any, was requested and actually provided; and*

    *(8)    describe any attempts the staff took to de-escalate prior to the use of force.*

*A. 3. d. OPSO shall require correctional officers to notify the watch commander as soon as practical of any use of force incident or allegation of use of force. When notified, the watch commander will respond to the scene of all Level 1 uses of force. When arriving on the scene, the watch commander shall:*

    *(1)    ensure the safety of everyone involved in or proximate to the incident;*

    *(2)    determine if any prisoner or correctional officer is injured and ensure that necessary medical care is provided;*

    *(3)    ensure that personnel and witnesses are identified, separated, and advised that communications with other witnesses or correctional officers regarding the incident are prohibited;*

    *(4)    ensure that witness and subject statements are taken from both staff and prisoner(s) outside of the presence of other prisoners and staff;*

    *(5)    ensure that the supervisor's use of force report is forwarded to IAD for investigation if, upon the supervisor's review, a violation of law or policy is suspected. The determination of what type of investigation is needed will be based on the degree of the force used consistent with the terms of this Agreement;*

    *(6)    If the watch commander is not involved in the use of force incident, the watch commander shall review all submitted use of force reports within 36 hours of the end of the incident, and shall specify his findings as to completeness and procedural errors. If the watch commander believes that the use of force may have been unnecessary or excessive, he shall immediately contact IAD for investigation consideration and shall notify the warden or assistant warden; and*

    *(7)    All Level 1 use of force reports, whether or not the force is believed by any party to be unnecessary or excessive, shall be sent to IAD for review. IAD shall develop and submit to the Monitor within 90 days of the Effective Date clear criteria to identify use of force incidents that warrant a full investigation, including injuries that are extensive or serious, visible in nature (including black eyes, injuries to the mouth, injuries to the genitals, etc.), injuries requiring hospitalization, staff misconduct (including inappropriate relationships*

        *with prisoners), and occasions when use of force reports are inconsistent, conflicting, or otherwise suspicious.*

*A. 3. e. Ensure that a first-line supervisor is present during all pre-planned uses of force, such as cell extractions.*

*A. 3. f. Within 36 hours, exclusive of weekends and holidays, of receiving the report and review from the shift commander, in order to determine the appropriateness of the force used and whether policy was followed, the Warden or Assistant Warden shall review all use of force reports and supervisory reviews including:*

    *(1)    the incident report associated with the use of force;*

    *(2)    any medical documentation of injuries and any further medical care;*

    *(3)    the prisoner disciplinary report associated with the use of force; and*

    *(4)    the Warden or Assistant Warden shall complete a written report or written statement of specific findings and determinations of the appropriateness of force.*

*A. 3. g. Provide the Monitor a periodic report detailing use of force by staff. These periodic reports shall*



*be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. Each report will include the following information:*

(1)    *a brief summary of all uses of force, by type;*
(2)    *date that force was used;*
(3)    *identity of staff members involved in using force;*
(4)    *identity of prisoners against whom force was used;*
(5)    *a brief summary of all uses of force resulting in injuries;*
(6)    *number of planned and unplanned uses of force;*
(7)    *a summary of all in-custody deaths related to use of force, including the identity of the decedent and the circumstances of the death; and*
(8)    *a listing of serious injuries requiring hospitalization.*

*A. 3. h. OPSO shall conduct, annually, a review of the use of force reporting system to ensure that it has been effective in reducing unnecessary or excessive uses of force. OPSO will document its review and conclusions and provide them to the Monitor, SPLC, and DOJ.*

Findings:

A. 3. a.  Partial Compliance

A. 3. b.  Partial Compliance

A. 3. c.  Partial Compliance

A. 3. d.  Partial Compliance

A. 3. e.  Partial Compliance

A. 3. f.  Partial Compliance

A. 3. g.  Partial Compliance

A. 3. h.  Partial Compliance

Observations:

As to provision A. 3. a., the use of force policy requires all uses of force to be reported timely and completely and sets out the potential discipline if the policy is not followed. There were three disciplinary memorandums submitted as documentation of discipline for failure to report a use of force. The Monitors identified over two dozen reports involving use of force during the compliance period for which there was no use of force report. Thus, the rating continues to be in Partial Compliance.

Provision A. 3. b. is in Partial Compliance due to the number of use of force reports that are incomplete or inadequate. The use of force policy includes the provisions required by the Consent Judgment, but lack of adherence still occurs. The Monitor provided a checklist of the report requirements to assist supervisors in ensuring reports include all necessary items. A review of those checklists and accompanying reports indicates that the required information is still found to be missing from the use of force reports such as what led to the incident, details of actions taken during the use of force,



and resolution of the incident. Seldom do reports include an articulation of any de-escalation tactics, a description of injuries sustained, and when medical attention was provided. No proof was provided that deputies and supervisors are being held accountable for failure to include required information. Provision A. 3. c. requires less information as it is a lesser level of force, but the deficiencies are the same as those noted for A. 3. b. and thus it is in Partial Compliance.

The watch commanders still are not consistently compliant with the requirements of the Consent Judgment (IV. A. 3. d.) as to their specific duties and the time requirement for performance of these duties under the policies. This has been noted in multiple reports. The Consent Judgment requires submission of the packet to the Assistant Warden/Deputy Chief of Corrections within 36 hours not three (3) days or three (3) 12-hour shifts. OPSO's audit of timeliness confirmed that it takes on average one and half times as long for submission as policy allows. The Jail Compliance Manager is now conducting audits targeting the 36-hour reporting compliance. A corrective action plan has been developed. The corrective action plan needs to be followed, and supervisors held accountable.

A. 3. e. requires the presence of a supervisor for planned uses of force. One of the main reasons for this provision is to allow for de-escalation to be attempted before force is carried out. A CAP was put in place regarding what was considered to be a planned use of force and there has been improvement in recognition of what constitutes a planned use of force. OPSO categorized seventeen as planned uses of force for this monitoring period. Monitor Frasier reviewed all of them and found two did not meet the criteria for a planned use of force. Of the fifteen planned uses of force, seven appeared to have attempted de-escalation techniques. OPSO is close to substantial compliance with this provision, but, given the repeated failure of supervisors to utilize de-escalation techniques, this provision's rating remains in Partial Compliance.

The Deputy Chief of Jail Operations conducted the review of the use of force during the monitoring period required by A. 3. f. OPSO claims its audit found that the review of the use of force by the Deputy Chief was made within thirty-six hours, 66% of the time. However, that number is questionable as OPSO continues to measure the thirty-six hours in terms of twelve-hour shifts as opposed to the plain language of the Consent Judgment



that states the review must take place "within 36 hours, exclusive of weekends and holidays". This provision remains in Partial Compliance.

OPSO relies on the semi-annual report issued by FIT for documentation as to compliance with IV. A. 3. g. While the FIT semi-annual report for January 2024-June 2024 was provided, no documentation for July 2024-September 2024 was provided. The information provided did not contain all of the required information for compliance with IV. A. 3. g. (3) and (5). The information for A. 3. g. (6) and (7) were provided by memorandum but did not include the entire monitoring period. Thus, this section continues to be in Partial Compliance.

The annual review of use of force incidents for CY 2023 was conducted March 15 and 20, 2024 but did not include all of the items required by IV. A. 3. h. In order to warrant a rating of substantial compliance, OPSO needed to address all of the issues; particularly the most serious issues such as the frequent use of force on the mental health housing units and lack of de-escalation that were not addressed. Also not addressed are how frequent uses of force would not be needed if policy was followed. Therefore, the compliance rating remains at partial compliance.

### IV. A. 4. Early Intervention System ("EIS")

*A. 4. a. OPSO shall develop, within 120 days of the Effective Date, a computerized relational database ("EIS") that will document and track staff members who are involved in use of force incidents and any complaints related to the inappropriate or excessive use of force, in order to alert OPSO management to any potential problematic policies or supervision lapses or need for retraining or discipline. The Chief of Operations Deputy, supervisors, and investigative staff shall have access to this information and shall review on a regular basis, but not less than quarterly, system reports to evaluate individual staff, supervisor, and housing area activity. OPSO will use the EIS as a tool for correcting inappropriate staff behavior before it escalates to more serious misconduct.*

*A. 4. b. Within 120 days of the Effective Date, OPSO senior management shall use EIS information to improve quality management practices, identify patterns and trends, and take necessary corrective action both on an individual and systemic level. IAD will manage and administer EIS systems. The Special Operations Division ("SOD") will have access to the EIS. IAD will conduct quarterly audits of the EIS to ensure that analysis and intervention is taken according to the process described below. Command staff shall review the data collected by the EIS on at least a quarterly basis to identify potential patterns or trends resulting in harm to prisoners. The Use of Force Review Board will periodically review information collected regarding uses of force in order to identify the need for corrective action, including changes to training protocols and policy or retraining or disciplining individual staff or staff members. Through comparison of the operation of this system to changes in the conditions in OPP, OPSO will assess whether the mechanism is effective at addressing the requirements of this Agreement.*

*A. 4. c. OPSO shall provide, within 180 days of the implementation date of its EIS, to SPLC, DOJ, and the Monitor, a list of all staff members identified through the EIS and corrective action taken.*

*A. 4. d. The EIS protocol shall include the following components: data storage, data retrieval, reporting, data analysis, pattern identification, supervisory assessment, supervisory intervention, documentation, and audit.*

*A. 4. e. On an annual basis, OPSO shall review the EIS to ensure that it has been effective in identifying*



*concerns regarding policy, training, or the need for discipline. This assessment will be based in part on the number and severity of harm and injury identified through data collected pursuant to this Agreement. OPSO will document its review and conclusions and provide them to the Monitor, who shall forward this document to DOJ and SPLC.*

Findings:

A. 4. a.  Partial Compliance

A. 4. b.  Partial Compliance

A. 4. c.  Partial Compliance

A. 4. d.  Partial Compliance

A. 4. e.  Partial Compliance

Observations:

Due to unreliability of the electronic EIS, OPSO abandoned the original system and fashioned an alternative version within the AS400. A FIT staff member manually monitors the database to alert FIT staff as to the need to review any uses of force by a staff member.

OPSO has provided its documentation to the Monitors as to the names of the staff members who are flagged for use of force. However, no review of staff alerted under the EIS was documented or provided. OPSO acknowledges that the reviews did not occur. Having alerts with no follow up negates the value of gathering the data. As no documentation of review by the command staff as required by the Consent Judgment; A. 4. a., A. 4. b, and A. 4. c. remain in partial compliance. Continued questionable and inappropriate uses of force by the same staff members and with the same inmates calls into question whether the EIS is being utilized to improve management quality practices, identify patterns and trends, and take necessary corrective action as required. Section A.4.d. is in partial compliance as the EIS protocol lists the required elements, but there is no supervisory assessment nor intervention.

No proof of the evaluation of the EIS data was provided. The annual review of use of force incidents and EIS for CY 2023 was conducted March 15 and 20, 2024, and did not include all of the items required by IV. A. 4. e. The review should consist of more than noting that the EIS was triggered. It involves assessing the effectiveness of the EIS which was not performed. Therefore, IV. A .4. e. is in partial compliance.

## IV. A. 5. Safety and Supervision

*A. 5. a. Maintain security policies, procedures, and practices to provide a reasonably safe and secure environment for prisoners and staff in accordance with this Agreement.*
*A. 5. b. Maintain policies, procedures, and practices to ensure the adequate supervision of prisoner*



*work areas and trustees.*
*A. 5. c. Maintain policies and procedures regarding care for and housing of protective custody prisoners and prisoners requesting protection from harm.*
*A. 5. d. Continue to ensure that correctional officers conduct appropriate rounds at least once during every 30- minute period, at irregular times, inside each general population housing unit and at least once during every 15-minute period of special management prisoners, or more often if necessary. All security rounds shall be documented on forms or logs that do not contain pre-printed rounding times. In the alternative, OPSO may provide direct supervision of prisoners by posting a correctional officer inside the day room area of a housing unit to conduct surveillance.*
*A. 5. e. Staff shall provide direct supervision in housing units that are designed for this type of supervision. Video surveillance may be used to supplement, but must not be used to replace, rounds by correctional officers.*
*A. 5. f. Increase the use of overhead video surveillance and recording cameras to provide adequate coverage throughout the common areas of the Jail, including the Intake Processing Center, all divisions' intake areas, mental health units, special management units, prisoner housing units, and in the divisions' common areas.*
*A. 5. g. Continue to ensure that correctional officers, who are transferred from one division to another, are required to attend training on division-specific post orders before working on the unit.*
*A. 5. h. Continue to ensure that correctional officers assigned to special management units, which include youth tiers, mental health tiers, disciplinary segregation, and protective custody, receive eight hours of specialized training regarding such units on prisoner safety and security on at least an annual basis.*
*A. 5. i. Continue to ensure that supervisors conduct daily rounds on each shift in the prisoner housing units and document the results of their rounds.*
*A. 5. j. Continue to ensure that staff conduct daily inspections of cells and common areas of the housing units to protect prisoners from unreasonable harm or unreasonable risk of harm.*
*A. 5. k. Continue to ensure that staff conduct random monthly shakedowns of cells and common areas so that prisoners do not possess or have access to dangerous contraband.*
*A. 5. l. Provide the Monitor a periodic report of safety and supervision at the Facility. These periodic reports shall be provided to the monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. Each report will provide the following information:*

    *(1)    a listing of special management prisoners, their housing assignments, the basis for them being placed in the specialized housing unit, and the date placed in the unit; and*

    *(2)    a listing of all contraband, including weapons seized, the type of contraband, date of seizure, location, and shift of seizure.*

<u>Findings:</u>

A. 5. a.  Partial Compliance

A. 5. b.  Substantial Compliance

A. 5. c.  Partial Compliance

A. 5. d.  Non-Compliance

A. 5. e.  Partial Compliance

A. 5. f.  Substantial Compliance

A. 5. g.  Substantial Compliance

A. 5. h.  Partial Compliance

A. 5. i.  Non-Compliance

A. 5. j.  Partial Compliance



A. 5. k.  Partial Compliance

A. 5. l.   Substantial Compliance

<u>Observations:</u>

OPSO has worked hard to finalize policies, procedures, and post orders. Having words written on paper without implementation of those policies, procedures, and practices is insufficient for substantial compliance, as demonstrated by the previous discussion of OPSO staff failing to follow established use of force policies and procedures. Policies and procedures must be adhered to and followed for them to be "maintained", and substantial compliance achieved. Practices, even if not included in policies and procedures, must adhere to the standard also. Thus, A. 5. a. remains in partial compliance. There is adequate supervision of inmate working areas to result in substantial compliance as to A. 5. b. The level of violence continues to be at an unacceptable level. It should be noted that the Lead Monitor actually reads every incident report sent by OPSO. The Lead Monitor often finds that incident reports involving assaults are often not properly categorized by OPSO. Thus, if OPSO is relying on the categorization of incidents for its analysis, the analysis is based on the improper categorization that routinely underreports assaults and altercations. There was a monthly average of 24 reported inmate-on-inmate assaults/altercations in CY 2021. That number rose to 27 in CY 2022 and nearly doubled as it rose to 53 in CY 2023. The number continued to increase in CY 2024 to a monthly average of 61. This is indicative that OPSO has not substantially complied with the requirement that the facility be reasonably safe for staff and inmates, and that the facility continues not to be safe. The current number reported, even while higher than previous calendar years, is suspect given the systematic underreporting of reportable incidents and the number of inmate-on-inmate assaults that are likely undetected due to the lack of staff in the housing areas. While the Monitors are well aware that violent incidents occur in jail facilities, the level currently reflects partial compliance with the obligation to provide a reasonably safe and secure environment as to A. 5. a. and A. 5. c. A disproportionate higher number of the incidents of violence occurred in the housing units involving protective custody inmates. Thus, the level of violence on the housing units involving protective custody levels exceeds the OJC population in general. A properly classified and operated protective custody housing unit should have



one of the lower, if not the lowest, level of violence in a correctional facility. OPSO is currently reviewing how inmates are selected for protective custody housing to lessen the likelihood that violent inmates will continue to manipulate the classification process and gain access to vulnerable inmates. The Monitors will continue to assess whether OPSO moves to being in Non-Compliance with the provisions to maintain a reasonably safe and secure environment.

Review of the significant incidents during the monitoring period indicates that the failure of staff to follow policy consistently continues to be a serious impediment to effective supervision of the inmates. Staff continue to leave inmates unsupervised for hours and allow them to have access to materials by which to fashion weapons and by pass the security systems including the locking mechanisms on the cell doors. Many of the inmate-on-inmate assaults occur because staff allow inmates out of their cells and leave them unsupervised, or inmates are able to manipulate the locks on their cells to open them. There are inmates who repeatedly do not follow the rules of OJC including assaulting other inmates, assaulting staff, destroying property, starting fires, smoking, possession of dangerous contraband and/or threatening self-harm. OPSO used to house many of those inmates in a high security unit but chose to abandon this practice shortly after Sheriff Hutson took office. OPSO did move the high-risk inmates that were housed in dormitories into units with cells during the previous monitoring period. It is of concern that the practice of limiting the movement of high-security inmates and the practice of placing them in specialty housing was eliminated. The Monitors strongly urge OPSO to reestablish a high security unit. OPSO has been discussing the re-establishment of a high security unit, but it is yet to be accomplished. Instead, OPSO resorted to transferring several of the most troublesome inmates to the Louisiana Department of Corrections. While this may be a short-term solution, it is problematic in that these are pretrial inmates who are now being housed under conditions which do not meet the requirements of the Consent Judgment. It would be beneficial to develop individual behavioral management plans for these inmates that include specific security measures to be used when these inmates are allowed out of their cells. Such plans, if carried out routinely and consistently followed by all staff, would likely reduce the level of violence in the facility. Once the locks are upgraded in the current disciplinary unit, the Monitors are



hopeful that a proper high security unit will be established.

## Table 5 CY 2018-CY 2024 OJC Reported Incidents

| 2018 | Use of Force | Inmate Misconduct FLD/FFD | Inmate / Inmate Assault | Inmate Staff Altercation | PREA | Death | Attempt Suicide/ Ideation | Internal Escape | Criminal Damage | Medical (AKA slip/falls / injury) | Contraband | Medical | Other | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Jan | 13 | 0 | 38 | 7 | 2 | 0 | 6 | 2 | 3 | 9 | 9 | NA | 3 | 92 |
| Feb | 10 | 0 | 28 | 6 | 4 | 0 | 14 | 2 | 10 | 5 | 15 | NA | 2 | 96 |
| March | 21 | 0 | 37 | 7 | 5 | 0 | 4 | 3 | 11 | 18 | 5 | NA | 1 | 112 |
| April | 22 | 0 | 39 | 9 | 4 | 0 | 4 | 3 | 12 | 22 | 5 | NA | 1 | 121 |
| May | 24 | 0 | 52 | 0 | 5 | 1 | 0 | 5 | 8 | 19 | 10 | NA | 0 | 124 |
| June | 26 | 0 | 46 | 7 | 5 | 0 | 6 | 7 | 3 | 32 | 9 | NA | 3 | 144 |
| July | 20 | 0 | 30 | 4 | 4 | 0 | 9 | 3 | 3 | 30 | 13 | NA | 0 | 116 |
| Aug | 27 | 0 | 39 | 3 | 3 | 0 | 13 | 2 | 6 | 30 | 6 | NA | 3 | 132 |
| Sept | 14 | 0 | 33 | 6 | 2 | 0 | 7 | 5 | 4 | 35 | 6 | NA | 0 | 112 |
| Oct | 28 | 0 | 32 | 9 | 5 | 0 | 3 | 0 | 2 | 26 | 7 | NA | 1 | 113 |
| Nov | 21 | 0 | 31 | 6 | 5 | 0 | 5 | 8 | 3 | 18 | 7 | NA | 1 | 105 |
| Dec | 34 | 0 | 37 | 0 | 3 | 1 | 7 | 8 | 4 | 18 | 14 | NA | 3 | 129 |
| Total | 260 | 0 | 442 | 64 | 47 | 2 | 78 | 48 | 69 | 262 | 106 | 0 | 18 | 1396 |

| 2019 | Use of Force | Inmate Misconduct FLD/FFD | Inmate / Inmate Assault | Inmate Staff Assault | PREA | Death | Attempt Suicide/ Ideation | Internal Escape | Criminal Damage | Medical (AKA slip/falls / injury) | Contraband | Medical | Other | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Jan | 27 | 0 | 40 | 1 | 2 | 0 | 15 | 3 | 7 | 14 | 14 | NA | 0 | 123 |
| Feb | 29 | 0 | 26 | 7 | 2 | 0 | 13 | 1 | 0 | 4 | 11 | NA | 0 | 93 |
| March | 26 | 0 | 25 | 4 | 1 | 0 | 6 | 1 | 2 | 16 | 21 | NA | 3 | 105 |
| April | 26 | 0 | 28 | 7 | 1 | 0 | 3 | 0 | 3 | 15 | 27 | NA | 2 | 112 |
| May | 22 | 12 | 36 | 11 | 6 | 0 | 13 | 0 | 2 | 11 | 25 | NA | 1 | 117 |
| June | 26 | 7 | 55 | 9 | 4 | 0 | 13 | 0 | 2 | 16 | 23 | NA | 0 | 129 |
| July | 31 | 13 | 50 | 15 | 5 | 0 | 6 | 0 | 3 | 8 | 13 | NA | 0 | 113 |
| Aug | 37 | 26 | 32 | 17 | 6 | 0 | 7 | 1 | 8 | 20 | 35 | NA | 0 | 152 |
| Sept | 31 | 18 | 32 | 4 | 3 | 0 | 2 | 0 | 1 | 10 | 24 | NA | 0 | 94 |
| Oct | 37 | 21 | 38 | 15 | 4 | 0 | 1 | 0 | 7 | 18 | 33 | NA | 0 | 137 |
| Nov | 33 | 17 | 55 | 12 | 7 | 0 | 0 | 0 | 6 | 5 | 42 | NA | 0 | 144 |
| Dec | 33 | 23 | 23 | 15 | 1 | 0 | 3 | 0 | 6 | 8 | 34 | NA | 0 | 113 |
| Total | 358 | 137 | 440 | 117 | 42 | 0 | 82 | 6 | 47 | 145 | 302 | 0 | 6 | 1432 |



| 2020 | Use of Force | Inmate Misconduct FLD/FFD | Inmate/ Inmate Assault | Inmate Staff Assault | PREA | Death | Attempt Suicide/ Ideation | Internal Escape | Criminal Damage | Medical (AKA slip/falls/ injury) | Contraband | Medical | Other | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Jan | 29 | 18 | 31 | 8 | 4 | 0 | 3 | 0 | 1 | 7 | 35 | NA | 0 | **107** |
| Feb | 33 | 17 | 35 | 12 | 2 | 0 | 0 | 1 | 3 | 13 | 29 | NA | 1 | **113** |
| March | 31 | 19 | 24 | 9 | 1 | 0 | 1 | 0 | 3 | 6 | 35 | NA | 0 | **98** |
| April | 45 | 29 | 25 | 19 | 7 | 0 | 0 | 0 | 4 | 1 | 24 | NA | 0 | **109** |
| May | 37 | 26 | 24 | 11 | 1 | 0 | 1 | 0 | 6 | 3 | 12 | NA | 0 | **84** |
| June | 22 | 16 | 28 | 13 | 4 | 2 | 1 | 0 | 5 | 12 | 63 | NA | 0 | **144** |
| July | 21 | 8 | 22 | 9 | 1 | 0 | 2 | 0 | 4 | 5 | 47 | NA | 0 | **98** |
| Aug | 22 | 23 | 22 | 8 | 2 | 1 | 4 | 0 | 11 | 4 | 31 | NA | 0 | **106** |
| Sept | 24 | 14 | 16 | 12 | 2 | 0 | 2 | 0 | 8 | 4 | 9 | NA | 0 | **67** |
| Oct | 35 | 18 | 24 | 10 | 2 | 0 | 1 | 0 | 3 | 3 | 14 | NA | 0 | **75** |
| Nov | 33 | 19 | 28 | 10 | 5 | 0 | 2 | 0 | 9 | 5 | 31 | NA | 0 | **109** |
| Dec | 40 | 25 | 30 | 18 | 4 | 0 | 4 | 0 | 7 | 1 | 21 | NA | 0 | **110** |
| Total | 372 | 232 | 309 | 139 | 35 | 3 | 21 | 1 | 64 | 64 | 351 | 0 | 1 | 1220 |

| 2021 | Use of Force | Inmate Misconduct FLD/FFD | Inmate/ Inmate Assault | Inmate Staff Assault | PREA | Death | Attempt Suicide/ Ideation | Internal Escape | Criminal Damage | Medical (AKA slip/falls/ injury) | Contraband | Medical | Other | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Jan | 38 | 34 | 32 | 20 | 1 | 0 | 0 | 0 | 3 | 3 | 32 | NA | 0 | 125 |
| Feb | 27 | 12 | 30 | 14 | 2 | 0 | 1 | 0 | 2 | 5 | 14 | NA | 0 | 80 |
| March | 16 | 10 | 24 | 7 | 4 | 0 | 0 | 0 | 5 | 4 | 24 | NA | 0 | 78 |
| April | 24 | 17 | 27 | 10 | 2 | 0 | 1 | 1 | 2 | 4 | 45 | NA | 0 | 109 |
| May | 21 | 12 | 31 | 7 | 0 | 0 | 0 | 0 | 3 | 1 | 23 | NA | 0 | 77 |
| June | 34 | 18 | 25 | 15 | 0 | 1 | 0 | 0 | 4 | 4 | 30 | NA | 0 | 97 |
| July | 22 | 11 | 22 | 10 | 0 | 0 | 6 | 0 | 8 | 3 | 31 | NA | 0 | 91 |
| Aug | 18 | 13 | 19 | 7 | 0 | 0 | 5 | 0 | 2 | 4 | 20 | NA | 0 | 70 |
| Sept | 28 | 19 | 18 | 6 | 3 | 0 | 1 | 0 | 1 | 7 | 23 | NA | 0 | 78 |
| Oct | 31 | 21 | 22 | 8 | 0 | 0 | 1 | 0 | 6 | 3 | 52 | NA | 0 | 113 |
| Nov | 27 | 12 | 21 | 7 | 2 | 0 | 4 | 0 | 4 | 1 | 38 | NA | 0 | 89 |
| Dec | 25 | 11 | 22 | 12 | 3 | 0 | 1 | 0 | 2 | 4 | 17 | NA | 0 | 72 |
| Total | 311 | 190 | 293 | 124 | 17 | 1 | 20 | 1 | 42 | 43 | 350 | 0 | 0 | 1079 |

| 2022 | Use of Force | Inmate Misconduct FLD/FFD | Inmate/ Inmate Assault | Inmate Staff Assault | PREA | Death | Attempt Suicide/ Ideation | Internal Escape | Criminal Damage | Medical (AKA slip/falls/ injury) | Contraband | Medical | Other | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Jan | 22 | 12 | 22 | 5 | 1 | 0 | 0 | 0 | 4 | 4 | 29 | NA | 0 | 77 |



| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Feb** | 26 | 21 | 18 | 10 | 3 | 0 | 1 | 0 | 4 | 0 | 31 | NA | 0 | **88** |
| **March** | 15 | 8 | 24 | 1 | 2 | 0 | 4 | 0 | 4 | 3 | 20 | NA | 0 | **66** |
| **April** | 12 | 6 | 28 | 3 | 1 | 0 | 6 | 0 | 4 | 1 | 1 | NA | 0 | **50** |
| **May** | 15 | 10 | 24 | 3 | 5 | 0 | 3 | 0 | 4 | 2 | 4 | NA | 0 | **55** |
| **June** | 22 | 15 | 31 | 2 | 2 | 2 | 5 | 1 | 2 | 2 | 4 | NA | 0 | **66** |
| **July** | 15 | 6 | 36 | 5 | 3 | 0 | 1 | 1 | 1 | 7 | 6 | NA | 1 | **67** |
| **Aug** | 15 | 12 | 24 | 1 | 0 | 0 | 1 | 0 | 3 | 2 | 8 | NA | 0 | **51** |
| **Sept** | 27 | 18 | 30 | 7 | 5 | 0 | 3 | 0 | 6 | 3 | 20 | NA | 1 | **93** |
| **Oct** | 23 | 16 | 55 | 8 | 9 | 0 | 2 | 0 | 2 | 7 | 37 | NA | 1 | **137** |
| **Nov** | 13 | 6 | 26 | 11 | 4 | 0 | 10 | 1 | 3 | 3 | 45 | NA | 6 | **115** |
| **Dec** | 24 | 11 | 33 | 15 | 1 | 0 | 9 | 3 | 2 | 1 | 43 | NA | 1 | **119** |
| **Total** | 229 | 141 | 351 | 71 | 36 | 2 | 45 | 6 | 39 | 35 | 248 | 0 | 10 | **984** |

| 2023 | Use of Force | Inmate Misconduct FLD/FFD | Inmate / Inmate Assault | Inmate Staff Assault | PREA | Death | Attempt Suicide/ Ideation | Internal Escape | Criminal Damage | Medical (AKA slip/falls / injury) | Contraband | Medical | Other | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Jan** | 24 | 17 | 34 | 9 | 2 | 0 | 5 | 2 | 6 | 15 | 75 | NA | 0 | **165** |
| **Feb** | 19 | 14 | 30 | 4 | 4 | 0 | 1 | 4 | 4 | 15 | 28 | NA | 2 | **106** |
| **March** | 14 | 7 | 46 | 9 | 2 | 0 | 5 | 8 | 1 | 7 | 40 | NA | 1 | **126** |
| **April** | 18 | 12 | 42 | 9 | 2 | 0 | 2 | 3 | 5 | 6 | 39 | NA | 4 | **124** |
| **May** | 21 | 12 | 43 | 11 | 2 | 0 | 1 | 5 | 1 | 15 | 52 | NA | 1 | **143** |
| **June** | 36 | 23 | 62 | 16 | 1 | 0 | 1 | 8 | 7 | 25 | 49 | NA | 3 | **195** |
| **July** | 32 | 20 | 66 | 18 | 5 | 0 | 4 | 4 | 8 | 20 | 35 | NA | 4 | **184** |
| **Aug** | 27 | 15 | 67 | 14 | 1 | 0 | 7 | 11 | 5 | 12 | 37 | NA | 5 | **174** |
| **Sept** | 25 | 19 | 67 | 15 | 1 | 0 | 4 | 6 | 14 | 53 | | NA | 2 | **181** |
| **Oct** | 44 | 37 | 64 | 10 | 5 | 0 | 3 | 7 | 7 | 12 | 44 | NA | 9 | **198** |
| **Nov** | 31 | 18 | 67 | 13 | 3 | 0 | 1 | 15 | 4 | 23 | 45 | NA | 7 | **196** |
| **Dec** | 25 | 21 | 48 | 11 | 2 | 0 | 4 | 10 | 6 | 14 | 57 | NA | 3 | **176** |
| **Total** | 316 | 215 | 636 | 139 | 30 | 0 | 34 | 81 | 60 | 178 | 554 | 0 | 41 | **1968** |

| 2024 | Use of Force | Inmate Misconduct FLD/FFD | Inmate / Inmate Assault | Inmate Staff Assault | PREA | Death | Attempt Suicide/ Ideation | Internal Escape | Criminal Damage | Slip / Fall / Injury | Contraband | Medical | Other | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Jan** | 27 | 23 | 45 | 23 | 2 | 0 | 3 | 14 | 8 | 15 | 64 | 86 | 3 | **286** |
| **Feb** | 24 | 17 | 35 | 9 | 1 | 0 | 2 | 7 | 21 | 9 | 32 | 46 | 5 | **184** |
| **March** | 22 | 14 | 39 | 5 | 4 | 0 | 7 | 21 | 16 | 6 | 50 | 43 | 5 | **210** |
| **April** | 16 | 12 | 44 | 11 | 0 | 0 | 7 | 7 | 19 | 24 | 34 | 70 | 1 | **224** |
| **May** | 40 | 21 | 70 | 16 | 2 | 0 | 7 | 10 | 30 | 13 | 79 | 68 | 4 | **320** |
| **June** | 24 | 15 | 72 | 6 | 2 | 0 | 1 | 12 | 18 | 15 | 42 | 49 | 3 | **235** |
| **July** | 49 | 25 | 69 | 16 | 4 | 0 | 9 | 29 | 29 | 20 | 38 | 54 | 5 | **298** |
| **Aug** | 27 | 10 | 79 | 22 | 5 | 0 | 7 | 21 | 12 | 18 | 56 | 37 | 2 | **269** |



| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Sept** | 54 | 36 | 76 | 14 | 7 | 0 | 6 | 31 | 7 | 15 | 58 | 54 | 1 | **305** |
| **Oct** | 42 | 12 | 80 | 13 | 5 | 0 | 6 | 28 | 23 | 21 | 33 | 38 | 3 | **262** |
| **Nov** | 49 | 25 | 57 | 12 | 4 | 0 | 2 | 27 | 14 | 9 | 36 | 48 | 1 | **235** |
| **Dec** | 35 | 13 | 69 | 8 | 1 | 0 | 5 | 22 | 15 | 10 | 40 | 30 | 1 | **214** |
| **Total** | **409** | **223** | **735** | **155** | **37** | **0** | **57** | **229** | **212** | **175** | **562** | **623** | **34** | **3042** |

OPSO continues to not timely conduct and document security rounds (30 minutes or 15 minutes depending on the unit) nor perform direct supervision surveillance consistent with the requirements of the Consent Judgment or OPSO policy.

Direct supervision requires surveillance of all of the inmates and cannot be properly performed by sitting behind a desk or in the control module. It requires walking around the unit, looking into the individual cells, and actively engaging with the inmates. Staffing in the housing units was observed to be inadequate throughout the OJC during the monitoring tour. Over the three years, the Monitors witnessed the majority of the units being unsupervised. A review of the log of security checks reveals TMH was the one area which appeared to have sufficient staff and consistently conducted security rounds. Review of incident reports revealed that units were often unstaffed, including many mandatory posts. If staff are not present, it is impossible to make the required rounds. While the write their rounds in the logbooks, this is insufficient proof that the security checks actually occurred and requires watching hours of video to verify. Review of video footage after an incident often reveals that security checks are not being conducted and/or inadequately conducted even if recorded in the logbook. OPSO has now started to audit log sheets with video footage but has almost exclusively performed the audits on the four housing units which the June 2024 Stipulation and Order required to be staffed all of the time. A simple review of the documentation provided indicates that there are often gaps of two or more hours in between security rounds. During the onsite monitoring visit, Monitors reviewed the logbooks. As is done during each monitoring visit, deputies were once questioned and often found to be incapable of describing what an acceptable security check would be like. At most, in the majority of the units, an adequate security check was only performed when a physical count of the inmates took place; at most, twice in a twelve-hour shift. The rest of the "checks" were no more than looking about the housing unit without leaving the deputy station, or, even more



troubling, the control station which is located outside of the housing unit. OPSO CAB performed an audit of a limited period of security checks for a period in April 2024. The results are illustrative of what the Monitors have observed and noted in previous reports. The CAB auditors found that while 137 security checks were noted on the pod log, Squads A and B actually only completed 5% of those security checks. Squad C only completed 2.25% of the security checks recorded and Squad D completed 12% of the security checks recorded. In the Stipulation and Order of June 2024, the Court specifically ordered OPSO to staff four housing units (mental health (2A), youthful offenders (2C), protective custody (2D), and disciplinary (3C)). OPSO's data indicates that it has made progress on these four specific housing units all of the time. While progress was shown during August and September of the monitoring period, it should be noted that the improvement was only related to those specific four housing units. Given the level of failure to perform security checks and lack of staff assigned to direct supervision, OPSO continues to be in noncompliance with IV. A. 5. d.

While not specifically required by the language of the Consent Judgment, if OPSO were able to provide a reliable system to allow for rounds, by both deputies and supervisors, to be recorded electronically, it would be extremely helpful in obtaining and demonstrating compliance. Not only would it allow supervisors to quickly determine whether rounds were being conducted in a timely manner, it would allow for OPSO to audit compliance and address non-adherence.

All twenty-four (24) of the housing units in OJC are designed for direct supervision. At the time of the drafting of the Consent Judgment the design of OJC was known. The Consent Judgment requires that staff provide direct supervision in housing units that are designed for this type of supervision. Thus, continual presence of a deputy in each housing unit at OJC and TMH is mandatory under the Consent Judgment. OPSO has taken the position that OPSO gets to determine which housing posts are mandatory and routinely does not assign mandatory staff to each housing unit. In addition, deputies are frequently absent from even the housing units designated by OPSO as mandatory. More often than not, one deputy is assigned to two or more housing units. The harm that results from not having a deputy in each pod, especially when inmates are out, is evident by the repeated serious incidents occurring when there is no deputy on the unit, including



those resulting in serious injury and/or necessitating hospital routes. Thus, IV. A. 5. e. remains in partial compliance.

Regarding overhead video surveillance and recording cameras for OJC (A. 5. f.), there has been a significant investment in cameras. There are times when a nonfunctional camera is discovered when a supervisor or an investigator tries to retrieve the videos, but it is rare. OPSO needs to continue to audit the system by having a supervisor test the various cameras on a monthly basis and prepare a report so issues can be addressed. IV. A. 5. f. continues to be in substantial compliance. Supervisors have improved on pulling video as required by the Use of Force policy. Deputies are now issued body worn cameras which is helpful as the body worn cameras provide audio in addition to video.

There were no divisional transfers into OJC during the monitoring period. Section IV. A. 5. g. is in substantial compliance. Given the necessity of utilizing staff from other areas of OPSO to supervise inmates in the OJC, OPSO is encouraged to provide training even if there is not an actual transfer from one division to another. Proof that recruits received training on specialized housing during pre-service was provided. However, no proof of the required annual eight (8) hours of training for all of the deputies assigned to specialized units was provided; IV. A. 5. h. is in partial compliance. It does appear that approximately 63% of the OJC security staff have received the specialized training. That rate of completion does not warrant the finding of Substantial Compliance absence proof as to what percentage of deputies assigned to the specialized housing received the training.

Documentation indicates that supervisors do not consistently conduct daily rounds. The audit performed by OPSO CAB in April 2024 found that the daily security checks by supervisors were actually performed 3.40% of the time on Squad A, 15.00% of the time on Squad B, 4.00% of the time on Squad C, and 1.6% of the time on Squad D. This audit confirms what was suspected by the Monitors. OPSO did not provide proof that supervisors conduct daily rounds. Stating the policy and asserting partial compliance without proof is insufficient. The only thing provided were copies of random logbook pages which sometimes contained an entry that a person with a supervisory title was on the unit. It is not sufficient that rounds were conducted daily. Thus, IV. A. 5. i. continues to be in non-compliance. Supervisors are required to sign off on the round sheet completed



by the pod deputy, but this does not provide proof that the supervisor conducted daily rounds. OPSO is encouraged to continue the focus on supervisors' rounds and actually perform audits of them.

The daily inspections of housing units as required by VI. A. 5. j. were not performed in a consistent enough manner to warrant a rating of substantial compliance, but there has been sufficient improvement to warrant an upgrade to partial compliance. Thus, VI. A. 5. j. has been upgraded to partial compliance. Proper inspections by the deputies and the supervisors would likely result in the discovery of the destruction of items that are part of the jail to fashion weapons and attempts by inmates to override the jail security systems including door locks. It is essential that the inspections be thorough and that corrective actions are taken to address the inspection findings. Training was provided on how to properly conduct an inspection. However, training without implementation is insufficient to satisfy the requirements of the provision.

Random monthly shakedowns to prevent inmates from possessing dangerous contraband are required. Proof provided indicates that the number and quality of shakedowns being conducted has significantly improved. Over the monitoring period, OPSO provided proof that seventy-seven (77) random shakedowns of units were conducted. Most of these were conducted by the ISB, but the OJC staff has also increased the number of shakedowns it performs. However, there was no documentation provided that 2C, the youthful offender housing unit, was shaken down during the monitoring period and an additional seven housing units were only shaken down one to two times during the six-month monitoring period. There continues to be significant incidents involving contraband including the manufacturing and use of weapons fashioned from the jail itself. The review of contraband reports clearly indicates reoccurring issues and that the number of contraband incidents continue to be high. The number of drug overdoses occurring is a direct reflection of the failure to prevent introduction of illicit drugs into the facility and the failure to perform timely and appropriate searches to remove the illicit drugs. There continues to be a serious issue of inmates hoarding medication. Reports demonstrate that inmates are fashioning weapons out of items in the jail which are then used to assault other inmates. Reports and the site visit reveal that inmates are smuggling in marijuana and narcotics to smoke. Some of these items come



through the mail, but there is a significant issue of staff smuggling in contraband and the failure to detect narcotics being brought in by inmates following their arrest. The failure to search inmates thoroughly and properly upon returning from court also constitutes a source of illegal drugs. This indicates the need to analyze the data and develop a corrective action plan to reduce, if not stop, the hoarding of medication, the fashioning of weapons, and the flow of contraband into the facility. Failure to conduct shakedowns on a proactive basis is directly related to the violence in the facility. A. 5. k. remains in partial compliance.

The documentation provided for A. 5. l. includes a categorization of contraband, and the classification required. Thus, A. 5. l. is now in Substantial Compliance.

### IV. A. 6. Security Staffing

*A. 6. a. OPSO shall ensure that correctional staffing and supervision is sufficient to adequately supervise prisoners, fulfill the terms of this Agreement, and allow for the safe operation of the Facility, consistent with constitutional standards.*

*(1) OPSO shall achieve adequate correctional officer staffing in the following manner: Within 90 days of the Effective Date, develop a staffing plan that will identify all posts and positions, the adequate number and qualification of staff to cover each post and position, adequate shift relief, and coverage for vacations. The staffing plan will ensure that there is adequate coverage inside each housing and specialized housing areas and to accompany prisoners for court, visits and legal visits, and other operations of OPP and to comply with all provisions of this Agreement. OPSO will provide its plan to the Monitor, SPLC, and DOJ for approval. The Monitor, SPLC, or DOJ will have 60 days to raise any objections and recommend revisions to the staffing plan.*

*(2) Within 120 days before the opening of any new facility, submit a staffing plan consistent with subsection (1) above.*

*(3) Within 90 days after completion of the staffing study, OPSO shall recruit and hire a full-time professional corrections administrator to analyze and review OPP operations. The professional corrections administrator shall report directly to the Sheriff and shall have responsibilities to be determined by the Sheriff. The professional corrections administrator shall have at least the following qualifications: (a) a bachelor's degree in criminal justice or other closely related field; (b) five years of experience in supervising a large correctional facility; and (c) knowledge of and experience in applying modern correctional standards, maintained through regular participation in corrections-related conferences or other continuing education.*

*(4) Provide the Monitor a periodic report on staffing levels at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. Each report will include the following information:*

  *i. a listing of each post and position needed;*

  *ii. the number of hours needed for each post and position; a listing of staff hired and positions filled;*

  *iii. a listing of staff working overtime and the amount of overtime worked by each staff member;*

  *iv. a listing of supervisors working overtime; and*

  *v. a listing of and types of critical incidents reported*



***A. 6. b. Review the periodic report to determine whether staffing is adequate to meet the requirements of this Agreement. OPSO shall make recommendations regarding staffing based on this review. The review and recommendations will be documented and provided to the Monitor.***

Findings:

A. 6. a.  Non-Compliance

A. 6. b.  Partial Compliance

An overall rating of A. 6. was provided in the previous reports. This was inconsistent with the other introductory paragraphs and has now been discontinued.

Observations:

The level of staffing is extremely insufficient to adequately supervise inmates and allow for the safe operation of the facility. There have been insufficient security staff over the past few monitoring periods, and it continues at a level where OPSO struggles to staff the facility and cover basic functions. OPSO's staffing reports document that more mandatory posts are being filled on a consistent basis, but not at a level to warrant partial compliance. Numerous incident reports and investigations reveal posts were not constantly staffed, which resulted in a high rate of violence. OPSO has now put in place the Emergency Staffing and Augmentation Plan (ESAP) which has resulted in escorts being provided to the psychiatrists and some of the medicals runs. The ESAP has not been shown to provide any increased coverage of the housing units as many of the individuals, especially the reserves, have been resistant to working in the housing units. Some of them do not have the required certification to supervise inmates. There is still a lack of a coordinated effort on the utilization of overtime and redeployment of staff to ensure the mandatory posts are covered on a consistent basis. While OPSO has updated its staffing plan, nearly half of the positions detailed in it are vacant. The deployment of staff is sufficiently inconsistent and insufficient to result in IV. A. 6. a. (1) and IV. A. 6. a. (2) continuing to be in non-compliance. For the monitoring period, there was an Acting Chief of Corrections whose background, education, and experience fulfilled the requirements of provision IV. A. 6. a. (3). In July 2024, a new Chief of Corrections was appointed that also met the qualification requirements of the provision. Thus, it is in substantial compliance. Paragraph IV. A. 6. a. (4) is in substantial compliance, as monthly reports are produced to document the hiring and termination of employees. The Stipulated Agreement also provides for bi-monthly reports regarding hiring. Paragraph 7. a. of the Stipulated



Agreement of February 11, 2015, requires monthly reporting. Given the importance of the actual implementation of an approved staffing plan, A. 6. a. remains in non-compliance as the actual implementation of an adequate staffing plan is the most crucial part of this provision. A staffing plan based on nonexistent staff is not enough to warrant partial compliance.

OPSO has now provided a periodic review of the staffing plan. What has not been provided are the recommendations to the Monitor as to how OPSO will enact the staffing plan given that almost half of the positions detailed in the staffing plan are vacant. Section A. 6. b. remains in partial compliance. OPSO has provided some compelling data as to the inadequacy of salaries. The Monitors suggest that this data be reflected in the recommendations and be provided to the Monitors and the New Orleans City Council as it is the funding agency for OPSO. The Monitors also suggest that OPSO consider the mandating of overtime for OPSO staff who are not assigned to OJC at OJC.

## IV. A. 7. Incidents and Referrals

*A.7.a.  OPSO shall develop and implement policies that ensure that Facility watch commanders have knowledge of reportable incidents in OPP to take action in a timely manner to prevent harm to prisoners or take other corrective action. At a minimum, OPSO shall do the following:*

*A.7.b.  Continue to ensure that Facility watch commanders document all reportable incidents by the end of their shift, but no later than 24 hours after the incident, including prisoner fights, rule violations, prisoner injuries, suicide attempts, cell extractions, medical emergencies, found contraband, vandalism, escapes and escape attempts, and fires.*

*A.7.c.  Continue to ensure that Facility watch commanders report all suicides and deaths no later than one hour after the incident, to a supervisor, IAD, the Special Operations Division, and medical and mental health staff.*

*A.7.d.  Provide formal pre-service and annual in-service training on proper incident reporting policies and procedures.*

*A.7.e.  Implement a policy providing that it is a disciplinary infraction for staff to fail to report any reportable incident that occurred on his or her shift. Failure to formally report any observed prisoner injury may result in staff discipline, up to and including termination.*

*A.7.f.  Maintain a system to track all reportable incidents that, at a minimum, includes the following information:*

*(1)      tracking number;*
*(2)      the prisoner(s) name;*
*(3)      housing classification and location;*
*(4)      date and time;*
*(5)      type of incident;*
*(6)      injuries to staff or prisoner;*
*(7)      medical care;*
*(8)      primary and secondary staff involved;*
*(9)      reviewing supervisor;*
*(10)     external reviews and results;*
*(11)     corrective action taken; and*
*(12)     administrative sign-off.*

*A.7.g.  Ensure that incident reports and prisoner grievances are screened for allegations of staff*



*misconduct, and, if the incident or allegation meets established criteria in accordance with this Agreement, it is referred for investigation.*

*A.7.h.   Provide the Monitor a periodic data report of incidents at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement.*

*A.7.i. The report will include the following information:*

> *(1)      a brief summary of all reportable incidents, by type and date;*
> *(2)      a description of all suicides and in-custody deaths, including the date, name of prisoner, and housing unit;*
> *(3)      number of prisoner grievances screened for allegations of misconduct; and*
> *(4)      number of grievances referred to IAD or SOD for investigation.*

*A.7.j.   Conduct internal reviews of the periodic reports to determine whether the incident reporting system is ensuring that the constitutional rights of prisoners are respected. Review the quarterly report to determine whether the incident reporting system is meeting the requirements of this Agreement. OPSO shall make recommendations regarding the reporting system or other necessary changes in policy or staffing based on this review. The review and recommendations will be documented and provided to the Monitor.*

<u>Findings:</u>

A. 7. a.  Substantial Compliance

A. 7. b.  Partial Compliance

A. 7. c.  Substantial Compliance

A. 7. d.  Substantial Compliance

A. 7. e.  Partial Compliance

A. 7. f.  Substantial Compliance

A. 7. g.  Substantial Compliance

A. 7. h.  Substantial Compliance

A. 7. i.  Substantial Compliance

A. 7. j.  Substantial Compliance

<u>Observations:</u>

OPSO has long had a policy on incidents and referrals that sets out the process for documenting and referring incidents. What has been lacking is a sufficient process to ensure all reportable incidents are being documented and that all incident reports are complete, prompt, and accurate. Watch commanders are required to be notified of any incident occurring and document the incident in their shift log which results in substantial compliance of A.7.a. However, review of the routes of inmates and medical clinic walk-in logs indicates that a number of incidents are not resulting in an incident report. Enough improvement has resulted in a continued finding of substantial compliance, but a corrective action plan to maintain substantial compliance is warranted.

OPSO implemented a process where an OPSO staff member reviewed the "routes"



of inmates with serious medical or trauma injuries to the hospital emergency room and the OPSO clinic walk-in logs and compared them to the reports received. The sergeant assigned has improved the quality of this review, but the lack of follow-through on items found to be unreported results in IV. A. 7. b. remaining in partial compliance. The Jail Compliance Team, after the compliance period, began to review the medical logs and has done a good job discovering injuries which indicate an incident report should have been written and requesting an incident report. Wexford, the new medical provider, had stopped providing the walk-in logs when it took over, but OPSO worked with Wexford to provide the logs in electronic form. Having a process for capturing incidents for which no reports were written is absolutely essential.

During this reporting period, several attempts at suicide were reported within an hour to the proper persons: thus IV. A. 7. c. is in substantial compliance. Documentation on preservice training and annual training on report writing was provided; IV. A. 7. d. is in substantial compliance.

OPSO still does not hold supervisors and security staff accountable for the late reports. No documentation regarding accountability was provided. OPSO's own documentation indicates that reports are often not timely filed. Failure to hold staff accountable results in IV. A. 7. e. being in partial compliance.

OPSO has transitioned to the AS 400 system to track the information required in IV. A. 7. f.  and is in substantial compliance. OPSO is doing a better job analyzing the data, but the analysis is still inadequate and often does not result in measures which would correct the problem being identified. The next step is utilizing the analysis to make required changes in policy and procedure. OPSO remains in substantial compliance with A. 7. g.; incidents, and grievances are reviewed for misconduct and referred for investigation where appropriate, but the lack of completeness of reports puts this rating at risk. The Monitors were provided with a semi-annual report of incidents that now, with the supplementation by the daily/weekly reports, contains all of the required information and, thus, IV. A. 7. h. and i. are in substantial compliance. OPSO performed an assessment of whether the reporting system meets the requirements of the Consent Judgment and is given substantial compliance for IV. A. 7. j. as OPSO is now addressing the lack of timeliness.



## VI.  A. 8.  Investigations

*A. 8. a. Maintain implementation of comprehensive policies, procedures, and practices for the timely and thorough investigation of alleged staff misconduct, sexual assaults, and physical assaults of prisoners resulting in serious injury, in accordance with this Agreement. Investigations shall:*

    *(1)    be conducted by persons who do not have conflicts of interest that bear on the partiality of the investigation;*

    *(2)    include timely, thorough, and documented interviews of all relevant staff and prisoners who were involved in or who witnessed the incident in question, to the extent practicable; and*

    *(3)    include all supporting evidence, including logs, witness and participant statements, references to policies and procedures relevant to the incident, physical evidence, and video or audio recordings.*

*A. 8. b. Continue to provide SOD and IAD staff with pre-service and annual in-service training on appropriate investigation policies and procedures, the investigation tracking process, investigatory interviewing techniques, and confidentiality requirements.*

*A. 8. c. Ensure that any investigative report indicating possible criminal behavior will be referred to IAD/SOD and then referred to the Orleans Parish District Attorney's Office, if appropriate.*

*A. 8. d. Provide the Monitor a periodic report of investigations conducted at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement.*

*A. 8. e. The report will include the following information:*

    *(4)    a brief summary of all completed investigations, by type and date;*

    *(5)    a listing of investigations referred for administrative investigation;*

    *(6)    a listing of all investigations referred to an appropriate law enforcement agency and the name of the agency; and*

    *(7)    a listing of all staff suspended, terminated, arrested, or reassigned because of misconduct or violations of policy and procedures. This list must also contain the specific misconduct and/or violation.*

*A. 8. f. OPSO shall review the periodic report to determine whether the investigation system is meeting the requirements of this Agreement and make recommendations regarding the investigation system or other necessary changes in policy based on this review. The review and recommendations will be documented and provided to the Monitor.*

Findings:

A. 8. a.  Partial Compliance

A. 8. b.  Substantial Compliance

A. 8. c.  Substantial Compliance

A. 8. d.  Substantial Compliance

A. 8. e.  Substantial Compliance

A. 8. f.   Substantial Compliance

Observations:

       The Investigative Services Division (ISB) is responsible for: the Criminal Investigation Division (investigates possible criminal activity by inmates), Internal Affairs Division-Criminal (investigates possible criminal activity by staff), the FIT (investigates use of force by staff), the Internal Affairs Division-Administrative (investigates possible



violation of policies by staff), and the Intelligence Unit (provides information and intelligence regarding activities that have taken place or may take place in the jail or support activities).

The timeliness and the quality of the investigations produced by ISB has improved during this monitoring period. However, FIT investigations are still often finalized without having interviewed any witnesses and relying on short self-serving statements by the deputy involved. Thus, IV. A. 8. a., remains in partial compliance.

The Monitor acknowledges that investigating incidents of inmate-on-inmate assaults, sexual assaults, staff on inmate assaults, etc. with a goal of seeking indictments is appropriate. Inmates should be held accountable when they commit criminal acts while in the jail facility. The same holds true for staff who commit criminal acts whether it be the smuggling of contraband or assault on inmates. The overall goal is to create a safe jail. In a jail setting, investigations play a critical role in protecting inmates from inappropriate and/or illegal staff actions, protecting inmates from each other, protecting staff from inappropriate and/or illegal inmate actions, and ensuring policy is followed. Continued emphasis is needed on the goal of investigations to prevent future incidents through analysis of the policy, procedures, training, supervision, and physical plant contributors to the incident. This function cannot and should not be performed by ISB alone. Also troubling is how seldom ISB recognizes the other factors which contributed to an incident such as failure to follow policy and/or includes them in the investigation reports. It should be noted that when ISB previously had included other factors in the investigation report, they have often received pushback from the leadership in OJC and been accused of overstepping their role. The collaboration between ISB and OJC and the opportunity to address the root causes of incidents continues to improve.

ISB has demonstrated training related to the investigative skills provided during 2023 and 2024. IV. A. 8. b. remains in substantial compliance.

Documentation presented demonstrates that investigations which reveal possible criminal activity by staff were referred to the Orleans Parish District Attorney's Office, if appropriate. Thus, A. 8. c. is in substantial compliance. The Monitors remain concerned about the frequent refusal by the district attorney to follow through with filing cases related to indecent exposure by inmates towards staff and assaults on staff due to the



throwing of urine and feces by inmates on staff. ISB provides reports in substantial compliance with IV. A. 8. d. and e. ISB reviewed the investigation system to determine whether the investigation system complies with the requirements of the Consent Judgment and forwarded any recommendations to the Monitors in substantial compliance with IV. A. 8. f. The quality of those recommendations has room for improvement and, unless implemented, may result in a lowering of the rating.

## IV. A. 9. Pretrial Placement in Alternative Settings

*A. 9. a. OPSO shall maintain its role of providing space and security to facilitate interviews conducted pursuant to the City's pretrial release program, which is intended to ensure placement in the least restrictive appropriate placement consistent with public safety.*
*A. 9. b. OPSO shall create a system to ensure that it does not unlawfully confine prisoners whose sole detainer is by Immigration and Customs Enforcement ("ICE"), where the detainer has expired.*

Findings:

A. 9. a.  Substantial Compliance

A. 9. b.  Substantial Compliance

Observations:

OPSO provided a memorandum noting that the pretrial program is managed by the Criminal District Court, and that space is provided. OPSO also provided a memorandum that ICE detainers are only accepted for a specified list of offenses.  OPSO has not detained any individuals under an ICE detainer during the monitoring period. The memos are dated November 1, 2024, and signed by the Chief of Staff.

## IV. A. 10. Custodial Placement within OPSO

Introduction:

OPSO designed and validated an objective classification system to assess and house OPSO inmates according to their threats to institutional safety and security. The automated classification system was implemented on January 15, 2015.[1] The 2024 OPSO draft staffing plan set the classification unit staffing at 21 FTEs.[2]

As of September 30, 2024, the Classification Unit staffing was 14 – one classification manager, four shift supervisors, and nine classification specialists.[3] One staff

---

[1] Hardyman, Patricia L. (2015). "Design and Validation of an Objective Classification System for the Orleans Parish Sheriff's Office: Final Report." Hagerstown, MD: Criminal Justice Institute, Inc.
[2] Mallett, Jay and Hammons, Deborah. (June 17, 2024). "JAIL POST & COVERAGE ANALYSIS – June 17, 2024" Orleans Parish, LA: Office of the Sheriff. page 2 of 12.
[3] During the Fall of 2022, OPSO created the option or the classification staff to become deputy recruits. Two individuals opted to remain civilian classification specialists, the remaining nine are "recruits." For the purposes of



member was on medical leave through October 2024. Since the end of the Compliance Review period (October 2024 – January 2025), two additional classification specialists were hired, and the specialist returned from medical leave. However, one staff member is on temporary suspension.  Thus, the current "active" staffing is 15.

Twelve (12) of the 15 staff members have NCIC clearance and passwords. NCIC coverage is available for each of the four squads. Staff have access to the criminal history records required to complete the custody and PREA assessments via the NCIC website. The rap sheets were missing from most classification folders reviewed for this Compliance Review.  The classification manager checks the folders at the start of her shift and prints any missing rap sheets. However, it was unclear that staff reviewed the rap sheets for the "completed" initial classifications.

An automated housing assignment process (HUAP) identifies housing options for inmates according to their custody level, gender, special population status, PREA designations, enemies, and associates. After the initial classification assessment, the specialists assign most male inmates to one of the roll in pods.[4] (Special population tags identify individuals for suicide observation versus suicide watch, medical housing/ isolation, academic education, or special diets.) (As needed, men with acute mental health or medical needs go directly to 2A or 2B, respectively. Individuals identified for suicide watch are housed in TMH.) Following the initial classification, minimum custody women with no immediate medical or mental health needs and at low risk for institutional predation and vulnerability (Non-Victims/Non-Predators) are transferred to TDC B3-E.

The OPSO automated housing process assigns enemies and associates to separate pods to prevent institutional violence and disruption. While tension between the Classification Unit and security staff appeared to have diminished, security staff and ISB remain reluctant to share information with the Classification Unit regarding neighborhood cliques, gang involvement, enemies, associates, and other housing separation requirements. Acquiescence to inmates' requests to move to reside with their

---

this report, the classification line staff are referred to as "Classification Officers" and the shift supervisors are referred to as "Shift Supervisors."
[4] When transferring inmates from the roll in or special population pods to a general population pod, the classification staff matches individuals by custody level, PREA designations, age, and crime/criminal history.



associates or to accommodate security staff "suggestions" for inmate moves continues unabated. Classification staff routinely accepts the security staff's suggestions and inmate requests with little to no analysis to determine if the inmates are trying to manipulate their housing assignments or if staff are avoiding problematic inmates.

The "ALL" custody and PREA designations continue in the special population units – Mental Health (Acute and Sub-Acute), Protective Custody, Disciplinary/ Segregation, Medical, etc. The OJC pods for housing women (3 E and F) are "ALL" custody and PREA designations."[5] Adherence to the custody and PREA designations during the out-of-cell times is vital. The short-term tradeoff of the custody and PREA separations creates more violence and disruption in the long term. With the recent rise in the OPSO population, most of the OJC pods are operating at capacity. The exceptions were OJC 2C (male, youthful offenders) and OJC 2B (Mental Health Step Down for men). As of September 30, 2024, for example,

- OJC 2C - 42 of 58 beds were empty,
- OJC 2B - 24 of 57 beds were empty[6], and
- TDC B-4E - 46 of 56 were empty.

In mid-April 2024, OJC 2-C became the youthful offender pod (i.e., individuals less than or equal to 17 years.) OJC 2D became the Protective Custody Unit.  The youthful offender pod reduced housing options for adults. (Between April and September 2024, the average daily population of youthful offenders was 20.)  OPSO should consider revamping the criteria for the kitchen workers.  As the OPSO population has increased, B4 - E has been used as an overflow unit for low and medium custody males. While this yields bed space for low and medium custody inmates, it does not address the need for kitchen workers.

During this Compliance Period, the classification day shift supervisor circulated a daily housing matrix to reflect the current OJC, TMH, and TDC populations. The matrices reflected fluctuations in the OPSO population. Isolations for COVID-19 have ceased. As per the OPSO Special Population Report for April 1, 2024 – September 30, 2024, no one

---

[5] As previously noted, TDC B3-E houses minimum custody women with no immediate medical or mental health needs and at low-risk for institutional predation and vulnerability (Non-Victims/Non-Predators).
[6] During May 2025, average daily count for OJC 2B was 39.6.



was identified as COVID-19 positive. (Previously, COVID-19 patients were transferred to TDC to minimize the spread of the virus throughout the system.)

Reliance on the roll in pods for the intake population has shifted. As of September 30, 2024, three pods -- OJC Tier 1 Pods A, B, and E were designated "ROLL INS" for men. (Pod 3-F serves as the Roll In Pod for high-risk women, i.e., individuals with high custody, medical, or mental health needs.) Thus, OPSO reduced the number of roll in pods from six to three.

A different housing issue emerged during this Compliance Period due to the significant increase in the OPSO average daily population. Bed space within the roll-in and general population pods was very limited, creating a backlog of individuals in the IPC/Booking area waiting for a bed assignment. IPC (Intake Processing Center)/Booking Area essentially became a "Roll In" pod.  The classification staff complete the custody and PREA assessments. However, individuals remain in the IPC /Booking area for days, waiting for an OJC bed assignment.  IPC staff rely on the custody and PREA assessments completed by the Classification Unit to assign individuals in the IPC/Booking area to holding cells for sleeping and lock-down for counts. Low and Medium custody, NP, and NV men are housed in IPC cells 1029, 1030, 1031, and 1037. Known predators/victims, high/maximum custody, medical isolation, and individuals with mental health needs are assigned to 1026, 1025, 1032, and 1033.  However, a standardized capacity rating per holding cell has not been established.  Seven to ten individuals are assigned to the "larger" IPC cells, i.e., 1029, 1030, 1031 and 1037.  Individuals sleep sitting up or on the floor.   There is only one cell (1013) for low- and medium-custody women.   Unclassified individuals, as well as those for whom full medical assessments have not been completed, are shuffled off to the holding cells.

With the continuing rise in the OPSO population, OPSO has explored various population management strategies:

1) Discontinue the use of the TDC units as "roll in pods." Reducing the number of roll in pods is critical for ensuring adequate space for the general population.

2) Increase the number of kitchen workers to facilitate the movement of minimum custody inmates to TDC B-4E and support the kitchen staff.



3)  Maximize the utilization of the MH beds within TMH and the OJC MH step-down unit.

4)  Work with LA DOC to expedite the movement of DOC inmates from OPSO to free up much-needed bed space in OJC.

During this Compliance Period, the Classification Unit conducted housing audits to verify the integrity of the housing assignments designed by the Classification staff. However, not all housing units were audited each month. Further, some audit reports were incomplete or unclear. Observation of the housing audits and protective custody reviews via the OJC camera system suggested that not all the audits were conducted as reported.

Assessment Methodology:

Compliance was assessed through multiple data sources and activities – review of the OPSO and JMS daily population, classification statistical reports and data files, observation of classification and audit procedures, onsite meetings with OPSO staff, housing matrices, and staffing rosters. A site visit was conducted on January 13 – 15, 2025. The OPSO documents included monthly statistical and protective custody status reports. Analyzed were custody assessment, override, attachment, and enemy refusal data downloaded from the AS400. The statistical reports tracked pending custody assessments, daily population counts, placement errors, the stock population, and monthly custody trends. Onsite activities included:

•  Meetings with OPSO classification, facility administration, and compliance unit staff;

•  Review of body-camera videos of staff interviews to resolve inmate enemy/associate separations and protective custody status;

•  Review of OJC security videos of housing audits; and

•  Examination of the protective custody placement and status reports.

This review focused primarily on the data and Classification Unit activities between April 1, 2024 – September 30, 2024. Some analyses considered trends over twelve to fifteen months (12-15) to detect variations due to seasonal variations. In addition, comments on the status of the classification unit- staffing, lack of leadership,



training for new/rehires and new responsibilities, and the integrity of the classification system – are provided to guide OPSO toward compliance.

Summary:

OPSO complies substantially with five of the eight Custodial Placement sections of the Consent Judgment (Sections b, c, g, and h). Sections a and f are rated as Partial Compliance. OPSO is non-compliant with Section d.  We commend the OPSO staff for their efforts and progress. Perhaps most important is the "can and will do" attitude exhibited by the Classification and Compliance Unit staff.

Findings:

A. 10. a.  Partial Compliance

A. 10. b.  Substantial Compliance

A. 10. c.  Substantial Compliance

A. 10. d.  Non-Compliance

A. 10. e.  Substantial Compliance

A. 10. f.   Partial Compliance

A. 10. g.  Substantial Compliance

A. 10. h.  Substantial Compliance

***IV.A.10. a. OPP shall implement an objective and validated classification system that assigns prisoners to housing units by security levels, among other valid factors, in order to protect prisoners from unreasonable risk of harm. The system shall include consideration of a prisoner's security needs, the severity of the current charge, types of prior commitments, suicide risk, history of escape attempts, history of violence, gang affiliations, and special needs, including mental illness, gender identity, age, and education requirements. OPSO shall anticipate periods of unusual intake volume and schedule sufficient classification staff to classify prisoners within 24 hours of booking and perform prisoner reclassifications, assist eligible DOC prisoners with re-entry assistance (release preparation), among other duties.***

Finding:

Partial Compliance

Observations:

Compliance with Section IV.A.10. a. remained in Partial Compliance during this review period.  During this Compliance period, 14 – one classification manager, four shift supervisors, and nine classification specialists.[7] Since the end of the Compliance Review

---

[7] During the Fall of 2022, OPSO created the option for the classification staff to become deputy recruits. Two individuals opted to remain civilian classification specialists, the remaining nine are "recruits." For the purposes of this report, the classification line staff are referred to as "Classification Officers" and the shift supervisors are referred to as "Shift Supervisors."



period – October 2024 – January 2025, two additional classification specialists were hired, and the specialist returned from medical leave. However, one staff member is on temporary suspension.  Thus, the current "active" staffing is 15.

The shift supervisors oversee the classification specialists, process housing transfers, complete custody reviews, conduct housing audits, and address classification-related grievances. The classification specialists complete the custody and predation/vulnerability (PREA) assessments and assign inmates to pod and cell housing accordingly. In August, a new Classification Manager assumed responsibility for the Unit, tackling the tasks of organizing the housing audits, conducting protective custody/ administrative segregation evaluations, assessing the accuracy of the custody assessments, and training and supervising Unit staff.  As previously noted, the new manager has no jail classification-related experience and has faced a steep learning curve and challenges in managing the Unit and achieving compliance with the Consent Judgment.

While the Unit was fully staffed during this compliance period, the rating is Partial Compliance for two reasons:

1) **Housing Matrix:** The special population pods (Mental Health, Medical, TMH, TDC, Disciplinary/Segregation, and female units) compromise the classification system. The OPSO matrix allows for all custody levels and PREA statuses in these pods. Per the September 30, 2024, Housing Matrix, 12 of the 32 OPSO living units housed individuals of all custody, vulnerability, predation, and special population status. An important step was to designate the TDC units for Low-Medium, Non-Victim, and Non-Predator individuals.

   The TMH treatment teams assign patients to cells according to their mental health needs with little regard for their custody or PREA status. (Known enemies live in separate pods.) The "treatment level" determines the housing assignments, activities, and out-of-cell times. While this practice may support the individuals' treatment plans, the classification system is compromised.

   Given the size and configuration of the OJC and TDC/TMH, we recognize that pods with multiple custody levels and PREA designations are unavoidable. However, OPSO appears to favor "ALL CUSTODY ALL STATUS" pods despite



inadequate security staffing and out-of-cell schedules activities that allow for mixing high-risk inmates.  Of particular concern was the failure of some special population units to maintain separations for out-of-cell activities.

OPSO drafted a new housing matrix to address security and classification separations. However, OPSO has not implemented the new matrix due to maintenance issues, policy updates, and technology changes. For example, the new matrix requires upgrading the cell locks and food ports, revising the administrative segregation and protective custody policies, and distributing information tablets to security and inmates.  OPSO anticipates implementing the new housing matrix in June of 2025.

2) **Classification staff control of housing assignments**: The housing audits completed during this Compliance Review Period reported that most inmates were in the cell and bunk assigned by the classification staff. (For a detailed discussion of the housing audit process and findings, see section IV. A. 10. f. of this report.) However, observation of the classification staff suggested that the security staff directed the housing assignments through repeated calls or emails to specify the pod and cell to which an inmate should be assigned. This is not acceptable and is likely to result in security staff and inmates continuing to manipulate housing assignments and facilitating gang/cliches and inmate-on-inmate violence.

The new Classification Manager must work closely with other OJC Divisions to facilitate information sharing and build trust. As the OPSO rebuilds the Classification Unit, the Classification Unit should consider strategies for utilizing the security staff's knowledge of local cliques, checking in with the inmates during their rounds or audits, and addressing inmate grievances.

***IV.A.10.b. Prohibit classifications based solely on race, color, national origin, or ethnicity.***

Finding:

Substantial Compliance

Observations:

The custody assessments consider objective risk factors validated for the OPSO male and female inmates. The individual's race is not one of the objective risk factors.



Classification specialists consider the individual's custody level, vulnerability designation, age, and charges to select a cell and bed from those the JMS automated housing program identifies as appropriate housing for the individual. To track this element of the Consent Judgment, OPSO created a monthly statistical report to record the race and gender of individuals per housing location.

The OPSO "Housing By Race" reports suggested that race was not a factor in OJC housing assignments. With a few exceptions, the number of black and white inmates within each OJC housing unit was consistent with the overall racial distributions among the OPSO inmate population. On the other hand, the racial distributions across the TDC and TMH units have not always reflected the OPSO population. (See Figures 1 and 2.) TDC 3 and 4 West were repurposed as General Population Low Medium housing.  Despite the increase in the average daily population, the proportion of white inmates within the total male inmate population has been relatively constant -- between October 2023 and September 2024 -- only 11.5% of the OPSO male population identified as white. During this Compliance Period, the percentage of white men assigned to THM decreased from an average of 12.6 to 10.5%. Given that the TDC/TMH population constitutes less than 2% of the total OPSO population, the elevation in the number of white males assigned to TDC/TMH did not significantly impact the distribution of inmates by race within OJC.



Figure 1: Percentage of White Males Assigned to OJC, TDC & TMH Housing Units – Apr 2022 – Sept 2024.

As shown in Figure 2, between April 2022 and September 2024, on average, 14.6%



of the OPSO female population identified as white. Over the same 30-month period, 13.1 percent of the women assigned to the TMH unit identified as white. However, month-to-month, the percentage of white-identified women assigned to TMH varied dramatically; it ranged from 30.0% (August 2022) to 0.0% (March - August 2024). Multiple factors appear to influence women's assignment to TMH.  Perhaps a more troubling trend was the number of white females assigned to TDC during June and September 2024.  On average, almost a third (32.2%) of the TDC female population identified as white.  During this same period, only 21.1% of the OPSO female population identified as white.  Note the OPSO female population increased from 13.3% to 20.8% of the OPSO population between April and September of 2024.



Figure 2: Percentage of White Females Assigned to OJC & TMH Housing Units – April 2022 – Sept 2024

***IV.A.10.c Ensure that the classification staff has sufficient access to current information regarding cell availability in each division.***

Finding:

Substantial Compliance

Observations:

OPSO automated housing assignment process (HUAP) considers the individual's custody level, gender, special population status, PREA designations, enemies, and associates versus available OJC beds to recommend an appropriate bed. Housing tags identify inmates on suicide observation, suicide watch, medical, mental health, alcohol/drug detoxification protocol, gang affiliation, special diets, and school participation.



The OPSO daily population report lists the units, cells, and beds offline for maintenance or staffing, as recorded in the AS400. The reliability of the AS400 data for cells/pods offline within the housing module was unavailable. Classification staff rely on maintenance reports from security and maintenance staff. The current matrix was posted in the classification specialists' work areas, and staff reported receiving a daily copy of the matrix via email.

Classification specialists track all pending bed assignments to avoid housing errors due to delays between the inmate's housing assignment and the physical transfer of the individual to the designated pod/cell. These <u>manual</u> lists and notes direct the housing assignments. Overall, during this compliance review period, the classification staff had access to automated and manual information regarding current bed availability throughout OJC, TDC, and TMH.

Progress was noted for the staff's clearance on the NCIC / Louisiana criminal record systems. Twelve (12) of the 15 staff have received their NCIC clearance and passwords. NCIC coverage is available on each of the four squads. Thus, most have access to the criminal history records required to complete the custody and PREA assessments. Classification staff indicated that the full rap sheets were missing from most classification folders. Thus, we asked IPC staff to include the NCIC criminal records in ALL classification folders to ensure the classification specialists can review the hard-copy rap sheets. The classification manager reviews the folders from the previous shift and generates any missing rap sheets. However, it was unclear whether the classification specialists reviewed these rap sheets and recomputed the assessments.  The problem appears to extend back to the NCIC System.  Staff reported that NCIC is down frequently and is slow to generate a rap sheet, particularly during afternoons and evenings.  While meeting with the classification manager, the Monitor observed 30 to 45 minutes delays from inputting the request to the generation of the full rap sheet.

***IV. A. 10. d. Continue to update the classification system to include information on each prisoner's history at OPSO.***

<u>Finding:</u>

Non-Compliance

<u>Observations:</u>



As shown in Figure 3, the monthly custodial reports provided by OPSO indicated:

- **Percent Initial Custody Assessments**: During this Compliance Period, the Classification Unit completed initial custody assessments for 76.3% of the inmates booked into OJC. This rate is a substantial drop from that observed for the previous compliance period (90.9%).

- **Percent Within 8 Hours:** During this Compliance Period, the percentage of initial classifications completed within the first eight hours of booking continued to decline. In April 2024, staff completed 73.5% of the initial classification assessments within eight hours of the booking. By September, the initial classification was completed within eight hours for only 12.7% of the individuals. During this Compliance Period, about 20 percent of the detainees remained in the booking area for more than eight hours before the initial custody assessment was completed. Given the OPSO classification policy to complete the initial custody assessment within eight hours of the individual's booking, the expectation is that 95% of the initial assessments are completed within eight hours of booking.



*Figure 3: Rates and Completion Time for Initial Custody Assessments Completed Oct 2022 – Sept 2024*

The OPSO Areas of Non-Compliance Action Plan (dated 6/12/2024 at 9:55 PM) requires staff to "Ensure that initial custody assessments are completed within the first 8 hours of booking for at least 95% of residents." Even if this standard had been achieved, completing the "initial custody assessments" within the first eight hours of booking



addresses neither the long "wait times" in IPC/Booking nor the failure to maintain adequate separation and service of individuals within the IPC/Booking cells. The initial classification process provides the custody and PREA designations to the IPC staff. However, OPSO must address the process by which individuals are: 1) assigned to the IPC/Booking cells to ensure separations by custody and PREA designations; and 2) monitored and prioritized for beds and services to expedite transfers from IPC to a "long-term" bed. In November, OPSO modified the initial classification module within the JMS to enable the classification staff to complete the custody and PREA assessments without assigning a bed for transfer from IPC. By December 2024, staff had completed 55% of the initial classification assessments within the first eight hours of booking. Unfortunately, individuals continued to remain in IPC/Booking for 72+ hours, multiple custody and unclassified individuals were housed in the relatively small IPC cells, and high-risk/needs individuals languished with minimal services and supervision.

When asked about the time from booking to housing, staff attributed the delays to the availability of beds within the roll-in pods rather than the custody assessment process or staffing. (See Figure 4 for the monthly OPSO bookings between January 2023 and December 2024.)



*Figure 4: Number of OPSO Bookings Per Month – February 2023 – December 2024*

Figure 3 suggested that staff completed an initial classification for ~76% of the bookings during this compliance period. However, only 37.3 % of the initial classifications



assessment and housing decisions were within eight (8) hours of the inmates' booking into OJC. There are growing concerns about the lag time between booking, classification, and housing. The medical clearances and/or the availability of lower bunks on the Roll-In pods slowed the initial classification and housing processes. When asked about reclassifying or transferring inmates who had cleared their detoxification process or isolation restrictions from the roll into general population pods, the classification specialist responded, "I don't know how to do that. I only classify and house inmates from the booking area." This comment suggested that the delays between booking and housing were due, at least in part, to inadequate classification staff training. A review of the length of stay within the roll in pods indicated that the delays were due to limited space within the general population, non-roll in pods.

The rationale for scheduling or clustering cells for joint out-of-cell times remains unclear. Security staff reported exchanging information regarding intra-pod conflicts and tensions. All agreed that intelligence sharing is essential for identifying and maintaining inmate separations. However, security and ISB staff do not share intelligence regarding these local "cliques" and conflicts with the Classification Unit, except as ad hoc requests for housing transfers. The simple statement, "ZZZZ XXX can't live on this pod." does not provide the classification staff with sufficient information to place the individual in a different housing unit. Thus, the transfer process is repeated again and again, multiplying the workload for the limited classification and escort staff.

Regardless of the staffing patterns, pod mission, and schedules, the sub-standard practice of mixing custody/vulnerable inmates during out-of-cell activities must be discontinued as soon as possible, particularly within the high-risk pods, i.e., mental health, protective custody, and youthful offenders.  A straightforward option is to list the custody level and key separation tags on the housing rosters. Further, adherence to the housing assignments by the Classification Unit is critical for maintaining inmate separations and, thus, institutional safety and security.

**Custody Overrides:** Previous compliance reports have delineated the dangers of overriding the scored custody levels for housing purposes. As shown in Figure 5, during this Compliance Period, April-September 2024, only 3.3% of custody overrides were for housing purposes.  On the other hand, the automatic overrides of "Potential



Victim/Potential Predators" from Minimum to Medium are another type of housing override. The number of cases overridden due to Potential Victim or Potential Predator status decreased during this Compliance Period. As shown in Figure 5, during this Compliance Period (April - September 2024), 23.6% of the overrides moved individuals from minimum to medium custody due to their "Potential Predator" or dual status as Potential Predator and Potential Victim.  It is important to note that staff did not document the reason for 57.4% of the custody overrides during this Compliance Period.[8]



Figure 5: Percent Overrides for Housing Purposes – April 2023 – Sept 2024

The April-September 2024 classification stock population reports indicate that staff overrode the scored custody level for ~2.4% percent of the men and 1.0% of the women. (See Figure 6.) These rates are well below the recommended rate of 5 to 15 percent.[9]  Within this small group of inmates, approximately ~a third are housing-related overrides. Continued tracking of the discretionary overrides for housing purposes remains essential as the ADP increases.

On the other hand, the percentage of custody assessments impacted by a mandatory override (OPSO policy restrictions) remains high. OSPO should revisit these restrictions as part of the revalidation of the classification system. However, in the

---

[8] To address this concern, the classification module was modified to require a reason for each override.
[9] Patricia L. Hardyman and Austin, James (2021). *Objective Prison Classification: A Guide For Correctional Agencies. 2nd Edition.* Washington, D.C.: National Institute of Corrections.



interim, OPSO should consider eliminating the mandatory restrictors at reclassification that require medium custody for all open felony detainers or open felony charges. This change would base the custody level on the individual's behaviors rather than legal status.



Figure 6: Mandatory and Discretionary Override Rates by Gender: April 2022 – September 2024

**Enemy Separation Reviews:** As part of the Compliance Report #14 review, we observed housing overrides for "inmate refusal of enemies" to facilitate housing decisions. Staff dismissed inmate-to-inmate conflicts to expedite transfer requests from one pod to another. In response to the Monitors' and Plaintiff attorneys' questions, OPSO revised its Inmate Classification Procedures (7020) to include rules for resolving an "Inmate Refusal of Enemy." These Procedures require detailed documentation of the reviews and quarterly audits to ensure the separation review process works as intended and to make recommendations for adjustments as needed. The Classification Manager updated the "Separation Review Checklist" (3-10-2022) to record the "enemy refusal" evaluations.[10] OPSO developed screens and reports in the AS400 to document and track the separation reviews as per the Inmate Classification Procedures (7020). In March 2022, the classification staff were instructed on the new procedures, screens, and interview form.

---

[10] The Classification Unit staff indicated that the checklist was "too long."



OPSO staff created automated screens within the AS400 to track and document enemy and associate separation reviews. Despite the efforts to develop a systematic process to review and verify inmate enemy and associate separations, OPSO continues to disregard its' policies and documentation standards. During this Compliance Period, 12 enemy separations were recorded in the AS 400. This number is only 1/7 of the number (174) recorded during the previous Review Period.[11] The 12 enemy separation reviews impacted the housing of 24 inmates; the number of enemies removed per individual ranged from one to five.  None of the reviews met the OPSO Inmate Classification Procedures standards for assessing and documenting the separations' validity. Rather than complete the "separation checklist" as OPSO policy requires, inmate "interviews" were recorded via a body camera. However, the practice of removing enemy separations ended in July with the resignation of the classification manager. The practice was not resumed when the new classification manager assumed the position in August. She recognized that the practice violated OPSO policy.  This was a significant step toward compliance for this Section of the Consent Judgement.

**Custody Reviews:** The Classification Monitor List (List) is an ad hoc report identifying inmates for whom a custody review is due. Custody reassessment reasons include a regular 60/90-day reassessment or a status change or event within their jail records, i.e., amended charge(s) or bail amount, disciplinary incident, detainer lodged/lifted, or a new sentence. The number of inmates on the list fluctuates as inmates return from court, move through the booking process, and the like. Staff are responsible for completing all pending custody reviews during their shift.

---

[11] During the Compliance Review period for Report #18 (October 2022 – March 2024), 11 enemy refusals were recorded. Thus, the number of enemy refusal record has quadrupled in during the last two compliance periods.





**Figure 7: Average Number of Pending Custody Assessments per Month – October 2023 - September 2024**

The number of pending custody assessments vacillates daily. During this Compliance Period, the number of pending initial custody assessments ranged between 0 and 56; the number of pending custody reassessments ranged between 1 and 114. Figure 7 provides the average number monthly initial and custody reviews from October 2023 to September 2024. The average number of pending custody assessments during this Compliance Period was – initial assessments = 10.7 and custody reassessments = 12.2. As shown in Figure 7, the trend lines suggest an increase in pending custody initial and reassessments.

As part of the transition of health care services from Wellpath to Wexford, OPSO and Wexford information and technology (IT) staff worked together to identify the data elements within the Wexford medical and mental health records required for scoring the PREA assessments and housing assignments and then to build the linkages between the OPSO and Wexford information systems. We verified the data exchange process as part of the onsite Compliance Review. The medical and mental health data required to score the PREA risk factors and track individuals on the medical and mental caseloads are uploaded to the AS 400 every 15 minutes. Thus, the data required for the initial and subsequent custody reviews and housing assignments are available. This was a significant step as WellPath provided data for the initial assessments, but the electronic data for updating the individual's service needs or caseload counts were unreliable. In addition to the electronic data exchanges, Wexford has continued to email the inmates' medical and



mental health placement requirements to the classification staff.  Thus, the transition from WellPath to Wexford has been smooth for sharing classification-related information. These data are essential for scoring seven PREA victimization and predation risk factors. Medical and mental health information is critical for the inmates' housing assignments.

As shown in Figure 8, OPSO disciplinary reports indicate that only eight (8) inmate-on-inmate battery incidents involved individuals on the mental health caseload during this Compliance Period. Given the average number of inmate-on-inmate battery/ assaults (20.3/month) and the OPSPO mental health caseload (65 individuals/month) during this Compliance period, these numbers appear to underreport the victimization of individuals on the mental health caseload. Note that these data reflect Disciplinary Code 101 (battery) and Code 102 (assault) infractions in which the perpetrator was found guilty. A review of the OPSO-reported incidents suggests a much higher rate of inmate-on-inmate assaults. (See Table 3 of this Compliance Report.)



Figure 8: Victimization of Inmates on the Mental Health Caseload - April 2022 – September 2024

Figure 9 provides the number of attachments to record criminal history data input by the classification staff between April 2021 and September 2024. In March – June 2024, attachments were input for ~80 assessments/month.  The number of attachments dropped to two in July; none (0) were input during September.  This dramatic drop in the number of attachments suggests that staff is not carefully reading the criminal rap sheets and/or double-checking the NCIC system if the rap sheet is not in the IPC folder. As



previously noted, OPSO has made strides to ensure staff have access to the NCIC system. However, these strides did not ensure the rap sheets are reviewed, and non-Orleans Parish convictions are added to the system.



Figure 9: Number of Attachments Input by Classification Staff – October 2021 – September 2024



Figure 10: Percentage of Initial Custody Assessments for Which an Attachment was Created -- October 2021 – September 2024

As previously noted, the full rap sheets were missing from most classification folders. Thus, we again asked IPC Intake staff to include the NCIC criminal records in ALL



classification folders to ensure the classification specialists can review the hard-copy rap sheets. The classification manager reviews the folders from the previous shift and generates any missing rap sheets. The classification specialists did not always review these rap sheets and recompute the classification assessments.  The problem seems to extend back to the NCIC System.  Staff reported that the System is down frequently and is slow to generate a rap sheet, particularly during afternoons and evenings.  While meeting with the classification staff, we observed a 30 to 45-minute delay from the input of the request to the generation of the full rap sheet.

Thus, it appears that the criminal history data required to score four of the custody factors, three of the vulnerability factors, and four of the predation are compromised by the failure to 1) ensure all staff had access to the NCIC criminal history system; 2) check the booking folders for the rap sheet; 3) train on the importance and process for inputting attachments in the JMS; 4) track and follow-up assessments with missing rap sheets; and 5) audit the accuracy of the custody and PREA assessments.[12] Also disconcerting is the failure to identify and address the problem. OPSO has lamented the time required to complete the NCIC certification process. However, even after certification, staff do not routinely review the rap sheets and input out-of-parish criminal convictions.

The final point of concern for Section d centers on the placement and review of inmates assigned to administrative segregation or protective custody placements. (Per the April – December Special Population Report, OPSO did not utilize administrative segregation/restriction housing during this Compliance Period. However, OPSO continues to disregard its' documentation standards for the protective custody population.

The previous classification manager created folders on the shared drive to organize and document protective custody (PC) and restrictive housing decisions. Unfortunately, the new classification manager abandoned these folders.  Missing/ unavailable was the documentation of the reason(s) for the PC placements[13] and PC

---

[12] "Missing" attachments were noted during the audits of the accuracy of the custody assessments.  Unfortunately, the auditor simply added the missing attachment, thus staff were not held accountable or reminded of importance of checking the NCIC rap sheets and inputting attachments as needed.

[13] PC Placement documentation should include the decision date, the PC committee members, and data to support the circumstances that require the PC placement. If these data are not available in the individual's PC folder, OPSO should assess and document the current PC requirements and house the individual accordingly.



Board's reviews. It appeared that the PC Review Board did not complete the required 7/30-day reviews for August – October.

To address disruptive behaviors within the PC unit, OPSO created a placement form to inform the individuals of the behavioral requirements for PC status.  While this is an essential step for unit order and safety, the videos suggested that the new process was not explained clearly to the inmates. Reviewing the "PC hearings" videos was a challenge.  The hearings were quite troubling as the videos did not document the participants or topics discussed.  When asked to sign the new PC Placement agreement, the individuals did not appear to understand the rules or the potential impact on their housing. Even when a security officer commented that the individuals did not understand what they were signing, the individuals were dismissed.

In sum, this section is rated as "Non-compliant" due to the continued failure to review the criminal history rap sheets and failure to comply with OPSO protective custody policies. Since the June 2024 compliance tour, Classification Unit staff have completed the required training to obtain NCIC certification and participated in training during which the importance of reviewing the criminal history sheets was emphasized. Unfortunately, these did not address the failure to review the criminal history sheets and document non-Orleans Parish convictions within the classification system. Further, OPSO must address the failure to comply with OPSO protective custody and administrative segregation policies. Updating the protective custody and administrative segregation policies prior to implementing restrictive housing pods is critical.  Termination of the enemy separation waivers was a significant step toward compliance. The Unit must stand firm to maintain this position under bed space pressures.

***IV.A.10.e. Continue competency-based training and access to all supervisors on the full capabilities of the OPSO classification and prisoner tracking system.***

<u>Finding</u>:

Substantial Compliance

<u>Observations</u>:

Classification training was held August 20 – 22, 2024.  The training documentation included the class sign-in rosters, pre-and post-tests, and training topics and content.  The objective classification training for the specialists and supervisors was ~ four hours and included the following topics:

- Purpose, reasons, and schedule of custody assessments,



- Discretionary and Mandatory overrides,
- Reclassification schedule and reasons
- Purpose, reasons, and schedule of PREA assessments,
- NCIC attachments, and
- Housing criteria and process.

A separation session (~1.5 hours) for the classification supervisors focused on:

- Housing audit procedures,
- Enemy separation policies and procedures,
- Specification of pods, cells, and beds by population type,
- Reclassification and housing updates, and
- Criminal history attachments.

These are essential classification topics, particularly the importance and process for NCIC attachments and timely custody assessments. Two classification specialists joined the Unit in October. Their training included the objective classification training classification listed above and the "Initial Classification Steps."

***IV.A.10.f. Conduct internal and external review and validation of the classification and prisoner tracking system on at least an annual basis.***

Finding:

Partial Compliance

Observations:

Compliance for this section focused on three types of audits: Housing (checking the integrity of the inmate housing assignments; internal (checking the accuracy of the custody, PREA, and housing designations), and statistical validation of the OPSO objective classification system. For this Compliance Period, Section f is rated as partial compliance because monthly housing audits were completed for some, but not all, pods. Further, the classification manager did not complete monthly internal audits of the accuracy of the custody assessments. A major step forward during this Compliance Period was completing the statistical validation of the classification system by the University of Cincinnati Corrections Institute.

**Housing Audits – Checking the Veracity of the Inmate Housing Assignments**



The Classification Unit supervisors conducted monthly housing audits for some, but certainly not all, housing units/month. May was the only month during which staff audited all OPSO pods. Missing were audits for:

| Pod(s) | Month |
|--------|-------|
| 3 A – F | April |
| 4 A – F | April |
| No audits | June |
| 1 A – F | August |
| 2 A – F | August |
| 3 A – F | August |
| 4 A – F | August |
| TMH | September |
| TDC | September |
| 3C | September |
| 3D | September |
| 4D | September |
| 4E | September |

.

In September, staff did not audit Floor 4 dorms because the "Majority of bunk numbers have faded. Inmates go to any available bunk." The Classification Unit should work with maintenance staff to re-number the fourth floor dormitory beds.

The audit reports indicated housing errors for 18.6% of the pods audited. The number of housing errors per report ranged from 0 to 34 individuals in the wrong cell or bed. The fourth-floor pods were particularly problematic, as one of the auditors observed, "Not able to verify, where the inmates sleeping. Most out of their bunks." A troubling pattern was one auditor finding "No Errors," but multiple errors were noted when another auditor checked the pod the following month. The Monitor selected a random sample of audit reports to verify the audit process and then viewed the audit via the OJC camera system. However, the failure to record the time the audit occurred precluded our ability to review the audits. We recommend that the auditors wear body cameras to allow for voice and video recording of the audits.

**Internal Audits – Checking the Accuracy of the Custody and PREA Assessments**

The Classification Manager is responsible for assessing the accuracy of a random sample of at least ten custody/PREA assessments each month. The classification manager reviewed a random sample of the custody assessments each month, except in May. Of



concern was the number of instances where the auditor noted "Missing Attachments." The error description for five of the six February 2024 custody assessments audited was "Did not add attachments." Of the 119 custody assessments audited during this review period, 14.3% had missing attachments. Missing attachments were noted for each staff member; thus, it is a pattern across the Unit rather than a single worker.

**Revalidation of the Classification System – Assessing the Validity of the System**

The University of Cincinnati Corrections Institute submitted a report documenting the validation of the OPSO classification system on September 17, 2024.[14]  The revalidation of the classification system was completed three months ahead of the deadline set by the District Court in its' June 2024 Order addressing OPSO's failure to timely perform a revalidation of the system. The overall findings support the continued use of the OPSO custody and PREA assessment tools. However, six updates to the System were recommended. While this validation study addressed the requirement for "external review and validation of the classification and prisoner tracking system on at least an annual basis," OPSO will need to review these recommendations to determine which, if any, of the changes to implement.

*A.10.g. Provide the Monitor a periodic report on classification at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date and every six months, thereafter, until termination of this Agreement. Each report will include the following information:*

> *(1)  number of prisoner-on-prisoner assaults;*
> *(2)  number of assaults against prisoners with mental illness;*
> *(3)  number of prisoners who report having gang affiliations;*
> *(4)  most serious offense leading to incarceration;*
> *(5)  number of prisoners classified in each security level;*
> *(6)  number of prisoners placed in protective custody; and*
> *(7)  number of misconduct complaints.*

Finding:

Substantial Compliance

Observations:

Daily population reports are received daily, indicating the number of inmates by location – OJC, TDC, TMH, and out-of-parish. In addition, as required under Section g, OPSO provided monthly custodial statistical reports regarding the custody assessments by type, gender, population, gang affiliation, discipline, and housing. These reports track

---

[14] D'Amato, Christopher and Chip Weir (September 17, 2024). "Revalidation of the Orleans Parish Classification System - 2024." Cincinnati, Ohio: University of Cincinnati Corrections Institute.



the timeliness of the initial custody assessments, the custody distributions, cases due for a custody assessment, the prevalence of special populations, and the rates and types of disciplinary infractions. The numbers of ***"prisoners who report having gang affiliations and the most serious offense leading to incarceration"*** are reported in the OPSO semi-annual statistical reports.

OPSO disciplinary data on the "*assaults against prisoners with mental illness"* suggest relatively few individuals on the mental health caseload are victims of assault or battery. However, the accuracy of these data is questionable as these counts reflect the inmate disciplinary data instead of incident reports. OPSO will need to ensure that Wexford's mental health caseload counts are integrated with the disciplinary data to ensure accurate counts of victimization of the individuals on the mental health caseload.

For this Compliance Period, OPSO reported only one active "gang" member. The initial classification interview includes a question about the individual's "gang" membership or affiliation. Staff indicated that inmates rarely reveal their alliances. In the past, the Classification Unit relied primarily on information from the District Attorney's Office to identify gang-related inmates. The IPC Major indicated that OPSO no longer received information regarding gang affiliations or prosecutions from the District Attorney and recommended checking with the OPSO ISB Unit. This conversation was interesting, although circular. The ISB agent indicated that they track "gang" behaviors within OJC but quickly pointed out that Orleans Parish "gangs" were better described as dynamic neighborhood/ward-based cliques. The ISB agent reported that they exchanged information with the NOPD. Yet, he was reluctant to share these data with the Classification Unit because, again, Orleans Parish "gangs" are dynamic neighborhood/ward-based cliques.

On the other hand, OJC security staff routinely interview inmates regarding "ward/neighborhood-based cliques" and who can live with whom. In sum, it appears that ISB collects and shares information with NOPD, and security staff requests housing assignments based on neighborhood associations. Yet, neither ISB nor security staff share intelligence with the Classification Unit or input the information into the AS400. Thus, the classification staff transfers inmates from pod to pod in response to emails indicating, "This individual cannot live on XX pod." To maintain Substantial Compliance with Section



g, OPSO must create a systematic process for collecting information on active "gang/cliques," sharing this intelligence across its various divisions <u>and</u> inputting this data into a standardized report available to the Classification Unit.

Figures 11 and 12 provide the OPSO monthly disciplinary data recorded in the JMS. To account for short-term variations and seasonal trends, we reviewed 21 months of disciplinary data. As shown in Figure 11, disciplinary report rates have fluctuated over the last 21 months. However, 30.0% of the inmates received a disciplinary report during this Compliance Period; 22.4% were found guilty of a major infraction.  During the previous Compliance Period – October 2023 – March 2024, on average, 26.8% of the inmates received a disciplinary report; 17.7% were found guilty of an infraction.



Figure 11: Rate of Disciplinary Infractions for the OPSO ADP – January 2023 – September 2024

Figure 12 illustrates the OPSO ADP (Average Daily Population) versus the number of disciplinary reports per month for January 2023 - September 2024.  As the ADP increased steadily during the last 21 months, so has the number of disciplinary reports. As shown in Figure 11, between January 2023 and September 2024, the OPSO ADP rose by 34.4%, from 1018 to 1,454. It appears that the rate of disciplinary reports per month is increasing faster than the increase in the ADP.  In January 2023, OPSO staff wrote 263 disciplinary reports; in September 2024, 488 reports were written. This represents a 78.7% increase.





Figure 12: OPSO ADP vs. Number of Disciplinary Reports: January 2023 - September 2024

Figure 13 illustrates the breakdown of the disciplinary infractions by type during this Compliance Period. (These data reflect the most severe violation of which the inmate was found guilty per report.) During this Compliance Period, the numbers of recorded predatory (e.g., assaults or battery) ranged between 37 (April) and 83 (July), and aggressive infractions ranged between 101 (June) and 173 (September) per month. For this Compliance Period, the average numbers of predatory and aggressive infractions were 64.7 and 135.5/month, respectively. The average number of assaults/fights per day was 4.5 (64.7 + 135.5 = 200.2/30 = 6.67/day).

During this Compliance Period, management problems and disruptive infractions also increased, although not nearly as sharply as the predatory and aggressive violations. Thus, Figures 11 and 12 illustrate while the level of facility disruption increased, troubling is the dramatic increase in the level of violence, as indicated by assaults and fights within the facilities (OJC, TDC, and TMH).





Figure 13: Most Serious Disciplinary Infraction/Report with Finding of Guilty: June 2022 – September 2024

*IV.A.10.h. OPSO shall review the periodic data report and make recommendations regarding proper placement consistent with this Agreement or other necessary changes in policy based on this review. The review and recommendations will be documented and provided to the Monitor.*

Finding:

Substantial Compliance

Observations:

The Monitor receives the daily "Active Inmates by Location reports and has access to the ad hoc Classification Monitor lists and various classification statistical reports. During this Compliance Period, there were multiple updates to the OPSO Housing Matrix. As of January 2023, the Classification staff provided the matrices daily. While OPSO has been slow to address concerns regarding the housing matrix and to move forward on the recommended population management strategies, the Classification Manager promptly responds to questions or issues raised throughout the Compliance Period.

There are still significant concerns about the quality of the documentation of the staff protective custody reviews and housing audits. These concerns were raised under Sections d and f, respectively.

## IV. A. 11.    Prisoner Grievance Process

*A. 11. a. OPSO shall ensure that prisoners have a mechanism to express their grievances, resolve disputes, and ensure that concerns regarding their constitutional rights are addressed. OPSO shall, at a minimum, do the following:*

> *(1) Continue to maintain policies and procedures to ensure that prisoners have access to an adequate grievance process and to ensure that grievances may be reported and filed confidentially, without requiring the intervention of a correctional officer. The policies and procedures should be applicable and standardized across all the Facility*



*divisions.*

*(2) Ensure that each grievance receives appropriate follow-up, including providing a timely written response and tracking implementation of resolutions.*

*(3) Ensure that grievance forms are available on all units and are available in Spanish and Vietnamese and that there is adequate opportunity for illiterate prisoners and prisoners who have physical or cognitive disabilities or language barriers to access the grievance system.*

*(4) Separate the process of "requests to staff" from the grievance process and prioritize grievances that raise issues regarding prisoner safety or health.*

*(5) Ensure that prisoner grievances are screened for allegations of staff misconduct and, if an incident or allegation warrants per this Agreement, that it is referred for investigation.*

*(6) A member of the management staff shall review the grievance tracking system quarterly to identify areas of concerns. These reviews and any recommendations will be documented and provided to the Monitor.*

<u>Findings:</u>

A. 11. a. (1)  Partial Compliance

A. 11. a. (2)  Partial Compliance

A. 11. a. (3)  Substantial Compliance

A. 11. a. (4)  Substantial Compliance

A. 11. a. (5)  Substantial Compliance

A. 11. a. (6)  Substantial Compliance

Until the September 2019 report, one rating was given for the entire section for the Prisoner Grievance Process. In order to highlight which provisions are in substantial compliance versus those which fall short, the decision was made to rate each provision separately.

This review covered April 2024 through September 2024. For this review, the Monitor interviewed the Grievance staff, security staff and inmates while inspecting the housing units. Reports and data submitted by OPSO covering the rating period were also reviewed.

As noted during the previous inspection, a review of the documentation demonstrated that all inmate submissions continue to be reviewed by Grievance staff, response. Statistical information was provided on all categories. Both requests and grievances continue to be sorted by type. Specific grievances related to inmate safety, medical issues, PREA, etc., are documented to reflect the date received, inmate information, type of grievance, time of notification made to the appropriate staff member, and the staff member making the notification. For the analysis, the Monitor created three



charts and added simple linear trendline overlays to each grievance category listed. A fourth chart was added to graphically represent the number of grievances overall relative to the inmate population.

Grievance staff once again provided detailed documentation as to their separate handling of the April 2024 through September 2024 inmate requests, grievances, and complaints related to inmate safety or health.

As reported by the OPSO Grievance staff, the monthly average of 182 grievances for the Report #17 rating period to 131 for Report #18, 100 for Report #19, 131 for Report #20 and 149 for this rating period reflects an increasing trend since the low average of 100 for Report #18. It is the Monitor's considered opinion that the increase can largely be attributed to the substantial increase in the Average Daily Population (ADP) that OPSO has experienced over the last 12 to 24 months. The Monitor selected a 2-year range for charts 1-3 below to demonstrate the up and downward trends for the various grievance categories. In general, grievances related to Commissary and Programs are trending upward. The three categories (Miscellaneous, Medical, Maintenance) that comprise an average of 60% of the grievances received and continue to be in an overall decline.

There were three items of concern for the Monitor. First, there were missing/unsecured medical and grievance boxes in two TDC housing units. It should be noted that OPSO has procured and installed a sufficient number of heavy steel boxes, secured with padlocks, to replace all of the lightweight boxes throughout OPJ. While still a manual process to retrieve and return paper grievances, the new boxes will ensure that medical requests and grievances can be submitted confidentially by the inmates. Since the monitoring period, most inmates have been provided with electronic tablets they can utilize to file grievances and requests. Kiosk are now available for those who are not permitted to have access to tablets.

Second, and critical to the effective administration of the paper grievance system, is the consistent retrieval of the grievance forms from the housing units on a daily basis. The Monitor reviewed the "Daily Activity Sheets" for the Grievance section. Staff document their rounds on each floor of OPJ as well as TDC/TMH (5 areas) while retrieving requests and grievances. The Monitor reviewed five months of the Activity



Sheets (the August 2024 file submitted was a duplicate of July—a clerical error). Depending on the days in the month, Grievance staff would make 150 to 155 rounds of the 5 areas, both morning and evening. The analysis of the "Daily Activity Sheets" provided showed a number of gaps in grievance retrieval services. The gaps ranged from 1% in May 2024 to 37% in July 2024 and averaged 22.5% monthly. The missed pickups ranged from one to five days for the affected areas. This is of particular concern for inmates in lockdown (disciplinary, psych, etc.). This finding also supports the Partial Compliance rating for IV.A. 11. a. (1). The Monitor encourages OPSO Management to refine the "Daily Activity Sheet" format and procedure to facilitate daily checks on staff performance of this duty. It should also be noted that OPSO anticipates the electronic Grievance module on the new kiosks will be available to inmates by the end of January 2025. This will eliminate the need for the paper grievances.

Third, the Grievance Lieutenant advised that in anticipation of the new electronic grievance system, the "Tiger" system was deactivated on November 14, 2024, making the grievance data for October 1, 2024, through November 14, 2024 unavailable. An older system was being utilized at the time of the inspection and will remain in use until the new system is online. The loss of access to the Tiger system not only affects the reporting of data, but also the inmates' ability to retrieve their grievance records for legal purposes. The Monitor was advised that OPSO is working to retrieve the Tiger data files.

Lastly, OPSO changed the way overdue grievances were reported and analyzed, dropping the data for the "Green" and "Yellow" categories and only focusing on the "Red" category (more than 10 days overdue). Upon discussion with OPSO, staff reinstated the reporting to the previous format beginning the second week of August 2024. Chart 4 reflects the temporary change and breaks out the data for OPSO and Wexford/Wellpath overdue grievances.

The Monitor will continue to observe the grievance trends reported by OPSO and anticipates changes in the specific numbers and trends with the impending implementation of the new electronic grievance system.

While the majority of the grievance categories represented in the categories below show to be trending downward or holding steady, the Monitor encourages OPSO to specifically look at the topics of the complaints, specific floors/pods the complaints are



originating from, spikes in the number of grievances from month-to-month, etc., to determine whether there is a root cause for the grievances (i.e. lack of security staff to address problems, insufficient response to complaints, etc.).

**Chart 1**



With Chart2, the Monitor continues to caution drawing any particular conclusions from the displayed trends and attributes any swings to the relatively small number of grievances in a given month for each category (less than 10 total). The "Life Threatening" category continues to show slightly declining numbers over the 2-year trendline with the actual number of grievances declining further during the rating period to an average of about 2 per month.

**Chart 2**





Chart 3 represents several categories, primarily inmate services and property/fund accounts. As with the categories in Chart 2, the Monitor cautions against drawing any conclusions as to long-term trends due to the relatively small number of grievances in each category overall.

**Chart 3**



The Monitor also reviewed the "Overdue Grievance Reports" for the rating period.



Totals for the monthly "Overdue" were considered by the Monitor to be indicative of OPSO's efforts in addressing inmate issues. The reports are created weekly for supervisory review, tracking, and follow-up to ensure a timely response. For the purposes of the report, the Monitor only included the data from the first week of each month through September 2024. Chart 4 reflects the data for grievances in the "Red" category (10+ days overdue), which represents overdue responses to inmates. OPSO has refined the data reporting to separate OPSO grievance responses from that of the medical contractor to better fix responsibility and accountability for grievance responses. Again, a significant effort by OPSO staff.

**Chart 4**



During the inspection, the Monitor noted that grievance forms, both in English and Spanish, were available in the pod control rooms as were hard copies of the Inmate Handbook. Accordingly, the Monitor has changed IV. A. 11 .a. (3) to Substantial Compliance.

The Monitor reviewed detailed documentation provided by Grievance staff for the rating period regarding the screening of grievances for staff misconduct. The documentation demonstrated that all inmate submissions are reviewed by Grievance staff



and those regarding staff misconduct are separately documented for appropriate referral to the administrative level for follow-up. Grievance staff processed a total of 54 such staff misconduct related grievances during this rating period, a significant increase over the previous two reporting periods. The Monitor recognizes that a certain number of staff misconduct complaints (founded and unfounded) will always present themselves due to the nature of the environment. So, while "zero complaints" is a laudable goal, the Monitor is not assessing the rise or fall of the number itself but the implementation and oversight of the process.

Grievances regarding staff misconduct are particularly susceptible to interception by staff accused of misconduct due to the reliance on paper grievances. The Grievance staff practice of making rounds in the housing units mitigates this concern, if the rounds are consistent, in the Monitor's opinion. The Monitor continues to recommend executive oversight of this process.

Grievance staff continue to separately document grievances that require specific referral to IAD, ISB, PREA, or FIT staff for review and investigation. Detailed information along with the date assigned and disposition is maintained as well as email transmission receipts. Grievances referred to IAD increased slightly from 9 to 10, which was still below the 11 noted in Report #18. Grievances referred to ISB increased by 30% from 33 to 43 for this monitoring period, indicating a concerning upward trend. The Monitor's opinion is that the ISB increase is due either to a significant rise in the number of actual incidents or to an increase in the inmates' utilization of the grievance process and OPSO leadership's improved responsiveness to addressing grievances—possibly a combination of the two. The Monitor recommends OPSO conduct additional analysis in this regard.

The rating for IV. A. 11. a. (4) remains in substantial compliance. The documentation provided by OPSO Grievance staff indicates that "requests to staff" are routinely separated from true grievances regarding prisoner safety or health and are separately reported and tracked.

The rating for IV. A. 11. a. (5) remains in substantial compliance. The documentation provided by OPSO indicates that OPSO Grievance staff routinely screens inmate grievances for allegations of staff misconduct, appropriately reports suspected instances of staff misconduct and verifies the receipt of the notifications.



The Monitor reviewed the quarterly data for the rating period and found documentation of a substantive review of the information by senior OPSO staff along with recommended courses of action based on the analysis. This supports a Substantial Compliance rating for IV.A. 11. a. (6).

In specific regard to Item 5 of the June 17, 2024, Stipulation and Order by the Court, copied below, the Monitor found the following conditions as of the date of the inspection:

- OPSO has secured a contract for the supply of electronic kiosks for the filing of electronic grievances and other functions.
- The kiosks were observed to be operational and in use by inmates, primarily for ordering commissary. OPSO staff advised that the rollout of the grievance function was delayed due to operational changes required by OPSO. The Monitor was advised that the updated system was anticipated to go live by the end of January 2025.
- OPSO provided a copy of the contract to the Lead Monitor and Plaintiffs upon its execution.

  *5. Grievances (§ IV.A.11.a.(1), (3)). Within 90 days, OPSO shall secure a contract for the supply of electronic kiosks that can be used to file confidential grievances electronically in each housing unit. The electronic kiosks, that will replace the currently nonfunctioning kiosks, shall be installed in each of the housing units, and shall be in workable order and fully operational, within 180 days. OPSO shall provide a copy of the contract to the Monitor and Plaintiffs upon its execution.*

**IV. A. 12.  Sexual Abuse**

***A. 12. OPSO will develop and implement policies, protocols, trainings, and audits, consistent with the requirements of the Prison Rape Elimination Act of 2003, 42 U.S.C. § 15601, et seq., and its implementation of regulations, including but not limited to, preventing, detecting, reporting, investigating, and collecting sexual abuse data, including prisoner-on-prisoner and staff-on-prisoner sexual abuse, sexual harassment, and sexual touching.***

<u>Finding:</u>

A. 12. Partial Compliance

<u>Observations</u>:

OPSO successfully completed its PREA audit in 2019. Passing a PREA audit that is now six years old is not considered as conclusory evidence of compliance. OPSO has



stated that a PREA Audit is scheduled for later in 2025. Proof of training and policies were provided, and the review of the policies was completed during the monitoring period. Documentation regarding PREA investigations was provided. No proof as to implementing the other requirements of PREA including education of inmates was provided. This provision remains in partial compliance, but significant progress has been made due to the efforts of the PREA Coordinator.

### IV. A. 13.    Access to Information

*A. 13. OPSO will ensure that all newly admitted prisoners receive information, through an inmate handbook and, at the discretion of the Jail, an orientation video, regarding the following topics: understanding Facility disciplinary process and rules and regulations; reporting misconduct; reporting sexual abuse or assault; accessing medical and mental health care; emergency procedures; and sending and receiving mail; understanding the visitation process; and accessing the grievance process.*

Finding:

A.13.   Partial Compliance

 Observations:

The proof provided indicated that inmate handbooks were finally provided in July 2024. After the monitoring period, the inmate handbook became available on the electronic kiosk. As the handbook was provided for half of the monitoring period, the provision has been placed in Partial Compliance.

### IV. B. Mental Health Care

*B. OPSO shall ensure constitutionally adequate intake, assessment, treatment, and monitoring of prisoners' mental health needs, including but not limited to, protecting the safety of and giving priority access to prisoners at risk for self-injurious behavior or suicide. OPSO shall assess, on an annual basis or more frequent basis, whether the mental health services at OPP comply with the Constitution. In order to provide mental health services to prisoners, OPSP, at a minimum shall:*

*Note – Adequate documentation was not present in the SharePoint folders to support improvement in operations at OPSO. Overall, the operations were more disorganized and Wexford corporate was informed of the need provide more oversight at OPSO to help with the lack of accountable and knowledgeable leadership which is currently severely affecting operations.*

*The Monitors also acknowledge a continued collaborative response from OSPO and Wexford regarding the provisions.*

Findings:

B. 1. a. Partial Compliance

B. 1. b. Partial Compliance



B. 1. c. Partial Compliance

B. 1. d. Partial Compliance

B. 1. e. Partial Compliance

B. 1. f. Partial Compliance

B. 1. g. Partial Compliance

B. 1. h. Partial Compliance

B. 1. i. Partial Compliance

B. 1. j. Partial Compliance

B. 1. k. Partial Compliance

B. 1. l. Partial Compliance

***B.1.a. Develop and maintain comprehensive policies and procedures for appropriate screening and assessment of prisoners with mental illness. These policies should include definitions of emergent, urgent, and routine mental health needs, as well as timeframes for the provision of services for each category of mental health needs.***

Finding:

Partial Compliance

There needs to be an update to the current policies and procedures where someone who is routed to court soon after participating in intake and has a mental health history is seen upon return to the facility. Patient **0 was seen on August 1, 2024, for intake and mentioned having a mental health history with current medications. He was taken to court soon after intake and, therefore, not seen by mental health. He was not seen by mental health until August 6,2024 for a Mental Health Initial Evaluation after placing a sick call on August 5,2024 requesting help for depression. There needs to be a practice in place where individuals like this are not overlooked and are proactively seen without the need to place a sick call request.

During the period under review there were also reports that intake nurses were not verifying community medications at intake and therefore there were gaps in patients receiving their psychotropic medications. Nurses have been trained in Doctor's First which should help verify prior medical history and limit the gaps in patients receiving medication. Wexford is actively revising its Intake Standard Operating Procedure (SOP) which should clearly define documentation expectations, triage criteria, and timeframes for clinical evaluations.



Finally, there was no process in place to ensure the backlog list was appropriately prioritized. People are added to the list based on date rather than presentation.

Suggestions:

A CAP be put in place to direct intake nurses to verify community medications at intake and the steps which need to be taken to ensure compliance. The steps include using Doctor's First, calling community pharmacies, reviewing the EPIC chart, looking at records from previous arrests and reaching out the contacts. These steps need to be documented as performed. If not performed, progressive discipline should be implemented. There is also a CAP needed to address what criteria will be used for urgent, emergent and routine referrals and how to adequately prioritize the lists when there is a backlog. This CAP can initially involve mental health and be expanded to medical once all the quirks are worked out.

***B.1.b. Develop and implement an appropriate screening instrument that identifies mental health needs, and ensures timely access to a mental health professional when presenting symptoms require such care. The screening instrument should include the factors described in Appendix B. The screening instrument will be validated by a qualified professional approved by the Monitor within 180 days of the Effective Date and every 12 months thereafter, if necessary.***

<u>Finding:</u> See B.1.a.

Partial Compliance

The instrument used by Wexford identifies mental health needs, but backlogs are developing for referrals which means mental health access is not timely. There is no system in place to ensure someone who is not seen, due to being in court or refuses care, has timely follow up. There is no alert in place or notification for a clinician to see someone who missed an initial appointment.

***B.1.c. Ensure that all prisoners are screened by Qualified Medical Staff upon arrival at OPP, but no later than within eight hours, to identify a prisoner's risk for suicide or self-injurious behavior. No prisoner shall be held in isolation prior to an evaluation by medical staff.***

<u>Finding:</u> See B.1.a.

Partial Compliance

<u>Suggestion:</u> There were no additional months submitted to support this provision remaining in substantial compliance. As reported in the last report, in May 2024, 88% of inmates were seen outside of the 8-hour window allotted for an QMHP to see the patient.



This means 47 inmates waited longer than 8 hours to be seen. Monitors continue to recommend a study to look at the smaller percentage of inmates who waited longer than 8 hours, to determine whether there are any factors under the control of Wexford which could alleviate the extended wait times, even for one inmate. There needs to be data submitted to support this provision returning to substantial compliance for the periods in question.

***B.1.d. Implement a triage policy that utilizes the screening and assessment procedures to ensure that prisoners with emergent and urgent mental health needs are prioritized for services.***

Finding: See B.1.c. Suggestion

Partial Compliance

Suggestion: The documentation in SharePoint is from August/September 2023, which falls outside of the period of review. There was no documentation provided to support improvement in this provision. For the referrals in question, inmates are to be seen within 2 hours for an emergent referral, within 24 hours for an urgent referral and within 7 days for a routine referral. For substantial compliance, the expectation is all supporting documentation is submitted with adequate time for the document to be reviewed and questions, if any, can be asked and addressed at the next site visit. The document needs to include clear support for inmates with urgent and emergent needs being prioritized for service and justification for any prisoner who is not. The compliance rate with this provision should be met (90%) in order to be rated and sustained at substantial compliance. Without proper and timely documentation for the next site visit, this provision risks falling into noncompliance.

***B.1.e. Develop and implement protocols, commensurate with the level of risk of suicide or self-harm, to ensure that prisoners are protected from identified risks for suicide or self-injurious behavior. The protocols shall also require that a Qualified Mental Health Professional perform a mental health assessment, based on prisoner's risk.***

Finding:

Partial Compliance

      For this provision, it is imperative that protocols are implemented with the level of risk of suicide or self-harm for the inmate's protection. It is not sufficient to have developed the protocols without the intentional implementation of them in everyday practice. There continue to be challenges with documentation and actual observation for



suicide watch at OJC.

The Monitor observed videos (June 1 and 15, 2024; July 20, 2024; August 13 and 30, 2024, September 19, 2024) of suicide watch during the period of review. The MHTs were more attentive overall and made more consistent rounds during the period in question. While the observations were not riddled with as many issues as had been observed during the prior site visit, there continued to be concerns seen. There was documentation on the MHT observation sheet of deputies being off the pod when they were not. There were times when deputies were absent, returned to the pod to conduct checks, yet MHTs did not capitalize on the opportunity to conduct their rounds and sat in the interlock area documenting there was no deputy available. A CQI study conducted between June 2024 and September 2024 documented MHT were in line of site of the inmate 7% of the time. The study showed there was "pre-filled" times 0% of the time and 0% of inmates were safely monitored.

While it is reported there are still concerns with deputies conducting adequate searches and appropriately securing inmates on suicide watch, there was no documentation in SharePoint to demonstrate this. The data in SharePoint is the same information, ending in March 2024, as was present at the last site visit. It is imperative for the safety of the patient and staff that searches are conducted timely and thoroughly, especially in this population who are at greater risk of self-harm.

Suggestion: The Mental Health Monitor expects consistency in suicide watches which will include all observers utilizing the same documentation for watches. Ensure there is no use of physical restraints for inmates on suicide watch in IPC or TMH and document any instance where this occurs. Document de-escalation procedures by Wexford and deputies and challenges with implementation. Adequate cell searches and body searches and properly securing inmates are necessary to protect inmates from the risk of self-injurious behavior. The Monitor recommends continued spot checks of QMHPs who are conducting watches and enforcing corrective actions as deemed necessary. The Monitor recommends continued video observations of suicide watches to ensure MHT compliance and help minimize any fraudulent activity.

**B.1.f. For prisoners with emergent or urgent mental health needs, search the prisoner and monitor with constant supervision until the prisoner is transferred to a Qualified Mental Health Professional for assessment.**

Finding:



Partial Compliance

There was no documentation to support improvements in this area. The submitted documentation was from March 2024 which is prior to the period in review for this report.

Suggestion: Submit documentation to demonstrate searches and supervision is being conducted at OJC. Submit documentation showing that inmates are being properly secured during times of crisis. Without documentation demonstrating these activities are being conducted, this provision risks falling into non-compliance at the next site visit. It is recommended that Wexford and OSPS provide written documentation of all protocols and procedures for searching inmates as soon as safely possible, along with attempts at having mental health staff available to try and limit the need for de-escalation interventions. This should all be completed prior to placement on any form of suicide precautions, watch or direct observation. Contraband left on an inmate because an adequate search was delayed, or inadequate search was conducted are unacceptable and not constitutionally adequate care in trying to ensure risk of self-harming behavior is minimized. The Monitor still expects there to be accurate documentation provided which accounts for contributing factors regarding why searches are not performed on 100% of inmates at risk of harm and appropriate steps (corrective active plan) to ensure future compliance. The documentation should also reflect what was done in leu of the immediate search to minimize harm, i.e. an inmate was watched directly until a search could be conducted. The Monitor looks forward to seeing how the Nurse Educator, the Mental Health Operational Manager, and the Mental Health Director implement the expanded training which will help bring this provision into substantial compliance. While the Monitor understands that security searches fall strictly under the purview of security operations and Wexford is unable to perform the functions required to bring this provision into substantial compliance, this provision requires this function be completed and constant observation by security until assessment by mental health. Communication and documentation will be imperative to show this function is happening on a consistent, collaborative and thorough basis and that each party is functioning within the confines of their responsibility.



***B.1.g. Ensure that a Qualified Mental Health Professional conducts appropriate mental health assessments within the following periods from the initial screen or other identification of need:***
> ***1) 14 days, or sooner, if medically necessary, for prisoners with routine mental health needs;***
> ***2) 48 hours, or sooner, if medically necessary, for prisoners with urgent mental health needs; and***
> ***3) immediately, but no later than two hours, for prisoners with emergent mental health needs.***

Finding:

Partial Compliance

Suggestion: There was no additional data in SharePoint to support this provision. This is the second site visit where there was no documentation submitted to support continued substantial compliance with this provision therefore this is being downgraded to partial compliance. Based on a discussion with the team, it appears there is 20% compliance for timeliness with emergent and 70% compliance with urgent referrals.

***B.1.h. Ensure a Qualified Mental Health Professional preforms a mental health assessment no later than the next working day following any adverse triggering event (i.e., any suicide attempt, any suicide ideation, or any aggression to self, resulting in serious injury).***

Finding:

Partial Compliance

As of the time of the site visit, the mental health case backlog was significant. There were backlogs for treatment plans, sick calls, TMH waitlist monitoring, follow up suicide assessments, and segregation rounds. The mental health leadership was not present during the site visit as the director was out on FMLA and the assistant director was terminated. There was no documentation that there were timely mental health assessments being conducted after a triggering event. The Mental Health Director, who was primarily responsible for reviewing the incident reports and assigning staff to perform assessments, was not present to verify whether this process was happening or the success. While there has been an agreement that OPSO will implement a system of notifying the mental health provider (Wexford) by radio for every use of force incident, this Monitor is unsure of the success as there were no documents to support this happening and the results of the interventions, which appear to be in the possession of the mental health director. This Monitor continues to consider use of force a triggering event and therefore mental health is required to be notified to perform a mental health assessment.

Suggestion: Submit the documentation to support this provision, including RANDOM



mental health assessments which have been completed after a triggering event. Three per month (total of at least 18 assessments along with the corresponding incident reports in the SharePoint folder) for the period in review would be helpful to support improvement in this provision. Conduct a CQI to keep track of these assessments and timeliness. This provision risks being rated as non-compliant in the next reporting period if documentation is not provided. Reeducate deputies regarding the importance of alerting mental health staff regarding all triggering events, in advance as much as feasible, so proper assessments and assistance can be provided. Ensure medical and mental health staff within Wexford are communicating and informing each other regarding triggering events as they become aware. It is encouraging to know that the Mental Health Administrative Assistant will be closely monitoring staff productivity and generating real-time task reports to help keep the staff on track with deadlines.

***B.1.i. Ensure that a Qualified Mental Health Professional, as part of the prisoner's interdisciplinary treatment team, maintains a risk profile for each prisoner on the mental health case load based on the Assessment Factors identified in Appendix B, and develops and implements a treatment plan to minimize the risk of harm to each of these prisoners.***

Finding:

Partial Compliance

There is a significant backlog in creating and updating treatment plans at OJC. Without an adequate treatment plan, it is difficult to maintain a risk profile. A treatment plan would help identify goals along with interventions to help mitigate risks, especially those identified in a risk profile. There are currently no consistent multidisciplinary treatment planning services occurring in OJC (general population). Treatment plans direct treatment and keep the clinicians involved and supporting staff abreast of interventions and objectives for each patient. The aim is to provide person-centered, coordinated, high-quality care to patients. All inmates on the mental health caseload require a risk profile based on the Assessment Factors in Appendix B, to include an acknowledgement that the factors were considered and may not apply to that individual AND an interdisciplinary treatment plan. While every inmate on the case load may not require a monthly treatment plan, an adequate treatment planning schedule needs to be created and implemented to ensure all inmates on the case load have a treatment plan. The mental health provider, in consultation with OPSO, should determine what is needed,



in terms of additional psychiatrists' hours, in order to conduct multidisciplinary treatment plans throughout the entire facility. At this juncture, triggering events do not typically result in any updates to the treatment plan, which it should. Overall, treatment planning is not only inadequate, but also not done in a timely manner as expected for treatment planning services.

Suggestion: A clinical analysis of treatment needs will be needed to inform an adequate and appropriate treatment planning schedule for OJC. Ensuring interdisciplinary treatment plans are created and followed for the general population, 2A, 2B and 3E patients with a risk profile for each inmate on the mental health case load will be necessary for substantial compliance. A suggestion is for Wexford to determine the staffing matrix needed (an independent staffing analysis has been recommended to be completed asap) to provide treatment plans every 60 days in general population and secure additional funding to secure that level of staffing, in addition to any staffing needs to ensure timely treatment plans and updates are conducted for specialty units. As stated before, these treatment plans must include interventions to minimize risk of harm for inmates throughout the system, including stepdown and outpatient level of care along with the acknowledgement that risks were assessed and may not be relevant for the patient. This risk profile should also include deficits in planned services and content, which could be due to lack of available staff, and remedies to correct the deficits. Triggering events should result in an update to the treatment plan which will address interventions and objectives to target recovery from the event.

***B.1.j. Ensure adequate and timely treatment for prisoners, whose assessments reveal mental illness and/or suicidal ideation, including timely and appropriate referrals for specialty care and visits with Qualified Mental Health Professionals, as clinically appropriate.***

Finding:

Partial Compliance

At the time of the site visit, there were 558 inmates on the psychiatric caseload and 615 inmates on the behavioral health caseload. OPSO/Wexford have experienced challenges in conducting daily visits by a QMHP for individuals awaiting transfer to TMH. Inmates on the TMH waitlist are seen about 77% of the time daily. While the provision does not direct the need for special areas to conduct mental health work, the provision calls for adequate treatment for inmates with mental illness. Adequate mental health



treatment is not conducted on the tier, from the module, cell side nor in a dayroom where an inmate may be reluctant to discuss private, intimate issues with a clinician. The lack of confidentiality and a space that promotes confidentiality leads to a lack of validity that the information received is adequate to provide the necessary treatment. Many group sessions are held sporadically or not at all for a number of reasons, including staffing challenges for Wexford (reiterating an independent staffing analysis be conducted). There are numerous examples of disruption to service to include group therapy sessions. Patient 2503275 was enrolled in biweekly groups sessions but had limited group sessions during the period in review. Individual sessions are conducted cell side which is inadequate treatment for someone with a mental illness. One of the advantages of the Phase III design is that it provides confidential spaces for conducting interviews of inmates in a manner which is safe for both the QMHP and inmate. It is encouraging to know that Wexford utilizes pod interview rooms, when available and safe, to provide more confidential clinical interactions.

Suggestion: There continues to be a need for a full range of mental health and consistent individual and group counseling services at OJC and TMH/TDC. Adequate treatment includes providing an environment where confidentiality is secured so the inmate can share valid information to inform necessary treatment. The mental health provider and OPSO must collaborate and plan TOGETHER in order to provide an adequate and therapeutic system of mental health services. The inmates are unable to attend therapeutic sessions without adequate clinical staff to conduct sessions and correctional staff to transport and provide security for both staff and inmates. The Monitor reiterates that cell side visits do not constitute therapeutically appropriate or clinically adequate mental health services and will not result in substantial compliance. The Monitor recommends continued documentation of barriers to providing timely and adequate mental health treatment for all individuals captured on the mental health caseload. Issues cannot be rectified without knowledge of the problem. Consistent and reliable access to care is necessary for substantial compliance. OPSO may want to consider having community-based volunteer services come in and facilitate groups which would help provide services for inmates. The Monitor also recommends an independent staff analysis be conducted to determine staffing needs for OJC with current and future expectations for



constitutionally adequate treatment.

***B.1.k. Ensure crisis services are available to manage psychiatric emergencies. Such services include licensed in-patient psychiatric care, when clinically appropriate.***

Finding:

Partial Compliance

There are no designated in-patient licensed facilities identified to provide treatment for the OPSO population.

Suggestion: OPSO continues to lack access to licensed in-patient psychiatric services for male and female inmates, beyond simple emergency room treatment. OPSO/Wellpath is encouraged to continue to provide documentation that all psychiatric emergencies are sent to an emergency department, and any crisis is adequately resolved, which will keep this provision in partial compliance. Currently, the utilization of TMH and external emergency departments are the resources which must be used.

***B.1.l. On an annual basis, assess the process for screening prisoners for mental health needs to determine whether prisoners are being appropriately identified for care. Based on this assessment, OPSO shall recommend changes to the screening system. The assessment and recommendations will be documented and provided to the monitor.***

Finding:

Partial Compliance

Suggestion: The folder of documents to support compliance for this provision was empty. There was no documentation submitted to keep this provision in substantial compliance. In the last report, this Monitor identified a major problem with OPSO not contributing recommendations regarding the screening system, even if the recommendation is simply that the system in place is sufficient. Screenings require an adequate clinical response and if there are inmates who are not being adequately screened and identified for care, from the perspective of OPSO, this needs to be addressed. Provide the necessary documentation to return this provision to substantial compliance which will be reviewed at the next site visit. If this folder continues to be empty and no documentation is provided to support that Wexford and OPSO are addressing this provision, it risks be rated as non-compliant.

Findings:

B.2.a.   Partial Compliance



B.2.b.   Partial Compliance

B.2.c.   Partial Compliance

B.2.d.   Partial Compliance

B.2.e.   Partial Compliance

B.2.f.   Partial Compliance

B.2.g.   Substantial Compliance

B.2.h.   Partial Compliance

***B.2.a. Review, revise, and supplement existing policies in order to implement a policy for the delivery of mental health services that includes a continuum of services, provides necessary and appropriate mental health staff, includes a treatment plan for prisoners with serious mental illness, and collects data and contains mechanisms sufficient to measure whether care is being provided in a manner consistent with the Constitution.***
<u>Finding</u>

Partial Compliance

Inmates on the waitlist for TMH are now to be seen daily 77% of the time by a QMHP. There needs to be a system in place to provide a continuum of treatment for all individuals on the behavioral health caseload at the jail, including a treatment plan for inmates with serious mental illness which directs care. There is a dire need for consistent therapeutic groups being available for all patients on the caseload. While offering group therapy is not a constitutional standard of care, if it is a clinical, therapeutic recommendation, it should occur. Serious mental illness is defined as mental, behavioral, or emotion disorder of mood, thought, or anxiety that significantly impairs judgment, behavior, capacity to recognize reality, or ability to cope with the ordinary demands of life. Those disorders include, but are not limited to, Schizophrenia Spectrum Disorders, other psychotics disorders, bipolar related disorder, major depressive disorders, and post-traumatic stress disorders. Implementation of policy to ensure the delivery of mental health services across the entire facility continues to be hampered by staffing deficits, from both Wexford and OPSO. Until a baseline number of services needed is generated and updated, there is no indication of the number of staff actually needed from Wexford or OPSO to provide a continuum of treatment services at OPSO. A staffing analysis would be beneficial. The lack of treatment teams and treatment plans at OJC require continued attention. Without adequate staff, there will be no consistent treatment, including scheduled mental health and activity groups for the inmates.



<u>Suggestion:</u> Both Wexford and OPSO must commit to consistent and appropriate implementation of policies in order to ensure an adequate delivery of mental health services, including de-escalation interventions. This will include documenting wait lists and service needs along with barriers to the provision of treatment, including missing group sessions and conducting suicide watches from the control room adjacent to the housing units. This also includes holding staff accountable for employment requirements. This will include documenting how long an inmate awaits transfer to TMH and what therapeutic and clinically adequate services are provided during that time. There continues to be a need for interdisciplinary treatment teams in the outpatient level of care which will help determine and implement appropriate levels of treatment. Wexford should produce for the monitor the total number of inmates with any of the diagnoses listed above, whether in TMH, 2A, 2B, or general population along with their corresponding multidisciplinary treatment plan. As stated above, Wexford needs to identify the appropriate staffing levels needed to move into substantial compliance with this provision and satisfy the requirements of the Consent Judgment, which is the reason for the recommendation for an independent staffing analysis to be done asap. A comprehensive plan as to how the staff will be secured is also recommended. While the Monitor can appreciate the physical plant constraints in providing an adequate continuum of care, the needs of the patient and ensuring constitutionally adequate treatment cannot be put on hold. The Monitor encourages Wexford and OPSO to collaborate and try and find solutions to the physical plant issues to ensure patients are receiving the care they need.

***B.2.b. Ensure that treatment plans adequately address prisoners' serious mental health needs and that the treatment plans contain interventions specifically tailored to the prisoner's diagnoses and problems.***

<u>Finding:</u>

Partial Compliance

Since the last site visit, Wexford has identified a current caseload, as of the current site visit, consisting of 558 inmates who receive psychiatric (medication) services and 615 inmates who receive treatment from the mental health staff at OJC. The vast majority of patients identified on the caseload do not have comprehensive treatment plan created by a multi-disciplinary treatment team. The follow up treatment plans are even more



scarce. The treatment plans created in TMH are adequate in providing a framework for treatment and are specifically tailored to the needs of the patient. The data in the folder was from March 2024 (prior to the review period) and showed on 2A – 27% of patients had a treatment plan which was appropriate for their individualized care and 7% had a timely update. On 2B – 53% of patients had a treatment plan which was appropriate for their individualized care and 7% had a timely update. On 3E/F, 33% of patients had a treatment plan which was appropriate for their individualized care and 0% had a timely update. There is no evidence these numbers have improved.

Suggestion: Continue to work towards providing interdisciplinary treatment plans to all individuals on the mental health case load throughout the facility. Treatment plans are needed for all male, female, and youthful inmates at all levels of care, including acute care, suicide watches, TDC and outpatient level of care. These treatment plans need to be developed by a multidisciplinary team, when clinically indicated, including the inmate, as much as possible. As stated above, staffing levels need to be assessed, and staff secured to provide the level of expected care and timely treatment for this population. This monitor again reiterates the dire need for an independent staffing analysis to be conducted. ***All patients who are receiving mental health services need a treatment plan to direct care.*** Treatment plans can be done on a schedule based on clinical needs and the schedule should be discussed and agreed on by Wexford and the Monitor. If an individual is in general population and receiving medication and follow up from a QMHP, that person should have a treatment plan created by the provider and QMHP to address ongoing needs. While every individual may not need a multidisciplinary plan where security, nursing, a provider and QMHP (for example) will need to be a part of the creation, for substantial compliance, there must be a treatment plan on record for every individual on the caseload, based on clinical interactions and needs.

***B.2.c. Provide group or individual therapy services by an appropriately licensed provider where necessary for prisoners with mental health needs.***

Finding:

Partial Compliance

There remain challenges with consistently providing group and individual therapy services outside of TMH. Some of this is due to lack of adequate deputies to secure pods



therefore the mental health provider has to cancel an intervention. Some is due to inadequate clinical staffing on the part of Wexford who would be able to consistently facilitate the groups. Until there are sufficient security staff to provide supervision for groups to take place, and Wexford knows the number of staff they will need to meet expected treatment goals, the Wexford staff was unable to provide concrete numbers at the most recent site visit,  it will be difficult to move this provision into substantial compliance. Until there are confidential locations to conduct interventions, the validity of inmate responses is in question which in turn questions whether appropriate, clinically therapeutic programming is being offered. One cannot offer what they do not know is needed.  Patient **5 was enrolled in biweekly groups sessions but had no documented group sessions from April 19, 2024, through June 28, 2024. Patient **7 was recommended for biweekly groups yet had no groups between April 18, 2024 and June 7, 2024. It has become too common for patients to be referred for groups which are not being consistently held.

Suggestion: This provision will remain a challenge to move into substantial compliance without adequate staff from both Wexford and OPSO, along with an adequate confidential environment to conduct these sessions. Confidentiality will help validate the responses of the inmate which will in turn inform what individual and group sessions are needed for the population. If individual and group sessions cannot be held consistently, this provision will not move to substantial compliance. Please note how many individuals are unable to access the service provided due to barriers like adequate space, staffing challenges (including Disruption of Service forms) and are on a waitlist. Document the corrective action plans which will be implemented to address these issues. Continue to provide data on the number of inmates who received counseling for sexual abuse, alcohol, and drug abuse. Currently these numbers are EXTREMELY low. Keep a running list of how many groups are not being held rather than just the attendance of inmates. If you have 10 groups scheduled and only facilitate one group, the data is skewed when you report 92% attendance. Wexford needs to work on a better reporting system to capture not just the needs of the population but the vast number of groups not being held and the groups which will be needed to address the entire mental health population. OPSO and Wexford both bear responsibility in bringing this provision into substantial compliance



and are encouraged to collaborate on solutions for the physical plant limitations to provide needed treatment to patients.

**B.2.d. Ensure that mental health evaluations that are done as part of the disciplinary process include recommendations based on the prisoner's mental health status.**

<u>Finding:</u>

Partial Compliance

There was no data submitted in this folder to support this provision moving into substantial compliance. The team discussed a document during the site visit which showed there were 68 people seen between June and November for discipline and not one incident was related to behavioral health issues nor a need to make recommendations based on a prisoner's mental health status. This Monitor questions the validity of this finding and whether proper assessments were conducted.

<u>Suggestion:</u> It is imperative that mental health staff are contacted prior to any inmate, especially those on the mental health caseload, being moved into disciplinary housing. Wexford should be using incident reports to ensure they are aware of all mental health inmates who may find themselves in disciplinary housing. Continued collaboration between OPSO and Wexford is crucial to this provision moving into substantial compliance. It is imperative that OPSO puts into place a consistent process to alert mental health prior to movement of an individual, especially one on the caseload, to disciplinary housing. This also means that OPSO needs to insist on having a current list of all patients on the mental health caseload to ensure OPSO can contact mental health as soon as safely possible, if not prior to movement.

**B.2.e. Ensure that prisoners receive psychotropic medications in a timely manner and that prisoners have proper diagnoses and/or indications for each psychotropic medication they receive.**

<u>Finding:</u>

Partial Compliance

<u>Suggestion:</u> The documentation submitted for this provision is the same as was submitted for the prior site visit therefore there was no data to review for the current period under review. There was also a report that when Wexford first began providing service in June 2024, there was a significant lag in patients receiving their psychotropic medication due to lack of communication from the intake nurse to the provider (see B.1.a). There



continues to be no medication variances captured to demonstrate whether medications are received in a timely manner. At the most recent site visit in December 2024, this Monitor watched a video of a medication pass on July 20, 2024. The nurse started prepping the medication cart for the second floor from 7:15am until 9:21am and began distributing medications at 9:28pm. Based on policy and prescriber orders, medications are to be delivered between 8:00am and 10:00am. It would be impossible for the nurse to complete her medication administration in 32 minutes therefore this medication administration should have generated a medication variance, which it did not. This Monitor also watched a medication pass during the site visit. The Monitor needs to see data which supports timeliness which would be captured with medication variances. Suggestion: Collect MEDICATION VARIANCES! Create criteria or use the ones discussed at prior site visits to begin collecting and analyzing medication variances. You can only fix a problem once it is identified. Provide documentation and analysis of data to ensure inmates are receiving psychotropic medications in a timely manner, especially upon admission to the facility. If there are delays in an inmate receiving medication, document and create a corrective action plan to address the deficiency. Ensure medications are being used to treat the diagnosis on record or there is clear justification in the record for the off-label use of a psychotropic medication. Consider progressive discipline for nurses who arrive late for work therefore making it impossible to distribute medication in a timely manner. Consider having the overnight nurses help prep the cart for the day shift to cut down on the delay to begin medication administration. Consider increasing the time for medication administration from a two-hour grace period to three hours. Ensure nurses are aware that collecting variances doesn't necessarily mean something is wrong or was done incorrectly but is a way to improve the system.

***B.2.f. Ensure that psychotropic medications are administered in a clinically appropriate manner as to prevent misuse, overdose, theft, or violence related to medication.***

Finding:

Partial Compliance

The folder containing data to support compliance with this provision was empty. As stated in the previous provision and in prior reports, medication variances are not yet sufficiently captured to help determine whether psychotropic medications are



administered in a clinically appropriate manner. Documentation of medication variances help ensure there is clinically appropriate administration of medication and allows staff to make corrections when needed. Variances include late administration of medication (nurses have one hour before and one hour after the set time for the medication to be given for administration to be timely), missed dose of medication, if a medication is ordered and not received by the patient within 24 hours of the order, the use of numerous smaller dose(s) of pills to equal the prescribed amount when the prescribed amount is available in one pill (olanzapine 20mg is prescribed and rather than give olanzapine 20mg tablet, which is available, two 10mg tablets are given). Improper searches of inmates by security staff contribute to inmates having contraband including excess medication and medication which may not be prescribed to them. Merely not having a recorded medication overdose does not equate to effective clinical practice and risk mitigation.

Suggestion: Implement monitoring of medication variances at OJC and TMH and accurately report findings. Wexford and OPSO need to work cooperatively to ensure medication passes are aligned with policy and procedures in order to prevent misuse, overdose, theft, and violence related to medication. Proper and thorough searches of cells and persons must be conducted by OPSO to help curb the presence of contraband, including excess prescribed and unprescribed medications. Found medications must be sent to the proper personnel for identification to help curb misuse, overdose, theft and violence in the facility. Further analysis may be needed to analyze the finding of contraband, prescribed and nonprescribed medication, and what corrective plan to put in place to minimize the risks.

***B.2.g. Ensure that prescriptions for psychotropic medication are reviewed by a Qualified Mental Health Professional on a regular, timely basis and prisoners are properly monitored.***

Finding:

Substantial Compliance

Suggestion: The collected data was from June and July 2024, as it was for the prior site visit. There appears to be compliance issues with monitoring A1c at baseline and within the past 90 days and monitoring other drug levels as indicated. There continues to be a lack of adequate laboratory work documented in the medical record to ensure unseen



harm is being avoided. Provide documentation of data collection and analysis of psychotropic medication prescriptions, including the timeliness between when the prescription is written, and the first dose is received by the inmate. There also needs to be documentation when there is a disruption in providing psychotropic medications along with the source of the disruption. Refusals of medications needs attention and require proper clinical assessment and documentation which is part of adequate monitoring of inmates. This provision will be downgraded into partial compliance in the next report without proper documentation and clinical practice to support appropriate labs are being drawn and inmates are properly monitored while on psychotropic medications. All documentation for this provision should be uploaded in SharePoint for discussion and review at the next site visit.

**B.2.h. Ensure that standards are established for the frequency of review and associated charting of psychotropic medication monitoring, including monitoring for metabolic effects of second-generation psychotropic medications.**

Finding:

Partial Compliance

Suggestion: The same data from January and March 2024 submitted for the prior site visit was again submitted for this visit. This provision risks being rated as noncompliant without proper documentation in SharePoint to provide support for this provision either remaining in partial compliance or improving to substantial compliance by the next site visit.

Findings:

B.3.a.   Partial Compliance

B.3.b.   Partial Compliance

**B.3.a. OPSO shall develop and implement policies and procedures for prisoner counseling in the areas of general mental health/therapy, sexual-abuse counseling, and alcohol and drug counseling. This should, at a minimum, include some provision for individual services.**
Finding:

Partial Compliance

Due to staffing challenges, groups and individual sessions continue to be conducted inconsistently throughout the reporting period. . This is of grave concern as it means the therapeutic needs of the patients are not being met.  While the provision does not require a confidential space provided for treatment, adequate treatment requires



confidentiality in order for there to be valid responses from inmates to inform necessary treatment. Cell side or on the tier interventions are not adequate mental health treatment. Development of the policies and procedures is not sufficient for substantial compliance without implementation, which would include consistent availability of therapeutic services.

Suggestion: An independent staffing analysis is being recommended to determine staffing needs to meet expectations for provision of mental health services throughout OJC. Tracking of the following is necessary to ensure services are available and implemented: 1) the overall baseline need for counseling services; 2) whether each counseling session identified is actually provided; 3) the reason service was not provided and corrective actions, if implemented. This documentation should be in SharePoint to review and discuss with the team at site visits. The need for counseling service should also be reflected in the treatment plan along with a clinically appropriate schedule and interventions.  The creation of dedicated space where confidential therapeutic engagement can occur would be ideal in moving this provision towards substantial compliance. The Monitor looks forward to this being the case once Phase III is operational. The staffing analysis will be crucial to ensure Phase III is utilized properly. Ensure the logbooks maintained by OPSO are accurate and completed as dictated by policy.

**B.3.b. Within 180 days of the Effective Date, and quarterly thereafter, report all prisoner counseling services to the Monitor, which should include:**
  **1)** **the number of prisoners who report having participated in general mental health/therapy counseling at OPP;**
  **2)** **the number of prisoners who report having participated in alcohol and drug counseling services at OPP;**
  **3)** **the number of prisoners who report having participated in sexual-abuse counseling at OPP; and**
  **4)** **the number of cases with an appropriately licensed practitioner and related one-on-one counseling at OPP.**

Finding:

Partial Compliance

Suggestion: Wexford has 558 inmates receiving psychiatric interventions and 615 inmates receiving mental health services. The numbers of individuals receiving general mental health/therapy counseling (April 232 and May 238), alcohol and drug counseling (April 81 and May 62), sexual-abuse counseling (April and May 0) and one-on-one



counseling (April 82 and May 80) is disconcerting.  It is difficult to believe that out of 615 patients, no one is in need of sexual abuse counseling. Only 80 inmates in May 2024 received one-on-one counseling. The appears to be a lack of knowledge as to what is needed and what should be provided to the population. There was no data from treatment services for the 3rd quarter of 2024.

Suggestion: Collect and analyze data concerning inmates in need of these services and create corrective action plans to address the deficits which may be present at OJC and TMH. As stated earlier, due to a lack of confidential engagements, the validity of responses from inmates is questionable and therefore the monitor is unsure whether the services offered are indeed adequate for the population.  An independent staffing analysis will assist in determining the number of staff needed to meet the needs of the population, once those needs are identified. Wexford needs to spend more time determining the true needs of the population, which they have begun doing with surveys of the population and determining what needs to be implemented to address those needs.

Findings:

B.4.a    Partial Compliance

B.4.b.   Substantial Compliance

B.4.c.   Substantial Compliance

B.4.d.   Partial Compliance

B.4.e.   Substantial Compliance

B.4.f.   Substantial Compliance

B.4.g.   Substantial Compliance

***B.4.a. OPSO shall ensure that all staff who supervise prisoners have the adequate knowledge, skill, and ability to address the needs of prisoners at risk for suicide. Within 180 days of the Effective Date, OPSO shall review and revise its current suicide prevention training curriculum to include the following topics:***
***1) suicide prevention policies and procedures (as revised consistent with this Agreement);***
***2) analysis of facility environments and why they may contribute to suicidal behavior;***
***3) potential predisposing factors to suicide;***
***4) high-risk suicide periods;***
***5) warning signs and symptoms of suicidal behavior;***
***6) case studies of recent suicides and serious suicide attempts;***
***7) differentiating suicidal and self-injurious behavior; and***
***8) the proper use of emergency equipment.***

Finding:

Partial Compliance



As stated earlier, there are still some issues with MHTs and the observation for suicide watch. There was documentation that deputies were not available, so a watch was not done, which was not verified on video. There appears to be some discrepancy in identifying self-injurious behavior and suicide behavior. While improved, there is still some discrepancy in how these behaviors are captured – OPSO may identify a behavior as one thing while Wexford identifies it as another. There needs to be proper vetting of all self-injurious and suicidal behaviors and education, as needed.   Training should also include mock demonstrations regarding the proper response to a suicide attempt. While searches are still not consistently done and inmates are not properly secured, it shows a lack of understanding of potential predisposing factors for suicide and leaves the inmate in danger. While this provision focusing on training curriculum, the curriculum is only as good as the manifestation of what has been learned which shows the ability to address the needs of the prisoners.

***B.4.b. Ensure that all correctional, medical, and mental health staff are trained on the suicide screening instrument and the medical intake tool.***

<u>Finding:</u>

Substantial Compliance

<u>Suggestion:</u> Continue to provide documentation that multi-disciplinary in-service training has been completed annually for all current correctional, medical, and mental health staff to include training on updated policies, procedures, and techniques. All incoming staff should be trained on the suicide screening instrument and medical intake tool during onboarding orientation. This monitor recommends Wexford keep a running list of ALL employees of OPSO, including Wexford employees, and document when training is due, when it has been done and the reason for pending status. Simply submitting a list of employees who have completed training is not sufficient to determine whether employees are up to date on this training. This list will be expected in the folder for the next review period.

***B.4.c. Ensure that multi-disciplinary in-service training is completed annually by correctional, medical, and mental health staff, to include training on updated policies, procedures, and techniques. The training will be reviewed and approved by the Monitor.***

<u>Finding:</u>



Substantial Compliance

Suggestion: Continue to provide documentation that multi-disciplinary in-service training has been completed annually for all current correctional, medical, and mental health staff, to include training on updated policies, procedures, and techniques. Training will need to address deficiencies in communication, especially between OPSO and Wexford clinicians, and documentation regarding de-escalation procedures, disciplinary process, and searches. Training should clearly delineate the responsibilities of various staff member involvement, including during medication pass. Supervisory spot checks may be needed to ensure training is adequate and adhered to during various processes around OJC and TMH. This monitor recommends Wexford keep a running list of ALL employees of OPSO and document when training is due, when it has been done and reason for pending status. Simply submitting a list of employees who have completed training for a month is not sufficient to determine whether employees are up to date on this training. Part of the training needs to include emphasis on communication between Wexford and OSPO, especially with de-escalation efforts and notification of mental health after an incident, along with identifying approved documentation which is to be used throughout the facility.

***B.4.d. Ensure that all staff are trained in observing prisoners on suicide watch and step-down units status.***

Finding:

Partial Compliance

The staffing changes were done during the period in review – special observation pods are to have deputies assigned first. With that said, there were still observation sheets that documented a deputy was unavailable therefore a watch was not conducted. While there were times when a deputy was off the pod, there were others when a deputy was present, yet the MHT did not capitalize on the opportunity to do a check. All staff conducting watch should be completing the approved Observation/Restraint Checklist document.

Suggestion: Continued training and supervisory observation, in person and via video will be necessary to ensure performance of suicide watches and accurate completion of these documents. There is a corrective action plan being created to address the issues



mentioned in this and previous reports around the issues of safety for inmates on suicide watch. This Monitor will be looking for improvements in this system and the achievement of benchmarks in the CAP to show movement towards substantial compliance.

***B.4.e. Ensure that all staff that have contact with prisoners are certified in cardiopulmonary resuscitation ("CPR").***

Finding:

Substantial Compliance

Suggestion: Continue to provide documentation that all current staff, including OPSO and Wexford, are certified in CPR. The goal is to have at least 90% of all staff at OPSO certified in CPR. As stated earlier, a list of ALL employees who come in contact with inmates should be created and a spreadsheet could help with organization to ensure everyone is up to date in all required trainings. This information should be housed in one location (SharePoint Folder) and be ready prior to the next site visit. Ensure each provider, security officer and staff member have accurate dates on record so there is no question as to who is in need of CPR certification.

***B.4.f. Ensure that an emergency response bag, which includes a first aid kit and emergency rescue tool, is in close proximity to all housing units. All staff that has contact with prisoners shall know the location of this emergency response bag and be trained to use its contents.***

Finding:

Substantial Compliance

The cut down tools were sharp and the bags were sealed and easily located by the deputies.

Suggestion: Ensure the cut down tools are maintained and adequately sharpened, and new staff are trained in the proper use of the tool throughout the facility. Training should also include proper technique in breaking the seal on the bag that holds the cutdown tool. Ensure that staff are available in the control room in order to access the cut down tool, if necessary. Ensure every bag has all necessary requirements.

***B.4.g. Randomly test five percent of relevant staff on an annual basis to determine their knowledge of suicide prevention policies. The testing instrument and policies shall be approved by the Monitor. The results of these assessments shall be evaluated to determine the need for changes in training practices. The review and conclusions will be documented and provided to the Monitor.***



Finding:

Substantial Compliance

Suggestion: Wexford needs to establish the total number of relevant staff employed at OJC – both OPSO and Wexford. Once that number is established, the Monitor expects 5% of OPSO and 5% of Wexford employees to be assessed. The data submitted was the same as was submitted in May (7 employees were tested, which represents 140 employees) and only included OPSO staff. This provision risks being downgraded to partial compliance, after the next site visit, if a baseline number is not established and the correct number of employees are not assessed. If someone scores below 80%, measures taken and/or changes made to ensure knowledge of suicide prevention policies should be included in the data.

Findings:

B.5.a.   Partial Compliance

B.5.b.   Partial Compliance

B.5.c.   Partial Compliance

B.5.d.   Partial Compliance

B.5.e.   Partial Compliance

B.5.f.   Partial Compliance

B.5.g.   Substantial Compliance

B.5.h.   Partial Compliance

B.5.i.   Partial Compliance

B.5.j.   Partial Compliance

B.5.k.   Partial Compliance

***B.5.a. OPSO shall implement a policy to ensure that prisoners at risk of self-harm are identified, protected, and treated in a manner consistent with the Constitution.***

Finding:

Partial Compliance

While various policies are in place to ensure inmates at risk of self-harm are identified, protected, and treated in a manner consistent with the Constitution, there remains the challenge of consistent implementation. The data captured in the SharePoint folder ends June 2024 so there was no submitted information to review for July –



September 2024. There continued to be reports of contraband found in cells housing an at-risk inmate. Without mental health being consulted prior to a use of force, inmates are at risk for harm. Without adequate staffing, consistent performance of duties and adequate supervision of line staff, inmates on suicide watch are not being adequately watched or protected, therefore increasing the risk of self-harm.

<u>Suggestion:</u> Some of the same issues which were observed in the prior site visit continue to plague OPSO. Ensure staffing is sufficient to allow prescribed suicide watches to be conducted as necessary – all direct observations should be monitored directly, and staff should not have to choose whom to watch or where to watch from, i.e. module or interlock area. Continue to offer a confidential space for the clinician designated to monitor inmates on suicide watch to conduct assessments. Continue to document any barriers to having access to confidential space. Ensure inmates are searched to prevent self-harm when placed on suicide watch and contraband is removed when reported. Implement medication administration policies, to include adequate mouth checks, to help prevent access of the inmate to medication to self-harm. Document consistent out of cell time for inmates on suicide watch. With the absence of the mental health administrative team during this site visit, the CAP benchmarks could not be reviewed. Individuals on suicide watch need intensive treatment interventions including out of cell time, counseling, and therapy, as medically indicated. Merely documenting an inmate has been viewed every 15 minutes is insufficient. Document treatment interventions of inmates on suicide watch and any barriers present in not providing appropriate treatment. Document any inmate on suicide watch or in detox protocols who is found with contraband or misuse of supplies. The key will be implementing standing policies to ensure the safety of inmates and staff. It is also imperative there is timely supervisory review of suicide watches to ensure employees are following existing policies and be held accountable, up to disciplinary procedures, if policies are not adhered to.

***B.5.b. Ensure that suicide prevention procedures include provisions for constant direct supervision of current suicidal prisoners and close supervision of special needs prisoners with lower levels of risk, at a minimum, 15 minutes check. Correctional officers shall document their checks in a format that does not have pre-printed times.***

<u>Finding:</u>

Partial Compliance



The Observation/Restraint Checklist and Worksheet does not have pre-printed times but continue to not be used or filled out accurately. On this visit, review of videos showed more attention by MHTs to conduct checks yet there were still times were misrepresentation was documented – MHTs writing that deputies were not present for a check when they were or not doing a check when deputies returned to the pod.

<u>Suggestion:</u> See comments in B.4.d. Submit documentation for suicide watches in IPC. There needs to be consistent supervisory review to ensure employees are adhering to existing policies and disciplinary actions taken if policies are not followed.

***B.5.c. Ensure that prisoners on suicide watch are immediately searched and monitored with consistent direct supervision until a Qualified Mental Health Care Professional conducts a suicide risk assessment, determines the degree of risk, and specifies the appropriate degree of supervision.***

<u>Finding:</u>

Partial Compliance

While there was no new data submitted in the SharePoint folder to support improvements in this area, the Monitor will assume the same issues which plagued OPSO and Wexford during the last tour remain. Inmates are not consistently and immediately searched nor secured when placed on suicide watch.

<u>Suggestion:</u> Inmates need to be immediately searched or as soon as safely possible 100% of the time. The threshold for compliance being used is 90%. Ideally, but not required and understandably not always feasible, a mental health professional should be present for searches to help with de-escalation and provide a therapeutic environment. Written procedures for searches should be a part of training, so each staff member is clear of their responsibilities. Cells should be searched prior to placement of an inmate on suicide watch and documented. Once identified by a MHP or MHT, contraband needs immediate removal from the vulnerable inmate to prevent self-harm. Collaboration and proactive communication are necessary between OPSO deputies and mental health staff to meet the requirements of this provision.

***B.5.d. Ensure that prisoners discharged from suicide precautions receive a follow-up assessment within three to eight working days after discharge, as clinically appropriate, in accordance with a treatment plan developed by a Qualified Mental Health Care Professional. Upon discharge, the Qualified Mental Health Care Professional shall conduct a documented in-person assessment regarding the clinically appropriate follow-up intervals.***

<u>Finding:</u>



Partial Compliance

There was no new data submitted in SharePoint to support an improvement in this provision. In discussions with Wexford during the site visit, there remain challenges in timely follow up sessions for individuals released from suicide watch. There were many follow-up visits throughout the period in question which were not done timely or completely missed. This provision risks being downgraded into non-compliance at the next site visit if documentation showing follow-up visits is not included. Without documentation, this Monitor is unable to conclude the visits are being made. While the spreadsheet data may not meet the compliance threshold of 90%, at least it will demonstrate the visits are being made. Treatment plan and treatment plan updates are needed to ensure prescribed treatments are being performed along with progress being made by the inmate. Treatment plan goals should be discussed in progress notes.

The plan will be to review safety plans at the next site visit since there were too many other issues to address during the December 2024 visit.

Suggestion: Put the supporting documentation showing suicide follow-up visits are occurring in SharePoint. The next site visit will be in the summer of 2025 therefore documentation should be submitted for October 2024-June 2025. Suicide ideation/attempt can be emotional and the need for follow-up is necessary. Just as suicide assessments are conducted in a confidential space, suicide follow-up assessments require the same degree of care. A cell side visit for suicide follow up is not adequate or clinically appropriate treatment. Continue to document if there are access issues to inmates. Document any barrier to having a confidential space to complete these post-suicide watch assessments. Continue to monitor and document follow-up appointments and ensure they are conducted as policy dictates.

***B.5.e. Implement a step-down program providing clinically appropriate transitions for prisoners discharged from suicide precautions.***

Finding:

Partial Compliance

Simply having a document which outlines a step-down program is insufficient for substantial compliance without implementing a clinically appropriate, consistently run program. At the prior site visit, the proposed programming for step-down units was



reviewed. It included individual and group counseling services, recreational and music therapy, medication education and addressed discharge resources. This program has not been consistently operational during the period in review for a myriad of reasons, including staffing deficits. Consistent implementation is just as important as having the program. The program is described as providing an individualized care approach to meet the needs of the patients who may require assistance transitioning from intensive acute treatment to the general population. Wexford has recently done a population survey which should help with better direct treatment in an individualized manner. As stated earlier, while the provision does not expressly dictate there be a confidential space dedicated to the step-down program, confidentiality is key in providing adequate clinical care for this population. It is difficult to provide adequate stepdown programming for women who share a housing unit with other classifications – general population and restrictive housing status.

<u>Suggestion:</u> Consistent implementation of the step-down program is necessary. The introduction of medication education (which is number 6 on the list of offerings for this program), even in a group setting, is imperative for this population. Ensure the multi-disciplinary treatment plans include individualized treatment for inmates which is reflected in the programming being offered in the step-down program. The progress notes should reflect the treatment being given in the program in line with the prescribed interventions in the treatment plan. Continue to document interruptions in service for this unit and any barriers in consistent programming.

***B.5.f. Develop and implement policies and procedures for suicide precautions that set forth the conditions of the watch, incorporating a requirement of an individualized clinical determination of allowable clothing, property, and utensils. These conditions shall be altered only on the written instruction of a Qualified Mental Health Care Professional, except under emergency circumstances or when security considerations require.***

<u>Finding:</u>

Partial Compliance

      One hundred percent (100%) of inmates are not searched properly prior to being placed on suicide watch. The compliance threshold this monitor uses for substantial compliance is 90%. This provision calls for individualized determination of allowable property. It appears the system is an all or none mentality as to what an individual can



have on suicide watch. The restrictions need to be clinically driven and properly documented to address the presented risk. There continues to be delay in removing contraband property from cells once brought to the attention of the deputies.  The Monitor will also review Wexford's policy at the next site visit to ensure staff is meeting expectations.

Suggestion: Document all searches, including whether it occurs prior to or after being placed on suicide watch. Provide documentation of individualized determinations of the conditions for watch for male and female inmates at OJC and at TMH. This should include all inmates who are in non-suicide resistant cells and are therefore on direct observation. Provide policy, procedure, and documentation about suicide watches in IPC. Once the documents are provided, implementation must also be monitored closely and employees held accountable for failing to adhere to existing policy. Once restricted property is identified, it should be removed immediately so as to prevent self-harm.

***B.5.g. Ensure that cells designated by OPSO for housing suicidal prisoners are retrofitted to render them suicide-resistant (e.g., eliminating bed frames/holes, sprinkler heads, water faucet lips, and unshielded lighting or electrical sockets).***

Finding:

Substantial Compliance

All the designated cells by OPSO have been retrofitted to render them suicide-resistant (9 cells on 2A, 2 cells on 3C, 2 cells on 2C, 2 cells on 3E). The toilets have been installed, and the cells have been updated. There are still inmates at risk for self-harm being housed in non-suicide resistant cells. At this site visit, all inmates on suicide watch were being housed in TMH.

Suggestion: Continue direct observation of individuals who are housed in non-suicide resistant cells while on suicide watch to best provide for their safety. Consider retrofitting all the cells on the first floor in 2A into suicide-resistant cells. There needs to be priority given to placing screening around the mezzanine and stairwells in 2A to prevent inmates from jumping. Inmates on suicide watch should not be allowed up on the mezzanine level.

***B.5.h. Ensure that every suicide or serious suicide attempt is investigated by appropriate mental health and correctional staff, and that the results of the investigation are provided to the Sheriff, and the Monitor.***

Finding:



Partial Compliance

There continues to be a need for more collaboration between OPSO and the mental health provider in investigations and a communal response to making systemic changes. There was no new data submitted for the period in review to support an improvement in this provision. Will need to review Wexford's compliance and communication with OPSO for the next site visit.

Suggestion: There needs to be intentional collaboration and systemic changes produced from investigations by OPSO and the mental health provider concerning suicides and serious suicide attempts at the facility. Wexford and OPSO may need to come up with criteria which will be used to classify an event as a suicide or suicide attempt. If either Wexford or OPSO identify an event as a self-harm episode, it needs to be investigated, and the COLLABORATIVE results of the investigation given to the Sheriff and the Monitor. To reiterate, there is no expectation that there will never be a suicide or suicide attempt in the correctional facility, but when they occur, they require more intentional and self-critical analysis of the event by both OPSO and the mental health provider (Wexford). Psychological autopsies should help in identifying systemic deficits which will help inform systemic changes throughout the system. Simply discussing these events at a meeting is not sufficient without real analysis and productive change being the product, including enforcing current policies like alerting mental health to help with de-escalation. Provide a COLLABORATIVE self-critical analysis to the Sheriff and Monitor which demonstrates a thorough understanding and investigation of these critical events.

***B.5.i. Direct observation orders for inmates placed on suicide watch shall be individualized by the ordering clinician based upon the clinical needs of each inmate and shall not be more restrictive than deemed necessary by the ordering clinician to ensure the safety and well-being of the inmate.***

Finding:

Partial Compliance

The lack of staff at OJC limits the ability of staff to provide direct observation for inmates. There was documentation seen where direct observations were conducted from the module due to lack of security presence. This is not direct observation. There was no data in the folder to support improved compliance with this provision.

Suggestion: The Monitor continues to recommend that inmates in IPC, who are placed on suicide watch and have yet to be assessed by an QMHP, should be on direct observation.



Continue to submit suicide watch audits with the location of the watch embedded in the report. Include random direct observation documentation in the folder along with orders for restriction which includes clinical rationale.

***B.5.j. Provide the Monitor with periodic report on suicide and self-harm at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. The report will include the following:***
***1) all suicides;***
***2)all serious suicide or self-harm attempts; and***
***3) all uses of restraints to respond to or prevent a suicide attempt.***

Finding:

Partial Compliance

Suggestion: These reports are completed in July and January. At the time of the site visit in December, the report from January to June was present in the folder. There continues to remain discrepancies in the recording of incidents between OPSO and Wexford. Clear and transparent communication is necessary to ensure all incidents are accounted for and any discrepancies in the numbers are appropriately documented.

***B.5.k. Assess the periodic report to determine whether prisoners are being appropriately identified for risk of self-harm, protected, and treated. Based on this assessment, OPSO shall document recommended changes to policies and procedures and provide these to the Monitor.***

Finding:

Partial Compliance

As stated above, this report is generated at the beginning of July and January. At the site visit in December, the July report was available for review. While the report was completed in a timely manner, there remain challenges in OPSO documenting changes to policies and procedures based on analysis of risk at the facility. There remain issues with adequate searches of inmates having access to contraband with no changes being offered to rectify the problem. The report needs to address the CAPs which may need to be put in place to better identify and rectify the gaps in the current procedures.

Suggestion: Provide updated procedures to the Monitor to address outstanding issues with implementation of ensuring risk challenges are adequately addressed. This provision will also require adequate treatment plan creation, as this would address risk of self-harm and the protective measures in place, to ensure all individuals who engage with the inmate are adequately knowledgeable about the needs of the patient.

Findings:



B.6.a.   Partial Compliance

B.6.b.   Substantial Compliance

B.6.c.   Substantial Compliance

B.6.d.   Substantial Compliance

B.6.e.   Substantial Compliance

B.6.f.   Substantial Compliance

B.6.g.   Substantial Compliance

Of note – there was a use of restraints after the period of review which was not authorized by policy and has not been included in this report. If restraints are to be used in this manner at OPSO in the future, it is imperative that appropriate policies and procedures be developed prior to its use again.  If these types of restraints are not to be used again, there should be written language prohibiting their use in the use of force policy.

***B.6.a. OPSO shall prevent the unnecessary or excessive use of physical or chemical restraints on prisoners with mental illness.***

<u>Finding:</u>

Partial Compliance

OPSO is not consistently and proactively contacting mental health prior to the use of force or needing to implement de-escalation in the Facility. With access to incident reports, Wexford will have more information regarding incidents in the facility and be able to help introduce and recommend strategies to prevent the unnecessary use of physical or chemical restraints on an inmate. Additionally, OPSO has developed a plan to alert mental health, via radio, of all use of force at OJC. This plan's implementation will be reviewed, and documentation should be provided at the next site visit as there were too many issues to address at this site visit. The use of a taser or chemical spray to, even momentarily, subdue an inmate is considered a form of restraint. Having access to the incident reports does not negate the need for better communication and seeking assistance from mental health prior to the use of restraints on an inmate by OPSO.

<u>Suggestion:</u> Provide documentation of policies in use for planned de-escalation and use of force. Provide documentation to support consistent implementation of the policy and procedures in place to ensure mental health is contacted prior to the use of force, when reasonably safe. OPSO needs to generate a report for the Monitor documenting all uses of



physical and chemical restraints throughout the Facility along with attempts to contact mental health and whether the restraint was planned. Create and submit to the Monitor documentation to determine how many instances of use-of-force incidents occurred over the year prior to the next site visit where mental health was not contacted prior to exercising the use-of-force.

***B.6.b. Maintain comprehensive policies and procedures for the use of restraints for prisoners with mental illness consistent with the Constitution.***

If restraints are to be used for inmates, ensure there are policies and procedures in place to ensure their use is consistent with the Constitution

<u>Finding:</u>

Substantial Compliance

***B.6.c. Ensure that approval by a Qualified Medical or Mental Health Professional is received and documented prior to the use of restraints on prisoners living with mental illness or requiring suicide precautions.***

<u>Finding:</u>

Substantial Compliance

Please see comments for B.6.a.

***B.6.d. Ensure that restrained prisoners with mental illness are monitored at least every 15 minutes by Custody Staff to assess their physical condition.***

<u>Finding:</u>

Substantial Compliance

Please see comments for B.6.a. and B.6.b.

***B.6.e. Ensure that Qualified Medical or Mental Health Staff document the use of restraints, including the basis for and duration of the use of restraints and the performance and results of welfare checks on restrained prisoners.***

<u>Finding:</u>

Substantial Compliance

Please see comments for B.6.c.

***B.6.f. Provide the Monitor a periodic report of restraint use at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. Each report shall include:***
> ***1)    A list of prisoners whom were restrained;***
> ***2)    A list of any self-injurious behavior observed or discovered while restrained; and***



*3)        A list of any prisoners whom were placed in restraints on three or more occasions in a thirty (30) day period or whom were kept in restraints for a period exceeding twenty-four (24) hours.*

Finding:

Substantial Compliance

The report for January – June 2024 was in the folder in August 2024. The report for July-December 2024 had not been completed at the site visit in December 2024

Suggestion: As there was a use of restraint in the facility in November or December 2024, this should be included in the report which will be reviewed at the next site visit. If there was none, that should be recorded for future reports.

*B.6.g. Assess the periodic report to determine whether restraints are being used appropriately on prisoners with mental illness. Based on this assessment, OPSO shall document recommended changes to policies and procedures and provide these to the Monitor.*

Finding:

Substantial Compliance

See comments from B.6.f.

Findings:

B.7.a.   Partial Compliance

B.7.b.   Partial Compliance

B.7.c.   Partial Compliance

B.7.d.   Partial Compliance


*B.7.a. OPSO shall ensure that all staff who supervise prisoners have the knowledge, skills, and abilities to identify and respond to detoxifying prisoners. Within 180 days of the Effective Date, OPSO shall institute an annual in-service detoxification training program for Qualified Medical and Mental Health Staff and for correctional staff. The detoxification training program shall include:*
*1) annual staff training on alcohol and drug abuse withdrawal.*
*2) training of Qualified Medical and Mental Health Staff on treatment of alcohol and drug abuse conducted by the Chief Medical Officer or his or her delegate.*
*3) oversight of the training of correctional staff, including booking and housing unit officers, on the policies and procedures of the detoxification unit, by the Chief Medical Officer or his or her delegate.*
*4) training on drug and alcohol withdrawal by Qualified Medical and Mental Health Staff.*
*5) training of Qualified Medical and Mental Health Staff in providing prisoners with timely access to a Qualified Mental Health Professional, including psychiatrists, as clinically appropriate; and*
*6) training of Qualified Medical and Mental Health Staff on the use and treatment of withdrawals, where medically appropriate.*

Finding:

B. 7. a. Partial Compliance



Overall, the training program is improved.  However, more custody staff need to take the training. Only 34% of the deputies took the training called *Symptoms of Alcohol Withdrawal.* In July 2024, custody officers were trained on the symptoms of alcohol withdrawal.  133 officers took the test. Of those, 14 failed.  Of the 133 officers who took the course, 45 showed either no change or a decrease from the pretest to the post test. Of the 255 deputies in total, only 42% took the Opioids training (107/255). Only 29% of the deputies took the suicide prevention training course.  Only 29% of the deputies took the training on abdominal problems. These low numbers may be a matter of documentation, or the timing of training for new classes of deputies. The Monitors look forward to the day that 100% of staff are trained and knowledgeable about intoxication and withdrawal and can tell the difference between the two.  This provision will reach substantial compliance when all of the staff are trained per the consent decree, and this training is documented carefully.

The best measure of medical staff proper training in this area is performance of proper assessments using the withdrawal tools, CIWA a and b and COWS. The Wexford Standard Operating Procedure (SOP) for CIWA- A, CIWA- B, and COWS is to perform an assessment every 8 hours for 7 days, regardless of the score on the assessment tool. . For those in alcohol or benzodiazepine withdrawal, the first dose of benzodiazepine is to be administered within 4 hours of the patient's arrival to the facility and the identification of a risk of withdrawal. Per the SOP, patients cannot refuse assessments. Assessments must be performed by directly observing the patient. It is this Monitor's observation that the increased training and the emphasis on the proper assessment of patients in withdrawal has improved. The training and setting of expectations has resulted in improvements. The Monitor does not see evidence that the training module includes training on the SOP.

Only Registered Nurses should be performing CIWA, and COWs assessments. Currently, that is not the case. The jail is budgeted for four more registered nurses. More registered nurses are needed to conduct safe withdrawal monitoring. The SOP states that a provider will be immediately informed for worsening abnormalities of vital signs for two consecutive evaluations that are greater than a score of 8, or a COWS or CIWA scores greater than or equal to 16. In this Monitor's opinion, these numbers are too liberal. In other words, if a LPN measures a CIWA score of 8, it should not take another assessment



for that patient to be brought to a provider's attention.  LPNs performing the withdrawal tools on a patient must escalate to a registered nurse or provider upon obtaining worsening vital signs or increasing CIWA or COWs scores. This is common sense but belongs in the training materials. That withdrawal is a life-threatening condition is not only due to the physiology of withdrawal, but also the increased risk of suicide in patients in withdrawal from substances.   "Suicide is the leading single cause of death in jails, but the exact role of substance withdrawal in these deaths is difficult to quantify.  Risk for suicidal ideation and attempts is increased among individuals in substance withdrawal and those with an substance use disorder. Notably, individuals with Opiate Use Disorder (OUD) have a threefold higher risk for suicidal behavior than those without OUD. (*Guidelines for Managing Substance Withdrawal in Jail.*  June 2023.   Bureau of Justice Assistance; US DOJ and the National Institute of Corrections). This belongs in the training materials. The Monitor looks forward to further improvements in the teaching materials and is available to assist.

Opioid Withdrawal and the Wexford Health Guidelines:

The goal of this training is that 100% of learners will pass the posttest with a minimum score of 85%. Although this teaching slide deck is called opioid withdrawal, the first thirty slides have to do with intoxication with opioids and not withdrawal from opioids. This contributes to confusion on the part of the learner. Then the same slide deck switches into symptoms of withdrawal from alcohol.  (Someone who is drunk (intoxicated) is not in withdrawal. A person who is drunk could then go into withdrawal). Wexford has supplied this slide deck, and this slide deck should be revised. The need to improve the teaching slides has been pointed out in a previous Monitors' report. The training slides provided by Wexford should be clear and accurate.

Because of the critical importance of training in preventing morbidity (illness) and mortality (death), B .7. 1, parts 1, 2,3, 4, 5, 6, will be closely monitored and emphasized in the expectation that such focus will result in better patient care and safety.

***B.7.b. Provide medical screenings to determine the degree of risk for potentially life-threatening withdrawal from alcohol, benzodiazepines, and other substances, in accordance with Appendix B.***
Finding:

Partial Compliance



There is no Register Nurse assigned to IPC at all times. The IPC needs an RN at all times. The RN can provide leadership and supervise to the LPN in intake and can perform health assessments on the patients. The Monitors understand that this is the goal of the medical leadership. Until IPC has a registered nurse at all times, this provision cannot be in substantial compliance. Additionally, the screening should be performed with auditory privacy, an ongoing criticism for many years. This must be remedied as no individual can be expected to divulge private and sensitive information regarding substance use in the current physical setting that does not allow for auditory privacy. Until screening is private, medical screenings will not reliably determine the degree of risk for life threatening withdrawal from opiates or alcohol and therefore this provision cannot be substantially compliant.

***B.7.c. Ensure that the nursing staff complete assessments of prisoners in detoxification on an individualized schedule, ordered by a Qualified Medical or Mental Health Professional, as clinically appropriate, to include observations and vital signs, including blood pressure.***

<u>Finding:</u>

Partial Compliance

The Monitor sees improvement in the assessment of patients in withdrawal. Specifically, when a patient refuses, it is much more common to see documentation of direct observation of the patient's condition.  This is a testament to the power of education and reinforcement of expectations. The educators are making improvements. The director of nursing or designee will track all patients on withdrawal protocols and assure that the assessments are completed and in the electronic health record. The assessments will take place at 6 a.m., 2 p.m. and 10 p.m. for 7 days. The charge nurse assuring that all withdrawal assessments are completed timely is improving the care of these patient.

By policy, an emergent (within 2 hours) or urgent (within 24 hours) staff referral to Mental Health is to be entered into the electronic health record.  A medical provider must see the patient within 5 days. The Monitor does not find that patients on withdrawal protocols are examined by a provider within 5 days. There should be a provider assigned to the detoxification patients. The monitor does not find that patients on the detoxification protocols are assessed timely by a mental health professional.

<u>Suggestion:</u> Submit the documentation to demonstrate that providers are seeing patients on the detoxification protocols, within the 5 days.



***B.7.d. Annually, conduct a review of whether the detoxification training program has been effective in identifying concerns regarding policy, training, or the proper identification of and response to detoxifying prisoners. OPSO will document this review and provide its conclusions to the Monitor.***
<u>Finding:</u>

Partial Compliance

As stated above in B. 7. a., the training program is improving. The content of the training is improving. Wexford must improve the training slides, as stated above. The numbers of custody staff who undergo training must increase. The training of nurses in the SOP for withdrawal should be part of the training materials.

<u>Suggestion:</u> Develop a training module that the Monitor can review. The module for health care staff should specifically address the policies and practices expected with respect to escalation of care to a registered nurse, and the other practices that are expected of nurses doing detoxification protocols.

B. 8. a.  Partial Compliance

B. 8. b. Partial Compliance

***B. 8. a. OPSO shall ensure that medical and mental health staffing is sufficient to provide adequate care for prisoners' serious medical and mental health needs, fulfill constitutional mandates and the terms of this Agreement, and allow for the adequate operation of the Facility, consistent with constitutional mandates.***
<u>Findings:</u>

Partial Compliance

There continue to be challenges in securing and retaining adequate numbers of staff, including medical and mental health staff, to provide adequate care for inmates' serious medical and mental health needs. For example, there are insufficient staff to create and complete a multi-disciplinary treatment plan in the outpatient setting where all members of the treatment team are physically present with the inmate.

<u>Suggestion:</u> There needs to be adequate funding set aside to hire staff and ensure there is adequate, constitutionally mandated treatment throughout the entire facility, including facilitating consistent groups. The mental health provider needs to ensure an adequate request for necessary staff to conduct all required services throughout OJC/TMH/TDC. An independent staffing analysis is needed to determine the number of staff needed to meet expectations. Once this analysis is completed, the contractor and OPSO will know how many qualified staff are needed to complete much needed treatment planning throughout the facility. This includes having adequate staff to conduct safety/suicide watches,



especially while non-suicide resistant cells are still in use.  Ensure the MAT program is properly staffed for the number of patients being served and adequate staff are available for group programming.

***B.8.b. Within 90 days of the Effective Date, OPSO shall conduct a comprehensive staffing plan and/or analysis to determine the medical and mental health staffing levels necessary to provide adequate care for prisoners' mental health needs and carry out the requirements of this Agreement. Upon completion of the staffing plan and/or analysis, OPSO shall provide its findings to the Monitor, SPLC, and DOJ for review. The Monitor, SPLC, and DOJ will have 60 days to raise any objections and recommend revisions to the staffing plan.***
<u>Finding:</u>

Partial Compliance

There is no updated comprehensive staffing plan/analysis done to keep this provision in Substantial compliance. An independent staffing analysis is needed to determine a staffing plan moving forward.


<u>Findings:</u>

B.9.a.   Partial Compliance

B.9.b.   Partial Compliance

B.9.c.   Partial Compliance

B.9.d.   Partial Compliance

B.9.e.   Partial Compliance

B.9.f.   Non-Compliance

***B.9.a. OPSO shall develop, implement, and maintain a system to ensure that trends and incidents involving avoidable suicides and self-injurious behavior are identified and corrected in a timely manner. Within 90 days of the Effective Date, OPSO shall develop and implement a risk management system that identifies levels of risk for suicide and self-injurious behavior and requires intervention at the individual and system levels to prevent or minimize harm to prisoners, based on the triggers and thresholds set forth in Appendix B.***
<u>Finding:</u>

Partial Compliance

There continues to be use of non-suicide resistant cells at OJC for inmates at high risk of self-harm without proper direct observation in place. There continues to be deviation from the policy when the document prescribed for suicide watch is not utilized. There has been no documented collaboration to implement and maintain a system to ensure trends and incidents involving avoidable suicides and self-injurious behavior are identified and corrected in a timely manner. Identification of contraband is not immediately addressed which increases the risk of self-harm in the facility. Inadequate



searches of inmates present risk factors which increases the risk of self-harm. The newly created CAPs should help address the outstanding issues for this provision.

Suggestion: Analyze the trends and incidents involving avoidable suicides and self-injurious behaviors to determine required interventions, like CAPs for adequate searches and removal of contraband, at the individual and system levels to prevent or minimize harm to inmates, especially inmates with repeated suicidal or self-harming behaviors. Ensure that any inmate who is not in a suicide resistant cell, especially in IPC, is under Direct Observation and that Observation Worksheets are accurately completed. Document and demonstrate the collaborative efforts between OPSO and Wexford to maintain a safe system.

**B.9.b. The risk management system shall include the following processes to supplement the mental health screening and assessment processes: incident reporting, data collection, and data aggregation to capture sufficient information to formulate a reliable risk assessment at the individual and system levels; identification of at-risk prisoners in need of clinical treatment or assessment by the Interdisciplinary Team or the Mental Health Committee; and development and implementation of interventions that minimize and prevent harm in response to identified patterns and trends.**

Finding:

Partial Compliance

Without collaboration between OPSO and Wexford, there can be no adequate risk management system in place for the facility. Both parties are necessary to submit and capture data which is analyzed in order to formulate a risk assessment to minimize harm. Simply having a meeting where one side offers information is not collaboration. These meetings should be where information is shared after collaborating and having a joint mission moving forward. There continues to be no functional Interdisciplinary Treatment Team operating consistently in general population to address formulating a reliable risk assessment or timely follow up treatment plans to address risk. There is limited to no mental health involvement prior to the implementation of the disciplinary process. Segregation is known as a risk factor which negatively interferes with inmates with mental health challenges. Further analysis is needed to ensure processes are in place to address individual and systemic risk levels, especially surrounding risks involved with segregation.

Suggestion: Analyze and provide COLLABORATIVE documentation of risk management system processes, including listed criteria, which minimize and prevent harm in response



to identified patterns and trends. This examination should include the need for functioning interdisciplinary treatment teams throughout the Facility who are focused on treatment strategies to minimize risk including adequate out-of-cell time and participation in the disciplinary process at the outset where a written recommendation can be completed and used to determine appropriate action. All parties have a part to play in decreasing risks and there should be intentional efforts to ensure that collaboration is happening and not just having one side sharing information at a monthly meeting. The newly created CAP should assist with improving the continued deficiencies with this provision reaching substantial compliance.

*B.9.c. OPSO shall develop and implement an Interdisciplinary Team, which utilizes intake screening, health assessment, and triggering event information for formulating treatment plans. The Interdisciplinary Team shall:*

*1. include the Medical and Nursing directors, one or more members of the psychiatry staff, counseling staff, social services staff, and security staff, and other members as clinical circumstances dictate;*

*2. conduct interdisciplinary treatment rounds, on a weekly basis, during which targeted patients are reviewed based upon screening and assessment factors, as well as triggering events; and*

*3. provide individualized treatment plans based, in part, on screening and assessment factors, to all mental health patients seen by various providers.*

<u>Finding:</u>

Partial Compliance

There continues to be no consistent, functional multidisciplinary teams operating in person at OJC. It continues to be the expectation that all inmates on the behavioral health caseload have a multidisciplinary treatment plan. The treatment plans generated by TMH are adequate to address the needs of the patient. The vast majority of treatment plans are not updated in a timely manner, if done at all.

<u>Suggestion:</u> Continue to generate and complete treatment plans in TMH. Create a plan/template for how treatment plans will be conducted and completed, including time frame, with a multidisciplinary team in all areas outside of TMH. Continue to work on the staffing plans and staffing needs, preferably with an independent staffing analysis, in order to have multidisciplinary treatment team meetings throughout the facility. Follow the prescribed policy and include all that is necessary for a completed treatment plan.

*B.9.d. OPSO shall develop and implement a Mental Health Review Committee that will, on a monthly basis, review mental health statistics including, but not limited to, risk management triggers and trends at both the individual and system levels. The Mental Health Review Committee shall:*



*1. include Medical and Nursing Director, one or more members of the psychiatry staff and social services staff, the Health Services Administrator, the Warden of the Facility housing the Acute Psychiatric Unit, and the Risk Manage;*
*2. identify at-risk patients in need of mental health case management who may require intervention from and referral to the Interdisciplinary Team, the OPSO administration, or other providers;*
*3. conduct department-wide analyses and validation of both the mental health and self-harm screening and assessment processes and tools, review the quality of screenings and assessments and the timeliness and appropriateness of care provided, and make recommendations on changes and corrective actions;*
*4. analyze individual and aggregate mental health data and identify trends and triggers that indicate risk of harm;*
*5. review data on mental health appointments, including the number of appointments and wait times before care is received;*
*6. review policies, training, and staffing and recommend changes, supplemental training, or corrective actions.*

Finding:

Partial Compliance

Until there is a functioning Interdisciplinary Treatment Team assigned to OJC, there will be limitations in being able to adequately address at-risk patients in need of mental health case management who may need a referral from the Mental Health Review Committee. Until there is timely follow up for treatment plans, based on the clinical schedule, limitations will continue in adequately addressing treatment needs. There also needs to be more collaboration between OPSO and Wexford for this provision to move into substantial compliance. The bulk of the work cannot be done by one party and presented to the other party but both parties need to be working together from the outset to help minimize risk and review the delivery of services by the system.

Suggestion: Create and implement an Interdisciplinary Treatment Team for OJC. Ensure treatment plans are done as per policy throughout the entire facility including 2A/2B/3E. TDC also has individuals in need of mental health treatment and should have treatment plans directing their care. Provide documentation of Mental Health Review Committee meetings, where COLLABORATION is taking place in both organizing and documenting findings, addressing all listed elements, including analysis of all data collected. This data should address and track systemic concerns as well.

*B.9.e. OPSO shall develop and implement a Quality Improvement and Morbidity and Mortality Review Committee that will review, on at least a quarterly basis, risk management triggers and trends and quality improvement reports in order to improve care on a Jail-wide basis.*
*1. The Quality Improvement Committee shall include the Medical Director, the Director of Psychiatry, the Chief Deputy, the Risk Manager, and the Director of Training.*
*2. The Quality Improvement Committee shall review and analyze activities and conclusions of the Mental Health Review Committee and pursue Jail-wide corrective actions. The Quality Improvement Committee shall:*



*a. monitor all risk management activities of the facilities through the review of risk data, identification of investigation or corrective action; and*
*b. generate reports of risk data analyzed and corrective actions taken.*

Finding:

Partial Compliance

This provision again requires collaboration between OPSO and Wexford to achieve substantial compliance. There needs to be the implementation of a quality improvement process where risk management triggers and trends are reviewed throughout the entire system and both parties work together to improve care at the facility. The Monitor is looking for OPSO input into joint meetings and a work product that shows how both parties are working together to establish a safer facility.

Suggestion: Jail-wide corrective actions plans have been created and the hope is they will foster collaborative efforts between OPSO and Wexford for all risk management activities to be properly monitored. COLLABORATION is a key component of this provision as it focuses on jail-wide CAPs. Provide documentation to support the implementation of collaborative corrective action plans for areas which have been identified for improvement like alerting mental health to planned use of force, access to care challenges, medication refusal, timely access to laboratory services after inmate refusal, the grievance process and chronic medical care access. Provide documentation of attendance and addressed topics for the quarterly meetings along with proposed action items which will be pursued on a COLLABORATIVE basis. Demonstrate how collected and analyzed data is being used to effect positive change throughout the system.

*B.9.f. OPSO shall review mortality and morbidity reports quarterly to determine whether the risk management system is ensuring compliance with the terms of this Agreement. OSPO shall make recommendations regarding the risk management system or other necessary changes in policy based on this review. The review and recommendations will be documented and provided to the Monitor.*

Finding:

Non-Compliance

The monitor has yet to receive any quarterly report from OPSO, as specified in this provision, addressing the risk management system (not just the M&M documentation or meetings) or making recommendations for necessary changes. The Monitor expects a joint analysis with clear OPSO contributions at the next site visit regarding mortality and morbidity.



<u>Suggestion:</u> Provide OPSO recommendations regarding the risk management system. This recommendation should be reviewed by Wexford and there should be a collaborative effort in correcting identified areas of concern. Submit all the information to demonstrate changes which have been made to address identified risk management issues throughout the jail facility. Provide the most recent report from OPSO to determine whether there is compliance with the terms of this Agreement. Provide corrective actions plans which have been created and implemented over the year along with the effectiveness of the proposed changes. If there are gaps or effectiveness is determined to be minimal, submit updated CAPs to address this.

**C.    Medical Care**

**Overview:**

The Monitors visited the jail from December 15-19, 2024.  There is a new regional site physician, and that person will be present on the next site visit in July 2025.

Constitutional Care: There should be a provider available in the jail 24/7 to provide face-to-face assessment of patients. The number of providers, one Nurse Practitioner and one physician puts OPSO non-compliant with the provision for providing adequate constitutional care. Fortunately, after this reporting period, two more providers have been hired. This is good progress. Unfortunately, the weekend coverage is covered by a provider who works prn, meaning many times on weekends and after hours during the week, there are no providers in the jail to see patients. There is no telehealth. So, after hours, there is no one in the jail to make a diagnosis. The previous provider provided telemedicine to meet the requirements for 24 /7 coverage by having telemedicine after hours. Hiring more providers and 24-hour coverage for a jail of this size and complexity is expected for substantial compliance.   Currently 6 full time Licensed practical nurses (LPN) and four registered nurses are needed.

Diversion: September 2024 numbers showed an upswing in diversion of medication administered as part of the medication assisted treatment program for opioid use disorder (MAT). Having observed the administration of the medications in the MAT program, the patients are released to the pod too quickly and the mouth checks are cursory if at all. Because mouth checks are inconsistently enforced, patients are able to hoard medicine. One patient was found with 30 metformin on his person. Thirty



metformin will result in a lethal ingestion, unless intensive care and in many cases, hemodialysis is performed in the hospital.

Dental Care: There are still over 100 outstanding dental requests. As the number of patients seen each day is about 5 or 6, one dentist four days a week is inadequate to meet the demands of the patients for dental care.

Medication Assisted Treatment (MAT): The Health Services Administrator Johnson was looking for a provider to staff the MAT program.  In August 2024, there were 104 patients on the wait list and 45 patients were on the MAT program. There are long waits for the MAT program and the program is under resourced.

Withdrawal Monitoring: The time studies for the administration of medications to individuals on the CIWA protocol demonstrated that patients received the first dose of medication on time about 50% of the time.  This was mostly due to nursing error or delay, and occasionally due to prolonged booking times.

Medication Administration: The CQI process study conducted in October 2024 recognized an increased number of missed or refused medication doses. Reasons for this included medication errors, insufficient oversight and monitoring. Certain shifts and staff members were found to have a higher rate of missed doses. There will be another quality study in three months to see the effectiveness of the corrective action plans.

Sick call: The Wexford nursing sick call process requires the med pass nurse to collect sick call requests during med pass. This process is not consistent.  Each of these sick call requests should be reviewed for urgent or emergency complaints.  Each emergent or urgent sick call request must be addressed and reported to the charge nurse immediately. The med pass nurse is to create a sick call task in the electronic medical record. The day shift should make every effort to complete sick calls during their shift. One med pass nurse told me that she does not want to go on the tier, and she does not have to administer medication as most patients can come to the interlock for their medications. However, the CAP requires the med pass nurse to go on the tier and collect the sick call requests. The CQI process study from October correctly identified that sick call is not functioning effectively. Face to face encounters are not timely. Nursing protocol forms or progress notes are not being consistently completed or maintained during the sick call process. The sick call log will be reinstated. The Sick call CQI will be repeated in



three months; February 2025.

Documentation: Poor documentation plagues the electronic medical record, and this is recognized in the CQI studies. The absence of documentation of SOP, medication reconciliation, writing "see NP note" as a substitute for a nursing encounter note, no medical decision-making notes, this charting is very poor, as is the new electronic health record. Suddenly the fundamentals of medical record keeping, a coherent timeline and the medical decision making, is completely absent. The only exception to this rule is when the physician writes a summary under chart notes. This is a very good practice and should be present in each chart.

Morbidity and Mortality (M&M) Reporting: The policy and procedures for morbidity reports and mortality reports have not been provided to the Monitors. .  The following are examples of patients who should have been the subject of a complete morbidity review.  There is no written documentation provided to the monitors summarizing the M and M reviews

Morbidity#1:

On September 3, 2024, a mental health patient jumped from the mezzanine balcony and landed on his feet and back.  The patient was sent to the University Medical Center. There he underwent eight CT scans as part of the trauma work up. All were negative. Upon return to the jail, the patient was evaluated by a Nurse Practitioner.  This provider ordered an x-ray of the spine, although the patient had already had CT scan of the entire spine. The patient told the nurse practitioner that he was concerned that deputies were going to try and kill him. He did not comment when the nurse asked him if he was suicidal. Before jumping off of the balcony, he submitted health service requests August 5, 12, 23, 2024. He was referred to a psychiatrist once. One request had no response at all. After jumping off of the balcony, he was added to the psychiatry case load on September 26, 2024, by the NP. This referral expired so he was added to the case load again on December 15, 2024, and again on December 18, 2024, by the compliance manager.

This case needs a formalized morbidity review and a written assessment of the case. This patient came up in a MAC meeting. It was said that there would be a review of spinal precautions and what to do for "man down".



Morbidity #2:

This patient put in sick call requests for a worsening infection in his leg, The sick call on August 30, 2024, read "my leg is swollen and hot and I can barely walk." There was no response to this sick call request in the record, but the bottom of the sick call request was dated and signed at 6:15 p.m. The sick call on September 2, 2024, read "the Tylenol doesn't work well on me can it be changed to Naprosyn or ibuprofen?" There was no response in the medical record to this sick call request. On September 3, 2024, the patient stated that his leg condition is getting worse. "It's swollen double now." The patient was sent to the hospital on September 4, 2024, and discharged on September 6, 2024. There is no record of what happened as a response to each of these sick calls. There is not provider assessment. There is no morbidity review of this patient. A written morbidity review would answer the questions; what was going on with this patient for his 3 sick calls requests? What happened?

Morbidity #3:

This man presented to UMC from the jail on April 9, 2024. He had a terrible rash. He went to the Intensive Care Unit. There is one note on April 4, 2024. This note describes blisters and sores. The provider diagnosed syphilis versus herpes. Two days later, the patient was in the ICU. The reaction was an allergy to Penicillin. The condition was called Steven Johnson Syndrome. People die of this. Where is the morbidity report? What was learned from this case? Did the patient get seen timely? Why was the patient on Penicillin? This patient needs a formal Morbidity report. In the MAC meeting, a ranking member expressed surprise that a few blisters got worse, and the patient was in the intensive care unit.  Without a morbidity review, of substance, nothing has been learned here. This patient needs a morbidity review, and the staff needs to learn something from this case. The documentation needs to be reviewed and improved.

Morbidity #4:

This patient returned from the hospital on the weekend. He had been hospitalized for a reaction called angioedema, a potentially life-threatening reaction to a class of medicine prescribed to treat high blood pressure. The patient went to bed asymptomatic and woke up around 2 a.m. and felt problems with swelling around the face. He was sent to the ER and admitted for 2 days. He was discharged from the hospital on September 28,



2024, a weekend. His hospital return evaluation was delayed until October 1, 2024. Then he was seen as a chronic care visit, returning from hospital. This case needs review. Why did the patient not get evaluated upon return from the hospital on a Saturday? Where is the documentation of the series of events that resulted in the patient being sent to the ER?

Improvements:

The chronic care list has been reduced. Repetition of tasks that resulted in one patient repeatedly showing up on the chronic care list is getting sorted out. The medical team is to be complimented on the improvement. Transportation to off-site visits is improved with better coordination with custody and medical. Another improvement is in the process of nurses obtaining signed refusals when a patient refuses something. This is a culture change. During the site visit, the nurses went back to those individuals who refused medication and talked with that person. The culture change is that nurses no longer dismiss a patient who refuses. This is a work in progress.

Health Assessments:

Due to the nursing shortage, a registered nurse who was always in intake (IPC), is no longer consistently present in intake. One of the tasks of this nurse was to complete the 14-day Health Assessments. For the first time, the timeliness of the Health Assessments has fallen off. However, as there are two newly hired providers at the time of this report, patients will hopefully again receive timely health assessments.

*C. OPSO shall ensure constitutionally adequate treatment of prisoners' medical needs. OPSO shall prevent unnecessary risks to prisoners and ensure proper medication administration practices. OPSO shall assess on an annual or more frequent basis whether the medical services at OPP comply with the Constitution. At a minimum, OPSO shall:*

*1. Quality Managing of Medication Administration:*

*a. Within 120 days of the Effective Date, ensure that medical and mental health staff are trained on proper medication administration practices, including appropriately labeling containers and contemporaneously recording medication administration.*

*b. Ensure that physicians provide a systematic review of the use of medication to ensure that each prisoner's prescribed regimen continues to be appropriate and effective for his or her condition.*

*c. Maintain medication administration protocols that provide adequate direction on how to take medications, describe the names of the medications, how frequently to take medications, and identify how prisoners taking such medications are monitored; an*

*d. Maintain medication administration protocols that prevent misuse, overdose, theft, or violence related to medication.*

C. 1. a. Partial Compliance



C. 1. b. Partial Compliance

C. 1. c. Substantial Compliance

C. 1. d. Partial Compliance

C. 1. a.

Finding:

Partial Compliance

There continue to be variances. During the site visit, one nurse took a 20 mg propranolol pill and broke it in half in order to provide the patient with the dose. In many instances, the variance was that the pill was not on the cart.  In other examples, other medications required two pills instead of one pill to get the correct dose. This raised questions for the patients. They wanted to know why they were getting two pills when they normally received one. One patient had an expensive chemotherapy drug approved but never received it. The jail kept waiting for it to come. By the time it arrived, the patient had died of her cancer. The patient had a lethal cancer. This variance should lead the pharmacist to investigate the reason for the delay.

This provision could come into substantial compliance with more oversight and involvement of the pharmacist.

C. 1. b.

Finding:

Partial Compliance

The primary area of focus to bring this into substantial compliance should be the control of diabetes, the treatment of sickle cell disease and the control of pain, and proper treatment of withdrawal syndromes.

C. 1. c.

Finding:

Substantial Compliance

The medication protocols are present but the adherence to the protocols is uneven. There should be a consistent method of recognizing and reporting errors and variances.

C. 1. d.



Finding:

Partial Compliance

Overdoses, hoarding of medication, and diversion of medication are common. Custody staff do not do mouth checks. In fact, watching med pass, custody did not do one mouth check. Nurses doing med pass do not do them either. The Monitor believes that an effective mouth check policy has one person responsible for the mouth check and that is the deputy. Now that the medication administration is in the interlock, the deputy is better able to control what is happening and to do a proper mouth check.

*C.2.a. Provide the Monitor a periodic report on health care at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. Each report will include:*
  *(1) number of prisoners transferred to the emergency room for medical treatment related to medication errors.*
  *(2) number of prisoners taken to the infirmary for non-emergency treatment related to medication errors.*
  *(3) number of prisoners prescribed psychotropic medications.*
  *(4) number of prisoners prescribed "keep on person" medications; and*
  *(5) occurrences of medication variances.*
*C.2.b. Review the periodic health care delivery reports to determine whether the medication administration protocols and requirements of this Agreement are followed. OPSO shall make recommendations regarding the medication administration process, or other necessary changes in policy, based on this review. The review and recommendations will be documented and provided to the Monitor.*


Findings:

C. 2. a.  Partial Compliance

C. 2. b. Partial Compliance

Finding:

C. 2. a. Partial Compliance

It is primarily the reporting of medication variances that causes this section to be partial instead of substantial compliance.  Errors involving the "five rights" of medication administration; the right patient, the right drug, the right dose, the right route, and the right time. The quality improvement team has identified a need for improved documentation of medication variances.

Finding:

C. 2. b. Partial Compliance

There continues to be no enforcement of mouth checks. One patient hoarded 30 metformin pills. Recently there have been increased diversions on the MAT program. This can



only be explained by the Monitor's observations of the medication administration. Mouth checks are the exception not the rule. These should be enforced by custody personnel. As a matter of fact, on the most recent visit, there were no mouth checks. One area of improvement is that custody staff are more available to accompany and provide security to medication pass nurses.

***3.a. OPSO shall notify Qualified Medical or Mental Health staff regarding the release of prisoners with serious medical and/or mental health needs from OPSO custody, as soon as such information is available.***

***3.b. When Qualified Medical or Mental Health staff are notified of the release of prisoners with serious medical and/or mental health needs from OPSO custody, OPSO shall provide these prisoners with at least a seven-day supply of appropriate prescription medication, unless a different amount is necessary and medically appropriate to serve as a bridge until prisoners can reasonably arrange for continuity of care in the community.***

***3.c. For all other prisoners with serious medical and/or mental health needs who are released from OPSO custody without advance notice, OPSO shall provide the prisoner a prescription for his or her medications, printed instructions regarding prescription medications, and resources indicating where prescriptions may be filled in the community.***

***3.d. For prisoners who are being transferred to another facility, OPSO shall prepare and send with a transferring prisoner, a transition summary detailing major health problems and listing current medications and dosages, as well as medication history while at the Facility. OPSO shall also supply sufficient medication for the period of transit for prisoners who are being transferred to another correctional facility or other institution, in the amount required by the receiving agency.***

Findings:

C. 3. a. Substantial compliance

The medical provider is aware of pending releases and consistently provides medication or a prescription.

C. 3. b. Substantial compliance

Upon release, the patients are provided with at least a seven-day supply of their prescription medications.

C. 3. c. Substantial compliance

There is good coordination of custody and the medical provider resulting in good compliance with providing medication prescriptions on release.

C. 3. d. Substantial compliance

The facility does provide the necessary information to the receiving correctional facility. Please add an updated quality improvement study addressing this provision.

**IV.    D. 1. Sanitation and Environmental Conditions**

Findings:

D.1. a.   Partial Compliance

D. 1. b.  Partial Compliance



D. 1. c.  Partial Compliance

D. 1. d.  Partial Compliance

D. 1. e.  Partial Compliance

D. 1. f.  Partial Compliance

D. 1. g.  Substantial Compliance

D. 1. h.  Substantial Compliance

***IV. D. 1. a. OPSO shall provide oversight and supervision of routine cleaning of housing units, showers, and medical areas. Such oversight and supervision will include meaningful inspection processes and documentation, as well as establish routine cleaning requirements for toilets, showers, and housing units to be documented at least once a week but to occur more frequently.***

<u>Finding:</u>

Partial Compliance

<u>Observations:</u>

The Monitor physically inspected every occupied housing unit in the OJC and TDC/TMH facilities. The Monitor also interviewed the OPSO Sanitarian and Environmental Officer as well as inmates and staff during the inspection. Section D.1.a. is upgraded to partial compliance based on the following observations.

The Monitor observed the overall level of cleanliness and sanitation in the TDC housing units to be generally acceptable with some specific exceptions to include showers in TDC and TMH. Otherwise, the cleanliness and sanitation of the TMH housing units was again found to be very good, including the appearance of the individual cells and janitor closets with some minor exceptions.  Cleaning equipment was improperly stored in several TMH/TDC units as well as a few areas in OJC.

The signs of insect infestation (ants and drain flies) noted during the previous inspection of the TDC housing units were observed to be substantially less than noted during Tours #19 and #20. However, there was evidence of drain flies in several OJC pods, particularly the open dormitories where inmates continue to launder their own clothing by hand and hang/drape the items on tables and rails throughout the unit(s). The sanitation/maintenance issue that has been noted repeatedly in and around janitor closet E205 (leak) was noted again. OPSO attempted to remedy the TDC inmate shower floors by applying an epoxy paint which was unsuccessful and subsequently had a contractor install a superior epoxy system. A subsequent drain repair effort resulted in



saw cuts to the shower floor in one TDC unit. The cuts have not been repaired and prevent the property cleaning and sanitation of this particular shower as the cuts hold water, soap scum and debris.

During the walk-through of the OJC facility, the Monitor noted that all circulation areas of the facility to be clean and generally well-kept to include the medical areas and dentist's office. The Monitor observed the overall cleanliness in the OJC open dorms as well as pods with individual cells to be improved in the dayrooms, showers and recreation yards. Cleanliness in the cells continues to be inconsistent. The Monitor noted several inmates in pods on each floor complained of a lack of cleaning supplies and/or the lack of cleaning supplies provided to the cell occupants. This was particularly noted in OJC 3C where the inmates are locked down and cannot pass supplies between them. Issues such as trash, debris, dirty floors, dirty windows, soaped windows, spilled food/milk, hoarded items, etc. were notably improved from past inspections.

The Monitor reviewed the "Logbook Audit" snapshots that were provided by the Sanitarian. The photos of the pod control logbook entries for each floor of OJC covered a random day from each month of the reporting period. The entries reflected few, if any, notations by security staff as to the provision of cleaning material/time in the pods. The Monitor recommends OPSO routinely document these activities in the pod control logbooks or develop a consolidated form, by shift, requiring staff sign-off for all days in a given month for ease of monitoring.

OPSO implemented a targeted cleaning program as of April 2024 primarily focused on the deep cleaning of pod showers and other common areas in the pod either not accessible by the pod inmates or generally not addressed by the pod inmates/security staff. The stated goal was weekly cleanings in all pods. OPSO provided documentation generated by the Sanitarian noting the routine provision of cleaning supplies to each floor for security staff/inmate use. The Sanitarian submitted weekly memos throughout the rating period validating the shower and pod cleaning activities documented by the individual leading the inmate work crews on the "Pod Cleaning Form". The documentation reflected that the staff member assigned was able to deep clean the pod showers once a month during the rating period, with a few pods addressed twice in a given month. While a significant effort and a notable improvement over previous



inspections, the Monitor is of the opinion that this effort in its current form is not sustainable. Currently, there is only a single staff-member assigned to this program and when this person is not present for duty (days off, training, vacation, etc.), the cleaning tasks are not accomplished. For example, the Pod Cleaning Form for September notes the staff member's absence due to the weeklong required training.

The Monitor also reviewed the Sanitarian's weekly and monthly inspection documentation. The forms generally reflected the Monitor's observations during the inspection. Improvement was noted in most pod common areas, with notations for cleanliness, clutter, and trash observed primarily in individual cells, but also some showers and dayrooms.

The Monitor also reviewed the "Monthly Environmental Inspection Report" summaries performed by the OPSO Environmental Officer for the entire rating period. The Environmental Officer's observations were consistent with that of the Monitor's during the December site inspection to include dirty showers, drain flies, draped clothing, cell trash and clutter in most pods. The Monitor echoes the Environmental Officer's recommendation in each monthly report that the pod inmates be provided with adequate supplies and time to clean their pods and cells on a daily basis.

Another area of concern was the Monitor's observation of several torn and altered mattresses in several cells throughout OJC. Torn and missing mattress covers cannot be properly sanitized. While OPSO has significantly improved its efforts towards locating and replacing damaged mattresses, it was apparent that some of these issues were either missed or ignored by security staff.

Security staff should also be documenting their own sanitation inspections daily, noting the condition of the pods and cells before and after inmates are allowed to clean their areas. OPSO provided documentation of these inspections only for a two-day period in October 2024. OPSO leadership is strongly encouraged to emphasize the performance and documentation of these inspections. OPSO provided documentation of training provided to security staff on the use of the forms and the importance of the required inspections.

As noted previously, the OPSO practice of consolidating all cleaning supplies outside of the units has continued over the last four inspections and inmate access to the



unit janitor closets remains restricted according to staff. The Monitor again observed a few spray bottles and other cleaning equipment in individual cells and in the dormitory housing units. This indicates that Security staff continues to have issues maintaining accountability for the supplies.

Based on the above and the observed conditions of the OJC pod cells, shower and common areas, and recognizing the progress of the new cleaning program, the Monitor is raising the Non-Compliance rating to Partial Compliance.

The Monitor observed relatively few inmate housing cells with obstructed air supply vents with only one pod "failing" the inspection item for half or more of the cells having blocked supply registers. Blocked supply registers present a code violation as it relates to ventilation and the number of required air exchanges per hour in rooms with toilets, the correctional environment presents unique challenges in maintaining this aspect of compliance. The continued observance of a significant number of return air grills to have substantial burn/smoke damage resulting from inmates lighting paper "wicks" and then inserting them into the return grills to keep them lit for extended periods. This allows the inmates to keep an ignition source available for smoking contraband materials. The Monitor again recommends the cleaning/painting of the grills so that new damage can be readily identified and the disciplinary process applied to the inmate occupant of the cell. This damage also occurs in open dorm units in the upstairs areas on the walls and floors. The Monitor noted that few of the dayroom return air registers to be excessively dirty; an improvement over the last inspection. The Monitor recommends Maintenance staff perform such cleanings as a part of the preventive maintenance program to inhibit the collection of dust and lint and, and the growth of mold.

As noted in previous inspections, numerous cells were observed to have lights covered, home-made clotheslines strung across the cells, cloth "ropes" used to manipulate food pass doors, extra blankets used as carpeting on the cell floors, and numerous altered clothing items, to name a few of the issues. A new item of note was torn cloth and plastic bag material being wrapped tightly around the top of the cell doors allowing inmates to affix "curtain" material to the door and obstructing the view into the cell. This contraband was very obvious to the Monitor and was apparently being ignored



by the Security staff present.

The documentation and interviews again reflected the Sanitarian and Environmental staff's efforts at maintaining consistent and regular cleaning schedules for circulation areas. The trial period whereby civilian janitorial staff were managed by the Sanitarian ended with the staff no longer providing services in secure areas.

As noted in the previous report, the number of grievances regarding sanitation issues remained relatively low during the rating period. Inmate reports via grievance of inadequate or missing cleaning supplies and clothing issues were few in number.

The regular provision of clean inmate clothing and bedding and an appropriate inventory of these supplies are essential to sanitation, infection control and disease prevention. The Sanitarian reported that the exchange of inmate uniforms (weekly), sheets (weekly) and blankets (monthly) has continued to adhere to the regular schedule and the inventory for these items was sufficient for scheduled exchanges. The Monitor did not receive any verbal complaints from inmates about the laundry exchange during this tour, however, the laundering of the inmates' personal clothing is still a work in progress as evidenced by the observed draping of self-laundered clothing.

The Monitor noted the continued hoarding and altering of issued clothing items, mattresses and blankets continues to be an issue. There were several instances of altered clothing (homemade "hoodies", sewn on designs, and clothing used for other than its intended purpose) which is of particular concern as it destroys the clothing item and precludes reissuance to another inmate thus decreasing stock levels prematurely. The security staff's apparent indifference to this issue continues to concern the Monitor.

The Monitor again noted that the chronic maintenance issues with washers and dryers have essentially been remedied by removing the equipment from all but a few select lockdown units and an "honors" unit where inmates earn additional privileges with good behavior.

In specific regard to Item 7 of the June 17, 2024 Stipulation and Order by the Court, copied below, the Monitor found the following conditions as of the date of the inspection:

- OPSO has developed and implemented a cleaning program as required by the Order, but documentation did not reflect that the cleanings were being



performed weekly according to the Order. Deep cleaning of the pods and adjacent areas were shown to be occurring monthly in most cases.

- Documentation submitted for the required weekly inspections effectively started mid-way through the rating period but was incomplete with only one to three weeks of a given month/area showing a documented inspection. The Monitor noted that for the inspections completed, the documentation appeared to be comprehensive for all areas of concern. (OPSO did provide documentation of a disciplinary action for one supervisor for failing to complete the weekly inspection.)

- A description of the cleaning program was provided to the Monitor as required.

> *7. Sanitation and Environmental Conditions (§ IV.D.1). Within 60 days, OPSO shall develop and implement a cleaning program to ensure that all housing units, including common areas, day rooms, restrooms, and shower areas, are cleaned at least once per week. The date of the weekly cleanings shall be documented by OPSO staff, and all housing units shall be inspected at least once a week by a security or cleaning supervisor to ensure compliance. A description of the cleaning program, and documentation of its implementation, shall be sent to the Monitor and Plaintiffs. Updates to the cleaning program must be submitted to the Plaintiffs and Monitor each monitoring cycle.*

Finding:

Partial Compliance

**IV. D. 1. b. Continue the preventive maintenance plan to respond to routine and emergency maintenance needs, including ensuring that showers, toilets, and sink units are adequately installed and maintained. Work orders will be submitted within 48 hours of identified deficiencies, or within 24 hours in the case of emergency maintenance needs.**

Finding:

Partial Compliance

Observations:

As with previous inspections, the Monitor reviewed the Sanitation and Environmental Conditions report, the OPSO Preventive Maintenance Plan, the Preventive



Maintenance Schedule Summary report, and a Preventive Maintenance work orders status report as well as inmate grievances related to maintenance issues. The Monitor also interviewed and toured portions of the facility with the new Maintenance Director. The documentation reflected an on-going preventive maintenance program for major building systems and components consistent with OPSO policy and the Consent Judgment. Preventive maintenance continues to be a challenge due to deferred maintenance, staffing and budget constraints. For example, water system equipment (boilers/heaters) necessary for the upcoming Phase III expansion had been left offline and in disrepair for several years. These systems are under repair.

Through the Monitor's personal observations and individual inmate interviews conducted during the walk-thru in each housing unit, the Monitor again observed a significant number of issues regarding water, electric or HVAC services in individual cells that were not addressed in a timely fashion, possibly due to a lapse in reporting by security staff and/or Maintenance staffing issues. The issues primarily involved water pressure issues at the restroom sinks in open dormitory pods and in individual cells and inoperable shower heads, toilets and urinals throughout OJC and TDC/TMH. Pod 3W had a measured water temp of 150 degrees at the shower heads and pod 4E had leaving-water temp settings at the hot water heater of 140 degrees. These are well above the recommended 120 degrees for hot water accessible to inmates and presented a safety hazard. The TMH pods as well as OJC were found to have acceptable warm water availability and temperatures. Given the number of additional inmates being housed in these areas, the reliable operation of these systems becomes even more important.

The current work order system and building automation system (BAS) are limited in their reporting capabilities, and OPSO staff are working to upgrade the BAS. The Monitor recommends OPSO Maintenance supervisors give considerable attention to this issue and utilize the work order data to periodically audit other maintenance/trade categories.

A review of the Maintenance-related grievances noted an increasing trend in the number of such grievances during the rating period, although the 2-year trend still reflects an overall decline in the number of grievances. The Monitor recommends Maintenance staff review the grievances to identify any significant grouping of issues by



type and/or location in order to mitigate the upward trend in the last three months of the rating period.

While work orders appear to be submitted in a timely manner is required by the Consent Judgment ("Work orders will be submitted within 48 hours of identified deficiencies, or within 24 hours in the case of emergency maintenance needs"), there is insufficient information to correlate deficiencies identified in daily pod inspections with work orders submitted. The Monitor recommends OPSO randomly sample the inspection reports vis-à-vis actual work orders to provide documentation as to the timely submission of work orders as the timely follow-on repair actions are essential.

The Monitor observed a significant number of broken cell door windows, primarily in lockdown OJC units, that need immediate replacement. The Monitor observed the vandalized light switches in pod interview rooms noted in the previous report had been substantially addressed, however several loose wires, broken outlet covers, and live circuits were again found in several OJC pod interview rooms and housing units posing a significant hazard to the inmates attempting to ignite materials for smoking or other unauthorized purposes. The Monitor provided guidance to the new Maintenance Director as to acceptable outlet box covers, security screws, and ready-replacement window material for temporary repairs while awaiting the installation of the security glass. The Monitor also noted several cell doors in OJC 3B and 3D that had been purposefully vandalized to prevent staff from securing the doors (bent hinges) and the damage was obvious. The Monitor was unable to determine if an emergency work order had been placed, but it appeared as if the damage had existed for several days.

This section remains in partial compliance.

***IV. D. 1. c. Maintain adequate ventilation throughout OPSO facilities to ensure that prisoners receive adequate air flow and reasonable levels of heating and cooling. Maintenance staff shall review and assess compliance with this requirement, as necessary, but no less than twice annually.***

<u>Finding:</u>

Partial Compliance

<u>Observations:</u>

As noted in previous tours, adequate air flow is maintained in the facilities but continues to be impeded in inmate cells when inmates block the air vents.  While the Monitor noted the number of cells with blocked supply registers did not exceed 50% in all



but one OJC pod, the issue is still of concern. Compliance in this area remains an inmate supervision issue and must continue to be addressed by security staff consistently. The Monitor noted that the majority of housing dayrooms and cells to be at relatively reasonable levels of heating and cooling and that inmates again reported a fewer number of cell clusters with low or no airflow and higher temperatures in various units in OJC. TDC Unit 4E was fully occupied and uncomfortably warm with a humidity level of 58%. The OPSO staff present were advised.

The following, regarding test and balance reports, is restated from previous reports. As noted in the previous reports, test, and balance reports for the Kitchen/Warehouse (2014), OJC (2017) and TDC (2012) were the latest available to the Monitor.

Prior to the September 2019 report, this section had been interpreted as requiring comprehensive "test and balance" assessments on a semi-annual basis. Such assessments are very expensive and typically performed only during the commissioning of new or replacement HVAC systems. The Monitor has consistently requested OPSO provide reports from the Building Automation System (BAS) covering the inspection period which would reflect the actual air temperatures in the units and cells on a continuous basis. The BAS controls the heating and cooling throughout all occupied areas in OJC, and the reports would be used to verify the system's performance as well as the maintenance response to routine and emergency situations requiring service or replacement of the HVAC components. The previous Maintenance Director failed consistently to provide the requested information.

With the on-boarding of the new Maintenance and Operations Director, the Monitor expects OPSO will be able to complete the BAS upgrade that will enhance the staff's ability to identify, remedy, and report on HVAC and other major systems throughout the facility. The Monitor looks forward to the full implementation of the upgrade and commends OPSO on the initiative.

As during previous tours, the Monitor reviewed live data of the system's warning and alarm functions which reflected no major equipment or systems issues that had not been addressed at that moment. The Monitor inspected the BAS system and noted no alarms or alerts present on the system. The Monitor continues to recommend that the



Maintenance Director implement a routine audit/inspection of the housing areas for such occurrences and compare the findings with the BAS and work order reports to ensure the systems are working as expected. Additionally, the Monitor continues to recommend the Maintenance Director establish a "system status review" protocol requiring the responsible on-duty staff member to review the live HVAC equipment monitor status throughout the facility at least once per day to facilitate the identification and repair of any issues noted and document/log these reviews for routine recordkeeping as well as staff accountability.

It is the Monitor's opinion that the OJC Building Automation System and the new BAS system supporting the TMH units, as currently operated, meets the intent of the Consent Judgment regarding this section. The requested supporting documentation will be necessary to support a finding of substantial compliance.

In light of the above, this section remains in Partial Compliance.

***IV. D. 1. d. Ensure adequate lighting in all prisoner housing units and prompt replacement and repair of malfunctioning lighting fixtures in living areas within five days unless the item must be specially ordered.***

Finding:

Partial Compliance

Observations:

The Monitor observed sufficient lighting being provided in housing units and the majority of individual cells of both OJC and TDC. The Monitor found all cell lighting in the upper tier cells of Pod 2D to be out with at least two inmates stating the condition had existed for several days. The Monitor inquired with the Pod Control staff member who stated they were unaware if there was a work order for the issue.

The Monitor also observed several inmate interview rooms on multiple floors with missing outlet/box covers, accessible wiring, and energized circuits. Several outlet boxes inside housing pods were also found to have exposed wiring. At least three of the circuits with accessible wiring were found to be energized—a significant shock hazard for the inmates and staff. This is a chronic issue that has been noted in several reports and is the reason for the downgrading of this section to Partial Compliance.

Maintenance staff continue to maintain a supply of replacement bulbs,



transformers, or ballasts to repair malfunctioning lighting.

***IV. D. 1. e. Ensure adequate pest control throughout the housing units, including routine pest control spraying on at least a quarterly basis and additional spraying as needed.***

Finding:

Partial Compliance

Observations:

A review of the documentation submitted found sufficient evidence of a pest control program that meets the intent of the Consent Judgment. OPSO continues to maintain a pest control contract with a state licensed company for monthly service of all housing areas and bi-weekly service for the Kitchen/Warehouse as well as on-demand services. The Monitor reviewed the vendor's pest activity reports for all three facilities and noted no issues. There were no inmate grievances related to pest control for the rating period per the Sanitarian. As with Tours #18 through #20, the Monitor observed several "drain fly" issues in housing units both at OJC and TDC (also noted in D.1.a.). The Monitor advised staff present to notify the Environmental Officer for remediation which was conducted prior to the end of the inspection.

The pest control contractor documentation showed no major infestations were found during routine inspections. However, the inspection reports by Sanitation and Life-Safety staff continue to note numerous issues with debris in housing units throughout OJC and TDC which was consistent with the Monitor's observations. The Monitor noted less clutter and debris (open and scattered food, trash, etc.) while inspecting the OJC than previously observed, however most of the drain fly issues relate directly to the level of cleanliness throughout the housing units and adjacent spaces. The exception was in the circulation and administrative areas maintained by the Sanitation staff. Again, the Monitor expects that OPSO can continue to reduce the issues noted by increasing the frequency and effectiveness of the cleaning of these areas by the inmates housed therein. While OPSO routinely has a pest control company treating the facility, the issue with the drain flies is chronic and at the time of the inspection were only being addressed when reported. The Maintenance Director advised that treatments for the drain flies is being incorporated into the Preventive Maintenance process which the Monitor believes will address the issue. It is also incumbent upon security staff to prevent inmates from doing



things that exacerbate the problem such as allowing inmates to keep mop buckets full of dirty water, washing clothing the housing units, and allowing them to drape wet clothing around the housing units which attracts and allow the drain flies to breed and grow. Based on the foregoing observations, this section remains in Partial Compliance.

***IV. D. 1.f. Ensure that any prisoner or staff assigned to clean a biohazardous area is properly trained in universal precautions, outfitted with protective materials, and properly supervised.***

<u>Finding:</u>

Partial Compliance

<u>Observations:</u>

As noted in previous inspections, Policy 1101.07, "Bio-hazardous Spill Cleaning Procedures" [Revised 1/18/2018] Section VIII. A. 1 has been revised to allow properly trained and equipped inmates and deputies to clean up bio-hazardous spills. Training materials were devised by the Sanitarian. Documentation was provided to indicate three inmates received the requisite training during the rating period.

The Monitor also reviewed training curricula and documentation indicating that during 2024, all pre-service staff received training in bio-hazardous cleanup procedures as part of their initial training in each new-hire class in 2024 up to the date of this inspection. The documentation reflected that the in-service training for this requirement was presented in CY2023 and augmented through roll-call training conducted in August 2024.

As of November 2018, the Sanitation and/or Environmental Officer is required to be notified of such incidents each business day to enable them to replace any bio-hazardous clean up protective materials used and inspect the area to ensure it was properly cleaned and sanitized. There was no documentation provided as to bio-hazard reports were submitted to the Sanitarian during this rating period, therefore there was again no evidence to support a change in the current rating. Given the number of incidents in the facility, the lack of any bio-hazard reports is somewhat concerning to the Monitor. The Sanitarian has previously advised that her practice is to routinely review all reports mentioning such incidents to ensure proper follow-up is conducted and that required cleanup/inspection procedures have been followed.



***IV. D. 1. g. Ensure the use of cleaning chemicals that sufficiently destroy the pathogens and organisms in biohazard spills.***

<u>Findings:</u>

Substantial Compliance

<u>Observations:</u>

The Monitor was able to make direct observation that the chemicals on-hand and available to staff were sufficient to destroy the pathogens and organisms in bio-hazardous spills common in a jail environment to include the COVID-19 virus. The Monitor is continuing to rate this section as being in substantial compliance.

Additionally, the chemical storage inventory documentation submitted demonstrated the availability of a consistent supply of the required chemicals being maintained by the designated staff. The Monitor identified two areas in the Maintenance Section where Material Safety Data sheets were not immediately available. This was reported to the Maintenance Director for correction of the deficiency.

***IV. D. 1. h. Maintain an infection control plan that addresses contact, blood borne, and airborne hazards and infections. The plan shall include provisions for the identification, treatment, and control of Methicillin-Resistant Staphylococcus Aureus ("MRSA") at the Facility.***

<u>Findings:</u>

Substantial compliance

<u>Observations:</u>

As with the previous inspection, the Monitor reviewed the OPSO infection control policy 1201.11 as well as the Wellpath Infection Control Program document (rev. 8/30/18) and the Wexford Infections Diseases and Infection Control Guidelines (effective April 2024) submitted by OPSO. OPSO advised via memo that the Wellpath document is under review with possible changes forthcoming by Wexford. The requisite areas required by the Consent Judgement were addressed by both documents, to include MRSA, and included by OPSO for the Monitor's review and found sufficient to maintain a rating of Substantial Compliance. The Monitor looks forward to the finalization of any changes to the plans.

## IV. D. 2. Environmental Control

<u>Findings:</u>



D. 2. a.  Substantial Compliance

D. 2. b.  Partial Compliance

***IV. D. 2. a. OPSO shall ensure that broken or missing electrical panels are repaired within 30 days of identified deficiencies, unless the item needs to be specially ordered.***

Findings:

Substantial Compliance

Observations:

OPSO Policies 601.02 "Reporting and Addressing Maintenance Needs" and Policy 601.03 "Preventive Maintenance" [August 15, 2016] are implemented. Major electrical panels at OJC and TMH are located in secure maintenance spaces inaccessible to inmates.

During the inspection, the Monitor noted no significant issues in electrical rooms accessible by security staff.

***IV. D. 2. b. Develop and implement a system for maintenance and timely repair of electrical panels, devices, and exposed electrical wires.***

Findings:

Partial Compliance

Observations:

During the tour, the Monitor noted several electrical outlet boxes with missing or damaged covers and exposed wiring. At least three of these boxes were found to have energized wiring accessible to the inmates and presenting an extreme safety hazard. This includes the vandalized light switch assemblies in the inmate interview rooms noted previously that had been substantially repaired as of the date of Tour #20.

As with the previous inspection, the Monitor noted ongoing issues with the inmate intercom equipment. The Monitor randomly asked inmates to activate their cell intercoms or did so himself to elicit a response from security staff.  The Monitor did not observe any intercoms to be non-functioning in OJC during these random checks. The Monitor observed that, if the inmate is locked in a cell, the inmate must either call out to the pod deputy (if present) or request another inmate who may be out of their cell to alert the pod control staff member if an issue or emergency arises.

The Monitor was encouraged by the presence of staff in the pod control rooms throughout OJC as these are the only workstations in OPJ currently capable of receiving emergency intercom calls. There is still no backup system whereby intercom calls from



OJC inmate cells can be answered if the control pod is not manned, however OPSO has had an assessment of the security electronics system performed by the original contractor. The intercom system in the TDC/TMH sallyport that provides backup response to TMH inmate intercom calls is still inoperative in that staff cannot speak to the inmate. This has been noted repeatedly. Intercom issues were noted in previous reports under Section IV.D.1.b. (with no apparent action from OPSO Maintenance), however the Monitor has determined that this issue is more appropriately covered in this section that requires the implementation of "a system for maintenance and timely repair of electrical panels, devices, and exposed electrical wires".

The inmate intercoms in the Temporary Mental Health (TMH) facility are non-working at the officer control stations, and while the Sallyport Control officer is able to observe and hear inmate intercom calls on the intercom system, and a microphone has been installed, there continues to be technical as well as staff training issues preventing two-way communication with the inmate in individual TMH cells. Subsequently, the Sallyport Control officer is not required to monitor inmate intercom calls. The Monitor continues to recommend TMH supervisory staff review the procedure and require the Sallyport Control officer to notify the respective TMH pod deputy any time a call is observed on the control screen once the equipment is in working order.

The Monitor continues to recommend that IT staff responsible for the intercom systems make a comprehensive survey of working/non-working intercom equipment in every housing unit to facilitate repair of the system throughout the facility and add random intercom testing in every unit to the routine inspection process. Additionally, security staff supervisors should continue to emphasize the importance of the prompt response to emergency intercom calls by pod deputies and pod control staff.

Due to the chronic issue with the inmate intercom field devices and control equipment devices as well as the damaged outlet boxes and energized circuits, the Monitor continues to rate this section as being in Partial Compliance.

**IV. D. 3. Food Service**

This report summarizes the findings for the Food Service provisions of the Consent Judgment based on the Monitor's document reviews and tour conducted December 16-19, 2024. The Monitor inspected the Orleans Justice Center (OJC)



Kitchen/Warehouse; observed meal service activities; and spoke with OPSO supervisors and deputies, Summit contracted food service employees, and inmates.

Sections IV. D. 3. a., IV. D. 3. b., and IV. D. 3. c of the Consent Judgment remained in Substantial Compliance.

<u>Findings:</u>

D. 3. a. Substantial Compliance

D. 3. b. Substantial Compliance

D. 3. c. Substantial Compliance

***IV. D. 3. a. OPSO shall ensure that food service staff, including prisoner staff, continues to receive in-service annual training in the areas of food safety, safe food handling procedures, and proper hygiene, to reduce the risk of food contamination and food-borne illnesses.***

<u>Findings:</u>

Substantial Compliance

<u>Observations:</u>

D. 3. a. remains in Substantial Compliance for the period of April 2024 through September 2024 based on the documentation provided by Summit. The in-service employee training included instruction on food safety, cleaning and sanitizing, food temperatures, and chemical safety. Documentation was provided substantiating food safety training and a kitchen orientation quiz was provided for new inmate kitchen workers, with the exception of September 2024 because there were no new inmate kitchen workers that month.

***IV. D. 3. b. Ensure that dishes and utensils, food preparation and storage areas, and vehicles and containers used to transport food are appropriately cleaned and sanitized on a daily basis.***

<u>Findings:</u>

Substantial Compliance

<u>Observations:</u>

The Monitor reviewed the documents submitted for the compliance period of April 2024 through September 2024, including the cleaning logs, daily chemical usage logs, chemical sanitizer concentration logs, and the kitchen vehicle inspection forms and no problems were found. The Monitor inspected the kitchen including areas where food is prepared, the bakery, tray preparation area, dishwashing room, dry goods storage, coolers and freezers, and the loading dock, and found all the areas to be appropriately clean. Therefore, D. 3. b. remains in Substantial Compliance.



***IV. D. 3. c. Check and record on a daily basis the temperatures in the refrigerators, coolers, walk-in refrigerators, the dishwasher water, and all other kitchen equipment with a temperature monitor, to ensure proper maintenance of food service equipment.***

Findings:

Substantial Compliance

Observations:

For the compliance period of April 2024 to September 2024, Section IV. D. 3. c. of the Consent Judgment remained in substantial compliance. During the July 2023 tour and inspections, significant problems with the refrigeration were found including unsafe food temperatures that failed to comply with regulatory requirements.[15] Therefore, IV. D. 3. c. is included in the Monitor's Report #19 Areas of Partial Compliance Action Plan (CAP), requiring that kitchen staff check and record all refrigerator and freezer temperatures daily and that kitchen supervisors will submit a work order within 24 hours of discovering any refrigerator or freezer that is not within regulatory requirements. The daily Cooler Temperature Logs[16] for the current compliance period were reviewed and indicate that the refrigeration and freezer temperatures were recorded daily and comply with the food code. The Monitor measured the temperatures in the coolers and freezers during the tour and they were within the proper range. The OJC Kitchen/Warehouse has 15 walk-in coolers and freezers, and refrigeration problems should be anticipated such as issues with the condensers, compressors, and refrigerant leaks, especially as the mechanical system ages. Therefore, it is still recommended that:

- OPSO develop and implement a formal preventive maintenance plan for the refrigeration system.

The Monitor reported in Compliance Report #20 that the daily food production records did not capture the temperatures of "cold" breakfast foods because only the temperatures of foods that were served "hot" were recorded on the production summary logs.[17] The problem has been resolved and the temperatures for "cold" items are

---

[15] The Louisiana Administrative Code does not designate a set-point for refrigerator/cooler temperatures, rather it states, "Food stored for cold holding and service shall be held at a temperature of 41°F (5°C) or below." Therefore, refrigeration must be set at a temperature that can maintain the foods stored therein at 41°F (5°C) or below. https://www.doa.la.gov/media/j3hnpfdy/51.pdf

[16] The Cooler Temperature Logs are also used to record the freezer temperatures.
[17] Louisiana, Title 51, Public Health, Sanitary Code, Ch. 13, Section 1309, states, "Food stored for cold holding and



documented on the tray temperature logs.

## IV. D. 4. Sanitation and Environmental Conditions Reporting

Findings:

D.4. a. Substantial Compliance

D.4. b. Partial Compliance

*D. 4. a. Provide the Monitor a periodic report on sanitation and environmental conditions in the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. The report will include*
> *(1) number and type of violations reported by health and sanitation inspectors;*
> *(2) number and type of violations of state standards;*
> *(3) number of prisoner grievances filed regarding the environmental conditions at the Facility;*
> *(4) number of inoperative plumbing fixtures, light fixtures, HVAC systems, fire protection systems, and security systems that have not been repaired within 30 days of discovery;*
> *(5) number of prisoner-occupied areas with significant vandalism, broken furnishings, or excessive clutter;*
> *(6) occurrences of insects and rodents in the housing units and dining halls; and*
> *(7) occurrences of poor air circulation in housing units.*

Findings:

Substantial Compliance

Observations:

OPSO provided the two Semi-annual reports covering the rating period under this section. This documentation, as well as the Sanitation and Environmental reports, contained the requisite information spelled out by the Consent Judgment for this section.

*IV. D. 4. b. Review the periodic sanitation and environmental conditions reports to determine whether the prisoner grievances and violations reported by health, sanitation, or state inspectors are addressed, ensuring that the requirements of this Agreement are met. OPSO shall make recommendations regarding the sanitation and environmental conditions, or other necessary changes in policy, based on this review. The review and recommendations will be documented and provided to the Monitor.*

Findings:

Substantial Compliance

Observations:

The Consent Judgment requires a review of the periodic sanitation, and environmental conditions reports to ensure issues are addressed along with making recommendations regarding sanitation and environmental conditions and policy changes based upon the review. Such reviews are to be documented and provided to the Monitor. The Monitor reviewed the Semi-annual report provided by OPSO as required and found

---

service shall be held at a temperature of 41°F (5°C) or below.



documentation supporting the review conducted by OPSO command staff. The documentation was sufficient to satisfy the requirements of the Consent Judgment for this rating period. This places this section in Substantial Compliance.

### IV. E. 1. Fire and Life Safety

<u>Findings:</u>

E.1. a.  Substantial Compliance

E. 1. b.  Substantial Compliance

E. 1. c.   Substantial Compliance

E. 1. d.  Partial Compliance

E. 1. e.  Substantial Compliance

***IV. E. 1. a. Ensure that necessary fire and life safety equipment is properly maintained and inspected at least quarterly. These inspections must be documented.***

<u>Finding:</u>

Substantial Compliance

<u>Observations:</u>

The Monitor was able to conduct a tour of the OJC, TDC/TMH, and the Kitchen/Warehouse facilities during the December 2024 inspection with the Facility Life Safety Officer and Maintenance Director. The Monitor observed no major issues with the fire and life safety equipment. The response procedure for broken sprinkler heads implemented prior to Tour #20 has significantly reduced the downtime for the suppression systems whenever an inmate vandalizes a sprinkler head.  The procedure includes a 15-minute "Fire Watch" security rounds in affected areas which further supports the mitigation of risk. All fire extinguishers observed were found to be current on required inspections.

The Fire Alarm Control Panels in the areas inspected were found to be properly inspected and free of trouble alarms with the exception of a VAV trouble alarm in TMH 1A/B and a trouble alarm noting a communication issue (outside notification) with a TDC alarm panel. For the latter issue, the Life Safety Officer has identified the issue as a broken communication wire. OPSO has determined that the outside notification function is redundant given the 24/7 monitoring occurring on-site. The Monitor is of the opinion that current operations meet local fire marshal requirements and is consistent with applicable code(s).



The Monitor also reviewed all monthly and quarterly inspection documentation as well as outside inspection documentation. OPSO provided documentation of the annual contractor fire detection systems for OJC (11/23), TMH/TDC (11/23), and the Kitchen/Warehouse (12/23) which indicated no significant issues along with minor device replacements/programming corrections. The Monitor noted that the contractor inspection and certification process for all OPSO fire detection systems was on-going at the time of the Monitor's visit. Preliminary indications were that no significant issues had been found. The Monitor expects the 2024 documentation to be provided within the month and will be noted with the next report.

There were no significant issues with the documentation, that requisite work orders had been generated when warranted, and that all major systems were operational/ "green tagged". Of note and previously reported, the inspection documentation again reflected clutter and trash issues throughout the OJC inmate housing areas, but the Monitor noted fewer observed instances than the previous inspection. The reports, as with the Sanitation and Environmental inspection reports, continued to note significant issues with excess inmate property being improperly stored in a substantial number of housing units. As previously noted, Staff should consider potential solutions to reduce the amount of clutter and potential fire-load the material presents.

As noted in the previous inspection, the Life Safety Officer continues to use the "Facility Dude" work order system to maintain the schedule of required inspections. The system notifies the Fire Safety Officer when an inspection is due. OPSO continues to maintain contracts with licensed vendors to complete annual inspections of all fire and life safety equipment. OPSO provided copies of quarterly inspections conducted by the Fire Safety Officer for Kitchen/Warehouse, OJC, and TDC/TMH for the second and third quarters of 2024. This documentation, supported by observations during the compliance tour, indicates that OPSO ensures that necessary fire and life safety equipment is properly maintained and inspected at required intervals.

*IV. E. 1. b. Ensure that a qualified fire safety officer conducts a monthly inspection of the facilities for compliance with fire and life safety standards (e.g., fire escapes, sprinkler heads, smoke detectors, etc.).*

Finding:



Substantial Compliance

Observations:

The Monitor was provided with the monthly inspection documents for the Kitchen /Warehouse, OJC, and TDC/TMH facilities performed during the current compliance period. The reports are thorough and complete with all noted discrepancies listed with the associated work order number where appropriate. Clutter in cells and the draping of inmate clothing items and contraband sheets/blankets continue to be the greatest contributors to the fire load in the pod housing units that can be effectively mitigated by security staff. These inspections are conducted by a qualified fire safety officer or a qualified contractor, as required by the Consent Judgment.

***IV. E. 1. c. Ensure that comprehensive fire drills are conducted every six months. OPSO shall document these drills, including start and stop times and the number and location of prisoners who were moved as part of the drills.***

Finding:

Substantial Compliance

Observations:

The Consent Judgment requires comprehensive fire drills every six months. OPSO provided documentation for 9 total fire drills conducted in August and September 2024 for the four squads at OJC and TDC/TMH as well as the Kitchen/Warehouse facility. This meets the requirements of this section, and it remains in Substantial Compliance. OPSO has continued its practice of conducting only "Level 1" drills (no inmate evacuation) due to COVID concerns associated with the mass movement of inmates. The Monitor has recommended to the Life Safety Officer that OPSO return to pre-COVID practices and have at least one quarterly drill consisting of an actual evacuation to better prepare staff for such an event. Pre-service training was provided to all participants in classes held during the rating period. The rating for this section continues to be Substantial Compliance.

***IV. E. 1. d. Provide competency-based training to staff on proper fire and emergency practices and procedures at least annually.***

Finding:

Partial Compliance

Observations:

OPSO has developed the requisite policy, training course syllabus/outline and written directives necessary for this section. OPSO training staff provided documentation



noting life safety training was provided for the pre-service classes during the compliance period. Documentation for the In-Service classes were provided only for the September, October, and November for a total of 68 staff members receiving training. As the week-long In-Service classes were conducted throughout the year, it appears that some documentation was missing for classes conducted from January through August 2024. A check of the In-Service training calendar showed classes were scheduled. Given the information available, the Monitor will continue to place this section in Partial Compliance.

***IV. E. 1. e. Within 120 days of the Effective Date, ensure that emergency keys are appropriately marked and identifiable by touch and consistently stored in a quickly accessible location, and that staff are adequately trained in use of the emergency keys.***

Finding:

Substantial Compliance

Observations:

Inspection reports note the routine verification of the keys and the Fire Safety Officer documents the periodic testing of the keys to verify they are operational. The Fire Safety Officer trains staff on the location and use of the keys during the fire and life safety training curriculum provided to all staff at the training academy. The Monitor was advised that the key box on the second-floor admin area was malfunctioning at the time of the inspection and the Fire Safety Officer was in the process of correcting the issue. The Monitor did not consider the issue serious enough to warrant a reduction in rating for this section as the main key box located in the secure entry hallway of the Jail was still operational, had all necessary emergency keys, and was unaffected by the remote box malfunction.

**IV. E. 2. Fire and Life Safety Reporting**

Findings:

E. 2. a.  Substantial Compliance

E. 2. b.  Substantial Compliance

***IV. E. 2. a. (1) – (3) Provide the Monitor a periodic report on fire and life safety conditions at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date and every six months thereafter until termination of this Agreement. Each report shall include:***
 ***(1) number and type of violations reported by fire and life safety inspectors;***
 ***(2) fire code violations during annual fire compliance tours; and***
 ***(3) occurrences of hazardous clutter in housing units that could lead to a fire.***



<u>Finding:</u>

Substantial Compliance

<u>Observations:</u>

The semiannual reports, referenced in IV. E. 2. a., are conducted by OPSO on a semi-annual basis (January through June and July through December). The Monitor was provided with the report covering the rating period and noting the requisite information. The 2024 Fire and Life Safety Conditions and inspection reports generated during the rating period were made available to the Monitor prior to the December 2024 inspection. The reports contained the supporting information for the semiannual reports spelled out by the Consent Judgment. In light of the supporting documentation, the Monitor finds this section to be in substantial compliance.

***IV. E. 2. b. Review the periodic fire and life safety reports to determine whether the violations reported by fire and life safety inspectors are addressed, ensuring the requirements of this Agreement are being met. OPSO shall make recommendations regarding the fire and life safety conditions, or other necessary changes in policy, based on this review. The review and recommendations will be documented and provided to the Monitor.***

<u>Finding:</u>

Substantial Compliance

<u>Observations</u>:

The Consent Judgment requires a review of the periodic fire and life safety reports to ensure issues are addressed along with making recommendations regarding the fire and life safety conditions and policy changes based upon the review. Such reviews are to be documented and provided to the Monitor.

The Monitor reviewed the supporting documentation provided by OPSO and determined that it was sufficient to satisfy the requirements of this section, to include the provision of documentation of the senior staff review of the semi-annual report as required. Accordingly, the rating for this section is changed to Substantial Compliance.

## IV. F. Language Assistance

***F.1.a. OPP shall ensure effective communication with and provide timely and meaningful access to services at OPP to all prisoners at OPP, regardless of their national origin or limited ability to speak, read, write, or understand English. To achieve this outcome, OPP shall:***

    ***(1)    Develop and implement a comprehensive language assistance plan and policy that complies, at a minimum, with Title VI of the Civil Rights Act of 1964, as amended, (42 U.S.C. § 2000d et seq.) and other applicable law;***

    ***(2)    Ensure that all OPP personnel take reasonable steps to provide timely, meaningful language assistance services to Limited English Proficient ("LEP") prisoners;***

    ***(3)    At intake and classification, identify and assess demographic data, specifically including***



*the number of LEP individuals at OPP on a monthly basis, and the language(s) they speak;*

*(4)      Use collected demographic information to develop and implement hiring goals for bilingual staff that meet the needs of the current monthly average population of LEP prisoners;*

*(5)      Regularly assess the proficiency and qualifications of bilingual staff to become an OPP Authorized Interpreter ("OPPAI");*

*(6)      Create and maintain an OPPAI list and provide that list to the classification and intake staff; and*

*(7)      Ensure that while at OPP, LEP prisoners are not asked to sign or initial documents in English without the benefit of a written translation from an OPPAI.*

*F.2.a. OPP shall develop and implement written policies, procedures and protocols for documenting, processing, and tracking of individuals held for up to 48 hours for the U.S. Department of Homeland Security ("DHS");*

*F.2.b Policies, procedures, and protocols for processing 48-hour holds for DHS will:*

*(1)      Clearly delineate when a 48-hour hold is deemed to begin and end;*

*(2)      Ensure that, if necessary, an OPPAI communicates verbally with the OPP prisoner about when the 48-hour period begins and is expected to end;*

*(3)      Provide a mechanism for the prisoner's family member and attorney to be informed of the 48-hour hold time period, using, as needed, an OPPAI or telephonic interpretation service;*

*(4)      Create an automated tracking method, not reliant on human memory or paper documentation, to trigger notification to DHS and to ensure that the 48-hour time period is not exceeded.*

*(5)      Ensure that telephone services have recorded instructions in English and Spanish;*

*(6)      Ensure that signs providing instructions to OPP prisoners or their families are translated into Spanish and posted;*

*(7)      Provide Spanish translations of vital documents that are subject to dissemination to OPP prisoners or their family members. Such vital documents include, but are not limited to:*

*i.      grievance forms;*

*ii.      sick call forms;*

*iii.      OPP inmate handbooks;*

*iv.      Prisoner Notifications (e.g., rule violations, transfers, and grievance responses) and*

*v.      "Request for Services" forms.*

*(8)      Ensure that Spanish-speaking LEP prisoners obtain the Spanish language translations of forms provided by DHS; and*

*(9)      Provide its language assistance plan and related policies to all staff within 180 days of the Effective Date of this Agreement.*

*F.3.a. Within 180 days of the Effective Date, OPP shall provide at least eight hours of LEP training to all corrections and medical and mental health staff who may regularly interact with LEP prisoners.*

*(1) LEP training to OPP staff shall include:*

*i.      OPP's LEP plan and policies, and the requirements of Title VI and this Agreement;*

*ii.      how to access OPP-authorized, telephonic and in-person OPPAIs; and*

*iii.      basic commands and statements in Spanish for OPP staff.*

*(2) OPP shall translate the language assistance plan and policy into Spanish, and other languages as appropriate, and post the English and translated versions in a public area of the OPP facilities, as well as online.*

*(3) OPP shall make its language assistance plan available to the public.*

*F.4.*

*(1)      OPP shall ensure that adequate bilingual staff are posted in housing units where DHS detainees and other LEP prisoners may be housed.*

*(2)      OPP shall ensure that an appropriate number of bilingual staff are available to translate or interpret for prisoners and other OPP staff. The appropriate number of bilingual staff will be determined based on a staffing assessment by OPP.*

Findings:

F.1. a.  Substantial Compliance

F. 2. a. Substantial Compliance



F. 2. b. Substantial Compliance

F. 3. a. Partial Compliance

F. 4.    Substantial Compliance

Observations:

The Language Assistance Plan required by this paragraph has been prepared and finalized. F. 1. a. remains in substantial compliance.

OPSO asserts that DHS and ICE inmates are not detained. OPSO developed a policy which was submitted to the Monitors. Provisions F. 2. a. and b. continue to be in substantial compliance.

OPSO provided documentation regarding the use of the language line. OPSO has provided documentation regarding the number of bilingual staff and the manner in which the needs of language assistance are provided resulting in the continuance of substantial compliance for provisions of F. 4. The Consent Judgment specifically requires at least eight hours of LEP training for all deputies and mental health staff who may regularly interact with LEP inmates. Provision IV. F. 3. a. is determined in partial compliance as proof of only four (4) hours of training as opposed to the eight hours of training was provided. No documentation was provided to prove that the required eight (8) of training was provided. Without proof, a claim of substantial compliance by OPSO is insufficient.

**IV. G.  Youthful Prisoners**

*IV. G. Consistent with the Prison Rape Elimination Act of 2003, 42 U.S.C. § 15601, et seq., and its implementation of regulations, a youthful prisoner shall not be placed in a housing unit in which the youthful prisoner will have sight, sound, or physical contact with any adult prisoner through use of a shared dayroom or other common space, shower area, or sleeping quarters. In areas outside of housing units, OPSO shall either: maintain sight and sound separation between youthful prisoners and adult prisoners, or provide direct staff supervision when youthful prisoners and adult prisoners have sight, sound, or physical contact. OPP shall ensure that youthful prisoners in protective custody status shall have no contact with, or access to or from, non- protective custody prisoners. OPP will develop policies for the provision of developmentally appropriate mental health and programming services.*
Finding:

Substantial Compliance

Observations:

OPSO housed youthful offenders during the entire monitoring period. While the change in Louisiana law will impact the number in the future, the initial group of youthful inmates were moved from the juvenile facility to OJC under the law that existed at the time. Youthful inmates housed by OPSO are housed separately from adult inmates. When



youthful inmates are in contact with adult inmates outside of the housing units, such as attending programs or going to court, they are directly supervised. During the monitoring period, developmentally appropriate mental health services were provided to youthful inmates. Travis School continues to provide educational and programming services. The requirement for developmentally appropriate mental health and programming services is separate and apart from PREA.

Housing youthful offenders places an additional strain on the overcrowded conditions. As of the writing of this report, eighteen (18) male youthful offenders were occupying a housing unit designed for sixty (6) inmates and no female youthful offenders were being housed. In the past, OPSO utilized one off the mental health units to house female youthful offenders, resulting in a backlog of male mental health inmates in the OJC.

### VI. A – D. The New Jail Facility and Related Issues

#### A. New Jail

***The Parties anticipate that Defendant will build a new jail facility or facilities that will replace or supplement the current facility located at 2800 Gravier Street, New Orleans, Louisiana. This Agreement shall apply to any new jail facility.***

<u>Finding:</u>

VI. A. Substantial Compliance.

#### B. Design and Design Document

***Defendant shall obtain the services of a qualified professional to evaluate, design, plan, oversee, and implement the construction of any new facility. At each major stage of the facility construction, Defendant shall provide the Monitor with copies of design documents.***

<u>Finding:</u>

VI. B. Substantial Compliance

<u>Observations</u>:

These provisions apply to the construction of any new facility. Phase III is such a facility. As the City is the entity overseeing the construction of Phase III, OPSO must coordinate with the City to provide copies of design document at each major stage. The City has been providing access to design documents and information regarding Phase III, but assistance from the Court has often been necessary to facilitate access.

#### C. Staffing

***Defendant shall consult with a qualified corrections expert as to the required services and staffing levels needed for any replacement facility. OPSO shall complete a staffing study to ensure that any new facility is adequately staffed to provide prisoners with reasonable safety.***



Finding:

IV. C. Partial Compliance

Observations:

The Consent Judgment requires that the Defendant **shall** consult with a qualified corrections expert as to the required services and staffing levels needed for any replacement facility. A new staffing study was conducted for OJC. However, OPSO still lacks the staff for its implementation. The paragraph remains in partial compliance.

### D.  Compliance with Code and Standards

*Defendant will ensure that the new jail facility will be built in accordance with: (1) the American Correctional Association's standards in effect at the time of construction; (2) the American with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101-12213, including changes made by the ADA Amendments of 2008 (P.L. 110-325) and 47 U.S.C. §§ 225-661, and the regulations there under; and (3) all applicable fire codes and regulations.*

Finding:

Monitors not qualified to evaluate.

Observations:

The Monitors do not have the knowledge or expertise to evaluate compliance with this paragraph. OPSO asserts that it is in compliance with this provision, without offering documentation. Documentation from the architect would be sufficient.

### VII. Compliance and Quality Improvement

### VII. A. Policies, Procedures, Protocols, Training Curriculum and Practices

*Within 120 days of the Effective Date, OPSO shall revise and/or develop its policies, procedures, protocols, training curricula, and practices to ensure that they are consistent with, incorporate, address, and implement all provisions of this Agreement. OPSO shall revise and/or develop, as necessary, other written documents, such as screening tools, logs, handbooks, manuals, and forms, to effectuate the provisions of this Agreement. OPSO shall send pertinent newly drafted and revised policies and procedures to the Monitor as they are promulgated. The Monitor will provide comments on the policies to OPSO, SPLC, and DOJ within 30 days.*

*OPSO, SPLC, and DOJ may provide comments on the Monitor's comments within 15 days. At that point, the Monitor will consider the Parties' comments, mediate any disputes, and approve the policies with any changes within 30 days. If either party disagrees with the Monitor, they may bring the dispute to the Court. OPSO shall provide initial and in-service training to all Facility staff with respect to newly implemented or revised policies and procedures. OPSO shall document employee review and training in new or revised policies and procedures.*

Finding:

VII. A. Partial Compliance

Observations:

OPSO has now completed the development of the required policies. OPSO's efforts in



the development of procedures and lesson plans resulted in this paragraph continuing to be in partial compliance. OPSO should continue to seek the input of the Monitors and Parties on any revisions of the policies required by the Consent Judgment. OPSO is reminded that it may not unilaterally change those policies.

### VII. (H). B.  Written Quality Improvement Policies and Procedures

*Within 180 days of the Effective Date, Defendant shall develop and implement written quality improvement policies and procedures adequate to identify serious deficiencies in protection from harm, prisoner suicide prevention, detoxification, mental health care, environmental health, and fire and life safety in order to assess and ensure compliance with the terms of this Agreement on an ongoing basis.  Within 90 days after identifying serious deficiencies, OPSO shall develop and implement policies and procedures to address problems that are uncovered during the course of quality improvement activities. These policies and procedures shall include the development and implementation of corrective action plans, as necessary, within 30 days of each biannual review.*

Finding:

VII. B. Partial compliance

Observations:

OPSO has developed corrective action plans to identify serious deficiencies, and to address problems that are uncovered during the course of quality improvement activities to warrant a finding of partial compliance. These corrective action plans have been agreed to by the parties and Monitors and have been filed with the Court. The plans contain specific performance measures, timelines, and the persons responsible. The issue now is implementation which will require the auditing of adherence to the action plan and appropriate accountability measures.

### VII. (I). C. Full-Time Compliance Coordinator

*The Parties agree that OPSO will hire and retain, or reassign a current OPSO employee for the duration of this Agreement, to serve as a full-time OPSO Compliance Coordinator. The Compliance Coordinator will serve as a liaison between the Parties and the Monitor and will assist with OPSO's compliance with this Agreement. At a minimum, the Compliance Coordinator will: coordinate OPSO's compliance and implementation activities; facilitate the provision of data, documents, materials, and access to OPSO's personnel to the Monitor, SPLC, DOJ, and the public, as needed; ensure that all documents and records are maintained as provided in this Agreement; and assist in assigning compliance tasks to OPSO personnel, as directed by the Sheriff or his or her designee. The Compliance Coordinator will take primary responsibility for collecting information the Monitor requires to carry out the duties assigned to the Monitor.*

Finding:

Substantial Compliance

Observations:

Major Nicole Harris continues to serve as the full-time Compliance Coordinator.

### VII. (J.) D. Self-Assessment



*On a bi-annual basis, OPSO will provide the public with a self-assessment in which areas of significant improvement or areas still undergoing improvement are presented either through use of the OPSO website or through issuance of a public statement or report.*

Finding:

Substantial Compliance

Observations:

OPSO provides the assessment through its website. This provision is in substantial compliance.

## VIII. Reporting Requirements and Right of Access

### VIII. A. Periodic Compliance Reporting

*OPSO shall submit periodic compliance reports to the Monitor. These periodic reports shall be provided to the Monitor within four months from the date of a definitive judgment on funding; and every six months thereafter until termination of this Agreement. Each compliance report shall describe the actions Defendant has taken during the reporting period to implement this Agreement and shall make specific reference to the Agreement provisions being implemented. The report shall also summarize audits and continuous improvement and quality assurance activities, and contain findings and recommendations that would be used to track and trend data compiled at the Facility. The report shall also capture data that is tracked and monitored under the reporting provisions of the following provisions: Use of Force; Suicide Prevention; Health Care Delivered; Sanitation and Environmental Conditions; and Fire and Life Safety.*

Finding:

Partial Compliance

Observations:

As noted in the individual section, OPSO failed to provide the periodic compliance reports required for suicide prevention and health care. The others were provided.

### VIII. B.  (Notification of) Death of Any Prisoner

*OPSO shall, within 24 hours, notify the Monitor upon the death of any prisoner. The Monitor shall forward any such notifications to SPLC and DOJ upon receipt. OPSO shall forward to the Monitor incident reports and medical and/or mental health reports related to deaths, autopsies, and/or death summaries of prisoners, as well as all final SOD and IAD reports that involve prisoners. The Monitor shall forward any such reports to SPLC and DOJ upon receipt.*

Finding:

Substantial Compliance

### VIII. C. Records

*Defendant shall maintain sufficient records to document that the requirements of this Agreement are being properly implemented and shall make such records available to the Monitor within seven days of request for inspection and copying. In addition, Defendant shall maintain and provide, upon request, all records or other documents to verify that they have taken the actions described in their compliance reports (e.g., census summaries, policies, procedures, protocols, training materials, investigations, incident reports, tier logs, or use of force reports).*

Finding:



Substantial Compliance

Observations:

   During this compliance period, OPSO provided the Monitors with any records requested within seven (7) days of request with the exception of some requests made by the Medical Monitor and Mental Health Monitor. This provision is now in substantial compliance, but improvement to responses from Wexford will be required to maintain the rating.

### III. Stipulated Orders

   OPSO and the Plaintiffs/DOJ negotiated two agreements after Compliance Report #3. OPSO and the Plaintiffs/DOJ agreed to a third Stipulation and Order after Compliance Report #20 which was signed on June 17, 2024. The language of the Stipulated Orders is linked directly to the Consent Judgment and represent priority areas for inmate safety. Some of them require a one-time action such as the posting of a memorandum or providing training by a specific date. Some of the provisions of the Stipulated Order of February 11, 2015, contain on-going obligations that are in addition to the Consent Judgment or clarify the obligations under the Consent Judgment. All of the provisions of the Stipulation and Order of June 17, 2024, contain on-going obligations that are in addition to the Consent Judgment or expand the obligations under the Consent Judgment.

   The three provisions of the April 22, 2015, Stipulated Order are in substantial compliance and contained provisions that were to be accomplished by specific dates during April 2015. As those dates have passed, the Monitors no longer monitor those provisions. The Stipulated Order of February 11, 2015, has provisions which require ongoing compliance. As of this report, Report #21, OPSO's compliance with the June 17, 2024 Stipulation and Order is included.

Stipulated Order of February 11, 2015:

*1. a. At each of the scheduled Court status conferences, the Sheriff or his designee shall report to the Court regarding OPSO's compliance status with each section (e.g. Section IV.A, IV.B.) of the Consent Judgment. This report shall include a summary of OPSO's progress since the immediate previously scheduled status conference and will include in the reporting OPSO's planned actions in the next 60 days to come into compliance.*

Finding:

Partial Compliance



Observations:

OPSO has not sufficiently complied with the requirements of this provision. This provision envisions outlining planned actions in the form of a report to the Court. Those are now being filed with the Court as to the items found in non-compliance in Report #20, but not as to those in partial compliance.

*1. b. OPSO shall comply with the Consent Judgment's requirement for periodic a compliance report as set forth in Consent Judgment Section VIII.A.2. The report shall describe the steps OPSO has taken in furtherance of compliance, and the activities planned during the next reporting period. The first report is due by April 1, 2015, and periodic reports shall be due in accordance with Section VIII.A, and/or on dates mutually agreed to by the parties and the Monitors, and approved by the Court, as necessary.*

Finding:

Partial Compliance

Observations:

OPSO has not sufficiently complied with the requirements of this provision. This provision envisions outlining planned actions in the form of a report to the Monitors every six months.

*1. c. Within 24 hours of the occurrence of any of the following incident, OPSO shall notify the Monitor via email:*
- *Death of an inmate/arrestee while held in custody (or housed in a hospital to which the inmate has been committed for care and retain in the custody of OPSO; or whose injury occurred while in custody and was subsequently released from custody);*
- *An inmate's/arrestee's suicide, suicide attempt, aborted suicide attempt, suicidal intent, and/or deliberate suicide self-harm gesture as defined by the American Psychiatric Association;*
- *An inmate's allegation of sexual abuse, sexual assault, sexual harassment, or voyeurism whether the incident is between or among inmates, or between or among inmates and a staff/contractor or volunteer;*
- *An inmate's report, or a report by a staff/contractor or volunteer, of any inmate/inmate allegation of assault; or other inmate allegation of felonies occurring to them while in custody;*
- *An inmate's report of a report by a staff/contractor or volunteer, of any allegation of excessive force by an employee, volunteer or contractor;*
- *Suspension or arrest of any OPSO employee, volunteer, or contractor for alleged criminal activities while on-duty and/or in a facility under the control of OPSO; and*
- *Any recovery of significant contraband, specifically weapons.*

Finding:

Partial Compliance

Observations:

OPSO has not sufficiently complied with the requirements of this provision.  At best, the Monitor learns of some of the items through incident reports, review of



investigations and newspaper reports. Seldom is the notification within 24 hours. OPSO should put in place a system to comply with this provision. It is suggested that the notification come from the Chief of Corrections or the Administrative Colonel as they are more likely to be aware of the occurrence of the triggering events.

*5. b. Commencing March 1, 2015, OPSO will make available to the Monitors, at the Monitors' request, the quarterly reviews conducted by ISB and the command staff regarding the operation of the EIS system, including supporting documentation reviews, as delineated by Section IV A. 4. b., c., d., and e. of the Consent Judgment.*

<u>Finding:</u>

Partial Compliance

<u>Observations:</u>

OPSO has not sufficiently complied with the requirements of this provision.  As noted in the rating and comments in Section IV. A. above, simply providing a list of names with no indication that the command staff has reviewed the list and determined what action, if any, should be taken is insufficient.

*7. a. OPSO shall provide a monthly report to the Monitors, identifying the number of deputies hired the previous month; the number of deputies who resigned, if known, the reason for resignation, and the date the deputy entered service; and the number of deputies who were terminated, the reason for termination, and the date the deputy entered service. The same report shall be provided for non-sworn (civilian staff). A cumulative annual total will also be included as part of this report.*

<u>Finding:</u>

Substantial Compliance

<u>Observations:</u>

OPSO provides a monthly report that complies with the requirements of this provision.

*7. c. At the scheduled status conferences with the Court, OPSO shall report regarding progress to achieving hiring based on the plan, as well as any modifications and update to the plan.*

<u>Finding:</u>

Partial Compliance

<u>Observations:</u>

OPSO has not sufficiently complied with the requirements of this provision. This provision envisions outlining progress on adherence to the recruitment plan in the form of a report to the Court.

<u>Stipulation and Order of June 17, 2024:</u>



**1. _Non-Compliance Corrective Action Planning_**
**a. OPSO shall implement the steps identified in the Non-Compliance Corrective Action Plan by the deadlines reported therein.**
**b. OPSO shall provide Plaintiffs and the Monitor with a monthly report regarding progress until those provisions are in substantial compliance. The Non-Compliance Monthly Report shall be sent to Plaintiffs and the Monitor three days before the regularly scheduled monthly meeting between OPSO, Plaintiffs, and the Monitor.**
**c. OPSO shall file the Non-Compliance Monthly Report with the Court once every quarter for the next calendar year. Specifically, OPSO shall file the Non-Compliance Monthly Report within 7 days of the monthly meeting held in August 2024, November 2024, February 2025, and May 2025.**

Finding:

Partial Compliance

Observations:

While OPSO has timely provided monthly reports on the Non-Compliance Action Plan and timely filed the reports within the quarterly meetings held during the monitoring period, OPSO has consistently failed to implement the steps identified by the deadlines contained therein as indicated in OPSO's own reports.

**2. _OPSO Communications to Plaintiffs and the Monitor_**
**a. Right of Access (VIII.D.-E.) Within 30 days, OPSO shall designate a new or current OPSO employee to serve under the title of "Compliance Information Officer" (CIO). The CIO will be responsible for responding to written requests for information from one or both of the Plaintiffs, including by orchestrating the production of requested documents in the possession or control of OPSO, within 14 days of receipt of such requests, consistent with paragraph 12a. of the 06/21/16 Stipulated Order. R. Doc. No. 1082. The CIO will work with OPSO staff and contractors to ensure timely production of document to the CIO within 10 days of the CIO's request to staff. If documents do not exist or are not responsive to the Plaintiffs' request for document, the OPSO employee or contractor must describe those particularized reasons for non-production of documents in a memorandum to the CIO with 10 days of the CIO's request for document. The CIO shall provide a memorandum each monitoring period to the Monitor and Plaintiffs about OPSO's compliance with this section.**

Finding:

Partial Compliance

Observations:

OPSO has failed to provide documents requested within 14 days of receipt of the request on numerous occasions. Also OPSO failed to provide a memorandum for this monitoring period regarding compliance with this section.

**3. _Staffing, Staffing Plans, and Recruitment (IV.A.6.a.-b.)_**
**a. Within 65 days, OPSO shall implement an Emergency Security Staffing Plan (ESSP). Under the ESSP, at least one deputy must be assigned to and must be physically present (and not in the pod module) on 2A (or any unit that has been designated by the Housing Unit Assignment Plan ("HUAP") as the MH (mental health) or SW (suicide watch) or DO (direct observation) or MH seg (mental health segregation) unit in the Orleans Justice Center ("OJC") , 2C (or any unit that has been designated by the HUAP to hold youthful offenders), 2D (or the units that has been designated by the HUAP to hold youthful offenders), and 3C (or the unit that has**



*been designated by the HUAP as the male disciplinary unit) 24 hours a day, 7 days a week. This deputy may not be assigned to other units and must be physically on the unit (and not in the pod module) at all times during their shift, but shall be periodically relieved by another deputy and/or supervisor during meals or breaks. The ESSP must describe how other deputies and/or supervisors will relieve the deputy assigned to 2A, 2C, 2D, and 3C during meals and breaks to ensure 24/7 physical staffing on these units. OPSO shall provide a memorandum each monitoring period to the Monitor and Plaintiffs about OPSO's compliance with this section.*

Finding:

Partial Compliance

Observations:

      OPSO implemented the Emergency Security Staffing Plan (ESSP), but at least one deputy was not consistently assigned to the required housing units. OPSO provides the required memorandum during the monitoring period.

**4.  *Custodial Placement Within OPSO (IV.A.10.)***
 **a.  *Classification System Validation (IV.A.10.f.)***
      ***i.  Within 90 days, OPSO shall secure a contract with a qualified organization or individual for the validation of the classification system. OPSO shall provide a copy of the contract to the Monitor and Plaintiffs upon its execution.***
      ***ii.  The validation of the classification system shall be completed within 180 days. OPSO shall provide documentation of the validation to the Monitor and Plaintiffs upon its completion***.

Finding:

Substantial Compliance

Observations:

      OPSO secured a contract for validation of the classification system within 90 days and provided it to the Monitors and Plaintiffs. The validation was completed within 180 days. OPSO provided documentation of the validation to the Monitors and Plaintiffs upon its completion.

**5.  *Grievances (IV.A.11.a.(1). (3))***
      ***Within 90 days, OPSO shall secure a contract for the supply of electronic kiosks that can be used to file confidential grievances electronically in each housing unit. The electronic kiosks, that will replace the currently non-functioning kiosks, shall be installed in each of the housing units, and shall be in workable order and fully operational, within 180 days. OPSO shall provide a copy of the contract to the Monitor and Plaintiffs upon its execution.***

Finding:

Partial Compliance

Observations:

      OPSO secured the contract for the supply of electronic kiosks for the confidential filing of grievances. It was not in workable order nor fully operation within 180 days. It became operational in April 2025.



**6.  *Medical and Mental Health Care (IV.B.-C.)***
***a.  Within 90 days, OPSO shall create and implement a system of notifying the Provider's mental health staff of every use of force incident by radio. For planned use of force incidents and use of force incidents where OPSO staff does not need to use immediate for to preserve the safety of staff or the safety of OPSO residents, a supervisor will radio for mental health staff prior to the use of force. This does not replace the need for identification and response to other triggering events, such as mental health involvement in de-escalation in advance of the use of force. Within 90 days, OPSO shall train deputies on the system and need to alert the Provider's mental health staff of all use of force incidents so the Provider can conduct a mental health assessment. OPSO shall provide the Monitor and Plaintiffs with documentation showing the change, the materials used during the training, and a record of who received the training.***

Finding:

Partial Compliance

Observations:

OPSO implemented a system of notifying the mental health staff of every use of force incident by radio, but did not effectively implement it. While roll call training was provided, the necessary documentation was not provided.

**7.  *Sanitation and Environment Conditions (IV.D.1.)***
***Within 60 days, OPSO shall develop and implement a cleaning program to ensure that all housing units, including common areas, day rooms, restrooms, and shower areas are cleaned at least once per week. The date of the weekly cleanings shall be documented by OPSO staff, and all housing units shall be inspected at least once a week by a security or cleaning supervisor to ensure compliance. A description of the cleaning program and documentation of its implementation shall be sent to the Monitor and Plaintiffs. Updates to the cleaning program must be submitted to the Plaintiffs and Monitor each monitoring cycle.***

Finding:

Partial Compliance

Observations:

OPSO developed and implemented a cleaning program, but the cleaning program, with the exception of the showers, was not effectively implemented so as to result in cleaning at least once per week. While documentation has improved, it was consistently provided during the monitoring period.



| | Report #1 2/13/14 | Report #2 8/26/14 | Report #3 2/25/15 | Report #4 9/9/15 | Report #5 3/17/16 | Report #6 10/25/16 | Report #7 5/1/17 | Report #8 1/12/18 | Report #9 8/25/18 | Report #10 3/18/19 | Report #11 9/19/19 | Report #12 3/6/20 | Report#13 11/16/20 | Report #14 5/17/21 | Report #15 11/15/21 | Report #16 06/26/22 | Report #17 12/08/22 | Report #18 07/13/23 | Report #19 12/07/23 | Report #20 06/24/24 | Report #21 12/19/24 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *IV.A. 1. Use of Force Policies and Procedures/Margo Frasier* | | | | | | | | | | | | | | | | | | | | | |
| *IV. A. 1.a.* | ND | NC | NC | PC | NC | PC | PC | PC | PC | SC | SC | SC | SC | PC | PC | PC | PC | PC | PC | SC | PC |
| *IV. A. 1.b.* | ND | NC | NC | PC | NC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | PC |
| *IV. A. 1.c.* | ND | NC | NC | PC | NC | NC | PC | PC | PC | SC | SC | PC | PC | PC | PC | NC | NC | NC | PC | PC | SC |
| *IV.A.2. Use of Force Training/Margo Frasier and Shane Poole* | | | | | | | | | | | | | | | | | | | | | |
| *IV. A. 2. a.* | ND | NC | NC | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC | PC | PC | SC | SC | PC | PC | PC | PC |
| *IV. A. 2. b.* | ND | NC | NC | PC | NC | PC | PC | PC | PC | PC | SC | SC | PC | PC | PC | SC | SC | SC | PC | PC | PC |
| *IV. A. 2. c.* | ND | NC | NC | NC | NC | NC | NC | NC | PC | SC | SC | SC | PC | SC | SC | SC | SC | SC | SC | SC | SC |
| *IV.A.3. Use of Force Reporting/Margo Frasier* | | | | | | | | | | | | | | | | | | | | | |
| *IV. A.3 a.* | ND | NC | NC | PC | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC | PC | PC | PC | PC | PC | PC | PC |
| *IV. A.3 b.* | ND | NC | NC | NC | NC | NC | PC | PC | PC | PC | SC | SC | SC | SC | PC | PC | PC | PC | PC | PC | PC |
| *IV. A.3 c.* | ND | NC | NC | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC | PC | PC | PC | PC | PC | PC | PC | PC |
| *IV. A.3 d.* | ND | NC | NC | PC | NC | NC | PC | PC | PC | PC | SC | SC | SC | PC | PC | PC | PC | PC | PC | PC | PC |
| *IV. A.3 e.* | ND | NC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| *IV. A.3 f.* | ND | NC | NC | PC | NC | PC | PC | PC | PC | PC | SC | SC | SC | PC | PC | PC | PC | PC | PC | PC | PC |
| *IV. A.3 g.* | ND | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | PC | PC | PC | PC | PC | PC | PC | PC |
| *IV. A.3 h.* | ND | NC | NC | PC | NC | PC | NC | PC | PC | PC | SC | SC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| *IV.A.4. Early Intervention System ("EIS") /Margo Frasier and Shane Poole* | | | | | | | | | | | | | | | | | | | | | |
| *IV.A.4.a.* | ND | NC | NC | NC | NC | PC | NC | PC | PC | PC | SC | SC | SC | PC | PC | PC | PC | PC | PC | PC | PC |
| *IV.A.4.b.* | ND | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | PC | PC | PC | PC | PC | PC | PC | PC |
| *IV.A.4.c.* | ND | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | PC | PC | PC | PC | PC |
| *IV.A.4.d.* | ND | NC | NC | NC | NC | PC | PC | NC | NC | PC | SC | SC | SC | SC | SC | PC | PC | PC | PC | PC | PC |
| *IV.A.4.e.* | ND | ND | ND | ND | NC | NC | NC | NC | NC | SC | SC | SC | SC | SC | SC | PC | PC | PC | PC | PC | PC |
| *IV.A.5. Safety and Supervision/Margo Frasier* | | | | | | | | | | | | | | | | | | | | | |

| | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IV.A.5.a. | ND | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.A.5.b. | ND | NC | NC | NC | NC | NC | NC | NC | NC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.5.c. | ND | NC | NC | NC | NC | NC | NC | PC | PC | PC | SC | SC | SC | SC | SC | PC | PC | PC | PC | PC |
| IV.A.5.d. | ND | NC | NC | PC | PC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | NC | NC | NC | NC |
| IV.A.5.e. | ND | NC | NC | PC | PC | PC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.A.5.f. | ND | NC | NC | NC | PC | PC | SC | SC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.5.g. | ND | NC | NC | ND | NC | NC | NC | NC | NC | NC | PC | SC | SC | SC | SC | PC | PC | PC | PC | PC |
| IV.A.5.h. | ND | NC | NC | NC | NC | NC | NC | NC | NC | SC | SC | SC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.A.5.i. | ND | NC | NC | PC | PC | PC | PC | PC | SC | PC | PC | PC | PC | PC | PC | PC | PC | PC | NC | NC |
| IV.A.5.j. | ND | NC | PC | PC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | NC | PC |
| IV.A.5.k. | ND | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | NC | NC | NC | PC | PC |
| IV.A.5.l. | ND | NC | NC | NC | PC | PC | PC | PC | PC | PC | SC | PC | PC | PC | PC | PC | PC | PC | PC | SC |
| **IV.A.6. Security Staffing/Margo Frasier** | | | | | | | | | | | | | | | | | | | | |
| IV.A.6.a. | ND | PC | PC | PC | SC | SC | PC | PC | PC | SC | SC | PC | PC | PC | NC | NC | NC | NC | NC | NC |
| IV.A.6.b. | ND | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | PC | PC | PC | NC | NC | NC | NC | PC | PC |
| **IV.A.7 Incidents and Referrals/Margo Frasier** | | | | | | | | | | | | | | | | | | | | |
| IV.A.7.a. | ND | NC | NC | NC | NC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.7.b. | ND | NC | NC | PC | NC | PC | PC | PC | PC | PC | PC | SC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.A.7.c. | ND | NC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.7.d. | ND | NC | NC | NC | NC | NC | NC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.7.e. | ND | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | PC | SC | SC | SC | PC | PC | PC | PC | PC |
| IV.A.7.f. | ND | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.7.g. | ND | NC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.7.h. | ND | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.7.i. | ND | NC | NC | PC | NC | NC | NC | NC | NC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.7.j. | ND | NC | NC | NC | NC | NC | NC | NC | NC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| **IV.A.8. Investigations/Margo Frasier** | | | | | | | | | | | | | | | | | | | | |
| IV.A.8.a. | ND | NC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | PC | PC | PC | PC | PC |
| IV.A.8.b. | ND | NC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |

| Provision | | | | | | | | | | | | | | | | | | | | Overall |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IV.A.8.c. | ND | NC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | PC | PC | PC | SC | SC |
| IV.A.8.d. | ND | NC | NC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.8.e. | ND | NC | NC | PC | PC | PC | PC | SCSC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.8.f. | ND | NC | NC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| *IV.A.9. Pretrial Placement in Alternative Settings/Margo Frasier* | | | | | | | | | | | | | | | | | | | | |
| IV.A.9.a. | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.9.b. | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| *IV.A.10. Custodial Placement within OPP/Patricia Hardyman* | | | | | | | | | | | | | | | | | | | | |
| IV.A.10.a. | NC | PC | SC | SC | PC | PC | PC | PC | PC | SC | SC | SC | PC | PC | NC | PC | PC | PC | PC | PC |
| IV.A.10.b. | NC | NC | NC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.10.c. | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | PC | PC | SC | SC | SC | SC |
| IV.A.10.d. | NC | NC | PC | PC | PC | PC | NC | PC | SC | PC | PC | SC | SC | SC | PC | NC | NC | NC | NC | NC |
| IV.A.10.e. | NC | NC | PC | SC | PC | PC | SC | PC | PC | PC | SC | SC | PC | PC | NC | NC | SC | NC | PC | SC |
| IV.A.10.f. | NC | NC | NC | NC | PC | PC | PC | NC | SC | PC | SC | PC | PC | PC | PC | NC | NC | NC | NC | PC |
| IV.A.10.g. | NC | NC | NC | NC | NC | PC | PC | PC | SC | SC | PC | SC | SC | PC | NC | NC | NC | SC | SC | SC |
| IV.A.10.h. | ND | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC | PC | SC | PC | SC | NC | SC | SC | SC | SC |
| *IV.A.11. Prisoner Grievance Process/Margo Frasier and Shane Poole* | | | | | | | | | | | | | | | | | | | | |
| IV.A.11.a | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | | | | | | | | | | |
| IV.A.11.a.(1) | | | | | | | | | | | SC | SC | SC | SC | SC | PC | PC | PC | PC | PC |
| IV.A.11.a.(2) | | | | | | | | | | | PC | PC | PC | PC | PC | PC | NC | NC | PC | PC |
| IV.A.11.a.(3) | | | | | | | | | | | SC | SC | SC | SC | SC | SC | SC | PC | PC | SC |
| IV.A.11.a.(4) | | | | | | | | | | | SC | SC | SC | SC | SC | SC | SC | PC | SC | SC |
| IV.A.11.a.(5) | | | | | | | | | | | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.11.a.(6) | | | | | | | | | | | PC | SC | SC | SC | SC | SC | SC | PC | PC | SC |
| *IV.A.12. Sexual Abuse/Margo Frasier* | | | | | | | | | | | | | | | | | | | | |
| IV.A.12. | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | PC | PC | PC | PC | PC | PC | PC | PC |
| *IV.A.13. Access to Information/Margo Frasier* | | | | | | | | | | | | | | | | | | | | |
| IV.A.13. | PC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | PC | PC | PC | NC | NC | NC | PC |
| *IV. B. Mental Health Care* | | | | | | | | | | | | | | | | | | | | |
| *IV.B.1. Screening and Assessment/Nicole Johnson* | | | | | | | | | | | | | | | | | | | | |

| | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IV.B.1.a. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | PC | PC | SC | SC | SC | SC | PC | PC | PC |
| IV.B.1.b. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | PC | SC | SC | SC | SC | SC | SC | PC |
| IV.B.1.c. | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | PC | SC | SC | SC | SC | SC | SC | PC |
| IV.B.1.d. | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | PC | SC | SC | SC | SC | PC | SC | PC |
| IV.B.1.e. | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.1.f. | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.1.g. | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.1.h. | NC | NC | NC | NC | NC | NC | NC | NC | PC | SC | SC | SC | SC | SC | SC | SC | SC | PC | PC | PC | PC |
| IV.B.1.i. | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.1.j. | NC | NC | NC | PC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.1.k. | NC | NC | NC | PC | NC | NC | NC | NC | NC | PC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.1.l. | NC | NC | NC | NC | NC | NC | NC | NC | NC | SC | SC | SC | SC | PC | PC | PC | PC | SC | SC | SC | PC |
| **B. 2. Treatment/Nicole Johnson** | | | | | | | | | | | | | | | | | | | | | |
| IV.B.2.a. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.2.b. | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.2.c. | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.2.d. | NC | NC | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.2.e. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | PC | PC | PC | PC |
| IV.B.2.f. | NC | NC | NC | PC | PC | PC | NC | PC | PC | PC | SC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.2.g. | NC | NC | NC | PC | PC | PC | NC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.B.2.h. | NC | NC | NC | PC | PC | PC | PC | PC | NC | PC | SC | SC | SC | PC | PC | PC | PC | PC | PC | PC | PC |
| **IV.B.3. Counseling/Nicole Johnson** | | | | | | | | | | | | | | | | | | | | | |
| IV.B.3.a. | NC | NC | NC | NC | PC | NC | NC | PC | PC | PC | PC | PC | PC | NC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.3.b. | NC | NC | NC | NC | NC | PC | NC | NC | NC | PC | PC | PC | PC | NC | PC | PC | SC | SC | SC | SC | PC |
| **IV.B.4. Suicide Prevention Training Program/Nicole Johnson** | | | | | | | | | | | | | | | | | | | | | |
| IV.B.4.a. | NC | NC | NC | PC | PC | PC | PC | PC | NC | PC | PC | PC | NC | NC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.4.b. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | PC | PC | PC | SC | SC | SC | SC |
| IV.B.4.c. | NC | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC | PC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.B.4.d. | NC | NC | NC | PC | PC | NC | NC | NC | PC | NC | PC | PC | PC | NC | NC | PC | PC | PC | PC | PC | PC |
| IV.B.4.e. | NC | NC | NC | PC | NA | PC | PC | PC | PC | PC | PC | SC | SC | PC | SC | SC | SC | PC | PC | PC | SC |

| | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IV.B.4.f. | NC | NC | NC | NC | PC | PC | NC | NC | SC | SC | SC | SC | SC | SC | PC | PC | PC | PC | PC | SC | SC |
| IV.B.4.g. | NC | NC | NC | SC | PC | NC | NC | NC | NC | PC | NC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| *IV.B.5. Suicide Precautions/Nicole Johnson* | | | | | | | | | | | | | | | | | | | | | |
| IV.B.5.a. | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.5.b. | NC | NC | NC | NC | NC | NC | NC | PC | PC | SC | PC | PC | NC | NC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.5.c. | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.5.d. | NC | NC | NC | NC | NC | NC | NC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | PC | PC | PC |
| IV.B.5.e. | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.5.f. | NC | NC | NC | NC | NC | NC | NC | NC | PC | SC | SC | PC | SC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.5.g. | NC | NC | NC | NC | NC | NC | NC | PC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC |
| IV.B.5.h. | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | SC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.5.i. | NC | NC | NC | NC | NC | NC | NC | PC | PC | SC | SC | SC | SC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.5.j. | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | PC |
| IV.B.5.k. | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| *IV.B.6. Use of Restraints/Nicole Johnson* | | | | | | | | | | | | | | | | | | | | | |
| IV.B.6.a. | PC | NC | PC | PC | PC | PC | PC | PC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.6.b. | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.B.6.c. | ND | NC | PC | PC | PC | PC | PC | PC | PC | NC | PC | NC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.B.6.d. | ND | NC | PC | PC | PC | PC | PC | PC | PC | NC | PC | SC | PC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.B.6.e. | NC | NC | PC | PC | PC | PC | PC | PC | NC | PC | NC | SC | SC | SC | PC | SC | SC | SC | SC | SC | SC |
| IV.B.6.f. | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.B.6.g. | NC | NC | PC | PC | PC | PC | PC | PC | NC | PC | NC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| *IV.B.7. Detoxification and Training/Nicole Johnson/Susi Vassallo* | | | | | | | | | | | | | | | | | | | | | |
| IV.B.7.a. | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.7.b. | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | PC | PC | PC | PC | PC |
| IV.B.7.c. | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | SC | PC | PC | PC | PC | PC | NC | NC | PC | PC | PC |
| IV.B.7.d. | NC | NC | PC | PC | PC | PC | PC | PC | PC | NC | PC | PC | PC | SC | SC | SC | PC | NC | PC | NC | PC |
| *IV.B.8. Medical and Mental Health Staffing/Nicole Johnson/Susi Vassallo* | | | | | | | | | | | | | | | | | | | | | |
| IV.B.8.a. | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.8.b. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | PC | PC |

| | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *IV.B.9. Risk Management/Nicole Johnson/Susi Vassallo* | | | | | | | | | | | | | | | | | | | | |
| IV.B.9.a. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.9.b. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.9.c. | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.9.d. | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.9.e. | NC | NC | NC | NC | PC | PC | PC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.9.f. | NC | NC | NC | NC | PC | PC | PC | NC | NC | PC | PC | PC | PC | PC | PC | PC | NC | PC | | NC |
| *IV.C. Medical Care* | | | | | | | | | | | | | | | | | | | | |
| *See SA 2/11/15 13.* | | | | | | | | | | | | | | | | | | | | |
| *IV. C. Quality Management of Medication Administration/Susi Vassallo* | | | | | | | | | | | | | | | | | | | | |
| IV.C.1.a. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | PC | PC | PC | PC |
| IV.C.1.b. | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | SC | PC | PC | SC | SC | SC | PC | PC | PC | PC |
| IV.C.1.c. | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | PC | SC | SC | SC | SC | SC | SC | SC |
| IV.C.1.d. | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | PC | PC | PC | PC | PC | PC | PC | PC |
| *IV.C.2. Health Care Delivered/Susi Vassallo* | | | | | | | | | | | | | | | | | | | | |
| IV.C.2.a. | NC | NC | PC | PC | PC | PC | PC | PC | NC | PC | PC | SC | SC | SC | SC | PC | PC | PC | PC | PC |
| IV.C.2.b. | NC | NC | PC | PC | PC | PC | PC | PC | NC | PC | PC | PC | PC | PC | PC | PC | SC | PC | PC | PC |
| *IV.C.3. Release and Transfer/Susi Vassallo* | | | | | | | | | | | | | | | | | | | | |
| IV.C.3.a. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.C.3.b. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.C.3.c. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.C.3.d. | NC | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| *IV.D. Sanitation and Environmental Conditions/Shane Poole* | | | | | | | | | | | | | | | | | | | | |
| IV. D. 1.a. | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | NC | NC | NC | NC | PC |
| IV. D. 1.b. | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | PC | PC | PC | PC |
| IV. D. 1.c. | NC | PC | PC | NC | NC | SC | SC | PC | PC | SC | SC | SC | SC | SC | NC | NC | PC | PC | | PC |
| IV. D. 1.d. | NC | NC | NC | NC | SC | SC | SC | SC | SC | SC | PC | PC | PC | NC | NC | SC | PC | PC | PC | PC |
| IV. D. 1.e. | NC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | PC | PC | PC | PC | PC | PC | PC |
| IV. D. 1.f. | NC | NC | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV. D. 1.g. | NC | NC | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |

| | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IV. D. 1.h. | NC | NC | NC | PC | NC | PC | NC | NC | NC | PC | PC | PC | SC | SC | SC | SC | SC | PC | PC | SC | SC |
| *IV. D. 2. Environmental Control/Shane Poole* | | | | | | | | | | | | | | | | | | | | | |
| IV. D. 2.a. | NC | NC | PC | PC | PC | SC | SC | SC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV. D. 2.b. | NC | NC | NC | NC | SC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | PC | PC | PC | PC | PC |
| *IV. D. 3. Food Service/Diane Skipworth* | | | | | | | | | | | | | | | | | | | | | |
| IV. D. 3.a. | NC | NC | NC | PC | PC | PC | NC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV. D. 3.b. | NC | NC | NC | PC | PC | PC | NC | NC | NC | NC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV. D. 3.c. | NC | NC | NC | PC | NC | NC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | PC | PC | SC | SC |
| *IV. D. 4. Sanitation and Environmental Conditions Reporting/Shane Poole* | | | | | | | | | | | | | | | | | | | | | |
| IV. D. 4.a. | NC | NC | PC | PC | PC | PC | PC | PC | NC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV. D. 4.b. | NC | NC | NC | PC | NC | NC | NC | PC | SC | SC | SC | SC | SC | SC | SC | PC | PC | SC | SC | SC | PC |
| *IV.E. Fire and Life Safety/Shane Poole* | | | | | | | | | | | | | | | | | | | | | |
| *IV. E. 1. Fire and Life Safety* | | | | | | | | | | | | | | | | | | | | | |
| IV. E. 1.a. | NC | PC | PC | PC | PC | PC | SC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | NC | SC | SC |
| IV. E. 1.b. | NC | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV. E. 1.c. | PC | PC | PC | PC | NC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | PC | SC | SC |
| IV. E. 1.d. | NC | NC | NC | NC | NC | NC | PC | SC | PC | SC | SC | SC | NC | PC | PC | SC | SC | SC | PC | PC | PC |
| IV. E. 1.e. | ND | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| *IV. E. 2. Fire and Life Safety Reporting* | | | | | | | | | | | | | | | | | | | | | |
| IV. E. 2.a.1-3 | ND | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | PC | PC | SC | SC | SC |
| IV. E. 2.b. | ND | NC | NC | PC | NC | NC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | PC | SC | SC | SC | SC |
| *IV.F. Language Assistance* | | | | | | | | | | | | | | | | | | | | | |
| *SCIV.F.1. Timely and Meaningful Access to Services/Margo Frasier* | | | | | | | | | | | | | | | | | | | | | |
| IV.F.1.a. | ND | PC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| *IV.F.2. Language Assistance Policies and Procedures/Margo Frasier* | | | | | | | | | | | | | | | | | | | | | |
| IV.F.2.a. | ND | PC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.F.2.b. | ND | PC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| *IV.F.3. Language Assistance Training/Margo Frasier* | | | | | | | | | | | | | | | | | | | | | |
| IV.F.3.a. | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |

| | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *IV.F.4. Bilingual Staff/Margo Frasier* | | | | | | | | | | | | | | | | | | | |
| *IV.F.4.* | NC | PC | PC | PC | PC | NC | NC | NC | NC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| *IV.G. Youthful Prisoners/Margo Frasier* | | | | | | | | | | | | | | | | | | | |
| *IV.G.* | NC | NC | NC | PC | PC | PC | PC | NC | NC | PC | PC | PC | SC | SC | SC | SC | PC | SC | SC |
| *VI. The New Jail Facility/Margo Frasier* | | | | | | | | | | | | | | | | | | | |
| *VI. A.* | ND | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| *VI. B.* | NC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| *VI. C.* | ND | SC | SC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | PC | PC | PC | PC | PC | PC |
| *VI. D.* | Monitors Not Qualified to Evaluate | | | | | | | | | | | | | | | | | | |
| *VII. Compliance and Quality Improvement/Margo Frasier* | | | | | | | | | | | | | | | | | | | |
| *VII. A.* | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | PC | SC | SC | PC | SC | PC | PC | PC |
| *VI. B. (H.)* | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| *VI. C. (I.)* | NC | NC | SC | SC | NC | SC | SC | NC | PC | SC | SC | SC | SC | PC | PC | SC | SC | SC | SC |
| *VI. D. (J.)* | ND | NC | NC | PC | PC | NC | NC | NC | SC | SC | SC | PC | PC | SC | SC | SC | SC | SC | SC |
| *VIII. Reporting Requirements and Right of Access/Margo Frasier* | | | | | | | | | | | | | | | | | | | |
| *VIII.A.* | ND | PC | PC | NC | PC | PC | NC | NC | PC | SC | SC | SC | SC | SC | PC | PC | PC | PC | PC |
| *VIII.B.* | PC | PC | PC | SC | SC | SC | SC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| *VIII.C.* | PC | PC | PC | SC | SC | SC | NC | NC | PC | PC | SC | SC | SC | PC | PC | PC | PC | PC | PC |
| *Legend:* | | | | | | | | | | | | | | | | | | | |
| *ND - Not scheduled for review* | | | | | | | | | | | | | | | | | | | |
| *NC - Non-compliance* | *106* | *51* | *62* | *52* | *53* | *43* | *44* | *8* | *5* | *0* | *4* | *7* | *0* | *5* | *17* | *12* | *11* | *9* | *5* |
| *PC - Partial Compliance* | *57* | *106* | *96* | *99* | *100* | *105* | *100* | *98* | *66* | *60* | *59* | *67* | *77* | *79* | *77* | *85* | *95* | *92* | *97* |
| *SC - Substantial Compliance* | *4* | *11* | *10* | *18* | *16* | *20* | *25* | *63* | *103* | *114* | *111* | *100* | *97* | *90* | *80* | *77* | *68* | *73* | *72* |
| *TOTAL* | | | | | | | | | *174* | *174* | *174* | *174* | *174* | *174* | *174* | *174* | *174* | *174* | *174* |

