# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| _____ | § |
| LASHAWN JONES, *et al.*, and | § |
| THE UNITED STATES OF AMERICA, | § |
| | § Civil Action No. 2:12-cv-00859 |
| PLAINTIFFS | § Section I, Division 5 |
| | § Judge Lance M. Africk |
| | § Magistrate Judge Michael B. North |
| SUSAN HUTSON, Sheriff, | § |
| | § |
| | § |
| DEFENDANT. | § |
| _____ | § |

---

## Report No. 22 of the Independent Monitors
## September 29, 2025

---

Margo L. Frasier, J.D., C.P.O., Lead Monitor
Susi Vassallo, M.D., Medical Monitor
Patricia L. Hardyman, Ph.D., Classification Monitor
Nicole Johnson, M.D., Mental Health Monitor
Shane J. Poole, M.S., C.JM., Environmental Fire Life Safety Monitor
Diane Skipworth, M.C.J., R.D.N., L.D., R.S., C.C.H.P., C.L.L.M., Food Safety Monitor



***Compliance Report #22***
***LASHAWN JONES, et al., and the United States of America v.***
***Susan Hutson, Sheriff***

Table of Contents

**Page**

| | | |
|---|---|---|
| I. | Introduction | 4 |
| | A. Summary of Compliance | 7 |
| | B. Opportunities for Progress | 11 |
| | C. Review Process of Monitors' Compliance Report #21 | 24 |
| | D. Communication with Stakeholders | 24 |
| | E. Recommendations | 25 |
| II. | Conclusions and Path Forward | 25 |
| III. | Substantive Provisions | |
| | A. Protection from Harm | 27 |
| | A.1. Use of Force Policies and Procedures | 31 |
| | A.2. Use of Force Training | 33 |
| | A.3. Use of Force Reporting | 36 |
| | A.4. Early Intervention System | 41 |
| | A.5. Safety and Supervision | 42 |
| | A.6. Security Staffing | 53 |
| | A.7. Incidents and Referrals | 55 |
| | A.8. Investigations | 58 |
| | A.9. Pretrial Placement in Alternative Settings | 60 |
| | A.10. Custodial Placement | 60 |
| | A.11. Prisoner Grievance Process | 90 |
| | A.12. Sexual Abuse | 99 |
| | A.13. Access to Information | 100 |
| | B. Mental Health Care | 100 |
| | C. Medical Care | 149 |
| | D. Sanitation and Environmental Conditions | 159 |
| | E. Fire and Life Safety | 178 |
| | F. Language Assistance | 183 |
| | G. Youthful Prisoners | 184 |
| | H. The New Jail Facility | 185 |
| | I. Compliance and Quality Improvement | 186 |
| | J. Reporting Requirements and Right of Access | 188 |
| IV. | Status of Stipulated Orders – February 2015, April 2015, and June 2024 | 189 |



**Page**

**Tables**
Table 1 – Summary of Compliance – All Compliance Reports          10
Table 2 – Status of Compliance – Stipulated Agreements          10
Table 3 – Summary of Incidents CY 2018-June 2025          28
Table 4 – CY 2018-June 2025 All OJC Reported Incidents by Month          30
Table 5 – CY 2018-June 2025 OJC Reported Incidents          46

**Figures**
Figure 1 – Percentage of Black Male Inmates Assigned Special Population
　　　　　Housing Units—Oct. 2024-June 2025          69
Figure 2 – Percentage of Black Male Inmates Assigned Special Population
　　　　　Versus OPSO Black Male Population—Oct. 2024-June 2025          69
Figure 3 – Rates and Completion Time of Initial Custody Assessments
　　　　　Completed July 2024-June 2025          72
Figure 4 – Number of OPSO Booking Per Month—Jan. 2023-June 2025          73
Figure 5 – Custody Override Reasons— Oct. 2024-June 2025          75
Figure 6 – Mandatory and Discretionary Override Rates by Gender
　　　　　July 2024-June 2025          76
Figure 7 – Pending Custody Assessments July 2023-June 2025          77
Figure 8 – Victimization of Inmates on the Mental Health Caseload
　　　　　July 2023-June 2025          79
Figure 9 – Number of Attachments input by Classification Staff
　　　　　—July 2023-June 2025          80
Figure 10 – Percentage of Initial Custody Assessments with Attachment
　　　　　July 2023-June 2025          80
Figure 11–Rate of Disciplinary Infractions for the OPSO ADP: July 2023-
　　　　　June 2025          87
Figure 12—OPSO ADP vs. Number of Disciplinary July 2023-June 2025          88
Figure 13—Most Serious Disciplinary Infraction/Report with Finding of
　　　　　Guilty: July 2023-June 2025          89

**Charts**
Chart 1—Facility, Food Service, Medical, Mental Health, and Miscellaneous
　　　　　Grievances          94
Chart 2-- Inmate/Inmate Physical Violence and PREA, Staff Misconduct and
　　　　　PREA, Life-Threatening, and Use of Force Grievances          95
Chart 3--  Commissary, Programs, Inmate Funds, Property, Grievance
　　　　　Appeals, Legal and Law Library Grievances          96
　Chart 4—Overdue Grievance Reports by Month          97

**Appendices**
Appendix A - Summary Compliance Findings by Section Compliance
Reports 1 – 18          195



**Compliance Report # 22**

I.    **Introduction:**

This is Compliance Report #22 submitted by the Independent Monitors providing assessment of the Orleans Parish Sheriff's Office's (OPSO) compliance with the Consent Judgment of June 6, 2013. Compliance Report #22 reflects the status of OPSO's compliance as of June 30, 2025. This report is based on incidents, documents, and compliance-related activities between October 1, 2024, and June 30, 2025. Where appropriate, the report reflects the change that occurred between June 30, 2025, and the on-site compliance tour. All of the monitors were present on-site for the compliance tour that occurred July 28-31, 2025. This report is based on the observations and review of OPSO documents by the Monitors during the on-site visits and during the monitoring period.

Compliance Report #22 is the first report filed since the escape of ten high-risk violent inmates from the OJC on May 16, 2025. The escape and the events that led up to its occurrence and to OPSO not detecting the escape for over seven hours are the result of OPSO's failure to correct the shortcomings which have been pointed out by the Monitors in the previous reports. When appropriate, Report #22 details how the failure to adhere to the provisions of the Consent Judgment contributed to the escape and/or the failure to detect the escape.

Throughout the time the Monitors have been involved in enforcement of the Consent Judgment, the on-site visits have played an integral role. During the on-site visits and the on-site visits by the Lead Monitor and various other monitors in between the monitoring tours, the Monitors have endeavored to provide guidance to OPSO as to how to remedy the unsafe and unconstitutional conditions which existed when we began monitoring in late 2013, and which continue to exist. In addition to the on-site compliance tours by the Monitors, the Lead Monitor also visited November 17-20, 2024, December 16-19, 2024, January 13-15, 2025, February 17-19,2025, March 17-19, 2025, May 19-21, 2025, June 10-11, 2025, June 16-18, 2025, July 9-10, 025, and July 22-23, 2025. Monitor Hardyman visited January 13-15, 2025, and May 20-21, 2025. Monitor Poole also visited November 18-20, 2024, January 13-15, 2025, February 17-19, 2025, and March 17-19, 2025. Additionally, all of the Monitors were in frequent contact with OPSO via other



methods such as emails, telephone calls, and virtual meetings.

Sheriff Susan Hutson was sworn in as Orleans Parish Sheriff in May 2022. Compliance Report #22 is the fifth monitoring period for which Sheriff Hutson was sheriff the entire time. For the entire compliance period, Jeworski Mallett served as the Chief of Corrections.

On May 14, 2024, Judge Africk held a hearing on the status of compliance with special emphasis on the findings in Report #19. After hearing testimony from the monitors as to conditions and compliance, the Court ordered OPSO, in consultation with the parties, to file a stipulation regarding a corrective action plan (CAP) with respect to provisions in non-compliance by June 13, 2024. The Court also set deadlines for the filing of stipulations regarding corrective action plans with respect to provisions in partial compliance June 24, 2024, August 2, 2024, and September 28, 2024. The parties also agreed to a Stipulation and Order that was entered by the Court on June 17, 2024. As part of the Stipulation and Order, OPSO was also required to provide a report on its progress with adherence to the corrective action plans each month, to file a report quarterly with the Court, and other obligations. OPSO has provided the monthly reports and filed quarterly reports. The quality of the reports and the progress on compliance with the corrective action plans will be addressed later in this report.

The requirement that OPSO, in consultation with the parties and monitors, formalize corrective action plans which are intended to ultimately result in substantial compliance with each provision of the Consent Judgment was a monumental step. The Monitors have consistently urged OPSO to put in place the necessary processes and procedures to not only obtain compliance, but to sustain compliance. The Monitors have stressed that such processes and procedures would allow OPSO to take the necessary steps towards compliance, provide adequate proof of compliance, independently assess compliance with the Consent Judgment and its own policies and procedures, and address shortcomings without waiting for the Monitors to point out the shortcomings in the bi-annual reports to the Court. The Monitors have provided guidance as to how to go about the various review functions and how to establish a compliance unit that would operate independently of those whose performance would be assessed. While there had been talk about the formation of a compliance unit over the lifetime of the Consent Judgment, it did



not become operational until Sheriff Hutson took office. The Compliance and Accountability Bureau (CAB) has been in existence for the past four monitoring periods. The requirements of the Orders issued by Judge Africk necessitated the formalization of the corrective action plans including producing a corrective action plan for every provision not in substantial compliance.

The establishment and development of the CAB and the Jail Compliance Team (JCT) are monumental steps in the right direction. A fully staffed compliance unit, trained in conducting audits in a correctional setting, with a fully developed strategic plan will allow OPSO to recognize deficiencies and address them. The CAB and JCT are important to the work to be done on gaining and sustaining compliance. Equally important is adopting a culture where accountability is embraced as opposed to a culture where there is a reluctance to address the deficiencies and, in some instances, undermining the efforts of those whose job it is to objectively review data and accurately assess compliance status.

OPSO continues to not have an electronic way of recording when and if security checks take place in the housing units. Since there is not an electronic record of security checks, deputies write the checks on a paper form. Often, supervisors, who are also required to make security checks and inspections, do not record their security checks in any manner. Even when recorded, the paper form is insufficient proof that an appropriate security check actually occurred and when it occurred. To appropriately verify the accuracy of the times recorded and the method used, the JCT spends hours watching video to determine if and when the security check occurred and whether it was performed correctly. As far as the corrective action plan, CAB performed a baseline audit of staff and supervisor security checks for the period of April 14, 2024, through April 20, 2024. The audit found that the day shift actually only performed 15% of the checks indicated on their logs and the night shift actually only performed 7% of the security checks indicated on their logs. It is important to note that this does not mean 15% and 7% of the required security checks were performed. It only means that, of the security checks recorded, 15% and 7% were accurate. The percentage of required security checks was even lower. This is, unfortunately, consistent with the systemic deficiencies identified by the monitoring team during on-site visits when deputies were inconsistent in describing how an acceptable security check would be performed and where it was



observed that having a security check indicated on a form did not mean it occurred in reality. The deputies admitted that they did not perform all of the tasks for a proper security check each time a security check was recorded as having taken place. On the majority of the housing units, an adequate security check was only performed, if at all, when a physical count of the inmates took place; twice a day. OPSO reported that the escape on May 16, 2025, was discovered by a deputy performing a security check at the beginning of her shift. While the official investigation report has yet to be released, given the lack of staff assigned to the unit, it is likely that no security check had been carried out on that housing unit for the previous eight to twelve hours before the escape was discovered. This not only resulted in the escape occurring undetected but provided the escaped inmates with a significant head start on those trying to recapture them. Supervisors often claim they conduct security checks and inspections, but the appearance of the housing areas and the lack of documentation calls those claims into doubt. While supervisors entered the housing unit from which the escape occurred several times during the period between midnight and discovery of the escape some seven hours later, it is likely that not one supervisor conducted an inspection or security check.

In other areas of the Consent Judgment, progress has been sporadic. In some areas, there has been progress, and in some cases, there has been regression. Overall, ratings improved in eleven (11) provisions and regressed in fourteen) provisions. Nine (9) provisions were moved to substantial compliance while twelve (12) provisions regressed from substantial compliance. One (1) provision moved from non-compliance to partial compliance, but two (2) provisions moved from partial compliance to non-compliance. Four (4) of the provisions in non-compliance related to the safety and security of the facility and the staffing of the facility. One non-compliant provision relates to maintenance issues. The remaining non-compliant provision relates to mental health care. The lack of additional progression and, in some cases, regression is due to a failure to follow the policies and procedures that have been put in place. It has been exacerbated by the lack of staff, but many of the provisions are not reliant on security staffing. The specific areas are addressed in this report.

**A.     Summary of Compliance**

The requirements of the Consent Judgment represent correctional practice



recognized as required for the operation of a Constitutional jail system. While there is some flexibility in addressing the mandates, achieving substantial compliance with the Consent Judgment, and Stipulated Agreements are necessary to bring OPSO and its correctional facilities into adherence with Constitutional requirements. The Consent Judgment contains 174 separately rated provisions. While they are separately rated, they are often intertwined. For example, effective implementation of a policy requires not only the drafting of a suitable policy, but appropriate training on the policy and enforcement of the policy. Enforcement of the policy is contingent on assessing whether the policy is being followed which requires supervision, analysis of incidents and data, and objective confirmation of compliance. A meaningful annual review of the adequacy of the policy does not just mean determining whether the wording of the policy should be changed but also includes evaluating adherence to the policy and whether the objectives of the policy are being met; which requires objective data collection and analysis, and the development of and adherence to corrective action plans. While appropriate policies have been developed, the objective data collection, and the analysis and development of corrective action plans have been lacking thus far. The collection of data is now in its infancy with the establishment and implementation of the CAB under Sheriff Hutson. The CAB has been instrumental in the development of the corrective actions plans now required by court order. The challenge has proven to be the execution of the corrective action plans in a timely and thorough manner. Thus far, implementation and adherence to the corrective actions plans filed with the Court has not been sufficient to bring OPSO into substantial compliance. The particulars as to each provision are addressed in this report.

The goal is substantial compliance with all of the provisions of the Consent Judgment. There has not been improvement in the number of provisions in non-compliance as there are now six (6) provisions in non-compliance (3.5%) as opposed to five (5) provisions in Report #21 (2.9%), nine (9) provisions in Report #20 (5.1%), eleven (11) provisions in Report #19 (6.3%), twelve (12) provisions in Report #18 (6.8%), and seventeen (17) provisions in Report #17; however, in Report #16, there were five (5). Substantial compliance was achieved for seventy (70) of the provisions (40.2%). Ninety-eight (98) of the provisions are in partial compliance (56.3%).

Under the authority of the Independent Compliance Director, OPSO made material



progress as indicated by the movement of non-compliance to partial compliance to substantial compliance for over half of the provisions. At different times during the duration of the Consent Judgment, including in some areas in this report, there has been regression in the progress towards compliance. As will be addressed in individual areas, OPSO has shown regression from the progress in some provisions due to failure to consistently follow and enforce policies and procedures and to provide meaningful training. OPSO has also shown improvement in other provisions.

During the onsite visit for Compliance Report #22, it was apparent that there continues to be an effort being made to utilize data analyses, including institutional violence data and use of force data to determine policy adherence and develop action plans to address shortcomings and make decisions. As the collection of data on institutional violence improves, the development of a systematic approach to making decisions and implementing and enforcing them to reduce institutional violence is key. For instance, review of incident reports and disciplinary reports continues to clearly indicate that much of the violence is perpetrated by an identifiable group of inmates. OJC leadership has compiled a list of the inmates involved in multiple incidents and have access to the data to allow OPSO to identify inmates involved in institutional violence. However, due to the lack of a close custody housing unit with appropriate security measures to house problematic inmates, other than the short time they might be placed on the disciplinary unit, little has been done to separate them from the general population. There were renewed discussions during the compliance period about reestablishing a close custody housing unit. There has been several meetings about the criteria for placement of inmates in the close custody unit, appropriate reviews of continued placement, makeup of the board conducting the reviews, and the restrictions on inmates in the close custody housing unit. It appears that the close custody unit will become a reality by October 2025.

The establishment of the CAB and the JCT are a definite move in the right direction, but the concept of accountability and a systematic approach must become part of the OPSO culture, and both the CAB and JCT must be fully staffed, fully trained, with a fully developed strategic plan to be effective. Otherwise, the same deficiencies are likely to continue to be noted time and time again.



**Table 1 – Summary of Compliance – All Compliance Reports[1]**

| Compliance Report/Date | Substantial Compliance | Partial Compliance | Non-Compliance | NA/Other | Total |
|---|---|---|---|---|---|
| #1 – December 2013 | 0 | 10 | 85 | 76 | 171 |
| #2 – July 2014 | 2 | 22 | 149 | 1 | 174 |
| #3 – January 2015 | 2 | 60 | 110 | 2 | 174 |
| #4 – August 2015 | 12 | 114 | 43 | 4 | 173 |
| #5 – February 2016 | 10 | 96 | 63 | 4 | 173 |
| #6 – September 2016 | 20 | 98 | 53 | 2 | 173 |
| #7 – March 2017 | 17 | 99 | 55 | 2 | 173 |
| #8 – November 2017 | 23 | 104 | 44 | 2 | 173 |
| #9 – June 2018 | 26 | 99 | 46 | 2 | 173 |
| #10 – January 2019 | 65 | 98 | 8 | 2 | 173 |
| #11 – September 2019 | 103 | 66 | 5 | 0 | 174 |
| #12 – May 2020 | 118 | 56 | 0 | 0 | 174 |
| #13-- November 2020 | 111 | 59 | 4 | 0 | 174 |
| #14—May 2021 | 100 | 67 | 7 | 0 | 174 |
| #15—November 2021 | 97 | 77 | 0 | 0 | 174 |
| #16—May 2022 | 95 | 72 | 5 | 0 | 174 |
| #17—December 2022 | 80 | 77 | 17 | 0 | 174 |
| #18—July 2023 | 76 | 86 | 12 | 0 | 174 |
| #19—December 2023 | 68 | 95 | 11 | 0 | 174 |
| #20—June-July 2024 | 73 | 92 | 9 | 0 | 174 |
| #21—December 2024 | 72 | 97 | 5 | 0 | 174 |
| #22—July 2025 | 70 | 98 | 6 | 0 | 174 |

With the entry of the Stipulated Order in June 2024, seven new supplemental provisions have been added. The status of compliance (February 2015, April 2015, and June 2024) is as follows:

**Table 2 – Status of Compliance with 2015 and 2024 Stipulated Agreements**

| Compliance Report/Date | Substantial Compliance | Partial Compliance | Non-Compliance | NA | Total |
|---|---|---|---|---|---|
| August 2015 | 21 | 12 | 1 | 0 | 34 |
| February 2016 | 21 | 12 | 1 | 1 | 34 |
| September 2016 | 26 | 7 | 1 | 0 | 34 |
| March 2017 | 28 | 4 | 1 | 1 | 34 |
| November 2017 | 21 | 11 | 1 | 1 | 34 |
| June 2018 | 23 | 8 | 2 | 1 | 34 |
| January 2019 | 28 | 5 | 0 | 1 | 34 |
| September 2019 | 28 | 5 | 0 | 1 | 34 |



| | | | | |
|---|---|---|---|---|
| May 2020 | 28 | 5 | 0 | 1 | 34 |
| November 2020 | 32 | 2 | 0 | 0 | 34 |
| May 2021 | 32 | 2 | 0 | 0 | 34 |
| November 2021 | 32 | 2 | 0 | 0 | 34 |
| May 2022 | 32 | 2 | 0 | 0 | 34 |
| December 2022 | 32 | 2 | 0 | 0 | 34 |
| July 2023 | 32 | 2 | 0 | 0 | 34 |
| December 2023 | 29 | 5 | 0 | 0 | 34 |
| June-July 2024 | 29 | 5 | 0 | 0 | 34 |
| December 2024 | 30 | 11 | 0 | 0 | 41 |
| July 2025 | 30 | 11 | 0 | 0 | 41 |

**B.      Opportunities for Continued Progress**

The Monitors summarize below the areas identified in preparation of this report regarding OPSO's current level of compliance with the Consent Judgment.

**1.      Foundational Work** - The essential, core work required to achieve compliance includes:

- Policies and Procedures – OPSO completed the essential policies and procedures. The required reviews and necessary updates fell behind with the promotion of the Policy Manager to Deputy Chief of Jail Operations in May 2023. The Policy Manager position was filled during the previous monitoring period, and there has been a concerted effort to conduct the annual reviews required. Finalization of policies reviewed has proven cumbersome as there appears to be a lack of coordination and communication within OPSO and with the parties and the Monitors. The Policy Manager seems to often be left out of the loop. In addition to the creation and/or revision of policies, it is essential that there be development, approval, and implementation of lessons plans and training that correspond with each of the policies. OPSO's policy governing its written directive system, if adhered to, would significantly improve the policy/procedure process. OPSO, as part of its corrective action plans, has begun to offer training, including roll call training, for areas where it has been found that the execution of policy is lacking. Adherence to the policies, procedures, and training is essential. While the full implementation of fully



staffed and functioning CAB and JCT will be helpful through its objective auditing of policy adherence, the consistent enforcement of policies is a role which must be performed by the supervisors at all levels. Too often the failure to follow policy is blamed on the lack of staff or training. Neither is an acceptable excuse. Whether it is lack of supervision, lack of staff, or inadequate training, the result of failure to follow policy is often harmful to staff and/or inmates and still is not adequately being addressed.

- <u>Inadequate staffing</u> – OPSO has continued to hire staff and has made progress despite the large number of terminations and resignations. During CY 2021, OPSO lost significant ground in that it hired 97 new staff members and lost 177 staff members through resignation, termination, and retirement. During CY 2022, OPSO hired 136 new staff members and lost 185 staff members through resignation, termination, and retirement. During CY 2023, OPSO hired 265 new staff members and lost 136 staff members through resignation, termination, and retirement. During CY 2024, OPSO hired 200 new staff members and lost 141 staff members through resignation, termination, and retirement. These staff members reflect staff across all operations of the OPSO; not solely the jail operation. Of the 200 staff members hired during CY of 2024, approximately two-thirds (134) were assigned to jail operations. This is an improvement over CY 2023 when it was less than half. However, 115 of the 141 staff members who left employment during CY 2024, were assigned to security functions in OJC. Thus, over 80% of the retirements, resignations, and terminations were assigned to security functions in the OJC. This resulted in a net gain of 19 new staff members assigned to jail operations. It should be noted that this does not mean 19 new recruits/deputies as it includes intake clerks and corrections monitoring technicians. During the first six months of 2025, 139 staff were hired of which 102 were assigned to jail operations. Seventy-six staff members were lost through resignation, termination, and retirement of which 52 were assigned to jail operations. This resulted in a net gain of 50 security staffing assigned to jail operations. Even with that



addition, the staff assigned to the housing areas of the facilities (OJC and TMH) is extremely inadequate to comply with the Consent Judgment. Given the lack of staff, it is the opinion of the Monitors that significant amounts of scheduled overtime of the current staff will continue to be required to staff the housing units at even a minimally acceptable level. Mandatory overtime of two shifts per pay period (14 days) was implemented in mid-September 2024. The requirement that units within the OPSO outside of OJC assist in staffing OJC has been formalized through the Emergency Staffing and Augmentation Plan (ESAP). The ESAP has resulted in the provision of deputies from outside OJC to assist in critical area such as escorts for the mental health and medical staff but has not resulted in additional staff working in the housing units; especially on the night shift and weekends. The outside unit that has contributed the most to filling the void is the Investigative Services Bureau (ISB). However, there has not been sufficient participation by other outside units to supplement security in housing units to any meaningful degree. During the monitoring period, there began to be a greater contribution to the staffing shortage from deputies assigned to courthouse security and the civil division. However, they are most often assigned to work the day shift and are seldom, if at all, assigned to work the night shift and weekends where the staff shortage is extremely severe. During the frequent site visits by the monitoring team, there continue to be housing units for which there is not a staff member present in the housing unit. The staff who were present were often tasked with manning two housing units and/or the control room despite the Consent Judgment requiring one deputy/recruit physically on each unit for direct supervision. Further, almost daily, assigned staff leave housing units and control pods unattended for meal breaks and other duties. During the escape on May 16, 2025, one corrections monitoring technician (CMT) was assigned to the control module for housing units 1C-D. No deputies were assigned to the housing unit. When the CMT went on her lunch break, there was no staff assigned to any of the three posts for housing unit 1C-D as no one relieved



her. The inmates took advantage of the absence of staff and forced the cell doors open to allow them to gather in the cell from which they made their escape. OPSO has been encouraged to require staff to notify their supervisors if they are leaving their post and to require the supervisor to assign a relief staff member during their absence.

The Stipulation and Order entered by Judge Africk in June 2024, mandates that the four specialty housing units be staffed 24/7, including breaks. Despite the mandate, these four specialty housing units remained unstaffed on occasion. The JCT conducts audits of the staffing of these units. The audits continue to confirm that the units were being left unstaffed or that the staff was in the control pod as opposed to being in the housing unit. If used properly, these audits provide useful information to OJC leadership to make staffing deployment decisions and provide notice of the lack to adhere to policy.

Sheriff Hutson raised the salaries for recruits and deputies as a result of the budget request submitted in the 2023 budget, but her request to further raise salaries for recruits and deputies in 2024 was not approved by the City Council. OPSO has made valiant efforts to hire new recruits to work in OJC. Retention of those recruits has proven difficult, and OJC has not seen a significant enough increase in staff to allow all housing units to be properly staffed. While OPSO has begun hiring directly for some of the non-OJC assignments (courthouse security, civil), there are still a number of staff continuing to transfer out of OJC or to specialty units within OJC such as the Special Response Team (SRT) and the training academy. This is concerning to the Monitors for two reasons: (1) it lessens the level of experience within OJC and (2) a higher percentage of male staff were transferred than female staff which exacerbated the disparate ratio of male staff to female staff within the OJC.  OPSO is strongly encouraged to continue its review of the deployment of staff. It is apparent that sufficient staff are not actually present in the areas where the need is most critical, staffing the housing units; especially on the night shift and weekends. Along with redeployment



of staff has to be the accountability of the supervisors to ensure the staff is physically present in the housing units. Sheriff Hutson has made the redeployment of staff, including adequate supervision on the night shift, a priority. However, the level of staffing on the night shift and weekends continues to create a dangerous situation. A promotional board was held during the monitoring period to ease the shortage of sergeants and lieutenants.

<u>Training</u> – Employee training for security staff, both pre-service and in-service, has made progress over time, but it has proven difficult to staff OJC while allowing staff to attend the Academy for their annual training and the training necessary to move from a Recruit to Deputy. In 2021, OPSO reinstated the practice of assigning new deputies to a training officer during the first three weeks of assignment to OJC (field training program), but enforcement and follow-through has been sporadic and occurred infrequently during the compliance period. A field training program needs to be fully implemented with follow up as to the impact the program has on turnover. The program, if allowed to be fully implemented, is likely to result in a reduction of turnover and a reduction in rule violation by new recruits. OPSO did its annual training in CY 2024 but had to deplete the staffing in OJC to get it completed as attendance was evenly spread over the year.

- <u>Supervision</u>—Safe operation of OPSO's facilities requires an adequate number of sufficiently trained first line and mid-management supervisors and clear lines of authority and responsibility. Captains and lieutenants have now been deployed in an effort to cover the shifts on a continuous basis. There are still shifts where the numbers of supervisors is not adequate.

2. **Medical and Mental Health Care** – During the previous monitoring period, the contracted provider for medical and mental health services was changed from Wellpath to Wexford. Wexford did a much better job this monitoring period of providing the reports and documentation required under the Consent Judgment. The Medical and Mental Health Monitors report that challenges remain in the



provision of basic care, staffing, and recordkeeping, as well as the continued need for improved collaboration with custody/security staffing. The Monitors continue to be concerned about key leadership positions being unfilled and the practice of having staff take on additional duties under an interim title. Security staff continued to be responsible for staffing some of the "suicide watches" during the on-site visit. The placement of male inmates on suicide watch in the Temporary Mental Health Facility (TMH) has resulted in an improvement of supervision of these inmates. On occasion, inmates are on suicide watch in OJC to prevent those who are housed in disciplinary housing from manipulating their housing assignment. While there was some improvement in the deputies' knowledge of their duties to perform and document suicide watches, inconsistency with how suicide watches were performed and documented were still noted, resulting in inconsistency of the reporting of data. An additional issue is that the mental health staff assigned to do suicide watches are required to leave the housing unit when there is no deputy present. The number of security staff assigned to 2A and the disciplinary unit (3C/3D) has improved, but they are still unstaffed at least 15% of the time. During the previous monitoring period, psychiatrists from LSU began providing psychiatric mental health care. There have been concerns expressed as to whether the quantity, and, perhaps the quality, of psychiatric care has declined with the new contractor. The design of the interview rooms and safety concerns in the OJC continues to require the assignment of one deputy to escort each psychiatrist. LSU is not responsible for many aspects of mental health care required by the Consent Judgment. An important part of the long-term solution to the lack of compliance with the Consent Judgment in the areas of medical and mental health is the design and construction of Phase III, a specialized building which will contain an infirmary and housing for inmates with acute mental health issues. For instance, having security staff escort each psychiatrist or other mental health to interview inmates is addressed in the design of Phase III as the psychiatrists and other mental health staff will be able to interview inmates in an environment which is much safer for both staff and inmates and will not require a deputy to be assigned to each mental health professional for security.  The City



extensively renovated portions of TDC (now referred to as TMH or Temporary Mental Health) as a stop gap measure. OPSO utilized all of the TMH units during this monitoring period, but the failure to fully utilize the capacity of TMH results in a backlog of inmates with acute mental health issues and the housing of inmates with acute mental health issues and other serious mental health issues continuing to be housed in OJC which is inadequate for the housing of these inmates. Even with TMH, the facilities within OJC to house and to provide individual and group programming for inmates with mental health issues are inadequate and create security and safety issues for both staff and inmates. The addition of a mesh barrier on the mezzanine level of the sub-acute mental health housing unit during the compliance period has greatly reduced the incidents where those inmates attempt or threaten to jump from over the mezzanine railing on that particular unit. There were uses of force, attempted suicides, and assaults on staff and inmates on the mental health units during the monitoring period which may have been avoided with better training of the security staff.

3.   **Inmate Safety and Protection from Harm** - Providing a safe and secure jail continues to be a challenge.

- <u>Violence and Contraband</u> – There were significant incidents of violence occurring within the facilities during the monitoring period; including inmate-on-inmate assaults and assaults on staff. The level of violence in the facility continued to be at all-time high levels during this monitoring period. Some of the inmates continue to be emboldened in their refusal to follow the rules and obey the orders of the security staff. Very concerning is that both staff and inmates continue to relay to the Monitors that there continue to be inmates who are acting as "tank bosses" and are extorting other inmates and requiring payment for protection or stealing commissary from other inmates. In order to gain control of this situation, it continues to be recommended by the monitors that OPSO finalize the plan to reestablish a housing unit in which these inmates can be housed with adequate security measures, i.e., adequate supervision, limited time out of cell, proper restraints when out of cell, and no access to items that can be used as



weapons. Most often, the inmate-on-inmate assaults occurred when there was no deputy stationed in the housing unit. Due to the locks on the doors not working properly, inmates are often able to force the doors open and gain access to their victims. Especially concerning is that inmates continue to fashion weapons from items found in the jail during the prolonged periods of time when the housing unit are without supervision. As sources of contraband (such as the light supports in the utility closets and the cabinets at the front of the day room) were identified and appeared to have been eliminated, the inmates then discovered a new source of material from which to fashion weapons. For example, inmates pry off the metal sheeting around the windows to fashion weapons. The brooms and mops, the facility provides for cleaning, often end up in the inmates' cells and are used as weapons as inmates are not supervised when cleaning with the exception of the inmate crews utilized to clean the showers. In reality, few, if any, of the sources of contraband would be available to the inmates if the staff followed policies regarding supervision and limiting access to materials. OPSO has increased the number of targeted and random shakedowns resulting in the removal of weapons, pills, narcotics, and other contraband from the housing units. Still, inmates are often observed smoking illegal substances and lighting wicks from dryers and electrical outlets. Inmates continue to start fires on the housing units. Disorder and non-compliance with the institutional rules cause staff to use force to gain control and compliance. While the force used may be reasonable in response to the threat, if appropriate security measures were taken in the first place (such as placing restraints on the inmate before the inmate is allowed to exit the cell), the force used to regain control would probably not be necessary. There is inadequate use of de-escalation techniques before resorting to force, including examples of using OC spray without adequate de-escalation and/or in retaliation against inmates. There is still a failure to have mental health staff involved in de-escalation even though a large percentage of the inmates involved in the use of force are on the



mental health caseload. Concerning is clearly unreasonable or unnecessary uses of force are found to be acceptable when reviewed at multiple levels at OPSO. The Use of Force Review Board's (UOFRB) role in addressing unreasonable and unnecessary uses of force is important and the length of time it takes for an incident to be reviewed by the UOFRB improved during the compliance period. However, the UOFRB is often unable to review an incident because the information was not properly assembled by the supervisor who prepared the original use of force report. The situation still frequently occur that the staff involved is no longer employed due to have been terminated for misconduct including improper use of force or has had multiple other uses of force by the time the review by the UOFRB takes place.

- <u>Inmate Classification</u> – The inmate classification process showed improvement this compliance period. There needs to be continued attention to ensure housing decisions and placements are consistent with OPSO policies and objective classification principles. Acquiescence to inmates or security staff by moving inmates to reside with their allies or accommodating staff to avoid problematic inmate(s) continues but has lessened. OPSO policy and procedures for reviewing and clearing separations that prevent inmates from being housed together or removed from protective custody are followed more closely, but the lack of prior recordkeeping has proven problematic. Credible auditing needs to focus on identifying issues and correcting placements. During this compliance period, it appeared that while the housing audits were filled out, videos of the audits suggested the housing audit process is still inconsistent and problematic.

4.    <u>Inmate Grievances</u> –Timeliness and adequacy of responses are still not acceptable. The trend data from the grievance system is now available to assist in identifying problems to be addressed, but there has not been adequate follow-through on addressing the issues identified. During the compliance period, the kiosks by which to file grievances were replaced and most inmates were issued tablets upon



which they can file grievances. This resulted in a huge surge in grievances and a corresponding backlog. The option of paper grievances is still available to those who do not have access to kiosks or tablets. The paper grievance process requires the Grievance Staff hand out and pick up paper grievances. It is hampered by the lack of security staff to allow them on the housing units.

5.  <u>Incident Reporting</u> –The accurate, timely reporting of incidents continues to be an area of concern. There remain serious incidents for which no report or no timely report is prepared by OPSO staff, including incidents involving the serious injury of inmates and drug overdoses. The Monitors and counsel for the Plaintiffs review the medical records, particularly the emergency room routes and walk-in clinic, for medical treatment related to incidents. Numerous unreported incidents are detected by these reviews. OPSO used to review the same, but such a review, if does at all by OPSO, has become very sporadic. Reports are often incomplete and do not provide the necessary information for the reader to determine what occurred and why it occurred. They are frequently miscategorized, including uses of force. It is particularly concerning that incomplete reports and miscategorized have been reviewed by and approved by a supervisor. OPSO began implementation of a corrective action plan nearly two years ago to address timeliness and thoroughness of reports which includes training and remedial action including discipline. The corrective action plan has resulted in mixed results as far as improvement of timeliness of reports and the thoroughness of the reports. The miscategorization, when detected by OPSO, is usually found by the JCT when it audits reports. While the JCT is to be commended, it is the job of the supervisors in the OJC to catch these errors upfront. The Monitors and parties receive reports electronically, which has improved the timeliness of provision of completed reports, but the timeliness of the completion of reports and quality of reports still need to be addressed. The change has also highlighted that there are numerous incidents which should be reported to the Monitors in the weekly summary which are not. A large part of the problem seems to be the incorrect categorization of reports when written. There are numerous reports where the narrative details a use of force, but the categorization does not indicate force was



used. Reports will describe an assault by an inmate on another inmate or the assault on a staff member and it will be incorrectly characterized as "other" or "inmate." Not only does the mischaracterization present an issue for the Monitors when reviewing reports, but it also makes the gathering of accurate data and the analysis of data on incidents more difficult for OPSO.

6. **Jail Management System –** An integral part of the jail's operational improvement is tied to an effective jail management system. Such capacity provides on-demand, routine, and periodic data to inform critical leadership and management decisions. Despite the passage of many years, there has not been a suitable system fully implemented. OPSO indicated that the JMS would "go live" in May 2025, but as of the date of the filing of this report, it still has not been put into operation. Another key component missing is the need to be able to electronically verify that security checks are taking place in a timely fashion.

7. **Sanitation and Environment Conditions** – Challenges remain regarding the public health and inmate/staff safety risks. The inability to fill support positions identified in OPSO's staffing analysis negatively impacts the ability of OPSO to sustain compliance with the requirements of the Consent Judgment and align with accepted correctional practice. OPSO instituted a special team to clean the showers and floors of the housing units in response to the Court's orders in June 2024. The failure to consistently clean the showers and floors is detailed later in this report. The main issue appears to be the failure to have a backup plan when the one security staff assigned to the task is absent due to training or leave. In addition, sanitation and cleanliness of the cells and housing areas are not solely the responsibility of the special cleaning team. The supervisors and unit deputies have the first responsibility for ensuring inmates keep their cells and dayroom areas clean and uncluttered. The level of cleanliness of cells and housing areas showed improvement during the compliance period but still has a great deal of room for improvement.

8. **Youthful Inmates** –Youthful offenders are housed in the OJC in part due to a change in Louisiana law, as well as to transfers from the juvenile detention facility. Although the number of male youthful offenders usually does not exceed 20, it



requires an entire housing unit to be used for these inmates. Each housing unit is designed to hold 60 inmates. Thus, in the male youthful offender unit, over two-thirds of the capacity cannot be utilized without violating classification principles. When female youthful offenders are housed, they are housed at TMH as it is the only housing option where they can be somewhat separated from adult inmates. In addition, the housing of youthful offenders presents special challenges when it comes to services and mental health care.

9. **Inmate Sexual Safety** – OPSO underwent its required audit of compliance with the Prison Rape Elimination Act of 2003 (PREA) and passed in September 2019. Continued internal collaboration among OPSO security, classification, and the medical/mental health provider is needed for the assessments of inmates' potential vulnerability to sexual assault. Due to the long time that inmates are housed in the IPC and intake units, inmates of various PREA designations continued to be housed in the same housing unit without an appropriate plan to keep them separate during time out of cell. Commingling of inmates of various PREA designations occurs on ten of the housing units. OPSO cannot rely on an audit that is five years old to demonstrate compliance with PREA. OPSO had a mock PREA Audit conducted in 2024 and is in the process of correcting the deficiencies noted in preparation for the PREA audit in 2025.

10. **Compliance, Quality Reporting, and Quality Improvement** – An essential element of inmate safety is OPSO's timely review of all serious incidents as well as of non-violent incidents to determine if there are trends and/or patterns. This ensures assessment of root causes and the development, implementation, and tracking of corrective action plans to address the causes. This activity focuses on resolving problems. OPSO has begun to undertake this function and has begun to identify some of the systemic issues. The next step is determining solutions for the systemic issues and implementing them. Failure to address the systemic issues will continue to create risks to institutional safety and security. The administration at OPSO has dedicated more time and knowledgeable resources to quality improvement. The corrective action plans (CAP)were finalized as a result of Judge Africk's order, but adherence is lacking. While there was a concerted effort when



the CAP was first formalized, the progress since then has been little. The challenge will be for the OPSO to hold the staff accountable for not complying with the CAP including timely completion of tasks. OPSO has designated a Major in charge of CAB and a Major in charge of the JCT. Having designated staff members of sufficient rank oversee the implementation of the corrective action plans is commendable; adherence to the CAPs must be a priority of the entire administration.

11. **Stipulated Agreements 2015 and 2024**– The section on the Stipulated Agreements of 2015 has been expanded to aid OPSO in reviewing its on-going compliance with the two Stipulated Agreements from 2015 and the Stipulated Agreement of June 2024 which added seven new provisions. Eleven (six of the seven new provisions) provisions are in partial compliance. Beginning with Report #21, compliance with the Stipulation and Order of June 2024 has been added.

12. **Construction Projects** –

- TDC Mental Health (TMH)– Two housing units in the Temporary Detention Center (TDC) (total of four housing areas) were renovated to provide for housing inmates with acute mental illness pending the construction of Phase III. After TMH's completion, the male inmates with acute mental illness were moved from Hunt into one of the housing units. During the monitoring period, OPSO housed acute male inmates and acute female inmates in TMH.  All four of the housing areas were operational during the monitoring period although several cells are not being used due to longstanding maintenance issues or because they were being used to house inmates for non-mental health purposes. OPSO is encouraged to limit the use of TMH to the inmates for which it is designed and utilize the capacity of TMH to its fullest. While TMH is not a suitable long-term solution to meet the requirements of the Consent Judgment as to medical and mental health services, it is a necessary interim step given no satisfactory housing for acute inmates in OJC. The operation of TMH has reaffirmed the necessity of single person cells for the majority of acute inmates in the initial stages of treatment which should be factored in the operational capacity of Phase III.



Housing sub-acute inmates in two person cells in Phase III will often be acceptable. It is important to note that TMH does nothing to address the lack of infirmary and medical housing in OJC and lack of programming space. Even with the construction of Phase III, there will be a need for safe and suitable housing for any sub-acute inmates which remain in OJC. One of the shortcomings of the TDC/TMH buildings is that the inmates have to be evacuated when there is the potential for a hurricane due to its propensity to flood. This occurred in September 2024 when the mental health inmates had to be moved to OJC, and the general population inmates were evacuated to the Louisiana Department of Corrections. It happened again in August 2025 when inmates in one of the housing areas of TMH had to be located to OJC due to plumbing repairs at TMH.

- Phase III –Monthly meetings of the Executive Committee have been held and have provided information to the parties and the Monitors. The construction and occupation of Phase III are critical to the provision of mental and medical health services in accordance with the Consent Judgment. Regular court intervention has been required to keep the project moving forward. The project has reached 73% completion, based on the status report the City filed with the Court in August 2025. It is imperative that OPSO fully develop and implement a transition plan for the occupation of Phase III.

**C.    <u>Review Process of Monitors' Compliance Report #22</u>**

A draft of this report was provided to OPSO, Counsel for the Plaintiff Class, and the Department of Justice (DOJ) on September 4, 2025.  Comments were provided by Counsel on September 19, 2025. Wexford was offered the opportunity to provide comments through OPSO. The Monitors considered the comments of the parties in finalizing Report #22.

**D.    <u>Communication with Stakeholders</u>**

The Monitors are committed to providing as much information as possible regarding the status of OPSO's efforts to comply with all orders of the Court. During the monitoring period, OPSO honored the request of the Monitors to provide a link to the



current reports on the OPSO website.

**E.**     **Recommendations**

Over the years, the Monitors have provided multiple recommendations and suggestions to OPSO to assist in achieving and maintaining compliance with the Consent Judgment. The purpose of the recommendations continues to be to assist OPSO in achieving and maintaining compliance; not to change the requirements of the Consent Judgment. There are recommendations and suggestions included within the body of this report.

**F.**     **Conclusions and Path Forward**

OPSO has been operating under the provisions of the Consent Judgment since June 2013; monitoring began in Fall 2013. During the previous leadership of Director Hodge, significant improvements were acknowledged by the Monitors. Sheriff Gusman resumed the role of full responsibility for bringing OPSO into compliance with the Consent Judgment in August 2020. Sheriff Gusman was defeated in the election held in December 2021. Sheriff Hutson was sworn in as Sheriff in May 2022. A suitable Chief of Corrections was appointed in July 2024 when Chief Mallett joined OPSO. Sheriff Hutson has embraced the challenge of complying with the Consent Judgment and has established a good working relationship with the monitoring team.

However, the same deficiencies pointed out in previous reports by the Monitors continue to exist and are not resolved. When OJC was placed back under the authority of the Sheriff, there were 118 provisions in substantial compliance. As of this report, there are only 70 provisions in substantial compliance. Serious incidents and harm to inmates continue to occur. OPSO has made some efforts to identify and address sources of contraband, but the Monitors encountered inmates smoking marijuana and narcotics in the housing units without fear of consequences. Weapons have frequently been fashioned from various materials within the OJC. Dangerous medication is frequently found during cell shakedowns. The medication distribution process was changed during the monitoring period, and the new process appears to be a significant improvement in the ability of inmates to hoard medication. However, it creates other issues as it requires taking inmates out of the housing area. There continues to be incidents of overdosing.

There continues to be an emphasis on OPSO's data collection. Data collection and



analysis is key to problem solving with a goal of a sustainable reduction in inmate-on-inmate assaults, inmate-on-staff assaults, uses of force, contraband, and property damage. Development of corrective action plans has taken place in accordance with the Court's order, but there is limited adherence to them. The Court's order in June 2024 requires monthly reports on progress to the parties and Monitors and quarterly reports on progress to the Court. Follow-through on implementation is essential. The Monitors continue to be hopeful that improvement will take place with the emphasis placed on data collection and analysis by OPSO.

The Monitors remain committed to the Court and the parties to collaborate on solutions that will result in significant improvement towards compliance with the provisions of the Consent Judgment and future achievement of constitutional conditions.

**The Monitors again thank and acknowledge the leadership, guidance, and support of The Honorable Lance M. Africk and The Honorable Michael B. North.**



**A.      Protection from Harm**

**Introduction**

This section of the Consent Judgment addresses core correctional functions including the use of force (policies, training, and reporting), identification of staff involved in uses of force through an early intervention system, safety and supervision of inmates, staffing, incidents and referrals, investigations, pre-trial placement of inmates in the facility, classification, the inmate grievance process, safety of inmates from sexual assault, and inmates' access to information.

The Consent Judgment requires that OPSO operate the facility to assure inmates are "reasonably safe and secure." Based on objective review of data, the facility has shown improvement in inmate and staff safety over the life of the Consent Judgment, but significant incidents that result in serious injury to inmates and staff continue to occur which confirmed that the facility is not reasonably safe and secure. Concerning is that inmates continue to fashion weapons out of items available in the jail including brooms, mops, and buckets provided by the jail and pry metal from around the windows and doors to manufacture knives or shanks. Inmate on inmate assaults often happen with no staff present to prevent the incident from occurring or to intervene to stop the incident. These are often incidents and uses of force which result in injuries severe enough to require hospitalization. This would be far less likely to have occurred if the facility was properly staffed, and the staff were properly supervising the inmates and conducting themselves in accordance with policy. Also concerning is the lack of action to securely house inmates who are easily identified as being frequently involved in violence, contraband, and disruption of the facility incidents.

Reaching and sustaining compliance with provisions of the Consent Judgment, particularly this section, relies on the collection, analysis, and corrective action planning using accurate and reliable data. The Monitors encourage OPSO to continue efforts to build its capacity to collect and analyze relevant accurate data, draw supportable conclusions to inform decisions throughout the organization, develop corrective action plans, implement corrective action plans, and hold staff accountable for non-adherence to corrective action plans and policies. As OPSO's capacity to collect, analyze, plan, and implement is enhanced, the ability to achieve and maintain compliance will be



strengthened. Without an enhancement in capacity and dedication to making and implementing informed decisions, OPSO is unlikely to achieve and maintain compliance.

The underreporting of incidents to the Monitors and parties has continued to exist during the monitoring period. In the past, OPSO had someone review the daily medical logs for inmates taken to the clinic for treatment subsequent to an altercation or a use of force, as well as the transport logs of inmates routed to the hospital with trauma-related injuries to cross check them against reported incidents. The review often found omissions. The review occurred with more regularity during the monitoring period for a while by the JCT, but it still does not occur as frequently as needed due to the JCT being assigned other additional duties which limited the time available for this valuable task. The time required for this review and the completeness of reports is directly related to the failure of supervisors to ensure reports are being written. While OPSO claims it has increased its efforts to discipline supervisors and deputies who fail to comply with the reporting policies resulting in late, incomplete, or missing incident reports, the documentation does not support the claim.

The Lead Monitor reviewed all reported incidents for the monitoring period in preparation of this report. The following charts compare the totals for the calendar years CY 2018-June 2025. Given that the system for reporting incidents has proven to be unreliable, in the past, it was unclear whether a particular decline or increase was the result of reporting errors as opposed to an actual decline in a type of reportable incident. Since October 2022, the Monitors received the reports automatically which supported the proposition that previous declines were more likely the result of not reporting incidents and/or not forwarding the incident reports to the Monitors.

### Table 3 - All OJC Reported Incidents for CY 2018-June 2025

|  | Inmate/Inmate Assault | Inmate Staff Altercation | Use of Force | PREA | Death | Attempt Suicide/Ideation | Internal Escape | Criminal Damage | Slip/Falls/Injury | Medical | Contraband | Other |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2018 | 442 | 64 | 260 | 47 | 2 | 78 | 48 | 69 | 262 | NA | 106 | 15 |
| 2019 | 440 | 117 | 358 | 42 | 0 | 82 | 6 | 47 | 145 | NA | 302 | 6 |
| 2020 | 309 | 139 | 372 | 35 | 3 | 21 | 1 | 64 | 64 | NA | 351 | 1 |
| 2021 | 293 | 124 | 311 | 17 | 1 | 20 | 1 | 42 | 43 | NA | 350 | 0 |
| 2022 | 351 | 71 | 229 | 36 | 2 | 45 | 6 | 39 | 35 | NA | 248 | 10 |
| 2023 | 636 | 139 | 316 | 30 | 0 | 34 | 81 | 60 | 178 | NA | 554 | 41 |
| 2024 | 735 | 155 | 409 | 37 | 0 | 57 | 229 | 212 | 175 | 623 | 562 | 34 |
| 2025 | 309 | 79 | 230 | 19 | 0 | 10 | 102 | 109 | 44 | 97 | 296 | 19 |





In CY 2021, the number of reported inmate on inmate assaults, inmate/staff altercations, and uses of force declined slightly. The rate of inmate-on-inmate assaults in CY 2022 increased by 20% over CY 2021. The rate of inmate-on-inmate assaults in CY 2023 increased by 45% over CY 2022. The rate of inmate-on-inmate assaults in CY 2024 increased 13% over CY 2023. If the trend continues for the second six months of 2025, the rate of inmate-on-inmate assaults will decline slightly for CY2025. However, it would still result in a 53% increase in the number of inmate-on-inmate assaults, which was under 300 in CY 2021. The number of contraband incidents reached an all-time high in CY 2023 also; a 123% increase from CY 2022 to CY 2023. The number of incidents involving contraband in CY 2024 essentially remained the same as the number of contraband incidents in CY 2023. The number of incidents involving contraband in CY 2025, is on pace to set a new record high and a 23% increase. While it is to be expected that, given the increased number of cell and unit searches that have taken place, the incidents of contraband would increase, it does call into question what steps need to be taken to keep inmates from gaining access to contraband in the first place. Many of the inmate injuries or slip and falls are suspected to, in actuality, be the result of an inmate-on-inmate assault that was not observed by staff and that inmates were afraid to report. The staff misconduct number reported is not accurate as it reflects what is reported; not what



occurred. It has been removed from the chart until reliable numbers are available as it was misleading. Of concern is the underreporting of incidents which calls into question whether the data, if accurate, would reflect an even higher level of violence and contraband.

**Table 4 –All OJC Reported Incidents by Type by Month CY 2018-June 2025**



| | Jan | Feb | March | April | May | June | July | August | September | October | November | December | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2018** | 92 | 96 | 112 | 121 | 124 | 144 | 116 | 132 | 112 | 113 | 105 | 129 | **1396** |
| **2019** | 123 | 93 | 105 | 112 | 117 | 129 | 113 | 152 | 94 | 137 | 144 | 113 | **1432** |
| **2020** | 107 | 113 | 98 | 109 | 84 | 144 | 98 | 106 | 67 | 75 | 109 | 110 | **1220** |
| **2021** | 125 | 80 | 78 | 109 | 77 | 97 | 91 | 70 | 78 | 113 | 89 | 72 | **1079** |
| **2022** | 77 | 88 | 66 | 50 | 55 | 66 | 67 | 51 | 93 | 137 | 115 | 119 | **984** |
| **2023** | 165 | 106 | 126 | 124 | 143 | 195 | 184 | 174 | 181 | 198 | 196 | 176 | **1968** |
| **2024** | 286 | 184 | 210 | 224 | 320 | 235 | 298 | 269 | 305 | 262 | 235 | 214 | 3042 |
| **2025** | 244 | 155 | 184 | 187 | 195 | 219 | | | | | | | |

**Assessment Methodology**

Dates of visits:

- November 17-20, 2024 (Leader Monitor Frasier and Monitor Poole)
- December 16-19, 2024 (All Monitors)
- January 13-15, 2025 (Lead Monitor Frasier)
- February 17-19, 2025 (Lead Monitor Frasier and Monitor Poole)
- March 17-19, 2025 (Lead Monitor Frasier and Monitor Poole)
- May 19-21, 2025 (Lead Monitor Frasier)



- June 10-June 11, 2025 (Lead Monitor Frasier)
- June 16-June 18, 2025 (Lead Monitor Frasier)
- July 9-10, 2025 (Lead Monitor Frasier)
- July 22-23, 2025 (Lead Monitor Frasier)
- July 28-31, 2025 (All Monitors)

Materials reviewed:
- Materials reviewed include the Consent Judgment, OPSO policies and procedures, use of force reports, incident reports, and investigations conducted by Investigative Services Bureau-Internal Affairs Division (ISB-IAD), investigations conducted by ISB-Criminal Division (ISB-Criminal), investigations conducted by ISB-Inmate Division, training materials, shakedown logs, OPSO self-assessment, Wellpath self-assessment, and post logs.

Interviews:
- Interviews included the Sheriff, Chief of Staff, command staff, jail supervisors, Chief of Corrections, Administrative Colonel of Jail, Operations Colonel of Jail, classification manager and staff, director of training, Wellpath staff, and various supervisors of units within ISB. Inmates were interviewed by the Monitors onsite for the visit. The Monitors also attended security-related meetings.

## IV. A. 1. Use of Force Policies and Procedures

*A. 1. a. OPSO shall develop, implement, and maintain comprehensive policies and procedures (in accordance with generally accepted correctional standards) relating to the use of force with particular emphasis regarding permissible and impermissible uses of force.*

*A. 1. b. OPSO shall develop and implement a single, uniform reporting system under a Use of Force Reporting policy. OPSO reportable force shall be divided into two levels, as further specified in policy: Level 1 uses of force will include all serious uses of force (i.e., the use of force leads to injuries that are extensive, serious or visible in nature, including black eyes, lacerations, injuries to the mouth or head, multiple bruises, injuries to the genitals, etc.), injuries requiring hospitalization, staff misconduct, and occasions when use of force reports are inconsistent, conflicting, or otherwise suspicious. Level 2 uses of force will include all escort or control holds used to overcome resistance that are not covered by the definition of Level 1 uses of force.*

*A. 1. c. OPSO shall assess, annually, all data collected regarding uses of force and make any necessary changes to use of force policies or procedures to ensure that unnecessary or excessive use of force is not used in OPP. The review and recommendations will be documented and provided to the Monitor, DOJ, and SPLC.*

Findings:

A. 1. a.  Partial Compliance

A. 1. b.  Substantial Compliance

A. 1. c.  Partial Compliance



<u>Observations:</u>

The current OPSO use of force policies were effective as of May 2016. OPSO conducted an annual review of the UOF policy in 2024. Changes were submitted in March 2024, but the changes were found to be unacceptable as the UOF policy no longer complied with the requirements of the Consent Judgment. OPSO, the Monitors, and the parties have met on suitable revised policies. They are now in the process of being finalized. While there are policies, the failure to fully adhere to the policy results in A.1.a. remaining in Partial Compliance. One of the most frequent violations of policy has to do with the failure to attempt de-escalation, including the utilization of mental health staff, before using force. The Stipulation and Order of June 2024 now specifies that OPSO security is to notify mental health staff of all non-spontaneous uses of force before they happen. The purpose is for mental health staff to assist in de-escalating the situation. There is a proper definition for de-escalation in the proposed revision of the UOF policies. The next steps are to incorporate it into the training of staff and hold staff accountable if it is not being followed. There are numerous examples of the situation being escalated, as opposed to de-escalated by staff, in retaliation for an inmate's actions for disobeying an order or for having thrown a substance on the staff from a locked cell which often does not constitute an immediate risk to staff or other inmates.

The reporting system does comply with the requirements of A.1.b., which remains in Substantial Compliance. There continues to be misclassification of uses of force between Level 1 and Level 2 uses of force but continues to improve. To be clear, the Monitors consider the use of OC spray, pepper ball guns, and any other intermediate weapon to be a Level 1 use of force. Level 2 is reserved for escort and control holds.

The Use of Force Review Board (UOFRB) begun to meet twice weekly during the compliance period. A new form was implemented to standardize UOFRB documentation. The UOFRB has reduced the backlog which resulted in reviewing cases closer to the time they occurred, but it is still over a month between the incident and the review. As a result, problematic staff often have continued contact with inmates. Consistency in membership is essential to identifying trends; the membership of the UOFRB became more stable with proper leadership during the compliance period. There still needs to be analysis of patterns and trends and corrective action.



On October 24, 2024, the UOFRB, in addition to the Major over CAB and the policy manager met to review the use of force policies. The main recommendation was to make sure the levels of force were in line with the Consent Judgment. The changes to the use of force policies have been agreed upon but have not yet been put in final form. It is concerning that no recommendations were made as to how to improve timeliness of reporting and review or the frequent failure in the categorization of reports. The failure to attempt de-escalation was also not addressed.

While there is improvement in the timeliness of holding of the UOFRB reviews, this section remains in Partial Compliance. It is recommended that the next annual review be much more robust and based on the findings of the UOFRB.

### IV. A. 2. Use of Force Training

*A. 2. a. OPSO shall ensure that all correctional officers are knowledgeable of and have the knowledge, skills, and abilities to comply with use of force policies and procedures. At a minimum, OPSO shall provide correctional officers with pre-service and annual in-service training in use of force, defensive tactics, and use of force policies and procedures. The training will include the following:*
> *(1) instruction on what constitutes excessive force;*
> *(2) de-escalation tactics; and*
> *(3) management of prisoners with mental illness to limit the need for using force.*

*A. 2. b. OPSO shall ensure that officers are aware of any change to policies and practices throughout their employment with OPP. At a minimum, OPSO shall provide pre-service and annual in-service use of force training that prohibits:*
> *(1) use of force as a response to verbal insults or prisoner threats where there is no immediate threat to the safety or security of the institution, prisoners, staff, or visitors;*
> *(2) use of force as a response to prisoners' failure to follow instructions where there is no immediate threat to the safety or security of the institution, prisoners, staff, or visitors;*
> *(3) use of force against a prisoner after the prisoner has ceased to offer resistance and is under control;*
> *(4) use of force as punishment or retaliation; and*
> *(5) use of force involving kicking, striking, hitting, or punching a non-combative prisoner.*

*A. 2. c. OPSO shall randomly test five percent of the correctional officer staff on an annual basis to determine their knowledge of the use of force policies and procedures. The testing instrument and policies shall be approved by the Monitor. The results of these assessments shall be evaluated to determine the need for changes in training practices. The review and conclusions will be documented and provided to the Monitor.*

<u>Findings:</u>

A. 2. a.  Substantial Compliance

A. 2. b.  Partial Compliance

A. 2. c.  Partial Compliance

<u>Observations:</u>

The Monitor reviewed the training materials, testing documentation, and the supplemental documentation submitted by training staff for the rating period and



interviewed the Training Captain and Training Coordinator present on the day of the inspection. It should be noted that this rating period covers the fourth quarter of 2024 through the second quarter of 2025. Training statistics are reported on a calendar year basis. It should be noted that OPSO elected to change the format for the annual in-service training requirements for CY2024 from offering training on a single topic scheduled for a one-week period with multiple classes throughout the week to offering week-long, 50-hour, in-service training blocks covering all topics required by the Consent Judgment as well as supplemental training topics offered by OPSO in furtherance of POST training requirements. As noted in report #21, the Training Captain had reported issues with attendance during the first quarter of 2024 but noted the scheduling/attendance of staff for in-service improved significantly as the training year progressed.

Documentation provided by the Academy reflected completion rates in excess of 99 percent for each of the three training topics covered under this section (Use of Force, Defensive Tactics, Use of Force Policies and Procedures). Given OPSO's staffing challenges, this is a significant improvement and warrants a change in the rating from Partial to Substantial Compliance for IV.A.2.a.

During the inspection interview, the Training Captain again noted that the scheduling difficulties previously mentioned are persistent. The Monitor suggests that the current policy of allowing individual staff members to sign themselves up for training plays a significant role in lower attendance in the first part of the calendar year as well as staff not reporting to training due to scheduling conflicts and the staffing needs within the jail on any given day. The Monitor recommends that OPSO consider making line supervisors solely responsible for registering their staff for the required in-service training throughout the training year. In the Monitor's opinion, this would significantly reduce scheduling conflicts, make the most of limited Academy resources, and allow senior leaders to hold line supervisors accountable in supporting the training requirements.

The Monitor continues to support the 50-hour format as a more effective training experience for both the participants and the training staff as the participants are able to focus solely on learning and retaining the information presented throughout the week. (The Training Academy continues to incorporate the training topics required by the



Consent Judgment into the 2025 POST Level 2 curriculum to minimize the scheduling impact on OPSO security functions.)

The Monitor has, in the past, observed that the Academy staff have maintained detailed, comprehensive, and up-to-date training files. For Report #21, the Monitor reviewed over 40 individual staff training records and found the files were not up-to-date and the filing system was lacking organization. The Monitor found that the new Training Coordinator and administrative staff had substantially re-worked the files to get them up to date as well as updating the Learning Management System (Target Solutions) as of the date of this inspection.

A thorough review of the use of force reports during the monitoring period reveals that the need for additional training which emphasizes de-escalation and use of force avoidance continues to exist. Reports indicate that staff often have difficulty dealing with inmates with mental health issues and inmates who are intent on engaging staff in a hostile manner. Reports also indicate that staff involved in use of force often do not report the use of force to their supervisors and/or the supervisors do not complete the necessary documentation. While the reporting of use of force is covered more specifically in IV. A. 3., it bears noting that supervisory training on expectations regarding use of force needs to be strengthened. Also, given some very problematic incidents in which staff observed inappropriate uses of force and did not stop or report the same, it is strongly suggested that the duty to intervene and report continued to be emphasized.

Under A. 2. c., OPSO is required to randomly test 5% of the correctional officer staff (deputies/recruits) on the use of force policies and procedures. The purpose of the testing is to measure the knowledge of use of force policies and procedures outside of the classroom setting. OPSO did not perform the random testing in CY2024. The Monitor reviewed training documentation provided by training staff specifically to the Use of Force class pre-training tests and post-training tests. Of the sample reviewed, the staff in each class demonstrated a pre-test passing percentage of 84%, down slightly from Report #21. The post-test average was 96%.  The training staff provided documentation of the review and analysis of the results of the in-classroom testing. While commendable, it is not an adequate substitute for the random testing. The rating for IV.A.2.c has been lowered to Partial Compliance. The last test approved by Monitor Frasier was on April 21,



2021. It is recommended that the test be reviewed to determine if a new test needs to be developed for review and approval. Then, the random testing of 5% of deputies/recruits needs to occur separately from the testing in the classroom after instruction on the use of force policies and procedures. If not done during the remainder of CY2025, the rating will be lowered to Non-Compliance.

The Monitor continues to review documentation and randomly interview staff regarding the content and quality of the training received throughout the year.

## IV. A. 3. Use of Force Reporting

*A. 3. a. Failure to report a use of force incident by any staff member engaging in the use of force or witnessing the use of force shall be grounds for discipline, up to and including termination.*
*A. 3. b. OPSO shall ensure that sufficient information is collected on uses of force to assess whether staff members complied with policy; whether corrective action is necessary including training or discipline; the effectiveness of training and policies; and whether the conditions in OPP comply with this Agreement. At a minimum, OPSO will ensure that officers using or observing a Level 1 use of force shall complete a use of force report that will:*

    *(1)    include the names of all staff, prisoner(s), or other visual or oral witness(es);*
    *(2)    contain an accurate and specific account of the events leading to the use of force;*
    *(3)    describe the level of resistance and the type and level of force used, consistent with OPP use of force; policy and procedure, as well as the precise actions taken by OPSO staff in response to the incident;*
    *(4)    describe the weapon or instrument(s) of restraint, if any, and the manner of such use be accompanied by a prisoner disciplinary report, if it exists, pertaining to the events or prisoner activity that prompted the use of force incident;*
    *(5)    describe the nature and extent of injuries sustained by anyone involved in the incident;*
    *(6)    contain the date and time when medical attention, if any, was requested and actually provided;*
    *(7)    describe any attempts the staff took to de-escalate prior to the use of force;*
    *(8)    include an individual written account of the use of force from every staff member who witnessed the use of force;*
    *(9)    include photographs taken promptly, but no later than two hours after a use of force incident, of all injuries sustained, or as evidence that no injuries were sustained, by prisoners and staff involved in the use of force incident;*
    *(10)    document whether the use of force was digitally or otherwise recorded. If the use of force is not digitally or otherwise recorded, the reporting officer and/or watch commander will provide an explanation as to why it was not recorded; and*
    *(11)    include a statement about the incident from the prisoner(s) against whom force was used.*

*A. 3. c. All officers using a Level 2 use of force shall complete a use of force report that will:*
    *(1)    include the names of staff, prisoner(s), or other visual or oral witness(es);*
    *(2)    contain an accurate and specific account of the events leading to the use of force;*
    *(3)    describe the level of resistance and the type and level of force used, consistent with OPP use of force policy and procedure, as well as the precise actions taken by OPSO staff in response to the incident;*
    *(4)    describe the weapon or instrument(s) of restraint, if any, and the manner of such use;*
    *(5)    be accompanied by a prisoner disciplinary report, if it exists, pertaining to the events or prisoner activity that prompted the use of force incident;*
    *(6)    describe the nature and extent of injuries sustained by anyone involved in the incident;*
    *(7)    contain the date and time when medical attention, if any, was requested and actually provided; and*
    *(8)    describe any attempts the staff took to de-escalate prior to the use of force.*



*A. 3. d. OPSO shall require correctional officers to notify the watch commander as soon as practical of any use of force incident or allegation of use of force. When notified, the watch commander will respond to the scene of all Level 1 uses of force. When arriving on the scene, the watch commander shall:*

    *(1)    ensure the safety of everyone involved in or proximate to the incident;*

    *(2)    determine if any prisoner or correctional officer is injured and ensure that necessary medical care is provided;*

    *(3)    ensure that personnel and witnesses are identified, separated, and advised that communications with other witnesses or correctional officers regarding the incident are prohibited;*

    *(4)    ensure that witness and subject statements are taken from both staff and prisoner(s) outside of the presence of other prisoners and staff;*

    *(5)    ensure that the supervisor's use of force report is forwarded to IAD for investigation if, upon the supervisor's review, a violation of law or policy is suspected. The determination of what type of investigation is needed will be based on the degree of the force used consistent with the terms of this Agreement;*

    *(6)    If the watch commander is not involved in the use of force incident, the watch commander shall review all submitted use of force reports within 36 hours of the end of the incident, and shall specify his findings as to completeness and procedural errors. If the watch commander believes that the use of force may have been unnecessary or excessive, he shall immediately contact IAD for investigation consideration and shall notify the warden or assistant warden; and*

    *(7)    All Level 1 use of force reports, whether or not the force is believed by any party to be unnecessary or excessive, shall be sent to IAD for review. IAD shall develop and submit to the Monitor within 90 days of the Effective Date clear criteria to identify use of force incidents that warrant a full investigation, including injuries that are extensive or serious, visible in nature (including black eyes, injuries to the mouth, injuries to the genitals, etc.), injuries requiring hospitalization, staff misconduct (including inappropriate relationships*

    *with prisoners), and occasions when use of force reports are inconsistent, conflicting, or otherwise suspicious.*

*A. 3. e. Ensure that a first-line supervisor is present during all pre-planned uses of force, such as cell extractions.*

*A. 3. f. Within 36 hours, exclusive of weekends and holidays, of receiving the report and review from the shift commander, in order to determine the appropriateness of the force used and whether policy was followed, the Warden or Assistant Warden shall review all use of force reports and supervisory reviews including:*

    *(1)    the incident report associated with the use of force;*

    *(2)    any medical documentation of injuries and any further medical care;*

    *(3)    the prisoner disciplinary report associated with the use of force; and*

    *(4)    the Warden or Assistant Warden shall complete a written report or written statement of specific findings and determinations of the appropriateness of force.*

*A. 3. g. Provide the Monitor a periodic report detailing use of force by staff. These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. Each report will include the following information:*

    *(1)    a brief summary of all uses of force, by type;*

    *(2)    date that force was used;*

    *(3)    identity of staff members involved in using force;*

    *(4)    identity of prisoners against whom force was used;*

    *(5)    a brief summary of all uses of force resulting in injuries;*

    *(6)    number of planned and unplanned uses of force;*

    *(7)    a summary of all in-custody deaths related to use of force, including the identity of the decedent and the circumstances of the death; and*

    *(8)    a listing of serious injuries requiring hospitalization.*

*A. 3. h. OPSO shall conduct, annually, a review of the use of force reporting system to ensure that it has been effective in reducing unnecessary or excessive uses of force. OPSO will document its review and*



*conclusions and provide them to the Monitor, SPLC, and DOJ.*

<u>Findings:</u>

A. 3. a.  Partial Compliance

A. 3. b.  Partial Compliance

A. 3. c.  Partial Compliance

A. 3. d.  Partial Compliance

A. 3. e.  Partial Compliance

A. 3. f.  Partial Compliance

A. 3. g.  Partial Compliance

A. 3. h.  Partial Compliance

<u>Observations</u>:

As to provision A. 3. a., the use of force policy requires all uses of force to be reported timely and completely and sets out the potential discipline if the policy is not followed. The Monitors identified one hundred and twenty-nine incidents, over the nine-month monitoring period, during which force was used, but no use of force report was generated. OPSO's own audit in April 2025 identified six incidents in which force was used for which there was no report. The Monitor identified forty-one reports, covering eight months of the monitoring period (data was not submitted for November 2024), where the use of force was not reported within five days of the incidents. This indicates that it is likely no use of force report would have been prepared if the incident had not been detected through review of the medical treatment logs and the supervisor ordered to prepare a use of force report. Thus, the rating continues to be in Partial Compliance and is dangerously close to Non-Compliance.

Provision A. 3. b. is in Partial Compliance due to the number of use of force reports that are incomplete or inadequate. The use of force policy includes the provisions required by the Consent Judgment, but lack of adherence still occurs. The Monitor provided a checklist of the report requirements to assist supervisors in ensuring reports include all necessary items. A review of those checklists and accompanying reports indicates that the required information is still found to be missing from the use of force reports such as what led to the incident, details of actions taken during the use of force, and resolution of the incident. Seldom do reports include an articulation of any de-



escalation tactics, a description of injuries sustained, and when medical attention was provided. No proof was provided that deputies and supervisors are being held accountable for failure to include required information. Provision A. 3. c. requires less information as it is a lesser level of force, but the deficiencies are the same as those noted for A. 3. b. and thus it is in Partial Compliance.

There continues to be a failure on the part of first line supervisors and the watch commanders to consistently comply with the requirements of the Consent Judgment (IV. A. 3. d.) as to their specific duties and the time requirement for performance of these duties under the policies. The use of force report is to be prepared by the end of the shift or at least within 24 hours of the incident. OPSO audits revealed that this criteria was met between 21% and 33% during the monitoring period. As for the Watch Commander's responsibilities, the Consent Judgment requires submission of the packet to the Assistant Warden/Deputy Chief of Corrections within 36 hours of the incident. OPSO's audits revealed that compliance with the 36-hour provision (not the quality of the packet) ranged between 47% and 100% during the monitoring period for an average of 72%. The JCT conducts audits targeting the 36-hour reporting compliance and provides the results to OPSO administration. This appears to have resulted in improvement in performance by the watch commanders.

A. 3. e. requires the presence of a supervisor for planned uses of force. One of the main reasons for this provision is to allow for de-escalation to be attempted before force is carried out. A CAP was put in place regarding what was considered to be a planned use of force and there has been improvement in recognition of what constitutes a planned use of force. OPSO categorized seventeen incidents as planned uses of force for this monitoring period. To be clear, when the Special Response Team (SRT) is deployed to handle a situation, it will almost always be a planned use of force as opposed to a spontaneous use of force. In two of the incidents, the report is unclear as to whether a first line supervisor was present at all. In four of the incidents, it does not appear that a first line supervisor was present and that the only persons of rank were SRT sergeants. Lead Monitor Frasier reviewed all of them and found that in five of them, de-escalation was attempted. In another four of them, de-escalation would not have been appropriate as the element of surprise was appropriate to handling the situation. That leaves seven



incidents in which the use of de-escalation would have been appropriate but was not attempted. OPSO is close to substantial compliance with this provision, but, given the repeated failure of supervisors to utilize de-escalation techniques, this provision's rating remains in Partial Compliance.

One of the OJC Colonels conducted the review of the use of force during the monitoring period required by A. 3. f. OPSO's audit found that the review of the use of force by the Colonel was made within thirty-six hours between 39% and 90% of the time (for an average of 70%). The Monitor agrees that the thirty-six-hour period begins when the report is approved by the watch commander. The plain language of the Consent Judgment that states the review must take place "within 36 hours, exclusive of weekends and holidays". This provision remains in Partial Compliance.

OPSO relies on the semi-annual report issued by FIT for documentation as to compliance with IV. A. 3. g. While the FIT semi-annual report for July 2024-December 2024 was provided for the documentation for the monitoring period of October 2024-December 2024, no documentation for January 2025-June 2025 was provided other than a spreadsheet for some of the months. Upon review of the information, it is clear that this information does not include all uses of force which occur involving inmates of Orleans Parish. At most, it contains information on uses of force referred to FIT for investigation. Even the information provided did not contain all of the required information for compliance with IV. A. 3. g. (3) and (5). The information for A. 3. g. (6) and (7) are normally provided by memorandum but were not included. Thus, this section continues to be in Partial Compliance.

The annual review of use of force incidents for CY 2024 was conducted February 20, 2025, but did not include all of the items required by IV. A. 3. h. In order to warrant a rating of substantial compliance, OPSO needed to address all of the issues; particularly the most serious issues such as the frequent use of force on the mental health housing units and lack of de-escalation that were not addressed. Also not addressed are how frequent uses of force would not be needed if policy was followed. Another major issue is that OPSO is not capturing all of the uses of force due to the failure to properly report the incident as a use of force, thereby, triggering the use of force review process. As noted above, the Monitors identified one hundred and twenty-nine incidents in which force was



used where it was not reported as a use of force. Therefore, the compliance rating remains at partial compliance.

### IV. A. 4. Early Intervention System ("EIS")

*A. 4. a. OPSO shall develop, within 120 days of the Effective Date, a computerized relational database ("EIS") that will document and track staff members who are involved in use of force incidents and any complaints related to the inappropriate or excessive use of force, in order to alert OPSO management to any potential problematic policies or supervision lapses or need for retraining or discipline. The Chief of Operations Deputy, supervisors, and investigative staff shall have access to this information and shall review on a regular basis, but not less than quarterly, system reports to evaluate individual staff, supervisor, and housing area activity. OPSO will use the EIS as a tool for correcting inappropriate staff behavior before it escalates to more serious misconduct.*

*A. 4. b. Within 120 days of the Effective Date, OPSO senior management shall use EIS information to improve quality management practices, identify patterns and trends, and take necessary corrective action both on an individual and systemic level. IAD will manage and administer EIS systems. The Special Operations Division ("SOD") will have access to the EIS. IAD will conduct quarterly audits of the EIS to ensure that analysis and intervention is taken according to the process described below. Command staff shall review the data collected by the EIS on at least a quarterly basis to identify potential patterns or trends resulting in harm to prisoners. The Use of Force Review Board will periodically review information collected regarding uses of force in order to identify the need for corrective action, including changes to training protocols and policy or retraining or disciplining individual staff or staff members. Through comparison of the operation of this system to changes in the conditions in OPP, OPSO will assess whether the mechanism is effective at addressing the requirements of this Agreement.*

*A. 4. c. OPSO shall provide, within 180 days of the implementation date of its EIS, to SPLC, DOJ, and the Monitor, a list of all staff members identified through the EIS and corrective action taken.*

*A. 4. d. The EIS protocol shall include the following components: data storage, data retrieval, reporting, data analysis, pattern identification, supervisory assessment, supervisory intervention, documentation, and audit.*

*A. 4. e. On an annual basis, OPSO shall review the EIS to ensure that it has been effective in identifying concerns regarding policy, training, or the need for discipline. This assessment will be based in part on the number and severity of harm and injury identified through data collected pursuant to this Agreement. OPSO will document its review and conclusions and provide them to the Monitor, who shall forward this document to DOJ and SPLC.*

Findings:

A. 4. a.  Partial Compliance

A. 4. b.  Partial Compliance

A. 4. c.  Partial Compliance

A. 4. d.  Partial Compliance

A. 4. e.  Partial Compliance

Observations:

Due to unreliability of the electronic EIS, OPSO abandoned the original system and fashioned an alternative version within the AS400. A FIT staff member manually monitors the database to prepare a list of employees who have been involved in three of more uses of force in a ninety-day period. It does include staff against whom a complaint of



inappropriate or excessive force has been made such as by inmate grievance or a family member of an inmate. Not much else is done with the list except for its compilation of names and whether the use of force was found to be justified or not justified on an individual basis as opposed identifying patterns and trends and taking corrective action.

OPSO has provided its documentation to the Monitors as to the names of the staff members who are flagged for use of force. However, no review of staff alerted under the EIS was documented or provided except to individual incidents. OPSO acknowledges that the reviews did not occur. Having alerts with no follow up negates the value of gathering the data. As there was no documentation of review by the command staff as required by the Consent Judgment; A. 4. a., A. 4. b, and A. 4. c. remain in partial compliance. Continued questionable and inappropriate uses of force by the same staff members and with the same inmates calls into question whether the EIS is being utilized to improve management quality practices, identify patterns and trends, and take necessary corrective action as required. Section A.4.d. is in partial compliance as the EIS protocol lists the required elements, but there is no supervisory assessment nor intervention.

On February 20, 2025, the EIS review was conducted. It appears from the notes that all that was done was the presentation of the number of staff members who alerted the system. There did not appear to be any evaluation of the data; much less an indepth discussion of the items required by IV. A. 4. e. The review should consist of more than noting that the EIS was triggered. It involves assessing the effectiveness of the EIS which was not performed. Therefore, IV. A .4. e. remains in partial compliance.

## IV. A. 5. Safety and Supervision

*A. 5. a. Maintain security policies, procedures, and practices to provide a reasonably safe and secure environment for prisoners and staff in accordance with this Agreement.*
*A. 5. b. Maintain policies, procedures, and practices to ensure the adequate supervision of prisoner work areas and trustees.*
*A. 5. c. Maintain policies and procedures regarding care for and housing of protective custody prisoners and prisoners requesting protection from harm.*
*A. 5. d. Continue to ensure that correctional officers conduct appropriate rounds at least once during every 30- minute period, at irregular times, inside each general population housing unit and at least once during every 15-minute period of special management prisoners, or more often if necessary. All security rounds shall be documented on forms or logs that do not contain pre-printed rounding times. In the alternative, OPSO may provide direct supervision of prisoners by posting a correctional officer inside the day room area of a housing unit to conduct surveillance.*
*A. 5. e. Staff shall provide direct supervision in housing units that are designed for this type of supervision. Video surveillance may be used to supplement, but must not be used to replace, rounds by correctional officers.*
*A. 5. f. Increase the use of overhead video surveillance and recording cameras to provide adequate*



*coverage throughout the common areas of the Jail, including the Intake Processing Center, all divisions' intake areas, mental health units, special management units, prisoner housing units, and in the divisions' common areas.*

*A. 5. g. Continue to ensure that correctional officers, who are transferred from one division to another, are required to attend training on division-specific post orders before working on the unit.*

*A. 5. h. Continue to ensure that correctional officers assigned to special management units, which include youth tiers, mental health tiers, disciplinary segregation, and protective custody, receive eight hours of specialized training regarding such units on prisoner safety and security on at least an annual basis.*

*A. 5. i. Continue to ensure that supervisors conduct daily rounds on each shift in the prisoner housing units and document the results of their rounds.*

*A. 5. j. Continue to ensure that staff conduct daily inspections of cells and common areas of the housing units to protect prisoners from unreasonable harm or unreasonable risk of harm.*

*A. 5. k. Continue to ensure that staff conduct random monthly shakedowns of cells and common areas so that prisoners do not possess or have access to dangerous contraband.*

*A. 5. l. Provide the Monitor a periodic report of safety and supervision at the Facility. These periodic reports shall be provided to the monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. Each report will provide the following information:*

> *(1)   a listing of special management prisoners, their housing assignments, the basis for them being placed in the specialized housing unit, and the date placed in the unit; and*

> *(2)   a listing of all contraband, including weapons seized, the type of contraband, date of seizure, location, and shift of seizure.*

Findings:

A. 5. a.  Partial Compliance

A. 5. b.  Substantial Compliance

A. 5. c.  Partial Compliance

A. 5. d.  Non-Compliance

A. 5. e.  Partial Compliance

A. 5. f.  Partial Compliance

A. 5. g.  Substantial Compliance

A. 5. h.  Substantial Compliance

A. 5. i.  Non-Compliance

A. 5. j.  Partial Compliance

A. 5. k.  Partial Compliance

A. 5. l.  Substantial Compliance

Observations:

OPSO has worked hard to finalize policies, procedures, and post orders. Having words written on paper without implementation of those policies, procedures, and practices is insufficient for substantial compliance, as demonstrated by the previous discussion of OPSO staff failing to follow established use of force policies and procedures.



Policies and procedures must be adhered to and followed for them to be "maintained", and substantial compliance achieved. Practices, even if not included in policies and procedures, must adhere to the standard also. The consequences of the failure to adhere to the requirements of the various policies in this section were on display in the escape of May 16, 2025. Policies were not followed, security checks were not made, surveillance video was not viewed in real time, inmates were not supervised, supervisors did not make their rounds, inspections were not performed, and inmates were able to gain access to dangerous materials which allowed them to cut bars.

Provision A. 5. a. remains in partial compliance as the policies exist but are not consistently followed. There is adequate supervision of inmate working areas to result in substantial compliance as to A. 5. b. The level of violence continues to be at an unacceptable level. It should be noted that the Lead Monitor actually reads every incident report sent by OPSO. The Lead Monitor often finds that incident reports involving assaults are often not properly categorized by OPSO. Thus, if OPSO is relying on the categorization of incidents for its analysis, the analysis is based on the improper categorization that routinely underreports assaults and altercations. There was a monthly average of 24 reported inmate-on-inmate assaults/altercations in CY 2021. That number rose to 27 in CY 2022 and nearly doubled as it rose to 53 in CY 2023. The number continued to increase in CY 2024 to a monthly average of 61. The monthly average for inmate-on-inmate assaults for CY 2025 is 52. This is indicative that OPSO has not substantially complied with the requirement that the facility be reasonably safe for staff and inmates, and that the facility continues not to be safe. The recent numbers reported, even while higher than previous calendar years, are suspect given the systematic underreporting of reportable incidents and the number of inmate-on-inmate assaults that are likely undetected due to the lack of staff in the housing areas. While the Monitors are well aware that violent incidents occur in jail facilities, the level currently reflects partial compliance with the obligation to provide a reasonably safe and secure environment. Incidents of violence continue to occur in the housing units for protective custody inmates. A properly classified and operated protective custody housing unit should have one of the lower, if not the lowest, level of violence in a correctional facility. OPSO is currently reviewing how inmates are selected for protective custody housing to lessen



the likelihood that violent inmates will continue to manipulate the classification process and gain access to vulnerable inmates. Until it is addressed and protective custody are not being victimized by inmates manipulating the classification system, A. 5. c. will remain in Partial Compliance.

Review of the significant incidents during the monitoring period indicates that the failure of staff to follow policy consistently continues to be a serious impediment to effective supervision of the inmates. Staff continue to leave inmates unsupervised for hours and allow them to have access to materials by which to fashion weapons and bypass the security systems including the locking mechanisms on the cell doors. Many of the inmate-on-inmate assaults occur because staff allow inmates out of their cells and leave them unsupervised, or inmates are able to manipulate the locks on their cells to open them. There are inmates who repeatedly do not follow the rules of OJC including assaulting other inmates, assaulting staff, destroying property, starting fires, smoking, possession of dangerous contraband and/or threatening self-harm. OPSO used to house many of those inmates in a high security unit but chose to abandon this practice shortly after Sheriff Hutson took office. OPSO did move the high-risk inmates that were housed in dormitories into units with cells during the previous monitoring period. However, OPSO chose to house high-risk inmates on the first floor behind slider doors that inmates are able to open due to the damage the inmates have caused to the locking mechanisms. This is the very type of housing unit from which the ten inmates were able to escape; a housing unit on the first floor with slider doors they were able to force open. It is of concern that the practice of limiting the movement of high-security inmates and the practice of placing them in specialty housing was eliminated. The Monitors strongly urge OPSO to finalize the reestablishment of a high security unit. OPSO has been discussing the re-establishment of a high security unit, but it is yet to be accomplished. As a stop gap measure, OPSO resorted to transferring several of the most troublesome inmates to the Louisiana Department of Corrections. While this may be a short-term solution, it is problematic in that these are pretrial inmates who are now being housed under conditions which do not meet the requirements of the Consent Judgment. It would be beneficial to develop individual behavioral management plans for these inmates that include specific security measures to be used when these inmates are allowed out of their cells. Such plans, if



carried out routinely and consistently followed by all staff, would likely reduce the level of violence in the facility. The upgrade to the locks on two of the housing units (3C/3D) should allow for a proper high security unit to be established.

### Table 5 CY 2018-June 2025 OJC Reported Incidents

| 2018 | Use of Force | Inmate Misconduct FLD/FFD | Inmate/ Inmate Assault | Inmate Staff Altercation | PREA | Death | Attempt Suicide/ Ideation | Internal Escape | Criminal Damage | Medical (AKA slip/falls/ injury) | Contraband | Medical | Other | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| January | 13 | 0 | 38 | 7 | 2 | 0 | 6 | 2 | 3 | 9 | 9 | NA | 3 | 92 |
| February | 10 | 0 | 28 | 6 | 4 | 0 | 14 | 2 | 10 | 5 | 15 | NA | 2 | 96 |
| March | 21 | 0 | 37 | 7 | 5 | 0 | 4 | 3 | 11 | 18 | 5 | NA | 1 | 112 |
| April | 22 | 0 | 39 | 9 | 4 | 0 | 4 | 3 | 12 | 22 | 5 | NA | 1 | 121 |
| May | 24 | 0 | 52 | 0 | 5 | 1 | 0 | 5 | 8 | 19 | 10 | NA | 0 | 124 |
| June | 26 | 0 | 46 | 7 | 5 | 0 | 6 | 7 | 3 | 32 | 9 | NA | 3 | 144 |
| July | 20 | 0 | 30 | 4 | 4 | 0 | 9 | 3 | 3 | 30 | 13 | NA | 0 | 116 |
| Aug | 27 | 0 | 39 | 3 | 3 | 0 | 13 | 2 | 6 | 30 | 6 | NA | 3 | 132 |
| Sept | 14 | 0 | 33 | 6 | 2 | 0 | 7 | 5 | 4 | 35 | 6 | NA | 0 | 112 |
| Oct | 28 | 0 | 32 | 9 | 5 | 0 | 3 | 0 | 2 | 26 | 7 | NA | 1 | 113 |
| Nov | 21 | 0 | 31 | 6 | 5 | 0 | 5 | 8 | 3 | 18 | 7 | NA | 1 | 105 |
| Dec | 34 | 0 | 37 | 0 | 3 | 1 | 7 | 8 | 4 | 18 | 14 | NA | 3 | 129 |
| Total | 260 | 0 | 442 | 64 | 47 | 2 | 78 | 48 | 69 | 262 | 106 | 0 | 18 | 1396 |

| 2019 | Use of Force | Inmate Misconduct FLD/FFD | Inmate/ Inmate Assault | Inmate Staff Assault | PREA | Death | Attempt Suicide/ Ideation | Internal Escape | Criminal Damage | Medical (AKA slip/falls/ injury) | Contraband | Medical | Other | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| January | 27 | 0 | 40 | 1 | 2 | 0 | 15 | 3 | 7 | 14 | 14 | NA | 0 | 123 |
| February | 29 | 0 | 26 | 7 | 2 | 0 | 13 | 1 | 0 | 4 | 11 | NA | 0 | 93 |
| March | 26 | 0 | 25 | 4 | 1 | 0 | 6 | 1 | 2 | 16 | 21 | NA | 3 | 105 |
| April | 26 | 0 | 28 | 7 | 1 | 0 | 3 | 0 | 3 | 15 | 27 | NA | 2 | 112 |
| May* | 22 | 12 | 36 | 11 | 6 | 0 | 13 | 0 | 2 | 11 | 25 | NA | 1 | 117 |
| June | 26 | 7 | 55 | 9 | 4 | 0 | 13 | 0 | 2 | 16 | 23 | NA | 0 | 129 |
| July | 31 | 13 | 50 | 15 | 5 | 0 | 6 | 0 | 3 | 8 | 13 | NA | 0 | 113 |
| Aug | 37 | 26 | 32 | 17 | 6 | 0 | 7 | 1 | 8 | 20 | 35 | NA | 0 | 152 |
| Sept | 31 | 18 | 32 | 4 | 3 | 0 | 2 | 0 | 1 | 10 | 24 | NA | 0 | 94 |
| Oct | 37 | 21 | 38 | 15 | 4 | 0 | 1 | 0 | 7 | 18 | 33 | NA | 0 | 137 |
| Nov | 33 | 17 | 55 | 12 | 7 | 0 | 0 | 0 | 6 | 5 | 42 | NA | 0 | 144 |
| Dec | 33 | 23 | 23 | 15 | 1 | 0 | 3 | 0 | 6 | 8 | 34 | NA | 0 | 113 |
| Total | 358 | 137 | 440 | 117 | 42 | 0 | 82 | 6 | 47 | 145 | 302 | 0 | 6 | 1432 |

| 2020 | Use of Force | Inmate Misconduct FLD/FFD | Inmate/ Inmate Assault | Inmate Staff Assault | PREA | Death | Attempt Suicide/ Ideation | Internal Escape | Criminal Damage | Medical (AKA slip/falls/ injury) | Contraband | Medical | Other | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| January | 29 | 18 | 31 | 8 | 4 | 0 | 3 | 0 | 1 | 7 | 35 | NA | 0 | 107 |
| February | 33 | 17 | 35 | 12 | 2 | 0 | 0 | 1 | 3 | 13 | 29 | NA | 1 | 113 |
| March | 31 | 19 | 24 | 9 | 1 | 0 | 1 | 0 | 3 | 6 | 35 | NA | 0 | 98 |
| April | 45 | 29 | 25 | 19 | 7 | 0 | 0 | 0 | 4 | 1 | 24 | NA | 0 | 109 |
| May | 37 | 26 | 24 | 11 | 1 | 0 | 1 | 0 | 6 | 3 | 12 | NA | 0 | 84 |
| June | 22 | 16 | 28 | 13 | 4 | 2 | 1 | 0 | 5 | 12 | 63 | NA | 0 | 144 |
| July | 21 | 8 | 22 | 9 | 1 | 0 | 2 | 0 | 4 | 5 | 47 | NA | 0 | 98 |
| Aug | 22 | 23 | 22 | 8 | 2 | 1 | 4 | 0 | 11 | 4 | 31 | NA | 0 | 106 |
| Sept | 24 | 14 | 16 | 12 | 2 | 0 | 2 | 0 | 8 | 4 | 9 | NA | 0 | 67 |
| Oct | 35 | 18 | 24 | 10 | 2 | 0 | 1 | 0 | 3 | 3 | 14 | NA | 0 | 75 |
| Nov | 33 | 19 | 28 | 10 | 5 | 0 | 2 | 0 | 9 | 5 | 31 | NA | 0 | 109 |
| Dec | 40 | 25 | 30 | 18 | 4 | 0 | 4 | 0 | 7 | 1 | 21 | NA | 0 | 110 |
| Total | 372 | 232 | 309 | 139 | 35 | 3 | 21 | 1 | 64 | 64 | 351 | 0 | 1 | 1220 |



| 2021 | Use of Force | Inmate Misconduct FLD/FFD | Inmate/ Inmate Assault | Inmate Staff Assault | PREA | Death | Attempt Suicide/ Ideation | Internal Escape | Criminal Damage | Medical (AKA slip/falls/ injury) | Contraband | Medical | Other | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| January | 38 | 34 | 32 | 20 | 1 | 0 | 0 | 0 | 3 | 3 | 32 | NA | 0 | 125 |
| February | 27 | 12 | 30 | 14 | 2 | 0 | 1 | 0 | 2 | 5 | 14 | NA | 0 | 80 |
| March | 16 | 10 | 24 | 7 | 4 | 0 | 0 | 0 | 5 | 4 | 24 | NA | 0 | 78 |
| April | 24 | 17 | 27 | 10 | 2 | 0 | 1 | 1 | 2 | 4 | 45 | NA | 0 | 109 |
| May | 21 | 12 | 31 | 7 | 0 | 0 | 0 | 0 | 3 | 1 | 23 | NA | 0 | 77 |
| June | 34 | 18 | 25 | 15 | 0 | 1 | 0 | 0 | 4 | 4 | 30 | NA | 0 | 97 |
| July | 22 | 11 | 22 | 10 | 0 | 0 | 6 | 0 | 8 | 3 | 31 | NA | 0 | 91 |
| Aug | 18 | 13 | 19 | 7 | 0 | 0 | 5 | 0 | 2 | 4 | 20 | NA | 0 | 70 |
| Sept | 28 | 19 | 18 | 6 | 3 | 0 | 1 | 0 | 1 | 7 | 23 | NA | 0 | 78 |
| Oct | 31 | 21 | 22 | 8 | 0 | 0 | 1 | 0 | 6 | 3 | 52 | NA | 0 | 113 |
| Nov | 27 | 12 | 21 | 7 | 2 | 0 | 4 | 0 | 4 | 1 | 38 | NA | 0 | 89 |
| Dec | 25 | 11 | 22 | 12 | 3 | 0 | 1 | 0 | 2 | 4 | 17 | NA | 0 | 72 |
| Total | 311 | 190 | 293 | 124 | 17 | 1 | 20 | 1 | 42 | 43 | 350 | 0 | 0 | 1079 |

| 2022 | Use of Force | Inmate Misconduct FLD/FFD | Inmate/ Inmate Assault | Inmate Staff Assault | PREA | Death | Attempt Suicide/ Ideation | Internal Escape | Criminal Damage | Medical (AKA slip/falls/ injury) | Contraband | Medical | Other | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| January | 22 | 12 | 22 | 5 | 1 | 0 | 0 | 0 | 4 | 4 | 29 | NA | 0 | 77 |
| February | 26 | 21 | 18 | 10 | 3 | 0 | 1 | 0 | 4 | 0 | 31 | NA | 0 | 88 |
| March | 15 | 8 | 24 | 1 | 2 | 0 | 4 | 0 | 4 | 3 | 20 | NA | 0 | 66 |
| April | 12 | 6 | 28 | 3 | 1 | 0 | 6 | 0 | 4 | 1 | 1 | NA | 0 | 50 |
| May | 15 | 10 | 24 | 3 | 5 | 0 | 3 | 0 | 4 | 2 | 4 | NA | 0 | 55 |
| June | 22 | 15 | 31 | 2 | 2 | 2 | 5 | 1 | 2 | 2 | 4 | NA | 0 | 66 |
| July | 15 | 6 | 36 | 5 | 3 | 0 | 1 | 1 | 1 | 7 | 6 | NA | 1 | 67 |
| Aug | 15 | 12 | 24 | 1 | 0 | 0 | 1 | 0 | 3 | 2 | 8 | NA | 0 | 51 |
| Sept | 27 | 18 | 30 | 7 | 5 | 0 | 3 | 0 | 6 | 3 | 20 | NA | 1 | 93 |
| Oct | 23 | 16 | 55 | 8 | 9 | 0 | 2 | 0 | 2 | 7 | 37 | NA | 1 | 137 |
| Nov | 13 | 6 | 26 | 11 | 4 | 0 | 10 | 1 | 3 | 3 | 45 | NA | 6 | 115 |
| Dec | 24 | 11 | 33 | 15 | 1 | 0 | 9 | 3 | 2 | 1 | 43 | NA | 1 | 119 |
| Total | 229 | 141 | 351 | 71 | 36 | 2 | 45 | 6 | 39 | 35 | 248 | 0 | 10 | 984 |

| 2023 | Use of Force | Inmate Misconduct FLD/FFD | Inmate/ Inmate Assault | Inmate Staff Assault | PREA | Death | Attempt Suicide/ Ideation | Internal Escape | Criminal Damage | Medical (AKA slip/falls/ injury) | Contraband | Medical | Other | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| January | 24 | 17 | 34 | 9 | 2 | 0 | 5 | 2 | 6 | 15 | 75 | NA | 0 | 165 |
| February | 19 | 14 | 30 | 4 | 4 | 0 | 1 | 4 | 4 | 15 | 28 | NA | 2 | 106 |
| March | 14 | 7 | 46 | 9 | 2 | 0 | 5 | 8 | 1 | 7 | 40 | NA | 1 | 126 |
| April | 18 | 12 | 42 | 9 | 2 | 0 | 2 | 3 | 5 | 6 | 39 | NA | 4 | 124 |
| May | 21 | 12 | 43 | 11 | 2 | 0 | 1 | 5 | 1 | 15 | 52 | NA | 1 | 143 |
| June | 36 | 23 | 62 | 16 | 1 | 0 | 1 | 8 | 7 | 25 | 49 | NA | 3 | 195 |
| July | 32 | 20 | 66 | 18 | 5 | 0 | 4 | 4 | 8 | 20 | 35 | NA | 4 | 184 |
| Aug | 27 | 15 | 67 | 14 | 1 | 0 | 7 | 11 | 5 | 12 | 37 | NA | 5 | 174 |
| Sept | 25 | 19 | 67 | 15 | 1 | 0 | 0 | 4 | 6 | 14 | 53 | NA | 2 | 181 |
| Oct | 44 | 37 | 64 | 10 | 5 | 0 | 3 | 7 | 7 | 12 | 44 | NA | 9 | 198 |
| Nov | 31 | 18 | 67 | 13 | 3 | 0 | 1 | 15 | 4 | 23 | 45 | NA | 7 | 196 |
| Dec | 25 | 21 | 48 | 11 | 2 | 0 | 4 | 10 | 6 | 14 | 57 | NA | 3 | 176 |
| Total | 316 | 215 | 636 | 139 | 30 | 0 | 34 | 81 | 60 | 178 | 554 | 0 | 41 | 1968 |


Orleans Parish
JAIL MONITORS

| 2024 | Use of Force | Inmate Misconduct FLD/FFD | Inmate/ Inmate Assault | Inmate Staff Assault | PREA | Death | Attempt Suicide/ Ideation | Internal Escape | Criminal Damage | Slip / Fall / Injury | Contraband | Medical | Other | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| January | 27 | 23 | 45 | 23 | 2 | 0 | 3 | 14 | 8 | 15 | 64 | 86 | 3 | 286 |
| February | 24 | 17 | 35 | 9 | 1 | 0 | 2 | 7 | 21 | 9 | 32 | 46 | 5 | 184 |
| March | 22 | 14 | 39 | 5 | 4 | 0 | 7 | 21 | 16 | 6 | 50 | 43 | 5 | 210 |
| April | 16 | 12 | 44 | 11 | 0 | 0 | 2 | 7 | 19 | 24 | 34 | 70 | 1 | 224 |
| May | 40 | 21 | 70 | 16 | 2 | 0 | 7 | 10 | 30 | 13 | 79 | 68 | 4 | 320 |
| June | 24 | 15 | 72 | 6 | 2 | 0 | 1 | 12 | 18 | 15 | 42 | 49 | 3 | 235 |
| July | 49 | 25 | 69 | 16 | 4 | 0 | 9 | 29 | 29 | 20 | 38 | 54 | 5 | 298 |
| Aug | 27 | 10 | 79 | 22 | 5 | 0 | 7 | 21 | 12 | 18 | 56 | 37 | 2 | 269 |
| Sept | 54 | 36 | 76 | 14 | 7 | 0 | 6 | 31 | 7 | 15 | 58 | 54 | 1 | 305 |
| Oct | 42 | 12 | 80 | 13 | 5 | 0 | 6 | 28 | 23 | 21 | 33 | 38 | 3 | 262 |
| Nov | 49 | 25 | 57 | 12 | 4 | 0 | 2 | 27 | 14 | 9 | 36 | 48 | 1 | 235 |
| Dec | 35 | 13 | 69 | 8 | 1 | 0 | 5 | 22 | 15 | 10 | 40 | 30 | 1 | 214 |
| Total | 409 | 223 | 735 | 155 | 37 | 0 | 57 | 229 | 212 | 175 | 562 | 623 | 34 | 3042 |

| 2025 | Use of Force | Inmate Misconduct FLD/FFD | Inmate/ Inmate Assault | Inmate Staff Assault | PREA | Death | Attempt Suicide/ Ideation | Internal Escape | Criminal Damage | Slip / Fall / Injury | Contraband | Medical | Other | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| January | 34 | 7 | 70 | 13 | 4 | 0 | 3 | 24 | 26 | 11 | 63 | 19 | 4 | 244 |
| February | 28 | 11 | 45 | 9 | 1 | 0 | 2 | 18 | 14 | 5 | 34 | 15 | 1 | 155 |
| March | 38 | 18 | 45 | 19 | 2 | 0 | 1 | 14 | 13 | 8 | 40 | 21 | 3 | 184 |
| April | 34 | 15 | 45 | 13 | 5 | 0 | 0 | 17 | 17 | 6 | 53 | 13 | 3 | 187 |
| May | 52 | 23 | 51 | 10 | 2 | 0 | 3 | 17 | 15 | 5 | 53 | 13 | 3 | 195 |
| June | 44 | 26 | 53 | 15 | 5 | 0 | 1 | 12 | 24 | 9 | 53 | 16 | 5 | 219 |
| July | | | | | | | | | | | | | | 0 |
| Aug | | | | | | | | | | | | | | 0 |
| Sept | | | | | | | | | | | | | | 0 |
| Oct | | | | | | | | | | | | | | 0 |
| Nov | | | | | | | | | | | | | | 0 |
| Dec | | | | | | | | | | | | | | 0 |
| Total | 230 | 100 | 309 | 79 | 19 | 0 | 10 | 102 | 109 | 44 | 296 | 97 | 19 | 1184 |

OPSO continues to not timely conduct and document security rounds (30 minutes or 15 minutes depending on the unit) nor perform direct supervision surveillance consistent with the requirements of the Consent Judgment or OPSO policy.

Direct supervision requires surveillance of all of the inmates and cannot be properly performed by sitting behind a desk or in the control module. It requires walking around the unit, looking into the individual cells, and actively engaging with the inmates. Staffing in the housing units was observed to be inadequate throughout the OJC during the monitoring tour. A review of documentation of shift rosters confirmed that staff are often assigned to cover three posts (the two housing units and control module). Often the only person assigned is a CMT who does not have the training nor authority to conduct security checks in the housing units. This practice is particularly prevalent on the night shift. A review of the log of security checks and shift rosters reveals TMH was the one area which appeared to have sufficient staff and consistently conducted security rounds. Review of incident reports revealed that units were often unstaffed, including many mandatory posts. If staff are not present, it is impossible to make the required rounds.



While there are some notations of rounds in the logbooks and on the security check form, this is insufficient proof that the security checks actually occurred and requires watching hours of video to verify. Review of video footage after an incident often reveals that security checks are not being conducted and/or inadequately conducted even if recorded in the logbook. The JCT audits security check forms with video footage but has almost exclusively performed the audits on the four housing units which the June 2024 Stipulation and Order required to be staffed all of the time. A simple review of the documentation provided indicates that there are often gaps of two or more hours in between security rounds. During the onsite monitoring visit, Monitors reviewed the logbooks. At most, in the majority of the units, an adequate security check was only performed when a physical count of the inmates took place; at most, twice in a twelve-hour shift. The rest of the "checks" were no more than looking about the housing unit without leaving the deputy station, or, even more troubling, the control station which is located outside of the housing unit. OPSO CAB performed an audit of a limited period of security checks for a period in April 2024. The results are illustrative of what the Monitors have observed and noted in previous reports. The CAB auditors found that while 137 security checks were noted on the pod log, Squads A and B actually only completed 5% of those security checks. Squad C only completed 2.25% of the security checks recorded and Squad D completed 12% of the security checks recorded. In the Stipulation and Order of June 2024, the Court specifically ordered OPSO to staff four housing units (mental health (2A), youthful offenders (2C), protective custody (2D), and disciplinary (3C)). OPSO's data indicates that it has not made significant progress on staffing these four specific housing units all of the time. Even with a court order specifically stating that the four housing units are to be staff 24/7 and security checks are to be made every 30 minutes, OPSO has not consistently abided by the Court's order. For example, in June 2025, the required security checks on the disciplinary housing unit were only performed 33% of the time on the day shift and 12% of the time on the night shift. The audits by JCT often found that deputies were often on the units but did not conduct the security checks. It should be noted that what improvement there was only related to those specific four housing units. Given the level of failure to perform security checks and lack of staff assigned to direct supervision, OPSO continues to be in noncompliance with



IV. A. 5. d. The most vivid example of the consequences of failure to staff housing units and to conduct security checks is the escape on May 16, 2025, where the escape went undetected at least seven hours due to the failure to assign a deputy or conduct a single security check on 1D between at least midnight and shift change.

While not specifically required by the language of the Consent Judgment, if OPSO were able to provide a reliable system to allow for rounds, by both deputies and supervisors, to be recorded electronically, it would be extremely helpful in obtaining and demonstrating compliance. Not only would it allow supervisors to quickly determine whether rounds were being conducted in a timely manner, it would allow for OPSO to audit compliance and address non-adherence.

All twenty-four (24) of the housing units in OJC are designed for direct supervision. At the time of the drafting of the Consent Judgment the design of OJC was known. The Consent Judgment requires that staff provide direct supervision in housing units that are designed for this type of supervision. Thus, continual presence of a deputy in each housing unit at OJC and TMH is mandatory under the Consent Judgment. OPSO has taken the position that OPSO gets to determine which housing posts are mandatory and routinely does not assign mandatory staff to each housing unit. In addition, deputies are frequently absent from even the housing units designated by OPSO as mandatory. More often than not, one deputy is assigned to two or more housing units. The harm that results from not having a deputy in each pod, especially when inmates are out, is evident by the repeated serious incidents occurring when there is no deputy on the unit, including those resulting in serious injury and/or necessitating hospital routes and the escape of May 16, 2025. Thus, IV. A. 5. e. remains in partial compliance.

Regarding overhead video surveillance and recording cameras for OJC (A. 5. f.), there has been a significant investment in cameras. There are two uses of the video surveillance system. One is to allow for areas to be viewed remotely from central control or elsewhere so as to detect issues when no staff is present. As learned from the escape of May 16, 2025, there is no systematic process whereby housing units which are unstaffed are viewed remotely. The other is to be able to retrieve the video footage to investigate an incident or confirm whether staff are appropriately performing tasks such as security checks, suicide watch, and housing audits. During the monitoring tour, it was discovered



that OPSO could not retrieve video that was over three months old. No explanation was offered for why video footage was no longer available as it had been in the past. This not only hinders monitoring activity, but it is also likely a violation of Louisiana's law regarding public record retention. Until this issue is corrected, IV. A. 5. f. will be rated as being in Partial Compliance. Supervisors have improved on pulling video as required by the Use of Force policy. Deputies are now issued body worn cameras which is helpful as the body worn cameras provide audio in addition to video.

There were no divisional transfers into OJC during the monitoring period as the staff transferred to security assignments were in-house (IPC to OJC). Section IV. A. 5. g. is in substantial compliance.

OPSO began providing training on special management housing units to all recruits and through in-service mandatory training in 2024. Given that over 90% of the OJC security staff have received the required annual eight (8) hours of training for all of the deputies assigned to specialized units was provided, IV. A. 5. h. is now in Substantial Compliance.

Documentation indicates that supervisors do not consistently conduct daily rounds. The audit performed by OPSO CAB in April 2024 found that the daily security checks by supervisors were actually performed 3.40% of the time on Squad A, 15.00% of the time on Squad B, 4.00% of the time on Squad C, and 1.6% of the time on Squad D. This audit confirms what was suspected by the Monitors. The JCT audit of security checks by supervisors on the four "super mandatory" housing revealed, in June 2025, supervisors on the day shift performed 20% of their required security checks. On the night shift, supervised performed only 10% of their required security checks. The failure of supervisors to perform required security checks is especially alarming in light of the fact that the failure of the night shift supervisors contributed to the failure to detect the escape that happened the month before. When supervisors fail to perform their required security checks, it sets an unacceptable example for the line staff. Stating the policy and asserting partial compliance without proof is insufficient. Thus, IV. A. 5. i. continues to be in non-compliance. Supervisors are required to sign off on the round sheet completed by the pod deputy, but this does not provide proof that the supervisor conducted daily rounds. OPSO is encouraged to continue the focus on supervisors' rounds and hold those



who fail to conduct them accountable.

No proof of the daily inspections of housing units as required by VI. A. 5. j. were submitted. Thus, VI. A. 5. j. has once again been downgraded to Non-Compliance. Proper inspections by the deputies and the supervisors would likely result in the discovery of the destruction of items that are part of the jail to fashion weapons and attempts by inmates to override the jail security systems including door locks. It is essential that the inspections be thorough and that corrective actions are taken to address the inspection findings. Training was provided on how to properly conduct an inspection. However, training without implementation is insufficient to satisfy the requirements of the provision.

Random monthly shakedowns to prevent inmates from possessing dangerous contraband are required. Proof provided indicates that the number and quality of shakedowns being conducted has significantly improved. OPSO did not provide the data required for the Monitor to determine exactly how many shakedowns were conducted during the monitoring period. The data provided did allow the Monitor to conclude that OPSO remain in Partial Compliance with A. 5. k.  Most of these were conducted by the ISB or the SRT. Without appropriate data, it is impossible to determine how often a particular housing area was shaken down, if at all. There continues to be significant incidents involving contraband including the manufacturing and use of weapons fashioned from the jail itself. The review of contraband reports clearly indicates reoccurring issues and that the number of contraband incidents continue to be high. The number of drug overdoses occurring is a direct reflection of the failure to prevent introduction of illicit drugs into the facility and the failure to perform timely and appropriate searches to remove the illicit drugs. There continues to be an issue of inmates hoarding medication. Reports demonstrate that inmates are fashioning weapons out of items in the jail which are then used to assault other inmates. Reports and the site visit reveal that inmates are smuggling in marijuana and narcotics to smoke. Some of these items come through the mail, but there is a significant issue of staff smuggling in contraband and the failure to detect narcotics being brought in by inmates following their arrest. The failure to search inmates thoroughly and properly upon returning from court also constitutes a source of illegal drugs. This indicates the need to analyze the data and develop a corrective action



plan to reduce, if not stop, the hoarding of medication, the fashioning of weapons, and the flow of contraband into the facility. Failure to conduct shakedowns on a proactive basis is directly related to the violence in the facility.

The documentation provided for A. 5. l. includes a categorization of contraband, and the classification required. Thus, A. 5. l. is now in Substantial Compliance.

## IV. A. 6. Security Staffing

*A. 6. a. OPSO shall ensure that correctional staffing and supervision is sufficient to adequately supervise prisoners, fulfill the terms of this Agreement, and allow for the safe operation of the Facility, consistent with constitutional standards.*

*(1)    OPSO shall achieve adequate correctional officer staffing in the following manner: Within 90 days of the Effective Date, develop a staffing plan that will identify all posts and positions, the adequate number and qualification of staff to cover each post and position, adequate shift relief, and coverage for vacations. The staffing plan will ensure that there is adequate coverage inside each housing and specialized housing areas and to accompany prisoners for court, visits and legal visits, and other operations of OPP and to comply with all provisions of this Agreement. OPSO will provide its plan to the Monitor, SPLC, and DOJ for approval. The Monitor, SPLC, or DOJ will have 60 days to raise any objections and recommend revisions to the staffing plan.*

*(2)    Within 120 days before the opening of any new facility, submit a staffing plan consistent with subsection (1) above.*

*(3)    Within 90 days after completion of the staffing study, OPSO shall recruit and hire a full-time professional corrections administrator to analyze and review OPP operations. The professional corrections administrator shall report directly to the Sheriff and shall have responsibilities to be determined by the Sheriff. The professional corrections administrator shall have at least the following qualifications: (a) a bachelor's degree in criminal justice or other closely related field; (b) five years of experience in supervising a large correctional facility; and (c) knowledge of and experience in applying modern correctional standards, maintained through regular participation in corrections-related conferences or other continuing education.*

*(4)    Provide the Monitor a periodic report on staffing levels at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. Each report will include the following information:*

*    i.    a listing of each post and position needed;*

*    ii.    the number of hours needed for each post and position; a listing of staff hired and positions filled;*

*    iii.    a listing of staff working overtime and the amount of overtime worked by each staff member;*

*    iv.    a listing of supervisors working overtime; and*

*    v.    a listing of and types of critical incidents reported*

*A. 6. b. Review the periodic report to determine whether staffing is adequate to meet the requirements of this Agreement. OPSO shall make recommendations regarding staffing based on this review. The review and recommendations will be documented and provided to the Monitor.*

Findings:

A. 6. a.  Non-Compliance

A. 6. b.  Partial Compliance



Observations:

The level of staffing assigned is extremely insufficient to adequately supervise inmates and allow for the safe operation of the facility; especially on the night shift and on weekends. There have been insufficient security staff over the past few monitoring periods, and it continues at a level where OPSO struggles to staff the facility and cover basic functions. OPSO's staffing reports document that some mandatory posts (particularly the four housing units for which there is a specific court order) are being filled on a consistent basis, but not at a level to warrant partial compliance. Numerous incident reports and investigations reveal posts were not constantly staffed, which resulted in a high rate of violence and allowed the escape of May 16, 2025, to occur and go undetected for over seven hours. OPSO has now put in place the Emergency Staffing and Augmentation Plan (ESAP) which has resulted in escorts being provided to the psychiatrists and some of the medicals runs. The ESAP has not been shown to provide any increased coverage of the housing units as many of the individuals, especially the reserves, have been resistant to working in the housing units. Some of them do not have the required certification to supervise inmates. There is still a lack of a coordinated effort on the utilization of overtime and redeployment of staff to ensure the mandatory posts are covered on a consistent basis. While OPSO has updated its staffing plan, a significant portion of the positions detailed in it are vacant. The deployment of staff is sufficiently inconsistent and insufficient to result in IV. A. 6. a. (1) and IV. A. 6. a. (2) continuing to be in non-compliance. For the monitoring period, there was a Chief of Corrections whose background, education, and experience fulfilled the requirements of provision IV. A. 6. a. (3). Thus, it is in substantial compliance. Paragraph IV. A. 6. a. (4) is in substantial compliance, as monthly reports are produced to document the hiring and termination of employees. The Stipulated Agreement also provides for bi-monthly reports regarding hiring. Paragraph 7. a. of the Stipulated Agreement of February 11, 2015, requires monthly reporting. Given the importance of the actual implementation of an approved staffing plan, A. 6. a. remains in non-compliance as the actual implementation of an adequate staffing plan is the most crucial part of this provision. A staffing plan based on nonexistent staff is not enough to warrant partial compliance.

OPSO has now provided a periodic review of the staffing plan. What has not been



provided are the recommendations to the Monitor as to how OPSO will enact the staffing plan given that a significant portion of the positions detailed in the staffing plan are vacant. Section A. 6. b. remains in partial compliance. OPSO has provided some compelling data as to the inadequacy of salaries. The Monitors suggest that this data be reflected in the recommendations and be provided to the Monitors and the New Orleans City Council as it is the funding agency for OPSO. The Monitors also suggest that OPSO consider the mandating of overtime for OPSO staff who are not assigned to OJC to work at OJC.

## IV. A. 7. Incidents and Referrals

*A.7.a.   OPSO shall develop and implement policies that ensure that Facility watch commanders have knowledge of reportable incidents in OPP to take action in a timely manner to prevent harm to prisoners or take other corrective action. At a minimum, OPSO shall do the following:*

*A.7.b.   Continue to ensure that Facility watch commanders document all reportable incidents by the end of their shift, but no later than 24 hours after the incident, including prisoner fights, rule violations, prisoner injuries, suicide attempts, cell extractions, medical emergencies, found contraband, vandalism, escapes and escape attempts, and fires.*

*A.7.c.   Continue to ensure that Facility watch commanders report all suicides and deaths no later than one hour after the incident, to a supervisor, IAD, the Special Operations Division, and medical and mental health staff.*

*A.7.d.   Provide formal pre-service and annual in-service training on proper incident reporting policies and procedures.*

*A.7.e.   Implement a policy providing that it is a disciplinary infraction for staff to fail to report any reportable incident that occurred on his or her shift. Failure to formally report any observed prisoner injury may result in staff discipline, up to and including termination.*

*A.7.f.   Maintain a system to track all reportable incidents that, at a minimum, includes the following information:*

> *(1)      tracking number;*
> *(2)      the prisoner(s) name;*
> *(3)      housing classification and location;*
> *(4)      date and time;*
> *(5)      type of incident;*
> *(6)      injuries to staff or prisoner;*
> *(7)      medical care;*
> *(8)      primary and secondary staff involved;*
> *(9)      reviewing supervisor;*
> *(10)     external reviews and results;*
> *(11)     corrective action taken; and*
> *(12)     administrative sign-off.*

*A.7.g.   Ensure that incident reports and prisoner grievances are screened for allegations of staff misconduct, and, if the incident or allegation meets established criteria in accordance with this Agreement, it is referred for investigation.*

*A.7.h.   Provide the Monitor a periodic data report of incidents at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement.*

*A.7.i. The report will include the following information:*

> *(1)      a brief summary of all reportable incidents, by type and date;*
> *(2)      a description of all suicides and in-custody deaths, including the date, name of prisoner, and housing unit;*
> *(3)      number of prisoner grievances screened for allegations of misconduct; and*
> *(4)      number of grievances referred to IAD or SOD for investigation.*



***A.7.j.   Conduct internal reviews of the periodic reports to determine whether the incident reporting system is ensuring that the constitutional rights of prisoners are respected. Review the quarterly report to determine whether the incident reporting system is meeting the requirements of this Agreement. OPSO shall make recommendations regarding the reporting system or other necessary changes in policy or staffing based on this review. The review and recommendations will be documented and provided to the Monitor.***

Findings:

A. 7. a.  Substantial Compliance

A. 7. b.  Partial Compliance

A. 7. c.  Substantial Compliance

A. 7. d.  Substantial Compliance

A. 7. e.  Partial Compliance

A. 7. f.  Substantial Compliance

A. 7. g.  Substantial Compliance

A. 7. h.  Substantial Compliance

A. 7. i.  Substantial Compliance

A. 7. j.  Substantial Compliance

Observations:

OPSO has long had a policy on incidents and referrals that sets out the process for documenting and referring incidents. What has been lacking is a sufficient process to ensure all reportable incidents are being documented and that all incident reports are complete, prompt, and accurate. Watch commanders are required to be notified of any incident occurring and document the incident in their shift log. However, review of the routes of inmates and medical clinic walk-in logs indicates that a number of incidents are not resulting in an incident report or inclusion in the shift log. Whether that is because the watch commander is not being made aware of the incident or is aware and is failing to record it is unclear. However, it occurred during the monitoring period with sufficient regularity to warrant a reduction in the rating to Partial Compliance of A.7.a. OPSO was warned in the last report that a corrective action plan addressing the issue would be necessary to maintain substantial compliance. No such corrective action plan was developed or implemented.

OPSO implemented a process where an OPSO staff member reviewed the "routes" of inmates with serious medical or trauma injuries to the hospital emergency room and the OPSO clinic walk-in logs and compared them to the reports received. The sergeant



assigned has improved the quality of this review, but the lack of follow-through on items found to be unreported results in IV. A. 7. b. remaining in partial compliance. The JCT reviews the medical logs and has done a good job discovering injuries which indicate an incident report should have been written and requesting an incident report. Wexford, the new medical provider, had stopped providing the walk-in logs when it took over, but OPSO worked with Wexford to provide the logs in electronic form. Having a process for capturing incidents for which no reports were written is absolutely essential.

During this reporting period, several attempts at suicide were reported within an hour to the proper persons; thus IV. A. 7. c. is in substantial compliance. Documentation on preservice training and annual training on report writing was provided; IV. A. 7. d. is in substantial compliance.

OPSO still does not consistently hold supervisors and security staff accountable for the late reports. No documentation regarding accountability was provided, but record of discipline was found on the spreadsheet of the Internal Affairs Division which was produced as documentation for another provision. OPSO's own documentation indicates that reports are often not timely filed. Failure to consistently hold staff accountable results in IV. A. 7. e. being in partial compliance.

OPSO has transitioned to the AS 400 system to track the information required in IV. A. 7. f.  and is in substantial compliance. OPSO runs the risk of this provision being downgraded to partial compliance due to the high number of reports that are misclassified. The analysis is still inadequate and often does not result in measures which would correct the problem being identified. The next step is utilizing the analysis to make required changes in policy and procedure. OPSO remains in substantial compliance with A. 7. g.; incidents and grievances are reviewed for misconduct and referred for investigation where appropriate. The Monitors were provided with a semi-annual report of incidents that now, with the supplementation by the daily/weekly reports, contains all of the required information and, thus, IV. A. 7. h. and i. are in substantial compliance. OPSO performed an assessment of whether the reporting system meets the requirements of the Consent Judgment and is given substantial compliance for IV. A. 7. j. as OPSO is now beginning to address the lack of timeliness.



## II.   A. 8.  Investigations

*A. 8. a. Maintain implementation of comprehensive policies, procedures, and practices for the timely and thorough investigation of alleged staff misconduct, sexual assaults, and physical assaults of prisoners resulting in serious injury, in accordance with this Agreement. Investigations shall:*

    *(1)   be conducted by persons who do not have conflicts of interest that bear on the partiality of the investigation;*

    *(2)   include timely, thorough, and documented interviews of all relevant staff and prisoners who were involved in or who witnessed the incident in question, to the extent practicable; and*

    *(3)   include all supporting evidence, including logs, witness and participant statements, references to policies and procedures relevant to the incident, physical evidence, and video or audio recordings.*

*A. 8. b. Continue to provide SOD and IAD staff with pre-service and annual in-service training on appropriate investigation policies and procedures, the investigation tracking process, investigatory interviewing techniques, and confidentiality requirements.*

*A. 8. c. Ensure that any investigative report indicating possible criminal behavior will be referred to IAD/SOD and then referred to the Orleans Parish District Attorney's Office, if appropriate.*

*A. 8. d. Provide the Monitor a periodic report of investigations conducted at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement.*

*A. 8. e. The report will include the following information:*

    *(4)   a brief summary of all completed investigations, by type and date;*

    *(5)   a listing of investigations referred for administrative investigation;*

    *(6)   a listing of all investigations referred to an appropriate law enforcement agency and the name of the agency; and*

    *(7)   a listing of all staff suspended, terminated, arrested, or reassigned because of misconduct or violations of policy and procedures. This list must also contain the specific misconduct and/or violation.*

*A. 8. f. OPSO shall review the periodic report to determine whether the investigation system is meeting the requirements of this Agreement and make recommendations regarding the investigation system or other necessary changes in policy based on this review. The review and recommendations will be documented and provided to the Monitor.*

<u>Findings:</u>

A. 8. a.  Partial Compliance

A. 8. b.  Substantial Compliance

A. 8. c.  Substantial Compliance

A. 8. d.  Substantial Compliance

A. 8. e.  Substantial Compliance

A. 8. f.  Partial Compliance

<u>Observations</u>:

    The Investigative Services Division (ISB) is responsible for: the Criminal Investigation Division (investigates possible criminal activity by inmates), Internal Affairs Division-Criminal (investigates possible criminal activity by staff), the FIT (investigates use of force by staff), the Internal Affairs Division-Administrative (investigates possible



violation of policies by staff), and the Intelligence Unit (provides information and intelligence regarding activities that have taken place or may take place in the jail or support activities).

The timeliness and the quality of the investigations produced by ISB was sporadic during this monitoring period. There continue to be FIT investigations finalized without having interviewed any witnesses and relying on short self-serving statements by the deputy involved. There were several serious incidents involving inmates where the investigation was extremely limited and then closed because the inmate victim declined to cooperate. Thus, IV. A. 8. a., remains in partial compliance.

The Monitor acknowledges that investigating incidents of inmate-on-inmate assaults, sexual assaults, staff on inmate assaults, etc. with a goal of seeking indictments is appropriate. Inmates should be held accountable when they commit criminal acts while in the jail facility. The same holds true for staff who commit criminal acts whether it be the smuggling of contraband or assault on inmates. The overall goal is to create a safe jail. In a jail setting, investigations play a critical role in protecting inmates from inappropriate and/or illegal staff actions, protecting inmates from each other, protecting staff from inappropriate and/or illegal inmate actions, and ensuring policy is followed. Continued emphasis is needed on the goal of investigations to prevent future incidents through analysis of the policy, procedures, training, supervision, and physical plant contributors to the incident. This function cannot and should not be performed by ISB alone. Also, troubling is how seldom ISB recognizes the other factors which contributed to an incident such as failure to follow policy and/or includes them in the investigation reports. The collaboration between ISB and OJC and the opportunity to address the root causes of incidents continues to have room for improvement.

ISB has demonstrated training related to the investigative skills provided during 2023 and 2024. IV. A. 8. b. remains in substantial compliance.

Documentation presented demonstrates that most investigations which reveal possible criminal activity by staff were referred to the Orleans Parish District Attorney's Office, if appropriate. Thus, A. 8. c. is in substantial compliance. The Monitors remain concerned about the frequent refusal by the district attorney to follow through with filing cases related to indecent exposure by inmates towards staff and assaults on staff due to



the throwing of urine and feces by inmates on staff. ISB provides reports in substantial compliance with IV. A. 8. d. and e. ISB provided a report for the first three months of the monitoring period but did not provide one for the January 2025-June 2025 period. The report that was provided did not include all of the information required. Providing spreadsheets which are often incomplete is not sufficient for substantial compliance. Thus, the rating IV. A. 8. f. has been lowered to Partial Compliance.

### IV. A. 9. Pretrial Placement in Alternative Settings

*A. 9. a. OPSO shall maintain its role of providing space and security to facilitate interviews conducted pursuant to the City's pretrial release program, which is intended to ensure placement in the least restrictive appropriate placement consistent with public safety.*
*A. 9. b. OPSO shall create a system to ensure that it does not unlawfully confine prisoners whose sole detainer is by Immigration and Customs Enforcement ("ICE"), where the detainer has expired.*

Findings:

A. 9. a.  Substantial Compliance

A. 9. b.  Substantial Compliance

Observations:

OPSO provided a memorandum noting that the pretrial program is managed by the Criminal District Court, and that space is provided. OPSO also provided a memorandum that ICE detainers are only accepted for a specified list of offenses.  OPSO has not detained any individuals under an ICE detainer during the monitoring period. The memos are dated November 1, 2024, and signed by the Chief of Staff.

### IV. A. 10. Custodial Placement within OPSO

Introduction:

OPSO designed and validated an objective classification system to assess and house OPSO inmates according to their threats to institutional safety and security. The automated classification system was implemented on January 15, 2015.[1] The 2024 OPSO draft staffing plan set the classification unit staffing at 21 FTEs.[2]

As of June 30, 2025, the Classification Unit staffing personnel included one classification manager, four shift supervisors, and eleven classification specialists.[3]

---

[1] Hardyman, Patricia L. (2015). "Design and Validation of an Objective Classification System for the Orleans Parish Sheriff's Office: Final Report." Hagerstown, MD: Criminal Justice Institute, Inc.
[2] Mallett, Jay and Hammons, Deborah. (June 17, 2024). "JAIL POST & COVERAGE ANALYSIS – June 17, 2024" Orleans Parish, LA: Office of the Sheriff. page 2 of 12.
[3] During the Fall of 2022, OPSO created the option or the classification staff to become deputy recruits. Two individuals opted to remain civilian classification specialists, the remaining nine are "recruits." For the purposes of



All staff members have NCIC clearance and passwords. NCIC coverage is available for each of the four squads. Staff have access to the criminal history records required to complete the custody and PREA assessments via the NCIC website. The rap sheets were available in the classification folders reviewed for this Compliance Review. The classification manager checks the folders at the start of her shift and prints any missing rap sheets.

An automated housing assignment process (HUAP) identifies housing options for inmates according to their custody level, gender, special population status, PREA designations, enemies, and associates. After the initial classification assessment, the specialists assign most male inmates to one of the roll-in pods.[4] (Special population tags identify individuals for suicide observation versus suicide watch, medical housing/ isolation, academic education, or special diets.) (As needed, men with acute mental health or medical needs go directly to 2A or 2B, respectively. Individuals identified for suicide watch and female youthful offenders are housed in TMH.) Following the initial classification, minimum custody women with no immediate medical or mental health needs and at low risk for institutional predation and vulnerability (Non-Victims/Non-Predators) are transferred to TDC B3-E.

The OPSO automated housing process assigns enemies and associates to separate pods to prevent institutional violence and disruption. While tension between the Classification Unit and security staff appeared to have diminished, security and ISB staff remain reluctant to share information with the Classification Unit regarding neighborhood cliques, gang involvement, enemies, associates, and other housing separation requirements. Acquiescence to inmates' requests to move to reside with their associates or to accommodate security staff's "suggestions" for inmate moves continues unabated. Classification staff routinely accepts the security staff's suggestions and inmate requests with little to no analysis to determine if the inmates are trying to manipulate their housing assignments or if staff are avoiding problematic inmates.

---

this report, the classification line staff are referred to as "Classification Officers" and the shift supervisors are referred to as "Shift Supervisors."

[4] When transferring inmates from the roll-in or special population pods to a general population pod, the classification staff matches individuals by custody level, PREA designations, age, and crime/criminal history.



The "ALL" custody and PREA designations continue in the special population units including Mental Health (Acute and Sub-Acute), Protective Custody, Disciplinary/ Segregation, Medical, etc. The OJC pods for housing women (1C and 1D) are "ALL" custody and PREA designations."[5] Adherence to the custody and PREA designations during the out-of-cell times is vital. The short-term tradeoff of the custody and PREA separations creates more violence and disruption in the long term. With the recent rise in the OPSO population, most of the OJC pods are operating at capacity. The exception is the OJC 2C (male, youthful offenders).[6] The number of men assigned to the mental health stepdown (MHSD) pod increased during this review period.  On average, during this review period, 62.1 men were identified as needing MHSD services, compared to 55.6 during the previous nine-month period (January – September 2024).  As of June 30, 2025, only 13 of the 58 MHSD beds (OJC 2B) were empty. Further, the Classification Unit made better use of TDC B-4E. Previously, OPSO reserved this dorm for kitchen workers. Currently, the dorm also houses low/medium custody, non-victim/non-predator (NV/NP) men.

During this Compliance Period, the classification day shift supervisor circulated a daily housing matrix to reflect the current OJC, TMH, and TDC populations. The matrices reflect fluctuations in the OPSO population. Isolation for COVID-19 was relatively rare. According to the OPSO Special Population Reports for the period from October 1, 2024 to June 30, 2025, 27 male residents were identified as having COVID-19. (COVID-19 patients were transferred to TDC to minimize the spread of the virus throughout the system.)

The reliance on the roll-in pods for the intake population has shifted. As of June 30, 2025, three pods -- OJC Tier 1 Pods A, B, and E were designated "ROLL-INS" for men. (Pod 1D serves as the Roll-In Pod for high-risk women, i.e., individuals with custody, medical, or mental health needs.)  As reported for the previous review period, the significant increase in the OPSO average daily population has limited bed space within

---

[5] As previously noted, TDC B3-E houses minimum custody women with no immediate medical or mental health needs and at low-risk for institutional predation and vulnerability (Non-Victims/Non-Predators).
[6] In mid-April 2024, OJC 2-C became the youthful offender pod (i.e., males less than or equal to 17 years.) The youthful offender pod reduced housing options for adults. (During this compliance period, the average daily population of youthful offenders was 23.4.)



the roll-in and general population pods. This created a backlog of individuals in the IPC/Booking area waiting for a bed assignment. IPC (Intake Processing Center)/Booking Area essentially became a "Roll-In" pod. The classification staff complete the custody and PREA assessments. However, individuals remain in the IPC/Booking area waiting for an OJC bed assignment. During January – June 2025, the average number of persons in BKG was 33.1; the wait time between booking and movement from IPC to an OJC/TDC/TMH bed was 33.46 hours. To reduce long wait times in BKG, we recommend housing high-custody males with Category V (Violent) or B (Aggravated) charges in a general population rather than a roll-in pod.

IPC staff rely on the custody and PREA assessments completed by the Classification Unit to assign individuals in the IPC/Booking area to holding cells for sleeping and lockdown for counts. IPC staff assign known predators, high/maximum custody, and individuals with isolation or mental health needs to cell 1026, 1025, 1032, or 1033. Known predators/victims, high/maximum custody, medical isolation, and individuals with mental health needs are assigned to 1026, 1025, 1032, and 1033. A review of the housing rosters indicated that staff did not always adhere to these rules. Some of the housing rosters suggested that high, medium, and low custody individuals were assigned to the same IPC cell. OPSO did not establish a standardized capacity rating for the IPC holding cells during the monitoring period. At best, the "larger" IPC cells (i.e., 1029, 1030, 1031, and 1037) accommodate seven to ten individuals. Inmates are forced to sleep on the floor; often without a mattress. There is only one cell (1013) for low- and medium-custody women. Unclassified individuals, as well as those awaiting a medical or mental health assessment, are directed to the holding cells.

With the continuing rise in the OPSO population, OPSO has explored various population management strategies. During April, for example, OPSO contracted with Plaquemines Parish (PPS) for space while completing much-needed maintenance. While placing inmates out of the parish provides flexibility, the OPSO must continue to monitor and input any status changes (i.e., criminal charges, warrants, bonds, etc.) and disciplinary infractions among the out-of-parish populations into its JMS. These data are essential for ensuring the accuracy of the individuals' custody, vulnerability, and predation designations on their return to OPSO custody.



During this Compliance Period, the Classification Unit conducted housing audits to verify the integrity of the housing assignments designed by the Classification staff. However, staff did not complete monthly audits for all OPSO housing units. Further, some audit reports were incomplete or unclear. Observation of the housing audits and protective custody reviews via the OJC camera videos suggested that not all the audits were conducted as reported.

Assessment Methodology:

Compliance was assessed through multiple data sources and activities including a review of the OPSO and JMS daily population, classification statistical reports and data files, housing matrices, and staffing rosters. The OPSO documents included monthly statistical and protective custody status reports. Analyzed were custody assessment, override, attachment, and enemy refusal data downloaded from the AS400. The statistical reports tracked pending custody assessments, daily population and IPC counts, placement errors, the stock population, and monthly custody trends. Our July 28 to 31, 2025, on-site activities included:

- Meetings with OPSO classification and facility administrative staff;
- Review of body-camera videos of protective custody reviews;
- Review of OJC security videos of housing audits; and
- Examination of the protective custody placement and status reports.
    - This review primarily focused on the data and Classification Unit activities between October 1, 2024, and June 30, 2025. Some analyses considered trends over 12 to 24 months to identify fluctuations due to seasonal variations.

This review primarily focused on the data and Classification Unit activities between October 1, 2024, and June 30, 2025. Some analyses considered trends over 12 to 24 months to identify fluctuations due to seasonal variations.

Summary:

OPSO complies substantially with five of the eight Custodial Placement sections of the Consent Judgment (Sections b, c, g, and h). Sections a, d, and f are rated as Partial Compliance. We commend the OPSO staff for their efforts and progress. Perhaps most



important is the "can and will do" attitude exhibited by the Classification and Compliance Unit staff.

Findings:

A. 10. a.  Partial Compliance

A. 10. b.  Substantial Compliance

A. 10. c.  Substantial Compliance

A. 10. d.  Partial Compliance

A. 10. e.  Substantial Compliance

A. 10. f.   Partial Compliance

A. 10. g.  Substantial Compliance

A. 10. h.  Substantial Compliance

*IV.A.10. a. OPP shall implement an objective and validated classification system that assigns prisoners to housing units by security levels, among other valid factors, in order to protect prisoners from unreasonable risk of harm. The system shall include consideration of a prisoner's security needs, the severity of the current charge, types of prior commitments, suicide risk, history of escape attempts, history of violence, gang affiliations, and special needs, including mental illness, gender identity, age, and education requirements. OPSO shall anticipate periods of unusual intake volume and schedule sufficient classification staff to classify prisoners within 24 hours of booking and perform prisoner reclassifications, assist eligible DOC prisoners with re-entry assistance (release preparation), among other duties.*

Finding:

Partial Compliance

Observations:

Compliance with Section IV.A.10. a. remained in Partial Compliance during this review period.  During this Compliance period, Unit staffing included one classification manager, four shift supervisors, and 11 classification specialists.[7] The shift supervisors oversee the classification specialists, process housing transfers, complete custody reviews, conduct housing audits, and address classification-related grievances. The classification specialists complete the custody and predation/vulnerability (PREA) assessments and assign inmates to pod and cell housing accordingly. The Classification Manager oversees the housing audits, reviews protective custody/administrative segregation placements, assesses the accuracy of custody assessments, and conducts

---

[7] During the Fall of 2022, OPSO created the option for the classification staff to become deputy recruits. Two individuals opted to remain civilian classification specialists, the remaining nine are "recruits." For the purposes of this report, the classification line staff are referred to as "Classification Officers" and the shift supervisors are referred to as "Shift Supervisors."



monthly training for Classification Unit staff.  As previously noted, the manager had no experience in jail classification and faced a steep learning curve, as well as significant challenges in managing the Unit and achieving compliance with the Consent Judgment.

While the Unit was fully staffed during this compliance period, the rating is Partial Compliance for two reasons:

1) **Housing Matrix:** The special population pods (Mental Health, Medical, TMH, TDC, Disciplinary/Segregation, and female units) compromise the classification system. The OPSO matrix allows for all custody levels and PREA statuses within these pods. According to the June 30, 2025, Housing Matrix, 10 of the 32 OPSO living units housed individuals across all custody levels, vulnerabilities, potential for predatory behavior, and special population statuses. An important step was to designate the TDC units for Low to Medium-Custody, Non-Victim, and Non-Predator individuals.

   The TMH treatment teams assign patients to cells according to their mental health needs with little regard for their custody or PREA status. (Known enemies live in separate pods.) The "treatment level" determines the housing assignments, activities, and out-of-cell times. While this practice may support the individuals' treatment plans, the classification system is compromised.

   Given the size and configuration of the OJC and TDC/TMH, we recognize that pods with multiple custody levels and PREA designations are unavoidable. However, OPSO appears to favor "ALL CUSTODY ALL STATUS" pods despite inadequate security staffing and out-of-cell schedules that allow for mixing high-risk inmates.  Of particular concern was the failure of some special population units to maintain separations for out-of-cell activities.

   OPSO revised its housing matrix to address security and classification separations.  The new matrix required upgrading the cell locks and food ports, revising the administrative segregation and protective custody policies, and distributing information tablets to security and inmates. OPSO is updating its restrictive housing policy and operating procedures; thus, 3D has NOT been opened as an administrative segregation pod.  Revisions to the OJC housing matrix included:



| Pod | Previous Mission | Custody | Current Mission | Custody |
|-----|------------------|---------|-----------------|---------|
| 1C | Male General Population | Med/High | Female – General Population | All |
| 1D | Male General Population | Med/High | Female – Roll-Ins | All |
| 2D | Male Protective Custody | All | Male General Population | Low/Med |
| 2F | Male General Population | Low/Med | Male Protective Custody | All |
| 3C | Male Disciplinary | All | Male – Admin Segregation | N/A |
| 2D | Male General Population | Med/High | Male Disciplinary | Med/High |
| 3E | Female General Population/Disciplinary | All | Male General Population | Med/High |
| 3F | Female Roll-In | All | Male General Population | Med/High |

1) **Classification staff control of housing assignments**: The housing audits completed during this Compliance Review Period reported that most inmates were in the cell and bunk assigned by the classification staff. (For a detailed discussion of the housing audit process and findings, see section IV. A. 10. f. of this report.) However, observation of the classification staff suggested that the security staff directed the housing assignments through repeated calls or emails to specify the pod and cell to which an inmate should be assigned. The protective custody files and videos suggested that classification staff placed inmates in protective custody following an email or phone call from security staff rather than a full review by the multi-disciplinary protective custody review board. Documentation of the reason(s) and/or investigation of the risks associated with the individual's vulnerability was missing from most of the protective custody files, suggesting that OPSO did not know why the individuals were in protective custody.  This is not acceptable and is likely to result in security staff and inmates continuing to manipulate housing assignments and facilitating gang/cliques and inmate-on-inmate violence.

2) This is not acceptable and is likely to result in security staff and inmates continuing to manipulate housing assignments and facilitating gang/cliques and inmate-on-inmate violence.

The Classification Manager must work closely with other OJC Divisions to facilitate information sharing and build trust. As the OPSO rebuilds the Classification Unit, it should consider strategies for utilizing the security staff's



knowledge of local cliques, checking in with inmates during their rounds or audits, and addressing inmate grievances.

***IV.A.10.b. Prohibit classifications based solely on race, color, national origin, or ethnicity.***

Finding:

Substantial Compliance

Observations:

The custody assessments consider objective risk factors validated for the OPSO male and female inmates. The individual's race is not one of the objective risk factors. Classification specialists consider the individual's custody level, vulnerability designation, age, and charges to select a cell and bed from those identified by the JMS automated housing program as appropriate for the individual. To track this element of the Consent Judgment, OPSO created a monthly statistical report to record the race and gender of individuals per housing location.

The OPSO "Housing By Race" reports suggested that race was not a factor in OJC general population housing assignments. With a few exceptions, the number of black and white inmates within each OPSO general housing unit was consistent with the overall racial distributions among the OPSO inmate population. On the other hand, the racial distributions across the special population units have not always reflected the OPSO population. (See Figures 1 and 2.)  The proportion of Black males within the total male inmate population has remained relatively constant. Between October 2024 and June 2025, 86.2% of the male OPSO population identified as Black.  However, as shown in Figure 1, the percentage of Black males assigned to the special population pods fluctuated during this review period.  Furthermore, as illustrated in Figure 2, the average percentage of Black males assigned to a special population pod, exceeded the overall percentage of Black males within the OPSO population for each month during this Compliance Period. Notable was the increase in the percentage of Black males transferred out-of-parish (OOP). In October 2024, only 83.3% of the OOP male inmates were Black; by June of 2025, 94.7% of the OPSO male inmates housed out-of-parish were Black.





Figure 1: Percentage of Black Males Assigned to Special Population Units – Oct 2024 – June 2025.



Figure 2: Percentage of Black Males Assigned to Special Population Units vs. OSPO Male Black Population  – October 1, 2024 – June 30, 2025 (DIS = Disciplinary Pod; TMH = Temporary Mental Health; OOP = Out-of-Parish; Honor = Honor Dorm (4C); and PC = Protective Custody.)

***IV.A.10.c Ensure that the classification staff has sufficient access to current information regarding cell availability in each division.***

<u>Finding:</u>

Substantial Compliance

<u>Observations</u>:



The OPSO automated housing assignment process (HUAP) considers an individual's custody level, gender, special population status, PREA designations, enemies, and associates as well as available OJC beds to recommend an appropriate bed. Housing tags identify inmates on suicide observation, suicide watch, medical, mental health, alcohol/drug detoxification protocol, gang affiliation, special diets, and school participation.

The OPSO daily population report lists the units, cells, and beds offline for maintenance or staffing, as recorded in the AS400. The reliability of the AS400 data for cells/pods offline within the housing module was unavailable. Classification staff rely on maintenance reports from security and maintenance staff. The current matrix was posted in the work areas of the classification specialists. The specialists reported receiving a daily email copy of the matrix.

Classification specialists track all pending bed assignments to prevent housing errors resulting from delays between the inmate's housing assignment and the physical transfer of the individual to the designated pod/cell. These manual lists and notes direct the housing assignments. Overall, during this compliance review period, the classification staff had access to automated and manual information regarding current bed availability throughout OJC, TDC, and TMH.

All classification staff have the required clearance and passwords to access the NCIC / Louisiana criminal record systems. Classification staff indicated that the full rap sheets are available in the classification folders. The classification manager reviews the folders from the previous shift and generates any missing rap sheets, as needed. For the initial classification assessments, the classification specialists review these rap sheets in the folders and double-check the NCIC system for out-of-state convictions   Staff indicated that NCIC is "down" less frequently and faster.

*IV. A. 10. d. Continue to update the classification system to include information on each prisoner's history at OPSO.*

Finding:

Partial Compliance

Observations:

As shown in Figure 3, the monthly custodial reports provided by OPSO indicated:



- **Percent Initial Custody Assessments**: During this Compliance Period, the Classification Unit completed initial custody assessments for 84.4% of the inmates booked into OJC. This rate is a marginal increase from that observed for the previous Compliance Review Period (76.3%).

- **Percent Within 8 Hours:** During this Compliance Period, the percentage of initial classifications completed within the first eight hours of booking fluctuated. In October 2024, staff completed only 11.1% of the initial classification assessments within eight hours of the booking. As previously noted, in November 2024, OPSO IT staff modified the classification module to enable staff to complete the custody assessment without assigning the individual to a bed.  During November through March, the percentage of initial classifications completed within eight hours increased to 73.7% of the individuals booked into OJC.  However, during April – June, the percentage of initial classification within eight (8) hours dropped back to 54.6%. In June 2025, the initial custody assessment was completed within eight (8) hours for only 46.2% of the individuals. Staff completed the custody assessment within 24 hours for 28.5% of the individuals.  During this Compliance Period, nearly 50% (45.2%) of the detainees remained in the booking area for more than eight hours before the initial custody assessment was completed. Given the OPSO classification policy to complete the initial custody assessment within eight hours of the individual's booking, the expectation is that 95% of initial assessments will be completed within eight hours of booking.





*Figure 3: Rates and Completion Time for Initial Custody Assessments Completed July 2023 – June 2025*

The OPSO Areas of Non-Compliance Action Plan (dated 6/12/2024 at 9:55 PM) requires staff to "Ensure that initial custody assessments are completed within the first 8 hours of booking for at least 95% of residents." Even if this standard had been achieved, completing the "initial custody assessments" within the first eight hours of booking addresses neither the long "wait times" in IPC/Booking nor the failure to maintain adequate separation and service of individuals within the IPC/Booking cells. The initial classification process provides the custody and PREA designations to the IPC staff. However, OPSO must address the process by which individuals are: 1) assigned to the IPC/Booking cells to ensure separations by custody and PREA designations; and 2) monitored and prioritized for beds and services to expedite transfers from IPC to a "long-term" bed. Unfortunately, many individuals remain in the IPC/Booking area for 24 hours or more. Unclassified, high, medium, and low custody individuals were housed together in the relatively small IPC cells, and high-risk/needs individuals languished with minimal services and supervision.

When asked about the time from booking to housing, staff attributed the delays to the availability of beds within the roll-in pods rather than the custody assessment process or staffing. (See Figure 4 for the monthly OPSO bookings between January 2023 and June 2025.)





*Figure 4: Number of OPSO Bookings Per Month – January 2023 – June 2025*

Figure 3 suggested that staff completed an initial classification for ~85% of the bookings during this compliance period. However, only 54.8 % of the initial classifications assessment and housing decisions were within eight (8) hours of the inmates' booking into OJC. Thus, the lag time between booking, classification, and housing remains a concern. The medical clearances and/or the availability of lower bunks on the Roll-In pods slowed the initial classification and housing processes. When asked about reclassifying or transferring inmates who had cleared their detoxification process or isolation restrictions from the roll into general population pods, the classification specialist responded, "I don't know how to do that. I only classify and house inmates from the booking area." This comment suggested that the delays between booking and housing were, at least in part, due to inadequate training.  Overcoming this barrier will require updates to the classification specialists' duties and training.

The rationale for scheduling or clustering cells for joint out-of-cell times remains unclear. Security staff reported exchanging information regarding intra-pod conflicts and tensions. All agreed that intelligence sharing is essential for identifying and maintaining inmate separations. However, neither the security nor ISB staff share intelligence regarding these local "cliques" and conflicts with the Classification Unit, except as ad hoc requests for housing transfers. The simple statement, "ZZZZ XXX can't live on this pod." does not provide the classification staff with sufficient information to place the individual



in a different housing unit. Thus, the transfer process is repeated again and again, multiplying the workload for the limited classification and escort staff.

Regardless of the staffing patterns, pod mission, and schedules, the sub-standard practice of mixing custody/vulnerable inmates during out-of-cell activities must be discontinued as soon as possible, particularly within the high-risk pods, i.e., mental health, protective custody, and youthful offenders. A straightforward option is to list the custody level and key separation tags on the housing rosters. Furthermore, adherence to housing assignments by the Classification Unit is crucial for maintaining inmate separations and institutional safety and security.

**Custody Overrides:** Previous compliance reports have highlighted the risks associated with overriding the scored custody levels for housing purposes. As shown in Figure 5, during the Compliance Period from October 2024 to June 2025, the most frequently cited reason for a custody level override was to transfer "Potential Victim/Potential Predators" from Minimum to Medium custody. As shown in Figure 5, during this Compliance Period, 78% of the overrides resulted in individuals being moved from minimum to medium custody due to their "Potential Predator" or dual status as both Potential Predator and Potential Victim. The other frequently cited reason for overriding the scored custody level was "Security." These overrides included individuals with serious/high-profile charges, a history of escape, or DOC sentences. Nearly 12% (11.9%) of the custody overrides were for security reasons.





Figure 5: Custody Override Reasons – October 2024 – June 2025

     The October 2024 – June 2025 classification stock population reports indicate that staff overrode the scored custody level for ~1.6% of the men and .64% of the women. (See Figure 6.) These rates are significantly lower than the recommended rate of 5 - 15 percent.[8] As shown in Figure 5, most of the overrides were related to the individual's PREA status. Continued tracking of the discretionary overrides for housing purposes remains essential as the ADP increases.

     On the other hand, as shown in Figure 6, the percentage of custody assessments impacted by a mandatory override (OPSO policy restrictions) decreased during this compliance period. However, the custody level for over 50% (51.2%) of the men and a third of the adult women (32.6%) was impacted by one or more of the OPSO mandatory restrictors. Based on the findings and recommendations from the 2024 revalidation report, OSPO revisited its' mandatory restrictions. As of the end of this Compliance Period, the updates to the classification module within the JMS were not complete; therefore, the changes have not been implemented. Training on the modified restrictions is anticipated for September 2025.

---

[8] Patricia L. Hardyman and Austin, James (2021). *Objective Prison Classification: A Guide For Correctional Agencies. 2nd Edition.* Washington, D.C.: National Institute of Corrections.





Figure 6: Mandatory and Discretionary Override Rates by Gender: July 2023 – June 2025

**Enemy Separation Reviews:** As part of the Compliance Report #14 review, we observed housing overrides for "inmate refusal of enemies" to facilitate housing decisions. Staff dismissed inmate-to-inmate conflicts to expedite transfer requests between pods. In response to the Monitors' and Plaintiff attorneys' questions, OPSO revised its Inmate Classification Procedures (7020) to include rules for resolving an "Inmate Refusal of Enemy." These Procedures require detailed documentation of the reviews and quarterly audits to ensure the separation review process works as intended and to make recommendations for adjustments as needed. OPSO developed screens and reports in the AS400 to document and track the separation reviews as per the Inmate Classification Procedures (7020). In March 2022, the classification manager provided training on the new procedures, screens, and interview form.

OPSO staff created automated screens within the AS400 to track and document enemy and associate separation reviews. Despite efforts to develop a systematic process for reviewing and verifying inmate enemy and associate separations, OPSO continues to disregard its policies and documentation standards. The current classification manager discontinued "Inmate Enemy Refusals." She recognized that the practice violated OPSO policy.  This was a significant step toward compliance for this Section of the Consent Judgement.

**Custody Reviews:** The Classification Monitor List (List) is an ad hoc report identifying inmates for whom a custody review is due. Custody reassessment reasons include a regular



60/90-day reassessment, a status change, or an event within their jail records, such as an amended charge(s), bail reduction, disciplinary infraction, detainer lodged/lifted, or a new sentence. The number of inmates on the list fluctuates as inmates return from court, move through the booking process, and the like. Staff are responsible for completing all pending custody reviews during their shift.



**Figure 7:   Number of Pending Custody Assessments per Month by Reason – October 2024 - June 2025**

The number of pending custody assessments vacillates daily. During this Compliance Review Period, the number of pending initial custody assessments ranged from 0 to 96; the number of pending custody reassessments ranged from 0 to 63.  Figure 7 provides the average number of initial and custody reviews/month between October 2024 and June 2025. The average number of pending custody assessments/day during this Compliance Period was – initial assessments = 9.5 and custody reassessments = 6.5. As shown in Figure 7, the number of pending assessments dropped dramatically in November and remained low. However, in June 2025, the number of pending initial custody assessments increased to 10.2.  Ongoing monitoring of these data is essential to determine if the June data is an outlier or the beginning of an upward trend.  The average wait time for the custody assessment varied by the type of assessment. During this Compliance Review Period, the average wait time for an initial classification for a new booking was 8.13 hours. In contrast, the average wait time for a custody review was 103.7 hours.



As part of the transition of health care services from Wellpath to Wexford, OPSO and Wexford information and technology (IT) staff worked together to identify the data elements within the Wexford medical and mental health records required for scoring the PREA assessments and housing assignments, and then to rebuild the linkages between the OPSO and Wexford information systems.  We verified the data exchange process as part of the onsite compliance review. The medical and mental health data required to score the PREA risk factors and track individuals on the medical and mental health caseloads are uploaded to the AS400 every 15 minutes. Thus, the data required for the initial and subsequent custody reviews and housing assignments are available.  This was a significant step, as WellPath provided data for the initial assessments, but the electronic data for updating the individual's service needs or caseload counts were unreliable. Wexford has continued to email the inmates' medical and mental health placement requirements to the classification staff.  However, as shown in Figure 8, the data for tracking assaults on individuals on the mental health caseload were unavailable for this Compliance Period.  OPSO will need to update the AS400 JMS programming to track assaults on individuals on the mental health caseload. These data are a requirement of the Consent Judgment. In addition, the mental health and medical data are essential for scoring seven PREA victimization and predation risk factors. Medical and mental health information is critical for the inmates' housing assignments.

As shown in Figure 8, OPSO disciplinary reports indicate that only two (2) inmate-on-inmate battery incidents involved individuals on the mental health caseload during this Compliance Period. Given the average number of inmate-on-inmate battery/ assaults (16.2/month) and the OPSPO mental health caseload (87.6 men/month and seven (7 women/month) during this Compliance period, these numbers appear to underreport the victimization of individuals on the mental health caseload. Note that these data reflect Disciplinary Code 101 (battery) and Code 102 (assault) infractions in which the perpetrator was found guilty. A review of the OPSO-reported incidents suggests a much higher rate of inmate-on-inmate assaults. (See Table 3 of this Compliance Report.)





Figure 8: Victimization of Inmates on the Mental Health Caseload - July 2023 – June 2025

Figure 9 provides the number of attachments to record criminal history data input by the classification staff between July 2023 and June 2025.  Figure 10 illustrates the percentage of initial custody assessments for which an attachment was input. These data indicate that in December 2024, staff resumed inputting attachments for the custody assessments. The number of attachments input increased each month, peaking at 165 in May 2025.  However, in June, an attachment was input for only 81custody assessments. The reason for the 50% drop in June is unclear, as the number of custody assessments completed in June was slightly higher than in May 2025. (The classification staff completed 678 initial custody assessments in June vs. 663 in May 2025.)  As previously noted, OPSO has made strides to ensure staff have access to the NCIC system, and the classification manager emphasized the importance of the attachments during the monthly classification in-service trainings. Continued monitoring of these data to ensure the classification staff systematically review the criminal rap sheets and input all non-Orleans Parish convictions in the JMS is essential.





Figure 9: Number of Attachments Input by Classification Staff – July 2023 – June 2025



Figure 10: Percentage of Initial Custody Assessments for Which an Attachment was Created – July 2023 – June 2025

      As previously noted, the NCIC rap sheets were available in the classification folders created during the booking process. Further, the classification manager reviews the folders from the previous shift and generates any missing rap sheets. The specialist reran the rap sheets to ensure the information was complete.  Thus, the rap sheets were available for custody assessments. However, the specialists reported that they only input attachments for convictions with a prison sentence.  Convictions for which the sentence was probation, jail, suspended, etc., were not input into the JMS.  Another concern was the variance in the number of attachments input by the classification specialists. Among the



classification specialists responsible for completing the initial custody assessments, two specialists input 53.9% of the attachments; two other specialists input another 21.0%. Among the assessments completed by a supervisor, one individual was responsible for inputting 51.9% of the attachments, while another inputted 33.3% of the attachments.

OPSO has certainly made strides for inputting the non-Orleans criminal history required to score the custody factors, vulnerability, and predation factors: 1) all staff have access to the NCIC criminal history system, 2) the booking folders include the rap sheets, 3) multiple training sessions emphasized the importance and process for inputting attachments in the JMS; and 4) audits to double-check to verify the required attachments.[9] The number of attachments input improved. However, there are still some concerns. Staff input attachments for only 13.5% of the custody assessments, and there were inconsistencies among the staff regarding the number of attachments input.

The final point of concern for Section d centers on the placement and review of inmates assigned to administrative segregation or protective custody placements. (During this Compliance Review Period, OPSO did not utilize administrative segregation/restriction housing for either the men or women.) OPSO continues to disregard its protective custody documentation and review standards.

While the classification manager created folders on the shared drive to organize and document protective custody (PC) and restrictive housing decisions, both the paper and electronic files were incomplete and disorganized. For example, the files were missing documentation on the reason(s), date, and staff responsible for the protective custody placement, as well as the criteria for the individual's removal from protective custody, and the required 7- or 30-day reviews of the individual's status and vulnerabilities. Attempts to review video of the hearings were hindered by poor documentation of the date/time, participants, and the PC Review Board's considerations and decisions. Hearings were frequently canceled or curtailed. Some individuals were not seen (or at least there was no documentation of a review) for several weeks.

In summary, the rating for this section (d) improved from non-compliance to partial compliance based on improvements in the time required to complete the custody

---

[9] "Missing" attachments were noted during the audits of the accuracy of the custody assessments. Unfortunately, the auditor simply added the missing attachment, thus staff were not held accountable or reminded of importance of checking the NCIC rap sheets and inputting attachments as needed.



assessments and a reduction in the lag time between booking, classification, and housing.
Additionally. we recognize the Unit's progress in reviewing the criminal history rap
sheets and inputting non-Orleans Parish convictions. Termination of the enemy
separation waivers was a significant step toward compliance.  However, this rating is
tenuous as it will depend on the Unit's continued improvement in the time required to
complete the custody assessments and review/input of the criminal history attachments.
A rating of substantial compliance will require OPSO to upgrade its protective custody
process to ensure compliance with its protective custody policy.

***IV.A.10.e. Continue competency-based training and access to all supervisors on the full capabilities of the OPSO classification and prisoner tracking system.***

Finding:

Substantial Compliance

Observations

The classification manager has implemented monthly in-service training meetings to
address questions or issues observed during the internal audit process and/or fulfill the
Consent Judgment requirements.  Training topics during this compliance review period
included:

October – Reviewing NCIC rap sheets and inputting attachments

November – Documentation of the classification process

December – Supervisor responsibilities and tasks

January – Inputting of attachments and required initial classification process/steps

February – Workload and accountability

March – Documentation of Protective Custody Placements – (Supervisor training)

April – Custody override review and approvals, housing audits, and reclassifications

May - Overview of the classification module within the new Beacon Software, Hurricane
        Deployment Line Up, and a re-entry data form.

In addition to the in-service monthly sessions, the classification manager provided training for
new classification specialists in October and November. These training sessions included
formal presentations, handouts, hands-on practice, group problem solving/scenarios, and
testing. The staff sign-in sheets documented participation.



*IV.A.10.f. Conduct internal and external review and validation of the classification and prisoner tracking system on at least an annual basis.*

Finding:

Partial Compliance

Observations:

Compliance for this section focused on three types of audits: housing (checking the integrity of inmate housing assignments), internal (verifying the accuracy of custody, PREA, and housing designations), and statistical validation of the OPSO objective classification system. For this Compliance Period, Section f is rated as partial compliance because monthly housing audits were completed for some, but not all, pods. Furthermore, the classification manager did not conduct monthly audits of the accuracy of the custody assessments.  A key step forward during this Compliance Period was completing the statistical validation of the classification system by the University of Cincinnati Corrections Institute.

**Housing Audits – Checking the Veracity of the Inmate Housing Assignments**

The Classification Unit supervisors conducted monthly housing audits for some, but certainly not all, housing units/month. May was the only month during which staff audited all OPSO pods. Missing were audits for:

| Month | Pod(s) | Auditor Comments |
|---|---|---|
| October | OJC 1 E &F | |
| | OJC 2 F | No deputy on the pod, no audit completed. |
| November | OJC 1 A - F | |
| | OJC 3 A - F | |
| December | OJC 1 E & F | No deputy on the pod; no audit completed. |
| | OJC 3 A – B | No deputy on the pod; no audit completed. |
| January | OJC 4 – D, E, & F | Inmates in boats – not able to verify assigned locations |
| | OJC 3 A – B, & D | |
| March | OJC 1- F | |
| | OJC 4-C, D, E, F | No deputy on the pod; no audit completed |
| May | OJC 1 A - F | |
| | OJC 4 A - F | |
| June | OJC 2 E & F | |
| | OJC 3-C | |
| | OJC 1-C | |



A key issue in the failure to complete the housing audits was the absence of security staff (deputy or supervisor) on the pod.  If the auditors discovered that security staff were unavailable to assist with the audit, the audits were not conducted, and the summary sheets were marked as "No Deputy on the pod."  While the absence of a deputy on the pod is quite troubling, it is also problematic that the classification auditor did not return to the pod the next night/shift to complete the missing audit. Thus, the absence of security staff hindered the classification staff's ability to complete the audit, however, the classification staff did not demonstrate initiative to return to the pod on subsequent shifts to complete their task. Furthermore, the auditors did not return to the pods to verify that the previously identified housing errors had been corrected.

The audit reports indicated housing errors for 18.6% of the pods audited.  The number of housing errors per report ranged from 0 to 24 individuals in the wrong cell or bed.  The fourth-floor pods were particularly problematic, as one auditor observed, "Not able to verify where the inmates are sleeping. Most out of their bunks."  A troubling pattern was one auditor finding "No Errors," while another auditor noted multiple housing errors the following month. The Monitor selected a random sample of audit reports to verify the audit process and then viewed the audit via the OJC camera system. However, the failure to record the time the audit occurred hampered our ability to locate and review the audits via the OJC video camera files.  Further, the OJC camera data are erased/overwritten after three months.  Thus, as of the July onsite review, video data were unavailable for the period from October 2024 to April 2025. We recommend that auditors wear body cameras to enable the recording of both voice and activity during audits and that OPSO increase the data-retention period to allow for a full review of the six-month compliance period data.

**Internal Audits – Checking the Accuracy of the Custody and PREA Assessments**

The Classification Manager is responsible for assessing the accuracy of a random sample of at least ten custody/PREA assessments each month.  The classification manager reviewed a random sample of the custody assessments for seven of the nine months within this Compliance Review Period. Missing was the documentation for internal audits completed for the March and June 2025 custody assessments.  The auditor's comments/findings were not always clear. The error description indicated "Attachment



added" or "No attachment." However, a quick check of the custody assessments and the attachment data within the JMS revealed that no attachment had been input for the "audited" custody assessments. Thus, it was unclear whether the auditor was indicating that she had added the required attachment, if staff had input the attachment, or if no attachment was needed (i.e., the individual had no out-of-parish convictions).

Furthermore, some cases, the auditor indicated that the case was "inactive." However, whether the inmate was released as of the audit date is irrelevant to the internal audit process. Thus, it appears that additional training for the internal audit process is much needed.

**Revalidation of the Classification System – Assessing the Validity of the System**

The University of Cincinnati Corrections Institute submitted a report on September 17, 2024, documenting the revalidation of the OPSO classification system.[10]  The revalidation of the classification system was completed three months ahead of the deadline set by the District Court in its June 2024 Order, addressing OPSO's failure to perform a timely revalidation of the system. The overall findings support the continued use of the OPSO custody and PREA assessment tools. OPSO has reviewed these recommendations, and the IT staff has updated the classification module within the AS400 to reflect the approved updates.  OPSO has tentatively scheduled staff training on the updates for September.

*A.10.g. Provide the Monitor a periodic report on classification at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date and every six months, thereafter, until termination of this Agreement. Each report will include the following information:*
>  *(1) number of prisoner-on-prisoner assaults;*
>  *(2) number of assaults against prisoners with mental illness;*
>  *(3) number of prisoners who report having gang affiliations;*
>  *(4) most serious offense leading to incarceration;*
>  *(5) number of prisoners classified in each security level;*
>  *(6) number of prisoners placed in protective custody; and*
>  *(7) number of misconduct complaints.*

Finding:

Substantial Compliance

Observations:

Daily population reports are received daily, indicating the number of inmates by location – OJC, TDC, TMH, and out-of-parish. In addition, as required under Section g,

---

[10] D'Amato, Christopher and Chip Weir (September 17, 2024). "Revalidation of the Orleans Parish Classification System - 2024." Cincinnati, Ohio: University of Cincinnati Corrections Institute.



OPSO provided monthly custodial statistical reports regarding the custody assessments by type, gender, population, gang affiliation, discipline, and housing. These reports track the timeliness of the initial custody assessments, the custody distributions, cases due for a custody assessment, the prevalence of special populations, and the rates and types of disciplinary infractions. The number of *"prisoners who report having gang affiliations and the most serious offense leading to incarceration"* was reported in the OPSO semi-annual statistical report.

OPSO disciplinary data on the "*assaults against prisoners with mental illness*" suggest relatively few individuals on the mental health caseload are victims of assault or battery. However, the accuracy of these data is questionable as they reflect the inmate disciplinary process rather than institutional incident reports. Further, Wexford determined that it was dramatically undercounting the mental health caseload and not identifying all individuals on the mental health case within the JMS system.

For this compliance period, OPSO reported only one active "gang" member. The initial classification interview includes a question about the individual's "gang" membership or affiliation. Staff indicated that inmates rarely reveal their alliances. Previously, the Classification Unit relied primarily on information from the District Attorney's Office to identify inmate gang affiliations. The IPC Major indicated that OPSO no longer received information regarding gang affiliations or prosecutions from the District Attorney and recommended checking with the OPSO ISB Unit. This conversation was interesting, although circular. The ISB agent indicated that they track "gang" behaviors within OJC but quickly pointed out that Orleans Parish "gangs" were better described as dynamic neighborhood/ward-based cliques. The ISB agent reported that they exchanged information with the NOPD. Yet, he was reluctant to share these data with the Classification Unit because, again, Orleans Parish "gangs" are dynamic neighborhood/ward-based cliques.

On the other hand, OJC security staff routinely interview inmates regarding "ward/neighborhood-based cliques" and who can live with whom. In sum, it appears that ISB collects and shares information with NOPD, and security staff requests housing assignments based on neighborhood associations. Yet, neither ISB nor security staff shares intelligence with the Classification Unit or inputs the information into the AS400.



Thus, the classification staff transfers inmates from pod to pod in response to emails indicating, "This individual cannot live on XX pod." To maintain Substantial Compliance with Section g, OPSO must create a systematic process for collecting information on active "gangs/cliques," sharing this intelligence across its various divisions, <u>and</u> inputting this data into a standardized report available to the Classification Unit.

Figures 11 and 12 provide the OPSO's monthly disciplinary data as recorded in the AS400. To account for short-term variations and seasonal trends, we reviewed 24 months of disciplinary data. As shown in Figure 11, disciplinary report rates have fluctuated over the last 24 months. During this Compliance Review Period, 24.7% of the inmates received a disciplinary report; 18.4% were found guilty of a major infraction. These rates represent a significant drop from those observed during the previous Compliance Period – April to September 2024, during which 30.0% of inmates received a disciplinary report and 22.4% were found guilty of an infraction.  Why the decrease in the number of disciplinary reports? This is not clear. The rates of institutional violence and disruption, as indicated by the incident reports, have not decreased.



Figure 11: Rate of Disciplinary Infractions for the OPSO ADP – July 2023 – June 2025

Figure 12 illustrates the OPSO ADP (Average Daily Population) versus the number of disciplinary reports per month for July 2023 - June 2025.  As the ADP increased steadily during the last 24 months, so has the raw number of disciplinary reports. However, the number of reports has not increased at the same rate as the population. As



shown in Figure 11, between July 2023 and June 2024, the OPSO ADP increased by 24.8%, rising from 1,139 to 1,421. (The ADP peaked at 1,544 during October 2024). The number of disciplinary reports per month increased by only 17.7%.  OPSO staff wrote 299 disciplinary reports in July 2023 and 262 reports in June 2025.



Figure 12: OPSO ADP vs. Number of Disciplinary Reports: July 2023 - June 2025

Figure 13 illustrates the breakdown of the disciplinary infractions by type during this same period –July 2023 – June 2024. (These data reflect the most severe violation of which the inmate was found guilty/disciplinary report.) During this Compliance Period, the number of predatory infractions (e.g., assaults or battery) ranged from 97 (October & November, 2024) to 38 (April 2025), and the number of aggressive infractions (fights/threats) ranged from 133 (January 2025) to 54 (June 2025) per month. For this Compliance Period, the average numbers of predatory and aggressive infractions were 61.89 and 61.89/month, respectively. The average number of assaults/fights per day was 4.96 (61.89 + 135.5 = 148.89/30 = 4.96/day).  During the previous nine months, the average number of assaults/fights per day was 5.98.  Thus, the average number of aggressive/ predatory behaviors per day was statistically unchanged – 4.96 vs. 5.98.

During this Compliance Period, as shown in Figure 13, the number of management problems infractions decreased while the number of disruptive infractions increased. During this Compliance Review period, there was an average of 23.03 management problem reports



per month compared to 26.13/month during January to September 2024. The rate of disruptive behavior reports increased: October 2024 – June 2025 = 11/month versus January -September 2024 = 5.7 disruptive reports/month. Thus, Figures 11 and 12 illustrate that while the level of facility management problem/disruptive behaviors increased slightly, the level of violence, as indicated by institutional assaults and fights, remains very troubling.



Figure 13: Most Serious Disciplinary Infraction/Report with Finding of Guilty: July 2023 – June 2025

***IV.A.10.h. OPSO shall review the periodic data report and make recommendations regarding proper placement consistent with this Agreement or other necessary changes in policy based on this review. The review and recommendations will be documented and provided to the Monitor.***

<u>Finding:</u>

Substantial Compliance

<u>Observations:</u>

The Monitor receives the daily "Active Inmates by Location" reports and has access to the ad hoc Classification Monitor lists and various classification statistical reports. During this Compliance Period, there were multiple updates to the OPSO Housing Matrix. As of January 2023, the Classification staff provided the matrices daily. While OPSO has been slow to address concerns regarding the housing matrix and to move forward on the



recommended population management strategies, the Classification Manager promptly responds to questions or issues raised throughout the Compliance Period.

There are still significant concerns about the quality of the documentation of the protective custody reviews and both the housing and internal housing audits. These concerns were raised under Sections d and f, respectively. There are also concerns as to the data and documentation provided for the Compliance Review. Multiple document requests and reports were required to generate accurate data for this Review.

## IV. A. 11.    Prisoner Grievance Process

*A. 11. a. OPSO shall ensure that prisoners have a mechanism to express their grievances, resolve disputes, and ensure that concerns regarding their constitutional rights are addressed. OPSO shall, at a minimum, do the following:*

    *(1) Continue to maintain policies and procedures to ensure that prisoners have access to an adequate grievance process and to ensure that grievances may be reported and filed confidentially, without requiring the intervention of a correctional officer. The policies and procedures should be applicable and standardized across all the Facility divisions.*

    *(2) Ensure that each grievance receives appropriate follow-up, including providing a timely written response and tracking implementation of resolutions.*

    *(3) Ensure that grievance forms are available on all units and are available in Spanish and Vietnamese and that there is adequate opportunity for illiterate prisoners and prisoners who have physical or cognitive disabilities or language barriers to access the grievance system.*

    *(4) Separate the process of "requests to staff" from the grievance process and prioritize grievances that raise issues regarding prisoner safety or health.*

    *(5) Ensure that prisoner grievances are screened for allegations of staff misconduct and, if an incident or allegation warrants per this Agreement, that it is referred for investigation.*

    *(6) A member of the management staff shall review the grievance tracking system quarterly to identify areas of concerns. These reviews and any recommendations will be documented and provided to the Monitor.*

Findings:

A. 11. a. (1)  Substantial Compliance

A. 11. a. (2)  Partial Compliance

A. 11. a. (3)  Substantial Compliance

A. 11. a. (4)  Substantial Compliance

A. 11. a. (5)  Substantial Compliance

A. 11. a. (6)  Substantial Compliance

This review covered October 2024 through June 2025. For this review, the Monitor interviewed the Grievance staff, security staff and inmates while inspecting the housing units. Reports and data submitted by OPSO covering the rating period were also



reviewed.

As noted during the previous inspection, a review of the documentation demonstrated that all inmate submissions continue to be reviewed by Grievance staff, response. Statistical information was provided on all categories. Both requests and grievances continue to be sorted by type. Specific grievances related to inmate safety, medical issues, PREA, etc., are documented to reflect the date received, inmate information, type of grievance, time of notification made to the appropriate staff member, and the staff member making the notification. On a positive note, OPSO implemented its new electronic grievance system along with inmate tablets in the first quarter of 2025. Inmates are now able to submit grievances electronically via the wall-mounted kiosks in the housing units as well as over their personal tablet. The Grievance Lieutenant stated that units that house lockdown inmates who cannot have a tablet continue to be visited twice-daily by Grievance staff who go door-to-door to collect grievances (if escort staff are available). The Monitor queried several inmates during the tour as to whether they could access the electronic grievance system and each inmate asked confirmed they could do so. The Grievance Lieutenant stated that the paper grievance system will continue to be maintained as a back-up to the electronic system and for the lockdown inmates mentioned above. For these reasons, the rating for A.11.a.(1) is raised to Substantial Compliance.

For the analysis, the Monitor incorporated data from the current rating period into three charts and added simple linear trendline overlays to each grievance category listed. A fourth chart was added to graphically represent the number of grievances overall relative to the inmate population.

Despite having to manually document all grievances for the 4th quarter of 2024 due to the new system implementation, Grievance staff once again provided detailed documentation as to their separate handling of the October 2024 through June 2025 inmate requests, grievances, and complaints related to inmate safety or health.

As reported by the OPSO Grievance staff, the OPSO averaged 182 grievances a month for Report #17 rating period, 131 for Report #18, 100 for Report #19, 131 for Report #20, 149 for Report #21, and 222 for this rating period. This continues the increasing trend since the low average of 100 for Report #19. It is the Monitor's



considered opinion that the increase can largely be attributed to the substantial increase in the Average Daily Population (ADP) that OPSO has experienced over the last 24 to 36 months. The Monitor also noted significant "spikes" in several categories that occurred primarily during the 1st quarter of 2025. This appears to have coincided with the implementation of the new electronic grievance system and tablets and can be attributed partially to inmates "trying out" the new system and devices, though each submission was still handled according to established procedure.

The Monitor selected a 2-year range for charts 1-3 below to demonstrate the up and downward trends for the various grievance categories. In general, most grievance categories were either stable or increasing slightly. Of note, the Miscellaneous, Medical, Maintenance, Food Service, and Life-Threatening categories all show significant upwards trends, and the Monitor recommends a more focused analysis as to the root cause(s) for each.

There were three items of concern for the Monitor during the last inspection. First, there were unsecured medical and grievance boxes in two TDC housing units. As OPSO intends to maintain the paper grievance system as a backup to the electronic system, the Monitor recommends OPSO replace the lightweight metal receptacles in TDC with the same heavy-duty receptacles installed in OJC. While still a manual process to retrieve and return paper grievances, the heavier boxes will ensure that medical requests and grievances can be submitted confidentially by the inmates. The Monitor noted the new kiosks were operational in every housing unit.

Second, and critical to the effective administration of the paper grievance system, is the consistent retrieval of the grievance forms from the housing units on a daily basis. The Monitor reviewed the "Daily Rounds" data for the Grievance section. Staff document their rounds on each floor of OJC as well as TDC/TMH (5 areas) while retrieving requests and grievances. For the 1st and 2nd quarters of 2025, Grievance staff completed 93% of the rounds. The 7% of rounds which were incomplete were typically a result of a lack of security escort staff, absent Grievance staff, or holidays where only one round would be made instead of the regular two rounds. The level of detail in the documentation provided, along with improved performance by staff, drastically improved this aspect of the Grievance process in the Monitor's opinion and is duly noted and considered in the



change of rating for subsection (1).

Third, the Grievance Lieutenant had advised that in anticipation of the new electronic grievance system, the "Tiger" system was deactivated on November 14, 2024, making the grievance data for October 1, 2024, through November 14, 2024 unavailable. However, the Grievance section was able to devise work-around procedures and were able to produce the basic data and analysis for this period that they customarily provide to the Monitor as well as the OPSO leadership team.

Chart 4 reflects the temporary change and breaks out the data for OPSO and Wexford/Wellpath overdue grievances.

The Monitor will continue to observe the grievance trends reported by OPSO and anticipates changes in the specific numbers and trends with the impending implementation of the new electronic grievance system.

While the majority of the grievance categories represented in the categories below show to be trending downward or holding steady, there are increasing trends in three (Miscellaneous, Maintenance, and Food Service).  The Monitor encourages OPSO to specifically look at the topics of the complaints, specific floors/pods the complaints are originating from, spikes in the number of grievances from month-to-month, etc., to determine whether there is a root cause for the grievances (i.e. lack of security staff to address problems, insufficient response to complaints, etc.).



**Chart 1**



With Chart 2, and as with previous reports, the Monitor continues to caution drawing any particular conclusions from the displayed trends and attributes any swings to the relatively small number of grievances in a given month for each category (less than 10 total). Of concern, the "Life Threatening" category stopped its decline and actually increased significantly during the rating period and the Monitor recommends further analysis by OPSO.



**Chart 2**



Chart 3 represents several categories, primarily inmate services and property/fund accounts. As with the categories in Chart 2, the Monitor cautions against drawing any conclusions as to long-term trends due to the relatively small number of grievances in each category overall. (The "spikes" in Programs, Property, and Funds appear to coincide with the overall increase in use with the implementation of the new system and tablets.)



**Chart 3**



The Monitor also reviewed the "Overdue Grievance Reports" for the rating period. Totals for the monthly "Overdue" were considered by the Monitor to be indicative of OPSO's efforts in addressing inmate issues. The reports are created weekly for supervisory review, tracking, and follow-up to ensure a timely response. For the purposes of the report, the Monitor only included the data from the first week of each month through June 2025. Chart 4 reflects the data for grievances in the "Red" category (10+ days overdue), which represents overdue responses to inmates. OPSO has refined the data reporting to separate OPSO grievance responses from that of the medical contractor to better fix responsibility and accountability for grievance responses. Both OPSO and Wexford went from no backlog to significantly increasing numbers beginning in April 2025 when the new electronic system came on-line. OPSO's weekly total reached 534 by the last week of June.  Wexford peaked at 353 the first week of June and reduced the backlog to 135 by the fourth week of June. In speaking with the Grievance Lieutenant, the issue is largely getting all involved staff trained and comfortable using the new system. While a concerted effort is being made, the sheer numbers of overdue grievances presents serious concerns, though the Monitor expects the totals to drop week by week and will continue to review the situation. In light of the significant numbers of overdue



grievance responses for both OPSO and Wexford for the last three months of the rating period, subsection (2) would be rated non-compliant if the rating was based on that three-month period alone. However, given the performance during the first six months of the compliance period, the rating of Partial Compliance will remain. The Grievance Lieutenant voiced several ideas on how to address the backlog; the Monitor looks forward to their implementation. If not addressed, this provision will be downgraded to Non-Compliance.

**Chart 4**



OVERDUE GRIEVANCE REPORTS BY MONTH
Oct 2024 - Jun 2025

| | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| OPSO 10+ Days | 33 | 41 | 22 | 119 | 0 | 0 | 2 | 204 | 421 | | |
| Wexford | 54 | 4 | 15 | 15 | 0 | 0 | 0 | 213 | 353 | | |

During the inspection, the Monitor continued to note that grievance forms, both in English and Spanish, were available in the pod control rooms as were hard copies of the Inmate Handbook. Accordingly, subsection IV. A. 11. a. (3) remains in Substantial Compliance.

The Monitor reviewed detailed documentation provided by Grievance staff for the rating period regarding the screening of grievances for staff misconduct. The documentation demonstrated that all inmate submissions are reviewed by Grievance staff and those regarding staff misconduct are separately documented for appropriate referral to the administrative level for follow-up. Grievance staff processed a total of 13 such staff misconduct related grievances for January through June 2025, a significant decrease from the previous reporting period. The Monitor recognizes that a certain number of staff misconduct complaints (founded and unfounded) will always present themselves due to



the nature of the environment. So, while "zero complaints" is a laudable goal, the Monitor is not assessing the rise or fall of the number itself but the implementation and oversight of the process which appears to be effective.

Grievances regarding staff misconduct are particularly susceptible to interception by staff accused of misconduct if paper grievances must be relied upon. The Monitor anticipates the new electronic system will eliminate this concern.

Grievance staff continue to separately document grievances that require specific referral to IAD, ISB, PREA, or FIT staff for review and investigation. Detailed information along with the date assigned and disposition is maintained as well as email transmission receipts. Grievances referred to IAD increased from 10 to 19. Grievances referred to ISB increased from 43 to 103—keeping in mind there was an additional three months in this rating period, the increase was still significant for this monitoring period. The Monitor's opinion is that the ISB increase is due either to a significant rise in the number of actual incidents or to an increase in the inmates' utilization of the grievance process or a belief among inmates that their concern is more likely to be addressed by ISB than OJC leadership—possibly a combination of the two. The Monitor recommends OPSO conduct additional analysis in this regard.

The rating for IV. A. 11. a. (4) remains in substantial compliance. The documentation provided by OPSO Grievance staff indicates that "requests to staff" continue to be routinely separated from true grievances regarding inmate safety or health and are separately reported and tracked.

The rating for IV. A. 11. a. (5) remains in substantial compliance. The documentation provided by OPSO indicates that OPSO Grievance staff routinely screens inmate grievances for allegations of staff misconduct, appropriately reports suspected instances of staff misconduct and verifies the receipt of the notifications.

The Monitor reviewed the quarterly data for the rating period and found documentation of a substantive review of the information by senior OPSO staff along with recommended courses of action based on the analysis. This supports a Substantial Compliance rating for IV.A. 11. a. (6).

In specific regard to Item 5 of the June 17, 2024, Stipulation and Order by the Court, copied below, the Monitor found the following conditions as of the date of the



inspection:

- OPSO has secured a contract for the supply of electronic kiosks for the filing of electronic grievances and other functions and has successfully implemented the new system.

- The kiosks were observed to be operational and in use by inmates, primarily for ordering commissary but with several additional features including the grievance module.

- OPSO provided a copy of the contract to the Lead Monitor and Plaintiffs upon its execution.

  *5. Grievances (§ IV.A.11.a.(1), (3)). Within 90 days, OPSO shall secure a contract for the supply of electronic kiosks that can be used to file confidential grievances electronically in each housing unit. The electronic kiosks, that will replace the currently nonfunctioning kiosks, shall be installed in each of the housing units, and shall be in workable order and fully operational, within 180 days. OPSO shall provide a copy of the contract to the Monitor and Plaintiffs upon its execution.*

## IV. A. 12. Sexual Abuse

***A. 12. OPSO will develop and implement policies, protocols, trainings, and audits, consistent with the requirements of the Prison Rape Elimination Act of 2003, 42 U.S.C. § 15601, et seq., and its implementation of regulations, including but not limited to, preventing, detecting, reporting, investigating, and collecting sexual abuse data, including prisoner-on-prisoner and staff-on-prisoner sexual abuse, sexual harassment, and sexual touching.***

Finding:

A. 12. Partial Compliance

Observations:

OPSO successfully completed its PREA audit in 2019. Passing a PREA audit that is now six years old is not considered as conclusory evidence of compliance. OPSO has stated that a PREA Audit is scheduled for later in 2025. Proof of training and policies were provided, and the review of the policies was completed during the monitoring period. Documentation regarding PREA investigations was provided. No proof as to implementing the other requirements of PREA including education of inmates was provided. This provision remains in partial compliance, but significant progress has been made due to the efforts of the PREA Coordinator.



### IV. A. 13.     Access to Information

***A. 13. OPSO will ensure that all newly admitted prisoners receive information, through an inmate handbook and, at the discretion of the Jail, an orientation video, regarding the following topics: understanding Facility disciplinary process and rules and regulations; reporting misconduct; reporting sexual abuse or assault; accessing medical and mental health care; emergency procedures; and sending and receiving mail; understanding the visitation process; and accessing the grievance process.***

Finding:

A.13.   Substantial Compliance

 Observations:

The proof provided indicated that inmate handbooks were finally provided in July 2024. During the monitoring period, the inmate handbook became available on the electronic kiosk and on the tablets provided to inmates. As the handbook was provided was provided in several forms, the provisions has been upgraded to Substantial Compliance.

## IV. B. Mental Health Care

***B. OPSO shall ensure constitutionally adequate intake, assessment, treatment, and monitoring of prisoners' mental health needs, including but not limited to, protecting the safety of and giving priority access to prisoners at risk for self-injurious behavior or suicide. OPSO shall assess, on an annual basis or more frequent basis, whether the mental health services at OPP comply with the Constitution. In order to provide mental health services to prisoners, OPSP, at a minimum shall:***

***The Monitors also acknowledge a continued collaborative response from OSPO and Wexford regarding the provisions.***

Findings:

B. 1. a. Substantial Compliance

B. 1. b. Partial Compliance

B. 1. c. Partial Compliance

B. 1. d. Partial Compliance

B. 1. e. Partial Compliance

B. 1. f.  Partial Compliance

B. 1. g. Partial Compliance

B. 1. h. Partial Compliance

B. 1. i.  Partial Compliance

B. 1. j.  Partial Compliance

B. 1. k. Partial Compliance



B. 1. l.  Partial Compliance

***B.1.a. Develop and maintain comprehensive policies and procedures for appropriate screening and assessment of prisoners with mental illness. These policies should include definitions of emergent, urgent, and routine mental health needs, as well as timeframes for the provision of services for each category of mental health needs.***
Finding:

Substantial Compliance

This provision is being graded SOLELY for having policies and procedures in place for screening and assessing prisoners with mental illness. These policies must be properly and timely maintained and updated when clinically appropriate. The implementation and challenges with the screening/assessment process, including delays and misses for medications being ordered, will be addressed in another provision. The policies in place include definitions of emergent, urgent, and routine mental health needs, as well as timeframes for the provision of service for each category.

Suggestions:

Ensure policies are updated timely, at least annually. The Monitor expects to see an updated addition to the screening policy by the next site visit to ensure screenings and assessments which are interrupted by court or absence from the housing unit are addressed in a timely manner. This is critical to ensure timely operation and that no individual fails to be provided treatment. There should be an addition to the policy to ensure screenings and assessments which are interrupted by court or absence from the housing unit are addressed in a timely manner. If a clinician is scheduled to see an inmate and is unable for any reason, there needs to be clear directions as to when the mental health staff is required to return to complete the screening or assessment. It cannot be left to the discretion of the clinician to return. If the decision is the task is assigned to the following shift, ensure the contact is made and implement disciplinary actions if the process is not followed.

***B.1.b. Develop and implement an appropriate screening instrument that identifies mental health needs, and ensures timely access to a mental health professional when presenting symptoms require such care. The screening instrument should include the factors described in Appendix B. The screening instrument will be validated by a qualified professional approved by the Monitor within 180 days of the Effective Date and every 12 months thereafter, if necessary.***

Finding:

Partial Compliance

This provision includes IMPLEMENTATION of the screening instrument that



identifies mental health needs and ENSURES timely access to a mental health professional during the screening process. The instrument used by Wexford identifies mental health needs, yet there remain delays, during the period in review, of patients not receiving medication in a timely manner (lack of ensuring timely access) and a lack of review of past available records to determine the needs of the patient. Inmate x417 reported a mental health history at intake yet there was no documentation of any attempt to secure records or refer urgently to a provider so treatment could begin in a timely manner. Inmate x812 had a documented history of receiving mental health treatment on intake yet was in custody for eight days prior to being seen for a mental health initial evaluation and did not start receiving medication until the following day. Inmate x445 reported numerous mental health diagnoses on intake yet was put in as a routine referral. She waited ten days before her psychotropic medications were started. In addition, the current system in place does not ensure someone who is not seen, due to being in court or refuses care, has timely follow up. There is no alert in place or notification for a clinician to see someone who missed an initial screening or assessment appointment. It is currently assigned, at times, to the next clinician but this is not always completed. Continue to train and educate staff regarding the importance of proper referrals from intake. The mental health provider is encouraged to bring data supporting 90% or more of all intakes receives timely mental health services to the site visit discussion including proof individuals are receiving medication timely and available records are reviewed. Merely saying it happens is not sufficient for substantial compliance. If time needs to be allotted during the site visit to review all intakes in the reporting period or there needs to be time set aside virtually for review with the Monitor, Wexford is encouraged to schedule this.

*B.1.c. Ensure that all prisoners are screened by Qualified Medical Staff upon arrival at OPP, but no later than within eight hours, to identify a prisoner's risk for suicide or self-injurious behavior. No prisoner shall be held in isolation prior to an evaluation by medical staff.*

<u>Finding:</u>

Partial Compliance

<u>Suggestion:</u> During the period in question, Wexford had two of nine months where screening of inmates by a QMHP within 8 hours fell below the 90% compliance threshold. Make sure the reported numbers are the same across all documents submitted. This is an improvement and movement in the right direction towards substantial compliance.



October 2024 – 82% screened within 8 hours

November 2024 – 84% screened within 8 hours

December 2024 – 95% screened within 8 hours

January 2025 – 94% screened within 8 hours

February 2025 – 94% screened within 8 hours

March 2025 – 94% screened within 8 hours

April 2025 – 97% screened within 8 hours

May 2025 – 98% screened within 8 hours

June 2025 – 98% screened within 8 hours

*****CQI study to determine average length of stays, each month, in IPC for an individual with mental health concerns.

***B.1.d. Implement a triage policy that utilizes the screening and assessment procedures to ensure that prisoners with emergent and urgent mental health needs are prioritized for services.***

Finding:

Partial Compliance

Suggestion:

The triage policy in place calls for inmates to be seen within two hours for an emergent referral, within twenty-four hours for an urgent referral and within seven days for a routine referral. While these identified times demonstrate that inmates are prioritized for service, the IMPLEMENTATION of this policy continues to face challenges. Only 50% of emergent referrals were addressed on time, while 60% of urgent referrals were addressed on time. Routine referrals were addressed 100% on time for the period in question. The compliance rate for this provision is 90% in order to be rated and sustained at substantial compliance.

***B.1.e. Develop and implement protocols, commensurate with the level of risk of suicide or self-harm, to ensure that prisoners are protected from identified risks for suicide or self-injurious behavior. The protocols shall also require that a Qualified Mental Health Professional perform a mental health assessment, based on prisoner's risk.***

Finding:

Partial Compliance

For this provision, it is imperative that protocols are implemented with the level of risk of suicide or self-harm for the inmate's protection. It is not sufficient to have



developed the protocols without the intentional IMPLEMENTATION of them in everyday practice. There has been improvement as suicide watches are now conducted, for the most part, at TMH. The Monitor was unable to access the video for TMH and therefore was unable to determine whether watches are performed as outlined in policy and protocols.

There continue to be challenges with adequate suicide watches that occur outside of TMH and prior to the move of suicide watches to TMH, which was during the period in question. On November 10, 2024, there was documentation of deputies being off the pod (2A) therefore adequate checks were not conducted on suicide watch. In April and May 2025, there were continued concerns of contraband being in a cell while an inmate was on suicide watch.

Searching and securing inmates placed on watch has improved over the 9-month reporting period. Based on data submitted by Wexford:

October 2024: 38 code whites called; 28 inmates were secured (73%); 13 inmates were searched (34%)

November 2024: 18 code whites were called; 15 inmates were secured (83%); 11 inmates were searched (61%)

December 2024: 20 code whites were called; 15 inmates were secured (75%); 8 inmates were searched (40%)

January 2025: 28 code whites were called; 22 inmates were secured (79%); 15 inmates were searched (54%)

February 2025: 17 code whites were called; 11 inmates were secured (65%); 8 inmates were searched (47%)

March 2025: 29 code whites were called; 22 inmates were secured (76%); 17 inmates were searched (59%)

April 2025: 16 code whites were called; 12 inmates were secured (75%); 5 inmates were searched (31%)

May 2025: 19 code whites were called; 16 inmates were secured (84%); 13 inmates were searched (68%)

June 2025: 19 code whites were called; 12 inmates were secured (63%); 7 inmates were searched (37%)



In the submitted data from Wexford, there were blank columns where no clinician is listed as having seen the inmate after a code white. This code white document needs to be updated and complete for the next tour.

<u>Suggestion:</u>

There has been movement in the right direction towards substantial compliance. Continue to conduct suicide watches in TMH. Watches done in OJC need continued attention to ensure the safety of the patient. Continue to secure and search inmates on watch and document barriers to performing this process. Document de-escalation procedures by Wexford and deputies and challenges with implementation. Adequate cell searches and body searches and properly securing inmates are necessary to protect inmates from the risk of self-injurious behavior. The Monitor recommends continued spot checks of QMHPs who are conducting watches and enforcing corrective actions as deemed necessary. The Monitor recommends video observations of suicide watches to ensure MHT compliance and help minimize any fraudulent activity.

***B.1.f. For prisoners with emergent or urgent mental health needs, search the prisoner and monitor with constant supervision until the prisoner is transferred to a Qualified Mental Health Professional for assessment.***

Finding:

Partial Compliance

      Based on documentation provided by Wexford:

      October 2024: 38 code whites called; 13 inmates were searched (34%)

      November 2024: 18 code whites were called; 11 inmates were searched (61%)

      December 2024: 20 code whites were called; 8 inmates were searched (4%)

      January 2025: 28 code whites were called; 15 inmates were searched (54%)

      February 2025: 17 code whites were called; 8 inmates were searched (47%)

      March 2025: 29 code whites were called; 17 inmates were searched (59%)

      April 2025: 16 code whites were called; 5 inmates were searched (31%)

      May 2025: 19 code whites were called; 13 inmates were searched (68%)

      June 2025: 19 code whites were called; 7 inmates were searched (37%)

There was no documentation submitted to support direct constant observation being rendered while an inmate is awaiting transfer to a QMHP for assessment.

<u>Suggestion:</u>

Continue to keep record of searches conducted at Code Whites. The Monitor



recommended OPSO document constant direct observation is being conducted while awaiting a QMHP assessment. The Monitor recommends there be accurate documentation provided which accounts for contributing factors regarding why searches are not performed on 100% of inmates at risk of harm and appropriate steps (corrective active plan) to ensure future compliance. The documentation should also reflect what was done in leu of the immediate search to minimize harm, i.e. an inmate was watched directly until a search could be conducted. While the Monitor understands that security searches fall strictly under the purview of security operations and Wexford is unable to perform the functions required to bring this provision into substantial compliance, this provision requires this function be completed and constant observation by security be performed until assessment by mental health. Communication and documentation will be imperative to show this function is happening on a consistent, collaborative and thorough basis and that each party is functioning within the confines of their responsibility.

***B.1.g. Ensure that a Qualified Mental Health Professional conducts appropriate mental health assessments within the following periods from the initial screen or other identification of need:***
> ***1) 14 days, or sooner, if medically necessary, for prisoners with routine mental health needs;***
> ***2) 48 hours, or sooner, if medically necessary, for prisoners with urgent mental health needs; and***
> ***3) immediately, but no later than two hours, for prisoners with emergent mental health needs.***

Finding:

Partial Compliance

Suggestion:

Based on data submitted by Wexford for the period in review, on average, 50% of emergent referrals were addressed on time, while 60% of urgent referrals were addressed on time. Routine referrals were addressed 100% on time for the period in question. The Monitor recommends Wexford separate referrals from intake versus referrals while admitted to OPSO to determine whether the issues are related to intake or after the inmates is already residing in jail. This may help Wexford focus limited resources on the problem area.

***B.1.h. Ensure a Qualified Mental Health Professional preforms a mental health assessment no later than the next working day following any adverse triggering event (i.e., any suicide attempt, any suicide ideation, or any aggression to self, resulting in serious injury).***

Finding:

Partial Compliance



With Wexford having access to OPSO's incident reports since May 2025, there should be fewer misses in terms of mental health seeing an inmate after an adverse triggering event. During the period of review, there continued to be times when an inmate was seen after an adverse triggering event by medical, yet mental health was not notified and therefore the person was not seen within 24 hours of the event. On January 9, 2025, AW was involved in the use of force yet when seen by mental health on February 5, there was no mention of it. A second person, TP, was also involved in the same use of force incident and was seen on February 6 by mental health for the UOF consult. RC was in a UOF event on June 5 yet was not seen by mental health until June 9. DF was in a UOF event on June 21 and was not seen until June 24.

Suggestion:

Submit RANDOM mental health assessments which have been completed after a triggering event. Three per month (total of at least 18 assessments along with the corresponding incident reports in the SharePoint folder) for the period in review would be helpful to support improvement in this provision. Conduct a CQI to keep track of these assessments and timeliness. Reeducate deputies regarding the importance of alerting mental health staff regarding all triggering events, in advance as much as feasible, so proper assessments and assistance can be provided. Ensure medical and mental health staff within Wexford are communicating and informing each other regarding triggering events as they become aware.

***B.1.i. Ensure that a Qualified Mental Health Professional, as part of the prisoner's interdisciplinary treatment team, maintains a risk profile for each prisoner on the mental health case load based on the Assessment Factors identified in Appendix B, and develops and implements a treatment plan to minimize the risk of harm to each of these prisoners.***

Finding:

Partial Compliance

At the time of the site visit, Wexford had completed 317/890 treatment plans at OJC. This is a significant improvement from prior site visits. While the Monitor did not investigate the treatment plans for quality, there is movement in the right direction to have treatment plans for every person on the Behavioral Health caseload. As has been stated in prior reports, without an adequate treatment plan, it is difficult to maintain a risk profile. A treatment plan would help identify goals along with interventions to help



mitigate risks, especially those identified in a risk profile. Toward the end of the period in review, Wexford created a multidisciplinary treatment planning team who are currently focusing on creating treatment plans for patients on the specialty mental health units (2A and 2B). This team has a psychiatrist, a psychiatric nurse, a social worker, a discharge planner and a deputy. On the day the Monitor sat in at the meeting, a representative from medical was present. The recommendation is for medical to be an ongoing part of the team. While having the team is a move in the right direction towards compliance, there were no goals or interventions discussed. It was more of a check-in with all the disciplines in attendance rather than a meeting to discuss treatment goals. What type of document is generated from this meeting is unknown and the Monitor did not have a chance to review it. The document should be a comprehensive treatment plan with goals, objectives and interventions. Due to Wexford trying to get treatment plans on all charts, there was no schedule created for follow up sessions with the MDT after the initial meeting.  Treatment plans direct treatment and keep the clinicians involved and supporting staff abreast of interventions and objectives for each patient. The aim is to provide person-centered, coordinated, high-quality care to patients. All inmates on the mental health caseload require a risk profile based on the Assessment Factors in Appendix B, to include an acknowledgement that the factors were considered and may not apply to that individual AND an interdisciplinary treatment plan. While every inmate on the case load may not require a monthly treatment plan, an adequate treatment planning schedule needs to be created and implemented to ensure all inmates on the case load have a treatment plan and an updated plan when clinically indicated or scheduled. The mental health provider, in consultation with OPSO, should determine what is needed, in terms of additional psychiatrists' hours, in order to conduct multidisciplinary treatment plans throughout the entire facility. At this juncture, triggering events do not typically result in any updates to the treatment plan, which it should.

Suggestion:

A clinical analysis of treatment needs will be needed to inform an adequate and appropriate treatment planning schedule for OJC. Ensuring interdisciplinary treatment plans are created and followed for the general population, and the inmates housed in the mental health housing units (2A, 2B and 1D) patients with a risk profile for each inmate



on the mental health case load will be necessary for substantial compliance. A suggestion is for Wexford to determine the staffing matrix needed (an independent staffing analysis has been recommended to be completed) to provide treatment plans every 60 days in general population and secure additional funding to secure that level of staffing, in addition to any staffing needs to ensure timely treatment plans and updates are conducted for specialty units. As stated before, these treatment plans must include interventions to minimize risk of harm for inmates throughout the system, including stepdown and outpatient level of care along with the acknowledgement that risks were assessed and may not be relevant for the patient. This risk profile should also include deficits in planned services and content, which could be due to lack of available staff, and remedies to correct the deficits. Triggering events should result in an update to the treatment plan which will address interventions and objectives to target recovery from the event.

***B.1.j. Ensure adequate and timely treatment for prisoners, whose assessments reveal mental illness and/or suicidal ideation, including timely and appropriate referrals for specialty care and visits with Qualified Mental Health Professionals, as clinically appropriate.***

<u>Finding:</u>

Partial Compliance

At the time of the site visit, there were 890 inmates on the behavioral health caseload. OPSO/Wexford have experienced challenges in conducting daily visits by a QMHP for individuals awaiting transfer to TMH. In November 2024, 51% of daily visits occurred for inmates on the TMH waiting list. In December 2024, 77% of daily visits occurred. In January and February 2025, 84% of daily visits occurred. In March 2025, 89% of daily visits occurred. In April 2025, 83% of daily visits occurred. In May 2025, 71% of daily visits occurred and in June 2025, 69% of daily visits occurred. Inmates on the TMH waitlist were seen on average of 76% of the time daily over the past 8 months. While the provision does not direct the need for special areas to conduct mental health work, the provision calls for adequate treatment for inmates with mental illness. Adequate mental health treatment is not conducted on the tier, from the module, cell side nor in a dayroom where an inmate may be reluctant to discuss private, intimate issues with a clinician. The lack of confidentiality and a space that promotes confidentiality leads to a lack of validity that the information received is adequate to provide the necessary



treatment. Many group sessions are held sporadically or not at all for a number of reasons, including staffing challenges for Wexford (reiterating an independent staffing analysis be conducted). There are numerous examples of disruption to service to include group therapy sessions. Patient x916 was enrolled in groups sessions yet had numerous disruptions due to "lack of time" on October 30, "deputy pulled" on November 6, "lack of time" on November 13, "lack of space" on December 11. The next group was held on February 5; therefore, no groups were held for almost two months. These disruptions would affect all participants scheduled to attend group. Due to drugs being passed between units, recreation and music therapy groups were suspended from April 16-May 21, 2025, on units 3A and 3B. Patient x677 was enrolled in biweekly groups yet during the period in question, he attended one activity therapy session on January 30, 2025, and refused the only other documented attempt on March 18, 2025. Some individual sessions are conducted cell side which is inadequate treatment for someone with a mental illness. The Monitor witnessed increased use of the interlock area for patient contacts, which is an improvement. One of the advantages of the Phase III design is that it provides confidential spaces for conducting interviews of inmates in a manner which is safe for both the QMHP and inmate.

Suggestion:

There continues to be a need for a full range of mental health and consistent individual and group counseling services at OJC and TMH/TDC. Adequate treatment includes providing an environment where confidentiality is secured so the inmate can share valid information to inform necessary treatment. While the Monitor is aware of and appreciates the structural limitations to providing constitutionally adequate mental health services at OJC, this does not supersede the needs of the patient and is one of the reasons for this consent decree. This need should be addressed once Phase III is operational. The mental health provider and OPSO must collaborate and plan TOGETHER in order to provide an adequate and therapeutic system of mental health services. The inmates are unable to attend therapeutic sessions without adequate clinical staff to conduct sessions and correctional staff to transport and provide security for both staff and inmates. The Monitor reiterates that cell side visits do not constitute therapeutically appropriate or clinically adequate mental health services and will not result in substantial



compliance. The Monitor recommends continued documentation of barriers to providing timely and adequate mental health treatment for all individuals captured on the mental health caseload. Issues cannot be rectified without knowledge of the problem. Consistent and reliable access to care is necessary for substantial compliance. OPSO may want to consider having community-based volunteer services come in and facilitate groups which would help provide services for inmates. Nurse practitioners, nurses and psychiatrists can all assist in facilitating programming for the mentally ill at OJC/TMH/TDC. The Monitor also recommends an independent staff analysis be conducted to determine staffing needs for OJC with current and future expectations for constitutionally adequate treatment. The staff analysis is recommended so all stakeholders are aware of what is needed and will be needed as Phase III comes online. Who conducts the analysis will be left to the stakeholders in New Orleans.

***B.1.k. Ensure crisis services are available to manage psychiatric emergencies. Such services include licensed in-patient psychiatric care, when clinically appropriate.***

Finding:

Partial Compliance

There are no designated in-patient licensed facilities identified to provide treatment for the OPSO population.

Suggestion: OPSO continues to lack access to licensed in-patient psychiatric services for male and female inmates, beyond simple emergency room treatment. OPSO/Wellpath is encouraged to continue to provide documentation that all psychiatric emergencies are sent to an emergency department, and any crisis is adequately resolved, which will keep this provision in partial compliance. Currently, the utilization of TMH and external emergency departments are the resources which must be used.

***B.1.l. On an annual basis, assess the process for screening prisoners for mental health needs to determine whether prisoners are being appropriately identified for care. Based on this assessment, OPSO shall recommend changes to the screening system. The assessment and recommendations will be documented and provided to the monitor.***

Finding:

Partial Compliance

Suggestion:

The 2024 Annual Report is in the folder. While it adequately describes the screening



process and includes data collected, there is no indication the OPSO has assessed the screening process and made recommendations for change. This provision SPECIFICALLY requires OPSO to provide recommendations/input into the screening process. This can be as simple and indicating the current system in place is adequate. An OPSO generated document or a paragraph/additional sheet attached to the Annual Report which demonstrates their attention to the screening process would suffice.  Screenings require an adequate clinical response and if there are inmates who are not being adequately screened and identified for care, from the perspective of OPSO, this needs to be addressed. Provide the recommended documentation to return this provision to substantial compliance.

Findings:

B.2.a.   Partial Compliance

B.2.b.   Partial Compliance

B.2.c.   Partial Compliance

B.2.d.   Substantial Compliance

B.2.e.   Partial Compliance

B.2.f.   Partial Compliance

B.2.g.   Partial Compliance

B.2.h.   Substantial Compliance

***B.2.a. Review, revise, and supplement existing policies in order to implement a policy for the delivery of mental health services that includes a continuum of services, provides necessary and appropriate mental health staff, includes a treatment plan for prisoners with serious mental illness, and collects data and contains mechanisms sufficient to measure whether care is being provided in a manner consistent with the Constitution.***

Finding:

Partial Compliance

Inmates on the waitlist for TMH are now to be seen daily 76% of the time by a QMHP. There needs to be policies in place to provide a continuum of treatment for all individuals on the behavioral health caseload at the jail. These policies should outline the purpose of the Multidisciplinary Team (MDT) along with expectations for follow-up work. These policies should outline expectations for treatment and care throughout OJC along with what an inmate can expect based on where they are housed. This provision not only covers having policies in place but IMPLEMENTING those polices in order to have a



continuum of services for all patients receiving mental health care. There is a dire need for consistent therapeutic groups being available for all patients on the caseload. While offering group therapy is not a constitutional standard of care, if it is a clinical, therapeutic recommendation, it should occur. Serious mental illness is defined as mental, behavioral, or emotion disorder of mood, thought, or anxiety that significantly impairs judgment, behavior, capacity to recognize reality, or ability to cope with the ordinary demands of life. Those disorders include, but are not limited to, Schizophrenia Spectrum Disorders, other psychotics disorders, bipolar related disorder, major depressive disorders, and post-traumatic stress disorders. Implementation of policy to ensure the delivery of mental health services across the entire facility continues to be hampered by staffing deficits, from both Wexford and OPSO. Until a baseline number of services needed is generated and updated, there is no indication of the number of staff actually needed from Wexford or OPSO to provide a continuum of treatment services at OPSO. A staffing analysis would be beneficial. While moving in the right direction, the expectation is by the next site visit most if not all individuals on the caseload should have a treatment plan in place. Wexford had completed 319/890 treatment plans at the site visit. Without adequate staff, there will be no consistent treatment, including scheduled mental health and activity groups for the inmates.

Suggestion:

Both Wexford and OPSO must commit to consistent and appropriate implementation of policies in order to ensure an adequate delivery of mental health services, including de-escalation interventions. This will include documenting wait lists and service needs along with barriers to the provision of treatment, including missing group sessions. This also includes holding staff accountable for employment requirements. This will include documenting how long an inmate awaits transfer to TMH and what therapeutic and clinically adequate services are provided during that time. The creation of the MDT is a positive addition to the services provided at OJC and will help create treatment plans in OJC. As stated above, Wexford needs to identify the appropriate staffing levels needed to move into substantial compliance with this provision and satisfy the requirements of the Consent Judgment, which is the reason for the recommendation for an independent staffing analysis to be done. A comprehensive plan as to how the staff will be secured is



also recommended. While the Monitor can appreciate the physical plant constraints in providing an adequate continuum of care, the needs of the patient and ensuring constitutionally adequate treatment cannot be put on hold. The Monitor encourages Wexford and OPSO to collaborate and try and find solutions to the physical plant issues to ensure patients are receiving the care they need.

***B.2.b. Ensure that treatment plans adequately address prisoners' serious mental health needs and that the treatment plans contain interventions specifically tailored to the prisoner's diagnoses and problems.***

Finding:

Partial Compliance

The current mental health caseload was 890 at the time of the site visit. They had completed 319 treatment plans. The multidisciplinary treatment team has been working since May to see patients on 2A and 2B. While a medical representative was not a consistent presence in the meetings, the plan is to have them going forward. The expectation is the MDT will create treatment plans which will help orchestrate the goals, objectives, and interventions which will dictate the comprehensive treatment each inmate will need. The follow-up treatment plans still remain scarce, but the hope is this will improve once the initial round of treatment plans is completed.

Suggestion:

Continue to work towards providing interdisciplinary treatment plans to all individuals on the mental health case load throughout the facility. Treatment plans are needed for all male, female, and youthful inmates at all levels of care, including acute care, suicide watches, TDC and outpatient level of care. These treatment plans need to be developed by a multidisciplinary team, when clinically indicated, including the inmate, as much as possible. As stated above, staffing levels need to be assessed, and staff secured to provide the level of expected care and timely treatment for this population. ***All patients who are receiving mental health services need a treatment plan to direct care.*** Treatment plans can be done on a schedule based on clinical needs and the schedule should be discussed and agreed on by Wexford and the Monitor. If an individual is in general population and receiving medication and follow up from a QMHP, that person should have a treatment plan created by the provider and QMHP to address ongoing needs. While every individual may not need a multidisciplinary plan where security, nursing, a



provider and QMHP (for example) will need to be a part of the creation, for substantial compliance, there must be a treatment plan on record for every individual on the caseload, based on clinical interactions and needs.

***B.2.c. Provide group or individual therapy services by an appropriately licensed provider where necessary for prisoners with mental health needs.***

Finding:

Partial Compliance

There remain challenges with consistently providing group and individual therapy services at OJC. Some of this is due to lack of adequate deputies to secure pods therefore the mental health provider has to cancel an intervention. Some is due to inadequate clinical staffing on the part of Wexford who would be able to consistently facilitate the groups. Until there are sufficient security staff to provide supervision for groups to take place, and Wexford knows the number of staff they will need to meet expected treatment goals, it will be difficult to move this provision into substantial compliance. Until there are confidential locations to conduct interventions, the validity of inmate responses is in question which in turn questions whether appropriate, clinically therapeutic programming is being offered. Please see summary regarding disruption of programming services in provision B.1.j.

For the fourth quarter of 2024: In October 2024, 6 individuals participated in general mental health counseling. In November 2024, 15 participated and in December 2024, 1 participated in general mental health counseling. Only 1 person in November 2024 participated in sexual abuse counseling. These numbers are drastically low for the number of inmates on the behavioral health caseload.

For the first quarter of 2025: Individuals who participated in general mental health counseling – January 22; February 19; March 16. Individuals who participated in sexual abuse counseling: January 2. These numbers remain low.

For the second quarter of 2025: In April 2025, 642 individuals participated in general mental health counseling. In May 2025, 399 participated and in June 2025, 503 individuals participated in general mental health counseling. Individuals participating in sexual abuse counseling: April 8; May 4; June 0 (as unable to verify the number presented by Wexford).



Suggestion:

This provision will remain a challenge to move into substantial compliance without adequate staff from both Wexford and OPSO, along with an adequate confidential environment to conduct these sessions. Confidentiality will help validate the responses of the inmate which will in turn inform what individual and group sessions are needed for the population. If individual and group sessions cannot be held consistently, this provision will not move to substantial compliance. Please note how many individuals are unable to access the service provided due to barriers like adequate space, staffing challenges (including Disruption of Service forms) and are on a waitlist. Document the corrective action plans which will be implemented to address these issues. Continue to provide data on the number of inmates who received counseling for sexual abuse, alcohol, and drug abuse. The numbers are steadily improving, and more services are being provided at OJC. While the Monitor is unsure how these services are being delivered (cell side, individual sessions, in the interlock area) or what the sessions entail or who is providing the services, it is encouraging to see patients being engaged. There continues to be a need for intentional invitations to be delivered to inmates for treatment services. The Monitor observed numerous clinical interactions and although a patient mentioned wanting services, the clinician did not offer to refer them or begin services at OJC. The Monitor had to interject and inquire whether the inmate wanted to begin services while incarcerated and the majority of them stated they would. Keep a running list of how many groups are not being held rather than just the attendance of inmates. Group sessions continue to have disruptions due to various reasons including "lack of time" or no deputy present or lockdowns due to disruptive behaviors. Wexford needs to work on a reporting system to capture not just the needs of the population but the vast number of groups not being held and the groups which will be needed to address the entire mental health population. OPSO and Wexford both bear responsibility in bringing this provision into substantial compliance and are encouraged to collaborate on solutions for the physical plant limitations to provide needed treatment to patients until Phase III is operational. As stated before, nurse practitioners, nurses and psychiatrists can all facilitate programming so groups and individual sessions can occur throughout the entire facility.

**B.2.d. Ensure that mental health evaluations that are done as part of the disciplinary process include recommendations based on the prisoner's mental health status.**



Finding:

Substantial Compliance

At this juncture, based solely on the documentation, which is completed, The Mental Health Caseload Disciplinary Hearing Form has a line to check "Due to mental illness, pt. exempt from disciplinary sanctions. MHP will consult with psych." Most forms completed indicate there was no mental illness as a contributing factor to patient's behavior. While the process my still have flaws, this provision is being graded on whether the evaluation includes recommendations.

Suggestion: It is imperative that mental health staff are contacted PRIOR to any inmate, especially those on the mental health caseload, being moved into disciplinary housing. There is still concern that QMHPs are not always notified prior to transfer of an inmate to a disciplinary unit and must assess the inmate after the transfer is complete. If this practice of not notifying mental health PRIOR to movement into disciplinary housing continues, there is a risk of this provision falling to partial compliance as it requires the evaluations not only have recommendations but are DONE as part of the disciplinary process, not after the process has commenced. Wexford should be using incident reports to ensure they are aware of all mental health inmates who may find themselves in disciplinary housing. It is imperative that OPSO puts into place a consistent process to alert mental health prior to movement of an individual, especially one on the caseload, to disciplinary housing. This also means that OPSO needs to insist on having a current list of all patients on the mental health caseload to ensure OPSO can contact mental health as soon as safely possible, if not prior to movement.

***B.2.e. Ensure that prisoners receive psychotropic medications in a timely manner and that prisoners have proper diagnoses and/or indications for each psychotropic medication they receive.***

Finding:

Partial Compliance

Suggestion:

During the period of review, there were reports of patients not receiving psychotropic medication in a TIMELY MANNER at intake. Patient x417 reported a mental health history with medications when she was admitted in December 2024. She did not receive



medication until March 2025. Patient x812 was admitted to the jail in October 2024 with information regarding a mental health history yet waited eight days to begin receiving her psychotropic medication. Patient x184 waited five days after intake to receive his psychotropic medication. Patient x445 waited ten days after intake to start her psychotropic medication. Wexford is beginning to capture medication variances which will help to demonstrate whether medications are received in a timely manner. Based on policy and prescriber orders, medications are to be delivered between 8:00 a.m. and 10:00 a.m. While the overall medication administration process appears to have improved, there are still untimely administration of medication due to various reasons. This Monitor watched a number of medication passes during the site visit. Nurses began distributing medication close to and after 9:00 a.m. and therefore it would be highly unlikely the medication administration would be completed by 10:00 a.m. The Monitor has some concerns regarding the prescribing of medications without the proper diagnosis/indication being explicitly documented in the medical record. One case Patient x812 received medication for a diagnosis which was not clinically present.

Suggestion:

Continue to collect MEDICATION VARIANCES! Continue to provide documentation and analysis of data to ensure inmates are receiving psychotropic medications in a timely manner, especially upon admission to the facility. If there are delays in an inmate receiving medication, document and create a corrective action plan to address the deficiency, this includes nurses arriving late in the morning who then have to prep their medication carts and begin administration. Ensure medications are being used to treat the diagnosis on record or there is clear justification in the record for the off-label use of a psychotropic medication. Consider having the overnight nurses help prep the cart for the day shift to cut down on the delay to begin medication administration. Consider increasing the time for medication administration from a two-hour grace period to three hours. Ensure nurses are aware that collecting variances does not necessarily mean something is wrong or was done incorrectly but is a way to improve the system. It is STRONGLY recommended that psychiatric nurse practitioners have oversight and supervision from psychiatrists in this setting. Ensure the diagnoses and prescriptions written by nurse practitioners is reviewed by an experienced psychiatrist who can give



appropriate feedback and education. Discussion of clinical cases will be beneficial to ensure clinical acumen. LSU has seasoned psychiatrists who could be of benefit in providing supervision for the nurse practitioners. It may be useful to have a monthly meeting with the Wexford psychiatrist, psychiatric nurse practitioners, and the LSU psychiatrists to ensure understanding of the patient population, collaboration on patients and ensure all the work is assigned and completed. This supervision should entail chart reviews, one on one periodic meetings (twice a month would be beneficial) to review cases, access to the supervisor for questions and collaboration on difficult cases and ensuring adequate and timely follow-up is occurring.

***B.2.f. Ensure that psychotropic medications are administered in a clinically appropriate manner as to prevent misuse, overdose, theft, or violence related to medication.***

Finding:

Partial Compliance

There were more mouth checks being performed during this site visit, but it was not consistent across all medication passes. The deputy was present and attentive at the medication passes this Monitor observed which is an improvement from the last site visit. The process of capturing medication variances has begun, and this Monitor hopes the items captured is more robust at the next site visit to support and improve on the process to ensure that psychotropic medications are administered in a clinically appropriate manner. Variances include late administration of medication (nurses have one hour before and one hour after the set time for the medication to be given for administration to be timely), missed dose of medication, if a medication is ordered and not received by the patient within 24 hours of the order, the use of numerous smaller dose(s) of pills to equal the prescribed amount when the prescribed amount is available in one pill (olanzapine 20mg is prescribed and rather than give olanzapine 20mg tablet, which is available, two 10mg tablets are given). While medication carts have signature pads on them for informed refusals, there is no education, at the medication passes the Monitor observed, given to the inmate regarding their refusal to take medication.

Suggestion:

Continue monitoring medication variances at OJC and TMH and accurately report findings. Wexford and OPSO need to work cooperatively to ensure medication passes are



aligned with policy and procedures in order to prevent misuse, overdose, theft, and violence related to medication. Proper and thorough searches of cells and persons must be conducted by OPSO to help curb the presence of contraband, including excess prescribed and unprescribed medications. Found medications must be sent to the proper personnel for identification to help curb misuse, overdose, theft and violence in the facility. Nurses need to be directed to educate and inform refusing inmates about the risks rather than just accept a signature for the chart.

***B.2.g. Ensure that prescriptions for psychotropic medication are reviewed by a Qualified Mental Health Professional on a regular, timely basis and prisoners are properly monitored.***

<u>Finding:</u>

Partial Compliance

<u>Suggestion:</u>

Based on the CQI studies submitted for this provision, there are compliance challenges with proper monitoring of patients on psychotropic medications. CQI pulls 15 random charts and looks for key components in the medical record to determine compliance with medication monitoring. In October 2024, only 73% of the random sample of patients had their diagnosis listed on the master problem list. Thirty-three percent (33%) of patients had other drug levels monitored as indicated. In January 2025, only 53% of the random sample had baseline workup completed while only 56% of the random sample had other drugs monitored as indicated. Regarding AIMS monitoring, in February 2025, no patient, of the 15 random charts reviewed, had AIMS documented at the initial psychiatric encounter or a treatment plan with AIM testing included every six months. Only 0.07% had their diagnosis listed in the treatment plan. Refusals of medications needs attention and require proper clinical assessment and documentation which is part of adequate monitoring of inmates. Patients are expected to be counseled when a pattern of refusals occur, which is not happening consistently. Patient x635 refused medication from March 7, 2025, through March 19, 2025, without documented intervention. The Monitor wants to reiterate the importance of the nurse practitioners at OJC/TMH/TDC receiving consistent and appropriate supervision for their work from a licensed, seasoned psychiatrist. Case conferences and discussions are important to ensure clinical acumen and impart knowledge which may be lacking in individuals new to the correctional



medicine system. This provision was in substantial compliance when psychotropic medication was distributed and monitored by psychiatrists. It has now been downgraded to partial compliance as the primary medication providers have shifted to nurse practitioners and there are gaps and missed monitoring benchmarks without proper supervision (patients saying they are having repeated labs drawn, lack of follow-up on laboratory work – Patient x517 waited 19 days to have her labs drawn and therefore was without medication for an extended period of time). Ordered labs and missed labs require follow up from the ordering provider. If a lab is missed, the ordering provider should be seeking clarity and ensuring the laboratory work is being done. If a completed lab returns abnormal, the provider should be documenting what is being done to address the lab. If a patient on a second-generation antipsychotic has metabolic issues, there should be collaboration with the somatic doctor regarding treatment rather than expecting the somatic doctor to handle the case. The medications psychiatrists and nurse practitioners order are the responsibility of the prescriber. Seeking assistance shows good judgment yet the ultimate liability lies with the prescriber.

***B.2.h. Ensure that standards are established for the frequency of review and associated charting of psychotropic medication monitoring, including monitoring for metabolic effects of second-generation psychotropic medications.***

<u>Finding:</u>

Substantial Compliance

<u>Suggestion:</u>

There are standards established for the frequency of review and associated charting of psychotropic medication monitoring. This grade is based on the standards being established not the implementation or follow-through which is expected which is captured in Provision B.2.g.

<u>Findings:</u>

B.3.a.   Partial Compliance

B.3.b.   Substantial Compliance

***B.3.a. OPSO shall develop and implement policies and procedures for prisoner counseling in the areas of general mental health/therapy, sexual-abuse counseling, and alcohol and drug counseling. This should, at a minimum, include some provision for individual services.***
<u>Finding:</u>

Partial Compliance



There have been improvements in implementing policies and procedures for inmate counseling in the areas of general mental health/therapy, sexual abuse counseling, and alcohol and drug counseling. For the fourth quarter of 2024: In October 2024, 6 individuals participated in general mental health counseling. In November 2024, 15 participated and in December 2024, 1 participated in general mental health counseling. Only 1 person in November 2024 participated in sexual abuse counseling. In October 2024, 45 individuals participated in substance abuse counseling. In November 2024, 127 individuals participated in substance abuse counseling. In December 2024, 118 individuals participated in substance abuse counseling. These numbers are drastically low for the number of inmates on the behavioral health caseload.

For the first quarter of 2025: Individuals who participated in general mental health counseling – January, 22; February, 19; March, 16. Individuals who participated in sexual abuse counseling: January 2. These numbers remain low. Individuals who participated in substance abuse counseling – January, 146; February, 97, and March, 168.

For the second quarter of 2025: In April 2025, 642 individuals participated in general mental health counseling. In May 2025, 399 participated and in June 2025, 503 individuals participated in general mental health counseling. Individuals participating in sexual abuse counseling: April. 8; May, 4; June, 0 (unable to verify number provided by Wexford). Participants in substance abuse counseling was April, 196; May, 101; June, 87.

For the fourth quarter of 2024, the number of cases with an appropriately licensed practitioner and related one-to-one counseling was: October, 4; November, 21; December, 0. For the first quarter of 2025, the number of cases with an appropriately licensed practitioner and related one-to-one counseling was: January, 41; February, 25; March, 22. For the second quarter of 2025, the number of cases with an appropriately licensed practitioner and related one-to-one counseling was: April, 67; May, 65; June, 139.

Groups and individual sessions continue to be conducted inconsistently throughout the reporting period.  While the provision does not require a confidential space provided for treatment, adequate treatment requires confidentiality in order for there to be valid responses from inmates to inform necessary treatment. Cell side or on the tier interventions are not adequate mental health treatment. Development of the policies and procedures is not sufficient for substantial compliance without



implementation, which would include consistent availability of therapeutic services.

Suggestion:

An independent staffing analysis is recommended to determine staffing needs to meet expectations for provision of mental health services throughout OJC. Tracking of the following is necessary to ensure services are available and implemented: 1) the overall baseline need for counseling services; 2) whether each counseling session identified is actually provided; and 3) the reason service was not provided and corrective actions, if implemented. The need for counseling service should also be reflected in the treatment plan along with a clinically appropriate schedule and interventions.  The creation of dedicated space where confidential therapeutic engagement can occur would be ideal in moving this provision towards substantial compliance. The Monitor looks forward to this being the case once Phase III is operational. The staffing analysis will be crucial to ensure Phase III is utilized properly. Nurse practitioners and psychiatrists can also provide counseling and groups, especially on the mental health specialty units where medication compliance and understanding is crucial.

***B.3.b. Within 180 days of the Effective Date, and quarterly thereafter, report all prisoner counseling services to the Monitor, which should include:***
***1)      the number of prisoners who report having participated in general mental health/therapy counseling at OPP;***
***2)      the number of prisoners who report having participated in alcohol and drug counseling services at OPP;***
***3)      the number of prisoners who report having participated in sexual-abuse counseling at OPP; and***
***4)      the number of cases with an appropriately licensed practitioner and related one-on-one counseling at OPP.***

Finding:

Substantial Compliance

Suggestion:

The provision is solely being graded on whether the report was submitted with the requested information. See numbers above in B.3.a. The quarterly review is submitted with the numbers of individuals who report participating in general mental health counseling, substance abuse counseling, and sexual abuse counseling. The questions as to the sufficiency of the service are addressed in Provision B.3.a.

Suggestion: Continue to collect and analyze data concerning inmates in need of these services and create corrective action plans to address the deficits which may be present



at OJC and TMH. Submit the quarterly report with numbers of individuals participating in the services listed above. Wexford needs to spend more time determining the true needs of the population, which they have begun doing with surveys of the population and determining what needs to be implemented to address those needs.

Findings:

B.4.a.   Partial Compliance

B.4.b.   Substantial Compliance

B.4.c.   Substantial Compliance

B.4.d.   Partial Compliance

B.4.e.   Substantial Compliance

B.4.f.   Substantial Compliance

B.4.g.   Substantial Compliance

*B.4.a. OPSO shall ensure that all staff who supervise prisoners have the adequate knowledge, skill, and ability to address the needs of prisoners at risk for suicide. Within 180 days of the Effective Date, OPSO shall review and revise its current suicide prevention training curriculum to include the following topics:*
*1) suicide prevention policies and procedures (as revised consistent with this Agreement);*
*2) analysis of facility environments and why they may contribute to suicidal behavior;*
*3) potential predisposing factors to suicide;*
*4) high-risk suicide periods;*
*5) warning signs and symptoms of suicidal behavior;*
*6) case studies of recent suicides and serious suicide attempts;*
*7) differentiating suicidal and self-injurious behavior; and*
*8) the proper use of emergency equipment.*

Finding:

Partial Compliance

While all staff are required to participate in suicide prevention training, the knowledge that is shared is not completely translated into demonstrating the skill and ability to address the needs of the inmates at risk of suicide. The lack of compliance with searches when someone is placed on watch remains a concern. The lack of searches results in at-risk inmates having access to contraband. There continues to times listed during the period in question, where a deputy was unavailable for a suicide check to occur.  There needs to be continued attention to all self-injurious and suicidal behaviors. Training should also include mock demonstrations regarding the proper response to a suicide attempt. While this provision focusing on training curriculum, the curriculum is only as good as the manifestation of what has been learned which shows the ability to



address the needs of the inmates.

***B.4.b. Ensure that all correctional, medical, and mental health staff are trained on the suicide screening instrument and the medical intake tool.***

Finding:

Substantial Compliance

Suggestion:

This provision is graded solely on all staff being trained on the suicide screening instrument and medical intake tool rather than the application and implementation of the tool. Continue to provide documentation that multi-disciplinary in-service training has been completed annually for all current correctional, medical, and mental health staff to include training on updated policies, procedures, and techniques. All incoming staff should be trained on the suicide screening instrument and medical intake tool during onboarding orientation. This monitor recommends Wexford keep a running list of ALL employees of OPSO, including Wexford employees, and document when training is due, when it has been done and the reason for pending status. Simply submitting a list of employees who have completed training is not sufficient to determine whether employees are up to date on this training.

***B.4.c. Ensure that multi-disciplinary in-service training is completed annually by correctional, medical, and mental health staff, to include training on updated policies, procedures, and techniques. The training will be reviewed and approved by the Monitor.***

Finding:

Substantial Compliance

Suggestion: This provision is being graded solely on annual training being completed and documented rather than whether staff are properly adhering to and implementing the training. Continue to provide documentation that multi-disciplinary in-service training has been completed annually for all current correctional, medical, and mental health staff, to include training on updated policies, procedures, and techniques. Training will need to address deficiencies in communication, especially between OPSO and Wexford clinicians, and documentation regarding de-escalation procedures, disciplinary process, and searches. Training should clearly delineate the responsibilities of various staff member involvement, including during medication pass. Supervisory spot checks may be needed



to ensure training is adequate and adhered to during various processes around OJC and TMH. This monitor recommends Wexford keep a running list of ALL employees of OPSO and document when training is due, when it has been done and reason for pending status. Simply submitting a list of employees who have completed training for a month is not sufficient to determine whether employees are up to date on this training. Part of the training needs to include emphasis on communication between Wexford and OSPO, especially with de-escalation efforts and notification of mental health after an incident, along with identifying approved documentation which is to be used throughout the facility.

***B.4.d. Ensure that all staff are trained in observing prisoners on suicide watch and step-down units status.***

<u>Finding:</u>

Partial Compliance

While training is done, there are still gaps in the process which places inmates at risk. There continues to be lack of documentation when an inmate is on direct observation prior to the mental health staff arrival. Patient x495 had an urgent referral placed for 3 days of self-injurious behavior on February 20, 2025, yet was not seen by mental health until March 6, 2025. There is no documentation the patient was under any observation for those 13 days. Patient x683 submitted a sick call on June 22, 2025, indicating suicidal thoughts, but was not seen until June 24. There is no indication any special observation status was in place during those two days. All staff conducting watch should be completing the approved Observation/Restraint Checklist document.

<u>Suggestion:</u>

Continued training and supervisory observation, in person and via video will be necessary to ensure performance of suicide watches and accurate completion of these documents. Movement of all suicide watches to TMH should help improve the process but will not prevent attention to direct observation needs until the prisoners is moved and placed in mental health's possession.

***B.4.e. Ensure that all staff that have contact with prisoners are certified in cardiopulmonary resuscitation ("CPR").***



Finding:

Substantial Compliance

Suggestion:

Continue to provide documentation that all current staff, including OPSO and Wexford, are certified in CPR. The goal is to have at least 90% of all staff at OPSO certified in CPR. As stated earlier, a list of ALL employees who come in contact with inmates should be created and a spreadsheet could help with organization to ensure everyone is up to date in all required trainings. This information should be housed in one location (SharePoint Folder) and be ready prior to the next site visit. Ensure each provider, security officer and staff member have accurate dates on record so there is no question as to who is in need of CPR certification.

**B.4.f. Ensure that an emergency response bag, which includes a first aid kit and emergency rescue tool, is in close proximity to all housing units. All staff that has contact with prisoners shall know the location of this emergency response bag and be trained to use its contents.**

Finding:

Substantial Compliance

     The cut down tools were sharp and the bags were sealed and easily located by the deputies.

Suggestion:

Ensure the cut down tools are maintained and adequately sharpened, and new staff are trained in the proper use of the tool throughout the facility. Training should also include proper technique in breaking the seal on the bag that holds the cutdown tool. Ensure that staff are available in the control room in order to access the cut down tool, if necessary. Ensure every bag has all necessary requirements.

**B.4.g. Randomly test five percent of relevant staff on an annual basis to determine their knowledge of suicide prevention policies. The testing instrument and policies shall be approved by the Monitor. The results of these assessments shall be evaluated to determine the need for changes in training practices. The review and conclusions will be documented and provided to the Monitor.**

Finding:

Substantial Compliance

Suggestion:

The Monitor, for the next site visit, expects the total number of relevant staff for both



Wexford and OPSO to be written down and placed in the Sharepoint folder. There is also an expectation for proof of how employees are randomly selected. There were 14 deputies (5% of 280) and 17 medical staff members (5% of 340) which were tested on their knowledge of suicide prevention policies. The average score for the deputies was 81% while the average score for the medical staff was 83%. Four deputies and two medical staff scored below 80% and were promptly remediated to ensure competency. Based on data from OPSO there were 345 officers (71 in IPC, 203 in OJC, 58 in TMH/TDC, and 13 in transportation) as of August 15, 2025 (the numbers were higher during the period of review) who may have contact with prisoners. The expectation is for the numbers to be verified, and the correct number of staff tested for the next site visit. This provision risks being downgraded at the next site visit if 1) the proper number of individuals (5%) is not completed and 2) random selection of staff is not verified.

Findings:

B.5.a.   Partial Compliance

B.5.b.   Partial Compliance

B.5.c.   Partial Compliance

B.5.d.   Partial Compliance

B.5.e.   Partial Compliance

B.5.f.   Partial Compliance

B.5.g.   Substantial Compliance

B.5.h.   Partial Compliance

B.5.i.   Partial Compliance

B.5.j.   Substantial Compliance

B.5.k.   Partial Compliance

***B.5.a. OPSO shall implement a policy to ensure that prisoners at risk of self-harm are identified, protected, and treated in a manner consistent with the Constitution.***

Finding:

Partial Compliance

While various policies are in place to ensure inmates at risk of self-harm are identified, protected, and treated in a manner consistent with the Constitution, there remains the challenge of consistent IMPLEMENTATION. Searches and securing inmate



who are at-risk remains a top priority for compliance. Consistent and documented direct observation of prisoners prior to mental health assessment and during the time before transfer to a secure location are paramount. Without mental health being consulted prior to a use of force, inmates are at risk for harm. At-risk inmates who have to wait days for a mental health assessment are at risk. See examples in B.4.d.

Suggestion:

Continue to offer a confidential space for the clinician designated to monitor inmates on suicide watch to conduct assessments. Continue to document any barriers to having access to confidential space. Ensure inmates are searched to prevent self-harm when placed on suicide watch and contraband is removed when reported. Implement medication administration policies, to include adequate mouth checks, to help prevent access of the inmate to medication for self-harm. Document consistent out of cell time for inmates on suicide watch. Individuals on suicide watch need intensive treatment interventions including out of cell time, counseling, and therapy, as medically indicated. Merely documenting an inmate has been viewed every 15 minutes is insufficient. Document treatment interventions of inmates on suicide watch and any barriers present in not providing appropriate treatment. Document any inmate on suicide watch or in detox protocols who is found with contraband or misuse of supplies. The key will be implementing standing policies to ensure the safety of inmates and staff. It is also imperative there is timely supervisory review of suicide watches to ensure employees are following existing policies and be held accountable, up to disciplinary procedures, if policies are not adhered to.

***B.5.b. Ensure that suicide prevention procedures include provisions for constant direct supervision of current suicidal prisoners and close supervision of special needs prisoners with lower levels of risk, at a minimum, 15 minutes check. Correctional officers shall document their checks in a format that does not have pre-printed times.***

Finding:

Partial Compliance

  The Observation/Restraint Checklist and Worksheet does not have pre-printed times. With suicide watch now being conducted at TMH, there appears to be some improvement in this area. This Monitor was unable to access the videos from TMH to determine whether watches were being conducted appropriately. There was no



documentation submitted to support improvement in direct observations which must be conducted after a watch is issued prior to mental health arrival and then until transfer to a safe environment.

Suggestion: Submit documentation for suicide watches in IPC and direct observations in OJC. There needs to be consistent supervisory review to ensure employees are adhering to existing policies and disciplinary actions taken if policies are not followed. Video access to TMH for suicide watches must be available at the next site visit.

***B.5.c. Ensure that prisoners on suicide watch are immediately searched and monitored with consistent direct supervision until a Qualified Mental Health Care Professional conducts a suicide risk assessment, determines the degree of risk, and specifies the appropriate degree of supervision.***

Finding:

Partial Compliance

Inmates are not consistently and immediately searched nor secured when placed on suicide watch. October 2024: 38 code whites called; 28 inmates were secured (73%); 13 inmates were searched (34%)

November 2024: 18 code whites were called; 15 inmates were secured (83%); 11 inmates were searched (61%)

December 2024: 20 code whites were called; 15 inmates were secured (75%); 8 inmates were searched (4%)

January 2025: 28 code whites were called; 22 inmates were secured (79%); 15 inmates were searched (54%)

February 2025: 17 code whites were called; 11 inmates were secured (65%); 8 inmates were searched (47%)

March 2025: 29 code whites were called; 22 inmates were secured (76%); 17 inmates were searched (59%)

April 2025: 16 code whites were called; 12 inmates were secured (75%); 5 inmates were searched (31%)

May 2025: 19 code whites were called; 16 inmates were secured (84%); 13 inmates were searched (68%)

June 2025: 19 code whites were called; 12 inmates were secured (63%); 7 inmates were searched (37%)

There was no documentation submitted to support an inmate is on direct observation



prior to a QMHP conducting a suicide risk assessment.

Suggestion:

Inmates need to be immediately searched or as soon as safely possible 100% of the time. The threshold for compliance being used is 90%. Written procedures for searches should be a part of training, so each staff member is clear of their responsibilities. Cells should be searched prior to placement of an inmate on suicide watch and documented. Once identified by a MHP or MHT, contraband needs immediate removal from the vulnerable inmate to prevent self-harm. Collaboration and proactive communication are necessary between OPSO deputies and mental health staff to meet the requirements of this provision.

***B.5.d. Ensure that prisoners discharged from suicide precautions receive a follow-up assessment within three to eight working days after discharge, as clinically appropriate, in accordance with a treatment plan developed by a Qualified Mental Health Care Professional. Upon discharge, the Qualified Mental Health Care Professional shall conduct a documented in-person assessment regarding the clinically appropriate follow-up intervals.***

Finding:

Partial Compliance

In discussions with Wexford during the site visit, there remain challenges in timely follow up sessions for individuals released from suicide watch. There have been improvements in daily evaluations of patients on suicide watch from 62.5% in March to 66.7% in July (after the period in review).  There were many follow-up visits throughout the period in question which were not done timely or completely missed.  The compliance for this rose from 50% in March to 73.3% in July. There is dearth in the development of written treatment plans within 72 hours of placement on suicide watch. This limits the continuity of care and comprehensive method needed to help these at-risk individuals. Treatment plan and treatment plan updates are needed to ensure prescribed treatments are being performed along with progress being made by the inmate. Treatment plan goals should be discussed in progress notes.

Suggestion:

Suicide ideation/attempt can be emotional and the need for follow-up is necessary. Just as suicide assessments are conducted in a confidential space, suicide follow-up assessments require the same degree of care. A cell side visit for suicide follow up is not adequate or clinically appropriate treatment. Continue to document if there are access



issues to inmates. Document any barrier to having a confidential space to complete these post-suicide watch assessments. Continue to monitor and document follow-up appointments and ensure they are conducted as policy dictates. Create treatment plans to assist with adequate care and oversight for these at-risk individuals.

***B.5.e. Implement a step-down program providing clinically appropriate transitions for prisoners discharged from suicide precautions.***

Finding:

Partial Compliance

Simply having a document which outlines a step-down program is insufficient for substantial compliance without implementing a clinically appropriate, consistently run program. At a prior site visit, the proposed programming for step-down units was reviewed. It included individual and group counseling services, recreational and music therapy, medication education and addressed discharge resources. While this programming is a good start, there are hours each day where the prisoners are unoccupied. There should be more mental health programming available than free time for this special housing population. This program has not been consistently operational during the period in review for a myriad of reasons, including staffing deficits. Consistent implementation is just as important as having the program. The program is described as providing an individualized care approach to meet the needs of the patients who may require assistance transitioning from intensive acute treatment to the general population. As stated earlier, while the provision does not expressly dictate there be a confidential space dedicated to the step-down program, confidentiality is key in providing adequate clinical care for this population. It is difficult to provide adequate stepdown programming for women who share a housing unit with other classifications – general population and restrictive housing status.

Suggestion:

Consistent implementation of the step-down program is necessary. The introduction of medication education (which is number 6 on the list of offerings for this program), even in a group setting, is imperative for this population. Ensure the multi-disciplinary treatment plans include individualized treatment for inmates which is reflected in the programming being offered in the step-down program. The progress notes should reflect



the treatment being given in the program in line with the prescribed interventions in the treatment plan. Continue to document interruptions in service for this unit and any barriers in consistent programming. Nurse practitioners, nurses and psychiatrists can provide resources in terms of facilitating programming on this unit to address medication issues, hygiene issues and medication education.

***B.5.f. Develop and implement policies and procedures for suicide precautions that set forth the conditions of the watch, incorporating a requirement of an individualized clinical determination of allowable clothing, property, and utensils. These conditions shall be altered only on the written instruction of a Qualified Mental Health Care Professional, except under emergency circumstances or when security considerations require.***

Finding:

Partial Compliance

One hundred percent (100%) of inmates are not searched properly prior to being placed on suicide watch. The compliance threshold this monitor uses for substantial compliance is 90%. This provision calls for individualized determination of allowable property. It appears the system is an all or none mentality as to what an individual can have on suicide watch. The restrictions need to be clinically driven and properly documented to address the presented risk. There continues to be delay in removing contraband property from cells once brought to the attention of the deputies.

Suggestion:

Document all searches, including whether it occurs prior to or after being placed on suicide watch. Provide documentation of individualized determinations of the conditions for watch for male and female inmates at OJC and at TMH. This should include all inmates who are in non-suicide resistant cells and are therefore on direct observation. Provide policy, procedure, and documentation about suicide watches in IPC. Once the documents are provided, implementation must also be monitored closely and employees held accountable for failing to adhere to existing policy. Once restricted property is identified, it should be removed immediately so as to prevent self-harm.

***B.5.g. Ensure that cells designated by OPSO for housing suicidal prisoners are retrofitted to render them suicide-resistant (e.g., eliminating bed frames/holes, sprinkler heads, water faucet lips, and unshielded lighting or electrical sockets).***

Finding:

Substantial Compliance



All the designated cells by OPSO have been retrofitted to render them suicide-resistant (9 cells on 2A, 2 cells on 3C, 2 cells on 2C, 2 cells on 3E). The toilets have been installed, and the cells have been updated. There are still inmates at risk for self-harm being housed in non-suicide resistant cells. At this site visit, all inmates on suicide watch were being housed in TMH. The installation of wire mesh screen on 2A was an improvement in preventing jumping from inmates. Ensure the cells being used for suicide watch in IPC are suicide resistant.

Suggestion:

Continue direct observation of individuals who are housed in non-suicide resistant cells while on suicide watch to best provide for their safety. Continue suicide watch at TMH.

**B.5.h. Ensure that every suicide or serious suicide attempt is investigated by appropriate mental health and correctional staff, and that the results of the investigation are provided to the Sheriff, and the Monitor.**

Finding:

Partial Compliance

Wexford is working on establishing what constitutes a true morbidity and mortality (M&M) case. During this site visit, Wexford, the Monitor and OPSO spoke about what constitutes an M&M case and there seems to be a better understanding of expectations from the Monitor. There continues to be confusion regarding what material can be shared with the Monitors when discussing M&M cases. There is concern that federal law prohibits disclosure of patient safety work product. The Monitor is unsure whether there continues to be information that is not shared during the M&M. The plan is to present M&M cases quarterly and the Monitors will provide feedback to the team regarding the presentation and whether appropriate cases have been captured. It is recommended that all completed suicides have a psychological autopsy completed by a psychologist which would help enhance the understanding and factors in the suicide.

Suggestion:

There needs to be intentional collaboration and systemic changes produced from investigations by OPSO and the mental health provider concerning suicides and serious suicide attempts at the facility. Wexford and OPSO may need to come up with criteria which will be used to classify an event as a suicide or suicide attempt. If either Wexford or OPSO identify an event as a self-harm episode, it needs to be investigated, and the



COLLABORATIVE results of the investigation given to the Sheriff and the Monitor. To reiterate, there is no expectation that there will never be a suicide or suicide attempt in the correctional facility, but when they occur, they require more intentional and self-critical analysis of the event by both OPSO and the mental health provider (Wexford). Psychological autopsies should help in identifying systemic deficits which will help inform systemic changes throughout the system. Simply discussing these events at a meeting is not sufficient without real analysis and productive change being the product, including enforcing current policies like alerting mental health to help with de-escalation. Provide a COLLABORATIVE self-critical analysis to the Sheriff and Monitor which demonstrates a thorough understanding and investigation of these critical events.

***B.5.i. Direct observation orders for inmates placed on suicide watch shall be individualized by the ordering clinician based upon the clinical needs of each inmate and shall not be more restrictive than is deemed necessary by the ordering clinician to ensure the safety and well-being of the inmate.***

Finding:

Partial Compliance

The lack of staff at OJC continues to limit the ability of staff to provide direct observation for inmates. There continue to be observations from adjacent modules.

Suggestion:

The Monitor continues to recommend that inmates in IPC or anywhere in OJC, now that watches have moved to TMH, who are placed on suicide watch and have yet to be assessed by an QMHP, should be on direct observation. If the QMHP determines that direct observation is necessary, there needs to be documentation to support this. Continue to submit suicide watch audits with the location of the watch embedded in the report. Include random direct observation documentation in the folder along with orders for restriction which includes clinical rationale. Include direct observation watchlist sheets in the Sharepoint folder. These sheets should be discussed at the next site visit to demonstrate the individualized nature of each. It is Wexford's responsibility to demonstrate substantial compliance and is encouraged to document the provisions which Wexford respectfully disagrees with the finding and have documented and verified proof for the following site visit.

***B.5.j. Provide the Monitor with periodic report on suicide and self-harm at the Facility. These periodic***



*reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. The report will include the following:*
*1) all suicides;*
*2) all serious suicide or self-harm attempts; and*
*3) all uses of restraints to respond to or prevent a suicide attempt.*

Finding:

Substantial Compliance

Suggestion:

The report for the first six months of 2025 was provided to the Monitor. The Monitor suggests OPSO and Wexford discuss all cases to ensure both parties are in agreement as to what is a suicide, what is a serious suicide or self-harm attempt, and the use of restraints to prevent a suicide attempt. If OPSO classifies an event as a suicide attempt or self-harm event and Wexford disagrees, it should be included in this report and the rationale as to why the differing of opinion should be present.

*B.5.k. Assess the periodic report to determine whether prisoners are being appropriately identified for risk of self-harm, protected, and treated. Based on this assessment, OPSO shall document recommended changes to policies and procedures and provide these to the Monitor.*

Finding:

Partial Compliance

　　　　The report for January 2025-June 2025 was available for the Monitor to review at the site visit in July 2025.  While the report was completed in a timely manner, there remain challenges in OPSO documenting changes to policies and procedures based on analysis of risk at the facility. There remain issues with adequate searches of inmates having access to contraband with no changes being offered to rectify the problem. The report needs to address the CAPs which may need to be put in place to better identify and rectify the gaps in the current procedures.

Suggestion:

Provide updated procedures to the Monitor to address outstanding issues with implementation of ensuring risk challenges are adequately addressed. This provision will also require adequate treatment plan creation, as this would address risk of self-harm and the protective measures in place, to ensure all individuals who engage with the inmate are adequately knowledgeable about the needs of the patient. Simply having training on these issues is not adequate if implementation is not routinely occurring.



Findings:

B.6.a.   Partial Compliance

B.6.b.   Partial Compliance

B.6.c.   Partial Compliance

B.6.d.   Substantial Compliance

B.6.e.   Substantial Compliance

B.6.f.   Partial Compliance

B.6.g.   Partial Compliance

***B.6.a. OPSO shall prevent the unnecessary or excessive use of physical or chemical restraints on prisoners with mental illness.***

Finding:

Partial Compliance

While improvements in communication between OPSO and Wexford is happening surrounding UOF events, there continues to be a need for consistent and proactively contacting of mental health prior to the use of force or needing to implement de-escalation in the Facility. With access to incident reports since May 2025, Wexford has had more information regarding incidents in the facility and are better equipped to address situations within 24 hours. There needs to be more reliance on contacting mental health before a UOF event so strategies can be put in place to prevent the unnecessary use of physical or chemical restraints on an inmate. There continue to be less than 50% de-escalation used for UOF events at OJC. A sample of 21 UOF events between March and May 2025 – 9 out of 21 used de-escalation (43%). The use of a taser or chemical spray to, even momentarily, subdue an inmate is considered a form of restraint. Having access to the incident reports does not negate the need for better communication and seeking assistance from mental health prior to the use of restraints on an inmate by OPSO.

Suggestion:

Provide documentation of policies in use for planned de-escalation and use of force. Provide documentation to support consistent implementation of the policy and procedures in place to ensure mental health is contacted prior to the use of force, when reasonably safe. OPSO needs to generate a report for the Monitor documenting all uses of physical and chemical restraints throughout the Facility along with attempts to contact



mental health and whether the restraint was planned. Create and submit to the Monitor documentation to determine how many instances of use-of-force incidents occurred over the year prior to the next site visit where mental health was not contacted prior to exercising the use-of-force.

***B.6.b. Maintain comprehensive policies and procedures for the use of restraints for prisoners with mental illness consistent with the Constitution.***

Finding:

Partial Compliance

There were two incidents of restraint use during the period in review. There was no updated/new policy or procedure presented to the Monitor for restraint use in the facility prior to these two incidents. After the monitoring period, the policy and procedure for restraint use was agreed upon by the Lead Monitor, DOJ and counsel for the Plaintiffs. As it did not occur before the incidents, this provision was downgraded to partial compliance. Ensure there are policies and procedures in place to ensure their use is consistent with the Constitution

***B.6.c. Ensure that approval by a Qualified Medical or Mental Health Professional is received and documented prior to the use of restraints on prisoners living with mental illness or requiring suicide precautions.***

Finding:

Partial Compliance

This was NOT DONE for the use of restraints in November and December 2024.

***B.6.d. Ensure that restrained prisoners with mental illness are monitored at least every 15 minutes by Custody Staff to assess their physical condition.***

Finding:

Substantial Compliance

Please see comments for B.6.a. and B.6.b.

***B.6.e. Ensure that Qualified Medical or Mental Health Staff document the use of restraints, including the basis for and duration of the use of restraints and the performance and results of welfare checks on restrained prisoners.***

Finding:

Partial Compliance

This was NOT DONE for the restraints used in November and December 2024.



***B.6.f. Provide the Monitor a periodic report of restraint use at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. Each report shall include:***

***1)    A list of prisoners whom were restrained;***
***2)    A list of any self-injurious behavior observed or discovered while restrained; and***
***3)    A list of any prisoners whom were placed in restraints on three or more occasions in a thirty (30) day period or whom were kept in restraints for a period exceeding twenty-four (24) hours.***

<u>Finding:</u>

Partial Compliance

The report for January – June 2025 was available for the Monitor at the site visit in July 2025. The report for November and December 2024 (evaluated during this site visit) did not include a report on the use of the restraint chair at OJC.

Suggestion: Continue to provide the periodic report on time and include any restraint chair use.

***B.6.g. Assess the periodic report to determine whether restraints are being used appropriately on prisoners with mental illness. Based on this assessment, OPSO shall document recommended changes to policies and procedures and provide these to the Monitor.***
<u>Finding:</u>

Partial Compliance

See comments from B.6.f.

***B.7.a. OPSO shall ensure that all staff who supervise prisoners have the knowledge, skills, and abilities to identify and respond to detoxifying prisoners. Within 180 days of the Effective Date, OPSO shall institute an annual in-service detoxification training program for Qualified Medical and Mental Health Staff and for correctional staff. The detoxification training program shall include:***

***1) annual staff training on alcohol and drug abuse withdrawal.***
***2) training of Qualified Medical and Mental Health Staff on treatment of alcohol and drug abuse conducted by the Chief Medical Officer or his or her delegate.***
***3) oversight of the training of correctional staff, including booking and housing unit officers, on the policies and procedures of the detoxification unit, by the Chief Medical Officer or his or her delegate.***
***4) training on drug and alcohol withdrawal by Qualified Medical and Mental Health Staff.***
***5) training of Qualified Medical and Mental Health Staff in providing prisoners with timely access to a Qualified Mental Health Professional, including psychiatrists, as clinically appropriate; and***
***6) training of Qualified Medical and Mental Health Staff on the use and treatment of withdrawals, where medically appropriate.***

<u>Findings:</u>

B.7.a.   Partial Compliance

B.7.b.   Partial Compliance

B.7.c.   Partial Compliance

B.7.d.   Partial Compliance



Finding:

B. 7. a. Partial Compliance

There continues to be insufficient documentation of completion of training for custody and medical staff. The provided documentation showed some individuals did not show up for training. There is no documentation demonstrating that these individuals were subsequently trained. The Monitors have sent an analysis of the training logs to the leadership and ask that this be remedied for the next reporting period. This Consent Judgment has been in place since 2013. Over the past 12 years, the standards for the treatment of detoxification from opioids has changed. Wexford's Addiction Medicine Guidelines, Section E. IV. Opioid Withdrawal has a discussion of the use of buprenorphine and a suggested dosing schedule for consideration. Section E.VI. states that "symptomatic treatment for opioid withdrawal should be considered, however, are infrequently needed when using a buprenorphine transition/taper approach." The NCCHC Position Statement 2021, "Opioid Use Disorder Treatment in Correctional Settings," has a robust discussion of the importance of providing medications to treat opioid use disorder. The 2023 "Guidelines for Managing Substance Withdrawal in Jails, A Tool for Local Government Officials, Jail administrators, Correctional Officers, and Health care Professionals," is an excellent resource for the standards of care for treatment of withdrawal in jails.

***B.7.b. Provide medical screenings to determine the degree of risk for potentially life-threatening withdrawal from alcohol, benzodiazepines, and other substances, in accordance with Appendix B.***

Finding:

Partial Compliance

To obtain an accurate medical history to determine the risk of withdrawal, intake screening should be performed with auditory privacy. At this time, intake medical screening takes place with other inmates able to overhear private medical and mental health information. According to Wexford policy, intake screening should take place within eight hours of the arrival of the inmate at the jail. The Wexford Annual Report addresses reasons for not meeting the 8-hour timeframe. Staff shortages are listed first. Intoxicated patients are listed second. Intoxication should not be the basis for delaying screening. Intoxication must be diagnosed and not assumed. Many serious medical illnesses mimic intoxication. Combative patients are listed as another reason for a delay



to intake screening The Wexford Standard Operating Procedure states that patients not fit for confinement, such as those with altered mental status, are not to be allowed into the facility and should be sent to the hospital for medical clearance. The deterioration of inmates without timely intake screening can be catastrophic. The intake screening tracking continuing quality study of May 2025 reviewed the intake screening for twenty-two patients. Intake screening for these patients did not occur within eight hours. In nine of the twenty patients, intake medical screening was postponed due to delays with booking.

***B.7.c. Ensure that the nursing staff complete assessments of prisoners in detoxification on an individualized schedule, ordered by a Qualified Medical or Mental Health Professional, as clinically appropriate, to include observations and vital signs, including blood pressure.***
Finding:

Partial Compliance

The Wexford Standard Operating Procedure for detoxification was revised July 2024. Importantly, it states that any patient under the influence of drugs and /or alcohol displaying signs and/or symptoms of altered mental status, are unable to stand without assistance and / or display any signs or symptoms of intoxication should not be accepted into the facility. The patient should be referred to the hospital for further evaluation before being admitted into the facility.

There should be a provider assigned to the detoxification patients. The Monitor does not find that patients on the detoxification protocol are assessed timely by a mental health professional.

***B.7.d. Annually, conduct a review of whether the detoxification training program has been effective in identifying concerns regarding policy, training, or the proper identification of and response to detoxifying prisoners. OPSO will document this review and provide its conclusions to the Monitor.***
Finding:

Partial Compliance

During the recent site visit, a deputy directed my attention to a woman who was vomiting from opioid withdrawal. The patient had a big clear trash bag with vomit in it. The patient was in a dormitory setting. This compassionate deputy was clearly concerned. This patient was on the opioid withdrawal monitoring COWS(Clinical Opioid Withdrawal Scale) protocol. Although she was given medicine to stop vomiting, it was insufficient. There are too few patients receiving the nationally recognized medications for opiate withdrawal; buprenorphine or methadone. The "Guidelines for Managing Substance Withdrawal in Jails"



was published in June 2023, due to the urgent need for appropriate management of substance withdrawal. Both the Bureau of Justice Assistance (BJA) and the National Institute of Corrections (NIC) collaborated with others to develop the guidelines in this document. The document is endorsed by the American Correctional Society (ACA), American Jail Association (AJA), American Society of Addiction Medicine (ASAM), Major County Sheriffs of America (MCSA) and the National Commission on Correctional Health Care and others. This document states that death and suffering due to withdrawal from opioid, alcohol and other substances are preventable. Suicide is the leading single cause of death in jails, and the risk is increased among individuals in substance withdrawal and those with substance use disorder. Long term pharmacotherapy minimizes the risk of opioid overdose death. The program is nascent in the Orleans Parish jail system. In November 2024, 723 people were taken into the jail, 696 of these were screened for opioid use disorder. Of the screened patients, seventy-one were referred to the medication assisted treatment (MAT) program. Of these 71, 10 patients were continuations of community prescribed medication to treat opioid use disorder (OUD) and 10 were inductions, of which 9 were induced with buprenorphine. In patients with opioid use disorder, treatment with buprenorphine reduces post release recidivism and death from overdose. During the first two weeks after release, the relative risk of death from overdose is 12 times greater, highlighting the importance of treatment in saving lives.

Patients with a history of alcohol use disorder are mostly started on the treatment (benzodiazepine) within 4 hours of entering the jail. There are few exceptions, but these are reviewed and reported.

The 2024 annual report authored by Wexford health addresses receiving screening. The focus is on mental health needs during screening. There is no privacy in the intake screening area and patients cannot be expected to divulge their mental health problems with other inmates able to overhear.

B. 8. a.  Partial Compliance

B. 8. b. Partial Compliance

***B. 8. a. OPSO shall ensure that medical and mental health staffing is sufficient to provide adequate care for prisoners' serious medical and mental health needs, fulfill constitutional mandates and the terms of this Agreement, and allow for the adequate operation of the Facility, consistent with constitutional mandates.***

<u>Findings:</u>

Partial Compliance



There continue to be challenges in securing and retaining adequate numbers of staff, including medical and mental health staff, to provide adequate care for inmates' serious medical and mental health needs. There continue to be disruption of service forms completed for missed group sessions. There are inadequate searches and securing of at-risk individuals. The lack of direct documented observation of prisoners who are at-risk, especially prior to the assessment by a QMHP, persists.

Suggestion:

There needs to be adequate funding set aside to hire staff and ensure there is adequate, constitutionally mandated treatment throughout the entire facility, including facilitating consistent groups. The mental health provider needs to ensure an adequate request for necessary staff to conduct all required services throughout OJC/TMH/TDC. An independent staffing analysis is needed to determine the number of staff needed to meet expectations, especially as Phase III comes online. As stated earlier in this report, who conducts the analysis is the responsibility of those in New Orleans and will assist in ensuring all parties are moving in the right direction, especially once Phase III is operational.  Once this analysis is completed, the contractor and OPSO will know how many qualified staff are needed to complete much needed treatment planning throughout the facility. This includes having adequate staff to conduct safety/suicide watches, especially while non-suicide resistant cells are still in use.  Ensure the MAT program is properly staffed for the number of patients being served and adequate staff are available for group programming. Plant facility limitations does not supersede the constitutional rights of the patients.

***B.8.b. Within 90 days of the Effective Date, OPSO shall conduct a comprehensive staffing plan and/or analysis to determine the medical and mental health staffing levels necessary to provide adequate care for prisoners' mental health needs and carry out the requirements of this Agreement. Upon completion of the staffing plan and/or analysis, OPSO shall provide its findings to the Monitor, SPLC, and DOJ for review. The Monitor, SPLC, and DOJ will have 60 days to raise any objections and recommend revisions to the staffing plan.***

Finding:

Partial Compliance

For this provision to be upgraded to substantial compliance, the current Monitor is requesting to see a current comprehensive staffing plan based on present day expectations and current census. Looking at the contract and/or RFP is not sufficient. The Monitor needs to know what OPSO and Wexford thinks is sufficient staff to operate OJC



with the current understanding of what is expected for substantial compliance. The population has changed; Phase III is coming online so the Monitor needs to see documentation of a comprehensive staffing plan.

Findings:

B.9.a.   Partial Compliance

B.9.b.   Partial Compliance

B.9.c.   Partial Compliance

B.9.d.   Partial Compliance

B.9.e.   Partial Compliance

B.9.f.   Non-Compliance

***B.9.a. OPSO shall develop, implement, and maintain a system to ensure that trends and incidents involving avoidable suicides and self-injurious behavior are identified and corrected in a timely manner. Within 90 days of the Effective Date, OPSO shall develop and implement a risk management system that identifies levels of risk for suicide and self-injurious behavior and requires intervention at the individual and system levels to prevent or minimize harm to prisoners, based on the triggers and thresholds set forth in Appendix B.***

Finding:

Partial Compliance

There continues to be use of non-suicide resistant cells at OJC for inmates at high risk of self-harm without proper direct observation in place. There continues to be deviation from the policy when the document prescribed for suicide watch is not utilized. There has been no documented collaboration to implement and maintain a system to ensure trends and incidents involving avoidable suicides and self-injurious behavior are identified and corrected in a timely manner. Identification of contraband is not immediately addressed which increases the risk of self-harm in the facility. Inadequate searches of inmates present risk factors which increases the risk of self-harm.

Suggestion:

Analyze the trends and incidents involving avoidable suicides and self-injurious behaviors to determine required interventions, like CAPs for adequate searches and removal of contraband, at the individual and system levels to prevent or minimize harm to inmates, especially inmates with repeated suicidal or self-harming behaviors. Ensure that any inmate who is not in a suicide resistant cell, especially in IPC, is under Direct Observation and that Observation Worksheets are accurately completed. Document and demonstrate the collaborative efforts between OPSO and Wexford to maintain a safe



system.

***B.9.b. The risk management system shall include the following processes to supplement the mental health screening and assessment processes: incident reporting, data collection, and data aggregation to capture sufficient information to formulate a reliable risk assessment at the individual and system levels; identification of at-risk prisoners in need of clinical treatment or assessment by the Interdisciplinary Team or the Mental Health Committee; and development and implementation of interventions that minimize and prevent harm in response to identified patterns and trends.***

Finding:

Partial Compliance

Without collaboration between OPSO and Wexford, there can be no adequate risk management system in place for the facility. Both parties are necessary to submit and capture data which is analyzed in order to formulate a risk assessment to minimize harm. There need to be meetings in place where both sides bring data, and information to collaborate and create a risk management system. The MDT is a good start to addressing comprehensive risk needs and hopefully this will expand to the general population where treatment plans and follow plans will direct service and capture risks to be addressed. Further analysis is needed to ensure processes are in place to address individual and systemic risk levels, especially surrounding risks involved with segregation.

Suggestion:

Analyze and provide COLLABORATIVE documentation of risk management system processes, including listed criteria, which minimize and prevent harm in response to identified patterns and trends. This examination should include the need for functioning interdisciplinary treatment teams throughout the Facility who are focused on treatment strategies to minimize risk including adequate out-of-cell time and participation in the disciplinary process at the outset where a written recommendation can be completed and used to determine appropriate action. All parties have a part to play in decreasing risks and there should be intentional efforts to ensure that collaboration is happening and not just having one side sharing information at a monthly meeting. The newly created CAP should assist with improving the continued deficiencies with this provision reaching substantial compliance.

***B.9.c. OPSO shall develop and implement an Interdisciplinary Team, which utilizes intake screening, health assessment, and triggering event information for formulating treatment plans. The Interdisciplinary Team shall:***



*1. include the Medical and Nursing directors, one or more members of the psychiatry staff, counseling staff, social services staff, and security staff, and other members as clinical circumstances dictate;*

*2. conduct interdisciplinary treatment rounds, on a weekly basis, during which targeted patients are reviewed based upon screening and assessment factors, as well as triggering events; and*

*3. provide individualized treatment plans based, in part, on screening and assessment factors, to all mental health patients seen by various providers.*

Finding:

Partial Compliance

The creation of the MDT which currently operates on 2A and 2B is a good start to having multidisciplinary teams operating in person at OJC. While they are not yet creating dynamic treatment plans or have a follow up schedule in place, the team is meeting with patients and beginning to target the comprehensive needs of the inmate. It continues to be the expectation that all inmates on the behavioral health caseload have a multidisciplinary treatment plan with a clinically appropriate follow-up schedule. The vast majority of treatment plans are still not updated in a timely manner, if done at all.

Suggestion:

Continue to generate and complete treatment plans in TMH. Create a plan/template for how treatment plans will be conducted and completed, including time frame, with a multidisciplinary team in all areas outside of TMH. Continue to work on the staffing plans and staffing needs, preferably with an independent staffing analysis, in order to have multidisciplinary treatment team meetings throughout the facility. Follow the prescribed policy and include all that is necessary for a completed treatment plan.

*B.9.d. OPSO shall develop and implement a Mental Health Review Committee that will, on a monthly basis, review mental health statistics including, but not limited to, risk management triggers and trends at both the individual and system levels. The Mental Health Review Committee shall:*

*1. include Medical and Nursing Director, one or more members of the psychiatry staff and social services staff, the Health Services Administrator, the Warden of the Facility housing the Acute Psychiatric Unit, and the Risk Manage;*

*2. identify at-risk patients in need of mental health case management who may require intervention from and referral to the Interdisciplinary Team, the OPSO administration, or other providers;*

*3. conduct department-wide analyses and validation of both the mental health and self-harm screening and assessment processes and tools, review the quality of screenings and assessments and the timeliness and appropriateness of care provided, and make recommendations on changes and corrective actions;*

*4. analyze individual and aggregate mental health data and identify trends and triggers that indicate risk of harm;*

*5. review data on mental health appointments, including the number of appointments and wait times before care is received;*

*6. review policies, training, and staffing and recommend changes, supplemental training, or corrective actions.*



Finding:

Partial Compliance

Until there is a functioning Interdisciplinary Treatment Team assigned to OJC, there will be limitations in being able to adequately address at-risk patients in need of mental health case management who may need a referral from the Mental Health Review Committee. Until there is timely follow up for treatment plans, based on the clinical schedule, limitations will continue in adequately addressing treatment needs. There are ongoing efforts to establish interdisciplinary teams to conduct reliable risk assessments. OPSO and Wexford are meeting on a more consistent basis which should help with collaboration in this area and help move towards substantial compliance.

Suggestion:

Continue to expand and utilize the Interdisciplinary Treatment Team for all of OJC. Ensure treatment plans are done as per policy throughout the entire facility including 2A/2B/3E. TDC also has individuals in need of mental health treatment and should have treatment plans directing their care. Provide documentation of Mental Health Review Committee meetings, where COLLABORATION is taking place in both organizing and documenting findings, addressing all listed elements, including analysis of all data collected. This data should address and track systemic concerns as well.

***B.9.e. OPSO shall develop and implement a Quality Improvement and Morbidity and Mortality Review Committee that will review, on at least a quarterly basis, risk management triggers and trends and quality improvement reports in order to improve care on a Jail-wide basis.***
***1.The Quality Improvement Committee shall include the Medical Director, the Director of Psychiatry, the Chief Deputy, the Risk Manager, and the Director of Training.***
***2.The Quality Improvement Committee shall review and analyze activities and conclusions of the Mental Health Review Committee and pursue Jail-wide corrective actions. The Quality Improvement Committee shall:***
***a. monitor all risk management activities of the facilities through the review of risk data, identification of investigation or corrective action; and***
***b. generate reports of risk data analyzed and corrective actions taken.***

Finding:

Partial Compliance

This provision again requires collaboration between OPSO and Wexford to achieve substantial compliance. There needs to be the implementation of a quality improvement process where risk management triggers and trends are reviewed throughout the entire system and both parties work together to improve care at the facility. The Monitor is looking for OPSO input into joint meetings and a work product that shows how both parties



are working together to establish a safer facility. Wexford, OPSO, and the Monitor continue to work on what constitutes an M&M and will address cases on a quarterly basis.

Suggestion:

Jail-wide corrective actions plans have been created, and the hope is they will foster collaborative efforts between OPSO and Wexford for all risk management activities to be properly monitored. COLLABORATION is a key component of this provision as it focuses on jail-wide CAPs. Provide documentation to support the implementation of collaborative corrective action plans for areas which have been identified for improvement like alerting mental health to planned use of force, access to care challenges, medication refusal, timely access to laboratory services after inmate refusal, the grievance process and chronic medical care access. Provide documentation of attendance and addressed topics for the quarterly meetings along with proposed action items which will be pursued on a COLLABORATIVE basis. Demonstrate how collected and analyzed data is being used to effect positive change throughout the system.

***B.9.f. OPSO shall review mortality and morbidity reports quarterly to determine whether the risk management system is ensuring compliance with the terms of this Agreement. OSPO shall make recommendations regarding the risk management system or other necessary changes in policy based on this review. The review and recommendations will be documented and provided to the Monitor.***

Finding:

Non-Compliance

The most recent M&M presentations were lacking in substance and information prior to the most recent site visit. They were disorganized and the facilitator was unable to answer questions about the case. It was basically a superficial chart review of the patient. After the latest site visit, OPSO understands the role they play in moving this provision into compliance. It is not enough for an M&M presentation or quarterly report, there must be an OPSO review with Wexford to determine whether the risk management system is ensuring compliance with the terms of this agreement, Recommendations must be made by OPSO, or documentation that no recommendations warranted, regarding the risk management system! The review and recommendation should be uploaded in the folder corresponding to this provision and available for the Monitor at each site visit.

Suggestion:

Provide OPSO with recommendations regarding the risk management system. This



recommendation should be reviewed by Wexford and there should be a collaborative effort in correcting identified areas of concern. Submit all the information to demonstrate changes which have been made to address identified risk management issues throughout the jail facility. Provide the most recent report from OPSO to determine whether there is compliance with the terms of this Agreement. Provide corrective actions plans which have been created and implemented over the year along with the effectiveness of the proposed changes. If there are gaps or effectiveness is determined to be minimal, submit updated CAPs to address this.

A proper M&M should include the following:

1) It should be comprehensive and involve providers, nurses, social workers, pharmacists and administrators who all contribute to the care of the patient
2) It should be presented in a structured format utilizing a standardized template
    a. The template should include a CLEAR timeline, psychiatric history, medical history, and diagnostic and treatment history
3) Consider presenting deaths, injuries, unexpected complications, near-misses, and ethical/legal issues which the team is trying to address
4) There should be a Root Cause Analysis (RCA) which includes all underlying reasons for the outcome
5) Most mental health patients have co-morbid medical conditions so this needs to be explored in an M&M
6) Actionable recommendations with assignment of which individual is responsible for which tasks
7) The written summary with recommendations should be shared with all stakeholders who are involved in the care and treatment of the individual

## C.    Medical Care

### Overview:

The Monitors visited the jail from July 28-July 31, 2025. Dr Pracha Peter Eamranond is the National Medical Director and Chief Medical Officer of Wexford Health Sources. This was the first time he was present on this site visit as it is a new position. He does not work directly at the jail.

To be compliant with the Consent Judgment *"OPSO shall prevent unnecessary risk*



COMPLIANCE REPORT # 22                                            149

*to prisoners."* Below are descriptions of systemic problems with medical care and case examples of how these systemic problems adversely affect patient care.

1. One practice that leaves the patients at unnecessary risk is having no provider present in the facility after 5:00 p.m. and on the weekends. Out of 168 hours in the week, 88 hours have no provider in the jail and there is no telemedicine for providers to assess patients. Providers can receive 40-60 calls overnight and on weekend days. These numbers are provided to the monitors by leadership and have not been disputed. If there is disagreement, every call should be listed so the numbers of calls are substantiated. The number of calls argue for the need for extended hours that a provider in present in the jail. Nurses call the provider on the phone. Importantly the nurses may be licensed practical nurses or registered nurses. Many calls come from the intake screening nurses. These nurses are LVN or LPN, not registered nurses. There is no registered nurse in IPC at night. Phone calls do not substitute for face-to-face assessments in person or by telemedicine. Some emergencies are missed because there are so many calls and nurses making the calls may not transmit the patients' physical findings and important medical history.

2. A second problem is the inadequacy of the electronic medical record. The electronic health record is so cumbersome as to impede the ability of health care personnel to ascertain a coherent narrative of the patients' conditions and treatments.  The electronic health record does not flag laboratory tests as complete, and it does not flag abnormal results. The quagmire of the medical record and the number of calls to providers results in providers not checking the electronic health record. (EHR) CorEMR is the specific brand and product name for the electronic medical records software system for correctional facilities in use by Wexford. CorEMR can offer integration to meet the needs of jails of different sizes.  CorEMR should be improved to meet the needs of the jail. Improvements to the electronic health record, including alerts on laboratory results, should be integrated into the system. The University Medical Center (UMC) uses a powerful Electronic Health Record Called EPIC. All providers at the jail can access EPIC. EPIC notes are scanned into the Core EMR jail system and summarized upon



return of patients from UMC. Ideally the two systems would be integrated.

3. A third practice that results in harm is that laboratory values are not reviewed timely. Patients' symptoms were misdiagnosed because no one checked the results of laboratory tests causing serious delays in care. The CQI study of 15 medical records of October 16, 2024, demonstrated that clinicians documented acknowledgment of laboratory results 26% time. This resulted in serious harm to patients. Patients were informed of results 20% of the time.

4. A fourth practice that leaves patients at unnecessary risk of harm is the continued high rate of medication variances.  A medication variance is said to be present if the medication is not administered according to the five rights: right patient, right drug, right time, right dose, and the right route. For example, evening medications to be given at 8:00 p.m. are administered more than two hours late routinely. The Monitors would be challenged to find a patient without significant variances regarding timely administration of medications. This is particularly important with respect to insulin. One patient timely received insulin only 21% of the time. The Monitor observed buprenorphine administered to three patients. The nurse put the three little dixie cups out in a row to correspond to the order of the three patients in front of her on chairs. None of the patients were wearing their identification bands. They were asked for their names and booking numbers. However, the nurse began to hand one patient the dose of buprenorphine meant for another patient. As the patients watch this process carefully, the mistake was caught by the patient. Medications are not renewed timely. The nurse dispensing medications, a process known as "med pass", may see the prescription needs renewal. The nurse sees this because the expiring medication is highlighted in yellow in the medication administration record (MAR). However, the nurse either does not inform the pharmacy, or the pharmacy takes no action.

5. A fifth practice is the lack of timeliness of health assessments. The Wexford Annual Report 2024 is a report that encompasses the October 2024 to December 2024



portion of the reporting period. This report addresses the timeliness of health assessments. Health assessments should be completed within 14 days of admission to the jail. The average the wait time for a Health assessment at OJC is 21.8 days. During October 2024, only 22% of health assessments were completed within 14 days; November only 45% and December only 54% completed timely. All of the below cases were discussed with medical leadership to ensure there were no errors in representation of the cases.

Case Examples

All the below cases were discussed with medical leadership to ensure there were no errors or disagreements in the representation of the cases.

**Case one:**

Laboratory testing results:

This patient had a kidney transplant and was on medicine to suppress his immune system; the usual treatment for a transplant patient. Such patients are vulnerable to infection. On Sunday evening, April 20, 2025, the patient submitted a sick call request complaining of stomach pain, sweats and really bad migraines. The next day, Monday, April 21, 2025, at 4:59 p.m., a provider was contacted by phone.  She ordered Tylenol for 10 days but did not assess the patient or review the urine result from April 19, 2025.  Had she reviewed the lab result, she would have seen the urine had many bacteria and was cloudy. Two weeks later, on May 5, 2025, the patient was evaluated by a registered nurse. That night, the registered nurse called a provider and received verbal orders by phone for laboratory testing of the urine.  The patient submitted another sick call request on May 7, 2025. He complained of blood in the urine, and he suggested that maybe he had a urinary tract infection (UTI).   A week later on May 14, 2025, the patient was assessed by a provider and sent to the emergency department. In the emergency department a CT scan demonstrated the transplanted kidney was infected.  In summary, an immunocompromised patient with a precious transplanted kidney had chills and abnormal labs and was not assessed by a provider from April 20, 2025, to May 14, 2025.

**Case 2**

Laboratory testing results

This 64-year-old man presented to the jail on February 12, 2025. He had a known



history of mental illness, heart problems and diabetes. On February 23, 2025, he had laboratory testing. The results were available on February 26, 2025. They demonstrated severe liver abnormalities. These results suggested an emergency condition for which the patient should have been sent to the emergency department. The results were not reviewed. The patient had multiple refusals of his medications and planned visits for health care assessments.  On March 11th, 2025, the patient submitted a sick call request for "hurting everywhere, it hurts to eat and don't have the strength to eat, hardly eating, not every time but most of the time." The LPN did not date or time the response but wrote "Task created."  It took six days for the task to take place. On March 17, 2025, six days after the sick call request and 19 days after the laboratory results were available for review, a provider reviewed the laboratory results and assessed the patient. The patient was sent to the emergency department. On arrival at the emergency department, the patient was admitted to the intensive care unit with life threatening conditions.

## Case 3

This patient was booked into the jail on December 24, 2024. He had a history of a deep vein blood clot to the leg in the past. On January 26, 2025, an ultrasound of the leg was ordered. The ultrasound never happened. The patient complained of pain in his left leg, the same leg that had the previous blood clot.  He submitted sick call requests for pain in his leg on January 27, 2025, and Feb 15, 2025. The LPN called the provider at 5:16 p.m. on Sunday February 16, 2025. The LPN was instructed to administer acetaminophen and to send an email regarding the ultrasound that had not yet been performed. This patient complained of leg pain and never had a provider assessment from January 27, 2025, to February 15, 2025.  When the patient was sent to the emergency department, he was found to have blood clots in the left leg. These clots traveled to both lungs. The blood clots in the lungs were a serious complication of an unrecognized leg blood clot.  During review with medical leadership, it was revealed that the nurse reporting to the provider did not recognize critical physical findings and did not report them to the provider. This is another reason that providers must be present in the jail to assess patients.

## Case 4

This patient had blood laboratory tests collected on April 25, 2025. The results were reported on April 26, 2025, at 11:10 a.m. The nurse was called to the dormitory for



a patient not feeling well. The patient was weak in his legs. The nurse did not check the laboratory results.  Had she done so, she would have seen the patient was in profound kidney failure. The nurse attributed the patient's symptoms to the medications to treat his hypertension. She telephoned the provider. It was a Saturday. The provider ordered that the patient stay hydrated and continue with the medication regiment and to check the blood pressure before medications and to change positions slowly. The results of the laboratory analysis demonstrated the patient was in profound kidney failure with life threatening electrolyte abnormalities. The patient was in critical condition when he eventually went to the emergency department.

**Case 5**

This patient was sent to the emergency department on Sunday June 8, 2025. The Monitor researched the electronic health record for documents in the two weeks before the transfer to the emergency department. However, documents are dated according to when they are entered into the electronic health record not the date the document was created. For example, in searching the medical record for events around the time of June 8, 2025, the review of over 100 records dated from May to August 2025, in the "Documents" folder, revealed that on only 5 of these records did the date entered into the electronic health record correspond with the date the document was created. The documents should be dated according to when they were created to allow a coherent narrative of care.

This patient was evaluated by the neurology service for seizures on February 22, 2025. There is no reference in the jail electronic health record referring to the neurologist's recommendation to increase the dose of anticonvulsant.  The document containing the neurologist recommendations was added to the medical record on July 23, 2025, four months after the neurologist did the consultation and made the recommendations.

**Case 6**

This man arrived in the jail on March 17, 2025. Laboratory tests were collected on March 21, 2025. The results were reported on March 23, 2025. The results of the laboratory tests were not reviewed. The patient was in kidney failure, a medical emergency. On March 24, 2025, the patient submitted a sick call request complaining of



symptoms. He was sent to the emergency department.  The sick call from March 23, 2025, is entered into the electronic health record under the date May 7, 2025. This is another example of poor care due to lack of review of laboratory results. The care is difficult to review when documents are dated according to the date the clerical staff had a chance to enter them into the medical record.

*C. OPSO shall ensure constitutionally adequate treatment of prisoners' medical needs. OPSO shall prevent unnecessary risks to prisoners and ensure proper medication administration practices. OPSO shall assess on an annual or more frequent basis whether the medical services at OPP comply with the Constitution. At a minimum, OPSO shall:*
*1. Quality Managing of Medication Administration:*
　*a. Within 120 days of the Effective Date, ensure that medical and mental health staff are trained on proper medication administration practices, including appropriately labeling containers and contemporaneously recording medication administration.*
　*b. Ensure that physicians provide a systematic review of the use of medication to ensure that each prisoner's prescribed regimen continues to be appropriate and effective for his or her condition.*
　*c. Maintain medication administration protocols that provide adequate direction on how to take medications, describe the names of the medications, how frequently to take medications, and identify how prisoners taking such medications are monitored; and*
　*d. Maintain medication administration protocols that prevent misuse, overdose, theft, or violence related to medication.*

C. 1. a. Partial Compliance

C. 1. b. Partial Compliance

C. 1. c. Partial Compliance

C. 1. d. Partial Compliance

C. 1. a.

<u>Finding:</u>

Partial Compliance

Medication variances are common. Until OPSO enforces mouth checks, hoarding and diversion will continue. According to the Self-Assessment document by Wexford, there is a new standard operating procedure (SOP) called the "Medication administration SOP. Mouth checks are to be conducted by the nurse with oversight and enforcement by the deputy assigned to the pod. Having observed Medication Administration, the monitors see that enforcement by the deputy is infrequent.  The supporting documentation is listed and includes many policies and procedures. Some of these are related to training of correctional officers. Training logs are incomplete. The



responsibility of the correctional officer in mouth checks is not universally accepted by custody staff. This has been a repeated observation of the monitors.

C. 1. b.

Finding:

Partial Compliance

There is no documentation in the medical records of systematic review of the use of medication to ensure that each prisoner's prescribed regimen continues to be appropriate and effective for their condition. Going forward this can be documented and monitored in the medical record.

The Wexford self-assessment document argues that this provision should be substantial compliance.  The supportive documentation provided for the "Substantial Compliance" rating is twenty-nine continuous quality improvement (CQI) studies. Many of these documents listed as supportive have nothing to do with the provision. CQI on x-rays, CQI on optometrist, lab and sexually transmitted infections process studies, sick call process outcome and others, are irrelevant. A good continuous quality study would be a selection of records to find a note from the physician addressing the use of medication, and the appropriateness and effectiveness of the regimen.

C. 1. c.

Finding:

Partial compliance

The medication protocols are present but the adherence to the protocols is inconsistent, resulting in medication variances. Documentation in the medical records describe medications as not administered for the following reasons; due to expiration, awaiting delivery, in transit, unavailable and pharmacy holds. Adherence to protocols should prevent lapses in the delivery of prescribed medications to patients.

C. 1. d.

Finding:

Partial Compliance

Hoarding of medication, and diversion of medication are common. In October 2024, one inmate had multiple medications that he had hoarded. These included nine Keppra, eight



Remeron, four Gabapentin. Another inmate had nine and a half Remeron, two Prazosin, another had four Norvasc, another had four Clonidine, others had Abilify, Zoloft and Zyprexa. Another had 30 metformin and eight Losartan.   Observing medication administration on the tiers, custody staff did not consistently perform   mouth checks. The Monitor believes that an effective mouth check policy has one person responsible for the mouth check and that is the deputy.

*C.2.a. Provide the Monitor a periodic report on health care at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. Each report will include:*
> *(1) number of prisoners transferred to the emergency room for medical treatment related to medication errors.*
> *(2) number of prisoners taken to the infirmary for non-emergency treatment related to medication errors.*
> *(3) number of prisoners prescribed psychotropic medications.*
> *(4) number of prisoners prescribed "keep on person" medications; and*
> *(5) occurrences of medication variances.*

*C.2.b. Review the periodic health care delivery reports to determine whether the medication administration protocols and requirements of this Agreement are followed. OPSO shall make recommendations regarding the medication administration process, or other necessary changes in policy, based on this review. The review and recommendations will be documented and provided to the Monitor.*

<u>Findings:</u>

C. 2. a. Partial Compliance

C. 2. b. Partial Compliance

<u>Finding:</u>

C. 2. a. Partial Compliance

It is primarily the catching and reporting of medication variances that causes this section to be partial instead of substantial compliance.  Errors involving the "five rights" of medication administration; the right patient, the right drug, the right dose, the right route, and the right time. The quality improvement team has identified a need for improved documentation of medication variances. However, upon review by the Monitors, these variances are vastly under reported. The most frequent variance is the administration of medications late particularly for the 8:00 p.m. med pass. The variances with respect to time of administration result in more refusals.

<u>Finding:</u>

C. 2. b. Partial Compliance

There are efforts to improve the medication administration including the



procedures and practices to identify the most efficient and safest physical placement of the nurse and the medication cart. There are examples of medication variances in the electronic health records. Medications are described in the electronic health record as not given due to being in transit, unavailable, expired or hoarded.

***3.a. OPSO shall notify Qualified Medical or Mental Health staff regarding the release of prisoners with serious medical and/or mental health needs from OPSO custody, as soon as such information is available.***

***3.b. When Qualified Medical or Mental Health staff are notified of the release of prisoners with serious medical and/or mental health needs from OPSO custody, OPSO shall provide these prisoners with at least a seven-day supply of appropriate prescription medication, unless a different amount is necessary and medically appropriate to serve as a bridge until prisoners can reasonably arrange for continuity of care in the community.***

***3.c. For all other prisoners with serious medical and/or mental health needs who are released from OPSO custody without advance notice, OPSO shall provide the prisoner a prescription for his or her medications, printed instructions regarding prescription medications, and resources indicating where prescriptions may be filled in the community.***

***3.d. For prisoners who are being transferred to another facility, OPSO shall prepare and send with a transferring prisoner, a transition summary detailing major health problems and listing current medications and dosages, as well as medication history while at the Facility. OPSO shall also supply sufficient medication for the period of transit for prisoners who are being transferred to another correctional facility or other institution, in the amount required by the receiving agency.***

Findings:

C. 3. a. Substantial Compliance

C. 3. b. Partial Compliance

C. 3. c. Substantial Compliance

C. 3. d. Substantial Compliance

Finding:

C. 3. a. Substantial compliance

The medical provider is aware of pending releases and consistently provides medication or a prescription.

C. 3. b. Substantial compliance

Upon release, the patients are provided with at least a seven-day supply of their prescription medications.

C. 3. c. Substantial compliance

There is good coordination of custody and the medical provider resulting in good compliance with providing medication prescriptions on release.

C. 3. d. Substantial compliance

The facility does provide the necessary information to the receiving correctional



facility. Please add an updated quality improvement study addressing this provision.

**IV.    D. 1. Sanitation and Environmental Conditions**

<u>Findings:</u>

D.1. a.   Partial Compliance

D. 1. b.  Non- Compliance

D. 1. c.  Partial Compliance

D. 1. d.  Partial Compliance

D. 1. e.  Partial Compliance

D. 1. f.   Partial Compliance

D. 1. g.  Substantial Compliance

D. 1. h.  Substantial Compliance

***IV. D. 1. a. OPSO shall provide oversight and supervision of routine cleaning of housing units, showers, and medical areas. Such oversight and supervision will include meaningful inspection processes and documentation, as well as establish routine cleaning requirements for toilets, showers, and housing units to be documented at least once a week but to occur more frequently.***

The Monitor physically inspected every occupied housing unit in the OJC and TDC/TMH facilities. The Monitor also interviewed the OPSO Sanitarian and Environmental Officer as well as inmates and staff during the inspection. Section D.1.a. remains in Partial Compliance based on the following observations.

The Monitor observed the overall level of cleanliness and sanitation in the TDC housing units to be generally acceptable with cleaning equipment and supplies found to be properly stored.  With one or two exceptions, the cleanliness and sanitation of the TMH housing units was again found to be very good, including the appearance of the individual cells and janitor closets with the exception of the 1B mop closet/sink. All of the cleaning equipment was crammed into the mop sink.

The signs of insect infestation (ants and drain flies) noted during the previous inspection of the TDC housing units were observed to be substantially less than noted during Tours #19, #20, and #21 though drain flies were observed in the 2A shower and ants were observed in 4W at the emergency exit door. However, there was evidence of drain flies in several OJC pods, particularly the open dormitories (4D, 4E, and 4F) where inmates continue to launder their own clothing by hand and hang/drape the items on tables and rails throughout the unit(s) (not observed by the Monitor but reported by the



inmates when questioned about the laundry service). The sanitation/maintenance issue that has been noted repeatedly in and around janitor closet TMH E205 (leak) was noted to have not been repaired since the last inspection.

During the walk-through of the OJC facility, the Monitor noted that all circulation areas of the facility to be clean and generally well-kept to include the medical areas and dentist's office. The Monitor observed the overall cleanliness in the OJC open dorms as well as pods with individual cells to be improved in the dayrooms, showers and recreation yards. Cleanliness in the cells was observed to be at its highest level relative to the last several inspections with some exceptions (primarily on the 3rd floor of OJC). The dormitory showers were observed to be the most problematic with chronic humidity issues, rusted doors and window frames, etc. Inmate complaints about lacking cleaning supplies and equipment were fewer than previously received by the Monitor. Issues such as trash, debris, dirty floors, dirty windows, soaped windows, spilled food/milk, hoarded items, excessive clutter, etc. showed improvement since the previous inspection.

The Monitor reviewed the "Logbook Audit" snapshots that were provided by the Sanitarian. The photos of the pod control logbook entries for each floor of OJC covered a random day from each month of the reporting period. The entries reflected few, if any, notations by security staff as to the provision of cleaning material/time in the pods. The Monitor recommends OPSO routinely document these activities in the pod control logbooks or develop a consolidated form, by shift, requiring staff sign-off for all days in a given month for ease of monitoring.

OPSO implemented a targeted cleaning program as of April 2024 primarily focused on the deep cleaning of pod showers and other common areas in the pod either not accessible by the pod inmates or generally not addressed by the pod inmates/security staff. The stated goal was weekly cleanings in all pods. OPSO provided documentation generated by the Sanitarian noting the routine provision of cleaning supplies to each floor for security staff/inmate use. The Sanitarian submitted weekly memos throughout the rating period validating the shower and pod cleaning activities documented by the individual leading the inmate work crews on the "Pod Cleaning Form". The documentation reflected that the frequency of the cleaning effort had waned for most of the rating period. For example, only 4 units showed to have the showers cleaned for the



month of January 2025 based on the documentation submitted. There were entire weeks throughout the rating period that showed no showers were cleaned. Again, the Monitor is of the opinion that this effort in its current form is not sustainable. There is still only a single staff-member assigned to this program and when this person is not present for duty (days off, training, vacation, etc.), the cleaning tasks are not accomplished.

The Monitor reviewed the Sanitarian's weekly and monthly inspection documentation. The forms generally reflected the Monitor's observations during the inspection. Improvement was again noted in most pod common areas, with notations for cleanliness, clutter, and trash observed primarily in individual cells, but also some showers and dayrooms.

The Monitor also reviewed the "Monthly Environmental Inspection Report" forms for April 2025 and the quarterly summaries performed by the OPSO Environmental Officer for the entire rating period. The Environmental Officer's observations were consistent with that of the Monitor's during the July site inspection to include dirty showers, drain flies, water leaks in pipe chases, cell trash and clutter in most pods. The Monitor inspected every housing unit pipe chase and found leaks and trash in at least 1/3 of the service areas, verifying the Environmental Officer's observations. The Monitor echoes the Environmental Officer's recommendation in each quarterly report that the pod inmates be provided with adequate supplies and time to clean their pods and cells on a daily basis and further encourages Maintenance staff to clean up the pipe chases after performing their work.

The issue of torn and altered mattresses throughout OJC was observed to be improved from the last inspection. It is important for security staff to confiscate and replace torn and missing mattress covers cannot be properly sanitized.

Again, Security staff should be documenting their own sanitation inspections daily, noting the condition of the pods and cells before and after inmates are allowed to clean their areas. The Monitor was unable to find any such documentation. OPSO provided documentation of these inspections only for a two-day period in October 2024. As with Report #21, OPSO leadership is strongly encouraged to emphasize the performance and documentation of these inspections. With the last inspection OPSO provided documentation of training provided to security staff on the use of the forms and



the importance of the required inspections.

As noted previously, the OPSO practice of consolidating all cleaning supplies outside of the units has continued over the last five inspections and inmate access to the unit janitor closets remains restricted according to staff. The Monitor again observed a few spray bottles and other cleaning equipment in individual cells and in the dormitory housing units. This indicates that Security staff continues to have issues maintaining accountability for the supplies.

Based on the above and the observed conditions of the OJC pod cells, shower and common areas, and recognizing the regression of the shower cleaning program, the Monitor notes this section will remain in Partial Compliance.

As with the December 2024 inspection, the Monitor observed relatively few inmate housing cells with obstructed air supply vents with only one pod "failing" the inspection item for half or more of the cells having blocked supply registers. Blocked supply registers present a code violation as it relates to ventilation and the number of required air exchanges per hour in rooms with toilets, the correctional environment presents unique challenges in maintaining this aspect of compliance. The continued observance of a significant number of return air grills to have substantial burn/smoke damage resulting from inmates lighting paper "wicks" and then inserting them into the return grills to keep them lit for extended periods and under exit doors (1st quarter Environmental Safety report). This allows the inmates to keep an ignition source available for smoking contraband materials. The Monitor again recommends the cleaning/painting of the grills so that new damage can be readily identified and the disciplinary process applied to the inmate occupant of the cell. This damage also occurs in open dorm units in the upstairs areas on the walls and floors. The Monitor noted fewer dayroom return air registers to be excessively dirty; an improvement over the last inspection. The Monitor recommends Maintenance staff perform such cleanings as a part of the preventive maintenance program to inhibit the collection of dust and lint and, and the growth of mold.

As noted in previous inspections, numerous cells were observed to have lights covered, home-made clotheslines strung across the cells. Cloth "ropes" used to manipulate food pass doors were less notable, particularly in the unit with the new food



pass boxes. The Monitor observed fewer extra blankets used as carpeting on the cell floors, and fewer altered clothing items. All likely a result of increased shakedown activities by security staff. The Monitor only noted a couple of instances where an inmate had used torn cloth or plastic bag material being wrapped tightly around the top of the cell doors allowing the inmate to affix "curtain" material to the door and obstructing the view into the cell.

The documentation and interviews again reflected the Sanitarian and Environmental staff's efforts at maintaining consistent and regular cleaning schedules for circulation areas.

As noted in the previous report, the number of grievances regarding sanitation issues remained relatively low during the rating period. Inmate reports via grievance of inadequate or missing cleaning supplies and clothing issues were few in number, and there were no grievances related to inmate injuries resulting from exposure to cleaning chemicals.

The regular provision of clean inmate clothing and bedding and an appropriate inventory of these supplies are essential to sanitation, infection control and disease prevention. The Sanitarian reported that the exchange of inmate uniforms (weekly), sheets (weekly) and blankets (monthly) has continued to adhere to the regular schedule and the inventory for these items was sufficient for scheduled exchanges, though the Monitor heard some complaints from inmates as to extended periods without clothing exchanges. (The Monitor noted that clean laundry had been received four days prior to the inspection at TDC/TMH and still had not been distributed to the inmates (TDC/TMH security staff perform this duty.) The Monitor asked several inmates whether they used the provided laundry bags for their personal items to be cleaned. Several stated they either did not know about the bags, had not seen them picked up, or they did not use them as it took too long to get their items returned. This issue is what leads to inmates hand-washing their personal items and draping them in the cells and on rails to dry leading to other sanitation issues.

The hoarding and altering of issued clothing items, mattresses and blankets was observed to be less prevalent during this inspection—a welcome improvement. During prior inspections, there were several instances of altered clothing (homemade "hoodies",



sewn on designs, and clothing used for other than its intended purpose) which is of particular concern as it destroys the clothing item and precludes reissuance to another inmate thus decreasing stock levels prematurely.

The Monitor again noted that the chronic maintenance issues with washers and dryers have essentially been remedied by removing the equipment from all but a few select lockdown units and an "honors" unit where inmates earn additional privileges with good behavior.

In specific regard to Item 7 of the June 17, 2024 Stipulation and Order by the Court, copied below, the Monitor found the following conditions as of the date of the inspection:

- OPSO has developed and implemented a cleaning program as required by the Order but, again, documentation did not reflect that the cleanings were being performed weekly according to the Order. Deep cleaning of the pods and adjacent areas were shown to be occurring monthly in most cases.

- No documentation was provided under this section for the required weekly inspections. "Monthly" inspection forms performed by security staff were submitted under D.1. b. but are focused on maintenance issues versus sanitation. A staff notation explains that no documentation of this form was available prior to May 2025.

- A description of the cleaning program was provided to the Monitor as required.

    *7. Sanitation and Environmental Conditions (§ IV.D.1). Within 60 days, OPSO shall develop and implement a cleaning program to ensure that all housing units, including common areas, day rooms, restrooms, and shower areas, are cleaned at least once per week. The date of the weekly cleanings shall be documented by OPSO staff, and all housing units shall be inspected at least once a week by a security or cleaning supervisor to ensure compliance. A description of the cleaning program, and documentation of its implementation, shall be sent to the Monitor and Plaintiffs. Updates to the cleaning program must be submitted to the Plaintiffs and Monitor each monitoring cycle.*



Finding:

Based on the observed conditions and documentation, the Monitor is encouraged by OPSO's progress, but this section remains in Partial Compliance.

***IV. D. 1. b. Continue the preventive maintenance plan to respond to routine and emergency maintenance needs, including ensuring that showers, toilets, and sink units are adequately installed and maintained. Work orders will be submitted within 48 hours of identified deficiencies, or within 24 hours in the case of emergency maintenance needs.***

Finding:

Non-Compliance

Observations:

As with previous inspections, the Monitor reviewed the Sanitation and Environmental Conditions report, the OPSO Preventive Maintenance Plan, the Preventive Maintenance Schedule Summary report, and a Preventive Maintenance work orders status report as well as inmate grievances related to maintenance issues. The Monitor also interviewed and toured portions of the facility with the Chief Financial Officer/Acting Maintenance Director. The documentation reflected an on-going preventive maintenance program for major building systems and components consistent with OPSO policy and the Consent Judgment. Preventive maintenance continues to be a challenge due to deferred maintenance, staffing and budget constraints. The documentation reflected a completion rate for PM work orders to be less than 30% for the 1st and 2nd quarters of 2025. The Monitor inspected every pipe chase in OJC TDC/TMH buildings 2, 3, and 4. Notable issues were clutter and trash from previous repairs were common throughout the facility despite a Maintenance Report noting that these areas were scheduled to be cleaned. (These issues lead to pest control, mold and mildew problems.) An example of deliberate failure to complete repairs was noted with the IKON plumbing monitoring systems installed in every pipe chase. The majority of waste flow monitoring devices located behind every inmate toilet were either non-functional and/or removed entirely from the waste pipe with many leaving the pipe open to the air and allowing backups to overflow onto the floor of the pipe chases. The CFO advised that the contractor had been notified and was working on a quote to restore the system. It is the Monitor's opinion that the monitoring system can be a valuable tool for the Maintenance staff if utilized properly. Alternatively, if the waste-line monitors are abandoned, removed, and capped off,



Maintenance staff will still have to perform the same repair tasks for the inevitable clogged drains, but will have to wait for notification by security staff when there is an issue in a given cell (or cells).

Through the Monitor's personal observations and individual inmate interviews conducted during the walk-thru in each housing unit, the Monitor again observed a significant number of issues regarding water, electric or HVAC services in individual cells and dormitories in OJC/TDC/TMH that were not addressed in a timely fashion, possibly due to a lapse in reporting by security staff and/or Maintenance staffing issues. The issues primarily involved water pressure issues at the restroom sinks in open dormitory pods and in individual cells and inoperable shower heads, toilets and urinals throughout OJC and TDC/TMH. The Monitor did not find excessively hot inmate domestic water supplies in TDC/TMH, but several were found to be insufficient (105 to 120 degrees is recommended for safety, sanitation, and personal hygiene.) Given the number of additional inmates being housed in these areas, the reliable operation of these systems becomes even more important.

The current work order system is limited in its reporting capabilities, however, OPSO has upgraded the building automation system (Siemans BAS) which should improve Maintenance's ability to monitor major systems and respond to failures/potential failures in a timely manner ONCE staff are trained to utilize the system to its potential. Only PM work order documentation was submitted under this section for review. The Monitor recommends OPSO Maintenance supervisors give considerable attention to this issue and utilize the work order data to periodically audit other maintenance/trade categories.

A review of the Maintenance-related grievances noted an increasing trend in the number of such grievances during the rating period continuing from the previous inspection. The Monitor recommends Maintenance staff review the grievances to identify any significant grouping of issues by type and/or location in order to mitigate the upward trend in since the last inspection.

While work orders appear to be submitted in a timely manner is required by the Consent Judgment ("Work orders will be submitted within 48 hours of identified deficiencies, or within 24 hours in the case of emergency maintenance needs") as the



Monitor was able to observe Maintenance personnel working on plumbing, lighting, and electrical issues, no routine, customer-submitted work order documentation was provided, so there is insufficient information to correlate deficiencies identified in daily pod inspections with work orders submitted. The Monitor recommends OPSO randomly sample the inspection reports vis-à-vis actual work orders to provide documentation as to the timely submission of work orders as the timely follow-on repair actions are essential.

The Monitor again observed a significant number of broken cell door windows, primarily in lockdown OJC units that were present during the last inspection and need immediate replacement. The Monitor observed several "hot" receptacles accessible to inmates in the housing units, to include an inmate-made receptable spliced into the power wire for the unit television, posing a significant hazard to the inmates attempting to ignite materials for smoking or other unauthorized purposes. The Monitor also noted several cell doors in OJC 3B and 3D that had been purposefully vandalized to prevent staff from securing the doors (bent hinges) and the damage was obvious and had not been repaired since the previous inspection. The Monitor was unable to determine if an emergency work order had been placed, but it appeared as if the damage had existed for several days.

Given the minimal completion rates for preventive maintenance work orders, the issues with incomplete/faulty repairs (IKON system), and the status of the damaged doors and windows, the Monitor is downgrading this section to non-compliance but looks forward to the initiatives being brought forward by the CFO and the hiring of a permanent maintenance supervisor.

***IV. D. 1. c. Maintain adequate ventilation throughout OPSO facilities to ensure that prisoners receive adequate air flow and reasonable levels of heating and cooling. Maintenance staff shall review and assess compliance with this requirement, as necessary, but no less than twice annually.***

<u>Finding:</u>

Partial Compliance

<u>Observations:</u>

As noted in previous tours, adequate air flow is maintained in the facilities but continues to be impeded in inmate cells when inmates block the air vents.  While the Monitor noted the number of cells with blocked supply registers did not exceed 50% in all but one OJC pod, the



issue is still of concern. Compliance in this area remains an inmate supervision issue and must continue to be addressed by security staff consistently. The Monitor noted that the majority of housing dayrooms and cells to be at relatively reasonable levels of heating and cooling with some exceptions in individual cells, and that inmates again reported a fewer number of cell clusters with low or no airflow and higher temperatures in various units in OJC. Several TDC Units had some HVAC issues (2E: 75° and malodorous; 2W: 75°;1E: 80°;1W: 78/79°;3W: 84° and malodorous; 3E: 75/76°; 4E: 80/81/83/84°; 4W: 84/85°) While the CFO noted that contractor repairs were anticipated soon, it remains a concern when temperatures in general population units reach 85 degrees and even less in the TMH units (Buildings 1 & 2) where inmates on certain psych meds may be more susceptible to warm temperatures. The recommended temperature range for the majority of housing units is 65 to 85 degrees. The OPSO staff present were advised.

The following, regarding test and balance reports, is restated from previous reports. As noted in the previous reports, test, and balance reports for the Kitchen/Warehouse (2014), OJC (2017) and TDC (2012) were the latest available to the Monitor.

Prior to the September 2019 report, this section had been interpreted as requiring comprehensive "test and balance" assessments on a semi-annual basis. Such assessments are very expensive and typically performed only during the commissioning of new or replacement HVAC systems. The Monitor has consistently requested OPSO provide reports from the Building Automation System (BAS) covering the inspection period which would reflect the actual air temperatures in the units and cells on a continuous basis. The BAS controls the heating and cooling throughout all occupied areas in OJC, and the reports would be used to verify the system's performance as well as the maintenance response to routine and emergency situations requiring service or replacement of the HVAC components.  The CFO arranged for the Monitor to meet the Siemens contractor who advised there were a couple of ways to provide the requested data for the Monitor's inspection/verification activities, and the Monitor anticipates this to improve.

With the on-boarding of the new Maintenance and Operations Director, the Monitor expects OPSO will be able to complete the BAS upgrade that will enhance the staff's ability to identify, remedy, and report on HVAC and other major systems



throughout the facility. The Monitor looks forward to the full implementation of the upgrade and commends OPSO on the initiative.

As during previous tours, the Monitor reviewed live data of the system's warning and alarm functions which reflected no major equipment or systems issues that had not been addressed at that moment. The Monitor inspected the BAS system and noted several alarms or alerts present on the system. The staff's relative unfamiliarity with the operation of the monitoring system led to the meeting with the contractor to outline some specific training for the staff. The staff performance should improve with more training and exposure to the system. The Monitor continues to recommend that the Maintenance Director implement a routine audit/inspection of the housing areas for such occurrences and compare the findings with the BAS and work order reports to ensure the systems are working as expected. Additionally, the Monitor continues to recommend the Maintenance Director establish a "system status review" protocol requiring the responsible on-duty staff member to review the live HVAC equipment monitor status throughout the facility at least once per day to facilitate the identification and repair of any issues noted and document/log these reviews for routine recordkeeping as well as staff accountability.

It is the Monitor's opinion that the OJC Building Automation System and the new BAS system supporting the TMH units, as currently operated, meets the intent of the Consent Judgment regarding this section. The requested supporting documentation will be necessary to support a finding of substantial compliance.

In light of the above, this section remains in Partial Compliance.

***IV. D. 1. d. Ensure adequate lighting in all prisoner housing units and prompt replacement and repair of malfunctioning lighting fixtures in living areas within five days unless the item must be specially ordered.***

<u>Finding:</u>

Partial Compliance

<u>Observations:</u>

The Monitor observed sufficient lighting being provided in housing units and the majority of individual cells of both OJC and TDC. The Monitor found several cells with dim or no lighting. While some required a lamp replacement, the majority of the light fixtures noted were covered with paper stuck to the fixture and one that had a partial sheet held



against the light fixture with homemade rope (this is a security staff issue).

Several outlet boxes inside housing pods were also found to have exposed wiring or energized outlets accessible to the inmates—an issue noted in every report since 2018 and significant shock hazard for the inmates and staff so this section remains in partial compliance.

Maintenance staff continue to maintain a supply of replacement lamps, transformers, or ballasts to repair malfunctioning lighting.

***IV. D. 1. e. Ensure adequate pest control throughout the housing units, including routine pest control spraying on at least a quarterly basis and additional spraying as needed.***

Finding:

Partial Compliance

Observations:

A review of the documentation submitted found sufficient evidence of a pest control program that meets the intent of the Consent Judgment. OPSO continues to maintain a pest control contract with a state licensed company for monthly service of all housing areas and bi-weekly service for the Kitchen/Warehouse as well as on-demand services. The Monitor reviewed the vendor's pest activity reports for all three facilities and noted no issues. There were no inmate grievances related to pest control for the rating period per the Sanitarian. As with Tours #18 through #21, the Monitor observed several "drain fly" issues in housing units both at OJC and TDC (also noted in D.1.a.). The Monitor advised staff present to notify the Environmental Officer for remediation which was conducted prior to the end of the inspection.

The pest control contractor documentation showed no major infestations were found during routine inspections. However, the inspection reports by Sanitation and Life-Safety staff continue to note numerous issues with debris in housing units throughout OJC and TDC which was consistent with the Monitor's observations. The Monitor noted less clutter and debris (open and scattered food, trash, etc.) while inspecting the OJC than previously observed, however most of the drain fly issues relate directly to the level of cleanliness throughout the housing units and adjacent spaces. The exception was in the circulation and administrative areas maintained by the Sanitation staff. Again, the Monitor expects that OPSO can continue to reduce the issues noted by increasing the frequency and effectiveness of the cleaning of these areas by the inmates housed therein.



While OPSO routinely has a pest control company treating the facility, the issue with the drain flies remains chronic and at the time of the inspection were only being addressed when reported. It is also incumbent upon security staff to prevent inmates from doing things that exacerbate the problem such as allowing inmates to keep mop buckets full of dirty water, washing clothing the housing units, and allowing them to drape wet clothing around the housing units which attracts and allow the drain flies to breed and grow. Based on the foregoing observations, this section remains in Partial Compliance.

***IV. D. 1.f. Ensure that any prisoner or staff assigned to clean a biohazardous area is properly trained in universal precautions, outfitted with protective materials, and properly supervised.***

Finding:

Partial Compliance

Observations:

As noted in previous inspections, Policy 1101.07, "Bio-hazardous Spill Cleaning Procedures" [Revised 1/18/2018] Section VIII. A. 1 has been revised to allow properly trained and equipped inmates and deputies to clean up bio-hazardous spills. Training materials were devised by the Sanitarian. Documentation was provided to indicate eight inmates received the requisite training during the rating period.

The Monitor also reviewed training curricula and documentation indicating that during 2024, all pre-service staff received training in bio-hazardous cleanup procedures as part of their initial training in each new-hire class in 2024 up to the date of this inspection. The documentation reflected that the in-service training for this requirement was presented in CY2024 as well.

As of November 2018, OPSO policy requires the Sanitation and/or Environmental Officer to be notified of such incidents each business day to enable them to replace any bio-hazardous clean up protective materials used and inspect the area to ensure it was properly cleaned and sanitized. While OPSO provided "OPSORE" spreadsheets for jail incidents involving biohazardous material (blood, feces, etc.) covering each month of the rating period, there was no documentation provided as to whether bio-hazard reports/notifications for these incidents were submitted to the Sanitarian during this rating period, therefore there was again no evidence to support a change in the current rating. Given the number of incidents in the facility, the lack of any bio-hazard reports is somewhat concerning to the Monitor. The Sanitarian has previously advised that her



practice is to routinely review all reports mentioning such incidents to ensure proper follow-up is conducted and that required cleanup/inspection procedures have been followed, but without timely notification, it is doubtful that a meaningful follow-up inspection by the Sanitarian can occur.

***IV. D. 1. g. Ensure the use of cleaning chemicals that sufficiently destroy the pathogens and organisms in biohazard spills.***

Findings:

Substantial Compliance

Observations:

The Monitor was able to make direct observation that the chemicals on-hand and available to staff were sufficient to destroy the pathogens and organisms in bio-hazardous spills common in a jail environment to include the COVID-19 virus. The Monitor is continuing to rate this section as being in substantial compliance.

Additionally, the chemical storage inventory documentation submitted demonstrated the availability of a consistent supply of the required chemicals being maintained by the designated staff. The Monitor identified an area in the Maintenance Section where Material Safety Data sheets were not immediately available and flammable metal coatings were improperly stored. This was reported to the staff for correction of the deficiency.

***IV. D. 1. h. Maintain an infection control plan that addresses contact, blood borne, and airborne hazards and infections. The plan shall include provisions for the identification, treatment, and control of Methicillin-Resistant Staphylococcus Aureus ("MRSA") at the Facility.***

Findings:

Substantial compliance

Observations:

As with the previous inspection, the Monitor reviewed the OPSO infection control policy 1201.11 and the Wexford Infections Diseases and Infection Control Guidelines (effective April 2024) submitted by OPSO and found the policy and Wexford document sufficient to meet the requirement for substantial compliance.

**IV. D. 2. Environmental Control**

Findings:

D. 2. a.  Partial Compliance

D. 2. b.  Partial Compliance



***IV. D. 2. a. OPSO shall ensure that broken or missing electrical panels are repaired within 30 days of identified deficiencies, unless the item needs to be specially ordered.***

Findings:

Partial Compliance

Observations:

OPSO Policies 601.02 "Reporting and Addressing Maintenance Needs" and Policy 601.03 "Preventive Maintenance" [August 15, 2016] are implemented. Major electrical panels at OJC and TMH are located in secure maintenance spaces inaccessible to inmates.

During the inspection, the Monitor noted two significant issues in electrical rooms accessible by security staff (maintenance equipment/materials improperly stored in front of electrical panels—corrected the same day). Of significant concern were the numerous junction box covers in several pipe chases adjacent to inmate cells that had covers removed and wiring pulled out of the boxes. The wiring supplied 277-volt service to the inmate cell lighting. Most of the covers were on the floor or nearby, indicating that that maintenance staff had neglected to replace them after repairs. The exposed wiring was energized and posed a significant safety risk to anyone entering these spaces for plumbing or electrical repairs.

***IV. D. 2. b. Develop and implement a system for maintenance and timely repair of electrical panels, devices, and exposed electrical wires.***

Findings:

Partial Compliance

Observations:

During the tour, the Monitor noted several energized electrical outlet boxes accessible to inmates which should be blanked off security covers or de-energized. The Monitor also observed a homemade electrical outlet spliced into the television power wire and lying on the mezzanine walkway in a housing unit. This presented an extreme safety hazard to inmates attempting to use the "outlet" or simply walking by. This vandalized light switch assemblies in the inmate interview rooms noted previously were observed to have been substantially repaired. As with the previous inspections, the Monitor noted ongoing issues with the inmate intercom equipment. The Monitor randomly asked inmates to activate their cell intercoms or did so himself to elicit a response from security staff.  The Monitor did not observe any intercoms to be non-



functioning in OJC during these random checks. The Monitor observed that, if the inmate is locked in a cell, the inmate must either call out to the pod deputy (if present) or request another inmate who may be out of their cell to alert the pod control staff member if an issue or emergency arises.

The Monitor was encouraged by the presence of staff in the majority of the pod control rooms throughout OJC as these are the only workstations in OJC currently capable of receiving emergency intercom calls. However, there is still no backup system whereby intercom calls from OJC inmate cells can be answered if the control pod is not manned, however OPSO has had an assessment of the security electronics system performed by the original contractor.

The intercom system in the TDC/TMH sallyport that provides backup response to TMH inmate intercom calls is still inoperative in that staff cannot speak to the inmate. The following is repeated from Report #21 to provide continuity in the Monitor's reporting. This has been noted repeatedly. Intercom issues were noted in previous reports under Section IV.D.1.b. (with no apparent action from OPSO Maintenance), however the Monitor has determined that this issue is more appropriately covered in this section that requires the implementation of "a system for maintenance and timely repair of electrical panels, devices, and exposed electrical wires".

The inmate intercoms in the Temporary Mental Health (TMH) facility are non-working at the officer control stations, and while the Sallyport Control officer is able to observe and hear inmate intercom calls on the intercom system, and a microphone has been installed, there continues to be technical as well as staff training issues preventing two-way communication with the inmate in individual TMH cells. Subsequently, the Sallyport Control officer is not required to monitor inmate intercom calls. The Monitor continues to recommend TMH supervisory staff review the procedure and require the Sallyport Control officer to notify the respective TMH pod deputy any time a call is observed on the control screen once the equipment is in working order.

The Monitor continues to recommend that IT staff responsible for the intercom systems make a comprehensive survey of working/non-working intercom equipment in every housing unit to facilitate repair of the system throughout the facility and add random intercom testing in every unit to the routine inspection process. Additionally,



security staff supervisors should continue to emphasize the importance of the prompt response to emergency intercom calls by pod deputies and pod control staff.

Due to the chronic issue with the inmate intercom field devices and control equipment devices as well as the damaged outlet boxes and energized circuits, the Monitor continues to rate this section as being in Partial Compliance.

**IV. D. 3. Food Service**

This report summarizes the findings for the Food Service provisions of the Consent Judgment based on the Monitor's document reviews and tour conducted July 28-31, 2025. The Monitor inspected the Orleans Justice Center (OJC) Kitchen/Warehouse; observed meal service activities; and spoke with OPSO supervisors and deputies, Summit contracted food service employees, and inmates.

Sections IV. D. 3. a., IV. D. 3. b., and IV. D. 3. c of the Consent Judgment remained in Substantial Compliance.

Findings:

D. 3. a. Substantial Compliance

D. 3. b. Substantial Compliance

D. 3. c. Substantial Compliance

*IV. D. 3. a. OPSO shall ensure that food service staff, including prisoner staff, continues to receive in-service annual training in the areas of food safety, safe food handling procedures, and proper hygiene, to reduce the risk of food contamination and food-borne illnesses.*

Findings:

Substantial Compliance

Observations:

D. 3. a. remains in Substantial Compliance for the period of October 2024 through June 2025 based on the documentation provided by Summit. The in-service employee training included instruction on foodborne illness, food safety, and personal hygiene. Documentation was provided substantiating food safety training, and a kitchen orientation quiz was provided for new inmate kitchen workers, with the exception of November 2024, December 2024, February 2025, and May 2025, because there were no new inmate kitchen workers employed during those months.

*IV. D. 3. B. Ensure that dishes and utensils, food preparation and storage areas, and vehicles and containers used to transport food are appropriately cleaned and sanitized on a daily basis.*



Findings:

Substantial Compliance

Observations:

The Monitor reviewed the documents submitted for the compliance period of October 2024 through June 2025, including the cleaning logs, daily chemical usage logs, chemical sanitizer concentration logs, and the kitchen vehicle inspection forms and no problems were found. The Monitor inspected the kitchen including areas where food is prepared, the bakery, tray preparation area, dishwashing room, dry goods storage, coolers and freezers, and the loading dock, and found all the areas to be appropriately clean. Therefore, D. 3. B. remains in Substantial Compliance.

***IV. D. 3. c. Check and record on a daily basis the temperatures in the refrigerators, coolers, walk-in refrigerators, the dishwasher water, and all other kitchen equipment with a temperature monitor, to ensure proper maintenance of food service equipment.***

Findings:

Substantial Compliance

Observations:

For the compliance period of October 2024 to June 2025, Section IV. D. 3. C. of the Consent Judgment remained in substantial compliance. The documentation related to cooler, freezer, and dishwasher water temperatures for the current compliance period were reviewed and indicated that the temperatures were checked and recorded daily and comply with the food code. The Monitor observed dishwashing operations and the dishwasher was operating within the proper temperature range. The Monitor measured the temperatures in the coolers and freezers during the tour, and they were within the proper range. The OJC Kitchen/Warehouse has 15 walk-in coolers and freezers, and refrigeration problems should be anticipated such as issues with the condensers, compressors, and refrigerant leaks, especially as the mechanical system ages. Therefore, it is recommended:

- OPSO develop and implement a formal preventive maintenance plan for the refrigeration system.

## IV. D. 4. Sanitation and Environmental Conditions Reporting

Findings:

D.4. a. Substantial Compliance



D.4. b. Partial Compliance

***D. 4. a. Provide the Monitor a periodic report on sanitation and environmental conditions in the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. The report will include***
> ***(1) number and type of violations reported by health and sanitation inspectors;***
> ***(2) number and type of violations of state standards;***
> ***(3) number of prisoner grievances filed regarding the environmental conditions at the Facility;***
> ***(4) number of inoperative plumbing fixtures, light fixtures, HVAC systems, fire protection systems, and security systems that have not been repaired within 30 days of discovery;***
> ***(5) number of prisoner-occupied areas with significant vandalism, broken furnishings, or excessive clutter;***
> ***(6) occurrences of insects and rodents in the housing units and dining halls; and***
> ***(7) occurrences of poor air circulation in housing units.***

Findings:

Substantial Compliance

Observations:

OPSO provided the two Semi-annual reports covering the rating period under this section. This documentation, as well as the Sanitation and Environmental reports, contained the requisite information spelled out by the Consent Judgment for this section.

***IV. D. 4. b. Review the periodic sanitation and environmental conditions reports to determine whether the prisoner grievances and violations reported by health, sanitation, or state inspectors are addressed, ensuring that the requirements of this Agreement are met. OPSO shall make recommendations regarding the sanitation and environmental conditions, or other necessary changes in policy, based on this review. The review and recommendations will be documented and provided to the Monitor.***

Findings:

Substantial Compliance

Observations:

The Consent Judgment requires a review of the periodic sanitation, and environmental conditions reports to ensure issues are addressed along with making recommendations regarding sanitation and environmental conditions and policy changes based upon the review. Such reviews are to be documented and provided to the Monitor. The Monitor reviewed the Semi-annual reports (7/24-12/24 and 1/25-6/25) provided by OPSO as required and found documentation supporting the review conducted by OPSO command staff. The documentation was sufficient to satisfy the requirements of the Consent Judgment for this rating period. This section remains in Substantial Compliance.



**IV. E. 1. Fire and Life Safety**

<u>Findings:</u>

E.1. a.  Substantial Compliance

E. 1. b.  Substantial Compliance

E. 1. c.  Substantial Compliance

E. 1. d.  Partial Compliance

E. 1. e.  Substantial Compliance

***IV. E. 1. a. Ensure that necessary fire and life safety equipment is properly maintained and inspected at least quarterly. These inspections must be documented.***

<u>Finding:</u>

Substantial Compliance

<u>Observations:</u>

The Monitor was able to conduct a tour of the OJC, TDC/TMH, and the Kitchen/Warehouse facilities during the July 2025 inspection with the Facility Life Safety Officer and CFO. The Monitor observed no major issues with the fire and life safety equipment other than noted below. The Monitor did note evidence of previously burned material in the form of black burn marks on the floor of the pipe chase vestibules just outside the housing unit door(s). The burn marks are made when inmates past ignited "wicks" made of paper towels under the doors to keep them lit and hidden from staff. While the odor persisted, the Monitor could not objectively determine whether the marks were recent or had been present for an extended period of time. The response procedure for broken sprinkler heads implemented prior to Tour #20 has significantly reduced the downtime for the suppression systems whenever an inmate vandalizes a sprinkler head. The procedure includes a 15-minute "Fire Watch" security rounds in affected areas which further supports the mitigation of risk. All fire extinguishers observed were found to be current on required inspections.

The Fire Alarm Control Panels in the areas inspected were found to be properly inspected and free of trouble alarms with the exception of two VAV trouble alarms in TDC/TMH (filters) and a trouble alarm noting a communication issue (outside notification) with a TDC alarm panel. For the latter issue and noted previously, the Life Safety Officer has identified the issue as a broken communication wire. OPSO has determined that the outside notification function is redundant given the 24/7 monitoring



occurring on-site. The Monitor is of the opinion that current operations meet local fire marshal requirements and is consistent with applicable code(s).

The Monitor also reviewed all monthly and quarterly inspection documentation as well as outside inspection documentation. OPSO provided documentation of the annual contractor fire detection systems for OJC (12/24), TMH/TDC (11/24), and the Kitchen/Warehouse (12/24) which indicated no significant issues along with minor device replacements/programming corrections.

There were no significant issues with the documentation, that requisite work orders had been generated when warranted, and that all major systems were operational/ "green tagged" with the exception of the vent hood fire suppression system over the main cooking line in the Kitchen. The system has to be tested/recertified due to its age. The Life-Safety Officer has already coordinated with the appropriate contractor for the work and is awaiting funding. Of note and previously reported, the inspection documentation again reflected clutter and trash issues throughout the OJC inmate housing areas, however the Monitor noted fewer observed instances than the previous inspection in December 2024 largely due to the increased frequency of shakedowns being performed in the units to remove contraband and excess personal property. The reports, as with the Sanitation and Environmental inspection reports, continued to note significant issues with excess inmate property being improperly stored in a substantial number of housing units. As previously noted, Staff should continue the unit shakedowns and consider potential solutions to reduce the amount of clutter and potential fire-load the material presents.

As noted in the previous inspection, the Life Safety Officer continues to use the "Facility Dude" work order system to maintain the schedule of required inspections. The system notifies the Fire Safety Officer when an inspection is due. OPSO continues to maintain contracts with licensed vendors to complete annual inspections of all fire and life safety equipment. OPSO provided copies of quarterly inspections conducted by the Fire Safety Officer for Kitchen/Warehouse, OJC, and TDC/TMH for the rating period. This documentation, supported by observations during the compliance tour, indicates that OPSO ensures that necessary fire and life safety equipment is properly maintained and inspected at required intervals.



***IV. E. 1. b. Ensure that a qualified fire safety officer conducts a monthly inspection of the facilities for compliance with fire and life safety standards (e.g., fire escapes, sprinkler heads, smoke detectors, etc.).***

Finding:

Substantial Compliance

Observations:

The Monitor was provided with the monthly inspection documents for the Kitchen /Warehouse, OJC, and TDC/TMH facilities performed during the current compliance period. The reports are thorough and complete with all noted discrepancies listed with the associated work order number where appropriate. Non-functioning exit signs, primarily in service spaces, were already noted by the Life-Safety Officer with repair/replacement parts being put on order. Clutter in cells and the draping of inmate clothing items, while not observed during the Monitor's inspection but self-reported by several inmates, and contraband sheets/blankets continue to be the greatest contributors to the fire load in the pod housing units that can be effectively mitigated by security staff. These inspections are conducted by a qualified fire safety officer or a qualified contractor, as required by the Consent Judgment.

***IV. E. 1. c. Ensure that comprehensive fire drills are conducted every six months. OPSO shall document these drills, including start and stop times and the number and location of prisoners who were moved as part of the drills.***

Finding:

Substantial Compliance

Observations:

The Consent Judgment requires comprehensive fire drills every six months. OPSO provided documentation for 8 total fire drills conducted in January through March 2025 for the four squads at OJC and TDC/TMH as well as the Kitchen/Warehouse facility. This meets the requirements of this section, and it remains in Substantial Compliance. OPSO has continued its practice of conducting only "Level 1" drills (no inmate evacuation) due to COVID concerns associated with the mass movement of inmates. The Monitor continues to recommend to the Life Safety Officer that OPSO return to pre-COVID practices and have at least one semiannual drill consisting of an actual evacuation to better prepare staff for such an event. Pre-service training was provided to all participants in classes held during the rating period. The rating for this section continues



to be Substantial Compliance.

***IV. E. 1. d. Provide competency-based training to staff on proper fire and emergency practices and procedures at least annually.***

<u>Finding:</u>

Partial Compliance

<u>Observations:</u>

OPSO has developed the requisite policy, training course syllabus/outline and written directives necessary for this section. OPSO training staff provided documentation noting life safety training was provided for the pre-service classes during the compliance period. Documentation for the In-Service classes were provided only for rating period, but no summary for the 2024 training year was available. Sign-in sheets submitted reflect that the life-safety material was being presented at every scheduled in-service class during the rating period. Pending the provision of the 2024 training year summary for this requirement, the Monitor will continue to place this section in Partial Compliance.

***IV. E. 1. e. Within 120 days of the Effective Date, ensure that emergency keys are appropriately marked and identifiable by touch and consistently stored in a quickly accessible location, and that staff are adequately trained in use of the emergency keys.***

<u>Finding:</u>

Substantial Compliance

<u>Observations:</u>

Inspection reports note the routine verification of the keys and the Fire Safety Officer documents the periodic testing of the keys to verify they are operational. The Fire Safety Officer trains staff on the location and use of the keys during the fire and life safety training curriculum provided to all staff at the training academy. The issue with the malfunctioning key box on the second-floor admin area noted during the December 2024 inspection had been remedied. The Monitor did not consider the issue serious enough to warrant a reduction in rating for this section as the main key box located in the secure entry hallway of the Jail was still operational, had all necessary emergency keys, and was unaffected by the remote box malfunction.

**IV. E. 2. Fire and Life Safety Reporting**

<u>Findings:</u>

E. 2. a.  Substantial Compliance

E. 2. b.  Substantial Compliance



*IV. E. 2. a. (1) – (3) Provide the Monitor a periodic report on fire and life safety conditions at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date and every six months thereafter until termination of this Agreement. Each report shall include:*
*(1) number and type of violations reported by fire and life safety inspectors;*
*(2) fire code violations during annual fire compliance tours; and*
*(3) occurrences of hazardous clutter in housing units that could lead to a fire.*

Finding:

Substantial Compliance

Observations:

The semiannual reports, referenced in IV. E. 2. a., are conducted by OPSO on a semi-annual basis (January through June and July through December). The Monitor was provided with the report covering the rating period and noting the requisite information. The 2024/2025 Fire and Life Safety Conditions and inspection reports generated during the rating period were made available to the Monitor prior to the July 2025 inspection. The reports contained the supporting information for the semiannual reports spelled out by the Consent Judgment. In light of the supporting documentation, the Monitor finds this section to be in substantial compliance.

*IV. E. 2. b. Review the periodic fire and life safety reports to determine whether the violations reported by fire and life safety inspectors are addressed, ensuring the requirements of this Agreement are being met. OPSO shall make recommendations regarding the fire and life safety conditions, or other necessary changes in policy, based on this review. The review and recommendations will be documented and provided to the Monitor.*
Finding:

Substantial Compliance

Observations:

The Consent Judgment requires a review of the periodic fire and life safety reports to ensure issues are addressed along with making recommendations regarding the fire and life safety conditions and policy changes based upon the review. Such reviews are to be documented and provided to the Monitor.

The Monitor reviewed the supporting documentation provided by OPSO (7/24-12/24 and 1/25-6/25 semi-annual reports) and determined that it was sufficient to satisfy the requirements of this section, to include the provision of documentation of the senior staff review of the semi-annual report as required. Accordingly, the rating for this section remains as Substantial Compliance.



## IV. F. Language Assistance

*F.1.a. OPP shall ensure effective communication with and provide timely and meaningful access to services at OPP to all prisoners at OPP, regardless of their national origin or limited ability to speak, read, write, or understand English. To achieve this outcome, OPP shall:*

    *(1)    Develop and implement a comprehensive language assistance plan and policy that complies, at a minimum, with Title VI of the Civil Rights Act of 1964, as amended, (42 U.S.C. § 2000d et seq.) and other applicable law;*

    *(2)    Ensure that all OPP personnel take reasonable steps to provide timely, meaningful language assistance services to Limited English Proficient ("LEP") prisoners;*

    *(3)    At intake and classification, identify and assess demographic data, specifically including the number of LEP individuals at OPP on a monthly basis, and the language(s) they speak;*

    *(4)    Use collected demographic information to develop and implement hiring goals for bilingual staff that meet the needs of the current monthly average population of LEP prisoners;*

    *(5)    Regularly assess the proficiency and qualifications of bilingual staff to become an OPP Authorized Interpreter ("OPPAI");*

    *(6)    Create and maintain an OPPAI list and provide that list to the classification and intake staff; and*

    *(7)    Ensure that while at OPP, LEP prisoners are not asked to sign or initial documents in English without the benefit of a written translation from an OPPAI.*

*F.2.a. OPP shall develop and implement written policies, procedures and protocols for documenting, processing, and tracking of individuals held for up to 48 hours for the U.S. Department of Homeland Security ("DHS");*

*F.2.b Policies, procedures, and protocols for processing 48-hour holds for DHS will:*

    *(1)    Clearly delineate when a 48-hour hold is deemed to begin and end;*

    *(2)    Ensure that, if necessary, an OPPAI communicates verbally with the OPP prisoner about when the 48-hour period begins and is expected to end;*

    *(3)    Provide a mechanism for the prisoner's family member and attorney to be informed of the 48-hour hold time period, using, as needed, an OPPAI or telephonic interpretation service;*

    *(4)    Create an automated tracking method, not reliant on human memory or paper documentation, to trigger notification to DHS and to ensure that the 48-hour time period is not exceeded.*

    *(5)    Ensure that telephone services have recorded instructions in English and Spanish;*

    *(6)    Ensure that signs providing instructions to OPP prisoners or their families are translated into Spanish and posted;*

    *(7)    Provide Spanish translations of vital documents that are subject to dissemination to OPP prisoners or their family members. Such vital documents include, but are not limited to:*

        *i.    grievance forms;*

        *ii.    sick call forms;*

        *iii.    OPP inmate handbooks;*

        *iv.    Prisoner Notifications (e.g., rule violations, transfers, and grievance responses) and*

        *v.    "Request for Services" forms.*

    *(8)    Ensure that Spanish-speaking LEP prisoners obtain the Spanish language translations of forms provided by DHS; and*

    *(9)    Provide its language assistance plan and related policies to all staff within 180 days of the Effective Date of this Agreement.*

*F.3.a. Within 180 days of the Effective Date, OPP shall provide at least eight hours of LEP training to all corrections and medical and mental health staff who may regularly interact with LEP prisoners.*

    *(1) LEP training to OPP staff shall include:*

        *i.    OPP's LEP plan and policies, and the requirements of Title VI and this Agreement;*

        *ii.    how to access OPP-authorized, telephonic and in-person OPPAIs; and*

        *iii.    basic commands and statements in Spanish for OPP staff.*

    *(2) OPP shall translate the language assistance plan and policy into Spanish, and other languages as appropriate, and post the English and translated versions in a public area of the OPP facilities, as well as online.*

    *(3) OPP shall make its language assistance plan available to the public.*



COMPLIANCE REPORT # 22        183

***F.4.***
  ***(1) OPP shall ensure that adequate bilingual staff are posted in housing units where DHS detainees and other LEP prisoners may be housed.***
  ***(2) OPP shall ensure that an appropriate number of bilingual staff are available to translate or interpret for prisoners and other OPP staff. The appropriate number of bilingual staff will be determined based on a staffing assessment by OPP.***

<u>Findings:</u>

F.1. a.  Substantial Compliance

F. 2. a. Substantial Compliance

F. 2. b. Substantial Compliance

F. 3. a. Partial Compliance

F. 4. Substantial Compliance

<u>Observations</u>:

  The Language Assistance Plan required by this paragraph has been prepared and finalized. F. 1. a. remains in substantial compliance.

  OPSO asserts that DHS and ICE inmates are not detained. OPSO developed a policy which was submitted to the Monitors. Provisions F. 2. a. and b. continue to be in substantial compliance.

  OPSO provided documentation regarding the use of the language line. OPSO has provided documentation regarding the number of bilingual staff and the manner in which the needs of language assistance are provided resulting in the continuance of substantial compliance for provisions of F. 4. The Consent Judgment specifically requires at least eight hours of LEP training for all deputies and mental health staff who may regularly interact with LEP inmates. Provision IV. F. 3. a. is determined in partial compliance as no proof of the eight hours of training was provided. Without proof, a claim of substantial compliance by OPSO is insufficient.

## IV. G.  Youthful Prisoners

***IV. G. Consistent with the Prison Rape Elimination Act of 2003, 42 U.S.C. § 15601, et seq., and its implementation of regulations, a youthful prisoner shall not be placed in a housing unit in which the youthful prisoner will have sight, sound, or physical contact with any adult prisoner through use of a shared dayroom or other common space, shower area, or sleeping quarters. In areas outside of housing units, OPSO shall either: maintain sight and sound separation between youthful prisoners and adult prisoners, or provide direct staff supervision when youthful prisoners and adult prisoners have sight, sound, or physical contact. OPP shall ensure that youthful prisoners in protective custody status shall have no contact with, or access to or from, non- protective custody prisoners. OPP will develop policies for the provision of developmentally appropriate mental health and programming services.***



Finding:

Substantial Compliance

Observations:

OPSO housed youthful offenders during the entire monitoring period. Youthful male inmates housed by OPSO are housed separately from adult inmates. Youthful female have sometimes been housed in a single cell within TMH, but it is rare that OPSO houses youthful female inmates. When youthful inmates are in contact with adult inmates outside of the housing units, such as attending programs or going to court, they are directly supervised. During the monitoring period, developmentally appropriate mental health services were provided to youthful inmates. Travis School continues to provide educational and programming services. The requirement for developmentally appropriate mental health and programming services is separate and apart from PREA.

Housing youthful offenders places an additional strain on the overcrowded conditions. As of the writing of this report, eighteen (18) male youthful offenders were occupying a housing unit designed for sixty (60) inmates and no female youthful offenders were being housed. In the past, OPSO utilized one off the mental health units to house female youthful offenders, resulting in a backlog of male mental health inmates in the OJC.

## VI. A – D. The New Jail Facility and Related Issues

### A. New Jail

*The Parties anticipate that Defendant will build a new jail facility or facilities that will replace or supplement the current facility located at 2800 Gravier Street, New Orleans, Louisiana. This Agreement shall apply to any new jail facility.*

Finding:

VI. A. Substantial Compliance.

### B. Design and Design Document

*Defendant shall obtain the services of a qualified professional to evaluate, design, plan, oversee, and implement the construction of any new facility. At each major stage of the facility construction, Defendant shall provide the Monitor with copies of design documents.*

Finding:

VI. B. Substantial Compliance

Observations:

These provisions apply to the construction of any new facility. Phase III is such a



facility. As the City is the entity overseeing the construction of Phase III, OPSO must coordinate with the City to provide copies of design document at each major stage. The City has been providing access to design documents and information regarding Phase III, but assistance from the Court has often been necessary to facilitate access.

### C. Staffing

***Defendant shall consult with a qualified corrections expert as to the required services and staffing levels needed for any replacement facility. OPSO shall complete a staffing study to ensure that any new facility is adequately staffed to provide prisoners with reasonable safety.***

Finding:

IV. C. Partial Compliance

Observations:

The Consent Judgment requires that the Defendant consult with a qualified corrections expert as to the required services and staffing levels needed for any replacement facility. A new staffing study was conducted for OJC. In addition, the Monitor agrees that Chief Mallett has the qualifications to complete a staffing study. However, OPSO still lacks the staff for its implementation or a plan as to how to go about the attainment of the required staff. The paragraph remains in partial compliance.

### D. Compliance with Code and Standards

***Defendant will ensure that the new jail facility will be built in accordance with: (1) the American Correctional Association's standards in effect at the time of construction; (2) the American with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101-12213, including changes made by the ADA Amendments of 2008 (P.L. 110-325) and 47 U.S.C. §§ 225-661, and the regulations there under; and (3) all applicable fire codes and regulations.***

Finding:

Monitors not qualified to evaluate.

Observations:

The Monitors do not have the knowledge or expertise to evaluate compliance with this paragraph. OPSO asserts that it is in compliance with this provision, without offering documentation. Documentation from the architect would be sufficient.

## VII. Compliance and Quality Improvement

### VII. A. Policies, Procedures, Protocols, Training Curriculum and Practices

***Within 120 days of the Effective Date, OPSO shall revise and/or develop its policies, procedures, protocols, training curricula, and practices to ensure that they are consistent with, incorporate, address, and implement all provisions of this Agreement. OPSO shall revise and/or develop, as necessary, other written documents, such as screening tools, logs, handbooks, manuals, and forms, to effectuate the provisions of this Agreement. OPSO shall send pertinent newly drafted and revised policies and procedures to the Monitor as they are promulgated. The Monitor will provide comments***



*on the policies to OPSO, SPLC, and DOJ within 30 days.*

*OPSO, SPLC, and DOJ may provide comments on the Monitor's comments within 15 days. At that point, the Monitor will consider the Parties' comments, mediate any disputes, and approve the policies with any changes within 30 days. If either party disagrees with the Monitor, they may bring the dispute to the Court. OPSO shall provide initial and in-service training to all Facility staff with respect to newly implemented or revised policies and procedures. OPSO shall document employee review and training in new or revised policies and procedures.*

Finding:

VII. A. Partial Compliance

Observations:

OPSO has now completed the development of the required policies. OPSO's efforts in the development of procedures and lesson plans resulted in this paragraph continuing to be in partial compliance. OPSO should continue to seek the input of the Monitors and Parties on any revisions of the policies required by the Consent Judgment. OPSO is reminded that it may not unilaterally change those policies.

## VII. (H). B.  Written Quality Improvement Policies and Procedures

*Within 180 days of the Effective Date, Defendant shall develop and implement written quality improvement policies and procedures adequate to identify serious deficiencies in protection from harm, prisoner suicide prevention, detoxification, mental health care, environmental health, and fire and life safety in order to assess and ensure compliance with the terms of this Agreement on an ongoing basis.  Within 90 days after identifying serious deficiencies, OPSO shall develop and implement policies and procedures to address problems that are uncovered during the course of quality improvement activities. These policies and procedures shall include the development and implementation of corrective action plans, as necessary, within 30 days of each biannual review.*

Finding:

VII. B. Partial compliance

Observations:

OPSO has developed corrective action plans to identify serious deficiencies, and to address problems that are uncovered during the course of quality improvement activities to warrant a finding of partial compliance. These corrective action plans have been agreed to by the parties and Monitors and have been filed with the Court. The plans contain specific performance measures, timelines, and the persons responsible. The issue now is implementation which will require the auditing of adherence to the action plan and appropriate accountability measures.

## VII. (I). C. Full-Time Compliance Coordinator

*The Parties agree that OPSO will hire and retain, or reassign a current OPSO employee for the duration of this Agreement, to serve as a full-time OPSO Compliance Coordinator. The Compliance Coordinator will serve as a liaison between the Parties and the Monitor and will assist with OPSO's*



*compliance with this Agreement. At a minimum, the Compliance Coordinator will: coordinate OPSO's compliance and implementation activities; facilitate the provision of data, documents, materials, and access to OPSO's personnel to the Monitor, SPLC, DOJ, and the public, as needed; ensure that all documents and records are maintained as provided in this Agreement; and assist in assigning compliance tasks to OPSO personnel, as directed by the Sheriff or his or her designee. The Compliance Coordinator will take primary responsibility for collecting information the Monitor requires to carry out the duties assigned to the Monitor.*

Finding:

Substantial Compliance

Observations:

Major Nicole Harris continues to serve as the full-time Compliance Coordinator.

### VII. (J.) D. Self-Assessment

*On a bi-annual basis, OPSO will provide the public with a self-assessment in which areas of significant improvement or areas still undergoing improvement are presented either through use of the OPSO website or through issuance of a public statement or report.*

Finding:

Substantial Compliance

Observations:

OPSO provides the assessment through its website. This provision is in substantial compliance.

### VIII. Reporting Requirements and Right of Access

### VIII. A. Periodic Compliance Reporting

*OPSO shall submit periodic compliance reports to the Monitor. These periodic reports shall be provided to the Monitor within four months from the date of a definitive judgment on funding; and every six months thereafter until termination of this Agreement. Each compliance report shall describe the actions Defendant has taken during the reporting period to implement this Agreement and shall make specific reference to the Agreement provisions being implemented. The report shall also summarize audits and continuous improvement and quality assurance activities, and contain findings and recommendations that would be used to track and trend data compiled at the Facility. The report shall also capture data that is tracked and monitored under the reporting provisions of the following provisions: Use of Force; Suicide Prevention; Health Care Delivered; Sanitation and Environmental Conditions; and Fire and Life Safety.*

Finding:

Substantial Compliance

Observations:

The required compliance reports were submitted during the monitoring period.

This provision is now in Substantial Compliance.

### VIII. B.  (Notification of) Death of Any Prisoner

*OPSO shall, within 24 hours, notify the Monitor upon the death of any prisoner. The Monitor shall forward any such notifications to SPLC and DOJ upon receipt. OPSO shall forward to the Monitor*



*incident reports and medical and/or mental health reports related to deaths, autopsies, and/or death summaries of prisoners, as well as all final SOD and IAD reports that involve prisoners. The Monitor shall forward any such reports to SPLC and DOJ upon receipt.*

Finding:

Substantial Compliance

### VIII. C. Records

*Defendant shall maintain sufficient records to document that the requirements of this Agreement are being properly implemented and shall make such records available to the Monitor within seven days of request for inspection and copying. In addition, Defendant shall maintain and provide, upon request, all records or other documents to verify that they have taken the actions described in their compliance reports (e.g., census summaries, policies, procedures, protocols, training materials, investigations, incident reports, tier logs, or use of force reports).*

Finding:

Substantial Compliance

Observations:

During this compliance period, OPSO provided the Monitors with any records requested within seven (7) days of request with the exception of some requests made by the Medical Monitor and Mental Health Monitor. This provision is in substantial compliance, but improvement to responses from Wexford is still warranted.

### III. Stipulated Orders

OPSO and the Plaintiffs/DOJ negotiated two agreements after Compliance Report #3. OPSO and the Plaintiffs/DOJ agreed to a third Stipulation and Order after Compliance Report #20 which was signed on June 17, 2024. The language of the Stipulated Orders is linked directly to the Consent Judgment and represent priority areas for inmate safety. Some of them require a one-time action such as the posting of a memorandum or providing training by a specific date. Some of the provisions of the Stipulated Order of February 11, 2015, contain on-going obligations that are in addition to the Consent Judgment or clarify the obligations under the Consent Judgment. All of the provisions of the Stipulation and Order of June 17, 2024, contain on-going obligations that are in addition to the Consent Judgment or expand the obligations under the Consent Judgment.

The three provisions of the April 22, 2015, Stipulated Order are in substantial compliance and contained provisions that were to be accomplished by specific dates during April 2015. As those dates have passed, the Monitors no longer monitor those provisions. The Stipulated Order of February 11, 2015 has provisions which require



ongoing compliance. As of Report #21, OPSO's compliance with the June 17, 2024 Stipulation and Order is included.

Stipulated Order of February 11, 2015:

*1. a. At each of the scheduled Court status conferences, the Sheriff or his designee shall report to the Court regarding OPSO's compliance status with each section (e.g. Section IV.A, IV.B.) of the Consent Judgment. This report shall include a summary of OPSO's progress since the immediate previously scheduled status conference and will include in the reporting OPSO's planned actions in the next 60 days to come into compliance.*

Finding:

Partial Compliance

Observations:

OPSO has not sufficiently complied with the requirements of this provision. This provision envisions outlining planned actions in the form of a report to the Court. Those are now being filed with the Court as to the items found in non-compliance in Report #20, but not as to those in partial compliance.

*1. b. OPSO shall comply with the Consent Judgment's requirement for periodic a compliance report as set forth in Consent Judgment Section VIII.A.2. The report shall describe the steps OPSO has taken in furtherance of compliance, and the activities planned during the next reporting period. The first report is due by April 1, 2015, and periodic reports shall be due in accordance with Section VIII.A, and/or on dates mutually agreed to by the parties and the Monitors, and approved by the Court, as necessary.*

Finding:

Partial Compliance

Observations:

OPSO has not sufficiently complied with the requirements of this provision. This provision envisions outlining planned actions in the form of a report to the Monitors every six months.

*1. c. Within 24 hours of the occurrence of any of the following incident, OPSO shall notify the Monitor via email:*
- *Death of an inmate/arrestee while held in custody (or housed in a hospital to which the inmate has been committed for care and retain in the custody of OPSO; or whose injury occurred while in custody and was subsequently released from custody);*
- *An inmate's/arrestee's suicide, suicide attempt, aborted suicide attempt, suicidal intent, and/or deliberate suicide self-harm gesture as defined by the American Psychiatric Association;*
- *An inmate's allegation of sexual abuse, sexual assault, sexual harassment, or voyeurism whether the incident is between or among inmates, or between or among inmates and a staff/contractor or volunteer;*
- *An inmate's report, or a report by a staff/contractor or volunteer, of any inmate/inmate allegation of assault; or other inmate allegation of felonies occurring to them while in custody;*



- *An inmate's report of a report by a staff/contractor or volunteer, of any allegation of excessive force by an employee, volunteer or contractor;*
- *Suspension or arrest of any OPSO employee, volunteer, or contractor for alleged criminal activities while on-duty and/or in a facility under the control of OPSO; and*
- *Any recovery of significant contraband, specifically weapons.*

Finding:

Partial Compliance

Observations:

OPSO has not sufficiently complied with the requirements of this provision. At best, the Monitor learns of some of the items through incident reports, review of investigations and newspaper reports. Seldom is the notification within 24 hours. OPSO should put in place a system to comply with this provision. It is suggested that the notification come from the Chief of Corrections or the Administrative Colonel as they are more likely to be aware of the occurrence of the triggering events.

*5. b. Commencing March 1, 2015, OPSO will make available to the Monitors, at the Monitors' request, the quarterly reviews conducted by ISB and the command staff regarding the operation of the EIS system, including supporting documentation reviews, as delineated by Section IV A. 4. b., c., d., and e. of the Consent Judgment.*

Finding:

Partial Compliance

Observations:

OPSO has not sufficiently complied with the requirements of this provision. As noted in the rating and comments in Section IV. A. above, simply providing a list of names with no indication that the command staff has reviewed the list and determined what action, if any, should be taken is insufficient.

*7. a. OPSO shall provide a monthly report to the Monitors, identifying the number of deputies hired the previous month; the number of deputies who resigned, if known, the reason for resignation, and the date the deputy entered service; and the number of deputies who were terminated, the reason for termination, and the date the deputy entered service. The same report shall be provided for non-sworn (civilian staff). A cumulative annual total will also be included as part of this report.*

Finding:

Substantial Compliance

Observations:

OPSO provides a monthly report that complies with the requirements of this provision.

*7. c. At the scheduled status conferences with the Court, OPSO shall report regarding progress to*



*achieving hiring based on the plan, as well as any modifications and update to the plan.*

Finding:

Partial Compliance

Observations:

OPSO has not sufficiently complied with the requirements of this provision. This provision envisions outlining progress on adherence to the recruitment plan in the form of a report to the Court.

Stipulation and Order of June 17, 2024:

**1. _Non-Compliance Corrective Action Planning_**
**a. OPSO shall implement the steps identified in the Non-Compliance Corrective Action Plan by the deadlines reported therein.**
**b. OPSO shall provide Plaintiffs and the Monitor with a monthly report regarding progress until those provisions are in substantial compliance. The Non-Compliance Monthly Report shall be sent to Plaintiffs and the Monitor three days before the regularly scheduled monthly meeting between OPSO, Plaintiffs, and the Monitor.**
**c. OPSO shall file the Non-Compliance Monthly Report with the Court once every quarter for the next calendar year. Specifically, OPSO shall file the Non-Compliance Monthly Report within 7 days of the monthly meeting held in August 2024, November 2024, February 2025, and May 2025.**

Finding:

Partial Compliance

Observations:

While OPSO has timely provided monthly reports on the Non-Compliance Action Plan and timely filed the reports within the quarterly meetings held during the monitoring period, OPSO has consistently failed to implement the steps identified by the deadlines contained therein as indicated in OPSO's own reports.

**2. _OPSO Communications to Plaintiffs and the Monitor_**
**a. Right of Access (VIII.D.-E.) Within 30 days, OPSO shall designate a new or current OPSO employee to serve under the title of "Compliance Information Officer" (CIO). The CIO will be responsible for responding to written requests for information from one or both of the Plaintiffs, including by orchestrating the production of requested documents in the possession or control of OPSO, within 14 days of receipt of such requests, consistent with paragraph 12a. of the 06/21/16 Stipulated Order. R. Doc. No. 1082. The CIO will work with OPSO staff and contractors to ensure timely production of document to the CIO within 10 days of the CIO's request to staff. If documents do not exist or are not responsive to the Plaintiffs' request for document, the OPSO employee or contractor must describe those particularized reasons for non-production of documents in a memorandum to the CIO with 10 days of the CIO's request for document. The CIO shall provide a memorandum each monitoring period to the Monitor and Plaintiffs about OPSO's compliance with this section.**

Finding:

Partial Compliance



Observations:

OPSO has failed to provide documents requested within 14 days of receipt of the request on numerous occasions. Also, OPSO failed to provide a memorandum for this monitoring period regarding compliance with this section. This provision is in danger of being downgraded to Non-Compliance.

**3.   _Staffing, Staffing Plans, and Recruitment (IV.A.6.a.-b.)_**
**a.  Within 65 days, OPSO shall implement an Emergency Security Staffing Plan (ESSP). Under the ESSP, at least one deputy must be assigned to and must be physically present (and not in the pod module) on 2A (or any unit that has been designated by the Housing Unit Assignment Plan ("HUAP") as the MH (mental health) or SW (suicide watch) or DO (direct observation) or MH seg (mental health segregation) unit in the Orleans Justice Center ("OJC") , 2C (or any unit that has been designated by the HUAP to hold youthful offenders), 2D (or the units that has been designated by the HUAP to hold youthful offenders), and 3C (or the unit that has been designated by the HUAP as the male disciplinary unit) 24 hours a day, 7 days a week. This deputy may not be assigned to other units and must be physically on the unit (and not in the pod module) at all times during their shift, but shall be periodically relieved by another deputy and/or supervisor during meals or breaks. The ESSP must describe how other deputies and/or supervisors will relieve the deputy assigned to 2A, 2C, 2D, and 3C during meals and breaks to ensure 24/7 physical staffing on these units. OPSO shall provide a memorandum each monitoring period to the Monitor and Plaintiffs about OPSO's compliance with this section.**

Finding:

Partial Compliance

Observations:

OPSO implemented the Emergency Security Staffing Plan (ESSP), but at least one deputy was not consistently assigned to the required housing units. OPSO provides the required memorandum during the monitoring period.

**4.  _Custodial Placement Within OPSO (IV.A.10.)_**
**a.  _Classification System Validation (IV.A.10.f.)_**
**i.  Within 90 days, OPSO shall secure a contract with a qualified organization or individual for the validation of the classification system. OPSO shall provide a copy of the contract to the Monitor and Plaintiffs upon its execution.**
**ii.  The validation of the classification system shall be completed within 180 days. OPSO shall provide documentation of the validation to the Monitor and Plaintiffs upon its completion**.

Finding:

Substantial Compliance

Observations:

OPSO secured a contract for validation of the classification system within 90 days and provided it to the Monitors and Plaintiffs. The validation was completed within 180 days. OPSO provided documentation of the validation to the Monitors and Plaintiffs upon its completion.

**5.  _Grievances (IV.A.11.a.(1), (3))_**
**Within 90 days, OPSO shall secure a contract for the supply of electronic kiosks that can be used to**



*file confidential grievances electronically in each housing unit. The electronic kiosks, that will replace the currently non-functioning kiosks, shall be installed in each of the housing units, and shall be in workable order and fully operational, within 180 days. OPSO shall provide a copy of the contract to the Monitor and Plaintiffs upon its execution.*

Finding:

Partial Compliance

Observations:

OPSO secured the contract for the supply of electronic kiosks for the confidential filing of grievances. It was not in workable order nor fully operation within 180 days. It became operational in April 2025; seven months into the monitoring period.

### 6.  *Medical and Mental Health Care (IV.B.-C.)*
*a.  Within 90 days, OPSO shall create and implement a system of notifying the Provider's mental health staff of every use of force incident by radio. For planned use of force incidents and use of force incidents where OPSO staff does not need to use immediate for to preserve the safety of staff or the safety of OPSO residents, a supervisor will radio for mental health staff prior to the use of force. This does not replace the need for identification and response to other triggering events, such as mental health involvement in de-escalation in advance of the use of force. Within 90 days, OPSO shall train deputies on the system and need to alert the Provider's mental health staff of all use of force incidents so the Provider can conduct a mental health assessment. OPSO shall provide the Monitor and Plaintiffs with documentation showing the change, the materials used during the training, and a record of who received the training*.

Finding:

Partial Compliance

Observations:

OPSO implemented a system of notifying the mental health staff of every use of force incident by radio but did not effectively implement it. While roll call training was provided, the necessary documentation was not provided.

### 7.  *Sanitation and Environment Conditions (IV.D.1.)*
*Within 60 days, OPSO shall develop and implement a cleaning program to ensure that all housing units, including common areas, day rooms, restrooms, and shower areas are cleaned at least once per week. The date of the weekly cleanings shall be documented by OPSO staff, and all housing units shall be inspected at least once a week by a security or cleaning supervisor to ensure compliance. A description of the cleaning program and documentation of its implementation shall be sent to the Monitor and Plaintiffs. Updates to the cleaning program must be submitted to the Plaintiffs and Monitor each monitoring cycle.*

Finding:

Partial Compliance

Observations:

OPSO developed and implemented a cleaning program, but the cleaning program, with the exception of the showers, was not effectively implemented so as to result in cleaning at least once per week. While documentation has improved, it was consistently provided during the monitoring period.



| | Report # 1 2/13/14 | Report # 2 8/26/14 | Report # 3 2/25/15 | Report # 4 9/9/15 | Report # 5 3/17/16 | Report # 6 10/25/16 | Report # 7 5/1/17 | Report # 8 1/12/18 | Report # 9 8/25/18 | Report # 10 3/18/19 | Report #11 9/19/19 | Report # 12 3/6/20 | Report #13 11/16/20 | Report # 14 5/17/21 | Report #15 11/15/21 | Report #16 06/26/22 | Report #17 12/08/22 | Report #18 07/13/23 | Report #19 12/07/23 | Report #20 06/24/24 | Report #21 12/19/24 | Report#22 07/28/24 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *IV.A. 1. Use of Force Policies and Procedures/Margo Frasier* | | | | | | | | | | | | | | | | | | | | | | |
| *IV. A. 1.a.* | ND | NC | NC | PC | NC | PC | PC | PC | PC | SC | SC | SC | SC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| *IV. A. 1.b.* | ND | NC | NC | PC | NC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | | SC | SC | SC | PC | PC |
| *IV. A. 1.c.* | ND | NC | NC | PC | NC | NC | PC | PC | SC | SC | PC | PC | PC | PC | NC | NC | NC | PC | PC | | SC | SC |
| *IV.A.2. Use of Force Training/Margo Frasier and Shane Poole* | | | | | | | | | | | | | | | | | | | | | | |
| *IV. A. 2. a.* | ND | NC | NC | PC | NC | PC | PC | PC | PC | SC | SC | SC | PC | SC | SC | PC | PC | PC | PC | PC | PC | SC |
| *IV. A. 2. b.* | ND | NC | NC | PC | NC | PC | PC | PC | PC | SC | SC | SC | PC | SC | SC | PC | PC | PC | PC | PC | PC | PC |
| *IV. A. 2. c.* | ND | NC | NC | NC | NC | NC | NC | NC | PC | PC | SC | SC | SC | SC | PC | SC | SC | SC | SC | SC | SC | PC |
| *IV.A.3. Use of Force Reporting/Margo Frasier* | | | | | | | | | | | | | | | | | | | | | | |
| *IV. A.3 a.* | ND | NC | NC | NC | NC | PC | PC | PC | PC | SC | PC | PC | SC | SC | PC | SC | PC | PC | PC | PC | PC | PC |
| *IV. A.3 b.* | ND | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC | PC | PC | PC | PC | PC | PC | PC | PC |
| *IV. A.3 c.* | ND | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC | PC | PC | PC | PC | PC | PC | PC |
| *IV. A.3 d.* | ND | NC | NC | PC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| *IV. A.3 e.* | ND | NC | NC | PC | PC | PC | PC | PC | SC | SC | PC | PC | SC | SC | PC | PC | PC | PC | PC | PC | PC | PC |
| *IV. A.3 f.* | ND | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| *IV. A.3 g.* | ND | NC | NC | PC | NC | PC | PC | PC | SC | SC | SC | SC | SC | SC | PC | SC | SC | SC | PC | PC | PC | PC |
| *IV. A.3 h.* | ND | NC | NC | NC | NC | NC | NC | NC | PC | SC | SC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| *IV.A.4. Early Intervention System ("EIS") /Margo Frasier and Shane Poole* | | | | | | | | | | | | | | | | | | | | | | |
| *IV.A.4.a.* | ND | NC | NC | PC | PC | PC | NC | NC | PC | PC | SC | SC | SC | SC | PC | PC | PC | PC | PC | PC | PC | PC |
| *IV.A.4.b.* | ND | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| *IV.A.4.c.* | ND | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | PC | PC | PC | PC | PC | PC | PC | PC |

| Item | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IV.A.4.d. | ND | NC | NC | NC | NC | PC | PC | NC | NC | PC | SC | SC | SC | SC | SC | PC | PC | PC | PC | PC | PC |
| IV.A.4.e. | ND | ND | ND | ND | NC | NC | NC | NC | SC | SC | SC | SC | SC | SC | PC | PC | PC | PC | PC | PC | PC |
| *IV.A.5. Safety and Supervision/Margo Frasier* | | | | | | | | | | | | | | | | | | | | | |
| IV.A.5.a. | ND | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.A.5.b. | ND | NC | NC | NC | NC | NC | NC | NC | NC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.5.c. | ND | NC | NC | NC | NC | NC | NC | PC | PC | PC | SC | SC | SC | SC | SC | PC | PC | PC | PC | PC | PC |
| IV.A.5.d. | NC | NC | PC | PC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | NC | NC | NC | NC | NC |
| IV.A.5.e. | ND | NC | NC | PC | PC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.A.5.f. | ND | NC | NC | PC | PC | SC | SC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | PC |
| IV.A.5.g. | ND | NC | ND | PC | NC | NC | NC | NC | NC | PC | SC | SC | SC | SC | SC | SC | SC | PC | PC | SC | SC |
| IV.A.5.h. | ND | NC | NC | NC | NC | NC | NC | PC | PC | SC | SC | PC | PC | PC | PC | PC | PC | PC | PC | PC | SC |
| IV.A.5.i. | ND | NC | NC | PC | PC | PC | PC | PC | SC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | NC | NC |
| IV.A.5.j. | ND | NC | PC | PC | NC | NC | PC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | NC | PC | NC |
| IV.A.5.k. | ND | NC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | PC | PC | PC | PC | NC | NC | NC | PC | PC |
| IV.A.5.l. | ND | NC | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC | PC | PC | PC | PC | PC | PC | PC | SC | SC |
| *IV.A.6. Security Staffing/Margo Frasier* | | | | | | | | | | | | | | | | | | | | | |
| IV.A.6.a. | ND | PC | PC | PC | SC | SC | PC | PC | SC | SC | SC | SC | PC | PC | PC | NC | NC | NC | NC | NC | NC |
| IV.A.6.b. | NC | PC | PC | NC | PC | PC | PC | PC | SC | SC | SC | PC | PC | PC | NC | NC | NC | NC | PC | PC | PC |
| *IV.A.7 Incidents and Referrals/Margo Frasier* | | | | | | | | | | | | | | | | | | | | | |
| IV.A.7.a. | ND | NC | NC | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | PC |
| IV.A.7.b. | ND | NC | NC | PC | NC | PC | PC | PC | PC | PC | PC | SC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.A.7.c. | ND | NC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.7.d. | ND | NC | NC | NC | NC | NC | NC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.7.e. | ND | NC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | PC | PC | PC | PC | PC | PC |
| IV.A.7.f. | ND | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.7.g. | ND | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.7.h. | ND | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.7.i. | ND | NC | NC | PC | NC | NC | NC | NC | NC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.7.j. | ND | NC | NC | NC | NC | NC | NC | NC | NC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |

| | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **IV.A.8. Investigations/Margo Frasier** | | | | | | | | | | | | | | | | | | | | | | |
| IV.A.8.a. | ND | NC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | PC | PC | PC | PC | PC | PC | PC |
| IV.A.8.b. | ND | NC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.8.c. | ND | NC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | PC | PC | PC | SC | SC | SC | SC |
| IV.A.8.d. | ND | NC | NC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.8.e. | ND | NC | NC | PC | PC | PC | PC | SCSC | | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.8.f. | ND | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | PC |
| **IV.A.9. Pretrial Placement in Alternative Settings/Margo Frasier** | | | | | | | | | | | | | | | | | | | | | | |
| IV.A.9.a. | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.9.b. | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| **IV.A.10. Custodial Placement within OPP/Patricia Hardyman** | | | | | | | | | | | | | | | | | | | | | | |
| IV.A.10.a. | NC | PC | SC | PC | SC | PC | PC | PC | PC | SC | SC | SC | SC | PC | PC | NC | PC | PC | PC | PC | PC | PC |
| IV.A.10.b. | NC | NC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.10.c. | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | PC | PC | PC | SC | SC | SC | SC |
| IV.A.10.d. | NC | NC | PC | PC | PC | PC | PC | NC | PC | SC | PC | PC | SC | SC | SC | PC | NC | NC | NC | NC | NC | PC |
| IV.A.10.e. | NC | NC | PC | SC | PC | PC | SC | PC | PC | PC | PC | PC | SC | PC | PC | NC | NC | SC | NC | PC | SC | SC |
| IV.A.10.f. | NC | NC | NC | NC | NC | PC | PC | PC | NC | SC | PC | PC | PC | PC | PC | PC | NC | NC | NC | NC | PC | PC |
| IV.A.10.g. | NC | NC | NC | NC | NC | PC | PC | PC | SC | SC | SC | SC | SC | SC | PC | NC | SC | SC | SC | | SC | SC |
| IV.A.10.h. | ND | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | PC | SC | PC | SC | NC | SC | SC | SC | SC | SC |
| **IV.A.11. Prisoner Grievance Process/Margo Frasier and Shane Poole** | | | | | | | | | | | | | | | | | | | | | | |
| IV.A.11.a | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | | | | | | | | | | | | |
| IV.A.11.a.(1) | | | | | | | | | | | SC | SC | SC | SC | SC | SC | PC | PC | PC | PC | PC | SC |
| IV.A.11.a.(2) | | | | | | | | | | | PC | PC | PC | PC | PC | PC | NC | NC | PC | PC | PC | PC |
| IV.A.11.a.(3) | | | | | | | | | | | SC | SC | SC | SC | SC | SC | PC | PC | | | SC | SC |
| IV.A.11.a.(4) | | | | | | | | | | | SC | SC | SC | SC | SC | SC | PC | PC | | | SC | SC |
| IV.A.11.a.(5) | | | | | | | | | | | SC | SC | SC | SC | SC | SC | PC | PC | | | SC | SC |
| IV.A.11.a.(6) | | | | | | | | | | | PC | PC | SC | SC | SC | SC | SC | PC | PC | PC | SC | SC |
| **IV.A.12. Sexual Abuse/Margo Frasier** | | | | | | | | | | | | | | | | | | | | | | |
| IV.A.12. | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | PC | PC | PC | PC | PC | PC | | PC | PC |
| **IV.A.13. Access to Information/Margo Frasier** | | | | | | | | | | | | | | | | | | | | | | |

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | A | B |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IV.A.13. | PC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | PC | NC | NC | NC | PC | SC |
| **IV. B. Mental Health Care** | | | | | | | | | | | | | | | | | | | | | | |
| *IV.B.1. Screening and Assessment/Nicole Johnson* | | | | | | | | | | | | | | | | | | | | | | |
| IV.B.1.a. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | PC | PC | SC | SC | SC | SC | PC | PC | PC | SC |
| IV.B.1.b. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | PC | SC | SC | SC | SC | SC | SC | PC | PC |
| IV.B.1.c. | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | PC | SC | SC | SC | SC | SC | SC | PC | PC |
| IV.B.1.d. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | PC | PC | SC | SC | SC | SC | PC | SC | PC | PC |
| IV.B.1.e. | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.1.f. | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.1.g. | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | PC | PC |
| IV.B.1.h. | NC | NC | NC | NC | NC | NC | NC | NC | PC | SC | SC | SC | SC | SC | SC | SC | PC | PC | PC | PC | PC | PC |
| IV.B.1.i. | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.1.j. | NC | NC | NC | PC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.1.k. | NC | NC | NC | PC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.1.l. | NC | NC | NC | NC | NC | NC | NC | NC | SC | SC | SC | PC | PC | PC | PC | SC | SC | SC | PC | PC | PC | PC |
| *B. 2. Treatment/Nicole Johnson* | | | | | | | | | | | | | | | | | | | | | | |
| IV.B.2.a. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.2.b. | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.2.c. | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.2.d. | NC | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | SC |
| IV.B.2.e. | NC | NC | NC | PC | PC | PC | PC | NC | NC | PC | SC | SC | SC | PC | SC | SC | SC | SC | SC | SC | PC | PC |
| IV.B.2.f. | NC | NC | NC | PC | PC | PC | NC | PC | PC | PC | SC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.2.g. | NC | NC | NC | PC | PC | PC | NC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | PC |
| IV.B.2.h. | NC | NC | NC | PC | PC | PC | PC | PC | NC | PC | SC | SC | PC | PC | PC | PC | PC | PC | PC | PC | PC | SC |
| *IV.B.3. Counseling/Nicole Johnson* | | | | | | | | | | | | | | | | | | | | | | |
| IV.B.3.a. | NC | NC | NC | NC | PC | NC | NC | PC | PC | PC | PC | PC | PC | NC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.3.b. | NC | NC | NC | NC | PC | PC | NC | PC | PC | PC | PC | PC | PC | NC | PC | PC | SC | SC | SC | SC | PC | SC |
| *IV.B.4. Suicide Prevention Training Program/Nicole Johnson* | | | | | | | | | | | | | | | | | | | | | | |
| IV.B.4.a. | NC | NC | NC | PC | PC | PC | PC | PC | NC | PC | PC | PC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.4.b. | NC | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | PC | PC | PC | SC | SC | SC | SC | SC | SC |

| | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IV.B.4.c. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | PC | SC | SC | SC | SC | SC | SC | SC |
| IV.B.4.d. | NC | NC | NC | PC | NC | NC | NC | NC | NC | PC | PC | PC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.4.e. | NC | NC | NC | PC | NA | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | PC | PC | PC | SC | SC |
| IV.B.4.f. | NC | NC | NC | NC | PC | PC | NC | NC | SC | SC | SC | SC | SC | SC | PC | PC | PC | PC | PC | SC | SC | SC |
| IV.B.4.g. | NC | NC | NC | SC | PC | NC | NC | NC | PC | NC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| **IV.B.5. Suicide Precautions/Nicole Johnson** | | | | | | | | | | | | | | | | | | | | | | |
| IV.B.5.a. | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.5.b. | NC | NC | NC | NC | NC | NC | NC | PC | PC | SC | PC | PC | PC | NC | NC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.5.c. | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.5.d. | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | PC | PC | PC |
| IV.B.5.e. | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.5.f. | NC | NC | NC | NC | NC | NC | NC | NC | PC | SC | SC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.5.g. | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.B.5.h. | NC | NC | NC | NC | NC | NC | PC | NC | PC | PC | SC | SC | SC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.5.i. | NC | NC | NC | NC | NC | NC | PC | NC | SC | SC | SC | SC | SC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.5.j. | NC | NC | NC | NC | NC | NC | NC | PC | NC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | PC | SC |
| IV.B.5.k. | NC | NC | NC | NC | NC | NC | NC | PC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| **IV.B.6. Use of Restraints/Nicole Johnson** | | | | | | | | | | | | | | | | | | | | | | |
| IV.B.6.a. | PC | NC | PC | PC | PC | PC | PC | PC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.6.b. | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | PC |
| IV.B.6.c. | ND | NC | PC | PC | PC | PC | PC | PC | NC | PC | NC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | PC |
| IV.B.6.d. | ND | NC | PC | PC | PC | PC | PC | PC | NC | PC | PC | SC | SC | PC | PC | SC | SC | SC | SC | SC | SC | SC |
| IV.B.6.e. | NC | NC | PC | PC | PC | PC | PC | PC | NC | PC | NC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | PC |
| IV.B.6.f. | NC | NC | PC | PC | PC | PC | PC | PC | NC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | PC |
| IV.B.6.g. | NC | NC | PC | PC | PC | PC | PC | PC | NC | PC | NC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | PC |
| **IV.B.7. Detoxification and Training/Nicole Johnson/Susi Vassallo** | | | | | | | | | | | | | | | | | | | | | | |
| IV.B.7.a. | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.7.b. | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | PC | PC | PC |
| IV.B.7.c. | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | NC | NC | PC | PC | PC | PC | PC |
| IV.B.7.d. | NC | NC | PC | PC | PC | PC | PC | PC | PC | NC | PC | PC | PC | SC | SC | SC | NC | PC | PC | NC | PC | PC |

| | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **IV.B.8. Medical and Mental Health Staffing/Nicole Johnson/Susi Vassallo** | | | | | | | | | | | | | | | | | | | | | | |
| IV.B.8.a. | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.8.b. | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | PC | | PC | PC |
| **IV.B.9. Risk Management/Nicole Johnson/Susi Vassallo** | | | | | | | | | | | | | | | | | | | | | | |
| IV.B.9.a. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | | PC | PC |
| IV.B.9.b. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | | PC | PC |
| IV.B.9.c. | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | | PC | PC |
| IV.B.9.d. | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | | PC | PC |
| IV.B.9.e. | NC | NC | NC | NC | PC | PC | PC | PC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | | PC | PC |
| IV.B.9.f. | NC | NC | NC | NC | PC | PC | PC | PC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | NC | | NC | NC |
| **IV.C. Medical Care** | | | | | | | | | | | | | | | | | | | | | | |
| *See SA 2/11/15 13.* | | | | | | | | | | | | | | | | | | | | | | |
| **IV. C. Quality Management of Medication Administration/Susi Vassallo** | | | | | | | | | | | | | | | | | | | | | | |
| IV.C.1.a. | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | PC | PC | PC | PC | PC |
| IV.C.1.b. | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | SC | PC | PC | SC | PC | PC | | PC | PC |
| IV.C.1.c. | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | PC | SC | SC | SC | SC | SC | SC | | SC | PC |
| IV.C.1.d. | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | PC | PC | PC | PC | PC | PC | PC | | PC | PC |
| **IV.C.2. Health Care Delivered/Susi Vassallo** | | | | | | | | | | | | | | | | | | | | | | |
| IV.C.2.a. | NC | NC | NC | PC | PC | PC | PC | PC | PC | NC | PC | PC | SC | SC | SC | PC | PC | PC | PC | | PC | PC |
| IV.C.2.b. | NC | NC | NC | PC | PC | PC | PC | PC | PC | NC | PC | PC | PC | PC | PC | PC | SC | PC | PC | | PC | PC |
| **IV.C.3. Release and Transfer/Susi Vassallo** | | | | | | | | | | | | | | | | | | | | | | |
| IV.C.3.a. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.C.3.b. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.C.3.c. | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.C.3.d. | NC | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| **IV.D. Sanitation and Environmental Conditions/Shane Poole** | | | | | | | | | | | | | | | | | | | | | | |
| IV.D.1.a. | NC | NC | NC | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | NC | NC | NC | NC | | PC | PC |
| IV.D.1.b. | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | PC | PC | PC | PC | | PC | NC |
| IV.D.1.c. | NC | NC | PC | PC | NC | NC | PC | SC | PC | PC | SC | SC | SC | SC | SC | NC | NC | PC | PC | | PC | PC |
| IV.D.1.d. | NC | NC | NC | NC | SC | SC | SC | SC | SC | SC | SC | SC | PC | PC | PC | NC | NC | SC | PC | SC | PC | PC |

| | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *IV. D. 1.e.* | NC | PC | PC | PC | PC | PC | PC | SC | PC | SC | SC | SC | SC | SC | SC | SC | SC | PC | PC | PC | PC | PC |
| *IV. D. 1.f.* | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC | PC | PC | SC | PC | PC | PC | PC | PC | PC |
| *IV. D. 1.g.* | NC | NC | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| *IV. D. 1.h.* | NC | NC | NC | PC | NC | PC | NC | NC | NC | PC | PC | PC | SC | SC | SC | SC | SC | PC | PC | SC | SC | SC |
| *IV. D. 2. Environmental Control/Shane Poole* | | | | | | | | | | | | | | | | | | | | | | |
| *IV. D. 2.a.* | NC | NC | PC | PC | PC | SC | SC | SC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | PC |
| *IV. D. 2.b.* | NC | NC | NC | NC | NC | SC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | PC | PC | PC | PC | PC | PC |
| *IV. D. 3. Food Service/Diane Skipworth* | | | | | | | | | | | | | | | | | | | | | | |
| *IV. D. 3.a.* | NC | NC | NC | PC | PC | PC | NC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| *IV. D. 3.b.* | NC | NC | NC | PC | PC | PC | NC | NC | NC | NC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| *IV. D. 3.c.* | NC | NC | NC | PC | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | PC | PC | SC | SC | SC | SC |
| *IV. D. 4. Sanitation and Environmental Conditions Reporting/Shane Poole* | | | | | | | | | | | | | | | | | | | | | | |
| *IV. D. 4.a.* | NC | NC | PC | PC | PC | PC | PC | PC | NC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| *IV. D. 4.b.* | NC | NC | NC | NC | NC | NC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | PC | PC | SC | SC | PC | PC |
| *IV.E. Fire and Life Safety/Shane Poole* | | | | | | | | | | | | | | | | | | | | | | |
| *IV. E. 1. Fire and Life Safety* | | | | | | | | | | | | | | | | | | | | | | |
| *IV. E. 1.a.* | NC | PC | PC | PC | PC | PC | PC | SC | PC | PC | PC | PC | SC | SC | SC | SC | SC | PC | NC | SC | SC | SC |
| *IV. E. 1.b.* | NC | NC | NC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| *IV. E. 1.c.* | PC | PC | PC | PC | NC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | PC | SC | SC | SC | SC |
| *IV. E. 1.d.* | NC | NC | NC | NC | NC | NC | PC | SC | PC | SC | SC | SC | SC | NC | PC | SC | SC | SC | PC | PC | PC | PC |
| *IV. E. 1.e.* | ND | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| *IV. E. 2. Fire and Life Safety Reporting* | | | | | | | | | | | | | | | | | | | | | | |
| *IV. E. 2.a.1-3* | ND | NC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | PC | PC | SC | SC | SC | SC | SC | SC |
| *IV. E. 2.b.* | ND | NC | NC | PC | NC | NC | NC | PC | SC | SC | SC | SC | SC | SC | SC | SC | PC | SC | SC | SC | SC | SC |
| *IV.F. Language Assistance* | | | | | | | | | | | | | | | | | | | | | | |
| *SCIV.F.1. Timely and Meaningful Access to Services/Margo Frasier* | | | | | | | | | | | | | | | | | | | | | | |
| *IV.F.1.a.* | ND | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| *IV.F.2. Language Assistance Policies and Procedures/Margo Frasier* | | | | | | | | | | | | | | | | | | | | | | |
| *IV.F.2.a.* | ND | PC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |

| | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *IV.F.2.b.* | ND | PC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| *IV.F.3. Language Assistance Training/Margo Frasier* | | | | | | | | | | | | | | | | | | | | |
| *IV.F.3.a.* | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| *IV.F.4. Bilingual Staff/Margo Frasier* | | | | | | | | | | | | | | | | | | | | |
| *IV.F.4.* | NC | PC | PC | PC | PC | NC | NC | NC | NC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| *IV.G. Youthful Prisoners/Margo Frasier* | | | | | | | | | | | | | | | | | | | | |
| *IV.G.* | NC | NC | NC | PC | PC | PC | NC | NC | PC | PC | PC | PC | SC | SC | SC | SC | SC | PC | SC | SC |
| *VI. The New Jail Facility/Margo Frasier* | | | | | | | | | | | | | | | | | | | | |
| *VI. A.* | ND | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| *VI. B.* | NC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| *VI. C.* | ND | PC | SC | SC | PC | PC | PC | PC | SC | SC | SC | SC | SC | PC | PC | PC | PC | PC | PC | PC |
| *VI. D.* | Monitors Not Qualified to Evaluate | | | | | | | | | | | | | | | | | | | |
| *VII. Compliance and Quality Improvement/Margo Frasier* | | | | | | | | | | | | | | | | | | | | |
| *VII. A.* | ND | NC | NC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | PC | SC | PC | PC | PC |
| *VI. B. (H.)* | NC | NC | NC | NC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| *VI. C. (I.)* | NC | NC | SC | SC | NC | SC | SC | NC | PC | SC | SC | SC | SC | SC | PC | PC | PC | SC | SC | SC |
| *VI. D. (J.)* | ND | NC | NC | PC | PC | PC | PC | NC | NC | NC | SC | SC | SC | SC | PC | PC | PC | SC | SC | SC |
| *VIII. Reporting Requirements and Right of Access/Margo Frasier* | | | | | | | | | | | | | | | | | | | | |
| *VIII.A.* | ND | PC | NC | PC | PC | PC | PC | NC | NC | PC | SC | SC | SC | SC | SC | SC | PC | PC | PC | PC |
| *VIII.B.* | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| *VIII.C.* | PC | PC | PC | SC | SC | SC | NC | NC | PC | PC | SC | SC | SC | SC | PC | PC | PC | PC | SC | SC |
| **Legend:** | | | | | | | | | | | | | | | | | | | | |
| **ND - Not scheduled for review** | | | | | | | | | | | | | | | | | | | | |
| **NC - Non-compliance** | 106 | 51 | 62 | 52 | 53 | 43 | 44 | 8 | 5 | 0 | 4 | 7 | 0 | 5 | 17 | 12 | 11 | 9 | 5 | 6 |
| **PC - Partial Compliance** | 57 | 106 | 96 | 99 | 100 | 105 | 100 | 98 | 66 | 60 | 59 | 67 | 77 | 79 | 77 | 85 | 95 | 92 | 97 | 98 |
| **SC - Substantial Compliance** | 4 | 11 | 10 | 18 | 16 | 20 | 25 | 63 | 103 | 114 | 111 | 100 | 97 | 90 | 80 | 77 | 68 | 73 | 72 | 70 |
| **TOTAL** | | | | | | | | | 174 | 174 | 174 | 174 | 174 | 174 | 174 | 174 | 174 | 174 | 174 | 174 |

